**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pangea Legal Services, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 3:20-cv-7721 |
| ) | |
| U.S. Dept. of Homeland Security, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ADMINISTRATIVE RECORD**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| Pangea Legal Services, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:20-cv-7721 |
| | ) | |
| U.S. Dept. of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFIED INDEX TO ADMINISTRATIVE RECORD

**DOCUMENT**                                                                                                      **PAGE**

Procedures for Asylum and Bars to Asylum Eligibility,
85 FR 67202 (Oct. 21, 2020) ............................................................................................ AR.00001

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens;
Conduct of Removal Proceedings; Asylum Procedures,
62 FR 10312-01 (Feb. 26, 1997) ........................................................................................ AR.00060

Foreign Employers Seeking To Employ Temporary Alien Workers in the
H, O, and P Nonimmigrant Classifications, 62 FR 18508-01 (April 16, 1997)................ AR.00224

Asylum Procedures, 65 FR 76121-01 (Dec. 6, 2000) ........................................................ AR.00235

Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under
the Immigration and Nationality Act, 84 FR 63994 (Nov. 19, 2019)................................ AR.00267

Procedures for Asylum and Bars to Asylum Eligibility,
84 FR 69640 (Dec. 19, 2019).............................................................................................. AR.00285

Appellate Procedures and Decisional Finality in Immigration Proceedings;
Administrative Closure, 85 FR 52491 (Aug. 26, 2020)...................................................... AR.00307

Asylum Eligibility and Procedural Modifications,
84 FR 33829 (July 16, 2019) ........................................................................AR.00331

Executive Office for Immigration Review, New Cases
and Total Completions (July 14, 2020)..........................................................AR.00348

Executive Office for Immigration Review, Asylum Decision Rates (July 14, 2020) ......AR.00349

Executive Office for Immigration Review, Total Asylum
Applications (July 14, 2020)..........................................................................AR.00350

Executive Office for Immigration Review, Immigration Judge (IJ)
Hiring (June 2020) .......................................................................................AR.00351

Executive Office for Immigration Review, Current
Representation Rates (April 15, 2020)...........................................................AR.00352

U.S. CONST. art. III.....................................................................................AR.00353

U.S. CONST. art. IV, § 1 .............................................................................AR.00354

C.F.R. T.5, Ch. III, Subch B, Pt. 1320...........................................................AR.00355

5 C.F.R. § 1320.1 ........................................................................................AR.00356

5 C.F.R. § 1320.2 ........................................................................................AR.00357

5 C.F.R. § 1320.3 ........................................................................................AR.00358

5 C.F.R. § 1320.4 ........................................................................................AR.00364

5 C.F.R. § 1320.5 ........................................................................................AR.00366

5 C.F.R. § 1320.6 ........................................................................................AR.00372

5 C.F.R. § 1320.7 ........................................................................................AR.00374

5 C.F.R. § 1320.8 ........................................................................................AR.00375

5 C.F.R. § 1320.9 ........................................................................................AR.00379

5 C.F.R. § 1320.10 ......................................................................................AR.00381

5 C.F.R. § 1320.11 ......................................................................................AR.00383

5 C.F.R. § 1320.12 ......................................................................................AR.00386

5 C.F.R. § 1320.13 ...................................................................................................AR.00390

5 C.F.R. § 1320.14 ...................................................................................................AR.00392

5 C.F.R. § 1320.15 ...................................................................................................AR.00393

5 C.F.R. § 1320.16 ...................................................................................................AR.00394

5 C.F.R. § 1320.17 ...................................................................................................AR.00396

5 C.F.R. § 1320.18 ...................................................................................................AR.00397

5 C.F.R. Pt. 1320, App. A ........................................................................................AR.00398

8 C.F.R. § 204.2 ........................................................................................................AR.00403

8 C.F.R. § 208.1 ........................................................................................................AR.00425

8 C.F.R. § 208.2 ........................................................................................................AR.00427

8 C.F.R. § 208.7 ........................................................................................................AR.00431

8 C.F.R. § 208.13 ......................................................................................................AR.00435

8 C.F.R. § 208.14 ......................................................................................................AR.00443

8 C.F.R. § 208.16 ......................................................................................................AR.00446

8 C.F.R. § 208.17 ......................................................................................................AR.00450

8 C.F.R. § 208.18 ......................................................................................................AR.00453

8 C.F.R. § 208.30 ......................................................................................................AR.00458

8 C.F.R. § 214.14 ......................................................................................................AR.00465

8 C.F.R. § 241.7 ........................................................................................................AR.00478

8 C.F.R. § 244.1 ........................................................................................................AR.00479

8 C.F.R. § 245.1 (1997) ............................................................................................AR.00481

8 C.F.R. § 270.2 ........................................................................................................AR.00488

8 C.F.R. § 274a.12 ....................................................................................................AR.00491

8 C.F.R. § 1003.1 ...................................................................................................AR.00503

8 C.F.R. § 1003.3 ...................................................................................................AR.00515

8 C.F.R. § 1003.10 .................................................................................................AR.00518

8 C.F.R. § 1003.23 .................................................................................................AR.00520

8 C.F.R. § 1003.29 .................................................................................................AR.00524

8 C.F.R. § 1003.37 .................................................................................................AR.00525

8 C.F.R. § 1003.38 .................................................................................................AR.00526

8 C.F.R. § 1208.2 ...................................................................................................AR.00528

8 C.F.R. § 1208.3 ...................................................................................................AR.00532

8 C.F.R. § 1208.7 ...................................................................................................AR.00534

8 C.F.R. § 1208.13 .................................................................................................AR.00537

8 C.F.R. § 1208.16 .................................................................................................AR.00546

8 C.F.R. § 1208.17 .................................................................................................AR.00550

8 C.F.R. § 1208.18 .................................................................................................AR.00553

8 C.F.R. § 1208.31 .................................................................................................AR.00558

8 C.F.R. § 1240.1 ...................................................................................................AR.00561

8 C.F.R. § 1240.8 ...................................................................................................AR.00563

8 C.F.R. § 1241.8 ...................................................................................................AR.00565

8 C.F.R. § 1270.2 ...................................................................................................AR.00567

21 C.F.R. § 1308.11 ...............................................................................................AR.00570

2 U.S.C. § 1532 ......................................................................................................AR.00586

5 U.S.C. § 552 ........................................................................................................AR.00588

5 U.S.C. § 553 ........................................................................................................AR.00619

5 U.S.C. § 601 ..................................................................................................AR.00621

5 U.S.C. § 804 ..................................................................................................AR.00707

5 U.S.C. § 7313 ................................................................................................AR.00709

6 U.S.C. § 271 ..................................................................................................AR.00711

6 U.S.C. § 279 ..................................................................................................AR.00716

6 U.S.C. § 521 ..................................................................................................AR.00721

8 U.S.C. § 1101 ................................................................................................AR.00722

8 U.S.C. § 1103 ................................................................................................AR.00755

8 U.S.C. § 1158 ................................................................................................AR.00775

8 U.S.C. § 1159 ................................................................................................AR.00783

8 U.S.C. § 1182 ................................................................................................AR.00785

8 U.S.C. § 1226 ................................................................................................AR.00903

8 U.S.C. § 1227 ................................................................................................AR.00906

8 U.S.C. § 1229a ..............................................................................................AR.00917

8 U.S.C. § 1229b ..............................................................................................AR.00926

8 U.S.C. § 1231 ................................................................................................AR.00934

8 U.S.C. § 1252 ................................................................................................AR.00951

8 U.S.C. § 1255 ................................................................................................AR.00960

8 U.S.C. § 1324 ................................................................................................AR.00969

8 U.S.C. § 1324c ..............................................................................................AR.00974

8 U.S.C. § 1326 ................................................................................................AR.00978

8 U.S.C. § 1362 ................................................................................................AR.00981

8 U.S.C. § 1611 ................................................................................................AR.00982

8 U.S.C. § 1612 ................................................................................................AR.00985

8 U.S.C. § 1621 ................................................................................................AR.00996

8 U.S.C. § 1622 ................................................................................................AR.00999

18 U.S.C. § 521 ................................................................................................AR.01002

18 U.S.C. § 921 ................................................................................................AR.01005

18 U.S.C. § 922 ................................................................................................AR.01013

18 U.S.C. § 924 ................................................................................................AR.01035

18 U.S.C. § 1959 ..............................................................................................AR.01044

18 U.S.C. § 3156 ..............................................................................................AR.01046

18 U.S.C. § 3559 ..............................................................................................AR.01048

21 U.S.C. § 844 ................................................................................................AR.01055

28 U.S.C. § 1738 ..............................................................................................AR.01057

34 U.S.C. § 12291 ............................................................................................AR.01058

Refugee Act of 1980, Public Law 96-212, 94 Stat. 102 ..................................AR.01076

REAL ID Act of 2005, Public Law 109-13, 119 Stat. 231 ..............................AR.01089

USA Patriot Act of 2001, Public Law 107-56, 115 Stat. 272 ..........................AR.01160

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Public Law 104-208, 110 Stat. 3009 ...............................................................AR.01275

Paperwork Reduction Act of 1995, Public Law 104-13, 109 Stat. 163 ...........AR.01831

Violence Against Women Act of 1994, Public Law 103-322, 108 Stat. 1902 ................AR.01848

Homeland Security Act of 2002, Public Law 107-296, 116 Stat. 2135 ...........AR.02161

Foreign Affairs Reform and Restructuring Act of 1998,
Public Law 105-277, div. G, sec. 2242, 112 Stat. 2681, 2631-822 .................AR.02326

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Public Law 104-208, 110 Stat. 3009 ...............................................................AR.03133

USA Patriot Act of 2001, Public Law 107-56, 115 Stat. 272 ........................................... AR.03689

Md. Code Ann., Alco. Bev. § 6-307 ............................................................................. AR.03804

Md. Code Ann., Alco. Bev. § 6-402 ............................................................................. AR.03806

Md. Code Ann., Crim. Law § 3-804 ............................................................................ AR.03808

Md. Code Ann., Crim. Law § 4-101 ............................................................................ AR.03811

Md. Code Ann., Crim. Law § 6-105 ............................................................................ AR.03814

Md. Code Ann., Crim. Law § 6-205 ............................................................................ AR.03816

Md. Code Ann., Crim. Law § 7-203 ............................................................................ AR.03818

Md. Code Ann., Tax-Gen. § 13-1015 .......................................................................... AR.03821

Minn. Stat. Ann. § 609.02 .......................................................................................... AR.03823

N.Y. Penal Law § 145.05 ............................................................................................ AR.03829

N.Y. Penal Law § 220.06 ............................................................................................ AR.03831

N.Y. Penal Law § 275.34 ............................................................................................ AR.03833

*Abebe v. Mukasey*, 554 F.3d 1203 (9th Cir. 2009) ........................................................ AR.03834

*Abel v. United States*, 362 U.S. 217 (1960) ................................................................. AR.03848

*Abovian v. INS*, 257 F.3d 971 (9th Cir. 2001) .............................................................. AR.03870

*Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1 (D.C. Cir. 1999) ...................................... AR.03879

*Akhtar v. Gonzales*, 461 F.3d 584 (5th Cir. 2006) ........................................................ AR.03891

*Akhtar v. Gonzales*, 450 F.3d 587 (5th Cir. 2006) ........................................................ AR.03889

*Al-Fara v. Gonzales*, 404 F.3d 733 (3d Cir. 2005) ........................................................ AR.03998

*Allen v. Ives*, 950 F.3d 1184 (9th Cir. 2020) ............................................................... AR.03909

*Ambati v. Reno*, 233 F.3d 1054 (7th Cir. 2000) ........................................................... AR.03926

*Am. Airlines v. Dep't. of Transp.*, 202 F.3d 788 (5th Cir. 2000) ..................................... AR.03935

*Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284 (3d Cir. 1977) ............................................AR.03959

*Anaya-Ortiz v. Holder*, 594 F.3d 673 (9th Cir. 2010)......................................................AR.03988

*Angov v. Lynch*, 788 F.3d 893 (9th Cir. 2015)..................................................................AR.03996

*Arevalo v. Barr*, 950 F.3d 15 (1st Cir. 2020) ..................................................................AR.04015

*Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005)................................................................AR.04021

*Austin v. Mich. Chamber of Com*, 494 U.S. 652 (1990) ..................................................AR.04048

*Ayala-Chavez v. U.S. INS*, 944 F.2d 638 (9th Cir. 1991) ................................................AR.04084

*Baliza v. INS*, 709 F.2d 1231 (9th Cir. 1983) ..................................................................AR.04089

*Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257 (5th Cir. 2017)........................................AR.04092

*Bedoya-Melendez v. U.S. Att'y Gen.*, 680 F.3d 1321 (11th Cir. 2012)..............................AR.04100

*Begay v. United States*, 553 U.S. 137 (2008)..................................................................AR.04107

*Berhe v. Gonzales*, 464 F.3d 74 (1st Cir. 2006)................................................................AR.04120

*Binderup v. Att'y Gen. U.S.A.*, 836 F.3d 336 (3d Cir. 2016) ............................................AR.04132

*Blackwood v. INS*, 803 F.2d 1165 (11th Cir. 1986)..........................................................AR.04200

*Blandino-Medina v. Holder*, 712 F.3d 1338 (9th Cir. 2013) ............................................AR.04204

*Bona v. Gonzales*, 425 F.3d 663 (9th Cir. 2005) ............................................................AR.04215

*Bustos-Torres v. INS*, 898 F.2d 1053 (5th Cir. 1990) ......................................................AR.04223

*Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010)........................................................AR.04229

*Carillo v. Holder*, 781 F.3d 1155 (9th Cir. 2015)............................................................AR.04242

*Cassella v. United States*, 469 F.3d 1376 (Fed. Cir. 2006)..............................................AR.04247

*Cazun v. Att'y Gen. U.S.A.*, 856 F.3d 249 (3d Cir. 2017)................................................AR.04258

*Cazun v. Sessions*, 138 S. Ct. 2648 (2018) ....................................................................AR.04274

*Chamber of Com. of the U.S. v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)..............................AR.04275

*Chavez-Reyes v. Holder*, 741 F.3d 1 (9th Cir. 2014).......................................................AR.04294

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ....................AR.04297

*Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.3d 1098 (4th Cir. 1985)...........................AR.04313

*City and Cty. of San Francisco v. USCIS*, 44 F.3d 773 (9th Cir. 2019) ..........................AR.04323

*Cole v. Holder*, 659 F.3d 762 (9th Cir. 2011)................................................................AR.04353

*Commonwealth v. Wardsworth*, 124 N.E.3d 662 (Mass. 2019) ........................................AR.04378

*Corley v. United States*, 106 S. Ct. 1162 (1986)...........................................................AR.04407

*Corley v. United States*, 556 U.S. 303 (2009) ..............................................................AR.04405

*Correa v. Thornburgh*, 901 F.3d 1166 (2d Cir. 1990)....................................................AR.04420

*Cuevas v. Holder*, 737 F.3d 972 (5th Cir. 2013)............................................................AR.04431

*DaCosta v. Gonzales*, 449 F.3d 45 (1st Cir. 2006) .......................................................AR.04435

*Dallo v. INS*, 765 F.2d 581 (6th Cir. 1985)..................................................................AR.04440

*De Leon v. Holder*, 761 F.3d 336 (4th Cir. 2014)..........................................................AR.04449

*Delgado v. Holder*, 648 F.3d 1095 (9th Cir. 2011) .......................................................AR.04460

*Duffy v. Int'l Union of Operating Engrs. Local 14-14 B,*
795 F. Supp. 2d 246 (E.D.N.Y. 2011)..........................................................................AR.04478

*E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) ............................AR.04488

*Elhaj-Chehade v. OCAHO*, 532 U.S. 1055 (2001) .........................................................AR.04533

*Elhaj-Chehade v. Univ. of Tex., Sw. Med. Ctr. at Dallas,*
8 OCAHO 1018 (OCAHO 1998) ..................................................................................AR.04534

*Elhaj-Chehade v. Univ. of Tex., Sw. Med. Ctr. at Dallas,*
8 OCAHO 1022 (OCAHO 1999) ..................................................................................AR.04533

*Espinoza-Gutierrez v. Smith*, 94 F.3d 1270 (9th Cir. 1996) ...........................................AR.04543

*Ezeagwuna v. Ashcroft*, 325 F.3d 396 (3d Cir. 2003)....................................................AR.04556

*Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996) ..................................................................AR.04570

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893).......................................................AR.04588

*Fook Hong Mak v. INS*, 435 F.2d 728 (2d Cir. 1970)......................................................AR.04619

*Garces v. U.S. Att'y Gen.*, 611 F.3d 1337 (11th Cir. 2010)............................................AR.04623

*Garcia v. Sessions*, 856 F.3d 27 (1st Cir. 2017) ..........................................................AR.04635

*Garcia v. Sessions*, 873 F.3d 553 (7th Cir. 2017).......................................................AR.04664

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)...............................................................AR.04670

*Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018)...................................................AR.04702

*Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212 (9th Cir. 1995) .......................AR.04745

*Hernandez v. Ashcroft*, 345 F.3d 824 (9th Cir. 2003)....................................................AR.04749

*Hernandez v. Sessions*, 884 F.3d 107 (2d Cir. 2018)....................................................AR.04773

*Herrera-Molina v. Holder*, 597 F.3d 128 (2d Cir. 2010)...............................................AR.04782

*Holloway v. Att'y Gen. U.S.*, 948 F.3d 164 (3d Cir. 2020) ...........................................AR.04793

*Huang v. INS*, 436 F.3d 89 (2d Cir. 2006) ...................................................................AR.04821

*Hussam F. v. Sessions*, 897 F.3d 707 (6th Cir. 2018)...................................................AR.04833

*Matter of Cota-Vargas*, 23 I. & N. Dec. 84 (BIA 2005).................................................AR.04852

*Matter of C–V–T–*, 22 I. & N. Dec. 7 (BIA 1998).........................................................AR.04859

*Matter of Jean*, 23 I. & N. Dec. 373 (A.G. 2002).........................................................AR.04865

*Matter of J–F–F–*, 23 I. & N. Dec. 912 (A.G. 2006).....................................................AR.04876

*Matter of Kasinga*, 21 I. & N. Dec. 357 (BIA 1996)......................................................AR.04883

*Matter of Mendez-Moralez*, 21 I. & N. Dec. 296 (BIA 1996) .........................................AR.04999

*Matter of N-A-M–*, 24 I. & N. Dec. 336 (BIA 2007).....................................................AR.04913

*Matter of Q-T-M-T–*, 21 I. & N. Dec. 639 (BIA 1996)....................................................AR.04920

*Matter of S–P–*, 21 I. & N. Dec. 486 (BIA 1996)..........................................................AR.04943

*Matter of Y–L–*, 23 I. & N. Dec. 270 (A.G. 2002) ........................................................... AR.04955

*Innovation Law Lab v. McAleenan*, 924 F.3d 503 (9th Cir. 2019) .................................... AR.04965

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) .................................................................. AR.04978

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ............................................................... AR.04988

*INS v. Chadha*, 462 U.S. 919 (1983) .............................................................................. AR.05013

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ............................................................... AR.05064

*INS v. Stevic*, 467 U.S. 407 (1984) ................................................................................. AR.05079

*Islas-Veloz v. Whitaker*, 914 F.3d 1249 (9th Cir. 2019) .................................................. AR.05092

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 13*,
138 S. Ct. 2248 (2018) .................................................................................................. AR.05102

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ............................................................... AR.05153

*Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307 (11th Cir. 2016) .............................. AR.05195

*Johnson v. Att'y Gen. U.S.*, 602 F.3d 508 (3d Cir. 2010) ................................................ AR.05199

*Johnson v. United States*, 576 U.S. 591 (2015) .............................................................. AR.05205

*Kawashima v. Holder*, 565 U.S. 478 (2012) ................................................................... AR.05233

*Komarenko v. INS*, 35 F.3d 432 (9th Cir. 1994) .............................................................. AR.05248

*Kouljinski v. Keisler*, 505 F.3d 534 (6th Cir. 2007) ........................................................ AR.05253

*Landon v. Plasencia*, 459 U.S. 21 (1982) ...................................................................... AR.05263

*Langoria-Castenada v. INS*, 548 F.2d 233 (1977) .......................................................... AR.05278

*Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138 (11th Cir. 2010) ............................................. AR.05284

*Lavoie v. INS*, 418 F.2d 732 (9th Cir. 1969) ................................................................... AR.05292

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ........................................................................... AR.05296

*Lopez v. Davis*, 531 U.S. 230 (2001) ............................................................................. AR.05304

*Lopez-Aguilar v. Barr*, 948 F.3d 1143 (9th Cir. 2020) .................................................... AR.05316

*Lopez-Birrueta v. Holder*, 633 F.3d 1211 ........................................................................... AR.05323

*Lopez-Molina v. Ashcroft*, 368 F.3d 1206 (9th Cir. 2004) .................................................. AR.05331

*Lopez–Umanzor v. Gonzales*, 405 F.3d 1049 (9th Cir. 2005) ............................................ AR.05329

*Lowe v. United States*, 920 F.3d 414 (6th Cir. 2019) ......................................................... AR.05349

*Luziga v. Att'y Gen. U.S.*, 937 F.3d 244 (3d Cir. 2019) ..................................................... AR.05356

*Lyon v. Inc. Vill. of Hempstead*, 2007 WL 1876502 (S.D.N.Y. Oct. 7, 2014) ................. AR.05368

*Lyon v. U.S. ICE*, 171 F. Supp. 3d 961 (N.D. Cal 2016) ................................................... AR.05385

*Mahmood v. Sessions*, 849 F.3d 187 (4th Cir. 2017) ......................................................... AR.05414

*Malave v. Holder*, 610 F.3d 483 (7th Cir. 2010) ............................................................... AR.05421

*Maldanado v. Att'y Gen. U.S.*, 422 F. App'x 120 (3d Cir. 2011) ...................................... AR.05426

*Maldonado v. Lynch*, 786 F.3d 1155 (9th Cir. 2015) ........................................................ AR.05430

*Mamouzian v. Ashcroft*, 390 F.3d 1129 (9th Cir. 2004) .................................................... AR.05442

*Marambo v. Barr*, 932 F.3d 650 (8th Cir. 2019) ............................................................... AR.05453

*Marin- Rodriguez v. Holder*, 612 F.3d 591 (7th Cir. 2010)............................................... AR.05459

*Mariscal-Sandoval v. Ashcroft* 370 F.3d 851 (9th Cir. 2004) .......................................... AR.05464

*Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) ........................................... AR.05474

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................................................ AR.05503

*Mathis v. United States*, 136 S. Ct. 2243 (2016)............................................................... AR.05521

*Matter of A-B–*, 27 I. & N. Dec. 316 (A.G. 2018) ............................................................. AR.05544

*Matter of Carballe*, 19 I. & N. Dec. 357 (BIA 1986) ....................................................... AR.05563

*Matter of Castillo-Perez*, 27 I. & N. Dec. 664 (A.G. 2019) ............................................. AR.05567

*Matter of C-T-L–*, 25 I. & N. Dec. 341 (BIA 2010) .......................................................... AR.05573

*Matter of D–A–C–*, 27 I. & N. Dec. 575 (BIA 2019) ....................................................... AR.05580

*Matter of D–J–*, 23 I. & N. Dec. 572 (A.G. 2003)..............................................AR.05585

*Matter of F–*, 8 I. & N. Dec. 251 (BIA 1959)..................................................AR.05594

*Matter of Garcia*, 19 I. & N. Dec. 270 (BIA 1985).........................................AR.05598

*Matter of G–G–S–*, 26 I. & N. Dec. 339 (BIA 2014) ......................................AR.05602

*Matter of Hashmi*, 24 I. & N. Dec. 785 (BIA 2009) ........................................AR.05609

*Matter of Guzman Martinez*, 25 I. & N. Dec. 845 (BIA 2012) ........................AR.05616

*Matter of Jimenez-Lopez*, 20 I. & N. Dec. 738 (BIA 1993)..............................AR.05619

*Matter of K–*, 20 I. & N. Dec. 418 (BIA 1991)...............................................AR.05623

*Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019) .......................................AR.05629

*Matter of Patel*, 20 I. & N. Dec. 368 (BIA 1991)............................................AR.05639

*Matter of Pierre, et al.*, 14 I. & N. Dec. 467 (BIA 1973) .................................AR.05648

*Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987).............................................AR.05652

*Matter of R–A–M–*, 25 I. & N. Dec. 657 (BIA 2012) ......................................AR.05659

*Matter of Mendoza-Hernandez and Capula-Cortes*, 27 I. & N. Dec. 520 (BIA 2019)....AR.05664

*Matter of Thomas and Thompson*, 27 I. & N. Dec. 674 (A.G. 2019) ...............AR.05681

*Matter of U–M–*, 20 I. & N. Dec. 327 (BIA 1991) ..........................................AR.05692

*Matter of Z-*, 20 I. & N. Dec. 707 (BIA 1993)................................................AR.05698

*Mejia v. Sessions*, 866 F.3d 573 (4th Cir. 2017) ............................................AR.05704

*Mellouli v. Lynch*, 575 U.S. 798 (2015) ........................................................AR.05725

*Michel v. INS*, 206 F.3d 253 (2d Cir. 2000) ...................................................AR.05739

*Miller v. Mays*, 879 F.3d 691 (6th Cir. 2018) ................................................AR.05756

*Mitondo v. Mukasey*, 523 F.3d 784 (7th Cir. 2008) ........................................AR.05776

*Mojica v. Reno*, 970 F. Supp 130 (E.D.N.Y. 1997) .........................................AR.05781

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) ....................................................................AR.05833

*Mouelle v. Gonzales*, 548 U.S. 901 (2006) .....................................................................AR.05853

*Mouelle v. Gonzales*, 416 F.3d 923 (8th Cir. 2005) .......................................................AR.05854

*Mudric v. Att'y Gen. U.S.*, 469 F.3d 94 (3d Cir. 2006) ..................................................AR.05861

*N-A-M- v. Holder*, 562 U.S. 1141 (2011) .......................................................................AR.05869

*N-A-M- v. Holder*, 587 F.3d 1052 (10th Cir. 2009) .......................................................AR.05870

*Narenji v. Civiletti*, 617 F.2d 745 (DC Cir. 1979) ..........................................................AR.05879

*Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019) .........................................AR.05890

*Negusie v. Holder*, 555 U.S. 511 (2009) ........................................................................AR.05905

*Nijhawan v. Holder*, 557 U.S. 29 (2009) ........................................................................AR.05927

*NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ........................................................AR.05939

*NLRB v. Yellow Freight Sys., Inc.*, 930 F.2d 316 (3d Cir. 1991)....................................AR.05960

*Noriega- Perez v. United States*, 179 F.3d 1166 (9th Cir. 1999)....................................AR.05967

*N.C. Growers' Ass'n, Inc. v. United Farm Workers*,
702 F.3d 755, 770 (4th Cir. 2012)  ..................................................................................AR.05988

*Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309 (8th Cir. 1981) ........................AR.06003

*Obleshchenko v. Ashcroft*, 392 F.3d 970 (8th Cir. 2004) ...............................................AR.06017

*Oil, Chem., & Atomic Workers, Int'l Union,*
*AFl-CIO v. Mobil Oil Corp.*, 426 U.S. 407 (1976).............................................................AR.06020

*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996) ..................................................AR.06035

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .......................................................................AR.06054

*Pereira v. Sessions*, 138 S. Ct. 2105 (2018)...................................................................AR.06074

*Perez-Guzman v. Lynch*, 835 F.3d 1066 (9th Cir. 2016) ................................................AR.06098

*Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984)...............................................................AR.06114

*Pickering v. Gonzales*, 465 F.3d 263 (6th Cir. 2006) .......................................................AR.06126

*Pinho v. Gonzales*, 432 F.3d 193 (3d Cir. 2005) ............................................................AR.06133

*Ramirez-Mejia v. Lynch*, 813 F.3d 240 (5th Cir. 2016).................................................AR.06153

*Ramirez-Mejia v. Lynch*, 794 F.3d 485 (5th Cir. 2015)................................................AR.06155

*Rashid v. Mukasey*, 254 F. App'x 113 (2007) ................................................................AR.06163

*Reyes-Torres v. Holder*, 645 F.3d 1073 (9th Cir. 2011) ................................................AR.06166

*Richardson v. Perales*, 402 U.S. 389 (1971) ..................................................................AR.06175

*Roberts v. United States*, 2018 WL 343508 (E.D. Tenn. July 17, 2018)..........................AR.06189

*Rodriguez v. Att'y Gen. U.S.*, 844 F.3d 392 (3d Cir. 2016).............................................AR.06197

*Rose v. Keystone Shoe Co.*, 4 A. 1 (Pa. 1886) .................................................................AR.06205

*R–S–C v. Sessions*, 869 F.3d 1176 (10th Cir. 2017) .......................................................AR.06208

*Saleh v. Gonzales*, 495 F.3d 17 (2d Cir. 2007) ...............................................................AR.06220

*Scheerer v. U.S. Att'y Gen.*, 445 F.3d 1311 (11th Cir. 2006) ...........................................AR.06229

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)...................................................................AR.06240

*Shantu v. Lynch*, 654 F. App'x 608 (4th Cir. 2016).........................................................AR.06285

*Sidhu v. Ashcroft*, 368 F.3d 1160 (9th Cir. 2004) ..........................................................AR.06294

*Singh v. Sessions*, 898 F.3d 720 (7th Cir. 2018) .............................................................AR.06300

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983) ....AR.06306

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)...............................................................AR.06355

*Sow v. U.S. Att'y Gen.*, 949 F.3d 1312 (11th Cir. 2020)...................................................AR.06390

*State v. Barac*, 558 S.W.3d 126 (Mo. Ct. App. 2018) ......................................................AR.06397

*Stepanovic v. Filip*, 554 F.3d 673 (7th Cir. 2009) ...........................................................AR.06404

*Stilwell v. Office of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009) ...........................AR.06412

*Stokeling v. United States*, 139 S. Ct. 544 (2019) ............................................................ AR.06418

*Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005) ............................................................... AR.06439

*Sukwanputra v. Gonzales*, 434 F.3d 627 (3d Cir. 2006) ................................................... AR.06464

*Suzhen Meng v. Holder*, 770 F.3d 1071 (2d Cir. 2014) .................................................... AR.06474

*Tamenut v. Mukasey*, 521 F.3d 1000 (8th Cir. 2008) ....................................................... AR.06480

*Tennessee v. Garner*, 471 U.S. 1 (1985) ......................................................................... AR.06487

*Ticoalu v. Gonzales*, 472 F.3d 8 (1st Cir. 2006) ............................................................. AR.06506

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ........................................................................ AR.06510

*United States v. Castillo-Mendez*, 868 F.3d 830 (9th Cir. 2017) ...................................... AR.06556

*United States v. Davis*, 139 S. Ct. 2319 (2019) ............................................................... AR.06565

*United States v. Hamilton*, 950 F.3d 567 (8th Cir. 2020) .................................................. AR.06597

*United States v. Hernandez-Perdomo*, 948 F.3d 807 (7th Cir. 2020) ................................ AR.06603

*United States v. James*, 950 F.3d 289 (5th Cir. 2020) ...................................................... AR.06610

*United States v. Keene*, 955 F.3d 391 (4th Cir. 2020) ...................................................... AR.06616

*United States v. Nikolla*, 950 F.3d 51 (2d Cir. 2020) ....................................................... AR.06623

*United States v. Ochoa*, 861 F.3d 1010 (9th Cir. 2017) .................................................... AR.06628

*United States v. Vazquez-Hernandez*, 849 F.3d 1219 (9th Cir. 2017) ............................... AR.06642

*United States v. Argueta-Rosales*, 819 F.3d 1149 (9th Cir. 2016) ..................................... AR.06653

*United States v. Barragan-Cepeda*, 29 F.3d 1378 (9th Cir. 1994) ..................................... AR.06672

*United States v. Brown*, 437 F.3d 450 (5th Cir. 2006) ...................................................... AR.06677

*United States v. Caso*, 723 F.3d 215 (D.C. Cir. 2013) ...................................................... AR.06681

*United States v. Castleman*, 572 U.S. 157 (2014) ............................................................ AR.06692

*United States v. DeSantiago-Gonzalez*, 207 F.3d 261 (5th Cir. 2000) ............................... AR.06709

*United States v. Fuller*, 769 F.2d 1095 (5th Cir. 1985) .................................................... AR.06713

*United States v. Gonzalez-Torres*, 30 F.3d 594 (9th Cir. 2002) ......................................... AR.06718

*United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) ................................. AR.06728

*United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014) .................................................... AR.06739

*United States v. Martin-Plascencia*, 532 F.2d 1316 (9th Cir. 1976) ................................. AR.06764

*United States v. Maturin*, 499 F.3d 1243 (11th Cir. 2007) ................................................ AR.06769

*United States v. Olmos-Esparza*, 484 F.3d 1111 (9th Cir. 2007) ...................................... AR.06772

*United States v. Sandoval*, 481 F. App'x 218 (5th Cir. 2012) ........................................... AR.06777

*United States v. Smith*, 818 F.2d 687 (9th Cir. 1987) ........................................................ AR.06779

*United States v. Vonn*, 535 U.S. 55 (2002) ........................................................................ AR.06784

*Virginia v. Harris*, 558 U.S. 978 (2009) ........................................................................... AR.06798

*Washington v. Davis*, 426 U.S. 229 (1976).........................................................................AR.06801

*Williams v. United States*, 2017 WL 11501870 (M.D. Fla. Dec. 8, 2017) ....................... AR.06822

*Xian Tong Dong v. Holder*, 696 F.3d 121 (1st Cir. 2012) ................................................ AR.06828

*Yang v. INS*, 79 F.3d 932 (9th Cir. 1996) .......................................................................... AR.06835

*Yang v. Maugans*, 68 F.3d 1540 (3d Cir. 1995).................................................................AR.06844

*Yong Gao v. Barr*, 950 F.3d 147 (1st Cir. 2020) ............................................................... AR.06866

*Yuen Jin v. Mukasey*, 538 F.3d 143 (2d Cir. 2008) ........................................................... AR.06874

*Zadvydas v. Davis*, 533 U.S. 678 (2001)............................................................................AR.06891

*Zang v. Peterson*, 917 F.2d 1308 (9th Cir. 1990) (unpublished) ...................................... AR.06914

*Zhang v. Holder*, 617 F.3d 650 (2d Cir. 2010).................................................................. AR.06920

*Zheng v. Gonzales*, 422 F.3d 98 (3d Cir. 2005).................................................................AR.06937

*Zuh v. Mukasey*, 547 F.3d 504 (4th Cir. 2008) ................................................................. AR.06961

*Abimbola v. Ashcroft*, 378 F.3d 173 (2d Cir. 2004) ............................................................ AR.06971

*Adam v. Saenger*, 303 U.S. 59 (1938) ................................................................................... AR.06980

*Ali v. Achim*, 468 F.3d 462 (7th Cir. 2006) .......................................................................... AR.06985

*Azim v. U.S. Att'y Gen.*, 314 F. App'x 193 (11th Cir. 2008) ............................................... AR.06995

*Bastardo-Vale v. Att'y Gen. U.S.*, 934 F.3d 255 (3d Cir. 2019) .......................................... AR.06999

*Boivin v. Hutchinson*, 2019 WL 1590945 (E.D. Ark. March 7, 2019) ................................ AR.07017

*Cap. Area Immigrant Rights' Coal. v. Trump*, 2019 WL 3436501
(D.D.C. July 24, 2019) ........................................................................................................ AR.07022

*Caroleo v. Gonzales*, 476 F.3d 158 (3d Cir. 2007) .............................................................. AR.07028

*Carr v. INS*, 86 F.3d 949 (9th Cir. 1996) .............................................................................. AR.07039

*Choeum v. INS*, 129 F.3d 29 (1st Cir. 1997) ......................................................................... AR.07043

*DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854 (2006) ..................................................... AR.07058

*Descamps v. United States*, 133 S. Ct. 2276 (2013) ............................................................. AR.07072

*Gao v. Holder*, 595 F.3d 549 (2010) .................................................................................... AR.07094

*Gatalski v. INS*, 72 F.3d 135 (9th Cir. 1995) (unpublished) ................................................ AR.07102

*Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) ............................................................. AR.07105

*Herrera-Inirio v. INS*, 208 F.3d 299 (1st Cir. 2000) ........................................................... AR.07115

*Matter of Luviano-Rodriguez*, 23 I. & N. Dec. 718 (BIA 2005) ......................................... AR.07123

*Matter of Pickering*, 23 I. & N. Dec. 621 (BIA 2003) ......................................................... AR.07126

*Marbury v. Madison*, 2 L. Ed. 60 (1803) ............................................................................. AR.07130

*Matter of A-F-*, 8 I. & N. Dec. 429 (BIA 1959) .................................................................... AR.07152

*Matter of J-D-E-C-*, 2018 WL 1990537 (DHS A.A.O. Apr. 10, 2018) ............................... AR.07164

*Matter of Seda*, 17 I. & N. Dec. 550 (BIA 1980) ................................................................ AR.07173

*Mena-Flores v. Holder*, 776 F.3d 1152 (10th Cir. 2015) .................................................... AR.07185

*Suzhen Meng v. Holder*, 770 F.3d 1071 (2d Cir. 2014) ...................................................AR.07204

*Mesnaoui v. Berlowitz*, 2012 WL 464001 (N.D. Cal. Feb. 23, 2012) ..............................AR.07210

*Nethagani v. Mukasey*, 523 F.3d 150 (2d Cir. 2008) .......................................................AR.07216

*Rodriguez v. Holder*, 683 F.3d 1164 (9th Cir. 2012) .......................................................AR.07223

*Ruhaak v. Comm'r of Internal Revenue*, 444 F. App'x 530 (7th Cir. 2011) ...................AR.07236

*Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145 (2013) ................................................AR.07238

*Sharifzadeh-Fahraji v. INS*, 24 F.3d 249 (9th Cir. 1994) ...............................................AR.07250

*Soliman v. Gonzales*, 419 F.3d 276 (4th Cir. 2005) .........................................................AR.07253

*Taylor v. United States*, 495 U.S. 575 (1990) ..................................................................AR.07262

*United States v. Caceres*, 440 U.S. 741 (1979) ...............................................................AR.07278

*United States v. Caneles-Amador*, 837 F.3d 668 (6th Cir. 2016) .....................................AR.07294

*United States v. Hernandez*, 228 F. Supp. 3d 128 (D. Me. 2017) ....................................AR.07300

*United States v. Corona-Sanchez*, 291 F.3d 1201 (9th Cir. 2002)....................................AR.07313

*United States v. Cuevas*, 75 F.3d 778 (1st Cir. 1996) ......................................................AR.07330

*United States v. Luna-Diaz*, 222 F.3d 1 (1st Cir. 2000).....................................................AR.07337

*Velasco-Giron v. Holder*, 773 F.3d 774 (7th Cir. 2014)....................................................AR.07343

*Zamora-Mallari v. Mukasey*, 514 F.3d 679 (7th Cir. 2008) ..............................................AR.07354

Executive Order 12866, Regulatory Planning and Review,
58 FR 51735 (Sept. 30, 1993) .............................................................................................AR.07366

Executive Order 12988, Civil Justice Reform, 64 FR 4729 (Feb. 5, 1996).......................AR.07386

Executive Order 13132, Federalism, 64 FR 43255 (Aug. 4, 1999) ....................................AR.07392

Executive Order 13563, Improving Regulation and Regulatory Review,
76 FR 3821 (Jan. 18, 2011)..................................................................................................AR.07397

Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs,
82 FR 9339 (Jan. 30, 2017)..................................................................................................AR.07400

Executive Office for Immigration Review, Office of Legal Access Programs,
https://www.justice.gov/eoir/office-of-legal-access-programs
(last updated Feb. 19, 2020)...................................................................................AR.07402

Executive Office for Immigration Review, *Policy Memorandum 19-05:*
*Guidance Regarding the Adjudication of Asylum Applications*
*Consistent with INA § 208(d)(5)(A)(iii)* (Nov. 19, 2018)...................................AR.07404

Executive Office for Immigration Review, *Policy Memorandum 19-11:*
*"No Dark Courtrooms"* (Mar. 29, 2019)...........................................................AR.07409

Executive Office for Immigration Review, Policy Memorandum 20-07:
Case Management and Docketing Practices (Jan. 31, 2020) .............................AR.07412

Executive Office for Immigration Review, Find Legal Representation,
https://www.justice.gov/eoir/find-legal-representation (last updated Oct. 1, 2020) .........AR.07418

Office of the Chief Immigration Judge,
*Immigration Court Practice Manual* (Mar. 17, 2020) ......................................AR.07420

Wharton's Criminal Law § 19 (15th ed.) ...........................................................AR.07690

*Imposition of Death Penalty by Jury*, 82 Harv. L. Rev. 156 (1968)..................AR.07692

Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577,
19 U.S.T. 6223 ....................................................................................................AR.07697

18 U.S.C. § 521 ...................................................................................................AR.07728

Office of Nat'l Drug Control Policy, *National Drug Control Strategy* (Feb. 2020) ........AR.07731

UNHCR, *Advisory Opinion on the Extraterritorial Application*
*of Non-Refoulement Obligations Under the 1951 Convention Relating*
*to the Status of Refugees and its 1967 Protocol* (Jan. 26, 2007) .....................AR.07775

Antiterrorism and Effective Death Penalty Act of 1996,
Public Law 104–132, 110 Stat. 1214 (Apr. 24, 1996)......................................AR.07794

Black's Law Dictionary, *Bibliography of Books Cited* (11th ed. 2019)...........AR.07882

Black's Law Dictionary, "Discretion" (11th ed. 2019) ....................................AR.07905

Black's Law Dictionary, "Judicial Discretion" (11th ed. 2019) .......................AR.07906

Convention Against Torture, Adopted and opened for signature
Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197,
U.N. Doc. A/RES/39/708 (1984) ................................................................AR.07907

Randy Alison Aussenberg, Cong. Research Serv., R45147, *Errors and
Fraud in the Supplemental Nutrition Assistance Program* (SNAP) (2018) ....................AR.07912

Immigration Judge Benchbook, *Requirements for an Entry* § 4(I)(D) (Feb. 2001) .........AR.07976

DHS, *Policy Guidance for Implementation for the Migrant
Protection Protocols* (Jan. 25, 2019) ................................................................AR.07977

''Discretion,'' Merriam-Webster, https://www.merriam-webster.com/
dictionary/discretion (last updated Nov. 3, 2020) ............................................AR.07981

Ryan Devereaux, *Documents Detail ICE Campaign to Prosecute
Migrant Parents as Smugglers*, The Intercept (Apr. 29, 2019) ........................AR.07992

DOJ, *Memorandum for the Executive Office for Immigration Review:
Renewing Our Commitment to the Timely and Efficient Adjudication
of Immigration Cases to Serve the National Interest* (Dec. 5, 2017)................................AR.07998

Model Penal Code § 1.04 ................................................................................AR.08000

Proc. No. 9928, 84 FR 49187 (Sept. 13, 2019)................................................AR.08002

Alan Feuer, *MS–13 Gang: 96 Charged in Sweeping Crackdown on Long Island*,
N.Y. Times (Dec. 20, 2019)................................................................................AR.08004

OMB, *Guidance Implementing Executive Order 13771, titled* ''*Reducing
Regulation and Controlling Regulatory Costs*'' (2017) ....................................AR.08009

Michael J. Lightfoot, *On a Level Playing Field*, 30 Loy. L.A. L. Rev. 69 (1996)...........AR.08026

The White House, *Protecting American Communities
from the Violence of MS–13* (Feb. 6, 2020) ....................................................AR.08032

Ravi Mahalingam, *The Compatibility of the Principle of
Nonintervention with the Right of Humanitarian Intervention*,
1 UCLA J. Int'l L. & Foreign Aff. 221 (1996) ................................................AR.08035

UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status
and Guidelines on International Protection* (reissued Feb. 2019) ....................AR.08058

Universal Declaration of Human Rights, G.A. Res. 217A (III),
U.N. Doc. A/810 (1948) ................................................................................AR.08336

18 U.S.C. § 2L1.2 ...............................................................................................AR.08342

18 U.S.C. § 4A1.2 ...............................................................................................AR.08346

U.S. Sentencing Guidelines Manual § 5G1.1 ...................................................AR.08354

Public Comments ..................................................................................................AR.08356

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 208**

**RIN 1615–AC41**

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1208**

**[EOIR Docket No. 18–0002; A.G. Order No. 4873–2020]**

**RIN 1125–AA87**

### Procedures for Asylum and Bars to Asylum Eligibility

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

---

**SUMMARY:** On December 19, 2019, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") published a notice of proposed rulemaking ("NPRM") that would amend their respective regulations governing the bars to asylum eligibility. The Departments also proposed to clarify the effect of criminal convictions and to remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. This final rule ("final rule" or "rule") responds to comments received and adopts the provisions of the NPRM with technical corrections to ensure clarity and internal consistency.

**DATES:** This rule is effective on November 20, 2020.

**FOR FURTHER INFORMATION CONTACT:**

Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041, telephone (703) 305–0289 (not a toll-free call).

Maureen Dunn, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services ("USCIS"), DHS, 20 Massachusetts Avenue NW, Washington, DC 20529–2140; telephone (202) 272–8377 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Proposed Rule

On December 19, 2019, the Departments published an NPRM that would amend their respective regulations governing the bars to asylum eligibility, clarify the effect of criminal convictions, and remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640 (Dec. 19, 2019).

### A. Authority and Legal Framework

The Departments published the proposed rule pursuant to their respective authorities regarding the adjudication of asylum applications. 84 FR at 69641–42, 69644–45.

Regarding the DOJ, the Attorney General, through himself and the Executive Office for Immigration Review ("EOIR"), has authority over immigration adjudications. *See* 6 U.S.C. 521; section 103(g) of the Immigration and Nationality Act ("INA" or "the Act") (8 U.S.C. 1103(g)). Immigration judges at DOJ adjudicate defensive asylum applications filed during removal proceedings [1] and affirmative asylum applications referred to the immigration courts by USCIS within DHS. INA 101(b)(4) (8 U.S.C. 1101(b)(4)); 8 CFR 1003.10(b), 1208.2. The Board of Immigration Appeals ("BIA" or "the Board") hears appeals from immigration judges' decisions, including decisions related to the relief of asylum. 8 CFR 1003.1.

The immigration laws further provide the Attorney General with authority regarding immigration adjudications and determinations. For example, the Attorney General's determination with respect to all questions of law is "controlling." INA 103(a)(1) (8 U.S.C. 1103(a)(1)). The Attorney General possesses a general authority to "establish such regulations * * * as the Attorney General determines to be necessary for carrying out" his authorities under the INA. INA 103(g)(2) (8 U.S.C. 1103(g)(2)). In addition, the INA authorizes the Attorney General to (1) "by regulation establish additional limitations and conditions, consistent with [INA 208 (8 U.S.C. 1158)], under which an alien shall be ineligible for asylum under," INA 208(b)(1) (8 U.S.C. 1158(b)(1)); and (2) "provide by regulation for * * * conditions or limitations on the consideration of an application for asylum not inconsistent with the Act." INA 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C) and (d)(5)(B)).

Regarding the Department of Homeland Security, the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charges the Secretary of Homeland Security ("the Secretary") "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1) (8 U.S.C. 1103(a)(1)), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the immigration and nationality laws, INA 103(a)(3) (8 U.S.C. 1103(a)(3)). The HSA also transferred to USCIS responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). If an alien is not in removal proceedings, USCIS asylum officers determine in the first instance whether an alien's asylum application should be granted. *See* 8 CFR 208.2.

### B. Provisions of the Proposed Rule

The NPRM proposed to amend 8 CFR 208.13 and 1208.13 by adding new paragraphs (c)(6)–(9) and amending 8 CFR 208.16 and 1208.16 by removing and reserving paragraphs (e) in each section.

#### 1. Bars to Asylum Eligibility

Pursuant to the authorities outlined above, the Departments proposed to revise 8 CFR 208.13 and 1208.13 in each section to add paragraphs (c)(6) to add the following bars on eligibility for asylum for the following aliens:

• Aliens who have been convicted of an offense arising under INA 274(a)(1)(A) or (a)(2) or INA 276 (8 U.S.C. 1324(a)(1)(A) or (a)(2) or 1326) (convictions related to alien harboring, alien smuggling, and illegal reentry). *See* 8 CFR 208.13(c)(6)(i) and 1208.13(c)(6)(i) (proposed); 84 FR at 69647–49.

• Aliens who have been convicted of a Federal, State, tribal, or local crime that the Attorney General or Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined under the law of the jurisdiction where the conviction occurred or as in 18 U.S.C. 521(a). *See* 8 CFR 208.13(c)(6)(ii) and 1208.13(c)(6)(ii) (proposed); 84 FR at 69649–50.

• Aliens who have been convicted of an offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where

---

[1] One exception is that asylum officers in DHS have initial jurisdiction to adjudicate asylum applications filed by unaccompanied alien children ("UAC") in removal proceedings. INA 208(b)(3)(C) (8 U.S.C. 1158(b)(3)(C)); *see also* 6 U.S.C. 279(g)(2) (UAC defined).

AR.00001

the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person. *See* 8 CFR 208.13(c)(6)(iii) and 1208.13(c)(6)(iii) (proposed); 84 FR at 69650–51.

• Aliens who have been convicted of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(iv)(A) and 1208.13(c)(6)(iv)(A) (proposed); 84 FR at 69650–51.[2]

• Aliens who have been convicted of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by (a) the person's current or former spouse, (b) an alien with whom the person shares a child in common, (c) an alien who is cohabitating with or who has cohabitated with the person as a spouse, (d) an alien similarly situated to a

spouse of the person under the domestic or family violence laws of the jurisdiction, or (e) any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government. *See* 8 CFR 208.13(c)(6)(v)(A), 1208.13(c)(6)(v)(A) (proposed); 84 FR at 69651–53. The NPRM also provided that an alien's conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act (8 U.S.C. 1227(a)(2)(E)(i)–(ii)) would not disqualify him or her from asylum under this provision if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)). *See* 8 CFR 208.13(c)(6)(v)(C), 1208.13(c)(6)(v)(C) (proposed); 84 FR at 69651–53.

• Aliens who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed); 84 FR at 69645–47.

• Aliens who have been convicted of any misdemeanor offense under Federal, State, tribal, or local law that involves (1) possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry; (2) the receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or (3) possession or trafficking of a controlled substance or controlled substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana. *See* 8 CFR 208.13(c)(6)(vi)(B), 1208.13(c)(6)(vi)(B) (proposed); 84 FR at 69653–54.

• Aliens for whom there are serious reasons to believe have engaged in acts of battery or extreme cruelty, as defined in 8 CFR 204.2(c)(1)(vi), upon a person and committed by the same list of aliens as set forth above regarding domestic-violence convictions. *See* 8 CFR 208.13(c)(6)(vii)(A)–(E), 1208.13(c)(6)(vii)(A)–(E) (proposed); 84

FR at 69651–53. The NPRM further provided that an alien's offense would not disqualify him or her from asylum under this provision for crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) and (ii) of the Act if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)) (8 U.S.C. 1227(a)(2)(E)(i)–(ii)). *See* 8 CFR 208.13(c)(6)(vii)(F), 1208.13(c)(6)(vii)(F) (proposed); 84 FR at 69651–53.

### 2. Additional Instruction and Definitions for Analyzing the New Bars to Eligibility

The Departments proposed to revise 8 CFR 208.13 and 1208.13 by adding paragraphs (c)(7) through (9), which would have provided relevant definitions and other procedural instructions for the implementation of the proposed bars to eligibility discussed above.

First, this proposed revision would have defined the terms "felony" ("any crime defined as a felony by the relevant jurisdiction * * * of conviction, or any crime punishable by more than one year of imprisonment") and "misdemeanor" ("any crime defined as a misdemeanor by the relevant jurisdiction * * * of conviction, or any crime not punishable by more than one year of imprisonment"). 8 CFR 208.13(c)(7)(i)–(ii), 1208.13(c)(7)(i)–(ii) (proposed); 84 FR at 69646, 69653.

The proposed rule further would have provided instructions that whether an activity would constitute a basis for removability is irrelevant to determining whether the activity would make an alien ineligible for asylum and that all criminal convictions referenced in the proposed bars to eligibility would include inchoate offenses. 8 CFR 208.13(c)(7)(iii)–(iv), 1208.13(c)(7)(iii)–(iv) (proposed).

Regarding convictions that have been modified, vacated, clarified, or otherwise altered, the proposed rule would have instructed that such modifications, vacaturs, clarifications, or alterations do not have any effect on the alien's eligibility for asylum unless the court issuing the order had jurisdiction and authority to do so, and the court did not do so for rehabilitative purposes or to alleviate possible immigration-related consequences of the conviction. 8 CFR 208.13(c)(7)(v), 1208.13(c)(7)(v) (proposed); 84 FR at 69654–56. The rule would have further provided that the modification, vacatur, clarification, or other alteration is presumed to be for the purpose of ameliorating the immigration

---

[2] When determining whether an alien's offense qualifies under this provision, the NPRM further provided that the adjudicator would not be required to find the initial conviction as a predicate offense. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Further, the NPRM provided that the adjudicator would be permitted to consider the underlying conduct of the crime and would not be limited to those facts found by the criminal court or otherwise contained in the record of conviction. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Instead, the adjudicator would be required only to make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the convictions occurred. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B).

**67204**    **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

consequences of a conviction if it was entered subsequent to the initiation of removal proceedings or if the alien moved for the order more than one year following the original order of conviction or sentencing. 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed); 84 FR at 69654–56. Finally, the proposed rule would have specifically allowed the asylum officer or immigration judge to ''look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence'' to determine what effect such order should be given under proposed 8 CFR 208.13(c)(7)(v) and 1208.13(c)(7)(v). 8 CFR 208.13(c)(9),1208.13(c)(9) (proposed); 84 FR at 69654–56.

### 3. Reconsideration of Discretionary Denials

Lastly, the proposed rule would have removed and reserved 8 CFR 208.16(e) and 1208.16(e), which provide for the automatic review of a discretionary denial of an alien's asylum application if the alien is subsequently granted withholding of removal. 84 FR at 69656–57.

## II. Public Comments on the Proposed Rule

### A. Summary of Public Comments

The comment period for the NPRM closed on January 21, 2020, with 581 comments received.[3] Individual commenters submitted 503 comments, and 78 comments were submitted by organizations, including non-government organizations, legal advocacy groups, non-profit organizations, religious organizations, congressional committees, and groups of members of Congress. Most individual commenters opposed the NPRM. All organizations opposed the NPRM.

### B. Comments Expressing Support for the Proposed Rule

*Comment:* One commenter supported the final rule to ensure that individuals who qualify for asylum are granted that status only when merited in the exercise of discretion and to provide a uniform and fair standard to prevent criminal aliens from ''gaining a foothold in the United States.''

One commenter stated that the NPRM was an appropriate exercise of discretionary authority. The commenter

stated that asylum is an extraordinary benefit that offers a path to lawful permanent residence and United States citizenship and, thus, should be discretionary. The commenter stated that asylees are protected from removal, authorized to work in the United States, and may travel under certain circumstances, and that asylees' spouses and children are eligible for derivative status in the United States. The commenter stated that the United States asylum system is generous, asserting that, in fiscal year 2018, 38,687 individuals were granted asylum, including 25,439 affirmative grants and 13,248 defensive grants. The commenter stated that this was the highest number of grants since fiscal year 2002.

The commenter cited the BIA: ''The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States.'' *Matter of D–A–C–*, 27 I&N Dec. 575, 578 (BIA 2019) (citing *Matter of C–V–T–*, 22 I&N Dec. 7, 11 (BIA 1998) and *Matter of Mendez*, 21 I&N Dec. 296, 305 (BIA 1996)). The commenter stated that criminal aliens, as described in the NPRM, should not be granted the benefit of asylum because their admission would not be in the best interest of the United States.

The commenter emphasized that the NPRM would not bar individuals from all forms of fear-based protection and that individuals who were barred from asylum under the NPRM could still apply for withholding of removal under the INA or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (''CAT'' and ''CAT regulations'').[4] The commenter opined that the NPRM would improve the integrity of the asylum system.

The commenter stated that the crimes and conduct listed in the NPRM should constitute a ''conclusive determination that an applicant does not merit asylum in the exercise of discretion.'' The commenter stated that the NPRM would ensure fair and uniform application of the immigration laws because aliens who have been convicted of similar crimes would not receive different

outcomes depending on their adjudicator.

The commenter stated that the NPRM was authorized by the Act, which the commenter stated provides for regulations establishing additional conditions or limitations on asylum. The commenter stated that the NPRM was consistent with existing limitations on asylum eligibility in the statute because several statutory provisions exclude individuals from asylum eligibility on the basis of criminal conduct or other conduct indicating that the applicant does not merit asylum. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (particularly serious crime); INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) (serious nonpolitical crime outside the United States); INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)) (conviction for aggravated felony); INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) (offenses designated as particularly serious crimes or serious nonpolitical crimes by regulation); INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (alien engaged in persecution of another on account of a protected ground); INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) (reasonable grounds to regard alien as a danger to the security of the United States); INA 208(b)(2)(A)(v) (8 U.S.C. 1158(b)(2)(A)(v)) (alien presents national security concerns or engaged in terrorist activity).

The commenter supported the NPRM's proposed limitation on asylum eligibility for those who have been convicted of a felony, stating that felonies are categorized as such because they present more serious criminal conduct, which has a higher social cost. The commenter asserted that a felony conviction should be such a heavily weighted negative factor that it should conclusively establish that an alien does not merit asylum. The commenter supported defining a crime by the maximum possible sentence, as opposed to the actual sentence imposed, because of the variability of sentences that can be imposed on individuals who commit the same crime yet appear before different judges or are charged in different jurisdictions. The commenter asserted that immigration consequences should not vary based on the jurisdiction or a judge's ''individual personality'' and instead should be standardized in the interest of fairness, uniformity, and efficiency.

Commenters also supported the NPRM's proposed limitation on eligibility for individuals convicted of alien harboring in violation of section 274(a)(1)(A) of the Act (8 U.S.C. 1324(a)(1)(A)). Specifically, the

---

[3] The Departments reviewed all 581 comments submitted in response to the rule; however, the Departments did not post 5 of the comments to regulations.gov for public inspection. Of these comments, three were duplicates of another comment written by the same commenter, and two were written in Spanish. Accordingly, the Departments posted 576 comments.

[4] Adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (implemented in the immigration context in principal part at 8 CFR 208.16(c) through 208.18 and 8 CFR 1208.16(c) through 1208.18). *See* Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA''), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note).

commenters stated that smuggling involves a business where people are routinely treated not as human beings, but as chattel. The commenters stated that individuals who participate in smuggling, or who place others into the hands of smugglers, should not be eligible for asylum because the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life. Commenters similarly supported the NPRM's proposed limitation on eligibility for asylum for aliens who have been convicted of illegal reentry in violation of section 276 of the Act (8 U.S.C. 1326). Commenters stated that such individuals have demonstrated contempt for U.S immigration law and should not be granted asylum. Commenters stated that a conviction under section 276 of the Act (8 U.S.C. 1326) requires that an alien repeatedly violated the immigration laws because such a conviction requires that the alien illegally reentered after a prior removal and intentionally chose not to present himself or herself at a port of entry. The commenters stated that whether or not the final rule includes the felony bar to asylum, it should incorporate a mandatory bar for those convicted of illegal reentry.

Commenters also expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have committed criminal acts on behalf of or in furtherance of a criminal street gang. The commenters stated that such activity is an indicator of ongoing danger to the community. The commenters noted that, although widespread criminal activity is not a sufficient legal basis to receive asylum protection, adjudicators routinely hear testimony about the harm suffered by people subjected to extortion threats, murders, kidnappings, and sexual assaults by organized criminal groups. The commenters stated that the United States immigration system should not award a discretionary benefit to those who would destabilize communities at home and abroad through violence.

Commenters supported the NPRM's approach authorizing adjudicators to determine—on the basis of sufficient evidence—whether a particular criminal act was committed "in support, promotion, or furtherance of a criminal street gang." Specifically, the commenters stated that the range of crimes committed by street gangs is broad and that not all gang members are convicted of a gang participation offense even when they commit a crime on behalf of the gang. The commenters noted that such a determination would

not be based on "mere suspicion" but would only occur where the adjudicator knows or has reason to believe that the crime was committed in furtherance of gang activity on the basis of competent evidence. The commenters stated that "[g]ang violence is a scourge on our communities, and those who further the goals of criminal street gangs should not be put on a path to citizenship."

Commenters expressed support for the NPRM's proposed limitation on asylum eligibility where an individual has been convicted of multiple driving-under-the-influence ("DUI") offenses or a single offense resulting in death or serious bodily injury. The commenters stated that drunk and impaired driving is a dangerous activity that kills more than 10,000 people in the United States each year and injures many more. The commenters stated that individuals with recidivist DUI records, or who have already caused injury or death, should not be rewarded with asylum. The commenters expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have been convicted of certain misdemeanors. The commenters encouraged the Departments to consider including misdemeanor offenses involving sexual abuse or offenses reflecting a danger to children, asserting that such offenses are indicative of an ongoing danger to the community.

The commenters expressed support for the NPRM's approach to treating vacated, expunged, or modified convictions and sentences. The commenter stated that the approach is consistent with the Attorney General's decision in *Matter of Thomas and Thompson,* 27 I&N Dec. 674 (A.G. 2019). The commenters also stated that such an approach would be appropriate in the interests of uniform application of the law across jurisdictions by helping to ensure that aliens convicted of the same or similar conduct receive the same consequence with respect to asylum eligibility.

The commenters expressed support for the NPRM's proposed removal of 8 CFR 208.16(e) and 1208.16(e), stating that these provisions are unnecessary. Specifically, the commenters stated that the current regulations require an adjudicator who denies an asylum application in the exercise of discretion to revisit and reconsider that denial by weighing factors that would already have been considered in the original discretionary analysis. The commenters stated that there should not be a presumption that the adjudicator did not properly weigh discretionary factors in the first instance. The commenters stated that, as noted by the NPRM, such

a requirement is inefficient, requiring additional adjudicatory resources to re-evaluate a decision that was only just decided by the same adjudicator. The commenters also stated that an alien already has opportunities to seek review of that discretionary decision through motions or an appeal.

Other commenters expressed general support for the NPRM. Some commenters stated that such a rule would make America safer. One commenter stated that further restrictions on asylum were necessary because individuals who have no basis to remain in the United States "routinely ask to use political asylum as a last ditch effort to remain." At least one commenter stated that the NPRM would not adversely affect "innocent asylum seeker[s] truly escaping political persecution." Other commenters stated that all applications for relief should require at least a minimum of good character and behavior. One commenter stated that the NPRM "is a direct result of state and local governments working to nullify undocumented criminal activity by dropping charges, expunging records or pardoning crimes, including serious crimes like armed robbery * * * sex assault, domestic abuse, wire fraud, identity theft etc."

One commenter expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who are convicted of offenses related to controlled substances, stating that the United States must bar those who engage in drug trafficking into the United States. Another commenter expressed support for the proposed limitations on asylum eligibility for individuals who are convicted of domestic violence offenses or who engage in identity theft, stating that such individuals should not have the opportunity to be lawfully present in the United States.

*Response:* The Departments note the commenters' support for the rule. The Departments have taken the commenters' recommendations under advisement.

## C. Comments Expressing Opposition to the Proposed Rule

### 1. General Opposition

*Comment:* Many commenters expressed general opposition to the NPRM. Some provided no reasoning, simply stating, "I oppose this proposed rule" with varying degrees of severity. Many commenters also asked the Departments to withdraw the NPRM. Others, as explained in the following sections, provided specific points of

opposition or their reasoning underlying their opposition.

*Response:* The Departments are unable to provide a detailed response to comments that express only general opposition without providing reasoning for their opposition. The following sections of this final rule provide the Departments' responses to comments that offered specific points of opposition or reasoning underlying their opposition.

2. Violation of Law

a. Violation of Domestic Law

Commenters asserted that the proposed rule violated United States law in three main ways: First, it violated law regarding particularly serious crimes; second, it improperly disposed of the categorical approach to determine immigration consequences of criminal offenses; and third, it violated law regarding the validity of convictions for immigration purposes. Overall, commenters were concerned that the NPRM's provisions contradicting case law would result in the "wrongful exclusion" of immigrants from asylum eligibility.

i. Law Regarding "Particularly Serious Crime" Bar

*Comment:* Commenters opposed the NPRM, stating that it violates domestic law and contravenes existing case law from the BIA, the circuit courts of appeals, and the Supreme Court of the United States regarding the particularly serious crime bar to asylum for multiple reasons. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)). In general, commenters alleged that the NPRM was untethered to the approach set out by Congress regarding particularly serious crimes and that if Congress had sought to sweepingly bar individuals from asylum eligibility based on their conduct or felony convictions, as outlined in the NPRM, it would have done so in the Act. Commenters stated that adding seven new categories of barred conduct rendered the language of section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)) essentially meaningless and drained the term "particularly serious crime" of any sensible meaning because the Departments were effectively considering all offenses, regardless of seriousness, as falling under the particularly serious crime bar to asylum. One organization asserted that this violated the Supreme Court's requirements for statutory interpretation, citing *Corley* v. *United States,* 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons[ ] [is] that a statute should be construed so

that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (alterations and quotation marks omitted)).

At the same time, commenters also asserted that the additional crimes to be considered particularly serious by the proposed rule have been repeatedly recognized as not particularly serious. For example, commenters cited *Matter of Pula,* 19 I&N Dec. 467, 474 (BIA 1987), and noted the BIA's conclusion that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Paraphrasing *Delgado* v. *Holder,* 648 F.3d 1095, 1110 (9th Cir. 2010) (Reinhardt, J., concurring in part and concurring in the judgment), commenters stated that, outside of the aggravated felony context, "it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, 'run-of-the-mill' offenses do not constitute particularly serious crimes."

Commenters asserted that low-level offenses like misdemeanor DUI with no injury or simple possession of a controlled substance cannot constitute a particularly serious crime. In support of this proposition, commenters cited *Mellouli* v. *Lynch,* 575 U.S. 798 (2015) (possession of drug paraphernalia was not a controlled substances offense); *Carachuri-Rosendo* v. *Holder,* 560 U.S. 563 (2010) (subsequent marijuana possession offense is not an aggravated felony); and *Leocal* v. *Ashcroft,* 543 U.S. 1 (2004) (conviction for DUI was not an aggravated felony crime of violence). Commenters asserted that if the Departments wished to abrogate the Supreme Court's interpretation of the statute, they should do so by passing new legislation, not by proposing what the commenters consider to be unlawful rules.

Moreover, commenters asserted that the "essential key to determining whether a crime is particularly serious * * * is whether the nature of the crime is one which indicates that the alien poses a danger to the community." *Matter of G–G–S–,* 26 I&N Dec. 339 (BIA 2014) (quotation marks omitted). Commenters argued that despite this analytical requirement, the proposed rule arbitrarily re-categorizes many offenses as particularly serious without consideration of whether the nature of the crime indicates that the alien poses a danger to the community. Commenters expressed additional concern that this categorization removes all discretion

from the adjudicator to determine whether an individual's circumstances merit such a harsh penalty.

Commenters further asserted that, because Congress made commission of a "particularly serious crime" a bar to asylum but did not make commission of other categories of crimes such a bar, Congress intended to preclude that result. Commenters alleged that the NPRM violated the canon of construction articulated in *United States* v. *Vonn,* 535 U.S. 55, 65 (2002), *expressio unius est exclusio alterius,* which means that "expressing one item of a commonly associated group or series excludes another left unmentioned," because it attempted to create additional categories of crime bars to asylum eligibility in a manner inconsistent with the statute and congressional intent. Commenters analogized these NPRM provisions to another rule that had categorically barred "arriving aliens" from applying for adjustment of status in removal proceedings. *See* 8 CFR 245.1(c)(8) (1997). The Federal courts of appeals were split over whether that now-rescinded rule circumvented the Act and congressional intent because adjustment of status was ordinarily a discretionary determination.[5]

Commenters further alleged that the NPRM unlawfully categorically exempted a wide range of offenses from a positive discretionary adjudication of asylum. Commenters acknowledged that the Attorney General can provide for "additional limitations and conditions" on asylum applications consistent with the asylum statute by designating offenses as per se particularly serious, *see* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), but commenters emphasized that crimes that are not particularly serious are still subject to a discretionary determination. Commenters stated that Congress did not intend to authorize the Attorney General to categorically bar "large swaths of asylum seekers from protection." Commenters alleged that the Departments purposefully wrote the NPRM in this way (designating the bars as both particularly serious crimes and categorical exceptions to positive

---

[5] *Compare Scheerer* v. *U.S. Att'y Gen.,* 445 F.3d 1311, 1321–22 (11th Cir. 2006) (holding that the regulation was unlawful); *Bona* v. *Gonzales,* 425 F.3d 663, 668–71 (9th Cir. 2005) (same); *Zheng* v. *Gonzales,* 422 F.3d 98, 116–20 (3d Cir. 2005) (same), *and Succar* v. *Ashcroft,* 394 F.3d 8, 29 (1st Cir. 2005) (same), *with Akhtar* v. *Gonzales,* 450 F.3d 587, 593–95 (5th Cir. 2006) (upholding validity of the regulation), *rehearing en banc granted and remanded on other grounds,* 461 F.3d 584 (2006) (en banc), *and Mouelle* v. *Gonzales,* 416 F.3d 923, 928–30 (8th Cir. 2005) (same), *vacated on other grounds,* 126 S. Ct. 2964 (2006).

discretionary adjudication) to "insulate the Proposed Rules from review."

*Response:* The Departments disagree with comments asserting that the rule violates domestic law. Commenters asserted that Congress did not intend for the Attorney General to categorically bar "large swaths of asylum seekers from protection." However, Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), vested the Attorney General with broad authority to establish conditions or limitations on asylum. Public Law 104–208, div. C, 110 Stat. 3009, 3009–546.

At that time, Congress created three categories of aliens who are barred from applying for asylum and adopted six other mandatory bars to asylum eligibility. IIRIRA, sec. 604(a), 110 Stat. at 3009–690 through 3009–694 (codified at INA 208(a)(2)(A)–(C), (b)(2)(A)(i)–(vi) (8 U.S.C. 1158(a)(2)(A)–(C), (b)(2)(A)(i)–(vi))). Congress further expressly authorized the Attorney General to expand upon two bars to asylum eligibility—the bars for "particularly serious crimes" and "serious nonpolitical crimes." INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)). Congress also vested the Attorney General with the ability to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Significantly, "[t]his delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1)," as "the statute clearly empowers" the Attorney General and the Secretary to "adopt[] further limitations" on eligibility to apply for or receive asylum. *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). In authorizing "additional limitations and conditions" by regulation, the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The Act instructs only that additional limitations on eligibility are to be established "by regulation," and must be "consistent with" the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); *see also* INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Moreover, a long-held principle of administrative law is that an agency, within its congressionally delegated policymaking responsibilities, may "properly rely upon the incumbent administration's view of wise policy to inform its judgments." *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 865 (1984). Accordingly, an agency may make policy choices that Congress either inadvertently or intentionally left to be resolved by the agency charged with administration of the statute, given the current realities faced by the agency. *See id.* at 865–66. Through the publication of the NPRM, the Departments have properly exercised this congressionally delegated authority. Such policymaking is well within the confines of permissible agency action. Additionally, despite commenters' assertions that the Departments should pursue these changes through legislative channels, the Departments, as part of the Executive Branch, do not pursue legislative changes but instead rely on regulatory authority to interpret and enforce legislation as enacted by Congress.

As explained in the NPRM, Congress granted the Attorney General and the Secretary broad authority to determine additional "limitations and conditions" on asylum. For example, the Attorney General and the Secretary have authority to impose procedural requirements for asylum seekers and to designate by regulation additional crimes that could be considered particularly serious crimes or serious nonpolitical crimes. *See* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)); *see also* INA 208(2)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Based on the comments received, the Departments realize that the preamble to the NPRM resulted in confusion regarding which authority the Departments relied on in promulgating this rule. Specifically, commenters raised concerns regarding the Departments' reliance on section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) in support of some of the new bars to asylum eligibility. In response to these concerns and confusion, the Departments emphasize that, as in the proposed rule, the regulatory text itself does not designate any offenses covered in 8 CFR 208.13(c)(6) or 1208.13(c)(6) as specific particularly serious crimes.[6] Instead, this rule, like the proposed rule, sets out seven new "additional limitations," consistent with the Departments' authority at INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) to establish "additional limitations and conditions" on asylum

eligibility. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

This reliance on the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) is consistent with the proposed rule. There, although the Departments cited the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes, the Departments also cited the authority at section 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) in support of each category of bars included in the rule. *See generally* 84 FR at 69645–54. The references throughout the preamble in the NPRM to the Attorney General's and the Secretary's authorities to designate additional particularly serious crimes accordingly highlighted one of two alternative bases for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. In other words, although the Departments are not specifically designating any categories of offenses as "particularly serious crimes," the authority of the Attorney General and the Secretary to deny eligibility to aliens convicted of such offenses helps demonstrate that the new bars are "consistent with" the INA because the offenses to which the new bars apply—similar to "particularly serious crimes"—indicate that the aliens who commit them may be dangerous to the community of the United States or otherwise may not merit eligibility for asylum. As a result, the Departments need not address in detail commenters' concerns about whether discrete categories of offenses should constitute "particularly serious crimes" because (1) the new rule does not actually designate any specific offense as such crimes; and (2) section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)), as already discussed and as recognized by the Departments, independently authorizes the Attorney General and the Secretary to establish additional limitations and conditions on asylum eligibility.

Commenters asserted that Congress intended for the only criminal bars to asylum to be those contemplated by the particularly serious crime and serious nonpolitical crime bars. The Departments, however, disagree. Although the INA explicitly permits the Attorney General and the Secretary to designate additional crimes as particularly serious crimes or serious nonpolitical crimes, this does not mean that any time the Attorney General and the Secretary decide to limit eligibility for asylum based on criminal activity,

---

[6] The Departments do not intend, however, to imply that an immigration adjudicator could not or should not find these offenses to be particularly serious crimes in the context of adjudicating individual asylum applications on a case-by-case basis.

**67208** **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

the limit must be based on either a particularly serious crime or a serious nonpolitical crime. Rather, the Attorney General and the Secretary may choose to designate certain criminal activity as a limitation or condition on asylum eligibility separate and apart from the scope of crimes considered particularly serious. These additional limitations must simply be established by regulation and must be consistent with the rest of section 208 of the Act (8 U.S.C. 1158).

Nothing in the Act suggests that Congress intended for the particularly serious crime bar at section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)) or the serious nonpolitical crime bar at section 208(b)(2)(A)(iii) of the Act (8 U.S.C. 1158(b)(2)(A)(iii)) to be the sole bars to asylum based on criminal activity. The Departments disagree with comments suggesting that existing exceptions to asylum eligibility occupy the entire field of existing exceptions. The Attorney General and the Secretary have the authority to impose additional limitations on asylum eligibility that are otherwise consistent with the limitations contained section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)). Those existing limitations on eligibility because of criminal conduct. *See, e.g.,* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime)) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Deciding to impose additional limitations on asylum eligibility that are also based on criminal conduct, as the Departments are doing in this rulemaking, is accordingly consistent with the statute. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).

Of note, in *Trump* v. *Hawaii,* the Supreme Court determined that the INA's provisions regarding the entry of aliens "did not implicitly foreclose the Executive from imposing tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA." 138 S. Ct. 2392, 2411–12 (2018). Thus, by the same reasoning, Congress's statutory command that certain aliens are ineligible for asylum based on a conviction for a particularly serious crime or serious nonpolitical crime does not deprive the Attorney General and Secretary of authority, by regulation, to deny asylum eligibility for certain other aliens whose circumstances may—in a general sense—be "similar."

Commenters' references to the proposed rule revising 8 CFR 245.1(c)(8) (1997) (limitations on eligibility for adjustment of status) and subsequent case law striking down that proposed rule are inapposite. The First Circuit explained that the adjustment of status statute grants the Attorney General discretion to grant applications, but that this authority does not extend to grant the Attorney General authority to define eligibility for that relief. *Succar,* 394 F.3d at 10. However, unlike the adjustment of status statute, INA 245(a) (8 U.S.C. 1255(a)), the asylum statute explicitly grants the Attorney General authority to define additional limitations on eligibility for relief that are "consistent with this section." [7] INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). This express grant of authority contradicts any implied limitation on the Attorney General's authority that might otherwise be inferred from Congress's delineation of certain statutory bars.

## ii. Law Regarding the Categorical Approach

*Comment:* Commenters asserted that the proposed rule violated the Supreme Court's longstanding categorical approach. Commenters stated that "federal courts have repeatedly embraced the 'categorical approach' to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court." Additionally, commenters noted that the Supreme Court has "long deemed undesirable" a "*post hoc* investigation into the facts of the predicate offenses." *Moncrieffe* v. *Holder,* 569 U.S. 184, 200 (2013). Commenters argued that the proposed rule directly contravenes this directive to avoid post hoc investigations.

[7] Moreover, at least two Federal courts of appeals rejected the reasoning in *Succar. See supra* note 5; *see also Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) ("We also reject [the] argument * * * that the agency must not make categorical exclusions, but may rely only on case-by-case assessments. Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. The approach pressed by [the petitioner]—case-by-case decisionmaking in thousands of cases each year—could invite favoritism, disunity, and inconsistency. The [agency] is not required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding." (citations, footnote, and quotation marks omitted)); *Fook Hong Mak v. INS,* 435 F.2d 728, 730 (2d Cir. 1970) ("We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis * * * .").

Commenters emphasized that the categorical approach promotes fairness and due process, as well as judicial and administrative efficiency by avoiding "pseudo-criminal trials." Citing *Moncrieffe,* commenters noted concern that if an immigration adjudicator were required to determine the nature and amount of remuneration involved in, for example, a marijuana-related conviction, the "overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary." *Id.* at 201. Commenters noted that this would result in a disparity of outcomes based on the presiding immigration judge and would further burden the immigration court system. Moreover, commenters noted that the Supreme Court has repeatedly applied the categorical approach and found that its virtues outweigh its shortcomings. Citing *Mathis* v. *United States,* 136 S. Ct. 2243, 2252–53 (2016), commenters noted that the Supreme Court articulated basic reasons for adhering to the elements-only inquiry of the categorical approach, including "serious Sixth Amendment concerns" and "unfairness to defendants" created by alternative approaches.

Commenters asserted that the Departments' concern regarding the unpredictable results of the categorical approach is misleading because immigration adjudicators may already utilize a facts-based analysis to determine whether an offense is a "particularly serious crime" that would bar asylum. Commenters further alleged that the Departments recognized that this was a red herring by noting that the BIA has rectified some anomalies by determining that certain crimes, although not aggravated felonies, nonetheless constitute particularly serious crimes. *See* 84 FR at 69646.

Commenters further noted that, even if an offense does not rise to the level of a particularly serious crime, immigration adjudicators may deny asylum as a matter of discretion. In addition, commenters averred that for gang-related and domestic violence offenses, the proposed rule undermined criminal judgments and violated due process because the proposed rule disregarded the established framework for determining whether a conviction is an aggravated felony. Rather than looking to the elements of the offense, as currently required by the categorical approach, commenters noted that the proposed rule required adjudicators to consider "gang-related" or "domestic violence" conduct that may not have been one of the required elements for a

conviction and therefore not objected to by the asylum applicant or his or her attorney during the criminal proceeding.

*Response:* The Departments first note that the traditional elements-to-elements categorical approach extolled by the commenters and as set out in *Mathis* by the Supreme Court is an interpretive tool frequently applied by the courts to determine the immigration-related or penal consequences of criminal convictions. *Cf. Mathis,* 136 S. Ct. at 2248 ("To determine whether a prior conviction is for generic burglary (or other listed crime) courts apply what is known as the categorical approach * * *."). However, this traditional categorical approach is not the only analytical tool blessed by the Supreme Court, and the exact analysis depends on the language of the statute at issue. For example, in *Nijhawan* v. *Holder,* 557 U.S. 29, 38 (2009), the Court held that the aggravated felony statute at section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43)) "contains some language that refers to generic crimes and some language that almost certainly refers to the specific circumstances in which a crime was committed." Based on the language of section 101(a)(43)(M)(i) of the Act (8 U.S.C. 1101(a)(43)(M)(i)), the Supreme Court held that the INA required a "circumstance-specific" analysis to determine whether an aggravated felony conviction for a fraud or deceit offense involved $10,000 or more under INA 101(a)(43)(M)(i) (8 U.S.C. 1101(a)(43)(M)(i)). *Id.* at 40. And in *Mathis* itself, the Supreme Court observed that the categorical approach is not the only permissible approach: Again relying on the language as written in a statute by Congress, the Supreme Court explained that "Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that." *Mathis,* 136 S. Ct. at 2252 (noting the determination in *Nijhawan* that a circumstance-specific approach applies when called for by Congress).

Nevertheless, the Departments did not purport to end the use of the traditional categorical approach for determining asylum eligibility through the proposed rule. Instead, the Departments explained that the use of the categorical approach has created inconsistent adjudications and created inefficiencies through the required complexities of the analysis in immigration adjudications. *See* 84 FR at 69646–47. The Departments' concerns with the categorical approach are in line with those of an increasing number of Federal judges and others who are required to work within its confines. *See, e.g., Lopez-Aguilar* v. *Barr,* 948

F.3d 1143, 1149 (9th Cir. 2020) (Graber, J., concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. * * * The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results."); *see also Lowe* v. *United States,* 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring) ("[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent.").

As a result, the Departments proposed, for example, that an alien who has been convicted of "[a]ny felony under Federal, State, tribal, or local law" would be ineligible for asylum. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). This provision would not require an adjudicator to conduct a categorical analysis and compare the elements of the alien's statute of conviction with a generic offense. As explained in the NPRM, the Departments believe this will create a more streamlined and predictable approach that will increase efficiency in immigration adjudications. 84 FR at 69647. It will also increase predictability because it will be clear and straightforward which offenses will bar an individual from asylum.

The Attorney General and the Secretary have the authority to place additional limitations on eligibility for asylum, provided that they are consistent with the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). There is no obligation that any criminal-based limitation implemented pursuant to this authority must correspond with a particular generic offense to which an adjudicator would compare the elements of the alien's offense using the categorical approach, particularly when not every criminal provision implemented by Congress itself requires such an analysis. *See Nijhawan,* 557 U.S. at 36; *see also United States* v. *Keene,* 955 F.3d 391, 393 (4th Cir. 2020) (holding that Congress did not intend for the violent crimes in aid of racketeering activity statute (18 U.S.C. 1959) to require a categorical analysis because "the statutory language * * * requires only that a defendant's *conduct,* presently before the court, constitute one of the enumerated federal offenses as well as the charged state crime" (emphasis in original)). Additionally, prior case law interpreting and applying the categorical approach

to determine whether a crime is particularly serious does not apply where, like here, the Departments are designating additional limitations on eligibility for asylum under the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).[8]

Finally, the Departments expect immigration adjudicators to determine whether an alien is barred from asylum eligibility under the other provisions of the proposed rule due to the alien's conviction or conduct in keeping with case law. For example, in order to determine whether an alien's misdemeanor conviction is a conviction for an offense "involving * * * the possession or trafficking of a controlled substance or controlled substance paraphernalia," the adjudicator would be required to review the specific elements of the underlying offense as required by the categorical approach. On the other hand, the inquiry into whether conduct is related to street-gang activity or domestic violence as promulgated by the rule is similar to statutory provisions that already require an inquiry into conduct-based allegations that may bar asylum but that do not require a categorical approach analysis. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (bar to asylum based on persecution of others); INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (immigration benefits for aliens who are battered or subjected to extreme cruelty).

### iii. Law Regarding the Validity of Convictions

*Comment:* Commenters also asserted that the proposed rule's establishment of criteria for determining whether a conviction or sentence is valid for immigration purposes exceeded the Act's statutory grant of authority, violated case law, and violated the Constitution. Broadly speaking,

---

[8] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of the new categories of bars in the proposed rule. *See* 84 FR at 69645–54. The regulatory text, however, does not actually designate any additional offenses as "particularly serious crimes." The text instead aligns with section 208(b)(2)(C) by setting out "[a]dditional limitations on asylum eligibility." *See id.* at 65659. Section 208(b)(2)(B)(ii) remains relevant to the current rule in that the new bars are "consistent with" the INA partly because they deny eligibility as a result of crimes or conduct that share certain characteristics with "particularly serious crimes," but the Departments clarify that they are promulgating this rule under section 208(b)(2)(C). Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

commenters asserted that the NPRM is contrary to the intent of Congress because it attempts to "rewrite immigration law." First, commenters asserted that the proposed rule violated the full faith and credit owed to State court decisions. Second, commenters asserted that the Departments misread and misinterpreted applicable case law in justifying the presumption against the validity of post-conviction relief. Third, commenters expressed concern with the rebuttable presumption against the validity of post-conviction relief in certain circumstances created by the proposed rule.

Commenters expressed opposition to the NPRM's rebuttable presumption that an order vacating a conviction or modifying, clarifying, or otherwise altering a sentence are for the purpose of ameliorating the conviction's immigration consequences in certain circumstances, *see* 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed), because they alleged that it could violate principles of federalism under the Constitution's Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, as codified by the Full Faith and Credit Act, 28 U.S.C. 1738. Commenters asserted that the proposed rule abandoned the presumption of regularity that should accompany State court orders. By precluding an adjudicator from considering a post-conviction order entered to cure substantive or procedural constitutional deficiencies, adjudicators are effectively given permission to second-guess State court decisions, which would undermine the authority of and attribute improper motives to State and Federal tribunals. Commenters alleged that, in this way, immigration judges would become fact-finders who look beyond State court records. Further, one commenter contended that the NPRM undermined local authority to "evaluate the impact and consequences certain conduct should have on its residents by adding broad misdemeanor offenses as a bar to asylum relief," which the commenter asserted would interfere with a local authority's "sovereign prerogative to shape its law enforcement policies to best account for its complex social and political realities."

Commenters averred that the Departments cited "a misleading quote" from *Matter of F–*, 8 I&N Dec. 251, 253 (BIA 1959), which would allow asylum adjudicators to look beyond the face of the State court order. *See* 84 FR at 69656. Commenters asserted that the Departments failed to read *Matter of F-* in its entirety and that, if they had, they would have noted that the BIA instead offered support in favor of presuming the validity of a State court order unless

there is a reason to doubt it. *Matter of F–*, 8 I&N Dec. at 253 ("Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself.").

Additionally, commenters stated the proposed rule violates circuit courts of appeals case law holding that the BIA may not consider outside motives. Commenters cited *Pickering* v. *Gonzales,* 465 F.3d 263, 267–70 (6th Cir. 2006), which held that the BIA was limited to reviewing the authority of the court issuing a vacatur and was not permitted to review outside motives, such as avoiding negative immigration consequences. Commenters also cited *Reyes-Torres* v. *Holder,* 645 F.3d 1073, 1077–78 (9th Cir. 2011), and noted that the court held that the respondent's motive was not relevant to the immigration court's inquiry into whether the decision vacating his conviction was valid. Finally, commenters cited *Rodriguez* v. *U.S. Attorney General,* 844 F.3d 392, 397 (3d Cir. 2006), which held that the immigration judge may rely only on "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Commenters asserted that, in direct contravention of these cases, the proposed rule grants "vague and indefinite authority to look beyond a facially valid vacatur," which violates asylum seekers' rights to a full and fair proceeding.

Commenters also asserted that the Departments improperly extended the decision in *Matter of Thomas and Thompson,* 27 I&N Dec. 674, to all forms of post-conviction relief. By extending this decision, commenters stated that the proposed rule imposes an ultra vires and unnecessary burden on asylum seekers. Commenters first asserted that the Attorney General's decision in *Matter of Thomas and Thompson* had no justification in the text or history of the Act. Specifically, commenters stated that the Act does not limit the authority of immigration judges by requiring them to consider only State court sentence modifications that are based on substantive or procedural defects in the underlying criminal proceedings. Rather, commenters asserted, the Act requires a "convict[ion] by a final judgment." Commenters argued that, because a vacated judgment is neither "final" nor a "judgment," it would have

no effect on immigration proceedings. Commenters argued therefore that the Act does not permit immigration judges to treat a vacated judgment as valid and effective based on when, how, or why it was vacated. Moreover, commenters asserted that "[c]ourt orders are presumptively valid, not the other way around."

Commenters asserted that the BIA, in *Matter of Cota-Vargas,* 23 I&N Dec. 849, 852 (BIA 2005), *overruled by Matter of Thomas and Thompson,* 27 I&N Dec. 674, relied on the text of the Act and the legislative history behind Congress's definition of "conviction" and "sentence" in section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)) to hold that proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Commenters argued that, as a result, neither the text of the Act nor the legislative history supports the conclusion reached in *Matter of Thomas and Thompson,* and hence that the decision should not be extended to the proposed rule. Commenters stated that the same is true of orders modifying, clarifying, or altering a judgment or sentence, as recognized by the BIA in *Matter of Cota-Vargas,* 23 I&N Dec. at 852. Specifically, commenters quoted *Matter of Cota-Vargas* in noting that the NPRM's approach to "sentence modifications has no discernible basis in the language of the Act."

Commenters also objected to the two situations in which the rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence arises: When a court enters a judgment or sentencing order after the asylum seeker is already in removal proceedings; or when the asylum seeker moves the court to modify, clarify, or alter a judgment or sentencing order more than one year after it was entered. Commenters cited the holding in *Padilla* v. *Kentucky,* 559 U.S. 356, 374 (2010), that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. Commenters alleged that the presumption is unlawful under *Padilla* because it holds asylum applicants whose rights were violated under *Padilla* to a different standard. Commenters similarly asserted that the presumption would prejudice asylum seekers who have not had an opportunity to seek review of their criminal proceedings until applying for asylum. Commenters stated that asylum applicants would be forced to rebut the presumption that an order, entered after the asylum seeker was

placed in removal proceedings or requested more than one year after the date of conviction or sentence was entered, is invalid. In this way, commenters alleged, the NPRM would "compound the harm to immigrants who * * * have been denied constitutionally compliant process in the United States criminal legal system."

One commenter asserted that some orders changing a sentence or conviction are entered after removal proceedings began because the alien had not received the constitutionally required advice regarding immigration consequences stemming from his or her criminal convictions. Other commenters explained that because criminal defendants oftentimes lack legal representation in post-conviction proceedings, they may have lacked knowledge of their constitutional rights or resources to challenge their convictions or related issues. Commenters also anticipated that asylum applicants may not have had reason to suspect defects in their criminal proceedings until they applied for asylum and met with an attorney. Commenters asserted that the NPRM would also harm those people if they realized these defects more than one year after their convictions were entered.

Another commenter explained that "state and federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings. Collateral sanctions imposed on persons convicted of crimes—such as ineligibility to apply for relief from removal and other immigration consequences—should be subject to waiver, modification, or another form of relief if the sanctions are inappropriate or unfair in a particular case."

*Response:* The Attorney General and the Secretary are granted general authority to "establish such regulations [as each determines to be] necessary for carrying out" their authorities under the INA. INA 103(a)(1), (a)(3), and (g)(2) (8 U.S.C. 1103(a)(1), (a)(3), and (g)(2)); *see also Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) (describing INA 103(g)(2) (8 U.S.C. 1103(g)(2)) as "a general grant of regulatory authority"); *cf. Narenji* v. *Civiletti,* 617 F.2d 745, 747 (DC Cir. 1979) ("The [INA] need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him."). As stated above, the Attorney General and the Secretary also have the congressionally provided

authority to place additional limitations and conditions on eligibility for asylum, provided that they are consistent with section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Prescribing the effect to be given to vacated, expunged, or modified convictions or sentences is an ancillary aspect of prescribing additional limitations or conditions on asylum eligibility.

As explained in the NPRM, the rule codifies the principle set forth in *Matter of Thomas and Thompson,* 27 I&N Dec. at 680, that, if the underlying reasons for the vacatur, expungement, or modification were for "rehabilitation or immigration hardship," the conviction remains effective for immigration purposes. *See* 84 FR at 69655. Even before *Matter of Thomas and Thompson* was decided, courts of appeals repeatedly accepted the result reached in that case. *See id.; see also Saleh* v. *Gonzales,* 495 F.3d 17, 24 (2d Cir. 2007); *Pinho* v. *Gonzales,* 432 F.3d 193, 215 (3d Cir. 2005). Therefore, the Departments reject commenters' assertions that the rule improperly relies on or extends *Matter of Thomas and Thompson.*[9] In addition, the Departments note that agencies may decide whether to announce reinterpretations of a statute through rulemaking or through adjudication. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 (citing, *inter alia, NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 294 (1974)). In *Matter of Thomas and Thompson,* the Attorney General elected to address prior BIA precedent regarding the validity of modifications, clarifications, or other alterations through administrative adjudication. *Id.* at 689. That the Attorney General declined to consider additional issues on this topic through the administrative adjudication does not foreclose him from later promulgating additional interpretations or reinterpretations of the Act through rulemaking, as is being

done in this final rule. *See Bell Aerospace Co.,* 416 U.S. at 294.

The Departments also reject commenters' claims that the approach set forth by the rule violates the Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, or the Full Faith and Credit Act, 28 U.S.C. 1738. The Full Faith and Credit provisions of 28 U.S.C. 1738 apply to courts and not administrative agencies. *See NLRB* v. *Yellow Freight Sys., Inc.,* 930 F.2d 316, 320 (3d Cir. 1991) (federal administrative agencies are not bound by section 1738 because they are not "courts"); *see also Am. Airlines* v. *Dep't. of Transp.,* 202 F.3d 788, 799 (5th Cir. 2000) (28 U.S.C. 1738 did not apply to the Department of Transportation because it is "an agency, not a 'court'").

Moreover, as explained by the Second Circuit, and as reiterated by the Attorney General in *Matter of Thomas and Thompson,* when an immigration judge reviews a State conviction for an offense, the immigration judge is merely comparing the State conviction to the Federal definition of an offense under the Act. *Saleh,* 495 F.3d at 26 ("[T]he BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction."); *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 ("[T]he immigration judge in such a case simply determines the effect of that order for the purposes of federal immigration law."). As a result, because the State court order remains effective and unchallenged for all other purposes, there is no intrusion on State law and no violation of the principles of federalism and comity. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688.

The Departments reject commenters' assertions that the NPRM improperly quotes *Matter of F–,* 8 I&N Dec. 251. The NPRM cites *Matter of F-* only to support the proposition that the alien must establish that a court issuing an order vacating or expunging a conviction or modifying a sentence had jurisdiction and authority to do so. 84 FR at 69656. No law compels the Departments to accept State court orders entered without jurisdiction, and there is no sound public policy reason for doing so. Further, adopting such a policy would also potentially raise difficulties for the faithful and consistent administration of the immigration laws, as the Departments could be required to accept a State court judgment declaring an alien to be a United States citizen, even though a State court cannot confer or establish United States citizenship. Both

---

[9] To the extent the commenters disagree with the substance of the Attorney General's decision in *Matter of Thomas and Thompson,* the Departments note that this rulemaking is not the mechanism for expressing such criticisms. The Attorney General has the authority to review administrative determinations in immigration proceedings, which includes the power to refer cases for review. INA 103(a)(1), (g) (8 U.S.C. 1103(a)(1), (g)); 8 CFR 1003.1(h)(1); *see also Xian Tong Dong* v. *Holder,* 696 F.3d 121, 124 (1st Cir. 2012) (the Attorney General is authorized to direct the BIA to refer cases to him for review and, given this authority, his decisions are entitled to *Chevron* deference). When the Attorney General certifies a case to himself, he has broad discretion to review the issues before him. *See Matter of J–F–F–,* 23 I&N Dec. 912, 913 (A.G. 2006).

*Matter of F-* and the regulatory language simply restate the longstanding proposition that adjudicators in the Departments are not bound by judgments rendered by courts without jurisdiction, and even the full language noted by commenters from *Matter of F-* adheres to that proposition. *Matter of F–,* 8 I&N Dec. at 253 (explaining that, although "familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court," the "presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself").

Commenters' statements that the Departments' interpretation of "conviction" runs contrary to Congress's intent in defining the term are similarly misplaced. As explained by the Attorney General, in enacting section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)), Congress made clear that immigration consequences should flow from the original determination of guilt. *Matter of Thomas and Thompson,* 27 I&N Dec. at 682 (describing subsequent case law analyzing Congress's intent in enacting a definition for conviction). To the extent that commenters relied on *Matter of Cota-Vargas,* 23 I&N Dec. 849, the Attorney General expressly overruled that decision and explained that Congress did intend to clarify the definition of "conviction" for immigration purposes. *Matter of Thomas and Thompson,* 27 I&N Dec. at 679, 682.

Regarding commenters' concerns about the creation of a rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence, the Departments reiterate that this is merely a presumption. Individuals will be able to overcome the presumption by providing evidence that the modification, clarification, or vacatur was sought for genuine substantive or procedural reasons. As noted in the NPRM, the purpose of this presumption is to promote finality in immigration proceedings by encouraging individuals to pursue legitimate concerns regarding the validity of prior convictions. 84 FR at 69656.

The Departments disagree that creating a rebuttable presumption is unlawful under *Padilla* v. *Kentucky,* 559 U.S. 356. In *Padilla,* the Supreme Court held that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. *Id.* at 374. The rule does not affect this right, and noncitizen defendants continue to retain this right in criminal proceedings. Moreover, if a noncitizen defendant is not properly apprised of the immigration consequences of a guilty plea, that individual continues to have the right to pursue the necessary action to address that error through the criminal justice system. Similarly, an individual whose Sixth Amendment rights were determined to have been violated in contravention of *Padilla* would be able to present this evidence in immigration proceedings and, if the evidence is sufficient, overcome the presumption that the individual was seeking a modification, clarification, or vacatur for immigration purposes.

Regarding commenters' assertions that State and Federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings, the Departments disagree. Administration and enforcement of the nation's immigration laws as written by Congress are entirely within the purview of the Executive Branch, specifically the Attorney General and the Secretary. *See* INA 103 (8 U.S.C. 1103). The Attorney General and the Secretary are granted discretion and authority to determine the manner in which to administer and enforce the immigration laws. *Id.* At the same time, this rule will not have any bearing on how States or other jurisdictions implement their criminal justice system because, as explained, any post-conviction relief remains valid for all other purposes.

b. Violation of International Law

*Comment:* Numerous commenters alleged that the proposed rule violates the United States' obligations to protect refugees and asylum seekers under international law, including obligations flowing from the Protocol relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 ("the Protocol" or "the 1967 Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6233, 6259–76 ("the Refugee Convention"). Commenters stated that, by virtue of signing the Protocol, the United States is bound to create refugee laws that comply with the Protocol. Commenters asserted that the current laws, regulations, and processes governing asylum adjudications are already exceedingly harsh and are not compliant with international obligations. Commenters claimed that, rather than working to better align the United States with international obligations, the proposed rule's new categorical bars to asylum violate both the language and spirit of the Refugee Convention.

Commenters speculated that the proposed rule will violate the principle of non-refoulement, as described in Article 33(1) of the Refugee Convention, which requires that "[n]o contracting state shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Commenters noted that, in considering non-refoulement, the United States is obligated to ensure a heightened consideration to children. Commenters also claimed that the exception to refugee protection contained in Article 33(2) of the Refugee Convention[10] does not affect non-refoulement obligations. Commenters also outlined the United States' obligations to protect migrants, irrespective of migration status, as outlined in the Universal Declaration of Human Rights and other human rights instruments. Commenters stated that to comply with these protection obligations, the United States must respond to the protection needs of migrants, with a particular duty of care for migrants in vulnerable situations.

Commenters also asserted that the proposed rule violates the United States' obligations under customary international law. These commenters cited Article III of the U.S. Constitution and *Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 729 (2004), in asserting that customary international law is recognized as and must be applied as U.S. law. Commenters stated that, unlike treaty law, customary international law cannot be derogated by later legislation and remains in full force at all times. Commenters claimed that even good faith efforts by States to change a rule are violations of customary international law until the rule has been changed by a consensus of States through *opinio juris* and state practice. Despite this summary of customary international law, these commenters did not specify how the proposed rule violates customary international law.

Other commenters averred that the proposed rule violates international law by expanding the definition of a "particularly serious crime" beyond the parameters of the term as defined by the United Nations High Commissioner for

---

[10] Article 33(2) of the Refugee Conviction provides: "The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

AR.00011

Refugees ("UNHCR") by rendering nearly all criminal convictions bars to asylum. Commenters recognized that Article 33(2) of the Refugee Convention allows states to exclude or expel individuals from refugee protection if they have been "convicted by a final judgment of a particularly serious crime" and "constitute[] a danger to the community of that country." However, commenters asserted that this clause is intended only for "extreme cases," in which the particularly serious crime is a "capital crime or a very grave punishable act." Commenters cited UNHCR's statement that the crime "must belong to the gravest category" and that the individual must "become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Again citing UNHCR, commenters further asserted that this exception does not include less extreme crimes such as "petty theft or the possession for personal use of illicit narcotic substances."

Commenters also expressed concern that the proposed rule's categorical bars do not allow for an individualized analysis as to whether an individual who has been convicted of a particularly serious crime also presents a danger to the community. Commenters noted that, in the proposed rule, the Departments cited the need for increased efficiency as a justification for creating these additional bars. However, commenters responded that an individualized determination is exactly what is required by the Refugee Convention. Specifically, commenters claimed that the Departments ignored UNHCR guidelines,[11] which require not only a conviction for a particularly serious crime but also a determination that the individual constitutes a danger to the community of the country of refuge. Commenters averred that a conviction, without more, does not make an individual a present or future danger to the community. Commenters accordingly asserted that the Refugee Convention's "particularly serious crime" bar should apply only after a determination that an individual was convicted of a particularly serious crime and a separate assessment demonstrates that he or she is a present or future danger.

In addition, commenters alleged that the Act, in combination with subsequent agency interpretations, have already expanded the term "particularly serious crime" far beyond its contemplated definition by creating the categorical "particularly serious crime" bar that incorporates the aggravated felony definition. Similarly, commenters stated that adjudicators already have overly broad discretion to deny asylum based on alleged criminal conduct. These commenters claimed that the proposed rule would cause the United States to further depart from its international obligations by creating additional bars without consideration of other factors, such as dangerousness. Commenters alleged that, in justifying the proposed rule, the Departments improperly cited the "serious non-political crime" bar that applies only to conduct that occurred outside the United States.

In addition to these alleged violations of international law, commenters also asserted that the Departments' emphasis on the discretionary nature of asylum violates U.S. treaty obligations, congressional intent, and case law. Commenters noted that, although a refugee seeking protection in the United States does not always have a claim to mandatory protection, Congress's intent, in enacting the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("the Refugee Act"), was to expand the availability of refugee protection and bring the United States into compliance with its obligations under the 1967 Protocol. Commenters alleged that the proposed rule does the opposite by providing seven categorical bars to asylum and, as a result, violates the spirit and intent of the Refugee Act.

Commenters alleged that the Departments' reliance on the Attorney General's discretion to enact the proposed changes is ultra vires because the Attorney General, even in his discretion, may not violate domestic law, international treaties, or fundamental human rights. Specifically, commenters averred that the Attorney General's discretion is limited by the criteria in sections 208(b) and (d) of the Act (8 U.S.C. 1158(b) and (d)) as well as the legislative history regarding these sections, which, according to the commenters, clearly incorporate international law and legal norms. Commenters stated, moreover, that where the United States is a party to a treaty, any decision to abrogate the treaty must be clearly expressed by Congress.

One commenter expressed concern with the Departments' interpretation and reliance on Article 34 of the Refugee Convention, which provides that parties "shall as far as possible facilitate the assimilation and naturalization of refugees." This commenter criticized the Departments' analysis regarding the availability of alternative relief for individuals barred from asylum under the proposed rule. Specifically, the commenter noted that, although Article 34 requires the United States only to make efforts to naturalize refugees, not to naturalize all refugees, this does not mean that the United States then has the discretion to limit access to the asylum system in the first place.

*Response:* As explained in the NPRM, this rule is consistent with the United States' obligations as a party to the 1967 Protocol, which incorporates Articles 2 through 34 of the 1951 Refugee Convention.[12] This rule is also consistent with U.S. obligations under Article 3 of the CAT, as implemented in the immigration regulations pursuant to the implementing legislation.

As an initial matter, the rule affects eligibility for asylum but does not place any additional limitations on statutory withholding of removal or protection under the CAT regulations. The United States implemented the non-refoulement provision of Article 33(1) of the Refugee Convention through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement provision of Article 3 of the CAT through the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 429, 440–41 (1987); *Matter of C-T-L–,* 25 I&N Dec. 341 (BIA 2010) (applying section 241(b)(3)); *see also* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822; 8 CFR 208.16 through 208.18; 1208.16 through 1208.18. The Supreme Court has explained that asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34," which provides that contracting States "'shall as far as possible facilitate the assimilation and naturalization of refugees.'" *Cardoza-Fonseca,* 480 U.S. at 441. Article 34 "is

---

[11] Commenters cited paragraph 154 the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees.

[12] The Departments also note that neither of these treaties is self-executing, and that they are therefore not directly enforceable in U.S. law except to the extent that they have been implemented by domestic legislation. *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (CAT "was not self-executing"); *see also INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984) ("Article 34 merely called on nations to facilitate the admission of refugees to the extent possible; the language of Article 34 was precatory and not self-executing.").

precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible.'' *Id.*

Because the rule does not affect statutory withholding of removal or CAT protection, the proposed rule is consistent with the non-refoulement provisions of the 1951 Refugee Convention, the 1967 Protocol, and the CAT. *See Matter of R–S–C–,* 869 F.3d at 1188 & n.11 (explaining that ''the Refugee Convention's non-refoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution— is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016); *Maldonado* v. *Lynch,* 786 F.3d 1155, 1162 (9th Cir. 2015) (explaining that Article 3 of the CAT, which sets out the non-refoulement obligations of parties, was implemented in the United States by FARRA and its implementing regulations).

The rule does not affect the withholding of removal process or standards. INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16, 1208.16. An alien who can demonstrate that he or she would more likely than not face persecution on account of a protected ground or torture may qualify for statutory withholding of removal or CAT protection. Therefore, because individuals who may be barred from asylum by the rule remain eligible to seek statutory withholding of removal and CAT protection, the rule does not violate the principle of non-refoulement. *Cf. Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) (discussing the distinction between asylum and withholding of removal and explaining that ''withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood'').

Commenters asserted, without support, that the United States must respond to the needs of migrants to comply with the 1948 Universal Declaration of Human Rights. *See* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (''UDHR''). The UDHR is a non-binding human rights instrument, not an international agreement, and thus it does not impose legal obligations on the United States. *Alvarez-Machain,* 542 U.S. at 728, 734–35 (citing John P. Humphrey, The U.N. Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39, 50 (Evan Luard ed., 1967) (quoting Eleanor Roosevelt as

stating that the Declaration is ''''a statement of principles * * * setting up a common standard of achievement for all peoples and all nations' and 'not a treaty or international agreement * * * impos[ing] legal obligations.' '')). In any case, although the UDHR proclaims the right of ''[e]veryone'' to ''seek and to enjoy'' asylum, UDHR Art. 14(1), it does not purport to state specific standards for establishing asylum eligibility, and it certainly cannot be read to impose an obligation on the United States to grant asylum to ''everyone,'' *see id.,* or to prevent the Attorney General and the Secretary from exercising their discretion granted by the INA, consistent with U.S. obligations under international law as implemented in domestic law. *See* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol* 3 (Jan. 26, 2007), *https://www.unhcr.org/4d9486929.pdf* (''The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.''). The United States' overall response to the needs of migrants extends beyond the scope of this rulemaking.

To the extent that commenters made blanket assertions that the rule violates customary international law or other international documents and statements of principles, the commenters ignore the fact that the rule leaves the requirements for an ultimate grant of statutory withholding of removal or CAT withholding or deferral of removal unchanged.

As explained in additional detail in section II.C.2.a.i of this preamble, the rule did not designate additional particularly serious crimes in the regulatory text. Because the Departments have the independent authority for these changes under INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)), the Departments need not further respond to comments regarding the current ''particularly serious crime'' bar, as those comments extend beyond the scope of this rulemaking. Nevertheless, commenters' assertions that the proposed rule improperly and unlawfully expands the definition of ''particularly serious crime'' beyond the definition provided by UNHCR are misguided. UNHCR's interpretations of or recommendations regarding the Refugee Convention and the Protocol, such as set forth in the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967

Protocol Relating to the Status of Refugees (Geneva 1992) (reissued Feb. 2019), are ''not binding on the Attorney General, the BIA, or United States courts.'' *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). ''Indeed, the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.' '' *Id.* at 427–28. To the extent such guidance ''may be a useful interpretative aid,'' *id.* at 427, it would apply to statutory withholding of removal—which is the protection that implements Article 33 of the Convention—and which, as discussed above, this rule does not affect.

Commenters also relied on the advisory opinion and UNHCR Handbook to assert that an adjudicator must make an individualized assessment as to whether an asylum applicant presents or will present a danger to the community. Again, as noted above, the Departments clarify in section II.C.2.a.i that the rule did not designate additional particularly serious crimes in the regulatory text. Regardless, the Departments have longstanding authority under U.S. law to create asylum-related conditions without an individualized consideration of present or future danger to the community.[13] For example, in 2000, Attorney General Janet Reno limited asylum eligibility pursuant to the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) based on ''a fundamental change in circumstances'' or the ability of an alien to reasonably relocate within the alien's country of nationality or last habitual residence, even where that alien had established he or she had suffered past persecution. *See* Asylum Procedures, 65 FR 76121, 76133–36 (Dec. 6, 2000) (adding 8 CFR 208.13(b)(1)(i)–(iii)). As outlined in the NPRM, the Attorney General and Congress have previously established several mandatory bars to asylum eligibility. 84 FR at 69641. The Departments note that the adjudicator must still make an individualized determination as to whether a given offense falls into the category of conduct

---

[13] In addition, even if this rulemaking did enact regulatory provisions requiring an interpretation of particularly serious crimes, U.S. law has long held that, once an alien is found to have been convicted of a particularly serious crime, there is no need for a separate determination whether he or she is a danger to the community. *See Matter of N–A–M–,* 24 I&N Dec. 336, 343 (BIA 2007), *aff'd, N–A–M–* v. *Holder,* 587 F.3d 1052 (10th Cir. 2009), *cert. denied,* 562 U.S. 1141 (2011); *Matter of Q-T-M-T–,* 21 I&N Dec. 639, 646–47 (BIA 1996); *Matter of K–,* 20 I&N Dec. 418, 423–24 (BIA 1991); *Matter of Frentescu,* 19 I&N Dec. 357, 360 (BIA 1986).

contemplated by an individual bar. *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009). In addition, as explained above, the UNHCR Handbook is not binding on the Attorney General, the BIA, or United States courts, although it "may be a useful interpretative aid." *Aguirre-Aguirre,* 526 U.S. at 427.

The Departments disagree with commenters' assertions that, by relying on the discretionary nature of asylum, the rule violates U.S. treaty obligations, congressional intent, and case law. As explained above, because the rule does not alter eligibility for withholding of removal or CAT protection, the rule does not violate U.S. treaty obligations and ensures continued compliance with U.S. non-refoulement obligations. Additionally, Congress's intent in enacting the Refugee Act was "a desire to revise and regularize the procedures governing the admission of refugees into the United States." *Stevic,* 467 U.S. at 425. Rather than expanding the availability of refugee protection, as asserted by commenters, the Refugee Act's definition of refugee does "not create a new and expanded means of entry, but instead regularizes and formalizes the policies and practices that have been followed in recent years." *Id.* at 426 (quoting H.R. Rep. No. 96–608, at 10 (1979)). Moreover, case law supports the Attorney General's authority under U.S. law to limit asylum. *See Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding regulatory implementation of the firm resettlement bar); *see also Komarenko,* 35 F.3d at 436 (upholding regulatory implementation of the "particularly serious crime" bar).

Regarding the Attorney General's and the Secretary's discretion to enact the rule, the Departments disagree that the rule is ultra vires because, as explained above, Congress has granted the Attorney General and the Secretary the authority to limit eligibility for asylum. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Moreover, the rule does not violate applicable obligations under domestic law or international treaties for the reasons discussed above.

3. Concerns With Categorical Bars

In addition to comments generally opposing the seven bars proposed by the NPRM, commenters also raised concerns related to specific bars.

a. Felonies

*Comment:* Commenters opposed the proposed limitation on asylum eligibility for individuals who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). Commenters generally stated that the proposed limitation was overbroad and that the Departments failed to support their stated position that offenses carrying potential sentences of more than one year correlate to recidivism and dangerousness. Commenters asserted that the proposed limitation would "sweep in" minor conduct, including some State misdemeanors.

Commenters also opposed the Departments' proposed definition of the term "felony," *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), as any crime defined as a felony by the relevant jurisdiction of conviction, or any crime punishable by more than one year imprisonment. Commenters objected to both portions of the proposed definition.

Specifically, commenters opposed the definition's reliance on the maximum possible sentence of an offense over the actual sentence imposed. Commenters opposed the Departments' reasoning for that determination. *See* 84 FR at 69646 ("[T]he sentence actually imposed often depends on factors such as offender characteristics that may operate to reduce a sentence but do not diminish the gravity of the crime." (alteration and quotation marks omitted)). Commenters stated that imposing a sentence requires careful consideration of numerous factors, including any mitigating circumstances, and that the proposed definition dismissed careful sentencing considerations by prosecutors and criminal sentencing courts, which are charged with considering public safety. Commenters stated that the actual sentence imposed is a more faithful and accurate measure of whether an individual's conduct was "particularly serious" and that not every offense that would be a felony under the proposed definition is or should be considered a "particularly serious crime." Commenters also stated that not every alien convicted of a crime that is punishable by more than one year of imprisonment is a danger to the community who should be barred from asylum eligibility.

Commenters also opposed the proposal that the definition of felony include any offense that is labeled as a felony in its respective jurisdiction, regardless of the maximum term of imprisonment or other factors. Commenters stated that, with certain types of offenses, the difference between misdemeanors and felonies does not necessarily involve aggravated conduct or heightened risk to the public but rather factual elements, such as the alleged dollar value of a stolen good. Accordingly, commenters stated, it would be inappropriate to categorically bar eligibility for asylum on this basis.

Commenters asserted that a categorical bar against all felonies, as defined by the NPRM, would result in drastic inconsistencies and unfair results and would undermine the Departments' stated goal of uniformity and consistency. Commenters stated that the proposed definition would improperly treat a broad range of offenses as equally severe. Additionally, commenters stated, a broad range of criminal conduct encompassing varying degrees of severity or dangerousness could be charged under the same disqualifying offense.

At the same time, commenters suggested that identical conduct in different States (or other jurisdictions) would have different consequences on eligibility for asylum, depending on whether the jurisdiction labeled the crime as a felony or set a maximum penalty of over one year of imprisonment. As an example, one commenter asserted that felony theft threshold amounts among the States vary considerably, ranging from $200 to $2,500 or more, but noted that the proposed rule would treat these varying offenses equally under the proposed definition. The commenter stated that the definition was overbroad and did not exercise the "special caution" that should be taken with asylum cases given the high stakes involved. Other commenters stated that the desire for consistency should not be elevated over "legitimate concerns of fairness and accurate assessments of dangerousness."

One commenter opined that the proposed limitation would ignore the federalist nature of the U.S. criminal justice system, where each State has its own criminal code and makes individual determinations about which conduct should be criminalized, and how.

Commenters stated that the "harsh inequities" created by the rule would dissuade aliens who are fleeing persecution to plead guilty to misdemeanor charges that could carry a one-year sentence, even if the plea agreement would not include any incarceration, which could in turn have a host of unintended collateral consequences in the criminal justice system. Numerous commenters offered specific examples of State laws that they asserted would improperly be considered disqualifying offenses under the proposed limitation and accompanying definition. For example,

Case 3:20-cv-07721-SI     Document 58-3     Filed 11/10/20     Page 38 of 3864

commenters stated that some States, such as Massachusetts, define misdemeanors, which may carry a sentence of one year or more in a ''house of correction,'' much more broadly than many other States. Commenters also listed statutes from New York,[14] Maryland,[15] and several other States that they believed should not qualify as a basis for limiting eligibility to asylum.

*Response:* The Departments disagree with commenters' opposition to the inclusion of any felony conviction as a bar to asylum eligibility and to the corresponding proposed definition of ''felony'' for the purposes of determining whether the bar applies. As an initial matter, to the extent commenters expressed concern that the inclusion of any felony is an inaccurate measure of whether an individual's conduct was ''particularly serious'' or that not every offense that would be a felony under the proposed definition is or should be considered a ''particularly serious crime,'' the Departments need not address these concerns in detail because this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[16] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

[14] *See* N.Y.P.L. 145.05. (criminalizing the causing of $250 worth of property damage); N.Y.P.L. 275.34 (criminalizing the recording of a movie in a theater two times); N.Y.P.L. 220.06 (criminalizing simple possession of more than half an ounce of a narcotic).

[15] *See* MD. CODE, ALCO. BEV. 6–307; MD. CODE, ALCO. BEV. 6–402 (criminalizing the sale of alcohol to a visibly intoxicated person with a sentence of up to two years); MD. CODE, CRIM. LAW 3–804 (criminalizing the use of a telephone to make a single anonymous phone call to annoy or embarrass another person with a sentence of up to three years); MD. CODE, CRIM. LAW 4–101 (criminalizing the simple possession of a ''dangerous weapon,'' including a utility knife, on one's person, with a sentence of up to three years); MD. CODE, CRIM. LAW 6–105 (criminalizing the burning of property under $1,000 with a sentence of up to 18 months); MD. CODE, CRIM. LAW 6–205 (criminalizing the unauthorized entry into a dwelling with a sentence of up to three years); MD. CODE, CRIM. LAW 7–203 (criminalizing the temporary use of another person's vehicle without his or her consent (*i.e.*, ''joyriding'') with a sentence of up to four years); MD. CODE, TAX–GEN. 13–1015 (criminalizing the import, sale or transportation of unstamped cigarettes within the state of Maryland with a sentence of up to two years).

[16] The proposed rule's preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of all felonies as bars to asylum eligibility. *Compare* 84 FR at 69645 (explaining that the Attorney General and the Secretary could reasonably exercise their discretion to ''classify felony offenses as particularly serious crimes for purposes of 8 U.S.C.

As explained above, the Departments reiterate the explanation in the NPRM that the inclusion of any felony conviction as a bar to asylum eligibility is intended to avoid inconsistencies, inefficiencies, and anomalous results that often follow from the application of the categorical approach. 84 FR at 69645–46. In addition, the felony limitation on eligibility for asylum is consistent with other losses of benefits for felony convictions. *See* 84 FR at 69647 (explaining that treating a felony conviction as disqualifying for purposes of obtaining the discretionary benefit of asylum would be consistent with the disabilities arising from felony convictions in other contexts and would reflect the ''serious social costs of such crimes'').

The Departments disagree with commenters' concerns that the felony limitation and related definition of ''felony'' would result in drastic inconsistencies and unfair results, undermining the stated purpose of the rule. As described in the NPRM, the existing reliance on the categorical approach to determine the immigration consequences of convictions has far too often resulted in seemingly inconsistent or anomalous results. 84 FR at 69645–46.[17] The rule will significantly help to curtail inconsistencies and confusion over what offenses may be disqualifying for purposes of asylum, as all aliens who have been convicted of the same level of offense will receive the same treatment during asylum proceedings.

The Departments understand that the States have different criminal codes with different definitions of crimes, levels of offense, and other differences. With respect to commenters' federalism concerns, Congress has plenary authority over aliens, and that authority has been delegated the Departments. *See Zadvydas* v. *Davis,* 533 U.S. 678, 695

1158(b)(2)(B)(ii)''), *with id.* at 69647 (explaining that, in addition to their authority under section 208(b)(2)(C), ''the Attorney General and the Secretary' 'further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to make all felony convictions disqualifying for purposes of asylum eligibility''). The regulatory text, however, does not actually designate any additional offenses as ''particularly serious crimes.'' Instead, the discussion of particularly serious crimes helps illustrate how issuing the new bars pursuant to section 208(b)(2)(C) is ''consistent with'' the rest of the INA because the new bars—similar to the ''particularly serious crime'' bar—exclude from eligibility those aliens whose conduct demonstrates that they are dangerous to the United States or otherwise do not merit eligibility for asylum. Further discussion of the interaction of the rule with the ''particularly serious crime'' bar is set out above in section II.C.2.a.i.

[17] Further discussion of the problems with the categorical approach is set out above in section II.C.2.a.ii.

(2001) (citing *INS* v. *Chadha,* 462 U.S. 919, 941–42 (1983), for the proposition that Congress must choose ''a constitutionally permissible means of implementing'' that power); INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Additionally, as stated in the NPRM and above in section II.C.2.A.ii, the categorical approach is overly complex, leads to inconsistent treatment of aliens who have been convicted of serious criminal offenses, and presents a strain on judicial and administrative resources. Although some aliens who have been convicted of serious criminal offenses are appropriately barred from discretionary benefits under the Act, such as asylum, others are not. *See, e.g., Lowe,* 920 F.3d at 420 (Thapar, J., concurring) (''[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent.''). This rule will provide certainty by establishing a bright-line rule that is both easy to understand and will apply uniformly to all applicants who have been convicted of felonies, which the Departments believe to be significant offenses. Aliens are being given advance notice through the NPRM, which was published on December 19, 2019, 84 FR at 69646, and by this publication of the final rule, that any felony conviction will be a bar to eligibility for the discretionary benefit of asylum. *Cf.* 8 CFR 208.3(c)(6)(vi)(A), 8 CFR 1208.3(c)(6)(vi)(A) (proposed) (barring aliens who have been convicted of felonies ''on or after [the effective] date'').

The Departments disagree that the proposed definition of ''felony'' implicates federalism concerns by defining the term ''felony,'' as it is to be used in this context, differently from States' (or other jurisdictions') definitions of felonies. In fact, the Departments believe that the felony definition is consistent with principles of federalism by primarily deferring to each State's choice of what offenses to define as felonies. Similarly, the alternative definition capturing any crime punishable by more than one year of imprisonment is consistent with the Federal definition and many States' definitions of ''felony.'' *See, e.g.,* 18 U.S.C. 3559 (defining ''felonies'' as offenses with a maximum term of imprisonment of more than one year); 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

Congress has delegated to the Departments, not the States or other jurisdictions, the authority to set additional limitations on eligibility for

asylum, and the Departments have reasonably determined that the offenses encompassed within the definition should be disqualifying offenses. This rule will not have any direct bearing on how States or other jurisdictions implement their criminal justice system.

With respect to commenters' concerns that the rule will affect how and when aliens enter into plea deals for criminal offenses, such pleadings take place during criminal proceedings, not immigration proceedings. Although asylum adjudications may rely on the information derived from criminal proceedings, the Departments believe that any effects that the rule might have outside of the immigration context are beyond the context of this rulemaking. *Cf. San Francisco* v. *USCIS,* 944 F.3d 773, 804 (9th Cir. 2019) ("Any effects [of a DHS rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). Additionally, the Departments believe that this rule would actually provide more clarity in the pleading process because the rule sets forth straightforward guidelines about what offenses would and would not be disqualifying offenses for purposes of asylum. In turn, criminal defense attorneys will be better able to advise their clients on the predictable immigration consequences of a conviction. *Cf. Padilla,* 559 U.S. at 357 ("There will, however, undoubtedly be numerous situations in which the deportation consequences of a plea are unclear. In those cases, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences. But when the deportation consequence is truly clear, as it was here, the duty to give correct advice is equally clear.").

Second, regarding the commenters' concerns with the definition for the term "felony," *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), the Departments disagree that the definition should look to the actual sentence imposed instead of the maximum possible sentence. As noted in the NPRM, consideration of an offense's maximum possible sentence is generally consistent with the way other Federal laws define felonies. *See* 84 FR at 69646; *see also, e.g.,* 5 U.S.C. 7313(b) ("For the purposes of this section, 'felony' means any offense for which imprisonment is authorized for a term exceeding one year."); *cf.* U.S.S.G. 2L1.2 cmt. n.2 ("'Felony' means any federal, state, or local offense punishable by imprisonment for a term exceeding one year."). The Model Penal Code and most States likewise define a felony as a crime with a possible sentence in

"excess of one year." Model Penal Code § 1.04(2); *see also* 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

In addition, as recognized by the commenters, sentencing courts and prosecutors consider a number of factors when imposing a sentence, many of which have no bearing on the seriousness of the crime committed. Specifically, in *Matter of N–A–M–,* 24 I&N Dec. 336 (BIA 2007), the BIA explained that the sentence imposed might be based on conduct "subsequent and unrelated to the commission of the offense, such as cooperation with law enforcement authorities," or "offender characteristics." *Id.* at 343 (determining that the respondent had been convicted of a particularly serious crime even where no term of imprisonment was imposed); *see also Holloway* v. *Att'y Gen. U.S.,* 948 F.3d 164, 175 (3d Cir. 2020) ("[T]he maximum penalty that may be imposed often reveals how the legislature views an offense. Put succinctly, the maximum possible punishment is certainly probative of a misdemeanor's seriousness." (footnote and internal quotation marks omitted)). Such considerations are necessarily unrelated to the seriousness of the actual crime, and the sentence imposed is "not the most accurate or salient factor to consider in determining the seriousness of an offense." *Matter of N–A–M–,* 24 I&N Dec. at 343; *see also Holloway,* 948 F.3d at 175 n.12 (stating that the penalty imposed may be more reflective of how a sentencing judge viewed an offender than the offense itself).

The Departments therefore reject recommendations to consider the sentence imposed when determining whether a conviction is a felony, as opposed to the NPRM's proposal to consider the maximum possible sentence associated with a given offense. The Departments are persuaded by the reasoning of the U.S. Court of Appeals for the Third Circuit, which recognized that, in cases where the analysis centers around an offense, and not the offender (as in the "particularly serious crime" analysis), "the maximum punishment is a more appropriate data point because it provides insight into how a state legislature views a crime—not how a sentencing judge views an individual." *Holloway,* 948 F.3d at 175 n.12. Thus, the Departments continue to believe that lengthier maximum sentences are associated with more serious offenses that appropriately should have consequences when determining asylum eligibility. 84 FR at 69646.

Furthermore, as noted above, the Departments are acting within their designated authority pursuant to section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum) to designate felonies, as defined in the rule, as disqualifying offenses for purposes of asylum eligibility. *See* section II.C.2.a.i. Assuming, arguendo, that the commenters are correct that felonies as defined by the final rule do not necessarily reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular dangerousness threshold. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of felonies as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars on eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Indeed, by expressly including "serious nonpolitical crimes" as a statutory basis for ineligibility, Congress indicated that "particularly serious crimes" need not be the only crime-based bar on asylum

**67218**    **Federal Register**/Vol. 85, No. 204/Wednesday, October 21, 2020/Rules and Regulations

eligibility. And by further excluding from eligibility aliens who engage in certain harmful conduct, regardless of whether those aliens pose a danger to the United States, *see* INA 208(b)(2)(A)(i) (persecutor bar) (8 U.S.C. 1158(b)(2)(A)(i)), Congress indicated that ''dangerousness'' need not be the only criterion by which eligibility for asylum is to be determined.

b. Alien Smuggling or Harboring

*Comment:* Commenters raised several concerns with respect to the NPRM's proposed bar to asylum eligibility for aliens convicted of harboring or smuggling offenses under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed).

First, commenters asserted that the NPRM improperly broadened the existing statutory bar to asylum for many individuals who have been convicted of alien smuggling or harboring under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). Specifically, commenters noted that such convictions already constitute aggravated felonies under the Act that would bar an alien from eligibility for asylum,[18] ''except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual).'' *See* INA 101(a)(43)(N) (8 U.S.C. 1101(a)(43)(N)). Commenters opposed the NPRM, asserting that it improperly proposed removing the limited exception to this bar and imposing a blanket bar against anybody convicted of such an offense. Commenters asserted that adjudicators should have the discretion to decide whether individuals convicted of such offenses, who are not already statutorily precluded because their convictions are not considered aggravated felonies, should be barred from asylum.

Commenters also asserted that the proposed limitation undermined congressional intent. Specifically, commenters stated that Congress intended to make asylum available to those present in the United States, without regard to how they entered, and would not have intended to bar from asylum first-time offenders who were convicted for helping their family

members escape persecution. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)) (providing that an alien ''who arrives in the United States (whether or not at a designated port of arrival * * *)'' may apply for asylum in accordance with the rest of the section). Commenters stated that this congressional intent is demonstrated by the fact that Congress did not consider such offenses to be aggravated felonies and thus, in turn, particularly serious crimes that would bar asylum eligibility.

Commenters also asserted that the proposed limitation undermined UNHCR's recognition that aliens must sometimes commit crimes ''as a means of, or concomitant with, escape from the country where persecution was feared,'' and that the fear of persecution should be considered a mitigating factor when considering such convictions. However, the commenters did not elaborate on how this assertion pertains to aliens who commit crimes concomitant with another person's escape from a country where persecution may be feared.

Commenters asserted that the Departments failed to properly explain how all smuggling and harboring convictions under section 274 of the Act (8 U.S.C. 1324) reflected a danger to the community that should result in a categorical bar to asylum.

Numerous commenters stated that they opposed the proposed limitation because it unfairly penalized asylum seekers for helping their family members, such as minor children and spouses, to come to the United States for any reason, including to escape from persecutors, traffickers, or abusers. Commenters stated that the proposed bar would force family members to choose between their loved ones remaining in danger in their countries of origin and themselves or their family being barred from asylum and returned to their persecutors. At least one commenter stated that the Departments illogically concluded that the hazard posed to a child or spouse being smuggled is greater than the harm the same child or spouse would face in the country of origin.

At least one commenter suggested that children in particular would be harmed by the proposed bar because children are often derivatives on their parents' asylum application and may have nobody else to care for them in the United States if their parents are deported. Commenters also stated that asylum seekers often travel to the United States in family units and that some types of persecution are ''familial by nature, culture, and law.'' Commenters suggested that the proposed limitation would undermine

the sanctity of the family and eliminate family reunification options, which would result in permanent separation of families.

Commenters asserted that survivors of domestic violence who are forced to flee to the United States without their children should not be barred from asylum for trying to later reunite the family.

Commenters also objected to the Departments' assertion that families could present themselves at the United States border, stating that this may not be possible due to recently implemented policies and regulations. Some commenters asserted that the proposed bar ''is particularly insidious'' in light of documents [19] that they claimed revealed efforts to utilize smuggling prosecutions against parents and caregivers as part of a strategy to deter families from seeking asylum in the United States and that the NPRM proposed an expansion of those efforts.

At least one commenter stated that the proposed bar, in addition to the above-described policies, would harm good Samaritans who provide humanitarian aid to migrants traversing deserts with harsh conditions. At least one commenter expressed concerns that existing prohibitions against harboring, which include ''transportation,'' could be applied to punish those who engage in routine conduct like driving someone to work or to a doctor's appointment. *See* INA 274(a)(1)(A)(iii) (8 U.S.C. 1324(a)(1)(A)(iii)) (establishing criminal penalties for an individual who ''conceals, harbors, or shields from detection [or attempts to do so], [an] alien in any place, including * * * any means of transportation'').

Commenters also generally asserted that the proposed limitation would multiply the harms that asylum seekers face in coming to the United States.

*Response:* The Departments disagree with comments suggesting that the additional limitation on eligibility for asylum for aliens who have been convicted of bringing in or harboring certain aliens pursuant to sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) is inappropriate or unlawful.

The Departments reject commenters' concerns that the additional limitation is an unlawful expansion of existing bars to asylum eligibility set forth at

---

[18] A conviction for an aggravated felony is automatically considered a conviction for a particularly serious crime that would bar an alien from asylum eligibility under section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)). INA 208(b)(2)(B)(i (8 U.S.C. 1158(b)(2)(B)(i)).

[19] Commenters cited Ryan Devereaux, *Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers,* The Intercept (Apr. 29, 2019), *https:// theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/)* (describing how, in May 2017, DHS allegedly set out to target parents and family members of unaccompanied minors for prosecution).

section 101(a)(43)(N) of the Act (8 U.S.C. 1101(a)(43)(N)). It is within the Departments' delegated authority to set forth additional limitations on asylum eligibility. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). In other words, the Departments may expand upon the existing grounds for ineligibility and the disqualifying offenses, even when those or similar grounds have already been assigned immigration consequences, and the Departments have done so in this rulemaking. *Cf. Hawaii,* 138 S. Ct. 2411–12 (holding that Congress "did not implicitly foreclose * * * tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA").

The Departments disagree with commenters that adjudicators should have the discretion to determine whether aliens who have been convicted of offenses under sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) should be eligible for asylum. Convictions for such offenses are serious and harmful. As noted in the NPRM, even first-time alien smuggling offenses display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse. 84 FR at 69648. And as also noted in the NPRM, the Act already bars most individuals who have been convicted of this offense from asylum eligibility, thus demonstrating congressional recognition of the seriousness of such offenses. *Id.* at 69647. Accordingly, the Departments have concluded that no aliens who have been convicted of such offenses should merit the discretionary benefit of asylum.

The Departments disagree with commenters that an additional limitation on eligibility for aliens who have been convicted of alien smuggling or harboring offenses contravenes the "whether or not a designated port of arrival" language in the asylum statute at section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)). The Departments stress that this additional limitation has no bearing on the asylum applicant's manner of entry; rather it involves the asylum applicant's conduct with respect to unlawful entry of others. Thus, the Departments do not further address these comments.

Comments concerning statements or guidance from UNHCR are misplaced. UNHCR's interpretations of or recommendations regarding the Refugee Convention and Refugee Protocol "may be a useful interpretative aid," but they are "not binding on the Attorney General, the BIA, or United States courts." *Aguirre-Aguirre,* 526 U.S. at 427. Indeed, as noted already, "the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.' " *Id.* at 427–28.

The Departments disagree with commenters who stated that the Departments failed to explain how all smuggling and harboring convictions reflected a danger to the community that should result in a categorical bar to asylum.[20] The Departments believe that they adequately explained their reasoning in the NPRM that such offenses place others, including children, in potentially hazardous situations that could result in injury or death, and that they reflect a flagrant disregard for immigration laws. As a result, those people who commit these offenses present a danger to the community. 84 FR at 69648.

Additionally, as stated above, the Departments have designated such alien smuggling or harboring offenses as discrete bases for ineligibility pursuant to the authority provided by section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum). Assuming, arguendo, that commenters are correct that the offenses designated by the rule do not accurately reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to the conditions or limitations meet a threshold of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of the alien smuggling and harboring offenses included in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). And, as explained previously, Congress's inclusion of statutory bars on eligibility for aliens who engage in certain harmful conduct or commit certain types of crimes that are not "particularly serious," *see* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)), demonstrates that the "dangerousness" associated with the conduct is not the sole criterion by which the Departments may consider whether an alien should be eligible for asylum.

The Departments disagree that this rule would undermine family values or particularly harm children. The Departments believe that the rule helps families and children by discouraging the dangerous practices of alien smuggling and harboring. The Departments disagree with commenters' assertions that current administrative policies or practices prevent families from presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

Finally, regarding commenters' concerns for good Samaritans, the Departments note again that the bar requires a conviction for it to apply in a particular case. As a result, an individual who leaves provisions or other assistance for individuals traversing the harsh terrain at the southern border would not be ineligible for asylum under this bar unless he or she is in fact prosecuted and convicted. As with the other bars, the Departments understand that the individual circumstances surrounding each offense will vary and that some cases may involve mitigating circumstances, but

---

[20] In addition, the Departments note that some commenters agreed with the Departments' determination regarding the dangerousness of these offenses. For example, one organization stated that "the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life."

the Departments find that in the context of asylum eligibility, adjudicators should not look behind a conviction to readjudicate an alien's criminal culpability. Although the individual circumstances behind an alien's prosecution may vary, the Departments have concluded that, to promote adjudicative efficiency, it is appropriate to provide a clear standard that defers to the original prosecutor's determination to pursue a conviction of the alien for his or her conduct, as well as the criminal court's existing determination of proof beyond a reasonable doubt that the alien engaged in the conduct.

c. Illegal Reentry

*Comment:* Commenters specified several reasons for opposing the NPRM's proposed limitation on eligibility for asylum for aliens convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed). Under section 276(a) of the Act (8 U.S.C. 1326(a)), aliens who unlawfully reenter the United States after having been previously removed are subject to fines and to a term of imprisonment of two years or less. Section 276(b) of the Act (8 U.S.C. 1326(b)) describes certain aliens, such as those who have been removed after commission of an aggravated felony, who face significantly higher penalties for unlawfully reentering the United States after previously having been removed and authorizes sentences of imprisonment up to 20 years as possible penalties.

Some commenters asserted that the Departments improperly concluded that aliens who have been convicted of such offenses are per se dangers to the community, as recidivist offenders of the law, because the NPRM did not consider whether an alien's prior offenses were serious. *See* 84 FR at 69648.

Commenters asserted that the proposed limitation would violate Article 31(1) of the Refugee Convention, which generally prohibits imposing penalties based on a refugee's manner of entry or presence in the country. Commenters stated that this is a critical principle of the Convention because "it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge." Commenters stated that the NPRM did not sufficiently explain how the proposed limitation was consistent with the Convention.

Commenters also asserted that the proposed limitation undermined congressional intent and was not consistent with other provisions in the Act. Specifically, commenters stated that Congress, in accordance with international treaty obligations, has "clearly supported the right to claim asylum anywhere on the U.S. border or at a land, sea, or air port of entry" for almost 40 years. The commenters cited the Refugee Act, where, they stated, Congress authorized asylum claims by any foreign national "physically present in the United States or at a land border or port of entry." The commenters stated that Congress later expressly reaffirmed this position in enacting section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)), which states that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival * * *)" may apply for asylum. Commenters believed that this provision "reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections."

Commenters also asserted that the proposed limitation was inconsistent with the Act because it would treat all immigration violations as just as serious as those violations that should fall under the particularly serious crime bar, thus rendering meaningless the limiting language of "particularly serious crimes" in the statute. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)).

Commenters asserted that the proposed limitation was inconsistent with any of the other bars previously recognized by the BIA or the circuit courts because the crime of illegal reentry under section 276 of the Act (8 U.S.C. 1326) has no element of danger or violence to others and has no victim.

Commenters stated that the BIA and the circuit courts have also recognized that an alien's manner of entry should have little effect on eligibility for asylum. *See, e.g., Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (holding that it was an abuse of discretion to deny asylum as a matter of discretion when the only negative factor was the alien's "intentional failure to disclose that his passport was obtained in a non-traditional manner"); *Zuh* v. *Mukasey,* 547 F.3d 504, 511 n.4 (4th Cir. 2008) ("When an alien uses fraudulent documents to escape imminent capture or further persecution, courts and [immigration judges] may give this

factor little to no weight."); *Huang* v. *INS,* 436 F.3d 89, 100 (2d Cir. 2006) ("As with peripheral embellishments, if illegal manner of flight and entry are enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the [immigration judge]."); *Mamouzian* v. *Ashcroft,* 390 F.3d 1129, 1138 (9th Cir. 2004) ("[I]n order to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation."); *Matter of Pula,* 19 I&N Dec. at 473–74 (holding that the circumvention of the immigration laws is one factor for consideration).

Commenters stated that asylum seekers are often motivated to illegally reenter the United States after having been deported to seek protection from harm rather than for criminal purposes, and that individuals who legitimately fear returning to their countries of origin have been criminally prosecuted under section 276 of the Act (8 U.S.C. 1326). Commenters were concerned that the proposed bar would further criminalize vulnerable individuals fleeing persecution and would result in denial of meritorious claims for asylum. Commenters opined that such individuals should not be barred from asylum.

Commenters stated that the Departments did not take into consideration that trafficking victims may have reentered the United States without authorization "either because they were smuggled in by [a] trafficker, or because they were removed by the U.S., and then returned to that safety."

Commenters stated that "racial and ethnic disparity in the number of sentenced offenders is even more pronounced in the context of illegal reentry" and that "latinx immigrants are disproportionately impacted by over-prosecution of illegal reentry offenses and harsh sentencing of illegal reentry convictions."

Some commenters described anecdotes of "clients who have had to enter the United States without inspection due to cartel kidnappings, fears of being separated at the border, or misinformation by coyotes." One commenter stated that juveniles who were apprehended at the border and placed in Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") custody might request to return to their country

of origin due to "detention fatigue." The commenter stated that, upon return, these juveniles might face the same or new persecution, forcing them to flee once again.

One commenter stated that this proposed limitation was unnecessary because many convictions under section 276 of the Act (8 U.S.C. 1326) already qualify as aggravated felonies. INA 101(a)(43)(O) (8 U.S.C. 1101(a)(43)(O)) (providing that "an offense described in section 1325(a) [illegal entry] or 1326 of this title [illegal reentry] committed by an alien who was previously deported on the basis of an [aggravated felony as defined by section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43))]" is an aggravated felony). Additionally, commenters stated that the proposed limitation was unnecessary because individuals who are convicted under section 276 of the Act (8 U.S.C. 1326) are also subject to reinstatement of a prior order of removal under section 241(a)(5) of the Act (8 U.S.C. 1231(a)(5)), and, thus, are barred from applying for asylum if the prior order is reinstated. *See* INA 241(a)(5) (8 U.S.C. 1231(a)(5)) (stating that an alien whose "prior order of removal is reinstated * * * is not eligible and may not apply" for any relief under the INA); 8 CFR 1208.31(e), (g)(2), 1241.8(e). The commenters suggested that the Departments inappropriately expanded the bar to categorically exclude anyone convicted of illegal reentry.

Some commenters stated that the proposed limitation was improper because underlying removal orders that are the basis for an illegal reentry conviction are often incorrectly issued and do not withstand legal scrutiny.

Commenters expressed concern that individuals who attempt illegal reentry into the United States to flee persecution may have been previously removed from the United States without being aware of their right to apply for asylum. Commenters opined that such individuals "would not have knowingly abandoned their right." Commenters also stated that some individuals may have been prevented from seeking asylum during prior entries.

Commenters asserted that asylum seekers who illegally reenter could have been incorrectly found to lack a credible fear in prior credible fear interviews. Some commenters stated that asylum seekers with legitimate claims may have been previously removed because they were unable to establish eligibility for relief without adequate access to legal representation. Some commenters asserted that there are credible reports that DHS officers do not comply with requirements to inform individuals subject to expedited removal of their rights or to refer those with a fear of return to asylum officers for credible fear screenings, even when requested, and that DHS officers have engaged in harassment or the spread of misinformation that interferes with individuals' abilities to pursue asylum. One commenter stated that there is a higher risk that credible fear interviews may result in erroneous denial because border patrol officers, not asylum officers, have been conducting asylum interviews. Commenters proposed that the illegal reentry bar to asylum eligibility would "essentially punish asylum seekers for the failure of DHS officers to follow the agency's own rules." Commenters stated that preserving discretion, rather than implementing a categorical bar, would ensure that meritorious asylum claims are heard and correct previous errors.

Some commenters stated that the Departments did not take into account that illegal reentry "may be the only possible option" for asylum applicants. Commenters asserted that "current U.S. violations of international and domestic law regarding access to territory" further intensified this proposition. Commenters stated that they believed that a number of the Executive Branch's administrative policies—such as (1) "metering" at the border; (2) the Migrant Protection Protocols ("MPP"), *see* DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/ default/files/publications/19_0129_ OPA_migrant-protection-protocols- policy-guidance.pdf;* (3) the "third- country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019); and (4) international asylum cooperative agreements, *see* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 FR 63994 (Nov. 19, 2019)—drive asylum seekers to enter illegally rather than wait to present themselves at a port of entry, which in turn subjects them to the illegal reentry bar. Commenters suggested that, given these policies, the Departments incorrectly asserted that aliens who have previously been removed from the United States may present themselves at a port of entry. *See* 84 FR at 69648. One commenter suggested that many individuals who are driven to enter the United States unlawfully due to these policies do so with the intention of turning themselves in to U.S. Border Patrol authorities. Commenters also raised concerns that the proposed limitation would "condemn to persecution those who are simply trying to enter the [United States] to reunite with their family and community." Commenters were also concerned that individuals with convictions under section 276 of the Act (8 U.S.C. 1326) would be punished twice for the same crime by also being barred from asylum.

Some commenters stated that the NPRM unfairly punished individuals who have fled persecution multiple times or who have faced persecution arising after they had been removed, resulting in multiple unlawful entries. Commenters stated that refugee protection principles upon which asylum law is based require newly arising claims to be examined. Commenters specifically stated that, in proposing the illegal reentry bar, the Departments did not consider that immigrant survivors of violence who are removed to their countries of nationality may face violent retaliation and possibly death at the hands of their abusers or perpetrators and may flee the same perpetrators of domestic and sexual violence multiple times. Commenters asserted that a discretionary assessment was necessary to ensure that meritorious claims are heard.

*Response:* The Departments disagree with commenters who oppose the rule's additional limitation on asylum eligibility for those who have been convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). The Departments have appropriately exercised their delegated authority to impose additional limitations on asylum eligibility per section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

First, the Departments clarify that this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[21] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6). Regardless of commenters' concerns regarding the dangerousness of these crimes, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) offers a discrete basis

---

[21] Although the Departments at times cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of a subset of the included bars in the proposed rule, *see* 84 FR at 69645–54, the references to the authority to designate additional particularly serious crimes highlighted an alternative basis for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

**67222**    **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

under which the Departments may designate these offenses as bases for ineligibility. Although the "particularly serious crime" designation would justify the conclusion that an alien is dangerous, *see* section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(a)(ii)) ("the alien, having been convicted by final judgment of a particularly serious crime, constitutes a danger to the community of the United States"), the Attorney General's and the Secretary's authorities to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) require only that such limitations or conditions be "consistent with [section 208 of the Act (8 U.S.C. 1158)]." Thus, even assuming, arguendo, that the offenses designated by the final rule do not necessarily reflect an alien's dangerousness, the Attorney General and the Secretary retain the authority to promulgate the new bar. Accordingly, the Departments are unpersuaded by commenters' concerns regarding whether these offenses may not pose a danger to the community because such a finding is not required under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

With respect to commenters who expressed concern that the proposed limitation would violate Article 31 of the Refugee Convention, as well as undermine congressional intent and established case law, the Departments note that the rule's limitations on eligibility for asylum are consistent with Article 31 of the Refugee Convention. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to receive asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention.[22] *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588.

The proposed rule is also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is

---

[22] The Ninth Circuit recently indicated—erroneously, in the view of the Departments—that removal can be considered a "penalty" under Article 31(1) of the Refugee Convention. *E. Bay Sanctuary Covenant* v. *Trump,* 950 F.3d 1242, 1276 (9th Cir. 2020). In doing so, however, the Ninth Circuit cited the Supreme Court's decision in *Padilla,* 559 U.S. at 364, which discussed immigration penalties in terms of criminal proceedings, not Article 31(1) of the Refugee Convention. Further, the Ninth Circuit noted its observation solely in the context of limiting asylum eligibility based on manner of entry, and the court did not reach other asylum restrictions such as this rule.

precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n.16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C,* 869 F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation. Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188. Additionally, as noted above, the United States implemented the non-refoulement obligation of Article 33(1) of the Refugee Convention through the withholding-of-removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement obligation of the CAT under the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. Individuals who may be barred from asylum by the rule remain eligible to seek withholding of removal and protection under CAT in accordance with non-refoulement obligations.

Additionally, as noted in the NPRM, the statutory bar on applying for asylum and other forms of relief when an order of removal is reinstated has been upheld by every circuit to consider the question. 84 FR at 69648; *see Garcia* v. *Sessions,* 873 F.3d 553, 557 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 2648 (2018); *R–S–C,* 869 F.3d at 1189; *Mejia,* 866 F.3d at 587; *Garcia,* 856 F.3d at 30; *Cazun,* 856 F.3d at 260; *Perez-Guzman* v. *Lynch,* 835 F.3d 1066, 1082 (9th Cir. 2016); *Jimenez-Morales* v. *U.S. Att'y Gen.,* 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia* v. *Lynch,* 794 F.3d 485, 489–90 (5th Cir. 2015); *Herrera-Molina* v. *Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010). This reflects a broad understanding that individuals who repeatedly enter the United States unlawfully should not be eligible for the discretionary benefit of asylum and that limiting such eligibility does not conflict with section 208(a) of the Act (8 U.S.C. 1158(a)).

The Departments disagree with commenters' assertions that current administrative practices prevent asylum seekers from lawfully presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

With respect to commenters' concerns that the rule should not apply to those who unlawfully reentered the United States because of their desire to be reunited with family members living in the United States or to individuals who have been victims of trafficking or smuggling, the Departments believe that evaluations of mitigating factors or criminal culpability based on motives are more appropriately reserved for criminal proceedings. As stated in the NPRM, the Departments believe it is reasonable to limit eligibility for asylum to exclude aliens convicted of illegal reentry because this type of offense demonstrates that an alien has repeatedly flouted the immigration laws. *See* 84 FR at 69648. The Departments have a legitimate interest in maintaining the orderly and lawful admission of aliens into the United States. Aliens convicted of illegal reentry have engaged in conduct that undermines that goal.

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with a legitimate fear of persecution or torture may still apply for statutory withholding of removal or CAT withholding and deferral, forms of protection that this final rule does not affect. Additionally, these commenters misapprehend the purpose of this rulemaking. Awarding the discretionary benefit of asylum to individuals described in this rule would, among other things, encourage lawless behavior and subject the United States and its communities to the dangers associated with the crimes or conduct in which such persons have engaged. The Departments have appropriately exercised their authority to impose additional limitations on asylum eligibility to bar such individuals from that relief. Accordingly, those persons do not have meritorious asylum claims. By definition, if an applicant is ineligible for the discretionary benefit of asylum because of this rule, or any other statutory or regulatory limitation, he or she does not have a meritorious claim for asylum.

The Departments disagree with commenters' concerns that individuals with convictions under section 276 of the INA (8 U.S.C. 1326) would be punished twice for the same crime by

being barred from asylum. The Departments emphasize that immigration proceedings are civil in nature, and thus denial of relief from removal is not a punishment, particularly with respect to a discretionary benefit such as asylum. *Cf. Mejia,* 866 F.3d at 588 ("We therefore perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional opportunities to apply for discretionary relief constitutes a 'penalty.'"). In addition, commenters' logic would have far-reaching implications that would undermine the entire statutory scheme that imposes any immigration consequences on account of an alien's criminal convictions, including eligibility for forms of relief or removability from the United States, *see, e.g.,* INA 212(a)(2) (8 U.S.C. 1182(a)(2)) (criminal grounds of inadmissibility); 237(a)(2) (8 U.S.C. 1227(a)(2)) (criminal grounds of deportability), but there has never been any reason to question the framework in such a manner, *see, e.g., Nijhawan,* 557 U.S. at 36 (analyzing whether convictions for certain crimes constituted aggravated felonies for purposes of the INA without questioning whether immigration penalties could be imposed for those convictions).

d. Criminal Street Gang Activity

*Comment:* Several commenters opposed the imposition of a bar to asylum eligibility based on the furtherance of criminal street gang activity.

As an initial matter, commenters noted that, under the current asylum system, a conviction for an offense categorized as a gang-related crime would bar an individual from asylum in most cases. However, commenters expressed concern that the NPRM extends culpability for gang-related crime beyond offenses categorized as gang-related crimes and would also bar individuals from asylum if an adjudicator "knows or has reason to believe the crime was committed in furtherance of criminal street gang activity." Commenters asserted that the standard for this bar is so broad that individuals not associated with gangs could be included in this category and barred from asylum.

At the same time, commenters argued that the proposed rule does not sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as gang-related. As a result, commenters expressed concern that the proposed rule granted immigration adjudicators too much latitude to determine whether

a crime fits into the vague category of supporting, promoting, or furthering the activity of a criminal street gang. Commenters were concerned that information in databases of gang-related crimes or factors such as where the criminal activity occurred may lead to improper categorization of gang-related activity. Commenters were similarly concerned that the bar does not account for the circumstances of the offense, such as whether coercion or threats forced the asylum applicant to undertake the criminal activity. Commenters asserted that immigration adjudicators should, at a minimum, be permitted to consider such factors as coercion or duress prior to granting or denying asylum.

Commenters asserted that the "reason to believe" standard is ultra vires and unconscionably limits asylum eligibility for those most in need of protection. Commenters asserted that the "reason to believe" standard grandly expands the number of convictions for which an eligibility analysis is required and would "sweep[] in even petty offenses that would otherwise not trigger immigration consequences." Commenters asserted, moreover, that the "reason to believe" standard for determining whether there is a sufficient link between the underlying conviction and the gang-related activity is "overly broad and alarmingly vague."

Additionally, commenters argued that the "reason to believe" standard places the adjudicator in the role of a second prosecutor and requires the adjudicator to decide, without the benefit of a criminal trial and attendant due process of law, whether a crime could have been potentially gang-related. At the same time, commenters stated that immigration adjudicators, who are not criminologists, sociologists, or criminal law experts, would be required to analyze past misdemeanor convictions to determine whether there is a link to gang activity, regardless of whether the individual was also charged or convicted of a street gang offense.

Commenters cited concerns regarding the admission of "all reliable evidence" to determine whether there was "reason to believe" that the conduct implicated gang-related matters. They averred that this phrase was potentially limitless and that its scope required both parties to present fulsome arguments regarding an offense's possible gang connections. Moreover, commenters asserted that the proposed rule fails to articulate what type of evidence or non-adjudicated conduct may be considered by an adjudicator when determining whether a bar to asylum applies.

In addition, commenters expressed concern that permitting adjudicators to rely on "all reliable evidence" will result in immigration adjudicators relying on any type of evidence, including police reports, unsubstantiated or subsequently recanted hearsay statements, and discredited methods of gang identification, such as gang databases. Commenters asserted that this will result in a compounded disparate racial impact based on over-inclusion of young people of color in those gang databases. Commenters asserted that gang databases are "notoriously inaccurate, outdated, and infected by racial bias." Additionally, commenters stated that gang databases are unregulated and that an individual may be included in a database simply based on "living in a building or even neighborhood where there are gang members, wearing certain colors or articles of clothing, or speaking to people law enforcement believe to be gang members."

One commenter referenced a decision of the Supreme Judicial Court of Massachusetts holding that the information contained in gang databases is hearsay, not independently admissible, and raises serious Confrontation Clause concerns. *Commonwealth* v. *Wardsworth,* 124 NE3d 662, 678–79 & nn.24–25 (Mass. 2019). That commenter also asserted that, despite the concern expressed by the Supreme Judicial Court of Massachusetts regarding the use of gang databases, immigration judges continue to regularly rely on such reports. By relying on such unreliable evidence, commenters averred, the proposed rule will exacerbate due process violations already occurring as a result of unsubstantiated gang ties.

Commenters further noted that, because these databases disparately affect young people of color, relying on these databases would multiply the harm already caused by racially disparate policing and racially disparate rates of guilty pleas to minor offenses. Commenters claimed that asylum seekers of color are subject to racially disparate policing, which results in racially disparate rates of guilty pleas to minor offense, and which also results in this population being erroneously entered and overrepresented in gang databases. In support of the inaccuracy of these databases, one commenter cited concerns that police departments falsify gang affiliations of youth encountered by police officers. As a result, commenters asserted, the proposed rule would "invite extended inquiry into the character of young men of color" who

may otherwise have meritorious asylum claims and who are already subject to racially suspect policing practices.

Commenters noted that police reports are inherently unreliable in the absence of the protections offered by the Confrontation Clause of the Sixth Amendment and the Federal Rules of Evidence, neither of which apply in immigration court. Regarding the unreliability of evidence, one commenter provided an example where neither the police officers nor the alleged victims were required to testify. Without this testimony, the commenter alleged, the immigration adjudicator would be unable to determine whether a victim had a motive to lie to the police, whether the victim later recanted his or her statements, or whether the police officer misunderstood some critical fact. Moreover, commenters asserted that, although immigration adjudicators would be unable to rely on uncorroborated allegations such as those contained in arrest reports, adjudicators could nevertheless shield denials based on such information by relying on discretion.

Commenters stated that the proposed rule would exacerbate due process violations that already occur as a result of unsubstantiated information about gang ties. Commenters claimed that asylum applicants are already subjected to wrongful denials of asylum based on allegations of gang activity made by DHS. Commenters alleged that DHS relies on unreliable foreign databases and "fusion" intelligence-gathering centers outside of the United States. For example, one commenter alleged that information regarding gang affiliations gathered from the fusion intelligence-gathering center in El Salvador has already been used against asylum seekers, despite having been found to be inaccurate. At the same time, commenters asserted that immigration adjudicators routinely premise enforcement, detention, and discretionary denials of relief on purported gang membership and often grant deference to gang allegations made by Immigration and Customs Enforcement ("ICE") personnel. Commenters asserted that the already expanded use of gang databases to apprehend and remove foreign nationals has been widely criticized as an overbroad, unreliable, and often biased measure of gang membership and involvement.

Additionally, commenters expressed disagreement with the Departments' position that all gang-related offenses could be considered as particularly serious crimes. Commenters criticized the Departments' reliance on statistics

from up to 16 years ago to demonstrate that gang members commit violent crimes and drug crimes. Commenters disagreed with the Departments' conclusion that all crimes that may be construed as connected to gang activity are particularly serious. Commenters asserted instead that it is illogical to argue that, because gang members may commit some violent crimes and drug crimes, all crimes committed by anyone remotely connected with a gang are particularly serious.

Commenters also asserted that the proposed rule will result in asylum seekers who live in economically distressed areas but who have a minor criminal conviction, for example for a property crime, being excluded from protection. Commenters asserted that including even minor crimes construed as gang-related in the "particularly serious crime" bar and preventing those individuals from accessing asylum is "disingenuous at best, and tinged with racial animus at worst." Commenters asserted that this bar would perpetuate racial bias within the immigration court system.

Commenters asserted that the gang-related-crimes bar should not be introduced at all due to the complex nature of gang ties and the frequency with which individuals are mislabeled as being part of a gang. These commenters argued that the risk of erroneously barring legitimate asylum seekers from eligibility is too high. Another commenter noted that it was "particularly cruel" to create a bar related to gang offenses "in the wake of this Administration's refusal to countenance gang violence as a ground to asylum." Moreover, commenters asserted that the INA and existing regulations already permit immigration adjudicators to deny asylum as a matter of discretion. Adding this new bar based on gang-related activity, according to these commenters, risks excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

Commenters noted that previous attempts to expand the grounds of removal and inadmissibility to include gang membership failed to pass both houses of Congress. One commenter noted concern that an individual could be erroneously convicted of a gang-related crime because of the widespread nature of gang activity in Central America. This commenter also expressed concern that, because gangs in Central America may act with impunity and "often control a corrupt judiciary," an individual could be erroneously convicted of a crime for

refusing to acquiesce to a gang's demands.

*Response:* As explained further in section II.C.2.a.i, the bar based on activity related to criminal street gangs is enacted pursuant to the Attorney General's and the Secretary's designated authorities to establish additional limitations and conditions on asylum. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[23] This authority requires such conditions and limitations to be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses meet a threshold of dangerousness or seriousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)"), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered a "danger to the community of the United States" by virtue of "having been convicted by a final judgment of a particularly serious crime"). Although the Departments have determined that the included offenses involving criminal street gangs represent dangerous offenses and that the offenders represent particular dangers to society, *see* 84 FR at 69649–50, the Departments would nevertheless be acting within the authority of section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) if commenters are correct that some offenses included are not connected to dangerousness. Section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of criminal street gang-

---

[23] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of gang-related crimes as bars to asylum eligibility. *Compare* 84 FR at 69650 ("Regardless, criminal street gangs-related offenses—whether felonies or misdemeanors—could reasonably be designated as 'particularly serious crimes' pursuant to 8 U.S.C. 1158(b)(2)(B)(ii)."), *with id.* ("Moreover, even if 8 U.S.C. 1158(b)(2)(B)(ii) did not authorize the proposed bar, the Attorney General and the Secretary would propose designating criminal gang-related offenses as disqualifying under 8 U.S.C. 1158(b)(2)(C)."). Nevertheless, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) aligns with the regulatory text and was used to support all of the categories of bars set out in the rule.

related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and the Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Moreover, Congress has expressly excluded from eligibility certain aliens who engage in conduct or commit crimes of a certain character or gravity, regardless of whether those aliens are "dangerous" to the United States, and regardless of whether those crimes have been formally designated as "particularly serious." *See* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)). The Departments have concluded that criminal street gang-related offenses are sufficiently similar to such conduct and crimes that aliens who commit such offenses should not be rewarded with asylum and the many benefits that asylum confers.

Further, the Departments disagree with comments asserting the criminal street gang-related offenses are not necessarily indicative of a danger to the United States. *See* 84 FR at 69650. Specifically, the Departments believe that such offenses are strong indicators of recidivism and ongoing, organized criminality. *Id.* Based on the data and research articulated in the NPRM, the Departments believe that individuals who enter the United States and are then convicted of a crime related to criminal street gang activity present an ongoing danger to the community and should therefore be ineligible for asylum. Significantly, the Departments reject commenters' assertions that the Departments relied on data that was over 16 years old. Although one of the reports relied upon in the NPRM was published in 2004, additional studies and information were cited ranging from 2010 to 2015. *See* 84 FR at 69650. Additionally, the White House recently issued a fact sheet observing that "[a]pproximately 38 percent of all murders in Suffolk County, New York, between January 2016 and June 2017"—were linked to a single criminal gang—MS–13—alone. The White House, *Protecting American Communities from the Violence of MS–13* (Feb. 6, 2020), *https://www.whitehouse.gov/briefings-statements/protecting-american-communities-violence-ms-13/; see also*

Alan Feuer, *MS–13 Gang: 96 Charged in Sweeping Crackdown on Long Island,* N.Y. Times (Dec. 20, 2019), *https://www.nytimes.com/2019/12/20/nyregion/ms-13-long-island.html;* Proc. No. 9928, 84 FR 49187, 49187 (Sept. 13, 2019) (explaining that the DOJ is working with law enforcement in El Salvador, Guatemala, and Honduras to "help coordinate the fight against MS–13, the 18th Street Gang, and other dangerous criminal organizations that try to enter the United States in an effort to ravage our communities," and that this partnership "targets gangs at the source and works to ensure that these criminals never reach our borders"); *id.* (observing that, in 2017 and 2018, ICE officers "made 266,000 arrests of aliens with criminal records, including those charged or convicted of 100,000 assaults, nearly 30,000 sex crimes, and 4,000 violent killings"). These more recent examples demonstrate the continued threat posed by gang-related crime.

The Departments disagree with commenters' assertions that the rule fails to sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as a gang-related event. As an initial matter, the rule does not purport to categorize individuals as street gang members. Rather, the inquiry is limited into whether an adjudicator knows or has reason to believe that a prior conviction for a Federal, State, tribal, or local crime was committed in support, promotion, or furtherance of criminal street gang activity. 84 FR at 69649. This rule defines "criminal street gang" by referencing how that term is defined in the convicting jurisdiction or, alternatively, as the term is defined in 18 U.S.C. 521(a). The Departments believe that the language of the Federal statute conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices, as do the definitions in the convicting jurisdictions. This rule leaves the determination of whether a crime was in fact committed "in furtherance" of gang-related activity to adjudicators in the first instance. As noted in the NPRM, to the extent that this type of inquiry may lead to concerns regarding inconsistent application of the bar, the Departments reiterate that the BIA is capable of ensuring a uniform approach. *See* 8 CFR 1003.1(e)(6)(i).

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with legitimate fear of persecution or torture may still apply for statutory

withholding of removal or protection under the CAT regulations, as discussed in section II.C.5. In addition, and as explained previously, these commenters misapprehend the purpose of this rulemaking. The Departments have concluded that persons subject to the new bars do not warrant asylum because awarding the discretionary benefit of asylum to such individuals would encourage lawless behavior, subject the United States to certain dangers, and otherwise undermine the policies underlying the statutory framework for asylum. These persons accordingly do not have meritorious asylum claims. And, because nothing in the INA precludes the imposition of these new bars, the fact that these persons' claims might otherwise be meritorious is irrelevant.

Regarding commenters' concerns with the "reason to believe" standard articulated in the rule, the Departments note that this standard is used elsewhere in the INA. For example, when considering admissibility, immigration judges consider whether there is reason to believe that the individual "is or has been an illicit trafficker in any controlled substance." INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)). In accordance with this provision, courts have upheld findings of inadmissibility in the absence of a conviction. *See Cuevas* v. *Holder,* 737 F.3d 972, 975 (5th Cir. 2013) (holding "that an alien can be inadmissible under [INA 212(a)(2)(C)] (8 U.S.C. 1182(a)(2)(C)] even when not convicted of a crime"); *Garces* v. *U.S. Att'y Gen.,* 611 F.3d 1337, 1345 (11th Cir. 2010) (stating that section 1182(a)(2)(C) of the Act (8 U.S.C. 1182(a)(2)(C)) renders an alien inadmissible based on a "reason to believe" standard, which does not require a conviction); *Lopez–Umanzor* v. *Gonzales,* 405 F.3d 1049, 1053 (9th Cir. 2005) ("Section 1182(a)(2)(C) does not require a conviction, but only a 'reason to believe' that the alien is or has been involved in drug trafficking."). The bar on criminal street gang-related activity is narrower in scope than the inadmissibility charge based on illicit trafficking in that the bar in this rule still requires a conviction. As such, the Departments believe that the "reason to believe" standard is appropriately applied to the final rule.

Similarly, the "all reliable evidence" standard is not a new standard in immigration proceedings. Immigration judges routinely consider any relevant evidence provided in removal hearings by either party. 8 CFR 1240.1(c). Additionally, the BIA held, in the context of evaluating whether a crime constitutes a particularly serious crime,

that, once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, the adjudicator may consider all reliable information in making a "particularly serious crime" determination, including but not limited to the record of conviction and sentencing information. *Matter of N-A-M-,* 24 I&N Dec. at 337–38. The Ninth Circuit has held that the BIA's interpretation in *Matter of N-A-M-* is reasonable. *Anaya-Ortiz* v. *Holder,* 594 F.3d 673, 678 (9th Cir. 2010). Additionally, various circuit courts have applied the "all reliable information" standard articulated in *Matter of N-A-M-* in considering whether crimes are particularly serious. *See, e.g., Luziga* v. *Att'y Gen. U.S.,* 937 F.3d 244, 253 (3d Cir. 2019); *Marambo* v. *Barr,* 932 F.3d 650, 655 (8th Cir. 2019).

The Departments disagree with commenters' concerns about adjudicators' reliance on arrest reports and uncorroborated information. As an initial point, most asylum claims are based significantly on hearsay evidence that is uncorroborated by non-hearsay evidence. Such evidence, however, does not necessarily make an asylum claim unreliable or insusceptible to proper adjudication. Adjudicators assessing asylum applications are well versed in separating reliable from unreliable information, assigning appropriate evidentiary weight to the evidence submitted by the applicant and DHS, and determining whether corroborative evidence needs to be provided. *See* INA 208(b)(1)(B) (8 U.S.C. 1158(b)(1)(B)). Moreover, this rule does not provide adjudicators with unfettered discretion; instead, adjudicators must consider such evidence in the context of making a criminal street gang determination under the "reason to believe" standard. An asylum officer's assessment of eligibility necessarily must explain the consideration of the evidence of record as it applies to the evaluation of bars to asylum and the burden of proof, and it must also explain the exercise of discretion. Similarly, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna* v. *Ashcroft,* 325 F.3d 396, 405 (3d Cir. 2003) (quoting *Bustos-Torres* v. *INS,* 898 F.2d 1053, 1055 (5th Cir. 1990)). Nothing in this rule undermines or withdraws from this standard. Moreover, the Departments would not purport to

impinge on an adjudicator's evidentiary determination or direct the result of such a determination. If aliens have concerns about the reliability of any evidence, aliens may challenge the reliability of that evidence as part of their arguments to the adjudicator. As a result, the Departments have concluded that concerns regarding the reliability of gang databases or other evidence are more properly addressed in front of the immigration judge or asylum officer in individual cases.

The Departments disagree with comments that adjudicators should have the discretion to determine whether factors such as coercion or duress affected an individual's involvement in criminal street gang-related activity. The Departments believe that criminal street gang-related activity is serious and harmful in all circumstances. As stated in the NPRM, "[c]riminal gangs of all types * * * are a significant threat to the security and safety of the American public." 84 FR at 69650. Accordingly, the Departments have concluded that aliens who have been convicted of such offenses do not merit the discretionary benefit of asylum, even if their gang involvement was potentially the result of coercion or some other unique circumstance. In addition, the Departments believe that considerations regarding criminal culpability for criminal street gang-related offenses would be best addressed during the individual's underlying criminal proceedings.

Commenters' assertions that the rule will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color are outside the scope of this rulemaking. *Cf. San Francisco,* 944 F.3d at 803–04 ("Any effects [of the public charge rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). The rulemaking does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Moreover, the rule was not racially motivated, nor did racial animus or a legacy of bias play any role in the publication of the rule. Rather, this final rule is being published to categorically preclude from asylum eligibility certain aliens with various criminal convictions because the Departments determined that individuals engaging in criminal activity that is related to criminal street gangs present a sufficient danger to the United States to warrant exclusion from the discretionary benefit of asylum. To the extent that the rule disproportionately affects any group referenced by the commenters, any such

impact is beyond the scope of this rule, as this rule was not drafted with discriminatory intent towards any group, and the provisions of the rule apply equally to all applicants for asylum.

e. Driving Under the Influence of an Intoxicant

*Comment:* Commenters opposed the proposed categorical bar to asylum based on a DUI conviction. Commenters stated that the proposed categorical bars encompass crimes with a wide range of severity, and commenters asserted that DUI does not rise to a comparable level of severity as a particularly serious crime warranting its promulgation as a categorical bar to asylum. Other commenters similarly stated that, because DUI does not involve conduct that is necessarily dangerous on its own, the offense is not serious enough to support a categorical bar to asylum. Commenters provided examples of allegedly low-level convictions for DUI, based on examples such as a court concluding that, when "the key is in the ignition and the engine is running, a person 'operates' a vehicle, even if that person is sleeping or unconscious," *State* v. *Barac,* 558 SW3d 126, 130 (Mo. Ct. App. 2018), or when a person operates a vehicle while under the influence but no injury to another person results. Accordingly, commenters asserted that DUI is not necessarily serious or sufficiently dangerous to warrant a categorical bar. One commenter summarized the concern by stating that offenses related to DUI are "excessively overbroad in the convictions and conduct covered[ ] and are not tailored to identify conduct that is 'serious' or identify individuals who pose a danger to the community."

Commenters also asserted that creating a blanket categorical bar to asylum based on a DUI conviction would eliminate the opportunity for adjudicators to consider the facts before them in exercising discretion. Commenters stated that adjudicators should consider the severity of the DUI offense given relevant facts, such as the applicant's criminal history, the underlying cause of the applicant's criminal record involving DUI, the applicant's efforts towards rehabilitation, the length of time passed since the conviction, the applicant's potential danger to the community, and the applicant's risk of persecution if returned to his or her home country.

Commenters noted that multiple DUI convictions are not an absolute bar to cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)) and cited the Attorney General's opinion that

such offenses were inconclusive of an individual's character, thus allowing individuals to rebut the presumption with evidence of good character and rehabilitation. *Matter of Castillo-Perez,* 27 I&N Dec. 664 (A.G. 2019). Commenters stated that, "if individuals seeking discretionary cancellation of removal are afforded the opportunity to show that they merit permanent residence in spite of their prior convictions for driving under the influence, it is nonsensical to promulgate a rule denying asylum seekers that same opportunity."

Finally, commenters noted that low-income people and people of color are more likely to be pulled over and charged with DUI. These commenters alleged that the proposed rule accordingly exacerbates the unjust criminal justice system by including these provisions as a bar to asylum eligibility.

*Response:* The Departments disagree that DUI does not warrant a categorical bar to asylum eligibility.

Although commenters provided limited examples of times where an individual convicted of a DUI offense fortunately may not have caused actual harm to others, these sorts of DUI convictions alone would not render an alien ineligible for asylum under this rule. The final rule bars aliens with DUI convictions from asylum eligibility under two grounds in 8 CFR 208.13(c)(6)(iii), (c)(6)(iv) and 1208.18(c)(6)(iii), (c)(6)(iv). First, under 8 CFR 208.13(c)(6)(iii) and 1208.18(c)(6)(iii), a single DUI offense would only be disqualifying if it "was a cause of serious bodily injury or death of another person." Second, under 8 CFR 208.13(c)(6)(iv)(A) and 1208.18(c)(6)(iv)(A), any second or subsequent DUI offense would be disqualifying. Accordingly, a single conviction that does not cause bodily injury or death to another would not be a bar to asylum, but would continue to be considered by adjudicators in determining whether an alien should receive asylum as a matter of discretion.

The Departments maintain that DUI convictions, particularly those covered by this rule (based on actions that cause serious bodily injury or death or that indicate recidivism, along with the risk of harm from such recurrent dangerous behavior), constitute serious, dangerous activity that threatens community safety. First, the Departments reiterate that DUI laws exist, in part, to protect unknowing persons from the dangerous people who "choose to willingly disregard common knowledge that their criminal acts endanger others." 84 FR at 69651. Second, the Supreme Court and

other Federal courts have repeatedly echoed the gravity of such acts. *See Begay* v. *United States,* 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson* v. *United States,* 576 U.S. 591 (2015); *United States* v. *DeSantiago-Gonzalez,* 207 F.3d 261, 264 (5th Cir. 2000) ("[T]he very nature of the crime * * * presents a 'serious risk of physical injury' to others[.]"); *Marmolejo-Campos* v. *Holder,* 558 F.3d 903, 913 (9th Cir. 2009) ("[T]he dangers of drunk driving are well established * * * ."); *see also Holloway,* 948 F.3d at 173–74 ("A crime that presents a potential for danger and risk of harm to self and others is 'serious.' * * * 'There is no question that drunk driving is a serious and potentially deadly crime * * * . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.'" (quoting *Virginia* v. *Harris,* 558 U.S. 978, 979–80 (2009) (Roberts, C.J., dissenting from denial of writ of certiorari))).

It is well within the Departments' authority to condition asylum eligibility based on a DUI conviction. The INA authorizes the Attorney General and the Secretary to establish by regulation additional limitations and conditions on asylum eligibility, INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)), and Federal courts have upheld BIA discretionary denials of asylum based on DUI convictions, even in circumstances where a DUI conviction does not constitute a particularly serious crime. *See, e.g., Kouljinski* v. *Keisler,* 505 F.3d 534, 543 (6th Cir. 2007). For the reasons above, DUI is a serious crime that represents a blatant disregard for the laws and societal values of the United States; accordingly, the final rule limits asylum eligibility by considering a DUI conviction to be a categorical bar to asylum.

For these reasons, the Departments decline to tailor the bar to precisely identify serious conduct, evaluate severity of conduct, identify individuals who pose a danger to communities, or provide discretion to adjudicators, as suggested by commenters. The Departments will no longer afford discretion to adjudicators considering DUI convictions in the circumstances defined by this rule; elimination of such discretion is, again, well within the Departments' authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Regarding DUI convictions in the context of cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)), the Departments note that cancellation of

removal is separate from asylum, and this rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum eligibility"). Although both forms of relief may eventually lead to lawful permanent resident status in the United States, cancellation of removal generally applies to a different class of aliens, and its conditions and requirements are different from asylum relief.[24] *Compare* INA 240A(b) (8 U.S.C. 1229b(b)), *with* INA 208 (8 U.S.C. 1158)). Cancellation of removal requires "good moral character," which asylum relief neither requires nor mentions. Thus, references to DUI convictions and their relative effect on the good moral character requirement for cancellation of removal are irrelevant to asylum eligibility. Commenters conflate two separate forms of relief from removal intended for separate populations with separate eligibility provisions.

Likewise, the Attorney General's statement in *Matter of Castillo-Perez,* 27 I&N Dec. at 671—that multiple DUI convictions were not necessarily conclusive evidence of an individual's character—was made in regards to eligibility for cancellation of removal, not asylum.[25] Accordingly, that case has no bearing on this rulemaking.

---

[24] Generally, cancellation of removal is a discretionary form of relief in which the Attorney General may cancel removal and adjust status to lawful permanent residence ("LPR") of an otherwise inadmissible or deportable alien who has been physically present in the United States for a continuous period of not less than 10 years preceding the date of the application; has been a person of good moral character during such period; has not been convicted of an offense under INA 212(a)(2), 237(a)(2), or 237(a)(3) (8 U.S.C. 1182(a)(2), 1226(a)(2), or 1226(a)(3)); and establishes that removal would result in exceptional and extremely unusual hardship to the applicant's U.S. citizen or LPR spouse, parent, or child. *See* INA 240A(b) (8 U.S.C. 1229b(b)). In contrast, asylum is a discretionary benefit that precludes an alien from removal, creates a pathway to LPR status and citizenship, and affords various ancillary benefits such as work authorization, opportunity for certain family members to obtain derivative asylee and LPR status, and authorization, in some cases, to receive certain financial assistance from the government. *See* INA 208 (8 U.S.C. 1158). Asylum eligibility includes the following factors: The alien must be physically present or arrive in the United States; the alien must meet the definition of "refugee" under INA 101(a)(42)(A) (8 U.S.C. 1101(a)(42)(A)), and the alien must otherwise be eligible for asylum in that no statutory bars or limitations apply. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)), INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), INA 208(b)(2) (8 U.S.C. 1158(b)(2)) and 8 CFR 1240.8(d); *see also* 84 FR at 69642.

[25] Nevertheless, the Attorney General in the context of discussing eligibility for cancellation of removal as a matter of discretion made clear that "[m]ultiple DUI convictions are a serious blemish on a person's record and reflect disregard for the safety of others and for the law." *Castillo-Perez,* 27 I&N Dec. at 670. This reasoning as to the

Continued

In sum, the rulemaking categorically bars asylum eligibility for those with one or more DUI convictions in order to protect communities from the dangers of driving under the influence. *See* 84 FR at 69650–51; *see also* 84 FR at 69640. It does not consider other factors of apparent concern to commenters, such as financial status, race, or nationality. The rulemaking also does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Such considerations are outside the scope of this rulemaking.

### f. Battery or Domestic Violence

*Comment:* Commenters opposed the proposed bar to asylum based on domestic assault or battery, stalking, or child abuse. Broadly, commenters opposed a bar to asylum based on "mere allegations of conduct without any adjudication of guilt" for several reasons. First, commenters stated that a bar based on conduct, not convictions, violates INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), which bars noncitizens who, "having been convicted by a final judgment of a particularly serious crime, constitute[ ] a danger to the community of the United States." In accordance with the plain text and judicial interpretation of this section of the Act, commenters asserted, the statute prohibits application of the "particularly serious crime" bar based only on non-adjudicated facts, thereby precluding separation of "the seriousness determination from the conviction." Accordingly, commenters stated that the proposed application of the "particularly serious crime" bar based on conduct involving domestic assault or battery directly contradicts the statute, which requires a final judgment of conviction. Commenters also alleged that the proposed rule violates the Supreme Court's holding that "conviction" refers to the "crime as generally committed," rather than the actual conduct. *See Sessions* v. *Dimaya,* 138 S. Ct. 1204, 1217 (2018); *see also Delgado,* 648 F.3d at 1109 n.1 (Reinhardt, J., concurring in part and concurring in the judgment). One commenter asserted that the statute "only bars asylum seekers for alleged conduct in exceptional circumstances like potential terrorist activity or persecution of others. * * * [C]onduct-based asylum bars should be used only in very limited circumstances, and in this case should not be expanded."

Relatedly, commenters raised constitutional concerns. Commenters cited constitutional principles that "individuals have a right to defend themselves against criminal charges and are presumed innocent until proven guilty. Individuals should not be excluded from asylum eligibility based on allegations of criminal misconduct that have not been proven in a court of law." Accordingly, commenters opposed the NPRM because it "deprives the individual the opportunity to challenge the alleged behavior and does away with the presumption of innocence." More specifically, a commenter claimed that, under the NPRM, an incident and subsequent arrest related to domestic assault or battery would trigger an inquiry into the alien's conduct, thereby undermining the criminal justice system and constitutional due process protections for criminal defendants who may not have access to counsel. The commenter alleged that, regardless of whether the alien was convicted of the offense, the alien may still be barred from asylum relief following an adjudicator's independent inquiry into the incident.

Commenters also stated that a bar based on conduct alone, especially in the context of domestic assault or battery, could disproportionately penalize innocent individuals and victims, and subsequently their spouses and children, who may be denied immigration status or be left with an abuser. First, commenters explained that specific barriers—including discrimination, community ostracism, community or religious norms, or lack of eligibility for certain services—deter aliens from even initially contacting law enforcement. Second, if law enforcement was involved, commenters expressed concern about cross arrests in which both the perpetrator of abuse and the victim are arrested but no clear determinations of fault are made. Commenters stated that "authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances." Further, commenters alleged that "identifying the primary aggressor is not always consistently nor correctly conducted," especially if survivors acted in self-defense. Commenters also expressed concern that survivors of domestic assault or battery are oftentimes vulnerable, with the result that a bar based on conduct alone could affect populations with overlapping

vulnerabilities. For example, commenters specifically referenced lesbian, gay, bisexual, transgender, and queer or questioning ("LGBTQ") survivors, who are already allegedly prone to experience inaction by law enforcement in response to domestic violence, and limited English proficiency individuals, who may be unable to fully describe the abuse to police officers, prompting officers to then use the offenses' perpetrators for interpretation.

One commenter expressed concern that the NPRM establishes a lower standard by which admission may be denied because other forms of admission require an actual conviction or factual admission to form the basis of denial. Accordingly, the commenter stated that similarly situated persons would be treated inconsistently based upon the mechanism for admission that they choose. This commenter also asserted that U nonimmigrant status and Violence Against Women Act of 1994, Public Law 103–322, 108 Stat. 1902 ("VAWA") relief are insufficient alternative forms of relief because they generally require acknowledgement from a local authority, negating the need for a fact-finding hearing. Presumably then, most individuals affected by the NPRM would be ineligible for these alternative forms of relief. In addition, the commenter noted that granting those benefits is entirely different from making an asylum applicant overcome an asylum bar.

Commenters also identified unintended consequences of the proposed rule, explaining that individuals may act maliciously. One commenter suggested that individuals may file for baseless temporary restraining orders or protective orders to try to block domestic violence victims' applications for employment authorization documents following an asylum application. Another commenter speculated that abusers may falsely accuse or frame survivors of domestic violence to terrorize or control them. One commenter asserted that survivors may be hesitant to report abuse or request a restraining order if it could negatively impact the immigration status of the perpetrator, especially in situations where they share a child. Another commenter stated that it would "undoubtedly embolden[ ] perpetrators more and len[d] more strength to otherwise weak accusations."

Some commenters generally stated that the NPRM too broadly categorized domestic violence offenses as particularly serious crimes. Relatedly, another commenter stated that the bar is too vague and requires adjudicators to

---

seriousness of DUI offenses supports the type of categorical bar at issue here and does not conflict with the Departments' determination that DUI offenses should categorically bar asylum eligibility.

become experts in domestic criminal law jurisdictions of every State to determine whether, for example, conduct "amounts to" domestic assault or battery, stalking, or child abuse. Further, the commenter noted that the NPRM's definition of battery and extreme cruelty is different from the various States' criminal laws, which creates inconsistent application. That commenter also alleged that the proposed exceptions for individuals who have been battered or subjected to extreme cruelty are "insufficient, vague, and place[d] a high burden on victims." Another commenter asserted that it is "unclear how 'serious' will be defined, and whether and how detrimental and potentially false information provided by abusers will be considered in decision-making." One commenter suggested that "the presentation of evidence under oath by adverse parties is a more appropriate forum for adjudications as to whether or not domestic violence took place, and will likely lead to fewer determinations that will cruelly strip immigrant survivors of their right to seek asylum." Another commenter asserted that the NPRM does not include a framework or limits to guide an adjudicator's inquiry, especially in the context of false accusations. For these reasons, commenters opposed the NPRM because it allegedly would cause inconsistent and unjust results.

Some commenters claimed that the proposed bar is unnecessary because the current bars for those with domestic violence convictions or aggravated felony convictions allow for "the denial of asylum protection for these types of crimes when appropriate," whereas the proposed bar denies asylum protection for vulnerable individuals. Accordingly, commenters believed that "immigration judges should retain discretion in these situations and be permitted to grant relief in situations where the asylum seeker is not at fault."

Many commenters alleged that the proposed bar conflicts with VAWA. One commenter alleged that the NPRM "distorts language contained in VAWA * * * in order to create barriers for asylum seekers." Commenters stated that VAWA gives discretion to adjudicators "based on a number of factors and circumstances." Accordingly, commenters stated that the proposed "blunt approach" conflicts with VAWA and lacks "evidence-based justification for treating asylum seekers differently." Commenters were also concerned with the lack of "analogous protections in the asylum context to protect a survivor from the devastating

effects of a vindictive abuser's unfounded allegations."

Commenters also disagreed with the proposed approach towards the burden of proof as compared to VAWA. Because of the "vastly different interests at stake," commenters stated that VAWA's low burden of proof is necessary for several reasons: More harm results from erroneously denying relief than erroneously granting relief, a lower standard maximizes the self-petitioner's confidentiality and safety, certain evidence may be inaccessible to a victim because the abuser blocked access, and no liberty interests are implicated for alleged perpetrators. By contrast, commenters asserted, a "rigorous burden of proof is appropriate when potentially barring applicants from asylum," as the NPRM did, because "[t]he consequences of invoking the bar are dire, with the applicant's life and safety hanging in the balance."

Commenters also disagreed that the exception for asylum applicants who demonstrate eligibility for a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) sufficiently protects survivors deemed not to be the primary aggressors. Commenters noted that survivors may be unaware of their eligibility for a waiver, unaware that such a waiver exists, or too fearful to apply.

Commenters also claimed that the waiver application process turns an otherwise non-adversarial inquiry into a "multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency." Commenters also questioned whether adjudicators could conduct such an inquiry and correctly apply the exception because they are removed from the immediate circumstances surrounding an incident. Accordingly, commenters alleged that the waiver fails to adequately protect survivors and, in some cases, inflicts harm.

*Response:* First, commenters are incorrect that the rule's conditioning of asylum eligibility on conduct violated INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)) because that section requires a final judgment of conviction. As discussed above, this rule, like the proposed rule, designates the listed offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[26] *See* 8 CFR 208.13(c)(6),

1208.13(c)(6). This section provides authority to the Attorney General and the Secretary to condition or limit asylum eligibility, consistent with the statute, but does not require any sort of conviction. Accordingly, the bar is consistent with the plain text of that section, and the Supreme Court cases cited by commenters are not specifically relevant.

The Departments disagree with the comment that conduct-based bars should be used only in "very limited circumstances," not including domestic assault or battery, stalking, or child abuse. As explained in the NPRM, the Departments believe that domestic violence is "particularly reprehensible because the perpetrator takes advantage of an 'especially vulnerable' victim." 84 FR at 69652 (quoting *Carillo* v. *Holder,* 781 F.3d 1155, 1159 (9th Cir. 2015)). Accordingly, the Departments emphasize that such conduct must not be tolerated in the United States, and the discretionary benefit of asylum, along with the numerous ancillary benefits that follow, will not be granted to aliens who engage in such acts. *See id.* Further, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(iv) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)– (iv)),[27] and the Departments believe it is

---

[26] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a

---

particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of these domestic violence-related bars at 8 CFR 208.13(c)(6)(vi), (vii), 1208.13(c)(6)(vi), (vii). *See* 84 FR at 69651–53. However, as stated in the proposed rule, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) provides underlying authority for all these provisions. 84 FR at 69652 (noting that, even if all of the proposed domestic violence offenses would not qualify as particularly serious crimes, convictions for such offenses—as well as engaging in conduct involving domestic violence that does not result in a conviction— "should be a basis for ineligibility for asylum under section 208(b)(2)(C) of the INA"). The Departments acknowledge that the proposed rule stated that the Attorney General and the Secretary were, in part, "[r]elying on the authority under section 208(b)(2)(B)(ii) of the INA." *Id.* at 69651. But the regulatory text of the new bar does not actually designate any additional offense as "particularly serious." The Departments thus clarify that the current bars are an exercise of the authority granted by section 208(b)(2)(C), and that the discussion of the "particularly serious crime" bar merely helps illustrate how the new bars are "consistent with" the statutory asylum scheme. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

[27] These provisions provide as follows: (1) INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) ("the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion"); (2) INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) ("there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the
Continued

appropriate to also enforce an asylum bar based on conduct involving domestic battery or extreme cruelty.

The rule does not violate the constitutional rights of aliens, nor does it offend constitutional principles referenced by the commenters. First, commenters incorrectly equated denial of a discretionary benefit to "criminal charges." The Departments will not bring "criminal charges" against aliens in this context; rather, the Departments will deny asylum based on certain convictions and conduct, in some limited instances, as stated in the NPRM and authorized by statute. *See* 84 FR at 69640.

The Departments disagree that the rule undermines the criminal justice system and constitutional due process protections in either the civil or criminal context. As an initial matter, aliens have no liberty interest in the discretionary benefit of asylum. *See Yuen Jin* v. *Mukasey,* 538 F.3d 143, 156–57 (2d Cir. 2008); *see also Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) (citing *DaCosta* v. *Gonzales,* 449 F.3d 45, 49–50 (1st Cir. 2006)); *cf. Hernandez* v. *Sessions,* 884 F.3d 107, 112 (2d Cir. 2018) (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko* v. *Ashcroft,* 392 F.3d 970, 971 (8th Cir. 2004) (finding that there is no right to effective assistance of counsel with regard to an asylum claim because an alien does not have a liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In other words, "[t]here is no constitutional right to asylum per se." *Mudric* v. *Mukasey,* 469 F.3d 94, 98 (3d Cir. 2006). Further, although aliens may choose to be represented by counsel, the government is not required to appoint counsel. INA 292 (8 U.S.C. 1362).

Second, the Departments reiterate that Congress authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The Departments exercise such authority in promulgating the provisions of the rule, 84 FR at 69652, that allow adjudicators to inquire into allegations of conduct to determine whether the conduct constitutes battery

or extreme cruelty barring asylum, similar to current statutory provisions requiring inquiry into other conduct-based allegations that may bar asylum. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)); *see also Meng* v. *Holder,* 770 F.3d 1071, 1076 (2d Cir. 2014) (considering evidence in the record to determine whether it supported the agency finding that an alien's conduct amounted to persecution, thus triggering the persecutor bar under INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). A similar inquiry is also conducted under INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) to determine immigration benefits for aliens who are battered or subjected to extreme cruelty. Hence, promulgating an additional conduct-based bar to asylum eligibility, even without a conviction, is consistent with and therefore not necessarily precluded by the INA.

The Departments disagree that the rule disproportionately penalizes innocent individuals, victims, and their spouses or children. First, the Departments emphasize the exceptions for aliens who have been battered or subjected to extreme cruelty and aliens who were not the primary perpetrators of violence in the relationship. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception protects qualified innocent individuals and their spouses or children from asylum ineligibility by providing that individuals whose crimes or conduct were based on "grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act [8 U.S.C. 1227(a)(2)(E)(i)–(ii)]" would nevertheless be not rendered ineligible for asylum if such individuals "would be described in section 237(a)(7)(A) of the Act [8 U.S.C. 1227(a)(7)(A)]." *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). Section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)), in turn, describes individuals who: (1) Were battered or subject to extreme cruelty; (2) were not the primary perpetrator of violence in the relationship; and (3) whose convictions were predicated upon conduct where the individual acted in self-defense, violated a protection order intended to protect that individual, or where the crime either did not result in serious bodily injury or was connected to the individual having been battered or subjected to extreme cruelty.

The Departments disagree with commenters' concerns that the provided exceptions are insufficient. To the extent that the commenters are concerned that individuals might not be able to avail themselves of the exception

because of a lack of awareness of the waiver or their eligibility for it, such concerns are unfounded. Just as aliens are currently informed of eligibility and other asylum requirements through the Act and regulations; the instructions to the I–589 application and the form itself; representatives or other legal assistance projects; or other sources, aliens will similarly be informed of the existence of this exception. The Departments encourage individuals to contact law enforcement if they experience domestic violence; however, potential resolutions to the sort of specific barriers referenced by the commenters are outside the scope of this rulemaking. It is the Departments' aim, however, that the exception to the bar would reduce such barriers.

In regard to commenters' concerns about cross arrests with no definite determinations made, the Departments note that the adjudicatory inquiry into whether acts constitute battery or extreme cruelty is in no way novel. *See, e.g.,* INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (providing for similar adjudicatory inquiry in the context of cancellation of removal). The Departments are confident in adjudicators' continued ability to conduct such inquiries, which include properly applying exceptions for innocent individuals. The Departments acknowledge that survivors are oftentimes vulnerable individuals. The bar and related exception are specifically promulgated to ensure that aliens with convictions for or who engage in conduct involving domestic assault or battery are ineligible for asylum, thereby reducing subsequent effects on vulnerable individuals.

The Departments may predicate asylum eligibility based on certain convictions or conduct under the statutory authority that allows them to limit or condition asylum eligibility. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Aliens may apply for immigration benefits for which they are eligible, and the INA affords various ancillary benefits in accordance with the specific relief granted. In other words, aliens are generally free to apply (or not to apply) for benefits, and then the relevant provisions of the statute are consistently applied. *See* 8 CFR 208.1(a)(1), 1208.1(a)(1). Accordingly, aliens may be "similarly situated," as phrased by the commenters, but whether "similarly situated" aliens choose to apply for the same benefits under the INA is not a decision for the Departments to make.

The Departments emphasize that the sufficiency of alternative forms of protection or relief, such as U

United States prior to the arrival of the alien in the United States"); and (3) INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) ("there are reasonable grounds for regarding the alien as a danger to the security of the United States").

nonimmigrant status and VAWA relief referenced by the commenters, varies in accordance with the unique facts in each case. For example, although some aliens may be unable to obtain the necessary law enforcement certification, many others are able to successfully meet all the necessary requirements. *See* 8 CFR 214.14. The Departments, however, reiterate that the new bar for convictions or conduct involving domestic assault or battery, stalking, or child abuse, contains an exception that is intended to ensure that innocent victims of violence are not rendered ineligible for asylum relief. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception demonstrates both the Departments' concern for domestic violence victims and their consideration of how best to address those victims' circumstances, and the Departments have concluded that—especially in light of countervailing considerations such as the need to protect the United States from the harms associated with domestic abusers—this exception is sufficient.

The Departments acknowledge the commenters' concerns regarding unintended consequences stemming from the rule. The Departments, however, reiterate that mere allegations alone would not automatically bar asylum eligibility. Rather, an adjudicator will consider the alleged conduct and make a determination on whether it amounts to battery or extreme cruelty, thereby triggering the bar to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vii),1208.13(c)(6)(vii) (proposed); *see also* 84 FR at 69652. Similar considerations are currently utilized in other immigration contexts, including other asylum provisions (INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) and removability (INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)). In conjunction with the exception at 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed), the Departments believe this inquiry is properly used in this context as well.

Commenters' allegations that the bar is too vague or broad to cover only offenses that constitute "particularly serious crimes" are irrelevant because, although the Departments possess statutory authority under section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii) to designate a "particularly serious crime," the Departments are also authorized to establish additional limitations or conditions on asylum. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The only requirement is that these limitations or conditions must be consistent with section 208 of the Act (8 U.S.C. 1158). Nothing in section 208 of the Act (8 U.S.C. 1158) conflicts with this rule.

The Departments also disagree with commenters who alleged that the rule requires adjudicators to have expertise in all State jurisdictions. The rule requires adjudicators to engage in a fact-based inquiry, and that inquiry accounts for the differences in State law regarding criminal convictions for offenses related to domestic violence. *See* 84 FR at 69652. Further, even if adjudicators must interpret and apply law from various jurisdictions, the Departments are confident that adjudicators will properly do so, as they currently do in other immigration contexts. *See, e.g.,* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (other asylum provisions); INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) (removability).

The Departments disagree that the exception is "insufficient" or "vague" or "place[s] a high burden on victims." The exception directly references and adapts the statutory requirements in INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)). In the interest of consistency and protection afforded to victims since its enactment, the exceptions to this categorical bar align with those enacted by Congress.

The Departments decline to evaluate the commenters' various examples. A proper inquiry is fact-based in nature; absent the entirety of facts for each unique case, various examples cannot be adequately addressed. The BIA has deemed some domestic violence offenses as "particularly serious crimes." *See* 84 FR at 69652 (providing such examples of BIA decisions). As explained in the proposed rule, that case-by-case approach fails to include all of the offenses enumerated in the rule, and it does not include conduct related to domestic violence. *Id.* Accordingly, the Departments believe this rule-based approach is preferable because it will facilitate fair and just adjudicatory results.

In addition, the Departments disagree with commenters that the bar is unnecessary. The Departments believe the bar and its exception establish important protections for vulnerable individuals, including those not at fault, and clarify the Departments' views on such reprehensible conduct. *See id.*

The rule does not conflict with or distort language in VAWA. The rule is solely applicable to eligibility for the discretionary benefit of asylum. The rule does not expound upon or specifically supplement VAWA. Rather, the rule adds categorical bars to asylum eligibility, clarifies the effect of certain criminal convictions—and, in one instance, abusive conduct that may not necessarily involve a criminal conviction—on asylum eligibility, and eliminates automatic reconsideration of discretionary denials of asylum. *See generally* 84 FR at 69640. The rule excludes from a grant of asylum and its many ancillary benefits aliens who have been convicted of certain offenses or engaged in certain conduct. Contrary to the commenters' remarks, the rule is not intended to exclude survivors of domestic violence; in fact, the preamble to the rule, 84 FR at 69652, provided an extensive explanation of the Departments' opposition to domestic violence, including an overview of various legislative and regulatory actions that seek to protect victims and to convey strong opposition to domestic violence. Moreover, the rule is fully consonant with other regulations, *see, e.g.,* 8 CFR 204.2(c)(1)(i)(E), designed to ensure that those who commit acts of domestic violence, even if they are not convicted, do not distort or undermine the immigration laws of the United States. Accordingly, although VAWA and the rule may not use the same approach, both are instrumental in the government's efforts to protect victims from domestic violence in the United States.

In that vein, the rule provides protection to victims of domestic violence by way of the exceptions to the bar in 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). The rule also conveys the Departments' opposition to domestic violence by denying asylum eligibility to aliens convicted of or who have engaged in such conduct so that abusers may not stay in the United States. *See* 84 FR at 69652.

Addressing commenters' concerns that the "life and safety" of aliens were "hanging in the balance," the Departments reiterate the alternative forms of relief or protection that may be available to applicants who are ineligible for asylum under the rulemaking—applicants may still apply for statutory withholding of removal or CAT protection. *See* 84 FR at 69642. Accordingly, the Departments disagree that a "vigorous burden of proof" is necessary in this context. On the contrary, asylum is a discretionary benefit in which the alien bears the burden of proof to demonstrate eligibility under the conditions and limitations Congress authorized the Departments to establish. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)).

To clarify the exception in 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed),

applicants need not be granted a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) to qualify for the exception. Rather, applicants must only satisfy one of the following criteria contained in the Act to the satisfaction of an adjudicator: (1) The applicant was acting in self-defense; (2) the applicant was found to have violated a protection order intended to protect the applicant; or (3) the applicant committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the applicant's having been battered or subjected to extreme cruelty. 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed); *see also* 84 FR at 69653. Together, the proposed rule and this final rule serve, in part, as notice to the public that such provisions exist— including the exception for applicants who are themselves victims. *See* 84 FR at 69640 (stating that this section of the **Federal Register** contains notices to the public of the proposed issuance of rules and regulations). Accordingly, just like other immigration benefits and relevant exceptions, aliens are on notice upon publication in the **Federal Register**.

Finally, the exceptions provided by 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) do not create an adversarial process. These provisions mirror the text of the statute except that aliens only need to satisfy the criteria, not be actually granted an exception. In this way, the exceptions as stated in the rule are arguably less stringent than the statutory exception. Further, the Departments remain confident that adjudicators will continue to properly apply the exceptions, regardless of commenters' concerns of how far removed adjudicators may be from the immediate circumstances of the conduct at issue. The exceptions are not intended to mitigate harm already suffered by survivors; rather, it is the Departments' hope that the exceptions ensure that the conduct of applicants who are actually victims of domestic violence does not bar their asylum eligibility. Accordingly, the Departments strongly disagree that the exceptions will inflict harm on survivors, as commenters alleged.

g. Document Fraud Misdemeanors

*Comment:* Numerous commenters opposed implementing a categorical limitation on eligibility for asylum for individuals convicted of Federal, State, tribal, or local misdemeanor offenses related to document fraud, stating that it would result in denial of meritorious asylum claims. *See* 8 CFR

208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1) (proposed). Commenters stated that some asylum applicants have necessarily and justifiably used false documents to escape persecution. Commenters stated that the NPRM ignored common circumstances related to convictions involving document fraud, such as when individuals flee their countries of origin with no belongings and "must rely on informal networks to navigate their new circumstances." Some commenters suggested that applicants' use of fraudulent documents in entering the United States can be linked to their financial means but did not offer further detail on that position. Commenters stated that it was "arbitrary and irrational" for the Departments to suggest that such conduct would render somebody unfit to remain in the United States or a threat to public safety.

Commenters also suggested that the proposed limitation contravened long-standing case law establishing that violations of the law arising from an asylum applicants' manner of flight should be just one of many factors to be considered in the exercise of discretion. *Matter of Pula,* 19 I&N Dec. at 474. Some commenters objected to the proposed limitation because it allegedly did not provide a sufficient exception for those who have unknowingly engaged in such conduct, such as those who have unknowingly obtained false documents from bad actors like unscrupulous notarios. Other commenters opposed the proposed limitation because it did not provide a sufficient exception for those who must use false documentation to flee persecution.

Some commenters recognized the NPRM's proposed exception to this limitation on asylum eligibility.[28] Commenters opined that the proposed exception was not sufficient, given the consequences for those who do not fit within the exception. Commenters stated that asylum seekers who obtain false documents when passing through a third country or who may be unable to prove that they fall within an

exception would be adversely affected by the proposed limitation.

Some commenters stated that the proposed exception was unrealistic given circumstances that could prevent asylum seekers from immediately claiming a fear of persecution, such as mistrust of government officials, language barriers, or trauma-induced barriers.

At least one commenter noted that traffickers routinely provide victims with false documents for crossing borders and that trafficking victims may be unable to explain the circumstances of their documentation to law enforcement. The commenter also noted that traffickers regularly confiscate, hide, or destroy their victims' documents to exert control over their victims and that trafficking victims often lack documentation. The commenter opined that trafficking victims were thus particularly vulnerable to bad actors who falsely claim that they can prepare legal documentation.

Commenters stated that the NPRM did not properly consider that some asylum seekers would be required to, or inadvertently, use false documents in the United States while their proceedings are pending, for example, in order to drive or work. Commenters suggested that continued availability of asylum protection to low-wage immigrant workers could encourage them to "step out of the shadows" when faced with workplace exploitation, dangers, and discrimination. By contrast, commenters stated, a categorical limitation would further incentivize some employers to hire and exploit undocumented workers where employers use aliens' immigration status against them and force asylum seekers "deeper into the dangerous informal economy." At least one commenter stated that DHS recently made it harder for asylum seekers with pending applications to survive without using fraudulent documents by proposing a rule that would extend the waiting period for asylum seekers to apply for work authorization from 180 days to one year.

At least one commenter suggested that the proposed limitation related to document-fraud offenses undermined an important policy objective to encourage truthful testimony by asylum seekers.

At least one commenter stated that there was a discrepancy between the Departments' reasoning that the use of fraudulent documents "so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense

---

[28] *See* 8 CFR 208.13(c)(6)(vi)(B)(1) and 1208.13(c)(6)(vi)(B)(1), which provide that a misdemeanor offense related to document fraud would bar eligibility for asylum unless the alien can establish (1) that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry.

to obtain the discretionary benefit of asylum'' and possible availability of adjustment of status for a document-fraud-related conviction if the conviction qualified as a petty offense or if the individual obtained a waiver of inadmissibility.

*Response:* The Departments have considered all comments and recommendations submitted regarding the bar to asylum eligibility for aliens with misdemeanor document fraud convictions. Despite commenters' concerns, the Departments continue to believe this exception is consistent with distinctions regarding certain document-related offenses as recognized by the BIA, *Matter of Pula,* 19 I&N Dec. at 474–75; existing statutes, *see* INA 274C(a)(6) and (d)(7) (8 U.S.C. 1324c(a)(6) and (d)(7)); and existing regulations, *see* 8 CFR 270.2(j) and 1270.2(j), as noted in the NPRM. *See* 84 FR at 69653; *cf. Matter of Kasinga,* 21 I&N Dec. 357, 368 (BIA 1996) (concluding that possession of a fraudulent passport was not a significant adverse factor where the applicant ''did not attempt to use the false passport to enter'' the United States, but instead ''told the immigration inspector the truth''). The Departments will not amend the bar as laid out in the proposed rule and will continue to rely on the justifications provided in the NPRM. *See* 84 FR at 69653.[29]

Further, offenses related to fraudulent documents that carry a potential sentence of at least one year are already aggravated felonies, and thus are disqualifying offenses for purposes of asylum. INA 101(a)(43)(P) (8 U.S.C. 1101(a)(43)(P)). Courts have recognized that proper identity documents are essential to the functioning of immigration proceedings. *See Noriega-Perez* v. *United States,* 179 F.3d 1166, 1173–74 (9th Cir. 1999). Furthermore, in passing the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 231, Congress acknowledged the critical role that identity documents play in protecting national security and public safety.

Regarding the commenters' concerns for aliens who may use fraudulent documents as a means to flee persecution or other harms, the Departments reiterate the exception for this bar in the rule for aliens who can establish (1) that the conviction resulted

from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry. 8 CFR 208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1).

The Departments agree with commenters that there are certain, limited circumstances under which an individual with a legitimate asylum claim might need to utilize fraudulent documents during his or her flight to the United States, and the Departments provided this exception to the bar to account for such circumstances. The Departments believe that the exception, as proposed in the NPRM, is sufficient to allow individuals who may have committed document-fraud offenses directly related to their legitimate claims of fear to apply for asylum. The Departments believe that this exception, which is consistent with the exception in INA 274C(d)(7), 8 U.S.C. 1324c(d)(7), allowing the Attorney General to waive civil money penalties for document fraud to an alien granted asylum or statutory withholding of removal, strikes the appropriate balance between recognizing the seriousness of document-fraud-related offenses, including the threat they pose to a functioning asylum system, and the very limited instances where a conviction for such an offense should not bar an applicant from eligibility for asylum.

The Departments disagree with concerns that aliens with viable asylum claims might not be able to either immediately disclose their fear of return at a port-of-entry or prove that they fall within an exception to the bar. DHS has, by regulation, established procedures for determining whether individuals who present themselves at the border have a credible fear of persecution or torture, 8 CFR 208.30, and officers who conduct the interviews are required by regulation to undergo ''special training in international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles,'' 8 CFR 208.1(b). Asylum officers are required to determine that the alien is able to participate effectively in his or her interview before proceeding, 8 CFR 208.30(d)(1), (5), and verify that the alien has received information about the credible fear process, 8 CFR

208.30(d)(2). The alien may consult with others prior to his or her interview. 8 CFR 208.30(d)(4). Such regulations are intended to recognize and accommodate the sensitive nature of fear-based claims and to foster an environment in which aliens may express their claims to an immigration officer.

The Departments disagree with the commenters that this bar to asylum is inconsistent with case law, particularly *Matter of Pula. See* 19 I&N Dec. at 474–75. The Departments first note that *Matter of Pula* pertains to how adjudicators should weigh discretionary factors in asylum applications. *Id.* This rule, by contrast, sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. Additionally, *Matter of Pula* stated that whether a fraudulent document offense should preclude a favorable finding of discretion depends on ''the seriousness of the fraud.'' *Id.* at 474. The Departments in this rule are clarifying that the disqualifying offenses, which as provided by the rule must have resulted in a misdemeanor conviction, are serious enough to preclude eligibility for asylum, and have provided an exception for those situations that the Departments have determined should not preclude eligibility.

The Departments further reject some comments as unjustified within the context of a law-abiding society. For example, criticizing the rule because it may discourage participation in criminal activity—*e.g.,* driving without a license—or other activity in violation of the law—*e.g.,* working without employment authorization—is tantamount to saying the Departments should encourage and reward unlawful behavior. The Departments decline to adopt such suggestions. More specifically, the Departments reject commenters' suggestions that the additional limitation should not apply to document-fraud-related offenses that stem from fraudulent driver's licenses or employment authorization. The Departments' position on this matter is both reasonable and justified. As explained in the NPRM, such offenses are serious, ''pos[ing] * * * a significant affront to government integrity'' and are particularly pernicious in the context of immigration law, where the use of fraudulent documents, ''especially involving the appropriation of someone else's identity, * * * strongly undermines government integrity.'' 84 FR at 69653. Commenters' concerns about how the rule might affect working conditions of aliens are beyond the scope of this rulemaking.

---

[29] The Departments also reject some comments as wholly unfounded. For example, there is no logical or factual indication that the rule, combined with a criminal conviction for document fraud necessary for the bar to apply, would subsequently cause an alien to commit another crime—*i.e.,* perjury—by testifying untruthfully while in immigration proceedings.

Congress has delegated its authority to the Departments to propose additional, *i.e.,* broader, limitations on the existing bars to asylum eligibility, so long as the additional limitations are consistent with the Act. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). The Departments are acting pursuant to their authority to create additional limitations on asylum eligibility and are not designating additional offenses as particularly serious crimes pursuant to INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), as discussed above. Accordingly, the Departments do not address commenters' concerns that the disqualifying offenses are not or should not be particularly serious crimes.

The Departments disagree with commenters' assertions that the rule would unfairly affect trafficking victims because traffickers force them to use fraudulent documents when they are crossing the border. The Departments recognize the serious nature of such circumstances, but they believe that considerations regarding criminal culpability for document-fraud-related offenses would be best addressed during criminal proceedings.

Finally, regarding commenters' points about the effect of document-fraud-related convictions in the context of adjustment of status under INA 245(a) (8 U.S.C. 1255(a)), the Departments note that adjustment of status is separate from asylum, and the rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum" eligibility). The adjustment of status conditions and consequent benefits are different from asylum. *See Mahmood* v. *Sessions,* 849 F.3d 187, 195 (4th Cir. 2017) (observing that, although "strong policies underlie" both asylum and adjustment of status, "[t]hese policies serve different purposes"). *Compare* INA 209(b) (8 U.S.C. 1159(b)) *and* 245(a) (8 U.S.C. 1255(a)), *with* INA 208 (8 U.S.C. 1158). The Departments do note, however, that, because adjustment of status is a discretionary form of relief, an alien's document-fraud-related conviction that would bar the alien from asylum eligibility under this rule could also separately be the basis for a denial of adjustment of status. *See, e.g., Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (instructing immigration judges to consider "whether the respondent's application for adjustment merits a favorable exercise of discretion" when considering whether to continue proceedings).

### h. Unlawful Public Benefits Misdemeanors

*Comment:* Commenters opposed the NPRM's proposed limitation on asylum eligibility based on convictions for misdemeanor offenses involving the "unlawful receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority." *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2). Commenters stated that this proposed limitation would disproportionately impact low-income individuals and people of color. Commenters stated that complex evaluations involving assets, income, household composition, and changing circumstances, such as employment or housing, could easily result in overpayments and miscalculations of benefits by both case workers for recipients and recipients themselves. Commenters asserted that these calculations could be especially confusing and difficult for low-income persons who may have literacy challenges, low education levels, or limited English proficiency.

One commenter stated that this proposed limitation was overbroad because there is no requirement that any convictions related to the unlawful receipt of public benefits be linked to fraud or require intentionality.

Commenters asserted that unlawful receipt of public benefits is not a "particularly serious crime." The commenters stated that the proposed limitation fails to differentiate between dangerous offenses and those committed out of desperation and observed that such offenses do not involve an element of intentional or threatened use of force. One commenter stated that the Departments' assertions that such offenses burden taxpayers and drain resources from lawful beneficiaries was not sufficient to render these offenses "particularly serious crimes." Specifically, the commenter stated that this was inconsistent with the intent of the Act and the 1967 Protocol, as well as BIA precedent, citing the following: United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.1.A.S. No. 6577, 606 U.N.T.S. 268 ("The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."); *Delgado,* 648 F.3d at 1110 (Reinhardt, J., concurring in part and concurring in the judgment) ("The agency's past precedential decisions also help to illuminate the definition of a 'particularly serious crime.' Crimes that the Attorney General has determined to be 'particularly serious' as a categorical matter, regardless of the circumstances of an individual conviction, include felony menacing (by threatening with a deadly weapon), armed robbery, and burglary of a dwelling (during which the offender is armed with a deadly weapon or causes injury to another). Common to these crimes is the intentional use or threatened use of force, the implication being that the perpetrator is a violent person." (footnotes omitted)).

Commenters stated that the Departments greatly overstated the scope of this issue and failed to support their assertions that such crimes are of an "inherently pernicious nature." *See* 84 FR at 69653. Commenters stated that, by contrast, "data demonstrates that the incidents of these types of fraud crimes are minimal. For example, the incidence of fraud in the Supplemental Nutrition Assistance Program is estimated at 1.5% for all incidents of fraud, including individuals of all citizenship categories and including both fraud committed by agencies, retailers/shops and individuals." *See* Randy Alison Aussenberg, Cong. Research Serv., R45147, *Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)* (2018), *https://fas.org/ sgp/crs/misc/R45147.pdf.*

*Response:* The Departments have considered all of the comments received, and have chosen not to make any changes to the NPRM's regulatory language establishing an additional limitation on asylum eligibility for individuals who have been convicted of an offense related to public benefits. *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2).

The Departments disagree with commenters who believe that the rule would unfairly impact low-income individuals. By contrast, the rule is designed to limit asylum eligibility for those who criminally take advantage of benefits designed to assist low-income individuals. The Departments recognize commenters' concerns that individuals might be unaware of the complex systems that might result in miscalculation and overpayment of benefits; however, the Departments believe that it would be more appropriate for criminal culpability for such offenses to be determined during criminal proceedings.

In response to comments that such offenses are not particularly serious crimes, the Departments again note that the Departments' authority to set forth additional limitations and conditions on asylum eligibility requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses be particularly serious crimes or involve any calculation of dangerousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). As discussed in the NPRM, limiting asylum eligibility for those who have been convicted of such offenses, which are of an "inherently pernicious nature," is consistent with previous Government actions to prioritize enforcement of the immigration laws against such offenders. 84 FR at 69653.

Regardless of the relative frequency of public benefits fraud, the Departments have concluded that convictions for such crimes, however often they occur, should be disqualifying for eligibility for the discretionary benefit of asylum. For example, the Departments are encouraged by the data cited by commenters indicating that the rate of fraud in certain programs may be low, but low rates of fraud do not support countenancing the abuse of public benefits by the remainder of the programs' participants.

i. Controlled Substance Possession or Trafficking Misdemeanors [30]

*Comment:* Commenters also opposed designation of misdemeanor possession or trafficking of a controlled substance or controlled-substance paraphernalia as categorical bars to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3) (proposed). Commenters asserted that the proposed limitation would be unnecessary, overbroad, and racially discriminatory.

Commenters remarked that the proposed limitation was overbroad with respect to the convictions and conduct covered and was not tailored to bar only those who have engaged in "serious" conduct or otherwise posed a danger to the community. Commenters also stated that the proposed limitation was overbroad because it did not account for jurisdictions that had decriminalized certain drugs, like cannabis.

Commenters said that, given the stakes at issue in asylum claims, protection should not be predicated on an applicant's abstinence from drugs. Commenters also stated that this proposed limitation was particularly inappropriate "at a time of such inconsistency in federal laws surrounding drug legalization." Commenters generally expressed concern about the Federal government's perpetuation of the "war on drugs."

Commenters stated that the proposed limitation would not make anybody safer but rather result in the denial of bona fide asylum claims. Commenters stated that the proposed limitation would "go beyond any common sense meaning" of the term "particularly serious crime." Commenters were particularly concerned with the implications of this proposed limitation because it would eliminate the opportunity for applicants to present mitigating circumstances that, commenters stated, are commonly associated with such convictions, such as addiction, self-medication, and any subsequent treatment or rehabilitation. Commenters asserted that the proposed limitation would improperly expand bars to asylum eligibility based on laws where enforcement decisions are "heavily tainted" by racial profiling.

Commenters also expressed concern that the proposed limitation would unfairly punish asylum seekers who might be vulnerable to struggles with addiction as a coping mechanism after facing significant trauma, particularly in light of obstacles to accessing medical or psychological treatment. Commenters stated that the proposed limitation eliminated any possibility of a treatment- and compassion-based approach to addiction. Commenters stated that the Departments' position on this matter was at odds with national trends to "move toward a harm reduction approach to combating drug and alcohol addiction." Some commenters noted that treatment of misdemeanor offenses relating to controlled substances, particularly with respect to offenses involving possession of marijuana or prescription drugs, was "wildly disproportionate to the severity of these offenses." One commenter asserted that these offenses do not have an element of violence or dangerousness and stated that the "only victims are the offenders themselves."

One commenter remarked that the Departments relied on "misleading evidence that does not create a link between dangerousness" and the disqualifying offense. The commenter stated that widespread opioid abuse is "rooted in over-prescription by healthcare providers based on the assurances of pharmaceutical companies" and does not serve as a relevant justification for the additional limitation.

One commenter stated that courts and statutes, including the Supreme Court, have treated varying simple possession drug offenses differently. For example, the commenter read the Supreme Court's decision in *Lopez* v. *Gonzales*, 549 U.S. 47 (2006), to mean that simple possession of a controlled substance is not a "drug trafficking crime unless it would be treated as a felony if prosecuted under federal law." The commenter also remarked that a single incident of simple possession of any controlled substance except for Flunitrazepam is not treated as a felony and is thus not considered an aggravated felony, *see* 21 U.S.C. 844; and that some second convictions for possession have been recognized as drug trafficking aggravated felonies, but not all, *see Carachuri-Rosendo* v. *Holder*, 560 U.S. 563, 566 (2010); *Berhe* v. *Gonzales*, 464 F.3d 74, 85–86 (1st Cir. 2006). The commenter asserted that the nuanced and varying assessments related to such offenses suggest "they do not merit blanket treatment of the same severity."

Some commenters objected to existing aggravated felony bars with respect to drug-related offenses in addition to the proposed limitation. Commenters stated that immigration judges should continue to be able to exercise discretion over those controlled-substance-related offenses that are not already subject to an existing bar to asylum. Commenters also generally objected to criminalizing possession of drugs for personal use, given the medical value and current inconsistent treatment among states, but no analysis was provided connecting these comments to the NPRM, specifically.

---

[30] In addition to the comments regarding the bar to asylum discussed in this section, multiple commenters shared their opinion that marijuana should be legalized, without reference to a particular provision of the proposed rule. The Departments note that broad questions of national drug policy, including the legalization of marijuana at the national or State level, are outside the scope of this rulemaking. Marijuana remains a controlled substance, with the resulting penalties that may flow from its possession, trafficking, or other activities involving it. *See* 21 CFR 1308.11 (Schedule I controlled substances).

*Response:* The Departments have considered all comments and recommendations submitted regarding the NPRM. The final rule does not alter the regulatory language set forth in the NPRM with respect to the limitation on misdemeanor offenses involving possession or trafficking of a controlled substance or controlled-substance paraphernalia. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3).

Consistent with the INA's approach toward controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), this rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. However, as discussed in the NPRM, the Departments have determined that possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." *Id.* Accordingly, the Departments made a policy decision to protect against such threats by barring asylum to such possessors and traffickers, and Federal courts have agreed with such treatment in the past. *See Ayala-Chavez* v. *U.S. INS,* 944 F.2d 638, 641 (9th Cir. 1991) ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood* v. *INS,* 803 F.2d 1165, 1167 (11th Cir. 1988))).

The Departments note that aliens barred from asylum eligibility as a result of this provision may still be eligible for withholding of removal under the Act or CAT protection, provisions that would preclude return to a country where they experienced or fear torture or persecution. *See* 84 FR at 69642.

The Departments disagree with comments suggesting that the bar is overbroad and not appropriately tailored only to aliens who have engaged in serious conduct or pose a danger to the community. Similarly, the Departments strongly disagree with commenters who asserted that this additional limitation will not make communities safer. Despite commenters' arguments, the Departments reiterate that controlled substance offenses represent significant and dangerous offenses that are damaging to society as a whole. *See Matter of Y–L–,* 23 I&N Dec. 270, 275 (A.G. 2002) (noting that "[t]he harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes"). The illicit use of controlled substances imposes

substantial costs on society from loss of life, familial disruption, the costs of treatment or incarceration, lost economic productivity, and more. *Id.* at 275–76 (citing *Matter of U–M–,* 20 I&N Dec. 327, 330–31 (BIA 1991) ("This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society.")); 84 FR at 69654; *see also* Office of Nat'l Drug Control Policy, *National Drug Control Strategy* 11 (Feb. 2020), *https:// www.whitehouse.gov/wp-content/ uploads/2020/02/2020-NDCS.pdf* (explaining, in support of the national drug control strategy, the devastating effects of drug use and the necessity for treatment that includes "continuing services and support structures over an extended period of time"). Increased controlled substance prevalence is often correlated with increased rates of violent crime and other criminal activities. *See* 84 FR at 69650 (explaining that perpetrators of crimes such as drug trafficking are "displaying a disregard for basic societal structures in preference of criminal activities that place other members of the community * * * in danger").

Even assuming, arguendo, the commenters are correct that such offenses do not reflect an alien's dangerousness to the same extent as those offenses that are formally designated "particularly serious crimes," the Departments' authority to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular level of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the

Secretary to establish a wide range of conditions on asylum eligibility, and the designation of certain drug-related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Further, as discussed at length in the NPRM, this additional limitation on asylum eligibility is consistent with the Act's treatment of controlled-substance offenses as offenses that may render aliens removable from or inadmissible to the United States. 84 FR at 69654.

### 4. Due Process and Fairness Considerations

*Comment:* The Departments received numerous comments asserting that the rule violates basic notions of fairness and due process. One commenter asserted that anything that makes the asylum process harder, which the NPRM does according to the commenter, is a denial of due process. Commenters claimed that the Departments' true goal in promulgating these rules is to reduce the protections offered by existing asylum laws and to erode "any semblance of due process and justice for those seeking safety and refuge in this country."

In addition to general objections regarding due process, commenters asserted various constitutional problems with the proposed rule. Citing *United States* v. *Davis,* 139 S. Ct. 2319, 2323 (2019), commenters specified that due process requires laws and regulations to "give ordinary people fair warning about what the law demands of them." These commenters argued that the proposed rule fails to give affected individuals fair notice of which offenses will bar asylum. Commenters also noted that equal protection principles require the government to treat similarly situated people in the same manner but averred that the proposed rule, as applied, would result in similarly situated applicants being treated differently.

Commenters stated that requiring immigration adjudicators to deny a legal benefit, even a discretionary one, based on alleged and uncharged conduct is a clear violation of the presumption of innocence, which the commenters

argued is a fundamental tenet of our democracy.

Commenters alleged that immigration proceedings are not the proper venue for the sort of evidentiary considerations required by the rule. Commenters argued that asylum applicants will not have the opportunity to be confronted by evidence or to contest such evidence in a criminal court. These commenters noted that criminal courts afford defendants additional due process protections not found in immigration court, such as the right to counsel, the right to discovery of the evidence that will be presented, and robust evidentiary rules protecting against the use of unreliable evidence.

Similarly, commenters alleged that, due to the "lack of robust evidentiary rules in immigration proceedings," many applicants would be unable to rebut negative evidence submitted against them, even if the evidence submitted is false. One commenter claimed, without more, that there is a high likelihood that such evidence is false. Commenters were concerned that unreliable evidence would be submitted in support of the application of the additional bars. Alternatively, commenters stated that immigration adjudicators might rely on evidence where a judicial court had already evaluated reliability and not credited the evidence based on a lack of reliability. In addition, commenters were concerned that the rule authorizes adjudicators to seek out unreliable evidence obtained in violation of due process to determine whether an applicant's conduct triggers the particularly serious crime bar.

Commenters were concerned that requiring applicants to disprove allegations of gang-related activity or domestic violence would result in re-litigation of convictions or litigation of conduct that fell outside the scope of prior convictions. Similarly, commenters were concerned that the rule violates due process because it requires adjudicators to consider an applicant's conduct, separate and apart from any criminal court decision, that may trigger a categorical bar to asylum. One commenter asserted that "people seeking asylum should have the right to be considered innocent until proven guilty, and should not be denied asylum based on an accusation." Moreover, commenters alleged that this consideration extends to whether a vacated or modified conviction or sentence still constitutes a conviction or sentence triggering the bar to asylum.

Commenters alleged that adjudicators might improperly rely on uncorroborated allegations in arrest reports and shield the ensuing decision from judicial review by claiming discretion. Commenters stated that the rule lacks safeguards to prevent such erroneous decisions.

Commenters expressed concern that asylum applicants, especially detained applicants, would struggle to find evidence related to events that may have occurred years prior to the asylum application. One organization noted that the rule would be particularly challenging for detained respondents because they often lack representation and would be required to rebut circumstantial allegations with limited access to witnesses and evidence.

The Departments also received numerous comments stating that asylum hearings, which typically last three or fewer hours, provide insufficient time to permit both parties to present full arguments on these complex issues, as effectively required by the rule, thereby resulting in due process violations.

One commenter raised due process and constitutional concerns if the rule fails to provide proper notice to the alien. In that case, commenters alleged that the Sixth Amendment right to "be accurately apprised by defense counsel of the immigration consequences of his guilty plea to criminal charges" applies but that the rule fails to account for those consequences.

*Response:* The rule does not violate notions of fairness or due process. As an initial matter, asylum is a discretionary benefit, as demonstrated by the text of the statute, which states the Departments "may" grant asylum, INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), and which provides authority to the Attorney General and the Secretary to limit and condition, by regulation, asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Courts have found that aliens have no cognizable due process interest in the discretionary benefit of asylum. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. Thus, how the Departments choose to exercise their authority to limit or condition asylum eligibility and an adjudicator's consideration of an applicant's conduct in relation to asylum eligibility do not implicate due process concerns.

The rule does not "reduce the protections offered by the asylum laws." In fact, the rule makes no changes to asylum benefits at all; rather, it changes who is eligible for such benefits. *See* 84 FR at 69640. Further, the rule is not intended to "erode" due process and justice for aliens seeking protection; instead, the rule revises asylum eligibility by adding categorical bars to asylum eligibility, clarifying the effect of certain criminal convictions and conduct on asylum eligibility, and removing automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. Although some of these changes may affect aliens seeking protection in the United States, these effects do not constitute a deprivation of due process or justice, and alternative forms of protection—withholding of removal under the Act along with withholding of removal or deferral of removal under the CAT regulations— remain available for qualifying aliens. *See* 84 FR at 69642.

Regarding commenters' concerns that the rule does not sufficiently provide notice to aliens regarding which offenses would bar asylum eligibility, the Departments first note that the publication of the NPRM and this final rule serves, in part, as notice to the public regarding which offenses bar asylum eligibility. *See* 5 U.S.C. 552. Courts have held that an agency's informal rulemaking pursuant to 5 U.S.C. 553 constitutes sufficient notice to the public if it "fairly apprise[s] interested persons of the 'subjects and issues' involved in the rulemaking[.]" *Air Transport Ass'n of America* v. *FAA,* 169 F.3d 1, 6 (D.C. Cir. 1999) (quoting *Small Refiner Lead Phase-Down Task Force* v. *EPA,* 705 F.2d 506, 547 (D.C. Cir. 1983)).

To the extent that commenters argued that the rule is insufficiently clear with regards to the substance of what offenses are disqualifying,[31] the Departments disagree. This rule clearly establishes which offenses bar asylum by listing such offenses in detail in the regulatory text at 8 CFR 208.13(c)(6)–(9) and 1208.13(c)(6)–(9). Unlike other statutory provisions that have been found unconstitutionally vague,[32] this rule clearly establishes grounds for mandatory denial of request for asylum. 8 CFR 208.13(c)(6)–(9), 1208.13(c)(6)–(9). The regulatory text adds paragraph (c)(7) to specifically define terms used

---

[31] *Cf. Dimaya,* 138 S. Ct. at 1225 ("Perhaps the most basic of due process's customary protections is the demand of fair notice.").

[32] For example, the Court in *Dimaya,* 138 S. Ct. at 1222–23, held that the Federal criminal code provision at issue was unconstitutionally vague in part because it failed to provide definitions for or explain such terms as "ordinary case" and "violent." On the other hand, the term "crime involving moral turpitude" has continuously been upheld as not unconstitutionally vague, despite repeated judicial criticism. *See, e.g., Islas-Veloz* v. *Whitaker,* 914 F.3d 1249, 1250 (9th Cir. 2019) ("the phrase 'crime involving moral turpitude' [is] not unconstitutionally vague").

in 8 CFR 208.13 and 1208.13, and the regulatory text otherwise references applicable definitions for terms not found in paragraph (c)(7). *See, e.g.,* 8 CFR 1208.13(c)(6)(iv)(A) (defining driving while intoxicated or impaired "as those terms are defined under the jurisdiction where the conviction occurred"). Further, just as the INA contains various criminal grounds for ineligibility without specified elements, *see generally* INA 101(a)(43) (8 U.S.C. 1101(a)(43)), here, the Departments have provided a detailed list of particular criminal offenses or related activities that would render an alien ineligible for asylum. Accordingly, despite the commenter's argument that the regulatory text fails to give "fair warning" of which offenses would bar asylum eligibility, the regulatory text is sufficiently clear to provide the public with the requisite notice. *See Davis,* 139 S. Ct. at 2323.

The Departments acknowledge the commenters' general equal protection concerns; however, without more detailed comments providing for the specific concerns of commenters, the Departments are unable to provide a complete response to these comments. The Departments note, however, that categorical bars to asylum apply equally to all asylum applicants and do not classify applicants on the basis of any protected characteristic, such as race or religion.

Immigration proceedings are civil in nature; thus constitutional protections for criminal defendants, including evidentiary rules, do not apply. *See INS* v. *Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984); *Dallo* v. *INS,* 765 F.2d 581, 586 (6th Cir. 1985); *Baliza* v. *INS,* 709 F.2d 1231, 1233 (9th Cir. 1983); *Longoria-Castaneda* v. *INS,* 548 F.2d 233 (8th Cir. 1977). In addition, any determinations regarding evidence or other related procedural issues by a criminal court do not automatically apply in a subsequent immigration proceeding or asylum interview. The Departments emphasize that the NRPM did not propose and the final rule does not enact any changes to the immigration court or asylum interview rules of procedure or evidentiary consideration processes. Accordingly, adjudicators will continue to receive and consider "material and relevant evidence," and it is the adjudicator who determines what evidence so qualifies. 8 CFR 1240.1(c). Immigration adjudicators regularly consider and receive evidence regarding criminal offenses or conduct in the context of immigration adjudications, including asylum applications, where such evidence has been frequently considered as part of the "particularly

serious crime" determination or as part of the ultimate discretionary decision. *Cf. Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (holding that aliens convicted of violent or dangerous offenses generally do not merit asylum as a matter of discretion).

Many of the commenters' concerns rely on circumstances that are purely speculative or that are only indirectly implicated by the rule. For example, commenters' concerns regarding an alien's hypothetical inability to confront evidence require first that concerning evidence is at issue, that such evidence is false, and finally that the alien is unable (for reasons unspecified by commenters) to rebut such evidence. Likewise, commenters' concerns regarding evidence supporting the bars rest on the premise that such specific evidence is submitted in the future, that such evidence has not been tested, and that such evidence is thus unreliable. Regarding these concerns, the Departments are unable to comment on speculative examples.

In regard to commenters' concerns about the reliability determinations of evidence already made by judicial courts, the regulations require that immigration judges consider material and relevant evidence. *See* 8 CFR 1240.1(c). Immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). The rule does not undermine or revise that standard; thus, commenters' concerns are unwarranted.

In general, commenters' concerns are no different than existing concerns regarding the reliability of evidence submitted by aliens in asylum cases, which is generally rooted in hearsay, frequently cannot be confronted or rebutted, and is typically uncorroborated except by other hearsay evidence. *See, e.g., Angov* v. *Lynch,* 788 F.3d 893, 901 (9th Cir. 2015) ("The specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for [DHS] to present evidence 'refuting or in any way contradicting' petitioner's testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative—that the incidents petitioner alleges did not happen." (quoting *Abovian* v. *INS,* 257 F.3d 971, 976 (9th Cir. 2001) (Kozinski, J., dissenting from denial of petition for

rehearing en banc))); *Mitondo* v. *Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008) ("Most claims of persecution can be neither confirmed nor refuted by documentary evidence. Even when it is certain that a particular incident occurred, there may be doubt about whether a given alien was among the victims. Then the alien's oral narration must stand or fall on its own terms. Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials."). Asylum adjudicators are well experienced at separating reliable from unreliable evidence, regardless of its provenance, and this rule neither inhibits their ability to do so nor changes the process for assessing evidence.

Further, as discussed in the preamble to the proposed rule, the rule contemplates the consideration of all "reliable" evidence and authorizes adjudicators to assess all "reliable" evidence. 84 FR at 69649 and 69652. The rule does not encourage adjudicators to "seek out unreliable evidence," as commenters alleged. Accordingly, the Departments disagree with commenters that adjudicators will improperly rely on information in arrest reports that the adjudicators have determined is unreliable, and the Departments further disagree that adjudicators would seek to protect such decisions by claiming discretion.

As explained in section II.C.2.a.i, the rule establishes limits and conditions on asylum eligibility; it does not add offenses to the "particularly serious crime" bar. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6) (both using prefatory language that reads "[a]dditional limitations on eligibility for asylum"). To the extent that commenters' concerns relate specifically to the "particularly serious crime" bar, the Departments decline to respond because those concerns are outside the scope of this rulemaking.

Regarding commenters' concerns that the domestic violence and gang-related bars to asylum eligibility would violate due process due to the requirement that the adjudication re-litigate the offense or consider conduct separate and apart from a criminal conviction, the Departments first note that there has never been a prohibition on the consideration of conduct when determining the immigration consequences of an offense or action.[33]

---

[33] To the extent the issues raised by commenters relate to the domestic violence provision of the rule that is not based on a criminal conviction, the Departments note that regulations have considered

Further, the consideration of conduct in this manner matches certain bars to admissibility or bases of deportability under the INA. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (instructing that an alien who the relevant official "knows or has reason to believe * * * is or has been an illicit trafficker in any controlled substance" is inadmissible); INA 212(a)(2)(H) (8 U.S.C. 1182(a)(2)(H)) (instructing that an alien who the relevant official "knows or has reason to believe is or has been * * * a trafficker in severe forms of trafficking in persons" is inadmissible); INA 237(a)(2)(F) (8 U.S.C. 1227(a)(2)(F)) (instructing that an alien described in section 212(a)(2)(H) of the Act (8 U.S.C. 1182(a)(2)(H)) is deportable); *see also, e.g., Lopez-Molina* v. *Ashcroft,* 368 F.3d 1206, 1207–08 & n.1 (9th Cir. 2004) (explaining that the immigration judge found the respondent removable due to a reason to believe he was a controlled substance trafficker on account of a prior arrest report and information surrounding his conviction for misprision of a felony). In addition, the consideration of the alien's conduct in these circumstances is consistent with the consideration of conduct when reviewing a circumstance-specific ground of removability or deportability. *See Nijhawan,* 55 U.S. at 38.

Further, as discussed above, the rule does not violate due process because asylum is a discretionary benefit that does not implicate a liberty interest. *See Yuen Jin,* 538 F.3d at 156–57 (collecting cases); *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50); *cf. Hernandez,* 884 F.3d at 112 (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko,* 392 F.3d at 971 (finding that an alien has no right to effective assistance of counsel with regard to an asylum claim because there is no liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In addition, aliens may provide argument and evidence that they are not subject to an asylum bar. *See* 8 CFR 1240.8(d) (providing that the alien bears the burden of proof to show that a basis for mandatory denial does not apply); *see also* 84 FR at 69642.

Finally, commenters' Sixth Amendment concerns, including the

similar conduct in the context of immigration law for nearly 25 years with no recorded challenges to the provisions of 8 CFR 204.2(c)(1)(i)(E) as a violation of due process.

presumption that a person is "innocent until proven guilty" are inapposite. The protections afforded by that amendment apply to criminal defendants, and asylum applicants in immigration proceedings are not criminal defendants. *See, e.g., Ambati* v. *Reno,* 233 F.3d 1054, 1061 (7th Cir. 2000) ("Deportation hearings are civil proceedings, and asylum-seekers, therefore, have no Sixth Amendment right to counsel."); *Lavoie* v. *Immigration and Naturalization Service,* 418 F.2d 732, 734 (9th Cir. 1969) ("[D]eportation proceedings are civil and not criminal, in nature, and [] the rules * * * requiring the presence of counsel during interrogation, and other Sixth Amendment safeguards, are not applicable to such proceedings."); *Lyon* v. *U.S. Immigr. and Customs Enf't,* 171 F. Supp. 3d 961, 975 (N.D. Cal 2016) ("[T]he Ninth Circuit has never so held, and the Court is reluctant to so interpret the INA absent any indication that Congress intended to import full Sixth Amendment standards into the INA.").

The Departments maintain that they have correctly concluded that convictions pursuant to expunged or vacated orders or modified sentences remain effective for immigration purposes if the underlying reason for expungement, vacatur, or modification was for "rehabilitation or immigration hardship." *Matter of Thomas and Thompson,* 27 I&N Dec. at 680; *see also* 84 FR at 69655. Courts also support this principle, stating that it is "entirely consistent with Congress's intent * * * [to] focus[ ] on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question)" and to "impose[ ] uniformity on the enforcement of immigration laws." *Saleh,* 495 F.3d at 24.

Next, contrary to commenters' concerns, this rule does not violate principles such as being "innocent until proven guilty." Convictions and sentences are not re-litigated during immigration proceedings. Rather, convictions and sentences at issue in immigration proceedings have already been determined in a separate hearing, consistent with due process, and "[l]ater alterations to that sentence that do not correct legal defects[ ] do not change the underlying gravity of the alien's action." *Matter of Thomas and Thompson,* 27 I&N Dec. at 683. Congress determined that immigration consequences should attach to an alien's original conviction and sentencing, pursuant to section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)). *See id.* Thus, the Departments do not deprive an alien of due process or presume guilt when an

alien's conviction or sentence, if expunged, vacated or modified for rehabilitation or immigration purposes, remains effective for immigration proceedings, including asylum adjudications, because such an expungement, vacatur, or modification does not call into question whether the underlying criminal proceedings themselves complied with due process.

The Departments once again reiterate their statutory authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). In accordance with that authority, the Departments promulgated the NPRM and believe that the provisions of this final rule are sufficient without commenters' recommended safeguards.

Finally, issues involving evidence gathering are beyond the scope of this rulemaking. For issues regarding representation, *see* section II.C.6.h. The Departments disagree that hearings lack sufficient time for both parties to present arguments. *See* Office of the Chief Immigration Judge, *Immigration Court Practice Manual,* 68–69 (Mar. 17, 2020), *https://www.justice.gov/eoir/page/file/1258536/download* (noting that, at a master calendar hearing, a respondent should be prepared "to estimate (in hours) the amount of time needed to present the case at the individual calendar hearing"). Moreover, if parties believe additional time is needed, the regulations provide a mechanism for them to seek additional time through a motion for continuance. *See* 8 CFR 1003.29.

## 5. Insufficient Alternative Protection From Removal

*Comment:* The Departments received numerous comments alleging that withholding of removal under the Act and protection under the CAT regulations are insufficient alternative forms of protection for individuals barred from asylum pursuant to the proposed rule. Overall, commenters believed that refugees "should not be required to settle for these lesser forms of relief." Commenters averred that the availability of these forms of protection does not justify the serious harm caused by the proposed rule's "overly harsh and broad limits on asylum." Specifically, statutory withholding of removal and protection under the CAT regulations are much narrower in scope and duration than asylum and require applicants to establish a higher burden of proof. One commenter noted that, even if an applicant was able to meet the higher burden of proof for statutory withholding of removal or protection

under the CAT regulations, the individual would not then be accorded the benefits required by the Refugee Convention.

Commenters cited a number of limitations imposed on recipients of these forms of protection to demonstrate why they are insufficient alternatives to asylum. For example, commenters expressed concern regarding the prohibition on international travel for recipients of statutory withholding of removal and CAT protection. Commenters noted that, unlike recipients of asylum, these individuals are not provided travel documents. At the same time, because these individuals have been ordered removed but that removal has been withheld or deferred, any international travel would be considered a "self-deportation," foreclosing any future return to the United States. Commenters stated that this conflicts with the Refugee Convention, which requires that contracting states issue travel documents for international travel to refugees lawfully staying in their territory.

Commenters also claimed the proposed rule contravenes the Refugee Convention by failing to ensure "that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country." Commenters alleged that individuals who are granted statutory withholding of removal or protection under the CAT regulations would be unable to reunite with family in the United States because these forms of relief do not allow the recipient to petition for derivative beneficiaries. Due to this, commenters stated that the proposed rule instituted another formal policy of family separation that permanently separate spouses and children from their family members.

Commenters also stated that the proposed rule would lead to additional forms of family separation because spouses and minor children who traveled with the primary asylum seeker would still need to establish individual eligibility for statutory withholding of removal or protection under the CAT regulations because there is no derivative application available in such circumstances. Also, commenters expressed concern that, without the ability to petition for additional family members, the proposed rule would force family members who remain in danger abroad to make the journey to the United States alone, likely endangering children who might be forced to make the journey as unaccompanied minors.

As another example of the lesser benefits of statutory withholding of removal and protection under the CAT regulations, commenters noted that recipients of withholding of removal must apply annually for work authorization. Commenters explained that individuals not only have to pay for these work authorization applications, but also face delays in adjudication of work authorization applications, which often results in the loss of legal authorization to work.

Similarly, commenters noted that recipients of statutory withholding of removal or protection under the CAT regulations may lose access to Federal public benefits, including "supplemental security income, food stamps, Medicaid, and cash assistance." Commenters expressed concern that, although recipients of withholding of removal may be eligible for a period of seven years to receive Federal means-tested public benefits, after seven years, the presumption is that the alien would have adjusted status. However, because recipients of withholding of removal are not provided a pathway to lawful permanent residency, commenters expressed concern that vulnerable individuals such as those who are disabled or elderly would be at risk of losing those public benefits.

Commenters also noted that recipients of statutory withholding of removal and protection under the CAT regulations remain in a tenuous position because they are not granted lawful status to remain in the United States indefinitely. Commenters averred that this contravenes the Refugee Convention by failing to "as far as possible facilitate the assimilation and naturalization of refugees." Recipients of statutory withholding of removal or protection under the CAT regulations may have their status terminated at any time based on a change in the conditions of their home country. Commenters explained that, because these individuals have no access to permanent residence or citizenship, they may be required to check in with immigration officials periodically. Commenters claimed that, at these check-ins, individuals may be required to undergo removal to a third country to which the individual has no connection.

Because of the constant prospect of deportation or removal, commenters stated that recipients of withholding of CAT protection are in a constant state of uncertainty. This uncertainty, commenters alleged, is particularly harmful to asylum seekers who have experienced severe human rights abuses. Commenters argued that certainty of a safe place to live forever

is one of the most important aspects of the treaties establishing the refugee system. Commenters claimed that uncertainty and limbo discourage recipients from establishing connections to the United States, which in turn generates community instability. Commenters alleged that a lack of community stability will result in increased criminal activity as individuals are less incentivized to invest in the community or keep the community safe. Additionally, this uncertainty may reduce the incentive for individuals to invest in their community by, for example, opening businesses, hiring others, or paying taxes.

Commenters were concerned that increasing the population of people who are ineligible to receive asylum may create a cohort of individuals who will later need a "legislative fix" to adjust their status and grant them full rights as citizens.

Finally, commenters noted that both statutory withholding of removal and protection under the CAT regulations require a higher burden of proof than asylum. Commenters explained that asylum requires only that the applicant demonstrate at least a 10 percent chance of being persecuted if removed. Withholding of removal, either under the Act or under the CAT regulations, however, requires the applicant to demonstrate that it is more likely than not that he or she would be persecuted or tortured if returned—*i.e.*, he or she must show a more than fifty percent chance of being persecuted or tortured if removed. Commenters noted that, because of this higher burden of proof, an applicant may have a valid and strong asylum claim but be unable to meet the burden for statutory withholding of removal or protection under the CAT regulations. As a result, commenters alleged that an individual may be returned to a country where he or she would face persecution or even death.

Commenters averred that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations.

*Response:* The Departments maintain that statutory withholding of removal under the Act and protection under the CAT regulations are sufficient alternatives for individuals who are barred from asylum by one of the new bars. As stated, asylum is a discretionary form of relief subject to regulation and limitations by the Attorney General and the Secretary. *See*

INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Significantly, the United States implemented the non-refoulement provisions of Article 33(1) of the Refugee Convention and Article 3 of the CAT through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41; *see also* 8 CFR 208.16 through 208.1; 1208.16 through 1208.18.

As recognized by commenters, asylum recipients are granted additional benefits not granted to recipients of statutory withholding of removal or CAT protection. Although the Attorney General and the Secretary are authorized to place limitations on those who receive asylum, it is Congress that delineates the attendant benefits to receiving relief or protection under the INA. *See, e.g.,* INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)) (asylees cannot be removed and can travel abroad without prior consent); INA 208(b)(3) (8 U.S.C. 1158(b)(3)) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b) (8 U.S.C. 1159(b)) (allowing the Attorney General or the Secretary to adjust the status of an asylee to that of a lawful permanent resident). Commenters identified various benefits that would be denied to individuals who receive statutory withholding of removal or protection under the CAT regulations as opposed to asylum. Congress chose not to provide the identified immigration benefits to recipients of statutory withholding of removal under the Act or protection under the CAT regulations. Congress, of course, may always revisit its decision; however, that is not the proper role of the Executive Branch.

Moreover, the United States is not required under U.S. law to provide the benefits identified by commenters to all individuals who seek asylum. For example, the valuable benefit of permanent legal status is not required under the United States' international treaty obligations.

In addition, recipients of statutory withholding of removal are eligible for numerous public benefits. Specifically, recipients of statutory withholding are eligible for Supplemental Security Income ("SSI"), the Supplemental Nutrition Assistance Program ("SNAP," also known as food stamps), and Medicaid for the first seven years after their applications are granted,[34] and for

Temporary Assistance to Needy Families ("TANF") during the first five years after their applications are granted.[35] Although asylees are eligible for additional benefits administered by HHS and ORR, the Departments believe that it is reasonable to exercise their discretion under U.S. law to limit these benefits to asylum recipients who do not have or who have not been found to have engaged in the sort of conduct identified in the bars to asylum eligibility being implemented in this rule because doing so incentivizes lawful behavior.

Commenters' assertions that statutory withholding of removal and protection under the CAT regulations essentially trap individuals in the United States is misplaced. Although an individual who has been granted these forms of protection is not guaranteed return to the United States if he or she leaves the country, these forms of protection do not prevent individuals from traveling outside the United States. *See Cazun,* 856 F.3d at 257 n.16.

To the extent commenters raised concerns that recipients of statutory withholding and CAT protection must apply annually for work authorization, the United States is permitted to place restrictions on work authorization. As required by Article 17 of the Refugee Convention, the United States must accord refugees "the most favourable treatment accorded to nationals of a foreign country in the same circumstances." Individuals who have received a grant of withholding of removal or protection under the CAT regulations are not in the same position as an individual who has been granted lawful permanent resident status. Rather, these individuals have been ordered removed and had their removal withheld or deferred pursuant to a grant of withholding of removal or protection under the CAT regulations. The United States has opted to grant these individuals work authorization, despite their lack of permanent lawful status. However, because these individuals are not accorded permanent lawful status, the United States has determined that they must submit a yearly renewal for that work authorization.

Significantly, although the burden of proof to establish statutory withholding of removal or protection under the CAT regulations is higher than to establish asylum, this burden remains in compliance with the Protocol and Refugee Convention, which require that

"[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion," and Article 3 of the CAT, which similarly requires that "[n]o State Party shall expel, return * * * or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." As explained by the Supreme Court with respect to statutory withholding of removal, the use of the term "would" be threatened as opposed to "might" or "could" indicates that a likelihood of persecution is required. *Stevic,* 467 U.S. at 422. Citing congressional intent to bring the laws of the United States into compliance with the Protocol, the Court concluded that Congress intended withholding of removal to require a higher burden of proof and that the higher burden complied with Article 33 of the Refugee Convention. *Id.* at 425–30. Similarly, the "burden of proof for an alien seeking CAT protection is higher than the burden for showing eligibility for asylum." *Lapaix* v. *U.S. Att'y Gen.,* 605 F.3d 1138, 1145 (11th Cir. 2010). As with statutory withholding of removal and the risk of persecution, the burden of proof for CAT protection and the risk of torture is "more likely than not." *Compare* 8 CFR 1208.16(b)(2) (statutory withholding), *with* 1208.16(c)(2) (CAT protection).[36]

In response to commenters who asserted that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations, the Departments note that such an assessment would not be feasible. The Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions or pertinent criminal conduct that would be subject to the bars added by this rule. Without this data, the

---

[34] 8 U.S.C. 1612(a)(1), (a)(2)(A)(iii), (a)(3) (SSI & SNAP); 8 U.S.C. 1612(b)(1), (b)(2)(A)(i)(III), (b)(3)(C) (Medicaid).

[35] 8 U.S.C. 1612(b)(1), (b)(2)(A)(ii)(III), (b)(3)(A)–(B) (TANF and Social Services Block Grant); 8 U.S.C. 1622(a), (b)(1)(C); 8 U.S.C. 1621(c) (state public assistance).

[36] The burden associated with the CAT regulations is consistent with congressional intent. As the Third Circuit has noted, the U.S. Senate gave its advice and consent to ratification of the CAT subject to several reservations, understandings, and declarations, including that the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *Auguste,* 395 F.3d at 132.

Departments cannot reliably estimate the population affected by this rule. In addition, even with these statistics, it is impossible to accurately predict in advance whether immigration judges would grant these individuals statutory withholding of removal or protection under the CAT regulations due to the fact-bound nature of such claims, the various factors that must be established for each claim (*e.g.,* credibility), independent nuances regarding the claim, evidence submitted, and myriad other factors.

### 6. Policy Concerns

#### a. Unfair, Cruel Effects on Asylum Seekers

*Comment:* Commenters opposed the rule because, among many reasons, they alleged that it imposes unfair, cruel effects on aliens who would otherwise be eligible for asylum. Commenters alleged that the rule constitutes an "unnecessary, harsh, and unlawful gutting of [ ] asylum protections." Commenters also alleged that the rule disadvantages asylum seekers because, in comparison to other forms of relief, no waiver of inadmissibility is available to waive misdemeanor convictions, rendering asylum "disproportionately and counterintuitively more difficult to obtain for some of the most vulnerable people." Many commenters were also concerned that the rule denies protection to people who most need it and whom the asylum system was designed to protect. For those people, commenters stated, asylum is their "only pathway to safety and protection."

Many commenters expressed opposition to the rule by claiming that the rule will exclude bona fide refugees from asylum eligibility. Relatedly, commenters also opposed the rule because they alleged that it prevents aliens from presenting meritorious, legitimate claims. Overall, most commenters asserted that the consequence of asylum ineligibility was "disproportionately harsh." In support, commenters provided various examples of offenses that would, in their view, unjustly render an alien ineligible for asylum under the rule: An alien in Florida who stole $301 worth of groceries; an alien with two convictions for DUI, regardless of whether the alien seeks treatment for alcohol addiction or the circumstances of the convictions; an alien defensively seeking asylum who has been convicted of a document fraud offense related to his or her immigration status; or a mother convicted for bringing her own child across the southern border seeking safety.

Commenters alleged that aliens seeking asylum are typically fleeing persecution or death, so ineligibility based on such minor infractions constitutes "punishment that clearly does not fit the crime." As stated by one commenter, "Congress designed our current laws to provide a safe haven for asylum seekers and their immediate family members who are still in danger abroad. If an asylum claim is denied, those individuals may be killed, tortured, or subjected to grave harm after being deported."

Commenters also opposed the rule by claiming that it bars asylum for aliens "simply accused" of engaging in battery or extreme cruelty; commenters believed it to be unfair that the rule could bar asylum based on conduct without a conviction.[37] Commenters opposed barring asylum relief based on "mere allegations" without any "adjudication of guilt." One commenter stated that the rule exceeds the scope of the Act because, the commenter claimed, the INA allows asylum bars to be based only on convictions for particularly serious crimes.

Many commenters expressed opposition to a wide range of issues related to asylum seekers. One commenter expressed concern with the treatment of immigrants, stating that mistreatment "increases blood pressure, diabetes, and risks for acute crises like heart attacks[,] which harm immigrant communities and negatively impact our healthcare system." Another commenter expressed opposition to the United States' allocation of resources, stating that the redirection of tax cuts and expanded military budgets could help to assist asylum seekers. Others more broadly expressed general opposition to family separation without relating that concern to this rule.

*Response:* The Departments disagree that the rule "guts" asylum protections or that the rule affects otherwise eligible asylum applicants in an unfair or otherwise cruel manner. First, as discussed elsewhere, asylum is a discretionary form of relief. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)). Accordingly, aliens who apply for asylum must establish that they are statutorily eligible for asylum and merit a favorable exercise of discretion. *See id.;* INA 240(c)(4)(A) (8 U.S.C. 8 U.S.C. 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. 316, 345 n.12 (A.G. 2018), *abrogated on other grounds by Grace* v. *Whitaker,* 344 F. Supp. 3d 96, 140

(D.D.C. 2018), *aff'd in part, Grace* v. *Barr,* 965 F.3d 883 (D.C. Cir. 2020). Over time, Congress, the Attorney General, and the Secretary have established various categories of aliens who are barred from asylum and have established additional limitations and conditions on asylum eligibility in keeping with the Departments' congressionally provided authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)); *see also* 84 FR at 69641.

Rather than "gut" asylum protections, the rule narrows asylum eligibility by adding categorical bars for aliens who have engaged in certain criminal conduct that the Departments have determined constitutes a disregard for the societal values of the United States; clarifies the effect of criminal convictions on asylum eligibility; and removes reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments establish these changes as additional limitations and conditions on asylum eligibility, pursuant to their statutory authority in sections 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Further, the Departments promulgate this rule to streamline determinations for asylum eligibility so that those who qualify for and demonstrate that they warrant a favorable exercise of discretion might be granted asylum and enjoy its ancillary benefits in a more timely fashion. Given the rule's clarified conditions and limitations on asylum eligibility, the Departments anticipate more timely adjudications for two reasons. First, non-meritorious claims will more quickly be resolved because the rule eliminates the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, thereby freeing up time and resources that can be subsequently allocated towards adjudication of meritorious asylum claims. Second, the Departments believe that, because fewer people would be eligible for asylum, fewer applications may be filed overall, thereby reducing the total number of asylum applications requiring adjudication. As a result, the Departments could allocate their time and resources to asylum applications that are more likely to be meritorious. In this way, the rule does not eliminate protection for those who need it most or the benefits available to asylees; instead, it may actually allow for those people to more quickly receive protection.

In response to commenters who claim that the rule prevents aliens from seeking asylum who otherwise have meritorious claims, the Departments

---

[37] Further discussions of comments specifically regarding allegations of gang-related activity and domestic violence are contained in sections II.C.3.d and II.C.3.f, respectively.

emphasize that the rule changes asylum eligibility. Accordingly, despite commenters' assertions, an alien who is ineligible under the provisions of this rule would not, in fact, have a meritorious claim.

The Departments do not believe that the examples of misdemeanors that commenters provided in response to the request for public feedback about whether the proposed rule was over-inclusive warrant altering the scope of the proposed rule. Regarding certain referenced examples, the Departments strongly disagree that the rule employs too harsh a consequence or that the "punishment does not fit the crime." The bars articulated in this rule indicate the Departments' refusal to harbor individuals who have committed conduct that the Departments have determined is undesirable. This is not a punishment. For example, the Departments strongly oppose driving under the influence and disagree that two DUI convictions, regardless of the circumstances or harm caused to others, do not warrant ineligibility for asylum. As previously stated, driving under the influence represents a blatant disregard for the laws of the United States. Further, the Departments disagree that document fraud does not warrant ineligibility for asylum, as it undermines the integrity of our national security and the rule of law. Overall, the Departments disagree that such examples demonstrate that revision of the rule is warranted.

The Departments further disagree that the rule disadvantages asylum seekers by failing to provide a waiver of inadmissibility for misdemeanor convictions. No such waiver is required by statute in the asylum eligibility context. Further, the Departments reiterate that alternative forms of relief or protection may still be available for aliens who are ineligible for asylum under the rule. *See* 84 FR at 69658 (explaining that an alien will still be eligible to apply for statutory withholding of removal or protection under regulations implementing U.S. obligations under Article 3 of the CAT); *see also* INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16 through 208.18; 1208.16 through 1208.18; *cf. Negusie* v. *Holder*, 555 U.S. 511, 527–28 (2009) (Scalia, J. and Alito, J., concurring) (noting that, if asylum is denied under the persecutor bar to an alien who was subject to coercion, that alien "might anyway be entitled to protection under the Convention Against Torture"). Accordingly, aliens who are ineligible for asylum under the rule will not "automatically" be returned to countries where they fear

persecution or torture, contrary to commenters' assertions.

The Departments emphasize that the rule changes the asylum eligibility regulations, but it does not affect the regulatory provisions for refugee processing under 8 CFR parts 207, 209, 1207, and 1209. Further, it does not categorically exclude "bona fide refugees" from the United States.

The INA does not preclude conduct-based bars. In fact, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(v) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(v)). Thus, commenters' concerns that the rule exceeds the scope of the statute are unwarranted, and the Departments choose, pursuant to statutory authority, to condition and limit asylum eligibility using conduct-based bars.

Relating to commenters' general humanitarian concerns for asylum seekers, such concerns are outside of the scope of this rulemaking, and the Departments decline to address them. Whether the current statutory framework appropriately addresses all aspects of the problems faced by aliens seeking asylum is a matter for Congress; here, the Departments merely exercise their authority under the discretion afforded to them by the existing statutes.

b. Incorrect Assumptions Regarding Criminal Convictions

*Comment:* Commenters alleged that the Departments promulgated the proposed rule based on incorrect assumptions regarding criminal convictions. Generally, commenters asserted that a conviction, without more, is both an unreliable predictor of future danger and an unreliable indicator of past criminal conduct. As an example, commenters stated that an alien may plead guilty to certain crimes to avoid the threat of a more severe sentence.

Commenters also asserted that not every noncitizen convicted of a crime punishable by more than one year in prison constitutes a danger to the community, which relates to the more general proposition advanced by commenters that the length of a sentence does not necessarily correlate with the consequential nature of the crime. One commenter mentioned that innocence and biased enforcement concerns underlie convictions and that there is a "growing understanding domestically that a criminal conviction is a poor metric for assessing current public safety risk." Another commenter disagreed with the Departments' use of "public safety" as a justified reason for restricting liberty—in this case, liberty of asylum seekers.

Commenters claimed that the Departments provided no evidence underlying these assumptions. Further, commenters alleged that the proposed rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because of these faulty assumptions.

*Response:* The Departments disagree that this rule was based on incorrect assumptions. The Departments have concluded that convictions with longer sentences tend to be associated with more consequential crimes and that offenders who commit such crimes are generally more likely to be dangerous to the community, and less deserving of the benefit of asylum, than offenders who commit crimes punishable by shorter sentences. *See* 84 FR at 69646. This determination is supported throughout the nation's criminal law framework. For example, for sentencing for Federal crimes, criminal history serves as a "proxy" for the need to protect the public from the defendant's future crimes. *See United States* v. *Hayes,* 762 F.3d 1300, 1314 n.8 (11th Cir. 2008); *see also* U.S. Sentencing Guidelines Manual § 4A1.2 cmt. Background (U.S. Sentencing Comm'n 2018). Further, in numerous Federal statutes and the Model Penal Code, crimes with a possible sentence exceeding one year constitute "felonies" regardless of the assumptions and implications referenced by the commenters. *See, e.g.,* 84 FR at 69646 (providing 5 U.S.C. 7313(b); Model Penal Code § 1.04(2); and 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) as exemplary authorities that define "felony," in part, by considering whether the sentence may exceed one year). Accordingly, and pursuant to their statutory authority, the Departments have determined that similarly conditioning asylum eligibility on criminal convictions with possible sentences of more than one year is proper and reasonable because such convictions are general indicators of social harm and conduct that the Departments have deemed undesirable.

Regarding commenters' claims that the proposed rule is arbitrary and capricious because it is based on faulty assumptions, the Departments respond in section II.D.1, which addresses comments related to the APA and other regulatory requirements.

c. Disregards Criminal Activity Linked to Trauma

*Comment:* Many commenters expressed opposition to the rule by alleging that it disregards the reality that criminal activity is oftentimes linked to trauma experienced by asylum seekers

in their countries of origin or on their journey to safety. Citing statistics and evidence regarding the vulnerability of asylum seekers and the high likelihood that they have experienced various forms of trauma related to the circumstances from which they are trying to escape and a lack of affordable healthcare, commenters asserted that asylum seekers are at a higher risk of self-medicating with drugs or alcohol, which in turn would increase the likelihood for asylum seekers to be involved in the criminal justice system and, as a result of the rule, ineligible for asylum. Commenters stated that aliens with substance use disorders, drug-related convictions, and other related addictions should be provided with "treatment and compassion" and not barred from asylum eligibility. A commenter stated that the rule renders aliens who have experienced persecution and subsequent trauma "at greater risk of being returned to a country where they will only be further tortured and harmed."

Commenters claimed that denying aliens who have experienced such trauma the opportunity to present countervailing factors regarding their subsequent or associated criminal activity was "simply cruel." Commenters alleged that the rule ignores the fact that these aliens likely struggle with post-traumatic stress disorder, other untreated mental health problems such as anxiety or depression, substance use disorders or addictions, self-medication, poverty, and over-policing. Accordingly, commenters stated that the rule would "further marginalize asylum seekers already struggling with trauma and discrimination" and exclude "those convicted of offenses that are coincident to their flight from persecution."

Some commenters emphasized the trauma experienced by children prior to arriving in the United States and in ORR custody. Those commenters also emphasized that many children are then convicted and tried as adults for crimes stemming from that trauma, which, under the NPRM, would bar them from asylum. The commenters stated that such children, if given appropriate treatment, support, and services, are able to recover rather than remain in the juvenile or criminal justice systems. Accordingly, commenters disagreed with the NPRM's approach of categorically barring such individuals and preventing them from presenting context and mitigating evidence for their crimes.

*Response:* The Departments acknowledge the trauma aliens may face but note that aliens barred from asylum

eligibility may still be eligible for alternative measures of protection precluding their return to a country where they experienced torture or persecution resulting in trauma. *See* 84 FR at 69642. The Departments, however, disagree that the possibility of personal trauma or other strife is sufficient to overcome the dangerousness or harms to society posed by the offenders subject to the sorts of bars to asylum implemented by the rule because, as discussed in the proposed rule, possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." 84 FR at 69654; *accord Ayala-Chavez*, 944 F.2d at 641 ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood*, 803 F.2d at 1167)). Also, commenters' suggestions regarding treatment, support, and services for children who have experienced trauma are outside the scope of this rulemaking.

Finally, the Departments note that, consistent with the INA's approach to controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), the rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. The Departments have concluded that allowing this limited exception to application of the new bar appropriately balances the competing policy objectives of protecting the United States from the harms associated with drug trafficking and possession, on the one hand, and the goal of not imposing unduly harsh penalties on persons subject to the new bars, on the other.

d. Problems With Existing Asylum System

*Comment:* Commenters opposed the NPRM because they alleged that the current overall asylum system is too harsh. Specifically, commenters stated that the current bars to asylum are too harsh and overly broad, given that all serious crimes are already considered as part of the discretionary analysis and that asylum seekers are already heavily vetted and scrutinized. Accordingly, commenters stated that the asylum restrictions should be narrowed rather than expanded.

Specifically, commenters asserted that the current "harsh system" places a high evidentiary burden on applicants to establish eligibility and disregards the danger they may face if they are sent

back to their countries.[38] Commenters claimed that conditions in Mexico, where many asylum seekers are sent, are dangerous, and that asylum seekers are killed or experience other harms. In addition, commenters referenced numerous other barriers to asylum—the complex "web" of laws and regulations that asylum seekers must navigate, sometimes from jail or without counsel, and other recent policies such as the MPP, *see* DHS, *Policy Guidance for Implementation for the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf*, and the "third-country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019).

Further, commenters asserted that the current criminal bars to asylum eligibility are too broad, emphasizing, for example, that the term "aggravated felony," which is a "particularly serious crime" that renders the applicant ineligible for asylum, has come to encompass "hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses and misdemeanors * * *. A single one of these past offenses eliminates an individual's eligibility for asylum, with no regard to the danger that person will face if sent back to their country."

Commenters also explained that immigration judges currently have full discretion to deny asylum to any alien who is not categorically barred from relief but who has been convicted of criminal conduct. Accordingly, commenters asserted that the existing system is sufficient to ensure that relief is denied to those who may be dangerous to a community, while at the same time providing latitude for adjudicators to consider unique challenges that asylum seekers face resulting from the harm they have faced. In light of these facts, commenters opposed adding more bars and encouraged the Departments to instead narrow the bars.

*Response:* Commenters' concerns regarding the entire asylum system, including the asserted complex "web" of asylum laws and regulations, are outside the scope of this rulemaking. The rule adds categorical bars to asylum

---

[38] Commenters also mentioned numerous other alleged barriers to asylum unrelated to the NPRM, including the required time between an application's submission and the attached photo's taking, English-only application forms, and additional concerns. The Departments acknowledge the general concerns with the asylum system, but because these concerns do not relate to particular provisions of the NPRM, the Departments do not address them further.

eligibility; clarifies the effect of criminal convictions and, in one instance, criminal conduct, on asylum eligibility; and removes automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments do not otherwise propose to amend the asylum system established by Congress and implemented by the Departments through rulemaking and policy over the years.

The Departments note here, and the proposed rule acknowledged, in part, *see, e.g.,* 84 FR at 69645–46, that, although immigration judge discretion, BIA review, and scrutiny of asylum applicants could achieve results similar to some of the proposed provisions, the rule streamlines the system to increase efficiency. By eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, the Departments anticipate that adjudication of asylum claims will be a much quicker process. In addition, the Departments believe that, given the clarified conditions and limitations on asylum eligibility, fewer non-meritorious or frivolous asylum claims may be filed overall, with the result that the Departments' adjudication resources would be allocated, from the beginning, to claims that are more likely to have merit. Overall, the Departments maintain that a rule-based approach to accomplish that goal is preferable. *See* 84 FR at 69646.

The Departments reiterate that asylum is a discretionary benefit; the Departments work in coordination to establish requirements, limits, and conditions, which may include evidentiary burdens. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Contrary to the commenters' assertions that the rule disregards the dangers faced by aliens, the rule noted alternative forms of protection for which aliens may apply, even if they are subject to an asylum bar. *See* 84 FR at 69642. Nevertheless, many commenters' concerns referencing allegedly dangerous conditions in Mexico, the effects of the MPP, and the third-country transit bar are also outside the scope of this rulemaking.

The Departments disagree with commenters' assertions that the asylum bars should be narrowed. Given efficiency interests, the Departments posit that expanded categorical bars will streamline the asylum system, with the result that asylum benefits may be granted more quickly to eligible aliens.

## e. Inefficiencies in Immigration Proceedings

*Comment:* Commenters opposed the rule because they alleged that various provisions would result in inefficiencies and exacerbate an already inefficient, backlogged, and under-staffed immigration system.

First, commenters stated that requiring adjudicators to make "complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct," would lead to inefficiencies. Many commenters stated that the rule effectively requires adjudicators to "engage in mini-trials into issues already adjudicated by the criminal law system based on evidence that may not have been properly tested for its veracity in the criminal process," thereby decreasing efficiency. Further, commenters stated that adjudicators will have to "conduct a separate factual inquiry into the basis for a criminal conviction or allegations of criminal conduct to determine whether the individual is eligible for asylum," instead of relying on adjudications from the criminal legal system.

Other commenters stated that the rule is especially inefficient in the case of family members' asylum eligibility. Commenters alleged that, under the proposed rule, family members' claims will be adjudicated separately and potentially before different adjudicators. Given that family members' claims are oftentimes interrelated and children are less able to sufficiently explain asylum claims, commenters concluded that the rule, especially as it relates to family claims, further increases inefficiencies in the system.

Commenters also stated that these ramifications directly contradict one of the rule's stated justifications of increased efficiency and alleged that the rule increased the time and expense necessary to process asylum claims. One commenter alleged that this will decrease the ability of asylum seekers to access healthcare, food, and housing. That commenter also averred that asylum seekers will likely have to request to reschedule interviews, which will introduce further delay, because the rule's filing deadlines restrict applicants' ability to provide supplementary evidence. Further, commenters alleged that the Departments failed to provide information or research to explain how the rule would increase efficiencies in the system.

Many commenters asserted that the rule will require a highly nuanced, resource-intensive inquiry that will prolong asylum proceedings and "invariably lead to erroneous determinations" or disparate results, with the consequence that appeals will increase and consume further Departmental resources.

*Response:* The Departments disagree with the commenters' assertions regarding inefficiencies.

First, adjudicators currently conduct a factual inquiry similar to the inquiry contemplated by the new bars in other immigration contexts. *See* 84 FR at 69652 (providing, as examples, the removability context in INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) and consideration of the persecutor bar in INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). Thus, adjudicators are adequately trained and equipped to conduct such analyses.

Second, the Departments emphasize that this rule is just one tool for increasing efficiencies in the immigration adjudications process and for correcting what the Departments view as problematic rules regarding asylum eligibility. This rule is not intended to correct all inefficiencies or to be a complete panacea, and DOJ has implemented numerous initiatives recently to address inefficiencies where appropriate. *See, e.g.,* EOIR, *Policy Memorandum 20–07: Case Management and Docketing Practices* (Jan. 31, 2020), *https://www.justice.gov/eoir/page/file/1242501/download* (implementing efficient docketing practices); EOIR, *Policy Memorandum 19–11:* "*No Dark Courtrooms*" (Mar. 31, 2019), *https://www.justice.gov/eoir/file/1149286/download* (providing policies to reduce and minimize the impact of unused courtrooms and docket times to address the caseload and backlog); EOIR, *Policy Memorandum 19–05: Guidance Regarding the Adjudication of Asylum Applications Consistent with INA § 208(d)(5)(A)(iii)* (Nov. 19, 2018), *https://www.justice.gov/eoir/page/file/1112581/download* (providing policy guidance to effectuate the statutory directive to complete asylum adjudications within 180 days of filing, absent extraordinary circumstances); *see also* DOJ, *Memorandum for the Executive Office for Immigration Review: Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest* (Dec. 5, 2017), *https://www.justice.gov/opa/press-release/file/1015996/download* (reiterating EOIR's commitment to efficient adjudication).

Although the Departments agree that the current system for adjudicating asylum applications frequently fails to meet the statutory deadline of completing such cases within 180 days

absent exceptional circumstances, INA 208(d)(5)(A)(iii) (8 U.S.C. 1158(d)(5)(A)(iii)) the Departments believe this rulemaking will improve efficiency. The Departments direct commenters to the proposed rule at 84 FR at 69645–46 for an extensive explanation of inefficiencies addressed through this rulemaking, which provides adequate "information and research" describing how the rule will increase efficiencies. Notably, courts have often recognized that rule-based approaches promote more efficient administration than wholly discretionary, case-by-case determinations. *See Lopez* v. *Davis,* 531 U.S. 230, 244 (2001) (observing that "a single rulemaking proceeding" may allow an agency to more "fairly and efficiently" address an issue than would "case-by-case decisionmaking" (quotation marks omitted)); *Marin-Rodriguez* v. *Holder,* 612 F.3d 591, 593 (7th Cir. 2010) ("An agency may exercise discretion categorically, by regulation, and is not limited to making discretionary decisions one case at a time under open-ended standards."); *cf. Baylor Cty. Hosp. Dist.* v. *Price,* 850 F.3d 257, 263 (5th Cir. 2017) ("DHHS opted for a bright-line rule after considering its lack of agency resources to make case-by-case judgments" because "the statutory text had to be articulated properly and in an administratively efficient way."). The Departments acknowledge the backlog in asylum applications, *see* EOIR, *Adjudication Statistics: Total Asylum Applications* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1106366/download,* and the Departments, as a matter of policy, choose to address this backlog and resulting inefficiencies in part through this rulemaking.

The backlogged asylum system presents challenges; however, the Departments disagree with commenters regarding how best to address the backlog. The Departments disagree that the rule will prolong proceedings and lead to erroneous determinations, thus allegedly prompting more appeals. On the contrary, the Departments have concluded that the rule will increase efficiencies by eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies as they apply to asylum adjudications. *See* 84 FR at 69646–47. The Departments have determined that this rule-based approach is preferable, partly because, given the specific context of asylum eligibility, it will result in consistent treatment of asylum

seekers with respect to criminal convictions. *See id.*

Finally, concerns regarding access to healthcare, food, and housing, are outside the scope of this rulemaking.

f. Disparate Impact on Certain Persons

*Comment:* Many commenters opposed the rule because they claimed it will harm or disparately affect asylum applicants whom commenters deem the most vulnerable people in society. Commenters explained that, although asylum seekers and refugees are generally vulnerable, the rule further implicates other vulnerable groups, such as LGBTQ individuals; victims of trafficking; communities of color, especially youth, and other minority ethnic groups; individuals who have experienced trauma, coercion, abuse, or assault; people with mental illness, especially those lacking adequate mental health services, such as children in ORR custody; people struggling with addictions and related convictions, regardless of whether they have sought treatment; parents who cross the border with children to seek safety; individuals convicted of document fraud who unknowingly use fraudulent documents or unscrupulous services to procure immigration documents; victims of domestic or intimate violence; people from Central America and the "Global South"; and low-income people. Commenters were concerned that the rule categorically bars these populations without consideration of mitigating factors, thereby potentially resulting in the return of such people to countries and communities where they initially experienced discrimination, bias, trauma, and violence. In a related vein, commenters were concerned that these populations are more prone to be convicted of minor offenses that will, under the rule, preclude them from asylum relief. For example, one commenter speculated that a trafficking victim who leaves a child alone at home while on a brief trip to a store could be convicted of "endangering the welfare of a child" and then barred from asylum.

Commenters especially emphasized concerns regarding the effect of the rule on two groups: LGBTQ individuals, especially transgender women; and trafficking victims.[39] Regarding LGBTQ individuals, multiple commenters asserted that the rule constitutes a

"unique threat" because those individuals have likely faced:

a high degree of violence and disenfranchisement from economic and political life in their home countries. * * * Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave[s] many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices.

One commenter explained that some LGBTQ individuals are charged with a variety of crimes in connection with their private, consensual conduct because of differences in discriminatory laws regarding this population around the world.

For trafficking victims, commenters explained that the rule bars them from asylum when they are only involuntarily part of a trafficking scheme and will likely face subsequent retaliation and other harms from their traffickers. Commenters were especially concerned that the rule denies asylum benefits to people who desperately need and will greatly benefit from them. Further, commenters asserted that alternative forms of relief are oftentimes insufficient for trafficking victims. For example, commenters explained that trafficking victims who have been removed are not eligible for T nonimmigrant status. Similarly, commenters explained that trafficking victims who are forced by their traffickers to commit other crimes may then be ineligible for other forms of relief under certain crime bars. Commenters also explained that trafficking victims typically receive intervention and other support services only after coming into contact with law enforcement; thus, this rule would preclude them from such resources.

Commenters explained that, not only are these people more prone to experiencing harms if they are barred from asylum, but also these people are more prone to initially experience harms that subsequently result in their involvement in the criminal justice system, which would, under this rule, bar them from asylum. For these reasons, commenters opposed the rule.

*Response:* To the extent that commenters ask the Departments to establish unique protections for these referenced groups, such protections are outside the scope of this particular rulemaking. Congress has chosen to provide special protections for certain groups, such as unaccompanied alien children, and Congress could choose to

---

[39] Commenters also expressed concerns for communities of color. These concerns, however, are addressed in section II.C.3.d because commenters' concerns on this point were primarily connected to concerns regarding the gang-related offenses included in the rule.

similarly extend protections to LGBTQ persons or other groups. Without such congressional action, however, the Departments are merely implementing the statutory framework as it currently exists. Further, to the extent that the commenters posit that the noted groups are more prone to engage in criminal conduct implicated by the rule—*e.g.,* fraud, DUI, human smuggling, gang activity, drug-related crimes—the Departments have no evidence that such groups are more likely to commit such crimes than any other groups of asylum applicants, and commenters did not provide evidence that would suggest otherwise. Thus, the Departments reject the assertion that the rule would have a disparate impact on discrete groups, absent evidence such groups are more likely to engage in criminal behavior addressed by the rule.

The rule includes several provisions that act, in part, to preclude returning vulnerable persons, including LGBTQ individuals and trafficking victims, to countries where they may have experienced or fear, as referenced by the commenters, discrimination, bias, trauma, and violence. As an initial matter, regardless of asylum eligibility, vulnerable persons may be eligible for statutory withholding of removal and protection under the CAT regulations. *See* 84 FR at 69642. Next, the rule includes an exception to the bar based on domestic assault or battery, stalking, or child abuse. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F). The exception mirrors the provisions in the statute at INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) (removability context), but has one significant difference. In the removability context, applicants claiming this exception must satisfy the statutory criteria and be granted a discretionary waiver. Under the rule, however, applicants claiming the exception must only satisfy the criteria; no waiver is required. *See* 84 FR at 69653. This exception exists so that proper considerations can be taken of the vulnerability of domestic violence victims. The Departments believe this exception strikes the proper balance between providing protections for domestic violence victims while advancing the goals of reducing the incidence of domestic violence and protecting the United States from the sorts of conduct that would subject offenders to the new bars.

Commenters' concerns regarding vulnerable individuals' increased likelihood of convictions for minor offenses for certain vulnerable groups relate to the larger criminal justice system and accordingly fall outside the scope of this rulemaking. *See* section II.C.6.k for further discussion. Moreover, as noted above, the Departments have no evidence—and commenters provided none—that the groups identified by commenters are more prone to engage in criminal conduct implicated by the rule that would increase the likelihood of a conviction for, *e.g.,* fraud, DUI, human smuggling, gang activity, or drug-related crimes.

Next, this rule expands asylum ineligibility based on offenses committed in the United States, not abroad. *See* 84 FR at 69647 n.5. Thus, the rule does not expand asylum ineligibility for trafficking victims forced to commit crimes abroad or LGBTQ individuals whose private, consensual acts are criminalized abroad. Indeed, case law has long recognized that some criminal prosecutions abroad, if pretextual, can, for example, form the basis of a protection claim. *See, e.g., Fisher* v. *INS,* 79 F.3d 955, 962 (9th Cir. 1996) (noting "two exceptions to the general rule that prosecution does not amount to persecution—disproportionately severe punishment and pretextual prosecution"); *Matter of S–P–,* 21 I&N Dec. 486, 492 (BIA 1996) (noting that "prosecution for an offense may be a pretext for punishing an individual" on account of a protected ground). The rule does not alter such case law.

### g. Adjudicator Discretion

*Comment:* Many commenters opposed the rule out of concern that it strips adjudicators of discretion. First, commenters stated that it is crucial that adjudicators consider countervailing factors "to determine whether the circumstances merit such a harsh penalty." Another commenter explained that "[d]iscretion allows an adjudicator to consider a person's entire experience, including those factors that led to criminal behavior as well as the steps towards rehabilitation that individuals have taken." Commenters claimed that effective use of discretion is crucial in these circumstances: "The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community." Thus, commenters alleged that the rule's removal of that discretion is punitive and unnecessary. One commenter stated that the purpose of the NPRM seems to be to remove all discretion from adjudicators to consider each case on a case-by-case basis. Another commenter underscored the importance of adjudicators retaining discretion to make individualized

determinations because Congress established asylum as a discretionary form of relief.

One commenter alleged that the rule diminishes due process protections, stating that, "by preventing the use of discretion in such cases[,] the proposed rules have a chilling effect on due process. Ensuring adjudicators have discretion to grant asylum under such circumstances allows asylum seekers to have a fair day in court and guards against further injustice resulting from errors that might have occurred in the criminal legal system."

Commenters also alleged that the proposed rule incorrectly raises the burden of proof to establish that a favorable grant of discretion is warranted so that it is equivalent to the burden required to establish a well-founded fear of persecution. These commenters averred that this is problematic in the face of contrary case law that requires a more cautious, restrained view of the Attorney General's and the Secretary's discretion and that cautions against permitting the Departments unchecked power and unrestrained discretion in making asylum determinations. Commenters first cited *Matter of Pula,* 19 I&N Dec. at 474, arguing that it encouraged a restrained view of discretion because the Board asserted that "the danger of persecution should generally outweigh all but the most egregious of adverse factors." Commenters averred that the Supreme Court cautioned against unlimited discretion in *Moncrieffe,* 569 U.S. at 200–01, by holding that the government must follow the categorical approach. Similarly, commenters cited *Delgado,* 648 F.3d at 1097, to support this proposition because the Ninth Circuit "first assert[ed] its jurisdiction to review the Attorney General's discretionary authority" and overruled an earlier decision that the jurisdiction-stripping provision at 8 U.S.C. 1252 barred the court's judicial review.

On the other hand, in the context of convictions or conduct related to domestic violence, battery, or extreme cruelty, commenters also opposed the amount of discretion afforded to adjudicators because the rule allegedly provides no clear guidance for the adjudicator's inquiry, analysis, and resulting determination. For example, commenters asserted that it is unclear what constitutes "reliable evidence" under the rule. Commenters were concerned that this would result in inconsistent decisions or diminished due process. Further, commenters were also concerned because determinations under the rule would be discretionary

and therefore non-appealable in most cases.

*Response:* Congress has authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility consistent with the statute. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Through this rule, the Departments exercise such authority by establishing categorical bars to asylum that constitute such limits and conditions. The Departments disagree that adjudicators must be afforded discretion to consider mitigating factors in determining asylum eligibility in all circumstances. Given the challenges faced by the agencies and the operative functioning of current categorical bars, *see* INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), the Departments add the new categorical bars, in part, to improve the efficient processing of asylum claims. The regulatory changes are not punitive or intended to revoke all discretion from adjudicators, as commenters alleged; rather, the Departments promulgate this rule to facilitate and streamline processing of asylum claims. *See e.g.,* 84 FR at 69646–47, 69657.

The rule does not diminish due process. As discussed above, the discretionary benefit of asylum is not a liberty or property interest subject to due process protections. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. The Departments disagree that affording discretion to adjudicators in lieu of promulgating the additional bars is a preferable way to process asylum applications. Moreover, nothing in this rule prevents individuals from appealing the immigration judge's determination. *See* 8 CFR 1003.38 (appeals with the BIA). Further, as explained in section II.C.6.k, resolving errors in the criminal justice system is beyond the scope of this rulemaking.

The Departments reiterate their authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Accordingly, the Departments may promulgate bars that govern determinations regarding asylum eligibility. In light of this authority, the Departments also disagree with commenters that the rule provides adjudicators with insufficient guidance for the sound exercise of their judgment in determining eligibility for asylum. For example, the proposed rule provides clarity surrounding determinations whether a conviction is a felony by applying the relevant jurisdiction's

definition; also, it provides detailed guidance on vacated or expunged convictions, and modified convictions and sentences. 84 FR at 69646, 69654–55. Immigration judges and asylum officers currently exercise discretion to determine whether an asylum seeker merits relief for a wide range of reasons, many of which are not similarly set out or defined in the Act or by regulation. *See, e.g., Matter of A–B–,* 27 I&N Dec. 316 at 345 n.12 (outlining factors for consideration in discretionary asylum determinations). The Departments accordingly do not believe that the new bars require immigration judges or asylum officers to exercise significantly more discretion than those judges or officers already do.

Further, the Departments note that providing more exacting guidance, as some commenters suggested, would impede the very nature of legal discretion, as demonstrated by its definition: "[f]reedom in the exercise of judgment," or "the power of free decision-making." Black's Law Dictionary (11th ed. 2019); *see also* "Discretion," Merriam-Webster, *https://www.merriam-webster.com/dictionary/discretion* (last updated Feb. 15, 2020) (defining "discretion" as the "power of free decision or latitude of choice within certain legal bounds"). Doing so would thus aggravate the problems that some commenters perceived in the rule's alleged lack of sufficient flexibility.

Next, nothing in the final rule changes the standard of proof as regards an individual's ability to demonstrate that he or she warrants a discretionary grant of discretion. As an initial matter, citing a standard of proof for discretion is a misnomer. Rather, the determination of whether an alien claims a discretionary grant of asylum is an analysis that requires reviewing the circumstances of the case. In determining whether the alien warrants a discretionary grant of asylum, the immigration judge considers a number of factors and considerations. *See Matter of Pula,* 19 I&N Dec. at 473–74 (outlining how adjudicators should weigh discretionary factors in applications for asylum). By contrast, the final rule sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. As a result, the final rule does not create a standard of proof for establishing that an alien warrants a discretionary grant of asylum.

Similarly, the Departments disagree with commenters' assertions that the final rule violates Supreme Court and court of appeals precedent regarding the

amount of discretion granted to the Attorney General and the Secretary. As explained, Congress, in IIRIRA, vested the Attorney General with broad authority to establish conditions or limitations on asylum. *See* 110 Stat. at 3009–692. Congress also vested the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)). This broad authority is not undercut by the cases cited by commenters. Neither *Moncrieffe* nor *Delgado* presumes to limit the Attorney General's discretion to place limits on asylum. Rather, *Moncrieffe* addressed whether a conviction for possession of a small amount of marijuana with intent to distribute qualified as an aggravated felony. 569 U.S. at 206. Similarly, the *Delgado* court held that it had authority to review certain discretionary determinations made by the Attorney General when not explicitly identified in the INA. 648 F.3d at 1100. However, this inquiry was based on statutory interpretation to determine whether the court had jurisdiction to review a BIA decision. Apart from disagreeing with the Department's legal arguments on appeal, neither of these two decisions purported, even in dicta, to place additional limitations on the Attorney General's ability to consider whether to grant asylum as a matter of discretion.

### h. Issues With Representation

*Comment:* Commenters opposed the NPRM because they alleged that it made the asylum system more arduous for asylum seekers, especially children, to navigate alone. One commenter claimed that 86 percent of detainees lack access to counsel. Overall, commenters were concerned that the rule's changes disadvantage asylum seekers by making it more difficult for them to proceed without representation and for organizations, in turn, to provide representation and assistance to aliens.

Commenters pointed out that asylum seekers lack the benefit of appointed counsel, which is especially significant for pro se aliens affected by the rule, particularly in regard to gathering evidence and developing responses to refute the "extremely broad grounds" for the denial of asylum.

Commenters also alleged that it will be more difficult for organizations to represent and assist aliens in accordance with the rule's provisions. Commenters stated that backlogs at USCIS are detrimental to organizations and the aliens they represent because

aliens may wait years for a decision on their applications, while organizations have limited resources to assist immigrants and must seek to prioritize spending for emergency situations.

Commenters also stated that the system is already complicated; further complicating it with additional barriers will require much time, funding, and effort by immigration advocates. Finally, commenters stated that an asserted "lack of predictability" in application of the rule would "create a substantial burden on immigration legal services providers, who [would] be unable to advise their clients as to their asylum eligibility, a long-term and stable form of protection from persecution."

*Response:* The commenters' particular concerns regarding representation in immigration proceedings or during asylum adjudications are outside the scope of this rulemaking. The rule does not involve securing or facilitating representation, and Congress has already directed that aliens have a right to counsel in removal proceedings but at no expense to the government. INA 292 (8 U.S.C. 1362). Moreover, 87 percent of asylum applicants in pending asylum cases have representation, and there is nothing in the rule that would cause a reduction in that representation rate. *See* EOIR, *Adjudication Statistics: Representation Rate* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1062991/download.*

In addition, the Departments continue to maintain resources designed to assist aliens in proceedings find representation or otherwise help themselves in their proceedings. *See* EOIR, *Find Legal Representation, https://www.justice.gov/eoir/find-legal-representation* (last updated Nov. 29, 2016). Further, the Office of Legal Access Programs within EOIR works to increase access to information and raise the level of representation for individuals in immigration proceedings. *See* EOIR, *Office of Legal Access Programs, https://www.justice.gov/eoir/office-of-legal-access-programs* (last updated Feb. 19, 2020).

In regard to commenters' concerns regarding the backlog at USCIS, the rule facilitates a more streamlined approach by eliminating inefficiencies. *See, e.g.,* 84 FR at 69647, 69656–57. For example, the rule's established definition for "felony" will create greater uniformity by accounting for "possible variations in how different jurisdictions may label the same offense" and avoid anomalies in the asylum context "that arise from the definition of 'aggravated felonies.'" *Id.* at 69647. Significantly, that definition eliminates the need for adjudicators and courts alike to engage

in the categorical approach for aggravated felonies. *See id.* These improvements to the asylum system will increase predictability, therefore rendering representation less complicated and potentially requiring less funding by immigration advocates.

The Departments emphasize that the rule does not create an entirely new system. As with any other change to the regulations, the Departments anticipate that immigration advocates and organizations will adjust and adapt their strategies to continue to provide effective representation for their selected clients.

i. Against American Ideals

*Comment:* Commenters opposed the rule because they alleged that it conflicts with American ideals. Commenters remarked that the rule conflicts with the United States' tradition and moral obligation of providing a "haven for persons fleeing oppression" and a "beacon of hope" for vulnerable people, and that it violates principles that people should have freedom and equal rights under the law "regardless of skin color or birthplace." Many commenters characterized these concerns as humanitarian, religious, and American ideals of showing compassion, fairness, and respect for human rights. Another commenter claimed that the rule "eviscerated the spirit and overall purpose of the U.S. asylum system by categorically refusing protection to large groups of vulnerable people who are neither a danger to the public nor a threat to U.S. national security interests, and who have no other safe and reasonable option for protection."

Other commenters expressed opposition by claiming that the rule would diminish the United States' role as a world leader, hurt the country's international reputation, and undermine foreign policy interests abroad. One commenter stated that the rule would diminish the "country's historical role as a defender of human rights."

*Response:* The rule does not conflict with American traditions or moral obligations related to caring for vulnerable people. On the contrary, the rule streamlines the asylum system to improve the consistency and predictability of the adjudication of claims, thereby enabling applicants who qualify for asylum eligibility to swiftly access the benefits that follow a grant of asylum. Those benefits include, among many, preclusion from removal, a path to lawful permanent resident status and citizenship, work authorization, the possibility of derivative lawful status for certain family members, and access to

certain financial assistance from the Federal government. *See R–S–C,* 869 F.3d at 1180; INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)); INA 208(c)(1)(B), (d)(2) (8 U.S.C. 1158(c)(1)(B), (d)(2)); *see also* 84 FR at 69641. The availability of these benefits demonstrates American ideals of compassion realized through the asylum system.

Aliens with certain criminal convictions demonstrate a disregard for the societal values of the United States and may constitute a danger to the community or threaten national security. The Departments have concluded that limiting asylum eligibility for these aliens furthers American ideals of the rule of law and a commitment to public safety. Although such aliens are not eligible for asylum under the rule, they may still be eligible for withholding of removal under the Act (INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 1208.16(b)), or protection under the CAT regulations (8 CFR 1208.16(c)). These forms of protection limit removal to a country where the alien is more likely than not to be persecuted based on protected grounds or tortured, thereby affording protection to aliens, even if they are ineligible for asylum.

The Departments do not agree that the rule diminishes the United States' international reputation for caring for the less fortunate. On the contrary, the Departments believe the rule strengthens the United States' ability to care for those who truly deserve the discretionary benefit of asylum and may take full advantage of the numerous benefits that follow.

j. Bad Motives

*Comment:* Commenters opposed the NPRM because they alleged that the Departments published it with racist motives. Commenters stated that the rule was published "out of animus to asylum seekers and [with] a desire to undermine the asylum system through an end-run around Congress" because the rule would "necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors." One commenter specifically stated the rule was based upon a "dark legacy" of bias against Latin American countries and violated the Equal Protection Clause of the Fourteenth Amendment.

One commenter stated that "the [A]dministration has targeted low-income, immigrant communities of color to further their white supremacist

agenda of maintaining a white majority in the United States.'' Other commenters alleged that DHS and ICE have relied on racist policing techniques to identify gang activity, which rarely result in criminal convictions.

Commenters also opposed the rule because they alleged that it is an attempt to ''drastically limit asylum eligibility,'' ''exclude refugees from stability and security,'' and make the United States more ''hostile'' towards immigrants. In other words, commenters alleged that the rule ''represent[ed] a thinly veiled attempt to prevent otherwise eligible asylum seekers from lawfully seeking refuge in the United States.'' Commenters referenced public documents allegedly revealing the Administration's efforts to utilize smuggling prosecutions against parents and caregivers as part of its overall strategy to deter families from seeking asylum. Commenters were concerned that the rule threatens to ''magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.''

*Response:* The rule is not racially motivated, nor did racial animus or a ''legacy of bias'' play a role in the rule. Rather, the rule categorically precludes from asylum eligibility certain aliens based on the aliens' various criminal convictions and, in one limited instance, criminal conduct, because the Departments believe that the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect communities from danger and inefficient in regard to overall case processing. *See* 84 FR at 69640.

To the extent that the rule disproportionately affects any group referenced by the commenters, the rule was not intentionally drafted to discriminate against any group. The provisions of the rule apply equally to all asylum applicants without regard to any applicant's ethnic or national background, or any other personal characteristics separate and apart from the criminal or conduct history laid out in the rule. Accordingly, the rule does not violate the Equal Protection Clause of the Fourteenth Amendment. *See Washington* v. *Davis,* 426 U.S. 229, 242 (1976) (''[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial

discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.'' (citation omitted)); *cf. United States* v. *Smith,* 818 F.2d 687, 691 (9th Cir. 1987) (''We begin our review of this challenge by holding that persons convicted of crimes are not a suspect class.'').

As explained in the proposed rule, Congress expressly authorized the Attorney General and the Secretary to establish conditions or limitations for the consideration of asylum applications under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)) that are not inconsistent with the statute. *See* 84 FR at 69643. The Departments promulgate this final rule in accordance with those statutory sections, and in doing so, have promulgated a rule that is equally applicable to all races. The Departments strongly disavow any allegation of white supremacy.

The Departments reiterate that the rule does not encourage or facilitate hostility towards immigrants. Instead, the rule categorically precludes from asylum eligibility certain aliens based on criminal convictions, and, in one limited instance, criminal conduct, because the Departments believe the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect the American public from danger and inefficient in regard to overall case processing. The rule retains the current general statutory asylum system, *see* 84 FR at 69640, with the result that applicants for asylum must prove that they are (1) statutorily eligible for asylum, and (2) merit a favorable exercise of discretion. INA 208(b)(1)(A), 240(c)(4)(A) (8 U.S.C. 1158(b)(1)(A) 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. at 345 n.12. That framework continues to be equally applicable to persons of all races.

The rule does not affect regulatory provisions regarding refugee processing under 8 CFR parts 207, 209, 1207, and 1209, and it does not categorically exclude refugees from the United States or facilitate hostility towards immigrants. The Departments disavow allegations that the government used smuggling prosecutions against parents and caregivers specifically to deter families from seeking asylum. Rather, the Departments anticipate that the rule will better facilitate efficient processing of asylum applications by introducing a more streamlined approach, thus helping families who qualify for asylum

and demonstrate their applications merit a favorable decision.

k. Problems With the Criminal Justice System

*Comment:* Commenters opposed the proposed rule because they alleged that it implicates a criminal justice system that suffers from structural challenges such as racial profiling, unjust outcomes, barriers to equal justice, and incentives to plead guilty, especially in the context of misdemeanors.

Related to commenters' concerns regarding racism in the NPRM,[40] commenters explained their concern that the NPRM imports racial disparities prevalent in the criminal justice system into the immigration system, stating, ''[a]sylum seekers of color, like all communities of color in the United States, are already disproportionately targeted and punished by the criminal justice system.'' Particularly, commenters stated that both undocumented and documented non-white immigrants are arrested, convicted of drug crimes, given longer sentences, and deported more frequently than their white counterparts. Further, commenters stated that LGBTQ aliens are more prone to experiencing violence from police.

One commenter opposed the NPRM, stating that it would exacerbate problems in our criminal justice system, such as increased incarceration, deportations, and racial profiling, which would, in turn, exacerbate health concerns for individuals and communities.

*Response:* The final rule amends the Departments' respective regulations governing bars to asylum eligibility. The rule clarifies the effect of criminal convictions and, in one instance, criminal conduct, in the asylum context and removes regulations governing automatic reconsideration of discretionary denials of asylum applications. *See* 84 FR at 69640. Accordingly, commenters' concerns regarding structural challenges to the criminal justice system are outside the scope of this rulemaking. The rule does not seek or intend to address actual or alleged injustices of the criminal justice system as a whole, as referenced by the commenters, including racial profiling, disparities based on race and sexual orientation, unjust outcomes, barriers to equal justice, incentives to plead guilty, and health concerns following alleged increases in incarceration, deportations, and racial profiling.

---

[40] *See* section II.C.6.j for further discussion.

l. Automatic Review of Discretionary Denials

*Comment:* Many commenters expressed strong opposition to the rule because it eliminates automatic review of discretionary denials. Commenters were concerned that language barriers and lack of financial resources may prevent applicants with meritorious claims from adequately presenting their cases. According to commenters, "[m]aintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections."

*Response:* The Departments disagree that reconsideration of discretionary denials of asylum is necessary and find that commenters' concerns regarding removal of these provisions are unwarranted. First, the current regulations providing for automatic reconsideration of discretionary denials at 8 CFR 208.16(e) and 1208.16(e) are inefficient, unclear, and unnecessary. *See* 84 FR at 69656. Federal courts have expressed similar sentiment as they approach related litigation. *See Shantu* v. *Lynch,* 654 F. App'x 608, 613–14 (4th Cir. 2016) (discussing unresolved anomalies of the regulations regarding reconsideration of discretionary denials); *see also* 84 FR at 69656–57.

Further, there are currently multiple avenues through which an asylum applicant may challenge a discretionary denial, with the result that removing the regulations providing for reconsideration (8 CFR 208.16(e) and 1208.16(e)) does not effectively render asylum eligibility determinations final. *See* 84 FR at 69657. First, under 8 CFR 1003.23(b)(1), an immigration judge may reconsider a decision upon his or her own motion.[41] Second, also under 8 CFR 1003.23(b)(1), an alien may file a motion to reconsider with the immigration judge. Third, under 8 CFR 1003.38, an alien may file an appeal with the BIA. The Departments have concluded that these alternatives sufficiently preserve the alien's ability to obtain review of the immigration judge's discretionary asylum decision, while removing the confusing,

---

[41] On August 26, 2020, the Department of Justice proposed restricting the ability of an immigration judge to reconsider a decision upon his or her own motion. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 52491, 52504–06 (Aug. 26, 2020). That rule has not yet been finalized, but even if the proposal is adopted in the final rule, asylum applicants would still remain able to file a motion to reconsider or an appeal in order to challenge an immigration judge's discretionary denial in these circumstances.

inefficient, and unnecessary automatic review provisions at 8 CFR 208.16(e) and 1208.16(e).

7. Recommendations

*Comment:* Commenters provided numerous recommendations to the Departments.

First, several commenters suggested that the Departments provide annual bias training to all immigration judges and prosecutors.

Next, two commenters recommended that the sentencing guidelines as provided in the Washington Adult Sentencing Guidelines Manual be incorporated into the NPRM to provide clarity and guidance to immigration judges.

Another commenter asserted that international human rights law obligations required the Departments to

(1) put in place and allocate resources to the identification and assessment of protection needs; and (2) establish mechanisms for entry and stay of migrants who are considered to have protection needs prohibiting their return under international human rights law, including non-refoulement, as well as the rights to health, family life, best interests of the child, and torture rehabilitation.

A commenter suggested the Departments should incorporate recent innovative criminal justice reforms. For example, the commenter pointed to special drug trafficking courts that "recognize the need for discretion in the determination of criminal culpability" and suggested that the Departments should create specialized asylum eligibility courts.

Another commenter emphasized the effects of climate change, claiming that the United States should be "creating new categories of asylum given the predictions on climate change migrants and the latest UN human rights ruling declaring governments cannot deport people back to countries if their lives are in danger due to climate change."

One commenter recommended that the Departments continue to hire more immigration judges and asylum officers and to retain discretion with immigration adjudicators to make determinations on a case-by-case basis rather than expand the categorical bars.

Some commenters emphasized the general need for comprehensive, compassionate immigration reform. One commenter specifically urged the Departments to support the New Way Forward Act, which, according to the commenter, "rolls back harmful immigration laws [because] it proposes immigration reform measures that dismantle abuses of our system and our asylum seeking community."

Some commenters urged the Departments to take a more "welcoming" approach, citing the positive effects of diversity and economic advantages.

Another commenter, despite opposing the NPRM, provided several recommendations regarding the domestic violence crime bar and primary perpetrator exception should the Departments publish the rule as final. First, the commenter recommended that all immigration adjudicators should receive specialized training developed with input from stakeholders regarding domestic violence and the unique vulnerabilities faced by immigrants. Second, the commenter recommended that an automatic supervisory review should follow any determination that an applicant does not meet an exception to an asylum bar. Third, the commenter recommended that adjudicators should be required to provide written explanations of (1) the factual findings, weighed against the evidence, if a determination is made that an applicant does not meet an exception to the asylum bar and (2) their initial decisions to apply the bar, including what "'serious reasons' existed for believing that the applicant engaged in acts of domestic violence or extreme cruelty." Fourth, when applicants do not meet the exception, the commenter recommended that adjudicators identify what evidence, if any, was provided by the alleged primary perpetrator, how it was weighed, and what the adjudicator did to determine whether it was false or fabricated. Fifth, the commenter requested that agencies regularly engage with stakeholders to assess the impact of the bar and the exception on survivors.

Several commenters urged the Departments to dedicate their efforts to ensuring that individuals fleeing violence would be granted full asylum protections. One commenter suggested that the bars to asylum be narrowed by eliminating the bar related to convictions in other countries.

Some commenters suggested that families, especially children, be allowed to apply for asylum together, rather than require each person to file a separate application.

*Response:* The Departments note the commenters' recommendations.

Some commenters' suggestions involved issues or topics outside the scope of the rule, such as the suggestions that immigration judges should be provided certain types of training or to allow for additional flexibilities for family-based versus individual asylum applications. The

Departments may consider these recommendations in the event of additional rulemakings, but do not take any further action in response to these out-of-scope suggestions at this point.

Other commenters' suggestions involved topics outside the authority of the Departments, such as suggestions that there should be new asylum-related protections due to concerns surrounding climate change or that legislative changes to the immigration laws should be enacted. If Congress enacts these or other changes to the immigration laws, the Departments' regulations will reflect such changes in future rules. However, this rule is designed to implement the immigration laws currently in force.

Regarding the remaining suggestions related to the provisions of this rule, the Departments decline to adopt the recommendations or make changes to the proposed rule except as set out below in section III. Overall, the Departments find that the commenters' recommendations would frustrate the rule's purpose by slowing and prolonging the adjudicatory process, thereby undermining the goal of more efficiently processing asylum claims. Further, the Departments have determined, as discussed above, that the included offenses are significant offenses that warrant rendering aliens described by the rule ineligible for asylum.

For example, the Departments decline to adopt one commenter's requests to automatically require supervisory review of an asylum officer's decision to apply a bar, or to require the asylum officer or immigration judge to issue a written decision explaining the application of the bars. The Departments believe that the existing processes for issuing decisions and providing review of asylum determinations give sufficient protections to applicants. *See, e.g.,* 8 CFR 208.14(c)(1) (explaining that, for a removable alien, when an asylum officer cannot grant an asylum application, the officer shall refer the application for adjudication in removal proceedings by an immigration judge); 8 CFR 1003.3(a)(1) (providing for appeals of immigration judge decisions to the BIA); 8 CFR 1003.37(a) (explaining that a "decision of the Immigration Judge may be rendered orally or in writing," and that, if the decision is oral, it shall be "stated by the Immigration Judge in the presence of the parties" and a memorandum "summarizing the oral decision shall be served on the parties"). Requiring additional steps beyond these long-standing processes would only create inefficiencies that this rule seeks to avoid. For example,

this rule removes the automatic review of a discretionary denial of asylum specifically because "mandating that the decision maker reevaluate the very issue just decided is an inefficient practice that * * * grants insufficient deference to the original fact finding and exercise of discretion." 84 FR at 69657.

The Departments also decline to incorporate a commenter's suggestion to include the Washington Adult Sentencing Guidelines Manual into the rule, as the Departments believe the rule provides sufficient guidance to adjudicators without adding a specific state's criminal law manual, which would only add confusion to the immigration adjudication process.

### D. Comments Regarding Regulatory Requirements

#### 1. Administrative Procedure Act

*Comment:* Commenters raised concerns that this rule violated the APA's requirements, as set forth in 5 U.S.C. 553(b) through (d). First, commenters stated that the 30-day comment period was not sufficient for such a significant rule and that, at a minimum, the comment period should have been 60 days. Commenters cited the complexity of the legal and policy issues raised by the rule, the impact of the rule on asylum-seekers, and the potential implications of the rule regarding the United States' compliance with international and domestic asylum law. In support, commenters referenced Executive Orders 12866 and 13563, both of which recommend a "meaningful opportunity to comment" with a comment period of not less than 60 days "in most cases." They also noted that the comment period for this rule ran through the winter holiday season, with multiple Federal holidays.

Commenters also stated that the rule was arbitrary and capricious under the APA because the Departments did not provide sufficient evidence to support such significant changes. For example, commenters noted the lack of statistics regarding the number of asylum seekers that would be affected by the rule and expressed concerned that the Departments were relying on conclusory statements in support of the rule.

Commenters further stated that the reasons given for the rule were insufficient and therefore, arbitrary and capricious. For example, commenters took issue with the Departments' explanation that the additional categories of criminal bars were necessary to address the "inefficient" and "unpredictable" case-by-case adjudication process. Instead, commenters stated that the case-by-case

process ensured that the adjudicator takes into account all of the relevant factors in making a determination.

Commenters had specific concerns with the rule's provision that all felony convictions constitute a particularly serious crime. Commenters stated that the rule provided no evidence to support the provision, and that a criminal record in and of itself does not reliably predict future dangerousness. Further, the provision does not address persons who accept plea deals to avoid lengthy potential sentences; who have rehabilitated since the conviction; or who have committed a crime that does not involve a danger to the community or circumstances when a Federal, State, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

Commenters stated that the rule was arbitrary and capricious because it is inconsistent with the statute, *see* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)), which requires a separate showing from the particularly serious crime determination that the alien constitutes a danger to the community.

Commenters also raised concerns with the "reason to believe" standard for gang-related crime determinations. The commenters asserted that the standard relied on ineffective, inaccurate, and discriminatory practices and was therefore arbitrary and capricious.

*Response:* The Departments believe the 30-day comment period was sufficient to allow for a meaningful public input, as evidenced by the significant number of public comments received, including almost 80 detailed comments from interested organizations. The APA does not require a specific comment period length. *See* 5 U.S.C. 553(b)–(c). Similarly, although Executive Orders 12866 and 13563 recommend a comment period of at least 60 days, such a period is not required. Federal courts have presumed 30 days to be a reasonable comment period length. For example, the D.C. Circuit recently stated that, "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n* v. *Fed. Commc'ns Comm'n,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Litigation has mainly focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances, and the Departments are unaware of any case

law holding that a 30-day comment period was insufficient. *See, e.g., N. Carolina Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 629–30 (D.C. Cir. 1996) (15-day comment period); *Northwest Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (7-day comment period).

The Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves public safety concerns. *Cf. Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (noting that the Federal Aviation Administration had good cause to not engage in notice-and-comment rulemaking because the rule was needed to protect public safety as demonstrated by numerous then-recent helicopter crashes). By proceeding with a 30-day comment period rather than a 60-day period, the Departments are able to more quickly finalize and implement this rule, which prevents persons with certain criminal histories, such as domestic violence or gang-related crimes, from receiving asylum and potentially residing or prolonging their presence in the United States on that basis during the pendency of the asylum process.

Regarding commenters' APA concerns about the statistical analysis in this rule, the Departments reiterate that they are unable to provide precise data on the number of persons affected by the rule because the Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. An attempt to quantify the population affected would risk providing the public with inaccurate data that at best would be unhelpful. As a general matter, the rule will likely result in fewer asylum grants annually, but the Departments do not believe that further analysis—in the absence of any reliable data—is warranted. *See Stilwell* v. *Office of Thrift Supervision,* 569 F.3d 514, 519 (D.C. Cir. 2009) ("The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation."); *see also id.* (upholding an agency's decision to rely on its "long experience" and "considered judgment," rather than statistical analyses, in promulgating a rule).

Likewise, the Departments disagree with commenters that the NPRM did not

sufficiently explain the reasons for adding additional per se criminal bars. As explained in the NPRM, immigration judges and the BIA have had difficulty applying the "particularly serious crime" bar and, therefore, the Departments believe additional standalone criminal bars will provide a clear and efficient process for adjudicating asylum applications involving criminal convictions. *See* 84 FR at 69646. The Attorney General and the Secretary have not issued regulations identifying additional categories of convictions that qualify as particularly serious crimes, which has in turn resulted in adjudicators and the courts analyzing on a case-by-case basis whether individual criminal statutes qualify as particularly serious crimes. However, this statute-by-statute determination has not provided adjudicators with sufficient guidance in making "particularly serious crime" determinations due to the individualized nature of the BIA's determinations. *See id.* By adding these standalone criminal bars, the rule helps ensure that immigration adjudicators will be able to apply clear standards outside of applying the particularly serious crime bar. In regards to commenters' concerns about the blanket felony conviction bar, the Departments chose to include a bar for all felony convictions because it provides a clear standard to apply in adjudicating the effect to be given to criminal offenses as part of asylum determinations.

Adjudicators will be able to efficiently determine the effect of criminal convictions without resort to complex legal determinations as to the immigration effects of a specific criminal statute. The Departments are aware that the particular personal circumstances and facts of each case are unique; however, the Departments believe that the clarity and consistency of a per se rule outweigh any benefits of a case-by-case approach.

Further, adding a bar to asylum eligibility for all felony convictions recognizes the significance of felony convictions. For example, Congress recognized the relationship between felonies and the seriousness of criminal offenses when it explicitly defined "aggravated felony" to include numerous offenses requiring a term of imprisonment of at least one year. *See* INA 101(a)(43)(F), (G), (J), (P), (R), (S) (8 U.S.C. 1101(a)(43)(F), (G), (J), (P), (R), (S)). Similarly, Congress focused on the importance of felonies in the Armed Career Criminal Act, a sentencing enhancement statute for persons who have been convicted of three violent felonies, which requires the predicate

offenses to be punishable by imprisonment for terms exceeding one year. *See* 18 U.S.C. 924(e)(2)(B).

The Departments also disagree that the use of the "reason to believe" standard for gang-related crime determinations is arbitrary and capricious. The "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations, and the Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes* v. *Holder,* 741 F.3d 1, 3–4 (9th Cir. 2014) (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). There is no reason that the Departments cannot apply this same standard when determining whether a criminal conviction involves gang activity.

In addition, the Departments disagree with commenters that the use of the "reason to believe" standard would enable adjudicators to rely on inaccurate, ineffective, or discriminatory evidence when making determinations regarding gang-related crimes. As discussed above, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). Nothing in the rule undermines or withdraws from this standard. If an alien believes that an adjudicator has relied on inaccurate, ineffective, or discriminatory evidence in making this determination, such decision would be subject to further review.

Finally, the Departments clarify that this rule creates additional standalone criminal bars to asylum and does not alter the definitions of the "particularly serious crime" bar. As a result, this rule does not create any inconsistencies with the "particularly serious crime" bar statutory language regarding dangerousness, which, the Departments note, does not require a separate finding of dangerousness. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)); *see also, e.g., Matter of R–A–M–,* 25 I&N Dec. 657, 662 (BIA 2012) (explaining that, for purposes of the "particularly serious crime" bar, "it is not necessary to make a separate determination whether the alien is a danger to the community").

AR.00052

2. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

*Comment:* Commenters raised concerns that the Departments' cost-benefit analysis presented no evidence that potential benefits from the rule exceed the potential costs. For example, commenters explained that the Departments' primary stated reason for adopting new categorical bars was that the exercise of discretion has created inefficiency and inconsistency. However, commenters stated that the Departments' cost-benefit estimates failed to account for new assessments regarding numerous questions of law and fact that the rule would require. Accordingly, commenters argued that the Departments' cost-benefit analysis was unreliable.

Further, commenters stated that the agencies did not comply with Executive Orders 12866, 13563, and 13771, which require agencies to quantify potential costs to the fullest extent possible. Commenters explained that the Departments noted that the rule would likely result in fewer asylum grants annually but failed to quantify or evaluate the impact of the decrease and did not provide any evidence or indication that an attempt was made at quantifying this impact. Commenters explained that the Departments are required to use the best methods available to estimate regulatory costs and benefits, even if those estimates cannot be precise. Commenters also noted that the Departments did not attempt to provide a high and low estimate for the rule's potential impacts despite such an estimation being common practice in rulemaking.

Commenters noted that public comments on this rule and other recent asylum-related rulemakings provided the Departments with data regarding the impacts of asylum denials. Commenters gave examples of potential costs that the Departments failed to consider, including, for example, costs from the differences in benefits for individuals who may obtain only lesser protection in the form of statutory withholding of removal or protection under the CAT regulations; costs from the detention and deportation of individuals who would otherwise have meritorious asylum claims; economic and non-economic costs to asylum-seekers' families; costs to businesses that currently employ or are patronized by asylum-seekers; costs from the torture and killings of deported asylum-seekers;

and intangible costs from the diminution of respect for U.S. treaty obligations and diminution of respect for human life and the safety of asylum-seekers, among others. As a result, commenters stated that the Departments did not support their conclusion that "the expected costs of this proposed rule are likely to be de minimis."

*Response:* The Departments disagree that the rule will create additional adjudicatory burdens that will outweigh the rule's benefits. The purpose of the rule is to limit asylum eligibility for persons with certain criminal convictions, which in turn will lessen the burdens on the overtaxed asylum system. There are currently more than one million pending cases at the immigration courts, with significant year over year increases, despite a near doubling of the number of immigration judges over the past decade and the completion of historic numbers of cases. *See* EOIR, *Adjudication Statistics: Pending Cases* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1242166/download;* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (June 2020), *https://www.justice.gov/eoir/page/file/1242156/download;* EOIR, *Adjudication Statistics: New Cases and Total Completions* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1060841/download*). Of these pending cases, over 575,000 include an asylum application.

These new bars will help achieve the goal of alleviating the burden on the immigration system while retaining the existing framework for asylum adjudications. As stated in the NPRM, this rule does not change the role of an immigration judge or asylum officer in adjudicating asylum applications; immigration judges and asylum officers currently consider an applicant's criminal history to determine the associated immigration consequences, if any, and whether the applicant warrants asylum as a matter of discretion. *See* 84 FR at 69657–58. These additional bars will be considered under that existing framework and, therefore, the Departments do not anticipate additional costs to the adjudication process.

In addition, the Departments believe the rule complies with the cost-benefit analysis required by Executive Orders 12866, 13563, and 13771. Executive Order 12866 requires the Departments to quantify costs "to the fullest extent that these can be usefully estimated." *See* E.O. 12866, 58 FR 51735, 51735, sec. 1(a) (Sept. 30, 1993). As explained in the NPRM, the Departments do not maintain data on the number of asylum applicants with criminal convictions or,

more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. Without this data, the Departments cannot reliably estimate the population effected by this rule, outside of identifying the group likely affected by the rule: Asylum applicants with criminal convictions and pertinent criminal conduct, barred under this rule, and asylum applicants denied asylum solely as a matter of discretion that will no longer receive automatic review of such decisions.

Based on this identified population, commenters provided a number of potential ancillary costs to the likely increase in asylum denials under these additional bars, which the Departments have reviewed. As explained in the NPRM, a main effect of the likely increase in asylum denials is a potential increase in grants of statutory withholding of removal or protection under the CAT regulations. 84 FR at 69658. These forms of protection do not provide the same benefits as asylum, including the ability to gain permanent status in the United States, obtain derivative status for family members, or travel outside the country. Such non-monetary costs are difficult to quantify, but the Departments believe that the similarly difficult-to-quantify benefits associated with the rule—such as a reduction in the risks associated with dangerous aliens and an increase in adjudicative efficiency—outweigh these costs.

Commenters also cited other potential costs, such as the effects that the bars could have on businesses employing or patronized by asylum applicants. However, such projections were general, tenuous, and unsupported by data, and the Departments are unaware of any reliable data parsing business income attributable to individuals affected by this rule—*i.e.,* asylum applicants who have been convicted of or engaged in certain types of criminal behavior—as opposed to non-criminal asylum applicants, asylees, refugees, aliens granted statutory withholding of removal or protection under the CAT, or other groups of aliens in general. Moreover, because aliens may still obtain work authorization if granted withholding of removal or protection under the CAT, 8 CFR 274a.12(a)(10), this rule would not necessarily foreclose employment or patronage opportunities for aliens subject to its parameters. Finally, even if there were identifiable economic costs for these aliens, the Departments believe that the benefits associated with limiting asylum eligibility based on certain criminal conduct would outweigh them because

of (1) the rule's likely impact in improving adjudicatory efficiency, and (2) the intangible benefits associated with promotion of the rule of law. *See* E.O. 12866, 58 FR at 51734 (directing agencies to account for "qualitative" benefits that are "difficult to quantify," but which are "essential to consider"). The Departments further disagree with commenters' assertions that these bars will have a negative intangible cost on the United States' interests or international standing, as Congress expressly conferred on the Attorney General and the Secretary the authority to provide these additional asylum limitations, which—as explained in the NPRM—are consistent with U.S. treaty obligations. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); 84 FR at 69644.

## III. Provisions of the Final Rule

The Departments have considered and responded to the comments received in response to the NPRM. In accordance with the authorities discussed above in section I.A, the Departments are now issuing this final rule to finalize the NPRM. The final rule adopts the provisions of the NPRM as final, with the following minor edits for clarity, for the reasons discussed above in section II in response to the comments received.[42]

### A. 8 CFR 208.13(c)(6)(ii)

As drafted in the NPRM, 8 CFR 208.13(c)(6)(ii) would have included a reference to "the Secretary:" "The alien has been convicted [of a crime] that the Secretary knows or has reason to believe * * * ." For internal consistency within 8 CFR 208.13(c)(6)(ii) and for specificity, the Departments are replacing this reference to "the Secretary" with "the asylum officer," the officials in DHS who adjudicate asylum applications.

### B. 8 CFR 1208.13(c)(6)(ii)

Regulations in chapter V of 8 CFR govern proceedings before EOIR and not before DHS. The Departments, however, mistakenly listed both the Attorney General and the Secretary in 8 CFR 1208.13(c)(6)(ii) as drafted in the NPRM: "The alien has been convicted [of a crime] that the Attorney General or Secretary knows or has reason to believe * * * ." This final rule removes the reference to the Secretary so that 8 CFR 208.13(c)(6)(ii), governing DHS, references the Secretary, and 8 CFR 1208.13(c)(6)(ii) references only officials within DOJ. It further changes "Attorney

General" to "immigration judge" for internal consistency within the rest of 8 CFR 1208.13.

### C. 8 CFR 1208.13(c)(6)(v)(B)

This rule amends the cross-reference in 8 CFR 1208.13(c)(6)(v)(B) so that it reads "under paragraph (c)(6)(v)(A)" instead of "under paragraph (c)(6)(v)" as published in the NPRM. This change provides clarity and matches the same cross-reference in 8 CFR 208.13(c)(6)(v)(B)–(C) and 8 CFR 1208.13(c)(6)(v)(C).

In addition, this rule changes "adjudicator" to "immigration judge" for specificity and clarity. This matches the specific reference to "asylum officer," who is the relevant adjudicating entity for DHS, in 8 CFR 208.13(c)(6)(v)(B).

### D. 8 CFR 1208.13(c)(7)(v)

As with the change discussed above to 8 CFR 1208.13(c)(6)(v)(B), this rule corrects the reference to the "asylum officer" to read "immigration judge" in 8 CFR 1208.13(c)(7)(v). The immigration judge is the relevant adjudicator for DOJ's regulations.

### E. 8 CFR 1208.13(c)(9)

As with the change discussed above regarding 8 CFR 1208.13(c)(6)(v)(B), this rule removes "or other adjudicator" from the proposed text for 8 CFR 1208.13(c)(9). This change provides clarity because the immigration judge is the relevant adjudicator for DOJ's regulations and matches the specific reference to only an "asylum officer" in 8 CFR 208.13(c)(9).

### F. 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii)

This rule amends the same language in both 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) so that the provisions instruct that an alien will be barred from asylum if the immigration judge or asylum officer "knows or has reason to believe" that the alien has engaged on or after the effective date in certain acts of battery or extreme cruelty. Previously, these provisions provided "[t]here are serious reasons for believing" the alien has engaged in such conduct. In other words, the Departments have replaced the "serious reasons for believing" standard in proposed 8 CFR 208.13(c)(6)(vii) and proposed 1208.13(c)(6)(vii) with a "knows or has reason to believe" standard.

This change is intended to prevent confusion and ensure the rule's consistency, both within the new provisions it adds to 8 CFR and with the INA more generally. As discussed

above, the "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (providing that an alien who "the consular officer or the Attorney General knows or has reason to believe" is an illicit trafficker of controlled substances is inadmissible). The Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes,* 741 F.3d at 3–4 (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). Further, without this change, the rule may have created additional unintended questions regarding what sort of reasons to believe are sufficient to qualify as "serious" reasons. Although the Departments are modifying the language in the final rule to reduce the likelihood of confusion, they reiterate that the language in 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) is intended to be analogous to similar provisions in 8 CFR 204.2.

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

### B. Administrative Procedure Act

This final rule is being published with a 30-day effective date as required by the Administrative Procedure Act. 5 U.S.C. 553(d).

### C. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

---

[42] In addition, the final rule makes clarifying grammatical edits to the punctuation of the proposed rule, such as by replacing semicolons with periods where relevant.

*D. Congressional Review Act*

The Office of Information and Regulatory Affairs has determined that this rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*E. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

The Office of Information and Regulatory Affairs, Office of Management and Budget ("OMB"), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866, but not an economically significant regulatory action. Accordingly, the rule has been submitted to OMB for review. The Departments certify that this rule has been drafted in accordance with the principles of Executive Order 12866, section 1(b); Executive Order 13563; and Executive Order 13771.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of using the best available methods to quantify costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Similarly, Executive Order 13771 requires agencies to manage both the public and private costs of regulatory actions.

Because this final rule does not make substantive changes from the NPRM that would impact the rule's expected costs and benefits, the Departments have performed the same analysis as set out in the NPRM. 84 FR at 69657–59.

This rule provides seven additional mandatory bars to eligibility for asylum pursuant to the Attorney General's and the Secretary's authorities under sections 208(b)(2)(C) and 208(d)(5) of the INA (8 U.S.C. 1182(b)(2)(C) and

1182(d)(5)).[43] This rule adds bars on eligibility for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of, or engage in criminal conduct, as appropriate, with respect to: (1) A felony under Federal, State, tribal, or local law; (2) an offense under section 274(a)(1)(A) or (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A) or 1324(a)(2)) (Alien Smuggling or Harboring); (3) an offense under section 276 of the Act (8 U.S.C. 1326) (Illegal Reentry); (4) a Federal, State, tribal, or local crime involving criminal street gang activity; (5) certain Federal, State, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a Federal, State, tribal, or local domestic violence offense; and (7) certain misdemeanors under Federal, State, tribal, or local law for offenses related to false identification; the unlawful receipt of public benefits from a Federal, State, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

The seven bars are in addition to the existing mandatory bars relating to the persecution of others, convictions for particularly serious crimes, commission of serious nonpolitical crimes, security threats, terrorist activity, and firm resettlement in another country that are currently contained in the INA and its implementing regulations. *See* INA 208(b)(2) (8 U.S.C. 1158(b)(2)); 8 CFR 208.13, 1208.13. Under the current statutory and regulatory framework, asylum officers and immigration judges consider the applicability of mandatory bars to the relief of asylum in every proceeding involving an alien who has submitted a Form I–589 application for asylum. Although this rule expands the mandatory bars to asylum, it does not change the nature or scope of the role of an immigration judge or an asylum officer during proceedings for consideration of asylum applications. Immigration judges and asylum officers are already trained to consider both an alien's previous conduct and criminal record to determine whether any immigration consequences result, and this rule does not propose any adjudications that are more challenging than those that are already conducted. For example, immigration judges already consider the documentation of an alien's criminal record that is filed by

the alien, the alien's representative, or the DHS representative in order to determine whether one of the mandatory bars applies and whether the alien warrants asylum as a matter of discretion. Because the new bars all relate to an alien's criminal convictions or other criminal conduct, adjudicators will conduct the same analysis to determine the applicability of the bars proposed by the rule.[44] The Departments do not expect the additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications.

The expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually;[45] however, because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application, neither DOJ nor DHS can quantify precisely the expected decrease. An alien who would be barred from asylum as a result of the rule may still be eligible to apply for the protection of withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or withholding of removal or deferral of removal under regulations implementing U.S. obligations under Article 3 of the CAT. *See* INA 241(b)(3) (8 U.S.C. 1231(b)(3));

---

[43] As discussed further below, this rule will not otherwise impact the ability of an alien who is denied asylum to receive the protection of withholding of removal under the Act or withholding of removal or deferral of removal under the CAT.

[44] The Departments note that one of the new bars, regarding whether the alien has "engaged" in certain acts of battery or extreme cruelty, does not necessarily require a criminal conviction or criminal conduct. The Departments believe that a criminal arrest or conviction is the most likely evidence to be filed with the immigration court related to this bar, but even in cases where no such evidence is available, the analysis by immigration judges related to this bar is not an expansion from the current analysis immigration judges employ in determining whether conduct rises to level of "extreme cruelty" under 8 CFR 204.2(c)(1)(vi) in other contexts during removal proceedings. *See, e.g., Bedoya-Melendez v. U.S. Atty. Gen.,* 680 F.3d 1321, 1326–28 (11th Cir. 2012) (demonstrating that, although there is a circuit split as to whether the "extreme cruelty" analysis is discretionary, all circuits look to conduct and not convictions in conducting the "extreme cruelty" analysis); *Stepanovic v. Filip,* 554 F.3d 673, 680 (7th Cir. 2009) (explaining that, in analyzing whether conduct rises to the level of "extreme cruelty," the immigration judge "must determine the facts of a particular case, make a judgment call as to whether those facts constitute cruelty, and, if so, whether the cruelty rises to such a level that it can rightly be described as extreme"). In addition, adjudicators have experience reviewing questions of an alien's conduct in other contexts during the course of removal proceedings. *See* INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)) (providing that an alien is inadmissible if "the Attorney General knows or has reason to believe" that the alien is an illicit trafficker of a controlled substance, regardless of whether the alien has a controlled substance-related conviction).

[45] In Fiscal Year ("FY") 2018, DOJ's immigration courts granted over 13,000 applications for asylum. *See* EOIR, *Adjudication Statistics: Asylum Decision Rates,* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1248491/download.*

8 CFR 208.16 through 208.18; 1208.16 through 1208.18. For those aliens barred from asylum under this rule who would otherwise be positively adjudicated for asylum, it is possible they would qualify for withholding (provided a bar to withholding did not apply separate and apart from this rule) or deferral of removal.[46] To the extent this rule has any impacts, they would almost exclusively fall on that population.[47]

The full extent of the impacts on this population is unclear and would depend on the specific circumstances and personal characteristics of each alien, and neither DHS nor DOJ collects such data at such a level of granularity. Both asylum applicants and those who receive withholding of removal or protection under CAT may obtain work authorization in the United States. Although asylees may apply for lawful permanent resident status and later citizenship, they are not required to do so, and some do not. Further, although asylees may bring certain family members to the United States, not all asylees have family members or family members who wish to leave their home countries. Moreover, family members of aliens granted withholding of removal may have valid asylum claims in their own right, which would provide them with a potential path to the United States as well. The only clear impact is that aliens granted withholding of removal generally may not travel outside the United States without executing their underlying order of removal and, thus, may not be allowed to return to the United States; however, even in that situation—depending on the destination of their travel—they may have a prima facie case for another grant of withholding of removal should they attempt to reenter. In short, there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole.

Applications for withholding of removal typically require a similar amount of in-court time to complete as an asylum application due to a similar nucleus of facts. 8 CFR 1208.3(b) (an

asylum application is deemed to be an application for withholding of removal). In addition, this rule does not affect the eligibility of applicants for the employment authorization documents available to recipients of those protections and during the pendency of the consideration of the application in accordance with the current regulations and agency procedures. *See* 8 CFR 274a.12(c)(8), (c)(18), 208.7, 1208.7.

This rule removes the provision at 8 CFR 208.16(e) and 1208.16(e) regarding automatic reconsideration of discretionary denials of asylum. This change has no impact on DHS adjudicative operations because DHS does not adjudicate withholding requests. DOJ estimates that immigration judges nationwide must apply 8 CFR 1208.16(e) in approximately 800 cases per year on average.[48] The removal of the requirement to reconsider a discretionary denial will increase immigration court efficiencies and reduce any cost from the increased adjudication time by no longer requiring a second review of the same application by the same immigration judge. This impact, however, would likely be minor because of the small number of affected cases, and because affected aliens have other means to seek reconsideration of a discretionary denial of asylum. Accordingly, DOJ has concluded that removal of paragraphs 8 CFR 208.16(e) and 1208.16(e) would not increase the costs of EOIR's operations, and would, if anything, result in a small increase in efficiency. Removal of 8 CFR 208.16(e) and 1208.16(e) may have a marginal cost for aliens in immigration court proceedings by removing one avenue for an alien who would otherwise be denied asylum as a matter of discretion to be granted that relief. However, of the average of 800 aliens situated as such each year during the last 10 years, an average of fewer than 150, or 0.4 percent, of the average 38,000 total asylum completions[49] each year filed an appeal in their case, so the affected population is very small, and the overall impact would be nominal at most.[50]

Moreover, such aliens would retain the ability to file a motion to reconsider in such a situation and, thus, would not actually lose the opportunity for reconsideration of a discretionary denial.

For the reasons explained above, the expected costs of this rule are likely to be *de minimis*. This rule is accordingly exempt from Executive Order 13771. *See* OMB, *Guidance Implementing Executive Order 13771, titled ''Reducing Regulation and Controlling Regulatory Costs''* (2017), *https://www.whitehouse .gov/sites/whitehouse.gov/files/omb/ memoranda/2017/M-17-21-OMB.pdf.*

### F. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

This rule does not propose new or revisions to existing ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. 3501 *et seq.,* and its implementing regulations, 5 CFR part 1320.

### I. Signature

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, has delegated the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the **Federal Register**.

### List of Subjects

#### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

---

[46] Because asylum applications may be denied for multiple reasons and because the proposed bars do not have exact analogues in existing immigration law, there is no precise data on how many otherwise grantable asylum applications would be denied using these bars and, thus, there is no way to calculate precisely how many aliens would be granted withholding. Further, because the immigration judge would have to adjudicate the application in either case, there is no cost to DOJ.

[47] In FY 2018, DOJ's immigration courts completed 45,923 cases with an application for asylum on file. For the first three quarters of FY 2018, 622 applicants were denied asylum but granted withholding.

[48] This approximation is based on the number of initial case completions with an asylum application on file that had a denial of asylum but a grant of withholding during FY's 2009 through the third quarter of 2018.

[49] Thirty-eight thousand is the average of completions of cases with an asylum application on file from FY 2008 through FY 2018. Completions consist of both initial case completions and subsequent case completions.

[50] Because each case may have multiple bases for appeal and appeal bases are not tracked to specific levels of granularity, it is not possible to quantify precisely how many appeals were successful on this particular issue.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble and pursuant to the authority vested in the Acting Secretary of Homeland Security, part 208 of title 8 of the Code of Federal Regulations is amended as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229, 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by adding paragraphs (c)(6) through (9) to read as follows:

### § 208.13   Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The asylum officer knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local

AR.00057

government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine

whether such order should be given any effect under this section.

**§ 208.16    [Amended]**

■ 3. Amend § 208.16 by removing and reserving paragraph (e).

**Department of Justice**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 4. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; Pub. L. 115–218.

■ 5. Amend § 1208.13 by adding paragraphs (c)(6) through (9) to read as follows:

**§ 1208.13    Establishing asylum eligibility.**

\*    \*    \*    \*    \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the immigration judge knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or

drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the immigration judge is not limited to facts found by the criminal court or

**67260**    **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The immigration judge knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the immigration judge determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An immigration judge is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

**§ 1208.16    [Amended]**

■ 6. Amend § 1208.16 by removing and reserving paragraph (e).

Approved:

**Chad R. Mizelle,**

*Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security.*

Approved:

Dated: October 14, 2020.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2020–23159 Filed 10–20–20; 8:45 am]

**BILLING CODE 4410–30–P 9111–97–P**

62 FR 10312-01, 1997 WL 93131(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

Executive Office for Immigration Review

8 CFR Parts 1, 3, 103, 204, 207, 208, 209, 211, 212, 213, 214, 216, 217, 221, 223, 232, 233, 234, 235, 236, 237,
238, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249, 251, 252, 253, 274a, 286, 287, 299, 316, 318, and 329

[INS No. 1788-96; AG ORDER No. 2071-97]

RIN 1115-AE47

Inspection and Expedited Removal of Aliens; Detention and Removal
of Aliens; Conduct of Removal Proceedings; Asylum Procedures

Thursday, March 6, 1997

**\*10312** AGENCY: Immigration and Naturalization Service, Justice, and Executive Office for Immigration Review, Justice.

ACTION: Interim rule with request for comments.

SUMMARY: This interim rule amends the regulations of the Immigration and Naturalization Service (Service) and the Executive Office for Immigration Review (EOIR) to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) governing expedited and regular removal proceedings, handling of asylum claims, and other activities involving the apprehension, detention, hearing of claims and ultimately the removal of inadmissible and deportable aliens. This rule incorporates a number of changes which are a part of the Administration's reinvention and regulation streamlining initiative.

DATES: Effective date: This interim rule is effective April 1, 1997.

Comment date: Written comments must be submitted on or before July 7, 1997.

ADDRESSES: Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW, Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS number 1788-96 on your correspondence. Comments are available for public inspection at the above address by calling (202) 514-3048 to arrange for an appointment.

FOR FURTHER INFORMATION CONTACT: For matters relating to the Executive Office for Immigration Review—Peggy Philbin, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2400, Falls Church, VA 22041, telephone number (703) 305-0470; for asylum issues—Michael Shaul, Field Manual Project Office, Immigration and Naturalization Service, 425 I Street NW, ULLB—4th Floor, Washington, DC 20536, telephone number (202) 616-7439; for inspections issues—Linda Loveless, Office of Inspections, Immigration and Naturalization Service, 425 I Street NW, Room 4064, Washington, DC 20536, telephone number (202) 616-7489; for detention and removal issues—Len Loveless, Office of Detention and Deportation, Immigration and Naturalization Service, 425 I Street NW, Room 3008, Washington, DC 20536, telephone number (202) 616-7799.

SUPPLEMENTARY INFORMATION:

**Background**

The Immigration and Naturalization Service and the Executive Office for Immigration Review jointly published a proposed rule on January 3, 1997 (62 FR 443-517 (1997)), to implement sections of the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, Pub. L. 104-208, which was enacted on September 30, 1996. This legislation significantly amended the Immigration and Nationality Act (Act) by revising the asylum process and providing a mechanism for the determination and review of certain applicants who demonstrate a credible fear of persecution if returned to their own country; expanding the grounds of inadmissibility; redefining applicants for admission to include aliens who entered the United States without inspection; creating new expedited removal procedures for aliens attempting to enter the United States through fraud or misrepresentation or without proper documents; consolidating the former exclusion and deportation proceedings into one unified removal proceeding; and reorganizing and renumbering numerous provisions of existing law.

The effective date of most of the provisions affecting asylum, inspection, and removal processes is April 1, 1997, and implementing regulations must be in place by March 1, 1997. The proposed rule allowed only a 30-day comment period. The limited comment period was necessary, given the short statutory deadline and the time needed to draft the rule, coordinate with interested agencies, and complete the regulatory review process by the Office of Management and Budget. In order to meet the statutory deadline for an implementing regulation and yet provide adequate opportunity for public input on the issues addressed in this rulemaking, this rule is being published as an interim rule with an additional 120-day comment period.

The Department received 124 comments on the proposed rule. Most of the commenters represented either attorney organizations or voluntary organizations predominantly involved with refugees and asylum claimants. Commenters addressed a variety of topics, with much of the focus on asylum, expedited removal, and voluntary departure. The Department also received comments from individual members of Congress and Congressional subcommittees. Since many of the comments were duplicative or endorsed the submissions of other commenters, they will be addressed by topic, rather than referencing each specific comment and commenter. Also, because many of the comments were complex and dealt with issues that may be better addressed after the Department has had a period of time to gain operational experience under the new law, suggestions that were not adopted for the interim period will be further considered when a final rule is prepared. A number of comments were received concerning sections of the regulations that were not specifically changed by the proposed rule, but were simply moved to new sections. The Department has not addressed these comments at this time, but will consider them either as part of separate rulemaking initiatives or as part of the final rule rather than the interim rule, after the Service and EOIR more closely study the proposals. This supplementary information will identify significant changes made to the proposed rule and briefly discuss reasons why many other major suggestions were not adopted at this time.

Although the Department has addressed the major comments received, there will be further detailed analysis of these comments, as well as consideration of the additional comments received during the 120-day comment period following publication of the interim regulation. This will ensure every suggestion is more fully explored. Commenters responding to the interim rule may choose to amend or expand on prior comments or address other areas not raised by commenters during the first comment period.

**Definitions**

Several sections of the statute, such as sections 212(a)(9), 240B, and 241 of the Act, refer to arriving aliens, even though this term is not defined in statute. After carefully considering these references, the Department felt that the statute **\*10313** seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States. For clarity, "arriving alien" was specifically defined in 8 CFR part 1, and the Department invited commentary on the proper scope of the regulatory definition.

One commenter suggested that aliens interdicted in United States waters should not be included in the definition because persons arriving in United States waters have already legally arrived in the United States. The Board of Immigration Appeals (BIA) has consistently held that the mere crossing into the territorial waters of the United States has never satisfied the test of having entered the United States. See Matter of G, 20 I&N Dec. 764 (BIA 1993). Aliens who have not yet established physical presence on land in the United States cannot be considered as anything other than arriving aliens. In addition, the Department has for years relied on interdiction efforts to stem the flow of inadmissible aliens and attempted illegal entries by sea. The inclusion of aliens interdicted at sea in the definition of arriving alien will support the Department's mandate to protect the nation's borders against illegal immigration. These provisions in no way alter the Department's current interdiction policy and should not be

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

construed as to require that all interdicted aliens be brought to the United States. Only when an express decision is made, in accordance with existing interdiction policies, to transport an interdicted alien to the United States, will that alien be considered an arriving alien for purposes of the Act.

Another commenter suggested that the definition be expanded to include aliens who have been present for less than 24 hours in the United States without inspection and admission. The Department extensively considered this and similar options, such as a distance-based distinction. For the reasons discussed below relating to the decision not to apply the expedited removal provisions at this time to certain aliens who entered without inspection, and considering the difficulty not only in establishing that the alien entered without inspection, but also in determining the exact time of the alien's arrival, the Department continues to believe the position taken in the proposed rule is correct and will not modify this definition in the interim rule. The definition of "arriving alien" will be given further consideration in the final rule, however, drawing upon the experience of the early implementation of the interim rule.

One commenter objected to the inclusion of parolee in the definition of arriving alien. The definition in the proposed rule states "An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act." The inclusion of paroled aliens was based on the statutory language in section 212(d)(5) of the Act, which states "* * * but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he or she was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Existing regulations at §212.5(d) relating to termination of parole echo this provision, stating "* * * he or she shall be restored to the status he or she had at the time of parole." The Department feels there is solid statutory basis for inclusion of certain paroled aliens in the definition of arriving alien, and so will retain this provision.

The Department has added two additional definitions for the sake of clarity. The term "Service counsel" has been added to clarify that although the term refers to any immigration officer designated to represent the Service before the Immigration Court or the BIA. Existing regulations interchangeably use this term and a variety of other terms, including trial attorney, district counsel and assistant district counsel. The term "aggravated felony" has also been defined by reference to section 101(a)(43) of the Act as amended by IIRIRA. The regulatory definition clarifies that the amended section 101(a)(43) applies to any proceeding, application, custody determination or adjudication.

**Parole of Aliens**

This interim rule modifies §212.5(a) to comport with the statutory change made by IIRIRA to section 212(d)(5)(A) of the Act.

**Withdrawal of Application for Admission**

The proposed rule contains provisions to implement the longstanding practice used by the Service to permit applicants for admission to voluntarily withdraw their application for admission to the United States in lieu of removal proceedings, now included in section 235(a)(4) of the Act. The withdrawal provisions in the proposed rule were written to conform with rulings of the BIA on withdrawal and with standard practice in many jurisdictions. Several commenters suggested that every alien subject to the expedited removal provisions should automatically be offered the opportunity to withdraw his or her application for admission prior to the secondary inspection interview. Permission to withdraw an application for admission is solely at the discretion of the Attorney General and is not a right of the alien, a premise that has been consistently upheld by the BIA. Only the Attorney General may decide whether to pursue removal charges against an alien who has violated the immigration laws. Withdrawal of application for admission is only one of several discretionary options that may be considered by the Service once the facts of the case are known, and so will not automatically be offered to all aliens subject to expedited removal.

The Department does, however, share the concern of several commenters that aliens who may be inadvertently or unintentionally in violation of the immigration laws or regulations should not be subject to the harsh consequences of a formal removal order. The Department also wishes to ensure that the expedited removal provisions and the discretionary option to permit withdrawal

are applied consistently and fairly throughout the nation. Although not included in the regulations at this time, the Department intends to formulate policy guidance and criteria for determining the types of cases in which such permission should or should not be considered.

**Classes Subject to Expedited Removal**

The Department requested public comment regarding the appropriate use of the authority conferred by the statute upon the Attorney General to expand the class of aliens subject to expedited removal. Most commenters commended the Department on its decision not to apply at this time the expedited removal provisions to aliens in the United States who have not been admitted or paroled and who cannot establish continuous physical presence in the United States for the previous two years. At this time, the Department will apply the provisions only to "arriving aliens," as defined in §1.1(q). The Department acknowledges that application of the expedited removal provisions to aliens already in the United States will involve more complex determinations of fact and will be more difficult to manage, and therefore wishes to gain insight and experience by initially applying these new provisions on a more limited and controlled basis. **\*10314**

The Department does, however, reserve the right to apply the expedited removal procedures to additional classes of aliens within the limits set by the statute, if, in the Commissioner's discretion, such action is operationally warranted. It is emphasized that a proposed expansion of the expedited removal procedures may occur at any time and may be driven either by specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations.

Although several commenters suggested that imposition of the provisions should only occur after publication of a proposed rule followed by a comment period, the statute does not impose any specific notice requirement in connection with the Attorney General's designation under section 235(b)(1)(A)(3), and certainly does not impose the requirement of a full administrative rulemaking. Indeed, such a requirement would defeat a major purpose of this provision: to allow the Attorney General to respond rapidly, effectively, and flexibly to situations of mass influx or other exigencies. The Attorney General has elected to exercise this authority in connection with publication of a notice in the Federal Register (in advance, where practicable) simply as a matter of sound administration and policy. The provisions contained in §235.3(b) of this interim rule will apply for now only to arriving aliens.

Several commenters suggested that certain classes of individuals, such as minors, certain nonimmigrant classifications, and aliens claiming to be lawful permanent residents or U.S. citizens, should not be subject to expedited removal, or that it should not be applied where resources or location do not permit optimal inspection conditions. Some stated that aliens in expedited removal should be entitled to a full hearing before an immigration judge. The statute is clear that the expedited removal provisions apply to all aliens inadmissible under sections 212(a)(6)(C) or (7) of the Act, and that such aliens are not entitled to further hearing or review with specific limited exceptions. Although the statute does not require it, the Department has provided for supervisory review and concurrence on all expedited removal orders. The statute itself provides for review of a claim to lawful permanent resident, refugee, or asylee status. In addition, the Department has a certain amount of prosecutorial discretion provided by statute. It may, in lieu of instituting removal proceedings, permit an alien to withdraw his or her application for admission in those cases where there is no fraudulent intent and the alien is inadmissible only through inadvertent error or misinformation. There are also discretionary waivers available in certain cases.

**Reorganization of §235.3(b)(1) and (2)**

In order to provide a more logical discussion of the applicability of the expedited removal provisions and the procedures for applying them, § 235.3(b)(1) (determination of inadmissibility) and §235.3(b)(2) (applicability) as they appeared in the proposed regulation have been interchanged and revised as discussed below.

**Expedited Removal Procedures**

Many commenters stated that the provisions in §235.3(b) were not sufficiently explicit to ensure that the expedited removal provisions are fairly and consistently applied. Because most of these commenters represented organizations primarily concerned with refugee and asylum issues, we have addressed this topic in detail below in the section relating to credible fear determinations and claims of asylum or fear of persecution by aliens subject to expedited removal.

**Review of Claim of Status as Lawful Permanent Resident, Asylee, or Refugee**

Several commenters suggested provisions of §235.3(b)(5) were not sufficiently clear to provide adequate review of claims by returning lawful permanent residents, asylees, or refugees who are subject to expedited removal. Specifically, the commenters asserted that §235.3(b)(5)(ii) could be interpreted to imply that an alien whose claim to lawful permanent residence is verified and is not granted a discretionary waiver or provided an opportunity through deferred inspection to present the required documents could be ordered removed under section 235(b) of the Act. These commenters requested that § 235.3(b)(5)(iv) of the proposed regulation be amended to allow that claimed lawful permanent residents, asylees, or refugees (who the Service has been unable to verify ever was admitted in such status) be referred directly to removal proceedings under section 240 of the Act.

For the following reasons, these sections of the proposed regulation will not be changed in the interim rule. Section 235.3(b)(5)(ii) of the proposed regulation relates to those arriving aliens whose prior admission as a lawful permanent resident has been verified by the immigration officer by referring to official Service records. The Department intends that when such a prior admission is verified, the individual will not be removed under the expedited removal provisions of section 235(b) of the Act, regardless of the officer's determination as to the individual's current admissibility and/or retention of such lawful permanent status. For that reason the first sentence of § 235.3(b)(5)(ii) sets forth this prohibition. Since the removal provisions under section 235(b) of the Act are not available, the only actions left for the examining officer are to: admit the individual (through the grant of a waiver if need be); defer inspection to allow the individual to retrieve the appropriate documents; or place the person in removal proceedings under section 240 of the Act. This process will allow those individuals verified as having once been admitted as a lawful permanent resident, asylee, or refugee a full evidentiary hearing in removal proceedings under section 240 of the Act before an immigration judge to address the heavily fact-based issues of abandonment of status or other issues concerning loss of status. The language "may initiate proceedings" was used here to indicate that the officer is not required to initiate any proceedings but may opt to admit the individual into the United States.

As for those individuals claiming to be returning lawful permanent residents, asylees, or refugees, but who are not verified by the Service as having ever been admitted in such status, the referral to the immigration judge in §235.3(b)(5)(iv) is for the purpose of allowing the individual to establish such a prior admission in such status, nothing more. If the individual establishes such a prior admission, the immigration judge will terminate the expedited removal order and at that point that person will be in the same position as the person whose prior admission was verified by the inspecting Service officer: the Service can admit the individual or contest his or her current retention of such status in the context of removal proceedings under section 240 of the Act.

Another commenter contended that it is not appropriate to refer aliens who are verified as having been admitted or establish that they were once admitted as lawful permanent residents, asylees, or refugees to proceedings under section 240 of the Act. Section 235(b)(1)(C) of the Act states that the Attorney General shall provide regulations for administrative review of an expedited removal order entered against "an alien who claims under oath . . ." to have **\*10315** been lawfully admitted as a lawful permanent resident, asylee, or refugee. The statute provides no further directive as to how aliens who actually have been admitted in such status are to be processed if, in fact, the Service believes that such status may no longer be valid. If that claim is never verified or established before the inspecting Service officer or an Immigration Judge, the expedited removal order entered against the alien will be effected and the alien will be removed from the United States. However, once an alien establishes admission in such status, it is not inconsistent with the statute for further proceedings against an alien known to have been lawfully admitted as a permanent resident, asylee, or refugee to occur in the context of proceedings under section 240 of the Act. Further, given the greater interests and ties to the United States normally at stake for such aliens compared to those arriving without any previous status, the Department considers it appropriate that verified arriving permanent residents, asylees, and refugees be accorded the protections inherent in proceedings under section 240 of the Act.

**Review of Claim to U.S. Citizenship**

Several commenters stated that while the statute and regulations provide for review of an expedited removal order of an alien claiming to be a lawful permanent resident, refugee, or asylee, there is no such provision for review of a claim to U.S. citizenship. While U.S. citizens are not subject to the inadmissibility and removal provisions of the Act and the Department makes every effort to prevent the inadvertent removal of U.S. citizens, there are approximately 35,000 false claims to U.S. citizenship made every year at ports-of-entry. Congress recognized this problem in IIRIRA by adding a new ground of inadmissibility to section 212(a)(6)(C)(ii) of the Act specifically designating such aliens as inadmissible and subject to the expedited removal provisions. Existing regulations at §235.1(b), which have been in place for many years, place the burden of establishing a claim to U.S. citizenship on the person seeking entry. Otherwise, that person is inspected as an alien. To provide an additional level of review and safeguard against a mistaken determination, the Department will institute the same procedures contained in §235.3(b)(5) for persons who have not been able to establish U.S. citizenship, but who maintain a claim under oath or under penalty of perjury to be U.S. citizens, which are used for persons claiming to be lawfully admitted as permanent residents, refugees, or asylees.

Several commenters stated that the regulations do not provide any criteria for the detention or release of these individuals. The provisions of §235.3(b)(2)(iii) requiring detention of all aliens subject to the expedited removal provisions and issued a removal order also apply to persons whose claim to lawful permanent resident, refugee, asylee, or U.S. citizen status has not been verified. To clarify that detention is required for these individuals, the interim rule reiterates this requirement in §235.3(b)(5)(i).

**Filing of an Application for a Refugee Travel Document While Outside the United States**

Several commenters remarked favorably on the proposal to revise 8 CFR part 223 to allow refugees and asylees to apply for refugee travel documents from outside the United States, after departure from the United States, under certain very limited circumstances. The Department proposed this revision with full awareness of the provision in section 208(c)(1) of the Act under which the Attorney General may allow the alien to travel abroad "with the prior consent of the Attorney General." Despite the implied language of the statute, the Department felt that an exception was warranted for those cases where the alien innocently departed in ignorance of the requirement or, although aware of the requirement, departed without applying for the document due to an urgent humanitarian need, such as the impending death of a close relative. It should be noted that the current regulations only require that an application be filed before departure, not that the applicant delay travel until after the application is approved and the document is received. The Service has always provided the option of allowing the alien to pick up the document overseas at an American consular post.

A few commenters suggested that the decision whether to accept such applications not be left to the discretion of the Service. This change has been made. However, the regulation does not remove the general requirement that the application be filed before departure, nor does it intend that the new procedure be viewed as a routine method of obtaining the document. Although not specifically stated in the regulation, the Department intends that if it is apparent that the alien knew of the general requirement and simply chose to ignore it (e.g., if the alien had previously been issued a refugee travel document through this "overseas procedure" and there was no emergency necessitating the more recent departure), the director may determine that favorable exercise of discretionary authority is not warranted. Accordingly, the regulation provides that the district director having jurisdiction over the overseas location, or over the inspection facility in the case of an alien at a port-of-entry, may deny the application as a matter of discretion.

A few commenters suggested that there be no limit on how long after departure the application may be filed. Others suggested that the time limit be shortened from 1 year to 6 months to coincide with the 6 month time frame in section 101(a)(13)(C) of the Act, which is the period during which a lawful permanent resident who meets certain other requirements is not considered to be an applicant for admission. Another commenter stated that the validity of a refugee travel document approved under this process should not be limited to 1 year from the date of the alien's departure from the United States, so long as the application was filed within 1 year of that departure. The 1-year limitation was chosen because it is the maximum validity period for which a document would have been approved had the alien complied with the requirement of filing prior to departure. Allowing an applicant to file from outside the United States more than 1 year after departure would effectively authorize a longer validity

period for the person who failed to comply with the requirement than for one who did. This would not be appropriate. Likewise, the 6-month period during which a lawful permanent resident (who meets the other criteria in section 101(a)(13) of the Act) is not deemed to be seeking admission is not analogous to that of the stranded refugee, since the refugee is clearly deemed to be seeking admission. Additionally, 6 months might be too short a time for the alien who realizes his or her error to file the application and for the Service to verify eligibility and approve that application. The Department feels that in those cases where it is proper to allow an exception from the requirement to file before departure, it is appropriate that the document be valid for the same length of time as for the person who complied with that requirement.

**Revision of Asylum Procedures**

In general, many commenters requested that specific "step-by-step" procedural instructions be placed in the regulations regarding the interview process at both the secondary inspection stage and the credible fear **\*10316** determination stage. Although a number of these suggestions have been adopted, others have not. While the Department appreciates both the necessity for equal and proper treatment of all cases and the advantages of standardization, it must also recognize that not all situations are identical and the interviewing officer must be allowed a certain amount of flexibility in conducting interviews to account for differences in individual situations.

**Convention Against Torture**

Many commenters urged that there be express reference in several parts of the regulation to the non-refoulement obligation under Article 3 of the Convention Against Torture. This article requires a state not to "expel, return ('refouler') or extradite a person to another state where there are substantial grounds for believing that he or she would be in danger of being subjected to torture." This article has been in effect for the United States since November 1994. Although Article 3 of the Torture Convention itself is not self-executing, the Attorney General has sufficient administrative authority to ensure that the United States observes the limitations on removal required by this provision. In fact, the Service has received and considered individual requests for relief under the Torture Convention since November 1994 and has arranged for relief where appropriate. For the present, the Department intends to continue to carry out the non-refoulement provision of the Torture Convention through its existing administrative authority rather than by promulgating regulations. The Service is, however, developing thorough guidelines to address Article 3 issues and intends to issue those guidelines soon. These guidelines generally, and the expedited removal process in particular, will be implemented in accordance with Article 3.

**Prohibitions on Filing Asylum Applications**

There were numerous comments on the prohibitions on the filing of asylum applications in section 208(a)(2) of the Act. Because of the importance of a decision to deny an alien the right to apply for asylum, the Department has chosen to adopt the suggestion that only asylum officers, immigration judges, and the BIA be empowered to make such determinations. The Department has also made clear that, while the alien must establish by clear and convincing evidence that he or she applied within one year of his or her arrival in the United States, the alien's burden of establishing that one of the exceptions in section 208(a)(2)(D) applies must only be to the "satisfaction of the Attorney General." The rule also contemplates that the asylum officer or immigration judge hearing such a case will explore the reasons for the late filing. Finally, and importantly, the Department has decided to follow the recommendation that the date of arrival used to determine the one-year period in section 208(a)(2)(B), consistent with the effective date of that section, be no earlier than April 1, 1997. Thus, the first case to which this prohibition could apply would be one filed on April 2, 1998.

Regarding the changed circumstances exception in section 208(a)(2)(D), the Department has followed the recommendation of numerous commentators to drop the language limiting this exception, for purposes of section 208(a)(2)(B), to circumstances that arise after the one-year period. The Department has also decided to provide a better definition of this exception by indicating that the definition may include either changed conditions in the home country or changes in objective circumstances relating to the applicant in the United States, including changes in applicable U.S. law, that create a reasonable possibility that the applicant may qualify for asylum. Because of inconsistency between the formulation of changed circumstances in section 208(a)(2)(D)

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and the formulation in section 240(c)(5)(ii) of the Act, which permits an alien to file a motion to reopen beyond the time limit normally applicable to such a motion, the Department has decided to drop the requirement that, for purposes of the prohibition in section 208(a)(2)C), such exception may only be raised through a motion to reopen.

A large number of commenters requested that the Department list examples of what is meant by extraordinary circumstances within the meaning of section 208(a)(2)(D) of the Act, and several commenters suggested examples that they believed were appropriate. Accordingly, the Department has included such a list in the interim rule. It is important to bear two points in mind when reviewing the list. First, the list is not all-inclusive, and it is recognized that there are many other circumstances that might apply if the applicant is able to show that but for such circumstances the application would have been filed within the first year of the alien's arrival in the United States. Second, the alien still has the burden of establishing the existence of the claimed circumstance and that but for that circumstance, the application would have been filed within the year.

Some commenters requested that the Department clarify that failure to establish changed circumstances or extraordinary circumstances might bar an applicant from applying for asylum, it does not bar him or her from applying for withholding of removal. The Department agrees and the interim rule contains this clarification.

Some commenters objected to the requirement that an alien who meets the extraordinary circumstances criteria, file the application "as soon after the deadline as practicable given those circumstances," preferring instead the phrase "within a reasonable time period given those circumstances." The Department has adopted this suggestion and a similar formulation for the "changed circumstances" exception.

### "Asylum-Only" Hearings

The Department noted a conflict in the proposed rule between the provisions of §208.2(b)(1)(i)(C) and §252.2(b) regarding crewmembers who are granted landing permits prior to April 1, 1997, and subsequently become deportable. The former provision would place such alien in "asylum-only" proceedings before the immigration judge, while the latter would place him or her in regular removal proceedings under section 240 of the Act. The interim rule corrects this conflict by specifying that the "asylum-only" process applies to those crewmembers granted landing privileges on or after April 1, 1997. Also, § 208.2(b)(2) has been expanded to explain the consequences of failure to appear for an asylum-only hearing and to set forth conditions and limitations on reopening such proceedings.

### Discovery and FOIA Issues

Some commenters expressed concern about the statement in 8 CFR 208.12 that "[n]othing in this part shall be construed to entitle the applicant to conduct discovery directed towards the records, officers, agents, or employees of the Service, the Department of Justice or the Department of States." Specifically, they feared that the provision would preclude someone from seeking, or excuse the Service from providing, information under the Freedom of Information Act (FOIA). This fear is totally groundless. FOIA provisions are covered under separate statutory and regulatory bases. The Service is guided by 5 U.S.C. 522 and 8 CFR 103 with regard to FOIA matters, neither of which are in any way affected by this rulemaking. **\*10317**

### Persecution for Illegal Departure or Applying for Asylum

Several commenters objected to the proposed elimination of §208.13(b)(2)(ii) and §208.16(b)(4), which require asylum officers and immigration judges to give "due consideration" to evidence that the government of the applicant's country of nationality or last habitual residence persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country. These commenters interpreted this change to mean that the Department does not wish to consider seriously such evidence or to grant asylum or withholding to persons who are at risk of punishment for illegal departure from their countries or for applying for asylum abroad. This is not the case. The Department and the United States Government continue to deplore and oppose certain countries' practice of severely punishing their citizens for illegal departure or for applying for asylum in another country. The Department also acknowledges that persons who face severe punishment for such acts may continue to

qualify for asylum or withholding of removal. However, the regulation at issue did not clearly implement this policy. First, it requires only that asylum officers and immigration judges give "due consideration" to evidence of such practices; this is a vague and indefinite standard. Second, it obliges adjudicators to consider evidence of whether a country "persecutes" its nationals for such actions. Such language begs the very question that an adjudicator must answer in deciding such a case: Does the alleged punishment amount to persecution? It is well-established that not all punishment for illegal departure constitutes persecution. See, e.g., Sovich v. Esperdy, 319 F. 2d 21 (2d Cir. 1963); Matter of Chumpitazi, 16 I&N Dec. 629 (BIA 1978). However, in some cases, it may. Such a question must be resolved on a case-by-case basis. Thus, rather than continue to have an ambiguous regulation on this issue, the Department believes its adjudicators should apply the same standards to these cases as they would to any other case in which the applicant claims a fear that derives from governmental prosecution. This is best accomplished by removing the provisions in question from the regulations.

**Exception to the Prohibition on Withholding of Deportation in Certain Cases**

Several commenters objected to the proposed rule's limitation in § 208.16(c)(3) on those aliens who may be eligible for relief under section 243(h)(3) of the Act, as amended by Pub. L. 104-132. In particular, these commenters object to the notion that the United States may summarily preclude from eligibility for withholding of deportation aliens convicted of a particularly serious crime, including an aggravated felony, without individually considering their cases. However, it is well established in U.S. law that aliens who have been convicted of an aggravated felony are mandatorily barred from obtaining withholding of deportation. See, e.g., Kofa v. INS, 60 F. 3d 1084, 1090 (4th Cir. 1995) (en banc). In the proposed regulation implementing section 243(h)(3) of the Act, the Department decided, consistent with the revisions made to the withholding of deportation statute by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, to make relief under this section available only to those persons convicted of an aggravated felony who receive an aggregate sentence of imprisonment of less than 5 years. This proposal is almost entirely consistent with a recent precedent decision issued by the BIA on this issue. See Matter of Q-T-M-T-, Int. Dec. 3300 (BIA 1996). Thus, the Department intends to retain the basic approach in the proposed regulation. We have only added a sentence providing that an alien convicted of an aggravated felony shall be presumed to have been convicted of a particularly serious crime. This minor change renders the regulation fully consistent with the Board's decision in Matter of Q-T-M-T-, supra.

**Admission of the Spouse and Children of an Asylee**

The proposed rule reserved §208.19 for regulations pertaining to the admission of the spouse and children of an asylee. This matter was the subject of a separate proposed rule published July 9, 1996, see 61 FR 35,984 (1996) and the Department had intended to incorporate the revised regulations into this interim rule. However, because analysis of the comments to that earlier proposed rule has not been completed, the Department will instead redesignate the existing regulations at §208.21 as §208.19. The revised regulations on the admission of the spouse and children of an asylee will be incorporated into the final regulations, which will be published after the expiration of the comment period for this interim rule.

**Credible Fear Standard**

Several commenters urged that we adopt regulatory language emphasizing that the credible fear standard is a low one and that cases of certain types should necessarily meet that standard. Since the statute expressly defines the term "credible fear of persecution," we have chosen not to provide in the rule a further refinement of this definition. However, both INS and EOIR will give extensive training to their officials on the purpose of the credible fear standard and how it is to be applied to particular cases. The Department believes that such training will ensure that the standard is implemented in a way which will encourage flexibility and a broad application of the statutory standard.

**Employment Authorization for Asylum Applicants**

Almost all who chose to comment on the Department's position regarding work authorization for asylum applicants were pleased with the decision to continue to allow the applicant to apply for an employment authorization document once the asylum application has been pending for 150 days. One commenter requested that the 150-day period be abolished, but that

suggestion was not deemed viable, especially in light of the new statutorily-mandated 6-month minimum time before granting such authorization contained in section 208(d)(2) of the Act.

The Department has also modified the regulations relating to employment authorization at §§208.7(a) and 274a.12(a)(8) to ensure that applicants who appear to an asylum officer to be eligible for asylum but have not yet received a grant of asylum are able to obtain employment authorization. Section 208(d)(5)(A)(i) of the Act obliges the Service, prior to granting asylum, to check the identity of the applicant "against all appropriate records or databases maintained by the Attorney General and by the Secretary of State * * *." Such databases include, among others, the Federal Bureau of Investigation's (FBI) fingerprint database. At present, the Service initiates such a fingerprint check at the time it grants asylum; if the check turns up information that undercuts that decision, asylum is later revoked. The Service's experience is that the FBI's fingerprint checks often take a significant period of time to complete. The new statutory requirement at section 208(d)(5)(A)(i) of the Act thus means that after April 1, 1997, an alien who would otherwise appear to be eligible for asylum may have to wait for a long period of time before he or she can be granted asylum or employment authorization. (A similar problem may  **\*10318**  arise in the case of an alien who is determined to be a refugee under the new language in section 101(a)(42) of the Act but is precluded from being granted asylum because of the cap in section 207(a)(5) of the Act.) Such a result is contrary to one of the chief purposes of the asylum reforms brought about by the regulatory changes of January 1995: to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible. Thus, consistent with the authority in section 208(d)(2) of the Act, the Department has decided to make employment authorization available to asylum applicants who are recommended for a grant of asylum but have not yet received such grant of asylum or withholding. An alien may apply for employment authorization under these provisions as soon as he or she receives notice of the grant recommendation.

**Credible Fear Determinations and Claims of Asylum or Fear of Persecution by Alien Subject to Expedited Removal**

Under the new section 235(b)(1)(A)(ii) of the Act, an alien subject to expedited removal who indicates an intention to apply for asylum or who expresses a fear of persecution will be referred to an asylum officer to determine if the alien has a credible fear of persecution. Many commenters stated that the regulation in §235.3 was not sufficiently detailed in delineating the following procedures for recognizing and referring arriving aliens who may be genuine refugees fleeing persecution: disclosures to arriving aliens; conditions of secondary inspection; use of interpreters; representation during secondary inspection; written record of proceeding; time and place of credible fear interview; detention pending a determination of credible fear; and detention following a determination of credible fear. We will address these concerns individually.

**Disclosures to Arriving Aliens**

Many commenters expressed the opinion that all arriving aliens should be provided with information concerning the credible fear interview. This contention is based on the language of the statute in section 235(b)(1)(B)(iv) that states: "The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible * * *." The commenters' position is that this requirement is not limited only to aliens who "are" eligible, but that all aliens who are suspected of qualifying for expedited removal "may" be eligible, and that the information should be given before the secondary inspection pre-screening process.

To understand the Service position on this issue, one must understand the general inspection process. All persons entering the United States at ports-of-entry undergo primary inspection. U.S. citizens are exempt from the inspection process, but must nevertheless undergo an examination to determine entitlement to exemption from inspection. In FY 96, the Service conducted more than 475 million primary inspections. During the primary inspection stage, the immigration officer literally has only a few seconds to examine documents, run basic lookout queries, and ask pertinent questions to determine admissibility and issue relevant entry documents. At most land border ports-of-entry, primary inspection duties are shared with U.S. Customs inspectors, who are cross-designated to perform primary immigration inspections. If there appear to be discrepancies in documents presented or answers given, or if there are any other problems, questions, or suspicions that cannot be resolved within the exceedingly brief period allowed for primary inspection, the person must be referred to a secondary inspection procedure, where a more thorough inquiry may be conducted. In addition, aliens are often referred to secondary inspection for routine matters,

such as processing immigration documents and responding to inquiries. While millions of aliens (almost 10 million in FY 96) are referred to secondary inspection each year for many reasons, approximately 90 percent of these aliens are ultimately admitted to the United States in a very short period of time once they have been interviewed and have established their admissibility.

The secondary officer often does not know if an alien is likely to be removed under the expedited removal process until he or she has questioned the alien. Congress, in drafting the expedited removal provisions, chose to include both section 212(a)(6)(C) and 212(a)(7) of the Act as the applicable grounds of inadmissibility. The common perception is that most expedited removal cases will involve obvious fraudulent documents, or aliens arriving with no documents at all. This is not necessarily the type of case that most frequently falls within the provisions of sections 212(a)(6)(C) and (7) of the Act. Section 212(a)(6)(C) of the Act includes "any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this Act * * *," as well as aliens who falsely represent themselves to be citizens of the United States. In addition to the presentation of fraudulent documents, the falsity of which may not be verified until a thorough examination has been conducted, the fraud and misrepresentation referenced in this section may include falsehoods told by the alien concerning his or her admission or other misrepresentations told to Government officials now or in the past.

Section 212(a)(7) of the Act, in addition to covering a lack of valid documents (including expired or incorrect visas or passports), also encompasses the alien "who is not in possession of a valid unexpired immigrant visa." Under immigration law, aliens who cannot establish entitlement to one of the nonimmigrant categories contained in the Act are presumed to be immigrants, and, if not in possession of a valid immigrant visa, are inadmissible under section 212(a)(7) of the Act. The majority of the aliens currently found inadmissible to the United States fall into this category and will now be subject to expedited removal. Again, inadmissibility under this ground often cannot be determined until the secondary inspector has thoroughly questioned the alien.

To fully advise, prior to any secondary questioning, nearly all aliens referred to secondary inspection of the expedited removal procedures and of the possibility of requesting asylum would needlessly delay the millions of aliens who are ultimately found admissible after secondary questioning. For almost all of these people, asylum, fear of persecution, or fear of return is not an issue.

The Service has very carefully considered how best to ensure that bona fide asylum claimants are given every opportunity to assert their claim, while at the same time not unnecessarily burdening the inspections process or encouraging spurious asylum claims. Service procedures require that all expedited removal cases will be documented by creation of an official Service file, to include a complete sworn statement taken from the alien recording all the facts of the case and the reasons for a finding of inadmissibility. This sworn statement will be taken on a new Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The form will be used in every case where it is determined that an alien  **\*10319**  is subject to the expedited removal process, and contains a statement of rights, purpose, and consequences of the process. Among other things, it clearly advises the alien that this may be the only opportunity to present information concerning any fears or concerns about being removed from the United States, and that any information concerning that fear will be heard confidentially by another officer. The final page of the form contains a standard question asking if the alien has any fear or concern of being removed or of being sent home. If, during the course of the sworn statement, or at any time in the process, the alien indicates a fear or concern of being removed, he or she will be given a more detailed written explanation of the credible fear interview process prior to being placed in detention pending the credible fear interview. The Inspector's Field Manual will contain detailed instructions and guidance to officers to assist them in recognizing potential asylum claims, and this topic will also be covered in officer training. Every expedited removal case also undergoes supervisory review before the alien is removed from the United States. The Service is confident that these safeguards will adequately protect potential asylum claimants. To ensure that these procedures are followed in every expedited removal case, language has been added to §235.3(b)(4) outlining the procedures.

**Conditions of Secondary Inspection**

Numerous commenters indicated that the secondary inspection should be conducted in private, comfortable rooms, and that no secondary inspection should take place before an alien has had time to rest (some commenters suggested 24 hours), eat, and

consult with family, friends, counsel, or other representatives. The commenters also suggest that aliens should have access to interpreters before and during the screening process.

At airports, the inspection facilities for the Federal Inspection Services (FIS), which includes the Service, U.S. Customs Service, the U.S. Department of Agriculture, and the U.S. Public Health Service, are provided by the airport authorities. While the Government has input when new facilities are constructed, the inspection areas, especially in older airports, simply do not allow for the amenities suggested by the commenters. The same is true for land border ports, where the facility is usually provided by the General Services Administration and overall space is often extremely limited. The Service has always made every effort to afford as much privacy during sensitive or complex interviews as conditions allow, and will continue to do so.

As for delaying the secondary interview to allow every alien time to rest prior to being questioned, the Service again points out that it conducts more than ten million secondary inspections each year. Most of those questioned are eager to have their inspection completed as quickly as possible. The Department has neither the resources nor the authority to detain all secondary referrals without first conducting a prompt interview to determine inadmissibility.

**Use of Interpreters**

The issue of language barriers and the use of interpreters is not new to the Service. The Service makes use of interpreters whenever necessary and will continue to do so to ensure that all aliens are fully apprised of the proceedings against them. The Service currently uses its own officers, many of whom are bilingual or multilingual, airport personnel, or telephonic interpretive services when in-person interpreters are not available. Occasionally, family members or persons waiting to meet the arriving alien may be allowed to assist in translation of the interview. The Service will use appropriate means to ensure that aliens being removed are advised of and understand the reasons for the removal and the consequences of such removal.

**Representation During Secondary Inspection**

Several commenters stated that an alien subject to expedited removal should be able to obtain representation or counsel prior to any secondary inspection interview. As discussed in the section on disclosures to aliens in expedited removal, the secondary inspection officer often does not know that an alien will be subject to expedited removal until such questioning has taken place, nor will all determinations of inadmissibility under section 212(a)(6)(C) or (7) of the Act result in an expedited removal order. Section 292 of the Act provides that in any removal proceeding before an immigration judge, the person concerned shall have the privilege of being represented by counsel, at no expense to the Government. Congress did not amend this section to include proceedings before an immigration officer. In addition, while Congress specifically provided for consultation prior to the credible fear interview, it did not provide for consultation prior to the immigration inspection and issuance of the order. Therefore, the Department will retain its interpretation that an alien in primary or secondary inspection is not entitled to representation, except where the person has become the focus of a criminal investigation and has been taken into custody for that purpose.

**Written Record of Proceeding**

Several commenters expressed concern that there be a complete record of proceeding to ensure that Service officers are making proper decisions. As previously explained, an official Service file will be created on every expedited removal case. The file will include photographs, fingerprints, copies of any documentary or other evidence presented or discovered, and a complete written sworn statement. The sworn statement will record all facts of the case and the alien's statements. As with all sworn statements taken by the Service, the alien is required to initial each page and any corrections, and sign the statement certifying that he or she has read (or had read to him or her), the statement and that it is true and correct. When necessary, interpreters will be used. The language added to the regulation at § 235.3(b)(2) requires that such sworn statement be taken in every case. Procedures developed for the Inspector's Field Manual also contain very specific instructions regarding the record of proceeding.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Time and Place of Credible Fear Interview**

Several commenters requested that the regulations state where and when the credible fear interviews will take place. The statute provides that credible fear interviews may take place either at a port-of-entry or at other locations that the Attorney General may designate. The Service intends that most interviews will be conducted at Service detention facilities, but prefers the flexibility to make adjustments to this arrangement as the need arises. Therefore, this operational concern will not be addressed in the regulation. The Service maintains detention facilities near several major airports such as JFK, Miami, and Los Angeles, as well as many locations along the southern border and other sites like Denver, Seattle, and Houston. In circumstances where the port of arrival is not near a Service detention facility and it is impractical to transport the alien to a Service facility, the alien may be detained in other Service-approved detention sites, such as local or county jails. In these instances an asylum **\*10320** officer will travel to the detention site to conduct the interview.

Several commenters suggest that the Service should conduct credible fear interviews at its local asylum offices whenever possible. The Service declines to be bound by this suggestion because of the prohibitive costs involved in transporting aliens, under escort, to and from detention facilities. However, the Service retains the option to conduct interviews at places designated for asylum officers.

Similarly, the Service intends that aliens will normally be given 48 hours from the time of arrival at the detention facility, in which to contact family members, friends, attorneys, or representatives. During the referral process from the port-of-entry, they will be given a list of pro bono representatives. This list is provided for the purpose of consultation prior to the interview, and does not entitle the alien to formal counsel or representation during the credible fear interview. The aliens will be given access to a telephone to make such contacts. Commenters suggest that aliens be given petty cash or be permitted to make telephone calls at Government expense; however, the statute that provides for such consultation specifically states that the consultation shall be at no expense to the Government.

**Detention Pending a Determination of Credible Fear**

A few commenters stated that the provisions of §235.3(b)(4) for detention of aliens awaiting a credible fear determination are too harsh, and asked that the rule be amended to allow for parole of such aliens. However, because section 235(b)(1)(B)(iii)(IV) of the Act requires that an alien in expedited removal proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed," the Department feels that parole is appropriate only in the very limited circumstances specified in §235.3(b)(4). The interim rule has been amended, however, to clarify that aliens found to have a credible fear will be subject to the generally applicable detention and parole standards contained in the Act. Although parole authority is specifically limited while a credible fear determination is pending under §235.3(b)(4), those found to have a credible fear and referred for a hearing under section 240 of the Act will be subject to the rule generally applicable to arriving aliens in §235.3(c). In addition, §235.3(c) has been amended to retain detention authority for aliens whose admissibility will be determined in exclusion proceedings after April 1, 1997.

**Review of Credible Fear Determinations**

The proposed regulation provides that an alien may receive, upon request, review by an immigration judge of an asylum officer's finding of no credible fear. A number of commenters requested that language be inserted in the interim regulation which presumes that an asylum officer's finding of no credible fear will be reviewed by an immigration judge unless the alien desires to abandon the review and return to his or her home country. If such a suggestion is not adopted, these commenters request that, at a minimum, language be inserted requiring that the asylum officer advise the alien of his or her right to request review of the negative decision and requiring the officer to ask the alien whether he or she desires such review. The language of section 235(b)(1)(B)(iii)(III) of the Act clearly provides that the alien has the obligation to request review of a negative credible fear determination. The Department notes that §208.30(e) of the proposed regulation requires the asylum officer to inquire whether the alien wishes review of the negative credible fear determination. This provision is appropriated into Form I-589.

AR.00072

A number of commenters asked that the regulation provide that, whenever practicable, the credible fear review be conducted in person; that the alien may be assisted by an attorney or other representative; and that an interpreter be provided when necessary. Another commenter stated, however, that no counsel should be allowed in the review of credible fear determinations; rather, a representative should be allowed to submit a written statement. The Department recognizes the concerns raised by these commenters. However, because the proposed regulation sets forth a procedure for credible fear review that is consistent with the language of section 235(b)(1)(B)(iii)(III) of the Act and provides the Attorney General the flexibility to administer such a procedure, the rule was not changed.

One commenter asserted that the proposed regulation that provides for an alien who demonstrates a credible fear of persecution to be placed in removal proceedings under section 240 of the Act is incorrect. The commenter maintains that IIRIRA contemplates that such aliens will be limited to an "asylum only" hearing with an appeal to the Board. This portion of the regulation will not be changed in the interim rule. Section 235(b)(1)(B)(ii) of the Act provides that if an asylum officer determines that an alien has a credible fear of persecution, the alien "shall be detained for further consideration of the application for asylum. The remainder of section 235(b) of the Act is very specific as to what procedures should be followed if an alien does not establish a credible fear. However, the statute is silent as to the procedures for those who do demonstrate a credible fear of persecution. Once an alien establishes a credible fear of persecution, the purpose behind the expedited removal provisions of section 235 of the Act to screen out arriving aliens with fraudulent documents or no documents and with no significant possibility of establishing a claim to asylum has been satisfied. Therefore, the further consideration of the application for asylum by an alien who has established a credible fear of persecution will be provided for in the context of removal proceedings under section 240 of the Act.

**Detention Following a Determination of Credible Fear**

Numerous commenters stated that aliens who have established a credible fear of persecution are presumptively eligible for release and should not be detained unless the government can demonstrate that the alien poses a danger to the community or a risk of flight. Some stated that the burden should be on the government to prove that custody is necessary. Again, the clear language of the statute states that such aliens shall be detained. The parole provisions of section 212(d)(5) of the Act provide discretionary authority to the Attorney General to parole into the United States or from custody only on a case-by-case basis. The credible fear standard sets a low threshold of proof of potential entitlement to asylum; many aliens who have passed the credible fear standard will not ultimately be granted asylum. It should also be noted, as stated by one commenter, that these aliens are prima facie inadmissible to the United States. However, the Department intends, as part of the credible fear interview process, to assess the eligibility for parole of aliens who have been determined to have a credible fear. The discretion to release from custody will remain with the district director on a case-by-case basis.

**Effect of Initiation of Removal Proceedings**

Several commenters objected to the language in section 239.3 providing that the filing of a notice to appear has no  **\*10321**  effect in determining periods of unlawful presence. These commenters noted that this section of the regulation could be interpreted to mean that the period of time a respondent is in removal proceedings is not a period "authorized by the Attorney General," which would mean that removal proceedings would not toll the running of time periods for purposes of the bars to admission in section 212(a)(9)(B) of the Act. The result, the commenters assert, would be that people would be compelled to abandon their legitimate claims for relief from removal because, by pursuing such relief before an immigration judge or on appeal to the Board, an individual would risk accruing over 180 days in "unlawful status" and thereby becoming inadmissible under section 212(a)(9)(B)(i)(I) of the Act. The commenters recommended that either this language in section 239.2 be deleted or that it be replaced by a statement that the filing of a notice to appear tolls the period of unlawful presence.

Upon review, the Department has concluded that the regulation will be retained without change in the interim rule. Section 212(a)(9)(B)(iv) of the statute is clear that any period of illegal presence may tolled only in very limited circumstances. This section of the statute does not include issuance of a charging document among those circumstances. The Department does not agree that application of this section will deter aliens from pursuing valid claims for relief in removal proceedings. The same forms of relief, including asylum and adjustment of status, remain available in such cases, even after passage of the 180 day

and one year time limits. Similarly, availability of voluntary departure is unchanged. Further clarification of the applicability of section 212(a)(9) will be included in a separate proposed rule which the Service is currently drafting.

**Motions to Reopen After Departure From United States**

A few commenters recommended that motions to reopen be permitted after departure and that the Department delete the language in §3.2(d) of the proposed rule providing that motions to reopen or reconsider cannot be made by or on behalf of a person after that person's departure from the United States. These commenters contend that this regulation is no longer valid because IIRIRA substituted former section 106(c) of the Act with new section 242. New section 242 of the Act does not contain the provision of former section 106(c) barring judicial review of a final order of deportation or exclusion if the alien departed the United States after issuance of that order. The commenters assert that if a petition for review of habeas corpus is successful, the petitioner should be lawfully entitled to reopen his or her removal case, even though he or she departed from the United States. They argue that such motions will promote judicial efficiency and economy.

The Department has decided not to adopt this suggestion and the interim regulations will not be changed. No provision of the new section 242 of the Act supports reversing the long established rule that a motion to reopen or reconsider cannot be made in immigration proceedings by or on behalf of a person after that person's departure from the United States.

**Departure Constituting Withdrawal of Motion**

In the proposed regulation, §3.2(d) did not provide that departure from the United States after the filing of a motion to reopen or a motion to reconsider constitutes a withdrawal of such motion. The Department has reconsidered the advisability of adjudicating motions to reopen and reconsider subsequent to an alien's departure from the United States. The interim regulation retains the long established principal that any departure subsequent to moving to reopen or reconsider constitutes a withdrawal of that motion. The Department believes that the burdens associated with the adjudication of motions to reopen and reconsider on behalf of deported or departed aliens would greatly outweigh any advantages this system might render. Further, the Department is confident that the immigration judge's discretionary authority to stay the deportation or removal of an alien who has filed a motion to reopen or a motion to reconsider will safeguard an alien from being inappropriately deported before he is heard on his motion to reopen or motion to reconsider.

**Time and Numerical Limitations on Filing Motions**

A number of commenters pointed out that §§3.2(d) and 3.23(b) subject all parties to time and numerical limits for motions to reopen in deportation and exclusion proceedings, but apply those limits only to aliens in removal proceedings. These commenters argue that the same limitations should apply to all parties in all proceedings.

IIRIRA specifically mandates that "[a]n alien may only file one motion to reopen" in removal proceedings. Congress has imposed limits on motions to reopen, where none existed by statute before, and specifically imposed those limits on the alien only. The interim regulations will not be changed.

One commenter suggested that the time and numerical limitations for motions to reopen should be broader than changed country conditions, as provided in § 3.23(b)(4). The commenter asserted that IIRIRA contains a much broader exception for individuals to apply for asylum beyond the one year deadline and that it is inconsistent for the statute to provide these broader exceptions if eligible applicants will be barred from applying for asylum because of the stricter motion to reopen standard. As noted earlier, the Department has decided to drop the requirement that the changed circumstances exception to the one year filing deadline in section 208(a)(2) of the Act be raised only through a motion to reopen. The Department also notes that the standard for reopening an asylum case provided in 8 CFR 3.23(b)(4) is entirely consistent with the asylum reopening standard provided in IIRIRA.

**Retention of September 30, 1996 Cut-Off Date on Filing Certain Motions**

Some commenters indicated that §3.2(c)(2) does not retain the September 30, 1996 cut-off date for earlier motions to reopen, while the proposed section 3.2(b)(2) does retain the July 31, 1996 cut-off date for earlier motions to reconsider. The commenters point out that although these dates have passed, they should be retained to ensure the rights of respondents who submitted timely motions that have not yet been adjudicated. Since the commenters demonstrate that the cut-off date in §§3.2(c)(2) and 3.23(b)(1) are not necessarily obsolete references, those sections are revised in the interim regulation to retain the appropriate cut-off dates.

**Immigration Court Rules of Procedure**

One commenter noted that §3.12 omitted disciplinary proceedings under §292.3 from the scope of the rules of Immigration Court procedure. The commenter correctly noted that no explanation had been given as to why disciplinary proceedings were omitted from the scope of the rules. Section 292.3 is currently being revised by EOIR and will ultimately be moved into 8 CFR 3. It was thought that the disciplinary proceedings regulations would have been revised and moved into part 3 prior to publication of this interim regulation and that a reference to §292.3 would not be necessary. The disciplinary proceedings regulation, however, is still in progress. The interim  **\*10312**  rule will therefore place the reference to disciplinary proceedings pursuant to §292.3 back into §3.12.

One commenter claimed that §3.25(b), which allows the immigration judge to waive a hearing and enter a decision upon a stipulated request for that order, raises due process concerns because the provision requiring an immigration judge to determine that the alien's waiver is voluntary, knowing and intelligent is not an adequate safeguard. The interim rule does not change this provision. The requirement that the immigration judge determine if an unrepresented alien's waiver is voluntary, knowing and intelligent before granting a stipulated request for an order safeguards against an imprudent waiver of a formal adjudication on the part of an unrepresented alien. Further, the request for the order and waiver of the hearing must not only be stipulated to by both the alien and the Service, but must also be approved by the immigration judge. If an immigration judge is confronted with a stipulated request raising due process concerns, he or she may examine that request in the context of a hearing.

**Comments Relating to Removal Hearings Under Section 240 of the Act**

Several commenters were concerned with various aspects of the ordinary removal hearing process. One aspect of the removal process that received several comments was the method of service of Form I-862, Notice to Appear. Specifically, commenters were concerned that service of the notice to appear by regular mail was inadequate. A few commenters have assumed that because service by certified mail is not required in all cases, it will not be used in any case. Both the statute and the regulations, however, allow for service by regular mail only when personal service is "not practicable." Moreover, because the regulatory provisions at issue follow exactly the requirements of the Act, these provisions have not been changed in the interim rule.

Commenters expressed concern over the provision at §240.8(d) that states that it is the alien's burden to establish that mandatory grounds for denial of any application for relief do not apply. It is well-settled that an alien bears the burden of establishing eligibility for relief or a benefit. This provision merely reflects this well-settled rule. Also, an alien is only required to establish eligibility by a preponderance of the evidence. This provision has not been changed in the interim rule.

One commenter expressed concern that §240.10 of the proposed regulation does not cross-reference §236.1(e). Section 236.1(e) requires that every detained alien be notified that he or she has the privilege of communication with consular authorities. The commenter proposed that §240.10 require the Service to determine whether the alien is covered by §236.1(e) and therefore must have an opportunity to contact the consular officer before a responsive pleading. The Service is required to comply with this requirement before commencement of removal proceedings. In the unlikely event that the Service failed to comply with this requirement, such a procedure could unduly delay an otherwise routine removal case. Contact with a consular officer is unlikely to have any bearing on a respondent's inadmissibility or deportability. The delay in the proceedings and its attendant cost would generate little substantive benefit for the alien as a result.

One commenter expressed concern over provisions in §240.10(g) implementing section 241(b) of the Act. Those provisions allow the Attorney General to remove an alien to a country other than as designated by the alien under certain circumstances.

The commenter suggests a 30-day waiting period for removal from the time the alien is given notice of the new country of removal. The Service has considered this suggestion and has decided not to change this provision in the interim rule. This procedure is not required by the Act, and would place a significant strain on detention resources.

Another commenter argued that provisions in §240.7(a) relating to the admissibility of prior statements in removal proceedings were unnecessary. Specifically, the commenter was concerned about criminal pleas resulting in less than a criminal conviction and their effect on removal proceedings. It is always within the authority of the immigration judge to assign the statement a proper weight. Moreover, this provision was carried over from the prior regulations where it formerly existed at §242.14(c). Thus, this section has not been changed in the interim rule.

Several commenters requested that §240.12(a) of the proposed regulation include language that was in former §242.18(a) requiring that the decision of an immigration judge "shall include a discussion of the evidence and findings as to deportability [inadmissibility]." The commenters assert that such findings and discussion of the evidence is necessary for the respondent to properly determine whether to file a motion for reconsideration of that decision or to prepare a notice of appeal with sufficient specificity to prevent a summary dismissal by the Board under §3.1(d)(1)(1-a) of the regulations. The Department disagrees. The proposed regulation allows for an adequate articulation of the immigration judge's basis for his or her decision as well as the underlying reasons for granting or denying the request. The rule provides sufficient information for the respondent to prepare a notice of appeal with sufficient specificity to prevent a summary dismissal of appeal. For these reasons this section has not been changed in the interim rule.

Other comments regarding procedures are not discussed individually and have not been adopted in this interim rule. Most recommended changes to existing procedures or commented on matters which directly resulted from changes to the law itself. These comments will be reviewed and considered in greater detail when the final rule is prepared.

**Guardian Ad Litem**
In the proposed rulemaking, the Department solicited comments on the advisability of procedures for appointment of guardians ad litem. Several thorough and detailed comments were received. Because the issue is a complex and sensitive one, the Department has decided to further examine the issue and prepare a separate rulemaking at a later date.

**Cancellation of Removal**
A number of commenters expressed concern with section 240.20(b) of the proposed regulation, which states that an application for cancellation of removal may be filed only with the Immigration Court after jurisdiction has vested pursuant to section 8 CFR 3.14. Section 3.14(a) provides that jurisdiction vests when a charging document is filed with the Immigration Court by the Service. The practical concern raised by the commenters arise if the Service serves Form I-862, Notice to Appear, on a respondent but does not file it with the Immigration Court. If the Service does not file a notice to appear which has been served, a respondent would not have access to the Immigration Court to obtain forms of relief such as cancellation of removal or adjustment of status. Moreover, the service of the notice to appear will cut off the accrual of time in continuous residence or continuous physical presence for that respondent under new section 240A(d)(1) of the Act. The commenters proposed that language be added to §3.14(a) of the regulation allowing for jurisdiction to vest and  **\*10323**  proceedings to commence when a charging document is filed by the Service or by a respondent. The commenters added that §3.14(a) already permits immigration judges to conduct bond proceedings and credible fear determinations without a charging document being filed with the court. Thus, they assert, there is no rational basis to permit the initiation of those two types of proceedings and not permit an immigration judge to consider an application for cancellation of removal after a respondent files a charging document that previously has been served on the respondent by the Service. The ability to file a charging document has rested exclusively with the Service for a number of years, without problem. This portion of the proposed regulation will not be changed in the interim rule. The issue of the initiation of removal proceedings lies within the prosecutorial discretion of the Service. The Service needs to have control over when charging documents are filed with the Immigration Courts in order to best manage its administrative resources.

**Apprehension, Custody, and Detention of Aliens**

The IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses. It also allowed the Attorney General the option of a transition period for implementation of mandatory detention. The Service exercised this discretion and implemented the transition period custody rules on October 9, 1996, effective for 1 year. This interim rule amends the regulations to comply with the amended Act by removing the release from custody provisions for aliens who may no longer be released. These amendments to the regulations will take effect upon the termination of the transition period. As for non-criminal aliens, the rule reflects the new $1,500 minimum bond amount specified by IIRIRA. Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination.

Several commenters complained that the Service has no national standards of detention. They stated that policies, practices, and decisions regarding outside communication are bewildering, arbitrary, and inconsistent. Consistent with its focus on providing safe, secure, and humane detention environments, the Service has implemented detention facility improvements and has set as a goal the accreditation of each of its facilities. The Krome Service Processing Center (SPC) has received accreditation with commendation from the Joint Commission of Healthcare Organizations (JCHO), the most prestigious medical accreditation that can be awarded. Currently, six SPCs are accredited by the National Commission on Correctional Health Care (NCCHC), and accreditation is pending at the remaining three SPCs. The Denver contract facility is also NCCHC accredited. Six contract facilities have American Correctional Association (ACA) accreditation and two others have begun the accreditation process.

Several commenters stated that the Service should require ACA standards in local detention facilities used. Approximately 46 percent of the detention space used by the Service is with state and local facilities. Formal ACA accreditation of a state or local facility is a matter for the state or local government. The Service could not meet its detention requirements by using only facilities that have been formally accredited. The Service has established its own rigorous inspection program that uses ACA standards for evaluation of a facility. The Service will not use a facility that fails to pass our inspection.

Several commenters stated that §236 of the proposed rule as written is a reversal of long established procedure that provides that a noncriminal alien is presumptively eligible for release. The Service has been strongly criticized for its failure to remove aliens who are not detained. A recent report by the Department of Justice Inspector General shows that when aliens are released from custody, nearly 90 percent abscond and are not removed from the United States. The mandate of Congress, as evidenced by budget enhancements and other legislation, is increased detention to ensure removal. Accordingly, because the Service believes that the regulation as written is consistent with the intent of Congress, the interim rule has not modified the proposed rule in this regard.

Several commenters noticed a discrepancy between the discussion in the supplementary information and the substance of §236.1(c)(5) of the proposed regulation. The supplementary information stated the Department's intended approach, and clause (i) of the proposed regulation was in error. Accordingly, the interim rule removes paragraph (c)(5)(i) of §236.1 and renumbers the remaining paragraphs (c)(5)(ii), (iii), and (iv). The effect of this change is that inadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge, while arriving aliens do not. This procedure maintains the status quo regarding release decisions for aliens in proceedings, as discussed in the supplementary information of the proposed regulation.

One commenter stated that no criminal alien may be released pursuant to the Transition Period Custody Rules in section 303(b)(3) of IIRIRA where there is sufficient space to detain the individual alien. The same commenter stated that it was not the intention of Congress that EOIR continue to exercise bond redetermination authority under the Transition Rules. Aside from the classes of aliens covered by the Transition Rules, however, the basic structure of the Rules is essentially that of section 242(a)(2) of the Act as it stood prior to AEDPA, providing for the release of "lawfully admitted" criminal aliens (as well as unremovable criminal aliens), in the exercise of the Attorney General's discretion, when such aliens can demonstrate the absence

of a danger to the community or a flight risk upon release. The Department intends to issue a separate proposed rule in the near future establishing both substantive limitations and procedural safeguards concerning the release of criminal aliens eligible to be considered for release under the Transition Rules. Accordingly, the interim rule has not been modified.

**Expedited Deportation Procedures for Aliens Convicted of Aggravated Felonies Who Are Not Lawful Permanent Residents**

The interim rule amends the Service's regulations to comply with the Act, as amended, by: including aliens who have lawful permanent residence on a conditional basis under section 216 of the Act as being subject to expedited administrative deportation procedures; removing references to prima facie eligibility for relief; and eliminating references to release from custody, since aliens subject to these proceedings are now statutorily ineligible for release as a result of changes to other sections of the Act.

Several commenters addressed the time period for response, the role of the deciding Service officer, the risk of deporting U.S. citizens or permanent residents, and other aspects of the procedure. These procedures were not changed from the regulation as it was written at §242.25. These comments were previously addressed when the regulation was published on August 24, 1995. **\*10324**

**Voluntary Departure and Employment Authorization**

The proposed rule outlined how voluntary departure would be handled at various stages of proceedings. Since new section 240B of the Act and the corresponding proposed regulations represented a significant departure from the predecessor provisions for voluntary departure, public comments regarding the Department's approach to implementation of this provision were particularly welcomed.

Several commenters wrote in opposition to the language in §240.25 providing that "[t]he Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States." Many based their opposition on their contention that the language was "beyond the scope of the legislation." However, a similar provision already exists in regulation. The present §242.5(b) states that "officers * * * may deny or grant the application and determine the conditions under which the alien's departure shall be effected." Similarly, current §244.1 states that voluntary departure may be authorized "under such conditions as the district director shall direct." Basically, the language of the proposed rule merely stated what was already in regulation. In addition, it is noted that voluntary departure is a privilege granted by the Service and is not an entitlement to be claimed by the alien. An alien must establish both that he or she is statutorily eligible for voluntary departure and that he or she merits voluntary departure in the exercise of discretion. See Matter of Seda, 17 I&N Dec. 550 (BIA 1980). The ability to attach conditions to a grant of voluntary departure is necessary to the Service's ability to consider the request and is fully consistent with the intent of Congress in enacting section 240B of the Act, which tightens the previously applicable voluntary departure provisions in order better to assure actual departure. Therefore, the language will not be changed for the interim rule.

Several commenters objected to the maximum time limits for voluntary departure of 120 days prior to completion of removal proceedings, and 60 days at the completion of removal proceedings. Those commenters indicated that the statutory language limiting voluntary departure to 120 and 60 days did not preclude an interpretation authorizing additional extensions of voluntary departure in increments of 120 or 60 days. Several commenters, however, wrote in support of the voluntary departure provisions contained in the proposed rule. One commenter stated that "it would be unlawful to extend or renew voluntary departure beyond the single period of 60 or 120 days specified in that section." Another commenter stated that "These changes represent nothing more or less than what has been mandated by Congress, and there is no basis on which they can be substantively altered or amended in the promulgation of the interim rule."

In its proper form, voluntary departure serves several functions. First, it allows the Service to allocate its enforcement resources more efficiently through case management. Second, it saves resources by allowing aliens to depart at their own expense rather than at the expense of the government. Finally, it benefits the aliens involved by allowing them to avoid the harsh consequences

AR.00078

of a formal order of removal. Too often, however, voluntary departure has been sought and obtained by persons who have no real intention to depart. The IIRIRA was intended as a comprehensive reform of the immigration system and was specifically designed to curb abuses of voluntary departure. A reading of the voluntary departure provisions allowing for extensions of voluntary departure in multiple increments of 120 or 60 days inconsistent with the purpose of the statute and would be at best difficult to reconcile with the language of section 240B of the Act.

Prior to IIRIRA, the authority for voluntary departure was found in section 244(e) of the Act, which contained no time limitation. Now, for the first time, there are statutory restrictions limiting the time for which voluntary departure may be authorized. The Conference Report on H.R. 2202 stated that under section 240B(a) of the Act, "[p]ermission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days * * *." Similarly, the Conference Report stated that under section 240B(b) of the Act, "[t]he period for voluntary departure cannot exceed 60 days * * *. The Department concludes that the total period, including all extensions, may not exceed 120 days for voluntary departure granted prior to completion of proceedings or 60 days for voluntary departure granted at the conclusion of proceedings.

Several commenters objected to the elimination of employment authorization for aliens who have been granted voluntary departure. Several other commenters wrote in favor of the elimination. Prior to April 1, 1997, voluntary departure was often granted by EOIR and the Service for extended periods of time. With grants and extensions of voluntary departure for extended periods of time, it was reasonable to allow for employment authorization. Now, voluntary departure is limited to a maximum of 120 days. Moreover, it has long been recognized that employment provides a magnet that draws aliens to this country. Voluntary departure provides an opportunity for an alien to complete the process of departure from the United States and should not be seen as a new opportunity for employment authorization. Although the granting of voluntary departure will not, in and of itself, cause any previously approved employment authorization to be terminated, neither will the granting of voluntary departure provide a new opportunity to apply for employment authorization. Therefore, the interim rule will eliminate the general provision found at § 274a.12(c)(12) for employment authorization for aliens who have been granted voluntary departure. Employment authorization will be retained only for beneficiaries of the Family Unity Program (section 301 of the Immigration Act of 1990, Pub. L. 101-649).

Several commenters expressed concern about the consequences for certain abused immigrant spouses and children of lawful permanent residents with properly filed self-petitions who were granted voluntary departure and work authorization pending availability of an immigrant visa. The Department shares the concerns of the commenters and is looking at how best to address them outside the context of voluntary departure.

Several commenters objected to the provisions for appeals, generally stating that the Service could appeal approvals, yet aliens cannot appeal denials. In §240.25 (voluntary departure by the Service), the appeal procedure at paragraph (e) states that a denial of an application for voluntary departure may not be appealed, but such denial shall be without prejudice to the alien's right to apply to the immigration judge in accordance with §240.26. Section 240.26(g)(1) (voluntary departure by EOIR) places limitations for appeals only on the Service, and places none on the alien. Section 240.26(g)(2) discusses an appeal of a grant or denial of voluntary departure. Therefore, the appeal procedures in §§240.25(e) and 240.26(g)(1) and (2) do not allow the Service to appeal approvals while precluding aliens from appealing denials. In reviewing the comments, however, it became apparent that the language of 240.26(g) appeared to  *10325  prohibit the Service from appealing a grant of voluntary departure on the ground that the alien was not eligible for the relief. Any such implication was unintended, and the language has been corrected to reflect that both the alien and the Government may appeal issues of both eligibility and discretion, but that neither may appeal the length of the voluntary departure period granted by the immigration judge.

One commenter expressed concern about the dangerous intersection between the voluntary departure time limits and new section 212(a)(9)(B) of the Act, which imposes a 3- to 10-year bar to admission upon any alien unlawfully present in the United States from 180 days to more than 1 year. The commenter pointed out that individuals now granted voluntary departure for extended periods of time for humanitarian reasons will become unlawfully present after 120 days of voluntary departure. The commenter stated that if deferred action is to be the sole avenue of relief, the Service needs to develop policy guidelines so

that district directors will not be afraid to use it to enable the sick and the dying to receive treatment and to enable their parents to work for health insurance. The Department acknowledges that there will be some compelling humanitarian cases for which voluntary departure cannot be extended. A district director will be able to give individual consideration for a recommendation for deferred action to the regional director. If approved by the regional director, employment authorization may be granted under the provisions of §274a.12(c)(14).

Several commenters objected to the provision for revocation found in § 240.25(f), and stated that revocation of voluntary departure should require notice and the opportunity to be heard. However, this provision already exists in the current §242.5(c), which provides for revocation of a grant of voluntary departure without notice. The revocation is an adverse action initiated by the Service; therefore, personal service of the decision is required in accordance with §103.5a(c). However, a notice of intent to revoke will not be issued. The interim rule will be amended to point out that the revocation shall be communicated in writing, and shall cite the statutory basis for revocation.

Several commenters objected to the limits in §240.26(b)(1) on grants of voluntary departure under section 240B(a) of the Act, particularly the requirement that a request for such relief be made at or before a master calendar hearing, and decided by the immigration judge within 30 days thereafter. Other commenters stated that these provisions were confusing.

The regulation has not been changed substantively based on these comments but has been revised to clarify the applicable time periods. The revisions make it clear that in order to obtain voluntary departure from an immigration judge under section 240B(a) of the Act, an alien must request it prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing, which is not necessarily the first master calendar hearing. This ensures that the alien is not obligated to request voluntary departure at preliminary stages of the process, before the case is ready to be scheduled for a merits hearing. The Department believes that this allows sufficient time for the alien to consider voluntary departure and other options and to discuss them with counsel. If such requests cannot be resolved at the master calendar hearing the immigration judge may take an additional 30 day period in case he or she desires additional time to consider the voluntary departure request or to complete the processing. In the event that the alien decides only after the specified master calendar hearing that he or she wishes to request voluntary departure, such a request can still be made later, but requires the concurrence of the Service under §240.26(b)(2). Finally, even without Service concurrence, the immigration judge may grant voluntary departure under section 240B(b) of the Act upon conclusion of the proceeding.

Several commenters objected to the language at §240.26(b)(1)(iv) authorizing the grant of voluntary departure by immigration judges pursuant to section 240B(a) of the Act only if the alien waives appeal of all issues. The Department believes that voluntary departure authorized by immigration judges prior to completion of proceedings should be for the purpose of settling cases in the interests of economy and justice. If an alien wishes to contest any issues, the proper forum will be a merits hearing. Once a case proceeds to a merits hearing and contested issues are settled, voluntary departure remains a form of relief; however, it may be authorized only pursuant to the provisions of section 240B(b) of the Act for voluntary departure granted at the completion of removal proceedings.

Several commenters wrote that the regulation should provide an exemption for an alien who would otherwise have a removal order issued against him or her for failing to depart when the alien, through no fault of his own, has not obtained travel documents. The regulation already provides, at §240.26(b)(3)(ii), that the Service in its discretion may extend the period within which the alien must provide such documentation. However, the provision for extension is discretionary and not an entitlement. The alien in removal proceedings bears the responsibility to demonstrate eligibility for any relief requested. The alien is encouraged to work with the government of his or her home country to obtain a valid passport or other travel authorization if a travel document is necessary for return to that country. Failure to obtain necessary travel documentation will leave the Department no option but to enforce the alternate order of removal.

Several commenters pointed out that in a case involving an alien who was previously granted voluntary departure and failed to depart, the proposed regulation correctly reflects the statutory language that such an alien is not eligible for voluntary departure

or relief under sections 240A, 245, 248, and 249 of the Act. The commenters pointed out, however, that the proposed regulation fails to include the statutory requirement that the alien must receive notice of the penalty for failing to depart. The Department agrees with the commenters, and will change the language in the interim rule to reflect the requirement that a voluntary departure order permitting an alien to depart voluntarily shall inform the alien of the penalties under section 240B(d) of the Act.

Sections 240B(a)(1) and 240B(b)(1)(C) of the statute bar aliens deportable under section 237(a)(2)(A)(iii) of the Act from voluntary departure. Because aliens entering without inspection are no longer considered deportable, however, the statutory bar might be read as allowing such aliens to obtain voluntary departure despite an aggravated felony conviction. The statute would thus create the anomaly of more favorable treatment for aggravated felons who enter without inspection. The Department does not believe that Congress intended such an anomaly. In any event, having become aware of the problem, the Department now exercises its discretion to bar such aliens from receiving this form of relief.

Finally, several commenters requested clarification regarding the effect of a motion or appeal to the Immigration Court, BIA, or a federal court on any period of voluntary departure already granted. Since an alien granted voluntary departure prior to completion of proceedings must concede removeability and agree to waive **\*10326** pursuit of any alternative form of relief, no such appeal or motion would be possible in this situation. Regarding post-hearing voluntary departure, the Department considered several options, but has not adopted any position or modified the interim rule. The Department has identified three possible options: no tolling of any period of voluntary departure; tolling the voluntary departure period for any period that an appeal or motion is pending; or setting a brief, fixed period of voluntary departure (for example, 10 days) after any appeal or motion is resolved. The Department wishes to solicit additional public comments on these or other possible approaches to this issue so that it can be resolved when a final rule is promulgated.

**Detention and Removal of Aliens Ordered Removed**

This rule provides for the assumption of custody during the removal period, allows detention beyond the period, and provides conditions for discretionary release and supervision of aliens who cannot be removed during the period.

Several commenters stated that the wording of the statute provides for release of noncriminal aliens during the removal period and suggested that the Service adopt a policy of allowing the alien to remain at liberty during the 90-day removal period. One commenter stated that the proposed rule is consistent with the language and intent of IIRIRA and should be retained in the interim rule. The plain language of the statute requires that an alien be held in custody during the 90-day removal period and not be released. Accordingly, the proposed language is retained in the interim rule.

Several commenters stated that the statute requires release on an order of supervision after the expiration of the 90-day removal period. One commenter stated that the proposed rule is consistent with the language and intent of IIRIRA and should be retained in the interim rule. Taken together, sections 241(a)(3) and (a)(6) of the Act provide that any alien who is inadmissible or who is deportable on the grounds enumerated in paragraph (a)(6) may be detained beyond the removal period. Additionally, any alien who is a risk to the community or is unlikely to appear for removal may be detained regardless of the charge of inadmissibility or deportability. Accordingly, the proposed language is retained in the interim rule.

**Reinstatement of Removal Orders Against Aliens Illegally Reentering**

Several commenters suggested that aliens caught illegally reentering the United States after removal should be provided a hearing before an immigration judge. They expressed concern that issues such as identity and the propriety of the earlier removal order would not be addressed. One commenter argued that new section 241(a)(5) of the Act was not intended to be a substantive revision of former section 242(f) of the Act, which also dealt with reinstatement of deportation orders, but was merely taken from a bill proposing to recodify the Act without substantive change. One commenter wrote in support of these provisions, stating that they were consistent with the language and intent of IIRIRA.

A review of the relevant statutory provisions reveals that a substantive change was in fact effected in the transition from section 242(f) of the Act to section 241(a)(5) of the Act. Section 242(f) of the Act provided only that the deportation order was to be reinstated upon illegal entry. New section 241(a)(5) of the Act provides that the removal order is reinstated from its original date, but adds the provision "and is not subject to being reopened or reviewed."

The Service has taken steps to ensure the positive identification of an alien apprehended and removed under this section. In §241.8(a)(2), the regulation requires fingerprint identification before an alien can be removed under section 241(a)(5) of the Act. In cases where no fingerprints are available and the alien disputes that he or she was previously removed, the alien will not be removed under section 241(a)(5) of the Act. Because the process mandated by the proposed rule adequately addresses the concerns expressed by the commenters, this provision remains unchanged in the interim rule.

**Detention and Removal of Stowaways**

Section 241.11 implements section 305 of IIRIRA, defining the responsibilities for stowaways and costs of detention in the new section 241 of the Act. All stowaways are deemed to be inadmissible under the Act and are not entitled to a hearing on admissibility. Those with a credible fear of persecution may seek asylum in accordance with 8 CFR part 208 in special proceedings before an immigration judge. The statute is very specific regarding most detention and removal responsibilities of the carriers.

Several commenters stated that the regulations do not contain a definition of stowaway. Since IIRIRA added a clear definition of stowaway in section 101(a)(49) of the Act, the Department saw no need to repeat the definition in the regulations. One commenter objected to the 15-day detention period for asylum-seeking stowaways, for which the owner of the vessel or aircraft bringing the stowaway is obligated for the costs of detention. As this time frame is mandated by statute in section 241(c)(3) (A)(ii)(III) of the Act, the Department is bound by it.

One commenter suggested that the regulation clearly define the situations where the Service should allow the carrier to remove, by aircraft, a stowaway who arrived by vessel. The regulation at §241.11(c)(1) has been amended to include general circumstances where the Service might favorably consider such request. These circumstances will also be more thoroughly addressed in the Inspector's Field Manual.

One commenter stated that the regulations should define how the Service will make a determination that the necessary travel documents for the stowaway cannot be obtained, so as to shift the costs of the stowaway's detention from the carrier to the Service, as stated in section 241(c)(3)(A)(ii)(II) of the Act. The Department has not had sufficient time to consider this issue and so will address it in the final rule.

**Adjustment of Status**

Some commenters objected to the policy statement contained in the proposed rule that amended §245.1(c)(8) and indicated that, as an exercise of discretion, the Attorney General would not adjust the status of arriving aliens ordered removed under section 235(b)(1) of the Act or in proceedings under section 240 of the Act. Those commenters believed that such a statement exceeded the Attorney General's authority by eliminating an immigration benefit that has not been eliminated by an act of Congress. Other commenters suggested that the policy statement did not go far enough and that the policy should be expanded to include all inadmissible aliens in section 240 proceedings, not just arriving aliens. In this interim rule, the Department will maintain the position taken in the proposed rule. This position promotes the Department's objective of taking steps to preserve the integrity of the visa issuance process while preserving the current additional avenue for review of discretionary denials of adjustment applications filed by aliens present without inspection and admission. The Department continues to believe this position is **\*10327** consistent with the intent of Congress when it passed IIRIRA.

In response to the commenters who suggested this policy exceeded the Attorney General's statutory authority, it is noted that section 245 of the Act clearly and unambiguously states that adjustment of status is a discretionary decision, subject to such

regulatory limitations as the Attorney General may prescribe. The same commenters stated that aliens who depart using an advance parole authorization and whose applications are subsequently denied would no longer be able to renew their adjustment application before an immigration judge. However, the revisions to §245.2(a)(5)(ii) contained in the proposed rule preserved this procedure.

**Rescission of Adjustment of Status**

The interim rule includes several changes to 8 CFR part 246 that update obsolete references and bring the regulation into agreement with the statute. References to special inquiry officer were updated to refer to immigration judges. References to status of permanent residence acquired through outdated sections of law, and any related procedures for special report to Congress, were eliminated. In §246.2, the provision that limited the rescission authority of the district director to cases that had been adjusted under section 245 of 249 or the Act was expanded to include all types of adjustment, thereby bringing the regulation into accord with the statute. In §246.6, the requirements for immigration judges' decisions were changed to comport with the requirements of immigration judges' decisions found in §240.12. The reference to Form I-151 in §246.9 was removed because Form I-151 is no longer a valid document.

**Elimination of Mexican Border Visitor's Permit**

The proposed rule eliminated the Form I-444, Mexican Border Visitor's Permit, which is issued at land border ports-of-entry along the United States/Mexico border to Mexican nationals traveling for more than 72 hours but less than 30 days in duration or for more than 25 miles from the United States/Mexico border but within the five states of Arizona, California, Nevada, New Mexico, or Texas. The elimination was proposed because the Form I-444 does not have adequate security features to deter counterfeiting, and provides no tracking or enforcement benefits.

One commenter suggested that since the elimination of the Form I-444 was not mandated by IIRIRA and represented a significant departure from past procedure, it should be removed from this rule and proposed in a separate rulemaking. The commenter specifically objected to the elimination of the time and distance controls imposed on Mexican nationals inherent in the issuance of the Form I-444. As stated in the proposed rule, the Service has been unable to demonstrate that there is any connection between the limits on travel by persons issued Forms I-444 and immigration violations. Mexican nationals must undergo the same interview process to obtain a Border Crossing Card (BCC) or nonimmigrant visa as any other applicant from any other country. New validity periods have been imposed in recent years on the BCC, requiring periodic renewal. A Mexican national entering with a BCC undergoes the same inspection process as any other applicant for admission and must establish eligibility as a visitor for business or pleasure upon each entry to the United States. Presently, Mexican nationals who request entry at a Mexican land border port-of-entry to travel more than 30 days or beyond the five-state area, and who establish admissibility as a visitor, are issued Form I-94, Arrival/Departure Record, and allowed to proceed anywhere in the United States with no additional restrictions. Mexican BCC holders entering the United States by air or via the Canadian land border are also admitted with no restrictions. The elimination of the Form I-444 does not expand the possible use of the BCC in any way; it merely standardizes the entry documentation issued. The Department can see no reason to continue to impose specific controls on Mexican nationals seeking admission only at Mexican border ports-of-entry, and so accordingly will retain in the interim rule the elimination of Form I-444 in favor of more thoroughly documenting entry with Form I-94.

**Visa Waiver Pilot Program (VWPP)**

The provisions relating to the VWPP in 8 CFR part 217 were included in the proposed rule primarily as part of the review intended to streamline and eliminate duplication in Department regulations. In addition, several changes were made to conform to new statutory terminology and to include certain new procedures created as a result of IIRIRA. One commenter expressed concern that there could be confusion in §217.4 as to what constitutes fraudulent or counterfeit documents and that aliens could be removed without the opportunity for review by an immigration judge. The language in this section was not changed from what has existed in the regulations for years. Moreover, aliens applying under the VWPP are, by statute, not entitled to a hearing before an immigration judge, except on the basis of an asylum claim. The only change that the proposed rule made to this

provision was that the hearing provided for VWPP asylum claimants is now more clearly limited to asylum issues only. In addition, inadmissible VWPP applicants may be temporarily refused permission to enter the United States, but are not subject to the formal expedited removal provisions of section 235(b)(1) of the Act.

One commenter objected to several aspects of the amended language in § 217.6 relating to carrier agreements. Since most of the language in this section is already contained on the Form I-775, Visa Waiver Pilot Program Agreement, which is signed by all carriers participating in the VWPP, much of this section has been removed from the interim rule. The commenter objected to the elimination of due process safeguards in allowing termination of agreements by the Commissioner, with 5 days notice to the carrier, for failure to meet the terms of the agreement. This is not a new provision. The exact language has existed in the regulations since at least 1991 and has also been part of the existing Form I-775 for years, and will be retained. The definition of round (return) trip ticket has been revised to conform with terminology used elsewhere in the regulation and carrier agreement, and to provide for electronic ticketing technology.

**Miscellaneous Changes**

The proposed rule contemplated removing 8 CFR part 215, Controls of Aliens Departing from the United States, because it was also contained in the Department of State regulations. The Department has decided to retain 8 CFR part 215.

The proposed rule contained §240.39, which retained material previously found in §242.22, and §240.54, which preserved the former §242.23. These sections have been removed from the interim rule since the subjects are encompassed by §§3.23 and 241.8, respectively.

One commenter correctly noted that §216.5(e)(3)(ii) had been amended to allow an alien in exclusion, deportation, or removal proceedings to file a petition for waiver only until such time as there is a final order of deportation or removal. In § 216.5(e) (3), adjudication of a waiver is based upon the alien's claim of having been battered or subjected to extreme mental cruelty. The commenter stated that there is no reason to shorten **\*10328** the period allotted for a battered woman and child to file a battered spouse waiver. The proposed rule change was meant to apply generally to all aliens filing a petition for a waiver, and was intended to add a point of finality to the time when the petition could be filed. Therefore, the interim rule has been amended to clarify the general applicability to all petitions for waiver. The regulation will permit filing of a petition for waiver at any time prior to the second anniversary of obtaining permanent resident status and up to the point of receiving a final order in exclusion, deportation, or removal proceedings, which includes any possible Federal court review.

Several commenters were concerned about removing language at § 204.2(a)(1)(iii)(A) through (C), which dealt with commencement and termination of proceedings, and exemptions from the general prohibition against approval of visa petitions filed on the basis of marriages during proceedings. The language was removed as part of the Service's streamlining initiative because it was duplicative of language in §245.1(c)(8). The interim rule does clarify that in visa petition proceedings the burden of proof remains on the petitioner to establish eligibility for the exemption found at section 204(g) of the Act. In addition, §204.2(a)(1)(iii) introductory text has been amended reflecting that §245.1(c)(8) has been renumbered as §245.1(c)(9).

**Streamlining, Updating, and Reorganization**

Several commenters expressed concern about sections of the regulation that were identified in the Supplementary Information of the proposed regulation as being revised solely for the purpose of streamlining: elimination of unnecessary recitation of statutory provisions; discussion of procedural matters; elimination of duplication; or general updating. It is emphasized that these streamlining changes neither created new requirements nor abolished any existing ones. Similarly, several comments concerned regulatory provisions that were simply carried over from the existing regulation, but relocated to new sections in order to conform with the general regulatory outline for the affected sections. Although the Department reviewed these comments, none resulted in further amendments to the streamlined or reorganized paragraphs. Other commenters proposed changes to current regulations that are beyond the scope of this rulemaking. These suggestions will be considered for inclusion in separate regulations after implementation of IIRIRA.

The Department solicited comments on the general organization and restructuring contained in the proposed regulation. No comments were received on this topic. Accordingly, the organizational structure has not been revised in the interim rule.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that the rule will not have a significant adverse economic impact on a substantial number of small entities because of the following factors. This rule affects only federal government operations by codifying statutory amendments to the Immigration and Nationality Act primarily regarding the examination, detention, and removal of aliens from the United States. It affects only individuals and does not impose any reporting or compliance requirements on small entities.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Executive Order 12866**

This rule is considered by the Department of Justice to be a "significant regulatory action" under Executive Order 12866, section 3(f), because it will have a significant economic impact on the federal government in excess of $100 million. No economic impact is anticipated for state and local governments. The Service projects significant increases in detention-related costs due to the provisions of IIRIRA that mandate the custody of criminal aliens who have committed two or more crimes involving moral turpitude, aliens convicted of firearms offenses, and aliens who have been convicted of an aggravated felony. The type of crime that will qualify as an "aggravated felony" has been greatly expanded under IIRIRA. In addition, all aliens, even non-criminal aliens, who are subject to a final administrative order of removal must be held in custody until the alien can be removed from the United States. If the person is not removed within 90 days he or she may be released from custody.

The Commissioner has notified Congress pursuant to section 303(b) of IIRIRA that the Service lacks sufficient space to immediately implement the mandatory custody provisions. This notification will delay for 1-year full implementation of the new mandatory custody provisions. Section 303(b) also provides for an additional 1-year delay in implementation of the mandatory custody provisions upon a second certification that space and personnel are inadequate to comply with the requirement. The Service estimates that the cost to enforce the requirement to detain all criminal aliens will be at least $205,000,000. Of that total, personnel costs account for $65,284,000 and include detention and deportation officers ($32,873,000), investigators ($25,501,000), legal proceedings personnel ($4,968,000), and administrative support ($1,942,000). Non-personnel requirements are projected to be at least $139,732,000 and includes increases in bed space and related alien custody requirements ($82,782,000 —funds 3,600 beds @ $63.00 per day), increases in alien travel expenses ($36,000,000—3,600 removals @ $1,000 each), and detention vehicle expenses ($20,950,000). The Service is currently in the process of projecting the costs of the IIRIRA requirement that we detain all aliens with administratively final orders of deportation pending their removal.

In addition to these detention related costs, the Service estimates that the expenses for training employees on the provisions of the new law and the regulations will be $2,977,500. The cost to the Service related to additional forms or changes needed to current forms is estimated to be $2,000,000 (until the final list of form requirements is completed it is not possible to more accurately assess this cost). Finally, the Department believes there may be some increases needed for immigration judges to review credible fear determinations made under section 235(b) of the Act.

The EOIR estimates increases in its costs related to IIRIRA-mandated immigration judge review of credible fear determinations (which must be made under stringent time frames) and the prompt immigration judge review that IIRIRA requires of certain expedited removal orders entered against aliens claiming to be, lawful permanent residents, asylees, or refugees. Further, EOIR

projects costs associated with the possible need for an Immigration Court presence at certain ports-of-entry and additional detention centers, which will result from the above-mentioned **\*10329** credible fear review and expedited removal review process. Also, there will be costs related to the overall need for an increased Immigration Court presence at existing Service detention centers to support the processing of the additional detainees that will result from the implementation of this rule. Similarly, EOIR anticipates a need for construction of new Immigration Courts at new detention facilities the Service may open as a result of this rule's implementation.

Although there are still a number of unknown variables which could effect the total costs to EOIR to implement its part of the new expedited removal process and to respond to the increased number of detained individuals in proceedings under this rule, EOIR estimates that the total annual cost for EOIR could be as high as $25,000,000. Of that total, the cost for hiring new immigration judges and legal support staff is projected to be $21,300,000. The cost for new video and audio teleconferencing equipment is estimated at $3,000,000. Training costs are expected to be approximately $400,000. Finally, forms and other support requirements are estimated to cost $300,000.

**Small Business Regulatory Enforcement Fairness Act of 1996**

The Department of Justice considers this rule to be a "major" rule under the Small Business Regulatory Enforcement Fairness Act of 1996 in view of the projected expenditures for the federal government as discussed in the preceding section. The Department finds good cause to make this rule effective on April 1, 1997, in order to meet the statutory deadline. These rules are essential for the implementation of the provisions of Title III-A of IIRIRA, which become effective on that date pursuant to Section 309(a) of IIRIRA.

**Executive Order 12612**

The regulation adopted herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

**Executive Order 12988**

This interim rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The information collection requirements contained in this rule have been approved by the Office of Management and Budget under the provisions of the Paperwork Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

**List of Subjects**

*8 CFR Part 1*

Administrative practice and procedure, Immigration.

*8 CFR Part 3*

Administrative practice and procedure, Immigration, Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Reporting and recordkeeping requirements.

***8 CFR Part 204***

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 207***

Administrative practice and procedure, Refugees, Reporting and recordkeeping requirements.

***8 CFR Part 208***

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 209***

Aliens, Immigration, Refugees.

***8 CFR Part 211***

Immigration, Passports and visas, Reporting and recordkeeping requirements.

***8 CFR Part 212***

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

***8 CFR Part 213***

Immigration, Surety bonds.

***8 CFR Part 214***

Administrative practice and procedure, Aliens.

***8 CFR Part 216***

Administrative practice and procedure, Aliens.

***8 CFR Part 217***

Air carriers, Aliens, Maritime carriers, Passports and visas.

***8 CFR Part 221***

Aliens, Surety bonds.

***8 CFR Part 223***

Aliens, Reporting and recordkeeping requirements.

***8 CFR Part 232***

Aliens, Public health.

*8 CFR Part 233*

Administrative practice and procedure, Air carriers, Government contracts, Travel.

*8 CFR Part 234*

Air carriers, Aircraft, Airports, Aliens.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 237*

Aliens.

*8 CFR Part 238*

Administrative practice and procedure, Aliens.

*8 CFR Part 239*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 240*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 241*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 242*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 243*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Aliens.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 246*

Administrative practice and procedure, Aliens, Immigration.  **\*10330**

*8 CFR Part 248*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 249*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 251*

Air carriers, Aliens, Crewmen, Maritime carriers, Reporting and recordkeeping requirements.

*8 CFR Part 252*

Air carriers, Airmen, Aliens, Crewmen, Maritime carriers, Reporting and recordkeeping requirements.

*8 CFR Part 253*

Air carriers, Airmen, Aliens, Maritime carriers, Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 286*

Air carriers, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 287*

Immigration, Law enforcement officers.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 316*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 318*

Citizenship and naturalization.

*8 CFR Part 329*

Citizenship and naturalization, Military Personnel, Veterans.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 1—DEFINITIONS

1. The authority citation for part 1 is revised to read as follows:

Authority: 8 U.S.C. 1101; 8 CFR part 2.

8 CFR § 1.1

2. Section 1.1 is amended by revising paragraph (l), and by adding new paragraphs (q) through (t) to read as follows:

8 CFR § 1.1

**§1.1 Definitions.**

* * * * *

(l) The term immigration judge means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240 of the Act. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

* * * * *

(q) The term arriving alien means an alien who seeks admission to or transit through the United States, as provided in 8 CFR part 235, at a port-of-entry, or an alien who is interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act.

(r) The term respondent means a person named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with §242.1 of this chapter as it existed prior to April 1, 1997.

(s) The term Service counsel means any immigration officer assigned to represent the Service in any proceeding before an immigration judge or the Board of Immigration Appeals.

(t) The term aggravated felony means a crime (or a conspiracy or attempt to commit a crime) described in section 101(a)(43) of the Act. This definition is applicable to any proceeding, application, custody determination, or adjudication pending on or after September 30, 1996, but shall apply under section 276(b) of the Act only to violations of section 276(a) of the Act occurring on or after that date.

## PART 3—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

3. The authority citation for part 3 continues to read as follows:

Authority: 5 U.S.C. 301; 8 U.S.C. 1103, 1252 note, 1252b, 1324b, 1362; 28 U.S.C. 509, 510, 1746; sec. 2, Reorg. Plan No. 2 of 1950; 3 CFR, 1949-1953 Comp., p. 1002.

8 CFR § 3.1

4. Section 3.1 is amended by revising paragraphs (b)(1), (b)(2), (b)(3), (b)(7), (b)(9), and (b)(10) to read as follows:

8 CFR § 3.1

**§3.1 General authorities.**

* * * * *

(b) * * *

(1) Decisions of Immigration Judges in exclusion cases, as provided in 8 CFR part 240, Subpart D.

(2) Decisions of Immigration Judges in deportation cases, as provided in 8 CFR part 240, Subpart E, except that no appeal shall lie seeking review of a length of a period of voluntary departure granted by an Immigration Judge under section 244E of the Act as it existed prior to April 1, 1997.

(3) Decisions of Immigration Judges in removal proceedings, as provided in 8 CFR part 240, except that no appeal shall lie seeking review of the length of a period of voluntary departure granted by an immigration judge under section 240B of the Act or part 240 of this chapter.

* * * * *

(7) Determinations relating to bond, parole, or detention of an alien as provided in 8 CFR part 236, Subpart A and 8 CFR part 240, Subpart E.

* * * * *

(9) Decisions of Immigration Judges in asylum proceedings pursuant to § 208.2(b) of this chapter.

(10) Decisions of Immigration Judges relating to Temporary Protected Status as provided in 8 CFR part 244.

* * * * *8 CFR § 3.2

5. Section 3.2 is amended by:

a. Revising the section heading;

b. Revising paragraph (b)(2);

c. Revising paragraph (c)(2) and (c)(3), and by

d. Revising paragraphs (d) through (g)(1), to read as follows:

8 CFR § 3.2

**§3.2 Reopening or reconsideration before the Board of Immigration Appeals.**

* * * * *

(b) * * *

(2) A motion to reconsider a decision must be filed with the Board within 30 days after the mailing of the Board decision or on or before July 31, 1996, whichever is later. A party may file only one motion to reconsider any given decision and may not seek reconsideration of a decision denying a previous motion to reconsider. In removal proceedings pursuant to section 240 of the Act, an alien may file only one motion to reconsider a decision that the alien is removable from the United States.

(c) * * *

(2) Except as provided in paragraph (c)(3) of this section, a party may file only one motion to reopen deportation or exclusion proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened, or on or before September 30, 1996, whichever is later. Except as provided in paragraph (c)(3) **\*10331** of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) In removal proceedings pursuant to section 240 of the Act, the time limitation set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen filed pursuant to the provisions of §3.23(b)(4)(ii). The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:

(i) Filed pursuant to the provisions of §3.23(b)(4)(iii)(A)(1) or § 3.23(b)(4)(iii)(A)(2);

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing;

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by the Service in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with §208.22(f) of this chapter.

\* \* \* \* \*

(d) Departure, deportation, or removal. A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

(e) Judicial proceedings. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding. If a motion to reopen or reconsider seeks discretionary relief, the motion shall include a statement by or on behalf of the moving party declaring whether the alien for whose relief the motion is being filed is subject to any pending criminal prosecution and, if so, the nature and current status of that prosecution.

(f) Stay of deportation. Except where a motion is filed pursuant to the provisions of §§3.23(b)(4)(ii) and 3.23(b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the Immigration Judge, or an authorized officer of the Service.

(g) Filing procedures. (1) English language, entry of appearance, and proof of service requirements. A motion and any submission made in conjunction with a motion must be in English or accompanied by a certified English translation. If the moving party, other than the Service, is represented, Form EOIR-27, Notice of Entry of Appearance as Attorney or Representative Before the Board, must be filed with the motion. In all cases, the motion shall include proof of service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed before the Immigration Judge.

\* \* \* \* \*8 CFR § 3.4

6. The following sentence is added to the end of §3.4:

8 CFR § 3.4

### §3.4 Withdrawal of appeal.

8 CFR § 1.1

\* \* \* Departure from the United States of a person who is the subject of deportation or removal proceedings, except for arriving aliens as defined in § 1.1(q) of this chapter, subsequent to the taking of an appeal, but prior to a decision thereon, shall constitute a withdrawal of the appeal, and the initial decision in the case shall be final to the same extent as though no appeal had been taken.

### Subpart B—Immigration Court

7. In Part 3, the heading of Subpart B is revised as set forth above.

8 CFR § 3.9

8. Section 3.9 is revised to read as follows:
 8 CFR § 3.9

**§3.9 Chief Immigration Judge.**
The Chief Immigration Judge shall be responsible for the general supervision, direction, and scheduling of the Immigration Judges in the conduct of the various programs assigned to them. The Chief Immigration Judge shall be assisted by Deputy Chief Immigration Judges and Assistant Chief Immigration Judges in the performance of his or her duties. These shall include, but are not limited to:

(a) Establishment of operational policies; and

(b) Evaluation of the performance of Immigration Courts, making appropriate reports and inspections, and taking corrective action where indicated.
 8 CFR § 3.10
9. Section 3.10 is revised to read as follows:
 8 CFR § 3.10

**§3.10 Immigration Judges.**
Immigration Judges, as defined in 8 CFR part 1, shall exercise the powers and duties in this chapter regarding the conduct of exclusion, deportation, removal, and asylum proceedings and such other proceedings which the Attorney General may assign them to conduct.
 8 CFR § 3.11
10. Section 3.11 is revised to read as follows:
 8 CFR § 3.11

**§3.11 Administrative control Immigration Courts.**
An administrative control Immigration Court is one that creates and maintains Records of Proceedings for Immigration Courts within an assigned geographical area. All documents and correspondence pertaining to a Record of Proceeding shall be filed with the Immigration Court having administrative control over that Record of Proceeding and shall not be filed with any other Immigration Court. A list of the administrative control Immigration Courts with their assigned geographical areas will be made available to the public at any Immigration Court.


**Subpart C—Immigration Court—Rules of Procedure**
11. In part 3, the heading of Subpart C is revised as set forth above.
 8 CFR § 3.12
12. Section 3.12 is amended by revising the last sentence, and adding a new sentence at the end of the section, to read as follows:
 8 CFR § 3.12

**§3.12 Scope of rules.**
8 CFR § 3.42

* * * Except where specifically stated, the rules in this subpart apply to matters before Immigration Judges, including, but not limited to, deportation, exclusion, removal, bond, rescission, departure control, asylum proceedings, and disciplinary  **\*10332** proceedings under §292.3 of this chapter. The sole procedures for review of credible fear determinations by Immigration Judges are provided for in §3.42.
 8 CFR § 3.13
13. Section 3.13 is revised to read as follows:
 8 CFR § 3.13

**§3.13 Definitions.**
As used in this subpart:

Administrative control means custodial responsibility for the Record of Proceeding as specified in §3.11.

Charging document means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

Filing means the actual receipt of a document by the appropriate Immigration Court.

Service means physically presenting or mailing a document to the appropriate party or parties; except that an Order to Show Cause or Notice of Deportation Hearing shall be served in person to the alien, or by certified mail to the alien or the alien's attorney and a Notice to Appear or Notice of Removal Hearing shall be served to the alien in person, or if personal service is not practicable, shall be served by regular mail to the alien or the alien's attorney of record.

8 CFR § 3.14

14. Section §3.14 is amended by:

a. Revising paragraph (a), and by

b. Adding a new paragraph (c) to read as follows:

8 CFR § 3.14

**§3.14 Jurisdiction and commencement of proceedings.**

(a) Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service. The charging document must include a certificate showing service on the opposing party pursuant to §3.32 which indicates the Immigration Court in which the charging document is filed. However, no charging document is required to be filed with the Immigration Court to commence bond proceedings pursuant to §§ 3.19, 236.1(d) and 240.2(b) of this chapter.

* * * * *

(c) Immigration Judges have jurisdiction to administer the oath of allegiance in administrative naturalization ceremonies conducted by the Service in accordance with §337.2(b) of this chapter.

8 CFR § 3.15

15. Section 3.15 is amended by:

a. Revising the section heading;

b. Amending paragraph (b) introductory text and paragraph (b)(6), by adding the phrase "and Notice to Appear" immediately after the phrase "Order to Show Cause";

c. Redesignating paragraph (c) as (d);

d. Adding a new paragraph (c); and by

e. Revising newly redesignated paragraph (d), to read as follows:

8 CFR § 3.15

**§3.15 Contents of the order to show cause and notice to appear and notification of change of address.**

* * * * *

(c) Contents of the Notice to Appear for Removal Proceedings. In the Notice to Appear for removal proceedings, the Service shall provide the following administrative information to the Immigration Court. Failure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights.

(1) The alien's names and any known aliases;

(2) The alien's address;

(3) The alien's registration number, with any lead alien registration number with which the alien is associated;

(4) The alien's alleged nationality and citizenship; and

(5) The language that the alien understands.

(d) Address and telephone number. (1) If the alien's address is not provided on the Order to Show Cause or Notice to Appear, or if the address on the Order to Show Cause or Notice to Appear is incorrect, the alien must provide to the Immigration Court where the charging document has been filed, within five days of service of that document, a written notice of an address and telephone number at which the alien can be contacted. The alien may satisfy this requirement by completing and filing Form EOIR-33.

(2) Within five days of any change of address, the alien must provide written notice of the change of address on Form EOIR-33 to the Immigration Court where the charging document has been filed, or if venue has been changed, to the Immigration Court to which venue has been changed.

 8 CFR § 3.16

**§3.16 [Amended]**
8 CFR § 3.16
16. Section 3.16(b) is amended by revising the term "respondent/applicant" to read "alien".
 8 CFR § 3.17

**§3.17 [Amended]**
8 CFR § 3.17
17. Section 3.17(a) is amended in the first sentence by revising the term "respondent/applicant" to read "alien", and by revising the phrase "the appropriate EOIR form" to read "Form EOIR-28".
 8 CFR § 3.18
18. Section 3.18 is revised to read as follows:
 8 CFR § 3.18

**§3.18 Scheduling of cases.**
(a) The Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings.

(b) In removal proceedings pursuant to section 240 of the Act, the Service shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable. If that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing. In the case of any change or postponement in the time and place of such proceeding, the Immigration Court shall provide written notice to the alien specifying the new time and place of the proceeding and the consequences under section 240(b)(5) of the Act of failing, except under exceptional circumstances as defined in section 240(e)(1) of the Act, to attend such proceeding. No such notice shall be required for an alien not in detention if the alien has failed to provide the address required in section 239(a)(1)(F) of the Act.
 8 CFR § 3.19

**§3.19 [Amended]**

8 CFR § 3.19

19. Section 3.19(a) is amended by revising the reference to "part 242 of this chapter" to read "8 CFR part 236" wherever it appears in the paragraph.

 8 CFR § 3.19

20. Section 3.19(d) is amended in the first sentence by adding the term "or removal" immediately after the word "deportation".

 8 CFR § 3.19

21. Section 3.19 is amended by removing paragraph (h).

 8 CFR § 3.20

22. In §3.20, paragraph (a) is revised to read as follows:

 8 CFR § 3.20

**§3.20 Change of venue.**

(a) Venue shall lie at the Immigration Court where jurisdiction vests pursuant to §3.14.

 * * * * *8 CFR § 3.23

23. Section 3.23 is amended by revising the section heading and paragraph (b) to read as follows:

 8 CFR § 3.23

**§3.23 Reopening or Reconsideration before the Immigration Court.**

(a) * * *

(b) Before the Immigration Court. (1) In general. An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the **\*10333** alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4), a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before July 31, 1996, whichever is later. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before September 30, 1996, whichever is later. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act. Nor shall such limitations apply to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 208.22(f) of this chapter.

(i) Form and contents of the motion. The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding.

(ii) Filing. Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed. If

the moving party, other than the Service, is represented, a Form EOIR-28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) Assignment to an Immigration Judge. If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) Replies to motions; decision. The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) Stays. Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) Motion to reconsider. A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) Motion to reopen. A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice to appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) Exceptions to filing deadlines.—(i) Asylum. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for relief under section 208 or 241(b)(3) of the Act and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien may request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) Order entered in absentia in asylum proceedings or removal proceedings. An order of removal entered in absentia in asylum proceedings pursuant to § 208.2(b) of this chapter or in removal proceedings pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien *10334 demonstrates that the failure to appear was because of exceptional circumstances as defined in section 240(e)(1) of the Act. An order entered in absentia pursuant to §208.2(b) of this chapter or pursuant to section 240(b)(5) may be rescinded upon a motion

to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a)(1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding shall be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion under this paragraph shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) Order entered in absentia in deportation or exclusion proceedings. (A) An order entered in absentia in deportation proceedings may be rescinded only upon a motion to reopen filed:

(1) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of exceptional circumstances beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(2) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraph (b)(4)(iii)(A) of this section.

(iv) Jointly filed motions. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.

8 CFR § 3.25

24. Section 3.25 is revised to read as follows:

8 CFR § 3.25

### §3.25 Form of the proceeding.

(a) Waiver of presence of the parties. The Immigration Judge may, for good cause, and consistent with section 240(b) of the Act, waive the presence of the alien at a hearing when the alien is represented or when the alien is a minor child at least one of whose parents or whose legal guardian is present. When it is impracticable by reason of an alien's mental incompetency for the alien to be present, the presence of the alien may be waived provided that the alien is represented at the hearing by an attorney or legal representative, a near relative, legal guardian, or friend.

(b) Stipulated request for order; waiver of hearing. An Immigration Judge may enter an order of deportation, exclusion or removal stipulated to by the alien (or the alien's representative) and the Service. The Immigration Judge may enter such an order without a hearing and in the absence of the parties based on a review of the charging document, the written stipulation, and supporting documents, if any. If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent. The stipulated request and required waivers shall be signed on behalf of the government and by the alien and his or her attorney or representative, if any. The attorney or representative shall file a Notice of Appearance in accordance with §3.16(b). A stipulated order shall constitute a conclusive determination of the alien's deportability or removability from the United States. The stipulation shall include:

(1) An admission that all factual allegations contained in the charging document are true and correct as written;

(2) A concession of deportability or inadmissibility as charged;

(3) A statement that the alien makes no application for relief under the Act;

(4) A designation of a country for deportation or removal under section 241(b)(2)(A)(i) of the Act;

(5) A concession to the introduction of the written stipulation of the alien as an exhibit to the Record of Proceeding;

(6) A statement that the alien understands the consequences of the stipulated request and that the alien enters the request voluntarily, knowingly, and intelligently;

(7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings; and

(8) A waiver of appeal of the written order of deportation or removal.

(c) Telephonic or video hearings. An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person. An Immigration Judge may also conduct a hearing through a telephone conference, but an evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or, where available, through a video conference, except that credible fear determinations may be reviewed by the Immigration Judge through a telephone conference without the consent of the alien.

8 CFR § 3.26

25. Section 3.26 is amended by revising paragraph (c) and adding a new paragraph (d) to read as follows:

8 CFR § 3.26

### §3.26 In absentia hearings.

* * * * *

(c) In any removal proceeding before an Immigration Judge in which the alien fails to appear, the Immigration Judge shall order the alien removed in absentia if:

(1) The Service establishes by clear, unequivocal, and convincing evidence that the alien is removable; and

(2) The Service establishes by clear, unequivocal, and convincing evidence that written notice of the time and place of proceedings and written notice of the consequences of failure to appear were provided to the alien.

(d) Written notice to the alien shall be considered sufficient for purposes of this section if it was provided at the most recent address provided by the alien. If the respondent fails to provide his or her address as required under §3.15(d), no written notice shall be required for an Immigration Judge to proceed with an in absentia hearing. This paragraph shall not apply in the event that the Immigration Judge waives the appearance of an alien under §3.25.

8 CFR § 3.27

26. Section 3.27 is amended by revising paragraph (c) to read as follows:

8 CFR § 3.27

### §3.27 Public access to hearings.

* * * * *

(c) In any proceeding before an Immigration Judge concerning an abused alien spouse, the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public. In any proceeding before an  **\*10335**  Immigration Judge concerning an abused alien child, the hearing and the Record of Proceeding shall be closed to the public.

8 CFR § 3.30

27. Section 3.30 is revised to read as follows:

8 CFR § 3.30

**§3.30 Additional charges in deportation or removal hearings.**

8 CFR § 240.10

At any time during deportation or removal proceedings, additional or substituted charges of deportability and/or factual allegations may be lodged by the Service in writing. The alien shall be served with a copy of these additional charges and/or allegations and the Immigration Judge shall read them to the alien. The Immigration Judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented. The alien may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of §240.10(b) of this chapter relating to pleading shall apply to the additional factual allegations and charges.

8 CFR § 3.35

28. Section 3.35 is revised to read as follows:

8 CFR § 3.35

**§3.35 Depositions and subpoenas.**

(a) Depositions. If an Immigration Judge is satisfied that a witness is not reasonably available at the place of hearing and that said witness' testimony or other evidence is essential, the Immigration Judge may order the taking of deposition either at his or her own instance or upon application of a party. Such order shall designate the official by whom the deposition shall be taken, may prescribe and limit the content, scope, or manner of taking the deposition, and may direct the production of documentary evidence.

(b) Subpoenas issued subsequent to commencement of proceedings. (1) General. In any proceeding before an Immigration Judge, other than under 8 CFR part 335, the Immigration Judge shall have exclusive jurisdiction to issue subpoenas requiring the attendance of witnesses or for the production of books, papers and other documentary evidence, or both. An Immigration Judge may issue a subpoena upon his or her own volition or upon application of the Service or the alien.

(2) Application for subpoena. A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding, what he or she expects to prove by such witnesses or documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same.

(3) Issuance of subpoena. Upon being satisfied that a witness will not appear and testify or produce documentary evidence and that the witness' evidence is essential, the Immigration Judge shall issue a subpoena. The subpoena shall state the title of the proceeding and shall command the person to whom it is directed to attend and to give testimony at a time and place specified. The subpoena may also command the person to whom it is directed to produce the books, papers, or documents specified in the subpoena.

(4) Appearance of witness. If the witness is at a distance of more than 100 miles from the place of the proceeding, the subpoena shall provide for the witness' appearance at the Immigration Court nearest to the witness to respond to oral or written interrogatories, unless there is no objection by any party to the witness' appearance at the proceeding.

(5) Service. A subpoena issued under this section may be served by any person over 18 years of age not a party to the case.

(6) Invoking aid of court. If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the Immigration Judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers or documents designated in the subpoena.

8 CFR § 3.42

29. In Subpart C, a new §3.42 is added to read as follows:

 8 CFR § 3.42

**§3.42 Review of credible fear determination.**

(a) Referral. Jurisdiction for an Immigration Judge to review an adverse credible fear finding by an asylum officer pursuant to section 235(b)(1)(B) of the Act shall commence with the filing by the Service of Form I-863, Notice of Referral to Immigration Judge. The Service shall also file with the notice of referral a copy of the written record of determination as defined in section 235(b)(1)(B)(iii)(II) of the Act, including a copy of the alien's written request for review, if any.

(b) Record of proceeding. The Immigration Court shall create a Record of Proceeding for a review of an adverse credible fear determination. This record shall not be merged with any later proceeding pursuant to section 240 of the Act involving the same alien.

(c) Procedures and evidence. The Immigration Judge may receive into evidence any oral or written statement which is material and relevant to any issue in the review. The testimony of the alien shall be under oath or affirmation administered by the Immigration Judge. If an interpreter is necessary, one will be provided by the Immigration Court. The Immigration Judge shall determine whether the review shall be in person, or through telephonic or video connection (where available). The alien may consult with a person or persons of the alien's choosing prior to the review.

(d) Standard of review. The Immigration Judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the Immigration Judge, that the alien could establish eligibility for asylum under section 208 of the Act.

(e) Timing. The Immigration Judge shall conclude the review to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date the supervisory asylum officer has approved the asylum officer's negative credible fear determination issued on Form I-869, Record of Negative Credible Fear Finding and Request for Review.

(f) Decision. If an Immigration Judge determines that an alien has a credible fear of persecution, the Immigration Judge shall vacate the order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. Subsequent to the order being vacated, the Service shall issue and file Form I-862, Notice to Appear, with the Immigration Court to commence removal proceedings. The alien shall have the opportunity to apply for asylum in the course of removal proceedings pursuant to section 240 of the Act. If an Immigration Judge determines that an alien does not have a credible fear of persecution, the Immigration Judge shall affirm the asylum officer's determination and remand the case to the Service for execution of the removal order entered pursuant to section 235(b)(1)(B)(iii)(I) of the Act. No appeal shall lie from a review of an adverse credible fear determination made by an Immigration Judge.

(g) Custody. An Immigration Judge shall have no authority to review an alien's custody status in the course of a review of an adverse credible fear determination made by the Service.  **\*10336**

**PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS**

30. The authority citation for part 103 continues to read as follows:

Authority: 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; E.O. 12356; 47 FR 14874, 15557; 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

 8 CFR § 103.1

31. In §103.1, paragraph (g)(3)(ii) is revised to read as follows:

 8 CFR § 103.1

**§103.1 Delegations of authority.**

* * * * *

(g) * * *

(3) * * *

(ii) Asylum officers. Asylum officers constitute a professional corps of officers who serve under the supervision and direction of the Director of International Affairs and shall be specially trained as required in §208.1(b) of this chapter. Asylum officers are delegated the authority to hear and adjudicate credible fear of persecution determinations under section 235(b)(1)(B) of the Act and applications for asylum and for withholding of removal, as provided under 8 CFR part 208.

* * * * *8 CFR § 103.5

§103.5 [Amended]

8 CFR § 103.5

32. Section 103.5 is amended by:

a. Removing paragraph (a)(1)(iii)(B);

b. Redesignating paragraphs (a)(1)(iii)(C) through (F) as paragraphs (a)(1)(iii)(B) through (E), respectively; and

c. Removing paragraph (a)(5)(iii).

8 CFR § 103.5a

33. In §103.5a, paragraph (c)(1) is revised to read as follows:

8 CFR § 103.5a

§103.5a Service of notification, decisions, and other papers by the Service.

* * * * *

(c) * * *

(1) Generally. In any proceeding which is initiated by the Service, with proposed adverse effect, service of the initiating notice and of notice of any decision by a Service officer shall be accomplished by personal service, except as provided in section 239 of the Act.

* * * * *8 CFR § 103.6

34. In §103.6, paragraph (a) is revised to read as follows:

8 CFR § 103.6

§103.6 Surety bonds.

(a) Posting of surety bonds.—(1) Extension agreements; consent of surety; collateral security. All surety bonds posted in immigration cases shall be executed on Form I-352, Immigration Bond, a copy of which, and any rider attached thereto, shall be furnished the obligor. A district director is authorized to approve a bond, a formal agreement to extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on Form I-312, Designation of Attorney in Fact. All other matters relating to bonds, including a power of attorney not executed on Form I-312 and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, shall be forwarded to the regional director for approval.

(2) Bond riders.—(i) General. Bond riders shall be prepared on Form I-351, Bond Riders, and attached to Form I-352. If a condition to be included in a bond is not on Form I-351, a rider containing the condition shall be executed.

* * * * *8 CFR § 103.7

35. Section 103.7(b)(1) is amended by:

a. Removing the entry to "Form I-444", and by

b. Adding the entry for "Form EOIR-42" to the listing of forms, in proper numerical sequence, to read as follows:

 8 CFR § 103.7

**§103.7** **Fees**

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

 \* \* \* \* \*

Form EOIR-42. For filing application for cancellation of removal under section 240A of the Act—$100.00. (A single fee of $100.00 will be charged whenever cancellation of removal applications are filed by two or more aliens in the same proceedings).

 \* \* \* \* \*

## PART 204—IMMIGRANT PETITIONS

36. The authority citation for part 204 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255; 8 CFR part 2.

 8 CFR § 204.2

37. Section 204.2 is amended by:

a. Revising paragraph (a)(1)(iii) introductory text;

b. Removing paragraphs (a)(1)(iii)(A) through (C); and

c. Redesignating paragraphs (a)(1)(iii)(D) through (I) as paragraphs (a)(1)(iii)(A) through (F) respectively, to read as follows:

 8 CFR § 204.2

**§204.2** **Petitions for relatives, widows, and widowers, and abused spouses and children.**

(a) \* \* \*

(1) \* \* \*

(iii) Marriage during proceedings—general prohibition against approval of visa petition. A visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse shall not be approved if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Determination of commencement and termination of proceedings and exemptions shall be in accordance with § 245.1(c)(9) of this chapter, except that the burden in visa petition proceedings to establish eligibility for the exemption in §245.1(c)(9)(iii)(F) of this chapter shall rest with the petitioner.

 \* \* \* \* \*

## PART 207—ADMISSION OF REFUGEES

38. The authority citation for part 207 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

 8 CFR § 207.1

39. Section 207.1 is amended by removing paragraph (e), and by revising paragraph (a) to read as follows:

 8 CFR § 207.1

**§207.1** **Eligibility.**

(a) Filing jurisdiction. Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by filing an application in accordance with §207.2 with the Service office having jurisdiction over the area where the applicant is located. In those areas too distant from a Service office, the application may be filed at a designated United States consular office.

* * * * *8 CFR § 207.3

40. Section 207.3 is revised to read as follows:

8 CFR § 207.3

### §207.3 Waivers of inadmissibility.

(a) Authority. Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved. Officers in charge of overseas offices are delegated authority to initiate the necessary investigations to establish the facts in each waiver application pending before them and to approve or deny such waivers.

(b) Filing requirements. The applicant for a waiver must submit Form I-602, Application by Refugee for Waiver of Grounds of Inadmissibility, with the Service office processing his or her case. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family **\*10337** unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial, if the application is denied. There is no appeal from such decision.

8 CFR § 207.8

### §207.8 [Amended]

8 CFR § 207.8

41. Section 207.8 is amended in the last sentence by revising the reference to "sections 235, 236, and 237" to read "sections 235, 240, and 241".

42. Part 208 is revised to read as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

### Subpart A—Asylum and Withholding of Removal

Sec.

208.1 General.

208.2 Jurisdiction.

208.3 Form of application.

208.4 Filing the application.

208.5 Special duties toward aliens in custody of the Service.

208.6 Disclosure to third parties.

208.7 Employment authorization.

208.8 Limitations on travel outside the United States.

208.9 Procedure for interview before an asylum officer.

208.10 Failure to appear at an interview before an asylum officer.

208.11 Comments from the Department of State.

208.12 Reliance on information compiled by other sources.

208.13 Establishing asylum eligibility.

208.14 Approval, denial, or referral of application.

208.15 Definition of "firm resettlement."

208.16 Withholding of removal.

208.17 Decisions.

208.18 Determining if an asylum application is frivolous.

208.19 Admission of the asylee's spouse and children.

208.20 Effect on exclusion, deportation, and removal proceedings.

208.21 Restoration of status.

208.22 Termination of asylum or withholding of removal or deportation.

208.23—29 [Reserved]

**Subpart B—Credible Fear of Persecution**

208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.
Authority: 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.


**Subpart A—Asylum and Withholding or Removal**
8 CFR § 208.1

**§208.1 General.**
(a) Applicability. Unless otherwise provided in this chapter, this subpart shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in §208.16(c). Such applications are hereinafter referred to generically as asylum applications. The provisions of this part shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer or immigration judge prior to April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(5) and (c)(6) of the Act, and 8 CFR parts 3 and 103, where applicable.

(b) Training of asylum officers. The Director of International Affairs shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Director of International Affairs shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on

account of race, religion, nationality, membership in a particular social group, or political opinion, as well as other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

 8 CFR § 208.2

## §208.2 Jurisdiction.

(a) Office of International Affairs. Except as provided in paragraph (b) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by, or a credible fear determination pertaining to, an alien physically present in the United States or seeking admission at a port-of-entry. An application that is complete within the meaning of §208.3(c)(3) shall be either adjudicated or referred by asylum officers under this part in accordance with §208.14. An application that is incomplete within the meaning of §208.3(c)(3) shall be returned to the applicant. Except as provided in §208.16(a), an asylum officer shall not decide whether an alien is entitled to withholding of removal under section 241(b)(3) of the Act.

(b) Immigration Court—(1) Certain aliens not entitled to proceedings under section 240 of the Act. After Form I-863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewmember who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) On or after April 1, 1997, was granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution pursuant to the procedure set forth in subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under section 235(c) of the Act; or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act.

(2) Rules of procedure. (i) General. Proceedings falling under the jurisdiction of the immigration judge pursuant to paragraph (b)(1) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, except the scope of review shall be limited to a determination of whether the alien is eligible for asylum or withholding of removal and whether asylum shall be granted in the exercise of discretion. During such proceedings all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, removability, eligibility for waivers, and eligibility for any form of relief other than asylum or withholding of removal.

(ii) Notice of hearing procedures and in-absentia decisions. The alien will be provided with notice of the time and place of the proceeding. The request for asylum and withholding of removal  **10338**  submitted by an alien who fails to appear for the hearing shall be denied. The denial of asylum and withholding of removal for failure to appear may be reopened only upon a motion filed with the immigration judge with jurisdiction over the case. Only one motion to reopen may be filed, and it must

AR.00106

47

be filed within 90 days, unless the alien establishes that he or she did not receive notice of the hearing date or was in Federal or State custody on the date directed to appear. The motion must include documentary evidence which demonstrates that:

(A) The alien did not receive the notice;

(B) The alien was in Federal or State custody and the failure to appear was through no fault of the alien; or

(C) "Exceptional circumstances," as defined in section 240(e)(1) of the Act, caused the failure to appear.

(iii) Relief. The filing of a motion to reopen shall not stay removal of the alien unless the immigration judge grants a written request for a stay pending disposition of the motion. An alien who fails to appear for a proceeding under this section shall not be eligible for relief under section 208, 212(h), 212(i), 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the denial.

(3) Other aliens. Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served Form I-221, Order to Show Cause; Form I-122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I-862, Notice to Appear, after a copy of the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program.

 8 CFR § 208.3

## §208.3 Form of application.

(a) An asylum applicant must file Form I-589, Application for Asylum or Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I-589 must be submitted for each dependent included in the principal's application.

(b) An asylum application shall be deemed to constitute at the same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997. In such instances, the asylum application shall be deemed to constitute an application for withholding of deportation under section 243(h) of the Act, as that section existed prior to April 1, 1997. Where a determination is made that an applicant is ineligible to apply for asylum under section 208(a)(2) of the Act, an asylum application shall be construed as an application for withholding of removal.

(c) Form I-589 shall be filed under the following conditions and shall have the following consequences:

(1) If the application was filed on or after January 4, 1995, information provided in the application may be used as a basis for the initiation of removal proceedings, or to satisfy any burden of proof in exclusion, deportation, or removal proceedings;

(2) The applicant and anyone other than a spouse, parent, son, or daughter of the applicant who assists the applicant in preparing the application must sign the application under penalty of perjury. The applicant's signature establishes a presumption that the applicant is aware of the contents of the application. A person other than a relative specified in this paragraph who assists the applicant in preparing the application also must provide his or her full mailing address;

(3) An asylum application that does not include a response to each of the questions contained in the Form I-589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filing of an incomplete application shall not commence the 150-day period after which the applicant may file an application for employment authorization in accordance with §208.7. An application that is incomplete shall be returned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant

within 30 days, it shall be deemed complete. An application returned to the applicant as incomplete shall be resubmitted by the applicant with the additional information if he or she wishes to have the application considered;

(4) Knowing placement of false information on the application may subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil penalties under section 274C of the Act; and

(5) Knowingly filing a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to §208.18.
 8 CFR § 208.4

## §208.4 Filing the application.

Except as prohibited in paragraph (a) of this section, asylum applications shall be filed in accordance with paragraph (b) of this section.

(a) Prohibitions on filing. Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate to the satisfaction of the Attorney General that one of the exceptions in section 208(a)(2)(D) of the Act applies. Such prohibition applies only to asylum applications under section 208 of the Act and not to applications for withholding of removal under section 241 of the Act. If an applicant submits an asylum application and it appears that one or more of the prohibitions contained in section 208(a)(2) of the Act apply, an asylum officer or an immigration judge shall review the application to determine if the application should be rejected or denied. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) Authority. Only an asylum officer, an immigration judge, or the Board of Immigration Appeals is authorized to make determinations regarding the prohibitions contained in section 208(a)(2)(B) or (C) of the Act;

(2) One-year filing deadline. (i) For purposes of section 208(a)(2)(B) of the Act, an applicant has the burden of proving

(A) By clear and convincing evidence that he or she applied within one year of the alien's arrival in the United States or

(B) To the satisfaction of the asylum officer, immigration judge, or Board of Immigration Appeals that he or she qualifies for an exception to the one-year deadline.

(ii) The one-year period shall be calculated from the date of the alien's last arrival in the United States or April 1, 1997, whichever is later. In the case of an application that appears to have been filed more than a year after the applicant arrived in the United States, an asylum officer or immigration judge will determine whether the applicant qualifies under one of the exceptions to the deadline;  **\*10339**

(3) Prior denial of application. For purposes of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals;

(4) Changed circumstances. (i) The term "changed circumstances" in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum. They may include:

(A) Changes in conditions in the applicant's country of nationality or, if the person is stateless, country of last habitual residence or

(B) Changes in objective circumstances relating to the applicant in the United States, including changes in applicable U.S. law, that create a reasonable possibility that applicant may qualify for asylum.

(ii) The applicant shall apply for asylum within a reasonable period given those "changed circumstances."

(5) The term extraordinary circumstances in section 208(a)(2)(D) of the Act shall refer to events or factors beyond the alien's control that caused the failure to meet the 1-year deadline. Such circumstances shall excuse the failure to file within the 1-year period so long as the alien filed the application within a reasonable period given those circumstances. The burden of proof is on the applicant to establish to the satisfaction of the asylum officer or immigration judge that the circumstances were both beyond his or her control and that, but for those circumstances, he or she would have filed within the 1-year period. These circumstances may include:

(i) Serious illness or mental or physical disability of significant duration, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival;

(ii) Legal disability (e.g., the applicant was an unaccompanied minor or suffered from a mental impairment) during the first year after arrival;

(iii) Ineffective assistance of counsel, provided that:

(A) The alien files an affidavit setting forth in detail the agreement that was entered into with counsel with respect to the actions to be taken and what representations counsel did or did not make to the respondent in this regard;

(B) The counsel whose integrity or competence is being impugned has been informed of the allegations leveled against him or her and given an opportunity to respond; and

(C) The alien indicates whether a complaint has been filed with appropriate disciplinary authorities with respect to any violation of counsel's ethical or legal responsibilities, and if not, why not;

(iv) The applicant maintained Temporary Protected Status until a reasonable period before the filing of the asylum application; and

(v) The applicant submitted an asylum application prior to the expiration of the 1-year deadline, but that application was rejected by the Service as not properly filed, was returned to the applicant for corrections, and was refiled within a reasonable period thereafter.

(b) Filing location—(1) With the service center by mail. Except as provided in paragraphs (b)(2), (b)(3), (b)(4) and (b)(5) of this section, asylum applications shall be filed directly by mail with the service center servicing the asylum office with jurisdiction over the place of the applicant's residence or, in the case of an alien without a United States residence, the applicant's current lodging or the land border port-of-entry through which the alien seeks admission to the United States.

(2) With the asylum office. Asylum applications shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who has received the express consent of the Director of Asylum to do so.

(3) With the immigration judge. Asylum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the port, district office, or sector after service and filing of the appropriate charging document.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(iii) In asylum proceedings pursuant to §208.2(b)(1) and after the Notice of Referral to Immigration Judge has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) With the Board of Immigration Appeals. In conjunction with a motion to remand or reopen pursuant to §§3.2 and 3.8 of this chapter where applicable, an initial asylum application shall be filed with the Board of Immigration Appeals if jurisdiction over the proceedings is vested in the Board of Immigration Appeals under 8 CFR part 3. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(5) With the district director. In the case of any alien described in §208.2(b)(1) and prior to the service on the alien of Form I-863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. The district director shall forward such asylum application to the appropriate Immigration Court with the Form I-863 being filed with that Immigration Court.

(c) Amending an application after filing. Upon request of the alien and as a matter of discretion, the asylum officer or immigration judge having jurisdiction may permit an asylum applicant to amend or supplement the application, but any delay caused by such request shall extend the period within which the applicant may not apply for employment authorization in accordance with §208.7(a).

 8 CFR § 208.5

§208.5 **Special duties toward aliens in custody of the Service.**
(a) General. When an alien in the custody of the Service requests asylum or withholding of removal or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear of persecution determination under section 235(b)(1)(B) of the Act. Where possible, expedited consideration shall be given to applications of detained aliens. Except as provided in paragraph (c) of this section, such alien shall not be excluded, deported, or removed before a decision is rendered on his or her asylum application.

(b) Certain aliens aboard vessels. (1) If an alien crewmember or alien stowaway on board a vessel or other conveyance alleges, claims, or otherwise makes known to an immigration inspector or other official making an examination on the conveyance that he or she is unable or unwilling to return to his or her country of nationality or last habitual residence (if not a national of any country) because of persecution or a fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, the alien shall be promptly removed from the conveyance. If the alien makes such fear known to an official while off such conveyance, the  *10340  alien shall not be returned to the conveyance but shall be retained in or transferred to the custody of the Service.

(i) An alien stowaway will be referred to an asylum officer for a credible fear determination under §208.30.

(ii) An alien crewmember shall be provided the appropriate application forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port of entry. The district director, pursuant to §208.4(b), shall serve Form I-863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I-863 being filed with that court.

(2) Pending adjudication of the application, and, in the case of a stowaway the credible fear determination and any review thereof, the alien may be detained by the Service or otherwise paroled in accordance with §212.5 of this chapter. However, pending the credible fear determination, parole of an alien stowaway may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(c) Exception to prohibition on removal. A motion to reopen or an order to remand accompanied by an asylum application pursuant to §208.4(b)(3)(iii) shall not stay execution of a final exclusion, deportation, or removal order unless such stay is specifically granted by the Board of Immigration Appeals or the immigration judge having jurisdiction over the motion.

8 CFR § 208.6

### §208.6 Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service that indicate that a specific alien has applied for asylum shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentiality of these records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The defense of any legal action arising from the adjudication of or failure to adjudicate the asylum application;

(iii) The defense of any legal action of which the asylum application is a part; or

(iv) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, state, or local court in the United States considering any legal action:

(i) Arising from the adjudication of or failure to adjudicate the asylum application; or

(ii) Arising from the proceedings of which the asylum application is a part.

8 CFR § 208.7

### §208.7 Employment authorization.

(a) Application and approval. (1) Subject to the restrictions contained in sections 208(d) and 236(a) of the Act, an applicant for asylum who is not an aggravated felon shall be eligible pursuant to §§274a.12(c)(8) and 274a.13(a) of this chapter to submit a Form I-765, Application for Employment Authorization. Except in the case of an alien whose asylum application has been recommended for approval, or in the case of an alien who filed an asylum application prior to January 4, 1995, the application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted in accordance with §§208.3 and 208.4 has been received. In the case of an applicant whose asylum application has been recommended for approval, the applicant may apply for employment authorization when he or she receives notice of the recommended approval. If an asylum application has been returned as incomplete in accordance with §208.3(c)(3), the 150-day period will commence upon receipt by the Service of a complete asylum application. An applicant whose asylum application has been denied by an asylum officer or by an immigration judge within the 150-day period shall not be eligible to apply for employment authorization. If an asylum application is denied prior to a decision on the application for employment authorization, the application for employment authorization shall be denied. If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the Form I-765 to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application filed on or after April 1, 1997.

(2) The time periods within which the alien may not apply for employment authorization and within which the Service must respond to any such application and within which the asylum application must be adjudicated pursuant to section 208(d)(5)(A)

AR.00111

(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with §§208.3 and 208.4. Any delay requested or caused by the applicant shall not be counted as part of these time periods. Such time periods also shall be extended by the equivalent of the time between issuance of a request for evidence under §103.2(b)(8) of this chapter and the receipt of the applicant's response to such request.

(3) The provisions of paragraphs (a)(1) and (a)(2) of this section apply to applications for asylum filed on or after January 4, 1995.

(4) Employment authorization pursuant to §274a.12(c)(8) of this chapter may not be granted to an alien who fails to appear for a scheduled interview before an asylum officer or a hearing before an immigration judge, unless the applicant demonstrates that the failure to appear was the result of exceptional circumstances.

(b) Renewal and termination. Employment authorization shall be renewable, in increments to be determined by the Commissioner, for the continuous period of time necessary for the asylum officer or immigration judge to decide the asylum application and, if necessary, for completion of any administrative or judicial review.

(1) If the asylum application is denied by the asylum officer, the employment authorization shall terminate at the expiration of the employment authorization document or 60 days after the denial of asylum, whichever is longer.

(2) If the application is denied by the immigration judge, the Board of Immigration Appeals, or a Federal court, the employment authorization terminates upon the expiration of the employment authorization document, unless the applicant has filed an appropriate request for administrative or judicial review.

(c) Supporting evidence for renewal of employment authorization. In order for employment authorization to be renewed under this section, the alien must provide the Service (in accordance with the instructions on or attached to the employment authorization application) with a Form I-765, the required fee (unless waived in accordance with §103.7(c) of this chapter), and (if applicable) proof that **\*10341** he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting to the Service one of the following, depending on the stage of the alien's immigration proceedings:

(1) If the alien's case is pending in proceedings before the immigration judge, and the alien wishes to continue to pursue his or her asylum application, a copy of any asylum denial, referral notice, or charging document placing the alien in such proceedings;

(2) If the immigration judge has denied asylum, a copy of the document issued by the Board of Immigration Appeals to show that a timely appeal has been filed from a denial of the asylum application by the immigration judge; or

(3) If the Board of Immigration Appeals has dismissed the alien's appeal of a denial of asylum, or sustained an appeal by the Service of a grant of asylum, a copy of the petition for judicial review or for habeas corpus pursuant to section 242 of the Act, date stamped by the appropriate court.

(d) In order for employment authorization to be renewed before its expiration, the application for renewal must be received by the Service 90 days prior to expiration of the employment authorization.

8 CFR § 208.8

## §208.8 Limitations on travel outside the United States.

(a) An applicant who leaves the United States without first obtaining advance parole under §212.5(e) of this chapter shall be presumed to have abandoned his or her application under this section.

(b) An applicant who leaves the United States pursuant to advance parole under §212.5(e) of this chapter and returns to the country of claimed persecution shall be presumed to have abandoned his or her application, unless the applicant is able to establish compelling reasons for such return.

8 CFR § 208.9

**§208.9 Procedure for interview before an asylum officer.**

(a) The Service shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of §208.3(c)(3) and is within the jurisdiction of the Service.

(b) The asylum officer shall conduct the interview in a nonadversarial manner and, except at the request of the applicant, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on the applicant's eligibility for asylum. At the time of the interview, the applicant must provide complete information regarding his or her identity, including name, date and place of birth, and nationality, and may be required to register this identity electronically or through any other means designated by the Attorney General. The applicant may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence.

(c) The asylum officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present and receive evidence, and question the applicant and any witnesses.

(d) Upon completion of the interview, the applicant or the applicant's representative shall have an opportunity to make a statement or comment on the evidence presented. The asylum officer may, in his or her discretion, limit the length of such statement or comment and may require its submission in writing. Upon completion of the interview, the applicant shall be informed that he or she must appear in person to receive and to acknowledge receipt of the decision of the asylum officer and any other accompanying material at a time and place designated by the asylum officer, except as otherwise provided by the asylum officer. An applicant's failure to appear to receive and acknowledge receipt of the decision shall be treated as delay caused by the applicant for purposes of §208.7(a)(3) and shall extend the period within which the applicant may not apply for employment authorization by the number of days until the applicant does appear to receive and acknowledge receipt of the decision or until the applicant appears before an immigration judge in response to the issuance of a charging document under §208.14(b).

(e) The asylum officer shall consider evidence submitted by the applicant together with his or her asylum application, as well as any evidence submitted by the applicant before or at the interview. As a matter of discretion, the asylum officer may grant the applicant a brief extension of time following an interview during which the applicant may submit additional evidence. Any such extension shall extend by an equivalent time the periods specified by §208.7 for the filing and adjudication of any employment authorization application.

(f) The asylum application, all supporting information provided by the applicant, any comments submitted by the Department of State or by the Service, and any other information specific to the applicant's case and considered by the asylum officer shall comprise the record.

(g) An applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure to appear for the interview for purposes of §208.10.

8 CFR § 208.10

**§208.10 Failure to appear at an interview before an asylum officer.**

Failure to appear for a scheduled interview without prior authorization may result in dismissal of the application or waiver of the right to an interview. Failure to appear shall be excused if the notice of the interview was not mailed to the applicant's current address and such address had been provided to the Office of International Affairs by the applicant prior to the date of mailing in accordance with section 265 of the Act and regulations promulgated thereunder, unless the asylum officer determines that the applicant received reasonable notice of the interview. Failure to appear will be excused if the applicant demonstrates that such failure was the result of exceptional circumstances.

8 CFR § 208.11

**§208.11 Comments from the Department of State.**

(a) The Service shall forward to the Department of State a copy of each completed application it receives. At its option, the Department of State may provide detailed country conditions information relevant to eligibility for asylum or withholding of removal.

(b) At its option, the Department of State may also provide:

(1) An assessment of the accuracy of the applicant's assertions about conditions in his or her country of nationality or habitual residence and his or her particular situation;

(2) Information about whether persons who are similarly situated to the applicant are persecuted in his or her country of nationality or habitual **\*10342** residence and the frequency of such persecution; or

(3) Such other information as it deems relevant.

(c) Asylum officers and immigration judges may request specific comments from the Department of State regarding individual cases or types of claims under consideration, or such other information as they deem appropriate.

(d) Any such comments received pursuant to paragraphs (b) and (c) of this section shall be made part of the record. Unless the comments are classified under the applicable Executive Order, the applicant shall be provided an opportunity to review and respond to such comments prior to the issuance of any decision to deny the application.

8 CFR § 208.12

**§208.12 Reliance on information compiled by other sources.**

(a) In deciding an asylum application, or whether the alien has a credible fear of persecution pursuant to section 235(b)(1)(B) of the Act, the asylum officer may rely on material provided by the Department of State, the Office of International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State.

8 CFR § 208.13

**§208.13 Establishing asylum eligibility.**

(a) Burden of proof. The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.

(b) Persecution. The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.

AR.00114

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

(i) If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

(ii) An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution under paragraph (b)(2) of this section, unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence arising out of the severity of the past persecution. If the applicant demonstrates such compelling reasons, he or she may be granted asylum unless such a grant is barred by paragraph (c) of this section .

(2) Well-founded fear of persecution. An applicant shall be found to have a well-founded fear of persecution if he or she can establish first, that he or she has a fear of persecution in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion; second, that there is a reasonable possibility of suffering such persecution if he or she were to return to that country; and third, that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country because of such fear. In evaluating whether the applicant has sustained his or her burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

(i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

(c) Mandatory denials. (1) Applications filed on or after April 1, 1997. For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the applicant is found to be ineligible for asylum under either section 208(a)(2) or 208(b)(2) of the Act, the applicant shall be considered for eligibility for withholding of removal under section 241(b)(3) of the Act.

(2) Applications filed before April 1, 1997. (i) An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(A) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(B) Has been firmly resettled within the meaning of §208.15;

(C) Can reasonably be regarded as a danger to the security of the United States;

(D) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(E) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

(ii) If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(d) Discretionary denial. An asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

 8 CFR § 208.14

## §208.14 Approval, denial, or referral of application.

(a) By an immigration judge. Unless otherwise prohibited in §208.13(c), an immigration judge may grant or deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(b) By an asylum officer. Unless otherwise prohibited in §208.13(c):

(1) An asylum officer may grant asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(2) If the alien appears to be deportable, excludable or removable under section 240 of the Act, the asylum **\*10343** officer shall either grant asylum or refer the application to an immigration judge for adjudication in deportation, exclusion, or removal proceedings. An asylum officer may refer such an application after an interview conducted in accordance with §208.9 or if, in accordance with §208.10, the applicant is deemed to have waived his or her right to an interview.

(3) If the applicant is maintaining valid nonimmigrant status at the time the application is decided, the asylum officer may grant or deny asylum, except in the case of an applicant described in §208.2(b)(1).

(c) Applicability of §103.2(b) of this chapter. No application for asylum or withholding of deportation shall be subject to denial pursuant to §103.2(b) of this chapter.

(d) Duration. If the alien's asylum application is granted, the grant will be effective for an indefinite period, subject to termination as provided in § 208.22.

(e) Effect of denial of principal's application on separate applications by dependents. The denial of an asylum application filed by a principal applicant for asylum shall also result in the denial of asylum status to any dependents of that principal applicant who are included in that same application. Such denial shall not preclude a grant of asylum for an otherwise eligible dependent who has filed a separate asylum application, nor shall such denial result in an otherwise eligible dependent becoming ineligible to apply for asylum due to the provisions of section 208(a)(2)(C) of the Act.

 8 CFR § 208.15

## §208.15 Definition of "firm resettlement."

An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:

(a) That his or her entry into that nation was a necessary consequence of his or her flight from persecution, that he or she remained in that nation only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that nation; or

(b) That the conditions of his or her residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the Asylum Officer or Immigration Judge shall consider the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 CFR § 208.16

### §208.16 Withholding of removal.

(a) Consideration of application for withholding of removal. An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) Eligibility for withholding of removal; burden of proof. The burden of proof is on the applicant for withholding of removal to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) The applicant's life or freedom shall be found to be threatened if it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) If the applicant is determined to have suffered persecution in the past such that his or her life or freedom was threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that his or her life or freedom would be threatened on return to that country unless a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there.

(3) In evaluating whether the applicant has sustained the burden of proving that his or her life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that there is a pattern or practice in the country of proposed removal of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return.

(c) Approval or denial of application. (1) General. Subject to paragraphs (c)(2) and (c)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraph (b) of this section.

(2) Mandatory denials. Except as provided in paragraph (c)(3) of this section, an application for withholding of removal shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an

alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the applicability of one or more of the grounds for denial enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) Exception to the prohibition on withholding of deportation in certain cases. Section 243(h)(3) of the Act, as added by section 413 of Public Law 104-132, shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was *10344 sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the 1967 Protocol Relating to the Status of Refugees.

(d) Reconsideration of discretionary denial of asylum. In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

8 CFR § 208.17

## §208.17 Decisions.

8 CFR § 208.14 8 CFR § 208.9

The decision of an asylum officer to grant or to deny asylum or withholding of removal, or to refer an asylum application in accordance with §208.14(b), shall be communicated in writing to the applicant. Notices of decisions to grant or deny asylum, or to refer an application, by asylum officers shall generally be served in person unless, in the discretion of the asylum office director, routine service by mail is appropriate. A letter communicating denial of the application shall state the basis for denial of the asylum application. The letter also shall contain an assessment of the applicant's credibility, unless the denial is the result of the applicant's conviction of an aggravated felony. Pursuant to §208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision.

8 CFR § 208.18

## §208.18 Determining if an asylum application is frivolous.

For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

8 CFR § 208.19

## §208.19 Admission of the asylee's spouse and children.

(a) Eligibility. A spouse, as defined in section 101(a)(35) of the Act, 8 U.S.C. 1101(a)(35), or child, as defined in section 101(b)(1)(A), (B), (C), (D), (E), or (F) of the Act, also may be granted asylum if accompanying or following to join the principal alien who was granted asylum, unless it is determined that:

(1) The spouse or child ordered, incited, assisted, or otherwise participated in the persecution of any persons on account of race, religion, nationality, membership in a particular social group, or political opinion;

(2) The spouse or child, having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community of the United States;

(3) The spouse or child has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(4) There are reasonable grounds for regarding the spouse or child a danger to the security of the United States.

(b) Relationship. The relationship of spouse and child as defined in section 101(b)(1) of the Act must have existed at the time the principal alien's asylum application was approved, except for children born to or legally adopted by the principal alien and spouse after approval of the principal alien's asylum application.

(c) Spouse or child in the United States. When a spouse or child of an alien granted asylum is in the United States but was not included in the principal alien's application, the principal alien may request asylum for the spouse or child by filing Form I-730 with the District Director having jurisdiction over his only place of residence, regardless of the status of that spouse or child in the United States.

(d) Spouse or child outside the United States. When a spouse or child of an alien granted asylum is outside the United States, the principal alien may request asylum for the spouse or child by filing form I-730 with the District Director, setting forth the full name, relationship, date and place of birth, and current location of each such person. Upon approval of the request, the District Director shall notify the Department of State, which will send an authorization cable to the American Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located.

(e) Denial. If the spouse or child is found to be ineligible for the status accorded under section 208(c) of the Act, a written notice stating the basis for denial shall be forwarded to the principal alien. No appeal shall lie from this decision.

(f) Burden of proof. To establish the claim of relationship of spouse or child as defined in section 101(b)(1) of the Act, evidence must be submitted with the request as set forth in part 204 of this chapter. Where possible this will consist of the documents specified in 8 CFR 204.2(c) (2) and (3). The burden of proof is on the principal alien to establish by a preponderance of the evidence that any person on whose behalf he or she is making a request under this section is an eligible spouse or child.

(g) Duration. The spouse or child qualifying under section 208(c) of the Act shall be granted asylum for an indefinite period unless the principal's status is revoked.

 8 CFR § 208.20

## §208.20 Effect on exclusion, deportation, and removal proceedings.

(a) An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to §208.22. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation may not be deported or removed to the country to which his or her deportation or removal is ordered withheld unless the withholding order is terminated pursuant to §208.22.

(b) When an alien's asylum status or withholding of removal or deportation is terminated under this chapter, the Service shall initiate removal proceedings under section 235 or 240 of the Act, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may also be in conjunction with a termination hearing scheduled under § 208.22(e).

 8 CFR § 208.21

## §208.21 Restoration of status.

An alien who was maintaining his or her nonimmigrant status at the time of filing an asylum application and has such application denied may continue in or be restored to that status, if it has not expired.

 8 CFR § 208.22

**§208.22** **Termination of asylum or withholding of removal or deportation.**

(a) Termination of asylum by the Service. Except as provided in **\*10345** paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that:

(1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted;

(2) As to applications filed on or after April 1, 1997, one or more of the conditions described in section 208(c)(2) of the Act exist; or

(3) As to applications filed before April 1, 1997, the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions in the alien's country of nationality or habitual residence or the alien has committed any act that would have been grounds for denial of asylum under §208.13(c)(2).

(b) Termination of withholding of deportation or removal by the Service. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of an asylum officer or a district director if the asylum officer determines, following an interview, that:

(1) The alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld;

(2) There is a showing of fraud in the alien's application such that the alien was not eligible for withholding of removal at the time it was granted;

(3) The alien has committed any other act that would have been grounds for denial of withholding of removal under section 241(b)(3)(B) of the Act had it occurred prior to the grant of withholding of removal; or

(4) For applications filed in proceedings commenced before April 1, 1997, the alien has committed any act that would have been grounds for denial of withholding of deportation under section 243(h)(2) of the Act.

(c) Procedure. Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reasons therefor, at least 30 days prior to the interview specified in paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice that asylum status or withholding of deportation or removal and any employment authorization issued pursuant thereto, are terminated.

(d) Termination of derivative status. The termination of asylum status for a person who was the principal applicant shall result in termination of the asylum status of a spouse or child whose status was based on the asylum application of the principal. Such termination shall not preclude the spouse or child of such alien from separately asserting an asylum or withholding of deportation or removal claim.

(e) Termination of asylum or withholding of deportation or removal by the Executive Office for Immigration Review. An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to §3.2 or §3.23 of this chapter for the purpose of terminating a grant of asylum or withholding of deportation or removal made under the jurisdiction of an immigration judge. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum or withholding of deportation or removal made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent

AR.00120 61

to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation or removal proceeding.

(f) Termination of asylum for arriving aliens. If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in section 208(c)(2) of the Act and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

 8 CFR § 208.23

§§208.23—208.29 [Reserved]

**Subpart B—Credible Fear of Persecution**

8 CFR § 208.30

**§208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

(a) Jurisdiction. The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (e) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and review under section 235(b)(1)(B) of the Act.

(b) Interview and procedure. The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall verify that the alien has received Form M-444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has an understanding of the credible fear determination process. The alien may be required to register his or her identity electronically or through any other means designated by the Attorney General. The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of such persons who may be present at the interview and on the length of statement or statements made. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country of nationality or, if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien  **\*10346**  has established a credible fear of persecution. The decision shall not become final until reviewed by a supervisory asylum officer.

(c) Authority. Asylum officers conducting credible fear interviews shall have the authorities described in §208.9(c).

(d) Referral for an asylum hearing. If an alien, other than an alien stowaway, is found to have a credible fear of persecution, the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum claim in proceedings under section 240 of the Act. Parole of the alien may only be considered in accordance with section 212(d)(5) of the Act and §212.5 of this chapter. If an alien stowaway is found to have a credible fear of persecution, the asylum officer will so inform the alien and issue a Form I-863, Notice to Referral to Immigration Judge, for full consideration of the asylum claim in proceedings under §208.2(b)(1).

(e) Removal of aliens with no credible fear of persecution. If an alien is found not to have a credible fear of persecution, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I-869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review. If the alien is not a stowaway, the officer shall also order the alien removed and issue a Form I-860, Notice and Order of Expedited Removal. If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall also refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(f) Review by immigration judge. The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, in accordance with section 235(b)(1)(B)(iii)(III) of the Act. If the alien requests such review, the asylum officer shall arrange for the detention of the alien and serve him or her with a Form I-863, Notice of Referral to Immigration Judge. The record of determination, including copies of the Form I-863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Upon review of the asylum officer's negative credible fear determination:

(1) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution, the case shall be returned to the Service for removal of the alien.

(2) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution, the immigration judge shall vacate the order of the asylum officer issued on Form I-860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an asylum application in accordance with §208.4(b)(3)(i).

(3) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution, the alien shall be allowed to file an asylum application before the immigration judge in accordance with §208.4(b)(3)(iii). The immigration judge shall decide the asylum application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If and when a denial of the asylum application becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If and when an approval of the asylum application becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.


## PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

43. The authority citation for part 209 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; 8 CFR part 2.

 8 CFR § 209.1

### §209.1 [Amended]

8 CFR § 209.1

44. In §209.1, paragraph (a)(1) is amended in the first sentence by revising the reference to ", 236, and 237" to read "and 240".

 8 CFR § 209.2

45. In §209.2, the last sentence of paragraph (c) is revised to read as follows:

 8 CFR § 209.2

### §209.2 Adjustment of status of alien granted asylum.

* * * * *

(c) Application. * * * If an alien has been placed in deportation, exclusion, or removal proceedings under any section of this Act (as effective on the date such proceedings commenced), the application can be filed and considered only in those proceedings.

 * * * * *

## PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS

46. Part 211 is revised to read as follows:

Sec.

211.1 Visas.

211.2 Passports.

211.3 Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I-551.

211.4 Waiver of documents for returning residents.

211.5 Alien commuters.

Authority: 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

 8 CFR § 211.1

### §211.1 Visas.

(a) General. Except as provided in paragraph (b) of this section, each arriving alien applying for admission (or boarding the vessel or aircraft on which he or she arrives) into the United States for lawful permanent residence, or as a lawful permanent resident returning to an unrelinquished lawful permanent residence in the United States, shall present one of the following:

(1) A valid, unexpired immigrant visa;

(2) A valid, unexpired Form I-551, Alien Registration Receipt Card, if seeking readmission after a temporary absence of less than 1 year, or in the case of a crewmember regularly serving on board a vessel or aircraft of United States registry seeking readmission after any temporary absence connected with his or her duties as a crewman;

(3) A valid, unexpired Form I-327, Permit to Reenter the United States;

(4) A valid, unexpired Form I-571, Refugee Travel Document, properly endorsed to reflect admission as a lawful permanent resident;

(5) An expired Form I-551, Alien Registration Receipt Card, accompanied by a filing receipt issued within the previous 6 months for either a Form I-751, Petition to Remove the Conditions on Residence, or Form I-829, Petition by Entrepreneur to Remove Conditions, if seeking admission or readmission after a temporary absence of less than 1 year;

(6) A Form I-551, whether or not expired, presented by a civilian or military employee of the United States Government who was outside the United States pursuant to official orders, or by the spouse or child of such employee who resided abroad while the employee or serviceperson was on overseas duty and who is preceding, accompanying or following to join within 4 months the employee, returning to the United States; or

(7) Form I-551, whether or not expired, or a transportation letter issued by an American consular officer,  **\*10347**  presented by an employee of the American University of Beirut, who was so employed immediately preceding travel to the United States, returning temporarily to the United States before resuming employment with the American University of Beirut, or resuming permanent residence in the United States.

(b) Waivers. (1) A waiver of the visa required in paragraph (a) of this section shall be granted without fee or application by the district director, upon presentation of the child's birth certificate, to a child born subsequent to the issuance of an immigrant

visa to his or her accompanying parent who applies for admission during the validity of such a visa; or a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within 2 years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States.

(2) For an alien described in paragraph (b)(1) of this section, recordation of the child's entry shall be on Form I-181, Memorandum of Creation of Record of Admission for Lawful Permanent Residence. The carrier of such alien shall not be liable for a fine pursuant to section 273 of the Act.

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an immigrant visa, Form I-551, or reentry permit, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I-193, Application for Waiver of Passport and/or Visa, with the fee prescribed in §103.7(b)(1) of this chapter, except that if the alien's Form I-551 was lost or stolen, the alien shall instead file Form I-90, Application to Replace Alien Registration Receipt Card, with the fee prescribed in §103.7(b)(1) of this chapter, provided the temporary absence did not exceed 1 year. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of an immigrant visa, Form I-551, or reentry permit and admit the alien as a returning resident, if the district director is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, Form I-551, or reentry permit. Filing the Form I-90 will serve as both application for replacement and as application for waiver of passport and visa, without the obligation to file a separate waiver application.

(c) Immigrants having occupational status defined in section 101(a)(15) (A), (E), or (G) of the Act. An immigrant visa, reentry permit, or Form I-551 shall be invalid when presented by an alien who has an occupational status under section 101(a)(15) (A), (E), or (G) of the Act, unless he or she has previously submitted, or submits at the time he or she applies for admission to the United States, the written waiver required by section 247(b) of the Act and 8 CFR part 247.

(d) Returning temporary residents. (1) Form I-688, Temporary Resident Card, may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of §210.1 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within one year after a temporary absence abroad.

(2) Form I-688 may be presented in lieu of an immigrant visa by an alien whose status has been adjusted to that of a temporary resident under the provisions of §245a.2 of this chapter, such status not having changed, and who is returning to an unrelinquished residence within 30 days after a temporary absence abroad, provided that the aggregate of all such absences abroad during the temporary residence period has not exceeded 90 days.

 8 CFR § 211.2

## §211.2 Passports.

(a) A passport valid for the bearer's entry into a foreign country at least 60 days beyond the expiration date of his or her immigrant visa shall be presented by each immigrant except an immigrant who:

(1) Is the parent, spouse, or unmarried son or daughter of a United States citizen or of an alien lawful permanent resident of the United States;

(2) Is entering under the provisions of §211.1(a)(2) through (a)(7);

(3) Is a child born during the temporary visit abroad of a mother who is a lawful permanent resident alien, or a national, of the United States, provided that the child's application for admission to the United States is made within 2 years of birth, the child is accompanied by the parent who is applying for readmission as a permanent resident upon the first return of the parent to the United States after the birth of the child, and the accompanying parent is found to be admissible to the United States;

(4) Is a stateless person or a person who because of his or her opposition to Communism is unwilling or unable to obtain a passport from the country of his or her nationality, or is the accompanying spouse or unmarried son or daughter of such immigrant; or

(5) Is a member of the Armed Forces of the United States.

(b) Except as provided in paragraph (a) of this section, if an alien seeking admission as an immigrant with an immigrant visa believes that good cause exists for his or her failure to present a passport, the alien may file an application for a waiver of this requirement with the district director in charge of the port-of-entry. To apply for this waiver, the alien must file Form I-193, Application for Waiver of Passport and/or Visa, with the fee prescribed in §103.7(b)(1) of this chapter. In the exercise of discretion, the district director in charge of the port-of-entry may waive the alien's lack of passport and admit the alien as an immigrant, if the district director is satisfied that the alien has established good cause for the alien's failure to present a passport.
 8 CFR § 211.3

### §211.3 Expiration of immigrant visas, reentry permits, refugee travel documents, and Forms I-551.

An immigrant visa, reentry permit, refugee travel document, or Form I—551 shall be regarded as unexpired if the rightful holder embarked or enplaned before the expiration of his or her immigrant visa, reentry permit, or refugee travel document, or with respect to Form I—551, before the first anniversary of the date on which he or she departed from the United States, provided that the vessel or aircraft on which he or she so embarked or enplaned arrives in the United States or foreign contiguous territory on a continuous voyage. The continuity of the voyage shall not be deemed to have been interrupted by scheduled or emergency stops of the vessel or aircraft en route to the United States or foreign contiguous territory, or by a layover in foreign contiguous territory necessitated solely for the purpose of effecting a transportation connection to the United States.
 8 CFR § 211.4

### §211.4 Waiver of documents for returning residents.

(a) Pursuant to the authority contained in section 211(b) of the Act, an alien previously lawfully admitted to the United States for permanent residence who, upon return from a temporary absence was inadmissible because of failure to have or to present  **\*10348**  a valid passport, immigrant visa, reentry permit, border crossing card, or other document required at the time of entry, may be granted a waiver of such requirement in the discretion of the district director if the district director determines that such alien:

(1) Was not otherwise inadmissible at the time of entry, or having been otherwise inadmissible at the time of entry is with respect thereto qualified for an exemption from deportability under section 237(a)(1)(H) of the Act; and

(2) Is not otherwise subject to removal.

(b) Denial of a waiver by the district director is not appealable but shall be without prejudice to renewal of an application and reconsideration in proceedings before the immigration judge.
 8 CFR § 211.5

### §211.5 Alien commuters.

(a) General. An alien lawfully admitted for permanent residence or a special agricultural worker lawfully admitted for temporary residence under section 210 of the Act may commence or continue to reside in foreign contiguous territory and commute as a special immigrant defined in section 101(a)(27)(A) of the Act to his or her place of employment in the United States. An alien commuter engaged in seasonal work will be presumed to have taken up residence in the United States if he or she is present in this country for more than 6 months, in the aggregate, during any continuous 12-month period. An alien commuter's address report under section 265 of the Act must show his or her actual residence address even though it is not in the United States.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) Loss of residence status. An alien commuter who has been out of regular employment in the United States for a continuous period of 6 months shall be deemed to have lost residence status, notwithstanding temporary entries in the interim for other than employment purposes. An exception applies when employment in the United States was interrupted for reasons beyond the individual's control other than lack of a job opportunity or the commuter can demonstrate that he or she has worked 90 days in the United States in the aggregate during the 12-month period preceding the application for admission into the United States. Upon loss of status, Form I-551 or I-688 shall become invalid and must be surrendered to an immigration officer.

(c) Eligibility for benefits under the immigration and nationality laws. Until he or she has taken up residence in the United States, an alien commuter cannot satisfy the residence requirements of the naturalization laws and cannot qualify for any benefits under the immigration laws on his or her own behalf or on behalf of his or her relatives other than as specified in paragraph (a) of this section. When an alien commuter takes up residence in the United States, he or she shall no longer be regarded as a commuter. He or she may facilitate proof of having taken up such residence by notifying the Service as soon as possible, preferably at the time of his or her first reentry for that purpose. Application for issuance of a new alien registration receipt card to show that he or she has taken up residence in the United States shall be made on Form I-90.

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

47. The authority citation for part 212 continues to read as follows:

Authority: 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1187, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

 8 CFR § 212.5

48. Section 212.5 is amended by:

a. Revising paragraph (a) and (b);

b. Revising introductory text in paragraph (c);

c. Revising paragraph (c)(1); and by

d. Revising paragraph (d)(2)(i), to read as follows:

 8 CFR § 212.5

### §212.5 Parole of aliens into the United States.

(a) The parole of aliens within the following groups who have been or are detained in accordance with §235.3(b) or (c) of this chapter would generally be justified only on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding:

(1) Aliens who have serious medical conditions in which continued detention would not be appropriate;

(2) Women who have been medically certified as pregnant;

(3) Aliens who are defined as juveniles in §236.3(a) of this chapter. The district director or chief patrol agent shall follow the guidelines set forth in §236.3(a) of this chapter and paragraphs (a)(3)(i) through (iii) of this section in determining under what conditions a juvenile should be paroled from detention:

(i) Juveniles may be released to a relative (brother, sister, aunt, uncle, or grandparent) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative notwithstanding that the juvenile has a relative who is in detention.

(ii) If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompanying relative who is in detention.

(iii) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a non-relative in detention who accompanied him or her on arrival, the question of releasing the minor and the accompanying non-relative adult shall be addressed on a case-by-case basis;

(4) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or

(5) Aliens whose continued detention is not in the public interest as determined by the district director or chief patrol agent.

(b) In the cases of all other arriving aliens, except those detained under § 235.3(b) or (c) of this chapter and paragraph (a) of this section, the district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) of the Act, any alien applicant for admission, under such terms and conditions, including those set forth in paragraph (c) of this section, as he or she may deem appropriate. An alien who arrives at a port-of-entry and applies for parole into the United States for the sole purpose of seeking adjustment of status under section 245A of the Act, without benefit of advance authorization as described in paragraph (e) of this section shall be denied parole and detained for removal in accordance with the provisions of §235.3(b) or (c) of this chapter. An alien seeking to enter the United States for the sole purpose of applying for adjustment of status under section 210 of the Act shall be denied parole and detained for removal under §235.3(b) or (c) of this chapter, unless the alien has been recommended for approval of such application for adjustment by a consular officer at an Overseas Processing Office.

(c) Conditions. In any case where an alien is paroled under paragraph (a) or (b) of this section, the district director or chief patrol agent may require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so. Not all factors listed need be present for parole to be exercised. The district director or chief patrol agent should apply reasonable discretion. The consideration of all relevant factors includes:  **\*10349**

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure, and a bond may be required on Form I-352 in such amount as the district director or chief patrol agent may deem appropriate;
 \* \* \* \* \*
(d) \* \* \*

(2)(i) On notice. In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director or chief patrol agent in charge of the area in which the alien is located, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 240 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed by removal within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director or the chief patrol agent the public interest requires that the alien be continued in custody.
 \* \* \* \* \*8 CFR § 212.6

49. In §212.6, paragraph (a)(2) is revised to read as follows:
 8 CFR § 212.6

### §212.6 Nonresident alien border crossing cards.
(a) \* \* \*

(2) Mexican border crossing card, Form I-186 or I-586. The rightful holder of a nonresident alien Mexican border crossing card, Form I-186 or I-586, may be admitted under §235.1(f) of this chapter if found otherwise admissible. However, any alien seeking entry as a visitor for business or pleasure must also present a valid passport and shall be issued Form I-94 if the alien is applying for admission from:

(i) A country other than Mexico or Canada, or

(ii) Canada if the alien has been in a country other than the United States or Canada since leaving Mexico.
* * * * *

## PART 213—ADMISSION OF ALIENS ON GIVING BOND OR CASH DEPOSIT

50. The authority citation for part 213 is revised to read as follows:

Authority: 8 U.S.C. 1103; 8 CFR part 2.
 8 CFR § 213.1

### §213.1 [Amended]
8 CFR § 213.1
51. Section 213.1 is amended in the last sentence by revising the term "part 103" to read "§103.6".


## PART 214—NONIMMIGRANT CLASSES

52. The authority citation for part 214 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282; 8 CFR part 2.
 8 CFR § 214.1
53. Section 214.1 is amended by revising paragraph (c)(4)(iv) to read as follows:
 8 CFR § 214.1

### §214.1 Requirements for admission, extension, and maintenance of status.
* * * * *
(c) * * *

(4) * * *

(iv) The alien is not the subject of deportation proceedings under section 242 of the Act (prior to April 1, 1997) or removal proceedings under section 240 of the Act.
 * * * * *

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

54. The authority citation for part 216 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.
 8 CFR § 216.3
55. Section 216.3 is revised to read as follows:
 8 CFR § 216.3

### §216.3 Termination of conditional resident status.
(a) During the two-year conditional period. The director shall send a formal written notice to the conditional permanent resident of the termination of the alien's conditional permanent resident status if the director determines that any of the conditions set forth in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or it becomes known to the government

that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs). If the Service issues a notice of intent to terminate an alien's conditional resident status, the director shall not adjudicate Form I-751 or Form I-829 until it has been determined that the alien's status will not be terminated. During this time, the alien shall continue to be a lawful conditional permanent resident with all the rights, privileges, and responsibilities provided to persons possessing such status. Prior to issuing the notice of termination, the director shall provide the alien with an opportunity to review and rebut the evidence upon which the decision is to be based, in accordance with §103.2(b)(2) of this chapter. The termination of status, and all of the rights and privileges concomitant thereto (including authorization to accept or continue in employment in this country), shall take effect as of the date of such determination by the director, although the alien may request a review of such determination in removal proceedings. In addition to the notice of termination, the director shall issue a notice to appear in accordance with 8 CFR part 239. During the ensuing removal proceedings, the alien may submit evidence to rebut the determination of the director. The burden of proof shall be on the Service to establish, by a preponderance of the evidence, that one or more of the conditions in section 216(b)(1) or 216A(b)(1) of the Act, whichever is applicable, are true, or that an alien entrepreneur who was admitted pursuant to section 203(b)(5) of the Act obtained his or her investment capital through other than legal means (such as through the sale of illegal drugs).

(b) Determination of fraud after two years. If, subsequent to the removal of the conditional basis of an alien's permanent resident status, the director determines that an alien spouse obtained permanent resident status through a marriage which was entered into for the purpose of evading the immigration laws or an alien entrepreneur obtained permanent resident status through a commercial enterprise which was improper under section 216A(b)(1) of the Act, the director may institute rescission proceedings pursuant to section 246 of the Act (if otherwise appropriate) or removal proceedings under section 240 of the Act.
 8 CFR § 216.4
56. Section 216.4 is amended by:

a. Revising paragraphs (a)(6), and (b)(3);

b. Revising paragraph, (c)(4);

c. Removing the unnumbered paragraph immediately after paragraph (c)(4); and by

d. Revising paragraph (d)(2) to read as follows:
 8 CFR § 216.4

**§216.4** Joint petition to remove conditional basis of lawful permanent resident status for alien spouse.
(a) * * *  **\*10350**

(6) Termination of status for failure to file petition. Failure to properly file Form I-751 within the 90-day period immediately preceding the second anniversary of the date on which the alien obtained lawful permanent residence on a conditional basis shall result in the automatic termination of the alien's permanent residence status and the initiation of proceedings to remove the alien from the United States. In such proceedings the burden shall be on the alien to establish that he or she complied with the requirement to file the joint petition within the designated period. Form I-751 may be filed after the expiration of the 90-day period only if the alien establishes to the satisfaction of the director, in writing, that there was good cause for the failure to file Form I-751 within the required time period. If the joint petition is filed prior to the jurisdiction vesting with the immigration judge in removal proceedings and the director excuses the late filing and approves the petition, he or she shall restore the alien's permanent residence status, remove the conditional basis of such status and cancel any outstanding notice to appear in accordance with §239.2 of this chapter. If the joint petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the alien and the Service.

(b) * * *

(3) Termination of status for failure to appear for interview. If the conditional resident alien and/or the petitioning spouse fail to appear for an interview in connection with the joint petition required by section 216(c) of the Act, the alien's permanent residence status will be automatically terminated as of the second anniversary of the date on which the alien obtained permanent residence. The alien shall be provided with written notification of the termination and the reasons therefor, and a notice to appear shall be issued placing the alien under removal proceedings. The alien may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the alien to establish compliance with the interview requirements. If the alien submits a written request that the interview be rescheduled or that the interview be waived, and the director determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate. If the interview is rescheduled at the request of the petitioners, the Service shall not be required to conduct the interview within the 90-day period following the filing of the petition.

(c) * * *

(4) A fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) in connection with the filing of the petition through which the alien obtained conditional permanent residence. If derogatory information is determined regarding any of these issues, the director shall offer the petitioners the opportunity to rebut such information. If the petitioners fail to overcome such derogatory information the director may deny the joint petition, terminate the alien's permanent residence, and issue a notice to appear to initiate removal proceedings. If derogatory information not relating to any of these issues is determined during the course of the interview, such information shall be forwarded to the investigations unit for appropriate action. If no unresolved derogatory information is determined relating to these issues, the petition shall be approved and the conditional basis of the alien's permanent residence status removed, regardless of any action taken or contemplated regarding other possible grounds for removal.

(d) * * *

(2) Denial. If the director denies the joint petition, he or she shall provide written notice to the alien of the decision and the reason(s) therefor and shall issue a notice to appear under section 239 of the Act and 8 CFR part 239. The alien's lawful permanent resident status shall be terminated as of the date of the director's written decision. The alien shall also be instructed to surrender any Alien Registration Receipt Card previously issued by the Service. No appeal shall lie from the decision of the director; however, the alien may seek review of the decision in removal proceedings. In such proceedings the burden of proof shall be on the Service to establish, by a preponderance of the evidence, that the facts and information set forth by the petitioners are not true or that the petition was properly denied.

8 CFR § 216.5

57. Section 216.5 is amended by revising paragraphs (a), (d), (e)(1), (e)(3)(ii), and (f) to read as follows:

8 CFR § 216.5

## §216.5 Waiver of requirement to file joint petition to remove conditions by alien spouse.

(a) General. (1) A conditional resident alien who is unable to meet the requirements under section 216 of the Act for a joint petition for removal of the conditional basis of his or her permanent resident status may file Form I-751, Petition to Remove the Conditions on Residence, if the alien requests a waiver, was not at fault in failing to meet the filing requirement, and the conditional resident alien is able to establish that:

(i) Deportation or removal from the United States would result in extreme hardship;

(ii) The marriage upon which his or her status was based was entered into in good faith by the conditional resident alien, but the marriage was terminated other than by death, and the conditional resident was not at fault in failing to file a timely petition; or

(iii) The qualifying marriage was entered into in good faith by the conditional resident but during the marriage the alien spouse or child was battered by or subjected to extreme cruelty committed by the citizen or permanent resident spouse or parent.

(2) A conditional resident who is in exclusion, deportation, or removal proceedings may apply for the waiver only until such time as there is a final order of exclusion, deportation or removal.

\* \* \* \* \*

(d) Interview. The service center director may refer the application to the appropriate local office and require that the alien appear for an interview in connection with the application for a waiver. The director shall deny the application and initiate removal proceedings if the alien fails to appear for the interview as required, unless the alien establishes good cause for such failure and the interview is rescheduled.

(e) Adjudication of waiver application. (1) Application based on claim of hardship. In considering an application for a waiver based upon an alien's claim that extreme hardship would result from the alien's removal from the United States, the director shall take into account only those factors that arose subsequent to the alien's entry as a conditional permanent resident. The director shall bear in mind that any removal from the United States is likely to result in a certain degree of hardship, and that only in those cases where the hardship is extreme should the application for a waiver be granted. The burden of establishing that extreme hardship exists rests solely with the applicant.

\* \* \* \* \*

(3) \* \* \*

(ii) A conditional resident or former conditional resident who has not departed the United States after termination of resident status may apply for the waiver. The conditional resident may apply for the waiver regardless of  **\*10351**  his or her present marital status. The conditional resident may still be residing with the citizen or permanent resident spouse, or may be divorced or separated.

\* \* \* \* \*

(f) Decision. The director shall provide the alien with written notice of the decision on the application for waiver. If the decision is adverse, the director shall advise the alien of the reasons therefor, notify the alien of the termination of his or her permanent residence status, instruct the alien to surrender any Alien Registration Receipt Card issued by the Service and issue a notice to appear placing the alien in removal proceedings. No appeal shall lie from the decision of the director; however, the alien may seek review of such decision in removal proceedings.


**PART 217—VISA WAIVER PILOT PROGRAM**

58. The authority citation for part 217 continues to read as follows:

Authority: 8 U.S.C. 1103, 1187; 8 CFR part 2.
 8 CFR § 217.1
59. Section 217.1 is revised to read as follows:
 8 CFR § 217.1

**§217.1 Scope.**

The Visa Waiver Pilot Program (VWPP) described in this section is established pursuant to the provisions of section 217 of the Act.
 8 CFR § 217.2
60. Section 217.2 is revised to read as follows:
 8 CFR § 217.2

**§217.2 Eligibility.**

(a) Definitions. As used in this part, the term:

Carrier refers to the owner, charterer, lessee, or authorized agent of any commercial vessel or commercial aircraft engaged in transporting passengers to the United States from a foreign place.

AR.00131

Designated country refers to Andorra, Argentina, Australia, Austria, Belgium, Brunei, Denmark, Finland, France, Germany, Iceland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, San Marino, Spain, Sweden, Switzerland, and the United Kingdom. The United Kingdom refers only to British citizens who have the unrestricted right of permanent abode in the United Kingdom (England, Scotland, Wales, Northern Ireland, the Channel Islands and the Isle of Man); it does not refer to British overseas citizens, British dependent territories' citizens, or citizens of British Commonwealth countries. Effective April 1, 1995, until September 30, 1998, or the expiration of the Visa Waiver Pilot Program, whichever comes first, Ireland has been designated as a Visa Waiver Pilot Program country with Probationary Status in accordance with section 217(g) of the Act.

Round trip ticket means any return trip transportation ticket in the name of an arriving Visa Waiver Pilot Program applicant on a participating carrier valid for at least 1 year, electronic ticket record, airline employee passes indicating return passage, individual vouchers for return passage, group vouchers for return passage for charter flights, and military travel orders which include military dependents for return to duty stations outside the United States on U.S. military flights. A period of validity of 1 year need not be reflected on the ticket itself, provided that the carrier agrees that it will honor the return portion of the ticket at any time, as provided in Form I-775, Visa Waiver Pilot Program Agreement.

(b) Special program requirements. (1) General. In addition to meeting all of the requirements for the Visa Waiver Pilot Program specified in section 217 of the Act, each applicant must possess a valid, unexpired passport issued by a designated country and present a completed, signed Form I-94W, Nonimmigrant Visa Waiver Arrival/Departure Form.

(2) Persons previously removed as deportable aliens. Aliens who have been deported or removed from the United States, after having been determined deportable, require the consent of the Attorney General to apply for admission to the United States pursuant to section 212(a)(9)(A)(iii) of the Act. Such persons may not be admitted to the United States under the provisions of this part notwithstanding the fact that the required consent of the Attorney General may have been secured. Such aliens must secure a visa in order to be admitted to the United States as nonimmigrants, unless otherwise exempt.

(c) Restrictions on manner of arrival. (1) Applicants arriving by air and sea. Applicants must arrive on a carrier that is signatory to a Visa Waiver Pilot Program Agreement and at the time of arrival must have a round trip ticket that will transport the traveler out of the United States to any other foreign port or place as long as the trip does not terminate in contiguous territory or an adjacent island; except that the round trip ticket may transport the traveler to contiguous territory or an adjacent island, if the traveler is a resident of the country of destination.

(2) Applicants arriving at land border ports-of-entry. Any Visa Waiver Pilot Program applicant arriving at a land border port-of-entry must provide evidence to the immigration officer of financial solvency and a domicile abroad to which the applicant intends to return. An applicant arriving at a land-border port-of-entry will be charged a fee as prescribed in §103.7(b)(1) of this chapter for issuance of Form I-94W, Nonimmigrant Visa Waiver Arrival/Departure Form. A round-trip transportation ticket is not required of applicants at land border ports-of-entry.

(d) Aliens in transit. An alien who is in transit through the United States is eligible to apply for admission under the Visa Waiver Pilot Program, provided the applicant meets all other program requirements.
  8 CFR § 217.3
61. Section 217.3 is revised to read as follows:
  8 CFR § 217.3

## §217.3 Maintenance of status.

(a) Satisfactory departure. If an emergency prevents an alien admitted under this part from departing from the United States within his or her period of authorized stay, the district director having jurisdiction over the place of the alien's temporary stay may, in his or her discretion, grant a period of satisfactory departure not to exceed 30 days. If departure is accomplished during that period, the alien is to be regarded as having satisfactorily accomplished the visit without overstaying the allotted time.

(b) Readmission after departure to contiguous territory or adjacent island. An alien admitted to the United States under this part may be readmitted to the United States after a departure to foreign contiguous territory or adjacent island for the balance of his or her original Visa Waiver Pilot Program admission period if he or she is otherwise admissible and meets all the conditions of this part with the exception of arrival on a signatory carrier.

 8 CFR § 217.4

62. Section 217.4 is amended by:

a. Revising the section heading:

b. Removing paragraph (a);

c. Redesignating paragraphs (b), (c), and (d) as paragraphs (a), (b), and (c) respectively;

d. Revising newly redesignated paragraph (a)(1);

e. Adding a new paragraph (a)(3);

f. Revising newly redesignated paragraph (b); and by

g. Revising newly redesignated paragraph (c) to read as follows:

 8 CFR § 217.4

## §217.4 Inadmissibility and deportability.

(a) Determinations of inadmissibility. (1) An alien who applies for admission under the provisions of section 217 of the Act, who is determined by an immigration officer not to be eligible for  **\*10352**  admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa), or who is in possession of and presents fraudulent or counterfeit travel documents, will be refused admission into the United States and removed. Such refusal and removal shall be made at the level of the port director or officer-in-charge, or an officer acting in that capacity, and shall be effected without referral of the alien to an immigration judge for further inquiry, examination, or hearing, except that an alien who presents himself or herself as an applicant for admission under section 217 of the Act, who applies for asylum in the United States must be issued a Form I-863, Notice of Referral to Immigration Judge, for a proceeding in accordance with §208.2(b)(1) and (2) of this chapter.

 \* \* \* \* \*

(3) Refusal of admission under paragraph (a)(1) of this section shall not constitute removal for purposes of the Act.

(b) Determination of deportability. (1) An alien who has been admitted to the United States under the provisions of section 217 of the Act and of this part who is determined by an immigration officer to be deportable from the United States under one or more of the grounds of deportability listed in section 237 of the Act shall be removed from the United States to his or her country of nationality or last residence. Such removal shall be determined by the district director who has jurisdiction over the place where the alien is found, and shall be effected without referral of the alien to an immigration judge for a determination of deportability, except that an alien admitted as a Visa Waiver Pilot Program visitor who applies for asylum in the United States must be issued a Form I-863 for a proceeding in accordance with §208.2(b)(1) and (2) of this chapter.

(2) Removal by the district director under paragraph (b)(1) of this section is equivalent in all respects and has the same consequences as removal after proceedings conducted under section 240 of the Act.

(c)(1) Removal of inadmissible aliens who arrived by air or sea. Removal of an alien from the United States under this section may be effected using the return portion of the round trip passage presented by the alien at the time of entry to the United States as required by section 217(a)(7) of the Act. Such removal shall be on the first available means of transportation to the

alien's point of embarkation to the United States. Nothing in this part absolves the carrier of the responsibility to remove any inadmissible or deportable alien at carrier expense, as provided in the carrier agreement.

(2) Removal of inadmissible and deportable aliens who arrived at land border ports-of-entry. Removal under this section will be by the first available means of transportation deemed appropriate by the district director.

8 CFR § 217.5

**§217.5 [Removed and reserved]**

8 CFR § 217.5

63. Section 217.5 is removed and reserved.

8 CFR § 217.6

64. Section 217.6 is revised to read as follows:

8 CFR § 217.6

**§217.6 Carrier agreements.**

(a) General. The carrier agreements referred to in section 217(e) of the Act shall be made by the Commissioner on behalf of the Attorney General and shall be on Form I-775, Visa Waiver Pilot Program Agreement.

(b) Termination of agreements. The Commissioner, on behalf of the Attorney General, may terminate any carrier agreement under this part, with 5 days notice to a carrier, for the carrier's failure to meet the terms of such agreement. As a matter of discretion, the Commissioner may notify a carrier of the existence of a basis for termination of a carrier agreement under this part and allow the carrier a period not to exceed 15 days within which the carrier may bring itself into compliance with the terms of the carrier agreement. The agreement shall be subject to cancellation by either party for any reason upon 15 days' written notice to the other party.

**PART 221—ADMISSION OF VISITORS OR STUDENTS**

65. The authority citation for part 221 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1201; 8 CFR part 2.

8 CFR § 221.1

**§221.1 [Amended]**

8 CFR § 221.1

66. Section 221.1 is amended in the last sentence by revising the term "part 103" to read "§103.6".

**PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS**

67. The authority citation for part 223 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, November 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

8 CFR § 223.1

68. In §223.1, paragraph (b) is revised to read as follows:

8 CFR § 223.1

**§223.1 Purpose of documents.**

* * * * *

(b) Refugee travel document. A refugee travel document is issued pursuant to this part and article 28 of the United Nations Convention of July 29, 1951, for the purpose of travel. Except as provided in §223.3(d)(2)(i), a person who holds refugee status

pursuant to section 207 of the Act, or asylum status pursuant to section 208 of the Act, must have a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document.

8 CFR § 223.2

69. In §223.2, paragraph (b)(2) is revised to read as follows:

8 CFR § 223.2

**§223.2 Processing.**

\* \* \* \* \*

(b) \* \* \*

(2) Refugee travel document. (i) General. Except as otherwise provided in this section, an application may be approved if filed by a person who is in the United States at the time of application, and either holds valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act, or is a permanent resident and received such status as a direct result of his or her asylum or refugee status.

(ii) Discretionary authority to adjudicate an application from an alien not within the United States. As a matter of discretion, a district director having jurisdiction over a port-of-entry or a preinspection station where an alien is an applicant for admission, or an overseas district director having jurisdiction over the place where an alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who had departed from the United States without having applied for such refugee travel document, provided:

(A) The alien submits a Form I-131, Application for Travel Document, with the fee required under §103.7(b)(1) of this chapter;

(B) The district director is satisfied that the alien did not intend to abandon his or her refugee status at the time of departure from the United States;

(C) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylee status; and **\*10353**

(D) The alien has been outside the United States for less than 1 year since his or her last departure.

\* \* \* \* \*8 CFR § 223.3

70. In §223.3, paragraph (d)(2) is revised to read as follows:

8 CFR § 223.3

**§223.3 Validity and effect on admissibility.**

\* \* \* \* \*

(d) \* \* \*

(2) Refugee travel document. (i) Inspection and immigration status. Upon arrival in the United States, an alien who presents a valid unexpired refugee travel document, or who has been allowed to file an application for a refugee travel document and this application has been approved under the procedure set forth in §223.2(b)(2)(ii), shall be examined as to his or her admissibility under the Act. An alien shall be accorded the immigration status endorsed in his or her refugee travel document, or (in the case of an alien discussed in § 223.2(b)(2)(ii)) which will be endorsed in such document, unless he or she is no longer eligible for that status, or he or she applies for and is found eligible for some other immigration status.

(ii) Inadmissibility. If an alien who presents a valid unexpired refugee travel document appears to the examining immigration officer to be inadmissible, he or she shall be referred for proceedings under section 240 of the Act. Section 235(c) of the Act shall not be applicable.

## PART 232—DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION

71. The heading for part 232 is revised to read as set forth above.

72. The authority citation for part 232 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1222, 1224, 1252; 8 CFR part 2.

8 CFR § 232.1

### §232.1 [Redesignated and revised]

8 CFR § 232.1 8 CFR § 232.3

73. Section 232.1 is redesignated as §232.3, and is revised to read as follows:

8 CFR § 232.3

### §232.3 Arriving aliens.

When a district director has reasonable grounds for believing that persons arriving in the United States should be detained for reasons specified in section 232 of the Act, he or she shall, after consultation with the United States Public Health Service at the port-of-entry, notify the master or agent of the arriving vessel or aircraft of his or her intention to effect such detention by serving on the master or agent Form I-259 in accordance with § 235.3(a) of this chapter.

8 CFR § 234.1 8 CFR § 234.2

### §§234.1 and 234.2 [Redesignated as §§232.1 and 232.2 respectively]

8 CFR § 232.1 8 CFR § 232.2 8 CFR § 234.1 8 CFR § 234.2

74. Sections 234.1 and 234.2 are redesignated as §§232.1 and 232.2 respectively.

## PART 234—[REMOVED]

75. Part 234 is removed.

76. The following parts are redesignated as set forth in the table below:

| Old part | New part |
| --- | --- |
| Part 238 | Part 233. |
| Part 239 | Part 234. |

## PART 233—CONTRACTS WITH TRANSPORTATION LINES

77. The authority citation for newly designated part 233 continues to read as follows:

Authority: 8 U.S.C. 1103, 1228; 8 CFR part 2.

8 CFR § 233.1

78. Newly redesignated §233.1 is revised to read as follows:

8 CFR § 233.1

### §233.1 Contracts.

The contracts with transportation lines referred to in section 233(c) of the Act may be entered into by the Executive Associate Commissioner for Programs, or by an immigration officer designated by the Executive Associate Commissioner for Programs on behalf of the government and shall be documented on Form I-420. The contracts with transportation lines referred to in section 233(a) of the Act shall be made by the Commissioner on behalf of the government and shall be documented on Form

I-426. The contracts with transportation lines desiring their passengers to be preinspected at places outside the United States shall be made by the Commissioner on behalf of the government and shall be documented on Form I-425; except that contracts for irregularly operated charter flights may be entered into by the Associate Commissioner for Examinations or an immigration officer designated by the Executive Associate Commissioner for Programs and having jurisdiction over the location where the inspection will take place.

8 CFR § 233.3

79. In newly redesignated §233.3, paragraph (b) is revised to read as follows (the list of agreements is removed):

8 CFR § 233.3

**§233.3 Aliens in immediate and continuous transit.**

* * * * *

(b) Signatory lines. A list of currently effective Form I-426 agreements is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

* * * * *8 CFR § 233.4

80. Newly redesignated §233.4 is revised to read as follows:

8 CFR § 233.4

**§233.4 Preinspection outside the United States.**

(a) Form I-425 agreements. A transportation line bringing applicants for admission to the United States through preinspection sites outside the United States shall enter into an agreement on Form I-425. Such an agreement shall be negotiated directly by the Service's Headquarters Office of Inspections and the head office of the transportation line.

(b) Signatory lines. A list of transportation lines with currently valid transportation agreements on Form I-425 is maintained by the Service's Headquarters Office of Inspections and is available upon written request.

8 CFR § 233.5

81. Newly redesignated §233.5 is revised to read as follows:

8 CFR § 233.5

**§233.5 Aliens entering Guam pursuant to section 14 of Public Law 99-396, "Omnibus Territories Act.'**

A transportation line bringing aliens to Guam under the visa waiver provisions of §212.1(e) of this chapter shall enter into an agreement on Form I-760. Such agreements shall be negotiated directly by the Service's Headquarters and head offices of the transportation lines.


**PART 234—DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL AIRCRAFT**

82. The heading for newly redesignated part 234 is revised as set forth above.

83. The authority citation for newly designated part 234 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

8 CFR § 234.3

**§234.3 [Amended]**

8 CFR § 234.3

84. Newly redesignated §234.3 is amended by removing the last sentence.


**PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION**

85. The authority citation for part 235 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1183, 1201, 1224, 1225, 1226, 1227, 1228, 1252; 8 CFR part 2.

8 CFR § 235.1

86. Section 235.1 is revised to read as follows:

8 CFR § 235.1

**§235.1 Scope of examination.**

(a) General. Application to lawfully enter the United States shall be made in **\*10354** person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section.

(b) U.S. citizens. A person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction and must present a U.S. passport if such passport is required under the provisions of 22 CFR part 53. If such applicant for admission fails to satisfy the examining immigration officer that he or she is a U.S. citizen, he or she shall thereafter be inspected as an alien.

(c) Alien members of United States Armed Forces and members of a force of a NATO country. Any alien member of the United States Armed Forces who is in the uniform of, or bears documents identifying him or her as a member of, such Armed Forces, and who is coming to or departing from the United States under official orders or permit of such Armed Forces is not subject to the removal provisions of the Act. A member of the force of a NATO country signatory to Article III of the Status of Forces Agreement seeking to enter the United States under official orders is exempt from the control provision of the Act. Any alien who is a member of either of the foregoing classes may, upon request, be inspected and his or her entry as an alien may be recorded. If the alien does not appear to the examining immigration officer to be clearly and beyond a doubt entitled to enter the United States under the provisions of the Act, the alien shall be so informed and his or her entry shall not be recorded.

(d) Alien applicants for admission. (1) Each alien seeking admission at a United States port-of-entry shall present whatever documents are required and shall establish to the satisfaction of the immigration officer that he or she is not subject to removal under the immigration laws, Executive Orders, or Presidential Proclamations and is entitled under all of the applicable provisions of the immigration laws and this chapter to enter the United States. A person claiming to have been lawfully admitted for permanent residence must establish that fact to the satisfaction of the inspecting immigration officer and must present proper documents in accordance with §211.1 of this chapter.

(2) An alien present in the United States who has not been admitted or paroled or an alien who seeks entry at other than an open, designated port-of-entry, except as otherwise permitted in this section, is subject to the provisions of section 212(a) of the Act and to removal under section 235(b) or 240 of the Act.

(3) An alien who is brought to the United States, whether or not to a designated port-of-entry and regardless of the means of transportation, after having been interdicted in international or United States waters, is considered an applicant for admission and shall be examined under section 235(b) of the Act.

(4) An alien stowaway is not an applicant for admission and may not be admitted to the United States. A stowaway shall be removed from the United States under section 235(a)(2) of the Act. The provisions of section 240 of the Act are not applicable to stowaways, nor is the stowaway entitled to further hearing or review of the removal, except that an alien stowaway who indicates an intention to apply for asylum shall be referred to an asylum officer for a determination of credible fear of persecution in accordance with section 235(b)(1)(B) of the Act and §208.30 of this chapter. An alien stowaway who is determined to have a credible fear of persecution shall have his or her asylum application adjudicated in accordance with §208.2(b)(2) of this chapter. Nothing in this section shall be construed to require expedited removal proceedings in accordance with section 235(b)(1) of the Act. A stowaway who absconds either prior to inspection by an immigration officer or after being ordered removed as a stowaway pursuant to section 235(a)(2) of the Act is not entitled to removal proceedings under section 240 of the Act and shall be removed under section 235(a)(2) of the Act as if encountered upon arrival. A stowaway who has been removed pursuant to section 235(a)(2) of the Act and this section shall be considered to have been formally removed from the United States for all purposes under the Act.

(e) U.S. citizens, lawful permanent residents of the United States, Canadian nationals, and other residents of Canada having a common nationality with Canadians, entering the United States by small craft. Upon being inspected by an immigration officer and found eligible for admission as a citizen of the United States, or found eligible for admission as a lawful permanent resident of the United States, or in the case of a Canadian national or other resident of Canada having a common nationality with Canadians being found eligible for admission as a temporary visitor for pleasure, a person who desires to enter the United States from Canada in a small pleasure craft of less than 5 net tons without merchandise may be issued, upon application and payment of a fee prescribed under §103.7(b)(1) of this chapter, Form I-68, Canadian Border Boat Landing Card, and may thereafter enter the United States along with the immediate shore area of the United States on the body of water designated on the Form I-68 from time to time for the duration of that navigation season without further inspection. In the case of a Canadian national or other resident of Canada having a common nationality with Canadians, the Form I-68 shall be valid only for the purpose of visits not to exceed 72 hours and only if the alien will remain in nearby shopping areas, nearby residential neighborhoods, or other similar areas adjacent to the immediate shore area of the United States. If the bearer of Form I-68 seeks to enter the United States by means other than small craft of less than 5 net tons without merchandise, or if he or she seeks to enter the United States for other purposes, or if he or she is an alien, other than a lawful permanent resident alien of the United States, and intends to proceed beyond an area adjacent to the immediate shore area of the United States, or remains in the United States longer than 72 hours, he or she must apply for admission at a United States port-of-entry.

(f) Form I-94, Arrival Departure Record. (1) Unless otherwise exempted, each arriving nonimmigrant who is admitted to the United States shall be issued, upon payment of a fee prescribed in §103.7(b)(1) of this chapter for land border admissions, a Form I-94 as evidence of the terms of admission. A Form I-94 issued at a land border port-of-entry shall be considered issued for multiple entries unless specifically annotated for a limited number of entries. A Form I-94 issued at other than a land border port-of-entry, unless issued for multiple entries, must be surrendered upon departure from the United States in accordance with the instructions on the form. Form I-94 is not required by:

(i) Any nonimmigrant alien described in §212.1(a) of this chapter and 22 CFR 41.33 who is admitted as a visitor for business or pleasure or admitted to proceed in direct transit through the United States;

(ii) Any nonimmigrant alien residing in the British Virgin Islands who was admitted only to the U.S. Virgin Islands as a visitor for business or pleasure under §212.1(b) of this chapter;

(iii) Any Mexican national in possession of a valid nonresident alien Mexican border crossing card, or a valid Mexican passport and a multiple-entry nonimmigrant visa issued under section 101(a)(15)(B) of the Act, who is admitted as a nonimmigrant visitor at a Mexican border port of entry for a  **10355**  period not to exceed 72 hours to visit within 25 miles of the border;

(iv) Bearers of Mexican diplomatic or official passports described in § 212.1(c-1) of this chapter.

(2) Paroled aliens. Any alien paroled into the United States under section 212(d)(5) of the Act, including any alien crewmember, shall be issued a completely executed Form I-94, endorsed with the parole stamp.
 8 CFR § 235.2
87. Section 235.2 is revised to read as follows:
 8 CFR § 235.2

§235.2 Parole for deferred inspection.

(a) A district director may, in his or her discretion, defer the inspection of any vessel or aircraft, or of any alien, to another Service office or port-of-entry. Any alien coming to a United States port from a foreign port, from an outlying possession of the United States, from Guam, Puerto Rico, or the Virgin Islands of the United States, or from another port of the United States at which examination under this part was deferred, shall be regarded as an applicant for admission at that onward port.

(b) An examining immigration officer may defer further examination and refer the alien's case to the district director having jurisdiction over the place where the alien is seeking admission, or over the place of the alien's residence or destination in the

United States, if the examining immigration officer has reason to believe that the alien can overcome a finding of inadmissibility by:

(1) Posting a bond under section 213 of the Act;

(2) Seeking and obtaining a waiver under section 211 or 212(d)(3) or (4) of the Act; or

(3) Presenting additional evidence of admissibility not available at the time and place of the initial examination.

(c) Such deferral shall be accomplished pursuant to the provisions of section 212(d)(5) of the Act for the period of time necessary to complete the deferred inspection.

(d) Refusal of a district director to authorize admission under section 213 of the Act, or to grant an application for the benefits of section 211 or section 212(d) (3) or (4) of the Act, shall be without prejudice to the renewal of such application or the authorizing of such admission by the immigration judge without additional fee.

(e) Whenever an alien on arrival is found or believed to be suffering from a disability that renders it impractical to proceed with the examination under the Act, the examination of such alien, members of his or her family concerning whose admissibility it is necessary to have such alien testify, and any accompanying aliens whose protection or guardianship will be required should such alien be found inadmissible shall be deferred for such time and under such conditions as the district director in whose district the port is located imposes.

8 CFR § 235.3

88. Section 235.3 is revised to read as follows:

8 CFR § 235.3

## §235.3 Inadmissible aliens and expedited removal.

(a) Detention prior to inspection. All persons arriving at a port-of-entry in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required. The owner, agent, master, commanding officer, person in charge, purser, or consignee of such vessel or aircraft shall deliver every alien requiring examination to an immigration officer for inspection or to a medical officer for examination. The Service will not be liable for any expenses related to such detention or presentation or for any expenses of a passenger who has not been presented for inspection and for whom a determination has not been made concerning admissibility by a Service officer.

(b) Expedited removal. (1) Applicability. The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:

(i) Arriving aliens, as defined in §1.1(q) of this chapter, except for citizens of Cuba arriving at a United States port-of-entry by aircraft;

(ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the Federal Register. However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the Federal Register as soon as practicable thereafter. When

these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.

(2) Determination of inadmissibility. (i) Record of proceeding. An alien who is arriving in the United States, or other alien as designated pursuant to paragraph (b)(1)(ii) of this section, who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under §211.1(b)(3) or §212.1 of this chapter), shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien. This shall be accomplished by means of a sworn statement using Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her **\*10356** on Form I-860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I-860 and the alien shall sign the reverse of the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) No entitlement to hearings and appeals. Except as otherwise provided in this section, such alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to section 240 of the Act, or to an appeal of the expedited removal order to the Board of Immigration Appeals.

(iii) Detention and parole of alien in expedited removal. An alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section shall be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(3) Additional charges of inadmissibility. In the expedited removal process, the Service may not charge an alien with any additional grounds of inadmissibility other than section 212(a)(6)(C) or 212(a)(7) of the Act. If an alien appears to be inadmissible under other grounds contained in section 212(a) of the Act, and if the Service wishes to pursue such additional grounds of inadmissibility, the alien shall be detained and referred for a removal hearing before an immigration judge pursuant to sections 235(b)(2) and 240 of the Act for inquiry into all charges. Once the alien is in removal proceedings under section 240 of the Act, the Service is not precluded from lodging additional charges against the alien. Nothing in this paragraph shall preclude the Service from pursuing such additional grounds of inadmissibility against the alien in any subsequent attempt to reenter the United States, provided the additional grounds of inadmissibility still exist.

(4) Claim of asylum or fear of persecution. If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, a fear of persecution, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with §208.30 of this chapter to determine if the alien has a credible fear of persecution. The examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern, and to establish the alien's inadmissibility.

(i) Referral. The referring officer shall provide the alien with a written disclosure on Form M-444, Information About Credible Fear Interview, describing:

(A) The purpose of the referral and description of the credible fear interview process;

(B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;

(C) The right to request a review by an immigration judge of the asylum officer's credible fear determination; and

(D) The consequences of failure to establish a credible fear of persecution.

(ii) Detention pending credible fear interview. Pending the credible fear determination by an asylum officer and any review of that determination by an immigration judge, the alien shall be detained. Parole of such alien in accordance with section 212(d)(5) of the Act may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Prior to the interview, the alien shall be given time to contact and consult with any person or persons of his or her choosing. Such consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process.

(5) Claim to lawful permanent resident, refugee, or asylee status or U.S. citizenship.—(i) Verification of status. If an applicant for admission who is subject to expedited removal pursuant to section 235(b)(1) of the Act claims to have been lawfully admitted for permanent residence, admitted as a refugee under section 207 of the Act, granted asylum under section 208 of the Act, or claims to be a U.S. citizen, the immigration officer shall attempt to verify the alien's claim. Such verification shall include a check of all available Service data systems and any other means available to the officer. An alien whose claim to lawful permanent resident, refugee, asylee status, or U.S. citizen status cannot be verified will be advised of the penalties for perjury, and will be placed under oath or allowed to make a declaration as permitted under 28 U.S.C. 1746, concerning his or her lawful admission for permanent residence, admission as a refugee under section 207 of the Act, grant of asylum status under section 208 of the Act, or claim to U.S. citizenship. A written statement shall be taken from the alien in the alien's own language and handwriting, stating that he or she declares, certifies, verifies, or states that the claim is true and correct. The immigration officer shall issue an expedited order of removal under section 235(b)(1)(A)(i) of the Act and refer the alien to the immigration judge for review of the order in accordance with paragraph (b)(5)(iv) of this section and §235.6(a)(2)(ii). The person shall be detained pending review of the expedited removal order under this section. Parole of such person, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

(ii) Verified lawful permanent residents. If the claim to lawful permanent resident status is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. The examining immigration officer will determine in accordance with section 101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission. If the alien is determined to be seeking admission and the alien is otherwise admissible, except that he or she is not in possession of the required documentation, a discretionary waiver of documentary requirements may be considered in accordance with section 211(b) of the Act and §211.1(b)(3) of this chapter or the alien's inspection may be deferred to an onward office for presentation of the required documents. If the alien appears to be inadmissible, the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iii) Verified refugees and asylees. If a check of Service records or other means indicates that the alien has been granted refugee status or asylee status, and such status has not been terminated in deportation, exclusion, or removal proceedings, the

immigration officer shall not order the alien removed pursuant to section 235(b)(1) of the Act. **\*10357** If the alien is not in possession of a valid, unexpired refugee travel document, the examining immigration officer may accept an application for a refugee travel document in accordance with §223.2(b)(2)(ii) of this chapter. If accepted, the immigration officer shall readmit the refugee or asylee in accordance with §223.3(d)(2)(i) of this chapter. If the alien is determined not to be eligible to file an application for a refugee travel document the immigration officer may initiate removal proceedings against the alien under section 240 of the Act.

(iv) Review of order for claimed lawful permanent residents, refugees, asylees, or U.S. citizens. A person whose claim to U.S. citizenship has been verified may not be ordered removed. When an alien whose status has not been verified but who is claiming under oath or under penalty of perjury to be a lawful permanent resident, refugee, asylee, or U.S. citizen is ordered removed pursuant to section 235(b)(1) of the Act, the case will be referred to an immigration judge for review of the expedited removal order under section 235(b)(1)(C) of the Act and §235.6(a)(2)(ii). If the immigration judge determines that the alien has never been admitted as a lawful permanent resident or as a refugee, granted asylum status, or is not a U.S. citizen, the order issued by the immigration officer will be affirmed and the Service will remove the alien. There is no appeal from the decision of the immigration judge. If the immigration judge determines that the alien was once so admitted as a lawful permanent resident or as a refugee, or was granted asylum status, or is a U.S. citizen, and such status has not been terminated by final administrative action, the immigration judge will terminate proceedings and vacate the expedited removal order. The Service may initiate removal proceedings against such an alien, but not against a person determined to be a U.S. citizen, in proceedings under section 240 of the Act. During removal proceedings, the immigration judge may consider any waivers, exceptions, or requests for relief for which the alien is eligible.

(6) Opportunity for alien to establish that he or she was admitted or paroled into the United States. If the Commissioner determines that the expedited removal provisions of section 235(b)(1) of the Act shall apply to any or all aliens described in paragraph (b)(2)(ii) of this section, such alien will be given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States following inspection at a port-of-entry. The alien will be allowed to present evidence or provide sufficient information to support the claim. Such evidence may consist of documentation in the possession of the alien, the Service, or a third party. The examining immigration officer will consider all such evidence and information, make further inquiry if necessary, and will attempt to verify the alien's status through a check of all available Service data systems. The burden rests with the alien to satisfy the examining immigration officer of the claim of lawful admission or parole. If the alien establishes that he or she was lawfully admitted or paroled, the case will be examined to determine if grounds of deportability under section 237(a) of the Act are applicable, or if paroled, whether such parole has been, or should be, terminated, and whether the alien is inadmissible under section 212(a) of the Act. An alien who cannot satisfy the examining officer that he or she was lawfully admitted or paroled will be ordered removed pursuant to section 235(b)(1) of the Act.

(7) Review of expedited removal orders. Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act must be reviewed and approved by the appropriate supervisor before the order is considered final. Such supervisory review shall not be delegated below the level of the second line supervisor, or a person acting in that capacity. The supervisory review shall include a review of the sworn statement and any answers and statements made by the alien regarding a fear of removal or return. The supervisory review and approval of an expedited removal order for an alien described in section 235(b)(1)(A)(iii) of the Act must include a review of any claim of lawful admission or parole and any evidence or information presented to support such a claim, prior to approval of the order. In such cases, the supervisor may request additional information from any source and may require further interview of the alien.

(8) Removal procedures relating to expedited removal. An alien ordered removed pursuant to section 235(b)(1) of the Act shall be removed from the United States in accordance with section 241(c) of the Act and 8 CFR part 241.

(9) Waivers of documentary requirements. Nothing in this section limits the discretionary authority of the Attorney General, including authority under sections 211(b) or 212(d) of the Act, to waive the documentary requirements for arriving aliens.

(10) Applicant for admission under section 217 of the Act. The provisions of §235.3(b) do not apply to an applicant for admission under section 217 of the Act.

(c) Arriving aliens placed in proceedings under section 240 of the Act. Except as otherwise provided in this chapter, any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act. Parole of such alien shall only be considered in accordance with §212.5(a) of this chapter. This paragraph shall also apply to any alien who arrived before April 1, 1997, and who was placed in exclusion proceedings.

(d) Service custody. The Service will assume custody of any alien subject to detention under paragraph (b) or (c) of this section. In its discretion, the Service may require any alien who appears inadmissible and who arrives at a land border port-of-entry from Canada or Mexico, to remain in that country while awaiting a removal hearing. Such alien shall be considered detained for a proceeding within the meaning of section 235(b) of the Act and may be ordered removed in absentia by an immigration judge if the alien fails to appear for the hearing.

(e) Detention in non-Service facility. Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

(1) 24-Hour supervision,

(2) Conformance with safety and emergency codes,

(3) Food service, and

(4) Availability of emergency medical care.

(f) Privilege of communication. The mandatory notification requirements of consular and diplomatic officers pursuant to §236.1(e) of this chapter apply when an inadmissible alien is detained for removal proceedings, including for purpose of conducting the credible fear determination.  *10358

8 CFR § 235.4

89. Section 235.4 is revised to read as follows:

8 CFR § 235.4

§235.4 Withdrawal of application for admission.

(a) The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings under section 240 of the Act or expedited removal under section 235(b)(1) of the Act. The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission. Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately. An alien permitted to withdraw his or her application for admission shall normally remain in carrier or Service custody pending departure, unless the district director determines that parole of the alien is warranted in accordance with §212.5(a) of this chapter.

(b) An immigration judge may allow only an arriving alien to withdraw an application for admission. Once the issue of inadmissibility has been resolved, permission to withdraw an application for admission should ordinarily be granted only with

the concurrence of the Service. An immigration judge shall not allow an alien to withdraw an application for admission unless the alien, in addition to demonstrating that he or she possesses both the intent and the means to depart immediately from the United States, establishes that factors directly relating to the issue of inadmissibility indicate that the granting of the withdrawal would be in the interest of justice. During the pendency of an appeal from the order of removal, permission to withdraw an application for admission must be obtained from the immigration judge or the Board.

8 CFR § 235.5

90. Section 235.5 is revised to read as follows:

8 CFR § 235.5

## §235.5 Preinspection.

(a) In United States territories and possessions. In the case of any aircraft proceeding from Guam, Puerto Rico, or the United States Virgin Islands destined directly and without touching at a foreign port or place, to any other of such places, or to one of the States of the United States or the District of Columbia, the examination of the passengers and crew required by the Act may be made prior to the departure of the aircraft, and in such event, final determination of admissibility shall be made immediately prior to such departure. The examination shall be conducted in accordance with sections 232, 235, and 240 of the Act and 8 CFR parts 235 and 240. If it appears to the examining immigration officer that any person in the United States being examined under this section is prima facie removable from the United States, further action with respect to his or her examination shall be deferred and further proceedings regarding removability conducted as provided in section 240 of the Act and 8 CFR part 240. When the foregoing inspection procedure is applied to any aircraft, persons examined and found admissible shall be placed aboard the aircraft, or kept at the airport separate and apart from the general public until they are permitted to board the aircraft. No other person shall be permitted to depart on such aircraft until and unless he or she is found to be admissible as provided in this section.

(b) In foreign territory. In the case of any aircraft, vessel, or train proceeding directly, without stopping, from a port or place in foreign territory to a port-of-entry in the United States, the examination and inspection of passengers and crew required by the Act and final determination of admissibility may be made immediately prior to such departure at the port or place in the foreign territory and shall have the same effect under the Act as though made at the destined port-of-entry in the United States.

8 CFR § 235.6

91. Section 235.6 is revised to read as follows:

8 CFR § 235.6

## §235.6 Referral to immigration judge.

(a) Notice. (1) Referral by Form I-862, Notice to Appear. An immigration officer or asylum officer will sign and deliver a Form I-862 to an alien in the following cases:

(i) If, in accordance with the provisions of section 235(b)(2)(A) of the Act, the examining immigration officer detains an alien for a proceeding before an immigration judge under section 240 of the Act; or

(ii) If, in accordance with section 235(b)(1)(B)(ii) of the Act, an asylum officer determines that an alien in expedited removal proceedings has a credible fear of persecution and refers the case to the immigration judge for consideration of the application for asylum.

(iii) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, the immigration judge determines that an alien in expedited removal proceedings has a credible fear of persecution and vacates the expedited removal order issued by the asylum officer pursuant to section 235(b)(1)(B)(iii) of the Act.

(iv) If an immigration officer verifies that an alien subject to expedited removal under section 235(b)(1) of the Act has been admitted as a lawful permanent resident refugee, or asylee, or upon review pursuant to § 235.3(b)(5)(iv) an immigration judge determines that the alien was once so admitted, provided that such status has not been terminated by final administrative action, and the Service initiates removal proceedings against the alien under section 240 of the Act.

(2) Referral by Form I-863, Notice of Referral to Immigration Judge. An immigration officer will sign and deliver a Form I-863 to an alien in the following cases:

(i) If, in accordance with section 235(b)(1)(B)(iii)(III) of the Act, an asylum officer determines that an alien does not have a credible fear of persecution, and the alien requests a review of that determination by an immigration judge; or

(ii) If, in accordance with section 235(b)(1)(C) of the Act, an immigration officer refers an expedited removal order entered on an alien claiming to be a lawful permanent resident, refugee, asylee, or U.S. citizen for whom the officer could not verify such status to an immigration judge for review of the order.

(iii) If an immigration officer refers an applicant described in §208.2(b)(1) of this chapter to an immigration judge for an asylum hearing under § 208.2(b)(2) of this chapter.

(b) Certification for mental condition; medical appeal. An alien certified under sections 212(a)(1) and 232(b) of the Act shall be advised by the examining immigration officer that he or she may appeal to a board of medical examiners of the United States Public Health Service pursuant to section 232 of the Act. If such appeal is taken, the district director shall arrange for the convening of the medical board.

 8 CFR § 235.7

## §235.7 [Removed]
8 CFR § 235.7
92. Section 235.7 is removed.

 8 CFR § 235.13

## §235.13 [Redesignated as §235.7]
8 CFR § 235.13 8 CFR § 235.7
93. Section 235.13 is redesignated as §235.7.

 8 CFR § 235.8
94. Section 235.8 is revised to read as follows:

 8 CFR § 235.8

## §235.8 Inadmissibility on security and related grounds.
(a) Report. When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii)), (B), or (C) of the  **\*10359**  Act, the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form I-147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

(b) Action by regional director. (1) In accordance with section 235(c)(2)(B) of the Act, the regional director may deny any further inquiry or hearing by an immigration judge and order the alien removed by personal service of Form I-148, Notice of Permanent Inadmissibility, or issue any other order disposing of the case that the regional director considers appropriate.

(2) If the regional director concludes that the case does not meet the criteria contained in section 235(c)(2)(B) of the Act, the regional director may direct that:

(i) An immigration officer shall conduct a further examination of the alien, concerning the alien's admissibility; or,

(ii) The alien's case be referred to an immigration judge for a hearing, or for the continuation of any prior hearing.

(3) The regional director's decision shall be in writing and shall be signed by the regional director. Unless the written decision contains confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security of the United States, the written decision shall be served on the alien. If the written decision contains such confidential information, the alien shall be served with a separate written order showing the disposition of the case, but with the confidential information deleted.

(c) Finality of decision. The regional director's decision under this section is final when it is served upon the alien in accordance with paragraph (b)(3) of this section. There is no administrative appeal from the regional director's decision.

(d) Hearing by immigration judge. If the regional director directs that an alien subject to removal under this section be given a hearing or further hearing before an immigration judge, the hearing and all further proceedings in the matter shall be conducted in accordance with the provisions of section 240 of the Act and other applicable sections of the Act to the same extent as though the alien had been referred to an immigration judge by the examining immigration officer. In a case where the immigration judge ordered the alien removed pursuant to paragraph (a) of this section, the Service shall refer the case back to the immigration judge and proceedings shall be automatically reopened upon receipt of the notice of referral. If confidential information, not previously considered in the matter, is presented supporting the inadmissibility of the alien under section 212(a)(3)(A) (other than clause (ii)), (B) or (C) of the Act, the disclosure of which, in the discretion of the immigration judge, may be prejudicial to the public interest, safety, or security, the immigration judge may again order the alien removed under the authority of section 235(c) of the Act and further action shall be taken as provided in this section.

(e) Nonapplicability. The provisions of this section shall apply only to arriving aliens, as defined in §1.1(q) of this chapter. Aliens present in the United States who have not been admitted or paroled may be subject to proceedings under Title V of the Act.
 8 CFR § 235.9

**§235.9 [Removed]**
8 CFR § 235.9
95. Section 235.9 is removed.
 8 CFR § 235.12

**§235.12 [Redesignated as §235.9 and revised]**
8 CFR § 235.12 8 CFR § 235.9
96. Section 235.12 is redesignated as §235.9 and is revised to read as follows:
 8 CFR § 235.9

**§235.9 Northern Marianas identification card.**
During the two-year period that ended July 1, 1990, the Service issued Northern Marianas Identification Cards to aliens who acquired United States citizenship when the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States entered into force on November 3, 1986. These cards remain valid as evidence of United States citizenship. Although the Service no longer issues these cards, a United States citizen to whom a card was issued may file Form I-777, Application for Issuance or Replacement of Northern Marianas Card, to obtain replacement of a lost, stolen, or mutilated Northern Marianas Identification Card.
 8 CFR § 235.10
97. Section 235.10 is revised to read as follows:
 8 CFR § 235.10

**§235.10 U.S. Citizen Identification Card.**

(a) General. Form I-197, U.S. Citizen Identification Card, is no longer issued by the Service but valid existing cards will continue to be acceptable documentation of U.S. citizenship. Possession of the identification card is not mandatory for any purpose. A U.S. Citizen Identification Card remains the property of the United States. Because the identification card is no longer issued, there are no provisions for replacement cards.

(b) Surrender and voidance. (1) Institution of proceeding under section 240 or 342 of the Act. A U.S. Citizen Identification Card must be surrendered provisionally to a Service office upon notification by the district director that a proceeding under section 240 or 342 of the Act is being instituted against the person to whom the card was issued. The card shall be returned to the person if the final order in the proceeding does not result in voiding the card under this paragraph. A U.S. Citizen Identification Card is automatically void if the person to whom it was issued is determined to be an alien in a proceeding conducted under section 240 of the Act, or if a certificate, document, or record relating to that person is canceled under section 342 of the Act.

(2) Investigation of validity of identification card. A U.S. Citizen Identification Card must be surrendered provisionally upon notification by a district director that the validity of the card is being investigated. The card shall be returned to the person who surrendered it if the investigation does not result in a determination adverse to his or her claim to be a United States citizen. When an investigation results in a tentative determination adverse to the applicant's claim to be a United States citizen, the applicant shall be notified by certified mail directed to his or her last known address. The notification shall inform the applicant of the basis for the determination and of the intention of the district director to declare the card void unless within 30 days the applicant objects and demands an opportunity to see and rebut the adverse evidence. Any rebuttal, explanation, or evidence presented by the applicant must be included in the record of proceeding. The determination whether the applicant is a United States citizen must be based on the entire record and the applicant shall be notified of the determination. If it is determined that the applicant is not a United States citizen, the applicant shall be notified of the reasons, and the card deemed void. There is no appeal from the district director's decision.

(3) Admission of alienage. A U.S. Citizen Identification Card is void if the person to whom it was issued admits in a statement signed before an  **\*10360**  immigration officer that he or she is an alien and consents to the voidance of the card. Upon signing the statement the card must be surrendered to the immigration officer.

(4) Surrender of void card. A void U.S. Citizen Identification Card which has not been returned to the Service must be surrendered without delay to an immigration officer or to the issuing office of the Service.

(c) U.S. Citizen Identification Card previously issued on Form I-179. A valid Form I-179, U.S. Citizen Identification Card, continues to be valid subject to the provisions of this section.
 8 CFR § 235.11
98. Section 235.11 is revised to read as follows:
 8 CFR § 235.11

## §235.11 Admission of conditional permanent residents.
(a) General. (1) Conditional residence based on family relationship. An alien seeking admission to the United States with an immigrant visa as the spouse or son or daughter of a United States citizen or lawful permanent resident shall be examined to determine whether the conditions of section 216 of the Act apply. If so, the alien shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the alien and his or her petitioning spouse must file a Form I-751, Petition to Remove the Conditions on Residence, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(2) Conditional residence based on entrepreneurship. An alien seeking admission to the United States with an immigrant visa as an alien entrepreneur (as defined in section 216A(f)(1) of the Act) or the spouse or unmarried minor child of an alien entrepreneur shall be admitted conditionally for a period of 2 years. At the time of admission, the alien shall be notified that the principal alien (entrepreneur) must file a Form I-829, Petition by Entrepreneur to Remove Conditions, within the 90-day period immediately preceding the second anniversary of the alien's admission for permanent residence.

(b) Correction of endorsement on immigrant visa. If the alien is subject to the provisions of section 216 of the Act, but the classification endorsed on the immigrant visa does not so indicate, the endorsement shall be corrected and the alien shall be admitted as a lawful permanent resident on a conditional basis, if otherwise admissible. Conversely, if the alien is not subject to the provisions of section 216 of the Act, but the visa classification endorsed on the immigrant visa indicates that the alien is subject thereto (e.g., if the second anniversary of the marriage upon which the immigrant visa is based occurred after the issuance of the visa and prior to the alien's application for admission) the endorsement on the visa shall be corrected and the alien shall be admitted as a lawful permanent resident without conditions, if otherwise admissible.

(c) Expired conditional permanent resident status. The lawful permanent resident alien status of a conditional resident automatically terminates if the conditional basis of such status is not removed by the Service through approval of a Form I-751, Petition to Remove the Conditions on Residence or, in the case of an alien entrepreneur (as defined in section 216A(f)(1) of the Act), Form I-829, Petition by Entrepreneur to Remove Conditions. Therefore, an alien who is seeking admission as a returning resident subsequent to the second anniversary of the date on which conditional residence was obtained (except as provided in §211.1(b)(1) of this chapter) and whose conditional basis of such residence has not been removed pursuant to section 216(c) or 216A(c) of the Act, whichever is applicable, shall be placed under removal proceedings. However, in a case where conditional residence was based on a marriage, removal proceedings may be terminated and the alien may be admitted as a returning resident if the required Form I-751 is filed jointly, or by the alien alone (if appropriate), and approved by the Service. In the case of an alien entrepreneur, removal proceedings may be terminated and the alien admitted as a returning resident if the required Form I-829 is filed by the alien entrepreneur and approved by the Service.

99. Part 236 is revised to read as follows:

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

### Subpart A—Detention of Aliens Prior to Order of Removal

Sec.

236.1 Apprehension, custody, and detention.

236.2 Confined aliens, incompetents, and minors.

236.3 Detention and release of juveniles.

236.4 Removal of S-5, S-6, and S-7 nonimmigrants.

236.5 Fingerprints and photographs.

236.6-236.9 Reserved.

### Subpart B—Family Unity Program

236.10 Description of program.

236.11 Definitions.

236.12 Eligibility.

236.13 Ineligible aliens.

236.14 Filing.

236.15 Voluntary departure and eligibility for employment.

236.16 Travel outside the United States.

236.17 Eligibility for Federal financial assistance programs.

236.18 Termination of Family Unity Program benefits.
Authority: 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1362; 8 CFR part 2.

**Subpart A—Detention of Aliens Prior to Order of Removal**
8 CFR § 236.1

**§236.1 Apprehension, custody, and detention.**
(a) Detainers. The issuance of a detainer under this section shall be governed by the provisions of §287.7 of this chapter.

(b) Warrant of arrest. (1) In general. At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in §287.5(e)(2) of this chapter and may be served only by those immigration officers listed in §287.5(e)(3) of this chapter.

(2) If, after the issuance of a warrant of arrest, a determination is made not to serve it, any officer authorized to issue such warrant may authorize its cancellation.

(c) Custody issues and release procedures. (1) After the expiration of the Transition Period Custody Rules under Public Law 104-208, no alien described in section 236(c)(1) of the Act shall be released from custody during removal proceedings except pursuant to section 236(c)(2) of the Act.

(2) Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

(3) When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge (except foreign), in which event the alien may be taken into physical custody and detained. If **\*10361** detained, unless a breach has occurred, any outstanding bond shall be revoked and canceled.

(4) The provisions of §103.6 of this chapter shall apply to any bonds authorized. Subject to the provisions of this section, the provisions of §3.19 of this chapter shall govern availability to the respondent of recourse to other administrative authority for release from custody.

(5) An immigration judge may not exercise authority provided in this section and the review process described in paragraph (d) of this section shall not apply with respect to:

(i) Arriving aliens, as described in §1.1(q) of this chapter, including aliens paroled pursuant to section 212(d)(5) of the Act, in removal proceedings,

(ii) Aliens described in section 237(a)(4) of the Act, or

(iii) After the expiration of section 303(b)(3) of Public Law 104-208, aliens described in section 236(c)(1) of the Act.

(d) Appeals from custody decisions. (1) Application to immigration judge. After an initial custody determination by the district director, including the setting of a bond, the respondent may, at any time before an order under 8 CFR part 240 becomes final, request amelioration of the conditions under which he or she may be released. Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in §3.19 of this chapter. If the alien has been released from custody, an application for amelioration of the terms of release must be filed within 7 days of release. Once a removal order becomes administratively final, determinations regarding custody and bond are made by the district director.

(2) Application to the district director. (i) After expiration of the 7-day period in paragraph (d)(1) of this section, the respondent may request review by the district director of the conditions of his or her release.

(ii) After an order becomes administratively final, the respondent may request review by the district director of the conditions of his or her release.

(3) Appeal to the Board of Immigration Appeals. An appeal relating to bond and custody determinations may be filed to the Board of Immigration Appeals in the following circumstances:

(i) In accordance with §3.38 of this chapter, the alien or the Service may appeal the decision of an immigration judge pursuant to paragraph (d)(1) of this section.

(ii) The alien, within 10 days, may appeal from the district director's decision under paragraph (d)(2)(i) of this section.

(iii) The alien, within 10 days, may appeal from the district director's decision under paragraph (d)(2)(ii) of this section, except that no appeal shall be allowed when the Service notifies the alien that it is ready to execute an order of removal and takes the alien into custody for that purpose.

(4) Effect of filing an appeal. The filing of an appeal from a determination of an immigration judge or district director under this paragraph shall not operate to delay compliance with the order, nor stay the administrative proceedings or removal.

(e) Privilege of communication. Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States. Existing treaties with the following countries require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in removal proceedings, whether or not requested by the alien and even if the alien requests that no communication be undertaken in his or her behalf. When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

Albania[FN1]

Antigua

Armenia

Azerbaijan

Bahamas

Barbados

Belarus

Belize

Brunei

Bulgaria

China (People's Republic of)[FN2]

Costa Rica

Cyprus

Czech Republic

Dominica

Fiji

Gambia, The

Georgia

Ghana

Grenada

Guyana

Hungary

Jamaica

Kazakhstan

Kiribati

Kuwait

Kyrgyzstan

Malaysia

Malta

Mauritius

Moldova

Mongolia

Nigeria

Philippines

Poland

Romania

Russian Federation

St. Kitts/Nevis

St. Lucia

St. Vincent/Grenadines

Seychelles

Sierra Leone

Singapore

Slovak Republic

South Korea

Tajikistan

Tanzania

Tonga

Trinidad/Tobago

Turkmenistan

Tuvalu

Ukraine

United Kingdom[FN3]

U.S.S.R.[FN4]

Uzbekistan

Zambia

(f) Notification to Executive Office for Immigration Review of change in custody status. The Service shall notify the Immigration Court having administrative control over the Record of Proceeding of any change in custody location or of release from, or subsequent taking into, Service custody of a respondent/applicant pursuant to §3.19(g) of this chapter.

8 CFR § 236.2

**§236.2 Confined aliens, incompetents, and minors.**

(a) Service. If the respondent is confined, or if he or she is an incompetent, or a minor under the age of 14, the notice to appear, and the warrant of arrest, if issued, shall be served in the manner prescribed in §239.1 of this chapter upon the person or persons specified by §103.5a(c) of this chapter.

(b) Service custody and cost of maintenance. An alien confined because of physical or mental disability in an institution or hospital shall not be **10362** accepted into physical custody by the Service until an order of removal has been entered and the Service is ready to remove the alien. When such an alien is an inmate of a public or private institution at the time of the commencement of the removal proceedings, expenses for the maintenance of the alien shall not be incurred by the Government until he or she is taken into physical custody by the Service.

8 CFR § 236.3

§236.3 Detention and release of juveniles.

(a) Juveniles. A juvenile is defined as an alien under the age of 18 years.

(b) Release. Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:

(1) Juveniles shall be released, in order of preference, to:

(i) A parent;

(ii) Legal guardian; or

(iii) An adult relative (brother, sister, aunt, uncle, grandparent) who is not presently in Service detention, unless a determination is made that the detention of such juvenile is required to secure his or her timely appearance before the Service or the Immigration Court or to ensure the juvenile's safety or that of others. In cases where the parent, legal guardian, or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at a Service office located near the parent, legal guardian, or adult relative.

(2) If an individual specified in paragraphs (b)(1)(i) through (iii) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in Service detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.

(3) In cases where the parent or legal guardian is in Service detention or outside the United States, the juvenile may be released to such person as is designated by the parent or legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraphs (b)(1)(i) through (iii) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(c) Juvenile coordinator. The case of a juvenile for whom detention is determined to be necessary should be referred to the "Juvenile Coordinator," whose responsibilities should include, but not be limited to, finding suitable placement of the juvenile in a facility designated for the occupancy of juveniles. These may include juvenile facilities contracted by the Service, state or local juvenile facilities, or other appropriate agencies authorized to accommodate juveniles by the laws of the state or locality.

(d) Detention. In the case of a juvenile for whom detention is determined to be necessary, for such interim period of time as is required to locate suitable placement for the juvenile, whether such placement is under paragraph (b) or (c) of this

section, the juvenile may be temporarily held by Service authorities or placed in any Service detention facility having separate accommodations for juveniles.

(e) Refusal of release. If a parent of a juvenile detained by the Service can be located, and is otherwise suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the parent(s), and shall be afforded an opportunity to present their views to the district director, chief patrol agent, or immigration judge before a custody determination is made.

(f) Notice to parent of application for relief. If a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse with those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest to the district director or immigration judge before a determination is made as to the merits of the request for relief.

(g) Voluntary departure. Each juvenile, apprehended in the immediate vicinity of the border, who resides permanently in Mexico or Canada, shall be informed, prior to presentation of the voluntary departure form or being allowed to withdraw his or her application for admission, that he or she may make a telephone call to a parent, close relative, a friend, or to an organization found on the free legal services list. A juvenile who does not reside in Mexico or Canada who is apprehended shall be provided access to a telephone and must in fact communicate either with a parent, adult relative, friend, or with an organization found on the free legal services list prior to presentation of the voluntary departure form. If such juvenile, of his or her own volition, asks to contact a consular officer, and does in fact make such contact, the requirements of this section are satisfied.

(h) Notice and request for disposition. When a juvenile alien is apprehended, he or she must be given a Form I-770, Notice of Rights and Disposition. If the juvenile is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the juvenile in a language he or she understands. In the event a juvenile who has requested a hearing pursuant to the notice subsequently decides to accept voluntary departure or is allowed to withdraw his or her application for admission, a new Form I-770 shall be given to, and signed by the juvenile.

 8 CFR § 236.4

## §236.4 Removal of S-5, S-6, and S-7 nonimmigrants.

(a) Condition of classification. As a condition of classification and continued stay in classification pursuant to section 101(a)(15)(S) of the Act, nonimmigrants in S classification must have executed Form I-854, Part B, Inter-agency Alien Witness and Informant Record, certifying that they have knowingly waived their right to a removal hearing and right to contest, other than on the basis of an application for withholding of deportation or removal, any removal action, including detention pending deportation or removal, instituted before lawful permanent resident status is obtained.

(b) Determination of deportability. (1) A determination to remove a deportable alien classified pursuant to section 101(a)(15)(S) of the Act shall be made by the district director having jurisdiction over the place where the alien is located.

(2) A determination to remove such a deportable alien shall be based on one or more of the grounds of deportability listed in section 237 of the Act based on conduct committed after, or conduct or a condition not disclosed to the Service prior to, the alien's classification as an S nonimmigrant under section 101(a)(15)(S) of the Act, or for a  **\*10363**  violation of, or failure to adhere to, the particular terms and conditions of status in S nonimmigrant classification.

(c) Removal procedures. (1) A district director who determines to remove an alien witness or informant in S nonimmigrant classification shall notify the Commissioner, the Assistant Attorney General, Criminal Division, and the relevant law enforcement agency in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter

AR.00155

will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant law enforcement agency have a right of appeal from any decision to remove.

(2) A district director who has provided notice as set forth in paragraph (c)(1) of this section and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall issue a Warrant of Removal. The alien shall immediately be arrested and taken into custody by the district director initiating the removal. An alien classified under the provisions of section 101(a)(15)(S) of the Act who is determined, pursuant to a warrant issued by a district director, to be deportable from the United States shall be removed from the United States to his or her country of nationality or last residence. The agency that requested the alien's presence in the United States shall ensure departure from the United States and so inform the district director in whose jurisdiction the alien has last resided. The district director, if necessary, shall oversee the alien's departure from the United States and, in any event, shall notify the Commissioner of the alien's departure.

(d) Withholding of removal. An alien classified pursuant to section 101(a)(15)(S) of the Act who applies for withholding of removal shall have 10 days from the date the Warrant of Removal is served upon the alien to file an application for such relief with the district director initiating the removal order. The procedures contained in §§208.2 and 208.16 of this chapter shall apply to such an alien who applies for withholding of removal.

(e) Inadmissibility. An alien who applies for admission under the provisions of section 101(a)(15)(S) of the Act who is determined by an immigration officer not to be eligible for admission under that section or to be inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act and which have not been previously waived by the Commissioner will be taken into custody. The district director having jurisdiction over the port-of-entry shall follow the notification procedures specified in paragraph (c)(1) of this section. A district director who has provided such notice and who has been advised by the Commissioner that the Assistant Attorney General, Criminal Division, has not objected shall remove the alien without further hearing. An alien may not contest such removal, other than by applying for withholding of removal.

8 CFR § 236.5

### §236.5 Fingerprints and photographs.

Every alien 14 years of age or older against whom proceedings based on deportability under section 237 of the Act are commenced under this part by service of a notice to appear shall be fingerprinted and photographed. Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies upon request to the district director or chief patrol agent having jurisdiction over the alien's record. Any such alien, regardless of his or her age, shall be photographed and/or fingerprinted if required by any immigration officer authorized to issue a notice to appear. Every alien 14 years of age or older who is found to be inadmissible to the United States and ordered removed by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

8 CFR § 236.6

### §§236.6—236.9 [Reserved]

### Subpart B—Family Unity Program
8 CFR § 236.10

### §236.10 Description of program.
The family unity program implements the provisions of section 301 of the Immigration Act of 1990, Public Law 101-649. This Act is referred to in this subpart as "IMMACT 90".

8 CFR § 236.11

### §236.11 Definitions.
In this subpart, the term:

Eligible immigrant means a qualified immigrant who is the spouse or unmarried child of a legalized alien.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Legalized alien means an alien who:

(1) Is a temporary or permanent resident under section 210 or 245A of the Act; or

(2) Is a permanent resident under section 202 of the Immigration Reform and Control Act of 1986 (Cuban/Haitian Adjustment).
 8 CFR § 236.12

### §236.12 Eligibility.

(a) General. An alien who is not a lawful permanent resident is eligible to apply for benefits under the Family Unity Program if he or she establishes:

(1) That he or she entered the United States before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), and has been continuously residing in the United States since that date; and

(2) That on May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), he or she was the spouse or unmarried child of a legalized alien, and that he or she has been eligible continuously since that time for family-sponsored second preference immigrant status under section 203(a)(2) of the Act based on the same relationship.

(b) Legalization application pending as of May 5, 1988 or December 1, 1988. An alien whose legalization application was filed on or before May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), but not approved until after that date will be treated as having been a legalized alien as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C) of section 301 of IMMACT 90), or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A) of section 301 of IMMACT 90), for purposes of the Family Unity Program.
 8 CFR § 236.13

### §236.13 Ineligible aliens.

The following categories of aliens are ineligible for benefits under the Family Unity Program:

(a) An alien who is deportable under any paragraph in section 237(a) of the Act, except paragraphs (1)(A), (1)(B), (1)(C), and (3)(A); provided that an alien who is deportable under section 237(a)(1)(A) of such Act is also ineligible for benefits under the Family Unity Program if deportability is based  **\*10364**  upon a ground of inadmissibility described in section 212(a)(2) or (3) of the Act;

(b) An alien who has been convicted of a felony or three or more misdemeanors in the United States; or

(c) An alien described in section 241(b)(3)(B) of the Act.
 8 CFR § 236.14

### §236.14 Filing.

(a) General. An application for voluntary departure under the Family Unity Program must be filed at the service center having jurisdiction over the alien's place of residence. A Form I-817, Application for Voluntary Departure under the Family Unity Program, must be filed with the correct fee required in §103.7(b)(1) of this chapter and the required supporting documentation. A separate application with appropriate fee and documentation must be filed for each person claiming eligibility.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) Decision. The service center director has sole jurisdiction to adjudicate an application for benefits under the Family Unity Program. The director will provide the applicant with specific reasons for any decision to deny an application. Denial of an application may not be appealed. An applicant who believes that the grounds for denial have been overcome may submit another application with the appropriate fee and documentation.

(c) Referral of denied cases for consideration of issuance of notice to appear. If an application is denied, the case will be referred to the district director with jurisdiction over the alien's place of residence for consideration of whether to issue a notice to appear. After an initial denial, an applicant's case will not be referred for issuance of a notice to appear until 90 days from the date of the initial denial, to allow the alien the opportunity to file a new Form I-817 application in order to attempt to overcome the basis of the denial. However, if the applicant is found not to be eligible for benefits under §236.13(b), the Service reserves the right to issue a notice to appear at any time after the initial denial.

 8 CFR § 236.15

## §236.15 Voluntary departure and eligibility for employment.

(a) Authority. Voluntary departure under this section implements the provisions of section 301 of IMMACT 90, and authority to grant voluntary departure under the family unity program derives solely from that section. Voluntary departure under the family unity program shall be governed solely by this section, notwithstanding the provisions of section 240B of the Act and 8 CFR part 240.

(b) Children of legalized aliens. Children of legalized aliens residing in the United States, who were born during an authorized absence from the United States of mothers who are currently residing in the United States under voluntary departure pursuant to the Family Unity Program, may be granted voluntary departure under section 301 of IMMACT 90 for a period of 2 years.

(c) Duration of voluntary departure. An alien whose application for benefits under the Family Unity Program is approved will receive voluntary departure for 2 years, commencing with the date of approval of the application. Voluntary departure under this section shall be considered effective from the date on which the application was properly filed.

(d) Employment authorization. An alien granted benefits under the Family Unity Program is authorized to be employed in the United States and may apply for an employment authorization document on Form I-765, Application for Employment Authorization. The application may be filed concurrently with Form I-817. The application must be accompanied by the correct fee required by § 103.7(b)(1) of this chapter. The validity period of the employment authorization will coincide with the period of voluntary departure.

(e) Extension of voluntary departure. An application for an extension of voluntary departure under the Family Unity Program must be filed by the alien on Form I-817 along with the correct fee required in §103.7(b)(1) of this chapter and the required supporting documentation. The submission of a copy of the previous approval notice will assist in shortening the processing time. An extension may be granted if the alien continues to be eligible for benefits under the Family Unity Program. However, an extension may not be approved if the legalized alien is a lawful permanent resident, and a petition for family-sponsored immigrant status has not been filed in behalf of the applicant. In such case the Service will notify the alien of the reason for the denial and afford him or her the opportunity to file another Form I-817 once the petition, Form I-130, has been filed in behalf of him or her. No charging document will be issued for a period of 90 days.

(f) Supporting documentation for extension application. Supporting documentation need not include documentation provided with the previous application(s). The extension application need only include changes to previous applications and evidence of continuing eligibility since the date of the prior approval.

 8 CFR § 236.16

## §236.16 Travel outside the United States.

An alien granted Family Unity Program benefits who intends to travel outside the United States temporarily must apply for advance authorization using Form I-131, Application for Travel Document. The authority to grant an application for advance

authorization for an alien granted Family Unity Program benefits rests solely with the district director. An alien who is granted advance authorization and returns to the United States in accordance with such authorization, and who is found not to be inadmissible under section 212(a)(2) or (3) of the Act, shall be inspected and admitted in the same immigration status as the alien had at the time of departure, and shall be provided the remainder of the voluntary departure period previously granted under the Family Unity Program.

 8 CFR § 236.17

**§236.17 Eligibility for Federal financial assistance programs.**

An alien granted Family Unity Program benefits based on a relationship to a legalized alien as defined in §236.11 is ineligible for public welfare assistance in the same manner and for the same period as the legalized alien who is ineligible for such assistance under section 245A(h) or 210(f) of the Act, respectively.


**§236. 18 Termination of Family Unity Program benefits.**

(a) Grounds for termination. The Service may terminate benefits under the Family Unity Program whenever the necessity for the termination comes to the attention of the Service. Such grounds will exist in situations including, but not limited to, those in which:

(1) A determination is made that Family Unity Program benefits were acquired as the result of fraud or willful misrepresentation of a material fact;

(2) The beneficiary commits an act or acts which render him or her inadmissible as an immigrant or who are ineligible for benefits under the Family Unity Program;

(3) The legalized alien upon whose status benefits under the Family Unity Program were based loses his or her legalized status;

(4) The beneficiary is the subject of a final order of exclusion, deportation, or removal issued subsequent to the grant of Family Unity benefits unless such final order is based on entry without inspection; violation of status; or failure to comply with section 265 of the Act;  **\*10365**  or inadmissibility at the time of entry other than inadmissibility pursuant to section 212(a)(2) or 212(a)(3) of the Act, regardless of whether the facts giving rise to such ground occurred before or after the benefits were granted; or

(5) A qualifying relationship to a legalized alien no longer exists.

(b) Notice procedure. Notice of intent to terminate and of the grounds thereof shall be served pursuant to the provisions of §103.5a of this chapter. The alien shall be given 30 days to respond to the notice and may submit to the Service additional evidence in rebuttal. Any final decision of termination shall also be served pursuant to the provisions of §103.5a of this chapter. Nothing in this section shall preclude the Service from commencing exclusion or deportation proceedings prior to termination of Family Unity Program benefits.

(c) Effect of termination. Termination of benefits under the Family Unity Program, other than as a result of a final order of removal, shall render the alien amenable to removal proceedings under section 240 of the Act. If benefits are terminated, the period of voluntary departure under this section is also terminated.


**PART 237—[REMOVED AND RESERVED]**

100. Part 237 is removed and reserved.

101. Part 238 is added to read as follows:

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

Sec.

238.1 Proceedings under section 238(b) of the Act.
Authority: 8 U.S.C. 1228; 8 CFR part 2.
 8 CFR § 238.1

### §238.1 Proceedings under section 238(b) of the Act.

(a) Definitions. As used in this part:

Deciding Service officer means a district director, chief patrol agent, or another immigration officer designated by a district director or chief patrol agent, who is not the same person as the issuing Service officer.

Issuing Service officer means any Service officer listed in §239.1 of this chapter as authorized to issue notices to appear.

(b) Preliminary consideration and Notice of Intent to Issue a Final Administrative Deportation Order; commencement of proceedings.—(1) Basis of Service charge. An issuing Service officer shall cause to be served upon an alien a Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent), if the officer is satisfied that there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual:

(i) Is an alien;

(ii) Has not been lawfully admitted for permanent residence, or has conditional permanent resident status under section 216 of the Act;

(iii) Has been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in §3.41 of this chapter) of an aggravated felony and such conviction has become final; and

(iv) Is deportable under section 237(a)(2)(A)(iii) of the Act, including an alien who has neither been admitted nor paroled, but who is conclusively presumed deportable under section 237(a)(2)(A)(iii) by operation of section 238(c) of the Act ("Presumption of Deportability").

(2) Notice. (i) Removal proceedings under section 238(b) of the Act shall commence upon personal service of the Notice of Intent upon the alien, as prescribed by §§103.5a(a)(2) and 103.5a(c)(2) of this chapter. The Notice of Intent shall set forth the preliminary determinations and inform the alien of the Service's intention to issue a Form I-851A, Final Administrative Removal Order, without a hearing before an immigration judge. This Notice shall constitute the charging document. The Notice of Intent shall include allegations of fact and conclusions of law. It shall advise that the alien: has the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing, as long as counsel is authorized to practice in deportation proceedings; may inspect the evidence supporting the Notice of Intent; and may rebut the charges within 10 calendar days after service of such Notice (or 13 calendar days if service of the Notice was by mail).

(ii) The Notice of Intent also shall advise the alien that he or she may designate in writing, within the rebuttal period, the country to which he or she chooses to be deported in accordance with section 241 of the Act, in the event that a Final Administrative Removal Order is issued, and that the Service will honor such designation only to the extent permitted under the terms, limitations, and conditions of section 241 of the Act.

(iii) The Service must determine that the person served with the Notice of Intent is the person named on the notice.

(iv) The Service shall provide the alien with a list of available free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to 8 CFR part 292, located within the district or sector where the Notice of Intent is issued.

(v) The Service must either provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands.

(c) Alien's response. (1) Time for response. The alien will have 10 calendar days from service of the Notice of Intent, or 13 calendar days if service is by mail, to file a response to the Notice of Intent. In the response, the alien may: designate his or her choice of country for removal; submit a written response rebutting the allegations supporting the charge and/or requesting the opportunity to review the Government's evidence; and/or request in writing an extension of time for response, stating the specific reasons why such an extension is necessary. Alternatively, the alien may, in writing, choose to accept immediate issuance of a Final Administrative Removal Order. The deciding Service officer may extend the time for response for good cause shown. A request for extension of time for response will not automatically extend the period for the response. The alien will be permitted to file a response outside the prescribed period only if the deciding Service officer permits it. The alien must send the response to the deciding Service officer at the address provided in the Notice of Intent.

(2) Nature of rebuttal or request to review evidence. (i) If an alien chooses to rebut the allegations contained in the Notice of Intent, the alien's written response must indicate which finding(s) are being challenged and should be accompanied by affidavit(s), documentary information, or other specific evidence supporting the challenge.

(ii) If an alien's written response requests the opportunity to review the Government's evidence, the Service shall serve the alien with a copy of the evidence in the record of proceeding upon which the Service is relying to support the charge. The alien may, within 10 calendar days following service of the Government's evidence (13 calendar days if service is by mail), furnish a final response in accordance with paragraph (c)(1) of this section. If the alien's final response is a rebuttal of the allegations, such a final response should be accompanied by affidavit(s), documentary information, or other **\*10366** specific evidence supporting the challenge.

(d) Determination by deciding Service officer. (1) No response submitted or concession of deportability. If the deciding Service officer does not receive a timely response and the evidence in the record of proceeding establishes deportability by clear, convincing, and unequivocal evidence, or if the alien concedes deportability, then the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the deportation decision. The alien may, in writing, waive the 14-day waiting period before execution of the final order of removal provided in a paragraph (f) of this section.

(2) Response submitted. (i) Insufficient rebuttal; no genuine issue of material fact. If the alien timely submits a rebuttal to the allegations, but the deciding Service officer finds that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(ii) Additional evidence required. (A) If the deciding Service officer finds that the record of proceeding, including the alien's timely rebuttal, raises a genuine issue of material fact regarding the preliminary findings, the deciding Service officer may either obtain additional evidence from any source, including the alien, or cause to be issued a notice to appear to initiate removal proceedings under section 240 of the Act. The deciding Service officer may also obtain additional evidence from any source, including the alien, if the deciding Service officer deems that such additional evidence may aid the officer in the rendering of a decision.

(B) If the deciding Service officer considers additional evidence from a source other than the alien, that evidence shall be made a part of the record of proceeding, and shall be provided to the alien. If the alien elects to submit a response to such

additional evidence, such response must be filed with the Service within 10 calendar days of service of the additional evidence (or 13 calendar days if service is by mail). If the deciding Service officer finds, after considering all additional evidence, that deportability is established by clear, convincing, and unequivocal evidence in the record of proceeding, the deciding Service officer shall issue and cause to be served upon the alien a Final Administrative Removal Order that states the reasons for the decision of deportability.

(iii) Conversion to proceedings under section 240 of the Act. If the deciding Service officer finds that the alien is not amenable to removal under section 238 of the Act, the deciding Service officer shall terminate the expedited proceedings under section 238 of the Act and shall, where appropriate, cause to be issued a notice to appear for the purpose of initiating removal proceedings before an immigration judge under section 240 of the Act.

(3) Termination of proceedings by deciding Service officer. Only the deciding Service officer may terminate proceedings under section 238 of the Act, in accordance with this section.

(e) Proceedings commenced under section 240 of the Act. In any proceeding commenced under section 240 of the Act which is based on deportability under section 237 of the Act, if it appears that the respondent alien is subject to removal pursuant to section 238 of the Act, the immigration judge may, upon the Service's request, terminate the case and, upon such termination, the Service may commence administrative proceedings under section 238 of the Act. However, in the absence of any such request, the immigration judge shall complete the proceeding commenced under section 240 of the Act.

(f) Executing final removal order of deciding Service officer. (1) Time of execution. Upon the issuance of a Final Administrative Removal Order, the Service shall issue a Warrant of Removal in accordance with §241.2 of this chapter; such warrant shall be executed no sooner than 14 calendar days after the date the Final Administrative Removal Order is issued, unless the alien knowingly, voluntarily, and in writing waives the 14-day period.

(2) Country to which alien is to be removed. The deciding Service officer shall designate the country of removal in the manner prescribed by section 241 of the Act.

(g) Arrest and detention. At the time of issuance of a Notice of Intent or at any time thereafter and up to the time the alien becomes the subject of a Warrant of Removal, the alien may be arrested and taken into custody under the authority of a Warrant of Arrest issued by an officer listed in §287.5(e)(2) of this chapter. The decision of the Service concerning custody or bond shall not be administratively appealable during proceedings initiated under section 238 of the Act and this part.

(h) Record of proceeding. The Service shall maintain a record of proceeding for judicial review of the Final Administrative Removal Order sought by any petition for review. The record of proceeding shall include, but not necessarily be limited to: the charging document (Notice of Intent); the Final Administrative Removal Order (including any supplemental memorandum of decision); the alien's response, if any; all evidence in support of the charge; and any admissible evidence, briefs, or documents submitted by either party respecting deportability. The executed duplicate of the Notice of Intent in the record of proceedings shall be retained as evidence that the individual upon whom the notice for the proceeding was served was, in fact, the alien named in the notice.

102. Part 239 is added to read as follows:

## PART 239—INITIATION OF REMOVAL PROCEEDINGS

Sec.

239.1 Notice to appear.

239.2 Cancellation of notice to appear.

239.3 Effect of filing notice to appear.
Authority: 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.
 8 CFR § 239.1

### §239.1 Notice to appear.

(a) Commencement. Every removal proceeding conducted under section 240 of the Act to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court. Any immigration officer performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such an alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);

(2) Deputy district directors (except foreign);

(3) Assistant district directors for investigations;

(4) Deputy assistant district directors for investigations;

(5) Assistant district directors for deportation;

(6) Deputy assistant district directors for deportation;

(7) Assistant district directors for examinations;

(8) Deputy assistant district directors for examinations;

(9) Officers in charge (except foreign);

(10) Assistant officers in charge (except foreign);

(11) Chief patrol agents;

(12) Deputy chief patrol agents;

(13) Associate chief patrol agents;  **10367**

(14) Assistant chief patrol agents;

(15) Patrol agents in charge;

(16) The Assistant Commissioner, Investigations;

(17) Service center directors;

(18) Deputy center directors;

(19) Assistant center directors for examinations;

(20) Supervisory asylum officers;

(21) Institutional Hearing Program directors; or

(22) Deputy Institutional Hearing Program directors.

(b) Service of notice to appear. Service of the notice to appear shall be in accordance with section 239 of the Act.

 8 CFR § 239.2

**§239.2 Cancellation of notice to appear.**

(a) Any officer authorized by §239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to §3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;

(2) The respondent is not deportable or inadmissible under immigration laws;

(3) The respondent is deceased;

(4) The respondent is not in the United States;

(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act;

(6) The notice to appear was improvidently issued, or

(7) Circumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government.

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) Motion to dismiss. After commencement of proceedings pursuant to §3.14 of this chapter, Service counsel, or any officer enumerated in paragraph (a) of this section may move for dismissal of the matter on the grounds set out under paragraph (a) of this section. Dismissal of the matter shall be without prejudice to the alien or the Service.

(d) Motion for remand. After commencement of the hearing, Service counsel, or any officer enumerated in paragraph (a) of this section may move for remand of the matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration. Remand of the matter shall be without prejudice to the alien or the Service.

(e) Warrant of arrest. When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) Termination of removal proceedings by immigration judge. An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

 8 CFR § 239.3

AR.00164
105

**§239.3 Effect of filing notice to appear.**

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

 8 CFR § 240.1-240.20

**§§240.1-240.20 [Redesignated as §§244.3-244.22]**

103. Sections 240.1 through 240.20 are redesignated as §§244.3 through 244.22.

104. Part 240 is revised to read as follows:


**PART 240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES**

**Subpart A—Removal Proceedings**

Sec.

240.1 Immigration judges.

240.2 Service counsel.

240.3 Representation by counsel.

240.4 Incompetent respondents.

240.5 Interpreter.

240.6 Postponement and adjournment of hearing.

240.7 Evidence in removal proceedings under section 240 of the Act.

240.8 Burdens of proof in removal proceedings.

240.9 Contents of record.

240.10 Hearing.

240.11 Ancillary matters, applications.

240.12 Decision of the immigration judge.

240.13 Notice of decision.

240.14 Finality of order.

240.15 Appeals.

240.16 Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Public Law 104-208.

240.17-240.19 [Reserved]

**Subpart B—Cancellation of Removal**

240.20 Cancellation of removal and adjustment of status under section 240A of the Act.

240.21-240.24 [Reserved]

**Subpart C—Voluntary Departure**

240.25 Voluntary departure—authority of the Service.

240.26 Voluntary departure—authority of the Executive Office for Immigration Review.

240.27-240.29 [Reserved]

**Subpart D—Exclusion of Aliens (for proceedings commenced prior to April 1, 1997)**

240.30 Proceedings prior to April 1, 1997.

240.31 Authority of immigration judges.

240.32 Hearing.

240.33 Applications for asylum or withholding of deportation.

240.34 Renewal of application for adjustment of status under section 245 of the Act.

240.35 Decision of the immigration judge; notice to the applicant.

240.36 Finality of order.

240.37 Appeals.

240.38 Fingerprinting of excluded aliens.

240.39 [Reserved]

**Subpart E—Proceedings to determine deportability of aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)**

240.40 Proceedings commenced prior to April 1, 1997.

240.41 Immigration judges.

240.42 Representation by counsel.

240.43 Incompetent respondents.

240.44 Interpreter.

240.45 Postponement and adjournment of hearing.

240.46 Evidence.

240.47 Contents of record.

240.48 Hearing.

240.49 Ancillary matters, applications.

240.50 Decision of the immigration judge.

240.51 Notice of decision.

240.52 Finality of order.

240.53 Appeals.

240.54 [Reserved]

**Subpart F—Suspension of Deportation and Voluntary Departure (for proceedings commenced prior to April 1, 1997)**

240.55 Proceedings commenced prior to April 1, 1997.

240.56 Application.

240.57 Extension of time to depart.

**Subpart G—Civil Penalties for Failure to Depart [Reserved]**
Authority: 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; 8 CFR part 2.


**Subpart A—Removal Proceedings**
8 CFR § 240.1

**§240.1 Immigration judges.**

(a) Authority. In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to: determine removability pursuant to section  **\*10368**  240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act; to determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act; to order withholding of removal pursuant to section 241(b)(3) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. In determining cases referred for further inquiry, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases. An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

(b) Withdrawal and substitution of immigration judges. The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

(c) Conduct of hearing. The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.
 8 CFR § 240.2

**§240.2 Service counsel.**
(a) Authority. Service counsel shall present on behalf of the government evidence material to the issues of deportability or inadmissibility and any other issues that may require disposition by the immigration judge. The duties of the Service counsel include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the respondent or other witnesses. Nothing contained in this subpart diminishes the authority of an immigration judge to conduct

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

proceedings under this part. The Service counsel is authorized to appeal from a decision of the immigration judge pursuant to §3.38 of this chapter and to move for reopening or reconsideration pursuant to §3.23 of this chapter.

(b) Assignment. In a removal proceeding, the Service shall assign an attorney to each case within the provisions of §240.10(d), and to each case in which an unrepresented respondent is incompetent or is under 18 years of age, and is not accompanied by a guardian, relative, or friend. In a case in which the removal proceeding would result in an order of removal, the Service shall assign an attorney to each case in which a respondent's nationality is in issue. A Service attorney shall be assigned in every case in which the Commissioner approves the submission of non-record information under §240.11(a)(3). In his or her discretion, whenever he or she deems such assignment necessary or advantageous, the General Counsel may assign a Service attorney to any other case at any stage of the proceeding.

8 CFR § 240.3

§240.3 Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

8 CFR § 240.4

§240.4 Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.

8 CFR § 240.5

§240.5 Interpreter.

Any person acting as an interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

8 CFR § 240.6

§240.6 Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

8 CFR § 240.7

§240.7 Evidence in removal proceedings under section 240 of the Act.

(a) Use of prior statements. The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(b) Testimony. Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(c) Depositions. The immigration judge may order the taking of depositions pursuant to §3.35 of this chapter.

8 CFR § 240.8

§240.8 Burdens of proof in removal proceedings.

(a) Deportable aliens. A respondent charged with deportability shall be found to be removable if the Service proves by clear and convincing evidence that the respondent is deportable as charged.

(b) Arriving aliens. In proceedings commenced upon a respondent's arrival in the Untied States or after the revocation or expiration of parole, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(c) Aliens present in the United States without being admitted or paroled. In the case of a respondent charged as being in the United States without being admitted or paroled, the Service must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(d) Relief from removal. The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

 8 CFR § 240.9

**§240.9 Contents of record.**

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all  **\*10369**  written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

 8 CFR § 240.10

**§240.10 Hearing.**

(a) Opening. In a removal proceeding, the immigration judge shall:

(1) Advise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation;

(2) Advise the respondent of the availability of free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized pursuant to §292.2 of this chapter, located in the district where the removal hearing is being held;

(3) Ascertain that the respondent has received a list of such programs, and a copy of appeal rights;

(4) Advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government (but the respondent shall not be entitled to examine such national security information as the government may proffer in opposition to the respondent's admission to the United States or to an application by the respondent for discretionary relief);

(5) Place the respondent under oath;

(6) Read the factual allegations and the charges in the notice to appear to the respondent and explain them in non-technical language; and

(7) Enter the notice to appear as an exhibit in the Record of Proceeding.

(b) Public access to hearings. Removal hearings shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in §3.27 of this chapter.

(c) Pleading by respondent. The immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability under the charges contained therein. If the respondent admits the factual allegations and admits his or her removability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that removability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of removability from an unrepresented respondent who is incompetent or under the age of 18 and is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

(d) Issues of removability. When removability is not determined under the provisions of paragraph (c) of this section, the immigration judge shall request the assignment of an Service counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The alien shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the alien. No JRAD is effective against a charge of deportability under former section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(e) Additional charges in removal hearings. At any time during the proceeding, additional or substituted charges of inadmissibility and/or deportability and/or factual allegations may be lodged by the Service in writing. The alien in removal proceedings shall be served with a copy of these additional charges and allegations. The immigration judge shall read the additional factual allegations and charges to the alien and explain them to him or her. The immigration judge shall advise the alien, if he or she is not represented by counsel, that the alien may be so represented, and that he or she may be given a reasonable continuance to respond to the additional factual allegations and charges. Thereafter, the provision of §240.6(b) relating to pleading shall apply to the additional factual allegations and charges.

(f) Country of removal. The immigration judge shall notify the alien that if he or she is finally ordered removed, the country of removal will in the first instance be directed pursuant to section 241(b) of the Act to the country designated by the alien, unless section 241(b)(2)(C) of the Act applies, and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which the alien's removal will be directed pursuant to section 241(b) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the alien declines to designate a country.

(g) In the event that the Service is unable to remove the alien to the specified or alternative country or countries, the Service may remove the alien to any other country as permitted by section 241(b) of the Act.

 8 CFR § 240.11

## §240.11 Ancillary matters, applications.

(a) Creation of the status of an alien lawfully admitted for permanent residence. (1) In a removal proceeding, an alien may apply to the immigration judge for cancellation of removal under section 240A of the Act, adjustment of status under section 245 of the Act, adjustment of status under section 1 of the Act of November 2, 1966 (as modified by section 606 of Public Law 104-132) or under section 101 or 104 of the Act of October 28, 1977, or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of §240.20, and 8 CFR parts 245 and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act) shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on Residence

required by section 216(c) of the Act, or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216.

(2) In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the alien is inadmissible under any provision of section 212(a) of the Act, and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or **\*10370** she may apply to the immigration judge for such waiver. The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing.

(3) In exercising discretionary power when considering an application for status as a permanent resident under this chapter, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the alien, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the alien of the general nature of the information in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) Voluntary departure. The alien may apply to the immigration judge for voluntary departure in lieu of removal pursuant to section 240B of the Act and subpart C of this part.

(c) Applications for asylum and withholding of removal. (1) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be removed pursuant to §240.10(f), and the alien has not previously filed an application for asylum or withholding of removal that has been referred to the immigration judge by an asylum officer in accordance with §208.14 of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of removal to those countries;

(ii) Make available the appropriate application forms; and

(iii) Advise the alien of the privilege of being represented by counsel at no expense to the government and of the consequences, pursuant to section 208(d)(6) of the Act, of knowingly filing a frivolous application for asylum. The immigration judge shall provide to the alien a list of persons who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(2) An application for asylum or withholding of removal must be filed with the Immigration Court, pursuant to §208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to §208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the alien and to the Service counsel representing the government.

(3) Applications for asylum and withholding of removal so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 of this chapter after an evidentiary hearing to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to §208.14 or §208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of removal will be open to the public unless the alien expressly requests that the hearing be closed pursuant to §3.27 of this chapter. The immigration judge shall inquire whether the alien requests such closure.

(ii) Nothing in this section is intended to limit the authority of the immigration judge to properly control the scope of any evidentiary hearing.

(iii) During the removal hearing, the alien shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The alien has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standards set forth in §208.13 of this chapter.

(iv) Service counsel may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information, he or she shall inform the alien. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the alien, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its sources. The summary should be as detailed as possible, in order that the alien may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(4) The decision of an immigration judge to grant or deny asylum or withholding of removal shall be communicated to the alien and to the Service counsel. An adverse decision shall state why asylum or withholding of removal was denied.

(d) Application for relief under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act. The respondent may apply to the immigration judge for relief from removal under sections 237(a)(1)(H) and 237(a)(1)(E)(iii) of the Act.

(e) General. An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his or her alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation or removal submitted to the Service on or after January 4, 1995, as the basis for issuance of a charging document or to establish alienage or deportability in a case referred to an immigration judge under §208.14(b) of this chapter. The alien shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. Nothing contained in this section is intended to foreclose the respondent from applying for any benefit or privilege that he or she believes himself or herself eligible to receive in proceedings under this part. Nothing in this section is intended to limit the Attorney General's authority to remove an alien to any country permitted by section 241(b) of the Act.

(f) Fees. The alien shall not be required to pay a fee on more than one application within paragraphs (a) and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee.

8 CFR § 240.12

## §240.12 Decision of the immigration judge.

(a) Contents. The decision of the immigration judge may be oral or written. The decision of the immigration judge shall include a finding as to inadmissibility or deportability. The formal enumeration of findings is not required. The decision shall also contain reasons for granting or denying the request. The decision shall be **\*10371** concluded with the order of the immigration judge.

(b) Summary decision. Notwithstanding the provisions of paragraph (a) of this section, in any case where inadmissibility or deportability is determined on the pleadings pursuant to §240.10(b) and the respondent does not make an application under §240.11, the alien is statutorily ineligible for relief, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision or, if voluntary departure is granted, a summary decision with an alternate order of removal.

(c) Order of the immigration judge. The order of the immigration judge shall direct the respondent's removal, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When removal is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's removal shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

 8 CFR § 240.13

**§240.13 Notice of decision.**

(a) Written decision. A written decision shall be served upon the respondent and the Service counsel, together with the notice referred to in §3.3 of this chapter. Service by mail is complete upon mailing.

(b) Oral decision. An oral decision shall be stated by the immigration judge in the presence of the respondent and the Service counsel, if any, at the conclusion of the hearing. A copy of the summary written order shall be furnished at the request of the respondent or the Service counsel.

(c) Summary decision. When the immigration judge renders a summary decision as provided in §240.12(b), he or she shall serve a copy thereof upon the respondent and the Service counsel at the conclusion of the hearing.

(d) Decision to remove. If the immigration judge decides that the respondent is removable and orders the respondent to be removed, the immigration judge shall advise the respondent of such decision, and of the consequences for failure to depart under the order of removal, including civil and criminal penalties described at sections 274D and 243 of the Act. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR-26, Notice of Appeal, and advised of the provisions of §240.15.

 8 CFR § 240.14

**§240.14 Finality of order.**

The order of the immigration judge shall become final in accordance with §3.39 of this chapter.

 8 CFR § 240.15

**§240.15 Appeals.**

8 CFR § 3.3 8 CFR § 3.31 8 CFR § 3.38 8 CFR § 3.1

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board of Immigration Appeals, except that no appeal shall lie from an order of removal entered in absentia. The procedures regarding the filing of a Form EOIR 26, Notice of Appeal, fees, and briefs are set forth in §§3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board of Immigration Appeals. The reasons for the appeal shall be stated in the Notice of Appeal in accordance with the provisions of §3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to §3.1(d)(1-a) of this chapter.

 8 CFR § 240.16

**§240.16 Application of new procedures or termination of proceedings in old proceedings pursuant to section 309(c) of Public Law 104-208.**

The Attorney General shall have the sole discretion to apply the provisions of section 309(c) of Public Law 104-208, which provides for the application of new removal procedures to certain cases in exclusion or deportation proceedings and for the termination of certain cases in exclusion or deportation proceedings and initiation of new removal proceedings. The Attorney General's application of the provisions of section 309(c) shall become effective upon publication of a notice in the Federal Register. However, if the Attorney General determines, in the exercise of his or her discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Attorney General's application shall become effective immediately upon issuance, and shall be published in the Federal Register as soon as practicable thereafter.

 8 CFR § 240.17

**§§240.17—240.19 [Reserved]**

**Subpart B—Cancellation of removal**
8 CFR § 240.20

**§240.20 Cancellation of removal and adjustment of status under section 240A of the Act.**

(a) Jurisdiction. An application for the exercise of discretion under section 240A of the Act shall be submitted on Form EOIR-42, Application for Cancellation of Removal, to the Immigration Court having administrative control over the Record of Proceeding of the underlying removal proceeding under section 240 of the Act. The application must be accompanied by payment of the filing fee as set forth in §103.7(b) of this chapter or a request for a fee waiver.

(b) Filing the application. The application may be filed only with the Immigration Court after jurisdiction has vested pursuant to §3.14 of this chapter.
 8 CFR § 240.21

**§§240.21—240.24 [Reserved]**

**Subpart C—Voluntary Departure**
8 CFR § 240.25

**§240.25 Voluntary departure—authority of the Service.**

(a) Authorized officers. The authority contained in section 240B(a) of the Act to permit aliens to depart voluntarily from the United States may be exercised in lieu of being subject to proceedings under section 240 of the Act by district directors, assistant district directors for investigations, assistant district directors for examinations, officers in charge, chief patrol agents, service center directors, and assistant center directors for examinations.

(b) Conditions. The Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure from the United States, including the posting of a bond, continued detention pending departure, and removal under safeguards. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service may hold the passport or documentation for sufficient time to investigate its authenticity. A voluntary departure order permitting an alien to depart voluntarily shall inform the alien of the penalties under section 240B(d) of the Act.

(c) Decision. The authorized officer, in his or her discretion, shall specify the period of time permitted for voluntary departure, and may grant extensions thereof, except that the total period allowed, including any extensions, shall not exceed 120 days. Every decision regarding voluntary departure shall be communicated in writing on Form I-210, Notice of Action—Voluntary Departure. Voluntary departure may not be granted unless the alien requests such voluntary departure and agrees to its terms and conditions.

(d) Application. Any alien who believes himself or herself to be eligible **\*10372** for voluntary departure under this section may apply therefor at any office of the Service. After the commencement of removal proceedings, the application may be communicated through the Service counsel. If the Service agrees to voluntary departure after proceedings have commenced, it may either:

(1) Join in a motion to terminate the proceedings, and if the proceedings are terminated, grant voluntary departure; or

(2) Join in a motion asking the immigration judge to permit voluntary departure in accordance with §240.26.

(e) Appeals. An appeal shall not lie from a denial of an application for voluntary departure under this section, but the denial shall be without prejudice to the alien's right to apply to the immigration judge for voluntary departure in accordance with §240.26 or for relief from removal under any provision of law.

(f) Revocation. If, subsequent to the granting of an application for voluntary departure under this section, it is ascertained that the application should not have been granted, that grant may be revoked without advance notice by any officer authorized to grant voluntary departure under §240.25(a). Such revocation shall be communicated in writing, citing the statutory basis for revocation. No appeal shall lie from revocation.

 8 CFR § 240.26

### §240.26 Voluntary departure—authority of the Executive Office for Immigration Review.

(a) Eligibility: general. An alien previously granted voluntary departure under section 240B of the Act, including by the Service under §240.25, and who fails to depart voluntarily within the time specified, shall thereafter be ineligible, for a period of ten years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act.

(b) Prior to completion of removal proceedings.—(1) Grant by the immigration judge. (i) An alien may be granted voluntary departure by an immigration judge pursuant to section 240B(a) of the Act only if the alien:

(A) Makes such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing;

(B) Makes no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability;

(D) Waives appeal of all issues; and

(E) Has not been convicted of a crime described in section 101(a)(43) of the Act and is not deportable under section 237(a)(4).

(ii) The judge may not grant voluntary departure under section 240B(a) of the Act beyond 30 days after the master calendar hearing at which the case is initially calendared for a merits hearing, except pursuant to a stipulation under paragraph (b)(2) of this section.

(2) Stipulation. At any time prior to the completion of removal proceedings, the Service counsel may stipulate to a grant of voluntary departure under section 240B(a) of the Act.

(3) Conditions. (i) The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified. The alien shall be required to present to the Service, for inspection and photocopying, his or her passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing, unless:

(A) A travel document is not necessary to return to his or her native country or to which country the alien is departing; or

(B) The document is already in the possession of the Service.

(ii) The Service may hold the passport or documentation for sufficient time to investigate its authenticity. If such documentation is not immediately available to the alien, but the immigration judge is satisfied that the alien is making diligent efforts to secure it, voluntary departure may be granted for a period not to exceed 120 days, subject to the condition that the alien within 60 days must secure such documentation and present it to the Service. The Service in its discretion may extend the period within which

the alien must provide such documentation. If the documentation is not presented within the 60-day period or any extension thereof, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect, as if in effect on the date of issuance of the immigration judge order.

(c) At the conclusion of the removal proceedings.—(1) Required findings. An immigration judge may grant voluntary departure at the conclusion of the removal proceedings under section 240B(b) of the Act, if he or she finds that:

(i) The alien has been physically present in the United States for period of at least one year preceding the date the Notice to Appear was served under section 239(a) of the Act;

(ii) The alien is, and has been, a person of good moral character for at least five years immediately preceding the application;

(iii) The alien has not been convicted of a crime described in section 101(a)(43) of the Act and is not deportable under section 237(a)(4); and

(iv) The alien has established by clear and convincing evidence that the alien has the means to depart the United States and has the intention to do so.

(2) Travel documentation. Except as otherwise provided in paragraph (b)(3) of this section, the clear and convincing evidence of the means to depart shall include in all cases presentation by the alien of a passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing. The Service shall have full opportunity to inspect and photocopy the documentation, and to challenge its authenticity or sufficiency before voluntary departure is granted.

(3) Conditions. The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States. In all cases under section 240B(b) of the Act, the alien shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien departs within the time specified, but in no case less than $500. The voluntary departure bond shall be posted with the district director within 5 business days of the immigration judge's order granting voluntary departure, and the district director may, at his or her discretion, hold the alien in custody until the bond is posted. If the bond is not posted within 5 business days, the voluntary departure order shall vacate automatically and the alternate order of removal will take effect on the following day. In order for the bond to be canceled, the alien must provide proof of departure to the district director.

(d) Alternate order of removal. Upon granting a request made for voluntary departure either prior to the completion of proceedings or at the conclusion of proceedings, the immigration judge shall also enter an alternate order or removal.

(e) Periods of time. If voluntary departure is granted prior to the completion of removal proceedings, the immigration judge may grant a period not to exceed 120 days. If voluntary departure is granted at the conclusion of proceedings, the immigration judge may grant a period not to exceed 60 days.

(f) Extension of time to depart. Authority to extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of  **10373**  the district director. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act.

(g) Administrative Appeals. No appeal shall lie regarding the length of a period of voluntary departure (as distinguished from issues of whether to grant voluntary departure).

(h) Reinstatement of voluntary departure. An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making application for voluntary departure, if reopening was granted prior to the expiration of the original period of voluntary departure. In no event can the total period of time, including any extension, exceed 120 days or 60 days as set forth in section 240B of the Act and paragraph (a) of this section.

 8 CFR § 240.27-240.29

§§240.27-240.29 [Reserved]

**Subpart D—Exclusion of Aliens (for proceedings commenced prior to April 1, 1997)**
8 CFR § 240.30

**§240.30 Proceedings prior to April 1, 1997.**
Subpart D of 8 CFR part 240 applies to exclusion proceedings commenced prior to April 1, 1997, pursuant to the former section 236 of the Act. An exclusion proceeding is commenced by the filing of Form I-122 with the Immigration Court, and an alien is considered to be in exclusion proceedings only upon such filing. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

 8 CFR § 240.31

**§240.31 Authority of immigration judges.**
In determining cases referred for further inquiry as provided in section 235 of the Act, immigration judges shall have the powers and authority conferred upon them by the Act and this chapter. Subject to any specific limitation prescribed by the Act and this chapter, immigration judges shall also exercise the discretion and authority conferred upon the Attorney General by the Act as is appropriate and necessary for the disposition of such cases.

 8 CFR § 240.32

**§240.32 Hearing.**
(a) Opening. Exclusion hearings shall be closed to the public, unless the alien at his or her own instance requests that the public, including the press, be permitted to attend; in that event, the hearing shall be open, provided that the alien states for the record that he or she is waiving the requirement in section 236 of the Act that the inquiry shall be kept separate and apart from the public. When the hearing is to be open, depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public. The immigration judge shall ascertain whether the applicant for admission is the person to whom Form I-122 was previously delivered by the examining immigration officer as provided in 8 CFR part 235; enter a copy of such form in evidence as an exhibit in the case; inform the applicant of the nature and purpose of the hearing; advise him or her of the privilege of being represented by an attorney of his or her own choice at no expense to the Government, and of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to §292.2 of this chapter located in the district where his or her exclusion hearing is to be held; and shall ascertain that the applicant has received a list of such programs; and request him or her to ascertain then and there whether he or she desires representation; advise him or her that he or she will have a reasonable opportunity to present evidence in his or her own behalf, to examine and object to evidence against him or her, and to cross-examine witnesses presented by the Government; and place the applicant under oath.

(b) Procedure. The immigration judge shall receive and adduce material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

(c) Attorney for the Service. The Service shall assign an attorney to each case in which an applicant's nationality is in issue and may assign an attorney to any case in which such assignment is deemed necessary or advantageous. The duties of the Service counsel include, but are not limited to, the presentation of evidence and the interrogation, examination, and cross-examination of the applicant and other witnesses. Nothing contained in this section diminishes the authority of an immigration judge to conduct proceedings under this part.

(d) Depositions. The procedures specified in §240.48(e) shall apply.

(e) Record. The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, and other papers filed in the proceeding shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge.

8 CFR § 240.33

## §240.33 Applications for asylum or withholding of deportation.

(a) If the alien expresses fear of persecution or harm upon return to his or her country of origin or to a country to which the alien may be deported after a determination of excludability from the United States pursuant to this subpart, and the alien has not been referred to the immigration judge by an asylum officer in accordance with §208.14(b) of this chapter, the immigration judge shall:

(1) Advise the alien that he or she may apply for asylum in the United States or withholding of deportation to that other country; and

(2) Make available the appropriate application forms.

(b) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to §208.4(c) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to §208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, from the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the Service counsel representing the government.

(c) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve material factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to §208.13(c) of this chapter is not necessary once the immigration judge has determined that such denial is required.

(1) Evidentiary hearings on applications for asylum or withholding of deportation will be closed to the public unless the applicant expressly requests that it be open pursuant to §236.3 of this chapter.

(2) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(3) During the exclusion hearing, the applicant shall be examined under oath on his or her application and may **\*10374** present evidence and witnesses on his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in §208.13 of this chapter.

(4) The Service counsel for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. The applicant shall be informed when the immigration judge receives such classified information. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that such information is material to the decision.

(d) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the Service counsel for the government. An adverse decision will state why asylum or withholding of deportation was denied.

 8 CFR § 240.34

### §240.34 Renewal of application for adjustment of status under section 245 of the Act.

An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the district director, may be renewed in exclusion proceedings under section 236 of the Act (as in effect prior to April 1, 1997) before an immigration judge under the following two conditions: first, the denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and second, the applicant's later absence from and return to the United States must have been under the terms of an advance parole authorization on Form I-512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.

 8 CFR § 240.35

### §240.35 Decision of the immigration judge; notice to the applicant.

(a) Decision. The immigration judge shall inform the applicant of his or her decision in accordance with §3.37 of this chapter.

(b) Advice to alien ordered excluded. An alien ordered excluded shall be furnished with Form I-296, Notice to Alien Ordered Excluded by Immigration Judge, at the time of an oral decision by the immigration judge or upon service of a written decision.

(c) Holders of refugee travel documents. Aliens who are the holders of valid unexpired refugee travel documents may be ordered excluded only if they are found to be inadmissible under section 212(a)(2), 212(a)(3), or 212(a)(6)(E) of the Act, and it is determined that on the basis of the acts for which they are inadmissible there are compelling reasons of national security or public order for their exclusion. If the immigration judge finds that the alien is inadmissible but determines that there are no compelling reasons of national security or public order for exclusion, the immigration judge shall remand the case to the district director for parole.

 8 CFR § 240.36

### §240.36 Finality of order.

The decision of the immigration judge shall become final in accordance with § 3.37 of this chapter.

 8 CFR § 240.37

### §240.37 Appeals.

Except for temporary exclusions under section 235(c) of the Act, an appeal from a decision of an Immigration Judge under this part may be taken by either party pursuant to §3.38 of this chapter.

 8 CFR § 240.38

### §240.38 Fingerprinting of excluded aliens.

Every alien 14 years of age or older who is excluded from admission to the United States by an immigration judge shall be fingerprinted, unless during the preceding year he or she has been fingerprinted at an American consular office.

 8 CFR § 240.39

### §240.39 [Reserved]

### Subpart E—Proceedings to Determine Deportability of Aliens in the United States: Hearing and Appeal (for proceedings commenced prior to April 1, 1997)

8 CFR § 240.40

### §240.40 Proceedings commenced prior to April 1, 1997.

Subpart E of 8 CFR part 240 applies only to deportation proceedings commenced prior to April 1, 1997. A deportation proceeding is commenced by the filing of Form I-221 (Order to Show Cause) with the Immigration Court, and an alien is

considered to be in deportation proceedings only upon such filing, except in the case of an alien admitted to the United States under the provisions of section 217 of the Act. All references to the Act contained in this subpart pertain to the Act as in effect prior to April 1, 1997.

8 CFR § 240.41

### §240.41 Immigration judges.

(a) Authority. In any proceeding conducted under this part the immigration judge shall have the authority to determine deportability and to make decisions, including orders of deportation, as provided by section 242(b) and 242B of the Act; to reinstate orders of deportation as provided by section 242(f) of the Act; to determine applications under sections 208, 212(k), 241(a)(1)(E)(iii), 241(a)(1)(H), 244, 245 and 249 of the Act; to determine the country to which an alien's deportation will be directed in accordance with section 243(a) of the Act; to order temporary withholding of deportation pursuant to section 243(h) of the Act; and to take any other action consistent with applicable law and regulations as may be appropriate. An immigration judge may certify his or her decision in any case to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under section 103 of the Act.

(b) Withdrawal and substitution of immigration judges. The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

8 CFR § 240.42

### §240.42 Representation by counsel.

The respondent may be represented at the hearing by an attorney or other representative qualified under 8 CFR part 292.

8 CFR § 240.43

### §240.43 Incompetent respondents.

When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the guardian, near relative, or friend who was served with a copy of the order to show cause shall be permitted to appear on behalf of the respondent. If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent.  **10375**

8 CFR § 240.44

### §240.44 Interpreter.

Any person acting as interpreter in a hearing before an immigration judge under this part shall be sworn to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath shall be required.

8 CFR § 240.45

### §240.45 Postponement and adjournment of hearing.

After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or the Service.

8 CFR § 240.46

### §240.46 Evidence.

(a) Sufficiency. A determination of deportability shall not be valid unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true.

(b) Use of prior statements. The immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

(c) Testimony. Testimony of witnesses appearing at the hearing shall be under oath or affirmation administered by the immigration judge.

(d) Depositions. The immigration judge may order the taking of depositions pursuant to §3.35 of this chapter.

8 CFR § 240.47

### §240.47 Contents of record.

The hearing before the immigration judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings shall constitute the record in the case. The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge. In his or her discretion, the immigration judge may exclude from the record any arguments made in connection with motions, applications, requests, or objections, but in such event the person affected may submit a brief.

8 CFR § 240.48

### §240.48 Hearing.

(a) Opening. The immigration judge shall advise the respondent of his or her right to representation, at no expense to the Government, by counsel of his or her own choice authorized to practice in the proceedings and require him or her to state then and there whether he or she desires representation; advise the respondent of the availability of free legal services programs qualified under 8 CFR part 3 and organizations recognized pursuant to §292.2 of this chapter, located in the district where the deportation hearing is being held; ascertain that the respondent has received a list of such programs, and a copy of Form I-618, Written Notice of Appeal Rights; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the Government; place the respondent under oath; read the factual allegations and the charges in the order to show cause to the respondent and explain them in nontechnical language, and enter the order to show cause as an exhibit in the record. Deportation hearings shall be open to the public, except that the immigration judge may, in his or her discretion and for the purpose of protecting witnesses, respondents, or the public interest, direct that the general public or particular individuals shall be excluded from the hearing in any specific case. Depending upon physical facilities, reasonable limitation may be placed upon the number in attendance at any one time, with priority being given to the press over the general public.

(b) Pleading by respondent. The immigration judge shall require the respondent to plead to the order to show cause by stating whether he or she admits or denies the factual allegations and his or her deportability under the charges contained therein. If the respondent admits the factual allegations and admits his or her deportability under the charges and the immigration judge is satisfied that no issues of law or fact remain, the immigration judge may determine that deportability as charged has been established by the admissions of the respondent. The immigration judge shall not accept an admission of deportability from an unrepresented respondent who is incompetent or under age 16 and is not accompanied by a guardian, relative, or friend; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge may not accept an admission of deportability, he or she shall direct a hearing on the issues.

(c) Issues of deportability. When deportability is not determined under the provisions of paragraph (b) of this section, the immigration judge shall request the assignment of a Service counsel, and shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading. The respondent shall provide a court certified copy of a Judicial Recommendation Against Deportation (JRAD) to the immigration judge when such recommendation will be the basis of denying any charge(s) brought by the Service in the proceedings against the respondent. No JRAD is effective against a charge of deportability under section 241(a)(11) of the Act or if the JRAD was granted on or after November 29, 1990.

(d) Additional charges. The Service may at any time during a hearing lodge additional charges of deportability, including factual allegations, against the respondent. Copies of the additional factual allegations and charges shall be submitted in writing for service on the respondent and entry as an exhibit in the record. The immigration judge shall read the additional factual allegations

and charges to the respondent and explain them to him or her. The immigration judge shall advise the respondent if he or she is not represented by counsel that he or she may be so represented and also that he or she may have a reasonable time within which to meet the additional factual allegations and charges. The respondent shall be required to state then and there whether he or she desires a continuance for either of these reasons. Thereafter, the provisions of paragraph (b) of this section shall apply to the additional factual allegations and lodged charges.

8 CFR § 240.49

### §240.49 Ancillary matters, applications.

(a) Creation of the status of an alien lawfully admitted for permanent residence. The respondent may apply to the immigration judge for suspension of deportation under section 244(a) of the Act; for adjustment of status under section 245 of the Act, or under section 1 of the Act of November 2, 1966, or under section 101 or 104 of the Act of October 28, 1977; or for the creation of a record of lawful admission for permanent residence under section 249 of the Act. The application shall be subject to the requirements of 8 CFR parts 240, 245, and 249. The approval of any application made to the immigration judge under section 245 of the Act by an alien spouse (as defined in section 216(g)(1) of the Act) or by an alien entrepreneur (as defined in section 216A(f)(1) of the Act), shall result in the alien's obtaining the status of lawful permanent resident on a conditional basis in accordance with the provisions of section 216 or 216A of the Act, whichever is applicable. However, the Petition to Remove the Conditions on *10376 Residence required by section 216(c) of the Act or the Petition by Entrepreneur to Remove Conditions required by section 216A(c) of the Act shall be made to the director in accordance with 8 CFR part 216. In conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge, if the respondent is inadmissible under any provision of section 212(a) of the Act and believes that he or she meets the eligibility requirements for a waiver of the ground of inadmissibility, he or she may apply to the immigration judge for such waiver. The immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the respondent an opportunity to make application therefor during the hearing. In exercising discretionary power when considering an application under this paragraph, the immigration judge may consider and base the decision on information not contained in the record and not made available for inspection by the respondent, provided the Commissioner has determined that such information is relevant and is classified under the applicable Executive Order as requiring protection from unauthorized disclosure in the interest of national security. Whenever the immigration judge believes that he or she can do so while safeguarding both the information and its source, the immigration judge should inform the respondent of the general nature of the information in order that the respondent may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state that the information is material to the decision.

(b) Voluntary departure. The respondent may apply to the immigration judge for voluntary departure in lieu of deportation pursuant to section 244(e) of the Act and §240.56.

(c) Applications for asylum or withholding of deportation. (1) The immigration judge shall notify the respondent that if he or she is finally ordered deported, his or her deportation will in the first instance be directed pursuant to section 243(a) of the Act to the country designated by the respondent and shall afford him or her an opportunity then and there to make such designation. The immigration judge shall then specify and state for the record the country, or countries in the alternative, to which respondent's deportation will be directed pursuant to section 243(a) of the Act if the country of his or her designation will not accept him or her into its territory, or fails to furnish timely notice of acceptance, or if the respondent declines to designate a country.

(2) If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be deported pursuant to paragraph (c)(1) of this section, and the alien has not previously filed an application for asylum or withholding of deportation that has been referred to the immigration judge by an asylum officer in accordance with §208.14(b) of this chapter, the immigration judge shall:

(i) Advise the alien that he or she may apply for asylum in the United States or withholding of deportation to those countries; and

(ii) Make available the appropriate application forms.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) An application for asylum or withholding of deportation must be filed with the Immigration Court, pursuant to §208.4(b) of this chapter. Upon receipt of an application that has not been referred by an asylum officer, the Immigration Court shall forward a copy to the Department of State pursuant to §208.11 of this chapter and shall calendar the case for a hearing. The reply, if any, of the Department of State, unless classified under the applicable Executive Order, shall be given to both the applicant and to the Service counsel representing the government.

(4) Applications for asylum or withholding of deportation so filed will be decided by the immigration judge pursuant to the requirements and standards established in 8 CFR part 208 after an evidentiary hearing that is necessary to resolve factual issues in dispute. An evidentiary hearing extending beyond issues related to the basis for a mandatory denial of the application pursuant to §208.13 or §208.16 of this chapter is not necessary once the immigration judge has determined that such a denial is required.

(i) Evidentiary hearings on applications for asylum or withholding of deportation will be open to the public unless the applicant expressly requests that it be closed.

(ii) Nothing in this section is intended to limit the authority of the immigration judge properly to control the scope of any evidentiary hearing.

(iii) During the deportation hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf. The applicant has the burden of establishing that he or she is a refugee as defined in section 101(a)(42) of the Act pursuant to the standard set forth in §208.13 of this chapter.

(iv) The Service counsel for the government may call witnesses and present evidence for the record, including information classified under the applicable Executive Order, provided the immigration judge or the Board has determined that such information is relevant to the hearing. When the immigration judge receives such classified information he or she shall inform the applicant. The agency that provides the classified information to the immigration judge may provide an unclassified summary of the information for release to the applicant, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its source. The summary should be as detailed as possible, in order that the applicant may have an opportunity to offer opposing evidence. A decision based in whole or in part on such classified information shall state whether such information is material to the decision.

(5) The decision of an immigration judge to grant or deny asylum or withholding of deportation shall be communicated to the applicant and to the Service counsel for the government. An adverse decision will state why asylum or withholding of deportation was denied.

(d) Application for relief under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act. The respondent may apply to the immigration judge for relief from deportation under sections 241(a)(1)(H) and 241(a)(1)(E)(iii) of the Act.

(e) General. An application under this section shall be made only during the hearing and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability. However, nothing in this section shall prohibit the Service from using information supplied in an application for asylum or withholding of deportation submitted to an asylum officer pursuant to §208.2 of this chapter on or after January 4, 1995, as the basis for issuance of an order to show cause or a notice to appear to establish alienage or deportability in a case referred to an immigration judge under §208.14(b) of this chapter. The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. The respondent shall not be required to pay a fee on more than one application within paragraphs (a) **10377** and (c) of this section, provided that the minimum fee imposed when more than one application is made shall be determined by the cost of the application with the highest fee. Nothing contained in this section is intended to foreclose the respondent from applying for any benefit or privilege which he or she believes himself or herself eligible to receive in proceedings under this part.

8 CFR § 240.50

**§240.50 Decision of the immigration judge.**

(a) Contents. The decision of the immigration judge may be oral or written. Except when deportability is determined on the pleadings pursuant to § 240.48(b), the decision of the immigration judge shall include a finding as to deportability. The formal enumeration of findings is not required. The decision shall also contain the reasons for granting or denying the request. The decision shall be concluded with the order of the immigration judge.

(b) Summary decision. Notwithstanding the provisions of paragraph (a) of this section, in any case where deportability is determined on the pleadings pursuant to §240.48(b) and the respondent does not make an application under § 240.49, or the respondent applies for voluntary departure only and the immigration judge grants the application, the immigration judge may enter a summary decision on Form EOIR-7, Summary Order of Deportation, if deportation is ordered, or on Form EOIR-6, Summary Order of Voluntary Departure, if voluntary departure is granted with an alternate order of deportation.

(c) Order of the immigration judge. The order of the immigration judge shall direct the respondent's deportation, or the termination of the proceedings, or such other disposition of the case as may be appropriate. When deportation is ordered, the immigration judge shall specify the country, or countries in the alternate, to which respondent's deportation shall be directed. The immigration judge is authorized to issue orders in the alternative or in combination as he or she may deem necessary.

8 CFR § 240.51

**§240.51 Notice of decision.**

(a) Written decision. A written decision shall be served upon the respondent and the Service counsel, together with the notice referred to in §3.3 of this chapter. Service by mail is complete upon mailing.

(b) Oral decision. An oral decision shall be stated by the immigration judge in the presence of the respondent and the trail attorney, if any, at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR-26, Notice of Appeal, and advised of the provisions of §240.53. A printed copy of the oral decision shall be furnished at the request of the respondent or the Service counsel.

(c) Summary decision. When the immigration judge renders a summary decision as provided in §240.51(b), he or she shall serve a copy thereof upon the respondent at the conclusion of the hearing. Unless appeal from the decision is waived, the respondent shall be furnished with Form EOIR-26, Notice of Appeal, and advised of the provisions of §240.54.

8 CFR § 240.52

**§240.52 Finality of order.**

The decision of the immigration judge shall become final in accordance with § 3.39 of this chapter.

8 CFR § 240.53

**§240.53 Appeals.**

(a) Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge to the Board, except that no appeal shall lie from an order of deportation entered in absentia. The procedures regarding the filing of a Form EOIR-26, Notice of Appeal, fees, and briefs are set forth in §§3.3, 3.31, and 3.38 of this chapter. An appeal shall be filed within 30 calendar days after the mailing of a written decision, the stating of an oral decision, or the service of a summary decision. The filing date is defined as the date of receipt of the Notice of Appeal by the Board. The reasons for the appeal shall be stated in the Form EOIR-26, Notice of Appeal, in accordance with the provisions of §3.3(b) of this chapter. Failure to do so may constitute a ground for dismissal of the appeal by the Board pursuant to §3.1(d)(1-a) of this chapter.

(b) Prohibited appeals; legalization or applications. An alien respondent defined in §245a.2(c)(6) or (7) of this chapter who fails to file an application for adjustment of status to that of a temporary resident within the prescribed period(s), and who is thereafter

found to be deportable by decision of an immigration judge, shall not be permitted to appeal the finding of deportability based solely on refusal by the immigration judge to entertain such an application in deportation proceedings.

8 CFR § 240.54

**§240.54 [Reserved]**

**Subpart F—Suspension of Deportation and Voluntary Departure (for proceedings commenced prior to April 1, 1997)**
8 CFR § 240.55

**§240.55 Proceedings commenced prior to April 1, 1997.**
Subpart F of 8 CFR part 240 applies to deportation proceedings commenced prior to April 1, 1997. A deportation proceeding is commenced by the filing of Form I-221 (Order to Show Cause) with the Immigration Court, and an alien is considered to be in deportation proceedings only upon such filing, except in the case of an alien admitted to the United States under the provisions of section 217 of the Act. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

8 CFR § 240.56

**§240.56 Application.**
Notwithstanding any other provision of this chapter, an alien who is deportable because of a conviction on or after November 18, 1988, for an aggravated felony as defined in section 101(a)(43) of the Act, shall not be eligible for voluntary departure as prescribed in 8 CFR part 240 and section 244 of the Act. Pursuant to subpart F of this part and section 244 of the Act, an immigration judge may authorize the suspension of an alien's deportation; or, if the alien establishes that he or she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorize the alien to depart voluntarily from the United States in lieu of deportation within such time as may be specified by the immigration judge when first authorizing voluntary departure, and under such conditions as the district director shall direct. An application for suspension of deportation shall be made on Form EOIR-40.

8 CFR § 240.57

**§240.57 Extension of time to depart.**
Authority to reinstate or extend the time within which to depart voluntarily specified initially by an immigration judge or the Board is within the sole jurisdiction of the district director, except that an immigration judge or the Board may reinstate voluntary departure in a deportation proceeding that has been reopened for a purpose other than solely making an application for voluntary departure. A request by an alien for reinstatement or an extension of time within which to depart voluntarily shall be filed with the district director having jurisdiction over the alien's place of residence. Written notice of the district director's decision **\*10378** shall be served upon the alien and no appeal may be taken therefrom.

**Subpart G—Civil Penalties for Failure to Depart [Reserved]**
105. Part 241 is revised to read as follows:

**PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED**

**Subpart A—Post-hearing Detention and Removal**

Sec.

241.1 Final order of removal.

241.2 Warrant of removal.

241.3 Detention of aliens during removal period.

241.4 Continued detention beyond the removal period.

241.5 Conditions of release after removal period.

241.6 Administrative stay of removal.

241.7 Self-removal.

241.8 Reinstatement of removal orders.

241.9 Notice to transportation line of alien's removal.

241.10 Special care and attention of removable aliens.

241.11 Detention and removal of stowaways.

241.12 Nonapplication of costs of detention and maintenance.

241.13—241.19 [Reserved]

**Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)**

241.20 Proceedings commenced prior to April 1, 1997.

241.21 Stay of deportation of excluded alien.

241.22 Notice to surrender for deportation.

241.23 Cost of maintenance not assessed.

241.24 Notice to transportation line of alien's exclusion.

241.25 Deportation.

241.26—241.29 [Reserved]

**Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997)**

241.30 Proceedings commenced prior to April 1, 1997.

241.31 Final order of deportation.

241.32 Warrant of deportation.

241.33 Expulsion.
Authority: 8 U.S.C. 1103, 1223, 1227, 1251, 1253, 1255, and 1330; 8 CFR part 2.


**Subpart A—Post-hearing Detention and Removal**
8 CFR § 241.1

**§241.1 Final order of removal.**
An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final:

(a) Upon dismissal of an appeal by the Board of Immigration Appeals;

(b) Upon waiver of appeal by the respondent;

(c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;

(d) If certified to the Board or Attorney General, upon the date of the subsequent decision ordering removal;

(e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or

(f) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period except where the respondent has filed a timely appeal with the Board. In such a case, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of any voluntary departure period granted or reinstated by the Board or the Attorney General.

 8 CFR § 241.2

## §241.2 Warrant of removal.

(a) Issuance of a warrant of removal. A Form I-205, Warrant of Removal, based upon the final administrative removal order in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 241 of the Act to determine at whose expense the alien shall be removed and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

(b) Execution of the warrant of removal. Any officer authorized by § 287.5(e) of this chapter to execute administrative warrants of arrest may execute a warrant of removal.

 8 CFR § 241.3

## §241.3 Detention of aliens during removal period.

(a) Assumption of custody. Once the removal period defined in section 241(a)(1) of the Act begins, an alien in the United States will be taken into custody pursuant to the warrant of removal.

(b) Cancellation of bond. Any bond previously posted will be canceled unless it has been breached or is subject to being breached.

(c) Judicial stays. The filing of (or intention to file) a petition or action in a Federal court seeking review of the issuance or execution of an order of removal shall not delay execution of the Warrant of Removal except upon an affirmative order of the court.

 8 CFR § 241.4

## §241.4 Continued detention beyond the removal period.

(a) Continuation of custody for inadmissible or criminal aliens. The district director may continue in custody any alien inadmissible under section 212(a) of the Act or removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal. The district may consider, but is not limited to considering, the following factors:

(1) The nature and seriousness of the alien's criminal convictions;

(2) Other criminal history;

(3) Sentence(s) imposed and time actually served;

(4) History of failures to appear for court (defaults);

(5) Probation history;

(6) Disciplinary problems while incarcerated;

(7) Evidence of rehabilitative effort or recidivism;

(8) Equities in the United States; and

(9) Prior immigration violations and history.

(b) Continuation of custody for other aliens. Any alien removable under any section of the Act other than section 212(a), 237(a)(1)(C), 237(a)(2), or 237(a)(4) may be detained beyond the removal period, in the discretion of the district director, unless the alien demonstrates to the satisfaction of the district director that he or she is likely to comply with the removal order and is not a risk to the community.

8 CFR § 241.5

**§241.5 Conditions of release after removal period.**

(a) Order of supervision. An alien released pursuant to §241.4 shall be released pursuant to an order of supervision. A district director, acting district director, deputy district director, assistant district director for investigations, assistant district director for detention and deportation, or officer in charge may issue an order of supervision on Form I-220B. The order shall specify conditions of supervision including, but not limited to, the following:

(1) A requirement that the alien report to a specified officer periodically and provide relevant information under oath as directed;

(2) A requirement that the alien continue efforts to obtain a travel document and assist the Service in obtaining a travel document; **\*10379**

(3) A requirement that the alien report as directed for a mental or physical examination or examinations as directed by the Service;

(4) A requirement that the alien obtain advance approval of travel beyond previously specified times and distances; and

(5) A requirement that the alien provide the Service with written notice of any change of address on Form AR-11 within ten days of the change.

(b) Posting of bond. An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the order, including surrender for removal.

(c) Employment authorization. An officer authorized to issue an order of supervision may, in his or her discretion, grant employment authorization to an alien released under an order of supervision if the officer specifically finds that:

(1) The alien cannot be removed because no country will accept the alien; or

(2) The removal of the alien is impracticable or contrary to public interest.

8 CFR § 241.6

**§241.6 Administrative stay of removal.**

8 CFR § 212.5

AR.00188

Any request of an alien under a final order of deportation or removal for a stay of deportation or removal shall be filed on Form I-246, Stay of Removal, with the district director having jurisdiction over the place where the alien is at the time of filing. The district director, in his or her discretion and in consideration of factors such as are listed in §212.5 of this chapter and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate. Neither the request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal. Denial by the district director of a request for a stay is not appealable, but such denial shall not preclude an immigration judge or the Board from granting a stay in connection with a motion to reopen or a motion to reconsider as provided in 8 CFR part 3. The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the Board. However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed.

8 CFR § 241.7

## §241.7 Self-removal.

A district director may permit an alien ordered removed (including an alien ordered excluded or deported in proceedings prior to April 1, 1997) to depart at his or her own expense to a destination of his or her own choice. Any alien who has departed from the United States while an order of deportation or removal is outstanding shall be considered to have been deported, excluded and deported, or removed, except that an alien who departed before the expiration of the voluntary departure period granted in connection with an alternate order of deportation or removal shall not be considered to have been so deported or removed.

8 CFR § 241.8

## §241.8 Reinstatement of removal orders.

(a) Applicability. An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:

(1) Whether the alien has been subject to a prior order of removal. The immigration officer must obtain the prior order of exclusion, deportation, or removal relating to the alien.

(2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who departed voluntarily while under an order of exclusion, deportation, or removal. In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints between those of the previously excluded, deported, or removed alien contained in Service records and those of the subject alien. In the absence of fingerprints in a disputed case the alien shall not be removed pursuant to this paragraph.

(3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

(b) Notice. If an officer determines that an alien is subject to removal under this section, he or she shall provide the alien with written notice of his or her determination. The officer shall advise the alien that he or she may make a written or oral statement contesting the determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination.

(c) Order. If the requirements of paragraph (a) of this section are met, the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with section 241(a)(5) of the Act.

(d) Exception for withholding of removal. If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer to determine whether the alien's removal to that country must be withheld under section 241(b)(3) of the Act. The alien's claim will be granted or denied by an asylum officer in accordance with §208.16 of this chapter. If the alien has previously had a claim to withholding of deportation or removal denied, then that decision shall prevail unless the alien can establish the existence of changed circumstances that materially affect the alien's eligibility for withholding. The alien's case shall not be referred to an immigration judge, and there is no appeal from the decision of the asylum officer. If the alien is found to merit withholding of removal, the Service shall not enforce the reinstated order.

(e) Execution of reinstated order. Execution of the reinstated order of removal and detention of the alien shall be administered in accordance with this part.

 8 CFR § 241.9

### §241.9 Notice to transportation line of alien's removal.

(a) An alien who has been ordered removed shall, immediately or as promptly as the circumstances permit, be offered for removal to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien is to be removed, as determined by the district director, with a written notice specifying the cause of inadmissibility or deportability, the class of travel in which such alien arrived and is to be removed, and with the return of any documentation that will assist in effecting his or her removal. If special care and attention are required, the provisions of §241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered removed shall result in the carrier being assessed any costs incurred by the **\*10380**  Service for detention after the carrier's failure to accept the alien for removal, including the cost of any transportation as required under section 241(e) of the Act. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 241 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the alien for an additional 7 days beyond the date of the removal order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

 8 CFR § 241.10

### §241.10 Special care and attention of removable aliens.

When, in accordance with section 241(c)(3) of the Act, a transportation line is responsible for the expenses of an inadmissible or deportable alien's removal, and the alien requires special care and attention, the alien shall be delivered to the owner, agent, master, commanding officer, person in charge, purser, or consignee of the vessel or aircraft on which the alien will be removed, who shall be given Forms I-287, I-287A, and I-287B. The reverse of Form I-287A shall be signed by the officer of the vessel or aircraft to whom the alien has been delivered and immediately returned to the immigration officer effecting delivery. Form I-287B shall be retained by the receiving officer and subsequently filled out by the agents or persons therein designated and returned by mail to the district director named on the form. The transportation line shall at its own expense forward the alien from the foreign port of disembarkation to the final destination specified on Form I-287. The special care and attention shall be continued to such final destination, except when the foreign public officers decline to allow such attendant to proceed and they take charge of the alien, in which case this fact shall be recorded by the transportation line on the reverse of Form I-287B. If the transportation line fails, refuses, or neglects to provide the necessary special care and attention or comply with the directions of Form I-287, the district director shall thereafter and without notice employ suitable persons, at the expense of the transportation line, and effect such removal.

 8 CFR § 241.11

### §241.11 Detention and removal of stowaways.

(a) Presentation of stowaways. The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft (referred to in this section as the carrier) bringing any alien stowaway to the United States is required to detain the stowaway on board the vessel or aircraft, at the expense of the owner of the vessel or aircraft, until completion of the inspection of the alien

by an immigration officer. If detention on board the vessel or aircraft pending inspection is not possible, the carrier shall advise the Service of this fact without delay, and the Service may authorize that the carrier detain the stowaway at another designated location, at the expense of the owner, until the immigration officer arrives. No notice to detain the alien shall be required. Failure to detain an alien stowaway pending inspection shall result in a civil penalty under section 243(c)(1)(A) of the Act. The owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft must present the stowaway for inspection, along with any documents or evidence of identity or nationality in the possession of the alien or obtained by the carrier relating to the alien stowaway, and must provide any available information concerning the alien's boarding or apprehension.

(b) Removal of stowaways from vessel or aircraft for medical treatment. The district director may parole an alien stowaway into the United States for medical treatment, but the costs of detention and treatment of the alien stowaway shall be at the expense of the owner of the vessel or aircraft, and such removal of the stowaway from the vessel or aircraft does not relieve the carrier of the requirement to remove the stowaway from the United States once such medical treatment has been completed.

(c) Repatriation of stowaways—(1) Requirements of carrier. Following inspection, an immigration officer may order the owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft bringing any alien stowaway to the United States to remove the stowaway on the vessel or aircraft of arrival, unless it is impracticable to do so or other factors exist which would preclude removal on the same vessel or aircraft. Such factors may include, but are not limited to, sanitation, health, and safety concerns for the crew and/or stowaway, whether the stowaway is a female or a juvenile, loss of insurance coverage on account of the stowaway remaining aboard, need for repairs to the vessel, and other similar circumstances. If the owner, agent, master, commanding officer, charterer, or consignee requests that he or she be allowed to remove the stowaway by other means, the Service shall favorably consider any such request, provided the carrier has obtained, or will obtain in a timely manner, any necessary travel documents and has made or will make all transportation arrangements. The owner, agent, master, commanding officer, charterer, or consignee shall transport the stowaway or arrange for secure escort of the stowaway to the vessel or aircraft of departure to ensure that the stowaway departs the United States. All expenses relating to removal shall be borne by the owner. Other than requiring compliance with the detention and removal requirements contained in section 241(d)(2) of the Act, the Service shall not impose additional conditions on the carrier regarding security arrangements. Failure to comply with an order to remove an alien stowaway shall result in a civil penalty under section 243(c)(1)(A) of the Act.

(2) Detention of stowaways ordered removed. If detention of the stowaway is required pending removal on other than the vessel or aircraft of arrival, or if the stowaway is to be removed on the vessel or aircraft of arrival but departure of the vessel or aircraft is not imminent and circumstances preclude keeping the stowaway on board the vessel or aircraft, the Service shall take the stowaway into Service custody. The owner is responsible for all costs of maintaining and detaining the stowaway pending removal, including costs for stowaways seeking asylum as described in paragraph (d) of this section. Such costs will be limited to those normally incurred in the detention of an alien by the Service, including, but not limited to, housing, food, transportation, medical expenses, and other reasonable costs incident to the detention of the stowaway. The Service may require the posting of a bond or other surety to ensure payment of costs of detention.

(d) Stowaways claiming asylum—(1) Referral for credible fear determination. A stowaway who indicates an intention to apply for asylum or a fear of persecution shall be removed from the vessel or aircraft of arrival in accordance with §208.5(b) of this chapter. The immigration officer shall refer the alien to an asylum officer for a determination of credible fear in accordance with section 235(b)(1)(B) of the Act and §208.30 of this chapter. The stowaway shall be detained in the custody of the Service pending the credible fear **10381 determination and any review thereof. Parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. A stowaway who has established a credible fear of persecution in accordance with §208.30 of this chapter may be detained or paroled pursuant to §212.5 of this chapter during any consideration of the asylum application. In determining whether to detain or parole the alien, the Service shall consider the likelihood that the alien will abscond or pose a security risk.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) Costs of detention of asylum-seeking stowaways. The owner of the vessel or aircraft that brought the stowaway to the United States shall reimburse the Service for the costs of maintaining and detaining the stowaway pending a determination of credible fear under section 235(b)(1)(B) of the Act, up to a maximum period of 72 hours. The owner is also responsible for the costs of maintaining and detaining the stowaway during the period in which the stowaway is pursuing his or her asylum application, for a maximum period of 15 working days, excluding Saturdays, Sundays, and holidays. The 15-day period shall begin on the day following the day in which the alien is determined to have a credible fear of persecution by the asylum officer, or by the immigration judge if such review was requested by the alien pursuant to section 235(b)(1)(B)(iii)(III) of the Act, but not later than 72 hours after the stowaway was initially presented to the Service for inspection. Following the determination of credible fear, if the stowaway's application for asylum is not adjudicated within 15 working days, the Service shall pay the costs of detention beyond this time period. If the stowaway is determined not to have a credible fear of persecution, or if the stowaway's application for asylum is denied, including any appeals, the carrier shall be notified and shall arrange for repatriation of the stowaway at the expense of the owner of the vessel or aircraft on which the stowaway arrived.

 8 CFR § 241.12

**§241.12 Nonapplication of costs of detention and maintenance.**
The owner of a vessel or aircraft bringing an alien to the United States who claims to be exempt from payment of the costs of detention and maintenance of the alien pursuant to section 241(c)(3)(B) of the Act shall establish to the satisfaction of the district director in charge of the port of arrival that such costs should not be applied. The district director shall afford the owner a reasonable time within which to submit affidavits and briefs to support the claim. There is no appeal from the decision of the district director.

 8 CFR § 241.13

**§§241.13—241.19 [Reserved]**

**Subpart B—Deportation of Excluded Aliens (for hearings commenced prior to April 1, 1997)**
8 CFR § 241.20

**§241.20 Proceedings commenced prior to April 1, 1997.**
Subpart B of 8 CFR part 241 applies to exclusion proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

 8 CFR § 241.21

**§241.21 Stay of deportation of excluded alien.**
The district director in charge of the port of arrival may stay the immediate deportation of an excluded alien pursuant to sections 237 (a) and (d) of the Act under such conditions as he or she may prescribe.

 8 CFR § 241.22

**§241.22 Notice to surrender for deportation.**
An alien who has been finally excluded pursuant to 8 CFR part 240, subpart D may at any time surrender himself or herself to the custody of the Service and shall surrender to such custody upon notice in writing of the time and place for his or her surrender. The Service may take the alien into custody at any time. An alien taken into custody either upon notice to surrender or by arrest shall not be deported less than 72 hours thereafter without his or her consent thereto filed in writing with the district director in charge of the place of his or her detention. An alien in foreign contiguous territory shall be informed that he or she may remain there in lieu of surrendering to the Service, but that he or she will be deemed to have acknowledged the execution of the order of exclusion and deportation in his or her case upon his or her failure to surrender at the time and place prescribed.

 8 CFR § 241.23

**§241.23 Cost of maintenance not assessed.**
A claim pursuant to section 237(a)(1) of the Act shall be established to the satisfaction of the district director in charge of the port of arrival, from whose adverse decision no appeal shall lie. The district director shall afford the line a reasonable time within which to submit affidavits and briefs to support its claim.

8 CFR § 241.24

**§241.24 Notice to transportation line of alien's exclusion.**

(a) An excluded alien shall, immediately or as promptly as the circumstances permit, be offered for deportation to the master, commanding officer, purser, person in charge, agent, owner, or consignee of the vessel or aircraft on which the alien is to be deported, as determined by the district director, with a written notice specifying the cause of exclusion, the class of travel in which such alien arrived and is to be deported, and with the return of any documentation that will assist in effecting his or her deportation. If special care and attention are required, the provisions of §241.10 shall apply.

(b) Failure of the carrier to accept for removal an alien who has been ordered excluded and deported shall result in the carrier being assessed any costs incurred by the Service for detention after the carrier's failure to accept the alien for removal including the cost of any transportation. The User Fee Account shall not be assessed for expenses incurred because of the carrier's violation of the provisions of section 237 of the Act and this paragraph. The Service will, at the carrier's option, retain custody of the excluded alien for an additional 7 days beyond the date of the deportation/exclusion order. If, after the third day of this additional 7-day period, the carrier has not made all the necessary transportation arrangements for the excluded alien to be returned to his or her point of embarkation by the end of the additional 7-day period, the Service will make the arrangements and bill the carrier for its costs.

8 CFR § 241.25

**§241.25 Deportation.**

(a) Definitions of terms. For the purposes of this section, the following terms mean:

(1) Adjacent island—as defined in section 101(b)(5) of the Act.

(2) Foreign contiguous territory—any country sharing a common boundary with the United States.

(3) Residence in foreign contiguous territory or adjacent island—any physical presence, regardless of intent, in a foreign contiguous territory or an adjacent island if the government of such territory or island agrees to accept the alien.

(4) Aircraft or vessel—any conveyance and other mode of travel by which arrival is effected.

(5) Next available flight—the carrier's next regularly scheduled departure to **\*10382** the excluded alien's point of embarkation regardless of seat availability. If the carrier's next regularly scheduled departure to the excluded aliens point of embarkation is full, the carrier has the option of arranging for return transportation on other carriers which service the excluded aliens point of embarkation.

(b) Place to which deported. Any alien (other than an alien crewmember or an alien who boarded an aircraft or vessel in foreign contiguous territory or an adjacent island) who is ordered excluded shall be deported to the country where the alien boarded the vessel or aircraft on which the alien arrived in the United States. If that country refuses to accept the alien, the alien shall be deported to:

(1) The country of which the alien is a subject, citizen, or national;

(2) The country where the alien was born;

(3) The country where the alien has a residence; or

(4) Any country willing to accept the alien.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(c) Contiguous territory and adjacent islands. Any alien ordered excluded who boarded an aircraft or vessel in foreign contiguous territory or in any adjacent island shall be deported to such foreign contiguous territory or adjacent island if the alien is a native, citizen, subject, or national of such foreign contiguous territory or adjacent island, or if the alien has a residence in such foreign contiguous territory or adjacent island. Otherwise, the alien shall be deported, in the first instance, to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island.

(d) Land border pedestrian arrivals. Any alien ordered excluded who arrived at a land border on foot shall be deported in the same manner as if the alien had boarded a vessel or aircraft in foreign contiguous territory.

8 CFR § 241.26-241.29

**§§241.26-241.29 [Reserved]**

**Subpart C—Deportation of Aliens in the United States (for hearings commenced prior to April 1, 1997)**
8 CFR § 241.30

**§241.30 Proceedings commenced prior to April 1, 1997.**
Subpart C of 8 CFR part 241 applies to deportation proceedings commenced prior to April 1, 1997. All references to the Act contained in this subpart are references to the Act in effect prior to April 1, 1997.

8 CFR § 241.31

**§241.31 Final order of deportation.**
Except as otherwise required by section 242(c) of the Act for the specific purposes of that section, an order of deportation, including an alternate order of deportation coupled with an order of voluntary departure, made by the immigration judge in proceedings under 8 CFR part 240 shall become final upon dismissal of an appeal by the Board of Immigration Appeals, upon waiver of appeal, or upon expiration of the time allotted for an appeal when no appeal is taken; or, if such an order is issued by the Board or approved by the Board upon certification, it shall be final as of the date of the Board's decision.

8 CFR § 241.32

**§241.32 Warrant of deportation.**
A Form I-205, Warrant of Deportation, based upon the final administrative order of deportation in the alien's case shall be issued by a district director. The district director shall exercise the authority contained in section 243 of the Act to determine at whose expense the alien shall be deported and whether his or her mental or physical condition requires personal care and attention en route to his or her destination.

8 CFR § 241.33

**§241.33 Expulsion.**
(a) Execution of order. Except in the exercise of discretion by the district director, and for such reasons as are set forth in §212.5(a) of this chapter, once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed. For the purposes of this part, an order of deportation is final and subject to execution upon the date when any of the following occurs:

(1) A grant of voluntary departure expires;

(2) An immigration judge enters an order of deportation without granting voluntary departure or other relief, and the alien respondent waives his or her right to appeal;

(3) The Board of Immigration Appeals enters an order of deportation on appeal, without granting voluntary departure or other relief; or

(4) A Federal district or appellate court affirms an administrative order of deportation in a petition for review or habeas corpus action.

(b) Service of decision. In the case of an order entered by any of the authorities enumerated above, the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody, provided that such period may be waived on the knowing and voluntary request of the alien. Nothing in this paragraph shall be construed, however, to preclude assumption of custody by the Service at the time of issuance of the final order.

## PART 242—[REMOVED AND RESERVED]

106. Part 242 is removed and reserved.

## PART 243—[REMOVED AND RESERVED]

107. Part 243 is removed and reserved.

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

108. The heading for part 244 is revised as set forth above.

109. The authority citation for part 244 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

 8 CFR § 244.1 8 CFR § 244.2

**§§244.1 and 244.2 [Removed]**

8 CFR § 244.1 8 CFR § 244.2

110. Sections 244.1 and 244.2 are removed.

**§§244.3 through 244.22 [Redesignated as §§244.1 through 244.20]**

111. Newly designated §§244.3 through 244.22 are further redesignated as §§ 244.1 through 244.20, respectively.

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

112. The authority citation for part 245 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1255; 8 CFR part 2.

 8 CFR § 245.1

113. Section 245.1 is amended by:

a. Removing the word "and" at the end of the paragraph (c)(3);

b. Removing the "." at the end of paragraphs (c)(4) through (c)(7), and replacing it with a ";";

c. Redesignating paragraph (c)(8) as paragraph (c)(9);

d. Adding a new paragraph (c)(8);

e. Revising newly redesignated paragraph (c)(9) introductory text;

f. Revising newly redesignated paragraphs (c)(9)(i) through (c)(9)(iii); and by

g. Revising paragraph (f), to read as follows:

8 CFR § 245.1

**§245.1 Eligibility.**

* * * * *

(c) * * *

(8) Any arriving alien who is in removal proceedings pursuant to section 235(b)(1) or section 240 of the Act; and

(9) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto.

(i) Commencement of proceedings. The period during which the alien is in **\*10383** deportation, exclusion, or removal proceedings or judicial proceedings relating thereto, commences:

(A) With the issuance of the Form I-221, Order to Show Cause and Notice of Hearing prior to June 20, 1991;

(B) With the filing of a Form I-221, Order to Show Cause and Notice of Hearing, issued on or after June 20, 1991, with the Immigration Court;

(C) With the issuance of Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge, prior to April 1, 1997,

(D) With the filing of a Form I-862, Notice to Appear, with the Immigration Court, or

(E) With the issuance and service of Form I-860, Notice and Order of Expedited Removal.

(ii) Termination of proceedings. The period during which the alien is in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto, terminates:

(A) When the alien departs from the United States while an order of exclusion, deportation, or removal is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation or removal;

(B) When the alien is found not to be inadmissible or deportable from the United States;

(C) When the Form I-122, I-221, I-860, or I-862 is canceled;

(D) When proceedings are terminated by the immigration judge or the Board of Immigration Appeals; or

(E) When a petition for review or an action for habeas corpus is granted by a Federal court on judicial review.

(iii) Exemptions. This prohibition shall no longer apply if:

(A) The alien is found not to be inadmissible or deportable from the United States;

(B) Form I-122, I-221, I-860, or I-862, is canceled;

(C) Proceedings are terminated by the immigration judge or the Board of Immigration Appeals;

(D) A petition for review or an action for habeas corpus is granted by a Federal court on judicial review;

(E) The alien has resided outside the United States for 2 or more years following the marriage; or

(F) The alien establishes the marriage is bona fide by providing clear and convincing evidence that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place, was not entered into for the purpose of procuring the alien's entry as an immigrant, and no fee or other consideration was given (other than to an attorney for assistance in preparation of a lawful petition) for the filing of a petition.

 * * * * *

(f) Concurrent applications to overcome grounds of inadmissibility. Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States. No fee is required for filing an application to overcome the grounds of inadmissibility of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.

 * * * * *8 CFR § 245.2

114. Section 245.2 is amended by:

a. Revising paragraph (a)(1);

b. Revising paragraph (a)(4)(ii);

c. Revising paragraph (a)(5)(ii) and (iii); and by

d. Revising paragraph (c), to read as follows:
 8 CFR § 245.2

## §245.2 Application.

(a) * * * (1) Jurisdiction. An alien who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and §245.1 shall apply to the director having jurisdiction over his or her place of residence unless otherwise instructed in 8 CFR part 245, or by the instruction on the application form. After an alien, other than an arriving alien, is in deportation or removal proceedings, his or her application for adjustment of status under section 245 of the Act or section 1 of the Act of November 2, 1966 shall be made and considered only in those proceedings. An arriving alien, other than an alien in removal proceedings, who believes he or she meets the eligibility requirements of section 245 of the Act or section 1 of the Act of November 2, 1966, and §245.1 shall apply to the director having jurisdiction over his or her place of arrival. An adjustment application by an alien paroled under section 212(d)(5) of the Act, which has been denied by the director, may be renewed in removal proceedings under 8 CFR part 240 only if:

(i) The denied application must have been properly filed subsequent to the applicant's earlier inspection and admission to the United States; and

(ii) The applicant's later absence from and return to the United States was under the terms of an advance parole authorization on Form I-512 granted to permit the applicant's absence and return to pursue the previously filed adjustment application.
 * * * * *

(4) * * *

(ii) Under section 245 of the Act. The departure from the United States of an applicant who is under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the application constituting grounds for termination of the proceeding by reason of the departure. The departure of an applicant who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of his or her application constituting grounds for termination, unless the applicant was previously granted advance parole by the Service for such absence, and was inspected upon returning to the United States. If the application

of an individual granted advance parole is subsequently denied, the applicant will be treated as an applicant for admission, and subject to the provisions of sections 212 and 235 of the Act.

\* \* \* \* \*

(5) \* \* \*

(ii) Under section 245 of the Act. If the application is approved, the applicant's permanent residence shall be recorded as of the date of the order approving the adjustment of status. An application for adjustment of status, as a preference alien, shall not be approved until an immigrant visa number has been allocated by the Department of State, except when the applicant has established eligibility for the benefits of Public Law 101-238. No appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in §245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility. At the time of renewal of the application, an applicant does not need to meet the statutory requirement of section 245(c) of the Act, or §245.1(g), if, in fact, those requirements were met at the time the renewed application was initially filed with the director. Nothing in this section shall entitle an alien to proceedings under section 240 of the Act who is not otherwise so entitled.

(iii) Under the Act of November 2, 1966. If the application is approved, the applicant's permanent residence shall be recorded in accordance with the provisions of section 1. No appeal lies from the denial of an application by the director, but the applicant, if not an **\*10384** arriving alien, retains the right to renew his or her application in proceedings under 8 CFR part 240. Also, an applicant who is a parolee and meets the two conditions described in § 245.2(a)(1) may renew a denied application in proceedings under 8 CFR part 240 to determine admissibility.

\* \* \* \* \*

(c) Application under section 214(d) of the Act. An application for permanent resident status pursuant to section 214(d) of the Act shall be filed on Form I-485 with the director having jurisdiction over the applicant's place of residence. A separate application shall be filed by each applicant. If the application is approved, the director shall record the lawful admission of the applicant as of the date of approval. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. No appeal shall lie from the denial of an application by the director but such denial shall be without prejudice to the alien's right to renew his or her application in proceedings under 8 CFR part 240.

8 CFR § 245.5

115. Section 245.5 is amended by revising the first sentence to read as follows:

8 CFR § 245.5

## §245.5 Medical examination.

Pursuant to section 232(b) of the Act, an applicant for adjustment of status shall be required to have a medical examination by a designated civil surgeon, whose report setting forth the findings of the mental and physical condition of the applicant, including compliance with section 212(a)(1)(A)(ii) of the Act, shall be incorporated into the record. \* \* \*

8 CFR § 245.8

116. Section 245.8 is amended by revising paragraph (e), to read as follows:

8 CFR § 245.8

## §245.8 Adjustment of status as a special immigrant under section 101(a)(27)(K) of the Act.

\* \* \* \* \*

(e) Removal provisions of section 237 of the Act. If the Service is made aware by notification from the appropriate executive department or by any other means that a section 101(a)(27)(K) special immigrant who has already been granted permanent residence fails to complete his or her total active duty service obligation for reasons other than an honorable discharge, the alien may become subject to the removal provisions of section 237 of the Act, provided the alien is in one or more of the classes of deportable aliens specified in section 237 of the Act. The Service shall obtain a current Form DD-214, Certificate of Release or Discharge from Active Duty, from the appropriate executive department for verification of the alien's failure to maintain eligibility.

\* \* \* \* \*8 CFR § 245.9

AR.00198

117. Section 245.9 is amended by revising paragraphs (d) and (m), to read as follows:

 8 CFR § 245.9

**§245.9** **Adjustment of Status of Certain Nationals of the People's Republic of China under Public Law 102-404.**

\* \* \* \* \*

(d) Waivers of inadmissibility under section 212(a) of the Act. An applicant for the benefits of the adjustment of status provisions of Pub. L. 102-404 is automatically exempted from compliance with the requirements of sections 212(a)(5) and 212(a)(7)(A) of the Act. A Pub. L. 102-404 applicant may also apply for one or more waivers of inadmissibility under section 212(a) of the Act, except for inadmissibility under section 212(a)(2)(C), 212(a)(3)(A), 212(a)(3)(B), 212(a)(3)(C) or 212(a)(3)(E) of the Act.

 \* \* \* \* \*

(m) Effect of enactment on family members other than qualified family members. The adjustment of status benefits and waivers provided by Pub. L. 102-404 do not apply to a spouse or child who is not a qualified family member as defined in paragraph (c) of this section. However, a spouse or child whose relationship to the principal alien was established prior to the approval of the principal's adjustment of status application may be accorded the derivative priority date and preference category of the principal alien, in accordance with the provisions of section 203(d) of the Act. The spouse or child may use the priority date and category when it becomes current, in accordance with the limitations set forth in sections 201 and 202 of the Act. Persons who are unable to maintain lawful nonimmigrant status in the United States and are not immediately eligible to apply for adjustment of status may request voluntary departure pursuant to 8 CFR part 240.

 8 CFR § 245.10

118. Section 245.10 is amended by:

a. Revising paragraphs (a) (3) and (6); and by

b. Revising introductory text in paragraph (b), to read as follows:

 8 CFR § 245.10

**§245.10** **Adjustment of status upon payment of additional sum under Public Law 103-317.**

(a) \* \* \*

(3) Is not inadmissible from the United States under any provision of section 212 of the Act, or all grounds for inadmissibility have been waived;

 \* \* \* \* \*

(6) Remits the sum specified in section 245(i) of the Act, unless payment of the sum is waived under section 245(i) of the Act; and

 \* \* \* \* \*

(b) Payment of additional sum. An applicant filing under the provisions of section 245(i) of the Act must pay the standard adjustment of status filing fee, as shown on Form I-485 and contained in §103.7(b)(1) of this chapter. The applicant must also pay the additional sum specified in section 245(i) of the Act, unless at the time the application for adjustment of status is filed, the alien is:

 \* \* \* \* \*8 CFR § 245.11

119. Section 245.11 is amended by:

a. Revising paragraph (a)(4)(ii)(B);

b. Revising paragraph (b)(1)(iii);

c. Revising the introductory text in paragraph (c); and by

d. Revising paragraphs (h) and (i), to read as follows:

 8 CFR § 245.11

**§245.11 Adjustment of aliens in S nonimmigrant classification.**

(a) * * *

(4) * * *

(ii) * * *

(B) Be admissible to the United States as an immigrant, unless the ground of inadmissibility has been waived;

* * * * *

(b) * * *

(1) * * *

(iii) The family member is not inadmissible from the United States as a participant in Nazi persecution or genocide as described in section 212(a)(3)(E) of the Act;

* * * * *

(c) Waivers of inadmissibility. An alien seeking to adjust status pursuant to the provisions of section 101(a)(15)(S) of the Act may not be denied adjustment of status for conduct or a condition that:

* * * * *

(h) Removal under section 237 of the Act. Nothing in this section shall prevent an alien adjusted pursuant to the terms of these provisions from being removed for conviction of a crime of moral turpitude committed within 10 years after being provided lawful permanent residence under this section or for any other ground under section 237 of the Act.

(i) Denial of application. In the event the district director decides to deny an application on Form I-485 and an approved Form I-854 to allow an S nonimmigrant to adjust status, the Assistant Attorney General, Criminal Division, and the relevant LEA shall be notified in writing to that effect. The Assistant Attorney General, Criminal Division, shall concur in or object to **\*10385** that decision. Unless the Assistant Attorney General, Criminal Division, objects within 7 days, he or she shall be deemed to have concurred in the decision. In the event of an objection by the Assistant Attorney General, Criminal Division, the matter will be expeditiously referred to the Deputy Attorney General for a final resolution. In no circumstances shall the alien or the relevant LEA have a right of appeal from any decision to deny. A denial of an adjustment application under this paragraph may not be renewed in subsequent removal proceedings.

120. Part 246 is revised to read as follows:

**PART 246—RESCISSION OF ADJUSTMENT OF STATUS**

Sec.

246.1 Notice.

246.2 Allegations admitted; no answer filed; no hearing requested.

246.3 Allegations contested or denied; hearing requested.

8 CFR § 246.4

246.4 Immigration judge's authority; withdrawal and substitution.

246.5 Hearing.

246.6 Decision and order.

246.7 Appeals.

8 CFR § 246.8

246.8 [Reserved]

246.9 Surrender of Form I-551.

Authority: Authority: 8 U.S.C. 1103, 1254, 1255, 1256, 1259; 8 CFR part 2.

8 CFR § 246.1

## §246.1 Notice.

If it appears to a district director that a person residing in his or her district was not in fact eligible for the adjustment of status made in his or her case, a proceeding shall be commenced by the personal service upon such person of a notice of intent to rescind which shall inform him or her of the allegations upon which it is intended to rescind the adjustment of his or her status. In such a proceeding the person shall be known as the respondent. The notice shall also inform the respondent that he or she may submit, within thirty days from the date of service of the notice, an answer in writing under oath setting forth reasons why such rescission shall not be made, and that he or she may, within such period, request a hearing before an immigration judge in support of, or in lieu of, his or her written answer. The respondent shall further be informed that he or she may have the assistance of or be represented by counsel or representative of his or her choice qualified under part 292 of this chapter, at no expense to the Government, in the preparation of his or her answer or in connection with his or her hearing, and that he or she may present such evidence in his or her behalf as may be relevant to the rescission.

8 CFR § 246.2

## §246.2 Allegations admitted; no answer filed; no hearing requested.

If the answer admits the allegations in the notice, or if no answer is filed within the thirty-day period, or if no hearing is requested within such period, the district director shall rescind the adjustment of status previously granted, and no appeal shall lie from his decision.

8 CFR § 246.3

## §246.3 Allegations contested or denied; hearing requested.

If, within the prescribed time following service of the notice pursuant to § 246.1, the respondent has filed an answer which contests or denies any allegation in the notice, or a hearing is requested, a hearing pursuant to § 246.5 shall be conducted by an immigration judge, and the requirements contained in §§240.3, 240.4, 240.5, 240.6, 240.7, and 240.9 of this chapter shall be followed.

8 CFR § 246.4

## §246.4 Immigration judge's authority; withdrawal and substitution.

8 CFR § 246.1 8 CFR § 246.2

In any proceeding conducted under this part, the immigration judge shall have authority to interrogate, examine, and cross-examine the respondent and other witnesses, to present and receive evidence, to determine whether adjustment of status shall be rescinded, to make decisions thereon, including an appropriate order, and to take any other action consistent with applicable provisions of law and regulations as may be appropriate to the disposition of the case. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges by the Act. The immigration judge assigned to conduct a hearing shall, at any time, withdraw if he or she deems himself or herself disqualified. If a hearing has begun but no evidence has been adduced other than the notice and answer, if any, pursuant to §§246.1 and 246.2, or if an immigration judge becomes unavailable to complete his or her duties within a reasonable time, or if at any time the respondent consents to a substitution, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she is familiar with the record in the case.

8 CFR § 246.5

## §246.5 Hearing.

(a) Service counsel. The Government shall be represented at the hearing by a Service counsel who shall have authority to present evidence, and to interrogate, examine, and cross-examine the respondent and other witnesses. The Service counsel is authorized to appeal from a decision of the immigration judge pursuant to §246.7 and to move for reopening or reconsideration pursuant to §3.23 of this chapter.

(b) Opening. The immigration judge shall advise the respondent of the nature of the proceeding and the legal authority under which it is conducted; advise the respondent of his or her right to representation, at no expense to the Government, by counsel or representative of his or her own choice qualified under part 292 of this chapter and require him or her to state then and there whether he or she desires representation; advise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf, and to cross-examine witnesses presented by the Government; place the respondent under oath; read the allegations in the notice to the respondent and explain them in nontechnical language, and enter the notice and respondent's answer, if any, as exhibits in the record.

(c) Pleading by respondent. The immigration judge shall require the respondent to state for the record whether he or she admits or denies the allegations contained in the notice, or any of them, and whether he or she concedes that his or her adjustment of status should be rescinded. If the respondent admits all of the allegations and concedes that the adjustment of status in his or her case should be rescinded under the allegations set forth in the notice, and the immigration judge is satisfied that no issues of law or fact remain, he or she may determine that rescission as alleged has been established by the respondent's admissions. The allegations contained in the notice shall be taken as admitted when the respondent, without reasonable cause, fails or refuses to attend or remain in attendance at the hearing.

 8 CFR § 246.6

### §246.6 Decision and order.

The decision of the immigration judge may be oral or written. The formal enumeration of findings is not required. The order shall direct either that the proceeding be terminated or that the adjustment of status be rescinded. Service of the decision and finality of the order of the immigration judge shall be in accordance with, and as stated in §§240.13 (a) and (b) and 240.14 of this chapter.  **\*10386**

 8 CFR § 246.7

### §246.7 Appeals.

Pursuant to 8 CFR part 3, an appeal shall lie from a decision of an immigration judge under this part to the Board of Immigration Appeals. An appeal shall be taken within 30 days after the mailing of a written decision or the stating of an oral decision. The reasons for the appeal shall be specifically identified in the Notice of Appeal (Form EOIR 26); failure to do so may constitute a ground for dismissal of the appeal by the Board.

 8 CFR § 246.8

### §246.8 [Reserved]

8 CFR § 246.9

### §246.9 Surrender of Form I-551.

A respondent whose status as a permanent resident has been rescinded in accordance with section 246 of the Act and this part, shall, upon demand, promptly surrender to the district director having administrative jurisdiction over the office in which the action under this part was taken, the Form I-551 issued to him or her at the time of the grant of permanent resident status.


## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

121. The authority citation for part 248 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1184, 1187, 1258; 8 CFR part 2.

 8 CFR § 248.1

122. Section 248.1 is amended by revising paragraph (b)(4) to read as follows:

8 CFR § 248.1

**§248.1** **Eligibility.**

* * * * *

(b) * * *

(4) The alien is not the subject of removal proceedings under 8 CFR part 240.

* * * * *

## PART 249—CREATION OF RECORDS OF LAWFUL ADMISSION FOR PERMANENT RESIDENCE

123. The authority citation for part 249 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1259; 8 CFR part 2.

8 CFR § 249.2

124. Section 249.2 is amended by revising the first sentence in paragraph (a) and by revising paragraph (b), to read as follows:

8 CFR § 249.2

**§249.2** **Application.**

(a) Jurisdiction. An application by an alien, other than an arriving alien, who has been served with a notice to appear or warrant of arrest shall be considered only in proceedings under 8 CFR part 240. * * *

(b) Decision. The applicant shall be notified of the decision and, if the application is denied, of the reasons therefor. If the application is granted, a Form I-551, showing that the applicant has acquired the status of an alien lawfully admitted for permanent residence, shall not be issued until the applicant surrenders any other document in his or her possession evidencing compliance with the alien registration requirements of former or existing law. No appeal shall lie from the denial of an application by the district director. However, an alien, other than an arriving alien, may renew the denied application in proceedings under 8 CFR part 240.

## PART 251—ARRIVAL MANIFESTS AND LISTS: SUPPORTING DOCUMENTS

125. The authority citation for part 251 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1221, 1281, 1282, 8 CFR part 2.

8 CFR § 251.1

126. Section 251.1 is revised to read as follows:

8 CFR § 251.1

**§251.1** **Arrival manifests and lists.**

(a) Vessels—(1) General. The master or agent of every vessel arriving in the United States from a foreign place or an outlying possession of the United States shall present to the immigration officer at the port where the immigration inspection is performed a manifest of all crewmen on board on Form I-418, Passenger List and Crew List, in accordance with the instructions contained thereon.

(2) Longshore work notations. The master or agent of the vessel shall indicate in writing immediately below the name of the last alien listed on the Form I-418 whether or not crewmen aboard the vessel will be used to perform longshore work at any United States port before the vessel departs the United States.

(i) If no longshore work will be performed, no further notation regarding longshore work is required.

(ii) If longshore work will be performed, the master or agent shall note which exception listed in section 258 of the Act permits the work. The exceptions are:

(A) The hazardous cargo exception;

(B) The prevailing practice exception in accordance with a port's collective bargaining agreements;

(C) The prevailing practice exception at a port where there is no collective bargaining agreement, but for which the vessel files an attestation;

(D) The prevailing practice exception for automated vessels; and

(E) The reciprocity exception.

(iii) If longshore work will be performed under the hazardous cargo exception, the vessel must either be a tanker or be transporting dry bulk cargo that qualifies as hazardous. All tankers qualify for the hazardous cargo exception, except for a tanker that has been gas-freed to load non-hazardous dry bulk commodities.

(A) To invoke the exception for tankers, the master or agent shall note on the manifest that the vessel is a qualifying tanker.

(B) If the vessel is transporting dry bulk hazardous cargo, the master or agent shall note on the manifest that the vessel's dry bulk cargo is hazardous and shall show the immigration officer the dangerous cargo manifest that is signed by the master or an authorized representative of the owner, and that under 46 CFR 148.02 must be kept in a conspicuous place near the bridge house.

(iv) If longshore work will be performed under the prevailing practice exception, the master or agent shall note on the manifest each port at which longshore work will be performed under this exception. Additionally, for each port the master or agent shall note either that:

(A) The practice of nonimmigrant crewmen doing longshore work is in accordance with all collective bargaining agreements covering 30 percent or more of the longshore workers in the port;

(B) The port has no collective bargaining agreement covering 30 percent or more of the longshore workers in the port and an attestation has been filed with the Secretary of Labor;

(C) An attestation that was previously filed is still valid and the vessel continues to comply with the conditions stated in that attestation; or

(D) The longshore work consists of operating an automated, self-unloading conveyor belt or a vacuum-actuated system.

(v) If longshore work will be performed under the reciprocity exception, the master or agent shall note on the manifest that the work will be done under the reciprocity exception, and will note the nationality of the vessel's registry and the nationality or nationalities of the holders of a majority of the ownership interest in the vessel.

(3) Exception for certain Great Lakes vessels. (i) A manifest shall not be required for a vessel of United States, Canadian, or British registry engaged solely in traffic on the Great Lakes or the St. Lawrence River and connecting waterways, herein designated as a Great Lakes vessel, unless: **10387**

(A) The vessel employs nonimmigrant crewmen who will do longshore work at a port in the United States; or

(B) The vessel employs crewmen of other than United States, Canadian, or British citizenship.

(ii) In either situation, the master shall note the manifest in the manner prescribed in paragraph (a)(2) of this section.

(iii) After submission of a manifest on the first voyage of a calendar year, a manifest shall not be required on subsequent arrivals unless a nonimmigrant crewman of other than Canadian or British citizenship is employed on the vessel who was not aboard and listed on the last prior manifest, or a change has occurred regarding the performance of longshore work in the United States by nonimmigrant crewmen, or a change has occurred in the exception that the master or agent of the vessel wishes to invoke which was not noted on the last prior manifest.

(4) The master or agent of a vessel that only bunkers at a United States port en route to another United States port shall annotate Form I-418 presented at the onward port to indicate the time, date, and place of bunkering.

(5) If documentation is required to support an exception, as described in § 258.2 of this chapter, it must accompany the manifest.

(b) Aircraft. The captain or agent of every aircraft arriving in the United States from a foreign place or from an outlying possession of the United States, except an aircraft arriving in the United States directly from Canada on a flight originating in that country, shall present to the immigration officer at the port where the inspection is performed a manifest on United States Customs Service Form 7507 or on the International Civil Aviation Organization's General Declaration of all the alien crewmembers on board, including alien crewmembers who are returning to the United States after taking an aircraft of the same line from the United States to a foreign place or alien crewmembers who are entering the United States as passengers solely for the purpose of taking an aircraft of the same line from the United States to a foreign port. The captain or agent of an aircraft that only refuels at the United States en route to another United States port must annotate the manifest presented at the onward port to indicate the time, date, and place of refueling. The surname, given name, and middle initial of each alien crewman listed also shall be shown on the manifest. In addition, the captain or agent of the aircraft shall indicate the total number of United States citizen crewmembers and total number of alien crewmembers.

(c) Additional documents. The master, captain, or agent shall prepare as a part of the manifest, when one is required for presentation to an immigration officer, a completely executed set of Forms I-95, Conditional Landing Permit, for each nonimmigrant alien crewman on board, except:

(1) A Canadian or British citizen crewman serving on a vessel plying solely between Canada and the United States; or

(2) A nonimmigrant crewman who is in possession of an unmutilated Form I-184, Alien Crewman Landing Permit and Identification Card, or an unmutilated Form I-95 with space for additional endorsements previously issued to him or her as a member of the crew of the same vessel or an aircraft of the same line on his or her last prior arrival in the United States, following which he or she departed from the United States as a member of the crew of the same vessel or an aircraft of the same line.

 8 CFR § 251.2

127. Section 251.2 is revised to read as follows:

 8 CFR § 251.2

## §251.2 Notification of illegal landings.

As soon as discovered, the master or agent of any vessel from which an alien crewman has illegally landed or deserted in the United States shall inform the immigration officer in charge of the port where the illegal landing or desertion occurred, in writing, of the name, nationality, passport number and, if known, the personal description, circumstances and time of such illegal landing or desertion of such alien crewman, and furnish any other information and documents that might aid in his or her apprehension, including any passport surrendered pursuant to §252.1(d) of this chapter. Failure to file notice of illegal landing or desertion and to furnish any surrendered passport within 24 hours of the time of such landing or desertion becomes known shall be regarded as lack of compliance with section 251(d) of the Act.

 8 CFR § 251.3

128. Section 251.3 is revised to read as follows:

 8 CFR § 251.3

## §251.3 Departure manifests and lists for vessels.

(a) Form I-418, Passenger List-Crew List. The master or agent of every vessel departing from the United States shall submit to the immigration officer at the port from which such vessel is to depart directly to some foreign place or outlying possession of the United States, except when a manifest is not required pursuant to §251.1(a), a single Form I-418 completed in accordance with the instructions on the form. Submission of a Form I-418 that lacks any required endorsement shall be regarded as lack of compliance with section 251(c) of the Act.

(b) Exception for certain Great Lakes vessels. The required list need not be submitted for Canadian or British crewmembers of Great Lakes vessels described in §251.1(a)(3).

8 CFR § 251.4

129. Section 251.4 is revised to read as follows:

8 CFR § 251.4

## §251.4 Departure manifests and lists for aircraft.

(a) United States Customs Service Form 7507 or International Civil Aviation Organization's General Declaration. The captain or agent of every aircraft departing from the United States for a foreign place or an outlying possession of the United States, except on a flight departing for and terminating in Canada, shall submit to the immigration officer at the port from which such aircraft is to depart a completed United States Customs Service Form 7507 or the International Civil Aviation Organization's General Declaration. The form shall contain a list of all alien crewmen on board, including alien crewmen who arrived in the United States as crewmen on an aircraft of the same line and who are departing as passengers. The surname, given name, and middle initial of each such alien crewman listed shall be shown. In addition, the captain or agent of the aircraft shall indicate the total number of alien crewmembers and the total number of United States citizen crewmembers.

(b) Notification of changes in employment for aircraft. The agent of the air transportation line shall immediately notify in writing the nearest immigration office of the termination of employment in the United States of each alien employee of the line furnishing the name, birth date, birthplace, nationality, passport number, and other available information concerning such alien. The procedure to follow in obtaining permission to pay off or discharge an alien crewman in the United States after initial immigration inspection, other than an alien lawfully admitted for permanent residence, is set forth in §252.1(f) of this chapter.

8 CFR § 251.5

130. Section 251.5 is revised to read as follows:

8 CFR § 251.5

## §251.5 Exemptions for private vessels and aircraft.

The provisions of this part relating to submission of arrival and departure manifests and lists shall not apply to a private vessel or a private aircraft not **10388** engaged directly or indirectly in the carriage of persons or cargo for hire.

## PART 252—LANDING OF ALIEN CREWMEN

131. The authority citation for part 252 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1184, 1258, 1281, 1282; 8 CFR part 2.

8 CFR § 252.1

132. Section 252.1 is amended by revising paragraphs (a) through (c) to read as follows:

8 CFR § 252.1

## §252.1 Examination of crewmen.

(a) Detention prior to examination. All persons employed in any capacity on board any vessel or aircraft arriving in the United States shall be detained on board the vessel or at the airport of arrival by the master or agent of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service.

(b) Classes of aliens subject to examination under this part. The examination of every nonimmigrant alien crewman arriving in the United States shall be in accordance with this part except that the following classes of persons employed on vessels or aircraft shall be examined in accordance with the provisions of 8 CFR parts 235 and 240:

(1) Canadian or British citizen crewmen serving on vessels plying solely between Canada and the United States; or

(2) Canadian or British citizen crewmen of aircraft arriving in a State of the United States directly from Canada on flights originating in that country. The crew of a vessel arriving at a United States port that may not require inspection by or clearance from the United States Customs Service is, nevertheless, subject to examination under this part; however, the master of such a vessel is not required to present Form I-95 for any crewman who is not an applicant for a conditional landing permit.

(c) Requirements for landing permits. Every alien crewman applying for landing privileges in the United States must make his or her application in person before an immigration officer, present whatever documents are required, be photographed and fingerprinted as the district director may require, and establish to the satisfaction of the immigration officer that he or she is not inadmissible under any provision of the law and is entitled clearly and beyond doubt to landing privileges in the United States.

 * * * * *8 CFR § 252.2

133. Section 252.2 is revised to read as follows:

 8 CFR § 252.2

## §252.2 Revocation of conditional landing permits; removal.

(a) Revocation and removal while vessel is in the United States. A crewman whose landing permit is subject to revocation pursuant to section 252(b) of the Act may be taken into custody by any immigration officer without a warrant of arrest and be transferred to the vessel of arrival, if the vessel is in any port in the United States and has not departed foreign since the crewman was issued his or her conditional landing permit. Detention and removal of the crewman shall be at the expense of the transportation line on which the crewman arrived. Removal may be effected on the vessel of arrival or, if the master of the vessel has requested in writing, by alternate means if removal on the vessel of arrival is impractical.

(b) Revocation and removal after vessel has departed the United States. A crewman who was granted landing privileges prior to April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to §252.1(f), is subject to removal proceedings under section 240 of the Act as an alien deportable pursuant to section 237(a)(1)(C)(i) of the Act. A crewman who was granted landing privileges on or after April 1, 1997, and who has not departed foreign on the vessel of arrival, or on another vessel or aircraft if such permission was granted pursuant to §252.1(f), shall be removed from the United States without a hearing, except as provided in §208.2(b)(1) of this chapter. In either case, if the alien is removed within 5 years of the date of landing, removal of the crewman shall be at the expense of the owner of the vessel. In the case of a crewman ordered removed more than 5 years after the date of landing, removal shall be at the expense of the appropriation for the enforcement of the Act.

 8 CFR § 252.3

134. Section 252.3 is revised to read as follows:

 8 CFR § 252.3

## §252.3 Great Lakes vessels and tugboats arriving in the United States from Canada; special procedures.

(a) United States vessels and tugboats. An immigration examination shall not be required of any crewman aboard a Great Lakes vessel of United States registry or a tugboat of United States registry arriving from Canada at a port of the United States who has been examined and admitted by an immigration officer as a member of the crew of the same vessel or tugboat or of any other vessel or tugboat of the same company during the current calendar year.

(b) Canadian or British vessels or tugboats. An alien crewman need not be presented for inspection if the alien crewman:

(1) Serves aboard a Great Lakes vessel of Canadian or British registry or aboard a tugboat of Canadian or British registry arriving at a United States port-of-entry from Canada;

(2) Seeks admission for a period of less than 29 days;

(3) Has, during the current calendar year, been inspected and admitted by an immigration officer as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(4) Is either a British or Canadian citizen or is in possession of a valid Form I-95 previously issued to him or her as a member of the crew of the same vessel or tugboat, or of any other vessel or tugboat of the same company;

(5) Does not request or require landing privileges in the United States beyond the time the vessel or tugboat will be in port; and,

(6) Will depart to Canada with the vessel or tugboat.

8 CFR § 252.4

135. Section 252.4 is revised to read as follows:

8 CFR § 252.4

**§252.4 Permanent landing permit and identification card.**
A Form I-184 is valid until revoked. It shall be revoked when an immigration officer finds that the crewman is in the United States in willful violation of the terms and conditions of his or her permission to land, or that he or she is inadmissible to the United States. On revocation, the Form I-184 shall be surrendered to an immigration officer. No appeal shall lie from the revocation of Form I-184.

8 CFR § 252.5

136. Section 252.5 is revised to read as follows:

8 CFR § 252.5

**§252.5 Special procedures for deserters from Spanish or Greek ships of war.**
(a) General. Under E.O. 11267 of January 19, 1966 (31 FR 807) and 28 CFR 0.109, and E.O. 11300 of August 17, 1966, (31 FR 11009), and 28 CFR 0.110, the Commissioner and immigration officers (as defined in §103.1(j) of this chapter) are designated as "competent national authorities" on the part of the United States within the meaning of Article XXIV of the 1903 Treaty of Friendship and General Relations between the United States and Spain (33 Stat. 2105, 2117), and "local authorities" and "competent officers" on the part of the United States within the meaning of Article XIII of the Convention between the United States and Greece (33 Stat. 2122, 2131).  **\*10389**

(b) Application for restoration. On application of a Consul General, Consul, Vice-Consul, or Consular-Agent of the Spanish or Greek Government, made in writing pursuant to Article XXIV of the treaty, or Article XIII of the Convention, respectively, stipulating for the restoration of crewmen deserting, stating that the person named therein has deserted from a ship of war of that government, while in any port of the United States, and on proof by the exhibition of the register, crew list, or official documents of the vessel, or a copy or extract therefrom, duly certified, that the person named belonged, at the time of desertion, to the crew of such vessel, such person shall be taken into custody by any immigration officer without a warrant of arrest. Written notification of charges shall be served on the alien when he or she is taken into custody or as soon as practical thereafter.

(c) Examination. Within a reasonable period of time after the arrest, the alien shall be accorded an examination by the district director, acting district director, or the deputy district director having jurisdiction over the place of arrest. The alien shall be informed that he or she may have the assistance of or be represented by a counsel or representative of his or her choice qualified under 8 CFR part 292 without expense to the Government, and that he or she may present such evidence in his or her behalf as may be relevant to this proceeding. If, upon the completion of such examination, it is determined that:

(1) The individual sought by the Spanish or Greek authorities had deserted from a Spanish or Greek ship of war in a United States port;

(2) The individual actually arrested and detained is the person sought;

(3) The individual is not a citizen of the United States; and

(4) The individual had not previously been arrested for the same cause and set at liberty because he or she had been detained for more than 3 months, or more than 2 months in the case of a deserter from a Greek ship of war, from the day of his or her arrest without the Spanish or Greek authorities having found an opportunity to send him or her home, the individual shall be served with a copy of the findings, from which no appeal shall lie, and be surrendered forthwith to the Spanish or Greek authorities if they are prepared to remove him or her from the United States. On written request of the Spanish or Greek authorities, the individual shall be detained, at their expense, for a period not exceeding 3 months or 2 months, respectively, from the day of arrest to afford opportunity to arrange for his or her departure from the United States.

(d) Timely departure not effected. If the Spanish authorities delay in sending the individual home for more than 3 months, or if the Greek authorities delay in sending the individual home for more than 2 months, from the day of his or her arrest, the individual shall be dealt with as any other alien unlawfully in the United States under the removal provisions of the Act, as amended.

(e) Commission of crime. If the individual has committed any crime or offense in the United States, he or she shall not be placed at the disposal of the consul until after the proper tribunal having jurisdiction in his or her case shall have pronounced sentence, and such sentence shall have been executed.

## PART 253—PAROLE OF ALIEN CREWMEN

137. The authority citation for part 253 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1282, 1283, 1285; 8 CFR part 2.

8 CFR § 253.1

138. In §253.1, paragraph (f) is revised to read as follows:

8 CFR § 253.1

**§253.1 Parole.**

* * * * *

(f) Crewman, stowaway, or alien removable under section 235(c) alleging persecution. Any alien crewman, stowaway, or alien removable under section 235(c) of the Act who alleges that he or she cannot return to his or her country of nationality or last habitual residence (if not a national of any country) because of fear of persecution in that country on account of race, religion, nationality, membership in a particular social group, or political opinion, is eligible to apply for asylum or withholding of removal under 8 CFR part 208. Service officers shall take particular care to ensure that the provisions of §208.5(b) of this chapter regarding special duties toward aliens aboard certain vessels are closely followed.

* * * * *

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

139. The authority citation for part 274a continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

8 CFR § 274a.12

140. Section 274a.12 is amended by:

a. Revising paragraphs (a)(10) and (12);

b. Revising paragraphs (c)(8) and (10);

c. Revising paragraph (c)(12); and by

d. Revising paragraph (c)(18), to read as follows:
 8 CFR § 274a.12

**§274a.12 Classes of aliens authorized to accept employment.**
(a) * * *

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;
 * * * * *

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or
 * * * * *

(c) * * *

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application:

(i) Has not been decided, and who is eligible to apply for employment authorization under §208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of §208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date; or

(ii) Has been recommended for approval, but who has not yet received a grant of asylum or withholding or deportation or removal;
 * * * * *

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997) or cancellation of removal pursuant to section 240A of the Act. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;
 * * * * *

(12) An alien granted benefits under the Family Unity provisions of section 301 of IMMACT 90 and the provisions of part 236, Subpart B of this chapter.
 * * * * *

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or **\*10390** contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.
 * * * * *

**PART 286—IMMIGRATION USER FEE**
141. The authority citation for part 286 continues to read as follows:

Authority: 8 U.S.C. 1103, 1356; 8 CFR part 2.

8 CFR § 286.9

142. In §286.9, paragraph (b)(3) is revised to read as follows:

8 CFR § 286.9

**§286.9 Fee for processing applications and issuing documentation at land border Ports-of-Entry.**

* * * * *

(b) * * *

(3) A Mexican national in possession of a valid nonresident alien border crossing card or nonimmigrant B-1/B-2 visa who is required to be issued Form I-94, Arrival/Departure Record, pursuant to §235.1(f) of this chapter, must remit the required fee for issuance of Form I-94 upon determination of admissibility.

* * * * *

**PART 287—FIELD OFFICERS; POWERS AND DUTIES**

143. The authority citation for part 287 continues to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; 8 CFR part 2.

8 CFR § 287.3

144. Section 287.3 is revised to read as follows:

8 CFR § 287.3

**§287.3 Disposition of cases of aliens arrested without warrant.**

(a) Examination. An alien arrested without a warrant of arrest under the authority contained in section 287(a)(2) of the Act will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

(b) Determination of proceedings. If the examining officer is satisfied that there is prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws, the examining officer will refer the case to an immigration judge for further inquiry in accordance with 8 CFR parts 235, 239, or 240, order the alien removed as provided for in section 235(b)(1) of the Act and §235.3(b) of this chapter, or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case.

(c) Notifications and information. Except in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act, an alien arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of the reasons for his or her arrest and the right to be represented at no expense to the Government. The examining officer will provide the alien with a list of the available free legal services provided by organizations and attorneys qualified under 8 CFR part 3 and organizations recognized under §292.2 of this chapter that are located in the district where the hearing will be held. The examining officer shall note on Form I-862 that such a list was provided to the alien. The officer will also advise the alien that any statement made may be used against him or her in a subsequent proceeding.

(d) Custody procedures. Unless voluntary departure has been granted pursuant to subpart C of 8 CFR part 240, a determination will be made within 24 hours of the arrest whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.

8 CFR § 287.4

145. In §287.4, paragraph (d) is revised to read as follows:

8 CFR § 287.4

**§287.4** Subpoena.

\* \* \* \* \*

(d) Invoking aid of court. If a witness neglects or refuses to appear and testify as directed by the subpoena served upon him or her in accordance with the provisions of this section, the officer or immigration judge issuing the subpoena shall request the United States Attorney for the district in which the subpoena was issued to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify and to produce the books, papers, or documents designated in the subpoena.

8 CFR § 287.5

146. In §287.5, paragraphs (b) through (f) are revised to read as follows:

8 CFR § 287.5

**§287.5** Exercise of power by immigration officers.

\* \* \* \* \*

(b) Power and authority to patrol the border. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to patrol the border conferred by section 287(a)(3) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Immigration inspectors (seaport operations only);

(4) Adjudications officers and deportation officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections (seaport operations only);

(5) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(6) Immigration officers who need the authority to patrol the border under section 287(a)(3) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(c) Power and authority to arrest—(1) Arrests of aliens under section 287(a)(2) of the Act for immigration violations. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(2) of the Act and in accordance with §287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(vii) Immigration officers who need the authority to arrest aliens under section 287(a)(2) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(2) Arrests of persons under section 287(a)(4) of the Act for felonies regulating the admission or removal of aliens. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise  **\*10391**  the arrest power conferred by section 287(a)(4) of the Act and in accordance with § 287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors;

(v) Adjudications officers;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(4) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(3) Arrests of persons under section 287(a)(5)(A) of the Act for any offense against the United States. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(A) of the Act and in accordance with §287.8(c):

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Immigration inspectors (permanent full-time immigration inspectors only);

(v) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vi) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(vii) Immigration officers who need the authority to arrest persons under section 287(a)(5)(A) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(4) Arrests of persons under section 287(a)(5)(B) of the Act for any felony. (i) Section 287(a)(5)(B) of the Act authorizes designated immigration officers, as listed in paragraph (c)(4)(iii) of this section, to arrest persons, without warrant, for any felony cognizable under the laws of the United States if:

(A) The immigration officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony;

(B) The immigration officer is performing duties relating to the enforcement of the immigration laws at the time of the arrest;

(C) There is a likelihood of the person escaping before a warrant can be obtained for his or her arrest; and

(D) The immigration officer has been certified as successfully completing a training program that covers such arrests and the standards with respect to the enforcement activities of the Service as defined in §287.8.

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the arrest power conferred by section 287(a)(5)(B) of the Act and in accordance with §287.8(c):

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors (permanent full-time immigration inspectors only);

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(G) Immigration officers who need the authority to arrest persons under section 287(a)(5)(B) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(iii) Notwithstanding the authorization and designation set forth in paragraph (c)(4)(ii) of this section, no immigration officer is authorized to make an arrest for any felony under the authority of section 287(a)(5)(B) of the Act until such time as he or she has been certified by the Director of Training as successfully completing a training course encompassing such arrests and the standards for enforcement activities as defined in §287.8. Such certification shall be valid for the duration of the immigration officer's continuous employment, unless it is suspended or revoked by the Commissioner or the Commissioner's designee for just cause.

(5) Arrests of persons under section 274(a) of the Act who bring in, transport, or harbor certain aliens, or induce them to enter. (i) Section 274(a) of the Act authorizes designated immigration officers, as listed in paragraph (c)(5)(ii) of this section, to arrest persons who bring in, transport, or harbor aliens, or induce them to enter the United States in violation of law. When making an arrest, the designated immigration officer shall adhere to the provisions of the enforcement standard governing the conduct of arrests in §287.8(c).

(ii) The following immigration officers who have successfully completed basic immigration law enforcement training are authorized and designated to exercise the arrest power conferred by section 274(a) of the Act:

(A) Border patrol agents, including aircraft pilots;

(B) Special agents;

(C) Deportation officers;

(D) Immigration inspectors;

(E) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(F) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(G) Immigration officers who need the authority to arrest persons under section 274(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(6) Custody and transportation of previously arrested persons. In addition to the authority to arrest pursuant to a warrant of arrest in paragraph (e)(3)(iv) of this section, detention enforcement officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to take and maintain custody of and transport any person who has been arrested by an immigration officer pursuant to paragraphs (c)(1) through (c)(5) of this section.

(d) Power and authority to conduct searches. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to conduct searches conferred by section 287(c) of the Act:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(7) Immigration officers who need the authority to conduct searches under section 287(c) of the Act in order to  **10392** effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner.

(e) Power and authority to execute warrants—(1) Search warrants. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to execute a search warrant:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph, and

(iv) Immigration officers who need the authority to execute search warrants under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(2) Issuance of arrest warrants for immigration violations. A warrant of arrest may be issued only by the following immigration officers:

(i) District directors (except foreign);

(ii) Deputy district directors (except foreign);

(iii) Assistant district directors for investigations;

(iv) Deputy assistant district directors for investigations;

(v) Assistant district directors for deportation;

(vi) Deputy assistant district directors for deportation;

(vii) Assistant district directors for examinations;

(viii) Deputy assistant district directors for examinations;

(ix) Officers in charge (except foreign);

(x) Assistant officers in charge (except foreign);

(xi) Chief patrol agents;

(xii) Deputy chief patrol agents;

(xiii) Associate chief patrol agents;

(xiv) Assistant chief patrol agents;

(xv) Patrol agents in charge;

(xvi) The Assistant Commissioner, Investigations;

(xvii) Institutional Hearing Program directors;

(xviii) Area port directors;

(xix) Port directors; or

(xx) Deputy port directors.

(3) Service of warrant of arrests for immigration violations. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power pursuant to section 287(a) of the Act to execute warrants of arrest for administrative immigration violations issued under section 236 of the Act or to execute warrants of criminal arrest issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Detention enforcement officers (warrants of arrest for administrative immigration violations only);

(v) Immigration inspectors;

(vi) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(vii) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(viii) Immigration officers who need the authority to execute arrest warrants for immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner, for warrants of arrest for administrative immigration violations, and with the approval of the Deputy Attorney General, for warrants of criminal arrest.

(4) Service of warrant of arrests for non-immigration violations. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to execute warrants of criminal arrest for non-immigration violations issued under the authority of the United States:

(i) Border patrol agents, including aircraft pilots;

(ii) Special agents;

(iii) Deportation officers;

(iv) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(v) Immigration officers who need the authority to execute warrants of arrest for non-immigration violations under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

(f) Power and authority to carry firearms. The following immigration officers who have successfully completed basic immigration enforcement training are hereby authorized and designated to exercise the power conferred by section 287(a) of the Act to carry firearms provided that they are individually qualified by training and experience to handle and safely operate the firearms they are permitted to carry, maintain proficiency in the use of such firearms, and adhere to the provisions of the enforcement standard governing the use of force in §287.8(a):

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Detention enforcement officers;

(5) Immigration inspectors;

(6) Adjudications officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections;

(7) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(8) Immigration officers who need the authority to carry firearms under section 287(a) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner with the approval of the Deputy Attorney General.

8 CFR § 287.7

147. Section 287.7 is revised to read as follows:

8 CFR § 287.7

## §287.7 Detainer provisions under section 287(d)(3) of the Act.

(a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter. Any authorized Service official may at any time issue a Form I-247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Service seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Service, prior to release of the alien, in order for the Service to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

(b) Authority to issue detainers. The following officers are authorized to issue detainers:

(1) Border patrol agents, including aircraft pilots;

(2) Special agents;

(3) Deportation officers;

(4) Immigration inspectors;

(5) Adjudications officers;

(6) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and

(7) Immigration officers who need the authority to issue detainers under **\*10393** section 287(d)(3) of the Act in order to effectively accomplish their individual missions and who are designated individually or as a class, by the Commissioner.

(c) Availability of records. In order for the Service to accurately determine the propriety of issuing a detainer, serving a notice to appear, or taking custody of an alien in accordance with this section, the criminal justice agency requesting such action or informing the Service of a conviction or act that renders an alien inadmissible or removable under any provision of law shall provide the Service with all documentary records and information available from the agency that reasonably relates to the alien's status in the United States, or that may have an impact on conditions of release.

(d) Temporary detention at Service request. Upon a determination by the Service to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Service.

(e) Financial responsibility for detention. No detainer issued as a result of a determination made under this chapter shall incur any fiscal obligation on the part of the Service, until actual assumption of custody by the Service, except as provided in paragraph (d) of this section.


## PART 299—IMMIGRATION FORMS

148. The authority citation for part 299 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103; 8 CFR part 2.

8 CFR § 299.1

149. Section 299.1 is amended by:

a. Revising the entries for Forms "I-147", "I-205", "I-246", "I-247", "I-259", "I-284", "I-286", "I-291", "I-296", "I-408", "I-541", "I-589", "I-775", "I-851", and "I-851A";

b. Removing the entries for Forms I-122", "I-221", "I-259C", "I-290A", and "I-444", and by

c. Adding the entries for Forms "I-94T", "I-99", "I-148", "I-160", "I-210", "I-213", "I-217", "I-220A", "I-220B", "I-241", "I-261", "I-270", "I-275", "I-294", "I-407", "I-546", "I-701", "I-770", "I-771", "I-826", "I-827B", "I-860", "I-862", "I-863", "I-867AB", and "I-869" in proper numerical sequence, to the listing of forms, to read as follows:

8 CFR § 299.1

**§299.1 Prescribed forms.**

\* \* \* \* \*

| Form No. | Edition date | Title |
|---|---|---|
| | \* \* \* \* \* \* \* | |
| I-94T | 09-22-87 | Arrival-Departure Record (Transit without visa). |
| | \* \* \* \* \* \* \* | |
| I-99 | 04-01-97 | Notice of Revocation and Penalty. |
| | \* \* \* \* \* \* \* | |

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

| I-147 | 04-01-97 | Notice of Temporary Inadmissibility to U.S. |
| I-148 | 04-01-97 | Notice of Permanent Inadmissibility. |
| I-160 | 04-01-97 | Notice of Parole/Lookout Intercept. |

\* \* \* \* \* \* \*

| I-205 | 04-01-97 | Warrant of Removal. |
| I-210 | 04-01-97 | Notice of Action—Voluntary Departure. |

\* \* \* \* \* \* \*

| I-213 | 04-01-97 | Record of Deportable/Inadmissible Alien. |
| I-217 | 04-01-97 | Information for Travel Document or Passport. |
| I-220A | 04-01-97 | Order of Release on Recognizance. |
| I-220B | 04-01-97 | Order of Supervision. |

\* \* \* \* \* \* \*

| I-241 | 04-01-97 | Request for Travel Document to Country Designated by Alien. |

\* \* \* \* \* \* \*

| I-246 | 04-01-97 | Application for Stay of Removal. |
| I-247 | 04-01-97 | Immigration Detainer—Notice of Action. |
| I-259 | 04-01-97 | Notice to Detain, Deport, Remove, or Present Aliens. |

\* \* \* \* \* \* \*

| I-261 | 04-01-97 | Additional Charges of Removability. |
| I-270 | 04-01-97 | Request for Consent to Return Person to Canada. |
| I-275 | 04-01-97 | Withdrawal of Application/Consular Notification. |
| I-284 | 04-01-97 | Notice to Transportation Line Regarding Deportation and Detention Expenses of Detained Alien. |
| I-286 | 04-01-97 | Notification to Alien of Conditions of Release or Detention. |

\* \* \* \* \* \* \*

| I-291 | 04-01-97 | Decision on Application for Status as Permanent Resident. |

\* \* \* \* \* \* \*

| I-294 | 04-01-97 | Notice of Country to Which Deportation has been Directed and Penalty for Reentry without Permission. |

| I-296 | 04-01-97 | Notice to Alien Ordered Removed. |
|---|---|---|

* * * * * * *

| I-407 | 04-01-97 | Abandonment by Alien of Status as Lawful Permanent Resident. |
|---|---|---|
| I-408 | 04-01-97 | Application to Pay Off or Discharge Alien Crewman. |

* * * * * * *

| I-541 | 04-01-97 | Order of Denial of Application for Extension of Stay or Student Employment or Student Transfer. |
|---|---|---|

* * * * * * *

| I-546 | 04-01-97 | Order to Appear—Deferred Inspection. |
|---|---|---|

* * * * * * *

| I-589 | 04-01-97 | Application for Asylum and Withholding of Removal. |
|---|---|---|

* * * * * * *

| I-701 | 04-01-97 | Detainee Transfer Worksheet. |
|---|---|---|

* * * * * * *

| I-770 | 04-01-97 | Notice of Rights and Request for Disposition. |
|---|---|---|
| I-771 | 04-01-97 | Bond Computation Worksheet. |
| I-775 | 04-01-97 | Visa Waiver Pilot Program Agreement. |

* * * * * * *

| I-826 | 04-01-97 | Notice of Rights and Request for Disposition |
|---|---|---|
| I-851 | 04-01-97 | Notice of Intent to Issue Final Administrative Removal Order. |
| I-851A | 04-01-97 | Final Administrative Removal Order. |

* * * * * * *

| I-860 | 04-01-97 | Notice and Order of Expedited Removal. |
|---|---|---|
| I-862 | 04-01-97 | Notice to Appear. |
| I-863 | 04-01-97 | Notice of Referral to Immigration Judge. |
| I-867AB | 04-01-97 | Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. |
| I-869 | 04-01-97 | Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. |

* * * * * * *

8 CFR § 299.5

150. Section 299.5 is amended by:

a. Removing the entry for Form "I-259C"; and by

b. Revising the entries for Forms "I-246" and "I-589", and to read as follows:

 8 CFR § 299.5

**§299.5 Display of control numbers.**

* * * * *

| INS form no. | INS form title | Currently assigned OMB control no. |
|---|---|---|
| | * * * * * * * | |
| I-246 | Application for Stay of Removal | 1115-0055 |
| | * * * * * * * | |
| I-589 | Application for Asylum and Withholding of Removal | 1115-0086 |
| | * * * * * * * | |

**\*10394  PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION**

151. The authority citation for part 316 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1443, 1447; 8 CFR part 2.

 8 CFR § 316.5

152. Section 316.5 is amended by revising paragraph (c)(3) to read as follows:

 8 CFR § 316.5

**§316.5 Residence in the United States.**

* * * * *

(c) * * *

(3) Removal and return. Any departure from the United States while under an order of removal (including previously issued orders of exclusion or deportation) terminates the applicant's status as a lawful permanent resident and, therefore, disrupts the continuity of residence for purposes of this part.

* * * * *

**PART 318—PENDING REMOVAL PROCEEDINGS**

153. The heading for part 318 is revised as set forth above.

154. The authority citation for part 318 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1252, 1429, 1443; 8 CFR part 2.

 8 CFR § 318.1

155. Section 318.1 is revised to read as follows:

 8 CFR § 318.1

### §318.1 Warrant of arrest.

For the purposes of section 318 of the Act, a notice to appear issued under 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) shall be regarded as a warrant of arrest.

### PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: NATURALIZATION BASED UPON ACTIVE DUTY SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES

156. The authority citation for part 329 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

*10395  159 Section 329.2 is amended by revising paragraph (e)(3) to read as follows:

8 CFR § 329.2

### §329.2 Eligibility.

* * * * *

(e) * * *

(3) The applicant may be naturalized even if an outstanding notice to appear pursuant to 8 CFR part 239 (including a charging document issued to commence proceedings under sections 236 or 242 of the Act prior to April 1, 1997) exists.

Dated: February 26, 1997.

Janet Reno,

Attorney General.

[FR Doc. 97-5250 Filed 2-28-97; 3:29 pm]

BILLING CODE 4410-10-P

### Footnotes

1    Arrangements with these countries provide that U.S. authorities shall notify responsible representatives within 72 hours of the arrest or detention of one of their nationals.

2    When Taiwan nationals (who carry "Republic of China" passports) are detained, notification should be made to the nearest office of the Taiwan Economic and Cultural Representative's Office, the unofficial entity representing Taiwan's interests in the United States.

3    British dependencies are also covered by this agreement. They are: Anguilla, British Virgin Islands, Hong Kong, Bermuda, Montserrat, and the Turks and Caicos Islands. Their residents carry British passports.

4    All U.S.S.R. successor states are covered by this agreement. They are: Armenia, Azerbaijan, Belarus, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Russian Federation, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

62 FR 18508-01, 1997 WL 178665(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Parts 214 and 274a

[INS 1653-94]

RIN 1115-AC72

Foreign Employers Seeking To Employ Temporary Alien
Workers in the H, O, and P Nonimmigrant Classifications

Wednesday, April 16, 1997

**\*18508**  AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Final rule.

SUMMARY: This rule amends the Immigration and Naturalization Service (the Service) regulations by precluding foreign employers from directly filing petitions for O and P nonimmigrant aliens. Prospective foreign employers seeking to file petitions in these two classifications will be required to use the services of an agent in the United States. This rule also amends the H nonimmigrant regulations by requiring foreign employers seeking to petition for H-2B nonimmigrant aliens to use the services of an agent in the United States, removes the current reference to the term "representative" from the H-2B regulations, expands the definition of an agent with respect to the H, O, and P nonimmigrant classifications, and codifies existing policy with regard to the filing of nonimmigrant petitions for certain professional athletes. This rule brings the H, O, and P nonimmigrant regulations into conformity with the employer sanctions provisions of section 274A of the Immigration and Nationality Act ("the Act").

EFFECTIVE DATE: April 16, 1997.

FOR FURTHER INFORMATION CONTACT:

John W. Brown, Adjudications Officer, Adjudications Division, Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514-3240.

SUPPLEMENTARY INFORMATION: The employer sanctions provisions of the Immigration and Nationality Act were created by the Immigration Reform and Control Act of 1986, Public Law 99-603, and are codified in section 274A of the Act, as amended. Among other things, section 274A of the Act contains provisions making it unlawful for a person or entity to hire an alien knowing the alien is not entitled to engage in employment. Section 274A of the Act also requires the employer to examine certain documentation in order to verify an individual's identity and eligibility to work in the United States. Civil and criminal penalties may be imposed upon employers who do not  **\*18509**  comply with the employer sanctions provisions of section 274A of the Act.

The Service has historically allowed foreign employers, i.e., those employers not amenable to service of process in the United States, to file petitions for certain nonimmigrant workers. However, in order for the Service to enforce the sanctions provisions of section 274A of the Act in an effective manner, an employer must have a legal presence in the United States for purposes of service of legal process. It has, therefore, been determined that, as in the case of the H nonimmigrant classification, foreign employers should be precluded from directly filing petitions for aliens in the O and P nonimmigrant classifications. Foreign employers will still be able to petition for an O and P nonimmigrant alien but will be required to use a United States agent to file the petition on their behalf. Through their United States agent, foreign employers will be responsible for complying with the provisions of section 274A of the Act. In order to accommodate the needs of those businesses which will use these classifications

and, at the same time, effectively enforce the sanctions provisions, the definition of an agent found at 8 CFR 214.2(h)(2)(i)(F), 8 CFR 214.2(o)(2)(iv)(E), and 8 CFR 214.2(p)(2)(iv)(E) has been amended by this rule to include business representatives.

On August 15, 1994, the Service published in the Federal Register at 59 FR 41843 a proposed rule with requests for comments. Interested persons were invited to submit written comments on or before October 14, 1994.

### Discussion of Comments on the Proposed Rule

The Service received four comments on the proposed rule. Each of the comments contained a discussion of a number of different issues. As a result, the number of issues discussed exceeds the total number of comments received. The commenters offered a number of suggestions and improvements for the final rule, some of which have been adopted. The following discussion addresses the issues raised by the specific issue proposed in the rule, provides the Service's position on the issues, and indicates the revisions adopted in the final rule based on the public's comments.

### Proposal Number One—The "30-Day Rule"

The Service proposed to codify its longstanding policy with respect to sports teams which allows professional athletes traded between teams to play for the new team prior to the filing of the appropriate petition, provided that the new team files a petition with the Service within 30 days of the trade. Since a single athlete can have a significant impact on a team's performance, and recognizing the length of time required to process certain I-129 petitions, the Service adopted a policy allowing players to play for the new team prior to the filing of the petition. Since no negative comments were received with respect to this particular proposal, the proposal will be adopted in the final rule.

One commenter did, however, note that 8 CFR 214.2(h)(6)(vii), which discusses the "30-day rule," contained a typographical error. The error has been corrected in this final rule.

The Service has clarified the rule in two respects. First, the references in the proposed rule to "U.S.-based" organizations have been deleted, in order to avoid any confusion regarding whether a team employing a professional athlete pursuant to an H-2B, O-1, or P-1 petition is "U.S.-based" or not (for example, a minor league affiliate in the United States of a foreign major league franchise). The final rule applies to any trade of an alien professional athlete in an H-2B, O-1, or P-1 classification. Second, the Service has clarified that an athlete to whom the final rule applies will remain in status, and will be eligible to be employed by the team to which the athlete is traded, after the expiration of 30 days following the trade until the Form I-129 is adjudicated, as long as the new petition is filed within the 30-day time frame provided by the rule.

### Proposal Number Two—Foreign Employers Filing O, P, and H-2B Petitions

All four of the commenters opposed the Service's proposal that foreign employers be precluded from filing O and P nonimmigrant petitions directly with the Service. The commenters raised seven separate arguments as to why the Service should not implement this proposal. All four of the commenters, however, suggested that, if the proposal was adopted, the term "established U.S. agent" contained in the proposed rule should be modified or altered to allow business entities in the United States which are related to the foreign employer to be classified as an agent and have the ability to file the petition.

After a careful review of the comments received from the public concerning this proposal, the Service will adopt without change the proposal contained in the proposed rule with respect to the filing of O or P petitions by foreign employers. It is the opinion of the Service that the adoption of the proposal does nothing more than reflect the intent of Congress when the employer sanction provisions were enacted. The purpose of this rule is to prevent abuses of section 274A of the Act by ensuring that the Service can enforce the section 274A provisions against foreign employers to the same extent as it currently does against domestic employers.

However, the Service will accept the suggestion of the commenters and modify the regulatory definition of the term "United States agent" to accommodate the needs of foreign employers. The final rule clarifies the definition of "United States agent" by specifying that general legal agency relationships satisfy this requirement. The proposed rule failed to state clearly that foreign employers are permitted to use an "agent" as commonly defined in legal agency terms. The final rule recognizes that the term "agent" need not be limited to a person or entity who has entered into a formal agency agreement with the employer. An "agent" can be someone authorized to represent and act for another, to transact business for another, or manage another's affairs. A United States agent filing a petition on behalf of a foreign employer must, however, be authorized by the foreign employer to file the petition, and to accept service of process in the United States in any proceeding under section 274A of the Act, on behalf of the foreign employer.

The Service has also clarified the final rule by defining "foreign employer" for purposes of the rule as "any employer who is not amenable to the service of process in the United States." This definition is intended to include all employers of H-2B, O, or P aliens who are not amenable to service of process within the United States for any reason.

**Discussion of the Specific Comments Raised in Objection to Proposal Number Two**

The following discussion addresses each of the seven reasons raised by the commenters as to why the proposal that foreign employers should not be permitted to file an H, O, or P petition directly should not be adopted.

One commenter suggested that if the Service required foreign employers to use an agent in the United States to file an O or P petition, foreign countries would retaliate against U.S. workers abroad in some fashion.

It is the opinion of the Service that the employer sanctions provisions must be enforced with equal effect with respect  **\*18510** to all persons or entities, regardless of whether they are foreign or domestic, which employ aliens in the United States. While it is theoretically possible that certain countries may retaliate against the United States for enforcing these statutory provisions, the Service is required to follow the intent of Congress in enacting section 274A of the Act and safeguard against unauthorized employment in this country.

The Service received comments expressing similar fears at the time it published its interim rule relating to the O and P classifications following enactment of the Immigration Act of 1990 (IMMACT 90). Specifically, the commenters suggested at the time that, as drafted, the Service's regulations would result in retaliatory actions towards U.S. workers abroad. Such fears have proven to be unfounded. In fact, more than 4 years after the effective date of IMMACT 90, the Service is unaware of any instances of retaliatory actions taken by foreign countries against United States entertainers and athletes abroad.

The Service received two comments which stated that requiring a foreign company to create a legal relationship with an agent within the United States will discourage foreign employers from filming and otherwise working in the United States, thereby harming the U.S. economy and jeopardizing American workers' jobs.

The Service believes that, as a practical matter, this rule is not onerous and will not have a negative effect upon such foreign employers or an adverse effect upon the U.S. economy. One of the commenters acknowledged that foreign companies are required to comply with all United States laws, including section 274A of the Act, and, in most cases, already have either a direct presence within the United States or an existing relationship with a United States entity. Far from imposing undue burdens on foreign companies, this regulation is intended only to ensure that employers who are not amenable to the service of process in the United States are held to the same standard of conduct as all other employers with respect to section 274A of the Act, by providing the Service with a mechanism for ensuring adequate service of process on such employers. In this regard, this regulation is similar to the laws of many states which require outside businesses to have a registered agent for service of legal process.

Further, because this rule expands the term "United States agent" to include a business representative, the Service believes most foreign employers will be able to continue their activities with very little or no additional burden or inconvenience. Foreign employers will, as a general rule, already have an agency relationship in place in the United States.

One commenter suggested that adoption of this proposal would discourage foreign employers from complying with U.S. immigration laws.

It is the opinion of the Service that the vast majority of individuals are honest and will comply with the law and applicable regulations. Further, as indicated in the discussion of the prior comment, the definition of agent has been modified by this rule and, as a result, compliance with the proposal will not be difficult to achieve.

One commenter stated that the rule should not be adopted since it was never anticipated by Congress that a foreign movie production company merely using United States-based venues to film a movie would be required to complete an employment verification eligibility form (Form I-9) for its O-1 and H-2B nonimmigrant employees. In drafting section 274A of the Act, Congress did not differentiate among employers based upon their country of license or registry. The implementation of this rule does not alter the existing responsibilities of all employers, domestic or foreign, to comply with section 274A of the Act with respect to employment within the United States.

Two commenters suggested that requiring the employer of an O or P nonimmigrant alien to complete a Form I-9 is superfluous since the employer has already received Service approval to work in the United States. The employment verification provisions are statutory and, therefore, the Service lacks the authority to waive this requirement. Moreover, since foreign employers have always been responsible for complying with the employer sanctions provisions of the Act, this rule does not add any additional verification requirements.

One commenter stated that there is no evidence that foreign employers are violating section 274A of the Act or that the Service is unable to take enforcement actions against them. Moreover, the commenter stated, if the foreign employer is still to remain liable for section 274A violations, then the foreign employers should be able to file O and P petitions directly. The Service is required to enact regulations which enable it to execute its various duties and responsibilities. Evidence of abuse is not a prerequisite for promulgating rules. As noted above, this rule is designed to ensure compliance with section 274A of the Act by providing a means of enforcing this section with respect to foreign as well as domestic employers. Direct filing of O and P petitions by foreign employers not amenable to service of process within the United States defeats this purpose, since, in certain cases, the Service may be unable to pursue actions against such employers for violations of section 274A of the Act. Foreign employers who benefit from this privilege must be held fully accountable for complying with our laws by rendering themselves amenable to service of process in enforcement actions. Since all employers, domestic or foreign, who use agents to fulfill their section 274A duties remain liable for violations, this rule will ensure effective enforcement against violating employers.

One commenter suggested that the language of the proposed rule does not solve enforcement problems with respect to section 274A. Specifically, the commenter questioned how the use of an agent could enhance the Service's enforcement if the agent itself has no liability under the Act. The commenter argued that, if the agent has no liability, then that contradicts 8 CFR part 274a unless the agents are not recruiters or referrers for a fee. See section 274A of the Act. Alternatively, if there is no existing liability, the commenter added, then the Service cannot argue that it is being hampered in its ability to enforce the employer sanctions provisions of the Act.

A person or entity acting as an agent may be subject to liability under section 274A for acts or omissions committed in that capacity. The issue, however, is not whether the agent is subject to section 274A of the Act, but whether the foreign employer can be served with process in a section 274A proceeding. As this commenter correctly indicates, foreign employers were, and continue to be, responsible for complying with section 274A of the Act. This rule does not expand or alter the requirements or liability imposed by section 274A of the Act. Foreign employers with a legal presence in the United States are subject to the Service's enforcement powers. Unfortunately, foreign employers not physically present in the United States who use the

privilege of directly petitioning for O and P visas may presently be able to avoid Service enforcement of section 274A because of difficulties in serving process on the employer abroad. It is necessary, therefore, to ensure that these foreign employers can be held accountable for complying with section 274A of the Act in the same manner as all other employers. This rule accomplishes that goal by using well-established agency **\*18511** principles, i.e., requiring the foreign employer to have an agent within the United States able to file the petition, and to accept service of process in any section 274A proceeding, on the employer's behalf.

Employers have always been able to delegate or contract their section 274A responsibilities to an agent, while still remaining fully liable for any violations. This rule does not change that. A foreign employer is free to delegate its section 274A compliance responsibilities to the agent filing the petition on its behalf, to another agent, or to carry out those responsibilities itself. The final rule requires only a limited agency for the purpose of filing the petition, and accepting service of process in section 274A proceedings, on behalf of the foreign employer. For purposes of this regulation, the term "service of process" is intended to include any method of commencing enforcement activity of proceedings that involves notice to the employer, including notices of inspection of Forms I-9, subpoenas, Notices of Intent to Fine, or complaints.

Another commenter stated that the sole effect of adopting the proposed rule would be to enhance the Service's ability to enforce employer sanctions provisions against a foreign employer who seeks to employ an O or P nonimmigrant alien. The purpose of the proposal with respect to foreign employers was to require those employers to comply with the same rules and regulations as all employers regardless of the nationality of their employees. Therefore, the commenter's statement is accurate.

**Regulatory Flexibility Act**

The Commissioner of the immigration and Naturalization Service, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that the rule will not have a significant economic impact on a substantial number of small entities. The majority of foreign employers who petition for nonimmigrant workers already have established a presence in the United States or use the services of a United States agent. Therefore, the number of small entities affected by this rule would be minimal.

**Executive Order 12866**

This rule is not considered by the Department of Justice, Immigration and Naturalization Service, to be a "significant regulatory action" under Executive Order 12866, section 3(f), regulatory Planning and Review, and the Office of Management and Budget has waived its review process under section 6(a)(3)(A).

**Executive Order 12612**

The regulation proposed herein will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices or significant adverse

effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**Paperwork Reduction Act**

This final rule does not impose any new reporting or recordkeeping requirements. The information collection requirements contained in this rule were previously cleared by the Office of Management and Budget (OMB) under the provisions of the Paperwork Reduction Act. The clearance number for this collection is contained in 8 CFR 299.5, Display of control numbers.

**List of Subjects**

*8 CFR Part 214*

Administrative practice and procedures, Aliens, Employment, Organization and functions (Government agencies).

*8 CFR Part 274a*

Administrative practice and procedures, Aliens, Employment, Organization and functions (Government agencies).

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended by follows:

**PART 214—NONIMMIGRANT CLASSES**

1. The authority citation for part 214 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282; 8 CFR part 2.
 8 CFR § 214.2
2. Section 214.2 is amended by:

a. Revising paragraph (h)(2)(i)(F);

b. Revising paragraph (h)(6)(iii)(B); and by

c. Adding a new paragraph (h)(6)(vii), to read as follows:
8 CFR § 214.2

**§214.2 Special requirements for admission, extension, and maintenance of status.**
* * * * *
(h) * * *

(2) * * *

(i) * * *

(F) Agents as petitioners. A United States agent may file a petition in cases involving workers who are traditionally self-employed or workers who use agents to arrange short-term employment on their behalf with numerous employers, and in cases where a foreign employer authorizes the agent to act on its behalf. A United States agent may be: the actual employer of the beneficiary, the representative of both the employer and the beneficiary, or, a person or entity authorized by the employer to act for, or in place of, the employer as it agent. A petition filed by a United States agent is subject to the following conditions;

(1) An agent performing the function of an employer must guarantee the wages and other terms and conditions of employment by contractual agreement with the beneficiary or beneficiaries of the petition. The agent/employer must also provide an itinerary of definite employment and information on any other services planned for the period of time requested.

(2) A person or company in business as an agent may file the H petition involving multiple employers as the representative of both the employers and the beneficiary or beneficiaries if the supporting documentation includes a complete itinerary of services or engagements. The itinerary shall specify the dates of each service or engagement, the names and addresses of the actual employers, and the names and addresses of the establishment, venues, **\*18512** or locations where the services will be performed. In questionable cases, a contract between the employers and the beneficiary or beneficiaries may be required. The burden is on the agent to explain the terms and conditions of the employment and to provide any required documentation.

(3) A foreign employer who, through a United States agent, files a petition for an H nonimmigrant alien is responsible for complying with all of the employer sanctions provisions of section 274A of the Act and 8 CFR part 274a.
 * * * * *
(6) * * *

(iii) * * *

(B) An H-2B petitioner shall be a United States employer, a United States agent, or a foreign employer filing through a United States agent. For purposes of paragraph (h) of this section, a foreign employer is any employer who is not amendable to service of process in the United States. A foreign employer may not directly petition for an H-2B nonimmigrant but must use the services of a United States agent to file a petition for an H-2B nonimmigrant. A United States agent petitioning on behalf of a foreign employer must be authorized to file the petition, and to accept service of process in the United States in proceedings under section 274A of the Act, on behalf of the employer. The petitioning employer shall consider available United States workers for the temporary services or labor, and shall offer terms and conditions of employment which are consistent with the nature of the occupation, activity, and industry in the United States.
 * * * * *

(vii) Traded professional H-2B athletes. In the case of a professional H-2B athlete who is traded from one organization or another organization, employment authorization for the player will automatically continue for a period of 30 days after the player's acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 for H-2B nonimmigrant classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete shall be deemed to be in valid H-2B status, and employment shall continue to be authorized, until the petition is adjudicated. If the new petition is denied, employment authorization will cease.
 * * * * *8 CFR § 214.2
3. Section 214.2 is amended by:


a. Revising paragraph (o)(2)(i);

b. Revising paragraph (o)(2)(iv)(A);

c. Revising paragraph (o)(2)(iv)(E); and by

d. Adding a new paragraph (o)(2)(iv)(G), to read as follows:
8 CFR § 214.2

**§214.2** **Special requirements for admission, extension, and maintenance of status.**
 * * * * *
(o) * * *

AR.00230

(2) Filing of petitions—(i) General. Except as provided for in paragraph (o)(2)(iv)(A) of this section, a petitioner seeking to classify an alien as an O-1 or O-2 nonimmigrant shall file a petition on Form I-129, Petition for a Nonimmigrant Worker, with the Service Center which has jurisdiction in the area where the alien will work. The petition may not be filed more than 6 months before the actual need for the alien's services. An O-1 or O-2 petition shall be adjudicated at the appropriate Service Center, even in emergency situations. Only one beneficiary may be included on an O-1 petition. O-2 aliens must be filed for on a separate petition from the O-1 alien. An O-1 or O-2 petition may only be filed by a United States employer, a United States agent, or a foreign employer through a United States agent. For purposes of paragraph (o) of this section, a foreign employer is any employer who is not amenable to service of process in the United States. A foreign employer may not directly petition for an O nonimmigrant alien but instead must use the services of a United States agent to file a petition for an O nonimmigrant alien. A United States agent petitioning on behalf of a foreign employer must be authorized to file the petition, and to accept services of process in the United States in proceedings under section 274A of the Act, on behalf of the foreign employer. An O alien may not petition for himself or herself.

* * * * *

(iv) Other filing situations—(A) Services in more than one location. A petition which requires the alien to work in more than one location must include an itinerary with the dates and locations of work and must be filed with the Service Center which has jurisdiction in the area where the petitioner is located. The address which the petitioner specifies as its location on the petition shall be where the petitioner is located for purposes of this paragraph.

* * * * *

(E) Agents as petitioners. A United States agent may file a petition in cases involving workers who are traditionally self-employed or workers who use agents to arrange short-term employment on their behalf with numerous employers, and in cases where a foreign employer authorizes the agent to act in its behalf. A United States agent may be: The actual employer of the beneficiary, the representative of both the employer and the beneficiary; or, a person or entity authorized by the employer to act for, or in place of, the employer as its agent. A petition filed by an agent is subject to the following conditions:

(1) An agent performing the function of an employer must provide the contractual agreement between the agent and the beneficiary which specifies the wage offered and the other terms and conditions of employment of the beneficiary.

(2) A person or company in business as an agent may file the petition involving multiple employers as the representative of both the employers and the beneficiary, if the supporting documentation includes a complete itinerary of the event or events. The itinerary must specify the dates of each service or engagement, the names and addresses of the actual employers, and the names and addresses of the establishments, venues, or locations where the services will be performed. A contract between the employers and the beneficiary is required. The burden is on the agent to explain the terms and conditions of the employment and to provide any required documentation.

(3) A foreign employer who, through a United States agent, files a petition for an O nonimmigrant alien is responsible for complying with all of the employer sanctions provisions of section 274A of the Act and 8 CFR part 274a.

* * * * *

(G) Traded professional O-1 athletes. In the case of a professional O-1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I-129. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete shall be deemed to be in valid O-1 status, and employment shall continue to be authorized, until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

* * * * * 8 CFR § 214.2

4. Section 214.2 is amended by:

a. Revising paragraph (p)(2)(i); and by

b. Revising paragraph (p)(2)(iv), to read as follows;  *18513

8 CFR § 214.2

**§214.2** **Special requirements for admission, extension, and maintenance of status.**

\* \* \* \* \*

(p) \* \* \*

(2) Filing of petitions—(i) General. A P-1 petition for an athlete or entertainment group shall be filed by a United States employer, a United States sponsoring organization, a United States agent, or a foreign employer through a United States agent. For purposes of paragraph (p) of this section, a foreign employer is any employer who is not amenable to service of process in the United States. Foreign employers seeking to employ a P-1 alien may not directly petition for the alien but must use a United States agent. A United States agent petitioning on behalf of a foreign employer must be authorized to file the petition, and to accept service of process in the United States in proceedings under section 274A of the Act, on behalf of the foreign employer. A P-2 petition for an artist or entertainer in a reciprocal exchange program shall be filed by the United States labor organization which negotiated the reciprocal exchange agreement, the sponsoring organization, or a United States employer. A P-3 petition for an artist or entertainer in a culturally unique program shall be filed by the sponsoring organization or a United States employer. Essential support personnel may not be included on the petition filed for the principal alien(s). These aliens require a separate petition. Except as provided for in paragraph (p)(2)(iv)(A) of this section, the petitioner shall file a P petition on Form I-129, Petition for Nonimmigrant Worker, with the Service Center which has jurisdiction in the area where the alien will work. The petition may not be filed more than 6 months before the actual need for the alien's services. A P-1, P-2, or P-3 petition shall be adjudicated at the appropriate Service Center, even in emergency situations.

\* \* \* \* \*

(iv) Other filing situations—(A) Services in more than one location. A petition which requires the alien to work in more than one location (e.g., a tour) must include an itinerary with the dates and locations of the performances and must be filed with the Service Center which has jurisdiction in the area where the petitioner is located. The address which the petitioner specifies as its location on the petition shall be where the petitioner is located for purposes of this paragraph.

(B) Servcies for more than one employer. If the beneficiary or beneficiaries will work for more than one employer within the same time period, each employer must file a separate petition with the Service Center that has jurisdiction over the area where the alien will perform the services, unless an agent files the petition pursuant to paragraph (p)(2)(iv)(E) of this section.

(C) Change of employer—(1) General. If a P-1, P-2, or P-3 alien in the United States seeks to change employers or sponsors, the new employer or sponsor must file both a petition and a request to extend the alien's stay in the United States. The alien may not commence employment with the new employer or sponsor until the petition and request for extension have been approved.

(2) Traded professional P-1 athletes. In the case of a professional P-1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 for P-1 nonimmigrant classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete shall be deemed to be in valid P-1 status, and employment shall continue to be authorized, until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(D) Amended petition. The petitioner shall file an amended petition, with fee, with the Service Center where the original petition was filed to reflect any material changes in the terms and conditions of employment or the beneficiary's eligibility as specified in the original approved petition. A petitioner may add additional, similar or comparable performance, engagements, or competitions during the validity period of the petition without filing an amended petition.

(E) Agents as petitioners. A United States agent may file a petition in cases involving workers who are traditionally self-employed or workers who use agents to arrange short-term employment on their behalf with numerous employers, and in cases where a foreign employer authorizes the agent to act on its behalf. A United States agent may be: the actual employer of the

beneficiary; the representative of both the employer and the beneficiary; or, a person or entity authorized by the employer to act for, or in place of, the employer as its agent. A petition filed by an United States agent is subject to the following conditions:

(1) An agent performing the function of an employer must specify the wage offered and the other terms and conditions of employment by contractual agreement with the beneficiary or beneficiaries. The agent/employer must also provide an itinerary of definite employment and information on any other services planned for the period of time requested.

(2) A person or company in business as an agent may file the P petition involving multiple employers as the representative of both the employers and the beneficiary or beneficiaries if the supporting documentation includes a complete itinerary of services or engagements. The itinerary shall specify the dates of each service or engagement, the names and addresses of the actual employers, the names and addresses of the establishment, venues, or locations where the services will be performed. In questionable cases, a contract between the employer(s) and the beneficiary or beneficiaries may be required. The burden is on the agent to explain the terms and conditions of the employment and to provide any required documentation.

(3) A foreign employer who, through a United States agent, files a petition for a P nonimmigrant alien is responsible for complying with all of the employer sanctions provisions of section 274A of the Act and 8 CFR part 274a.

(F) Multiple beneficiaries. More than one beneficiary may be included in a P petition if they are members of a group seeking classification based on the reputation of the group as an entity, or if they will provide essential support to P-1, P-2, or P-3 beneficiaries performing in the same location and in the same occupation.

(G) Named beneficiaries. Petitions for P classification must include the names of beneficiaries and other required information at the time of filing.

(H) Substitution of beneficiaries. A petitioner may request substitution of beneficiaries in approved P-1, P-2, and P-3 petitions for groups. To request substitution, the petitioner shall submit a letter requesting such substitution, along with a copy of the petitioner's approval notice, to the consular office at which the alien will apply for a visa or the Port-of-Entry where the alien will apply for admission. Essential support personnel may not be substituted at consular offices or at Ports-of-entry. In order to add additional new essential support personnel, a new I-129 petition must be filed with the appropriate Service Center.
* * * *

## *18514  PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

5. The authority citation for part 274a continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.
 8 CFR § 274a.12
6. Section 274a.12 is amended by:

a. Revising paragraph (b)(9);

b. Revising paragraph (b)(13); and by

c. Revising paragraph (b)(14), to read as follows:

**§174a.12 Clauses of aliens authorized to accept employment.**
* * * * *
(b) * * *

(9) A temporary worker or trainee (H-1, H-2A, H-2B, or H-3), pursuant to § 214.2(h) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H-2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 to petition for H-2B classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

* * * * *

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O-1), and an accompanying alien (O-2), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O-1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 petition for O nonimmigrant classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P-1, P-2, or P-3), pursuant to §214.2(p) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P-1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 for P-1 nonimmigrant classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

* * * * *

Dated: February 13, 1997.

Doris Meissner,

Commissioner, Immigration and Naturalization Service.

[FR Doc. 97-9814 Filed 4-15-97; 8:45 am]

BILLING CODE 4410-10-M

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

65 FR 76121-01, 2000 WL 1780075(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Part 208

[INS Order No. 1865-97; AG Order No. 2340-2000]

RIN 1115-AE93

Asylum Procedures

Wednesday, December 6, 2000

**\*76121** AGENCY: Immigration and Naturalization Service, Justice; and Executive Office for Immigration Review, Justice.

ACTION: Final rule.

SUMMARY: This final rule amends the Department of Justice regulations implementing the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), governing asylum claims. Additionally, this rule amends portions of the regulations governing cases in which an applicant has established past persecution or in which an applicant may be able to avoid persecution in a particular country by relocating to another area of that country. Finally, the rule identifies factors that may be considered in the exercise of discretion in asylum cases in which the alien has established past persecution but may not have a well-founded fear of future persecution. This final rule will ensure that asylum applications are processed in accordance with the Immigration and Nationality Act (Act), as amended by IIRIRA, as well as with international instruments.

DATES: This rule is effective January 5, 2001.

FOR FURTHER INFORMATION CONTACT: For matters relating to the Immigration and Naturalization Service—Joanna Ruppel, International Affairs, Department of Justice, Immigration and Naturalization Service, 425 I Street NW., ULLICO third floor, Washington, DC 20536, telephone (202) 305-2663. For matters relating to the Executive Office for Immigration Review—Charles Adkins-Blanch, General Counsel, Executive Office for Immigration Review, Suite 2400, 5107 Leesburg Pike, Falls Church, Virginia 22041, telephone (703) 305-0470.

SUPPLEMENTARY INFORMATION:

**I. Background**

*Regulations To Implement the Illegal Immigration Reform and Immigrant Responsibility Act of 1996*

On March 6, 1997, the Service and EOIR jointly published in the Federal Register, at 62 FR 10312, an interim rule to implement Public Law 104-208 (110 Stat. 3546) (IIRIRA). That legislation significantly amended several parts of the Immigration and Nationality Act ("Act" or "INA"), including part 208. The interim regulations implementing IIRIRA were preceded by a notice of proposed rulemaking, published in the Federal Register on January 3, 1997, at 62 FR 444, and providing a 30-day comment period. The interim rule provided a 120-day comment period. The Department of Justice (Department) received 39 comments on the interim rule in addition to the 124 comments already received as a result of the proposed rule. This final rule reflects further changes resulting from comments received in response to both the original proposed rule and the interim rule.

*Proposed Rule Regarding Past Persecution, Internal Relocation, and Discretion (Past Persecution Rule)*

On June 11, 1998, at 63 FR 31945, the Service and EOIR jointly published in the Federal Register a proposed rule to change portions of 8 CFR 208.13 and 208.16 in order to provide further guidance on adjudicating asylum cases and withholding of

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

removal cases when an applicant has established past persecution and when the applicant may be able to avoid persecution in his or her home country by relocating to another area of that country. The rule proposed to establish new guidelines concerning the Attorney General's exercise of discretion in cases in which past persecution is established, and the types of evidence that may be considered in determining whether an applicant has a well-founded fear of future persecution. Additionally, the rule proposed to identify new factors that could be considered in the determination whether to grant asylum when an applicant has established past persecution but no longer has a well-founded fear of future persecution. The Department received 35 comments on the proposed past persecution rule.

The Department has elected to split part 208 from the rest of the IIRIRA interim regulations and to incorporate amendments to part 208 into this final rule based both on comments to the IIRIRA interim rule and on comments to the June 1998 proposed rule regarding past persecution. In the future, the Department will publish a proposed rule concerning the definition of "persecution" and the definition of "particular social group." Those new proposals are based in part on certain of the provisions being made final in this rule.

## II. Comments

Most of the commenters on both the interim IIRIRA rule and proposed past persecution rule represented either attorney organizations or voluntary organizations predominantly involved with refugees and asylum claimants. The Department also received comments from individual attorneys and the regional representative of United Nations High Commissioner for Refugees (UNHCR). Since many of the comments were duplicative or endorsed the submissions of other commenters, the Department will address the comments by section and topic, rather than reference each comment and commenter. The following discussion **\*76122** also identifies amendments made by the Department to clarify and streamline the regulations as part of the Administration's reinvention and regulation streamlining initiative.

## *§ 208.2—Jurisdiction*

To clarify jurisdiction over asylum applications, the Department has reorganized and revised this section as follows:

(1) Language has been added to § 208.2(a) to establish that the Office of International Affairs has initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

(2) Language in § 208.2(a) relating to the filing of a complete application has been removed as redundant with the provisions of § 208.3.

(3) Section 208.2(b)(3) has been redesignated as § 208.2(b) to provide a general description of Immigration Court jurisdiction, relevant to the majority of asylum applications adjudicated in Immigration Court, prior to discussion of the more limited jurisdiction applicable in circumstances described in new § 208.2(c).

(4) The first sentence in new § 208.2(b) (formerly § 208.2(b)(3)), which refers to an immigration judge's jurisdiction over asylum applications "after a copy of the charging document has been filed with the Immigration Court," has been amended. The Department has removed the words "a copy of" from that sentence because, in general, only the charging document with the original signature of the Service officer who issued the charging document may be filed with the Immigration Court. The Department also amended the last sentence in § 208.2(b) to establish that immigration judges have exclusive jurisdiction over credible fear determinations that have been referred to the Immigration Court pursuant to § 208.30, as well as reasonable fear determinations that have been referred to the Immigration Court pursuant to § 208.31. In addition, the reference to "Executive Office for Immigration Review" has been replaced with "Immigration Court" because only immigration judges have jurisdiction over credible fear and reasonable fear review proceedings.

(5) Section 208.2(b)(1) has been redesignated as § 208.2(c), governing asylum and withholding proceedings for those aliens not entitled to removal proceedings under section 240 of the Act. Section 208.2(c)(1) relates to aliens who are not entitled to

proceedings under section 240 of the Act and are eligible to apply only for asylum and withholding of removal. Section 208.2(c)(2) relates to jurisdiction over proceedings that are limited to requests for withholding of removal pursuant to § 208.31, after an alien subject to reinstatement of a prior order under section 241(a)(5) of the Act or administrative removal under section 238(b) of the Act has been found to have a reasonable fear.

(6) The Department has rewritten the language of § 208.2(c)(1)(v) (formerly § 208.2(b)(1)(v)), to clarify the existing rules relating to cases falling under section 235(c) of the Act. Section 235(c) provides an expedited removal process for certain aliens who are suspected of being inadmissible on national security grounds; the Service has the authority to order such an alien removed without further inquiry or hearing by an immigration judge, as provided in § 235.8 of this chapter.

The current regulatory scheme provides adequate safeguards to ensure that the expedited nature of removal under section 235(c) is balanced against the right to apply for asylum in appropriate cases. An immigration officer or immigration judge must initiate certain procedures described in 8 CFR 235.8 when an arriving alien is suspected of being inadmissible on security or related grounds. Only after those procedures have been completed and a permanent order of inadmissibility is issued would the question arise regarding eligibility for asylum or withholding of removal. Although some categories of persons found inadmissible on those grounds are ineligible for asylum, other persons, such as those found inadmissible based on membership in a terrorist organization, remain eligible for asylum.

The Regional Director is authorized to pretermit an asylum application for aliens who have been issued a permanent order of inadmissibility. However, in some cases, and in the exercise of prosecutorial discretion, the Regional Director may choose to place persons found subject to removal under section 235(c) of the Act, but who are not subject to the bars to asylum, in asylum-only proceedings under § 208.2(c)(1) by issuing a Form I-863, Notice of Referral to Immigration Judge. In those cases in which the Service has affirmatively decided to place an alien in asylum-only proceedings and has issued a Form I-863, the immigration judge would then have jurisdiction to hear the alien's asylum application. Of course, unless the Service has issued a Form I-863 to an alien who is found to be removable under section 235(c) of the Act, the immigration judges have no jurisdiction with respect to those cases.

The Department further notes that § 235.8 of this chapter, as amended by the regulations implementing the Convention Against Torture, expressly limits the applicability of § 208.2. Section 235.8(b)(4) specifically states that persons seeking withholding under section 241(b)(3) of the Act or the Convention Against Torture are not subject to the "provisions of part 208 of this chapter relating to consideration or review by an immigration judge, the Board of Immigration Appeals or an asylum officer." Instead, it is the Service's responsibility to ensure that no removals are conducted under section 235(c) that violate our international obligations; the process for making such a determination remains within the Service's control.

(7) Section 208.2(c)(1)(vi) [formerly section 208.2(b)(1)(vi)] has been amended to clarify that the exclusive jurisdiction of the immigration judge comes into effect only when the district director refers an alien described in this provision for a hearing that is limited to asylum and withholding of removals.

(8) In § 208.2(c)(3)(i) (formerly § 208.2(b)(2)(i)), which describes rules of procedures, the reference to "8 CFR part 240" in the first sentence has been amended to read "8 CFR part 240, subpart A," to clarify that hearings limited to eligibility for asylum and/or withholding of removal shall be conducted under the same procedures that apply in removal proceedings.

(9) Section § 208.2(b)(2)(ii) has been redesignated as § 208.2(c)(3)(ii), but otherwise is unchanged.

(10) Section 208.2(b)(2)(iii) has been redesignated as § 208.2(c)(3)(iii). Additionally, it has been amended by removing reference to sections 208, 212(h), 212(i) of the Act and by adding an exception based on a showing of exceptional circumstances, in order to reflect the statutory language in section 240(b)(7) of the Act.

*§ 208.3—Form of Application*

The name of the Form I-589, Application for Asylum and Withholding of Removal, as it appeared in § 208.3(a) has been corrected to "Form I-589, Application for Asylum and for Withholding of Removal." Section 208.3(c)(4) has been corrected to reflect that section 274C of the Act provides for criminal as well as civil penalties for knowingly placing false information on an Application.

### § 208.4—*Filing the Application*

A considerable number of comments were received regarding the 1-year filing deadline contained in section 208(a)(2)(B) of the Act and the  **\*76123**  provisions for exemption contained in section 208(a)(2)(D) of the Act relating to changed conditions.

Some commenters took issue with the deadline itself. While the Department understands the concerns of those commenters, the 1-year filing deadline is a statutory requirement and therefore cannot be removed by rulemaking.

Some commenters suggested that an asylum officer or immigration judge should question an applicant before an application can be rejected as untimely filed. This suggestion has been adopted for two reasons. First, the decision on a tardy filing issue can best be made only after an asylum officer, in an interview, or immigration judge, in a hearing, has given an applicant the opportunity to present any relevant and useful information bearing on any prohibitions on filing. Second, for applicants who are placed in removal proceedings, the immigration judge must still determine whether the applicant is eligible for withholding of removal, even if it is found that the alien is ineligible to apply for asylum.

Language in § 208.4(a)(2)(ii) was added for consistency with § 1.1(h), which defines the term "day" for computing the period of time for taking action provided in 8 CFR. When calculating the one-year period when the last day of the period falls on a Saturday, Sunday, or legal holiday, the period shall run until the end of the next day that is not a Saturday, Sunday, or legal holiday. One commenter suggested that the Department consider the filing of an asylum application to be the date the application is mailed or otherwise sent to the Service or Immigration Court. This suggestion has been adopted in part. For an application filed with the Service, an application is considered to have been filed on the date it is received by the Service. In a case in which the 1-year filing deadline has not been met, however, if the applicant provides clear and convincing documentary evidence of mailing the application within the 1-year period, the mailing date shall be considered the filing date. For a case before the Immigration Court or the Board of Immigration Appeals (Board), an asylum application is considered to have been filed on the date it is received by the Court or the Board.

In addition, other references to filing an application in paragraph (a) relating to "submission of," "submitted," or "applied for" have also been changed to "filed" in order to make language in the section consistent. Language was also added to reflect that the provisions of this section apply to asylum applications decided by an asylum officer, an immigration judge, or the Board.

Many commenters recommended a change in the language of § 208.4(a)(4) and § 208.4(a)(5) that would indicate the list of circumstances is not all-inclusive. That suggestion has been adopted.

The Department agreed with several of the recommended amendments to § 208.4(a)(4), relating to changed circumstances. First, the Department eliminated the requirement that the changed circumstances be "objective." The modifier "objective" was removed to avoid confusion in cases where, for example, the changed circumstance relates to a subjective choice an applicant has made, such as a religious conversion or adoption of political views. Additionally, the Department eliminated the requirement that the changed circumstances occur within the United States, because there may be situations in which the changed circumstances, such as religious conversion, took place outside the United States, but not in the applicant's home country. The Department also specified that cessation of the requisite relationship between a principal applicant and a dependent after the dependent has been included in the principal applicant's application as a derivative applicant may constitute a changed circumstance. Finally, the Department clarified that an adjudicator must take into account an applicant's delayed awareness of a changed circumstance, such as events in the home country, when determining whether a period of delay is reasonable.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Section 208.4(a)(5), relating to extraordinary circumstances, has been revised to reflect the numerous comments regarding the current list of circumstances that may constitute extraordinary circumstances. The Department has added additional circumstances to the non-exhaustive list, as discussed below. Additionally, the Department has changed the word "shall" in the second sentence of paragraph (a)(5) to "may" to better reflect the statutory language in section 208(a)(2)(D) and to reinforce the necessity of analyzing each case on an individual basis. The Department has also added language to the burden of proof requirement to specify clearly that the applicant bears the burden to demonstrate that the delay was reasonable under the circumstances.

With respect to § 208.4(a)(5), some commenters suggested that extraordinary circumstances not be limited to factors beyond the alien's control. That suggestion has been partially adopted. While it is hard to imagine a situation that both would be entirely within the alien's control and would also prevent him or her from filing the application, it is not difficult to imagine qualifying situations in which the alien might be forced to choose between the lesser of two evils, or the alien might be able to exercise a limited amount of control. The regulation has been amended to provide that the alien must not have intentionally created the circumstance.

Additionally, the phrase "but for those circumstances he or she would have been able to file the application within the 1-year period" has been modified to ensure consistency with the statutory language to read "those circumstances were directly related to the alien's failure to file the application within the 1-year period."

In § 208.4(a)(5)(i), the phrase "of significant duration," in reference to an experience of serious illness or disability, was removed to allow for a situation in which the timing of an applicant's serious illness or disability prohibited him or her from filing the asylum application within one year of the individual's arrival in the United States, even though the illness or disability was of short duration.

Several commenters recommended that the list of extraordinary circumstances be expanded to include maintaining valid immigrant or nonimmigrant status, in addition to maintaining Temporary Protected Status. The Department has accepted the recommendation because there are sound policy reasons to permit persons who were in a valid immigrant or nonimmigrant status, or were given parole, to apply for asylum within a reasonable time after termination of parole or immigration status. The Department does not wish to force a premature application for asylum in cases in which an individual believes circumstances in his country may improve, thus permitting him to return to his country. For example, an individual admitted as a student who expects that the political situation in her country may soon change for the better as a result of recent elections may wish to refrain from applying for asylum until absolutely necessary. The Department would expect a person in that situation to apply for asylum, should conditions not improve, within a very short period of time after the expiration of her status. Failure to apply within a reasonable time after expiration of the status would foreclose the person from meeting the statutory filing requirements. Generally, the Department expects an asylum-seeker to apply as soon as possible after expiration of his or her valid status, and failure to do so will result in rejection **76124** of the asylum application. Clearly, waiting six months or longer after expiration or termination of status would not be considered reasonable. Shorter periods of time would be considered on a case-by-case basis, with the decision-maker taking into account the totality of the circumstances.

Others recommended including situations involving the death or serious illness or incapacity of the applicant's legal representative or of a member of the applicant's immediate family. The Department agrees that there may be situations in which the serious illness of an applicant's representative or family member could relate to an applicant's delay in applying for asylum. Therefore, that suggestion has been adopted. As with all exceptions to the 1-year filing requirement based on extraordinary circumstances, the applicant would have to demonstrate that the illness of the representative or family related to the delay in filing and that the applicant applied for asylum within a reasonable amount of time after the illness.

Some commenters suggested broadening the two illustrative lists. The lists have been expanded to include some, but not all, of the suggestions. The Department's decision to include only some of the circumstances suggested in the comments does not mean that the Department has determined that those that were not included could never excuse tardiness. The fact that an applicant's

circumstances are described in the list of possible changed or extraordinary circumstances does not in itself mandate that a tardy filing be excused; nor does the lack of such a description mean that the circumstances cannot be raised during an interview or hearing and result in excuse of the untimely filing. The lists merely provide examples of circumstances that might result in a tardiness being excused. In order for a tardy filing to be excused, an applicant must first credibly show the existence or occurrence of the circumstances (regardless of whether those circumstances are specifically listed in the regulations), and then show (1) for changed circumstances, that those changes materially affect the alien's eligibility for asylum, or (2) for extraordinary circumstances, that those circumstances directly relate to the alien's failure to file the application within the 1-year deadline. Without the direct connection, the alien is statutorily ineligible to apply for asylum.

The Department notes that the existing provision in this section relating to "ineffective assistance of counsel" raises questions that have arisen under the Act more generally concerning whether, and if so when, errors by counsel may furnish a ground for an alien to obtain relief, such as setting aside a final order or excusing a failure to comply with a statutory deadline. For example, in a case that is currently pending before the Board of Immigration Appeals, the Service is arguing that because there is no constitutional right to government-furnished counsel in immigration proceedings, there is, under Coleman v. Thompson, 501 U.S. 722 (1991), no constitutional basis for relief based on a claim of ineffective assistance of counsel. Similar issues concerning errors of counsel have been raised in court in other contexts under the Act. The Department accordingly is re-examining the ineffective-assistance-of-counsel provision in the asylum regulations as part of a broader assessment of the role that counsel error may play in requests for relief in immigration proceedings. However, because those issues have not yet been raised in the context of the current rulemaking proceedings, this provision is being carried forward unchanged at the present time. The Department will address those issues separately in the future.

Certain commenters appeared to be confused about the amount of additional time an applicant should receive in order to file an application when it has been determined that a changed or extraordinary circumstance is present in a particular case. While most understood that the finding of changed or extraordinary circumstances justifies the tardiness being excused to the extent necessary to allow the alien a reasonable amount of time to submit the application, some believed that the alien would automatically receive one year from the date of the circumstance involved to file a timely application. Although there may be some rare cases in which a delay of one year or more may be justified because of particular circumstances, in most cases such a delay would not be justified. Allowing an automatic one year extension from the date a changed or extraordinary circumstance occurred would clearly exceed the statutory intent that the delay be related to the circumstance. Accordingly, that approach has not been adopted.

Section 208.4(b)(2) has been clarified to reflect that the director of the local asylum office, in addition to the director of the asylum program, can authorize the filing of an application directly with a local asylum office instead of with a Service Center. A provision was also added to this section that allows an application to be filed directly with an asylum office in a case in which an individual who was previously included in a principal applicant's asylum application as a dependent has lost derivative status and wants to file as a principal applicant.

The title of § 208.4(b)(3) has been changed from "With the immigration judge" to "With the Immigration Court," and in § 208.4(b)(3)(i), the phrase "jurisdiction over the port, district office, or sector after service and filing of the appropriate charging document" has been changed to "jurisdiction over the underlying proceeding." The form number of the Notice of Referral to Immigration Judge (I-863) has also been added to § 208.4(b)(3)(iii).

Finally, the second sentence of § 208.4(b)(5) has been amended to reflect that submission of an asylum application to the district director does not automatically trigger the issuance of a Form I-863, Notice of Referral to an Immigration Judge.

### § 208.5—Special Duties Towards Aliens in Custody of the Service

Language was added to reflect that paragraph (a), which relates to aliens in the custody of the Service who request asylum or withholding of removal, or who express a fear of persecution or harm, does not pertain to an alien in custody pending a reasonable fear determination pursuant to § 208.31, just as it does not pertain to an alien pending a credible fear determination. However,

a sentence was added to reflect that, even though the Service is not required to provide application forms to aliens pending a credible fear or reasonable fear determination, the Service may provide the forms upon request. The word "persecution" was deleted after the terms "credible fear" and "reasonable fear" to reflect that a credible fear or reasonable fear determination involves an evaluation of both fear of persecution and fear of torture. Finally, § 208.5(b)(1)(ii) has been amended to allow a district director to extend the 10-day filing period for crewmen when good cause exists.

### § 208.6—Disclosure to Third Parties

One commenter suggested the restoration of the second sentence in § 208.6(a), which had been removed as superfluous, relating to the deletion of identifying details from copies of asylum cases in public reading rooms. The Department believes § 208.6 protects the confidentiality of asylum applicants in public reading rooms and, therefore, has decided not to restore the removed language to this section. The Department has added language to **\*76125** § 208.6 regarding the disclosure to third parties of information and records relating to credible fear interviews and determinations, as well as reasonable fear interviews and determinations, to protect claimants' confidentiality in those proceedings.

The Department is considering further amendments to the confidentiality provisions and will publish a proposed rule if it decides further change is necessary.

### § 208.7—Employment Authorization

One commenter suggested a clarification that an asylum office referral of an asylum application to an immigration judge does not stop the 150-day employment authorization clock. This suggestion has not been adopted because it is not entirely accurate. Although the 150-day clock continues to run even if an asylum application is referred to the Immigration Court, an applicant may cause a delay that could stop the clock, including failing to appear at a hearing before the Immigration Court, or failing to follow fingerprinting requirements. Accordingly, this section has not been changed.

### § 208.9—Procedure for Interview Before an Asylum Officer

This section has not been substantively changed, although several comments were received. The reference to § 208.14(b) in paragraph (d) of this section was amended to refer to § 208.14(c) for consistency with revisions to § 208.14.

One commenter suggested that the regulations should contain protections to ensure the non-adversarial nature of the asylum interview and further commented that, because § 208.9(b) states that interviews will be conducted separate and apart from the public except at the request of the applicant, the asylum applicant, not the asylum officer, has the right to determine the number of individuals who may be present during an asylum interview. The Department believes that the regulations contain sufficient guidelines regarding the nonadversarial nature of the interview and has not amended them. The asylum officer needs to retain control over the flow and parameters of the interview, and the Department believes it is appropriate for asylum officers, taking into account the applicant's right to bring a representative and to present witnesses, and his or her need for an interpreter, to determine the number of individuals who may be present at the interview. Individual problems that may arise are more appropriately addressed by raising them with local asylum office directors than through regulatory changes.

The same commenter suggested that the asylum interview should be taped for accurate preservation of the record. While the Department has carefully considered that comment, and the Service does not rule out adopting a policy to tape record interviews in the future, at the present time the Department will not adopt that suggestion. In order to benefit the process, the taping would have to be transcribed for inclusion in the record. That would increase the cost, time, and personnel resources required to adjudicate an asylum application in a system that was designed to have an initial nonadversarial hearing with an asylum officer, followed, if the case is referred, by a de novo, more formal adversarial hearing, which is recorded, before an immigration judge. The Service believes that, in light of current circumstances, the administrative cost and burden of tape recording asylum interviews outweigh any expected benefit from the recording of interviews. As previously stated, however, the Service does not rule the option out for the future.

The same commenter also suggested that the Department should secure interpreters for asylum applicants who are interviewed at an asylum office. If the Department is unwilling to do so, the commenter continued, the Department should not penalize an applicant with an unexcused absence for failing to bring a qualified interpreter. The interim regulation provided an applicant a greater opportunity to find a qualified interpreter by permitting an applicant to provide an interpreter who is fluent in English and the applicant's native language, or any other language in which the applicant is fluent. The Service recognizes that Service-appointed interpreters could benefit applicants and the program. At this time, all federal agencies, including the Service, are reviewing issues relating to language interpreters in light of the recent Presidential Executive Order 13116, which directs federal agencies to establish written policies by December 11, 2000, on the language-accessibility of their programs and the programs of those who receive federal funds. The issue of interpreters raised by the commenter will therefore be addressed in compliance with Executive Order 13116.

The commenter's final suggestion was to incorporate into this part of the regulations guidelines for paroling detained asylum-seekers. The parole of aliens into the United States is within the purview of a district director and covered under § 212.5. The Department believes that § 212.5 contains sufficient guidelines to the Service for determining which aliens may be paroled, and has not included any guidelines for paroling aliens into this part.

Another commenter suggested that an applicant should be able to authorize counsel or a representative to pick-up a decision, without interruption of the 150-day clock. Section 239(a)(1) of the Act, however, specifically states that a Notice to Appear shall be given in person to the alien. The Act does not allow for a counsel or representative to accept service of a Notice to Appear unless the decision is mailed.

The same commenter suggested that § 208.9(d) should allow an attorney the opportunity to respond orally to any questions or evidence presented at the interview rather than allowing an asylum officer to require a representative to submit comments in writing. The current provisions in this section do allow for an attorney or representative to make an oral statement, and they also allow an asylum officer the discretion to have a representative submit comments in writing rather than orally, depending upon the particular facts in the case. Consistent with the current regulations, it is the general practice of asylum officers to allow an attorney the opportunity for oral responses and to ask questions at the end of the interview, subject to appropriate limitations. Therefore, the Department does not believe it necessary to make the suggested changes.

### § 208.10—Failure To Appear at an Interview

The Department received comments from one commenter on this section. The comments included a request for guidance on how an applicant can prove that the Service did not mail notice of interview to his or her address, and what constitutes "exceptional circumstances." With regard to the latter, the commenter recommended that the term "exceptional circumstances," which the commenter viewed as too harsh, be replaced with "good cause."

The Department declines to provide guidance on how to prove a notice of interview was not properly provided, and to further define "exceptional circumstances" beyond the definition provided in section 240(e)(1) of the Act. Determining whether a notice was properly provided and what constitutes "exceptional circumstances" must be reviewed on a case-by-case basis. That **\*76126** approach allows an asylum office director the discretion to determine the type of evidence necessary to show that notice of interview was not properly given in a particular individual's case, and the types of circumstances that may be considered "exceptional." In accordance with section 208(d)(5)(A)(v) of the Act, the Service must excuse the applicant's failure to appear for an interview for exceptional circumstances, but may excuse an applicant's failure to appear for good cause where appropriate. As a practical matter, the Service generally will exercise discretion to excuse a first-time failure to appear if (1) good cause has been shown, (2) proceedings before the Immigration Court have not been initiated, and (3) the excuse is received within a reasonable amount of time after the interview date. In the near future, the Service intends to issue a proposed rule clarifying the consequences of failure to appear, which will give the public further opportunity to comment on those issues.

### *§ 208.12—Reliance on Information Compiled by Other Sources*

In response to one comment, paragraph (b) of this section was revised to clarify that a prohibition on discovery of information does not include requests for information made under the Freedom of Information Act (FOIA).

### *§ 208.13—Establishing Asylum Eligibility*

Some commenters suggested that the former §§ 208.13(b)(2)(ii) and 208.16(b)(4) (giving due consideration to evidence that the government persecutes its nationals for unauthorized departure or seeking asylum) be reinstated in the regulations. This matter was thoroughly reviewed in the preamble to the interim rule at 62 FR 10312 in response to the earlier comments to the proposed rule at 62 FR 444. The comments to the interim rule raised no significant issues that were not previously addressed, and no changes have been made in that regard.

A new § 208.13(c)(2)(F) was added for consistency with the provisions of the Anti-terrorist and Effective Death Penalty Act of 1996 (AEDPA). For applications for asylum filed prior to April 1, 1997, an applicant who falls within subclauses (I), (II), or (III) of section 212(a)(3)(B)(i) of the Act (relating to terrorist activity) is ineligible for a grant of asylum unless it is determined that there are no reasonable grounds to believe that the individual is a danger to the security of the United States.

Some commenters argued that language about discretionary denials of asylum in § 208.13(d) was inconsistent with section 208(a)(2)(A) of the Act, which provides for rejection of an asylum application when an alien may be removed pursuant to a bilateral or multilateral agreement to a safe third country. In drafting the interim rule, the Department had based its decision to include this regulatory provision on section 208(d)(5)(B) of the Act (which gives the Attorney General the authority to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act") and section 208(b)(2)(C) of the Act (which gives the Attorney General authority to establish limitations and conditions under which an alien may be found ineligible for asylum), not on section 208(a)(2)(A) of the Act. While the Department still finds that the regulatory provision would be fully in keeping with the Act, it has decided to remove it from the regulations to avoid confusion.

The Department notes that it has not issued a notice in the Federal Register announcing that the United States has entered into a bilateral or multilateral agreement permitting removal to a safe third country pursuant to section 208(a)(2)(A) of the Act. The Department indicated in the final rule at 59 FR 62284 its intent to notify the public in advance through a Federal Register publication should the United States enter into any such agreements.

**Past Persecution Rule**

This final rule also incorporates changes to this section and § 208.16 (withholding of removal) that were the subject of a proposed rule that was published in the Federal Register on June 11, 1998, at 63 FR 31945. In that rule, changes were proposed for adjudicating cases in which an applicant has established past persecution or in which an applicant may be able to avoid persecution in his or her home country by relocating to another area of that country.

There were 35 comments submitted in response to the publication of the June 11, 1998, proposed rule. Twenty-six of the commenters argued that the proposal should be withdrawn and the effort to amend the regulation abandoned because the proposed changes violate the Act under which the Attorney General is given authority over the adjudication of applications for asylum and withholding of removal, and are inconsistent with precedent court decisions and international law. The other commenters were also opposed to virtually all the changes included in the proposed rule, but did not specifically request that the proposed rule be abandoned outright.

First, the Department does not agree with the argument that those regulatory changes are ultra vires, or beyond the authority granted to the Attorney General under the Act. Under section 208 of the Act, when an individual has established that he or she is a "refugee," as defined in section 101(a)(42)(A) of the Act, the Attorney General is granted the discretion to determine

which "refugees" will be granted asylum in the United States. Prior to enactment of IIRIRA, this broad delegation of power to the Attorney General over the adjudication of asylum applications withstood challenges to the Attorney General's authority to implement rules that denied asylum to persons who otherwise met the "refugee" definition for reasons other than those listed in the Act. Komarenko v. INS, 35 F.3d 432, 435-36 (9th Cir. 1994) (rejected challenge to the Attorney General's authority to issue a regulatory provision that denied asylum to refugees who were convicted of particularly serious crimes); Yang v. INS, 79 F.3d 932 (9th Cir.), cert. denied, 519 U.S. 824 (1996) (rejected challenge to the Attorney General's authority to deny asylum to refugees who were found to have been firmly resettled). Although the commenters correctly point out that section 208 of the Act was amended by IIRIRA to make several categories of individuals ineligible for asylum who had previously been barred only by regulation, section 208(b)(2)(C) of the Act specifically continues to give the Attorney General authority "by regulation (to) establish additional limitations and conditions * * * under which an alien shall be ineligible for asylum."

The Department has concluded that revisions to the regulatory language providing guidelines on the exercise of discretion in determining an applicant's eligibility for asylum, once he or she has been found to meet the definition of refugee based on past persecution, are justified and in line with the administrative and judicial precedents outlined in the Supplementary Information section to the proposed rule at 63 FR 31945. That includes, inter alia, consideration of the ability of an applicant who has been subjected to past persecution to relocate safely in his or her home country, a factor that has been recognized as appropriate for the Attorney General to consider in the exercise of her discretion to grant or deny asylum. Harpinder **\*76127** Singh v. Ilchert, 63 F.3d 1501, 1511 (9th Cir. 1995); Surinder Singh v. Ilchert, 69 F.3d 375, 379 (9th Cir. 1995). In addition, the Department has concluded that requiring consideration of the applicant's ability to relocate safely in his or her home country in determining whether the applicant has a well-founded fear of persecution is in line with the previous administrative and judicial decisions, such as Matter of Acosta, 19 I. & N. Dec. 211, 235 (BIA 1985), modified on other grounds, Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987); Etugh v. INS, 921 F.2d 36, 39 (3rd Cir. 1990); Quintanilla-Ticas v. INS, 783 F.2d 955, 957 (9th Cir. 1986), outlined in the Supplementary Information section to the proposed rule.

The Department does agree, however, that some changes to the proposed language are appropriate in order to ensure that those provisions are applied in a manner that complies with our international obligations under the 1951 Convention relating to the Status of Refugees ("1951 Convention"), as modified by the 1967 Protocol relating to the Status of Refugees. In determining how to revise these provisions, the Department referred to the relevant provisions of the United Nations High Commissioner for Refugee's Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook"). Although the Department is not bound by the UNHCR Handbook, the handbook can serve as a "useful interpretative aid," INS v. Aguirre-Aguirre, 526 U.S. 415, 427 (1999), and "provides significant guidance in construing the Protocol, to which Congress sought to conform" with the passage of the Refugee Act of 1980. INS v. Cardoza-Fonseca, 480 U.S. 421, 439 n.22 (1987). In §§ 208.13(b)(1)(i)(A) and 208.16(b)(1)(i)(A), the regulatory language for overcoming the presumption of a well-founded fear of persecution and a threat to the applicant's life or freedom because of past persecution is changed to state that the Service must show a "fundamental change in circumstances" in order to overcome the presumption. That phrase is consistent with Article 1 C(5) of the 1951 Convention, reflects the relevant language regarding the fundamental nature of the change at paragraph 135 of the UNHCR Handbook, and is also the exact language provided in section 208(c)(2)(A) of the Act concerning the termination of a refugee's grant of asylum in the United States. By adopting that language rather than that requiring a showing of changed country conditions to overcome the presumption, other changes in the circumstances surrounding the asylum claim, including a fundamental change in personal circumstances, may be considered, so long as those changes are fundamental in nature and go to the basis of the fear of persecution.

The amended language in §§ 208.13(b)(1) and 208.16(b)(1)(i) is not intended to alter the holding in the Board decision Matter of N-M-A, Int. Dec. 3368 (BIA 1998), that the presumption raised by a finding of past persecution applies only to a fear of future persecution based on the original persecution, and not to a fear of persecution from a new source unrelated to the past persecution. In Matter of N-M-A, the Board explained, "once an applicant has demonstrated that he has suffered past persecution on account of a statutorily-protected ground, and the record reflects that country conditions have changed to such an extent that the applicant no longer has a well-founded fear of persecution from his original persecutors, the applicant bears the burden of demonstrating that he has a well-founded fear of persecution from any new source." While the amendments to §§ 208.13(b)(1)

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and 208.16(b)(1)(i) change the regulations to the extent that the presumption may be overcome by events other than a change in country conditions, the regulations retain and specify the requirement that the presumption relates only to fear of harm based on facts that give rise to the original persecution.

In the sections of the regulations dealing with the issue of internal relocation, §§ 208.13(b)(1)(i)(B) and (b)(2)(ii), and 208.16(b)(1)(i)(B) and (b)(2), the provisions have been revised to require a showing by the Service that "under all the circumstances, it would be reasonable to expect the applicant to (relocate)." That language is nearly identical to the language used in the relevant section of the UNHCR Handbook, paragraph 91. The reasonableness standard with regards to relocation is consistent with the general standard for adjudicating well-founded fear claims.

With regard to other sections of the proposed rule at 63 FR 31945, some commenters recommended that the language regarding the burden of proof to overcome the presumption that arises after a finding of past persecution should be revised to indicate clearly that the Service bears the burden to overcome those presumptions, by a preponderance of the evidence, even in the context of asylum adjudications by an asylum officer. The Department agrees, and changes have been made accordingly.

The Department declines to adopt the recommendation of many commenters to allow adjudicators to consider additional humanitarian factors, unrelated to the severity of the past persecution or other serious harm, in exercising their discretion to grant asylum to a refugee who no longer has a well-founded fear of persecution. In allowing an applicant to be granted asylum based on past persecution alone when it is determined that the applicant has established either (1) compelling reasons because of the severity of the past harm, or (2) a reasonable possibility that he or she may suffer serious harm upon removal to his or her home country, the Department is already providing avenues for relief that are consistent with the protection function of the 1951 Convention, and that go beyond the provisions of the UNHCR Handbook. See paragraph 136 of the UNHCR Handbook. As explained in the Supplementary Information to the proposed rule published in the Federal Register on June 11, 1998, at 63 FR 31945, 31947, by "other serious harm," the Department means harm that is not inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion, but is so serious that it equals the severity of persecution. Mere economic disadvantage or the inability to practice one's chosen profession would not qualify as "other serious harm."

In summary, the changes in the regulation are consistent with the Act, relevant case law, international instruments, and guidance in the UNHCR Handbook. The regulations leave intact the important principle that an applicant who has established past persecution on account of one of the five grounds is a refugee. It also continues to provide that a person who has established past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion shall be presumed to have a well-founded fear of future persecution on account of those same grounds, and shall also be presumed to have established a threat to his or her life or freedom under the standard for eligibility for withholding of removal. The regulations also make it clear that the Service has the burden of overcoming such presumptions by a preponderance of the evidence.

Finally, the Department has renamed paragraph (b) of § 208.13, currently "persecution," to "eligibility," to reflect the incorporation of the new paragraph (b)(3), regarding reasonableness of internal relocation, as well as the other eligibility requirements contained in paragraphs (b)(1) and (b)(2). **76128**

### *§ 208.14—Approval, Denial, Referral, or Dismissal of Application*

This section has been substantially revised and reorganized to clarify the circumstances under which an asylum officer may grant, deny, or refer an asylum application. Because an asylum officer's authority to grant asylum to an applicant within the Asylum Office's jurisdiction is unrelated to an applicant's status, discussion of authority to grant asylum has been consolidated in § 208.14(b). The statutory requirement that identity checks be completed before asylum can be granted by an asylum officer has been added to paragraph (b).

Discussion of an asylum officer's authority to deny, dismiss, or refer an application has been placed in a new § 208.14(c), with a breakdown of how an application will be processed based on the applicant's status. In § 208.14(c)(1), language was added to clarify that applicants who are inadmissible or deportable will either be referred to the Immigration Court, or have their asylum

applications dismissed. Section 208.14(c)(2) now clarifies that the classes of aliens to whom an asylum officer may grant or deny asylum status include aliens in valid Temporary Protected Status and immigrant status. New §§ 208.14(c)(3) and 208.14(c)(4) were added, and detail how the Service processes asylum applications of aliens who were paroled into the United States, depending upon the decision an asylum officer makes on the application and the validity of the parole.

### § 208.15—Definition of "firm resettlement"

All of the references to "he" have been changed to "he or she," and the references to "nation" have been changed to "country."

### § 208.16—Withholding of Removal Under Section 241(b)(3)(B) of the Act and Withholding of Removal Under the Convention Against Torture

This section was substantially revised with the publication of February 19, 1999, interim regulations on Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture) in the Federal Register, at 64 FR 8478, with a request for comments. Any comments regarding that interim rule will be addressed in the final rule implementing the Convention Against Torture. Some of the comments on the March 6, 1997, interim rule addressed concerns about how the Department would implement Article 3 of the Convention Against Torture. Because many of the commenters' concerns were addressed with the February 19, 1999, interim rule, they will not be addressed in this supplementary information.

Language in paragraph (b) relating to eligibility for withholding of removal is being amended to reflect similar amendments to § 208.13 on adjudicating claims where past persecution has been established. See the discussion in this preamble regarding changes in § 208.13.

### § 208.19—Decisions

With the publication of the interim rule at 64 FR 8478 to implement Article 3 of the Convention Against Torture, § 208.17 was revised, §§ 208.18 through 208.22 were redesignated as §§ 208.19 through 208.23, and a new § 208.18 was added. However, due to Department error, § 208.17 was not redesignated and was, therefore, dropped from 8 CFR part 208. This final rule reinstates the former § 208.17 relating to decisions on applications for asylum and for withholding of removal as the new § 208.19, and redesignates §§ 208.19 through 208.23 as §§ 208.20 through 208.24.

Language in § 208.17 that appeared before it was dropped from 8 CFR part 208 has been slightly amended. In response to one comment, language has been added to indicate that a letter communicating denial or referral of the application shall state the basis for the denial or referral.

### § 208.20—Determining if an Asylum Application is Frivolous

Section 208.19 has been redesignated as § 208.20, with no substantive changes. One commenter stated that the regulatory definition of "frivolous" does not contain appropriate safeguards, and that the Service should advise every asylum applicant of the consequences of filing frivolous claims. The current regulation provides appropriate safeguards by stipulating that an immigration judge or the Board must be satisfied that an applicant had sufficient opportunity to account for any discrepancies before finding that an applicant filed a frivolous application, and by permitting an applicant to seek withholding or removal even if he or she is found to have filed a frivolous application. The regulation itself also advises an applicant that he or she is subject to the provisions of section 208(d)(6) of the Act if a final order specifically finds that the alien knowingly filed a frivolous application. Finally, both the instructions to the Form I-589 and the application itself warn the applicant about the consequences of filing a frivolous claim, as required by section 208(d)(4) of the Act.

The Department believes that the current regulation provides for appropriate safeguards for filing a frivolous asylum application, and that, for the reasons set forth in the supplemental information to the January 3, 1997 proposed rule, the definition of frivolous is sufficient. The Department, therefore, has not changed any language in this section.

A commenter also suggested that an applicant should not be punished for voluntarily withdrawing an asylum application, and that the Department should advise adjudicators that, before finding that an individual filed a frivolous application, they should consider the fact that an applicant may not have been able to afford to retain counsel for advice on the legal strength of an asylum claim. The current regulation does not contain any provisions that punish an applicant for withdrawing an asylum application. Any applicant may choose to withdraw an application at any time prior to a final decision; however, a withdrawal does not preclude the Service from seeking removal of the alien if he or she is deportable or removable. The fact that an applicant may not have hired legal counsel may be one factor, among others, that an immigration judge or the Board may consider when determining whether an applicant had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

### § 208.21—*Admission of Asylee's Spouse and Children*

Section 208.20 has been redesignated as § 208.21 and restructured to provide greater clarity. Additionally, this section has been amended to correct an error in the interim rule published in the Federal Register at 62 FR 10312, effective April 1, 1997, which omitted the bar to asylum eligibility based on the commission of a serious non-political crime outside the United States, for applicants who applied on or after April 1, 1997. The omission was inadvertent, since such ground had been specifically included under IIRIRA for asylees. That error has been corrected and the provision redrafted to specify the applicable bar for derivative applications filed prior to April 1, 1997, and those filed on or after April 1, 1997. The Service finds that good cause exists for adopting the provision in this final rule without the prior notice and comment period ordinarily required by 5 U.S.C. 553(b) because the provision merely codifies in the Service's regulation the statutory mandates of **\*76129** section 604 of IIRIRA. In addition, after reviewing the Department's implementation of the statutory mandate, it is clear that the omission was an inadvertent error. Therefore, the notice and comment period normally required under 5 U.S.C. 553(b) is impracticable and unnecessary prior to adopting this provision.

### § 208.22—*Effect on Exclusion, Deportation, or Removal Proceedings*

Section 208.21 has been redesignated as § 208.22, and paragraph (b), which addresses the initiation of removal proceedings upon termination of an asylum grant, has been moved to § 208.24.

### § 208.24—*Termination of Asylum and Withholding of Removal*

Section 208.23 has been redesignated as § 208.24. Some comments on § 208.24 suggested that the provision be removed or narrowed, and that more procedural protections be provided before termination. The Department finds that the existing procedural protections, which provide for prior notice of grounds for termination and an opportunity to respond, are sufficient. No changes have been made in the regulations governing termination procedures.

However, § 208.24(b)(1) was revised for consistency with the revisions in this final rule to § 208.16 and for consistency with the provisions for termination of asylum. The provision that "[t]he alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld" has been replaced with, "The alien is no longer entitled to withholding of deportation or removal because, owing to a fundamental change in circumstances relating to the original claim, the alien's life or freedom no longer would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion in the country from which deportation or removal was withheld."

In addition, the former § 208.21(b), concerning the initiation of removal proceedings, is now paragraph (e) of this section. The Department deleted the phrase "under section 235 or 240 of the Act" from the former § 280.21(b) because an alien may be subject to removal under other sections of the Act, such as section 238, which concerns administrative removal of aggravated felons, or section 241(a)(5), which requires reinstatement of prior orders under certain circumstances.

*§ 208.30*—*Credible Fear Determinations*

The format of this section has been revised for the purpose of clarity. Also, a new paragraph (b) has been added at § 208.30; that paragraph provides that an accompanying dependent (spouse or child) may be included in the application of the principal alien, if the spouse or child so chooses.

Some commenters objected to the use of telephonic interpreters in credible fear interviews. Telephonic interpretation has given asylum officers flexibility in scheduling and conducting credible fear interviews, and has proven to be a reliable source of interpretation services. First, because the number of languages available through telephonic interpretation is quite large, applicants can be interviewed in the language or dialect with which they are most comfortable. Relying on physically present interpreters would limit the number of languages that are available and, although an alien may be able to speak a particular language or dialect, it may not be the language or dialect with which the alien is most comfortable speaking and understanding. Second, if an applicant requests an interpreter of a gender other than that of the individual initially assigned to perform telephonic interpretation services, a replacement interpreter can be easily identified and enlisted when using a telephonic interpreter, so the interview does not need rescheduling. The use of physically present interpreters usually limits the ability to secure such quick personnel replacements. Finally, an asylum officer can always locate an interpreter for a particular language on short notice regardless of whether the interview is conducted at a detention facility or at a remote location, such as a border port-of-entry. In many instances, live interpreters cannot appear for an interview on short notice or are not willing to travel to a remote location for an interview. The current provision for using telephonic interpreters, which has been in place for approximately 3 years, has worked well. However, as mentioned earlier, practices relating to language accessibility in federal programs are under review as part of the Department's compliance with Presidential Executive Order 13116. Therefore, the use of telephonic interpretation will be addressed in compliance with that Executive Order.

Some commenters suggested that the regulations allow counsel to be present during the credible fear interview. The regulations already allow any person with whom the alien chooses to consult to be present. For purposes of this section, the term "persons" is interpreted to include legal counsel. Accordingly, the regulation has not been changed in that regard.

There were also some suggestions that the asylum officer's credible fear interview should also serve as an Asylum Pre-Screening Officer (APSO) interview for purposes of determining whether the alien should be released from detention. While a positive credible fear determination may be considered by a district director when making a parole decision, it is not determinative, and other factors must be taken into account, such as whether the applicant is likely to appear for a hearing or may pose a threat to the community.

Some commenters suggested that the rules specify that credible fear is a low screening standard. The Department finds that language in section 235(b)(1)(B)(v) of the Act is more precise than the rather vague term "low." While the Department does not disagree that it is a threshold or low standard, defining it as such would only foster debate about what "low" means. Accordingly, the regulation has not been amended in that regard.

There were also some suggestions that, when a case raises a novel issue of law, the individual should be referred for a full hearing before an immigration judge. The regulation has been clarified to provide that, in making a credible fear determination, the asylum officer or immigration judge shall take into consideration whether the case presents novel or unique issues.

Likewise, there were also suggestions that such a referral should be made regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the Act. The Department has adopted that suggestion and has so amended the regulation.

Several commenters suggested that the Service should presume a request for appeal by any alien who expressed fear to a pre-screening officer and tried without success to persuade an asylum officer that the alien has a credible fear of persecution. It would be contrary to the intent of the statute to mandate a review in every case, including those where the alien clearly and

knowingly decides not to pursue a review. However, the regulations have been modified to provide that an alien's failure or refusal to indicate whether he or she desires a review shall be deemed to be a request for such review.

The Department has also amended paragraph (b) regarding the interview procedure by adopting language from § 208.9 on eliciting testimony and who may act as an interpreter.  **\*76130**

Finally, in § 208.30(g)(2)(iv)(A), the Department added language that would permit the Service to reconsider a negative credible fear determination, even after such determination has been affirmed by an immigration judge, as long as the Service provides the immigration judge with notice of its reconsideration.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant impact on a substantial number of small entities. This rule will ensure that asylum applications are processed in accordance with the Act, as amended by IIRIRA, as well as with international instruments. Moreover, it will have no effect on small entities, as that term is defined in 5 U.S.C. 601(6).

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any 1 year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**Executive Order 12866**

This rule is considered by the Department of Justice, Immigration and Naturalization Service, to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review. Accordingly, this rule has been submitted to the Office of Management and Budget for review.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibility among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a summary impact statement.

**Executive Order 12988**

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

**Paperwork Reduction Act**

The information collection requirements contained in this rule have been approved by the Office of Management and Budget under the provisions of the Paperwork Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

**List of Subjects in 8 CFR Part 208**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Accordingly, part 208 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

Authority: 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.
 8 CFR § 208.2

2. Section 208.2 is revised to read as follows:
 8 CFR § 208.2

**§ 208.2 Jurisdiction**

(a) Office of International Affairs. Except as provided in paragraph (b) or (c) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry. The Office of International Affairs shall also have initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

(b) Jurisdiction of Immigration Court in general. Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served a Form I-221, Order to Show Cause; Form I-122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I-862, Notice to Appear, after the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review reasonable fear determinations referred to the Immigration Court under § 208.31, and credible fear determinations referred to the Immigration Court under § 208.30.

(c) Certain aliens not entitled to proceedings under section 240 of the Act.

(1) Asylum applications and withholding of removal applications only. After Form I-863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewmember who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) On or after April 1, 1997, was granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution or torture pursuant to the procedures set forth in subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under § 235(c) of the Act, as described in § 235.8(a) of this chapter (applicable only in the event that the alien is referred for proceedings under this paragraph by the Regional Director pursuant to section 235.8(b)(2)(ii) of this chapter); or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act (applicable only in the event that the alien is referred for proceedings under this paragraph by the district director).  **\*76131**

(2) Withholding of removal applications only. After Form I-863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any application for withholding of removal filed by:

(i) An alien who is the subject of a reinstated removal order pursuant to section 241(a)(5) of the Act; or

(ii) An alien who has been issued an administrative removal order pursuant to section 238 of the Act as an alien convicted of committing an aggravated felony.

(3) Rules of procedure.

(i) General. Except as provided in this section, proceedings falling under the jurisdiction of the immigration judge pursuant to paragraph (c)(1) or (c)(2) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, subpart A. The scope of review in proceedings conducted pursuant to paragraph (c)(1) of this section shall be limited to a determination of whether the alien is eligible for asylum or withholding or deferral of removal, and whether asylum shall be granted in the exercise of discretion. The scope of review in proceedings conducted pursuant to paragraph (c)(2) of this section shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal. During such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief.

(ii) Notice of hearing procedures and in-absentia decisions. The alien will be provided with notice of the time and place of the proceeding. The request for asylum and withholding of removal submitted by an alien who fails to appear for the hearing shall be denied. The denial of asylum and withholding of removal for failure to appear may be reopened only upon a motion filed with the immigration judge with jurisdiction over the case. Only one motion to reopen may be filed, and it must be filed within 90 days, unless the alien establishes that he or she did not receive notice of the hearing date or was in Federal or State custody on the date directed to appear. The motion must include documentary evidence, which demonstrates that:

(A) The alien did not receive the notice;

(B) The alien was in Federal or State custody and the failure to appear was through no fault of the alien; or

(C) "Exceptional circumstances," as defined in section 240(e)(1) of the Act, caused the failure to appear.

(iii) Relief. The filing of a motion to reopen shall not stay removal of the alien unless the immigration judge issues an order granting a stay pending disposition of the motion. An alien who fails to appear for a proceeding under this section shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 of the Act for a period of 10 years after the date of the denial, unless the applicant can show exceptional circumstances resulted in his or her failure to appear.

8 CFR § 208.3

3. Section 208.3 is amended by:

a. Revising paragraph (a);

b. Revising paragraph (c)(4); and

c. Revising paragraph (c)(5), to read as follows:

8 CFR § 208.3

### § 208.3  Form of application.

(a) An asylum applicant must file Form I-589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I-589 must be submitted for each dependent included in the principal's application.

* * * * *

(c) * * *

(4) Knowing placement of false information on the application may subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil or criminal penalties under section 274C of the Act; and

(5) Knowingly filing a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to § 208.20.

8 CFR § 208.4

4. Section 208.4 is amended by:

a. Revising paragraph (a);

b. Revising paragraph (b)(2);

c. Revising paragraph (b)(3); and

d. Revising paragraph (b)(5), to read as follows:

8 CFR § 208.4

### § 208.4  Filing the application.

* * * * *

(a) Prohibitions on filing. Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate to the satisfaction of the Attorney General that one of the exceptions in section 208(a)(2)(D) of the Act applies. Such prohibition applies only to asylum applications under section 208 of the Act and not to applications for withholding of removal under § 208.16. If an applicant files an asylum application and it appears that one or more of the prohibitions contained in section 208(a)(2) of the Act apply, an asylum officer, in an interview, or an immigration judge, in a hearing, shall review the application and give the applicant the opportunity to present any relevant and useful information bearing on any prohibitions on filing to determine if the application should be rejected. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) Authority. Only an asylum officer, an immigration judge, or the Board of Immigration Appeals is authorized to make determinations regarding the prohibitions contained in section 208(a)(2)(B) or (C) of the Act.

(2) One-year filing deadline.

(i) For purposes of section 208(a)(2)(B) of the Act, an applicant has the burden of proving:

(A) By clear and convincing evidence that the application has been filed within 1 year of the date of the alien's arrival in the United States, or

(B) To the satisfaction of the asylum officer, the immigration judge, or the Board that he or she qualifies for an exception to the 1-year deadline.

(ii) The 1-year period shall be calculated from the date of the alien's last arrival in the United States or April 1, 1997, whichever is later. When the last day of the period so computed falls on a Saturday, Sunday, or legal holiday, the period shall run until the end of the next day that is not a Saturday, Sunday, or legal holiday. For the purpose of making determinations under section 208(a)(2)(B) of the Act only, an application is considered to have been filed on the date it is received by the Service, pursuant to § 103.2(a)(7) of this chapter. In a case in which the application has not been received by the Service within 1 year from the applicant's date of entry into the United States, but the applicant provides clear and convincing documentary evidence of mailing the application within the 1-year period, the mailing date shall be considered the filing date. For cases before the Immigration Court in accordance with § 3.13 of this chapter, the application is considered to have been filed on the date it is received by the Immigration Court. For cases before the Board of Immigration Appeals, the application is considered to have been **\*76132** filed on the date it is received by the Board. In the case of an application that appears to have been filed more than a year after the applicant arrived in the United States, the asylum officer, the immigration judge, or the Board will determine whether the applicant qualifies for an exception to the deadline.

(3) Prior denial of application. For purposes of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals.

(4) Changed circumstances.

(i) The term "changed circumstances" in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum. They may include, but are not limited to:

(A) Changes in conditions in the applicant's country of nationality or, if the applicant is stateless, country of last habitual residence;

(B) Changes in the applicant's circumstances that materially affect the applicant's eligibility for asylum, including changes in applicable U.S. law and activities the applicant becomes involved in outside the country of feared persecution that place the applicant at risk; or

(C) In the case of an alien who had previously been included as a dependent in another alien's pending asylum application, the loss of the spousal or parent-child relationship to the principal applicant through marriage, divorce, death, or attainment of age 21.

(ii) The applicant shall file an asylum application within a reasonable period given those "changed circumstances." If the applicant can establish that he or she did not become aware of the changed circumstances until after they occurred, such delayed awareness shall be taken into account in determining what constitutes a "reasonable period."

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(5) The term "extraordinary circumstances" in section 208(a)(2)(D) of the Act shall refer to events or factors directly related to the failure to meet the 1-year deadline. Such circumstances may excuse the failure to file within the 1-year period as long as the alien filed the application within a reasonable period given those circumstances. The burden of proof is on the applicant to establish to the satisfaction of the asylum officer, the immigration judge, or the Board of Immigration Appeals that the circumstances were not intentionally created by the alien through his or her own action or inaction, that those circumstances were directly related to the alien's failure to file the application within the 1-year period, and that the delay was reasonable under the circumstances. Those circumstances may include but are not limited to:

(i) Serious illness or mental or physical disability, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival;

(ii) Legal disability (e.g., the applicant was an unaccompanied minor or suffered from a mental impairment) during the 1-year period after arrival;

(iii) Ineffective assistance of counsel, provided that:

(A) The alien files an affidavit setting forth in detail the agreement that was entered into with counsel with respect to the actions to be taken and what representations counsel did or did not make to the respondent in this regard;

(B) The counsel whose integrity or competence is being impugned has been informed of the allegations leveled against him or her and given an opportunity to respond; and

(C) The alien indicates whether a complaint has been filed with appropriate disciplinary authorities with respect to any violation of counsel's ethical or legal responsibilities, and if not, why not;

(iv) The applicant maintained Temporary Protected Status, lawful immigrant or nonimmigrant status, or was given parole, until a reasonable period before the filing of the asylum application;

(v) The applicant filed an asylum application prior to the expiration of the 1-year deadline, but that application was rejected by the Service as not properly filed, was returned to the applicant for corrections, and was refiled within a reasonable period thereafter; and

(vi) The death or serious illness or incapacity of the applicant's legal representative or a member of the applicant's immediate family.

(b) * * *

(2) With the asylum office. An asylum application shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who:

(i) Has received the express consent of the asylum office director or the Director of Asylum to do so, or

(ii) Previously was included in a spouse's or parent's pending application but is no longer eligible to be included as a derivative. In such cases, the derivative should include a cover letter referencing the previous application and explaining that he or she is now independently filing for asylum.

(3) With the Immigration Court. Asylum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the underlying proceeding.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(iii) In asylum proceedings pursuant to § 208.2(c)(1) and after the Form I-863, Notice of Referral to Immigration Judge, has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) * * *

(5) With the district director. In the case of any alien described in § 208.2(c)(1) and prior to the service on the alien of Form I-863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. If the district director elects to issue the Form I-863, the district director shall forward such asylum application to the appropriate Immigration Court with the Form I-863 being filed with that Immigration Court.

* * * * *8 CFR § 208.5

5. Section 208.5 is amended by:

a. Revising the first sentence in paragraph (a);

b. Adding a new second sentence in paragraph (a); and

c. Revising paragraph (b)(1)(ii), to read as follows:

8 CFR § 208.5

## § 208.5 Special duties toward aliens in custody of the Service.

(a) General. When an alien in the custody of the Service requests asylum or withholding of removal, or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear determination under § 208.30 or a reasonable fear determination pursuant to § 208.31. Although the Service does not have a duty in the case of an alien who is in custody pending a credible fear or reasonable fear determination under either § 208.30 or § 208.31, the Service **76133** may provide the appropriate forms, upon request. * * *

(b) * * *

(1) * * *

(ii) An alien crewmember shall be provided the appropriate application forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port-of-entry. The district director may extend the 10-day filing period for good cause. Once the application has been filed, the district director, pursuant to § 208.4(b), shall serve Form I-863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I-863 being filed with that court.

* * * * *8 CFR § 208.6

6. Section 208.6 is revised to read as follows:

8 CFR § 208.6

## § 208.6 Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service and the Executive Office for Immigration Review that indicate that a specific alien has applied for asylum, received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentiality of those records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The consideration of a request for a credible fear or reasonable fear interview, or a credible fear or reasonable fear review;

(iii) The defense of any legal action arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear determination or reasonable fear determination under § 208.30 or § 208.31;

(iv) The defense of any legal action of which the asylum application, credible fear determination, or reasonable fear determination is a part; or

(v) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, State, or local court in the United States considering any legal action:

(i) Arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear or reasonable fear determination under § 208.30 or § 208.31; or

(ii) Arising from the proceedings of which the asylum application, credible fear determination, or reasonable fear determination is a part.

8 CFR § 208.9

## § 208.9 [Amended]
8 CFR § 208.9

7. In § 208.9, paragraph (d) is amended by revising the reference to "§ 208.14(b)" to read "§ 208.14(c)."

8 CFR § 208.12

8. Section 208.12 is amended by revising paragraph (b) to read as follows:

8 CFR § 208.12

## § 208.12 Reliance on information compiled by other sources.

* * * * *

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State. Persons may continue to seek documents available through a Freedom of Information Act (FOIA) request pursuant to 8 CFR part 103.

8 CFR § 208.13

9. Section 208.13 is amended by:

a. Revising the heading of paragraph (b);

b. Revising paragraph (b)(1);

c. Revising paragraph (b)(2);

d. Adding new paragraph (b)(3);

e. Adding a new paragraph (c)(2)(i)(F); and

f. Removing paragraph (d), to read as follows:
 8 CFR § 208.13

**§ 208.13** **Establishing asylum eligibility.**
* * * * *
(b) Eligibility. * * *

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted if an asylum officer or immigration judge makes one of the findings described in paragraph (b)(1)(i) of this section. If the applicant's fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded.

(i) Discretionary referral or denial. Except as provided in paragraph (b)(1)(iii) of this section, an asylum officer shall, in the exercise of his or her discretion, refer or deny, or an immigration judge, in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution if any of the following is found by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; or

(B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) Burden of proof. In cases in which an applicant has demonstrated past persecution under paragraph (b)(1) of this section, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i) (A) or (B) of this section.

(iii) Grant in the absence of well-founded fear of persecution. An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:

(A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or

(B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

(2) Well-founded fear of persecution. (i) An applicant has a well-founded fear of persecution if: **\*76134**

(A) The applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and

(C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.

(ii) An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so.

(iii) In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:

(A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1)(i), (b)(1)(ii), and (b)(2) of this section, adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

 \* \* \* \* \*

(c) \* \* \*

(2) \* \* \*

(i) \* \* \*

(F) Is described within section 212(a)(3)(B)(i)(I),(II), and (III) of the Act as it existed prior to April 1, 1997, and as amended by the Anti-terrorist and Effective Death Penalty Act of 1996 (AEDPA), unless it is determined that there are no reasonable grounds to believe that the individual is a danger to the security of the United States.

* * * * *8 CFR § 208.14

10. Section 208.14 is amended by:

a. Revising paragraph (b);

b. Redesignating paragraphs (c)-(f) as paragraphs (d)-(g);

c. Adding a new paragraph (c);

d. Revising newly redesignated paragraph (e); and

e. Adding a heading to new redesignated paragraph (g), to read as follows:

8 CFR § 208.14

## § 208.14 Approval, denial, referral, or dismissal of application.
* * * * *
(b) Approval by an asylum officer. In any case within the jurisdiction of the Office of International Affairs, unless otherwise prohibited in § 208.13(c), an asylum officer may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) Denial, referral, or dismissal by an asylum officer. If the asylum officer does not grant asylum to an applicant after an interview conducted in accordance with § 208.9, or if, as provided in § 208.10, the applicant is deemed to have waived his or her right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application, as follows:

(1) Inadmissible or deportable aliens. Except as provided in paragraph (c)(4) of this section, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

(2) Alien in valid status. In the case of an applicant who is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status at the time the application is decided, the asylum officer shall deny the application for asylum.

(3) Alien with valid parole. If an applicant has been paroled into the United States and the parole has not expired or been terminated by the Service, the asylum officer shall deny the application for asylum.

(4) Alien paroled into the United States whose parole has expired or is terminated.

(i) Alien paroled prior to April 1, 1997, or with advance authorization for parole. In the case of an applicant who was paroled into the United States prior to April 1, 1997, or who, prior to departure from the United States, had received an advance authorization for parole, the asylum officer shall refer the application, together with the appropriate charging documents, to an immigration judge for adjudication in removal proceedings if the parole has expired, the Service has terminated parole, or the Service is terminating parole through issuance of the charging documents, pursuant to § 212.5(d)(2)(i) of this chapter.

(ii) Alien paroled on or after April 1, 1997, without advance authorization for parole. In the case of an applicant who is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter, and was paroled into the United States on or

after April 1, 1997, without advance authorization for parole prior to departure from the United States, the asylum officer will take the following actions, if the parole has expired or been terminated:

(A) Inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act. If the applicant appears inadmissible to the United States under section 212(a)(6)(C) or 212(a)(7) of the Act and the asylum officer does not intend to lodge any additional charges of inadmissibility, the asylum officer shall proceed in accordance with § 235.3(b) of this chapter. If such applicant is found to have a credible fear of persecution or torture based on information elicited from the asylum interview, an asylum officer may refer the applicant directly to an immigration judge in removal proceedings under section 240 of the Act, without conducting a separate **\*76135** credible fear interview pursuant to § 208.30. If such applicant is not found to have a credible fear based on information elicited at the asylum interview, an asylum officer will conduct a credible fear interview and the applicant will be subject to the credible fear process specified at § 208.30(b).

(B) Inadmissible on other grounds. In the case of an applicant who was paroled into the United States on or after April 1, 1997, and will be charged as inadmissible to the United States under provisions of the Act other than, or in addition to, sections 212(a)(6)(C) or 212(a)(7), the asylum officer shall refer the application to an immigration judge for adjudication in removal proceedings.

\* \* \* \* \*

(e) Duration. If the applicant is granted asylum, the grant will be effective for an indefinite period, subject to termination as provided in § 208.24.

\* \* \* \* \*

(g) Applicants granted lawful permanent residence status. \* \* \*

8 CFR § 208.15

11. Section 208.15 is revised to read as follows:

8 CFR § 208.15

## § 208.15 Definition of "firm resettlement."

An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:

(a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

(b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 CFR § 208.16

12. Section 208.16 is amended by

a. Revising paragraph (b)(1);

b. Revising paragraph (b)(2);

c. Revising paragraph (b)(3);

The revisions read as follows:

8 CFR § 208.16

**§ 208.16 Withholding of removal under section 241(b)(3) of the Act and withholding of removal under the Convention Against Torture.**

* * * * *

(b) * * *

(1) Past threat to life or freedom. (i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

(iii) If the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.

(2) Future threat to life or freedom. An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country. Such an applicant cannot demonstrate that his or her life or freedom would be threatened if the asylum officer or immigration judge finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so. In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1) and (b)(2) of this section, adjudicators should consider, among other things, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. These factors may or may not be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that under all the circumstances it would be reasonable for the applicant to relocate.

* * * * *

**\*76136  §§ 208.19 through 208.23 [Redesignated as §§ 208.20 through 208.24, respectively].**

13. Sections 208.19 through 208.23 are redesignated as §§ 208.20 through 208.24, respectively.

8 CFR § 208.19

14. Section 208.19 is added to read as follows:

8 CFR § 208.19

### § 208.19 Decisions.

The decision of an asylum officer to grant or to deny asylum or to refer an asylum application, in accordance with § 208.14(b) or (c), shall be communicated in writing to the applicant. Pursuant to § 208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision to grant or deny asylum, or to refer an asylum application unless, in the discretion of the asylum office director, service by mail is appropriate. A letter communicating denial of asylum or referral of the application shall state the basis for denial or referral and include an assessment of the applicant's credibility.

8 CFR § 208.21

15. Newly redesignated § 208.21 is amended by revising paragraph (a) to read as follows:

8 CFR § 208.21

### § 208.21 Admission of the asylee's spouse and children.

(a) Eligibility. In accordance with section 208(b)(3) of the Act, a spouse, as defined in section 101(a)(35) of the Act, 8 U.S.C. 1101(a)(35), or child, as defined in section 101(b)(1) of the Act, also may be granted asylum if accompanying, or following to join, the principal alien who was granted asylum, unless it is determined that the spouse or child is ineligible for asylum under section 208(b)(2)(A)(i), (ii), (iii), (iv) or (v) of the Act for applications filed on or after April 1, 1997, or under § 208.13(c)(2)(i)(A), (C), (D), (E), or (F) for applications filed before April 1, 1997.

* * * * *8 CFR § 208.22

16. Newly redesignated § 208.22 is revised to read as follows:

8 CFR § 208.22

### § 208.22 Effect on exclusion, deportation, and removal proceedings.

8 CFR § 208.24 8 CFR § 208.17

An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.24. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation, or deferral of removal, may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to § 208.24 or deferral is terminated pursuant to § 208.17(d) or (e).

8 CFR § 208.24

17. Newly redesignated § 208.24 is amended by:

a. Revising paragraph (b)(1);

b. Redesignating paragraphs (e) and (f) as paragraphs (f) and (g), respectively;

c. Adding a new paragraph (e); and

d. Revising newly redesignated paragraphs (f) and (g), to read as follows:

8 CFR § 208.24

**§ 208.24 Termination of asylum or withholding of removal or deportation.**

* * * * *

(b) * * *

(1) The alien is no longer entitled to withholding of deportation or removal because, owing to a fundamental change in circumstances relating to the original claim, the alien's life or freedom no longer would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion in the country from which deportation or removal was withheld.

* * * * *

(e) Removal proceedings. When an alien's asylum status or withholding of removal or deportation is terminated under this section, the Service shall initiate removal proceedings, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may take place in conjunction with a termination hearing scheduled under § 208.24(f).

(f) Termination of asylum, or withholding of deportation or removal, by an immigration judge or the Board of Immigration Appeals. An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to § 3.2 or § 3.23 of this chapter for the purpose of terminating a grant of asylum, or a withholding of deportation or removal. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum, or a withholding of deportation or removal, made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation, or removal proceeding.

(g) Termination of asylum for arriving aliens. If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in § 208.24 and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

8 CFR § 208.30

18. Section 208.30 is revised to read as follows:

8 CFR § 208.30

**§ 208.30 Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

(a) Jurisdiction. The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (g) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and reviews under section 235(b)(1)(B) of the Act.

(b) Treatment of dependents. A spouse or child of an alien may be included in that alien's credible fear evaluation and determination, if such spouse or child:

(1) Arrived in the United States concurrently with the principal alien; and

(2) Desires to be included in the principal alien's determination. However, any alien may have his or her credible fear evaluation and determination made separately, if he or she expresses such a desire.

(c) Authority. Asylum officers conducting credible fear interviews shall have the authorities described in § 208.9(c).

(d) Interview. The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture, and shall conduct the interview as follows:

(1) If the officer conducting the credible fear interview determines that the alien is unable to participate effectively in the interview because of illness, fatigue, or other impediments, the officer may reschedule the interview.

(2) At the time of the interview, the asylum officer shall verify that the alien has received Form M-444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has **\*76137** an understanding of the credible fear determination process.

(3) The alien may be required to register his or her identity electronically or through any other means designated by the Attorney General.

(4) The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and on the length of the statement.

(5) If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter must be at least 18 years of age and may not be the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, a representative or employee of the applicant's country of nationality, or, if the applicant is stateless, the applicant's country of last habitual residence.

(6) The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct any errors therein.

(e) Determination. (1) The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture.

(2) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer or immigration judge shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(3) If an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Service shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Service shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(4) An asylum officer's determination shall not become final until reviewed by a supervisory asylum officer.

(f) Procedures for a positive credible fear finding. If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I-863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter.

(g) Procedures for a negative credible fear finding. (1) If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I-869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. The alien shall indicate whether he or she desires such review on Form I-869. A refusal by the alien to make such indication shall be considered a request for review.

(i) If the alien requests such review, or refuses to either request or decline such review, the asylum officer shall arrange for detention of the alien and serve him or her with a Form I-863, Notice of Referral to Immigration Judge, for review of the credible fear determination in accordance with paragraph (f)(2) of this section.

(ii) If the alien is not a stowaway and does not request a review by an immigration judge, the officer shall order the alien removed and issue a Form I-860, Notice and Order of Expedited Removal, after review by a supervisory asylum officer.

(iii) If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(2) Review by immigration judge of a negative credible fear finding.

(i) The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, or upon the applicant's refusal either to request or to decline the review after being given such opportunity, in accordance with section 235(b)(1)(B)(iii)(III) of the Act.

(ii) The record of the negative credible fear determination, including copies of the Form I-863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

(iii) A credible fear hearing shall be closed to the public unless the alien states for the record or submits a written statement that the alien is waiving that requirement; in that event the hearing shall be open to the public, subject to the immigration judge's discretion as provided in § 3.27.

(iv) Upon review of the asylum officer's negative credible fear determination:

(A) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to the Service for removal of the alien. The immigration judge's decision is final and may not be appealed. The Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge.

(B) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the order of the asylum officer issued on Form I-860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 208.4(b)(3)(i).

(C) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the **\*76138** application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If a denial of the application for asylum and for withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If an approval of the application for asylum or for withholding of removal becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

Dated: November 27, 2000.

Janet Reno,

Attorney General.

[FR Doc. 00-30601 Filed 12-5-00; 8:45 am]

BILLING CODE 4410-10-P

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**63994**    **Federal Register** / Vol. 84, No. 223 / Tuesday, November 19, 2019 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**8 CFR Part 208**

[USCIS Docket No. USCIS–2019–0021]

RIN 1615–AC49

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Parts 1003, 1208, and 1240**

[EOIR Docket No. 19–0021; A.G. Order No. 4581–2019]

RIN 1125–AA98

### Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") are adopting an interim final rule ("IFR" or "rule") to modify existing regulations to provide for the implementation of Asylum Cooperative Agreements ("ACAs") that the United States enters into pursuant to section 208(a)(2)(A) of the Immigration and Nationality Act ("INA" or "Act"). Because the underlying purpose of section 208(a)(2)(A) is to provide asylum seekers with access to only one of the ACA signatory countries' protection systems, this rule adopts a modified approach to the expedited removal ("ER") and section 240 processes in the form of a threshold screening as to which country will consider the alien's claim. This rule will apply to all ACAs in force between the United States and countries other than Canada, including bilateral ACAs recently entered into with El Salvador, Guatemala, and Honduras in an effort to share the distribution of hundreds of thousands of asylum claims. The rule will apply only prospectively to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United States between ports of entry, on or after the effective date of the rule.

**DATES:**
*Effective date:* This rule is effective November 19, 2019.
*Submission of public comments:* Comments must be submitted on or before December 19, 2019.

**ADDRESSES:** You may submit comments, identified by Docket Numbers USCIS–2019–0021 and EOIR Docket No. 19–0021, through the *Federal eRulemaking Portal: http://www.regulations.gov.* If you cannot submit your material by using *https://www.regulations.gov,* contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this document for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**
*USCIS:* Andrew Davidson, Chief, Asylum Division, Refugee Asylum and International Operations, U.S. Citizenship & Immigration Services, 20 Massachusetts Ave NW, Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–8377 (not a toll-free call).

*EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041; Telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the potential economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change. Comments received will be considered and addressed in the process of drafting the final rule.

All comments submitted for this rulemaking should include the agency names and Docket Numbers USCIS–2019–0021 and EOIR Docket No. 19–0021. Please note that all comments received are considered part of the public record and made available for public inspection at *https://www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

## II. Executive Summary

The Departments are adopting an interim final rule to modify existing

regulations to provide for the implementation of agreements that the United States enters into pursuant to section 208(a)(2)(A) of the INA. 8 U.S.C. 1158(a)(2)(A). Such agreements— referred to by the Departments as Asylum Cooperative Agreements and alternatively described as safe third country agreements in existing regulations—are formed between the United States and foreign countries where aliens removed to those countries would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.[1] In certain circumstances, an ACA, in conjunction with section 208(a)(2)(A), bars an alien subject to the agreement from applying for asylum in the United States and provides for the removal of the alien, pursuant to the agreement, to a country that will provide access to a full and fair procedure for determining the alien's protection claim. Removal pursuant to these agreements will be ordered within ER proceedings or, in certain instances, within INA section 240 removal proceedings. But because the underlying purpose of section 208(a)(2)(A) is to provide asylum seekers with access to only one of the ACA signatory countries' protection systems, this rule adopts a modified approach to the ER and section 240 processes in the form of a threshold screening as to which country will consider the alien's claim. This rule will apply to all ACAs between the United States and countries other than Canada. In 2002, the United States and Canada entered into a bilateral ACA, titled the "Agreement Between the Government of the United States and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries," which the Departments implemented by regulation in 2004.

Although various recent regulatory reforms have reduced the burdens associated with adjudicating asylum claims (and others hold out promise to do so should injunctions on their implementation be lifted), the U.S. asylum system remains overtaxed. Hundreds of thousands of migrants have reached the United States in recent years and have claimed a fear of persecution[2] or torture. They often do

---

[1] For ease of reference, this rule refers to an asylum claim in the third country as alternatively encompassing "equivalent temporary protection" consistent with INA section 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

[2] "Fear of persecution" as used in this document describes persecution "on account of race, religion, nationality, membership in a particular social

not ultimately establish legal qualification for such relief or even actually applying for protection after being released into the United States, which has contributed to a backlog of 987,198 cases before the Executive Office for Immigration Review (including 474,327 asylum cases), each taking an average of 816 days to complete. Asylum claims by aliens from El Salvador, Guatemala, and Honduras account for over half of the pending asylum cases.

To help alleviate those burdens and promote regional migration cooperation, the United States recently signed bilateral ACAs with El Salvador, Guatemala, and Honduras in an effort to share the distribution of asylum claims.[3] Pending the Department of State's publication of the ACAs in the United States Treaties and Other International Agreements series in accordance with 1 U.S.C. 112a, the agreements will be published in a document in the **Federal Register**. This rule will establish the authority of DHS asylum officers to make threshold determinations as to whether aliens are ineligible to apply for asylum under those three ACAs, and any future ones, in the course of ER proceedings under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), once the agreements enter into force. As a practical matter, this rule will also establish the authority of immigration judges ("IJs") to make such determinations in the context of removal proceedings under INA section 240, 8 U.S.C. 1229a. To the extent that an alien in ER proceedings is rendered ineligible to apply for asylum by more than one ACA, the immigration officer will assess which agreement is most appropriately applicable to the alien. Immigration officers may exercise discretion in making such determinations as authorized by the Secretary of Homeland Security ("Secretary") via field guidance. To the extent that an alien in section 240 proceedings is rendered ineligible to apply for asylum by more than one ACA, the immigration judge shall enter alternate orders of removal to each country that is a signatory to an applicable ACA. DHS immigration officers may exercise discretion when selecting from among the alternate orders, again, as authorized by the Secretary via field guidance. The rule will apply only prospectively to aliens who arrive at a U.S. port of entry, or enter or attempt to enter the United

States between ports of entry, on or after the effective date of the rule.

## III. Purpose of This Interim Final Rule

Asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States. *See* INA 208(a)(1), 8 U.S.C. 1158(a)(1). Throughout the past decade, the United States has experienced a significant increase in the number of aliens encountered at or near its borders, particularly the southern land border with Mexico, as described by the Departments' recent joint rule requiring certain aliens seeking to apply for asylum to have first applied for equivalent protection in at least one country through which they transited en route to the United States, *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829, 33830 (July 16, 2019). This increase has been accompanied by a sharp increase in the number and percentage of aliens requesting asylum or claiming a fear of persecution or torture when apprehended or encountered by DHS. As noted by the third-country-transit rule, for example, over the past decade the percentage of aliens referred for credible fear interviews within ER proceedings jumped from approximately 5 percent to above 40 percent. *Id.* at 33830–31. The number of asylum cases filed with DOJ also rose sharply, more than tripling between 2013 and 2018. *Id.* at 33831. During that same period, the filing of affirmative asylum applications rose from 44,453 in 2013 to 106,147 in 2018.

This increase reflects high rises in both defensive asylum claims (*i.e.,* asylum claims raised after removal proceedings have begun) and affirmative asylum claims (*i.e.,* asylum claims raised apart from or before removal proceedings have begun). In Fiscal Year ("FY") 2018, 110,136 individuals in ER proceedings raised claims of persecution or torture and were referred for credible fear interviews (99,035 individuals) or reasonable fear interviews (11,101 individuals). These individuals, combined with individuals who filed for asylum while in INA section 240 removal proceedings, resulted in 114,532 defensive asylum applications filed with DOJ in FY2018. Additionally, in FY2018, 48,922 affirmative asylum applications were also referred to DOJ. By contrast, in FY2013, 43,768 individuals in ER proceedings raised claims of persecution or torture and were referred for credible fear interviews (36,035 individuals) or reasonable fear interviews (7,733 individuals). These

individuals, combined with individuals who filed for asylum while in section 240 removal proceedings, resulted in 23,500 defensive asylum applications filed with DOJ in FY2013. Additionally, in FY2013, 19,963 affirmative asylum applications were also referred to DOJ.

This has led to a backlog that, as of October 11, 2019, included more than 476,000 asylum cases before DOJ's Executive Office for Immigration Review ("EOIR"). The backlog of affirmative asylum applications pending with USCIS sits at 340,810, as of the end of FY2019. Historically, only a small minority of the individuals claiming a fear of return on the basis of persecution or torture were ultimately granted asylum or had even applied for it. Indeed, over the years, many aliens who initially claimed a fear of return upon entry or arrival abandoned those claims altogether.

Immigration detention centers have often been pushed to capacity, making even temporary detention for arriving aliens difficult to sustain. Or aliens have been released into the interior of the country, after which they often fail to appear for their removal proceedings, or unlawfully abscond after receiving removal orders, becoming fugitives. To help ease some of the burden on the immigration detention system and to reduce the numbers of aliens illegally entering the country, the Administration has worked with Mexico to permit people attempting to enter the United States from Mexico on land to remain in Mexico while awaiting their removal proceedings, pursuant to section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).

Arresting the significant number of aliens who illegally enter the United States or arrive at ports of entry without the necessary documents to enter the United States legally, and processing and adjudicating their fear of return claims for ER, and processing and adjudicating their asylum claims in removal proceedings under INA section 240, consumes a tremendous amount of resources within the Departments of Justice and Homeland Security. After surveilling and arresting aliens, DHS must devote significant resources towards detaining many aliens pending further proceedings, process (and in the context of ER) adjudicate their claims (which are subject to potentially multiple layers of review), and represent the United States during removal proceedings before EOIR.

The large number of aliens seeking relief in the United States also consumes substantial DOJ resources. Within DOJ, IJs adjudicate aliens' asylum claims in INA section 240

---

group, or political opinion.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

[3] None of these agreements have yet entered into force.

proceedings, prosecutors and law enforcement officials must prosecute and maintain custody of aliens who violate Federal criminal law, and DOJ attorneys represent the United States in civil cases involving immigration and detention issues. Despite DOJ deploying 80% more immigration judges than in 2010, and completing nearly double the number of asylum cases in FY2018 as in FY2010, more than 476,000 asylum cases remain pending before the immigration courts. Further, immigration courts have an additional caseload that stems from cases that are not related to asylum. This significantly increased backlog is due in part to the sharp increase in the numbers of filed asylum applications. Between 2010 and 2018, there was a nearly nine-fold increase in defensive asylum cases and the number of affirmative asylum cases referred to EOIR more than doubled.

The large majority of fear of persecution or torture claims raised by those arrested at the southern border either have not led to actual claims for asylum or have been ultimately determined to be without legal merit. For example, in FY2018, 34,031 individuals who had received credible fear interviews before asylum officers were referred to DOJ for asylum hearings. Approximately 39%, or 13,369, of these individuals failed to file an asylum application, and thus abandoned their claims. Only 5,577 individuals were granted asylum, a number equal to 16.4% of all individuals referred to DOJ after credible fear interviews, or 27% of individuals who were referred to DOJ following a credible fear interview and filed an asylum application. The success rate declines when one looks at all asylum applications adjudicated by DOJ. In FY2018, 64,223 asylum applications were adjudicated by DOJ's immigration judges. Only 13,173, or 20.5%, were granted. The strain on the U.S. immigration system, and the wait times for aliens seeking to process legitimate claims through the U.S. asylum system, is extreme. This delay extends to the immigration court system, where cases involving related immigration and detention issues have caused significant docket backlogs.

In section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), Congress provided a mechanism to help ease this strain on the immigration system by authorizing the Executive Branch to enter into agreements with other countries to distribute the burdens associated with adjudicating claims for asylum or equivalent temporary protection. Specifically, section 208(a)(2)(A) authorizes the Executive Branch to bar

an alien from applying for asylum in the United States where, pursuant to a bilateral or multilateral agreement, the alien may be removed to a third country (*i.e.,* a country other than the alien's country of nationality or last habitual residence, *see* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), that affords the alien access to a full and fair procedure for determining claims for asylum or equivalent temporary protection. Consistent with the President's extensive foreign affairs authority, *see, e.g., Zivotofsky* v. *Kerry,* 135 S. Ct. 2076, 2084–94 (2015); *United States* v. *Curtiss-Wright Exp. Corp.,* 299 U.S. 304, 319 (1936) (emphasizing the President's extensive role representing U.S. interests in relations with foreign nations), section 208(a)(2)(A), by its terms, provides substantial flexibility to the Executive Branch in negotiating and implementing ACAs. *Accord* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Attorney General and Secretary to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter"); *see also Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 635 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."); *id.* at 637 (observing that an exercise of federal affairs power "pursuant to an Act of congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation").

In contrast to statutory and regulatory bars providing that certain aliens are ineligible to *receive* asylum, *see, e.g.,* INA 208(b)(2)(A), (C), 8 U.S.C. 1158(b)(2)(A), (C), the ACA bar relates to whether an alien may even *apply* for asylum. Unlike the restrictions on asylum eligibility, application of the ACA bar does not involve an evaluation of whether an alien would ultimately receive asylum relief if able to apply, or even whether the alien has made a preliminary showing of a significant possibility that the alien would be eligible for asylum. Rather, section 208(a)(2)(A) bars an alien from applying for asylum in the United States when the following four requirements are satisfied: (i) The United States has entered into a requisite "bilateral or multilateral agreement"; (ii) at least one of the signatory countries to the agreement is a "third country" with respect to the alien; (iii) "the alien's life or freedom would not be threatened" in

that third country "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (iv) that third country provides aliens removed there pursuant to the agreement "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." [4] Even if all of these elements are satisfied, the Secretary nonetheless may determine in his discretion "that it is in the public interest for the alien to receive asylum in the United States." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

This interim rule will amend DHS and DOJ regulations implementing section 208(a)(2)(A) to effectuate ACAs other than the agreement already formed with Canada in 2002 and implemented by regulation in 2004. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 69480 ((Nov. 29, 2004) (DHS) Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR 69490 (Nov. 29, 2004) (DOJ).

In particular, this rule will broaden the procedures (implemented in ER and INA section 240 proceedings) for determining whether an alien is subject to an ACA or within one of its exceptions to account for ACAs other than the U.S.-Canada Agreement. Additionally, this rule will establish a screening mechanism to evaluate whether an alien who would otherwise be removable to a third country under an ACA other than the U.S.-Canada Agreement can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion, or would be tortured in that third country. This rule consequently will provide a general mechanism for implementation of all existing and future ACAs not previously implemented.[5] In sum, this

---

[4] Unaccompanied alien children, as defined by 6 U.S.C. 279(g), are categorically exempted from the ACA bar. *See* INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E).

[5] This interim rule leaves in place the regulatory structure specific to the U.S.-Canada Agreement so as to avoid disruption to long-standing processes and expectations concerning implementation of that agreement. This rule will allow for implementation of ACAs that have a broader scope of applicability than the U.S.-Canada Agreement and, consequently, provides for a more robust threshold screening mechanism for evaluating whether an alien is properly removed subject to an ACA other than the U.S.-Canada Agreement, which is narrowly directed to third country nationals seeking to enter the United States at a U.S.-Canada land border port of entry.

rule implements a screening mechanism to determine: (i) Whether an alien falls within the terms of a bilateral or multilateral ACA formed under section 208(a)(2)(A), other than the previously implemented U.S.-Canada Agreement, (ii) whether an alien within an ACA's plain terms nonetheless falls under one of the agreement's exceptions, and (iii) whether an alien within an ACA's scope but not subject to an exception nonetheless demonstrates that it is more likely than not that the alien's life or freedom would be threatened or the alien would be tortured in the third country.

ACAs entered pursuant to section 208(a)(2)(A) will be published in the **Federal Register**. Prior to implementation of an ACA, the Attorney General and the Secretary of Homeland Security ("Secretary") will evaluate and make a categorical determination whether a country to which aliens would be removed under such an agreement provides "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). Section 208(a)(2)(A) of the INA also requires a determination that an alien's life and freedom would not be threatened on account of a protected ground in a third country with which the United States has entered into an ACA. This rule effectuates such a determination via individualized threshold screening that provides an opportunity for an alien to establish fear of persecution in the third country to which he would be removed pursuant to an ACA.

The INA's ACA provision provides authority to pursue significant policy interests by entering into bilateral or multilateral agreements allowing for burden-sharing between the United States and other countries with respect to refugee-protection claims.

Consistent with this compelling policy aim, this interim rule is intended to aid the United States in its negotiations with foreign nations on migration issues. Specifically, the rule will aid the United States as it seeks to develop a regional framework with other countries to more equitably distribute the burden of processing the protection claims of the hundreds of thousands of irregular migrants who now seek to enter the United States every year and claim a fear of return. Addressing the eligibility for asylum of aliens who enter or attempt to enter the United States will better position the United States as it engages in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (El

Salvador, Guatemala, and Honduras) regarding migration issues in general, and related measures employed to curtail the irregular flow of aliens into the United States.

## IV. Background and Legal Basis for Regulatory Changes

### A. DOJ and DHS Authority To Promulgate This Rule

The Attorney General and the Secretary publish this joint IFR pursuant to their respective authorities concerning asylum determinations. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the execution of Federal immigration law. The Secretary was charged "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1), 8 U.S.C. 1103(a)(1), and granted the power to take all actions "necessary for carrying out" his authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3).

The HSA thus transferred to DHS some authority to adjudicate asylum applications, including the authority to conduct "credible fear" interviews in the context of ER. INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* HSA 451(b), 116 Stat. at 2196 (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services). That authority has been delegated within DHS to USCIS. *See* 8 CFR 208.2(a), 208.30.

In addition, under the HSA, the Attorney General retained authority over individual immigration adjudications (including certain adjudications related to asylum applications) conducted within EOIR. *See* HSA 1101(a), 6 U.S.C. 521; INA 103(g), 8 U.S.C. 1103(g). IJs within DOJ continue to adjudicate all asylum applications made by aliens during the removal process, and they also review asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 240(a)(1), 8 U.S.C. 1101(b)(4), 1229a(a)(1); 8 CFR 1208.2(b), 1240.1(a). Additionally, the INA provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

This rule specifically concerns implementation of section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), which generally provides that an alien

may not apply for asylum if the Attorney General and the Secretary determine that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Secretary finds that it is in the public interest for the alien to receive asylum in the United States.

By operation of the HSA, the reference to "Attorney General" is understood to also encompass the Secretary, depending on whether the alien is in immigration proceedings before DHS or DOJ. Thus, determinations as to whether an alien's asylum application is barred by INA section 208(a)(2)(A), in conjunction with an ACA, fall within the scope of both DHS and DOJ authority, as each department bears responsibility for adjudicating asylum applications. In addition, section 208(d)(5)(B) of the INA authorizes the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." 8 U.S.C. 1158(d)(5)(B); *see* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620, 10622 (Mar. 8, 2004) (DHS) (proposed rule) (relying in part on INA 208(d)(5)(B) to establish threshold screening for applicability of INA 208(a)(2)(A) in relation to the U.S.-Canada Agreement). This broad division of functions and authorities informs the background of this interim rule.

### B. Adjudication of Asylum Applications and the Section 208(a)(2)(A) Bar

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158. Under that provision, aliens applying for asylum must establish (i) that they meet the definition of a "refugee" set forth at INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A); (ii) that they are not subject to a bar to asylum for asylum or receiving asylum; and (iii) that they merit a favorable exercise of discretion. INA 208(a)–(b), 8 U.S.C. 1158(a)–(b).

## 1. Removal Under ER and INA Section 240 Proceedings

When aliens indicate an intention to apply for asylum, or express a fear of persecution or torture, or a fear of removal to their country in the context of ER proceedings, they are evaluated in ER proceedings by immigration officers through a credible fear interview designed to determine whether there is a significant possibility that the alien would be eligible for asylum, statutory withholding of removal, or protection under the regulations issued pursuant to legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), December 10, 1984, 1465 U.N.T.S. 84, S. Treaty Doc. No. 100–20 (1988). INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B), 8 CFR 208.30, 235.3(b)(4). Section 235(a)(3) of the INA provides that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected by immigration officers." 8 U.S.C. 1225(a)(3). As part of initial inspections, immigration officers must assess whether an alien is inadmissible. Aliens who cannot establish "clearly and beyond a doubt" that they are "entitled to be admitted" will be examined for removal, as a matter of discretion, under the jurisdictional framework of either ER (if they are eligible)[6] or section 240 removal proceedings (or, in certain circumstances, other removal proceedings). *See* INA 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section [240]."); INA 235(b)(2)(B), 8 U.S.C. 1225(b)(2)(B) (providing that crewmen, stowaways, and aliens subject to ER need not receive section 240 hearings).

In the ER process, if a DHS immigration officer determines that an alien is inadmissible on one of two specified grounds, and meets certain other criteria, the alien generally must be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [section 208] or

a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). If, however, such an alien "indicates either an intention to apply for asylum . . . or a fear of persecution" (or, by regulation, a fear of torture), the alien must instead be referred "for an interview by an asylum officer." INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); *see also* 8 CFR 235.3(b)(4).

Generally, in that interview, the asylum officer determines whether the alien has "a credible fear of persecution or torture"—that is, whether there is a "significant possibility" that the alien could succeed on the merits of his or her claims for asylum, statutory withholding of removal, or protection under the CAT regulations. 8 CFR 208.30(d), (e)(2)–(3). If the officer makes a positive credible fear determination, the officer must refer the alien "for full consideration of [the alien's claim(s) for relief or protection] in proceedings under section 240 of the Act." *Id.* 208.30(f). If the asylum officer makes a negative determination, and a supervisory officer concurs, the asylum officer "shall order the alien removed," subject to review by an IJ at the request of the alien of the negative credible fear determination. *Id.* 208.30(g)(1)(ii)–(ii).

Similarly, in section 240 removal proceedings, an IJ first determines whether the alien is inadmissible or deportable. *See* INA 240(c)(2)–(3), 8 U.S.C. 1229a(c)(2)–(3); 8 CFR 1240.8(a)–(c). If the IJ determines that the alien is inadmissible or deportable, the alien then bears the burden to demonstrate that he or she should receive any form of relief or protection from removal— *e.g.*, asylum. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4); 8 CFR 1240.8(d). If the alien does so, the IJ grants the alien's application for relief or protection; if not, the IJ orders the alien removed, subject to potential review by the Board of Immigration Appeals ("BIA") and a federal court of appeals. *See* INA 240(c)(1), (5), 8 U.S.C. 1229a(c)(1), (5); INA 242, 8 U.S.C. 1252; 8 CFR 1003.1(b)(3), 1240.1(a)(1).

## 2. Removals to Third Countries Consistent With the ACA Provision of INA Section 208(a)(2)(A)

Directly upon an initial inadmissibility or deportability determination within either an ER proceeding or a section 240 proceeding, *see, e.g.,* INA 235(b)(1)(A)(ii), 240(c)(2)– (3), 8 U.S.C. 1225(b)(1)(A)(ii), 1229a(c)(2)–(3), section 208(a)(2)(A) authorizes an asylum officer or IJ to conduct a threshold screening to determine whether an alien is barred from applying for asylum in the United

States pursuant to an ACA, 8 U.S.C. 1158(a)(2)(A). This rule will provide a mechanism for the operation of these threshold screenings. Under this rule, an asylum officer or IJ will determine whether an alien is subject to an ACA, and, if so, in those instances in which the alien affirmatively states a fear of removal to a country that is a signatory to the agreement, whether the alien can affirmatively establish it is more likely than not that the alien would be persecuted or tortured in that country. If the alien is subject to the ACA but fails to demonstrate it is more likely than not that he or she would be subject to persecution on account of a protected ground or to torture in that country, the ER or section 240 proceeding would be completed without an adjudication of any claims relating to a fear of persecution or torture in the alien's home country.

Under this rule, however, an alien may voluntarily abandon his or her asylum claim prior to removal pursuant to an ACA, choosing instead to accept a removal order without pursuing any application for asylum. *Cf.* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 8 at 69482 (DHS) (noting that immigration officers can use their discretion to permit aliens subject to removal under ACAs to withdraw their applications for admission so that they do not face an admissibility bar to a subsequent admission to the United States). Further, application of an ACA remains within the discretion of the screening officer and DHS, which may conclude nonetheless that "it is in the public interest for the alien to receive asylum in the United States."[7] INA 208(a)(2)(A), 1158(a)(2)(A); *see* Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR 10627, 10628 (DOJ) (proposed rule) (recognizing that "the United States Government may conclude, in its discretion, that it is in the public interest to allow an arriving alien to remain in the United States to pursue

---

[6] *See* INA 235(b)(1)(A), 8 U.S.C. 1225(b)(1)(A) (authorizing screening by immigration officers to determine whether aliens are eligible for ER because they are inadmissible for engaging in fraud or willful misrepresentation related to a visa, other documentation, or admission, or for falsely claiming U.S. citizenship, INA 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C), or for not possessing valid entry documents, INA 212(a)(7), 8 U.S.C. 1182(a)(7)).

[7] As in the case of the U.S.-Canada Agreement, if there are unique considerations that the individual would like DHS to consider with respect to the "public interest" exception to application of an ACA, the individual should timely bring them to the officer's attention. *Cf.* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69483 (DHS) (noting that the Agreement's public interest exception is "best administered through operational guidance and on an individualized, case-by-case basis").

AR.00271

protection'' even if the alien is subject to an ACA and that this ''discretionary determination is reserved to DHS'').

Section 208(a)(1) generally establishes that ''[a]ny alien who is physically present in . . . or who arrives in the United States . . . may apply for asylum.'' 8 U.S.C. 1158(a)(1). But section 208(a)(2) places limitations on those applications. Most of the section 208(a)(2) application limitations are procedural, such as the stipulation that asylum applications must generally be filed within one year of arrival in the United States. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B). But section 208(a)(2)(A) provides a more substantive limitation—establishing that, in certain circumstances, an alien covered by an ACA is prohibited from applying for asylum in the United States.

Specifically, an alien's asylum application is barred if the following four conditions are satisfied: (i) The United States has entered ''a bilateral or multilateral agreement'' under which certain aliens may be removed—that is, an ACA; (ii) the alien is subject to the ACA, and one of the signatory countries is a ''third country'' with respect to the alien; (iii) ''the alien's life or freedom would not be threatened'' in that third country ''on account of race, religion, nationality, membership in a particular social group, or political opinion''; and (iv) that third country will provide the alien with ''access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The INA provides that ''[n]o court shall have jurisdiction'' to review any determination of the Attorney General or Secretary made under any of the provisions within section 208(a)(2). INA 208(a)(3), 8 U.S.C. 1158(a)(3).

3. Protection Screening With Respect to Removal to the Third Country

Where section 208(a)(2)(A) applies, it bars an alien from applying for asylum in the United States and authorizes the removal of the alien to a third country that will provide procedures for asylum or equivalent temporary protection in the place of the United States. This rule, however, provides that if an alien states a fear of persecution or torture in, or removal to, the third country, an asylum officer will determine whether ''the alien's life or freedom would . . . be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The terms of section 208(a)(2)(A) do not specify the precise procedural mechanism by which the Attorney

General and Secretary must determine that an alien's life or freedom will not be threatened on account of a protected ground in the third country. As the relevant text of section 208(a)(2)(A) (''the alien's life or freedom will not be threatened [in the third country] on account of race, religion, nationality, membership in a particular social group, or political opinion'') mirrors the standard for protection contained in the INA's withholding-of-removal provision, INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A), this regulation adopts the burden of proof that applies in the withholding-of-removal context. And the withholding-of-removal provision has long been construed to call for a determination as to whether the alien can show that it is ''more likely than not'' that he or she would be persecuted on account of a protected ground in the country of removal. *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 423 (1987); *INS* v. *Stevic,* 467 U.S. 407, 429–30 (1984); *see also* 8 CFR 1208.16(b)(2). Accordingly, under the threshold screening implemented by this rule, an alien will not be removed to a third country under INA section 208(a)(2)(A) if the alien establishes that it is more likely than not that the alien would be persecuted on account of a protected ground in that country.

The United States has undertaken certain *non-refoulement* (non-return) obligations under the 1967 Protocol relating to the Status of Refugees (''1967 Protocol''), which incorporates Articles 2–34 of the 1951 Convention relating to the Status of Refugees (''1951 Convention'').[8] Article 33 of the 1951 Refugee Convention, as understood in U.S. law, generally precludes state parties from removing individuals to any country where their lives or freedom would be threatened on account of their race, religion,

nationality, political opinion, or membership in a particular social group. Consistent with these obligations, Congress has precluded removal of an alien to a third country under section 208(a)(2)(A) if ''the alien's life or freedom would . . . be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.'' 8 U.S.C. 1158(a)(2)(A).

The United States has also undertaken certain *non-refoulement* obligations under CAT, which are effectuated by DHS and DOJ regulations that prohibit the removal of an alien to a country where he or she would more likely than not be tortured. *See* 8 CFR 208.16(c), 1208.16(c).[9] Removing an alien to a third country pursuant to an ACA for consideration of the alien's protection claim in that country is consistent with U.S. obligations under CAT, in the absence of grounds for believing that the alien would be persecuted on account of a protected ground or tortured in the third country. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10624 (DHS) (proposed rule) (explaining the interaction between CAT obligations and the application of the U.S.-Canada Agreement).

Congress enacted section 208(a)(2)(A) as a mechanism for countries to burden-share the responsibility for providing protection to refugees. Such agreements allocate responsibility between the United States and the third country with which it has formed an ACA whereby one country or the other (but not both) will bear responsibility for processing the asylum and other protection claims of refugees subject to the terms of the ACA. *See id.* at 10620 (explaining the legal authority for applying cooperative agreements rather than permitting applications for asylum or other relief in the United States); *see also* Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 10628 (DOJ) (proposed rule) (providing that aliens subject to the U.S.-Canada Agreement are ''not eligible to apply for asylum, withholding of removal, or protection under [CAT] in the United States''). The salient factor for the formulation and application of a section 208(a)(2)(A) agreement is whether the country sharing responsibility with the United States for refugee protection has laws and

---

[8] The United States is a party to the 1967 Protocol, but not the 1951 Convention. *Stevic,* 467 U.S. at 416 & n.9. The Protocol is not self-executing in the United States. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009). But the United States has implemented Article 34 of the 1951 Convention—which provides that party states ''shall as far as possible facilitate the assimilation and naturalization of refugees''—through the INA's asylum provision, section 208. *See Cardoza-Fonseca,* 480 U.S. at 441 (internal quotation marks omitted). As the Supreme Court has recognized, Article 34 is ''precatory'' and ''does not require [an] implementing authority actually to grant asylum to all'' persons determined to be refugees. *Id.* Thus, Congress's decision to bar certain classes of aliens from applying for asylum does not contravene Article 34. *See Garcia* v. *Sessions,* 856 F.3d 27, 42 (1st Cir. 2017) (Article 34 does not ''preclude[] a contracting State from imposing a limitation on the eligibility of an alien to seek asylum''); *see also R–S–C–* v. *Sessions,* 869 F.3d 1176, 1188 (10th Cir. 2017) (similar); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017) (similar).

[9] CAT is also not self-executing in the United States. *See Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005).

mechanisms in place that adhere to international treaty obligations to protect refugees. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule).

Accordingly, this interim rule provides that an alien who will potentially be subject to an ACA will be advised that he or she may be removed to a third country pursuant to a bilateral or multilateral agreement. If the alien affirmatively states a fear of removal to or persecution or torture in that third country, a DHS asylum officer will interview the alien to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in the third country. *See* 8 CFR 208.30. DOJ immigration judges will apply a similar procedure to determine whether a removal pursuant to an ACA cannot proceed because the individual has established that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country. *See id.* 1240.11.

4. Additional Consequences of the Applicability of Section 208(a)(2)(A) to an Alien's Asylum Application

If an asylum officer or IJ determines that an alien is barred from applying for asylum under section 208(a)(2)(A), then the alien is also barred from applying for withholding of removal under section 241(b)(3)(A) of the INA, 8 U.S.C. 1231(b)(3)(A), and protection under the regulations implementing CAT. The purpose of section 208(a)(2)(A)—and an agreement between the United States and another country formed thereunder—is to vest "one country or the other (but not both) [with the] responsibility for processing" an alien's claims related to fear of persecution or torture in the alien's home country. Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule). That purpose would be defeated if, even when section 208(a)(2)(A) and an ACA made another country responsible for adjudicating an alien's asylum claim, the United States remained responsible for adjudicating his or her claims for withholding of removal and CAT protection. Moreover, even if the United States granted an alien's claims to withholding of removal or CAT protection, thereby eliminating

the possibility of removal to the alien's home country, "[n]othing . . . [would] prevent the [United States] from removing [the] alien to a third country"—including a country that is a signatory to an applicable ACA. 8 CFR 208.16(f), 1208.16(f). Because the alien could be removed to a third country pursuant to an ACA regardless of the eventual outcome of his or her withholding-of-removal or CAT protection claims, Congress cannot have intended to require DHS and DOJ to adjudicate those claims before effectuating such a removal. *See* Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 69492–93 (DOJ) (for similar reasons, concluding that, if the U.S.-Canada Agreement bars an alien from applying for asylum in the United States, the alien is also barred from applying for withholding of removal and CAT protection).

*C. Consistency With International Practice*

The INA's ACA provision embodies the policy aim of entering into bilateral or multilateral agreements to promote burden-sharing between the United States and other countries with respect to refugee protection. The U.S. efforts to formulate ACAs with foreign countries is in keeping with the efforts of other liberal democracies to formulate cooperative arrangements in which multiple countries agree to share the review of refugee claims for protection.

For example, in 1990, European countries adopted the Dublin Regulation in response to an asylum crisis as refugees and economic migrants fled communism at the end of the Cold War; it came into force in 1997. *See* Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, 1997 O.J. (C 254). The United Nations High Commissioner for Refugees ("UNHCR") praised the Dublin Regulation's "commendable efforts to share and allocate the burden of review of refugee and asylum claims." UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions), 3 Eur. Series 2, 385 (1991). Now in its third iteration, the Dublin III Regulation sets asylum criteria and protocol for the European Union ("EU"). It instructs that asylum claims "shall be examined by a single Member State." Regulation (EU) No. 604/2013 of the European Parliament and of the Council of 26 June 2013, Establishing the Criteria and Mechanisms for Determining the Member State Responsible for

Examining an Application for International Protection Lodged in One of the Member States by a Third-Country National or a Stateless Person (Recast), 2013 O.J. (L 180) 31, 37.

UNHCR likewise generally has accepted the safe third country concept as consonant with international refugee law principles. UNHCR, *Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries* (Apr. 2018), *available at http://www.refworld.org/pdfid/5acb33ad4.pdf.* According to UNHCR, "refugees do not have an unfettered right to choose their 'asylum country.'" *Id.* at 1 & n.1 (citing UNHCR, *Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers,* May 2013, para. 3(i), *http://www.refworld.org/docid/51af82794.html;* UNHCR, *Summary Conclusions on the Concept of "Effective Protection" in the Context of Secondary Movements of Refugees and Asylum-Seekers (Lisbon Expert Roundtable, 9–10 December 2002),* Feb. 2003, para. 11, *http://www.refworld.org/docid/3fe9981e4.html*). Instead, "[r]efugees may be returned or transferred to a state where they had found, could have found or, pursuant to a formal agreement, can find international protection. The 1951 Convention relating to the Status of Refugees and its 1967 Protocol do not prohibit such return or transfer."[10] *Id.* at 1.

*D. The U.S-Canada Agreement and Its Implementing Regulations*

Section 208(a)(2)(A) itself does not mandate a particular set of procedures for determining whether the section's requirements are satisfied—and thus whether an alien is barred from applying for asylum. The ample regulatory flexibility that section 208(a)(2)(A) affords the Departments has been utilized in the regulations implementing the U.S.-Canada Agreement.

In those regulations, the Attorney General and Secretary made an across-the-board determination that all aliens removed to Canada pursuant to the U.S.-Canada Agreement would have "access to a full and fair procedure" for adjudicating their asylum claims within the meaning of INA section 208(a)(2)(A). In reaching that across-the-board finding, the Departments clarified that

[10] Formal advisory opinions of UNHCR are not binding on the United States, but they have been recognized as useful aids in interpreting the 1951 Convention and 1967 Protocol. *See, e.g., INS v. Aguirre-Aguirre,* 526 U.S. 415, 427–28 (1999).

"harmonization of asylum laws and procedures is not a prerequisite to entering into responsibility-sharing arrangements" under INA section 208(a)(2)(A). Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule). Rather, "[t]he salient factor is whether the countries sharing responsibility for refugee protection have laws and mechanisms in place that adhere to their international obligations to protect refugees." *Id.*

In contrast to the categorical finding on the full-and-fair-procedure requirement in the 2004 rule, the implementing regulations for the U.S.-Canada Agreement call for individualized determinations as to whether an alien falls within the terms of the Agreement, and, if so, whether the alien qualifies for one of the Agreement's exceptions. Specifically, with respect to ER, the regulations provide that, when an alien seeks to apply for asylum, the asylum officer must first determine whether the alien falls within one of the classes generally subject to the Agreement—that is, "whether [the] alien arriv[ed] in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada." Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69489 (DHS) (codified at 8 CFR 208.30(e)(6)). If so, the asylum officer must then determine whether "the alien [can] establish[] by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement"—including the exception applicable where certain DHS officials have determined that it is in the public interest for the alien to have his asylum claim heard in the United States. *Id.* (codified at 8 CFR 208.30(e)(6)(ii), (iii)(F)).

If the asylum officer determines that the alien is not subject to the Agreement, or meets an exception, the asylum officer proceeds to conduct a credible fear interview. *Id.* (codified at 8 CFR 208.30(e)(6)(ii)). But if the asylum officer determines that the alien is subject to the Agreement, and does not meet an exception, the asylum officer submits his or her findings to a "supervisory asylum officer." *Id.* (codified at 8 CFR 208.30(e)(6)(i)). If that supervisory officer concurs, the alien is barred from applying for asylum in the

United States. And if the alien is so barred, he or she can be removed to Canada without any further administrative review by an IJ or the BIA. Asylum Claims Made by Aliens Arriving From Canada at Land Border Ports-of-Entry, 69 FR at 69496 (DOJ) (codified at 8 CFR 1003.42(h)).

The regulations governing INA section 240 proceedings are similar. They require an IJ—after determining that an alien is inadmissible or deportable, but before assessing the merits of the alien's claims for asylum, withholding of removal, or protection under the regulations implementing CAT—to determine whether the U.S.-Canada Agreement "appl[ies] to the alien" and whether "[t]he alien qualifies for an exception to the Agreement." *Id.* at 69497 (codified at 8 CFR 1240.11(g)(2)(i)–(ii)). If the Agreement does not apply, or the alien meets an exception, the IJ assesses the alien's claims for relief as usual. *Id.* (codified at 8 CFR 1240.11(g)(1)). But if the Agreement applies, and the alien does not meet an exception, the IJ does not assess the merits of any potential statutory withholding-of-removal or CAT claim and instead may order the alien removed, with the proviso that the alien may apply for any other relief from removal for which the alien may be eligible. *Id.* (codified at 8 CFR 1240.11(g)(4)).

## V. Detailed Discussion of Regulatory Changes

### A. Summary of the New and Amended Regulatory Provisions and Their Import

Despite the existence of regulations effectuating the U.S.-Canada Agreement within the ER and INA section 240 frameworks, this rule is necessary because several of the current implementing regulations are specific to the U.S.-Canada Agreement, *see* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10620 (DHS) (proposed rule); *id.* at 69480 (DHS), and Canada is specially situated in a number of ways including its shared border with the United States. In addition, this rule provides for individualized screening of claims by aliens that they will face persecution or torture in the third country to which they would be removed pursuant to an ACA other than the U.S.-Canada Agreement.

The scope of the U.S.-Canada Agreement, and, consequently, the U.S.-Canada Agreement regulations, is limited to aliens arriving at ports of

entry along the U.S. border with Canada. In contrast, this generalized rule for the implementation of all ACAs (with countries other than Canada) will cover ACAs to the full extent permitted by section 208(a)(2)(A), which contains no limitation to only those aliens who have transited through the relevant third country or who arrive at ports of entry. To accommodate for the expanded applicability of the ACAs implemented under this current rule beyond the narrower class of aliens subject to the U.S.-Canada Agreement after traveling through Canada, this rule expands the threshold screening of aliens potentially subject to ACAs other than the U.S.-Canada Agreement. The rule gives aliens subject to an ACA an opportunity, during threshold screening, to establish that it would be "more likely than not" that the alien's life or freedom would be threatened in the third country on account of a protected ground or that the alien would be tortured in the third country. If DHS officers or IJs determine that an alien establishes such a fear by a preponderance of the evidence, the alien will not be removed to the third country pursuant to the ACA formed with that particular country. *Cf.* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A) (eliminating the opportunity to apply for asylum in the United States "if the Attorney General [or Secretary] determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion," among other required determinations described elsewhere in this rule).

In contrast to many of the countries listed as potential countries of removal in section 241(b) of the INA, the third country to which an alien would be removed under an ACA is a country to which an alien does not necessarily have preexisting ties or any preexisting reason to fear persecution or torture. *Compare* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A), *with* INA 241(b)(1)–(2), 8 U.S.C. 1231(b)(1)–(2). Moreover, unlike the countries to which aliens typically would be removed under section 241(b) of the INA, these third countries of removal would have pre-committed, per binding agreements with the United States, to provide access to a "full and fair procedure" for the alien to acquire "asylum or equivalent temporary

protection,'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). Aliens subject to an ACA thus would have an avenue for protection in the third country of removal not necessarily available in an INA section 241(b) country of removal— a country that may not have entered a binding agreement to provide the alien procedures for requesting safe haven and that may have originally prompted the alien's flight and application for asylum.

This rule retains the existing regulations implementing the U.S.-Canada Agreement, while also crafting a new regulatory framework under which other ACAs will be implemented. Even though the regulatory framework for implementation of the new ACAs will differ in some significant respects from the earlier 2004 regulations, in part for the reasons described above, this rule also replicates several key aspects of implementation of the U.S.-Canada Agreement. First, as with the regulatory scheme for the U.S.-Canada Agreement, prior to implementation of an ACA subject to this rule, the Departments will make a generalized determination as to whether the third country grants asylum seekers ''access to a full and fair procedure'' within the meaning of INA 208(a)(2)(A). This finding is required by the text of section 208(a)(2)(A), and the Departments will make the ''full and fair'' third country determination separate and apart from the regulatory provisions provided for here, to address this threshold statutory element that must be satisfied before any section 208(a)(2)(A) bilateral or multilateral agreement is effectuated. Second, under this rule, there will be an individualized screening process within the preexisting ER and INA section 240 frameworks to evaluate whether an alien falls within the terms of an agreement and, if so, whether the alien nonetheless meets one of its exceptions. The statute also provides an exception to the terms of an ACA in the event that the Secretary determines in the Secretary's discretion that ''it is in the public interest for the alien to receive asylum in the United States.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). As under the U.S.-Canada Agreement, the public interest exception is to be applied on a case-by-case basis, as a matter of discretion, to permit certain individuals to pursue applications for asylum or withholding of removal in the United States, where the Secretary or his immigration officers ''find[] that it is in the public interest for the alien to receive asylum in the United States.'' *See* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A); *cf.* 8 CFR 208.30(e)(6)(iii)(F). Application of the

exception is ''solely within the discretion of DHS.'' Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 10628, 10630 (DOJ) (proposed rule); *see also* INA 208(a)(3), 8 U.S.C. 1158(a)(3) (''No court shall have jurisdiction to review any determination of the Attorney General [or Secretary] under paragraph (2).'').

As with the regulations implementing the U.S.-Canada Agreement, this rule will implement the statutory requirements into its threshold screening mechanism for evaluating which aliens are barred from applying for asylum under an ACA. The applicability of any additional limitations on the categories of aliens subject to the terms of a particular ACA will also be assessed during the initial screening. If an ACA is determined to be applicable to an alien applying for asylum, and the alien does not demonstrate that his life or freedom will more likely than not be threatened in the third country, the immigration officer may proceed to order removal without consideration of asylum, withholding-of-removal, or CAT claims, analogous to the U.S.-Canada Agreement removal arrangements. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69481 (DHS) (''[A] careful reading of the Act makes clear that credible fear interviews are not required for aliens subject to [ACAs].'').

The U.S.-Canada Agreement applies only to aliens who had arrived in the United States to seek asylum after traveling through Canada. However, the terms of section 208(a)(2)(A) do not limit the applicability of ACAs to aliens who have traveled through the third country in transit to the United States. Consequently, in contrast to the U.S.-Canada provisions, this rule provides that the screening procedures for ACAs with countries other than Canada (which, with one possible exception, would not be contiguous to the United States) will afford aliens an opportunity to establish that it is more likely than not that they would be persecuted or tortured if removed to the applicable third country. It provides an additional screening component enabling asylum officers and IJs to assess whether an alien who affirmatively states a fear of removal to the signatory country under an applicable ACA would more likely than not be persecuted or tortured in such country.

*B. New 8 CFR 208.30(e)(7)*

The regulations at 8 CFR 208.30 govern interviews, conducted by DHS asylum officers, of stowaways and aliens subject to ER. *See* 8 CFR 208.30(a). New paragraph (e)(7) requires an asylum officer, in an appropriate case, to make several threshold screening determinations before assessing the merits of an alien's claims for asylum, withholding of removal, or CAT protection. First, the asylum officer must determine whether the alien is subject to one or more ACAs. Second, if so, the officer must determine whether the alien meets any exception to the applicable agreement(s)—including the public-interest exception, which, under section 208(a)(2)(A), all ACAs must contain. If the alien is not subject to any ACA, or the alien meets an exception to each applicable agreement, the asylum officer will assess the merits of the alien's claims for relief as usual—that is, assess whether the alien has a credible fear of persecution or torture under existing paragraphs (e)(2) and (3). But if the alien is subject to an ACA, and does not meet any exception, the asylum officer will inform the alien that he or she is potentially subject to removal to the third country signatory to the relevant ACA, and that the third country, rather than the United States, will provide access to a full and fair procedure for adjudication of the alien's claims.

After identifying the third country or countries to which the alien may be removed, if the alien does not affirmatively state a fear of persecution or torture in, or removal to, the country or countries, the asylum officer will refer the determination—*i.e.,* that the alien is barred from applying for asylum, withholding of removal, and CAT protection in the United States, and subject to removal to the third country or countries—to a supervisory officer for review. If the supervisory asylum officer disagrees, that officer will remand the case to the asylum officer for a credible fear interview.

If, on the other hand, the alien affirmatively states a fear of persecution or torture in, or removal to, the third country or countries, the asylum officer will then determine whether the alien can establish, by a preponderance of the evidence, that, if the alien were removed to the third country or countries, it is more likely than not that he or she would be persecuted on account of a protected ground or tortured. If the officer determines the alien has met that burden, given that the alien has already been placed into ER proceedings, the officer will assess the

AR.00275

merits of the alien's claims for relief and protection as usual—*i.e.,* conduct a normal credible fear interview. But if the officer determines the alien has not met that burden, the officer will refer the determination to a supervisory asylum officer for review.

The threshold screening determinations under the U.S.-Canada Agreement regulatory procedures similarly incorporate a preponderance-of-the-evidence standard. *See* 8 CFR 208.30(e)(6)(ii). As under the U.S.-Canada screening procedures, in making the threshold determinations discussed above, asylum officers "will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases." Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10623 (DHS) (proposed rule); *see also id.* at 69482 (DHS) ("The Department has clarified, in the final rule, that the same safeguards accorded to aliens who are eligible for a credible fear determination will be accorded to aliens who receive threshold screening interviews."). In the asylum officer's discretion, "[c]redible testimony alone may be sufficient" to meet the alien's burden "if there is a satisfactory explanation of why corroborative documentation is not reasonably available." Implementation of the Agreement Between the Government of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 10623 (DHS) (proposed rule). Asylum officers have received "extensive training in evaluating credibility of testimony when there is little or no documentation in support of that testimony," *id.,* and will apply that training to the threshold determination of whether an alien falls within the terms of an ACA or an exception and whether the alien has established a clear probability of persecution or torture in the third country.

In contrast to the final rule implementing the U.S.-Canada Agreement that provided an alien with a minimal consultation period prior to the threshold screening interview to determine the applicability of the Agreement, this rule does not mandate such a period. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at

69482 (DHS) (providing a minimal consultation period but emphasizing that the consultation period would not permit the postponement of the threshold screening interview process so as not to "compromise the principle underlying the Agreement that aliens be returned promptly to the country of last presence"). Rather, this rule expands the threshold screening process itself to allow for an alien to demonstrate that he or she is "more likely than not" to be subject to persecution on account of a protected ground or torture in the receiving country under the ACA.

The bilateral ACAs that the United States has signed as of the effective date of this rule include agreements with El Salvador, Guatemala, and Honduras and incorporate fewer and less complex exceptions than the U.S.-Canada Agreement, eliminating the need for a consultation period analogous to the consultation period permitted by the U.S.-Canada Agreement.[11] Further, this rule's expansion of the underlying threshold screening procedures to provide an opportunity for aliens to establish "more likely than not" persecution or torture in the receiving country provides additional process beyond that which is available under the regulations implementing the U.S.-Canada Agreement.

Although section 208(a)(2)(A) is silent with respect to which party bears the burden (or inapplicability) of the bar and the appropriate standard of proof for such a showing, section 208(b)(1) indicates that the ultimate burden of proof in establishing asylum eligibility is on the applicant. *See* INA 208(b)(1)(A)–(B), 8 U.S.C. 1158(b)(1)(A)–(B) (authorizing a grant of asylum to an alien who meets the burden of establishing that he or she is a refugee). Moreover, the section 208(a)(2)(A) language regarding protection against harm from the third country of removal is parallel to the section 241(b)(3) language establishing withholding-of-removal protection with respect to the typical potential countries of removal specified by INA sections 241(b)(1) and (2). When evaluating

whether an alien is entitled to withholding of removal under INA 241(b)(3) or evaluating a claim for protection under the regulations implementing CAT, an IJ addresses whether an alien has established the relevant fear by a preponderance of the evidence. *See* 8 CFR 1208.16(b)–(c). It is therefore reasonable to require an alien to show, by a preponderance of the evidence, that he or she meets an exception to an otherwise applicable ACA, and that he or she would face harm in the third country. *See* Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR at 69483 (DHS) (reasoning that, because "applicants for asylum, withholding of removal, and protection under [CAT] bear the burden of proof," it is reasonable for aliens to bear "the burden of proof for purposes of establishing that an exception to the [U.S.-Canada] Agreement applies").

### C. Amended 8 CFR 1003.42(h)(1)–(2) and New 8 CFR 1003.42(h)(3)–(4)

This rule will amend 8 CFR 1003.42(h) to reflect the implementation of ACAs other than the U.S.-Canada Agreement. In particular, the rule will make technical amendments to 8 CFR 1003.42(h)(1) and (2) to clarify that those paragraphs apply to only the preexisting U.S.-Canada Agreement. The rule creates new 8 CFR 1003.42(h)(3) and (4) to reflect the distinction that the threshold officer screening in the non-Canada ACAs includes an opportunity for the alien to establish that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured. Under the new paragraph (h)(3), an IJ is prohibited from reviewing an officer's determination that section 208(a)(2)(A) bars an alien from applying for asylum. But an IJ acquires jurisdiction to review a negative credible fear finding in any case where an alien either establishes that he or she qualifies for an ACA exception, *or* establishes more-likely-than-not harm in the relevant third country, thus prohibiting the application of the ACA to that alien. (In such a case, the asylum officer would apply typical credible fear screening to the alien, giving an IJ jurisdiction to review a negative finding by that officer.) The new (h)(4) clarifies that an alien subject to removal under an ACA is ineligible to apply for withholding-of-removal and CAT relief in the United States, along with asylum, as explained in the detailed legal background section of the rule.

---

[11] Applicability of the exceptions at issue in the non-Canada ACAs generally can be evaluated through records checks and by asking straightforward biographic questions. Conversely, the exceptions to the U.S.-Canada Agreement required more detailed information from the alien, such as whether certain family members of the applicant are present in the United States, the immigration status of those family members, and whether the family members have pending asylum applications. *See* 8 CFR 208.30(e)(6)(iii)(A)–(F). Should the U.S. enter into additional ACAs in the future having exceptions that mirror the complexity of those contained in the U.S.-Canada Agreement, DHS could choose to establish consultation periods as needed.

AR.00276

This IFR preserves the general review framework currently underlying 8 CFR 1003.42(h)(1), which provides that an IJ lacks jurisdiction to review an asylum officer's determination that the U.S.-Canada Agreement bars an alien from applying for asylum in the United States and makes them removable to Canada for adjudication of his or her claim for asylum or equivalent protection. In proposing a framework for implementing the U.S.-Canada Agreement, DOJ noted that, in a given case, the asylum officer would be making an individualized determination only as to whether the Agreement (or any of its exceptions) applied to the alien. Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry, 69 FR at 10630 (DOJ) (proposed rule). Given the "narrowness of the factual issues" underlying such a determination, DOJ determined that review by an IJ was unnecessary. *Id.*

DOJ suggested the analysis might be different if an asylum officer were evaluating "the merits of an . . . alien's asylum claims." *Id.* And under this IFR, an asylum officer does need to determine whether the alien would more likely than not be persecuted or tortured in the third country to which he or she would be removed under an ACA. But when evaluating an asylum claim on the merits, an asylum officer or IJ is often forced to make a complex assessment as to whether wrongs done to the asylum seeker (or those similarly situated) in the asylum seeker's home country were motivated by animus against a protected group or some other factor. In contrast, evaluating whether an asylum seeker would face persecution or torture in a country to which he has no substantial connections is more straightforward. The third country with which the United States has formed an ACA is, by definition, not an alien's country of nationality or last habitual residence. *See* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A) (authorizing ACA removal only to countries other than that of the alien's nationality or last habitual residence, if the alien has no nationality). And, thus, the country of removal under an ACA is not the country originally prompting the asylum seeker's claim, unlike the potential countries of removal under section 241(b)(1)–(2) to which section 241(b)(3) withholding of removal claims are directed, *see* 8 U.S.C. 1231(b)(1)–(2) (providing, *e.g.,* for an alien to be removed to the country in which he or she boarded a vessel or aircraft to reach the United States or the country in which he or she is a citizen or was born or has a residence). Because the ACA

country of removal did not prompt the alien's claim, the process for determining simply whether to send the alien to a third country for that consideration is reasonably more minimalistic than the requisite procedures for deciding asylum and withholding of removal claims on the merits.

Finally, Congress chose not to mandate IJ review of decisions as to whether an alien is subject to an ACA. Yet, in the same legislation creating section 208(a)(2)(A), Congress created the ER process. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, sec. 302 and 604, 110 Stat. 3009–546, –579, –690. And in that process, Congress expressly mandated IJ review (at the request of the alien) of a negative credible fear determination by an asylum officer. *Compare* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A) *with* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). That difference strongly suggests that Congress did not intend to require IJ review of decisions by asylum officers as to whether aliens are barred from applying for asylum under section 208(a)(2)(A).

Therefore, it is unnecessary—and indeed would be inconsistent with the INA removal statutory scheme—to mandate IJ review of a determination that section 208(a)(2)(A) bars an alien from applying for asylum. In section 208(a)(2)(A), Congress authorized the Executive Branch to operate within the President's foreign affairs authority to enter international agreements more evenly distributing the load of providing access to potential asylum for international refugees and asylees. By its terms, section 208(a)(2)(A) preserves flexibility for the Executive Branch in entering such agreements. The provision imposes two clear requirements, limiting such international agreements only to countries that provide access to full and fair protection procedures and are places in which an alien's life or freedom would not be harmed on account of a protected ground. Beyond those specifications, the Executive Branch's utilization of its statutory authority under section 208(a)(2)(A) is subject to no express procedural stipulations.

In any event, this rule preserves unchanged the existing credible fear process itself, including the statutorily required availability of review by an IJ. So, if an asylum officer determines that an alien subject to the terms of an ACA bar would more likely than not be persecuted or tortured in the third country or, for any reason, that the ACA does not prohibit the alien's U.S.

asylum application, the officer will then proceed immediately to a credible fear determination. If necessary, as required by statute and preexisting regulations, an IJ will conduct a review of this determination.

### D. Amended 8 CFR 1240.11(g) and New 8 CFR 1240.11(h)

This rule will amend 8 CFR 1240.11(g) to reflect that the section will now apply only to the U.S.-Canada Agreement. The rule will also create a new 8 CFR 1240.11(h) to provide for the implementation of all other existing and future ACAs within the context of section 240 proceedings. Similar to the threshold determinations that asylum officers must make in ER proceedings, as described above, this new regulatory section will require IJs to determine whether an alien falls within an exception to an otherwise applicable ACA, and will authorize IJs to provide an alien subject to the terms of an ACA an opportunity to establish that it is more likely than not that the alien would be persecuted or tortured on account of a protected ground or tortured in the applicable third country.

## VI. Regulatory Requirements

### A. Administrative Procedure Act

The Departments' decision to promulgate the regulations implementing the U.S.-Canada Agreement through formal notice-and-comment rulemaking does not obligate the Departments to do so here. *See, e.g., Hoctor* v. *U.S. Dep't of Agric.,* 82 F.3d 165, 171–72 (7th Cir. 1996) (observing that courts should "attach no weight" to an agency's varied approaches to the use of notice-and-comment rulemaking involving similar rules and that "there is nothing in the [Administrative Procedure Act ("APA")] to forbid an agency to use the notice and comment procedure in cases in which it is not *required* to do so"); *Indep. Living Res.* v. *Or. Arena Corp.,* 982 F. Supp. 698, 744 n.62 (D. Or. 1997) ("There are many reasons why an agency may voluntarily elect to utilize notice and comment rulemaking . . . ."). For the reasons that follow, the Departments are issuing this rule as an interim final rule pursuant to the APA's exemption from notice-and-comment requirements for rules involving "foreign affairs function[s]" and the "good cause" exception for rules with respect to which "notice and public procedure" is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(a)(1), (b)(B).

1. Foreign Affairs Exemption

The Departments may forgo notice-and-comment procedures and a delay in the effective date of this rule because the rule involves a "foreign affairs function of the United States," and thus is exempt from the procedural requirements of 5 U.S.C. 553. *See id.* 553(a)(1). This rule puts into effect ACAs already negotiated with El Salvador, Guatemala, and Honduras, and will remove obstacles to successfully negotiating ACAs with other countries. This rule is thus similar to others that courts have determined are within the scope of the foreign affairs exemption and is likewise exempt from notice-and-comment rulemaking requirements and the required delay in the effective date. *See, e.g., Int'l Bhd. of Teamsters* v. *Peña,* 17 F.3d 1478, 1486 (D.C. Cir. 1994) (holding that a Federal Highway Administration rule "implement[ing] an agreement between the United States and Mexico" was necessary for the United States to avoid "reneging on [its] international obligations" and thus was appropriately promulgated under the foreign affairs exemption of the APA); *City of New York* v. *Permanent Mission of India to United Nations,* 618 F.3d 172, 201 (2d Cir. 2010) (quoting the description of the purpose of the foreign affairs exemption in H.R. Rep. No. 79–1980, at 23 (1946)).

This rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States. *See City of New York,* 618 F.3d at 201 (finding that rules related to diplomacy with specific other countries fall within the scope of the foreign affairs exemption). Those ongoing discussions relate to proposals for increased efforts by third countries to help reduce the flow of illegal aliens north to the United States and to join the United States in shouldering the load of providing asylum procedures, and possible relief or protection, to the migrants from around the world flocking to U.S. borders. *See Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (per curiam) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

In the latter half of 2019, U.S. officials entered into agreements with El Salvador, Guatemala, and Honduras pursuant to INA 208(a)(2)(A). U.S. officials remain in negotiations with other nations to enter into additional ACAs. Delaying the implementation of the rule due to notice-and-comment rulemaking could impact the ability of the United States to negotiate by creating uncertainty about the regulatory framework that the United States will have in place to carry out such agreements. *See East Bay I,* 909 F.3d at 1252–53 (suggesting that reliance on the exemption is justified where the Government "explain[s] how immediate publication of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment" is necessary in light of the Government's foreign affairs efforts). Potential signatories to such agreements may be more hesitant to negotiate with the United States and to rely on a commitment by the United States to meet the terms of negotiated agreements if the regulatory framework to carry out such agreements is uncertain and not yet in place.

The terms of some of the current ACAs have been contingent on the signing countries exchanging diplomatic notes certifying that each country has put in place the legal framework necessary to effectuate and operationalize the agreement. The United States will have a stronger negotiating position in entering additional agreements if a domestic regulatory framework is already in effect during the negotiations. The circumstances of the U.S.-Canada Agreement underscore this reality, as a period of nearly two years passed between the formation of the agreement and its effectuation through the promulgation of final rules. That delay was not as problematic in the context of U.S.-Canada relations, as comparatively few aliens are subject to the U.S.-Canada Agreement. In contrast, a far greater number of aliens arriving at the southern border will be affected by the non-Canada ACAs currently under development. To bring the numbers of U.S. asylum applicants to a more manageable level, and to have a strong negotiating position with other potential third countries, the United States needs the flexibility to effectuate the current ACAs much more rapidly than the two-year time period that transpired between the signing and execution of the U.S.-Canada Agreement. Further, countries that sign ACAs with the United States may be deterred from sustaining their commitments to the agreements if the United States materially delays its operationalization after representing to those countries that their entry into these agreements is an urgent U.S. priority. *Cf. E. Bay Sanctuary Covenant* v. *Trump,* 932 F.3d 742, 776 (9th Cir. 2018) ("*East Bay I*") ("Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of 'definitely undesirable international consequence' that warrants invocation of the foreign affairs exception.").

Similarly, a delayed effective date for the rule may weaken the facility of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners. *See, e.g., Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which so affect relations with other Governments that . . . public rule-making provisions would provoke definitely undesirable international consequences" (internal quotation marks omitted)). In addition, addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico [12] and the Northern Triangle countries the sooner that this interim final rule is in place, as it will help address the enormous flow of aliens through these countries to the southern border, where aliens seeking ultimately meritless asylum claims continue to strain resources and contribute to a national security and humanitarian crisis. *Cf. id.* ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country."). Further, the efficient implementation of this interim rule will improve the ability of the United States to negotiate successfully with these and potentially other countries. *See Rajah* v. *Mukasey,* 544 F.3d 427, 438 (2d Cir. 2008) (finding that the notice-and-comment process can be "slow and cumbersome," which can negatively affect efforts to secure U.S. national interests, thereby justifying application of the foreign affairs exemption).

This rule supports the President's foreign policy with respect to Mexico, the Northern Triangle countries, and other potential partner countries in this area and thus is exempt from the notice-and-comment and delayed-effective-

---

[12] The United States and Mexico have been engaged in ongoing discussions regarding both regional and bilateral approaches to asylum. *See, e.g.,* Secretary Nielsen Meets with Mexican Officials on Border Emergency, Travels to Honduras to Meet with Northern Triangle Governments to Address Crisis at Source (Mar. 26, 2019), *available at http://www.dhs.gov/news/2019/03/26/secretary-nielsen-meets-mexican-officials-border-emergency-travels-honduras-meet.*

AR.00278

date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.,* 751 F.2d at 1249; *Yassini,* 618 F.2d at 1361.

Invoking the APA's foreign affairs exemption is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS, in consultation with the Department of State, recently provided notice that it was eliminating an exception to expedited removal for certain Cuban nationals. The document explained that the change in policy was consistent with the foreign affairs exemption for rules subject to notice-and-comment requirements because the change was central to ongoing negotiations between the two countries. Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902, 4904–05 (Jan. 17, 2017).

Some courts have layered onto the foreign affairs exemption a requirement that the agency show not merely that the rule implicates foreign affairs, but also that the use of notice-and-comment procedures would "provoke definitely undesirable international consequences." *See, e.g., East Bay I,* 932 F.3d at 775–76 (internal quotation marks omitted). As explained above, even this constraint on application of the APA foreign affairs exemption is satisfied here, as a delayed effective date for this rule could have far-reaching consequences for the strength of the negotiating position of the United States in relation to potential signatories of future ACAs.

2. Good Cause Exception

Alternatively, the Departments may forgo notice-and-comment rulemaking and a delayed effective date while this rulemaking is published in the **Federal Register** for public comment, because the APA provides an exception from those requirements when an agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B); *see* 5 U.S.C. 553(d)(3). This exception relieves agencies of notice-and-comment requirements in urgent situations, or in circumstances where "the delay created by the notice and comment procedures would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also Nat'l Fed'n of Fed. Emps.* v. *Devine,* 671 F.2d 607, 611–12 (D.C. Cir. 1982); *United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010). On multiple occasions, agencies have relied on this exception to promulgate immigration-related interim rules.[13]

The Departments have concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Delaying implementation of this rule until the conclusion of notice-and-comment procedures and the 30-day delayed effective date would be impracticable and contrary to the public interest. In rejecting challenges to the prior use of interim rules, courts have cited evidence that pre-publication of a significant change in asylum procedures will cause migrants to rush to U.S. borders. *See East Bay I,* 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018) (concluding that the Government was "likely to prevail on its claim regarding the good cause exception" in the context of a November 2018 interim rule barring asylum eligibility for aliens who, in violation of a Presidential proclamation, enter between ports of entry); *cf. Barr* v. *East Bay Sanctuary Covenant,* ("*East Bay II*"), No. 19A230, 588 U.S. ___ (Sept. 11, 2019) (granting, without explanation, a stay on appeal from a circuit court order that had concluded, in part, that the Government had inadequately justified reliance on the good cause and foreign affairs APA exemptions in promulgating an IFR). Would-be asylum applicants have a strong incentive to intensify their efforts to rapidly reach the U.S. border when the United States announces a regulatory change that will impact asylum applications. *See, e.g., Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) (concluding that good cause exists when "the very announcement" of a rule could "be expected to precipitate

activity by affected parties that would harm the public welfare"); *see also id.* (collecting cases).

Here, the announcement that the United States has arranged for other countries to consider certain protection applications, in lieu of any ability to apply for protection within the United States itself, would create a perceived urgency for aliens to enter the United States illegally or apply for admission without proper documentation before the ACAs take effect. The implementation of ACAs would require significant numbers of aliens to file applications for protection in third countries rather than the United States. Recent events have shown that knowledge of this kind of impending change is highly likely to cause a dramatic increase in the numbers of aliens who enter or attempt to enter the United States to file asylum applications before the effective date of the change. For example, over a one-year period from 2018 to 2019, southwestern-border family-unit apprehensions rose 469 percent. *See* Application for a Stay Pending Appeal at 24, *Barr* v. *East Bay Sanctuary Covenant,* No. 19A230 (U.S. Aug. 26, 2019) ("Stay Application, *East Bay II*") (citing Administrative Record at 233, *East Bay Sanctuary Covenant* v. *Barr,* No. 19–cv–04073–JST (N.D. Cal. 2019) ("A.R., *East Bay II*"). And numerous news articles connect such recent surges to changes in immigration policy. *See* Stay Application, *East Bay II,* at 25 (citing A.R., *East Bay II,* at 438–39 (describing how smugglers persuaded migrants to cross the border after family separation was halted by telling the migrants to "hurry up before they might start doing so again"); *id.* at 452–54 (indicating that migrants refused offers to stay in Mexico because their goal is to enter the United States); *id.* at 663–665, 683 (indicating that Mexico faced a migrant surge when it changed its policies)).

Further, as courts have recognized, smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy, and, in fact, "the number of asylum seekers entering as families has risen" in a way that "suggests a link to knowledge of those policies." *East Bay,* 354 F. Supp. 3d at 1115. If this rule were published for notice and comment before becoming effective, "smugglers might similarly communicate th[is] Rule's potentially relevant change in U.S. immigration policy," *id.,* and the risk of a surge in migrants hoping to enter the country before the rule becomes effective supports a finding of good cause under 5 U.S.C. 553.

---

[13] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require a passport and visa from certain H2–A Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over a six-month period).

Past experience shows that individuals inside and outside of the United States change their behavior in anticipation of changes to U.S. immigration laws. For example, Central American officials reported that after President Donald Trump's victory in the November 2016 election, Central Americans began "crossing illegally into the U.S. at the fastest rate in years, many of them hoping to sneak in before Donald Trump's presidential inauguration and the heightened border-security measures he has promised." Robbie Whelan, *Central Americans Surge at Border Before Trump Takes Over,* Wall Street Journal (Dec. 23, 2016), *http://www.wsj.com/articles/central-americans-surge-at-border-before-trump-takes-over-1482489047.* Honduras's deputy foreign minister attested, "We're worried because we're seeing a rise in the flow of migrants leaving the country, who have been urged to leave by coyotes telling them that they have to reach the United States before Trump takes office." Gustavo Palencia & Sofia Menchu, *Central Americans Surge North, Hoping To Reach U.S. Before Trump Inauguration,* Reuters (Nov. 24, 2016), *http://www.reuters.com/article/us-usa-trump-immigration-centralamerica/central-americans-surge-north-hoping-to-reach-u-s-before-trump-inauguration-idUSKBN13J2A7* (internal quotation marks omitted). Guatemala's foreign minister similarly stated that people were "leaving Guatemala en masse before Trump becomes president." *Id.*

The enactment of the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009–546 (1996), similarly prompted immigrants to change their behavior and seek to take advantage of the pre-IIRIRA rules. IIRIRA made several changes to asylum law. For example, it added three categorical bars to asylum: (1) Aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C). IIRIRA also provided that aggravated felonies, defined in INA 101(a)(43), 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]" that render an alien ineligible for asylum. INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i). IIRIRA was signed into law on September 30, 1996, *see* President William Jefferson Clinton, Statement on Signing H.R. 3610, the Omnibus Appropriations Act, 1997 (Sept. 30, 1996), but did not take effect until April 1, 1997. Data shows a large spike in asylum applications filed just before IIRIRA went into effect and a large dip the week it went into effect. *See* Initial Asylum Receipts by Week, April 1, 1994, to March 31, 1997, PASD #19–227, Planning, Analysis, and Statistics Division, EOIR (recording 52 successive weeks with fewer than 3,000 total "[i]nitial [a]sylum [r]eceipts," spiking to an intake of 4,448 new asylum cases the week of Monday, March 24, 1997, and then dipping back down to just 1,099 new cases the week of March 31, 1997). This suggests that some asylum seekers that would have otherwise applied in April may have instead applied in March to avoid IIRIRA's new rules on asylum.

In addition to the factual basis for reliance on the good cause exception here, in light of these numerous examples in which announcements of U.S. immigration policy changes immediately impacted migrant behavior, application of the exception here comports with repeated agency practice. For example, in January 2017, DHS concluded that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017). DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded that "a surge could result in significant loss of human life." *Id.*

Reliance on the good cause exception in effecting immediate changes in immigration policy is not a new practice. In 2004, for example, DHS relied on the exception to immediately expand ER to further national security and deter dangerous migrant travel. *See, e.g.,* Designating Aliens For Expedited Removal, 69 FR 48877 (Aug. 11, 2004); *see also, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR at 5907 (finding the good cause exception applicable because of similar concerns).

DOJ and DHS raised similar concerns and drew similar conclusions in the July 2019 joint interim final rule that limited asylum eligibility for aliens who had transited to the United States through a third country without applying for available asylum relief. Asylum Eligibility and Procedural Modifications, 84 FR 33829, 33840–41 (July 16, 2019); *see also, e.g.,* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55950–51 (Nov. 9, 2018) (also relying on the good cause exception). As noted above, the Supreme Court granted (without explanation) a stay of a lower court decision that had ruled against use of an IFR to promulgate the third-country-transit requirement.

These same concerns apply to this rule to an even greater extent. Pre-promulgation notice and comment, or a delay in the effective date, would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule limiting asylum applications took effect. *See East Bay I,* 354 F. Supp. 3d at 1115 (citing a newspaper article suggesting that such a rush to the border occurred due to knowledge of a pending regulatory change in immigration law). Furthermore, an additional surge of aliens seeking to enter via the southern border prior to the effective date of this rule would be destabilizing to the region, as well as to the U.S. immigration system. In recent years, there has been a massive increase in the number of aliens who assert a fear of persecution. This massive increase is overwhelming the U.S. immigration system as a result of a variety of factors, including the extraordinary proportion of aliens who are initially found to have a credible fear and therefore are referred to full removal proceedings in immigration court; a lack of detention space; and the resulting high rate of release into the interior of the United States of aliens with a positive credible fear determination, many of whom then abscond without pursuing their asylum claims to a final conclusion and become difficult to locate and remove. Recent initiatives to track family-unit cases in 10 cities and from Sept. 24, 2018, through October 25, 2019, revealed that 79 percent of removal orders were

AR.00280

issued in absentia—*i.e.*, were issued to an alien who had absconded. A large additional influx of aliens who intend to enter illegally or to apply for admission without proper documentation would exacerbate this crisis. This concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events. Therefore, this interim final rule is a practical and necessary means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This rule is not subject to Executive Order 12866 as it is implicates a foreign affairs function of the United States relating to ongoing discussions with implications for a set of specified international relationships. As this is not a regulatory action under Executive Order 12866, it is not subject to Executive Order 13771.

*F. Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

*H. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal Services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1240*

Administrative practice and procure, Aliens.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title of Public Law 110–229, 8 CFR part 2.

■ 2. Section 208.4 is amended by revising paragraph (a)(6) to read as follows:

**§ 208.4  Filing the application.**

\* \* \* \* \*

(a) \* \* \*

(6) Asylum Cooperative Agreements. Immigration officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a third country pursuant to a bilateral or multilateral agreement, as provided in § 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), see 8 CFR 1240.11(g) and (h).

\* \* \* \* \*

■ 3. Section 208.30 is amended by revising paragraph (e)(7) and adding paragraph (e)(8) to read as follows:

**§ 208.30  Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.**

\* \* \* \* \*

(e) \* \* \*

(7) When an immigration officer has made an initial determination that an alien, other than an alien described in paragraph (e)(6) of this section and regardless of whether the alien is arriving at a port of entry, appears to be subject to the terms of an agreement authorized by section 208(a)(2)(A) of the Act, and seeks the alien's removal consistent with this provision, prior to any determination concerning whether the alien has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether the alien is ineligible to apply for asylum in the United States and is subject to removal to a country (''receiving country'') that is a signatory to the applicable agreement authorized by section 208(a)(2)(A) of the Act, other than the U.S.-Canada Agreement effectuated in 2004. In conducting this threshold screening interview, the asylum officer shall apply all relevant

interview procedures outlined in paragraph (d) of this section, except that paragraphs (d)(2) and (4) of this section shall not apply to aliens described in this paragraph (e)(7). The asylum officer shall advise the alien of the applicable agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case. The alien shall be provided written notice that if he or she fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country and wants the officer to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country, the alien should affirmatively state to the officer such a fear of removal. If the alien affirmatively states such a fear, the asylum officer will determine whether the individual has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in that country.

(i)(A) If the asylum officer, with concurrence from a supervisory asylum officer, determines during the threshold screening interview that an alien does not qualify for an exception under the applicable agreement, and, if applicable, that the alien has not demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the receiving country, the alien is ineligible to apply for asylum in the United States. Subject to paragraph (e)(7)(i)(B) of this section, after the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that he or she will be removed to the receiving country, as appropriate under the applicable agreement, in order to pursue his or her claims relating to a fear of persecution or torture under the law of the receiving country. Prior to removal to a receiving country under an agreement authorized by section 208(a)(2)(A), the alien shall be informed that, in the receiving country, the alien will have an opportunity to pursue the alien's claim for asylum or equivalent temporary protection.

(B) Aliens found ineligible to apply for asylum under this paragraph (e)(7) shall be removed to the receiving country, depending on the applicable agreement, unless the alien voluntarily withdraws his or her request for asylum.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the applicable agreement, or would more likely than not be

persecuted on account of a protected ground delineated in section 208(a)(2)(A) of the Act or tortured in the receiving country, the asylum officer shall make a written notation to that effect, and may then proceed to determine whether any other agreement is applicable to the alien under the procedures set forth in this paragraph (e)(7). If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of each of the applicable agreements, or would more likely than not be persecuted on account of a protected ground or tortured in each of the prospective receiving countries, the asylum officer shall make a written notation to that effect, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An exception to an applicable agreement is defined under the terms of the agreement itself. Each agreement, including any exceptions, will be announced in a **Federal Register** document. If the asylum officer determines that an alien is within one of the classes covered by a section 208(a)(2)(A) agreement, the officer shall next determine whether the alien meets any of the applicable agreement's exceptions. Regardless of whether the text of the applicable agreement provides for the following exceptions, all such agreements, by operation of section 208(a)(2)(A) of the Act, and as applicable to the United States, are deemed to contain the following provisions:

(A) No alien may be removed, pursuant to an agreement authorized by section 208(a)(2)(A), to the alien's country of nationality, or, if the alien has no nationality, to the alien's country of last habitual residence; and

(B) No alien may be removed, pursuant to an agreement authorized by section 208(a)(2)(A), where the Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest for the alien to receive asylum in the United States, and that the alien therefore may apply for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) If the asylum officer determines the alien meets an exception under the applicable agreement, or would more likely than not be persecuted on account of a protected ground or tortured in the prospective receiving country, the officer may consider whether the alien is subject to another agreement and its exceptions or would more likely than

not be persecuted on account of a protected ground or tortured in another receiving country. If another section 208(a)(2)(A) agreement may not be applied to the alien, the officer should immediately proceed to a credible fear interview.

(8) An asylum officer's determination shall not become final until reviewed by a supervisory asylum officer.

\*    \*    \*    \*    \*

**Department of Justice**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003, 1208, and 1240 as follows:

**PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

■ 4. The authority citation for part 1003 continues to read as follows:

   **Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. Section 1003.42 is amended by revising paragraph (h) to read as follows:

**§ 1003.42   Review of credible fear determination.**

\*    \*    \*    \*    \*

(h) *Asylum cooperative agreement—* (1) *Arriving alien.* An asylum judge has no jurisdiction to review a determination by an immigration officer that an arriving alien is not eligible to apply for asylum pursuant to the 2002 U.S.-Canada Agreement formed under section 208(a)(2)(A) of the Act and should be returned to Canada to pursue his or her claims for asylum or other protection under the laws of Canada. *See* 8 CFR 208.30(e)(6). However, in any case where an asylum officer has found that an arriving alien qualifies for an exception to that Agreement, an immigration judge does have jurisdiction to review a negative credible fear finding made thereafter by the asylum officer as provided in this section.

(2) *Aliens in transit.* An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from Canada in transit through the United States should be returned to Canada to pursue asylum claims under Canadian law, under the terms of the 2002 U.S.-Canada Agreement.

(3) *Applicants for admission.* An immigration judge has no jurisdiction to review a determination by an asylum officer that an alien is not eligible to apply for asylum pursuant to a bilateral or multilateral agreement with a third country under section 208(a)(2)(A) of the Act and should be removed to the third country to pursue his or her claims for asylum or other protection under the laws of that country. *See* 8 CFR 208.30(e)(7). However, if the asylum officer has determined that the alien may not or should not be removed to a third country under section 208(a)(2)(A) of the Act and subsequently makes a negative credible fear determination, an immigration judge has jurisdiction to review the negative credible fear finding as provided in this section.

(4) *Aliens in transit through the United States from countries other than Canada.* An immigration judge has no jurisdiction to review any determination by DHS that an alien being removed from a receiving country in transit through the United States should be returned to pursue asylum claims under the terms of the applicable cooperative agreement. *See* 8 CFR 208.30(e)(7).

## PART 1208—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title of Public Law 110–229, 8 CFR part 2.

■ 7. Section 1208.4 is amended by revising paragraph (a)(6) to read as follows:

### § 1208.4   Filing the application.

\*    \*    \*    \*    \*

(a) \* \* \*

(6) *Asylum cooperative agreements.* Immigration judges have authority to consider issues under section 208(a)(2)(A) of the Act, relating to the determination of whether an alien is ineligible to apply for asylum and should be removed to a third country pursuant to a bilateral or multilateral agreement, only with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act, as provided in 8 CFR 1240.11(g) and (h). For DHS regulations relating to determinations by immigration officers on this subject, see 8 CFR 208.30(e)(6) and (7).

\*    \*    \*    \*    \*

## PART 1240—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 8. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 9. Section 1240.11 is amended by revising the paragraph (g) subject heading and paragraphs (g)(1) and (4) and adding paragraph (h) to read as follows:

### § 1240.11   Ancillary matters, applications.

\*    \*    \*    \*    \*

(g) *U.S.-Canada safe third country agreement.* (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to Canada pursuant to the 2002 Agreement Between the Government of the United States of America and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries (''Agreement''), in the case of an alien who is subject to the terms of the Agreement and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under that Agreement the alien should be returned to Canada, or whether the alien should be permitted to pursue asylum or other protection claims in the United States.

\*    \*    \*    \*    \*

(4) An alien who is found to be ineligible to apply for asylum under section 208(a)(2)(A) of the Act is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention against Torture. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to the Agreement and section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to Canada, in which the alien will be able to pursue his or her claims for asylum or protection against persecution or torture under the laws of Canada.

(h) *Other asylum cooperative agreements.* (1) The immigration judge has authority to apply section 208(a)(2)(A) of the Act, relating to a determination that an alien may be removed to a third country pursuant to a bilateral or multilateral agreement— other than the 2002 U.S.-Canada Agreement—in the case of an alien who is subject to the terms of the relevant agreement and is placed in proceedings pursuant to section 240 of the Act. In an appropriate case, the immigration judge shall determine whether under the relevant agreement the alien should be removed to the third country, or whether the alien should be permitted to pursue asylum or other protection claims in the United States. If more than one agreement applies to the alien and the alien is ordered removed, the immigration judge shall enter alternate orders of removal to each relevant country.

(2) An alien described in paragraph (h)(1) of this section is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act, or for withholding of removal or CAT protection in the United States, unless the immigration judge determines, by a preponderance of the evidence, that:

(i) The relevant agreement does not apply to the alien or does not preclude the alien from applying for asylum in the United States;

(ii) The alien qualifies for an exception to the relevant agreement as set forth in paragraph (h)(3) of this section and the **Federal Register** document specifying the exceptions particular to the relevant agreement; or

(iii) The alien has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country.

(3) The immigration judge shall apply the applicable regulations in deciding whether an alien described in paragraph (h)(1) of this section qualifies for an exception under the relevant agreement that would permit the United States to exercise authority over the alien's asylum claim. The exceptions for agreements with countries other than Canada are further explained by the applicable published **Federal Register** document setting out each Agreement and its exceptions. The immigration judge shall not review, consider, or decide any issues pertaining to any discretionary determination on whether an alien described in paragraph (h)(1) of this section should be allowed to pursue an application for asylum in the United States notwithstanding the general terms of an agreement, as section 208(a)(2)(A) of the Act reserves to the Secretary or his delegates the determination whether it is in the public interest for the alien to receive asylum in the United States. However, an alien in removal proceedings who is otherwise ineligible to apply for asylum under an agreement may apply for asylum if DHS files a written notice in the proceedings before the immigration judge that DHS has decided in the

AR.00283

public interest that the alien may pursue an application for asylum or withholding of removal in the United States.

(4) If the immigration judge determines that an alien described in paragraph (h)(1) of this section is subject to the terms of agreements formed pursuant to section 208(a)(2)(A) of the Act, and that the alien has failed to demonstrate that it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in those third countries, then

the alien is ineligible to apply for withholding of removal pursuant to section 241(b)(3) of the Act and the Convention Against Torture notwithstanding any other provision in this chapter. However, the alien may apply for any other relief from removal for which the alien may be eligible. If an alien who is subject to section 208(a)(2)(A) of the Act is ordered removed, the alien shall be ordered removed to the relevant third country in which the alien will be able to pursue his or her claims for asylum or

protection against persecution or torture under the laws of that country.

Approved:

Dated: November 14, 2019.

**Chad F. Wolf,**

*Acting Secretary of Homeland Security.*

Approved:

Dated: November 14, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–25137 Filed 11–18–19; 8:45 am]

**BILLING CODE 9111–97–P; 4410–30–P**

AR.00284

69640

# Proposed Rules

**Federal Register**

Vol. 84, No. 244

Thursday, December 19, 2019

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**8 CFR Part 208**

**RIN 1615–AC41**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

**[EOIR Docket No. 18–0002; A.G. Order No. 4592–2019]**

**RIN 1125–AA87**

**Procedures for Asylum and Bars to Asylum Eligibility**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Joint notice of proposed rulemaking.

**SUMMARY:** The Department of Justice and the Department of Homeland Security (collectively, "the Departments") propose to amend their respective regulations governing the bars to asylum eligibility. The Departments also propose to clarify the effect of criminal convictions and to remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications.

**DATES:** Written or electronic comments must be submitted on or before January 21, 2020. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 18–0002, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.
• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 18–0002 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.
• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:**

Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

Maureen Dunn, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Citizenship and Immigration Services (USCIS), DHS, 20 Massachusetts NW, Washington, DC 20529–2140; Contact Telephone Number (202) 272–8377 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this rule. Comments must be submitted in English, or an English translation must be provided. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that support the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 18–0002. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information for which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information for which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in EOIR's public docket file, but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Background**

Asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States, irrespective of their status, as provided in section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158. Congress, however, has provided that certain

categories of aliens cannot receive asylum and has further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility to the extent consistent with the asylum statute, as well as the authority to establish "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). This proposed rule will limit aliens' eligibility for this discretionary benefit if they fall within certain categories related to criminal behavior. The proposed rule will also eliminate a regulation concerning the automatic reconsideration of discretionary denials of asylum applications.

*A. Joint Notice of Proposed Rulemaking*

The Attorney General and the Acting Secretary of Homeland Security publish this joint notice of proposed rulemaking in the exercise of their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002, Public Law 107–296, as amended ("the Act" or "the HSA"), transferred many functions related to the execution of federal immigration law to the newly created Department of Homeland Security ("DHS"). The Act charges the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the immigration and nationality laws, *id.* 1103(a)(3). The Act also transferred to U.S. Citizenship and Immigration Services ("USCIS") responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). If an alien is not in removal proceedings or is an unaccompanied alien child, DHS asylum officers determine in the first instance whether an alien's asylum application should be granted. *See* 8 CFR 208.9.

At the same time, the Act retained for the Attorney General authority over certain individual immigration adjudications, including those related to asylum. These proceedings are conducted by the Department of Justice through the Executive Office for Immigration Review ("EOIR"), subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Accordingly, immigration judges within the

Department of Justice continue to adjudicate all defensive asylum applications made by aliens during the removal process and review affirmative asylum applications referred by USCIS to the immigration courts. *See* 8 U.S.C. 1101(b)(4); 8 CFR 1208.2. *See generally Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals within the Department of Justice, in turn, hears appeals from immigration judges' decisions. 8 CFR 1003.1. In addition, the HSA amended the INA to mandate "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this proposed rule.

*B. Domestic Legal Framework for Asylum*

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that precludes an alien from being subject to removal, creates a path to lawful permanent resident status and citizenship, and affords a variety of other ancillary benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed and can travel abroad without prior consent); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for naturalization of lawful permanent residents). Aliens who are granted asylum are authorized to work in the United States and to receive certain financial assistance from the Federal Government. *See* INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2); 8 U.S.C. 1612(a)(2)(A), (b)(2)(A); 8 U.S.C. 1613(b)(1); 8 CFR 274a.12(a)(5); *see also* 8 CFR 274a.12(c)(8) (providing that asylum applicants may seek employment authorization 150 days after filing a complete application for asylum).

In 1980, the Attorney General, in his discretion, established several mandatory bars to asylum eligibility. *See* 8 CFR 208.8(f) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum

regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the alien as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674–01, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm resettlement bar); *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc). In 1990, Congress added another mandatory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4987.

With the passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, Congress added three more categorical bars on the ability to apply for asylum, for: (1) Aliens who can be removed to a safe third country pursuant to a bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars set forth in the Attorney General's existing asylum regulations. These bars cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States;" (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* (codified at 8 U.S.C. 1158(b)(2) (1997)). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* (codified at 8 U.S.C. 1158(b)(2)(B)(i) (1997)).

Although Congress has enacted specific asylum eligibility bars, that statutory list is not exhaustive. Congress, in IIRIRA, further provided

the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B); *see also* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). Aliens who apply for asylum must satisfy two criteria. They must establish that they (1) are statutorily eligible for asylum; and (2) merit a favorable exercise of discretion. INA 208(b)(1)(A), 240(c)(4)(A), 8 U.S.C. 1158(b)(1)(A), 1229a(c)(4)(A); *Matter of A–B–*, 27 I&N Dec. 316, 345 n.12 (A.G. 2018), *abrogated on other grounds by Grace* v. *Whitaker*, 344 F. Supp. 3d 96, 140 (D.D.C. 2018); *see also, e.g., Fisenko* v. *Lynch*, 826 F.3d 287, 291 (6th Cir. 2016); *Kouljinski* v. *Keisler*, 505 F.3d 534, 541–42 (6th Cir. 2007); *Gulla* v. *Gonzales*, 498 F.3d 911, 915 (9th Cir. 2007); *Dankam* v. *Gonzales*, 495 F.3d 113, 120 (4th Cir. 2007); *Krastev* v. *INS*, 292 F.3d 1268, 1270 (10th Cir. 2002). As the Attorney General recently observed, "[a]sylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that he also merits asylum as a matter of discretion." *Matter of A–B–*, 27 I&N Dec. at 345 n.12; *see also Moncrieffe* v. *Holder*, 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . , it remains within the Attorney General's discretion to deny asylum.").

With respect to eligibility for asylum, section 208 of the INA provides that an applicant must (1) be "physically present" or "arrive[ ]" in the United States, INA 208(a)(1), 8 U.S.C. 1158(a)(1); (2) meet the statutory definition of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); and (3) otherwise be eligible for asylum, INA 208(b)(2), 8 U.S.C. 1158(b)(2); 8 CFR 1240.8(d).

In general, a refugee is someone who is outside of his country of nationality and who is unable or unwilling to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). The alien bears the burden of proof to establish that he meets eligibility criteria, including that he qualifies as a refugee. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i).

Aliens must also establish that they are otherwise eligible for asylum, meaning that they are not subject to one of the statutory bars to asylum or any "additional limitations and conditions . . . under which an alien shall be ineligible for asylum" established by regulation. *See* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). The INA currently bars from asylum eligibility any alien who (1) "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground; (2) "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;" (3) "has committed a serious nonpolitical crime outside the United States" prior to arrival in the United States; (4) constitutes "a danger to the security of the United States;" (5) is described in the terrorism-related inadmissibility grounds, with limited exception; or (6) "was firmly resettled in another country prior to arriving in the United States." INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi).

Aliens who fall within one of these bars are subject to mandatory denial of asylum. Where there is evidence that "one or more of the grounds for mandatory denial of the application for relief may apply," the applicant in immigration court proceedings bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey*, 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Su Qing Chen* v. *U.S. Att'y Gen.*, 513 F.3d 1255, 1257 (11th Cir. 2008) (applying 8 CFR 1240.8 in the context of the persecutor bar); *Xu Sheng Gao* v. *U.S. Att'y Gen.*, 500 F.3d 93, 98 (2d Cir. 2007) (same).

Because asylum is a discretionary benefit, aliens who are eligible for asylum are not automatically entitled to it. Rather, after demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General *may* grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a refugee (emphasis added)); *Matter of A–B–*, 27 I&N Dec. at 345 n.12; *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987).

Additionally, aliens whose asylum applications are denied may nonetheless be able to obtain protection from removal under other provisions of the immigration laws. A defensive

application for asylum that is submitted by an alien in removal proceedings is also automatically deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b). An immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations implementing U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), which were issued pursuant to section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277 (8 U.S.C. 1231 note). *See* 8 CFR 1208.13(c)(1); *see also* 8 CFR 1208.16(c) through 1208.18.

These forms of protection prohibit removal to any country where the alien would more likely than not be persecuted on account of a protected ground or tortured. Applying the relevant standard, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason— for instance, because of an eligibility bar or a discretionary denial of asylum—the alien may be entitled to statutory withholding of removal if not otherwise statutorily barred. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions*, 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that it is more likely than not that he or she would be tortured if removed to the proposed country of removal will qualify for CAT protection. *See* 8 CFR 1208.16(c) through 1208.18. But, unlike asylum, statutory withholding and CAT protection do not (1) prohibit the Government from removing the alien to a third country where the alien does not face persecution or torture, regardless of whether the country is a party to a bilateral or multilateral agreement specifically authorizing such removal, *contra* 8 U.S.C. 1158(a)(2)(A) (denying eligibility to apply for asylum "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a [third] country"); (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as derivative protection for family members). *See R– S–C*, 869 F.3d at 1180.

## C. Bars to Eligibility for Asylum

Eligibility for asylum has long been qualified both by statutory bars and by the discretion of the Attorney General and the Secretary to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum provisions, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum," and provided that "the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the title. 8 U.S.C. 1158(a) (1994); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to asylum eligibility that were modeled on the mandatory bars to eligibility for withholding of deportation under the existing section 243(h) of the INA. *See* 8 CFR 208.8(f) (1980); 45 FR at 37392 ("The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, *e.g.,* having been convicted of a serious crime, constitutes a danger to the United States."). Those regulations required denial of an asylum application if it was determined that (1) the alien was not a refugee within the meaning of section 101(a)(42) of the INA; (2) the alien was firmly resettled in a foreign country before arriving in the United States; (3) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion; (4) the alien had been convicted by a final judgment of a particularly serious crime and therefore constituted a danger to the community of the United States; (5) there were serious reasons for considering that the alien has committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States; or (6) there were reasonable grounds for regarding the alien as a danger to the security of the United States. 45 FR at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility for persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and reasonable grounds to regard the alien as a danger to the security of the United States. *See* 55 FR at 30683; *see also Yang,* 79 F.3d at 936–39 (upholding firm resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly serious crime bar). In the Immigration Act of 1990, Congress added an additional mandatory bar to eligibility to apply for or be granted asylum for "an[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515, 104 Stat. 4987.

In 1996, with the passage of IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended the asylum provisions in section 208 of the INA, 8 U.S.C. 1158. Among other amendments, Congress created three categories of aliens who are barred from applying for asylum: (1) Aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604.

Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars set forth in the Attorney General's existing asylum regulations. These bars cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States;" (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* (codified at 8 U.S.C. 1158(b)(2) (1997)). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* (codified at 8 U.S.C. 1158(b)(2)(B)(i) (1997)).

Although Congress has enacted specific asylum eligibility bars, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two bars to asylum eligibility—the bars for "particularly serious crimes" and "serious nonpolitical offenses." *See id.* Although Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime," by reason of which the offender "constitutes a danger to the community of the United States." INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board of Immigration Appeals ("Board") have long held that this grant of authority also authorizes the Board to identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc); *Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii).[1]

In addition to authorizing the discretionary expansion of crimes that would constitute particularly serious crimes or serious nonpolitical offenses, Congress further provided the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B); *see also* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C) (allowing for the establishment by regulation of "additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum"). As the Tenth Circuit has recognized, "[t]his delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1)," given that "the statute clearly empowers" the Attorney General and the Secretary to "adopt[ ] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. In providing for "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be—*e.g.,* based on non-criminal or procedural grounds like the existing

---

[1] Although these provisions continue to refer only to the Attorney General, those authorities also lie with the Secretary by operation of the HSA.

exceptions for firm resettlement, INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi), or based on filing time limits, INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), or based on certain criminal activity, INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii). The additional limitations on eligibility must simply be established "by regulation," and must be "consistent with" the rest of 8 U.S.C. 1158.

Thus, the Attorney General in the past has invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within a country. *See* Asylum Procedures, 65 FR 76121, 76127 (Dec. 6, 2000) (codified at 8 CFR 208.13(b)(1)(i)(A) and (B)). The courts have also viewed this provision as a broad authority, and have suggested that ineligibility based on fraud would be authorized under it. *See Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

The current statutory framework accordingly leaves the Attorney General (and, after the HSA, the Secretary) significant discretion to adopt additional bars to asylum eligibility. Congress has expressly identified one class of particularly serious crimes—aggravated felonies—so that aliens who commit such offenses are categorically ineligible for asylum and there is no discretion to grant such aliens asylum under any circumstances. Congress has left the task of further defining particularly serious crimes or serious nonpolitical offenses to the discretion of the Attorney General and the Secretary.[2] And Congress has provided the Attorney General and Secretary with additional discretion to establish by regulation additional limitations or conditions on eligibility for asylum. Those limitations may involve other types of crimes or non-criminal conduct, so long as the limitations are consistent with other aspects of the asylum statute.

## D. United States Laws Implementing International Treaty Obligations

The proposed rule is consistent with U.S. obligations under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol") (incorporating Articles 2 through 34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention")) and the CAT. Neither the 1967 Refugee Protocol nor the CAT is self-executing. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ('[T]he [1967 Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). Therefore, these treaties are not directly enforceable in U.S. law, but some of the obligations they contain have been implemented by domestic legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture—through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, not through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41. The proposed rule is consistent with those obligations because it affects only eligibility for asylum. It does not affect grants of the statutory withholding of removal or protection under the CAT regulations. *See R–S–C,* 869 F.3d at 1188 n. 11; *Cazun* v. *Att'y Gen.,* 856 F.3d 249, 257 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Limitations on eligibility for asylum are also consistent with Article 34 of the 1951 Refugee Convention, concerning assimilation of refugees, as implemented by 8 U.S.C. 1158. Section 1158 reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *R–S–C,* 869 F.3d at 1188; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n.16; *Ramirez-Mejia,* 813 F.3d at 241. Moreover, the state parties to the Refugee Convention sought to "deny admission to their territories of criminals who would present a danger to security and public order." United Nations High Comm'r for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees ¶ 148 (1979) (edited Jan. 1992). Accordingly, the Refugee Convention incorporated exclusion clauses, including a bar to refugee status for those who committed serious nonpolitical crimes outside the country of refuge prior to their entry into the country of refuge that sought "to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime." *Id.* ¶ 151. As noted above, Congress has long recognized this principle in U.S. law by imposing various statutory bars to eligibility for asylum and by authorizing the creation of new bars to eligibility through regulation.[3]

## III. Regulatory Changes

The Departments now propose to (1) establish additional bars to eligibility for asylum for aliens with certain criminal convictions; (2) clarify the effect of criminal convictions; and (3) remove the regulations regarding reconsideration of discretionary denials of asylum.

The Attorney General possesses general authority under section 103(g)(2) of the INA, 8 U.S.C. 1103(g)(2), to "establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section." *See Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) (describing section 1103(g)(2) as "a general grant of regulatory authority"). Similarly, Congress has conferred upon the Secretary the authority to "establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of [the INA]." INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

Additionally, the Attorney General and the Secretary have authority to promulgate this proposed rule under sections 208(b)(2)(B)(ii) and (C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C). Under section 208(b)(2)(B)(ii), "[t]he Attorney General may designate by regulation offenses that will be considered to be a "particularly serious crime" under INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), or a "serious nonpolitical crime" under INA 208(b)(2)(A)(iii), 8 U.S.C.

---

[2] "[A]n alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." H.R. Rep No. 104–863, at 616 (1996).

[3] Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *R–S–C,* 869 F.3d at 1188; *Garcia,* 856 F.3d at 42.

1158(b)(2)(A)(iii). Under INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C), the Attorney General may "by regulation establish additional limitations and conditions, consistent with [8 U.S.C. 1158], under which an alien shall be ineligible for asylum under" INA 208(b)(1).

*A. Additional Limitations on Eligibility for Asylum*

The Departments propose to revise 8 CFR 208.13 and 1208.13 by adding paragraphs (c)(6) through (8) to add bars on eligibility for asylum for certain aliens. First, the regulations would add bars on eligibility for asylum for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of (1) a felony under federal or state law; (2) an offense under 8 U.S.C. 1324(a)(1)(A) or 1324(a)(1)(2) (Alien Smuggling or Harboring); (3) an offense under 8 U.S.C. 1326 (Illegal Reentry); (4) a federal, state, tribal, or local crime involving criminal street gang activity; (5) certain federal, state, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a federal, state, tribal, or local domestic violence offense, or who are found by an adjudicator to have engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted; and (7) certain misdemeanors under federal or state law for offenses related to false identification; the unlawful receipt of public benefits from a federal, state, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia. The Departments intend that the criminal ineligibility bars would be limited only to aliens with convictions and—with a narrow exception in the domestic violence context[4]—not based only on criminal conduct for which the alien has not been convicted. In addition, although 8 U.S.C. 1101(a)(43) provides for the application of the aggravated felony definition to offenses in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years, this proposal is not intended to cover such foreign convictions.

---

[4] A conviction would not be required in certain situations involving battery or extreme cruelty. That conduct-specific inquiry is essentially identical to the inquiry already undertaken in situations in which an alien seeks to obtain immigration benefits based on domestic violence that does not necessarily result in a conviction. *See, e.g.,* INA 240A(b)(2)(A), 8 U.S.C. 1229b(b)(2)(A); 8 CFR 204.2(c)(1)(i)(E), (c)(1)(vi), (c)(2)(iv), (e)(1)(i)(E), (e)(1)(vi), and (e)(2)(iv).

1. Aliens Convicted of a Felony Under Federal, State, Tribal, or Local Law

The Departments are proposing to implement a new bar on eligibility for asylum for felony convictions. *See* 8 U.S.C. 1158(b)(2)(B)(ii) and (C). Felonies are defined in the proposed rule as crimes designated as felonies by the relevant jurisdiction or crimes punishable by more than one year's imprisonment.

In the first instance, the Attorney General and the Secretary could reasonably exercise their discretion to classify felony offenses as particularly serious crimes for purposes of 8 U.S.C. 1158(b)(2)(B)(ii). Congress defined "particularly serious crimes" in the asylum statute to expressly encompass all aggravated felonies. *See* INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i). At present, the INA defines an aggravated felony by reference to an enumerated list of 21 types of convictions. INA 101(a)(43), 8 U.S.C. 1101(a)(43). But Congress did not limit the definition of particularly serious crimes to aggravated felonies. Rather, Congress expressly authorized the Attorney General to designate additional particularly serious crimes through regulation or by case-by-case adjudication. INA 208(b)(2)(B)(ii), 8 U.S.C. 1158(b)(2)(B)(ii); *Delgado,* 648 F.3d at 1106 ("[t]here is little question that [the asylum] provision permits the Attorney General, by regulation, to make particular crimes categorically particularly serious" (emphasis omitted)); *Gao* v. *Holder,* 595 F.3d 549, 556 (4th Cir. 2010) ("we think that [s]ection 1158(b)(2)(B)(ii) . . . empowers the Attorney General to designate offenses which, like aggravated felonies, will be considered per se particularly serious"). By defining "particularly serious crimes" to include all "aggravated felonies," but then giving the Attorney General the discretion to "designate by regulation offenses that will be considered" a "particularly serious crime," Congress made clear that the bar on asylum eligibility for particularly serious crimes necessarily includes, but is not limited to, aggravated felonies. *See* INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii); *Delgado,* 648 F.3d at 1105–06 (explaining that the asylum statute specifies two categories of crimes that are per se particularly serious—aggravated felonies, and those that the Attorney General designates by regulation).

To date, the Attorney General has not used the above-described authority to promulgate regulations identifying additional categories of particularly

serious crimes. The Board has engaged in case-by-case adjudication to identify some particularly serious crimes, but this approach imposes significant interpretive difficulties and costs, while producing unpredictable results. The Supreme Court has employed the so-called "categorical" approach, established in *Taylor* v. *United States,* 495 U.S. 575 (1990), and its progeny such as *Mathis* v. *United States,* 136 S. Ct. 2243 (2016), and *Descamps* v. *United States,* 133 S. Ct. 2276 (2013), to determine when an offense constitutes an aggravated felony. Under that approach, courts must compare the elements of the statutory crime for which an alien was convicted with the generic elements of the specified federal aggravated felony. As a general matter, any mismatch between the elements means that the crime of conviction is not an aggravated felony (unless the statute of conviction is divisible and the alien was convicted of a particular offense within the statute that would satisfy the generic definition of the relevant aggravated felony).

Courts, however, have repeatedly expressed frustration with the complexity of applying this approach. *See, e.g., United States* v. *Aguila-Montes de Oca,* 655 F.3d 915, 917 (9th Cir. 2011), *overruled by Descamps,* 570 U.S. 254 ("In the twenty years since *Taylor,* we have struggled to understand the contours of the Supreme Court's framework. Indeed, over the past decade, perhaps no other area of the law has demanded more of our resources."); *see also Quarles* v. *United States,* 139 S. Ct. 1872, 1880 (2019) (Thomas, J., concurring); *Williams* v. *United States,* 927 F.3d 427, 446 (6th Cir. 2019) (Merritt, J., concurring); *Lowe* v. *United States,* 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring) ("in the categorical-approach world, we cannot call rape what it is . . . . [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent"); *United States* v. *Evans,* 924 F.3d 21, 31 (2d Cir. 2019) (observing that, although the court may resolve only an actual case or controversy, "the categorical approach paradoxically instructs courts resolving such cases to embark on an intellectual enterprise grounded in the facts of *other* cases not before them, or even *imagined* scenarios" (emphases in original)); *United States* v. *Chapman,* 866 F.3d 129, 136–39 (3d Cir. 2017) (Jordan, J., concurring); *United States* v. *Faust,* 853 F.3d 39, 60–61 (1st Cir. 2017) (Lynch, J., concurring).

Application of the categorical approach has resulted in anomalous

decisions in which aliens convicted of a serious criminal offense have been found not to have been convicted of an aggravated felony. *See, e.g., Harbin* v. *Sessions,* 860 F.3d 58 (2d Cir. 2017) (holding that a New York controlled substance law was not written in a way that allowed it to be used as the basis for establishing that a convicted alien was removable under the INA for drug trafficking); *Larios-Reyes* v. *Lynch,* 843 F.3d 146, 149–50 (4th Cir. 2016) (alien's conviction under Maryland law for sexual abuse of a victim under the age of 14 did not amount to the aggravated felony of "sexual abuse of a minor"). The Board has rectified some anomalies by determining that certain crimes, though not aggravated felonies, are of a sufficiently pernicious nature that they should facially constitute particularly serious crimes that would disqualify aliens from eligibility for asylum or withholding of removal. *See Sopo* v. *U.S. Att'y Gen.,* 739 F. App'x 554, 558 (11th Cir. 2018) (the Board and immigration judges "may focus solely on the elements of the offense" to determine whether an offense is a "particularly serious crime"); *In re N–A–M–,* 24 I&N Dec. 336, 343 (BIA 2007) (explaining that "the proper focus for determining whether a crime is particularly serious is on the nature of the crime," and that its elements alone may be dispositive); *see also, e.g., Ahmetovic* v. *INS,* 62 F.3d 48, 52 (2d Cir. 1995) (upholding the Board's determination that first-degree manslaughter, while not an aggravated felony, is per se "particularly serious" for asylum purposes). Furthermore, the Board has looked at the individual circumstances of a crime to conclude that an even wider range of offenses can be considered particularly serious crimes on an as-applied basis. *See, e.g., Vaskovska* v. *Lynch,* 655 F. App'x 880, 884 (2d Cir. 2016) (the Board did not err in its individualized determination that an alien's conviction for drug possession was a particularly serious crime); *Arbid* v. *Holder,* 700 F.3d 379, 381 (9th Cir. 2012) (the Board did not err in determining that an alien's mail fraud conviction was particularly serious even if not an aggravated felony). Even in the withholding context—where an alien is deemed to have committed a particularly serious crime if he has been convicted of an aggravated felony (or felonies) for which the sentence was an aggregate term of imprisonment of at least 5 years, *see* 8 U.S.C. 1231(b)(3)(B)—courts have routinely concluded that crimes that are not aggravated felonies may be particularly serious. *See, e.g., Valerio-*

*Ramirez* v. *Sessions,* 882 F.3d 289, 291, 296 (1st Cir. 2018) (the Board did not err in determining that an alien's identity theft conviction was particularly serious even though it was not an aggravated felony); *Hamama* v. *INS,* 78 F.3d 233, 240 (6th Cir. 1996) (the Board had power to declare certain firearm possession crimes "facially" particularly serious without an individualized evaluation of the alien's case, even if such crimes are not always aggravated felonies); *In re N–A–M–,* 24 I&N Dec. at 338–39 (felony menacing is a particularly serious crime based on its elements, though not an aggravated felony).

Nonetheless, this mix of case-by-case adjudication and per se rules is an inefficient means of identifying categories of offenses that should constitute particularly serious crimes. The Board has only rarely exercised its authority to designate categories of offenses as facially or per se particularly serious, and instead typically looks to a wide and variable range of evidence in making an individualized determination of a crime's seriousness. *See In re N–A– M–,* 24 I&N Dec. at 343–44; *Matter of L– S–,* 22 I&N Dec. 645, 651 (BIA 1999). This case-by-case adjudication means that aliens convicted of the exact same offense can receive different asylum treatment. For certain crimes—*i.e.,* those described in this notice of proposed rulemaking—the Attorney General and the Secretary have determined that the possibility of such inconsistency is not desirable and that a rule-based approach is instead warranted in this specific context.

The proposed rule would eliminate the inefficiencies described above by providing that all felonies would constitute particularly serious crimes. The determination of whether a crime would be a felony for purposes of asylum eligibility would depend on whether the relevant jurisdiction defines the crime as a felony or whether the statute of conviction allows for a sentence of more than one year. Convictions for which sentences are longer tend to be associated with crimes of a more consequential nature. For example, an offender's "criminal history category" for the purposes of sentencing for federal crimes "serves as [a] proxy for the need to protect the public from further crimes of the defendant." *United States* v. *Hayes,* 762 F.3d 1300, 1314 n.8 (11th Cir. 2014); *see also id.* ("In other words, it is a proxy for recidivism."). And the criminal history category, in turn, is "based on the maximum term imposed in previous sentences rather than on other measures, such as whether the conviction was designated

a felony or misdemeanor." U.S. Sentencing Guidelines Manual § 4A1.2 cmt. background (U.S. Sentencing Comm'n 2018). This calculation thus reflects a recognition that crimes with the potential for longer sentences tend to indicate that the offenders who commit such crimes are greater dangers to the community.

In addition, defining a felony to include such offenses would also be consistent with the definition of felonies in other federal statutes. For instance, convictions for crimes that states designated as felonies may serve as predicate "prior felony conviction[s]" under the federal career offender statute. *See United States* v. *Beasley,* 12 F.3d 280, 282–84 (1st Cir. 1993); *United States* v. *Rivera,* 996 F.2d 993, 994–97 (9th Cir. 1993).

Furthermore, defining felonies to include crimes that involve a possible sentence of more than one year in prison would be generally consistent with the way that federal law defines felonies. *See, e.g.,* 5 U.S.C. 7313(b) ("For the purposes of this section, 'felony' means any offense for which imprisonment is authorized for a term exceeding one year"); *cf.* U.S.S.G. 2L1.2 cmt. n.2 ("'Felony' means any federal, state, or local offense punishable by imprisonment for a term exceeding one year."). The Model Penal Code and most states likewise define a felony as a crime with a possible sentence in "excess of one year." Model Penal Code § 1.04(2); *see* 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying state laws). Finally, relying on the possibility of a sentence in excess of one year—rather than on the actual sentence imposed— would be consistent with Board precedents adjudicating whether a crime qualifies as "particularly serious" for purposes of asylum or withholding eligibility. In that context, "the sentence imposed is not a dominant factor in determining whether a conviction is for a particularly serious crime" because the sentence actually imposed often depends on factors such as offender characteristics that "may operate to reduce a sentence but do not diminish the gravity of [the] crime." *In re N–A– M–,* 24 I&N Dec. at 343.

Relying on the possibility of a sentence of over one year to define a felony would capture crimes of a particularly serious nature because the offenders who commit such crimes are—as a general matter—more likely to be dangerous to the community than those offenders whose crimes are punishable by shorter sentences. *See* 8 U.S.C. 1158(b)(2)(A)(ii) (tying the "particularly serious crime" determination to "danger[ousness] to

the community''). In addition, by encompassing all crimes with a sentence of more than one year, regardless of whether the crimes are defined felonies by the relevant jurisdiction, the definition would create greater uniformity by accounting for possible variations in how different jurisdictions may label the same offense. Such a definition would also avoid anomalies in the asylum context that arise from the definition of ''aggravated felonies'' under 8 U.S.C. 1101(a)(43), which defines some qualifying offenses with reference to the length of the actual sentence ordered. *See United States* v. *Pacheco,* 225 F.3d 148, 153–54 (2d Cir. 2000) (agreeing that ordinarily the touchstone in the aggravated felony definition's reference to sentences is the actual term of imprisonment imposed). The proposed definition of a felony would also obviate the need for immigration adjudicators and courts to apply the categorical approach with respect to aggravated felonies. This proposal thus would offer a more streamlined and predictable approach to be applied in the asylum context.[5]

In addition to their authority under section 208(b)(2)(B)(ii) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii), the Attorney General and the Secretary further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to make all felony convictions disqualifying for purposes of asylum eligibility. Federal, state, tribal, or local felony convictions already carry a number of serious repercussions over and above the sentence imposed. Felons, including those who are U.S. citizens, may lose certain privileges, including the ability to apply for Government grants and live in public housing. *See Estep* v. *United States,* 327 U.S. 114, 122 & n.13 (1946) (explaining that ''[a] felon customarily suffers the loss of substantial rights''); *see also, e.g., Dist. of Columbia* v. *Heller,* 554 U.S. 570, 626–27 (2008) (the Second Amendment does not prohibit laws disallowing the possession of firearms by felons). Treating a felony conviction as disqualifying for purposes of obtaining the discretionary benefit of asylum would be consistent with the disabilities arising from felony convictions in these other contexts and

would reflect the serious social cost of such crimes.

The Departments also seek public comment on whether (and, if so, how) to differentiate among crimes designated as felonies and among crimes punishable by more than one year of imprisonment. For example, are there crimes that are currently designated as felonies in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum eligibility? Are there crimes that are currently punishable by more than one year's imprisonment in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum? Should the definition of a felony depend instead on the term of imprisonment that was ordered by the court of jurisdiction? In addition to seeking public comment on whether the definition of felony in the proposed rule might be over-inclusive, the Departments also seek comment on whether it might be under-inclusive—*i.e.,* are there crimes that would not fall under the definition of felony in the proposed rule, and that do not otherwise constitute categorical bars to asylum eligibility, that should be made categorical bars? In sum, the Departments seek input on how the proposed definition of a felony might be modified. Further, the Departments seek comment on what measures, if any, are necessary to ensure that aliens who are victims of human trafficking, but also have convictions caused by or incident to victimization, are not subject to this bar. For instance, victims of severe forms of human trafficking may nevertheless receive a waiver of criminal grounds for inadmissibility in order to qualify for T nonimmigrant status pursuant to 8 CFR 212.16. *See* INA 101(a)(15)(T), 212(d)(13)(B), 8 U.S.C. 1101(a)(15)(T), 1182(d)(13)(B).

Regardless of whether the rule encompasses all felony convictions or some subset of such convictions, the Departments have identified specific types of offenses below that are proposed in this rule as grounds for ineligibility for asylum.

2. Federal Convictions for Harboring Aliens

The Attorney General and the Secretary propose to designate all offenses involving the federal crimes of bringing in or harboring certain aliens pursuant to sections 274(a)(1)(A) and (2) of the INA, 8 U.S.C. 1324(a)(1)(A), (2), as particularly serious crimes and, in all events, as discrete bases for ineligibility. *See* INA 208(b)(2)(B)(ii), (C), 8 U.S.C. 1158(b)(2)(B)(ii), (C). To convict a person of harboring an alien under

sections 274(a)(1)(A) or (2) of the INA, the Government must establish that the defendant concealed, harbored, shielded from detection, or transported an alien, or attempted to do so. INA 274(a)(1)(A), (2), 8 U.S.C. 1324(a)(1)(A), (2). Penalties differ depending on whether the act was for commercial advantage or financial gain and on whether serious bodily injury or death occurred. INA 274(a)(1)(B), (2)(B), 8 U.S.C. 1324(a)(1)(B), (2)(B). Most of the prohibited acts carry a penalty of possible imprisonment of at least five years, INA 274(a)(1)(B)(i)–(iii), 8 U.S.C. 1324(a)(1)(B)(i)–(iii), and committing those acts in circumstances resulting in the death of another person can be punished by a sentence of death or life imprisonment, INA 274(a)(1)(B)(iv), 8 U.S.C. 1324(a)(1)(B)(iv). The only exception is for certain instances of the offense of bringing or attempting to bring in an alien who lacks official authorization to enter under section 274(a)(2) of the INA, 8 U.S.C. 1324(a)(2), which carries a possible penalty of imprisonment up to one year, INA 274(a)(2)(A), 8 U.S.C. 274(a)(2)(A).

Convictions under section 1324 are often aggravated felonies under section 101(a)(43)(N) of the INA, 8 U.S.C. 1101(a)(43)(N), which defines an aggravated felony as including ''an offense described in [INA 274(a)(1)(A) or (2)], except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent.'' *See Matter of Ruiz-Romero,* 22 I&N Dec. 486, 488, 492–93 (BIA 1999) (holding that an alien convicted of transporting an illegal alien committed an aggravated felony under section 101(a)(43)(N) of the INA and was thus deportable); *see also Patel* v. *Ashcroft,* 294 F.3d 465 (3d Cir. 2002) (holding that harboring an alien constitutes an aggravated felony); *Gavilan-Cuate* v. *Yetter,* 276 F.3d 418, 419–20 (8th Cir. 2002) (dismissing an appeal for lack of jurisdiction because the court had already determined on the petitioner's direct appeal that he had been convicted of the aggravated felony of transporting and harboring aliens); *United States* v. *Galindo-Gallegos,* 244 F.3d 728, 733–34 (9th Cir. 2001) (holding that transporting aliens under 8 U.S.C. 1324(a)(1)(A)(ii) is an aggravated felony for purposes of section 101(a)(43)(N) of the INA). Aliens convicted of such aggravated felonies would already be ineligible for asylum under section 208(b)(2)(B)(i) of the INA.

The proposed rule would broaden this bar so that first-time offenders who engage in illegal smuggling or harboring

---

[5] The Departments intend that this proposed provision would be limited to aliens with convictions and would not apply to criminal conduct for which the alien has not been convicted. Further, this provision would expand ineligibility for asylum based on offenses committed in the United States, not offenses committed abroad. This provision would thus leave unchanged the provision in 8 U.S.C. 1101(a)(43) that provides for application of the aggravated felony definition to offenses in violation of the law of a foreign country.

to aid certain family members, in violation of section 1324(a)(1)(A) or (2), are deemed to have committed particularly serious crimes. The *mens rea* required for a section 1324 conviction under subsection (a)(1)(A) is "knowing," and under (a)(2) is "knowing or in reckless disregard," meaning such a conviction displays a serious disregard for U.S. immigration law. In all events, conviction of a smuggling offense under section 1324(a)(1)(A) or (2) should also be disqualifying under section 1158(b)(2)(C), which gives the Attorney General and the Secretary additional discretion to identify grounds for ineligibility. Even first-time alien smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse. *See Arizona* v. *United States,* 567 U.S. 387, 396 (noting the "danger" posed by "alien smugglers or aliens who commit a serious crime"); *United States* v. *Miguel,* 368 F.3d 1150, 1157 (9th Cir. 2004), *overruled on other grounds by United States* v. *Gasca-Ruiz,* 852 F.3d 1167 (9th Cir. 2017) (noting that "young children [are] more susceptible to the criminal conduct because they [do] not fully appreciate the danger involved in illegal smuggling").

3. Federal Convictions for Illegal Reentry

The Attorney General and the Secretary further propose to exercise their authority under sections 208(b)(2)(B)(ii) and 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C), to designate a conviction for the federal crime of illegal reentry pursuant to section 276 of the INA, 8 U.S.C. 1326, as precluding asylum eligibility.

Under section 1326(a), aliens who were previously removed and reenter the United States are subject to fines and to a term of imprisonment of two years or less. 8 U.S.C. 1326(a). Section 1326(b) prescribes significantly higher penalties for certain removed aliens who reenter, such as aliens who were removed after being convicted for aggravated felonies and then reenter. 8 U.S.C. 1326(b) (authorizing sentences of imprisonment up to 20 years as possible penalties).

Some convictions under section 1326 already qualify as aggravated felonies under section 101(a)(43)(O) of the INA, 8 U.S.C. 1101(a)(43)(O), which defines an aggravated felony as including "an offense described in section . . . 1326 . . . committed by an alien who was previously deported on the basis of a

conviction for an [aggravated felony]." Aliens who commit such offenses are thus already ineligible for asylum under section 208(b)(2)(B)(i) of the INA, 8 U.S.C. 1158(b)(2)(B)(i).

The proposed rule would broaden this bar so that all aliens convicted of illegal reentry under section 1326 would be considered to have committed an offense that disqualifies them from asylum eligibility. It would also harmonize the treatment of most aliens who have illegally reentered the United States after being removed, as such aliens who have a prior order of removal reinstated are already precluded from asylum eligibility. Section 1326 makes clear that all offenses relating to illegal reentry are quite serious; even the most basic illegal reentry offense is punishable by fine and by up to two years' imprisonment. 8 U.S.C. 1326(a). Illegal reentry also reflects a willingness to repeatedly disregard the immigration laws despite alternative means of presenting a claim of persecution. An alien seeking protection, even one who has previously been removed from the United States, may present himself or herself at a port of entry without illegally reentering the United States. An alien who chooses instead to again enter illegally has repeatedly chosen to flout immigration laws, and such recidivism suggests that the offense should be treated more severely. The fact that the alien has *repeatedly* engaged in criminal conduct suggests a tendency to engage in such conduct in the future, thus warranting a conclusion that the alien poses a danger to the community that makes the alien's crime particularly serious. *See* Mariel Alper et al., 2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005–2014) 17 (2018) ("Overall, excluding probation and parole violations, 82.4% of prisoners released in 30 states in 2005 were arrested within 9 years."); U.S. Sentencing Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders 14 (2017) ("Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points. Each additional criminal history point is generally associated with a greater likelihood of recidivism."); Nick Tilley, Analyzing and Responding to Repeat Offending 11 (2013) ("Once criminal careers are established and offenders are processed by the criminal justice system, recidivism rates become very high: Up

to two-thirds of those who are incarcerated will reoffend within a few years.").

Moreover, Congress, as noted above, has already designated certain crimes related to illegal reentry as aggravated felonies. *See* 8 U.S.C. 1101(a)(43)(O). This designation reflects a congressional decision that aliens who commit these crimes are dangers to the community, *see* 8 U.S.C. 1158(b)(2)(A)(ii) (tying the "particularly serious crime" determination to "danger[ousness] to the community"), so aliens who commit similar crimes related to reentry are also likely to be dangers to the community. Further, 63% of those convicted of illegal reentry had a prior criminal history, again suggesting that the offenders who commit these crimes pose an ongoing danger to others. *See* U.S. Sentencing Comm'n, Quick Facts: Illegal Reentry Offenses 1 (2019), *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY18.pdf.*

As a separate basis for this aspect of the proposed rule, the Attorney General and the Secretary propose making illegal reentry a ground for ineligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). A regulation providing for the mandatory ineligibility for asylum based on convictions for illegal reentry of removed aliens, *see* INA 276, 8 U.S.C. 1326, would bear a close relationship to the statutory bar on applying for asylum when a previous order of removal is reinstated, *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). An alien subject to reinstatement of a prior removal order is not eligible to apply for any relief from removal, but may seek protection such as statutory withholding of removal and protection pursuant to the CAT regulations. *See, e.g., Cazun,* 856 F.3d at 254. The statutory bar on applying for asylum and other forms of relief when an order of removal is reinstated has been upheld by every circuit to consider the question. *See Garcia* v. *Sessions,* 873 F.3d 553, 557 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 2648 (2018); *R–S–C,* 869 F.3d at 1189; *Mejia,* 866 F.3d at 587; *Garcia,* 856 F.3d at 30; *Cazun,* 856 F.3d at 260; *Perez-Guzman* v. *Lynch,* 835 F.3d 1066, 1082 (9th Cir. 2016); *Jimenez-Morales* v. *U.S. Att'y Gen.,* 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia* v. *Lynch,* 794 F.3d 485, 489–90 (5th Cir. 2015); *Herrera-Molina* v. *Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010). That bar reflects legislators' apparent concerns that aliens who re-cross the border illegally after having been removed once should not be rewarded with benefits that the United States is not obliged to offer them. *See R–S–C,* 869 F.3d at 1179 &

n.2; H.R. Rep. No. 104–469, pt. 1, at 155 (1996) ("[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border."); H.R. Rep. No. 104–469, pt. 1, 113 ("One seemingly intractable problem is repeat border-crossings.").

The existing statutory bar for reinstated removal orders and the proposed bar for aliens convicted of illegal reentry after being previously removed are not coterminous because not all persons with a conviction under section 276 of the INA, 8 U.S.C. 1326, have orders of removal reinstated. *See Lara-Aguilar* v. *Sessions,* 889 F.3d 134, 144 (4th Cir. 2018) (reinstatement of a prior removal order is neither automatic nor obligatory). Furthermore, not all persons with reinstated removal orders have been convicted under section 276 of the INA, 8 U.S.C. 1326. However, the Departments believe that similar policy considerations support the barring of aliens convicted of illegal reentry under section 276 of the INA, 8 U.S.C. 1326, from eligibility for asylum.

Furthermore, although this proposed bar would render ineligible for asylum an alien whose threat of persecution arose after the initial removal and illegal reentry, such an alien could still seek other forms of protection, such as statutory withholding of removal and withholding or deferral of removal under the regulations implementing the CAT. The proposed rule is consistent, therefore, with U.S. treaty obligations under the Refugee Protocol (which incorporates Articles 2 through 34 of the Refugee Convention) and the CAT. U.S. asylum law implements Article 34 of the Refugee Convention, concerning assimilation of refugees, which is precatory and not mandatory. *See Cardoza-Fonseca,* 480 U.S. at 441. In accordance with the non-mandatory nature of Article 34, the asylum statute, INA 208, 8 U.S.C. 1158, was drawn to be discretionary; it does not require asylum to be granted to all refugees. *Id.* For the reasons outlined above, limitations like the ones proposed here do not violate Article 34. *See Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188; *Mejia,* 866 F.3d at 588; *Cazun* , 856 F.3d at 257 & n.16; *Ramirez-Mejia,* 813 F.3d at 241. In contrast, the United States' non-refoulement obligations under Article 33(1) of the Refugee Convention and Article 3 of the CAT are mandatory to the extent provided by domestic law. They are implemented by statutory withholding of removal, a mandatory provision, and withholding or deferral of removal under the CAT regulations. Because the new limitations adopted here do not affect the availability of

statutory withholding of removal, INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A), or protection under the regulations implementing the CAT, 8 CFR 1208.16(c) through 1208.18, the rule does not affect U.S. compliance with its obligations under Article 33(1) of the Refugee Convention or Article 3 of the CAT. *See R–S–C,* 869 F.3d at 1188 n.11; *Cazun,* 856 F.3d at 257; *Ramirez-Mejia,* 813 F.3d at 241.

Moreover, in rejecting any argument that the Refugee Convention and Refugee Protocol require that the U.S. must grant asylum to anyone who qualifies as a "refugee," the Departments note that the Refugee Convention and Refugee Protocol are not self-executing. Rather, Congress implemented relevant U.S. obligations under the Refugee Protocol through the Refugee Act. *Matter of D–J–,* 23 I&N Dec. 572, 584 n.8 (A.G. 2003). The Refugee Act made asylum discretionary, meaning that Congress did not consider it obligatory to grant asylum to every refugee who qualifies. Public Law 96– 212, sec. 208(a), 94 Stat. 102. Moreover, as noted earlier in footnote 3, courts have rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188. Thus, the Attorney General may render aliens ineligible for asylum if they enter illegally and are then convicted of unlawfully entering the country, and still remain faithful to U.S. obligations under the Refugee Protocol.

### 4. Federal, State, Tribal, or Local Convictions for Offenses Involving Criminal Street Gangs

The Departments are proposing to bar from asylum all those who are convicted of a crime involving criminal street gangs, regardless of whether that crime qualifies as a felony or as a misdemeanor. One approach the Attorney General and the Secretary are considering is to exercise their

discretionary authority under sections 208(b)(2)(B)(ii) and (C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C), to exclude individuals convicted of federal, state, tribal, or local crimes committed in support, promotion, or furtherance of a criminal street gang as that term is defined in the convicting jurisdiction or under 18 U.S.C. 521(a). Specifically, the proposed rule would cover individuals convicted of federal, state, tribal, or local crimes in cases in which the adjudicator knows or has reason to believe the crime was committed in furtherance of criminal street gang activity.[6] The "reason to believe" standard is used elsewhere in the INA, *see* 8 U.S.C. 1182(a)(2)(C), and would allow for consideration of all reliable evidence, including any penalty enhancements, to determine whether the crime was committed for or related to criminal gang activities, *see Garces* v. *U.S. Att'y Gen.,* 611 F.3d 1337, 1350 (11th Cir. 2010); *Matter of Rico,* 16 I&N Dec. 181, 185–86 (BIA 1977). In addition, the Departments have concluded that it is appropriate to allow the adjudicator to determine whether a crime was in fact committed "in furtherance" of gang-related activity. The states, as noted above, have enacted numerous laws that address gang-related crimes, but they have not enacted a uniform definition of what constitutes activity taken "in furtherance" of a gang-related crime. It thus appropriately falls to immigration judges in the first instance to determine whether a person committed the type of crime that warrants withholding of the benefit of legal presence in our communities. Moreover, to the extent that allowing the adjudicator to undertake such an inquiry might raise concerns about inconsistent application of the proposed bar, the Departments note that the Board is capable of

---

[6] California enacted the first major anti-gang legislation in the country in 1988. *See* Cal. Penal. Code 186.22(a) (establishing a substantive criminal offense for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang"). In the years since, 49 states, the District of Columbia, and the Federal Government have enacted legislation that provides for penalties (including sentence enhancements, fines, or damages) for gang-related criminal activity. National Gang Center, Highlights of Gang-Related Legislation (Dec. 31, 2018), *https:// www.nationalgangcenter.org/Legislation/Highlights* (last visited June 3, 2019); *see also, e.g.,* 18 U.S.C. 521 (providing a 10-year sentence enhancement for certain convictions regarding criminal street gang activity); Idaho Code Ann. 18–8503; Iowa Code Ann. 723A.2; Kan. Stat. Ann. 21–6314; La. Rev. Stat. 1403; Minn. Stat. Ann. 609.229; Mo. Rev. Stat. 578.423; Mont. Code Ann. 45–8–405; N.C. Gen. Stat. 14–50.17; Ohio Rev. Code Ann. 2923.42; Tenn. Code Ann. 40–35–121; Utah Code Ann. 76–9–903.

ensuring a uniform approach to the gang-related crimes inquiry. *See, e.g.,* 8 CFR 1003.1(e)(6)(i) (allowing for referral of cases to a three-member panel of the Board "to settle inconsistencies among the rulings of different immigration judges").

Some of the relevant criminal street gang-related offenses may already constitute aggravated felonies, such that aliens convicted of such offenses would already be ineligible for asylum. The most common criminal street gang crimes "are street-level drug trafficking, assault, threats and intimidation, robbery, and large-scale drug trafficking." National Gang Intelligence Center, 2015 National Gang Report 12 (2015). Many convictions for such offenses could qualify as aggravated felonies. *See, e.g.,* 8 U.S.C. 1101(a)(43)(B) (defining drug trafficking crimes as aggravated felonies); *id.* 1101(a)(43)(F) (defining crimes of violence punishable by at least one year in prison as aggravated felonies).

Regardless, criminal street gang-related offenses—whether felonies or misdemeanors—could reasonably be designated as "particularly serious crimes" pursuant to 8 U.S.C. 1158(b)(2)(B)(ii). All criminal street gang-related offenses appear to be particularly serious because they are strong indicators of recidivism and ongoing, organized criminality within a community, thus implying that aliens who commit such crimes are likely to pose an ongoing danger to that community. For example, research suggests that criminal street gang members are responsible for 48 percent of violent crime in most U.S. jurisdictions. *See* National Gang Intelligence Center, National Gang Threat Assessment 15 (2011). Criminal street gang members are also more likely than nonmembers to be involved in selling drugs. *See* Dana Peterson, et al., *Gang Membership and Violent Victimization* 21 Just. Q. 793, 798 (2004). And the Federal Bureau of Investigation reports that more than 96 criminal street gangs conduct cross-border crimes such as cross-border drug trafficking. National Gang Intelligence Center, 2015 National Gang Report 9–10 (2015); *see also* J.C. Barnes et al., *Estimating the Effect of Gang Membership on Nonviolent and Violent Delinquency: A Counterfactual Analysis,* 36 Aggressive Behav. 437, 438 (2010) (studying the link between gang membership and crime, and reporting that gang members account for 86 percent of all "serious delinquent acts"). In light of this well-documented link between gang membership and a range of crimes, the Departments believe that aliens who enter the United States and proceed to be convicted of crimes involving criminal street gang-related activity should be deemed to have committed particularly serious crimes that render them ineligible for asylum.

Further, some of the crimes in which gangs frequently engage—such as drug trafficking—are similar to the kinds of crimes that Congress has already classified as aggravated felonies. *See, e.g.,* 8 U.S.C. 1101(a)(43)(B) (defining aggravated felonies to include "illicit trafficking in a controlled substance"). This classification reflects a congressional determination that such crimes pose a danger to the community, *see* 8 U.S.C. 1158(b)(2)(A)(ii), (b)(2)(B)(i), such that aliens involved in similar, gang-related crimes are also likely to pose a danger to the community. Indeed, the perpetrators of crimes that further gang activity are, by the very nature of the acts they commit, displaying a disregard for basic societal structures in preference of criminal activities that place other members of the community—even other gang members—in danger. Existing law in some cases thus already treats gang-related offenders more harshly than other offenders, *see, e.g.,* U.S. Sentencing Guidelines Manual § 5K2.18 (U.S. Sentencing Comm'n 2018) (allowing for upward departures "to enhance the sentences of defendants who participate in groups, clubs, organizations, or associations that use violence to further their ends"), thereby confirming that these offenders are more likely to be dangerous to the community.

Moreover, even if 8 U.S.C. 1158(b)(2)(B)(ii) did not authorize the proposed bar, the Attorney General and the Secretary would propose designating criminal gang-related offenses as disqualifying under 8 U.S.C. 1158(b)(2)(C). Criminal gangs of all types—including local, regional, or national street gangs; outlaw motorcycle gangs; and prison gangs—are a significant threat to the security and safety of the American public. *See, e.g.,* National Gang Intelligence Center, 2015 National Gang Report 8 (2015) (explaining that "each gang type poses a unique threat to the nation"). Transnational organized crime has also expanded in size, scope, and impact over the past several years.[7] In Executive Order 13773, Enforcing Federal Law With Respect to Transnational Criminal Organizations and Preventing International

Trafficking, 82 FR 10691 (Feb. 9, 2017), the President emphasized the scourge of transnational criminal organizations and directed federal agencies to "pursue and support additional efforts to prevent the operational success of transnational criminal organizations and subsidiary organizations within and beyond the United States." Aliens involved in gang-related criminal activity accordingly represent a threat to the safety and security of the United States, and barring aliens convicted of such activity from receiving the discretionary benefit of asylum is "consistent with" the asylum statute's current provisions specifying that aliens posing such a threat are not eligible for asylum. *See* 8 U.S.C. 1158(b)(2)(A)(ii), (iv).

Finally, the Departments solicit public comments on:

(1) What should be considered a sufficient link between an alien's underlying conviction and the gang-related activity in order to trigger the application of the proposed bar; and

(2) any other regulatory approaches to defining the type of gang-related activities that should render aliens ineligible for asylum.

## 5. Convictions for Offenses Involving Driving While Intoxicated or Impaired

The Attorney General and Secretary further propose that, pursuant to their authorities under 8 U.S.C. 1158(b)(2)(B)(ii) and (C), aliens convicted under federal, state, tribal, or local law of certain offenses involving driving while intoxicated or impaired (also known as driving under the influence ("DUI")) should be ineligible for asylum. Specifically, aliens should be ineligible for asylum if they are convicted under federal, state, tribal, or local law of a second or subsequent offense of driving while intoxicated or impaired, or for a single such offense resulting in death or serious bodily injury. Whether a conviction involves driving while intoxicated or impaired would depend on the definition that the jurisdiction of conviction gives those terms. Such convictions would be disqualifying regardless of whether they constituted felonies or misdemeanors in the jurisdiction of conviction.

An alien convicted of DUI may remain eligible for asylum under current law, even when it is an alien's second or subsequent such conviction or when the DUI offense results in death or serious injury. Not all DUI offenses constitute aggravated felonies within the meaning of section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), and thus these offenses may not automatically constitute "particularly serious crimes" for purposes of 8 U.S.C. 1158(b)(2)(B)(i).

---

[7] Office of the Dir. Of Nat'l Intelligence, Transnational Organized Crime, *https://www.dni.gov/files/documents/NIC_toc_foldout.pdf.*

AR.00295

*Cf. Leocal* v. *Ashcroft,* 543 U.S. 1, 13 (2004) (noting that DUI offenses in states whose relevant statutes ''do not require any mental state'' are not aggravated felony crimes of violence). However, the Board in the withholding of removal context has concluded that a number of DUI-related offenses involving death or serious injury constitute particularly serious crimes, and courts have upheld those determinations. *See, e.g., Avendano-Hernandez* v. *Lynch,* 800 F.3d 1072, 1076, 1076–78 (9th Cir. 2015) (affirming the Board's determination that a felony DUI conviction involving injury to another was a particularly serious crime for purposes of withholding of removal given the inherently dangerous nature of the offense, even though the alien was sentenced to less than one year's imprisonment); *Anaya-Ortiz* v. *Holder,* 594 F.3d 673, 675, 679–80 (9th Cir. 2010) (the Board applied the correct standard to conclude that an alien's actions in crashing ''into a house while driving drunk . . . [and] caus[ing] part of the house's sheetrock wall to collapse on an elderly woman who lived inside'' constituted a particularly serious crime); *Ursu* v. *INS,* 20 F. App'x 702, 705 (9th Cir. 2001) (upholding the Board's conclusion that a specific DUI offense was a particularly serious crime for withholding purposes because the alien ''caused the death of another human being'' while severely impaired). These holdings indicate that DUI offenses often have grave consequences, thus supporting a conclusion that they can reasonably be considered ''particularly serious'' for purposes of asylum eligibility. DUI laws exist, in part, to protect unknowing persons who are transiting through their communities from the dangerous persons who choose to willingly disregard common knowledge that their criminal acts endanger others.

As noted above, however, existing law does not clearly or categorically limit asylum eligibility for aliens convicted of serious DUI offenses, including those resulting in death or serious bodily injury. Establishing such a bar would be consistent with the Attorney General and the Secretary's statutory authority to designate by regulation ''particularly serious crimes'' that constitute a danger to the community and, thus, render aliens ineligible for asylum. INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii); *Delgado,* 648 F.3d at 1105–06; *Gao,* 595 F.3d at 555–56; *see also Matter of Carballe,* 19 I&N Dec. 357, 360 (BIA 1986) (an alien convicted of a particularly serious crime constitutes a danger to the community

of the United States). The Fifth Circuit has noted that ''the very nature of the crime of [driving while intoxicated] presents a 'serious risk of physical injury' to others.'' *United States* v. *DeSantiago-Gonzalez,* 207 F.3d 261, 264 (5th Cir. 2000). These decisions in the withholding context underscore that DUI offenses involving serious bodily harm or death are routinely deemed ''particularly serious crimes'' in that context, and section 101(h)(3) of the INA, 8 U.S.C. 1101(h)(3), classifies driving under the influence as a ''serious criminal offense'' for purposes of the ground of inadmissibility at section 1182(a)(2)(E). Classifying DUI offenses that involve serious bodily harm or death as particularly serious crimes as a categorical matter would be reasonable given that all such offenses by definition involve a serious danger to the community. Likewise, categorically classifying repeat DUI offenses as particularly serious crimes would be a reasonable exercise of the Attorney General and the Secretary's discretion to designate particularly serious crimes because repeat offenders have already exhibited disregard for the safety of others as well as a likelihood of continuing to engage in extremely dangerous conduct.

Even if some of the proposed DUI-related bars could not be characterized as ''particularly serious crimes'' for purposes of section 1158(b)(2)(B)(ii), such bars would be within the Attorney General and the Secretary's authority to establish under 8 U.S.C. 1158(b)(2)(C). As the Supreme Court has recognized, ''[d]runk driving is an extremely dangerous crime'' as a general matter. *Begay* v. *United States,* 553 U.S. 137, 141 (2008), *abrogated on other grounds by Johnson* v. *United States,* 135 S. Ct. 2551 (2015). It takes ''a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every year.'' *Birchfield* v. *North Dakota,* 136 S. Ct. 2160, 2166 (2016); *see also Marmolejo-Campos* v. *Holder,* 558 F.3d 903, 913 (9th Cir. 2009) (noting that ''the dangers of drunk driving are well established''). Furthermore, federal courts have upheld the Board's determination that even if a particular DUI-related offense does not qualify as a ''particularly serious crime,'' such a conviction warrants a discretionary denial of asylum. *See, e.g., Kouljinski* v. *Keisler,* 505 F.3d 534, 543 (6th Cir. 2007) (holding that, regardless of whether driving under the influence of alcohol is a ''particularly serious crime,'' the immigration judge ''did not abuse his discretion in this case by

basing his discretionary denial of asylum on [the petitioner's] three drunk-driving convictions''). These cases are consistent with the notion that the Attorney General and Secretary could, in their discretion, identify a subset of DUI convictions reflecting particularly dangerous conduct as grounds to deny eligibility for asylum.

## 6. Domestic Assault or Battery, Stalking, or Child Abuse

Relying on the authority under section 208(b)(2)(B)(ii) of the INA, the proposed regulation would also render aliens convicted of federal, state, tribal, or local offenses involving conduct amounting to domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum, irrespective of whether those offenses qualify as felonies or misdemeanors. Relying solely on the Attorney General and the Secretary's authority under section 208(b)(2)(C) of the INA, the regulation would also render ineligible aliens who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction. Notably, the asylum statute already contemplates that individuals who engage in certain harmful behavior will be ineligible, regardless of whether that behavior resulted in a conviction. 8 U.S.C. 1158(b)(2)(A)(i), (iii)–(v). Finally, the proposed regulation would except from the ineligibility bar aliens who have been battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships.

Some of the offenses described above may already render an alien ineligible for asylum, to the extent that a particular conviction qualifies as an aggravated felony. For instance, aggravated felonies encompass ''murder, rape, or sexual abuse of a minor,'' 8 U.S.C. 1101(a)(43)(A), as well as any ''crime of violence . . . for which the term of imprisonment [is] at least one year,'' *id.* 1101(a)(43)(F). Convictions for such offenses automatically constitute ''particularly serious crimes'' for purposes of 8 U.S.C. 1158(b)(2)(A)(ii). *See* 8 U.S.C. 1158(b)(2)(B)(i). But, as noted, due to the application of the categorical approach, many state convictions that involve sexual abuse or domestic violence-related offenses may not qualify as aggravated felonies. *E.g., Larios-Reyes,* 843 F.3d at 149–50 (alien's conviction under Maryland law for sexual abuse of a victim under the age of 14 did not amount to the aggravated felony of ''sexual abuse of a minor''); *Ortega-Mendez* v. *Gonzales,* 450 F.3d

1010, 1021 (9th Cir. 2006) (holding that a conviction for battery under California Penal Code section 242 is not a "crime of violence" within the meaning of 18 U.S.C. 16(a) and thus is not a "crime of domestic violence" within the meaning of 8 U.S.C. 1227(a)(2)(E)(i)); *Tokatly* v. *Ashcroft*, 371 F.3d 613, 624 (9th Cir. 2004) ("Applying *Taylor*, a court may not look beyond the record of conviction to determine whether an alien's crime was one of 'violence,' or whether the violence was 'domestic' within the meaning of the provision.").

The Board has routinely deemed some of the identified domestic violence offenses as particularly serious crimes, and many of those decisions have been upheld on appeal. *See Pervez* v. *Holder*, 546 F. App'x 157, 159 (4th Cir. 2013) (attempted indecent liberties with a child constituted a particularly serious crime even where "no child was actually harmed"); *Lara-Perez* v. *Holder*, 517 F. App'x 255 (5th Cir. 2013) (lewd and lascivious acts with a child constituted particularly serious crime); *Uzoka* v. *Att'y Gen.*, 489 F. App'x 595 (3d Cir. 2012) (endangering welfare of a child constituted a particularly serious crime); *Sosa* v. *Holder*, 457 F. App'x 691 (9th Cir. 2011) (willful infliction of corporal injury on a spouse or cohabitant constituted a particularly serious crime); *Hernandez-Vasquez* v. *Holder*, 430 F. App'x 448 (6th Cir. 2011) (child endangerment constituted a particularly serious crime); *Matter of Singh*, 25 I&N Dec. 670, 670 (BIA 2012) (stalking offense constituted a crime of violence). But the Board's case-by-case assessment of each domestic violence conviction does not cover all of the offenses identified above, and it would not cover domestic violence that does not result in a conviction, as the proposed rule would.

The Attorney General and the Secretary propose classifying domestic violence convictions as particularly serious crimes under section 208(b)(2)(B)(ii) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii), because violent conduct, or conduct creating a substantial risk of violence against the person, generally constitutes a particularly serious offense rendering an alien ineligible for asylum or withholding of removal. *Matter of E–A–*, 26 I&N Dec. 1, 9 n.3 (BIA 2012) (a "serious" crime involves "a substantial risk of violence and harm to persons"); *Matter of Frentescu*, 18 I&N Dec. 244, 247 (BIA 1982) ("Crimes against persons are more likely to be categorized as 'particularly serious crimes.' ").

Even if all of the proposed domestic violence offenses would not qualify as particularly serious crimes, convictions for such offenses—as well as engaging in conduct involving domestic violence that does not result in a conviction—should be a basis for ineligibility for asylum under section 208(b)(2)(C) of the INA. Domestic violence is particularly reprehensible because the perpetrator takes advantage of an "especially vulnerable" victim. *Carrillo* v. *Holder*, 781 F.3d 1155, 1159 (9th Cir. 2015). Congress enacted grounds for removability for domestic violence offenses because "[w]hen someone is an alien and has already shown a predisposition toward violence against women and children, we should get rid of them the first time." *See* 142 Cong. Rec. S4058–02, S4059 (daily ed. Apr. 24, 1996) (statement of Senator Dole on his amendment adding grounds for removability under subsection (E) to 8 U.S.C. 1227(a)(2)). Congress included stalking within the same statutory provision as domestic violence offenses that make an alien subject to removal because it is a "vicious act:" "Of all the women killed in the United States by husbands or boyfriends, 90 percent were stalked before being murdered." *Id.* In addition, "[s]talking behavior often leads to violence which may result in the serious injury or death of stalking victims." *Id.* Congress also included child abuse within the same statutory provision as domestic violence offenses, noting that child abuse includes a range of serious maltreatment, such as negligence, physical abuse, sexual abuse, emotional abuse, and medical negligence. *See id.* (statement of Senator Coverdale). "[American] society will not tolerate crimes against women and children." *Id.* (statement of Senator Dole on his amendment to add subsection (E) to 8 U.S.C. 1227(a)(2)). The same rationale should render aliens who commit domestic violence in the United States ineligible for the discretionary benefit of asylum. Denying asylum eligibility to an alien who has engaged in domestic violence accords with the aim of "send[ing] a message that we will protect our citizens against [domestic] assaults" committed by aliens. *Id.*

The portions of the proposed regulation that require a conviction would permit the adjudicator to assess all reliable evidence in order to determine whether that conviction amounts to a domestic violence offense. In limited circumstances, a similar type of analysis already occurs in the removal context. Although the ground of removability at 8 U.S.C. 1227(a)(2)(E)(ii)—which applies to individuals who violate certain portions of a protective order—does not require a criminal conviction, it does require a judicial order. *See Garcia-Hernandez* v.

*Boente*, 847 F.3d 869, 872 (7th Cir. 2017) ("The text of [8 U.S.C. 1227(a)(2)](E)(ii) does not depend on a criminal conviction but on what a court 'determines' about the alien's conduct."). That ground of removability requires the immigration judge to consider "the probative and reliable evidence regarding what a State court has determined about the alien's violation [of a protective order]." *Matter of Medina-Jimenez*, 27 I&N Dec. 399, 401 (BIA 2018). And, under 8 U.S.C. 1227(a)(2)(E)(i), which requires a conviction, the immigration judge may still apply a circumstance-specific approach to determine whether the "domestic relationship component" of that removability ground is met. *Hernandez-Zavala* v. *Lynch*, 806 F.3d 259, 266–67 (4th Cir. 2015); *Matter of Estrada*, 26 I&N Dec. 749, 752–53 (BIA 2016) ("[T]he circumstance-specific approach is properly applied in analyzing the domestic nature of a conviction to determine if it is for a crime of domestic violence."). Because some states may not have separate offenses for the different types of conduct recognized in federal law as domestic violence offenses, relying on such a factual inquiry would "clos[e] the . . . loopholes" where aliens might otherwise escape the immigration consequences due to the vagaries of states' laws. 142 Cong. Rec. S4058–02, S4059 (statement of Senator Dole).

For similar reasons, the portions of the proposed rule at 8 CFR 208.13(c)(6)(vii) and 1208.13(c)(6)(vii), which would not require a conviction to trigger ineligibility, allow the adjudicator to consider what conduct the alien engaged in to determine if the conduct amounts to a covered act of battery or extreme cruelty. There is precedent for such a conduct-specific inquiry in the asylum statute, *see* INA 208(b)(2)(A)(i), 8 U.S.C. 1158(b)(2)(A)(i), as well as in the removability context, *see* INA 237(a)(1)(E), 8 U.S.C. 1227(a)(1)(E); *see also* Meng v. *Holder*, 770 F.3d 1071, 1076 (2d Cir. 2014) (reviewing the record evidence to determine whether it supported the agency's finding that the applicant's conduct triggered section 1158(b)(2)(A)(i)'s persecutor bar); *Santiago-Rodriguez* v. *Holder*, 657 F.3d 820, 829 (9th Cir. 2011) (explaining that a factual admission may be sufficient to satisfy the Government's burden of demonstrating removability under section 1227(a)(1)(E)(i)). Moreover, this conduct-specific inquiry is materially similar to the inquiry already undertaken in situations in which an

alien seeks to obtain immigration benefits based on domestic violence actions that do not necessarily result in a conviction. *See, e.g.,* 8 U.S.C. 1229b(b)(2)(A); 8 CFR 204.2(c)(1)(i)(E), (c)(1)(vi), (c)(2)(iv), (e)(1)(i)(E), (e)(1)(vi), and (e)(2)(iv).

Finally, the proposed regulation would exempt from the ineligibility bar aliens who have been battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships. These aliens are generally described in section 237(a)(7)(A) of the INA, 8 U.S.C. 1227(a)(7)(A), which provides a waiver of the domestic violence and stalking removability ground when it is determined that the alien (1) was acting in self-defense; (2) was found to have violated a protection order intended to protect the alien; or (3) committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the alien's having been battered or subjected to extreme cruelty. Although section 237(a)(7)(A) of the INA, 8 U.S.C. 1227(a)(7)(A), excepts such aliens from removability only if they are granted a discretionary waiver, the proposed rule would except all aliens who satisfy the above criteria from the proposed asylum bar. Asylum officers or immigration judges could thus make factual determinations regarding whether an alien fit into this category, making the exception more administrable and uniform in the asylum context. The Departments believe that this exception would provide important protections for domestic violence victims.

## 7. Convictions for Certain Misdemeanor Offenses

The proposed regulation would also make certain misdemeanor offenses bars to asylum based on the authority to create new grounds for ineligibility in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Other provisions of the INA render aliens ineligible for other benefits based on convictions for certain misdemeanors. *See, e.g.,* INA 244(c)(2)(B)(i), 8 U.S.C. 1254a(c)(2)(B)(i) (barring aliens from eligibility for temporary protected status if they have been convicted of two or more misdemeanors in the United States). The proposed rule would designate offenses involving the use of fraudulent documents, the receipt of public benefits under false pretenses, or the possession or trafficking of drugs as disqualifying for purposes of asylum, even if such offenses are misdemeanors rather than felonies. The proposed

regulation would define a misdemeanor in this context as a crime defined as a misdemeanor by the jurisdiction of conviction, or that involves a potential penalty of one year or less in prison. Convictions for such misdemeanor offenses should be disqualifying because these offenses inherently undermine public safety or Government integrity.

The Departments also seek public comment on whether (and, if so, how) to differentiate among misdemeanor convictions that should warrant designation as grounds for ineligibility for asylum. Are there any additional misdemeanor convictions that should be bars to asylum eligibility? Conversely, should any of the below proposed misdemeanor bars be eliminated?

### a. Fraudulent Document Offenses

The Departments propose to make aliens ineligible for asylum when they are convicted of a federal, state, tribal, or local misdemeanor for the possession or use, without lawful authority, of an identification document, authentication feature, or false identification document as defined in 18 U.S.C. 1028(d). Aliens convicted of falsifying passports or other identity documents where the term of imprisonment is at least a year are already ineligible for asylum (unless the conduct was a first-time offense for purposes of aiding a specified family member) because such conduct constitutes an aggravated felony under 8 U.S.C. 1101(a)(43)(P). Other felonies relating to fraudulent document offenses would be encompassed within the proposed eligibility bar for felony convictions.

The Attorney General and the Secretary believe that fraudulent document offenses pose such a significant affront to government integrity that even misdemeanor fraudulent document offenses should disqualify aliens from eligibility for asylum. Proper identity documentation is critical in the immigration context. *See Noriega-Perez* v. *United States,* 179 F.3d 1166, 1173–74 (9th Cir. 1999). Furthermore, as Congress acknowledged when it passed the REAL ID Act of 2005, Public Law 109–13, preserving the integrity of identity documents is critical for general national security and public safety reasons. The United States has taken concrete steps to protect all Government-issued identification documents by making the process to obtain identification documents more rigorous. *See, e.g.,* H.R. Rep. No. 109– 72, at 179 (2005) (Conf. Rep.) (explaining that the REAL ID Act was passed in part to "correct the chronic weakness among many of the states in

the verification of identity'' for the purpose of issuing Government identification documents).

The use of fraudulent documents, especially involving the appropriation of someone else's identity, so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense to obtain the discretionary benefit of asylum.

Despite the concerns articulated above, the proposed rule would provide an exception for the bar to asylum based on convictions for use or misuse of identification documents if the alien can show that the document was presented before boarding a common carrier for the purpose of coming to the United States, that the document relates to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry. This exception is consistent with distinctions regarding certain document-related offenses made in *Matter of Pula,* 19 I&N Dec. at 474–75, existing statutes, *see* INA 274C(a)(6) and (d)(7), 8 U.S.C. 1324c(a)(6) and (d)(7), and existing regulations, *see* 8 CFR 270.2(j) and 1270.2(j); *see also Matter of Kasinga,* 21 I&N Dec. 357, 368 (BIA 1996) (use of fraudulent passport to come to the United States was not a significant adverse factor where, upon arrival, applicant told the immigration inspector the truth). Other than this exception, aliens seeking to enter, remain, obtain employment, or obtain benefits and services who are convicted of using false or fraudulent documents should not be eligible for asylum.

### b. Public Benefits Offenses

Many aliens are legally entitled to receive certain categories of federal public benefits. 8 U.S.C. 1611, 1641. The unlawful receipt of public benefits, however, burdens taxpayers and drains a system intended to assist lawful beneficiaries. The inherently pernicious nature of such conduct has previously led the Government to prioritize enforcement of the immigration laws against such offenders, *see* Enhancing Public Safety in the Interior of the United States, Exec. Order No. 13768, 82 FR 8799 (Jan. 25, 2017), and this pernicious conduct warrants the use of the Attorney General and the Secretary's authority to bar convicted individuals

from receiving the discretionary benefit of asylum.[8]

### c. Controlled Substances Offenses

Relying on the authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments propose to make aliens ineligible for asylum when they are convicted of a federal, state, tribal, or local misdemeanor involving controlled-substances offenses. Specifically, the Departments propose that a conviction for possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana, should disqualify an alien from eligibility for asylum.

Aliens who violate controlled substance laws may be removable, *see* INA 212(a)(2)(A)(i)(II), 237(a)(2)(B)(i), 8 U.S.C. 1182(a)(2)(A)(i)(II), 1227(a)(2)(B)(i), and they would already be barred from receiving asylum to the extent a controlled-substance offense constitutes an aggravated felony, *see* INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i); *see also* INA 101(a)(43)(B), 8 U.S.C. 1101(a)(43)(B); *United States* v. *Valdivia-Flores*, 876 F.3d 1201, 1206–07 (9th Cir. 2017) (controlled-substances offenses are aggravated felonies under the INA if they meet the definition of trafficking or involve state analogues to federal trafficking offenses). Furthermore, in cases that the courts of appeals have often upheld, the Board has concluded that various controlled-substances offenses can constitute particularly serious crimes even if they do not rise to the level of aggravated felonies. *See, e.g., Herrera-Davila* v. *Sessions*, 725 F. App'x 589, 590 (9th Cir. 2018) (the Board and immigration judge did not err in determining that an immigrant's conviction for drug possession constituted a particularly serious crime for both asylum and withholding of removal); *Vaskovska* v. *Lynch*, 655 F. App'x 880, 884 (2d Cir. 2016) (the Board did not err in determining that an alien's conviction for drug possession was "a particularly serious crime rendering her ineligible for asylum and withholding of removal"); *Bertrand* v. *Holder*, 448 F. App'x 744, 745 (9th Cir. 2011) (the Board did not err in determining that an alien's conviction for selling cannabis constituted a

particularly serious crime for purposes of both asylum and withholding of removal). Additionally, drug paraphernalia possession can include certain equipment associated with the use, manufacture, packaging, or sale of illegal drugs. *See, e.g.,* 21 U.S.C. 863(d). Under the proposed eligibility bar for felonies, all felony convictions relating to controlled substances would become a basis for ineligibility for asylum.

The Departments further propose to implement a new bar for asylum to include convictions for misdemeanors involving the trafficking or possession of controlled substances. Both possessors and traffickers of controlled substances pose a direct threat to the public health and safety interests of the United States, and they should not be entitled to the benefit of asylum. The harmful effects of controlled substance offenses have been recognized consistently by policymakers and courts. "[F]ar more people die from the misuse of opioids in the United States each year than from road traffic accidents or violence." United Nations Office on Drugs and Crime, World Drug Report: Executive Summary, Conclusions, and Policy Implications 10 (2017). As Attorney General Ashcroft previously recognized in an immigration opinion, "[t]he harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes." *Matter of Y–L–*, 23 I&N Dec. 270, 275 (A.G. 2002). He concluded that the "unfortunate situation" of drug abuse and related crime "has reached epidemic proportions and . . . tears the very fabric of American society." *Id.* The federal courts have agreed that drug offenses are serious, and have noted that "immigration laws clearly reflect strong congressional policy against lenient treatment of drug offenders." *Ayala-Chavez* v. *U.S. INS*, 944 F.2d 638 (9th Cir. 1991) (quoting *Blackwood* v. *INS*, 803 F.2d 1165, 1167 (11th Cir. 1988)); *see also Hazzard* v. *INS*, 951 F.2d 435, 438 (1st Cir. 1991); *cf. Mason* v. *Brooks*, 862 F.2d 190, 194 (9th Cir. 1988) ("Congress has forcefully expressed our national policy against persons who possess controlled substances by enacting laws . . . to exclude them from the United States if they are aliens.").

For these reasons, the proposed bar on asylum eligibility is consistent with the INA's current treatment of controlled-substance offenses. Nevertheless, the Departments also propose a limited exception to the proposed bar for convictions involving a single offense involving possession for one's own use

of 30 grams or less of marijuana. That exception would be consistent with an existing exception in the removability context: One who is convicted of a single offense of simple possession of marijuana is not automatically removable under the INA. *See* INA 237(a)(2)(B)(i), 8 U.S.C. 1227(a)(2)(B)(i). An alien with the same conviction would be inadmissible, but has a statutory right to request a waiver, which the Attorney General or the Secretary may grant in his or her discretion. *See* INA 212(a)(2)(A)(i)(II), (h), 8 U.S.C. 1182(a)(2)(A)(i)(II), (h); 8 CFR 212.7(d) and 1212.7(d); *see also* INA 103(a), 8 U.S.C. 1103(a).

The Departments seek public comment on how to differentiate among controlled substance offenses. Are there offenses that are currently designated as a controlled substance offense in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum eligibility? In addition to seeking public comment on whether this proposed definition is over-inclusive, the Departments seek comment on whether it might be under-inclusive: Are there crimes that would not fall under this definition that should be made categorical bars?

### B. Clarifying the Effect of Criminal Convictions

The proposed regulations governing ineligibility for asylum would also set forth criteria for determining whether a vacated, expunged, or modified conviction or sentence should be recognized for purposes of determining whether an alien is eligible for asylum. The proposed rule would apply the same set of principles to federal, state, tribal, or local convictions that are relevant to the eligibility bars described above. The rule would not apply to convictions that exist prior to the effective date of the proposed regulation. For convictions or sentences imposed thereafter, the proposed rule would provide that (1) vacated or expunged convictions, or modified convictions or sentences, remain valid for purposes of ascertaining eligibility for asylum if courts took such action for rehabilitative or immigration purposes; (2) an immigration judge or other adjudicator may look to evidence other than the order itself to determine whether the order was issued for rehabilitative or immigration purposes; (3) the alien bears the burden of establishing that the vacatur, expungement, or sentence modification was not for rehabilitative or immigration purposes; (4) the alien must further establish that the court had jurisdiction and authority to alter the relevant order;

---

[8] In Fiscal Year ("FY") 2017, approximately 20 percent of Government benefits fraud offenders at the federal level were not U.S. citizens. *See* U.S. Sentencing Comm'n, Quick Facts, *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Government_Benefits_Fraud_FY17.pdf.*

and (5) there exists a rebuttable presumption against the effectiveness, for immigration purposes, of the order vacating, expunging, or modifying a conviction or sentence if either (i) the order was entered after the initiation of any removal proceeding; or (ii) the alien moved for the order more than one year after the date of the original order of conviction or sentencing. The rule would thus ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes.

The authority of the Attorney General and the Secretary to promulgate this proposed rule derives from sections 208(b)(2)(B)(ii) and (C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C). Prescribing the effect to be given to vacated, expunged, or modified convictions or sentences is an ancillary aspect of prescribing which criminal convictions should constitute ''particularly serious crimes'' for purposes of asylum ineligibility, as well as prescribing additional limitations or conditions on asylum eligibility. Additionally, the Attorney General possesses general authority under section 103(g)(2) of the INA, 8 U.S.C. 1103(g)(2), to ''establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section.'' *See Tamenut,* 521 F.3d at 1004 (describing section 1103(g)(2) as ''a general grant of regulatory authority'').[9] Similarly, Congress has conferred upon the Secretary the authority to ''establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of [the INA].'' INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

First, regarding the immigration effect of expungements, vacaturs, or sentence modifications, the rule would codify the principle set forth in *Matter of Thomas and Thompson,* 27 I&N Dec. 674 (A.G. 2019), that, if the underlying reason for the vacatur, expungement, or modification was for ''rehabilitation or immigration hardship,'' the conviction remains effective for immigration purposes. *Id.* at 680; *see also id.*

(distinguishing between convictions vacated on the basis of a procedural or substantive defect in the underlying proceeding and those vacated because of post-conviction events, such as rehabilitation or immigration hardships); *Matter of Pickering,* 23 I&N Dec. 621 (BIA 2003) (finding that a conviction remains valid for immigration purposes if the conviction is vacated for reasons unrelated to the merits of the underlying criminal proceedings), *rev'd on other grounds by Pickering* v. *Gonzales,* 465 F.3d 263, 267–70 (6th Cir. 2006).

Courts of appeals have repeatedly accepted this principle. The Second Circuit deemed it ''reasonable'' for the Board to conclude in *Pickering* that convictions vacated for rehabilitative reasons are still effective for purposes of immigration consequences. *Saleh* v. *Gonzales,* 495 F.3d 17, 24 (2d Cir. 2007). That interpretation is ''entirely consistent with Congress's intent in enacting the 1996 amendments to broaden the definition of conviction and advances the two purposes earlier identified by the Board: It focuses on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question) and imposes uniformity on the enforcement of immigration laws.'' *Id.; see also Pinho* v. *Gonzales,* 432 F.3d 193, 215 (3d Cir. 2005) (applying *Pickering* to conclude that a conviction was vacated ''based on a defect in the underlying criminal proceedings,'' not for rehabilitative or immigration purposes); *cf. Dickerson* v. *New Banner Inst., Inc.,* 460 U.S. 103, 120 (1983) (accepting that Congress need not ''be bound by post-conviction state actions . . . that vary widely from State to State and that provide less than positive assurance that the person in question no longer poses an unacceptable risk of dangerousness'').

For similar reasons, the rule would provide that court orders *modifying* criminal sentences for rehabilitative purposes should also have no effect on the alien's eligibility for asylum. *See Matter of Thomas and Thompson,* 27 I&N Dec. at 680 (explaining that ''the *Pickering* test should apply to state-court orders that modify, clarify, or otherwise alter the term of imprisonment or sentence associated with a state-court conviction'').

Second, to avoid gamesmanship and manipulation in the drafting of orders vacating a conviction or modifying a criminal sentence, the proposed regulations would allow an adjudicator to look beyond the face of the order to determine whether it was issued for rehabilitative or immigration purposes

and to determine whether the other requirements of proposed 8 CFR 208.13(c)(7)(v) and 1208.13(c)(7)(v) have been met, notwithstanding the putative basis of the order on its face. This rule is largely consistent with existing precedent. *See Rodriguez* v. *U.S. Att'y Gen.,* 844 F.3d 392, 396–97 (3d Cir. 2016) (applying this approach and looking to court records absent a clear explanation for the basis of the order in the order itself); *see also Cruz* v. *Att'y Gen.,* 452 F.3d 240, 244, 248 (3d Cir. 2006) (holding that the Board could reasonably determine that a conviction was vacated to avoid immigration consequences where a state prosecutor's letter stipulating the terms of a settlement agreement explicitly stated that the petitioner's scheduled deportation was a reason for the state's support for vacating the conviction).

Third, the proposed rule would clarify that the alien bears the burden of establishing that the vacatur, expungement, or sentence modification was not for rehabilitative or immigration purposes. Therefore, if the record is inconclusive based on a standard of preponderance of the evidence, the order should not be given effect for immigration purposes. The burden of proof is on the alien because the INA places the overall burden to establish asylum eligibility on the alien. *See* INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); *Marikasi* v. *Lynch,* 840 F.3d 281, 287 (6th Cir. 2016). Where there is evidence that ''one or more of the grounds for mandatory denial of the application for relief may apply,'' the applicant bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d). Consistent with this principle, in an analogous context, the Eighth Circuit has held that, because the INA places the burden of proof on the alien to establish eligibility for cancellation of removal, a form of discretionary relief, the alien bears the burden to prove that he has no disqualifying convictions, including the burden to show that the vacatur of any disqualifying conviction was not for rehabilitative purposes. *Andrade-Zamora* v. *Lynch,* 814 F.3d 945, 949 (8th Cir. 2016).[10] This allocation of the

---

[9] The Attorney General has previously exercised his authorities to address related questions regarding what immigration effect should be given to expunged convictions. For example, in 1959, Attorney General Rogers concluded that certain narcotics convictions would survive subsequent expungement for purposes of the immigration laws. *Matter of A–F–,* 8 I&N Dec. 429, 445–46 (A.G. 1959). More recently, Attorney General Ashcroft held that, in light of the INA's definition of ''conviction,'' an alien whose firearms conviction was expunged pursuant to section 1203.4 of the California Penal Code remained ''convicted'' for immigration purposes. *Matter of Luviano-Rodriguez,* 23 I&N Dec. 718, 718 (A.G. 2005).

[10] In contrast, when DHS uses a criminal conviction to prove deportability of an admitted alien, some courts have held that the Government bears the burden of establishing that a subsequent vacatur of that conviction should not be recognized because the vacatur was granted for immigration purposes. *See Nath* v. *Gonzales,* 467 F.3d 1185, 1188–89 (9th Cir. 2006); *Pickering,* 465 F.3d at 268–69 & n.4. Unlike applications for asylum and other forms of relief, where the alien has the burden of proving eligibility, the Government bears the burden of establishing that an admitted alien is

Continued

**69656**   **Federal Register** / Vol. 84, No. 244 / Thursday, December 19, 2019 / Proposed Rules

burden of proof makes sense because, as the Board and federal courts have noted, an alien is in the "best position" to present evidence on the issue. *Id.* at 950. The alien "was a direct party to the criminal proceeding leading to the vacation of his conviction and is therefore in the best position to know why the conviction was vacated and to offer evidence related to the record of conviction." *Matter of Chavez-Martinez,* 24 I&N Dec. 272, 274 (BIA 2007); *see also Rumierz* v. *Gonzales,* 456 F.3d 31, 39 (1st Cir. 2006) (outlining several other reasons that placing the burden on the alien is rational, such as similar burden allocations in the context of criminal law and habeas petitions).

Fourth, the rule would provide that the alien must establish that the court issuing an order vacating or expunging a conviction or modifying a sentence had jurisdiction and authority to do so. This requirement would be consistent with Board precedent, which provides that facially valid orders can be disregarded based on a lack of jurisdiction. *See, e.g., Matter of F-,* 8 I&N Dec. 251 (BIA 1959) ("[T]he presumption of regularity and of jurisdiction [of a state court order] may be overcome by extrinsic evidence or by the record itself."); *cf. Adam* v. *Saenger,* 303 U.S. 59, 62 (1938) ("If it appears on its face to be a record of a court of general jurisdiction, such jurisdiction over the cause and the parties is to be presumed unless disproved by extrinsic evidence, or by the record itself. . . . But in a suit upon the judgment of another state the jurisdiction of the court which rendered it is open to judicial inquiry . . . and when the matter of fact or law on which jurisdiction depends was not litigated in the original suit it is a matter to be adjudicated in the suit founded upon the judgment." (citations omitted)). In short, an order purporting to vacate, expunge, or otherwise modify a conviction or sentence is inoperative for purposes of immigration law if the state court lacked jurisdiction over the subject matter or the parties to the action.

Jurisdictional defects in court orders might arise in a number of ways. For example, in *United States* v. *Garza-Mendez,* 735 F.3d 1284 (11th Cir. 2013), a criminal sentencing case, the Eleventh Circuit refused to recognize a clarification order issued by a state judge after the sentencing judge had ordered the defendant to serve 12 months of confinement. The Eleventh Circuit rejected the "subjective,

interpretive clarification order," noting that it was obtained from a different judge, long after entry of the original sentence, for the purpose of preventing enhancement of the defendant's sentence for unlawful reentry in federal court. *Id.* at 1289; *cf. Herrera* v. *U.S. Att'y Gen.,* 811 F.3d 1298, 1299–1301 (11th Cir. 2016) (affirming a Board decision declining to give effect to orders clarifying that defendants were never sentenced to terms of confinement when the original sentencing orders clearly stated to the contrary). A jurisdictional defect could also arise where state law limits the court's authority to grant post-conviction relief in certain ways, such as by imposing a time limitation. *See Matter of Estrada,* 26 I&N Dec. at 756 (noting that section 17–10–1(f) of the Georgia Code Annotated imposes strict time limits with respect to a sentencing court's ability to change or "modify" a sentence).

Finally, the proposed rule creates a rebuttable presumption that the order vacating or expunging the conviction or modifying the sentence was issued for immigration purposes if either (1) the order was entered after the initiation of any proceeding to remove the alien from the United States; or (2) the alien moved for the order more than one year after the date of the original order of conviction or sentencing.

Precedents establish that the timing of such a process is relevant to whether the resulting order should be recognized for immigration purposes. The initiation of such a process after removal proceedings have commenced naturally raises an inference that the resulting order was issued for immigration or rehabilitative purposes. For instance, in *Andrade-Zamora,* the Eighth Circuit refused to credit a state court's vacatur of a conviction when the vacatur occurred two weeks after the Government commenced removal proceedings based on the conviction, and where the state court also modified the alien's sentence for a different conviction in an apparent attempt to fit the conviction within an exception to a criminal ground of removability. 814 F.3d at 949. The court affirmed the Board's refusal to recognize the vacatur and modification, reasoning: "The timing and effect of the order . . . raise an inference the state court did not vacate the conviction on a substantive or procedural ground, but rather to avoid the immigration consequences of the conviction." *Id.* at 949–50.

Further, the rule would create a rebuttable presumption providing that if more than a year has passed between the original conviction and the alien's

effort to seek a subsequent vacatur or expungement of a conviction, or the modification of sentence, the immigration adjudicator should weigh that fact against recognizing the vacatur or modification. It is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds, and who might delay such a challenge until DHS commences immigration proceedings or attempts to remove the alien. *See Rumierz,* 456 F.3d at 38 (affirming the Board's refusal to recognize a vacatur and the Board's reasoning that "Rumierz could easily have sought to vacate the January 1994 Vermont conviction and have presented the vacated conviction to the [Board] in the six years before the [Board's] 2000 order"). This rule promotes finality in immigration proceedings by encouraging an alien to act diligently if there is a legitimate basis to challenge a conviction or sentence.

## C. Reconsiderations of Discretionary Denials of Asylum

The proposed rule would remove the automatic review of a discretionary denial of an alien's asylum application by removing and reserving paragraph (e) in 8 CFR 208.16 and 1208.16. The present regulation provides that the denial of asylum shall be reconsidered in the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her. Factors to be considered include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country. This provision, however, has proved confusing, inefficient, and unnecessary.

The courts of appeals have expressed ongoing confusion related to this provision. For example, the regulation states that when an asylum application is denied in the exercise of discretion, but withholding of removal is granted, "the denial of asylum shall be reconsidered," but the regulation does not say who shall reconsider the denial, when the reconsideration shall occur, or how the reconsideration is to be initiated. *See Shantu* v. *Lynch,* 654 F. App'x 608, 613–14 (4th Cir. 2016) (discussing these ambiguities); *see also*

---

deportable by clear and convincing evidence. INA 240(c)(3)(A), 8 U.S.C. 1229a(c)(3)(A).

*Huang* v. *INS,* 436 F.3d 89, 93 (2d Cir. 2006). These ambiguities have not been "definitively resolved," *Shantu,* 654 F. App'x at 614, and continued litigation on these questions would be an ongoing burden for applicants, the immigration system, and courts.

Further, mandating that the decision maker reevaluate the very issue just decided is an inefficient practice that, in the view of the Departments, grants insufficient deference to the original fact finding and exercise of discretion. The regulation also appears unnecessary given that other regulations provide multiple avenues to challenge or otherwise seek to change a discretionary denial of asylum coupled with a grant of withholding of removal.[11] First, an immigration judge may reconsider that decision upon his or her own motion. 8 CFR 1003.23(b)(1). Second, the alien may file a motion to reconsider. *Id.* Third, the alien may also appeal the decision to the Board. 8 CFR 1003.38. The existence of at least three alternative processes for altering a discretionary denial of asylum obviates the need for a mandatory fourth. Moreover, the objective of facilitating family reunification, *see Huang,* 436 F.3d at 93 (describing 8 CFR 1208.16(e) as "manifestly a law designed to further family reunification"), can be fulfilled even in the absence of the existing reconsideration provision because the immigration judge (or other decision maker) already considers these factors when making a discretionary decision in the first instance, *see Fisenko* v. *Lynch,* 826 F.3d 287, 292 (6th Cir. 2016) (stating that "a crucial factor in weighing asylum as a discretionary matter' is family reunification" (internal quotation marks and citation omitted)).

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*)) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

### B. Unfunded Mandates Reform Act of 1995

This proposed rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

### C. Congressional Review Act

The Office of Information and Regulatory Affairs has determined that this proposed rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

### D. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

The Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866, but not an economically significant regulatory action. Accordingly, the rule has been submitted to OMB for review. The Departments certify that this rule has been drafted in accordance with the principles of Executive Order 12866, section 1(b), Executive Order 13563, and Executive Order 13771.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of using the best available methods to quantify costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Similarly, Executive Order 13771 requires agencies to manage both the public and private costs of regulatory actions.

The proposed regulation would provide seven additional mandatory bars to eligibility for asylum pursuant to the Attorney General and the Secretary's authorities under sections 208(b)(2)(B)(ii), 208(b)(2)(C), and 208(d)(5) of the INA.[12] The proposed rule would add bars on eligibility for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of (1) a felony under federal or state law; (2) an offense under 8 U.S.C. 1324(a)(1)(A) or 1324(a)(1)(2) (Alien Smuggling or Harboring); (3) an offense under 8 U.S.C. 1326 (Illegal Reentry); (4) a federal, state, tribal, or local crime involving criminal street gang activity; (5) certain federal, state, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a federal, state, tribal, or local domestic violence offense, or who are found by an adjudicator to have engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted; and (7) certain misdemeanors under federal or state law for offenses related to false identification; the unlawful receipt of public benefits from a federal, state, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

The seven proposed bars would be in addition to the existing mandatory bars relating to the persecution of others, convictions for particularly serious crimes, commission of serious nonpolitical crimes, security threats, terrorist activity, and firm resettlement in another country that are currently contained in the INA and its implementing regulations. *See* INA 208(b)(2); 8 CFR 208.13 and 1208.13. Under the current statutory and regulatory framework, asylum officers and immigration judges consider the applicability of mandatory bars to the relief of asylum in every proceeding involving an alien who has submitted an I–589 application for asylum. Although the proposed regulation would expand the mandatory bars to asylum, the proposed regulation does not change the nature or scope of the role of an immigration judge or an asylum officer during proceedings for consideration of asylum applications. Immigration judges and asylum officers are already trained to consider both an alien's previous conduct and criminal

---

[11] With respect to the DHS regulation at 8 CFR 208.16(e), if USCIS denies an individual's asylum application on discretionary grounds, USCIS does not have jurisdiction to consider withholding of removal eligibility because withholding of removal determinations are made by immigration judges and the Board.

[12] As discussed further below, the proposed regulation would not otherwise impact the ability of an alien who is denied asylum to receive the protection of withholding of removal under the INA or withholding of removal or deferral of removal under the CAT.

AR.00302

**69658**    **Federal Register** / Vol. 84, No. 244 / Thursday, December 19, 2019 / Proposed Rules

record to determine whether any immigration consequences result, and the proposed rule does not propose any adjudications that are more challenging than those that are already conducted. For example, immigration judges already consider the documentation of an alien's criminal record that is filed by the alien, the alien's representative, or the DHS representative in order to determine whether one of the mandatory bars applies and whether the alien warrants asylum as a matter of discretion. Because the proposed bars all relate to an alien's criminal convictions or other criminal conduct, adjudicators will conduct the same analysis to determine the applicability of the bars proposed by the rule.[13] The Departments do not expect the proposed additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications.

The Departments note that the proposed expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually;[14] however, because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application, neither the Department of Justice (''DOJ'') nor DHS can quantify precisely the expected decrease. An alien who would be barred from asylum as a result of the proposed rule may still be eligible to apply for the protection of withholding of removal under section 241(b)(3) of the INA or withholding of removal or deferral of removal under regulations implementing U.S. obligations under Article 3 of the CAT. *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 208.17 through 18, 1208.16, and 1208.17 through 18. For those aliens barred from asylum under this rule who would otherwise be positively adjudicated for asylum, it is possible they would qualify for withholding (provided a bar to withholding did not apply separate and apart from this rule).[15] To the extent there are any impacts of this rule, they would almost exclusively fall on that population.[16]

The full extent of the impacts on this population is unclear and would depend on the specific circumstances and personal characteristics of each alien, and neither DHS nor DOJ collects such data at such a level of granularity. Both asylum applicants and those who receive withholding of removal may obtain work authorization in the United States. Although asylees may apply for lawful permanent resident status and later citizenship, they are not required to do so, and some do not. Further, although asylees may bring certain family members to the United States, not all asylees have family members or family members that wish to leave their home countries. Moreover, family members of aliens granted withholding of removal may have valid asylum claims in their own right, which would provide them with a potential path to the United States as well. The only clear impact is that aliens granted withholding of removal generally may not travel outside the United States without executing their underlying order of removal and, thus, may not be allowed to return to the United States; however, even in that situation— depending on the destination of their travel—they may have a prima facie case for another grant of withholding of removal should they attempt to reenter. In short, there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole.

Applications for withholding of removal typically require a similar amount of in-court time to complete as an asylum application due to a similar nucleus of facts. 8 CFR 1208.3(b) (an asylum application is deemed to be an application for withholding of removal). In addition, this proposed rule would not affect the eligibility of applicants for the employment authorization documents available to recipients of those protections and during the pendency of the consideration of the application in accordance with the current regulations and agency procedures. *See* 8 CFR 274a.12(c)(8) and (18), 208.7, and 1208.7.

The proposed rule would also remove the provision at 8 CFR 208.16(e) and 1208.16(e) regarding reconsideration of discretionary denials of asylum. This change would have no impact on DHS adjudicative operations because DHS does not adjudicate withholding requests. DOJ estimates that immigration judges nationwide must apply 8 CFR 1208.16(e) in approximately 800 cases per year on average.[17] The removal of the requirement to reconsider a discretionary denial would increase immigration court efficiencies and reduce any cost from the increased adjudication time by no longer requiring a second review of the same application by the same immigration judge. This impact, however, would likely be minor because of the small number of affected cases. Accordingly, DOJ assesses that removal of paragraphs 8 CFR 208.16(e) and 1208.16(e) would not increase any EOIR costs or operations, and would, if anything, result in a small increase in efficiency. The Departments note that removal of 8 CFR 208.16(e) and 1208.16(e) may have a marginal cost for aliens in immigration court proceedings by removing one avenue for an alien who would otherwise be denied asylum as a matter of discretion to be granted that relief. DOJ notes, however, that of the average of 800 aliens situated as such each year during the last ten years, an average of fewer than 150, or 0.4%, of the average 38,000 total asylum completions[18] each year filed an appeal in their case, so the affected population is very small and the overall impact would be nominal at most.[19] Moreover, such aliens would retain the ability to file a motion to reconsider in such a situation and, thus, would not actually

---

[13] The Departments note that one of the newly proposed bars, regarding whether or not the alien has ''engaged'' in acts of battery or extreme cruelty, does not necessarily require a criminal conviction. The Departments believe that a criminal arrest or conviction is the most likely evidence to be filed with the immigration court related to this bar, but even in cases where no such evidence is available, the analysis by immigration judges related to this proposed bar is not an expansion from the current analysis immigration judges may conduct during the course of removal proceedings. *See, e.g.,* INA 212(a)(2)(C) (providing that an alien is inadmissible if ''the Attorney General knows or has reason to believe'' that the alien is an illicit trafficker of a controlled substance, regardless of whether the alien has a controlled substance-related conviction).

[14] In FY 2018, DOJ's immigration courts granted 13,169 applications for asylum.

[15] Because statutory withholding of removal has a higher burden of proof, an alien granted such protection would necessarily also meet the statutory burden of proof for asylum, but would not be otherwise eligible for asylum due to a statutory bar or as a matter of discretion. Because asylum applications may be denied for multiple reasons and because the proposed bars do not have analogues in existing immigration law, there is no precise data on how many otherwise grantable asylum applications would be denied using these bars and, thus, there is no way to calculate precisely how many aliens would be granted withholding. Further, because the immigration judge would have to adjudicate the application in either case, there is no cost to DOJ.

[16] In FY 2018, DOJ's immigration courts completed 45,923 cases with an application for asylum on file. For the first three quarters of FY 2018, 622 applicants were denied asylum but granted withholding.

[17] This approximation is based on the number of initial case completions with an asylum application on file that had a denial of asylum but a grant of withholding during FYs 2009 through the third quarter of 2018.

[18] Thirty-eight thousand is the average of completions of cases with an asylum application on file from years FY 2008 through FY 2018. Completions consist of both initial case completions and subsequent case completions.

[19] Because each case may have multiple bases for appeal and appeal bases are not tracked to specific levels of granularity, it is not possible to quantify precisely how many appeals were successful on this particular issue.

AR.00303

lose the opportunity for reconsideration of a discretionary denial.

For the reasons explained above, the expected costs of this proposed rule are likely to be *de minimis*. This proposed rule is accordingly exempt from Executive Order 13771. *See* Office of Mgmt. & Budget, Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs" (2017).

### E. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. 3501 *et seq.*, and its implementing regulations, 5 CFR part 1320.

### List of Subjects in 8 CFR Parts 208 and 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Proposed Regulatory Amendments

### DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Acting Secretary of Homeland Security is proposing to amend 8 CFR part 208 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229, 8 CFR part 2.

■ 2. Section 208.13 is amended by adding paragraphs (c)(6) through (9) to read as follows:

### § 208.13    Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(6) Additional limitations on eligibility for asylum. For applications filed on or after [the effective date of the final rule], an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs);

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse,

child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

*(1)* A current or former spouse of the person;

*(2)* An alien with whom the person shares a child in common;

*(3)* An alien who is cohabiting with or has cohabited with the person as a spouse;

*(4)* An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

*(5)* Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction;

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

*(1)* The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the

document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

*(2)* The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

*(3)* Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana;

(vii) There are serious reasons for believing the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) A current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any

crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

§ 208.16    [Amended]

■ 3. In § 208.16, remove and reserve paragraph (e).

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General proposes to amend 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 4. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 5. Section 1208.13 is amended by adding paragraphs (c)(6) through (9) to read as follows:

§ 1208.13    Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(6) Additional limitations on eligibility for asylum. For applications filed on or after [the effective date of the final rule], an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the Attorney General or Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse,

child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) A current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the adjudicator is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction

resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) There are serious reasons for believing the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) A current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or convictions also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An immigration judge or other adjudicator is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

### § 1208.16   [Amended]

■ 6. In § 1208.16, remove and reserve paragraph (e).

Dated: December 9, 2019.

**Chad F. Wolf,**

*Acting Secretary of Homeland Security.*

Dated: December 10, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–27055 Filed 12–18–19; 8:45 am]

**BILLING CODE 9111–97–P 4410–30–P**

AR.00306

# Proposed Rules

**Federal Register**

Vol. 85, No. 166

Wednesday, August 26, 2020

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Parts 1003 and 1240**

[EOIR Docket No. 19–0022; A.G. Order No. 4800–2020]

**RIN 1125–AA96**

**Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure**

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Department of Justice ("Department") proposes to amend the regulations of the Executive Office for Immigration Review ("EOIR") regarding the handling of appeals to the Board of Immigration Appeals ("BIA" or "Board"). The Department proposes multiple changes to the processing of appeals to ensure the consistency, efficiency, and quality of its adjudications. The Department also proposes to amend the regulations to make clear that there is no freestanding authority of line immigration judges or BIA members to administratively close cases. Finally, the Department proposes to remove inapplicable or unnecessary provisions regarding the forwarding of the record of proceedings on appeal.

**DATES:** Written or electronic comments must be submitted on or before September 25, 2020. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight Eastern Time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 19–0022, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 19–0022 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. EOIR also invites comments that relate to the economic, environmental, or federalism effects that might result from this rule. Comments must be submitted in English, or an English translation must be provided. To provide the most assistance to EOIR, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that support the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 19–0022. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the agency's public docket file, but not posted online. To inspect the agency's public docket file in person, you must make an appointment with agency counsel. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the agency counsel's contact information specific to this rule.

## II. Executive Summary

Under this rule, for most appeals from immigration judge decisions and from certain decisions of Department of Homeland Security ("DHS") officers, the parties would have a standardized briefing schedule with the filing of simultaneous briefs within 21 days. The Department also proposes to set the period of time by which the BIA may extend the period for filing a brief at 14 days. Additionally, the Department proposes to revise the regulations regarding cases that require current identity, law enforcement, or security investigations or examinations in order to eliminate unnecessary remands to the immigration court for purposes of completing or updating identity, law enforcement, or security investigations or examinations and to standardize the authority of EOIR adjudicators to deem an application abandoned if an applicant fails to comply with the necessary requirements regarding identity, law enforcement, or security investigations or examinations.

Furthermore, the Department proposes to amend the regulations to clearly authorize the BIA to issue dispositive decisions, including decisions on voluntary departure, and to limit the BIA's authority to consider new evidence on appeal or to grant motions to remand for consideration of new evidence, except in cases where there is new evidence or information obtained as the result of identity, law enforcement, or security investigations or examinations or where the new information raises a question of jurisdiction or removability. The

**52492**    **Federal Register** / Vol. 85, No. 166 / Wednesday, August 26, 2020 / Proposed Rules

Department also proposes to clarify the limited situations in which the BIA may engage in factfinding on appeal, to make it clear that the BIA may affirm a decision based on any reason contained in the record, and to make clear that there is no "totality of the circumstances" standard of review. It also proposes to clarify that the Board may limit the purpose or scope of a remand when it divests jurisdiction to the immigration judge on remand. The Department proposes to amend the regulations to assure quality control and accuracy of Board decisions through an immigration judge certification process in limited circumstances.

The Department proposes to amend 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to make clear that those provisions—and similar provisions in 8 CFR part 1240—provide no freestanding authority for immigration judges or BIA members to administratively close immigration cases absent an express regulatory or settlement basis to do so. The Department also proposes to withdraw the Attorney General's delegated authority to the BIA to certify cases to itself and the authority of the BIA and immigration judges to *sua sponte* reopen a case or reconsider a decision, except in limited circumstances evincing a need to correct typographical errors or defective service. The Department also proposes to allow the filing of motions to reopen notwithstanding existing time and number bars in limited circumstances implicating jurisdiction or removability, though such motions before the Board could be granted only by a three-member panel. The Department further proposes to clarify regulatory timeliness guidelines for appeals assigned to three-member panels of the BIA. Finally, the Department is proposing to add additional timeliness guidelines for the processing of appeals, provide for a further delegation of authority from the Attorney General to the EOIR Director ("Director") regarding the efficient disposition of appeals, and delete inapplicable or unnecessary provisions regarding the forwarding of the record of proceedings on appeal.

A party to EOIR proceedings may appeal immigration judge decisions and certain DHS decisions, including administrative fines and visa petitions under section 204 of the Immigration and Nationality Act ("INA"), to the BIA. *See* 8 CFR 1003.1(b). Because the INA contains few details regarding the appeals process, EOIR's regulations govern the specific procedural requirements for appeals to the BIA. *See*

*generally* 8 CFR part 1003, subpart A.[1] Over time, the Department has frequently reviewed the relevant regulations in order to address management challenges at the BIA and to ensure the efficient adjudication of immigration proceedings to best use EOIR's resources. This proposed rule will further ensure that cases heard at the BIA are adjudicated in a consistent and timely manner.

The number of cases pending within EOIR has increased tremendously, particularly in recent years. EOIR had approximately 130,000 pending cases in 1998. At the end of Fiscal Year ("FY") 2019, EOIR had approximately 1.08 million pending cases, up from approximately 430,000 pending at the end of FY 2014 and approximately 263,000 at the end of FY 2010. EOIR's current pending caseload represents a more than 800 percent increase over the amount pending 21 years ago. *See* EOIR, *Adjudication Statistics: Pending Cases* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1242166/download;* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1060841/download.*

With the increase in pending cases at the immigration courts, EOIR has recently begun to have a corresponding increase in the number of appeals of immigration judge decisions. In FY 2018, the number of such appeals increased to 39,096—a 70 percent increase over the previous high in the last five fiscal years. EOIR, *Adjudication Statistics: Case Appeals Filed, Completed, and Pending* (Oct. 23, 2019), *https://www.justice.gov/eoir/page/file/1198906/download.* In FY 2019, the number of such appeals increased to 54,092, a 38 percent increase from FY 2018 and a 250 percent increase from FY 2015. *Id.* The BIA ended FY 2019 with 65,201 pending appeals from immigration judge decisions, up from 12,677 at the end of FY 2017. *Id.*

Due to these significant increases, the Department believes it is necessary to again review the BIA's regulations to reduce any unwarranted delays in the appeals process and to ensure the efficient use of BIA and EOIR resources.

Additionally, the Department believes that it is necessary to provide the BIA with the appropriate tools to make final decisions wherever possible to reduce unnecessary and inefficient remands to the immigration courts, including remands solely for the completion of background checks or to allow a respondent to be granted voluntary departure. Remands to the immigration court delay case completion due to the amount of time it takes for the case to be placed back on the immigration courts' already full dockets. Additionally, remands to the immigration court for issues that could be addressed by the BIA needlessly prolong case adjudications and take valuable time away from other cases before the immigration court, further straining the limited court resources.

Accordingly, the Department proposes to make seven changes to the BIA's regulations regarding adjudicative and appellate procedures:

1. In all cases, shorten the time allowed for the BIA to grant an extension for a party to file an initial brief or a reply brief from 90 days to 14 days, while also allowing the Board to seek supplemental briefing if it believes such briefing would be beneficial;

2. Make all briefing for appeals of immigration judge decisions simultaneous;

3. End the BIA practice of remanding to the immigration court solely for the purpose of completing or updating identity, law enforcement, or security investigations or examinations or solely because an immigration judge did not provide required advisals regarding an application for voluntary departure;

4. Delegate clear authority to the BIA to issue orders of removal, termination or dismissal, and voluntary departure, and orders granting relief or protection as part of the process to adjudicate appeals;

5. Decrease the scope of motions to remand that the BIA may consider, make clear that the BIA cannot remand a case under a "totality of the circumstances" standard, clarify the limited situations in which the BIA may engage in factfinding on appeal, and make clear that the BIA may affirm a decision based on any valid reason supported by the record;

6. Clarify that the BIA may limit or qualify the scope of a remand while simultaneously divesting itself of jurisdiction over the case; and

7. Allow immigration judges to certify BIA remand or reopening decisions for further review in limited circumstances as part of a quality assurance process.

Overall, the Department believes these proposed changes will enable

---

[1] As the Supreme Court has recognized, "the BIA is simply a regulatory creature of the Attorney General, to which he has delegated much of his authority under the applicable statutes." *INS* v. *Doherty,* 502 U.S. 314, 327 (1992). Although there is a reference to the BIA in section 101(a)(47)(B) of the INA, 8 U.S.C. 1101(a)(47)(B), that reference occurs only in the context of establishing the finality of an order of deportation or removal after the BIA has affirmed the order or the time allowed for appeal to the BIA has expired. It does not address the scope of the BIA's authority or its procedures.

EOIR to better address the growing number of cases and related challenges, as well as to ensure that all cases are treated in an expeditious manner consistent with due process. These changes also build on ongoing reviews of all procedures to ensure that cases are completed in a timely manner consistent with due process. Each change is discussed in turn below. The Department intends for these changes to be effective for appeals filed with the BIA on or after the effective date of the final rule.

The Department also proposes to clarify the scope of 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) regarding the extent of authority of immigration judges and Board members to take action "appropriate and necessary for the disposition" of the cases they adjudicate. The broad sweep of this language has caused confusion regarding the limits of immigration judges and Board members' authority to take action in handling cases before them, especially regarding administrative closure. The proposed rule seeks to address that confusion by making it clear that neither the Board nor immigration judges have authority under 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to administratively close a case—either unilaterally or with the consent of the parties—unless authorized by regulation or a judicial settlement and that neither 8 CFR 1003.1(d)(1)(ii) nor 1003.10(b) provides such authorization.

The Department also proposes to make changes to the BIA to improve its internal consistency in decision-making and its adjudicatory efficiency. First, the proposed rule will improve consistency in BIA decision-making by withdrawing, with limited exceptions, the delegation of the Attorney General's authority for the BIA to *sua sponte* reopen or reconsider decisions[2] and for the Board to certify cases to itself on its own motion. These procedures have few standards to ensure consistent application. Without clear standards, and without the possibility of further review in most cases, they are subject to inconsistent application and even abuse. Moreover, they severely undermine the importance of finality in immigration proceedings by encouraging the filing of motions in contravention of the strict time and number limits imposed by statute. *See, e.g., Doherty,* 502 U.S. at 323 ("Motions for reopening of immigration

proceedings are disfavored for the same reasons as are petitions for rehearing and motions for a new trial on the basis of newly discovered evidence. This is especially true in a deportation proceeding, where, as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." (citation omitted)); *INS* v. *Abudu,* 485 U.S. 94, 107 (1988) ("The reasons why motions to reopen are disfavored in deportation proceedings are comparable to those that apply to petitions for rehearing, and to motions for new trials on the basis of newly discovered evidence. There is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." (footnotes omitted)); *see also Matter of Beckford,* 22 I&N Dec. 1216, 1221 (BIA 2000) (en banc) ("When Congress directed the Attorney General to promulgate regulations limiting motions to reopen and reconsider, it clearly sought to (1) limit the ability of aliens to file motions, and (2) bring finality to immigration proceedings."). To ensure that there remains a mechanism for reopening the proceedings of individuals with colorable claims to United States citizenship or nationality and aliens whose removability is vitiated in full prior to the execution of the removal order, the Department also proposes to amend the regulations to allow the filing of a motion to reopen, notwithstanding the time and number bars, in certain circumstances. Those circumstances are when an alien claims that an intervening change in law or fact renders the alien no longer removable and the alien has exercised diligence in pursuing his or her motion, or when an individual claims, supported by evidence, that he or she is a United States citizen or national.

Second, the proposed rule will ensure that cases at the Board are timely adjudicated. Current regulations place an emphasis on timeliness only near the end of the adjudication process, which ignores the potential for significant delays much earlier in the process. Moreover, the regulations do not provide for an overall timeliness goal, and the BIA's accounting of the timeliness of adjudications is confusing and potentially misleading. *See* Office of the Inspector Gen., Dep't of Justice, *Management of Immigration Cases and Appeals by the Executive Office for Immigration Review* 41 (Oct. 2012), *https://oig.justice.gov/reports/2012/e1301.pdf* ("DOJ OIG Report") ("EOIR's

performance reporting does not reflect appeal delays and underreports actual processing time, which undermines EOIR's ability to identify problems and take corrective actions."). Consequently, this proposed rule ensures that all phases of the appeal process are subject to timeliness goals, provides appropriate accounting of the timely disposition of appeals, and provides a mechanism to ensure that no one appeal remains pending for too long without a regulatory or operational basis for the delay.

**III. Background**

*A. Appellate Briefings*

A party to EOIR proceedings may appeal immigration judge decisions and certain DHS decisions, including administrative fines and visa petitions under section 204 of the INA, to the BIA. *See* 8 CFR 1003.1(b). Because the INA contains few details regarding the appeals process, EOIR's regulations govern the specific procedural requirements for appeals to the BIA. *See generally* 8 CFR part 1003, subpart A. Over time, the Department has reviewed the relevant regulations in order to find the proper balance between the length of time allowed for the appeal process and the efficient adjudication of immigration proceedings that best uses EOIR's resources.

EOIR first implemented regulations regarding the time for filing a BIA appeal in 1987. Aliens and Nationality; Rules of Procedure for Proceedings Before Immigration Judges, 52 FR 2931 (Jan. 29, 1987).[3] EOIR's regulations did not historically specify a particular time period for the BIA briefing schedule, though EOIR did set briefing schedules in certain situations by policy. *See, e.g.,* EOIR, *Operating Policies and Procedures Memorandum 84–1: Case Priorities and Processing* 1 (Feb. 6, 1984), *https://www.justice.gov/sites/default/files/eoir/legacy/2001/09/26/84-1.pdf* ("Because of the necessity of forwarding bond appeals expeditiously to the Board, I [Chief Immigration Judge William R. Robie] suggest that requests for briefing time wherever possible be

---

[2] For the same reasons, and to maintain a parallel level of authority, the proposed rule also withdraws the delegation of the Attorney General's authority for immigration judges to reopen or reconsider decisions *sua sponte,* subject to a limited exception.

[3] The 1987 final rule amended 8 CFR 3.36, in addition to other regulatory sections. In 1992, 8 CFR 3.36 was redesignated as 8 CFR 3.38. Executive Office for Immigration Review; Rules of Procedures, 57 FR 11568 (Apr. 6, 1992). Following the creation of DHS in 2003 after the passage of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, EOIR's regulations were moved from chapter I of Title 8 of the Code of Federal Regulations to chapter V. Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824 (Feb. 28, 2003). Accordingly, section 3.38 of the EOIR regulations was transferred to 8 CFR 1003.38. *Id.* at 9830.

limited to a *maximum* of ten days per party.'' (underlining in original)).

Congress subsequently instructed the Department to implement regulations regarding, among other things, ''the time period for the filing of administrative appeals . . . and for the filing of appellate and reply briefs.'' Immigration Act of 1990, Public Law 101–649, sec. 545(d)(2), 104 Stat. 4978, 5066. In 1996, the Department updated the regulations regarding the BIA appeals process after publishing multiple related proposed rules in 1994 and 1995. *See* Executive Office for Immigration Review; Motions and Appeals in Immigration Proceedings, 61 FR 18900 (Apr. 29, 1996). The final rule established a sequential filing schedule for BIA briefing, which allowed each party 30 days to file a brief in sequence, although the BIA retained the authority to set a shorter period in individual cases. *Id.* at 18906. The 30-day period for all cases was a departure from the Department's 1994 proposal to allow 30 days to file a brief only in non-detained cases and to allow 14 days for detained cases, which commenters objected to for treating the different classes of appellants differently. *See* Executive Office for Immigration Review; Motions and Appeals in Immigration Proceedings, 59 FR 29386, 29386 (June 7, 1994).

In 2002, the Department again updated EOIR's regulations regarding the BIA's appeals process. Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 FR 54878 (Aug. 26, 2002). The reforms were designed to reduce the BIA's backlog of pending cases, eliminate unwarranted delays in the adjudication of appeals, use the BIA's resources efficiently, and focus resources on the most complicated appeals. Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 FR 7309, 7310 (Feb. 19, 2002) (notice of proposed rulemaking (''NPRM'') that was finalized with the publication of 67 FR 54878). The Department reduced the time allowed for filing briefs from 30 days to 21 days after the transcript becomes available, regardless of the alien's detention status, and maintained the BIA's ability to set a shorter time for briefing in individual cases. 67 FR at 54904; 8 CFR 1003.3(c)(1). The Department also implemented a simultaneous briefing requirement for cases involving a detained alien but retained consecutive briefing for non-detained aliens. 67 FR at 54904.

In 2002, the Department also changed the standard time to file a brief in support of or in opposition to an appeal from a DHS decision from 30 days to 21 days. *Id.;* 8 CFR 1003.3(c)(2). These regulatory changes standardized the briefing process for all appeals under the BIA's jurisdiction.

The Department has not made any further amendments to the relevant regulations governing BIA briefing schedules since 2002. Under the current regulatory framework, for appeals of immigration judge decisions in cases involving aliens who are not detained in DHS custody, the appellant has 21 days to file a brief and the appellee then has the same amount of time to file a response brief. 8 CFR 1003.3(c)(1).[4] For appeals of immigration judge decisions in cases involving aliens detained in DHS custody, as well as appeals from certain DHS adjudications, the parties have 21 days to file briefs in support of or in opposition to the appeal. 8 CFR 1003.3(c)(1) and (2).[5] The BIA may extend the time to file a brief, including a reply brief, for an additional 90 days for good cause shown. 8 CFR 1003.3(c)(1). Briefs in appeals from an immigration judge decision involving an alien who is in custody are filed simultaneously, while briefs in appeals from an immigration judge decision involving an alien who is not in custody are filed consecutively. *Id.*

*B. Identity, Law Enforcement, or Security Investigations or Examinations*

The BIA generally may not grant an application for relief or protection unless DHS has completed the appropriate identity, law enforcement, or security investigations or examinations of the applicant and the results of those investigations or examinations are current. 8 CFR 1003.1(d)(6).[6] Affected applications include the forms of relief or protection most frequently sought before EOIR, such as asylum, statutory withholding of removal, and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (''CAT'');[7] adjustment of status; and cancellation of removal. 8 CFR 1003.47(b); *see also* 8 CFR 1003.1(d)(6)(i).

In cases where identity, law enforcement, or security investigations or examinations have not been completed or the results of such are no longer current, 8 CFR 1003.1(d)(6)(ii) currently allows the BIA two alternatives in order to further the adjudication of the case. First, the BIA may issue an order remanding the case to the immigration judge with instructions to permit DHS to complete or update investigations or examinations and report the results to the immigration judge. 8 CFR 1003.1(d)(6)(ii)(A). Alternatively, the BIA may provide notice to the parties that the case is being placed on hold until all identity, law enforcement, or security investigations or examinations are completed or updated and those results reported to the BIA. 8 CFR 1003.1(d)(6)(ii)(B).

The current regulations regarding the identity, law enforcement, or security investigations or examinations for aliens in EOIR proceedings were implemented in 2005. Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals, 70 FR 4743 (Jan. 31, 2005).[8] At that time, the Department included the option for the BIA to remand a case to the immigration judge while DHS completed or updated the appropriate investigations or examinations. *Id.* at 4748. This option addressed those cases that were pending before the BIA prior to publication of the interim rule. *Id.* This was because, prior to the regulatory changes, the record before the BIA would likely not have indicated whether DHS had ever conducted identity, law enforcement, or security investigations or examinations, and the BIA would not have been able to issue a final decision based on an incomplete record. *Id.* The Department did not intend the BIA issuance of

---

[4] Although the regulation from 2002 refers to the appellee's brief as a ''reply brief,'' the BIA Practice Manual refers to it as a response brief. Bd. of Immigration Appeals, Dep't of Justice, *Practice Manual* 63 (2018), *https://www.justice.gov/eoir/page/file/1101411/download* (''BIA Practice Manual''). By contrast, it refers to a brief filed in reply to the response brief as a ''reply brief.'' *Id.* The Supreme Court similarly distinguishes between response briefs and reply briefs. *E.g., Amgen, Inc.* v. *Sandoz, Inc.,* 137 S.Ct. 908 (2017). By requiring simultaneous briefing in all cases, the proposed rule makes clear that there are no longer response briefs, only the possibility of reply briefs.

[5] For appeals of immigration judge decisions in which the underlying proceedings are transcribed, the briefing schedule is set by the BIA after the transcript is available. 8 CFR 1003.3(c)(1).

[6] Immigration judges are similarly unable to grant most applications for relief or protection without complete and current DHS identity, law enforcement, or security investigations or examinations. *See* 8 CFR 1003.47. Further, by statute, no alien can be granted asylum ''until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum.'' 8 U.S.C. 1158(d)(5)(A)(i).

[7] *See generally* 8 CFR 1208.16(c), 1208.17, 1208.18.

[8] The regulations were promulgated through an interim rule with request for comments, but that rule has not yet been finalized.

remands for the completion of identity, law enforcement, or security investigations or examinations to be an ongoing practice. *See id.* at 4749 (noting that "after the [rule's] implementation period, it [was] expected that the number of cases where . . . the Board is required to hold or remand a case under 8 CFR 1003.1(d)(6) [would] diminish over time").

Additionally, the EOIR regulations state that an alien's failure to file necessary documentation or to comply with the requirements to provide biometrics and other biographical information in conformity with the applicable regulations, the instructions to the applications, the biometrics notice, and instructions provided by DHS within the time allowed by the immigration judge's order constitutes abandonment of the application. 8 CFR 1003.47(c). The immigration judge may then enter an appropriate order dismissing the application unless the applicant demonstrates that such failure was the result of good cause. *Id.* For cases pending before the BIA, if the alien fails to comply with necessary procedures for collecting biometrics or other biographical information, DHS may move to remand the record to the immigration judge for consideration of whether the relief sought should be denied. 8 CFR 1003.1(d)(6)(iii). The regulations, however, do not currently provide Board members with the same authority as immigration judges to deem an application abandoned on this basis.

### C. Voluntary Departure

An alien in removal proceedings may request voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c. Voluntary departure permits an eligible alien to leave the United States on his or her own volition, and at his or her own expense, in lieu of receiving an order of removal. INA 240B(a)(1), 8 U.S.C. 1229c(a)(1). To qualify for voluntary departure before an immigration judge prior to the conclusion of removal proceedings pursuant to INA 240B(a)(1), an alien must make such request prior to or at the master calendar hearing during which the case is initially calendared for a merits hearing; make no additional requests for relief (or if such requests have been made, withdraw such requests prior to any grant of voluntary departure pursuant to that section); concede removability; waive appeal of all issues; not be convicted of a crime described in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43); and not be deportable under section 237(a)(4) of the INA, 8 U.S.C. 1227(a)(4). *See* 8 CFR 1240.26(b). To qualify for voluntary

departure before an immigration judge at the conclusion of removal proceedings, an alien must have at least one year of physical presence in the United States; have been a person of good moral character for five years preceding the application for voluntary departure; must not be deportable under specified sections of the INA; and must be able to establish by clear and convincing evidence that he or she has the means and intention to depart the United States. INA 240B(b)(1)(A)–(D), 8 U.S.C. 1229c(b)(1)(A)–(D); 8 CFR 1240.26(c).[9]

Although voluntary departure provides an alternative to an order of removal, it does not allow an alien to remain in the United States beyond a prescribed period, and the disposition of a request for voluntary departure does not affect determinations of an alien's removability or adjudication of an alien's application for protection or relief from removal that would allow the alien to remain in the United States. In *Dada* v. *Mukasey*, the Supreme Court described voluntary departure as "an agreed-upon exchange of benefits, much like a settlement agreement." 554 U.S. 1, 19 (2008). An alien, in agreeing to voluntary departure, avoids the consequences of being ordered removed from the United States, thus preserving the opportunity for future benefits, including the possibility of lawful readmission. *Id.; cf.* INA 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (providing for the inadmissibility of aliens ordered removed or who depart while under an order of removal). The Supreme Court recognized that voluntary departure is beneficial for the Government as well, as it "expedites the departure process and avoids the expense of deportation" as well as "eliminate[s] some of the costs and burdens associated with litigation over the departure." *Dada,* 554 U.S. at 11.

Upon granting a request for voluntary departure, an immigration judge must also enter an alternate order of removal. 8 CFR 1240.26(d). Failure to comply with specified conditions of voluntary departure, filing a motion to reopen or reconsider during the voluntary departure period, or filing a petition for review or any other judicial challenge to the final administrative order may result in automatic termination of voluntary departure and effectuate the alternate order of removal. 8 CFR 1240.26(c)(4), (e), (i). In addition to rendering the alien

subject to the alternate order of removal, failure to depart within the voluntary departure period may result in civil penalties. INA 240B(b), 8 U.S.C. 1229c(b); 8 CFR 1240.26(j).

Currently, the regulations describe only an immigration judge's authority to grant voluntary departure in the first instance. *See generally* 8 CFR 1240.26. However, the regulations specify that in limited circumstances, the BIA may reinstate an order of voluntary departure when removal proceedings have been reopened for a purpose other than solely requesting voluntary departure. 8 CFR 1240.26(h). Under current EOIR practice, the BIA may remand a case to the immigration court for the sole purpose of considering eligibility for voluntary departure, a decision that has no bearing on the respondent's removability or eligibility for relief or protection that would allow the respondent to remain in the United States. The BIA may also remand a case for the purpose of the immigration judge's "ministerial review" of whether the alien received the proper voluntary departure advisals described in 8 CFR 1240.26(b)(3)(iii), (c)(3) and (j). *See Batubara* v. *Holder,* 733 F.3d 1040, 1042 (10th Cir. 2013). The BIA will also remand a case when such advisals have not been given. *Matter of Gamero,* 25 I&N Dec. 164, 168 (BIA 2010).

### D. Motions To Remand

Parties to EOIR proceedings may file a motion to remand while their appeal is pending before the BIA. A motion to remand seeks to return jurisdiction of a case pending before the BIA to the immigration judge. Motions to remand, which are not described in the INA, were initially a judicially created concept rooted in principles of civil practice that were later codified into Title 8 of the CFR. *See Matter of Coelho,* 20 I&N Dec. 464, 470–71 (BIA 1992); 61 FR at 18904.

Currently, a party asserting that the BIA cannot properly resolve an appeal without further factfinding must file a motion to remand. 8 CFR 1003.1(d)(3)(iv). Motions to remand in most cases are subject to the same substantive requirements as motions to reopen. *See Matter of Coelho,* 20 I&N Dec. at 471. Accordingly, the BIA may deny a motion to remand where the evidence was previously available at an earlier stage in the proceedings or if the evidence is not material. *See* BIA Practice Manual at 84.

A motion to remand is filed while an appeal is still pending before the BIA, whereas a motion to reopen is typically filed after agency review of the case has concluded. A motion to reopen a

---

[9] Under certain circumstances, an alien may be granted voluntary departure by DHS in lieu of removal proceedings, as provided in 8 CFR 240.25. This form of voluntary departure is subject to regulatory procedures that are not implicated by the proposed rule.

decision rendered by an immigration judge that is pending when an appeal is filed or that is filed while an appeal is pending may be deemed a motion to remand and may be consolidated with the appeal. 8 CFR 1003.2(c)(4). Motions to remand are not subject to the same time or number limitations as motions to reopen because they are made during the pendency of an appeal. *See Matter of Oparah,* 23 I&N Dec. 1, 2 (BIA 2000). Currently, BIA policy states that if the BIA grants a motion to remand a decision back to the immigration judge, a party may once again file an appeal from the immigration judge's resulting decision, and that party may pursue any new or unresolved issues from the prior appeal. BIA Practice Manual at 85.

*E. Factfinding*

Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board does not engage in factfinding in the course of deciding appeals. 8 CFR 1003.1(d)(3)(iv). A party asserting that an appeal cannot be properly resolved without further factfinding must file a motion for remand. *Id.* If further factfinding is needed, the Board may remand the proceeding. *Id.*

*F. Scope of a Board Remand*

When the Board remands a case, it divests itself of jurisdiction unless jurisdiction is expressly retained. *Matter of Patel,* 16 I&N Dec. 600, 601 (BIA 1978). ''[W]hen this is done, unless the Board qualifies or limits the remand for a specific purpose, the remand is effective for the stated purpose and for consideration of any and all matters which the service officer deems as appropriate . . . .'' *Id.* Cases remanded for the completion of identity, law enforcement, or security investigations or examinations pursuant to 8 CFR 1003.47(h) are also treated as general remands, and an immigration judge may consider new evidence in such a remanded case ''if it is material, was not previously available, and could not have been discovered or presented at the former hearing.'' *Matter of M–D–,* 24 I&N Dec. 138, 141 (BIA 2007). Circuit courts have construed *Matter of Patel* to mean that the BIA can limit the scope of its remand only if it (1) expressly retains jurisdiction and (2) qualifies or limits the scope of remand. *Bermudez-Ariza* v. *Sessions,* 893 F.3d 685, 688 (9th Cir. 2018); *Johnson* v. *Ashcroft,* 286 F.3d 696, 701 (3rd Cir. 2002). No regulation allows the Board to expressly retain jurisdiction over a remanded case, however, and the Board rarely, if ever, does so in practice unless the remand is

for a ministerial issue such as the need to forward the administrative record. *See* BIA Practice Manual at 76 (''Once a case has been remanded to the Immigration Judge, the only motion that the Board will entertain is a motion to reconsider the decision to remand.'').

*G. Quality Assurance*

In contrast to other administrative adjudicatory agencies, the Board does not have a formal quality assurance process to ensure that its remand decisions provide appropriate and sufficient direction to the immigration judges. *See, e.g.,* Soc. Sec. Admin., *Hearings, Appeals, and Litigation Law Manual* I–2–1–85 through I–2–1–88, *https://www.ssa.gov/OP_Home/hallex/I-02/I-2-1.html* (''HALLEX'') (outlining policies for administrative law judges (''ALJs'') at the Social Security Administration (''SSA'') to seek clarifications of remand orders from the SSA Appeals Council and a feedback initiative allowing ALJs to raise other issues regarding remand orders). Although the Board has used various informal and internal quality control measures over time, no formal mechanism exists allowing immigration judges to raise issues regarding remand orders that may need clarification or further explanation.

*H. 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) and Administrative Closure*

Under 8 CFR 1003.1(d)(1)(ii) and 1003.10(b), Board members and immigration judges are authorized, *inter alia,* to ''take any action consistent with their authorities under the [INA] and regulations that is appropriate and necessary for the disposition'' of cases before them.[10]

Prior to 2012, the Department did not consider 8 CFR 1003.1(d)(1)(ii) or 1003.10(b) or any similar regulatory provision to authorize an immigration judge or the Board to unilaterally administratively close a case over a party's objection.[11] To the contrary,

longstanding Board precedent made clear that an immigration judge was required both to complete a case and to complete it through only one of three avenues: An order of termination, an order of removal, or an order of relief or protection. *Matter of Chamizo,* 13 I&N Dec. 435, 437 (BIA 1969) (''We hold that 8 CFR 242.18(c) [now 8 CFR 1240.13(c)] requires that in deportation proceedings an order be entered which will result in the proceedings being processed to a *final conclusion,* whether by the deportation of the alien, the termination of proceedings or the granting of some form of discretionary relief as provided in the [INA].'' (emphasis added)).[12]

Moreover, similarly longstanding Board precedent and administrative law separation-of-function principles dictated that the Board or an immigration judge should not assume the role of the prosecutor and determine which immigration cases should be adjudicated and which ones should not. Thus, as one Board decision described the previous state of affairs, an immigration judge ''may neither terminate nor indefinitely adjourn the proceedings in order to delay an alien's deportation . . . [and] [o]nce deportation proceedings have been initiated by the District Director, the immigration judge may not review the [discretion] of the District Director's action, but must execute his duty to determine whether the deportation charge is sustained by the requisite evidence in an expeditious manner.'' *Matter of Quintero,* 18 I&N Dec. 348, 350 (BIA 1982), *aff'd sub nom. Quintero-Martinez* v. *INS,* 745 F.2d 67 (9th Cir. 1984); *see also Matter of Roussis,* 18 I&N Dec. 256, 258 (BIA 1982) (''It has long been held that when enforcement officials of the [Immigration and Naturalization Service (''INS''), now DHS] choose to initiate proceedings against an alien and to prosecute those proceedings to a conclusion, the immigration judge is obligated to order deportation if the evidence supports a finding of deportability on the ground charged.''); *cf. Lopez-Telles* v. *INS,* 564 F.2d 1302, 1304 (9th Cir. 1977) (''Rather, these decisions plainly hold that the

---

[10] Similar language for immigration judges also occurs in 8 CFR 1240.1(a)(1)(iv) and (c).

[11] ''In 1984, the Chief Immigration Judge instructed immigration judges to consider administrative closure as one means of addressing the 'recurring problem' of respondents' failure to appear at hearings. The Chief Immigration Judge did not identify any basis for this authority. Nonetheless, immigration judges and the Board soon employed administrative closure in all types of removal proceedings. By 1988, the Board described the practice as an 'administrative convenience.' Between 1988 and 2012, Board precedent held that an immigration judge could grant administrative closure only where both parties supported the request. These decisions again assumed without explanation that immigration judges and the Board possessed this general authority.'' *Matter of Castro-Tum,* 27 I&N Dec. 271, 273–74 (A.G. 2018) (citations omitted).

[12] Administrative closure is not in itself relief from removal. *Matter of W–Y–U–,* 27 I&N Dec. 17, 18 (BIA 2017) (''Administrative closure is not a form of relief from removal and does not provide an alien with any immigration status.''), *overruled on other grounds by Matter of Castro-Tum,* 27 I&N Dec. 271. Courts, however, have routinely (and erroneously) characterized it as such. *See, e.g., Caballero-Martinez* v. *Barr,* 920 F.3d 543, 549–550 (8th Cir. 2019); *Perez Alba* v. *Gonzales,* 148 F. App'x 593, 594 (9th Cir. 2005); *Singh* v. *Gonzales,* 123 F. App'x 299, 300 (9th Cir. 2005); *Mickeviciute* v. *INS,* 327 F.3d 1159, 1161 n.1 (10th Cir. 2003).

immigration judge is without discretionary authority to terminate deportation proceedings so long as enforcement officials of the INS choose to initiate proceedings against a deportable alien and prosecute those proceedings to a conclusion. The immigration judge is not empowered to review the wisdom of the INS in instituting the proceedings. His powers are sharply limited, usually to the determination of whether grounds for deportation charges are sustained by the requisite evidence or whether there has been abuse by the INS in its exercise of particular discretionary powers. This division between the functions of the immigration judge and those of INS enforcement officials is quite plausible and has been undeviatingly adhered to by the INS.''); *Matter of Silva-Rodriguez,* 20 I&N Dec. 448, 449–50 (BIA 1992) (undue delay by an immigration judge may frustrate or circumvent statutory purpose of prompt immigration proceedings); *Matter of Yazdani,* 17 I&N Dec. 626, 630 (BIA 1991) (''However, so long as the enforcement officials of the [INS] choose to initiate proceedings against an alien and to prosecute those proceedings to a conclusion, the immigration judge and the Board must order deportation if the evidence supports a finding of deportability on the ground charged.'').

In 2012, however, the Board relied, in part, on language in 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to hold that immigration judges may unilaterally and indefinitely suspend immigration proceedings through the use of administrative closure even if one party objected. *Matter of Avetisyan,* 25 I&N Dec. 688, 697 (BIA 2012), *overruled by Matter of Castro-Tum,* 27 I&N Dec. 271. The *Avetisyan* decision was overruled in 2018 when the Attorney General, in accordance with his statutory authority, 8 U.S.C. 1103(a)(1), held that immigration judges and Board members ''do not have the general authority to suspend indefinitely immigration proceedings by administrative closure'' and that they ''may only administratively close a case where a previous regulation or a previous judicially approved settlement expressly authorizes such an action.'' *Matter of Castro-Tum,* 27 I&N Dec. at 271. Notwithstanding the Attorney General's controlling interpretation of the law under 8 U.S.C. 1103(a)(1), the question whether 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) allow immigration judges and Board members to indefinitely adjourn immigration proceedings through the use of administrative closure continues to

drive litigation and cause inconsistent application of immigration laws. *See, e.g., Romero* v. *Barr,* 937 F.3d 282 (4th Cir. 2019) (holding that 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) allow immigration judges and Board members to indefinitely postpone immigration proceedings through the use of administrative closure and abrogating *Matter of Castro-Tum* within the jurisdiction of the Fourth Circuit); *see also Morales* v. *Barr,* 963 F.3d 629 (7th Cir. 2020) (same for the Seventh Circuit).[13]

### I. Sua Sponte Reopening or Reconsideration of Closed Cases

In general, motions to reopen or reconsider a case in which the immigration judge or the Board has rendered a decision are subject to time and number limitations. These limitations were initially promulgated by regulation. *See* 8 CFR 3.2, 3.23, 103.5, and 208.19 (1996). Congress subsequently enacted statutory time and number limitations for reopening or reconsideration of removal proceedings, as provided in section 240(c)(6) and (7) of the INA, 8 U.S.C. 1229a(c)(6) and (7). In general, the EOIR regulations and the statutory provisions of section 240 of the INA provide that an alien may file only one motion to reconsider the decision of the immigration judge or the BIA and must do so within 30 days of the entry of the final administrative order, and that the alien may file only one motion to reopen the decision of the immigration judge or the BIA and must do so within 90 days of the entry of the final administrative order. However, there are specific statutory exceptions from these time limits in cases involving in absentia orders of removal, asylum claims based on changed country conditions after the entry of the previous decision, or certain claims involving battered spouses, children, or parents. *See* 8 U.S.C. 1229a(c)(7)(C)(ii)–(iv). These principles are embodied in the current EOIR regulations at 8 CFR 1003.2 and 1003.23.

As a further exception to the time and number limitations on motions to reopen and reconsider, both the BIA and immigration judges presently have the authority to reopen or reconsider a case *sua sponte. See* 8 CFR 1003.2(a), 1003.23(b)(1). The Board has made clear that this authority ''is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship.'' *Matter of J–J–,* 21 I&N Dec. 976, 984 (BIA 1997); *see also Matter of G–D–,* 22 I&N Dec. 1132, 1133–34 (BIA 1999) (explaining that the Board's discretion to reconsider a case *sua sponte* is ''an extraordinary remedy reserved for truly exceptional situations''). It has further emphasized the importance of both complying with the time and number limitations on motions and ensuring the finality of immigration proceedings and of not utilizing its *sua sponte* authority to circumvent those considerations. *Matter of Beckford,* 22 I&N Dec. at 1221.

### J. Certification Authority

In most instances, decisions by immigration judges are brought to the Board for review through an appeal filed by the respondent or by DHS. Under 8 CFR 1003.38, the parties have 30 calendar days from the issuance of an oral decision or the mailing of a written decision to file an appeal with the Board. However, apart from the appeal process, the Secretary of Homeland Security, any other duly authorized officer of DHS, any immigration judge, or the Board itself may certify an immigration judge's decision or a reviewable DHS decision for review by the Board. 8 CFR 1003.1(c); *see also* 8 CFR 1001.1(c) and (d). The Board can certify cases only for matters within its appellate jurisdiction. 8 CFR 1003.1(c); *Matter of Sano,* 19 I&N Dec. 299, 301 (BIA 1985). Further, the Board cannot certify cases or issues implicitly. *Matter of Jean,* 23 I&N Dec. 373, 380 n.9 (A.G. 2002). Although the regulations do not specify any standard governing the Board's certification to itself, the Attorney General has concluded that the Board's discretion is not unbounded and is analogous to its authority to reopen or reconsider proceedings *sua sponte. Id.*

### K. Timeliness of the Adjudication of BIA Appeals and Composition of BIA Panels

Except in limited circumstances, appeals assigned to a single Board member are to be decided within 90 days of completion of the record on appeal, whereas appeals assigned to a three-member panel are to be decided within 180 days (including any

---

[13] *Matter of Castro-Tum* continues to apply to immigration proceedings outside of the Fourth and Seventh Circuits. Also, neither *Romero* nor *Morales* addressed the statutory commitment to the Attorney General to make ''controlling'' determinations of immigration laws under 8 U.S.C. 1103(a)(1); the regulatory specifications that only the Director, the Chief Appellate Immigration Judge, and the Chief Immigration Judge—and not line appellate immigration judges or line immigration judges—have authority to defer adjudication of cases; nor the evident superfluousness of those specifications for the Chief Appellate Immigration Judge and the Chief Immigration Judge if all appellate immigration judges and immigration judges already possess that authority. *See* 8 CFR 1003.0(b)(1)(ii), 1003.1(a)(2)(i)(C), 1003.9(b)(3); *compare* 8 CFR 1003.0(b)(1)(ii) *and* 1003.1(a)(2)(i)(C), *with* 8 CFR 1003.1(d)(1)(ii) *and* 1003.10(b).

**52498**    **Federal Register** / Vol. 85, No. 166 / Wednesday, August 26, 2020 / Proposed Rules

additional opinion by a member of the panel) of assignment to the panel. 8 CFR 1003.1(e)(8)(i). The regulations do not specify completion parameters for other categories of appeals, such as interlocutory appeals and appeals subject to summary dismissal, nor do they specify time frames for pre-adjudicatory processing such as requesting the record of proceeding and ordering transcripts. *See id.*

If an appeal is taken from a decision of an immigration judge, the record of proceeding is forwarded to the Board upon request or order of the Board. 8 CFR 1003.5(a). Where transcription of a decision is required, the immigration judge shall review the transcript within 14 days of receipt or within 7 days after returning to his or her duty station. *Id.* If an appeal is taken from a decision by DHS, the record of proceeding shall be forwarded to the Board by the DHS officer upon receipt of the briefs or expiration of the time allowed for briefs. 8 CFR 1003.5(b); *see also* 8 CFR 1001.1(c).

## IV. Proposed Changes

The changes proposed by the Department are summarized below. The changes discussed in subsections A through G, K, and L below are intended to apply to appeals filed on or after the effective date of publication. The changes discussed in subsections H through J below are intended to be effective on the date of publication.

### A. Briefing Extensions

First, this NPRM would reduce the maximum allowable time for an extension of the briefing schedule to 14 days. Although current regulations allow an extension of up to 90 days, Board policy for many years has been to grant an extension of only 21 days regardless of the amount of time actually requested. BIA Practice Manual at 65; *cf.* Revised General Practice Regarding First Briefing Deadline Extension Request for Detained Aliens, 71 FR 51856, 51857 (Aug. 31, 2006) (noting that Board policy will continue to allow granting briefing extension requests of 21 days in detained cases). Because briefing extensions are disfavored in the first instance, BIA Practice Manual at 65 ("In the interest of fairness and the efficient use of administrative resources, extension requests are not favored."), and because the Board expects any extension request to be for the purpose of completing or finalizing a brief—rather than drafting it from the beginning—there is no justification for a lengthy extension period. Moreover, reducing the amount of time for an extension will decrease

the likelihood of gamesmanship associated with simultaneous briefing in which one party files a last-minute extension request and then has a lengthy period of time to review and address arguments made in the opposing party's brief that was already filed consistent with the prior deadline.

If the appeal is from an immigration judge decision in a case that is transcribed, the BIA will continue to set the briefing schedule after the transcript becomes available. This proposal would not eliminate the BIA's continued ability to extend the time allowed for filing a brief for good cause shown or to consider a late-filed brief as a matter of discretion. 8 CFR 1003.3(c). However, it would expressly limit the number of allowable extensions consistent with current Board policy "*not* to grant second briefing extension requests." BIA Practice Manual at 65 (emphasis in original).

The proposed rule further clarifies that there is no right to a briefing extension by any party in any case and prohibits the Board from adopting a policy of granting all extension requests without an individualized finding of good cause. Should the Board determine that supplemental briefing may be beneficial in particular cases, however, the proposed rule allows the Board to ask for such briefing after the expiration of the initial briefing schedule.

Under the proposed framework, depending on whether the case requires the preparation of a transcript, whether the transcript can be timely prepared, and whether a briefing extension is granted, a party would have at least a month and potentially up to almost three months to submit a brief if it chooses, from the time an appeal is filed, which the Department expects to be ample time even without access to the transcript to address the issues in most cases. Approximately 78 percent of respondents have representation on appeal, and DHS is represented in all appeals. EOIR, *Adjudication Statistics: Current Representation Rates* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1062991/download.* Consequently, in most cases, both parties have reviewed the case at the time an appeal is filed. Moreover, the issues should be squarely presented in the Notice of Appeal, which requires specific details about the case and arguments to be considered, well before any briefs are filed. Under 8 CFR 1003.3(b), the party taking the appeal must identify the reasons for the appeal in the Notice of Appeal (Form EOIR–26 or Form EOIR–29) or in any attachments thereto, in order to avoid summary dismissal pursuant to § 1003.1(d)(2)(i).

Such a statement must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged. Moreover, if a question of law is presented, supporting authority must be cited. If the dispute is over the findings of fact, the specific facts contested must be identified. In addition, where the appeal concerns discretionary relief, the appellant must state whether the alleged error relates to statutory grounds of eligibility or to the exercise of discretion and must identify the specific factual and legal finding or findings that are being challenged. Furthermore, the parties frequently do not file a brief at all.[14] For instance, in FY 2019, the Board issued a briefing schedule in approximately 17,069 cases. Of those, the respondent did not file a brief in approximately 4,400 cases, DHS did not file a brief in roughly 10,900 cases, and neither party filed a brief in over 3,000 cases.[15]

Consequently, although the changes will allow the Board to more expeditiously address its growing caseload, they should have relatively little impact on the preparation of cases by the parties on appeal. Further, it is expected that these changes will shorten the time required for a case to work through the BIA's adjudicatory process, enabling the BIA to maximize its adjudicatory capacity and EOIR to meet its obligation to complete cases in an expeditious manner. EOIR will be able to adjudicate more cases annually, ensuring that both parties receive a final decision expeditiously following notice and an opportunity to be heard consistent with the requirements of due process.

### B. Simultaneous Briefing

Additionally, the Department proposes to adopt simultaneous briefing schedules instead of consecutive briefing schedules for cases involving aliens who are not in custody. This change would reduce adjudicatory delay by shortening the briefing period for non-detained cases from a total of 63 days (21 days for the initial brief, plus a 21-day extension, plus 21 days for the responsive brief) to a total of 35 days (21 days for simultaneous briefs, plus a 14-day extension), not counting any time needed for preparation of a transcript

---

[14] Neither the appellee nor the appellant is required to submit a brief. The party taking an appeal will indicate on Form EOIR 26, Notice of Appeal from a Decision of an Immigration Judge, whether it intends to submit a brief on appeal by checking a box.

[15] These numbers treat the filing of a motion to summarily affirm the decision below as the filing of a brief. These numbers do not exclude cases in which a party indicated on the Notice of Appeal that it did not intend to file a separate brief.

AR.00314

and setting the briefing schedule or filing of a reply brief, if applicable. This change in turn will enable the BIA to more expeditiously review and adjudicate non-detained appeals. The proposed regulation maintains the BIA's ability to permit reply briefs in certain cases. 8 CFR 1003.3(c).

The Department previously considered simultaneous briefing for all appeals but ultimately adopted the practice only for detained appeals. 67 FR 54895. Simultaneous briefing has worked well for appeals involving aliens who are in custody, and upon further consideration, there is no apparent reason not to apply it to non-detained cases as well, particularly when both parties are frequently represented on appeal and one or both parties may often choose not to file a brief at all. It is also important to harmonize the briefing requirements to the maximum extent possible to ensure that all cases—and not solely detained cases—are adjudicated in a timely manner. Both the parties and the Department have a strong interest in ensuring that appeals are adjudicated expeditiously, and there is currently no legal or operational reason to adjudicate non-detained cases in a less efficient manner than detained cases. In light of the Department's experience with simultaneous briefing in detained cases, the Department believes that, whatever basis there may have been previously to treat the two categories of cases differently, *see id.,* those reasons are no longer sufficiently compelling to warrant the continued disparate treatment of detained and non-detained cases on appeal. To that end, the Department believes that implementing simultaneous briefing would allow non-detained cases to be adjudicated in a more expeditious manner. The Department also notes that this change is consistent with a previously-expressed public concern that treating two classes of appellants differently—*i.e.,* non-detained aliens and detained aliens—was "inequitable and fundamentally unfair." *See* 61 FR 18902–03.

## C. BIA Remands for Identity, Law Enforcement, or Security Investigations or Examinations

The Department proposes to revise 8 CFR 1003.1(d)(6)(ii) to provide that, when a case before the BIA requires completing or updating identity, law enforcement, or security investigations or examinations, the exclusive course of action would be for the BIA to place the case on hold while identity, law enforcement, or security investigations or examinations are being completed or

updated, unless DHS reports that identity, law enforcement, or security investigations or examinations are no longer necessary or until DHS does not timely report the results of completed or updated identity, law enforcement, or security investigations or examinations. Under this NPRM, the BIA would no longer remand a case to the immigration court for the sole purpose of completing or updating identity, law enforcement, or security investigations or examinations, which has become a common practice in the 14 years since the relevant regulations were last updated. *See, e.g., Matter of S–A–K– and H–A–H–,* 24 I&N Dec. 464, 466 (BIA 2008) (order sustaining appeal and remanding the case to the immigration judge for DHS to complete or update background checks). There is no apparent operational reason why the BIA cannot hold a decision until it receives information from DHS regarding completed or updated identity, law enforcement, or security investigations or examinations. And routinely remanding cases solely for that purpose both needlessly delays resolution of a case and takes up space on an immigration court docket that could otherwise be used to address another case. In light of the growing immigration court backlog and the necessity to preserve overburdened judicial resources at the immigration courts, it is appropriate to remove the option to remand cases to the immigration court for the sole purpose of completing or updating identity, law enforcement, or security investigations or examinations to ensure that such cases are addressed as expeditiously as possible.[16] The Board need not hold a case, however, if it decides to dismiss a respondent's appeal or to deny the relief or protection sought. 8 CFR 1003.1(d)(6)(iv).[17]

Only if the results are not reported by DHS within 180 days of the Board's notice of placing a case on hold will the Board remand a case to an immigration court for further proceedings. The proposed rule makes clear, however,

that the Board may also remand a case if the results of the identity, law enforcement, or security investigations or examinations raise an issue that should be considered by the immigration judge in the first instance.

Additionally, the Department proposes to authorize the BIA to deem an application abandoned when the applicant fails, after being notified by DHS, to comply with the requisite procedures for DHS to complete the identity, law enforcement, or security investigations or examinations within 90 days of the BIA's notice that the case is being placed on hold for the completion of the identity, law enforcement, or security investigations or examinations. This change provides the BIA with similar authority already delegated to immigration judges pursuant to 8 CFR 1003.47(c) and (d).[18] The Department believes that authorizing the BIA to deem such applications abandoned will promote uniformity in EOIR adjudicatory procedure and maximize the prompt adjudication of cases.

## D. Finality of BIA Decisions and Voluntary Departure Authority

The Department proposes to amend 8 CFR 1003.1(d)(7) to provide further guidance regarding the finality of BIA decisions. First, the Department proposes to add a new paragraph (d)(7)(i) to clarify that the BIA has authority to issue final orders when adjudicating an appeal, including final orders of removal when a finding of removability has been made by an immigration judge and an application for protection or relief from removal has been denied;[19] grants of relief or

---

[16] As discussed further, *infra,* the Board may remand cases to the immigration judge in which the identity, law enforcement, or security investigations or examinations need to be completed or updated but DHS has not timely reported the results of those checks. Further, DHS may move to remand a case based on the results of the identity, law enforcement, or security investigations or examinations.

[17] The proposed rule makes conforming edits to 8 CFR 1003.1(d)(6)(iv) due to the proposed changes to 8 CFR 1003.1(d)(6)(ii). It also makes a clarifying edit to 8 CFR 1003.1(d)(6)(iv) in recognition of the fact that the Board considers appeals of applications for protection—*e.g.,* withholding of removal under the INA or protection under the CAT—in addition to appeals of applications for relief.

[18] Because DHS is responsible for biometrics checks for detained aliens, because a non-detained alien will have already had biometrics taken at the immigration court level, and because the biometrics checks can often be updated without requiring the alien to be fingerprinted again, *see* U.S. Citizenship & Immigration Servs., Dep't of Homeland Sec., *Fingerprint Check Update Request: Agreement Between USCIS and ICE* (July 27, 2016), *https:// www.uscis.gov/forms/fingerprints/fingerprint-check-update-request-agreement-between-uscis-and-ice,* the alien will not generally need to do anything once the BIA issues its notice. Nevertheless, the BIA's notice will notify the alien that, if the alien is non-detained and biometrics need to be taken again, DHS will contact the alien.

[19] An immigration judge generally will not consider an application for protection or relief from removal until a finding of removability has been made. Thus, in cases in which an immigration judge has terminated proceedings after finding an alien not removable, DHS has appealed that decision, and the Board sustains the appeal, the Board would remand that case to the immigration judge for consideration of any applications for protection or relief the alien may choose to file rather than issuing an order of removal in the first instance.

**52500**    **Federal Register** / Vol. 85, No. 166 / Wednesday, August 26, 2020 / Proposed Rules

protection from removal; and orders to terminate or dismiss proceedings. Most circuit courts to consider this issue have concluded that the BIA possesses such authority.[20] *See, e.g., Sosa-Valenzuela* v. *Gonzales,* 483 F.3d 1140, 1146 (10th Cir. 2007) (collecting cases); *accord Solano-Chicas* v. *Gonzales,* 440 F.3d 1050, 1054 (8th Cir. 2006) ("[T]he BIA's power is not just one of merely affirming or reversing IJ decisions; it may order relief itself. We find it entirely consistent that the BIA also may deny status and order an alien removed." (internal citations omitted)).

The Department also proposes to add a new paragraph (d)(7)(iii) to 8 CFR 1003.1 to delegate clear authority to the BIA to consider issues relating to the immigration judge's decision on voluntary departure *de novo* and, within the scope of the BIA's review authority on appeal, to issue final decisions on requests for voluntary departure based on the record of proceedings. The proposed rule enumerates procedural and substantive requirements related to this authority, including, *inter alia,* the content of advisals that the BIA must provide to the alien, the means by which the BIA must provide advisals, the means by which an alien may accept or decline the BIA's grant of voluntary departure, and how an alien is required to post a voluntary departure bond. These amendments follow the current regulations regarding voluntary departure before the immigration court at 8 CFR 1240.26 and are intended to create analogous authority at the BIA, based on the record developed at the immigration judge hearing.

Additionally, the proposed rule would directly state that the BIA may not remand a case to the immigration court solely to consider a request for voluntary departure under section 240B(b) of the INA. Because the Board may provide relevant advisals to a respondent regarding voluntary departure; because appeals raising the issue of voluntary departure will proffer a respondent's eligibility for that relief before the immigration court (or else the issue will be deemed waived); and because the record will otherwise contain evidence of such eligibility (or else the opportunity to present such evidence will be deemed waived), a remand solely to consider that issue is a waste of resources and places wholly

unnecessary burdens on immigration courts. In short, there is no operational reason that the BIA cannot resolve a request for voluntary departure rather than remanding the case to an immigration judge, prolonging the case unnecessarily, and inviting an additional appeal if the respondent disagrees with the immigration judge's determination. Any BIA final order or grant of voluntary departure would continue to be a legal determination based upon the facts as found by the immigration judge during the course of the underlying proceedings, subject to a "clearly erroneous" standard. Moreover, for cases in which an immigration judge failed to provide advisals related to a request for voluntary departure, the Board can provide such advisals without needing to engage in factfinding—and without remanding the case—because the advisals are established by regulation.

Together with the amendment to the identity, law enforcement, or security investigations or examinations procedures described above, these amendments would ensure that the BIA is empowered to make all relevant decisions related to an appeal and prevent the BIA from issuing an order to remand a case solely to instruct the immigration judge to issue a particular final order that is within the BIA's authority.

*E. Prohibition on Consideration of New Evidence, Limitations on Motions To Remand, Factfinding by the BIA, and the Standard of Review*

The Department proposes several changes to clarify the BIA's ability to take certain actions in adjudicating an appeal to ensure that appeals are adjudicated in a timely fashion without undue remands and consistent with the applicable law. First, the Department proposes to limit the scope of motions to remand that the BIA may consider. Under the proposed paragraph (d)(7)(v) to 8 CFR 1003.1, the BIA would be prohibited from receiving new evidence on appeal, remanding a case for the immigration judge to consider new evidence in the course of adjudicating an appeal, or considering a motion to remand based on new evidence. Parties who wish to have new evidence considered in other circumstances may file a motion to reopen in accordance with the standard procedures for such motions, *i.e.,* compliance with the substantive requirements for such a motion at 8 CFR 1003.2(c). There would be three exceptions to these prohibitions. The first would be for new evidence that is the result of identity, law enforcement, or security

investigations or examinations, including civil or criminal investigations of immigration fraud.[21] The second would be for new evidence pertaining to a respondent's removability under the provisions of 8 U.S.C. 1182 and 8 U.S.C. 1227. The third would be for new evidence that calls into question an aspect of the jurisdiction of the immigration courts, such as evidence pertaining to alienage, *e.g., Matter of Fuentes,* 21 I&N Dec. 893, 898 (BIA 1997) (EOIR has no jurisdiction over United States citizens), or EOIR's authority vis-à-vis DHS regarding an application for immigration benefits, *see, e.g.,* 8 U.S.C. 1158(b)(3)(C) (DHS has initial jurisdiction over an asylum application filed by a genuine unaccompanied alien child (as defined in 6 U.S.C. 279(g))); *Matter of M–A–C–O–,* 27 I&N Dec. 477, 480 (BIA 2018) (an immigration judge has initial jurisdiction over an asylum application filed by a respondent who was previously determined to be an unaccompanied alien child but who turned 18 before filing the application); *Matter of Martinez-Montalvo,* 24 I&N Dec. 778, 778–89 (BIA 2009) (immigration judges have no jurisdiction to adjudicate an application filed by an arriving alien seeking adjustment of status under the Cuban Refugee Adjustment Act of November 2, 1966, with the limited exception of an alien who has been placed in removal proceedings after returning to the United States pursuant to a grant of advance parole to pursue a previously filed application); *Matter of Singh,* 21 I&N Dec. 427, 433–34 (BIA 1996) (EOIR lacks jurisdiction over legalization applications pursuant to section 245A of the INA).

Ordinarily the BIA does not consider new evidence on appeal. *Matter of Fedorenko,* 19 I&N Dec. 57, 74 (BIA 1984). In other cases, however, it will remand a case for consideration of new evidence when the alien "ha[s] met the 'heavy burden' of showing that the new evidence presented 'would likely change the result in the case.' " *Matter of L–O–G–,* 21 I&N Dec. 413, 420 (BIA 1996) (quoting *Matter of Coelho,* 20 I&N Dec. at 473). It will also sometimes construe the submission of new evidence on appeal as a motion to remand for further factfinding pursuant to 8 CFR 1003.1(d)(3)(iv). The lines

---

[20] The Department is not aware of a circuit court that has concluded to the contrary. Although the Ninth Circuit in 2004 held the Board lacked such authority, it reversed itself in 2007 and agreed with three other circuits that the Board does possess such authority. *See Lolong* v. *Gonzales,* 484 F.3d 1173, 1176 (9th Cir. 2007) (overruling *Molina-Camacho* v. *Ashcroft,* 393 F.3d 937 (9th Cir. 2004)).

[21] The proposed rule makes clear that nothing in the regulation prohibits the Board from remanding a case based on new evidence or information obtained after the date of the immigration judge's decision as a result of identity, law enforcement, or security investigations or examinations, including investigations occurring separate from those required by 8 CFR 1003.47.

between these three views of new evidence on appeal are not clearly delineated and may lead to inconsistent application. *Cf. Ramirez-Alejandre* v. *Ashcroft,* 319 F.3d 365, 376 (9th Cir. 2003) ("However, the BIA was inconsistent with respect to its treatment of relevant supplemental evidence tendered on appeal. It did not have formal procedures for consideration of such evidence. In some cases, it accepted the evidence; in other cases it remanded for further findings; and in some, like the present case, it declared itself precluded from entertaining the evidence."). Their lack of clarity also allows gamesmanship on appeal—*e.g.,* a respondent whose application is denied might seek additional evidence to present on appeal in order to procure a second attempt at establishing eligibility, even though such evidence should have been presented in the first instance. Although a motion to remand must "be based on new, previously unavailable" evidence, *Matter of W–Y–C– & H–O–B–,* 27 I&N Dec. 189, 192 (BIA 2018), respondents frequently seek remands based on evidence that could have been submitted to the immigration judge in the first instance. Consequently, to eliminate confusion, avoid inconsistent results, and encourage the presentation of all available and probative evidence at the trial level before an immigration judge, the Department believes it is appropriate to establish a clearer, bright-line rule regarding the submission of new evidence on appeal.

Prohibiting the BIA from considering new evidence on appeal as a ground for remand is in keeping with the general authority of EOIR adjudicators to manage the filing of applications and collection of relevant documents. Additionally, this prohibition reduces the likelihood of the need for a remand to the immigration court given the BIA's general inability to engage in factfinding about the newly proffered evidence. The proposed exceptions cover situations in which the need for a remand due to new evidence—*e.g.,* to address an issue of alienage or removability—overrides any other consideration because the new evidence calls into question the availability or scope of proceedings in the first instance. In all other situations, the potential for gamesmanship, the need to ensure that evidence is heard in a timely manner at the trial level, and the operational burden of sending the case back to an immigration judge to begin the adjudicatory process anew strongly counsel against allowing the Board to consider allegedly new evidence on direct appeal. Given the

requirement to submit relevant evidence within the deadlines set by the immigration judge and the ability to submit newly discovered or previously unavailable evidence as part of a motion to reopen, the Department believes that these changes are an appropriate means to reduce remands and ensure the BIA is able to move forward independently with as many appeals as possible without further delay.

An immigration judge loses jurisdiction over a motion to reopen that is pending when an appeal of the immigration judge's decision is filed with the BIA, and an immigration judge lacks jurisdiction over a motion to reopen filed while an appeal is already pending at the BIA. *See* 8 CFR 1003.23(b)(1). The proposed rule would remove 8 CFR 1003.2(c)(4) and eliminate the treatment of motions to remand for the same reasons that the proposed rule seeks to establish clearer rules for the submission of new evidence and the handling of remands by the BIA. Due to the requirement to submit relevant evidence within the deadlines set by the immigration judge and the ability to submit newly discovered or previously unavailable evidence as part of a motion to reopen, these changes are an appropriate means to reduce remands and ensure the BIA is able to move forward independently with as many appeals as possible without further delay.

The Department proposes to more clearly delineate the circumstances in which the BIA may engage in factfinding on appeal. Because the BIA is not authorized to consider new evidence on appeal, *see* 8 CFR 1003.1(d)(3)(iv), and because an issue not raised before the immigration judge is waived, *see, e.g., Matter of J–Y–C–,* 24 I&N Dec. 260, 266 n.1 (BIA 2007), the BIA should not have any need to engage in factfinding in the mine run of immigration case appeals, nor should it have a need to remand for further factfinding. To that end, the proposed rule more clearly spells out the limitations on the Board's ability to remand for additional factfinding, subject to an exception related to factual issues raised by identity, law enforcement, or security investigations or examinations, or other investigations as noted above in footnote 21.

Nevertheless, the Department recognizes that there may be situations in which the Board should engage in factfinding and proposes to clarify limited circumstances in which the Board may do so—*i.e.,* situations in which the Board may take administrative notice of facts that are

not reasonably subject to dispute, such as current events, the contents of official documents outside the record, or facts that can be accurately and readily determined from official government sources and whose accuracy is not disputed. The proposed rule makes clear, however, that if the Board intends to administratively notice a fact outside the record that would be the basis for overturning a grant of relief or protection issued by an immigration judge, the Board must give notice to the parties and an opportunity for them to address the matter.

The Department further proposes to amend the regulations to make clear that the Board may take administrative notice of any undisputed facts contained in the record. There is simply no operational or legal reason to remand a case for factfinding if the record already contains evidence of undisputed facts, and the BIA may appropriately rely on such facts without remanding the case. *See generally Guerrero-Lasprilla* v. *Barr,* 140 S. Ct. 1062, 1072 (2020) (holding that "the application of a legal standard to established or undisputed facts" is a question of law).[22] To that end, the proposed rule also makes clear that the BIA may affirm the decision of the immigration judge or DHS on any basis supported by the record, including a basis supported by facts that are not disputed.[23]

Finally, the proposed rule would make clear that the BIA cannot remand a case based solely on the "totality of the circumstances." Although the Board sometimes uses that standard to justify remanding a case, there is no statutory or regulatory basis for this standard. Accordingly, the proposed rule makes clear that the BIA could not employ such a standard in its review.

---

[22] Facts may be undisputed when the one party proffers them and the opposing party concedes the truth of those facts, *see, e.g., Matter of T–M–H– & S–W–C–,* 25 I&N Dec. 193, 193–94 (BIA 2010), or when they are found by the immigration judge and they are "not meaningfully challenged on appeal," *Matter of Diaz & Lopez,* 25 I&N Dec. 188, 189 (BIA 2010).

[23] Although the Board is not an Article III appellate tribunal, this rule also follows the longstanding principle of federal appellate review that a reviewing court may affirm a lower court decision on any basis contained in the record. *See, e.g., Richison* v. *Ernest Group, Inc.,* 634 F.3d 1123, 1130 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal."); *cf. Helvering* v. *Gowran,* 302 U.S. 238, 245 (1937) ("In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.").

*F. Scope of a Board Remand*

When the Board remands a case, it divests itself of jurisdiction unless jurisdiction is expressly retained. *Matter of Patel,* 16 I&N Dec. at 601. When this is done, unless the Board qualifies or limits the remand for a specific purpose, the remand is effective for the stated purpose and for consideration of any and all other matters as appropriate. *Id.* Cases remanded for the completion of identity, law enforcement, or security investigations or examinations pursuant to 8 CFR 1003.47(h) are also treated as general remands, and an immigration judge may consider new evidence in such a remanded case "if it is material, was not previously available, and could not have been discovered or presented at the former hearing." *Matter of M–D–,* 24 I&N Dec. at 141. Circuit courts have construed *Matter of Patel* to mean that the BIA can only limit the scope of its remand if it (1) expressly retains jurisdiction and (2) qualifies or limits the scope of remand. *Bermudez-Ariza,* 893 F.3d at 688; *Johnson,* 286 F.3d at 701.

Confusion arises, however, because no regulation allows the Board to expressly retain jurisdiction over a remanded case, and the Board rarely, if ever, does so in practice. *See* BIA Practice Manual at 76 ("Once a case has been remanded to the Immigration Judge, the only motion that the Board will entertain is a motion to reconsider the decision to remand."). Consequently, even though a Board remand may clearly be intended for a limited purpose, the Board's failure to explicitly state that it is retaining jurisdiction over an appeal while simultaneously remanding the case— consistent with both its practice and the lack of clear regulatory authority to do so—means that the remand is not actually so limited. *See, e.g., Bermudez-Ariza,* 893 F.3d at 688–89 ("We think it likely that the BIA limited the scope of remand to a specific purpose in this case by stating that it was remanding 'for further consideration of the respondent's claim under the Convention Against Torture.' That said, the BIA's remand order nowhere mentioned jurisdiction, much less expressly retained it. Thus, irrespective of whether the BIA qualified or limited the scope of remand, the IJ had jurisdiction to reconsider his earlier decisions . . . .").

Put differently, even if the Board clearly indicates that the remand is for a limited purpose, most—if not all—of its remands would be interpreted to be general remands allowing for consideration of issues well beyond the intended scope of the remand. Consequently, even where the Board clearly intends a remand to be for a limited purpose, an immigration judge faces potential confusion regarding the scope of the remand and will often treat that order as a general remand that would allow consideration of other issues. *See id.* (a remand to consider a claim under the CAT does not preclude consideration of an asylum claim because the Board did not specifically reserve jurisdiction); *see also Matter of M–D–,* 24 I&N Dec. at 141–42 (a remand for completion of background checks for one application does not preclude consideration of new evidence for another application).

To eliminate this confusion for immigration judges, the Department proposes to amend the regulations to make it clear that the Board may limit the scope of a remand while simultaneously divesting itself of jurisdiction on remand.[24] Thus, a remand for a limited purpose—*e.g.,* the completion of identity, law enforcement, or security investigations or examinations—would be limited solely to that purpose consistent with the Board's intent, and the immigration judge would be precluded from considering any issues beyond the scope of the remand.

*G. Immigration Judge Quality Assurance Certification of a BIA Decision*

To ensure the quality of Board decision-making, the Department proposes to allow immigration judges to certify BIA decisions reopening or remanding proceedings for further review by the Director in situations in which the immigration judge alleges that the BIA made an error. Currently, there is no clear mechanism to efficiently address concerns regarding errors made by the BIA in reopening or remanding proceedings. Although parties may file a motion to reconsider, that process is cumbersome, time-consuming, and may not fully address the alleged error. If the error inures to the favor of DHS, the respondent must again wait for an order of removal in order to bring another appeal, either to the BIA or to federal court through a petition for review. If the error inures to the favor of the respondent, DHS has no effective mechanism of correcting the error, except through another hearing and an appeal to the BIA. Additionally, an erroneous remand by the BIA inappropriately affects an immigration judge's performance evaluation by affecting that judge's remand rate, which is a component of the judge's performance evaluation. Overall, an immigration judge is in the best position to identify an error made by the BIA and to seek to remedy it expeditiously without needlessly placing additional burdens on the parties. Consequently, the Department has determined that it is appropriate to ensure immigration judges have a mechanism through which they can request the correction of errors by the Board and thereby improve the quality of adjudications as whole.

The Department's proposal is limited only to cases in which the immigration judge articulates a specific error allegedly committed by the Board within a narrow set of criteria: (1) The Board decision contains a typographical or clerical error affecting the outcome of the case; (2) the Board decision is clearly contrary to a provision of the INA, any other immigration law or statute, any applicable regulation, or a published, binding precedent; (3) the Board decision is vague, ambiguous, internally inconsistent, or otherwise did not resolve the basis for the appeal; or (4) a material factor pertinent to the issue(s) before the immigration judge was clearly not considered in the Board decision. These criteria are used in similar circumstances at other adjudicatory agencies, *e.g.,* HALLEX I–3–6–10 (delineating criteria for protests of decisions by SSA ALJs or administrative appellate judges), and they are intended to strike an appropriate balance in situations in which errors by the Board should be corrected as quickly as possible.

The Department's proposal also outlines three procedural criteria that an immigration judge must follow in order to certify a Board decision for review: (1) The certification order must be issued within 30 days of the Board decision if the alien is not detained and within 15 days of the Board decision if the alien is detained; (2) the immigration judge, in the certification order, must specify the regulatory basis for the certification and summarize the underlying procedural, factual, or legal basis; and (3) the immigration judge must provide notice of the certification to both parties. To ensure a neutral arbiter between the immigration judge and the Board, such certification orders would be reviewed by the Director. In reviewing such orders, the Director would have delegated authority from the Attorney General similar to that of the Board but would be limited in deciding the merits of the case. For a case certified to the Director, the Director would be allowed to dismiss

---

[24] The only exception would be cases in which the Board remands a case to an immigration court due to the court's failure to forward the administrative record in response to the Board's request.

AR.00318

the certification and return the case to the immigration judge or to remand the case back to the Board for further proceedings; the Director, however, would not issue an order of removal, grant a request for voluntary departure, or grant or deny an application for relief or protection from removal. Finally, the Department's quality assurance certification process would make clear that it is a mechanism to ensure that BIA decisions are accurate and dispositive—and not a mechanism solely to express disagreements with Board decisions or to lodge objections to particular legal interpretations.

### H. 8 CFR 1003.1(d)(1)(ii) and 1003.10(b)

Prior to 2012, the Department did not consider 8 CFR 1003.1(d)(1)(ii) or 1003.10(b), or similar language in 8 CFR part 1240, to authorize an immigration judge or the Board to unilaterally administratively close a case over a party's objection. In fact, longstanding Board precedent was clear that an immigration judge was required both to complete a case and to complete it through only one of three avenues: An order of termination, an order of removal, or an order of relief [25] or protection. *Matter of Chamizo,* 13 I&N Dec. at 437.

Further, as previously noted, longstanding Board precedent and well-established administrative law separation-of-function principles strongly oppose placing the immigration judge in the role of the prosecutor and determining which immigration cases should be adjudicated and which ones should not. *See, e.g., Matter of Quintero,* 18 I&N Dec. at 350; *cf. Lopez-Telles* v. *INS,* 564 F.2d at 1304; *Matter of Silva-Rodriguez,* 20 I&N Dec. at 449–50.

Nevertheless, the Board in 2012 departed from these established precedents without explanation and held that an immigration judge—and by extension, the Board itself—could unilaterally determine which cases should not be adjudicated by administratively closing cases over the objections of one or both parties. *Matter of Avetisyan,* 25 I&N Dec. at 690. In doing so, the Board did not substantively engage with its prior precedent, *e.g., Matter of Chamizo, Matter of Quintero,* or *Matter of Roussis.* Rather, it simply asserted—paradoxically and without justification—that its decision would not preclude DHS from pursuing removal proceedings, even though administrative closure, in fact, does

preclude DHS from pursuing the removal proceedings while the administrative closure order is in effect.[26] *Compare Matter of Avetisyan,* 25 I&N Dec. at 694 ("Although administrative closure impacts the course removal proceedings may take, it does not preclude the DHS from . . . pursuing those proceedings . . . ."), *with Matter of Amico,* 19 I&N Dec. 652, 654 (BIA 1988) ("When a case is administratively closed, the respondent is allowed . . . to avoid an order regarding his deportability, and the consequences an order of deportation could bring."). It also did not address regulatory provisions that assign the authority to defer adjudication of cases to the Director, the Board Chairman, and the Chief Immigration Judge—but not to immigration judges or Board members themselves. *See* 8 CFR 1003.1(d)(1)(ii), 1003.1(a)(2)(i)(C), 1003.9(b)(3). Further, the Board did not acknowledge that, if 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) provided freestanding authority for administrative closures, then other regulatory provisions that do expressly provide for such closures would be superfluous. *See, e.g.,* 8 CFR 1245.13(d)(3)(i) (stating that immigration judges or the BIA "shall, upon request of the alien and with the concurrence of [DHS], administratively close the proceedings"). Finally, the Board did not address the reference in 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to the "disposition" of cases, which ordinarily connotes a final or dispositive decision, which an order of administrative closure is not. *Compare* Black's Law Dictionary (11th ed. 2019) (defining "disposition" as "[a] *final* settlement or determination" (emphasis added)), *with Matter of Avetisyan,* 25 I&N Dec. at 695 (describing the "fact that administrative closure does not result in a final order" as "undisputed") *and Matter of Amico,* 19 I&N Dec. at 654 n.1 ("The administrative closing of a case does not result in a final order.").

In 2018, the Attorney General overruled *Matter of Avetisyan* and expressly renounced reliance on 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) as a basis for Board members and immigration judges to utilize a freestanding authority to administratively close cases. *See Matter of Castro-Tum,* 27 I&N Dec. at 284 ("Neither section 1003.10(b) nor section 1003.1(d)(1)(ii) confers the authority to grant administrative

closure. Grants of general authority to take measures 'appropriate and necessary for the disposition of such cases' would not ordinarily include the authority to suspend such cases indefinitely. Administrative closure, in fact, is the antithesis of a final disposition. These provisions further direct immigration judges or the Board to resolve matters 'in a timely fashion'—another requirement that conflicts with a general suspension authority.").[27] Although the Department continues to maintain that *Matter of Castro-Tum* is the correct reading of the law, it also seeks to codify that determination in the regulations in order to eliminate any residual confusion regarding the scope of 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) and associated regulations in 8 CFR part 1240.

To that end, the Department proposes to amend 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to make clear that those provisions—and similar provisions in 8 CFR part 1240—provide no freestanding authority for immigration judges or Board members to administratively close immigration cases absent an express regulatory or judicially approved settlement basis to do so. The balance of authority is clear that DHS exercises prosecutorial functions in immigration proceedings and that it is inappropriate for neutral arbiters such as immigration judges or Board members to second-guess DHS prosecution decisions in order to determine which cases should be prosecuted. *See, e.g., Lopez-Telles,* 564 F.2d at 1304; *Matter of Quintero,* 18 I&N Dec. at 350; *Matter of Roussis,* 18 I&N Dec. at 258. Moreover, the regulations make clear that general authority to defer the adjudication of cases lies with EOIR leadership and not with individual Board members or immigration judges themselves. *See* 8 CFR 1003.0(b)(1)(ii), 1003.1(a)(2)(i)(C), 1003.9(b)(3). Further, as the Attorney General previously noted, interpreting 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to allow for general authority for adjudicators to administratively close cases would render other regulatory provisions referencing such authority superfluous.

---

[25] Relief, as used here, includes voluntary departure, even though such an order is issued with an alternate order of removal. 8 CFR 1240.26(d).

[26] Although DHS could still move to recalendar proceedings after *Matter of Avetisyan,* such recalendaring was no longer automatic, and it would be strange to expect an immigration judge to simply recalendar a case upon a motion by DHS that he or she had already determined should not proceed.

[27] The Board is subject to the decisions of the Attorney General under 8 CFR 1003.1(d)(1)(i), which provides that the Board shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General. Also, section 1003.1(d)(1)(ii) provides that the authority of the Board in adjudicating cases is "[s]ubject to [the] governing standards" in paragraph (d)(1)(i). Immigration judges are similarly subject to the Attorney General's decisions under 8 CFR 1003.10(d).

Finally, as a policy matter, the changes wrought by *Matter of Avetisyan* simply exacerbated both the extent of the existing backlog of immigration court cases and the difficulty in addressing that backlog in a fair and timely manner. In the six-plus years between the decisions in *Matter of Avetisyan* in 2012 and *Matter of Castro-Tum* in 2018, despite the lowest levels of new case filings by DHS since the early and mid-2000s, the active pending caseload in immigration proceedings increased from 301,250 cases to 715,246 cases and the inactive pending caseload increased from 149,006 cases to 306,785 cases. *See* EOIR, *Adjudication Statistics: Active and Inactive Pending Cases Between February 1, 2012 and May 17, 2018* (Jan. 30, 2019), *https://www.justice.gov/eoir/page/file/1296536/download*. Similarly, between FY 2012 and FY 2017, the number of completed cases annually fell below 200,000 for the first time in a decade, including dropping below 145,000 for three consecutive years and to the lowest overall number since 1995. EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1139176/download*. After averaging approximately 225,000 completions per year in the five full FYs prior to the FY in which *Matter of Avetisyan* was decided, immigration judges averaged only approximately 149,500 completions per year in the five full FYs after it was decided. *See id.* This marked decline in productivity, which is correlated with the increase in the use of administrative closure caused by *Matter of Avetisyan,* unquestionably exacerbated the growth in the pending caseload during that time period.[28]

Additionally, by definition, administrative closure lengthens and delays proceedings because it defers disposition of a case until an unknown and unpredictable date. Although administrative closure removes a case from an immigration court's active calendar, it does not remove the case from the docket. Consequently, the practice of administrative closure does not reduce the overall pending caseload, and the strain on immigration courts due to the volume of cases is the same, regardless of whether administrative closure is available. Moreover,

indefinite delay does not create flexibility in docketing; it merely puts off a decision until an unknown time in the future. Thus, as additional cases continue to accrue while an administratively closed case remains pending, the deferral of a significant number of cases in the present ultimately undermines the ability of an immigration court to address both new cases and postponed cases in the future.[29] Further, the churning of cases required to separate those to administratively close and those to proceed, as well as the likelihood of inconsistent outcomes among immigration judges regarding which cases should proceed and which ones should not, strongly militates against the use of administrative closure as an efficient or fair docket management strategy. Overall, administrative closure does little to manage immigration court dockets effectively and does much to undermine the efficient and timely administration of immigration proceedings.

In short, administrative closure of cases by the immigration judges or the Board, especially the unilateral use of administrative closure, failed as a policy matter and is unsupported by the law; accordingly, the Department proposes to amend 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to ensure that it is clearly prohibited unless authorized by a Department regulation[30] or a judicially approved settlement agreement.

The Department also proposes to revise §§ 1003.1(d)(1)(ii) and 1003.10(b) for clarity, to provide explicitly that the existing references in those paragraphs to "governing standards" refer to the applicable governing standards as set forth in the existing provisions of §§ 1003.1(d)(1)(i) and 1003.10(d), respectively.

## I. Sua Sponte Authority

As currently constituted, 8 CFR 1003.2(a) and 8 CFR 1003.23(b)(1) allow the BIA and immigration judges, respectively, to reopen proceedings or reconsider a decision *sua sponte* without regard to the time or number limits that would otherwise apply to motions to reopen or reconsider filed by a party. This *sua sponte* authority is entirely a product of delegated authority from the Attorney General, pursuant to 8 U.S.C. 1103(g)(1)–(2), which is codified in the regulations. *See* 8 CFR 1003.1(a)(1) ("Board members shall be attorneys appointed by the Attorney General to act as the Attorney General's delegates in the cases that come before them."); 8 CFR 1003.10(a) ("Immigration judges shall act as the Attorney General's delegates in the cases that come before them."). Although use of *sua sponte* authority is limited to "exceptional situations," *Matter of J–J–,* 21 I&N Dec. at 984, that term is not defined by statute or regulation. Further, as explained in *Lenis* v. *United States Attorney General,* "no statute expressly authorizes the BIA to reopen cases *sua sponte;* rather, the regulation at issue derives from a statute that grants general authority over immigration and nationalization matters to the Attorney General, and sets no standard for the Attorney General's decision-making in this context." 525 F.3d 1291, 1293 (11th Cir. 2008).

Notwithstanding the BIA's disclaimer that *sua sponte* authority "is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship," *Matter of J–J–,* 21 I&N Dec. at 984, and despite the Supreme Court's instruction that a *sua sponte* order is one necessarily independent of any party's motion or request, *see Calderon* v. *Thompson,* 523 U.S. 538, 554 (1998), aliens often invite the BIA and immigration judges to reopen or reconsider a case *sua sponte* where the alien's motion for such an action was untimely or otherwise procedurally improper.[31] *See also*

[28] The Department notes that in the first full FY after *Matter of Castro-Tum* was decided, it completed the highest number of immigration court cases in its history. EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1139176/download*. That level of productivity would have been sufficient to reduce the pending caseload in every FY prior to FY 2017. *See id.*

[29] For example, in the first full FY after *Matter of Castro-Tum* was decided, DHS filed the highest number of new immigration cases in the Department's history, 537,793, representing a 70 percent increase over the previous high. EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1139176/download*. The need to address both that volume of new cases and the significant volume of cases deferred following the decision in *Matter of Avetisyan,* some of which would have otherwise already been completed, illustrates that the practice of administrative closure makes fair and efficient docket administration harder, not easier.

[30] A regulation applying only to another agency cannot provide authorization for an immigration judge or Board member to administratively close a case. *Matter of Castro-Tum,* 27 I&N Dec. at 277 n.3 ("Regulations that apply only to DHS do not provide authorization for an immigration judge or the Board to administratively close or terminate an immigration proceeding.").

[31] Despite this case law to the contrary, the Board has sometimes granted motions using what it erroneously labels as "*sua sponte*" authority. *See, e.g., Matter of Sandra Gabriela Martinez-Reyes,* 2016 WL 6519966 (BIA Sept. 28, 2016) ("Based on the totality of the circumstances in this case, we will grant the respondent's motion to reopen to allow her to pursue relief from removal pursuant to our sua sponte authority."); *Matter of Nana Owusu Poku,* 2016 WL 4120576 (BIA July 8, 2016) ("[W]e are granting the motion to reopen in the exercise of our sua sponte authority."); *Matter of Tania Suyapa Padgett-Zelaya,* 2010 WL 4035400 (Sept. 29, 2010) ("This case was last before us on August 31, 2009, when we denied the respondent's motion to reopen as untimely and numerically barred. The

AR.00320

*Gonzales-Veliz* v. *Barr,* 938 F.3d 219, 227 n.3 (5th Cir. 2019) ("If the BIA does something because an alien requests it to do it, then the BIA's action cannot be characterized as *sua sponte.*"); *Malukas* v. *Barr,* 940 F.3d 968, 969 (7th Cir. 2019) ("Reopening in response to a motion is not *sua sponte;* it is a response to the motion and thus subject to the time-and-number limits.").

Further, eleven federal circuit courts agree that, as a general matter, no meaningful standards exist to evaluate the BIA's decision not to reopen or reconsider a case based on *sua sponte* authority. *See Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam); *Lenis,* 525 F.3d at 1293; *Ali* v. *Gonzalez,* 448 F.3d 515, 518 (2d Cir. 2006) (per curiam); *Doh* v. *Gonzales,* 193 F. App'x 245, 246 (4th Cir. 2006) (per curiam); *Enriquez-Alvarado* v. *Ashcroft,* 371 F.3d 246, 249 (5th Cir. 2004), *overruled on other grounds by Mata* v. *Lynch,* 576 U.S. 143 (2015); *Harchenko* v. *INS,* 379 F.3d 405, 411 (6th Cir. 2004); *Calle-Vujiles* v. *Ashcroft,* 320 F.3d 472, 475 (3d Cir. 2003); *Pilch* v. *Ashcroft,* 353 F.3d 585, 586 (7th Cir. 2003); *Belay-Gebru* v. *INS,* 327 F.3d 998, 1000–01 (10th Cir. 2003); *Ekimian* v. *INS,* 303 F.3d 1153, 1159 (9th Cir. 2002); *Luis* v. *INS,* 196 F.3d 36, 41 (1st Cir. 1999); *accord Malukas,* 940 F.3d at 970 ("*Gonzalez* [v. *Crosby,* 545 U.S. 524 (2005)] and *Calderon* require us to reject Malukas's position that adding the phrase '*sua sponte*' to an untimely or number-barred motion makes those limits go away and opens the Board's decision to plenary judicial review. Instead we reiterate the conclusion of *Anaya-Aguilar* v. *Holder,* 683 F.3d 369, 371–73 (7th Cir. 2012) that, because the Board has unfettered discretion to reopen, or not, *sua sponte,* its decision is not subject to judicial review at all.").[32] Consequently, Federal

circuit courts are, in most cases, unable to review decisions not to reopen or reconsider based on the BIA's or immigration judges' *sua sponte* authority. *See Tamenut,* 521 F.3d at 1004–05 (collecting cases).

The Board has never utilized genuine *sua sponte* authority—rather than in response to a motion—as the direct basis for any precedential decision.[33] Although it has putatively invoked such authority on occasion—*e.g., Matter of X–G–W–,* 22 I&N Dec. 71, 73 (BIA 1998)—in each case its invocation was in response to a motion rather than a true exercise of its *sua sponte* authority. Further, although it ostensibly used its *sua sponte* authority in response to a motion in 1998 to effectuate a policy change allowing the Board to grant untimely motions to reopen due to a fundamental change in law, *see id.,* it subsequently withdrew from that policy in 2002 due to finality concerns and has not relied on such authority to effectuate policy in the subsequent 18 years, *see Matter of G–C–L–,* 23 I&N Dec. 359, 361 (BIA 2002) (ending the policy of considering untimely motions to reopen asylum claims *sua sponte*). The Department has determined that this one-time, *sui generis* use of *sua sponte* authority to make policy, which was subsequently ended after 4 years and has not been repeated in the subsequent 18 years, does not justify continuing the delegation of such authority from the Attorney General. To the contrary, the Board's one-time direct use of genuine *sua sponte* authority in a precedential decision, coupled with its more frequent misapplication of the *sua sponte* label, demonstrate the problems with such authority and strongly counsel in favor of withdrawing it.

Given the lack of a meaningful standard to guide a decision whether to order reopening or reconsideration of cases through the use of *sua sponte* authority, the lack of a definition of "exceptional situations" for purposes of exercising *sua sponte* authority, the

resulting potential for inconsistent application or even abuse of this authority, the inherent problems in exercising *sua sponte* authority based on a procedurally improper motion or request, and the strong interest in finality, the Attorney General has concluded that such delegation of *sua sponte* authority, particularly to the extent that it may be used to circumvent timing and numerical limits for such motions, is no longer appropriate. *See Doherty,* 502 U.S. at 323; *Abudu,* 485 U.S. at 107. Although there may be rare instances in which *sua sponte* authority could be appropriately used—*e.g.,* correcting clerical mistakes[34]—the Department has concluded, on balance, that the negative consequences delineated above outweigh any benefits that may accrue as a result of Board members or immigration judges retaining such authority. Accordingly, the regulation would remove the Attorney General's general delegation of *sua sponte* authority to the BIA and immigration judges to reopen or reconsider cases.

The inherent problems in exercising *sua sponte* authority based on a procedurally improper motion or request, its potential for inconsistent usage and abuse, and the strong interest in bringing finality to immigration proceedings all strongly outweigh its one-time, limited usage over 20 years ago. First, as noted, genuine *sua sponte* authority has been used directly by the Board only once in a precedential decision in the past several decades and not at all in a precedential decision since 2002. Second, there is no right by a respondent to the exercise of *sua sponte* authority; to the contrary, the Board maintains "unfettered discretion to reopen, or not, *sua sponte.*" *Malukas,* 940 F.3d at 970. Third, the regulations already contemplate a mechanism for overcoming time and numerical limitations in order to reopen cases, thus making *sua sponte* authority unnecessary, as the time or numerical limitations that would otherwise prompt a request for *sua sponte* reopening do not apply to joint motions to reopen. *See* 8 CFR 1003.2(c)(3)(iii), 1003.23(b)(4)(iv). Nothing in this proposed rule precludes the parties from filing such joint motions, including in situations in which there has been a relevant change in facts or law. Other regulations similarly provide expressly that the parties may file a joint

---

respondent now has filed another motion to reopen based on changed country conditions in Honduras. We will grant the respondent's motion *sua sponte* and will remand the record to the Immigration Judge for further proceedings consistent with this order."). The Board's putative use of its "*sua sponte*" authority in response to a motion highlights the inherent problems in exercising *sua sponte* authority based on procedurally improper motions or requests.

[32] Several circuit courts have concluded that there is a limited exception to this jurisdictional limitation where the BIA's decision not to exercise its *sua sponte* authority is based on a legally erroneous determination, or where a colorable constitutional issue is raised in a petition for review. *See Bonilla* v. *Lynch,* 840 F.3d 575, 587–89 (9th Cir. 2016) (citing 8 U.S.C. 1252(a)(2)(D)); *Salgado-Toribio* v. *Holder,* 713 F.3d 1267, 1271 (10th Cir. 2013); *Zambrano-Reyes* v. *Holder,* 725 F.3d 744, 751 (7th Cir. 2013); *Pllumi* v. *U.S. Att'y Gen.,* 642 F.3d 155, 160 (3d Cir. 2011); *Mahmood* v. *Holder,* 570 F.3d 466, 471 (2d Cir. 2009). Otherwise, however, the Board's choice not to

exercise its *sua sponte* authority is unreviewable. *See, e.g., Bonilla,* 840 F.3d at 586; *Mahmood,* 570 F.3d at 471. As noted, however, the Board's authority in these contexts was not genuinely *sua sponte* because it involved the Board ruling on a motion. *See Gonzales-Veliz,* 938 F.3d at 227 n.3 ("If the BIA does something because an alien requests it to do it, then the BIA's action cannot be characterized as *sua sponte.*"); *Malukas,* 940 F.3d at 969 ("Reopening in response to a motion is not *sua sponte;* it is a response to the motion and thus subject to the time-and-number limits.").

[33] In 2011, the Board did *sua sponte* reopen a case in an unpublished interim order and then reinstate the appeal following a decision by the Ninth Circuit. Following briefing by both parties, it subsequently issued a precedential decision in the case in 2012. *See Matter of Valenzuela Gallardo,* 25 I&N Dec. 838 (BIA 2012).

[34] The Department is retaining the ability of the Board and immigration judges to use *sua sponte* authority to correct ministerial mistakes or typographical errors or to reissue decisions if service was defective.

motion to circumvent time and number limits, rather than rely on an immigration judge's or the Board's *sua sponte* authority, when an intervening event no longer makes an alien removable. *See, e.g.,* 8 CFR 214.11(d)(9)(ii), 214.14(c)(5)(i) (both noting that the parties may file a joint motion to reopen an order of removal issued by an immigration judge in order to overcome any time or number bars when an alien has received a nonimmigrant visa subsequent to the issuance of the removal order). Moreover, nothing in this proposed rule precludes the ability of a respondent to argue, in an appropriate case, that a time limit is inapplicable due to equitable tolling. In short, given the exceptional nature of a situation required to invoke *sua sponte* authority in the first instance, the general lack of use of genuine *sua sponte* authority since 2002, and the availability of multiple other avenues to reopen or reconsider cases and to alleviate the hardships imposed by time and number deadlines, the Attorney General no longer sees a need to retain the delegation of *sua sponte* authority to the Board or to immigration judges as either a matter of law or policy.

In addition, the Department recognizes that the Board may have cited its *sua sponte* authority to reopen—albeit typically in response to a motion rather than a genuine *sua sponte* situation—in circumstances where an alien is no longer removable due, for example, to an intervening change in law or the vacatur of a criminal conviction on the merits. To ensure that aliens whose removability is vitiated *in toto* prior to the execution of the removal order retain a mechanism for reopening their proceedings, the Department proposes to amend the regulations to allow the filing of a motion to reopen, notwithstanding the time and number bars, when an alien claims that an intervening change in law or fact renders the alien no longer removable at all and the alien has exercised diligence in pursuing his or her motion.[35] This amendment is consistent with current case law allowing the equitable tolling of the time and number bars for motions to

reopen in exceptional circumstances when an alien has shown diligence in pursuing the claim. *See, e.g., Avila-Santoyo* v. *U.S. Att'y Gen.,* 713 F.3d 1357, 1363–64 & n.2 (11th Cir. 2013). To ensure consistency of application regarding both what constitutes a change in law or fact and whether an alien exercised diligence, the proposed rule provides that such a motion could be granted only by a three-member panel at the Board level. Similarly, the Department proposes to amend the regulations to allow the filing of a motion to reopen, notwithstanding the time and number bars, when an individual claims that he or she is a United States citizen or national in recognition that the law provides jurisdiction only in removal proceedings for aliens. *See* 8 U.S.C. 1229a(a)(1).

Finally, the Department proposes to amend the regulations to clarify that the filing of a motion to reopen with the Board by DHS in removal proceedings or in proceedings initiated pursuant to 8 CFR 1208.2(c) is not subject to the time and numerical limits applicable to such motions. Such an allowance already exists for DHS motions to reopen at the immigration court level, 8 CFR 1003.23(b)(1), and extending that allowance to DHS motions filed with the Board would provide greater parity between proceedings at the immigration court level and the appellate level. Moreover, doing so would ameliorate the effects of the withdrawal of *sua sponte* authority to reopen cases from the Board for DHS just as the exceptions discussed above ameliorate any deleterious effects of the withdrawal of such authority for respondents.

*J. Certification Authority*

Current regulations authorize the Board to certify cases to itself for review but provide no standards for deciding when to exercise that authority. 8 CFR 1003.1(c). Although the Attorney General has concluded that the Board's self-certification authority is similar to its *sua sponte* authority and, thus, should be used only in "exceptional" situations, *Matter of Jean,* 23 I&N Dec. at 380 n.9, the certification authority is subject to inconsistent application for the same reasons as the *sua sponte* authority. Further, unlike certification requests made by DHS or an immigration judge, which require notice to the parties, 8 CFR 1003.7, the Board may certify a case without notice if it concludes that the parties have been given a fair opportunity to make representations before the Board regarding the case, 8 CFR 1003.1(c). In those circumstances, however, the

parties would not have had the opportunity to address whether self-certification by the Board is appropriate—*i.e.,* whether the case presents an exceptional situation—because they would have had no way of knowing that the Board was considering taking the case through self-certification.

Additionally, despite clear language requiring the Board to have jurisdiction over the underlying matter in the first instance in order to exercise its certification authority, *see* 8 CFR 1003.1(c) (restricting self-certification to cases arising under the Board's appellate jurisdiction), the Board often reverses that principle and uses its certification authority to avoid deciding a question of jurisdiction. *Compare Matter of Sano,* 19 I&N Dec. at 300 (holding that the use of certification authority to circumvent a jurisdictional requirement is "inappropriate"), *with, e.g., Matter of Carlos Daniel Jarquin-Burgos,* 2019 WL 5067262, at *1 n.1 (BIA Aug. 5, 2019) ("On March 29, 2019, we accepted the respondent's untimely appeal. To further settle any issues of jurisdiction, we accept this matter on appeal pursuant to 8 CFR 1003.1(c)."), *Matter of Daniel Tipantasig-Matzaquiza,* 2016 WL 4976725, at *1 (BIA Jul. 22, 2016) ("To settle any issues regarding jurisdiction, we will exercise our discretionary authority to accept this appeal on certification. *See* 8 CFR 1003.1(c)."), *and Matter of Rafael Antonio Hanze Fuentes,* 2011 WL 7071021, at *1 n.1 (BIA Dec. 29, 2011) ("In order to avoid any question regarding our jurisdiction over this appeal, we take jurisdiction over this matter by certification pursuant to 8 CFR 1003.1(c).").

Similarly, despite the clear directive in *Matter of Jean* that certification should be used only in "exceptional" situations, the Board frequently uses its certification authority in otherwise unexceptional circumstances, such as to avoid finding appeals untimely, or to simply correct filing defects. *Matter of Alhassan Kamara,* 2015 WL4873247, at *1 (BIA Jun. 30, 2015) ("To resolve any issue of timeliness, we adjudicate the appeal in the exercise of our certification authority. 8 CFR 1003.1(c)."); *Matter of Mohamed Saad Maroof,* 2006 WL 3712722, at *1 n.1 (BIA Nov. 17, 2006) ("We will take this appeal on certification to correct any filing defects. *See* 8 CFR 1003.1(c)(2006)."); *Matter of Edwin R. Jimenez,* 2005 WL 3016034, at *1 n.1 (BIA Aug. 8, 2005) ("To resolve any questions of timeliness, we will assume jurisdiction over the appeal by certification pursuant to our authority

---

[35] This provision would apply only when the intervening change vitiated the alien's removability completely—an alien charged with multiple removability grounds would remain subject to the time and number bars unless the intervening change vitiated each removability ground. Additionally, this provision would apply only to grounds of removability. Aliens arguing that an intervening change in law or fact affected their eligibility for relief or protection from removal would remain subject to existing regulatory provisions on such motions.

under 8 CFR 1003.1(c).''); *cf. Matter of Liadov,* 23 I&N Dec. 990, 993 (BIA 2006) (short delays in filing timely are not ''rare'' or ''extraordinary'' such that the acceptance of an appeal through the Board's certification authority would be warranted).

Due to the lack of clear governing standards, the lack of a definition of ''exceptional'' situations for purposes of utilizing self-certification, the potential for lack of notice of the Board's use of certification authority, the overall potential for inconsistent application and abuse of this authority, and the strong interest in finality, the Attorney General has concluded that such delegation of self-certification authority to the BIA, particularly to the extent it may be used to circumvent appellate filing deadlines, is no longer appropriate. Accordingly, for reasons similar to those underlying the withdrawal of the delegation of *sua sponte* authority, this rule would withdraw the delegation of certification authority from the Board. No other aspect of the regulations governing certification of cases to the Board would be affected.[36]

*K. Timeliness of Adjudication of BIA Appeals*

The number of cases pending before EOIR has increased tremendously, particularly in recent years. EOIR had approximately 130,000 pending cases in 1998. At the end of FY 2019, EOIR had 1,079,168 pending cases, up from 430,123 at the end of FY 2014 and 262,748 at the end of FY 2010. *See* EOIR, *Adjudication Statistics: Pending Cases* (Apr. 15, 2020), *https:// www.justice.gov/eoir/page/file/1242166/ download.* Put differently, EOIR's current pending caseload has increased more than 800 percent in the past 21 years.

With the increase in pending cases at the immigration courts, EOIR has recently begun to have a corresponding increase in the number of appeals of immigration judge decisions. In FY 2019, 54,092 case appeals were filed with the BIA—an increase of over 250 percent from FY 2015, when 15,423 case appeals were filed. The BIA ended FY 2019 with 65,201 pending case appeals, up from 12,677 at the end of FY 2017. EOIR, *Adjudication Statistics: Case Appeals1 Filed, Completed, and*

*Pending* (Oct. 23, 2019), *https:// www.justice.gov/eoir/page/file/1198906/ download.* Paradoxically, although the Board operated between 16 and 21 adjudicators for all of FY 2018, adjudications of case appeals actually *fell* by roughly 500 from FY 2017 when it had no more than 16 adjudicators for nearly all of the fiscal year. *Id.* Case appeal completions fell yet again in FY 2019, by nearly 1500, even though the Board operated with at least 18 adjudicators—and, at times, as many as 21 total—for the entire fiscal year. *Id.* Overall, Board productivity in adjudicating case appeals has declined by 33 percent since FY 2008.[37] Although the Department has utilized multiple temporary Board members and increased the number of permanent Board members in 2018, *see* Expanding the Size of the Board of Immigration Appeals, 83 FR 8321 (Feb. 27, 2018), an increase in the number of adjudicators is not necessarily commensurate with an increase in productivity. Due to these concerns about BIA productivity—and the need to ensure that improved productivity at the immigration court level is not subverted by inefficient practices at the administrative appellate level—the Department believes it is necessary to again review the BIA's regulations to reduce any unwarranted delays in the appeals process and to ensure that the BIA's, as well as the rest of EOIR's, resources are used efficiently.

To that end, the Department is changing the BIA's case management system to ensure that all appeals are being adjudicated in a timely manner. Currently, except in limited circumstances, appeals assigned to a single Board member are expected to be decided within 90 days of completion of the record on appeal, whereas appeals assigned to a three-member panel are to be decided within 180 days of assignment to the panel (including any additional opinion by a member of the panel), which may occur well after the record on appeal is complete. 8 CFR 1003.1(e)(8)(i). Although the Board maintains a single case management system to screen cases for either single-member or three-member panel disposition, the current regulatory language sets timeliness deadlines based on different criteria, which may cause inefficiencies and potential delays. *See* 8 CFR 1003.1(e). It has also caused confusion regarding how the Board tracks cases and raised questions about

the accuracy of the Board's statistics and the timeliness of the Board's adjudications. *See* DOJ OIG Report at 50 (''Further, EOIR's tracking method for the length of appeals does not include total processing times for appeals. Depending on the type of review—one or three board members—EOIR counts the appeal processing time from different starting points. These different starting points significantly skew the reported achievement of its completion goals for appeals and impede EOIR's effective management of the appeals process. The total number of days taken to review and decide appeals, not EOIR's count of days, represents how long the aliens and the DHS wait for decisions on their appeals.''). Because the number of appeals has risen considerably in recent years, the Department believes it is important to eliminate all potential inefficiencies to ensure that appeals are completed in a timely manner. Consequently, the Department is changing the regulatory language to harmonize the time limits for adjudicating appeals so that both the 90- and 180-day deadlines are set from the same starting point—when the record is complete.

The Department is also implementing additional changes to ensure that appeals are adjudicated in a timely manner. For example, the proposed rule establishes specific time frames for review by the screening panel, processing of transcripts, issuance of briefing schedules, and review by a single Board member to determine whether a single member or a three-member panel should adjudicate the appeal, none of which are considered in the current regulations or tracked effectively to prevent delays. It also adds tracking and accountability requirements for the Board Chairman in cases where the adjudication of appeals must be delayed to ensure that no appeals are overlooked or lost in the process. It also establishes specific time frames for the adjudication of summary dismissals, providing substance to the current language that such cases be identified ''promptly'' by the screening panel. *See* 8 CFR 1003.1(d)(2)(ii). Additionally, it establishes specific time frames for the adjudication of interlocutory appeals, which are not currently addressed in the regulations, except insofar as they may be referred to a three-member panel for review. The BIA does not normally entertain interlocutory appeals, and neither transcripts nor briefing schedules are generally issued for interlocutory appeals. *See* BIA Practice Manual at 63, 70–71. Consequently, there is no reason

[36] On November 25, 2002, the President signed into law the Homeland Security Act of 2002, creating the new DHS and transferring the functions of the former INS to DHS. Public Law 107–296, tit. IV, subtitles D, E, F, 116 Stat. 2135, 2192 (Nov. 25, 2002). Accordingly, this rule also replaces outdated references to the INS in 8 CFR 1003.1(c) and 1003.7 with references to DHS.

[37] The Board completed 29,433 case appeals in FY 2008, but only 19,449 in FY 2019. *See* EOIR, *Case Appeals Filed, Completed, and Pending* (Oct. 23, 2019), *https://www.justice.gov/eoir/page/file/ 1198906/download.*

that those appeals also cannot be addressed promptly within 30 days, unless the BIA determines that they involve "important jurisdictional questions regarding the administration of the immigration laws or recurring questions in the handling of cases by Immigration Judges" amenable to review by a three-member panel. *Id.* at 70 (citing *Matter of K–,* 20 I&N Dec. 418 (BIA 1991)). Finally, these changes will ensure that EOIR will "improve its collecting, tracking, and reporting of BIA appeal statistics to accurately reflect actual appeal processing times," as has previously been recommended. DOJ OIG Report at 50.

Further, the Department is cognizant that, absent a regulatory basis for delay,[38] there is no reason for a typical appeal to take more than 335 days to adjudicate—including time for transcription, briefing, and adherence to the existing 90- or 180-day time frames for decision.[39] The rule therefore also

ensures timely dispositions by referring appeals pending beyond that mark to the EOIR Director for adjudication.[40] As indicated in 8 CFR 1003.1(e)(8)(vi), these changes reflect management directives in favor of timely dispositions and do not establish any substantive or procedural rights. Because most appeals are already decided within these parameters, unless there is a regulatory or policy basis for delay, the Department expects few, if any, appeals to need to be referred to the Director. Nevertheless, such authority is necessary to ensure management oversight consistent with the Director's authority to "set priorities or time frames for the resolution of cases" and the Director's responsibility "to ensure the efficient disposition of all pending cases." 8 CFR 1003.0(b)(1)(ii).[41] Moreover, this delegation of authority to the Director does not change the applicable law that the Board or the Director must apply in deciding each appeal, nor does it change appellate briefing procedures, which would be expected to be completed before any case would need to be referred. Rather, this delegation ensures that any unwarranted delays in the adjudication of appeals are eliminated and any bottlenecks in the Board's processing of appeals are minimized or eliminated.

Finally, the rule removes and reserves 8 CFR 1003.1(e)(8)(iv). That provision allowed the BIA Chairman to grant an extension of 120 days to the 90- and 180-day adjudicatory time frames for cases ready for adjudication as of September 25, 2002, that had not been completed within those time frames.

That provision is no longer necessary because the relevant dates and time frames have long since passed.

*L. Forwarding the Record on Appeal*

The Department is also revising 8 CFR 1003.5 regarding the forwarding of the record of proceedings in an appeal to ensure that the transcription process does not cause any unwarranted delays. The Department notes that it is not necessary for immigration judges to affirmatively review, potentially revise, and then approve the transcripts of oral decisions; EOIR utilizes reliable digital audio recording technology that produces clear audio recordings, and the additional 7- or 14-day review period creates an unnecessary delay in the adjudication of appeals. Moreover, because errors should not be corrected during the review, *see, e.g., Mamedov* v. *Ashcroft,* 387 F.3d 918, 920 (7th Cir. 2004) ("[I]n general it is a bad practice for a judge to continue working on his opinion after the case has entered the appellate process . . . ."); because EOIR already has a procedure for the parties to address defective or inaccurate transcripts on appeal, BIA Practice Manual at 51–52; and because the BIA may remedy defects through a remand for clarification or correction if necessary, 8 CFR 1003.1(e)(2), there is no operational reason for immigration judges to continue to review transcripts of their decisions solely for minor typographical errors. *Accord Witjaksono* v. *Holder,* 573 F.3d 968, 976 (10th Cir. 2009) ("When an alien follows these procedures [under the regulations and the BIA Practice Manual], the BIA is able to evaluate whether the 'gaps [in the transcript] relate to matters material to [the] case and [whether] they materially affect [the alien's] ability to obtain meaningful review.' Moreover, if the BIA concludes that a defective transcript did not cause prejudice, these procedures create a record that facilitates the meaningful and effective *judicial* review to which a petitioner is entitled." ((first alteration added) (internal citation omitted)). Further, such review also takes immigration judges away from their primary duty of adjudicating cases expeditiously and impartially, consistent with the law. Finally, federal courts have criticized the practice of immigration judges revising transcripts after an appeal has been filed. *See Mamedov,* 387 F.3d at 920. Accordingly, there is simply no reason to retain the requirement that immigration judges continue to review transcripts, and removing this requirement will also eliminate the possibility of the transcript being amended incorrectly, even

---

[38] For example, in exigent circumstances, the BIA Chairman may grant a 60-day extension of the 90- and 180-day adjudicatory processing deadlines currently in the regulations. 8 CFR 1003.1(e)(8)(ii). Additionally, the BIA may place a case on hold while it awaits the completion or updating of all identity, law enforcement, or security investigations or examinations. 8 CFR 1003.1(d)(6)(ii)(B). The Chairman may also hold a case pending a decision by the U.S. Supreme Court or a U.S. Court of Appeals, in anticipation of a Board *en banc* decision, or in anticipation of an amendment to regulations. 8 CFR 1003.1(e)(8)(iii). The proposed rule amends this last category by removing a pending Court of Appeals decision and a pending regulatory action as bases for a hold. Unlike Supreme Court decisions, which are typically issued by the end of a fixed term, and Board *en banc* decisions, which are subject to regulatory timelines discussed herein, neither regulatory actions nor Court of Appeals decisions have a fixed deadline and may stretch out for years, making them poor bases to warrant an adjudicatory delay. In recognition of the need for efficient decision-making and finality in case adjudications, the rule also places a 120-day limit on the length of a hold imposed by the Chairman.

[39] The median time for all appeals from immigration judge decisions in FY 2019 was 168 days. Excluding interlocutory appeals, appeals from custody redetermination decisions, and appeals from decisions on motions to reopen, the median time to completion for case appeals in FY 2019 was 323 days, which is consistent with the timeline outlined in the proposed rule. More specifically, the proposed rule provides that screening should occur no later than 14 days after the notice to appeal is filed with the Board. If there is funding and vendor availability, the transcript should be ordered within 7 days, and transcription takes 14 to 28 days. The briefing schedule is then issued within seven days of receipt of the transcript. Completion of briefing requires, at most, 63 days under the current regulation and would require less time under the proposed rule. Once the record is complete, a single panel member should review the case within 14 days to determine whether it should be referred to a three-member panel or adjudicated by that single Board member. If it is referred, the panel has 180 days to decide the appeal. Combined, even under the current regulations, a typical appeal should take no longer than 313 days to adjudicate from the date it was filed, though the proposed rule provides an

additional allowance to account for miscellaneous delays that may occur due to human error or movement of the record of proceeding from one location to another.

[40] The Attorney General recently delegated authority to the EOIR Director to potentially adjudicate appeals that have exceeded the established 90- and 180-day regulatory time limits, unless the Board Chairman assigns the case to himself or the Vice Chairman. Organization of the Executive Office for Immigration Review, 84 FR 44537, 44538 (Aug. 26, 2019). As the DOJ OIG previously pointed out, however, those time limits count only part of the overall appellate processing time, "and the parts that are excluded represent a significant portion of the processing time." DOJ OIG Report at 48. The narrowness of the prior delegation and the lack of an overall timeliness metric for deciding appeals that accounts for all of the appellate processing time limits the utility of that delegation in addressing delays in the overall appeals process.

[41] The Director is also responsible for providing "comprehensive, continuing training and support" for, *inter alia,* EOIR staff "in order to promote the quality and consistency of adjudications." 8 CFR 1003.0(b)(1)(vii). Consequently, the Director will ensure that any support staff assisting in preparing cases for adjudication under this delegation of authority are sufficiently trained. Additionally, the proposed rule makes clear that the Director may not delegate this authority further to any employee within EOIR.

inadvertently, after a decision has been rendered.

Further, the Department notes that the section regarding the forwarding of the physical record of proceeding to the BIA is being rendered obsolete by the EOIR Court & Appeals System ("ECAS"), which has been deployed to 14 immigration courts and adjudication centers and is currently in the midst of a nationwide rollout following a successful pilot.[42] *See* EOIR Electronic Filing Pilot Program, 83 FR 29575 (June 25, 2018); EOIR, *EOIR Launches Electronic Filing Pilot Program* (July 19, 2018), *https://www.justice.gov/eoir/pr/eoir-launches-electronic-filing-pilot-program;* EOIR Policy Memorandum 20–13, *EOIR Practices Related to the COVID–19 Outbreak* 3 n.7 (June 11, 2020), *https://www.justice.gov/eoir/page/file/1284706/download.* ECAS will enable EOIR to maintain fully electronic records of proceeding, which in turn will enable the BIA to directly access all relevant records in an appeal from the decision of an immigration judge without the need for court staff to forward the record. In short, there is no basis to retain 8 CFR 1003.5(a) in its current format, and the Department is revising it accordingly.[43]

Finally, 8 CFR 1003.5(b) describes procedures regarding appeals from DHS decisions that are within the BIA's appellate jurisdiction. *See* 8 CFR 1003.1(b)(4)–(5). Much of the language in that paragraph concerns authority exercised by DHS officers rather than by EOIR. Accordingly, EOIR is proposing to delete language that is not applicable to its adjudicators and modifying the regulatory text accordingly. In doing so, EOIR also proposes replacing outdated references to the INS. *See supra,* note 36. The changes do not substantively affect the Board's adjudication of any appeals subject to 8 CFR 1003.5(b).

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Department has reviewed this rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and has determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule will not regulate "small entities," as that term is defined in 5

---

[42] The rollout was temporarily paused on March 16, 2020, due to the outbreak of COVID–19 in the United States and will resume at an appropriate time.

[43] The Department is also streamlining the language in § 1003.5(a) to better reflect responsibility for ensuring the timely processing of transcripts consistent with the EOIR Director's authority to ensure the efficient disposition of all pending cases. 8 CFR 1003.0(b)(1)(ii).

U.S.C. 601(6). The rule will not economically impact representatives of aliens in immigration proceedings. It does not limit the fees they may charge, or the number of cases a representative may ethically accept under the rules of professional responsibility.

### B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year (adjusted annually for inflation), and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Congressional Review Act

This proposed rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

### D. Executive Order 12866 and Executive Order 13563

The Department has determined that this rule is a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review. Accordingly, this rule has been submitted to the Office of Management and Budget for review.

The Department certifies that this regulation has been drafted in accordance with the principles of Executive Order 12866 and Executive Order 13563. Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Department believes that shortening the time for briefing extensions and schedules and clarifying the standards for review will help reduce the number of cases pending

before EOIR and will enable the BIA to adjudicate more appeals annually. The Department believes the costs to the public will be negligible, if any, because the basic briefing procedures will remain the same, because current BIA policy already disfavors multiple briefing extension requests, and because the BIA is already prohibited from considering new evidence on appeal. The proposed rule does not impose any new costs, and most, if not all, of the proposed rule is directed at internal case processing. Any changes contemplated by the rule would have no apparent impact on the public but would substantially improve both the quality and efficiency of BIA appellate adjudications.

### E. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 1003

Administrative practice and procedure, Immigration.

### 8 CFR Part 1240

Administrative practice and procedure, Aliens.

Accordingly, for the reasons set forth in the preamble, the Department proposes to amend 8 CFR parts 1003 and 1240 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 1. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 2. Amend § 1003.1 by:
■ a. Revising paragraphs (c), (d)(1)(ii), and (d)(3)(iv);
■ b. Adding paragraph (d)(3)(v);
■ c. Revising paragraphs (d)(6)(ii) through (iv), (d)(7), (e)(1), (e)(8) introductory text, and (e)(8)(i) and (iii);
■ d. Removing and reserving paragraph (e)(8)(iv);
■ e. Adding four sentences at the end of paragraph (e)(8)(v); and
■ f. Adding paragraph (k).
  The revisions and additions read as follows:

**§ 1003.1   Organization, jurisdiction, and powers of the Board of Immigration Appeals.**

\*     \*     \*     \*     \*

  (c) *Jurisdiction by certification.* The Secretary, or any other duly authorized officer of DHS, or an immigration judge may in any case arising under paragraph (b) of this section certify such case to the Board for adjudication.
  (d) \* \* \*
  (1) \* \* \*
  (ii) Subject to the governing standards set forth in paragraph (d)(1)(i) of this section, Board members shall exercise their independent judgment and discretion in considering and determining the cases coming before the Board, and a panel or Board member to whom a case is assigned may take any action consistent with their authorities under the Act and the regulations as is appropriate and necessary for the disposition of the case. Nothing in this paragraph shall be construed as authorizing the Board to administratively close or suspend adjudication of a case unless a regulation promulgated by the Department of Justice or a previous judicially approved settlement expressly authorizes such an action. Only the Director or Chief Appellate Immigration Judge may direct the deferral of adjudication of any case or cases by the Board.

\*     \*     \*     \*     \*

  (3) \* \* \*
  (iv)(A) The Board will not engage in factfinding in the course of deciding appeals, except that the Board may take administrative notice of facts that are not reasonably subject to dispute, such as

  (*1*) Current events;
  (*2*) The contents of official documents outside the record;
  (*3*) Facts that can be accurately and readily determined from official government sources and whose accuracy is not disputed; or
  (*4*) Undisputed facts contained in the record.
  (B) If the Board intends to rely on an administratively noticed fact outside of the record, such as those indicated in paragraphs (d)(3)(iv)(A)(*1*) through (*3*) of this section, as the basis for reversing an immigration judge's grant of relief or protection from removal, it must provide notice to the parties of its intent and afford them an opportunity of not less than 14 days to respond to the notice.
  (C) The Board shall not *sua sponte* remand a case for further factfinding unless the factfinding is necessary to determine whether the immigration judge had jurisdiction over the case.
  (D) Except as provided in paragraph (d)(6)(iii) or (d)(7)(v)(B) of this section, the Board shall not remand a case for additional factfinding unless
  (*1*) The party seeking remand preserved the issue by presenting it before the immigration judge;
  (*2*) The party seeking remand, if it bore the burden of proof before the immigration judge, attempted to adduce the additional facts before the immigration judge;
  (*3*) The additional factfinding would alter the outcome or disposition of the case;
  (*4*) The additional factfinding would not be cumulative of the evidence already presented or contained in the record; and
  (*5*) One of the following circumstances is present in the case:
  (*i*) The immigration judge's factual findings were clearly erroneous, or
  (*ii*) Remand to DHS is warranted following de novo review.
  (v) The Board may affirm the decision of the immigration judge or the Department of Homeland Security on any basis supported by the record, including a basis supported by facts that are not reasonably subject to dispute, such as undisputed facts in the record.

\*     \*     \*     \*     \*

  (6) \* \* \*
  (ii) Except as provided in paragraph (d)(6)(iv) of this section, if identity, law enforcement, or security investigations or examinations have not been completed or DHS reports that the results of prior investigations or examinations are no longer current under the standards established by DHS, and the completion of the investigations

or examinations is necessary for the Board to complete its adjudication of the appeal, the Board will provide notice to both parties that, in order to complete adjudication of the appeal, the case is being placed on hold until such time as all identity, law enforcement, or security investigations or examinations are completed or updated and the results have been reported to the Board. Unless DHS advises the Board that such information is no longer necessary in the particular case, the Board's notice will notify the alien that DHS will contact the alien to take additional steps to complete or update the identity, law enforcement, or security investigations or examinations only if DHS is unable to independently update the necessary investigations or examinations. The Board's notice will also advise the alien of the consequences for failing to comply with the requirements of this section. DHS is responsible for obtaining biometrics and other biographical information to complete or update the identity, law enforcement, or security investigations or examinations with respect to any alien in detention.

  (iii) In any case placed on hold under paragraph (d)(6)(ii) of this section, DHS shall report to the Board promptly when the identity, law enforcement, or security investigations or examinations have been completed or updated. If a non-detained alien fails to comply with necessary procedures for collecting biometrics or other biographical information within 90 days of the Board's notice under paragraph (d)(6)(ii) of this section, the Board shall deem the application abandoned unless the alien shows good cause before the 90-day period has elapsed, in which case the alien should be given no more than an additional 30 days to comply with the procedures. If the Board deems an application abandoned under this section, it shall adjudicate the remainder of the appeal within 30 days and shall enter an order of removal or a grant of voluntary departure, as appropriate. If DHS obtains relevant information as a result of the identity, law enforcement, or security investigations or examinations, including civil or criminal investigations of immigration fraud, DHS may move the Board to remand the record to the immigration judge for consideration of whether, in view of the new information, any pending applications for immigration relief or protection should be denied, either on grounds of eligibility or, where applicable, as a matter of discretion. If DHS fails to report the results of timely-completed or updated identity, law

enforcement, or security investigations or examinations within 180 days of the Board's notice under paragraph (d)(6)(ii) of this section, the Board shall remand the case to the immigration judge for further proceedings under § 1003.47(h).

(iv) The Board is not required to hold a case pursuant to paragraph (d)(6)(ii) of this section if the Board decides to dismiss the respondent's appeal or deny the relief or protection sought.

\* \* \* \* \*

(7) *Finality of decision*—(i) *In general.* The decision of the Board shall be final except in those cases reviewed by the Attorney General in accordance with paragraph (h) of this section. In adjudicating an appeal, the Board possesses authority to issue an order of removal, an order granting relief from removal, an order granting protection from removal combined with an order of removal as appropriate, an order granting voluntary departure with an alternate order of removal, and an order terminating or dismissing proceedings, provided that the issuance of any order is consistent with applicable law. The Board may affirm the decision of the immigration judge or DHS on any basis supported by the record. In no case shall the Board order a remand for an immigration judge to issue an order that the Board itself could issue.

(ii) *Remands.* After applying the appropriate standard of review on appeal, the Board may issue an order remanding a case to an immigration judge or DHS for further consideration based on an error of law or fact, subject to any applicable statutory or regulatory limitations, including paragraph (d)(3)(iv)(D) of this section, and the following:

(A) The Board shall not remand a case for further action without identifying the standard of review it applied and the specific error or errors made by the adjudicator below.

(B) The Board shall not remand a case based on the "totality of the circumstances."

(C) The Board shall not remand a case based on a legal argument not presented below unless that argument pertains to an issue of jurisdiction over an application or the proceedings, or to a material change in fact or law underlying a removability ground or grounds specified in section 212 or 237 of the Act that occurred after the date of the immigration judge's decision, and substantial evidence indicates that change has vitiated all grounds of removability applicable to the alien.

(D) The Board shall not *sua sponte* remand a case unless the basis for such a remand is solely a question of

jurisdiction over an application or the proceedings.

(E) The Board shall not remand a case to an immigration judge solely to consider a request for voluntary departure nor solely due to the failure of the immigration judge to provide advisals following a grant of voluntary departure. In such situations, the Board shall follow the procedures in § 1240.26(k).

(iii) *Scope of the remand.* Where the Board remands a case to an immigration judge, it divests itself of jurisdiction of that case, unless the Board remands a case due to the court's failure to forward the administrative record in response to the Board's request. The Board may qualify or limit the scope or purpose of a remand order without retaining jurisdiction over the case following the remand. In any case in which the Board has qualified or limited the scope or purpose of the remand, the immigration judge shall not consider any issues outside the scope or purpose of that order, unless such an issue calls into question the immigration judge's continuing jurisdiction over the case.

(iv) *Voluntary departure.* The Board may issue an order of voluntary departure under section 240B of the Act, with an alternate order of removal, if the alien requested voluntary departure before an immigration judge, the alien's notice of appeal specified that the alien is appealing the immigration judge's denial of voluntary departure and identified the specific factual and legal findings that the alien is challenging, and the Board finds that the alien is otherwise eligible for voluntary departure, as provided in § 1240.26(k). In order to grant voluntary departure, the Board must find that all applicable statutory and regulatory criteria have been met, based on the record and within the scope of its review authority on appeal, and that the alien merits voluntary departure as a matter of discretion. If the Board does not grant the request for voluntary departure, it must deny the request.

(v) *New evidence on appeal.* (A) Subject to paragraph (d)(7)(v)(B) of this section, the Board shall not receive or review new evidence submitted on appeal, shall not remand a case for consideration of new evidence received on appeal, and shall not consider a motion to remand based on new evidence. A party seeking to submit new evidence shall file a motion to reopen in accordance with applicable law.

(B) Nothing in paragraph (d)(7)(v)(A) of this section shall preclude the Board from remanding a case based on new evidence or information obtained after the date of the immigration judge's

decision as a result of identity, law enforcement, or security investigations or examinations, including civil or criminal investigations of immigration fraud, regardless of whether the investigations or examinations were conducted pursuant to § 1003.47(h) or paragraph (d)(6) of this section, nor from remanding a case to address a question of jurisdiction over an application or the proceedings or a question regarding a ground or grounds of removability specified in section 212 or 237 of the Act.

(e) \* \* \*

(1) *Initial screening.* All cases shall be referred to the screening panel for review upon the filing of a Notice of Appeal or a motion. Screening panel review shall be completed within 14 days of the filing. Appeals subject to summary dismissal as provided in paragraph (d)(2) of this section, except for those subject to summary dismissal as provided in paragraph (d)(2)(i)(E) of this section, shall be promptly dismissed no later than 30 days after the Notice of Appeal was filed. Unless referred for a three-member panel decision pursuant to paragraph (e)(6) of this section, an interlocutory appeal shall be adjudicated within 30 days of the filing of the appeal.

\* \* \* \* \*

(8) *Timeliness.* The Board shall promptly enter orders of summary dismissal, or other miscellaneous dispositions, in appropriate cases consistent with paragraph (e)(1) of this section. In all other cases, the Board shall promptly order a transcript, if appropriate, within seven days after the screening panel completes its review and shall issue a briefing schedule within seven days after the transcript is provided. If no transcript may be ordered due to a lack of available funding or a lack of vendor capacity, the Chairman shall so certify that fact in writing to the Director. The Chairman shall also maintain a record of all such cases in which transcription cannot be ordered and provide that record to the Director. If no transcript is required, the Board shall issue a briefing schedule within seven days after the screening panel completes its review. The case shall be assigned to a single Board member for merits review under paragraph (e)(3) of this section within seven days of the completion of the record on appeal, including any briefs or motions. The single Board member shall then determine whether to adjudicate the appeal or to designate the case for decision by a three-member panel under paragraphs (e)(5) and (6) of this section within 14 days of being

**52512**    **Federal Register** / Vol. 85, No. 166 / Wednesday, August 26, 2020 / Proposed Rules

assigned the case. The single Board member or three-member panel to which the case is assigned shall issue a decision on the merits consistent with this section and with a priority for cases or custody appeals involving detained aliens.

(i) Except in exigent circumstances as determined by the Chairman, subject to concurrence by the Director, or as provided in paragraph (d)(6) of this section or as provided in § 1003.6(c) and § 1003.19(i), the Board shall dispose of all appeals assigned to a single Board member within 90 days of completion of the record on appeal, or within 180 days of completion of the record on appeal for all appeals assigned to a three-member panel (including any additional opinion by a member of the panel).

\*    \*    \*    \*    \*

(iii) In rare circumstances, when an impending decision by the United States Supreme Court or an impending *en banc* Board decision may substantially determine the outcome of a group of cases pending before the Board, the Chairman, subject to concurrence by the Director, may hold the cases until such decision is rendered, temporarily suspending the time limits described in this paragraph (e)(8). The length of such a hold shall not exceed 120 days.

\*    \*    \*    \*    \*

(v) \* \* \* The Chairman shall notify the Director of all cases in which an extension under paragraph (e)(8)(ii) of this section, a hold under paragraph (e)(8)(iii) of this section, or any other delay in meeting the requirements of this paragraph (e)(8) occurs. For any case still pending adjudication by the Board more than 335 days after the appeal was filed and not otherwise subject to an extension under paragraph (e)(8)(ii) or a hold under paragraph (e)(8)(iii), the Chairman shall refer that case to the Director for decision. For a case referred to the Director under this paragraph (e)(8)(v), the Director shall exercise delegated authority from the Attorney General identical to that of the Board as described in this section, including the authority to issue a precedential decision and the authority to refer the case to the Attorney General for review, either on his own or at the direction of the Attorney General. The Director may not further delegate this authority.

\*    \*    \*    \*    \*

(k) *Quality assurance certification.* (1) In any case in which the Board remands a case to an immigration judge or reopens and remands a case to an immigration judge, the immigration judge may forward that case by

certification to the Director for further review only in the following circumstances:

(i) The Board decision contains a typographical or clerical error affecting the outcome of the case;

(ii) The Board decision is clearly contrary to a provision of the Act, any other immigration law or statute, any applicable regulation, or a published, binding precedent;

(iii) The Board decision is vague, ambiguous, internally inconsistent, or otherwise did not resolve the basis for the appeal; or

(iv) A material factor pertinent to the issue(s) before the immigration judge was clearly not considered in the decision.

(2) In order to certify a decision under paragraph (k)(1) of this section, an immigration judge must:

(i) Issue an order of certification within 30 days of the Board decision if the alien is not detained and within 15 days of the Board decision if the alien is detained;

(ii) In the order of certification, specify the regulatory basis for the certification and summarize the underlying procedural, factual, or legal basis; and

(iii) Provide notice of the certification to both parties.

(3) For a case certified to the Director under this paragraph, the Director shall exercise delegated authority from the Attorney General identical to that of the Board as described in this section, except as otherwise provided in this paragraph, including the authority to issue a precedent decision and the authority to refer the case to the Attorney General for review, either on the Director's own or at the direction of the Attorney General. For a case certified to the Director under this paragraph, the Director may dismiss the certification and return the case to the immigration judge or the Director may remand the case back to the Board for further proceedings. In a case certified to the Director under this paragraph, the Director may not issue an order of removal, grant a request for voluntary departure, or grant or deny an application for relief or protection from removal.

(4) The quality assurance certification process shall not be used as a basis solely to express disapproval of or disagreement with the outcome of a Board decision unless that decision is alleged to reflect an error described in paragraph (k)(1) of this section.

■ 3. Amend § 1003.2 by:

■ a. Revising the first sentence of paragraph (a);

■ b. Removing the second and third sentences of paragraph (b)(1);

■ c. Adding paragraphs (c)(3)(v) through (vii); and

■ d. Removing and reserving paragraph (c)(4).

The revisions and additions read as follows:

### § 1003.2 Reopening or reconsideration before the Board of Immigration Appeals.

(a) \* \* \* The Board may at any time reopen a case in which it has rendered a decision on its own motion solely in order to correct a ministerial mistake or typographical error in that decision or to reissue the decision to correct a defect in service. In all other cases, the Board may only reopen or reconsider any case in which it has rendered a decision solely pursuant to a motion filed by one or both parties. \* \* \*

\*    \*    \*    \*    \*

(c) \* \* \*

(3) \* \* \*

(v) For which a three-member panel of the Board agrees that reopening is warranted when the following circumstances are present, provided that a respondent may file only one motion to reopen pursuant to this paragraph:

(A) A material change in fact or law underlying a removability ground or grounds specified in section 212 or 237 of the Act that occurred after the entry of an administratively final order that vitiates all grounds of removability applicable to the alien; and

(B) The movant exercised diligence in pursuing the motion to reopen;

(vi) Filed based on specific allegations, supported by evidence, that the respondent is a United States citizen or national; or

(vii) Filed by DHS in removal proceedings pursuant to section 240 of the Act or in proceedings initiated pursuant to § 1208.2(c).

\*    \*    \*    \*    \*

■ 4. Amend § 1003.3 by revising paragraphs (a)(2) and (c) to read as follows:

### § 1003.3 Notice of appeal.

(a) \* \* \*

(2) *Appeal from decision of a DHS officer.* A party affected by a decision of a DHS officer that may be appealed to the Board under this chapter shall be given notice of the opportunity to file an appeal. An appeal from a decision of a DHS officer shall be taken by filing a Notice of Appeal to the Board of Immigration Appeals from a Decision of a DHS Officer (Form EOIR–29) directly with DHS in accordance with the instructions in the decision of the DHS officer within 30 days of the service of the decision being appealed. An appeal

is not properly filed until it is received at the appropriate DHS office, together with all required documents, and the fee provisions of § 1003.8 are satisfied.

\* \* \* \* \*

(c) *Briefs*—(1) *Appeal from decision of an immigration judge.* Briefs in support of or in opposition to an appeal from a decision of an immigration judge shall be filed directly with the Board. In those cases that are transcribed, the briefing schedule shall be set by the Board after the transcript is available. In all cases, the parties shall be provided 21 days in which to file simultaneous briefs unless a shorter period is specified by the Board. Reply briefs shall be permitted only by leave of the Board and only if filed within 14 days of the deadline for the initial briefs. The Board, upon written motion and a maximum of one time per case, may extend the period for filing a brief or, if permitted, a reply brief for up to 14 days for good cause shown. If an extension is granted, it is granted to both parties, and neither party may request a further extension. Nothing in this paragraph shall be construed as creating a right to a briefing extension for any party in any case, and the Board shall not adopt a policy of granting all extension requests without individualized consideration of good cause. In its discretion, the Board may consider a brief that has been filed out of time. In its discretion, the Board may request supplemental briefing from the parties after the expiration of the briefing deadline. All briefs, filings, and motions filed in conjunction with an appeal shall include proof of service on the opposing party.

(2) *Appeal from decision of a DHS officer.* Briefs in support of or in opposition to an appeal from a decision of a DHS officer shall be filed directly with DHS in accordance with the instructions in the decision of the DHS officer. The applicant or petitioner and DHS shall be provided 21 days in which to file a brief, unless a shorter period is specified by the DHS officer from whose decision the appeal is taken, and reply briefs shall be permitted only by leave of the Board and only if filed within 14 days of the deadline for the initial briefs. Upon written request of the alien and a maximum of one time per case, the DHS officer from whose decision the appeal is taken or the Board may extend the period for filing a brief for up to 14 days for good cause shown. After the forwarding of the record on appeal by the DHS officer the Board may, solely in its discretion, authorize the filing of supplemental briefs directly with the Board and may provide the parties up to a maximum of 14 days to

simultaneously file such briefs. In its discretion, the Board may consider a brief that has been filed out of time. All briefs and other documents filed in conjunction with an appeal, unless filed by an alien directly with a DHS office, shall include proof of service on the opposing party.

\* \* \* \* \*

■ 5. Revise § 1003.5 to read as follows:

### § 1003.5   Forwarding of record on appeal.

(a) *Appeal from decision of an immigration judge.* If an appeal is taken from a decision of an immigration judge, the record of proceeding shall be promptly forwarded to the Board upon the request or the order of the Board, unless the Board already has access to the record of proceeding in electronic format. The Director, in consultation with the Chairman and the Chief Immigration Judge, shall determine the most effective and expeditious way to transcribe proceedings before the immigration judges. The Chairman and the Chief Immigration Judge shall take such steps as necessary to reduce the time required to produce transcripts of those proceedings and to ensure their quality.

(b) *Appeal from decision of a DHS officer.* If an appeal is taken from a decision of a DHS officer, the record of proceeding shall be forwarded to the Board by the DHS officer promptly upon receipt of the briefs of the parties, or upon expiration of the time allowed for the submission of such briefs, unless the DHS officer reopens and approves the petition.

### § 1003.7   [Amended]

■ 6. Amend § 1003.7 by removing the word "Service" each place that it appears and adding in its place the word "DHS".

■ 7. Amend § 1003.10 in paragraph (b) by removing "governing standards" and adding in its place "governing standards set forth in paragraph (d) of this section" and by adding two sentences at the end.

The additions read as follows:

### § 1003.10   Immigration judges.

\* \* \* \* \*

(b) \* \* \* Nothing in this paragraph nor in any regulation contained in 8 CFR part 1240 shall be construed as authorizing an immigration judge to administratively close or suspend adjudication of a case unless a regulation promulgated by the Department of Justice or a previous judicially approved settlement expressly authorizes such an action. Only the Director or Chief Immigration Judge may

direct the deferral of adjudication of any case or cases by an immigration judge.

\* \* \* \* \*

■ 8. Amend § 1003.23 by revising the first sentence of, and adding a new second sentence to, paragraph (b)(1), and adding paragraphs (b)(4)(v) and (vi) to read as follows:

### § 1003.23   Reopening or reconsideration before the immigration court.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* Unless jurisdiction is vested with the Board of Immigration Appeals, an immigration judge may at any time reopen a case in which he or she has rendered a decision on his or her own motion solely in order to correct a ministerial mistake or typographical error in that decision or to reissue the decision to correct a defect in service. Unless jurisdiction is vested with the Board of Immigration Appeals, in all other cases, an immigration judge may only reopen or reconsider any case in which he or she has rendered a decision solely pursuant to a motion filed by one or both parties. \* \* \*

\* \* \* \* \*

(4) \* \* \*

(v) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen proceedings filed when each of the following circumstances is present, provided that a respondent may file only one motion to reopen pursuant to this paragraph:

(A) A material change in fact or law underlying a removability ground or grounds specified in section 212 or 237 of the Act occurred after the entry of an administratively final order that vitiates all grounds of removability applicable to the alien; and

(B) The movant exercised diligence in pursuing the motion to reopen.

(vi) The time limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen proceedings filed based on specific allegations, supported by evidence, that the respondent is a United States citizen or national.

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF ALIENS IN THE UNITED STATES

■ 9. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 10. Amend § 1240.26 by:

■ a. Redesignating paragraph (j) as paragraph (l);
■ b. Adding and reserving a new paragraph (j); and
■ c. Adding paragraph (k).

The additions read as follows:

**§ 1240.26  Voluntary departure—authority of the Executive Office for Immigration Review.**

\*    \*    \*    \*    \*

(j) [Reserved]

(k) *Authority of the Board to grant voluntary departure in the first instance.* The following procedures apply to any request for voluntary departure reviewed by the Board:

(1) The Board shall not remand a case to an immigration judge to reconsider a request for voluntary departure. If the Board first finds that an immigration judge incorrectly denied an alien's request for voluntary departure or failed to provide appropriate advisals, the Board shall consider the alien's request for voluntary departure de novo and, if warranted, may enter its own order of voluntary departure with an alternate order of removal.

(2) The Board shall not grant voluntary departure under section 240B(a) of the Act unless:

(i) The alien requested voluntary departure under that section before the immigration judge, the immigration judge denied the request, and the alien timely appealed;

(ii) The alien's notice of appeal specified that the alien is appealing the immigration judge's denial of voluntary departure and identified the specific factual and legal findings that the alien is challenging;

(iii) The Board finds that the immigration judge's decision was in error; and

(iv) The Board finds that the alien meets all applicable statutory and regulatory criteria for voluntary departure under that section.

(3) The Board shall not grant voluntary departure under section 240B(b) of the Act unless:

(i) The alien requested voluntary departure under that section before the immigration judge, the immigration judge denied the request, and the alien timely appealed;

(ii) the alien's notice of appeal specified that the alien is appealing the immigration judge's denial of voluntary departure and identified the specific factual and legal findings that the alien is challenging;

(iii) The Board finds that the immigration judge's decision was in error; and

(iv) The Board finds that the alien meets all applicable statutory and regulatory criteria for voluntary departure under that section.

(4) The Board may impose such conditions as it deems necessary to ensure the alien's timely departure from the United States, if supported by the record on appeal and within the scope of the Board's authority on appeal. The Board shall advise the alien in writing of the conditions set by the Board, consistent with the conditions set forth in paragraphs (c), (d), (e), (h), and (i) (other than paragraph (c)(3)(ii)) of this section. If the Board imposes conditions beyond those specifically enumerated, the Board shall advise the alien in writing of such conditions. The alien may accept or decline the grant of voluntary departure and may manifest his or her declination either by written notice to the Board within five days of receipt of its decision, by failing to timely post any required bond, or by otherwise failing to comply with the Board's order. The grant of voluntary departure shall automatically terminate upon a filing by the alien of a motion to reopen or reconsider the Board's decision, or by filing a timely petition for review of the Board's decision. The alien may decline voluntary departure if he or she is unwilling to accept the amount of the bond or other conditions.

Dated: August 20, 2020.

**William P. Barr,**
*Attorney General.*

[FR Doc. 2020–18676 Filed 8–21–20; 4:15 pm]

**BILLING CODE 4410–30–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 87 and 1030**

**[EPA–HQ–OAR–2018–0276; FRL–10013–21–OAR]**

**RIN 2060–AT26**

**Public Hearing for Control of Air Pollution From Airplanes and Airplane Engines: GHG Emission Standards and Test Procedures**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notification of public hearing.

**SUMMARY:** The Environmental Protection Agency (EPA) is announcing a virtual public hearing to be held on September 17, 2020, on its proposed greenhouse gas (GHG) emission standards for airplanes and airplane engines, which was published on August 20, 2020.

**DATES:** EPA will hold a virtual public hearing on September 17, 2020. Please refer to the **SUPPLEMENTARY INFORMATION**

section for additional information on the public hearing.

**ADDRESSES:** The virtual public hearing will be held on September 17, 2020. The hearing will begin at 10 a.m. Eastern Time (ET) and end when all parties who wish to speak have had an opportunity to do so. Additional information regarding the hearing appears below under **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:** Bryan Manning, Office of Transportation and Air Quality, Assessment and Standards Division, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: 734–214–4832; email address: *manning.bryan@epa.gov*.

**SUPPLEMENTARY INFORMATION:** EPA is proposing GHG emission standards applicable to certain classes of engines used by certain civil subsonic jet airplanes and by certain civil larger subsonic propeller-driven airplanes with turboprop engines 85 FR 51556, August 20, 2020. These proposed standards are equivalent to the airplane $CO_2$ standards adopted by the International Civil Aviation Organization (ICAO) in 2017.

*Participation in virtual public hearing.* Please note that EPA is deviating from its typical approach because the President has declared a national emergency. Because of current recommendations from the Centers for Disease Control and Prevention (CDC), as well as state and local orders for social distancing to limit the spread of COVID–19, EPA cannot hold in-person public meetings at this time.

The virtual public hearing will provide interested parties the opportunity to present data, views, or arguments concerning the proposal (the official version of which was published 85 FR 51556, August 20, 2020, and a copy of which is available at *https://www.epa.gov/regulations-emissions-vehicles-and-engines/regulations-greenhouse-gas-emissions-aircraft*). EPA may ask clarifying questions during the oral presentations but will not respond to the presentations at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as any oral comments and supporting information presented at the public hearing. EPA recommends submitting the text of your oral comments as written comments to the rulemaking Docket ID No. EPA–HQ–OAR–2018–0276, which can be found at *https://www.regulations.gov*. Written comments must be received on or before October 19, 2020.

to $44.00 per ton of assessable olives. The Committee unanimously recommended 2019 expenditures of $1,628,923 and an assessment rate of $44.00 per ton of assessable olives. The recommended assessment rate of $44.00 is $20.00 higher than the 2018 rate. The quantity of assessable olives for the 2019 Fiscal year is 17,953 tons. The $44.00 rate should provide $789,932 in assessment revenue. The higher assessment rate is needed because annual receipts for the 2018 crop year are 17,953 tons compared to 90,188 tons for the 2017 crop year. Olives are an alternate-bearing crop, with a small crop followed by a large crop. Income derived from the $44.00 per ton assessment rate, along with funds from the authorized reserve and interest income, should be adequate to meet this fiscal year's expenses.

The major expenditures recommended by the Committee for the 2019 fiscal year include $713,900 for program administration, $513,500 for marketing activities, $343,523 for research, and $58,000 for inspection equipment. Budgeted expenses for these items during the 2018 fiscal year were $401,200 for program administration, $973,500 for marketing activities, $297,777 for research, and $77,000 for inspection equipment. The Committee deliberated on many of the expenses, weighed the relative value of various programs or projects, and increased their expenses for marketing and research activities.

Prior to arriving at this budget and assessment rate, the Committee considered information from various sources including the Committee's executive, marketing, inspection, and research subcommittees. Alternate expenditure levels were discussed by these groups, based upon the relative value of various projects to the olive industry. The assessment rate of $44.00 per ton of assessable olives was derived by considering anticipated expenses, the low volume of assessable olives, and a late season freeze.

A review of NASS information indicates that the average producer price for the 2017 crop year was $974.00 per ton. Therefore, utilizing the assessment rate of $44.00 per ton, the assessment revenue for the 2019 fiscal year as a percentage of total producer revenue would be approximately 4.52 percent.

This action increases the assessment obligation imposed on handlers which are minimal and uniform on all handlers. Some of the additional costs may be passed on to producers. However, these costs would be offset by the benefits derived by the operation of

the marketing order. In addition, the Committee's December 11, 2018 meeting was widely publicized throughout the production area and all interested persons were invited to attend the meeting and participate in Committee deliberations on all issues.

In accordance with the Paperwork Reduction Act of 1995, (44 U.S.C. chapter 35), the marketing order's information collection requirements have been previously approved by OMB and assigned OMB No. 0581–0178 Vegetable and Specialty Crops. No changes in those requirements because of this action are necessary. Should any changes become necessary, they would be submitted to OMB for approval.

This final rule imposes no additional reporting or recordkeeping requirements on either small or large California olive handlers. As with all Federal marketing order programs, reports and forms are periodically reviewed to reduce information requirements and duplication by industry and public sector agencies. USDA has not identified any relevant Federal rules that duplicate, overlap, or conflict with this final rule.

AMS is committed to complying with the E-Government Act, to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

A proposed rule concerning this action was published in the **Federal Register** on April 24, 2019 (84 FR 17089). Copies of the proposed rule were provided to all California olive handlers. The proposal was also made available through the internet by USDA and the Office of the Federal Register. A 30-day comment period ending May 24, 2019, was provided for interested persons to respond to the proposal. No comments were received. Accordingly, no changes will be made to the rule as proposed.

A small business guide on complying with fruit, vegetable, and specialty crop marketing agreements and orders may be viewed at: *http://www.ams.usda.gov/ rules-regulations/moa/small-businesses.* Any questions about the compliance guide should be sent to Richard Lower at the previously-mentioned address in the **FOR FURTHER INFORMATION CONTACT** section.

After consideration of all relevant material presented, including the information and recommendation submitted by the Committee and other available information, it is hereby found that this rule will tend to effectuate the declared policy of the Act.

**List of Subjects in 7 CFR Part 932**

Olives, Marketing agreements, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, 7 CFR part 932 is amended as follows:

**PART 932—OLIVES GROWN IN CALIFORNIA**

■ 1. The authority citation for 7 CFR part 932 continues to read as follows:

  **Authority:** 7 U.S.C. 601–674.

■ 2. Section 932.230 is revised to read as follows:

**§ 932.230   Assessment rate.**

On and after January 1, 2019, an assessment rate of $44.00 per ton is established for California olives.

  Dated: July 11, 2019.

**Bruce Summers,**
*Administrator, Agricultural Marketing Service.*

[FR Doc. 2019–15061 Filed 7–15–19; 8:45 am]

**BILLING CODE 3410–02–P**

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC44**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

**[EOIR Docket No. 19–0504; A.G. Order No. 4488–2019]**

**RIN 1125–AA91**

**Asylum Eligibility and Procedural Modifications**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or collectively, "the Departments") are adopting an interim final rule ("interim rule" or "rule") governing asylum claims in the context of aliens who enter or attempt to enter the United States across the southern land border after failing to apply for protection from persecution or torture while in a third country through which

**33830** **Federal Register** / Vol. 84, No. 136 / Tuesday, July 16, 2019 / Rules and Regulations

they transited en route to the United States. Pursuant to statutory authority, the Departments are amending their respective regulations to provide that, with limited exceptions, an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection in a third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States is ineligible for asylum. This basis for asylum ineligibility applies only prospectively to aliens who enter or arrive in the United States on or after the effective date of this rule. In addition to establishing a new mandatory bar for asylum eligibility for aliens who enter or attempt to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited en route to the United States, this rule would also require asylum officers and immigration judges to apply this new bar on asylum eligibility when administering the credible-fear screening process applicable to stowaways and aliens who are subject to expedited removal under section 235(b)(1) of the Immigration and Nationality Act. The new bar established by this regulation does not modify withholding or deferral of removal proceedings. Aliens who fail to apply for protection in a third country of transit may continue to apply for withholding of removal under the Immigration and Nationality Act ("INA") and deferral of removal under regulations issued pursuant to the legislation implementing U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

**DATES:**
*Effective date:* This rule is effective July 16, 2019.

*Submission of public comments:* Written or electronic comments must be submitted on or before August 15, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 19–0504, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive

Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 19–0504 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:**
Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the potential economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change. Comments received will be considered and addressed in the process of drafting the final rule.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 19–0504. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS

INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office for Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Purpose of This Interim Rule**

As discussed further below, asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States, irrespective of their status, as provided in section 208 of the INA, 8 U.S.C. 1158. Congress, however, has provided that certain categories of aliens cannot receive asylum and has further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility to the extent consistent with the asylum statute, as well as the authority to establish "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). This interim rule will limit aliens' eligibility for this discretionary benefit if they enter or attempt to enter the United States across the southern land border after failing to apply for protection in at least one third country through which they transited en route to the United States, subject to limited exceptions.

The United States has experienced a dramatic increase in the number of aliens encountered along or near the southern land border with Mexico. This increase corresponds with a sharp increase in the number, and percentage, of aliens claiming fear of persecution or torture when apprehended or encountered by DHS. For example, over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview on claims of a fear of return has jumped from approximately 5

percent to above 40 percent. The number of cases referred to DOJ for proceedings before an immigration judge has also risen sharply, more than tripling between 2013 and 2018. These numbers are projected to continue to increase throughout the remainder of Fiscal Year ("FY") 2019 and beyond. Only a small minority of these individuals, however, are ultimately granted asylum.

The large number of meritless asylum claims places an extraordinary strain on the nation's immigration system, undermines many of the humanitarian purposes of asylum, has exacerbated the humanitarian crisis of human smuggling, and affects the United States' ongoing diplomatic negotiations with foreign countries. This rule mitigates the strain on the country's immigration system by more efficiently identifying aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture. Aliens who transited through another country where protection was available, and yet did not seek protection, may fall within that category.

Apprehending the great number of aliens crossing illegally into the United States and processing their credible-fear and asylum claims consumes an inordinate amount of resources of the Departments. DHS must surveil, apprehend, screen, and process the aliens who enter the country. DHS must also devote significant resources to detain many aliens pending further proceedings and to represent the United States in immigration court proceedings. The large influx of aliens also consumes substantial resources of DOJ, whose immigration judges adjudicate aliens' claims and whose officials are responsible for prosecuting and maintaining custody over those who violate Federal criminal law. Despite DOJ deploying close to double the number of immigration judges as in 2010 and completing historic numbers of cases, currently more than 900,000 cases are pending before the immigration courts. This represents an increase of more than 100,000 cases (or a greater than 13 percent increase in the number of pending cases) since the start of FY 2019. And this increase is on top of an already sizeable jump over the previous five years in the number of cases pending before immigration judges. From the end of FY 2013 to the close of FY 2018, the number of pending cases more than doubled, increasing nearly 125 percent.

That increase is owing, in part, to the continued influx of aliens and record numbers of asylum applications being filed: More than 436,000 of the currently pending immigration cases include an asylum application. But a large majority of the asylum claims raised by those apprehended at the southern border are ultimately determined to be without merit. The strain on the immigration system from those meritless cases has been extreme and extends to the judicial system. The INA provides many asylum-seekers with rights of appeal to the Article III courts of the United States. Final disposition of asylum claims, even those that lack merit, can take years and significant government resources to resolve, particularly where Federal courts of appeals grant stays of removal when appeals are filed. *See De Leon* v. *INS*, 115 F.3d 643 (9th Cir. 1997).

The rule's bar on asylum eligibility for aliens who fail to apply for protection in at least one third country through which they transit en route to the United States also aims to further the humanitarian purposes of asylum. It prioritizes individuals who are unable to obtain protection from persecution elsewhere and individuals who are victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11, many of whom do not volitionally transit through a third country to reach the United States. By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have obtained protection in another country, the Departments seek to ensure that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking are able to obtain relief more quickly.

Additionally, the rule seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing the incentive for aliens without an urgent or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will enable them to remain in the United States for years, typically free from detention and with work authorization, despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, the rule aims to aid the United States in its negotiations with foreign nations on migration issues. Addressing the eligibility for asylum of aliens who enter or attempt to enter the United States after failing to seek protection in at least one third country through which they transited en route to the United States will better position the United States as it engages in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) regarding migration issues in general, related measures employed to control the flow of aliens into the United States (such as the recently implemented Migrant Protection Protocols [1]), and the urgent need to address the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, this rule provides that, with limited exceptions, an alien who enters or arrives in the United States across the southern land border is ineligible for the discretionary benefit of asylum unless he or she applied for and received a final judgment denying protection in at least one third country through which he or she transited en route to the United States. The alien would, however, remain eligible to apply for statutory withholding of removal and for deferral of removal under the CAT.

In order to alleviate the strain on the U.S. immigration system and more effectively provide relief to those most in need of asylum—victims of a severe form of trafficking and refugees who have no other option—this rule incorporates the eligibility bar on asylum into the credible-fear screening process applicable to stowaways and aliens placed in expedited removal proceedings.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charged the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and granted the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* at 1103(a)(3). The HSA also transferred to DHS some responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). That authority has been delegated within DHS to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers

[1] *See* Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 FR 6811 (Feb. 28, 2019).

determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.4(b), 208.9.

But the HSA retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) for DOJ, under EOIR and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (Board), also within DOJ, hears appeals from certain decisions by immigration judges. 8 CFR 1003.1(b)–(d). Asylum-seekers may appeal certain Board decisions to the Article III courts of the United States. *See* INA 242(a), 8 U.S.C. 1252(a).

The HSA also provided "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

*B. Legal Framework for Asylum*

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that generally, if granted, keeps an alien from being subject to removal, creates a path to lawful permanent resident status and U.S. citizenship, and affords a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R– S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed subject to certain exceptions and can travel abroad with prior consent); INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2) (asylees shall be given work authorization; asylum applicants may be granted work authorization 180 days after the filing of their applications); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for an asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); 8 CFR 209.2; 8 U.S.C. 1612(a)(2)(A) (asylees are eligible for certain Federal means-tested benefits on a preferential basis compared to most legal permanent residents); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for the naturalization of lawful permanent residents).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 8 U.S.C. 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise the discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A)(ii); 8 CFR 1240.8(d); *see Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriving" in the United States, INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to obtain asylum, the alien must demonstrate that he or she meets the statutory definition of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2); 8 CFR 1240.8(d). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi), an alien must show not only that he or she does not fit within one of the statutory bars to granting asylum but also that he or she is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for asylum" established by a regulation that is "consistent with" section 208 of the INA, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). The asylum applicant bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir. 2007) (same).

Because asylum is a discretionary benefit, those aliens who are statutorily eligible for asylum (*i.e.,* those who meet the definition of "refugee" and are not subject to a mandatory bar) are not entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "[i]s a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.' " *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis.

*C. Establishing Bars to Asylum*

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum statute, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the INA. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–

**Federal Register** / Vol. 84, No. 136 / Tuesday, July 16, 2019 / Rules and Regulations     **33833**

29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the then-existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See* 45 FR at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who (1) persecuted others on account of a protected ground; (2) were convicted of a particularly serious crime in the United States; (3) firmly resettled in another country; or (4) presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar), *abrogated on other grounds, Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc). In the Immigration Act of 1990, Congress added an additional mandatory bar to applying for or being granted asylum for "an[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515 (1990).

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended section 208

of the INA, 8 U.S.C. 1158, to include the asylum provisions in effect today: Among other things, Congress designated three categories of aliens who, with limited exceptions, are ineligible to apply for asylum: (1) Aliens who can be removed to a safe third country pursuant to a bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C). Congress also adopted six mandatory bars to granting asylum, which largely tracked the pre-existing asylum regulations. These bars prohibited asylum for (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific bars to asylum eligibility, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime," the perpetrator of which "constitutes a danger to the community of the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to identify additional particularly serious

crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) (finding that Congress's decisions over time to amend the particularly serious crime bar by statute did not call into question the Board's additional authority to name serious crimes via case-by-case adjudication); *Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006) (relying on the absence of an explicit statutory mandate that the Attorney General designate "particular serious crimes" *only* via regulation). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii).[2]

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General and the Secretary to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the creation by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General has previously invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). More recently, the Attorney General and Secretary invoked section 208(b)(2)(C) to limit eligibility for asylum for aliens subject to a bar on entry under certain presidential proclamations. *See* Aliens Subject to a Bar on Entry Under Certain Presidential

---

[2] These provisions continue to refer only to the Attorney General, but the Departments interpret the provisions to also apply to the Secretary by operation of the HSA, Public Law 107–296. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

AR.00335

Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018).[3] The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the HSA, also the Secretary) significant discretion to adopt additional bars to asylum eligibility. As noted above, when creating mandatory bars to asylum eligibility in the IIRIRA, Congress simultaneously delegated the authority to create additional bars in section 1158(b)(2)(C). Public Law 104–208, sec. 604 (codified at 8 U.S.C. 1158(b)(2)). Pursuant to this broad delegation of authority, the Attorney General and the Secretary have in the past acted to protect the integrity of the asylum system by limiting eligibility for those who do not truly require this country's protection, and do so again here. *See, e.g.,* 83 FR at 55944; 65 FR at 76126.

In promulgating this rule, the Departments rely on the broad authority granted by 8 U.S.C. 1158(b)(2)(C) to protect the "core regulatory purpose" of asylum law by prioritizing applicants "with nowhere else to turn." *Matter of B–R–,* 26 I&N Dec. 119, 122 (BIA 2013) (internal quotation marks omitted) (explaining that, in light of asylum law's "core regulatory purpose," several provisions of the U.S. Code "limit an alien's ability to claim asylum in the United States when other safe options are available"). Such prioritization is consistent with the purpose of the statutory firm-resettlement bar (8 U.S.C. 1158(b)(2)(A)(vi)), which likewise was implemented to limit the availability of asylum for those who are seeking to choose among a number of safe countries. *See Sall* v. *Gonzales,* 437 F.3d 229, 233 (2d Cir. 2006); *Matter of A–G–G–,* 25 I&N Dec. 486, 503 (BIA 2011); *see also* 8 CFR 1158(a)(2)(A) (providing that aliens who may be removed, pursuant to a bilateral or multilateral agreement, to a safe third country may not apply for asylum, and further demonstrating the intention of Congress to afford asylum protection only to those applicants who cannot seek effective protection in third countries). The concern with avoiding such forum-shopping has only been heightened by the dramatic increase in aliens entering or arriving in the United States along the southern border after transiting through one or more third countries where they could have sought protection, but did not. *See infra* at 33–41; *Kalubi* v. *Ashcroft,* 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that forum-shopping might be "part of the totality of circumstances that sheds light on a request for asylum in this country"). While under the current regulatory regime the firm-resettlement bar applies only in circumstances in which offers of permanent status have been extended by third countries, *see* 8 CFR 208.15, 1208.15, the additional bar created by this rule also seeks—like the firm-resettlement bar—to deny asylum protection to those persons effectively choosing among several countries where avenues to protection from return to persecution are available by waiting until they reach the United States to apply for protection. *See Sall,* 437 F.3d at 233. Thus, the rule is well within the authority conferred by section 208(b)(2)(C).

*D. Other Forms of Protection*

Aliens who are not eligible to apply for or receive a grant of asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4); 8 CFR 1208.16(a). And an immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the implementing legislation regarding U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b) (1998); 8 CFR 1208.13(c); 8 CFR 1208.3(b), *see also* 8 CFR 1208.16(c) and 1208.17.

Those forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a). In contrast to the more generous benefits available through asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as derivative protection for family members) and access to Federal means-tested public benefits. *See R–S–C,* 869 F.3d at 1180.

*E. Implementation of International Treaty Obligations*

The framework described above is consistent with certain U.S. obligations under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2–34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v.

---

[3] This rule is currently subject to a preliminary injunction against its enforcement. *See East Bay Sanctuary Covenant* v. *Trump,* 354 F. Supp. 3d 1094, 1115, 1121 (N.D. Cal. 2018), *on remand from* 909 F.3d 1219 (9th Cir. 2018).

*Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ("[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of their obligations have been implemented by domestic legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, rather than through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b); 8 CFR 208.16(b)– (c), 208.17–208.18; 1208.16(b)–(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R–S–C,* 869 F.3d at 1188 & n. 11; *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Courts have rejected arguments that the Refugee Convention, as implemented, requires that every qualified refugee receive asylum. For example, the Supreme Court has made clear that Article 34, which concerns the assimilation and naturalization of refugees, is precatory and not mandatory, and, accordingly, does not mandate that all refugees be granted asylum. *See Cardoza-Fonseca,* 480 U.S. at 441. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See id.; see also R–S–C,* 869 F.3d at 1188; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun,* 856 F.3d at 257 & n. 16; *Garcia,* 856 F.3d at 42; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has also recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. For example, courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under

Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 & n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *R–S–C,* 869 F.3d at 1188; *Garcia,* 856 F.3d at 42.

## IV. Regulatory Changes

*A. Limitation on Eligibility for Asylum for Aliens Who Enter or Attempt To Enter the United States Across the Southern Land Border After Failing To Apply for Protection in at Least One Country Through Which They Transited En Route to the United States*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar to eligibility for asylum for an alien who enters or attempts to enter the United States across the southern border, but who did not apply for protection from persecution or torture where it was available in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, such as in Mexico via that country's robust protection regime. The bar would be subject to several limited exceptions, for (1) an alien who demonstrates that he or she applied for protection from persecution or torture in at least one of the countries through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country; (2) an alien who demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or (3) an alien who has transited en route to the United States through only a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT.

In all cases the burden would remain with the alien to establish eligibility for asylum consistent with current law, including—if the evidence indicates that a ground for mandatory denial applies—the burden to prove that a ground for mandatory denial of the asylum application does not apply. 8 CFR 1240.8(d).

In addition to establishing a new mandatory bar for asylum eligibility for

an alien who enters or attempts to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which he or she transited en route to the United States, this rule would also modify certain aspects of the process for screening fear claims asserted by such aliens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Under current procedures, aliens subject to expedited removal may avoid being removed by making a threshold showing of a credible fear of persecution or torture at an initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in removal proceedings under section 240 of the INA, especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to a third-country-transit asylum eligibility bar would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening the new mandatory third-country-transit asylum eligibility bar imposed by the present rule.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens— apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under section 212(a)(6)(C) or (a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an

alien encountered in the interior of the United States who entered the country after the publication of this rule imposing the third-country-transit bar and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, the House Judiciary Committee expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." H.R. Rep. No. 104–469, pt. 1, at 107 (1996). The Committee accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (D.C. Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House

report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H.R. Rep. No. 104–69, at 158.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the Federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998 at sec. 2242(b) (requiring implementation of the CAT); IIRIRA at sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately meeting the statutory standards for asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B), *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for

asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.13(c)(1), 208.30(e)(2)–(4), 1208.13(c)(1), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum," not the CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process and screening standard for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT regulations, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the former Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have had were referred as well. This was done on the assumption that it would not "disrupt[] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not mandate that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same manner.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protection. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent

resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he or she is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a ''reasonable fear'' of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e).

To establish a reasonable fear of persecution or torture, an alien must establish a ''reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal.'' *Id.* § 208.31(c). ''This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard.'' Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing ''fair and efficient procedures'' in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, ''[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum,'' and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. ''Because the standard for showing entitlement to these forms of protection (a clear probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'' *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of falling subject to this rule's third-country-transit eligibility bar, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103(a)(3), 8 U.S.C. 1103(a)(3), and to regulate ''conditions or limitations on the consideration of an application for asylum,'' *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in his ''sole and unreviewable discretion,'' the exercise of which may be ''modified at any time''—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to the third-country-transit bar and nonetheless has entered the United States along the southern land border after the effective date of this rule creating the bar would be ineligible for asylum and would thus not be able to establish a ''significant possibility . . . [of] eligibility for asylum under section 1158.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation or suspension on entry imposed by the third-country-transit bar. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of falling subject to the third-country-transit bar, however, would still be screened, but in a manner that reflects that their only viable claims could be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16. After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with DOJ's longstanding rationale that ''aliens ineligible for asylum,'' who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 (''Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum[,] . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'').

3. The screening process established by the interim rule accordingly will proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All such aliens will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to the third-country-transit bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the third-country-transit bar, then the asylum officer will make a negative credible-fear finding.

The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the third-country-transit asylum eligibility bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the third-country-transit ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the third-country-transit bar, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the Board and then seek review from a Federal court of appeals.

Conversely, an alien who is found to be subject to the third-country-transit asylum eligibility bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the third-country-transit asylum eligibility bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the third-country-transit asylum eligibility bar will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.

4. The above process will not affect the process in 8 CFR 208.30(e)(5) (to be redesignated as 8 CFR 208.30(e)(5)(i) under this rule) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings and have their asylum claim adjudicated by an immigration judge, if they establish a credible fear of persecution, followed by further review of any denial of their asylum application before the Board and the courts of appeals.

### B. Anticipated Effects of the Rule

When the expedited procedures were first implemented approximately two decades ago, very few aliens within those proceedings claimed a fear of persecution. Since then, the numbers have dramatically increased. In FY 2018, USCIS received 99,035 credible-fear claims, a 175 percent increase from five years earlier and a 1,883 percent increase from ten years earlier. FY 2019 is on track to see an even greater increase in claims, with more than 35,000 credible-fear claims received in the first four months of the fiscal year. This unsustainable, increased burden on the U.S. immigration system also extends to DOJ: Immigration courts received over 162,000 asylum applications in FY 2018, a 270 percent increase from five years earlier.

This dramatic increase in credible-fear claims has been complicated by a demographic shift in the alien population crossing the southern border from Mexican single adult males to predominantly Central American family units and unaccompanied alien minors. Historically, aliens coming unlawfully to the United States along the southern land border were predominantly Mexican single adult males who generally were removed or who voluntarily departed within 48 hours if they had no legal right to stay in the United States. As of January 2019, more than 60 percent are family units and unaccompanied alien children; 60 percent are non-Mexican. In FY 2017, CBP apprehended 94,285 family units from the Northern Triangle countries at the southern land border. Of those family units, 99 percent remained in the country (as of January 2019). And, while Mexican single adults who are not legally eligible to remain in the United States may be immediately repatriated to Mexico, it is more difficult to expeditiously repatriate family units and unaccompanied alien children not from Mexico or Canada. And the long and arduous journey of children to the United States brings with it a great risk of harm that could be relieved if individuals were to more readily avail themselves of legal protection from persecution in a third country closer to the child's country of origin.

Even though the overall number of apprehensions of illegal aliens was relatively higher two decades ago than it is today (around 1.6 million in 2000), given the demographic of aliens arriving to the United States at that time, they could be processed and removed more quickly, often without requiring detention or lengthy court proceedings. Moreover, apprehension numbers in past years often reflected individuals being apprehended multiple times over the course of a given year.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who claim a fear of persecution or torture and are subsequently placed into removal proceedings before an immigration judge. This is particularly true for non-Mexican aliens, who now constitute the overwhelming majority of aliens encountered along the southern border with Mexico, and the overwhelming majority of aliens who assert claims of fear. But while the number of non-Mexican aliens encountered at the southern border has dramatically increased, a substantial number of such aliens failed to apply for asylum or refugee status in Mexico—despite the availability of a functioning asylum system.

In May of FY 2017, DHS recorded 7,108 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 36 percent of all enforcement actions along the southern border that month. In May of FY 2018, DHS recorded 32,477 enforcement actions with non-Mexican aliens along the southern border—which accounted for roughly 63 percent of that month's enforcement actions along the southern border. And in May of FY 2019, DHS recorded 121,151 enforcement actions with non-Mexican aliens along the southern border—which accounted for approximately 84 percent of enforcement actions along the southern border that month. Accordingly, the number of enforcement actions involving non-Mexican aliens increased by more than 1,600 percent from May FY 2017 to May FY 2019, and the percentage of enforcement actions at the southern land border involving non-Mexican aliens increased from 36 percent to 84 percent. Overall, southern border non-Mexican enforcement actions in FY 2017 totaled 233,411; they increased to 298,503 in FY 2018; and, in the first eight months of FY 2019 (through May) they already total 524,446.

This increase corresponds to a growing trend over the past decade, in which the overall percentage of all aliens subject to expedited removal who are referred for a credible-fear interview by DHS jumped from approximately 5 percent to above 40 percent. The total number of aliens referred by DHS for credible-fear screening increased from

fewer than 5,000 in FY 2008 to more than 99,000 in FY 2018. The percentage of aliens who receive asylum remains small. In FY 2018, DHS asylum officers found over 75 percent of interviewed aliens to have a credible fear of persecution or torture and referred them for proceedings before an immigration judge within EOIR under section 240 of the INA. In addition, EOIR immigration judges overturn about 20 percent of the negative credible-fear determinations made by asylum officers, finding those aliens also to have a credible fear. Such aliens are referred to immigration judges for full hearings on their asylum claims.

But many aliens who receive a positive credible-fear determination never file an application for asylum. From FY 2016 through FY 2018, approximately 40 percent of aliens who received a positive credible-fear determination failed to file an asylum application. And of those who did proceed to file asylum applications, relatively few established that they should be granted such relief. From FY 2016 through FY 2018, among aliens who received a positive credible-fear determination, only 12,062 aliens [4]—an average of 4,021 per year—were granted asylum (14 percent of all completed asylum cases, and about 36 percent of asylum cases decided on the merits).[5] The many cases that lack merit occupy a large portion of limited docket time and absorb scarce government resources, exacerbating the backlog and diverting attention from other meritorious cases. Indeed, despite DOJ deploying the largest number of immigration judges in history and completing historic numbers of cases, a significant backlog remains. There are more than 900,000 pending cases in immigration courts, at least 436,000 of which include an asylum application.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures consumes an ever-increasing amount of resources of DHS, which must surveil, apprehend, screen, and process the aliens who enter the country and must represent the U.S. Government in cases before immigration judges, the Board, and the U.S. Courts of Appeals. The interim rule seeks to ameliorate these strains on the immigration system.

The rule also aims to further the humanitarian purposes of asylum by prioritizing individuals who are unable to obtain protection from persecution elsewhere and individuals who have been victims of a "severe form of trafficking in persons" as defined by 8 CFR 214.11,[6] many of whom do not volitionally transit through a third country to reach the United States.[7] By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have sought protection in another country before reaching the United States, the Departments seek to ensure that those asylees who need relief most urgently are better able to obtain it.

The interim rule would further this objective by restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity. An alien's decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful.[8] By barring such claims, the interim final rule would encourage those fleeing genuine persecution to seek protection as soon as possible and dissuade those with non-viable claims, including aliens merely seeking employment, from further overburdening the Nation's immigration system.

Many of the aliens who wait to seek asylum until they arrive in the United States transit through not just one country, but multiple countries in which they may seek humanitarian protection. Yet they do not avail themselves of that option despite their claims of fear of persecution or torture in their home country. Under these circumstances, it is reasonable to question whether the aliens genuinely fear persecution or torture, or are simply economic migrants seeking to exploit our overburdened immigration system by filing a meritless asylum claim as a way of entering, remaining, and legally obtaining employment in the United States.[9]

All seven countries in Central America plus Mexico are parties to both the Refugee Convention and the Refugee Protocol. Moreover, Mexico has expanded its capacity to adjudicate asylum claims in recent years, and the number of claims submitted in Mexico has increased. In 2016, the Mexican government received 8,789 asylum applications. In 2017, it received 14,596. In 2018, it received 29,623 applications. And in just the first three months of 2019, Mexico received 12,716 asylum

---

[4] These numbers are based on data generated by EOIR on April 12, 2019.

[5] Completed cases include both those in which an asylum application was filed and those in which an application was not filed. Cases decided on the merits include only those completed cases in which an asylum application was filed and the immigration judge granted or denied the application.

[6] "Severe form of trafficking in persons means sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act is under the age of 18 years; or the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 8 CFR 214.11. Determinations made with respect to this exception will not be binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

[7] This rule does not provide for a categorical exception for unaccompanied alien children ("UAC"), as defined in 6 U.S.C. 279(g)(2). The Departments recognize that UAC are exempt from two of three statutory bars to applying for asylum: The "safe third country" bar and the one-year filing deadline, see INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E). Congress, however, did not exempt UAC from the bar on filing successive applications for asylum, see INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C), the various bars to asylum eligibility in INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), or the bars, like this one, established pursuant to the Departments' authorities under INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). But UAC, like others subject to this rule, will be able to apply for withholding of removal under INA section 241(b)(3), 8 U.S.C. 1231(b)(3), or the CAT regulations. UAC will not be returned to the transit country for consideration of these protection claims.

[8] Indeed, the Board has previously held that this is a relevant consideration in asylum applications. In *Matter of Pula,* 19 I&N Dec. 467, 473–74 (BIA 1987), the Board stated that "in determining whether a favorable exercise of discretion is warranted" for an applicant under the asylum statute, INA 208(a), 8 U.S.C. 1158(2)(a), "[a]mong those factors which should be considered are whether the alien passed through any other

countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States." Consistent with the reasoning in *Pula,* this rule establishes that an alien who failed to request asylum in a country where it was available is not eligible for asylum in the United States. Even though the Board in *Pula* indicated that a range of factors is relevant to evaluating discretionary asylum relief under the general *statutory* asylum provision, the INA also authorizes the establishment of additional limitations to asylum eligibility by *regulation*—beyond those embedded in the statute. *See* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). This rule uses that authority to establish one of the factors specified as relevant in *Pula* as the foundation of a new categorical asylum bar. This rule's prioritization of the third-country-transit factor, considered as just one of many factors in *Pula,* is justified, as explained above, by the increased numbers and changed nature of asylum claims in recent years.

[9] Economic migrants are not eligible for asylum. *See, e.g., In re: Brenda Leticia Sonday-Chavez,* No. A–7–969, 2017 WL 4946947, at *1 (BIA Sept. 7, 2017) ("[E]conomic reasons for coming to the United States . . . would generally not render an alien eligible for relief from removal."); *see also Sale* v. *Haitian Centers Council Inc.,* 509 U.S. 155, 161–62 & n.11 (1993); *Hui Zhuang* v. *Gonzales,* 471 F.3d 884, 890 (8th Cir. 2006) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution.").

applications, putting Mexico on track to receive more than 50,000 asylum applications by the end of 2019 if that quarterly pace continues. Instead of availing themselves of these available protections, many aliens transiting through Central America and Mexico decide not to seek protection, likely based upon a preference for residing in the United States. The United States has experienced an overwhelming surge in the number of non-Mexican aliens crossing the southern border and seeking asylum. This overwhelming surge and its accompanying burden on the United States has eroded the integrity of our borders, and it is inconsistent with the national interest to provide a discretionary benefit to those who choose not to seek protection at the first available opportunity.

The interim final rule also is in keeping with the efforts of other liberal democracies to prevent forum-shopping by directing asylum-seekers to present their claims in the first safe country in which they arrive. In 1990, European states adopted the Dublin Regulation in response to an asylum crisis as refugees and economic migrants fled communism at the end of the Cold War; it came into force in 1997. *See* Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, 1997 O.J. (C 254). The United Nations High Commission for Refugees praised the Dublin Regulation's "commendable efforts to share and allocate the burden of review of refugee and asylum claims." *See* UN High Comm'r for Refugees, *UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions),* 3 Eur. Series 2, 385 (1991). Now in its third iteration, the Dublin III Regulation sets asylum criteria and protocol for the European Union ("EU"). It instructs that asylum claims "shall be examined by a single Member State." Regulation (EU) No 604/2013 of the European Parliament and of the Council of 26 June 2013, Establishing the Criteria and Mechanisms for Determining the Member State Responsible for Examining an Application for International Protection Lodged in One of the Member States by a Third-Country National or a Stateless Person (Recast), 2013 O.J. (L 180) 31, 37. Typically, for irregular migrants seeking asylum, the member state by which the asylum applicant first entered the EU "shall be responsible for examining the application for international protection." *Id.* at 40. Generally, when

a third-country national seeks asylum in a member state other than the state of first entry into the EU, that state may transfer the asylum-seeker back to the state of first safe entry. *Id.* at 2.

This rule also seeks to curtail the humanitarian crisis created by human smugglers bringing men, women, and children across the southern border. By reducing a central incentive for aliens without a genuine need for asylum to cross the border—the hope of a lengthy asylum process that will enable them to remain in the United States for years despite their statutory ineligibility for relief—the rule aims to reduce human smuggling and its tragic effects.

Finally, as discussed further below, this rule will facilitate ongoing diplomatic negotiations with Mexico and the Northern Triangle countries regarding general migration issues, related measures employed to control the flow of aliens (such as the Migrant Protection Protocols), and the humanitarian and security crisis along the southern land border between the United States and Mexico.

In sum, the rule would bar asylum for any alien who has entered or attempted to enter the United States across the southern border and who has failed to apply for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, unless the alien demonstrates that the alien only transited through countries that were not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the CAT, or the alien was a victim of "a severe form of trafficking in persons" as defined by 8 CFR 214.11.

Such a rule would ensure that the ever-growing influx of meritless asylum claims do not further overwhelm the country's immigration system, would promote the humanitarian purposes of asylum by speeding relief to those who need it most (*i.e.,* individuals who have no alternative country where they can escape persecution or torture or who are victims of a severe form of trafficking and thus did not volitionally travel through a third country to reach the United States), would help curtail the humanitarian crisis created by human smugglers, and would aid U.S. negotiations on migration issues with foreign countries.

## V. Regulatory Requirements

### A. Administrative Procedure Act

#### 1. Good Cause Exception

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). That exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010); *Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982). Agencies have previously relied on that exception in promulgating immigration-related interim rules.[10] Furthermore, DHS has relied on that exception as additional legal justification when issuing orders related to expedited removal—a context in which Congress explicitly recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[11]

---

[10] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over a six-month period).

[11] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017) (identifying the APA good cause factors as additional justification for issuing an immediately effective expedited removal order because the ability to detain certain Cuban nationals "while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status,

The Departments have concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid a surge of aliens who would have strong incentives to seek to cross the border during pre-promulgation notice and comment or during the 30-day delay in the effective date under 5 U.S.C. 553(d). As courts have recognized, smugglers encourage migrants to enter the United States based on changes in U.S. immigration policy, and in fact "the number of asylum seekers entering as families has risen" in a way that "suggests a link to knowledge of those policies." *East Bay Sanctuary Covenant* v. *Trump*, 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018). If this rule were published for notice and comment before becoming effective, "smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy, albeit in non-technical terms," and the risk of a surge in migrants hoping to enter the country before the rule becomes effective supports a finding of good cause under 5 U.S.C. 553. *See id.*

This determination is consistent with the historical view of the agencies regulating in this area. DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017). DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to

travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded that "a surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

DOJ and DHS raised similar concerns and drew similar conclusions in the November 2018 joint interim final rule that limited eligibility for asylum for aliens, subject to a bar on entry under certain presidential proclamations. *See* 83 FR at 55950. These same concerns would apply to an even greater extent to this rule. Pre-promulgation notice and comment, or a delay in the effective date, would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect. The Departments' experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border. *See East Bay Sanctuary Covenant*, 354 F. Supp. 3d at 1115 (citing a newspaper article suggesting that such a rush to the border occurred due to knowledge of a pending regulatory change in immigration law). Thus, there continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." 69 FR at 48878.

Furthermore, an additional surge of aliens who sought to enter via the southern border prior to the effective date of this rule would be destabilizing to the region, as well as to the U.S. immigration system. The massive increase in aliens arriving at the southern border who assert a fear of persecution is overwhelming our

immigration system as a result of a variety of factors, including the significant proportion of aliens who are initially found to have a credible fear and therefore are referred to full hearings on their asylum claims; the huge volume of claims; a lack of detention space; and the resulting high rate of release into the interior of the United States of aliens with a positive credible-fear determination, many of whom then abscond without pursuing their asylum claims. Recent initiatives to track family unit cases revealed that close to 82 percent of completed cases have resulted in an *in absentia* order of removal. A large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis. This concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events. This interim final rule is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx. An extended notice-and-comment rulemaking process would be impracticable and self-defeating for the public.

2. Foreign Affairs Exemption

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1), and proceeding through notice and comment may "provoke definitely undesirable international consequences," *City of New York* v. *Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010) (quoting the description of the purpose of the foreign affairs exception in H.R. Rep. No. 79–1980, 69th Cong., 2d Sess. 257 (1946)). The flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy and national security interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017) (discussing the important national security and foreign affairs-related interests associated with securing the border); Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System (Apr. 29, 2019) ("This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty."); *see also, e.g., Malek-Marzban* v. *INS*, 653 F.2d 113, 115–16 (4th Cir. 1981) (finding that a regulation

is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004) (identifying the APA good cause factors as additional justification for issuing an immediately effective order to expand expedited removal due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

requiring the expedited departure of Iranians from the United States in light of the international hostage crisis clearly related to foreign affairs and fell within the notice-and-comment exception).

This rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States (such as the Migrant Protection Protocols), and the urgent need to address the current humanitarian and security crisis along the southern land border between the United States and Mexico. *See City of New York*, 618 F.3d at 201 (finding that rules related to diplomacy with a potential impact on U.S. relations with other countries fall within the scope of the foreign affairs exemption). Those ongoing discussions relate to proposals for how these other countries could increase efforts to help reduce the flow of illegal aliens north to the United States and encourage aliens to seek protection at the safest and earliest point of transit possible.

Those negotiations would be disrupted if notice-and-comment procedures preceded the effective date of this rule—provoking a disturbance in domestic politics in Mexico and the Northern Triangle countries, and eroding the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners. *See, e.g., Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (the foreign affairs exemption facilitates "more cautious and sensitive consideration of those matters which so affect relations with other Governments that . . . public rulemaking provisions would provoke definitely undesirable international consequences" (internal quotation marks omitted)). During a notice-and-comment process, public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries— actors with whom the United States must partner to ensure that refugees can more effectively find refuge and safety in third countries. *Cf. Rajah* v. *Mukasey*, 544 F.3d 427, 437–38 (2d Cir. 2008) ("[R]elations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security.").

In addition, the longer that the effective date of the interim rule is delayed, the greater the number of people who will pass through third countries where they may have

otherwise received refuge and reach the U.S. border, which has little present capacity to provide assistance. *Cf. East Bay Sanctuary Covenant* v. *Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018) ("Hindering the President's ability to implement a new policy in response to a current foreign affairs crisis is the type of 'definitely undesirable international consequence' that warrants invocation of the foreign affairs exception."). Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place to help address the enormous flow of aliens through these countries to the southern U.S. border. *Cf. Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.*, 751 F.2d at 1249 ("The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country."); *Rajah*, 544 F.3d at 438 (finding that the notice-and-comment process can be "slow and cumbersome," which can negatively impact efforts to secure U.S. national interests, thereby justifying application of the foreign affairs exemption); *East Bay Sanctuary Covenant*, 909 F.3d at 1252–53 (9th Cir. 2018) (suggesting that reliance on the exemption is justified where the Government "explain[s] how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment" is necessary in light of the Government's foreign affairs efforts).

The United States and Mexico have been engaged in ongoing discussions regarding both regional and bilateral approaches to asylum. This interim final rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations. This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.*, 751 F.2d at 1249 (noting that the foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the

foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was consistent with the foreign affairs exception for rules subject to notice-and-comment requirements because the change was central to ongoing negotiations between the two countries. Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902, 4904–05 (Jan. 17, 2017).

## B. Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

## C. Unfunded Mandates Reform Act of 1995

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## D. Congressional Review Act

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-

based companies in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This rule is not subject to Executive Order 12866 as it implicates a foreign affairs function of the United States related to ongoing discussions with potential impact on a set of specified international relationships. As this is not a regulatory action under Executive Order 12866, it is not subject to Executive Order 13771.

*F. Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; 8 CFR part 2.

■ 2. Section 208.13 is amended by adding paragraphs (c)(4) and (5) to read as follows:

**§ 208.13    Establishing asylum eligibility.**

\*    \*    \*    \*    \*

(c) \* \* \*

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the provisions of § 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11; or

(iii) The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the INA or for benefits or services

under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 3. In § 208.30, revise the section heading, the first sentence of paragraph (e)(2), and paragraphs (e)(3) and (5) to read as follows:

**§ 208.30    Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.**

\*    \*    \*    \*    \*

(e) \* \* \*

(2) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. \* \* \*

(3) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

\*    \*    \*    \*    \*

(5)(i) Except as provided in this paragraph (e)(5)(i) or paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(ii) If the alien is found to be an alien described in § 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's

claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

(iii) If the alien is found to be an alien described as ineligible for asylum in § 208.13(c)(4), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. The scope of review shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal, accordingly. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

\*    \*    \*    \*    \*

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231,

1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. In § 1003.42, revise paragraph (d) to read as follows:

## § 1003.42   Review of credible fear determination.

\*    \*    \*    \*    \*

(d) *Standard of review.* (1) The immigration judge shall make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum under section 208 of the Act or withholding under section 241(b)(3) of the Act or withholding or deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(2) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(ii), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

(3) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5)(iii), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) prior to any further review of the asylum officer's negative determination.

\*    \*    \*    \*    \*

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraphs (c)(4) and (5) to read as follows:

## § 1208.13   Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \*  \*  \*

(4) *Additional limitation on eligibility for asylum.* Notwithstanding the

provisions of 8 CFR 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or

(iii) The only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) *Non-binding determinations.* Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

■ 8. In § 1208.30, revise the section heading and paragraph (g)(1) to read as follows:

## § 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from persecution in a third country where potential relief is available while en route to the United States.

\*    \*    \*    \*    \*

(g) \*  \*  \*

(1) *Review by immigration judge of a mandatory bar finding.* (i) If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge

finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

(ii) If the alien is determined to be an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4). If the immigration judge finds that the alien is not described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described as ineligible for asylum in 8 CFR 208.13(c)(4) or 1208.13(c)(4), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

*    *    *    *    *

Approved:

Dated: July 12, 2019.

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

Approved:

Dated: July 12, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–15246 Filed 7–15–19; 8:45 am]

**BILLING CODE 4410–30–P; 9111–97–P**

# DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 73**

[Docket No. FAA–2018–0984; Airspace Docket No. 18–ASW–8]

**RIN 2120–AA66**

## Expansion of R–3803 Restricted Area Complex; Fort Polk, LA

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action expands the R–3803 restricted area complex in central Louisiana by establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and makes minor technical amendments to the existing R–3803A and R–3803B legal descriptions for improved operational efficiency and administrative standardization. The restricted area establishments and amendments support U.S. Army Joint Readiness Training Center training requirements at Fort Polk for military units preparing for overseas deployment.

**DATES:** *Effective date:* 0901 UTC, September 13, 2019.

**FOR FURTHER INFORMATION CONTACT:** Colby Abbott, Airspace Policy Group, Office of Airspace Services, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

### Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it establishes restricted area airspace at Fort Polk, LA, to enhance aviation safety and accommodate essential U.S. Army hazardous force-on-force and force-on-target training activities.

### History

The FAA published a notice of proposed rulemaking for Docket No.

FAA–2018–0984 in the **Federal Register** (83 FR 60382; November 26, 2018) establishing four new restricted areas, R–3803C, R–3803D, R–3803E, and R–3803F, and making minor technical amendments to the R–3803A and R–3803B descriptions for improved operational efficiency and administrative standardization in support of hazardous U.S. Army force-on-force and force-on-target training activities. Interested parties were invited to participate in this rulemaking effort by submitting written comments on the proposal. Two comments were received.

### Discussion of Comments

While supportive of the U.S. Army's need to train as they fight, the first commenter noted that modern general aviation aircraft have longer flight endurance today, making timely NOTAM publication of restricted area activations necessary for effective flight planning. To overcome the possibility of the restricted areas being activated with no advance notification, the commenter recommended adding "at least 4 hours in advance" to the "By NOTAM" time of designation proposed for the R–3803A, R–3803C, and R–3803D restricted areas. Additionally, the commenter requested the effective date of the proposed restricted areas, if approved, coincide with the next update of the Houston Sectional Aeronautical Chart.

It is FAA policy that when NOTAMs are issued to activate special use airspace, the NOTAMs should be issued as far in advance as feasible to ensure the widest dissemination of the information to airspace users. The FAA acknowledges that the addition of the "at least 4 hours in advance" provision to the proposed "By NOTAM" time of designation, as recommended by the commenter, would contribute to ensuring the widest dissemination of the restricted areas being activated to effected airspace users. As such, the FAA adopts the commenter's recommendation to amend the time of designation for R–3803A, R–3803C, and R–3803D to reflect "By NOTAM issued at least 4 hours in advance."

Additionally, the establishment of R–3803C, R–3803D, R–3803E, and R–3803F, and the minor technical amendments to the existing R–3803A and R–3803B legal descriptions are being made effective to coincide with the upcoming Houston Sectional Aeronautical Chart date.

The second commenter raised aerial access concerns of the area in which the new restricted areas were proposed to be established. The commenter stated

AR.00347

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## New Cases and Total Completions



| Fiscal Year | Initial Receipts[1] | Average Initial Receipts per Month | Total Completions[2] | Average Total Completions per Month |
|---|---|---|---|---|
| 2008 | 225,871 | 18,823 | 228,832 | 19,069 |
| 2009 | 255,035 | 21,253 | 231,607 | 19,301 |
| 2010 | 247,187 | 20,599 | 222,277 | 18,523 |
| 2011 | 238,157 | 19,846 | 219,132 | 18,261 |
| 2012 | 212,935 | 17,745 | 186,083 | 15,507 |
| 2013 | 196,621 | 16,385 | 155,964 | 12,997 |
| 2014 | 230,176 | 19,181 | 141,692 | 11,808 |
| 2015 | 192,997 | 16,083 | 143,654 | 11,971 |
| 2016 | 228,455 | 19,038 | 143,489 | 11,957 |
| 2017 | 295,236 | 24,603 | 163,068 | 13,589 |
| 2018 | 316,077 | 26,340 | 195,091 | 16,258 |
| 2019 | 543,997 | 45,333 | 276,821 | 23,068 |
| 2020 (Third Quarter)[3] | 310,789 | 34,532 | 214,427 | 23,825 |

Data Generated: July 14, 2020
[1] Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding only cases.
[2] Total completions equals initial case completions plus subsequent case completions.
[3] FY 2020 Third Quarter through June 30, 2020.

AR.00348

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Asylum Decision Rates[1]



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2008 | 8,731 | 23.68% | 11,494 | 31.18% | 14,298 | 38.79% | 2,341 | 6.35% | 36,864 |
| 2009 | 8,303 | 23.92% | 9,889 | 28.49% | 14,310 | 41.23% | 2,208 | 6.36% | 34,710 |
| 2010 | 8,167 | 25.34% | 8,360 | 25.93% | 12,395 | 38.45% | 3,314 | 10.28% | 32,236 |
| 2011 | 9,828 | 31.35% | 9,312 | 29.71% | 10,782 | 34.40% | 1,423 | 4.54% | 31,345 |
| 2012 | 10,421 | 30.55% | 8,513 | 24.96% | 10,321 | 30.26% | 4,853 | 14.23% | 34,108 |
| 2013 | 9,674 | 24.93% | 8,820 | 22.73% | 10,494 | 27.05% | 9,812 | 25.29% | 38,800 |
| 2014 | 8,543 | 22.84% | 9,224 | 24.66% | 10,131 | 27.08% | 9,509 | 25.42% | 37,407 |
| 2015 | 8,076 | 18.70% | 8,790 | 20.35% | 10,947 | 25.35% | 15,376 | 35.60% | 43,189 |
| 2016 | 8,649 | 15.80% | 11,691 | 21.36% | 12,841 | 23.46% | 21,563 | 39.39% | 54,744 |
| 2017 | 10,522 | 19.65% | 17,575 | 32.82% | 14,584 | 27.23% | 10,875 | 20.31% | 53,556 |
| 2018 | 13,128 | 20.68% | 26,507 | 41.76% | 21,752 | 34.27% | 2,090 | 3.29% | 63,477 |
| 2019 | 18,824 | 20.60% | 45,301 | 49.57% | 27,135 | 29.69% | 131 | 0.14% | 91,391 |
| 2020 (Third Quarter)[4] | 13,358 | 19.20% | 38,309 | 55.06% | 17,570 | 25.25% | 340 | 0.49% | 69,577 |

Data Generated: July 14, 2020
[1] Asylum decisions on affirmative and defensive applications issues in completed removal, deportation, exclusion, and asylum only proceedings or in proceedings that have been administratively closed. Initial case completions only.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative closure decisions for cases that have not been placed back on the docket. Redocketing occurs following an immigration judge's grant of a party's motion to recalendar.
[4] FY 2020 Third Quarter through June 30, 2020.

AR.00349

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Total Asylum Applications[1]



| Fiscal Year | Filed | Granted | Total Receipts : Total Grants Ratio |
|---|---|---|---|
| 2008 | 42,836 | 8,728 | 4.9:1 |
| 2009 | 35,812 | 8,301 | 4.31:1 |
| 2010 | 32,888 | 8,167 | 4.02:1 |
| 2011 | 41,466 | 9,828 | 4.21:1 |
| 2012 | 44,588 | 10,420 | 4.27:1 |
| 2013 | 43,505 | 9,674 | 4.49:1 |
| 2014 | 47,607 | 8,541 | 5.57:1 |
| 2015 | 63,744 | 8,072 | 7.89:1 |
| 2016 | 82,765 | 8,648 | 9.57:1 |
| 2017 | 145,274 | 10,521 | 13.8:1 |
| 2018 | 164,372 | 13,128 | 12.52:1 |
| 2019 | 213,320 | 18,824 | 11.33:1 |
| 2020 (Third Quarter)[2] | 155,023 | 13,350 | 11.61:1 |

Data Generated: July 14, 2020
[1] Total (affirmative and defensive) asylum applications filed and total asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.
[2] FY 2020 Third Quarter through June 30, 2020.

AR.00350

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

## Immigration Judge (IJ) Hiring



| FY | Total IJs Hired | Total IJs on Board |
|---|---|---|
| 2010 | 17 | 245 |
| 2011 | 39 | 273 |
| 2012 | 4 | 267 |
| 2013 | 8 | 262 |
| 2014 | 0 | 249 |
| 2015 | 20 | 254 |
| 2016 | 56 | 289 |
| 2017 | 64 | 338 |
| 2018 | 81 | 395 |
| 2019 | 92 | 442 |
| 2020 (Third Quarter) | 79 | 509 |

Data Generated: June 2020

AR.00351

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Current Representation Rates[1]



| Fiscal Year | Universe | Unrepresented | Represented | Total | Representation Rate |
|---|---|---|---|---|---|
| 2020 (Second Quarter)[4] | Overall Pending[2] | 410,152 | 707,913 | 1,118,065 | 63% |
| | All Pending UAC Cases[2] | 31,003 | 64,806 | 95,809 | 68% |
| | UAC Cases Pending More than One Year[2] | 14,825 | 61,075 | 75,900 | 80% |
| | Pending Asylum Cases[2] | 72,335 | 467,281 | 539,616 | 87% |
| | Completed Asylum Cases[3] | 15,563 | 51,396 | 66,959 | 77% |
| | All Completed Appeals | 3,779 | 13,040 | 16,819 | 78% |

### Asylum Decision Rates and Representation

| Fiscal Year | Represented Grants | Represented Grant Rate | Overall Grant Rate | Represented Denials | Represented Denial Rate | Overall Denial Rate | Represented Others | Represented Other Rate | Overall Other Rate | Total Represented |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 12,537 | 25% | 21% | 20,702 | 42% | 42% | 15,928 | 32% | 34% | 49,167 |
| 2019 | 17,392 | 24% | 21% | 36,247 | 50% | 50% | 18,833 | 26% | 30% | 72,472 |
| 2020 (Second Quarter)[4] | 11,298 | 23% | 19% | 27,004 | 55% | 55% | 10,627 | 22% | 25% | 48,929 |

Data Generated: April 15, 2020
[1] Representation status is recorded in EOIR's case management system when a representative of record is noted for a proceeding during an alien's immigration case.
[2] Representation in removal, deportation, exclusion, and asylum-only proceedings.
[3] Representation in removal, deportation, exclusion, and asylum-only proceedings. Initial and Subsequent Case Completions.
[4] FY 2020 Second Quarter through March 31, 2020.

United States Code Annotated
  Constitution of the United States
    Annotated
      Article III. The Judiciary

U.S.C.A. Const. Art. III

ARTICLE III. THE JUDICIARY

Currentness

**Section 1.** The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

**Section 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States,--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects. [1]

[1]    This clause has been affected by the Eleventh Amendment.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

**Section 3.** Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

U.S.C.A. Const. Art. III, USCA CONST Art. III
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Constitution of the United States
    Annotated
      Article IV. States--Reciprocal Relationship Between States and with United States

U.S.C.A. Const. Art. IV § 1

Section 1. Full Faith and Credit

Currentness

**Section 1.** Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

Notes of Decisions (627)

U.S.C.A. Const. Art. IV § 1, USCA CONST Art. IV § 1
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 378 of 3864

T. 5, Ch. III, Subch. B, Pt. 1320, Refs & Annos, C.F.R. T. 5, Ch. III, Subch. B, Pt....

Code of Federal Regulations
    Title 5. Administrative Personnel
        Chapter III. Office of Management and Budget
            Subchapter B. OMB Directives
                Part 1320. Controlling Paperwork Burdens on the Public

C.F.R. T. 5, Ch. III, Subch. B, Pt. 1320, Refs & Annos

Currentness

Authority: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

**Credits**

Source: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

Current through October 29, 2020; 85 FR 68703.

---

End of Document
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.1

§ 1320.1 Purpose.

Currentness

The purpose of this part is to implement the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 35)(the Act) concerning collections of information. It is issued under the authority of section 3516 of the Act, which provides that "The Director shall promulgate rules, regulations, or procedures necessary to exercise the authority provided by this chapter." It is designed to reduce, minimize and control burdens and maximize the practical utility and public benefit of the information created, collected, disclosed, maintained, used, shared and disseminated by or for the Federal government.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (1)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.2

§ 1320.2 Effect.

Currentness

(a) Except as provided in paragraph (b) of this section, this part takes effect on October 1, 1995.

(b)(1) In the case of a collection of information for which there is in effect on September 30, 1995, a control number issued by the Office of Management and Budget under 44 U.S.C. Chapter 35, the provisions of this Part shall take effect beginning on the earlier of:

(i) The date of the first extension of approval for or modification of that collection of information after September 30, 1995; or

(ii) The date of the expiration of the OMB control number after September 30, 1995.

(2) Prior to such extension of approval, modification, or expiration, the collection of information shall be subject to 5 CFR Part 1320, as in effect on September 30, 1995.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.3

§ 1320.3 Definitions.

Currentness

For purposes of implementing the Act and this Part, the following terms are defined as follows:

(a) Agency means any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the government, or any independent regulatory agency, but does not include:

(1) The General Accounting Office;

(2) Federal Election Commission;

(3) The governments of the District of Columbia and the territories and possessions of the United States, and their various subdivisions; or

(4) Government-owned contractor-operated facilities, including laboratories engaged in national defense research and production activities.

(b)(1) Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency, including:

(i) Reviewing instructions;

(ii) Developing, acquiring, installing, and utilizing technology and systems for the purpose of collecting, validating, and verifying information;

(iii) Developing, acquiring, installing, and utilizing technology and systems for the purpose of processing and maintaining information;

(iv) Developing, acquiring, installing, and utilizing technology and systems for the purpose of disclosing and providing information;

(v) Adjusting the existing ways to comply with any previously applicable instructions and requirements;

(vi) Training personnel to be able to respond to a collection of information;

(vii) Searching data sources;

(viii) Completing and reviewing the collection of information; and

(ix) Transmitting, or otherwise disclosing the information.

(2) The time, effort, and financial resources necessary to comply with a collection of information that would be incurred by persons in the normal course of their activities (e.g., in compiling and maintaining business records) will be excluded from the "burden" if the agency demonstrates that the reporting, recordkeeping, or disclosure activities needed to comply are usual and customary.

(3) A collection of information conducted or sponsored by a Federal agency that is also conducted or sponsored by a unit of State, local, or tribal government is presumed to impose a Federal burden except to the extent that the agency shows that such State, local, or tribal requirement would be imposed even in the absence of a Federal requirement.

(c) Collection of information means, except as provided in § 1320.4, the obtaining, causing to be obtained, soliciting, or requiring the disclosure to an agency, third parties or the public of information by or for an agency by means of identical questions posed to, or identical reporting, recordkeeping, or disclosure requirements imposed on, ten or more persons, whether such collection of information is mandatory, voluntary, or required to obtain or retain a benefit. "Collection of information" includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information. As used in this Part, "collection of information" refers to the act of collecting or disclosing information, to the information to be collected or disclosed, to a plan and/or an instrument calling for the collection or disclosure of information, or any of these, as appropriate.

(1) A "collection of information" may be in any form or format, including the use of report forms; application forms; schedules; questionnaires; surveys; reporting or recordkeeping requirements; contracts; agreements; policy statements; plans; rules or regulations; planning requirements; circulars; directives; instructions; bulletins; requests for proposal or other procurement requirements; interview guides; oral communications; posting, notification, labeling, or similar disclosure requirements; telegraphic or telephonic requests; automated, electronic, mechanical, or other technological collection techniques; standard questionnaires used to monitor compliance with agency requirements; or any other techniques or technological methods used to monitor compliance with agency requirements. A "collection of information" may implicitly or explicitly include related collection of information requirements.

(2) Requirements by an agency for a person to obtain or compile information for the purpose of disclosure to members of the public or the public at large, through posting, notification, labeling or similar disclosure requirements constitute

the "collection of information" whenever the same requirement to obtain or compile information would be a "collection of information" if the information were directly provided to the agency. The public disclosure of information originally supplied by the Federal government to the recipient for the purpose of disclosure to the public is not included within this definition.

(3) "Collection of information" includes questions posed to agencies, instrumentalities, or employees of the United States, if the results are to be used for general statistical purposes, that is, if the results are to be used for statistical compilations of general public interest, including compilations showing the status or implementation of Federal activities and programs.

(4) As used in paragraph (c) of this section, "ten or more persons" refers to the persons to whom a collection of information is addressed by the agency within any 12–month period, and to any independent entities to which the initial addressee may reasonably be expected to transmit the collection of information during that period, including independent State, territorial, tribal or local entities and separately incorporated subsidiaries or affiliates. For the purposes of this definition of "ten or more persons," "persons" does not include employees of the respondent acting within the scope of their employment, contractors engaged by a respondent for the purpose of complying with the collection of information, or current employees of the Federal government (including military reservists and members of the National Guard while on active duty) when acting within the scope of their employment, but it does include retired and other former Federal employees.

(i) Any recordkeeping, reporting, or disclosure requirement contained in a rule of general applicability is deemed to involve ten or more persons.

(ii) Any collection of information addressed to all or a substantial majority of an industry is presumed to involve ten or more persons.

(d) Conduct or Sponsor. A Federal agency is considered to "conduct or sponsor" a collection of information if the agency collects the information, causes another agency to collect the information, contracts or enters into a cooperative agreement with a person to collect the information, or requires a person to provide information to another person, or in similar ways causes another agency, contractor, partner in a cooperative agreement, or person to obtain, solicit, or require the disclosure to third parties or the public of information by or for an agency. A collection of information undertaken by a recipient of a Federal grant is considered to be "conducted or sponsored" by an agency only if:

(1) The recipient of a grant is conducting the collection of information at the specific request of the agency; or

(2) The terms and conditions of the grant require specific approval by the agency of the collection of information or collection procedures.

(e) Director means the Director of OMB, or his or her designee.

(f) Display means:

(1) In the case of forms, questionnaires, instructions, and other written collections of information sent or made available to potential respondents (other than in an electronic format), to place the currently valid OMB control number on the front page of the collection of information;

(2) In the case of forms, questionnaires, instructions, and other written collections of information sent or made available to potential respondents in an electronic format, to place the currently valid OMB control number in the instructions, near the title of the electronic collection instrument, or, for on-line applications, on the first screen viewed by the respondent;

(3) In the case of collections of information published in regulations, guidelines, and other issuances in the Federal Register, to publish the currently valid OMB control number in the Federal Register (for example, in the case of a collection of information in a regulation, by publishing the OMB control number in the preamble or the regulatory text for the final rule, in a technical amendment to the final rule, or in a separate notice announcing OMB approval of the collection of information). In the case of a collection of information published in an issuance that is also included in the Code of Federal Regulations, publication of the currently valid control number in the Code of Federal Regulations constitutes an alternative means of "display." In the case of a collection of information published in an issuance that is also included in the Code of Federal Regulations, OMB recommends for ease of future reference that, even where an agency has already "displayed" the OMB control number by publishing it in the Federal Register as a separate notice or in the preamble for the final rule (rather than in the regulatory text for the final rule or in a technical amendment to the final rule), the agency also place the currently valid control number in a table or codified section to be included in the Code of Federal Regulations. For placement of OMB control numbers in the Code of Federal Regulations, see 1 CFR 21.35.

(4) In other cases, and where OMB determines in advance in writing that special circumstances exist, to use other means to inform potential respondents of the OMB control number.

(g) Independent regulatory agency means the Board of Governors of the Federal Reserve System, the Commodity Futures Trading Commission, the Consumer Product Safety Commission, the Federal Communications Commission, the Federal Deposit Insurance Corporation, the Federal Energy Regulatory Commission, the Federal Housing Finance Board, the Federal Maritime Commission, the Federal Trade Commission, the Interstate Commerce Commission, the Mine Enforcement Safety and Health Review Commission, the National Labor Relations Board, the Nuclear Regulatory Commission, the Occupational Safety and Health Review Commission, the Postal Rate Commission, the Securities and Exchange Commission, and any other similar agency designated by statute as a Federal independent regulatory agency or commission.

(h) Information means any statement or estimate of fact or opinion, regardless of form or format, whether in numerical, graphic, or narrative form, and whether oral or maintained on paper, electronic or other media. "Information" does not generally include items in the following categories; however, OMB may determine that any specific item constitutes "information":

(1) Affidavits, oaths, affirmations, certifications, receipts, changes of address, consents, or acknowledgments; provided that they entail no burden other than that necessary to identify the respondent, the date, the respondent's address, and the nature of the instrument (by contrast, a certification would likely involve the collection of "information" if an agency conducted or sponsored it as a substitute for a collection of information to collect evidence of, or to monitor, compliance with regulatory standards, because such a certification would generally entail burden in addition to that necessary to identify the respondent, the date, the respondent's address, and the nature of the instrument);

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) Samples of products or of any other physical objects;

(3) Facts or opinions obtained through direct observation by an employee or agent of the sponsoring agency or through nonstandardized oral communication in connection with such direct observations;

(4) Facts or opinions submitted in response to general solicitations of comments from the public, published in the Federal Register or other publications, regardless of the form or format thereof, provided that no person is required to supply specific information pertaining to the commenter, other than that necessary for self-identification, as a condition of the agency's full consideration of the comment;

(5) Facts or opinions obtained initially or in follow-on requests, from individuals (including individuals in control groups) under treatment or clinical examination in connection with research on or prophylaxis to prevent a clinical disorder, direct treatment of that disorder, or the interpretation of biological analyses of body fluids, tissues, or other specimens, or the identification or classification of such specimens;

(6) A request for facts or opinions addressed to a single person;

(7) Examinations designed to test the aptitude, abilities, or knowledge of the persons tested and the collection of information for identification or classification in connection with such examinations;

(8) Facts or opinions obtained or solicited at or in connection with public hearings or meetings;

(9) Facts or opinions obtained or solicited through nonstandardized follow-up questions designed to clarify responses to approved collections of information; and

(10) Like items so designated by OMB.

(i) OMB refers to the Office of Management and Budget.

(j) Penalty includes the imposition by an agency or court of a fine or other punishment; a judgment for monetary damages or equitable relief; or the revocation, suspension, reduction, or denial of a license, privilege, right, grant, or benefit.

(k) Person means an individual, partnership, association, corporation (including operations of government-owned contractor-operated facilities), business trust, or legal representative, an organized group of individuals, a State, territorial, tribal, or local government or branch thereof, or a political subdivision of a State, territory, tribal, or local government or a branch of a political subdivision;

(l) Practical utility means the actual, not merely the theoretical or potential, usefulness of information to or for an agency, taking into account its accuracy, validity, adequacy, and reliability, and the agency's ability to process the information it collects (or a person's ability to receive and process that which is disclosed, in the case of a third-party or public disclosure) in a useful

and timely fashion. In determining whether information will have "practical utility," OMB will take into account whether the agency demonstrates actual timely use for the information either to carry out its functions or make it available to third-parties or the public, either directly or by means of a third-party or public posting, notification, labeling, or similar disclosure requirement, for the use of persons who have an interest in entities or transactions over which the agency has jurisdiction. In the case of recordkeeping requirements or general purpose statistics (see § 1320.3(c)(3)), "practical utility" means that actual uses can be demonstrated.

(m) Recordkeeping requirement means a requirement imposed by or for an agency on persons to maintain specified records, including a requirement to:

(1) Retain such records;

(2) Notify third parties, the Federal government, or the public of the existence of such records;

(3) Disclose such records to third parties, the Federal government, or the public; or

(4) Report to third parties, the Federal government, or the public regarding such records.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (9)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.4

§ 1320.4 Coverage.

Currentness

(a) The requirements of this part apply to all agencies as defined in § 1320.3(a) and to all collections of information conducted or sponsored by those agencies, as defined in § 1320.3 (c) and (d), wherever conducted or sponsored, but, except as provided in paragraph (b) of this section, shall not apply to collections of information:

(1) During the conduct of a Federal criminal investigation or prosecution, or during the disposition of a particular criminal matter;

(2) During the conduct of a civil action to which the United States or any official or agency thereof is a party, or during the conduct of an administrative action, investigation, or audit involving an agency against specific individuals or entities;

(3) By compulsory process pursuant to the Antitrust Civil Process Act and section 13 of the Federal Trade Commission Improvements Act of 1980; or

(4) During the conduct of intelligence activities as defined in section 3.4(e) of Executive Order No. 12333, issued December 4, 1981, or successor orders, or during the conduct of cryptologic activities that are communications security activities.

(b) The requirements of this Part apply to the collection of information during the conduct of general investigations or audits (other than information collected in an antitrust investigation to the extent provided in paragraph (a)(3) of this section) undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry.

(c) The exception in paragraph (a)(2) of this section applies during the entire course of the investigation, audit, or action, whether before or after formal charges or complaints are filed or formal administrative action is initiated, but only after a case file or equivalent is opened with respect to a particular party. In accordance with paragraph (b) of this section, collections of information prepared or undertaken with reference to a category of individuals or entities, such as a class of licensees or an industry, do not fall within this exception.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (8)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.5

§ 1320.5 General requirements.

Currentness

(a) An agency shall not conduct or sponsor a collection of information unless, in advance of the adoption or revision of the collection of information—

(1) The agency has—

(i) Conducted the review required in § 1320.8;

(ii) Evaluated the public comments received under § 1320.8(d) and § 1320.11;

(iii) Submitted to the Director, in accordance with such procedures and in such form as OMB may specify,

(A) The certification required under § 1320.9,

(B) The proposed collection of information in accordance with § 1320.10, § 1320.11, or § 1320.12, as appropriate,

(C) An explanation for the decision that it would not be appropriate, under § 1320.8(b)(1), for a proposed collection of information to display an expiration date;

(D) An explanation for a decision to provide for any payment or gift to respondents, other than remuneration of contractors or grantees;

(E) A statement indicating whether (and if so, to what extent) the proposed collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses, and an explanation for the decision;

(F) A summary of the public comments received under § 1320.8(d), including actions taken by the agency in response to the comments, and the date and page of the publication in the Federal Register of the notice therefor; and

(G) Copies of pertinent statutory authority, regulations, and such related supporting materials as OMB may request; and

(iv) Published, except as provided in § 1320.13(d), a notice in the Federal Register—

(A) Stating that the agency has made such submission; and

(B) Setting forth—

(1) A title for the collection of information;

(2) A summary of the collection of information;

(3) A brief description of the need for the information and proposed use of the information;

(4) A description of the likely respondents, including the estimated number of likely respondents, and proposed frequency of response to the collection of information;

(5) An estimate of the total annual reporting and recordkeeping burden that will result from the collection of information;

(6) Notice that comments may be submitted to OMB; and

(7) The time period within which the agency is requesting OMB to approve or disapprove the collection of information if, at the time of submittal of a collection of information for OMB review under § 1320.10, § 1320.11 or § 1320.12, the agency plans to request or has requested OMB to conduct its review on an emergency basis under § 1320.13; and

(2) OMB has approved the proposed collection of information, OMB's approval has been inferred under § 1320.10(c), § 1320.11(i), or § 1320.12(e), or OMB's disapproval has been voided by an independent regulatory agency under § 1320.15; and

(3) The agency has obtained from the Director a control number to be displayed upon the collection of information.

(b) In addition to the requirements in paragraph (a) of this section, an agency shall not conduct or sponsor a collection of information unless:

(1) The collection of information displays a currently valid OMB control number; and

(2)(i) The agency informs the potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

(ii) An agency shall provide the information described in paragraph (b)(2)(i) of this section in a manner that is reasonably calculated to inform the public.

(A) In the case of forms, questionnaires, instructions, and other written collections of information sent or made available to potential respondents (other than in an electronic format), the information described in paragraph (b)(2)(i) of this section is provided "in a manner that is reasonably calculated to inform the public" if the agency includes it either on the form, questionnaire or other collection of information, or in the instructions for such collection.

(B) In the case of forms, questionnaires, instructions, and other written collections of information sent or made available to potential respondents in an electronic format, the information described in paragraph (b)(2)(i) of this section is provided "in a manner that is reasonably calculated to inform the public" if the agency places the currently valid OMB control number in the instructions, near the title of the electronic collection instrument, or, for on-line applications, on the first screen viewed by the respondent.

(C) In the case of collections of information published in regulations, guidelines, and other issuances in the Federal Register, the information described in paragraph (b)(2)(i) of this section is provided "in a manner that is reasonably calculated to inform the public" if the agency publishes such information in the Federal Register (for example, in the case of a collection of information in a regulation, by publishing such information in the preamble or the regulatory text, or in a technical amendment to the regulation, or in a separate notice announcing OMB approval of the collection of information). In the case of a collection of information published in an issuance that is also included in the Code of Federal Regulations, publication of such information in the Code of Federal Regulations constitutes an alternative means of providing it "in a manner that is reasonably calculated to inform the public." In the case of a collection of information published in an issuance that is also included in the Code of Federal Regulations, OMB recommends for ease of future reference that, even where an agency has already provided such information "in a manner that is reasonably calculated to inform the public" by publishing it in the Federal Register as a separate notice or in the preamble for the final rule (rather than in the regulatory text for the final rule or in a technical amendment to the final rule), the agency also publish such information along with a table or codified section of OMB control numbers to be included in the Code of Federal Regulations (see § 1320.3(f)(3)).

(D) In other cases, and where OMB determines in advance in writing that special circumstances exist, to use other means that are reasonably calculated to inform the public of the information described in paragraph (b)(2)(i) of this section.

(c)(1) Agencies shall submit all collections of information, other than those contained in proposed rules published for public comment in the Federal Register or in current regulations that were published as final rules in the Federal Register, in accordance with the requirements in § 1320.10. Agencies shall submit collections of information contained in interim final rules or direct final rules in accordance with the requirements of § 1320.10.

(2) Agencies shall submit collections of information contained in proposed rules published for public comment in the Federal Register in accordance with the requirements in § 1320.11.

(3) Agencies shall submit collections of information contained in current regulations that were published as final rules in the Federal Register in accordance with the requirements in § 1320.12.

(4) Special rules for emergency processing of collections of information are set forth in § 1320.13.

(5) For purposes of time limits for OMB review of collections of information, any submission properly submitted and received by OMB after 12:00 noon will be deemed to have been received on the following business day.

(d)(1) To obtain OMB approval of a collection of information, an agency shall demonstrate that it has taken every reasonable step to ensure that the proposed collection of information:

(i) Is the least burdensome necessary for the proper performance of the agency's functions to comply with legal requirements and achieve program objectives;

(ii) Is not duplicative of information otherwise accessible to the agency; and

(iii) Has practical utility. The agency shall also seek to minimize the cost to itself of collecting, processing, and using the information, but shall not do so by means of shifting disproportionate costs or burdens onto the public.

(2) Unless the agency is able to demonstrate, in its submission for OMB clearance, that such characteristic of the collection of information is necessary to satisfy statutory requirements or other substantial need, OMB will not approve a collection of information—

(i) Requiring respondents to report information to the agency more often than quarterly;

(ii) Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;

(iii) Requiring respondents to submit more than an original and two copies of any document;

(iv) Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records, for more than three years;

(v) In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;

(vi) Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;

(vii) That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or

(viii) Requiring respondents to submit proprietary, trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.

(e) OMB shall determine whether the collection of information, as submitted by the agency, is necessary for the proper performance of the agency's functions. In making this determination, OMB will take into account the criteria set forth in paragraph (d) of this section, and will consider whether the burden of the collection of information is justified by its practical utility. In addition:

(1) OMB will consider necessary any collection of information specifically mandated by statute or court order, but will independently assess any collection of information to the extent that the agency exercises discretion in its implementation; and

(2) OMB will consider necessary any collection of information specifically required by an agency rule approved or not acted upon by OMB under § 1320.11 or § 1320.12, but will independently assess any such collection of information to the extent that it deviates from the specifications of the rule.

(f) Except as provided in § 1320.15, to the extent that OMB determines that all or any portion of a collection of information is unnecessary, for any reason, the agency shall not engage in such collection or portion thereof. OMB will reconsider its disapproval of a collection of information upon the request of the agency head or Senior Official only if the sponsoring agency is able to provide significant new or additional information relevant to the original decision.

(g) An agency may not make a substantive or material modification to a collection of information after such collection of information has been approved by OMB, unless the modification has been submitted to OMB for review and approval under this Part.

(h) An agency should consult with OMB before using currently approved forms or other collections of information after the expiration date printed thereon (in those cases where the actual form being used contains an expiration date that would expire before the end of the use of the form).

**Credits**

[60 FR 46148, Sept. 5, 1995]

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (11)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.6

§ 1320.6 Public protection.

Currentness

(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to the requirements of this part if:

(1) The collection of information does not display, in accordance with § 1320.3(f) and § 1320.5(b)(1), a currently valid OMB control number assigned by the Director in accordance with the Act; or

(2) The agency fails to inform the potential person who is to respond to the collection of information, in accordance with § 1320.5(b)(2), that such person is not required to respond to the collection of information unless it displays a currently valid OMB control number.

(b) The protection provided by paragraph (a) of this section may be raised in the form of a complete defense, bar, or otherwise to the imposition of such penalty at any time during the agency administrative process in which such penalty may be imposed or in any judicial action applicable thereto.

(c) Whenever an agency has imposed a collection of information as a means for proving or satisfying a condition for the receipt of a benefit or the avoidance of a penalty, and the collection of information does not display a currently valid OMB control number or inform the potential persons who are to respond to the collection of information, as prescribed in § 1320.5(b), the agency shall not treat a person's failure to comply, in and of itself, as grounds for withholding the benefit or imposing the penalty. The agency shall instead permit respondents to prove or satisfy the legal conditions in any other reasonable manner.

(1) If OMB disapproves the whole of such a collection of information (and the disapproval is not overridden under § 1320.15), the agency shall grant the benefit to (or not impose the penalty on) otherwise qualified persons without requesting further proof concerning the condition.

(2) If OMB instructs an agency to make a substantive or material change to such a collection of information (and the instruction is not overridden under § 1320.15), the agency shall permit respondents to prove or satisfy the condition by complying with the collection of information as so changed.

(d) Whenever a member of the public is protected from imposition of a penalty under this section for failure to comply with a collection of information, such penalty may not be imposed by an agency directly, by an agency through judicial process, or by any other person through administrative or judicial process.

(e) The protection provided by paragraph (a) of this section does not preclude the imposition of a penalty on a person for failing to comply with a collection of information that is imposed on the person by statute—e.g., 26 U.S.C. § 6011(a) (statutory requirement for person to file a tax return), 42 U.S.C. § 6938(c) (statutory requirement for person to provide notification before exporting hazardous waste).

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (23)

Current through October 29, 2020; 85 FR 68703.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

> Code of Federal Regulations
>   Title 5. Administrative Personnel
>     Chapter III. Office of Management and Budget
>       Subchapter B. OMB Directives
>         Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.7

§ 1320.7 Agency head and Senior Official responsibilities.

Currentness

(a) Except as provided in paragraph (b) of this section, each agency head shall designate a Senior Official to carry out the responsibilities of the agency under the Act and this part. The Senior Official shall report directly to the head of the agency and shall have the authority, subject to that of the agency head, to carry out the responsibilities of the agency under the Act and this part.

(b) An agency head may retain full undelegated review authority for any component of the agency which by statute is required to be independent of any agency official below the agency head. For each component for which responsibility under the Act is not delegated to the Senior Official, the agency head shall be responsible for the performance of those functions.

(c) The Senior Official shall head an office responsible for ensuring agency compliance with and prompt, efficient, and effective implementation of the information policies and information resources management responsibilities established under the Act, including the reduction of information collection burdens on the public.

(d) With respect to the collection of information and the control of paperwork, the Senior Official shall establish a process within such office that is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved under this Part.

(e) Agency submissions of collections of information for OMB review, and the accompanying certifications under § 1320.9, may be made only by the agency head or the Senior Official, or their designee.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (8)

Current through October 29, 2020; 85 FR 68703.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
    Subchapter B. OMB Directives
      Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.8

§ 1320.8 Agency collection of information responsibilities.

Currentness

The office established under § 1320.7 shall review each collection of information before submission to OMB for review under this part.

(a) This review shall include:

(1) An evaluation of the need for the collection of information, which shall include, in the case of an existing collection of information, an evaluation of the continued need for such collection;

(2) A functional description of the information to be collected;

(3) A plan for the collection of information;

(4) A specific, objectively supported estimate of burden, which shall include, in the case of an existing collection of information, an evaluation of the burden that has been imposed by such collection;

(5) An evaluation of whether (and if so, to what extent) the burden on respondents can be reduced by use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses;

(6) A test of the collection of information through a pilot program, if appropriate; and

(7) A plan for the efficient and effective management and use of the information to be collected, including necessary resources.

(b) Such office shall ensure that each collection of information:

(1) Is inventoried, displays a currently valid OMB control number, and, if appropriate, an expiration date;

(2) Is reviewed by OMB in accordance with the clearance requirements of 44 U.S.C. § 3507; and

(3) Informs and provides reasonable notice to the potential persons to whom the collection of information is addressed of—

(i) The reasons the information is planned to be and/or has been collected;

(ii) The way such information is planned to be and/or has been used to further the proper performance of the functions of the agency;

(iii) An estimate, to the extent practicable, of the average burden of the collection (together with a request that the public direct to the agency any comments concerning the accuracy of this burden estimate and any suggestions for reducing this burden);

(iv) Whether responses to the collection of information are voluntary, required to obtain or retain a benefit (citing authority), or mandatory (citing authority);

(v) The nature and extent of confidentiality to be provided, if any (citing authority); and

(vi) The fact that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

(c)(1) An agency shall provide the information described in paragraphs (b)(3)(i) through (v) of this section as follows:

(i) In the case of forms, questionnaires, instructions, and other written collections of information sent or made available to potential respondents (except in an electronic format), such information can be included either on the form, questionnaire or other collection of information, as part of the instructions for such collection, or in a cover letter or memorandum that accompanies the collection of information.

(ii) In the case of forms, questionnaires, instructions, and other written collections of information sent or made available to potential respondents in an electronic format, such information can be included either in the instructions, near the title of the electronic collection instrument or, for on-line applications, on the first screen viewed by the respondent;

(iii) In the case of collections of information published in regulations, guidelines, and other issuances in the Federal Register, such information can be published in the Federal Register (for example, in the case of a collection of information in a regulation, by publishing such information in the preamble or the regulatory text to the final rule, or in a technical amendment to the final rule, or in a separate notice announcing OMB approval of the collection of information).

(iv) In other cases, and where OMB determines in advance in writing that special circumstances exist, agencies may use other means to inform potential respondents.

(2) An agency shall provide the information described in paragraph (b)(3)(vi) of this section in a manner that is reasonably calculated to inform the public (see § 1320.5(b)(2)(ii)).

(d)(1) Before an agency submits a collection of information to OMB for approval, and except as provided in paragraphs (d)(3) and (d)(4) of this section, the agency shall provide 60–day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to:

(i) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(ii) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(iii) Enhance the quality, utility, and clarity of the information to be collected; and

(iv) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

(2) If the agency does not publish a copy of the proposed collection of information, together with the related instructions, as part of the Federal Register notice, the agency should—

(i) Provide more than 60–day notice to permit timely receipt, by interested members of the public, of a copy of the proposed collection of information and related instructions; or

(ii) Explain how and from whom an interested member of the public can request and obtain a copy without charge, including, if applicable, how the public can gain access to the collection of information and related instructions electronically on demand.

(3) The agency need not separately seek such public comment for any proposed collection of information contained in a proposed rule to be reviewed under § 1320.11, if the agency provides notice and comment through the notice of proposed rulemaking for the proposed rule and such notice specifically includes the solicitation of comments for the same purposes as are listed under paragraph (d)(1) of this section.

(4) The agency need not seek or may shorten the time allowed for such public comment if OMB grants an exemption from such requirement for emergency processing under § 1320.13.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                               © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.9

§ 1320.9 Agency certifications for proposed collections of information.

Currentness

As part of the agency submission to OMB of a proposed collection of information, the agency (through the head of the agency, the Senior Official, or their designee) shall certify (and provide a record supporting such certification) that the proposed collection of information—

(a) Is necessary for the proper performance of the functions of the agency, including that the information to be collected will have practical utility;

(b) Is not unnecessarily duplicative of information otherwise reasonably accessible to the agency;

(c) Reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, including with respect to small entities, as defined in the Regulatory Flexibility Act (5 U.S.C. 601(6)), the use of such techniques as:

　　(1) Establishing differing compliance or reporting requirements or timetables that take into account the resources available to those who are to respond;

　　(2) The clarification, consolidation, or simplification of compliance and reporting requirements; or

　　(3) An exemption from coverage of the collection of information, or any part thereof;

(d) Is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond;

(e) Is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond;

(f) Indicates for each recordkeeping requirement the length of time persons are required to maintain the records specified;

(g) Informs potential respondents of the information called for under § 1320.8(b)(3);

(h) Has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public;

(i) Uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected; and

(j) To the maximum extent practicable, uses appropriate information technology to reduce burden and improve data quality, agency efficiency and responsiveness to the public.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.00380   2

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.10

§ 1320.10 Clearance of collections of information, other
than those contained in proposed rules or in current rules.

Currentness

Agencies shall submit all collections of information, other than those contained either in proposed rules published for public comment in the Federal Register (which are submitted under § 1320.11) or in current rules that were published as final rules in the Federal Register (which are submitted under § 1320.12), in accordance with the following requirements:

(a) On or before the date of submission to OMB, the agency shall, in accordance with the requirements in § 1320.5(a)(1)(iv), forward a notice to the Federal Register stating that OMB approval is being sought. The notice shall direct requests for information, including copies of the proposed collection of information and supporting documentation, to the agency, and shall request that comments be submitted to OMB within 30 days of the notice's publication. The notice shall direct comments to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for [name of agency]. A copy of the notice submitted to the Federal Register, together with the date of expected publication, shall be included in the agency's submission to OMB.

(b) Within 60 days after receipt of the proposed collection of information or publication of the notice under paragraph (a) of this section, whichever is later, OMB shall notify the agency involved of its decision to approve, to instruct the agency to make a substantive or material change to, or to disapprove, the collection of information, and shall make such decision publicly available. OMB shall provide at least 30 days for public comment after receipt of the proposed collection of information before making its decision, except as provided under § 1320.13. Upon approval of a collection of information, OMB shall assign an OMB control number and, if appropriate, an expiration date. OMB shall not approve any collection of information for a period longer than three years.

(c) If OMB fails to notify the agency of its approval, instruction to make substantive or material change, or disapproval within the 60–day period, the agency may request, and OMB shall assign without further delay, an OMB control number that shall be valid for not more than one year.

(d) As provided in § 1320.5(b) and § 1320.6(a), an agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

(e)(1) In the case of a collection of information not contained in a published current rule which has been approved by OMB and has a currently valid OMB control number, the agency shall:

(i) Conduct the review established under § 1320.8, including the seeking of public comment under § 1320.8(d); and

(ii) After having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the OMB control number for the currently approved collection of information, submit the collection of information for review and approval under this part, which shall include an explanation of how the agency has used the information that it has collected.

(2) The agency may continue to conduct or sponsor the collection of information while the submission is pending at OMB.

(f) Prior to the expiration of OMB's approval of a collection of information, OMB may decide on its own initiative, after consultation with the agency, to review the collection of information. Such decisions will be made only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. Upon notification by OMB of its decision to review the collection of information, the agency shall submit it to OMB for review under this part.

(g) For good cause, after consultation with the agency, OMB may stay the effectiveness of its prior approval of any collection of information that is not specifically required by agency rule; in such case, the agency shall cease conducting or sponsoring such collection of information while the submission is pending, and shall publish a notice in the Federal Register to that effect.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (2)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.11

§ 1320.11 Clearance of collections of information in proposed rules.

Currentness

Agencies shall submit collections of information contained in proposed rules published for public comment in the Federal Register in accordance with the following requirements:

(a) The agency shall include, in accordance with the requirements in § 1320.5(a)(1)(iv) and § 1320.8(d)(1) and (3), in the preamble to the Notice of Proposed Rulemaking a statement that the collections of information contained in the proposed rule, and identified as such, have been submitted to OMB for review under section 3507(d) of the Act. The notice shall direct comments to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for [name of agency].

(b) All such submissions shall be made to OMB not later than the day on which the Notice of Proposed Rulemaking is published in the Federal Register, in such form and in accordance with such procedures as OMB may direct. Such submissions shall include a copy of the proposed regulation and preamble.

(c) Within 60 days of publication of the proposed rule, but subject to paragraph (e) of this section, OMB may file public comments on collection of information provisions. The OMB comments shall be in the form of an OMB Notice of Action, which shall be sent to the Senior Official or agency head, or their designee, and which shall be made a part of the agency's rulemaking record.

(d) If an agency submission is not in compliance with paragraph (b) of this section, OMB may, subject to paragraph (e) of this section, disapprove the collection of information in the proposed rule within 60 days of receipt of the submission. If an agency fails to submit a collection of information subject to this section, OMB may, subject to paragraph (e) of this section, disapprove it at any time.

(e) OMB shall provide at least 30 days after receipt of the proposed collection of information before submitting its comments or making its decision, except as provided under § 1320.13.

(f) When the final rule is published in the Federal Register, the agency shall explain how any collection of information contained in the final rule responds to any comments received from OMB or the public. The agency shall include an identification and explanation of any modifications made in the rule, or explain why it rejected the comments. If requested by OMB, the agency shall include OMB's comments in the preamble to the final rule.

(g) If OMB has not filed public comments under paragraph (c) of this section, or has approved without conditions the collection of information contained in a rule before the final rule is published in the Federal Register, OMB may assign an OMB control number prior to publication of the final rule.

(h) On or before the date of publication of the final rule, the agency shall submit the final rule to OMB, unless it has been approved under paragraph (g) of this section (and not substantively or materially modified by the agency after approval). Not later than 60 days after publication, but subject to paragraph (e) of this section, OMB shall approve, instruct the agency to make a substantive or material change to, or disapprove, the collection of information contained in the final rule. Any such instruction to change or disapprove may be based on one or more of the following reasons, as determined by OMB:

(1) The agency has failed to comply with paragraph (b) of this section;

(2) The agency had substantially modified the collection of information contained in the final rule from that contained in the proposed rule without providing OMB with notice of the change and sufficient information to make a determination concerning the modified collection of information at least 60 days before publication of the final rule; or

(3) In cases in which OMB had filed public comments under paragraph (c) of this section, the agency's response to such comments was unreasonable, and the collection of information is unnecessary for the proper performance of the agency's functions.

(i) After making such decision to approve, to instruct the agency to make a substantive or material change to, or disapprove, the collection of information, OMB shall so notify the agency. If OMB approves the collection of information or if it has not acted upon the submission within the time limits of this section, the agency may request, and OMB shall assign an OMB control number. If OMB disapproves or instructs the agency to make substantive or material change to the collection of information, it shall make the reasons for its decision publicly available.

(j) OMB shall not approve any collection of information under this section for a period longer than three years. Approval of such collection of information will be for the full three-year period, unless OMB determines that there are special circumstances requiring approval for a shorter period.

(k) After receipt of notification of OMB's approval, instruction to make a substantive or material change to, disapproval of a collection of information, or failure to act, the agency shall publish a notice in the Federal Register to inform the public of OMB's decision.

(l) As provided in § 1320.5(b) and § 1320.6(a), an agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AR.00384

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (8)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
    Title 5. Administrative Personnel
        Chapter III. Office of Management and Budget
        Subchapter B. OMB Directives
            Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.12

§ 1320.12 Clearance of collections of information in current rules.

Currentness

Agencies shall submit collections of information contained in current rules that were published as final rules in the Federal Register in accordance with the following procedures:

(a) In the case of a collection of information contained in a published current rule which has been approved by OMB and has a currently valid OMB control number, the agency shall:

(1) Conduct the review established under § 1320.8, including the seeking of public comment under § 1320.8(d); and

(2) After having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the OMB control number for the currently approved collection of information, submit the collection of information for review and approval under this part, which shall include an explanation of how the agency has used the information that it has collected.

(b)(1) In the case of a collection of information contained in a published current rule that was not required to be submitted for OMB review under the Paperwork Reduction Act at the time the collection of information was made part of the rule, but which collection of information is now subject to the Act and this part, the agency shall:

(i) Conduct the review established under § 1320.8, including the seeking of public comment under § 1320.8(d); and

(ii) After having made a reasonable effort to seek public comment, submit the collection of information for review and approval under this part, which shall include an explanation of how the agency has used the information that it has collected.

(2) The agency may continue to conduct or sponsor the collection of information while the submission is pending at OMB. In the case of a collection of information not previously approved, approval shall be granted for such period, which shall not exceed 60 days, unless extended by the Director for an additional 60 days, and an OMB control number assigned. Upon assignment of the OMB control number, and in accordance with § 1320.3(f) and § 1320.5(b), the agency shall display the number and inform the potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

(c) On or before the day of submission to OMB under paragraphs (a) or (b) of this section, the agency shall, in accordance with the requirements set forth in § 1320.5(a)(1)(iv), forward a notice to the Federal Register stating that OMB review is being sought. The notice shall direct requests for copies of the collection of information and supporting documentation to the agency, and shall request that comments be submitted to OMB within 30 days of the notice's publication. The notice shall direct comments to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for [name of agency]. A copy of the notice submitted to the Federal Register, together with the date of expected publication, shall be included in the agency's submission to OMB.

(d) Within 60 days after receipt of the collection of information or publication of the notice under paragraph (c) of this section, whichever is later, OMB shall notify the agency involved of its decision to approve, to instruct the agency to make a substantive or material change to, or to disapprove, the collection of information, and shall make such decision publicly available. OMB shall provide at least 30 days for public comment after receipt of the proposed collection of information before making its decision, except as provided under § 1320.13.

(e)(1) Upon approval of a collection of information, OMB shall assign an OMB control number and an expiration date. OMB shall not approve any collection of information for a period longer than three years. Approval of any collection of information submitted under this section will be for the full three-year period, unless OMB determines that there are special circumstances requiring approval for a shorter period.

(2) If OMB fails to notify the agency of its approval, instruction to make substantive or material change, or disapproval within the 60–day period, the agency may request, and OMB shall assign without further delay, an OMB control number that shall be valid for not more than one year.

(3) As provided in § 1320.5(b) and § 1320.6(a), an agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

(f)(1) If OMB disapproves a collection of information contained in an existing rule, or instructs the agency to make a substantive or material change to a collection of information contained in an existing rule, OMB shall:

(i) Publish an explanation thereof in the Federal Register; and

(ii) Instruct the agency to undertake a rulemaking within a reasonable time limited to consideration of changes to the collection of information contained in the rule and thereafter to submit the collection of information for approval or disapproval under § 1320.10 or § 1320.11, as appropriate; and

(iii) Extend the existing approval of the collection of information (including an interim approval granted under paragraph (b) of this section) for the duration of the period required for consideration of proposed changes, including that required for OMB approval or disapproval of the collection of information under § 1320.10 or § 1320.11, as appropriate.

(2) Thereafter, the agency shall, within a reasonable period of time not to exceed 120 days, undertake such procedures as are necessary in compliance with the Administrative Procedure Act and other applicable law to amend or rescind the collection of information, and shall notify the public through the Federal Register. Such notice shall identify the proposed changes in the collections of information and shall solicit public comment on retention, change, or rescission of such collections of information. If the agency employs notice and comment rulemaking procedures for amendment or rescission of the collection of information, publication of the above in the Federal Register and submission to OMB shall initiate OMB clearance procedures under section 3507(d) of the Act and § 1320.11. All procedures shall be completed within a reasonable period of time to be determined by OMB in consultation with the agency.

(g) OMB may disapprove, in whole or in part, any collection of information subject to the procedures of this section, if the agency:

(1) Has refused within a reasonable time to comply with an OMB instruction to submit the collection of information for review;

(2) Has refused within a reasonable time to initiate procedures to change the collection of information; or

(3) Has refused within a reasonable time to publish a final rule continuing the collection of information, with such changes as may be appropriate, or otherwise complete the procedures for amendment or rescission of the collection of information.

(h)(1) Upon disapproval by OMB of a collection of information subject to this section, except as provided in paragraph (f)(1)(iii) of this section, the OMB control number assigned to such collection of information shall immediately expire, and no agency shall conduct or sponsor such collection of information. Any such disapproval shall constitute disapproval of the collection of information contained in the Notice of Proposed Rulemaking or other submissions, and also of the preexisting information collection instruments directed at the same collection of information and therefore constituting essentially the same collection of information.

(2) The failure to display a currently valid OMB control number for a collection of information contained in a current rule, or the failure to inform the potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number, does not, as a legal matter, rescind or amend the rule; however, such absence will alert the public that either the agency has failed to comply with applicable legal requirements for the collection of information or the collection of information has been disapproved, and that therefore the portion of the rule containing the collection of information has no legal force and effect and the public protection provisions of 44 U.S.C. 3512 apply.

(i) Prior to the expiration of OMB's approval of a collection of information in a current rule, OMB may decide on its own initiative, after consultation with the agency, to review the collection of information. Such decisions will be made only when relevant circumstances have changed or the burden estimates provided by the agency at the time of initial submission were materially in error. Upon notification by OMB of its decision to review the collection of information, the agency shall submit it to OMB for review under this Part.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.13

§ 1320.13 Emergency processing.

Currentness

An agency head or the Senior Official, or their designee, may request OMB to authorize emergency processing of submissions of collections of information.

(a) Any such request shall be accompanied by a written determination that:

(1) The collection of information:

(i) Is needed prior to the expiration of time periods established under this Part; and

(ii) Is essential to the mission of the agency; and

(2) The agency cannot reasonably comply with the normal clearance procedures under this part because:

(i) Public harm is reasonably likely to result if normal clearance procedures are followed;

(ii) An unanticipated event has occurred; or

(iii) The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed.

(b) The agency shall state the time period within which OMB should approve or disapprove the collection of information.

(c) The agency shall submit information indicating that it has taken all practicable steps to consult with interested agencies and members of the public in order to minimize the burden of the collection of information.

(d) The agency shall set forth in the Federal Register notice prescribed by § 1320.5(a)(1)(iv), unless waived or modified under this section, a statement that it is requesting emergency processing, and the time period stated under paragraph (b) of this section.

(e) OMB shall approve or disapprove each such submission within the time period stated under paragraph (b) of this section, provided that such time period is consistent with the purposes of this Act.

(f) If OMB approves the collection of information, it shall assign a control number valid for a maximum of 90 days after receipt of the agency submission.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 5. Administrative Personnel
      Chapter III. Office of Management and Budget
         Subchapter B. OMB Directives
            Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.14

§ 1320.14 Public access.

Currentness

(a) In order to enable the public to participate in and provide comments during the clearance process, OMB will ordinarily make its paperwork docket files available for public inspection during normal business hours. Notwithstanding other provisions of this Part, and to the extent permitted by law, requirements to publish public notices or to provide materials to the public may be modified or waived by the Director to the extent that such public participation in the approval process would defeat the purpose of the collection of information; jeopardize the confidentiality of proprietary, trade secret, or other confidential information; violate State or Federal law; or substantially interfere with an agency's ability to perform its statutory obligations.

(b) Agencies shall provide copies of the material submitted to OMB for review promptly upon request by any person.

(c) Any person may request OMB to review any collection of information conducted by or for an agency to determine, if, under this Act and this part, a person shall maintain, provide, or disclose the information to or for the agency. Unless the request is frivolous, OMB shall, in coordination with the agency responsible for the collection of information:

(1) Respond to the request within 60 days after receiving the request, unless such period is extended by OMB to a specified date and the person making the request is given notice of such extension; and

(2) Take appropriate remedial action, if necessary.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Notes of Decisions (1)

Current through October 29, 2020; 85 FR 68703.

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 5. Administrative Personnel
Chapter III. Office of Management and Budget
Subchapter B. OMB Directives
Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.15

§ 1320.15 Independent regulatory agency override authority.

Currentness

(a) An independent regulatory agency which is administered by two or more members of a commission, board, or similar body, may by majority vote void:

(1) Any disapproval, instruction to such agency to make material or substantive change to, or stay of the effectiveness of OMB approval of, any collection of information of such agency; or

(2) An exercise of authority under § 1320.10(g) concerning such agency.

(b) The agency shall certify each vote to void such OMB action to OMB, and explain the reasons for such vote. OMB shall without further delay assign an OMB control number to such collection of information, valid for the length of time requested by the agency, up to three years, to any collection of information as to which this vote is exercised. No override shall become effective until the independent regulatory agency, as provided in § 1320.5(b) and § 1320.6(2), has displayed the OMB control number and informed the potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.16

§ 1320.16 Delegation of approval authority.

Currentness

(a) OMB may, after complying with the notice and comment procedures of the Administrative Procedure Act, delegate OMB review of some or all of an agency's collections of information to the Senior Official, or to the agency head with respect to those components of the agency for which he or she has not delegated authority.

(b) No delegation of review authority shall be made unless the agency demonstrates to OMB that the Senior Official or agency head to whom the authority would be delegate:

(1) Is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved;

(2) Has sufficient resources to carry out this responsibility effectively; and

(3) Has established an agency review process that demonstrates the prompt, efficient, and effective performance of collection of information review responsibilities.

(c) OMB may limit, condition, or rescind, in whole or in part, at any time, such delegations of authority, and reserves the right to review any individual collection of information, or part thereof, conducted or sponsored by an agency, at any time.

(d) Subject to the provisions of this part, and in accordance with the terms and conditions of each delegation as specified in Appendix A to this part, OMB delegates review and approval authority to the following agencies:

(1) Board of Governors of the Federal Reserve System; and

(2) Managing Director of the Federal Communications Commission.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 5. Administrative Personnel
    Chapter III. Office of Management and Budget
      Subchapter B. OMB Directives
        Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.17

§ 1320.17 Information collection budget.

Currentness

Each agency's Senior Official, or agency head in the case of any agency for which the agency head has not delegated responsibility under the Act for any component of the agency to the Senior Official, shall develop and submit to OMB, in such form, at such time, and in accordance with such procedures as OMB may prescribe, an annual comprehensive budget for all collections of information from the public to be conducted in the succeeding twelve months. For good cause, OMB may exempt any agency from this requirement.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 5. Administrative Personnel
Chapter III. Office of Management and Budget
Subchapter B. OMB Directives
Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. § 1320.18

§ 1320.18 Other authority.

Currentness

(a) OMB shall determine whether any collection of information or other matter is within the scope of the Act, or this Part.

(b) In appropriate cases, after consultation with the agency, OMB may initiate a rulemaking proceeding to determine whether an agency's collection of information is consistent with statutory standards. Such proceedings shall be in accordance with the informal rulemaking procedures of the Administrative Procedure Act.

(c) Each agency is responsible for complying with the information policies, principles, standards, and guidelines prescribed by OMB under this Act.

(d) To the extent permitted by law, OMB may waive any requirements contained in this part.

(e) Nothing in this part shall be interpreted to limit the authority of OMB under this Act, or any other law. Nothing in this part or this Act shall be interpreted as increasing or decreasing the authority of OMB with respect to the substantive policies and programs of the agencies.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 5. Administrative Personnel
      Chapter III. Office of Management and Budget
         Subchapter B. OMB Directives
            Part 1320. Controlling Paperwork Burdens on the Public (Refs & Annos)

5 C.F.R. Pt. 1320, App. A

Appendix A to Part 1320—Agencies With Delegated Review and Approval Authority

Currentness

### 1. The Board of Governors of the Federal Reserve System

(a) Authority to review and approve collection of information requests, collection of information requirements, and collections of information in current rules is delegated to the Board of Governors of the Federal Reserve System.

(1) This delegation does not include review and approval authority over any new collection of information or any modification to an existing collection of information that:

(i) Is proposed to be collected as a result of a requirement or other mandate of the Federal Financial Institutions Examination Council, or other Federal executive branch entities with authority to require the Board to conduct or sponsor a collection of information.

(ii) Is objected to by another Federal agency on the grounds that agency requires information currently collected by the Board, that the currently collected information is being deleted from the collection, and the deletion will have a serious adverse impact on the agency's program, provided that such objection is certified to OMB by the head of the Federal agency involved, with a copy to the Board, before the end of the comment period specified by the Board on the Federal Register notices specified in paragraph (1)(3)(i) of this section 1.

(iii) Would cause the burden of the information collections conducted or sponsored by the Board to exceed by the end of the fiscal year the Information Collection Budget allowance set by the Board and OMB for the fiscal year-end.

(2) The Board may ask that OMB review and approve collections of information covered by this delegation.

(3) In exercising delegated authority, the Board will:

(i) Provide the public, to the extent possible and appropriate, with reasonable opportunity to comment on collections of information under review prior to taking final action approving the collection. Reasonable opportunity for public comment will include publishing a notice in the Federal Register informing the public of the proposed collection of information, announcing the beginning of a 60–day public comment period, and the availability of copies of the "clearance package," to provide the public with the opportunity to comment. Such Federal Register notices shall also advise the public that they may also send a copy of their comments to the Federal Reserve Board and to the OMB/OIRA Desk Officer.

(A) Should the Board determine that a new collection of information or a change in an existing collection must be instituted quickly and that public participation in the approval process would defeat the purpose of the collection or substantially interfere

with the Board's ability to perform its statutory obligation, the Board may temporarily approve of the collection of information for a period not to exceed 90 days without providing opportunity for public comment.

(B) At the earliest practical date after approving the temporary extension to the collection of information, the Board will publish a Federal Register notice informing the public of its approval of the collection of information and indicating why immediate action was necessary. In such cases, the Board will conduct a normal delegated review and publish a notice in the Federal Register soliciting public comment on the intention to extend the collection of information for a period not to exceed three years.

(ii) Provide the OMB/OIRA Desk Officer for the Federal Reserve Board with a copy of the Board's Federal Register notice not later than the day the Board files the notice with the Office of the Federal Register.

(iii) Assure that approved collections of information are reviewed not less frequently than once every three years, and that such reviews are normally conducted before the expiration date of the prior approval. Where the review has not been completed prior to the expiration date, the Board may extend the report, for up to three months, without public notice in order to complete the review and consequent revisions, if any. There may also be other circumstances in which the Board determines that a three-month extension without public notice is appropriate.

(iv) Take every reasonable step to conduct the review established under 5 CFR 1320.8, including the seeking of public comment under 5 CFR 1320.8(d). In determining whether to approve a collection of information, the Board will consider all comments received from the public and other agencies. The Board will not approve a collection of information that it determines does not satisfy the guidelines set forth in 5 CFR 1320.5(d)(2), unless it determines that departure from these guidelines is necessary to satisfy statutory requirements or other substantial need.

(v)(A) Assure that each approved collection of information displays, as required by 5 CFR 1320.6, a currently valid OMB control number and the fact that a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

(B) Assure that all collections of information, except those contained in regulations, display the expiration date of the approval, or, in case the expiration date has been omitted, explain the decision that it would not be appropriate, under 5 CFR 1320.5(a)(1)(iii)(C), for a proposed collection of information to display an expiration date.

(C) Assure that each collection of information, as required by 5 CFR 1320.8(b)(3), informs and provides fair notice to the potential respondents of why the information is being collected; the way in which such information is to be used; the estimated burden; whether responses are voluntary, required to obtain or retain a benefit, or mandatory; the confidentiality to be provided; and the fact that an agency may not conduct or sponsor, and the respondent is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

(vi) Assure that each approved collection of information, together with a completed form OMB 83–I, a supporting statement, a copy of each comment received from the public and other agencies in response to the Board's Federal Register notice or a summary of these comments, the certification required by 5 CFR 1320.9, and a certification that the Board has approved of the collection of information in accordance with the provisions of this delegation is transmitted to OMB for incorporation into OMB's public docket files. Such transmittal shall be made as soon as practical after the Board has taken final action approving the collection. However, no collection of information may be instituted until the Board has delivered this transmittal to OMB.

(b) OMB will:

(1) Provide the Board in advance with a block of control numbers which the Board will assign in sequential order to and display on, new collections of information.

(2) Provide a written notice of action to the Board indicating that the Board approvals of collections of information that have been received by OMB and incorporated into OMB's public docket files and an inventory of currently approved collections of information.

(3) Review any collection of information referred by the Board in accordance with the provisions of section 1(a)(2) of this Appendix.

(c) OMB may review the Board's paperwork review process under the delegation. The Board will cooperate in carrying out such a review. The Board will respond to any recommendations resulting from such review and, if it finds the recommendations to be appropriate, will either accept the recommendations or propose an alternative approach to achieve the intended purpose.

(d) This delegation may, as provided by 5 CFR 1320.16(c), be limited, conditioned, or rescinded, in whole or in part at any time. OMB will exercise this authority only in unusual circumstances and, in those rare instances, will do so, subject to the provisions of 5 CFR 1320.10(f) and 1320.10(g), prior to the expiration of the time period set for public comment in the Board's Federal Register notices and generally only if:

(1) Prior to the commencement of a Board review (e.g., during the review for the Information Collection Budget). OMB has notified the Board that it intends to review a specific new proposal for the collection of information or the continued use (with or without modification) of an existing collection;

(2) There is substantial public objection to a proposed information collection: or

(3) OMB determines that a substantially inadequate and inappropriate lead time has been provided between the final announcement date of the proposed requirement and the first date when the information is to be submitted or disclosed. When OMB exercises this authority it will consider that the period of its review began the date that OMB received the Federal Register notice provided for in section 1(a)(3)(i) of this Appendix.

(e) Where OMB conducts a review of a Board information collection proposal under section 1(a)(1), 1(a)(2), or 1(d) of this Appendix, the provisions of 5 CFR 1320.13 continue to apply.

## 2. The Managing Director of the Federal Communications Commission

(a) Authority to review and approve currently valid (OMB-approved) collections of information, including collections of information contained in existing rules, that have a total annual burden of 5,000 hours or less and a burden of less than 500 hours per respondent is delegated to the Managing Director of the Federal Communications Commission.

(1) This delegation does not include review and approval authority over any new collection of information, any collections whose approval has lapsed, any substantive or material modification to existing collections, any reauthorization of information collections employing statistical methods, or any information collections that exceed a total annual burden of 5,000 hours or an estimated burden of 500 hours per respondent.

(2) The Managing Director may ask that OMB review and approve collections of information covered by the delegation.

(3) In exercising delegated authority, the Managing Director will:

(i) Provide the public, to the extent possible and appropriate, with reasonable opportunity to comment on collections of information under review prior to taking final action on reauthorizing an existing collection. Reasonable opportunity for public comment will include publishing a notice in the Federal Register and an FCC Public Notice informing the public that a collection of information is being extended and announcing the beginning of a 60-day comment period, notifying the public of the "intent

to extend an information collection," and providing the public with the opportunity to comment on the need for the information, its practicality, the accuracy of the agency's burden estimate, and on ways to minimize burden, including the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses. Such notices shall advise the public that they may also send a copy of their comments to the OMB/Office of Information and Regulatory Affairs desk officer for the Commission.

(A) Should the Managing Director determine that a collection of information that falls within the scope of this delegation must be reauthorized quickly and that public participation in the reauthorization process interferes with the Commission's ability to perform its statutory obligation, the Managing Director may temporarily reauthorize the extension of an information collection, for a period not to exceed 90 days, without providing opportunity for public comment.

(B) At the earliest practical date after granting this temporary extension to an information collection, the Managing Director will conduct a normal delegated review and publish a Federal Register notice soliciting public comment on its intention to extend the collection of information for a period not to exceed three years.

(ii) Assure that approved collections of information are reviewed not less frequently than once every three years and that such reviews are conducted before the expiration date of the prior approval. When the review is not completed prior to the expiration date, the Managing Director will submit the lapsed information collection to OMB for review and reauthorization.

(iii) Assure that each reauthorized collection of information displays an OMB control number and, except for those contained in regulations or specifically designated by OMB, displays the expiration date of the approval.

(iv) Inform and provide fair notice to the potential respondents, as required by 5 CFR 1320.8(b)(3), of why the information is being collected; the way in which such information is to be used; the estimated burden; whether responses are voluntary, required, required to obtain or retain a benefit, or mandatory; the confidentiality to be provided; and the fact that an agency may not conduct or sponsor, and the respondent is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

(v) Transmit to OMB for incorporation into OMB's public docket files, a report of delegated approval certifying that the Managing Director has reauthorized each collection of information in accordance with the provisions of this delegation. The Managing Director shall also make the certification required by 5 CFR 1320.9, e.g., that the approved collection of information reduces to the extent practicable and appropriate, the burden on respondents, including, for small business, local government, and other small entities, the use of the techniques outlined in the Regulatory Flexibility Act. Such transmittals shall be made no later than 15 days after the Managing Director has taken final action reauthorizing the extension of an information collection.

(vi) Ensure that the personnel in the Commission's functional bureaus and offices responsible for managing information collections receive periodic training on procedures related to meeting the requirements of this part and the Act.

(b) OMB will:

(1) Provide notice to the Commission acknowledging receipt of the report of delegated approval and its incorporation into OMB's public docket files and inventory of currently approved collections of information.

(2) Act upon any request by the Commission to review a collection of information referred by the Commission in accordance with the provisions of section 2(a)(2) of this appendix.

(3) Periodically assess, at its discretion, the Commission's paperwork review process as administered under the delegation. The Managing Director will cooperate in carrying out such an assessment. The Managing Director will respond to any

recommendations resulting from such a review and, if it finds the recommendations to be appropriate, will either accept the recommendation or propose an alternative approach to achieve the intended purpose.

(c) This delegation may, as provided by 5 CFR 1320.16(c), be limited, conditioned, or rescinded, in whole or in part at any time. OMB will exercise this authority only in unusual circumstances.

SOURCE: 60 FR 44984, Aug. 29, 1995, unless otherwise noted.

AUTHORITY: 31 U.S.C. Sec. 1111 and 44 U.S.C. Chs. 21, 25, 27, 29, 31, 35.

Current through October 29, 2020; 85 FR 68703.

**End of Document**                                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Invalid   Chen v. Board of Immigration Appeals,  S.D.N.Y.,  Feb. 29, 2016

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

---

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 204. Immigrant Petitions (Refs & Annos)
          Subpart A. Immigrant Visa Petitions (Refs & Annos)

---

8 C.F.R. § 204.2

§ 204.2 Petitions for relatives, widows and widowers, and abused spouses and children.

Effective: November 5, 2007

Currentness

&lt;For statute(s) affecting validity, see: 8 USCA § 1154(l)(1).&gt;

(a) Petition for a spouse—

(1) Eligibility. A United States citizen or alien admitted for lawful permanent residence may file a petition on behalf of a spouse.

(i) Marriage within five years of petitioner's obtaining lawful permanent resident status.

(A) A visa petition filed on behalf of an alien by a lawful permanent resident spouse may not be approved if the marriage occurred within five years of the petitioner being accorded the status of lawful permanent resident based upon a prior marriage to a United States citizen or alien lawfully admitted for permanent residence, unless:

(1) The petitioner establishes by clear and convincing evidence that the marriage through which the petitioner gained permanent residence was not entered into for the purposes of evading the immigration laws; or

(2) The marriage through which the petitioner obtained permanent residence was terminated through death.

(B) Documentation. The petitioner should submit documents which cover the period of the prior marriage. The types of documents which may establish that the prior marriage was not entered into for the purpose of evading the immigration laws include, but are not limited to:

AR.00403

(1) Documentation showing joint ownership of property;

(2) A lease showing joint tenancy of a common residence;

(3) Documentation showing commingling of financial resources;

(4) Birth certificate(s) of child(ren) born to the petitioner and prior spouse;

(5) Affidavits sworn to or affirmed by third parties having personal knowledge of the bona fides of the prior marital relationship. (Each affidavit must contain the full name and address, date and place of birth of the person making the affidavit; his or her relationship, if any, to the petitioner, beneficiary or prior spouse; and complete information and details explaining how the person acquired his or her knowledge of the prior marriage. The affiant may be required to testify before an immigration officer about the information contained in the affidavit. Affidavits should be supported, if possible, by one or more types of documentary evidence listed in this paragraph.); or

(6) Any other documentation which is relevant to establish that the prior marriage was not entered into in order to evade the immigration laws of the United States.

(C) The petitioner must establish by clear and convincing evidence that the prior marriage was not entered into for the purpose of evading the immigration laws. Failure to meet the "clear and convincing evidence" standard will result in the denial of the petition. Such a denial shall be without prejudice to the filing of a new petition once the petitioner has acquired five years of lawful permanent residence. The director may choose to initiate deportation proceedings based upon information gained through the adjudication of the petition; however, failure to initiate such proceedings shall not establish that the petitioner's prior marriage was not entered into for the purpose of evading the immigration laws. Unless the petition is approved, the beneficiary shall not be accorded a filing date within the meaning of section 203(c) of the Act based upon any spousal second preference petition.

(ii) Fraudulent marriage prohibition. Section 204(c) of the Act prohibits the approval of a visa petition filed on behalf of an alien who has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws. The director will deny a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of such an attempt or conspiracy, regardless of whether that alien received a benefit through the attempt or conspiracy. Although it is not necessary that the alien have been convicted of, or even prosecuted for, the attempt or conspiracy, the evidence of the attempt or conspiracy must be contained in the alien's file.

(iii) Marriage during proceedings—general prohibition against approval of visa petition. A visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse shall not be approved if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Determination of commencement and termination of proceedings and exemptions shall be in accordance with § 245.1(c)(9) of this chapter, except that the burden in visa petition proceedings to establish eligibility for the exemption in § 245.1(c)(9)(iii)(F) of this chapter shall rest with the petitioner.

(A) Request for exemption. No application or fee is required to request an exemption. The request must be made in writing and submitted with the Form I–130. The request must state the reason for seeking the exemption and must be supported by documentary evidence establishing eligibility for the exemption.

(B) Evidence to establish eligibility for the bona fide marriage exemption. The petitioner should submit documents which establish that the marriage was entered into in good faith and not entered into for the purpose of procuring the alien's entry as an immigrant. The types of documents the petitioner may submit include, but are not limited to:

(1) Documentation showing joint ownership of property;

(2) Lease showing joint tenancy of a common residence;

(3) Documentation showing commingling of financial resources;

(4) Birth certificate(s) of child(ren) born to the petitioner and beneficiary;

(5) Affidavits of third parties having knowledge of the bona fides of the marital relationship (Such persons may be required to testify before an immigration officer as to the information contained in the affidavit. Affidavits must be sworn to or affirmed by people who have personal knowledge of the marital relationship. Each affidavit must contain the full name and address, date and place of birth of the person making the affidavit and his or her relationship to the spouses, if any. The affidavit must contain complete information and details explaining how the person acquired his or her knowledge of the marriage. Affidavits should be supported, if possible, by one or more types of documentary evidence listed in this paragraph); or

(6) Any other documentation which is relevant to establish that the marriage was not entered into in order to evade the immigration laws of the United States.

(C) Decision. Any petition filed during the prohibited period shall be denied, unless the petitioner establishes eligibility for an exemption from the general prohibition. The petitioner shall be notified in writing of the decision of the director.

(D) Denials. The denial of a petition because the marriage took place during the prohibited period shall be without prejudice to the filing of a new petition after the beneficiary has resided outside the United States for the required period of two years following the marriage. The denial shall also be without prejudice to the consideration of a new petition or a motion to reopen the visa petition proceedings if deportation or exclusion proceedings are terminated after the denial other than by the beneficiary's departure from the United States. Furthermore, the denial shall be without prejudice to the consideration of a new petition or motion to reopen the visa petition proceedings, if the petitioner establishes eligibility for the bona fide marriage exemption contained in this part: Provided, That no motion to reopen visa petition proceedings may be accepted if the approval of the motion would result in the beneficiary being accorded a priority date within the meaning of section 203(c) of the Act earlier than November 29, 1990.

(E) Appeals. The decision of the Board of Immigration Appeals concerning the denial of a relative visa petition because the petitioner failed to establish eligibility for the bona fide marriage exemption contained in this part will constitute the single level of appellate review established by statute.

(F) Priority date. A preference beneficiary shall not be accorded a priority date within the meaning of section 203(c) of the Act based upon any relative petition filed during the prohibited period, unless an exemption contained in this part has been granted. Furthermore, a preference beneficiary shall not be accorded a priority date prior to November 29, 1990, based upon the approval of a request for consideration for the bona fide marriage exemption contained in this part.

(2) Evidence for petition for a spouse. In addition to evidence of United States citizenship or lawful permanent residence, the petitioner must also provide evidence of the claimed relationship. A petition submitted on behalf of a spouse must be accompanied by a recent ADIT-style photograph of the petitioner, a recent ADIT-style photograph of the beneficiary, a certificate of marriage issued by civil authorities, and proof of the legal termination of all previous marriages of both the petitioner and the beneficiary. However, non-ADIT-style photographs may be accepted by the district director when the petitioner or beneficiary reside(s) in a country where such photographs are unavailable or cost prohibitive.

(3) Decision on and disposition of petition. The approved petition will be forwarded to the Department of State's Processing Center. If the beneficiary is in the United States and is eligible for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the petition is denied, the petitioner will be notified of the reasons for the denial and of the right to appeal in accordance with the provisions of 8 CFR 3.3.

(4) Derivative beneficiaries. No alien may be classified as an immediate relative as defined in section 201(b) of the Act unless he or she is the direct beneficiary of an approved petition for that classification. Therefore, a child of an alien approved for classification as an immediate relative spouse is not eligible for derivative classification and must have a separate petition filed on his or her behalf. A child accompanying or following to join a principal alien under section 203(a)(2) of the Act may be included in the principal alien's second preference visa petition. The child will be accorded second preference classification and the same priority date as the principal alien. However, if the child reaches the age of twenty-one prior to the issuance of a visa to the principal alien parent, a separate petition will be required. In such a case, the original priority date will be retained if the subsequent petition is filed by the same petitioner. Such retention of priority date will be accorded only to a son or daughter previously eligible as a derivative beneficiary under a second preference spousal petition.

(b) Petition by widow or widower of a United States citizen—

(1) Eligibility. A widow or widower of a United States citizen may file a petition and be classified as an immediate relative under section 201(b) of the Act if:

(i) He or she had been married for at least two years to a United States citizen.

(Note: The United States citizen is not required to have had the status of United States citizen for the entire two year period, but must have been a United States citizen at the time of death.)

(ii) The petition is filed within two years of the death of the citizen spouse or before November 29, 1992, if the citizen spouse died before November 29, 1990;

(iii) The alien petitioner and the citizen spouse were not legally separated at the time of the citizen's death; and

(iv) The alien spouse has not remarried.

(2) Evidence for petition of widow or widower. If a petition is submitted by the widow or widower of a deceased United States citizen, it must be accompanied by evidence of citizenship of the United States citizen and primary evidence, if available, of the relationship in the form of a marriage certificate issued by civil authorities, proof of the termination of all prior marriages of both husband and wife, and the United States citizen's death certificate issued by civil authorities. To determine the availability of primary documents, the Service will refer to the Department of State's Foreign Affairs Manual (FAM). When the FAM shows that primary documents are generally available in the country at issue but the petitioner claims that his or her document is unavailable, a letter from the appropriate registrar stating that the document is not available will be required before the Service will accept secondary evidence. Secondary evidence will be evaluated for its authenticity and credibility. Secondary evidence may include:

(i) Such evidence of the marriage and termination of prior marriages as religious documents, tribal records, census records, or affidavits; and

(ii) Such evidence of the United States citizen's death as religious documents, funeral service records, obituaries, or affidavits. Affidavits submitted as secondary evidence pursuant to paragraphs (b)(2)(i) and (b)(2)(ii) of this section must be sworn to or affirmed by people who have personal knowledge of the event to which they attest. Each affidavit should contain the full name and address, date and place of birth of the person making the affidavit and his or her relationship, if any, to the widow or widower. Any such affidavit must contain complete information and details explaining how knowledge of the event was acquired.

(3) Decision on and disposition of petition. The approved petition will be forwarded to the Department of State's Processing Center. If the widow or widower is in the United States and is eligible for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the petition is denied, the widow or widower will be notified of the reasons for the denial and of the right to appeal in accordance with the provisions of 8 CFR 3.3.

(4) Derivative beneficiaries. A child of an alien widow or widower classified as an immediate relative is eligible for derivative classification as an immediate relative. Such a child may be included in the principal alien's immediate relative visa petition, and may accompany or follow to join the principal alien to the United States. Derivative benefits do not extend to an unmarried or married son or daughter of an alien widow or widower.

(c) Self-petition by spouse of abusive citizen or lawful permanent resident—

(1) Eligibility—

AR.00407

(i) Basic eligibility requirements. A spouse may file a self-petition under section 204(a)(1)(A)(iii) or 204(a)(1)(B)(ii) of the Act for his or her classification as an immediate relative or as a preference immigrant if he or she:

(A) Is the spouse of a citizen or lawful permanent resident of the United States;

(B) Is eligible for immigrant classification under section 201(b)(2)(A)(i) or 203(a)(2)(A) of the Act based on that relationship;

(C) Is residing in the United States;

(D) Has resided in the United States with the citizen or lawful permanent resident spouse;

(E) Has been battered by, or has been the subject of extreme cruelty perpetrated by, the citizen or lawful permanent resident during the marriage; or is that parent of a child who has been battered by, or has been the subject of extreme cruelty perpetrated by, the citizen or lawful permanent resident during the marriage;

(F) Is a person of good moral character;

(G) Is a person whose deportation would result in extreme hardship to himself, herself, or his or her child; and

(H) Entered into the marriage to the citizen or lawful permanent resident in good faith.

(ii) Legal status of the marriage. The self-petitioning spouse must be legally married to the abuser when the petition is properly filed with the Service. A spousal self-petition must be denied if the marriage to the abuser legally ended through annulment, death, or divorce before that time. After the self-petition has been properly filed, the legal termination of the marriage will have no effect on the decision made on the self- petition. The self-petitioner's remarriage, however, will be a basis for the denial of a pending self-petition.

(iii) Citizenship or immigration status of the abuser. The abusive spouse must be a citizen of the United States or a lawful permanent resident of the United States when the petition is filed and when it is approved. Changes in the abuser's citizenship or lawful permanent resident status after the approval will have no effect on the self-petition. A self-petition approved on the basis of a relationship to an abusive lawful permanent resident spouse will not be automatically upgraded to immediate relative status. The self-petitioner would not be precluded, however, from filing a new self-petition for immediate relative classification after the abuser's naturalization, provided the self-petitioner continues to meet the self-petitioning requirements.

(iv) Eligibility for immigrant classification. A self-petitioner is required to comply with the provisions of section 204(c) of the Act, section 204(g) of the Act, and section 204(a)(2) of the Act.

(v) Residence. A self-petition will not be approved if the self-petitioner is not residing in the United States when the self-petition is filed. The self-petitioner is not required to be living with the abuser when the petition is filed, but he or she must have resided with the abuser in the United States in the past.

(vi) Battery or extreme cruelty. For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but that are a part of an overall pattern of violence. The qualifying abuse must have been committed by the citizen or lawful permanent resident spouse, must have been perpetrated against the self-petitioner or the self-petitioner's child, and must have taken place during the self-petitioner's marriage to the abuser.

(vii) Good moral character. A self-petitioner will be found to lack good moral character if he or she is a person described in section 101(f) of the Act. Extenuating circumstances may be taken into account if the person has not been convicted of an offense or offenses but admits to the commission of an act or acts that could show a lack of good moral character under section 101(f) of the Act. A person who was subjected to abuse in the form of forced prostitution or who can establish that he or she was forced to engage in other behavior that could render the person excludable under section 212(a) of the Act would not be precluded from being found to be a person of good moral character, provided the person has not been convicted for the commission of the offense or offenses in a court of law. A self-petitioner will also be found to lack good moral character, unless he or she establishes extenuating circumstances, if he or she willfully failed or refused to support dependents; or committed unlawful acts that adversely reflect upon his or her moral character, or was convicted or imprisoned for such acts, although the acts do not require an automatic finding of lack of good moral character. A self-petitioner's claim of good moral character will be evaluated on a case-by-case basis, taking into account the provisions of section 101(f) of the Act and the standards of the average citizen in the community. If the results of record checks conducted prior to the issuance of an immigrant visa or approval of an application for adjustment of status disclose that the self-petitioner is no longer a person of good moral character or that he or she has not been a person of good moral character in the past, a pending self-petition will be denied or the approval of a self-petition will be revoked.

(viii) Extreme hardship. The Service will consider all credible evidence of extreme hardship submitted with a self-petition, including evidence of hardship arising from circumstances surrounding the abuse. The extreme hardship claim will be evaluated on a case-by-case basis after a review of the evidence in the case. Self-petitioners are encouraged to cite and document all applicable factors, since there is no guarantee that a particular reason or reasons will result in a finding that deportation would cause extreme hardship. Hardship to persons other than the self-petitioner or the self-petitioner's child cannot be considered in determining whether a self-petitioning spouse's deportation would cause extreme hardship.

(ix) Good faith marriage. A spousal self-petition cannot be approved if the self-petitioner entered into the marriage to the abuser for the primary purpose of circumventing the immigration laws. A self-petition will not be denied, however, solely because the spouses are not living together and the marriage is no longer viable.

(2) Evidence for a spousal self-petition—

(i) General. Self-petitioners are encouraged to submit primary evidence whenever possible. The Service will consider, however, any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Service.

(ii) Relationship. A self-petition filed by a spouse must be accompanied by evidence of citizenship of the United States citizen or proof of the immigration status of the lawful permanent resident abuser. It must also be accompanied by evidence of the relationship. Primary evidence of a marital relationship is a marriage certificate issued by civil authorities, and proof of the termination of all prior marriages, if any, of both the self-petitioner and the abuser. If the self-petition is based on a claim that the self-petitioner's child was battered or subjected to extreme cruelty committed by the citizen or lawful permanent resident spouse, the self-petition should also be accompanied by the child's birth certificate or other evidence showing the relationship between the self-petitioner and the abused child.

(iii) Residence. One or more documents may be submitted showing that the self-petitioner and the abuser have resided together in the United States. One or more documents may also be submitted showing that the self-petitioner is residing in the United States when the self-petition is filed. Employment records, utility receipts, school records, hospital or medical records, birth certificates of children born in the United States, deeds, mortgages, rental records, insurance policies, affidavits or any other type of relevant credible evidence of residency may be submitted.

(iv) Abuse. Evidence of abuse may include, but is not limited to, reports and affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, and other social service agency personnel. Persons who have obtained an order of protection against the abuser or have taken other legal steps to end the abuse are strongly encouraged to submit copies of the relating legal documents. Evidence that the abuse victim sought safe-haven in a battered women's shelter or similar refuge may be relevant, as may a combination of documents such as a photograph of the visibly injured self-petitioner supported by affidavits. Other forms of credible relevant evidence will also be considered. Documentary proof of non-qualifying abuses may only be used to establish a pattern of abuse and violence and to support a claim that qualifying abuse also occurred.

(v) Good moral character. Primary evidence of the self-petitioner's good moral character is the self-petitioner's affidavit. The affidavit should be accompanied by a local police clearance or a state-issued criminal background check from each locality or state in the United States in which the self-petitioner has resided for six or more months during the 3–year period immediately preceding the filing of the self-petition. Self-petitioners who lived outside the United States during this time should submit a police clearance, criminal background check, or similar report issued by the appropriate authority in each foreign country in which he or she resided for six or more months during the 3–year period immediately preceding the filing of the self-petition. If police clearances, criminal background checks, or similar reports are not available for some or all locations, the self-petitioner may include an explanation and submit other evidence with his or her affidavit. The Service will consider other credible evidence of good moral character, such as affidavits from responsible persons who can knowledgeably attest to the self-petitioner's good moral character.

(vi) Extreme hardship. Evidence of extreme hardship may include affidavits, birth certificates of children, medical reports, protection orders and other court documents, police reports, and other relevant credible evidence.

(vii) Good faith marriage. Evidence of good faith at the time of marriage may include, but is not limited to, proof that one spouse has been listed as the other's spouse on insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding courtship, wedding ceremony, shared residence and experiences. Other types of

readily available evidence might include the birth certificates of children born to the abuser and the spouse; police, medical, or court documents providing information about the relationship; and affidavits of persons with personal knowledge of the relationship. All credible relevant evidence will be considered.

(3) Decision on and disposition of the petition—

(i) Petition approved. If the self-petitioning spouse will apply for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the self-petitioner will apply for an immigrant visa abroad, the approved self-petition will be forwarded to the Department of State's National Visa Center.

(ii) Petition denied. If the self-petition is denied, the self-petitioner will be notified in writing of the reasons for the denial and of the right to appeal the decision.

(4) Derivative beneficiaries. A child accompanying or following-to-join the self-petitioning spouse may be accorded the same preference and priority date as the self-petitioner without the necessity of a separate petition, if the child has not been classified as an immigrant based on his or her own self-petition. A derivative child who had been included in a parent's self-petition may later file a self-petition, provided the child meets the self-petitioning requirements. A child who has been classified as an immigrant based on a petition filed by the abuser or another relative may also be derivatively included in a parent's self-petition. The derivative child must be unmarried, less than 21 years old, and otherwise qualify as the self-petitioner's child under section 101(b)(1)(F) of the Act until he or she becomes a lawful permanent resident based on the derivative classification.

(5) Name change. If the self-petitioner's current name is different than the name shown on the documents, evidence of the name change (such as the petitioner's marriage certificate, legal document showing name change, or other similar evidence) must accompany the self-petition.

(6) Prima facie determination.

(i) Upon receipt of a self-petition under paragraph (c)(1) of this section, the Service shall make a determination as to whether the petition and the supporting documentation establish a "prima facie case" for purposes of 8 U.S.C. 1641, as amended by section 501 of Public Law 104–208.

(ii) For purposes of paragraph (c)(6)(i) of this section, a prima facie case is established only if the petitioner submits a completed Form I–360 and other evidence supporting all of the elements required of a self-petitioner in paragraph (c)(1) of this section. A finding of prima facie eligibility does not relieve the petitioner of the burden of providing additional evidence in support of the petition and does not establish eligibility for the underlying petition.

(iii) If the Service determines that a petitioner has made a "prima facie case," the Service shall issue a Notice of Prima Facie Case to the petitioner. Such Notice shall be valid until the Service either grants or denies the petition.

(iv) For purposes of adjudicating the petition submitted under paragraph (c)(1) of this section, a prima facie determination—

(A) Shall not be considered evidence in support of the petition;

(B) Shall not be construed to make a determination of the credibility or probative value of any evidence submitted along with that petition; and,

(C) Shall not relieve the self-petitioner of his or her burden of complying with all of the evidentiary requirements of paragraph (c)(2) of this section.

(d) Petition for a child or son or daughter—

(1) Eligibility. A United States citizen may file a petition on behalf of an unmarried child under twenty-one years of age for immediate relative classification under section 201(b) of the Act. A United States citizen may file a petition on behalf of an unmarried son or daughter over twenty-one years of age under section 203(a)(1) or for a married son or daughter for preference classification under section 203(a)(3) of the Act. An alien lawfully admitted for permanent residence may file a petition on behalf of a child or an unmarried son or daughter for preference classification under section 203(a)(2) of the Act.

(2) Evidence to support petition for child or son or daughter. In addition to evidence of United States citizenship or lawful permanent resident, the petitioner must also provide evidence of the claimed relationship.

(i) Primary evidence for a legitimate child or son or daughter. If a petition is submitted by the mother, the birth certificate of the child showing the mother's name must accompany the petition. If the mother's name on the birth certificate is different from her name on the petition, evidence of the name change must be submitted. If a petition is submitted by the father, the birth certificate of the child, a marriage certificate of the parents, and proof of legal termination of the parents' prior marriages, if any, issued by civil authorities must accompany the petition. If the father's name has been legally changed, evidence of the name change must also accompany the petition.

(ii) Primary evidence for a legitimated child or son or daughter. A child can be legitimated through the marriage of his or her natural parents, by the laws of the country or state of the child's residence or domicile, or by the laws of the country or state of the father's residence or domicile. If the legitimation is based on the natural parents' marriage, such marriage must have taken place while the child was under the age of eighteen. If the legitimation is based on the laws of the country or state of the child's residence or domicile, the law must have taken effect before the child's eighteenth birthday. If the legitimation is based on the laws of the country or state of the father's residence or domicile, the father must have resided— while the child was under eighteen years of age—in the country or state under whose laws the child has been legitimated. Primary evidence of the relationship should consist of the beneficiary's birth certificate and the parents' marriage certificate or other evidence of legitimation issued by civil authorities.

(iii) Primary evidence for an illegitimate child or son or daughter. If a petition is submitted by the mother, the child's birth certificate, issued by civil authorities and showing the mother's name, must accompany the petition. If the mother's name on the birth certificate is different from her name as reflected in the petition, evidence of the name change must also be submitted. If the petition is submitted by the purported father of a child or son or daughter born out of wedlock, the father must show that he is the natural father and that a bona fide parent-child relationship was established when the child or son or daughter was unmarried and under twenty-one years of age. Such a relationship will be deemed to exist or to have existed where the father demonstrates or has demonstrated an active concern for the child's support, instruction,

and general welfare. Primary evidence to establish that the petitioner is the child's natural father is the beneficiary's birth certificate, issued by civil authorities and showing the father's name. If the father's name has been legally changed, evidence of the name change must accompany the petition. Evidence of a parent/child relationship should establish more than merely a biological relationship. Emotional and/or financial ties or a genuine concern and interest by the father for the child's support, instruction, and general welfare must be shown. There should be evidence that the father and child actually lived together or that the father held the child out as being his own, that he provided for some or all of the child's needs, or that in general the father's behavior evidenced a genuine concern for the child. The most persuasive evidence for establishing a bona fide parent/child relationship and financial responsibility by the father is documentary evidence which was contemporaneous with the events in question. Such evidence may include, but is not limited to: money order receipts or cancelled checks showing the father's financial support of the beneficiary; the father's income tax returns; the father's medical or insurance records which include the beneficiary as a dependent; school records for the beneficiary; correspondence between the parties; or notarized affidavits of friends, neighbors, school officials, or other associates knowledgeable about the relationship.

(iv) Primary evidence for a stepchild. If a petition is submitted by a stepparent on behalf of a stepchild or stepson or stepdaughter, the petition must be supported by the stepchild's or stepson's or stepdaughter's birth certificate, issued by civil authorities and showing the name of the beneficiary's parent to whom the petitioner is married, a marriage certificate issued by civil authorities which shows that the petitioner and the child's natural parent were married before the stepchild or stepson or stepdaughter reached the age of eighteen; and evidence of the termination of any prior marriages of the petitioner and the natural parent of the stepchild or stepson or stepdaughter.

(v) Secondary evidence. When it is established that primary evidence is not available, secondary evidence may be accepted. To determine the availability of primary documents, the Service will refer to the Department of State's Foreign Affairs Manual (FAM). When the FAM shows that primary documents are generally available in the country at issue but the petitioner claims that his or her document is unavailable, a letter from the appropriate registrar stating that the document is not available will be required before the Service will accept secondary evidence. Secondary evidence will be evaluated for its authenticity and credibility. Secondary evidence may take the form of historical evidence; such evidence must have been issued contemporaneously with the event which it documents any may include, but is not limited to, medical records, school records, and religious documents. Affidavits may also by accepted. When affidavits are submitted, they must be sworn to by persons who were born at the time of and who have personal knowledge of the event to which they attest. Any affidavit must contain the affiant's full name and address, date and place of birth, relationship to the party, if any, and complete details concerning how the affiant acquired knowledge of the event.

(vi) Blood tests. The director may require that a specific Blood Group Antigen Test be conducted of the beneficiary and the beneficiary's father and mother. In general, blood tests will be required only after other forms of evidence have proven inconclusive. If the specific Blood Group Antigen Test is also found not to be conclusive and the director determines that additional evidence is needed, a Human Leucocyte Antigen (HLA) test may be requested. Tests will be conducted, at the expense of the petitioner or beneficiary, by the United States Public Health Service physician who is authorized overseas or by a qualified medical specialist designated by the district director. The results of the test should be reported on Form G–620. Refusal to submit to a Specific Blood Group Antigen or HLA test when requested may constitute a basis for denial of the petition, unless a legitimate religious objection has been established. When a legitimate religious objection is established, alternate forms of evidence may be considered based upon documentation already submitted.

(vii) Primary evidence for an adopted child or son or daughter. A petition may be submitted on behalf of an adopted child or son or daughter by a United States citizen or lawful permanent resident if the adoption took place before the beneficiary's sixteenth birthday, and if the child has been in the legal custody of the adopting parent or parents and has resided with

the adopting parent or parents for at least two years. A copy of the adoption decree, issued by the civil authorities, must accompany the petition.

(A) Legal custody means the assumption of responsibility for a minor by an adult under the laws of the state and under the order or approval of a court of law or other appropriate government entity. This provision requires that a legal process involving the courts or other recognized government entity take place. If the adopting parent was granted legal custody by the court or recognized governmental entity prior to the adoption, that period may be counted toward fulfillment of the two-year legal custody requirement. However, if custody was not granted prior to the adoption, the adoption decree shall be deemed to mark the commencement of legal custody. An informal custodial or guardianship document, such as a sworn affidavit signed before a notary public, is insufficient for this purpose.

(B) Evidence must also be submitted to show that the beneficiary resided with the petitioner for at least two years. Generally, such documentation must establish that the petitioner and the beneficiary resided together in a familial relationship. Evidence of parental control may include, but is not limited to, evidence that the adoptive parent owns or maintains the property where the child resides and provides financial support and day-to-day supervision. The evidence must clearly indicate the physical living arrangements of the adopted child, the adoptive parent(s), and the natural parent(s) for the period of time during which the adoptive parent claims to have met the residence requirement. When the adopted child continued to reside in the same household as a natural parent(s) during the period in which the adoptive parent petitioner seeks to establish his or her compliance with this requirement, the petitioner has the burden of establishing that he or she exercised primary parental control during that period of residence.

(C) Legal custody and residence occurring prior to or after the adoption will satisfy both requirements. Legal custody, like residence, is accounted for in the aggregate. Therefore, a break in legal custody or residence will not affect the time already fulfilled. To meet the definition of child contained in sections 101(b)(1)(E) and 101(b)(2) of the Act, the child must have been under 16 years of age when the adoption is finalized.

(D) On or after the Convention effective date, as defined in 8 CFR part 204.301, a United States citizen who is habitually resident in the United States, as determined under 8 CFR 204.303, may not file a Form I–130 under this section on behalf of child who was habitually resident in a Convention country, as determined under 8 CFR 204.303, unless the adoption was completed before the Convention effective date. In the case of any adoption occurring on or after the Convention effective date, a Form I–130 may be filed and approved only if the United States citizen petitioner was not habitually resident in the United States at the time of the adoption.

(E) For purposes of paragraph (d)(2)(vii)(D) of this section, USCIS will deem a United States citizen, 8 CFR 204.303 notwithstanding, to have been habitually resident outside the United States, if the citizen satisfies the 2–year joint residence and custody requirements by residing with the child outside the United States.

(F) For purposes of paragraph (d)(2)(vii)(D) of this section, USCIS will not approve a Form I–130 under section 101(b)(1)(E) of the Act on behalf of an alien child who is present in the United States based on an adoption that is entered on or after the Convention effective date, but whose habitual residence immediately before the child's arrival in the United States was in a Convention country. However, the U.S. citizen seeking the child's adoption may file a Form I–800A and Form I–800 under 8 CFR part 204, subpart C.

AR.00414

(3) Decision on and disposition of petition. The approved petition will be forwarded to the Department of State's Processing Center. If the beneficiary is in the United States and is eligible for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the petition is denied, the petitioner will be notified of the reasons for the denial and of the right to appeal in accordance with the provisions of 8 CFR 3.3.

(4) Derivative beneficiaries. A spouse or child accompanying or following to join a principal alien as used in this section may be accorded the same preference and priority date as the principal alien without the necessity of a separate petition. However, a child of an alien who is approved for classification as an immediate relative is not eligible for derivative classification and must have a separate petition approved on his or her behalf.

(5) Name change. When the petitioner's name does not appear on the child's birth certificate, evidence of the name change (such as the petitioner's marriage certificate, legal document showing name change, or other similar evidence) must accompany the petition. If the beneficiary's name has been legally changed, evidence of the name change must also accompany the petition.

(e) Self-petition by child of abusive citizen or lawful permanent resident—

(1) Eligibility.

(i) A child may file a self-petition under section 204(a)(1)(A)(iv) or 204(a)(1)(B)(iii) of the Act if he or she:

(A) Is the child of a citizen or lawful permanent resident of the United States;

(B) Is eligible for immigrant classification under section 201(b)(2)(A)(i) or 203(a)(2)(A) of the Act based on that relationship;

(C) Is residing in the United States;

(D) Has resided in the United States with the citizen or lawful permanent resident parent;

(E) Has been battered by, or has been the subject of extreme cruelty perpetrated by, the citizen or lawful permanent resident parent while residing with that parent;

(F) Is a person of good moral character; and

(G) Is a person whose deportation would result in extreme hardship to himself or herself.

(ii) Parent-child relationship to the abuser. The self-petitioning child must be unmarried, less than 21 years of age, and otherwise qualify as the abuser's child under the definition of child contained in section 101(b)(1) of the Act when the

petition is filed and when it is approved. Termination of the abuser's parental rights or a change in legal custody does not alter the self-petitioning relationship provided the child meets the requirements of section 101(b)(1) of the Act.

(iii) Citizenship or immigration status of the abuser. The abusive parent must be a citizen of the United States or a lawful permanent resident of the United States when the petition is filed and when it is approved. Changes in the abuser's citizenship or lawful permanent resident status after the approval will have no effect on the self-petition. A self-petition approved on the basis of a relationship to an abusive lawful permanent resident will not be automatically upgraded to immediate relative status. The self-petitioning child would not be precluded, however, from filing a new self-petition for immediate relative classification after the abuser's naturalization, provided the self-petitioning child continues to meet the self-petitioning requirements.

(iv) Eligibility for immigrant classification. A self-petitioner is required to comply with the provisions of section 204(c) of the Act, section 204(g) of the Act, and section 204(a)(2) of the Act.

(v) Residence. A self-petition will not be approved if the self-petitioner is not residing in the United States when the self-petition is filed. The self-petitioner is not required to be living with the abuser when the petition is filed, but he or she must have resided with the abuser in the United States in the past.

(vi) Battery or extreme cruelty. For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but are a part of an overall pattern of violence. The qualifying abuse must have been committed by the citizen or lawful permanent resident parent, must have been perpetrated against the self-petitioner, and must have taken place while the self-petitioner was residing with the abuser.

(vii) Good moral character. A self-petitioner will be found to lack good moral character if he or she is a person described in section 101(f) of the Act. Extenuating circumstances may be taken into account if the person has not been convicted of an offense or offenses but admits to the commission of an act or acts that could show a lack of good moral character under section 101(f) of the Act. A person who was subjected to abuse in the form of forced prostitution or who can establish that he or she was forced to engage in other behavior that could render the person excludable under section 212(a) of the Act would not be precluded from being found to be a person of good moral character, provided the person has not been convicted for the commission of the offense or offenses in a court of law. A self-petitioner will also be found to lack good moral character, unless he or she establishes extenuating circumstances, if he or she willfully failed or refused to support dependents; or committed unlawful acts that adversely reflect upon his or her moral character, or was convicted or imprisoned for such acts, although the acts do not require an automatic finding of lack of good moral character. A self-petitioner's claim of good moral character will be evaluated on a case-by-case basis, taking into account the provisions of section 101(f) of the Act and the standards of the average citizen in the community. If the results of record checks conducted prior to the issuance of an immigrant visa or approval of an application for adjustment of status disclose that the self-petitioner is no longer a person of good moral character or that he or she has not been a person of good moral character in the past, a pending self-petition will be denied or the approval of a self-petition will be revoked.

(viii) Extreme hardship. The Service will consider all credible evidence of extreme hardship submitted with a self-petition, including evidence of hardship arising from circumstances surrounding the abuse. The extreme hardship claim will be

evaluated on a case-by-case basis after a review of the evidence in the case. Self-petitioners are encouraged to cite and document all applicable factors, since there is no guarantee that a particular reason or reasons will result in a finding that deportation would cause extreme hardship. Hardship to persons other than the self-petitioner cannot be considered in determining whether a self-petitioning child's deportation would cause extreme hardship.

(2) Evidence for a child's self-petition—

(i) General. Self-petitioners are encouraged to submit primary evidence whenever possible. The Service will consider, however, any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Service.

(ii) Relationship. A self-petition filed by a child must be accompanied by evidence of citizenship of the United States citizen or proof of the immigration status of the lawful permanent resident abuser. It must also be accompanied by evidence of the relationship. Primary evidence of the relationship between:

(A) The self-petitioning child and an abusive biological mother is the self-petitioner's birth certificate issued by civil authorities;

(B) A self-petitioning child who was born in wedlock and an abusive biological father is the child's birth certificate issued by civil authorities, the marriage certificate of the child's parents, and evidence of legal termination of all prior marriages, if any;

(C) A legitimated self-petitioning child and an abusive biological father is the child's birth certificate issued by civil authorities, and evidence of the child's legitimation;

(D) A self-petitioning child who was born out of wedlock and an abusive biological father is the child's birth certificate issued by civil authorities showing the father's name, and evidence that a bona fide parent-child relationship has been established between the child and the parent;

(E) A self-petitioning stepchild and an abusive stepparent is the child's birth certificate issued by civil authorities, the marriage certificate of the child's parent and the stepparent showing marriage before the stepchild reached 18 years of age, and evidence of legal termination of all prior marriages of either parent, if any; and

(F) An adopted self-petitioning child and an abusive adoptive parent is an adoption decree showing that the adoption took place before the child reached 16 years of age, and evidence that the child has been residing with and in the legal custody of the abusive adoptive parent for at least 2 years.

(iii) Residence. One or more documents may be submitted showing that the self-petitioner and the abuser have resided together in the United States. One or more documents may also be submitted showing that the self-petitioner is residing in the United States when the self-petition is filed. Employment records, school records, hospital or medical records, rental records, insurance policies, affidavits or any other type of relevant credible evidence of residency may be submitted.

AR.00417

(iv) Abuse. Evidence of abuse may include, but is not limited to, reports and affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, and other social service agency personnel. Persons who have obtained an order of protection against the abuser or taken other legal steps to end the abuse are strongly encouraged to submit copies of the relating legal documents. Evidence that the abuse victim sought safe-haven in a battered women's shelter or similar refuge may be relevant, as may a combination of documents such as a photograph of the visibly injured self-petitioner supported by affidavits. Other types of credible relevant evidence will also be considered. Documentary proof of non-qualifying abuse may only be used to establish a pattern of abuse and violence and to support a claim that qualifying abuse also occurred.

(v) Good moral character. Primary evidence of the self-petitioner's good moral character is the self-petitioner's affidavit. The affidavit should be accompanied by a local police clearance or a state-issued criminal background check from each locality or state in the United States in which the self-petitioner has resided for six or more months during the 3–year period immediately preceding the filing of the self-petition. Self-petitioners who lived outside the United States during this time should submit a police clearance, criminal background check, or similar report issued by the appropriate authority in the foreign country in which he or she resided for six or more months during the 3–year period immediately preceding the filing of the self-petition. If police clearances, criminal background checks, or similar reports are not available for some or all locations, the self-petitioner may include an explanation and submit other evidence with his or her affidavit. The Service will consider other credible evidence of good moral character, such as affidavits from responsible persons who can knowledgeably attest to the self-petitioner's good moral character. A child who is less than 14 years of age is presumed to be a person of good moral character and is not required to submit affidavits of good moral character, police clearances, criminal background checks, or other evidence of good moral character.

(vi) Extreme hardship. Evidence of extreme hardship may include affidavits, medical reports, protection orders and other court documents, police reports, and other relevant credible evidence.

(3) Decision on and disposition of the petition—

(i) Petition approved. If the self-petitioning child will apply for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the self-petitioner will apply for an immigrant visa abroad, the approved self-petition will be forwarded to the Department of State's National Visa Center.

(ii) Petition denied. If the self-petition is denied, the self-petitioner will be notified in writing of the reasons for the denial and of the right to appeal the decision.

(4) Derivative beneficiaries. A child of a self-petitioning child is not eligible for derivative classification and must have a petition filed on his or her behalf if seeking immigrant classification.

(5) Name change. If the self-petitioner's current name is different than the name shown on the documents, evidence of the name change (such as the petitioner's marriage certificate, legal document showing the name change, or other similar evidence) must accompany the self-petition.

(6) Prima facie determination.

(i) Upon receipt of a self-petition under paragraph (e)(1) of this section, the Service shall make a determination as to whether the petition and the supporting documentation establish a "prima facie case" for purposes of 8 U.S.C. 1641, as amended by section 501 of Public Law 104–208.

(ii) For purposes of paragraph (e)(6)(i) of this section, a prima facie case is established only if the petitioner submits a completed Form I–360 and other evidence supporting all of the elements required of a self-petitioner in paragraph (e)(1) of this section. A finding of prima facie eligibility does not relieve the petitioner of the burden of providing additional evidence in support of the petition and does not establish eligibility for the underlying petition.

(iii) If the Service determines that a petitioner has made a "prima facie case" the Service shall issue a Notice of Prima Facie Case to the petitioner. Such Notice shall be valid until the Service either grants or denies the petition.

(iv) For purposes of adjudicating the petition submitted under paragraph (e)(1) of this section, a prima facie determination:

(A) Shall not be considered evidence in support of the petition;

(B) Shall not be construed to make a determination of the credibility or probative value of any evidence submitted along with that petition; and,

(C) Shall not relieve the self-petitioner of his or her burden of complying with all of the evidentiary requirements of paragraph (e)(2) of this section.

(f) Petition for a parent—

(1) Eligibility. Only a United States citizen who is twenty-one years of age or older may file a petition on behalf of a parent for classification under section 201(b) of the Act.

(2) Evidence to support a petition for a parent. In addition to evidence of United States citizenship as listed in § 204.1(g) of this part, the petitioner must also provide evidence of the claimed relationship.

(i) Primary evidence if petitioner is a legitimate son or daughter. If a petition is submitted on behalf of the mother, the birth certificate of the petitioner showing the mother's name must accompany the petition. If the mother's name on the birth certificate is different from her name as reflected in the petition, evidence of the name change must also be submitted. If a petition is submitted on behalf of the father, the birth certificate of the petitioner, a marriage certificate of the parents, and proof of legal termination of the parents' prior marriages, if any, issued by civil authorities must accompany the petition. If the father's name on the birth certificate has been legally changed, evidence of the name change must also accompany the petition.

(ii) Primary evidence if petitioner is a legitimated son or daughter. A child can be legitimated through the marriage of his or her natural parents, by the laws of the country or state of the child's residence or domicile, or by the laws of the country or state of the father's residence or domicile. If the legitimation is based on the natural parent's marriage, such marriage

must have taken place while the child was under the age of eighteen. If the legitimation is based on the laws of the country or state of the child's residence or domicile, the law must have taken effect before the child's eighteenth birthday. If the legitimation is based on the laws of the country or state of the father's residence or domicile, the father must have resided— while the child was under eighteen years of age—in the country or state under whose laws the child has been legitimated. Primary evidence of the relationship should consist of petitioner's birth certificate and the parents' marriage certificate or other evidence of legitimation issued by civil authorities.

(iii) Primary evidence if the petitioner is an illegitimate son or daughter. If a petition is submitted on behalf of the mother, the petitioner's birth certificate, issued by civil authorities and showing the mother's name, must accompany the petition. If the mother's name on the birth certificate is different from her name as reflected in the petition, evidence of the name change must also be submitted. If the petition is submitted on behalf of the purported father of the petitioner, the petitioner must show that the beneficiary is his or her natural father and that a bona fide parent-child relationship was established when the petitioner was unmarried and under twenty-one years of age. Such a relationship will be deemed to exist or to have existed where the father demonstrates or has demonstrated an active concern for the child's support, instruction, and general welfare. Primary evidence to establish that the beneficiary is the petitioner's natural father is the petitioner's birth certificate, issued by civil authorities and showing the father's name. If the father's name has been legally changed, evidence of the name change must accompany the petition. Evidence of a parent/child relationship should establish more than merely a biological relationship. Emotional and/or financial ties or a genuine concern and interest by the father for the child's support, instruction, and general welfare must be shown. There should be evidence that the father and child actually lived together or that the father held the child out as being his own, that he provided for some or all of the child's needs, or that in general the father's behavior evidenced a genuine concern for the child. The most persuasive evidence for establishing a bona fide parent/child relationship is documentary evidence which was contemporaneous with the events in question. Such evidence may include, but is not limited to: money order receipts or cancelled checks showing the father's financial support of the beneficiary; the father's income tax returns; the father's medical or insurance records which include the petitioner as a dependent; school records for the petitioner; correspondence between the parties; or notarized affidavits of friends, neighbors, school officials, or other associates knowledgeable as to the relationship.

(iv) Primary evidence if petitioner is an adopted son or daughter. A petition may be submitted for an adoptive parent by a United States citizen who is twenty-one years of age or older if the adoption took place before the petitioner's sixteenth birthday and if the two year legal custody and residence requirements have been met. A copy of the adoption decree, issued by the civil authorities, must accompany the petition.

(A) Legal custody means the assumption of responsibility for a minor by an adult under the laws of the state and under the order or approval of a court of law or other appropriate government entity. This provision requires that a legal process involving the courts or other recognized government entity take place. If the adopting parent was granted legal custody by the court or recognized governmental entity prior to the adoption, that period may be counted toward fulfillment of the two-year legal custody requirement. However, if custody was not granted prior to the adoption, the adoption decree shall be deemed to mark the commencement of legal custody. An informal custodial or guardianship document, such as a sworn affidavit signed before a notary public, is insufficient for this purpose.

(B) Evidence must also be submitted to show that the beneficiary resided with the petitioner for at least two years. Generally, such documentation must establish that the petitioner and the beneficiary resided together in a parental relationship. The evidence must clearly indicate the physical living arrangements of the adopted child, the adoptive parent(s), and the natural parent(s) for the period of time during which the adoptive parent claims to have met the residence requirement.

(C) Legal custody and residence occurring prior to or after the adoption will satisfy both requirements. Legal custody, like residence, is accounted for in the aggregate. Therefore, a break in legal custody or residence will not affect the time already fulfilled. To meet the definition of child contained in sections 101(b)(1)(E) and 101(b)(2) of the Act, the child must have been under 16 years of age when the adoption is finalized.

(v) Name change. When the petition is filed by a child for the child's parent, and the parent's name is not on the child's birth certificate, evidence of the name change (such as the parent's marriage certificate, a legal document showing the parent's name change, or other similar evidence) must accompany the petition. If the petitioner's name has been legally changed, evidence of the name change must also accompany the petition.

(3) Decision on and disposition of petition. The approved petition will be forwarded to the Department of State's Processing Center. If the beneficiary is in the United States and is eligible for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the petition is denied, the petitioner will be notified of the reasons for the denial and of the right to appeal in accordance with the provisions of 8 CFR 3.3.

(4) Derivative beneficiaries. A child or a spouse of a principal alien who is approved for classification as an immediate relative is not eligible for derivative classification and must have a separate petition approved on his or her behalf.

(g) Petition for a brother or sister—

(1) Eligibility. Only a United States citizen who is twenty-one years of age or older may file a petition of a brother or sister for classification under section 203(a)(4) of the Act.

(2) Evidence to support a petition for brother or sister. In addition to evidence of United States citizenship, the petitioner must also provide evidence of the claimed relationship.

(i) Primary evidence if the siblings share a common mother or are both legitimate children of a common father. If a sibling relationship is claimed through a common mother, the petition must be supported by a birth certificate of the petitioner and a birth certificate of the beneficiary showing a common mother. If the mother's name on one birth certificate is different from her name as reflected on the other birth certificate or in the petition, evidence of the name change must also be submitted. If a sibling relationship is claimed through a common father, the birth certificates of the beneficiary and petitioner, a marriage certificate of the parents' and proof of legal termination of the parents, prior marriage(s), if any, issued by civil authorities must accompany the petition. If the father's name has been legally changed, evidence of the name change must also accompany the petition.

(ii) Primary evidence if either or both siblings are legitimated. A child can be legitimated through the marriage of his or her natural parents, by the laws of the country or state of the child's residence or domicile, or by the laws of the country or state of the father's residence or domicile. If the legitimation is based on the natural parents' marriage, such marriage must have taken place while the child was under the age of eighteen. If the legitimation is based on the laws of the country or state of the child's residence or domicile, the law must have taken effect before the child's eighteenth birthday. If based on the laws of the country or state of the father's residence or domicile, the father must have resided—while the child was under eighteen years of age—in the country or state under whose laws the child has been legitimated. Primary evidence of the

relationship should consist of the petitioner's birth certificate, the beneficiary's birth certificate, and the parents' marriage certificate or other evidence of legitimation issued by civil authorities.

(iii) Primary evidence if either sibling is illegitimate. If one or both of the siblings is (are) the illegitimate child(ren) of a common father, the petitioner must show that they are the natural children of the father and that a bona fide parent-child relationship was established when the illegitimate child(ren) was (were) unmarried and under twenty-one years of age. Such a relationship will be deemed to exist or to have existed where the father demonstrates or has demonstrated an active concern for the child's support, instruction, and general welfare. Primary evidence is the petitioner's and beneficiary's birth certificates, issued by civil authorities and showing the father's name, and evidence that the siblings have or had a bona fide parent/child relationship with the natural father. If the father's name has been legally changed, evidence of the name change must accompany the petition. Evidence of a parent/child relationship should establish more than merely a biological relationship. Emotional and/or financial ties or a genuine concern and interest by the father for the child's support, instruction, and general welfare must be shown. There should be evidence that the father and child actually lived together or that the father held the child out as being his own, that he provided for some or all of the child's needs, or that in general the father's behavior evidenced a genuine concern for the child. The most persuasive evidence for establishing a bona fide parent/child relationship is documentary evidence which was contemporaneous with the events in question. Such evidence may include, but is not limited to: money order receipts or canceled checks showing the father's financial support of the beneficiary; the father's income tax returns; the father's medical or insurance records which include the beneficiary as a dependent; school records for the beneficiary; correspondence between the parties; or notarized affidavits of friends, neighbors, school officials, or other associates knowledgeable about the relationship.

(iv) Primary evidence for stepsiblings. If the petition is submitted on behalf of a brother or sister having a common father, the relationship of both the petitioner and the beneficiary to the father must be established as required in paragraphs (g)(2)(ii) and (g)(2)(iii) of this section. If the petitioner and beneficiary are stepsiblings through the marriages of their common father to different mothers, the marriage certificates of the parents and evidence of the termination of any prior marriages of the parents must be submitted.

(3) Decision on and disposition of petition. The approved petition will be forwarded to the Department of State's Processing Center. If the beneficiary is in the United States and is eligible for adjustment of status under section 245 of the Act, the approved petition will be retained by the Service. If the petition is denied, the petitioner will be notified of the reasons for the denial and of the right to appeal in accordance with the provisions of 8 CFR 3.3.

(4) Derivative beneficiaries. A spouse or a child accompanying or following to join a principal alien beneficiary under this section may be accorded the same preference and priority date as the principal alien without the necessity of a separate petition.

(5) Name change. If the name of the petitioner, the beneficiary, or both has been legally changed, evidence showing the name change (such as a marriage certificate, a legal document showing the name change, or other similar evidence) must accompany the petition.

(h) Validity of approved petitions—

(1) General. Unless terminated pursuant to section 203(g) of the Act or revoked pursuant to part 205 of this chapter, the approval of a petition to classify an alien as a preference immigrant under paragraphs (a)(1), (a)(2), (a)(3), or (a)(4) of

section 203 of the Act, or as an immediate relative under section 201(b) of the Act, shall remain valid for the duration of the relationship to the petitioner and of the petitioner's status as established in the petition.

(2) *Subsequent petition by same petitioner for same beneficiary.* When a visa petition has been approved, and subsequently a new petition by the same petitioner is approved for the same preference classification on behalf of the same beneficiary, the latter approval shall be regarded as a reaffirmation or reinstatement of the validity of the original petition, except when the original petition has been terminated pursuant to section 203(g) of the Act or revoked pursuant to part 205 of this chapter, or when an immigrant visa has been issued to the beneficiary as a result of the petition approval. A self-petition filed under section 204(a)(1)(A)(iii), 204(a)(1)(A)(iv), 204(a)(1)(B)(ii), 204(a)(1)(B)(iii) of the Act based on the relationship to an abusive citizen or lawful permanent resident of the United States will not be regarded as a reaffirmation or reinstatement of a petition previously filed by the abuser. A self-petitioner who has been the beneficiary of a visa petition filed by the abuser to accord the self-petitioner immigrant classification as his or her spouse or child, however, will be allowed to transfer the visa petition's priority date to the self-petition. The visa petition's priority date may be assigned to the self-petition without regard to the current validity of the visa petition. The burden of proof to establish the existence of and the filing date of the visa petition lies with the self-petitioner, although the Service will attempt to verify a claimed filing through a search of the Service's computerized records or other records deemed appropriate by the adjudicating officer. A new self-petition filed under section 204(a)(1)(A)(iii), 204(a)(1)(A)(iv), 204(a)(1)(B)(ii), or 204(a)(1)(B)(iii) of the Act will not be regarded as a reaffirmation or reinstatement of the original self-petition unless the prior and the subsequent self-petitions are based on the relationship to the same abusive citizen or lawful permanent resident of the United States.

(i) *Automatic conversion of preference classification—*

(1) *By change in beneficiary's marital status.*

(i) A currently valid petition previously approved to classify the beneficiary as the unmarried son or daughter of a United States citizen under section 203(a)(1) of the Act shall be regarded as having been approved for preference status under section 203(a)(3) of the Act as of the date the beneficiary marries. The beneficiary's priority date is the same as the date the petition for classification under section 203(a)(1) of the Act was properly filed.

(ii) A currently valid petition previously approved to classify a child of a United States citizen as an immediate relative under section 201(b) of the Act shall be regarded as having been approved for preference status under section 203(a)(3) of the Act as of the date the beneficiary marries. The beneficiary's priority date is the same as the date the petition for 201(b) classification was properly filed.

(iii) A currently valid petition classifying the married son or married daughter of a United States citizen for preference status under section 203(a)(3) of the Act shall, upon legal termination of the beneficiary's marriage, be regarded as having been approved under section 203(a)(1) of the Act if the beneficiary is over twenty-one years of age. The beneficiary's priority date is the same as the date the petition for classification under section 203(a)(3) of the Act was properly filed. If the beneficiary is under twenty-one years of age, the petition shall be regarded as having been approved for classification as an immediate relative under section 201(b) of the Act as of the date the petition for classification under section 203(a)(3) of the Act was properly filed.

(iv) A currently valid visa petition previously approved to classify the beneficiary as an immediate relative as the spouse of a United States citizen must be regarded, upon the death of the petitioner, as having been approved as a Form I–360,

Petition for Amerasian, Widow(er) or Special Immigrant for classification under paragraph (b) of this section, if, on the date of the petitioner's death, the beneficiary satisfies the requirements of paragraph (b)(1) of this section. If the petitioner dies before the petition is approved, but, on the date of the petitioner's death, the beneficiary satisfies the requirements of paragraph (b)(1) of this section, then the petition shall be adjudicated as if it had been filed as a Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant under paragraph (b) of this section.

(2) By the beneficiary's attainment of the age of twenty-one years. A currently valid petition classifying the child of a United States citizen as an immediate relative under section 201(b) of the Act shall be regarded as having been approved for preference status under section 203(a)(1) of the Act as of the beneficiary's twenty-first birthday. The beneficiary's priority date is the same as the date the petition for section 201(b) classification was filed.

(3) By the petitioner's naturalization. Effective upon the date of naturalization of a petitioner who had been lawfully admitted for permanent residence, a currently valid petition according preference status under section 203(a)(2) of the Act to the petitioner's spouse and unmarried children under twenty-one years of age shall be regarded as having been approved for immediate relative status under section 201(b) of the Act. Similarly, a currently valid petition according preference status under section 203(a)(2) of the Act for the unmarried son or daughter over twenty-one years of age shall be regarded as having been approved under section 203(a)(1) of the Act. In any case of conversion to classification under section 203(a)(1) of the Act, the beneficiary's priority date is the same as the date the petition for classification under section 203(a)(2) of the Act was properly filed. A self-petition filed under section 204(a)(1)(B)(ii) or 204(a)(1)(B)(iii) of the Act based on the relationship to an abusive lawful permanent resident of the United States for classification under section 203(a)(2) of the Act will not be affected by the abuser's naturalization and will not be automatically converted to a petition for immediate relative classification.

**Credits**

[30 FR 14773, Nov. 30, 1965; 48 FR 4453, Feb. 1, 1983; 48 FR 19155, April 28, 1983; 48 FR 52689, Nov. 22, 1983; 49 FR 8422, March 7, 1984; 50 FR 38969, Sept. 26, 1985; 52 FR 16233, May 4, 1987; 54 FR 11161, March 17, 1989; 54 FR 36754, Sept. 5, 1989; 54 FR 40239, Sept. 29, 1989; 57 FR 41057, Sept. 9, 1992; 60 FR 34090, June 30, 1995; 60 FR 38948, July 31, 1995; 61 FR 7207, Feb. 27, 1996; 61 FR 13073, 13075, 13077, March 26, 1996; 62 FR 10336, March 6, 1997; 62 FR 60771, Nov. 13, 1997; 71 FR 35749, June 21, 2006; 72 FR 19107, April 17, 2007; 72 FR 56853, Oct. 4, 2007]

SOURCE: 52 FR 30900, Aug. 18, 1987; 52 FR 33797, Sept. 8, 1987; 54 FR 11161, March 17, 1988; 53 FR 30016, Aug. 10, 1988; 56 FR 60905, Nov. 29, 1991; 57 FR 41056, Sept. 9, 1992; 59 FR 38881, Aug. 1, 1994; 62 FR 60771, Nov. 13, 1997; 63 FR 12986, March 17, 1998; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 72 FR 56853, Oct. 4, 2007; 73 FR 78127, Dec. 19, 2008; 81 FR 82484, Nov. 18, 2016, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

Notes of Decisions (492)

Current through October 29, 2020; 85 FR 68703.

---

📁 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.1

§ 208.1 General.

Effective: June 18, 2020
Currentness

(a) Applicability.

(1) General. Unless otherwise provided in this chapter I, this subpart A shall apply to all applications for asylum under section 208 of the Act or for withholding of deportation or withholding of removal under section 241(b)(3) of the Act, or under the Convention Against Torture, whether before an asylum officer or an immigration judge, regardless of the date of filing. For purposes of this chapter I, withholding of removal shall also mean withholding of deportation under section 243(h) of the Act, as it appeared prior to April 1, 1997, except as provided in § 208.16(d). Such applications are referred to as "asylum applications." The provisions of this part 208 shall not affect the finality or validity of any decision made by a district director, an immigration judge, or the Board of Immigration Appeals in any such case prior to April 1, 1997. No asylum application that was filed with a district director, asylum officer, or immigration judge before April 1, 1997, may be reopened or otherwise reconsidered under the provisions of this part 208 except by motion granted in the exercise of discretion by the Board of Immigration Appeals, an immigration judge, or an asylum officer for proper cause shown. Motions to reopen or reconsider must meet the requirements of sections 240(c)(6) and (c)(7) of the Act, and 8 CFR parts 103 and 1003, as applicable.

(2) Commonwealth of the Northern Mariana Islands. The provisions of this subpart A shall not apply prior to January 1, 2030, to an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands seeking to apply for asylum. No application for asylum may be filed prior to January 1, 2030, pursuant to section 208 of the Act by an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands. Effective on the transition program effective date, the provisions of this subpart A shall apply to aliens physically present in or arriving in the CNMI with respect to withholding of removal under section 241(b)(3) of the Act and withholding and deferral of removal under the Convention Against Torture.

(b) Training of asylum officers. The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO) shall ensure that asylum officers receive special training in international human rights law, nonadversarial interview techniques, and other relevant national and international refugee laws and principles. The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO) shall also, in cooperation with the Department of State and other appropriate sources, compile and disseminate to asylum officers information concerning the persecution of persons in other countries on account of race,

religion, nationality, membership in a particular social group, or political opinion, torture of persons in other countries, and other information relevant to asylum determinations, and shall maintain a documentation center with information on human rights conditions.

**Credits**

[64 FR 8487, Feb. 19, 1999; 74 FR 55736, Oct. 28, 2009; 76 FR 53784, Aug. 29, 2011; 85 FR 29310, May 14, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (298)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version's Validity Called into Doubt by   Nreka v. U.S. Atty. Gen.,   11th Cir.,   May 16, 2005

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations
Title 8. Aliens and Nationality
Chapter I. Department of Homeland Security (Refs & Annos)
Subchapter B. Immigration Regulations
Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.2

§ 208.2 Jurisdiction.

Effective: June 18, 2020

Currentness

(a) Refugee, Asylum, and International Operations (RAIO). Except as provided in paragraph (b) or (c) of this section, RAIO shall have initial jurisdiction over an asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry. RAIO shall also have initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

(b) Jurisdiction of Immigration Court in general. Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served a Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review reasonable fear determinations referred to the Immigration Court under § 208.31, and credible fear determinations referred to the Immigration Court under § 208.30.

(c) Certain aliens not entitled to proceedings under section 240 of the Act—

(1) Asylum applications and withholding of removal applications only. After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewmember who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) On or after April 1, 1997, was granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution or torture pursuant to the procedures set forth in subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Program under section 217 of the Act, except that if such an alien is an applicant for admission to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum prior to January 1, 2030;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status, except that if such an alien was admitted to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum in the Commonwealth of the Northern Mariana Islands prior to January 1, 2030;

(v) An alien who has been ordered removed under § 235(c) of the Act, as described in § 235.8(a) of this chapter (applicable only in the event that the alien is referred for proceedings under this paragraph by the Regional Director pursuant to section 235.8(b)(2)(ii) of this chapter);

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act (applicable only in the event that the alien is referred for proceedings under this paragraph by the district director);

(vii) An alien who is an applicant for admission to Guam or the Commonwealth of the Northern Mariana Islands pursuant to the Guam–CNMI Visa Waiver Program under section 212(l) of the Act, except that if such an alien is an applicant for admission to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum prior to January 1, 2030; or

(viii) An alien who was admitted to Guam or the Commonwealth of the Northern Mariana Islands pursuant to the Guam–CNMI Visa Waiver Program under section 212(l) of the Act and has remained longer than authorized or has otherwise violated his or her immigration status, except that if such an alien was admitted to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum in the Commonwealth of the Northern Mariana Islands prior to January 1, 2030.

(2) Withholding of removal applications only. After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any application for withholding of removal filed by:

(i) An alien who is the subject of a reinstated removal order pursuant to section 241(a)(5) of the Act; or

(ii) An alien who has been issued an administrative removal order pursuant to section 238 of the Act as an alien convicted of committing an aggravated felony.

(3) Rules of procedure—

(i) General. Except as provided in this section, proceedings falling under the jurisdiction of the immigration judge pursuant to paragraph (c)(1) or (c)(2) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, subpart A. The scope of review in proceedings conducted pursuant to paragraph (c)(1) of this section shall be limited to a determination of whether the alien is eligible for asylum or withholding or deferral of removal, and whether asylum shall be granted in the exercise of discretion. The scope of review in proceedings conducted pursuant to paragraph (c)(2) of this section shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal. During such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief.

(ii) Notice of hearing procedures and in-absentia decisions. The alien will be provided with notice of the time and place of the proceeding. The request for asylum and withholding of removal submitted by an alien who fails to appear for the hearing shall be denied. The denial of asylum and withholding of removal for failure to appear may be reopened only upon a motion filed with the immigration judge with jurisdiction over the case. Only one motion to reopen may be filed, and it must be filed within 90 days, unless the alien establishes that he or she did not receive notice of the hearing date or was in Federal or State custody on the date directed to appear. The motion must include documentary evidence, which demonstrates that:

(A) The alien did not receive the notice;

(B) The alien was in Federal or State custody and the failure to appear was through no fault of the alien; or

(C) "Exceptional circumstances," as defined in section 240(e)(1) of the Act, caused the failure to appear.

(iii) Relief. The filing of a motion to reopen shall not stay removal of the alien unless the immigration judge issues an order granting a stay pending disposition of the motion. An alien who fails to appear for a proceeding under this section shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 of the Act for a period of 10 years after the date of the denial, unless the applicant can show exceptional circumstances resulted in his or her failure to appear.

**Credits**

[62 FR 15362, April 1, 1997; 64 FR 8487, Feb. 19, 1999; 65 FR 76130, Dec. 6, 2000; 74 FR 55736, Oct. 28, 2009; 76 FR 53784, Aug. 29, 2011; 85 FR 29310, May 14, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (179)

Current through October 29, 2020; 85 FR 68703.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by  Casa de Maryland, Inc. v. Wolf,  D.Md.,  Sep. 11, 2020

Code of Federal Regulations
   Title 8. Aliens and Nationality
      Chapter I. Department of Homeland Security (Refs & Annos)
         Subchapter B. Immigration Regulations
            Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
               Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.7

§ 208.7 Employment authorization.

Effective: August 25, 2020

Currentness

<Casa de Maryland, Inc. v. Wolf, __ F.Supp.3d __, 2020 WL 5500165 (D. MD. 2020), preliminarily enjoined enforcement of the amendments to this section by 85 FR 38532-01 against members of plaintiff-organizations with associational standing.>

(a) Application and decision—

(1)(i) In General. Subject to the restrictions contained in sections 208(d) and 236(a) of the Act, and except as otherwise provided in paragraphs (b) and (c) of this section, an applicant for asylum who is in the United States may apply for employment authorization pursuant to 8 CFR 274a.12(c)(8) and 274a.13(a)(2) of this chapter. The applicant must request employment authorization on the form and in the manner prescribed by USCIS and according to the form instructions, and must submit biometrics at a scheduled biometrics services appointment. USCIS has exclusive jurisdiction over all applications for employment authorization and employment authorization documentation based on a pending application for asylum under 8 CFR 274a.12(c)(8), regardless of whether the asylum application is pending with USCIS or the Executive Office for Immigration Review. Employment authorization is not permitted during any period of judicial review of the asylum application, but may be requested if a Federal court remands the case to the Board of Immigration Appeals. USCIS may grant initial employment authorization under 8 CFR 274a.12(c)(8) for a period that USCIS determines is appropriate at its discretion, not to exceed increments of two years.

(ii) Period for filing. An applicant for asylum cannot apply for initial employment authorization earlier than 365 calendar days after the date USCIS or the immigration court receives the asylum application in accordance with 8 CFR part 103 or 8 CFR 1003.31, respectively, and the filing instructions on the application. If an asylum application is denied by USCIS before a decision on an initial or renewal application for employment authorization, the application for employment authorization will be denied.

(iii) Asylum applicants who are ineligible for employment authorization. An applicant for asylum is not eligible for employment authorization if:

(A) The applicant was convicted at any time in the United States or abroad of any aggravated felony as described in section 101(a)(43) of the Act;

(B) The applicant was convicted on or after [effective date of final rule] of a particularly serious crime;

(C) There are serious reasons for believing that the applicant on or after August 25, 2020 has committed a serious non-political crime outside the United States;

(D) The applicant fails to establish that he or she is not subject to a mandatory denial of asylum due to any regulatory criminal grounds under 8 CFR 208.13(c);

(E) An asylum officer or an immigration judge has denied the applicant's asylum application within the 365–day period or before the adjudication of the initial request for employment authorization;

(F) The applicant filed his or her asylum application on or after August 25, 2020 and filed the application after the one-year filing deadline, unless and until the asylum officer or immigration judge determines that the applicant meets an exception for late filing as provided in section 208(a)(2)(D) of the Act and 8 CFR 208.4 and 1208.4, or unless the applicant was an unaccompanied alien child on the date the asylum application was first filed.

(G) The applicant is an alien who entered or attempted to enter the United States at a place and time other than lawfully through a U.S. port of entry on or after August 25, 2020, unless the alien demonstrates that he or she:

(1) Presented himself or herself without delay but no later than 48 hours after the entry or attempted entry to the Secretary of Homeland Security or his or her delegate;

(2) Indicated to the Secretary of Homeland Security or his or her delegate an intention to apply for asylum or expresses a fear of persecution or torture; and

(3) Has good cause for the illegal entry or attempted entry, provided such good cause does not include the evasion of U.S. immigration officers, convenience, or for the purpose of circumvention of the orderly processing of asylum seekers at a U.S. port of entry.

(iv) Delay. Any delay requested or caused by the applicant in the adjudication of the asylum application that is still outstanding or has not been remedied when the initial application for employment authorization under 8 CFR 274a.12(c) (8) is filed will result in a denial of such application. Examples of applicant-caused delays include, but are not limited to the list below:

(A) A request to amend or supplement an asylum application that causes a delay in its adjudication or in proceedings as described in 8 CFR 208.4(c);

(B) Failure to appear to receive and acknowledge receipt of the decision as specified in 8 CFR 208.9(d);

(C) A request for extension to submit additional evidence fewer than 14–days prior to the interview date as described by 8 CFR 208.9(e);

(D) Failure to appear for an asylum interview, unless excused by USCIS as described in 8 CFR 208.10(b)(1) for the failure to appear;

(E) Failure to appear for scheduled biometrics collection on the asylum application;

(F) A request to reschedule an interview for a later date;

(G) A request to transfer a case to a new asylum office or interview location, including when the transfer is based on a new address;

(H) A request to provide additional evidence for an interview;

(I) Failure to provide a competent interpreter at an interview; and

(J) Failure to comply with any other request needed to determine asylum eligibility.

(b) Renewal and termination—

(1) Renewals. USCIS may renew employment authorization under 8 CFR 274a.12(c)(8) in increments determined by USCIS in its discretion, but not to exceed increments of two years. Employment authorization is not permitted during any period of judicial review, but may be requested if a Federal court remands the case to the Board of Immigration Appeals. For employment authorization to be renewed under this section, the alien must request employment authorization on the form and in the manner prescribed by USCIS and according to the form instructions. USCIS will require that an alien establish that he or she has continued to pursue an asylum application before USCIS, an immigration judge, or the Board of Immigration Appeals and that he or she continues to meet the eligibility criteria for employment authorization set forth in 8 CFR 208.7(a). For purposes of renewal of employment authorization, pursuit of an asylum application before an immigration judge or the Board of Immigration Appeals is established by submitting a copy of the referral notice or Notice to Appear placing the alien in proceedings, any hearing notices issued by the immigration court, evidence of a timely filed appeal if the alien appealed the denial of the asylum application to the Board of Immigration Appeals, or remand order to the immigration judge or Board of Immigration Appeals.

(i) Referrals to an immigration judge. Employment authorization granted after the required 365–day waiting period will continue for the remaining period authorized (unless otherwise terminated or revoked) if the asylum officer refers the alien's asylum application to an immigration judge. In accordance with 8 CFR 208.7(b)(1), the alien may be granted renewals of employment authorization while under such review by the immigration judge.

(ii) Appeals to the Board of Immigration Appeals. If the immigration judge denies the alien's asylum application, any remaining period of employment authorization will continue for the period authorized (unless otherwise terminated or revoked) during the period for filing an appeal with the Board of Immigration Appeals under 8 CFR 1003.38(b) or, if an appeal is timely filed within such period, during the pendency of the appeal with the Board of Immigration Appeals. In accordance with 8 CFR 208.7(b)(1), the alien may be granted renewals of employment authorization during these periods while the appeal is under review by the Board of Immigration Appeals and any remand to the immigration judge.

(2) Terminations. The alien's employment authorization granted pursuant to 8 CFR 274a.12(c)(8) will automatically terminate effective on the date the asylum officer denies the asylum application, thirty days after an immigration judge denies the asylum application unless timely appealed to the Board of Immigration Appeals, or the Board of Immigration Appeals affirms or upholds a denial, regardless of whether any automatic extension period pursuant to 8 CFR 274a.13(d)(3) is in place.

(c) Severability. The provisions in this section are intended to be independent severable parts. In the event that any provision in this section is not implemented, DHS intends that the remaining provisions be implemented as an independent rule.

(d) [Reserved by 85 FR 37545]

**Credits**

[63 FR 12986, March 17, 1998; 76 FR 53784, Aug. 29, 2011; 85 FR 37545, June 22, 2020; 85 FR 38626, June 26, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (16)

Current through October 29, 2020; 85 FR 68703.

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Invalid   East Bay Sanctuary Covenant v. Barr,   9th Cir.(Cal.),   July 06, 2020

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

> Code of Federal Regulations
>   Title 8. Aliens and Nationality
>     Chapter I. Department of Homeland Security (Refs & Annos)
>     Subchapter B. Immigration Regulations
>       Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
>       Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.13

§ 208.13 Establishing asylum eligibility.

Effective: July 16, 2019

Currentness

<For statute(s) affecting validity of this section, see: 5 U.S.C.A. § 706(2)(A), (C); Immigration and Nationality Act §§ 208, 8 U.S.C.A. §§ 1158(a)(2)(A), 1158(b)(2)(A)(vi), 1158(b)(2)(C).>

(a) Burden of proof. The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.

(b) Eligibility. The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted if an asylum officer or immigration judge makes one of the findings described in paragraph (b)(1)(i) of this section. If the applicant's fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded.

(i) Discretionary referral or denial. Except as provided in paragraph (b)(1)(iii) of this section, an asylum officer shall, in the exercise of his or her discretion, refer or deny, or an immigration judge, in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution if any of the following is found by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; or

(B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) Burden of proof. In cases in which an applicant has demonstrated past persecution under paragraph (b)(1) of this section, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (B) of this section.

(iii) Grant in the absence of well-founded fear of persecution. An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:

(A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or

(B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

(2) Well-founded fear of persecution.

(i) An applicant has a well-founded fear of persecution if:

(A) The applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and

(C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.

(ii) An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so.

AR.00436

(iii) In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:

(A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1)(i), (b)(1)(ii), and (b)(2) of this section, adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

(c) Mandatory denials—

(1) Applications filed on or after April 1, 1997. For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the applicant is found to be ineligible for asylum under either section 208(a)(2) or 208(b)(2) of the Act, the applicant shall be considered for eligibility for withholding of removal under section 241(b)(3) of the Act. The applicant shall also be considered for eligibility for withholding of removal under the Convention Against Torture if the applicant requests such consideration or if the evidence presented by the alien indicates that the alien may be tortured in the country of removal.

(2) Applications filed before April 1, 1997.

(i) An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(A) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(B) Has been firmly resettled within the meaning of § 208.15;

(C) Can reasonably be regarded as a danger to the security of the United States;

(D) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(E) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

(F) Is described within section 212(a)(3)(B)(i)(I), (II), and (III) of the Act as it existed prior to April 1, 1997, and as amended by the Anti-terrorist and Effective Death Penalty Act of 1996 (AEDPA), unless it is determined that there are no reasonable grounds to believe that the individual is a danger to the security of the United States.

(ii) If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(3) Additional limitation on eligibility for asylum. For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

(4) Additional limitation on eligibility for asylum. Notwithstanding the provisions of § 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or

(iii) The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the

Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) Non-binding determinations. Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the INA or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

<Text of subsection (c)(6) added by 85 FR 67258, effective Nov. 20, 2020.>

(6) Additional limitations on eligibility for asylum. For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated,

voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(1) An alien who is a current or former spouse of the person;

(2) An alien with whom the person shares a child in common;

(3) An alien who is cohabiting with or has cohabited with the person as a spouse;

(4) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(5) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(1) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(2) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(3) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The asylum officer knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)-(ii) of the Act.

<Text of subsection (c)(7) added by 85 FR 67258, effective Nov. 20, 2020.>

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

<Text of subsection (c)(8) added by 85 FR 67258, effective Nov. 20, 2020.>

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

<Text of subsection (c)(9) added by 85 FR 67258, effective Nov. 20, 2020.>

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

**Credits**

[64 FR 8488, Feb. 19, 1999; 65 FR 76133, Dec. 6, 2000; 78 FR 42863, July 18, 2013; 83 FR 55952, Nov. 9, 2018; 84 FR 33843, July 16, 2019; 85 FR 67258, Oct. 21, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (2358)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  AR.00442  8

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.14

§ 208.14 Approval, denial, referral, or dismissal of application.

Effective: November 28, 2011
Currentness

(a) By an immigration judge. Unless otherwise prohibited in § 208.13(c), an immigration judge may grant or deny asylum in the exercise of discretion to an applicant who qualifies as a refugee under section 101(a)(42) of the Act.

(b) Approval by an asylum officer. In any case within the jurisdiction of the RAIO, unless otherwise prohibited in § 208.13(c), an asylum officer may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) Denial, referral, or dismissal by an asylum officer. If the asylum officer does not grant asylum to an applicant after an interview conducted in accordance with § 208.9, or if, as provided in § 208.10, the applicant is deemed to have waived his or her right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application, as follows:

(1) Inadmissible or deportable aliens. Except as provided in paragraph (c)(4) of this section, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

(2) Alien in valid status. In the case of an applicant who is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status at the time the application is decided, the asylum officer shall deny the application for asylum.

(3) Alien with valid parole. If an applicant has been paroled into the United States and the parole has not expired or been terminated by the Service, the asylum officer shall deny the application for asylum.

(4) Alien paroled into the United States whose parole has expired or is terminated—

(i) Alien paroled prior to April 1, 1997, or with advance authorization for parole. In the case of an applicant who was paroled into the United States prior to April 1, 1997, or who, prior to departure from the United States, had received an advance authorization for parole, the asylum officer shall refer the application, together with the appropriate charging

documents, to an immigration judge for adjudication in removal proceedings if the parole has expired, the Service has terminated parole, or the Service is terminating parole through issuance of the charging documents, pursuant to § 212.5(d)(2)(i) of this chapter.

(ii) Alien paroled on or after April 1, 1997, without advance authorization for parole. In the case of an applicant who is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter, and was paroled into the United States on or after April 1, 1997, without advance authorization for parole prior to departure from the United States, the asylum officer will take the following actions, if the parole has expired or been terminated:

(A) Inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act. If the applicant appears inadmissible to the United States under section 212(a)(6)(C) or 212(a)(7) of the Act and the asylum officer does not intend to lodge any additional charges of inadmissibility, the asylum officer shall proceed in accordance with § 235.3(b) of this chapter. If such applicant is found to have a credible fear of persecution or torture based on information elicited from the asylum interview, an asylum officer may refer the applicant directly to an immigration judge in removal proceedings under section 240 of the Act, without conducting a separate credible fear interview pursuant to § 208.30. If such applicant is not found to have a credible fear based on information elicited at the asylum interview, an asylum officer will conduct a credible fear interview and the applicant will be subject to the credible fear process specified at § 208.30(b).

(B) Inadmissible on other grounds. In the case of an applicant who was paroled into the United States on or after April 1, 1997, and will be charged as inadmissible to the United States under provisions of the Act other than, or in addition to, sections 212(a)(6)(C) or 212(a)(7), the asylum officer shall refer the application to an immigration judge for adjudication in removal proceedings.

(d) Applicability of § 103.2(b) of this chapter. No application for asylum or withholding of deportation shall be subject to denial pursuant to § 103.2(b) of this chapter.

(e) Duration. If the applicant is granted asylum, the grant will be effective for an indefinite period, subject to termination as provided in § 208.24.

(f) Effect of denial of principal's application on separate applications by dependents. The denial of an asylum application filed by a principal applicant for asylum shall also result in the denial of asylum status to any dependents of that principal applicant who are included in that same application. Such denial shall not preclude a grant of asylum for an otherwise eligible dependent who has filed a separate asylum application, nor shall such denial result in an otherwise eligible dependent becoming ineligible to apply for asylum due to the provisions of section 208(a)(2)(C) of the Act.

(g) Applicants granted lawful permanent residence status. If an asylum applicant is granted adjustment of status to lawful permanent resident, the Service may provide written notice to the applicant that his or her asylum application will be presumed abandoned and dismissed without prejudice, unless the applicant submits a written request within 30 days of the notice, that the asylum application be adjudicated. If an applicant does not respond within 30 days of the date the written notice was sent or served, the Service may presume the asylum application abandoned and dismiss it without prejudice.

**Credits**

[63 FR 12986, March 17, 1998; 64 FR 27875, May 21, 1999; 65 FR 76134, Dec. 6, 2000; 76 FR 53784, Aug. 29, 2011]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (271)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.16

§ 208.16 Withholding of removal under section 241(b)(3)(B) of the Act
and withholding of removal under the Convention Against Torture.

Currentness

(a) Consideration of application for withholding of removal. An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) Eligibility for withholding of removal under section 241(b)(3) of the Act; burden of proof. The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) Past threat to life or freedom.

(i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

(iii) If the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.

(2) Future threat to life or freedom. An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country. Such an applicant cannot demonstrate that his or her life or freedom would be threatened if the asylum officer or immigration judge finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so. In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1) and (b)(2) of this section, adjudicators should consider, among other things, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. These factors may or may not be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that under all the circumstances it would be reasonable for the applicant to relocate.

(c) Eligibility for withholding of removal under the Convention Against Torture.

(1) For purposes of regulations under Title II of the Act, "Convention Against Torture" shall refer to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any

reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub.L. 105–277, 112 Stat. 2681, 2681–821). The definition of torture contained in § 208.18(a) of this part shall govern all decisions made under regulations under Title II of the Act about the applicability of Article 3 of the Convention Against Torture.

(2) The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

(4) In considering an application for withholding of removal under the Convention Against Torture, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the immigration judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section, the alien's removal shall be deferred under § 208.17(a).

(d) Approval or denial of application—

(1) General. Subject to paragraphs (d)(2) and (d)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraphs (b) or (c) of this section.

(2) Mandatory denials. Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3) (B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the

applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) Exception to the prohibition on withholding of deportation in certain cases. Section 243(h)(3) of the Act, as added by section 413 of Pub.L. 104–132 (110 Stat. 1214), shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577.

<Subsection (e) reserved effective Nov. 20, 2020; see 85 FR 67259.>

(e) Reconsideration of discretionary denial of asylum. In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

(f) Removal to third country. Nothing in this section or § 208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.

**Credits**

[64 FR 8488, Feb. 19, 1999; 65 FR 76135, Dec. 6, 2000; 85 FR 67259, Oct. 21, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (616)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 8. Aliens and Nationality
        Chapter I. Department of Homeland Security (Refs & Annos)
            Subchapter B. Immigration Regulations
                Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
                    Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.17

§ 208.17 Deferral of removal under the Convention Against Torture.

Currentness

(a) Grant of deferral of removal. An alien who: has been ordered removed; has been found under § 208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

(b) Notice to alien.

(1) After an immigration judge orders an alien described in paragraph (a) of this section removed, the immigration judge shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section. The immigration judge shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of the Service if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

(c) Detention of an alien granted deferral of removal under this section. Nothing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter.

(d) Termination of deferral of removal.

(1) At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 3.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

(2) The Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail). At the expiration of this 10 or 13 day period, the Immigration Court shall forward a copy of the original application, and any supplemental information the alien or the Service has submitted, to the Department of State, together with notice to the Department of State of the time, place and date of the termination hearing. At its option, the Department of State may provide comments on the case, according to the provisions of § 208.11 of this part.

(3) The immigration judge shall conduct a hearing and make a de novo determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the immigration judge's decision shall lie to the Board.

(e) Termination at the request of the alien.

(1) At any time while deferral of removal is in effect, the alien may make a written request to the Immigration Court having administrative control pursuant to § 3.11 of this chapter to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the immigration judge shall terminate the order of deferral and the alien may be removed.

(2) If necessary the immigration judge may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the immigration judge determines that the alien's request is knowing and voluntary,

the order of deferral shall be terminated. If the immigration judge determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

(f) Termination pursuant to § 208.18(c). At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the Secretary of State pursuant to the procedures in § 208.18(c).

**Credits**

[64 FR 8489, Feb. 19, 1999]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (57)

Current through October 29, 2020; 85 FR 68703.

---

End of Document                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 208.18

§ 208.18 Implementation of the Convention Against Torture.

Currentness

(a) Definitions. The definitions in this subsection incorporate the definition of torture contained in Article 1 of the Convention Against Torture, subject to the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture.

(4) In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from:

(i) The intentional infliction or threatened infliction of severe physical pain or suffering;

(ii) The administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(iii) The threat of imminent death; or

(iv) The threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the sense or personality.

(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

(6) In order to constitute torture an act must be directed against a person in the offender's custody or physical control.

(7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.

(8) Noncompliance with applicable legal procedural standards does not per se constitute torture.

(b) Applicability of §§ 208.16(c) and 208.17(a)—

(1) Aliens in proceedings on or after March 22, 1999. An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999 may apply for withholding of removal under § 208.16(c), and, if applicable, may be considered for deferral of removal under § 208.17(a).

(2) Aliens who were ordered removed, or whose removal orders became final, before March 22, 1999. An alien under a final order of deportation, exclusion, or removal that became final prior to March 22, 1999 may move to reopen proceedings for the sole purpose of seeking protection under § 208.16(c). Such motions shall be governed by §§ 3.23 and 3.2 of this chapter, except that the time and numerical limitations on motions to reopen shall not apply and the alien shall not be required to demonstrate that the evidence sought to be offered was unavailable and could not have been discovered or presented at the former hearing. The motion to reopen shall not be granted unless:

(i) The motion is filed within June 21, 1999; and

(ii) The evidence sought to be offered establishes a prima facie case that the applicant's removal must be withheld or deferred under §§ 208.16(c) or 208.17(a).

(3) Aliens who, on March 22, 1999, have requests pending with the Service for protection under Article 3 of the Convention Against Torture.

(i) Except as otherwise provided, after March 22, 1999, the Service will not:

(A) Consider, under its pre-regulatory administrative policy to ensure compliance with the Convention Against Torture, whether Article 3 of that Convention prohibits the removal of an alien to a particular country, or

(B) Stay the removal of an alien based on a request filed with the Service for protection under Article 3 of that Convention.

(ii) For each alien who, on or before March 22, 1999, filed a request with the Service for protection under Article 3 of the Convention Against Torture, and whose request has not been finally decided by the Service, the Service shall provide written notice that, after March 22, 1999, consideration for protection under Article 3 can be obtained only through the provisions of this rule.

(A) The notice shall inform an alien who is under an order of removal issued by EOIR that, in order to seek consideration of a claim under §§ 208.16(c) or 208.17(a), such an alien must file a motion to reopen with the immigration court or the Board of Immigration Appeals. This notice shall be accompanied by a stay of removal, effective until 30 days after service of the notice on the alien. A motion to reopen filed under this paragraph for the limited purpose of asserting a claim under §§ 208.16(c) or 208.17(a) shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter. Such a motion shall be granted if it is accompanied by a copy of the notice described in paragraph (b)(3)(ii) or by other convincing evidence that the alien had a request pending with the Service for protection under Article 3 of the Convention Against Torture on March 22, 1999. The filing of such a motion shall extend the stay of removal during the pendency of the adjudication of this motion.

(B) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 238(b) of the Act or an exclusion, deportation, or removal order reinstated by the Service under section 241(a)(5) of the Act that the alien's claim to withholding of removal under § 208.16(c) or deferral of removal under § 208.17(a) will be considered under § 208.31.

(C) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 235(c) of the Act that the alien's claim to protection under the Convention Against Torture will be decided by the Service as provided in § 208.18(d) and 235.8(b)(4) and will not be considered under the provisions of this part relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(4) Aliens whose claims to protection under the Convention Against Torture were finally decided by the Service prior to March 22, 1999. Sections 208.16(c) and 208.17 (a) and paragraphs (b)(1) through (b)(3) of this section do not apply to cases in which, prior to March 22, 1999, the Service has made a final administrative determination about the applicability of Article 3 of the Convention Against Torture to the case of an alien who filed a request with the Service for protection under Article 3. If, prior to March 22, 1999, the Service determined that an applicant cannot be removed consistent with the Convention Against Torture, the alien shall be considered to have been granted withholding of removal under § 208.16(c), unless the alien is subject to mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), in which case the alien will be considered to have been granted deferral of removal under 208.17(a). If, prior to March 22, 1999, the Service determined that an alien can be removed consistent with the Convention Against Torture, the alien will be considered to have been finally denied withholding of removal under § 208.16(c) and deferral of removal under § 208.17(a).

(c) Diplomatic assurances against torture obtained by the Secretary of State.

(1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

(2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. The Attorney General's authority under this paragraph may be exercised by the Deputy Attorney General or by the Commissioner, Immigration and Naturalization Service, but may not be further delegated.

(3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention Against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(d) Cases involving aliens ordered removed under section 235(c) of the Act. With respect to an alien terrorist or other alien subject to administrative removal under section 235(c) of the Act who requests protection under Article 3 of the Convention Against Torture, the Service will assess the applicability of Article 3 through the removal process to ensure that a removal order will not be executed under circumstances that would violate the obligations of the United States under Article 3. In such cases, the provisions of Part 208 relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply.

(e) Judicial review of claims for protection from removal under Article 3 of the Convention Against Torture.

(1) Pursuant to the provisions of section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, there shall be no judicial appeal or review of any action, decision, or claim raised under the Convention or that section, except as part of the review of a final order of removal pursuant to section 242 of the Act; provided however, that any appeal or petition regarding an action, decision, or claim under the Convention or under section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 shall not be deemed to include or authorize the consideration of any administrative order or decision, or portion thereof, the appeal or review of which is restricted or prohibited by the Act.

(2) Except as otherwise expressly provided, nothing in this paragraph shall be construed to create a private right of action or to authorize the consideration or issuance of administrative or judicial relief.

**Credits**
[64 FR 8490, Feb. 19, 1999; 64 FR 13881, March 23, 1999]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (310)

Current through October 29, 2020; 85 FR 68703.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Invalid   Capital Area Immigrants' Rights Coalition v. Trump,   D.D.C.,   June 30, 2020

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

---

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
    Subchapter B. Immigration Regulations
      Part 208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
      Subpart B. Credible Fear of Persecution

---

8 C.F.R. § 208.30

§ 208.30 Credible fear determinations involving stowaways and applicants for admission who are
found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act, whose entry is limited
or suspended under section 212(f) or 215(a)(1) of the Act, or who failed to apply for protection from
persecution in a third country where potential relief is available while en route to the United States.

Effective: June 18, 2020

Currentness

<For statute(s) affecting validity of this section, see: 5 U.S.C.A. § 706(2)(A), (C); Immigration
and Nationality Act §§ 208, 8 U.S.C.A. §§ 1158(a)(2)(A), 1158(b)(2)(A)(vi), 1158(b)(2)(C).>

(a) Jurisdiction. The provisions of this subpart B apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant
to section 235(b)(1)(B) of the Act, DHS has exclusive jurisdiction to make credible fear determinations, and the Executive Office
for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart
B, paragraphs (b) through (g) of this section are the exclusive procedures applicable to credible fear interviews, determinations,
and reviews under section 235(b)(1)(B) of the Act. Prior to January 1, 2030, an alien present in or arriving in the Commonwealth
of the Northern Mariana Islands is ineligible to apply for asylum and may only establish eligibility for withholding of removal
pursuant to section 241(b)(3) of the Act or withholding or deferral of removal under the Convention Against Torture.

(b) Treatment of dependents. A spouse or child of an alien may be included in that alien's credible fear evaluation and
determination, if such spouse or child:

(1) Arrived in the United States concurrently with the principal alien; and

(2) Desires to be included in the principal alien's determination. However, any alien may have his or her credible fear
evaluation and determination made separately, if he or she expresses such a desire.

(c) Authority. Asylum officers conducting credible fear interviews shall have the authorities described in § 208.9(c).

---

(d) Interview. The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture, and shall conduct the interview as follows:

(1) If the officer conducting the credible fear interview determines that the alien is unable to participate effectively in the interview because of illness, fatigue, or other impediments, the officer may reschedule the interview.

(2) At the time of the interview, the asylum officer shall verify that the alien has received Form M–444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has an understanding of the credible fear determination process.

(3) The alien may be required to register his or her identity.

(4) The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and on the length of the statement.

(5) If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter must be at least 18 years of age and may not be the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, a representative or employee of the applicant's country of nationality, or, if the applicant is stateless, the applicant's country of last habitual residence.

(6) The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct any errors therein.

(e) Determination.

(1) The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture.

(2) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act. However, prior to January 1, 2030, in the case of an alien physically present in or arriving in the Commonwealth of the Northern Mariana Islands, the officer may only find

a credible fear of persecution if there is a significant possibility that the alien can establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act.

(3) Subject to paragraph (e)(5) of this section, an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5)(i) Except as provided in this paragraph (e)(5)(i) or paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(ii) If the alien is found to be an alien described in § 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's intention to apply for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

(iii) If the alien is found to be an alien described as ineligible for asylum in § 208.13(c)(4), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture, if the alien establishes, respectively, a reasonable fear of persecution or torture. The scope of review shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal, accordingly. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.–Canada land border port-of-entry or in transit through the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada by operation of the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum

officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, provided, however, that paragraph (d)(2) of this section shall not apply to aliens described in this paragraph. The asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer, with concurrence from a supervisory asylum officer, determines that an alien does not qualify for an exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the United States pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States to the alien, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) As used in 8 CFR 208.30(e)(6)(iii)(B), (C) and (D) only, "legal guardian" means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

(7) When an immigration officer has made an initial determination that an alien, other than an alien described in paragraph (e)(6) of this section and regardless of whether the alien is arriving at a port of entry, appears to be subject to the terms of an agreement authorized by section 208(a)(2)(A) of the Act, and seeks the alien's removal consistent with this provision, prior to any determination concerning whether the alien has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether the alien is ineligible to apply for asylum in the United States and is subject to removal to a country ("receiving country") that is a signatory to the applicable agreement authorized by section 208(a)(2)(A) of the Act, other than the U.S.–Canada Agreement effectuated in 2004. In conducting this threshold screening interview, the asylum officer shall apply all relevant interview procedures outlined in paragraph (d) of this section, except that paragraphs (d)(2) and (4) of this section shall not apply to aliens described in this paragraph (e)(7). The asylum officer shall advise the alien of the applicable agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case. The alien shall be provided written notice that if he or she fears removal to the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country and wants the officer to determine whether it is more likely than not that the alien would be persecuted on account of a protected ground or tortured in that country, the alien should affirmatively state to the officer such a fear of removal. If the alien affirmatively states such a fear, the asylum officer will determine whether the individual has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in that country.

(i)(A) If the asylum officer, with concurrence from a supervisory asylum officer, determines during the threshold screening interview that an alien does not qualify for an exception under the applicable agreement, and, if applicable, that the alien has not demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the receiving country, the alien is ineligible to apply for asylum in the United States. Subject to paragraph (e)(7)(i)(B) of this section, after the asylum officer's documented finding is reviewed by a supervisory asylum officer, the alien shall be advised that he or she will be removed to the receiving country, as appropriate under the applicable agreement, in order to pursue his or her claims relating to a fear of persecution or torture under the law of the receiving country. Prior to removal to a receiving country under an agreement authorized by section 208(a)(2)(A), the alien shall be informed that, in the receiving country, the alien will have an opportunity to pursue the alien's claim for asylum or equivalent temporary protection.

(B) Aliens found ineligible to apply for asylum under this paragraph (e)(7) shall be removed to the receiving country, depending on the applicable agreement, unless the alien voluntarily withdraws his or her request for asylum.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the applicable agreement, or would more likely than not be persecuted on account of a protected ground delineated in section 208(a)(2)(A) of the Act or tortured in the receiving country, the asylum officer shall make a written notation to that effect, and may then proceed to determine whether any other agreement is applicable to the alien under the procedures set forth in this paragraph (e)(7). If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of each of the applicable agreements, or would more likely than not be persecuted on account of a protected ground or tortured in each of the prospective receiving countries, the asylum officer shall make a written notation to that effect, and then proceed immediately to a determination concerning whether the alien has a credible fear of persecution or torture under paragraph (d) of this section.

(iii) An exception to an applicable agreement is defined under the terms of the agreement itself. Each agreement, including any exceptions, will be announced in a Federal Register document. If the asylum officer determines that an alien is within one of the classes covered by a section 208(a)(2)(A) agreement, the officer shall next determine whether the alien meets any of the applicable agreement's exceptions. Regardless of whether the text of the applicable agreement provides for the following exceptions, all such agreements, by operation of section 208(a)(2)(A) of the Act, and as applicable to the United States, are deemed to contain the following provisions:

(A) No alien may be removed, pursuant to an agreement authorized by section 208(a)(2)(A), to the alien's country of nationality, or, if the alien has no nationality, to the alien's country of last habitual residence; and

(B) No alien may be removed, pursuant to an agreement authorized by section 208(a)(2)(A), where the Director of USCIS, or the Director's designee, determines, in the exercise of unreviewable discretion, that it is in the public interest for the alien to receive asylum in the United States, and that the alien therefore may apply for asylum, withholding of removal, or protection under the Convention Against Torture, in the United States.

(iv) If the asylum officer determines the alien meets an exception under the applicable agreement, or would more likely than not be persecuted on account of a protected ground or tortured in the prospective receiving country, the officer may consider whether the alien is subject to another agreement and its exceptions or would more likely than not be persecuted on account of a protected ground or tortured in another receiving country. If another section 208(a)(2)(A) agreement may not be applied to the alien, the officer should immediately proceed to a credible fear interview.

(8) An asylum officer's determination shall not become final until reviewed by a supervisory asylum officer.

(f) Procedures for a positive credible fear finding. If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter.

(g) Procedures for a negative credible fear finding.

(1) If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. The alien shall indicate whether he or she desires such review on Form I–869. A refusal by the alien to make such indication shall be considered a request for review.

(i) If the alien requests such review, or refuses to either request or decline such review, the asylum officer shall arrange for detention of the alien and serve him or her with a Form I–863, Notice of Referral to Immigration Judge, for review of the credible fear determination in accordance with paragraph (f)(2) of this section.

(ii) If the alien is not a stowaway and does not request a review by an immigration judge, the officer shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal, after review by a supervisory asylum officer.

(iii) If the alien is a stowaway and the alien does not request a review by an immigration judge, the asylum officer shall refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(2) Review by immigration judge of a negative credible fear finding.

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

(ii) The record of the negative credible fear determination, including copies of the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

## Credits

[64 FR 8492, Feb. 19, 1999; 65 FR 76136, Dec. 6, 2000; 69 FR 69488, Nov. 29, 2004; 74 FR 55737, Oct. 28, 2009; 76 FR 53785, Aug. 29, 2011; 83 FR 55952, Nov. 9, 2018; 84 FR 33843, July 16, 2019; 84 FR 64008, Nov. 19, 2019; 85 FR 29310, May 14, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 74 FR 55736, Oct. 28, 2009; 85 FR 29310, May 14, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (4)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 214. Nonimmigrant Classes (Refs & Annos)

8 C.F.R. § 214.14

§ 214.14 Alien victims of certain qualifying criminal activity.

Effective: October 2, 2020

Currentness

(a) Definitions. As used in this section, the term:

(1) BIWPA means Battered Immigrant Women Protection Act of 2000 of the Victims of Trafficking and Violence Protection Act of 2000, div. B, Violence Against Women Act of 2000, tit. V, Pub.L. 106–386, 114 Stat. 1464, (2000), amended by Violence Against Women and Department of Justice Reauthorization Act of 2005, tit. VIII, Pub.L. 109–162, 119 Stat. 2960 (2006), amended by Violence Against Women and Department of Justice Reauthorization Act—Technical Corrections, Pub.L. 109–271, 120 Stat. 750 (2006).

(2) Certifying agency means a Federal, State, or local law enforcement agency, prosecutor, judge, or other authority, that has responsibility for the investigation or prosecution of a qualifying crime or criminal activity. This definition includes agencies that have criminal investigative jurisdiction in their respective areas of expertise, including, but not limited to, child protective services, the Equal Employment Opportunity Commission, and the Department of Labor.

(3) Certifying official means:

(i) The head of the certifying agency, or any person(s) in a supervisory role who has been specifically designated by the head of the certifying agency to issue U nonimmigrant status certifications on behalf of that agency; or

(ii) A Federal, State, or local judge.

(4) Indian Country is defined as:

(i) All land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation;

(ii) All dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state; and

(iii) All Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through such allotments.

(5) Investigation or prosecution refers to the detection or investigation of a qualifying crime or criminal activity, as well as to the prosecution, conviction, or sentencing of the perpetrator of the qualifying crime or criminal activity.

(6) Military Installation means any facility, base, camp, post, encampment, station, yard, center, port, aircraft, vehicle, or vessel under the jurisdiction of the Department of Defense, including any leased facility, or any other location under military control.

(7) Next friend means a person who appears in a lawsuit to act for the benefit of an alien under the age of 16 or incapacitated or incompetent, who has suffered substantial physical or mental abuse as a result of being a victim of qualifying criminal activity. The next friend is not a party to the legal proceeding and is not appointed as a guardian.

(8) Physical or mental abuse means injury or harm to the victim's physical person, or harm to or impairment of the emotional or psychological soundness of the victim.

(9) Qualifying crime or qualifying criminal activity includes one or more of the following or any similar activities in violation of Federal, State or local criminal law of the United States: Rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes. The term "any similar activity" refers to criminal offenses in which the nature and elements of the offenses are substantially similar to the statutorily enumerated list of criminal activities.

(10) Qualifying family member means, in the case of an alien victim 21 years of age or older who is eligible for U nonimmigrant status as described in section 101(a)(15)(U) of the Act, 8 U.S.C. 1101(a)(15)(U), the spouse or child(ren) of such alien; and, in the case of an alien victim under the age of 21 who is eligible for U nonimmigrant status as described in section 101(a)(15)(U) of the Act, qualifying family member means the spouse, child(ren), parents, or unmarried siblings under the age of 18 of such an alien.

(11) Territories and Possessions of the United States means American Samoa, Swains Island, Bajo Nuevo (the Petrel Islands), Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Atoll, Navassa Island, Palmyra Atoll, Serranilla Bank, and Wake Atoll.

(12) U nonimmigrant status certification means Form I–918, Supplement B, "U Nonimmigrant Status Certification," which confirms that the petitioner has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim.

(13) U interim relief refers to the interim benefits that were provided by USCIS to petitioners for U nonimmigrant status, who requested such benefits and who were deemed prima facie eligible for U nonimmigrant status prior to the publication of the implementing regulations.

(14) Victim of qualifying criminal activity generally means an alien who has suffered direct and proximate harm as a result of the commission of qualifying criminal activity.

(i) The alien spouse, children under 21 years of age and, if the direct victim is under 21 years of age, parents and unmarried siblings under 18 years of age, will be considered victims of qualifying criminal activity where the direct victim is deceased due to murder or manslaughter, or is incompetent or incapacitated, and therefore unable to provide information concerning the criminal activity or be helpful in the investigation or prosecution of the criminal activity. For purposes of determining eligibility under this definition, USCIS will consider the age of the victim at the time the qualifying criminal activity occurred.

(ii) A petitioner may be considered a victim of witness tampering, obstruction of justice, or perjury, including any attempt, solicitation, or conspiracy to commit one or more of those offenses, if:

(A) The petitioner has been directly and proximately harmed by the perpetrator of the witness tampering, obstruction of justice, or perjury; and

(B) There are reasonable grounds to conclude that the perpetrator committed the witness tampering, obstruction of justice, or perjury offense, at least in principal part, as a means:

(1) To avoid or frustrate efforts to investigate, arrest, prosecute, or otherwise bring to justice the perpetrator for other criminal activity; or

(2) To further the perpetrator's abuse or exploitation of or undue control over the petitioner through manipulation of the legal system.

(iii) A person who is culpable for the qualifying criminal activity being investigated or prosecuted is excluded from being recognized as a victim of qualifying criminal activity.

(b) Eligibility. An alien is eligible for U–1 nonimmigrant status if he or she demonstrates all of the following in accordance with paragraph (c) of this section:

(1) The alien has suffered substantial physical or mental abuse as a result of having been a victim of qualifying criminal activity. Whether abuse is substantial is based on a number of factors, including but not limited to: The nature of the injury inflicted or suffered; the severity of the perpetrator's conduct; the severity of the harm suffered; the duration of the infliction of the harm; and the extent to which there is permanent or serious harm to the appearance, health, or physical or mental soundness of the victim, including aggravation of pre-existing conditions. No single factor is a prerequisite to establish that the abuse suffered was substantial. Also, the existence of one or more of the factors automatically does not

create a presumption that the abuse suffered was substantial. A series of acts taken together may be considered to constitute substantial physical or mental abuse even where no single act alone rises to that level;

(2) The alien possesses credible and reliable information establishing that he or she has knowledge of the details concerning the qualifying criminal activity upon which his or her petition is based. The alien must possess specific facts regarding the criminal activity leading a certifying official to determine that the petitioner has, is, or is likely to provide assistance to the investigation or prosecution of the qualifying criminal activity. In the event that the alien has not yet reached 16 years of age on the date on which an act constituting an element of the qualifying criminal activity first occurred, a parent, guardian or next friend of the alien may possess the information regarding a qualifying crime. In addition, if the alien is incapacitated or incompetent, a parent, guardian, or next friend may possess the information regarding the qualifying crime;

(3) The alien has been helpful, is being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based, and since the initiation of cooperation, has not refused or failed to provide information and assistance reasonably requested. In the event that the alien has not yet reached 16 years of age on the date on which an act constituting an element of the qualifying criminal activity first occurred, a parent, guardian or next friend of the alien may provide the required assistance. In addition, if the petitioner is incapacitated or incompetent and, therefore, unable to be helpful in the investigation or prosecution of the qualifying criminal activity, a parent, guardian, or next friend may provide the required assistance; and

(4) The qualifying criminal activity occurred in the United States (including Indian country and U.S. military installations) or in the territories or possessions of the United States, or violated a U.S. federal law that provides for extraterritorial jurisdiction to prosecute the offense in a U.S. federal court.

(c) Application procedures for U nonimmigrant status—

(1) Filing a petition. USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit, Form I–918, Petition for U Nonimmigrant Status, and initial evidence to USCIS in accordance with this paragraph and the instructions to Form I–918. A petitioner who received interim relief is not required to submit initial evidence with Form I–918 if he or she wishes to rely on the law enforcement certification and other evidence that was submitted with the request for interim relief.

(i) Petitioners in pending immigration proceedings. An alien who is in removal proceedings under section 240 of the Act, 8 U.S.C. 1229a, or in exclusion or deportation proceedings initiated under former sections 236 or 242 of the Act, 8 U.S.C. 1226 and 1252 (as in effect prior to April 1, 1997), and who would like to apply for U nonimmigrant status must file a Form I–918 directly with USCIS. U.S. Immigration and Customs Enforcement (ICE) counsel may agree, as a matter of discretion, to file, at the request of the alien petitioner, a joint motion to terminate proceedings without prejudice with the immigration judge or Board of Immigration Appeals, whichever is appropriate, while a petition for U nonimmigrant status is being adjudicated by USCIS.

(ii) Petitioners with final orders of removal, deportation, or exclusion. An alien who is the subject of a final order of removal, deportation, or exclusion is not precluded from filing a petition for U–1 nonimmigrant status directly with USCIS. The filing of a petition for U–1 nonimmigrant status has no effect on ICE's authority to execute a final order, although the alien may file a request for a stay of removal pursuant to 8 CFR 241.6(a) and 8 CFR 1241.6(a). If the alien is in detention

pending execution of the final order, the time during which a stay is in effect will extend the period of detention (under the standards of 8 CFR 241.4) reasonably necessary to bring about the petitioner's removal.

(2) Initial evidence. Form I–918 must include the following initial evidence:

(i) Form I–918, Supplement B, "U Nonimmigrant Status Certification," signed by a certifying official within the six months immediately preceding the filing of Form I–918. The certification must state that: the person signing the certificate is the head of the certifying agency, or any person(s) in a supervisory role who has been specifically designated by the head of the certifying agency to issue U nonimmigrant status certifications on behalf of that agency, or is a Federal, State, or local judge; the agency is a Federal, State, or local law enforcement agency, or prosecutor, judge or other authority, that has responsibility for the detection, investigation, prosecution, conviction, or sentencing of qualifying criminal activity; the applicant has been a victim of qualifying criminal activity that the certifying official's agency is investigating or prosecuting; the petitioner possesses information concerning the qualifying criminal activity of which he or she has been a victim; the petitioner has been, is being, or is likely to be helpful to an investigation or prosecution of that qualifying criminal activity; and the qualifying criminal activity violated U.S. law, or occurred in the United States, its territories, its possessions, Indian country, or at military installations abroad.

(ii) Any additional evidence that the petitioner wants USCIS to consider to establish that: the petitioner is a victim of qualifying criminal activity; the petitioner has suffered substantial physical or mental abuse as a result of being a victim of qualifying criminal activity; the petitioner (or, in the case of a child under the age of 16 or petitioner who is incompetent or incapacitated, a parent, guardian or next friend of the petitioner) possesses information establishing that he or she has knowledge of the details concerning the qualifying criminal activity of which he or she was a victim and upon which his or her application is based; the petitioner (or, in the case of a child under the age of 16 or petitioner who is incompetent or incapacitated, a parent, guardian or next friend of the petitioner) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement agency, prosecutor, or authority, or Federal or State judge, investigating or prosecuting the criminal activity of which the petitioner is a victim; or the criminal activity is qualifying and occurred in the United States (including Indian country and U.S. military installations) or in the territories or possessions of the United States, or violates a U.S. federal law that provides for extraterritorial jurisdiction to prosecute the offense in a U.S. federal court;

(iii) A signed statement by the petitioner describing the facts of the victimization. The statement also may include information supporting any of the eligibility requirements set out in paragraph (b) of this section. When the petitioner is under the age of 16, incapacitated, or incompetent, a parent, guardian, or next friend may submit a statement on behalf of the petitioner; and

(iv) If the petitioner is inadmissible, Form I–192, "Application for Advance Permission to Enter as Non–Immigrant," in accordance with 8 CFR 212.17.

(3) Biometric capture. All petitioners for U–1 nonimmigrant status must submit to biometric capture and pay a biometric capture fee. USCIS will notify the petitioner of the proper time and location to appear for biometric capture after the petitioner files Form I–918.

(4) Evidentiary standards and burden of proof. The burden shall be on the petitioner to demonstrate eligibility for U–1 nonimmigrant status. The petitioner may submit any credible evidence relating to his or her Form I–918 for consideration

by USCIS. USCIS shall conduct a de novo review of all evidence submitted in connection with Form I–918 and may investigate any aspect of the petition. Evidence previously submitted for this or other immigration benefit or relief may be used by USCIS in evaluating the eligibility of a petitioner for U–1 nonimmigrant status. However, USCIS will not be bound by its previous factual determinations. USCIS will determine, in its sole discretion, the evidentiary value of previously or concurrently submitted evidence, including Form I–918, Supplement B, "U Nonimmigrant Status Certification."

(5) Decision. After completing its de novo review of the petition and evidence, USCIS will issue a written decision approving or denying Form I–918 and notify the petitioner of this decision. USCIS will include in a decision approving Form I–918 a list of nongovernmental organizations to which the petitioner can refer regarding his or her options while in the United States and available resources.

(i) Approval of Form I–918, generally. If USCIS determines that the petitioner has met the requirements for U–1 nonimmigrant status, USCIS will approve Form I–918. For a petitioner who is within the United States, USCIS also will concurrently grant U–1 nonimmigrant status, subject to the annual limitation as provided in paragraph (d) of this section. For a petitioner who is subject to an order of exclusion, deportation, or removal issued by the Secretary, the order will be deemed canceled by operation of law as of the date of USCIS' approval of Form I–918. A petitioner who is subject to an order of exclusion, deportation, or removal issued by an immigration judge or the Board may seek cancellation of such order by filing, with the immigration judge or the Board, a motion to reopen and terminate removal proceedings. ICE counsel may agree, as a matter of discretion, to join such a motion to overcome any applicable time and numerical limitations of 8 CFR 1003.2 and 1003.23.

(A) Notice of Approval of Form I–918 for U–1 petitioners within the United States. After USCIS approves Form I–918 for an alien who filed his or her petition from within the United States, USCIS will notify the alien of such approval on Form I–797, "Notice of Action," and include Form I–94 (see § 1.4), "Arrival–Departure Record," indicating U–1 nonimmigrant status.

(B) Notice of Approval of Form I–918 for U–1 petitioners outside the United States. After USCIS approves Form I–918 for an alien who filed his or her petition from outside the United States, USCIS will notify the alien of such approval on Form I–797, "Notice of Action," and will forward notice to the Department of State for delivery to the U.S. Embassy or Consulate having jurisdiction over the area in which the alien is located, or, for a visa exempt alien, to the appropriate port of entry.

(ii) Denial of Form I–918. USCIS will provide written notification to the petitioner of the reasons for the denial. The petitioner may appeal a denial of Form I–918 to the Administrative Appeals Office (AAO) in accordance with the provisions of 8 CFR 103.3. For petitioners who appeal a denial of their Form I–918 to the AAO, the denial will not be deemed administratively final until the AAO issues a decision affirming the denial. Upon USCIS' final denial of a petition for a petitioner who was in removal proceedings that were terminated pursuant to 8 CFR 214.14(c)(1)(i), DHS may file a new Notice to Appear (see section 239 of the Act, 8 U.S.C. 1229) to place the individual in proceedings again. For petitioners who are subject to an order of removal, deportation, or exclusion and whose order has been stayed, USCIS' denial of the petition will result in the stay being lifted automatically as of the date the denial becomes administratively final.

(6) Petitioners granted U interim relief. Petitioners who were granted U interim relief as defined in paragraph (a)(13) of this section and whose Form I–918 is approved will be accorded U–1 nonimmigrant status as of the date that a request for U interim relief was initially approved.

(7) Employment authorization. An alien granted U–1 nonimmigrant status is employment authorized incident to status. USCIS automatically will issue an initial Employment Authorization Document (EAD) to such aliens who are in the United States. For principal aliens who applied from outside the United States, the initial EAD will not be issued until the petitioner has been admitted to the United States in U nonimmigrant status. After admission, the alien may receive an initial EAD, upon request and submission of a copy of his or her Form I–94, "Arrival–Departure Record," to the USCIS office having jurisdiction over the adjudication of petitions for U nonimmigrant status. No additional fee is required. An alien granted U–1 nonimmigrant status seeking to renew his or her expiring EAD or replace an EAD that was lost, stolen, or destroyed, must file Form I–765 in accordance with the instructions to the form.

(d) Annual cap on U–1 nonimmigrant status—

(1) General. In accordance with section 214(p)(2) of the Act, 8 U.S.C. 1184(p)(2), the total number of aliens who may be issued a U–1 nonimmigrant visa or granted U–1 nonimmigrant status may not exceed 10,000 in any fiscal year.

(2) Waiting list. All eligible petitioners who, due solely to the cap, are not granted U–1 nonimmigrant status must be placed on a waiting list and receive written notice of such placement. Priority on the waiting list will be determined by the date the petition was filed with the oldest petitions receiving the highest priority. In the next fiscal year, USCIS will issue a number to each petition on the waiting list, in the order of highest priority, providing the petitioner remains admissible and eligible for U nonimmigrant status. After U–1 nonimmigrant status has been issued to qualifying petitioners on the waiting list, any remaining U–1 nonimmigrant numbers for that fiscal year will be issued to new qualifying petitioners in the order that the petitions were properly filed. USCIS will grant deferred action or parole to U–1 petitioners and qualifying family members while the U–1 petitioners are on the waiting list. USCIS, in its discretion, may authorize employment for such petitioners and qualifying family members.

(3) Unlawful presence. During the time a petitioner for U nonimmigrant status who was granted deferred action or parole is on the waiting list, no accrual of unlawful presence under section 212(a)(9)(B) of the INA, 8 U.S.C. 1182(a)(9)(B), will result. However, a petitioner may be removed from the waiting list, and the deferred action or parole may be terminated at the discretion of USCIS.

(e) Restrictions on use and disclosure of information relating to petitioners for U nonimmigrant classification—

(1) General. The use or disclosure (other than to a sworn officer or employee of DHS, the Department of Justice, the Department of State, or a bureau or agency of any of those departments, for legitimate department, bureau, or agency purposes) of any information relating to the beneficiary of a pending or approved petition for U nonimmigrant status is prohibited unless the disclosure is made:

(i) By the Secretary of Homeland Security, at his discretion, in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under 13 U.S.C. 8;

(ii) By the Secretary of Homeland Security, at his discretion, to law enforcement officials to be used solely for a legitimate law enforcement purpose;

(iii) In conjunction with judicial review of a determination in a manner that protects the confidentiality of such information;

(iv) After adult petitioners for U nonimmigrant status or U nonimmigrant status holders have provided written consent to waive the restrictions prohibiting the release of information;

(v) To Federal, State, and local public and private agencies providing benefits, to be used solely in making determinations of eligibility for benefits pursuant to 8 U.S.C. 1641(c);

(vi) After a petition for U nonimmigrant status has been denied in a final decision;

(vii) To the chairmen and ranking members of the Committee on the Judiciary of the Senate or the Committee on the Judiciary of the House of Representatives, for the exercise of congressional oversight authority, provided the disclosure relates to information about a closed case and is made in a manner that protects the confidentiality of the information and omits personally identifying information (including locational information about individuals);

(viii) With prior written consent from the petitioner or derivative family members, to nonprofit, nongovernmental victims' service providers for the sole purpose of assisting the victim in obtaining victim services from programs with expertise working with immigrant victims; or

(ix) To federal prosecutors to comply with constitutional obligations to provide statements by witnesses and certain other documents to defendants in pending federal criminal proceedings.

(2) Agencies receiving information under this section, whether governmental or non-governmental, are bound by the confidentiality provisions and other restrictions set out in 8 U.S.C. 1367.

(3) Officials of the Department of Homeland Security are prohibited from making adverse determinations of admissibility or deportability based on information obtained solely from the perpetrator of substantial physical or mental abuse and the criminal activity.

(f) Admission of qualifying family members—

(1) Eligibility. An alien who has petitioned for or has been granted U–1 nonimmigrant status (i.e., principal alien) may petition for the admission of a qualifying family member in a U–2 (spouse), U–3 (child), U–4 (parent of a U–1 alien who is a child under 21 years of age), or U–5 (unmarried sibling under the age of 18) derivative status, if accompanying or following to join such principal alien. A qualifying family member who committed the qualifying criminal activity in a family violence or trafficking context which established the principal alien's eligibility for U nonimmigrant status shall not be granted U–2, U–3, U–4, or U–5 nonimmigrant status. To be eligible for U–2, U–3, U–4, or U–5 nonimmigrant status, it must be demonstrated that:

(i) The alien for whom U–2, U–3, U–4, or U–5 status is being sought is a qualifying family member, as defined in paragraph (a)(10) of this section; and

(ii) The qualifying family member is admissible to the United States.

(2) Filing procedures. A petitioner for U–1 nonimmigrant status may apply for derivative U nonimmigrant status on behalf of qualifying family members by submitting a Form I–918, Supplement A, "Petition for Qualifying Family Member of U–1 Recipient," for each family member either at the same time the petition for U–1 nonimmigrant status is filed, or at a later date. An alien who has been granted U–1 nonimmigrant status may apply for derivative U nonimmigrant status on behalf of qualifying family members by submitting Form I–918, Supplement A for each family member. All Forms I–918, Supplement A must be accompanied by initial evidence and the required fees specified in the instructions to the form. Forms I–918, Supplement A that are not filed at the same time as Form I–918 but are filed at a later date must be accompanied by a copy of the Form I–918 that was filed by the principal petitioner or a copy of his or her Form I–94 demonstrating proof of U–1 nonimmigrant status, as applicable.

(i) Qualifying family members in pending immigration proceedings. The principal alien of a qualifying family member who is in removal proceedings under section 240 of the Act, 8 U.S.C. 1229a, or in exclusion or deportation proceedings initiated under former sections 236 or 242 of the Act, 8 U.S.C. 1226 and 1252 (as in effect prior to April 1, 1997), and who is seeking U nonimmigrant status, must file a Form I–918, Supplement A directly with USCIS. ICE counsel may agree to file, at the request of the qualifying family member, a joint motion to terminate proceedings without prejudice with the immigration judge or Board of Immigration Appeals, whichever is appropriate, while the petition for U nonimmigrant status is being adjudicated by USCIS.

(ii) Qualifying family members with final orders of removal, deportation, or exclusion. An alien who is the subject of a final order of removal, deportation, or exclusion is not precluded from filing a petition for U–2, U–3, U–4, or U–5 nonimmigrant status directly with USCIS. The filing of a petition for U–2, U–3, U–4, or U–5 nonimmigrant status has no effect on ICE's authority to execute a final order, although the alien may file a request for a stay of removal pursuant to 8 CFR 241.6(a) and 8 CFR 1241.6(a). If the alien is in detention pending execution of the final order, the time during which a stay is in effect will extend the period of detention (under the standards of 8 CFR 241.4) reasonably necessary to bring about the alien's removal.

(3) Initial evidence. Form I–918, Supplement A, must include the following initial evidence:

(i) Evidence demonstrating the relationship of a qualifying family member, as provided in paragraph (f)(4) of this section;

(ii) If the qualifying family member is inadmissible, Form I–192, "Application for Advance Permission to Enter as a Non–Immigrant," in accordance with 8 CFR 212.17.

(4) Relationship. Except as set forth in paragraphs (f)(4)(i) and (ii) of this section, the relationship between the U–1 principal alien and the qualifying family member must exist at the time Form I–918 was filed, and the relationship must continue to exist at the time Form I–918, Supplement A is adjudicated, and at the time of the qualifying family member's subsequent admission to the United States.

(i) If the U–1 principal alien proves that he or she has become the parent of a child after Form I–918 was filed, the child shall be eligible to accompany or follow to join the U–1 principal alien.

(ii) If the principal alien was under 21 years of age at the time he or she filed Form I–918, and filed Form I–918, Supplement A for an unmarried sibling under the age of 18, USCIS will continue to consider such sibling as a qualifying family member for purposes of U nonimmigrant status even if the principal alien is no longer under 21 years of age at the time of adjudication, and even if the sibling is no longer under 18 years of age at the time of adjudication.

(5) Biometric capture and evidentiary standards. The provisions for biometric capture and evidentiary standards in paragraphs (c)(3) and (c)(4) of this section also are applicable to petitions for qualifying family members.

(6) Decision. USCIS will issue a written decision approving or denying Form I–918, Supplement A and send notice of this decision to the U–1 principal petitioner. USCIS will include in a decision approving Form I–918 a list of nongovernmental organizations to which the qualifying family member can refer regarding his or her options while in the United States and available resources. For a qualifying family member who is subject to an order of exclusion, deportation, or removal issued by the Secretary, the order will be deemed canceled by operation of law as of the date of USCIS' approval of Form I–918, Supplement A. A qualifying family member who is subject to an order of exclusion, deportation, or removal issued by an immigration judge or the Board may seek cancellation of such order by filing, with the immigration judge or the Board, a motion to reopen and terminate removal proceedings. ICE counsel may agree, as a matter of discretion, to join such a motion to overcome any applicable time and numerical limitations of 8 CFR 1003.2 and 1003.23.

(i) Approvals for qualifying family members within the United States. When USCIS approves a Form I–918, Supplement A for a qualifying family member who is within the United States, it will concurrently grant that alien U–2, U–3, U–4, or U–5 nonimmigrant status. USCIS will notify the principal of such approval on Form I–797, "Notice of Action," with Form I–94, "Arrival–Departure Record," indicating U–2, U–3, U–4, or U–5 nonimmigrant status. Aliens who were previously granted U interim relief as defined in paragraph (a)(13) of this section will be accorded U nonimmigrant status as of the date that the request for U interim relief was approved. Aliens who are granted U–2, U–3, U–4, or U–5 nonimmigrant status are not subject to an annual numerical limit. USCIS may not approve Form I–918, Supplement A unless it has approved the principal alien's Form I–918.

(ii) Approvals for qualifying family members outside the United States. When USCIS approves Form I–918, Supplement A for a qualifying family member who is outside the United States, USCIS will notify the principal alien of such approval on Form I–797. USCIS will forward the approved Form I–918, Supplement A to the Department of State for delivery to the U.S. Embassy or Consulate having jurisdiction over the area in which the qualifying family member is located, or, for a visa exempt alien, to the appropriate port of entry.

(iii) Denial of the Form I–918, Supplement A. In accordance with 8 CFR 103.3(a)(1), USCIS will provide written notification of the reasons for the denial. The principal alien may appeal the denial of Form I–918, Supplement A to the Administrative Appeals Office in accordance with the provisions of 8 CFR 103.3. Upon USCIS' final denial of Form I–918, Supplement A for a qualifying family member who was in removal proceedings that were terminated pursuant to 8 CFR 214.14(f)(2)(i), DHS may file a new Notice to Appear (see section 239 of the INA, 8 U.S.C. 1229) to place the individual in proceedings again. For qualifying family members who are subject to an order of removal, deportation, or exclusion and whose order has been stayed, USCIS' denial of the petition will result in the stay being lifted automatically as of the date the denial becomes administratively final.

(7) Employment authorization. An alien granted U–2, U–3, U–4, or U–5 nonimmigrant status is employment authorized incident to status. To obtain an Employment Authorization Document (EAD), such alien must file Form I–765, "Application for Employment Authorization," with the appropriate fee or a request for a fee waiver, in accordance with the instructions to the form. For qualifying family members within the United States, the Form I–765 may be filed concurrently with Form I–918, Supplement A, or at any time thereafter. For qualifying family members who are outside the United States, Form I–765 only may be filed after admission to the United States in U nonimmigrant status.

(g) Duration of U nonimmigrant status—

(1) In general. U nonimmigrant status may be approved for a period not to exceed 4 years in the aggregate. A qualifying family member granted U–2, U–3, U–4, and U–5 nonimmigrant status will be approved for an initial period that does not exceed the expiration date of the initial period approved for the principal alien.

(2) Extension of status.

(i) Where a U nonimmigrant's approved period of stay on Form I–94 is less than 4 years, he or she may file Form I–539, "Application to Extend/Change Nonimmigrant Status," to request an extension of U nonimmigrant status for an aggregate period not to exceed 4 years. USCIS may approve an extension of status for a qualifying family member beyond the date when the U–1 nonimmigrant's status expires when the qualifying family member is unable to enter the United States timely due to delays in consular processing, and an extension of status is necessary to ensure that the qualifying family member is able to attain at least 3 years in nonimmigrant status for purposes of adjusting status under section 245(m) of the Act, 8 U.S.C. 1255.

(ii) Extensions of U nonimmigrant status beyond the 4–year period are available upon attestation by the certifying official that the alien's presence in the United States continues to be necessary to assist in the investigation or prosecution of qualifying criminal activity. In order to obtain an extension of U nonimmigrant status based upon such an attestation, the alien must file Form I–539 and a newly executed Form I–918, Supplement B in accordance with the instructions to Form I–539.

(h) Revocation of approved petitions for U nonimmigrant status—

(1) Automatic revocation. An approved petition for U–1 nonimmigrant status will be revoked automatically if, pursuant to 8 CFR 214.14(d)(1), the beneficiary of the approved petition notifies the USCIS office that approved the petition that he or she will not apply for admission to the United States and, therefore, the petition will not be used.

(2) Revocation on notice.

(i) USCIS may revoke an approved petition for U nonimmigrant status following a notice of intent to revoke. USCIS may revoke an approved petition for U nonimmigrant status based on one or more of the following reasons:

(A) The certifying official withdraws the U nonimmigrant status certification referred to in 8 CFR 214.14(c)(2)(i) or disavows the contents in writing;

(B) Approval of the petition was in error;

(C) Where there was fraud in the petition;

(D) In the case of a U–2, U–3, U–4, or U–5 nonimmigrant, the relationship to the principal petitioner has terminated; or

(E) In the case of a U–2, U–3, U–4, or U–5 nonimmigrant, the principal U–1's nonimmigrant status is revoked.

(ii) The notice of intent to revoke must be in writing and contain a statement of the grounds for the revocation and the time period allowed for the U nonimmigrant's rebuttal. The alien may submit evidence in rebuttal within 30 days of the date of the notice. USCIS shall consider all relevant evidence presented in deciding whether to revoke the approved petition for U nonimmigrant status. The determination of what is relevant evidence and the weight to be given to that evidence will be within the sole discretion of USCIS. If USCIS revokes approval of a petition and thereby terminates U nonimmigrant status, USCIS will provide the alien with a written notice of revocation that explains the specific reasons for the revocation.

(3) Appeal of a revocation of approval. A revocation on notice may be appealed to the Administrative Appeals Office in accordance with 8 CFR 103.3 within 30 days after the date of the notice of revocation. Automatic revocations may not be appealed.

(4) Effects of revocation of approval. Revocation of a principal alien's approved Form I–918 will result in termination of status for the principal alien, as well as in the denial of any pending Form I–918, Supplement A filed for qualifying family members seeking U–2, U–3, U–4, or U–5 nonimmigrant status. Revocation of a qualifying family member's approved Form I–918, Supplement A will result in termination of status for the qualifying family member. Revocation of an approved Form I–918 or Form I–918, Supplement A also revokes any waiver of inadmissibility granted in conjunction with such petition.

(i) Removal proceedings. Nothing in this section prohibits USCIS from instituting removal proceedings under section 240 of the Act, 8 U.S.C. 1229(a), for conduct committed after admission, for conduct or a condition that was not disclosed to USCIS prior to the granting of U nonimmigrant status, for misrepresentations of material facts in Form I–918 or Form I–918, Supplement A and supporting documentation, or after revocation of U nonimmigrant status.

**Credits**

[72 FR 53036, Sept. 17, 2007; 72 FR 54813, Sept. 27, 2007; 74 FR 55738, Oct. 28, 2009; 78 FR 18472, March 27, 2013; 81 FR 91670, Dec. 19, 2016; 85 FR 46925, Aug. 3, 2020]

SOURCE: 50 FR 42007, Oct. 17, 1985; 52 FR 13226, April 22, 1987; 52 FR 20555, June 1, 1987; 52 FR 45446, Nov. 30, 1987; 52 FR 48084, Dec. 18, 1987; 53 FR 3331, Feb. 5, 1988; 53 FR 24900, June 30, 1988; 53 FR 30017, Aug. 10, 1988; 53 FR 46852, Nov. 21, 1988; 54 FR 10979, March 16, 1989; 54 FR 48577, Nov. 24, 1989; 55 FR 5573, Feb. 16, 1990; 56 FR 38333, Aug. 13, 1991; 56 FR 61119, Dec. 2, 1991; 57 FR 40832, Sept. 8, 1992; 58 FR 58097, Oct. 29, 1993; 59 FR 1463, Jan. 11, 1994;

65 FR 56465, Sept. 19, 2000; 66 FR 46702, Sept. 7, 2001; 67 FR 4795, Jan. 31, 2002; 67 FR 52591, Aug. 12, 2002; 67 FR 76270, Dec. 11, 2002; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 69 FR 479, Jan. 5, 2004; 70 FR 23783, May 5, 2005; 72 FR 53035, Sept. 17, 2007; 73 FR 55698, Sept. 26, 2008; 73 FR 76911, Dec. 18, 2008; 74 FR 2835, Jan. 16, 2009; 74 FR 55109, Oct. 27, 2009; 74 FR 55738, Oct. 28, 2009; 75 FR 79275, Dec. 20, 2010; 81 FR 2083, Jan. 15, 2016; 81 FR 13117, March 11, 2016; 81 FR 72491, Oct. 20, 2016; 84 FR 23978, May 23, 2019; 85 FR 29311, May 14, 2020, unless otherwise noted.

AUTHORITY: 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Pub.L. 104–208, 110 Stat. 3009–708; Pub.L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub.L. 115–218.

Notes of Decisions (11)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 241. Apprehension and Detention of Aliens Ordered Removed (Refs & Annos)
          Subpart A. Post-Hearing Detention and Removal

8 C.F.R. § 241.7

§ 241.7 Self-removal.

Currentness

A district director, the Deputy Executive Associate Commissioner for Detention and Removal, or the Director of the Office of Juvenile Affairs may permit an alien ordered removed (including an alien ordered excluded or deported in proceedings prior to April 1, 1997) to depart at his or her own expense to a destination of his or her own choice. Any alien who has departed from the United States while an order of deportation or removal is outstanding shall be considered to have been deported, excluded and deported, or removed, except that an alien who departed before the expiration of the voluntary departure period granted in connection with an alternate order of deportation or removal shall not be considered to be so deported or removed.

**Credits**
[67 FR 39260, June 7, 2002]

SOURCE: 62 FR 10378, March 6, 1997; 65 FR 80294, Dec. 21, 2000; 66 FR 29451, May 31, 2001; 67 FR 19511, April 22, 2002; 68 FR 4367, Jan. 29, 2003; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 70 FR 67089, Nov. 4, 2005, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1223, 1224, 1225, 1226, 1227, 1228, 1231, 1251, 1253, 1255, 1330, 1362; 18 U.S.C. 4002, 4013(c)(4); Pub.L. 107–296, 116 Stat. 2135 (6 U.S.C. 101, et seq.); 8 CFR part 2.

Current through October 29, 2020; 85 FR 68703.

**End of Document**                               © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 244. Temporary Protected Status for Nationals of Designated States (Refs & Annos)

8 C.F.R. § 244.1

§ 244.1 Definitions.

Currentness

As used in this part:

Brief, casual, and innocent absence means a departure from the United States that satisfies the following criteria:

(1) Each such absence was of short duration and reasonably calculated to accomplish the purpose(s) for the absence;

(2) The absence was not the result of an order of deportation, an order of voluntary departure, or an administrative grant of voluntary departure without the institution of deportation proceedings; and

(3) The purposes for the absence from the United States or actions while outside of the United States were not contrary to law.

Charging document means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

Continuously physically present means actual physical presence in the United States for the entire period specified in the regulations. An alien shall not be considered to have failed to maintain continuous physical presence in the United States by virtue of brief, casual, and innocent absences as defined within this section.

Continuously resided means residing in the United States for the entire period specified in the regulations. An alien shall not be considered to have failed to maintain continuous residence in the United States by reason of a brief, casual and innocent absence as defined within this section or due merely to a brief temporary trip abroad required by emergency or extenuating circumstances outside the control of the alien.

Felony means a crime committed in the United States, punishable by imprisonment for a term of more than one year, regardless of the term such alien actually served, if any, except: When the offense is defined by the State as a misdemeanor and the sentence actually imposed is one year or less regardless of the term such alien actually served. Under this exception for purposes of section 244 of the Act, the crime shall be treated as a misdemeanor.

Foreign state means any foreign country or part thereof as designated by the Attorney General pursuant to section 244 of the Act.

Misdemeanor means a crime committed in the United States, either:

(1) Punishable by imprisonment for a term of one year or less, regardless of the term such alien actually served, if any, or

(2) A crime treated as a misdemeanor under the term "felony" of this section.

For purposes of this definition, any crime punishable by imprisonment for a maximum term of five days or less shall not be considered a felony or misdemeanor.

Prima facie means eligibility established with the filing of a completed application for Temporary Protected Status containing factual information that if unrebutted will establish a claim of eligibility under section 244 of the Act.

Register means to properly file, with the director, a completed application, with proper fee, for Temporary Protected Status during the registration period designated under section 244(b) of the Act.

**Credits**

[56 FR 23497, May 22, 1991; 62 FR 10367, 10382, March 6, 1997; 63 FR 63595, Nov. 16, 1998; 64 FR 4781, Feb. 1, 1999; 65 FR 82257, Dec. 28, 2000; 66 FR 7863, Jan. 26, 2001]

SOURCE: 55 FR 24859, June 19, 1990; 62 FR 10382, March 6, 1997; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

Notes of Decisions (5)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Code of Federal Regulations - 1997

8 C.F.R. s 245.1
CODE OF FEDERAL REGULATIONS
TITLE 8—ALIENS AND NATIONALITY
CHAPTER I—IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE
SUBCHAPTER B—IMMIGRATION REGULATIONS
PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

© 1997 West, a Thomson business. No claim to original U.S. Govt. works
Current through December 31, 1996, 61 FR 69366

s 245.1 Eligibility.

 (a) General. Any alien who is physically present in the United States, except for an alien who is ineligible to apply for adjustment of status under paragraph (b) or (c) of this section, may apply for adjustment of status to that of a lawful permanent resident of the United States if the applicant is eligible to receive an immigrant visa and an immigrant visa is immediately available at the time of filing of the application. A special immigrant described under section 101(a)(27)(J) of the Act shall be deemed, for the purpose of applying the adjustment to status provisions of section 245(a) of the Act, to have been paroled into the United States, regardless of the actual method of entry into the United States.

 (b) Restricted aliens. The following categories of aliens are ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act, unless the alien establishes eligibility under the provisions of section 245(i) of the Act and s 245.10, is not included in the categories of aliens prohibited from applying for adjustment of status listed in s 245.1(c), is eligible to receive an immigrant visa, and has an immigrant visa immediately available at the time of filing the application for adjustment of status:

 (1) Any alien who entered the United States in transit without a visa;

 (2) Any alien who, on arrival in the United States, was serving in any capacity on board a vessel or aircraft or was destined to join a vessel or aircraft in the United States to serve in any capacity thereon;

 (3) Any alien who was not admitted or paroled following inspection by an immigration officer;

 (4) Any alien who, on or after January 1, 1977, was employed in the United States without authorization prior to filing an application for adjustment of status. This restriction shall not apply to an alien who is:

 (i) An immediate relative as defined in section 201(b) of the Act;

 (ii) A special immigrant as defined in section 101(a)(27)(H) or (J) of the Act;

 (iii) Eligible for the benefits of Public Law 101-238 (the Immigration Nursing Relief Act of 1989) and files an application for adjustment of status on or before October 17, 1991; or

 (iv) Eligible for the benefits of Public Law 101-238 (the Immigration Nursing Relief Act of 1989), and has not entered into or continued in unauthorized employment on or after November 29, 1990.

 (5) Any alien who on or after November 6, 1986 is not in lawful immigration status on the date of filing his or her application for adjustment of status, except an applicant who is an immediate relative as defined in section 201(b) or a special immigrant as defined in section 101(a)(27) (H), (I), or (J);

 (6) Any alien who files an application for adjustment of status on or after November 6, 1986, who has failed (other than through no fault of his or her own or for technical reasons) to maintain continuously a lawful status since entry into the United States, except an applicant who is an immediate relative as defined in section 201(b) of the Act or a special immigrant as defined in section 101(a)(27) (H), (I), or (J) of the Act;

 (7) Any alien admitted as a visitor under the visa waiver provisions of s 212.1(e) of this chapter.

 (8) Any alien admitted as a Visa Waiver Pilot Program visitor under the provisions of section 217 of the Act and part 217 of this chapter other than an immediate relative as defined in section 201(b) of the Act.

(c) Ineligible aliens. The following categories of aliens are ineligible to apply for adjustment of status to that of a lawful permanent resident alien under section 245 of the Act:

 (1) Any nonpreference alien who is seeking or engaging in gainful employment in the United States who is not the beneficiary of a valid individual or blanket labor certification issued by the Secretary of Labor or who is not exempt from certification requirements under s 212.8(b) of this chapter;

 (2) Except for an alien who is applying for residence under the provisions of section 133 of the Immigration Act of 1990, any alien who has or had the status of an exchange visitor under section 101(a) (15) (J) of the Act and who is subject to the foreign residence requirement of section 212(e) of the Act, unless the alien has complied with the foreign residence requirement or has been granted a waiver of that requirement, under that section. An alien who has been granted a waiver under section 212(e)(iii) of the Act based on a request by a State Department of Health (or its equivalent) under Pub. L. 103-416 shall be ineligible to apply for adjustment of status under section 245 of the Act if the terms and conditions specified in section 214(k) of the Act and s 212.7(c)(9) of this chapter have not been met;

 (3) Any alien who has nonimmigrant status under paragraph (15) (A), (15) (E), or (15) (G) of section 101(a) of the Act, or has an occupational status which would, if the alien were seeking admission to the United States, entitle the alien to nonimmigrant status under those paragraphs, unless the alien first executes and submits the written waiver required by section 247(b) of the Act and part 247 of this chapter; and

 (4) Any alien who claims immediate relative status under section 201(b) or preference status under sections 203(a) or 203(b) of the Act, unless the applicant is the beneficiary of a valid unexpired visa petition filed in accordance with part 204 of this chapter.

 (5) Any alien who is already an alien lawfully admitted to the United States for permanent residence on a conditional basis pursuant to section 216 or 216A of the Act, regardless of any other quota or non-quota immigrant visa classification for which the alien may otherwise be eligible.

 (6) Any alien admitted to the United States as a nonimmigrant fiance as defined in section 101(a)(15)(K) of the Act, unless the alien is applying for adjustment of status based upon a marriage which was contracted within 90 days of entry with the United States citizen who filed a petition on behalf of the alien pursuant to s 214.2(k) of this chapter.

 (7) A nonimmigrant classified pursuant to section 101(a)(15)(S) of the Act, unless the nonimmigrant is applying for adjustment of status pursuant to the request of a law enforcement authority, the provisions of section 101(a)(15)(S) of the Act, and 8 CFR 245.11.

 (8) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986, and while the alien was in deportation or exclusion proceedings, or judicial proceedings relating thereto.

 (i) Commencement of proceedings. The period during which the alien is in deportation or exclusion proceedings, or judicial proceedings relating thereto commences:

 (A) With the issuance of the Order to Show Cause and Notice of Hearing (Form I-221) prior to June 20, 1991;

 (B) With the filing of the Order to Show Cause and Notice of Hearing (Form I-221) issued on or after June 20, 1991 with the Immigration Court; or

 (C) With the issuance of the Notice to Applicant for Admission Detained for Hearing before Immigration Judge (Form I-122).

 (ii) Termination of Proceedings. The period during which the alien is in deportation or exclusion proceedings, or judicial proceedings relating thereto terminates:

 (A) When the alien departs from the United States while an order of deportation is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation under 8 CFR 243.5;

 (B) When the alien departs from the United States pursuant to an order of exclusion;

 (C) When the alien is found not to be excludable or deportable from the United States;

 (D) When the Order to Show Cause is canceled pursuant to 8 CFR 242.7(a);

 (E) When the proceedings are terminated by the immigration judge or the Board of Immigration Appeals; or

 (F) When a petition for review or an action for habeas corpus is granted by a Federal Court on judicial review.

 (iii) Exemptions. This prohibition shall no longer apply if:

 (A) The alien is found not to be excludable or deportable from the United States;

 (B) The Order to Show Cause is canceled pursuant to 8 CFR 242.7(a);

 (C) Proceedings are terminated by the immigration judge or Board of Immigration Appeals;

 (D) A petition for review or an action for habeas corpus is granted by a Federal Court on judicial review;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(E) The alien has resided outside the United States for two or more years following the marriage; or

(F) The alien establishes that the marriage is bona fide by providing clear and convincing evidence that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place, was not entered into for the purpose of procuring the alien's entry as an immigrant, and no fee or other consideration was given (other than to an attorney for assistance in preparation of a lawful petition) for the filing of a petition.

(iv) Request for exemption. No application or fee is required to request the exemption under section 245(e) of the Act. The request must be made in writing and submitted with the Form I-485. Application for Permanent Residence. The request must state the basis for requesting consideration for the exemption and must be supported by documentary evidence establishing eligibility for the exemption.

(v) Evidence to establish eligibility for the bona fide marriage exemption. Section 204(g) of the Act provides that certain visa petitions based upon marriages entered into during deportation, exclusion or related judicial proceedings may be approved only if the petitioner provides clear and convincing evidence that the marriage is bona fide. Evidence that a visa petition based upon the same marriage was approved under the bona fide marriage exemption to section 204(g) of the Act will be considered primary evidence of eligibility for the bona fide marriage exemption provided in this part. The applicant will not be required to submit additional evidence to qualify for the bona fide marriage exemption provided in this part, unless the district director determines that such additional evidence is needed. In cases where the district director notifies the applicant that additional evidence is required, the applicant must submit documentary evidence which clearly and convincingly establishes that the marriage was entered into in good faith and not entered into for the purpose of procuring the alien's entry as an immigrant. Such evidence may include:

(A) Documentation showing joint ownership of property;

(B) Lease showing joint tenancy of a common residence;

(C) Documentation showing commingling of financial resources;

(D) Birth certificates of children born to the applicant and his or her spouse;

(E) Affidavits of third parties having knowledge of the bona fides of the marital relationship, or

(F) Other documentation establishing that the marriage was not entered into in order to evade the immigration laws of the United States.

(vi) Decision. An application for adjustment of status filed during the prohibited period shall be denied, unless the applicant establishes eligibility for an exemption from the general prohibition.

(vii) Denials. The denial of an application for adjustment of status because the marriage took place during the prohibited period shall be without prejudice to the consideration of a new application or a motion to reopen a previously denied application, if deportation or exclusion proceedings are terminated while the alien is in the United States. The denial shall also be without prejudice to the consideration of a new application or motion to reopen the adjustment of status application, if the applicant presents clear and convincing evidence establishing eligibility for the bona fide marriage exemption contained in this part.

(viii) Appeals. An application for adjustment of status to lawful permanent resident which is denied by the district director solely because the applicant failed to establish eligibility for the bona fide marriage exemption contained in this part may be appealed to the Associate Commissioner, Examinations, in accordance with 8 CFR part 103. The appeal to the Associate Commissioner, Examinations, shall be the single level of appellate review established by statute.

(d) Definitions—

(1) Lawful Immigration Status. For purposes of section 245(c)(2) of the Act, the term "lawful immigration status" will only describe the immigration status of an individual who is:

(i) In lawful permanent resident status;

(ii) An alien admitted to the United States in nonimmigrant status as defined in section 101(a)(15) of the Act, whose initial period of admission has not expired or whose nonimmigrant status has been extended in accordance with part 214 of this chapter;

(iii) In refugee status under section 207 of the Act, such status not having been revoked;

(iv) In asylee status under section 208 of the Act, such status not having been revoked;

(v) In parole status which has not expired, been revoked or terminated; or

(vi) Eligible for the benefits of Public Law 101-238 (the Immigration Nursing Relief Act of 1989) and files an application for adjustment of status on or before October 17, 1991.

(2) No fault of the applicant or for technical reasons. The parenthetical phrase "other than through no fault of his or her own or for technical reasons" shall be limited to:

(i) Inaction of another individual or organization designated by regulation to act on behalf of an individual and over whose actions the individual has no control, if the inaction is acknowledged by that individual or organization (as, for example, where a designated school official certified under s 214.2(f) of this chapter or an exchange program sponsor under s 214.2(j) of this chapter did not provide required notification to the Service of continuation of status, or did not forward a request for continuation of status to the Service); or

(ii) A technical violation resulting from inaction of the Service (as for example, where an applicant establishes that he or she properly filed a timely request to maintain status and the Service has not yet acted on that request). An individual whose refugee or asylum status has expired through passage of time, but whose status has not been revoked, will be considered to have gone out of status for a technical reason.

(iii) A technical violation caused by the physical inability of the applicant to request an extension of nonimmigrant stay from the Service either in person or by mail (as, for example, an individual who is hospitalized with an illness at the time nonimmigrant stay expires). The explanation of such a technical violation shall be accompanied by a letter explaining the circumstances from the hospital or attending physician.

(iv) A technical violation resulting from the Service's application of the maximum five/six year period of stay for certain H-1 nurses only if the applicant was subsequently reinstated to H-1 status in accordance with the terms of Public Law 101-656 (Immigration Amendments of 1988).

(3) Effect of departure. The departure and subsequent reentry of an individual who was employed without authorization in the United States after January 1, 1977 does not erase the bar to adjustment of status in section 245(c)(2) of the Act. Similarly, the departure and subsequent reentry of an individual who has not maintained a lawful immigration status on any previous entry into the United States does not erase the bar to adjustment of status in section 245(c)(2) of the Act for any application filed on or after November 6, 1986.

(e) Special categories—

(1) Alien medical graduates. Any alien who is a medical graduate qualified for special immigrant classification under section 101(a)(27)(H) of the Act and is the beneficiary of an approved petition as required under section 204(a)(1)(E)(i) of the Act is eligible for adjustment of status. An accompanying spouse and children also may apply for adjustment of status under this section. Temporary absences from the United States for 30 days or less, during which the applicant was practicing or studying medicine, do not interrupt the continuous presence requirement. Temporary absences authorized under the Service's advance parole procedures will not be considered interruptive of continuous presence when the alien applies for adjustment of status.

(2) Adjustment of certain nurses who were in H-1 nonimmigrant status on September 1, 1989 (Pub.L. 101-238)—

(i) Eligibility. An alien is eligible to apply for adjustment of status without regard to the numerical limitations of sections 201 and 202 of the Act if:

(A) The applicant was admitted to the United States in, or had been granted a change of status to, nonimmigrant status under section 101(a)(15)(H)(i) of the Act on or before September 1, 1989, to perform services as a registered nurse (regardless of the date upon which the applicant's authorization to remain in the United States expired or will expire), and the applicant had not thereafter been granted a change to status to any other nonimmigrant classification prior to September 1, 1989,

(B) The applicant has been employed in the United States as a registered nurse for an aggregate of three years prior to the date of application for adjustment of status,

(C) The applicant's continued employment as a registered nurse meets the standards established for certification described in section 212(a)(5)(A)(i) of the Act,

(D) The applicant is the beneficiary of:

(1) A valid, unexpired visa petition filed prior to October 1, 1991, which has been approved to grant the applicant preference status under section 202(a) (3) or (6) of the Act (as in effect prior to October 1, 1991), and is deemed by operation of the automatic conversion provisions of section 4 of Public Law 102-110 (the Armed Forces Immigration Adjustment Act of 1991), to be effective to grant the applicant preference status under section 203(b) (2) or (3) of the Act (as in effect on and after October 1, 1991) because of his or her occupation as a registered nurse, provided the application for adjustment of status is approved no later than October 1, 1993, or

(2) A valid, unexpired visa petition filed on or after October 1, 1991, which has been approved to grant the applicant preference status under section 203(b) (1), (2), or (3) of this Act (as in effect on and after October 1, 1991) because of his or her occupation as a registered nurse, and

(E) The applicant properly files an application for adjustment of status under the provisions of section 245 of the Act.

(ii) Application period. To benefit from the provisions of Public Law 101-238, an alien must properly file an application for adjustments of status under section 245 of the Act on or before March 20, 1995.

(iii) Application. An applicant for the benefits of Public Law 101-238 must file an application for adjustment of status on Form I-485, accompanied by the fee and supporting documents described in s 245.2 of this part. Beneficiaries of Public Law 101-238 must also submit:

(A) Evidence that the applicant is the beneficiary of:

(1) A valid, unexpired visa petition filed prior to October 1, 1991, which has been approved to grant the applicant preference status under section 203(a) (3) or (6) of the Act (as in effect prior to October 1, 1991) and is deemed by operation of the automatic conversion provisions of section 4 of Public Law 101-110 to be effective to grant the applicant preference status under section 203(b) (2) or (3) of the Act (as in effect on and after October 1, 1991) because of his or her occupation as a registered nurse, provided the application for adjustment of status is approved no later than October 1, 1993, or

(2) A valid, unexpired visa petition filed on or after October 1, 1991, which has been approved to grant the applicant preference status under section 203(b) (1), (2), or (3) of the Act (as in effect on and after October 1, 1991) because of his or her occupation as a registered nurse, and

(B) A request, made on Form ETA 750 submitted in duplicate, for a determination by the district director that the alien is qualified for and will engage in the occupation of registered nurse, as currently listed on Schedule A (20 CFR part 656),

(C) Evidence showing that the applicant has been employed in the United States as a registered nurse for an aggregate of three years prior to the date the application for adjustment of status is filed, in the form of:

(1) Letters from employers stating the beginning and ending dates of employment as a registered nurse, or

(2) Other evidence of employment as a registered nurse, such as pay receipts supported by affidavits of co-workers, which is accompanied by evidence that the nurse has made reasonable efforts to obtain employment letter(s), but has been unable to do so because the current or former employer refuses to issue the letter or has gone out of business,

(D) Evidence that the applicant was licensed, either temporarily or permanently, as a registered nurse during all periods of qualifying employment, and

(E) Evidence which establishes that the applicant was in the United States in H-1 nonimmigrant status for the purpose of performing services as a registered nurse on September 1, 1989.

(iv) Effect of section 245(c)(2). An applicant for the benefits of the adjustment of status provisions of Public Law 101-238 must establish eligibility for adjustment of status under all provisions of section 245 unless those provisions have specifically been waived.

(A) Application for adjustment of status filed on or before October 17, 1991. An applicant who qualifies for the benefits of Public Law 101-238, who properly files an application for adjustment of status on or before October 17, 1991, may be granted adjustment of status even though the alien has engaged or is engaging in unauthorized employment. For purposes of adjustment of status, the applicant will be considered to have continuously maintained a lawful nonimmigrant status throughout his or her stay in the United States as a nonimmigrant and to be in lawful nonimmigrant status at the time the application is filed.

(B) Application for adjustment of status filed after October 17, 1991. An alien who files an application for adjustment of status after October 17, 1991, will not automatically be considered as having maintained lawful nonimmigrant status. An alien who files for adjustment after this date will be subject to the statutory bar of section 245(c)(2) of the Act and will be ineligible to apply for adjustment of status if he or she has failed to continuously maintain lawful nonimmigrant status (other than through no fault of his or her own or for technical reasons); if he or she was not in lawful nonimmigrant status at the time the application was filed; or if he or she was employed without authorization on or after November 29, 1990. Unauthorized employment which has been waived as a basis for ineligibility for adjustment of status may not be used as the basis of a determination that the applicant is ineligible for adjustment of status due to failure to continuously maintain lawful nonimmigrant status.

(C) Motions to reopen. Public Law 101-649 (the Immigration Act of 1990), which became law on November 29, 1990, retroactively amended Public Law 101-238 (the Immigration Nursing Relief Act of 1989). An alien whose application for adjustment of status under the provisions of Public Law 101-238 was denied by the district director before November 29, 1990,

because of unauthorized employment, failure to continuously maintain a lawful nonimmigrant status, or not being in lawful immigration status at the time of filing, may file a motion to reopen the adjustment application. The motion to reopen must be made in accordance with the provisions of 8 CFR 103.5. The district director will reopen the application for adjustment of status and enter a new decision based upon the provisions of Public Law 101-238, as amended by Public Law 101-649. Any other alien whose application for adjustment of status was denied may file a motion to reopen or reconsider in accordance with normal statutory and regulatory provisions.

(v) Description of qualifying employment. Qualifying employment as a registered nurse may have taken place at any time before the alien files the application for adjustment of status. It may have occurred before, on, or after the enactment of Public Law 101-238. All qualifying employment must have occurred in the United States. The qualifying employment as a registered nurse may have occurred while the alien was in any immigration status, provided that the alien had been admitted in or changed to H-1 status for the purpose of performing services as a registered nurse on or before September 1, 1989, and had not thereafter changed from H-1 status to any other status before September 1, 1989. The employment need not have been continuous, provided the applicant can establish that he or she engaged in qualifying employment for a total of three or more years. Qualifying employment may include periods when the applicant possessed a provisional, temporary, interim, or other permit or license authorizing the applicant to perform services as a registered nurse; provided the license or permit was issued or recognized by the State Board of Nursing of the state in which the employment was performed. Qualifying employment may not include periods when the applicant performed duties as a registered nurse in violation of any state law regulating the employment of registered nurses in that state.

(vi) Effect of enactment on spouse or child—

(A) Spouse or child accompanying principal alien. The accompanying spouse or child of an applicant for adjustment of status who benefits from Public Law 101-238, may also apply for adjustment of status. All benefits and limitations of this section, including those resulting from the implementation of the adjustment of status provisions of section 162(f) of Public Law 101-649, apply equally to the principal applicant and his or her accompanying spouse or child.

(B) Spouse or child residing outside the United States or ineligible for adjustment of status. A spouse or child who is ineligible to apply for adjustment of status as an accompanying spouse or child is not immediately eligible for issuance of an immigrant visa under the provisions of Public Law 101-238. However, the spouse or child may be eligible for visa issuance under other provisions of the Act.

(1) Existing relationship. A spouse or child acquired by the principal alien prior to the approval of the principal's adjustment of status application may be accorded the derivative priority date and preference category of the principal alien. The spouse or child may use the priority date and category when it becomes current, in accordance with existing limitations outlined in sections 201 and 202 of the Act. The priority date is not considered immediately available for these family members under Public Law 101-238.

(2) Relationship entered into after adjustment of status is approved. An alien who acquires lawful permanent residence under the provisions of Public Law 101-238 may file a petition under section 204 of the Act for an alien spouse, unmarried son or unmarried daughter in accordance with existing laws and regulations. The priority date is not considered immediately available for these family members under Public Law 101-238.

(3) Special immigrant juveniles. Any alien qualified for special immigrant classification under section 101(a)(27)(J) of the Act shall be deemed, for the purpose of section 245(a) of the Act, to have been paroled into the United States, regardless of the alien's actual method of entry into the United States. Neither the provisions of section 245(c)(2) nor the exclusion provisions of sections 212(a)(4), (5)(A), or (7)(A) of the Act shall apply to a qualified special immigrant under section 101(a)(27)(J) of the Act. The exclusion provisions of sections 212(a)(2)(A), (2)(B), (2)(C) (except for so much of such paragraph as related to a single offense of simple possession of 30 grams or less of marijuana), (3)(A), (3)(B), (3)(C), or (3)(E) of the Act may not be waived. Any other exclusion provision may be waived on an individual basis for humanitarian purposes, family unity, or when it is otherwise in the public interest; however, the relationship between the alien and the alien's natural parents or prior adoptive parents shall not be considered a factor in a discretionary waiver determination.

(f) Concurrent applications to overcome exclusionary grounds. *Except as provided in Parts 235 and 249 of this chapter, an application under this part shall be the sole method of requesting the exercise of discretion under section 212(g), (h), (i), and (k) of the Act, as they relate to the excludability of an alien in the United States. Any applicant for adjustment under this part may also apply for the benefits of section 212(c) of the Act, for permission to reapply after deportation or removal under section*

*212(a) (17) of the Act, and for the benefits of section 212(a) (28) (I) (ii) of the Act. No fee is required for filing an application to overcome the exclusionary grounds of the Act if filed concurrently with an application for adjustment of status under the provisions of the Act of October 28, 1977, and of this part.*

(g) Availability of immigrant visas under section 245 and priority dates—

(1) Availability of immigrant visas under section 245. An alien is ineligible for the benefits of section 245 of the Act unless an immigrant visa is immediately available to him or her at the time the application is filed. If the applicant is a preference alien, the current Department of State Bureau of Consular Affairs Visa office Bulletin will be consulted to determine whether an immigrant visa is immediately available. An immigrant visa is considered available for accepting and processing the application Form I-485 if the preference category applicant has a priority date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current), and (if the applicant is seeking status pursuant to section 203(b) of the Act) the applicant presents evidence that the appropriate petition filed on his or her behalf has been approved. An immigrant visa is also considered immediately available if the applicant establishes eligibility for the benefits of Public Law 101-238. Information concerning the immediate availability of an immigrant visa may be obtained at any Service office.

(2) Priority dates. The priority date of an applicant who is seeking the allotment of an immigrant visa number under one of the preference classes specified in section 203(a) or 203(b) of the Act by virtue of a valid visa petition approved in his or her behalf shall be fixed by the date on which such approved petition was filed.

(h) Conditional basis of status. Whenever an alien spouse (as defined in section 216(g)(1) of the Act), an alien son or daughter (as defined in section 216(g)(2) of the Act), an alien entrepreneur (as defined in section 216A(f)(1) of the Act), or an alien spouse or child (as defined in section 216A(f)(2) of the Act) is granted adjustment of status to that of lawful permanent residence, the alien shall be considered to have obtained such status on a conditional basis subject to the provisions of section 216 or 216A of the Act, as appropriate.

(Title I of Pub. L. 95-145 enacted Oct. 28, 1977 (91 Stat. 1223), sec. 103 of the Immigration and Nationality Act (8 U.S.C. 1103). Interpret or apply secs. 101, 212, 242 and 245 (8 U.S.C. 1101, 1182, 1252 and 1255))

[30 FR 14778, Nov. 30, 1965, as amended at 31 FR 535; Jan. 15, 1966; 31 FR 2373, Feb. 4, 1966; 31 FR 15235, Dec. 6, 1966; 32 FR 9632, July 4, 1967; 35 FR 5960, Apr. 10, 1970; 41 FR 55850, Dec. 29, 1976; 43 FR 18644, May 2, 1978; 45 FR 37396, June 2, 1980; 45 FR 69429, Oct. 21, 1980; 46 FR 25598, May 8, 1981; 47 FR 12133, Mar. 22, 1982; 47 FR 44237, Oct. 7, 1982; 52 FR 6321, March 3, 1987; 52 FR 48084, Dec. 18, 1987; 53 FR 24903, June 30, 1988; 53 FR 30022, Aug. 10, 1988; 54 FR 29441, July 12, 1989; 54 FR 47676, Nov. 16, 1989; 55 FR 10397, March 21, 1990; 56 FR 28040, June 19, 1991; 56 FR 28313, June 20, 1991; 56 FR 49840, Oct. 2, 1991; 57 FR 56812, 56813, Dec. 1, 1992; 58 FR 42851, Aug. 12, 1993; 59 FR 51095, Oct. 7, 1994; 60 FR 26683, May 18, 1995; 60 FR 34090, June 30, 1995; 60 FR 44269, Aug. 25, 1995]

<<PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE>>

Authority: 8 U.S.C. 1101, 1103, 1182, 1255; 8 CFR part 2.

Source: 52 FR 34764, Sept. 15, 1987; 52 FR 48084, Dec. 18, 1987; 53 FR 24903, June 30, 1988; 53 FR 30022, Aug. 10, 1988; 54 FR 29441, July 12, 1989; 54 FR 47348, Nov. 14, 1989; 54 FR 47968, Nov. 20, 1989; 57 FR 56812, Dec. 1, 1992; 60 FR 34090, June 30, 1995, unless otherwise noted.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.00487   7

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 270. Penalties for Document Fraud (Refs & Annos)

8 C.F.R. § 270.2

§ 270.2 Enforcement procedures.

Effective: November 28, 2011
Currentness

(a) Procedures for the filing of complaints. Any person or entity having knowledge of a violation or potential violation of section 274C of the Act may submit a signed, written complaint to the Service office having jurisdiction over the business or residence of the potential violator or the location where the violation occurred. The signed, written complaint must contain sufficient information to identify both the complainant and the alleged violator, including their names and addresses. The complaint should also contain detailed factual allegations relating to the potential violation including the date, time and place of the alleged violation and the specific act or conduct alleged to constitute a violation of the Act. Written complaints may be delivered either by mail to the appropriate Service office or by personally appearing before any immigration officer at a Service office.

(b) Investigation. When the Service receives complaints from a third party in accordance with paragraph (a) of this section, it shall investigate only those complaints which, on their face, have a substantial probability of validity. The Service may also conduct investigations for violations on its own initiative, and without having received a written complaint. If it is determined after investigation that the person or entity has violated section 274C of the Act, the Service may issue and serve upon the alleged violator a Notice of Intent to Fine.

(c) Issuance of a subpoena. Service officers shall have reasonable access to examine any relevant evidence of any person or entity being investigated. The Service may issue subpoenas pursuant to its authority under sections 235(a) and 287 of the Act, in accordance with the procedures set forth in § 287.4 of this chapter.

(d) Notice of Intent to Fine. The proceeding to assess administrative penalties under section 274C of the Act is commenced when the Service issues a Notice of Intent to Fine. Service of this notice shall be accomplished by personal service pursuant to 8 CFR 103.8(a)(2). Service is effective upon receipt, as evidenced by the certificate of service or the certified mail return receipt. The person or entity identified in the Notice of Intent to Fine shall be known as the respondent. The Notice of Intent to Fine may be issued by an officer defined in § 242.1 of this chapter or by an INS port director designated by his or her district director.

(e) Contents of the Notice of Intent to Fine.

(1) The Notice of Intent to Fine shall contain the basis for the charge(s) against the respondent, the statutory provisions alleged to have been violated, and the monetary amount of the penalty the Service intends to impose.

(2) The Notice of Intent to Fine shall provide the following advisals to the respondent:

(i) That the person or entity has the right to representation by counsel of his or her own choice at no expense to the government;

(ii) That any statement given may be used against the person or entity;

(iii) That the person or entity has the right to request a hearing before an administrative law judge pursuant to 5 U.S.C. 554–557, and that such request must be filed with INS within 60 days from the service of the Notice of Intent to Fine; and

(iv) That if a written request for a hearing is not timely filed, the Service will issue a final order from which there is no appeal.

(f) Request for hearing before an administrative law judge. If a respondent contests the issuance of a Notice of Intent to Fine, the respondent must file with the INS, within 60 days of the Notice of Intent to Fine, a written request for a hearing before an administrative law judge. Any written request for a hearing submitted in a foreign language must be accompanied by an English language translation. A request for hearing is deemed filed when it is either received by the Service office designated in the Notice of Intent to Fine, or addressed to such office, stamped with the proper postage, and postmarked within the 60–day period. In computing the 60–day period prescribed by this section, the day of service of the Notice of Intent to Fine shall not be included. In the request for a hearing, the respondent may, but is not required to, respond to each allegation listed in the Notice of Intent to Fine. A respondent may waive the 60–day period in which to request a hearing before an administrative law judge and ask that the INS issue a final order from which there is no appeal. Prior to execution of the waiver, a respondent who is not a United States citizen will be advised that a waiver of a section 274C hearing will result in the issuance of a final order and that the respondent will be excludable and/or deportable from the United States pursuant to the Act.

(g) Failure to file a request for hearing. If the respondent does not file a written request for a hearing within 60 days of service of the Notice of Intent to Fine, the INS shall issue a final order from which there shall be no appeal.

(h) Issuance of the final order. A final order may be issued by an officer defined in § 242.1 of this chapter, by an INS port director designated by his or her district director, or by the Director of the INS National Fines Office.

(i) Service of the final order—

(1) Generally. Service of the final order shall be accomplished by personal service pursuant to 8 CFR 103.8(a)(2). Service is effective upon receipt, as evidenced by the certificate of service or the certified mail return receipt.

(2) Alternative provisions for service in a foreign country. When service is to be effected upon a party in a foreign country, it is sufficient if service of the final order is made:

(i) In the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or

(ii) As directed by the foreign authority in response to a letter rogatory, when service in either case is reasonably calculated to give actual notice; or

(iii) When applicable, pursuant to § 103.5a(a)(2) of this chapter.

Service is effective upon receipt of the final order. Proof of service may be made as prescribed by the law of the foreign country, or, when service is pursuant to § 103.5a(a)(2) of this chapter, as evidenced by the certificate of service or the certified mail return receipt.

(j) Declination to file charges for document fraud committed by refugees at the time of entry. The Service shall not issue a Notice of Intent to Fine for acts of document fraud committed by an alien pursuant to direct departure from a country in which the alien has a well-founded fear of persecution or from which there is a significant danger that the alien would be returned to a country in which the alien would have a well-founded fear of persecution, provided that the alien has presented himself or herself without delay to an INS officer and shown good cause for his or her illegal entry or presence. Other acts of document fraud committed by such an alien may result in the issuance of a Notice of Intent to Fine and the imposition of civil money penalties.

[76 FR 53796, Aug. 29, 2011]

SOURCE: 57 FR 33866, July 31, 1992; 64 FR 47101, Aug. 30, 1999; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 81 FR 43001, July 1, 2016, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, and 1324c; Pub.L. 101–410, 104 Stat. 890, as amended by Pub.L. 104–134, 110 Stat. 1321 and Pub.L. 114–74, 129 Stat. 599.

Notes of Decisions (2)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by  Casa de Maryland, Inc. v. Wolf,  D.Md.,  Sep. 11, 2020

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

---

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter I. Department of Homeland Security (Refs & Annos)
      Subchapter B. Immigration Regulations
        Part 274a. Control of Employment of Aliens (Refs & Annos)
          Subpart B. Employment Authorization

---

8 C.F.R. § 274a.12

§ 274a.12 Classes of aliens authorized to accept employment.

Effective: October 2, 2020

Currentness

<Casa de Maryland, Inc. v. Wolf, __ F.Supp.3d __, 2020 WL 5500165 (D. MD. 2020), preliminarily enjoined enforcement of the amendments to this section by 85 FR 38532-01 against members of plaintiff-organizations with associational standing.>

(a) Aliens authorized employment incident to status. Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes. Any alien who is within a class of aliens described in paragraphs (a)(3), (a)(4), (a)(6)–(a)(8), (a)(10)–(a)(15), or (a)(20) of this section, and who seeks to be employed in the United States, must apply to U.S. Citizenship and Immigration Services (USCIS) for a document evidencing such employment authorization. USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States.

(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I–551 issued by the Service. An expiration date on the Form I–551 reflects only that the card must be renewed, not that the bearer's work authorization has expired;

(2) An alien admitted to the United States as a lawful temporary resident pursuant to sections 245A or 210 of the Act, as evidenced by an employment authorization document issued by the Service;

(3) An alien admitted to the United States as a refugee pursuant to section 207 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(4) An alien paroled into the United States as a refugee for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

AR.00491

(5) An alien granted asylum under section 208 of the Act for the period of time in that status, as evidenced by an employment authorization document, issued by USCIS to the alien. An expiration date on the employment authorization document issued by USCIS reflects only that the document must be renewed, and not that the bearer's work authorization has expired. Evidence of employment authorization shall be granted in increments not exceeding 5 years for the period of time the alien remains in that status.

(6) An alien admitted to the United States as a nonimmigrant fiancé or fiancée pursuant to section 101(a)(15)(K)(i) of the Act, or an alien admitted as a child of such alien, for the period of admission in that status, as evidenced by an employment authorization document issued by the Service;

(7) An alien admitted as a parent (N–8) or dependent child (N–9) of an alien granted permanent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a nonimmigrant pursuant to the Compact of Free Association between the United States and of the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau;

(9) Any alien admitted as a nonimmigrant spouse pursuant to section 101(a)(15)(K)(ii) of the Act, or an alien admitted as a child of such alien, for the period of admission in that status, as evidenced by an employment authorization document, with an expiration date issued by the Service;

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(11) An alien whose enforced departure from the United States has been deferred in accordance with a directive from the President of the United States to the Secretary. Employment is authorized for the period of time and under the conditions established by the Secretary pursuant to the Presidential directive;

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(13) An alien granted voluntary departure by the Attorney General under the Family Unity Program established by section 301 of the Immigration Act of 1990, as evidenced by an employment authorization document issued by the Service;

(14) An alien granted Family Unity benefits under section 1504 of the Legal Immigrant Family Equity (LIFE) Act Amendments, Public Law 106–554, and the provisions of 8 CFR part 245a, Subpart C of this chapter, as evidenced by an employment authorization document issued by the Service;

(15) Any alien in V nonimmigrant status as defined in section 101(a)(15)(V) of the Act and 8 CFR 214.15.

(16) Any alien in T–1 nonimmigrant status, pursuant to 8 CFR 214.11, for the period in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(17), (18) [Reserved by 72 FR 53041]

(19) Any alien in U–1 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(20) Any alien in U–2, U–3, U–4, or U–5 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(b) Aliens authorized for employment with a specific employer incident to status or parole. The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole or of their admission in, or subsequent change to, the designated nonimmigrant classification. An alien in one of these classes is not issued an employment authorization document by DHS:

(1) A foreign government official (A–1 or A–2), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government entity;

(2) An employee of a foreign government official (A–3), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government official;

(3) A foreign government official in transit (C–2 or C–3), pursuant to § 214.2(c) of this chapter. An alien in this status may be employed only by the foreign government entity;

(4) [Reserved]

(5) A nonimmigrant treaty trader (E–1) or treaty investor (E–2), pursuant to § 214.2(e) of this chapter. An alien in this status may be employed only by the treaty-qualifying company through which the alien attained the status. Employment authorization does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E–1" or "E–2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant (F–1) student who is in valid nonimmigrant student status and pursuant to 8 CFR 214.2(f) is seeking:

(i) On-campus employment for not more than twenty hours per week when school is in session or full-time employment when school is not in session if the student intends and is eligible to register for the next term or session. Part-time on-campus employment is authorized by the school and no specific endorsement by a school official or Service officer is necessary;

(ii) [Reserved]

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(iii) Curricular practical training (internships, cooperative training programs, or work-study programs which are part of an established curriculum) after having been enrolled full-time in a Service approved institution for one full academic year. Curricular practical training (part-time or full-time) is authorized by the Designated School Official on the student's Form I–20. No Service endorsement is necessary.

(iv) An Employment Authorization Document, Form I–766 or successor form, under paragraph (c)(3)(i)(C) of this section based on a STEM Optional Practical Training extension, and whose timely filed Form I–765 or successor form is pending and employment authorization and accompanying Form I–766 or successor form issued under paragraph (c)(3)(i)(B) of this section have expired. Employment is authorized beginning on the expiration date of the Form I–766 or successor form issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current Form I–765 or successor form, but not to exceed 180 days. For this same period, such Form I–766 or successor form is automatically extended and is considered unexpired when combined with a Certificate of Eligibility for Nonimmigrant (F–1/M–1) Students, Form I–20 or successor form, endorsed by the Designated School Official recommending such an extension; or

(v) Pursuant to 8 CFR 214.2(h) is seeking H–1B nonimmigrant status and whose duration of status and employment authorization have been extended pursuant to 8 CFR 214.2(f)(5)(vi).

(7) A representative of an international organization (G–1, G–2, G–3, or G–4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G–5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker pursuant to sections 101(a)(15)(H)(i)(b)(1), 101(a)(15)(H)(i)(a), 101(a)(15)(H)(ii)(b) and INA 101(a)(15)(H)(iii) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization must file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H);

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extend to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J–1), pursuant to § 214.2(j) of this chapter and 22 CFR part 62. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program

approved by the Department of State as set forth in the Form DS–2019, Certificate of Eligibility, issued by the program sponsor;

(12) An intra-company transferee (L–1), pursuant to § 214.2(1) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), pursuant to 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), pursuant to 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

(15) An international cultural exchange visitor (Q–1), according to § 214.2(q)(1) of this chapter. An alien may only be employed by the petitioner through whom the status was obtained;

(16) An alien having a religious occupation, pursuant to § 214.2(r) of this chapter. An alien in this status may be employed only by the religious organization through whom the status was obtained;

(17) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO–1, NATO–2, NATO–3, NATO–4, NATO–5 and NATO–6), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by NATO;

(18) An attendant, servant or personal employee (NATO–7) of an alien admitted as a NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6, pursuant to § 214.2(o) of this chapter. An alien admitted under this classification may be employed only by the NATO alien through whom the status was obtained;

(19) A nonimmigrant pursuant to section 214(e) of the Act. An alien in this status must be engaged in business activities at a professional level in accordance with the provisions of Chapter 16 of the North American Free Trade Agreement (NAFTA);

(20) A nonimmigrant alien within the class of aliens described in paragraphs (b)(2), (b)(5), (b)(8), (b)(9), (b)(10), (b)(11), (b)(12), (b)(13), (b)(14), (b)(16), (b)(19), (b)(23) and (b)(25) of this section whose status has expired but on whose behalf an application for an extension of stay was timely filed pursuant to § 214.2 or § 214.6 of this chapter. These aliens are

authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay. Such authorization shall be subject to any conditions and limitations noted on the initial authorization. However, if the district director or service center director adjudicates the application prior to the expiration of this 240 day period and denies the application for extension of stay, the employment authorization under this paragraph shall automatically terminate upon notification of the denial decision;

(21) A nonimmigrant alien within the class of aliens described in 8 CFR 214.2(h)(1)(ii)(C) who filed an application for an extension of stay pursuant to 8 CFR 214.2 during his or her period of admission. Such alien is authorized to be employed by a new employer that has filed an H–2A petition naming the alien as a beneficiary and requesting an extension of stay for the alien for a period not to exceed 120 days beginning from the "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition requesting an extension of stay, provided that the employer has enrolled in and is a participant in good standing in the E–Verify program, as determined by USCIS in its discretion. Such authorization will be subject to any conditions and limitations noted on the initial authorization, except as to the employer and place of employment. However, if the District Director or Service Center director adjudicates the application prior to the expiration of this 120–day period and denies the application for extension of stay, the employment authorization under this paragraph (b)(21) shall automatically terminate upon 15 days after the date of the denial decision. The employment authorization shall also terminate automatically if the employer fails to remain a participant in good standing in the E–Verify program, as determined by USCIS in its discretion;

(22) An alien in E–2 CNMI Investor nonimmigrant status pursuant to 8 CFR 214.2(e)(23). An alien in this status may be employed only by the qualifying company through which the alien attained the status. An alien in E–2 CNMI Investor nonimmigrant status may be employed only in the Commonwealth of the Northern Mariana Islands for a qualifying entity. An alien who attained E–2 CNMI Investor nonimmigrant status based upon a Foreign Retiree Investment Certificate or Certification is not employment-authorized. Employment authorization does not extend to the dependents of the principal investor (also designated E–2 CNMI Investor nonimmigrants) other than those specified in paragraph (c)(12) of this section;

(23) A Commonwealth of the Northern Mariana Islands transitional worker (CW–1) pursuant to 8 CFR 214.2(w). An alien in this status may be employed only in the CNMI during the transition period, and only by the petitioner through whom the status was obtained, or as otherwise authorized by 8 CFR 214.2(w).

(24) [Reserved by 85 FR 29317]

(25) A nonimmigrant treaty alien in a specialty occupation (E–3) pursuant to section 101(a)(15)(E)(iii) of the Act; or

<Text of subsection (b)(26) added by 85 FR 51312, effective Aug. 19, 2020 through Aug. 19, 2023. >

(26)(i) Pursuant to 8 CFR 214.2(h)(21) and notwithstanding 8 CFR 214.2(h)(2)(i)(D) and paragraph (b)(21) of this section, an alien is authorized to be employed, but no earlier than the start date of employment indicated in the H–2A petition, by a new employer that has filed an H–2A petition naming the alien as a beneficiary and requesting an extension of stay for the alien, for a period not to exceed 45 days beginning from the "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition requesting an extension of stay, or 45 days beginning on the start date of employment if the start date of employment indicated in the H–2A petition occurs after the filing. The length of the period (up to 45 days) is to be determined by USCIS in its discretion. However, if USCIS adjudicates the petition prior to the expiration of this 45–day period and denies the petition for extension of stay, or if the petitioner withdraws the petition before the

AR.00496

expiration of the 45–day period, the employment authorization under this paragraph (b)(26) will automatically terminate upon 15 days after the date of the denial decision or the date on which the petition is withdrawn.

(ii) Authorization to initiate employment changes pursuant to 8 CFR 214.2(h)(21) and paragraph (b)(26)(i) of this section begins at 12 a.m. on August 19, 2020, and ends at the end of December 17, 2020.

<Text of subsection (b)(27) added by 85 FR 28851, effective May 14, 2020 through May 15, 2023. >

(27)(i) Pursuant to 8 CFR 214.2(h)(23) and notwithstanding 8 CFR 214.2(h)(2)(i)(D) and the second sentence of 8 CFR 274a.12(b)(9), an alien is authorized to be employed, beginning no later than the start date of employment indicated in the H–2B petition and no earlier than May 14, 2020, by a new employer that has filed an H–2B petition, which includes the attestation described in 8 CFR 214.2(h)(23)(v)(A) naming the alien as a beneficiary and requesting an extension of stay for the alien. The authorization is for a period not to exceed 60 days beginning on the later of the following three dates: The "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition requesting the extension of stay, which includes the attestation described in 8 CFR 214.2(h)(23)(v)(A); the date on which USCIS acknowledges in writing the receipt of the properly filed attestation described in 8 CFR 214.2(h)(23)(v)(A) submitted while the H–2B petition is pending; or the start date of employment if the start date of employment indicated in the H–2B petition occurs after the filing. However, if USCIS adjudicates the petition prior to the expiration of this 60–day period and denies the petition for extension of stay, or if the petitioner withdraws the petition before the expiration of the 60–day period, the employment authorization under this paragraph (b)(27) will automatically terminate 15 days after the date of the denial decision or 15 days after the date on which the petition is withdrawn. Nothing in this section is intended to alter the availability of employment authorization related to professional H–2B athletes who are traded between organizations pursuant to paragraph (b)(9) of this section and 8 CFR 214.2(h)(6)(vii).

(ii) Authorization to initiate employment changes pursuant to 8 CFR 214.2(h)(23)(ii) and (iii) and this paragraph (b)(27) begins at 12 a.m. on May 14, 2020, and ends at the end of September 11, 2020.

(28) to (36) [Reserved]

(37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240–day period and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

(c) Aliens who must apply for employment authorization. An alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions stated in the regulations or cited on the employment authorization document. USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending, unless otherwise provided in this chapter.

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:

(i)(A) Is seeking pre-completion practical training pursuant to 8 CFR 214.2(f)(10)(ii)(A)(1) and (2);

(B) Is seeking authorization to engage in up to 12 months of post-completion Optional Practical Training (OPT) pursuant to 8 CFR 214.2(f)(10)(ii)(A)(3); or

(C) Is seeking a 24–month OPT extension pursuant to 8 CFR 214.2(f)(10)(ii)(C);

(ii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) and who presents a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship. The F–1 student must also present a Form I–20 ID or SEVIS Form I–20 with employment page completed by DSO certifying eligibility for employment; or

(iii) Is seeking employment because of severe economic hardship pursuant to 8 CFR 214.2(f)(9)(ii)(C) and has filed the Form I–20 ID and Form I–538 (for non–SEVIS schools), or SEVIS Form I–20 with employment page completed by the DSO certifying eligibility, and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization.

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

(5) An alien spouse or minor child of an exchange visitor (J–2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M–1) student seeking employment for practical training pursuant to 8 CFR 214.2(m) following completion of studies. The alien may be employed only in an occupation or vocation directly related to his or her course of study as recommended by the endorsement of the designated school official on the I–20 ID;

(7) A dependent of an alien classified as NATO–1 through NATO–7 pursuant to § 214.2(n) of this chapter;

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR parts 103 and 208, whose application has not been decided, and who is eligible to apply for employment authorization under 8 CFR 208.7 because the 365–day period set forth in that section has expired. Employment authorization may be

granted according to the provisions of 8 CFR 208.7 of this chapter in increments to be determined by USCIS but not to exceed increments of two years.

(9) An alien who has filed an application for adjustment of status to lawful permanent resident pursuant to part 245 of this chapter. For purposes of section 245(c)(8) of the Act, an alien will not be deemed to be an "unauthorized alien" as defined in section 274A(h)(3) of the Act while his or her properly filed Form I–485 application is pending final adjudication, if the alien has otherwise obtained permission from the Service pursuant to 8 CFR 274a.12 to engage in employment, or if the alien had been granted employment authorization prior to the filing of the adjustment application and such authorization does not expire during the pendency of the adjustment application. Upon meeting these conditions, the adjustment applicant need not file an application for employment authorization to continue employment during the period described in the preceding sentence;

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the Act, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Pub.L. 104–208 (110 Stat. 3009–625) (as amended by the Nicaraguan Adjustment and Central American Relief Act (NACARA)), title II of Pub.L. 105–100 (111 Stat. 2160, 2193) and whose properly filed application has been accepted by the Service or EOIR;

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section, 8 CFR 212.19(h)(4), and except for aliens paroled from custody after having established a credible fear or reasonable fear of persecution or torture under 8 CFR 208.30, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

(12) An alien spouse of a long-term investor in the Commonwealth of the Northern Mariana Islands (E–2 CNMI Investor) other than an E–2 CNMI investor who obtained such status based upon a Foreign Retiree Investment Certificate, pursuant to 8 CFR 214.2(e)(23). An alien spouse of an E–2 CNMI Investor is eligible for employment in the CNMI only;

(13) [Reserved]

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) [Reserved]

(16) Any alien who has filed an application for creation of record of lawful admission for permanent residence pursuant to part 249 of this chapter;

(17) A nonimmigrant visitor for business (B–1) who:

(i) Is a personal or domestic servant who is accompanying or following to join an employer who seeks admission into, or is already in, the United States as a nonimmigrant defined under sections 101(a)(15)(B), (E), (F), (H), (I), (J), (L) or section 214(e) of the Act. The personal or domestic servant shall have a residence abroad which he or she has no intention

of abandoning and shall demonstrate at least one year's experience as a personal or domestic servant. The nonimmigrant's employer shall demonstrate that the employer/employee relationship has existed for at least one year prior to the employer's admission to the United States; or, if the employer/employee relationship existed for less than one year, that the employer has regularly employed (either year-round or seasonally) personal or domestic servants over a period of several years preceding the employer's admission to the United States;

(ii) Is a domestic servant of a United States citizen accompanying or following to join his or her United States citizen employer who has a permanent home or is stationed in a foreign country, and who is visiting temporarily in the United States. The employer/employee relationship shall have existed prior to the commencement of the employer's visit to the United States; or

(iii) Is an employee of a foreign airline engaged in international transportation of passengers freight, whose position with the foreign airline would otherwise entitle the employee to classification under section 101(a)(15)(E)(i) of the Immigration and Nationality Act, and who is precluded from such classification solely because the employee is not a national of the country of the airline's nationality or because there is no treaty of commerce and navigation in effect between the United States and the country of the airline's nationality.

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

(19) An alien applying for Temporary Protected Status pursuant to section 244 of the Act shall apply for employment authorization only in accordance with the procedures set forth in part 244 of this chapter.

(20) Any alien who has filed a completed legalization application pursuant to section 210 of the Act (and part 210 of this chapter).

(21) A principal nonimmigrant witness or informant in S classification, and qualified dependent family members.

(22) Any alien who has filed a completed legalization application pursuant to section 245A of the Act (and part 245a of this chapter). Employment authorization shall be granted in increments not exceeding 1 year during the period the application is pending (including any period when an administrative appeal is pending) and shall expire on a specified date.

(23) [Reserved by 76 FR 53796]

(24) An alien who has filed an application for adjustment pursuant to section 1104 of the LIFE Act, Public Law 106–553, and the provisions of 8 CFR part 245a, Subpart B of this chapter.

(25) Any alien in T–2, T–3, T–4, T–5, or T–6 nonimmigrant status, pursuant to 8 CFR 214.11, for the period in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(26) An H–4 nonimmigrant spouse of an H–1B nonimmigrant described as eligible for employment authorization in 8 CFR 214.2(h)(9)(iv).

(27) to (33) [Reserved]

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

(35) An alien who is the principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

(36) A spouse or child of a principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

(d) An alien lawfully enlisted in one of the Armed Forces, or whose enlistment the Secretary with jurisdiction over such Armed Force has determined would be vital to the national interest under 10 U.S.C. 504(b)(2), is authorized to be employed by that Armed Force in military service, if such employment is not otherwise authorized under this section and the immigration laws. An alien described in this section is not issued an employment authorization document.

(e) Basic criteria to establish economic necessity. Title 45—Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under § 274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.

**Credits**

[53 FR 8614, March 16, 1988; 53 FR 46855, Nov. 21, 1988; 54 FR 16, Jan. 3, 1989; 54 FR 48577, Nov. 24, 1989; 55 FR 5576, Feb. 16, 1990; 55 FR 25935, 25936, June 25, 1990; 56 FR 624, Jan. 7, 1991; 56 FR 23496, 23499, May 22, 1991; 56 FR 41782, 41786, 41787, Aug. 23, 1991; 56 FR 55616, Oct. 29, 1991; 57 FR 6462, Feb. 25, 1992; 57 FR 31956, July 20, 1992; 57 FR 42884, Sept. 17, 1992; 58 FR 48780, Sept. 20, 1993; 58 FR 69217, Dec. 30, 1993; 59 FR 42487, Aug. 15, 1994; 59 FR 47063, Sept. 14, 1994; 59 FR 52894, Oct. 20, 1994; 59 FR 62302, Dec. 5, 1994; 60 FR 14353, March 17, 1995; 60 FR 21976, May 4, 1995; 60 FR 44271, Aug. 25, 1995; 60 FR 66067, 66069, Dec. 21, 1995; 61 FR 46537, Sept. 4, 1996; 62 FR 10389, March 6,

1997; 62 FR 18514, April 16, 1997; 62 FR 39425, July 23, 1997; 62 FR 46553, Sept. 3, 1997; 63 FR 1334, Jan. 9, 1998; 63 FR 27833, May 21, 1998; 63 FR 63597, Nov. 16, 1998; 64 FR 25773, May 12, 1999; 64 FR 27881, May 21, 1999; 65 FR 14780, March 17, 2000; 65 FR 15844, 15846, 15854, March 24, 2000; 65 FR 43680, July 14, 2000; 66 FR 29681, June 1, 2001; 66 FR 42595, Aug. 14, 2001; 66 FR 46704, Sept. 7, 2001; 67 FR 4803, Jan. 31, 2002; 67 FR 38350, June 4, 2002; 67 FR 76280, Dec. 11, 2002; 69 FR 45557, July 30, 2004; 69 FR 47763, Aug. 6, 2004; 72 FR 53041, Sept. 17, 2007; 73 FR 18956, April 8, 2008; 73 FR 76914, Dec. 18, 2008; 74 FR 7995, Feb. 23, 2009; 74 FR 26515, June 3, 2009; 74 FR 55111, Oct. 27, 2009; 74 FR 55740, Oct. 28, 2009; 75 FR 47701, Aug. 9, 2010; 75 FR 58990, Sept. 24, 2010; 75 FR 79277, Dec. 20, 2010; 76 FR 53796, Aug. 29, 2011; 76 FR 55538, Sept. 7, 2011; 80 FR 10311, Feb. 25, 2015; 81 FR 2084, Jan. 15, 2016; 81 FR 13121, March 11, 2016; 81 FR 82491, Nov. 18, 2016; 81 FR 92312, Dec. 19, 2016; 82 FR 5289, Jan. 17, 2017; 82 FR 31887, July 11, 2017; 85 FR 21744, April 20, 2020; 85 FR 28851, May 14, 2020; 85 FR 29317, May 14, 2020; 85 FR 38628, June 26, 2020; 85 FR 46928, Aug. 3, 2020; 85 FR 51312, Aug. 20, 2020]

SOURCE: 52 FR 16221, May 1, 1987; 52 FR 43052, Nov. 9, 1987; 53 FR 8612, March 16, 1988; 55 FR 5576, Feb. 16, 1990; 57 FR 6462, Feb. 25, 1992; 57 FR 42884, Sept. 17, 1992; 64 FR 47101, Aug. 30, 1999; 66 FR 42595, Aug. 14, 2001; 66 FR 46704, Sept. 7, 2001; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 73 FR 10136, Feb. 26, 2008; 74 FR 55739, Oct. 28, 2009; 75 FR 79277, Dec. 20, 2010; 81 FR 43002, July 1, 2016; 85 FR 29317, May 14, 2020; 85 FR 38628, June 26, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub.L. 101–410, 104 Stat. 890, as amended by Pub.L. 114–74, 129 Stat. 599.

Notes of Decisions (19)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Adopted Regulation

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
Title 8. Aliens and Nationality
Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
Subchapter A. General Provisions (Refs & Annos)
Part 1003. Executive Office for Immigration Review (Refs & Annos)
Subpart A. Board of Immigration Appeals

8 C.F.R. § 1003.1

§ 1003.1 Organization, jurisdiction, and powers of the Board of Immigration Appeals.

Effective: April 1, 2020
Currentness

(a)(1) Organization. There shall be in the Department of Justice a Board of Immigration Appeals, subject to the general supervision of the Director, Executive Office for Immigration Review (EOIR). The Board members shall be attorneys appointed by the Attorney General to act as the Attorney General's delegates in the cases that come before them. The Board shall consist of 23 members. A vacancy, or the absence or unavailability of a Board member, shall not impair the right of the remaining members to exercise all the powers of the Board. The Board members shall also be known as Appellate Immigration Judges.

(2) Chairman. The Attorney General shall designate one of the Board members to serve as Chairman. The Attorney General may designate one or two Vice Chairmen to assist the Chairman in the performance of his duties and to exercise all of the powers and duties of the Chairman in the absence or unavailability of the Chairman. The Chairman of the Board of Immigration Appeals shall also be known as the Chief Appellate Immigration Judge, and a Vice Chairman of the Board of Immigration Appeals shall also be known as a Deputy Chief Appellate Immigration Judge.

(i) The Chairman, subject to the supervision of the Director, shall direct, supervise, and establish internal operating procedures and policies of the Board. The Chairman shall have authority to:

(A) Issue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities;

(B) Provide for appropriate training of Board members and staff on the conduct of their powers and duties;

(C) Direct the conduct of all employees assigned to the Board to ensure the efficient disposition of all pending cases, including the power, in his discretion, to set priorities or time frames for the resolution of cases; to direct that the adjudication of certain cases be deferred, to regulate the assignment of Board members to cases, and otherwise to manage the docket of matters to be decided by the Board;

(D) Evaluate the performance of the Board by making appropriate reports and inspections, and take corrective action where needed;

(E) Adjudicate cases as a Board member; and

(F) Exercise such other authorities as the Director may provide.

(ii) The Chairman shall have no authority to direct the result of an adjudication assigned to another Board member or to a panel; provided, however, that nothing in this section shall be construed to limit the management authority of the Chairman under paragraph (a)(2)(i) of this section.

(3) Panels. The Chairman shall divide the Board into three-member panels and designate a presiding member of each panel if the Chairman or Vice Chairman is not assigned to the panel. The Chairman may from time to time make changes in the composition of such panels and of presiding members. Each three-member panel shall be empowered to decide cases by majority vote, and a majority of the Board members assigned to the panel shall constitute a quorum for such panel. In addition, the Chairman shall assign any number of Board members, as needed, to serve on the screening panel to implement the case management process as provided in paragraph (e) of this section.

(4) Temporary Board members. The Director may in his discretion designate immigration judges, retired Board members, retired immigration judges, and administrative law judges employed within, or retired from, EOIR to act as temporary Board members for terms not to exceed six months. In addition, with the approval of the Deputy Attorney General, the Director may designate one or more senior EOIR attorneys with at least ten years of experience in the field of immigration law to act as temporary Board members for terms not to exceed six months. A temporary Board member shall have the authority of a Board member to adjudicate assigned cases, except that temporary Board members shall not have the authority to vote on any matter decided by the Board en banc. Temporary Board members shall also be known as temporary Appellate Immigration Judges.

(5) En banc process. A majority of the permanent Board members shall constitute a quorum for purposes of convening the Board en banc. The Board may on its own motion by a majority vote of the permanent Board members, or by direction of the Chairman, consider any case en banc, or reconsider as the Board en banc any case that has been considered or decided by a three-member panel. En banc proceedings are not favored, and shall ordinarily be ordered only where necessary to address an issue of particular importance or to secure or maintain consistency of the Board's decisions.

(6) Board staff. There shall also be attached to the Board such number of attorneys and other employees as the Deputy Attorney General, upon recommendation of the Director, shall from time to time direct.

(7) [Reserved]

(b) Appellate jurisdiction. Appeals may be filed with the Board of Immigration Appeals from the following:

(1) Decisions of Immigration Judges in exclusion cases, as provided in 8 CFR part 240, subpart D.

(2) Decisions of Immigration Judges in deportation cases, as provided in 8 CFR part 1240, subpart E, except that no appeal shall lie seeking review of a length of a period of voluntary departure granted by an Immigration Judge under section 244E of the Act as it existed prior to April 1, 1997.

(3) Decisions of Immigration Judges in removal proceedings, as provided in 8 CFR part 1240, except that no appeal shall lie seeking review of the length of a period of voluntary departure granted by an immigration judge under section 240B of the Act or part 240 of this chapter.

(4) Decisions involving administrative fines and penalties, including mitigation thereof, as provided in part 280 of this chapter.

(5) Decisions on petitions filed in accordance with section 204 of the act (except petitions to accord preference classifications under section 203(a)(3) or section 203(a)(6) of the act, or a petition on behalf of a child described in section 101(b)(1)(F) of the act), and decisions on requests for revalidation and decisions revoking the approval of such petitions, in accordance with section 205 of the act, as provided in parts 204 and 205, respectively, of 8 CFR chapter I or parts 1204 and 1205, respectively, of this chapter.

(6) Decisions on applications for the exercise of the discretionary authority contained in section 212(d)(3) of the act as provided in part 1212 of this chapter.

(7) Determinations relating to bond, parole, or detention of an alien as provided in 8 CFR part 1236, subpart A.

(8) Decisions of Immigration Judges in rescission of adjustment of status cases, as provided in part 1246 of this chapter.

(9) Decisions of Immigration Judges in asylum proceedings pursuant to § 1208.2(b) of this chapter.

(10) Decisions of Immigration Judges relating to Temporary Protected Status as provided in 8 CFR part 1244.

(11) [Reserved by 80 FR 59510]

(12) Decisions of Immigration Judges on applications for adjustment of status referred on a Notice of Certification (Form I–290C) to the Immigration Court in accordance with §§ 1245.13(n)(2) and 1245.15(n)(3) of this chapter or remanded to the Immigration Court in accordance with §§ 1245.13(d)(2) and 1245.15(e)(2) of this chapter.

(13) Decisions of adjudicating officials in disciplinary proceedings involving practitioners or recognized organizations as provided in subpart G of this part.

AR.00505

(14) Decisions of immigration judges regarding custody of aliens subject to a final order of removal made pursuant to § 1241.14 of this chapter.

(c) Jurisdiction by certification. The Commissioner, or any other duly authorized officer of the Service, any Immigration Judge, or the Board may in any case arising under paragraph (b) of this section certify such case to the Board. The Board in its discretion may review any such case by certification without regard to the provisions of § 1003.7 if it determines that the parties have already been given a fair opportunity to make representations before the Board regarding the case, including the opportunity request oral argument and to submit a brief.

(d) Powers of the Board—

(1) Generally. The Board shall function as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it. The Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations. In addition, the Board, through precedent decisions, shall provide clear and uniform guidance to the Service, the immigration judges, and the general public on the proper interpretation and administration of the Act and its implementing regulations.

(i) The Board shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General (through review of a decision of the Board, by written order, or by determination and ruling pursuant to section 103 of the Act).

(ii) Subject to these governing standards, Board members shall exercise their independent judgment and discretion in considering and determining the cases coming before the Board, and a panel or Board member to whom a case is assigned may take any action consistent with their authorities under the Act and the regulations as is appropriate and necessary for the disposition of the case.

(2) Summary dismissal of appeals—

(i) Standards. A single Board member or panel may summarily dismiss any appeal or portion of any appeal in any case in which:

(A) The party concerned fails to specify the reasons for the appeal on Form EOIR–26 or Form EOIR–29 (Notices of Appeal) or other document filed therewith;

(B) The only reason for the appeal specified by the party concerned involves a finding of fact or a conclusion of law that was conceded by that party at a prior proceeding;

(C) The appeal is from an order that granted the party concerned the relief that had been requested;

(D) The Board is satisfied, from a review of the record, that the appeal is filed for an improper purpose, such as to cause unnecessary delay, or that the appeal lacks an arguable basis in fact or in law unless the Board determines that it is supported by a good faith argument for extension, modification, or reversal of existing law;

(E) The party concerned indicates on Form EOIR–26 or Form EOIR–29 that he or she will file a brief or statement in support of the appeal and, thereafter, does not file such brief or statement, or reasonably explain his or her failure to do so, within the time set for filing;

(F) The appeal does not fall within the Board's jurisdiction, or lies with the Immigration Judge rather than the Board;

(G) The appeal is untimely, or barred by an affirmative waiver of the right of appeal that is clear on the record; or

(H) The appeal fails to meet essential statutory or regulatory requirements or is expressly excluded by statute or regulation.

(ii) Action by the Board. The Board's case management screening plan shall promptly identify cases that are subject to summary dismissal pursuant to this paragraph. An order dismissing any appeal pursuant to this paragraph (d)(2) shall constitute the final decision of the Board.

(iii) Disciplinary consequences. The filing by a practitioner, as defined in § 1003.101(b), of an appeal that is summarily dismissed under paragraph (d)(2)(i) of this section, may constitute frivolous behavior under § 1003.102(j). Summary dismissal of an appeal under paragraph (d)(2)(i) of this section does not limit the other grounds and procedures for disciplinary action against attorneys or representatives.

(3) Scope of review.

(i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

(ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

(iii) The Board may review all questions arising in appeals from decisions issued by Service officers de novo.

(iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding appeals. A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand. If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to the Service.

(4) Rules of practice. The Board shall have authority, with the approval of the Director, EOIR, to prescribe procedures governing proceedings before it.

(5) Discipline of practitioners and recognized organizations. The Board shall have the authority pursuant to § 1003.101 et seq. to impose sanctions upon practitioners who appear in a representative capacity before the Board, the Immigration Courts, or DHS, and upon recognized organizations. The Board shall also have the authority pursuant to § 1003.107 to reinstate disciplined practitioners to appear in a representative capacity before the Board and the Immigration Courts, or DHS, or all three authorities.

(6) Identity, law enforcement, or security investigations or examinations.

(i) The Board shall not issue a decision affirming or granting to an alien an immigration status, relief or protection from removal, or other immigration benefit, as provided in 8 CFR 1003.47(b), that requires completion of identity, law enforcement, or security investigations or examinations if:

(A) Identity, law enforcement, or security investigations or examinations have not been completed during the proceedings;

(B) DHS reports to the Board that the results of prior identity, law enforcement, or security investigations or examinations are no longer current under the standards established by DHS and must be updated; or

(C) Identity, law enforcement, or security investigations or examinations have uncovered new information bearing on the merits of the alien's application for relief.

(ii) Except as provided in paragraph (d)(6)(iv) of this section, if identity, law enforcement, or security investigations or examinations have not been completed or DHS reports that the results of prior investigations or examinations are no longer current under the standards established by DHS, then the Board will determine the best means to facilitate the final disposition of the case, as follows:

(A) The Board may issue an order remanding the case to the immigration judge with instructions to allow DHS to complete or update the appropriate identity, law enforcement, or security investigations or examinations pursuant to § 1003.47; or

(B) The Board may provide notice to both parties that in order to complete adjudication of the appeal the case is being placed on hold until such time as all identity, law enforcement, or security investigations or examinations are completed or updated and the results have been reported to the Board.

(iii) In any case placed on hold under paragraph (d)(6)(ii)(B) of this section, DHS shall report to the Board promptly when the identity, law enforcement, or security investigations or examinations have been completed or updated. If DHS obtains relevant information as a result of the identity, law enforcement, or security investigations or examinations, or if the applicant fails to comply with necessary procedures for collecting biometrics or other biographical information, DHS

may move to remand the record to the immigration judge for consideration of whether, in view of the new information or the alien's failure to comply, the immigration relief should be denied, either on grounds of eligibility or, where applicable, as a matter of discretion.

(iv) The Board is not required to remand or hold a case pursuant to paragraph (d)(6)(ii) of this paragraph if the Board decides to dismiss the respondent's appeal or deny the relief sought.

(v) The immigration relief described in 8 CFR 1003.47(b) and granted by the Board shall take effect as provided in 8 CFR 1003.47(i).

(7) Finality of decision. The decision of the Board shall be final except in those cases reviewed by the Attorney General in accordance with paragraph (h) of this section. The Board may return a case to the Service or an immigration judge for such further action as may be appropriate, without entering a final decision on the merits of the case.

(e) Case management system. The Chairman shall establish a case management system to screen all cases and to manage the Board's caseload. Unless a case meets the standards for assignment to a three-member panel under paragraph (e)(6) of this section, all cases shall be assigned to a single Board member for disposition. The Chairman, under the supervision of the Director, shall be responsible for the success of the case management system. The Chairman shall designate, from time to time, a screening panel comprising a sufficient number of Board members who are authorized, acting alone, to adjudicate appeals as provided in this paragraph.

(1) Initial screening. All cases shall be referred to the screening panel for review. Appeals subject to summary dismissal as provided in paragraph (d)(2) of this section should be promptly dismissed.

(2) Miscellaneous dispositions. A single Board member may grant an unopposed motion or a motion to withdraw an appeal pending before the Board. In addition, a single Board member may adjudicate a Service motion to remand any appeal from the decision of a Service officer where the Service requests that the matter be remanded to the Service for further consideration of the appellant's arguments or evidence raised on appeal; a case where remand is required because of a defective or missing transcript; and other procedural or ministerial issues as provided by the case management plan.

(3) Merits review. In any case that has not been summarily dismissed, the case management system shall arrange for the prompt completion of the record of proceedings and transcript, and the issuance of a briefing schedule. A single Board member assigned under the case management system shall determine the appeal on the merits as provided in paragraph (e)(4) or (e)(5) of this section, unless the Board member determines that the case is appropriate for review and decision by a three-member panel under the standards of paragraph (e)(6) of this section. The Board member may summarily dismiss an appeal after completion of the record of proceeding.

(4) Affirmance without opinion.

(i) The Board member to whom a case is assigned shall affirm the decision of the Service or the immigration judge, without opinion, if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or

(B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

(ii) If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. See 8 CFR 3.1(e)(4)." [1] An order affirming without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the immigration judge or the Service were harmless or nonmaterial.

[1]    So in original; probably should read 1003.1(e)(4). See 68 FR 9824.

(5) Other decisions on the merits by single Board member. If the Board member to whom an appeal is assigned determines, upon consideration of the merits, that the decision is not appropriate for affirmance without opinion, the Board member shall issue a brief order affirming, modifying, or remanding the decision under review, unless the Board member designates the case for decision by a three-member panel under paragraph (e)(6) of this section under the standards of the case management plan. A single Board member may reverse the decision under review if such reversal is plainly consistent with and required by intervening Board or judicial precedent, by an intervening Act of Congress, or by an intervening final regulation. A motion to reconsider or to reopen a decision that was rendered by a single Board member may be adjudicated by that Board member unless the case is reassigned to a three-member panel as provided under the standards of the case management plan.

(6) Panel decisions. Cases may only be assigned for review by a three-member panel if the case presents one of these circumstances:

(i) The need to settle inconsistencies among the rulings of different immigration judges;

(ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;

(iii) The need to review a decision by an immigration judge or DHS that is not in conformity with the law or with applicable precedents;

(iv) The need to resolve a case or controversy of major national import;

(v) The need to review a clearly erroneous factual determination by an immigration judge;

(vi) The need to reverse the decision of an immigration judge or DHS, other than a reversal under § 1003.1(e)(5); or

(vii) The need to resolve a complex, novel, unusual, or recurring issue of law or fact.

(7) Oral argument. When an appeal has been taken, a request for oral argument if desired shall be included in the Notice of Appeal. A three-member panel or the Board en banc may hear oral argument, as a matter of discretion, at such date and time as is established under the Board's case management plan. Oral argument shall be held at the offices of the Board unless the Deputy Attorney General or his designee authorizes oral argument to be held elsewhere. The Service may be represented before the Board by an officer of the Service designated by the Service. No oral argument will be allowed in a case that is assigned for disposition by a single Board member.

(8) Timeliness. As provided under the case management system, the Board shall promptly enter orders of summary dismissal, or other miscellaneous dispositions, in appropriate cases. In other cases, after completion of the record on appeal, including any briefs, motions, or other submissions on appeal, the Board member or panel to which the case is assigned shall issue a decision on the merits as soon as practicable, with a priority for cases or custody appeals involving detained aliens.

(i) Except in exigent circumstances as determined by the Chairman, or as provided in paragraph (d)(6) of this section, the Board shall dispose of all appeals assigned to a single Board member within 90 days of completion of the record on appeal, or within 180 days after an appeal is assigned to a three-member panel (including any additional opinion by a member of the panel).

(ii) In exigent circumstances, the Chairman may grant an extension in particular cases of up to 60 days as a matter of discretion. Except as provided in paragraph (e)(8)(iii) or (iv) of this section, in those cases where the panel is unable to issue a decision within the established time limits, as extended, the Chairman shall either assign the case to himself or a Vice Chairman for final decision within 14 days or shall refer the case to the Director for decision. If a dissenting or concurring panel member fails to complete his or her opinion by the end of the extension period, the decision of the majority will be issued without the separate opinion. For a case referred to the Director under this paragraph, the Director shall exercise delegated authority from the Attorney General identical to that of the Board as described in this section, including the authority to issue a precedent decision and the authority to refer the case to the Attorney General for review, either on his own or at the direction of the Attorney General.

(iii) In rare circumstances, when an impending decision by the United States Supreme Court or a United States Court of Appeals, or impending Department regulatory amendments, or an impending en banc Board decision may substantially determine the outcome of a case or group of cases pending before the Board, the Chairman may hold the case or cases until such decision is rendered, temporarily suspending the time limits described in this paragraph (e)(8).

(iv) For any case ready for adjudication as of September 25, 2002, and that has not been completed within the established time lines, the Chairman may, as a matter of discretion, grant an extension of up to 120 days.

(v) The Chairman shall notify the Director of EOIR and the Attorney General if a Board member consistently fails to meet the assigned deadlines for the disposition of appeals, or otherwise fails to adhere to the standards of the case management system. The Chairman shall also prepare a report assessing the timeliness of the disposition of cases by each Board member on an annual basis.

(vi) The provisions of this paragraph (e)(8) establishing time limits for the adjudication of appeals reflect an internal management directive in favor of timely dispositions, but do not affect the validity of any decision issued by the Board and do not, and shall not be interpreted to, create any substantive or procedural rights enforceable before any immigration judge or the Board, or in any court of law or equity.

(9) The provisions of paragraphs (e)(4)(i) and (e)(5) and (6) of this section are internal agency directives for the purpose of efficient management and disposition of cases pending before the Board and are not intended to create any substantive or procedural rights to a particular form of Board decision. A decision by the Board under paragraph (e)(4), (5), or (6) of this section carries the presumption that the Board properly and thoroughly considered all issues, arguments, and claims raised or presented by the parties on appeal or in a motion that were deemed appropriate to the disposition of the appeal or motion, whether or not specifically mentioned in the decision. A decision by the Board under paragraph (e)(4), (5), or (6) also carries the presumption that the Board did not need to consider any issue, argument, or claim not raised or presented by the parties on appeal or in a motion to the Board. In any decision under paragraph (e)(5) or (6) of this section, the Board may rule, in the exercise of its discretion as provided under this part, on any issue, argument, or claim not raised by the parties, and the Board may solicit supplemental briefing from the parties on the issues to be considered before rendering a decision.

(f) Service of Board decisions. The decision of the Board shall be in writing and copies thereof shall be transmitted by the Board to the Service and a copy shall be served upon the alien or party affected as provided in part 292 of this chapter.

(g) Decisions as precedents—

(1) In general. Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board and decisions of the Attorney General are binding on all officers and employees of DHS or immigration judges in the administration of the immigration laws of the United States.

(2) Precedent decisions. Selected decisions designated by the Board, decisions of the Attorney General, and decisions of the Secretary of Homeland Security as provided in paragraph (h)(2)(i) of this section will be published and serve as precedents in all proceedings involving the same issue or issues.

(3) Designation of precedents. By majority vote of the permanent Board members, or as directed by the Attorney General or his designee, selected decisions of the Board issued by a three-member panel or by the Board en banc may be designated to be published and to serve as precedents in all proceedings involving the same issue or issues. In determining whether to publish a precedent decision, the Board may take into account relevant considerations, in the exercise of discretion, including among other matters:

(i) Whether the case involves a substantial issue of first impression;

(ii) Whether the case involves a legal, factual, procedural, or discretionary issue that can be expected to arise frequently in immigration cases;

(iii) Whether the issuance of a precedent decision is needed because the decision announces a new rule of law, or modifies, clarifies, or distinguishes a rule of law or prior precedent;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 536 of 3864

(iv) Whether the case involves a conflict in decisions by immigration judges, the Board, or the federal courts;

(v) Whether there is a need to achieve, maintain, or restore national uniformity of interpretation of issues under the immigration laws or regulations; and

(vi) Whether the case warrants publication in light of other factors that give it general public interest.

(h) Referral of cases to the Attorney General.

(1) The Board shall refer to the Attorney General for review of its decision all cases that:

(i) The Attorney General directs the Board to refer to him.

(ii) The Chairman or a majority of the Board believes should be referred to the Attorney General for review.

(iii) The Secretary of Homeland Security, or specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General, refers to the Attorney General for review.

(2) In any case the Attorney General decides, the Attorney General's decision shall be stated in writing and shall be transmitted to the Board or Secretary, as appropriate, for transmittal and service as provided in paragraph (f) of this section.

(i) Publication of Secretary's precedent decisions. The Secretary of Homeland Security, or specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General, may file with the Attorney General decisions relating to the administration of the immigration laws of the United States for publication as precedent in future proceedings, and, upon approval of the Attorney General as to the lawfulness of such decision, the Director of the Executive Office for Immigration Review shall cause such decisions to be published in the same manner as decisions of the Board and the Attorney General.

(j) Continuation of jurisdiction and procedure. The jurisdiction of, and procedures before, the Board of Immigration Appeals in exclusion, deportation, removal, rescission, asylum-only, and any other proceedings, shall remain in effect as in effect on February 28, 2003, until the regulations in this chapter are further modified by the Attorney General. Where a decision of an officer of the Immigration and Naturalization Service was, before March 1, 2003, appealable to the Board or to an immigration judge, or an application denied could be renewed in proceedings before an immigration judge, the same authority and procedures shall be followed until further modified by the Attorney General.

**Credits**

[23 FR 9117, Nov. 26, 1958, as amended at 27 FR 96, Jan. 5, 1962; 27 FR 10789, Nov. 6, 1962; 29 FR 9709, July 18, 1964; 30 FR 14772, Nov. 30, 1965; 36 FR 316, Jan. 9, 1971; 40 FR 37207, Aug. 26, 1975; 44 FR 67960, Nov. 28, 1979; 45 FR 9893, Feb. 14, 1980; 47 FR 16772, April 20, 1982; 48 FR 8039, Feb. 25, 1983; 52 FR 2943, Jan. 29, 1987; 52 FR 24981, July 2, 1987; 53 FR 15659, May 3, 1988; 55 FR 30680, July 27, 1990; 56 FR 624, Jan. 7, 1991; 56 FR 23496, May 22, 1991; 57 FR 11570,

April 6, 1992; 59 FR 1899, Jan. 13, 1994; 59 FR 47231, Sept. 15, 1994; 60 FR 29469, June 5, 1995; 60 FR 57313, Nov. 15, 1995; 61 FR 18904, April 29, 1996; 61 FR 59305, Nov. 22, 1996; 62 FR 9072, Feb. 28, 1997; 62 FR 10330, March 6, 1997; 62 FR 15362, April 1, 1997; 63 FR 27829, May 21, 1998; 63 FR 31890, June 11, 1998; 63 FR 51519, Sept. 28, 1998; 64 FR 25766, May 12, 1999; 64 FR 56141, Oct. 18, 1999; 65 FR 15844, 15854, March 24, 2000; 65 FR 20068, April 14, 2000; 65 FR 39525, 39526, June 27, 2000; 66 FR 6445, Jan. 22, 2001; 66 FR 47380, Sept. 12, 2001; 66 FR 56976, Nov. 14, 2001; 67 FR 54901, Aug. 26, 2002; 68 FR 9831, Feb. 28, 2003; 68 FR 10350, March 5, 2003; 69 FR 44906, July 28, 2004; 70 FR 4752, Jan. 31, 2005; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008; 73 FR 76923, Dec. 18, 2008; 80 FR 31463, June 3, 2015; 80 FR 59510, Oct. 1, 2015; 81 FR 92361, Dec. 19, 2016; 83 FR 8323, Feb. 27, 2018; 84 FR 31470, July 2, 2019; 84 FR 44542, Aug. 26, 2019; 85 FR 18107, April 1, 2020]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (489)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

📁 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter A. General Provisions (Refs & Annos)
        Part 1003. Executive Office for Immigration Review (Refs & Annos)
          Subpart A. Board of Immigration Appeals

8 C.F.R. § 1003.3

§ 1003.3 Notice of appeal.

Currentness

(a) Filing—

(1) Appeal from decision of an immigration judge. A party affected by a decision of an immigration judge which may be appealed to the Board under this chapter shall be given notice of the opportunity for filing an appeal. An appeal from a decision of an immigration judge shall be taken by filing a Notice of Appeal from a Decision of an Immigration Judge (Form EOIR–26) directly with the Board, within the time specified in § 1003.38. The appealing parties are only those parties who are covered by the decision of an immigration judge and who are specifically named on the Notice of Appeal. The appeal must reflect proof of service of a copy of the appeal and all attachments on the opposing party. An appeal is not properly filed unless it is received at the Board, along with all required documents, fees or fee waiver requests, and proof of service, within the time specified in the governing sections of this chapter. A Notice of Appeal may not be filed by any party who has waived appeal pursuant to § 1003.39.

(2) Appeal from decision of a Service officer. A party affected by a decision of a Service officer that may be appealed to the Board under this chapter shall be given notice of the opportunity to file an appeal. An appeal from a decision of a Service officer shall be taken by filing a Notice of Appeal to the Board of Immigration Appeals from a Decision of an INS Officer (Form EOIR–29) directly with the office of the Service having administrative control over the record of proceeding within 30 days of the service of the decision being appealed. An appeal is not properly filed until it is received at the appropriate office of the Service, together with all required documents, and the fee provisions of § 1003.8 are satisfied.

(3) General requirements for all appeals. The appeal must be accompanied by a check, money order, or fee waiver request in satisfaction of the fee requirements of § 1003.8. If the respondent or applicant is represented, a Notice of Entry of Appearance as Attorney or Representative Before the Board (Form EOIR–27) must be filed with the Notice of Appeal. The appeal and all attachments must be in English or accompanied by a certified English translation.

(b) Statement of the basis of appeal. The party taking the appeal must identify the reasons for the appeal in the Notice of Appeal (Form EOIR–26 or Form EOIR–29) or in any attachments thereto, in order to avoid summary dismissal pursuant to § 1003.1(d)(2)(i). The statement must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged. If a question of law is presented, supporting authority must be cited. If the dispute is over the findings of fact, the specific facts

contested must be identified. Where the appeal concerns discretionary relief, the appellant must state whether the alleged error relates to statutory grounds of eligibility or to the exercise of discretion and must identify the specific factual and legal finding or findings that are being challenged. The appellant must also indicate in the Notice of Appeal (Form EOIR–26 or Form EOIR–29) whether he or she desires oral argument before the Board and whether he or she will be filing a separate written brief or statement in support of the appeal. An appellant who asserts that the appeal may warrant review by a three-member panel under the standards of § 1003.1(e)(6) may identify in the Notice of Appeal the specific factual or legal basis for that contention.

(c) Briefs—

(1) Appeal from decision of an immigration judge. Briefs in support of or in opposition to an appeal from a decision of an immigration judge shall be filed directly with the Board. In those cases that are transcribed, the briefing schedule shall be set by the Board after the transcript is available. In cases involving aliens in custody, the parties shall be provided 21 days in which to file simultaneous briefs unless a shorter period is specified by the Board, and reply briefs shall be permitted only by leave of the Board. In cases involving aliens who are not in custody, the appellant shall be provided 21 days in which to file a brief, unless a shorter period is specified by the Board. The appellee shall have the same period of time in which to file a reply brief that was initially granted to the appellant to file his or her brief. The time to file a reply brief commences from the date upon which the appellant's brief was due, as originally set or extended by the Board. The Board, upon written motion, may extend the period for filing a brief or a reply brief for up to 90 days for good cause shown. In its discretion, the Board may consider a brief that has been filed out of time. All briefs, filings, and motions filed in conjunction with an appeal shall include proof of service on the opposing party.

(2) Appeal from decision of a Service officer. Briefs in support of or in opposition to an appeal from a decision of a Service officer shall be filed directly with the office of the Service having administrative control over the file. The alien and the Service shall be provided 21 days in which to file a brief, unless a shorter period is specified by the Service officer from whose decision the appeal is taken, and reply briefs shall be permitted only by leave of the Board. Upon written request of the alien, the Service officer from whose decision the appeal is taken or the Board may extend the period for filing a brief for good cause shown. The Board may authorize the filing of briefs directly with the Board. In its discretion, the Board may consider a brief that has been filed out of time. All briefs and other documents filed in conjunction with an appeal, unless filed by an alien directly with a Service office, shall include proof of service on the opposing party.

(d) Effect of certification. The certification of a case, as provided in this part, shall not relieve the party affected from compliance with the provisions of this section in the event that he or she is entitled and desires to appeal from an initial decision, nor shall it serve to extend the time specified in the applicable parts of this chapter for the taking of an appeal.

(e) Effect of departure from the United States. Departure from the United States of a person who is the subject of deportation proceedings, prior to the taking of an appeal from a decision in his or her case, shall constitute a waiver of his or her right to appeal.

(f) Application on effective date. All cases and motions pending on September 25, 2002, shall be adjudicated according to the rules in effect on or after that date, except that § 1003.1(d)(3)(i) shall not apply to appeals filed before September 25, 2002. A party to an appeal or motion pending on August 26, 2002, may, until September 25, 2002, or the expiration of any briefing schedule set by the Board, whichever is later, submit a brief or statement limited to explaining why the appeal or motion does or does not meet the criteria for three-member review under § 1003.1(e)(6).

**Credits**

[23 FR 9118, Nov. 26, 1958, as amended by Order No. 325–64, 29 FR 14717, Oct. 29, 1964; 48 FR 8040, Feb. 25, 1983; 52 FR 2936, Jan. 29, 1987; 60 FR 34089, June 30, 1995; 61 FR 18906, April 29, 1996; 66 FR 6445, Jan. 22, 2001; 67 FR 54904, Aug. 26, 2002]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (21)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
    Subchapter A. General Provisions (Refs & Annos)
      Part 1003. Executive Office for Immigration Review (Refs & Annos)
      Subpart B. Office of the Chief Immigration Judge (Refs & Annos)

8 C.F.R. § 1003.10

§ 1003.10 Immigration judges.

Effective: July 11, 2014

Currentness

(a) Appointment. The immigration judges are attorneys whom the Attorney General appoints as administrative judges within the Office of the Chief Immigration Judge to conduct specified classes of proceedings, including hearings under section 240 of the Act. Immigration judges shall act as the Attorney General's delegates in the cases that come before them.

(b) Powers and duties. In conducting hearings under section 240 of the Act and such other proceedings the Attorney General may assign to them, immigration judges shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation. In deciding the individual cases before them, and subject to the applicable governing standards, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases. Immigration judges shall administer oaths, receive evidence, and interrogate, examine, and cross-examine aliens and any witnesses. Subject to §§ 1003.35 and 1287.4 of this chapter, they may issue administrative subpoenas for the attendance of witnesses and the presentation of evidence. In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations.

(c) Review. Decisions of immigration judges are subject to review by the Board of Immigration Appeals in any case in which the Board has jurisdiction as provided in 8 CFR 1003.1.

(d) Governing standards. Immigration judges shall be governed by the provisions and limitations prescribed by the Act and this chapter, by the decisions of the Board, and by the Attorney General (through review of a decision of the Board, by written order, or by determination and ruling pursuant to section 103 of the Act).

(e) Temporary immigration judges—

  (1) Designation. The Director is authorized to designate or select temporary immigration judges as provided in this paragraph (e).

(i) The Director may designate or select, with the approval of the Attorney General, former Board members, former immigration judges, administrative law judges employed within or retired from EOIR, and administrative law judges from other Executive Branch agencies to serve as temporary immigration judges for renewable terms not to exceed six months. Administrative law judges from other Executive Branch agencies must have the consent of their agencies to be designated as temporary immigration judges.

(ii) In addition, the Director may designate, with the approval of the Attorney General, Department of Justice attorneys with at least 10 years of legal experience in the field of immigration law to serve as temporary immigration judges for renewable terms not to exceed six months.

(2) Authority. A temporary immigration judge shall have the authority of an immigration judge to adjudicate assigned cases and administer immigration court matters, as provided in the immigration laws and regulations, subject to paragraph (e)(3) of this section.

(3) Assignment of temporary immigration judges. The Chief Immigration Judge is responsible for the overall oversight and management of the utilization of temporary immigration judges and for evaluating the results of the process. The Chief Immigration Judge shall ensure that each temporary immigration judge has received a suitable level of training to enable the temporary immigration judge to carry out the duties assigned.

**Credits**

[48 FR 8040, Feb. 25, 1983; 62 FR 10331, March 6, 1997; 72 FR 53677, Sept. 20, 2007; 79 FR 39956, July 11, 2014]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 72 FR 53677, Sept. 20, 2007; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (9)

Current through October 29, 2020; 85 FR 68703.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Invalid  Garcia-Carias v. Holder,  5th Cir.,  Sep. 27, 2012

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations

Title 8. Aliens and Nationality

Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)

Subchapter A. General Provisions (Refs & Annos)

Part 1003. Executive Office for Immigration Review (Refs & Annos)

Subpart C. Immigration Court—Rules of Procedure (Refs & Annos)

8 C.F.R. § 1003.23

§ 1003.23 Reopening or reconsideration before the Immigration Court.

Currentness

<For statute(s) affecting validity of par. (b)(1), see: 5 USCA § 301; 6 USCA § 521; 8 USCA §§ 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 USCA §§ 509, 510, 1746.>

(a) Pre–decision motions. Unless otherwise permitted by the Immigration Judge, motions submitted prior to the final order of an Immigration Judge shall be in writing and shall state, with particularity the grounds therefore, the relief sought, and the jurisdiction. The Immigration Judge may set and extend time limits for the making of motions and replies thereto. A motion shall be deemed unopposed unless timely response is made.

(b) Before the Immigration Court—

(1) In general. An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4), a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before July 31, 1996, whichever is later. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before September 30, 1996, whichever is later. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act. Nor shall such limitations apply to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 1208.22(e) of this chapter.

(i) Form and contents of the motion. The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding.

(ii) Filing. Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed. If the moving party, other than the Service, is represented, a Form EOIR–28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) Assignment to an Immigration Judge. If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) Replies to motions; decision. The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) Stays. Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) Motion to reconsider. A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) Motion to reopen. A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for

certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice to appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigration Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) Exceptions to filing deadlines—

(i) Asylum and withholding of removal. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien may request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) Order entered in absentia or removal proceedings. An order of removal entered in absentia or in removal proceedings pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien demonstrates that the failure to appear was because of exceptional circumstances as defined in section 240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a)(1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding shall be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion under this paragraph shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) Order entered in absentia in deportation or exclusion proceedings.

(A) An order entered in absentia in deportation proceedings may be rescinded only upon a motion to reopen filed:

(1) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of exceptional circumstances beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(2) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraph (b)(4)(iii)(A) of this section.

(iv) Jointly filed motions. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.

**Credits**

[55 FR 30680, July 27, 1990; 57 FR 11571, April 6, 1992; 59 FR 1899, Jan. 13, 1994; 60 FR 34089, June 30, 1995; 61 FR 18907, April 29, 1996; 61 FR 19976, May 3, 1996; 61 FR 21228, May 9, 1996; 62 FR 10332, March 6, 1997; 62 FR 15362, April 1, 1997; 62 FR 17048, April 9, 1997; 64 FR 8487, Feb. 19, 1999; 68 FR 10350, March 5, 2003]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 52 FR 2936, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (104)

Current through October 29, 2020; 85 FR 68703.

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter A. General Provisions (Refs & Annos)
        Part 1003. Executive Office for Immigration Review (Refs & Annos)
          Subpart C. Immigration Court—Rules of Procedure (Refs & Annos)

8 C.F.R. § 1003.29

§ 1003.29 Continuances.

Currentness

The Immigration Judge may grant a motion for continuance for good cause shown.

**Credits**

[57 FR 11571, April 6, 1992; 59 FR 1899, Jan. 13, 1994]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 52 FR 2936, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (67)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter A. General Provisions (Refs & Annos)
        Part 1003. Executive Office for Immigration Review (Refs & Annos)
          Subpart C. Immigration Court—Rules of Procedure (Refs & Annos)

8 C.F.R. § 1003.37

§ 1003.37 Decisions.

Currentness

(a) A decision of the Immigration Judge may be rendered orally or in writing. If the decision is oral, it shall be stated by the Immigration Judge in the presence of the parties and a memorandum summarizing the oral decision shall be served on the parties. If the decision is in writing, it shall be served on the parties by first class mail to the most recent address contained in the Record of Proceeding or by personal service.

(b) A written copy of the decision will not be sent to an alien who has failed to provide a written record of an address.

**Credits**

[57 FR 11571, 11573, April 6, 1992; 59 FR 1900, Jan. 13, 1994]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 52 FR 2936, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (1)

Current through October 29, 2020; 85 FR 68703.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.00525    1

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter A. General Provisions (Refs & Annos)
        Part 1003. Executive Office for Immigration Review (Refs & Annos)
          Subpart C. Immigration Court—Rules of Procedure (Refs & Annos)

8 C.F.R. § 1003.38

§ 1003.38 Appeals.

Currentness

(a) Decisions of Immigration Judges may be appealed to the Board of Immigration Appeals as authorized by 8 CFR 3.1(b). [1]

[1]    So in original; probably should read 1003.1(b). See 68 FR 9824.

(b) The Notice of Appeal to the Board of Immigration Appeals of Decision of Immigration Judge (Form EOIR–26) shall be filed directly with the Board of Immigration Appeals within 30 calendar days after the stating of an Immigration Judge's oral decision or the mailing of an Immigration Judge's written decision. If the final date for filing falls on a Saturday, Sunday, or legal holiday, this appeal time shall be extended to the next business day. A Notice of Appeal (Form EOIR–26) may not be filed by any party who has waived appeal.

(c) The date of filing of the Notice of Appeal (Form EOIR–26) shall be the date the Notice is received by the Board.

(d) A Notice of Appeal (Form EOIR–26) must be accompanied by the appropriate fee or by an Appeal Fee Waiver Request (Form EOIR–26A). If the fee is not paid or the Appeal Fee Waiver Request (Form EOIR–26A) is not filed within the specified time period indicated in paragraph (b) of this section, the appeal will not be deemed properly filed and the decision of the Immigration Judge shall be final to the same extent as though no appeal had been taken.

(e) Within five working days of any change of address, an alien must provide written notice of the change of address on Form EOIR–33 to the Board. Where a party is represented, the representative should also provide to the Board written notice of any change in the representative's business mailing address.

(f) Briefs may be filed by both parties pursuant to 8 CFR 3.3(c). [2]

[2]    So in original; probably should read 1003.3(c). See 68 FR 9824.

(g) In any proceeding before the Board wherein the respondent/applicant is represented, the attorney or representative shall file a notice of appearance on the appropriate form. Withdrawal or substitution of an attorney or representative may be permitted by the Board during proceedings only upon written motion submitted without fee.

**Credits**

[57 FR 11571, April 6, 1992; 59 FR 1899, Jan, 13, 1994; 60 FR 34089, June 30, 1995; 61 FR 18908, April 29, 1996]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 52 FR 2936, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006; 73 FR 33876, June 16, 2008, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub.L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub.L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub.L. 106–554, 114 Stat. 2763A–326 to –328.

Notes of Decisions (25)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.


KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
   Title 8. Aliens and Nationality
      Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter B. Immigration Regulations (Refs & Annos)
         Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
            Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.2

§ 1208.2 Jurisdiction.

Effective: June 1, 2020

Currentness

(a) Office of International Affairs. Except as provided in paragraph (b) or (c) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry. The Office of International Affairs shall also have initial jurisdiction over credible fear determinations under § 1208.30 and reasonable fear determinations under § 1208.31.

(b) Jurisdiction of Immigration Court in general. Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served a Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review reasonable fear determinations referred to the Immigration Court under § 1208.31, and credible fear determinations referred to the Immigration Court under § 1208.30.

(c) Certain aliens not entitled to proceedings under section 240 of the Act—

(1) Asylum applications and withholding of removal applications only. After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewmember who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) On or after April 1, 1997, was granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution or torture pursuant to the procedures set forth in subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Program under section 217 of the Act, except that if such an alien is an applicant for admission to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum prior to January 1, 2030;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status, except that if such an alien was admitted to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum in the Commonwealth of the Northern Mariana Islands prior to January 1, 2030;

(v) An alien who has been ordered removed under § 235(c) of the Act, as described in § 235.8(a) of this chapter (applicable only in the event that the alien is referred for proceedings under this paragraph by the Regional Director pursuant to section 235.8(b)(2)(ii) of this chapter);

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act (applicable only in the event that the alien is referred for proceedings under this paragraph by the district director);

(vii) An alien who is an applicant for admission to Guam or the Commonwealth of the Northern Mariana Islands pursuant to the Guam–CNMI Visa Waiver Program under section 212(l) of the Act, except that if such an alien is an applicant for admission to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum prior to January 1, 2030; or

(viii) An alien who was admitted to Guam or the Commonwealth of the Northern Mariana Islands pursuant to the Guam–CNMI Visa Waiver Program under section 212(l) of the Act and has remained longer than authorized or has otherwise violated his or her immigration status, except that if such an alien was admitted to the Commonwealth of the Northern Mariana Islands, then he or she shall not be eligible for asylum in the Commonwealth of the Northern Mariana Islands prior to January 1, 2030.

(2) Withholding of removal applications only. After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any application for withholding of removal filed by:

(i) An alien who is the subject of a reinstated removal order pursuant to section 241(a)(5) of the Act; or

(ii) An alien who has been issued an administrative removal order pursuant to section 238 of the Act as an alien convicted of committing an aggravated felony.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) Rules of procedure—

(i) General. Except as provided in this section, proceedings falling under the jurisdiction of the immigration judge pursuant to paragraph (c)(1) or (c)(2) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 1240, subpart A. The scope of review in proceedings conducted pursuant to paragraph (c)(1) of this section shall be limited to a determination of whether the alien is eligible for asylum or withholding or deferral of removal, and whether asylum shall be granted in the exercise of discretion. The scope of review in proceedings conducted pursuant to paragraph (c)(2) of this section shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal. During such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief.

(ii) Notice of hearing procedures and in-absentia decisions. The alien will be provided with notice of the time and place of the proceeding. The request for asylum and withholding of removal submitted by an alien who fails to appear for the hearing shall be denied. The denial of asylum and withholding of removal for failure to appear may be reopened only upon a motion filed with the immigration judge with jurisdiction over the case. Only one motion to reopen may be filed, and it must be filed within 90 days, unless the alien establishes that he or she did not receive notice of the hearing date or was in Federal or State custody on the date directed to appear. The motion must include documentary evidence, which demonstrates that:

(A) The alien did not receive the notice;

(B) The alien was in Federal or State custody and the failure to appear was through no fault of the alien; or

(C) "Exceptional circumstances," as defined in section 240(e)(1) of the Act, caused the failure to appear.

(iii) Relief. The filing of a motion to reopen shall not stay removal of the alien unless the immigration judge issues an order granting a stay pending disposition of the motion. An alien who fails to appear for a proceeding under this section shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 of the Act for a period of 10 years after the date of the denial, unless the applicant can show exceptional circumstances resulted in his or her failure to appear.

**Credits**

[62 FR 15362, April 1, 1997; 64 FR 8487, Feb. 19, 1999; 65 FR 76130, Dec. 6, 2000; 68 FR 10352, March 5, 2003; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (5)

Current through October 29, 2020; 85 FR 68703.

**End of Document**  <span style="float:right">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter B. Immigration Regulations (Refs & Annos)
        Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.3

§ 1208.3 Form of application.

Currentness

(a) An asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

(b) An asylum application shall be deemed to constitute at the same time an application for withholding of removal, unless adjudicated in deportation or exclusion proceedings commenced prior to April 1, 1997. In such instances, the asylum application shall be deemed to constitute an application for withholding of deportation under section 243(h) of the Act, as that section existed prior to April 1, 1997. Where a determination is made that an applicant is ineligible to apply for asylum under section 208(a)(2) of the Act, an asylum application shall be construed as an application for withholding of removal.

(c) Form I–589 shall be filed under the following conditions and shall have the following consequences:

(1) If the application was filed on or after January 4, 1995, information provided in the application may be used as a basis for the initiation of removal proceedings, or to satisfy any burden of proof in exclusion, deportation, or removal proceedings;

(2) The applicant and anyone other than a spouse, parent, son, or daughter of the applicant who assists the applicant in preparing the application must sign the application under penalty of perjury. The applicant's signature establishes a presumption that the applicant is aware of the contents of the application. A person other than a relative specified in this paragraph who assists the applicant in preparing the application also must provide his or her full mailing address;

(3) An asylum application that does not include a response to each of the questions contained in the Form I–589, is unsigned, or is unaccompanied by the required materials specified in paragraph (a) of this section is incomplete. The filing of an incomplete application shall not commence the 150–day period after which the applicant may file an application for employment authorization in accordance with § 1208.7. An application that is incomplete shall be returned by mail to the applicant within 30 days of the receipt of the application by the Service. If the Service has not mailed the incomplete application back to the applicant within 30 days, it shall be deemed complete. An application returned to the applicant as

incomplete shall be resubmitted by the applicant with the additional information if he or she wishes to have the application considered;

(4) Knowing placement of false information on the application may subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil or criminal penalties under section 274C of the Act; and

(5) Knowingly filing a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to § 1208.20.

**Credits**

[65 FR 76131, Dec. 6, 2000]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (42)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

☐ KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter B. Immigration Regulations (Refs & Annos)
        Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.7

§ 1208.7 Employment authorization.

Currentness

(a) Application and approval.

(1) Subject to the restrictions contained in sections 208(d) and 236(a) of the Act, an applicant for asylum who is not an aggravated felon shall be eligible pursuant to §§ 1274a.12(c)(8) and 1274a.13(a) of this chapter to submit a Form I–765, Application for Employment Authorization. Except in the case of an alien whose asylum application has been recommended for approval, or in the case of an alien who filed an asylum application prior to January 4, 1995, the application shall be submitted no earlier than 150 days after the date on which a complete asylum application submitted in accordance with §§ 1208.3 and 1208.4 has been received. In the case of an applicant whose asylum application has been recommended for approval, the applicant may apply for employment authorization when he or she receives notice of the recommended approval. If an asylum application has been returned as incomplete in accordance with § 1208.3(c)(3), the 150–day period will commence upon receipt by the Service of a complete asylum application. An applicant whose asylum application has been denied by an asylum officer or by an immigration judge within the 150–day period shall not be eligible to apply for employment authorization. If an asylum application is denied prior to a decision on the application for employment authorization, the application for employment authorization shall be denied. If the asylum application is not so denied, the Service shall have 30 days from the date of filing of the Form I–765 to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180–day period following the filing of the asylum application filed on or after April 1, 1997.

(2) The time periods within which the alien may not apply for employment authorization and within which the Service must respond to any such application and within which the asylum application must be adjudicated pursuant to section 208(d)(5)(A)(iii) of the Act shall begin when the alien has filed a complete asylum application in accordance with §§ 1208.3 and 1208.4. Any delay requested or caused by the applicant shall not be counted as part of these time periods, including delays caused by failure without good cause to follow the requirements for fingerprint processing. Such time periods shall also be extended by the equivalent of the time between issuance of a request for evidence pursuant to § 103.2(b)(8) of 8 CFR chapter I and the receipt of the applicant's response to such request.

(3) The provisions of paragraphs (a)(1) and (a)(2) of this section apply to applications for asylum filed on or after January 4, 1995.

(4) Employment authorization pursuant to § 1274a.12(c)(8) of this chapter may not be granted to an alien who fails to appear for a scheduled interview before an asylum officer or a hearing before an immigration judge, unless the applicant demonstrates that the failure to appear was the result of exceptional circumstances.

(b) Renewal and termination. Employment authorization shall be renewable, in increments to be determined by the Commissioner, for the continuous period of time necessary for the asylum officer or immigration judge to decide the asylum application and, if necessary, for completion of any administrative or judicial review.

(1) If the asylum application is denied by the asylum officer, the employment authorization shall terminate at the expiration of the employment authorization document or 60 days after the denial of asylum, whichever is longer.

(2) If the application is denied by the immigration judge, the Board of Immigration Appeals, or a Federal court, the employment authorization terminates upon the expiration of the employment authorization document, unless the applicant has filed an appropriate request for administrative or judicial review.

(c) Supporting evidence for renewal of employment authorization. In order for employment authorization to be renewed under this section, the alien must provide the Service (in accordance with the instructions on or attached to the employment authorization application) with a Form I–765, the required fee (unless waived in accordance with § 103.7(c) of this chapter), and (if applicable) proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting to the Service one of the following, depending on the stage of the alien's immigration proceedings:

(1) If the alien's case is pending in proceedings before the immigration judge, and the alien wishes to continue to pursue his or her asylum application, a copy of any asylum denial, referral notice, or charging document placing the alien in such proceedings;

(2) If the immigration judge has denied asylum, a copy of the document issued by the Board of Immigration Appeals to show that a timely appeal has been filed from a denial of the asylum application by the immigration judge; or

(3) If the Board of Immigration Appeals has dismissed the alien's appeal of a denial of asylum, or sustained an appeal by the Service of a grant of asylum, a copy of the petition for judicial review or for habeas corpus pursuant to section 242 of the Act, date stamped by the appropriate court.

(d) In order for employment authorization to be renewed before its expiration, the application for renewal must be received by the Service 90 days prior to expiration of the employment authorization.

**Credits**

[63 FR 12986, March 17, 1998; 68 FR 10352, March 5, 2003]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (2)

Current through October 29, 2020; 85 FR 68703.

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Invalid   Capital Area Immigrants' Rights Coalition v. Trump,   D.D.C.,   June 30, 2020

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations
Title 8. Aliens and Nationality
Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
Subchapter B. Immigration Regulations (Refs & Annos)
Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.13

§ 1208.13 Establishing asylum eligibility.

Effective: July 16, 2019

Currentness

<In Barr v. East Bay Sanctuary Covenant, 140 S.Ct. 3 (Mem), 2019 WL 4292781 (Mem) (Sept. 11, 2019), the opinion of the Supreme Court with reference to amendment to this section by the final rule entitled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims" at 83 FR 55934, states that, "[t]he application for stay presented to Justice KAGAN and by her referred to the Court is granted. The district court's July 24, 2019 order granting a preliminary injunction and September 9, 2019 order restoring the nationwide scope of the injunction are stayed in full pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is sought. If a writ of certiorari is sought and the Court denies the petition, this order shall terminate automatically. If the Court grants the petition for a writ of certiorari, this order shall terminate when the Court enters its judgment.">

(a) Burden of proof. The burden of proof is on the applicant for asylum to establish that he or she is a refugee as defined in section 101(a)(42) of the Act. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.

(b) Eligibility. The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.

(1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted if an asylum officer or immigration judge makes one of the findings described in paragraph (b)(1)(i) of this section. If the applicant's

fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded.

(i) Discretionary referral or denial. Except as provided in paragraph (b)(1)(iii) of this section, an asylum officer shall, in the exercise of his or her discretion, refer or deny, or an immigration judge, in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution if any of the following is found by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; or

(B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) Burden of proof. In cases in which an applicant has demonstrated past persecution under paragraph (b)(1) of this section, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (B) of this section.

(iii) Grant in the absence of well-founded fear of persecution. An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:

(A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or

(B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

(2) Well-founded fear of persecution.

(i) An applicant has a well-founded fear of persecution if:

(A) The applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and

(C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.

(ii) An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so.

(iii) In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:

(A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1)(i), (b)(1)(ii), and (b)(2) of this section, adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

(c) Mandatory denials—

(1) Applications filed on or after April 1, 1997. For applications filed on or after April 1, 1997, an applicant shall not qualify for asylum if section 208(a)(2) or 208(b)(2) of the Act applies to the applicant. If the applicant is found to be ineligible for asylum under either section 208(a)(2) or 208(b)(2) of the Act, the applicant shall be considered for eligibility for withholding of removal under section 241(b)(3) of the Act. The applicant shall also be considered for eligibility for withholding of removal under the Convention Against Torture if the applicant requests such consideration or if the evidence presented by the alien indicates that the alien may be tortured in the country of removal.

(2) Applications filed before April 1, 1997.

(i) An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien:

(A) Having been convicted by a final judgment of a particularly serious crime in the United States, constitutes a danger to the community;

(B) Has been firmly resettled within the meaning of § 1208.15;

(C) Can reasonably be regarded as a danger to the security of the United States;

(D) Has been convicted of an aggravated felony, as defined in section 101(a)(43) of the Act; or

(E) Ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

(F) Is described within section 212(a)(3)(B)(i)(I), (II), and (III) of the Act as it existed prior to April 1, 1997, and as amended by the Anti-terrorist and Effective Death Penalty Act of 1996 (AEDPA), unless it is determined that there are no reasonable grounds to believe that the individual is a danger to the security of the United States.

(ii) If the evidence indicates that one of the above grounds apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

(3) Additional limitation on eligibility for asylum. For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

(4) Additional limitation on eligibility for asylum. Notwithstanding the provisions of 8 CFR 208.15, any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

(i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien received a final judgment denying the alien protection in such country;

(ii) The alien demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or

(iii) The only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

(5) Non-binding determinations. Determinations made with respect to paragraph (c)(4)(ii) of this section are not binding on Federal departments or agencies in subsequent determinations of eligibility for T or U nonimmigrant status under section 101(a)(15)(T) or (U) of the Act or for benefits or services under 22 U.S.C. 7105 or 8 U.S.C. 1641(c)(4).

<Text of subsection (c)(6) added by 85 FR 67259, effective Nov. 20, 2020.>

(6) Additional limitations on eligibility for asylum. For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the immigration judge knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

  (1) An alien who is a current or former spouse of the person;

  (2) An alien with whom the person shares a child in common;

  (3) An alien who is cohabiting with or has cohabited with the person as a spouse;

  (4) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

  (5) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the immigration judge is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

  (1) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

AR.00542

(2) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(3) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The immigration judge knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)-(ii) of the Act.

<Text of subsection (c)(7) added by 85 FR 67259, effective Nov. 20, 2020.>

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the immigration judge determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

<Text of subsection (c)(8) added by 85 FR 67259, effective Nov. 20, 2020.>

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

<Text of subsection (c)(9) added by 85 FR 67259, effective Nov. 20, 2020.>

(9) An immigration judge is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

**Credits**

[64 FR 8488, Feb. 19, 1999; 65 FR 76133, Dec. 6, 2000; 78 FR 42863, July 18, 2013; 83 FR 55952, Nov. 9, 2018; 84 FR 33844, July 16, 2019; 85 FR 67259, Oct. 21, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (2133)

Current through October 29, 2020; 85 FR 68703.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter B. Immigration Regulations (Refs & Annos)
        Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.16

§ 1208.16 Withholding of removal under section 241(b)(3)(B) of the
Act and withholding of removal under the Convention Against Torture.

Currentness

(a) Consideration of application for withholding of removal. An asylum officer shall not decide whether the exclusion, deportation, or removal of an alien to a country where the alien's life or freedom would be threatened must be withheld, except in the case of an alien who is otherwise eligible for asylum but is precluded from being granted such status due solely to section 207(a)(5) of the Act. In exclusion, deportation, or removal proceedings, an immigration judge may adjudicate both an asylum claim and a request for withholding of removal whether or not asylum is granted.

(b) Eligibility for withholding of removal under section 241(b)(3) of the Act; burden of proof. The burden of proof is on the applicant for withholding of removal under section 241(b)(3) of the Act to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration. The evidence shall be evaluated as follows:

(1) Past threat to life or freedom.

(i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

(iii) If the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.

(2) Future threat to life or freedom. An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country. Such an applicant cannot demonstrate that his or her life or freedom would be threatened if the asylum officer or immigration judge finds that the applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so. In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

(3) Reasonableness of internal relocation. For purposes of determinations under paragraphs (b)(1) and (b)(2) of this section, adjudicators should consider, among other things, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. These factors may or may not be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that under all the circumstances it would be reasonable for the applicant to relocate.

(c) Eligibility for withholding of removal under the Convention Against Torture.

(1) For purposes of regulations under Title II of the Act, "Convention Against Torture" shall refer to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, subject to any

reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, as implemented by section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (Pub.L. 105–277, 112 Stat. 2681, 2681–821). The definition of torture contained in § 1208.18(a) of this part shall govern all decisions made under regulations under Title II of the Act about the applicability of Article 3 of the Convention Against Torture.

(2) The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

(3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

(4) In considering an application for withholding of removal under the Convention Against Torture, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the immigration judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section, the alien's removal shall be deferred under § 1208.17(a).

(d) Approval or denial of application—

(1) General. Subject to paragraphs (d)(2) and (d)(3) of this section, an application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for withholding is established pursuant to paragraphs (b) or (c) of this section.

(2) Mandatory denials. Except as provided in paragraph (d)(3) of this section, an application for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the Act or, for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act as it appeared prior to that date. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. If the evidence indicates the

applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

(3) Exception to the prohibition on withholding of deportation in certain cases. Section 243(h)(3) of the Act, as added by section 413 of Pub.L. 104–132 (110 Stat. 1214), shall apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, T.I.A.S. No. 6577.

<Subsection (e) reserved effective Nov. 20, 2020; see 85 FR 67260.>

(e) Reconsideration of discretionary denial of asylum. In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

(f) Removal to third country. Nothing in this section or § 1208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.

**Credits**

[64 FR 8488, Feb. 19, 1999; 65 FR 76135, Dec. 6, 2000; 85 FR 67260, Oct. 21, 2020]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (463)

Current through October 29, 2020; 85 FR 68703.

End of Document                                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
    Subchapter B. Immigration Regulations (Refs & Annos)
      Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
        Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.17

§ 1208.17 Deferral of removal under the Convention Against Torture.

Currentness

(a) Grant of deferral of removal. An alien who: has been ordered removed; has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

(b) Notice to alien.

(1) After an immigration judge orders an alien described in paragraph (a) of this section removed, the immigration judge shall inform the alien that his or her removal to the country where he or she is more likely than not to be tortured shall be deferred until such time as the deferral is terminated under this section. The immigration judge shall inform the alien that deferral of removal:

(i) Does not confer upon the alien any lawful or permanent immigration status in the United States;

(ii) Will not necessarily result in the alien being released from the custody of the Service if the alien is subject to such custody;

(iii) Is effective only until terminated; and

(iv) Is subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred, or if the alien requests that deferral be terminated.

(2) The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is likely to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.

(c) Detention of an alien granted deferral of removal under this section. Nothing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter.

(d) Termination of deferral of removal.

(1) At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 1003.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

(2) The Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail). At the expiration of this 10 or 13 day period, the Immigration Court shall forward a copy of the original application, and any supplemental information the alien or the Service has submitted, to the Department of State, together with notice to the Department of State of the time, place and date of the termination hearing. At its option, the Department of State may provide comments on the case, according to the provisions of § 1208.11 of this part.

(3) The immigration judge shall conduct a hearing and make a de novo determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 1208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

(4) If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country. Appeal of the immigration judge's decision shall lie to the Board.

(e) Termination at the request of the alien.

(1) At any time while deferral of removal is in effect, the alien may make a written request to the Immigration Court having administrative control pursuant to § 1003.11 of this chapter to terminate the deferral order. If satisfied on the basis of the written submission that the alien's request is knowing and voluntary, the immigration judge shall terminate the order of deferral and the alien may be removed.

(2) If necessary the immigration judge may calendar a hearing for the sole purpose of determining whether the alien's request is knowing and voluntary. If the immigration judge determines that the alien's request is knowing and voluntary,

the order of deferral shall be terminated. If the immigration judge determines that the alien's request is not knowing and voluntary, the alien's request shall not serve as the basis for terminating the order of deferral.

(f) Termination pursuant to § 1208.18(c). At any time while deferral of removal is in effect, the Attorney General may determine whether deferral should be terminated based on diplomatic assurances forwarded by the Secretary of State pursuant to the procedures in § 1208.18(c).

**Credits**

[64 FR 8489, Feb. 19, 1999; 68 FR 10352, March 5, 2003]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (50)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
    Title 8. Aliens and Nationality
        Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
            Subchapter B. Immigration Regulations (Refs & Annos)
                Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
                    Subpart A. Asylum and Withholding of Removal

8 C.F.R. § 1208.18

§ 1208.18 Implementation of the Convention Against Torture.

Currentness

(a) Definitions. The definitions in this subsection incorporate the definition of torture contained in Article 1 of the Convention Against Torture, subject to the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture.

(4) In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from:

(i) The intentional infliction or threatened infliction of severe physical pain or suffering;

(ii) The administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(iii) The threat of imminent death; or

(iv) The threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the sense or personality.

(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

(6) In order to constitute torture an act must be directed against a person in the offender's custody or physical control.

(7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.

(8) Noncompliance with applicable legal procedural standards does not per se constitute torture.

(b) Applicability of §§ 1208.16(c) and 1208.17(a)—

(1) Aliens in proceedings on or after March 22, 1999. An alien who is in exclusion, deportation, or removal proceedings on or after March 22, 1999 may apply for withholding of removal under § 1208.16(c), and, if applicable, may be considered for deferral of removal under § 1208.17(a).

(2) Aliens who were ordered removed, or whose removal orders became final, before March 22, 1999. An alien under a final order of deportation, exclusion, or removal that became final prior to March 22, 1999 may move to reopen proceedings for the sole purpose of seeking protection under § 1208.16(c). Such motions shall be governed by §§ 1003.23 and 1003.2 of this chapter, except that the time and numerical limitations on motions to reopen shall not apply and the alien shall not be required to demonstrate that the evidence sought to be offered was unavailable and could not have been discovered or presented at the former hearing. The motion to reopen shall not be granted unless:

(i) The motion is filed within June 21, 1999; and

(ii) The evidence sought to be offered establishes a prima facie case that the applicant's removal must be withheld or deferred under §§ 1208.16(c) or 1208.17(a).

(3) Aliens who, on March 22, 1999, have requests pending with the Service for protection under Article 3 of the Convention Against Torture.

(i) Except as otherwise provided, after March 22, 1999, the Service will not:

(A) Consider, under its pre-regulatory administrative policy to ensure compliance with the Convention Against Torture, whether Article 3 of that Convention prohibits the removal of an alien to a particular country, or

AR.00554

(B) Stay the removal of an alien based on a request filed with the Service for protection under Article 3 of that Convention.

(ii) For each alien who, on or before March 22, 1999, filed a request with the Service for protection under Article 3 of the Convention Against Torture, and whose request has not been finally decided by the Service, the Service shall provide written notice that, after March 22, 1999, consideration for protection under Article 3 can be obtained only through the provisions of this rule.

(A) The notice shall inform an alien who is under an order of removal issued by EOIR that, in order to seek consideration of a claim under §§ 1208.16(c) or 1208.17(a), such an alien must file a motion to reopen with the immigration court or the Board of Immigration Appeals. This notice shall be accompanied by a stay of removal, effective until 30 days after service of the notice on the alien. A motion to reopen filed under this paragraph for the limited purpose of asserting a claim under §§ 1208.16(c) or 1208.17(a) shall not be subject to the requirements for reopening in §§ 1003.2 and 1003.23 of this chapter. Such a motion shall be granted if it is accompanied by a copy of the notice described in paragraph (b)(3)(ii) or by other convincing evidence that the alien had a request pending with the Service for protection under Article 3 of the Convention Against Torture on March 22, 1999. The filing of such a motion shall extend the stay of removal during the pendency of the adjudication of this motion.

(B) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 238(b) of the Act or an exclusion, deportation, or removal order reinstated by the Service under section 241(a)(5) of the Act that the alien's claim to withholding of removal under § 1208.16(c) or deferral of removal under § 1208.17(a) will be considered under § 1208.31.

(C) The notice shall inform an alien who is under an administrative order of removal issued by the Service under section 235(c) of the Act that the alien's claim to protection under the Convention Against Torture will be decided by the Service as provided in § 1208.18(d) and 1235.8(b)(4) and will not be considered under the provisions of this part relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(4) Aliens whose claims to protection under the Convention Against Torture were finally decided by the Service prior to March 22, 1999. Sections 208.16(c) and 208.17(a) and paragraphs (b)(1) through (b)(3) of this section do not apply to cases in which, prior to March 22, 1999, the Service has made a final administrative determination about the applicability of Article 3 of the Convention Against Torture to the case of an alien who filed a request with the Service for protection under Article 3. If, prior to March 22, 1999, the Service determined that an applicant cannot be removed consistent with the Convention Against Torture, the alien shall be considered to have been granted withholding of removal under § 1208.16(c), unless the alien is subject to mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3), in which case the alien will be considered to have been granted deferral of removal under 208.17(a). If, prior to March 22, 1999, the Service determined that an alien can be removed consistent with the Convention Against Torture, the alien will be considered to have been finally denied withholding of removal under § 1208.16(c) and deferral of removal under § 1208.17(a).

(c) Diplomatic assurances against torture obtained by the Secretary of State.

(1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

AR.00555

(2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. The Attorney General's authority under this paragraph may be exercised by the Deputy Attorney General or by the Commissioner, Immigration and Naturalization Service, but may not be further delegated.

(3) Once assurances are provided under paragraph (c)(2) of this section, the alien's claim for protection under the Convention Against Torture shall not be considered further by an immigration judge, the Board of Immigration Appeals, or an asylum officer.

(d) Cases involving aliens ordered removed under section 235(c) of the Act. With respect to an alien terrorist or other alien subject to administrative removal under section 235(c) of the Act who requests protection under Article 3 of the Convention Against Torture, the Service will assess the applicability of Article 3 through the removal process to ensure that a removal order will not be executed under circumstances that would violate the obligations of the United States under Article 3. In such cases, the provisions of Part 208 relating to consideration or review by an immigration judge, the Board of Immigration Appeals, or an asylum officer shall not apply.

(e) Judicial review of claims for protection from removal under Article 3 of the Convention Against Torture.

(1) Pursuant to the provisions of section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998, there shall be no judicial appeal or review of any action, decision, or claim raised under the Convention or that section, except as part of the review of a final order of removal pursuant to section 242 of the Act; provided however, that any appeal or petition regarding an action, decision, or claim under the Convention or under section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 shall not be deemed to include or authorize the consideration of any administrative order or decision, or portion thereof, the appeal or review of which is restricted or prohibited by the Act.

(2) Except as otherwise expressly provided, nothing in this paragraph shall be construed to create a private right of action or to authorize the consideration or issuance of administrative or judicial relief.

**Credits**
[64 FR 8490, Feb. 19, 1999; 64 FR 13881, March 23, 1999; 68 FR 10352, March 5, 2003]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (123)

Current through October 29, 2020; 85 FR 68703.

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter B. Immigration Regulations (Refs & Annos)
        Part 1208. Procedures for Asylum and Withholding of Removal (Refs & Annos)
          Subpart B. Credible Fear of Persecution

8 C.F.R. § 1208.31

§ 1208.31 Reasonable fear of persecution or torture determinations involving aliens ordered removed under section 238(b) of the Act and aliens whose removal is reinstated under section 241(a)(5) of the Act.

Currentness

(a) Jurisdiction. This section shall apply to any alien ordered removed under section 238(b) of the Act or whose deportation, exclusion, or removal order is reinstated under section 241(a)(5) of the Act who, in the course of the administrative removal or reinstatement process, expresses a fear of returning to the country of removal. The Service has exclusive jurisdiction to make reasonable fear determinations, and EOIR has exclusive jurisdiction to review such determinations.

(b) Initiation of reasonable fear determination process. Upon issuance of a Final Administrative Removal Order under § 238.1 of this chapter, or notice under § 1241.8(b) of this chapter that an alien is subject to removal, an alien described in paragraph (a) of this section shall be referred to an asylum officer for a reasonable fear determination. In the absence of exceptional circumstances, this determination will be conducted within 10 days of the referral.

(c) Interview and procedure. The asylum officer shall conduct the interview in a non-adversarial manner, separate and apart from the general public. At the time of the interview, the asylum officer shall determine that the alien has an understanding of the reasonable fear determination process. The alien may be represented by counsel or an accredited representative at the interview, at no expense to the Government, and may present evidence, if available, relevant to the possibility of persecution or torture. The alien's representative may present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and the length of the statement. If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter may not be a representative or employee of the applicant's country or nationality, or if the applicant is stateless, the applicant's country of last habitual residence. The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture. The alien shall be determined to have a reasonable fear of persecution or torture if the alien establishes a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal. For purposes of the screening determination, the bars to eligibility for withholding of removal under section 241(b)(3)(B) of the Act shall not be considered.

(d) Authority. Asylum officers conducting screening determinations under this section shall have the authority described in § 1208.9(c).

(e) Referral to Immigration Judge. If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal only. Such cases shall be adjudicated by the immigration judge in accordance with the provisions of § 1208.16. Appeal of the immigration judge's decision shall lie to the Board of Immigration Appeals.

(f) Removal of aliens with no reasonable fear of persecution or torture. If the asylum officer determines that the alien has not established a reasonable fear of persecution or torture, the asylum officer shall inform the alien in writing of the decision and shall inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–898, Record of Negative Reasonable Fear Finding and Request for Review by Immigration Judge, on which the alien shall indicate whether he or she desires such review.

(g) Review by immigration judge. The asylum officer's negative decision regarding reasonable fear shall be subject to review by an immigration judge upon the alien's request. If the alien requests such review, the asylum officer shall serve him or her with a Form I–863. The record of determination, including copies of the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. In the absence of exceptional circumstances, such review shall be conducted by the immigration judge within 10 days of the filing of the Form I–863 with the immigration court. Upon review of the asylum officer's negative reasonable fear determination:

(1) If the immigration judge concurs with the asylum officer's determination that the alien does not have a reasonable fear of persecution or torture, the case shall be returned to the Service for removal of the alien. No appeal shall lie from the immigration judge's decision.

(2) If the immigration judge finds that the alien has a reasonable fear of persecution or torture, the alien may submit Form I–589, Application for Asylum and Withholding of Removal.

(i) The immigration judge shall consider only the alien's application for withholding of removal under § 1208.16 and shall determine whether the alien's removal to the country of removal must be withheld or deferred.

(ii) Appeal of the immigration judge's decision whether removal must be withheld or deferred lies to the Board of Immigration Appeals. If the alien or the Service appeals the immigration judge's decision, the Board shall review only the immigration judge's decision regarding the alien's eligibility for withholding or deferral of removal under § 1208.16.

**Credits**

[64 FR 8493, Feb. 19, 1999; 64 FR 13881, March 23, 1999; 68 FR 10352, March 5, 2003]

SOURCE: 62 FR 10337, March 6, 1997; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9834, Feb. 28, 2003; 69 FR 69497, Nov. 29, 2004; 70 FR 4754, Jan. 31, 2005; 74 FR 55741, Oct. 28, 2009; 85 FR 23904, April 30, 2020, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub.L. 110–229; Pub.L. 115–218.

Notes of Decisions (1921)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
    Subchapter B. Immigration Regulations (Refs & Annos)
      Part 1240. Proceedings to Determine Removability of Aliens in the United States (Refs & Annos)
    Subpart A. Removal Proceedings

8 C.F.R. § 1240.1

§ 1240.1 Immigration judges.

Effective: October 22, 2007

Currentness

(a) Authority.

(1) In any removal proceeding pursuant to section 240 of the Act, the immigration judge shall have the authority to:

(i) Determine removability pursuant to section 240(a)(1) of the Act; to make decisions, including orders of removal as provided by section 240(c)(1)(A) of the Act;

(ii) To determine applications under sections 208, 212(a)(2)(F), 212(a)(6)(F)(ii), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(g), 212(h), 212(i), 212(k), 237(a)(1)(E)(iii), 237(a)(1)(H), 237(a)(3)(C)(ii), 240A(a) and (b), 240B, 245, and 249 of the Act, section 202 of Pub.L. 105–100, section 902 of Pub.L. 105–277, and former section 212(c) of the Act (as it existed prior to April 1, 1997);

(iii) To order withholding of removal pursuant to section 241(b)(3) of the Act and pursuant to the Convention Against Torture; and

(iv) To take any other action consistent with applicable law and regulations as may be appropriate.

(2) An immigration judge may certify his or her decision in any case under section 240 of the Act to the Board of Immigration Appeals when it involves an unusually complex or novel question of law or fact. Nothing contained in this part shall be construed to diminish the authority conferred on immigration judges under sections 101(b)(4) and 103 of the Act.

(b) Withdrawal and substitution of immigration judges. The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to complete the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

(c) Conduct of hearing. The immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing.

(d) Withdrawal of application for admission. An immigration judge may allow only an arriving alien to withdraw an application for admission. Once the issue of inadmissibility has been resolved, permission to withdraw an application for admission should ordinarily be granted only with the concurrence of the Service. An immigration judge shall not allow an alien to withdraw an application for admission unless the alien, in addition to demonstrating that he or she possesses both the intent and the means to depart immediately from the United States, establishes that factors directly relating to the issue of inadmissibility indicate that the granting of the withdrawal would be in the interest of justice. During the pendency of an appeal from the order of removal, permission to withdraw an application for admission must be obtained from the immigration judge or the Board.

**Credits**

[62 FR 15363, April 1, 1997; 63 FR 27829, May 21, 1998; 64 FR 8495, Feb. 19, 1999; 64 FR 25766, May 12, 1999; 65 FR 15844, 15854, March 24, 2000; 69 FR 57835, Sept. 28, 2004; 72 FR 53678, Sept. 20, 2007]

SOURCE: 62 FR 10367, March 6, 1997; 63 FR 27829, May 21, 1998; 64 FR 25766, May 12, 1999; 64 FR 27875, May 21, 1999; 65 FR 15844, March 24, 2000; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9838, Feb. 28, 2003; 69 FR 57835, Sept. 28, 2004; 69 FR 69497, Nov. 29, 2004; 70 FR 674, Jan. 5, 2005; 71 FR 35757, June 21, 2006; 78 FR 19080, March 29, 2013, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub.L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub.L. 105–277 (112 Stat. 2681).

Notes of Decisions (23)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 8. Aliens and Nationality
        Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
        Subchapter B. Immigration Regulations (Refs & Annos)
            Part 1240. Proceedings to Determine Removability of Aliens in the United States (Refs & Annos)
            Subpart A. Removal Proceedings

8 C.F.R. § 1240.8

§ 1240.8 Burdens of proof in removal proceedings.

Currentness

(a) Deportable aliens. A respondent charged with deportability shall be found to be removable if the Service proves by clear and convincing evidence that the respondent is deportable as charged.

(b) Arriving aliens. In proceedings commenced upon a respondent's arrival in the United States or after the revocation or expiration of parole, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(c) Aliens present in the United States without being admitted or paroled. In the case of a respondent charged as being in the United States without being admitted or paroled, the Service must first establish the alienage of the respondent. Once alienage has been established, unless the respondent demonstrates by clear and convincing evidence that he or she is lawfully in the United States pursuant to a prior admission, the respondent must prove that he or she is clearly and beyond a doubt entitled to be admitted to the United States and is not inadmissible as charged.

(d) Relief from removal. The respondent shall have the burden of establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion. If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

SOURCE: 62 FR 10367, March 6, 1997; 63 FR 27829, May 21, 1998; 64 FR 25766, May 12, 1999; 64 FR 27875, May 21, 1999; 65 FR 15844, March 24, 2000; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9838, Feb. 28, 2003; 69 FR 57835, Sept. 28, 2004; 69 FR 69497, Nov. 29, 2004; 70 FR 674, Jan. 5, 2005; 71 FR 35757, June 21, 2006; 78 FR 19080, March 29, 2013, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub.L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub.L. 105–277 (112 Stat. 2681).

Notes of Decisions (30)

Current through October 29, 2020; 85 FR 68703.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
    Subchapter B. Immigration Regulations (Refs & Annos)
      Part 1241. Apprehension and Detention of Aliens Ordered Removed (Refs & Annos)
      Subpart A. Post-Hearing Detention and Removal

8 C.F.R. § 1241.8

§ 1241.8 Reinstatement of removal orders.

Currentness

(a) Applicability. An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances. In establishing whether an alien is subject to this section, the immigration officer shall determine the following:

(1) Whether the alien has been subject to a prior order of removal. The immigration officer must obtain the prior order of exclusion, deportation, or removal relating to the alien.

(2) The identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who departed voluntarily while under an order of exclusion, deportation, or removal. In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints between those of the previously excluded, deported, or removed alien contained in Service records and those of the subject alien. In the absence of fingerprints in a disputed case the alien shall not be removed pursuant to this paragraph.

(3) Whether the alien unlawfully reentered the United States. In making this determination, the officer shall consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

(b) Notice. If an officer determines that an alien is subject to removal under this section, he or she shall provide the alien with written notice of his or her determination. The officer shall advise the alien that he or she may make a written or oral statement contesting the determination. If the alien wishes to make such a statement, the officer shall allow the alien to do so and shall consider whether the alien's statement warrants reconsideration of the determination.

(c) Order. If the requirements of paragraph (a) of this section are met, the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with section 241(a)(5) of the Act.

(d) Exception for applicants for benefits under section 902 of HRIFA or sections 202 or 203 of NACARA. If an alien who is otherwise subject to this section has applied for adjustment of status under either section 902 of Division A of Public Law 105–277, the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA), or section 202 of Public Law 105–100, the

Nicaraguan Adjustment and Central American Relief Act (NACARA), the provisions of section 241(a)(5) of the Immigration and Nationality Act shall not apply. The immigration officer may not reinstate the prior order in accordance with this section unless and until a final decision to deny the application for adjustment has been made. If the application for adjustment of status is granted, the prior order shall be rendered moot.

(e) Exception for withholding of removal. If an alien whose prior order of removal has been reinstated under this section expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture pursuant to § 1208.31 of this chapter.

(f) Execution of reinstated order. Execution of the reinstated order of removal and detention of the alien shall be administered in accordance with this part.

**Credits**

[64 FR 8495, Feb. 19, 1999; 66 FR 29451, May 31, 2001; 68 FR 10357, March 5, 2003]

SOURCE: 62 FR 10378, March 6, 1997; 65 FR 80294, Dec. 21, 2000; 66 FR 29451, May 31, 2001; 67 FR 19511, April 22, 2002; 68 FR 4367, Jan. 29, 2003; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9840, Feb. 28, 2003; 70 FR 674, Jan. 5, 2005, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1223, 1224, 1225, 1226, 1227, 1231, 1251, 1253, 1255, 1330, 1362; 18 U.S.C. 4002, 4013(c)(4).

Notes of Decisions (8)

Current through October 29, 2020; 85 FR 68703.

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<div style="border:1px solid">

Code of Federal Regulations
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
      Subchapter B. Immigration Regulations (Refs & Annos)
        Part 1270. Penalties for Document Fraud (Refs & Annos)

</div>

8 C.F.R. § 1270.2

§ 1270.2 Enforcement procedures.

Currentness

(a) Procedures for the filing of complaints. Any person or entity having knowledge of a violation or potential violation of section 274C of the Act may submit a signed, written complaint to the Service office having jurisdiction over the business or residence of the potential violator or the location where the violation occurred. The signed, written complaint must contain sufficient information to identify both the complainant and the alleged violator, including their names and addresses. The complaint should also contain detailed factual allegations relating to the potential violation including the date, time and place of the alleged violation and the specific act or conduct alleged to constitute a violation of the Act. Written complaints may be delivered either by mail to the appropriate Service office or by personally appearing before any immigration officer at a Service office.

(b) Investigation. When the Service receives complaints from a third party in accordance with paragraph (a) of this section, it shall investigate only those complaints which, on their face, have a substantial probability of validity. The Service may also conduct investigations for violations on its own initiative, and without having received a written complaint. If it is determined after investigation that the person or entity has violated section 274C of the Act, the Service may issue and serve upon the alleged violator a Notice of Intent to Fine.

(c) Issuance of a subpoena. Service officers shall have reasonable access to examine any relevant evidence of any person or entity being investigated. The Service may issue subpoenas pursuant to its authority under sections 235(a) and 287 of the Act, in accordance with the procedures set forth in § 1287.4 of this chapter.

(d) Notice of Intent to Fine. The proceeding to assess administrative penalties under section 274C of the Act is commenced when the Service issues a Notice of Intent to Fine. Service of this notice shall be accomplished by personal service pursuant to § 103.5a(a)(2) of 8 CFR chapter I. Service is effective upon receipt, as evidenced by the certificate of service or the certified mail return receipt. The person or entity identified in the Notice of Intent to Fine shall be known as the respondent. The Notice of Intent to Fine may be issued by an officer defined in § 242.1 of this chapter or by an INS port director designated by his or her district director.

(e) Contents of the Notice of Intent to Fine.

(1) The Notice of Intent to Fine shall contain the basis for the charge(s) against the respondent, the statutory provisions alleged to have been violated, and the monetary amount of the penalty the Service intends to impose.

(2) The Notice of Intent to Fine shall provide the following advisals to the respondent:

(i) That the person or entity has the right to representation by counsel of his or her own choice at no expense to the government;

(ii) That any statement given may be used against the person or entity;

(iii) That the person or entity has the right to request a hearing before an administrative law judge pursuant to 5 U.S.C. 554–557, and that such request must be filed with INS within 60 days from the service of the Notice of Intent to Fine; and

(iv) That if a written request for a hearing is not timely filed, the Service will issue a final order from which there is no appeal.

(f) Request for hearing before an administrative law judge. If a respondent contests the issuance of a Notice of Intent to Fine, the respondent must file with the INS, within 60 days of the Notice of Intent to Fine, a written request for a hearing before an administrative law judge. Any written request for a hearing submitted in a foreign language must be accompanied by an English language translation. A request for hearing is deemed filed when it is either received by the Service office designated in the Notice of Intent to Fine, or addressed to such office, stamped with the proper postage, and postmarked within the 60–day period. In computing the 60–day period prescribed by this section, the day of service of the Notice of Intent to Fine shall not be included. In the request for a hearing, the respondent may, but is not required to, respond to each allegation listed in the Notice of Intent to Fine. A respondent may waive the 60–day period in which to request a hearing before an administrative law judge and ask that the INS issue a final order from which there is no appeal. Prior to execution of the waiver, a respondent who is not a United States citizen will be advised that a waiver of a section 274C hearing will result in the issuance of a final order and that the respondent will be excludable and/or deportable from the United States pursuant to the Act.

(g) Failure to file a request for hearing. If the respondent does not file a written request for a hearing within 60 days of service of the Notice of Intent to Fine, the INS shall issue a final order from which there shall be no appeal.

(h) Issuance of the final order. A final order may be issued by an officer defined in § 242.1 of 8 CFR chapter I, by an INS port director designated by his or her district director, or by the Director of the INS National Fines Office.

(i) Service of the final order—

(1) Generally. Service of the final order shall be accomplished by personal service pursuant to § 103.5a(a)(2) of 8 CFR chapter I. Service is effective upon receipt, as evidenced by the certificate of service or the certified mail return receipt.

(2) Alternative provisions for service in a foreign country. When service is to be effected upon a party in a foreign country, it is sufficient if service of the final order is made:

(i) In the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or

AR.00568

(ii) As directed by the foreign authority in response to a letter rogatory, when service in either case is reasonably calculated to give actual notice; or

(iii) When applicable, pursuant to § 103.5a(a)(2) of 8 CFR chapter I.

Service is effective upon receipt of the final order. Proof of service may be made as prescribed by the law of the foreign country, or, when service is pursuant to § 103.5a(a)(2) of 8 CFR chapter I, as evidenced by the certificate of service or the certified mail return receipt.

(j) Declination to file charges for document fraud committed by refugees at the time of entry. The Service shall not issue a Notice of Intent to Fine for acts of document fraud committed by an alien pursuant to direct departure from a country in which the alien has a well-founded fear of persecution or from which there is a significant danger that the alien would be returned to a country in which the alien would have a well-founded fear of persecution, provided that the alien has presented himself or herself without delay to an INS officer and shown good cause for his or her illegal entry or presence. Other acts of document fraud committed by such an alien may result in the issuance of a Notice of Intent to Fine and the imposition of civil money penalties.

SOURCE: 57 FR 33866, July 31, 1992; 64 FR 47101, Aug. 30, 1999; 68 FR 9830, 9832, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 68 FR 9843, Feb. 28, 2003, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, and 1324c; Pub.L. 101–410, 104 Stat. 890, as amended by Pub.L. 104–134, 110 Stat. 1321.

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid  Hemp Industries Ass'n. v. Drug Enforcement Admin.,  9th Cir.,  Feb. 06, 2004

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations
Title 21. Food and Drugs
Chapter II. Drug Enforcement Administration, Department of Justice
Part 1308. Schedules of Controlled Substances (Refs & Annos)
Schedules

21 C.F.R. § 1308.11

§ 1308.11 Schedule I.

Effective: October 2, 2020
Currentness

(a) Schedule I shall consist of the drugs and other substances, by whatever official name, common or usual name, chemical name, or brand name designated, listed in this section. Each drug or substance has been assigned the DEA Controlled Substances Code Number set forth opposite it.

(b) Opiates. Unless specifically excepted or unless listed in another schedule, any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters and ethers, whenever the existence of such isomers, esters, ethers and salts is possible within the specific chemical designation (for purposes of 3–methylthiofentanyl only, the term isomer includes the optical and geometric isomers):

(1)    Acetyl-alpha-methylfentanyl (N-[1-(methyl-2-phenethyl)-4- piperidinyl]-N-phenylacetamide)........................9815

(2)    Acetylmethadol................................................................................................................9601

(3)    Acetyl fentanyl (N–(1–phenethylpiperidin–4–yl)–N–phenylacetamide)..................................................9821

(4)    Acryl fentanyl (N–(1–phenethylpiperidin–4–yl)–N–phenylacrylamide; other name: acryloylfentanyl) . . ...  ..........9811

(5)    AH-7921 (3,4-dichloro-N-[(1-dimethylamino) cyclohexylmethyl]benzamide................................. .........9551

(6)    Allylprodine.....................................................................................................................9602

(7)    Alphacetylmethadol (except levo-alphacetylmethadol also known as levo-alpha-acetylmethadol, levomethadyl acetate, or LAAM)........................................................................................................9603

(8)    Alphameprodine..............................................................................................................9604

(9)    Alphamethadol............................................................................................... ........ .........9605

(10)    Alpha-methylfentanyl (N-[1-(alpha-methyl-beta-phenyl)ethyl-4-piperidyl] propionanilide; 1-(1-methyl-2-phenylethyl)-4-(N-propanilido) piperidine)..................................................... ..........9814

(11)   Alpha-methylthiofentanyl (N-[1-methyl-2-(2-thienyl)ethyl-4- piperidinyl]-N-phenylpropanamide).................9832

(12)   Benzethidine.................9606

(13)   Betacetylmethadol.................9607

(14)   Beta-hydroxyfentanyl (N-[1-(2-hydroxy-2-phenethyl)- 4-piperidinyl]-N-phenylpropanamide).................9830

(15)   Beta-hydroxy-3-methylfentanyl (other name: N-[1-(2-hydroxy-2- phenethyl)-3-methyl-4-piperidinyl]-N-phenylpropanamide.................9831

(16)   N-[1-[2-hydroxy-2-(thiophen-2-yl)ethyl]piperidin-4-yl]-N-phenylpropionamide (Other name: beta-Hydroxythiofentanyl).................9836

(17)   Betameprodine.................9608

(18)   Betamethadol.................9609

(19)   Betaprodine.................9611

(20)   Butyryl fentanyl (N-(1-phenethylpiperidin-4-yl)-N-phenylbutyramide).................9822

(21)   Clonitazene.................9612

(22)   Crotonyl fentanyl ((E)-N-(1-phenethylpiperidin-4-yl)-N-phenylbut-2-enamide).................9844

(23)   Cyclopropyl fentanyl (N–(1–phenethylpiperidin–4–yl)–N–phenylcyclopropanecarboxamide).................9845

(24)   Dextromoramide.................9613

(25)   Diampromide.................9615

(26)   Diethylthiambutene.................9616

(27)   Difenoxin.................9168

(28)   Dimenoxadol.................9617

(29)   Dimepheptanol.................9618

(30)   Dimethylthiambutene.................9619

(31)   Dioxaphetyl butyrate.................9621

(32)   Dipipanone.................9622

(33)   Ethylmethylthiambutene.................9623

(34)   Etonitazene.................9624

(35)   Etoxeridine.................9625

(36)   4–Fluoroisobutyryl fentanyl (N–(4–fluorophenyl)–N–(1–phenethylpiperidin–4–yl)isobutyramide; other name: para-fluoroisobutyryl fentanyl).................9824

(37)   Furanyl fentanyl (N–(1–phenethylpiperidin–4–yl)–N–phenylfuran–2–carboxamide).................9834

(38)   Furethidine.................9626

(39)    Hydroxypethidine.....................................................................................................................9627

(40)    Ketobemidone.........................................................................................................................9628

(41)    Levomoramide........................................................................................................................9629

(42)    Levophenacylmorphan...........................................................................................................9631

(43)    Methoxyacetyl fentanyl (2–methoxy–N–(1–phenethylpiperidin–4–yl)–N–phenylacetamide)..................... ...........9825

(44)    3-Methylfentanyl (N-[3-methyl-1-(2-phenylethyl)-4- piperidyl]-N-phenylpropanamide)................................9813

(45)    3-methylthiofentanyl (N-[(3-methyl-1-(2-thienyl)ethyl-4- piperidinyl]-N-phenylpropanamide)....................9833

(46)    Morpheridine...........................................................................................................................9632

(47)    MPPP (1-methyl-4-phenyl-4-propionoxypiperidine)................................................................9661

(48)    MT–45 (1–cyclohexyl–4–(1,2–diphenylethyl)piperazine).................................................... ......(9560)

(49)    Noracymethadol.......................................................................................................................9633

(50)    Norlevorphanol.......................................................................................................................9634

(51)    Normethadone..........................................................................................................................9635

(52)    Norpipanone............................................................................................................................9636

(53)    Ocfentanil (N–(2–fluorophenyl)–2–methoxy–N–(1–phenethylpiperidin–4–yl)acetamide)............................9838

(54)    ortho–Fluorofentanyl (N–(2–fluorophenyl)–N–(1–phenethylpiperidin–4–yl)propionamide); other name:
        2–fluorofentanyl)...................................................................................................................9816

(55)    para–Fluorobutyryl fentanyl (N–(4–fluorophenyl)–N–(1–phenethylpiperidin–4–yl)butyramide)........................9823

(56)    Para-fluorofentanyl (N-(4-fluorophenyl)- N-[1-(2-phenethyl)-4-piperidinyl] propanamide...........................9812

(57)    PEPAP (1-(-2-phenethyl)-4-phenyl-4-acetoxypiperidine...........................................................9663

(58)    Phenadoxone...........................................................................................................................9637

(59)    Phenampromide.......................................................................................................................9638

(60)    Phenomorphan........................................................................................................................9647

(61)    Phenoperidine.........................................................................................................................9641

(62)    Piritramide..............................................................................................................................9642

(63)    Proheptazine...........................................................................................................................9643

(64)    Properidine.............................................................................................................................9644

(65)    Propiram.................................................................................................................................9649

(66)    Racemoramide.........................................................................................................................9645

(67)   Tetrahydrofuranyl fentanyl (N–(1–phenethylpiperidin–4–yl)–N–phenyltetrahydrofuran–2–carboxamide).. ..........9843

(68)   Thiofentanyl (N-phenyl-N-[1-(2-thienyl)ethyl-4-piperidinyl]-propanamide........................................................9835

(69)   Tilidine...................................................................................................................................................................9750

(70)   Trimeperidine.......................................................................................................................................................9646

(71)   U-47700 (3,4-Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide).................................................9547

(c) Opium derivatives. Unless specifically excepted or unless listed in another schedule, any of the following opium derivatives, its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(1)    Acetorphine........................................................................................................................................ ...........9319

(2)    Acetyldihydrocodeine...........................................................................................................................9051

(3)    Benzylmorphine.............................................................................................................................. ...........9052

(4)    Codeine methylbromide.........................................................................................................................9070

(5)    Codeine-N-Oxide...................................................................................................................................9053

(6)    Cyprenorphine.......................................................................................................................................9054

(7)    Desomorphine.......................................................................................................................................9055

(8)    Dihydromorphine..................................................................................................................................9145

(9)    Drotebanol.............................................................................................................................................9335

(10)   Etorphine (except hydrochloride salt)................................................................................ ...........9056

(11)   Heroin....................................................................................................................................................9200

(12)   Hydromorphinol....................................................................................................................................9301

(13)   Methyldesorphine..................................................................................................................................9302

(14)   Methyldihydromorphine........................................................................................................................9304

(15)   Morphine methylbromide......................................................................................................................9305

(16)   Morphine methylsulfonate.....................................................................................................................9306

(17)   Morphine-N-Oxide.................................................................................................................................9307

(18)   Myrophine..............................................................................................................................................9308

(19)   Nicocodeine...........................................................................................................................................9309

(20)   Nicomorphine.........................................................................................................................................9312

(21)   Normorphine..........................................................................................................................................9313

(22)   Pholcodine...................................................................................................................9314

(23)   Thebacon....................................................................................................................9315

(d) Hallucinogenic substances. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation (for purposes of this paragraph only, the term "isomer" includes the optical, position and geometric isomers):

(1)   Alpha-ethyltryptamine..................................................................................................7249

Some trade or other names: etryptamine; Monase; α-ethyl-1H-indole-3-ethanamine; 3-(2-aminobutyl) indole; α-ET; and AET.

(2)   4-bromo-2,5-dimethoxy-amphetamine............................................................................7391

Some trade or other names: 4-bromo-2,5-dimethoxy-α-methylphenethylamine; 4-bromo-2,5-DMA

(3)   4-Bromo-2,5-dimethoxyphenethylamine...........................................................................7392

Some trade or other names: 2-(4-bromo-2,5-dimethoxyphenyl)-1-aminoethane; alpha-desmethyl DOB; 2C-B, Nexus.

(4)   2,5-dimethoxyamphetamine..........................................................................................7396

Some trade or other names: 2,5-dimethoxy-α-methylphenethylamine; 2,5-DMA

(5)   2,5-dimethoxy-4-ethylamphet-amine...............................................................................7399

Some trade or other names: DOET

(6)   2,5-dimethoxy-4-(n)-propylthiophenethylamine (other name: 2C-T-7)..................................7348

(7)   4-methoxyamphetamine.................................................................................................7411

Some trade or other names: 4-methoxy-α-methylphenethylamine; paramethoxyamphetamine, PMA

(8)   5–methoxy–3,4–methylenedioxy-amphetamine...................................................................7401

(9)   4-methyl-2,5-dimethoxy-amphetamine.............................................................................7395

Some trade and other names: 4-methyl-2,5-dimethoxy-α-methylphenethylamine; "DOM"; and "STP"

(10)   3,4-methylenedioxy amphetamine.................................................................................7400

(11)   3,4-methylenedioxymethamphetamine (MDMA)..............................................................7405

(12)   3,4-methylenedioxy-N-ethylamphetamine (also known as N-ethyl-alpha-methyl-3,4(methylenedioxy)phenethylamine, N-ethyl MDA, MDE, MDEA.........................................7404

(13)   N-hydroxy-3,4-methylenedioxyamphetamine (also known as N-hydroxy-alpha-methyl-3,4(methylenedioxy)phenethylamine, and N-hydroxy MDA.............................................7402

AR.00574

(14)   3,4,5-trimethoxy amphetamine...........................................................................................7390

(15)   5–methoxy–N,N–dimethyltryptamine. Some trade or other names: 5–methoxy–3–[2–
(dimethylamino)ethyl]indole; 5–MeO–DMT...........................................................................7431

(16)   Alpha-methyltryptamine (other name: AMT)........................................................................7432

(17)   Bufotenine...................................................................................................................7433

Some trade and other names: 3-(β-Dimethylaminoethyl)-5- hydroxyindole; 3-(2-
dimethylaminoethyl)-5-indolol; N, N-dimethylserotonin; 5-hydroxy-N,N- dimethyltryptamine;
mappine

(18)   Diethyltryptamine...........................................................................................................7434

Some trade and other names: N,N-Diethyltryptamine; DET

(19)   Dimethyltryptamine.........................................................................................................7435

Some trade or other names: DMT

(20)   5–methoxy–N,N–diisopropyltryptamine (other name: 5–MeO–DIPT).........................................7439

(21)   Ibogaine......................................................................................................................7260

Some trade and other names: 7-Ethyl-6,6&beta;,7,8,9,10,12,13- octahydro-2-methoxy-6,9-
methano-5H-pyrido [1′, 2′:1,2] azepino [5,4-b] indole; Tabernanthe iboga

(22)   Lysergic acid diethylamide...............................................................................................7315

(23)   Marihuana...................................................................................................................7360

(24)   Mescaline....................................................................................................................7381

(25)   Parahexyl–7374; some trade or other names: 3-Hexyl-1-hydroxy- 7,8,9,10-tetrahydro-6,6,9-
trimethyl-6H-dibenzo[b,d]pyran; Synhexyl.

(26)   Peyote........................................................................................................................7415

Meaning all parts of the plant presently classified botanically as Lophophora williamsii Lemaire,
whether growing or not, the seeds thereof, any extract from any part of such plant, and every
compound, manufacture, salts, derivative, mixture, or preparation of such plant, its seeds or extracts

(Interprets 21 USC 812(c), Schedule I(c) (12))

(27)   N-ethyl-3-piperidyl benzilate.............................................................................................7482

(28)   N-methyl-3-piperidyl benzilate...........................................................................................7484

(29)   Psilocybin....................................................................................................................7437

(30)   Psilocyn......................................................................................................................7438

(31)   Tetrahydrocannabinols....................................................................................................7370

(i) Meaning tetrahydrocannabinols, except as in paragraph (d)(31)(ii) of this section, naturally
contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the
substances contained in the cannabis plant, or in the resinous extractives of such plant, and/or synthetic

substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant, such as the following:

1 cis or trans tetrahydrocannabinol, and their optical isomers

6 cis or trans tetrahydrocannabinol, and their optical isomers

3, 4 cis or trans tetrahydrocannabinol, and its optical isomers

(Since nomenclature of these substances is not internationally standardized, compounds of these structures, regardless of numerical designation of atomic positions covered.)

(ii) Tetrahydrocannabinols does not include any material, compound, mixture, or preparation that falls within the definition of hemp set forth in 7 U.S.C. 1639*o*.

(32) Ethylamine analog of phencyclidine..............................................................................................7455

Some trade or other names: N-ethyl-1-phenylcyclohexylamine, (1-phenylcyclohexyl)ethylamine, N-(1-phenylcyclohexyl)ethylamine, cyclohexamine, PCE

(33) Pyrrolidine analog of phencyclidine................................................................................................7458

Some trade or other names: 1-(1-phenylcyclohexyl)-pyrrolidine, PCPy, PHP

(34) Thiophene analog of phencyclidine..................................................................................................7470

Some trade or other names: 1-[1-(2-thienyl)-cyclohexyl]-piperidine, 2-thienylanalog of phencyclidine, TPCP, TCP

(35) 1-[1-(2-thienyl)cyclohexyl]pyrrolidine............................................................................................7473

Some other names: TCPy

(36) 4-methylmethcathinone (Mephedrone)............................................................................................1248

(37) 3,4-methylenedioxypyrovalerone (MDPV).......................................................................................7535

(38) 2-(2,5-Dimethoxy-4-ethylphenyl)ethanamine (2C-E)......................................................................7509

(39) 2-(2,5-Dimethoxy-4-methylphenyl)ethanamine (2C-D)....................................................................7508

(40) 2-(4-Chloro-2,5-dimethoxyphenyl)ethanamine (2C-C).....................................................................7519

(41) 2-(4-Iodo-2,5-dimethoxyphenyl)ethanamine (2C-I).........................................................................7518

(42) 2-[4-(Ethylthio)-2,5-dimethoxyphenyl]ethanamine (2C-T-2)...........................................................7385

(43) 2-[4-(Isopropylthio)-2,5-dimethoxyphenyl]ethanamine (2C-T-4).....................................................7532

(44) 2-(2,5-Dimethoxyphenyl)ethanamine (2C-H)...................................................................................7517

(45) 2-(2,5-Dimethoxy-4-nitro-phenyl)ethanamine (2C-N)......................................................................7521

(46) 2-(2,5-Dimethoxy-4-(n)-propylphenyl)ethanamine (2C-P)...............................................................7524

(47) 3,4-Methylenedioxy-N-methylcathinone (Methylone).....................................................................7540

(48) (1-pentyl-1H-indol-3-yl)(2,2,3,3-tetramethylcyclopropyl)methanone (UR-144)............................(7144)

(49)   [1-(5-fluoro-pentyl)-1H-indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone (5-fluoro-UR-144, XLR11)..................................................................................................................(7011)

(50)   N-(1-adamantyl)-1-pentyl-1H-indazole-3-carboxamide (APINACA, AKB48).............................(7048)

(51)   quinolin-8-yl 1-pentyl-1H-indole-3-carboxylate (PB-22; QUPIC)..............................................(7222)

(52)   quinolin-8-yl 1-(5-fluoropentyl)-1H-indole-3-carboxylate (5-fluoro-PB-22; 5F-PB-22)...................(7225)

(53)   N-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1H-indazole-3-carboxamide (AB-FUBINACA).........................................................................................................................(7012)

(54)   N-(1-amino-3,3-dimethyl-1-oxobutan-2-yl)-1-pentyl-1H-indazole-3-carboxamide (ADB-PINACA)..........(7035)

(55)   2–(4–iodo–2,5–dimethoxyphenyl)–N–(2–methoxybenzyl)ethanamine (25I–NBOMe, 2C–I–NBOMe)........(7538)

(56)   2–(4–chloro–2,5–dimethoxyphenyl)–N–(2–methoxybenzyl)ethanamine (25C–NBOMe, 2C–C–NBOMe). ...(7537)

(57)   2–(4–bromo–2,5–dimethoxyphenyl)–N–(2–methoxybenzyl)ethanamine (25B–NBOMe, 2C–B–NBOMe). ...(7536)

(58)   Marihuana Extract...................................................................................................................7350

Meaning an extract containing one or more cannabinoids that has been derived from any plant of the genus Cannabis, containing greater than 0.3% delta–9–tetrahydrocannabinol on a dry weight basis, other than the separated resin (whether crude or purified) obtained from the plant.

(59)   4-methyl-N-ethylcathinone (4-MEC)........................................................................................(1249)

(60)   4-methyl-alpha-pyrrolidinopropiophenone (4-MePPP)................................................................(7498)

(61)   alpha-pyrrolidinopentiophenone (α-PVP).................................................................................(7545)

(62)   1-(1,3-benzodioxol-5-yl)-2-(methylamino)butan-1-one (butylone, bk-MBDB).................................(7541)

(63)   2-(methylamino)-1-phenylpentan-1-one (pentedrone)................................................................(1246)

(64)   1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one (pentylone, bk-MBDP)..............................(7542)

(65)   4-fluoro-N-methylcathinone (4-FMC; flephedrone)....................................................................(1238)

(66)   3-fluoro-N-methylcathinone (3-FMC)......................................................................................(1233)

(67)   1-(naphthalen-2-yl)-2-(pyrrolidin-1-yl)pentan-1-one (naphyrone)...............................................(1258)

(68)   alpha-pyrrolidinobutiophenone (α-PBP)...................................................................................(7546)

(69)   N-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(cyclohexylmethyl)-1H-i ndazole-3-carboxamide (AB-CHMINACA)....................................................................................................................(7031)

(70)   N-(1-amino-3-methyl-1-oxobutan-2-yl)-1-pentyl-1H-indazole -3-carboxamide (AB-PINACA)...................(7023)

(71)   [1-(5-fluoropentyl)-1H-indazol-3-yl] (naphthalen-1-yl)methanone (THJ-2201)...............................(7024)

(72)   N–(1–amino–3,3–dimethyl–1–oxobutan–2–yl)–1–(cyclohexylmethyl)–1H–indazole–3–carboxamide (MAB–CHMINACA; ADB–CHMINACA)..................................................................................(7032)

(73)    methyl 2-(1-(5-fluoropentyl)-1H-indazole-3-carboxamido)-3,3-dimethylbutanoate (Other names: 5F-ADB; 5F-MDMB-PINACA)...................................................................................................7034

(74)    methyl 2-(1-(5-fluoropentyl)-1H-indazole-3-carboxamido)-3-methylbutanoate (Other names: 5F-AMB)... ..........7033

(75)    N-(adamantan-1-yl)-1-(5-fluoropentyl)-1H-indazole-3-carboxamide (Other names: 5F-APINACA, 5F-AKB48)...................................................................................................... ..........7049

(76)    N-(1-amino-3,3-dimethyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1H-indazole-3-carboxamide (Other names:  ADB-FUBINACA).............................................................................................7010

(77)    methyl 2-(1-(cyclohexylmethyl)-1H-indole-3-carboxamido)-3,3-dimethylbutanoate (Other names: MDMB-CHMICA, MMB-CHMINACA)......................................................................7042

(78)    methyl 2-(1-(4-fluorobenzyl)-1H-indazole-3-carboxamido)-3,3-dimethylbutanoate (Other names: MDMB-FUBINACA)......................................................................................................7020

(79)    methyl 2-(1-(4-fluorobenzyl)-1H-indazole-3-carboxamido)-3-methylbutanoate, (FUB-AMB, MMB-FUBINACA, AMB-FUBINACA)...............................................................................(7021)

(80)    1–(1,3–benzodioxol–5–yl)–2–(ethylamino)propan–1–one (ethylone) ...........................................7547

(e) Depressants. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a depressant effect on the central nervous system, including its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(1)    gamma-hydroxybutyric acid (some other names include GHB; gamma-hydroxybutyrate; 4-hydroxybutyrate; 4-hydroxybutanoic acid; sodium oxybate; sodium oxybutyrate)...........................................2010

(2)    Mecloqualone.....................................................................................................................2572

(3)    Methaqualone....................................................................................................................2565

(f) Stimulants. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system, including its salts, isomers, and salts of isomers:

(1)    Aminorex (Some other names: aminoxaphen; 2-amino-5-phenyl-2-oxazoline; or 4,5-dihydro-5-phenly-2-oxazolamine)....................................................................................................1585

(2)    N-Benzylpiperazine (some other names: BZP, 1-benzylpiperazine).........................................7493

(3)    Cathinone........................................................................................................................1235

       Some trade or other names: 2-amino-1-phenyl-1-propanone, alpha-aminopropiophenone, 2-aminopropiophenone, and norephedrone

(4)    Fenethylline.....................................................................................................................1503

(5)    Methcathinone (Some other names: 2-(methylamino)-propiophenone; alpha-(methylamino)propiophenone; 2-(methylamino)-1-phenylpropan-1-one; alpha-N-..........1237

methylaminopropiophenone; monomethylpropion; ephedrone; N-methylcathinone; methylcathinone; AL–464; AL–422; AL–463 and UR1432), its salts, optical isomers and salts of optical isomers.................

(6)    (±)cis-4-methylaminorex ((±)cis-4,5- dihydro-4-methyl-5- phenyl-2-oxazolamine)...................................... ..........1590

(7)    N-ethylamphetamine......................................................................................................................... ..........1475

(8)    N,N-dimethylamphetamine (also known as N,N-alpha-trimethyl- benzeneethanamine; N,N-alpha-trimethylphenethylamine)...................................................................................................................1480

(g) Cannabimimetic agents. Unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances, or which contains their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(1) 5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497)...............................................    7297

(2) 5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol or CP-47,497 C8-homolog)...........................................................................................................................................    7298

(3) 1-pentyl-3-(1-naphthoyl)indole (JWH-018 and AM678)..........................................................................    7118

(4) 1-butyl-3-(1-naphthoyl)indole (JWH-073)..........................................................................................    7173

(5) 1-hexyl-3-(1-naphthoyl)indole (JWH-019)...........................................................................................    7019

(6) 1-[2-(4-morpholinyl)ethyl]-3-(1-naphthoyl)indole (JWH-200).................................................................    7200

(7) 1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250)............................................................................    6250

(8) 1-pentyl-3-[1-(4-methoxynaphthoyl)]indole (JWH-081)...........................................................................    7081

(9) 1-pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122)..............................................................................    7122

(10) 1-pentyl-3-(4-chloro-1-naphthoyl)indole (JWH-398)............................................................................    7398

(11) 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201)............................................................................    7201

(12) 1-(5-fluoropentyl)-3-(2-iodobenzoyl)indole (AM694)...........................................................................    7694

(13) 1-pentyl-3-[(4-methoxy)-benzoyl]indole (SR-19 and RCS-4)..................................................................    7104

(14) 1-cyclohexylethyl-3-(2-methoxyphenylacetyl)indole 7008 (SR-18 and RCS-8)...........................................    7008

(15) 1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203)............................................................................    7203

(h) Temporary listing of substances subject to emergency scheduling. Any material, compound, mixture or preparation which contains any quantity of the following substances:

(1) [Reserved by 84 FR 448]

(2) [Reserved by 83 FR 17488]

(3) [Reserved by 84 FR 20027]

(4) [Reserved by 83 FR 17488]

(5) [Reserved by 83 FR 61323]

(6) [Reserved by 85 FR 4215]

(7) [Reserved by 85 FR 4215]

(8) [Reserved by 85 FR 4215]

(9) [Reserved by 85 FR 4215]

(10) [Reserved by 85 FR 4215]

(11) [Reserved by 85 FR 4215]

(12) [Reserved]

(13) [Reserved by 83 FR 61323]

(14) [Reserved by 83 FR 61323]

(15) [Reserved]

(16) [Reserved]

(17) [Reserved]

(18) [Reserved by 85 FR 17497]

(19) [Reserved by 84 FR 57326]

(20) [Reserved by 83 FR 61323]

(21) [Reserved by 84 FR 57326]

(22) [Reserved by 84 FR 57326]

<Text of subsection (h)(23) temporarily added by 83 FR 4584, amended by 83 FR 10368, and extended by 85 FR 5322, effective March 9, 2018, until expiration on Feb. 1, 2021.>

(23) N-(1-phenethylpiperidin-4-yl)-N-phenylpentanamide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: Valeryl fentanyl) (9840)

(24) [Reserved by 84 FR 57326]

<Text of subsection (h)(25) added by 83 FR 4584, and extended by 85 FR 5322, effective March 9, 2018, until expiration on Feb. 1, 2021.>

(25) N-(4-methoxyphenyl)-N-(1-phenethylpiperidin-4-yl)butyramide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: para-methoxybutyryl fentanyl) (9837)

<Text of subsection (h)(26) added by 83 FR 4584, and extended by 85 FR 5322, effective March 9, 2018, until expiration on Feb. 1, 2021.>

(26) N-(4-chlorophenyl)-N-(1-phenethylpiperidin-4-yl)isobutyramide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: para-chloroisobutyryl fentanyl) (9826)

<Text of subsection (h)(27) added by 83 FR 4584, and extended by 85 FR 5322, effective March 9, 2018, until expiration on Feb. 1, 2021.>

(27) N-(1-phenethylpiperidin-4-yl)-N-phenylisobutyramide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: isobutyryl fentanyl) (9827)

<Text of subsection (h)(28) added by 83 FR 4584, and extended by 85 FR 5322, effective March 9, 2018, until expiration on Feb. 1, 2021.>

(28)  N-(1-phenethylpiperidin-4-yl)-N-phenylcyclopentanecarboxamide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: cyclopentyl fentanyl) (9847)

(29) [Reserved by 83 FR 61323]

<Text of subsection (h)(30) added by 85 FR 20155, effective April 10, 2020 through May 6, 2021.>

(30) Fentanyl-related substances, their isomers, esters, ethers, salts and salts of isomers, esters and ethers (9850)

(i) Fentanyl-related substance means any substance not otherwise listed under another Administration Controlled Substance Code Number, and for which no exemption or approval is in effect under section 505 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355], that is structurally related to fentanyl by one or more of the following modifications:

(A) Replacement of the phenyl portion of the phenethyl group by any monocycle, whether or not further substituted in or on the monocycle;

(B) Substitution in or on the phenethyl group with alkyl, alkenyl, alkoxyl, hydroxyl, halo, haloalkyl, amino or nitro groups;

(C) Substitution in or on the piperidine ring with alkyl, alkenyl, alkoxyl, ester, ether, hydroxyl, halo, haloalkyl, amino or nitro groups;

(D) Replacement of the aniline ring with any aromatic monocycle whether or not further substituted in or on the aromatic monocycle; and/or

(E) Replacement of the N–propionyl group by another acyl group.

(ii) This definition includes, but is not limited to, the following substances:

(A), (B) [Reserved]

(31), (35) [Reserved by 83 FR 31882]

<Text of subsection (h)(36) added by 83 FR 44478, and extended by 85 FR 52915, effective Aug. 31, 2018 until Aug. 31, 2021.>

(36) N–Ethylpentylone, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: ephylone, 1–(1,3–benzodioxol–5–yl)–2–(ethylamino)-pentan–1–one)...........(7543)

<Text of subsection (h)(37) added by 84 FR 15511, effective April 16, 2019 until April 16, 2021.>

(37) ethyl 2-(1-(5-fluoropentyl)-1H-indazole-3-carboxamido)-3,3-dimethylbutanoate, its optical, positional, and geometric isomers, salts and salts of isomers (trivial name: 5F-EDMB-PINACA)

<Text of subsection (h)(38) added by 84 FR 15511, effective April 16, 2019 until April 16, 2021.>

(38) methyl 2-(1-(5-fluoropentyl)-1H-indole-3-carboxamido)-3,3-dimethylbutanoate, its optical, positional, and geometric isomers, salts and salts of isomers (trivial name: 5F-MDMB-PICA)

<Text of subsection (h)(39) added by 84 FR 15511, effective April 16, 2019 until April 16, 2021.>

(39) N-(adamantan-1-yl)-1-(4-fluorobenzyl)-1H-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts and salts of isomers (trivial names: FUB-AKB48; FUB-APINACA; AKB48 N-(4-FLUOROBENZYL))

<Text of subsection (h)(40) added by 84 FR 15511, effective April 16, 2019 until April 16, 2021.>

(40) 1-(5-fluoropentyl)-N-(2-phenylpropan-2-yl)-1H-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts and salts of isomers (trivial names: 5F-CUMYL-PINACA; SGT-25)

<Text of subsection (h)(41) added by 84 FR 15511, effective April 16, 2019 until April 16, 2021.>

(41) (1-(4-fluorobenzyl)-1H-indol-3-yl)(2,2,3,3-tetramethylcyclopropyl) methanone, its optical, positional, and geometric isomers, salts and salts of isomers (trivial name: FUB-144)

<Text of subsection (h)(42) added by 84 FR 34297, effective July 18, 2019 until July 18, 2021.>

(42) N-Ethylhexedrone, its optical, positional, and geometric isomers, salts and salts of isomers (Other name: 2-(ethylamino)-1-phenylhexan-1-one)...........7246

<Text of subsection (h)(43) added by 84 FR 34297, effective July 18, 2019 until July 18, 2021.>

(43) α-Pyrrolidinohexanophenone, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: α-PHP; α-pyrrolidinohexiophenone; 1-phenyl-2-(pyrrolidin-1-yl)hexan-1-one)...........7544

<Text of subsection (h)(44) added by 84 FR 34297, effective July 18, 2019 until July 18, 2021.>

(44) 4-Methyl-alpha-ethylaminopentiophenone, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: 4-MEAP; 2-(ethylamino)-1-(4-methylphenyl)pentan-1-one)...........7245

<Text of subsection (h)(45) added by 84 FR 34297, effective July 18, 2019 until July 18, 2021.>

(45) 4'-Methyl-alpha-pyrrolidinohexiophenone, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: MPHP; 4'-methyl-α-pyrrolidinohexanophenone; 1-(4-methylphenyl)-2-(pyrrolidin-1-yl)hexan-1-one)...........7446

<Text of subsection (h)(46) added by 84 FR 34297, effective July 18, 2019 until July 18, 2021.>

(46) α-Pyrrolidinoheptaphenone, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: PV8; 1-phenyl-2-(pyrrolidin-1-yl)heptan-1-one)...........7548

<Text of subsection (h)(47) added by 84 FR 34297, effective July 18, 2019 until July 18, 2021.>

(47) 4'-Chloro-alpha-pyrrolidinovalerophenone, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: 4-chloro-α-PVP; 4'-chloro-α-pyrrolidinopentiophenone; 1-(4-chlorophenyl)-2-(pyrrolidin-1-yl)pentan-1-one)............7443

<Text of subsection (h)(48) added by 85 FR 51346, effective Aug. 20, 2020 until Aug. 20, 2022.>

(48) N,N-diethyl-2-(2-(4 isopropoxybenzyl)-5-nitro-1H-benzimidazol-1-yl)ethan-1-amine, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other names: isotonitazene; N,N-diethyl-2-[[4-(1-methylethoxy)phenyl]methyl]-5-nitro-1H-benzimidazole-1-ethanamine)............9614

**Credits**

[39 FR 22141, June 20, 1974, as amended at 40 FR 19813, May 7, 1975; 47 FR 52433, Nov. 22, 1982; 49 FR 22075, May 25, 1984; 49 FR 25850, June 25, 1984; 49 FR 33871, Aug. 27, 1984; 50 FR 11692, March 25, 1985; 50 FR 23119, May 31, 1985; 50 FR 28100, July 10, 1985; 50 FR 28396, July 12, 1985; 50 FR 43700, Oct. 29, 1985; 51 FR 4723, Feb. 7, 1986; 51 FR 5320, Feb. 13, 1986; 51 FR 9440, March 19, 1986; 51 FR 15474, April 24, 1986; 51 FR 21912, June 17, 1986; 51 FR 28695, Aug. 11, 1986; 51 FR 33593, Sept. 22, 1986; 51 FR 36560, Oct. 14, 1986; 51 FR 42834, Nov. 26, 1986; 52 FR 2516, 2517, Jan. 23, 1987; 52 FR 6546, March 4, 1987; 52 FR 20072, May 29, 1987; 52 FR 38226, Oct. 15, 1987; 53 FR 501, Jan. 8, 1988; 53 FR 2226, Jan. 27, 1988; 53 FR 3744, Feb. 9, 1988; 53 FR 5158, Feb. 22, 1988; 53 FR 29233, Aug. 3, 1988; 53 FR 40061, Oct. 13, 1988; 54 FR 14798, 14800, April 13, 1989; 54 FR 28415, July 6, 1989; 55 FR 3588, Feb. 2, 1990; 55 FR 9117, March 12, 1990; 57 FR 18825, May 1, 1992; 57 FR 43401, Sept. 21, 1992; 58 FR 4317, 4318, Jan. 14, 1993; 58 FR 13534, March 12, 1993; 58 FR 43796, Aug. 18, 1993; 58 FR 44611, Aug. 24, 1993; 58 FR 53406, Oct. 15, 1993; 59 FR 673, Jan. 6, 1994; 59 FR 10720, March 7, 1994; 59 FR 12829, 12830, March 18, 1994; 59 FR 46759, Sept. 12, 1994; 59 FR 65710, Dec. 21, 1994; 60 FR 28719, June 2, 1995; 65 FR 13238, March 13, 2000; 67 FR 59162, 59165, Sept. 20, 2002; 68 FR 14te119, March 21, 2003; 68 FR 16430, April 4, 2003; 69 FR 12796, March 18, 2004; 69 FR 58053, Sept. 29, 2004; 75 FR 37301, June 29, 2010; 75 FR 79300, Dec. 20, 2010; 76 FR 11078, March 1, 2011; 76 FR 65374, Oct. 21, 2011; 77 FR 4235, Jan. 27, 2012; 78 FR 665, Jan. 4, 2013; 78 FR 21825, April 12, 2013; 78 FR 28738, May 16, 2013; 78 FR 68719, Nov. 15, 2013; 79 FR 7582, Feb. 10, 2014; 79 FR 12942, March 7, 2014; 80 FR 5047, Jan. 30, 2015; 80 FR 14844, March 20, 2015; 80 FR 42385, July 17, 2015; 81 FR 6175, Feb. 5, 2016; 81 FR 22025, April 14, 2016; 81 FR 29145, May 11, 2016; 81 FR 29496, May 12, 2016; 81 FR 61133, Sept. 6, 2016; 81 FR 66184, Sept. 27, 2016; 81 FR 79393, Nov. 14, 2016; 81 FR 85877, Nov. 29, 2016; 81 FR 90196, Dec. 14, 2016; 81 FR 93599, Dec. 21, 2016; 82 FR 2218, Jan. 9, 2017; 82 FR 12177, March 1, 2017; 82 FR 17123, April 10, 2017; 82 FR 20547, May 3, 2017; 82 FR 26351, June 7, 2017; 82 FR 32457, July 14, 2017; 82 FR 47974, Oct. 16, 2017; 82 FR 49508, Oct. 26, 2017; 82 FR 51158, Nov. 3, 2017; 82 FR 58559, Dec. 13, 2017; 83 FR 472, Jan. 4, 2018; 83 FR 4411, Jan. 30, 2018; 83 FR 4584, Feb. 1, 2018; 83 FR 5191, Feb. 6, 2018; 83 FR 10368, March 9, 2018; 83 FR 17488, April 20, 2018; 83 FR 21834, May 10, 2018; 83 FR 31882, July 10, 2018; 83 FR 44478, Aug. 31, 2018; 83 FR 61323, Nov. 29, 2018; 84 FR 448, Jan. 29, 2019; 84 FR 13796, April 8, 2019; 84 FR 15511, April 16, 2019; 84 FR 20023, May 8, 2019; 84 FR 20027, May 8, 2019; 84 FR 34297, July 18, 2019; 84 FR 57326, Oct. 25, 2019; 84 FR 58045, Oct. 30, 2019; 85 FR 4215, Jan. 24, 2020; 85 FR 5322, Jan. 30, 2020; 85 FR 17497, March 30, 2020; 85 FR 20155, April 10, 2020; 85 FR 34969, June 8, 2020; 85 FR 42296, July 13, 2020; 85 FR 51346, Aug. 20, 2020; 85 FR 51645, Aug. 21, 2020; 85 FR 52915, Aug. 27, 2020; 85 FR 62217, Oct. 2, 2020]

SOURCE: 38 FR 8254, Mar. 30, 1973. Redesignated at 38 FR 26609, Sept. 24, 1973; 50 FR 23119, May 31, 1985; 81 FR 97021, Dec. 30, 2016, unless otherwise noted.

AUTHORITY: 21 U.S.C. 811, 812, 871(b), 956(b), unless otherwise noted.

Notes of Decisions (97)

Current through October 29, 2020; 85 FR 68703.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🏳 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 2. The Congress (Refs & Annos)
    Chapter 25. Unfunded Mandates Reform (Refs & Annos)
      Subchapter II. Regulatory Accountability and Reform (Refs & Annos)

2 U.S.C.A. § 1532

§ 1532. Statements to accompany significant regulatory actions

Currentness

**(a) In general**

Unless otherwise prohibited by law, before promulgating any general notice of proposed rulemaking that is likely to result in promulgation of any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year, and before promulgating any final rule for which a general notice of proposed rulemaking was published, the agency shall prepare a written statement containing--

  **(1)** an identification of the provision of Federal law under which the rule is being promulgated;

  **(2)** a qualitative and quantitative assessment of the anticipated costs and benefits of the Federal mandate, including the costs and benefits to State, local, and tribal governments or the private sector, as well as the effect of the Federal mandate on health, safety, and the natural environment and such an assessment shall include--

    **(A)** an analysis of the extent to which such costs to State, local, and tribal governments may be paid with Federal financial assistance (or otherwise paid for by the Federal Government); and

    **(B)** the extent to which there are available Federal resources to carry out the intergovernmental mandate;

  **(3)** estimates by the agency, if and to the extent that the agency determines that accurate estimates are reasonably feasible, of--

    **(A)** the future compliance costs of the Federal mandate; and

    **(B)** any disproportionate budgetary effects of the Federal mandate upon any particular regions of the nation or particular State, local, or tribal governments, urban or rural or other types of communities, or particular segments of the private sector;

(4) estimates by the agency of the effect on the national economy, such as the effect on productivity, economic growth, full employment, creation of productive jobs, and international competitiveness of United States goods and services, if and to the extent that the agency in its sole discretion determines that accurate estimates are reasonably feasible and that such effect is relevant and material; and

(5)(A) a description of the extent of the agency's prior consultation with elected representatives (under section 1534 of this title) of the affected State, local, and tribal governments;

(B) a summary of the comments and concerns that were presented by State, local, or tribal governments either orally or in writing to the agency; and

(C) a summary of the agency's evaluation of those comments and concerns.

**(b) Promulgation**

In promulgating a general notice of proposed rulemaking or a final rule for which a statement under subsection (a) is required, the agency shall include in the promulgation a summary of the information contained in the statement.

**(c) Preparation in conjunction with other statement**

Any agency may prepare any statement required under subsection (a) in conjunction with or as a part of any other statement or analysis, provided that the statement or analysis satisfies the provisions of subsection (a).

## CREDIT(S)

(Pub.L. 104-4, Title II, § 202, Mar. 22, 1995, 109 Stat. 64.)

Notes of Decisions (1)

2 U.S.C.A. § 1532, 2 USCA § 1532
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> United States Code Annotated
>    Title 5. Government Organization and Employees (Refs & Annos)
>      Part I. The Agencies Generally
>       Chapter 5. Administrative Procedure (Refs & Annos)
>        Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 552

§ 552. Public information; agency rules, opinions, orders, records, and proceedings [Statutory Text & Notes of Decisions subdivisions I, II]

Effective: June 30, 2016

Currentness

<Notes of Decisions for 5 USCA § 552 are displayed in multiple documents.>

**(a)** Each agency shall make available to the public information as follows:

  **(1)** Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

    **(A)** descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

    **(B)** statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

    **(C)** rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

    **(D)** substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

    **(E)** each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

**(2)** Each agency, in accordance with published rules, shall make available for public inspection in an electronic format--

**(A)** final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

**(B)** those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

**(C)** administrative staff manuals and instructions to staff that affect a member of the public;

**(D)** copies of all records, regardless of form or format--

**(i)** that have been released to any person under paragraph (3); and

**(ii)(I)** that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

**(II)** that have been requested 3 or more times; and

**(E)** a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if--

**(i)** it has been indexed and either made available or published as provided by this paragraph; or

**(ii)** the party has actual and timely notice of the terms thereof.

**(3)(A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

**(B)** In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

**(C)** In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

**(D)** For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

**(E)** An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to--

**(i)** any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

**(ii)** a representative of a government entity described in clause (i).

**(4)(A)(i)** In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

**(ii)** Such agency regulations shall provide that--

**(I)** fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

**(II)** fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(III)** for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

**(iii)** Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

**(iv)** Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section--

**(I)** if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

**(II)** for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

**(v)** No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

**(vi)** Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

**(vii)** In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency.

**(viii)(I)** Except as provided in subclause (II), an agency shall not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) under this subparagraph if the agency has failed to comply with any time limit under paragraph (6).

**(II)(aa)** If an agency has determined that unusual circumstances apply (as the term is defined in paragraph (6)(B)) and the agency provided a timely written notice to the requester in accordance with paragraph (6)(B), a failure described in subclause (I) is excused for an additional 10 days. If the agency fails to comply with the extended time limit, the agency may not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees).

**(bb)** If an agency has determined that unusual circumstances apply and more than 5,000 pages are necessary to respond to the request, an agency may charge search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) if the agency has provided a timely written notice to the requester in accordance with paragraph (6)(B) and the agency has discussed with the requester via written mail, electronic mail, or telephone (or made not less than 3 good-faith attempts to do so) how the requester could effectively limit the scope of the request in accordance with paragraph (6)(B)(ii).

**(cc)** If a court has determined that exceptional circumstances exist (as that term is defined in paragraph (6)(C)), a failure described in subclause (I) shall be excused for the length of time provided by the court order.

**(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

**(C)** Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[**(D)** Repealed. Pub.L. 98-620, Title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357]

**(E)(i)** The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

**(ii)** For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

**(I)** a judicial order, or an enforceable written agreement or consent decree; or

**(II)** a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

**(F)(i)** Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

**(ii)** The Attorney General shall--

**(I)** notify the Special Counsel of each civil action described under the first sentence of clause (i); and

**(II)** annually submit a report to Congress on the number of such civil actions in the preceding year.

**(iii)** The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

**(G)** In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

**(5)** Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

**(6)(A)** Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--

**(i)** determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of--

**(I)** such determination and the reasons therefor;

**(II)** the right of such person to seek assistance from the FOIA Public Liaison of the agency; and

**(III)** in the case of an adverse determination--

**(aa)** the right of such person to appeal to the head of the agency, within a period determined by the head of the agency that is not less than 90 days after the date of such adverse determination; and

**(bb)** the right of such person to seek dispute resolution services from the FOIA Public Liaison of the agency or the Office of Government Information Services; and

**(ii)** make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

**(I)** that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

**(II)** if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

**(B)(i)** In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

**(ii)** With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency, and notify the requester of the right of the requester to seek dispute resolution services from the Office of Government Information Services. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

**(iii)** As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests--

**(I)** the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

**(II)** the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(III)** the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

**(iv)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

**(C)(i)** Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

**(ii)** For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

**(iii)** Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

**(D)(i)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

**(ii)** Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

**(iii)** This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

**(E)(i)** Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records--

**(I)** in cases in which the person requesting the records demonstrates a compelling need; and

**(II)** in other cases determined by the agency.

**(ii)** Notwithstanding clause (i), regulations under this subparagraph must ensure--

**(I)** that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

**(II)** expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

**(iii)** An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

**(iv)** A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

**(v)** For purposes of this subparagraph, the term "compelling need" means--

**(I)** that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

**(II)** with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

**(vi)** A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

**(F)** In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

**(7)** Each agency shall--

**(A)** establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

**(B)** establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including--

    **(i)** the date on which the agency originally received the request; and

    **(ii)** an estimated date on which the agency will complete action on the request.

**(8)(A)** An agency shall--

    **(i)** withhold information under this section only if--

        **(I)** the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

        **(II)** disclosure is prohibited by law; and

    **(ii)(I)** consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and

    **(II)** take reasonable steps necessary to segregate and release nonexempt information; and

**(B)** Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3).

**(b)** This section does not apply to matters that are--

    **(1)(A)** specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

    **(2)** related solely to the internal personnel rules and practices of an agency;

    **(3)** specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

        **(A)(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

        **(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

**(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

**(4)** trade secrets and commercial or financial information obtained from a person and privileged or confidential;

**(5)** inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

**(6)** personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

**(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

**(8)** contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

**(9)** geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

**(c)(1)** Whenever a request is made which involves access to records described in subsection (b)(7)(A) and--

**(A)** the investigation or proceeding involves a possible violation of criminal law; and

**(B)** there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

**(2)** Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

**(3)** Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

**(d)** This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

**(e)(1)** On or before February 1 of each year, each agency shall submit to the Attorney General of the United States and to the Director of the Office of Government Information Services a report which shall cover the preceding fiscal year and which shall include--

**(A)** the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

**(B)(i)** the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

**(ii)** a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

**(C)** the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

**(D)** the number of requests for records received by the agency and the number of requests which the agency processed;

**(E)** the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

**(F)** the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

**(G)** based on the number of business days that have elapsed since each request was originally received by the agency--

**(i)** the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

**(ii)** the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

**(iii)** the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

**(iv)** the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

**(H)** the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

**(I)** the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

**(J)** data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

**(K)** data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

**(L)** the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

**(M)** the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

**(N)** the total amount of fees collected by the agency for processing requests;

**(O)** the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests;

**(P)** the number of times the agency denied a request for records under subsection (c); and

**(Q)** the number of records that were made available for public inspection in an electronic format under subsection (a)(2).

**(2)** Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

**(3)** Each agency shall make each such report available for public inspection in an electronic format. In addition, each agency shall make the raw statistical data used in each report available in a timely manner for public inspection in an electronic format, which shall be made available--

**(A)** without charge, license, or registration requirement;

**(B)** in an aggregated, searchable format; and

**(C)** in a format that may be downloaded in bulk.

**(4)** The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Oversight and Government Reform of the House of Representatives and the Chairman and ranking minority member of the Committees on Homeland Security and Governmental Affairs and the Judiciary of the Senate, no later than March 1 of the year in which each such report is issued, that such reports are available by electronic means.

**(5)** The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

**(6)(A)** The Attorney General of the United States shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President a report on or before March 1 of each calendar year, which shall include for the prior calendar year--

**(i)** a listing of the number of cases arising under this section;

**(ii)** a listing of--

**(I)** each subsection, and any exemption, if applicable, involved in each case arising under this section;

**(II)** the disposition of each case arising under this section; and

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(III)** the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4); and

**(iii)** a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

**(B)** The Attorney General of the United States shall make--

**(i)** each report submitted under subparagraph (A) available for public inspection in an electronic format; and

**(ii)** the raw statistical data used in each report submitted under subparagraph (A) available for public inspection in an electronic format, which shall be made available--

**(I)** without charge, license, or registration requirement;

**(II)** in an aggregated, searchable format; and

**(III)** in a format that may be downloaded in bulk.

**(f)** For purposes of this section, the term--

**(1)** "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

**(2)** "record" and any other term used in this section in reference to information includes--

**(A)** any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

**(B)** any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

**(g)** The head of each agency shall prepare and make available for public inspection in an electronic format, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including--

**(1)** an index of all major information systems of the agency;

**(2)** a description of major information and record locator systems maintained by the agency; and

**(3)** a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

**(h)(1)** There is established the Office of Government Information Services within the National Archives and Records Administration. The head of the Office shall be the Director of the Office of Government Information Services.

**(2)** The Office of Government Information Services shall--

    **(A)** review policies and procedures of administrative agencies under this section;

    **(B)** review compliance with this section by administrative agencies; and

    **(C)** identify procedures and methods for improving compliance under this section.

**(3)** The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a nonexclusive alternative to litigation and may issue advisory opinions at the discretion of the Office or upon request of any party to a dispute.

**(4)(A)** Not less frequently than annually, the Director of the Office of Government Information Services shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President--

    **(i)** a report on the findings of the information reviewed and identified under paragraph (2);

    **(ii)** a summary of the activities of the Office of Government Information Services under paragraph (3), including--

        **(I)** any advisory opinions issued; and

        **(II)** the number of times each agency engaged in dispute resolution with the assistance of the Office of Government Information Services or the FOIA Public Liaison; and

    **(iii)** legislative and regulatory recommendations, if any, to improve the administration of this section.

**(B)** The Director of the Office of Government Information Services shall make each report submitted under subparagraph (A) available for public inspection in an electronic format.

AR.00603

**(C)** The Director of the Office of Government Information Services shall not be required to obtain the prior approval, comment, or review of any officer or agency of the United States, including the Department of Justice, the Archivist of the United States, or the Office of Management and Budget before submitting to Congress, or any committee or subcommittee thereof, any reports, recommendations, testimony, or comments, if such submissions include a statement indicating that the views expressed therein are those of the Director and do not necessarily represent the views of the President.

**(5)** The Director of the Office of Government Information Services may directly submit additional information to Congress and the President as the Director determines to be appropriate.

**(6)** Not less frequently than annually, the Office of Government Information Services shall conduct a meeting that is open to the public on the review and reports by the Office and shall allow interested persons to appear and present oral or written statements at the meeting.

**(i)** The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

**(j)(1)** Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

**(2)** The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency--

**(A)** have agency-wide responsibility for efficient and appropriate compliance with this section;

**(B)** monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

**(C)** recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

**(D)** review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

**(E)** facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply;

**(F)** offer training to agency staff regarding their responsibilities under this section;

**(G)** serve as the primary agency liaison with the Office of Government Information Services and the Office of Information Policy; and

**(H)** designate 1 or more FOIA Public Liaisons.

**(3)** The Chief FOIA Officer of each agency shall review, not less frequently than annually, all aspects of the administration of this section by the agency to ensure compliance with the requirements of this section, including--

**(A)** agency regulations;

**(B)** disclosure of records required under paragraphs (2) and (8) of subsection (a);

**(C)** assessment of fees and determination of eligibility for fee waivers;

**(D)** the timely processing of requests for information under this section;

**(E)** the use of exemptions under subsection (b); and

**(F)** dispute resolution services with the assistance of the Office of Government Information Services or the FOIA Public Liaison.

**(k)(1)** There is established in the executive branch the Chief FOIA Officers Council (referred to in this subsection as the "Council").

**(2)** The Council shall be comprised of the following members:

**(A)** The Deputy Director for Management of the Office of Management and Budget.

**(B)** The Director of the Office of Information Policy at the Department of Justice.

**(C)** The Director of the Office of Government Information Services.

**(D)** The Chief FOIA Officer of each agency.

**(E)** Any other officer or employee of the United States as designated by the Co-Chairs.

**(3)** The Director of the Office of Information Policy at the Department of Justice and the Director of the Office of Government Information Services shall be the Co-Chairs of the Council.

**(4)** The Administrator of General Services shall provide administrative and other support for the Council.

**(5)(A)** The duties of the Council shall include the following:

**(i)** Develop recommendations for increasing compliance and efficiency under this section.

**(ii)** Disseminate information about agency experiences, ideas, best practices, and innovative approaches related to this section.

**(iii)** Identify, develop, and coordinate initiatives to increase transparency and compliance with this section.

**(iv)** Promote the development and use of common performance measures for agency compliance with this section.

**(B)** In performing the duties described in subparagraph (A), the Council shall consult on a regular basis with members of the public who make requests under this section.

**(6)(A)** The Council shall meet regularly and such meetings shall be open to the public unless the Council determines to close the meeting for reasons of national security or to discuss information exempt under subsection (b).

**(B)** Not less frequently than annually, the Council shall hold a meeting that shall be open to the public and permit interested persons to appear and present oral and written statements to the Council.

**(C)** Not later than 10 business days before a meeting of the Council, notice of such meeting shall be published in the Federal Register.

**(D)** Except as provided in subsection (b), the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents that were made available to or prepared for or by the Council shall be made publicly available.

**(E)** Detailed minutes of each meeting of the Council shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the Council. The minutes shall be redacted as necessary and made publicly available.

**(l)** FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

**(m)(1)** The Director of the Office of Management and Budget, in consultation with the Attorney General, shall ensure the operation of a consolidated online request portal that allows a member of the public to submit a request for records under subsection (a) to any agency from a single website. The portal may include any additional tools the Director of the Office of Management and Budget finds will improve the implementation of this section.

**(2)** This subsection shall not be construed to alter the power of any other agency to create or maintain an independent online portal for the submission of a request for records under this section. The Director of the Office of Management and Budget shall establish standards for interoperability between the portal required under paragraph (1) and other request processing software used by agencies subject to this section.

### CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 383; Pub.L. 90-23, § 1, June 5, 1967, 81 Stat. 54; Pub.L. 93-502, §§ 1 to 3, Nov. 21, 1974, 88 Stat. 1561 to 1564; Pub.L. 94-409, § 5(b), Sept. 13, 1976, 90 Stat. 1247; Pub.L. 95-454, Title IX, § 906(a)(10), Oct. 13, 1978, 92 Stat. 1225; Pub.L. 98-620, Title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357; Pub.L. 99-570, Title I, §§ 1802, 1803, Oct. 27, 1986, 100 Stat. 3207-48, 3207-49; Pub.L. 104-231, §§ 3 to 11, Oct. 2, 1996, 110 Stat. 3049 to 3054; Pub.L. 107-306, Title III, § 312, Nov. 27, 2002, 116 Stat. 2390; Pub.L. 110-175, §§ 3, 4(a), 5, 6(a)(1), (b)(1), 7(a), 8 to 10(a), 12, Dec. 31, 2007, 121 Stat. 2525 to 2530; Pub.L. 111-83, Title V, § 564(b), Oct. 28, 2009, 123 Stat. 2184; Pub.L. 114-185, § 2, June 30, 2016, 130 Stat. 538.)

### EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12174

Ex. Ord. No. 12174, Nov. 30, 1979, 44 F.R. 69609, which related to minimizing Federal paperwork, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

### EXECUTIVE ORDER NO. 12600

<June 23, 1987, 52 F.R. 23781>

#### Predisclosure Notification Procedures for Confidential Commercial Information

By the authority vested in me as President by the Constitution and statutes of the United States of America, and in order to provide predisclosure notification procedures under the Freedom of Information Act [this section] concerning confidential commercial information, and to make existing agency notification provisions more uniform, it is hereby ordered as follows:

**Section 1.** The head of each Executive department and agency subject to the Freedom of Information Act [5 U.S.C.A. § 552] shall, to the extent permitted by law, establish procedures to notify submitters of records containing confidential commercial information as described in section 3 of this Order, when those records are requested under the Freedom of Information Act [FOIA], 5 U.S.C. 552, as amended, if after reviewing the request, the responsive records, and any appeal by the requester, the department or agency determines that it may be required to disclose the records. Such notice requires that an agency use good-faith efforts to advise submitters of confidential commercial information of the procedures established under this Order. Further, where notification of a voluminous number of submitters is required, such notification may be accomplished by posting or publishing the notice in a place reasonably calculated to accomplish notification.

**Sec. 2.** For purposes of this Order, the following definitions apply:

**(a)** "Confidential commercial information" means records provided to the government by a submitter that arguably contain material exempt from release under Exemption 4 of the Freedom of Information Act, 5 U.S.C. 552(b)(4) [subsec. (b)(4) of this section], because disclosure could reasonably be expected to cause substantial competitive harm.

**(b)** "Submitter" means any person or entity who provides confidential commercial information to the government. The term "submitter" includes, but is not limited to, corporations, state governments, and foreign governments.

**Sec. 3. (a)** For confidential commercial information submitted prior to January 1, 1988, the head of each Executive department or agency shall, to the extent permitted by law, provide a submitter with notice pursuant to section 1 whenever:

**(i)** the records are less than 10 years old and the information has been designated by the submitter as confidential commercial information; or

**(ii)** the department or agency has reason to believe that disclosure of the information could reasonably be expected to cause substantial competitive harm.

**(b)** For confidential commercial information submitted on or after January 1, 1988, the head of each Executive department or agency shall, to the extent permitted by law, establish procedures to permit submitters of confidential commercial information to designate, at the time the information is submitted to the Federal government or a reasonable time thereafter, any information the disclosure of which the submitter claims could reasonably be expected to cause substantial competitive harm. Such agency procedures may provide for the expiration, after a specified period of time or changes in circumstances, of designations of competitive harm made by submitters. Additionally, such procedures may permit the agency to designate specific classes of information that will be treated by the agency as if the information had been so designated by the submitter. The head of each Executive department or agency shall, to the extent permitted by law, provide the submitter notice in accordance with section 1 of this Order whenever the department or agency determines that it may be required to disclose records:

**(i)** designated pursuant to this subsection; or

**(ii)** the disclosure of which the department or agency has reason to believe could reasonably be expected to cause substantial competitive harm.

**Sec. 4.** When notification is made pursuant to section 1, each agency's procedures shall, to the extent permitted by law, afford the submitter a reasonable period of time in which the submitter or its designee may object to the disclosure of any specified portion of the information and to state all grounds upon which disclosure is opposed.

**Sec. 5.** Each agency shall give careful consideration to all such specified grounds for nondisclosure prior to making an administrative determination of the issue. In all instances when the agency determines to disclose the requested records, its procedures shall provide that the agency give the submitter a written statement briefly explaining why the submitter's objections are not sustained. Such statement shall, to the extent permitted by law, be provided a reasonable number of days prior to a specified disclosure date.

**Sec. 6.** Whenever a FOIA requester brings suit seeking to compel disclosure of confidential commercial information, each agency's procedures shall require that the submitter be promptly notified.

**Sec. 7.** The designation and notification procedures required by this Order shall be established by regulations, after notice and public comment. If similar procedures or regulations already exist, they should be reviewed for conformity and revised where necessary. Existing procedures or regulations need not be modified if they are in compliance with this Order.

**Sec. 8.** The notice requirements of this Order need not be followed if:

**(a)** The agency determines that the information should not be disclosed;

**(b)** The information has been published or has been officially made available to the public;

**(c)** Disclosure of the information is required by law (other than 5 U.S.C. 552);

**(d)** The disclosure is required by an agency rule that (1) was adopted pursuant to notice and public comment, (2) specifies narrow classes of records submitted to the agency that are to be released under the Freedom of Information Act [5 U.S.C.A. § 552], and (3) provides in exceptional circumstances for notice when the submitter provides written justification, at the time the information is submitted or a reasonable time thereafter, that disclosure of the information could reasonably be expected to cause substantial competitive harm;

**(e)** The information requested is not designated by the submitter as exempt from disclosure in accordance with agency regulations promulgated pursuant to section 7, when the submitter had an opportunity to do so at the time of submission of the information or a reasonable time thereafter, unless the agency has substantial reason to believe that disclosure of the information would result in competitive harm; or

**(f)** The designation made by the submitter in accordance with agency regulations promulgated pursuant to section 7 appears obviously frivolous; except that, in such case, the agency must provide the submitter with written notice of any final administrative disclosure determination within a reasonable number of days prior to the specified disclosure date.

**Sec. 9.** Whenever an agency notifies a submitter that it may be required to disclose information pursuant to section 1 of this Order, the agency shall also notify the requester that notice and an opportunity to comment are being provided the submitter. Whenever an agency notifies a submitter of a final decision pursuant to section 5 of this Order, the agency shall also notify the requester.

**Sec. 10.** This Order is intended only to improve the internal management of the Federal government, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

<div align="right">RONALD REAGAN</div>

<div align="center">

**EXECUTIVE ORDER NO. 13110**

<Jan. 11, 1999, 64 F.R. 2419>

**Nazi War Criminal Records Interagency Working Group**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Nazi War Crimes Disclosure Act (Public Law 105-246) (the "Act") [set out as a note under this section], it is hereby ordered as follows:

**Section 1. Establishment of Working Group.** There is hereby established the Nazi War Criminal Records Interagency Working Group (Working Group). The function of the Group shall be to locate, inventory, recommend for declassification, and make available to the public at the National Archives and Records Administration all classified Nazi war criminal records of the United

States, subject to certain designated exceptions as provided in the Act. The Working Group shall coordinate with agencies and take such actions as necessary to expedite the release of such records to the public.

**Sec. 2. Schedule.** The Working Group should complete its work to the greatest extent possible and report to the Congress within 1 year.

**Sec. 3. Membership. (a)** The Working Group shall be composed of the following members:

**(1)** Archivist of the United States (who shall serve as Chair of the Working Group);

**(2)** Secretary of Defense;

**(3)** Attorney General;

**(4)** Director of Central Intelligence;

**(5)** Director of the Federal Bureau of Investigation;

**(6)** Director of the United States Holocaust Memorial Museum;

**(7)** Historian of the Department of State; and

**(8)** Three other persons appointed by the President.

**(b)** The Senior Director for Records and Access Management of the National Security Council will serve as the liaison to and attend the meetings of the Working Group. Members of the Working Group who are full-time Federal officials may serve on the Working Group through designees.

**Sec. 4. Administration.(a)** To the extent permitted by law and subject to the availability of appropriations, the National Archives and Records Administration shall provide the Working Group with funding, administrative services, facilities, staff, and other support services necessary for the performance of the functions of the Working Group.

**(b)** The Working Group shall terminate 3 years from the date of this Executive order.

WILLIAM J. CLINTON


**EXECUTIVE ORDER NO. 13392**

<Dec. 14, 2005, 70 F.R. 75373>


**Improving Agency Disclosure of Information**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to ensure appropriate agency disclosure of information, and consistent with the goals of section 552 of title 5, United States Code, it is hereby ordered as follows:

**Section 1. Policy.**

**(a)** The effective functioning of our constitutional democracy depends upon the participation in public life of a citizenry that is well informed. For nearly four decades, the Freedom of Information Act (FOIA) [The Freedom of Information Act, is 5 U.S.C.A. § 552] has provided an important means through which the public can obtain information regarding the activities of Federal agencies. Under the FOIA, the public can obtain records from any Federal agency, subject to the exemptions enacted by the Congress to protect information that must be held in confidence for the Government to function effectively or for other purposes.

**(b)** FOIA requesters are seeking a service from the Federal Government and should be treated as such. Accordingly, in responding to a FOIA request, agencies shall respond courteously and appropriately. Moreover, agencies shall provide FOIA requesters, and the public in general, with citizen-centered ways to learn about the FOIA process, about agency records that are publicly available (e.g., on the agency's website), and about the status of a person's FOIA request and appropriate information about the agency's response.

**(c)** Agency FOIA operations shall be both results-oriented and produce results. Accordingly, agencies shall process requests under the FOIA in an efficient and appropriate manner and achieve tangible, measurable improvements in FOIA processing. When an agency's FOIA program does not produce such results, it should be reformed, consistent with available resources appropriated by the Congress and applicable law, to increase efficiency and better reflect the policy goals and objectives of this order.

**(d)** A citizen-centered and results-oriented approach will improve service and performance, thereby strengthening compliance with the FOIA, and will help avoid disputes and related litigation.

**Sec. 2. Agency Chief FOIA Officers.**

**(a) Designation.** The head of each agency shall designate within 30 days of the date of this order a senior official of such agency (at the Assistant Secretary or equivalent level), to serve as the Chief FOIA Officer of that agency. The head of the agency shall promptly notify the Director of the Office of Management and Budget (OMB Director) and the Attorney General of such designation and of any changes thereafter in such designation.

**(b) General Duties.** The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency:

**(i)** have agency-wide responsibility for efficient and appropriate compliance with the FOIA;

**(ii)** monitor FOIA implementation throughout the agency, including through the use of meetings with the public to the extent deemed appropriate by the agency's Chief FOIA Officer, and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing the FOIA, including the extent to which the agency meets the milestones in the agency's plan under section 3(b) of this order and training and reporting standards established consistent with applicable law and this order;

**(iii)** recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to carry out the policy set forth in section 1 of this order;

**(iv)** review and report, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing the FOIA; and

**(v)** facilitate public understanding of the purposes of the FOIA's statutory exemptions by including concise descriptions of the exemptions in both the agency's FOIA handbook issued under section 552(g) of title 5, United States Code, and the agency's annual FOIA report, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply.

**(c) FOIA Requester Service Center and FOIA Public Liaisons.** In order to ensure appropriate communication with FOIA requesters:

**(i)** Each agency shall establish one or more FOIA Requester Service Centers (Center), as appropriate, which shall serve as the first place that a FOIA requester can contact to seek information concerning the status of the person's FOIA request and appropriate information about the agency's FOIA response. The Center shall include appropriate staff to receive and respond to inquiries from FOIA requesters;

**(ii)** The agency Chief FOIA Officer shall designate one or more agency officials, as appropriate, as FOIA Public Liaisons, who may serve in the Center or who may serve in a separate office. FOIA Public Liaisons shall serve as supervisory officials to whom a FOIA requester can raise concerns about the service the FOIA requester has received from the Center, following an initial response from the Center staff. FOIA Public Liaisons shall seek to ensure a service-oriented response to FOIA requests and FOIA-related inquiries. For example, the FOIA Public Liaison shall assist, as appropriate, in reducing delays, increasing transparency and understanding of the status of requests, and resolving disputes. FOIA Public Liaisons shall report to the agency Chief FOIA Officer on their activities and shall perform their duties consistent with applicable law and agency regulations;

**(iii)** In addition to the services to FOIA requesters provided by the Center and FOIA Public Liaisons, the agency Chief FOIA Officer shall also consider what other FOIA-related assistance to the public should appropriately be provided by the agency;

**(iv)** In establishing the Centers and designating FOIA Public Liaisons, the agency shall use, as appropriate, existing agency staff and resources. A Center shall have appropriate staff to receive and respond to inquiries from FOIA requesters;

**(v)** As determined by the agency Chief FOIA Officer, in consultation with the FOIA Public Liaisons, each agency shall post appropriate information about its Center or Centers on the agency's website, including contact information for its FOIA Public Liaisons. In the case of an agency without a website, the agency shall publish the information on the Firstgov.gov website or, in the case of any agency with neither a website nor the capability to post on the Firstgov.gov website, in the Federal Register; and

**(vi)** The agency Chief FOIA Officer shall ensure that the agency has in place a method (or methods), including through the use of the Center, to receive and respond promptly and appropriately to inquiries from FOIA requesters about the status of their requests. The Chief FOIA Officer shall also consider, in consultation with the FOIA Public Liaisons, as appropriate, whether the agency's implementation of other means (such as tracking numbers for requests, or an agency telephone or Internet hotline) would be appropriate for responding to status inquiries.

**Sec. 3. Review, Plan, and Report.**

**(a) Review.** Each agency's Chief FOIA Officer shall conduct a review of the agency's FOIA operations to determine whether agency practices are consistent with the policies set forth in section 1 of this order. In conducting this review, the Chief FOIA Officer shall:

**(i)** evaluate, with reference to numerical and statistical benchmarks where appropriate, the agency's administration of the FOIA, including the agency's expenditure of resources on FOIA compliance and the extent to which, if any, requests for records have not been responded to within the statutory time limit (backlog);

**(ii)** review the processes and practices by which the agency assists and informs the public regarding the FOIA process;

**(iii)** examine the agency's:

**(A)** use of information technology in responding to FOIA requests, including without limitation the tracking of FOIA requests and communication with requesters;

AR.00612 25

**(B)** practices with respect to requests for expedited processing; and

**(C)** implementation of multi-track processing if used by such agency;

**(iv)** review the agency's policies and practices relating to the availability of public information through websites and other means, including the use of websites to make available the records described in section 552(a)(2) of title 5, United States Code; and

**(v)** identify ways to eliminate or reduce its FOIA backlog, consistent with available resources and taking into consideration the volume and complexity of the FOIA requests pending with the agency.

**(b) Plan.**

**(i)** Each agency's Chief FOIA Officer shall develop, in consultation as appropriate with the staff of the agency (including the FOIA Public Liaisons), the Attorney General, and the OMB Director, an agency-specific plan to ensure that the agency's administration of the FOIA is in accordance with applicable law and the policies set forth in section 1 of this order. The plan, which shall be submitted to the head of the agency for approval, shall address the agency's implementation of the FOIA during fiscal years 2006 and 2007.

**(ii)** The plan shall include specific activities that the agency will implement to eliminate or reduce the agency's FOIA backlog, including (as applicable) changes that will make the processing of FOIA requests more streamlined and effective, as well as increased reliance on the dissemination of records that can be made available to the public through a website or other means that do not require the public to make a request for the records under the FOIA.

**(iii)** The plan shall also include activities to increase public awareness of FOIA processing, including as appropriate, expanded use of the agency's Center and its FOIA Public Liaisons.

**(iv)** The plan shall also include, taking appropriate account of the resources available to the agency and the mission of the agency, concrete milestones, with specific timetables and outcomes to be achieved, by which the head of the agency, after consultation with the OMB Director, shall measure and evaluate the agency's success in the implementation of the plan.

**(c) Agency Reports to the Attorney General and OMB Director.**

**(i)** The head of each agency shall submit a report, no later than 6 months from the date of this order, to the Attorney General and the OMB Director that summarizes the results of the review under section 3(a) of this order and encloses a copy of the agency's plan under section 3(b) of this order. The agency shall publish a copy of the agency's report on the agency's website or, in the case of an agency without a website, on the Firstgov.gov website, or, in the case of any agency with neither a website nor the capability to publish on the Firstgov.gov website, in the Federal Register.

**(ii)** The head of each agency shall include in the agency's annual FOIA reports for fiscal years 2006 and 2007 a report on the agency's development and implementation of its plan under section 3(b) of this order and on the agency's performance in meeting the milestones set forth in that plan, consistent with any related guidelines the Attorney General may issue under section 552(e) of title 5, United States Code.

**(iii)** If the agency does not meet a milestone in its plan, the head of the agency shall:

**(A)** identify this deficiency in the annual FOIA report to the Attorney General;

**(B)** explain in the annual report the reasons for the agency's failure to meet the milestone;

**(C)** outline in the annual report the steps that the agency has already taken, and will be taking, to address the deficiency; and

**(D)** report this deficiency to the President's Management Council.

**Sec. 4. Attorney General.**

**(a) Report.** The Attorney General, using the reports submitted by the agencies under subsection 3(c)(i) of this order and the information submitted by agencies in their annual FOIA reports for fiscal year 2005, shall submit to the President, no later than 10 months from the date of this order [Dec. 14, 2005], a report on agency FOIA implementation. The Attorney General shall consult the OMB Director in the preparation of the report and shall include in the report appropriate recommendations on administrative or other agency actions for continued agency dissemination and release of public information. The Attorney General shall thereafter submit two further annual reports, by June 1, 2007, and June 1, 2008, that provide the President with an update on the agencies' implementation of the FOIA and of their plans under section 3(b) of this order.

**(b) Guidance.** The Attorney General shall issue such instructions and guidance to the heads of departments and agencies as may be appropriate to implement sections 3(b) and 3(c) of this order.

**Sec. 5. OMB Director.** The OMB Director may issue such instructions to the heads of agencies as are necessary to implement this order, other than sections 3(b) and 3(c) of this order.

**Sec. 6. Definitions.** As used in this order:

**(a)** the term "agency" has the same meaning as the term "agency" under section 552(f)(1) of title 5, United States Code; and

**(b)** the term "record" has the same meaning as the term "record" under section 552(f)(2) of title 5, United States Code.

**Sec. 7. General Provisions.**

**(a)** The agency reviews under section 3(a) of this order and agency plans under section 3(b) of this order shall be conducted and developed in accordance with applicable law and applicable guidance issued by the President, the Attorney General, and the OMB Director, including the laws and guidance regarding information technology and the dissemination of information.

**(b)** This order:

**(i)** shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations;

**(ii)** shall not be construed to impair or otherwise affect the functions of the OMB Director relating to budget, legislative, or administrative proposals; and

**(iii)** is intended only to improve the internal management of the executive branch and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

GEORGE W. BUSH

**EXECUTIVE ORDER NO. 13642**

<May 9, 2013, 78 F.R. 28111>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.00614   27

**Making Open and Machine Readable the New Default for Government Information**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. General Principles.** Openness in government strengthens our democracy, promotes the delivery of efficient and effective services to the public, and contributes to economic growth. As one vital benefit of open government, making information resources easy to find, accessible, and usable can fuel entrepreneurship, innovation, and scientific discovery that improves Americans' lives and contributes significantly to job creation.

Decades ago, the U.S. Government made both weather data and the Global Positioning System freely available. Since that time, American entrepreneurs and innovators have utilized these resources to create navigation systems, weather newscasts and warning systems, location-based applications, precision farming tools, and much more, improving Americans' lives in countless ways and leading to economic growth and job creation. In recent years, thousands of Government data resources across fields such as health and medicine, education, energy, public safety, global development, and finance have been posted in machine-readable form for free public use on Data.gov. Entrepreneurs and innovators have continued to develop a vast range of useful new products and businesses using these public information resources, creating good jobs in the process.

To promote continued job growth, Government efficiency, and the social good that can be gained from opening Government data to the public, the default state of new and modernized Government information resources shall be open and machine readable. Government information shall be managed as an asset throughout its life cycle to promote interoperability and openness, and, wherever possible and legally permissible, to ensure that data are released to the public in ways that make the data easy to find, accessible, and usable. In making this the new default state, executive departments and agencies (agencies) shall ensure that they safeguard individual privacy, confidentiality, and national security.

**Sec. 2. Open Data Policy. (a)** The Director of the Office of Management and Budget (OMB), in consultation with the Chief Information Officer (CIO), Chief Technology Officer (CTO), and Administrator of the Office of Information and Regulatory Affairs (OIRA), shall issue an Open Data Policy to advance the management of Government information as an asset, consistent with my memorandum of January 21, 2009 (Transparency and Open Government), OMB Memorandum M-10-06 (Open Government Directive), OMB and National Archives and Records Administration Memorandum M-12-18 (Managing Government Records Directive), the Office of Science and Technology Policy Memorandum of February 22, 2013 (Increasing Access to the Results of Federally Funded Scientific Research), and the CIO's strategy entitled "Digital Government: Building a 21st Century Platform to Better Serve the American People." The Open Data Policy shall be updated as needed.

**(b)** Agencies shall implement the requirements of the Open Data Policy and shall adhere to the deadlines for specific actions specified therein. When implementing the Open Data Policy, agencies shall incorporate a full analysis of privacy, confidentiality, and security risks into each stage of the information lifecycle to identify information that should not be released. These review processes should be overseen by the senior agency official for privacy. It is vital that agencies not release information if doing so would violate any law or policy, or jeopardize privacy, confidentiality, or national security.

**Sec. 3. Implementation of the Open Data Policy.** To facilitate effective Government-wide implementation of the Open Data Policy, I direct the following:

**(a)** Within 30 days of the issuance of the Open Data Policy, the CIO and CTO shall publish an open online repository of tools and best practices to assist agencies in integrating the Open Data Policy into their operations in furtherance of their missions. The CIO and CTO shall regularly update this online repository as needed to ensure it remains a resource to facilitate the adoption of open data practices.

**(b)** Within 90 days of the issuance of the Open Data Policy, the Administrator for Federal Procurement Policy, Controller of the Office of Federal Financial Management, CIO, and Administrator of OIRA shall work with the Chief Acquisition Officers Council, Chief Financial Officers Council, Chief Information Officers Council, and Federal Records Council to identify and initiate implementation of measures to support the integration of the Open Data Policy requirements into Federal acquisition and grant-making processes. Such efforts may include developing sample requirements language, grant and contract language, and workforce tools for agency acquisition, grant, and information management and technology professionals.

**(c)** Within 90 days of the date of this order, the Chief Performance Officer (CPO) shall work with the President's Management Council to establish a Cross-Agency Priority (CAP) Goal to track implementation of the Open Data Policy. The CPO shall work with agencies to set incremental performance goals, ensuring they have metrics and milestones in place to monitor advancement toward the CAP Goal. Progress on these goals shall be analyzed and reviewed by agency leadership, pursuant to the GPRA Modernization Act of 2010 (Public Law 111-352).

**(d)** Within 180 days of the date of this order, agencies shall report progress on the implementation of the CAP Goal to the CPO. Thereafter, agencies shall report progress quarterly, and as appropriate.

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof; or

**(ii)** the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** Nothing in this order shall compel or authorize the disclosure of privileged information, law enforcement information, national security information, personal information, or information the disclosure of which is prohibited by law.

**(e)** Independent agencies are requested to adhere to this order.

BARACK OBAMA

### MEMORANDA OF PRESIDENT

### PRESIDENTIAL MEMORANDUM

<Jan. 21, 2009, 74 F.R. 4683>

### Freedom of Information Act

Memorandum for the Heads of Executive Departments and Agencies

A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, "sunlight is said to be the best of disinfectants." In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national commitment to ensuring an open Government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. The presumption of disclosure should be applied to all decisions involving FOIA.

The presumption of disclosure also means that agencies should take affirmative steps to make information public. They should not wait for specific requests from the public. All agencies should use modern technology to inform citizens about what is known and done by their Government. Disclosure should be timely.

I direct the Attorney General to issue new guidelines governing the FOIA to the heads of executive departments and agencies, reaffirming the commitment to accountability and transparency, and to publish such guidelines in the Federal Register. In doing so, the Attorney General should review FOIA reports produced by the agencies under Executive Order 13392 of December 14, 2005. I also direct the Director of the Office of Management and Budget to update guidance to the agencies to increase and improve information dissemination to the public, including through the use of new technologies, and to publish such guidance in the Federal Register.

This memorandum does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The Director of the Office of Management and Budget is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

### PRESIDENTIAL MEMORANDUM

<Jan. 21, 2009, 74 F.R. 4685>

### Transparency and Open Government

Memorandum for the Heads of Executive Departments and Agencies

My Administration is committed to creating an unprecedented level of openness in Government. We will work together to ensure the public trust and establish a system of transparency, public participation, and collaboration. Openness will strengthen our democracy and promote efficiency and effectiveness in Government.

*Government should be transparent.* Transparency promotes accountability and provides information for citizens about what their Government is doing. Information maintained by the Federal Government is a national asset. My Administration will take appropriate action, consistent with law and policy, to disclose information rapidly in forms that the public can readily find and use. Executive departments and agencies should harness new technologies to put information about their operations and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.00617   30

decisions online and readily available to the public. Executive departments and agencies should also solicit public feedback to identify information of greatest use to the public.

*Government should be participatory.* Public engagement enhances the Government's effectiveness and improves the quality of its decisions. Knowledge is widely dispersed in society, and public officials benefit from having access to that dispersed knowledge. Executive departments and agencies should offer Americans increased opportunities to participate in policymaking and to provide their Government with the benefits of their collective expertise and information. Executive departments and agencies should also solicit public input on how we can increase and improve opportunities for public participation in Government.

*Government should be collaborative.* Collaboration actively engages Americans in the work of their Government. Executive departments and agencies should use innovative tools, methods, and systems to cooperate among themselves, across all levels of Government, and with nonprofit organizations, businesses, and individuals in the private sector. Executive departments and agencies should solicit public feedback to assess and improve their level of collaboration and to identify new opportunities for cooperation.

I direct the Chief Technology Officer, in coordination with the Director of the Office of Management and Budget (OMB) and the Administrator of General Services, to coordinate the development by appropriate executive departments and agencies, within 120 days, of recommendations for an Open Government Directive, to be issued by the Director of OMB, that instructs executive departments and agencies to take specific actions implementing the principles set forth in this memorandum. The independent agencies should comply with the Open Government Directive.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

This memorandum shall be published in the Federal Register.

BARACK OBAMA

Notes of Decisions (4309)

5 U.S.C.A. § 552, 5 USCA § 552
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
      Part I. The Agencies Generally
        Chapter 5. Administrative Procedure (Refs & Annos)
          Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 553

§ 553. Rule making

Currentness

**(a)** This section applies, according to the provisions thereof, except to the extent that there is involved--

**(1)** a military or foreign affairs function of the United States; or

**(2)** a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

**(1)** a statement of the time, place, and nature of public rule making proceedings;

**(2)** reference to the legal authority under which the rule is proposed; and

**(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply--

**(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

**(B)** when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**(d)** The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--

    **(1)** a substantive rule which grants or recognizes an exemption or relieves a restriction;

    **(2)** interpretative rules and statements of policy; or

    **(3)** as otherwise provided by the agency for good cause found and published with the rule.

**(e)** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 383.)

<div align="center">

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12044**

</div>

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

Notes of Decisions (1480)

5 U.S.C.A. § 553, 5 USCA § 553
Current through P.L. 116-182.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 6. The Analysis of Regulatory Functions (Refs & Annos)

5 U.S.C.A. § 601

§ 601. Definitions

Effective: March 29, 1996
Currentness

For purposes of this chapter--

**(1)** the term "agency" means an agency as defined in section 551(1) of this title;

**(2)** the term "rule" means any rule for which the agency publishes a general notice of proposed rulemaking pursuant to section 553(b) of this title, or any other law, including any rule of general applicability governing Federal grants to State and local governments for which the agency provides an opportunity for notice and public comment, except that the term "rule" does not include a rule of particular applicability relating to rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or to valuations, costs or accounting, or practices relating to such rates, wages, structures, prices, appliances, services, or allowances;

**(3)** the term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act, unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register;

**(4)** the term "small organization" means any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register;

**(5)** the term "small governmental jurisdiction" means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register;

**(6)** the term "small entity" shall have the same meaning as the terms "small business", "small organization" and "small governmental jurisdiction" defined in paragraphs (3), (4) and (5) of this section; and

**(7)** the term "collection of information"--

    **(A)** means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either--

        **(i)** answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the United States; or

        **(ii)** answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes; and

    **(B)** shall not include a collection of information described under section 3518(c)(1) of title 44, United States Code.

**(8) Recordkeeping requirement.**--The term "recordkeeping requirement" means a requirement imposed by an agency on persons to maintain specified records.

### CREDIT(S)

    (Added Pub.L. 96-354, § 3(a), Sept. 19, 1980, 94 Stat. 1165; amended Pub.L. 104-121, Title II, § 241(a)(2), Mar. 29, 1996, 110 Stat. 864.)

### EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12291

Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, which established requirements for agencies to follow in promulgating regulations, reviewing existing regulations, and developing legislative proposals concerning regulation, was revoked by Ex. Ord. No. 12866, Sept. 30, 1993, 58 F.R. 51735, set out as a note under this section.

### EXECUTIVE ORDER NO. 12498

Ex. Ord. No. 12498, Jan. 4, 1985, 50 F.R. 1036, which established a regulatory planning process by which to develop and publish a regulatory program for each year, was revoked by Ex. Ord. No. 12866, § 11, Sept. 30, 1993, 58 F.R. 51735, set out as a note under this section.

### EXECUTIVE ORDER NO. 12606

Ex. Ord. No. 12606, Sept. 2, 1987, 52 F.R. 34188, relating to family considerations in policy formulation and implementation, was revoked by Ex. Ord. No. 13045, Apr. 21, 1997, 62 F.R. 19885, set out as a note under section 4321 of Title 42, The Public Health and Welfare.

## EXECUTIVE ORDER NO. 12612

Ex. Ord. No. 12612, Oct. 26, 1987, 52 F.R. 41685, relating to federalism considerations in policy formulation and implementation, was revoked by Ex. Ord. No. 13083, May 14, 1998, 63 F.R. 27651, formerly set out as a note under this section, and subsequently also revoked by Ex. Ord. No. 13132, Aug. 4, 1999, 64 F.R. 43255, set out as a note under this section. [Ex. Ord. No. 13083 was suspended by Ex. Ord. No. 13095, Aug. 5, 1998, 63 F.R. 42565, also formerly set out as a note under this section. Both Ex.Ords. 13083 and 13095 were also revoked by Ex. Ord. No. 13132.]

## EXECUTIVE ORDER NO. 12630

<Mar. 15, 1988, 53 F.R. 8859>

**Governmental Actions and Interference with Constitutionally Protected Property Rights**

By the authority vested in me as President by the Constitution and laws of the United States of America, and in order to ensure that government actions are undertaken on a well-reasoned basis with due regard for fiscal accountability, for the financial impact of the obligations imposed on the Federal government by the Just Compensation Clause of the Fifth Amendment, and for the Constitution, it is hereby ordered as follows:

**Section 1. Purpose. (a)** The Fifth Amendment of the United States Constitution provides that private property shall not be taken for public use without just compensation. Government historically has used the formal exercise of the power of eminent domain, which provides orderly processes for paying just compensation, to acquire private property for public use. Recent Supreme Court decisions, however, in reaffirming the fundamental protection of private property rights provided by the Fifth Amendment and in assessing the nature of governmental actions that have an impact on constitutionally protected property rights, have also reaffirmed that governmental actions that do not formally invoke the condemnation power, including regulations, may result in a taking for which just compensation is required.

**(b)** Responsible fiscal management and fundamental principles of good government require that government decision-makers evaluate carefully the effect of their administrative, regulatory, and legislative actions on constitutionally protected property rights. Executive departments and agencies should review their actions carefully to prevent unnecessary takings and should account in decision-making for those takings that are necessitated by statutory mandate.

**(c)** The purpose of this Order is to assist Federal departments and agencies in undertaking such reviews and in proposing, planning, and implementing actions with due regard for the constitutional protections provided by the Fifth Amendment and to reduce the risk of undue or inadvertent burdens on the public fisc resulting from lawful governmental action. In furtherance of the purpose of this Order, the Attorney General shall, consistent with the principles stated herein and in consultation with the Executive departments and agencies, promulgate Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings to which each Executive department or agency shall refer in making the evaluations required by this Order or in otherwise taking any action that is the subject of this Order. The Guidelines shall be promulgated no later than May 1, 1988, and shall be disseminated to all units of each Executive department and agency no later than July 1, 1988. The Attorney General shall, as necessary, update these guidelines to reflect fundamental changes in takings law occurring as a result of Supreme Court decisions.

**Sec. 2. Definitions. For the purpose of this Order: (a)** "Policies that have takings implications" refers to Federal regulations, proposed Federal regulations, proposed Federal legislation, comments on proposed Federal legislation, or other Federal policy statements that, if implemented or enacted, could effect a taking, such as rules and regulations that propose or implement licensing, permitting, or other condition requirements or limitations on private property use, or that require dedications or exactions from owners of private property. "Policies that have takings implications" does not include:

**(1)** Actions abolishing regulations, discontinuing governmental programs, or modifying regulations in a manner that lessens interference with the use of private property;

**(2)** Actions taken with respect to properties held in trust by the United States or in preparation for or during treaty negotiations with foreign nations;

**(3)** Law enforcement actions involving seizure, for violations of law, of property for forfeiture or as evidence in criminal proceedings;

**(4)** Studies or similar efforts or planning activities;

**(5)** Communications between Federal agencies or departments and State or local land-use planning agencies regarding planned or proposed State or local actions regulating private property regardless of whether such communications are initiated by a Federal agency or department or are undertaken in response to an invitation by the State or local authority;

**(6)** The placement of military facilities or military activities involving the use of Federal property alone; or

**(7)** Any military or foreign affairs functions (including procurement functions thereunder) but not including the U.S. Army Corps of Engineers civil works program.

**(b)** Private property refers to all property protected by the Just Compensation Clause of the Fifth Amendment.

**(c)** "Actions" refers to proposed Federal regulations, proposed Federal legislation, comments on proposed Federal legislation, applications of Federal regulations to specific property, or Federal governmental actions physically invading or occupying private property, or other policy statements or actions related to Federal regulation or direct physical invasion or occupancy, but does not include:

**(1)** Actions in which the power of eminent domain is formally exercised;

**(2)** Actions taken with respect to properties held in trust by the United States or in preparation for or during treaty negotiations with foreign nations;

**(3)** Law enforcement actions involving seizure, for violations of law, of property for forfeiture or as evidence in criminal proceedings;

**(4)** Studies or similar efforts or planning activities;

**(5)** Communications between Federal agencies or departments and State or local land-use planning agencies regarding planned or proposed State or local actions regulating private property regardless of whether such communications are initiated by a Federal agency or department or are undertaken in response to an invitation by the State or local authority;

**(6)** The placement of military facilities or military activities involving the use of Federal property alone; or

**(7)** Any military or foreign affairs functions (including procurement functions thereunder), but not including the U.S. Army Corps of Engineers civil works program.

**Sec. 3. General Principles.** In formulating or implementing policies that have takings implications, each Executive department and agency shall be guided by the following general principles:

**(a)** Governmental officials should be sensitive to, anticipate, and account for, the obligations imposed by the Just Compensation Clause of the Fifth Amendment in planning and carrying out governmental actions so that they do not result in the imposition of unanticipated or undue additional burdens on the public fisc.

**(b)** Actions undertaken by governmental officials that result in a physical invasion or occupancy of private property, and regulations imposed on private property that substantially affect its value or use, may constitute a taking of property. Further, governmental action may amount to a taking even though the action results in less than a complete deprivation of all use or value, or of all separate and distinct interests in the same private property and even if the action constituting a taking is temporary in nature.

**(c)** Government officials whose actions are taken specifically for purposes of protecting public health and safety are ordinarily given broader latitude by courts before their actions are considered to be takings. However, the mere assertion of a public health and safety purpose is insufficient to avoid a taking. Actions to which this Order applies asserted to be for the protection of public health and safety, therefore, should be undertaken only in response to real and substantial threats to public health and safety, be designed to advance significantly the health and safety purpose, and be no greater than is necessary to achieve the health and safety purpose.

**(d)** While normal governmental processes do not ordinarily effect takings, undue delays in decision-making during which private property use if interfered with carry a risk of being held to be takings. Additionally, a delay in processing may increase significantly the size of compensation due if a taking is later found to have occurred.

**(e)** The Just Compensation Clause is self-actuating, requiring that compensation be paid whenever governmental action results in a taking of private property regardless of whether the underlying authority for the action contemplated a taking or authorized the payment of compensation. Accordingly, governmental actions that may have a significant impact on the use or value of private property should be scrutinized to avoid undue or unplanned burdens on the public fisc.

**Sec. 4. Department and Agency Action.** In addition to the fundamental principles set forth in Section 3, Executive departments and agencies shall adhere, to the extent permitted by law, to the following criteria when implementing policies that have takings implications:

**(a)** When an Executive department or agency requires a private party to obtain a permit in order to undertake a specific use of, or action with respect to, private property, any conditions imposed on the granting of a permit shall:

**(1)** Serve the same purpose that would have been served by a prohibition of the use or action; and

**(2)** Substantially advance that purpose.

**(b)** When a proposed action would place a restriction on a use of private property, the restriction imposed on the use shall not be disproportionate to the extent to which the use contributes to the overall problem that the restriction is imposed to redress.

**(c)** When a proposed action involves a permitting process or any other decision-making process that will interfere with, or otherwise prohibit, the use of private property pending the completion of the process, the duration of the process shall be kept to the minimum necessary.

**(d)** Before undertaking any proposed action regulating private property use for the protection of public health or safety, the Executive department or agency involved shall, in internal deliberative documents and any submissions to the Director of the Office of Management and Budget that are required:

**(1)** Identify clearly, with as much specificity as possible, the public health or safety risk created by the private property use that is the subject of the proposed action;

**(2)** Establish that such proposed action substantially advances the purpose of protecting public health and safety against the specifically identified risk;

**(3)** Establish to the extent possible that the restrictions imposed on the private property are not disproportionate to the extent to which the use contributes to the overall risk; and

**(4)** Estimate, to the extent possible, the potential cost to the government in the event that a court later determines that the action constituted a taking.

In instances in which there is an immediate threat to health and safety that constitutes an emergency requiring immediate response, this analysis may be done upon completion of the emergency action.

**Sec. 5. Executive Department and Agency Implementation. (a)** The head of each Executive department and agency shall designate an official to be responsible for ensuring compliance with this Order with respect to the actions of that department or agency.

**(b)** Executive departments and agencies shall, to the extent permitted by law, identify the takings implications of proposed regulatory actions and address the merits of those actions in light of the identified takings implications, if any, in all required submissions made to the Office of Management and Budget. Significant takings implications should also be identified and discussed in notices of proposed rule-making and messages transmitting legislative proposals to the Congress, stating the departments' and agencies' conclusions on the takings issues.

**(c)** Executive departments and agencies shall identify each existing Federal rule and regulation against which a takings award has been made or against which a takings claim is pending including the amount of each claim or award. A "takings" award has been made or a "takings" claim pending if the award was made, or the pending claim brought, pursuant to the Just Compensation Clause of the Fifth Amendment. An itemized compilation of all such awards made in Fiscal Years 1985, 1986, and 1987 and all such pending claims shall be submitted to the Director, Office of Management and Budget, on or before May 16, 1988.

**(d)** Each Executive department and agency shall submit annually to the Director, Office of Management and Budget, and to the Attorney General an itemized compilation of all awards of just compensation entered against the United States for takings, including awards of interest as well as monies paid pursuant to the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. 4601 [section 4601 et seq. of Title 42, The Public Health and Welfare].

**(e)(1)** The Director, Office of Management and Budget, and the Attorney General shall each, to the extent permitted by law, take action to ensure that the policies of the Executive departments and agencies are consistent with the principles, criteria, and requirements stated in Sections 1 through 5 of this Order, and the Office of Management and Budget shall take action to ensure that all takings awards levied against agencies are properly accounted for in agency budget submissions.

**(2)** In addition to the guidelines required by Section 1 of this Order, the Attorney General shall, in consultation with each Executive department and agency to which this Order applies, promulgate such supplemental guidelines as may be appropriate to the specific obligations of that department or agency.

**Sec. 6. Judicial Review.** This Order is intended only to improve the internal management of the Executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

RONALD REAGAN

[For Executive Order No. 13406 of June 23, 2006, *Protecting the Property Rights of the American People*, see Ex. Ord. No. 13406, June 23, 2006, 71 F.R. 36973, set out under this section.]

## EXECUTIVE ORDER NO. 12803

Ex. Ord. No. 12803, Apr. 30, 1992, 57 F.R. 19063, relating to Infrastructure Privatization, is set out in a note under 31 U.S.C.A. § 501.

## EXECUTIVE ORDER NO. 12861

<Sept. 11, 1993, 58 F.R. 48255>

### Elimination of One-Half of Executive Branch Internal Regulations

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code [section 301 of Title 3, The President], and section 1111 of title 31, United States Code [section 1111 of Title 31, Money and Finance], and to cut 50 percent of the executive branch's internal regulations in order to streamline and improve customer service to the American people, it is hereby ordered as follows:

**Section 1. Regulatory Reductions.** Each executive department and agency shall undertake to eliminate not less than 50 percent of its civilian internal management regulations that are not required by law within 3 years of the effective date of this order. An agency internal management regulation, for the purposes of this order, means an agency directive or regulation that pertains to its organization, management, or personnel matters. Reductions in agency internal management regulations shall be concentrated in areas that will result in the greatest improvement in productivity, streamlining of operations, and improvement in customer service.

**Sec. 2. Coverage.** This order applies to all executive branch departments and agencies.

**Sec. 3. Implementation.** The Director of the Office of Management and Budget shall issue instructions regarding the implementation of this order, including exemptions necessary for the delivery of essential services and compliance with applicable law.

**Sec. 4. Independent Agencies.** All independent regulatory commissions and agencies are requested to comply with the provisions of this order.

WILLIAM J. CLINTON

## EXECUTIVE ORDER NO. 12866

<Sept. 30, 1993, 58 F.R. 51735>

### Regulatory Planning and Review

[Ex. Ord. No. 13258, Feb. 26, 2002, 67 F.R. 9385 and Ex. Ord. No. 13422, Jan. 18, 2007, 72 F.R. 2763, which amended Ex. Ord. No. 12866 were revoked by section 1 of Ex. Ord. No. 13497, January 30, 2009, which is set as a note under this section

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

following this note. The revocation of Ex. Ord. No. 13258, Feb. 26, 2002, 67 F.R. 9385 and Ex. Ord. No. 13422, Jan. 18, 2007, 72 F.R. 2763, by section 1 of Ex. Ord. No. 13497, January 30, 2009, was executed by undoing the amendments made by Ex. Ords. No. 13258 and 13422 to Ex. Ord. No. 12866 .]

The American people deserve a regulatory system that works for them, not against them: a regulatory system that protects and improves their health, safety, environment, and well-being and improves the performance of the economy without imposing unacceptable or unreasonable costs on society; regulatory policies that recognize that the private sector and private markets are the best engine for economic growth; regulatory approaches that respect the role of State, local, and tribal governments; and regulations that are effective, consistent, sensible, and understandable. We do not have such a regulatory system today.

With this Executive order, the Federal Government begins a program to reform and make more efficient the regulatory process. The objectives of this Executive order are to enhance planning and coordination with respect to both new and existing regulations; to reaffirm the primacy of Federal agencies in the regulatory decision-making process; to restore the integrity and legitimacy of regulatory review and oversight; and to make the process more accessible and open to the public. In pursuing these objectives, the regulatory process shall be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Statement of Regulatory Philosophy and Principles. (a) The Regulatory Philosophy.** Federal agencies should promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American people. In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

**(b) The Principles of Regulation.** To ensure that the agencies' regulatory programs are consistent with the philosophy set forth above, agencies should adhere to the following principles, to the extent permitted by law and where applicable:

**(1)** Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem.

**(2)** Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively.

**(3)** Each agency shall identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

**(4)** In setting regulatory priorities, each agency shall consider, to the extent reasonable, the degree and nature of the risks posed by various substances or activities within its jurisdiction.

**(5)** When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective. In doing so, each agency shall consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.

**(6)** Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.

**(7)** Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation.

**(8)** Each agency shall identify and assess alternative forms of regulation and shall, to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt.

**(9)** Wherever feasible, agencies shall seek views of appropriate State, local, and tribal officials before imposing regulatory requirements that might significantly or uniquely affect those governmental entities. Each agency shall assess the effects of Federal regulations on State, local, and tribal governments, including specifically the availability of resources to carry out those mandates, and seek to minimize those burdens that uniquely or significantly affect such governmental entities, consistent with achieving regulatory objectives. In addition, as appropriate, agencies shall seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions.

**(10)** Each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies.

**(11)** Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.

**(12)** Each agency shall draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty.

**Sec. 2.** Organization. An efficient regulatory planning and review process is vital to ensure that the Federal Government's regulatory system best serves the American people.

**(a) The Agencies.** Because Federal agencies are the repositories of significant substantive expertise and experience, they are responsible for developing regulations and assuring that the regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order.

**(b) The Office of Management and Budget.** Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency. The Office of Management and Budget (OMB) shall carry out that review function. Within OMB, the Office of Information and Regulatory Affairs (OIRA) is the repository of expertise concerning regulatory issues, including methodologies and procedures that affect more than one agency, this Executive order, and the President's regulatory policies. To the extent permitted by law, OMB shall provide guidance to agencies and assist the President, the Vice President, and other regulatory policy advisors to the President in regulatory planning and shall be the entity that reviews individual regulations, as provided by this Executive order.

**(c) The Vice President.** The Vice President is the principal advisor to the President on, and shall coordinate the development and presentation of recommendations concerning, regulatory policy, planning, and review, as set forth in this Executive order. In fulfilling their responsibilities under this Executive order, the President and the Vice President shall be assisted by the regulatory policy advisors within the Executive Office of the President and by such agency officials and personnel as the President and the Vice President may, from time to time, consult.

**Sec. 3. Definitions.** For purposes of this Executive order: **(a)** "Advisors" refers to such regulatory policy advisors to the President as the President and Vice President may from time to time consult, including, among others: **(1)** the Director of OMB; **(2)** the Chair (or another member) of the Council of Economic Advisers; **(3)** the Assistant to the President for Economic Policy; **(4)** the Assistant to the President for Domestic Policy; **(5)** the Assistant to the President for National Security Affairs; (6) the Assistant to the President for Science and Technology; **(7)** the Assistant to the President for Intergovernmental Affairs; **(8)** the Assistant to the President and Staff Secretary; **(9)** the Assistant to the President and Chief of Staff to the Vice President; **(10)** the Assistant to the President and Counsel to the President; **(11)** the Deputy Assistant to the President and Director of the White House Office on Environmental Policy; and **(12)** the Administrator of OIRA, who also shall coordinate communications relating to this Executive order among the agencies, OMB, the other Advisors, and the Office of the Vice President.

**(b)** "Agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10).

**(c)** "Director" means the Director of OMB.

**(d)** "Regulation" or "rule" means an agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency. It does not, however, include:

**(1)** Regulations or rules issued in accordance with the formal rulemaking provisions of 5 U.S.C. 556, 557;

**(2)** Regulations or rules that pertain to a military or foreign affairs function of the United States, other than procurement regulations and regulations involving the import or export of non-defense articles and services;

**(3)** Regulations or rules that are limited to agency organization, management, or personnel matters; or

**(4)** Any other category of regulations exempted by the Administrator of OIRA.

**(e)** "Regulatory action" means any substantive action by an agency (normally published in the Federal Register) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking.

**(f)** "Significant regulatory action" means any regulatory action that is likely to result in a rule that may:

**(1)** Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

**(2)** Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

**(3)** Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

**(4)** Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.

**Sec. 4. Planning Mechanism.** In order to have an effective regulatory program, to provide for coordination of regulations, to maximize consultation and the resolution of potential conflicts at an early stage, to involve the public and its State, local, and tribal officials in regulatory planning, and to ensure that new or revised regulations promote the President's priorities and the principles set forth in this Executive order, these procedures shall be followed, to the extent permitted by law: **(a) Agencies' Policy Meeting.** Early in each year's planning cycle, the Vice President shall convene a meeting of the Advisors and the heads of agencies to seek a common understanding of priorities and to coordinate regulatory efforts to be accomplished in the upcoming year.

**(b) Unified Regulatory Agenda.** For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). Each agency shall prepare an agenda of all regulations under development or review, at a time and in a manner specified by the Administrator of OIRA. The description of each regulatory action shall contain, at a minimum, a regulation identifier number, a brief summary of the action, the legal authority for the action, any legal deadline for the action, and the name and telephone number of a knowledgeable agency official. Agencies may incorporate the information required under 5 U.S.C. 602 and 41 U.S.C. 402 into these agendas.

**(c) The Regulatory Plan.** For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). **(1)** As part of the Unified Regulatory Agenda, beginning in 1994, each agency shall prepare a Regulatory Plan (Plan) of the most important significant regulatory actions that the agency reasonably expects to issue in proposed or final form in that fiscal year or thereafter. The Plan shall be approved personally by the agency head and shall contain at a minimum:

**(A)** A statement of the agency's regulatory objectives and priorities and how they relate to the President's priorities;

**(B)** A summary of each planned significant regulatory action including, to the extent possible, alternatives to be considered and preliminary estimates of the anticipated costs and benefits;

**(C)** A summary of the legal basis for each such action, including whether any aspect of the action is required by statute or court order;

**(D)** A statement of the need for each such action and, if applicable, how the action will reduce risks to public health, safety, or the environment, as well as how the magnitude of the risk addressed by the action relates to other risks within the jurisdiction of the agency;

**(E)** The agency's schedule for action, including a statement of any applicable statutory or judicial deadlines; and

**(F)** The name, address, and telephone number of a person the public may contact for additional information about the planned regulatory action.

**(2)** Each agency shall forward its Plan to OIRA by June 1st of each year.

**(3)** Within 10 calendar days after OIRA has received an agency's Plan, OIRA shall circulate it to other affected agencies, the Advisors, and the Vice President.

**(4)** An agency head who believes that a planned regulatory action of another agency may conflict with its own policy or action taken or planned shall promptly notify, in writing, the Administrator of OIRA, who shall forward that communication to the issuing agency, the Advisors, and the Vice President.

**(5)** If the Administrator of OIRA believes that a planned regulatory action of an agency may be inconsistent with the President's priorities or the principles set forth in this Executive order or may be in conflict with any policy or action taken or planned by another agency, the Administrator of OIRA shall promptly notify, in writing, the affected agencies, the Advisors, and the Vice President.

**(6)** The Vice President, with the Advisors' assistance, may consult with the heads of agencies with respect to their Plans and, in appropriate instances, request further consideration or inter-agency coordination.

**(7)** The Plans developed by the issuing agency shall be published annually in the October publication of the Unified Regulatory Agenda. This publication shall be made available to the Congress; State, local, and tribal governments; and the public. Any views on any aspect of any agency Plan, including whether any planned regulatory action might conflict with any other planned or existing regulation, impose any unintended consequences on the public, or confer any unclaimed benefits on the public, should be directed to the issuing agency, with a copy to OIRA.

**(d) Regulatory Working Group.** Within 30 days of the date of this Executive order, the Administrator of OIRA shall convene a Regulatory Working Group ("Working Group"), which shall consist of representatives of the heads of each agency that the Administrator determines to have significant domestic regulatory responsibility, the Advisors, and the Vice President. The Administrator of OIRA shall chair the Working Group and shall periodically advise the Vice President on the activities of the Working Group. The Working Group shall serve as a forum to assist agencies in identifying and analyzing important regulatory issues (including, among others (1) the development of innovative regulatory techniques, (2) the methods, efficacy, and utility of comparative risk assessment in regulatory decision-making, and (3) the development of short forms and other streamlined regulatory approaches for small businesses and other entities). The Working Group shall meet at least quarterly and may meet as a whole or in subgroups of agencies with an interest in particular issues or subject areas. To inform its discussions, the Working Group may commission analytical studies and reports by OIRA, the Administrative Conference of the United States, or any other agency.

**(e) Conferences.** The Administrator of OIRA shall meet quarterly with representatives of State, local, and tribal governments to identify both existing and proposed regulations that may uniquely or significantly affect those governmental entities. The Administrator of OIRA shall also convene, from time to time, conferences with representatives of businesses, nongovernmental organizations, and the public to discuss regulatory issues of common concern.

**Sec. 5. Existing Regulations.** In order to reduce the regulatory burden on the American people, their families, their communities, their State, local, and tribal governments, and their industries; to determine whether regulations promulgated by the executive branch of the Federal Government have become unjustified or unnecessary as a result of changed circumstances; to confirm that regulations are both compatible with each other and not duplicative or inappropriately burdensome in the aggregate; to ensure that all regulations are consistent with the President's priorities and the principles set forth in this Executive order, within applicable law; and to otherwise improve the effectiveness of existing regulations: **(a)** Within 90 days of the date of this Executive order, each agency shall submit to OIRA a program, consistent with its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified or eliminated so as to make the agency's regulatory program more effective in achieving the regulatory objectives, less burdensome, or in greater alignment with the President's priorities and the principles set forth in this Executive order. Any significant regulations selected for review shall be included in the agency's annual Plan. The agency shall also identify any legislative mandates that require the agency to promulgate or continue to impose regulations that the agency believes are unnecessary or outdated by reason of changed circumstances.

**(b)** The Administrator of OIRA shall work with the Regulatory Working Group and other interested entities to pursue the objectives of this section. State, local, and tribal governments are specifically encouraged to assist in the identification of

regulations that impose significant or unique burdens on those governmental entities and that appear to have outlived their justification or be otherwise inconsistent with the public interest.

**(c)** The Vice President, in consultation with the Advisors, may identify for review by the appropriate agency or agencies other existing regulations of an agency or groups of regulations of more than one agency that affect a particular group, industry, or sector of the economy, or may identify legislative mandates that may be appropriate for reconsideration by the Congress.

**Sec. 6. Centralized Review of Regulations.** The guidelines set forth below shall apply to all regulatory actions, for both new and existing regulations, by agencies other than those agencies specifically exempted by the Administrator of OIRA:

**(a) Agency Responsibilities. (1)** Each agency shall (consistent with its own rules, regulations, or procedures) provide the public with meaningful participation in the regulatory process. In particular, before issuing a notice of proposed rulemaking, each agency should, where appropriate, seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation (including, specifically, State, local, and tribal officials). In addition, each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days. Each agency also is directed to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking.

**(2)** Within 60 days of the date of this Executive order, each agency head shall designate a Regulatory Policy Officer who shall report to the agency head. The Regulatory Policy Officer shall be involved at each stage of the regulatory process to foster the development of effective, innovative, and least burdensome regulations and to further the principles set forth in this Executive order.

**(3)** In addition to adhering to its own rules and procedures and to the requirements of the Administrative Procedure Act, the Regulatory Flexibility Act, the Paperwork Reduction Act, and other applicable law, each agency shall develop its regulatory actions in a timely fashion and adhere to the following procedures with respect to a regulatory action:

**(A)** Each agency shall provide OIRA, at such times and in the manner specified by the Administrator of OIRA, with a list of its planned regulatory actions, indicating those which the agency believes are significant regulatory actions within the meaning of this Executive order. Absent a material change in the development of the planned regulatory action, those not designated as significant will not be subject to review under this section unless, within 10 working days of receipt of the list, the Administrator of OIRA notifies the agency that OIRA has determined that a planned regulation is a significant regulatory action within the meaning of this Executive order. The Administrator of OIRA may waive review of any planned regulatory action designated by the agency as significant, in which case the agency need not further comply with subsection (a)(3)(B) or subsection (a)(3)(C) of this section.

**(B)** For each matter identified as, or determined by the Administrator of OIRA to be, a significant regulatory action, the issuing agency shall provide to OIRA:

**(i)** The text of the draft regulatory action, together with a reasonably detailed description of the need for the regulatory action and an explanation of how the regulatory action will meet that need; and

**(ii)** An assessment of the potential costs and benefits of the regulatory action, including an explanation of the manner in which the regulatory action is consistent with a statutory mandate and, to the extent permitted by law, promotes the President's priorities and avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions.

**(C)** For those matters identified as, or determined by the Administrator of OIRA to be, a significant regulatory action within the scope of section 3(f)(1), the agency shall also provide to OIRA the following additional information developed as part of the agency's decision-making process (unless prohibited by law):

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(i)** An assessment, including the underlying analysis, of benefits anticipated from the regulatory action (such as, but not limited to, the promotion of the efficient functioning of the economy and private markets, the enhancement of health and safety, the protection of the natural environment, and the elimination or reduction of discrimination or bias) together with, to the extent feasible, a quantification of those benefits;

**(ii)** An assessment, including the underlying analysis, of costs anticipated from the regulatory action (such as, but not limited to, the direct cost both to the government in administering the regulation and to businesses and others in complying with the regulation, and any adverse effects on the efficient functioning of the economy, private markets (including productivity, employment, and competitiveness), health, safety, and the natural environment), together with, to the extent feasible, a quantification of those costs; and

**(iii)** An assessment, including the underlying analysis, of costs and benefits of potentially effective and reasonably feasible alternatives to the planned regulation, identified by the agencies or the public (including improving the current regulation and reasonably viable nonregulatory actions), and an explanation why the planned regulatory action is preferable to the identified potential alternatives.

**(D)** In emergency situations or when an agency is obligated by law to act more quickly than normal review procedures allow, the agency shall notify OIRA as soon as possible and, to the extent practicable, comply with subsections (a)(3)(B) and (C) of this section. For those regulatory actions that are governed by a statutory or court-imposed deadline, the agency shall, to the extent practicable, schedule rulemaking proceedings so as to permit sufficient time for OIRA to conduct its review, as set forth below in subsection (b)(2) through (4) of this section.

**(E)** After the regulatory action has been published in the Federal Register or otherwise issued to the public, the agency shall:

**(i)** Make available to the public the information set forth in subsections (a)(3)(B) and (C);

**(ii)** Identify for the public, in a complete, clear, and simple manner, the substantive changes between the draft submitted to OIRA for review and the action subsequently announced; and

**(iii)** Identify for the public those changes in the regulatory action that were made at the suggestion or recommendation of OIRA.

**(F)** All information provided to the public by the agency shall be in plain, understandable language.

**(b) OIRA Responsibilities.** The Administrator of OIRA shall provide meaningful guidance and oversight so that each agency's regulatory actions are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order and do not conflict with the policies or actions of another agency. OIRA shall, to the extent permitted by law, adhere to the following guidelines:

**(1)** OIRA may review only actions identified by the agency or by OIRA as significant regulatory actions under subsection (a)(3)(A) of this section.

**(2)** OIRA shall waive review or notify the agency in writing of the results of its review within the following time periods:

**(A)** For any notices of inquiry, advance notices of proposed rulemaking, or other preliminary regulatory actions prior to a Notice of Proposed Rulemaking, within 10 working days after the date of submission of the draft action to OIRA;

**(B)** For all other regulatory actions, within 90 calendar days after the date of submission of the information set forth in subsections (a)(3)(B) and (C) of this section, unless OIRA has previously reviewed this information and, since that review, there

has been no material change in the facts and circumstances upon which the regulatory action is based, in which case, OIRA shall complete its review within 45 days; and

**(C)** The review process may be extended (1) once by no more than 30 calendar days upon the written approval of the Director and (2) at the request of the agency head.

**(3)** For each regulatory action that the Administrator of OIRA returns to an agency for further consideration of some or all of its provisions, the Administrator of OIRA shall provide the issuing agency a written explanation for such return, setting forth the pertinent provision of this Executive order on which OIRA is relying. If the agency head disagrees with some or all of the bases for the return, the agency head shall so inform the Administrator of OIRA in writing.

**(4)** Except as otherwise provided by law or required by a Court, in order to ensure greater openness, accessibility, and accountability in the regulatory review process, OIRA shall be governed by the following disclosure requirements:

**(A)** Only the Administrator of OIRA (or a particular designee) shall receive oral communications initiated by persons not employed by the executive branch of the Federal Government regarding the substance of a regulatory action under OIRA review;

**(B)** All substantive communications between OIRA personnel and persons not employed by the executive branch of the Federal Government regarding a regulatory action under review shall be governed by the following guidelines: **(i)** A representative from the issuing agency shall be invited to any meeting between OIRA personnel and such person(s);

**(ii)** OIRA shall forward to the issuing agency, within 10 working days of receipt of the communication(s), all written communications, regardless of format, between OIRA personnel and any person who is not employed by the executive branch of the Federal Government, and the dates and names of individuals involved in all substantive oral communications (including meetings to which an agency representative was invited, but did not attend, and telephone conversations between OIRA personnel and any such persons); and

**(iii)** OIRA shall publicly disclose relevant information about such communication(s), as set forth below in subsection (b)(4)(C) of this section.

**(C)** OIRA shall maintain a publicly available log that shall contain, at a minimum, the following information pertinent to regulatory actions under review:

**(i)** The status of all regulatory actions, including if (and if so, when and by whom) Vice Presidential and Presidential consideration was requested;

**(ii)** A notation of all written communications forwarded to an issuing agency under subsection (b)(4)(B)(ii) of this section; and

**(iii)** The dates and names of individuals involved in all substantive oral communications, including meetings and telephone conversations, between OIRA personnel and any person not employed by the executive branch of the Federal Government, and the subject matter discussed during such communications.

**(D)** After the regulatory action has been published in the Federal Register or otherwise issued to the public, or after the agency has announced its decision not to publish or issue the regulatory action, OIRA shall make available to the public all documents exchanged between OIRA and the agency during the review by OIRA under this section.

**(5)** All information provided to the public by OIRA shall be in plain, understandable language.

**Sec. 7. Resolution of Conflicts.** To the extent permitted by law, disagreements or conflicts between or among agency heads or between OMB and any agency that cannot be resolved by the Administrator of OIRA shall be resolved by the President, or by the Vice President acting at the request of the President, with the relevant agency head (and, as appropriate, other interested government officials). Vice Presidential and Presidential consideration of such disagreements may be initiated only by the Director, by the head of the issuing agency, or by the head of an agency that has a significant interest in the regulatory action at issue. Such review will not be undertaken at the request of other persons, entities, or their agents.

Resolution of such conflicts shall be informed by recommendations developed by the Vice President, after consultation with the Advisors (and other executive branch officials or personnel whose responsibilities to the President include the subject matter at issue). The development of these recommendations shall be concluded within 60 days after review has been requested.

During the Vice Presidential and Presidential review period, communications with any person not employed by the Federal Government relating to the substance of the regulatory action under review and directed to the Advisors or their staffs or to the staff of the Vice President shall be in writing and shall be forwarded by the recipient to the affected agency(ies) for inclusion in the public docket(s). When the communication is not in writing, such Advisors or staff members shall inform the outside party that the matter is under review and that any comments should be submitted in writing.

At the end of this review process, the President, or the Vice President acting at the request of the President, shall notify the affected agency and the Administrator of OIRA of the President's decision with respect to the matter.

**Sec. 8. Publication.** Except to the extent required by law, an agency shall not publish in the Federal Register or otherwise issue to the public any regulatory action that is subject to review under section 6 of this Executive order until (1) the Administrator of OIRA notifies the agency that OIRA has waived its review of the action or has completed its review without any requests for further consideration, or (2) the applicable time period in section 6(b)(2) expires without OIRA having notified the agency that it is returning the regulatory action for further consideration under section 6(b)(3), whichever occurs first. If the terms of the preceding sentence have not been satisfied and an agency wants to publish or otherwise issue a regulatory action, the head of that agency may request Presidential consideration through the Vice President, as provided under section 7 of this order. Upon receipt of this request, the Vice President shall notify OIRA and the Advisors. The guidelines and time period set forth in section 7 shall apply to the publication of regulatory actions for which Presidential consideration has been sought.

**Sec. 9. Agency Authority.** Nothing in this order shall be construed as displacing the agencies' authority or responsibilities, as authorized by law.

**Sec. 10. Judicial Review.** Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 11. Revocations.** Executive Orders Nos. 12291 and 12498; all amendments to those Executive orders; all guidelines issued under those orders; and any exemptions from those orders heretofore granted for any category of rule are revoked.

WILLIAM CLINTON

[For provisions supplementing, but not superseding, the provisions of this Executive Order, see Ex.Ord. No. 13132, Aug. 4, 1999, 64 F.R. 43255, set out as a note under this section.]

[Ex. Ord. No. 13497 of Jan. 30, 2009, "Revocation of Certain Executive Orders Concerning Regulatory Planning and Review", provided:

["By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered that:

"**Section 1.** Executive Order 13258 of February 26, 2002, and Executive Order 13422 of January 18, 2007, concerning regulatory planning and review, which amended Executive Order 12866 of September 30, 1993 [set out as a note under 5 U.S.C.A. § 601], are revoked.

"**Sec. 2.** The Director of the Office of Management and Budget and the heads of executive departments and agencies shall promptly rescind any orders, rules, regulations, guidelines, or policies implementing or enforcing Executive Order 13258 or Executive Order 13422, to the extent consistent with law.

"**Sec. 3.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

[The revocation of Ex. Ord. No. 13258, Feb. 26, 2002, 67 F.R. 9385 and Ex. Ord. No. 13422, Jan. 18, 2007, 72 F.R. 2763, which amended Ex. Ord. No. 12866, by section 1 of Ex. Ord. No. 13497, January 30, 2009, was executed by undoing the amendments made by Ex. Ords. No. 13258 and 13422 to Ex. Ord. No. 12866 .]

### EXECUTIVE ORDER NO. 12875

Ex. Ord. No. 12875, Oct. 26, 1993, 58 F.R. 58093, relating to enhancing the intergovernmental partnership, was revoked by Ex. Ord. No. 13083, May 14, 1998, 63 F.R. 27651, formerly set out as a note under this section, and also subsequently revoked by Ex.Ord. No. 13132, Aug. 4, 1999, 64 F.R. 43255, set out as a note under this section. [Ex. Ord. No. 13083 was suspended by Ex. Ord. No. 13095, Aug. 5, 1998, 63 F.R. 42565, also formerly set out as a note under this section. Both Ex. Ords. 13083 and 13095 were also revoked by Ex. Ord. No. 13132.]

### EXECUTIVE ORDER NO. 12878

Ex. Ord. No. 12878, Nov. 5, 1993, 58 F.R. 59343, as amended by Ex. Ord. No. 12887, Dec. 23, 1993, 58 F.R. 68713, relating to the bipartisan commission on entitlement reform, was deleted by the Law Revision Counsel.

### EXECUTIVE ORDER NO. 13083

Ex. Ord. No. 13083, May 14, 1998, 63 F.R. 27651, relating to federalism considerations in policy formulation and implementation, was suspended by Ex. Ord. No. 13095, Aug. 5, 1998, 63 F.R. 42565, formerly set out as a note under this section, and subsequently revoked by Ex. Ord. No. 13132, Aug. 4, 1999, 64 F.R. 43255, set out as a note under this section. [Ex. Ord. No. 13095 was also revoked by Ex. Ord. No. 13132.]

### EXECUTIVE ORDER NO. 13095

Ex. Ord. No. 13095, Aug. 5, 1998, 63 F.R. 42565, formerly set out as a note under this section, which had suspended Ex. Ord. No. 13083, May 14, 1998, 63 F.R. 27651, also formerly set out as a note under this section, was revoked by Ex. Ord. No. 13132, Aug. 4, 1999, 64 F.R. 43255, set out as a note under this section. [Ex. Ord. No. 13083 was also revoked by Ex. Ord. No. 13132.]

## EXECUTIVE ORDER NO. 13107

<Dec. 10, 1998, 63 F.R. 68991>

### Implementation of Human Rights Treaties

By the authority vested in me as President by the Constitution and the laws of the United States of America, and bearing in mind the obligations of the United States pursuant to the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), the Convention on the Elimination of All Forms of Racial Discrimination (CERD), and other relevant treaties concerned with the protection and promotion of human rights to which the United States is now or may become a party in the future, it is hereby ordered as follows:

**Section 1. Implementation of Human Rights Obligations.**

**(a)** It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under the international human rights treaties to which it is a party, including the ICCPR, the CAT, and the CERD.

**(b)** It shall also be the policy and practice of the Government of the United States to promote respect for international human rights, both in our relationships with all other countries and by working with and strengthening the various international mechanisms for the promotion of human rights, including, inter alia, those of the United Nations, the International Labor Organization, and the Organization of American States.

**Sec. 2. Responsibility of Executive Departments and Agencies.(a)** All executive departments and agencies (as defined in 5 U.S.C. 101-105, including boards and commissions, and hereinafter referred to collectively as "agency" or "agencies") shall maintain a current awareness of United States international human rights obligations that are relevant to their functions and shall perform such functions so as to respect and implement those obligations fully. The head of each agency shall designate a single contact officer who will be responsible for overall coordination of the implementation of this order. Under this order, all such agencies shall retain their established institutional roles in the implementation, interpretation, and enforcement of Federal law and policy.

**(b)** The heads of agencies shall have lead responsibility, in coordination with other appropriate agencies, for questions concerning implementation of human rights obligations that fall within their respective operating and program responsibilities and authorities or, to the extent that matters do not fall within the operating and program responsibilities and authorities of any agency, that most closely relate to their general areas of concern.

**Sec. 3. Human Rights Inquiries and Complaints.** Each agency shall take lead responsibility, in coordination with other appropriate agencies, for responding to inquiries, requests for information, and complaints about violations of human rights obligations that fall within its areas of responsibility or, if the matter does not fall within its areas of responsibility, referring it to the appropriate agency for response.

**Sec. 4. Interagency Working Group on Human Rights Treaties. (a)** There is hereby established an Interagency Working Group on Human Rights Treaties for the purpose of providing guidance, oversight, and coordination with respect to questions concerning the adherence to and implementation of human rights obligations and related matters.

**(b)** The designee of the Assistant to the President for National Security Affairs shall chair the Interagency Working Group, which shall consist of appropriate policy and legal representatives at the Assistant Secretary level from the Department of State,

the Department of Justice, the Department of Labor, the Department of Defense, the Joint Chiefs of Staff, and other agencies as the chair deems appropriate. The principal members may designate alternates to attend meetings in their stead.

**(c)** The principal functions of the Interagency Working Group shall include:

**(i)** coordinating the interagency review of any significant issues concerning the implementation of this order and analysis and recommendations in connection with pursuing the ratification of human rights treaties, as such questions may from time to time arise;

**(ii)** coordinating the preparation of reports that are to be submitted by the United States in fulfillment of treaty obligations;

**(iii)** coordinating the responses of the United States Government to complaints against it concerning alleged human rights violations submitted to the United Nations, the Organization of American States, and other international organizations;

**(iv)** developing effective mechanisms to ensure that legislation proposed by the Administration is reviewed for conformity with international human rights obligations and that these obligations are taken into account in reviewing legislation under consideration by the Congress as well;

**(v)** developing recommended proposals and mechanisms for improving the monitoring of the actions by the various States, Commonwealths, and territories of the United States and, where appropriate, of Native Americans and Federally recognized Indian tribes, including the review of State, Commonwealth, and territorial laws for their conformity with relevant treaties, the provision of relevant information for reports and other monitoring purposes, and the promotion of effective remedial mechanisms;

**(vi)** developing plans for public outreach and education concerning the provisions of the ICCPR, CAT, CERD, and other relevant treaties, and human rights-related provisions of domestic law;

**(vii)** coordinating and directing an annual review of United States reservations, declarations, and understandings to human rights treaties, and matters as to which there have been nontrivial complaints or allegations of inconsistency with or breach of international human rights obligations, in order to determine whether there should be consideration of any modification of relevant reservations, declarations, and understandings to human rights treaties, or United States practices or laws. The results and recommendations of this review shall be reviewed by the head of each participating agency;

**(viii)** making such other recommendations as it shall deem appropriate to the President, through the Assistant to the President for National Security Affairs, concerning United States adherence to or implementation of human rights treaties and related matters; and

**(ix)** coordinating such other significant tasks in connection with human rights treaties or international human rights institutions, including the Inter-American Commission on Human Rights and the Special Rapporteurs and complaints procedures established by the United Nations Human Rights Commission.

**(d)** The work of the Interagency Working Group shall not supplant the work of other interagency entities, including the President's Committee on the International Labor Organization, that address international human rights issues.

**Sec. 5. Cooperation Among Executive Departments and Agencies.** All agencies shall cooperate in carrying out the provisions of this order. The Interagency Working Group shall facilitate such cooperative measures.

**Sec. 6. Judicial Review, Scope, and Administration. (a)** Nothing in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**(b)** This order does not supersede Federal statutes and does not impose any justiciable obligations on the executive branch.

**(c)** The term "treaty obligations" shall mean treaty obligations as approved by the Senate pursuant to Article II, section 2, clause 2 of the United States Constitution.

**(d)** To the maximum extent practicable and subject to the availability of appropriations, agencies shall carry out the provisions of this order.

WILLIAM J. CLINTON

## EXECUTIVE ORDER NO. 13132

<Aug. 4, 1999, 64 F.R. 43255>

### Federalism

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to guarantee the division of governmental responsibilities between the national government and the States that was intended by the Framers of the Constitution, to ensure that the principles of federalism established by the Framers guide the executive departments and agencies in the formulation and implementation of policies, and to further the policies of the Unfunded Mandates Reform Act [Pub.L. 104-4, Mar. 22, 1995, 109 Stat. 48; see Tables for classification], it is hereby ordered as follows:

**Section 1. Definitions.** For purposes of this order:

**(a)** "Policies that have federalism implications" refers to regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

**(b)** "State" or "States" refer to the States of the United States of America, individually or collectively, and, where relevant, to State governments, including units of local government and other political subdivisions established by the States.

**(c)** "Agency" means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

**(d)** "State and local officials" means elected officials of State and local governments or their representative national organizations.

**Sec. 2. Fundamental Federalism Principles.** In formulating and implementing policies that have federalism implications, agencies shall be guided by the following fundamental federalism principles:

**(a)** Federalism is rooted in the belief that issues that are not national in scope or significance are most appropriately addressed by the level of government closest to the people.

**(b)** The people of the States created the national government and delegated to it enumerated governmental powers. All other sovereign powers, save those expressly prohibited the States by the Constitution, are reserved to the States or to the people.

**(c)** The constitutional relationship among sovereign governments, State and national, is inherent in the very structure of the Constitution and is formalized in and protected by the Tenth Amendment to the Constitution.

**(d)** The people of the States are free, subject only to restrictions in the Constitution itself or in constitutionally authorized Acts of Congress, to define the moral, political, and legal character of their lives.

**(e)** The Framers recognized that the States possess unique authorities, qualities, and abilities to meet the needs of the people and should function as laboratories of democracy.

**(f)** The nature of our constitutional system encourages a healthy diversity in the public policies adopted by the people of the several States according to their own conditions, needs, and desires. In the search for enlightened public policy, individual States and communities are free to experiment with a variety of approaches to public issues. One-size-fits-all approaches to public policy problems can inhibit the creation of effective solutions to those problems.

**(g)** Acts of the national government--whether legislative, executive, or judicial in nature--that exceed the enumerated powers of that government under the Constitution violate the principle of federalism established by the Framers.

**(h)** Policies of the national government should recognize the responsibility of--and should encourage opportunities for-- individuals, families, neighborhoods, local governments, and private associations to achieve their personal, social, and economic objectives through cooperative effort.

**(i)** The national government should be deferential to the States when taking action that affects the policymaking discretion of the States and should act only with the greatest caution where State or local governments have identified uncertainties regarding the constitutional or statutory authority of the national government.

**Sec. 3. Federalism Policymaking Criteria.** In addition to adhering to the fundamental federalism principles set forth in section 2, agencies shall adhere, to the extent permitted by law, to the following criteria when formulating and implementing policies that have federalism implications:

**(a)** There shall be strict adherence to constitutional principles. Agencies shall closely examine the constitutional and statutory authority supporting any action that would limit the policymaking discretion of the States and shall carefully assess the necessity for such action. To the extent practicable, State and local officials shall be consulted before any such action is implemented. Executive Order 12372 of July 14, 1982 ("Intergovernmental Review of Federal Programs") [31 U.S.C.A. § 6506 note] remains in effect for the programs and activities to which it is applicable.

**(b)** National action limiting the policymaking discretion of the States shall be taken only where there is constitutional and statutory authority for the action and the national activity is appropriate in light of the presence of a problem of national significance. Where there are significant uncertainties as to whether national action is authorized or appropriate, agencies shall consult with appropriate State and local officials to determine whether Federal objectives can be attained by other means.

**(c)** With respect to Federal statutes and regulations administered by the States, the national government shall grant the States the maximum administrative discretion possible. Intrusive Federal oversight of State administration is neither necessary nor desirable.

**(d)** When undertaking to formulate and implement policies that have federalism implications, agencies shall:

**(1)** encourage States to develop their own policies to achieve program objectives and to work with appropriate officials in other States;

**(2)** where possible, defer to the States to establish standards;

**(3)** in determining whether to establish uniform national standards, consult with appropriate State and local officials as to the need for national standards and any alternatives that would limit the scope of national standards or otherwise preserve State prerogatives and authority; and

**(4)** where national standards are required by Federal statutes, consult with appropriate State and local officials in developing those standards.

**Sec. 4. Special Requirements for Preemption.** Agencies, in taking action that preempts State law, shall act in strict accordance with governing law.

**(a)** Agencies shall construe, in regulations and otherwise, a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute.

**(b)** Where a Federal statute does not preempt State law (as addressed in subsection (a) of this section), agencies shall construe any authorization in the statute for the issuance of regulations as authorizing preemption of State law by rulemaking only when the exercise of State authority directly conflicts with the exercise of Federal authority under the Federal statute or there is clear evidence to conclude that the Congress intended the agency to have the authority to preempt State law.

**(c)** Any regulatory preemption of State law shall be restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated.

**(d)** When an agency foresees the possibility of a conflict between State law and Federally protected interests within its area of regulatory responsibility, the agency shall consult, to the extent practicable, with appropriate State and local officials in an effort to avoid such a conflict.

**(e)** When an agency proposes to act through adjudication or rulemaking to preempt State law, the agency shall provide all affected State and local officials notice and an opportunity for appropriate participation in the proceedings.

**Sec. 5. Special Requirements for Legislative Proposals.** Agencies shall not submit to the Congress legislation that would:

**(a)** directly regulate the States in ways that would either interfere with functions essential to the States' separate and independent existence or be inconsistent with the fundamental federalism principles in section 2;

**(b)** attach to Federal grants conditions that are not reasonably related to the purpose of the grant; or

**(c)** preempt State law, unless preemption is consistent with the fundamental federalism principles set forth in section 2, and unless a clearly legitimate national purpose, consistent with the federalism policymaking criteria set forth in section 3, cannot otherwise be met.

**Sec. 6. Consultation.**

**(a)** Each agency shall have an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications. Within 90 days after the effective date of this order, the

head of each agency shall designate an official with principal responsibility for the agency's implementation of this order and that designated official shall submit to the Office of Management and Budget a description of the agency's consultation process.

**(b)** To the extent practicable and permitted by law, no agency shall promulgate any regulation that has federalism implications, that imposes substantial direct compliance costs on State and local governments, and that is not required by statute, unless:

**(1)** funds necessary to pay the direct costs incurred by the State and local governments in complying with the regulation are provided by the Federal Government; or

**(2)** the agency, prior to the formal promulgation of the regulation,

**(A)** consulted with State and local officials early in the process of developing the proposed regulation;

**(B)** in a separately identified portion of the preamble to the regulation as it is to be issued in the Federal Register, provides to the Director of the Office of Management and Budget a federalism summary impact statement, which consists of a description of the extent of the agency's prior consultation with State and local officials, a summary of the nature of their concerns and the agency's position supporting the need to issue the regulation, and a statement of the extent to which the concerns of State and local officials have been met; and

**(C)** makes available to the Director of the Office of Management and Budget any written communications submitted to the agency by State and local officials.

**(c)** To the extent practicable and permitted by law, no agency shall promulgate any regulation that has federalism implications and that preempts State law, unless the agency, prior to the formal promulgation of the regulation,

**(1)** consulted with State and local officials early in the process of developing the proposed regulation;

**(2)** in a separately identified portion of the preamble to the regulation as it is to be issued in the Federal Register, provides to the Director of the Office of Management and Budget a federalism summary impact statement, which consists of a description of the extent of the agency's prior consultation with State and local officials, a summary of the nature of their concerns and the agency's position supporting the need to issue the regulation, and a statement of the extent to which the concerns of State and local officials have been met; and

**(3)** makes available to the Director of the Office of Management and Budget any written communications submitted to the agency by State and local officials.

**Sec. 7. Increasing Flexibility for State and Local Waivers.**

**(a)** Agencies shall review the processes under which State and local governments apply for waivers of statutory and regulatory requirements and take appropriate steps to streamline those processes.

**(b)** Each agency shall, to the extent practicable and permitted by law, consider any application by a State for a waiver of statutory or regulatory requirements in connection with any program administered by that agency with a general view toward increasing opportunities for utilizing flexible policy approaches at the State or local level in cases in which the proposed waiver is consistent with applicable Federal policy objectives and is otherwise appropriate.

**(c)** Each agency shall, to the extent practicable and permitted by law, render a decision upon a complete application for a waiver within 120 days of receipt of such application by the agency. If the application for a waiver is not granted, the agency shall provide the applicant with timely written notice of the decision and the reasons therefor.

**(d)** This section applies only to statutory or regulatory requirements that are discretionary and subject to waiver by the agency.

**Sec. 8. Accountability.**

**(a)** In transmitting any draft final regulation that has federalism implications to the Office of Management and Budget pursuant to Executive Order 12866 of September 30, 1993 [set out as a note under this section], each agency shall include a certification from the official designated to ensure compliance with this order stating that the requirements of this order have been met in a meaningful and timely manner.

**(b)** In transmitting proposed legislation that has federalism implications to the Office of Management and Budget, each agency shall include a certification from the official designated to ensure compliance with this order that all relevant requirements of this order have been met.

**(c)** Within 180 days after the effective date of this order, the Director of the Office of Management and Budget and the Assistant to the President for Intergovernmental Affairs shall confer with State and local officials to ensure that this order is being properly and effectively implemented.

**Sec. 9. Independent Agencies.** Independent regulatory agencies are encouraged to comply with the provisions of this order.

**Sec. 10. General Provisions.**

**(a)** This order shall supplement but not supersede the requirements contained in Executive Order 12372 ("Intergovernmental Review of Federal Programs") [31 U.S.C.A. § 6506 note], Executive Order 12866 ("Regulatory Planning and Review") [set out as a note under this section], Executive Order 12988 ("Civil Justice Reform") [28 U.S.C.A. § 519 note], and OMB Circular A-19.

**(b)** Executive Order 12612 ("Federalism"), Executive Order 12875 ("Enhancing the Intergovernmental Partnership"), Executive Order 13083 ("Federalism"), and Executive Order 13095 ("Suspension of Executive Order 13083") [all formerly set out as notes under this section] are revoked.

**(c)** This order shall be effective 90 days after the date of this order.

**Sec. 11. Judicial Review.** This order is intended only to improve the internal management of the executive branch, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

WILLIAM J. CLINTON

**EXECUTIVE ORDER NO. 13198**

<Jan. 29, 2001, 66 F.R. 8497, as amended Ex. Ord. No. 13831, § 2, May 3, 2018, 83 F.R. 20715>

**Agency Responsibilities with Respect to Faith-Based and Community Initiatives**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to help the Federal Government coordinate a national effort to expand opportunities for faith-based and other community organizations and to strengthen their capacity to better meet social needs in America's communities, it is hereby ordered as follows:

**Section 1. Establishment of Executive Department Centers for Faith and Opportunity Initiatives. (a)** The Attorney General, the Secretary of Education, the Secretary of Labor, the Secretary of Health and Human Services, and the Secretary of Housing and Urban Development shall each establish within their respective departments a Center for Faith and Opportunity Initiatives (Center).

**(b)** Each executive department Center shall be supervised by a Director, appointed by the department head in consultation with the White House Faith and Opportunity Initiative (White House OFBCI).

**(c)** Each department shall provide its Center with appropriate staff, administrative support, and other resources to meet its responsibilities under this order.

**(d)** Each department's Center shall begin operations no later than 45 days from the date of this order.

**Sec. 2. Purpose of Executive Department Centers for Faith and Opportunity Initiatives.** The purpose of the executive department Centers will be to coordinate department efforts to eliminate regulatory, contracting, and other programmatic obstacles to the participation of faith-based and other community organizations in the provision of social services.

**Sec. 3. Responsibilities of Executive Department Centers for Faith and Opportunity Initiatives.** Each Center shall, to the extent permitted by law: **(a)** conduct, in coordination with the White House Faith and Opportunity Initiative, a department-wide audit to identify all existing barriers to the participation of faith-based and other community organizations in the delivery of social services by the department, including but not limited to regulations, rules, orders, procurement, and other internal policies and practices, and outreach activities that either facially discriminate against or otherwise discourage or disadvantage the participation of faith-based and other community organizations in Federal programs;

**(b)** coordinate a comprehensive departmental effort to incorporate faith-based and other community organizations in department programs and initiatives to the greatest extent possible;

**(c)** propose initiatives to remove barriers identified pursuant to section 3(a) of this order, including but not limited to reform of regulations, procurement, and other internal policies and practices, and outreach activities;

**(d)** propose the development of innovative pilot and demonstration programs to increase the participation of faith-based and other community organizations in Federal as well as State and local initiatives; and

**(e)** develop and coordinate department outreach efforts to disseminate information more effectively to faith-based and other community organizations with respect to programming changes, contracting opportunities, and other department initiatives, including but not limited to Web and Internet resources.

**Sec. 4. Additional Responsibilities of the Department of Health and Human Services and the Department of Labor Centers.** In addition to those responsibilities described in section 3 of this order, the Department of Health and Human Services and the Department of Labor Centers shall, to the extent permitted by law: (a) conduct a comprehensive review of policies and practices affecting existing funding streams governed by so-called "Charitable Choice" legislation to assess the department's compliance with the requirements of Charitable Choice; and (b) promote and ensure compliance with existing Charitable Choice legislation by the department, as well as its partners in State and local government, and their contractors.

**Sec. 5. Reporting Requirements. (a) Report.** Not later than 180 days after the date of this order and annually thereafter, each of the five executive department Centers described in section 1 of this order shall prepare and submit a report to the White House Faith and Opportunity Initiative.

**(b) Contents.** The report shall include a description of the department's efforts in carrying out its responsibilities under this order, including but not limited to:

**(1)** a comprehensive analysis of the barriers to the full participation of faith-based and other community organizations in the delivery of social services identified pursuant to section 3(a) of this order and the proposed strategies to eliminate those barriers; and

**(2)** a summary of the technical assistance and other information that will be available to faith-based and other community organizations regarding the program activities of the department and the preparation of applications or proposals for grants, cooperative agreements, contracts, and procurement.

**(c) Performance Indicators.** The first report, filed 180 days after the date of this order, shall include annual performance indicators and measurable objectives for department action. Each report filed thereafter shall measure the department's performance against the objectives set forth in the initial report.

**Sec. 6. Responsibilities of All Executive Departments and Agencies.** All executive departments and agencies (agencies) shall: **(a)** designate an agency employee to serve as the liaison and point of contact with the White House Faith and Opportunity Initiative; and

**(b)** cooperate with the White House Faith and Opportunity Initiative and provide such information, support, and assistance to the White House Faith and Opportunity Initiative as it may request, to the extent permitted by law.

**Sec. 7. Administration and Judicial Review. (a)** The agencies' actions directed by this Executive Order shall be carried out subject to the availability of appropriations and to the extent permitted by law.

**(b)** This order does not create any right or benefit, substantive or procedural, enforceable at law or equity against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

GEORGE W. BUSH


**EXECUTIVE ORDER NO. 13272**

<Aug. 13, 2002, 67 F.R. 53461>


**Proper Consideration of Small Entities in Agency Rulemaking**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. General Requirements.** Each agency shall establish procedures and policies to promote compliance with the Regulatory Flexibility Act, as amended (5 U.S.C. 601 et seq.) (the "Act"). Agencies shall thoroughly review draft rules to assess and take appropriate account of the potential impact on small businesses, small governmental jurisdictions, and small organizations, as provided by the Act. The Chief Counsel for Advocacy of the Small Business Administration (Advocacy) shall remain available to advise agencies in performing that review consistent with the provisions of the Act.

**Sec. 2. Responsibilities of Advocacy.** Consistent with the requirements of the Act, other applicable law, and Executive Order 12866 of September 30, 1993, as amended, Advocacy [set out as a note under this section]:

**(a)** shall notify agency heads from time to time of the requirements of the Act, including by issuing notifications with respect to the basic requirements of the Act within 90 days of the date of this order;

**(b)** shall provide training to agencies on compliance with the Act; and

**(c)** may provide comment on draft rules to the agency that has proposed or intends to propose the rules and to the Office of Information and Regulatory Affairs of the Office of Management and Budget (OIRA).

**Sec. 3. Responsibilities of Federal Agencies.** Consistent with the requirements of the Act and applicable law, agencies shall:

**(a)** Within 180 days of the date of this order, issue written procedures and policies, consistent with the Act, to ensure that the potential impacts of agencies' draft rules on small businesses, small governmental jurisdictions, and small organizations are properly considered during the rulemaking process. Agency heads shall submit, no later than 90 days from the date of this order, their written procedures and policies to Advocacy for comment. Prior to issuing final procedures and policies, agencies shall consider any such comments received within 60 days from the date of the submission of the agencies' procedures and policies to Advocacy. Except to the extent otherwise specifically provided by statute or Executive Order, agencies shall make the final procedures and policies available to the public through the Internet or other easily accessible means;

**(b)** Notify Advocacy of any draft rules that may have a significant economic impact on a substantial number of small entities under the Act. Such notifications shall be made (i) when the agency submits a draft rule to OIRA under Executive Order 12866 if that order requires such submission, or (ii) if no submission to OIRA is so required, at a reasonable time prior to publication of the rule by the agency; and

**(c)** Give every appropriate consideration to any comments provided by Advocacy regarding a draft rule. Consistent with applicable law and appropriate protection of executive deliberations and legal privileges, an agency shall include, in any explanation or discussion accompanying publication in the Federal Register of a final rule, the agency's response to any written comments submitted by Advocacy on the proposed rule that preceded the final rule; provided, however, that such inclusion is not required if the head of the agency certifies that the public interest is not served thereby.

Agencies and Advocacy may, to the extent permitted by law, engage in an exchange of data and research, as appropriate, to foster the purposes of the Act.

**Sec. 4. Definitions.** Terms defined in section 601 of title 5, United States Code, including the term "agency," shall have the same meaning in this order.

**Sec. 5. Preservation of Authority.** Nothing in this order shall be construed to impair or affect the authority of the Administrator of the Small Business Administration to supervise the Small Business Administration as provided in the first sentence of section 2(b)(1) of Public Law 85-09536 (15 U.S.C. 633(b)(1)).

**Sec. 6. Reporting.** For the purpose of promoting compliance with this order, Advocacy shall submit a report not less than annually to the Director of the Office of Management and Budget on the extent of compliance with this order by agencies.

**Sec. 7. Confidentiality.** Consistent with existing law, Advocacy may publicly disclose information that it receives from the agencies in the course of carrying out this order only to the extent that such information already has been lawfully and publicly disclosed by OIRA or the relevant rulemaking agency.

**Sec. 8. Judicial Review.** This order is intended only to improve the internal management of the Federal Government. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

GEORGE W. BUSH

**EXECUTIVE ORDER NO. 13279**

<Dec. 12, 2002, 67 F.R. 77141, as amended Ex. Ord. No. 13403, § 2, May 12, 2006, 71 F.R. 28543; Ex. Ord. No. 13559, § 1, Nov. 17, 2010, 75 FR 71319; Ex. Ord. No. 13831, § 2, May 3, 2018, 83 F.R. 20715>

**Equal Protection of the Laws for Faith-Based and Other Neighborhood Organizations**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 121(a) of title 40, United States Code, and section 301 of title 3, United States Code, and in order to guide Federal agencies in formulating and developing policies with implications for faith-based organizations and other neighborhood organizations, to ensure equal protection of the laws for faith-based and community organizations, to further the national effort to expand opportunities for, and strengthen the capacity of, faith-based and other neighborhood organizations so that they may better meet social needs in America's communities, and to ensure the economical and efficient administration and completion of Government contracts, it is hereby ordered as follows:

**Section 1. Definitions.** For purposes of this order:

**(a)** "Federal financial assistance" means assistance that non-Federal entities receive or administer in the form of grants, contracts, loans, loan guarantees, property, cooperative agreements, food commodities, direct appropriations, or other assistance, but does not include a tax credit, deduction, or exemption.

**(b)** "Social service program" means a program that is administered by the Federal Government, or by a State or local government using Federal financial assistance, and that provides services directed at reducing poverty, improving opportunities for low-income children, revitalizing low-income communities, empowering low-income families and low-income individuals to become self-sufficient, or otherwise helping people in need. Such programs include, but are not limited to, the following:

**(i)** child care services, protective services for children and adults, services for children and adults in foster care, adoption services, services related to the management and maintenance of the home, day care services for adults, and services to meet the special needs of children, older individuals, and individuals with disabilities (including physical, mental, or emotional disabilities);

**(ii)** transportation services;

**(iii)** job training and related services, and employment services;

**(iv)** information, referral, and counseling services;

**(v)** the preparation and delivery of meals and services related to soup kitchens or food banks;

**(vi)** health support services;

**(vii)** literacy and mentoring programs;

**(viii)** services for the prevention and treatment of juvenile delinquency and substance abuse, services for the prevention of crime and the provision of assistance to the victims and the families of criminal offenders, and services related to intervention in, and prevention of, domestic violence; and

**(ix)** services related to the provision of assistance for housing under Federal law.

**(c)** "Policies that have implications for faith-based and other neighborhood organizations" refers to all policies, programs, and regulations, including official guidance and internal agency procedures, that have significant effects on faith-based organizations participating in or seeking to participate in social service programs supported with Federal financial assistance.

**(d)** "Agency" means a department or agency in the executive branch.

**(e)** "Specified agency heads" means:

**(i)** the Attorney General;

**(ii)** the Secretary of Agriculture;

**(iii)** the Secretary of Commerce;

**(iv)** the Secretary of Labor;

**(v)** the Secretary of Health and Human Services;

**(vi)** the Secretary of Housing and Urban Development;

**(vii)** the Secretary of Education;

**(viii)** the Secretary of Veterans Affairs;

**(ix)** the Secretary of Homeland Security;

**(x)** the Administrator of the Environmental Protection Agency;

**(xi)** the Administrator of the Small Business Administration;

**(xii)** the Administrator of the United States Agency for International Development; and

**(xiii)** the Chief Executive Officer of the Corporation for National and Community Service.

**Sec. 2. Fundamental Principles.** In formulating and implementing policies that have implications for faith-based and other neighborhood organizations, agencies that administer social service programs or that support (including through prime awards or sub-awards) social service programs with Federal financial assistance shall, to the extent permitted by law, be guided by the following fundamental principles:

**(a)** Federal financial assistance for social service programs should be distributed in the most effective and efficient manner possible.

**(b)** The Nation's social service capacity will benefit if all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs.

**(c)** No organization should be discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs.

**(d)** All organizations that receive Federal financial assistance under social service programs should be prohibited from discriminating against beneficiaries or prospective beneficiaries of the social service programs on the basis of religion or religious belief. Accordingly, organizations, in providing services supported in whole or in part with Federal financial assistance, and in their outreach activities related to such services, should not be allowed to discriminate against current or prospective program beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

**(e)** The Federal Government must implement Federal programs in accordance with the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution, as well as other applicable law, and must monitor and enforce standards regarding the relationship between religion and government in ways that avoid excessive entanglement between religious bodies and governmental entities.

**(f)** Organizations that engage in explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization) must perform such activities and offer such services outside of programs that are supported with direct Federal financial assistance (including through prime awards or sub-awards), separately in time or location from any such programs or services supported with direct Federal financial assistance, and participation in any such explicitly religious activities must be voluntary for the beneficiaries of the social service program supported with such Federal financial assistance.

**(g)** Faith-based organizations should be eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social service programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character. Accordingly, a faith-based organization that applies for, or participates in, a social service program supported with Federal financial assistance may retain its independence and may continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs, provided that it does not use direct Federal financial assistance that it receives (including through a prime award or sub-award) to support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization), or in any other manner prohibited by law. Among other things, faith-based organizations that receive Federal financial assistance may use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities. In addition, a faith-based organization that applies for, or participates in, a social service program supported with Federal financial assistance may retain religious terms in its name, select its board members on a religious basis, and include religious references in its organization's mission statements and other chartering or governing documents.

**(h)** To promote transparency and accountability, agencies that provide Federal financial assistance for social service programs shall post online, in an easily accessible manner, regulations, guidance documents, and policies that reflect or elaborate upon the fundamental principles described in this section. Agencies shall also post online a list of entities that receive Federal financial assistance for provision of social service programs, consistent with law and pursuant to guidance set forth in paragraph (c) of section 3 of this order.

**(i)** Decisions about awards of Federal financial assistance must be free from political interference or even the appearance of such interference and must be made on the basis of merit, not on the basis of the religious affiliation of a recipient organization or lack thereof.

**Sec. 3. Ensuring Uniform Implementation Across the Federal Government.**

In order to promote uniformity in agencies' policies that have implications for faith-based and other neighborhood organizations and in related guidance, and to ensure that those policies and guidance are consistent with the fundamental principles set forth in section 2 of this order, there is established an Interagency Working Group on Faith-Based and Other Neighborhood Partnerships (Working Group).

**(a)** Mission and Function of the Working Group. The Working Group shall meet periodically to review and evaluate existing agency regulations, guidance documents, and policies that have implications for faith-based and other neighborhood organizations. Where appropriate, specified agency heads shall, to the extent permitted by law, amend all such existing policies of their respective agencies to ensure that they are consistent with the fundamental principles set forth in section 2 of this order.

**(b)** Uniform Agency Implementation. Within 120 days of the date of this order, the Working Group shall submit a report to the President on amendments, changes, or additions that are necessary to ensure that regulations and guidance documents associated with the distribution of Federal financial assistance for social service programs are consistent with the fundamental principles set forth in section 2 of this order. The Working Group's report should include, but not be limited to, a model set of regulations and guidance documents for agencies to adopt in the following areas:

**(i)** prohibited uses of direct Federal financial assistance and separation requirements; **(ii)** protections for religious identity; **(iii)** the distinction between "direct" and "indirect" Federal financial assistance; **(iv)** protections for beneficiaries of social service programs; **(v)** transparency requirements, consistent with and in furtherance of existing open government initiatives; **(vi)** obligations of nongovernmental and governmental intermediaries; **(vii)** instructions for peer reviewers and those who recruit peer reviewers; and **(viii)** training on these matters for government employees and for Federal, State, and local governmental and nongovernmental organizations that receive Federal financial assistance under social service programs. In developing this report and in reviewing agency regulations and guidance for consistency with section 2 of this order, the Working Group shall consult the March 2010 report and recommendations prepared by the President's Advisory Council on Faith-Based and Neighborhood Partnerships on the topic of reforming the White House Faith and Opportunity Initiative.

**(c) Guidance.** The Director of the Office of Management and Budget (OMB), following receipt of a copy of the report of the Working Group, and in coordination with the Department of Justice, shall issue guidance to agencies on the implementation of this order, including in particular subsections 2(h)-(j).

**(d)** Membership of the Working Group. The Director of the White House Faith and Opportunity Initiative and a senior official from the OMB designated by the Director of the OMB shall serve as the Co-Chairs of the Working Group. The Co-Chairs shall convene regular meetings of the Working Group, determine its agenda, and direct its work. In addition to the Co-Chairs, the Working Group shall consist of a senior official with knowledge of policies that have implications for faith-based and other neighborhood organizations from the following agencies and offices:

**(i)** the Department of State;

**(ii)** the Department of Justice;

**(iii)** the Department of the Interior;

**(iv)** the Department of Agriculture;

**(v)** the Department of Commerce;

**(vi)** the Department of Labor;

**(vii)** the Department of Health and Human Services;

**(viii)** the Department of Housing and Urban Development;

**(ix)** the Department of Education;

**(x)** the Department of Veterans Affairs;

**(xi)** the Department of Homeland Security;

**(xii)** the Environmental Protection Agency;

**(xiii)** the Small Business Administration;

**(xiv)** the United States Agency for International Development;

**(xv)** the Corporation for National and Community Service; and

**(xvi)** other agencies and offices as the President, from time to time, may designate.

**(e) Administration of the Initiative.** The Department of Health and Human Services shall provide funding and administrative support for the Working Group to the extent permitted by law and within existing appropriations.

**Sec. 4. Amendment of Executive Order 11246.**

Pursuant to section 121(a) of title 40, United States Code, and section 301 of title 3, United States Code, and in order to further the strong Federal interest in ensuring that the cost and progress of Federal procurement contracts are not adversely affected by an artificial restriction of the labor pool caused by the unwarranted exclusion of faith-based organizations from such contracts, section 204 of Executive Order 11246 of September 24, 1965, as amended [set out under 42 U.S.C.A. § 2000e], is hereby further amended to read as follows:

"**Sec. 204(a)** The Secretary of Labor may, when the Secretary deems that special circumstances in the national interest so require, exempt a contracting agency from the requirement of including any or all of the provisions of Section 202 of this Order in any specific contract, subcontract, or purchase order.

**(b)** The Secretary of Labor may, by rule or regulation, exempt certain classes of contracts, subcontracts, or purchase orders (1) whenever work is to be or has been performed outside the United States and no recruitment of workers within the limits of the United States is involved; (2) for standard commercial supplies or raw materials; (3) involving less than specified amounts of money or specified numbers of workers; or (4) to the extent that they involve subcontracts below a specified tier.

**(c)** Section 202 of this Order shall not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities. Such contractors and subcontractors are not exempted or excused from complying with the other requirements contained in this Order.

**(d)** The Secretary of Labor may also provide, by rule, regulation, or order, for the exemption of facilities of a contractor that are in all respects separate and distinct from activities of the contractor related to the performance of the contract: provided, that

such an exemption will not interfere with or impede the effectuation of the purposes of this Order: and provided further, that in the absence of such an exemption all facilities shall be covered by the provisions of this Order."

**Sec. 5. General Provisions.**

**(a)** This order supplements but does not supersede the requirements contained in Executive Orders 13198 [set out under this section] and 13199 [set out preceding 3 U.S.C.A. § 101] of January 29, 2001.

**(b)** The agencies shall coordinate with the White House Faith and Opportunity Initiative concerning the implementation of this order.

**(c)** Nothing in this order shall be construed to require an agency to take any action that would impair the conduct of foreign affairs or the national security.

**Sec. 6.** Responsibilities of Executive Departments and Agencies. All executive departments and agencies (agencies) shall:

**(a)** designate an agency employee to serve as the liaison and point of contact with the White House Faith and Opportunity Initiative; and

**(b)** cooperate with the White House Faith and Opportunity Initiative and provide such information, support, and assistance to the White House Faith and Opportunity Initiative as it may request, to the extent permitted by law.

**Sec. 7. Judicial Review.**

This order is intended only to improve the internal management of the executive branch, and it is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its agencies, or entities, its officers, employees or agents, or any person.

<div align="right">

GEORGE W. BUSH
</div>

## EXECUTIVE ORDER NO. 13280

<Dec. 12, 2002, 67 F.R. 77145, as amended Ex. Ord. No. 13831, § 2, May 3, 2018, 83 F.R. 20715>

### Responsibilities of the Department of Agriculture and the Agency for International Development With Respect to Faith-Based and Community Initiatives

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to help the Federal Government coordinate a national effort to expand opportunities for faith-based and other community organizations and to strengthen their capacity to better meet social needs in America's communities, it is hereby ordered as follows:

**Section 1.** Establishment of Centers for Faith and Opportunity Initiatives at the Department of Agriculture and the Agency for International Development. **(a)** The Secretary of Agriculture and the Administrator of the Agency for International Development shall each establish within their respective agencies a Centers for Faith and Opportunity Initiatives (Center).

**(b)** Each of these Centers shall be supervised by a Director, appointed by the agency head in consultation with the White House Faith and Opportunity Initiative (White House Faith and Opportunity Initiative).

**(c)** Each agency shall provide its Center with appropriate staff, administrative support, and other resources to meet its responsibilities under this order.

**(d)** Each Center shall begin operations no later than 45 days from the date of this order.

**Sec. 2.** Purpose of Executive Branch Centers for Faith and Opportunity Initiatives. The purpose of the agency Centers will be to coordinate agency efforts to eliminate regulatory, contracting, and other programmatic obstacles to the participation of faith-based and other community organizations in the provision of social services.

**Sec. 3. Responsibilities of the Centers for Faith and Opportunity Initiatives.** Each Center shall, to the extent permitted by law:

**(a)** conduct, in coordination with the White House Faith and Opportunity Initiative, an agency-wide audit to identify all existing barriers to the participation of faith-based and other community organizations in the delivery of social services by the agency, including but not limited to regulations, rules, orders, procurement, and other internal policies and practices, and outreach activities that either facially discriminate against or otherwise discourage or disadvantage the participation of faith-based and other community organizations in Federal programs;

**(b)** coordinate a comprehensive agency effort to incorporate faith-based and other community organizations in agency programs and initiatives to the greatest extent possible;

**(c)** propose initiatives to remove barriers identified pursuant to section 3(a) of this order, including but not limited to reform of regulations, procurement, and other internal policies and practices, and outreach activities;

**(d)** propose the development of innovative pilot and demonstration programs to increase the participation of faith-based and other community organizations in Federal as well as State and local initiatives; and

**(e)** develop and coordinate agency outreach efforts to disseminate information more effectively to faith-based and other community organizations with respect to programming changes, contracting opportunities, and other agency initiatives, including but not limited to Web and Internet resources.

**Sec. 4. Reporting Requirements.**

**(a) Report.** Not later than 180 days from the date of this order and annually thereafter, each of the two Centers described in section 1 of this order shall prepare and submit a report to the White House Faith and Opportunity Initiative.

**(b) Contents.** The report shall include a description of the agency's efforts in carrying out its responsibilities under this order, including but not limited to:

**(i)** a comprehensive analysis of the barriers to the full participation of faith-based and other community organizations in the delivery of social services identified pursuant to section 3(a) of this order and the proposed strategies to eliminate those barriers; and

**(ii)** a summary of the technical assistance and other information that will be available to faith-based and other community organizations regarding the program activities of the agency and the preparation of applications or proposals for grants, cooperative agreements, contracts, and procurement.

**(c)** Performance Indicators. The first report, filed 180 days after the date of this order, shall include annual performance indicators and measurable objectives for agency action. Each report filed thereafter shall measure the agency's performance against the objectives set forth in the initial report.

**Sec. 5.** Responsibilities of the Secretary of Agriculture and the Administrator of the Agency for International Development. The Secretary and the Administrator shall:

**(a)** designate an employee within their respective agencies to serve as the liaison and point of contact with the White House Faith and Opportunity Initiative; and

**(b)** cooperate with the White House Faith and Opportunity Initiative and provide such information, support, and assistance to the White House Faith and Opportunity Initiative as it may request, to the extent permitted by law.

**Sec. 6.** Administration and Judicial Review. **(a)** The agency actions directed by this executive order shall be carried out subject to the availability of appropriations and to the extent permitted by law.

**(b)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH


### EXECUTIVE ORDER NO. 13342

<June 1, 2004, 69 F.R. 31509, as amended Ex. Ord. No. 13831, § 2, May 3, 2018, 83 F.R. 20715>


**Responsibilities of the Departments of Commerce and Veterans Affairs and the Small Business Administration with Respect to Faith-Based and Community Initiatives**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to help the Federal Government coordinate a national effort to expand opportunities for faith-based and other community organizations and to strengthen their capacity to better meet America's social and community needs, it is hereby ordered as follows:

**Section 1.** Establishment of Centers for Faith,Based and Community Initiatives at the Departments of Commerce and Veterans Affairs and the Small Business Administration

**(a)** The Secretaries of Commerce and Veterans Affairs and the Administrator of the Small Business Administration shall each establish within their respective agencies a Centers for Faith and Opportunity Initiatives (Center).

**(b)** Each of these Centers shall be supervised by a Director, appointed by the agency head in consultation with the White House Faith and Opportunity Initiative (White House Faith and Opportunity Initiative).

**(c)** Each agency shall provide its Center with appropriate staff, administrative support, and other resources to meet its responsibilities under this order.

**(d)** Each Center shall begin operations no later than 45 days from the date of this order [June 1, 2004].

**Sec. 2. Purpose of Executive Branch Centers for Faith and Opportunity Initiatives.** The purpose of the agency Centers will be to coordinate agency efforts to eliminate regulatory, contracting, and other programmatic obstacles to the participation of faith-based and other community organizations in the provision of social and community services.

**Sec. 3. Responsibilities of the Centers for Faith and Opportunity Initiatives.** Each Center shall, to the extent permitted by law:

**(a)** conduct, in coordination with the White House Faith and Opportunity Initiative, an agency-wide audit to identify all existing barriers to the participation of faith-based and other community organizations in the delivery of social and community services by the agency, including but not limited to regulations, rules, orders, procurement, and other internal policies and practices, and outreach activities that either facially discriminate against or otherwise discourage or disadvantage the participation of faith-based and other community organizations in Federal programs;

**(b)** coordinate a comprehensive agency effort to incorporate faith-based and other community organizations in agency programs and initiatives to the greatest extent possible;

**(c)** propose initiatives to remove barriers identified pursuant to section 3(a) of this order [of this note], including but not limited to reform of regulations, procurement, and other internal policies and practices, and outreach activities;

**(d)** propose the development of innovative pilot and demonstration programs to increase the participation of faith-based and other community organizations in Federal as well as State and local initiatives; and

**(e)** develop and coordinate agency outreach efforts to disseminate information more effectively to faith-based and other community organizations with respect to programming changes, contracting opportunities, and other agency initiatives, including but not limited to Web and Internet resources.

**Sec. 4. Reporting Requirements. (a) Report.** Not later than 180 days from the date of this order [June 1, 2004] and annually thereafter, each of the three Centers described in section 1 of this order [of this note] shall prepare and submit a report to the President through the White House Faith and Opportunity Initiative.

**(b) Contents.** The report shall include a description of the agency's efforts in carrying out its responsibilities under this order, including but not limited to:

**(i)** a comprehensive analysis of the barriers to the full participation of faith-based and other community organizations in the delivery of social and community services identified pursuant to section 3(a) of this order [of this note] and the proposed strategies to eliminate those barriers; and

**(ii)** a summary of the technical assistance and other information that will be available to faith-based and other community organizations regarding the program activities of the agency and the preparation of applications or proposals for grants, cooperative agreements, contracts, and procurement.

**(c) Performance Indicators.** The first report, filed pursuant to section 4(a) of this order [of this note], shall include annual performance indicators and measurable objectives for agency action. Each report filed thereafter shall measure the agency's performance against the objectives set forth in the initial report.

**Sec. 5. Responsibilities of the Secretaries of Commerce and Veterans Affairs and the Administrator of the Small Business Administration.** The Secretaries and the Administrator shall:

**(a)** designate an employee within their respective agencies to serve as the liaison and point of contact with the White House Faith and Opportunity Initiative; and

**(b)** cooperate with the White House Faith and Opportunity Initiative and provide such information, support, and assistance to the White House Faith and Opportunity Initiative as it may request, to the extent permitted by law.

**Sec. 6. Administration and Judicial Review. (a)** The agency actions directed by this executive order shall be carried out subject to the availability of appropriations and to the extent permitted by law.

**(b)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

<div align="right">GEORGE W. BUSH</div>

<div align="center">

**EXECUTIVE ORDER NO. 13353**

</div>

Ex. Ord. No. 13353, Aug. 27, 2004, 69 F.R. 53585, which established the President's Board on Safeguarding Americans' Civil Liberties, is set out as a note under 42 U.S.C.A. § 2000ee note.

<div align="center">

**EXECUTIVE ORDER NO. 13397**

</div>

<div align="center">

<Mar. 7, 2006, 71 F.R. 12275, as amended Ex. Ord. No. 13831, § 2, May 3, 2018, 83 F.R. 20715>

</div>

<div align="center">

**Responsibilities of the Department of Homeland Security with Respect to Faith-Based and Community Initiatives**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to help the Federal Government coordinate a national effort to expand opportunities for faith-based and other community organizations and to strengthen their capacity to better meet America's social and community needs, it is hereby ordered as follows:

**Section 1. Establishment of a Centers for Faith and Opportunity Initiatives at the Department of Homeland Security.**

   **(a)** The Secretary of Homeland Security (Secretary) shall establish within the Department of Homeland Security (Department) a Centers for Faith and Opportunity Initiatives (Center).

   **(b)** The Center shall be supervised by a Director appointed by Secretary. The Secretary shall consult with the Director of the White House Faith and Opportunity Initiative (White House Faith and Opportunity Initiative Director) prior to making such appointment.

   **(c)** The Department shall provide the Center with appropriate staff, administrative support, and other resources to meet its responsibilities under this order.

   **(d)** The Center shall begin operations no later than 45 days from the date of this order [March 7, 2006].

**Sec. 2. Purpose of Center.** The purpose of the Center shall be to coordinate agency efforts to eliminate regulatory, contracting, and other programmatic obstacles to the participation of faith-based and other community organizations in the provision of social and community services.

**Sec. 3. Responsibilities of the Centers for Faith and Opportunity Initiatives.** In carrying out the purpose set forth in section 2 of this order, the Center shall:

**(a)** conduct, in coordination with the WHOFBCI Director, a department-wide audit to identify all existing barriers to the participation of faith-based and other community organizations in the delivery of social and community services by the Department, including but not limited to regulations, rules, orders, procurement, and other internal policies and practices, and outreach activities that unlawfully discriminate against, or otherwise discourage or disadvantage the participation of faith-based and other community organizations in Federal programs;

**(b)** coordinate a comprehensive departmental effort to incorporate faith-based and other community organizations in Department programs and initiatives to the greatest extent possible;

**(c)** propose initiatives to remove barriers identified pursuant to section 3(a) of this order, including but not limited to reform of regulations, procurement, and other internal policies and practices, and outreach activities;

**(d)** propose the development of innovative pilot and demonstration programs to increase the participation of faith-based and other community organizations in Federal as well as State and local initiatives; and

**(e)** develop and coordinate Departmental outreach efforts to disseminate information more effectively to faith-based and other community organizations with respect to programming changes, contracting opportunities, and other agency initiatives, including but not limited to Web and Internet resources.

**Sec. 4. Reporting Requirements.**

**(a) Report.** Not later than 180 days from the date of this order [March 7, 2006] and annually thereafter, the Center shall prepare and submit a report to the WHOFBCI Director.

**(b) Contents.** The report shall include a description of the Department's efforts in carrying out its responsibilities under this order, including but not limited to:

**(i)** a comprehensive analysis of the barriers to the full participation of faith-based and other community organizations in the delivery of social and community services identified pursuant to section 3(a) of this order and the proposed strategies to eliminate those barriers; and

**(ii)** a summary of the technical assistance and other information that will be available to faith-based and other community organizations regarding the program activities of the agency and the preparation of applications or proposals for grants, cooperative agreements, contracts, and procurement.

**(c) Performance Indicators.** The first report shall include annual performance indicators and measurable objectives for Departmental action. Each report filed thereafter shall measure the Department's performance against the objectives set forth in the initial report.

**Sec. 5. Responsibilities of the Secretary.** The Secretary shall:

**(a)** designate an employee within the department to serve as the liaison and point of contact with the WHOFBCI Director; and

**(b)** cooperate with the WHOFBCI Director and provide such information, support, and assistance to the WHOFBCI Director as requested to implement this order.

**Sec. 6. General Provisions. (a)** This order shall be implemented subject to the availability of appropriations and to the extent permitted by law.

**(b)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">GEORGE W. BUSH</div>

## EXECUTIVE ORDER NO. 13406

<div align="center"><June 23, 2006, 71 F.R. 36973></div>

### Protecting the Property Rights of the American People

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to strengthen the rights of the American people against the taking of their private property, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of the United States to protect the rights of Americans to their private property, including by limiting the taking of private property by the Federal Government to situations in which the taking is for public use, with just compensation, and for the purpose of benefiting the general public and not merely for the purpose of advancing the economic interest of private parties to be given ownership or use of the property taken.

**Sec. 2. Implementation. (a)** The Attorney General shall:

(i) issue instructions to the heads of departments and agencies to implement the policy set forth in section 1 of this order; and

(ii) monitor takings by departments and agencies for compliance with the policy set forth in section 1 of this order.

**(b)** Heads of departments and agencies shall, to the extent permitted by law:

(i) comply with instructions issued under subsection (a)(i); and

(ii) provide to the Attorney General such information as the Attorney General determines necessary to carry out subsection (a)(ii).

**Sec. 3. Specific Exclusions.** Nothing in this order shall be construed to prohibit a taking of private property by the Federal Government, that otherwise complies with applicable law, for the purpose of:

**(a)** public ownership or exclusive use of the property by the public, such as for a public medical facility, roadway, park, forest, governmental office building, or military reservation;

**(b)** projects designated for public, common carrier, public transportation, or public utility use, including those for which a fee is assessed, that serve the general public and are subject to regulation by a governmental entity;

**(c)** conveying the property to a nongovernmental entity, such as a telecommunications or transportation common carrier, that makes the property available for use by the general public as of right;

**(d)** preventing or mitigating a harmful use of land that constitutes a threat to public health, safety, or the environment;

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(e)** acquiring abandoned property;

**(f)** quieting title to real property;

**(g)** acquiring ownership or use by a public utility;

**(h)** facilitating the disposal or exchange of Federal property; or

**(i)** meeting military, law enforcement, public safety, public transportation, or public health emergencies.

**Sec. 4. General Provisions. (a)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

   **(i)** authority granted by law to a department or agency or the head thereof; or

   **(ii)** functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

**(c)** This order shall be implemented in a manner consistent with Executive Order 12630 of March 15, 1988 [Ex. Ord. No. 12630, Mar. 15, 1988, 53 F.R. 8859, set out under this section].

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity against the United States, its departments, agencies, entities, officers, employees, or agents, or any other person.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13443

For Executive Order No. 13443, "Facilitation of Hunting Heritage and Wildlife Conservation", see Ex. Ord. No. 13443, August 16, 2007, 72 F.R. 46537, set out as a note under 16 U.S.C.A. § 661.

### EXECUTIVE ORDER NO. 13497

For Executive Order No. 13497, "Revocation of Certain Executive Orders Concerning Regulatory Planning and Review", see Ex. Ord. No. 13497, Jan. 30, 2009, 74 F.R. 6113, which is set out as a note following Ex. Ord. No. 12866, Sept. 30, 1993, 58 F.R. 51735, set out as a note under this section.

### EXECUTIVE ORDER NO. 13559

<Nov. 17, 2010, 75 FR 71319>

### Fundamental Principles and Policymaking Criteria for Partnerships with Faith-Based and Other Neighborhood Organizations

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to guide Federal agencies in formulating and developing policies with implications for faith-based and other neighborhood organizations, to promote compliance with constitutional and other applicable legal principles, and to strengthen the capacity of faith-based and other neighborhood organizations to deliver services effectively to those in need, it is hereby ordered:

**Section 1.** [Omitted; Amended Ex. Ord. No. 13279, Dec. 12, 2002, 67 F.R. 77141, set out as a note under this section.]

**Sec. 2. General Provisions.**

**(a)** This order amends the requirements contained in Executive Order 13279. This order supplements, but does not supersede, the requirements contained in Executive Orders 13198 and 13199 of January 29, 2001, and Executive Order 13498 of February 5, 2009.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to an executive department, agency, or the head thereof; or

(ii) functions of the Director of the OMB relating to budgetary, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

## EXECUTIVE ORDER NO. 13563

<Jan. 18, 2011, 76 F.R. 3821>

### Improving Regulation and Regulatory Review

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to improve regulation and regulatory review, it is hereby ordered as follows:

**Section 1. General Principles of Regulation. (a)** Our regulatory system must protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation. It must be based on the best available science. It must allow for public participation and an open exchange of ideas. It must promote predictability and reduce uncertainty. It must identify and use the best, most innovative, and least burdensome tools for achieving regulatory ends. It must take into account benefits and costs, both quantitative and qualitative. It must ensure that regulations are accessible, consistent, written in plain language, and easy to understand. It must measure, and seek to improve, the actual results of regulatory requirements.

**(b)** This order is supplemental to and reaffirms the principles, structures, and definitions governing contemporary regulatory review that were established in Executive Order 12866 of September 30, 1993. As stated in that Executive Order and to the extent permitted by law, each agency must, among other things: (1) propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify); (2) tailor its regulations to

impose the least burden on society, consistent with obtaining regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations; (3) select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity); (4) to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt; and (5) identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

**(c)** In applying these principles, each agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. Where appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

**Sec. 2. Public Participation. (a)** Regulations shall be adopted through a process that involves public participation. To that end, regulations shall be based, to the extent feasible and consistent with law, on the open exchange of information and perspectives among State, local, and tribal officials, experts in relevant disciplines, affected stakeholders in the private sector, and the public as a whole.

**(b)** To promote that open exchange, each agency, consistent with Executive Order 12866 and other applicable legal requirements, shall endeavor to provide the public with an opportunity to participate in the regulatory process. To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days. To the extent feasible and permitted by law, each agency shall also provide, for both proposed and final rules, timely online access to the rulemaking docket on regulations.gov, including relevant scientific and technical findings, in an open format that can be easily searched and downloaded. For proposed rules, such access shall include, to the extent feasible and permitted by law, an opportunity for public comment on all pertinent parts of the rulemaking docket, including relevant scientific and technical findings.

**(c)** Before issuing a notice of proposed rulemaking, each agency, where feasible and appropriate, shall seek the views of those who are likely to be affected, including those who are likely to benefit from and those who are potentially subject to such rulemaking.

**Sec. 3. Integration and Innovation.** Some sectors and industries face a significant number of regulatory requirements, some of which may be redundant, inconsistent, or overlapping. Greater coordination across agencies could reduce these requirements, thus reducing costs and simplifying and harmonizing rules. In developing regulatory actions and identifying appropriate approaches, each agency shall attempt to promote such coordination, simplification, and harmonization. Each agency shall also seek to identify, as appropriate, means to achieve regulatory goals that are designed to promote innovation.

**Sec. 4. Flexible Approaches.** Where relevant, feasible, and consistent with regulatory objectives, and to the extent permitted by law, each agency shall identify and consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public. These approaches include warnings, appropriate default rules, and disclosure requirements as well as provision of information to the public in a form that is clear and intelligible.

**Sec. 5. Science.** Consistent with the President's Memorandum for the Heads of Executive Departments and Agencies, "Scientific Integrity" (March 9, 2009), and its implementing guidance, each agency shall ensure the objectivity of any scientific and technological information and processes used to support the agency's regulatory actions.

**Sec. 6. Retrospective Analyses of Existing Rules. (a)** To facilitate the periodic review of existing significant regulations, agencies shall consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or

excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned. Such retrospective analyses, including supporting data, should be released online whenever possible.

**(b)** Within 120 days of the date of this order, each agency shall develop and submit to the Office of Information and Regulatory Affairs a preliminary plan, consistent with law and its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives.

**Sec. 7. General Provisions. (a)** For purposes of this order, "agency" shall have the meaning set forth in section 3(b) of Executive Order 12866.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to a department or agency, or the head thereof; or

(ii) functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

### EXECUTIVE ORDER NO. 13579

<July 11, 2011, 76 F.R. 41587>

**Regulation and Independent Regulatory Agencies**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to improve regulation and regulatory review, it is hereby ordered as follows:

**Section 1. Policy. (a)** Wise regulatory decisions depend on public participation and on careful analysis of the likely consequences of regulation. Such decisions are informed and improved by allowing interested members of the public to have a meaningful opportunity to participate in rulemaking. To the extent permitted by law, such decisions should be made only after consideration of their costs and benefits (both quantitative and qualitative).

**(b)** Executive Order 13563 of January 18, 2011, "Improving Regulation and Regulatory Review," directed to executive agencies, was meant to produce a regulatory system that protects "public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation." Independent regulatory agencies, no less than executive agencies, should promote that goal.

**(c)** Executive Order 13563 set out general requirements directed to executive agencies concerning public participation, integration and innovation, flexible approaches, and science. To the extent permitted by law, independent regulatory agencies should comply with these provisions as well.

**Sec. 2. Retrospective Analyses of Existing Rules. (a)** To facilitate the periodic review of existing significant regulations, independent regulatory agencies should consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned. Such retrospective analyses, including supporting data and evaluations, should be released online whenever possible.

**(b)** Within 120 days of the date of this order, each independent regulatory agency should develop and release to the public a plan, consistent with law and reflecting its resources and regulatory priorities and processes, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives.

**Sec. 3. General Provisions. (a)** For purposes of this order, "executive agency" shall have the meaning set forth for the term "agency" in section 3(b) of Executive Order 12866 of September 30, 1993, and "independent regulatory agency" shall have the meaning set forth in 44 U.S.C. 3502(5).

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** authority granted by law to a department or agency, or the head thereof; or

**(ii)** functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

### EXECUTIVE ORDER NO. 13580

For Executive Order No. 13580, relating to establishment of an interagency working group on coordination of domestic energy development and permitting in Alaska, see Ex. Ord. No. 13580, July 12, 2011, 76 F.R. 41989, set out as a note preceding 16 U.S.C.A. § 3101.

### EXECUTIVE ORDER NO. 13604

<March 22, 2012, 77 F.R. 18887>

**Improving Performance of Federal Permitting and Review of Infrastructure Projects**

AR.00664

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to significantly reduce the aggregate time required to make decisions in the permitting and review of infrastructure projects by the Federal Government, while improving environmental and community outcomes, it is hereby ordered as follows:

**Section 1. Policy. (a)** To maintain our Nation's competitive edge and ensure an economy built to last, the United States must have fast, reliable, resilient, and environmentally sound means of moving people, goods, energy, and information. In a global economy, we will compete for the world's investments based in significant part on the quality of our infrastructure. Investing in the Nation's infrastructure provides immediate and long-term economic benefits for local communities and the Nation as a whole.

The quality of our Nation's infrastructure depends in critical part on Federal permitting and review processes, including planning, approval, and consultation processes. These processes inform decision-makers and affected communities about the potential benefits and impacts of proposed infrastructure projects, and ensure that projects are designed, built, and maintained in a manner that is consistent with protecting our public health, welfare, safety, national security, and environment. Reviews and approvals of infrastructure projects can be delayed due to many factors beyond the control of the Federal Government, such as poor project design, incomplete applications, uncertain funding, or multiple reviews and approvals by State, local, tribal, or other jurisdictions. Given these factors, it is critical that executive departments and agencies (agencies) take all steps within their authority, consistent with available resources, to execute Federal permitting and review processes with maximum efficiency and effectiveness, ensuring the health, safety, and security of communities and the environment while supporting vital economic growth.

To achieve that objective, our Federal permitting and review processes must provide a transparent, consistent, and predictable path for both project sponsors and affected communities. They must ensure that agencies set and adhere to timelines and schedules for completion of reviews, set clear permitting performance goals, and track progress against those goals. They must encourage early collaboration among agencies, project sponsors, and affected stakeholders in order to incorporate and address their interests and minimize delays. They must provide for transparency and accountability by utilizing cost-effective information technology to collect and disseminate information about individual projects and agency performance, so that the priorities and concerns of all our citizens are considered. They must rely upon early and active consultation with State, local, and tribal governments to avoid conflicts or duplication of effort, resolve concerns, and allow for concurrent rather than sequential reviews. They must recognize the critical role project sponsors play in assuring the timely and cost-effective review of projects by providing complete information and analysis and by supporting, as appropriate, the costs associated with review. And, they must enable agencies to share priorities, work collaboratively and concurrently to advance reviews and permitting decisions, and facilitate the resolution of disputes at all levels of agency organization.

Each of these elements must be incorporated into routine agency practice to provide demonstrable improvements in the performance of Federal infrastructure permitting and review processes, including lower costs, more timely decisions, and a healthier and cleaner environment. Also, these elements must be integrated into project planning processes so that projects are designed appropriately to avoid, to the extent practicable, adverse impacts on public health, security, historic properties and other cultural resources, and the environment, and to minimize or mitigate impacts that may occur. Permitting and review process improvements that have proven effective must be expanded and institutionalized.

**(b)** In advancing this policy, this order expands upon efforts undertaken pursuant to Executive Order 13580 of July 12, 2011 (Interagency Working Group on Coordination of Domestic Energy Development and Permitting in Alaska), Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), and my memorandum of August 31, 2011 (Speeding Infrastructure Development Through More Efficient and Effective Permitting and Environmental Review), as well as other ongoing efforts.

**Sec. 2. Steering Committee on Federal Infrastructure Permitting and Review Process Improvement.** There is established a Steering Committee on Federal Infrastructure Permitting and Review Process Improvement (Steering Committee), to be chaired by the Chief Performance Officer (CPO), in consultation with the Chair of the Council on Environmental Quality (CEQ).

**(a) Infrastructure Projects Covered by this Order.** The Steering Committee shall facilitate improvements in Federal permitting and review processes for infrastructure projects in sectors including surface transportation, aviation, ports and waterways, water resource projects, renewable energy generation, electricity transmission, broadband, pipelines, and other such sectors as determined by the Steering Committee.

**(b) Membership.** Each of the following agencies (Member Agencies) shall be represented on the Steering Committee by a Deputy Secretary or equivalent officer of the United States:

**(i)** the Department of Defense;

**(ii)** the Department of the Interior;

**(iii)** the Department of Agriculture;

**(iv)** the Department of Commerce;

**(v)** the Department of Transportation;

**(vi)** the Department of Energy;

**(vii)** the Department of Homeland Security;

**(viii)** the Environmental Protection Agency;

**(ix)** the Advisory Council on Historic Preservation;

**(x)** the Department of the Army; and

**(xi)** such other agencies or offices as the CPO may invite to participate.

**(c) Projects of National or Regional Significance.** In furtherance of the policies of this order, the Member Agencies shall coordinate and consult with each other to select, submit to the CPO by April 30, 2012, and periodically update thereafter, a list of infrastructure projects of national or regional significance that will have their status tracked on the online Federal Infrastructure Projects Dashboard (Dashboard) created pursuant to my memorandum of August 31, 2011.

**(d) Responsibilities of the Steering Committee.** The Steering Committee shall:

**(i)** develop a Federal Permitting and Review Performance Plan (Federal Plan), as described in section 3(a) of this order;

**(ii)** implement the Federal Plan and coordinate resolution of disputes among Member Agencies relating to implementation of the Federal Plan; and

**(iii)** coordinate and consult with other agencies, offices, and interagency working groups as necessary, including the President's Management Council and Performance Improvement Councils, and, with regard to use and expansion of the Dashboard, the Chief Information Officer (CIO) and Chief Technology Officer to implement this order.

**(e) Duties of the CPO.** The CPO shall:

**(i)** in consultation with the Chair of CEQ and Member Agencies, issue guidance on the implementation of this order;

**(ii)** in consultation with Member Agencies, develop and track performance metrics for evaluating implementation of the Federal Plan and Agency Plans; and

**(iii)** by January 31, 2013, and annually thereafter, after input from interested agencies, evaluate and report to the President on the implementation of the Federal Plan and Agency Plans, and publish the report on the Dashboard.

**(f) No Involvement in Particular Permits or Projects.** Neither the Steering Committee, nor the CPO, may direct or coordinate agency decisions with respect to any particular permit or project.

**Sec. 3. Plans for Measurable Performance Improvement. (a)** By May 31, 2012, the Steering Committee shall, following coordination with Member Agencies and other interested agencies, develop and publish on the Dashboard a Federal Plan to significantly reduce the aggregate time required to make Federal permitting and review decisions on infrastructure projects while improving outcomes for communities and the environment. The Federal Plan shall include, but not be limited to, the following actions to implement the policies outlined in section 1 of this order, and shall reflect the agreement of any Member Agency with respect to requirements in the Federal Plan affecting such agency:

**(i)** institutionalizing best practices for: enhancing Federal, State, local, and tribal government coordination on permitting and review processes (such as conducting reviews concurrently rather than sequentially to the extent practicable); avoiding duplicative reviews; and engaging with stakeholders early in the permitting process;

**(ii)** developing mechanisms to better communicate priorities and resolve disputes among agencies at the national and regional levels;

**(iii)** institutionalizing use of the Dashboard, working with the CIO to enhance the Dashboard, and utilizing other cost-effective information technology systems to share environmental and project-related information with the public, project sponsors, and permit reviewers; and

**(iv)** identifying timeframes and Member Agency responsibilities for the implementation of each proposed action.

**(b)** Each Member Agency shall:

**(i)** by June 30, 2012, submit to the CPO an Agency Plan identifying those permitting and review processes the Member Agency views as most critical to significantly reducing the aggregate time required to make permitting and review decisions on infrastructure projects while improving outcomes for communities and the environment, and describing specific and measurable actions the agency will take to improve these processes, including:

**(1)** performance metrics, including timelines or schedules for review;

**(2)** technological improvements, such as institutionalized use of the Dashboard and other information technology systems;

**(3)** other practices, such as pre-application procedures, early collaboration with other agencies, project sponsors, and affected stakeholders, and coordination with State, local, and tribal governments; and

**(4)** steps the Member Agency will take to implement the Federal Plan.

**(ii)** by July 31, 2012, following coordination with other Member Agencies and interested agencies, publish its Agency Plan on the Dashboard; and

**(iii)** by December 31, 2012, and every 6 months thereafter, report progress to the CPO on implementing its Agency Plan, as well as specific opportunities for additional improvements to its permitting and review procedures.

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order shall be implemented consistent with Executive Order 13175 of November 6, 2000 (Consultation and Coordination with Indian Tribal Governments) and my memorandum of November 5, 2009 (Tribal Consultation).

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

**EXECUTIVE ORDER NO. 13609**

<May 1, 2012, 77 F.R. 26413>

**Promoting International Regulatory Cooperation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to promote international regulatory cooperation, it is hereby ordered as follows:

**Section 1. Policy.** Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), states that our regulatory system must protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation. In an increasingly global economy, international regulatory cooperation, consistent with domestic law and prerogatives and U.S. trade policy, can be an important means of promoting the goals of Executive Order 13563.

The regulatory approaches taken by foreign governments may differ from those taken by U.S. regulatory agencies to address similar issues. In some cases, the differences between the regulatory approaches of U.S. agencies and those of their foreign counterparts might not be necessary and might impair the ability of American businesses to export and compete internationally. In meeting shared challenges involving health, safety, labor, security, environmental, and other issues, international regulatory cooperation can identify approaches that are at least as protective as those that are or would be adopted in the absence of such cooperation. International regulatory cooperation can also reduce, eliminate, or prevent unnecessary differences in regulatory requirements.

**Sec. 2. Coordination of International Regulatory Cooperation. (a)** The Regulatory Working Group (Working Group) established by Executive Order 12866 of September 30, 1993 (Regulatory Planning and Review), which was reaffirmed by Executive Order 13563, shall, as appropriate:

**(i)** serve as a forum to discuss, coordinate, and develop a common understanding among agencies of U.S. Government positions and priorities with respect to:

**(A)** international regulatory cooperation activities that are reasonably anticipated to lead to significant regulatory actions;

**(B)** efforts across the Federal Government to support significant, cross-cutting international regulatory cooperation activities, such as the work of regulatory cooperation councils; and

**(C)** the promotion of good regulatory practices internationally, as well as the promotion of U.S. regulatory approaches, as appropriate; and

**(ii)** examine, among other things:

**(A)** appropriate strategies for engaging in the development of regulatory approaches through international regulatory cooperation, particularly in emerging technology areas, when consistent with section 1 of this order;

**(B)** best practices for international regulatory cooperation with respect to regulatory development, and, where appropriate, information exchange and other regulatory tools; and

**(C)** factors that agencies should take into account when determining whether and how to consider other regulatory approaches under section 3(d) of this order.

**(b)** As Chair of the Working Group, the Administrator of the Office of Information and Regulatory Affairs (OIRA) of the Office of Management and Budget (OMB) shall convene the Working Group as necessary to discuss international regulatory cooperation issues as described above, and the Working Group shall include a representative from the Office of the United States Trade Representative and, as appropriate, representatives from other agencies and offices.

**(c)** The activities of the Working Group, consistent with law, shall not duplicate the efforts of existing interagency bodies and coordination mechanisms. The Working Group shall consult with existing interagency bodies when appropriate.

**(d)** To inform its discussions, and pursuant to section 4 of Executive Order 12866, the Working Group may commission analytical reports and studies by OIRA, the Administrative Conference of the United States, or any other relevant agency, and the Administrator of OIRA may solicit input, from time to time, from representatives of business, nongovernmental organizations, and the public.

**(e)** The Working Group shall develop and issue guidelines on the applicability and implementation of sections 2 through 4 of this order.

**(f)** For purposes of this order, the Working Group shall operate by consensus.

**Sec. 3. Responsibilities of Federal Agencies.** To the extent permitted by law, and consistent with the principles and requirements of Executive Order 13563 and Executive Order 12866, each agency shall:

**(a)** if required to submit a Regulatory Plan pursuant to Executive Order 12866, include in that plan a summary of its international regulatory cooperation activities that are reasonably anticipated to lead to significant regulations, with an explanation of how these activities advance the purposes of Executive Order 13563 and this order;

**(b)** ensure that significant regulations that the agency identifies as having significant international impacts are designated as such in the Unified Agenda of Federal Regulatory and Deregulatory Actions, on RegInfo.gov, and on Regulations.gov;

**(c)** in selecting which regulations to include in its retrospective review plan, as required by Executive Order 13563, consider:

**(i)** reforms to existing significant regulations that address unnecessary differences in regulatory requirements between the United States and its major trading partners, consistent with section 1 of this order, when stakeholders provide adequate information to the agency establishing that the differences are unnecessary; and

**(ii)** such reforms in other circumstances as the agency deems appropriate; and

**(d)** for significant regulations that the agency identifies as having significant international impacts, consider, to the extent feasible, appropriate, and consistent with law, any regulatory approaches by a foreign government that the United States has agreed to consider under a regulatory cooperation council work plan.

**Sec. 4. Definitions.** For purposes of this order:

**(a)** "Agency" means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

**(b)** "International impact" is a direct effect that a proposed or final regulation is expected to have on international trade and investment, or that otherwise may be of significant interest to the trading partners of the United States.

**(c)** "International regulatory cooperation" refers to a bilateral, regional, or multilateral process, other than processes that are covered by section 6(a)(ii), (iii), and (v) of this order, in which national governments engage in various forms of collaboration and communication with respect to regulations, in particular a process that is reasonably anticipated to lead to the development of significant regulations.

**(d)** "Regulation" shall have the same meaning as "regulation" or "rule" in section 3(d) of Executive Order 12866.

**(e)** "Significant regulation" is a proposed or final regulation that constitutes a significant regulatory action.

**(f)** "Significant regulatory action" shall have the same meaning as in section 3(f) of Executive Order 12866.

**Sec. 5. Independent Agencies.** Independent regulatory agencies are encouraged to comply with the provisions of this order.

**Sec. 6. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to a department or agency, or the head thereof;

**(ii)** the coordination and development of international trade policy and negotiations pursuant to section 411 of the Trade Agreements Act of 1979 (19 U.S.C. 2451) and section 141 of the Trade Act of 1974 (19 U.S.C. 2171);

**(iii)** international trade activities undertaken pursuant to section 3 of the Act of February 14, 1903 (15 U.S.C. 1512), subtitle C of the Export Enhancement Act of 1988, as amended (15 U.S.C. 4721 et seq.), and Reorganization Plan No. 3 of 1979 (19 U.S.C. 2171 note);

**(iv)** the authorization process for the negotiation and conclusion of international agreements pursuant to 1 U.S.C. 112b(c) and its implementing regulations (22 C.F.R. 181.4) and implementing procedures (11 FAM 720);

**(v)** activities in connection with subchapter II of chapter 53 of title 31 of the United States Code, title 26 of the United States Code, or Public Law 111-203 and other laws relating to financial regulation; or (vi) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">BARACK OBAMA</div>

<div align="center">

**EXECUTIVE ORDER NO. 13610**

<May 10, 2012, 77 F.R. 28469>

**Identifying and Reducing Regulatory Burdens**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to modernize our regulatory system and to reduce unjustified regulatory burdens and costs, it is hereby ordered as follows:

**Section 1. Policy.** Regulations play an indispensable role in protecting public health, welfare, safety, and our environment, but they can also impose significant burdens and costs. During challenging economic times, we should be especially careful not to impose unjustified regulatory requirements. For this reason, it is particularly important for agencies to conduct retrospective analyses of existing rules to examine whether they remain justified and whether they should be modified or streamlined in light of changed circumstances, including the rise of new technologies.

Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), states that our regulatory system "must measure, and seek to improve, the actual results of regulatory requirements." To promote this goal, that Executive Order requires agencies not merely to conduct a single exercise, but to engage in "periodic review of existing significant regulations." Pursuant to section 6(b) of that Executive Order, agencies are required to develop retrospective review plans to review existing significant regulations in order to "determine whether any such regulations should be modified, streamlined, expanded, or repealed." The purpose of this requirement is to "make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives."

In response to Executive Order 13563, agencies have developed and made available for public comment retrospective review plans that identify over five hundred initiatives. A small fraction of those initiatives, already finalized or formally proposed to the public, are anticipated to eliminate billions of dollars in regulatory costs and tens of millions of hours in annual paperwork burdens. Significantly larger savings are anticipated as the plans are implemented and as action is taken on additional initiatives.

As a matter of longstanding practice and to satisfy statutory obligations, many agencies engaged in periodic review of existing regulations prior to the issuance of Executive Order 13563. But further steps should be taken, consistent with law, agency resources, and regulatory priorities, to promote public participation in retrospective review, to modernize our regulatory system, and to institutionalize regular assessment of significant regulations.

**Sec. 2. Public Participation in Retrospective Review.** Members of the public, including those directly and indirectly affected by regulations, as well as State, local, and tribal governments, have important information about the actual effects of existing regulations. For this reason, and consistent with Executive Order 13563, agencies shall invite, on a regular basis (to be determined by the agency head in consultation with the Office of Information and Regulatory Affairs (OIRA)), public suggestions about regulations in need of retrospective review and about appropriate modifications to such regulations. To promote an open exchange of information, retrospective analyses of regulations, including supporting data, shall be released to the public online wherever practicable.

**Sec. 3. Setting Priorities.** In implementing and improving their retrospective review plans, and in considering retrospective review suggestions from the public, agencies shall give priority, consistent with law, to those initiatives that will produce significant quantifiable monetary savings or significant quantifiable reductions in paperwork burdens while protecting public health, welfare, safety, and our environment. To the extent practicable and permitted by law, agencies shall also give special consideration to initiatives that would reduce unjustified regulatory burdens or simplify or harmonize regulatory requirements imposed on small businesses. Consistent with Executive Order 13563 and Executive Order 12866 of September 30, 1993 (Regulatory Planning and Review), agencies shall give consideration to the cumulative effects of their own regulations, including cumulative burdens, and shall to the extent practicable and consistent with law give priority to reforms that would make significant progress in reducing those burdens while protecting public health, welfare, safety, and our environment.

**Sec. 4. Accountability.** Agencies shall regularly report on the status of their retrospective review efforts to OIRA. Agency reports should describe progress, anticipated accomplishments, and proposed timelines for relevant actions, with an emphasis on the priorities described in section 3 of this order. Agencies shall submit draft reports to OIRA on September 10, 2012, and on the second Monday of January and July for each year thereafter, unless directed otherwise through subsequent guidance from OIRA. Agencies shall make final reports available to the public within a reasonable period (not to exceed three weeks from the date of submission of draft reports to OIRA).

**Sec. 5. General Provisions. (a)** For purposes of this order, "agency" means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to a department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### EXECUTIVE ORDER NO. 13707

<Sept. 15, 2015, 80 F.R. 56365>

**Using Behavioral Science Insights To Better Serve the American People**

A growing body of evidence demonstrates that behavioral science insights_research findings from fields such as behavioral economics and psychology about how people make decisions and act on them_can be used to design government policies to better serve the American people.

Where Federal policies have been designed to reflect behavioral science insights, they have substantially improved outcomes for the individuals, families, communities, and businesses those policies serve. For example, automatic enrollment and automatic escalation in retirement savings plans have made it easier to save for the future, and have helped Americans accumulate billions of dollars in additional retirement savings. Similarly, streamlining the application process for Federal financial aid has made college more financially accessible for millions of students.

To more fully realize the benefits of behavioral insights and deliver better results at a lower cost for the American people, the Federal Government should design its policies and programs to reflect our best understanding of how people engage with, participate in, use, and respond to those policies and programs. By improving the effectiveness and efficiency of Government, behavioral science insights can support a range of national priorities, including helping workers to find better jobs; enabling Americans to lead longer, healthier lives; improving access to educational opportunities and support for success in school; and accelerating the transition to a low-carbon economy.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States, I hereby direct the following:

**Section 1. Behavioral Science Insights Policy Directive.**

**(a)** Executive departments and agencies (agencies) are encouraged to:

**(i)** identify policies, programs, and operations where applying behavioral science insights may yield substantial improvements in public welfare, program outcomes, and program cost effectiveness;

**(ii)** develop strategies for applying behavioral science insights to programs and, where possible, rigorously test and evaluate the impact of these insights;

**(iii)** recruit behavioral science experts to join the Federal Government as necessary to achieve the goals of this directive; and

**(iv)** strengthen agency relationships with the research community to better use empirical findings from the behavioral sciences.

**(b)** In implementing the policy directives in section (a), agencies shall:

**(i)** identify opportunities to help qualifying individuals, families, communities, and businesses access public programs and benefits by, as appropriate, streamlining processes that may otherwise limit or delay participation_for example, removing administrative hurdles, shortening wait times, and simplifying forms;

**(ii)** improve how information is presented to consumers, borrowers, program beneficiaries, and other individuals, whether as directly conveyed by the agency, or in setting standards for the presentation of information, by considering how the content, format, timing, and medium by which information is conveyed affects comprehension and action by individuals, as appropriate;

**(iii)** identify programs that offer choices and carefully consider how the presentation and structure of those choices, including the order, number, and arrangement of options, can most effectively promote public welfare, as appropriate, giving particular consideration to the selection and setting of default options; and

**(iv)** review elements of their policies and programs that are designed to encourage or make it easier for Americans to take specific actions, such as saving for retirement or completing education programs. In doing so, agencies shall consider how the timing, frequency, presentation, and labeling of benefits, taxes, subsidies, and other incentives can more effectively and efficiently promote those actions, as appropriate. Particular attention should be paid to opportunities to use nonfinancial incentives.

**(c)** For policies with a regulatory component, agencies are encouraged to combine this behavioral science insights policy directive with their ongoing review of existing significant regulations to identify and reduce regulatory burdens, as appropriate and consistent with Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), and Executive Order 13610 of May 10, 2012 (Identifying and Reducing Regulatory Burdens).

**Sec. 2. Implementation of the Behavioral Science Insights Policy Directive. (a)** The Social and Behavioral Sciences Team (SBST), under the National Science and Technology Council (NSTC) and chaired by the Assistant to the President for Science and Technology, shall provide agencies with advice and policy guidance to help them execute the policy objectives outlined in section 1 of this order, as appropriate.

**(b)** The NSTC shall release a yearly report summarizing agency implementation of section 1 of this order each year until 2019. Member agencies of the SBST are expected to contribute to this report.

**(c)** To help execute the policy directive set forth in section 1 of this order, the Chair of the SBST shall, within 45 days of the date of this order and thereafter as necessary, issue guidance to assist agencies in implementing this order.

**Sec. 3. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to a department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** Independent agencies are strongly encouraged to comply with the requirements of this order.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

**EXECUTIVE ORDER NO. 13725**

<April 15, 2016, 81 F.R. 23417>

**Steps to Increase Competition and Better Inform Consumers and
Workers to Support Continued Growth of the American Economy**

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to protect American consumers and workers and encourage competition in the U.S. economy, it is hereby ordered as follows:

**Section 1. Policy.** Maintaining, encouraging, and supporting a fair, efficient, and competitive marketplace is a cornerstone of the American economy. Consumers and workers need both competitive markets and information to make informed choices.

Certain business practices such as unlawful collusion, illegal bid rigging, price fixing, and wage setting, as well as anticompetitive exclusionary conduct and mergers stifle competition and erode the foundation of America's economic vitality. The immediate results of such conduct_higher prices and poorer service for customers, less innovation, fewer new businesses being launched, and reduced opportunities for workers_can impact Americans in every walk of life.

Competitive markets also help advance national priorities, such as the delivery of affordable health care, energy independence, and improved access to fast and affordable broadband. Competitive markets also promote economic growth, which creates opportunity for American workers and encourages entrepreneurs to start innovative companies that create jobs.

The Department of Justice (DOJ) and the Federal Trade Commission (FTC) have a proven record of detecting and stopping anticompetitive conduct and challenging mergers and acquisitions that threaten to consolidate markets and reduce competition.

Promoting competitive markets and ensuring that consumers and workers have access to the information needed to make informed choices must be a shared priority across the Federal Government. Executive departments and agencies can contribute to these goals through, among other things, pro-competitive rulemaking and regulations, and by eliminating regulations that create barriers to or limit competition. Such Government-wide action is essential to ensuring that consumers, workers, startups, small businesses, and farms reap the full benefits of competitive markets.

**Sec. 2. Agency Responsibilities.** **(a)** Executive departments and agencies with authorities that could be used to enhance competition (agencies) shall, where consistent with other laws, use those authorities to promote competition, arm consumers and workers with the information they need to make informed choices, and eliminate regulations that restrict competition without corresponding benefits to the American public.

**(b)** Agencies shall identify specific actions that they can take in their areas of responsibility to build upon efforts to detect abuses such as price fixing, anticompetitive behavior in labor and other input markets, exclusionary conduct, and blocking access to critical resources that are needed for competitive entry. Behaviors that appear to violate our antitrust laws should be referred to antitrust enforcers at DOJ and the FTC. Such a referral shall not preclude further action by the referring agency against that behavior under that agency's relevant statutory authority.

**(c)** Agencies shall also identify specific actions that they can take in their areas of responsibility to address undue burdens on competition. As permitted by law, agencies shall consult with other interested parties to identify ways that the agency can promote competition through pro-competitive rulemaking and regulations, by providing consumers and workers with information they need to make informed choices, and by eliminating regulations that restrict competition without corresponding benefits to the American public.

**(d)** Not later than 30 days from the date of this order, agencies shall submit to the Director of the National Economic Council an initial list of (1) actions each agency can potentially take to promote more competitive markets; (2) any specific practices, such as blocking access to critical resources, that potentially restrict meaningful consumer or worker choice or unduly stifle new market

entrants, along with any actions the agency can potentially take to address those practices; and (3) any relevant authorities and tools potentially available to enhance competition or make information more widely available for consumers and workers.

**(e)** Not later than 60 days from the date of this order, agencies shall report to the President, through the Director of the National Economic Council, recommendations on agency-specific actions that eliminate barriers to competition, promote greater competition, and improve consumer access to information needed to make informed purchasing decisions. Such recommendations shall include a list of priority actions, including rulemakings, as well as timelines for completing those actions.

**(f)** Subsequently, agencies shall report semi-annually to the President, through the Director of the National Economic Council, on additional actions that they plan to undertake to promote greater competition.

**(g)** Sections 2(d), 2(e), and 2(f) of this order do not require reporting of information related to law enforcement policy and activities.

**Sec. 3. General Provisions. (a)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(b)** Independent agencies are strongly encouraged to comply with the requirements of this order.

**(c)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to a department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

**EXECUTIVE ORDER NO. 13748**

<November 16, 2016, 81 F.R. 83619>

**Establishing a Community Solutions Council**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** Place is a strong determinant of opportunity and well-being. Research shows that the neighborhood in which a child grows up impacts his or her odds of going to college, enjoying good health, and obtaining a lifetime of economic opportunities. Even after 73 consecutive months of total job growth since 2009, communities of persistent poverty remain and for far too many, the odds are stacked against opportunity and achieving the American dream. In addition, between now and 2050, growing our economy, expected population growth, climate change, and demographic shifts will require major new investments in physical, social, and technological infrastructure.

Specific challenges in communities_including crime, access to care, opportunities to pursue quality education, lack of housing options, unemployment, and deteriorating infrastructure_can be met by leveraging Federal assistance and resources. While the Federal Government provides rural, suburban, urban, and tribal communities with significant investments in aid annually, coordinating these investments, as appropriate, across agencies based on locally led visions can more effectively reach communities of greatest need to maximize impact. In recent years, the Federal Government has deepened its engagement with communities, recognizing the critical role of these partnerships in enabling Americans to live healthier and more prosperous lives. Since 2015, the Community Solutions Task Force, comprising executive departments, offices, and agencies (agencies) across the Federal Government, has served as the primary interagency coordinator of agency work to engage with communities to deliver improved outcomes. This order builds on recent work to facilitate inter-agency and community-level collaboration to meet the unique needs of communities in a way that reflects these communities' local assets, economies, geography, size, history, strengths, talent networks, and visions for the future.

**Sec. 2. Principles.** Our effort to modernize the Federal Government's work with communities is rooted in the following principles:

**(a)** A community-driven, locally led vision and long-term plan for clear outcomes should guide individual projects.

**(b)** The Federal Government should coordinate its efforts at the Federal, regional, State, local, tribal, and community level, and with cross-sector partners, to offer a more seamless process for communities to access needed support and ensure equitable investments.

**(c)** The Federal Government should help communities identify, develop, and share local solutions, rely on data to determine what does and does not work, and harness technology and modern collaboration and engagement methods to help share these solutions and help communities meet their local goals.

**Sec. 3. Community Solutions Council.**

**(a) Establishment.** There is hereby established a Council for Community Solutions (Council), led by two Co-Chairs. One Co-Chair will be an Assistant to the President or the Director of the Office of Management and Budget, as designated by the President. The second Co-Chair will be rotated every y836204 years and designated by the President from among the heads of the Departments of Justice, Agriculture, Commerce, Labor, Health and Human Services, Housing and Urban Development, Transportation, and Education, and the Environmental Protection Agency (Agency Co-Chair).

**(b) Membership.** The Council shall consist of the following members:

**(i)** the Secretary of State;

**(ii)** the Secretary of the Treasury;

**(iii)** the Secretary of Defense;

**(iv)** the Attorney General;

**(v)** the Secretary of the Interior;

**(vi)** the Secretary of Agriculture;

**(vii)** the Secretary of Commerce;

**(viii)** the Secretary of Labor;

**(ix)** the Secretary of Health and Human Services;

**(x)** the Secretary of Housing and Urban Development;

**(xi)** the Secretary of Transportation;

**(xii)** the Secretary of Energy;

**(xiii)** the Secretary of Education;

**(xiv)** the Secretary of Veterans Affairs;

**(xv)** the Secretary of Homeland Security;

**(xvi)** the Administrator of the Environmental Protection Agency;

**(xvii)** the Administrator of General Services;

**(xviii)** the Administrator of the Small Business Administration;

**(xix)** the Chief Executive Officer of the Corporation for National and Community Service;

**(xx)** the Chairperson of the National Endowment for the Arts;

**(xxi)** the Director of the Institute for Museum and Library Services;

**(xxii)** the Federal Co-Chair of the Delta Regional Authority;

**(xxiii)** the Federal Co-Chair of the Appalachian Regional Commission;

**(xxiv)** the Director of the Office of Personnel Management;

**(xxv)** the Director of the Office of Management and Budget;

**(xxvi)** the Chair of the Council of Economic Advisers;

**(xxvii)** the Assistant to the President for Intergovernmental Affairs and Public Engagement;

**(xxviii)** the Assistant to the President and Cabinet Secretary;

**(xxix)** the Assistant to the President for Economic Policy and Director of the National Economic Council;

**(xxx)** the Chair of the Council on Environmental Quality;

**(xxxi)** the Director of the Office of Science and Technology Policy;

**(xxxii)** the Assistant to the President and Chief Technology Officer;

**(xxxiii)** the Administrator of the United States Digital Service; and

**(xxxiv)** other officials, as the Co-Chairs may designate or invite to participate.

**(c)** Administration.

**(i)** The President will designate one of the Co-Chairs to appoint or designate, as appropriate, an Executive Director, who shall coordinate the Council's activities. The department, agency, or component within the Executive Office of the President in which the Executive Director is appointed or designated, as appropriate, (funding entity) shall provide funding and administrative support for the Council to the extent permitted by law and within existing appropriations as may be necessary for the performance of its functions.

**(ii)** To the extent permitted by law, including the Economy Act, and within existing appropriations, participating agencies may detail staff to the funding entity to support the Council's coordination and implementation efforts.

**(iii)** The Co-Chairs shall convene regular meetings of the Council, determine its agenda, and direct its work. At the direction of the Co-Chairs, the Council may establish subgroups consisting exclusively of Council members or their designees, as appropriate.

**(iv)** A member of the Council may designate a senior-level official who is part of the member's department, agency, or office to perform the Council functions of the member.

**Sec. 4. Mission and Priorities of the Council. (a)** The Council shall foster collaboration across agencies, policy councils, and offices to coordinate actions, identify working solutions to share broadly, and develop and implement policy recommendations that put the community-driven, locally led vision at the center of policymaking. The Council shall:

**(i)** Work across agencies to coordinate investments in initiatives and practices that align the work of the Federal Government to have the greatest impact on the lives of individuals and communities.

**(ii)** Use evidence-based practices in policymaking, including identifying existing solutions, scaling up practices that are working, and designing solutions with regular input of the individuals and communities to be served.

**(iii)** Invest in recruiting, training, and retaining talent to further the effective delivery of services to individuals and communities and empower them with best-practice community engagement options, open government transparency methods, equitable policy approaches, technical assistance and capacity building tools, and data-driven practice.

**(b)** Consistent with the principles set forth in this order and in accordance with applicable law, including the Federal Advisory Committee Act, the Council should conduct outreach to representatives of nonprofit organizations, civil rights organizations, businesses, labor and professional organizations, start-up and entrepreneurial communities, State, local, and tribal government agencies, school districts, youth, elected officials, seniors, faith and other community-based organizations, philanthropies, technologists, other institutions of local importance, and other interested or affected persons with relevant expertise in the expansion and improvement of efforts to build local capacity, ensure equity, and address economic, social, environmental, and other issues in communities or regions.

**Sec. 5.** Executive Orders 13560 and 13602, and Building Upon Other Efforts. This order supersedes Executive Order 13560 of December 14, 2010 (White House Council for Community Solutions), and Executive Order 13602 of March 15, 2012 (Establishing a White House Council on Strong Cities, Strong Communities), which are hereby revoked.

This Council builds on existing efforts involving Federal working groups, task forces, memoranda of agreement, and initiatives, including the Community Solutions Task Force, the Federal Working Groups dedicated to supporting the needs and priorities of local leadership in Detroit, Baltimore, and Pine Ridge; the Interagency Working Group on Environmental Justice; the Partnership for Sustainable Communities; Local Foods, Local Places; Performance Partnership Pilots for Disconnected Youth; Empowerment Zones; StrikeForce; Partnerships for Opportunity and Workforce and Economic Revitalization; the Neighborhood Revitalization Initiative; Climate Action Champions; Better Communities Alliance; Investing in Manufacturing Communities Partnership; Promise Zones; and the 2016 Memorandum of Agreement on Interagency Technical Assistance. The Council shall also coordinate with existing Chief Officer Councils across the government with oversight responsibility for human capital, performance improvement, and financial assistance.

**Sec. 6. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof, or the status of that department or agency within the Federal Government; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA

### EXECUTIVE ORDER NO. 13771

<January 30, 2017, 82 F.R. 9339>

#### Reducing Regulation and Controlling Regulatory Costs

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Budget and Accounting Act of 1921, as amended (31 U.S.C. 1101 et seq.), section 1105 of title 31, United States Code, and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1. Purpose.** It is the policy of the executive branch to be prudent and financially responsible in the expenditure of funds, from both public and private sources. In addition to the management of the direct expenditure of taxpayer dollars through the budgeting process, it is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations. Toward that end, it is important that for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process.

**Sec. 2. Regulatory Cap for Fiscal Year 2017. (a)** Unless prohibited by law, whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed.

**(b)** For fiscal year 2017, which is in progress, the heads of all agencies are directed that the total incremental cost of all new regulations, including repealed regulations, to be finalized this year shall be no greater than zero, unless otherwise required by law or consistent with advice provided in writing by the Director of the Office of Management and Budget (Director).

**(c)** In furtherance of the requirement of subsection (a) of this section, any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations. Any agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law.

**(d)** The Director shall provide the heads of agencies with guidance on the implementation of this section. Such guidance shall address, among other things, processes for standardizing the measurement and estimation of regulatory costs; standards for determining what qualifies as new and offsetting regulations; standards for determining the costs of existing regulations that are considered for elimination; processes for accounting for costs in different fiscal years; methods to oversee the issuance of rules with costs offset by savings at different times or different agencies; and emergencies and other circumstances that might justify individual waivers of the requirements of this section. The Director shall consider phasing in and updating these requirements.

**Sec. 3. Annual Regulatory Cost Submissions to the Office of Management and Budget. (a)** Beginning with the Regulatory Plans (required under Executive Order 12866 of September 30, 1993, as amended, or any successor order) for fiscal year 2018, and for each fiscal year thereafter, the head of each agency shall identify, for each regulation that increases incremental cost, the offsetting regulations described in section 2(c) of this order, and provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation.

**(b)** Each regulation approved by the Director during the Presidential budget process shall be included in the Unified Regulatory Agenda required under Executive Order 12866, as amended, or any successor order.

**(c)** Unless otherwise required by law, no regulation shall be issued by an agency if it was not included on the most recent version or update of the published Unified Regulatory Agenda as required under Executive Order 12866, as amended, or any successor order, unless the issuance of such regulation was approved in advance in writing by the Director.

**(d)** During the Presidential budget process, the Director shall identify to agencies a total amount of incremental costs that will be allowed for each agency in issuing new regulations and repealing regulations for the next fiscal year. No regulations exceeding the agency's total incremental cost allowance will be permitted in that fiscal year, unless required by law or approved in writing by the Director. The total incremental cost allowance may allow an increase or require a reduction in total regulatory cost.

**(e)** The Director shall provide the heads of agencies with guidance on the implementation of the requirements in this section.

**Sec. 4. Definition.** For purposes of this order the term "regulation" or "rule" means an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency, but does not include:

**(a)** regulations issued with respect to a military, national security, or foreign affairs function of the United States;

**(b)** regulations related to agency organization, management, or personnel; or

**(c)** any other category of regulations exempted by the Director.

**Sec. 5. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">DONALD J. TRUMP</div>

## EXECUTIVE ORDER NO. 13777

<div align="center">&lt;February 24, 2017, 82 F.R. 12285&gt;</div>

<div align="center">

**Enforcing the Regulatory Reform Agenda**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to lower regulatory burdens on the American people by implementing and enforcing regulatory reform, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of the United States to alleviate unnecessary regulatory burdens placed on the American people.

**Sec. 2. Regulatory Reform Officers. (a)** Within 60 days of the date of this order, the head of each agency, except the heads of agencies receiving waivers under section 5 of this order, shall designate an agency official as its Regulatory Reform Officer (RRO). Each RRO shall oversee the implementation of regulatory reform initiatives and policies to ensure that agencies effectively carry out regulatory reforms, consistent with applicable law. These initiatives and policies include:

**(i)** Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs), regarding offsetting the number and cost of new regulations;

**(ii)** Executive Order 12866 of September 30, 1993 (Regulatory Planning and Review), as amended, regarding regulatory planning and review;

**(iii)** section 6 of Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), regarding retrospective review; and

**(iv)** the termination, consistent with applicable law, of programs and activities that derive from or implement Executive Orders, guidance documents, policy memoranda, rule interpretations, and similar documents, or relevant portions thereof, that have been rescinded.

**(b)** Each agency RRO shall periodically report to the agency head and regularly consult with agency leadership.

**Sec. 3. Regulatory Reform Task Forces. (a)** Each agency shall establish a Regulatory Reform Task Force composed of:

**(i)** the agency RRO;

**(ii)** the agency Regulatory Policy Officer designated under section 6(a)(2) of Executive Order 12866;

**(iii)** a representative from the agency's central policy office or equivalent central office; and

**(iv)** for agencies listed in section 901(b)(1) of title 31, United States Code, at least three additional senior agency officials as determined by the agency head.

**(b)** Unless otherwise designated by the agency head, the agency RRO shall chair the agency's Regulatory Reform Task Force.

**(c)** Each entity staffed by officials of multiple agencies, such as the Chief Acquisition Officers Council, shall form a joint Regulatory Reform Task Force composed of at least one official described in subsection (a) of this section from each constituent agency's Regulatory Reform Task Force. Joint Regulatory Reform Task Forces shall implement this order in coordination with the Regulatory Reform Task Forces of their members' respective agencies.

**(d)** Each Regulatory Reform Task Force shall evaluate existing regulations (as defined in section 4 of Executive Order 13771) and make recommendations to the agency head regarding their repeal, replacement, or modification, consistent with applicable law. At a minimum, each Regulatory Reform Task Force shall attempt to identify regulations that:

**(i)** eliminate jobs, or inhibit job creation;

**(ii)** are outdated, unnecessary, or ineffective;

**(iii)** impose costs that exceed benefits;

**(iv)** create a serious inconsistency or otherwise interfere with regulatory reform initiatives and policies;

**(v)** are inconsistent with the requirements of section 515 of the Treasury and General Government Appropriations Act, 2001 (44 U.S.C. 3516 note), or the guidance issued pursuant to that provision, in particular those regulations that rely in whole or in part on data, information, or methods that are not publicly available or that are insufficiently transparent to meet the standard for reproducibility; or

**(vi)** derive from or implement Executive Orders or other Presidential directives that have been subsequently rescinded or substantially modified.

**(e)** In performing the evaluation described in subsection (d) of this section, each Regulatory Reform Task Force shall seek input and other assistance, as permitted by law, from entities significantly affected by Federal regulations, including State, local, and tribal governments, small businesses, consumers, non-governmental organizations, and trade associations.

**(f)** When implementing the regulatory offsets required by Executive Order 13771, each agency head should prioritize, to the extent permitted by law, those regulations that the agency's Regulatory Reform Task Force has identified as being outdated, unnecessary, or ineffective pursuant to subsection (d)(ii) of this section.

**(g)** Within 90 days of the date of this order, and on a schedule determined by the agency head thereafter, each Regulatory Reform Task Force shall provide a report to the agency head detailing the agency's progress toward the following goals:

**(i)** improving implementation of regulatory reform initiatives and policies pursuant to section 2 of this order; and

**(ii)** identifying regulations for repeal, replacement, or modification.

**Sec. 4. Accountability.** Consistent with the policy set forth in section 1 of this order, each agency should measure its progress in performing the tasks outlined in section 3 of this order.

**(a)** Agencies listed in section 901(b)(1) of title 31, United States Code, shall incorporate in their annual performance plans (required under the Government Performance and Results Act, as amended (see 31 U.S.C. 1115(b))), performance indicators that measure progress toward the two goals listed in section 3(g) of this order. Within 60 days of the date of this order, the Director of the Office of Management and Budget (Director) shall issue guidance regarding the implementation of this subsection. Such guidance may also address how agencies not otherwise covered under this subsection should be held accountable for compliance with this order.

**(b)** The head of each agency shall consider the progress toward the two goals listed in section 3(g) of this order in assessing the performance of the Regulatory Reform Task Force and, to the extent permitted by law, those individuals responsible for developing and issuing agency regulations.

**Sec. 5. Waiver.** Upon the request of an agency head, the Director may waive compliance with this order if the Director determines that the agency generally issues very few or no regulations (as defined in section 4 of Executive Order 13771). The Director may revoke a waiver at any time. The Director shall publish, at least once every 3 months, a list of agencies with current waivers.

**Sec. 6. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">DONALD J. TRUMP</div>

<div align="center">

**EXECUTIVE ORDER NO. 13828**

<April 10, 2018, 83 F.R. 15941>

**Reducing Poverty in America by Promoting Opportunity and Economic Mobility**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to promote economic mobility, strong social networks, and accountability to American taxpayers, it is hereby ordered as follows:

**Section 1. Purpose.** The United States and its Constitution were founded on the principles of freedom and equal opportunity for all. To ensure that all Americans would be able to realize the benefits of those principles, especially during hard times, the Government established programs to help families with basic unmet needs. Unfortunately, many of the programs designed to help families have instead delayed economic independence, perpetuated poverty, and weakened family bonds. While bipartisan welfare reform enacted in 1996 was a step toward eliminating the economic stagnation and social harm that can result from long-term Government dependence, the welfare system still traps many recipients, especially children, in poverty and is in need of further reform and modernization in order to increase self-sufficiency, well-being, and economic mobility.

**Sec. 2. Policy. (a)** In 2017, the Federal Government spent more than $700 billion on low-income assistance. Since its inception, the welfare system has grown into a large bureaucracy that might be susceptible to measuring success by how many people are enrolled in a program rather than by how many have moved from poverty into financial independence. This is not the type of system that was envisioned when welfare programs were instituted in this country. The Federal Government's role is to clear paths to self-sufficiency, reserving public assistance programs for those who are truly in need. The Federal Government should do everything within its authority to empower individuals by providing opportunities for work, including by investing in Federal programs that are effective at moving people into the workforce and out of poverty. It must examine Federal policies and programs to ensure that they are consistent with principles that are central to the American spirit_work, free enterprise, and safeguarding human and economic resources. For those policies or programs that are not succeeding in those respects, it is our duty to either improve or eliminate them.

**(b)** It shall be the policy of the Federal Government to reform the welfare system of the United States so that it empowers people in a manner that is consistent with applicable law and the following principles, which shall be known as the Principles of Economic Mobility:

**(i)** Improve employment outcomes and economic independence (including by strengthening existing work requirements for work-capable people and introducing new work requirements when legally permissible);

**(ii)** Promote strong social networks as a way of sustainably escaping poverty (including through work and marriage);

**(iii)** Address the challenges of populations that may particularly struggle to find and maintain employment (including single parents, formerly incarcerated individuals, the homeless, substance abusers, individuals with disabilities, and disconnected youth);

**(iv)** Balance flexibility and accountability both to ensure that State, local, and tribal governments, and other institutions, may tailor their public assistance programs to the unique needs of their communities and to ensure that welfare services and administering agencies can be held accountable for achieving outcomes (including by designing and tracking measures that assess whether programs help people escape poverty);

**(v)** Reduce the size of bureaucracy and streamline services to promote the effective use of resources;

**(vi)** Reserve benefits for people with low incomes and limited assets;

**(vii)** Reduce wasteful spending by consolidating or eliminating Federal programs that are duplicative or ineffective;

**(viii)** Create a system by which the Federal Government remains updated on State, local, and tribal successes and failures, and facilitates access to that information so that other States and localities can benefit from it; and

**(ix)** Empower the private sector, as well as local communities, to develop and apply locally based solutions to poverty.

**(c)** As part of our pledge to increase opportunities for those in need, the Federal Government must first enforce work requirements that are required by law. It must also strengthen requirements that promote obtaining and maintaining employment in order to move people to independence. To support this focus on employment, the Federal Government should:

**(i)** review current federally funded workforce development programs. If more than one executive department or agency (agency) administers programs that are similar in scope or population served, they should be consolidated, to the extent permitted by law, into the agency that is best equipped to fulfill the expectations of the programs, while ineffective programs should be eliminated; and

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(ii)** invest in effective workforce development programs and encourage, to the greatest extent possible, entities that have demonstrated success in equipping participants with skills necessary to obtain employment that enables them to financially support themselves and their families in today's economy.

**(d)** It is imperative to empower State, local, and tribal governments and private-sector entities to effectively administer and manage public assistance programs. Federal policies should allow local entities to develop and implement programs and strategies that are best for their respective communities. Specifically, policies should allow the private sector, including community and faith-based organizations, to create solutions that alleviate the need for welfare assistance, promote personal responsibility, and reduce reliance on government intervention and resources.

**(i)** To promote the proper scope and functioning of government, the Federal Government must afford State, local, and tribal governments the freedom to design and implement programs that better allocate limited resources to meet different community needs.

**(ii)** States and localities can use such flexibility to devise and evaluate innovative programs that serve diverse populations and families. States and localities can also model their own initiatives on the successful programs of others. To achieve the right balance, Federal leaders must continue to discuss opportunities to improve public assistance programs with State and local leaders, including our Nation's governors.

**(e)** The Federal Government owes it to Americans to use taxpayer dollars for their intended purposes. Relevant agencies should establish clear metrics that measure outcomes so that agencies administering public assistance programs can be held accountable. These metrics should include assessments of whether programs help individuals and families find employment, increase earnings, escape poverty, and avoid long-term dependence. Whenever possible, agencies should harmonize their metrics to facilitate easier cross-y15943programmatic comparisons and to encourage further integration of service delivery at the local level. Agencies should also adopt policies to ensure that only eligible persons receive benefits and enforce all relevant laws providing that aliens who are not otherwise qualified and eligible may not receive benefits.

**(i)** All entities that receive funds should be required to guarantee the integrity of the programs they administer. Technology and innovation should drive initiatives that increase program integrity and reduce fraud, waste, and abuse in the current system.

**(ii)** The Federal Government must support State, local, and tribal partners by investing in tools to combat payment errors and verify eligibility for program participants. It must also work alongside public and private partners to assist recipients of welfare assistance to maximize access to services and benefits that support paths to self-sufficiency.

**Sec. 3. Review of Regulations and Guidance Documents. (a)** The Secretaries of the Treasury, Agriculture, Commerce, Labor, Health and Human Services, Housing and Urban Development, Transportation, and Education (Secretaries) shall:

**(i)** review all regulations and guidance documents of their respective agencies relating to waivers, exemptions, or exceptions for public assistance program eligibility requirements to determine whether such documents are, to the extent permitted by law, consistent with the principles outlined in this order;

**(ii)** review any public assistance programs of their respective agencies that do not currently require work for receipt of benefits or services, and determine whether enforcement of a work requirement would be consistent with Federal law and the principles outlined in this order;

**(iii)** review any public assistance programs of their respective agencies that do currently require work for receipt of benefits or services, and determine whether the enforcement of such work requirements is consistent with Federal law and the principles outlined in this order;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(iv)** within 90 days of the date of this order, and based on the reviews required by this section, submit to the Director of the Office of Management and Budget and the Assistant to the President for Domestic Policy a list of recommended regulatory and policy changes and other actions to accomplish the principles outlined in this order; and

**(v)** not later than 90 days after submission of the recommendations required by section 3(a)(iv) of this order, and in consultation with the Director of the Office of Management and Budget and the Assistant to the President for Domestic Policy, take steps to implement the recommended administrative actions.

**(b)** Within 90 days of the date of this order, the Secretaries shall each submit a report to the President, through the Director of the Office of Management and Budget and the Assistant to the President for Domestic Policy, that:

**(i)** states how their respective agencies are complying with 8 U.S.C. 1611(a), which provides that an alien who is not a "qualified alien" as defined by 8 U.S.C. 1641 is, subject to certain statutorily defined exceptions, not eligible for any Federal public benefit as defined by 8 U.S.C. 1611(c);

**(ii)** provides a list of Federal benefit programs that their respective agencies administer that are restricted pursuant to 8 U.S.C. 1611; and

**(iii)** provides a list of Federal benefit programs that their respective agencies administer that are not restricted pursuant to 8 U.S.C. 1611.

**Sec. 4. Definitions.** For the purposes of this order:

**(a)** the terms "individuals," "families," and "persons" mean any United States citizen, lawful permanent resident, or other lawfully present alien who is qualified to or otherwise may receive public benefits;

**(b)** the terms "work" and "workforce" include unsubsidized employment, subsidized employment, job training, apprenticeships, career and technical education training, job searches, basic education, education directly related to current or future employment, and workfare; and

**(c)** the terms "welfare" and "public assistance" include any program that provides means-tested assistance, or other assistance that provides benefits to people, households, or families that have low incomes (i.e., those making less than twice the Federal poverty level), the unemployed, or those out of the labor force.

**Sec. 5. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## EXECUTIVE ORDER NO. 13891

<October 9, 2019, 84 FR 55235>

### Promoting the Rule of Law Through Improved Agency Guidance Documents

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to ensure that Americans are subject to only those binding rules imposed through duly enacted statutes or through regulations lawfully promulgated under them, and that Americans have fair notice of their obligations, it is hereby ordered as follows:

**Section 1. Policy.** Departments and agencies (agencies) in the executive branch adopt regulations that impose legally binding requirements on the public even though, in our constitutional democracy, only Congress is vested with the legislative power. The Administrative Procedure Act (APA) generally requires agencies, in exercising that solemn responsibility, to engage in notice-and-comment rulemaking to provide public notice of proposed regulations under section 553 of title 5, United States Code, allow interested parties an opportunity to comment, consider and respond to significant comments, and publish final regulations in the Federal Register.

Agencies may clarify existing obligations through non-binding guidance documents, which the APA exempts from notice-and-comment requirements. Yet agencies have sometimes used this authority inappropriately in attempts to regulate the public without following the rulemaking procedures of the APA. Even when accompanied by a disclaimer that it is non-binding, a guidance document issued by an agency may carry the implicit threat of enforcement action if the regulated public does not comply. Moreover, the public frequently has insufficient notice of guidance documents, which are not always published in the Federal Register or distributed to all regulated parties.

Americans deserve an open and fair regulatory process that imposes new obligations on the public only when consistent with applicable law and after an agency follows appropriate procedures. Therefore, it is the policy of the executive branch, to the extent consistent with applicable law, to require that agencies treat guidance documents as non-binding both in law and in practice, except as incorporated into a contract, take public input into account when appropriate in formulating guidance documents, and make guidance documents readily available to the public. Agencies may impose legally binding requirements on the public only through regulations and on parties on a case-by-case basis through adjudications, and only after appropriate process, except as authorized by law or as incorporated into a contract.

**Sec. 2. Definitions.** For the purposes of this order:

**(a)** "Agency" has the meaning given in section 3(b) of Executive Order 12866 (Regulatory Planning and Review), as amended.

**(b)** "Guidance document" means an agency statement of general applicability, intended to have future effect on the behavior of regulated parties, that sets forth a policy on a statutory, regulatory, or technical issue, or an interpretation of a statute or regulation, but does not include the following:

**(i)** rules promulgated pursuant to notice and comment under section 553 of title 5, United States Code, or similar statutory provisions;

**(ii)** rules exempt from rulemaking requirements under section 553(a) of title 5, United States Code;

**(iii)** rules of agency organization, procedure, or practice;

**(iv)** decisions of agency adjudications under section 554 of title 5, United States Code, or similar statutory provisions;

**(v)** internal guidance directed to the issuing agency or other agencies that is not intended to have substantial future effect on the behavior of regulated parties; or

**(vi)** internal executive branch legal advice or legal opinions addressed to executive branch officials.

**(c)** "Significant guidance document" means a guidance document that may reasonably be anticipated to:

**(i)** lead to an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

**(ii)** create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

**(iii)** materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

**(iv)** raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles of Executive Order 12866.

**(d)** "Pre-enforcement ruling" means a formal written communication by an agency in response to an inquiry from a person concerning compliance with legal requirements that interprets the law or applies the law to a specific set of facts supplied by the person. The term includes informal guidance under section 213 of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104-121 (Title II), as amended, letter rulings, advisory opinions, and no-action letters.

**Sec. 3. Ensuring Transparent Use of Guidance Documents. (a)** Within 120 days of the date on which the Office of Management and Budget (OMB) issues an implementing memorandum under section 6 of this order, each agency or agency component, as appropriate, shall establish or maintain on its website a single, searchable, indexed database that contains or links to all guidance documents in effect from such agency or component. The website shall note that guidance documents lack the force and effect of law, except as authorized by law or as incorporated into a contract.

**(b)** Within 120 days of the date on which OMB issues an implementing memorandum under section 6 of this order, each agency shall review its guidance documents and, consistent with applicable law, rescind those guidance documents that it determines should no longer be in effect. No agency shall retain in effect any guidance document without including it in the relevant database referred to in subsection (a) of this section, nor shall any agency, in the future, issue a guidance document without including it in the relevant database. No agency may cite, use, or rely on guidance documents that are rescinded, except to establish historical facts. Within 240 days of the date on which OMB issues an implementing memorandum, an agency may reinstate a guidance document rescinded under this subsection without complying with any procedures adopted or imposed pursuant to section 4 of this order, to the extent consistent with applicable law, and shall include the guidance document in the relevant database.

**(c)** The Director of OMB (Director), or the Director's designee, may waive compliance with subsections (a) and (b) of this section for particular guidance documents or categories of guidance documents, or extend the deadlines set forth in those subsections.

**(d)** As requested by the Director, within 240 days of the date on which OMB issues an implementing memorandum under section 6 of this order, an agency head shall submit a report to the Director with the reasons for maintaining in effect any guidance documents identified by the Director. The Director shall provide such reports to the President. This subsection shall apply only to guidance documents existing as of the date of this order.

**Sec. 4. Promulgation of Procedures for Issuing Guidance Documents. (a)** Within 300 days of the date on which OMB issues an implementing memorandum under section 6 of this order, each agency shall, consistent with applicable law, finalize regulations, or amend existing regulations as necessary, to set forth processes and procedures for issuing guidance documents. The process set forth in each regulation shall be consistent with this order and shall include:

**(i)** a requirement that each guidance document clearly state that it does not bind the public, except as authorized by law or as incorporated into a contract;

**(ii)** procedures for the public to petition for withdrawal or modification of a particular guidance document, including a designation of the officials to which petitions should be directed; and

**(iii)** for a significant guidance document, as determined by the Administrator of OMB's Office of Information and Regulatory Affairs (Administrator), unless the agency and the Administrator agree that exigency, safety, health, or other compelling cause warrants an exemption from some or all requirements, provisions requiring:

**(A)** a period of public notice and comment of at least 30 days before issuance of a final guidance document, and a public response from the agency to major concerns raised in comments, except when the agency for good cause finds (and incorporates such finding and a brief statement of reasons therefor into the guidance document) that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest;

**(B)** approval on a non-delegable basis by the agency head or by an agency component head appointed by the President, before issuance;

**(C)** review by the Office of Information and Regulatory Affairs (OIRA) under Executive Order 12866, before issuance; and

**(D)** compliance with the applicable requirements for regulations or rules, including significant regulatory actions, set forth in Executive Orders 12866, 13563 (Improving Regulation and Regulatory Review), 13609 (Promoting International Regulatory Cooperation), 13771 (Reducing Regulation and Controlling Regulatory Costs), and 13777 (Enforcing the Regulatory Reform Agenda).

**(b)** The Administrator shall issue memoranda establishing exceptions from this order for categories of guidance documents, and categorical presumptions regarding whether guidance documents are significant, as appropriate, and may require submission of significant guidance documents to OIRA for review before the finalization of agency regulations under subsection (a) of this section. In light of the Memorandum of Agreement of April 11, 2018, this section and section 5 of this order shall not apply to the review relationship (including significance determinations) between OIRA and any component of the Department of the Treasury, or to compliance by the latter with Executive Orders 12866, 13563, 13609, 13771, and 13777. Section 4(a)(iii) and section 5 of this order shall not apply to pre-enforcement rulings.

**Sec. 5. Executive Orders 12866, 13563, and 13609.** The requirements and procedures of Executive Orders 12866, 13563, and 13609 shall apply to guidance documents, consistent with section 4 of this order.

**Sec. 6. Implementation.** The Director shall issue memoranda and, as appropriate, regulations pursuant to sections 3504(d)(1) and 3516 of title 44, United States Code, and other appropriate authority, to provide guidance regarding or otherwise implement this order.

**Sec. 7. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** Notwithstanding any other provision in this order, nothing in this order shall apply:

**(i)** to any action that pertains to foreign or military affairs, or to a national security or homeland security function of the United States (other than guidance documents involving procurement or the import or export of non-defense articles and services);

**(ii)** to any action related to a criminal investigation or prosecution, including undercover operations, or any civil enforcement action or related investigation by the Department of Justice, including any action related to a civil investigative demand under 18 U.S.C. 1968;

**(iii)** to any investigation of misconduct by an agency employee or any disciplinary, corrective, or employment action taken against an agency employee;

**(iv)** to any document or information that is exempt from disclosure under section 552(b) of title 5, United States Code (commonly known as the Freedom of Information Act); or

**(v)** in any other circumstance or proceeding to which application of this order, or any part of this order, would, in the judgment of the head of the agency, undermine the national security.

DONALD J. TRUMP

## EXECUTIVE ORDER NO. 13893

<October 10, 2019, 84 FR 55487>

**Increasing Government Accountability for Administrative Actions by Reinvigorating Administrative PAYGO**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Purpose.** In May 2005, the Office of Management and Budget (OMB) implemented a budget-neutrality requirement on executive branch administrative actions affecting mandatory spending. This mechanism, commonly referred to as "Administrative pay-as-you-go" (Administrative PAYGO), requires each executive department and agency (agency) to include one or more proposals for reducing mandatory spending whenever an agency proposes to undertake a discretionary administrative action that would increase mandatory spending.

In practice, however, agencies have applied this requirement with varying degrees of stringency, sometimes resulting in higher mandatory spending. Accordingly, institutionalizing and reinvigorating Administrative PAYGO through this order is a prudent approach to keeping mandatory spending under control.

**Sec. 2. Policy.** It is the policy of the executive branch to control Federal spending and restore the Nation's fiscal security. This policy includes ensuring that agencies consider the costs of their administrative actions, take steps to offset those costs, and curtail costly administrative actions.

**Sec. 3. Definitions.** For the purposes of this order:

**(a)** the term "discretionary administrative action" means any administrative action that is not required by statute and that would impact mandatory spending, including, but not limited to, the issuance of any agency rule, demonstration, program notice, or guidance; and

**(b)** the term "increase" in the context of mandatory spending means an increase relative to the projection in the most recent President's Budget, as described in 31 U.S.C. 1105, or Mid-Session Review, as described in 31 U.S.C. 1106, of what is required, under current law, to fund the mandatory-spending program.

**Sec. 4. Scope.** This order applies to discretionary administrative actions undertaken by agencies. If an agency determines that a proposed administrative action that would increase mandatory spending is required by statute and therefore is not a discretionary administrative action, the agency's general counsel shall provide a written opinion to the Director of OMB (Director) explaining that legal conclusion, and the agency shall consult with OMB prior to taking further action.

**Sec. 5. Agency Proposal Requirements. (a)** Before an agency may undertake any discretionary administrative action, the head of the agency shall submit the proposed discretionary administrative action to the Director for review. Such submission shall include an estimate of the budgetary effects of such action.

**(b)** If an agency's proposed discretionary administrative action would increase mandatory spending, the agency head's submission under subsection (a) of this section shall include a proposal to undertake other administrative action(s) that would comparably reduce mandatory spending. Submissions to increase mandatory spending that do not include a proposal to offset such increased spending shall be returned to the agency for reconsideration. The Director shall have the discretion to determine whether a proposed offset in mandatory spending is comparable to the relevant increase in mandatory spending, taking into account the magnitude of the offset and the increase and any other factors the Director deems appropriate.

**Sec. 6. Issuance of Administrative PAYGO Guidance and Revocation of OMB PAYGO Memorandum.** Within 90 days of the date of this order, the Director shall issue instructions regarding the implementation of this order, including how agency administrative action proposals that increase mandatory spending and non-tax receipts will be evaluated. In addition, within 90 days of the date of this order, the Director shall revoke OMB Memorandum M-05-13.

**Sec. 7. Waiver.** The Director may waive the requirements of section 5 of this order when the Director concludes that such a waiver is necessary for the delivery of essential services, for effective program delivery, or because a waiver is otherwise warranted by the public interest.

**Sec. 8. Flexibility for the Director of OMB to Pursue Additional Deficit Reduction.** The Director may pursue additional deficit reduction through agency administrative actions.

**Sec. 9. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div align="right">DONALD J. TRUMP</div>

<div align="center">

**MEMORANDA OF PRESIDENT**

**PRESIDENTIAL MEMORANDUM**

<Apr. 21, 1995, 60 F.R. 20621>

**Regulatory Reform--Waiver of Penalties and Reduction of Reports**

</div>

Memorandum for

The Secretary of State

The Secretary of the Treasury

The Secretary of Defense

The Attorney General

The Secretary of the Interior

The Secretary of Agriculture

The Secretary of Commerce

The Secretary of Labor

The Secretary of Health and Human Services

The Secretary of Housing and Urban Development

The Secretary of Transportation

The Secretary of Energy

The Secretary of Education

The Secretary of Veterans Affairs

The Administrator, Environmental Protection Agency

The Administrator, Small Business Administration

The Secretary of the Army

The Secretary of the Navy

The Secretary of the Air Force

The Director, Federal Emergency Management Agency

The Administrator, National Aeronautics and Space Administration

The Director, National Science Foundation

The Acting Archivist of the United States

The Administrator of General Services

The Chair, Railroad Retirement Board

The Chairperson, Architectural and Transportation Barriers Compliance Board

The Executive Director, Pension Benefit Guaranty Corporation

On March 16, I announced that the Administration would implement new policies to give compliance officials more flexibility in dealing with small business and to cut back on paperwork. These Governmentwide policies, as well as the specific agency actions I announced, are part of this Administration's continuing commitment to sensible regulatory reform. With your help and cooperation, we hope to move the Government toward a more flexible, effective, and user friendly approach to regulation.

**A. Actions:** This memorandum directs the designated department and agency heads to implement the policies set forth below.

**1. Authority to Waive Penalties. (a)** To the extent permitted by law, each agency shall use its discretion to modify the penalties for small businesses in the following situations. Agencies shall exercise their enforcement discretion to waive the imposition of all or a portion of a penalty when the violation is corrected within a time period appropriate to the violation in question. For those violations that may take longer to correct than the period set by the agency, the agency shall use its enforcement discretion to waive up to 100 percent of the financial penalties if the amounts waived are used to bring the entity into compliance. The provisions in paragraph 1(a) of this memorandum shall apply only where there has been a good faith effort to comply with applicable regulations and the violation does not involve criminal wrongdoing or significant threat to health, safety, or the environment.

**(b)** Each agency shall, by June 15, 1995, submit a plan to the Director of the Office of Management and Budget ("Director") describing the actions it will take to implement the policies in paragraph 1(a) of this memorandum. The plan shall provide that the agency will implement the policies described in paragraph 1(a) of this memorandum on or before July 14, 1995. Plans should include information on how notification will be given to frontline workers and small businesses.

**2. Cutting Frequency of Reports. (a)** Each agency shall reduce by one-half the frequency of the regularly scheduled reports that the public is required, by rule or by policy, to provide to the Government (from quarterly to semiannually, from semiannually to annually, etc.), unless the department or agency head determines that such action is not legally permissible; would not adequately protect health, safety, or the environment; would be inconsistent with achieving regulatory flexibility or reducing regulatory burdens; or would impede the effective administration of the agency's program. The duty to make such determinations shall be nondelegable.

**(b)** Each agency shall, by June 15, 1995, submit a plan to the Director describing the actions it will take to implement the policies in paragraph 2(a), including a copy of any determination that certain reports are excluded.

**B. Application and Scope: 1.** The Director may issue further guidance as necessary to carry out the purposes of this memorandum.

**2.** This memorandum does not apply to matters related to law enforcement, national security, or foreign affairs, the importation or exportation of prohibited or restricted items, Government taxes, duties, fees, revenues, or receipts; nor does it apply to agencies (or components thereof) whose principal purpose is the collection, analysis, and dissemination of statistical information.

**3.** This memorandum is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or its employees.

**4.** The Director of the Office of Management and Budget is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON

[References to the Director of the Federal Emergency Management Agency to be considered to refer and apply to the Administrator of the Federal Emergency Management Agency, see section 612(c) of Pub.L. 109-295, set out as a note under 6 U.S.C.A. § 313.]

## PRESIDENTIAL MEMORANDUM

<June 1, 1998, 63 F.R. 31885>

### Plain Language in Government Writing

Memorandum for the Heads of Executive Departments and Agencies

The Vice President and I have made reinventing the Federal Government a top priority of my Administration. We are determined to make the Government more responsive, accessible, and understandable in its communications with the public.

The Federal Government's writing must be in plain language. By using plain language, we send a clear message about what the Government is doing, what it requires, and what services it offers. Plain language saves the Government and the private sector time, effort, and money.

Plain language requirements vary from one document to another, depending on the intended audience. Plain language documents have logical organization, easy-to-read design features, and use:

• common, everyday words, except for necessary technical terms;

• "you" and other pronouns;

• the active voice; and

• short sentences.

To ensure the use of plain language, I direct you to do the following:

• By October 1, 1998, use plain language in all new documents, other than regulations, that explain how to obtain a benefit or service or how to comply with a requirement you administer or enforce. For example, these documents may include letters, forms, notices, and instructions. By January 1, 2002, all such documents created prior to October 1, 1998, must also be in plain language.

• By January 1, 1999, use plain language in all proposed and final rulemaking documents published in the Federal Register, unless you proposed the rule before that date. You should consider rewriting existing regulations in plain language when you have the opportunity and resources to do so.

The National Partnership for Reinventing Government will issue guidance to help you comply with these directives and to explain more fully the elements of plain language. You should also use customer feedback and common sense to guide your plain language efforts.

I ask the independent agencies to comply with these directives.

This memorandum does not confer any right or benefit enforceable by law against the United States or its representatives. The Director of the Office of Management and Budget will publish this memorandum in the Federal Register.

WILLIAM J. CLINTON


### PRESIDENTIAL MEMORANDUM

<May 20, 2009, 74 F.R. 24693>


### Preemption

Memorandum for the Heads of Executive Departments and Agencies

From our Nation's founding, the American constitutional order has been a Federal system, ensuring a strong role for both the national Government and the States. The Federal Government's role in promoting the general welfare and guarding individual liberties is critical, but State law and national law often operate concurrently to provide independent safeguards for the public. Throughout our history, State and local governments have frequently protected health, safety, and the environment more aggressively than has the national Government.

An understanding of the important role of State governments in our Federal system is reflected in longstanding practices by executive departments and agencies, which have shown respect for the traditional prerogatives of the States. In recent years, however, notwithstanding Executive Order 13132 of August 4, 1999 (Federalism), executive departments and agencies have sometimes announced that their regulations preempt State law, including State common law, without explicit preemption by the Congress or an otherwise sufficient basis under applicable legal principles.

The purpose of this memorandum is to state the general policy of my Administration that preemption of State law by executive departments and agencies should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption. Executive departments and agencies should be mindful that in our Federal system, the citizens of the several States have distinctive circumstances and values, and that in many instances it is appropriate for them to apply to themselves rules and principles that reflect these circumstances and values. As Justice Brandeis explained more than

70 years ago, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."

To ensure that executive departments and agencies include statements of preemption in regulations only when such statements have a sufficient legal basis:

**1.** Heads of departments and agencies should not include in regulatory preambles statements that the department or agency intends to preempt State law through the regulation except where preemption provisions are also included in the codified regulation.

**2.** Heads of departments and agencies should not include preemption provisions in codified regulations except where such provisions would be justified under legal principles governing preemption, including the principles outlined in Executive Order 13132.

**3.** Heads of departments and agencies should review regulations issued within the past 10 years that contain statements in regulatory preambles or codified provisions intended by the department or agency to preempt State law, in order to decide whether such statements or provisions are justified under applicable legal principles governing preemption. Where the head of a department or agency determines that a regulatory statement of preemption or codified regulatory provision cannot be so justified, the head of that department or agency should initiate appropriate action, which may include amendment of the relevant regulation.

Executive departments and agencies shall carry out the provisions of this memorandum to the extent permitted by law and consistent with their statutory authorities. Heads of departments and agencies should consult as necessary with the Attorney General and the Office of Management and Budget's Office of Information and Regulatory Affairs to determine how the requirements of this memorandum apply to particular situations.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The Director of the Office of Management and Budget is authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

### PRESIDENTIAL MEMORANDUM

<Jan. 18, 2011, 76 F.R. 3825>

### Regulatory Compliance

Memorandum for the Heads of Executive Departments and Agencies

My Administration is committed to enhancing effectiveness and efficiency in Government. Pursuant to the Memorandum on Transparency and Open Government, issued on January 21, 2009, executive departments and agencies (agencies) have been working steadily to promote accountability, encourage collaboration, and provide information to Americans about their Government's activities.

To that end, much progress has been made toward strengthening our democracy and improving how Government operates. In the regulatory area, several agencies, such as the Department of Labor and the Environmental Protection Agency, have begun to post online (at ogesdw.dol.gov and www.epa-echo.gov), and to make readily accessible to the public, information concerning their regulatory compliance and enforcement activities, such as information with respect to administrative inspections, examinations, reviews, warnings, citations, and revocations (but excluding law enforcement or otherwise sensitive information about ongoing enforcement actions).

Greater disclosure of regulatory compliance information fosters fair and consistent enforcement of important regulatory obligations. Such disclosure is a critical step in encouraging the public to hold the Government and regulated entities accountable. Sound regulatory enforcement promotes the welfare of Americans in many ways, by increasing public safety, improving working conditions, and protecting the air we breathe and the water we drink. Consistent regulatory enforcement also levels the playing field among regulated entities, ensuring that those that fail to comply with the law do not have an unfair advantage over their law-abiding competitors. Greater agency disclosure of compliance and enforcement data will provide Americans with information they need to make informed decisions. Such disclosure can lead the Government to hold itself more accountable, encouraging agencies to identify and address enforcement gaps.

Accordingly, I direct the following:

First, agencies with broad regulatory compliance and administrative enforcement responsibilities, within 120 days of this memorandum, to the extent feasible and permitted by law, shall develop plans to make public information concerning their regulatory compliance and enforcement activities accessible, downloadable, and searchable online. In so doing, agencies should prioritize making accessible information that is most useful to the general public and should consider the use of new technologies to allow the public to have access to real-time data. The independent agencies are encouraged to comply with this directive.

Second, the Federal Chief Information Officer and the Chief Technology Officer shall work with appropriate counterparts in each agency to make such data available online in searchable form, including on centralized platforms such as data.gov, in a manner that facilitates easy access, encourages cross-agency comparisons, and engages the public in new and creative ways of using the information.

Third, the Federal Chief Information Officer and the Chief Technology Officer, in coordination with the Director of the Office of Management and Budget (OMB) and their counterparts in each agency, shall work to explore how best to generate and share enforcement and compliance information across the Government, consistent with law. Such data sharing can assist with agencies' risk-based approaches to enforcement: A lack of compliance in one area by a regulated entity may indicate a need for examination and closer attention by another agency. Efforts to share data across agencies, where appropriate and permitted by law, may help to promote flexible and coordinated enforcement regimes.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing in this memorandum shall be construed to impair or otherwise affect the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

The Director of OMB is authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

## PRESIDENTIAL MEMORANDUM

<Jan. 21, 2011, 76 F.R. 3827>

**Regulatory Flexibility, Small Business, and Job Creation**

Memorandum for the Heads of Executive Departments and Agencies

Small businesses play an essential role in the American economy; they help to fuel productivity, economic growth, and job creation. More than half of all Americans working in the private sector either are employed by a small business or own one. During a recent 15-year period, small businesses created more than 60 percent of all new jobs in the Nation.

Although small businesses and new companies provide the foundations for economic growth and job creation, they have faced severe challenges as a result of the recession. One consequence has been the loss of significant numbers of jobs.

The Regulatory Flexibility Act (RFA), 5 U.S.C. 601-612, establishes a deep national commitment to achieving statutory goals without imposing unnecessary burdens on the public. The RFA emphasizes the importance of recognizing "differences in the scale and resources of regulated entities" and of considering "alternative regulatory approaches . . . which minimize the significant economic impact of rules on small businesses, small organizations, and small governmental jurisdictions." 5 U.S.C. 601 note.

To promote its central goals, the RFA imposes a series of requirements designed to ensure that agencies produce regulatory flexibility analyses that give careful consideration to the effects of their regulations on small businesses and explore significant alternatives in order to minimize any significant economic impact on small businesses. Among other things, the RFA requires that when an agency proposing a rule with such impact is required to provide notice of the proposed rule, it must also produce an initial regulatory flexibility analysis that includes discussion of significant alternatives. Significant alternatives include the use of performance rather than design standards; simplification of compliance and reporting requirements for small businesses; establishment of different timetables that take into account the resources of small businesses; and exemption from coverage for small businesses.

Consistent with the goal of open government, the RFA also encourages public participation in and transparency about the rulemaking process. Among other things, the statute requires agencies proposing rules with a significant economic impact on small businesses to provide an opportunity for public comment on any required initial regulatory flexibility analysis, and generally requires agencies promulgating final rules with such significant economic impact to respond, in a final regulatory flexibility analysis, to comments filed by the Chief Counsel for Advocacy of the Small Business Administration.

In the current economic environment, it is especially important for agencies to design regulations in a cost-effective manner consistent with the goals of promoting economic growth, innovation, competitiveness, and job creation.

Accordingly, I hereby direct executive departments and agencies and request independent agencies, when initiating rulemaking that will have a significant economic impact on a substantial number of small entities, to give serious consideration to whether and how it is appropriate, consistent with law and regulatory objectives, to reduce regulatory burdens on small businesses, through increased flexibility. As the RFA recognizes, such flexibility may take many forms, including:

- extended compliance dates that take into account the resources available to small entities;

- performance standards rather than design standards;

- simplification of reporting and compliance requirements (as, for example, through streamlined forms and electronic filing options);

- different requirements for large and small firms; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

- partial or total exemptions.

I further direct that whenever an executive agency chooses, for reasons other than legal limitations, not to provide such flexibility in a proposed or final rule that is likely to have a significant economic impact on a substantial number of small entities, it should explicitly justify its decision not to do so in the explanation that accompanies that proposed or final rule.

Adherence to these requirements is designed to ensure that regulatory actions do not place unjustified economic burdens on small business owners and other small entities. If regulations are preceded by careful analysis, and subjected to public comment, they are less likely to be based on intuition and guesswork and more likely to be justified in light of a clear understanding of the likely consequences of alternative courses of action. With that understanding, agencies will be in a better position to protect the public while avoiding excessive costs and paperwork.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing in this memorandum shall be construed to impair or otherwise affect the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

The Director of the Office of Management and Budget is authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

## PRESIDENTIAL MEMORANDUM

<May 17, 2013, 78 F.R. 30733>

### Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures

Memorandum for the Heads of Executive Departments and Agencies

Reliable, safe, and resilient infrastructure is the backbone of an economy built to last. Investing in our Nation's infrastructure serves as an engine for job creation and economic growth, while bringing immediate and long-term economic benefits to communities across the country. The quality of our infrastructure is critical to maintaining our Nation's competitive edge in a global economy and to securing our path to energy independence. In taking steps to improve our infrastructure, we must remember that the protection and continued enjoyment of our Nation's environmental, historical, and cultural resources remain an equally important driver of economic opportunity, resiliency, and quality of life.

Through the implementation of Executive Order 13604 of March 22, 2012 (Improving Performance of Federal Permitting and Review of Infrastructure Projects), executive departments and agencies (agencies) have achieved better outcomes for communities and the environment and realized substantial time savings in review and permitting by prioritizing the deployment of resources to specific sectors and projects, and by implementing best-management practices.

These best-management practices include: integrating project reviews among agencies with permitting responsibilities; ensuring early coordination with other Federal agencies, as well as with State, local, and tribal governments; strategically engaging with, and conducting outreach to, stakeholders; employing project-planning processes and individual project designs that consider local and regional ecological planning goals; utilizing landscape-and watershed-level mitigation practices; promoting the sharing of scientific and environmental data in open-data formats to minimize redundancy, facilitate informed project planning, and identify data gaps early in the review and permitting process; promoting performance-based permitting and

regulatory approaches; expanding the use of general permits where appropriate; improving transparency and accountability through the electronic tracking of review and permitting schedules; and applying best environmental and cultural practices as set forth in existing statutes and policies.

Based on the process and policy improvements that are already being implemented across the Federal Government, we can continue to modernize the Federal Government's review and permitting of infrastructure projects and reduce aggregate timelines for major infrastructure projects by half, while also improving outcomes for communities and the environment by institutionalizing these best-management practices, and by making additional improvements to enhance efficiencies in the application of regulations and processes involving multiple agencies--including expanding the use of web-based techniques for sharing project-related information, facilitating targeted and relevant environmental reviews, and providing meaningful opportunities for public input through stakeholder engagement.

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to advance the goal of cutting aggregate timelines for major infrastructure projects in half, while also improving outcomes for communities and the environment, I hereby direct the following:

**Section 1. Modernization of Review and Permitting Regulations, Policies, and Procedures. (a)** The Steering Committee on Federal Infrastructure Permitting and Review Process Improvement (Steering Committee), established by Executive Order 13604, shall work with the Chief Performance Officer (CPO), in coordination with the Office of Information and Regulatory Affairs (OIRA) and the Council on Environmental Quality (CEQ), to modernize Federal infrastructure review and permitting regulations, policies, and procedures to significantly reduce the aggregate time required by the Federal Government to make decisions in the review and permitting of infrastructure projects, while improving environmental and community outcomes.

This modernization shall build upon and incorporate reforms identified by agencies pursuant to Executive Order 13604 and Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review).

**(b)** Through an interagency process, coordinated by the CPO and working closely with CEQ and OIRA, the Steering Committee shall conduct the following modernization efforts:

**(i)** Within 60 days of the date of this memorandum, the Steering Committee shall identify and prioritize opportunities to modernize key regulations, policies, and procedures--both agency-specific and those involving multiple agencies--to reduce the aggregate project review and permitting time, while improving environmental and community outcomes.

**(ii)** Within 120 days of the date of this memorandum, the Steering Committee shall prepare a plan for a comprehensive modernization of Federal review and permitting for infrastructure projects based on the analysis required by subsection (b)(i) of this section that outlines specific steps for re-engineering both the intra-and inter-agency review and approval processes based on experience implementing Executive Order 13604. The plan shall identify proposed actions and associated timelines to:

**(1)** institutionalize or expand best practices or process improvements that agencies are already implementing to improve the efficiency of reviews, while improving outcomes for communities and the environment;

**(2)** revise key review and permitting regulations, policies, and procedures (both agency-specific and Government-wide);

**(3)** identify high-performance attributes of infrastructure projects that demonstrate how the projects seek to advance existing statutory and policy objectives and how they lead to improved outcomes for communities and the environment, thereby facilitating a faster and more efficient review and permitting process;

**(4)** create process efficiencies, including additional use of concurrent and integrated reviews;

**(5)** identify opportunities to use existing share-in-cost authorities and other non-appropriated funding sources to support early coordination and project review;

**(6)** effectively engage the public and interested stakeholders;

**(7)** expand coordination with State, local, and tribal governments;

**(8)** strategically expand the use of information technology (IT) tools and identify priority areas for IT investment to replace paperwork processes, enhance effective project siting decisions, enhance interagency collaboration, and improve the monitoring of project impacts and mitigation commitments; and

**(9)** identify improvements to mitigation policies to provide project developers with added predictability, facilitate landscape-scale mitigation based on conservation plans and regional environmental assessments, facilitate interagency mitigation plans where appropriate, ensure accountability and the long-term effectiveness of mitigation activities, and utilize innovative mechanisms where appropriate.

The modernization plan prepared pursuant to this section shall take into account funding and resource constraints and shall prioritize implementation accordingly.

**(c)** Infrastructure sectors covered by the modernization effort include: surface transportation, such as roadways, bridges, railroads, and transit; aviation; ports and related infrastructure, including navigational channels; water resources projects; renewable energy generation; conventional energy production in high-demand areas; electricity transmission; broadband; pipelines; storm water infrastructure; and other sectors as determined by the Steering Committee.

**(d)** The following agencies or offices and their relevant sub-divisions shall engage in the modernization effort:

**(i)** the Department of Defense;

**(ii)** the Department of the Interior;

**(iii)** the Department of Agriculture;

**(iv)** the Department of Commerce;

**(v)** the Department of Transportation;

**(vi)** the Department of Energy;

**(vii)** the Department of Homeland Security;

**(viii)** the Environmental Protection Agency;

**(ix)** the Advisory Council on Historic Preservation;

**(x)** the Department of the Army;

**(xi)** the Council on Environmental Quality; and

**(xii)** such other agencies or offices as the CPO may invite to participate.

**Sec. 2. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals, or the regulatory review process.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum shall be implemented consistent with Executive Order 12898 of February 11, 1994 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations), Executive Order 13175 of November 6, 2000 (Consultation and Coordination with Indian Tribal Governments), and my memorandum of November 5, 2009 (Tribal Consultation).

**(d)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(e)** The Director of the Office of Management and Budget is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

### PRESIDENTIAL MEMORANDUM

<January 16, 2015, 80 F.R. 3455>

### Expanding Federal Support for Predevelopment Activities for Nonfederal Domestic Infrastructure Assets

Memorandum for the Heads of Executive Departments and Agencies

The United States is significantly underinvesting in both the maintenance of existing public infrastructure and the development of new infrastructure projects. While there is no replacement for adequate public funding, innovative financing options and increased collaboration between the private and public sectors can help to increase overall investment in infrastructure.

However, a major challenge for innovative infrastructure projects, whether using emerging technologies or alternative financing, is the lack of funding for the phases of infrastructure project development that precede actual construction. Infrastructure projects require upfront costs, commonly known as ''predevelopment'' costs, for activities such as project and system planning, economic impact analyses, preliminary engineering assessments, and environmental review. Although only accounting for a small percentage of total costs, predevelopment activities have considerable influence on which projects will move forward, where and how they will be built, who will fund them, and who will benefit from them. Yet, in light of factors like fiscal constraints, the extent of overall needs, and risk aversion, State, local, and tribal governments tend to focus scarce resources on constructing and developing conventional projects and addressing their most critical infrastructure needs, thereby underinvesting in predevelopment.

Greater attention to the predevelopment phase could yield a range of benefits-- for example, providing the opportunity to develop longer-term, more innovative, and more complex infrastructure projects and facilitating assessment of a range of financing

approaches, including public-private partnerships. Additional investment in predevelopment costs also may enable State, local, and tribal governments to utilize innovations in infrastructure design and emerging technologies, reduce long-term costs to infrastructure project users, and provide other benefits, such as improved environmental performance and enhanced resilience to climate change.

The Federal Government can meaningfully expand opportunities for publicprivate collaboration, encourage more transformational projects, and improve project outcomes by encouraging Federal investment in robust predevelopment activities and providing other forms of support, such as technical assistance, to communities during the predevelopment phase.

Therefore, by the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby direct the following:

**Section 1. Policy.** It shall be the policy of the Federal Government for all executive departments and agencies (agencies) that provide grants, technical assistance, and other forms of support for nonfederal domestic infrastructure assets, or regulate the development of these infrastructure assets, to actively support nonfederal predevelopment activities with all available tools, including grants, technical assistance, and regulatory changes, to the extent permitted by law and consistent with agency mission. Agencies shall seek to make predevelopment funding and support available, as permitted by law and consistent with agency mission and where it is in the public interest and does not supplant existing public investment, to encourage opportunities for private sector investment. Agencies shall pay particular attention to predevelopment activities in sectors where State, local, and tribal governments have traditionally played a significant role, such as surface transportation, drinking water, sewage and storm water management systems, landside ports, and social infrastructure like schools and community facilities.

**Sec. 2. Definitions.** For the purposes of this memorandum:

**(a)** ''Predevelopment activities'' means activities that provide decisionmakers with the opportunity to identify and assess potential infrastructure projects and modifications to existing infrastructure projects, and to advance those projects from the conceptual phase to actual construction. Predevelopment activities include:

**(i)** project planning, feasibility studies, economic assessments and costbenefit analyses, and public benefit studies and value-for-money analyses;

**(ii)** design and engineering;

**(iii)** financial planning (including the identification of funding and financing options);

**(iv)** permitting, environmental review, and regulatory processes;

**(v)** assessment of the impacts of potential projects on the area, including the effect on communities, the environment, the workforce, and wages and benefits, as well as assessment of infrastructure vulnerability and resilience to climate change and other risks; and

**(vi)** public outreach and community engagement.

**(b)** ''Predevelopment funding'' means funding for predevelopment activities and associated costs, such as flexible staff, external advisors, convening potential investment partners, and associated legal costs directly related to predevelopment activities.

**Sec. 3. Federal Action to Support Predevelopment Activities.** Agencies shall take the following actions to support predevelopment activities:

**(a)** the Department of Commerce, through the Economic Development Administration's Public Works grants and Economic Adjustment Assistance grants, and consistent with the programs' mission and goals, shall take steps to increase assistance for the predevelopment phase of infrastructure projects;

**(b)** the Department of Transportation shall develop guidance to clarify where predevelopment activities are eligible for funding through its programs. To further encourage early collaboration in the project development process, the Department of Transportation shall also clarify options for providing early feedback into environmental review processes;

**(c)** the Department of Homeland Security shall clarify for grantees where predevelopment funding is available through the Hazard Mitigation Grant Program;

**(d)** the Department of Housing and Urban Development shall clarify for grantees how the Community Development Block Grant program and other Federal funding sources can be used for predevelopment activities;

**(e)** the Department of Agriculture shall develop guidance to clarify where predevelopment activities are eligible for funding through its programs, including grants for water and waste projects pursuant to 7 CFR 1780.1 et seq., the Special Evaluation Assistance for Rural Communities and Households Program, the Community Facilities Grant program, and the Watershed and Flood Prevention Operations Program. To encourage innovative predevelopment work, the Department of Agriculture shall also train Water and Environmental Programs field staff on predevelopment best practices and prioritize predevelopment in the Department of Agriculture's project development process; and

**(f)** the other members of the Working Group established in section 3 of my memorandum of July 17, 2014 (Expanding Public-Private Collaboration on Infrastructure Development and Financing), shall take such steps as appropriate to clarify program eligibilities related to predevelopment activities for nonfederal domestic infrastructure assets.

**Sec. 4. Implementation, Public Education, and Best Practices.** The Departments of Agriculture, Commerce, Labor, Housing and Urban Development, Transportation, Energy, and Homeland Security, and the Environmental Protection Agency shall develop plans for implementing the requirements of this memorandum, providing technical assistance to nonfederal actors engaged in predevelopment activities, and educating grantees and the public on the benefits of predevelopment and the Federal resources available for these activities. These agencies shall also work together to develop a guide for nonfederal actors undertaking nonfederal predevelopment activities that includes best practices on how to evaluate and compare traditional and alternative financing strategies. No later than 60 days after the date of this memorandum, these agencies shall provide these plans and the best practice guide to the Director of the National Economic Council. Subsequently, these agencies shall provide regular updates to the Director of the National Economic Council on their progress in increasing support for predevelopment activities.

**Sec. 5. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(c)** The Secretary of Transportation is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Notes of Decisions (5)

5 U.S.C.A. § 601, 5 USCA § 601
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.00706    86

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 8. Congressional Review of Agency Rulemaking

5 U.S.C.A. § 804

§ 804. Definitions

Effective: March 29, 1996
Currentness

For purposes of this chapter--

**(1)** The term "Federal agency" means any agency as that term is defined in section 551(1).

**(2)** The term "major rule" means any rule that the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget finds has resulted in or is likely to result in--

**(A)** an annual effect on the economy of $100,000,000 or more;

**(B)** a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or

**(C)** significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

The term does not include any rule promulgated under the Telecommunications Act of 1996 and the amendments made by that Act.

**(3)** The term "rule" has the meaning given such term in section 551, except that such term does not include--

**(A)** any rule of particular applicability, including a rule that approves or prescribes for the future rates, wages, prices, services, or allowances therefor, corporate or financial structures, reorganizations, mergers, or acquisitions thereof, or accounting practices or disclosures bearing on any of the foregoing;

**(B)** any rule relating to agency management or personnel; or

**(C)** any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**CREDIT(S)**

(Added Pub.L. 104-121, Title II, § 251, Mar. 29, 1996, 110 Stat. 873.)

5 U.S.C.A. § 804, 5 USCA § 804
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part III. Employees (Refs & Annos)
      Subpart F. Labor-Management and Employee Relations
        Chapter 73. Suitability, Security, and Conduct (Refs & Annos)
          Subchapter II. Employment Limitations (Refs & Annos)

5 U.S.C.A. § 7313

§ 7313. Riots and civil disorders

Currentness

**(a)** An individual convicted by any Federal, State, or local court of competent jurisdiction of--

**(1)** inciting a riot or civil disorder;

**(2)** organizing, promoting, encouraging, or participating in a riot or civil disorder;

**(3)** aiding or abetting any person in committing any offense specified in clause (1) or (2); or

**(4)** any offense determined by the head of the employing agency to have been committed in furtherance of, or while participating in, a riot or civil disorder;

shall, if the offense for which he is convicted is a felony, be ineligible to accept or hold any position in the Government of the United States or in the government of the District of Columbia for the five years immediately following the date upon which his conviction becomes final. Any such individual holding a position in the Government of the United States or the government of the District of Columbia on the date his conviction becomes final shall be removed from such position.

**(b)** For the purposes of this section, "felony" means any offense for which imprisonment is authorized for a term exceeding one year.

**CREDIT(S)**

(Added Pub.L. 90-351, Title V, § 1001(a), June 19, 1968, 82 Stat. 235.)

5 U.S.C.A. § 7313, 5 USCA § 7313
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 6. Domestic Security (Refs & Annos)
    Chapter 1. Homeland Security Organization
      Subchapter IV. Border, Maritime, and Transportation Security (Refs & Annos)
        Part E. Citizenship and Immigration Services

6 U.S.C.A. § 271

§ 271. Establishment of Bureau of Citizenship and Immigration Services

Effective: October 9, 2013
Currentness

**(a) Establishment of Bureau**

**(1) In general**

There shall be in the Department a bureau to be known as the "Bureau of Citizenship and Immigration Services".

**(2) Director**

The head of the Bureau of Citizenship and Immigration Services shall be the Director of the Bureau of Citizenship and Immigration Services, who--

**(A)** shall report directly to the Deputy Secretary;

**(B)** shall have a minimum of 5 years of management experience; and

**(C)** shall be paid at the same level as the Assistant Secretary of the Bureau of Border Security.

**(3) Functions**

The Director of the Bureau of Citizenship and Immigration Services--

**(A)** shall establish the policies for performing such functions as are transferred to the Director by this section or this chapter or otherwise vested in the Director by law;

**(B)** shall oversee the administration of such policies;

**(C)** shall advise the Deputy Secretary with respect to any policy or operation of the Bureau of Citizenship and Immigration Services that may affect the Bureau of Border Security of the Department, including potentially conflicting policies or operations;

**(D)** shall establish national immigration services policies and priorities;

**(E)** shall meet regularly with the Ombudsman described in section 272 of this title to correct serious service problems identified by the Ombudsman; and

**(F)** shall establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress within 3 months after its submission to Congress.

**(4) Managerial rotation program**

**(A) In general**

Not later than 1 year after the effective date specified in section 455, the Director of the Bureau of Citizenship and Immigration Services shall design and implement a managerial rotation program under which employees of such bureau holding positions involving supervisory or managerial responsibility and classified, in accordance with chapter 51 of Title 5, as a GS-14 or above, shall--

**(i)** gain some experience in all the major functions performed by such bureau; and

**(ii)** work in at least one field office and one service center of such bureau.

**(B) Report**

Not later than 2 years after the effective date specified in section 455, the Secretary shall submit a report to Congress on the implementation of such program.

**(5) Pilot initiatives for backlog elimination**

The Director of the Bureau of Citizenship and Immigration Services is authorized to implement innovative pilot initiatives to eliminate any remaining backlog in the processing of immigration benefit applications, and to prevent any backlog in the processing of such applications from recurring, in accordance with section 1573(a) of Title 8. Such initiatives may include measures such as increasing personnel, transferring personnel to focus on areas with the largest potential for backlog, and streamlining paperwork.

**(b) Transfer of functions from Commissioner**

In accordance with subchapter XII (relating to transition provisions), there are transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services the following functions, and all personnel, infrastructure, and funding provided to the Commissioner in support of such functions immediately before the effective date specified in section 455:

**(1)** Adjudications of immigrant visa petitions.

**(2)** Adjudications of naturalization petitions.

**(3)** Adjudications of asylum and refugee applications.

**(4)** Adjudications performed at service centers.

**(5)** All other adjudications performed by the Immigration and Naturalization Service immediately before the effective date specified in section 455.

## (c) Chief of Policy and Strategy

### (1) In general

There shall be a position of Chief of Policy and Strategy for the Bureau of Citizenship and Immigration Services.

### (2) Functions

In consultation with Bureau of Citizenship and Immigration Services personnel in field offices, the Chief of Policy and Strategy shall be responsible for--

**(A)** making policy recommendations and performing policy research and analysis on immigration services issues; and

**(B)** coordinating immigration policy issues with the Chief of Policy and Strategy for the Bureau of Border Security of the Department.

## (d) Legal advisor

### (1) In general

There shall be a principal legal advisor to the Director of the Bureau of Citizenship and Immigration Services.

### (2) Functions

The legal advisor shall be responsible for--

**(A)** providing specialized legal advice, opinions, determinations, regulations, and any other assistance to the Director of the Bureau of Citizenship and Immigration Services with respect to legal matters affecting the Bureau of Citizenship and Immigration Services; and

**(B)** representing the Bureau of Citizenship and Immigration Services in visa petition appeal proceedings before the Executive Office for Immigration Review.

## (e) Budget Officer

### (1) In general

There shall be a Budget Officer for the Bureau of Citizenship and Immigration Services.

### (2) Functions

#### (A) In general

The Budget Officer shall be responsible for--

**(i)** formulating and executing the budget of the Bureau of Citizenship and Immigration Services;

**(ii)** financial management of the Bureau of Citizenship and Immigration Services; and

**(iii)** collecting all payments, fines, and other debts for the Bureau of Citizenship and Immigration Services.

## (f) Chief of Office of Citizenship

### (1) In general

There shall be a position of Chief of the Office of Citizenship for the Bureau of Citizenship and Immigration Services.

### (2) Functions

The Chief of the Office of Citizenship for the Bureau of Citizenship and Immigration Services shall be responsible for promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials.

## (g) Repealed. Pub.L. 110-382, § 4, Oct. 9, 2008, 122 Stat. 4089

**CREDIT(S)**

(Pub.L. 107-296, Title IV, § 451, Nov. 25, 2002, 116 Stat. 2195; Pub.L. 110-382, § 2(a), Oct. 9, 2008, 122 Stat. 4087.)

Notes of Decisions (5)

6 U.S.C.A. § 271, 6 USCA § 271
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 6. Domestic Security (Refs & Annos)
    Chapter 1. Homeland Security Organization
      Subchapter IV. Border, Maritime, and Transportation Security (Refs & Annos)
        Part E. Citizenship and Immigration Services

6 U.S.C.A. § 279

§ 279. Children's affairs

Currentness

**(a) Transfer of functions**

There are transferred to the Director of the Office of Refugee Resettlement of the Department of Health and Human Services functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the effective date specified in subsection (d).

**(b) Functions**

**(1) In general**

Pursuant to the transfer made by subsection (a), the Director of the Office of Refugee Resettlement shall be responsible for--

**(A)** coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status, including developing a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child, consistent with the law regarding appointment of counsel that is in effect on November 25, 2002;

**(B)** ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child;

**(C)** making placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status;

**(D)** implementing the placement determinations;

**(E)** implementing policies with respect to the care and placement of unaccompanied alien children;

**(F)** identifying a sufficient number of qualified individuals, entities, and facilities to house unaccompanied alien children;

**(G)** overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside;

**(H)** reuniting unaccompanied alien children with a parent abroad in appropriate cases;

**(I)** compiling, updating, and publishing at least annually a state-by-state list of professionals or other entities qualified to provide guardian and attorney representation services for unaccompanied alien children;

**(J)** maintaining statistical information and other data on unaccompanied alien children for whose care and placement the Director is responsible, which shall include--

   **(i)** biographical information, such as a child's name, gender, date of birth, country of birth, and country of habitual residence;

   **(ii)** the date on which the child came into Federal custody by reason of his or her immigration status;

   **(iii)** information relating to the child's placement, removal, or release from each facility in which the child has resided;

   **(iv)** in any case in which the child is placed in detention or released, an explanation relating to the detention or release; and

   **(v)** the disposition of any actions in which the child is the subject;

**(K)** collecting and compiling statistical information from the Department of Justice, the Department of Homeland Security, and the Department of State on each department's actions relating to unaccompanied alien children; and

**(L)** conducting investigations and inspections of facilities and other entities in which unaccompanied alien children reside, including regular follow-up visits to such facilities, placements, and other entities, to assess the continued suitability of such placements.

**(2) Coordination with other entities; no release on own recognizance**

In making determinations described in paragraph (1)(C), the Director of the Office of Refugee Resettlement--

**(A)** shall consult with appropriate juvenile justice professionals, the Director of the Bureau of Citizenship and Immigration Services, and the Assistant Secretary of the Bureau of Border Security to ensure that such determinations ensure that unaccompanied alien children described in such subparagraph--

**(i)** are likely to appear for all hearings or proceedings in which they are involved;

**(ii)** are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity; and

**(iii)** are placed in a setting in which they are not likely to pose a danger to themselves or others; and

**(B)** shall not release such children upon their own recognizance.

**(3) Duties with respect to foster care**

In carrying out the duties described in paragraph (1), the Director of the Office of Refugee Resettlement is encouraged to use the refugee children foster care system established pursuant to section 412(d) of the Immigration and Nationality Act (8 U.S.C. 1522(d)) for the placement of unaccompanied alien children.

**(4) Rule of construction**

Nothing in paragraph (2)(B) may be construed to require that a bond be posted for an unaccompanied alien child who is released to a qualified sponsor.

**(c) Rule of construction**

Nothing in this section may be construed to transfer the responsibility for adjudicating benefit determinations under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) from the authority of any official of the Department of Justice, the Department of Homeland Security, or the Department of State.

**(d) Effective date**

Notwithstanding section 4, this section shall take effect on the date on which the transfer of functions specified under section 251 of this title takes effect.

**(e) References**

With respect to any function transferred by this section, any reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or pertaining to a component of government from which such function is transferred--

**(1)** to the head of such component is deemed to refer to the Director of the Office of Refugee Resettlement; or

**(2)** to such component is deemed to refer to the Office of Refugee Resettlement of the Department of Health and Human Services.

**(f) Other transition issues**

**(1) Exercise of authorities**

Except as otherwise provided by law, a Federal official to whom a function is transferred by this section may, for purposes of performing the function, exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function immediately before the effective date specified in subsection (d).

**(2) Savings provisions**

Subsections (a), (b), and (c) of section 552 of this title shall apply to a transfer of functions under this section in the same manner as such provisions apply to a transfer of functions under this chapter to the Department of Homeland Security.

**(3) Transfer and allocation of appropriations and personnel**

The personnel of the Department of Justice employed in connection with the functions transferred by this section, and the assets, liabilities, contracts, property, records, and unexpended balance of appropriations, authorizations, allocations, and other funds employed, held, used, arising from, available to, or to be made available to, the Immigration and Naturalization Service in connection with the functions transferred by this section, subject to section 1531 of Title 31, shall be transferred to the Director of the Office of Refugee Resettlement for allocation to the appropriate component of the Department of Health and Human Services. Unexpended funds transferred pursuant to this paragraph shall be used only for the purposes for which the funds were originally authorized and appropriated.

**(g) Definitions**

As used in this section--

**(1)** the term "placement" means the placement of an unaccompanied alien child in either a detention facility or an alternative to such a facility; and

**(2)** the term "unaccompanied alien child" means a child who--

**(A)** has no lawful immigration status in the United States;

**(B)** has not attained 18 years of age; and

**(C)** with respect to whom--

**(i)** there is no parent or legal guardian in the United States; or

**(ii)** no parent or legal guardian in the United States is available to provide care and physical custody.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 107-296, Title IV, § 462, Nov. 25, 2002, 116 Stat. 2202; Pub.L. 110-457, Title II, § 235(f), Dec. 23, 2008, 122 Stat. 5081.)

Notes of Decisions (22)

6 U.S.C.A. § 279, 6 USCA § 279
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 6. Domestic Security (Refs & Annos)
    Chapter 1. Homeland Security Organization
      Subchapter XI. Department of Justice Divisions
        Part A. Executive Office for Immigration Review

6 U.S.C.A. § 521

§ 521. Legal status of EOIR

Effective: March 1, 2003
Currentness

**(a) [1] Existence of EOIR**

There is in the Department of Justice the Executive Office for Immigration Review, which shall be subject to the direction and regulation of the Attorney General under section 1103(g) of Title 8.

**CREDIT(S)**

(Pub.L. 107-296, Title XI, § 1101, Nov. 25, 2002, 116 Stat. 2273.)

**Footnotes**

1    So in original. No subsec. (b) was enacted.

6 U.S.C.A. § 521, 6 USCA § 521

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or PreemptedHeld Unconstitutional by Golicov v. Lynch, 10th Cir., Sep. 19, 2016

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 12. Immigration and Nationality (Refs & Annos)
            Subchapter I. General Provisions (Refs & Annos)

8 U.S.C.A. § 1101

§ 1101. Definitions

Effective: January 17, 2014

Currentness

**(a)** As used in this chapter--

**(1)** The term "administrator" means the official designated by the Secretary of State pursuant to section 1104(b) of this title.

**(2)** The term "advocates" includes, but is not limited to, advises, recommends, furthers by overt act, and admits belief in.

**(3)** The term "alien" means any person not a citizen or national of the United States.

**(4)** The term "application for admission" has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.

**(5)** The term "Attorney General" means the Attorney General of the United States.

**(6)** The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations. Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.

**(7)** The term "clerk of court" means a clerk of a naturalization court.

**(8)** The terms "Commissioner" and "Deputy Commissioner" mean the Commissioner of Immigration and Naturalization and a Deputy Commissioner of Immigration and Naturalization, respectively.

**(9)** The term "consular officer" means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas or, when used in subchapter III, for the purpose of adjudicating nationality.

**(10)** The term "crewman" means a person serving in any capacity on board a vessel or aircraft.

**(11)** The term "diplomatic visa" means a nonimmigrant visa bearing that title and issued to a nonimmigrant in accordance with such regulations as the Secretary of State may prescribe.

**(12)** The term "doctrine" includes, but is not limited to, policies, practices, purposes, aims, or procedures.

**(13)(A)** The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

**(B)** An alien who is paroled under section 1182(d)(5) of this title or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

**(C)** An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien--

  **(i)** has abandoned or relinquished that status,

  **(ii)** has been absent from the United States for a continuous period in excess of 180 days,

  **(iii)** has engaged in illegal activity after having departed the United States,

  **(iv)** has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,

  **(v)** has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or

  **(vi)** is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

AR.00723

**(14)** The term "foreign state" includes outlying possessions of a foreign state, but self-governing dominions or territories under mandate or trusteeship shall be regarded as separate foreign states.

**(15)** The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens--

**(A)(i)** an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government, recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family;

**(ii)** upon a basis of reciprocity, other officials and employees who have been accredited by a foreign government recognized de jure by the United States, who are accepted by the Secretary of State, and the members of their immediate families; and

**(iii)** upon a basis of reciprocity, attendants, servants, personal employees, and members of their immediate families, of the officials and employees who have a nonimmigrant status under (i) and (ii) above;

**(B)** an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure;

**(C)** an alien in immediate and continuous transit through the United States, or an alien who qualifies as a person entitled to pass in transit to and from the United Nations Headquarters District and foreign countries, under the provisions of paragraphs (3), (4), and (5) of section 11 of the Headquarters Agreement with the United Nations (61 Stat. 758);

**(D)(i)** an alien crewman serving in good faith as such in a capacity required for normal operation and service on board a vessel, as defined in section 1288(a) of this title (other than a fishing vessel having its home port or an operating base in the United States), or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft;

**(ii)** an alien crewman serving in good faith as such in any capacity required for normal operations and service aboard a fishing vessel having its home port or an operating base in the United States who intends to land temporarily in Guam or the Commonwealth of the Northern Mariana Islands and solely in pursuit of his calling as a crewman and to depart from Guam or the Commonwealth of the Northern Mariana Islands with the vessel on which he arrived;

**(E)** an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national, and the spouse and children of any such alien if accompanying or following to join him; (i) solely to carry on substantial trade, including trade in services or trade in technology, principally between the United States and the foreign state of which he is a national; (ii) solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital; or (iii) solely to perform services in a specialty occupation in the United States if the alien is a national of the Commonwealth of Australia and with respect to whom the Secretary of Labor

determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title;

**(F)** (i) an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 1184(l) of this title at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's qualifications for and actual course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

**(G)(i)** a designated principal resident representative of a foreign government recognized de jure by the United States, which foreign government is a member of an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (59 Stat. 669), accredited resident members of the staff of such representatives, and members of his or their immediate family;

**(ii)** other accredited representatives of such a foreign government to such international organizations, and the members of their immediate families;

**(iii)** an alien able to qualify under (i) or (ii) above except for the fact that the government of which such alien is an accredited representative is not recognized de jure by the United States, or that the government of which he is an accredited representative is not a member of such international organization; and the members of his immediate family;

**(iv)** officers, or employees of such international organizations, and the members of their immediate families;

**(v)** attendants, servants, and personal employees of any such representative, officer, or employee, and the members of the immediate families of such attendants, servants, and personal employees;

**(H)** an alien (i) (a) [Repealed. Pub.L. 106-95, § 2(c), Nov. 12, 1999, 113 Stat. 1316] (b) subject to section 1182(j)(2) of this title, who is coming temporarily to the United States to perform services (other than services described in subclause (a) during the period in which such subclause applies and other than services described in subclause (ii)(a) or in subparagraph (O) or (P)) in a specialty occupation described in section 1184(i)(1) of this title or as a fashion model, who meets the requirements for the occupation specified in section 1184(i)(2) of this title or, in the case of a fashion model, is of distinguished merit and ability, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that the intending employer has filed with the Secretary an application under section 1182(n)(1) of this title, or (b1) who is entitled to enter the United States under and in pursuance of the provisions of an agreement listed in section 1184(g)(8)(A) of this title, who is engaged in a specialty occupation described in section 1184(i)(3) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title, or

(c) who is coming temporarily to the United States to perform services as a registered nurse, who meets the qualifications described in section 1182(m)(1) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that an unexpired attestation is on file and in effect under section 1182(m)(2) of this title for the facility (as defined in section 1182(m)(6) of this title) for which the alien will perform the services; or (ii)(a) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature, or (b) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country, but this clause shall not apply to graduates of medical schools coming to the United States to perform services as members of the medical profession; or (iii) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States as a trainee, other than to receive graduate medical education or training, in a training program that is not designed primarily to provide productive employment; and the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him;

**(I)** upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative, if accompanying or following to join him;

**(J)** an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 1182(j) of this title, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

**(K)** subject to subsections (d) and (p) of section 1184 of this title, an alien who--

**(i)** is the fiancee or fiance of a citizen of the United States (other than a citizen described in section 1154(a)(1)(A)(viii)(I) of this title) and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after admission;

**(ii)** has concluded a valid marriage with a citizen of the United States (other than a citizen described in section 1154(a)(1)(A)(viii)(I) of this title) who is the petitioner, is the beneficiary of a petition to accord a status under section 1151(b)(2)(A)(i) of this title that was filed under section 1154 of this title by the petitioner, and seeks to enter the United States to await the approval of such petition and the availability to the alien of an immigrant visa; or

**(iii)** is the minor child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

**(L)** subject to section 1184(c)(2) of this title, an alien who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an

affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

**(M)** (i) an alien having a residence in a foreign country which he has no intention of abandoning who seeks to enter the United States temporarily and solely for the purpose of pursuing a full course of study at an established vocational or other recognized nonacademic institution (other than in a language training program) in the United States particularly designated by him and approved by the Attorney General, after consultation with the Secretary of Education, which institution shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant nonacademic student and if any such institution fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

**(N)(i)** the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i) (or under analogous authority under paragraph (27)(L)), but only if and while the alien is a child, or

**(ii)** a child of such parent or of an alien accorded the status of a special immigrant under clause (ii), (iii), or (iv) of paragraph (27)(I) (or under analogous authority under paragraph (27)(L));

**(O)** an alien who--

**(i)** has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim or, with regard to motion picture and television productions a demonstrated record of extraordinary achievement, and whose achievements have been recognized in the field through extensive documentation, and seeks to enter the United States to continue work in the area of extraordinary ability; or

**(ii)(I)** seeks to enter the United States temporarily and solely for the purpose of accompanying and assisting in the artistic or athletic performance by an alien who is admitted under clause (i) for a specific event or events,

**(II)** is an integral part of such actual performance,

**(III)** (a) has critical skills and experience with such alien which are not of a general nature and which cannot be performed by other individuals, or (b) in the case of a motion picture or television production, has skills and experience with such alien which are not of a general nature and which are critical either based on a pre-existing longstanding working relationship or, with respect to the specific production, because significant production (including pre- and post-production work) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production, and

**(IV)** has a foreign residence which the alien has no intention of abandoning; or

**(iii)** is the alien spouse or child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

**(P)** an alien having a foreign residence which the alien has no intention of abandoning who--

**(i)** (a) is described in section 1184(c)(4)(A) of this title (relating to athletes), or (b) is described in section 1184(c)(4)(B) of this title (relating to entertainment groups);

**(ii)(I)** performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

**(II)** seeks to enter the United States temporarily and solely for the purpose of performing as such an artist or entertainer or with such a group under a reciprocal exchange program which is between an organization or organizations in the United States and an organization or organizations in one or more foreign states and which provides for the temporary exchange of artists and entertainers, or groups of artists and entertainers;

**(iii)(I)** performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

**(II)** seeks to enter the United States temporarily and solely to perform, teach, or coach as such an artist or entertainer or with such a group under a commercial or noncommercial program that is culturally unique; or

**(iv)** is the spouse or child of an alien described in clause (i), (ii), or (iii) and is accompanying, or following to join, the alien;

**(Q)** an alien having a residence in a foreign country which he has no intention of abandoning who is coming temporarily (for a period not to exceed 15 months) to the United States as a participant in an international cultural exchange program approved by the Secretary of Homeland Security for the purpose of providing practical training, employment, and the sharing of the history, culture, and traditions of the country of the alien's nationality and who will be employed under the same wages and working conditions as domestic workers;

**(R)** an alien, and the spouse and children of the alien if accompanying or following to join the alien, who--

**(i)** for the 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States; and

**(ii)** seeks to enter the United States for a period not to exceed 5 years to perform the work described in subclause (I), (II), or (III) of paragraph (27)(C)(ii);

**(S)** subject to section 1184(k) of this title, an alien--

**(i)** who the Attorney General determines--

**(I)** is in possession of critical reliable information concerning a criminal organization or enterprise;

**(II)** is willing to supply or has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and

**(III)** whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual involved in the criminal organization or enterprise; or

**(ii)** who the Secretary of State and the Attorney General jointly determine--

**(I)** is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

**(II)** is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

**(III)** will be or has been placed in danger as a result of providing such information; and

**(IV)** is eligible to receive a reward under section 2708(a) of Title 22,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien;

**(T)(i)** subject to section 1184(o) of this title, an alien who the Secretary of Homeland Security, or in the case of subclause (III)(aa) the Secretary of Homeland Security, in consultation with the Attorney General, determines--

**(I)** is or has been a victim of a severe form of trafficking in persons, as defined in section 7102 of Title 22;

**(II)** is physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a port of entry thereto, on account of such trafficking, including physical presence on account of the alien having been allowed entry into the United States for participation in investigative or judicial processes associated with an act or a perpetrator of trafficking;

**(III)(aa)** has complied with any reasonable request for assistance in the Federal, State, or local investigation or prosecution of acts of trafficking or the investigation of crime where acts of trafficking are at least one central reason for the commission of that crime;

**(bb)** in consultation with the Attorney General, as appropriate, is unable to cooperate with a request described in item (aa) due to physical or psychological trauma; or

**(cc)** has not attained 18 years of age; and

**(IV)** the alien [1] would suffer extreme hardship involving unusual and severe harm upon removal; and

**(ii)** if accompanying, or following to join, the alien described in clause (i)--

**(I)** in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien;

**(II)** in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; or

**(III)** any parent or unmarried sibling under 18 years of age, or any adult or minor children of a derivative beneficiary of the alien, as of an alien described in subclause (I) or (II) who the Secretary of Homeland Security, in consultation with the law enforcement officer investigating a severe form of trafficking, determines faces a present danger of retaliation as a result of the alien's escape from the severe form of trafficking or cooperation with law enforcement.

**(U)(i)** subject to section 1184(p) of this title, an alien who files a petition for status under this subparagraph, if the Secretary of Homeland Security determines that--

**(I)** the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity described in clause (iii);

**(II)** the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning criminal activity described in clause (iii);

**(III)** the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official, to a Federal, State, or local prosecutor, to a Federal or State judge, to the Service, or to other Federal, State, or local authorities investigating or prosecuting criminal activity described in clause (iii); and

**(IV)** the criminal activity described in clause (iii) violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States;

**(ii)** if accompanying, or following to join, the alien described in clause (i)--

**(I)** in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien; or

**(II)** in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; and

**(iii)** the criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; stalking; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; fraud in foreign labor contracting (as defined in section 1351 of Title 18); or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes; or

**(V)** subject to section 1184(q) of this title, an alien who is the beneficiary (including a child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of a petition to accord a status under section 1153(a)(2)(A) of this title that was filed with the Attorney General under section 1154 of this title on or before December 21, 2000, if--

**(i)** such petition has been pending for 3 years or more; or

**(ii)** such petition has been approved, 3 years or more have elapsed since such filing date, and--

**(I)** an immigrant visa is not immediately available to the alien because of a waiting list of applicants for visas under section 1153(a)(2)(A) of this title; or

**(II)** the alien's application for an immigrant visa, or the alien's application for adjustment of status under section 1255 of this title, pursuant to the approval of such petition, remains pending.

**(16)** The term "immigrant visa" means an immigrant visa required by this chapter and properly issued by a consular officer at his office outside of the United States to an eligible immigrant under the provisions of this chapter.

**(17)** The term "immigration laws" includes this chapter and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens.

**(18)** The term "immigration officer" means any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title.

**(19)** The term "ineligible to citizenship," when used in reference to any individual, means, notwithstanding the provisions of any treaty relating to military service, an individual who is, or was at any time permanently debarred from becoming a citizen of the United States under section 3(a) of the Selective Training and Service Act of 1940, as amended (54 Stat. 885; 55 Stat. 844), or under section 4(a) of the Selective Service Act of 1948, as amended (62 Stat. 605; 65 Stat. 76), or under

any section of this chapter, or any other Act, or under any law amendatory of, supplementary to, or in substitution for, any of such sections or Acts.

**(20)** The term "lawfully admitted for permanent residence" means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

**(21)** The term "national" means a person owing permanent allegiance to a state.

**(22)** The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

**(23)** The term "naturalization" means the conferring of nationality of a state upon a person after birth, by any means whatsoever.

**(24)** Repealed. Pub.L. 102-232, Title III, § 305(m)(1), Dec. 12, 1991, 105 Stat. 1750.

**(25)** The term "noncombatant service" shall not include service in which the individual is not subject to military discipline, court martial, or does not wear the uniform of any branch of the armed forces.

**(26)** The term "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter.

(27) The term "special immigrant" means--

  **(A)** an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad;

  **(B)** an immigrant who was a citizen of the United States and may, under section 1435(a) or 1438 of this title, apply for reacquisition of citizenship;

  **(C)** an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who--

    **(i)** for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

    **(ii)** seeks to enter the United States--

      **(I)** solely for the purpose of carrying on the vocation of a minister of that religious denomination,

**(II)** before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

**(III)** before September 30, 2015, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and

**(iii)** has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

**(D)** an immigrant who is an employee, or an honorably retired former employee, of the United States Government abroad, or of the American Institute in Taiwan, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: *Provided*, That the principal officer of a Foreign Service establishment (or, in the case of the American Institute in Taiwan, the Director thereof), in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status;

**(E)** an immigrant, and his accompanying spouse and children, who is or has been an employee of the Panama Canal Company or Canal Zone Government before the date on which the Panama Canal Treaty of 1977 (as described in section 3602(a)(1) of Title 22) enters into force [October 1, 1979], who was resident in the Canal Zone on the effective date of the exchange of instruments of ratification of such Treaty [April 1, 1979], and who has performed faithful service as such an employee for one year or more;

**(F)** an immigrant, and his accompanying spouse and children, who is a Panamanian national and (i) who, before the date on which such Panama Canal Treaty of 1977 enters into force [October 1, 1979], has been honorably retired from United States Government employment in the Canal Zone with a total of 15 years or more of faithful service, or (ii) who, on the date on which such Treaty enters into force, has been employed by the United States Government in the Canal Zone with a total of 15 years or more of faithful service and who subsequently is honorably retired from such employment or continues to be employed by the United States Government in an area of the former Canal Zone;

**(G)** an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone Government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977 [April 1, 1979], who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment;

**(H)** an immigrant, and his accompanying spouse and children, who--

**(i)** has graduated from a medical school or has qualified to practice medicine in a foreign state,

**(ii)** was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(iii)** entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) before January 10, 1978, and

**(iv)** has been continuously present in the United States in the practice or study of medicine since the date of such entry;

**(I)(i)** an immigrant who is the unmarried son or daughter of an officer or employee, or of a former officer or employee, of an international organization described in paragraph (15)(G)(i), and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least seven years between the ages of five and 21 years, and (II) applies for a visa or adjustment of status under this subparagraph no later than his twenty-fifth birthday or six months after October 24, 1988, whichever is later;

**(ii)** an immigrant who is the surviving spouse of a deceased officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the death of such officer or employee, and (II) files a petition for status under this subparagraph no later than six months after the date of such death or six months after October 24, 1988, whichever is later;

**(iii)** an immigrant who is a retired officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the officer or employee's retirement from any such international organization, and (II) files a petition for status under this subparagraph no later than six months after the date of such retirement or six months after October 25, 1994, whichever is later; or

**(iv)** an immigrant who is the spouse of a retired officer or employee accorded the status of special immigrant under clause (iii), accompanying or following to join such retired officer or employee as a member of his immediate family;

**(J)** an immigrant who is present in the United States--

**(i)** who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

**(ii)** for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

**(iii)** in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status, except that--

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(I)** no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction; and

**(II)** no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter;

**(K)** an immigrant who has served honorably on active duty in the Armed Forces of the United States after October 15, 1978, and after original lawful enlistment outside the United States (under a treaty or agreement in effect on October 1, 1991) for a period or periods aggregating--

**(i)** 12 years and who, if separated from such service, was never separated except under honorable conditions, or

**(ii)** 6 years, in the case of an immigrant who is on active duty at the time of seeking special immigrant status under this subparagraph and who has reenlisted to incur a total active duty service obligation of at least 12 years,

and the spouse or child of any such immigrant if accompanying or following to join the immigrant, but only if the executive department under which the immigrant serves or served recommends the granting of special immigrant status to the immigrant;

**(L)** an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause--

**(i)** to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North Atlantic Treaty Organization (NATO);

**(ii)** to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO-6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the "Protocol on the Status of International Military Headquarters" set up pursuant to the North Atlantic Treaty, or as a dependent); and

**(iii)** to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the American Competitiveness and Workforce Improvement Act of 1998 [2]

**(M)** subject to the numerical limitations of section 1153(b)(4) of this title, an immigrant who seeks to enter the United States to work as a broadcaster in the United States for the International Broadcasting Bureau of the Broadcasting Board of Governors, or for a grantee of the Broadcasting Board of Governors, and the immigrant's accompanying spouse and children.

**(28)** The term "organization" means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects.

**(29)** The term "outlying possessions of the United States" means American Samoa and Swains Island.

**(30)** The term "passport" means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the admission of the bearer into a foreign country.

**(31)** The term "permanent" means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law.

**(32)** The term "profession" shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries.

**(33)** The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.

**(34)** The term "Service" means the Immigration and Naturalization Service of the Department of Justice.

**(35)** The term "spouse", "wife", or "husband" do not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated.

**(36)** The term "State" includes the District of Columbia, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

**(37)** The term "totalitarian party" means an organization which advocates the establishment in the United States of a totalitarian dictatorship or totalitarianism. The terms "totalitarian dictatorship" and "totalitarianism" mean and refer to systems of government not representative in fact, characterized by (A) the existence of a single political party, organized on a dictatorial basis, with so close an identity between such party and its policies and the governmental policies of the country in which it exists, that the party and the government constitute an indistinguishable unit, and (B) the forcible suppression of opposition to such party.

**(38)** The term "United States", except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

**(39)** The term "unmarried", when used in reference to any individual as of any time, means an individual who at such time is not married, whether or not previously married.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(40)** The term "world communism" means a revolutionary movement, the purpose of which is to establish eventually a Communist totalitarian dictatorship in any or all the countries of the world through the medium of an internationally coordinated Communist political movement.

**(41)** The term "graduates of a medical school" means aliens who have graduated from a medical school or who have qualified to practice medicine in a foreign state, other than such aliens who are of national or international renown in the field of medicine.

**(42)** The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

**(43)** The term "aggravated felony" means--

**(A)** murder, rape, or sexual abuse of a minor;

**(B)** illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18);

**(C)** illicit trafficking in firearms or destructive devices (as defined in section 921 of Title 18) or in explosive materials (as defined in section 841(c) of that title);

**(D)** an offense described in section 1956 of Title 18 (relating to laundering of monetary instruments) or section 1957 of that title (relating to engaging in monetary transactions in property derived from specific unlawful activity) if the amount of the funds exceeded $10,000;

**(E)** an offense described in--

**(i)** section 842(h) or (i) of Title 18, or section 844(d), (e), (f), (g), (h), or (i) of that title (relating to explosive materials offenses);

**(ii)** section 922(g)(1), (2), (3), (4), or (5), (j), (n), (o), (p), or (r) or 924(b) or (h) of Title 18 (relating to firearms offenses); or

**(iii)** section 5861 of Title 26 (relating to firearms offenses);

**(F)** a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment at [3] least one year;

**(G)** a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at [3] least one year;

**(H)** an offense described in section 875, 876, 877, or 1202 of Title 18 (relating to the demand for or receipt of ransom);

**(I)** an offense described in section 2251, 2251A, or 2252 of Title 18 (relating to child pornography);

**(J)** an offense described in section 1962 of Title 18 (relating to racketeer influenced corrupt organizations), or an offense described in section 1084 (if it is a second or subsequent offense) or 1955 of that title (relating to gambling offenses), for which a sentence of one year imprisonment or more may be imposed;

**(K)** an offense that--

**(i)** relates to the owning, controlling, managing, or supervising of a prostitution business;

**(ii)** is described in section 2421, 2422, or 2423 of Title 18 (relating to transportation for the purpose of prostitution) if committed for commercial advantage; or

**(iii)** is described in any of sections 1581-1585 or 1588-1591 of Title 18 (relating to peonage, slavery, involuntary servitude, and trafficking in persons);

**(L)** an offense described in--

**(i)** section 793 (relating to gathering or transmitting national defense information), 798 (relating to disclosure of classified information), 2153 (relating to sabotage) or 2381 or 2382 (relating to treason) of Title 18;

**(ii)** section 3121 of Title 50 (relating to protecting the identity of undercover intelligence agents); or

**(iii)** section 3121 of Title 50 (relating to protecting the identity of undercover agents);

**(M)** an offense that--

**(i)** involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

**(ii)** is described in section 7201 of Title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000;

**(N)** an offense described in paragraph (1)(A) or (2) of section 1324(a) of this title (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter [4]

**(O)** an offense described in section 1325(a) or 1326 of this title committed by an alien who was previously deported on the basis of a conviction for an offense described in another subparagraph of this paragraph;

**(P)** an offense (i) which either is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of Title 18 or is described in section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment is at least 12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter;

**(Q)** an offense relating to a failure to appear by a defendant for service of sentence if the underlying offense is punishable by imprisonment for a term of 5 years or more;

**(R)** an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles the identification numbers of which have been altered for which the term of imprisonment is at least one year;

**(S)** an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which the term of imprisonment is at least one year;

**(T)** an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of 2 years' imprisonment or more may be imposed; and

**(U)** an attempt or conspiracy to commit an offense described in this paragraph.

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15

years. Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996.

**(44)(A)** The term "managerial capacity" means an assignment within an organization in which the employee primarily--

**(i)** manages the organization, or a department, subdivision, function, or component of the organization;

**(ii)** supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

**(iii)** if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

**(iv)** exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

**(B)** The term "executive capacity" means an assignment within an organization in which the employee primarily--

**(i)** directs the management of the organization or a major component or function of the organization;

**(ii)** establishes the goals and policies of the organization, component, or function;

**(iii)** exercises wide latitude in discretionary decision-making; and

**(iv)** receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

**(C)** If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the Attorney General shall take into account the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function. An individual shall not be considered to be acting in a managerial or executive capacity (as previously defined) merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed.

**(45)** The term "substantial" means, for purposes of paragraph (15)(E) with reference to trade or capital, such an amount of trade or capital as is established by the Secretary of State, after consultation with appropriate agencies of Government.

**(46)** The term "extraordinary ability" means, for purposes of subsection (a)(15)(O)(i), in the case of the arts, distinction.

**(47)(A)** The term "order of deportation" means the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation.

**(B)** The order described under subparagraph (A) shall become final upon the earlier of--

  **(i)** a determination by the Board of Immigration Appeals affirming such order; or

  **(ii)** the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals.

**(48)(A)** The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where--

  **(i)** a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

  **(ii)** the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

**(B)** Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

**(49)** The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.

**(50)** The term "intended spouse" means any alien who meets the criteria set forth in section 1154(a)(1)(A)(iii)(II)(aa)(BB), 1154(a)(1)(B)(ii)(II)(aa)(BB), or 1229b(b)(2)(A)(i)(III) of this title.

**(51)** The term "VAWA self-petitioner" means an alien, or a child of the alien, who qualifies for relief under--

  **(A)** clause (iii), (iv), or vii) of section 1154(a)(1)(A) of this title;

  **(B)** clause (ii) or (iii) of section 1154(a)(1)(B) of this title;

  **(C)** section 1186a(c)(4)(C) of this title;

**(D)** the first section of Public Law 89-732 (8 U.S.C. 1255 note) (commonly known as the Cuban Adjustment Act) as a child or spouse who has been battered or subjected to extreme cruelty;

**(E)** section 902(d)(1)(B) of the Haitian Refugee Immigration Fairness Act of 1998 (8 U.S.C. 1255 note);

**(F)** section 202(d)(1) of the Nicaraguan Adjustment and Central American Relief Act; or

**(G)** section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104-208).

**(52)** The term "accredited language training program" means a language training program that is accredited by an accrediting agency recognized by the Secretary of Education.

**(b)** As used in subchapters I and II--

**(1)** The term "child" means an unmarried person under twenty-one years of age who is--

**(A)** a child born in wedlock;

**(B)** a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred;

**(C)** a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation;

**(D)** a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person;

**(E)(i)** a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years or if the child has been battered or subject to extreme cruelty by the adopting parent or by a family member of the adopting parent residing in the same household: *Provided*, That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

**(ii)** subject to the same proviso as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (F)(i); (II) was adopted by the adoptive parent or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child was adopted while under the age of 18 years;

**(F)(i)** a child, under the age of sixteen at the time a petition is filed in his behalf to accord a classification as an immediate relative under section 1151(b) of this title, who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care and has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and spouse jointly, or by an unmarried United States citizen who is at least 25 years of age, at least 1 of whom personally saw and observed the child before or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who have or has complied with the preadoption requirements, if any, of the child's proposed residence; *Provided*, That the Attorney General is satisfied that proper care will be furnished the child if admitted to the United States: *Provided further*, That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

**(ii)** subject to the same provisos as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (E)(i); (II) has been adopted abroad, or is coming to the United States for adoption, by the adoptive parent (or prospective adoptive parent) or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child is under the age of 18 at the time a petition is filed in his or her behalf to accord a classification as an immediate relative under section 1151(b) of this title; or

**(G)(i)** a child, younger than 16 years of age at the time a petition is filed on the child's behalf to accord a classification as an immediate relative under section 1151(b) of this title, who has been adopted in a foreign state that is a party to the Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, done at The Hague on May 29, 1993, or who is emigrating from such a foreign state to be adopted in the United States by a United States citizen and spouse jointly or by an unmarried United States citizen who is at least 25 years of age, Provided, That--

**(I)** the Secretary of Homeland Security is satisfied that proper care will be furnished the child if admitted to the United States;

**(II)** the child's natural parents (or parent, in the case of a child who has one sole or surviving parent because of the death or disappearance of, abandonment or desertion by, the other parent), or other persons or institutions that retain legal custody of the child, have freely given their written irrevocable consent to the termination of their legal relationship with the child, and to the child's emigration and adoption;

**(III)** in the case of a child having two living natural parents, the natural parents are incapable of providing proper care for the child;

**(IV)** the Secretary of Homeland Security is satisfied that the purpose of the adoption is to form a bona fide parent-child relationship, and the parent-child relationship of the child and the natural parents has been terminated (and in carrying out both obligations under this subclause the Secretary of Homeland Security may consider whether there is a petition pending to confer immigrant status on one or both of such natural parents); and

**(V)** in the case of a child who has not been adopted--

**(aa)** the competent authority of the foreign state has approved the child's emigration to the United States for the purpose of adoption by the prospective adoptive parent or parents; and

**(bb)** the prospective adoptive parent or parents has or have complied with any pre-adoption requirements of the child's proposed residence; and

**(ii)** except that no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

**(iii)** subject to the same provisos as in clauses (i) and (ii), a child who--

**(I)** is a natural sibling of a child described in clause (i), subparagraph (E)(i), or subparagraph (F)(i);

**(II)** was adopted abroad, or is coming to the United States for adoption, by the adoptive parent (or prospective adoptive parent) or parents of the sibling described in clause (i), subparagraph (E)(i), or subparagraph (F)(i); and

**(III)** is otherwise described in clause (i), except that the child is younger than 18 years of age at the time a petition is filed on his or her behalf for classification as an immediate relative under section 1151(b) of this title.

**(2)** The terms "parent", "father", or "mother" mean a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection, except that, for purposes of paragraph (1)(F) (other than the second proviso therein) and paragraph (1)(G)(i) in the case of a child born out of wedlock described in paragraph (1)(D) (and not described in paragraph (1)(C)), the term "parent" does not include the natural father of the child if the father has disappeared or abandoned or deserted the child or if the father has in writing irrevocably released the child for emigration and adoption.

**(3)** The term "person" means an individual or an organization.

**(4)** The term "immigration judge" means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 1229a of this title. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

**(5)** The term "adjacent islands" includes Saint Pierre, Miquelon, Cuba, the Dominican Republic, Haiti, Bermuda, the Bahamas, Barbados, Jamaica, the Windward and Leeward Islands, Trinidad, Martinique, and other British, French, and Netherlands territory or possessions in or bordering on the Caribbean Sea.

**(c)** As used in subchapter III--

**(1)** The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, and, except as otherwise provided in sections 1431 and 1432 of this title, a child adopted in the United States, if such legitimation or adoption takes place before the child reaches the age of 16 years (except to the extent that the child is described in subparagraph (E)(ii) or (F)(ii) of subsection (b)(1)), and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

**(2)** The terms "parent", "father", and "mother" include in the case of a posthumous child a deceased parent, father, and mother.

**(d)** Repealed. Pub.L. 100-525, § 9(a)(3), Oct. 24, 1988, 102 Stat. 2619.

**(e)** For the purposes of this chapter--

**(1)** The giving, loaning, or promising of support or of money or any other thing of value to be used for advocating any doctrine shall constitute the advocating of such doctrine; but nothing in this paragraph shall be construed as an exclusive definition of advocating.

**(2)** The giving, loaning, or promising of support or of money or any other thing of value for any purpose to any organization shall be presumed to constitute affiliation therewith; but nothing in this paragraph shall be construed as an exclusive definition of affiliation.

**(3)** Advocating the economic, international, and governmental doctrines of world communism means advocating the establishment of a totalitarian Communist dictatorship in any or all of the countries of the world through the medium of an internationally coordinated Communist movement.

**(f)** For the purposes of this chapter--

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was--

**(1)** a habitual drunkard;

**(2)** Repealed. Pub.L. 97-116, § 2(c)(1), Dec. 29, 1981, 95 Stat. 1611.

**(3)** a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D), (6)(E), and (10)(A) of section 1182(a) of this title; or subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section [5] (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana), if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

**(4)** one whose income is derived principally from illegal gambling activities;

**(5)** one who has been convicted of two or more gambling offenses committed during such period;

**(6)** one who has given false testimony for the purpose of obtaining any benefits under this chapter;

**(7)** one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;

**(8)** one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43)); or

**(9)** one who at any time has engaged in conduct described in section 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 1182(a)(2)(G) of this title (relating to severe violations of religious freedom).

The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character. In the case of an alien who makes a false statement or claim of citizenship, or who registers to vote or votes in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of such registration or voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such statement, claim, or violation that he or she was a citizen, no finding that the alien is, or was, not of good moral character may be made based on it.

**(g)** For the purposes of this chapter any alien ordered deported or removed (whether before or after the enactment of this chapter) who has left the United States, shall be considered to have been deported or removed in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

**(h)** For purposes of section 1182(a)(2)(E) of this title, the term "serious criminal offense" means--

**(1)** any felony;

**(2)** any crime of violence, as defined in section 16 of Title 18; or

**(3)** any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances if such crime involves personal injury to another.

**(i)** With respect to each nonimmigrant alien described in subsection (a)(15)(T)(i)--

**(1)** the Secretary of Homeland Security, the Attorney General, and other Government officials, where appropriate, shall provide the alien with a referral to a nongovernmental organization that would advise the alien regarding the alien's options while in the United States and the resources available to the alien; and

**(2)** the Secretary of Homeland Security shall, during the period the alien is in lawful temporary resident status under that subsection, grant the alien authorization to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

## CREDIT(S)

(June 27, 1952, c. 477, Title I, § 101, 66 Stat. 166; Pub.L. 85-316, §§ 1, 2, Sept. 11, 1957, 71 Stat. 639; Pub.L. 85-508, § 22, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(a), Mar. 18, 1959, 73 Stat. 13; Pub.L. 87-256, § 109(a), (b), Sept. 21, 1961, 75 Stat. 534; Pub.L. 87-301, §§ 1, 2, 7, Sept. 26, 1961, 75 Stat. 650, 653; Pub.L. 89-236, §§ 8, 24, Oct. 3, 1965, 79 Stat. 916, 922; Pub.L. 89-710, Nov. 2, 1966, 80 Stat. 1104; Pub.L. 91-225, § 1, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-155, Dec. 16, 1975, 89 Stat. 824; Pub.L. 94-484, Title VI, § 601(b), (e), Oct. 12, 1976, 90 Stat. 2301, 2302; Pub.L. 94-571, § 7(a), Oct. 20, 1976, 90 Stat. 2706; Pub.L. 94-484, Title VI, § 602(c), Oct. 12, 1976, as added Pub.L. 95-83, Title III, § 307(q)(3), Aug. 1, 1977, 91 Stat. 395; Pub.L. 95-105, Title I, § 109(b)(3), Aug. 17, 1977, 91 Stat. 847; Pub.L. 96-70, Title III, § 3201(a), Sept. 27, 1979, 93 Stat. 496; Pub.L. 96-212, Title II, § 201(a), Mar. 17, 1980, 94 Stat. 102; Pub.L. 97-116, §§ 2, 5(d)(1), 18(a), Dec. 29, 1981, 95 Stat. 1611, 1614, 1619; Priv.L. 98-47, § 3, Oct. 30, 1984, 98 Stat. 3435; Pub.L. 99-505, § 1, Oct. 21, 1986, 100 Stat. 1806; Pub.L. 99-603, Title III, §§ 301(a), 312, 315(a), Nov. 6, 1986, 100 Stat. 3411, 3434, 3439; Pub.L. 99-653, §§ 2, 3, Nov. 14, 1986, 100 Stat. 3655; Pub.L. 100-459, Title II, § 210(a), Oct. 1, 1988, 102 Stat. 2203; Pub.L. 100-525, §§ 2(o)(1), 8(b), 9(a), Oct. 24, 1988, 102 Stat. 2613, 2617, 2619; Pub.L. 100-690, Title VII, § 7342, Nov. 18, 1988, 102 Stat. 4469; Pub.L. 101-162, Title VI, § 611(a), Nov. 21, 1989, 103 Stat. 1038; Pub.L. 101-238, § 3(a), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(b), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, §§ 123, 151(a), 153(a), 162(f)(2)(A), Title II, §§ 203(c), 204(a), (c), 205(c) (1), (d), (e), 206(c), 207(a), 208, 209(a), Title IV, § 407(a)(2), Title V, §§ 501(a), 509(a), Title VI, § 603(a)(1), Nov. 29, 1990, 104 Stat. 4995, 5004, 5005, 5012, 5018 to 5020, 5022, 5023, 5026, 5027, 5040, 5048, 5051, 5082; Pub.L. 102-110, § 2(a), Oct. 1, 1991, 105 Stat. 555; Pub.L. 102-232, Title II, §§ 203(a), 205(a) to (c), 206(b), (c)(1), (d), 207(b), Title III, §§ 302(e)(8)(A), 303(a)(5)(A), (7)(A), (14), 305(m)(1), 306(a)(1), 309(b)(1), (4), Dec. 12, 1991, 105 Stat. 1737, 1740, 1741, 1746 to 1748, 1750, 1751, 1758; Pub.L. 103-236, Title I, § 162(h)(1), Apr. 30, 1994, 108 Stat. 407; Pub.L. 103-322, Title XIII, § 130003(a), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-337, Div. C, Title XXXVI, § 3605, Oct. 5, 1994, 108 Stat. 3113; Pub.L. 103-416, Title II, §§ 201, 202, 214, 219(a), 222(a), Oct. 25, 1994, 108 Stat. 4310, 4311, 4314, 4316, 4320; Pub.L. 104-51, § 1, Nov. 15, 1995, 109 Stat. 467; Pub.L. 104-132, Title IV, § 440(b), (e), Apr. 24, 1996, 110 Stat. 1277; Pub.L. 104-208, Div. C, Title I, § 104(a), Title III, §§ 301(a), 308(d)(3)(A), (4)(A), (e)(3), (f)(1)(A), (B), 321(a), (b), 322(a)(1), (2)(A), 361(a), 371(a), Title VI, §§ 601(a)(1), 625(a)(2), 671(a)(3)(B), (b)(5), (e)(2), Sept. 30, 1996, 110 Stat. 3009-555, 3009-575, 3009-617, 3009-620, 3009-621, 3009-627 to 3009-629, 3009-644, 3009-645, 3009-689, 3009-700, 3009-721 to 3009-723; Pub.L. 105-54, § 1(a), Oct. 6, 1997, 111 Stat. 1175; Pub.L. 105-119, Title I, § 113, Nov. 26, 1997, 111 Stat. 2460; Pub.L. 105-277, Div. C, Title IV, § 421, Div. G, Title XXII, § 2222(e), Oct. 21, 1998, 112 Stat. 2681-657, 2681-819; Pub.L. 105-319, § 2(b)(1), (e)(2), formerly (d)(2), Oct. 30, 1998, 112 Stat. 3014, 3015; renumbered § 2(e)(2), Pub.L. 108-449, § 1(a)(3)(A), Dec. 10, 2004, 118 Stat. 3470; amended Pub.L. 106-95, § 2(a), (c), Nov. 12, 1999, 113 Stat. 1312; Pub.L. 106-139, § (1)(a), (b)(1), Dec. 7, 1999, 113 Stat. 1696; Pub.L. 106-279, Title III, § 302(a), (c), Oct. 6, 2000, 114 Stat. 838, 839; Pub.L. 106-386, Div. A, § 107(e)(1), (4), Div. B, Title V, §§ 1503(a), 1513(b), Oct. 28, 2000, 114 Stat. 1477, 1479, 1518, 1534; Pub.L. 106-395, Title II, § 201(a)(1), Oct. 30, 2000, 114 Stat. 1633; Pub.L. 106-409, § 2(a), Nov. 1, 2000, 114 Stat. 1787; Pub.L. 106-536, § 1(a), Nov. 22, 2000, 114 Stat. 2560; Pub.L. 106-553, § 1(a)(2) [Title XI, § 1102(a), 1103(a)], Dec. 21, 2000, 114 Stat. 2762, 2762A-142, 2762A-143; Pub.L. 107-125, § 2(b), Jan. 16, 2002, 115 Stat. 2403; Pub.L. 107-274, § 2(a), (b), Nov. 2, 2002, 116 Stat. 1923; Pub.L. 108-77, Title IV, § 402(a)(1), Sept. 3, 2003, 117 Stat. 939; Pub.L. 108-99, § 1, Oct. 15, 2003, 117 Stat. 1176; Pub.L. 108-193, §§ 4(b)(1), (5), 8(a)(1), Dec. 19, 2003, 117 Stat. 2878, 2879, 2886; Pub.L. 108-449, § 1(a)(2)(B), (b)(1), Dec. 10, 2004, 118 Stat. 3469, 3470; Pub.L. 108-458, Title V, § 5504, Dec. 17, 2004, 118 Stat. 3741; Pub.L. 109-13, Div. B, Title V, § 501(a), May 11, 2005, 119 Stat. 321; Pub.L. 109-90, Title

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

V, § 536, Oct. 18, 2005, 119 Stat. 2087; Pub.L. 109-162, Title VIII, §§ 801, 805(d), 811, 822(c)(1), Jan. 5, 2006, 119 Stat. 3053, 3056, 3057, 3063; Pub.L. 109-248, Title IV, § 402(b), July 27, 2006, 120 Stat. 623; Pub.L. 110-229, Title VII, § 702(j)(1) to (3), May 8, 2008, 122 Stat. 866; Pub.L. 110-391, § 2(a), Oct. 10, 2008, 122 Stat. 4193; Pub.L. 110-457, Title II, §§ 201(a), 235(d) (1), Dec. 23, 2008, 122 Stat. 5052, 5079; Pub.L. 111-9, § 1, Mar. 20, 2009, 123 Stat. 989; Pub.L. 111-83, Title V, § 568(a)(1), Oct. 28, 2009, 123 Stat. 2186; Pub.L. 111-287, § 3, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 111-306, § 1(a), Dec. 14, 2010, 124 Stat. 3280; Pub.L. 112-176, § 3, Sept. 28, 2012, 126 Stat. 1325; Pub.L. 113-4, Title VIII, § 801, Title XII, §§ 1221, 1222, Mar. 7, 2013, 127 Stat. 110, 144; Pub.L. 113-76, Div. K, Title VII, § 7083, Jan. 17, 2014, 128 Stat. 567.)

## TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12711

<Apr. 11, 1990, 55 F.R. 13897>

### Policy Implementation with Respect to Nationals of People's Republic of China

By the authority vested in me as President by the Constitution and laws of the United States of America, the Attorney General and the Secretary of State are hereby ordered to exercise their authority, including that under the Immigration and Nationality Act (8 U.S.C. 1101-1557) [this chapter], as follows:

**Section 1.** The Attorney General is directed to take any steps necessary to defer until January 1, 1994, the enforced departure of all nationals of the People's Republic of China (PRC) and their dependents who were in the United States on or after June 5, 1989, up to and including the date of this order (hereinafter "such PRC nationals").

**Sec. 2.** The Secretary of State and the Attorney General are directed to take all steps necessary with respect to such PRC nationals (a) to waive through January 1, 1994, the requirement of a valid passport and (b) to process and provide necessary documents, both within the United States and at U.S. consulates overseas, to facilitate travel across the borders of other nations and reentry into the United States in the same status such PRC nationals had upon departure.

**Sec. 3.** The Secretary of State and the Attorney General are directed to provide the following protections:

**(a)** irrevocable waiver of the 2-year home country residence requirement that may be exercised until January 1, 1994, for such PRC nationals;

**(b)** maintenance of lawful status for purposes of adjustment of status or change of nonimmigrant status for such PRC nationals who were in lawful status at any time on or after June 5, 1989, up to and including the date of this order;

**(c)** authorization for employment of such PRC nationals through January 1, 1994; and

**(d)** notice of expiration of nonimmigrant status (if applicable) rather than the institution of deportation proceedings, and explanation of options available for such PRC nationals eligible for deferral of enforced departure whose nonimmigrant status has expired.

**Sec. 4.** The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990.

**Sec. 5.** The Attorney General is directed to ensure that the Immigration and Naturalization Service finalizes and makes public its position on the issue of training for individuals in F-1 visa status and on the issue of reinstatement into lawful nonimmigrant status of such PRC nationals who have withdrawn their applications for asylum.

**Sec. 6.** The Departments of Justice and State are directed to consider other steps to assist such PRC nationals in their efforts to utilize the protections that I have extended pursuant to this order.

**Sec. 7.** This order shall be effective immediately.

<div align="right">GEORGE BUSH</div>

<div align="center">

**PROCLAMATIONS**

**PROCLAMATION NO. 8697**

</div>

For Proclamation No. 8697, relating to suspension of entry as immigrants and nonimmigrants of persons who participate in serious human rights and humanitarian law violations and other abuses, see Proc. No. 8697, Aug. 4, 2011, 76 F.R. 49277, set out as a note under 8 U.S.C.A. § 1182.

<div align="center">

**MEMORANDA OF PRESIDENT**

**PRESIDENTIAL MEMORANDUM**

<Feb. 7, 1995, 60 F.R. 7885>

**Deterring Illegal Immigration**

</div>

**Memorandum for the Heads of Executive Departments and Agencies**

It is a fundamental right and duty for a nation to protect the integrity of its borders and its laws. This Administration shall stand firm against illegal immigration and the continued abuse of our immigration laws. By closing the back door to illegal immigration, we will continue to open the front door to legal immigrants.

My Administration has moved swiftly to reverse the course of a decade of failed immigration policies. Our initiatives have included increasing overall Border personnel by over 50 percent since 1993. We also are strengthening worksite enforcement and work authorization verification to deter employment of illegal aliens. Asylum rules have been reformed to end abuse by those falsely claiming asylum, while offering protection to those in genuine fear of persecution. We are cracking down on smugglers of illegal aliens and reforming criminal alien deportation for quicker removal. And we are the first Administration to obtain funding to reimburse States for a share of the costs of incarcerating criminal illegal aliens.

While we already are doing more to stem the flow of illegal immigration than has any previous Administration, more remains to be done. In conjunction with the Administration's unprecedented budget proposal to support immigration initiatives, this directive provides a blueprint of policies and priorities for this Administration's continuing work to curtail illegal immigration.

With its focus on strong border deterrence backed up by effective worksite enforcement, removal of criminal and other deportable aliens and assistance to states, this program protects the security of our borders, our jobs and our communities for all Americans--citizens and legal immigrants alike.

**COMPREHENSIVE BORDER CONTROL STRATEGY**

**A. Deterring Illegal Immigration At Our Borders**

I have directed the Attorney General to move expeditiously toward full implementation of our comprehensive border control strategy, including efforts at the southwest border. To support sustained long-term strengthening of our deterrence capacity, the Administration shall seek funding to add new Border Patrol agents to reach the goal of at least 7,000 agents protecting our borders by the year 2000.

**Flexible Border Response Capacity**

To further this strategy, the Department of Justice shall implement the capacity to respond to emerging situations anywhere along our national borders to deter buildups of illegal border crossers, smuggling operations, or other developing problems.

**Strategic Use of High Technology**

Through the strategic use of sensors, night scopes, helicopters, light planes, all-terrain vehicles, fingerprinting and automated recordkeeping, we have freed many Border Patrol agents from long hours of bureaucratic tasks and increased the effectiveness of these highly-trained personnel. Because these tools are essential for the Immigration and Naturalization Service (INS) to do its job, I direct the Attorney General to accelerate to the greatest extent possible their utilization and enhancement to support implementation of our deterrence strategy.

**Strong Enforcement Against Repeat Illegal Crossers**

The Department of Justice shall assess the effectiveness of efforts underway to deter repeat illegal crossers, such as fingerprinting and dedicating prosecution resources to enforce the new prosecution authority provided by the Violent Crime Control and Law Enforcement Act of 1994 [Pub.L. 103-322, Sept. 13, 1994, 108 Stat. 1796; for complete classification of this Act to the Code, see Tables].

The Department of Justice shall determine whether accelerated expansion of these techniques to additional border sectors is warranted.

**B. Deterring Alien Smuggling**

This Administration has had success deterring large ship-based smuggling directly to United States shores. In response, smugglers are testing new routes and tactics. Our goal: similar success in choking off these attempts by adjusting our anti-smuggling initiatives to anticipate shifting smuggling patterns.

To meet new and continuing challenges posed along transport routes and in foreign locations by smuggling organizations, we will augment diplomatic and enforcement resources at overseas locations to work with host governments, and increase related intelligence gathering efforts.

The Departments of State and Justice, in cooperation with other relevant agencies, will report to the National Security Council within 30 days on the structure of interagency coordination to achieve these objectives.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Congressional action will be important to provide U.S. law enforcement agencies with needed authority to deal with international smuggling operations. I will propose that the Congress pass legislation providing wiretap authority for investigation of alien smuggling cases and providing authorization to seize the assets of groups engaged in trafficking in human cargo.

In addition, I will propose legislation to give the Attorney General authority to implement procedures for expedited exclusion to deal with large flows of undocumented migrants, smuggling operations, and other extraordinary migration situations.

### C. Visa Overstay Deterrence

Nearly half of this country's illegal immigrants come into the country legally and then stay after they are required by law to depart, often using fraudulent documentation. No Administration has ever made a serious effort to identify and deport these individuals. This Administration is committed to curtailing this form of illegal immigration.

Therefore, relevant departments and agencies are directed to review their policies and practices to identify necessary reforms to curtail visa overstayers and to enhance investigations and prosecution of those who fraudulently produce or misuse passports, visas, and other travel related documents. Recommendations for administrative initiatives and legislative reform shall be presented to the White House Interagency Working Group on Immigration by June 30, 1995.

### REDUCING THE MAGNET OF WORK OPPORTUNITIES, WORKSITE ENFORCEMENT, AND DETERRENCE

Border deterrence cannot succeed if the lure of jobs in the United States remains. Therefore, a second major component of the Administration's deterrence strategy is to toughen worksite enforcement and employer sanctions. Employers who hire illegal immigrants not only obtain unfair competitive advantage over law-abiding employers, their unlawful use of illegal immigrants suppresses wages and working conditions for our country's legal workers. Our strategy, which targets enforcement efforts at employers and industries that historically have relied upon employment of illegal immigrants, will not only strengthen deterrence of illegal immigration, but better protect American workers and businesses that do not hire illegal immigrants.

Central to this effort is an effective, nondiscriminatory means of verifying the employment authorization of all new employees. The Administration fully supports the recommendation of the Commission on Legal Immigration Reform to create pilot projects to test various techniques for improving workplace verification, including a computer database test to validate a new worker's social security number for work authorization purposes. The Immigration and Naturalization Service (INS) and Social Security Administration are directed to establish, implement, monitor, and review the pilots and provide me with an interim report on the progress of this program by March 1, 1996.

In addition, the INS is directed to finalize the Administration's reduction of the number of authorized documents to support work verification for noncitizens. Concurrently, the Administration will seek further reduction legislatively in the number of documents that are acceptable for proving identity and work authorization. The Administration will improve the security of existing documents to be used for work authorization and seek increased penalties for immigration fraud, including fraudulent production and use of documents.

The Department of Labor shall intensify its investigations in industries with patterns of labor law violations that promote illegal immigration.

I also direct the Department of Labor, INS, and other relevant Federal agencies to expand their collaboration in cracking down on those who subvert fair competition by hiring illegal aliens. This may include increased Federal authority to confiscate assets that are the fruits of that unfair competition.

The White House Interagency Working Group on Immigration shall further examine the link between immigration and employment, including illegal immigration, and recommend to me other appropriate measures.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**DETENTION AND REMOVAL OF DEPORTABLE ILLEGAL ALIENS**

The Administration's deterrence strategy includes strengthening the country's detention and deportation capability. No longer will criminals and other high risk deportable aliens be released back into communities because of a shortage of detention space and ineffective deportation procedures.

**A. Comprehensive Deportation Process Reform**

The Department of Justice, in consultation with other relevant agencies, shall develop a streamlined, fair, and effective procedure to expedite removal of deportable aliens. As necessary, additional legislative authority will be sought in this area. In addition, the Department of Justice shall increase its capacity to staff deportation and exclusion hearings to support these objectives.

**B. National Detention and Removal Plan**

To address the shortage of local detention space for illegal aliens, the Administration shall devise a National Detention, Transportation, and Removal Policy that will permit use of detention space across the United States and improve the ability to remove individuals with orders of deportation. The Department of Justice, in consultation with other agencies as appropriate and working under the auspices of the White House Interagency Working Group on Immigration, shall finalize this plan by April 30, 1995.

The Administration will seek support and funding from the Congress for this plan and for our efforts to double the removal of illegal aliens with final orders of deportation.

**C. Identification and Removal of Criminal Aliens**

The Institutional Hearing Program is successfully expediting deportation of incarcerated criminal aliens after they serve their sentences.

To further expedite removal of criminal aliens from this country and reduce costs to Federal and State governments, the Department of Justice is directed to develop an expanded program of verification of the immigration status of criminal aliens within our country's prisons. In developing this program, the viability of expanding the work of the Law Enforcement Support Center should be assessed and all necessary steps taken to increase coordination and cooperative efforts with State, and local law enforcement officers in identification of criminal aliens.

**TARGETED DETERRENCE AREAS**

Many of the Administration's illegal immigration enforcement initiatives are mutually reinforcing. For example, strong interior enforcement supports border control. While there have been efforts over the years at piecemeal cooperation, this Administration will examine, develop, and test a more comprehensive coordinated package of deterrence strategies in selected metropolitan areas by multiple Federal, State, and local agencies.

The White House Interagency Working Group on Immigration shall coordinate the development of this interagency and intergovernmental operation.

**VERIFICATION OF ELIGIBILITY FOR BENEFITS**

The law denies most government benefits to illegal aliens. The government has a duty to assure that taxpayer-supported public assistance programs are not abused. As with work authorization, enforcement of eligibility requirements relies upon a credible

system of verification. The INS, working with the White House Interagency Working Group on Immigration as appropriate, shall review means of improving the existing benefits verification program. In addition, we will seek new mechanisms--including increased penalties for false information used to qualify for benefits--to protect the integrity of public programs.

**ANTI-DISCRIMINATION**

Our efforts to combat illegal immigration must not violate the privacy and civil rights of legal immigrants and U.S. citizens. Therefore, I direct the Attorney General, the Secretary of Health and Human Services, the Chair of the Equal Employment Opportunity Commission, and other relevant Administration officials to vigorously protect our citizens and legal immigrants from immigration-related instances of discrimination and harassment. All illegal immigration enforcement measures shall be taken with due regard for the basic human rights of individuals and in accordance with our obligations under applicable international agreements.

**ASSISTANCE TO STATES**

States today face significant costs for services provided to illegal immigrants as a result of failed policies of the past. Deterring illegal immigration is the best long-term solution to protect States from growing costs for illegal immigration. This is the first Administration to address this primary responsibility squarely. We are targeting most of our Federal dollars to those initiatives that address the root causes that lead to increased burdens on States.

The Federal Government provides States with billions of dollars to provide for health care, education, and other services and benefits for immigrants. This Administration is proposing increases for immigration and immigration-related spending of 25 percent in 1996 compared to 1993 levels. In addition, this Administration is the first to obtain funding from the Congress to reimburse States for a share of the costs of incarcerated illegal aliens.

This Administration will continue to work with States to obtain more Federal help for certain State costs and will oppose inappropriate cost-shifting to the States.

**INTERNATIONAL COOPERATION**

This Administration will continue to emphasize international cooperative efforts to address illegal immigration.

Pursuant to a Presidential Review Directive (PRD), the Department of State is now coordinating a study on United States policy toward international refugee and migration affairs. I hereby direct that, as part of that PRD process, this report to the National Security Council include the relationship of economic development and migration in the Western Hemisphere and, in particular, provide recommendations for further foreign economic policy measures to address causes of illegal immigration.

The Department of State shall coordinate an interagency effort to consider expanded arrangements with foreign governments for return of criminal and deportable aliens.

The Department of State also shall seek to negotiate readmission agreements for persons who could have sought asylum in the last country from which they arrived. Such agreements will take due regard of U.S. obligations under the Protocol Relating to the Status of Refugees.

The Department of State further shall implement cooperative efforts with other nations receiving smuggled aliens or those used as transshipment points by smugglers. In particular, we will look to countries in our hemisphere to join us by denying their territory as bases for smuggling operations.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The Department of State shall initiate negotiations with foreign countries to secure authority for the United States Coast Guard to board source country vessels suspected of transporting smuggled aliens.

This directive shall be published in the **Federal Register.**

WILLIAM J. CLINTON

### DETERMINATION OF PRESIDENT

**Immigration Emergency Resulting From Alien Smuggling**

Presidential Determinations regarding the immigration emergency resulting from alien smuggling were contained in the following:

Presidential Determination No. 97-16, Feb. 12, 1997, 62 F.R. 13981.

Presidential Determination No. 95-49, Sept. 28, 1995, 60 F.R. 53677.

Notes of Decisions (3511)

### Footnotes

| | |
|---|---|
| 1 | So in original. The words "the alien" probably should not appear. |
| 2 | So in original. Probably should be followed by "; or". |
| 3 | So in original. Probably should be preceded by "is". |
| 4 | So in original. Probably should be followed by a semicolon. |
| 5 | So in original. The phrase "of such section" probably should not appear. |

8 U.S.C.A. § 1101, 8 USCA § 1101

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.00754    33

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter I. General Provisions (Refs & Annos)

8 U.S.C.A. § 1103

§ 1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General

Effective: December 22, 2009

Currentness

**(a) Secretary of Homeland Security**

**(1)** The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

**(2)** He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

**(3)** He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

**(4)** He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

**(5)** He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

**(6)** He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

**(7)** He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

**(8)** After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

**(9)** Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

**(10)** In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

**(11)** The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized--

**(A)** to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

**(B)** to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

**(1)** The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

**(2)** The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

**(3)** When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of Title 40.

**(4)** The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

**(1)** The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

**(2)** Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

**(3)** Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

**(1)** The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) and an analysis of trends in immigration and naturalization.

**(2)** Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

   **(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

<div align="center">

**CREDIT(S)**

</div>

(June 27, 1952, c. 477, Title I, § 103, 66 Stat. 173; Pub.L. 100-525, § 9(c), Oct. 24, 1988, 102 Stat. 2619; Pub.L. 101-649, Title I, § 142, Nov. 29, 1990, 104 Stat. 5004; Pub.L 104-208, Div. C, Title I, §§ 102(d), 125, 134(a), Title III, §§ 308(d)(4)(C), (e)(4), 372, 373, Sept. 30, 1996, 110 Stat. 3009-555, 3009-562, 3009-564, 3009-618, 3009-620, 3009-646, 3009-647; Pub.L. 107-296, Title XI, § 1102, Nov. 25, 2002, 116 Stat. 2273; Pub.L. 108-7, Div. L, § 105(a)(1), (2), Feb. 20, 2003, 117 Stat. 531; Pub.L. 108-458, Title V, § 5505(a), Dec. 17, 2004, 118 Stat. 3741; Pub.L. 111-122, § 2(a), Dec. 22, 2009, 123 Stat. 3480.)

<div align="center">

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12656**

</div>

Attorney General to develop national security emergency plans for regulation of immigration, regulation of nationals of enemy countries,and plans to implement laws for control of persons entering or leaving the United States, see section 1101(4) of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under 42 U.S.C.A. § 5195.

<div align="center">

**EXECUTIVE ORDER NO. 13404**

<June 7, 2006, 71 F.R. 33593>

**Task Force on New Americans**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to strengthen the efforts of the Department of Homeland Security and Federal, State, and local agencies to help legal immigrants embrace the common core of American civic culture, learn our common language, and fully become Americans, it is hereby ordered as follows:

**Section 1. Establishment.** The Secretary of Homeland Security (Secretary) shall immediately establish within the Department of Homeland Security (Department) a Task Force on New Americans (Task Force).

**Sec. 2. Membership and Operation. (a)** The Task Force shall be limited to the following members or employees designated by them at no lower than the Assistant Secretary level or its equivalent:

    **(i)** the Secretary of Homeland Security, who shall serve as Chair;

    **(ii)** the Secretary of State;

**(iii)** the Secretary of the Treasury;

**(iv)** the Secretary of Defense;

**(v)** the Attorney General;

**(vi)** the Secretary of Agriculture;

**(vii)** the Secretary of Commerce;

**(viii)** the Secretary of Labor;

**(ix)** the Secretary of Health and Human Services;

**(x)** the Secretary of Housing and Urban Development;

**(xi)** the Secretary of Education;

**(xii)** such other officers or employees of the Department of Homeland Security as the Secretary may from time to time designate; and

**(xiii)** such other officers of the United States as the Secretary may designate from time to time, with the concurrence of the respective heads of departments and agencies concerned.

**(b)** The Secretary shall convene and preside at meetings of the Task Force, direct its work, and as appropriate, establish and direct subgroups of the Task Force that shall consist exclusively of Task Force members. The Secretary shall designate an official of the Department to serve as the Executive Secretary of the Task Force, and the Executive Secretary shall head the staff assigned to the Task Force.

**Sec. 3. Functions.** Consistent with applicable law, the Task Force shall:

**(a)** provide direction to executive departments and agencies (agencies) concerning the integration into American society of America's legal immigrants, particularly through instruction in English, civics, and history;

**(b)** promote public-private partnerships that will encourage businesses to offer English and civics education to workers;

**(c)** identify ways to expand English and civics instruction for legal immigrants, including through faith-based, community, and other groups, and ways to promote volunteer community service; and

**(d)** make recommendations to the President, through the Secretary, from time to time regarding:

**(i)** actions to enhance cooperation among agencies on the integration of legal immigrants into American society;

**(ii)** actions to enhance cooperation among Federal, State, and local authorities responsible for the integration of legal immigrants;

**(iii)** changes in rules, regulations, or policy to improve the effective integration of legal immigrants into American society; and

**(iv)** proposed legislation relating to the integration of legal immigrants into American society.

**Sec. 4. Administration. (a)** To the extent permitted by law, the Department shall provide the funding and administrative support the Task Force needs to implement this order, as determined by the Secretary.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** authority granted by law to an agency or the head thereof; or

**(ii)** functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** This order is intended to improve the internal management of the Federal Government. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity against the United States, its departments, agencies, entities, instrumentalities, officers, employees, agents, or any other person.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13767

<January 25, 2017, 82 F.R. 8793>

**Border Security and Immigration Enforcement Improvements**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) (INA), the Secure Fence Act of 2006 (Public Law 109-367) (Secure Fence Act), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104-208 Div. C) (IIRIRA), and in order to ensure the safety and territorial integrity of the United States as well as to ensure that the Nation's immigration laws are faithfully executed, I hereby order as follows:

**Section 1. Purpose.** Border security is critically important to the national security of the United States. Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety. Such aliens have not been identified or inspected by Federal immigration officers to determine their admissibility to the United States. The recent surge of illegal immigration at the southern border with Mexico has placed a significant strain on Federal resources and overwhelmed agencies charged with border security and immigration enforcement, as well as the local communities into which many of the aliens are placed.

Transnational criminal organizations operate sophisticated drug-and human-trafficking networks and smuggling operations on both sides of the southern border, contributing to a significant increase in violent crime and United States deaths from dangerous drugs. Among those who illegally enter are those who seek to harm Americans through acts of terror or criminal conduct. Continued illegal immigration presents a clear and present danger to the interests of the United States.

Federal immigration law both imposes the responsibility and provides the means for the Federal Government, in cooperation with border States, to secure the Nation's southern border. Although Federal immigration law provides a robust framework for Federal-State partnership in enforcing our immigration laws_and the Congress has authorized and provided appropriations to secure our borders_the Federal Government has failed to discharge this basic sovereign responsibility. The purpose of this order

is to direct executive departments and agencies (agencies) to deploy all lawful means to secure the Nation's southern border, to prevent further illegal immigration into the United States, and to repatriate illegal aliens swiftly, consistently, and humanely.

**Sec. 2. Policy.** It is the policy of the executive branch to:

**(a)** secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism;

**(b)** detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations;

**(c)** expedite determinations of apprehended individuals' claims of eligibility to remain in the United States;

**(d)** remove promptly those individuals whose legal claims to remain in the United States have been lawfully rejected, after any appropriate civil or criminal sanctions have been imposed; and

**(e)** cooperate fully with States and local law enforcement in enacting Federal-State partnerships to enforce Federal immigration priorities, as well as State monitoring and detention programs that are consistent with Federal law and do not undermine Federal immigration priorities.

**Sec. 3. Definitions. (a)** "Asylum officer" has the meaning given the term in section 235(b)(1)(E) of the INA (8 U.S.C. 1225(b)(1)).

**(b)** "Southern border" shall mean the contiguous land border between the United States and Mexico, including all points of entry.

**(c)** "Border States" shall mean the States of the United States immediately adjacent to the contiguous land border between the United States and Mexico.

**(d)** Except as otherwise noted, "the Secretary" shall refer to the Secretary of Homeland Security.

**(e)** "Wall" shall mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier.

**(f)** "Executive department" shall have the meaning given in section 101 of title 5, United States Code.

**(g)** "Regulations" shall mean any and all Federal rules, regulations, and directives lawfully promulgated by agencies.

**(h)** "Operational control" shall mean the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.

**Sec. 4. Physical Security of the Southern Border of the United States.** The Secretary shall immediately take the following steps to obtain complete operational control, as determined by the Secretary, of the southern border:

**(a)** In accordance with existing law, including the Secure Fence Act and IIRIRA, take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border;

**(b)** Identify and, to the extent permitted by law, allocate all sources of Federal funds for the planning, designing, and constructing of a physical wall along the southern border;

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(c)** Project and develop long-term funding requirements for the wall, including preparing Congressional budget requests for the current and upcoming fiscal years; and

**(d)** Produce a comprehensive study of the security of the southern border, to be completed within 180 days of this order, that shall include the current state of southern border security, all geophysical and topographical aspects of the southern border, the availability of Federal and State resources necessary to achieve complete operational control of the southern border, and a strategy to obtain and maintain complete operational control of the southern border.

**Sec. 5. Detention Facilities. (a)** The Secretary shall take all appropriate action and allocate all legally available resources to immediately construct, operate, control, or establish contracts to construct, operate, or control facilities to detain aliens at or near the land border with Mexico.

**(b)** The Secretary shall take all appropriate action and allocate all legally available resources to immediately assign asylum officers to immigration detention facilities for the purpose of accepting asylum referrals and conducting credible fear determinations pursuant to section 235(b)(1) of the INA (8 U.S.C. 1225(b)(1)) and applicable regulations and reasonable fear determinations pursuant to applicable regulations.

**(c)** The Attorney General shall take all appropriate action and allocate all legally available resources to immediately assign immigration judges to immigration detention facilities operated or controlled by the Secretary, or operated or controlled pursuant to contract by the Secretary, for the y8795purpose of conducting proceedings authorized under title 8, chapter 12, subchapter II, United States Code.

**Sec. 6. Detention for Illegal Entry.** The Secretary shall immediately take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law. The Secretary shall issue new policy guidance to all Department of Homeland Security personnel regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch and release," whereby aliens are routinely released in the United States shortly after their apprehension for violations of immigration law.

**Sec. 7. Return to Territory.** The Secretary shall take appropriate action, consistent with the requirements of section 1232 of title 8, United States Code, to ensure that aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came pending a formal removal proceeding.

**Sec. 8. Additional Border Patrol Agents.** Subject to available appropriations, the Secretary, through the Commissioner of U.S. Customs and Border Protection, shall take all appropriate action to hire 5,000 additional Border Patrol agents, and all appropriate action to ensure that such agents enter on duty and are assigned to duty stations as soon as is practicable.

**Sec. 9. Foreign Aid Reporting Requirements.** The head of each executive department and agency shall identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico on an annual basis over the past five years, including all bilateral and multilateral development aid, economic assistance, humanitarian aid, and military aid. Within 30 days of the date of this order, the head of each executive department and agency shall submit this information to the Secretary of State. Within 60 days of the date of this order, the Secretary shall submit to the President a consolidated report reflecting the levels of such aid and assistance that has been provided annually, over each of the past five years.

**Sec. 10. Federal-State Agreements.** It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

**(a)** In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

**(b)** To the extent permitted by law, and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

**(c)** To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in the manner that provides the most effective model for enforcing Federal immigration laws and obtaining operational control over the border for that jurisdiction.

**Sec. 11. Parole, Asylum, and Removal.** It is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens.

**(a)** The Secretary shall immediately take all appropriate action to ensure that the parole and asylum provisions of Federal immigration law are not illegally exploited to prevent the removal of otherwise removable aliens.

**(b)** The Secretary shall take all appropriate action, including by promulgating any appropriate regulations, to ensure that asylum referrals and credible fear determinations pursuant to section 235(b)(1) of the INA (8 U.S.C. 1125(b)(1)) and 8 CFR 208.30, and reasonable fear determinations pursuant to 8 CFR 208.31, are conducted in a manner consistent with the plain language of those provisions.

**(c)** Pursuant to section 235(b)(1)(A)(iii)(I) of the INA, the Secretary shall take appropriate action to apply, in his sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II).

**(d)** The Secretary shall take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole.

**(e)** The Secretary shall take appropriate action to require that all Department of Homeland Security personnel are properly trained on the proper application of section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 U.S.C. 1232) and section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)), to ensure that unaccompanied alien children are properly processed, receive appropriate care and placement while in the custody of the Department of Homeland Security, and, when appropriate, are safely repatriated in accordance with law.

**Sec. 12. Authorization to Enter Federal Lands.** The Secretary, in conjunction with the Secretary of the Interior and any other heads of agencies as necessary, shall take all appropriate action to:

**(a)** permit all officers and employees of the United States, as well as all State and local officers as authorized by the Secretary, to have access to all Federal lands as necessary and appropriate to implement this order; and

**(b)** enable those officers and employees of the United States, as well as all State and local officers as authorized by the Secretary, to perform such actions on Federal lands as the Secretary deems necessary and appropriate to implement this order.

**Sec. 13. Priority Enforcement.** The Attorney General shall take all appropriate steps to establish prosecution guidelines and allocate appropriate resources to ensure that Federal prosecutors accord a high priority to prosecutions of offenses having a nexus to the southern border.

**Sec. 14. Government Transparency.** The Secretary shall, on a monthly basis and in a publicly available way, report statistical data on aliens apprehended at or near the southern border using a uniform method of reporting by all Department of Homeland Security components, in a format that is easily understandable by the public.

**Sec. 15. Reporting.** Except as otherwise provided in this order, the Secretary, within 90 days of the date of this order, and the Attorney General, within 180 days, shall each submit to the President a report on the progress of the directives contained in this order.

**Sec. 16. Hiring.** The Office of Personnel Management shall take appropriate action as may be necessary to facilitate hiring personnel to implement this order.

**Sec. 17. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

**EXECUTIVE ORDER NO. 13768**

<January 25, 2017, 82 F.R. 8799>

**Enhancing Public Safety in the Interior of the United States**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 et seq.), and in order to ensure the public safety of the American people in communities across the United States as well as to ensure that our Nation's immigration laws are faithfully executed, I hereby declare the policy of the executive branch to be, and order, as follows:

**Section 1. Purpose.** Interior enforcement of our Nation's immigration laws is critically important to the national security and public safety of the United States. Many aliens who illegally enter the United States and those who overstay or otherwise violate the terms of their visas present a significant threat to national security and public safety. This is particularly so for aliens who engage in criminal conduct in the United States.

Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States. These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic.

Tens of thousands of removable aliens have been released into communities across the country, solely because their home countries refuse to accept their repatriation. Many of these aliens are criminals who have served time in our Federal, State, and local jails. The presence of such individuals in the United States, and the practices of foreign nations that refuse the repatriation of their nationals, are contrary to the national interest.

Although Federal immigration law provides a framework for Federal-State partnerships in enforcing our immigration laws to ensure the removal of aliens who have no right to be in the United States, the Federal Government has failed to discharge this basic sovereign responsibility. We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement. The purpose of this order is to direct executive departments and agencies (agencies) to employ all lawful means to enforce the immigration laws of the United States.

**Sec. 2. Policy.** It is the policy of the executive branch to:

**(a)** Ensure the faithful execution of the immigration laws of the United States, including the INA, against all removable aliens, consistent with Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code;

**(b)** Make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States;

**(c)** Ensure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law;

**(d)** Ensure that aliens ordered removed from the United States are promptly removed; and

**(e)** Support victims, and the families of victims, of crimes committed by removable aliens.

**Sec. 3. Definitions.** The terms of this order, where applicable, shall have the meaning provided by section 1101 of title 8, United States Code.

**Sec. 4. Enforcement of the Immigration Laws in the Interior of the United States.** In furtherance of the policy described in section 2 of this order, I hereby direct agencies to employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens.

**Sec. 5. Enforcement Priorities.** In executing faithfully the immigration laws of the United States, the Secretary of Homeland Security (Secretary) shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:

**(a)** Have been convicted of any criminal offense;

**(b)** Have been charged with any criminal offense, where such charge has not been resolved;

**(c)** Have committed acts that constitute a chargeable criminal offense;

**(d)** Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

**(e)** Have abused any program related to receipt of public benefits;

**(f)** Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

**(g)** In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

**Sec. 6. Civil Fines and Penalties.** As soon as practicable, and by no later than one year after the date of this order, the Secretary shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under the law to assess and collect from aliens unlawfully present in the United States and from those who facilitate their presence in the United States.

**Sec. 7. Additional Enforcement and Removal Officers.** The Secretary, through the Director of U.S. Immigration and Customs Enforcement, shall, to the extent permitted by law and subject to the availability of appropriations, take all appropriate action to hire 10,000 additional immigration officers, who shall complete relevant training and be authorized to perform the law enforcement functions described in section 287 of the INA (8 U.S.C. 1357).

**Sec. 8. Federal-State Agreements.** It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

**(a)** In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

**(b)** To the extent permitted by law and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

**(c)** To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in a manner that provides the most effective model for enforcing Federal immigration laws for that jurisdiction.

**Sec. 9. Sanctuary Jurisdictions.** It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

**(a)** In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

**(b)** To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of

criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

**(c)** The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

**Sec. 10. Review of Previous Immigration Actions and Policies. (a)** The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as "Secure Communities" referenced in that memorandum.

**(b)** The Secretary shall review agency regulations, policies, and procedures for consistency with this order and, if required, publish for notice and comment proposed regulations rescinding or revising any regulations inconsistent with this order and shall consider whether to withdraw or modify any inconsistent policies and procedures, as appropriate and consistent with the law.

**(c)** To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Secretary shall consolidate and revise any applicable forms to more effectively communicate with recipient law enforcement agencies.

**Sec. 11. Department of Justice Prosecutions of Immigration Violators.** The Attorney General and the Secretary shall work together to develop and implement a program that ensures that adequate resources are devoted to the prosecution of criminal immigration offenses in the United States, and to develop cooperative strategies to reduce violent crime and the reach of transnational criminal organizations into the United States.

**Sec. 12. Recalcitrant Countries.** The Secretary of Homeland Security and the Secretary of State shall cooperate to effectively implement the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), as appropriate. The Secretary of State shall, to the maximum extent permitted by law, ensure that diplomatic efforts and negotiations with foreign states include as a condition precedent the acceptance by those foreign states of their nationals who are subject to removal from the United States.

**Sec. 13. Office for Victims of Crimes Committed by Removable Aliens.** The Secretary shall direct the Director of U.S. Immigration and Customs Enforcement to take all appropriate and lawful action to establish within U.S. Immigration and Customs Enforcement an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens and the family members of such victims. This office shall provide quarterly reports studying the effects of the victimization by criminal aliens present in the United States.

**Sec. 14. Privacy Act.** Agencies shall, to the extent consistent with applicable law, ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information.

**Sec. 15. Reporting.** Except as otherwise provided in this order, the Secretary and the Attorney General shall each submit to the President a report on the progress of the directives contained in this order within 90 days of the date of this order and again within 180 days of the date of this order.

**Sec. 16. Transparency.** To promote the transparency and situational awareness of criminal aliens in the United States, the Secretary and the Attorney General are hereby directed to collect relevant data and provide quarterly reports on the following:

**(a)** the immigration status of all aliens incarcerated under the supervision of the Federal Bureau of Prisons;

**(b)** the immigration status of all aliens incarcerated as Federal pretrial detainees under the supervision of the United States Marshals Service; and

**(c)** the immigration status of all convicted aliens incarcerated in State prisons and local detention centers throughout the United States.

**Sec. 17. Personnel Actions.** The Office of Personnel Management shall take appropriate and lawful action to facilitate hiring personnel to implement this order.

**Sec. 18. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## EXECUTIVE ORDER NO. 13841

<June 20, 2018, 83 F.R. 29435>

### Affording Congress an Opportunity To Address Family Separation

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of this Administration to rigorously enforce our immigration laws. Under our laws, the only legal way for an alien to enter this country is at a designated port of entry at an appropriate time. When an alien enters or attempts to enter the country anywhere else, that alien has committed at least the crime of improper entry and is subject to a fine or imprisonment under section 1325(a) of title 8, United States Code. This Administration will initiate proceedings to enforce this and other criminal provisions of the INA until and unless Congress directs otherwise. It is also the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources. It is unfortunate that Congress's failure to act and court orders have put the Administration in the position of separating alien families to effectively enforce the law.

**Sec. 2. Definitions.** For purposes of this order, the following definitions apply:

**(a)** "Alien family" means

**(i)** any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an alien child or alien children at or between designated ports of entry and who was detained; and

**(ii)** that person's alien child or alien children.

**(b)** "Alien child" means any person not a citizen or national of the United States who

**(i)** has not been admitted into, or is not authorized to enter or remain in, the United States;

**(ii)** is under the age of 18; and

**(iii)** has a legal parent-child relationship to an alien who entered the United States with the alien child at or between designated ports of entry and who was detained.

**Sec. 3. Temporary Detention Policy for Families Entering this Country Illegally. (a)** The Secretary of Homeland Security (Secretary), shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members.

**(b)** The Secretary shall not, however, detain an alien family together when there is a concern that detention of an alien child with the child's alien parent would pose a risk to the child's welfare.

**(c)** The Secretary of Defense shall take all legally available measures to provide to the Secretary, upon request, any existing facilities available for the housing and care of alien families, and shall construct such facilities if necessary and consistent with law. The Secretary, to the extent permitted by law, shall be responsible for reimbursement for the use of these facilities.

**(d)** Heads of executive departments and agencies shall, to the extent consistent with law, make available to the Secretary, for the housing and care of alien families pending court proceedings for improper entry, any facilities that are appropriate for such purposes. The Secretary, to the extent permitted by law, shall be responsible for reimbursement for the use of these facilities.

**(e)** The Attorney General shall promptly file a request with the U.S. District Court for the Central District of California to modify the Settlement Agreement in Flores v. Sessions, CV 85-4544 ("Flores settlement"), in a manner that would permit the Secretary, under present resource constraints, to detain alien families together throughout the pendency of criminal proceedings for improper entry or any removal or other immigration proceedings.

**Sec. 4. Prioritization of Immigration Proceedings Involving Alien Families.** The Attorney General shall, to the extent practicable, prioritize the adjudication of cases involving detained families.

**Sec. 5. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

**MEMORANDA OF PRESIDENT**

**PRESIDENTIAL MEMORANDUM**

<November 21, 2014, 79 F.R. 70765>

**Creating Welcoming Communities and Fully Integrating Immigrants and Refugees**

Memorandum for the Heads of Executive Departments and Agencies

Our country has long been a beacon of hope and opportunity for people from around the world. Nearly 40 million foreign-born residents nationwide contribute to their communities every day, including 3 million refugees who have resettled here since 1975. These new Americans significantly improve our economy. They make up 13 percent of the population, but are over 16 percent of the labor force and start 28 percent of all new businesses. Moreover, immigrants or their children have founded more than 40 percent of Fortune 500 companies, which collectively employ over 10 million people worldwide and generate annual revenues of $4.2 trillion.

By focusing on the civic, economic, and linguistic integration of new Americans, we can help immigrants and refugees in the United States contribute fully to our economy and their communities. Civic integration provides new Americans with security in their rights and liberties. Economic integration empowers immigrants to be self-sufficient and allows them to give back to their communities and contribute to economic growth. English language acquisition allows new Americans to attain employment or career advancement and be more active civic participants.

Our success as a Nation of immigrants is rooted in our ongoing commitment to welcoming and integrating newcomers into the fabric of our country. It is important that we develop a Federal immigrant integration strategy that is innovative and competitive with those of other industrialized nations and supports mechanisms to ensure that our Nation's diverse people are contributing to society to their fullest potential.

Therefore, I am establishing a White House Task Force on New Americans, an interagency effort to identify and support State and local efforts at integration that are working and to consider how to expand and replicate successful models. The Task Force, which will engage with community, business, and faith leaders, as well as State and local elected officials, will help determine additional steps the Federal Government can take to ensure its programs and policies are serving diverse communities that include new Americans.

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby order as follows:

**Section 1. White House Task Force on New Americans. (a)** There is established a White House Task Force on New Americans (Task Force) to develop a coordinated Federal strategy to better integrate new Americans into communities and support State and local efforts to do the same. It shall be co-chaired by the Director of the Domestic Policy Council and Secretary of Homeland Security, or their designees. In addition to the Co-Chairs, the Task Force shall consist of the following members:

**(i)** the Secretary of State;

**(ii)** the Attorney General;

**(iii)** the Secretary of Agriculture;

**(iv)** the Secretary of Commerce;

**(v)** the Secretary of Labor;

**(vi)** the Secretary of Health and Human Services;

**(vii)** the Secretary of Housing and Urban Development;

**(viii)** the Secretary of Transportation;

**(ix)** the Secretary of Education;

**(x)** the Chief Executive Officer of the Corporation for National and Community Service;

**(xi)** the Director of the Office of Management and Budget;

**(xii)** the Administrator of the Small Business Administration;

**(xiii)** the Senior Advisor and Assistant to the President for Intergovernmental Affairs and Public Engagement;

**(xiv)** the Director of the National Economic Council;

**(xv)** the Assistant to the President for Homeland Security and Counterterrorism; and

**(xvi)** the Director of the Office of Science and Technology Policy.

**(b)** A member of the Task Force may designate a senior-level official who is from the member's department, agency, or office, and is a full-time officer or employee of the Federal Government, to perform day-to-day Task Force functions of the member. At the direction of the Co-Chairs, the Task Force may establish subgroups consisting exclusively of Task Force members or their designees under this subsection, as appropriate.

**(c)** The Secretary of Homeland Security shall appoint an Executive Director who will determine the Task Force's agenda, convene regular meetings of the Task Force, and supervise work under the direction of the Co-Chairs. The Department of Homeland Security shall provide funding and administrative support for the Task Force to the extent permitted by law and subject to the availability of appropriations. Each executive department or agency shall bear its own expenses for participating in the Task Force.

**Sec. 2. Mission and Function of the Task Force. (a)** The Task Force shall, consistent with applicable law, work across executive departments and agencies to:

**(i)** review the policies and programs of all relevant executive departments and agencies to ensure they are responsive to the needs of new Americans and the receiving communities in which they reside, and identify ways in which such programs can be used to increase meaningful engagement between new Americans and the receiving community;

**(ii)** identify and disseminate best practices at the State and local level;

**(iii)** provide technical assistance, training, or other support to existing Federal grantees to increase their coordination and capacity to improve long-term integration and foster welcoming community climates;

**(iv)** collect and disseminate immigrant integration data, policies, and programs that affect numerous executive departments and agencies, as well as State and local governments and nongovernmental actors;

**(v)** conduct outreach to representatives of nonprofit organizations, State and local government agencies, elected officials, and other interested persons that can assist with the Task Force's development of recommendations;

**(vi)** work with Federal, State, and local entities to measure and strengthen equitable access to services and programs for new Americans, consistent with applicable law; and

**(vii)** share information with and communicate to the American public regarding the benefits that result from integrating new Americans into communities.

**(b)** Within 120 days of the date of this memorandum, the Task Force shall develop and submit to the President an Integration Plan with recommendations for agency actions to further the integration of new Americans. The Integration Plan shall include:

**(i)** an assessment by each Task Force member of the status and scope of the efforts by the member's department, agency, or office to further the civic, economic, and linguistic integration of new Americans, including a report on the status of any offices or programs that have been created to develop, implement, or monitor targeted initiatives concerning immigrant integration; and

**(ii)** recommendations for issues, programs, or initiatives that should be further evaluated, studied, and implemented, as appropriate.

**(c)** The Task Force shall provide, within 1 year of the date of this memorandum, a status report to the President regarding the implementation of this memorandum. The Task Force shall review and update the Integration Plan periodically, as appropriate, and shall present to the President any updated recommendations or findings.

**Sec. 3. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department, agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** The Secretary of Homeland Security is hereby authorized and directed to publish this memorandum in the *Federal Register*.

BARACK OBAMA

**PRESIDENTIAL MEMORANDUM**

<April 22, 2019, 84 F.R. 19853>

### Combating High Nonimmigrant Overstay Rates

Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1. Policy. (a)** My Administration is committed to securing the borders of the United States and fostering respect for the laws of our country, both of which are cornerstones of our Republic. Nonimmigrant visa (visa) overstay rates are unacceptably high for nationals of certain countries. Aliens must abide by the terms and conditions of their visas for our immigration system to function as intended. Although the United States benefits from legitimate nonimmigrant entry, individuals who abuse the visa process and decline to abide by the terms and conditions of their visas, including their visa departure dates, undermine the integrity of our immigration system and harm the national interest.

**(b)** The large numbers of aliens who overstay their period of lawful admission, failing to comply with the terms of a visa or the Visa Waiver Program, place significant strain on Department of Justice and Department of Homeland Security resources, which are currently needed to address the national emergency on our southern border.

**Sec. 2. Addressing High Visa Overstay Rates. (a)** The Secretary of State shall engage with the governments of countries with a total overstay rate greater than 10 percent in the combined B-1 and B-2 nonimmigrant visa category based on the Department of Homeland Security Fiscal Year 2018 Entry/Exit Overstay Report. This engagement should identify conditions contributing to high overstay rates among nationals of those countries and methods to address those conditions.

**(b)** Within 120 days of the date of this memorandum, the Secretary of State, in consultation with the Attorney General and the Secretary of Homeland Security, shall provide to the President recommendations to reduce B-1 and B-2 nonimmigrant visa overstay rates from the identified countries. With respect to any of the identified countries, the recommendations may include, as appropriate and to the extent consistent with applicable law, a proclamation, relying on authorities such as sections 212(f) and 215 of the INA (8 U.S.C. 1182(f) and 1185(a)), suspending or limiting entry of nationals of those countries who hold B-1 or B-2 visas; targeted suspension of visa issuance for certain nationals; limits to duration of admission, to be implemented by the Department of Homeland Security; and additional documentary requirements.

**(c)** The Secretary of State and the Secretary of Homeland Security shall immediately begin taking all appropriate actions that are within the scope of their respective authorities to reduce overstay rates for all classes of nonimmigrant visas.

**(d)** Within 180 days of the date of this memorandum, the Secretary of Homeland Security shall provide to the President a summary of the Department of Homeland Security's ongoing efforts to reduce overstays from countries participating in the Visa Waiver Program, to include any recommendations for additional action necessary and appropriate to ensure the integrity and security of that Program.

**Sec. 3. Admission Bonds.** The Secretary of State and the Secretary of Homeland Security shall take steps to develop measures required for imposing admission bonds as a means for improving compliance with the terms and conditions of nonimmigrant visas. The Secretaries shall provide a status report to the President within 120 days of the date of this memorandum.

**Sec. 4. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof;

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals; or

**(iii)** existing rights or obligations under international agreements.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 5.** The Secretary of State is hereby authorized and directed to publish this memorandum in the Federal Register.

DONALD J. TRUMP

Notes of Decisions (180)

8 U.S.C.A. § 1103, 8 USCA § 1103
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Recognized as Repealed by Implication   Husyev v. Mukasey,   9th Cir.,   June 16, 2008

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part I. Selection System

8 U.S.C.A. § 1158

§ 1158. Asylum

Effective: June 1, 2009

Currentness

**(a) Authority to apply for asylum**

**(1) In general**

Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

**(2) Exceptions**

**(A) Safe third country**

Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

**(B) Time limit**

Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States.

**(C) Previous asylum applications**

Subject to subparagraph (D), paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

**(D) Changed circumstances**

An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

**(E) Applicability**

Subparagraphs (A) and (B) shall not apply to an unaccompanied alien child (as defined in section 279(g) of Title 6).

**(3) Limitation on judicial review**

No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2).

**(b) Conditions for granting asylum**

**(1) In general**

**(A) Eligibility**

The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

**(B) Burden of proof**

**(i) In general**

The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of section 1101(a)(42)(A) of this title. To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.

**(ii) Sustaining burden**

AR.00776

The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

**(iii) Credibility determination**

Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

**(2) Exceptions**

**(A) In general**

Paragraph (1) shall not apply to an alien if the Attorney General determines that--

**(i)** the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

**(ii)** the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

**(iii)** there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

**(iv)** there are reasonable grounds for regarding the alien as a danger to the security of the United States;

**(v)** the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title or section 1227(a)(4)(B) of this title (relating to terrorist activity), unless, in the case only of an alien described in subclause (IV) of section 1182(a)(3)(B)(i) of this title, the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

**(vi)** the alien was firmly resettled in another country prior to arriving in the United States.

**(B) Special rules**

**(i) Conviction of aggravated felony**

For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

**(ii) Offenses**

The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

**(C) Additional limitations**

The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1).

**(D) No judicial review**

There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

**(3) Treatment of spouse and children**

**(A) In general**

A spouse or child (as defined in section 1101(b)(1) (A), (B), (C), (D), or (E) of this title) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

**(B) Continued classification of certain aliens as children**

An unmarried alien who seeks to accompany, or follow to join, a parent granted asylum under this subsection, and who was under 21 years of age on the date on which such parent applied for asylum under this section, shall continue to be classified as a child for purposes of this paragraph and section 1159(b)(3) of this title, if the alien attained 21 years of age after such application was filed but while it was pending.

**(C) Initial jurisdiction**

An asylum officer (as defined in section 1225(b)(1)(E) of this title) shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child (as defined in section 279(g) of Title 6), regardless of whether filed in accordance with this section or section 1225(b) of this title.

**(c) Asylum status**

**(1) In general**

In the case of an alien granted asylum under subsection (b), the Attorney General--

**(A)** shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

**(B)** shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

**(C)** may allow the alien to travel abroad with the prior consent of the Attorney General.

**(2) Termination of asylum**

Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that--

**(A)** the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

**(B)** the alien meets a condition described in subsection (b)(2);

**(C)** the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

**(D)** the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

**(E)** the alien has acquired a new nationality and enjoys the protection of the country of his or her new nationality.

**(3) Removal when asylum is terminated**

An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section [1] 1182(a) and 1227(a) of this title, and the alien's removal or return shall be directed by the Attorney General in accordance with sections 1229a and 1231 of this title.

**(d) Asylum procedure**

**(1) Applications**

The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). The Attorney General may require applicants to submit fingerprints and a photograph at such time and in such manner to be determined by regulation by the Attorney General.

**(2) Employment**

An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

**(3) Fees**

The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 1159(b) of this title. Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title.

**(4) Notice of privilege of counsel and consequences of frivolous application**

At the time of filing an application for asylum, the Attorney General shall--

**(A)** advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

**(B)** provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

**(5) Consideration of asylum applications**

**(A) Procedures**

The procedure established under paragraph (1) shall provide that--

**(i)** asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout

System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

**(ii)** in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

**(iii)** in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

**(iv)** any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 1229a of this title, whichever is later; and

**(v)** in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 1229a of this title, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

**(B) Additional regulatory conditions**

The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter.

**(6) Frivolous applications**

If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

**(7) No private right of action**

Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

**(e) Commonwealth of the Northern Mariana Islands**

The provisions of this section and section 1159(b) of this title shall apply to persons physically present in the Commonwealth of the Northern Mariana Islands or arriving in the Commonwealth (whether or not at a designated port of arrival and including persons who are brought to the Commonwealth after having been interdicted in international or United States waters) only on or after January 1, 2014.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 1, § 208, as added Pub.L. 96-212, Title II, § 201(b), Mar. 17, 1980, 94 Stat. 105; amended Pub.L. 101-649, Title V, § 515(a)(1), Nov. 29, 1990, 104 Stat. 5053; Pub.L. 103-322, Title XIII, § 130005(b), Sept. 13, 1994, 108 Stat. 2028; Pub.L. 104-132, Title IV, § 421(a), Apr. 24, 1996, 110 Stat. 1270; Pub.L. 104-208, Div. C, Title VI, § 604(a), Sept. 30, 1996, 110 Stat. 3009-690; Pub.L. 107-56, Title IV, § 411(b)(2), Oct. 26, 2001, 115 Stat. 348; Pub.L. 107-208, § 4, Aug. 6, 2002, 116 Stat. 928; Pub.L. 109-13, Div. B, Title I, § 101(a), (b), May 11, 2005, 119 Stat. 302, 303; Pub.L. 110-229, Title VII, § 702(j)(4), May 8, 2008, 122 Stat. 866; Pub.L. 110-457, Title II, § 235(d)(7), Dec. 23, 2008, 122 Stat. 5080.)

Notes of Decisions (3056)

## Footnotes

1    So in original. Probably should be "sections".

8 U.S.C.A. § 1158, 8 USCA § 1158

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part I. Selection System

8 U.S.C.A. § 1159

§ 1159. Adjustment of status of refugees

Effective: May 11, 2005
Currentness

**(a) Inspection and examination by Department of Homeland Security**

**(1)** Any alien who has been admitted to the United States under section 1157 of this title--

**(A)** whose admission has not been terminated by the Secretary of Homeland Security or the Attorney General pursuant to such regulations as the Secretary of Homeland Security or the Attorney General may prescribe,

**(B)** who has been physically present in the United States for at least one year, and

**(C)** who has not acquired permanent resident status,

shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title.

**(2)** Any alien who is found upon inspection and examination by an immigration officer pursuant to paragraph (1) or after a hearing before an immigration judge to be admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of the alien's inspection and examination shall, notwithstanding any numerical limitation specified in this chapter, be regarded as lawfully admitted to the United States for permanent residence as of the date of such alien's arrival into the United States.

**(b) Requirements for adjustment**

The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who--

**(1)** applies for such adjustment,

**(2)** has been physically present in the United States for at least one year after being granted asylum,

**(3)** continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,

**(4)** is not firmly resettled in any foreign country, and

**(5)** is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of examination for adjustment of such alien.

Upon approval of an application under this subsection, the Secretary of Homeland Security or the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

**(c) Coordination with section 1182**

The provisions of paragraphs (4), (5), and (7)(A) of section 1182(a) of this title shall not be applicable to any alien seeking adjustment of status under this section, and the Secretary of Homeland Security or the Attorney General may waive any other provision of such section (other than paragraph (2)(C) or subparagraph (A), (B), (C), or (E) of paragraph (3)) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 1, § 209, as added Pub.L. 96-212, Title II, § 201(b), Mar. 17, 1980, 94 Stat. 105; amended Pub.L. 101-649, Title I, § 104(a)(1), Title VI, § 603(a)(4), Nov. 29, 1990, 104 Stat. 4985, 5082; Pub.L. 102-232, Title III, § 307(l)(1), Dec. 12, 1991, 105 Stat. 1756; Pub.L. 104-208, Div. C, Title III, §§ 308(g)(3)(A), (4)(A), 371(b)(2), Sept. 30, 1996, 110 Stat. 3009-622, 3009-645; Pub.L. 109-13, Div. B, Title I, § 101(g)(1), May 11, 2005, 119 Stat. 305.)

Notes of Decisions (46)

8 U.S.C.A. § 1159, 8 USCA § 1159
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by   Doe v. Trump,    D.Or.,   Nov. 26, 2019

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 8. Aliens and Nationality (Refs & Annos)
      Chapter 12. Immigration and Nationality (Refs & Annos)
         Subchapter II. Immigration
            Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1182

§ 1182. Inadmissible aliens

Effective: March 7, 2013

Currentness

<For Proclamation No. 9984, "Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus and Other Appropriate Measures To Address This Risk", see Proc. No. 9984, Jan. 31, 2020, 85 F.R. 6709.>

<For Proclamation No. 9992, "Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus", see Proc. No. 9992, Feb. 29, 2020, 85 F.R. 12855.>

<For Proclamation No. 9993, "Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus", see Proc. No. 9993, Mar. 11, 2020, 85 F.R. 15045.>

<For Proclamation No. 9996, "Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus", see Proc. No. 9996, Mar. 14, 2020, 85 F.R. 15341. >

<For Proclamation No. 10014, "Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak", see Proc. No. 10014, Apr. 22, 2020, 85 FR 23441.>

<For Proclamation No. 10041 (amended by Proc. No. 10042, May 25, 2020, 85 FR 31933), "Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus", see Proc. No. 10041, May 24, 2020, 85 FR 31933. >

<For Proclamation No. 10052, "Suspension of Entry of Immigrants and Nonimmigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak", see Proc. No. 10052, June 22, 2020, 85 F.R. 38263.>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(a) Classes of aliens ineligible for visas or admission**

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

**(1) Health-related grounds**

**(A) In general**

Any alien--

**(i)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance; [1]

**(ii)** except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

**(iii)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)--

**(I)** to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

**(II)** to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

**(iv)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is inadmissible.

**(B) Waiver authorized**

For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

**(C) Exception from immunization requirement for adopted children 10 years of age or younger**

Clause (ii) of subparagraph (A) shall not apply to a child who--

**(i)** is 10 years of age or younger,

**(ii)** is described in subparagraph (F) or (G) of section 1101(b)(1) of this title; [1] and

**(iii)** is seeking an immigrant visa as an immediate relative under section 1151(b) of this title,

if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

**(2) Criminal and related grounds**

**(A) Conviction of certain crimes**

**(i) In general**

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--

**(I)** a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

**(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21),

is inadmissible.

**(ii) Exception**

Clause (i)(I) shall not apply to an alien who committed only one crime if--

**(I)** the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

**(II)** the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

**(B) Multiple criminal convictions**

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible.

**(C) Controlled substance traffickers**

Any alien who the consular officer or the Attorney General knows or has reason to believe--

**(i)** is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; or

**(ii)** is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity,

is inadmissible.

**(D) Prostitution and commercialized vice**

Any alien who--

**(i)** is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status,

**(ii)** directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

**(iii)** is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

is inadmissible.

**(E) Certain aliens involved in serious criminal activity who have asserted immunity from prosecution**

Any alien--

**(i)** who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

**(ii)** for whom immunity from criminal jurisdiction was exercised with respect to that offense,

**(iii)** who as a consequence of the offense and exercise of immunity has departed from the United States, and

**(iv)** who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

is inadmissible.

**(F) Waiver authorized**

For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

**(G) Foreign government officials who have committed particularly severe violations of religious freedom**

Any alien who, while serving as a foreign government official, was responsible for or directly carried out, at any time, particularly severe violations of religious freedom, as defined in section 6402 of Title 22, is inadmissible.

**(H) Significant traffickers in persons**

**(i) In general**

Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a trafficker in severe forms of trafficking in persons, as defined in the section 7102 of Title 22, is inadmissible.

**(ii) Beneficiaries of trafficking**

Except as provided in clause (iii), any alien who the consular officer or the Attorney General knows or has reason to believe is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

**(iii) Exception for certain sons and daughters**

Clause (ii) shall not apply to a son or daughter who was a child at the time he or she received the benefit described in such clause.

**(I) Money laundering**

Any alien--

**(i)** who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of Title 18 (relating to laundering of monetary instruments); or

**(ii)** who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section;

is inadmissible.

**(3) Security and related grounds**

**(A) In general**

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in--

**(i)** any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

**(ii)** any other unlawful activity, or

**(iii)** any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is inadmissible.

**(B) Terrorist activities**

**(i) In general**

Any alien who--

**(I)** has engaged in a terrorist activity;

**(II)** a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

**(III)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

**(IV)** is a representative (as defined in clause (v)) of--

    **(aa)** a terrorist organization (as defined in clause (vi)); or

    **(bb)** a political, social, or other group that endorses or espouses terrorist activity;

**(V)** is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

**(VI)** is a member of a terrorist organization described in clause (vi) (III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(VII)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

**(VIII)** has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

**(IX)** is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years,

is inadmissible. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

**(ii) Exception**

Subclause (IX) of clause (i) does not apply to a spouse or child--

    **(I)** who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

    **(II)** whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

**(iii) "Terrorist activity" defined**

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

**(I)** The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

**(II)** The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

**(III)** A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

**(IV)** An assassination.

**(V)** The use of any--

    **(a)** biological agent, chemical agent, or nuclear weapon or device, or

    **(b)** explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

    with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

**(VI)** A threat, attempt, or conspiracy to do any of the foregoing.

**(iv) "Engage in terrorist activity" defined**

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

**(I)** to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

**(II)** to prepare or plan a terrorist activity;

**(III)** to gather information on potential targets for terrorist activity;

**(IV)** to solicit funds or other things of value for--

    **(aa)** a terrorist activity;

    **(bb)** a terrorist organization described in clause (vi)(I) or (vi)(II); or

    **(cc)** a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(V)** to solicit any individual--

    **(aa)** to engage in conduct otherwise described in this subsection;

    **(bb)** for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

    **(cc)** for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

**(VI)** to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

    **(aa)** for the commission of a terrorist activity;

    **(bb)** to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

    **(cc)** to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

    **(dd)** to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

**(v) "Representative" defined**

As used in this paragraph, the term "representative" includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

### (vi) "Terrorist organization" defined

As used in this section, the term "terrorist organization" means an organization--

**(I)** designated under section 1189 of this title;

**(II)** otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

**(III)** that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

## (C) Foreign policy

### (i) In general

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible.

### (ii) Exception for officials

An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

### (iii) Exception for other aliens

An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

### (iv) Notification of determinations

If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the

Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

**(D) Immigrant membership in totalitarian party**

**(i) In general**

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible.

**(ii) Exception for involuntary membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

**(iii) Exception for past membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that--

**(I)** the membership or affiliation terminated at least--

**(a)** 2 years before the date of such application, or

**(b)** 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

**(II)** the alien is not a threat to the security of the United States.

**(iv) Exception for close family members**

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

**(E) Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

**(i) Participation in Nazi persecutions**

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with--

**(I)** the Nazi government of Germany,

**(II)** any government in any area occupied by the military forces of the Nazi government of Germany,

**(III)** any government established with the assistance or cooperation of the Nazi government of Germany, or

**(IV)** any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

**(ii) Participation in genocide**

Any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in section 1091(a) of Title 18, is inadmissible.

**(iii) Commission of acts of torture or extrajudicial killings**

Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of--

**(I)** any act of torture, as defined in section 2340 of Title 18; or

**(II)** under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note),

is inadmissible.

**(F) Association with terrorist organizations**

Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.

**(G) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18, is inadmissible.

**(4) Public charge**

**(A) In general**

Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.

**(B) Factors to be taken into account**

**(i)** In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's--

**(I)** age;

**(II)** health;

**(III)** family status;

**(IV)** assets, resources, and financial status; and

**(V)** education and skills.

**(ii)** In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph.

**(C) Family-sponsored immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1151(b)(2) or 1153(a) of this title is inadmissible under this paragraph unless--

**(i)** the alien has obtained--

**(I)** status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 1154(a)(1)(A) of this title;

**(II)** classification pursuant to clause (ii) or (iii) of section 1154(a)(1)(B) of this title; or

**(III)** classification or status as a VAWA self-petitioner; or

**(ii)** the person petitioning for the alien's admission (and any additional sponsor required under section 1183a(f) of this title or any alternative sponsor permitted under paragraph (5)(B) of such section) has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(D) Certain employment-based immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1153(b) of this title by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible under this paragraph unless such relative has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(E) Special rule for qualified alien victims**

Subparagraphs (A), (B), and (C) shall not apply to an alien who--

**(i)** is a VAWA self-petitioner;

**(ii)** is an applicant for, or is granted, nonimmigrant status under section 1101(a)(15)(U) of this title; or

**(iii)** is a qualified alien described in section 1641(c) of this title.

**(5) Labor certification and qualifications for certain immigrants**

**(A) Labor certification**

**(i) In general**

Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that--

**(I)** there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

**(II)** the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

**(ii) Certain aliens subject to special rule**

For purposes of clause (i)(I), an alien described in this clause is an alien who--

**(I)** is a member of the teaching profession, or

**(II)** has exceptional ability in the sciences or the arts.

**(iii) Professional athletes**

**(I) In general**

A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

**(II) "Professional athlete" defined**

For purposes of subclause (I), the term "professional athlete" means an individual who is employed as an athlete by--

**(aa)** a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

**(bb)** any minor league team that is affiliated with such an association.

**(iv) Long delayed adjustment applicants**

A certification made under clause (i) with respect to an individual whose petition is covered by section 1154(j) of this title shall remain valid with respect to a new job accepted by the individual after the individual changes jobs or employers if the new job is in the same or a similar occupational classification as the job for which the certification was issued.

**(B) Unqualified physicians**

An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession is inadmissible, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National

Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C) Uncertified foreign health-care workers**

Subject to subsection (r), any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is inadmissible unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that--

**(i)** the alien's education, training, license, and experience--

**(I)** meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

**(II)** are comparable with that required for an American health-care worker of the same type; and

**(III)** are authentic and, in the case of a license, unencumbered;

**(ii)** the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

**(iii)** if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.

**(D) Application of grounds**

The grounds for inadmissibility of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph (2) or (3) of section 1153(b) of this title.

**(6) Illegal entrants and immigration violators**

**(A) Aliens present without admission or parole**

**(i) In general**

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

**(ii) Exception for certain battered women and children**

Clause (i) shall not apply to an alien who demonstrates that--

**(I)** the alien is a VAWA self-petitioner;

**(II)** (a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

**(III)** there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

**(B) Failure to attend removal proceeding**

Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.

**(C) Misrepresentation**

**(i) In general**

Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

**(ii) Falsely claiming citizenship**

**(I) In general**

Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible.

**(II) Exception**

In the case of an alien making a representation described in subclause (I), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (i).

**(D) Stowaways**

Any alien who is a stowaway is inadmissible.

**(E) Smugglers**

**(i) In general**

Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(11).

**(F) Subject of civil penalty**

**(i) In general**

An alien who is the subject of a final order for violation of section 1324c of this title is inadmissible.

**(ii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(12).

**(G) Student visa abusers**

An alien who obtains the status of a nonimmigrant under section 1101(a)(15)(F)(i) of this title and who violates a term or condition of such status under section 1184(l) of this title is inadmissible until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.

**(7) Documentation requirements**

**(A) Immigrants**

**(i) In general**

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission--

**(I)** who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

**(II)** whose visa has been issued without compliance with the provisions of section 1153 of this title,

is inadmissible.

**(ii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (k).

**(B) Nonimmigrants**

**(i) In general**

Any nonimmigrant who--

**(I)** is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

**(II)** is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

is inadmissible.

**(ii) General waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(4).

**(iii) Guam and Northern Mariana Islands visa waiver**

For provision authorizing waiver of clause (i) in the case of visitors to Guam or the Commonwealth of the Northern Mariana Islands, see subsection (l).

**(iv) Visa waiver program**

For authority to waive the requirement of clause (i) under a program, see section 1187 of this title.

**(8) Ineligible for citizenship**

**(A) In general**

Any immigrant who is permanently ineligible to citizenship is inadmissible.

**(B) Draft evaders**

Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency is inadmissible, except that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

**(9) Aliens previously removed**

**(A) Certain aliens previously removed**

**(i) Arriving aliens**

Any alien who has been ordered removed under section 1225(b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(ii) Other aliens**

Any alien not described in clause (i) who--

    **(I)** has been ordered removed under section 1229a of this title or any other provision of law, or

    **(II)** departed the United States while an order of removal was outstanding,

        and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(iii) Exception**

Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

**(B) Aliens unlawfully present**

**(i) In general**

Any alien (other than an alien lawfully admitted for permanent residence) who--

    **(I)** was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e) [2] of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or

    **(II)** has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

        is inadmissible.

**(ii) Construction of unlawful presence**

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

**(iii) Exceptions**

**(I) Minors**

No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(II) Asylees**

No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

**(III) Family unity**

No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(IV) Battered women and children**

Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if "violation of the terms of the alien's nonimmigrant visa" were substituted for "unlawful entry into the United States" in subclause (III) of that paragraph.

**(V) Victims of a severe form of trafficking in persons**

Clause (i) shall not apply to an alien who demonstrates that the severe form of trafficking (as that term is defined in section 7102 of Title 22) was at least one central reason for the alien's unlawful presence in the United States.

**(iv) Tolling for good cause**

In the case of an alien who--

**(I)** has been lawfully admitted or paroled into the United States,

**(II)** has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

**(III)** has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

AR.00806

**(v) Waiver**

The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

**(C) Aliens unlawfully present after previous immigration violations**

**(i) In general**

Any alien who--

**(I)** has been unlawfully present in the United States for an aggregate period of more than 1 year, or

**(II)** has been ordered removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

**(ii) Exception**

Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission.

**(iii) Waiver**

The Secretary of Homeland Security may waive the application of clause (i) in the case of an alien who is a VAWA self-petitioner if there is a connection between--

**(I)** the alien's battering or subjection to extreme cruelty; and

**(II)** the alien's removal, departure from the United States, reentry or reentries into the United States; or attempted reentry into the United States.

**(10) Miscellaneous**

**(A) Practicing polygamists**

Any immigrant who is coming to the United States to practice polygamy is inadmissible.

**(B) Guardian required to accompany helpless alien**

Any alien--

**(i)** who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 1222(c) of this title, and

**(ii)** whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.

**(C) International child abduction**

**(i) In general**

Except as provided in clause (ii), any alien who, after entry of an order by a court in the United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, is inadmissible until the child is surrendered to the person granted custody by that order.

**(ii) Aliens supporting abductors and relatives of abductors**

Any alien who--

**(I)** is known by the Secretary of State to have intentionally assisted an alien in the conduct described in clause (i),

**(II)** is known by the Secretary of State to be intentionally providing material support or safe haven to an alien described in clause (i), or

**(III)** is a spouse (other than the spouse who is the parent of the abducted child), child (other than the abducted child), parent, sibling, or agent of an alien described in clause (i), if such person has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion, is inadmissible until the child described in clause (i) is surrendered to the person granted custody by the order described in that clause, and such person and child are permitted to return to the United States or such person's place of residence.

**(iii) Exceptions**

Clauses (i) and (ii) shall not apply--

**(I)** to a government official of the United States who is acting within the scope of his or her official duties;

**(II)** to a government official of any foreign government if the official has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion; or

**(III)** so long as the child is located in a foreign state that is a party to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.

## (D) Unlawful voters

### (i) In general

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is inadmissible.

### (ii) Exception

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such violation.

### (E) Former citizens who renounced citizenship to avoid taxation

Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is inadmissible.

## (b) Notices of denials

**(1)** Subject to paragraphs (2) and (3), if an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be inadmissible under subsection (a), the officer shall provide the alien with a timely written notice that--

**(A)** states the determination, and

**(B)** lists the specific provision or provisions of law under which the alien is inadmissible or adjustment [3] of status.

**(2)** The Secretary of State may waive the requirements of paragraph (1) with respect to a particular alien or any class or classes of inadmissible aliens.

**(3)** Paragraph (1) does not apply to any alien inadmissible under paragraph (2) or (3) of subsection (a).

**(c) Repealed. Pub.L. 104-208, Div. C, Title III, § 304(b), Sept. 30, 1996, 110 Stat. 3009-597**

**(d) Temporary admission of nonimmigrants**

**(1)** The Attorney General shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(S) of this title. The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(S) of this title, if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting removal proceedings against an alien admitted as a nonimmigrant under section 1101(a)(15)(S) of this title for conduct committed after the alien's admission into the United States, or for conduct or a condition that was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 1101(a)(15)(S) of this title.

**(2)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(3)(A)** Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3) (A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A) (iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

**(B)(i)** The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II), no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi), and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians. Such a determination shall neither prejudice the ability of the United States Government to commence criminal or civil proceedings involving a beneficiary of

such a determination or any other person, nor create any substantive or procedural right or benefit for a beneficiary of such a determination or any other person. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review such a determination or revocation except in a proceeding for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D). The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.

(ii) Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.

(4) Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands and residents thereof having a common nationality with such nationals, or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 1223(c) of this title.

(5)(A) The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than admitted as a refugee under section 1157 of this title.

(6) Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

(7) The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, the Commonwealth of the Northern Mariana Islands, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso.[4] Any alien described in this paragraph, who is denied admission to the United States, shall be immediately removed in the manner provided by section 1231(c) of this title.

(8) Upon a basis of reciprocity accredited officials of foreign governments, their immediate families, attendants, servants, and personal employees may be admitted in immediate and continuous transit through the United States without regard to the provisions of this section except paragraphs (3)(A), (3)(B), (3)(C), and (7)(B) of subsection (a) of this section.

**(9), (10)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(11)** The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(E) in the case of any alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of removal, and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title and in the case of an alien seeking admission or adjustment of status as an immediate relative or immigrant under section 1153(a) of this title (other than paragraph (4) thereof), if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of such action was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(12)** The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)--

> **(A)** in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title, and

> **(B)** in the case of an alien seeking admission or adjustment of status under section 1151(b)(2)(A) of this title or under section 1153(a) of this title,

if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.

**(13)(A)** The Secretary of Homeland Security shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(T) of this title, except that the ground for inadmissibility described in subsection (a)(4) shall not apply with respect to such a nonimmigrant.

**(B)** In addition to any other waiver that may be available under this section, in the case of a nonimmigrant described in section 1101(a)(15)(T) of this title, if the Secretary of Homeland Security considers it to be in the national interest to do so, the Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of--

> **(i)** subsection (a)(1); and

> **(ii)** any other provision of subsection (a) (excluding paragraphs (3), (4), (10)(C), and (10(E)) [6] if the activities rendering the alien inadmissible under the provision were caused by, or were incident to, the victimization described in section 1101(a)(15)(T)(i)(I) of this title.

**(14)** The Secretary of Homeland Security shall determine whether a ground of inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(U) of this title. The Secretary of Homeland Security, in the Attorney General's [5]

discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(U) of this title, if the Secretary of Homeland Security considers it to be in the public or national interest to do so.

**(e) Educational visitor status; foreign residence requirement; waiver**

No person admitted under section 1101(a)(15)(J) of this title or acquiring such status after admission (i) whose participation in the program for which he came to the United States was financed in whole or in part, directly or indirectly, by an agency of the Government of the United States or by the government of the country of his nationality or his last residence, (ii) who at the time of admission or acquisition of status under section 1101(a)(15)(J) of this title was a national or resident of a country which the Director of the United States Information Agency, pursuant to regulations prescribed by him, had designated as clearly requiring the services of persons engaged in the field of specialized knowledge or skill in which the alien was engaged, or (iii) who came to the United States or acquired such status in order to receive graduate medical education or training, shall be eligible to apply for an immigrant visa, or for permanent residence, or for a nonimmigrant visa under section 1101(a)(15)(H) or section 1101(a)(15)(L) of this title until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least two years following departure from the United States: *Provided,* That upon the favorable recommendation of the Director, pursuant to the request of an interested United States Government agency (or, in the case of an alien described in clause (iii), pursuant to the request of a State Department of Public Health, or its equivalent), or of the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien), or that the alien cannot return to the country of his nationality or last residence because he would be subject to persecution on account of race, religion, or political opinion, the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest except that in the case of a waiver requested by a State Department of Public Health, or its equivalent, or in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii), the waiver shall be subject to the requirements of section 1184(l) of this title: *And provided further,* That, except in the case of an alien described in clause (iii), the Attorney General may, upon the favorable recommendation of the Director, waive such two-year foreign residence requirement in any case in which the foreign country of the alien's nationality or last residence has furnished the Director a statement in writing that it has no objection to such waiver in the case of such alien.

**(f) Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

**(g) Bond and conditions for admission of alien inadmissible on health-related grounds**

The Attorney General may waive the application of--

**(1)** subsection (a)(1)(A)(i) in the case of any alien who--

(A) is the spouse or the unmarried son or daughter, or the minor unmarried lawfully adopted child, of a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa,

(B) has a son or daughter who is a United States citizen, or an alien lawfully admitted for permanent residence, or an alien who has been issued an immigrant visa; or

(C) is a VAWA self-petitioner,

in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

(2) subsection (a)(1)(A)(ii) in the case of any alien--

(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

(C) under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.

## (h) Waiver of subsection (a)(2)(A)(i)(I), (II), (B), (D), and (E)

The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if--

(1)(A) in the case of any immigrant it is established to the satisfaction of the Attorney General that--

(i) the alien is inadmissible only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is inadmissible occurred more than 15 years before the date of the alien's application for a visa, admission, or adjustment of status,

**(ii)** the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

**(iii)** the alien has been rehabilitated; or

**(B)** in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; or

**(C)** the alien is a VAWA self-petitioner; and

**(2)** the Attorney General, in his discretion, and pursuant to such terms, conditions and procedures as he may by regulations prescribe, has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.

No waiver shall be provided under this subsection in the case of an alien who has been convicted of (or who has admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture. No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.

### (i) Admission of immigrant inadmissible for fraud or willful misrepresentation of material fact

**(1)** The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien or, in the case of a VAWA self-petitioner, the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident, or qualified alien parent or child.

**(2)** No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).

### (j) Limitation on immigration of foreign medical graduates

**(1)** The additional requirements referred to in section 1101(a)(15)(J) of this title for an alien who is coming to the United States under a program under which he will receive graduate medical education or training are as follows:

(A) A school of medicine or of one of the other health professions, which is accredited by a body or bodies approved for the purpose by the Secretary of Education, has agreed in writing to provide the graduate medical education or training under the program for which the alien is coming to the United States or to assume responsibility for arranging for the provision thereof by an appropriate public or nonprofit private institution or agency, except that, in the case of such an agreement by a school of medicine, any one or more of its affiliated hospitals which are to participate in the provision of the graduate medical education or training must join in the agreement.

(B) Before making such agreement, the accredited school has been satisfied that the alien (i) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States); or (ii)(I) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services), (II) has competency in oral and written English, (III) will be able to adapt to the educational and cultural environment in which he will be receiving his education or training, and (IV) has adequate prior education and training to participate satisfactorily in the program for which he is coming to the United States. For the purposes of this subparagraph, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners examination if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

(C) The alien has made a commitment to return to the country of his nationality or last residence upon completion of the education or training for which he is coming to the United States, and the government of the country of his nationality or last residence has provided a written assurance, satisfactory to the Secretary of Health and Human Services, that there is a need in that country for persons with the skills the alien will acquire in such education or training.

(D) The duration of the alien's participation in the program of graduate medical education or training for which the alien is coming to the United States is limited to the time typically required to complete such program, as determined by the Director of the United States Information Agency at the time of the alien's admission into the United States, based on criteria which are established in coordination with the Secretary of Health and Human Services and which take into consideration the published requirements of the medical specialty board which administers such education or training program; except that--

(i) such duration is further limited to seven years unless the alien has demonstrated to the satisfaction of the Director that the country to which the alien will return at the end of such specialty education or training has an exceptional need for an individual trained in such specialty, and

(ii) the alien may, once and not later than two years after the date the alien is admitted to the United States as an exchange visitor or acquires exchange visitor status, change the alien's designated program of graduate medical education or training if the Director approves the change and if a commitment and written assurance with respect to the alien's new program have been provided in accordance with subparagraph (C).

(E) The alien furnishes the Attorney General each year with an affidavit (in such form as the Attorney General shall prescribe) that attests that the alien (i) is in good standing in the program of graduate medical education or training in which the alien is participating, and (ii) will return to the country of his nationality or last residence upon completion of the education or training for which he came to the United States.

**(2)** An alien who is a graduate of a medical school and who is coming to the United States to perform services as a member of the medical profession may not be admitted as a nonimmigrant under section 1101(a)(15)(H)(i)(b) of this title unless--

    **(A)** the alien is coming pursuant to an invitation from a public or nonprofit private educational or research institution or agency in the United States to teach or conduct research, or both, at or for such institution or agency, or

    **(B)(i)** the alien has passed the Federation licensing examination (administered by the Federation of State Medical Boards of the United States) or an equivalent examination as determined by the Secretary of Health and Human Services, and

    **(ii)** (I) has competency in oral and written English or (II) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States).

**(3)** Omitted

**(k) Attorney General's discretion to admit otherwise inadmissible aliens who possess immigrant visas**

Any alien, inadmissible from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an immigrant visa may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

**(l) Guam and Northern Mariana Islands visa waiver program**

    **(1) In general**

    The requirement of subsection (a)(7)(B)(i) may be waived by the Secretary of Homeland Security, in the case of an alien applying for admission as a nonimmigrant visitor for business or pleasure and solely for entry into and stay in Guam or the Commonwealth of the Northern Mariana Islands for a period not to exceed 45 days, if the Secretary of Homeland Security, after consultation with the Secretary of the Interior, the Secretary of State, the Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands, determines that--

        **(A)** an adequate arrival and departure control system has been developed in Guam and the Commonwealth of the Northern Mariana Islands; and

        **(B)** such a waiver does not represent a threat to the welfare, safety, or security of the United States or its territories and commonwealths.

    **(2) Alien waiver of rights**

An alien may not be provided a waiver under this subsection unless the alien has waived any right--

**(A)** to review or appeal under this chapter an immigration officer's determination as to the admissibility of the alien at the port of entry into Guam or the Commonwealth of the Northern Mariana Islands; or

**(B)** to contest, other than on the basis of an application for withholding of removal under section 1231(b)(3) of this title or under the Convention Against Torture, or an application for asylum if permitted under section 1158 of this title, any action for removal of the alien.

**(3) Regulations**

All necessary regulations to implement this subsection shall be promulgated by the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, on or before the 180th day after May 8, 2008. The promulgation of such regulations shall be considered a foreign affairs function for purposes of section 553(a) of Title 5. At a minimum, such regulations should include, but not necessarily be limited to--

**(A)** a listing of all countries whose nationals may obtain the waiver also provided by this subsection, except that such regulations shall provide for a listing of any country from which the Commonwealth has received a significant economic benefit from the number of visitors for pleasure within the one-year period preceding May 8, 2008, unless the Secretary of Homeland Security determines that such country's inclusion on such list would represent a threat to the welfare, safety, or security of the United States or its territories; and

**(B)** any bonding requirements for nationals of some or all of those countries who may present an increased risk of overstays or other potential problems, if different from such requirements otherwise provided by law for nonimmigrant visitors.

**(4) Factors**

In determining whether to grant or continue providing the waiver under this subsection to nationals of any country, the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, shall consider all factors that the Secretary deems relevant, including electronic travel authorizations, procedures for reporting lost and stolen passports, repatriation of aliens, rates of refusal for nonimmigrant visitor visas, overstays, exit systems, and information exchange.

**(5) Suspension**

The Secretary of Homeland Security shall monitor the admission of nonimmigrant visitors to Guam and the Commonwealth of the Northern Mariana Islands under this subsection. If the Secretary determines that such admissions have resulted in an unacceptable number of visitors from a country remaining unlawfully in Guam or the Commonwealth of the Northern Mariana Islands, unlawfully obtaining entry to other parts of the United States, or seeking withholding of removal or asylum, or that visitors from a country pose a risk to law enforcement or security interests of Guam or the Commonwealth of the Northern Mariana Islands or of the United States (including the interest in the enforcement of the immigration laws of the United States), the Secretary shall suspend the admission of nationals of such country under this subsection. The Secretary of

Homeland Security may in the Secretary's discretion suspend the Guam and Northern Mariana Islands visa waiver program at any time, on a country-by-country basis, for other good cause.

**(6) Addition of countries**

The Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands may request the Secretary of the Interior and the Secretary of Homeland Security to add a particular country to the list of countries whose nationals may obtain the waiver provided by this subsection, and the Secretary of Homeland Security may grant such request after consultation with the Secretary of the Interior and the Secretary of State, and may promulgate regulations with respect to the inclusion of that country and any special requirements the Secretary of Homeland Security, in the Secretary's sole discretion, may impose prior to allowing nationals of that country to obtain the waiver provided by this subsection.

**(m) Requirements for admission of nonimmigrant nurses**

**(1)** The qualifications referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to an alien who is coming to the United States to perform nursing services for a facility, are that the alien--

**(A)** has obtained a full and unrestricted license to practice professional nursing in the country where the alien obtained nursing education or has received nursing education in the United States;

**(B)** has passed an appropriate examination (recognized in regulations promulgated in consultation with the Secretary of Health and Human Services) or has a full and unrestricted license under State law to practice professional nursing in the State of intended employment; and

**(C)** is fully qualified and eligible under the laws (including such temporary or interim licensing requirements which authorize the nurse to be employed) governing the place of intended employment to engage in the practice of professional nursing as a registered nurse immediately upon admission to the United States and is authorized under such laws to be employed by the facility.

**(2)(A)** The attestation referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to a facility for which an alien will perform services, is an attestation as to the following:

**(i)** The facility meets all the requirements of paragraph (6).

**(ii)** The employment of the alien will not adversely affect the wages and working conditions of registered nurses similarly employed.

**(iii)** The alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility.

**(iv)** The facility has taken and is taking timely and significant steps designed to recruit and retain sufficient registered nurses who are United States citizens or immigrants who are authorized to perform nursing services, in order to remove as quickly as reasonably possible the dependence of the facility on nonimmigrant registered nurses.

**(v)** There is not a strike or lockout in the course of a labor dispute, the facility did not lay off and will not lay off a registered nurse employed by the facility within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition, and the employment of such an alien is not intended or designed to influence an election for a bargaining representative for registered nurses of the facility.

**(vi)** At the time of the filing of the petition for registered nurses under section 1101(a)(15)(H)(i)(c) of this title, notice of the filing has been provided by the facility to the bargaining representative of the registered nurses at the facility or, where there is no such bargaining representative, notice of the filing has been provided to the registered nurses employed at the facility through posting in conspicuous locations.

**(vii)** The facility will not, at any time, employ a number of aliens issued visas or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title that exceeds 33 percent of the total number of registered nurses employed by the facility.

**(viii)** The facility will not, with respect to any alien issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title--

**(I)** authorize the alien to perform nursing services at any worksite other than a worksite controlled by the facility; or

**(II)** transfer the place of employment of the alien from one worksite to another.

Nothing in clause (iv) shall be construed as requiring a facility to have taken significant steps described in such clause before November 12, 1999. A copy of the attestation shall be provided, within 30 days of the date of filing, to registered nurses employed at the facility on the date of filing.

**(B)** For purposes of subparagraph (A)(iv), each of the following shall be considered a significant step reasonably designed to recruit and retain registered nurses:

**(i)** Operating a training program for registered nurses at the facility or financing (or providing participation in) a training program for registered nurses elsewhere.

**(ii)** Providing career development programs and other methods of facilitating health care workers to become registered nurses.

**(iii)** Paying registered nurses wages at a rate higher than currently being paid to registered nurses similarly employed in the geographic area.

**(iv)** Providing reasonable opportunities for meaningful salary advancement by registered nurses.

The steps described in this subparagraph shall not be considered to be an exclusive list of the significant steps that may be taken to meet the conditions of subparagraph (A)(iv). Nothing in this subparagraph shall require a facility to take more than one step if the facility can demonstrate that taking a second step is not reasonable.

**(C)** Subject to subparagraph (E), an attestation under subparagraph (A)--

**(i)** shall expire on the date that is the later of--

**(I)** the end of the one-year period beginning on the date of its filing with the Secretary of Labor; or

**(II)** the end of the period of admission under section 1101(a)(15)(H)(i)(c) of this title of the last alien with respect to whose admission it was applied (in accordance with clause (ii)); and

**(ii)** shall apply to petitions filed during the one-year period beginning on the date of its filing with the Secretary of Labor if the facility states in each such petition that it continues to comply with the conditions in the attestation.

**(D)** A facility may meet the requirements under this paragraph with respect to more than one registered nurse in a single petition.

**(E)(i)** The Secretary of Labor shall compile and make available for public examination in a timely manner in Washington, D.C., a list identifying facilities which have filed petitions for nonimmigrants under section 1101(a)(15)(H)(i)(c) of this title and, for each such facility, a copy of the facility's attestation under subparagraph (A) (and accompanying documentation) and each such petition filed by the facility.

**(ii)** The Secretary of Labor shall establish a process, including reasonable time limits, for the receipt, investigation, and disposition of complaints respecting a facility's failure to meet conditions attested to or a facility's misrepresentation of a material fact in an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives, associations deemed appropriate by the Secretary, and other aggrieved parties as determined under regulations of the Secretary). The Secretary shall conduct an investigation under this clause if there is reasonable cause to believe that a facility fails to meet conditions attested to. Subject to the time limits established under this clause, this subparagraph shall apply regardless of whether an attestation is expired or unexpired at the time a complaint is filed.

**(iii)** Under such process, the Secretary shall provide, within 180 days after the date such a complaint is filed, for a determination as to whether or not a basis exists to make a finding described in clause (iv). If the Secretary determines that such a basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint within 60 days of the date of the determination.

**(iv)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that a facility (for which an attestation is made) has failed to meet a condition attested to or that there was a misrepresentation of material fact in the attestation, the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per nurse per violation, with the total penalty not to exceed $10,000

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

per violation) as the Secretary determines to be appropriate. Upon receipt of such notice, the Attorney General shall not approve petitions filed with respect to a facility during a period of at least one year for nurses to be employed by the facility.

**(v)** In addition to the sanctions provided for under clause (iv), if the Secretary of Labor finds, after notice and an opportunity for a hearing, that a facility has violated the condition attested to under subparagraph (A)(iii) (relating to payment of registered nurses at the prevailing wage rate), the Secretary shall order the facility to provide for payment of such amounts of back pay as may be required to comply with such condition.

**(F)(i)** The Secretary of Labor shall impose on a facility filing an attestation under subparagraph (A) a filing fee, in an amount prescribed by the Secretary based on the costs of carrying out the Secretary's duties under this subsection, but not exceeding $250.

**(ii)** Fees collected under this subparagraph shall be deposited in a fund established for this purpose in the Treasury of the United States.

**(iii)** The collected fees in the fund shall be available to the Secretary of Labor, to the extent and in such amounts as may be provided in appropriations Acts, to cover the costs described in clause (i), in addition to any other funds that are available to the Secretary to cover such costs.

**(3)** The period of admission of an alien under section 1101(a)(15)(H)(i)(c) of this title shall be 3 years.

**(4)** The total number of nonimmigrant visas issued pursuant to petitions granted under section 1101(a)(15)(H)(i)(c) of this title in each fiscal year shall not exceed 500. The number of such visas issued for employment in each State in each fiscal year shall not exceed the following:

**(A)** For States with populations of less than 9,000,000, based upon the 1990 decennial census of population, 25 visas.

**(B)** For States with populations of 9,000,000 or more, based upon the 1990 decennial census of population, 50 visas.

**(C)** If the total number of visas available under this paragraph for a fiscal year quarter exceeds the number of qualified nonimmigrants who may be issued such visas during those quarters, the visas made available under this paragraph shall be issued without regard to the numerical limitation under subparagraph (A) or (B) of this paragraph during the last fiscal year quarter.

**(5)** A facility that has filed a petition under section 1101(a)(15)(H)(i)(c) of this title to employ a nonimmigrant to perform nursing services for the facility--

**(A)** shall provide the nonimmigrant a wage rate and working conditions commensurate with those of nurses similarly employed by the facility;

**(B)** shall require the nonimmigrant to work hours commensurate with those of nurses similarly employed by the facility; and

**(C)** shall not interfere with the right of the nonimmigrant to join or organize a union.

**(6)** For purposes of this subsection and section 1101(a)(15)(H)(i)(c) of this title, the term "facility" means a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) that meets the following requirements:

**(A)** As of March 31, 1997, the hospital was located in a health professional shortage area (as defined in section 254e of Title 42).

**(B)** Based on its settled cost report filed under title XVIII of the Social Security Act for its cost reporting period beginning during fiscal year 1994--

**(i)** the hospital has not less than 190 licensed acute care beds;

**(ii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of such title is not less than 35 percent of the total number of such hospital's acute care inpatient days for such period; and

**(iii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX of the Social Security Act, is not less than 28 percent of the total number of such hospital's acute care inpatient days for such period.

**(7)** For purposes of paragraph (2)(A)(v), the term "lay off", with respect to a worker--

**(A)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(B)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

Nothing in this paragraph is intended to limit an employee's or an employer's rights under a collective bargaining agreement or other employment contract.

**(n) Labor condition application**

**(1)** No alien may be admitted or provided status as an H-1B nonimmigrant in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status as an H-1B nonimmigrant wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the application, and

**(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the application--

**(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought, or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which H-1B nonimmigrants are sought.

**(D)** The application shall contain a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(E)(i)** In the case of an application described in clause (ii), the employer did not displace and will not displace a United States worker (as defined in paragraph (4)) employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application.

**(ii)** An application described in this clause is an application filed on or after the date final regulations are first promulgated to carry out this subparagraph, and before [7] by an H-1B-dependent employer (as defined in paragraph (3)) or by an employer that has been found, on or after October 21, 1998, under paragraph (2)(C) or (5) to have committed a willful failure or misrepresentation during the 5-year period preceding the filing of the application. An application is not described in this clause if the only H-1B nonimmigrants sought in the application are exempt H-1B nonimmigrants.

**(F)** In the case of an application described in subparagraph (E)(ii), the employer will not place the nonimmigrant with another employer (regardless of whether or not such other employer is an H-1B-dependent employer) where--

**(i)** the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and

**(ii)** there are indicia of an employment relationship between the nonimmigrant and such other employer;

unless the employer has inquired of the other employer as to whether, and has no knowledge that, within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, the other employer has displaced or intends to displace a United States worker employed by the other employer.

**(G)(i)** In the case of an application described in subparagraph (E)(ii), subject to clause (ii), the employer, prior to filing the application--

**(I)** has taken good faith steps to recruit, in the United States using procedures that meet industry-wide standards and offering compensation that is at least as great as that required to be offered to H-1B nonimmigrants under subparagraph (A), United States workers for the job for which the nonimmigrant or nonimmigrants is or are sought; and

**(II)** has offered the job to any United States worker who applies and is equally or better qualified for the job for which the nonimmigrant or nonimmigrants is or are sought.

**(ii)** The conditions described in clause (i) shall not apply to an application filed with respect to the employment of an H-1B nonimmigrant who is described in subparagraph (A), (B), or (C) of section 1153(b)(1) of this title.

The employer shall make available for public examination, within one working day after the date on which an application under this paragraph is filed, at the employer's principal place of business or worksite, a copy of each such application (and such accompanying documents as are necessary). The Secretary shall compile, on a current basis, a list (by employer and by occupational classification) of the applications filed under this subsection. Such list shall include the wage rate, number of aliens sought, period of intended employment, and date of need. The Secretary shall make such list available for public examination in Washington, D.C. The Secretary of Labor shall review such an application only for completeness and obvious inaccuracies. Unless the Secretary finds that the application is incomplete or obviously inaccurate, the Secretary shall provide the certification described in section 1101(a)(15)(H)(i)(b) of this title within 7 days of the date of the filing of the application. The application form shall include a clear statement explaining the liability under subparagraph (F) of a placing employer if the other employer described in such subparagraph displaces a United States worker as described in such subparagraph. Nothing in subparagraph (G) shall be construed to prohibit an employer from using legitimate selection criteria relevant to the job that are normal or customary to the type of job involved, so long as such criteria are not applied in a discriminatory manner.

**(2)(A)** Subject to paragraph (5)(A), the Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or

misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under such process, the Secretary shall provide, within 30 days after the date such a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary determines that such a reasonable basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), (1) (E), or (1)(F), a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an application, or a violation of clause (iv)--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an application, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an application under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Attorney General shall devise a process under which an H-1B nonimmigrant who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an application under this subsection to require an H-1B nonimmigrant to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** It is a violation of this clause for an employer who has filed an application under this subsection to require an alien who is the subject of a petition filed under section 1184(c)(1) of this title, for which a fee is imposed under section 1184(c)(9) of this title, to reimburse, or otherwise compensate, the employer for part or all of the cost of such fee. It is a violation of this clause for such an employer otherwise to accept such reimbursement or compensation from such an alien.

**(III)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a full-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a part-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on such petition consistent with the rate of pay identified on such petition.

**(III)** In the case of an H-1B nonimmigrant who has not yet entered into employment with an employer who has had approved an application under this subsection, and a petition under section 1184(c)(1) of this title, with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States pursuant to the petition, or 60 days after the date the nonimmigrant becomes eligible to work for the employer (in the case of a nonimmigrant who is present in the United States on the date of the approval of the petition).

**(IV)** This clause does not apply to a failure to pay wages to an H-1B nonimmigrant for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to an H-1B nonimmigrant an established salary practice of the employer, under which the employer pays to H-1B nonimmigrants and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

   **(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

   **(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an application under this subsection to fail to offer to an H-1B nonimmigrant, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and noncash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** If an H-1B-dependent employer places a nonexempt H-1B nonimmigrant with another employer as provided under paragraph (1)(F) and the other employer has displaced or displaces a United States worker employed by such other employer during the period described in such paragraph, such displacement shall be considered for purposes of this paragraph a failure, by the placing employer, to meet a condition specified in an application submitted under paragraph (1); except that the Attorney General may impose a sanction described in subclause (II) of subparagraph (C)(i), (C)(ii), or (C)(iii) only if the Secretary of Labor found that such placing employer--

**(i)** knew or had reason to know of such displacement at the time of the placement of the nonimmigrant with the other employer; or

**(ii)** has been subject to a sanction under this subparagraph based upon a previous placement of an H-1B nonimmigrant with the same other employer.

**(F)** The Secretary may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date (on or after October 21, 1998) on which the employer is found by the Secretary to have committed a willful failure to meet a condition of paragraph (1) (or has been found under paragraph (5) to have committed a willful failure to meet the condition of paragraph (1)(G)(i)(II)) or to have made a willful misrepresentation of material fact in an application. The preceding sentence shall apply to an employer regardless of whether or not the employer is an H-1B-dependent employer. The authority of the Secretary under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(G)(i)** The Secretary of Labor may initiate an investigation of any employer that employs nonimmigrants described in section 1101(a)(15)(H)(i)(b) of this title if the Secretary of Labor has reasonable cause to believe that the employer is not in compliance with this subsection. In the case of an investigation under this clause, the Secretary of Labor (or the acting Secretary in the case of the absence of[8] disability of the Secretary of Labor) shall personally certify that reasonable cause exists and shall approve commencement of the investigation. The investigation may be initiated for reasons other than completeness and obvious inaccuracies by the employer in complying with this subsection.

**(ii)** If the Secretary of Labor receives specific credible information from a source who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's labor condition application under paragraph (1), and whose identity is known to the Secretary of Labor, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor may conduct an investigation into the alleged failure or failures. The Secretary of Labor may withhold the identity of the source from the employer, and the source's identity shall not be subject to disclosure under section 552 of Title 5.

**(iii)** The Secretary of Labor shall establish a procedure for any person desiring to provide to the Secretary of Labor information described in clause (ii) that may be used, in whole or in part, as the basis for the commencement of an investigation described in such clause, to provide the information in writing on a form developed and provided by the Secretary of Labor and completed by or on behalf of the person. The person may not be an officer or employee of the Department of Labor, unless the information satisfies the requirement of clause (iv)(II) (although an officer or employee of the Department of Labor may complete the form on behalf of the person).

**(iv)** Any investigation initiated or approved by the Secretary of Labor under clause (ii) shall be based on information that satisfies the requirements of such clause and that

**(I)** originates from a source other than an officer or employee of the Department of Labor; or

**(II)** was lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation under this chapter of [8] any other Act.

**(v)** The receipt by the Secretary of Labor of information submitted by an employer to the Attorney General or the Secretary of Labor for purposes of securing the employment of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title shall not be considered a receipt of information for purposes of clause (ii).

**(vi)** No investigation described in clause (ii) (or hearing described in clause (viii) based on such investigation) may be conducted with respect to information about a failure to meet a condition described in clause (ii), unless the Secretary of Labor receives the information not later than 12 months after the date of the alleged failure.

**(vii)** The Secretary of Labor shall provide notice to an employer with respect to whom there is reasonable cause to initiate an investigation described in clauses [9] (i) or (ii), prior to the commencement of an investigation under such clauses, of the intent to conduct an investigation. The notice shall be provided in such a manner, and shall contain sufficient detail, to permit the employer to respond to the allegations before an investigation is commenced. The Secretary of Labor is not required to comply with this clause if the Secretary of Labor determines that to do so would interfere with an effort by the Secretary of Labor to secure compliance by the employer with the requirements of this subsection. There shall be no judicial review of a determination by the Secretary of Labor under this clause.

**(viii)** An investigation under clauses [9] (i) or (ii) may be conducted for a period of up to 60 days. If the Secretary of Labor determines after such an investigation that a reasonable basis exists to make a finding that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing in accordance with section 556 of Title 5 within 120 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 120 days after the date of the hearing.

**(H)(i)** Except as provided in clauses (ii) and (iii), a person or entity is considered to have complied with the requirements of this subsection, notwithstanding a technical or procedural failure to meet such requirements, if there was a good faith attempt to comply with the requirements.

**(ii)** Clause (i) shall not apply if--

**(I)** the Department of Labor (or another enforcement agency) has explained to the person or entity the basis for the failure;

**(II)** the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure; and

**(III)** the person or entity has not corrected the failure voluntarily within such period.

**(iii)** A person or entity that, in the course of an investigation, is found to have violated the prevailing wage requirements set forth in paragraph (1)(A), shall not be assessed fines or other penalties for such violation if the person or entity can establish that the manner in which the prevailing wage was calculated was consistent with recognized industry standards and practices.

**(iv)** Clauses (i) and (iii) shall not apply to a person or entity that has engaged in or is engaging in a pattern or practice of willful violations of this subsection.

**(I)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(3)(A)** For purposes of this subsection, the term "H-1B-dependent employer" means an employer that

**(i)**(I) has 25 or fewer full-time equivalent employees who are employed in the United States; and (II) employs more than 7 H-1B nonimmigrants;

**(ii)**(I) has at least 26 but not more than 50 full-time equivalent employees who are employed in the United States; and (II) employs more than 12 H-1B nonimmigrants; or

**(iii)**(I) has at least 51 full-time equivalent employees who are employed in the United States; and (II) employs H-1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

**(B)** For purposes of this subsection

**(i)** the term "exempt H-1B nonimmigrant" means an H-1B nonimmigrant who--

**(I)** receives wages (including cash bonuses and similar compensation) at an annual rate equal to at least $60,000; or

**(II)** has attained a master's or higher degree (or its equivalent) in a specialty related to the intended employment; and

**(ii)** the term "nonexempt H-1B nonimmigrant" means an H-1B nonimmigrant who is not an exempt H-1B nonimmigrant.

**(C)** For purposes of subparagraph (A)

**(i)** in computing the number of full-time equivalent employees and the number of H-1B nonimmigrants, exempt H-1B nonimmigrants shall not be taken into account during the longer of--

**(I)** the 6-month period beginning on October 21, 1998; or

**(II)** the period beginning on October 21, 1998, and ending on the date final regulations are issued to carry out this paragraph; and

**(ii)** any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as a single employer.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the H-1B nonimmigrant is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an application with respect to one or more H-1B nonimmigrants by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)** The term "H-1B nonimmigrant" means an alien admitted or provided status as a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title.

**(D)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract (other than a temporary employment contract entered into in order to evade a condition described in subparagraph (E) or (F) of paragraph (1)); but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer (or, in the case of a placement of a worker with another employer under paragraph (1)(F), with either employer described in such paragraph) at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(E)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Attorney General, to be employed.

**(5)(A)** This paragraph shall apply instead of subparagraphs (A) through (E) of paragraph (2) in the case of a violation described in subparagraph (B), but shall not be construed to limit or affect the authority of the Secretary or the Attorney General with respect to any other violation.

**(B)** The Attorney General shall establish a process for the receipt, initial review, and disposition in accordance with this paragraph of complaints respecting an employer's failure to meet the condition of paragraph (1)(G)(i)(II) or a petitioner's misrepresentation of material facts with respect to such condition. Complaints may be filed by an aggrieved individual who has submitted a resume or otherwise applied in a reasonable manner for the job that is the subject of the condition. No proceeding shall be conducted under this paragraph on a complaint concerning such a failure or misrepresentation unless the Attorney General determines that the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.

**(C)** If the Attorney General finds that a complaint has been filed in accordance with subparagraph (B) and there is reasonable cause to believe that such a failure or misrepresentation described in such complaint has occurred, the Attorney General shall initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of such Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings. The Attorney General shall pay the fee and expenses of the arbitrator.

**(D)(i)** The arbitrator shall make findings respecting whether a failure or misrepresentation described in subparagraph (B) occurred. If the arbitrator concludes that failure or misrepresentation was willful, the arbitrator shall make a finding to that effect. The arbitrator may not find such a failure or misrepresentation (or that such a failure or misrepresentation was willful) unless the complainant demonstrates such a failure or misrepresentation (or its willful character) by clear and convincing evidence. The arbitrator shall transmit the findings in the form of a written opinion to the parties to the arbitration and the Attorney General. Such findings shall be final and conclusive, and, except as provided in this subparagraph, no official or court of the United States shall have power or jurisdiction to review any such findings.

**(ii)** The Attorney General may review and reverse or modify the findings of an arbitrator only on the same bases as an award of an arbitrator may be vacated or modified under section 10 or 11 of Title 9.

**(iii)** With respect to the findings of an arbitrator, a court may review only the actions of the Attorney General under clause (ii) and may set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5. Notwithstanding any other provision of law, such judicial review may only be brought in an appropriate United States court of appeals.

**(E)** If the Attorney General receives a finding of an arbitrator under this paragraph that an employer has failed to meet the condition of paragraph (1)(G)(i)(II) or has misrepresented a material fact with respect to such condition, unless the Attorney General reverses or modifies the finding under subparagraph (D)(ii)--

**(i)** the Attorney General may impose administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation or $5,000 per violation in the case of a willful failure or misrepresentation) as the Attorney General determines to be appropriate; and

**(ii)** the Attorney General is authorized to not approve petitions filed, with respect to that employer and for aliens to be employed by the employer, under section 1154 or 1184(c) of this title--

**(I)** during a period of not more than 1 year; or

**(II)** in the case of a willful failure or willful misrepresentation, during a period of not more than 2 years.

**(F)** The Attorney General shall not delegate, to any other employee or official of the Department of Justice, any function of the Attorney General under this paragraph, until 60 days after the Attorney General has submitted a plan for such delegation to the Committees on the Judiciary of the United States House of Representatives and the Senate.

**(o) Omitted**

**(p) Computation of prevailing wage level**

**(1)** In computing the prevailing wage level for an occupational classification in an area of employment for purposes of subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) in the case of an employee of--

**(A)** an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity; or

**(B)** a nonprofit research organization or a Governmental research organization,

the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment.

**(2)** With respect to a professional athlete (as defined in subsection (a)(5)(A)(iii)(II)) when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations shall be considered as not adversely affecting the wages of United States workers similarly employed and be considered the prevailing wage.

**(3)** The prevailing wage required to be paid pursuant to subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) shall be 100 percent of the wage determined pursuant to those sections.

**(4)** Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference

between the 2 levels offered, adding the quotient thus obtained to the first level and subtracting that quotient from the second level.

**(q) Academic honoraria**

Any alien admitted under section 1101(a)(15)(B) of this title may accept an honorarium payment and associated incidental expenses for a usual academic activity or activities (lasting not longer than 9 days at any single institution), as defined by the Attorney General in consultation with the Secretary of Education, if such payment is offered by an institution or organization described in subsection (p)(1) and is made for services conducted for the benefit of that institution or entity and if the alien has not accepted such payment or expenses from more than 5 institutions or organizations in the previous 6-month period.

**(r) Exception for certain alien nurses**

Subsection (a)(5)(C) shall not apply to an alien who seeks to enter the United States for the purpose of performing labor as a nurse who presents to the consular officer (or in the case of an adjustment of status, the Attorney General) a certified statement from the Commission on Graduates of Foreign Nursing Schools (or an equivalent independent credentialing organization approved for the certification of nurses under subsection (a)(5)(C) by the Attorney General in consultation with the Secretary of Health and Human Services) that--

**(1)** the alien has a valid and unrestricted license as a nurse in a State where the alien intends to be employed and such State verifies that the foreign licenses of alien nurses are authentic and unencumbered;

**(2)** the alien has passed the National Council Licensure Examination (NCLEX);

**(3)** the alien is a graduate of a nursing program--

**(A)** in which the language of instruction was English;

**(B)** located in a country--

**(i)** designated by such commission not later than 30 days after November 12, 1999, based on such commission's assessment that the quality of nursing education in that country, and the English language proficiency of those who complete such programs in that country, justify the country's designation; or

**(ii)** designated on the basis of such an assessment by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection; and

**(C)(i)** which was in operation on or before November 12, 1999; or

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(ii)** has been approved by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection.

**(s) Consideration of benefits received as battered alien in determination of inadmissibility as likely to become public charge**

In determining whether an alien described in subsection (a)(4)(C)(i) is inadmissible under subsection (a)(4) or ineligible to receive an immigrant visa or otherwise to adjust to the status of permanent resident by reason of subsection (a)(4), the consular officer or the Attorney General shall not consider any benefits the alien may have received that were authorized under section 1641(c) of this title.

**(t)** [10] **Nonimmigrant professionals; labor attestations**

**(1)** No alien may be admitted or provided status as a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title in an occupational classification unless the employer has filed with the Secretary of Labor an attestation stating the following:

   **(A)** The employer--

      **(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title wages that are at least--

         **(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question; or

         **(II)** the prevailing wage level for the occupational classification in the area of employment,

         whichever is greater, based on the best information available as of the time of filing the attestation; and

      **(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

   **(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

   **(C)** The employer, at the time of filing the attestation--

      **(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought; or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title are sought.

**(D)** A specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(2)(A)** The employer shall make available for public examination, within one working day after the date on which an attestation under this subsection is filed, at the employer's principal place of business or worksite, a copy of each such attestation (and such accompanying documents as are necessary).

**(B)(i)** The Secretary of Labor shall compile, on a current basis, a list (by employer and by occupational classification) of the attestations filed under this subsection. Such list shall include, with respect to each attestation, the wage rate, number of aliens sought, period of intended employment, and date of need.

**(ii)** The Secretary of Labor shall make such list available for public examination in Washington, D.C.

**(C)** The Secretary of Labor shall review an attestation filed under this subsection only for completeness and obvious inaccuracies. Unless the Secretary of Labor finds that an attestation is incomplete or obviously inaccurate, the Secretary of Labor shall provide the certification described in section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title within 7 days of the date of the filing of the attestation.

**(3)(A)** The Secretary of Labor shall establish a process for the receipt, investigation, and disposition of complaints respecting the failure of an employer to meet a condition specified in an attestation submitted under this subsection or misrepresentation by the employer of material facts in such an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary of Labor shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under the process described in subparagraph (A), the Secretary of Labor shall provide, within 30 days after the date a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary of Labor determines that such a reasonable basis exists, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary of Labor may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), a substantial failure to meet a condition of paragraph (1)(C) or (1)(D), or a misrepresentation of material fact in an attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an attestation, or a violation of clause (iv)--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an attestation, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition or application supported by the attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an attestation under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Secretary of Homeland Security shall devise a process under which a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who files a complaint regarding a violation

of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an attestation under this subsection to require a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary of Labor shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary of Labor may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a full-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a part-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on the attestation consistent with the rate of pay identified on the attestation.

**(III)** In the case of a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who has not yet entered into employment with an employer who has had approved an attestation under this subsection with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States, or 60 days after the date the nonimmigrant becomes eligible to work for the employer in the case of a nonimmigrant who is present in the United States on the date of the approval of the attestation filed with the Secretary of Labor.

**(IV)** This clause does not apply to a failure to pay wages to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title an established salary practice of the employer, under which the employer pays to nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

**(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

**(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection to fail to offer to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and non-cash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified in the attestation and required under paragraph (1), the Secretary of Labor shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** The Secretary of Labor may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date on which the employer is found by the Secretary of Labor to have committed a willful failure to meet a condition of paragraph (1) or to have made a willful misrepresentation of material fact in an attestation. The authority of the Secretary of Labor under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(F)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an attestation with respect to one or more nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(D)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Secretary of Homeland Security, to be employed.

**(t)** [10] **Foreign residence requirement**

**(1)** Except as provided in paragraph (2), no person admitted under section 1101(a)(15)(Q)(ii)(I) of this title, or acquiring such status after admission, shall be eligible to apply for nonimmigrant status, an immigrant visa, or permanent residence under this chapter until it is established that such person has resided and been physically present in the person's country of nationality or last residence for an aggregate of at least 2 years following departure from the United States.

**(2)** The Secretary of Homeland Security may waive the requirement of such 2-year foreign residence abroad if the Secretary determines that--

**(A)** departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or an alien lawfully admitted for permanent residence); or

**(B)** the admission of the alien is in the public interest or the national interest of the United States.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 212, 66 Stat. 182; July 18, 1956, c. 629, Title III, § 301(a), 70 Stat. 575; Pub.L. 85-508, § 23, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(b), Mar. 18, 1959, 73 Stat. 13; Pub.L. 86-648, § 8, July 14, 1960, 74 Stat. 505; Pub.L. 87-256, § 109(c), Sept. 21, 1961, 75 Stat. 535; Pub.L. 87-301, §§ 11-15, Sept. 26, 1961, 75 Stat. 654, 655; Pub.L.

89-236, §§ 10, 15, Oct. 3, 1965, 79 Stat. 917, 919; Pub.L. 91-225, § 2, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-484, Title VI, § 601(a), (c), (d), Oct. 12, 1976, 90 Stat. 2300, 2301; Pub.L. 94-571, §§ 5, 7(d), Oct. 20, 1976, 90 Stat. 2705, 2706; Pub.L. 95-83, Title III, § 307(q)(1), (2), Aug. 1, 1977, 91 Stat. 394; Pub.L. 95-549, Title I, §§ 101, 102, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 96-70, Title III, § 3201(b), Sept. 27, 1979, 93 Stat. 497; Pub.L. 96-212, Title II, § 203(d), (f), Mar. 17, 1980, 94 Stat. 107; Pub.L. 96-538, Title IV, § 404, Dec. 17, 1980, 94 Stat. 3192; Pub.L. 97-116, §§ 4, 5(a)(1), (2), (b), 18(e), Dec. 29, 1981, 95 Stat. 1611, 1612, 1620; Pub.L. 98-454, Title VI, § 602[(a)], Oct. 5, 1984, 98 Stat. 1737; Pub.L. 98-473, Title II, § 220(a), Oct. 12, 1984, 98 Stat. 2028; Pub.L. 99-396, § 14(a), Aug. 27, 1986, 100 Stat. 842; Pub.L. 99-570, Title I, § 1751(a), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-639, § 6(a), Nov. 10, 1986, 100 Stat. 3543; Pub.L. 99-653, § 7(a), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-204, Title VIII, § 806(c), Dec. 22, 1987, 101 Stat. 1399; Pub.L. 100-525, §§ 3(1)(A), 7(c)(1), (3), 8(f), 9(i), Oct. 24, 1988, 102 Stat. 2614, 2616, 2617, 2620; Pub.L. 100-690, Title VII, § 7349(a), Nov. 18, 1988, 102 Stat. 4473; Pub.L. 101-238, § 3(b), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(a), (c), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, § 162(e)(1), (f)(2)(B), Title II, §§ 202(b), 205(c)(3), Title V, §§ 511(a), 514(a), Title VI, § 601(a), (b), (d), Nov. 29, 1990, 104 Stat. 5011, 5012, 5014, 5020, 5052, 5053, 5067, 5075 to 5077; Pub.L. 102-232, Title III, §§ 302(e)(6), (9), 303(a)(5)(B), (6), (7) (B), 306(a)(10), (12), 307(a) to (g), 309(b)(7), Dec. 12, 1991, 105 Stat. 1746, 1747, 1751, 1753 to 1755, 1759; Pub.L. 103-43, Title XX, § 2007(a), June 10, 1993, 107 Stat. 210; Pub.L. 103-317, Title V, § 506(a), Aug. 26, 1994, 108 Stat. 1765; Pub.L. 103-322, Title XIII, § 130003(b)(1), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-416, Title II, §§ 203(a), 219(e), (z)(1), (5), 220(a), Oct. 25, 1994, 108 Stat. 4311, 4316, 4318, 4319; Pub.L. 104-132, Title IV, §§ 411, 412, 440(d), Apr. 24, 1996, 110 Stat. 1268, 1269, 1277; Pub.L. 104-208, Div. C, Title I, § 124(b)(1), Title III, §§ 301(b)(1), (c)(1), 304(b), 305(c), 306(d), 308(d)(2) (B), (d)(1), (e)(1)(B), (C), (2)(A), (6), (f)(1)(C) to (F), (3)(A), (g)(1), (4)(B), (10)(A), (H), 322(a)(2)(B), 341(a), (b), 342(a), 343, 344(a), 345(a), 346(a), 347(a), 348(a), 349, 351(a), 352(a), 355, Title V, § 531(a), Title VI, §§ 602(a), 622(b), 624(a), 671(e)(3), Sept. 30, 1996, 110 Stat. 3009-562, 3009-576, 3009-578, 3009-597, 3009-607, 3009-612, 3009-616, 3009-619 to 3009-622, 3009-625, 3009-629, 3009-635 to 3009-641, 3009-644, 3009-674, 3009-689, 3009-695, 3009-698, 3009-723; Pub.L. 105-73, Nov. 12, 1997, 111 Stat. 1459; Pub.L. 105-277, Div. C, Title IV, §§ 412(a) to (c), 413(a) to (e)(1), (f), 415(a), 431(a), Div. G, Title XXII, § 2226(a), Oct. 21, 1998, 112 Stat. 2681-642 to 2681-651, 2681-654, 2681-658, 2681-820; Pub.L. 105-292, Title VI, § 604(a), Oct. 27, 1998, 112 Stat. 2814; Pub.L. 106-95, §§ 2(b), 4(a), Nov. 12, 1999, 113 Stat. 1312, 1317; Pub.L. 106-120, Title VIII, § 809, Dec. 3, 1999, 113 Stat. 1632; Pub.L. 106-313, Title I, §§ 106(c)(2), 107(a), Oct. 17, 2000, 114 Stat. 1254, 1255; Pub.L. 106-386, Div. A, §§ 107(e)(3), 111(d), Div. B, Title V, §§ 1505(a), (c)(1), (d) to (f), 1513(e), Oct. 28, 2000, 114 Stat. 1478, 1485, 1525, 1526, 1536; Pub.L. 106-395, Title II, § 201(b)(1), (2), Oct. 30, 2000, 114 Stat. 1633, 1634; Pub.L. 106-396, Title I, § 101(b)(1), Oct. 30, 2000, 114 Stat. 1638; Pub.L. 107-56, Title IV, § 411(a), Title X, § 1006(a), Oct. 26, 2001, 115 Stat. 345, 394; Pub.L. 107-150, § 2(a)(2), Mar. 13, 2002, 116 Stat. 74; Pub.L. 107-273, Div. C, Title I, § 11018(c), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 108-77, Title IV, § 402(b), (c), Sept. 3, 2003, 117 Stat. 940, 946; Pub.L. 108-193, §§ 4(b)(4), 8(a)(2), Dec. 19, 2003, 117 Stat. 2879; Pub.L. 108-447, Div. J, Title IV, §§ 422(a), 423, 424(a)(1), (b), Dec. 8, 2004, 118 Stat. 3353 to 3355; Pub.L. 108-449, § 1(b)(2), Dec. 10, 2004, 118 Stat. 3470; Pub.L. 108-458, Title V, §§ 5501(a), 5502(a), 5503, Dec. 17, 2004, 118 Stat. 3740, 3741; Pub.L. 109-13, Div. B, Title I, §§ 103(a) to (c), 104, Title V, § 501(d), May 11, 2005, 119 Stat. 306 to 309, 322; Pub.L. 109-162, Title VIII, § 802, Jan. 5, 2006, 119 Stat. 3054; Pub.L. 109-271, § 6(b), Aug. 12, 2006, 120 Stat. 762; Pub.L. 110-161, Div. J, Title VI, § 691(a), (c), Dec. 26, 2007, 121 Stat. 2364, 2365; Pub.L. 110-229, Title VII, § 702(b)(2), (3), (d), May 8, 2008, 122 Stat. 860, 862; Pub.L. 110-293, Title III, § 305, July 30, 2008, 122 Stat. 2963; Pub.L. 110-340, § 2(b), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, § 222(f)(1), 234, Dec. 23, 2008, 122 Stat. 5071, 5074; Pub.L. 111-122, § 3(b), Dec. 22, 2009, 123 Stat. 3481; Pub.L. 111-287, § 2, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 113-4, Title VIII, § 804, Mar. 7, 2013, 127 Stat. 111.)

## TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

## EXECUTIVE ORDERS

AR.00842

### EXECUTIVE ORDER NO. 12324

Ex. Ord. No. 12324, Sept. 29, 1981, 46 F.R. 48109, relating to high seas interdiction of illegal aliens, was revoked by Ex. Ord. No. 12807, May 24, 1992, 57 F.R. 23133, set out as a note under this section.

### EXECUTIVE ORDER NO. 12807

<May 24, 1992, 57 F.R. 23133, as amended Ex. Ord. No. 13286, Sec. 30, Feb. 28, 2003, 68 F.R. 10625>

### Interdiction of Illegal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title] and whereas:

**(1)** The President has authority to suspend the entry of aliens coming by sea to the United States without necessary documentation, to establish reasonable rules and regulations regarding, and other limitations on, the entry or attempted entry of aliens into the United States, and to repatriate aliens interdicted beyond the territorial sea of the United States;

**(2)** The international legal obligations of the United States under the United Nations Protocol Relating to the Status of Refugees (U.S. T.I.A.S. 6577; 19 U.S.T. 6223) to apply Article 33 of the United Nations Convention Relating to the Status of Refugees do not extend to persons located outside the territory of the United States;

**(3)** Proclamation No. 4865 [set out as a note under this section] suspends the entry of all undocumented aliens into the United States by the high seas; and

**(4)** There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally;

I, GEORGE BUSH, President of the United States of America, hereby order as follows:

**Section 1.** The Secretary of State shall undertake to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea.

**Sec. 2. (a)** The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appropriate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.

**(b)** Those instructions shall apply to any of the following defined vessels:

**(1)** Vessels of the United States, meaning any vessel documented or numbered pursuant to the laws of the United States, or owned in whole or in part by the United States, a citizen of the United States, or a corporation incorporated under the laws of the United States or any State, Territory, District, Commonwealth, or possession thereof, unless the vessel has been granted nationality by a foreign nation in accord with Article 5 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(2)** Vessels without nationality or vessels assimilated to vessels without nationality in accordance with paragraph (2) of Article 6 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(3)** Vessels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels.

**(c)** Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:

**(1)** To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.

**(2)** To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.

**(3)** To return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Secretary of Homeland Security, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.

**(d)** These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.

**Sec. 3.** This order is intended only to improve the internal management of the Executive Branch. Neither this order nor any agency guidelines, procedures, instructions, directives, rules or regulations implementing this order shall create, or shall be construed to create, any right or benefit, substantive or procedural (including without limitation any right or benefit under the Administrative Procedure Act [section 551 et seq. of Title 5, Government Organization and Employees]), legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person. Nor shall this order be construed to require any procedures to determine whether a person is a refugee.

**Sec. 4.** Executive Order No. 12324 [formerly set out as a note under this section] is hereby revoked and replaced by this order.

**Sec. 5.** This order shall be effective immediately.

<div align="right">GEORGE BUSH</div>

<div align="center">

**EXECUTIVE ORDER NO. 13276**

<Nov. 15, 2002, 67 F.R. 69985, as amended Ex. Ord. No. 13286, Sec. 1, Feb. 28, 2003, 68 F.R. 10619>

</div>

**Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) (1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsecs. (f) and (a)(1) of this section], and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

**Section 1.** Duties and Authorities of Agency Heads. Consistent with applicable law,

**(a)(i)** The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean

region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

**(ii)** The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

**(b)** The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

**(c)(i)** The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

**(ii)** In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out under this section], regarding interdiction of migrants.

**Sec. 2.** Definitions. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

**Sec. 3. Scope.**

**(a)** Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992.

**(b)** Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

**(c)** This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

**(d)** Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

**(e)** This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

GEORGE W. BUSH

### EXECUTIVE ORDER NO. 13769

Ex. Ord. No. 13769, January 27, 2017, 82 F.R. 8977, relating to protecting the Nation from foreign terrorist entry into the United States, was revoked by Ex. Ord. No. 13780, § 13, March 9, 2017, 82 F.R. 13209.

### EXECUTIVE ORDER NO. 13780

<March 6, 2017, 82 F.R. 13209>

**Protecting the Nation From Foreign Terrorist Entry Into the United States**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, and to protect the Nation from terrorist activities by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1. Policy and Purpose. (a)** It is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals. The screening and vetting protocols and procedures associated with the visa-issuance process and the United States Refugee Admissions Program (USRAP) play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States. It is therefore the policy of the United States to improve the screening and vetting protocols and procedures associated with the visa-issuance process and the USRAP.

**(b)** On January 27, 2017, to implement this policy, I issued Executive Order 13769 (Protecting the Nation from Foreign Terrorist Entry into the United States).

**(i)** Among other actions, Executive Order 13769 suspended for 90 days the entry of certain aliens from seven countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. These are countries that had already been identified as presenting heightened concerns about terrorism and travel to the United States. Specifically, the suspension applied to countries referred to in, or designated under, section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), in which Congress restricted use of the Visa Waiver Program for nationals of, and aliens recently present in, (A) Iraq or Syria, (B) any country designated by the Secretary of State as a state sponsor of terrorism (currently Iran, Syria, and Sudan), and (C) any other country designated as a country of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence. In 2016, the Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern for travel purposes, based on consideration of three statutory factors related to terrorism and national security: "(I) whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States; (II) whether a foreign terrorist organization has a significant presence in the country or area; and (III) whether the country or area is a safe haven for terrorists." 8 U.S.C. 1187(a)(12)(D)(ii). Additionally, Members of Congress have expressed concerns about screening and vetting procedures following recent terrorist attacks in this country and in Europe.

**(ii)** In ordering the temporary suspension of entry described in subsection (b)(i) of this section, I exercised my authority under Article II of the Constitution and under section 212(f) of the INA, which provides in relevant part: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United

States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). Under these authorities, I determined that, for a brief period of 90 days, while existing screening and vetting procedures were under review, the entry into the United States of certain aliens from the seven identified countries_each afflicted by terrorism in a manner that compromised the ability of the United States to rely on normal decision-making procedures about travel to the United States_would be detrimental to the interests of the United States. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to grant case-by-case waivers when they determined that it was in the national interest to do so.

**(iii)** Executive Order 13769 also suspended the USRAP for 120 days. Terrorist groups have sought to infiltrate several nations through refugee programs. Accordingly, I temporarily suspended the USRAP pending a review of our procedures for screening and vetting refugees. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to jointly grant case-by-case waivers when they determined that it was in the national interest to do so.

**(iv)** Executive Order 13769 did not provide a basis for discriminating for or against members of any particular religion. While that order allowed for prioritization of refugee claims from members of persecuted religious minority groups, that priority applied to refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion. That order was not motivated by animus toward any religion, but was instead intended to protect the ability of religious minorities_whoever they are and wherever they reside_to avail themselves of the USRAP in light of their particular challenges and circumstances.

**(c)** The implementation of Executive Order 13769 has been delayed by litigation. Most significantly, enforcement of critical provisions of that order has been temporarily halted by court orders that apply nationwide and extend even to foreign nationals with no prior or substantial connection to the United States. On February 9, 2017, the United States Court of Appeals for the Ninth Circuit declined to stay or narrow one such order pending the outcome of further judicial proceedings, while noting that the "political branches are far better equipped to make appropriate distinctions" about who should be covered by a suspension of entry or of refugee admissions.

**(d)** Nationals from the countries previously identified under section 217(a)(12) of the INA warrant additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats. Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States. Finally, once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these countries typically delay issuing, or refuse to issue, travel documents.

**(e)** The following are brief descriptions, taken in part from the Department of State's Country Reports on Terrorism 2015 (June 2016), of some of the conditions in six of the previously designated countries that demonstrate why their nationals continue to present heightened risks to the security of the United States:

**(i) Iran.** Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq. Iran has also been linked to support for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts.

**(ii) Libya.** Libya is an active combat zone, with hostilities between the internationally recognized government and its rivals. In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions.

Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country. The Libyan government provides some cooperation with the United States' counterterrorism efforts, but it is unable to secure thousands of miles of its land and maritime borders, enabling the illicit flow of weapons, migrants, and foreign terrorist fighters. The United States Embassy in Libya suspended its operations in 2014.

**(iii) Somalia.** Portions of Somalia have been terrorist safe havens. Al-Shabaab, an al-Qa'ida-affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries. Somalia has porous borders, and most countries do not recognize Somali identity documents. The Somali government cooperates with the United States in some counterterrorism operations but does not have the capacity to sustain military pressure on or to investigate suspected terrorists.

**(iv) Sudan.** Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas. Historically, Sudan provided safe havens for al-Qa'ida and other terrorist groups to meet and train. Although Sudan's support to al-Qa'ida has ceased and it provides some cooperation with the United States' counterterrorism efforts, elements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country.

**(v) Syria.** Syria has been designated as a state sponsor of terrorism since 1979. The Syrian government is engaged in an ongoing military conflict against ISIS and others for control of portions of the country. At the same time, Syria continues to support other terrorist groups. It has allowed or encouraged extremists to pass through its territory to enter Iraq. ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States. The United States Embassy in Syria suspended its operations in 2012. Syria does not cooperate with the United States' counterterrorism efforts.

**(vi) Yemen.** Yemen is the site of an ongoing conflict between the incumbent government and the Houthi-led opposition. Both ISIS and a second group, al-Qa'ida in the Arabian Peninsula (AQAP), have exploited this conflict to expand their presence in Yemen and to carry out hundreds of attacks. Weapons and other materials smuggled across Yemen's porous borders are used to finance AQAP and other terrorist activities. In 2015, the United States Embassy in Yemen suspended its operations, and embassy staff were relocated out of the country. Yemen has been supportive of, but has not been able to cooperate fully with, the United States in counterterrorism efforts.

**(f)** In light of the conditions in these six countries, until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high. Accordingly, while that assessment is ongoing, I am imposing a temporary pause on the entry of nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen, subject to categorical exceptions and case-by-case waivers, as described in section 3 of this order.

**(g)** Iraq presents a special case. Portions of Iraq remain active combat zones. Since 2014, ISIS has had dominant influence over significant territory in northern and central Iraq. Although that influence has been significantly reduced due to the efforts and sacrifices of the Iraqi government and armed forces, working along with a United States-led coalition, the ongoing conflict has impacted the Iraqi government's capacity to secure its borders and to identify fraudulent travel documents. Nevertheless, the close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combat ISIS justify different treatment for Iraq. In particular, those Iraqi government forces that have fought to regain more than half of the territory previously dominated by ISIS have shown steadfast determination and earned enduring respect as they battle an armed group that is the common enemy of Iraq and the United States. In addition, since Executive Order 13769 was issued, the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal. Decisions about issuance of visas or granting admission to Iraqi nationals should be subjected to additional scrutiny to determine if applicants have connections with ISIS or other terrorist organizations, or otherwise pose a risk to either national security or public safety.

**(h)** Recent history shows that some of those who have entered the United States through our immigration system have proved to be threats to our national security. Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States. They have included not just persons who came here legally on visas but also individuals who first entered the country as refugees. For example, in January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses. And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon. The Attorney General has reported to me that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

**(i)** Given the foregoing, the entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism remains a matter of grave concern. In light of the Ninth Circuit's observation that the political branches are better suited to determine the appropriate scope of any suspensions than are the courts, and in order to avoid spending additional time pursuing litigation, I am revoking Executive Order 13769 and replacing it with this order, which expressly excludes from the suspensions categories of aliens that have prompted judicial concerns and which clarifies or refines the approach to certain other issues or categories of affected aliens.

**Sec. 2. Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period. (a)** The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat. The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country.

**(b)** The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the worldwide review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed from each country for adjudications and a list of countries that do not provide adequate information, within 20 days of the effective date of this order. The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State, the Attorney General, and the Director of National Intelligence.

**(c)** To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

**(d)** Upon submission of the report described in subsection (b) of this section regarding the information needed from each country for adjudications, the Secretary of State shall request that all foreign governments that do not supply such information regarding their nationals begin providing it within 50 days of notification.

**(e)** After the period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not

provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means. The Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

**(f)** At any point after the submission of the list described in subsection (e) of this section, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, may submit to the President the names of any additional countries recommended for similar treatment, as well as the names of any countries that they recommend should be removed from the scope of a proclamation described in subsection (e) of this section.

**(g)** The Secretary of State and the Secretary of Homeland Security shall submit to the President a joint report on the progress in implementing this order within 60 days of the effective date of this order, a second report within 90 days of the effective date of this order, a third report within 120 days of the effective date of this order, and a fourth report within 150 days of the effective date of this order.

**Sec. 3. Scope and Implementation of Suspension.**

**(a) Scope.** Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who:

**(i)** are outside the United States on the effective date of this order;

**(ii)** did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and

**(iii)** do not have a valid visa on the effective date of this order.

**(b) Exceptions.** The suspension of entry pursuant to section 2 of this order shall not apply to:

**(i)** any lawful permanent resident of the United States;

**(ii)** any foreign national who is admitted to or paroled into the United States on or after the effective date of this order;

**(iii)** any foreign national who has a document other than a visa, valid on the effective date of this order or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document;

**(iv)** any dual national of a country designated under section 2 of this order when the individual is traveling on a passport issued by a non-designated country;

**(v)** any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C-2 visa for travel to the United Nations, or G-1, G-2, G-3, or G-4 visa; or

**(vi)** any foreign national who has been granted asylum; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

**(c) Waivers.** Notwithstanding the suspension of entry pursuant to section 2 of this order, a consular officer, or, as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP), or the Commissioner's delegee, may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat

to national security and would be in the national interest. Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa issuance process will be effective both for the issuance of a visa and any subsequent entry on that visa, but will leave all other requirements for admission or entry unchanged. Case-by-case waivers could be appropriate in circumstances such as the following:

**(i)** the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the effective date of this order, seeks to reenter the United States to resume that activity, and the denial of reentry during the suspension period would impair that activity;

**(ii)** the foreign national has previously established significant contacts with the United States but is outside the United States on the effective date of this order for work, study, or other lawful activity;

**(iii)** the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations;

**(iv)** the foreign national seeks to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship;

**(v)** the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

**(vi)** the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee) and the employee can document that he or she has provided faithful and valuable service to the United States Government;

**(vii)** the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 et seq., traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under the IOIA;

**(viii)** the foreign national is a landed Canadian immigrant who applies for a visa at a location within Canada; or

**(ix)** the foreign national is traveling as a United States Government-sponsored exchange visitor.

**Sec. 4. Additional Inquiries Related to Nationals of Iraq.** An application by any Iraqi national for a visa, admission, or other immigration benefit should be subjected to thorough review, including, as appropriate, consultation with a designee of the Secretary of Defense and use of the additional information that has been obtained in the context of the close U.S.-Iraqi security partnership, since Executive Order 13769 was issued, concerning individuals suspected of ties to ISIS or other terrorist organizations and individuals coming from territories controlled or formerly controlled by ISIS. Such review shall include consideration of whether the applicant has connections with ISIS or other terrorist organizations or with territory that is or has been under the dominant influence of ISIS, as well as any other information bearing on whether the applicant may be a threat to commit acts of terrorism or otherwise threaten the national security or public safety of the United States.

**Sec. 5. Implementing Uniform Screening and Vetting Standards for All Immigration Programs. (a)** The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall implement a program, as part of the process for adjudications, to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry. This program shall include the development of a uniform baseline

for screening and vetting standards and procedures, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that applicants are who they claim to be; a mechanism to assess whether applicants may commit, aid, or support any kind of violent, criminal, or terrorist acts after entering the United States; and any other appropriate means for ensuring the proper collection of all information necessary for a rigorous evaluation of all grounds of inadmissibility or grounds for the denial of other immigration benefits.

**(b)** The Secretary of Homeland Security, in conjunction with the Secretary of State, the Attorney General, and the Director of National Intelligence, shall submit to the President an initial report on the progress of the program described in subsection (a) of this section within 60 days of the effective date of this order, a second report within 100 days of the effective date of this order, and a third report within 200 days of the effective date of this order.

**Sec. 6. Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017. (a)** The Secretary of State shall suspend travel of refugees into the United States under the USRAP, and the Secretary of Homeland Security shall suspend decisions on applications for refugee status, for 120 days after the effective date of this order, subject to waivers pursuant to subsection (c) of this section. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication processes to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. The suspension described in this subsection shall not apply to refugee applicants who, before the effective date of this order, have been formally scheduled for transit by the Department of State. The Secretary of State shall resume travel of refugees into the United States under the USRAP 120 days after the effective date of this order, and the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that the additional procedures implemented pursuant to this subsection are adequate to ensure the security and welfare of the United States.

**(b)** Pursuant to section 212(f) of the INA, I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any entries in excess of that number until such time as I determine that additional entries would be in the national interest.

**(c)** Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretary of State and the Secretary of Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such individuals as refugees is in the national interest and does not pose a threat to the security or welfare of the United States, including in circumstances such as the following: the individual's entry would enable the United States to conform its conduct to a preexisting international agreement or arrangement, or the denial of entry would cause undue hardship.

**(d)** It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees. To that end, the Secretary of State shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

**Sec. 7. Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.** The Secretary of State and the Secretary of Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority permitted by section 212(d)(3)(B) of the INA, 8 U.S.C. 1182(d)(3)(B), relating to the terrorism grounds of inadmissibility, as well as any related implementing directives or guidance.

**Sec. 8. Expedited Completion of the Biometric Entry-Exit Tracking System. (a)** The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for in-scope travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

**(b)** The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive set forth in subsection (a) of this section. The initial report shall be submitted within 100 days of the effective date of this order, a second report shall be submitted within 200 days of the effective date of this order, and a third report shall be submitted within 365 days of the effective date of this order. The Secretary of Homeland Security shall submit further reports every 180 days thereafter until the system is fully deployed and operational.

**Sec. 9. Visa Interview Security. (a)** The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, 8 U.S.C. 1202, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions. This suspension shall not apply to any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C-2 visa for travel to the United Nations, or G-1, G-2, G-3, or G-4 visa; traveling for purposes related to an international organization designated under the IOIA; or traveling for purposes of conducting meetings or business with the United States Government.

**(b)** To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that nonimmigrant visa-interview wait times are not unduly affected.

**Sec. 10. Visa Validity Reciprocity.** The Secretary of State shall review all nonimmigrant visa reciprocity agreements and arrangements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment. If another country does not treat United States nationals seeking nonimmigrant visas in a truly reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by that foreign country, to the extent practicable.

**Sec. 11. Transparency and Data Collection. (a)** To be more transparent with the American people and to implement more effectively policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available the following information:

**(i)** information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;

**(ii)** information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;

**(iii)** information regarding the number and types of acts of gender-based violence against women, including so-called "honor killings," in the United States by foreign nationals; and

**(iv)** any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

**(b)** The Secretary of Homeland Security shall release the initial report under subsection (a) of this section within 180 days of the effective date of this order and shall include information for the period from September 11, 2001, until the date of the initial report. Subsequent reports shall be issued every 180 days thereafter and reflect the period since the previous report.

**Sec. 12. Enforcement. (a)** The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of the actions directed in this order.

**(b)** In implementing this order, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including, as appropriate, those providing an opportunity for individuals to claim a fear of persecution or torture, such as the credible fear determination for aliens covered by section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A).

**(c)** No immigrant or nonimmigrant visa issued before the effective date of this order shall be revoked pursuant to this order.

**(d)** Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

**(e)** This order shall not apply to an individual who has been granted asylum, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this order shall be construed to limit the ability of an individual to seek asylum, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 13. Revocation.** Executive Order 13769 of January 27, 2017, is revoked as of the effective date of this order.

**Sec. 14. Effective Date.** This order is effective at 12:01 a.m., eastern daylight time on March 16, 2017.

**Sec. 15. Severability. (a)** If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby.

**(b)** If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements.

**Sec. 16. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## EXECUTIVE ORDER NO. 13815

<October 24, 2017, 82 F.R. 50055>

### Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1. Policy. (a)** It is the policy of the United States to protect its people from terrorist attacks and other public-safety threats. Screening and vetting procedures associated with determining which foreign nationals may enter the United States, including through the U.S. Refugee Admissions Program (USRAP), play a critical role in implementing that policy. Those procedures enhance our ability to detect foreign nationals who might commit, aid, or support acts of terrorism, or otherwise pose a threat to the national security or public safety of the United States, and they bolster our efforts to prevent such individuals from entering the country.

**(b)** Section 5 of Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to develop a uniform baseline for screening and vetting standards and procedures applicable to all travelers who seek to enter the United States. A working group was established to satisfy this directive.

**(c)** Section 6(a) of Executive Order 13780 directed a review to strengthen the vetting process for the USRAP. It also instructed the Secretary of State to suspend the travel of refugees into the United States under that program, and the Secretary of Homeland Security to suspend decisions on applications for refugee status, subject to certain exceptions. Section 6(a) also required the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, to conduct a 120-day review of the USRAP application and adjudication process in order to determine, and implement, additional procedures to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States. Executive Order 13780 noted that terrorist groups have sought to infiltrate several nations through refugee programs and that the Attorney General had reported that more than 300 persons who had entered the United States as refugees were then the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

**(d)** The Secretary of State convened a working group to implement the review process under section 6(a) of Executive Order 13780. This review was informed by the development of uniform baseline screening and vetting standards and procedures for all travelers under section 5 of Executive Order 13780. The section 6(a) working group compared the process for screening and vetting refugees with the uniform baseline standards and procedures established by the section 5 working group. The section 6(a) working group identified several ways to enhance the process for screening and vetting refugees and began implementing those improvements.

**(e)** The review process for refugees required by Executive Order 13780 has made our Nation safer. The improvements the section 6(a) working group has identified will strengthen the data-collection process for all refugee applicants considered for resettlement in the United States. They will also bolster the process for interviewing refugees through improved training, fraud-detection procedures, and interagency information sharing. Further, they will enhance the ability of our systems to check biometric and biographic information against a broad range of threat information contained in various Federal watchlists and databases.

AR.00855

71

**(f)** Section 2 of Proclamation 9645 of September 24, 2017 (Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats), suspended and limited, subject to exceptions and case-by-case waivers, the entry into the United States of foreign nationals of eight countries. As noted in that Proclamation, those suspensions and limitations are in the interest of the United States because of certain deficiencies in those countries' identity-management and information-sharing protocols and procedures, and because of the national security and public-safety risks that emanate from their territory, including risks that result from the significant presence of terrorists within the territory of several of those countries.

**(g)** The entry restrictions and limitations in Proclamation 9645 apply to the immigrant and nonimmigrant visa application and adjudication processes, which foreign nationals use to seek authorization to travel to the United States and apply for admission. Pursuant to section 3(b)(iii) of Proclamation 9645, however, those restrictions and limitations do not apply to those who seek to enter the United States through the USRAP.

**(h)** Foreign nationals who seek to enter the United States with an immigrant or nonimmigrant visa stand in a different position from that of refugees who are considered for entry into this country under the USRAP. For a variety of reasons, including substantive differences in the risk factors presented by the refugee population and in the quality of information available to screen and vet refugees, the refugee screening and vetting process is different from the process that applies to most visa applicants. At the same time, the entry of certain refugees into the United States through the USRAP poses unique security risks and considerable domestic challenges that require the application of substantial resources.

**Sec. 2. Resumption of the U.S. Refugee Admissions Program. (a)** Section 6(a) of Executive Order 13780 provided for a temporary, 120-day review of the USRAP application and adjudication process and an accompanying worldwide suspension of refugee travel to the United States and of application decisions under the USRAP. That 120-day period expires on October 24, 2017. Section 6(a) further provided that refugee travel and application decisions could resume after 120 days for stateless persons and for the nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence jointly determine that the additional procedures identified through the USRAP review process are adequate to ensure the security and welfare of the United States. The Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have advised that the improvements to the USRAP vetting process are generally adequate to ensure the security and welfare of the United States, that the Secretary of State and Secretary of Homeland Security may resume that program, and that they will apply special measures to certain categories of refugees whose entry continues to pose potential threats to the security and welfare of the United States.

**(b)** With the improvements identified by the section 6(a) working group and implemented by the participating agencies, the refugee screening and vetting process generally meets the uniform baseline for immigration screening and vetting established by the section 5 working group. Accordingly, a general resumption of the USRAP, subject to the conditions set forth in section 3 of this order, is consistent with the security and welfare of the United States.

**(c)** The suspension of the USRAP and other processes specified in section 6(a) of Executive Order 13780 are no longer in effect. Subject to the conditions set forth in section 3 of this order, the Secretary of State may resume travel of qualified and appropriately vetted refugees into the United States, and the Secretary of Homeland Security may resume adjudicating applications for refugee resettlement.

**Sec. 3. Addressing the Risks Presented by Certain Categories of Refugees. (a)** Based on the considerations outlined above, including the special measures referred to in subsection (a) of section 2 of this order, Presidential action to suspend the entry of refugees under the USRAP is not needed at this time to protect the security and interests of the United States and its people. The Secretary of State and the Secretary of Homeland Security, however, shall continue to assess and address any risks posed by particular refugees as follows:

**(i)** The Secretary of State and the Secretary of Homeland Security shall coordinate to assess any risks to the security and welfare of the United States that may be presented by the entry into the United States through the USRAP of stateless persons and foreign nationals. Under section 207(c) and applicable portions of section 212(a) of the INA, 8 U.S.C. 1157(c) and 1182(a), section 402(4) of the Homeland Security Act of 2002, 6 U.S.C. 202(4), and other applicable authorities, the Secretary of Homeland Security, in consultation with the Secretary of State, shall determine, as appropriate and consistent with applicable law, whether any actions should be taken to address the risks to the security and welfare of the United States presented by permitting any category of refugees to enter this country, and, if so, what those actions should be. The Secretary of State and the Secretary of Homeland Security shall administer the USRAP consistent with those determinations, and in consultation with the Attorney General and the Director of National Intelligence.

**(ii)** Within 90 days of the date of this order and annually thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall determine, as appropriate and consistent with applicable law, whether any actions taken to address the risks to the security and welfare of the United States presented by permitting any category of refugees to enter this country should be modified or terminated, and, if so, what those modifications or terminations should be. If the Secretary of Homeland Security, in consultation with the Secretary of State, determines, at any time, that any actions taken pursuant to section 3(a)(i) should be modified or terminated, the Secretary of Homeland Security may modify or terminate those actions accordingly. The Secretary of Homeland Security and the Secretary of State shall administer the USRAP consistent with the determinations made under this subsection, and in consultation with the Attorney General and the Director of National Intelligence.

**(b)** Within 180 days of the date of this order, the Attorney General shall, in consultation with the Secretary of State and the Secretary of Homeland Security, and in cooperation with the heads of other executive departments and agencies as he deems appropriate, provide a report to the President on the effect of refugee resettlement in the United States on the national security, public safety, and general welfare of the United States. The report shall include any recommendations the Attorney General deems necessary to advance those interests.

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

## PROCLAMATIONS

## PROCLAMATION NO. 4865

<Sept. 29, 1981, 46 F.R. 48107>

## High Seas Interdiction of Illegal Aliens

The ongoing migration of persons to the United States in violation of our laws is a serious national problem detrimental to the interests of the United States. A particularly difficult aspect of the problem is the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States. These arrivals have severely strained the law enforcement resources of the Immigration and Naturalization Service and have threatened the welfare and safety of communities in that region.

As a result of our discussions with the Governments of affected foreign countries and with agencies of the Executive Branch of our Government, I have determined that new and effective measures to curtail these unlawful arrivals are necessary. In this regard, I have determined that international cooperation to intercept vessels trafficking in illegal migrants is a necessary and proper means of insuring the effective enforcement of our laws.

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and the statutes of the United States, including Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title], in order to protect the sovereignty of the United States, and in accordance with cooperative arrangements with certain foreign governments, and having found that the entry of undocumented aliens, arriving at the borders of the United States from the high seas, is detrimental to the interests of the United States, do proclaim that:

The entry of undocumented aliens from the high seas is hereby suspended and shall be prevented by the interdiction of certain vessels carrying such aliens.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of September, in the year of our Lord nineteen hundred and eighty-one, and of the Independence of the United States of America the two hundred and sixth.

RONALD REAGAN

## PROCLAMATION NO. 7359

Proc. No. 7359, Oct. 10, 2000, 65 F.R. 60831, related to the suspension of entry as immigrants and nonimmigrants of persons impeding the peace process in Sierra Leone.

## PROCLAMATION NO. 7750

<Jan. 12, 2004, 69 F.R. 2287>

**To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged in or Benefitting from Corruption**

**By the President of the United States of America**

**A Proclamation**

In light of the importance of legitimate and transparent public institutions to world stability, peace, and development, and the serious negative effects that corruption of public institutions has on the United States efforts to promote security and to strengthen democratic institutions and free market systems, and in light of the importance to the United States and the international community of fighting corruption, as evidenced by the Third Global Forum on Fighting Corruption and Safeguarding Integrity and other intergovernmental efforts, I have determined that it is in the interests of the United States to take action to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons who have committed, participated in, or are beneficiaries of corruption in the performance of public functions where that corruption

has serious adverse effects on international activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States, including section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182(f) [subsec. (f) of this section], and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided in sections 2 and 3 of this proclamation, be detrimental to the interests of the United States.

I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Public officials or former public officials whose solicitation or acceptance of any article of monetary value, or other benefit, in exchange for any act or omission in the performance of their public functions has or had serious adverse effects on the national interests of the United States.

**(b)** Persons whose provision of or offer to provide any article of monetary value or other benefit to any public official in exchange for any act or omission in the performance of such official's public functions has or had serious adverse effects on the national interests of the United States.

**(c)** Public officials or former public officials whose misappropriation of public funds or interference with the judicial, electoral, or other public processes has or had serious adverse effects on the national interests of the United States.

**(d)** The spouses, children, and dependent household members of persons described in paragraphs (a), (b), and (c) above, who are beneficiaries of any articles of monetary value or other benefits obtained by such persons.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of the person into the United States would not be contrary to the interests of the United States.

**Sec. 3.** Persons covered by sections 1 and 2 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 4.** For purposes of this proclamation, "serious adverse effects on the national interests of the United States" means serious adverse effects on the international economic activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

**Sec. 5.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements.

**Sec. 6.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary may, in the Secretary's discretion, establish.

**Sec. 7.** This proclamation is effective immediately.

**Sec. 8.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twelfth day of January, in the year of our Lord two thousand four, and of the Independence of the United States of America the two hundred and twenty-eighth.

<div align="right">GEORGE W. BUSH</div>

<div align="center">PROCLAMATION NO. 8342</div>

<div align="center"><Jan. 16, 2009, 74 F.R. 4093></div>

**To Suspend Entry as Immigrants and Nonimmigrants of Foreign Government Officials Responsible for Failing to Combat Trafficking in Persons**

**By the President of the United States of America**

**A Proclamation**

In order to foster greater resolve to address trafficking in persons (TIP), specifically in punishing acts of trafficking and providing protections to the victims of these crimes, consistent with the Trafficking Victims Protection Act of 2000, as amended (the "Act") (22 U.S.C. 7101et seq.), it is in the interests of the United States to restrict the international travel and to suspend entry into the United States, as immigrants or nonimmigrants, of certain senior government officials responsible for domestic law enforcement, justice, or labor affairs who have impeded their governments' antitrafficking efforts, have failed to implement their governments' antitrafficking laws and policies, or who otherwise bear responsibility for their governments' failures to take steps recognized internationally as appropriate to combat trafficking in persons, and whose governments have been ranked more than once as Tier 3 countries, which represent the worst anti-TIP performers, in the Department of State's annual Trafficking in Persons Report, and for which I have made a determination pursuant to section 110(d)(1)-(2) or (4) of the Act. The Act reflects international antitrafficking standards that guide efforts to eradicate this modern-day form of slavery around the world.

NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by virtue of the authority vested in me by the Constitution and the laws of the United States, including section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182(f), and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided for in sections 2 and 3 of this proclamation, be detrimental to the interests of the United States.

I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following aliens is hereby suspended:

**(a)** Senior government officials--defined as the heads of ministries or agencies and officials occupying positions within the two bureaucratic levels below those top positions--responsible for domestic law enforcement, justice, or labor affairs who have impeded their governments' antitrafficking efforts, have failed to implement their governments' antitrafficking laws and policies, or who otherwise bear responsibility for their governments' failures to take steps recognized internationally as appropriate to combat trafficking in persons, and who are members of governments for which I have made a determination pursuant to section 110(d)(1)-(2) or (4) of the Act, in the current year and at least once in the preceding 3 years;

**(b)** The spouses of persons described in subsection (a) of this section.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of such person would not be contrary to the interest of the United States.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Sec. 3.** Persons covered by sections 1 or 2 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such procedures as the Secretary may establish under section 5 of this proclamation.

**Sec. 4.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements.

**Sec. 5.** The Secretary of State shall implement this proclamation pursuant to such procedures as the Secretary, in consultation with the Secretary of Homeland Security, may establish.

**Sec. 6.** This proclamation is effective immediately. It shall remain in effect until such time as the Secretary of State determines that it is no longer necessary and should be terminated, either in whole or in part. Any such determination by the Secretary of State shall be published in the **Federal Register**.

**Sec. 7.** This proclamation is not intended to, and does not, create any right, benefit, or privilege, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this sixteenth day of January, in the year of our Lord two thousand nine, and of the Independence of the United States of America the two hundred and thirty-third.

GEORGE W. BUSH

**PROCLAMATION NO. 8693**

<July 24, 2011, 76 F.R. 44751>

**Suspension of Entry of Aliens Subject to United Nations Security Council
Travel Bans and International Emergency Economic Powers Act Sanctions**

By the President of the United States of America

A Proclamation

In light of the firm commitment of the United States to the preservation of international peace and security and our obligations under the United Nations Charter to carry out the decisions of the United Nations Security Council imposed under Chapter VII, I have determined that it is in the interests of the United States to suspend the entry into the United States, as immigrants or nonimmigrants, of aliens who are subject to United Nations Security Council travel bans as of the date of this proclamation. I have further determined that the interests of the United States are served by suspending the entry into the United States, as immigrants or nonimmigrants, of aliens whose property and interests in property have been blocked by an Executive Order issued in whole or in part pursuant to the President's authority under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).

NOW, THEREFORE, I, BARACK OBAMA, by the authority vested in me as President by the Constitution and the laws of the United States of America, including section 212(f) of the Immigration and Nationality Act of 1952, as amended (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would be detrimental to the interests of the United States. I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Any alien who meets one or more of the specific criteria for the imposition of a travel ban provided for in a United Nations Security Council resolution referenced in Annex A to this proclamation.

**(b)** Any alien who meets one or more of the specific criteria contained in an Executive Order referenced in Annex B to this proclamation [not set out in the Code].

**Sec. 2.** Persons covered by section 1 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 3.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary, in consultation with the Secretary of the Treasury and Secretary of Homeland Security, may establish.

**Sec. 4.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of the person into the United States would not be contrary to the interests of the United States, as determined by the Secretary of State. In exercising the functions and authorities in the previous sentence, the Secretary of State shall consult the Secretary of Homeland Security on matters related to admissibility or inadmissibility within the authority of the Secretary of Homeland Security.

**Sec. 5.** Nothing in this proclamation shall be construed to require actions that would be inconsistent with the United States obligations under applicable international agreements.

**Sec. 6.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 7.** This proclamation is effective immediately and shall remain in effect until such time as the Secretary of State determines that it is no longer necessary and should be terminated, either in whole or in part. Any such termination shall become effective upon publication in the Federal Register.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fourth day of July, in the year of our Lord two thousand eleven, and of the Independence of the United States of America the two hundred and thirty-sixth.

BARACK OBAMA

### PROCLAMATION NO. 8697

<Aug. 4, 2011, 76 F.R. 49277>

### Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses

By the President of the United States

A Proclamation

The United States enduring commitment to respect for human rights and humanitarian law requires that its Government be able to ensure that the United States does not become a safe haven for serious violators of human rights and humanitarian law and those who engage in other related abuses. Universal respect for human rights and humanitarian law and the prevention of atrocities internationally promotes U.S. values and fundamental U.S. interests in helping secure peace, deter aggression, promote the rule of law, combat crime and corruption, strengthen democracies, and prevent humanitarian crises around the globe. I therefore have determined that it is in the interests of the United States to take action to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons who have engaged in the acts outlined in section 1 of this proclamation.

NOW, THEREFORE, I, BARACK OBAMA, by the authority vested in me as President by the Constitution and the laws of the United States of America, including section 212(f) of the Immigration and Nationality Act of 1952, as amended (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would be detrimental to the interests of the United States. I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Any alien who planned, ordered, assisted, aided and abetted, committed or otherwise participated in, including through command responsibility, widespread or systematic violence against any civilian population based in whole or in part on race; color; descent; sex; disability; membership in an indigenous group; language; religion; political opinion; national origin; ethnicity; membership in a particular social group; birth; or sexual orientation or gender identity, or who attempted or conspired to do so.

**(b)** Any alien who planned, ordered, assisted, aided and abetted, committed or otherwise participated in, including through command responsibility, war crimes, crimes against humanity or other serious violations of human rights, or who attempted or conspired to do so.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where the entry of such person would not harm the foreign relations interests of the United States.

**Sec. 3.** The Secretary of State, or the Secretary's designee, in his or her sole discretion, shall identify persons covered by section 1 of this proclamation, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 4.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary, in consultation with the Secretary of Homeland Security, may establish.

**Sec. 5.** For any person whose entry is otherwise suspended under this proclamation entry will be denied, unless the Secretary of State determines that the particular entry of such person would be in the interests of the United States. In exercising such authority, the Secretary of State shall consult the Secretary of Homeland Security on matters related to admissibility or inadmissibility within the authority of the Secretary of Homeland Security.

**Sec. 6.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements, or to suspend entry based solely on an alien's ideology, opinions, or beliefs, or based solely on expression that would be considered protected under U.S. interpretations of international agreements to which the United States is a party. Nothing in this proclamation shall be construed to limit the authority of the United States to admit or to suspend entry of particular individuals into the United States under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) or under any other provision of U.S. law.

**Sec. 7.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 8.** This proclamation is effective immediately and shall remain in effect until such time as the Secretary of State determines that it is no longer necessary and should be terminated, either in whole or in part. Any such termination shall become effective upon publication in the Federal Register.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of August, in the year of our Lord two thousand eleven, and of the Independence of the United States of America the two hundred and thirty-sixth.

BARACK OBAMA

### PROCLAMATION NO. 9645

<September 24, 2017, 82 F.R. 45161; Amended Proc. No. 9723 § 1, Apr. 10, 2018, 83 F.R. 15939; Proc. No. 9983, § 3, Jan. 31, 2020, 85 F.R. 6706.>

**Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats**

By the President of the United States of America

A Proclamation

In Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), on the recommendations of the Secretary of Homeland Security and the Attorney General, I ordered a worldwide review of whether, and if so what, additional information would be needed from each foreign country to assess adequately whether their nationals seeking to enter the United States pose a security or safety threat. This was the first such review of its kind in United States history. As part of the review, the Secretary of Homeland Security established global requirements for information sharing in support of immigration screening and vetting. The Secretary of Homeland Security developed a comprehensive set of criteria and applied it to the information-sharing practices, policies, and capabilities of foreign governments. The Secretary of State thereafter engaged with the countries reviewed in an effort to address deficiencies and achieve improvements. In many instances, those efforts produced positive results. By obtaining additional information and formal commitments from foreign governments, the United States Government has improved its capacity and ability to assess whether foreign nationals attempting to enter the United States pose a security or safety threat. Our Nation is safer as a result of this work.

Despite those efforts, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, has determined that a small number of countries_out of nearly 200 evaluated_remain deficient at this time with respect to their identity-management and information-sharing capabilities, protocols, and practices. In some cases, these countries also have a significant terrorist presence within their territory.

As President, I must act to protect the security and interests of the United States and its people. I am committed to our ongoing efforts to engage those countries willing to cooperate, improve information-sharing and identity-management protocols and procedures, and address both terrorism-related and public-safety risks. Some of the countries with remaining inadequacies face significant challenges. Others have made strides to improve their protocols and procedures, and I commend them for these efforts. But until they satisfactorily address the identified inadequacies, I have determined, on the basis of recommendations from the Secretary of Homeland Security and other members of my Cabinet, to impose certain conditional restrictions and

limitations, as set forth more fully below, on entry into the United States of nationals of the countries identified in section 2 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Policy and Purpose. (a)** It is the policy of the United States to protect its citizens from terrorist attacks and other public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. They enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

**(b)** Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems.

**(c)** Section 2(a) of Executive Order 13780 directed a "worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." That review culminated in a report submitted to the President by the Secretary of Homeland Security on July 9, 2017. In that review, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat. That baseline incorporates three categories of criteria:

**(i)** Identity-management information. The United States expects foreign governments to provide the information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be. The identity-management information category focuses on the integrity of documents required for travel to the United States. The criteria assessed in this category include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports.

**(ii)** National security and public-safety information. The United States expects foreign governments to provide information about whether persons who seek entry to this country pose national security or public-safety risks. The criteria assessed in this category include whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States.

**(iii)** National security and public-safety risk assessment. The national security and public-safety risk assessment category focuses on national security risk indicators. The criteria assessed in this category include whether the country is a known or

potential terrorist safe haven, whether it is a participant in the Visa Waiver Program established under section 217 of the INA, 8 U.S.C. 1187, that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States.

**(d)** The Department of Homeland Security, in coordination with the Department of State, collected data on the performance of all foreign governments and assessed each country against the baseline described in subsection (c) of this section. The assessment focused, in particular, on identity management, security and public-safety threats, and national security risks. Through this assessment, the agencies measured each country's performance with respect to issuing reliable travel documents and implementing adequate identity-management and information-sharing protocols and procedures, and evaluated terrorism-related and public-safety risks associated with foreign nationals seeking entry into the United States from each country.

**(e)** The Department of Homeland Security evaluated each country against the baseline described in subsection (c) of this section. The Secretary of Homeland Security identified 16 countries as being "inadequate" based on an analysis of their identity-management protocols, information-sharing practices, and risk factors. Thirty-one additional countries were classified "at risk" of becoming "inadequate" based on those criteria.

**(f)** As required by section 2(d) of Executive Order 13780, the Department of State conducted a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either "inadequate" or "at risk," to improve their performance with respect to the baseline described in subsection (c) of this section. Those engagements yielded significant improvements in many countries. Twenty-nine countries, for example, provided travel document exemplars for use by Department of Homeland Security officials to combat fraud. Eleven countries agreed to share information on known or suspected terrorists.

**(g)** The Secretary of Homeland Security assesses that the following countries continue to have "inadequate" identity-management protocols, information-sharing practices, and risk factors, with respect to the baseline described in subsection (c) of this section, such that entry restrictions and limitations are recommended: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. The Secretary of Homeland Security also assesses that Iraq did not meet the baseline, but that entry restrictions and limitations under a Presidential proclamation are not warranted. The Secretary of Homeland Security recommends, however, that nationals of Iraq who seek to enter the United States be subject to additional scrutiny to determine if they pose risks to the national security or public safety of the United States. In reaching these conclusions, the Secretary of Homeland Security considered the close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS).

**(h)** Section 2(e) of Executive Order 13780 directed the Secretary of Homeland Security to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means." On September 15, 2017, the Secretary of Homeland Security submitted a report to me recommending entry restrictions and limitations on certain nationals of 7 countries determined to be "inadequate" in providing such information and in light of other factors discussed in the report. According to the report, the recommended restrictions would help address the threats that the countries' identity-management protocols, information-sharing inadequacies, and other risk factors pose to the security and welfare of the United States. The restrictions also encourage the countries to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible.

**(i)** In evaluating the recommendations of the Secretary of Homeland Security and in determining what restrictions to impose for each country, I consulted with appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General. I considered several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's

risk factors, such as whether it has a significant terrorist presence within its territory. I also considered foreign policy, national security, and counterterrorism goals. I reviewed these factors and assessed these goals, with a particular focus on crafting those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. These restrictions and limitations are also needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments; and to advance foreign policy, national security, and counterterrorism objectives.

**(ii)** After reviewing the Secretary of Homeland Security's report of September 15, 2017, and accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to restrict and limit the entry of nationals of 7 countries found to be "inadequate" with respect to the baseline described in subsection (c) of this section: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. These restrictions distinguish between the entry of immigrants and nonimmigrants. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants even after national security concerns arise, which heightens the costs and dangers of errors associated with admitting such individuals. And although immigrants generally receive more extensive vetting than nonimmigrants, such vetting is less reliable when the country from which someone seeks to emigrate exhibits significant gaps in its identity-management or information-sharing policies, or presents risks to the national security of the United States. For all but one of those 7 countries, therefore, I am restricting the entry of all immigrants.

**(iii)** I am adopting a more tailored approach with respect to nonimmigrants, in accordance with the recommendations of the Secretary of Homeland Security. For some countries found to be "inadequate" with respect to the baseline described in subsection (c) of this section, I am restricting the entry of all nonimmigrants. For countries with certain mitigating factors, such as a willingness to cooperate or play a substantial role in combatting terrorism, I am restricting the entry only of certain categories of nonimmigrants, which will mitigate the security threats presented by their entry into the United States. In those cases in which future cooperation seems reasonably likely, and accounting for foreign policy, national security, and counterterrorism objectives, I have tailored the restrictions to encourage such improvements.

**(i)** Section 2(e) of Executive Order 13780 also provided that the "Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States." The Secretary of Homeland Security determined that Somalia generally satisfies the information-sharing requirements of the baseline described in subsection (c) of this section, but its government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory, present special circumstances that warrant restrictions and limitations on the entry of its nationals into the United States. Somalia's identity-management deficiencies and the significant terrorist presence within its territory make it a source of particular risks to the national security and public safety of the United States. Based on the considerations mentioned above, and as described further in section 2(h) of this proclamation, I have determined that entry restrictions, limitations, and other measures designed to ensure proper screening and vetting for nationals of Somalia are necessary for the security and welfare of the United States.

**(j)** Section 2 of this proclamation describes some of the inadequacies that led me to impose restrictions on the specified countries. Describing all of those reasons publicly, however, would cause serious damage to the national security of the United States, and many such descriptions are classified.

**Sec. 2. Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to categorical exceptions and case-by-case waivers, as described in sections 3 and 6 of this proclamation:

**(a)** [Repealed. Proc. 9723, April 10, 2018, 83 F.R. 15937]

**(b)** Iran.

**(i)** Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States. The Department of State has also designated Iran as a state sponsor of terrorism.

**(ii)** The entry into the United States of nationals of Iran as immigrants and as nonimmigrants is hereby suspended, except that entry by such nationals under valid student (F and M) and exchange visitor (J) visas is not suspended, although such individuals should be subject to enhanced screening and vetting requirements.

**(c)** Libya.

**(i)** The government of Libya is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding on that cooperation, including in the areas of immigration and border management. Libya, nonetheless, faces significant challenges in sharing several types of information, including public-safety and terrorism-related information necessary for the protection of the national security and public safety of the United States. Libya also has significant inadequacies in its identity-management protocols. Further, Libya fails to satisfy at least one key risk criterion and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. The substantial terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

**(ii)** The entry into the United States of nationals of Libya, as immigrants, and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas, is hereby suspended.

**(d)** North Korea.

**(i)** North Korea does not cooperate with the United States Government in any respect and fails to satisfy all information-sharing requirements.

**(ii)** The entry into the United States of nationals of North Korea as immigrants and nonimmigrants is hereby suspended.

**(e)** Syria.

**(i)** Syria regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorist threats, and has been designated by the Department of State as a state sponsor of terrorism. Syria has significant inadequacies in identity-management protocols, fails to share public-safety and terrorism information, and fails to satisfy at least one key risk criterion.

**(ii)** The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby suspended.

**(f)** Venezuela.

**(i)** Venezuela has adopted many of the baseline standards identified by the Secretary of Homeland Security and in section 1 of this proclamation, but its government is uncooperative in verifying whether its citizens pose national security or public-safety threats. Venezuela's government fails to share public-safety and terrorism-related information adequately, fails to satisfy at least one key risk criterion, and has been assessed to be not fully cooperative with respect to receiving its nationals subject

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

to final orders of removal from the United States. There are, however, alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela. As a result, the restrictions imposed by this proclamation focus on government officials of Venezuela who are responsible for the identified inadequacies.

(ii) Notwithstanding section 3(b)(v) of this proclamation, the entry into the United States of officials of government agencies of Venezuela involved in screening and vetting procedures_including the Ministry of the Popular Power for Interior, Justice and Peace; the Administrative Service of Identification, Migration and Immigration; the Scientific, Penal and Criminal Investigation Service Corps; the Bolivarian National Intelligence Service; and the Ministry of the Popular Power for Foreign Relations_and their immediate family members, as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas, is hereby suspended. Further, nationals of Venezuela who are visa holders should be subject to appropriate additional measures to ensure traveler information remains current.

(g) Yemen.

(i) The government of Yemen is an important and valuable counterterrorism partner, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Yemen, nonetheless, faces significant identity-management challenges, which are amplified by the notable terrorist presence within its territory. The government of Yemen fails to satisfy critical identity-management requirements, does not share public-safety and terrorism-related information adequately, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Yemen as immigrants, and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas, is hereby suspended.

(h) Somalia.

(i) The Secretary of Homeland Security's report of September 15, 2017, determined that Somalia satisfies the information-sharing requirements of the baseline described in section 1(c) of this proclamation. But several other considerations support imposing entry restrictions and limitations on Somalia. Somalia has significant identity-management deficiencies. For example, while Somalia issues an electronic passport, the United States and many other countries do not recognize it. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. Terrorists use under-governed areas in northern, central, and southern Somalia as safe havens from which to plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The State Department's 2016 Country Reports on Terrorism observed that Somalia has not sufficiently degraded the ability of terrorist groups to plan and mount attacks from its territory. Further, despite having made significant progress toward formally federating its member states, and its willingness to fight terrorism, Somalia continues to struggle to provide the governance needed to limit terrorists' freedom of movement, access to resources, and capacity to operate. The government of Somalia's lack of territorial control also compromises Somalia's ability, already limited because of poor recordkeeping, to share information about its nationals who pose criminal or terrorist risks. As a result of these and other factors, Somalia presents special concerns that distinguish it from other countries.

(ii) The entry into the United States of nationals of Somalia as immigrants is hereby suspended. Additionally, visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny to determine if applicants are connected to terrorist organizations or otherwise pose a threat to the national security or public safety of the United States.

**Sec. 3. Scope and Implementation of Suspensions and Limitations. (a) Scope.** Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspensions of and limitations on entry pursuant to section 2 of this proclamation shall apply only to foreign nationals of the designated countries who:

**(i)** are outside the United States on the applicable effective date under section 7 of this proclamation;

**(ii)** do not have a valid visa on the applicable effective date under section 7 of this proclamation; and

**(iii)** do not qualify for a visa or other valid travel document under section 6(d) of this proclamation.

**(b) Exceptions.** The suspension of entry pursuant to section 2 of this proclamation shall not apply to:

**(i)** any lawful permanent resident of the United States;

**(ii)** any foreign national who is admitted to or paroled into the United States on or after the applicable effective date under section 7 of this proclamation;

**(iii)** any foreign national who has a document other than a visa_such as a transportation letter, an appropriate boarding foil, or an advance parole document_valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission;

**(iv)** any dual national of a country designated under section 2 of this proclamation when the individual is traveling on a passport issued by a non-designated country;

**(v)** any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C-2 visa for travel to the United Nations, or G-1, G-2, G-3, or G-4 visa; or

**(vi)** any foreign national who has been granted asylum by the United States; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

**(c) Waivers.** Notwithstanding the suspensions of and limitations on entry set forth in section 2 of this proclamation, a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent with subsections (i) through (iv) of this subsection. The Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants.

**(i)** A waiver may be granted only if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that:

**(A)** denying entry would cause the foreign national undue hardship;

**(B)** entry would not pose a threat to the national security or public safety of the United States; and

**(C)** entry would be in the national interest.

**(ii)** The guidance issued by the Secretary of State and the Secretary of Homeland Security under this subsection shall address the standards, policies, and procedures for:

**(A)** determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States;

**(B)** determining whether the entry of a foreign national would be in the national interest;

**(C)** addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to the restrictions and limitations imposed by this proclamation;

**(D)** assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy the requirements of subsection (i) of this subsection; and

**(E)** determining the special circumstances that would justify granting a waiver under subsection (iv)(E) of this subsection.

**(iii)** Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa adjudication process will be effective both for the issuance of a visa and for any subsequent entry on that visa, but will leave unchanged all other requirements for admission or entry.

**(iv)** Case-by-case waivers may not be granted categorically, but may be appropriate, subject to the limitations, conditions, and requirements set forth under subsection (i) of this subsection and the guidance issued under subsection (ii) of this subsection, in individual circumstances such as the following:

**(A)** the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the applicable effective date under section 7 of this proclamation, seeks to reenter the United States to resume that activity, and the denial of reentry would impair that activity;

**(B)** the foreign national has previously established significant contacts with the United States but is outside the United States on the applicable effective date under section 7 of this proclamation for work, study, or other lawful activity;

**(C)** the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry would impair those obligations;

**(D)** the foreign national seeks to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship;

**(E)** the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

**(F)** the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee), and the foreign national can document that he or she has provided faithful and valuable service to the United States Government;

**(G)** the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 et seq., traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under the IOIA;

**(H)** the foreign national is a Canadian permanent resident who applies for a visa at a location within Canada;

**(I)** the foreign national is traveling as a United States Government-sponsored exchange visitor; or

**(J)** the foreign national is traveling to the United States, at the request of a United States Government department or agency, for legitimate law enforcement, foreign policy, or national security purposes.

**Sec. 4. Adjustments to and Removal of Suspensions and Limitations. (a)** The Secretary of Homeland Security, in consultation with the Secretary of State, shall on October 1, 2020, and annually thereafter, submit to the President the results of an evaluation as to whether to continue, terminate, modify, or supplement any suspensions of, or limitations on, the entry on certain classes of nationals of countries identified in section 2 of this proclamation and section 1(b) of the Proclamation "Improving Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats," signed on January 31, 2020.

**(b)** The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall not less than every 2 years evaluate whether each country in the world sufficiently shares relevant information and maintains adequate identity-management and information-sharing practices to mitigate the risk that its citizens or residents may travel to the United States in furtherance of criminal or terrorist objectives, or otherwise seek to violate any law of the United States through travel or immigration. In doing so, the Secretary of Homeland Security shall:

**(i)** in consultation with the Secretary of State, Attorney General, and the Director of National Intelligence, report to the President, through the appropriate Assistants to the President, any instance in which, based on a review conducted under subsection (b) of this section, the Secretary of Homeland Security believes it is in the interests of the United States to suspend or limit the entry of certain classes of nationals of a country; and

**(ii)** in consultation with the Secretary of State and the Director of National Intelligence, regularly review and update as necessary the criteria and methodology by which such evaluations are implemented to ensure they continue to protect the national interests of the United States.

**(c)** Notwithstanding the requirements set forth in subsections (a) and (b) of this section, the Secretary of Homeland Security, in consultation with the Secretary of State, Attorney General, and the Director of National Intelligence, may, at any time, recommend that the President impose, modify, or terminate a suspension or limitation on entry on certain classes of foreign nationals to protect the national interests of the United States.

**Sec. 5. Revoked by Proc. No. 9983, Jan. 31, 2020, 85 F.R. 6699.**

**Sec. 6. Enforcement. (a)** The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

**(b)** In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including those that provide an opportunity for individuals to enter the United States on the basis of a credible claim of fear of persecution or torture.

**(c)** No immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation.

**(d)** Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 of January 27, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), shall be entitled to a travel document confirming

that the individual is permitted to travel to the United States and seek entry under the terms and conditions of the visa marked revoked or marked canceled. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

**(e)** This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 7. Effective Dates.** Executive Order 13780 ordered a temporary pause on the entry of foreign nationals from certain foreign countries. In two cases, however, Federal courts have enjoined those restrictions. The Supreme Court has stayed those injunctions as to foreign nationals who lack a credible claim of a bona fide relationship with a person or entity in the United States, pending its review of the decisions of the lower courts.

**(a)** The restrictions and limitations established in section 2 of this proclamation are effective at 3:30 p.m. eastern daylight time on September 24, 2017, for foreign nationals who:

**(i)** were subject to entry restrictions under section 2 of Executive Order 13780, or would have been subject to the restrictions but for section 3 of that Executive Order, and

**(ii)** lack a credible claim of a bona fide relationship with a person or entity in the United States.

**(b)** The restrictions and limitations established in section 2 of this proclamation are effective at 12:01 a.m. eastern daylight time on October 18, 2017, for all other persons subject to this proclamation, including nationals of:

**(i)** Iran, Libya, Syria, Yemen, and Somalia who have a credible claim of a bona fide relationship with a person or entity in the United States; and

**(ii)** Chad, North Korea, and Venezuela.

**Sec. 8. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 9. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fourth day of September, in the year of our Lord two thousand seventeen, and of the Independence of the United States of America the two hundred and forty-second.

DONALD J. TRUMP

### PROCLAMATION NO. 9723

<April 10, 2018, 83 F.R. 15937>

**Maintaining Enhanced Vetting Capabilities and Processes for Detecting Attempted
Entry Into the United States by Terrorists or Other Public-Safety Threats**

By the President of the United States of America

A Proclamation

In Proclamation 9645 of September 24, 2017 (Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats), I recognized that the United States has "developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat" That baseline is designed to allow the United States to assess adequately whether foreign nationals from a particular country seeking to enter or apply for an immigration benefit from the United States pose a national security or public-safety threat. It also includes an assessment of any national security or public-safety risks that may emanate from a country's territory.

After evaluating a comprehensive worldwide assessment of the performance of more than 200 countries against the baseline criteria, I placed entry suspensions and limitations on nationals of countries that failed to meet the baseline or whose nationals otherwise posed a significant threat. I also directed the Secretary of Homeland Security (Secretary), in consultation with the Secretary of State, to develop and implement a process to review whether countries have met the baseline criteria described in Proclamation 9645; develop recommendations regarding whether the suspensions and limitations should be continued, modified, terminated, or supplemented; and submit to me a report detailing these recommendations every 180 days. I further directed the Secretary of State to engage with countries subject to these entry restrictions in order to improve their performance against the baseline criteria, as practicable and appropriate, and consistent with the foreign policy, national security, and public-safety objectives of the United States. In taking these steps, I strengthened U.S. immigration vetting capabilities and processes, making our country safer. More work remains to be done, especially in light of evolving modern global threats, but we have made important progress.

On March 30, 2018, the Secretary transmitted to me the first of the required reports. In the report, the Secretary recommended that the suspensions and limitations on the entry of foreign nationals from one country be terminated. The Secretary based this recommendation on the results of the review and engagement process developed with the Secretary of State. The review process consisted of three phases: (1) country data collection; (2) data review, analysis, and engagement; and (3) consultation with executive departments and agencies (agencies).

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

During the data collection phase, the Department of State (State) surveyed all U.S. diplomatic missions worldwide on the performance of each country in meeting the baseline. For countries with deficiencies previously identified in the summer of 2017, missions provided their perspective on any steps taken to improve. The Department of Homeland Security (DHS) simultaneously collected and reviewed relevant diplomatic, law enforcement, and intelligence reporting, along with data from other authoritative sources within the United States Government, intergovernmental organizations, and the public domain.

During the data review, analysis, and engagement phase, DHS and State reviewed the information gathered, including survey responses from missions covering more than 200 countries, to determine whether each country's performance against the baseline criteria had improved, worsened, or remained the same. The review focused on any observed changes during the review period in a country's cooperation with the United States, as well as any indicators of potential deficiencies in satisfying the baseline. In cases in which survey responses from the U.S. missions required follow-up, DHS and State engaged with the missions and requested additional information. DHS and State also, as practicable and appropriate, verified each country's implementation of the criteria against other diplomatic, law enforcement, and intelligence reporting, and through authoritative sources of information external to the United States Government.

DHS and State prioritized and, as practicable and appropriate, actively engaged those countries currently subject to travel restrictions in an effort to address and correct any deficiencies. U.S. missions abroad routinely engaged with their host governments, and DHS and State engaged with the pertinent foreign embassies in Washington, D.C. When a foreign government expressed interest in cooperating with the United States to address deficiencies, such discussions were supplemented by high-level meetings with appropriate U.S. officials and subject-matter experts. Through this process, for example, DHS and State organized a site visit to the Republic of Chad (Chad) in December 2017 to discuss specific deficiencies and potential remedies with relevant officials. Additionally, DHS met with the Libyan Foreign Minister to discuss Libya's ongoing efforts to comply with the baseline.

Based on the information collected, DHS evaluated whether each country in the world is meeting the baseline criteria. If the information indicated a potential change in a country's performance, but the information was not sufficiently concrete, that country's compliance status was not adjusted. In such instances, DHS and State have treated such indicators as the basis for further evaluation during the next review period.

DHS and State also identified certain developments or contextual indicators that would trigger further review of a country's performance to assess whether the country continues to meet information-sharing and identity-management criteria in a manner that mitigates any emerging risk, threat, or vulnerability. The goal of this evaluation was to ensure any recommendation to adjust current travel restrictions, either positively or negatively, would be grounded in articulable information and observations that demonstrate improved or degraded performance.

The Secretary's review concluded that, while more work must be done, identity-management and information-sharing practices are improving globally. Countries have revived partnership negotiations with the United States that were long dormant; improved the fraud-deterring aspects of their passports; established new protocols for cooperating with U.S. visa-issuing consulates; and shared information on criminals, known or suspected terrorists, and lost and stolen passports.

In Proclamation 9645, I imposed entry suspensions and limitations on the nationals of Chad. The Secretary has concluded that Chad has made marked improvements in its identity-management and information-sharing practices. Shortly after I signed the Proclamation, Chad made additional efforts to cooperate with the United States to help it satisfy the baseline. The United States worked closely with Chad to discuss the identity-management and information-sharing criteria. This endeavor included U.S. officials engaging with the Government of Chad to understand its domestic operations in significant detail in order to develop advice and guidance on how Chad could satisfy the baseline.

Chad was receptive to this engagement and has made notable improvements. Specifically, Chad has improved its identity-management practices by taking concrete action to enhance travel document security for its nationals, including taking steps

to issue more secure passports and sharing updated passport exemplars to help detect fraud. The Government of Chad also improved handling of lost and stolen passports, the sharing of which helps the United States and other nations prevent the fraudulent use of such documents. Additionally, the United States has confirmed that Chad shares information about known or suspected terrorists in a manner that makes that information available to our screening and vetting programs and has created a new, standardized process for processing requests for relevant criminal information. Chad has proven its commitment to sustaining cooperation with the United States through a regular review and coordination working group. This working group, which has met twice since Proclamation 9645 was issued, allows for regular tracking of the progress summarized above. In sum, Chad has made improvements and now sufficiently meets the baseline. I am therefore terminating the entry restrictions and limitations previously placed on the nationals of Chad.

The Secretary determined that, despite our engagement efforts, other countries currently subject to entry restrictions and limitations did not make notable or sufficient improvements in their identity-management and information-sharing practices. Though remaining deficient, the State of Libya (Libya) is taking initial steps to improve its practices. DHS and State are currently working with the Government of Libya, which has designated a senior official in its Ministry of Foreign Affairs to serve as a central focal point for working with the United States. DHS and State presented Libya with a list of measures it can implement to rectify its deficiencies, and it has committed to do so. Despite this progress, Libya remains deficient in its performance against the baseline criteria, and the Secretary recommends at this time against removal of the entry restrictions and limitations on that country and the other countries currently subject to them.

Finally, the Secretary found insufficient information that other countries' performance against the baseline criteria had degraded during the review period. In addition, DHS identified contextual indicators suggesting closer review of a country's practice was warranted in only one instance, and on closer examination, DHS determined that the country's practice did not warrant imposition of additional restrictions or limitations at this time.

During the interagency consultation and recommendation phase, the Secretary presented to the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies a preliminary recommendation that the suspensions and limitations of entry of foreign nationals from Chad be terminated, while the other suspensions and limitations remain unaltered. Following this consultation, the Secretary finalized her recommendations and submitted the report to me.

I have decided, on the basis of the Secretary's recommendations, to modify Proclamation 9645.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States, including sections 212(f) and 215(a) of the Immigration and Nationality Act, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, find that the entry into the United States of the nationals of Chad, as immigrants, and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas, no longer would be detrimental to the interests of the United States, and therefore hereby proclaim the following:

**Section 1. Removal of Restrictions and Limitations on Chad.** Section 2 of Proclamation 9645 is amended by striking subsection (a).

**Sec. 2. Effective Date.** This proclamation is effective at 12:01 a.m., eastern daylight time on April 13, 2018.

**Sec. 3. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this tenth day of April, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-second.

DONALD J. TRUMP

### PROCLAMATION NO. 9931

<September 25, 2019, 84 F.R. 51931>

**Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Venezuela's Democratic Institutions**

By the President of the United States of America

A Proclamation

There remains a political and humanitarian crisis in Venezuela due to the continued failure of Nicolas Maduro, Maduro regime officials, and others to support the rule of law. Given the importance to the United States of fostering the functioning of constitutional government and democratic institutions in Venezuela, I have determined that it is in the interest of the United States to take action to restrict and suspend the entry into the United States, as immigrants or nonimmigrants, of senior members of the regime of Nicolas Maduro and others described in this proclamation who formulate, implement, or benefit from policies or actions that undermine or injure Venezuela's democratic institutions or impede the restoration of constitutional government to Venezuela. This suspension is not intended to apply to those who cease these actions and who take concrete steps to help return Venezuela to a functioning, democratic country.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 4 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Members of the regime of Nicolas Maduro at the level of Vice Minister, or equivalent, and above;

**(b)** All officers of the Venezuelan military, police, or National Guard at the rank of Colonel, or equivalent, and above;

**(c)** All members of the organization known as the National Constituent Assembly of Venezuela;

**(d)** All other aliens who act on behalf of or in support of the Maduro regime's efforts to undermine or injure Venezuela's democratic institutions or impede the restoration of constitutional government to Venezuela;

**(e)** Aliens who derive significant financial benefit from transactions or business dealings with persons described in subsections (a) through (d) of this section; and

**(f)** The immediate family members of persons described in subsections (a) through (e) of this section.

**Sec. 2. Delegation of Authority to the Secretary of State.** Persons covered by section 1 of this proclamation shall be identified by the Secretary of State, or the Secretary's designee, in his or her sole discretion, pursuant to such procedures as the Secretary may establish under section 3 of this proclamation.

**Sec. 3. Implementation of Suspension and Limitation on Entry.** The Secretary of State shall implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish. The Secretary of Homeland Security shall implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

**Sec. 4. Scope of Suspension and Limitation on Entry.** Section 1 of this proclamation shall not apply to:

**(a)** Any lawful permanent resident of the United States;

**(b)** Any individual who has been granted asylum by the United States, any refugee who has already been admitted to the United States, or any individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws and regulations of the United States; and

**(c)** Any person otherwise covered by section 1 of this proclamation, upon determination by the Secretary of State that the person's entry would not be contrary to the interests of the United States, including when the Secretary so determines, based on a recommendation of the Attorney General, that the person's entry would further important United States law enforcement objectives. In exercising this responsibility, the Secretary of State shall consult the Secretary of Homeland Security on matters related to admissibility or inadmissibility within the authority of the Secretary of Homeland Security.

**Sec. 5. Termination.** This proclamation shall remain in effect until such time as the Secretary of State determines that it is no longer necessary and should be terminated, either in whole or in part. Any such determination by the Secretary of State shall become effective upon publication in the Federal Register.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** United States Government obligations under applicable international agreements;

**(ii)** the authority granted by law to an executive department or agency, or the head thereof; or

**(iii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fifth day of September, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-fourth.

<div align="right">DONALD J. TRUMP</div>

### PROCLAMATION NO. 9932

<September 25, 2019, 84 F.R. 51935>

**Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran**

By the President of the United States of America

A Proclamation

The Government of Iran is a state sponsor of terrorism, and the Islamic Revolutionary Guard Corps, including its Qods Force, supports terrorists and directly engages in terrorism. Iran arbitrarily detains United States citizens. The Iranian regime contributes to humanitarian crises, threatens its neighbors, threatens international shipping, and conducts destructive cyberattacks. Given that this behavior threatens peace and stability in the Middle East and beyond, I have determined that it is in the interest of the United States to take action to restrict and suspend the entry into the United States, as immigrants or nonimmigrants, of senior government officials of Iran, and their immediate family members.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 4 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Senior officials of the Government of Iran; and

**(b)** The immediate family members of senior officials of the Government of Iran.

**Sec. 2. Delegation of Authority to the Secretary of State.** Persons covered by section 1 of this proclamation shall be identified by the Secretary of State, or the Secretary's designee, in his or her sole discretion, pursuant to such procedures as the Secretary may establish under section 3 of this proclamation.

**Sec. 3. Implementation of Suspension and Limitation on Entry.** The Secretary of State shall implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish. The Secretary of Homeland Security shall implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

**Sec. 4. Scope of Suspension and Limitation on Entry.** Section 1 of this proclamation shall not apply to:

**(a)** Any lawful permanent resident of the United States;

**(b)** Any individual who has been granted asylum by the United States, any refugee who has already been admitted to the United States, or any individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws and regulations of the United States; and

**(c)** Any person otherwise covered by section 1 of this proclamation, upon determination by the Secretary of State that the person's entry would not be contrary to the interests of the United States, including when the Secretary so determines, based on a recommendation of the Attorney General, that the person's entry would further important United States law enforcement objectives. In exercising this responsibility, the Secretary of State shall consult the Secretary of Homeland Security on matters related to admissibility or inadmissibility within the authority of the Secretary of Homeland Security.

**Sec. 5. Termination.** This proclamation shall remain in effect until such time as the Secretary of State determines that it is no longer necessary and should be terminated, either in whole or in part. Any such determination by the Secretary of State shall become effective upon publication in the Federal Register.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** United States Government obligations under applicable international agreements;

**(ii)** the authority granted by law to an executive department or agency, or the head thereof; or

**(iii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fifth day of September, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

## PROCLAMATION NO. 9945

<October 4, 2019, 84 F.R. 53991>

**Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order To Protect the Availability of Healthcare Benefits for Americans**

**By the President of the United States of America**

**A Proclamation**

Healthcare providers and taxpayers bear substantial costs in paying for medical expenses incurred by people who lack health insurance or the ability to pay for their healthcare. Hospitals and other providers often administer care to the uninsured without any hope of receiving reimbursement from them. The costs associated with this care are passed on to the American people in the form of higher taxes, higher premiums, and higher fees for medical services. In total, uncompensated care costs the overall measure of unreimbursed services that hospitals give their patients have exceeded $35 billion in each of the last 10 years. These costs amount to approximately $7 million on average for each hospital in the United States, and can drive hospitals into insolvency. Beyond uncompensated care costs, the uninsured strain Federal and State government budgets through their reliance on publicly funded programs, which ultimately are financed by taxpayers.

Beyond imposing higher costs on hospitals and other healthcare infrastructure, uninsured individuals often use emergency rooms to seek remedies for a variety of non-emergency conditions, causing overcrowding and delays for those who truly need emergency services. This non-emergency usage places a large burden on taxpayers, who reimburse hospitals for a portion of their uncompensated emergency care costs.

While our healthcare system grapples with the challenges caused by uncompensated care, the United States Government is making the problem worse by admitting thousands of aliens who have not demonstrated any ability to pay for their healthcare costs. Notably, data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance. Immigrants who enter this country should not further saddle our healthcare system, and subsequently American taxpayers, with higher costs.

The United States has a long history of welcoming immigrants who come lawfully in search of brighter futures. We must continue that tradition while also addressing the challenges facing our healthcare system, including protecting both it and the American taxpayer from the burdens of uncompensated care. Continuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental to these interests.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry. (a)** The entry into the United States as immigrants of aliens who will financially burden the United States healthcare system is hereby suspended and limited subject to section 2 of this proclamation. An alien will financially burden the United States healthcare system unless the alien will be covered by approved health insurance, as defined in subsection (b) of this section, within 30 days of the alien's entry into the United States, or unless the alien possesses the financial resources to pay for reasonably foreseeable medical costs.

**(b)** Approved health insurance means coverage under any of the following plans or programs:

**(i)** an employer-sponsored plan, including a retiree plan, association health plan, and coverage provided by the Consolidated Omnibus Budget Reconciliation Act of 1985;

**(ii)** an unsubsidized health plan offered in the individual market within a State;

**(iii)** a short-term limited duration health policy effective for a minimum of 364 days or until the beginning of planned, extended travel outside the United States;

**(iv)** a catastrophic plan;

**(v)** a family member's plan;

**(vi)** a medical plan under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

**(vii)** a visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days or until the beginning of planned, extended travel outside the United States;

**(viii)** a medical plan under the Medicare program; or

**(ix)** any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee.

**(c)** For persons over the age of 18, approved health insurance does not include coverage under the Medicaid program.

**Sec. 2. Scope of Suspension and Limitation on Entry. (a)** Section 1 of this proclamation shall apply only to aliens seeking to enter the United States pursuant to an immigrant visa.

**(b)** Section 1 of this proclamation shall not apply to:

**(i)** any alien holding a valid immigrant visa issued before the effective date of this proclamation;

**(ii)** any alien seeking to enter the United States pursuant to a Special Immigrant Visa, in either the SI or SQ classification, who is also a national of Afghanistan or Iraq, or his or her spouse and children, if any;

**(iii)** any alien who is the child of a United States citizen or who is seeking to enter the United States pursuant to an IR-2, IR-3, IR-4, IH-3, or IH-4 visa;

**(iv)** any alien seeking to enter the United States pursuant to an IR-5 visa, provided that the alien or the alien's sponsor demonstrates to the satisfaction of the consular officer that the alien's healthcare will not impose a substantial burden on the United States healthcare system;

**(v)** any alien seeking to enter the United States pursuant to a SB-1 visa;

**(vi)** any alien under the age of 18, except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation;

**(vii)** any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State or his designee based on a recommendation of the Attorney General or his designee; or

**(viii)** any alien whose entry would be in the national interest, as determined by the Secretary of State or his designee on a case-by-case basis.

**(c)** Consistent with subsection (a) of this section, this proclamation does not affect the entry of aliens entering the United States through means other than immigrant visas, including lawful permanent residents. Further, nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, refugee status, withholding of removal, or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, consistent with the laws and regulations of the United States.

**Sec. 3. Implementation and Enforcement. (a)** An alien subject to this proclamation must establish that he or she meets its requirements, to the satisfaction of a consular officer, before the adjudication and issuance of an immigrant visa. The Secretary of State may establish standards and procedures governing such determinations.

**(b)** The review required by subsection (a) of this section is separate and independent from the review and determination required by other statutes, regulations, or proclamations in determining the admissibility of an alien.

**(c)** An alien who circumvents the application of this proclamation through fraud, willful misrepresentation of a material fact, or illegal entry shall be a priority for removal by the Department of Homeland Security.

**Sec. 4. Reports on the Financial Burdens Imposed by Immigrants on the Healthcare System. (a)** The Secretary of State, in consultation with the Secretary of Health and Human Services, the Secretary of Homeland Security, and the heads of other appropriate agencies, shall submit to the President a report regarding:

**(i)** the continued necessity of and any adjustments that may be warranted to the suspension and limitation on entry in section 1 of this proclamation; and

**(ii)** other measures that may be warranted to protect the integrity of the United States healthcare system.

**(b)** The report required by subsection (a) of this section shall be submitted within 180 days of the effective date of this proclamation, with subsequent reports submitted annually thereafter throughout the effective duration of the suspension and limitation on entry set forth in section 1 of this proclamation. If the Secretary of State, in consultation with the heads of other appropriate executive departments and agencies, determines that circumstances no longer warrant the continued effectiveness of the suspension or limitation on entry set forth in section 1 of this proclamation or that circumstances warrant additional measures, the Secretary shall immediately so advise the President.

**(c)** The Secretary of State and Secretary of Health and Human Services shall coordinate any policy recommendations associated with the reports described in subsection (a) of this section.

**Sec. 5. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of the proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** United States Government obligations under applicable international agreements;

**(ii)** the authority granted by law to an executive department or agency, or the head thereof; or

**(iii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 7. Effective Date.** This proclamation is effective at 12:01 a.m. eastern daylight time on November 3, 2019.

DONALD J. TRUMP

PROCLAMATION NO. 9983

<January 31, 2020, 85 F.R. 6699>

**Improving Enhanced Vetting Capabilities and Processes for Detecting Attempted
Entry Into the United States by Terrorists or Other Public-Safety Threats**

By the President of the United States of America

A Proclamation

In Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry Into the United States), I temporarily suspended entry of nationals of certain specified countries and ordered a worldwide review of whether the United States would need additional information from each foreign country to assess adequately whether nationals of that foreign country seeking to enter the United States pose a security or public-safety threat to the United States, and if so, what additional information was needed. The Secretary of Homeland Security, pursuant to Executive Order 13780 and in consultation with the Secretary of State and the Director of National Intelligence, developed an assessment model using three categories of criteria to assess national security and public-safety threats: whether a foreign government engages in reliable identity-management practices and shares relevant information; whether a foreign government shares national security and public-safety information; and whether a country otherwise poses a national security or public-safety risk.

Following a comprehensive worldwide review of the performance of approximately 200 countries using these criteria, the Secretary of Homeland Security presented the results of this review, focusing in particular on those countries that were deficient or at risk of becoming deficient in their performance under the assessment criteria. After a subsequent period of diplomatic engagement on these issues by the Department of State, the Acting Secretary of Homeland Security submitted a report in September 2017, which found that eight countries were hindering the ability of the United States Government to identify threats posed by foreign nationals attempting to enter the United States. The Secretary of Homeland Security then recommended that I impose travel restrictions on certain nationals of those countries. After consultation with relevant Cabinet officials and appropriate Assistants to the President, I issued Proclamation 9645 of September 24, 2017 (Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats).

In Proclamation 9645, I suspended and limited the entry into the United States of certain nationals of eight countries that failed to satisfy the criteria and were unable or unwilling to improve their information sharing, or that otherwise presented serious terrorism-related risks. Those travel restrictions remain in effect today, with one exception. On April 10, 2018, I issued Proclamation 9723 (Maintaining Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats), removing travel restrictions on nationals of the Republic of Chad. Chad had improved its identity-management and information-sharing practices by taking steps to issue more secure passports and by increasing the integrity of how its government handles lost and stolen passports. Chad also began to share information about

known or suspected terrorists in a manner that makes that information available to the United States screening and vetting programs, and it created a new, standardized process for the United States to request relevant criminal information.

Pursuant to my directives in section 4 of Proclamation 9645, the Department of Homeland Security (DHS) has continued to assess every 180 days and report to me on whether the interests of the United States require the suspension of or limitation on entry of certain classes of foreign nationals. DHS has also continued to assess ways to further improve its processes for measuring how countries perform under the assessment criteria. From July 2018 through August 2019, DHS updated its methodology to assess compliance with the assessment criteria, which has allowed for more in-depth analysis and yields even more granularity and increased accuracy regarding each country's performance under the criteria.

In this updated methodology, the general overall criteria for review have not changed. The United States Government still expects all foreign governments to share needed identity-management information, to share national security and public-safety information, and to pass a security and public-safety risk assessment. Building on experience and insight gained over the last 2 years, DHS has, however, refined and modified the specific performance metrics by which it assesses compliance with the above criteria. For example, while the prior model determined whether a country shares certain needed information, the revised model accounts for how frequently the country shares that information and the extent to which that data contributes to border and immigration screening and vetting. As another example, the prior system asked whether a country issued electronic passports at all, whereas the refined metrics assess whether a country issues electronic passports for all major classes of travel documents. Similarly, the lost and stolen passports criterion previously assessed whether a country had prior instances of reporting loss or theft to the International Criminal Police Organization (INTERPOL), whereas the revised model now assesses whether the country has reported lost or stolen passports to INTERPOL within 30 days of a report of a loss or theft.

The DHS improvements to the assessment criteria also involve additional, and more customized, data from the United States Intelligence Community. DHS's original evaluation under Executive Order 13780 relied on existing intelligence products to assess the threat from each country. With the benefit of 2 years of experience, DHS has worked closely with the Intelligence Community to define intelligence requirements and customize intelligence reporting that offers a detailed characterization of the relative risk of terrorist travel to the United States from each country in the world. This additional detail improves DHS's assessment of national security and public-safety risk.

In addition, DHS greatly increased the amount of information obtained from United States Embassies abroad, which work closely with foreign governments. United States Embassies are best positioned to understand their host countries' ability and willingness to provide information to the United States, and United States Embassies' assessments contribute to a clearer understanding of how well a foreign government satisfies the assessment criteria. DHS also consolidated statistical information on operational encounters with foreign nationals. This information speaks to the frequency with which a country's nationals commit offenses while in the United States or otherwise develop grounds for inadmissibility under the Immigration and Nationality Act (INA).

Finally, as more precise, granular data became available, it became clear that many countries were only partially implementing each criterion. The 2017 process had three basic potential compliance ratings for each criterion: in compliance, out of compliance, or unknown. The updated methodology allows the United States to account for ways in which countries partially comply with the metrics associated with each criterion. As a result, for example, countries that DHS assessed in the 2017 review have now received more nuanced, partial compliance ratings. In addition, the process now weighs each criterion and risk factor based on its degree of importance to the United States Government for conducting screening and vetting of visa applicants and other travelers to the United States.

Using this enhanced review process, DHS conducted its most recent, worldwide review pursuant to Proclamation 9645 between March 2019 and September 2019. The process began on March 11, 2019, when the United States Government formally notified all foreign governments (except for Iran, Syria, and North Korea) about the refined performance metrics for the identity-management and information-sharing criteria. After collecting information from foreign governments, multilateral

organizations, United States Embassies, Federal law enforcement agencies, and the Intelligence Community, multiple subject matter experts reviewed each country's data and measured its identity-management and information-sharing practices against the criteria. DHS then applied the data to an algorithm it developed to consistently assess each country's compliance with the criteria.

DHS identified the worst-performing countries for further interagency review and for an assessment of the potential impact of visa restrictions. As in the worldwide review culminating in Proclamation 9645, the Acting Secretary of Homeland Security assessed that Iraq did not meet the baseline for compliance. As part of the interagency review process, the Acting Secretary of Homeland Security determined, however, not to recommend entry restrictions and limitations for nationals of Iraq. In his report, the Acting Secretary of Homeland Security recognized a close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS). The Acting Secretary of Homeland Security considered another similarly situated country and determined that, for reasons similar to those present in Iraq, entry restrictions and limitations would not be appropriate.

In addition, the United States Government, led by the Department of State, continued or increased engagements with many countries about those countries' deficiencies. A number of foreign governments sent senior officials to Washington, D.C., to discuss those issues, explore potential solutions, and convey views about obstacles to improving performance. As a result of this engagement, one country made sufficient improvements in its information-sharing and identity-management practices and was removed from consideration for travel restrictions.

On September 13, 2019, the Acting Secretary of Homeland Security, after consulting with the Secretary of State, the Attorney General, the Director of National Intelligence, and the heads of other appropriate agencies, submitted a fourth report to me recommending the suspension of, or limitation on, the entry of certain classes of nationals from certain countries in order to protect United States national security, including by incentivizing those foreign governments to improve their practices. The Acting Secretary of Homeland Security recommended maintaining the current restrictions on the seven countries announced in Proclamation 9645 (apart from Chad), as well as implementing suspensions and limitations on entry for certain nationals of twelve additional countries.

Since the Acting Secretary of Homeland Security issued his report on September 13, 2019, the Secretary of State, consistent with section 4(b) of Proclamation 9645, has continued to engage many foreign governments regarding the deficiencies identified in DHS's report and has continued to consult with the Acting Secretary of Homeland Security, the Secretary of Defense, and other Cabinet-level officials about how best to protect the national interest. Based on these engagements, in January 2020, those senior officials recommended that I maintain the entry restrictions adopted in Proclamation 9645 (as modified by Proclamation 9723), and that I exercise my authority under section 212(f) of the INA to suspend entry into the United States for nationals of six new countries_Burma (Myanmar), Eritrea, Kyrgyzstan, Nigeria, Sudan, and Tanzania_until those countries address their identified deficiencies.

The January 2020 proposal recommended visa restrictions on fewer countries than identified by the September 2019 DHS report. For example, the January 2020 proposal recommended no entry restrictions on nationals of one country that had been recommended for restrictions in the September 2019 report. This country made exceptional progress in correcting deficiencies since the September 2019 report, such that it could no longer be characterized as a country that is among those posing the highest degree of risk. In addition, the January 2020 proposal recommended that, for five poorly performing countries, foreign policy interests warranted a different approach than recommended in the September 2019 report. Specifically, the January 2020 proposal suggested that diplomatic engagement and requests for specific improvements during a defined 180-day period would be more appropriate and more likely to result in immediate improvements in these five countries. Each of these five countries provides critical counterterrorism cooperation with the United States and therefore holds strategic importance in countering malign external actors. In several of the five countries, the United States has experienced a recent deepening of diplomatic ties that generally mark increased cooperation toward achieving key regional and global United States foreign policy goals.

Importantly, all five countries have credibly communicated willingness to work directly with the United States Government to correct their outstanding deficiencies, and the United States believes progress is imminent for several countries and underway for others. For these reasons, these countries will be given an opportunity to show specific improvements in their deficiencies within the next 180 days.

Consistent with recommendations contained in the January 2020 proposal, I have decided to leave unaltered the existing entry restrictions imposed by Proclamation 9645, as amended by Proclamation 9723, and to impose tailored entry restrictions and limitations on nationals from six additional countries. I have decided not to impose any nonimmigrant visa restrictions for the newly identified countries, which substantially reduces the number of people affected by the proposed restrictions. Like the seven countries that continue to face travel restrictions pursuant to Proclamation 9645, the six additional countries recommended for restrictions in the January 2020 proposal are among the worst performing in the world. However, there are prospects for near-term improvement for these six countries. Each has a functioning government and each maintains productive relations with the United States. Most of the newly identified countries have expressed a willingness to work with the United States to address their deficiencies, although it may take some time to identify and implement specific solutions to resolve the deficiencies.

Consistent with the January 2020 proposal, I have prioritized restricting immigrant visa travel over nonimmigrant visa travel because of the challenges of removing an individual in the United States who was admitted with an immigrant visa if, after admission to the United States, the individual is discovered to have terrorist connections, criminal ties, or misrepresented information. Because each of the six additional countries identified in the January 2020 proposal has deficiencies in sharing terrorist, criminal, or identity information, there is an unacceptable likelihood that information reflecting the fact that a visa applicant is a threat to national security or public safety may not be available at the time the visa or entry is approved.

For two newly identified countries that were among the highest risk countries, but performed somewhat better than others, I have decided, consistent with the January 2020 proposal, to suspend entry only of Diversity Immigrants, as described in section 203(c) of the INA, 8 U.S.C. 1153(c). Such a suspension represents a less severe limit compared to a general restriction on immigrant visas, given the significantly fewer number of aliens affected. The Acting Secretary of Homeland Security considers foreign-government-y6703supplied information especially important for screening and vetting the Diversity Visa population in comparison to other immigrant visa applicants, and I agree with that assessment. In many cases, the United States Government may not have the same amount of information about Diversity Visa applicants compared with other categories of immigrant visa applicants because Diversity Visa applicants, with limited exceptions, do not have the burden to show certain family ties to or employment in the United States, or particular service to the United States Government, as required for other immigrant visa categories.

Consistent with the January 2020 proposal, I have decided not to impose any restrictions on certain Special Immigrant Visas for nationals of the six newly identified countries. Applicants under Special Immigrant programs generally do not need to demonstrate the same work or familial ties as other immigrant visas, but do need to show other unique qualifications. This exception is intended to cover those Special Immigrants who have advanced United States interests (and their eligible family members), such as foreign nationals who have worked for a United States Embassy for 15 years or more and are especially deserving of a visa.

As President, I must continue to act to protect the security and interests of the United States and its people. I remain committed to our ongoing efforts to engage those countries willing to cooperate, to improve information-sharing and identity-management protocols and procedures, and to address both terrorism-related and public-safety risks. And I believe that the assessment process, including enhancements made to that process, leads to new partnerships that strengthen our immigration screening and vetting capabilities. Until the countries identified in this proclamation satisfactorily address the identified deficiencies, I have determined, on the basis of a recommendation from the Acting Secretary of Homeland Security and other members of my Cabinet, to impose certain conditional restrictions and limitations on entry into the United States of nationals of the countries identified in section 1 of this proclamation, as set forth more fully below.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant entry into the United States of persons described in section 1 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to section 2 of this proclamation.

**(a)** The entry suspensions and limitations enacted by section 2 of Proclamation 9645 are not altered by this proclamation, and they remain in force by their terms, except as modified by Proclamation 9723.

**(b)** Burma (Myanmar)

**(i)** Although Burma has begun to engage with the United States on a variety of identity-management and information-sharing issues, it does not comply with the established identity-management and information-sharing criteria assessed by the performance metrics. Burma does not issue electronic passports nor does it adequately share several types of information, including public-safety and terrorism-related information, that are necessary for the protection of the national security and public safety of the United States. Burma is in the process of modernizing its domestic identity-management and criminal-records systems and has worked with the United States to develop some of those systems. It has also recognized the need to make improvements. As its capabilities improve, the prospect for further bilateral cooperation will likely also increase. Despite these encouraging prospects, Burma's identified deficiencies create vulnerabili-ties that terrorists, criminals, and fraudulent entrants could exploit to harm United States national security and public safety.

**(ii)** The entry into the United States of nationals of Burma as immigrants, except as Special Immigrants whose eligibility is based on having provided assistance to the United States Government, is hereby suspended.

**(c)** Eritrea

**(i)** Eritrea does not comply with the established identity-management and information-sharing criteria assessed by the performance metrics. Eritrea does not issue electronic passports or adequately share several types of information, including public-safety and terrorism-related information, that are necessary for the protection of the national security and public safety of the United States. Further, Eritrea is currently subject to several nonimmigrant visa restrictions. Eritrea does not accept return of its nationals subject to final orders of removal from the United States, which further magnifies the challenges of removing its nationals who have entered with immigrant visas. Eritrea has engaged with the United States about its deficiencies, but it also requires significant reforms to its border security, travel-document security, and information-sharing infrastructure. Improvements in these areas will increase its opportunities to come into compliance with the United States Government's identity-management and information-sharing criteria.

**(ii)** The entry into the United States of nationals of Eritrea as immigrants, except as Special Immigrants whose eligibility is based on having provided assistance to the United States Government, is hereby suspended.

**(d)** Kyrgyzstan

**(i)** Kyrgyzstan does not comply with the established identity-management and information-sharing criteria assessed by the performance metrics. Kyrgyzstan does not issue electronic passports or adequately share several types of information, including public-safety and terrorism-related information, that are necessary for the protection of the national security and public safety

of the United States. Kyrgyzstan also presents an elevated risk, relative to other countries in the world, of terrorist travel to the United States, though it has been responsive to United States diplomatic engagement on the need to make improvements.

**(ii)** The entry into the United States of nationals of Kyrgyzstan as immigrants, except as Special Immigrants whose eligibility is based on having provided assistance to the United States Government, is hereby suspended.

**(e)** Nigeria

**(i)** Nigeria does not comply with the established identity-management and information-sharing criteria assessed by the performance metrics. Nigeria does not adequately share public-safety and terrorism-related information, which is necessary for the protection of the national security and public safety of the United States. Nigeria also presents a high risk, relative to other countries in the world, of terrorist travel to the United States. Nigeria is an important strategic partner in the global fight against terrorism, and the United States continues to engage with Nigeria on these and other issues. The Department of State has provided significant assistance to Nigeria as it modernizes its border management capabilities, and the Government of Nigeria recognizes the importance of improving its information sharing with the United States. Nevertheless, these investments have not yet resulted in sufficient improvements in Nigeria's information sharing with the United States for border and immigration screening and vetting.

**(ii)** The entry into the United States of nationals of Nigeria as immigrants, except as Special Immigrants whose eligibility is based on having provided assistance to the United States Government, is hereby suspended.

**(f)** Sudan

**(i)** Sudan generally does not comply with our identity-management performance metrics and presents a high risk, relative to other countries in the world, of terrorist travel to the United States. Sudan is, however, transitioning to civilian rule, a process which should improve opportunities for cooperation in the future, and it has already made progress in addressing its deficiencies in several areas. For example, Sudan now issues electronic passports and has improved its coordination with INTERPOL in several respects. Sudan has also shared exemplars of its passports with the United States and now permanently invalidates lost and stolen passports and fraudulently obtained travel documents. Because Sudan performed somewhat better than the countries listed earlier in this proclamation and is making important reforms to its system of government, different travel restrictions are warranted.

**(ii)** The entry into the United States of nationals of Sudan as Diversity Immigrants, as described in section 203(c) of the INA, 8 U.S.C. 1153(c), is hereby suspended.

**(g)** Tanzania

**(i)** Tanzania does not comply with the established identity-management and information-sharing criteria assessed by the performance metrics. Tanzania does not adequately share several types of information, including public-safety and terrorism-related information, that is necessary for the protection of the national security and public safety of the United States. The Government of Tanzania's significant failures to adequately share information with the United States and other countries about possible Ebola cases in its territory detract from my confidence in its ability to resolve these deficiencies. Tanzania also presents an elevated risk, relative to other countries in the world, of terrorist travel to the United States. Tanzania does, however, issue electronic passports for all major passport classes, reports lost and stolen travel documents to INTERPOL at least once a month, and has provided exemplars of its current passports to the United States. Further, Tanzania does share some information with the United States, although its processes can be slow, overly bureaucratic, and complicated by limited technical capability. In light of these considerations, different travel restrictions are warranted.

**(ii)** The entry into the United States of nationals of Tanzania as Diversity Immigrants, as described in section 203(c) of the INA, 8 U.S.C. 1153(c), is hereby suspended.

**Sec. 2. Scope and Implementation of Suspensions and Limitations.** (a) Subject to the exceptions set forth in section 3(b) of Proclamation 9645, any waiver under section 3(c) of Proclamation 9645, and any enforcement provision of section 6(b) through (e) of Proclamation 9645, the suspensions of and limitations on entry pursuant to section 1(b) of this proclamation shall apply to foreign nationals of the designated countries who:

**(i)** are outside the United States on the applicable effective date of this proclamation;

**(ii)** do not have a valid visa on the applicable effective date of this proclamation; and

**(iii)** do not qualify for a visa or other valid travel document under section 6(d) of Proclamation 9645.

**(b)** The Secretary of State and the Secretary of Homeland Security shall coordinate to update guidance, if necessary, to implement this proclamation as to nationals of the six countries identified in section 1(b) of this proclamation, consistent with the provisions of this section.

**(c)** For purposes of this proclamation, the phrase "Special Immigrants whose eligibility is based on having provided assistance to the United States Government" means those aliens described in section 101(a)(27)(D) through (G) and (K) of the INA, 8 U.S.C. 1101(a)(27)(D) through (G) and (K), any alien seeking to enter the United States pursuant to a Special Immigrant Visa in the SI or SQ classification, and any spouse and children of any such individual.

**Sec. 3. Reporting Requirements. (a)** Section 4 of Proclamation 9645 is amended to read as follows:

**"Sec. 4. Adjustments to Removal of Suspensions and Limitations.**

**"(a)** The Secretary of Homeland Security, in consultation with the Secretary of State, shall on October 1, 2020, and annually thereafter, submit to the President the results of an evaluation as to whether to continue, terminate, modify, or supplement any suspensions of, or limitations on, the entry on certain classes of nationals of countries identified in section 2 of this proclamation and section 1(b) of the Proclamation "Improving Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats," signed on January 31, 2020.

**"(b)** The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall not less than every 2 years evaluate whether each country in the world sufficiently shares relevant information and maintains adequate identity-management and information-sharing practices to mitigate the risk that its citizens or residents may travel to the United States in furtherance of criminal or terrorist objectives, or otherwise seek to violate any law of the United States through travel or immigration. In doing so, the Secretary of Homeland Security shall:

**"(i)** in consultation with the Secretary of State, Attorney General, and the Director of National Intelligence, report to the President, through the appropriate Assistants to the President, any instance in which, based on a review conducted under subsection (b) of this section, the Secretary of Homeland Security believes it is in the interests of the United States to suspend or limit the entry of certain classes of nationals of a country; and

**"(ii)** in consultation with the Secretary of State and the Director of National Intelligence, regularly review and update as necessary the criteria and methodology by which such evaluations are implemented to ensure they continue to protect the national interests of the United States.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"**(c)** Notwithstanding the requirements set forth in subsections (a) and (b) of this section, the Secretary of Homeland Security, in consultation with the Secretary of State, Attorney General, and the Director of National Intelligence, may, at any time, recommend that the President impose, modify, or terminate a suspension or limitation on entry on certain classes of foreign nationals to protect the national interests of the United States."

**(b) Section 5 of Proclamation 9645 is revoked.**

**Sec. 4. Effective Date.** This proclamation is effective at 12:01 a.m. eastern standard time on February 21, 2020. With respect to the application of those provisions of Proclamation 9645 that are incorporated here through section 2 for countries designated in section 1(b), and that contained their own effective dates, those dates are correspondingly updated to be January 31, 2020, or February 21, 2020, as appropriate.

**Sec. 5. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 6. General Provisions.** (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** United States Government obligations under applicable international agreements;

**(ii)** the authority granted by law to an executive department or agency, or the head thereof; or

**(iii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirty-first day of January, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

**PROCLAMATION NO. 9984**

<January 31, 2020, 85 F.R. 6709>

AR.00891

**Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus and Other Appropriate Measures To Address This Risk**

By the President of the United States of America

A Proclamation

The United States has confirmed cases of individuals who have a severe acute respiratory illness caused by a novel (new) coronavirus ("2019-nCoV") ("the virus") first detected in Wuhan, Hubei Province, People's Republic of China ("China"). The virus was discovered in China in December 2019. As of January 31, 2020, Chinese health officials have reported approximately 10,000 confirmed cases of 2019-nCoV in China, more than the number of confirmed cases of Severe Acute Respiratory Syndrome (SARS) during its 2003 outbreak. An additional 114 cases have been confirmed across 22 other countries; in several of these cases, the infected individuals had not visited China. More than 200 people have died from the virus, all in China.

Coronaviruses are a large family of viruses. Some cause illness in people and others circulate among animals, including camels, cats, and bats. Animal coronaviruses are capable of evolving to infect people and subsequently spreading through human-to-human transmission. This occurred with both Middle East Respiratory Syndrome and SARS. Many of the individuals with the earliest confirmed cases of 2019-nCoV in Wuhan, China had some link to a large seafood and live animal market, suggesting animal-to-human transmission. Later, a growing number of infected individuals reportedly did not have exposure to animal markets, indicating human-to-human transmission. Chinese officials now report that sustained human-to-human transmission of the virus is occurring in China. Manifestations of severe disease have included severe pneumonia, acute respiratory distress syndrome, septic shock, and multi-organ failure.

Neighboring jurisdictions have taken swift action to protect their citizens by closing off travel between their territories and China. On January 30, 2020, the World Health Organization declared the 2019-nCoV outbreak a public health emergency of international concern.

Outbreaks of novel viral infections among people are always of public health concern, and older adults and people with underlying health conditions may be at increased risk. Public health experts are still learning about the severity of 2019-nCoV. An understanding of the key attributes of this novel virus, including its transmission dynamics, incubation period, and severity, is critical to assessing the risk it poses to the American public. Nonetheless, the Centers for Disease Control and Prevention (CDC) has determined that the virus presents a serious public health threat.

The CDC is closely monitoring the situation in the United States, is conducting enhanced entry screening at 5 United States airports where the majority of travelers from Wuhan arrive, and is enhancing illness response capacity at the 20 ports of entry where CDC medical screening stations are located. The CDC is also supporting States in conducting contact investigations of confirmed 2019-nCoV cases identified within the United States. The CDC has confirmed that the virus has spread between two people in the United States, representing the first instance of person-to-person transmission of the virus within the United States. The CDC, along with state and local health departments, has limited resources and the public health system could be overwhelmed if sustained human-to-human transmission of the virus occurred in the United States. Sustained human-to-human transmission has the potential to have cascading public health, economic, national security, and societal consequences.

During Fiscal Year 2019, an average of more than 14,000 people traveled to the United States from China each day, via both direct and indirect flights. The United States Government is unable to effectively evaluate and monitor all of the travelers continuing to arrive from China. The potential for widespread transmission of the virus by infected individuals seeking to enter the United States threatens the security of our transportation system and infrastructure and the national security. Given the importance of protecting persons within the United States from the threat of this harmful communicable disease, I have determined that it is in the interests of the United States to take action to restrict and suspend the entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States. I have also determined that the United States should take all necessary and appropriate measures to facilitate orderly medical screening and, where appropriate, quarantine of persons allowed to enter the United States who may have been exposed to this virus.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

**Sec. 2. Scope of Suspension and Limitation on Entry.**

**(a)** Section 1 of this proclamation shall not apply to:

**(i)** any lawful permanent resident of the United States;

**(ii)** any alien who is the spouse of a U.S. citizen or lawful permanent resident;

**(iii)** any alien who is the parent or legal guardian of a U.S. citizen or lawful permanent resident, provided that the U.S. citizen or lawful permanent resident is unmarried and under the age of 21;

**(iv)** any alien who is the sibling of a U.S. citizen or lawful permanent resident, provided that both are unmarried and under the age of 21;

**(v)** any alien who is the child, foster child, or ward of a U.S. citizen or lawful permanent resident, or who is a prospective adoptee seeking to enter the United States pursuant to the IR-4 or IH-4 visa classifications;

**(vi)** any alien traveling at the invitation of the United States Government for a purpose related to containment or mitigation of the virus;

**(vii)** any alien traveling as a nonimmigrant under section 101(a)(15)(C) or (D) of the INA, 8 U.S.C. 1101(a)(15)(C) or (D), as a crewmember or any alien otherwise traveling to the United States as air or sea crew;

**(viii)** any alien (A) seeking entry into or transiting the United States pursuant to one of the following visas: A-1, A-2, C-2, C-3 (as a foreign government official or immediate family member of an official), E-1 (as an employee of TECRO or TECO or the employee's immediate family members), G-1, G-2, G-3, G-4, NATO-1 through NATO-4, or NATO-6 (or seeking to enter as a nonimmigrant in one of those NATO categories); or (B) whose travel falls within the scope of section 11 of the United Nations Headquarters Agreement;

**(ix)** any alien whose entry would not pose a significant risk of introducing, transmitting, or spreading the virus, as determined by the CDC Director, or his designee;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(x)** any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees based on a recommendation of the Attorney General or his designee; or

**(xi)** any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their designees.

**(b)** Nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, withholding of removal, or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, consistent with the laws and regulations of the United States.

**Sec. 3. Implementation and Enforcement. (a)** The Secretary of State shall implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish. The Secretary of Homeland Security shall implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

**(b)** Consistent with applicable law, the Secretary of State, the Secretary of Transportation, and the Secretary of Homeland Security shall ensure that any alien subject to this proclamation does not board an aircraft traveling to the United States.

**(c)** The Secretary of Homeland Security may establish standards and procedures to ensure the application of this proclamation at and between all United States ports of entry.

**(d)** An alien who circumvents the application of this proclamation through fraud, willful misrepresentation of a material fact, or illegal entry shall be a priority for removal by the Department of Homeland Security.

**Sec. 4. Orderly Medical Screening and Quarantine.** The Secretary of Homeland Security shall take all necessary and appropriate steps to regulate the travel of persons and aircraft to the United States to facilitate the orderly medical screening and, where appropriate, quarantine of persons who enter the United States and who may have been exposed to the virus. Such steps may include directing air carriers to restrict and regulate the boarding of such passengers on flights to the United States.

**Sec. 5. Termination.** This proclamation shall remain in effect until terminated by the President. The Secretary of Health and Human Services shall, as circumstances warrant and no more than 15 days after the date of this proclamation and thereafter on the first and fifteenth day of each calendar month, recommend that the President continue, modify, or terminate this proclamation and any other proclamation suspending or limiting the entry of foreign nationals into the United States as immigrants or nonimmigrants because of the threat posed by the virus.

**Sec. 6. Effective Date.** This proclamation is effective at 5:00 p.m. eastern standard time on February 2, 2020.

**Sec. 7. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, public safety, and foreign policy interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 8. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirty-first day of January, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

## PROCLAMATION NO. 9992

<February 29, 2020, 85 FR 12855>

### Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus

By the President of the United States of America

A Proclamation

On January 31, 2020, I issued Proclamation 9984 (Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus and Other Appropriate Measures To Address This Risk). I found that the potential for widespread transmission of a novel (new) coronavirus (which has since been renamed SARS-CoV-2 and causes the disease COVID-19) (SARS-CoV-2 or the virus) by infected individuals seeking to enter the United States threatens the security of our transportation system and infrastructure and the national security. Because the outbreak of the virus was (and is) centered in the People's Republic of China, I suspended and limited the entry of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States, subject to certain exceptions.

The Centers for Disease Control and Prevention (CDC), a component of the Department of Health and Human Services, has determined that the virus presents a serious public health threat and continues to take steps to prevent its spread. But CDC, along with State and local health departments, has limited resources, and the public health system could be overwhelmed if sustained human-to-human transmission of the virus occurred in the United States. Sustained human-to-human transmission has the potential to have cascading public health, economic, national security, and societal consequences.

CDC has determined that the Islamic Republic of Iran (Iran) is experiencing sustained person-to-person transmission of SARS-CoV-2. As of February 28, 2020, Iran had 388 cases of COVID-19, a significant increase from prior days. In response to that increase, on February 28, 2020, CDC raised its infectious disease alert to level 3, its highest level, which recommends that travelers avoid all nonessential travel to Iran. According to the World Health Organization, as of February 28, 2020, 97 COVID-19 cases have been exported from Iran to 11 other countries.

Iran is not a trustworthy state actor, as it has repeatedly demonstrated through its history of engaging in malign activity and confirmed most recently by its repeated denials of responsibility for shooting down an international airliner. The United States Government is therefore unable to rely on official information disseminated by Iran, undermining the effective evaluation and monitoring of travelers continuing to arrive from that country.

The potential for undetected transmission of the virus by infected individuals seeking to enter the United States from Iran threatens the security of our transportation system and infrastructure and the national security. Given the importance of protecting persons within the United States from the threat of this harmful communicable disease, I have determined that it is in the interests of the United States to take action to restrict and suspend the entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within Iran during the 14-day period preceding their entry or attempted entry into the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that the unrestricted entry into the United States of persons described in section 1 of this proclamation would, except as provided for in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry into the United States, as immigrants or nonimmigrants, of all aliens who were physically present within the Islamic Republic of Iran during the 14-day period preceding their entry or attempted entry into the United States is hereby suspended and limited subject to section 2 of this proclamation.

**Sec. 2. Scope of Suspension and Limitation on Entry. (a)** Section 1 of this proclamation shall not apply to:

**(i)** any lawful permanent resident of the United States;

**(ii)** any alien who is the spouse of a U.S. citizen or lawful permanent resident;

**(iii)** any alien who is the parent or legal guardian of a U.S. citizen or lawful permanent resident, provided that the U.S. citizen or lawful permanent resident is unmarried and under the age of 21;

**(iv)** any alien who is the sibling of a U.S. citizen or lawful permanent resident, provided that both are unmarried and under the age of 21;

**(v)** any alien who is the child, foster child, or ward of a U.S. citizen or lawful permanent resident, or who is a prospective adoptee seeking to enter the United States pursuant to the IR-4 or IH-4 visa classifications;

**(vi)** any alien traveling at the invitation of the United States Government for a purpose related to containment or mitigation of the virus;

**(vii)** any alien traveling as a nonimmigrant pursuant to a C-1, D, or C-1/D nonimmigrant visa as a crewmember or any alien otherwise traveling to the United States as air or sea crew;

**(viii)** any alien

**(A)** seeking entry into or transiting the United States pursuant to one of the following visas: A-1, A-2, C-2, C-3 (as a foreign government official or immediate family member of an official), E-1 (as an employee of TECRO or TECO or the employee's

immediate family members), G-1, G-2, G-3, G-4, NATO-1 through NATO-4, or NATO-6 (or seeking to enter as a nonimmigrant in one of those NATO categories); or

**(B)** whose travel falls within the scope of section 11 of the United Nations Headquarters Agreement;

**(ix)** any alien whose entry would not pose a significant risk of introducing, transmitting, or spreading the virus, as determined by the Secretary of Health and Human Services, through the CDC Director or his designee;

**(x)** any alien whose entry would further important United States law enforcement objectives, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees, based on a recommendation of the Attorney General or his designee;

**(xi)** any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their designees; or

**(xii)** members of the U.S. Armed Forces and spouses and children of members of the U.S. Armed Forces.

**(b)** Nothing in this proclamation shall be construed to affect any individual's eligibility for asylum, withholding of removal, or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, consistent with the laws and regulations of the United States.

**Sec. 3. Implementation and Enforcement. (a)** The Secretary of State shall implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish. The Secretary of Homeland Security shall implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

**(b)** Consistent with applicable law, the Secretary of State, the Secretary of Transportation, and the Secretary of Homeland Security shall ensure that any alien subject to this proclamation does not board an aircraft traveling to the United States.

**(c)** The Secretary of Homeland Security may establish standards and procedures to ensure the application of this proclamation at and between all United States ports of entry.

**(d)** An alien who circumvents the application of this proclamation through fraud, willful misrepresentation of a material fact, or illegal entry shall be a priority for removal by the Department of Homeland Security.

**Sec. 4. Amendments to Proclamation 9984.** Proclamation 9984 is amended as follows:

**(a)** Section 2(a)(viii) of Proclamation 9984 is amended to read as follows: (viii) any alien (A) seeking entry into or transiting the United States pursuant to one of the following visas: A-1, A-2, C-2, C-3 (as a foreign government official or immediate family member of an official), E-1 (as an employee of TECRO or TECO or the employee's immediate family members), G-1, G-2, G-3, G-4, NATO-1 through NATO-4, or NATO-6 (or seeking to enter as a nonimmigrant in one of those NATO categories); or (B) whose travel falls within the scope of section 11 of the United Nations Headquarters Agreement;

**(b)** Section 3(c) of Proclamation 9984 is amended to read as follows: (c) The Secretary of Homeland Security may establish standards and procedures to ensure the application of this proclamation at and between all United States ports of entry.

**(c)** Section 5 of Proclamation 9984 is amended to read as follows:

**Sec. 5. Termination.** This proclamation shall remain in effect until terminated by the President. The Secretary of Health and Human Services shall, as circumstances warrant and no more than 15 days after the date of this proclamation and thereafter on the first and fifteenth day of each calendar month, recommend that the President continue, modify, or terminate this proclamation and any other proclamation suspending or limiting the entry of foreign nationals into the United States as immigrants or nonimmigrants because of the threat posed by the virus.

**Sec. 5. Termination.** This proclamation shall remain in effect until terminated by the President.

**Sec. 6. Effective Date.** This proclamation is effective at 5:00 p.m. eastern standard time on March 2, 2020. This proclamation does not apply to persons aboard a flight scheduled to arrive in the United States that departed prior to 5:00 p.m. eastern standard time on March 2, 2020.

**Sec. 7. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, public safety, and foreign policy interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 8. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of February, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

## MEMORANDA OF PRESIDENT

## DELEGATION OF AUTHORITY UNDER SECTIONS 212(f) AND 215(a)(1) OF THE IMMIGRATION AND NATIONALITY ACT

<Sept. 24, 1999, 64 F.R. 55809>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  AR.00898  14

**Memorandum for the Attorney General**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and in light of Proclamation 4865 of September 29, 1981 [set out as a note under this section], I hereby delegate to the Attorney General the authority to:

**(a)** Maintain custody, at any location she deems appropriate, and conduct any screening she deems appropriate in her unreviewable discretion, of any undocumented person she has reason to believe is seeking to enter the United States and who is encountered in a vessel interdicted on the high seas through December 31, 2000; and

**(b)** Undertake any other appropriate actions with respect to such aliens permitted by law.

With respect to the functions delegated by this order, all actions taken after April 16, 1999, for or on behalf of the President that would have been valid if taken pursuant to this memorandum are ratified.

This memorandum is not intended to create, and should not be construed to create, any right or benefit, substantive or procedural, legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person, or to require any procedures to determine whether a person is a refugee.

You are authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON


**PRESIDENTIAL MEMORANDUM**

<March 6, 2017, 82 F.R. 16279>


**Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits, Ensuring Enforcement of All Laws for Entry Into the United States, and Increasing Transparency Among Departments and Agencies of the Federal Government and for the American People**

Memorandum for the Secretary of State[,] the Attorney General[, and] the Secretary of Homeland Security

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, I hereby direct the following:

**Section 1. Policy.** It is the policy of the United States to keep its citizens safe from terrorist attacks, including those committed by foreign nationals. To avert the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts, it is critical that the executive branch enhance the screening and vetting protocols and procedures for granting visas, admission to the United States, or other benefits under the INA. For that reason, in the executive order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States," and issued today, I directed the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, to conduct a review to "identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat."

While that comprehensive review is ongoing, however, this Nation cannot delay the immediate implementation of additional heightened screening and vetting protocols and procedures for issuing visas to ensure that we strengthen the safety and security of our country.

Moreover, because it is my constitutional duty to "take Care that the Laws be faithfully executed," the executive branch is committed to ensuring that all laws related to entry into the United States are enforced rigorously and consistently.

**Sec. 2. Enhanced Vetting Protocols and Procedures for Visas and Other Immigration Benefits.** The Secretary of State and the Secretary of Homeland Security, in consultation with the Attorney General, shall, as permitted by law, implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and vetting of applications for visas and all other immigration benefits, so as to increase the safety and security of the American people. These additional protocols and procedures should focus on:

**(a)** preventing the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts; and

**(b)** ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits.

**Sec. 3. Enforcement of All Laws for Entry into the United States.** I direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of all other relevant executive departments and agencies (as identified by the Secretary of Homeland Security) to rigorously enforce all existing grounds of inadmissibility and to ensure subsequent compliance with related laws after admission. The heads of all relevant executive departments and agencies shall issue new rules, regulations, or guidance (collectively, rules), as appropriate, to enforce laws relating to such grounds of inadmissibility and subsequent compliance. To the extent that the Secretary of Homeland Security issues such new rules, the heads of all other relevant executive departments and agencies shall, as necessary and appropriate, issue new rules that conform to them. Such new rules shall supersede any previous rules to the extent of any conflict.

**Sec. 4. Transparency and Data Collection. (a)** To ensure that the American people have more regular access to information, and to ensure that the executive branch shares information among its departments and agencies, the Secretary of State and Secretary of Homeland Security shall, consistent with applicable law and national security, issue regular reports regarding visas and adjustments of immigration status, written in non-technical language for broad public use and understanding. In addition to any other information released by the Secretary of State, the Attorney General, or the Secretary of Homeland Security:

**(i)** Beginning on April 28, 2017, and by the last day of every month thereafter, the Secretary of State shall publish the following information about actions taken during the preceding calendar month:

**(A)** the number of visas that have been issued from each consular office within each country during the reporting period, disaggregated by detailed visa category and country of issuance; and

**(B)** any other information the Secretary of State considers appropriate, including information that the Attorney General or Secretary of Homeland Security may request be published.

**(ii)** The Secretary of Homeland Security shall issue reports detailing the number of adjustments of immigration status that have been made during the reporting period, disaggregated by type of adjustment, type and detailed class of admission, and country of nationality. The first report shall be issued within 90 days of the date of this memorandum, and subsequent reports shall be issued every 90 days thereafter. The first report shall address data from the date of this memorandum until the report is issued, and each subsequent report shall address new data since the last report was issued.

**(b)** To further ensure transparency for the American people regarding the efficiency and effectiveness of our immigration programs in serving the national interest, the Secretary of State, in consultation with the Secretary of Health and Human Services, the Secretary of Homeland Security, and the Director of the Office of Management and Budget, shall, within 180 days of the date of this memorandum, submit to me a report detailing the estimated long-term costs of the United States Refugee Admissions Program at the Federal, State, and local levels, along with recommendations about how to curtail those costs.

**(c)** The Secretary of State, in consultation with the Director of the Office of Management and Budget, shall, within 180 days of the date of this memorandum, produce a report estimating how many refugees are being supported in countries of first asylum (near their home countries) for the same long-term cost as supporting refugees in the United States, taking into account the full lifetime cost of Federal, State, and local benefits, and the comparable cost of providing similar benefits elsewhere.

**Sec. 5. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** All actions taken pursuant to this memorandum shall be consistent with requirements and authorities to protect intelligence and law enforcement sources and methods, personally identifiable information, and the confidentiality of visa records. Nothing in this memorandum shall be interpreted to supersede measures established under authority of law to protect the security and integrity of specific activities and associations that are in direct support of intelligence and law enforcement operations.

**(d)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(e)** The Secretary of State is hereby authorized and directed to publish this memorandum in the Federal Register.

DONALD J. TRUMP

**PRESIDENTIAL MEMORANDUM**

<June 14, 2017, 82 F.R. 27965>

**Effective Date in Executive Order 13780**

**Memorandum for the Secretary of State[,] the Attorney General[,] the Secretary of Homeland Security[, and] the Director of National Intelligence**

This memorandum provides guidance for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence in light of two preliminary injunctions that bar enforcement of certain provisions of Executive Order 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States" (Mar. 6, 2017). The preliminary injunction entered by the United States District Court for the District of Maryland, and affirmed in substantial part by the United States Court of Appeals for the Fourth Circuit, bars enforcement of section 2(c) of the Executive Order. The portions of the preliminary injunction entered by the United States District Court for the District of Hawaii that were affirmed

by the recent decision of the United States Court of Appeals for the Ninth Circuit bar enforcement of certain provisions of sections 2 and 6 of the Executive Order.

Various provisions of sections 2 and 6 of the Executive Order (as well as sections 3 and 12(c), which delineate the scope of the suspension contained in section 2(c)), refer to the Order's effective date. Section 14 of the Executive Order provides that the Order was effective at 12:01 a.m., eastern daylight time on March 16, 2017. Sections 2 and 6, however, were enjoined before that effective date, and the courts of appeals have affirmed the injunctions with respect to certain provisions of sections 2 and 6. As a result, under the terms of the Executive Order, the effective date of the enjoined provisions (as well as related provisions of sections 3 and 12(c)) is delayed or tolled until those injunctions are lifted or stayed.

In light of questions in litigation about the effective date of the enjoined provisions and in the interest of clarity, I hereby declare the effective date of each enjoined provision to be the date and time at which the referenced injunctions are lifted or stayed with respect to that provision. To the extent it is necessary, this memorandum should be construed to amend the Executive Order.

Because the injunctions have delayed the effective date of section 12(c), no immigrant or nonimmigrant visa issued before the effective date of section 2(c) shall be revoked pursuant to the Executive Order.

I hereby direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to jointly begin implementation of each relevant provision of sections 2 and 6 of the Executive Order 72 hours after all applicable injunctions are lifted or stayed with respect to that provision, to ensure an orderly and proper implementation of those provisions. Prior to that time, consular officers may issue valid visas to, and the Secretary of Homeland Security may admit, otherwise eligible aliens without regard to sections 2 and 6. If not otherwise revoked, visas and other travel documents issued during this period remain valid for travel as if they were issued prior to the effective date.

DONALD J. TRUMP

Notes of Decisions (2689)

## Footnotes

| | |
|---|---|
| 1 | So in original. The semicolon probably should be a comma. |
| 2 | So in original. Probably should be a reference to section 1229c of this title. |
| 3 | So in original. Probably should be preceded by "ineligible for". |
| 4 | So in original. |
| 5 | So in original. Probably should be "Secretary's". |
| 6 | So in original. Probably should be "(10)(E))". |
| 7 | So in original. |
| 8 | So in original. Probably should be "or". |
| 9 | So in original. Probably should be "clause". |
| 10 | So in original. Two subsecs. (t) have been enacted. |

8 U.S.C.A. § 1182, 8 USCA § 1182

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

End of Document                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Unconstitutional or Preempted  Unconstitutional as Applied by  J.N.C.G. v. Warden, Stewart Detention Center,  M.D.Ga.,  Aug. 26, 2020

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1226

§ 1226. Apprehension and detention of aliens

Currentness

**(a) Arrest, detention, and release**

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

**(1)** may continue to detain the arrested alien; and

**(2)** may release the alien on--

**(A)** bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

**(B)** conditional parole; but

**(3)** may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

**(b) Revocation of bond or parole**

The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

**(c) Detention of criminal aliens**

**(1) Custody**

The Attorney General shall take into custody any alien who--

**(A)** is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

**(B)** is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

**(C)** is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [1] to a term of imprisonment of at least 1 year, or

**(D)** is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

**(2) Release**

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

**(d) Identification of criminal aliens**

**(1)** The Attorney General shall devise and implement a system--

**(A)** to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

**(B)** to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

**(C)** which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

**(2)** The record under paragraph (1)(C) shall be made available--

**(A)** to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

**(B)** to officials of the Department of State for use in its automated visa lookout system.

**(3)** Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

**(e) Judicial review**

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 4, § 236, 66 Stat. 200; Pub.L. 101-649, Title V, § 504(b), Title VI, § 603(a)(12), Nov. 29, 1990, 104 Stat. 5050, 5083; Pub.L. 102-232, Title III, § 306(a)(5), Dec. 12, 1991, 105 Stat. 1751; Pub.L. 104-208, Div. C, Title III, §§ 303(a), 371(b)(5), Sept. 30, 1996, 110 Stat. 3009-585, 3009-645.)

Notes of Decisions (620)

**Footnotes**

1        So in original. Probably should be "sentenced".
8 U.S.C.A. § 1226, 8 USCA § 1226
Current through P.L. 116-188. Some statute sections may be more current, see credits for details.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1227

§ 1227. Deportable aliens

Effective: December 23, 2008
Currentness

**(a) Classes of deportable aliens**

Any alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens:

  **(1) Inadmissible at time of entry or of adjustment of status or violates status**

    **(A) Inadmissible aliens**

    Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable.

    **(B) Present in violation of law**

    Any alien who is present in the United States in violation of this chapter or any other law of the United States, or whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 1201(i) of this title, is deportable.

    **(C) Violated nonimmigrant status or condition of entry**

      **(i) Nonimmigrant status violators**

      Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status, is deportable.

      **(ii) Violators of conditions of entry**

Any alien whom the Secretary of Health and Human Services certifies has failed to comply with terms, conditions, and controls that were imposed under section 1182(g) of this title is deportable.

**(D) Termination of conditional permanent residence**

**(i) In general**

Any alien with permanent resident status on a conditional basis under section 1186a of this title (relating to conditional permanent resident status for certain alien spouses and sons and daughters) or under section 1186b of this title (relating to conditional permanent resident status for certain alien entrepreneurs, spouses, and children) who has had such status terminated under such respective section is deportable.

**(ii) Exception**

Clause (i) shall not apply in the cases described in section 1186a(c)(4) of this title (relating to certain hardship waivers).

**(E) Smuggling**

**(i) In general**

Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(iii) Waiver authorized**

The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) in the case of any alien lawfully admitted for permanent residence if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of the offense was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(F) Repealed. Pub.L. 104-208**, Div. C, **Title VI, § 671(d)(1)(C)**, Sept. 30, 1996, 110 Stat. 3009-723

**(G) Marriage fraud**

An alien shall be considered to be deportable as having procured a visa or other documentation by fraud (within the meaning of section 1182(a)(6)(C)(i) of this title) and to be in the United States in violation of this chapter (within the meaning of subparagraph (B)) if--

**(i)** the alien obtains any admission into the United States with an immigrant visa or other documentation procured on the basis of a marriage entered into less than 2 years prior to such admission of the alien and which, within 2 years subsequent to any admission of the alien in the United States, shall be judicially annulled or terminated, unless the alien establishes to the satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws, or

**(ii)** it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of procuring the alien's admission as an immigrant.

**(H) Waiver authorized for certain misrepresentations**

The provisions of this paragraph relating to the removal of aliens within the United States on the ground that they were inadmissible at the time of admission as aliens described in section 1182(a)(6)(C)(i) of this title, whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien (other than an alien described in paragraph (4) (D)) who--

**(i)(I)** is the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

**(II)** was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation.

**(ii)** is a VAWA self-petitioner.

A waiver of removal for fraud or misrepresentation granted under this subparagraph shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation.

**(2) Criminal offenses**

**(A) General crimes**

**(i) Crimes of moral turpitude**

Any alien who--

**(I)** is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and

**(II)** is convicted of a crime for which a sentence of one year or longer may be imposed,

is deportable.

**(ii) Multiple criminal convictions**

Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

**(iii) Aggravated felony**

Any alien who is convicted of an aggravated felony at any time after admission is deportable.

**(iv) High speed flight**

Any alien who is convicted of a violation of section 758 of Title 18 (relating to high speed flight from an immigration checkpoint) is deportable.

**(v) Failure to register as a sex offender**

Any alien who is convicted under section 2250 of Title 18 is deportable.

**(vi) Waiver authorized**

Clauses (i), (ii), (iii), and (iv) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.

**(B) Controlled substances**

**(i) Conviction**

Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

**(ii) Drug abusers and addicts**

Any alien who is, or at any time after admission has been, a drug abuser or addict is deportable.

**(C) Certain firearm offenses**

Any alien who at any time after admission is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of Title 18) in violation of any law is deportable.

**(D) Miscellaneous crimes**

Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate--

**(i)** any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of Title 18 for which a term of imprisonment of five or more years may be imposed;

**(ii)** any offense under section 871 or 960 of Title 18;

**(iii)** a violation of any provision of the Military Selective Service Act (50 U.S.C. App. 451 et seq.) or the Trading With the Enemy Act (50 U.S.C. App. 1 et seq.); or

**(iv)** a violation of section 1185 or 1328 of this title,

is deportable.

(E) Crimes of domestic violence, stalking, or violation of protection order, crimes against children and [1]

**(i) Domestic violence, stalking, and child abuse**

Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term "crime of domestic violence" means any crime of violence (as defined in section 16 of Title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

**(ii) Violators of protection orders**

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Any alien who at any time after admission is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term "protection order" means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.

**(F) Trafficking**

Any alien described in section 1182(a)(2)(H) of this title is deportable.

**(3) Failure to register and falsification of documents**

**(A) Change of address**

An alien who has failed to comply with the provisions of section 1305 of this title is deportable, unless the alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

**(B) Failure to register or falsification of documents**

Any alien who at any time has been convicted--

**(i)** under section 1306(c) of this title or under section 36(c) of the Alien Registration Act, 1940,

**(ii)** of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.), or

**(iii)** of a violation of, or an attempt or a conspiracy to violate, section 1546 of Title 18 (relating to fraud and misuse of visas, permits, and other entry documents),

is deportable.

**(C) Document fraud**

**(i) In general**

An alien who is the subject of a final order for violation of section 1324c of this title is deportable.

**(ii) Waiver authorized**

The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.

### (D) Falsely claiming citizenship

#### (i) In general

Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law is deportable.

#### (ii) Exception

In the case of an alien making a representation described in clause (i), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such representation.

### (4) Security and related grounds

#### (A) In general

Any alien who has engaged, is engaged, or at any time after admission engages in--

##### (i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

##### (ii) any other criminal activity which endangers public safety or national security, or

##### (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

### (B) Terrorist activities

Any alien who is described in subparagraph (B) or (F) of section 1182(a)(3) of this title is deportable.

### (C) Foreign policy

### (i) In general

An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.

### (ii) Exceptions

The exceptions described in clauses (ii) and (iii) of section 1182(a)(3)(C) of this title shall apply to deportability under clause (i) in the same manner as they apply to inadmissibility under section 1182(a)(3)(C)(i) of this title.

### (D) Participated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing

Any alien described in clause (i), (ii), or (iii) of section 1182(a)(3)(E) of this title is deportable.

### (E) Participated in the commission of severe violations of religious freedom

Any alien described in section 1182(a)(2)(G) of this title is deportable.

### (F) Recruitment or use of child soldiers

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is deportable.

## (5) Public charge

Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.

## (6) Unlawful voters

### (A) In general

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.

### (B) Exception

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be deportable under any provision of this subsection based on such violation.

**(7) Waiver for victims of domestic violence**

**(A) In general**

The Attorney General is not limited by the criminal court record and may waive the application of paragraph (2)(E)(i) (with respect to crimes of domestic violence and crimes of stalking) and (ii) in the case of an alien who has been battered or subjected to extreme cruelty and who is not and was not the primary perpetrator of violence in the relationship--

**(i)** [2] upon a determination that--

**(I)** the alien was acting is [3] self-defense;

**(II)** the alien was found to have violated a protection order intended to protect the alien; or

**(III)** the alien committed, was arrested for, was convicted of, or pled guilty to committing a crime--

**(aa)** that did not result in serious bodily injury; and

**(bb)** where there was a connection between the crime and the alien's having been battered or subjected to extreme cruelty.

**(B) Credible evidence considered**

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

**(b) Deportation of certain nonimmigrants**

An alien, admitted as a nonimmigrant under the provisions of either section 1101(a)(15)(A)(i) or 1101(a)(15)(G)(i) of this title, and who fails to maintain a status under either of those provisions, shall not be required to depart from the United States without the approval of the Secretary of State, unless such alien is subject to deportation under paragraph (4) of subsection (a).

**(c) Waiver of grounds for deportation**

Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of inadmissibility described in paragraph (2) or (3) of section 1182(a) of this title) shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title based upon circumstances that existed before the date the alien was provided such special immigrant status.

**(d) Administrative stay**

**(1)** If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, the Secretary may grant the alien an administrative stay of a final order of removal under section 1231(c)(2) of this title until

  **(A)** the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

  **(B)** there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

**(2)** The denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

**(3)** During any period in which the administrative stay of removal is in effect, the alien shall not be removed.

**(4)** Nothing in this subsection may be construed to limit the authority of the Secretary of Homeland Security or the Attorney General to grant a stay of removal or deportation in any case not described in this subsection.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 4, § 237, formerly c. 5, § 241, 66 Stat. 204; July 18, 1956, c. 629, Title III, § 301(b), (c), 70 Stat. 575; Pub.L. 86-648, § 9, July 14, 1960, 74 Stat. 505; Pub.L. 87-301, § 16, Sept. 26, 1961, 75 Stat. 655; Pub.L. 89-236, § 11(e), Oct. 3, 1965, 79 Stat. 918; Pub.L. 94-571, § 7(e), Oct. 20, 1976, 90 Stat. 2706; Pub.L. 95-549, Title I, § 103, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 97-116, § 8, Dec. 29, 1981, 95 Stat. 1616; Pub.L. 99-570, Title I, § 1751(b), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-603, Title III, § 303(b), Nov. 6, 1986, 100 Stat. 3431; Pub.L. 99-639, § 2(b), Nov. 10, 1986, 100 Stat. 3541; Pub.L. 99-653, § 7(c), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-525, §§ 2(n)(2), 9(m), Oct. 24, 1988, 102 Stat. 2613, 2620; Pub.L. 100-690, Title VII, §§ 7344(a), 7348(a), Nov. 18, 1988, 102 Stat. 4470, 4473; Pub.L. 101-649, Title I, § 153(b), Title V, §§ 505(a), 508(a), 544(b), Title VI, § 602(a), (b), Nov. 29, 1990, 104 Stat. 5006, 5050, 5051, 5061, 5077, 5081; Pub.L. 102-232, Title III, §§ 302(d)(3), 307(h), (k), Dec. 12, 1991, 105 Stat. 1745, 1755, 1756; Pub.L. 103-322, Title XIII, § 130003(d), Sept. 13, 1994, 108 Stat. 2026; Pub.L. 103-416, Title II, §§ 203(b), 219(g), Oct. 25, 1994, 108 Stat. 4311, 4317; Pub.L. 104-132, Title IV, §§ 414(a), 435(a), Apr. 24, 1996, 110 Stat. 1270, 1274; renumbered c. 4, § 237, and amended Pub.L. 104-208, Div. C, Title I, § 108(c), Title III, §§ 301(d), 305(a)(2), 308(d)(2), (3)(A), (e)(1)(E), (2)(C), (f)(1)(L) to (N), (5), 344(b), 345(b), 347(b), 350(a), 351(b), Title VI, § 671(a)(4)(B), (d)(1)(C), Sept. 30, 1996, 110 Stat. 3009-558, 3009-579, 3009-598, 3009-617, 3009-619 to 3009-622, 3009-637 to 3009-640, 3009-721, 3009-723; Pub.L. 106-386, Div. B, Title V, § 1505(b)(1), (c)(2), Oct. 28, 2000, 114 Stat. 1525, 1526; Pub.L. 106-395, Title II, § 201(c)(1), (2), Oct. 30, 2000, 114 Stat. 1634, 1635; Pub.L. 107-56, Title IV, § 411(b)(1), Oct. 26, 2001, 115 Stat. 348; Pub.L. 108-458, Title V, §§ 5304(b), 5402, 5501(b), 5502(b), Dec. 17, 2004, 118 Stat. 3736, 3737, 3740, 3741; Pub.L. 109-13, Div. B, Title I, § 105(a)(1), (b), May 11, 2005, 119 Stat. 309, 310; Pub.L. 109-248, Title IV, § 401, July 27, 2006, 120 Stat. 622; Pub.L. 109-271, § 6(c), Aug. 12, 2006, 120 Stat. 763; Pub.L. 110-340, § 2(c), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 204, 222(f)(2), Dec. 23, 2008, 122 Stat. 5060, 5071.)

Notes of Decisions (2449)

## Footnotes

| | |
|---|---|
| 1 | So in original. |
| 2 | So in original. No cl. (ii) has been enacted |
| 3 | So in original. Probably should be "in". |

8 U.S.C.A. § 1227, 8 USCA § 1227

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1229a

§ 1229a. Removal proceedings

Effective: January 5, 2006
Currentness

**(a) Proceeding**

**(1) In general**

An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

**(2) Charges**

An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title or any applicable ground of deportability under section 1227(a) of this title.

**(3) Exclusive procedures**

Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 1228 of this title.

**(b) Conduct of proceeding**

**(1) Authority of immigration judge**

The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this chapter.

**(2) Form of proceeding**

**(A) In general**

The proceeding may take place--

    **(i)** in person,

    **(ii)** where agreed to by the parties, in the absence of the alien,

    **(iii)** through video conference, or

    **(iv)** subject to subparagraph (B), through telephone conference.

**(B) Consent required in certain cases**

An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

**(3) Presence of alien**

If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

**(4) Alien's rights in proceeding**

In proceedings under this section, under regulations of the Attorney General--

    **(A)** the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

    **(B)** the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter, and

    **(C)** a complete record shall be kept of all testimony and evidence produced at the proceeding.

**(5) Consequences of failure to appear**

    **(A) In general**

Any alien who, after written notice required under paragraph (1) or (2) of section 1229(a) of this title has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 1229(a)(1)(F) of this title.

**(B) No notice if failure to provide address information**

No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 1229(a)(1)(F) of this title.

**(C) Rescission of order**

Such an order may be rescinded only--

**(i)** upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

**(ii)** upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 1229(a) of this title or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion by the immigration judge.

**(D) Effect on judicial review**

Any petition for review under section 1252 of this title of an order entered in absentia under this paragraph shall (except in cases described in section 1252(b)(5) of this title) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

**(E) Additional application to certain aliens in contiguous territory**

The preceding provisions of this paragraph shall apply to all aliens placed in proceedings under this section, including any alien who remains in a contiguous foreign territory pursuant to section 1225(b)(2)(C) of this title.

**(6) Treatment of frivolous behavior**

The Attorney General shall, by regulation--

(A) define in a proceeding before an immigration judge or before an appellate administrative body under this subchapter, frivolous behavior for which attorneys may be sanctioned,

(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

**(7) Limitation on discretionary relief for failure to appear**

Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 1229(a) of this title, was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 1229b, 1229c, 1255, 1258, or 1259 of this title for a period of 10 years after the date of the entry of the final order of removal.

**(c) Decision and burden of proof**

**(1) Decision**

**(A) In general**

At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

**(B) Certain medical decisions**

If a medical officer or civil surgeon or board of medical officers has certified under section 1222(b) of this title that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 1182(a) of this title, the decision of the immigration judge shall be based solely upon such certification.

**(2) Burden on alien**

In the proceeding the alien has the burden of establishing--

(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182 of this title; or

AR.00920

**(B)** by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

### (3) Burden on service in cases of deportable aliens

#### (A) In general

In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

#### (B) Proof of convictions

In any proceeding under this chapter, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

**(i)** An official record of judgment and conviction.

**(ii)** An official record of plea, verdict, and sentence.

**(iii)** A docket entry from court records that indicates the existence of the conviction.

**(iv)** Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

**(v)** An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

**(vi)** Any document or record prepared by, or under the direction of, the court in which the conviction was entered that indicates the existence of a conviction.

**(vii)** Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

#### (C) Electronic records

In any proceeding under this chapter, any record of conviction or abstract that has been submitted by electronic means to the Service from a State or court shall be admissible as evidence to prove a criminal conviction if it is--

**(i)** certified by a State official associated with the State's repository of criminal justice records as an official record from its repository or by a court official from the court in which the conviction was entered as an official record from its repository, and

**(ii)** certified in writing by a Service official as having been received electronically from the State's record repository or the court's record repository.

A certification under clause (i) may be by means of a computer-generated signature and statement of authenticity.

#### (4) Applications for relief from removal

##### (A) In general

An alien applying for relief or protection from removal has the burden of proof to establish that the alien--

**(i)** satisfies the applicable eligibility requirements; and

**(ii)** with respect to any form of relief that is granted in the exercise of discretion, that the alien merits a favorable exercise of discretion.

##### (B) Sustaining burden

The applicant must comply with the applicable requirements to submit information or documentation in support of the applicant's application for relief or protection as provided by law or by regulation or in the instructions for the application form. In evaluating the testimony of the applicant or other witness in support of the application, the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof. In determining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony along with other evidence of record. Where the immigration judge determines that the applicant should provide evidence which corroborates otherwise credible testimony, such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence.

##### (C) Credibility determination

Considering the totality of the circumstances, and all relevant factors, the immigration judge may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard

to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

**(5) Notice**

If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

**(6) Motions to reconsider**

**(A) In general**

The alien may file one motion to reconsider a decision that the alien is removable from the United States.

**(B) Deadline**

The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

**(C) Contents**

The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

**(7) Motions to reopen**

**(A) In general**

An alien may file one motion to reopen proceedings under this section, except that this limitation shall not apply so as to prevent the filing of one motion to reopen described in subparagraph (C)(iv).

**(B) Contents**

The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

**(C) Deadline**

**(i) In general**

Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

**(ii) Asylum**

There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections [1] 1158 or 1231(b)(3) of this title and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

**(iii) Failure to appear**

The filing of a motion to reopen an order entered pursuant to subsection (b)(5) is subject to the deadline specified in subparagraph (C) of such subsection.

**(iv) Special rule for battered spouses, children, and parents**

Any limitation under this section on the deadlines for filing such motions shall not apply--

**(I)** if the basis for the motion is to apply for relief under clause (iii) or (iv) of section 1154(a)(1)(A) of this title, clause (ii) or (iii) of section 1154(a)(1)(B) of this title,, [2] section 1229b(b) of this title, or section 1254(a)(3) of this title (as in effect on March 31, 1997);

**(II)** if the motion is accompanied by a cancellation of removal application to be filed with the Attorney General or by a copy of the self-petition that has been or will be filed with the Immigration and Naturalization Service upon the granting of the motion to reopen;

**(III)** if the motion to reopen is filed within 1 year of the entry of the final order of removal, except that the Attorney General may, in the Attorney General's discretion, waive this time limitation in the case of an alien who demonstrates extraordinary circumstances or extreme hardship to the alien's child; and

**(IV)** if the alien is physically present in the United States at the time of filing the motion.

The filing of a motion to reopen under this clause shall only stay the removal of a qualified alien (as defined in section 1641(c)(1)(B) of this title [3] pending the final disposition of the motion, including exhaustion of all appeals if the motion establishes that the alien is a qualified alien.

**(d) Stipulated removal**

The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.

**(e) Definitions**

In this section and section 1229b of this title:

**(1) Exceptional circumstances**

The term "exceptional circumstances" refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the alien, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.

**(2) Removable**

The term "removable" means--

**(A)** in the case of an alien not admitted to the United States, that the alien is inadmissible under section 1182 of this title, or

**(B)** in the case of an alien admitted to the United States, that the alien is deportable under section 1227 of this title.

### CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 4, § 240, as added Pub.L. 104-208, Div. C, Title III, § 304(a)(3), Sept. 30, 1996, 110 Stat. 3009-589; amended Pub.L. 106-386, Div. B, Title V, § 1506(c)(1)(A), Oct. 28, 2000, 114 Stat. 1528; Pub.L. 109-13, Div. B, Title I, § 101(d), May 11, 2005, 119 Stat. 304; Pub.L. 109-162, Title VIII, §§ 813(a)(1), 825(a), Jan. 5, 2006, 119 Stat. 3057, 3063.)

Notes of Decisions (2437)

### Footnotes

1    So in original. Probably should be "section".
2    So in original. The second comma probably should not appear.
3    So in original. A closing parenthesis probably should appear.
8 U.S.C.A. § 1229a, 8 USCA § 1229a
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedLimited on Constitutional Grounds by Carranza-De Salinas v. Holder, 5th Cir., Nov. 06, 2012

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 12. Immigration and Nationality (Refs & Annos)
            Subchapter II. Immigration
                Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1229b

§ 1229b. Cancellation of removal; adjustment of status

Effective: December 23, 2008

Currentness

**(a) Cancellation of removal for certain permanent residents**

The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien--

**(1)** has been an alien lawfully admitted for permanent residence for not less than 5 years,

**(2)** has resided in the United States continuously for 7 years after having been admitted in any status, and

**(3)** has not been convicted of any aggravated felony.

**(b) Cancellation of removal and adjustment of status for certain nonpermanent residents**

**(1) In general**

The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien--

**(A)** has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

**(B)** has been a person of good moral character during such period;

**(C)** has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and

**(D)** establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

**(2) Special rule for battered spouse or child**

**(A) Authority**

The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien demonstrates that--

**(i)(I)** the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a United States citizen (or is the parent of a child of a United States citizen and the child has been battered or subjected to extreme cruelty by such citizen parent);

**(II)** the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a lawful permanent resident (or is the parent of a child of an alien who is or was a lawful permanent resident and the child has been battered or subjected to extreme cruelty by such permanent resident parent); or

**(III)** the alien has been battered or subjected to extreme cruelty by a United States citizen or lawful permanent resident whom the alien intended to marry, but whose marriage is not legitimate because of that United States citizen's or lawful permanent resident's bigamy;

**(ii)** the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application, and the issuance of a charging document for removal proceedings shall not toll the 3-year period of continuous physical presence in the United States;

**(iii)** the alien has been a person of good moral character during such period, subject to the provisions of subparagraph (C);

**(iv)** the alien is not inadmissible under paragraph (2) or (3) of section 1182(a) of this title, is not deportable under paragraphs (1)(G) or (2) through (4) of section 1227(a) of this title, subject to paragraph (5), and has not been convicted of an aggravated felony; and

**(v)** the removal would result in extreme hardship to the alien, the alien's child, or the alien's parent.

**(B) Physical presence**

Notwithstanding subsection (d)(2), for purposes of subparagraph (A)(ii) or for purposes of section 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility

Act of 1996), an alien shall not be considered to have failed to maintain continuous physical presence by reason of an absence if the alien demonstrates a connection between the absence and the battering or extreme cruelty perpetrated against the alien. No absence or portion of an absence connected to the battering or extreme cruelty shall count toward the 90-day or 180-day limits established in subsection (d)(2). If any absence or aggregate absences exceed 180 days, the absences or portions of the absences will not be considered to break the period of continuous presence. Any such period of time excluded from the 180-day limit shall be excluded in computing the time during which the alien has been physically present for purposes of the 3-year requirement set forth in this subparagraph, subparagraph (A)(ii), and section 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).

**(C) Good moral character**

Notwithstanding section 1101(f) of this title, an act or conviction that does not bar the Attorney General from granting relief under this paragraph by reason of subparagraph (A)(iv) shall not bar the Attorney General from finding the alien to be of good moral character under subparagraph (A)(iii) or section 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996), if the Attorney General finds that the act or conviction was connected to the alien's having been battered or subjected to extreme cruelty and determines that a waiver is otherwise warranted.

**(D) Credible evidence considered**

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

**(3) Recordation of date**

With respect to aliens who the Attorney General adjusts to the status of an alien lawfully admitted for permanent residence under paragraph (1) or (2), the Attorney General shall record the alien's lawful admission for permanent residence as of the date of the Attorney General's cancellation of removal under paragraph (1) or (2).

**(4) Children of battered aliens and parents of battered alien children**

**(A) In general**

The Attorney General shall grant parole under section 1182(d)(5) of this title to any alien who is a--

**(i)** child of an alien granted relief under section 1229b(b)(2) or 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996); or

**(ii)** parent of a child alien granted relief under section 1229b(b)(2) or 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).

**(B) Duration of parole**

The grant of parole shall extend from the time of the grant of relief under subsection (b)(2) or section 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996) to the time the application for adjustment of status filed by aliens covered under this paragraph has been finally adjudicated. Applications for adjustment of status filed by aliens covered under this paragraph shall be treated as if the applicants were VAWA self-petitioners. Failure by the alien granted relief under subsection (b)(2) or section 1254(a)(3) of this title (as in effect before the title III-A effective date in section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996) to exercise due diligence in filing a visa petition on behalf of an alien described in clause (i) or (ii) may result in revocation of parole.

**(5) Application of domestic violence waiver authority**

The authority provided under section 1227(a)(7) of this title may apply under paragraphs (1)(B), (1)(C), and (2)(A)(iv) in a cancellation of removal and adjustment of status proceeding.

**(6) Relatives of trafficking victims**

**(A) In general**

Upon written request by a law enforcement official, the Secretary of Homeland Security may parole under section 1182(d)(5) of this title any alien who is a relative of an alien granted continued presence under section 7105(c)(3)(A) of Title 22, if the relative--

**(i)** was, on the date on which law enforcement applied for such continued presence--

**(I)** in the case of an alien granted continued presence who is under 21 years of age, the spouse, child, parent, or unmarried sibling under 18 years of age, of the alien; or

**(II)** in the case of an alien granted continued presence who is 21 years of age or older, the spouse or child of the alien; or

**(ii)** is a parent or sibling of the alien who the requesting law enforcement official, in consultation with the Secretary of Homeland Security, as appropriate, determines to be in present danger of retaliation as a result of the alien's escape from the severe form of trafficking or cooperation with law enforcement, irrespective of age.

**(B) Duration of parole**

**(i) In general**

The Secretary may extend the parole granted under subparagraph (A) until the final adjudication of the application filed by the principal alien under section 1101(a)(15)(T)(ii) of this title.

AR.00929

**(ii) Other limits on duration**

If an application described in clause (i) is not filed, the parole granted under subparagraph (A) may extend until the later of--

**(I)** the date on which the principal alien's authority to remain in the United States under section 7105(c)(3)(A) of Title 22 is terminated; or

**(II)** the date on which a civil action filed by the principal alien under section 1595 of Title 18 is concluded.

**(iii) Due diligence**

Failure by the principal alien to exercise due diligence in filing a visa petition on behalf of an alien described in clause (i) or (ii) of subparagraph (A), or in pursuing the civil action described in clause (ii)(II) (as determined by the Secretary of Homeland Security in consultation with the Attorney General), may result in revocation of parole.

**(C) Other limitations**

A relative may not be granted parole under this paragraph if--

**(i)** the Secretary of Homeland Security or the Attorney General has reason to believe that the relative was knowingly complicit in the trafficking of an alien permitted to remain in the United States under section 7105(c)(3)(A) of Title 22; or

**(ii)** the relative is an alien described in paragraph (2) or (3) of section 1182(a) of this title or paragraph (2) or (4) of section 1227(a) of this title.

**(c) Aliens ineligible for relief**

The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

**(1)** An alien who entered the United States as a crewman subsequent to June 30, 1964.

**(2)** An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 1101(a)(15)(J) of this title, or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 1182(e) of this title.

**(3)** An alien who--

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(A)** was admitted to the United States as a nonimmigrant exchange alien as defined in section 1101(a)(15)(J) of this title or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

**(B)** is subject to the two-year foreign residence requirement of section 1182(e) of this title, and

**(C)** has not fulfilled that requirement or received a waiver thereof.

**(4)** An alien who is inadmissible under section 1182(a)(3) of this title or deportable under section 1227(a)(4) of this title.

**(5)** An alien who is described in section 1231(b)(3)(B)(i) of this title.

**(6)** An alien whose removal has previously been cancelled under this section or whose deportation was suspended under section 1254(a) of this title or who has been granted relief under section 1182(c) of this title, as such sections were in effect before September 30, 1996.

**(d) Special rules relating to continuous residence or physical presence**

**(1) Termination of continuous period**

For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) except in the case of an alien who applies for cancellation of removal under subsection (b)(2), when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest.

**(2) Treatment of certain breaks in presence**

An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

**(3) Continuity not required because of honorable service in Armed Forces and presence upon entry into service**

The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who--

**(A)** has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

**(B)** at the time of the alien's enlistment or induction was in the United States.

AR.00931

**(e) Annual limitation**

**(1) Aggregate limitation**

Subject to paragraphs (2) and (3), the Attorney General may not cancel the removal and adjust the status under this section, nor suspend the deportation and adjust the status under section 1254(a) of this title (as in effect before September 30, 1996), of a total of more than 4,000 aliens in any fiscal year. The previous sentence shall apply regardless of when an alien applied for such cancellation and adjustment, or such suspension and adjustment, and whether such an alien had previously applied for suspension of deportation under such section 1254(a) of this title. The numerical limitation under this paragraph shall apply to the aggregate number of decisions in any fiscal year to cancel the removal (and adjust the status) of an alien, or suspend the deportation (and adjust the status) of an alien, under this section or such section 1254(a) of this title.

**(2) Fiscal year 1997**

For fiscal year 1997, paragraph (1) shall only apply to decisions to cancel the removal of an alien, or suspend the deportation of an alien, made after April 1, 1997. Notwithstanding any other provision of law, the Attorney General may cancel the removal or suspend the deportation, in addition to the normal allotment for fiscal year 1998, of a number of aliens equal to 4,000 less the number of such cancellations of removal and suspensions of deportation granted in fiscal year 1997 after April 1, 1997.

**(3) Exception for certain aliens**

Paragraph (1) shall not apply to the following:

**(A)** Aliens described in section 309(c)(5)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (as amended by the Nicaraguan Adjustment and Central American Relief Act).

**(B)** Aliens in deportation proceedings prior to April 1, 1997, who applied for suspension of deportation under section 1254(a)(3) of this title (as in effect before September 30, 1996).

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 4, § 240A, as added Pub.L. 104-208, Div. C, Title III, § 304(a)(3), Sept. 30, 1996, 110 Stat. 3009-594; amended Pub.L. 105-100, Title II, § 204(a) to (c), Nov. 19, 1997, 111 Stat. 2200, 2201; Pub.L. 106-386, Div. B, Title V, §§ 1504(a), (b), 1505(b)(2), 1506(b)(1), Oct. 28, 2000, 114 Stat. 1522, 1525, 1527; Pub.L. 109-162, Title VIII, §§ 813(c)(1), 822(a), (b), Jan. 5, 2006, 119 Stat. 3058, 3062, 3063; Pub.L. 109-271, § 6(e), Aug. 12, 2006, 120 Stat. 763; Pub.L. 110-457, Title II, § 205(b), Dec. 23, 2008, 122 Stat. 5062.)

Notes of Decisions (771)

8 U.S.C.A. § 1229b, 8 USCA § 1229b
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedLimitation Recognized by Ochoa v. Kolitwenzew, C.D.Ill., June 02, 2020

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 12. Immigration and Nationality (Refs & Annos)
            Subchapter II. Immigration
                Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

8 U.S.C.A. § 1231

§ 1231. Detention and removal of aliens ordered removed

Effective: October 1, 2006

Currentness

**(a) Detention, release, and removal of aliens ordered removed**

**(1) Removal period**

**(A) In general**

Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

**(B) Beginning of period**

The removal period begins on the latest of the following:

**(i)** The date the order of removal becomes administratively final.

**(ii)** If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

**(iii)** If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

**(C) Suspension of period**

The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

**(2) Detention**

During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

**(3) Supervision after 90-day period**

If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien--

**(A)** to appear before an immigration officer periodically for identification;

**(B)** to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

**(C)** to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

**(D)** to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

**(4) Aliens imprisoned, arrested, or on parole, supervised release, or probation**

**(A) In general**

Except as provided in section 259(a) of Title 42 and paragraph (2)[1], the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

**(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment--

**(i)** in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring

of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title [2] and (II) the removal of the alien is appropriate and in the best interest of the United States; or

**(ii)** in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

**(C) Notice**

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

**(D) No private right**

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

**(5) Reinstatement of removal orders against aliens illegally reentering**

If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

**(6) Inadmissible or criminal aliens**

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

**(7) Employment authorization**

No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that--

**(A)** the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

**(B)** the removal of the alien is otherwise impracticable or contrary to the public interest.

AR.00936

**(b) Countries to which aliens may be removed**

**(1) Aliens arriving at the United States**

Subject to paragraph (3)--

**(A) In general**

Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 1229a of this title were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

**(B) Travel from contiguous territory**

If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

**(C) Alternative countries**

If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

**(i)** The country of which the alien is a citizen, subject, or national.

**(ii)** The country in which the alien was born.

**(iii)** The country in which the alien has a residence.

**(iv)** A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

**(2) Other aliens**

Subject to paragraph (3)--

**(A) Selection of country by alien**

Except as otherwise provided in this paragraph--

**(i)** any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

**(ii)** the Attorney General shall remove the alien to the country the alien so designates.

**(B) Limitation on designation**

An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

**(C) Disregarding designation**

The Attorney General may disregard a designation under subparagraph (A)(i) if--

**(i)** the alien fails to designate a country promptly;

**(ii)** the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

**(iii)** the government of the country is not willing to accept the alien into the country; or

**(iv)** the Attorney General decides that removing the alien to the country is prejudicial to the United States.

**(D) Alternative country**

If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country--

**(i)** does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

**(ii)** is not willing to accept the alien into the country.

**(E) Additional removal countries**

If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

**(i)** The country from which the alien was admitted to the United States.

**(ii)** The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

**(iii)** A country in which the alien resided before the alien entered the country from which the alien entered the United States.

**(iv)** The country in which the alien was born.

**(v)** The country that had sovereignty over the alien's birthplace when the alien was born.

**(vi)** The country in which the alien's birthplace is located when the alien is ordered removed.

**(vii)** If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

**(F) Removal country when United States is at war**

When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien--

**(i)** to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

**(ii)** if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

**(3) Restriction on removal to a country where alien's life or freedom would be threatened**

**(A) In general**

Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

**(B) Exception**

AR.00939

Subparagraph (A) does not apply to an alien deportable under section 1227(a)(4)(D) of this title or if the Attorney General decides that--

**(i)** the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;

**(ii)** the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

**(iii)** there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or

**(iv)** there are reasonable grounds to believe that the alien is a danger to the security of the United States.

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section 1227(a)(4)(B) of this title shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States.

**(C) Sustaining burden of proof; credibility determinations**

In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 1158(b)(1)(B) of this title.

**(c) Removal of aliens arriving at port of entry**

**(1) Vessels and aircraft**

An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 1225(b)(1) or 1225(c) of this title or pursuant to proceedings under section 1229a of this title initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless--

**(A)** it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

**(B)** the alien is a stowaway--

**(i)** who has been ordered removed in accordance with section 1225(a)(1) of this title,

**(ii)** who has requested asylum, and

**(iii)** whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

**(2) Stay of removal**

**(A) In general**

The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that--

**(i)** immediate removal is not practicable or proper; or

**(ii)** the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

**(B) Payment of detention costs**

During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation "Immigration and Naturalization Service--Salaries and Expenses"--

**(i)** the cost of maintenance of the alien; and

**(ii)** a witness fee of $1 a day.

**(C) Release during stay**

The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on--

**(i)** the alien's filing a bond of at least $500 with security approved by the Attorney General;

**(ii)** condition that the alien appear when required as a witness and for removal; and

**(iii)** other conditions the Attorney General may prescribe.

**(3) Costs of detention and maintenance pending removal**

**(A) In general**

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Except as provided in subparagraph (B) and subsection (d) [3], an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien--

**(i)** while the alien is detained under subsection (d)(1), and

**(ii)** in the case of an alien who is a stowaway, while the alien is being detained pursuant to--

**(I)** subsection (d)(2)(A) or (d)(2)(B)(i),

**(II)** subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

**(III)** section 1225(b)(1)(B)(ii) of this title, for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

**(B) Nonapplication**

Subparagraph (A) shall not apply if--

**(i)** the alien is a crewmember;

**(ii)** the alien has an immigrant visa;

**(iii)** the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

**(iv)** the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

**(v)(I)** the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

**(II)** the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

**(III)** the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

**(vi)** the individual claims to be a national of the United States and has a United States passport.

## (d) Requirements of persons providing transportation

### (1) Removal at time of arrival

An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall--

**(A)** receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

**(B)** take the alien to the foreign country to which the alien is ordered removed.

### (2) Alien stowaways

An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway--

**(A)** shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

**(B)** may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily--

**(i)** for medical treatment,

**(ii)** for detention of the stowaway by the Attorney General, or

**(iii)** for departure or removal of the stowaway; and

**(C)** if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if the requester has obtained any travel documents necessary for departure or repatriation of the stowaway and removal of the stowaway will not be unreasonably delayed.

**(3) Removal upon order**

An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this chapter.

**(e) Payment of expenses of removal**

**(1) Costs of removal at time of arrival**

In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 1225(a)(1)[4] or 1225(c) of this title or pursuant to proceedings under section 1229a of this title initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may--

**(A)** pay the cost from the appropriation "Immigration and Naturalization Service--Salaries and Expenses"; and

**(B)** recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

**(2) Costs of removal to port of removal for aliens admitted or permitted to land**

In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this chapter.

**(3) Costs of removal from port of removal for aliens admitted or permitted to land**

**(A) Through appropriation**

Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this chapter.

**(B) Through owner**

**(i) In general**

In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

**(ii) Aliens described**

An alien described in this clause is an alien who--

**(I)** is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or

**(II)** is an alien crewman permitted to land temporarily under section 1282 of this title and is ordered removed within 5 years of the date of landing.

**(C) Costs of removal of certain aliens granted voluntary departure**

In the case of an alien who has been granted voluntary departure under section 1229c of this title and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this chapter.

**(f) Aliens requiring personal care during removal**

**(1) In general**

If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

**(2) Costs**

The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

**(g) Places of detention**

**(1) In general**

The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service-- Salaries and Expenses", without regard to section 6101 of Title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

**(2) Detention facilities of the Immigration and Naturalization Service**

Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

**(h) Statutory construction**

Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

**(i) Incarceration**

**(1)** If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General--

**(A)** enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

**(B)** take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

**(2)** Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

**(3)** For purposes of this subsection, the term "undocumented criminal alien" means an alien who--

**(A)** has been convicted of a felony or two or more misdemeanors; and

**(B)(i)** entered the United States without inspection or at any time or place other than as designated by the Attorney General;

**(ii)** was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

**(iii)** was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status.

**(4)(A)** In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

**(B)** The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

**(5)** There are authorized to be appropriated to carry out this subsection--

  **(A)** $750,000,000 for fiscal year 2006;

  **(B)** $850,000,000 for fiscal year 2007; and

  **(C)** $950,000,000 for each of the fiscal years 2008 through 2011.

**(6)** Amounts appropriated pursuant to the authorization of appropriations in paragraph (5) that are distributed to a State or political subdivision of a State, including a municipality, may be used only for correctional purposes.

### CREDIT(S)

  (June 27, 1952, c. 477, Title II, c. 4, § 241, as added and amended Pub.L. 104-208, Div. C, Title III, §§ 305(a)(3), 306(a)(1), 328(a)(1), Sept. 30, 1996, 110 Stat. 3009-598, 3009-607, 3009-630; Pub.L. 107-273, Div. C, Title I, § 11014, Nov. 2, 2002, 116 Stat. 1824; Pub.L. 109-13, Div. B, Title I, § 101(c), May 11, 2005, 119 Stat. 304; Pub.L. 109-162, Title XI, § 1196(a), (b), Jan. 5, 2006, 119 Stat. 3130.)

### PROCLAMATIONS

### PROCLAMATION NO. 9842

<February 7, 2019, 84 F.R. 3665>

### Addressing Mass Migration through the Southern Border of the United States

By the President of the United States of America

A Proclamation

In Proclamation 9822 of November 9, 2018 (Addressing Mass Migration Through the Southern Border of the United States), I found that our immigration and asylum system is in crisis as a consequence of the mass migration of aliens across the border between the United States and Mexico (southern border). Accordingly, pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f) and 1185(a), respectively), I found that the unlawful entry of aliens through that border is detrimental to the interests of the United States and suspended and limited entry of such aliens. I exempted from the scope of Proclamation 9822 any alien who entered the United States at a port of entry and properly presented for inspection, as well as any lawful permanent resident of the United States.

Section 2(d) of Proclamation 9822 directed the Secretary of State, the Attorney General, and the Secretary of Homeland Security jointly to submit to me a recommendation on whether an extension or renewal of the suspension and limitation on entry

in Proclamation 9822 is in the interests of the United States. Those officials have now jointly recommended extending the suspension and limitation for an additional 90 days.

As that recommendation reflects, the problem of large numbers of aliens traveling through Mexico to enter our country unlawfully or without proper documentation has not materially improved, and indeed in several respects has worsened, since November 9, 2018. An average of approximately 2,000 inadmissible aliens continue to enter the United States each day at our southern border. And large, organized groups of aliens continue to travel through Mexico towards the United States with the reported intention to enter the United States unlawfully or without proper documentation.

The ability of the United States to address those problems has also been hampered by a nationwide injunction issued by a United States District Judge in the Northern District of California. That injunction currently prevents the Attorney General and the Secretary of Homeland Security from implementing an interim final rule that would render any alien who enters the country in contravention of a proclamation limiting or suspending entry at the southern border, including Proclamation 9822, ineligible to be granted asylum. The United States is appealing that injunction. Should the injunction be lifted, aliens who enter the United States unlawfully through the southern border in contravention of this proclamation will be ineligible to be granted asylum under that interim final rule.

As President, I must act to protect the national interest, and to maintain an effectively functioning asylum system for legitimate asylum seekers who demonstrate that they have fled persecution and warrant the many special benefits associated with being granted asylum. In view of the foregoing circumstances, and the joint recommendation from the Secretary of State, the Attorney General, and the Secretary of Homeland Security, I have determined to extend the suspension and limitation, as set forth below, on entry into the United States through the southern border established by Proclamation 9822.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry of any alien into the United States across the international boundary between the United States and Mexico is hereby suspended and limited, subject to section 2 of this proclamation. That suspension and limitation shall expire 90 days after the date of this proclamation or the date on which an agreement permits the United States to remove aliens to Mexico in compliance with the terms of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)), whichever is earlier.

**Sec. 2. Scope and Implementation of Suspension and Limitation on Entry. (a)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter the United States after the date of this proclamation.

**(b)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States.

**(c)** Nothing in this proclamation shall limit an alien entering the United States from being considered for withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or protection pursuant to the regulations promulgated under the authority of the implementing legislation regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, or limit the statutory processes afforded to unaccompanied alien children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**(d)** No later than 75 days after the date of this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President for National Security Affairs, a

recommendation on whether an extension or renewal of the suspension or limitation on entry in section 1 of this proclamation is in the interests of the United States.

**Sec. 3. Interdiction.** The Secretary of State and the Secretary of Homeland Security shall continue to consult with the Government of Mexico regarding appropriate steps_consistent with applicable law and the foreign policy, national security, and public-safety interests of the United States_to address the approach of large groups of aliens traveling through Mexico with the intent of entering the United States unlawfully, including efforts to deter, dissuade, and return such aliens before they physically enter United States territory through the southern border.

**Sec. 4. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 5. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this seventh day of February, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

Pres. Proc. No. 9842 84 FR 3665 2019 WL 529119(Pres.)

DONALD J. TRUMP

Notes of Decisions (2469)

## Footnotes

1        So in original. Probably should be "subparagraph (B)".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 973 of 3864

2       So in original. Probably should be followed by a closing parenthesis.

3       So in original. Probably should be subsection "(e)".

4       So in original. Probably should be "1225(b)(1)".

8 U.S.C.A. § 1231, 8 USCA § 1231

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Unconstitutional as Applied by  Joshua M. v. Barr,  E.D.Va.,  Feb. 20, 2020

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part V. Adjustment and Change of Status (Refs & Annos)

8 U.S.C.A. § 1252

§ 1252. Judicial review of orders of removal

Effective: May 11, 2005

Currentness

**(a) Applicable provisions**

**(1) General orders of removal**

Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of Title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

**(2) Matters not subject to judicial review**

**(A) Review relating to section 1225(b)(1)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review--

**(i)** except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

**(ii)** except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

**(iii)** the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

**(iv)** except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

**(B) Denials of discretionary relief**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review--

**(i)** any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

**(ii)** any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

**(C) Orders against criminal aliens**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

**(D) Judicial review of certain legal claims**

Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

**(3) Treatment of certain decisions**

No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 1229a(c)(1)(B) of this title.

**(4) Claims under the United Nations Convention**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

**(5) Exclusive means of review**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e). For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

**(b) Requirements for review of orders of removal**

With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

**(1) Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2) Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

**(3) Service**

**(A) In general**

The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 1229a of this title was entered.

**(B) Stay of order**

Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

**(C) Alien's brief**

The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shown. If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

**(4) Scope and standard for review**

Except as provided in paragraph (5)(B)--

**(A)** the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

**(B)** the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

**(C)** a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

**(D)** the Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the court finds, pursuant to subsection (b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.

**(5) Treatment of nationality claims**

**(A) Court determination if no issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

**(B) Transfer if issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28.

**(C) Limitation on determination**

The petitioner may have such nationality claim decided only as provided in this paragraph.

**(6) Consolidation with review of motions to reopen or reconsider**

When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

**(7) Challenge to validity of orders in certain criminal proceedings**

**(A) In general**

If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 1253(a) of this title may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

**(B) Claims of United States nationality**

If the defendant claims in the motion to be a national of the United States and the district court finds that--

**(i)** no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

**(ii)** a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of Title 28.

The defendant may have such nationality claim decided only as provided in this subparagraph.

**(C) Consequence of invalidation**

If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 1253(a) of this title. The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

**(D) Limitation on filing petitions for review**

The defendant in a criminal proceeding under section 1253(a) of this title may not file a petition for review under subsection (a) during the criminal proceeding.

**(8) Construction**

This subsection--

**(A)** does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 1231(a) of this title;

**(B)** does not relieve the alien from complying with section 1231(a)(4) of this title and section 1253(g) [1] of this title; and

**(C)** does not require the Attorney General to defer removal of the alien.

**(9) Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

**(c) Requirements for petition**

A petition for review or for habeas corpus of an order of removal--

**(1)** shall attach a copy of such order, and

**(2)** shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

**(d) Review of final orders**

A court may review a final order of removal only if--

**(1)** the alien has exhausted all administrative remedies available to the alien as of right, and

**(2)** another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

**(e) Judicial review of orders under section 1225(b)(1)**

**(1) Limitations on relief**

Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may--

**(A)** enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection, or

**(B)** certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

**(2) Habeas corpus proceedings**

Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of--

**(A)** whether the petitioner is an alien,

**(B)** whether the petitioner was ordered removed under such section, and

**(C)** whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

**(3) Challenges on validity of the system**

**(A) In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of--

**(i)** whether such section, or any regulation issued to implement such section, is constitutional; or

**(ii)** whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

**(B) Deadlines for bringing actions**

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

**(C) Notice of appeal**

A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

**(D) Expeditious consideration of cases**

It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

**(4) Decision**

In any case where the court determines that the petitioner--

**(A)** is an alien who was not ordered removed under section 1225(b)(1) of this title, or

**(B)** has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 1229a of this title. Any alien who is provided a hearing under section 1229a of this title pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

**(5) Scope of inquiry**

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

**(f) Limit on injunctive relief**

**(1) In general**

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

**(2) Particular cases**

Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

**(g) Exclusive jurisdiction**

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 5, § 242, 66 Stat. 208; Sept. 3, 1954, c. 1263, § 17, 68 Stat. 1232; Pub.L. 97-116, § 18(h)(1), Dec. 29, 1981, 95 Stat. 1620; Pub.L. 98-473, Title II, § 220(b), Oct. 12, 1984, 98 Stat. 2028; Pub.L. 99-603, Title VII, § 701, Nov. 6, 1986, 100 Stat. 3445; Pub.L. 100-525, § 9(n), Oct. 24, 1988, 102 Stat. 2620; Pub.L. 100-690, Title VII, § 7343(a), Nov. 18, 1988, 102 Stat. 4470; Pub.L. 101-649, Title V, §§ 504(a), 545(e), Title VI, § 603(b)(2), Nov. 29, 1990, 104 Stat. 5049, 5066, 5085; Pub.L. 102-232, Title III, §§ 306(a)(4), (c)(7), 307(m)(2), 309(b)(9), Dec. 12, 1991, 105 Stat. 1751, 1753, 1757, 1759; Pub.L. 103-322, Title II, § 20301(a), Title XIII, § 130001(a), Sept. 13, 1994, 108 Stat. 1823, 2023; Pub.L. 103-416, Title II, §§ 219(h), 224(b), Oct. 25, 1994, 108 Stat. 4317, 4324; Pub.L. 104-132, Title IV, §§ 436(a), (b)(1), 438(a), 440(c), (h), Apr. 24, 1996, 110 Stat. 1275, 1277, 1279; Pub.L. 104-208, Div. C, Title III, §§ 306(a), (d), 308(g)(10)(H), 371(b)(6), Sept. 30, 1996, 110 Stat. 3009-607, 3009-612, 3009-625, 3009-645; Pub.L. 109-13, Div. B, Title I, §§ 101(e), (f), 106(a), May 11, 2005, 119 Stat. 305, 310.)

Notes of Decisions (2215)

## Footnotes

1    So in original. Section 1253 of this title was amended by Pub.L. 104-208, Div. C, Title III, § 307(a), Sept. 30, 1996, 110 Stat. 3009-612, and as so amended, no longer contains a subsec. (g); provisions similar to those contained in former 8 U.S.C.A. § 1253(g) are now contained in 8 U.S.C.A. § 1253(d).

8 U.S.C.A. § 1252, 8 USCA § 1252

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part V. Adjustment and Change of Status (Refs & Annos)

8 U.S.C.A. § 1255

§ 1255. Adjustment of status of nonimmigrant to that of person admitted for permanent residence

Effective: March 23, 2009

Currentness

**(a) Status as person admitted for permanent residence on application and eligibility for immigrant visa**

The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

**(b) Record of lawful admission for permanent residence; reduction of preference visas**

Upon the approval of an application for adjustment made under subsection (a), the Attorney General shall record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for the adjustment of status is made, and the Secretary of State shall reduce by one the number of the preference visas authorized to be issued under sections 1152 and 1153 of this title within the class to which the alien is chargeable for the fiscal year then current.

**(c) Alien crewmen, aliens continuing or accepting unauthorized employment, and aliens admitted in transit without visa**

Other than an alien having an approved petition for classification as a VAWA self-petitioner, subsection (a) shall not be applicable to (1) an alien crewman; (2) subject to subsection (k), an alien (other than an immediate relative as defined in section 1151(b) of this title or a special immigrant described in section 1101(a)(27)(H), (I), (J), or (K) of this title) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States; (3) any alien admitted in transit without visa under section 1182(d)(4)(C) of this title; (4) an alien (other than an immediate relative as defined in section 1151(b) of this title) who was admitted as a nonimmigrant visitor without a visa under section 1182(l) of this title or section 1187 of this title; (5) an alien who was admitted as a nonimmigrant described in section 1101(a)(15)(S) of this title, [1] (6) an alien who is deportable under section 1227(a)(4)(B) of this title; (7) any alien who seeks adjustment of status to that of an immigrant under section 1153(b) of this title and is not in a lawful nonimmigrant status; or (8) any alien who was employed

while the alien was an unauthorized alien, as defined in section 1324a(h)(3) of this title, or who has otherwise violated the terms of a nonimmigrant visa.

**(d) Alien admitted for permanent residence on conditional basis; fiancee or fiance of citizen**

The Attorney General may not adjust, under subsection (a), the status of an alien lawfully admitted to the United States for permanent residence on a conditional basis under section 1186a of this title. The Attorney General may not adjust, under subsection (a), the status of a nonimmigrant alien described in section 1101(a)(15)(K) of this title except to that of an alien lawfully admitted to the United States on a conditional basis under section 1186a of this title as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent) to the citizen who filed the petition to accord that alien's nonimmigrant status under section 1101(a)(15)(K) of this title.

**(e) Restriction on adjustment of status based on marriages entered while in admissibility or deportation proceedings; bona fide marriage exception**

**(1)** Except as provided in paragraph (3), an alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a).

**(2)** The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to be admitted or remain in the United States.

**(3)** Paragraph (1) and section 1154(g) of this title shall not apply with respect to a marriage if the alien establishes by clear and convincing evidence to the satisfaction of the Attorney General that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place and the marriage was not entered into for the purpose of procuring the alien's admission as an immigrant and no fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) for the filing of a petition under section 1154(a) of this title or subsection (d) or (p) of section 1184 of this title with respect to the alien spouse or alien son or daughter. In accordance with regulations, there shall be only one level of administrative appellate review for each alien under the previous sentence.

**(f) Limitation on adjustment of status**

The Attorney General may not adjust, under subsection (a), the status of an alien lawfully admitted to the United States for permanent residence on a conditional basis under section 1186b of this title.

**(g) Special immigrants**

In applying this section to a special immigrant described in section 1101(a)(27)(K) of this title, such an immigrant shall be deemed, for purposes of subsection (a), to have been paroled into the United States.

**(h) Application with respect to special immigrants**

In applying this section to a special immigrant described in section 1101(a)(27)(J) of this title--

**(1)** such an immigrant shall be deemed, for purposes of subsection (a), to have been paroled into the United States; and

**(2)** in determining the alien's admissibility as an immigrant--

**(A)** paragraphs (4), (5)(A), (6)(A), (6)(C), (6)(D), (7)(A), and (9)(B) of section 1182(a) of this title shall not apply; and

**(B)** the Attorney General may waive other paragraphs of section 1182(a) of this title (other than paragraphs (2)(A), (2)(B), (2)(C) (except for so much of such paragraph as related to a single offense of simple possession of 30 grams or less of marijuana), (3)(A), (3)(B), (3)(C), and (3)(E)) in the case of individual aliens for humanitarian purposes, family unity, or when it is otherwise in the public interest.

The relationship between an alien and the alien's natural parents or prior adoptive parents shall not be considered a factor in making a waiver under paragraph (2)(B). Nothing in this subsection or section 1101(a)(27)(J) of this title shall be construed as authorizing an alien to apply for admission or be admitted to the United States in order to obtain special immigrant status described in such section.

**(i) Adjustment in status of certain aliens physically present in United States**

**(1)** Notwithstanding the provisions of subsections (a) and (c) of this section, an alien physically present in the United States--

**(A)** who--

**(i)** entered the United States without inspection; or

**(ii)** is within one of the classes enumerated in subsection (c) of this section;

**(B)** who is the beneficiary (including a spouse or child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of--

**(i)** a petition for classification under section 1154 of this title that was filed with the Attorney General on or before April 30, 2001; or

**(ii)** an application for a labor certification under section 1182(a)(5)(A) of this title that was filed pursuant to the regulations of the Secretary of Labor on or before such date; and

**(C)** who, in the case of a beneficiary of a petition for classification, or an application for labor certification, described in subparagraph (B) that was filed after January 14, 1998, is physically present in the United States on December 21, 2000;

may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence. The Attorney General may accept such application only if the alien remits with such application a sum equalling

$1,000 as of the date of receipt of the application, but such sum shall not be required from a child under the age of seventeen, or an alien who is the spouse or unmarried child of an individual who obtained temporary or permanent resident status under section 1160 or 1255a of this title or section 202 of the Immigration Reform and Control Act of 1986 at any date, who--

**(i)** as of May 5, 1988, was the unmarried child or spouse of the individual who obtained temporary or permanent resident status under section 1160 or 1255a of this title or section 202 of the Immigration Reform and Control Act of 1986;

**(ii)** entered the United States before May 5, 1988, resided in the United States on May 5, 1988, and is not a lawful permanent resident; and

**(iii)** applied for benefits under section 301(a) of the Immigration Act of 1990. The sum specified herein shall be in addition to the fee normally required for the processing of an application under this section.

**(2)** Upon receipt of such an application and the sum hereby required, the Attorney General may adjust the status of the alien to that of an alien lawfully admitted for permanent residence if--

**(A)** the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and

**(B)** an immigrant visa is immediately available to the alien at the time the application is filed.

**(3)(A)** The portion of each application fee (not to exceed $200) that the Attorney General determines is required to process an application under this section and is remitted to the Attorney General pursuant to paragraphs (1) and (2) of this subsection shall be disposed of by the Attorney General as provided in subsections (m), (n), and (o) of section 1356 of this title.

**(B)** Any remaining portion of such fees remitted under such paragraphs shall be deposited by the Attorney General into the Breached Bond/Detention Fund established under section 1356(r) of this title, except that in the case of fees attributable to applications for a beneficiary with respect to whom a petition for classification, or an application for labor certification, described in paragraph (1)(B) was filed after January 14, 1998, one-half of such remaining portion shall be deposited by the Attorney General into the Immigration Examinations Fee Account established under section 1356(m) of this title.

**(j) Adjustment to permanent resident status**

**(1)** If, in the opinion of the Attorney General--

**(A)** a nonimmigrant admitted into the United States under section 1101(a)(15)(S)(i) of this title has supplied information described in subclause (I) of such section; and

**(B)** the provision of such information has substantially contributed to the success of an authorized criminal investigation or the prosecution of an individual described in subclause (III) of that section,

the Attorney General may adjust the status of the alien (and the spouse, married and unmarried sons and daughters, and parents of the alien if admitted under that section) to that of an alien lawfully admitted for permanent residence if the alien is not described in section 1182(a)(3)(E) of this title.

**(2)** If, in the sole discretion of the Attorney General--

**(A)** a nonimmigrant admitted into the United States under section 1101(a)(15)(S)(ii) of this title has supplied information described in subclause (I) of such section, and

**(B)** the provision of such information has substantially contributed to--

**(i)** the prevention or frustration of an act of terrorism against a United States person or United States property, or

**(ii)** the success of an authorized criminal investigation of, or the prosecution of, an individual involved in such an act of terrorism, and

**(C)** the nonimmigrant has received a reward under section 2708(a) of Title 22,

the Attorney General may adjust the status of the alien (and the spouse, married and unmarried sons and daughters, and parents of the alien if admitted under such section) to that of an alien lawfully admitted for permanent residence if the alien is not described in section 1182(a)(3)(E) of this title.

**(3)** Upon the approval of adjustment of status under paragraph (1) or (2), the Attorney General shall record the alien's lawful admission for permanent residence as of the date of such approval and the Secretary of State shall reduce by one the number of visas authorized to be issued under sections 1151(d) and 1153(b)(4) of this title for the fiscal year then current.

**(k) Inapplicability of certain provisions for certain employment-based immigrants**

An alien who is eligible to receive an immigrant visa under paragraph (1), (2), or (3) of section 1153(b) of this title (or, in the case of an alien who is an immigrant described in section 1101(a)(27)(C) of this title, under section 1153(b)(4) of this title) may adjust status pursuant to subsection (a) and notwithstanding subsection (c)(2), (c)(7), and (c)(8), if--

**(1)** the alien, on the date of filing an application for adjustment of status, is present in the United States pursuant to a lawful admission;

**(2)** the alien, subsequent to such lawful admission has not, for an aggregate period exceeding 180 days--

**(A)** failed to maintain, continuously, a lawful status;

**(B)** engaged in unauthorized employment; or

AR.00964

**(C)** otherwise violated the terms and conditions of the alien's admission.

**(l) Adjustment of status for victims of trafficking**

**(1)** If, in the opinion of the Secretary of Homeland Security, or in the case of subparagraph (C)(i), in the opinion of the Secretary of Homeland Security, in consultation with the Attorney General, as appropriate [2] a nonimmigrant admitted into the United States under section 1101(a)(15)(T)(i) of this title--

    **(A)** has been physically present in the United States for a continuous period of at least 3 years since the date of admission as a nonimmigrant under section 1101(a)(15)(T)(i) of this title, or has been physically present in the United States for a continuous period during the investigation or prosecution of acts of trafficking and that, in the opinion of the Attorney General, the investigation or prosecution is complete, whichever period of time is less;

    **(B)** subject to paragraph (6), has, throughout such period, been a person of good moral character; and

    **(C)(i)** has, during such period, complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking;

    **(ii)** the alien [3] would suffer extreme hardship involving unusual and severe harm upon removal from the United States; or

    **(iii)** was younger than 18 years of age at the time of the victimization qualifying the alien for relief under section 1101(a)(15)(T) of this title. [4]

the Secretary of Homeland Security may adjust the status of the alien (and any person admitted under section 1101(a)(15)(T)(ii) of this title as the spouse, parent, sibling, or child of the alien) to that of an alien lawfully admitted for permanent residence.

**(2)** Paragraph (1) shall not apply to an alien admitted under section 1101(a)(15)(T) of this title who is inadmissible to the United States by reason of a ground that has not been waived under section 1182 of this title, except that, if the Secretary of Homeland Security considers it to be in the national interest to do so, the Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of

    **(A)** paragraphs (1) and (4) of section 1182(a) of this title; and

    **(B)** any other provision of such section (excluding paragraphs (3), (10)(C), and (10(E)) [6], if the activities rendering the alien inadmissible under the provision were caused by, or were incident to, the victimization described in section 1101(a)(15)(T)(i)(I) of this title.

**(3)** An alien shall be considered to have failed to maintain continuous physical presence in the United States under paragraph (1)(A) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days, unless--

    **(A)** the absence was necessary to assist in the investigation or prosecution described in paragraph (1)(A); or

    **(B)** an official involved in the investigation or prosecution certifies that the absence was otherwise justified.

**(4)(A)** The total number of aliens whose status may be adjusted under paragraph (1) during any fiscal year may not exceed 5,000.

**(B)** The numerical limitation of subparagraph (A) shall only apply to principal aliens and not to the spouses, sons, daughters, siblings, or parents of such aliens.

**(5)** Upon the approval of adjustment of status under paragraph (1), the Secretary of Homeland Security shall record the alien's lawful admission for permanent residence as of the date of such approval.

**(6)** For purposes of paragraph (1)(B), the Secretary of Homeland Security may waive consideration of a disqualification from good moral character with respect to an alien if the disqualification was caused by, or incident to, the trafficking described in section 1101(a)(15)(T)(i)(I) of this title.

**(7)** The Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U), 1105a, 1229b(b)(2), and 1254a(a)(3) of this title (as in effect on March 31, 1997).

**(m) Adjustment of status for victims of crimes against women**

**(1)** The Secretary of Homeland Security may adjust the status of an alien admitted into the United States (or otherwise provided nonimmigrant status) under section 1101(a)(15)(U) of this title to that of an alien lawfully admitted for permanent residence if the alien is not described in section 1182(a)(3)(E) of this title, unless the Secretary determines based on affirmative evidence that the alien unreasonably refused to provide assistance in a criminal investigation or prosecution, if--

    **(A)** the alien has been physically present in the United States for a continuous period of at least 3 years since the date of admission as a nonimmigrant under clause (i) or (ii) of section 1101(a)(15)(U) of this title; and

    **(B)** in the opinion of the Secretary of Homeland Security, the alien's continued presence in the United States is justified on humanitarian grounds, to ensure family unity, or is otherwise in the public interest.

**(2)** An alien shall be considered to have failed to maintain continuous physical presence in the United States under paragraph (1)(A) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate

exceeding 180 days unless the absence is in order to assist in the investigation or prosecution or unless an official involved in the investigation or prosecution certifies that the absence was otherwise justified.

**(3)** Upon approval of adjustment of status under paragraph (1) of an alien described in section 1101(a)(15)(U)(i) of this title the Secretary of Homeland Security may adjust the status of or issue an immigrant visa to a spouse, a child, or, in the case of an alien child, a parent who did not receive a nonimmigrant visa under section 1101(a)(15)(U)(ii) of this title if the Secretary considers the grant of such status or visa necessary to avoid extreme hardship.

**(4)** Upon the approval of adjustment of status under paragraph (1) or (3), the Secretary of Homeland Security shall record the alien's lawful admission for permanent residence as of the date of such approval.

**(5)(A)** The Secretary of Homeland Security shall consult with the Attorney General, as appropriate, in making a determination under paragraph (1) whether affirmative evidence demonstrates that the alien unreasonably refused to provide assistance to a Federal law enforcement official, Federal prosecutor, Federal judge, or other Federal authority investigating or prosecuting criminal activity described in section 1101(a)(15)(U)(iii) of this title.

**(B)** Nothing in paragraph (1)(B) may be construed to prevent the Secretary from consulting with the Attorney General in making a determination whether affirmative evidence demonstrates that the alien unreasonably refused to provide assistance to a State or local law enforcement official, State or local prosecutor, State or local judge, or other State or local authority investigating or prosecuting criminal activity described in section 1101(a)(15)(U)(iii) of this title.

<div align="center">

**CREDIT(S)**

</div>

(June 27, 1952, c. 477, Title II, c. 5, § 245, 66 Stat. 217; Pub.L. 85-700, § 1, Aug. 21, 1958, 72 Stat. 699; Pub.L. 86-648, § 10, July 14, 1960, 74 Stat. 505; Pub.L. 89-236, § 13, Oct. 3, 1965, 79 Stat. 918; Pub.L. 94-571, § 6, Oct. 20, 1976, 90 Stat. 2705; Pub.L. 97-116, § 5(d)(2), Dec. 29, 1981, 95 Stat. 1614; Pub.L. 99-603, Title I, § 117, Title III, § 313(c), Nov. 6, 1986, 100 Stat. 3384, 3438; Pub.L. 99-639, §§ 2(e), 3(b), 5(a), Nov. 10, 1986, 100 Stat. 3542, 3543; Pub.L. 100-525, §§ 2(f)(1), (p)(3), 7(b), Oct. 24, 1988, 102 Stat. 2611, 2613, 2616; Pub.L. 101-649, Title I, §§ 121(b)(4), 162(e)(3), Title VII, § 702(a), Nov. 29, 1990, 104 Stat. 4994, 5011, 5086; Pub.L. 102-110, § 2(c), Oct. 1, 1991, 105 Stat. 556; Pub.L. 102-232, Title III, §§ 302(d)(2), (e)(7), 308(a), Dec. 12, 1991, 105 Stat. 1744, 1746, 1757; Pub.L. 103-317, Title V, § 506(b), Aug. 26, 1994, 108 Stat. 1765; Pub.L. 103-322, Title XIII, § 130003(c), Sept. 13, 1994, 108 Stat. 2025; Pub.L. 103-416, Title II, § 219(k), Oct. 25, 1994, 108 Stat. 4317; Pub.L. 104-132, Title IV, § 413(d), Apr. 24, 1996, 110 Stat. 1269; Pub.L. 104-208, Div. C, Title III, §§ 308(f)(1)(O), (2) (C), (g)(10)(B), 375, 376(a), Title VI, § 671(a)(4)(A), (5), Sept. 30, 1996, 110 Stat. 3009-621, 3009-625, 3009-648, 3009-721; Pub.L. 105-119, Title I, §§ 110(3), 111(a), (c), Nov. 26, 1997, 111 Stat. 2458; Pub.L. 106-386, Div. A, § 107(f), Div. B, Title V, §§ 1506(a)(1), 1513(f), Oct. 28, 2000, 114 Stat. 1479, 1527, 1536; Pub.L. 106-553, § 1(a)(2) [Title XI, §§ 1102(c), (d)(2), 1103(c)(3)], Dec. 21, 2000, 114 Stat. 2762, 2762A-143 to 2762A-145; Pub.L. 106-554, § 1(a)(4) [Div. B, Title XV, § 1502], Dec. 21, 2000, 114 Stat. 2763, 2763A-324; Pub.L. 108-193, §§ 4(b)(3), 8(a)(4), Dec. 19, 2003, 117 Stat. 2879, 2886; Pub.L. 109-162, Title VIII, § 803, Jan. 5, 2006, 119 Stat. 3054; Pub.L. 109-271, § 6(f), Aug. 12, 2006, 120 Stat. 763; Pub.L. 110-457, Title II, §§ 201(d), (e), 235(d)(3), Dec. 23, 2008, 122 Stat. 5053, 5054, 5080.)

Notes of Decisions (749)

## Footnotes

1     So in original. The comma probably should be a semicolon.
2     So in original. Probably should be followed by a comma.
3     So in original. The words "the alien" probably should not appear.
4     So in original. The period probably should be a comma.
5     So in original. The term "Attorney General's" probably should be "Secretary's".
6     So in original. Probably should be "(10)(E))".

8 U.S.C.A. § 1255, 8 USCA § 1255

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by  United States v. Raniere,  E.D.N.Y.,  Apr. 29, 2019

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 8. Aliens and Nationality (Refs & Annos)
      Chapter 12. Immigration and Nationality (Refs & Annos)
         Subchapter II. Immigration
            Part VIII. General Penalty Provisions

8 U.S.C.A. § 1324

§ 1324. Bringing in and harboring certain aliens

Effective: November 10, 2005
Currentness

**(a) Criminal penalties**

**(1)(A)** Any person who--

**(i)** knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

**(ii)** knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

**(iii)** knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

**(iv)** encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

**(v)(I)** engages in any conspiracy to commit any of the preceding acts, or

**(II)** aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

**(B)** A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs--

**(i)** in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both;

**(ii)** in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under Title 18, imprisoned not more than 5 years, or both;

**(iii)** in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of Title 18) to, or places in jeopardy the life of, any person, be fined under Title 18, imprisoned not more than 20 years, or both; and

**(iv)** in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under Title 18, or both.

**(C)** It is not a violation of clauses [1] (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

**(2)** Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs--

**(A)** be fined in accordance with Title 18 or imprisoned not more than one year, or both; or

**(B)** in the case of--

**(i)** an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

**(ii)** an offense done for the purpose of commercial advantage or private financial gain, or

**(iii)** an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under Title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

**(3)(A)** Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under Title 18 or imprisoned for not more than 5 years, or both.

**(B)** An alien described in this subparagraph is an alien who--

**(i)** is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and

**(ii)** has been brought into the United States in violation of this subsection.

**(4)** In the case of a person who has brought aliens into the United States in violation of this subsection, the sentence otherwise provided for may be increased by up to 10 years if--

**(A)** the offense was part of an ongoing commercial organization or enterprise;

**(B)** aliens were transported in groups of 10 or more; and

**(C)(i)** aliens were transported in a manner that endangered their lives; or

**(ii)** the aliens presented a life-threatening health risk to people in the United States.

**(b) Seizure and forfeiture**

**(1) In general**

Any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of a violation of subsection (a), the gross proceeds of such violation, and any property traceable to such conveyance or proceeds, shall be seized and subject to forfeiture.

**(2) Applicable procedures**

Seizures and forfeitures under this subsection shall be governed by the provisions of chapter 46 of Title 18 relating to civil forfeitures, including section 981(d) of such title, except that such duties as are imposed upon the Secretary of the Treasury

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

under the customs laws described in that section shall be performed by such officers, agents, and other persons as may be designated for that purpose by the Attorney General.

**(3) Prima facie evidence in determinations of violations**

In determining whether a violation of subsection (a) has occurred, any of the following shall be prima facie evidence that an alien involved in the alleged violation had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law:

**(A)** Records of any judicial or administrative proceeding in which that alien's status was an issue and in which it was determined that the alien had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.

**(B)** Official records of the Service or of the Department of State showing that the alien had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.

**(C)** Testimony, by an immigration officer having personal knowledge of the facts concerning that alien's status, that the alien had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.

**(c) Authority to arrest**

No officer or person shall have authority to make any arrests for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, and all other officers whose duty it is to enforce criminal laws.

**(d) Admissibility of videotaped witness testimony**

Notwithstanding any provision of the Federal Rules of Evidence, the videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation if the witness was available for cross examination and the deposition otherwise complies with the Federal Rules of Evidence.

**(e) Outreach program**

The Secretary of Homeland Security, in consultation with the Attorney General and the Secretary of State, as appropriate, shall develop and implement an outreach program to educate the public in the United States and abroad about the penalties for bringing in and harboring aliens in violation of this section.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 8, § 274, 66 Stat. 228; Pub.L. 95-582, § 2, Nov. 2, 1978, 92 Stat. 2479; Pub.L. 97-116, § 12, Dec. 29, 1981, 95 Stat. 1617; Pub.L. 99-603, Title I, § 112, Nov. 6, 1986, 100 Stat. 3381; Pub.L. 100-525, § 2(d), Oct. 24,

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 996 of 3864

1988, 102 Stat. 2610; Pub.L. 103-322, Title VI, § 60024, Sept. 13, 1994, 108 Stat. 1981; Pub.L. 104-208, Div. C, Title II, §§ 203(a) to (d), 219, Title VI, § 671(a)(1), Sept. 30, 1996, 110 Stat. 3009-565, 3009-566, 3009-574, 3009-721; Pub.L. 106-185, § 18(a), Apr. 25, 2000, 114 Stat. 222; Pub.L. 108-458, Title V, § 5401, Dec. 17, 2004, 118 Stat. 3737; Pub.L. 109-97, Title VII, § 796, Nov. 10, 2005, 119 Stat. 2165.)

Notes of Decisions (738)

# Footnotes

1        So in original. Probably should be "clause".

8 U.S.C.A. § 1324, 8 USCA § 1324

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part VIII. General Penalty Provisions

8 U.S.C.A. § 1324c

§ 1324c. Penalties for document fraud

Effective: September 30, 1996

Currentness

**(a) Activities prohibited**

It is unlawful for any person or entity knowingly--

**(1)** to forge, counterfeit, alter, or falsely make any document for the purpose of satisfying a requirement of this chapter or to obtain a benefit under this chapter,

**(2)** to use, attempt to use, possess, obtain, accept, or receive or to provide any forged, counterfeit, altered, or falsely made document in order to satisfy any requirement of this chapter or to obtain a benefit under this chapter,

**(3)** to use or attempt to use or to provide or attempt to provide any document lawfully issued to or with respect to a person other than the possessor (including a deceased individual) for the purpose of satisfying a requirement of this chapter or obtaining a benefit under this chapter,

**(4)** to accept or receive or to provide any document lawfully issued to or with respect to a person other than the possessor (including a deceased individual) for the purpose of complying with section 1324a(b) of this title or obtaining a benefit under this chapter, or

**(5)** to prepare, file, or assist another in preparing or filing, any application for benefits under this chapter, or any document required under this chapter, or any document submitted in connection with such application or document, with knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted, or

**(6)** (A) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States, and (B) to fail to present such document to an immigration officer upon arrival at a United States port of entry.

**(b) Exception**

This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a subdivision of a State, or of an intelligence agency of the United States, or any activity authorized under chapter 224 of Title 18.

**(c) Construction**

Nothing in this section shall be construed to diminish or qualify any of the penalties available for activities prohibited by this section but proscribed as well in Title 18.

**(d) Enforcement**

**(1) Authority in investigations**

In conducting investigations and hearings under this subsection--

**(A)** immigration officers and administrative law judges shall have reasonable access to examine evidence of any person or entity being investigated,

**(B)** administrative law judges, may, if necessary, compel by subpoena the attendance of witnesses and the production of evidence at any designated place or hearing, and

**(C)** immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).

In case of contumacy or refusal to obey a subpoena lawfully issued under this paragraph and upon application of the Attorney General, an appropriate district court of the United States may issue an order requiring compliance with such subpoena and any failure to obey such order may be punished by such court as a contempt thereof.

**(2) Hearing**

**(A) In general**

Before imposing an order described in paragraph (3) against a person or entity under this subsection for a violation of subsection (a), the Attorney General shall provide the person or entity with notice and, upon request made within a reasonable time (of not less than 30 days, as established by the Attorney General) of the date of the notice, a hearing respecting the violation.

**(B) Conduct of hearing**

Any hearing so requested shall be conducted before an administrative law judge. The hearing shall be conducted in accordance with the requirements of section 554 of Title 5. The hearing shall be held at the nearest practicable place to the place where the person or entity resides or of the place where the alleged violation occurred. If no hearing is so requested, the Attorney General's imposition of the order shall constitute a final and unappealable order.

**(C) Issuance of orders**

If the administrative law judge determines, upon the preponderance of the evidence received, that a person or entity has violated subsection (a), the administrative law judge shall state his findings of fact and issue and cause to be served on such person or entity an order described in paragraph (3).

**(3) Cease and desist order with civil money penalty**

With respect to a violation of subsection (a), the order under this subsection shall require the person or entity to cease and desist from such violations and to pay a civil penalty in an amount of--

**(A)** not less than $250 and not more than $2,000 for each document that is the subject of a violation under subsection (a), or

**(B)** in the case of a person or entity previously subject to an order under this paragraph, not less than $2,000 and not more than $5,000 for each document that is the subject of a violation under subsection (a).

In applying this subsection in the case of a person or entity composed of distinct, physically separate subdivisions each of which provides separately for the hiring, recruiting, or referring for employment, without reference to the practices of, and not under the control of or common control with, another subdivision, each such subdivision shall be considered a separate person or entity.

**(4) Administrative appellate review**

The decision and order of an administrative law judge shall become the final agency decision and order of the Attorney General unless either (A) within 30 days, an official delegated by regulation to exercise review authority over the decision and order modifies or vacates the decision and order, or (B) within 30 days of the date of such a modification or vacation (or within 60 days of the date of decision and order of an administrative law judge if not so modified or vacated) the decision and order is referred to the Attorney General pursuant to regulations, in which case the decision and order of the Attorney General shall become the final agency decision and order under this subsection.

**(5) Judicial review**

A person or entity adversely affected by a final order under this section may, within 45 days after the date the final order is issued, file a petition in the Court of Appeals for the appropriate circuit for review of the order.

**(6) Enforcement of orders**

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

If a person or entity fails to comply with a final order issued under this section against the person or entity, the Attorney General shall file a suit to seek compliance with the order in any appropriate district court of the United States. In any such suit, the validity and appropriateness of the final order shall not be subject to review.

**(7) Waiver by Attorney General**

The Attorney General may waive the penalties imposed by this section with respect to an alien who knowingly violates subsection (a)(6) if the alien is granted asylum under section 1158 of this title or withholding of removal under section 1231(b)(3) of this title.

**(e) Criminal penalties for failure to disclose role as document preparer**

**(1)** Whoever, in any matter within the jurisdiction of the Service, knowingly and willfully fails to disclose, conceals, or covers up the fact that they have, on behalf of any person and for a fee or other remuneration, prepared or assisted in preparing an application which was falsely made (as defined in subsection (f)) for immigration benefits, shall be fined in accordance with Title 18, imprisoned for not more than 5 years, or both, and prohibited from preparing or assisting in preparing, whether or not for a fee or other remuneration, any other such application.

**(2)** Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for immigration benefits pursuant to this chapter, or the regulations promulgated thereunder, whether or not for a fee or other remuneration and regardless of whether in any matter within the jurisdiction of the Service, shall be fined in accordance with Title 18, imprisoned for not more than 15 years, or both, and prohibited from preparing or assisting in preparing any other such application.

**(f) Falsely make**

For purposes of this section, the term "falsely make" means to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a fact which is material to the purpose for which it was submitted.

<center>**CREDIT(S)**</center>

(June 27, 1952, c. 477, Title II, ch. 8, § 274C, as added Pub.L. 101-649, Title V, § 544(a), Nov. 29, 1990, 104 Stat. 5059; amended Pub.L. 102-232, Title III, § 306(c)(5)(A), Dec. 12, 1991, 105 Stat. 1752; Pub.L. 103-416, Title II, § 219(r), Oct. 25, 1994, 108 Stat. 4317; Pub.L. 104-208, Div. C, Title I, §§ 212(a) to (d), 213, 220, Title III, §§ 308(g)(10)(D), 379(a), Sept. 30, 1996, 110 Stat. 3009-570, 3009-571, 3009-575, 3009-625, 3009-649.)

Notes of Decisions (12)

8 U.S.C.A. § 1324c, 8 USCA § 1324c
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.00977   4

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  United States v. Gonzalez-Fierro,   10th Cir.(N.M.),   Feb. 04, 2020

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part VIII. General Penalty Provisions

8 U.S.C.A. § 1326

§ 1326. Reentry of removed aliens

Effective: September 30, 1996

Currentness

**(a) In general**

Subject to subsection (b), any alien who--

**(1)** has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

**(2)** enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

**(b) Criminal penalties for reentry of certain removed aliens**

Notwithstanding subsection (a), in the case of any alien described in such subsection--

**(1)** whose removal was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under Title 18, imprisoned not more than 10 years, or both;

**(2)** whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both;

**(3)** who has been excluded from the United States pursuant to section 1225(c) of this title because the alien was excludable under section 1182(a)(3)(B) of this title or who has been removed from the United States pursuant to the provisions of subchapter V, and who thereafter, without the permission of the Attorney General, enters the United States, or attempts to do so, shall be fined under Title 18 and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence. [1] or

**(4)** who was removed from the United States pursuant to section 1231(a)(4)(B) of this title who thereafter, without the permission of the Attorney General, enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be fined under Title 18, imprisoned for not more than 10 years, or both.

For the purposes of this subsection, the term "removal" includes any agreement in which an alien stipulates to removal during (or not during) a criminal trial under either Federal or State law.

**(c) Reentry of alien deported prior to completion of term of imprisonment**

Any alien deported pursuant to section 1252(h)(2) [2] of this title who enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be incarcerated for the remainder of the sentence of imprisonment which was pending at the time of deportation without any reduction for parole or supervised release. Such alien shall be subject to such other penalties relating to the reentry of deported aliens as may be available under this section or any other provision of law.

**(d) Limitation on collateral attack on underlying deportation order**

In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that--

**(1)** the alien exhausted any administrative remedies that may have been available to seek relief against the order;

**(2)** the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

**(3)** the entry of the order was fundamentally unfair.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.)

Notes of Decisions (1440)

## Footnotes

1    So in original. The period probably should be a semicolon.
2    So in original. Section 1252 of this title, was amended by Pub.L. 104-208, Div. C, Title III, § 306(a)(2), Sept. 30, 1996, 110 Stat. 3009-607, and as so amended, does not contain a subsec. (h); for provisions similar to those formerly contained in section 1252(h)(2) of this title, see 8 U.S.C.A. § 1231(a)(4).

8 U.S.C.A. § 1326, 8 USCA § 1326

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part IX. Miscellaneous

8 U.S.C.A. § 1362

§ 1362. Right to counsel

Currentness

In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, ch. 9, § 292, 66 Stat. 235; Pub.L. 104-208, Div. C, Title III, §§ 308(d)(4)(O), 371(b)(9), Sept. 30, 1996, 110 Stat. 3009-619, 3009-645.)

Notes of Decisions (73)

8 U.S.C.A. § 1362, 8 USCA § 1362
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

📁 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 14. Restricting Welfare and Public Benefits for Aliens
      Subchapter I. Eligibility for Federal Benefits

8 U.S.C.A. § 1611

§ 1611. Aliens who are not qualified aliens ineligible for Federal public benefits

Effective: October 28, 1998
Currentness

**(a) In general**

Notwithstanding any other provision of law and except as provided in subsection (b), an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit (as defined in subsection (c)).

**(b) Exceptions**

**(1)** Subsection (a) shall not apply with respect to the following Federal public benefits:

  **(A)** Medical assistance under title XIX of the Social Security Act (or any successor program to such title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the State plan approved under such title (other than the requirement of the receipt of aid or assistance under title IV of such Act, supplemental security income benefits under title XVI of such Act, or a State supplementary payment).

  **(B)** Short-term, non-cash, in-kind emergency disaster relief.

  **(C)** Public health assistance (not including any assistance under title XIX of the Social Security Act) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

  **(D)** Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

**(E)** Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under title V of the Housing Act of 1949, or any assistance under section 1926c of Title 7, to the extent that the alien is receiving such a benefit on August 22, 1996.

**(2)** Subsection (a) shall not apply to any benefit payable under title II of the Social Security Act to an alien who is lawfully present in the United States as determined by the Attorney General, to any benefit if nonpayment of such benefit would contravene an international agreement described in section 233 of the Social Security Act, to any benefit if nonpayment would be contrary to section 202(t) of the Social Security Act, or to any benefit payable under title II of the Social Security Act to which entitlement is based on an application filed in or before August 1996.

**(3)** Subsection (a) shall not apply to any benefit payable under title XVIII of the Social Security Act (relating to the medicare program) to an alien who is lawfully present in the United States as determined by the Attorney General and, with respect to benefits payable under part A of such title, who was authorized to be employed with respect to any wages attributable to employment which are counted for purposes of eligibility for such benefits.

**(4)** Subsection (a) shall not apply to any benefit payable under the Railroad Retirement Act of 1974 or the Railroad Unemployment Insurance Act to an alien who is lawfully present in the United States as determined by the Attorney General or to an alien residing outside the United States.

**(5)** Subsection (a) shall not apply to eligibility for benefits for the program defined in section 1612(a)(3)(A) of this title (relating to the supplemental security income program), or to eligibility for benefits under any other program that is based on eligibility for benefits under the program so defined, for an alien who was receiving such benefits on August 22, 1996.

**(c) "Federal public benefit" defined**

**(1)** Except as provided in paragraph (2), for purposes of this chapter the term "Federal public benefit" means--

**(A)** any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

**(B)** any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

**(2)** Such term shall not apply--

**(A)** to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;

**(B)** with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Attorney General, after consultation with the Secretary of State; or

**(C)** to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 104-193, Title IV, § 401, Aug. 22, 1996, 110 Stat. 2261; Pub.L. 105-33, Title V, §§ 5561, 5565, Aug. 5, 1997, 111 Stat. 638, 639; Pub.L. 105-306, §§ 2, 5(a), Oct. 28, 1998, 112 Stat. 2926, 2927.)

Notes of Decisions (3)

8 U.S.C.A. § 1611, 8 USCA § 1611
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 14. Restricting Welfare and Public Benefits for Aliens
      Subchapter I. Eligibility for Federal Benefits

---

8 U.S.C.A. § 1612

§ 1612. Limited eligibility of qualified aliens for certain Federal programs

Effective: October 1, 2008
Currentness

**(a) Limited eligibility for specified Federal programs**

**(1) In general**

Notwithstanding any other provision of law and except as provided in paragraph (2), an alien who is a qualified alien (as defined in section 1641 of this title) is not eligible for any specified Federal program (as defined in paragraph (3)).

**(2) Exceptions**

**(A) Time-limited exception for refugees and asylees**

With respect to the specified Federal programs described in paragraph (3), paragraph (1) shall not apply to an alien until 7 years after the date--

**(i)** an alien is admitted to the United States as a refugee under section 207 of the Immigration and Nationality Act;

**(ii)** an alien is granted asylum under section 208 of such Act;

**(iii)** an alien's deportation is withheld under section 243(h) of such Act (as in effect immediately before the effective date of section 307 of division C of Public Law 104-208) or section 241(b)(3) of such Act (as amended by section 305(a) of division C of Public Law 104-208);

**(iv)** an alien is granted status as a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980); or

**(v)** an alien is admitted to the United States as an Amerasian immigrant pursuant to section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in section 101(e) of Public Law 100-202 and amended by the 9th proviso under Migration and Refugee Assistance in title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, Public Law 100-461, as amended).

### (B) Certain permanent resident aliens

Paragraph (1) shall not apply to an alien who--

**(i)** is lawfully admitted to the United States for permanent residence under the Immigration and Nationality Act; and

**(ii)** (I) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters as provided under section 1645 of this title, and (II) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 1613 of this title) during any such period.

### (C) Veteran and active duty exception

Paragraph (1) shall not apply to an alien who is lawfully residing in any State and is--

**(i)** a veteran (as defined in section 101, 1101, or 1301, or as described in section 107 of Title 38) with a discharge characterized as an honorable discharge and not on account of alienage and who fulfills the minimum active-duty service requirements of section 5303A(d) of Title 38,

**(ii)** on active duty (other than active duty for training) in the Armed Forces of the United States, or

**(iii)** the spouse or unmarried dependent child of an individual described in clause (i) or (ii) or the unremarried surviving spouse of an individual described in clause (i) or (ii) who is deceased if the marriage fulfills the requirements of section 1304 of Title 38.

### (D) Transition for aliens currently receiving benefits

#### (i) SSI

##### (I) In general

With respect to the specified Federal program described in paragraph (3)(A), during the period beginning on August 22, 1996, and ending on September 30, 1998, the Commissioner of Social Security shall redetermine the eligibility of any individual who is receiving benefits under such program as of August 22, 1996, and whose eligibility for such benefits may terminate by reason of the provisions of this subsection.

AR.00986

**(II) Redetermination criteria**

With respect to any redetermination under subclause (I), the Commissioner of Social Security shall apply the eligibility criteria for new applicants for benefits under such program.

**(III) Grandfather provision**

The provisions of this subsection and the redetermination under subclause (I), shall only apply with respect to the benefits of an individual described in subclause (I) for months beginning on or after September 30, 1998.

**(IV) Notice**

Not later than March 31, 1997, the Commissioner of Social Security shall notify an individual described in subclause (I) of the provisions of this clause.

**(ii) Food stamps**

**(I) In general**

With respect to the specified Federal program described in paragraph (3)(B), ineligibility under paragraph (1) shall not apply until April 1, 1997, to an alien who received benefits under such program on August 22, 1996, unless such alien is determined to be ineligible to receive such benefits under the Food Stamp Act of 1977. The State agency shall recertify the eligibility of all such aliens during the period beginning April 1, 1997, and ending August 22, 1997.

**(II) Recertification criteria**

With respect to any recertification under subclause (I), the State agency shall apply the eligibility criteria for applicants for benefits under such program.

**(III) Grandfather provision**

The provisions of this subsection and the recertification under subclause (I) shall only apply with respect to the eligibility of an alien for a program for months beginning on or after the date of recertification, if on August 22, 1996, the alien is lawfully residing in any State and is receiving benefits under such program on August 22, 1996.

**(E) Aliens receiving SSI on August 22, 1996**

With respect to eligibility for benefits for the program defined in paragraph (3)(A) (relating to the supplemental security income program), paragraph (1) shall not apply to an alien who is lawfully residing in the United States and who was receiving such benefits on August 22, 1996.

**(F) Disabled aliens lawfully residing in the United States on August 22, 1996**

AR.00987

With respect to eligibility for benefits for the specified Federal programs described in paragraph (3), paragraph (1) shall not apply to an alien who--

    **(i)** in the case of the specified Federal program described in paragraph (3)(A)--

        **(I)** was lawfully residing in the United States on August 22, 1996; and

        **(II)** is blind or disabled (as defined in paragraph (2) or (3) of section 1614(a) of the Social Security Act (42 U.S.C. 1382c(a))); and

    **(ii)** in the case of the specified Federal program described in paragraph (3)(B), is receiving benefits or assistance for blindness or disability (within the meaning of section 3(j) of the Food Stamp Act of 1977 (7 U.S.C. 2012(r))). [1]

**(G) Exception for certain Indians**

With respect to eligibility for benefits for the specified Federal programs described in paragraph (3), section 1611(a) of this title and paragraph (1) shall not apply to any individual--

    **(i)** who is an American Indian born in Canada to whom the provisions of section 289 of the Immigration and Nationality Act (8 U.S.C. 1359) apply; or

    **(ii)** who is a member of an Indian tribe (as defined in section 5304(e) of Title 25).

**(H) SSI exception for certain recipients on the basis of very old applications**

With respect to eligibility for benefits for the program defined in paragraph (3)(A) (relating to the supplemental security income program), paragraph (1) shall not apply to any individual--

    **(i)** who is receiving benefits under such program for months after July 1996 on the basis of an application filed before January 1, 1979; and

    **(ii)** with respect to whom the Commissioner of Social Security lacks clear and convincing evidence that such individual is an alien ineligible for such benefits as a result of the application of this section.

**(I) Food stamp exception for certain elderly individuals**

With respect to eligibility for benefits for the specified Federal program described in paragraph (3)(B), paragraph (1) shall not apply to any individual who on August 22, 1996--

    **(i)** was lawfully residing in the United States; and

**(ii)** was 65 years of age or older.

**(J) Food stamp exception for certain children**

With respect to eligibility for benefits for the specified Federal program described in paragraph (3)(B), paragraph (1) shall not apply to any individual who is under 18 years of age.

**(K) Food stamp exception for certain Hmong and Highland Laotians**

With respect to eligibility for benefits for the specified Federal program described in paragraph (3)(B), paragraph (1) shall not apply to--

**(i)** any individual who--

**(I)** is lawfully residing in the United States; and

**(II)** was a member of a Hmong or Highland Laotian tribe at the time that the tribe rendered assistance to United States personnel by taking part in a military or rescue operation during the Vietnam era (as defined in section 101 of Title 38);

**(ii)** the spouse, or an unmarried dependent child, of such an individual; or

**(iii)** the unremarried surviving spouse of such an individual who is deceased.

**(L) Food stamp exception for certain qualified aliens**

With respect to eligibility for benefits for the specified Federal program described in paragraph (3)(B), paragraph (1) shall not apply to any qualified alien who has resided in the United States with a status within the meaning of the term "qualified alien" for a period of 5 years or more beginning on the date of the alien's entry into the United States.

**(M) SSI extensions through fiscal year 2011**

**(i) Two-year extension for certain aliens and victims of trafficking**

**(I) In general**

Subject to clause (ii), with respect to eligibility for benefits under subparagraph (A) for the specified Federal program described in paragraph (3)(A) of qualified aliens (as defined in section 1641(b) of this title) and victims of trafficking in persons (as defined in section 7105(b)(1)(C) of Title 22 or as granted status under section 101(a)(15)(T)(ii) of the Immigration and Nationality Act), the 7-year period described in subparagraph (A) shall be deemed to be a 9-year period during fiscal years 2009 through 2011 in the case of such a qualified alien or victim of trafficking who

furnishes to the Commissioner of Social Security the declaration required under subclause (IV) (if applicable) and is described in subclause (III).

**(II) Aliens and victims whose benefits ceased in prior fiscal years**

Subject to clause (ii), beginning on September 30, 2008, any qualified alien (as defined in section 1641(b) of this title) or victim of trafficking in persons (as defined in section 7105(b)(1)(C) of Title 22 or as granted status under section 101(a)(15)(T)(ii) of the Immigration and Nationality Act) rendered ineligible for the specified Federal program described in paragraph (3)(A) during the period beginning on August 22, 1996, and ending on September 30, 2008, solely by reason of the termination of the 7-year period described in subparagraph (A) shall be eligible for such program for an additional 2-year period in accordance with this clause, if such qualified alien or victim of trafficking meets all other eligibility factors under title XVI of the Social Security Act, furnishes to the Commissioner of Social Security the declaration required under subclause (IV) (if applicable), and is described in subclause (III).

**(III) Aliens and victims described**

For purposes of subclauses (I) and (II), a qualified alien or victim of trafficking described in this subclause is an alien or victim who--

**(aa)** has been a lawful permanent resident for less than 6 years and such status has not been abandoned, rescinded under section 246 of the Immigration and Nationality Act, or terminated through removal proceedings under section 240 of the Immigration and Nationality Act, and the Commissioner of Social Security has verified such status, through procedures established in consultation with the Secretary of Homeland Security;

**(bb)** has filed an application, within 4 years from the date the alien or victim began receiving supplemental security income benefits, to become a lawful permanent resident with the Secretary of Homeland Security, and the Commissioner of Social Security has verified, through procedures established in consultation with such Secretary, that such application is pending;

**(cc)** has been granted the status of Cuban and Haitian entrant, as defined in section 501(e) of the Refugee Education Assistance Act of 1980 (Public Law 96-422), for purposes of the specified Federal program described in paragraph (3)(A);

**(dd)** has had his or her deportation withheld by the Secretary of Homeland Security under section 243(h) of the Immigration and Nationality Act (as in effect immediately before the effective date of section 307 of division C of Public Law 104-208), or whose removal is withheld under section 241(b)(3) of such Act;

**(ee)** has not attained age 18; or

**(ff)** has attained age 70.

**(IV) Declaration required**

**(aa) In general**

For purposes of subclauses (I) and (II), the declaration required under this subclause of a qualified alien or victim of trafficking described in either such subclause is a declaration under penalty of perjury stating that the alien or victim has made a good faith effort to pursue United States citizenship, as determined by the Secretary of Homeland Security. The Commissioner of Social Security shall develop criteria as needed, in consultation with the Secretary of Homeland Security, for consideration of such declarations.

**(bb) Exception for children**

A qualified alien or victim of trafficking described in subclause (I) or (II) who has not attained age 18 shall not be required to furnish to the Commissioner of Social Security a declaration described in item (aa) as a condition of being eligible for the specified Federal program described in paragraph (3)(A) for an additional 2-year period in accordance with this clause.

**(V) Payment of benefits to aliens whose benefits ceased in prior fiscal years**

Benefits paid to a qualified alien or victim described in subclause (II) shall be paid prospectively over the duration of the qualified alien's or victim's renewed eligibility.

**(ii) Special rule in case of pending or approved naturalization application**

With respect to eligibility for benefits for the specified program described in paragraph (3)(A), paragraph (1) shall not apply during fiscal years 2009 through 2011 to an alien described in one of clauses (i) through (v) of subparagraph (A) or a victim of trafficking in persons (as defined in section 7105(b)(1)(C) of Title 22 or as granted status under section 101(a)(15)(T)(ii) of the Immigration and Nationality Act), if such alien or victim (including any such alien or victim rendered ineligible for the specified Federal program described in paragraph (3)(A) during the period beginning on August 22, 1996, and ending on September 30, 2008, solely by reason of the termination of the 7-year period described in subparagraph (A)) has filed an application for naturalization that is pending before the Secretary of Homeland Security or a United States district court based on section 336(b) of the Immigration and Nationality Act, or has been approved for naturalization but not yet sworn in as a United States citizen, and the Commissioner of Social Security has verified, through procedures established in consultation with the Secretary of Homeland Security, that such application is pending or has been approved.

**(3) "Specified Federal program" defined**

For purposes of this chapter, the term "specified Federal program" means any of the following:

**(A) SSI**

The supplemental security income program under title XVI of the Social Security Act, including supplementary payments pursuant to an agreement for Federal administration under section 1616(a) of the Social Security Act and payments pursuant to an agreement entered into under section 212(b) of Public Law 93-66.

**(B) Food stamps**

The food stamp program as defined in section 3(l) of the Food Stamp Act of 1977.

## (b) Limited eligibility for designated Federal programs

### (1) In general

Notwithstanding any other provision of law and except as provided in section 1613 of this title and paragraph (2), a State is authorized to determine the eligibility of an alien who is a qualified alien (as defined in section 1641 of this title) for any designated Federal program (as defined in paragraph (3)).

### (2) Exceptions

Qualified aliens under this paragraph shall be eligible for any designated Federal program.

#### (A) Time-limited exception for refugees and asylees

##### (i) Medicaid

With respect to the designated Federal program described in paragraph (3)(C), paragraph (1) shall not apply to an alien until 7 years after the date--

**(I)** an alien is admitted to the United States as a refugee under section 207 of the Immigration and Nationality Act;

**(II)** an alien is granted asylum under section 208 of such Act;

**(III)** an alien's deportation is withheld under section 243(h) of such Act (as in effect immediately before the effective date of section 307 of division C of Public Law 104-208) or section 241(b)(3) of such Act (as amended by section 305(a) of division C of Public Law 104-208);

**(IV)** an alien is granted status as a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980); or

**(V)** an alien [2] admitted to the United States as an Amerasian immigrant as described in subsection (a)(2)(A)(i)(V) until 5 years after the date of such alien's entry into the United States.

##### (ii) Other designated Federal programs

With respect to the designated Federal programs under paragraph (3) (other than subparagraph (C)), paragraph (1) shall not apply to an alien until 5 years after the date--

**(I)** an alien is admitted to the United States as a refugee under section 207 of the Immigration and Nationality Act;

**(II)** an alien is granted asylum under section 208 of such Act;

**(III)** an alien's deportation is withheld under section 243(h) of such Act (as in effect immediately before the effective date of section 307 of division C of Public Law 104-208) or section 241(b)(3) of such Act (as amended by section 305(a) of division C of Public Law 104-208);

**(IV)** an alien is granted status as a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980); or

**(V)** an alien [2] admitted to the United States as an Amerasian immigrant as described in subsection (a)(2)(A)(i)(V) until 5 years after the date of such alien's entry into the United States.

## (B) Certain permanent resident aliens

An alien who--

**(i)** is lawfully admitted to the United States for permanent residence under the Immigration and Nationality Act; and

**(ii)** (I) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters as provided under section 1645 of this title, and (II) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 1613 of this title) during any such period.

## (C) Veteran and active duty exception

An alien who is lawfully residing in any State and is--

**(i)** a veteran (as defined in section 101, 1101, or 1301, or as described in section 107 of Title 38) with a discharge characterized as an honorable discharge and not on account of alienage and who fulfills the minimum active-duty service requirements of section 5303A(d) of Title 38,

**(ii)** on active duty (other than active duty for training) in the Armed Forces of the United States, or

AR.00993

**(iii)** the spouse or unmarried dependent child of an individual described in clause (i) or (ii) or the unremarried surviving spouse of an individual described in clause (i) or (ii) who is deceased if the marriage fulfills the requirements of section 1304 of Title 38.

**(D) Transition for those currently receiving benefits**

An alien who on August 22, 1996, is lawfully residing in any State and is receiving benefits under such program on August 22, 1996, shall continue to be eligible to receive such benefits until January 1, 1997.

**(E) Medicaid exception for certain Indians**

With respect to eligibility for benefits for the program defined in paragraph (3)(C) (relating to the medicaid program), section 1611(a) of this title and paragraph (1) shall not apply to any individual described in subsection (a)(2)(G).

**(F) Medicaid exception for aliens receiving SSI**

An alien who is receiving benefits under the program defined in subsection (a)(3)(A) (relating to the supplemental security income program) shall be eligible for medical assistance under a State plan under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.) under the same terms and conditions that apply to other recipients of benefits under the program defined in such subsection.

**(3) "Designated Federal program" defined**

For purposes of this chapter, the term "designated Federal program" means any of the following:

**(A) Temporary assistance for needy families**

The program of block grants to States for temporary assistance for needy families under part A of title IV of the Social Security Act.

**(B) Social services block grant**

The program of block grants to States for social services under title XX of the Social Security Act.

**(C) Medicaid**

A State plan approved under title XIX of the Social Security Act, other than medical assistance described in section 1611(b)(1)(A) of this title.

**CREDIT(S)**

(Pub.L. 104-193, Title IV, § 402, Aug. 22, 1996, 110 Stat. 2262; Pub.L. 104-208, Div. C, Title V, § 510, Sept. 30, 1996, 110 Stat. 3009-673; Pub.L. 105-18, Title II, § 6005(a), June 12, 1997, 111 Stat. 191; Pub.L. 105-33, Title V, §§ 5301 to 5302(b),

5303(a), (b), 5304, 5305(b), 5306(a), (b), 5562, 5563, Aug. 5, 1997, 111 Stat. 597, 598, 600 to 602, 638; Pub.L. 105-185, Title V, §§ 503 to 508, June 23, 1998, 112 Stat. 578, 579; Pub.L. 107-171, Title IV, § 4401(a), (b)(1), (c)(1), May 13, 2002, 116 Stat. 333; Pub.L. 110-234, Title IV, § 4115(c)(2)(D), May 22, 2008, 122 Stat. 1110; Pub.L. 110-246, § 4(a), Title IV, § 4115(c)(2)(D), June 18, 2008, 122 Stat. 1664, 1871; Pub.L. 110-328, § 2, Sept. 30, 2008, 122 Stat. 3567.)

Notes of Decisions (18)

### Footnotes

1    So in original. Probably should be "2012(j))).".
2    So in original. Probably should be "alien is".

8 U.S.C.A. § 1612, 8 USCA § 1612

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                                                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
   Chapter 14. Restricting Welfare and Public Benefits for Aliens
    Subchapter II. Eligibility for State and Local Public Benefits Programs

---

8 U.S.C.A. § 1621

§ 1621. Aliens who are not qualified aliens or nonimmigrants ineligible for State and local public benefits

Effective: October 28, 1998
Currentness

**(a) In general**

Notwithstanding any other provision of law and except as provided in subsections (b) and (d), an alien who is not--

  **(1)** a qualified alien (as defined in section 1641 of this title),

  **(2)** a nonimmigrant under the Immigration and Nationality Act, or

  **(3)** an alien who is paroled into the United States under section 212(d)(5) of such Act for less than one year,

is not eligible for any State or local public benefit (as defined in subsection (c)).

**(b) Exceptions**

Subsection (a) shall not apply with respect to the following State or local public benefits:

  **(1)** Assistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b(v)(3) of Title 42) of the alien involved and are not related to an organ transplant procedure.

  **(2)** Short-term, non-cash, in-kind emergency disaster relief.

  **(3)** Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

  **(4)** Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with

---

appropriate Federal agencies and departments, which (A) deliver in-kind services at the community level, including through public or private nonprofit agencies; (B) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (C) are necessary for the protection of life or safety.

**(c) "State or local public benefit" defined**

**(1)** Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means--

**(A)** any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

**(B)** any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government.

**(2)** Such term shall not apply--

**(A)** to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;

**(B)** with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Secretary of State, after consultation with the Attorney General; or

**(C)** to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

**(3)** Such term does not include any Federal public benefit under section 1611(c) of this title.

**(d) State authority to provide for eligibility of illegal aliens for State and local public benefits**

A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

### CREDIT(S)

(Pub.L. 104-193, Title IV, § 411, Aug. 22, 1996, 110 Stat. 2268; Pub.L. 105-33, Title V, §§ 5565, 5581(b)(1), Aug. 5, 1997, 111 Stat. 639, 642; Pub.L. 105-306, § 5(b), Oct. 28, 1998, 112 Stat. 2927.)

AR.00997

Notes of Decisions (6)

8 U.S.C.A. § 1621, 8 USCA § 1621
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 14. Restricting Welfare and Public Benefits for Aliens
      Subchapter II. Eligibility for State and Local Public Benefits Programs

8 U.S.C.A. § 1622

§ 1622. State authority to limit eligibility of qualified aliens for State public benefits

Effective: August 5, 1997

Currentness

**(a) In general**

Notwithstanding any other provision of law and except as provided in subsection (b), a State is authorized to determine the eligibility for any State public benefits of an alien who is a qualified alien (as defined in section 1641 of this title), a nonimmigrant under the Immigration and Nationality Act, or an alien who is paroled into the United States under section 212(d)(5) of such Act for less than one year.

**(b) Exceptions**

Qualified aliens under this subsection shall be eligible for any State public benefits.

**(1) Time-limited exception for refugees and asylees**

**(A)** An alien who is admitted to the United States as a refugee under section 207 of the Immigration and Nationality Act until 5 years after the date of an alien's entry into the United States.

**(B)** An alien who is granted asylum under section 208 of such Act until 5 years after the date of such grant of asylum.

**(C)** An alien whose deportation is being withheld under section 243(h) of such Act (as in effect immediately before the effective date of section 307 of division C of Public Law 104-208) or section 241(b)(3) of such Act (as amended by section 305(a) of division C of Public Law 104-208) until 5 years after such withholding.

**(D)** An alien who is a Cuban and Haitian entrant as defined in section 501(e) of the Refugee Education Assistance Act of 1980 until 5 years after the alien is granted such status.

**(E)** An alien admitted to the United States as an Amerasian immigrant as described in section 1612(a)(2)(A)(i)(V) of this title.

**(2) Certain permanent resident aliens**

An alien who--

(A) is lawfully admitted to the United States for permanent residence under the Immigration and Nationality Act; and

(B) (i) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters as provided under section 1645 of this title, and (ii) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 1613 of this title) during any such period.

**(3) Veteran and active duty exception**

An alien who is lawfully residing in any State and is--

(A) a veteran (as defined in section 101, 1101, or 1301, or as described in section 107 of Title 38) with a discharge characterized as an honorable discharge and not on account of alienage and who fulfills the minimum active-duty service requirements of section 5303A(d) of Title 38,

(B) on active duty (other than active duty for training) in the Armed Forces of the United States, or

(C) the spouse or unmarried dependent child of an individual described in subparagraph (A) or (B) or the unremarried surviving spouse of an individual described in clause (i) or (ii) [1] who is deceased if the marriage fulfills the requirements of section 1304 of Title 38.

**(4) Transition for those currently receiving benefits**

An alien who on August 22, 1996, is lawfully residing in any State and is receiving benefits on August 22, 1996, shall continue to be eligible to receive such benefits until January 1, 1997.

**CREDIT(S)**

(Pub.L. 104-193, Title IV, § 412, Aug. 22, 1996, 110 Stat. 2269; Pub.L. 105-33, Title V, §§ 5302(c)(2), 5306(d), 5562, 5563, 5581(b)(3), Aug. 5, 1997, 111 Stat. 599, 602, 638, 643.)

**Footnotes**

1        So in original. Probably should be "subparagraph (A) or (B)".

8 U.S.C.A. § 1622, 8 USCA § 1622

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 26. Criminal Street Gangs

18 U.S.C.A. § 521

§ 521. Criminal street gangs

Effective: December 21, 2018
Currentness

**(a) Definitions.--**

"conviction" includes a finding, under State or Federal law, that a person has committed an act of juvenile delinquency involving a violent or controlled substances felony.

"criminal street gang" means an ongoing group, club, organization, or association of 5 or more persons--

**(A)** that has as 1 of its primary purposes the commission of 1 or more of the criminal offenses described in subsection (c);

**(B)** the members of which engage, or have engaged within the past 5 years, in a continuing series of offenses described in subsection (c); and

**(C)** the activities of which affect interstate or foreign commerce.

"State" means a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(b) Penalty.--**The sentence of a person convicted of an offense described in subsection (c) shall be increased by up to 10 years if the offense is committed under the circumstances described in subsection (d).

**(c) Offenses.--**The offenses described in this section are--

**(1)** a Federal felony involving a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which the maximum penalty is not less than 5 years;

**(2)** a Federal felony crime of violence that has as an element the use or attempted use of physical force against the person of another;

**(3)** a Federal offense involving human trafficking, sexual abuse, sexual exploitation, or transportation for prostitution or any illegal sexual activity; and

**(4)** a conspiracy to commit an offense described in paragraph (1), (2), or (3).

**(d) Circumstances.**--The circumstances described in this section are that the offense described in subsection (c) was committed by a person who--

**(1)** participates in a criminal street gang with knowledge that its members engage in or have engaged in a continuing series of offenses described in subsection (c);

**(2)** intends to promote or further the felonious activities of the criminal street gang or maintain or increase his or her position in the gang; and

**(3)** has been convicted within the past 5 years for--

**(A)** an offense described in subsection (c);

**(B)** a State offense--

**(i)** involving a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which the maximum penalty is not less than 5 years' imprisonment; or

**(ii)** that is a felony crime of violence that has as an element the use or attempted use of physical force against the person of another;

**(C)** any Federal or State felony offense that by its nature involves a substantial risk that physical force against the person of another may be used in the course of committing the offense; or

**(D)** a conspiracy to commit an offense described in subparagraph (A), (B), or (C).

<div align="center">

**CREDIT(S)**

</div>

(Added Pub.L. 103-322, Title XV, § 150001(a), Sept. 13, 1994, 108 Stat. 2034; amended Pub.L. 104-294, Title VI, § 607(q), Oct. 11, 1996, 110 Stat. 3513; Pub.L. 107-273, Div. B, Title IV, § 4002(b)(3), Nov. 2, 2002, 116 Stat. 1807; Pub.L. 115-392, § 12, Dec. 21, 2018, 132 Stat. 5255.)

Notes of Decisions (3)

18 U.S.C.A. § 521, 18 USCA § 521
Current through P.L. 116-188. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 921

§ 921. Definitions

Effective: February 1, 2019

Currentness

**(a)** As used in this chapter--

**(1)** The term "person" and the term "whoever" include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

**(2)** The term "interstate or foreign commerce" includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, but such term does not include commerce between places within the same State but through any place outside of that State. The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

**(3)** The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**(4)** The term "destructive device" means--

   **(A)** any explosive, incendiary, or poison gas--

      **(i)** bomb,

      **(ii)** grenade,

      **(iii)** rocket having a propellant charge of more than four ounces,

      **(iv)** missile having an explosive or incendiary charge of more than one-quarter ounce,

**(v)** mine, or

**(vi)** device similar to any of the devices described in the preceding clauses;

**(B)** any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

**(C)** any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

**(5)** The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

**(6)** The term "short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches.

**(7)** The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

**(8)** The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

**(9)** The term "importer" means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term "licensed importer" means any such person licensed under the provisions of this chapter.

**(10)** The term "manufacturer" means any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

AR.01006

**(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

**(12)** The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money.

**(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

**(14)** The term "indictment" includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

**(15)** The term "fugitive from justice" means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

**(16)** The term "antique firearm" means--

**(A)** any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or

**(B)** any replica of any firearm described in subparagraph (A) if such replica--

**(i)** is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

**(ii)** uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

**(C)** any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

**(17)(A)** The term "ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.

**(B)** The term "armor piercing ammunition" means--

**(i)** a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

**(ii)** a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

**(C)** The term "armor piercing ammunition" does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

**(18)** The term "Attorney General" means the Attorney General of the United States [1]

**(19)** The term "published ordinance" means a published law of any political subdivision of a State which the Attorney General determines to be relevant to the enforcement of this chapter and which is contained on a list compiled by the Attorney General, which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this chapter.

**(20)** The term "crime punishable by imprisonment for a term exceeding one year" does not include--

**(A)** any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

**(B)** any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(21)** The term "engaged in the business" means--

**(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

**(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;

**(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

**(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which--

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended--

**(i)** to intimidate or coerce a civilian population;

**(ii)** to influence the policy of a government by intimidation or coercion; or

**(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

**(24)** The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

**(25)** The term "school zone" means--

    **(A)** in, or on the grounds of, a public, parochial or private school; or

    **(B)** within a distance of 1,000 feet from the grounds of a public, parochial or private school.

**(26)** The term "school" means a school which provides elementary or secondary education, as determined under State law.

**(27)** The term "motor vehicle" has the meaning given such term in section 13102 of title 49, United States Code.

**(28)** The term "semiautomatic rifle" means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

**(29)** The term "handgun" means--

    **(A)** a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and

    **(B)** any combination of parts from which a firearm described in subparagraph (A) can be assembled.

**[(30), (31)** Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000.]

**(32)** The term "intimate partner" means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person.

**(33)(A)** Except as provided in subparagraph (C), [2] the term "misdemeanor crime of domestic violence" means an offense that--

    **(i)** is a misdemeanor under Federal, State, or Tribal [3] law; and

    **(ii)** has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

**(B)(i)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless--

**(I)** the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

**(II)** in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

**(aa)** the case was tried by a jury, or

**(bb)** the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

**(ii)** A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

**(34)** The term "secure gun storage or safety device" means--

**(A)** a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;

**(B)** a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or

**(C)** a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

**(35)** The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.

**(b)** For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

<div align="center">

**CREDIT(S)**

</div>

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 226; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1214; Pub.L. 93-639, § 102, Jan. 4, 1975, 88 Stat. 2217; Pub.L. 99-308, § 101, May 19, 1986, 100 Stat. 449; Pub.L. 99-360, § 1(b), July 8, 1986, 100 Stat. 766; Pub.L. 99-408, § 1, Aug. 28, 1986, 100 Stat. 920; Pub.L. 101-647, Title XVII, §

1702(b)(2), Title XXII, § 2204(a), Nov. 29, 1990, 104 Stat. 4845, 4857; Pub.L. 103-159, Title I, § 102(a)(2), Nov. 30, 1993, 107 Stat. 1539; Pub.L. 103-322, Title XI, §§ 110102(b), 110103(b), 110105(2), 110401(a), 110519, Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1997, 1999, 2000, 2014, 2020, 2150; Pub.L. 104-88, Title III, § 303(1), Dec. 29, 1995, 109 Stat. 943; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, § 658(a)], Sept. 30, 1996, 110 Stat. 3009-314, 3009-371; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 119(a)], (h) [Title I, § 115], Oct. 21, 1998, 112 Stat. 2681-50, 2681-69, 2681-480, 2681-490; Pub.L. 107-273, Div. C, Title I, § 11009(e)(1), Nov. 2, 2002, 116 Stat. 1821; Pub.L. 107-296, Title XI, § 1112(f)(1) to (3), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-162, Title IX, § 908(a), Jan. 5, 2006, 119 Stat. 3083; Pub.L. 115-232, Div. A, Title VIII, § 809(e)(2), Aug. 13, 2018, 132 Stat. 1842.)

Notes of Decisions (283)

# Footnotes

1    So in original. Probably should be followed by a period.
2    So in original. No subparagraph (C) was enacted in subsec. (a)(33).
3    So in original. Probably should not be capitalized.

18 U.S.C.A. § 921, 18 USCA § 921

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Unconstitutional as Applied by  Miller v. Sessions,  E.D.Pa.,  Feb. 04, 2019

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
Title 18. Crimes and Criminal Procedure (Refs & Annos)
Part I. Crimes (Refs & Annos)
Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 922

§ 922. Unlawful acts

Effective: December 4, 2015

Currentness

**(a)** It shall be unlawful--

**(1)** for any person--

**(A)** except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

**(B)** except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

**(2)** for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, except that--

**(A)** this paragraph and subsection (b)(3) shall not be held to preclude a licensed importer, licensed manufacturer, licensed dealer, or licensed collector from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received; and this paragraph shall not be held to preclude an individual from mailing a firearm owned in compliance with Federal, State, and local law to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector;

**(B)** this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of this title, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty; and

**(C)** nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States;

**(3)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;

**(4)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

**(5)** for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

**(6)** for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter;

**(7)** for any person to manufacture or import armor piercing ammunition, unless--

**(A)** the manufacture of such ammunition is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

**(B)** the manufacture of such ammunition is for the purpose of exportation; or

**(C)** the manufacture or importation of such ammunition is for the purpose of testing or experimentation and has been authorized by the Attorney General;

**(8)** for any manufacturer or importer to sell or deliver armor piercing ammunition, unless such sale or delivery--

**(A)** is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

**(B)** is for the purpose of exportation; or

**(C)** is for the purpose of testing or experimentation and has been authorized by the Attorney General; [1]

**(9)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.

**(b)** It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

**(1)** any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

**(2)** any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance;

**(3)** any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

**(4)** to any person any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity; and

**(5)** any firearm or armor-piercing ammunition to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, licensed dealers, and licensed collectors. Paragraph (4) of this subsection shall not apply to a sale or delivery to any research organization designated by the Attorney General.

**(c)** In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if--

 **(1)** the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are ............................................................................................................................

          Signature ........ Date ........"

 and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

 **(2)** the transferor has, prior to the shipment or delivery of the firearm, forwarded by registered or certified mail (return receipt requested) a copy of the sworn statement, together with a description of the firearm, in a form prescribed by the Attorney General, to the chief law enforcement officer of the transferee's place of residence, and has received a return receipt evidencing delivery of the statement or has had the statement returned due to the refusal of the named addressee to accept such letter in accordance with United States Post Office Department regulations; and

 **(3)** the transferor has delayed shipment or delivery for a period of at least seven days following receipt of the notification of the acceptance or refusal of delivery of the statement.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer, together with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 923(g).

**(d)** It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person--

 **(1)** is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

 **(2)** is a fugitive from justice;

**(3)** is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

**(4)** has been adjudicated as a mental defective or has been committed to any mental institution;

**(5)** who, being an alien--

**(A)** is illegally or unlawfully in the United States; or

**(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who [2] has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that--

**(A)** was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

**(B)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** has been convicted in any court of a misdemeanor crime of domestic violence.

This subsection shall not apply with respect to the sale or disposition of a firearm or ammunition to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms or ammunition, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

**(e)** It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who

owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter. No common or contract carrier shall require or cause any label, tag, or other written notice to be placed on the outside of any package, luggage, or other container that such package, luggage, or other container contains a firearm.

**(f)(1)** It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

**(2)** It shall be unlawful for any common or contract carrier to deliver in interstate or foreign commerce any firearm without obtaining written acknowledgement of receipt from the recipient of the package or other container in which there is a firearm.

**(g)** It shall be unlawful for any person--

**(1)** who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

**(2)** who is a fugitive from justice;

**(3)** who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

**(4)** who has been adjudicated as a mental defective or who has been committed to a mental institution;

**(5)** who, being an alien--

**(A)** is illegally or unlawfully in the United States; or

**(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** who is subject to a court order that--

**(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

**(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

**(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** who has been convicted in any court of a misdemeanor crime of domestic violence,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(h)** It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment--

**(1)** to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

**(2)** to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(i)** It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**(j)** It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**(k)** It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

**(l)** Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

**(m)** It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

**(n)** It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(o)(1)** Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

**(2)** This subsection does not apply with respect to--

  **(A)** a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

  **(B)** any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

**(p)(1)** It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm--

  **(A)** that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

  **(B)** any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

**(2)** For purposes of this subsection--

  **(A)** the term "firearm" does not include the frame or receiver of any such weapon;

  **(B)** the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and

  **(C)** the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is--

    **(i)** constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and

AR.01020

**(ii)** suitable for testing and calibrating metal detectors:

*Provided, however,* That at the close of such 12-month period, and at appropriate times thereafter the Attorney General shall promulgate regulations to permit the manufacture, importation, sale, shipment, delivery, possession, transfer, or receipt of firearms previously prohibited under this subparagraph that are as detectable as a "Security Exemplar" which contains 3.7 ounces of material type 17-4 PH stainless steel, in a shape resembling a handgun, or such lesser amount as is detectable in view of advances in state-of-the-art developments in weapons detection technology.

**(3)** Under such rules and regulations as the Attorney General shall prescribe, this subsection shall not apply to the manufacture, possession, transfer, receipt, shipment, or delivery of a firearm by a licensed manufacturer or any person acting pursuant to a contract with a licensed manufacturer, for the purpose of examining and testing such firearm to determine whether paragraph (1) applies to such firearm. The Attorney General shall ensure that rules and regulations adopted pursuant to this paragraph do not impair the manufacture of prototype firearms or the development of new technology.

**(4)** The Attorney General shall permit the conditional importation of a firearm by a licensed importer or licensed manufacturer, for examination and testing to determine whether or not the unconditional importation of such firearm would violate this subsection.

**(5)** This subsection shall not apply to any firearm which--

**(A)** has been certified by the Secretary of Defense or the Director of Central Intelligence, after consultation with the Attorney General and the Administrator of the Federal Aviation Administration, as necessary for military or intelligence applications; and

**(B)** is manufactured for and sold exclusively to military or intelligence agencies of the United States.

**(6)** This subsection shall not apply with respect to any firearm manufactured in, imported into, or possessed in the United States before the date of the enactment of the Undetectable Firearms Act of 1988.

**(q)(1)** The Congress finds and declares that--

**(A)** crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

**(B)** crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

**(C)** firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the [3] House of Representatives and the Committee on the Judiciary of the Senate;

**(D)** in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

**(E)** while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

**(F)** the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

**(G)** this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

**(H)** States, localities, and school systems find it almost impossible to handle gun-related crime by themselves--even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

**(I)** the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

**(2)(A)** It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

**(B)** Subparagraph (A) does not apply to the possession of a firearm--

**(i)** on private property not part of school grounds;

**(ii)** if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

**(iii)** that is--

**(I)** not loaded; and

**(II)** in a locked container, or a locked firearms rack that is on a motor vehicle;

**(iv)** by an individual for use in a program approved by a school in the school zone;

**(v)** by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

**(vi)** by a law enforcement officer acting in his or her official capacity; or

**(vii)** that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

**(3)(A)** Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

**(B)** Subparagraph (A) does not apply to the discharge of a firearm--

**(i)** on private property not part of school grounds;

**(ii)** as part of a program approved by a school in the school zone, by an individual who is participating in the program;

**(iii)** by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

**(iv)** by a law enforcement officer acting in his or her official capacity.

**(4)** Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.

**(r)** It shall be unlawful for any person to assemble from imported parts any semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation under section 925(d)(3) of this chapter as not being particularly suitable for or readily adaptable to sporting purposes except that this subsection shall not apply to--

**(1)** the assembly of any such rifle or shotgun for sale or distribution by a licensed manufacturer to the United States or any department or agency thereof or to any State or any department, agency, or political subdivision thereof; or

**(2)** the assembly of any such rifle or shotgun for the purposes of testing or experimentation authorized by the Attorney General.

**(s)(1)** Beginning on the date that is 90 days after the date of enactment of this subsection and ending on the day before the date that is 60 months after such date of enactment, it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer a handgun (other than the return of a handgun to the person from whom it was received) to an individual who is not licensed under section 923, unless--

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**(A)** after the most recent proposal of such transfer by the transferee--

**(i)** the transferor has--

**(I)** received from the transferee a statement of the transferee containing the information described in paragraph (3);

**(II)** verified the identity of the transferee by examining the identification document presented;

**(III)** within 1 day after the transferee furnishes the statement, provided notice of the contents of the statement to the chief law enforcement officer of the place of residence of the transferee; and

**(IV)** within 1 day after the transferee furnishes the statement, transmitted a copy of the statement to the chief law enforcement officer of the place of residence of the transferee; and

**(ii)(I)** 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

**(II)** the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law;

**(B)** the transferee has presented to the transferor a written statement, issued by the chief law enforcement officer of the place of residence of the transferee during the 10-day period ending on the date of the most recent proposal of such transfer by the transferee, stating that the transferee requires access to a handgun because of a threat to the life of the transferee or of any member of the household of the transferee;

**(C)(i)** the transferee has presented to the transferor a permit that--

**(I)** allows the transferee to possess or acquire a handgun; and

**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and

**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of the law;

**(D)** the law of the State requires that, before any licensed importer, licensed manufacturer, or licensed dealer completes the transfer of a handgun to an individual who is not licensed under section 923, an authorized government official verify that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of law;

**(E)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

**(F)** on application of the transferor, the Attorney General has certified that compliance with subparagraph (A)(i)(III) is impracticable because--

**(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

**(ii)** the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

**(iii)** there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

**(2)** A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General.

**(3)** The statement referred to in paragraph (1)(A)(i)(I) shall contain only--

**(A)** the name, address, and date of birth appearing on a valid identification document (as defined in section 1028(d)(1)) of the transferee containing a photograph of the transferee and a description of the identification used;

**(B)** a statement that the transferee--

**(i)** is not under indictment for, and has not been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year, and has not been convicted in any court of a misdemeanor crime of domestic violence;

**(ii)** is not a fugitive from justice;

**(iii)** is not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act);

**(iv)** has not been adjudicated as a mental defective or been committed to a mental institution;

**(v)** is not an alien who--

    **(I)** is illegally or unlawfully in the United States; or

    **(II)** subject to subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(vi)** has not been discharged from the Armed Forces under dishonorable conditions; and

**(vii)** is not a person who, having been a citizen of the United States, has renounced such citizenship;

**(C)** the date the statement is made; and

**(D)** notice that the transferee intends to obtain a handgun from the transferor.

**(4)** Any transferor of a handgun who, after such transfer, receives a report from a chief law enforcement officer containing information that receipt or possession of the handgun by the transferee violates Federal, State, or local law shall, within 1 business day after receipt of such request, communicate any information related to the transfer that the transferor has about the transfer and the transferee to--

    **(A)** the chief law enforcement officer of the place of business of the transferor; and

    **(B)** the chief law enforcement officer of the place of residence of the transferee.

**(5)** Any transferor who receives information, not otherwise available to the public, in a report under this subsection shall not disclose such information except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

**(6)(A)** Any transferor who sells, delivers, or otherwise transfers a handgun to a transferee shall retain the copy of the statement of the transferee with respect to the handgun transaction, and shall retain evidence that the transferor has complied with subclauses (III) and (IV) of paragraph (1)(A)(i) with respect to the statement.

**(B)** Unless the chief law enforcement officer to whom a statement is transmitted under paragraph (1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law--

    **(i)** the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III);

**(ii)** the information contained in the statement shall not be conveyed to any person except a person who has a need to know in order to carry out this subsection; and

**(iii)** the information contained in the statement shall not be used for any purpose other than to carry out this subsection.

**(C)** If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request.

**(7)** A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection shall not be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a handgun.

**(8)** For purposes of this subsection, the term "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

**(9)** The Attorney General shall take necessary actions to ensure that the provisions of this subsection are published and disseminated to licensed dealers, law enforcement officials, and the public.

**(t)(1)** Beginning on the date that is 30 days after the Attorney General notifies licensees under section 103(d) of the Brady Handgun Violence Prevention Act that the national instant criminal background check system is established, a licensed importer, licensed manufacturer, or licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless--

**(A)** before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

**(B)(i)** the system provides the licensee with a unique identification number; or

**(ii)** 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section; and

**(C)** the transferor has verified the identity of the transferee by examining a valid identification document (as defined in section 1028(d) of this title) of the transferee containing a photograph of the transferee.

**(2)** If receipt of a firearm would not violate subsection (g) or (n) or State law, the system shall--

   **(A)** assign a unique identification number to the transfer;

   **(B)** provide the licensee with the number; and

   **(C)** destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

**(3)** Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if--

   **(A)(i)** such other person has presented to the licensee a permit that--

      **(I)** allows such other person to possess or acquire a firearm; and

      **(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and

   **(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;

   **(B)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

   **(C)** on application of the transferor, the Attorney General has certified that compliance with paragraph (1)(A) is impracticable because--

      **(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

      **(ii)** the business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer (as defined in subsection (s)(8)); and

      **(iii)** there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

**(4)** If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer.

**(5)** If the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer and, at the time such other person most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that receipt of a firearm by such other person would violate subsection (g) or (n) of this section or State law, the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000.

**(6)** Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

**(u)** It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce.

**[(v), (w)** Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000.]

**(x)(1)** It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile--

**(A)** a handgun; or

**(B)** ammunition that is suitable for use only in a handgun.

**(2)** It shall be unlawful for any person who is a juvenile to knowingly possess--

**(A)** a handgun; or

**(B)** ammunition that is suitable for use only in a handgun.

**(3)** This subsection does not apply to--

**(A)** a temporary transfer of a handgun or ammunition to a juvenile or to the possession or use of a handgun or ammunition by a juvenile if the handgun and ammunition are possessed and used by the juvenile--

(i) in the course of employment, in the course of ranching or farming related to activities at the residence of the juvenile (or on property used for ranching or farming at which the juvenile, with the permission of the property owner or lessee, is performing activities related to the operation of the farm or ranch), target practice, hunting, or a course of instruction in the safe and lawful use of a handgun;

(ii) with the prior written consent of the juvenile's parent or guardian who is not prohibited by Federal, State, or local law from possessing a firearm, except--

(I) during transportation by the juvenile of an unloaded handgun in a locked container directly from the place of transfer to a place at which an activity described in clause (i) is to take place and transportation by the juvenile of that handgun, unloaded and in a locked container, directly from the place at which such an activity took place to the transferor; or

(II) with respect to ranching or farming activities as described in clause (i), a juvenile may possess and use a handgun or ammunition with the prior written approval of the juvenile's parent or legal guardian and at the direction of an adult who is not prohibited by Federal, State or local law from possessing a firearm;

(iii) the juvenile has the prior written consent in the juvenile's possession at all times when a handgun is in the possession of the juvenile; and

(iv) in accordance with State and local law;

(B) a juvenile who is a member of the Armed Forces of the United States or the National Guard who possesses or is armed with a handgun in the line of duty;

(C) a transfer by inheritance of title (but not possession) of a handgun or ammunition to a juvenile; or

(D) the possession of a handgun or ammunition by a juvenile taken in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest.

(4) A handgun or ammunition, the possession of which is transferred to a juvenile in circumstances in which the transferor is not in violation of this subsection shall not be subject to permanent confiscation by the Government if its possession by the juvenile subsequently becomes unlawful because of the conduct of the juvenile, but shall be returned to the lawful owner when such handgun or ammunition is no longer required by the Government for the purposes of investigation or prosecution.

(5) For purposes of this subsection, the term "juvenile" means a person who is less than 18 years of age.

(6)(A) In a prosecution of a violation of this subsection, the court shall require the presence of a juvenile defendant's parent or legal guardian at all proceedings.

**(B)** The court may use the contempt power to enforce subparagraph (A).

**(C)** The court may excuse attendance of a parent or legal guardian of a juvenile defendant at a proceeding in a prosecution of a violation of this subsection for good cause shown.

**(y) Provisions relating to aliens admitted under nonimmigrant visas.--**

**(1) Definitions.--**In this subsection--

**(A)** the term "alien" has the same meaning as in section 101(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a) (3)); and

**(B)** the term "nonimmigrant visa" has the same meaning as in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)).

**(2) Exceptions.--**Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is--

**(A)** admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;

**(B)** an official representative of a foreign government who is--

**(i)** accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; or

**(ii)** en route to or from another country to which that alien is accredited;

**(C)** an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; or

**(D)** a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business.

**(3) Waiver.--**

**(A) Conditions for waiver.--**Any individual who has been admitted to the United States under a nonimmigrant visa may receive a waiver from the requirements of subsection (g)(5), if--

**(i)** the individual submits to the Attorney General a petition that meets the requirements of subparagraph (C); and

**(ii)** the Attorney General approves the petition.

**(B) Petition.--**Each petition under subparagraph (B) shall--

**(i)** demonstrate that the petitioner has resided in the United States for a continuous period of not less than 180 days before the date on which the petition is submitted under this paragraph; and

**(ii)** include a written statement from the embassy or consulate of the petitioner, authorizing the petitioner to acquire a firearm or ammunition and certifying that the alien would not, absent the application of subsection (g)(5)(B), otherwise be prohibited from such acquisition under subsection (g).

**(C) Approval of petition.--**The Attorney General shall approve a petition submitted in accordance with this paragraph, if the Attorney General determines that waiving the requirements of subsection (g)(5)(B) with respect to the petitioner--

**(i)** would be in the interests of justice; and

**(ii)** would not jeopardize the public safety.

**(z) Secure gun storage or safety device.--**

**(1) In general.--**Except as provided under paragraph (2), it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer any handgun to any person other than any person licensed under this chapter, unless the transferee is provided with a secure gun storage or safety device (as defined in section 921(a)(34)) for that handgun.

**(2) Exceptions.--**Paragraph (1) shall not apply to--

**(A)(i)** the manufacture for, transfer to, or possession by, the United States, a department or agency of the United States, a State, or a department, agency, or political subdivision of a State, of a handgun; or

**(ii)** the transfer to, or possession by, a law enforcement officer employed by an entity referred to in clause (i) of a handgun for law enforcement purposes (whether on or off duty); or

**(B)** the transfer to, or possession by, a rail police officer directly employed by or contracted by a rail carrier and certified or commissioned as a police officer under the laws of a State of a handgun for purposes of law enforcement (whether on or off duty);

**(C)** the transfer to any person of a handgun listed as a curio or relic by the Secretary pursuant to section 921(a)(13); or

**(D)** the transfer to any person of a handgun for which a secure gun storage or safety device is temporarily unavailable for the reasons described in the exceptions stated in section 923(e), if the licensed manufacturer, licensed importer, or licensed dealer delivers to the transferee within 10 calendar days from the date of the delivery of the handgun to the transferee a secure gun storage or safety device for the handgun.

**(3) Liability for use.--**

**(A) In general.**--Notwithstanding any other provision of law, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, shall be entitled to immunity from a qualified civil liability action.

**(B) Prospective actions.**--A qualified civil liability action may not be brought in any Federal or State court.

**(C) Defined term.**--As used in this paragraph, the term "qualified civil liability action"--

**(i)** means a civil action brought by any person against a person described in subparagraph (A) for damages resulting from the criminal or unlawful misuse of the handgun by a third party, if--

**(I)** the handgun was accessed by another person who did not have the permission or authorization of the person having lawful possession and control of the handgun to have access to it; and

**(II)** at the time access was gained by the person not so authorized, the handgun had been made inoperable by use of a secure gun storage or safety device; and

**(ii)** shall not include an action brought against the person having lawful possession and control of the handgun for negligent entrustment or negligence per se.

**[APPENDIX A Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000]**

**CREDIT(S)**

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 228; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1216; Pub.L. 97-377, Title I, § 165(a), Dec. 21, 1982, 96 Stat. 1923; Pub.L. 99-308, § 102, May 19, 1986, 100 Stat. 451; Pub.L. 99-408, § 2, Aug. 28, 1986, 100 Stat. 920; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 100-649, § 2(a), (f)(2)(A), Nov. 10, 1988, 102 Stat. 3816, 3818; Pub.L. 100-690, Title VII, § 7060(c), Nov. 18, 1988, 102 Stat. 4404; Pub.L. 101-647, Title XVII, § 1702(b)(1), Title XXII, §§ 2201, 2202, 2204(b), Title XXXV, § 3524, Nov. 29, 1990, 104 Stat. 4844, 4856, 4857, 4924; Pub.L. 103-159, Title I, § 102(a)(1), (b), Title III, § 302(a) to (c), Nov. 30, 1993, 107 Stat. 1536, 1539, 1545; Pub.L. 103-322, Title XI, §§ 110102(a), 110103(a), 110105(2), 110106, 110201(a), 110401(b), (c), 110511, 110514, Title XXXII, §§ 320904, 320927, Title XXXIII, § 330011(i), Sept. 13, 1994, 108 Stat. 1996, 1998, 2000, 2010, 2014, 2019, 2125, 2131, 2145; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, §§ 657, 658(b)], Sept. 30, 1996, 110 Stat. 3009-314, 3009-369,

AR.01033

3009-372; Pub.L. 104-294, Title VI, § 603(b), (c)(1), (d) to (f)(1), (g), Oct. 11, 1996, 110 Stat. 3503, 3504; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 121], Oct. 21, 1998, 112 Stat. 2681-50, 2681-71; Pub.L. 107-273, Div. B, Title IV, § 4003(a)(1), Nov. 2, 2002, 116 Stat. 1811; Pub.L. 107-296, Title XI, § 1112(f)(4), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-92, §§ 5(c)(1), 6(a), Oct. 26, 2005, 119 Stat. 2099, 2101; Pub.L. 114-94, Div. A, Title XI, § 11412(c)(2), Dec. 4, 2015, 129 Stat. 1688.)

## REPEAL OF SUBSEC. (P)

<Pub.L. 100-649, § 2(f)(2)(A), Nov. 10, 1988, 102 Stat. 3818, as amended Pub.L. 105-277, Div. A, § 101(h) [Title VI, § 649], Oct. 21, 1998, 112 Stat. 2681-528; Pub.L. 108-174, § 1(1), Dec. 9, 2003, 117 Stat. 2481; Pub.L. 113-57, § 1, Dec. 9, 2013, 127 Stat. 656, provided that, effective 35 years after the 30th day beginning after Nov. 10, 1988 [see section 2(f)(1) of Pub.L. 100-649, set out as a note under this section], subsec. (p) of this section is repealed.>

## MEMORANDA OF PRESIDENT

### PRESIDENTIAL MEMORANDUM

Memorandum of the President of the United States, dated January 16, 2013, 78 F.R. 4295, authorizing the Secretary of Health and Human Services to conduct or sponsor research on the causes and prevention of gun violence, is set out as a note under 42 U.S.C.A. § 241.

### PRESIDENTIAL MEMORANDUM

Memorandum of the President of the United States, January 16, 2013, 78 F.R. 4301, directing the Heads of Executive Departments and Agencies to take steps to ensure that firearms recovered in the course of criminal investigations and taken into Federal custody are traced through ATF, is set out as a note under Chapter 44 of this title, see 18 U.S.C.A. prec. § 921.

Notes of Decisions (2454)

## Footnotes

1      So in original. Probably should be followed with "and".
2      So in original. The word "who" probably should not appear.
3      So in original. Probably should be "of the".
18 U.S.C.A. § 922, 18 USCA § 922
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Unconstitutional by    United States v. Davis,    U.S.,   June 24, 2019

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 924

§ 924. Penalties

Effective: December 21, 2018

Currentness

**(a)(1)** Except as otherwise provided in this subsection, subsection (b), (c), (f), or (p) of this section, or in section 929, whoever--

**(A)** knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

**(B)** knowingly violates subsection (a)(4), (f), (k), or (q) of section 922;

**(C)** knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(l); or

**(D)** willfully violates any other provision of this chapter,

shall be fined under this title, imprisoned not more than five years, or both.

**(2)** Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.

**(3)** Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly--

**(A)** makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or

**(B)** violates subsection (m) of section 922,

shall be fined under this title, imprisoned not more than one year, or both.

**(4)** Whoever violates section 922(q) shall be fined under this title, imprisoned for not more than 5 years, or both. Notwithstanding any other provision of law, the term of imprisonment imposed under this paragraph shall not run concurrently with any other term of imprisonment imposed under any other provision of law. Except for the authorization of a term of imprisonment of not more than 5 years made in this paragraph, for the purpose of any other law a violation of section 922(q) shall be deemed to be a misdemeanor.

**(5)** Whoever knowingly violates subsection (s) or (t) of section 922 shall be fined under this title, imprisoned for not more than 1 year, or both.

**(6)(A)(i)** A juvenile who violates section 922(x) shall be fined under this title, imprisoned not more than 1 year, or both, except that a juvenile described in clause (ii) shall be sentenced to probation on appropriate conditions and shall not be incarcerated unless the juvenile fails to comply with a condition of probation.

**(ii)** A juvenile is described in this clause if--

    **(I)** the offense of which the juvenile is charged is possession of a handgun or ammunition in violation of section 922(x)(2); and

    **(II)** the juvenile has not been convicted in any court of an offense (including an offense under section 922(x) or a similar State law, but not including any other offense consisting of conduct that if engaged in by an adult would not constitute an offense) or adjudicated as a juvenile delinquent for conduct that if engaged in by an adult would constitute an offense.

**(B)** A person other than a juvenile who knowingly violates section 922(x)--

    **(i)** shall be fined under this title, imprisoned not more than 1 year, or both; and

    **(ii)** if the person sold, delivered, or otherwise transferred a handgun or ammunition to a juvenile knowing or having reasonable cause to know that the juvenile intended to carry or otherwise possess or discharge or otherwise use the handgun or ammunition in the commission of a crime of violence, shall be fined under this title, imprisoned not more than 10 years, or both.

**(7)** Whoever knowingly violates section 931 shall be fined under this title, imprisoned not more than 3 years, or both.

**(b)** Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce shall be fined under this title, or imprisoned not more than ten years, or both.

**(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

**(i)** be sentenced to a term of imprisonment of not less than 5 years;

**(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

**(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

**(B)** If the firearm possessed by a person convicted of a violation of this subsection--

**(i)** is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

**(ii)** is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

**(C)** In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall--

**(i)** be sentenced to a term of imprisonment of not less than 25 years; and

**(ii)** if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.

**(D)** Notwithstanding any other provision of law--

**(i)** a court shall not place on probation any person convicted of a violation of this subsection; and

**(ii)** no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

**(2)** For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46.

**(3)** For purposes of this subsection the term "crime of violence" means an offense that is a felony and--

    **(A)** has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

    **(B)** that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

**(4)** For purposes of this subsection, the term "brandish" means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person.

**(5)** Except to the extent that a greater minimum sentence is otherwise provided under this subsection, or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries armor piercing ammunition, or who, in furtherance of any such crime, possesses armor piercing ammunition, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime or conviction under this section--

    **(A)** be sentenced to a term of imprisonment of not less than 15 years; and

    **(B)** if death results from the use of such ammunition--

        **(i)** if the killing is murder (as defined in section 1111), be punished by death or sentenced to a term of imprisonment for any term of years or for life; and

        **(ii)** if the killing is manslaughter (as defined in section 1112), be punished as provided in section 1112.

**(d)(1)** Any firearm or ammunition involved in or used in any knowing violation of subsection (a)(4), (a)(6), (f), (g), (h), (i), (j), or (k) of section 922, or knowing importation or bringing into the United States or any possession thereof any firearm or ammunition in violation of section 922(l), or knowing violation of section 924, or willful violation of any other provision of this chapter or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the United States, or any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1986 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter: *Provided,* That upon acquittal of the owner or possessor, or dismissal of the charges against him other than upon motion of the Government prior to trial, or lapse of or court termination of the restraining order to which he is subject, the seized or relinquished firearms or ammunition

shall be returned forthwith to the owner or possessor or to a person delegated by the owner or possessor unless the return of the firearms or ammunition would place the owner or possessor or his delegate in violation of law. Any action or proceeding for the forfeiture of firearms or ammunition shall be commenced within one hundred and twenty days of such seizure.

**(2)(A)** In any action or proceeding for the return of firearms or ammunition seized under the provisions of this chapter, the court shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

**(B)** In any other action or proceeding under the provisions of this chapter, the court, when it finds that such action was without foundation, or was initiated vexatiously, frivolously, or in bad faith, shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

**(C)** Only those firearms or quantities of ammunition particularly named and individually identified as involved in or used in any violation of the provisions of this chapter or any rule or regulation issued thereunder, or any other criminal law of the United States or as intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure, forfeiture, and disposition.

**(D)** The United States shall be liable for attorneys' fees under this paragraph only to the extent provided in advance by appropriation Acts.

**(3)** The offenses referred to in paragraphs (1) and (2)(C) of this subsection are--

**(A)** any crime of violence, as that term is defined in section 924(c)(3) of this title;

**(B)** any offense punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.) or the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.);

**(C)** any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title, where the firearm or ammunition intended to be used in any such offense is involved in a pattern of activities which includes a violation of any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title;

**(D)** any offense described in section 922(d) of this title where the firearm or ammunition is intended to be used in such offense by the transferor of such firearm or ammunition;

**(E)** any offense described in section 922(i), 922(j), 922(l), 922(n), or 924(b) of this title; and

**(F)** any offense which may be prosecuted in a court of the United States which involves the exportation of firearms or ammunition.

**(e)(1)** In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different

from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

**(2)** As used in this subsection--

**(A)** the term "serious drug offense" means--

**(i)** an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46 for which a maximum term of imprisonment of ten years or more is prescribed by law; or

**(ii)** an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law;

**(B)** the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that--

**(i)** has as an element the use, attempted use, or threatened use of physical force against the person of another; or

**(ii)** is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and

**(C)** the term "conviction" includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.

**(f)** In the case of a person who knowingly violates section 922(p), such person shall be fined under this title, or imprisoned not more than 5 years, or both.

**(g)** Whoever, with the intent to engage in conduct which--

**(1)** constitutes an offense listed in section 1961(1),

**(2)** is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46,

**(3)** violates any State law relating to any controlled substance (as defined in section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6))), or

**(4)** constitutes a crime of violence (as defined in subsection (c)(3)),

travels from any State or foreign country into any other State and acquires, transfers, or attempts to acquire or transfer, a firearm in such other State in furtherance of such purpose, shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

**(h)** Whoever knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence (as defined in subsection (c)(3)) or drug trafficking crime (as defined in subsection (c)(2)) shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

**(i)(1)** A person who knowingly violates section 922(u) shall be fined under this title, imprisoned not more than 10 years, or both.

**(2)** Nothing contained in this subsection shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this subsection operate to the exclusion of State laws on the same subject matter, nor shall any provision of this subsection be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this subsection.

**(j)** A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall--

**(1)** if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and

**(2)** if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.

**(k)** A person who, with intent to engage in or to promote conduct that--

**(1)** is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

**(2)** violates any law of a State relating to any controlled substance (as defined in section 102 of the Controlled Substances Act, 21 U.S.C. 802); or

**(3)** constitutes a crime of violence (as defined in subsection (c)(3)),

smuggles or knowingly brings into the United States a firearm, or attempts to do so, shall be imprisoned not more than 10 years, fined under this title, or both.

**(l)** A person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.

**(m)** A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall be fined under this title, imprisoned not more than 10 years, or both.

**(n)** A person who, with the intent to engage in conduct that constitutes a violation of section 922(a)(1)(A), travels from any State or foreign country into any other State and acquires, or attempts to acquire, a firearm in such other State in furtherance of such purpose shall be imprisoned for not more than 10 years.

**(o)** A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

**(p) Penalties relating to secure gun storage or safety device.--**

    **(1) In general.--**

        **(A) Suspension or revocation of license; civil penalties.--**With respect to each violation of section 922(z)(1) by a licensed manufacturer, licensed importer, or licensed dealer, the Secretary may, after notice and opportunity for hearing--

            **(i)** suspend for not more than 6 months, or revoke, the license issued to the licensee under this chapter that was used to conduct the firearms transfer; or

            **(ii)** subject the licensee to a civil penalty in an amount equal to not more than $2,500.

        **(B) Review.--**An action of the Secretary under this paragraph may be reviewed only as provided under section 923(f).

    **(2) Administrative remedies.--**The suspension or revocation of a license or the imposition of a civil penalty under paragraph (1) shall not preclude any administrative remedy that is otherwise available to the Secretary.

## CREDIT(S)

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 233; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1223; Pub.L. 91-644, Title II, § 13, Jan. 2, 1971, 84 Stat. 1889; Pub.L. 98-473, Title II, §§ 223(a), 1005(a), Oct. 12, 1984, 98 Stat. 2028, 2138; Pub.L. 99-308, § 104(a), May 19, 1986, 100 Stat. 456; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 99-570, Title I, § 1402, Oct. 27, 1986, 100 Stat. 3207-39; Pub.L. 100-649, § 2(b), (f)(2)(B), (D), Nov. 10, 1988, 102 Stat. 3817, 3818; Pub.L. 100-690, Title VI, §§ 6211, 6212, 6451, 6460, 6462, Title VII, §§ 7056, 7060(a), Nov. 18, 1988, 102 Stat. 4359, 4360, 4371, 4373, 4374, 4402, 4403; Pub.L. 101-647, Title XI, § 1101, Title XVII, § 1702(b)(3), Title XXII, §§ 2203(d), 2204(c), Title XXXV, §§ 3526 to 3529, Nov. 29, 1990, 104 Stat. 4829, 4845, 4857, 4924; Pub.L. 103-159, Title I, § 102(c), Title III, § 302(d), Nov. 30, 1993, 107 Stat. 1541, 1545; Pub.L. 103-322, Title VI, § 60013, Title XI, §§ 110102(c), 110103(c), 110105(2), 110201(b), 110401(e), 110503, 110504(a), 110507, 110510, 110515(a), 110517, 110518(a), Title XXXIII, §§ 330002(h), 330003(f)(2), 330011(i), (j), 330016(1)(H), (K), (L), Sept. 13, 1994, 108 Stat. 1973, 1998, 1999, 2000, 2011, 2015, 2016, 2018, 2019, 2020, 2140, 2141, 2145, 2147; Pub.L. 104-294, Title VI, § 603(m)(1), (n) to (p)(1), (q) to (s), Oct. 11, 1996, 110 Stat. 3505; Pub.L. 105-386, § 1(a), Nov. 13, 1998, 112 Stat. 3469; Pub.L. 107-273, Div. B, Title IV,

§ 4002(d)(1)(E), Div. C, Title I, § 11009(e)(3), Nov. 2, 2002, 116 Stat. 1809, 1821; Pub.L. 109-92, §§ 5(c)(2), 6(b), Oct. 26, 2005, 119 Stat. 2100, 2102; Pub.L. 109-304, § 17(d)(3), Oct. 6, 2006, 120 Stat. 1707; Pub.L. 115-391, Title IV, § 403(a), Dec. 21, 2018, 132 Stat. 5221.)

<div align="center">

**AMENDMENT OF SECTION**

</div>

<Pub.L. 100-649, § 2(f)(2)(B), (D), Nov. 10, 1988, 102 Stat. 3818, as amended Pub.L. 101-647, Title XXXV, § 3526(b), Nov. 29, 1990, 104 Stat. 4924; Pub.L. 105-277, Div. A, § 101(h) [Title VI, § 649], Oct. 21, 1998, 112 Stat. 2681-528; Pub.L. 108-174, § 1, Dec. 9, 2003, 117 Stat. 2481; Pub.L. 113-57, § 1, Dec. 9, 2013, 127 Stat. 656, provided that, effective 35 years after the 30th day beginning after Nov. 10, 1988 [see section 2(f)(1) of Pub.L. 100-649, set out as a note under 18 U.S.C.A. § 922], subsec. (a)(1) of this section is amended by striking "this subsection, subsection (b), (c), or (f) of this section, or in section 929" and inserting "this chapter"; subsec. (f) of this section is repealed; and subsecs. (g) through (o) of this section are redesignated as subsecs. (f) through (n), respectively.>

<div align="center">

**VALIDITY**

</div>

<The United States Supreme Court has held that the residual clause of the Armed Career Criminal Act (18 U.S.C.A. § 924 (c)(3)(B)), is unconstitutionally vague under due process and separation of powers principles, see United States v. Davis, June 24, 2019, 139 S.Ct. 2319, 204 L.Ed.2d 757.>

<The United States Supreme Court has held that the imposition of an increased sentence under the residual clause of the Armed Career Criminal Act (18 U.S.C.A. § 924 (e)(2)(B)(ii)), violates the Constitution's guarantee of due process, see Johnson v. U.S., U.S.2015, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569. >

Notes of Decisions (4241)

18 U.S.C.A. § 924, 18 USCA § 924
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Unconstitutional as Applied by   United States v. Conyers,   S.D.N.Y.,   Dec. 29, 2016

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1959

§ 1959. Violent crimes in aid of racketeering activity

Currentness

**(a)** Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished--

**(1)** for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

**(2)** for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

**(3)** for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

**(4)** for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

**(5)** for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

**(6)** for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine of [1] under this title, or both.

**(b)** As used in this section--

**(1)** "racketeering activity" has the meaning set forth in section 1961 of this title; and

**(2)** "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.

### CREDIT(S)

(Added Pub.L. 98-473, Title II, § 1002(a), Oct. 12, 1984, 98 Stat. 2137, § 1952B; renumbered § 1959, Pub.L. 100-690, Title VII, § 7053(b), Nov. 18, 1988, 102 Stat. 4402; amended Pub.L. 103-322, Title VI, § 60003(a)(12), Title XXXIII, §§ 330016(1)(J), (2)(C), 330021(1), Sept. 13, 1994, 108 Stat. 1969, 2147, 2148, 2150.)

Notes of Decisions (167)

### Footnotes

1        So in original. The word "of" probably should not appear.

18 U.S.C.A. § 1959, 18 USCA § 1959

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
 Title 18. Crimes and Criminal Procedure (Refs & Annos)
  Part II. Criminal Procedure
   Chapter 207. Release and Detention Pending Judicial Proceedings (Refs & Annos)

18 U.S.C.A. § 3156

§ 3156. Definitions

Effective: May 29, 2015

Currentness

**(a)** As used in sections 3141-3150 of this chapter--

**(1)** the term "judicial officer" means, unless otherwise indicated, any person or court authorized pursuant to section 3041 of this title, or the Federal Rules of Criminal Procedure, to detain or release a person before trial or sentencing or pending appeal in a court of the United States, and any judge of the Superior Court of the District of Columbia;

**(2)** the term "offense" means any criminal offense, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress;

**(3)** the term "felony" means an offense punishable by a maximum term of imprisonment of more than one year;

**(4)** the term "crime of violence" means--

**(A)** an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another;

**(B)** any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or

**(C)** any felony under chapter 77, 109A, 110, or 117; and

**(5)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(b)** As used in sections 3152-3155 of this chapter--

**(1)** the term "judicial officer" means, unless otherwise indicated, any person or court authorized pursuant to section 3041 of this title, or the Federal Rules of Criminal Procedure, to detain or release a person before trial or sentencing or pending appeal in a court of the United States, and

**(2)** the term "offense" means any Federal criminal offense which is in violation of any Act of Congress and is triable by any court established by Act of Congress (other than a Class B or C misdemeanor or an infraction, or an offense triable by court-martial, military commission, provost court, or other military tribunal).

## CREDIT(S)

(Added Pub.L. 93-619, Title II, § 201, Jan. 3, 1975, 88 Stat. 2088; amended Pub.L. 98-473, Title II, §§ 203(c), 223(h), Oct. 12, 1984, 98 Stat. 1985, 2029; Pub.L. 99-646, § 55(i), Nov. 10, 1986, 100 Stat. 3610; Pub.L. 103-322, Title IV, § 40501, Sept. 13, 1994, 108 Stat. 1945; Pub.L. 104-294, Title VI, § 607(i), Oct. 11, 1996, 110 Stat. 3512; Pub.L. 105-314, Title VI, § 601, Oct. 30, 1998, 112 Stat. 2982; Pub.L. 114-22, Title I, § 112, May 29, 2015, 129 Stat. 240.)

Notes of Decisions (20)

18 U.S.C.A. § 3156, 18 USCA § 3156
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Held Unconstitutional by   United States v. Goodridge,   D.Mass.,   July 23, 2019

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part II. Criminal Procedure
        Chapter 227. Sentences (Refs & Annos)
            Subchapter A. General Provisions (Refs & Annos)

18 U.S.C.A. § 3559

§ 3559. Sentencing classification of offenses

Effective: July 27, 2006

Currentness

**(a) Classification.**--An offense that is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is--

**(1)** life imprisonment, or if the maximum penalty is death, as a Class A felony;

**(2)** twenty-five years or more, as a Class B felony;

**(3)** less than twenty-five years but ten or more years, as a Class C felony;

**(4)** less than ten years but five or more years, as a Class D felony;

**(5)** less than five years but more than one year, as a Class E felony;

**(6)** one year or less but more than six months, as a Class A misdemeanor;

**(7)** six months or less but more than thirty days, as a Class B misdemeanor;

**(8)** thirty days or less but more than five days, as a Class C misdemeanor; or

**(9)** five days or less, or if no imprisonment is authorized, as an infraction.

**(b) Effect of classification.**--Except as provided in subsection (c), an offense classified under subsection (a) carries all the incidents assigned to the applicable letter designation, except that the maximum term of imprisonment is the term authorized by the law describing the offense.

**(c) Imprisonment of certain violent felons.**--

**(1) Mandatory life imprisonment.**--Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if--

**(A)** the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of--

**(i)** 2 or more serious violent felonies; or

**(ii)** one or more serious violent felonies and one or more serious drug offenses; and

**(B)** each serious violent felony or serious drug offense used as a basis for sentencing under this subsection, other than the first, was committed after the defendant's conviction of the preceding serious violent felony or serious drug offense.

**(2) Definitions.**--For purposes of this subsection--

**(A)** the term "assault with intent to commit rape" means an offense that has as its elements engaging in physical contact with another person or using or brandishing a weapon against another person with intent to commit aggravated sexual abuse or sexual abuse (as described in sections 2241 and 2242);

**(B)** the term "arson" means an offense that has as its elements maliciously damaging or destroying any building, inhabited structure, vehicle, vessel, or real property by means of fire or an explosive;

**(C)** the term "extortion" means an offense that has as its elements the extraction of anything of value from another person by threatening or placing that person in fear of injury to any person or kidnapping of any person;

**(D)** the term "firearms use" means an offense that has as its elements those described in section 924(c) or 929(a), if the firearm was brandished, discharged, or otherwise used as a weapon and the crime of violence or drug trafficking crime during and relation to which the firearm was used was subject to prosecution in a court of the United States or a court of a State, or both;

**(E)** the term "kidnapping" means an offense that has as its elements the abduction, restraining, confining, or carrying away of another person by force or threat of force;

**(F)** the term "serious violent felony" means--

**(i)** a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as described in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); robbery (as described in sections 2111, 2113, or 2118); carjacking (as described in section 2119); extortion; arson; firearms use; firearms possession (as described in section 924(c)); or attempt, conspiracy, or solicitation to commit any of the above offenses; and

**(ii)** any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense;

**(G)** the term "State" means a State of the United States, the District of Columbia, and a commonwealth, territory, or possession of the United States; and

**(H)** the term "serious drug offense" means--

**(i)** an offense that is punishable under section 401(b)(1)(A) or 408 of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A), 848) or section 1010(b)(1)(A) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)(1)(A)); or

**(ii)** an offense under State law that, had the offense been prosecuted in a court of the United States, would have been punishable under section 401(b)(1)(A) or 408 of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A), 848) or section 1010(b)(1)(A) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)(1)(A)).

**(3) Nonqualifying felonies.--**

**(A) Robbery in certain cases.**--Robbery, an attempt, conspiracy, or solicitation to commit robbery; or an offense described in paragraph (2)(F)(ii) shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that--

**(i)** no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and

**(ii)** the offense did not result in death or serious bodily injury (as defined in section 1365) to any person.

**(B) Arson in certain cases.**--Arson shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that--

**(i)** the offense posed no threat to human life; and

**(ii)** the defendant reasonably believed the offense posed no threat to human life.

**(4) Information filed by United States Attorney.**--The provisions of section 411(a) of the Controlled Substances Act (21 U.S.C. 851(a)) shall apply to the imposition of sentence under this subsection.

**(5) Rule of construction.**--This subsection shall not be construed to preclude imposition of the death penalty.

**(6) Special provision for Indian country.**--No person subject to the criminal jurisdiction of an Indian tribal government shall be subject to this subsection for any offense for which Federal jurisdiction is solely predicated on Indian country (as defined in section 1151) and which occurs within the boundaries of such Indian country unless the governing body of the tribe has elected that this subsection have effect over land and persons subject to the criminal jurisdiction of the tribe.

**(7) Resentencing upon overturning of prior conviction.**--If the conviction for a serious violent felony or serious drug offense that was a basis for sentencing under this subsection is found, pursuant to any appropriate State or Federal procedure, to be unconstitutional or is vitiated on the explicit basis of innocence, or if the convicted person is pardoned on the explicit basis of innocence, the person serving a sentence imposed under this subsection shall be resentenced to any sentence that was available at the time of the original sentencing.

**(d) Death or imprisonment for crimes against children.**--

**(1) In general.**--Subject to paragraph (2) and notwithstanding any other provision of law, a person who is convicted of a Federal offense that is a serious violent felony (as defined in subsection (c)) or a violation of section 2422, 2423, or 2251 shall, unless the sentence of death is imposed, be sentenced to imprisonment for life, if--

**(A)** the victim of the offense has not attained the age of 14 years;

**(B)** the victim dies as a result of the offense; and

**(C)** the defendant, in the course of the offense, engages in conduct described in section 3591(a)(2).

**(2) Exception.**--With respect to a person convicted of a Federal offense described in paragraph (1), the court may impose any lesser sentence that is authorized by law to take into account any substantial assistance provided by the defendant in the investigation or prosecution of another person who has committed an offense, in accordance with the Federal Sentencing Guidelines and the policy statements of the Federal Sentencing Commission pursuant to section 994(p) of title 28, or for other good cause.

**(e) Mandatory life imprisonment for repeated sex offenses against children.**--

**(1) In general.**--A person who is convicted of a Federal sex offense in which a minor is the victim shall be sentenced to life imprisonment if the person has a prior sex conviction in which a minor was the victim, unless the sentence of death is imposed.

AR.01051

**(2) Definitions.**--For the purposes of this subsection--

**(A)** the term "Federal sex offense" means an offense under section 1591 (relating to sex trafficking of children), 2241 (relating to aggravated sexual abuse), 2242 (relating to sexual abuse), 2244(a)(1) (relating to abusive sexual contact), 2245 (relating to sexual abuse resulting in death), 2251 (relating to sexual exploitation of children), 2251A (relating to selling or buying of children), 2422(b) (relating to coercion and enticement of a minor into prostitution), or 2423(a) (relating to transportation of minors);

**(B)** the term "State sex offense" means an offense under State law that is punishable by more than one year in prison and consists of conduct that would be a Federal sex offense if, to the extent or in the manner specified in the applicable provision of this title--

   **(i)** the offense involved interstate or foreign commerce, or the use of the mails; or

   **(ii)** the conduct occurred in any commonwealth, territory, or possession of the United States, within the special maritime and territorial jurisdiction of the United States, in a Federal prison, on any land or building owned by, leased to, or otherwise used by or under the control of the Government of the United States, or in the Indian country (as defined in section 1151);

**(C)** the term "prior sex conviction" means a conviction for which the sentence was imposed before the conduct occurred constituting the subsequent Federal sex offense, and which was for a Federal sex offense or a State sex offense;

**(D)** the term "minor" means an individual who has not attained the age of 17 years; and

**(E)** the term "State" has the meaning given that term in subsection (c)(2).

**(3) Nonqualifying felonies.**--An offense described in section 2422(b) or 2423(a) shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that--

**(A)** the sexual act or activity was consensual and not for the purpose of commercial or pecuniary gain;

**(B)** the sexual act or activity would not be punishable by more than one year in prison under the law of the State in which it occurred; or

**(C)** no sexual act or activity occurred.

**(f) Mandatory minimum terms of imprisonment for violent crimes against children.**--A person who is convicted of a Federal offense that is a crime of violence against the person of an individual who has not attained the age of 18 years shall,

unless a greater mandatory minimum sentence of imprisonment is otherwise provided by law and regardless of any maximum term of imprisonment otherwise provided for the offense--

**(1)** if the crime of violence is murder, be imprisoned for life or for any term of years not less than 30, except that such person shall be punished by death or life imprisonment if the circumstances satisfy any of subparagraphs (A) through (D) of section 3591(a)(2) of this title;

**(2)** if the crime of violence is kidnapping (as defined in section 1201) or maiming (as defined in section 114), be imprisoned for life or any term of years not less than 25; and

**(3)** if the crime of violence results in serious bodily injury (as defined in section 1365), or if a dangerous weapon was used during and in relation to the crime of violence, be imprisoned for life or for any term of years not less than 10.

**(g)(1)** If a defendant who is convicted of a felony offense (other than offense of which an element is the false registration of a domain name) knowingly falsely registered a domain name and knowingly used that domain name in the course of that offense, the maximum imprisonment otherwise provided by law for that offense shall be doubled or increased by 7 years, whichever is less.

**(2)** As used in this section--

**(A)** the term "falsely registers" means registers in a manner that prevents the effective identification of or contact with the person who registers; and

**(B)** the term "domain name" has the meaning given that term is [1] section 45 of the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes" approved July 5, 1946 (commonly referred to as the "Trademark Act of 1946") (15 U.S.C. 1127).

## CREDIT(S)

(Added Pub.L. 98-473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 1991; amended Pub.L. 100-185, § 5, Dec. 11, 1987, 101 Stat. 1279; Pub.L. 100-690, Title VII, § 7041, Nov. 18, 1988, 102 Stat. 4399; Pub.L. 103-322, Title VII, § 70001, Sept. 13, 1994, 108 Stat. 1982; Pub.L. 105-314, Title V, § 501, Oct. 30, 1998, 112 Stat. 2980; Pub.L. 105-386, § 1(b), Nov. 13, 1998, 112 Stat. 3470; Pub.L. 108-21, Title I, § 106(a), Apr. 30, 2003, 117 Stat. 654; Pub.L. 108-482, Title II, § 204(a), Dec. 23, 2004, 118 Stat. 3917; Pub.L. 109-248, Title II, §§ 202, 206(c), July 27, 2006, 120 Stat. 612, 614.)

Notes of Decisions (91)

## Footnotes

1      So in original. Probably should be the word "in".

18 U.S.C.A. § 3559, 18 USCA § 3559

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
      Subchapter I. Control and Enforcement
        Part D. Offenses and Penalties

21 U.S.C.A. § 844

§ 844. Penalties for simple possession

Effective: August 3, 2010

Currentness

**(a) Unlawful acts; penalties**

It shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized by this subchapter or subchapter II. It shall be unlawful for any person knowingly or intentionally to possess any list I chemical obtained pursuant to or under authority of a registration issued to that person under section 823 of this title or section 958 of this title if that registration has been revoked or suspended, if that registration has expired, or if the registrant has ceased to do business in the manner contemplated by his registration. It shall be unlawful for any person to knowingly or intentionally purchase at retail during a 30 day period more than 9 grams of ephedrine base, pseudoephedrine base, or phenylpropanolamine base in a scheduled listed chemical product, except that, of such 9 grams, not more than 7.5 grams may be imported by means of shipping through any private or commercial carrier or the Postal Service. Any person who violates this subsection may be sentenced to a term of imprisonment of not more than 1 year, and shall be fined a minimum of $1,000, or both, except that if he commits such offense after a prior conviction under this subchapter or subchapter II, or a prior conviction for any drug, narcotic, or chemical offense chargeable under the law of any State, has become final, he shall be sentenced to a term of imprisonment for not less than 15 days but not more than 2 years, and shall be fined a minimum of $2,500, except, further, that if he commits such offense after two or more prior convictions under this subchapter or subchapter II, or two or more prior convictions for any drug, narcotic, or chemical offense chargeable under the law of any State, or a combination of two or more such offenses have become final, he shall be sentenced to a term of imprisonment for not less than 90 days but not more than 3 years, and shall be fined a minimum of $5,000. Notwithstanding any penalty provided in this subsection, any person convicted under this subsection for the possession of flunitrazepam shall be imprisoned for not more than 3 years, shall be fined as otherwise provided in this section, or both. The imposition or execution of a minimum sentence required to be imposed under this subsection shall not be suspended or deferred. Further, upon conviction, a person who violates this subsection shall be fined the reasonable costs of the investigation and prosecution of the offense, including the costs of prosecution of an offense as defined in sections 1918 and 1920 of Title 28, except that this sentence shall not apply and a fine under this section need not be imposed if the court determines under the provision of Title 18 that the defendant lacks the ability to pay.

**(b) Repealed. Pub.L. 98-473, Title II, § 219(a), Oct. 12, 1984, 98 Stat. 2027**

**(c) "Drug, narcotic, or chemical offense" defined**

As used in this section, the term "drug, narcotic, or chemical offense" means any offense which proscribes the possession, distribution, manufacture, cultivation, sale, transfer, or the attempt or conspiracy to possess, distribute, manufacture, cultivate, sell or transfer any substance the possession of which is prohibited under this subchapter.

## CREDIT(S)

(Pub.L. 91-513, Title II, § 404, Oct. 27, 1970, 84 Stat. 1264; Pub.L. 98-473, Title II, § 219, Oct. 12, 1984, 98 Stat. 2027; Pub.L. 99-570, Title I, § 1052, Oct. 27, 1986, 100 Stat. 3207-8; Pub.L. 100-690, Title VI, §§ 6371, 6480, Nov. 18, 1988, 102 Stat. 4370, 4382; Pub.L. 101-647, Title XII, § 1201, Title XIX, § 1907, Nov. 29, 1990, 104 Stat. 4829, 4854; Pub.L. 104-237, Title II, § 201(a), Oct. 3, 1996, 110 Stat. 3101; Pub.L. 104-305, § 2(c), Oct. 13, 1996, 110 Stat. 3808; Pub.L. 109-177, Title VII, § 711(e)(1), Mar. 9, 2006, 120 Stat. 262; Pub.L. 111-220, § 3, Aug. 3, 2010, 124 Stat. 2372.)

Notes of Decisions (417)

21 U.S.C.A. § 844, 21 USCA § 844
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part V. Procedure
      Chapter 115. Evidence; Documentary (Refs & Annos)

28 U.S.C.A. § 1738

§ 1738. State and Territorial statutes and judicial proceedings; full faith and credit

Currentness

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 947.)

Notes of Decisions (870)

28 U.S.C.A. § 1738, 28 USCA § 1738
Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 34. Crime Control and Law Enforcement (Refs & Annos)
    Subtitle I. Comprehensive Acts
      Chapter 121. Violent Crime Control and Law Enforcement
        Subchapter III. Violence Against Women

34 U.S.C.A. § 12291

Formerly cited as 42 USCA § 13925

§ 12291. Definitions and grant provisions

Effective: September 1, 2017

Currentness

**(a) Definitions**

In this subchapter:

**(1) Alaska Native village**

The term "Alaska Native village" has the same meaning given such term in the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.).

**(2) Courts**

The term "courts" means any civil or criminal, tribal, and Alaska Native Village, Federal, State, local or territorial court having jurisdiction to address domestic violence, dating violence, sexual assault or stalking, including immigration, family, juvenile, and dependency courts, and the judicial officers serving in those courts, including judges, magistrate judges, commissioners, justices of the peace, or any other person with decisionmaking authority.

**(3) Child abuse and neglect**

The term "child abuse and neglect" means any recent act or failure to act on the part of a parent or caregiver with intent to cause death, serious physical or emotional harm, sexual abuse, or exploitation, or an act or failure to act which presents an imminent risk of serious harm to an unemancipated minor. This definition shall not be construed to mean that failure to leave an abusive relationship, in the absence of other action constituting abuse or neglect, is itself abuse or neglect.

**(4) Community-based organization**

The term "community-based organization" means a nonprofit, nongovernmental, or tribal organization that serves a specific geographic community that--

(A) focuses primarily on domestic violence, dating violence, sexual assault, or stalking;

(B) has established a specialized culturally specific program that addresses domestic violence, dating violence, sexual assault, or stalking;

(C) has a primary focus on underserved populations (and includes representatives of these populations) and domestic violence, dating violence, sexual assault, or stalking; or

(D) obtains expertise, or shows demonstrated capacity to work effectively, on domestic violence, dating violence, sexual assault, and stalking through collaboration.

**(5) Child maltreatment**

The term "child maltreatment" means the physical or psychological abuse or neglect of a child or youth, including sexual assault and abuse.

**(6) Culturally specific**

The term "culturally specific" means primarily directed toward racial and ethnic minority groups (as defined in section 1707(g) of the Public Health Service Act (42 U.S.C. 300u-6(g)). [1]

**(7) Culturally specific services**

The term "culturally specific services" means community-based services that include culturally relevant and linguistically specific services and resources to culturally specific communities.

**(8) Domestic violence**

The term "domestic violence" includes felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

**(9) Dating partner**

The term "dating partner" refers to a person who is or has been in a social relationship of a romantic or intimate nature with the abuser, and where the existence of such a relationship shall be determined based on a consideration of--

(A) the length of the relationship;

**(B)** the type of relationship; and

**(C)** the frequency of interaction between the persons involved in the relationship.

**(10) Dating violence**

The term "dating violence" means violence committed by a person--

   **(A)** who is or has been in a social relationship of a romantic or intimate nature with the victim; and

   **(B)** where the existence of such a relationship shall be determined based on a consideration of the following factors:

     **(i)** The length of the relationship.

     **(ii)** The type of relationship.

     **(iii)** The frequency of interaction between the persons involved in the relationship.

**(11) Elder abuse**

The term "elder abuse" means any action against a person who is 50 years of age or older that constitutes the willful--

   **(A)** infliction of injury, unreasonable confinement, intimidation, or cruel punishment with resulting physical harm, pain, or mental anguish; or

   **(B)** deprivation by a person, including a caregiver, of goods or services with intent to cause physical harm, mental anguish, or mental illness.

**(12) Homeless**

The term "homeless" has the meaning provided in section 12473(6) of this title.

**(13) Indian**

The term "Indian" means a member of an Indian tribe.

**(14) Indian country**

The term "Indian country" has the same meaning given such term in section 1151 of Title 18.

**(15) Indian housing**

The term "Indian housing" means housing assistance described in the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4101 et seq., as amended).

**(16) Indian tribe**

The term "Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including any Alaska Native village or regional or village corporation (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(17) Indian law enforcement**

The term "Indian law enforcement" means the departments or individuals under the direction of the Indian tribe that maintain public order.

**(18) Law enforcement**

The term "law enforcement" means a public agency charged with policing functions, including any of its component bureaus (such as governmental victim services programs or Village Public Safety Officers), including those referred to in section 2802 of Title 25.

**(19) Legal assistance**

The term "legal assistance" includes assistance to adult and youth victims of domestic violence, dating violence, sexual assault, and stalking in--

  **(A)** family, tribal, territorial, immigration, employment, administrative agency, housing matters, campus administrative or protection or stay away order proceedings, and other similar matters; and

  **(B)** criminal justice investigations, prosecutions and post-trial matters (including sentencing, parole, and probation) that impact the victim's safety and privacy.

  Intake or referral, by itself, does not constitute legal assistance.

**(20) Personally identifying information or personal information**

The term "personally identifying information" or "personal information" means individually identifying information for or about an individual including information likely to disclose the location of a victim of domestic violence, dating violence, sexual assault, or stalking, regardless of whether the information is encoded, encrypted, hashed, or otherwise protected, including--

**(A)** a first and last name;

**(B)** a home or other physical address;

**(C)** contact information (including a postal, e-mail or Internet protocol address, or telephone or facsimile number);

**(D)** a social security number, driver license number, passport number, or student identification number; and

**(E)** any other information, including date of birth, racial or ethnic background, or religious affiliation, that would serve to identify any individual.

## (21) Population specific organization

The term "population specific organization" means a nonprofit, nongovernmental organization that primarily serves members of a specific underserved population and has demonstrated experience and expertise providing targeted services to members of that specific underserved population.

## (22) Population specific services

The term "population specific services" means victim-centered services that address the safety, health, economic, legal, housing, workplace, immigration, confidentiality, or other needs of victims of domestic violence, dating violence, sexual assault, or stalking, and that are designed primarily for and are targeted to a specific underserved population.

## (23) Prosecution

The term "prosecution" means any public agency charged with direct responsibility for prosecuting criminal offenders, including such agency's component bureaus (such as governmental victim assistance programs).

## (24) Protection order or restraining order

The term "protection order" or "restraining order" includes--

**(A)** any injunction, restraining order, or any other order issued by a civil or criminal court for the purpose of preventing violent or threatening acts or harassment against, sexual violence or contact or communication with or physical proximity to, another person, including any temporary or final orders issued by civil or criminal courts whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection; and

**(B)** any support, child custody or visitation provisions, orders, remedies, or relief issued as part of a protection order, restraining order, or stay away injunction pursuant to State, tribal, territorial, or local law authorizing the issuance of

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

protection orders, restraining orders, or injunctions for the protection of victims of domestic violence, dating violence, sexual assault, or stalking.

**(25) Rape crisis center**

The term "rape crisis center" means a nonprofit, nongovernmental, or tribal organization, or governmental entity in a State other than a Territory that provides intervention and related assistance, as specified in section 12511(b)(2)(C) of this title, to victims of sexual assault without regard to their age. In the case of a governmental entity, the entity may not be part of the criminal justice system (such as a law enforcement agency) and must be able to offer a comparable level of confidentiality as a nonprofit entity that provides similar victim services.

**(26) Rural area and rural community**

The term "rural area" and "rural community" mean--

    **(A)** any area or community, respectively, no part of which is within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

    **(B)** any area or community, respectively, that is--

        **(i)** within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area; and

        **(ii)** located in a rural census tract; or

    **(C)** any federally recognized Indian tribe.

**(27) Rural State**

The term "rural State" means a State that has a population density of 57 or fewer persons per square mile or a State in which the largest county has fewer than 250,000 people, based on the most recent decennial census.

**(28) Sex trafficking**

The term "sex trafficking" means any conduct proscribed by section 1591 of Title 18, whether or not the conduct occurs in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States.

**(29) Sexual assault**

The term "sexual assault" means any nonconsensual sexual act proscribed by Federal, tribal, or State law, including when the victim lacks capacity to consent.

**(30) Stalking**

The term "stalking" means engaging in a course of conduct directed at a specific person that would cause a reasonable person to--

    **(A)** fear for his or her safety or the safety of others; or

    **(B)** suffer substantial emotional distress.

**(31) State**

The term "State" means each of the several States and the District of Columbia, and except as otherwise provided, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, and the Northern Mariana Islands.

**(32) State domestic violence coalition**

The term "State domestic violence coalition" means a program determined by the Administration for Children and Families under sections 10402 and 10411 of Title 42.

**(33) State sexual assault coalition**

The term "State sexual assault coalition" means a program determined by the Center for Injury Prevention and Control of the Centers for Disease Control and Prevention under the Public Health Service Act (42 U.S.C. 280b et seq.).

**(34) Territorial domestic violence or sexual assault coalition**

The term "territorial domestic violence or sexual assault coalition" means a program addressing domestic or sexual violence that is--

    **(A)** an established nonprofit, nongovernmental territorial coalition addressing domestic violence or sexual assault within the territory; or

    **(B)** a nongovernmental organization with a demonstrated history of addressing domestic violence or sexual assault within the territory that proposes to incorporate as a nonprofit, nongovernmental territorial coalition.

**(35) Tribal coalition**

The term "tribal coalition" means an established nonprofit, nongovernmental Indian organization, Alaska Native organization, or a Native Hawaiian organization that--

**(A)** provides education, support, and technical assistance to member Indian service providers in a manner that enables those member providers to establish and maintain culturally appropriate services, including shelter and rape crisis services, designed to assist Indian women and the dependents of those women who are victims of domestic violence, dating violence, sexual assault, and stalking; and

**(B)** is comprised of board and general members that are representative of--

    **(i)** the member service providers described in subparagraph (A); and

    **(ii)** the tribal communities in which the services are being provided.

**(36) Tribal government**

The term "tribal government" means--

    **(A)** the governing body of an Indian tribe; or

    **(B)** a tribe, band, pueblo, nation, or other organized group or community of Indians, including any Alaska Native village or regional or village corporation (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(37) Tribal nonprofit organization**

The term "tribal nonprofit organization" means--

    **(A)** a victim services provider that has as its primary purpose to assist Native victims of domestic violence, dating violence, sexual assault, or stalking; and

    **(B)** staff and leadership of the organization must include persons with a demonstrated history of assisting American Indian or Alaska Native victims of domestic violence, dating violence, sexual assault, or stalking.

**(38) Tribal organization**

The term "tribal organization" means--

    **(A)** the governing body of any Indian tribe;

**(B)** any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body of a tribe or tribes to be served, or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities; or

**(C)** any tribal nonprofit organization.

**(39) Underserved populations**

The term "underserved populations" means populations who face barriers in accessing and using victim services, and includes populations underserved because of geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age), and any other population determined to be underserved by the Attorney General or by the Secretary of Health and Human Services, as appropriate.

**(40) Unit of local government**

The term "unit of local government" means any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a State.

**(41) Victim advocate**

The term "victim advocate" means a person, whether paid or serving as a volunteer, who provides services to victims of domestic violence, sexual assault, stalking, or dating violence under the auspices or supervision of a victim services program.

**(42) Victim assistant**

The term "victim assistant" means a person, whether paid or serving as a volunteer, who provides services to victims of domestic violence, sexual assault, stalking, or dating violence under the auspices or supervision of a court or a law enforcement or prosecution agency.

**(43) Victim service provider**

The term "victim service provider" means a nonprofit, nongovernmental or tribal organization or rape crisis center, including a State or tribal coalition, that assists or advocates for domestic violence, dating violence, sexual assault, or stalking victims, including domestic violence shelters, faith-based organizations, and other organizations, with a documented history of effective work concerning domestic violence, dating violence, sexual assault, or stalking.

**(44) Victim services or services**

The terms "victim services" and "services" mean services provided to victims of domestic violence, dating violence, sexual assault, or stalking, including telephonic or web-based hotlines, legal advocacy, economic advocacy, emergency and transitional shelter, accompaniment and advocacy through medical, civil or criminal justice, immigration, and social support

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

systems, crisis intervention, short-term individual and group support services, information and referrals, culturally specific services, population specific services, and other related supportive services.

**(45) Youth**

The term "youth" means a person who is 11 to 24 years old.

**(b) Grant conditions**

**(1) Match**

No matching funds shall be required for any grant or subgrant made under this Act for--

**(A)** any tribe, territory, or victim service provider; or

**(B)** any other entity, including a State, that--

**(i)** petitions for a waiver of any match condition imposed by the Attorney General or the Secretaries of Health and Human Services or Housing and Urban Development; and

**(ii)** whose petition for waiver is determined by the Attorney General or the Secretaries of Health and Human Services or Housing and Urban Development to have adequately demonstrated the financial need of the petitioning entity.

**(2) Nondisclosure of confidential or private information**

**(A) In general**

In order to ensure the safety of adult, youth, and child victims of domestic violence, dating violence, sexual assault, or stalking, and their families, grantees and subgrantees under this subchapter shall protect the confidentiality and privacy of persons receiving services.

**(B) Nondisclosure**

Subject to subparagraphs (C) and (D), grantees and subgrantees shall not--

**(i)** disclose, reveal, or release any personally identifying information or individual information collected in connection with services requested, utilized, or denied through grantees' and subgrantees' programs, regardless of whether the information has been encoded, encrypted, hashed, or otherwise protected; or

**(ii)** disclose, reveal, or release individual client information without the informed, written, reasonably time-limited consent of the person (or in the case of an unemancipated minor, the minor and the parent or guardian or in the case of

legal incapacity, a court-appointed guardian) about whom information is sought, whether for this program or any other Federal, State, tribal, or territorial grant program, except that consent for release may not be given by the abuser of the minor, incapacitated person, or the abuser of the other parent of the minor.

If a minor or a person with a legally appointed guardian is permitted by law to receive services without the parent's or guardian's consent, the minor or person with a guardian may release information without additional consent.

**(C) Release**

If release of information described in subparagraph (B) is compelled by statutory or court mandate--

**(i)** grantees and subgrantees shall make reasonable attempts to provide notice to victims affected by the disclosure of information; and

**(ii)** grantees and subgrantees shall take steps necessary to protect the privacy and safety of the persons affected by the release of the information.

**(D) Information sharing**

**(i)** Grantees and subgrantees may share--

**(I)** nonpersonally identifying data in the aggregate regarding services to their clients and nonpersonally identifying demographic information in order to comply with Federal, State, tribal, or territorial reporting, evaluation, or data collection requirements;

**(II)** court-generated information and law enforcement-generated information contained in secure, governmental registries for protection order enforcement purposes; and

**(III)** law enforcement-generated and prosecution-generated information necessary for law enforcement and prosecution purposes.

**(ii)** In no circumstances may--

**(I)** an adult, youth, or child victim of domestic violence, dating violence, sexual assault, or stalking be required to provide a consent to release his or her personally identifying information as a condition of eligibility for the services provided by the grantee or subgrantee;

**(II)** any personally identifying information be shared in order to comply with Federal, tribal, or State reporting, evaluation, or data collection requirements, whether for this program or any other Federal, tribal, or State grant program.

**(E) Statutorily mandated reports of abuse or neglect**

Nothing in this section prohibits a grantee or subgrantee from reporting suspected abuse or neglect, as those terms are defined and specifically mandated by the State or tribe involved.

**(F) Oversight**

Nothing in this paragraph shall prevent the Attorney General from disclosing grant activities authorized in this Act to the chairman and ranking members of the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate exercising Congressional oversight authority. All disclosures shall protect confidentiality and omit personally identifying information, including location information about individuals.

**(G) Confidentiality assessment and assurances**

Grantees and subgrantees must document their compliance with the confidentiality and privacy provisions required under this section.

**(3) Approved activities**

In carrying out the activities under this subchapter, grantees and subgrantees may collaborate with or provide information to Federal, State, local, tribal, and territorial public officials and agencies to develop and implement policies and develop and promote State, local, or tribal legislation or model codes designed to reduce or eliminate domestic violence, dating violence, sexual assault, and stalking.

**(4) Non-supplantation**

Any Federal funds received under this subchapter shall be used to supplement, not supplant, non-Federal funds that would otherwise be available for activities under this subchapter.

**(5) Use of funds**

Funds authorized and appropriated under this subchapter may be used only for the specific purposes described in this subchapter and shall remain available until expended.

**(6) Reports**

An entity receiving a grant under this subchapter shall submit to the disbursing agency a report detailing the activities undertaken with the grant funds, including and providing additional information as the agency shall require.

**(7) Evaluation**

Federal agencies disbursing funds under this subchapter shall set aside up to 3 percent of such funds in order to conduct--

**(A)** evaluations of specific programs or projects funded by the disbursing agency under this subchapter or related research; or

**(B)** evaluations of promising practices or problems emerging in the field or related research, in order to inform the agency or agencies as to which programs or projects are likely to be effective or responsive to needs in the field.

Final reports of such evaluations shall be made available to the public via the agency's website.

## (8) Nonexclusivity

Nothing in this subchapter shall be construed to prohibit male victims of domestic violence, dating violence, sexual assault, and stalking from receiving benefits and services under this subchapter.

## (9) Prohibition on tort litigation

Funds appropriated for the grant program under this subchapter may not be used to fund civil representation in a lawsuit based on a tort claim. This paragraph should not be construed as a prohibition on providing assistance to obtain restitution in a protection order or criminal case.

## (10) Prohibition on lobbying

Any funds appropriated for the grant program shall be subject to the prohibition in section 1913 of Title 18, relating to lobbying with appropriated moneys.

## (11) Technical assistance

Of the total amounts appropriated under this subchapter, not less than 3 percent and up to 8 percent, unless otherwise noted, shall be available for providing training and technical assistance relating to the purposes of this subchapter to improve the capacity of the grantees, subgrantees, and other entities. If there is a demonstrated history that the Office on Violence Against Women has previously set aside amounts greater than 8 percent for technical assistance and training relating to grant programs authorized under this subchapter, the Office has the authority to continue setting aside amounts greater than 8 percent.

## (12) Delivery of legal assistance

Any grantee or subgrantee providing legal assistance with funds awarded under this subchapter shall comply with the eligibility requirements in section 20121(d) of this title.

## (13) Civil rights

### (A) Nondiscrimination

No person in the United States shall, on the basis of actual or perceived race, color, religion, national origin, sex, gender identity (as defined in paragraph 249(c)(4) of Title 18), sexual orientation, or disability, be excluded from participation

AR.01070

in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under the Violence Against Women Act of 1994 (title IV of Public Law 103-322; 108 Stat. 1902), the Violence Against Women Act of 2000 (division B of Public Law 106-386; 114 Stat. 1491), the Violence Against Women and Department of Justice Reauthorization Act of 2005 (title IX of Public Law 109-162; 119 Stat. 3080),[2] the Violence Against Women Reauthorization Act of 2013, and any other program or activity funded in whole or in part with funds appropriated for grants, cooperative agreements, and other assistance administered by the Office on Violence Against Women.

**(B) Exception**

If sex segregation or sex-specific programming is necessary to the essential operation of a program, nothing in this paragraph shall prevent any such program or activity from consideration of an individual's sex. In such circumstances, grantees may meet the requirements of this paragraph by providing comparable services to individuals who cannot be provided with the sex-segregated or sex-specific programming.

**(C) Discrimination**

The authority of the Attorney General and the Office of Justice Programs to enforce this paragraph shall be the same as it is under section 10228 of this title.

**(D) Construction**

Nothing contained in this paragraph shall be construed, interpreted, or applied to supplant, displace, preempt, or otherwise diminish the responsibilities and liabilities under other State or Federal civil rights law, whether statutory or common.

**(14) Clarification of victim services and legal assistance**

Victim services and legal assistance under this subchapter also include services and assistance to victims of domestic violence, dating violence, sexual assault, or stalking who are also victims of severe forms of trafficking in persons as defined by section 7102 of Title 22.

**(15) Conferral**

**(A) In general**

The Office on Violence Against Women shall establish a biennial conferral process with State and tribal coalitions and technical assistance providers who receive funding through grants administered by the Office on Violence Against Women and authorized by this Act, and other key stakeholders.

**(B) Areas covered**

The areas of conferral under this paragraph shall include--

**(i)** the administration of grants;

**(ii)** unmet needs;

**(iii)** promising practices in the field; and

**(iv)** emerging trends.

**(C) Initial conferral**

The first conferral shall be initiated not later than 6 months after March 7, 2013.

**(D) Report**

Not later than 90 days after the conclusion of each conferral period, the Office on Violence Against Women shall publish a comprehensive report that--

**(i)** summarizes the issues presented during conferral and what, if any, policies it intends to implement to address those issues;

**(ii)** is made available to the public on the Office on Violence Against Women's website and submitted to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives.

**(16) Accountability**

All grants awarded by the Attorney General under this Act shall be subject to the following accountability provisions:

**(A) Audit requirement**

**(i) In general**

Beginning in the first fiscal year beginning after the date of the enactment of this Act, [2] and in each fiscal year thereafter, the Inspector General of the Department of Justice shall conduct audits of recipients of grants under this Act to prevent waste, fraud, and abuse of funds by grantees. The Inspector General shall determine the appropriate number of grantees to be audited each year.

**(ii) Definition**

In this paragraph, the term "unresolved audit finding" means a finding in the final audit report of the Inspector General of the Department of Justice that the audited grantee has utilized grant funds for an unauthorized expenditure or otherwise unallowable cost that is not closed or resolved within 12 months from the date when the final audit report is issued.

### (iii) Mandatory exclusion

A recipient of grant funds under this Act that is found to have an unresolved audit finding shall not be eligible to receive grant funds under this Act during the following 2 fiscal years.

### (iv) Priority

In awarding grants under this Act, the Attorney General shall give priority to eligible entities that did not have an unresolved audit finding during the 3 fiscal years prior to submitting an application for a grant under this Act.

### (v) Reimbursement

If an entity is awarded grant funds under this Act during the 2-fiscal-year period in which the entity is barred from receiving grants under paragraph (2), the Attorney General shall--

**(I)** deposit an amount equal to the grant funds that were improperly awarded to the grantee into the General Fund of the Treasury; and

**(II)** seek to recoup the costs of the repayment to the fund from the grant recipient that was erroneously awarded grant funds.

## (B) Nonprofit organization requirements

### (i) Definition

For purposes of this paragraph and the grant programs described in this Act, the term "nonprofit organization" means an organization that is described in section 501(c)(3) of Title 26 and is exempt from taxation under section 501(a) of such title.

### (ii) Prohibition

The Attorney General may not award a grant under any grant program described in this Act to a nonprofit organization that holds money in offshore accounts for the purpose of avoiding paying the tax described in section 511(a) of Title 26.

### (iii) Disclosure

Each nonprofit organization that is awarded a grant under a grant program described in this Act and uses the procedures prescribed in regulations to create a rebuttable presumption of reasonableness for the compensation of its officers, directors, trustees and key employees, shall disclose to the Attorney General, in the application for the grant, the process

for determining such compensation, including the independent persons involved in reviewing and approving such compensation, the comparability data used, and contemporaneous substantiation of the deliberation and decision. Upon request, the Attorney General shall make the information disclosed under this subsection available for public inspection.

**(C) Conference expenditures**

**(i) Limitation**

No amounts authorized to be appropriated to the Department of Justice under this Act may be used by the Attorney General, or by any individual or organization awarded discretionary funds through a cooperative agreement under this Act, to host or support any expenditure for conferences that uses more than $20,000 in Department funds, unless the Deputy Attorney General or such Assistant Attorney Generals, Directors, or principal deputies as the Deputy Attorney General may designate, provides prior written authorization that the funds may be expended to host a conference.

**(ii) Written approval**

Written approval under clause (i) shall include a written estimate of all costs associated with the conference, including the cost of all food and beverages, audiovisual equipment, honoraria for speakers, and any entertainment.

**(iii) Report**

The Deputy Attorney General shall submit an annual report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on all approved conference expenditures referenced in this paragraph.

**(D) Annual certification**

Beginning in the first fiscal year beginning after the date of the enactment of this Act,[2] the Attorney General shall submit, to the Committee on the Judiciary and the Committee on Appropriations of the Senate and the Committee on the Judiciary and the Committee on Appropriations of the House of Representatives, an annual certification that--

**(i)** all audits issued by the Office of the Inspector General under paragraph (1) have been completed and reviewed by the appropriate Assistant Attorney General or Director;

**(ii)** all mandatory exclusions required under subparagraph (A)(iii) have been issued;

**(iii)** all reimbursements required under subparagraph (A)(v) have been made; and

**(iv)** includes a list of any grant recipients excluded under subparagraph (A) from the previous year.

**CREDIT(S)**

(Pub.L. 103-322, Title IV, § 40002, as added Pub.L. 109-162, § 3(a), Jan. 5, 2006, 119 Stat. 2964; amended Pub.L. 109-271, §§ 1(d) to (f), 2(e), Aug. 12, 2006, 120 Stat. 751, 752; Pub.L. 111-320, Title II, § 202(d), Dec. 20, 2010, 124 Stat. 3509; Pub.L. 113-4, § 3, Mar. 7, 2013, 127 Stat. 56.)

Notes of Decisions (4)

### Footnotes

1        So in original. The period probably should be preceded by another closing parenthesis.
2        See References in Text note set out under this section.

34 U.S.C.A. § 12291, 34 USCA § 12291

Current through P.L. 116-187. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 96–212, MARCH 17, 1980, 94 Stat 102

UNITED STATES PUBLIC LAWS

96th Congress - Second Session

Convening January 3, 1980

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)

Additions and Deletions are not identified in this document.

PL 96–212 (S 643)

MARCH 17, 1980

An Act to amend the Immigration and Nationality Act to revise the procedures for the admission of refugees, to amend the Migration and Refugee Assistance Act of 1962 to establish a more uniform basis for the provision of assistance to refugees, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act // 8 USC 1101 // may be cited as the " Refugee Act of 1980".

TITLE I—PURPOSE

Sec. 101. // 8 USC 1521 // (a) The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States. The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.

(b) The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

TITLE II— ADMISSION OF REFUGEES

Sec. 201. (a) Section 101(a) of the Immigration and Nationality Act (8 U.S.C. 1101(a)) is amended by adding after paragraph (41) the following new paragraph:

"(42) The term 'refugee' means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 207(e) of this Act) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.".

(b) Chapter 1 of title II of such Act is amended by adding after section 206 (8 U.S.C. 1156) the following new sections:

"ANNUAL ADMISSION OF REFUGEES AND ADMISSION OF EMERGENCY SITUATION REFUGEES

" Sec. 207. // 8 USC 1157. // (a)(1) Except as provided in subsection (b), the number of refugees who may be admitted under this section in fiscal year 1980, 1981, or 1982, may not exceed fifty thousand unless the President determines, before the beginning of the fiscal year and after appropriate consultation (as defined in subsection (e)), that admission of a specific number of refugees in excess of such number is justified by humanitarian concerns or is otherwise in the national interest.

"(2) Except as provided in subsection (b), the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

"(3) Admissions under this subsection shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.

"(b) If the President determines, after appropriate consultation, that (1) an unforeseen emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United States of these refugees cannot be accomplished under subsection (a), the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided under this subsection.

"(c)(1) Subject to the numerical limitations established pursuant to subsections (a) and (b), the Attorney General may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this Act.

"(2) A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) // 8 USC 1101. // of any refugee who qualifies for admission under paragraph (1) shall, if not otherwise entitled to admission under paragraph (1) and if not a person described in the second sentence of section 101(a)(42), be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this Act. Upon the spouse's or child's admission to the United States, such admission shall be charged against the numerical limitation established in accordance with the appropriate subsection under which the refugee's admission is charged.

"(3) The provisions of paragraphs (14), (15), (20), (21), (25), and (32) of section 212(a) // 8 USC 1182. // shall not be applicable to any alien seeking admission to the United States under this subsection, and the Attorney General may waive any other provision of such section (other than paragraph (27), (29), or (33) and other than so much of paragraph (23) as relates to trafficking in narcotics) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest. Any such waiver by the Attorney General shall be in writing and shall be granted only on an individual basis following an investigation. The Attorney General shall provide for the annual reporting to Congress of the number of waivers granted under this paragraph in the previous fiscal year and a summary of the reasons for granting such waivers.

"(4) The refugee status of any alien (and of the spouse or child of the alien) may be terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe if the Attorney General determines that the alien was not in fact a refugee within the meaning of section 101(a)(42) at the time of the alien's admission.

"(d)(1) Before the start of each fiscal year the President shall report to the Committees on the Judiciary of the House of Representatives and of the Senate regarding the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions during the fiscal year. The President shall provide for periodic discussions between designated representatives of the President and members of such committees regarding changes in the worldwide refugee situation, the progress of refugee admissions, and the possible need for adjustments in the allocation of admissions among refugees.

"(2) As soon as possible after representatives of the President initiate appropriate consultation with respect to the number of refugee admissions under subsection (a) or with respect to the admission of refugees in response to an emergency refugee situation under subsection (b), the Committees on the Judiciary of the House of Representatives and of the Senate shall cause to have printed in the Congressional Record the substance of such consultation.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(3)(A) After the President initiates appropriate consultation prior to making a determination under subsection (a), a hearing to review the proposed determination shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

"(B) After the President initiates appropriate consultation prior to making a determination, under subsection (b), that the number of refugee admissions should be increased because of an unforeseen emergency refugee situation, to the extent that time and the nature of the emergency refugee situation permit, a hearing to review the proposal to increase refugee admissions shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

"(e) For purposes of this section, the term 'appropriate consultation' means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet–level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

"(1) A description of the nature of the refugee situation.

"(2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.

"(3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.

"(4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.

"(5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.

"(6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.

"(7) Such additional information as may be appropriate or requested by such members.

To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members.

## " ASYLUM PROCEDURE

" Sec. 208. // 8 USC 1158. // (a) The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

"(b) Asylum granted under subsection (a) may be terminated if the Attorney General, pursuant to such regulations as the Attorney General may prescribe, determines that the alien is no longer a refugee within the meaning of section 101(a)(42)(A) owing to a change in circumstances in the alien's country of nationality or, in the case of an alien having no nationality, in the country in which the alien last habitually resided.

"(c) A spouse or child (as defined in section 101(b)(1) (A), (B), (C), (D), or or (E)), // 8 USC 1101. // of an alien who is granted asylum under subsection (a) may, if not otherwise eligible for asylum under such subsection, be granted the same status as the alien if accompanying, or following to join, such alien.

## " ADJUSTMENT OF STATUS OF REFUGEES

" Sec. 209. // 8 USC 1159. // (a)(1) Any alien who has been admitted to the United States under section 207—,

"(A) whose admission has not been terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe,

"(B) who has been physically present in the United States for at least one year, and

"(C) who has not acquired permanent resident status,

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shall, at the end of such year period, return or be returned to the custody of the Service for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 235, 236, and 237. // 8 USC 1225, 1226, 1227. //

"(2) Any alien who is found upon inspection and examination by an immigration officer pursuant to paragraph (1) or after a hearing before a special inquiry officer to be admissible (except as otherwise provided under subsection (c)) as an immigrant under this Act at the time of the alien's inspection and examination shall, notwithstanding any numerical limitation specified in this Act, be regarded as lawfully admitted to the United States for permanent residence as of the date of such alien's arrival into the United States.

"(b) Not more than five thousand of the refugee admissions authorized under section 207(a) in any fiscal year may be made available by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—,

"(1) applies for such adjustment,

"(2) has been physically present in the United States for at least one year after being granted asylum,

"(3) continues to be a refugee within the meaning of section 101(a)(42)(A) or a spouse or child of such a refugee,

"(4) is not firmly resettled in any foreign country, and

"(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this Act at the time of examination for adjustment of such alien.

Upon approval of an application under this subsection, the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

"(c) The provisions of paragraphs (14), (15), (20), (21), (25), and (32) of section 212(a) // 8 USC 1182. // shall not be applicable to any alien seeking adjustment of status under this section, and the Attorney General may waive any other provision of such section (other than paragraph (27), (29), or (33) and other than so much of paragraph (23) as relates to trafficking in narcotics) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.".

(c) The table of contents of such Act is amended by inserting after the item relating to section 206 the following new items:

" Sec. 207. Annual admission of refugees and admission of emergency situation refugees.

"Sec. 208. Asylum procedure.

" Sec. 209. Adjustment of status of refugees.".

Sec. 202. Section 211 of the Immigration and Nationality Act (8 U. S. C. 1181) is amended—,

(1) by inserting "and subsection (c)" in subsection (a) after "Except as provided in subsection (b)"; and

(2) by adding at the end thereof the following new subsection:

"(c) The provisions of subsection (a) shall not apply to an alien whom the Attorney General admits to the United States under section 207.".

Sec. 203. (a) Subsection (a) of section 201 of the Immigration and Nationality Act (8 U.S.C. 1151) is amended to read as follows:

"(a) Exclusive of special immigrants defined in section 101(a)(27), // 8 USC 1101. // immediate relatives specified in subsection (b) of this section, and aliens who are admitted or granted asylum under section 207 or 208, the number of aliens born in any foreign state or dependent area who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence, shall not in any of the first three quarters of any fiscal year exceed a total of seventy-two thousand and shall not in any fiscal year exceed two hundred and seventy thousand.".

(b) Section 202 of such Act (8 U.S.C. 1152) is amended—,

(1) by striking out "and the number of conditional entries" in subsection (a);

(2) by striking out "(8)" in subsection (a) and inserting in lieu thereof "(7)";

(3) by striking out "or conditional entries" and "and conditional entries" in subsection (e);

(4) by striking out "20 per centum" in subsection (e)(2) and inserting in lieu thereof "26 per centum";

(5) by striking out paragraph (7) of subsection (e);

(6) by striking out "(7)" in paragraph (8) of subsection (e) and inserting in lieu thereof "(6)"; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(7) by redesignating paragraph (8) of subsection (e) as paragraph (7).

(c) Section 203 of such Act (8 U.S.C. 1153) is amended—,

(1) by striking out "or their conditional entry authorized, as the case may be," in subsection (a);

(2) by striking out "20 per centum" in subsection (a)(2) and inserting in lieu thereof "26 per centum";

(3) by striking out paragraph (7) of subsection (a);

(4) by striking out "and less the number of conditional entries and visas available pursuant to paragraph (7)" in subsection (a)(8);

(5) by striking out "or to conditional entry under paragraphs (1) through (8)" in subsection (a)(9) and inserting in lieu thereof "under paragraphs (1) through (7)";

(6) by redesignating paragraphs (8) and (9) of subsection (a) as paragraphs (7) and (8), respectively;

(7) by striking out "(7)" in subsection (d) and inserting in lieu thereof "(6)"; and

(8) by striking out subsections (f), (g), and (h).

(d) Sections 212(a)(14), 212(a)(32), and 244(d) of such Act (8 U.S. C. 1182(a)(14), 1182(a)(32), 1254(d)) are each amended by striking out "section 203(a)(8)" and inserting in lieu thereof "section 203(a)(7)".

(e) Subsection (h) of section 243 of such Act (8 U.S.C. 1253) is amended to read as follows:

"(h)(1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(19)) // 8 USC 1251. // to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

"(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—,

"(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

"(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

"(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

"(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.".

(f) Section 212(d)(5) of such Act (8 U.S.C. 1182(d)(5)) is amended—,

(1) by inserting "(A)" after "(5)";

(2) by inserting ", except as provided in subparagraph (B)," after " Attorney General may"; and

(3) by adding at the end thereof the following new subparagraph:

"(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.".

(g) Section 5 of Public Law 95—412 (8 U.S.C. 1182 note) is amended by striking out "September 30, 1980" and inserting in lieu thereof "April 1, 1980".

(h) Any reference in any law (other than the Immigration and Nationality Act or this Act) in effect on April 1, 1980, to section 203(a)(7) of the Immigration and Nationality Act shall be deemed to be a reference to such section as in effect before such date and to sections 207 and 208 of the Immigration and Nationality Act.

(i) Section 203(g) of such Act (8 U.S.C. 1153(g)), section 101(a)(3) of Public Law 95—145, // 8 USC 1255 // and the first section of Public Law 89—732 are each amended by striking out "two years" and inserting in lieu thereof "one year".

Sec. 204. // 8 USC 1101 // (a) Except as provided in subsections (b) and (c), this title and the amendments made by this title shall take effect on the date of the enactment of this Act, and shall apply to fiscal years beginning with the fiscal year beginning October 1, 1979.

(b)(1)(A) Section 207(c) of the Immigration and Nationality Act (as added by section 201(b) of this Act) and the amendments made by subsections (b), (c), and (d) of section 203 of this Act shall take effect on April 1, 1980.

(B) The amendments made by section 203(f) shall apply to aliens paroled into the United States on or after the sixtieth day after the date of the enactment of this Act.

(C) The amendments made by section 203(i) shall take effect immediately before April 1, 1980.

(2) Notwithstanding sections 207(a) and 209(b) of the Immigration and Nationality Act (as added by section 201(b) of this Act), the fifty thousand and five thousand numerical limitations specified in such respective sections shall, for fiscal year 1980, be equal to 25,000 and 2,500, respectively.

(3) Notwithstanding any other provision of law, for fiscal year 1980—,

(A) the fiscal year numerical limitation specified in section 201(a) of the Immigration and Nationality Act

// 8 USC 1151. // shall be equal to 280,000, and

(B) for the purpose of determining the number of immigrant visas and adjustments of status which may be made available under sections 203(a)(2) and 202(e)(2) of such Act,

// 8 USC 1153, 1152. // the granting of a conditional entry or adjustment of status under section 203(a)(7) or 202(e)(7) of such Act after September 30, 1979, and before April 1, 1980, shall be considered to be the granting of an immigrant visa under section 203(a)(2) or 202(e)( 2), respectively, of such Act during such period.

(c)(1) The repeal of subsections (g) and (h) of section 203 of the Immigration and Nationality Act, made by section 203(c)(8) of this title, shall not apply with respect to any individual who before April 1, 1980, was granted a conditional entry under section 203(a)(7) of the Immigration and Nationality Act (and under section 202(e)(7) of such Act, if applicable), as in effect immediately before such date, and it shall not apply to any alien paroled into the United States before April 1, 1980, who is eligible for the benefits of section 5 of Public Law 95 - 412. // 8 USC 1182 //

(2) An alien who, before April 1, 1980, established a date of registration at an immigration office in a foreign country on the basis of entitlement to a conditional entrant status under section 203(a)(7) of the Immigration and Nationality Act // 8 USC 1153. // (as in effect before such date), shall be deemed to be entitled to refugee status under section 207 of such Act (as added by section 201(b) of this title) and shall be accorded the date of registration previously established by that alien. Nothing in this paragraph shall be construed to preclude the acquisition by such an alien of a preference status under section 203(a) of such Act.

(3) The provisions of paragraphs (14), (15), (20), (21), (25), and (32) of section 212(a) of the Immigration and Nationality Act // 8 USC 1182. // shall not be applicable to any alien who has entered the United States before April 1, 1980, pursuant to section 203(a)(7) of such Act or who has been paroled as a refugee into the United States under section 212(d)(5) of such Act, and who is seeking adjustment of status, and the Attorney General may waive any other provision of section 212(a) of such Act (other than paragraph (27), (29), or (33) and other than so much of paragraph (23) as relates to trafficking in narcotics) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

(d)(1) Notwithstanding section 207(a) of the Immigration and Nationality Act (as added by section 201(b) of this title), // 8 USC 1157 // the President may make the determination described in the first sentence of such section not later than forty-five days after the date of the enactment of this Act for fiscal year 1980.

(2) The Attorney General shall establish the asylum procedure referred to in section 208(a) of the Immigration and Nationality Act // 8 USC 1158 // (as added by section 201(b) of this title) not later than June 1, 1980.

(e) Any reference in this Act // 8 USC 1521 // or in chapter 2 of title IV of the Immigration and Nationality Act to the Secretary of Education or the Secretary of Health and Human Services or to the Department of Health and Human Services shall be deemed, before the effective date of the Department of Education Organization Act, // 93 Stat. 668. // to be a reference to the Secretary of Health, Education, and Welfare or to the Department of Health, Education, and Welfare, respectively.

TITLE III— UNITED STATES COORDINATOR FOR REFUGEE AFFAIRS AND
ASSISTANCE FOR EFFECTIVE RESETTLEMENT OF REFUGEES IN THE UNITED STATES

Part A—United States Coordinator for Refugee Affairs

Sec. 301. // 8 USC 1525. // (a) The President shall appoint, by and with the advice and consent of the Senate, a United States Coordinator for Refugee Affairs (hereinafter in this part referred to as the "Coordinator"). The Coordinator shall have the rank of Ambassador–at–Large.

(b) The Coordinator shall be responsible to the President for—,

(1) the development of overall United States refugee admission and resettlement policy;

(2) the coordination of all United States domestic and international refugee admission and resettlement programs in a manner that assures that policy objectives are met in a timely fashion;

(3) the design of an overall budget strategy to provide individual agencies with policy guidance on refugee matters in the preparation of their budget requests, and to provide the Office of Management and Budget with an overview of all refugee-related budget requests;

(4) the presentation to the Congress of the Administration's overall refugee policy and the relationship of individual agency refugee budgets to that overall policy;

(5) advising the President, Secretary of State, Attorney General, and the Secretary of Health and Human Services on the relationship of overall United States refugee policy to the admission of refugees to, and the resettlement of refugees in, the United States;

(6) under the direction of the Secretary of State, representation and negotiation on behalf of the United States with foreign governments and international organizations in discussions on refugee matters and, when appropriate, submitting refugee issues for inclusion in other international negotiations;

(7) development of an effective and responsive liaison between the Federal Government and voluntary organizations, Governors and mayors, and others involved in refugee relief and resettlement work to reflect overall United States Government policy;

(8) making recommendations to the President and to the Congress with respect to policies for, objectives of, and establishment of priorities for, Federal functions relating to refugee admission and resettlement in the United States; and

(9) reviewing the regulations, guidelines, requirements, criteria, and procedures of Federal departments and agencies applicable to the performance of functions relating to refugee admission and resettlement in the United States.

(c)(1) In the conduct of the Coordinator's duties, the Coordinator shall consult regularly with States, localities, and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees.

(2) The Secretary of Labor and the Secretary of Education shall provide the Coordinator with regular reports describing the efforts of their respective departments to increase refugee access to programs within their jurisdiction, and the Coordinator shall include information on such programs in reports submitted under section 413(a)( 1) of the Immigration and Nationality Act.

Part B—Assistance for Effective Resettlement of Refugees in the United States

Sec. 311. (a) Title IV of the Immigration and Nationality Act is amended—,

(1) by striking out the title heading and inserting in lieu thereof the following:

"TTITLE IV— MISCELLANEOUS AND REFUGEE ASSISTANCE

" Chapter 1—Miscellaneous"; and

(2) by adding at the end thereof the following new chapter:

"Chapter 2—Refugee Assistance

" OFFICE OF REFUGEE RESETTLEMENT

"Sec. 411. // 8 USC 1521. // (a) There is established, within the Department of Health and Human Services, an office to be known as the Office of Refugee Resettlement (hereinafter in this chapter referred to as the ' Office'). The head of the Office shall be a Director (hereinafter in this chapter referred to as the ' Director'), to be appointed by the Secretary of Health and Human Services (hereinafter in this chapter referred to as the ' Secretary').

"(b) The function of the Office and its Director is to fund and administer (directly or through arrangements with other Federal agencies), in consultation with and under the general policy guidance of the United States Coordinator for Refugee Affairs (hereinafter in this chapter referred to as the ' Coordinator'), programs of the Federal Government under this chapter.

" AUTHORIZATION FOR PROGRAMS FOR DOMESTIC RESETTLEMENT OF AND ASSISTANCE TO REFUGEES

" Sec. 412. // 8 USC 1522. // (a) Conditions and Considerations.—( 1) In providing assistance under this section, the Director shall, to the extent of available appropriations, (A) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, (B) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, (C) insure

that cash assistance is made available to refugees in such a manner as not to discourage their economic self–sufficiency, in accordance with subsection (e)(2), and (D) insure that women have the same opportunities as men to participate in training and instruction.

"(2) The Director, together with the Coordinator, shall consult regularly with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities.

"(3) In the provision of domestic assistance under this section, the Director shall make a periodic assessment, based on refugee population and other relevant factors, of the relative needs of refugees for assistance and services under this chapter and the resources available to meet such needs. In allocating resources, the Director shall avoid duplication of services and provide for maximum coordination between agencies providing related services.

"(4) No grant or contract may be awarded under this section unless an appropriate proposal and application (including a description of the agency's ability to perform the services specified in the proposal) are submitted to, and approved by, the appropriate administering official. Grants and contracts under this section shall be made to those agencies which the appropriate administering official determines can best perform the services. Payments may be made for activities authorized under this chapter in advance or by way of reimbursement. In carrying out this section, the Director, the Secretary of State, and any such other appropriate administering official are authorized—,

"(A) to make loans, and

"(B) to accept and use money, funds, property, and services of any kind made available by gift, devise, bequest, grant, or otherwise for the purpose of carrying out this section.

"(5) Assistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion.

"(6) As a condition for receiving assistance under this section, a State must—,

"(A) submit to the Director a plan which provides—,

"(i) a description of how the State intends to encourage effective refugee resettlement and to promote economic self–sufficiency as quickly as possible,

"(ii) a description of how the State will insure that language training and employment services are made available to refugees receiving cash assistance,

"(iii) for the designation of an individual, employed by the State, who will be responsible for insuring coordination of public and private resources in refugee resettlement,

"(iv) for the care and supervision of and legal responsibility for unaccompanied refugee children in the State, and

"(v) for the identification of refugees who at the time of resettlement in the State are determined to have medical conditions requiring, or medical histories indicating a need for, treatment or observation and such monitoring of such treatment or observation as may be necessary;

"(B) meet standards, goals, and priorities, developed by the Director, which assure the effective resettlement of refugees and which promote their economic self-sufficiency as quickly as possible and the efficient provision of services; and

"(C) submit to the Director, within a reasonable period of time after the end of each fiscal year, a report on the uses of funds provided under this chapter which the State is responsible for administering.

"(7) The Secretary, together with the Secretary of State with respect to assistance provided by the Secretary of State under subsection (b), shall develop a system of monitoring the assistance provided under this section. This system shall include—,

"(A) evaluations of the effectiveness of the programs funded under this section and the performance of States, grantees, and contractors;

"(B) financial auditing and other appropriate monitoring to detect any fraud, abuse, or mismanagement in the operation of such programs; and

"(C) data collection on the services provided and the results achieved.

"(8) The Attorney General shall provide the Director with information supplied by refugees in conjunction with their applications to the Attorney General for adjustment of status, and the Director shall compile, summarize, and evaluate such information.

"(9) The Secretary and the Secretary of State may issue such regulations as each deems appropriate to carry out this chapter.

"(10) For purposes of this chapter, the term 'refugee' includes any alien described in section 207(c)(2).

"(b) Program of Initial Resettlement.—(1)(A) For—,

"(i) fiscal years 1980 and 1981, the Secretary of State is authorized, and

(ii) fiscal year 1982 and succeeding fiscal years, the Director (except as provided in subparagraph (B)) is authorized,

to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States. Grants to, or contracts with, private nonprofit voluntary agencies under this paragraph shall be made consistent with the objectives of this chapter, taking into account the different resettlement approaches and practices of such agencies. Resettlement assistance under this paragraph shall be provided in coordination with the Director's provision of other assistance under this chapter. The Secretary of State and the Director shall jointly monitor the assistance provided during fiscal years 1980 and 1981 under this paragraph.

"(B) The President shall provide for a study of which agency is best able to administer the program under this paragraph and shall report, not later than March 1, 1981, to the Congress on such study. If the President determines after such study that the Director should not administer the program under this paragraph, the authority of the Director under the first sentence of subparagraph (A) shall be exercised by such officer as the President shall from time to time specify.

"(2) The Director is authorized to develop programs for such orientation, instruction in English, and job training for refugees, and such other education and training of refugees, as facilitates their resettlement in the United States. The Director is authorized to implement such programs, in accordance with the provisions of this section, with respect to refugees in the United States. The Secretary of State is authorized to implement such programs with respect to refugees awaiting entry into the United States.

"(3) The Secretary is authorized, in consultation with the Coordinator, to make arrangements (including cooperative arrangements with other Federal agencies) for the temporary care of refugees in the United States in emergency circumstances, including the establishment of processing centers, if necessary, without regard to such provisions of law (other than the Renegotiation Act of 1951 // 50 USC app. 1211 // and section 414(b) of this chapter) regulating the making, performance, amendment, or modification of contracts and the expenditure of funds of the United States Government as the Secretary may specify.

"(4) The Secretary, in consultation with the Coordinator, shall—,

 "(A) assure that an adequate number of trained staff are available at the location at which the refugees enter the United States to assure that all necessary medical records are available and in proper order;

 "(B) provide for the identification of refugees who have been determined to have medical conditions affecting the public health and requiring treatment;

 "(C) assure that State or local health officials at the resettlement destination within the United States of each refugee are promptly notified of the refugee's arrival and provided with all applicable medical records; and

 "(D) provide for such monitoring of refugees identified under subparagraph (B) as will insure that they receive appropriate and timely treatment.

The Secretary shall develop and implement methods for monitoring and assessing the quality of medical screening and related health services provided to refugees awaiting resettlement in the United States.

"(c) Project Grants and Contracts for Services for Refugees.—, The Director is authorized to make grants to, and enter into contracts with, public or private nonprofit agencies for projects specifically designed—,

"(1) to assist refugees in obtaining the skills which are necessary for economic self-sufficiency, including projects for job training, employment services, day care, professional refresher training, and other recertification services;

"(2) to provide training in English where necessary (regardless of whether the refugees are employed or receiving cash or other assistance); and

"(3) to provide where specific needs have been shown and recognized by the Director, health (including mental health) services, social services, educational and other services.

"(d) Assistance for Refugee Children.—(1) The Director is authorized to make grants, and enter into contracts, for payments for projects to provide special educational services (including English language training) to refugee children in elementary and secondary schools where a demonstrated need has been shown.

"(2)(A) The Director is authorized to provide assistance, reimbursement to States, and grants to and contracts with public and private nonprofit agencies, for the provision of child welfare services, including foster care maintenance payments and services and health care, furnished to any refugee child (except as provided in subparagraph (B)) during the thirty-six month period beginning with the first month in which such refugee child is in the United States.

"(B)(i) In the case of a refugee child who is unaccompanied by a parent or other close adult relative (as defined by the Director), the services described in subparagraph (A) may be furnished until the month after the child attains eighteen years of age (or such higher age as the State's child welfare services plan under part B of title IV of the Social Security Act // 42 USC 620. // prescribes for the availability of such services to any other child in that State).

"(ii) The Director shall attempt to arrange for the placement under the laws of the States of such unaccompanied refugee children, who have been accepted for admission to the United States, before (or as soon as possible after) their arrival in the United States. During any interim period while such a child is in the United States or in transit to the United States but before the child is so placed, the Director shall assume legal responsibility (including financial responsibility) for the child, if necessary, and is authorized to make necessary decisions to provide for the child's immediate care.

"(iii) In carrying out the Director's responsibilities under clause (ii), the Director is authorized to enter into contracts with appropriate public or private nonprofit agencies under such conditions as the Director determines to be appropriate.

"(iv) The Director shall prepare and maintain a list of (I) all such unaccompanied children who have entered the United States after April 1, 1975, (II) the names and last known residences of their parents (if living) at the time of arrival, and (III) the children's location, status, and progress.

"(e) Cash Assistance and Medical Assistance to Refugees.—(1) The Director is authorized to provide assistance, reimbursement to States, and grants to, and contracts with, public or private nonprofit agencies for up to 100 per centum of the cash assistance and medical assistance provided to any refugee during the thirty-six month period beginning with the first month in which such refugee has entered the United States and for the identifiable and reasonable administrative costs of providing this assistance.

"(2) Cash assistance provided under this subsection to an employable refugee is conditioned, except for good cause shown—,

"(A) on the refugee's registration with an appropriate agency providing employment services described in subsection (c)(1), or, if there is no such agency available, with an appropriate State or local employment service; and

"(B) on the refugee's acceptance of appropriate offers of employment;

except that subparagraph (A) does not apply during the first sixty days after the date of the refugee's entry.

"(3) The Director shall develop plans to provide English training and other appropriate services and training to refugees receiving cash assistance.

"(4) If a refugee is eligible for aid or assistance under a State plan approved under part A of title IV or under title XIX of the Social Security Act, // 42 USC 601, 1396. // or for supplemental security income benefits (including State supplementary payments) under the program established under title XVI of that Act, // 42 USC 1381. // funds authorized under this subsection shall only be used for the non–Federal share of such aid or assistance, or for such supplementary payments, with respect to cash and medical assistance provided with respect to such refugee under this paragraph.

"(5) The Director is authorized to allow for the provision of medical assistance under paragraph (1) to any refugee, during the one-year period after entry, who does not qualify for assistance under a State plan approved under title XIX of the Social Security Act // 42 USC 1396. // on account of any resources or income requirement of such plan, but only if the Director determines that—,

"(A) this will (i) encourage economic self-sufficiency, or (ii) avoid a significant burden on State and local governments; and

"(B) the refugee meets such alternative financial resources and income requirements as the Director shall establish.

" CONGRESSIONAL REPORTS

" Sec. 413. // 8 USC 1523. // (a)(1) The Secretary, in consultation with the Coordinator, shall submit a report on activities under this chapter to the Committees on the Judiciary of the House of Representatives and of the Senate not later than the January 31 following the end of each fiscal year, beginning with fiscal year 1980.

"(2) Each such report shall contain—,

"(A) an updated profile of the employment and labor force statistics for refugees who have entered under this Act since May 1975, as well as a description of the extent to which refugees received the forms of assistance or services under this chapter during that period;

"(B) a description of the geographic location of refugees;

"(C) a summary of the results of the monitoring and evaluation conducted under section 412(a)(7) during the period for which the report is submitted;

"(D) a description of (i) the activities, expenditures, and policies of the Office under this chapter and of the activities of States, voluntary agencies, and sponsors, and (ii) the Director's plans for improvement of refugee resettlement;

"(E) evaluations of the extent to which (i) the services provided under this chapter are assisting refugees in achieving economic self-sufficiency, achieving ability in English, and achieving employment commensurate with their skills and abilities, and (ii) any fraud, abuse, or mismanagement has been reported in the provisions of services or assistance;

"(F) a description of any assistance provided by the Director pursuant to section 412(e)(5);

"(G) a summary of the location and status of unaccompanied refugee children admitted to the United States; and

"(H) a summary of the information compiled and evaluation made under section 412(a)(8).

"(b) The Secretary, in consultation with the Coordinator, shall conduct and report to Congress, not later than one year after the date of the enactment of this chapter, an analysis of—,

"(1) resettlement systems used by other countries and the applicability of such systems to the United States;

"(2) the desirability of using a system other than the current welfare system for the provision of cash assistance, medical assistance, or both, to refugees; and

"(3) alternative resettlement strategies.

" AUTHORIZATION OF APPROPRIATIONS

" Sec. 414. // 8 USC 1524. // (a)(1) There are hereby authorized to be appropriated for fiscal year 1980 and for each of the two succeeding fiscal years, such sums as may be necessary for the purpose of providing initial resettlement assistance, cash and medical assistance, and child welfare services under subsections (b)(1), (b)(3), (b)(4), (d)(2), and (e) of section 412.

"(2) There are hereby authorized to be appropriated for fiscal year 1980 and for each of the two succeeding fiscal years $200,000,000, for the purpose of carrying out the provisions (other than those described in paragraph (1)) of this chapter.

"(b) The authority to enter into contracts under this chapter shall be effective for any fiscal year only to such extent or in such amounts as are provided in advance in appropriation Acts.".

Sec. 312. (a) The table of contents of the Immigration and Nationality Act is amended—,

(1) by striking out the item relating to title IV and inserting in lieu thereof the following:

" Title IV— Miscellaneous and Refugee Assistance

"CHAPTER 1—MISCELLANEOUS"; and

(2) by adding at the end the following new items:

"CHAPTER 2—REFUGEE ASSISTANCE

" Sec. 411. Office of Refugee Resettlement.

"Sec. 412. Authorization for programs for domestic resettlement of and assistance to refugees.

" Sec. 413. Congressional reports.

"Sec. 414. Authorization of appropriations.".

(b)(1) Subsection (b) of section 2 of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601) is amended by striking out paragraphs (1) through (6) and inserting in lieu thereof the following:

"(1) for contributions to the activities of the United Nations High Commissioner for Refugees for assistance to refugees under his mandate or persons on behalf of whom he is exercising his good offices, and for contributions to the Intergovernmental Committee for European Migration, the International Committee of the Red Cross, and to other relevant international organizations; and

"(2) for assistance to or on behalf of refugees who are outside the United States designated by the President (by class, group, or designation of their respective countries of origin or areas of residence) when the President determines that such assistance will contribute to the foreign policy interests of the United States.".

(2) Subsection (c)(2) of such section is amended by striking out "$25,000,000" and inserting in lieu thereof "$50,000,000".

(c) The Indochina Migration and Refugee Assistance Act of 1975 (Public Law 94—23) // 22 USC 2601 // is repealed.

Sec. 313. (a) Except as otherwise provided in this section, the amendments made by this part // 8 USC 1522 // shall apply to fiscal years beginning on or after October 1, 1979.

(b) Subject to subsection (c), the limitations contained in sections 412(d)(2)(A) and 412(e)(1) of the Immigration and Nationality Act on the duration of the period for which child welfare services and cash and medical assistance may be provided to particular refugees shall not apply to such services and assistance provided before April 1, 1981.

(c) Notwithstanding section 412(e)(1) of the Immigration and Nationality Act and in lieu of any assistance which may otherwise be provided under such section with respect to Cuban refugees who entered the United States and were receiving assistance under section 2(b) of the Migration and Refugee Assistance Act of 1962 // 22 USC 2601. // before October 1, 1978, the Director of the Office of Refugee Resettlement is authorized—,

(1) to provide reimbursement—,

(A) in fiscal year 1980, for 75 percent,

(B) in fiscal year 1981, for 60 percent,

(C) in fiscal year 1982, for 45 percent, and

(D) in fiscal year 1983, for 25 percent, of the non-Federal costs of providing cash and medical assistance (other than assistance described in paragraph (2)) to such refugees, and

(2) to provide reimbursement in any fiscal year for 100 percent of the non-Federal costs associated with such Cuban refugees with respect to whom supplemental security income payments were being paid as of September 30, 1978, under title XVI of the Social Security Act.

(d) The requirements of section 412(a)(6)(A) of the Immigration and Nationality Act shall apply to assistance furnished under chapter 2 of title IV of such Act after October 1, 1980, or such earlier date as the Director of the Office of Refugee Resettlement may establish.

## TITLE IV— SOCIAL SERVICES FOR CERTAIN APPLICANTS FOR ASYLUM

Sec. 401. // 8 USC 1522 // (a) The Director of the Office of Refugee Resettlement is authorized to use funds appropriated under paragraphs (1) and (2) of section 414(a) of the Immigration and Nationality Act to reimburse State and local public agencies for expenses which those agencies incurred, at any time, in providing aliens described in subsection (c) of this section with social services of the types for which reimbursements were made with respect to refugees under paragraphs (3) through (6) of section 2(b) of the Migration and Refugee Assistance Act of 1962 (as in effect prior to the enactment of this Act) // 22 USC 2601. // or under any other Federal law.

(b) The Attorney General is authorized to grant to an alien described in subsection (c) of this section permission to engage in employment in the United States and to provide to that alien an "employment authorized" endorsement or other appropriate work permit.

(c) This section applies with respect to any alien in the United States (1) who has applied before November 1, 1979, for asylum in the United States, (2) who has not been granted asylum, and (3) with respect to whom a final, nonappealable, and legally enforceable order of deportation or exclusion has not been entered.

Approved March 17, 1980.

### LEGISLATIVE HISTORY:

HOUSE REPORTS: No. 96—608 accompanying H.R. 2816 (Comm. on the Judiciary) and No. 96—781 (Comm. of Conference).

SENATE REPORTS: No. 96—256 (Comm. on the Judiciary) and No. 96—590 (Comm. of Conference).

### CONGRESSIONAL RECORD:

Vol. 125 (1979): Sept. 6, considered and passed Senate. Dec. 20, H.R. 2816 considered and passed House; passage vacated and S. 643, amended, passed in lieu.

Vol. 126 (1980): Feb. 26, Senate agreed to conference report. Mar. 4, House agreed to conference report.

### WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS:

Vol. 16, No. 12 (1980): Mar. 18, Presidential statement.

PL 96–212, 1980 S 643

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 109–13, May 11, 2005, 119 Stat 231

UNITED STATES PUBLIC LAWS

109th Congress - First Session

Convening January 7, 2005

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed

PL 109–13 (HR 1268)

May 11, 2005

EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT FOR DEFENSE,
THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005

An Act Making Emergency Supplemental Appropriations for Defense, the Global War on Terror, and Tsunami Relief, for the fiscal year ending September 30, 2005, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005".

SEC. 2. TABLE OF CONTENTS.

The table of contents for this Act is as follows:

Sec. 1. Short title.

Sec. 2. Table of contents.

Sec. 3. References.

DIVISION A—EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR
DEFENSE, THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005

Title I—Defense Related Appropriations

Title II—International Programs and Assistance for Reconstruction and the War on Terror

Title III—Domestic Appropriations for the War on Terror

Title IV—Indian Ocean Tsunami Relief

Title V—Other Emergency Appropriations

Title VI—General Provisions and Technical Corrections

DIVISION B—REAL ID Act of 2005

## SEC. 3. REFERENCES.

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

### DIVISION A—EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT FOR DEFENSE, THE GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2005, and for other purposes, namely:

### TITLE I—DEFENSE–RELATED APPROPRIATIONS

### DEPARTMENT OF DEFENSE—MILITARY

### MILITARY PERSONNEL

#### Military Personnel, Army

For an additional amount for "Military Personnel, Army", $13,609,208,000, of which not to exceed $508,374,000 shall remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Military Personnel, Navy

For an additional amount for "Military Personnel, Navy", $535,108,000, of which not to exceed $19,928,000 shall remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Military Personnel, Marine Corps

For an additional amount for "Military Personnel, Marine Corps", $1,358,053,000, of which not to exceed $220,227,000 shall remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Military Personnel, Air Force

For an additional amount for "Military Personnel, Air Force", $1,599,943,000, of which not to exceed $16,471,000 shall remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Reserve Personnel, Army

For an additional amount for "Reserve Personnel, Army", $39,627,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Reserve Personnel, Navy

For an additional amount for "Reserve Personnel, Navy", $9,411,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Reserve Personnel, Marine Corps

For an additional amount for "Reserve Personnel, Marine Corps", $4,015,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Reserve Personnel, Air Force

For an additional amount for "Reserve Personnel, Air Force", $130,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### National Guard Personnel, Army

For an additional amount for "National Guard Personnel, Army", $291,100,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### National Guard Personnel, Air Force

For an additional amount for "National Guard Personnel, Air Force", $91,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## OPERATION AND MAINTENANCE

### Operation and Maintenance, Army

For an additional amount for "Operation and Maintenance, Army", $16,980,304,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Navy

For an additional amount for "Operation and Maintenance, Navy", $3,030,574,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Marine Corps

For an additional amount for "Operation and Maintenance, Marine Corps", $982,464,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Air Force

For an additional amount for "Operation and Maintenance, Air Force", $5,627,053,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Defense–Wide

For an additional amount for "Operation and Maintenance, Defense–Wide", $3,042,265,000, of which—

(1) not to exceed $25,000,000 may be used for the Combatant Commander Initiative Fund, to be used in support of Operation Iraqi Freedom and Operation Enduring Freedom; and

(2) up to $1,220,000,000, to remain available until expended, may be used for payments to reimburse Pakistan, Jordan, and other key cooperating nations, for logistical, military, and other support provided, or to be provided, to United States military operations, notwithstanding any other provision of law: *Provided*, That such payments may be made in such amounts as the Secretary of Defense, with the concurrence of the Secretary of State, and in consultation with the Director of the Office of Management and Budget, may determine, in his discretion, based on documentation determined by the Secretary of Defense to adequately account for the support provided, and such determination is final and conclusive upon the accounting officers of the United States, and 15 days following notification to the appropriate congressional committees: *Provided further*, That the Secretary of Defense shall provide quarterly reports to the congressional defense committees on the use of funds provided in this paragraph: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### Operation and Maintenance, Army Reserve

For an additional amount for "Operation and Maintenance, Army Reserve", $26,354,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Navy Reserve

For an additional amount for "Operation and Maintenance, Navy Reserve", $75,164,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Marine Corps Reserve

For an additional amount for "Operation and Maintenance, Marine Corps Reserve", $24,920,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operation and Maintenance, Army National Guard

For an additional amount for "Operation and Maintenance, Army National Guard", $326,850,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Afghanistan Security Forces Fund

### (INCLUDING TRANSFER OF FUNDS)

For the "Afghanistan Security Forces Fund", $1,285,000,000, to remain available until September 30, 2006: *Provided*, That such funds shall be available to the Secretary of Defense, notwithstanding any other provision of law, for the purpose of allowing the Commander, Combined Forces Command—Afghanistan, or the Secretary's designee to provide assistance, with the concurrence of the Secretary of State, to the security forces of Afghanistan including the provision of equipment, supplies, services, training, facility and infrastructure repair, renovation, and construction, and funding: *Provided further*, That the authority to provide assistance under this section is in addition to any other authority to provide assistance to foreign nations: *Provided further*, That the Secretary of Defense may transfer the funds provided herein to appropriations for military personnel; operation and maintenance; Overseas Humanitarian, Disaster, and Civic Aid; procurement; research, development, test and evaluation; and defense working capital funds to accomplish the purposes provided herein: *Provided further*, That this transfer authority is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That upon a determination that all or part of the funds so transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: *Provided further*, That of the amounts provided under this heading, $290,000,000 shall be transferred to "Operation and Maintenance, Army" to reimburse the Department of the Army for costs incurred to train, equip and provide related assistance to Afghan security forces: *Provided further*, That contributions of funds for the purposes provided herein from any person, foreign government, or international organization may be credited to this Fund, and used for such purposes: *Provided further*, That the Secretary shall notify the congressional defense committees in writing upon the receipt and upon the transfer of any contribution delineating the sources and amounts of the funds received and the specific use of such contributions: *Provided further*, That the Secretary of Defense shall, not fewer than 5 days prior to making transfers from this appropriation, notify the congressional defense committees in writing of the details of any such transfer: *Provided further*, That the Secretary shall submit a report no later than 30 days after the end of each fiscal quarter to the congressional defense committees summarizing the details of the transfer of funds from this appropriation: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Iraq Security Forces Fund

### (INCLUDING TRANSFER OF FUNDS)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For the "Iraq Security Forces Fund", $5,700,000,000, to remain available until September 30, 2006: *Provided*, That such funds shall be available to the Secretary of Defense, notwithstanding any other provision of law, for the purpose of allowing the Commander, Multi–National Security Transition Command—Iraq, or the Secretary's designee to provide assistance, with the concurrence of the Secretary of State, to the security forces of Iraq including the provision of equipment, supplies, services, training, facility and infrastructure repair, renovation, and construction, and funding: *Provided further*, That the authority to provide assistance under this section is in addition to any other authority to provide assistance to foreign nations: Provided further, That the Secretary of Defense may transfer the funds provided herein to appropriations for military personnel; operation and maintenance; Overseas Humanitarian, Disaster, and Civic Aid; procurement; research, development, test and evaluation; and defense working capital funds to accomplish the purposes provided herein: *Provided further*, That this transfer authority is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That upon a determination that all or part of the funds so transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: *Provided further*, That of the amounts provided under this heading, $210,000,000 shall be transferred to "Operation and Maintenance, Army" to reimburse the Department of the Army for costs incurred to train, equip, and provide related assistance to Iraqi security forces: *Provided further*, That contributions of funds for the purposes provided herein from any person, foreign government, or international organization may be credited to this Fund, and used for such purposes: *Provided further*, That the Secretary shall notify the congressional defense committees in writing upon the receipt and upon the transfer of any contribution delineating the sources and amounts of the funds received and the specific use of such contributions: *Provided further*, That, notwithstanding any other provision of law, from funds made available under this heading, $99,000,000 shall be used to provide assistance to the Government of Jordan to establish a regional training center designed to provide comprehensive training programs for regional military and security forces and military and civilian officials, to enhance the capability of such forces and officials to respond to existing and emerging security threats in the region: *Provided further*, That assistance authorized by the preceding proviso may include the provision of facilities, equipment, supplies, services and training, and the Secretary of Defense may transfer funds to any Federal agency for the purpose of providing such assistance: *Provided further*, That the Secretary of Defense shall, not fewer than 5 days prior to making transfers from this appropriation, notify the congressional defense committees in writing of the details of any such transfer: *Provided further*, That the Secretary shall submit a report no later than 30 days after the end of each fiscal quarter to the congressional defense committees summarizing the details of the transfer of funds from this appropriation: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## PROCUREMENT

### Aircraft Procurement, Army

For an additional amount for "Aircraft Procurement, Army", $458,677,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Missile Procurement, Army

For an additional amount for "Missile Procurement, Army", $310,250,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Procurement of Weapons and Tracked Combat Vehicles, Army

For an additional amount for "Procurement of Weapons and Tracked Combat Vehicles, Army", $2,551,187,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Procurement of Ammunition, Army

For an additional amount for "Procurement of Ammunition, Army", $532,800,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### Other Procurement, Army

For an additional amount for "Other Procurement, Army", $6,250,505,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Aircraft Procurement, Navy

For an additional amount for "Aircraft Procurement, Navy", $200,295,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Weapons Procurement, Navy

For an additional amount for "Weapons Procurement, Navy", $66,000,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Procurement of Ammunition, Navy and Marine Corps

For an additional amount for "Procurement of Ammunition, Navy and Marine Corps", $139,635,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Other Procurement, Navy

For an additional amount for "Other Procurement, Navy", $78,397,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Procurement, Marine Corps

For an additional amount for "Procurement, Marine Corps", $3,283,042,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Aircraft Procurement, Air Force

For an additional amount for "Aircraft Procurement, Air Force", $277,309,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Procurement of Ammunition, Air Force

For an additional amount for "Procurement of Ammunition, Air Force", $6,998,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Other Procurement, Air Force

For an additional amount for "Other Procurement, Air Force", $2,577,560,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Procurement, Defense–Wide

For an additional amount for "Procurement, Defense–Wide", $645,939,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION

### Research, Development, Test and Evaluation, Army

For an additional amount for "Research, Development, Test and Evaluation, Army", $37,170,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Research, Development, Test and Evaluation, Navy

For an additional amount for "Research, Development, Test and Evaluation, Navy", $204,051,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Research, Development, Test and Evaluation, Air Force

For an additional amount for "Research, Development, Test and Evaluation, Air Force", $142,500,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Research, Development, Test and Evaluation, Defense–Wide

For an additional amount for "Research, Development, Test and Evaluation, Defense–Wide", $203,561,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## REVOLVING AND MANAGEMENT FUNDS

### Defense Working Capital Funds

For an additional amount for "Defense Working Capital Funds", $1,511,300,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### National Defense Sealift Fund

For an additional amount for "National Defense Sealift Fund", $32,400,000, to remain available until expended: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## RELATED AGENCIES

### Intelligence Community Management Account

For an additional amount for "Intelligence Community Management Account", $250,300,000, of which $181,000,000 is to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## OTHER DEPARTMENT OF DEFENSE PROGRAMS

### Drug Interdiction and Counter–Drug Activities, Defense

### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Drug Interdiction and Counter–Drug Activities, Defense", $242,000,000: *Provided*, That these funds may be used for such activities related to Afghanistan and the Central Asia area: *Provided further*, That the Secretary of Defense may transfer the funds provided herein only to appropriations for military personnel; operation and maintenance; and procurement: *Provided further*, That the funds transferred shall be merged with and be available for the same purposes and for the same time period as the appropriation to which transferred: *Provided further*, That the transfer authority provided in this paragraph is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: *Provided further*, That not to exceed $70,000,000 of the

funds provided herein may be used to reimburse fully this account for obligations incurred for the purposes provided under this heading prior to enactment of this Act: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## Office of the Inspector General

For an additional amount for "Office of the Inspector General", $148,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## Defense Health Program

For an additional amount for "Defense Health Program", $210,550,000 for Operation and maintenance: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## MILITARY CONSTRUCTION

## Military Construction, Army

For an additional amount for "Military Construction, Army", $847,191,000, to remain available until September 30, 2006: *Provided*, That notwithstanding any other provision of law, such funds may be obligated or expended to carry out planning and design and military construction projects not otherwise authorized by law: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## Military Construction, Navy and Marine Corps

For an additional amount for "Military Construction, Navy and Marine Corps", $139,880,000, to remain available until September 30, 2006: *Provided*, That notwithstanding any other provision of law, such funds may be obligated or expended to carry out planning and design and military construction projects not otherwise authorized by law: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## Military Construction, Air Force

For an additional amount for "Military Construction, Air Force", $140,983,000, to remain available until September 30, 2006: *Provided*, That notwithstanding any other provision of law, such funds may be obligated or expended to carry out planning and design and military construction projects not otherwise authorized by law: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## GENERAL PROVISIONS, THIS TITLE

## SPECIAL TRANSFER AUTHORITY

### (TRANSFER OF FUNDS)

SEC. 1001. Upon his determination that such action is necessary in the national interest, the Secretary of Defense may transfer between appropriations up to $3,000,000,000 of the funds made available to the Department of Defense in this title, except for military construction: *Provided*, That the Secretary shall notify the Congress promptly of each transfer made pursuant to this authority: *Provided further*, That the transfer authority provided in this section is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the authority in this section is subject to the same terms and conditions as the authority provided in section 8005 of the Department of Defense Appropriations Act, 2005, except for the fourth proviso: *Provided further*, That the amount made available by the transfer of funds in or pursuant to this section is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.01096   8

## GENERAL TRANSFER AUTHORITY

### (TRANSFER OF FUNDS)

SEC. 1002. Section 8005 of the Department of Defense Appropriations Act, 2005 (Public Law 108–287; 118 Stat. 969), is amended by striking "$3,500,000,000" and inserting in lieu thereof "$6,185,000,000": *Provided*, That the amount made available by the transfer of funds in or pursuant to this section is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## COUNTER–DRUG ACTIVITIES

SEC. 1003. (a) AUTHORITY TO PROVIDE SUPPORT.—Of the amount appropriated by this Act under the heading "Drug Interdiction and Counter–Drug Activities, Defense", not to exceed $34,000,000 may be made available for support for counter-drug activities of the Government of Afghanistan, and not to exceed $4,000,000 may be made available for support for counter-drug activities of the Government of Pakistan: *Provided*, That such support shall be in addition to support provided for the counter-drug activities of said Governments under any other provision of the law.

(b) TYPES OF SUPPORT.—(1) Except as specified in subsections (b)(2) and (b)(3) of this section, the support that may be provided under the authority in this section shall be limited to the types of support specified in section 1033(c)(1) of the National Defense Authorization Act for Fiscal Year 1998 (Public Law 105–85, as amended by Public Law 106–398 and Public Law 108–136) and conditions on the provision of support as contained in section 1033 shall apply for fiscal year 2005.

(2) The Secretary of Defense may transfer vehicles, aircraft, and detection, interception, monitoring and testing equipment to said Governments for counter-drug activities.

(3) For the Government of Afghanistan, the Secretary of Defense may also provide individual and crew-served weapons, and ammunition for counter-drug security forces.

## EXTRAORDINARY AND EMERGENCY EXPENSES

SEC. 1004. The paragraph under the heading "Operation and Maintenance, Defense–Wide" in title II of the Department of Defense Appropriations Act, 2005 (Public Law 108–287; 118 Stat. 954), is amended in the first proviso by striking "$32,000,000" and inserting "$40,000,000".

## ADVANCE BILLING

### << 10 USCA § 2208 NOTE >>

SEC. 1005. For fiscal year 2005, the limitation under paragraph (3) of section 2208(l) of title 10, United States Code, on the total amount of advance billings rendered or imposed for all working capital funds of the Department of Defense in a fiscal year shall be applied by substituting "$1,500,000,000" for "$1,000,000,000".

## COMMANDER'S EMERGENCY RESPONSE PROGRAM

SEC. 1006. Section 1201(a) of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (Public Law 108–375; 118 Stat. 2077), as amended by section 102 of title I of division J of the Consolidated Appropriations Act, 2005 (Public Law 108–447), is further amended by striking "$500,000,000" in the matter preceding paragraph (1) and inserting "$854,000,000": *Provided*, That from funds available for the Commander's Emergency Response Program for fiscal year 2005, not to exceed $10,000,000 may be used to purchase weapons from any person, foreign government, international organization or other entity for the purpose of protecting United States forces overseas, and to dispose of the weapons purchased: *Provided further*, That the Secretary of Defense shall submit to the congressional defense committees quarterly reports regarding the purchase and disposal of weapons under this subsection.

## CLASSIFIED PROGRAM

SEC. 1007. Section 8090(b) of the Department of Defense Appropriations Act, 2005 (Public Law 108–287), is amended by striking "$185,000,000" and inserting "$210,000,000".

## LIMITATION ON CIVILIAN COMPENSATION

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 1121 of 3864

SEC. 1008. (a) During calendar year 2005 and notwithstanding section 5547 of title 5, United States Code, the head of an Executive agency may waive the limitation, up to $200,000, established in that section for total compensation, including limitations on the aggregate of basic pay and premium pay payable in a calendar year, to an employee who performs work while in an overseas location that is in the area of responsibility of the Commander of the U.S. Central Command, in support of, or related to—

  (1) a military operation, including a contingency operation; or

  (2) an operation in response to a declared emergency.

(b) To the extent that a waiver under subsection (a) results in payment of additional premium pay of a type that is normally creditable as basic pay for retirement or any other purpose, such additional pay shall not be considered to be basic pay for any purpose, nor shall it be used in computing a lump-sum payment for accumulated and accrued annual leave under section 5551 of title 5, United States Code.

(c) The Director of the Office of Personnel Management may issue regulations to ensure appropriate consistency among heads of executive agencies in the exercise of authority granted by this section.

## OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

<< 50 USCA § 401 NOTE >>

SEC. 1009. Section 1096(b) of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458), is amended—

  (1) by striking "in the fiscal year after the effective date of this Act" and inserting in lieu thereof "in the fiscal years 2005 and 2006"; and

  (2) in paragraph (1) by striking "500 new personnel billets" and inserting in lieu thereof "the total of 500 new personnel positions".

## COALITION LIAISON OFFICERS

<< 10 USCA § 1051a >>

SEC. 1010. Section 1051a(e) of title 10, United States Code, is amended by striking "September 30, 2005" and inserting "December 31, 2005".

## RESERVE AFFILIATION BONUS

SEC. 1011. Notwithstanding subsection (c) of section 308e of title 37, United States Code, the maximum amount of the bonus paid to a member of the Armed Forces pursuant to a reserve affiliation agreement entered into under such section during fiscal year 2005 shall not exceed $10,000, and the Secretary of Defense and the Secretary of Homeland Security, with respect to the Coast Guard, may prescribe regulations under subsection (f) of such section to modify the method by which bonus payments are made under reserve affiliation agreements entered into during such fiscal year.

## SERVICEMEMBERS' GROUP LIFE INSURANCE

SEC. 1012. (a) INCREASED MAXIMUM AMOUNT OF SERVICEMBERS' GROUP LIFE INSURANCE.—Section 1967 of title 38, United States Code, is amended—

<< 38 USCA § 1967 >>

(1) in subsection (a)(3)(A), by striking clause (i) and inserting the following new clause:

"(i) In the case of a member—

  "(I) $400,000 or such lesser amount as the member may elect as provided in subparagraph (B);

  "(II) in the case of a member covered by subsection (e), the amount provided for or elected by the member under subclause (I) plus the additional amount of insurance provided for the member by subsection (e); or

  "(III) in the case of a member covered by subsection (e) who has made an election under paragraph (2)(A) not to be insured under this subchapter, the amount of insurance provided for the member by subsection (e)."; and

<< 38 USCA § 1967 >>

(2) in subsection (d), by striking "$250,000" and inserting "$400,000".

<< 38 USCA § 1967 >>

(b) INCREMENTS OF DECREASED AMOUNTS ELECTABLE BY MEMBERS.—Subsection (a)(3)(B) of such section is amended by striking "member or spouse" in the last sentence and inserting "member, be evenly divisible by $50,000 and, in the case of a member's spouse".

(c) ADDITIONAL AMOUNT FOR MEMBERS SERVING IN CERTAIN AREAS OR OPERATIONS.—

<< 38 USCA § 1967 >>

(1) INCREASED AMOUNT.—Section 1967 of such title is further amended—

(A) by redesignating subsection (e) as subsection (f); and
(B) by inserting after subsection (d) the following new subsection (e):

<< 38 USCA § 1967 >>

"(e)(1) A member covered by this subsection is any member as follows:

"(A) Any member who dies as a result of one or more wounds, injuries, or illnesses incurred while serving in an operation or area that the Secretary designates, in writing, as a combat operation or a zone of combat, respectively, for purposes of this subsection.

"(B) Any member who formerly served in an operation or area so designated and whose death is determined (under regulations prescribed by the Secretary of Defense) to be the direct result of injury or illness incurred or aggravated while so serving.

"(2) The additional amount of insurance under this subchapter that is provided for a member by this subsection is $150,000, except that in a case in which the amount provided for or elected by the member under subsection (a)(3)(A)(i)(I) exceeds $250,000, the additional amount of insurance under this subchapter that is provided for the member by this subsection shall be reduced to such amount as is necessary to comply with the limitation in paragraph (3).

"(3) The total amount of insurance payable for a member under this subchapter may not exceed $400,000.

"(4) While a member is serving in an operation or area designated as described in paragraph (1), the cost of insurance of the member under this subchapter that is attributable to $150,000 of insurance coverage shall, at the election of the Secretary concerned—

"(A) be contributed as provided in section 1969(b)(2) of this title, rather through deduction or withholding from the member's pay; or

"(B) if deducted or withheld from the member's pay, be reimbursed to the member through such mechanism as the Secretary concerned determines appropriate.".

<< 38 USCA § 1969 >>

(2) FUNDING.—Section 1969(b) of such title is amended—
(A) by inserting "(1)" after "(b)"; and
(B) by adding at the end the following new paragraph:

"(2) For each month for which a member insured under this subchapter is serving in an operation or area designated as described by paragraph (1)(A) of section 1967(e) of this title, there may, at the election of the Secretary concerned under paragraph (4)(A) of such section, be contributed from the appropriation made for active duty pay of the uniformed service concerned an amount determined by the Secretary and certified to the Secretary concerned to be the cost of Servicemembers' Group Life Insurance which is traceable to the cost of providing insurance for the member under section 1967 of this title in the amount of $150,000.".

<< 38 USCA § 1967 >>

(d) CONFORMING AMENDMENT.—Section 1967(a)(2)(A) of such title is amended by inserting before the period at the end the following: ", except with respect to insurance provided under paragraph (3)(A)(i)(III)".

<< 38 USCA § 1977 >>

(e) COORDINATION WITH VGLI.—Section 1977(a) of such title is amended—

 (1) by striking "$250,000" each place it appears and inserting "$400,000"; and
 (2) by adding at the end of paragraph (1) the following new sentence: "Any additional amount of insurance provided a member under section 1967(e) of this title may not be treated as an amount for which Veterans' Group Life Insurance shall be issued under this section.".

(f) REQUIREMENTS REGARDING ELECTIONS OF MEMBERS TO REDUCE OR DECLINE INSURANCE.—Section 1967(a) of such title is further amended—

<< 38 USCA § 1967 >>

 (1) in paragraph (2), by adding at the end the following new subparagraph:
 "(C) Pursuant to regulations prescribed by the Secretary of Defense, notice of an election of a member with a spouse not to be insured under this subchapter, or to be insured under this subchapter in an amount less than the maximum amount provided under paragraph (3)(A)(i)(I), shall be provided to the spouse of the member."; and

<< 38 USCA § 1967 >>

 (2) in paragraph (3)—
  (A) in the matter preceding clause (i), by striking "and (C)" and inserting ", (C), and (D)"; and
  (B) by adding at the end the following new subparagraphs:

<< 38 USCA § 1967 >>

 "(D) A member with a spouse may not elect not to be insured under this subchapter, or to be insured under this subchapter in an amount less than the maximum amount provided under subparagraph (A)(i)(I), without the written consent of the spouse.

<< 38 USCA § 1967 >>

 "(E) Whenever a member who is not married elects not to be insured under this subchapter, or to be insured under this subchapter in an amount less than the maximum amount provided for under subparagraph (A)(i)(I), the Secretary concerned shall provide a notice of such election to any person designated by the member as a beneficiary or designated as the member's next-of-kin for the purpose of emergency notification, as determined under regulations prescribed by the Secretary of Defense.".

<< 38 USCA § 1970 >>

 (g) REQUIREMENT REGARDING REDESIGNATION OF BENEFICIARIES.—Section 1970 of such title is amended by adding at the end the following new subsection:
 "(j) A member with a spouse may not modify the beneficiary or beneficiaries designated by the member under subsection (a) without providing written notice of such modification to the spouse.".

<< 38 USCA § 1967 NOTE >>

 (h) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the first day of the first month that begins more than 90 days after the date of the enactment of this Act.

<< 38 USCA § 1967 NOTE >>

(i) TERMINATION.—The amendments made by this section shall terminate on September 30, 2005. Effective on October 1, 2005, the provisions of sections 1967, 1969, 1970, and 1977 of title 38, United States Code, as in effect on the day before the date of the enactment of this Act shall be revived.

DEATH GRATUITY

<< 10 USCA § 1478 >>

SEC. 1013. (a) INCREASE IN DEATH GRATUITY.—
  (1) AMOUNT.—Section 1478 of title 10, United States Code, is amended—

<< 10 USCA § 1478 >>

(A) in subsection (a), by inserting ", except as provided in subsections (c), (e), and (f)" after "$12,000";

<< 10 USCA § 1478 >>

(B) by redesignating subsection (c) as subsection (d); and

<< 10 USCA § 1478 >>

(C) by inserting after subsection (b) the following new subsection (c):
  "(c) The death gratuity payable under sections 1475 through 1477 of this title is $100,000 in the case of a death resulting from wounds, injuries, or illnesses that are—
  "(1) incurred as described in section 1413a(e)(2) of this title; or
  "(2) incurred in an operation or area designated as a combat operation or a combat zone, respectively, by the Secretary of Defense under section 1967(e)(1)(A) of title 38.".

<< 10 USCA § 1478 >>

(2) CONFORMING AMENDMENT.—Subsection (a) of such section, as amended by paragraph (1), is further amended by striking "(as adjusted under subsection (c))" and inserting "(as adjusted under subsection (d))".

<< 10 USCA § 1478 >>

(b) RETROACTIVE PAYMENT OF DEATH GRATUITY FOR DEATHS AFTER OCTOBER 7, 2001, FROM COMBAT–RELATED CAUSES OR CAUSES INCURRED IN COMBAT OPERATIONS OR AREAS.—Such section is further amended by adding at the end the following new subsection:
  "(e)(1) In the case of a person described in paragraph (2), a death gratuity shall be payable in accordance with this subsection for the death of such person that is in addition to the death gratuity payable in the case of such death under subsection (a).
  "(2) This subsection applies in the case of a member of the armed forces who dies before the date of the enactment of this subsection as a direct result of one or more wounds, injuries, or illnesses that—
  "(A) were incurred in the theater of operations of Operation Enduring Freedom or Operation Iraqi Freedom; or
  "(B) were incurred as described in section 1413a(e)(2) of this title on or after October 7, 2001.
  "(3) The amount of additional death gratuity payable under this subsection shall be $238,000, of which—
  "(A) $150,000 shall be paid in the manner specified in paragraph (4); and
  "(B) $88,000 shall be paid in the manner specified in paragraph (5).
  "(4) A payment pursuant to paragraph (3)(A) by reason of a death covered by this subsection shall be paid—
  "(A) to a beneficiary in proportion to the share of benefits applicable to such beneficiary in the payment of life insurance proceeds paid on the basis of that death under the Servicemembers Group Life Insurance program under subchapter III of chapter 19 of title 38; or

AR.01101

"(B) in the case of a person who elected not to be insured under the provisions of that subchapter, in equal shares to the person or persons who would have received proceeds under those provisions of law for a member who is insured under that subchapter but does not designate named beneficiaries.

"(5) A payment pursuant to paragraph (3)(B) by reason of a death covered by this subsection shall be paid equal shares to the beneficiaries who were paid the death gratuity that was paid with respect to that death under this section.".

<< 10 USCA § 1478 >>

(c) PAYMENT OF DEATH GRATUITY FOR CERTAIN OTHER DEATHS FROM COMBAT–RELATED CAUSES OR CAUSES INCURRED IN COMBAT OPERATIONS OR AREAS.—Such section is further amended by adding at the end the following new subsection:

"(f)(1) In the case of a person described in paragraph (2), a death gratuity shall be payable in accordance with this subsection for the death of such person that is in addition to the death gratuity payable in the case of such death under subsection (e).

"(2) This subsection applies in the case of a member of the armed forces who dies during the period beginning on the date of the enactment of this subsection and ending on the first day of the first month that begins more than 90 days after such date of one or more wounds, injuries, or illnesses that—

"(A) are incurred in the theater of operations of Operation Enduring Freedom or Operation Iraqi Freedom; or

"(B) are incurred as described in section 1413a(e)(2) of this title.

"(3) The amount of additional death gratuity payable under this subsection shall be $150,000.

"(4) A payment pursuant to paragraph (3) by reason of a death covered by this subsection shall be paid—

"(A) to a beneficiary in proportion to the share of benefits applicable to such beneficiary in the payment of life insurance proceeds payable on the basis of that death under the Servicemembers Group Life Insurance program under subchapter III of chapter 19 of title 38; or

"(B) in the case of a person who elected not to be insured under the provisions of that subchapter, in equal shares to the person or persons who receive proceeds under those provisions of law for a member who is insured under that subchapter but does not designate named beneficiaries.".

<< 10 USCA § 1478 NOTE >>

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date of the enactment of this Act.

<< 10 USCA § 1478 NOTE >>

(e) TERMINATION.—

(1) IN GENERAL.—This section and the amendment made by this subsection shall terminate on September 30, 2005. Effective as of October 1, 2005, the provisions of section 1478 of title 10, United States Code, as in effect on the date before the date of the enactment of this Act shall be revived.

(2) CONTINUING OBLIGATION TO PAY.—Any amount of additional death gratuity payable under section 1478 of title 10, United States Code, by reason of the amendments made by subsections (b) and (c) of this section that remains payable as of September 30, 2005, shall, notwithstanding paragraph (1), remain payable after that date until paid.

## INTELLIGENCE ACTIVITIES AUTHORIZATION

SEC. 1014. Funds appropriated in this title, or made available by the transfer of funds in or pursuant to this title, for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

## PROHIBITION OF NEW START PROGRAMS

SEC. 1015. (a) None of the funds provided in this title may be used to finance programs or activities denied by Congress in fiscal year 2004 and 2005 appropriations to the Department of Defense or to initiate a procurement or research, development, test and evaluation new start program without prior written notification to the congressional defense committees.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) Notwithstanding subsection (a) of this section, the Department of the Army may use funds made available in this Act under the heading "Procurement of Ammunition, Army" to procure ammunition and accessories therefor that have a standard-type classification, under Army regulations pertaining to the acceptability of materiel for use, and that are the same as other ammunition and accessories therefor that have been procured with funds made available under such heading in past appropriations Acts for the Department of Defense, only for 25mm high explosive rounds for M2 Bradley Fighting Vehicles, 120mm multi-purpose anti-tank and obstacle reduction rounds for M1 Abrams tanks, L410 aircraft countermeasure flares, 81mm mortar red phosphorous smoke rounds, MD73 impulse cartridge for aircraft flares, and 20mm high explosive rounds for C–RAM, whose stocks have been depleted and must be replenished for continuing operations of the Department of the Army.

## CHEMICAL WEAPONS DEMILITARIZATION

SEC. 1016. (a)(1) Notwithstanding section 917 of Public Law 97–86, as amended, of the funds appropriated or otherwise made available by the Department of Defense Appropriations Act, 2005 (Public Law 108–287), the Military Construction Appropriations and Emergency Hurricane Supplemental Appropriations Act, 2005 (Public Law 108–324), and other Acts for the purpose of the destruction of the United States stockpile of lethal chemical agents and munitions at Blue Grass Army Depot, Kentucky, and Pueblo Chemical Depot, Colorado, the unobligated balance as of the date of enactment of this Act, shall remain available for obligation solely for such purpose and shall be made available not later than 30 days after the date of the enactment of this Act to the Program Manager for Assembled Chemical Weapons Alternatives for activities related to such purpose at Blue Grass Army Depot, Kentucky, and Pueblo Chemical Depot, Colorado.

(2) Of the funds made available under paragraph (a)(1), not less than $100,000,000 shall be obligated not later than 120 days after the date of the enactment of this Act.

(b)(1) Notwithstanding section 917 of Public Law 97–86, as amended, none of the funds appropriated or otherwise made available by the Department of Defense Appropriations Act, 2005, the Military Construction Appropriations and Emergency Hurricane Supplemental Appropriations Act, 2005, and other Acts for the purpose of the destruction of the United States stockpile of lethal chemical agents and munitions at Blue Grass Army Depot, Kentucky, and Pueblo Chemical Depot, Colorado, may be deobligated, transferred, or reprogrammed out of the Assembled Chemical Weapons Alternatives Program.

(2) The amount appropriated or otherwise made available by the Department of Defense Appropriations Act, 2005, the Military Construction Appropriations and Emergency Hurricane Supplemental Appropriations Act, 2005, and other Acts for the purpose of the destruction of the United States stockpile of lethal chemical agents and munitions at Blue Grass Army Depot, Kentucky, and Pueblo Chemical Depot, Colorado, is $813,440,000.

(c) No funds appropriated or otherwise made available to the Secretary of Defense under this Act or any other Act may be obligated or expended to finance directly or indirectly any study related to the transportation of chemical weapons across State lines.

## PHILADELPHIA REGIONAL PORT AUTHORITY

SEC. 1017. Section 115 of division H of Public Law 108–199 is amended by striking all after "made available" and substituting ", notwithstanding section 2218(c)(1) of title 10, United States Code, for a grant to Philadelphia Regional Port Authority, to be used solely for the purpose of construction, by and for a Philadelphia-based company established to operate high-speed, advanced-design vessels for the transport of high-value, time-sensitive cargoes in the foreign commerce of the United States, of a marine cargo terminal and IT network for high-speed commercial vessels that is capable of supporting military sealift requirements.": *Provided*, That of the funds provided in Public Law 108–287 under the heading "Operation and Maintenance, Army" for Woody Island and Historic Structure, $1,000,000 shall be made available in the form of a grant for these purposes.

## LPD–17 COST ADJUSTMENT

### (TRANSFER OF FUNDS)

SEC. 1018. Upon enactment of this Act, the Secretary of Defense shall make the following transfer of funds: *Provided*, That funds so transferred shall be merged with and shall be available for the same purpose and for the same time period as the appropriation to which transferred: *Provided further*, That the amounts shall be transferred between the following appropriations in the amounts specified:

From:

Under the heading "Shipbuilding and Conversion, Navy, 2005/2009":

  LCU (X), $19,000,000.

To:

Under the heading "Shipbuilding and Conversion, Navy, 1996/2008":

  LPD–17, $19,000,000:

*Provided further*, That the amount made available by the transfer of funds in or pursuant to this section is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### PROHIBITION ON COMPETITION OF THE NEXT GENERATION DESTROYER (DD(X))

SEC. 1019. (a) No funds appropriated or otherwise made available by this Act, or by prior Acts, may be obligated or expended to prepare for, conduct, or implement a strategy for the acquisition of the next generation destroyer (DD(X)) program through a winner-take-all strategy.

(b) WINNER–TAKE–ALL STRATEGY DEFINED.—In this section, the term "winner-take-all strategy", with respect to the acquisition of destroyers under the next generation destroyer program, means the acquisition (including design and construction) of such destroyers through a single shipyard.

### CIVILIAN PAY

### << 5 USCA § 9902 NOTE >>

SEC. 1020. None of the funds appropriated to the Department of Defense by this Act or any other Act for fiscal year 2005 or any other fiscal year may be expended for any pay raise granted on or after January 1, 2005, that is implemented in a manner that provides a greater increase for non-career employees than for career employees on the basis of their status as career or non-career employees, unless specifically authorized by law: *Provided*, That this provision shall be implemented for fiscal year 2005 without regard to the requirements of section 5383 of title 5, United States Code: *Provided further*, That no employee of the Department of Defense shall have his or her pay reduced for the purpose of complying with the requirements of this provision.

### INDUSTRIAL MOBILIZATION CAPACITY

SEC. 1021. Of the amounts appropriated or otherwise made available by the Department of Defense Appropriations Act, 2005, $12,500,000 shall be available only for industrial mobilization capacity at Rock Island Arsenal.

### BASIC ALLOWANCE FOR HOUSING FOR DEPENDENTS

### << 37 USCA § 403 >>

SEC. 1022. (a) Section 403(l) of title 37, United States Code, is amended by striking "180 days" each place it appears and inserting "365 days".

### << 37 USCA § 403 NOTE >>

(b) TERMINATION.—The amendment made by this section shall terminate on September 30, 2005. Effective on October 1, 2005, the provisions of section 403(l) of title 37, United States Code, as in effect on the date before the date of the enactment of this Act shall be revived.

### PROHIBITION ON CHARGES FOR MEALS

SEC. 1023. (a) PROHIBITION.—A member of the Armed Forces entitled to a basic allowance for subsistence under section 402 of title 37, United States Code, who is undergoing medical recuperation or therapy, or is otherwise in the status of continuous care, including outpatient care, at a military treatment facility for an injury, illness, or disease incurred or aggravated while on active duty in the Armed Forces in Operation Iraqi Freedom or Operation Enduring Freedom shall not, during any month in which so entitled, be required to pay any charge for meals provided such member by the military treatment facility.

(b) EFFECTIVE DATE.—The limitation in paragraph (a) shall take effect upon enactment of this Act, and shall apply with respect to meals provided members of the Armed Forces as described in that paragraph on or after that date.

(c) TERMINATION.—The amendment made by this section shall terminate on September 30, 2005. Effective on October 1, 2005, the provisions of section 402 of title 37, United States Code, as in effect on the date before the date of the enactment of this Act shall be revived.

REQUESTS FOR FUTURE FUNDING FOR MILITARY OPERATIONS IN AFGHANISTAN AND IRAQ

SEC. 1024. (a) FINDINGS.—The Senate makes the following findings:

(1) The Department of Defense Appropriations Act, 2004 (Public Law 108–87) and the Department of Defense Appropriations Act, 2005 (Public Law 108–287) each contain a sense of the Senate provision urging the President to provide in the annual budget requests of the President for a fiscal year under section 1105(a) of title 31, United States Code, an estimate of the cost of ongoing military operations in Iraq and Afghanistan in such fiscal year.

(2) The budget for fiscal year 2006 submitted to Congress by the President on February 7, 2005, requests no funds for fiscal year 2006 for ongoing military operations in Iraq or Afghanistan.

(3) According to the Congressional Research Service, there exists historical precedent for including the cost of ongoing military operations in the annual budget requests of the President following initial funding for such operations by emergency or supplemental appropriations Acts, including—

(A) funds for Operation Noble Eagle, beginning in the budget request of President George W. Bush for fiscal year 2005;

(B) funds for operations in Kosovo, beginning in the budget request of President George W. Bush for fiscal year 2001;

(C) funds for operations in Bosnia, beginning in budget request of President Clinton for fiscal year 1997;

(D) funds for operations in Southwest Asia, beginning in the budget request of President Clinton for fiscal year 1997;

(E) funds for operations in Vietnam, beginning in the budget request of President Johnson for fiscal year 1966; and

(F) funds for World War II, beginning in the budget request of President Roosevelt for fiscal year 1943.

(4) The Senate has included in its version of the fiscal year 2006 budget resolution, which was adopted by the Senate on March 17, 2005, a reserve fund of $50,000,000,000 for overseas contingency operations, but the determination of that amount could not take into account any Administration estimate on the projected cost of such operations in fiscal year 2006.

(5) In February 2005, the Congressional Budget Office estimated that fiscal year 2006 costs for ongoing military operations in Iraq and Afghanistan could total $65,000,000,000.

(b) SENSE OF SENATE.—It is the sense of the Senate that—

(1) any request for funds for a fiscal year after fiscal year 2006 for an ongoing military operation overseas, including operations in Afghanistan and Iraq, should be included in the annual budget of the President for such fiscal year as submitted to Congress under section 1105(a) of title 31, United States Code;

(2) the President should submit to Congress, not later than September 1, 2005, an amendment to the budget of the President for fiscal year 2006 that was submitted to Congress under section 1105(a) of title 31, United States Code, setting forth detailed cost estimates for ongoing military operations overseas during such fiscal year; and

(3) any funds provided for a fiscal year for ongoing military operations overseas should be provided in appropriations Acts for such fiscal year through appropriations to specific accounts set forth in such appropriations Acts.

<< 10 USCA § 113 NOTE >>

(c) ADDITIONAL REQUIREMENTS FOR CERTAIN REPORTS.—(1) Each semiannual report to Congress required under a provision of law referred to in paragraph (2) shall include, in addition to the matters specified in the applicable provision of law, the following:

(A) A statement of the cumulative total of all amounts obligated, and of all amounts expended, as of the date of such report for Operation Enduring Freedom.

(B) A statement of the cumulative total of all amounts obligated, and of all amounts expended, as of the date of such report for Operation Iraqi Freedom.

(C) An estimate of the reasonably foreseeable costs for ongoing military operations to be incurred during the 12–month period beginning on the date of such report.

(2) The provisions of law referred to in this paragraph are as follows:

(A) Section 1120 of the Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004 (Public Law 108–106; 117 Stat. 1219; 10 U.S.C. 113 note).

(B) Section 9010 of the Department of Defense Appropriations Act, 2005 (Public Law 108–287; 118 Stat. 1008; 10 U.S.C. 113 note).

### AIRCRAFT CARRIERS OF THE NAVY

SEC. 1025. (a) FUNDING FOR REPAIR AND MAINTENANCE OF U.S.S. JOHN F. KENNEDY.—Of the amount appropriated to the Department of the Navy in this Act, necessary funding will be made available for such repair and maintenance of the U.S.S. John F. Kennedy as the Navy considers appropriate to extend the life of U.S.S. John F. Kennedy.

(b) LIMITATION ON REDUCTION IN NUMBER OF ACTIVE AIRCRAFT CARRIERS.—No funds appropriated or otherwise made available in this Act may be obligated or expended to reduce the number of active aircraft carriers of the Navy below 12 active aircraft carriers until after the date of the submittal to Congress of the quadrennial defense review required in 2005 under section 118 of title 10, United States Code.

(c) ACTIVE AIRCRAFT CARRIERS.—For purposes of this section, an active aircraft carrier of the Navy includes an aircraft carrier that is temporarily unavailable for worldwide deployment due to routing or scheduled maintenance.

(d) PACIFIC FLEET AUTHORITIES.—None of the funds available to the Department of the Navy may be obligated to modify command and control relationships to give Fleet Forces Command administrative and operational control of U.S. Navy forces assigned to the Pacific fleet: *Provided*, That the command and control relationships which existed on October 1, 2004, shall remain in force unless changes are specifically authorized in a subsequent Act.

### TRAVEL FOR FAMILY OF HOSPITALIZED SERVICEMEMBERS

SEC. 1026. (a) AUTHORITY.—Subsection (a) of section 411h of title 37, United States Code, is amended—

(1) in paragraph (2)—

<< 37 USCA § 411h >>

(A) by inserting "and" at the end of subparagraph (A); and
(B) by striking subparagraphs (B) and (C) and inserting the following new subparagraph:

<< 37 USCA § 411h >>

"(B) either—
"(i) is seriously ill, seriously injured, or in a situation of imminent death (whether or not electrical brain activity still exists or brain death is declared), and is hospitalized in a medical facility in or outside the United States; or
"(ii) is not described in clause (i), but has an injury incurred in an operation or area designated as a combat operation or combat zone, respectively, by the Secretary of Defense under section 1967(e)(1)(A) of title 38 and is hospitalized in a medical facility in the United States for treatment of that injury."; and

(2) by adding at the end the following new paragraph:

<< 37 USCA § 411h >>

"(3) Not more than one roundtrip may be provided to a family member under paragraph (1) on the basis of clause (ii) of paragraph (2)(B).".

(b) CONFORMING AMENDMENTS.—
(1) HEADING FOR AMENDED SECTION.—The heading for section 411h of such title is amended to read as follows:

<< 37 USCA § 411h >>

"§ 411h. Travel and transportation allowances: transportation of family members incident to illness or injury of members".

(2) CLERICAL AMENDMENT.—The item relating to such section in the table of sections at the beginning of chapter 7 of such title is amended to read as follows:

<< 37 USCA prec. § 401 >>

"411h. Travel and transportation allowances: transportation of family members incident to illness or injury of members.".

(c) FUNDING.—Funds for the provision of travel in fiscal year 2005 under section 411h of title 37, United States Code, by reason of the amendments made by this section shall be derived as follows:

(1) In the case of travel provided by the Department of the Army, from amounts appropriated for fiscal year 2005 by this Act and the Department of Defense Appropriations Act, 2005 (Public Law 108–287) for the Operation and Maintenance, Army account.

(2) In the case of travel provided by the Department of the Navy, from amounts appropriated for fiscal year 2005 by the Acts referred to in paragraph (1) for the Operation and Maintenance, Navy account.

(3) In the case of travel provided by the Department of the Air Force, from amounts appropriated for fiscal year 2005 by the Acts referred to in paragraph (1) for the Operation and Maintenance, Air Force account.

<< 37 USCA § 411h NOTE >>

(d) REPORT ON TRAVEL IN EXCESS OF CERTAIN LIMIT.—If in any fiscal year the amount of travel provided in such fiscal year under section 411h of title 37, United States Code, by reason of the amendments made by this section exceeds $20,000,000, the Secretary of Defense shall submit to the congressional defense committees a report on that fact, including the total amount of travel provided in such fiscal year under such section 411h by reason of the amendments made by this section.

<< 37 USCA § 411h NOTE >>

(e) TERMINATION.—The amendment made by this section shall terminate on September 30, 2005. Effective on October 1, 2005, the provisions of section 411h of title 37, United States Code, as in effect on the date before the date of the enactment of this Act shall be revived.

PROHIBITION ON TERMINATION OF MULTIYEAR PROCUREMENT CONTRACT FOR C/KC–130J AIRCRAFT

SEC. 1027. No funds in this Act may be obligated or expended to terminate the joint service multiyear procurement contract for C/KC–130J aircraft that is in effect on the date of the enactment of this Act.

PURPLE HEART COMMENDATIONS

SEC. 1028. None of the funds in this Act or prior Acts may be used to revoke Purple Heart commendations awarded to members of the Armed Forces who have served in Operation Iraqi Freedom or Operation Enduring Freedom: *Provided*, That the Secretary of any military department may, on a case-by-case basis, waive this provision fifteen days after notifying the congressional defense committees of their intent to revoke an individual's Purple Heart commendation.

VIRTUAL TRAINING COCKPIT OPTIMIZATION PROGRAM

(TRANSFER OF FUNDS)

SEC. 1029. Upon enactment of this Act, the Secretary of Defense shall make the following transfer of funds: *Provided*, That funds so transferred shall be merged with and shall be available for the same purpose and for the same time period as the appropriation to which transferred: *Provided further*, That the authority provided in this section is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the amounts shall be transferred between the following appropriations in the amounts specified:

From:

Under the heading "Aircraft Procurement, Army, 2004/2006", $2,000,000.

To:

Under the heading "Research, Development, Test and Evaluation, Army, 2004/2005", $2,000,000:

*Provided further*, That these funds may only be used for the Virtual Training Cockpit Optimization Program: *Provided further*, That the amount made available by the transfer of funds in or pursuant to this section is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

TRANSFER OF FUNDS FOR FORCE PROTECTION PROGRAMS

(TRANSFER OF FUNDS)

SEC. 1030. Notwithstanding any other provision of law, upon enactment of this Act, the Secretary of Defense shall make the following transfers of funds previously made available in the Department of Defense Appropriations Act, 2005 (Public Law 108–287): *Provided*, That the amounts transferred shall be made available for the same purpose and the same time period as the appropriation to which transferred: *Provided further*, That the authority provided in this section is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the amounts shall be transferred between the following appropriations, in the amounts specified:

  To:
   Under the heading "Research, Development, Test and Evaluation, Air Force, 2005/2006", $500,000.
  From:
    Under the heading "Other Procurement, Air Force", $500,000.
  To:
    Under the heading "Other Procurement, Air Force, 2005/2007", $8,200,000.
  From:
    Under the heading "Other Procurement, Navy, 2005/2007", $8,200,000:
 *Provided further*, That the amounts made available by the transfer of funds in or pursuant to this section are designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

PROHIBITION ON TORTURE AND CRUEL, INHUMAN, OR DEGRADING TREATMENT

SEC. 1031. (a)(1) None of the funds appropriated or otherwise made available by this Act shall be obligated or expended to subject any person in the custody or under the physical control of the United States to torture or cruel, inhuman, or degrading treatment or punishment that is prohibited by the Constitution, laws, or treaties of the United States.

 (2) Nothing in this section shall affect the status of any person under the Geneva Conventions or whether any person is entitled to the protections of the Geneva Conventions.

 (b) As used in this section—

  (1) the term "torture" has the meaning given that term in section 2340(1) of title 18, United States Code; and

  (2) the term "cruel, inhuman, or degrading treatment or punishment" means the cruel, unusual, and inhumane treatment or punishment prohibited by the fifth amendment, eighth amendment, or fourteenth amendment to the Constitution of the United States.

TRAUMATIC INJURY PROTECTION

SEC. 1032. TRAUMATIC INJURY PROTECTION. (a) IN GENERAL.—Subchapter III of chapter 19, Title 38, United States Code, is amended—

 (1) in section 1965, by adding at the end the following:

<< 38 USCA § 1965 >>

 "(11) The term 'activities of daily living' means the inability to independently perform 2 of the 6 following functions:
  "(A) Bathing.
  "(B) Continence.
  "(C) Dressing.
  "(D) Eating.
  "(E) Toileting.
  "(F) Transferring."; and
 (2) by adding at the end the following:

<< 38 USCA § 1980A >>

"§ 1980A. Traumatic injury protection

"(a) A member who is insured under subparagraph (A)(i), (B), or (C)(i) of section 1967(a)(1) shall automatically be issued a traumatic injury protection rider that will provide for a payment not to exceed $100,000 if the member, while so insured, sustains a traumatic injury that results in a loss described in subsection (b)(1). The maximum amount payable for all injuries resulting from the same traumatic event shall be limited to $100,000. If a member suffers more than 1 such loss as a result of traumatic injury, payment will be made in accordance with the schedule in subsection (d) for the single loss providing the highest payment.

"(b)(1) A member who is issued a traumatic injury protection rider under subsection (a) is insured against such traumatic injuries, as prescribed by the Secretary, in collaboration with the Secretary of Defense, including, but not limited to—

"(A) total and permanent loss of sight;

"(B) loss of a hand or foot by severance at or above the wrist or ankle;

"(C) total and permanent loss of speech;

"(D) total and permanent loss of hearing in both ears;

"(E) loss of thumb and index finger of the same hand by severance at or above the metacarpophalangeal joints;

"(F) quadriplegia, paraplegia, or hemiplegia;

"(G) burns greater than second degree, covering 30 percent of the body or 30 percent of the face; and

"(H) coma or the inability to carry out the activities of daily living resulting from traumatic injury to the brain.

"(2) For purposes of this subsection—

"(A) the term 'quadriplegia' means the complete and irreversible paralysis of all 4 limbs;

"(B) the term 'paraplegia' means the complete and irreversible paralysis of both lower limbs; and

"(C) the term 'hemiplegia' means the complete and irreversible paralysis of the upper and lower limbs on 1 side of the body.

"(3) The Secretary, in collaboration with the Secretary of Defense, shall prescribe, by regulation, the conditions under which coverage against loss will not be provided.

"(c) A payment under this section may be made only if—

"(1) the member is insured under Servicemembers' Group Life Insurance when the traumatic injury is sustained;

"(2) the loss results directly from that traumatic injury and from no other cause; and

"(3) the member suffers the loss before the end of the period prescribed by the Secretary, in collaboration with the Secretary of Defense, which begins on the date on which the member sustains the traumatic injury, except, if the loss is quadriplegia, paraplegia, or hemiplegia, the member suffers the loss not later than 365 days after sustaining the traumatic injury.

"(d) Payments under this section for losses described in subsection (b)(1) shall be—

"(1) made in accordance with a schedule prescribed by the Secretary, in collaboration with the Secretary of Defense;

"(2) based on the severity of the covered condition; and

"(3) in an amount that is equal to not less than $25,000 and not more than $100,000.

"(e)(1) During any period in which a member is insured under this section and the member is on active duty, there shall be deducted each month from the member's basic or other pay until separation or release from active duty an amount determined by the Secretary of Veterans Affairs as the premium allocable to the pay period for providing traumatic injury protection under this section (which shall be the same for all such members) as the share of the cost attributable to provided coverage under this section, less any costs traceable to the extra hazards of such duty in the uniformed services.

"(2) During any month in which a member is assigned to the Ready Reserve of a uniformed service under conditions which meet the qualifications set forth in section 1965(5)(B) of this title and is insured under a policy of insurance purchased by the Secretary of Veterans Affairs under section 1966 of this title, there shall be contributed from the appropriation made for active duty pay of the uniformed service concerned an amount determined by the Secretary of Veterans Affairs (which shall be the same for all such members) as the share of the cost attributable to provided coverage under this section, less any costs traceable to the extra hazards of such duty in the uniformed services. Any amounts so contributed on behalf of any member shall be collected by the Secretary of the concerned service from such member (by deduction from pay or otherwise) and shall be credited to the appropriation from which such contribution was made in advance on a monthly basis.

"(3) The Secretary of Veterans Affairs shall determine the premium amounts to be charged for traumatic injury protection coverage provided under this section.

"(4) The premium amounts shall be determined on the basis of sound actuarial principles and shall include an amount necessary to cover the administrative costs to the insurer or insurers providing such insurance.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(5) Each premium rate for the first policy year shall be continued for subsequent policy years, except that the rate may be adjusted for any such subsequent policy year on the basis of the experience under the policy, as determined by the Secretary of Veterans Affairs in advance of that policy year.

"(6) The cost attributable to insuring such member under this section, less the premiums deducted from the pay of the member's uniformed service, shall be paid by the Secretary of Defense to the Secretary of Veterans Affairs. This amount shall be paid on a monthly basis, and shall be due within 10 days of the notice provided by the Secretary of Veterans Affairs to the Secretary of the concerned uniformed service.

"(7) The Secretary of Defense shall provide the amount of appropriations required to pay expected claims in a policy year, as determined according to sound actuarial principles by the Secretary of Veterans Affairs.

"(8) The Secretary of Defense shall forward an amount to the Secretary of Veterans Affairs that is equivalent to half the anticipated cost of claims for the current fiscal year, upon the effective date of this legislation.

"(f) The Secretary of Defense shall certify whether any member claiming the benefit under this section is eligible.

"(g) Payment for a loss resulting from traumatic injury will not be made if the member dies before the end of the period prescribed by the Secretary, in collaboration with the Secretary of Defense, which begins on the date on which the member sustains the injury. If the member dies before payment to the member can be made, the payment will be made according to the member's most current beneficiary designation under Servicemembers' Group Life Insurance, or a by law designation, if applicable.

"(h) Coverage for loss resulting from traumatic injury provided under this section shall cease at midnight on the date of the member's separation from the uniformed service. Payment will not be made for any loss resulting from injury incurred after the date a member is separated from the uniformed services.

"(i) Insurance coverage provided under this section is not convertible to Veterans' Group Life Insurance.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter 19 of title 38, United States Code, is amended by adding after the item relating to section 1980 the following:

<< 38 USCA prec. § 1901 >>

"1980A. Traumatic injury protection.".

<< 38 USCA § 1980A NOTE >>

(c) RETROACTIVE PROVISION.—

(1) IN GENERAL.—Any member who experienced a traumatic injury (as described in section 1980A(b)(1) of title 38, United States Code) between October 7, 2001, and the effective date under subsection (d), is eligible for coverage provided in such section 1980A if the qualifying loss was a direct result of injuries incurred in Operation Enduring Freedom or Operation Iraqi Freedom.

(2) CERTIFICATION; PAYMENT.—The Secretary of Defense shall—

(A) certify to the Office of Servicemembers' Group Life Insurance the names and addresses of those members the Secretary of Defense determines to be eligible for retroactive traumatic injury benefits under such section 1980A; and

(B) forward to the Secretary of Veterans Affairs, at the time the certification is made under subparagraph (A), an amount of money equal to the amount the Secretary of Defense determines to be necessary to pay all cost related to claims for retroactive benefits under such section 1980A.

<< 38 USCA § 1980A NOTE >>

(d) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall take effect on the first day of the first month beginning more than 180 days after the date of enactment of this Act.

(2) RULEMAKING.—Before the effective date described in paragraph (1), the Secretary of Veterans Affairs, in collaboration with the Secretary of Defense, shall issue regulations to carry out the amendments made by this section.

AMOUNTS FROM PRIOR YEAR IRAQ FREEDOM FUND APPROPRIATION

### (RESCISSION OF FUNDS)

SEC. 1033. Of the funds appropriated in title IX of Public Law 108–287 for "Iraq Freedom Fund" (118 Stat. 1005) that remain available for obligation, $50,000,000 is hereby rescinded.

### TECHNICAL CORRECTION

SEC. 1034. Of the funds available in the Department of Defense Appropriations Act, 2005 (Public Law 108–287), under the heading "Defense Health Program", $1,000,000 shall be available to the Paralyzed Veterans of America (PVA) Outdoor Sports Heritage Fund.

### DEFENSE TRANSFER AUTHORITY

SEC. 1035. In addition to amounts appropriated elsewhere in this Act, there is hereby appropriated $50,000,000 for "Research, Development, Test and Evaluation, Defense–Wide", to remain available until September 30, 2006: *Provided*, That these funds are available for transfer to any other appropriations accounts of the Department of Defense, for certain classified activities, and notwithstanding any other provision of law and of this Act, such funds may be obligated to carry out projects not otherwise authorized by law: *Provided further*, That any funds transferred shall be merged with and shall be available for the same purposes and for the same time period as the appropriation to which transferred: *Provided further*, That the transfer authority provided in this section is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the amount provided in this section is designated an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### RE–USE AND REDEVELOPMENT OF CLOSED OR REALIGNED MILITARY INSTALLATIONS

SEC. 1036. (a) In order to assist communities with preparations for the results of the 2005 round of defense base closure and realignment, and consistent with assistance provided to communities by the Department of Defense in previous rounds of base closure and realignment, the Secretary of Defense shall, not later than July 15, 2005, submit to the congressional defense committees a report on the processes and policies of the Federal Government for disposal of property at military installations proposed to be closed or realigned as part of the 2005 round of base closure and realignment, and the assistance available to affected local communities for re-use and redevelopment decisions.

(b) The report under subsection (a) shall include—

(1) a description of the processes of the Federal Government for disposal of property at military installations proposed to be closed or realigned;

(2) a description of Federal Government policies for providing re-use and redevelopment assistance;

(3) a catalogue of community assistance programs that are provided by the Federal Government related to the re-use and redevelopment of closed or realigned military installations;

(4) a description of the services, policies, and resources of the Department of Defense that are available to assist communities affected by the closing or realignment of military installations as a result of the 2005 round of base closure and realignment;

(5) guidance to local communities on the establishment of local redevelopment authorities and the implementation of a base redevelopment plan; and

(6) a description of the policies and responsibilities of the Department of Defense related to environmental clean-up and restoration of property disposed by the Federal Government.

### CAMP JOSEPH T. ROBINSON

SEC. 1037. The United States releases to the State of Arkansas the reversionary interest described in sections 2 and 3 of the Act entitled "An Act authorizing the transfer of part of Camp Joseph T. Robinson to the State of Arkansas", approved June 30, 1950 (64 Stat. 311, chapter 429), in and to the surface estate of the land constituting Camp Joseph T. Robinson, Arkansas, which lies east of the Batesville Pike county road, in sections 24, 25, and 36, township 3 north, range 12 west, Pulaski County, Arkansas.

### TITLE II—INTERNATIONAL PROGRAMS AND ASSISTANCE FOR RECONSTRUCTION AND THE WAR ON TERROR

### CHAPTER 1

## DEPARTMENT OF AGRICULTURE

### Foreign Agricultural Service

#### PUBLIC LAW 480 TITLE II GRANTS

For additional expenses during the current fiscal year, not otherwise recoverable, and unrecovered prior years' costs, including interest thereon, under the Agricultural Trade Development and Assistance Act of 1954, for commodities supplied in connection with dispositions abroad under title II of said Act, $240,000,000 to remain available until expended: *Provided*, That from this amount, to the maximum extent possible, funding shall be restored to the previously approved fiscal year 2005 programs under section 204(a)(2) of the Agricultural Trade Development and Assistance Act of 1954: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### CHAPTER 2

### DEPARTMENT OF STATE AND RELATED AGENCY

### DEPARTMENT OF STATE

#### Administration of Foreign Affairs

##### DIPLOMATIC AND CONSULAR PROGRAMS

For an additional amount for "Diplomatic and Consular Programs", $734,000,000, to remain available until September 30, 2006, of which $10,000,000 is provided for security requirements in the detection of explosives: *Provided*, That of the funds appropriated under this heading, not less than $250,000 shall be made available for programs to assist Iraqi and Afghan scholars who are in physical danger to travel to the United States to engage in research or other scholarly activities at American institutions of higher education: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

##### EMBASSY SECURITY, CONSTRUCTION, AND MAINTENANCE

For an additional amount for "Embassy Security, Construction, and Maintenance", $592,000,000, to remain available until expended: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### INTERNATIONAL ORGANIZATIONS

##### Contributions for International Peacekeeping Activities

##### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Contributions for International Peacekeeping Activities", $680,000,000, to remain available until September 30, 2006: *Provided*, That of the funds appropriated under this heading, up to $50,000,000 may be transferred to "Peacekeeping Operations" for support of the efforts of the African Union to halt genocide and other atrocities in Darfur, Sudan: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### RELATED AGENCY

### BROADCASTING BOARD OF GOVERNORS

#### International Broadcasting Operations

For an additional amount for "International Broadcasting Operations" for activities related to broadcasting to the broader Middle East, $4,800,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## Broadcasting Capital Improvements

For an additional amount for "Broadcasting Capital Improvements", $2,500,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## BILATERAL ECONOMIC ASSISTANCE

## FUNDS APPROPRIATED TO THE PRESIDENT

## UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT

### International Disaster and Famine Assistance

For an additional amount for "International Disaster and Famine Assistance", $90,000,000, to remain available until expended, for emergency expenses related to the humanitarian crisis in the Darfur region of Sudan and other African countries: *Provided*, That these funds may be used to reimburse fully accounts administered by the United States Agency for International Development for obligations incurred for the purposes provided under this heading prior to enactment of this Act from funds appropriated for foreign operations, export financing, and related programs: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operating Expenses of the United States Agency for International Development

For an additional amount for "Operating Expenses of the United States Agency for International Development", $24,400,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Operating Expenses of the United States Agency for International Development Office of Inspector General

For an additional amount for "Operating Expenses of the United States Agency for International Development Office of Inspector General", $2,500,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## OTHER BILATERAL ECONOMIC ASSISTANCE

### Economic Support Fund

### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Economic Support Fund", $1,433,600,000, to remain available until September 30, 2006: *Provided*, That of the funds appropriated under this heading, $200,000,000 should be made available for programs, activities, and efforts to support Palestinians, of which $50,000,000 should be made available for assistance for Israel to help ease the movement of Palestinian people and goods in and out of Israel: *Provided further*, That of the funds appropriated under this heading, $5,000,000 should be made available for assistance for displaced persons in Afghanistan: *Provided further*, That of the funds appropriated under this heading, $2,500,000 should be made available for assistance for families and communities of Afghan civilians who have suffered losses as a result of the military operations: *Provided further*, That of the funds appropriated under this heading, $20,000,000 should be made available for assistance for Haiti, of which $2,500,000 should be made available for criminal case management, case tracking, and the reduction of pre-trial detention in Haiti, notwithstanding any other provision of law: *Provided further*, That of the funds appropriated under this heading, $5,000,000 should be made available for programs and activities to promote democracy, including political party development, in Lebanon: *Provided further*, That of the funds appropriated under this heading, up to $10,000,000 may be transferred to the Overseas Private Investment Corporation for the cost of direct and guaranteed loans as authorized by section 234 of the Foreign Assistance Act of 1961: *Provided further*, That

such costs, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Assistance for the Independent States of the Former Soviet Union

For an additional amount for "Assistance for the Independent States of the Former Soviet Union", $70,000,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## DEPARTMENT OF STATE

### International Narcotics Control and Law Enforcement

For an additional amount for "International Narcotics Control and Law Enforcement", $620,000,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Migration and Refugee Assistance

For an additional amount for "Migration and Refugee Assistance", $120,400,000, to remain available until September 30, 2006: *Provided*, That of the funds appropriated under this heading, not less than $67,000,000 shall be made available for assistance for refugees in Africa and to fulfill refugee protection goals set by the President for fiscal year 2005: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Nonproliferation, Anti–Terrorism, Demining and Related Programs

For an additional amount for "Nonproliferation, Anti–Terrorism, Demining and Related Programs", $24,600,000, to remain available until September 30, 2006, of which not to exceed $7,500,000, to remain available until expended, may be made available for the Nonproliferation and Disarmament Fund, notwithstanding any other provision of law, to promote bilateral and multilateral activities relating to nonproliferation and disarmament: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## MILITARY ASSISTANCE

## FUNDS APPROPRIATED TO THE PRESIDENT

### Foreign Military Financing Program

For an additional amount for "Foreign Military Financing Program", $250,000,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Peacekeeping Operations

For an additional amount for "Peacekeeping Operations", $240,000,000, to remain available until September 30, 2006, of which up to $200,000,000 is for military and other security assistance to coalition partners in Iraq and Afghanistan: *Provided*, That up to $30,000,000 may be used only pursuant to a determination by the President, and after consultation with the Committees on Appropriations, that such use will support the global war on terrorism: *Provided further*, That these funds may be transferred by the Secretary of State to other Federal agencies or accounts to support the global war on terrorism: *Provided further*, That funds appropriated under this heading shall be subject to the regular notification procedures of the Committees on Appropriations, except that such notifications shall be submitted no less than five days prior to the obligation of funds: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## GENERAL PROVISIONS, THIS CHAPTER

AR.01114

## VOLUNTARY CONTRIBUTION

<< 22 USCA § 2227 >>

SEC. 2101. Section 307(a) of the Foreign Assistance Act of 1961, as amended (22 U.S.C. 2227), is further amended by striking "Iraq,".

## (RESCISSION OF FUNDS)

SEC. 2102. The unexpended balance appropriated by Public Law 108–11 under the heading "Economic Support Fund" and made available for Turkey is rescinded.

## AUDIT REQUIREMENT

SEC. 2103. Section 559 of division D of Public Law 108–447 is amended by adding at the end the following:

"(e) Subsequent to the certification specified in subsection (a), the Comptroller General of the United States shall conduct an audit and an investigation of the treatment, handling, and uses of all funds for the bilateral West Bank and Gaza Program in fiscal year 2005 under the heading 'Economic Support Fund'. The audit shall address—

"(1) the extent to which such Program complies with the requirements of subsections (b) and (c), and

"(2) an examination of all programs, projects, and activities carried out under such Program, including both obligations and expenditures.".

## REPORTING REQUIREMENT

SEC. 2104. The Secretary of State shall submit to the Committees on Appropriations not later than 30 days after enactment, and prior to the initial obligation of funds appropriated under this chapter, a report on the proposed uses of all funds on a project-by-project basis, for which the obligation of funds is anticipated: *Provided*, That up to 15 percent of funds appropriated under this chapter may be obligated before the submission of the report subject to the normal notification procedures of the Committees on Appropriations: *Provided further*, That the report shall be updated and submitted to the Committees on Appropriations every six months and shall include information detailing how the estimates and assumptions contained in previous reports have changed: *Provided further*, That any new projects and increases in funding of ongoing projects shall be subject to the prior approval of the Committees on Appropriations: *Provided further*, That the Secretary of State shall submit to the Committees on Appropriations, not later than 210 days following enactment of this Act and annually thereafter, a report detailing on a project-by-project basis the expenditure of funds appropriated under this chapter until all funds have been fully expended.

## AUDIT REQUIREMENT

SEC. 2105. The Comptroller General of the United States shall conduct an audit of the use of all funds for the bilateral Afghanistan counternarcotics and alternative livelihood programs in fiscal year 2005 under the heading "Economic Support Fund" and "International Narcotics Control and Law Enforcement": *Provided*, That the audit shall include an examination of all programs, projects and activities carried out under such programs, including both obligations and expenditures.

## REPORTING REQUIREMENT

SEC. 2106. Not later than 60 days after the date of enactment of this Act, the President shall submit a report to the Congress detailing: (1) information regarding the Palestinian security services, including their numbers, accountability, and chains of command, and steps taken to purge from their ranks individuals with ties to terrorist entities; (2) specific steps taken by the Palestinian Authority to dismantle the terrorist infrastructure, confiscate unauthorized weapons, arrest and bring terrorists to justice, destroy unauthorized arms factories, thwart and preempt terrorist attacks, and cooperate with Israel's security services; (3) specific actions taken by the Palestinian Authority to stop incitement in Palestinian Authority-controlled electronic and print media and in schools, mosques, and other institutions it controls, and to promote peace and coexistence with Israel; (4) specific steps the Palestinian Authority has taken to further democracy, the rule of law, and an independent judiciary, and transparent and accountable governance; (5) the Palestinian Authority's cooperation with United States officials in investigations into the late Palestinian leader Yasser Arafat's finances; and (6) the amount of assistance pledged and actually provided to the Palestinian Authority by other donors: *Provided*, That not later than 180 days after enactment of this Act, the President shall submit to

the Congress an update of this report: *Provided further*, That up to $5,000,000 of the funds made available for assistance for the West Bank and Gaza by this chapter under "Economic Support Fund" shall be used for an outside, independent evaluation by an internationally recognized accounting firm of the transparency and accountability of Palestinian Authority accounting procedures and an audit of expenditures by the Palestinian Authority.

## REPROGRAMMING AUTHORITY

SEC. 2107. The amounts set forth in the eighth proviso in the Diplomatic and Consular Programs appropriation in the fiscal year 2005 Departments of Commerce, Justice, State, the Judiciary, and Related Agencies Appropriations Act (Public Law 108–447, division B) may be subject to reprogramming pursuant to section 605 of that Act.

## MARLA RUZICKA IRAQI WAR VICTIMS FUND

SEC. 2108. Of the funds appropriated by chapter 2 of title II of Public Law 108–106 under the heading "Iraq Relief and Reconstruction Fund", not less than $20,000,000 should be made available for assistance for families and communities of Iraqi civilians who have suffered losses as a result of the military operations: *Provided*, That such assistance shall be designated as the "Marla Ruzicka Iraqi War Victims Fund".

## CANDIDATE COUNTRIES

SEC. 2109. Section 616(b)(1) of the Millennium Challenge Act of 2003 (Public Law 108–199) is amended—

<< 22 USCA § 7715 >>

(1) by striking "subparagraphs (A) and (B) of section 606(a)(1)"; and

(2) inserting in lieu thereof "subsection (a) or (b) of section 606".

## HUMANITARIAN ASSISTANCE CODE OF CONDUCT

<< 22 USCA § 2370b >>

SEC. 2110. (a) None of the funds made available for foreign operations, export financing, and related programs under the headings "Migration and Refugee Assistance", "United States Emergency Refugee and Migration Assistance Fund", "International Disaster and Famine Assistance", or "Transition Initiatives" may be obligated to an organization that fails to adopt a code of conduct that provides for the protection of beneficiaries of assistance under any such heading from sexual exploitation and abuse in humanitarian relief operations.

(b) The code of conduct referred to in subsection (a) shall, to the maximum extent practicable, be consistent with the six core principles of the United Nations Inter–Agency Standing Committee Task Force on Protection From Sexual Exploitation and Abuse in Humanitarian Crises.

(c) Not later than 180 days after the date of the enactment of this Act, and not later than one year after the date of the enactment of this Act, the President shall transmit to the appropriate congressional committees a report on the implementation of this section.

(d) This section shall take effect 60 days after the date of the enactment of this Act and shall apply to funds obligated after such date for fiscal year 2005 and any subsequent fiscal year.

## JOINT EXPLANATORY STATEMENT

SEC. 2111. (a) Funds provided in this Act for the following accounts shall be made available for programs and countries in the amounts contained in the joint explanatory statement of managers accompanying this Act:

"Economic Support Fund"; and

"Assistance for the Independent States of the Former Soviet Union".

(b) Any proposed increases or decreases to the amounts contained in such tables in the joint explanatory statement of managers shall be subject to the regular notification procedures of the Committees on Appropriations and section 634A of the Foreign Assistance Act of 1961.

## TITLE III—DOMESTIC APPROPRIATIONS FOR THE WAR ON TERROR

CHAPTER 1

DEPARTMENT OF ENERGY

National Nuclear Security Administration

DEFENSE NUCLEAR NONPROLIFERATION

For an additional amount for "Defense Nuclear Nonproliferation", $84,000,000, to remain available until expended: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

CHAPTER 2

DEPARTMENT OF HOMELAND SECURITY

CUSTOMS AND BORDER PROTECTION

Salaries and Expenses

For an additional amount for "Salaries and Expenses", $124,425,000, to remain available until September 30, 2006, for hiring, training, supporting, and equipping 500 border patrol agents above the level funded in Public Law 108–334: *Provided*, That the Secretary of Homeland Security shall provide the Committees on Appropriations of the Senate and the House of Representatives no later than June 15, 2005, with a plan for the expeditious implementation and execution of these funds: *Provided further*, That of the amount provided under this heading, $49,075,000 is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

Construction

For an additional amount for "Construction", $51,875,000, to remain available until September 30, 2006: *Provided*, That the Secretary of Homeland Security shall provide the Committees on Appropriations of the Senate and the House of Representatives no later than June 15, 2005, with a plan for the expeditious implementation and execution of these funds: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

IMMIGRATION AND CUSTOMS ENFORCEMENT

Salaries and Expenses

For an additional amount for "Salaries and Expenses", $454,250,000, of which not less than $11,000,000 shall be available for the costs of increasing by no less than seventy-nine the level of full-time equivalents on board on the date of enactment of this Act: *Provided*, That of the total amount provided, $178,250,000 is available until September 30, 2006, of which $93,050,000 is for new investigators, enforcement agents, detention officers, and detention bedspace: *Provided further*, That the Secretary of Homeland Security shall provide the Committees on Appropriations of the Senate and the House of Representatives no later than June 15, 2005, with a plan for the expeditious implementation and execution of these funds: *Provided further*, That of the amount provided under this heading, $349,050,000 is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

UNITED STATES COAST GUARD

Operating Expenses

For an additional amount for "Operating Expenses", $111,950,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

Acquisition, Construction, and Improvements

For an additional amount for "Acquisition, Construction, and Improvements", $49,200,000, to remain available until September 30, 2007: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### Salaries and Expenses

For an additional amount for "Salaries and Expenses", $2,568,000, to remain available until September 30, 2006.

### Acquisition, Construction, Improvements, and Related Expenses

For an additional amount for "Acquisition, Construction, Improvements, and Related Expenses", $1,882,000, to remain available until September 30, 2006.

## CHAPTER 3

## DEPARTMENT OF JUSTICE

### General Administration

### DETENTION TRUSTEE

For an additional amount for "Detention Trustee", $184,000,000, for necessary expenses of the Federal Detention Trustee: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Legal Activities

### ASSET FORFEITURE FUND

### (RESCISSION)

Of the unobligated balances available under this heading, $40,000,000 are rescinded.

### United States Marshals Service

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $11,935,000, for increased judicial security outside of courthouse facilities, including home intrusion detection systems for Federal judges, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Federal Bureau of Investigation

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $73,991,000, to remain available until September 30, 2006: *Provided*, That of the amount appropriated, $1,250,000 shall be transferred to and merged with the appropriation for "Department of Justice, General Administration, Office of Inspector General": *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Drug Enforcement Administration

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $7,648,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

Bureau of Alcohol, Tobacco, Firearms and Explosives

SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $4,000,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

CHAPTER 4

LEGISLATIVE BRANCH

HOUSE OF REPRESENTATIVES

Payment to Widows and Heirs of Deceased Members of Congress

For payment to Doris K. Matsui, widow of Robert T. Matsui, late a Representative from the State of California, $162,100.

Salaries and Expenses

For an additional amount for salaries and expenses of the House of Representatives, $39,000,000, to remain available until expended: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

Administrative Provisions

HOUSE SERVICES REVOLVING FUND

SEC. 3401. (a) Section 103(b) of the Legislative Branch Appropriations Act, 2005 (Public Law 108–447; 118 Stat. 3175) is amended to read as follows:

"(b) USE OF FEES.—Any amounts paid as fees for the use of the exercise facility described in subsection (a) shall be deposited into the House Services Revolving Fund established under section 105.".

(b) Section 105(a) of such Act (2 U.S.C. 117m(a)) is amended by adding at the end the following new paragraph:

<< 2 USCA § 117m >>

"(5) The payment of fees for the use of the exercise facility described in section 103(a).".

<< 2 USCA § 117m NOTE >>

(c) The amendments made by this section shall take effect as if included in the enactment of the Legislative Branch Appropriations Act, 2005.

TECHNICAL CORRECTIONS

<< 2 USCA § 132b NOTE >>

SEC. 3402. (a) The last proviso under the heading "LIBRARY OF CONGRESS—Salaries and Expenses" in chapter 9 of division A of the Miscellaneous Appropriations Act, 2001, as enacted into law by section 1(a)(4) of the Consolidated Appropriations Act, 2001 (2 U.S.C. 132b note), is amended by striking "chair of the Subcommittee on the Legislative Branch of the Committee on Appropriations of the House of Representatives" and inserting "chair of the Committee on Appropriations of the House of Representatives (or another member of such Committee designated by the chair)".

<< 2 USCA § 1151 >>

(b) Section 313(a)(2)(E) of the Legislative Branch Appropriations Act, 2001 (2 U.S.C. 1151(a)(2)(E)), as added by section 1502 of the Legislative Branch Appropriations Act, 2005 (Public Law 108–447), is amended by striking "chair of the Subcommittee

on Legislative Branch of the Committee on Appropriations of the House of Representatives" and inserting "chair of the Committee on Appropriations of the House of Representatives (or another member of such Committee designated by the chair)".

## CAPITOL POLICE

### General Expenses

For an additional amount for necessary expenses of the Capitol Police, $11,000,000, to remain available until expended: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## ARCHITECT OF THE CAPITOL

### Capitol Grounds

For an additional amount for "Capitol Grounds", $8,200,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### Capitol Police Buildings and Grounds

For an additional amount for "Capitol Police Buildings and Grounds", $4,100,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## TITLE IV—INDIAN OCEAN TSUNAMI RELIEF

## CHAPTER 1

## FUNDS APPROPRIATED TO THE PRESIDENT

## OTHER BILATERAL ASSISTANCE

### Tsunami Recovery and Reconstruction Fund

### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses to carry out the Foreign Assistance Act of 1961, for emergency relief, rehabilitation, and reconstruction aid to countries affected by the tsunami and earthquakes of December 2004 and March 2005, and the Avian influenza virus, $656,000,000, to remain available until September 30, 2006: *Provided*, That these funds may be transferred by the Secretary of State to Federal agencies or accounts for any activity authorized under part I (including chapter 4 of part II) of the Foreign Assistance Act, or under the Agricultural Trade Development and Assistance Act of 1954, to accomplish the purposes provided herein: *Provided further*, That upon a determination that all or part of the funds so transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: *Provided further*, That funds appropriated under this heading may be used to reimburse fully accounts administered by the United States Agency for International Development for obligations incurred for the purposes provided under this heading prior to enactment of this Act, including Public Law 480 Title II grants: *Provided further*, That of the amounts provided herein: up to $10,000,000 may be transferred to and consolidated with "Development Credit Authority" for the cost of direct loans and loan guarantees as authorized by sections 256 and 635 of the Foreign Assistance Act of 1961 in furtherance of the purposes of this heading; up to $17,500,000 may be transferred to and consolidated with "Operating Expenses of the United States Agency for International Development", of which up to $2,000,000 may be used for administrative expenses to carry out credit programs administered by the United States Agency for International Development in furtherance of the purposes of this heading; up to $1,000,000 may be transferred to and consolidated with "Operating Expenses of the United States Agency for International Development Office of Inspector General"; and up to $5,000,000 may be transferred to and consolidated with "Emergencies in the Diplomatic and Consular Service" for the purpose of providing support services for United States citizen victims and related operations: *Provided further*, That of the funds appropriated under this heading, $5,000,000 should be made available

for environmental recovery activities in tsunami affected countries: *Provided further*, That of the funds appropriated under this heading, $10,000,000 should be made available for programs and activities which create new economic opportunities for women: *Provided further*, That of the funds appropriated under this heading, $1,500,000 should be made available for programs to address the needs of people with physical and mental disabilities resulting from the tsunami: *Provided further*, That of the funds appropriated under this heading, not less than $12,500,000 should be made available to support initiatives that focus on the immediate and long-term needs of children for protection and permanency, including the registration of unaccompanied children, the reunification of children with their immediate or extended families, the protection of women and children from violence and exploitation, and activities designed to prevent the capture of children by armed forces and promote the integration of war affected youth: *Provided further*, That of the funds appropriated under this heading, $20,000,000 should be made available for microenterprise development programs in countries affected by the tsunami, of which $5,000,000 should be made available for microcredit programs, to be administered by the United States Agency for International Development: *Provided further*, That of the funds appropriated under this heading, $1,500,000 should be made available for trafficking in persons monitoring and prevention programs and activities in tsunami affected countries: *Provided further*, That the President is hereby authorized to defer and reschedule for such period as he may deem appropriate any amounts owed to the United States or any agency of the United States by those countries significantly affected by the tsunami and earthquakes of December 2004 and March 2005, including the Republic of Indonesia, the Republic of Maldives and the Democratic Socialist Republic of Sri Lanka: *Provided further*, That funds appropriated under this heading may be made available for the modification costs, as defined in section 502 of the Congressional Budget Act of 1974, if any, associated with any deferral and rescheduling authorized under this heading: *Provided further*, That such amounts shall not be considered "assistance" for the purposes of provisions of law limiting assistance to any such affected country: *Provided further*, That any agreement to defer and reschedule such debt will include a commitment by the recipient government that resources freed by the debt deferral will benefit directly the people affected by the tsunami: *Provided further*, That the Secretary of State shall arrange for an outside, independent evaluation of each government's compliance with the commitment: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

## GENERAL PROVISIONS, THIS CHAPTER

### ANNUAL LIMITATION

  SEC. 4101. Amounts made available pursuant to section 492(b) of the Foreign Assistance Act of 1961, as amended (22 U.S.C. 2292a), to address relief and rehabilitation needs for countries affected by the Indian Ocean tsunami and earthquakes of December 2004 and March 2005, prior to the enactment of this Act, shall be in addition to the amount that may be obligated in fiscal year 2005 under that section.

### REPORTING REQUIREMENT

  SEC. 4102. The Secretary of State shall submit to the Committees on Appropriations not later than 30 days after enactment, and prior to the initial obligation of funds appropriated under this chapter not used to reimburse accounts for obligations made prior to enactment, a report on the proposed uses of all funds on a project-by-project basis, for which such initial obligation of funds is anticipated: *Provided*, That up to 15 percent of funds appropriated under this chapter may be obligated before the submission of the report subject to the regular notification procedures of the Committees on Appropriations: *Provided further*, That the report shall be updated and submitted to the Committees on Appropriations every six months and shall include information detailing how the estimates and assumptions contained in previous reports have changed: *Provided further*, That any proposed new projects and increases in funding of ongoing projects shall be reported to the Committees on Appropriations in accordance with regular notification procedures: *Provided further*, That the Secretary of State shall submit to the Committees on Appropriations, not later than 210 days following enactment of this Act, and every six months thereafter, a report detailing on a project-by project basis, the expenditure of funds appropriated under this chapter until all funds have been fully expended.

### AUTHORIZATION OF FUNDS

  SEC. 4103. Funds appropriated by this Act may be obligated and expended notwithstanding section 15 of the State Department Basic Authorities Act of 1956, section 313 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public

AR.01121

Law 103–236), section 10 of Public Law 91–672 (22 U.S.C. 2412), and section 504(a)(1) of the National Security Act of 1947 (50 U.S.C. 414(a)(1)).

### AVIAN INFLUENZA VIRUS

SEC. 4104. Of the funds appropriated under this chapter, $25,000,000 shall be made available for a coordinated program to prevent and control the spread of the Avian influenza virus: *Provided*, That not less than $15,000,000 of such funds should be transferred to the Centers for Disease Control and Prevention: *Provided further*, That prior to the obligation of such funds, the Centers for Disease Control and Prevention shall consult with the United States Agency for International Development on the proposed use of such funds: *Provided further*, That funds made available by this section and transferred to the Centers for Disease Control and Prevention shall be for necessary expenses to carry out Titles III and XXIII of the Public Health Service Act.

### CHAPTER 2

### DEPARTMENT OF DEFENSE—MILITARY

### OPERATION AND MAINTENANCE

#### Operation and Maintenance, Navy

For an additional amount for "Operation and Maintenance, Navy", $124,100,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Operation and Maintenance, Marine Corps

For an additional amount for "Operation and Maintenance, Marine Corps", $2,800,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Operation and Maintenance, Air Force

For an additional amount for "Operation and Maintenance, Air Force", $30,000,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Operation and Maintenance, Defense–Wide

For an additional amount for "Operation and Maintenance, Defense–Wide", $29,150,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

#### Overseas Humanitarian, Disaster, and Civic Aid

For an additional amount for "Overseas Humanitarian, Disaster, and Civic Aid", $36,000,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### OTHER DEPARTMENT OF DEFENSE PROGRAMS

#### Defense Health Program

For an additional amount for "Defense Health Program", $3,600,000 for Operation and maintenance: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### CHAPTER 3

### DEPARTMENT OF HOMELAND SECURITY UNITED STATES COAST GUARD

Operating Expenses

For an additional amount for "Operating Expenses", $350,000: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

CHAPTER 4

DEPARTMENT OF THE INTERIOR

United States Geological Survey

SURVEYS, INVESTIGATIONS, AND RESEARCH

For an additional amount for "Surveys, Investigations, and Research", $8,100,000, to remain available until September 30, 2006: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

CHAPTER 5

DEPARTMENT OF COMMERCE

National Oceanic and Atmospheric Administration

OPERATIONS, RESEARCH, AND FACILITIES

For an additional amount for "Operations, Research, and Facilities", $7,070,000, to remain available until September 30, 2006, for United States tsunami warning capabilities and operations: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

PROCUREMENT, ACQUISITION AND CONSTRUCTION

For an additional amount for "Procurement, Acquisition and Construction", $10,170,000, to remain available until September 30, 2007, for United States tsunami warning capabilities: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

TITLE V—OTHER EMERGENCY APPROPRIATIONS

CHAPTER 1

DEPARTMENT OF AGRICULTURE

Natural Resources Conservation Service

EMERGENCY WATERSHED PROTECTION PROGRAM

For an additional amount for the emergency watershed protection program established under section 403 of the Agricultural Credit Act of 1978 (16 U.S.C. 2203) to repair damages to waterways and watersheds resulting from natural disasters, $104,500,000, to remain available until expended: *Provided*, That the above amount includes funding for eligible work identified in the Emergency Watershed Program Recovery Projects Unfunded list as of April 25, 2005: *Provided further*, That notwithstanding any other provision of law, the Secretary of Agriculture shall count local financial and technical resources, including in-kind materials and services, contributed toward recovery from the flooding events of January 2005 in Washington County, Utah, toward local matching requirements for the emergency watershed protection program assistance provided to Washington County, Utah: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

GENERAL PROVISIONS, THIS CHAPTER

### RURAL HOUSING SERVICE

SEC. 5101. Hereafter, notwithstanding any other provision of law, the Secretary of Agriculture may transfer any unobligated amounts made available under the heading "Rural Housing Service", "Rural Housing Insurance Fund Program Account" in chapter 1 of title II of Public Law 106–246 (114 Stat. 540) to the Rural Housing Service "Rental Assistance Program" account for projects in North Carolina: *Provided*, That the amounts made available by the transfer of funds in or pursuant to this section are designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### RURAL HOUSING ASSISTANCE GRANTS

SEC. 5102. Notwithstanding any other provision of law, the Secretary of Agriculture shall consider the Village of New Miami, Ohio, a rural area for purposes of eligibility for grants funded through the Rural Housing Assistance Grants account.

### WATERSHED PROJECTS IN WEST VIRGINIA

SEC. 5103. Of the amount provided to the Secretary of Agriculture under the Consolidated Appropriations Act, 2005 (Public Law 108–447) for the Lost River Watershed project, West Virginia, $4,000,000 may be transferred to the Upper Tygart Watershed project, West Virginia, to be used under the same terms and conditions under which funds for that project were appropriated in section 735 of the Consolidated Appropriations Act, 2004 (Public Law 108–199; 118 Stat. 36).

### FARM SERVICE AGENCY

SEC. 5104. The funds made available in section 786 of title VII of the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2005 as contained in division A of the Consolidated Appropriations Act, 2005 (Public Law 108–447) may be applied to accounts of Alaska dairy farmers owed to the Secretary of Agriculture.

### CHAPTER 2

### DEPARTMENT OF THE INTERIOR

Departmental Management

### SALARIES AND EXPENSES

For an additional amount for "Departmental Management", $3,000,000 to support deployment of business systems to the bureaus and offices of the Department of the Interior, including the Financial and Business Management System: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### RELATED AGENCY

### DEPARTMENT OF AGRICULTURE

Forest Service

### CAPITAL IMPROVEMENT AND MAINTENANCE

For an additional amount for "Capital Improvement and Maintenance", $24,390,000, to remain available until expended, to repair damages to national forest facilities and lands caused by severe storms in southern California: *Provided*, That such funds shall be available to perform repair activities including, but not limited to, restoration of roads, trails and facilities; removal of landslides; drainage protection; waste removal; and stream stabilization: *Provided further*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### CHAPTER 3

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

Office of the Secretary

PUBLIC HEALTH AND SOCIAL SERVICES EMERGENCY FUND

(INCLUDING RESCISSIONS OF FUNDS)

For an additional amount for the "Public Health and Social Services Emergency Fund" in title II of Public Law 108–447, $10,000,000, to remain available until expended, for an infrastructure grant to improve the supply of domestically produced vaccine: *Provided*, That the entire amount is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress): *Provided further*, That under the heading "Health Resources and Services Administration, Health Resources and Services", the unobligated balance for the Health Professions Teaching Facilities Program authorized in sections 726 and 805 of the Public Health Service Act; the unobligated balance of the Health Teaching Construction Interest Subsidy Program authorized in section 726 and title XVI of the Public Health Service Act; and the unobligated balance of the AIDS Facilities Renovation and Support Program authorized in title XVI of the Public Health Service Act are all hereby rescinded: *Provided further*, That under the heading "Office of the Secretary, Office of the Inspector General", the unobligated balance of the Medicaid Fraud Control Program authorized in section 1903 of the Social Security Act and appropriated to the Office of the Inspector General in the Department of Health and Human Services is hereby rescinded: *Provided further*, That under the heading "Assistant Secretary for Health Scientific Activities Overseas (Special Foreign Currency Program)" the unobligated balance of the Scientific Activities Overseas (Special Foreign Currency Program) account within the Department of Health and Human Services is hereby rescinded.

For an additional amount for the "Public Health and Social Services Emergency Fund" in title II of Public Law 108–447, $58,000,000, to remain available until expended, to be transferred to the Centers for Disease Control and Prevention for the purchase of influenza countermeasures for the Strategic National Stockpile: *Provided*, That $58,000,000 appropriated by section 1897(g) of the Social Security Act, as added by section 1016 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108–173) is rescinded.

CHAPTER 4

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Housing Programs

HOUSING FOR PERSONS WITH DISABILITIES

(INCLUDING RESCISSION OF FUNDS)

Of the amount made available under this heading in Public Law 108–447, $238,080,000 are rescinded.

For an additional amount for "Housing for Persons with Disabilities", $238,080,000, to remain available until September 30, 2006: *Provided*, That these funds shall be available under the same terms and conditions as authorized for funds under this heading in Public Law 108–447.

Office of Federal Housing Enterprise Oversight

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For an additional amount for the "Office of Federal Housing Enterprise Oversight" for carrying out the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, $5,000,000 to remain available until expended, to be derived from the Federal Housing Enterprises Oversight Fund but not any funds collected under section 1316(c) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. 4516(c)): *Provided*, That notwithstanding section 1316(d) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, any funds collected under section 1316(c) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 shall not be credited for fiscal year 2006 as surplus under section 1316(d) of such Act or as part of any assessment to be collected for fiscal year 2006 under section 1316(a) of such

Act: *Provided further*, That not to exceed the amount provided herein shall be available from the general fund of the Treasury to the extent necessary to incur obligations and make expenditures pending the receipt of collections to the Fund: *Provided further*, That the general fund amount shall be reduced as collections are received during the fiscal year so as to result in a final appropriation from the general fund estimated at not more than $0.

## TITLE VI—GENERAL PROVISIONS AND TECHNICAL CORRECTIONS

### AVAILABILITY OF FUNDS

SEC. 6001. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

### REFERENCES TO EMERGENCY REQUIREMENTS

SEC. 6002. Any reference in this Act to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress) shall be treated as a reference to the emergency legislation section of H. Con. Res. 95 (109th Congress), if H. Con. Res. 95 (109th Congress) is adopted prior to the enactment of this Act.

### RURAL BUSINESS–COOPERATIVE SERVICE

SEC. 6003. None of the funds made available by this or any other Act may be used to deny the provision of assistance under section 310B(a)(1) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1932(a)(1)) solely due to the failure of the Secretary of Labor to respond to a request to certify assistance within the time period specified in section 310B(d)(4) of that Act.

### MCCLELLAN KERR NAVIGATION SYSTEM ADVANCED OPERATIONS AND MAINTENANCE

SEC. 6004. The last proviso under the heading "Operation and Maintenance" in title I of division C of Public Law 108–447 is amended by striking "Public Law 108–357" and inserting "Public Law 108–137".

### ENVIRONMENTAL INFRASTRUCTURE

<< 33 USCA § 2221 >>

SEC. 6005. Section 101 of title I of division C of Public Law 108–447 is amended by striking "per project" and all that follows through the period at the end and inserting "for all applicable programs and projects not to exceed $80,000,000 in each fiscal year.".

### DESOTO COUNTY, MISSISSIPPI

SEC. 6006. Section 219(f)(30) of the Water Resources Development Act of 1992 (106 Stat. 4835; 106 Stat. 3757; 113 Stat. 334) is amended by striking "$20,000,000" and inserting "$55,000,000" in lieu thereof, and by striking "treatment" and inserting "infrastructure" in lieu thereof: *Provided*, That the Secretary is authorized and directed to reimburse the non-Federal local sponsor of the project described in section 219(f)(30) of the Water Resources Development Act of 1992 (106 Stat. 4835; 106 Stat. 3757; 113 Stat. 334) for costs incurred between May 13, 2002, and September 30, 2005, in excess of the required non-Federal share if the Secretary determines that such costs were incurred for work that is compatible with and integral to the project: *Provided further*, That the non-Federal local sponsor, at its option, may choose to accept, in lieu of reimbursement, a credit against the non-Federal share of project cost incurred after May 13, 2002.

### FORT PECK FISH HATCHERY, MONTANA

SEC. 6007. Section 325(f)(1)(A) of Public Law 106–541 is modified by striking "$20,000,000" and inserting in lieu thereof "$25,000,000".

### INTERCOASTAL WATERWAY, DELAWARE RIVER TO CHESAPEAKE BAY, SR–1 BRIDGE, DELAWARE

SEC. 6008. The first proviso under the heading "Operation and Maintenance" in title I of division C of Public Law 108–447 is amended by striking "October 1, 2003, and September 30, 2004" and inserting "October 1, 2004, and September 30, 2005".

### OFFSHORE OIL AND GAS FABRICATION PORTS

SEC. 6009. In determining the economic justification for navigation projects involving offshore oil and gas fabrication ports, the Secretary of the Army, acting through the Chief of Engineers, is directed to measure and include in the National Economic Development calculation the value of future energy exploration and production fabrication contracts and transportation cost savings that would result from larger navigation channels.

## ENVIRONMENTAL INFRASTRUCTURE

SEC. 6010. In division C, title I of the Consolidated Appropriations Act, 2005 (Public Law 108–447), the item relating to Corps of Engineers—Civil, Construction, General, is amended by inserting before the period at the end the following: ": *Provided further*, That of the funds made available herein for Ohio Environmental Infrastructure, $500,000 shall be used for the Liberty Little Squaw Creek sewer upgrade and $1,000,000 shall be used for the Lake County, Concord Township sanitary sewer line improvement: *Provided further*, That of the funds made available herein, $350,000 shall be used to complete design for the St. Croix Falls, Wisconsin, wastewater infrastructure project".

## INDIANA HARBOR, INDIANA

SEC. 6011. The Secretary of the Army, acting through the Chief of Engineers, is directed to complete, at full Federal expense, the Indiana Harbor and Canal, Confined Disposal Facility, Indiana, currently under construction.

## SEMINOLE TRIBE, BIG CYPRESS PROJECT

SEC. 6012. Section 528(b)(3) of the Water Resources Development Act of 1996 (110 Stat. 3769; 113 Stat. 286) is amended by adding the following:

"(5) The Seminole Tribe of Florida shall receive a mitigation credit for 50 percent of the net wetland benefits derived within the footprint of the Big Cypress Seminole Reservation Water Conservation Plan Project. Such credit may be used to meet the mitigation requirements of section 404 of the Clean Water Act as they may apply to future projects proposed by the Seminole Tribe of Florida.".

## SAN GABRIEL BASIN RESTORATION

SEC. 6013. (a) The matter under the heading "Water and Related Resources" in title II of division C of Public Law 108–447 is amended by inserting before the period at the end the following: ": *Provided further*, That $4,023,000 of the funds appropriated under this heading shall be deposited in the San Gabriel Basin Restoration Fund established by section 110 of title I of division B of the Miscellaneous Appropriations Act, 2001 (as enacted into law by Public Law 106–554)".

(b) Section 110(a)(3)(A)(ii) of the Miscellaneous Appropriations Act, 2001 (as enacted into law by section 1(a)(4) of Public Law 106–554) as amended is further amended by inserting the words "and maintain" after the word "operate".

## SILVERY MINNOW OFF–CHANNEL SANCTUARIES

SEC. 6014. The Secretary of the Interior is authorized to perform such analyses and studies as needed to determine the viability of establishing an off-channel sanctuary for the Rio Grande Silvery Minnow in the Middle Rio Grande Valley. In conducting these studies, the Secretary shall take into consideration:

(1) providing off-channel, naturalistic habitat conditions for propagation, recruitment, and maintenance of Rio Grande silvery minnows; and

(2) minimizing the need for acquiring water or water rights to operate the sanctuary.

If the Secretary determines the project to be viable, the Secretary is further authorized to design and construct the sanctuary and to thereafter operate and maintain the sanctuary. The Secretary may enter into grant agreements, cooperative agreements, financial assistance agreements, interagency agreements, and contracts with Federal and non-Federal entities to carry out the purposes of this Act.

## DESALINATION ACT EXTENSION

<< 42 USCA § 10301 NOTE >>

SEC. 6015. Section 8 of Public Law 104–298 (The Water Desalination Act of 1996) (110 Stat. 3624) as amended by section 210 of Public Law 108–7 (117 Stat. 146) is amended by—

(1) in paragraph (a) by striking "2004" and inserting in lieu thereof "2005"; and

(2) in paragraph (b) by striking "2004" and inserting in lieu thereof "2005".

## ENERGY SUPPLY

SEC. 6016. In division C, title III of the Consolidated Appropriations Act, 2005 (Public Law 108–447), the item relating to "Department of Energy, Energy Programs, Energy Supply" is amended by inserting before the period at the end the following: "*: Provided*, That $2,000,000 is made available for the National Center for Manufacturing Sciences in Michigan: *Provided further*, That $825,000 is made available for research and development in California to advance the state of metal hydride hydrogen storage".

## OFFICE OF SCIENCE

SEC. 6017. In division C, title III of the Consolidated Appropriations Act, 2005 (Public Law 108–447), the item relating to "Department of Energy, Energy Programs, Science" is amended by inserting "*: Provided*, That $2,000,000 is provided within available funds to continue funding for project #DE–FG0204ER63842–04090945, the Southeast Regional Cooling, Heating and Power and Bio–Fuel Application Center, and $3,000,000 is provided from within available funds for the University of Texas Southwestern Medical Center, University of Texas at Dallas Metroplex Comprehensive Imaging Center: *Provided further*, That within funds made available herein $500,000 is provided for the desalination plant technology program at the University of Nevada–Reno (UNR) and $500,000 for the Oral History of the Negotiated Settlement project at UNR: *Provided further*, That $4,000,000 is to be provided from within available funds to the Fire Sciences Academy in Elko, Nevada, for purposes of capital debt service: *Provided further*, That $2,000,000 is made available within available funds to upgrade chemistry laboratories at Drew University, New Jersey" after "$3,628,902,000".

## FOSSIL ENERGY

SEC. 6018. In division E, title II of the Consolidated Appropriations Act, 2005 (Public Law 108–447), the item relating to "Department of Energy, Fossil Energy Research and Development" is amended by inserting before the period at the end the following: "*: Provided further*, That $1,000,000 is made available for the National Energy Technology Laboratory in Pennsylvania to work with the Borough of Versailles, Pennsylvania, to remediate leaks from abandoned natural gas wells".

## WEAPONS ACTIVITIES

### (INCLUDING TRANSFER OF FUNDS)

SEC. 6019. Notwithstanding the provisions of section 302 of Public Law 102–377 and section 4705 of Public Law 107–314, as amended, the Department may transfer up to $10,000,000 from the Weapons Activities appropriation for purposes of carrying out section 3147 of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Public Law 108–375: *Provided*, That $825,000 is made available for cybersecurity at Department of Energy laboratories using the CimTrak technology.

## DEFENSE ENVIRONMENTAL SERVICES

SEC. 6020. Title III of division C of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by inserting before the period at the end of "Defense Environmental Services" the following: "*: Provided*, That to the extent activities to be funded within the 'Defense Environmental Services' cannot be funded without unduly impacting mission activities and statutory requirements, up to $30,000,000 from 'Defense Site Acceleration Completion' may be used for these activities: *Provided further*, That $2,000,000 is provided within available funds to support desalination activities in partnership with the Bureau of Reclamation at the Tularosa Basin desalination facility, New Mexico".

## DEFENSE SITE ACCELERATION COMPLETION TRANSFER TO WEAPONS ACTIVITIES

### (INCLUDING TRANSFER OF FUNDS)

SEC. 6021. Notwithstanding the provisions of section 302 of Public Law 102–377 and section 4705 of Public Law 107–314, as amended, the Department may transfer up to $4,000,000 from the "Defense Site Acceleration Completion" appropriation to

"Weapons Activities" appropriation contained in the Consolidated Appropriations Act, 2005 (Public Law 108–447), division C—Energy and Water Development.

SMALL BUSINESS CONTRACTING

<< 42 USCA § 7256 NOTE >>

SEC. 6022. (a) Not later than September 30, 2005, the Department of Energy and the Small Business Administration shall enter into a memorandum of understanding setting forth an appropriate methodology for measuring the achievement of the Department of Energy with respect to awarding contracts to small businesses.

<< 42 USCA § 7256 NOTE >>

(b) The methodology set forth in the memorandum of understanding entered into under subsection (a) shall, at a minimum, include—

(1) a method of counting the achievement of the Department of Energy in awards of—

(A) prime contracts; and

(B) subcontracts to small businesses awarded by Department of Energy management and operating, management and integration, and other facility management prime contractors; and

(2) uniform criteria that could be used by prime contractors when measuring the value and number of subcontracts awarded to small businesses.

(c)(1) Not later than September 30, 2005, the Administrator of the Small Business Administration, the Chief Counsel for Advocacy of the Small Business Administration, the Chairman of the Defense Nuclear Facilities Safety Board, the Secretary of Energy, and the Administrator of the National Nuclear Security Administration, shall jointly conduct a study regarding the feasibility of possible changes to management and operating contracts and other management contracts within the Department of Energy to encourage new opportunities for small businesses to increase their role as prime contractors.

(2) In conducting the study under paragraph (1), the Administrator of the Small Business Administration, the Chief Counsel for Advocacy of the Small Business Administration, the Chairman of the Defense Nuclear Facilities Safety Board, the Secretary of Energy, and the Administrator of the National Nuclear Security Administration shall jointly consider the impact of changes studied on—

(A) accountability, competition, and sound management practices at the Department of Energy and its facilities managed by prime contractors;

(B) safety, security, and oversight of Department of Energy facilities; and

(C) the potential oversight and management requirements necessary to implement the findings of the study.

(3) The Administrator of the Small Business Administration, the Chief Counsel for Advocacy of the Small Business Administration, the Chairman of the Defense Nuclear Facilities Safety Board, the Secretary of Energy, and the Administrator of the National Nuclear Security Administration shall report their joint findings to—

(A) the Committee on Small Business and Entrepreneurship, the Committee on Energy and Natural Resources, the Committee on Armed Services, the Committee on Homeland Security and Government Affairs, and the Committee on Appropriations of the Senate; and

(B) the Committee on Small Business, the Committee on Energy and Commerce, the Committee on Armed Services, the Committee on Homeland Security, and the Committee on Appropriations of the House of Representatives.

(d)(1) Beginning on the date of enactment of this Act and ending at the conclusion of fiscal year 2007, in any case in which the Secretary of Energy decides to break-out appropriate large prime contracts, known as the management and operating contracts, for award to small businesses, the Secretary shall consider whether—

(A) the services under the contract have previously been provided by a small business concern; and

(B) the contract is of the type capable of being performed by a small business concern.

(2) In the case of a contract awarded by the Department of Energy as a result of a break-out of subcontracts previously awarded by management and operating prime contractors and rewarded as a small business prime contract under paragraph (1)—

(A) any such contract valued at more than $25,000,000 shall be required to have a subcontracting plan for small businesses; and

AR.01129

(B) the Secretary shall make a determination on the advisability of requiring a local presence for small business subcontractors.

## NUCLEAR WASTE DISPOSAL

SEC. 6023. Title III of division C of the Consolidated Appropriations Act, 2005 (Public Law 108–447; 118 Stat. 2951) is amended in the matter under the heading "Nuclear Waste Disposal"—

(1) by inserting "to be derived from the Nuclear Waste Fund and" after "$346,000,000,"; and

(2) in the second proviso, by striking "to conduct scientific oversight responsibilities and participate in licensing activities pursuant to the Act" and inserting "to participate in licensing activities and other appropriate activities pursuant to that Act".

## DEPARTMENT OF HOMELAND SECURITY

## WORKING CAPITAL FUND

SEC. 6024. None of the funds appropriated or otherwise made available to the Department of Homeland Security may be used to make payments to the "Department of Homeland Security Working Capital Fund", except for the activities for fiscal year 2005 contained in the April 11, 2005, report submitted to the Committees on Appropriations of the Senate and the House of Representatives on the Department of Homeland Security Working Capital Fund, and all activities and services funded by the Federal Emergency Management Agency "Working Capital Fund" before March 1, 2003: *Provided*, That all organizations shall be charged only for direct usage of each service: *Provided further*, That for fiscal year 2005, funding for activities shall not exceed the amounts listed in the Department of Homeland Security Working Capital Fund April 11, 2005, report: *Provided further*, That any additional activities and amounts must be approved by the Committees on Appropriations of the Senate and the House of Representatives 30 days in advance of obligation.

<< 31 USCA § 501 NOTE >>

SEC. 6025. The Department of Homeland Security shall henceforth provide an appropriations justification for the "Department of Homeland Security Working Capital Fund" to the Committees on Appropriations of the Senate and House of Representatives: *Provided*, That an annual appropriations justification shall be submitted to the Congress as a part of the President's budget as submitted under Section 1105(a) of Title 31, United States Code, and shall contain the same level of detail as the Department's Congressional appropriations justification in support of the President's budget: *Provided further*, That the "Department of Homeland Security Working Capital Fund" Congressional appropriations justification for fiscal year 2006 shall be submitted within 15 days of enactment of this Act: *Provided further*, That the Chief Financial Officer shall ensure that all planned activities and amounts to be funded by the "Department of Homeland Security Working Capital Fund", all reimbursable agreements, and all uses of the Economy Act are explicitly identified in each Congressional appropriations justification in support of the President's budget provided for each agency and component of the Department.

## OFFICE OF THE CHIEF INFORMATION OFFICER

SEC. 6026. Of the funds provided under the heading "Office of the Chief Information Officer" in Public Law 108–334, $5,000,000 shall not be obligated for salaries and expenses until an expenditure plan is submitted to the Committees on Appropriations of the Senate and the House of Representatives for any information technology project that: (1) is funded by the "Office of the Chief Information Officer"; or (2) is funded by multiple components of the Department of Homeland Security through reimbursable agreements: *Provided*, That such expenditure plan shall include each specific project funded, key milestones, all funding sources for each project, details of annual and lifecycle costs, and projected cost savings or cost avoidance to be achieved by project: *Provided further*, That the expenditure plan shall include a complete list of all legacy systems operational as of March 1, 2003, the current operational status of each system, and the plans for continued operation or termination of each system.

## RESCISSION OF FUNDS

SEC. 6027. Of the funds appropriated by Public Law 108–334 (118 Stat. 1298, 1300, 1302), the following are rescinded: $500,000 under the heading "Office of the Secretary and Executive Management"; $3,300,000 under the heading "Office of the Under Secretary for Management"; $76,000,000 under the heading "Customs and Border Protection, Salaries and Expenses"; and $85,200,000 under the heading "Immigration and Customs Enforcement, Salaries and Expenses".

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 1154 of 3864

SEC. 6028. Of the unobligated balances available in the "Department of Homeland Security Working Capital Fund", $20,000,000 are rescinded.

## REPROGRAMMING AND TRANSFER OF FUNDS

SEC. 6029. Any funds made available to the Department of Homeland Security by this Act shall be subject to the terms and conditions of Title V of Public Law 108–334.

## BUREAU OF LAND MANAGEMENT, TECHNICAL CORRECTION

SEC. 6030. Section 144 of division E of Public Law 108–447 is amended in paragraph (b)(2) by striking "September 24, 2004" and inserting "November 12, 2004".

## FOREST SERVICE TRANSFER

SEC. 6031. Funds in the amount of $1,500,000, provided in Public Law 108–447 for the "Forest Service, Capital Improvement and Maintenance" account, are hereby transferred to the "Forest Service, State and Private Forestry" account.

## WEST YELLOWSTONE VISITOR INFORMATION CENTER

SEC. 6032. Notwithstanding any other provision of law, the National Park Service is authorized to expend appropriated funds for the construction, operations and maintenance of an expansion to the West Yellowstone Visitor Information Center to be constructed for visitors to, and administration of, Yellowstone National Park.

## PESTICIDES TOLERANCE FEES

SEC. 6033. None of the funds in this or any other Appropriations Act may be used by the Environmental Protection Agency or any other Federal agency to develop, promulgate, or publish a pesticides tolerance fee rulemaking.

## GULF ISLANDS NATIONAL SEASHORE

SEC. 6034. (a) The Secretary of the Interior shall allow the State of Mississippi, its lessees, contractors, and permittees, to conduct, under reasonable regulation not inconsistent with extraction of the oil and gas minerals reserved by the State of Mississippi in the deed referenced in subsection (b):

  (1) exploration, development and production operations on sites outside the boundaries of Gulf Islands National Seashore that use directional drilling techniques which result in the drill hole crossing into the Gulf Islands National Seashore and passing under any land or water the surface of which is owned by the United States, including terminating in bottom hole locations thereunder; and

  (2) seismic and seismic-related exploration activities inside the boundaries of Gulf Islands National Seashore to identify the oil and gas minerals located within the boundaries of the Gulf Islands National Seashore under the surface estate conveyed by the State of Mississippi, all of which oil and gas minerals the State of Mississippi reserved the right to extract.

(b) The provisions of subsection (a) shall not take effect until the State of Mississippi enters into an agreement with the Secretary providing that any actions by the United States in relation to the provisions in the section shall not trigger any reverter of any estate conveyed by the State of Mississippi to the United States within the Gulf Islands National Seashore in Chapter 482 of the General Laws of the State of Mississippi, 1971, and the quitclaim deed of June 15, 1972.

## SURFACE MINING CONTROL AND RECLAMATION ACT

<< 30 USCA § 1232 >>

SEC. 6035. Section 402(b) of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1232(b)) is amended by striking "June 30, 2005," and inserting "September 30, 2005,".

## RESIDENT AND NONRESIDENT HUNTING AND FISHING REGULATIONS

SEC. 6036. STATE REGULATION OF RESIDENT AND NONRESIDENT HUNTING AND FISHING. (a) SHORT TITLE. —This section may be cited as the "Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005".

(b) DECLARATION OF POLICY AND CONSTRUCTION OF CONGRESSIONAL SILENCE.—

(1) IN GENERAL.—It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of laws or regulations that differentiate between residents and nonresidents of such State with respect to the availability of licenses or permits for taking of particular species of fish or wildlife, the kind and numbers of fish and wildlife that may be taken, or the fees charged in connection with issuance of licenses or permits for hunting or fishing.

(2) CONSTRUCTION OF CONGRESSIONAL SILENCE.—Silence on the part of Congress shall not be construed to impose any barrier under clause 3 of Section 8 of Article I of the Constitution (commonly referred to as the "commerce clause") to the regulation of hunting or fishing by a State or Indian tribe.

(c) LIMITATIONS.—Nothing in this section shall be construed—

(1) to limit the applicability or effect of any Federal law related to the protection or management of fish or wildlife or to the regulation of commerce;

(2) to limit the authority of the United States to prohibit hunting or fishing on any portion of the lands owned by the United States; or

(3) to abrogate, abridge, affect, modify, supersede or alter any treaty-reserved right or other right of any Indian tribe as recognized by any other means, including, but not limited to, agreements with the United States, Executive Orders, statutes, and judicial decrees, and by Federal law.

(d) STATE DEFINED.—For purposes of this section, the term "State" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, American Samoa, and the Commonwealth of the Northern Mariana Islands.

### STATE AND TRIBAL ASSISTANCE GRANTS, TECHNICAL CORRECTIONS

SEC. 6037. The referenced statement of the managers under the heading "State and Tribal Assistance Grants" for the Environmental Protection Agency in Public Law 106–377, in reference to item 80, is deemed to be amended by striking all after "for" and inserting in lieu thereof "wastewater infrastructure improvements".

SEC. 6038. The referenced statement of the managers under the heading "State and Tribal Assistance Grants" for the Environmental Protection Agency in Public Law 108–199 is deemed to be amended, in reference to item 331, by striking all after "to" and inserting in lieu thereof "Wayne County, New York Water and Sewer Authority for wastewater infrastructure improvements" and, in reference to item 25, by striking all after "for" and inserting in lieu thereof "water and wastewater improvements".

SEC. 6039. The referenced statement of the managers under the heading "State and Tribal Assistance Grants" for the Environmental Protection Agency in Public Law 108–447 is deemed to be amended, in reference to item 235, by striking "$650,000" and inserting in lieu thereof "$1,000,000" and is deemed to be amended by adding "668. $150,000 to the City of Oldsmar, Florida for water and wastewater infrastructure improvements.".

### TRANSFER AUTHORITY

SEC. 6040. (a) Section 102 of division F of Public Law 108–447 is hereby repealed.

(b) Section 208 of division F of Public Law 108–447 is amended by inserting before the period at the end the following: ": *Provided further*, That such authority shall be limited to emergency use only, and is not to be used to create new programs, or to fund any project or activity for which no funds were provided".

### TECHNICAL CORRECTIONS—FUND FOR THE IMPROVEMENT OF EDUCATION—FISCAL YEAR 2005

SEC. 6041. In the statement of the managers of the committee of conference accompanying H.R. 4818 (Public Law 108–447; House Report 108–792), in the matter in title III of division F, relating to the Fund for the Improvement of Education under the heading "Innovation and Improvement"—

(1) the provision specifying $500,000 for the Mississippi Museum of Art, Jackson, MS for Hardy Middle School After School Program shall be deemed to read "Mississippi Museum of Art, Jackson, MS for a Mississippi Museum of Art After–School Collaborative";

(2) the provision specifying $2,000,000 for the Milken Family Foundation, Santa Monica, CA, for the Teacher Advancement Program shall be deemed to read "Teacher Advancement Program Foundation, Santa Monica, CA for the Teacher Advancement Program";

(3) the provision specifying $1,000,000 for Batelle for Kids, Columbus, OH for a multi-state effort to evaluate and learn the most effective ways for accelerating student academic growth shall be deemed to read "Battelle for Kids, Columbus, OH for a multi-state effort to implement, evaluate and learn the most effective ways for accelerating student academic growth";

(4) the provision specifying $750,000 for the Institute of Heart Math, Boulder Creek, CO for a teacher retention and student dropout prevention program shall be deemed to read "Institute of Heart Math, Boulder Creek, CA for a teacher retention and student dropout prevention program";

(5) the provision specifying $200,000 for Fairfax County Public Schools, Fairfax, VA for Chinese language programs in Franklin Sherman Elementary School and Chesterbrook Elementary School in McLean, Virginia shall be deemed to read "Fairfax County Public Schools, Fairfax, VA for Chinese language programs in Shrevewood Elementary School and Wolftrap Elementary School";

(6) the provision specifying $1,250,000 for the University of Alaska/Fairbanks in Fairbanks, AK, working with the State of Alaska and Catholic Community Services, for the Alaska System for Early Education Development (SEED) shall be deemed to read "University of Alaska/Southeast in Juneau, AK, working with the State of Alaska and Catholic Community Services, for the Alaska System for Early Education Development (SEED)";

(7) the provision specifying $25,000 for QUILL Productions, Inc., Aston, PA, to develop and disseminate programs to enhance the teaching of American history shall be deemed to read "QUILL Entertainment Company, Aston, PA, to develop and disseminate programs to enhance the teaching of American history";

(8) the provision specifying $780,000 for City of St. Charles, MO for the St. Charles Foundry Arts Center in support of arts education shall be deemed to read "The Foundry Art Centre, St. Charles, Missouri for support of arts education in conjunction with the City of St. Charles, MO";

(9) the provision specifying $100,000 for Community Arts Program, Chester, PA, for arts education shall be deemed to read "Chester Economic Development Authority, Chester, PA for a community arts program";

(10) the provision specifying $100,000 for Kids with A Promise—The Bowery Mission, Bushkill, PA shall be deemed to read "Kids with A Promise—The Bowery Mission, New York, NY";

(11) the provision specifying $50,000 for Great Projects Film Company, Inc., Washington, DC, to produce "Educating America", a documentary about the challenges facing our public schools shall be deemed to read "Great Projects Film Company, Inc., New York, NY, to produce 'Educating America', a documentary about the challenges facing our public schools";

(12) the provision specifying $30,000 for Summer Camp Opportunities Provide an Edge (SCOPE), New York, NY for YMCA Camps Skycrest, Speers and Elijabar shall be deemed to read "American Camping Association for Summer Camp Opportunities Provide an Edge (SCOPE), New York, NY for YMCA Camps Skycrest and Speers–Elijabar";

(13) the provision specifying $163,000 for Space Education Initiatives, Green Bay, WI for the Wisconsin Space Science Initiative shall be deemed to read "Space Education Initiatives, De Pere, WI for the Wisconsin Space Science Initiative";

(14) the provision specifying $100,000 for Clarion County Career Center, Shippenville, PA for curriculum development shall be deemed to read "Clarion County Career Center, Shippenville, PA for curriculum development, technology and/or equipment";

(15) the provision specifying $100,000 for Central Pennsylvania Institute of Science and Technology, Pleasant Gap, PA for curriculum development shall be deemed to read "Central Pennsylvania Institute of Science and Technology, Pleasant Gap, PA for curriculum development, technology and/or equipment";

(16) the provision specifying $100,000 for Forest Area High School, Tionesta, PA, for curriculum development shall be deemed to read "Forest Area High School, Tionesta, PA for curriculum development, technology and/or equipment";

(17) the provision specifying $100,000 for Jersey Shore High School, Jersey Shore, PA, for curriculum development shall be deemed to read "Jersey Shore High School, Jersey Shore, PA for curriculum development, technology and/or equipment";

(18) the provision specifying $100,000 for Montgomery Area School District, Montgomery, PA for curriculum development shall be deemed to read "Montgomery Area School District, Montgomery, PA for curriculum development, technology and/or equipment";

(19) the provision specifying $100,000 for Southern Tioga School District, Blossburg, PA for curriculum development shall be deemed to read "Southern Tioga School District, Blossburg, PA for curriculum development, technology and/or equipment";

(20) the provision specifying $300,000 for Venango County AVTS, Oil City, PA for curriculum development shall be deemed to read "Venango County AVTS, Oil City, PA for curriculum development, technology and/or equipment";

(21) the provision specifying $100,000 for Warren County Career Center, Warren, PA, for curriculum development shall be deemed to read "Warren County Career Center, Warren, PA for curriculum development, technology and/or equipment"; and

(22) the provision specifying $100,000 for Wellsboro Area School District, Wellsboro, PA, for curriculum development shall be deemed to read "Wellsboro Area School District, Wellsboro, PA for curriculum development, technology and/or equipment".

## TECHNICAL CORRECTIONS—FUND FOR THE IMPROVEMENT OF POSTSECONDARY EDUCATION—FISCAL YEAR 2005

SEC. 6042. In the statement of the managers of the committee of conference accompanying H.R. 4818 (Public Law 108–447; House Report 108–792), in the matter in title III of division F, relating to the Fund for the Improvement of Postsecondary Education under the heading "Higher Education"—

(1) the provision specifying $145,000 for the Belin–Blank Center at the University of Iowa, Iowa City, IA for the Big 10 school initiative to improve minority student access to Advanced Placement courses shall be deemed to read "University of Iowa, Iowa City, IA for the Iowa and Israel: Partners in Excellence program to enhance math and science opportunities to rural Iowa students";

(2) the provision specifying $150,000 for Mercy College, Dobbs Ferry, NY for the development of a registered nursing program shall be deemed to read "Mercy College, Dobbs Ferry, NY, for the development of a master's degree program in nursing education, including marketing and recruitment activities";

(3) the provision specifying $100,000 for University of Alaska/Southeast to develop distance education coursework for arctic engineering courses and programs shall be deemed to read "University of Alaska System Office to develop distance education coursework for arctic engineering courses and programs";

(4) the provision specifying $170,000 for Shippensburg University Foundation, Shippensburg, PA, for the Center for Land Use shall be deemed to read "Shippensburg University, Shippensburg, PA, for the Center for Land Use"; and

(5) the provision specifying $100,000 for Culver–Stockton College, Canton, MO for equipment and technology shall be deemed to read "Moberly Area Community College, Moberly, MO for equipment and technology".

## TECHNICAL CORRECTIONS—FUND FOR THE IMPROVEMENT OF EDUCATION—FISCAL YEAR 2004

SEC. 6043. In the statement of the managers of the committee of conference accompanying H.R. 2673 (Public Law 108–199; House Report 108–401), in the matter in title III of division E, relating to the Fund for the Improvement of Education under the heading "Innovation and Improvement" the provision specifying $1,500,000 for the University of Alaska at Fairbanks for Alaska System for Early Education Development (SEED) program to expand early childhood services and to train Early Head Start teachers with AAS degrees for positions in rural Alaska shall be deemed to read "University of Alaska/Southeast in Juneau, AK, working with the State of Alaska and Catholic Community Services, for the Alaska System for Early Education Development (SEED) program to expand early childhood services and to train Early Head Start teachers with AAS degrees for positions in rural Alaska".

## CORPORATION FOR NATIONAL AND COMMUNITY SERVICE FOR GRANT REVIEWS

SEC. 6044. The matter under the heading "Corporation for National and Community Service—National and Community Service Programs Operating Expenses" in title III of division I of Public Law 108–447 is amended by inserting before the period at the end the following: ": *Provided further*, That the Corporation may use up to 1 percent of program grant funds made available under this heading to defray its costs of conducting grant application reviews, including the use of outside peer reviewers".

## MEDICARE HEALTH CARE INFRASTRUCTURE IMPROVEMENT PROGRAM

SEC. 6045. (a) IN GENERAL.—Section 1897(c) of the Social Security Act (42 U.S.C. 1395hhh(c)) is amended—

(1) in paragraph (2)—

<< 42 USCA § 1395hhh >>

(A) in the matter preceding subparagraph (A), by inserting "or an entity described in paragraph (3)" after "means a hospital"; and

<< 42 USCA § 1395hhh >>

(B) in subparagraph (B)—
  (i) by inserting "legislature" after "State" the first place it appears; and
  (ii) by inserting "and such designation by the State legislature occurred prior to December 8, 2003" before the period at the end; and
(2) by adding at the end the following new paragraph:

<< 42 USCA § 1395hhh >>

"(3) ENTITY DESCRIBED.—An entity described in this paragraph is an entity that—
  "(A) is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;
  "(B) has at least 1 existing memorandum of understanding or affiliation agreement with a hospital located in the State in which the entity is located; and
  "(C) retains clinical outpatient treatment for cancer on site as well as lab research and education and outreach for cancer in the same facility.".

<< 42 USCA § 1395hhh >>

(b) LIMITATION ON REVIEW.—Section 1897 of the Social Security Act (42 U.S.C. 1395hhh(c)) is amended by adding at the end the following new subsection:
  "(i) LIMITATION ON REVIEW.—There shall be no administrative or judicial review of any determination made by the Secretary under this section.".

<< 42 USCA § 1395hhh NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the enactment of section 1016 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108–173; 117 Stat. 2447).

APPLICATION PROCESSING AND ENFORCEMENT FEES

<< 8 USCA § 1356 >>

SEC. 6046. Section 286(s)(6) of the Immigration and Nationality Act (8 U.S.C. 1356(s)(6)) is amended in the second sentence by inserting "and section 212(a)(5)(A)" before the period at the end.

TECHNICAL CORRECTION—HIGHER EDUCATION

(INCLUDING RESCISSION OF FUNDS)

SEC. 6047. (a) RESCISSION.—Of the funds made available under the heading "Higher Education" in title III of division F of Public Law 108–447, $496,000 is rescinded, to be derived from the amount provided pursuant to the last proviso under such heading for the IWF Leadership Foundation, Washington, DC, for a scholarship fund.

(b) APPROPRIATION.—The amount rescinded by subsection (a) is appropriated for "General Services Administration—Operating Expenses", for a grant to the IWF Leadership Foundation, Washington, DC, for a scholarship fund.

COPYRIGHT ROYALTY JUDGES

SEC. 6048. (a) The item relating to "LIBRARY OF CONGRESS—Copyright Office—salaries and expenses" in the Legislative Branch Appropriations Act, 2005 (Public Law 108–447; 118 Stat. 3187), is amended by striking the period at the end and

inserting the following: ": *Provided further*, That notwithstanding any provision of chapter 8 of title 17, United States Code, any amounts made available under this heading which are attributable to royalty fees and payments received by the Copyright Office pursuant to sections 111 and 119, and chapter 10 of such title may be used for the costs incurred in the administration of the Copyright Royalty Judges program during any portion of fiscal year 2005 in which such program is in effect.".

(b) The amendment made by subsection (a) shall take effect as if included in the enactment of the Legislative Branch Appropriations Act, 2005.

### CAPITOL VISITOR CENTER

SEC. 6049. (a) The item relating to "Architect of the Capitol—Capitol Visitor Center" in the Legislative Branch Appropriations Act, 2002 (Public Law 107–68; 115 Stat. 588), is amended by striking "chair and ranking minority member of the".

(b) The amendment made by subsection (a) shall take effect as if included in the enactment of the Legislative Branch Appropriations Act, 2002.

### TECHNICAL CORRECTION

SEC. 6050. Notwithstanding any other provision of law, unexpended and unobligated funds appropriated by Public Law 108–7 to the accounts under the heading "SENATE" relating to Legislative Branch appropriations shall remain available without fiscal year limitation: *Provided*, That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of the conference report to accompany S. Con. Res. 95 (108th Congress).

### TECHNICAL CORRECTIONS—NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION—FISCAL YEAR 2005

SEC. 6051. The referenced statement of managers under the heading "National Oceanic and Atmospheric Administration" in title II of division B of Public Law 108–447 is deemed to be amended after "Bonneau Ferry, SC" by striking "20,000" and inserting "19,200" in the "Procurement, Acquisition and Construction" account: *Provided*, That the difference in these amounts are available for transfer to the "Operations, Research, and Facilities" account for "Response and Restoration Base".

SEC. 6052. The referenced statement of managers under the heading "National Oceanic and Atmospheric Administration" in title II of division B of Public Law 108–447 is deemed to be amended under the heading "Construction/Acquisition, Coastal and Estuarine Land Conservation Program" by striking "Tonner Canyon, CA" and inserting "Tolay Lake, Sonoma County, CA".

SEC. 6053. The referenced statement of managers under the heading "National Oceanic and Atmospheric Administration" in title II of division B of Public Law 108–447 is deemed to be amended under the heading "Construction/Acquisition, Coastal and Estuarine Land Conservation Program" by striking "Port Aransas Nature Preserve Wetlands Project, TX—3,000" and under the heading "Section 2 (FWCA) Coastal/Estuarine Land Acquisition" by inserting "Port Aransas Nature Preserve Wetlands Project, TX—3,000".

### SMALL BUSINESS ADMINISTRATION—TECHNICAL CORRECTIONS

SEC. 6054. Section 621 of title VI of division B of Public Law 108–199 is amended by striking "of passenger, cargo and other aviation services".

SEC. 6055. Section 619(a) of title VI of division B of Public Law 108–447 is amended by striking "Asheville-Buncombe Technical Community College" and inserting "the International Small Business Institute".

SEC. 6056. (a) Section 619(a) of title VI of division B of Public Law 108–447 is amended by striking "for the continued modernization of the Mason Building".

(b) Section 621 of title VI of division B of Public Law 108–199, as amended by Public Law 108–447, is amended by striking ", for the continued modernization of the Mason Building".

SEC. 6057. (a) Section 633 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2001 (as enacted into law by Public Law 106–553) and section 629 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2002 (Public Law 107–77) are each amended by striking "NTTC at Wheeling Jesuit University" and inserting "West Virginia High Technology Consortium Foundation".

(b) The amendments made by subsection (a) shall apply to the remaining balances of the grants involved.

### TECHNICAL CORRECTION—BANKRUPTCY

SEC. 6058. (a) Section 325 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 is amended to read as follows:

<< 28 USCA § 589a >>

<< 28 USCA § 589a NOTE >>

<< 28 USCA § 1930 >>

<< 28 USCA § 1930 NOTE >>

<< 28 USCA § 1931 NOTE >>

"SEC. 325. UNITED STATES TRUSTEE PROGRAM FILING FEE INCREASE.
  "(a) BANKRUPTCY FILING FEES.—Section 1930(a) of title 28, United States Code, is amended—

<< 28 USCA § 1930 >>

  "(1) by striking paragraph (1) and inserting the following:
  "(1) For a case commenced under—
    "(A) chapter 7 of title 11, $220, and
    "(B) chapter 13 of title 11, $150.'; and

<< 28 USCA § 1930 >>

  "(2) in paragraph (3), by striking '$800' and inserting '$1,000'.

<< 28 USCA § 589a >>

  "(b) UNITED STATES TRUSTEE SYSTEM FUND.—Section 589a(b) of title 28, United States Code, is amended—
  "(1) by striking paragraph (1) and inserting the following:
  "(1)(A) 40.46 percent of the fees collected under section 1930(a)(1)(A); and
  "(B) 28.33 percent of the fees collected under section 1930(a)(1)(B);'; and
  "(2) in paragraph (2), by striking 'one-half' and inserting '55 percent'.

<< 28 USCA §§ 1931 NOTE, 1930 NOTE, 589a NOTE >>

  "(c) COLLECTIONS AND DEPOSITS OF MISCELLANEOUS BANKRUPTCY FEES.—Section 406(b) of the Judiciary Appropriations Act, 1990 (28 U.S.C. 1931 note) is amended by striking 'pursuant to 28 U.S.C. section 1930(b)' and all that follows through '28 U.S.C. section 1931' and inserting 'under section 1930(b) of title 28, United States Code, 28.87 percent of the fees collected under section 1930(a)(1)(A) of that title, 35.00 percent of the fees collected under section 1930(a)(1)(B) of that title, and 25 percent of the fees collected under section 1930(a)(3) of that title shall be deposited as offsetting receipts to the fund established under section 1931 of that title'.".

<< 28 USCA § 589a NOTE >>

  (b) This section and the amendment made by this section shall take effect immediately after the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

DEPARTMENT OF COMMERCE—CONFERENCE
  SEC. 6059. Within the amount provided for the Department of Commerce in division B of Public Law 108–447, the Secretary of Commerce shall convene a national conference on science, technology, trade and manufacturing.

TECHNICAL CORRECTION—9/11 HEROES

AR.01137

<< 31 USCA § 5111 NOTE >>

SEC. 6060. Subsection (d) of the section 124 that appears under the item relating to "General Provisions—Department of Justice" of the Consolidated Appropriations Act of 2005 (Public Law 108–447) is amended—

(1) in paragraph (2), by striking "with the Secretary of the Treasury to prepare and strike, on a reimbursable basis," and inserting "for striking"; and

(2) by striking paragraph (3).

### TECHNICAL CORRECTIONS—DEPARTMENT OF TRANSPORTATION

SEC. 6061. The matter under the heading "Federal Transit Administration, Capital Investment Grants" in title I of division H of Public Law 108–447 is amended by striking "$3,591,548" and inserting "$1,362,683" and by striking "$22,554,144" and inserting "$12,998,815": *Provided*, That the amount of new fixed guideway funds available for each project expected to complete its full funding grant agreement this fiscal year shall not exceed the amount which, when reduced by the across-the-board rescission of 0.80 percent of such Act, is equal to the amount of new fixed guideway funds required to complete the commitment of Federal new fixed guideway funds reflected in the project's full funding grant agreement: *Provided further*, That of the new fixed guideway funds available in Public Law 108–447, $1,352,899 shall be available for the Northern New Jersey Newark Rail Link MOS 1 project, no funds shall be available for the Northern New Jersey Newark–Elizabeth Rail Line MOS 1 project, and $316,427 shall be available for the Northern New Jersey Hudson–Bergen Light Rail MOS 1 project.

SEC. 6062. Notwithstanding any other provision of law, in section 1602 of the Transportation Equity Act for the 21st Century, item number 744 is amended by striking "Preliminary design of Route 2 Connector to Downtown Fitchburg" and inserting "design, construction/reconstruction and right of way acquisition for roadway improvements along the Route 12 corridor in Leominster and Fitchburg to enhance access from Route 2 to North Leominster and Downtown Fitchburg".

SEC. 6063. Section 198 of division H of Public Law 108–447 is amended by inserting "under title 23 of the United States Code" after "law".

### PAYMENTS TO AIR CARRIERS

SEC. 6064. Notwithstanding any other provision of law, for the current fiscal year and any period covered by an Act making continuing appropriations for fiscal year 2006, all overflight fees collected and credited to the account established under section 45303(a) of title 49, United States Code, shall be made available immediately for obligation and expenditure to meet the costs of the essential air service program under 49 U.S.C. 41731 through 41742: *Provided*, That, if the funds in this account are insufficient to meet the costs of the essential air service program in such fiscal year, the Secretary of Transportation shall transfer such sums as may be necessary to carry out the essential air service program from any available amounts appropriated to or directly administered by the Office of the Secretary for such fiscal year.

### MARITIME ADMINISTRATION

SEC. 6065. No provision of this Act may be construed as altering or amending the force or effect of any of the following provisions of law as currently applied:

(1) Sections 2631 and 2631a of title 10, United States Code.

(2) Sections 901(b) and 901b of the Merchant Marine Act, 1936 (46 U.S.C. App. 1241(b), 1241f).

(3) Public Resolution Numbered 17, Seventy-third Congress (48 Stat. 500).

(4) Any other similar provision of law requiring the use of privately owned United States flag commercial vessels for certain transportation purposes of the United States.

### THE JUDICIARY

<< 28 USCA § 331 NOTE >>

SEC. 6066. Section 308 of division B of Public Law 108–447 is amended by striking all after the words "shall be deposited", and inserting "as offsetting receipts to the fund established under 28 U.S.C. 1931 and shall remain available to the Judiciary

AR.01138

until expended to reimburse any appropriation for the amount paid out of such appropriation for expenses of the Courts of Appeals, District Courts, and Other Judicial Services and the Administrative Offices of the United States Courts.".

TECHNICAL CORRECTIONS—GENERAL SERVICES ADMINISTRATION

SEC. 6067. Under the heading "Federal Buildings Fund" in title IV of division H of Public Law 108–447, strike "$60,000,000" and insert in lieu thereof "$60,600,000" in reference to the Las Cruces United States Courthouse.

<< 40 USCA § 572 >>

SEC. 6068. Section 408 in title IV of division H of Public Law 108–447 is amended by striking "Section 572(a)(2)(ii)" and inserting in lieu thereof "Section 572(a)(2)(A)(ii)".

TECHNICAL CORRECTIONS—DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SEC. 6069. (a) The referenced statement of the managers under the heading "Community Development Fund" in title II of division I of Public Law 108–447 is deemed to be amended—

(1) with respect to item 230 by striking "City" and inserting "Port";

(2) with respect to item 233 by inserting "Port of" before the words "Brookings Harbor"; and

(3) with respect to item number 30 by inserting "to be used for planning, design, and construction" after "California,".

SEC. 6070. The referenced statement of managers under the heading "Community Development Fund" in title II of division K of Public Law 108–7 is deemed to be amended—

(1) with respect to item number 39 by striking "Conference and Workforce Center in Harrison, Arkansas" and inserting "in Harrison, Arkansas for facilities construction of the North Arkansas College Health Sciences Education Center"; and

(2) with respect to item number 316 by striking "for renovation of a visitor center to accommodate a Space and Flight Center" and inserting "to build-out the Prince George's County Economic Development and Business Assistance Center".

SEC. 6071. The referenced statement of the managers under the heading "Community Development Fund" in title II of division G of Public Law 108–199 is deemed to be amended—

(1) with respect to item number 56 by striking "Conference and Training Center" and inserting "North Arkansas College Health Sciences Education Center";

(2) with respect to item number 102 by striking "to the Town of Groveland, California for purchase of a youth center" and inserting "to the County of Tuolomne for the purchase of a new youth center in the mountain community of Groveland";

(3) with respect to item number 218 by striking "for construction" and inserting "for design and engineering";

(4) with respect to item number 472 by striking "for sidewalk, curbs and facade improvements in the Morton Avenue neighborhood" and inserting "for streetscape renovation";

(5) with respect to item number 493 by striking "for land acquisition" and inserting "for planning and design of its Sports and Recreation Center and Education Complex";

(6) with respect to item number 122 by inserting "to be used for planning, design, and construction" after "California,";

(7) with respect to item number 369 by striking "for the" after "Michigan" and inserting "to be used for planning, design, and construction of the"; and

(8) with respect to item number 450 by striking "V.I.C.T.E.M. Family Center in Washoe County, Nevada for the construction of a facility for multi-purpose social services referral and victim counseling;" and inserting "Washoe County, Nevada for a facility and equipment for the SART/CARES victim programs;".

SEC. 6072. The referenced statement of the managers under the heading "Community Development Fund" in title II of division I of Public Law 108–447 is deemed to be amended as follows—

(1) with respect to item number 706 by striking "a public swimming pool" and inserting "recreation fields";

(2) with respect to item number 667 by striking "to the Town of Appomattox, Virginia for facilities construction of an African–American cultural and heritage museum at the Carver–Price building" and inserting "to the County of Appomattox, Virginia for renovation of the Carver–Price building";

(3) with respect to item number 668 by striking "for the Town of South Boston, Virginia for renovations and creation of a community arts center at the Prizery" and inserting "for The Prizery in South Boston, Virginia for renovations and creation of a community arts center";

(4) with respect to item number 669 by striking "for the City of Moneta, Virginia for facilities construction and renovations of an art, education, and community outreach center" and inserting "for the Moneta Arts, Education, and Community Outreach Center in Moneta, Virginia for facilities construction and renovations";

(5) with respect to item number 910 by striking "repairs to" and inserting "renovation and construction of";

(6) with respect to item number 902 by striking "City of Brooklyn" and inserting "Fifth Ave Committee in Brooklyn"; and

(7) with respect to item number 244 by inserting "Historic" before the words "Village, Inc".

<< 12 USCA § 1709 >>

SEC. 6073. (a) Section 222 of title II of division I of Public Law 108–447 is deleted; and

<< 12 USCA § 1709 >>

(b) Section 203(c)(1) of the National Housing Act (12 U.S.C. 1709(c)) is amended by—

(1) striking "subsections" and inserting "subsection", and

(2) striking "or (k)" each place that it appears.

<< 12 USCA § 1715z–20 >>

SEC. 6074. Section 255(g) of the National Housing Act (12 U.S.C. 1715z–20(g)) is amended by striking "150,000" and inserting "250,000".

SEC. 6075. The matter under the heading relating to "PUBLIC AND INDIAN HOUSING—PUBLIC HOUSING CAPITAL FUND" in title II of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 2005 (enacted as division I of the Consolidated Appropriations Act, 2005 (Public Law 108–447; 118 Stat. 3297)) is amended by striking the 8th proviso and inserting the following: ": Provided further, That up to $3,000,000 is to support the costs of administrative and judicial receiverships".

PREPACKAGED NEWS

SEC. 6076. Unless otherwise authorized by existing law, none of the funds provided in this Act or any other Act, may be used by an executive branch agency to produce any prepackaged news story intended for broadcast or distribution in the United States unless the story includes a clear notification within the text or audio of the prepackaged news story that the prepackaged news story was prepared or funded by that executive branch agency.

LOCAL BUDGET AUTHORITY FOR THE DISTRICT OF COLUMBIA

SEC. 6077. The District of Columbia Appropriations Act, 2005 (Public Law 108–335) approved October 18, 2004, is amended as follows:

(1) Section 331 is amended as follows:

(A) in the first sentence by striking "$15,000,000" and inserting "$42,000,000, to remain available until expended," in its place, and

(B) by amending subsection (5) to read as follows:

"(5) The amounts may be obligated or expended only if the Mayor notifies the Committees on Appropriations of the House of Representatives and Senate in writing 30 days in advance of any obligation or expenditure.".

(2) By inserting a new section before the short title at the end to read as follows:

"SEC. 348. The amount appropriated by this Act may be increased by an additional amount of $206,736,000 (including $49,927,000 from local funds and $156,809,000 from other funds) to be transferred by the Mayor of the District of Columbia to the various headings under this Act as follows:

"(1) $174,927,000 (including $34,927,000 from local funds and $140,000,000 from other funds) shall be transferred under the heading 'Government Direction and Support': Provided, That of the funds, $33,000,000 from local funds shall remain available until expended: Provided further, That of the funds, $140,000,000 from other funds shall remain available until expended and shall only be available in conjunction with revenue from a private or alternative financing proposal approved

pursuant to section 106 of DC Act 15–717, the 'Ballpark Omnibus Financing and Revenue Act of 2004' approved by the District of Columbia, December 29, 2004, and

"(2) $15,000,000 from local funds shall be transferred under the heading 'Repayment of Loans and Interest', and

"(3) $14,000,000 from other funds shall be transferred under the heading 'Sports and Entertainment Commission', and

"(4) $2,809,000 from other funds shall be transferred under the heading 'Water and Sewer Authority'.".

## USE OF FUNDS FOR EMERGENCY PREPAREDNESS CENTERS

SEC. 6078. Section 114 of title I of division I of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by inserting before the period "and section 303 of Public Law 108–422".

## COLLECTIONS DEPOSITED INTO PROJECT CONSTRUCTION ACCOUNTS

SEC. 6079. Section 117 of title I of division I of the Consolidated Appropriations Act, 2005 (Public Law 108–447) is amended by striking "that are deposited into the Medical Care Collections Fund may be transferred and merged with" and inserting "may be deposited into the".

## CONTRACTS FOR HOSPITAL CARE AND MEDICAL SERVICES

<< 38 USCA § 1703 >>

SEC. 6080. Section 1703(d)(2) of title 38, United States Code, is amended by striking "shall be available for the purposes" and inserting "shall be available, without fiscal year limitation, for the purposes".

## IMPLEMENTATION OF MISSION CHANGES AT SPECIFIC VETERANS HEALTH ADMINISTRATION FACILITIES

SEC. 6081. (a) IN GENERAL.—Section 414 of the Veterans Health Programs Improvement Act of 2004, is amended by adding at the end the following:

"(h) DEFINITION.—In this section, the term 'medical center' includes any outpatient clinic.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the Veterans Health Programs Improvement Act of 2004 (Public Law 108–422).

This division may be cited as the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005".

## DIVISION B—REAL ID ACT OF 2005

<< 8 USCA § 1101 NOTE >>

## SECTION 1. SHORT TITLE.

This division may be cited as the "REAL ID Act of 2005".

## TITLE I—AMENDMENTS TO FEDERAL LAWS TO PROTECT AGAINST TERRORIST ENTRY

## SEC. 101. PREVENTING TERRORISTS FROM OBTAINING RELIEF FROM REMOVAL.

<< 8 USCA § 1158 >>

(a) CONDITIONS FOR GRANTING ASYLUM.—Section 208(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(1)) is amended—

(1) by striking "The Attorney General" the first place such term appears and inserting the following:

"(A) ELIGIBILITY.—The Secretary of Homeland Security or the Attorney General";

<< 8 USCA § 1158 >>

(2) by striking "the Attorney General" the second and third places such term appears and inserting "the Secretary of Homeland Security or the Attorney General"; and

<< 8 USCA § 1158 >>

(3) by adding at the end the following:

"(B) BURDEN OF PROOF.—

"(i) IN GENERAL.—The burden of proof is on the applicant to establish that the applicant is a refugee, within the meaning of section 101(a)(42)(A). To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.

"(ii) SUSTAINING BURDEN.—The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

"(iii) CREDIBILITY DETERMINATION.—Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".

<< 8 USCA § 1158 >>

(b) EXCEPTIONS TO ELIGIBILITY FOR ASYLUM.—Section 208(b)(2)(A)(v) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(2)(A)(v)) is amended—

(1) by striking "inadmissible under" each place such term appears and inserting "described in"; and

(2) by striking "removable under".

<< 8 USCA § 1231 >>

(c) WITHHOLDING OF REMOVAL.—Section 241(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)) is amended by adding at the end the following:

"(C) SUSTAINING BURDEN OF PROOF; CREDIBILITY DETERMINATIONS.—In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 208(b)(1)(B).".

<< 8 USCA § 1229a >>

(d) OTHER REQUESTS FOR RELIEF FROM REMOVAL.—Section 240(c) of the Immigration and Nationality Act (8 U.S.C. 1230(c)) is amended—

(1) by redesignating paragraphs (4), (5), and (6) as paragraphs (5), (6), and (7), respectively; and

(2) by inserting after paragraph (3) the following:

"(4) APPLICATIONS FOR RELIEF FROM REMOVAL.—

"(A) IN GENERAL.—An alien applying for relief or protection from removal has the burden of proof to establish that the alien—

"(i) satisfies the applicable eligibility requirements; and

"(ii) with respect to any form of relief that is granted in the exercise of discretion, that the alien merits a favorable exercise of discretion.

"(B) SUSTAINING BURDEN.—The applicant must comply with the applicable requirements to submit information or documentation in support of the applicant's application for relief or protection as provided by law or by regulation or in the instructions for the application form. In evaluating the testimony of the applicant or other witness in support of the application, the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof. In determining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony along with other evidence of record. Where the immigration judge determines that the applicant should provide evidence which corroborates otherwise credible testimony, such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence.

"(C) CREDIBILITY DETERMINATION.—Considering the totality of the circumstances, and all relevant factors, the immigration judge may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".

<< 8 USCA § 1252 >>

(e) STANDARD OF REVIEW FOR ORDERS OF REMOVAL.—Section 242(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1252(b)(4)) is amended by adding at the end, after subparagraph (D), the following: "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 208(b)(1)(B), 240(c)(4)(B), or 241(b)(3)(C), unless the court finds, pursuant to section 242(b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.".

<< 8 USCA § 1252 >>

(f) CLARIFICATION OF DISCRETION.—Section 242(a)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(2)(B)) is amended—

(1) by inserting "or the Secretary of Homeland Security" after "Attorney General" each place such term appears; and

(2) in the matter preceding clause (i), by inserting "and regardless of whether the judgment, decision, or action is made in removal proceedings," after "other provision of law,".

(g) REMOVAL OF CAPS.—

(1) ASYLEES.—Section 209 of the Immigration and Nationality Act (8 U.S.C.1159) is amended—

<< 8 USCA § 1159 >>

(A) in subsection (a)(1)—

(i) by striking "Service" and inserting "Department of Homeland Security"; and

(ii) by striking "Attorney General" each place such term appears and inserting "Secretary of Homeland Security or the Attorney General";

<< 8 USCA § 1159 >>

(B) in subsection (b)—

(i) by striking "Not more" and all that follows through "asylum who—" and inserting "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary

or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—"; and

  (ii) in the matter following paragraph (5), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General"; and

<< 8 USCA § 1159 >>

  (C) in subsection (c), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General".

<< 8 USCA § 1157 >>

  (2) PERSONS RESISTING COERCIVE POPULATION CONTROL METHODS.—Section 207(a) of the Immigration and Nationality Act (8 U.S.C. 1157(a)) is amended by striking paragraph (5).
  (h) EFFECTIVE DATES.—

<< 8 USCA § 1158 NOTE >>

  (1) The amendments made by paragraphs (1) and (2) of subsection (a) shall take effect as if enacted on March 1, 2003.

<< 8 USCA § 1158 NOTE >>

  (2) The amendments made by subsections (a)(3), (b), (c), and (d) shall take effect on the date of the enactment of this division and shall apply to applications for asylum, withholding, or other relief from removal made on or after such date.

<< 8 USCA § 1252 NOTE >>

  (3) The amendment made by subsection (e) shall take effect on the date of the enactment of this division and shall apply to all cases in which the final administrative removal order is or was issued before, on, or after such date.

<< 8 USCA § 1252 NOTE >>

  (4) The amendment made by subsection (f) shall take effect on the date of the enactment of this division and shall apply to all cases pending before any court on or after such date.

<< 8 USCA § 1157 NOTE >>

  (5) The amendments made by subsection (g) shall take effect on the date of the enactment of this division.
  (i) REPEAL.—Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458) is repealed.

<< 8 USCA § 1103 NOTE >>

## SEC. 102. WAIVER OF LEGAL REQUIREMENTS NECESSARY FOR IMPROVEMENT OF BARRIERS AT BORDERS; FEDERAL COURT REVIEW.

 Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended to read as follows:
 "(c) WAIVER.—
  "(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.
  "(2) FEDERAL COURT REVIEW.—

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 1168 of 3864

"(A) IN GENERAL.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

"(B) TIME FOR FILING OF COMPLAINT.—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

"(C) ABILITY TO SEEK APPELLATE REVIEW.—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.".

## SEC. 103. INADMISSIBILITY DUE TO TERRORIST AND TERRORIST-RELATED ACTIVITIES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—So much of section 212(a)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(i)) as precedes the final sentence is amended to read as follows:

"(i) IN GENERAL.—Any alien who—

"(I) has engaged in a terrorist activity;

"(II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

"(IV) is a representative (as defined in clause (v)) of—

"(aa) a terrorist organization (as defined in clause (vi)); or

"(bb) a political, social, or other group that endorses or espouses terrorist activity;

"(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

"(VI) is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

"(VIII) has received military-type training (as defined in section 2339D(c)(1) of title 18, United States Code) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

"(IX) is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible.".

<< 8 USCA § 1182 >>

(b) ENGAGE IN TERRORIST ACTIVITY DEFINED.—Section 212(a)(3)(B)(iv) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iv)) is amended to read as follows:

"(iv) ENGAGE IN TERRORIST ACTIVITY DEFINED.—As used in this Act, the term 'engage in terrorist activity' means, in an individual capacity or as a member of an organization—

"(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

"(II) to prepare or plan a terrorist activity;

"(III) to gather information on potential targets for terrorist activity;

"(IV) to solicit funds or other things of value for—

"(aa) a terrorist activity;

"(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

"(V) to solicit any individual—

"(aa) to engage in conduct otherwise described in this subsection;

"(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

"(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

"(aa) for the commission of a terrorist activity;

"(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

"(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

"(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.".

<< 8 USCA § 1182 >>

(c) TERRORIST ORGANIZATION DEFINED.—Section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)) is amended to read as follows:

"(vi) TERRORIST ORGANIZATION DEFINED.—As used in this section, the term 'terrorist organization' means an organization—

"(I) designated under section 219;

"(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

"(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).".

<< 8 USCA § 1182 NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this division, and these amendments, and section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)), as amended by this section, shall apply to—

(1) removal proceedings instituted before, on, or after the date of the enactment of this division; and

(2) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

SEC. 104. WAIVER FOR CERTAIN GROUNDS OF INADMISSIBILITY.

Section 212(d)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(3)) is amended—

<< 8 USCA § 1182 >>

(1) by striking "(3)" and inserting "(3)(A)";

<< 8 USCA § 1182 >>

(2) by striking "alien (A)" and inserting "alien (i)";

<< 8 USCA § 1182 >>

(3) by striking "or (B)" and inserting "or (ii)"; and

<< 8 USCA § 1182 >>

(4) by adding at the end the following:

"(B)(i) The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may conclude in such Secretary's sole unreviewable discretion that subsection (a)(3)(B)(i)(IV)(bb) or (a)(3)(B)(i)(VII) shall not apply to an alien, that subsection (a)(3)(B)(iv)(VI) shall not apply with respect to any material support an alien afforded to an organization or individual that has engaged in a terrorist activity, or that subsection (a)(3)(B)(vi)(III) shall not apply to a group solely by virtue of having a subgroup within the scope of that subsection. The Secretary of State may not, however, exercise discretion under this clause with respect to an alien once removal proceedings against the alien are instituted under section 240.

"(ii) Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.".

SEC. 105. REMOVAL OF TERRORISTS.

(a) IN GENERAL.—

<< 8 USCA § 1227 >>

(1) IN GENERAL.—Section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)) is amended to read as follows:

"(B) TERRORIST ACTIVITIES.—Any alien who is described in subparagraph (B) or (F) of section 212(a)(3) is deportable.".

<< 8 USCA § 1227 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall take effect on the date of the enactment of this division, and the amendment, and section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)), as amended by such paragraph, shall apply to—

(A) removal proceedings instituted before, on, or after the date of the enactment of this division; and

(B) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

<< 8 USCA § 1227 NOTE >>

<< 8 USCA § 1227 >>

(b) REPEAL.—Effective as of the date of the enactment of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458), section 5402 of such Act is repealed, and the Immigration and Nationality Act shall be applied as if such section had not been enacted.

SEC. 106. JUDICIAL REVIEW OF ORDERS OF REMOVAL.

(a) IN GENERAL.—Section 242 of the Immigration and Nationality Act (8 U.S.C. 1252) is amended—

(1) in subsection (a)—

<< 8 USCA § 1252 >>

(A) in paragraph (2)—

(i) in subparagraph (A), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "Notwithstanding any other provision of law";

<< 8 USCA § 1252 >>

(ii) in each of subparagraphs (B) and (C), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D)" after "Notwithstanding any other provision of law"; and

(iii) by adding at the end the following:

<< 8 USCA § 1252 >>

"(D) JUDICIAL REVIEW OF CERTAIN LEGAL CLAIMS.—Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."; and

(B) by adding at the end the following:

<< 8 USCA § 1252 >>

"(4) CLAIMS UNDER THE UNITED NATIONS CONVENTION.—Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

<< 8 USCA § 1252 >>

"(5) EXCLUSIVE MEANS OF REVIEW.—Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act, except as provided in subsection (e). For purposes of this Act, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms 'judicial review' and 'jurisdiction to review' include habeas corpus review pursuant to section 2241 of title 28, United States Code, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).";

<< 8 USCA § 1252 >>

(2) in subsection (b)(9), by adding at the end the following: "Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, United States Code, or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact."; and

<< 8 USCA § 1252 >>

(3) in subsection (g), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "notwithstanding any other provision of law".

<< 8 USCA § 1252 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect upon the date of the enactment of this division and shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division.

<< 8 USCA § 1252 NOTE >>

(c) TRANSFER OF CASES.—If an alien's case, brought under section 2241 of title 28, United States Code, and challenging a final administrative order of removal, deportation, or exclusion, is pending in a district court on the date of the enactment of this division, then the district court shall transfer the case (or the part of the case that challenges the order of removal, deportation, or exclusion) to the court of appeals for the circuit in which a petition for review could have been properly filed under section 242(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section, or under section 309(c)(4)(D) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note). The court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section shall not apply.

<< 8 USCA § 1252 NOTE >>

(d) TRANSITIONAL RULE CASES.—A petition for review filed under former section 106(a) of the Immigration and Nationality Act (as in effect before its repeal by section 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1252 note)) shall be treated as if it had been filed as a petition for review under section 242 of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, such petition for review shall be the sole and exclusive means for judicial review of an order of deportation or exclusion.

<< 49 USCA § 30301 NOTE >>

TITLE II—IMPROVED SECURITY FOR DRIVERS' LICENSES AND PERSONAL IDENTIFICATION CARDS

<< 49 USCA § 30301 NOTE >>

SEC. 201. DEFINITIONS.

In this title, the following definitions apply:

  (1) DRIVER'S LICENSE.—The term "driver's license" means a motor vehicle operator's license, as defined in section 30301 of title 49, United States Code.
  (2) IDENTIFICATION CARD.—The term "identification card" means a personal identification card, as defined in section 1028(d) of title 18, United States Code, issued by a State.
  (3) OFFICIAL PURPOSE.—The term "official purpose" includes but is not limited to accessing Federal facilities, boarding federally regulated commercial aircraft, entering nuclear power plants, and any other purposes that the Secretary shall determine.
  (4) SECRETARY.—The term "Secretary" means the Secretary of Homeland Security.
  (5) STATE.—The term "State" means a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and any other territory or possession of the United States.

<< 49 USCA § 30301 NOTE >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 202. MINIMUM DOCUMENT REQUIREMENTS AND ISSUANCE STANDARDS FOR FEDERAL RECOGNITION.

(a) MINIMUM STANDARDS FOR FEDERAL USE.—

(1) IN GENERAL.—Beginning 3 years after the date of the enactment of this division, a Federal agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section.

(2) STATE CERTIFICATIONS.—The Secretary shall determine whether a State is meeting the requirements of this section based on certifications made by the State to the Secretary. Such certifications shall be made at such times and in such manner as the Secretary, in consultation with the Secretary of Transportation, may prescribe by regulation.

(b) MINIMUM DOCUMENT REQUIREMENTS.—To meet the requirements of this section, a State shall include, at a minimum, the following information and features on each driver's license and identification card issued to a person by the State:

(1) The person's full legal name.

(2) The person's date of birth.

(3) The person's gender.

(4) The person's driver's license or identification card number.

(5) A digital photograph of the person.

(6) The person's address of principle residence.

(7) The person's signature.

(8) Physical security features designed to prevent tampering, counterfeiting, or duplication of the document for fraudulent purposes.

(9) A common machine-readable technology, with defined minimum data elements.

(c) MINIMUM ISSUANCE STANDARDS.—

(1) IN GENERAL.—To meet the requirements of this section, a State shall require, at a minimum, presentation and verification of the following information before issuing a driver's license or identification card to a person:

(A) A photo identity document, except that a non-photo identity document is acceptable if it includes both the person's full legal name and date of birth.

(B) Documentation showing the person's date of birth.

(C) Proof of the person's social security account number or verification that the person is not eligible for a social security account number.

(D) Documentation showing the person's name and address of principal residence.

(2) SPECIAL REQUIREMENTS.—

(A) IN GENERAL.—To meet the requirements of this section, a State shall comply with the minimum standards of this paragraph.

(B) EVIDENCE OF LAWFUL STATUS.—A State shall require, before issuing a driver's license or identification card to a person, valid documentary evidence that the person—

(i) is a citizen or national of the United States;

(ii) is an alien lawfully admitted for permanent or temporary residence in the United States;

(iii) has conditional permanent resident status in the United States;

(iv) has an approved application for asylum in the United States or has entered into the United States in refugee status;

(v) has a valid, unexpired nonimmigrant visa or nonimmigrant visa status for entry into the United States;

(vi) has a pending application for asylum in the United States;

(vii) has a pending or approved application for temporary protected status in the United States;

(viii) has approved deferred action status; or

(ix) has a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States.

(C) TEMPORARY DRIVERS' LICENSES AND IDENTIFICATION CARDS.—

(i) IN GENERAL.—If a person presents evidence under any of clauses (v) through (ix) of subparagraph (B), the State may only issue a temporary driver's license or temporary identification card to the person.

(ii) EXPIRATION DATE.—A temporary driver's license or temporary identification card issued pursuant to this subparagraph shall be valid only during the period of time of the applicant's authorized stay in the United States or, if there is no definite end to the period of authorized stay, a period of one year.

(iii) DISPLAY OF EXPIRATION DATE.—A temporary driver's license or temporary identification card issued pursuant to this subparagraph shall clearly indicate that it is temporary and shall state the date on which it expires.

(iv) RENEWAL.—A temporary driver's license or temporary identification card issued pursuant to this subparagraph may be renewed only upon presentation of valid documentary evidence that the status by which the applicant qualified for the temporary driver's license or temporary identification card has been extended by the Secretary of Homeland Security.

(3) VERIFICATION OF DOCUMENTS.—To meet the requirements of this section, a State shall implement the following procedures:

(A) Before issuing a driver's license or identification card to a person, the State shall verify, with the issuing agency, the issuance, validity, and completeness of each document required to be presented by the person under paragraph (1) or (2).

(B) The State shall not accept any foreign document, other than an official passport, to satisfy a requirement of paragraph (1) or (2).

(C) Not later than September 11, 2005, the State shall enter into a memorandum of understanding with the Secretary of Homeland Security to routinely utilize the automated system known as Systematic Alien Verification for Entitlements, as provided for by section 404 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (110 Stat. 3009–664), to verify the legal presence status of a person, other than a United States citizen, applying for a driver's license or identification card.

(d) OTHER REQUIREMENTS.—To meet the requirements of this section, a State shall adopt the following practices in the issuance of drivers' licenses and identification cards:

(1) Employ technology to capture digital images of identity source documents so that the images can be retained in electronic storage in a transferable format.

(2) Retain paper copies of source documents for a minimum of 7 years or images of source documents presented for a minimum of 10 years.

(3) Subject each person applying for a driver's license or identification card to mandatory facial image capture.

(4) Establish an effective procedure to confirm or verify a renewing applicant's information.

(5) Confirm with the Social Security Administration a social security account number presented by a person using the full social security account number. In the event that a social security account number is already registered to or associated with another person to which any State has issued a driver's license or identification card, the State shall resolve the discrepancy and take appropriate action.

(6) Refuse to issue a driver's license or identification card to a person holding a driver's license issued by another State without confirmation that the person is terminating or has terminated the driver's license.

(7) Ensure the physical security of locations where drivers' licenses and identification cards are produced and the security of document materials and papers from which drivers' licenses and identification cards are produced.

(8) Subject all persons authorized to manufacture or produce drivers' licenses and identification cards to appropriate security clearance requirements.

(9) Establish fraudulent document recognition training programs for appropriate employees engaged in the issuance of drivers' licenses and identification cards.

(10) Limit the period of validity of all driver's licenses and identification cards that are not temporary to a period that does not exceed 8 years.

(11) In any case in which the State issues a driver's license or identification card that does not satisfy the requirements of this section, ensure that such license or identification card—

(A) clearly states on its face that it may not be accepted by any Federal agency for federal identification or any other official purpose; and

(B) uses a unique design or color indicator to alert Federal agency and other law enforcement personnel that it may not be accepted for any such purpose.

(12) Provide electronic access to all other States to information contained in the motor vehicle database of the State.

(13) Maintain a State motor vehicle database that contains, at a minimum—

(A) all data fields printed on drivers' licenses and identification cards issued by the State; and

(B) motor vehicle drivers' histories, including motor vehicle violations, suspensions, and points on licenses.

<< 49 USCA § 30301 NOTE >>

SEC. 203. TRAFFICKING IN AUTHENTICATION FEATURES FOR USE IN FALSE IDENTIFICATION DOCUMENTS.

<< 18 USCA § 1028 >>

(a) CRIMINAL PENALTY.—Section 1028(a)(8) of title 18, United States Code, is amended by striking "false authentication features" and inserting "false or actual authentication features".

(b) USE OF FALSE DRIVER'S LICENSE AT AIRPORTS.—

(1) IN GENERAL.—The Secretary shall enter, into the appropriate aviation security screening database, appropriate information regarding any person convicted of using a false driver's license at an airport (as such term is defined in section 40102 of title 49, United States Code).

(2) FALSE DEFINED.—In this subsection, the term "false" has the same meaning such term has under section 1028(d) of title 18, United States Code.

<< 49 USCA § 30301 NOTE >>

SEC. 204. GRANTS TO STATES.

(a) IN GENERAL.—The Secretary may make grants to a State to assist the State in conforming to the minimum standards set forth in this title.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Secretary for each of the fiscal years 2005 through 2009 such sums as may be necessary to carry out this title.

<< 49 USCA § 30301 NOTE >>

SEC. 205. AUTHORITY.

(a) PARTICIPATION OF SECRETARY OF TRANSPORTATION AND STATES.—All authority to issue regulations, set standards, and issue grants under this title shall be carried out by the Secretary, in consultation with the Secretary of Transportation and the States.

(b) EXTENSIONS OF DEADLINES.—The Secretary may grant to a State an extension of time to meet the requirements of section 202(a)(1) if the State provides adequate justification for noncompliance.

<< 49 USCA § 30301 NOTE >>

<< 49 USCA § 30301 NOTE >>

SEC. 206. REPEAL.

Section 7212 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108–458) is repealed.

<< 49 USCA § 30301 NOTE >>

SEC. 207. LIMITATION ON STATUTORY CONSTRUCTION.

Nothing in this title shall be construed to affect the authorities or responsibilities of the Secretary of Transportation or the States under chapter 303 of title 49, United States Code.

TITLE III—BORDER INFRASTRUCTURE AND TECHNOLOGY INTEGRATION

<< 8 USCA § 1778 >>

SEC. 301. VULNERABILITY AND THREAT ASSESSMENT.

 (a) STUDY.—The Under Secretary of Homeland Security for Border and Transportation Security, in consultation with the Under Secretary of Homeland Security for Science and Technology and the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, shall study the technology, equipment, and personnel needed to address security vulnerabilities within the United States for each field office of the Bureau of Customs and Border Protection that has responsibility for any portion of the United States borders with Canada and Mexico. The Under Secretary shall conduct follow-up studies at least once every 5 years.

 (b) REPORT TO CONGRESS.—The Under Secretary shall submit a report to Congress on the Under Secretary's findings and conclusions from each study conducted under subsection (a) together with legislative recommendations, as appropriate, for addressing any security vulnerabilities found by the study.

 (c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Department of Homeland Security Directorate of Border and Transportation Security such sums as may be necessary for fiscal years 2006 through 2011 to carry out any such recommendations from the first study conducted under subsection (a).

<< 8 USCA § 1712 NOTE >>

SEC. 302. USE OF GROUND SURVEILLANCE TECHNOLOGIES FOR BORDER SECURITY.

 (a) PILOT PROGRAM.—Not later than 180 days after the date of the enactment of this division, the Under Secretary of Homeland Security for Science and Technology, in consultation with the Under Secretary of Homeland Security for Border and Transportation Security, the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, and the Secretary of Defense, shall develop a pilot program to utilize, or increase the utilization of, ground surveillance technologies to enhance the border security of the United States. In developing the program, the Under Secretary shall—

   (1) consider various current and proposed ground surveillance technologies that could be utilized to enhance the border security of the United States;

   (2) assess the threats to the border security of the United States that could be addressed by the utilization of such technologies; and

   (3) assess the feasibility and advisability of utilizing such technologies to address such threats, including an assessment of the technologies considered best suited to address such threats.

 (b) ADDITIONAL REQUIREMENTS.—

   (1) IN GENERAL.—The pilot program shall include the utilization of a variety of ground surveillance technologies in a variety of topographies and areas (including both populated and unpopulated areas) on both the northern and southern borders of the United States in order to evaluate, for a range of circumstances—

     (A) the significance of previous experiences with such technologies in homeland security or critical infrastructure protection for the utilization of such technologies for border security;

     (B) the cost, utility, and effectiveness of such technologies for border security; and

     (C) liability, safety, and privacy concerns relating to the utilization of such technologies for border security.

   (2) TECHNOLOGIES.—The ground surveillance technologies utilized in the pilot program shall include the following:

     (A) Video camera technology.

     (B) Sensor technology.

     (C) Motion detection technology.

 (c) IMPLEMENTATION.—The Under Secretary of Homeland Security for Border and Transportation Security shall implement the pilot program developed under this section.

 (d) REPORT.—Not later than 1 year after implementing the pilot program under subsection (a), the Under Secretary shall submit a report on the program to the Senate Committee on Commerce, Science, and Transportation, the House of Representatives Committee on Science, the House of Representatives Committee on Homeland Security, and the House of Representatives Committee on the Judiciary. The Under Secretary shall include in the report a description of the program

together with such recommendations as the Under Secretary finds appropriate, including recommendations for terminating the program, making the program permanent, or enhancing the program.

<< 8 USCA § 1712 NOTE >>

## SEC. 303. ENHANCEMENT OF COMMUNICATIONS INTEGRATION AND INFORMATION SHARING ON BORDER SECURITY.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary of Homeland Security, acting through the Under Secretary of Homeland Security for Border and Transportation Security, in consultation with the Under Secretary of Homeland Security for Science and Technology, the Under Secretary of Homeland Security for Information Analysis and Infrastructure Protection, the Assistant Secretary of Commerce for Communications and Information, and other appropriate Federal, State, local, and tribal agencies, shall develop and implement a plan—

   (1) to improve the communications systems of the departments and agencies of the Federal Government in order to facilitate the integration of communications among the departments and agencies of the Federal Government and State, local government agencies, and Indian tribal agencies on matters relating to border security; and

   (2) to enhance information sharing among the departments and agencies of the Federal Government, State and local government agencies, and Indian tribal agencies on such matters.

(b) REPORT.—Not later than 1 year after implementing the plan under subsection (a), the Secretary shall submit a copy of the plan and a report on the plan, including any recommendations the Secretary finds appropriate, to the Senate Committee on Commerce, Science, and Transportation, the House of Representatives Committee on Science, the House of Representatives Committee on Homeland Security, and the House of Representatives Committee on the Judiciary.

## TITLE IV—TEMPORARY WORKERS

<< 8 USCA § 1101 NOTE >>

## SEC. 401. SHORT TITLE.

This title may be cited as the "Save Our Small and Seasonal Businesses Act of 2005".

## SEC. 402. NUMERICAL LIMITATIONS ON H–2B WORKERS.

<< 8 USCA § 1184 >>

(a) IN GENERAL.—Section 214(g) of the Immigration and Nationality Act (8 U.S.C. 1184(g)) is amended by adding at the end the following:

"(9)(A) Subject to subparagraphs (B) and (C), an alien who has already been counted toward the numerical limitations of paragraph (1)(B) during any 1 of the 3 fiscal years prior to the fiscal year of the approved start date of a petition for a nonimmigrant worker described in section 101(a)(15)(H)(ii)(b) shall not be counted toward such limitation for the fiscal year in which the petition is approved. Such an alien shall be considered a returning worker.

"(B) A petition referred to in subparagraph (A) shall include, with respect to a returning worker—

   "(i) all information and evidence that the Secretary of Homeland Security determines is required to support a petition for status under section 101(a)(15)(H)(ii)(b);

   "(ii) the full name of the alien; and

   "(iii) a certification to the Department of Homeland Security that the alien is a returning worker.

"(C) An H–2B visa or grant of nonimmigrant status for a returning worker shall be approved only if the alien is confirmed to be a returning worker by—

   "(i) the Department of State; or

   "(ii) if the alien is visa exempt or seeking to change to status under section 101 (a)(15)(H)(ii)(b), the Department of Homeland Security.".

AR.01154

<< 8 USCA § 1184 NOTE >>

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendment in subsection (a) shall take effect as if enacted on October 1, 2004, and shall expire on October 1, 2006.

(2) IMPLEMENTATION.—Not later than 14 days after the date of the enactment of this Act, the Secretary of Homeland Security shall begin accepting and processing petitions filed on behalf of aliens described in section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act, in a manner consistent with this section and the amendments made by this section. Notwithstanding section 214(g)(9)(B) of such Act, as added by subsection (a), the Secretary of Homeland Security shall allocate additional numbers for fiscal year 2005 based on statistical estimates and projections derived from Department of State data.

SEC. 403. FRAUD PREVENTION AND DETECTION FEE.

<< 8 USCA § 1184 >>

(a) IMPOSITION OF FEE.—Section 214(c) of the Immigration and Nationality Act (8 U.S.C. 1184(c)), as amended by section 426(a) of division J of the Consolidated Appropriations Act, 2005 (Public Law 108–447), is amended by adding at the end the following:

"(13)(A) In addition to any other fees authorized by law, the Secretary of Homeland Security shall impose a fraud prevention and detection fee on an employer filing a petition under paragraph (1) for nonimmigrant workers described in section 101(a)(15)(H)(ii)(b).

"(B) The amount of the fee imposed under subparagraph (A) shall be $150.".

(b) USE OF FEES.—

(1) FRAUD PREVENTION AND DETECTION ACCOUNT.—Subsection (v) of section 286 of the Immigration and Nationality Act (8 U.S.C. 1356), as added by section 426(b) of division J of the Consolidated Appropriations Act, 2005 (Public Law 108–447), is amended—

<< 8 USCA § 1356 >>

(A) in paragraphs (1), (2)(A), (2)(B), (2)(C), and (2)(D) by striking "H1–B and L" each place it appears;

<< 8 USCA § 1356 >>

(B) in paragraph (1), as amended by subparagraph (A), by striking "section 214(c)(12)" and inserting "paragraph (12) or (13) of section 214(c)";

<< 8 USCA § 1356 >>

(C) in paragraphs (2)(A)(i) and (2)(B), as amended by subparagraph (A), by striking "(H)(i)" each place it appears and inserting "(H)(i), (H)(ii),"; and

<< 8 USCA § 1356 >>

(D) in paragraph (2)(D), as amended by subparagraph (A), by inserting before the period at the end "or for programs and activities to prevent and detect fraud with respect to petitions under paragraph (1) or (2)(A) of section 214(c) to grant an alien nonimmigrant status described in section 101(a)(15)(H)(ii)".

<< 8 USCA § 1356 >>

(2) CONFORMING AMENDMENT.—The heading of such subsection (v) of section 286 is amended by striking "H1–B and L".

<< 8 USCA § 1184 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall take effect 14 days after the date of the enactment of this Act and shall apply to filings for a fiscal year after fiscal year 2005.

SEC. 404. SANCTIONS.

<< 8 USCA § 1184 >>

(a) IN GENERAL.—Section 214(c) of the Immigration and Nationality Act (8 U.S.C. 1184(c)), as amended by section 403, is further amended by adding at the end the following:

"(14)(A) If the Secretary of Homeland Security finds, after notice and an opportunity for a hearing, a substantial failure to meet any of the conditions of the petition to admit or otherwise provide status to a nonimmigrant worker under section 101(a) (15)(H)(ii)(b) or a willful misrepresentation of a material fact in such petition—

"(i) the Secretary of Homeland Security may, in addition to any other remedy authorized by law, impose such administrative remedies (including civil monetary penalties in an amount not to exceed $10,000 per violation) as the Secretary of Homeland Security determines to be appropriate; and

"(ii) the Secretary of Homeland Security may deny petitions filed with respect to that employer under section 204 or paragraph (1) of this subsection during a period of at least 1 year but not more than 5 years for aliens to be employed by the employer.

"(B) The Secretary of Homeland Security may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the authority given to the Secretary of Homeland Security under subparagraph (A)(i).

"(C) In determining the level of penalties to be assessed under subparagraph (A), the highest penalties shall be reserved for willful failures to meet any of the conditions of the petition that involve harm to United States workers.

"(D) In this paragraph, the term 'substantial failure' means the willful failure to comply with the requirements of this section that constitutes a significant deviation from the terms and conditions of a petition.".

<< 8 USCA § 1184 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on October 1, 2005.

<< 8 USCA § 1184 >>

SEC. 405. ALLOCATION OF H–2B VISAS OR H–2B NONIMMIGRANT STATUS DURING A FISCAL YEAR.

Section 214(g) of the Immigration and Nationality Act (8 U.S.C. 1184(g)), as amended by section 402, is further amended by adding at the end the following new paragraph:

"(10) The numerical limitations of paragraph (1)(B) shall be allocated for a fiscal year so that the total number of aliens subject to such numerical limits who enter the United States pursuant to a visa or are accorded nonimmigrant status under section 101(a) (15)(H)(ii)(b) during the first 6 months of such fiscal year is not more than 33,000.".

<< 8 USCA § 1184 NOTE >>

SEC. 406. SUBMISSION TO CONGRESS OF INFORMATION REGARDING H–2B NONIMMIGRANTS.

Section 416 of the American Competitiveness and Workforce Improvement Act of 1998 (title IV of division C of Public Law 105–277; 8 U.S.C. 1184 note) is amended—

(1) by striking "Attorney General" each place that term appears and inserting "Secretary of Homeland Security"; and

(2) by adding at the end the following new subsection:

"(d) PROVISION OF INFORMATION.—

"(1) SEMIANNUAL NOTIFICATION.—Beginning not later than March 1, 2006, the Secretary of Homeland Security and the Secretary of State shall notify, on a semiannual basis, the Committees on the Judiciary of the House of Representatives and the Senate of the number of aliens who during the preceding 1–year period—

AR.01156

"(A) were issued visas or otherwise provided nonimmigrant status under section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (8 U.S.C.1101(a)(15)(H)(ii)(b)); or

"(B) had such a visa or such status be revoked or otherwise terminated.

"(2) ANNUAL SUBMISSION.—Beginning in fiscal year 2007, the Secretary of Homeland Security and the Secretary of State shall submit, on an annual basis, to the Committees on the Judiciary of the House of Representatives and the Senate—

"(A) information on the countries of origin of, occupations of, and compensation paid to aliens who were issued visas or otherwise provided nonimmigrant status under section 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)(ii)(b)) during the previous fiscal year;

"(B) the number of aliens who had such a visa or such status expire or be revoked or otherwise terminated during each month of such fiscal year; and

"(C) the number of aliens who were provided nonimmigrant status under such section during both such fiscal year and the preceding fiscal year.

"(3) INFORMATION MAINTAINED BY STATE.—If the Secretary of Homeland Security determines that information maintained by the Secretary of State is required to make a submission described in paragraph (1) or (2), the Secretary of State shall provide such information to the Secretary of Homeland Security upon request.".

<< 8 USCA § 1184 NOTE >>

SEC. 407. EXEMPTION FROM ADMINISTRATIVE PROCEDURE ACT.

The requirements of chapter 5 of title 5, United States Code (commonly referred to as the "Administrative Procedure Act") or any other law relating to rulemaking, information collection or publication in the Federal Register, shall not apply to any action to implement sections 402, 403, and 405 or the amendments made by such sections to the extent the Secretary Homeland of Security, the Secretary of Labor, or the Secretary of State determine that compliance with any such requirement would impede the expeditious implementation of such sections or the amendments made by such sections.

TITLE V—OTHER CHANGES TO PROVISIONS GOVERNING NONIMMIGRANT AND IMMIGRANT VISAS

SEC. 501. RECIPROCAL VISAS FOR NATIONALS OF AUSTRALIA.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(15)(E) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(E)) is amended—

(1) by adding at the end "or (iii) solely to perform services in a specialty occupation in the United States if the alien is a national of the Commonwealth of Australia and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 212(t)(1);"; and

(2) in clause (i), by striking "or" after "national;".

<< 8 USCA § 1184 >>

(b) NUMERICAL LIMITATION TO ANY SINGLE FOREIGN STATE.—Section 214(g) of such Act (8 U.S.C. 1184(g)), as amended by section 405, is further amended by adding at the end the following new paragraph:

"(11)(A) The Secretary of State may not approve a number of initial applications submitted for aliens described in section 101(a)(15)(E)(iii) that is more than the applicable numerical limitation set out in this paragraph.

"(B) The applicable numerical limitation referred to in subparagraph (A) is 10,500 for each fiscal year.

"(C) The applicable numerical limitation referred to in subparagraph (A) shall only apply to principal aliens and not to the spouses or children of such aliens.".

<< 8 USCA § 1184 >>

(c) SPECIALTY OCCUPATION DEFINED.—Section 214(i)(1) of such Act (8 U.S.C. 1184(i)(1)) is amended by inserting ", section 101(a)(15)(E)(iii)," after "section 101(a)(15)(H)(i)(b)".

(d) ATTESTATION.—Section 212(t) of such Act (8 U.S.C. 1182(t)), as added by section 402(b)(2) of the United States–Chile Free Trade Agreement Implementation Act (Public Law 108–77; 117 Stat. 941), is amended—

<< 8 USCA § 1182 >>

(1) by inserting "or section 101(a)(15)(E)(iii)" after "section 101(a)(15)(H)(i)(b1)" each place it appears; and

<< 8 USCA § 1182 >>

(2) in paragraphs (3)(C)(i)(II), (3)(C)(ii)(II), and (3)(C)(iii)(II) by striking "or 101(a)(15)(H)(i)(b1)" each place it appears and inserting "101(a)(15)(H)(i)(b1), or 101(a)(15)(E)(iii)".

<< 8 USCA § 1153 NOTE >>

SEC. 502. VISAS FOR NURSES.

Section 106(d) of the American Competitiveness in the Twenty-first Century Act of 2000 (Public Law 106–313; 8 U.S.C. 1153 note) is amended—

(1) in paragraph (1), by inserting before the period at the end of the second sentence "and any such visa that is made available due to the difference between the number of employment-based visas that were made available in fiscal year 2001, 2002, 2003, or 2004 and the number of such visas that were actually used in such fiscal year shall be available only to employment-based immigrants (and their family members accompanying or following to join under section 203(d) of such Act (8 U.S.C. 1153(d))) whose immigrant worker petitions were approved based on schedule A, as defined in section 656.5 of title 20, Code of Federal Regulations, as promulgated by the Secretary of Labor";

(2) in paragraph (2)(A), by striking "and 2000" and inserting "through 2004"; and

(3) in paragraph (2), by amending subparagraph (B) to read as follows:

"(B)(i) REDUCTION.—The number described in subparagraph (A) shall be reduced, for each fiscal year after fiscal year 2001, by the cumulative number of immigrant visas actually used under paragraph (1) for previous fiscal years.

"(ii) MAXIMUM.—The total number of visas made available under paragraph (1) from unused visas from the fiscal years 2001 through 2004 may not exceed 50,000.".

Approved May 11, 2005.

LEGISLATIVE HISTORY—H.R. 1268:

HOUSE REPORTS: Nos. 109–16 (Comm. on Appropriations) and 109–72 (Comm. of Conference).

SENATE REPORTS: No. 109–52 (Comm. on Appropriations).

CONGRESSIONAL RECORD, Vol. 151 (2005):

Mar. 15, 16, considered and passed House.

Apr. 11–15, 18–21, considered and passed Senate, amended.

May 5, House agreed to conference report.

May 10, Senate agreed to conference report.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 41 (2005):

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

May 11, Presidential statement.

PL 109–13, 2005 HR 1268

---

**End of Document**                                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 107–56, October 26, 2001, 115 Stat 272

UNITED STATES PUBLIC LAWS

107th Congress - First Session

Convening January, 2001

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed

PL 107–56 (HR 3162)

October 26, 2001

UNITING AND STRENGTHENING AMERICA BY PROVIDING APPROPRIATE TOOLS
REQUIRED TO INTERCEPT AND OBSTRUCT TERRORISM (USA PATRIOT ACT) ACT OF 2001

An Act To deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

<< 18 USCA § 1 NOTE >>

 (a) SHORT TITLE.—This Act may be cited as the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001".
 (b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title and table of contents.

Sec. 2. Construction; severability.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

Sec. 101. Counterterrorism fund.

Sec. 102. Sense of Congress condemning discrimination against Arab and Muslim Americans.

Sec. 103. Increased funding for the technical support center at the Federal Bureau of Investigation.

Sec. 104. Requests for military assistance to enforce prohibition in certain emergencies.

Sec. 105. Expansion of National Electronic Crime Task Force Initiative.

Sec. 106. Presidential authority.

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

Sec. 201. Authority to intercept wire, oral, and electronic communications relating to terrorism.

Sec. 202. Authority to intercept wire, oral, and electronic communications relating to computer fraud and abuse offenses.

Sec. 203. Authority to share criminal investigative information.

Sec. 204. Clarification of intelligence exceptions from limitations on interception and disclosure of wire, oral, and electronic communications.

Sec. 205. Employment of translators by the Federal Bureau of Investigation.

Sec. 206. Roving surveillance authority under the Foreign Intelligence Surveillance Act of 1978.

Sec. 207. Duration of FISA surveillance of non-United States persons who are agents of a foreign power.

Sec. 208. Designation of judges.

Sec. 209. Seizure of voice-mail messages pursuant to warrants.

Sec. 210. Scope of subpoenas for records of electronic communications.

Sec. 211. Clarification of scope.

Sec. 212. Emergency disclosure of electronic communications to protect life and limb.

Sec. 213. Authority for delaying notice of the execution of a warrant.

Sec. 214. Pen register and trap and trace authority under FISA.

Sec. 215. Access to records and other items under the Foreign Intelligence Surveillance Act.

Sec. 216. Modification of authorities relating to use of pen registers and trap and trace devices.

Sec. 217. Interception of computer trespasser communications.

Sec. 218. Foreign intelligence information.

Sec. 219. Single-jurisdiction search warrants for terrorism.

Sec. 220. Nationwide service of search warrants for electronic evidence.

Sec. 221. Trade sanctions.

Sec. 222. Assistance to law enforcement agencies.

Sec. 223. Civil liability for certain unauthorized disclosures.

Sec. 224. Sunset.

Sec. 225. Immunity for compliance with FISA wiretap.

TITLE III—INTERNATIONAL MONEY LAUNDERING
ABATEMENT AND ANTI–TERRORIST FINANCING ACT OF 2001

Sec. 301. Short title.

Sec. 302. Findings and purposes.

Sec. 303. 4–year congressional review; expedited consideration.

Subtitle A—International Counter Money Laundering and Related Measures

Sec. 311. Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern.

Sec. 312. Special due diligence for correspondent accounts and private banking accounts.

Sec. 313. Prohibition on United States correspondent accounts with foreign shell banks.

Sec. 314. Cooperative efforts to deter money laundering.

Sec. 315. Inclusion of foreign corruption offenses as money laundering crimes.

Sec. 316. Anti-terrorist forfeiture protection.

Sec. 317. Long-arm jurisdiction over foreign money launderers.

Sec. 318. Laundering money through a foreign bank.

Sec. 319. Forfeiture of funds in United States interbank accounts.

Sec. 320. Proceeds of foreign crimes.

Sec. 321. Financial institutions specified in subchapter II of chapter 53 of title 31, United States code.

Sec. 322. Corporation represented by a fugitive.

Sec. 323. Enforcement of foreign judgments.

Sec. 324. Report and recommendation.

Sec. 325. Concentration accounts at financial institutions.

Sec. 326. Verification of identification.

Sec. 327. Consideration of anti-money laundering record.

Sec. 328. International cooperation on identification of originators of wire transfers.

Sec. 329. Criminal penalties.

Sec. 330. International cooperation in investigations of money laundering, financial crimes, and the finances of terrorist groups.

Subtitle B—Bank Secrecy Act Amendments and Related Improvements

Sec. 351. Amendments relating to reporting of suspicious activities.

Sec. 352. Anti-money laundering programs.

Sec. 353. Penalties for violations of geographic targeting orders and certain recordkeeping requirements, and lengthening effective period of geographic targeting orders.

Sec. 354. Anti-money laundering strategy.

Sec. 355. Authorization to include suspicions of illegal activity in written employment references.

Sec. 356. Reporting of suspicious activities by securities brokers and dealers; investment company study.

Sec. 357. Special report on administration of bank secrecy provisions.

Sec. 358. Bank secrecy provisions and activities of United States intelligence agencies to fight international terrorism.

Sec. 359. Reporting of suspicious activities by underground banking systems.

Sec. 360. Use of authority of United States Executive Directors.

Sec. 361. Financial crimes enforcement network.

Sec. 362. Establishment of highly secure network.

Sec. 363. Increase in civil and criminal penalties for money laundering.

Sec. 364. Uniform protection authority for Federal Reserve facilities.

Sec. 365. Reports relating to coins and currency received in nonfinancial trade or business.

Sec. 366. Efficient use of currency transaction report system.

Subtitle C—Currency Crimes and Protection

Sec. 371. Bulk cash smuggling into or out of the United States.

Sec. 372. Forfeiture in currency reporting cases.

Sec. 373. Illegal money transmitting businesses.

Sec. 374. Counterfeiting domestic currency and obligations.

Sec. 375. Counterfeiting foreign currency and obligations.

Sec. 376. Laundering the proceeds of terrorism.

Sec. 377. Extraterritorial jurisdiction.

TITLE IV—PROTECTING THE BORDER

Subtitle A—Protecting the Northern Border

Sec. 401. Ensuring adequate personnel on the northern border.

Sec. 402. Northern border personnel.

Sec. 403. Access by the Department of State and the INS to certain identifying information in the criminal history records of visa applicants and applicants for admission to the United States.

Sec. 404. Limited authority to pay overtime.

Sec. 405. Report on the integrated automated fingerprint identification system for ports of entry and overseas consular posts.

Subtitle B—Enhanced Immigration Provisions

Sec. 411. Definitions relating to terrorism.

Sec. 412. Mandatory detention of suspected terrorists; habeas corpus; judicial review.

Sec. 413. Multilateral cooperation against terrorists.

Sec. 414. Visa integrity and security.

Sec. 415. Participation of Office of Homeland Security on Entry–Exit Task Force.

Sec. 416. Foreign student monitoring program.

Sec. 417. Machine readable passports.

Sec. 418. Prevention of consulate shopping.

Subtitle C—Preservation of Immigration Benefits for Victims of Terrorism

Sec. 421. Special immigrant status.

Sec. 422. Extension of filing or reentry deadlines.

Sec. 423. Humanitarian relief for certain surviving spouses and children.

Sec. 424. "Age-out" protection for children.

Sec. 425. Temporary administrative relief.

Sec. 426. Evidence of death, disability, or loss of employment.

Sec. 427. No benefits to terrorists or family members of terrorists.

Sec. 428. Definitions.

TITLE V—REMOVING OBSTACLES TO INVESTIGATING TERRORISM

Sec. 501. Attorney General's authority to pay rewards to combat terrorism.

Sec. 502. Secretary of State's authority to pay rewards.

Sec. 503. DNA identification of terrorists and other violent offenders.

Sec. 504. Coordination with law enforcement.

Sec. 505. Miscellaneous national security authorities.

Sec. 506. Extension of Secret Service jurisdiction.

Sec. 507. Disclosure of educational records.

Sec. 508. Disclosure of information from NCES surveys.

TITLE VI—PROVIDING FOR VICTIMS OF TERRORISM, PUBLIC SAFETY OFFICERS, AND THEIR FAMILIES

Subtitle A—Aid to Families of Public Safety Officers

Sec. 611. Expedited payment for public safety officers involved in the prevention, investigation, rescue, or recovery efforts related to a terrorist attack.

Sec. 612. Technical correction with respect to expedited payments for heroic public safety officers.

Sec. 613. Public safety officers benefit program payment increase.

Sec. 614. Office of Justice programs.

Subtitle B—Amendments to the Victims of Crime Act of 1984

Sec. 621. Crime victims fund.

Sec. 622. Crime victim compensation.

Sec. 623. Crime victim assistance.

Sec. 624. Victims of terrorism.

TITLE VII—INCREASED INFORMATION SHARING FOR CRITICAL INFRASTRUCTURE PROTECTION

Sec. 701. Expansion of regional information sharing system to facilitate Federal-State-local law enforcement response related to terrorist attacks.

TITLE VIII—STRENGTHENING THE CRIMINAL LAWS AGAINST TERRORISM

Sec. 801. Terrorist attacks and other acts of violence against mass transportation systems.

Sec. 802. Definition of domestic terrorism.

Sec. 803. Prohibition against harboring terrorists.

Sec. 804. Jurisdiction over crimes committed at U.S. facilities abroad.

Sec. 805. Material support for terrorism.

Sec. 806. Assets of terrorist organizations.

Sec. 807. Technical clarification relating to provision of material support to terrorism.

Sec. 808. Definition of Federal crime of terrorism.

Sec. 809. No statute of limitation for certain terrorism offenses.

Sec. 810. Alternate maximum penalties for terrorism offenses.

Sec. 811. Penalties for terrorist conspiracies.

Sec. 812. Post-release supervision of terrorists.

Sec. 813. Inclusion of acts of terrorism as racketeering activity.

Sec. 814. Deterrence and prevention of cyberterrorism.

Sec. 815. Additional defense to civil actions relating to preserving records in response to Government requests.

Sec. 816. Development and support of cybersecurity forensic capabilities.

Sec. 817. Expansion of the biological weapons statute.

## TITLE IX—IMPROVED INTELLIGENCE

Sec. 901. Responsibilities of Director of Central Intelligence regarding foreign intelligence collected under Foreign Intelligence Surveillance Act of 1978.

Sec. 902. Inclusion of international terrorist activities within scope of foreign intelligence under National Security Act of 1947.

Sec. 903. Sense of Congress on the establishment and maintenance of intelligence relationships to acquire information on terrorists and terrorist organizations.

Sec. 904. Temporary authority to defer submittal to Congress of reports on intelligence and intelligence-related matters.

Sec. 905. Disclosure to Director of Central Intelligence of foreign intelligence-related information with respect to criminal investigations.

Sec. 906. Foreign terrorist asset tracking center.

Sec. 907. National Virtual Translation Center.

Sec. 908. Training of government officials regarding identification and use of foreign intelligence.

## TITLE X—MISCELLANEOUS

Sec. 1001. Review of the department of justice.

Sec. 1002. Sense of congress.

Sec. 1003. Definition of "electronic surveillance".

Sec. 1004. Venue in money laundering cases.

Sec. 1005. First responders assistance act.

Sec. 1006. Inadmissibility of aliens engaged in money laundering.

Sec. 1007. Authorization of funds for dea police training in south and central asia.

Sec. 1008. Feasibility study on use of biometric identifier scanning system with access to the fbi integrated automated fingerprint identification system at overseas consular posts and points of entry to the United States.

Sec. 1009. Study of access.

Sec. 1010. Temporary authority to contract with local and State governments for performance of security functions at United States military installations.

Sec. 1011. Crimes against charitable americans.

Sec. 1012. Limitation on issuance of hazmat licenses.

Sec. 1013. Expressing the sense of the senate concerning the provision of funding for bioterrorism preparedness and response.

Sec. 1014. Grant program for State and local domestic preparedness support.

Sec. 1015. Expansion and reauthorization of the crime identification technology act for antiterrorism grants to States and localities.

Sec. 1016. Critical infrastructures protection.

<< 18 USCA § 1 NOTE >>

SEC. 2. CONSTRUCTION; SEVERABILITY.

 Any provision of this Act held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to give it the maximum effect permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event such provision shall be deemed severable from this Act and shall not affect the remainder thereof or the application of such provision to other persons not similarly situated or to other, dissimilar circumstances.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

<< 28 USCA § 524 NOTE >>

SEC. 101. COUNTERTERRORISM FUND.

 (a) ESTABLISHMENT; AVAILABILITY.—There is hereby established in the Treasury of the United States a separate fund to be known as the "Counterterrorism Fund", amounts in which shall remain available without fiscal year limitation—
  (1) to reimburse any Department of Justice component for any costs incurred in connection with—
   (A) reestablishing the operational capability of an office or facility that has been damaged or destroyed as the result of any domestic or international terrorism incident;
   (B) providing support to counter, investigate, or prosecute domestic or international terrorism, including, without limitation, paying rewards in connection with these activities; and
   (C) conducting terrorism threat assessments of Federal agencies and their facilities; and
  (2) to reimburse any department or agency of the Federal Government for any costs incurred in connection with detaining in foreign countries individuals accused of acts of terrorism that violate the laws of the United States.
 (b) NO EFFECT ON PRIOR APPROPRIATIONS.—Subsection (a) shall not be construed to affect the amount or availability of any appropriation to the Counterterrorism Fund made before the date of the enactment of this Act.

SEC. 102. SENSE OF CONGRESS CONDEMNING DISCRIMINATION AGAINST ARAB AND MUSLIM AMERICANS.

 (a) FINDINGS.—Congress makes the following findings:
  (1) Arab Americans, Muslim Americans, and Americans from South Asia play a vital role in our Nation and are entitled to nothing less than the full rights of every American.
  (2) The acts of violence that have been taken against Arab and Muslim Americans since the September 11, 2001, attacks against the United States should be and are condemned by all Americans who value freedom.
  (3) The concept of individual responsibility for wrongdoing is sacrosanct in American society, and applies equally to all religious, racial, and ethnic groups.
  (4) When American citizens commit acts of violence against those who are, or are perceived to be, of Arab or Muslim descent, they should be punished to the full extent of the law.
  (5) Muslim Americans have become so fearful of harassment that many Muslim women are changing the way they dress to avoid becoming targets.
  (6) Many Arab Americans and Muslim Americans have acted heroically during the attacks on the United States, including Mohammed Salman Hamdani, a 23–year–old New Yorker of Pakistani descent, who is believed to have gone to the World Trade Center to offer rescue assistance and is now missing.
 (b) SENSE OF CONGRESS.—It is the sense of Congress that—
  (1) the civil rights and civil liberties of all Americans, including Arab Americans, Muslim Americans, and Americans from South Asia, must be protected, and that every effort must be taken to preserve their safety;
  (2) any acts of violence or discrimination against any Americans be condemned; and
  (3) the Nation is called upon to recognize the patriotism of fellow citizens from all ethnic, racial, and religious backgrounds.

SEC. 103. INCREASED FUNDING FOR THE TECHNICAL SUPPORT CENTER AT THE FEDERAL BUREAU OF INVESTIGATION.

There are authorized to be appropriated for the Technical Support Center established in section 811 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132) to help meet the demands for activities to combat terrorism and support and enhance the technical support and tactical operations of the FBI, $200,000,000 for each of the fiscal years 2002, 2003, and 2004.

<< 18 USCA § 2332e >>

SEC. 104. REQUESTS FOR MILITARY ASSISTANCE TO ENFORCE PROHIBITION IN CERTAIN EMERGENCIES.

Section 2332e of title 18, United States Code, is amended—
  (1) by striking "2332c" and inserting "2332a"; and
  (2) by striking "chemical".

<< 18 USCA § 3036 NOTE >>

SEC. 105. EXPANSION OF NATIONAL ELECTRONIC CRIME TASK FORCE INITIATIVE.

The Director of the United States Secret Service shall take appropriate actions to develop a national network of electronic crime task forces, based on the New York Electronic Crimes Task Force model, throughout the United States, for the purpose of preventing, detecting, and investigating various forms of electronic crimes, including potential terrorist attacks against critical infrastructure and financial payment systems.

SEC. 106. PRESIDENTIAL AUTHORITY.

Section 203 of the International Emergency Powers Act (50 U.S.C. 1702) is amended—
  (1) in subsection (a)(1)—

<< 50 USCA § 1702 >>

(A) at the end of subparagraph (A) (flush to that subparagraph), by striking "; and" and inserting a comma and the following:

"by any person, or with respect to any property, subject to the jurisdiction of the United States;";

<< 50 USCA § 1702 >>

(B) in subparagraph (B)—
  (i) by inserting ", block during the pendency of an investigation" after "investigate"; and
  (ii) by striking "interest;" and inserting "interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and";

<< 50 USCA § 1702 >>

(C) by striking "by any person, or with respect to any property, subject to the jurisdiction of the United States'; and

<< 50 USCA § 1702 >>

(D) by inserting at the end the following:
  "(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States;

and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes."; and

<< 50 USCA § 1702 >>

(2) by inserting at the end the following:

"(c) CLASSIFIED INFORMATION.—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.".

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

SEC. 201. AUTHORITY TO INTERCEPT WIRE, ORAL, AND ELECTRONIC COMMUNICATIONS RELATING TO TERRORISM.

Section 2516(1) of title 18, United States Code, is amended—

<< 18 USCA § 2516 >>

(1) by redesignating paragraph (p), as so redesignated by section 434(2) of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132; 110 Stat. 1274), as paragraph (r); and

<< 18 USCA § 2516 >>

(2) by inserting after paragraph (p), as so redesignated by section 201(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 110 Stat. 3009–565), the following new paragraph:

"(q) any criminal violation of section 229 (relating to chemical weapons); or sections 2332, 2332a, 2332b, 2332d, 2339A, or 2339B of this title (relating to terrorism); or".

<< 18 USCA § 2516 >>

SEC. 202. AUTHORITY TO INTERCEPT WIRE, ORAL, AND ELECTRONIC COMMUNICATIONS RELATING TO COMPUTER FRAUD AND ABUSE OFFENSES.

Section 2516(1)(c) of title 18, United States Code, is amended by striking "and section 1341 (relating to mail fraud)," and inserting "section 1341 (relating to mail fraud), a felony violation of section 1030 (relating to computer fraud and abuse),".

SEC. 203. AUTHORITY TO SHARE CRIMINAL INVESTIGATIVE INFORMATION.

(a) AUTHORITY TO SHARE GRAND JURY INFORMATION.—

<< FRCRP Rule 6 >>

(1) IN GENERAL.—Rule 6(e)(3)(C) of the Federal Rules of Criminal Procedure is amended to read as follows:

"(C)(i) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

"(I) when so directed by a court preliminarily to or in connection with a judicial proceeding;

"(II) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury;

"(III) when the disclosure is made by an attorney for the government to another Federal grand jury;

"(IV) when permitted by a court at the request of an attorney for the government, upon a showing that such matters may disclose a violation of State criminal law, to an appropriate official of a State or subdivision of a State for the purpose of enforcing such law; or

"(V) when the matters involve foreign intelligence or counterintelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 401a)), or foreign intelligence information (as defined in clause (iv) of this subparagraph), to any Federal law enforcement, intelligence, protective, immigration, national defense, or national security official in order to assist the official receiving that information in the performance of his official duties.

"(ii) If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct.

"(iii) Any Federal official to whom information is disclosed pursuant to clause (i)(V) of this subparagraph may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information. Within a reasonable time after such disclosure, an attorney for the government shall file under seal a notice with the court stating the fact that such information was disclosed and the departments, agencies, or entities to which the disclosure was made.

"(iv) In clause (i)(V) of this subparagraph, the term 'foreign intelligence information' means—

"(I) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—

"(aa) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(bb) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(cc) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of foreign power; or

"(II) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—

"(aa) the national defense or the security of the United States; or

"(bb) the conduct of the foreign affairs of the United States.".

<< FRCRP Rule 6 >>

(2) CONFORMING AMENDMENT.—Rule 6(e)(3)(D) of the Federal Rules of Criminal Procedure is amended by striking "(e)(3)(C)(i)" and inserting "(e) (3)(C)(i)(I)".

(b) AUTHORITY TO SHARE ELECTRONIC, WIRE, AND ORAL INTERCEPTION INFORMATION.—

<< 18 USCA § 2517 >>

(1) LAW ENFORCEMENT.—Section 2517 of title 18, United States Code, is amended by inserting at the end the following:

"(6) Any investigative or law enforcement officer, or attorney for the Government, who by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to any other Federal law enforcement, intelligence, protective, immigration, national defense, or national security official to the extent that such contents include foreign intelligence or counterintelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 401a)), or foreign intelligence information (as defined in subsection (19) of section 2510 of this title), to assist the official who is to receive that information in the performance of his official duties. Any Federal official who receives information pursuant to this provision may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information.".

(2) DEFINITION.—Section 2510 of title 18, United States Code, is amended by—

<< 18 USCA § 2510 >>

(A) in paragraph (17), by striking "and" after the semicolon;

<< 18 USCA § 2510 >>

(B) in paragraph (18), by striking the period and inserting "; and"; and

<< 18 USCA § 2510 >>

(C) by inserting at the end the following:

"(19) 'foreign intelligence information' means—

"(A) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—

"(i) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(ii) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(iii) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

"(B) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—

"(i) the national defense or the security of the United States; or

"(ii) the conduct of the foreign affairs of the United States.".

<< 18 USCA § 2517 NOTE >>

(c) PROCEDURES.—The Attorney General shall establish procedures for the disclosure of information pursuant to section 2517(6) and Rule 6(e)(3)(C)(i)(V) of the Federal Rules of Criminal Procedure that identifies a United States person, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801)).

<< 50 USCA § 403–5d >>

(d) FOREIGN INTELLIGENCE INFORMATION.—

(1) IN GENERAL.—Notwithstanding any other provision of law, it shall be lawful for foreign intelligence or counterintelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 401a)) or foreign intelligence information obtained as part of a criminal investigation to be disclosed to any Federal law enforcement, intelligence, protective, immigration, national defense, or national security official in order to assist the official receiving that information in the performance of his official duties. Any Federal official who receives information pursuant to this provision may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information.

(2) DEFINITION.—In this subsection, the term "foreign intelligence information" means—

(A) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—

(i) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

(ii) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

(iii) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

(B) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—

(i) the national defense or the security of the United States; or

(ii) the conduct of the foreign affairs of the United States.

<< 18 USCA § 2511 >>

SEC. 204. CLARIFICATION OF INTELLIGENCE EXCEPTIONS FROM LIMITATIONS ON INTERCEPTION AND DISCLOSURE OF WIRE, ORAL, AND ELECTRONIC COMMUNICATIONS.

Section 2511(2)(f) of title 18, United States Code, is amended—

(1) by striking "this chapter or chapter 121" and inserting "this chapter or chapter 121 or 206 of this title"; and

(2) by striking "wire and oral" and inserting "wire, oral, and electronic".

<< 28 USCA § 532 NOTE >>

## SEC. 205. EMPLOYMENT OF TRANSLATORS BY THE FEDERAL BUREAU OF INVESTIGATION.

(a) AUTHORITY.—The Director of the Federal Bureau of Investigation is authorized to expedite the employment of personnel as translators to support counterterrorism investigations and operations without regard to applicable Federal personnel requirements and limitations.

(b) SECURITY REQUIREMENTS.—The Director of the Federal Bureau of Investigation shall establish such security requirements as are necessary for the personnel employed as translators under subsection (a).

(c) REPORT.—The Attorney General shall report to the Committees on the Judiciary of the House of Representatives and the Senate on—

(1) the number of translators employed by the FBI and other components of the Department of Justice;

(2) any legal or practical impediments to using translators employed by other Federal, State, or local agencies, on a full, part-time, or shared basis; and

(3) the needs of the FBI for specific translation services in certain languages, and recommendations for meeting those needs.

<< 50 USCA § 1805 >>

## SEC. 206. ROVING SURVEILLANCE AUTHORITY UNDER THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978.

Section 105(c)(2)(B) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805(c)(2)(B)) is amended by inserting ", or in circumstances where the Court finds that the actions of the target of the application may have the effect of thwarting the identification of a specified person, such other persons," after "specified person".

## SEC. 207. DURATION OF FISA SURVEILLANCE OF NON–UNITED STATES PERSONS WHO ARE AGENTS OF A FOREIGN POWER.

(a) DURATION.—

<< 50 USCA § 1805 >>

(1) SURVEILLANCE.—Section 105(e)(1) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805(e)(1)) is amended by—

(A) inserting "(A)" after "except that"; and

(B) inserting before the period the following: ", and (B) an order under this Act for a surveillance targeted against an agent of a foreign power, as defined in section 101(b)(1)(A) may be for the period specified in the application or for 120 days, whichever is less".

<< 50 USCA § 1824 >>

(2) PHYSICAL SEARCH.—Section 304(d)(1) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1824(d)(1)) is amended by—

(A) striking "forty-five" and inserting "90";

(B) inserting "(A)" after "except that"; and

(C) inserting before the period the following: ", and (B) an order under this section for a physical search targeted against an agent of a foreign power as defined in section 101(b)(1)(A) may be for the period specified in the application or for 120 days, whichever is less".

(b) EXTENSION.—

<< 50 USCA § 1805 >>

(1) IN GENERAL.—Section 105(d)(2) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805(d)(2)) is amended by—

(A) inserting "(A)" after "except that"; and

(B) inserting before the period the following: ", and (B) an extension of an order under this Act for a surveillance targeted against an agent of a foreign power as defined in section 101(b)(1)(A) may be for a period not to exceed 1 year".

<< 50 USCA § 1824 >>

(2) DEFINED TERM.—Section 304(d)(2) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1824(d)(2) is amended by inserting after "not a United States person," the following: "or against an agent of a foreign power as defined in section 101(b)(1)(A),".

<< 50 USCA § 1803 >>

SEC. 208. DESIGNATION OF JUDGES.

Section 103(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(a)) is amended by—

(1) striking "seven district court judges" and inserting "11 district court judges"; and

(2) inserting "of whom no fewer than 3 shall reside within 20 miles of the District of Columbia" after "circuits".

SEC. 209. SEIZURE OF VOICE-MAIL MESSAGES PURSUANT TO WARRANTS.

Title 18, United States Code, is amended—

(1) in section 2510—

<< 18 USCA § 2510 >>

(A) in paragraph (1), by striking beginning with "and such" and all that follows through "communication"; and

<< 18 USCA § 2510 >>

(B) in paragraph (14), by inserting "wire or" after "transmission of"; and

<< 18 USCA § 2703 >>

(2) in subsections (a) and (b) of section 2703—

(A) by striking "CONTENTS OF ELECTRONIC" and inserting "CONTENTS OF WIRE OR ELECTRONIC" each place it appears;

(B) by striking "contents of an electronic" and inserting "contents of a wire or electronic" each place it appears; and

(C) by striking "any electronic" and inserting "any wire or electronic" each place it appears.

SEC. 210. SCOPE OF SUBPOENAS FOR RECORDS OF ELECTRONIC COMMUNICATIONS.

Section 2703(c)(2) of title 18, United States Code, as redesignated by section 212, is amended—

<< 18 USCA § 2703 >>

(1) by striking "entity the name, address, local and long distance telephone toll billing records, telephone number or other subscriber number or identity, and length of service of a subscriber" and inserting the following: "entity the—

"(A) name;

"(B) address;

"(C) local and long distance telephone connection records, or records of session times and durations;

"(D) length of service (including start date) and types of service utilized;

"(E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

"(F) means and source of payment for such service (including any credit card or bank account number),

of a subscriber"; and

<< 18 USCA § 2703 >>

(2) by striking "and the types of services the subscriber or customer utilized,".

SEC. 211. CLARIFICATION OF SCOPE.

Section 631 of the Communications Act of 1934 (47 U.S.C. 551) is amended—

(1) in subsection (c)(2)—

<< 47 USCA § 551 >>

(A) in subparagraph (B), by striking "or";

<< 47 USCA § 551 >>

(B) in subparagraph (C), by striking the period at the end and inserting "; or"; and

<< 47 USCA § 551 >>

(C) by inserting at the end the following:

"(D) to a government entity as authorized under chapters 119, 121, or 206 of title 18, United States Code, except that such disclosure shall not include records revealing cable subscriber selection of video programming from a cable operator."; and

<< 47 USCA § 551 >>

(2) in subsection (h), by striking "A governmental entity" and inserting "Except as provided in subsection (c)(2)(D), a governmental entity".

SEC. 212. EMERGENCY DISCLOSURE OF ELECTRONIC COMMUNICATIONS TO PROTECT LIFE AND LIMB.

(a) DISCLOSURE OF CONTENTS.—

(1) IN GENERAL.—Section 2702 of title 18, United States Code, is amended—

<< 18 USCA § 2702 >>

(A) by striking the section heading and inserting the following:

"§ 2702. Voluntary disclosure of customer communications or records";

(B) in subsection (a)—

<< 18 USCA § 2702 >>

(i) in paragraph (2)(A), by striking "and" at the end;

<< 18 USCA § 2702 >>

(ii) in paragraph (2)(B), by striking the period and inserting "; and"; and

<< 18 USCA § 2702 >>

(iii) by inserting after paragraph (2) the following:

"(3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1) or (2)) to any governmental entity.";

<< 18 USCA § 2702 >>

(C) in subsection (b), by striking "EXCEPTIONS.—A person or entity" and inserting "EXCEPTIONS FOR DISCLOSURE OF COMMUNICATIONS.— A provider described in subsection (a)";

(D) in subsection (b)(6)—

<< 18 USCA § 2702 >>

(i) in subparagraph (A)(ii), by striking "or";

<< 18 USCA § 2702 >>

(ii) in subparagraph (B), by striking the period and inserting "; or"; and

<< 18 USCA § 2702 >>

(iii) by adding after subparagraph (B) the following:

"(C) if the provider reasonably believes that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure of the information without delay."; and

<< 18 USCA § 2702 >>

(E) by inserting after subsection (b) the following:

"(c) EXCEPTIONS FOR DISCLOSURE OF CUSTOMER RECORDS.—A provider described in subsection (a) may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))—

"(1) as otherwise authorized in section 2703;

"(2) with the lawful consent of the customer or subscriber;

"(3) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;

"(4) to a governmental entity, if the provider reasonably believes that an emergency involving immediate danger of death or serious physical injury to any person justifies disclosure of the information; or

"(5) to any person other than a governmental entity.".

<< 18 USCA prec. § 2701 >>

(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 121 of title 18, United States Code, is amended by striking the item relating to section 2702 and inserting the following:

"2702. Voluntary disclosure of customer communications or records.".

(b) REQUIREMENTS FOR GOVERNMENT ACCESS.—

(1) IN GENERAL.—Section 2703 of title 18, United States Code, is amended—

<< 18 USCA § 2703 >>

(A) by striking the section heading and inserting the following:

"§ 2703. Required disclosure of customer communications or records";

<< 18 USCA § 2703 >>

(B) in subsection (c) by redesignating paragraph (2) as paragraph (3);
(C) in subsection (c)(1)—

<< 18 USCA § 2703 >>

(i) by striking "(A) Except as provided in subparagraph (B), a provider of electronic communication service or remote computing service may" and inserting "A governmental entity may require a provider of electronic communication service or remote computing service to";

<< 18 USCA § 2703 >>

(ii) by striking "covered by subsection (a) or (b) of this section) to any person other than a governmental entity.
"(B) A provider of electronic communication service or remote computing service shall disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a) or (b) of this section) to a governmental entity' and inserting ')";

<< 18 USCA § 2703 >>

(iii) by redesignating subparagraph (C) as paragraph (2);

<< 18 USCA § 2703 >>

(iv) by redesignating clauses (i), (ii), (iii), and (iv) as subparagraphs (A), (B), (C), and (D), respectively;

<< 18 USCA § 2703 >>

(v) in subparagraph (D) (as redesignated) by striking the period and inserting "; or"; and

<< 18 USCA § 2703 >>

(vi) by inserting after subparagraph (D) (as redesignated) the following:
"(E) seeks information under paragraph (2)."; and

<< 18 USCA § 2703 >>

(D) in paragraph (2) (as redesignated) by striking "subparagraph (B)" and insert "paragraph (1)".

<< 18 USCA prec. § 2701 >>

(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 121 of title 18, United States Code, is amended by striking the item relating to section 2703 and inserting the following:

"2703. Required disclosure of customer communications or records.".

SEC. 213. AUTHORITY FOR DELAYING NOTICE OF THE EXECUTION OF A WARRANT.

Section 3103a of title 18, United States Code, is amended—

<< 18 USCA § 3103a >>

(1) by inserting "(a) IN GENERAL.—" before "In addition"; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 3103a >>

(2) by adding at the end the following:

"(b) DELAY.—With respect to the issuance of any warrant or court order under this section, or any other rule of law, to search for and seize any property or material that constitutes evidence of a criminal offense in violation of the laws of the United States, any notice required, or that may be required, to be given may be delayed if—

"(1) the court finds reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result (as defined in section 2705);

"(2) the warrant prohibits the seizure of any tangible property, any wire or electronic communication (as defined in section 2510), or, except as expressly provided in chapter 121, any stored wire or electronic information, except where the court finds reasonable necessity for the seizure; and

"(3) the warrant provides for the giving of such notice within a reasonable period of its execution, which period may thereafter be extended by the court for good cause shown.".

SEC. 214. PEN REGISTER AND TRAP AND TRACE AUTHORITY UNDER FISA.

(a) APPLICATIONS AND ORDERS.—Section 402 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1842) is amended—

<< 50 USCA § 1842 >>

(1) in subsection (a)(1), by striking "for any investigation to gather foreign intelligence information or information concerning international terrorism" and inserting "for any investigation to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution";

<< 50 USCA § 1842 >>

(2) by amending subsection (c)(2) to read as follows:

"(2) a certification by the applicant that the information likely to be obtained is foreign intelligence information not concerning a United States person or is relevant to an ongoing investigation to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution.";

<< 50 USCA § 1842 >>

(3) by striking subsection (c)(3); and

<< 50 USCA § 1842 >>

(4) by amending subsection (d)(2)(A) to read as follows:

"(A) shall specify—

"(i) the identity, if known, of the person who is the subject of the investigation;

"(ii) the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied;

"(iii) the attributes of the communications to which the order applies, such as the number or other identifier, and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied and, in the case of a trap and trace device, the geographic limits of the trap and trace order.".

(b) AUTHORIZATION DURING EMERGENCIES.—Section 403 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1843) is amended—

<< 50 USCA § 1843 >>

(1) in subsection (a), by striking "foreign intelligence information or information concerning international terrorism" and inserting "foreign intelligence information not concerning a United States person or information to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution"; and

<< 50 USCA § 1843 >>

(2) in subsection (b)(1), by striking "foreign intelligence information or information concerning international terrorism" and inserting "foreign intelligence information not concerning a United States person or information to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution".

SEC. 215. ACCESS TO RECORDS AND OTHER ITEMS UNDER THE FOREIGN INTELLIGENCE SURVEILLANCE ACT.

<< 50 USCA §§ 1861, 1862, 1863 >>

Title V of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1861 et seq.) is amended by striking sections 501 through 503 and inserting the following:

<< 50 USCA § 1861 >>

"SEC. 501. ACCESS TO CERTAIN BUSINESS RECORDS FOR FOREIGN INTELLIGENCE AND INTERNATIONAL TERRORISM INVESTIGATIONS.

"(a)(1) The Director of the Federal Bureau of Investigation or a designee of the Director (whose rank shall be no lower than Assistant Special Agent in Charge) may make an application for an order requiring the production of any tangible things (including books, records, papers, documents, and other items) for an investigation to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution.

"(2) An investigation conducted under this section shall—

"(A) be conducted under guidelines approved by the Attorney General under Executive Order 12333 (or a successor order); and

"(B) not be conducted of a United States person solely upon the basis of activities protected by the first amendment to the Constitution of the United States.

"(b) Each application under this section—

"(1) shall be made to—

"(A) a judge of the court established by section 103(a); or

"(B) a United States Magistrate Judge under chapter 43 of title 28, United States Code, who is publicly designated by the Chief Justice of the United States to have the power to hear applications and grant orders for the production of tangible things under this section on behalf of a judge of that court; and

"(2) shall specify that the records concerned are sought for an authorized investigation conducted in accordance with subsection (a)(2) to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities.

"(c)(1) Upon an application made pursuant to this section, the judge shall enter an ex parte order as requested, or as modified, approving the release of records if the judge finds that the application meets the requirements of this section.

"(2) An order under this subsection shall not disclose that it is issued for purposes of an investigation described in subsection (a).

"(d) No person shall disclose to any other person (other than those persons necessary to produce the tangible things under this section) that the Federal Bureau of Investigation has sought or obtained tangible things under this section.

"(e) A person who, in good faith, produces tangible things under an order pursuant to this section shall not be liable to any other person for such production. Such production shall not be deemed to constitute a waiver of any privilege in any other proceeding or context.

<< 50 USCA § 1862 >>

"SEC. 502. CONGRESSIONAL OVERSIGHT.

"(a) On a semiannual basis, the Attorney General shall fully inform the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate concerning all requests for the production of tangible things under section 402.

"(b) On a semiannual basis, the Attorney General shall provide to the Committees on the Judiciary of the House of Representatives and the Senate a report setting forth with respect to the preceding 6–month period—

"(1) the total number of applications made for orders approving requests for the production of tangible things under section 402; and

"(2) the total number of such orders either granted, modified, or denied.".

SEC. 216. MODIFICATION OF AUTHORITIES RELATING TO USE OF PEN REGISTERS AND TRAP AND TRACE DEVICES.

<< 18 USCA § 3121 >>

(a) GENERAL LIMITATIONS.—Section 3121(c) of title 18, United States Code, is amended—

 (1) by inserting "or trap and trace device" after "pen register";

 (2) by inserting ", routing, addressing," after "dialing"; and

 (3) by striking "call processing" and inserting "the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communications".

(b) ISSUANCE OF ORDERS.—

<< 18 USCA § 3123 >>

 (1) IN GENERAL.—Section 3123(a) of title 18, United States Code, is amended to read as follows:

"(a) IN GENERAL.—

 "(1) ATTORNEY FOR THE GOVERNMENT.—Upon an application made under section 3122(a)(1), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation. The order, upon service of that order, shall apply to any person or entity providing wire or electronic communication service in the United States whose assistance may facilitate the execution of the order. Whenever such an order is served on any person or entity not specifically named in the order, upon request of such person or entity, the attorney for the Government or law enforcement or investigative officer that is serving the order shall provide written or electronic certification that the order applies to the person or entity being served.

 "(2) STATE INVESTIGATIVE OR LAW ENFORCEMENT OFFICER.—Upon an application made under section 3122(a)(2), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device within the jurisdiction of the court, if the court finds that the State law enforcement or investigative officer has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

 "(3)(A) Where the law enforcement agency implementing an ex parte order under this subsection seeks to do so by installing and using its own pen register or trap and trace device on a packet-switched data network of a provider of electronic communication service to the public, the agency shall ensure that a record will be maintained which will identify—

 "(i) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network;

 "(ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information;

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and

"(iv) any information which has been collected by the device.

To the extent that the pen register or trap and trace device can be set automatically to record this information electronically, the record shall be maintained electronically throughout the installation and use of such device.

"(B) The record maintained under subparagraph (A) shall be provided ex parte and under seal to the court which entered the ex parte order authorizing the installation and use of the device within 30 days after termination of the order (including any extensions thereof).".

(2) CONTENTS OF ORDER.—Section 3123(b)(1) of title 18, United States Code, is amended—

<< 18 USCA § 3123 >>

(A) in subparagraph (A)—

(i) by inserting "or other facility" after "telephone line"; and

(ii) by inserting before the semicolon at the end "or applied"; and

<< 18 USCA § 3123 >>

(B) by striking subparagraph (C) and inserting the following:

"(C) the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of an order authorizing installation and use of a trap and trace device under subsection (a)(2), the geographic limits of the order; and".

<< 18 USCA § 3123 >>

(3) NONDISCLOSURE REQUIREMENTS.—Section 3123(d)(2) of title 18, United States Code, is amended—

(A) by inserting "or other facility" after "the line"; and

(B) by striking ", or who has been ordered by the court" and inserting "or applied, or who is obligated by the order".

(c) DEFINITIONS.—

<< 18 USCA § 3127 >>

(1) COURT OF COMPETENT JURISDICTION.—Section 3127(2) of title 18, United States Code, is amended by striking subparagraph (A) and inserting the following:

"(A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals having jurisdiction over the offense being investigated; or".

<< 18 USCA § 3127 >>

(2) PEN REGISTER.—Section 3127(3) of title 18, United States Code, is amended—

(A) by striking "electronic or other impulses" and all that follows through "is attached" and inserting "dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication"; and

<< 18 USCA § 3127 >>

(B) by inserting "or process" after "device" each place it appears.

(3) TRAP AND TRACE DEVICE.—Section 3127(4) of title 18, United States Code, is amended—

(A) by striking "of an instrument" and all that follows through the semicolon and inserting "or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;"; and

(B) by inserting "or process" after "a device".

<< 18 USCA § 3127 >>

(4) CONFORMING AMENDMENT.—Section 3127(1) of title 18, United States Code, is amended—
 (A) by striking "and"; and
 (B) by inserting ", and 'contents' " after "electronic communication service".

<< 18 USCA § 3124 >>

(5) TECHNICAL AMENDMENT.—Section 3124(d) of title 18, United States Code, is amended by striking "the terms of".

<< 18 USCA § 3124 >>

(6) CONFORMING AMENDMENT.—Section 3124(b) of title 18, United States Code, is amended by inserting "or other facility" after "the appropriate line".

SEC. 217. INTERCEPTION OF COMPUTER TRESPASSER COMMUNICATIONS.

 Chapter 119 of title 18, United States Code, is amended—
 (1) in section 2510—

<< 18 USCA § 2510 >>

 (A) in paragraph (18), by striking "and" at the end;

<< 18 USCA § 2510 >>

 (B) in paragraph (19), by striking the period and inserting a semicolon; and

<< 18 USCA § 2510 >>

 (C) by inserting after paragraph (19) the following:
 "(20) 'protected computer' has the meaning set forth in section 1030; and
 "(20)
 "(21) 'computer trespasser'—
  "(A) means a person who accesses a protected computer without authorization and thus has no reasonable expectation of privacy in any communication transmitted to, through, or from the protected computer; and
  "(B) does not include a person known by the owner or operator of the protected computer to have an existing contractual relationship with the owner or operator of the protected computer for access to all or part of the protected computer."; and

<< 18 USCA § 2511 >>

 (2) in section 2511(2), by inserting at the end the following:
 "(i) It shall not be unlawful under this chapter for a person acting under color of law to intercept the wire or electronic communications of a computer trespasser transmitted to, through, or from the protected computer, if—
  "(I) the owner or operator of the protected computer authorizes the interception of the computer trespasser's communications on the protected computer;
  "(II) the person acting under color of law is lawfully engaged in an investigation;
  "(III) the person acting under color of law has reasonable grounds to believe that the contents of the computer trespasser's communications will be relevant to the investigation; and
  "(IV) such interception does not acquire communications other than those transmitted to or from the computer trespasser.".

<< 50 USCA § 1804 >>

AR.01181

<< 50 USCA § 1823 >>

SEC. 218. FOREIGN INTELLIGENCE INFORMATION.

 Sections 104(a)(7)(B) and section 303(a)(7)(B) (50 U.S.C. 1804(a)(7)(B) and 1823(a)(7)(B)) of the Foreign Intelligence Surveillance Act of 1978 are each amended by striking "the purpose" and inserting "a significant purpose".

<< FRCRP Rule 41 >>

SEC. 219. SINGLE–JURISDICTION SEARCH WARRANTS FOR TERRORISM.

 Rule 41(a) of the Federal Rules of Criminal Procedure is amended by inserting after "executed" the following: "and (3) in an investigation of domestic terrorism or international terrorism (as defined in section 2331 of title 18, United States Code), by a Federal magistrate judge in any district in which activities related to the terrorism may have occurred, for a search of property or for a person within or outside the district".

SEC. 220. NATIONWIDE SERVICE OF SEARCH WARRANTS FOR ELECTRONIC EVIDENCE.

 (a) IN GENERAL.—Chapter 121 of title 18, United States Code, is amended—

<< 18 USCA § 2703 >>

 (1) in section 2703, by striking "under the Federal Rules of Criminal Procedure" every place it appears and inserting "using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation"; and
 (2) in section 2711—

<< 18 USCA § 2711 >>

 (A) in paragraph (1), by striking "and";

<< 18 USCA § 2711 >>

 (B) in paragraph (2), by striking the period and inserting "; and"; and

<< 18 USCA § 2711 >>

 (C) by inserting at the end the following:
 "(3) the term 'court of competent jurisdiction' has the meaning assigned by section 3127, and includes any Federal court within that definition, without geographic limitation.".

<< 18 USCA § 2703 >>

 (b) CONFORMING AMENDMENT.—Section 2703(d) of title 18, United States Code, is amended by striking "described in section 3127(2)(A)".

SEC. 221. TRADE SANCTIONS.

 (a) IN GENERAL.—The Trade Sanctions Reform and Export Enhancement Act of 2000 (Public Law 106–387; 114 Stat. 1549A–67) is amended—

<< 22 USCA § 7203 >>

 (1) by amending section 904(2)(C) to read as follows:

"(C) used to facilitate the design, development, or production of chemical or biological weapons, missiles, or weapons of mass destruction.";

<< 22 USCA § 7205 >>

(2) in section 906(a)(1)—
  (A) by inserting ", the Taliban or the territory of Afghanistan controlled by the Taliban," after "Cuba"; and
  (B) by inserting ", or in the territory of Afghanistan controlled by the Taliban," after "within such country"; and

<< 22 USCA § 7205 >>

(3) in section 906(a)(2), by inserting ", or to any other entity in Syria or North Korea" after "Korea".

<< 22 USCA § 7210 >>

  (b) APPLICATION OF THE TRADE SANCTIONS REFORM AND EXPORT ENHANCEMENT ACT. — Nothing in the Trade Sanctions Reform and Export Enhancement Act of 2000 shall limit the application or scope of any law establishing criminal or civil penalties, including any Executive order or regulation promulgated pursuant to such laws (or similar or successor laws), for the unlawful export of any agricultural commodity, medicine, or medical device to—
  (1) a foreign organization, group, or person designated pursuant to Executive Order No. 12947 of January 23, 1995, as amended;
  (2) a Foreign Terrorist Organization pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132);
  (3) a foreign organization, group, or person designated pursuant to Executive Order No. 13224 (September 23, 2001);
  (4) any narcotics trafficking entity designated pursuant to Executive Order No. 12978 (October 21, 1995) or the Foreign Narcotics Kingpin Designation Act (Public Law 106–120); or
  (5) any foreign organization, group, or persons subject to any restriction for its involvement in weapons of mass destruction or missile proliferation.

<< 18 USCA § 3124 NOTE >>

SEC. 222. ASSISTANCE TO LAW ENFORCEMENT AGENCIES.

  Nothing in this Act shall impose any additional technical obligation or requirement on a provider of a wire or electronic communication service or other person to furnish facilities or technical assistance. A provider of a wire or electronic communication service, landlord, custodian, or other person who furnishes facilities or technical assistance pursuant to section 216 shall be reasonably compensated for such reasonable expenditures incurred in providing such facilities or assistance.

SEC. 223. CIVIL LIABILITY FOR CERTAIN UNAUTHORIZED DISCLOSURES.

  (a) Section 2520 of title 18, United States Code, is amended—

<< 18 USCA § 2520 >>

  (1) in subsection (a), after "entity", by inserting ", other than the United States,";

<< 18 USCA § 2520 >>

  (2) by adding at the end the following:
  "(f) ADMINISTRATIVE DISCIPLINE.—If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true

and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted. If the head of the department or agency involved determines that disciplinary action is not warranted, he or she shall notify the Inspector General with jurisdiction over the department or agency concerned and shall provide the Inspector General with the reasons for such determination."; and

<< 18 USCA § 2520 >>

(3) by adding a new subsection (g), as follows:

"(g) IMPROPER DISCLOSURE IS VIOLATION.—Any willful disclosure or use by an investigative or law enforcement officer or governmental entity of information beyond the extent permitted by section 2517 is a violation of this chapter for purposes of section 2520(a).".

(b) Section 2707 of title 18, United States Code, is amended—

<< 18 USCA § 2707 >>

(1) in subsection (a), after "entity", by inserting ", other than the United States,";

<< 18 USCA § 2707 >>

(2) by striking subsection (d) and inserting the following:

"(d) ADMINISTRATIVE DISCIPLINE.—If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted. If the head of the department or agency involved determines that disciplinary action is not warranted, he or she shall notify the Inspector General with jurisdiction over the department or agency concerned and shall provide the Inspector General with the reasons for such determination."; and

<< 18 USCA § 2707 >>

(3) by adding a new subsection (g), as follows:

"(g) IMPROPER DISCLOSURE.—Any willful disclosure of a 'record', as that term is defined in section 552a(a) of title 5, United States Code, obtained by an investigative or law enforcement officer, or a governmental entity, pursuant to section 2703 of this title, or from a device installed pursuant to section 3123 or 3125 of this title, that is not a disclosure made in the proper performance of the official functions of the officer or governmental entity making the disclosure, is a violation of this chapter. This provision shall not apply to information previously lawfully disclosed (prior to the commencement of any civil or administrative proceeding under this chapter) to the public by a Federal, State, or local governmental entity or by the plaintiff in a civil action under this chapter.".

(c)(1) Chapter 121 of title 18, United States Code, is amended by adding at the end the following:

<< 18 USCA § 2712 >>

"§ 2712. Civil actions against the United States

"(a) IN GENERAL.—Any person who is aggrieved by any willful violation of this chapter or of chapter 119 of this title or of sections 106(a), 305(a), or 405(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U. S.C. 1801 et seq.) may commence an action in United States District Court against the United States to recover money damages. In any such action, if a person who is aggrieved successfully establishes such a violation of this chapter or of chapter 119 of this title or of the above specific provisions of title 50, the Court may assess as damages—

"(1) actual damages, but not less than $10,000, whichever amount is greater; and

"(2) litigation costs, reasonably incurred.

"(b) PROCEDURES.—(1) Any action against the United States under this section may be commenced only after a claim is presented to the appropriate department or agency under the procedures of the Federal Tort Claims Act, as set forth in title 28, United States Code.

"(2) Any action against the United States under this section shall be forever barred unless it is presented in writing to the appropriate Federal agency within 2 years after such claim accrues or unless action is begun within 6 months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. The claim shall accrue on the date upon which the claimant first has a reasonable opportunity to discover the violation.

"(3) Any action under this section shall be tried to the court without a jury.

"(4) Notwithstanding any other provision of law, the procedures set forth in section 106(f), 305(g), or 405(f) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) shall be the exclusive means by which materials governed by those sections may be reviewed.

"(5) An amount equal to any award against the United States under this section shall be reimbursed by the department or agency concerned to the fund described in section 1304 of title 31, United States Code, out of any appropriation, fund, or other account (excluding any part of such appropriation, fund, or account that is available for the enforcement of any Federal law) that is available for the operating expenses of the department or agency concerned.

"(c) ADMINISTRATIVE DISCIPLINE.—If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted. If the head of the department or agency involved determines that disciplinary action is not warranted, he or she shall notify the Inspector General with jurisdiction over the department or agency concerned and shall provide the Inspector General with the reasons for such determination.

"(d) EXCLUSIVE REMEDY.—Any action against the United States under this subsection shall be the exclusive remedy against the United States for any claims within the purview of this section.

"(e) STAY OF PROCEEDINGS.—(1) Upon the motion of the United States, the court shall stay any action commenced under this section if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related investigation or the prosecution of a related criminal case. Such a stay shall toll the limitations periods of paragraph (2) of subsection (b).

"(2) In this subsection, the terms 'related criminal case' and 'related investigation' mean an actual prosecution or investigation in progress at the time at which the request for the stay or any subsequent motion to lift the stay is made. In determining whether an investigation or a criminal case is related to an action commenced under this section, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the 2 proceedings, without requiring that any one or more factors be identical.

"(3) In requesting a stay under paragraph (1), the Government may, in appropriate cases, submit evidence ex parte in order to avoid disclosing any matter that may adversely affect a related investigation or a related criminal case. If the Government makes such an ex parte submission, the plaintiff shall be given an opportunity to make a submission to the court, not ex parte, and the court may, in its discretion, request further information from either party.".

<< 18 USCA prec. § 2701 >>

(2) The table of sections at the beginning of chapter 121 is amended to read as follows:

"2712. Civil action against the United States.".

<< 18 USCA § 2510 NOTE >>

SEC. 224. SUNSET.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(a) IN GENERAL.—Except as provided in subsection (b), this title and the amendments made by this title (other than sections 203(a), 203(c), 205, 208, 210, 211, 213, 216, 219, 221, and 222, and the amendments made by those sections) shall cease to have effect on December 31, 2005.

(b) EXCEPTION.—With respect to any particular foreign intelligence investigation that began before the date on which the provisions referred to in subsection (a) cease to have effect, or with respect to any particular offense or potential offense that began or occurred before the date on which such provisions cease to have effect, such provisions shall continue in effect.

SEC. 225. IMMUNITY FOR COMPLIANCE WITH FISA WIRETAP.

<< 50 USCA § 1805 >>

Section 105 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805) is amended by inserting after subsection (g) the following:

"(h) No cause of action shall lie in any court against any provider of a wire or electronic communication service, landlord, custodian, or other person (including any officer, employee, agent, or other specified person thereof) that furnishes any information, facilities, or technical assistance in accordance with a court order or request for emergency assistance under this Act.".

TITLE III—INTERNATIONAL MONEY LAUNDERING
ABATEMENT AND ANTI–TERRORIST FINANCING ACT OF 2001

<< 31 USCA § 5301 NOTE >>

SEC. 301. SHORT TITLE.

This title may be cited as the "International Money Laundering Abatement and Financial Anti–Terrorism Act of 2001".

<< 31 USCA § 5311 NOTE >>

SEC. 302. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds that—

(1) money laundering, estimated by the International Monetary Fund to amount to between 2 and 5 percent of global gross domestic product, which is at least $600,000,000,000 annually, provides the financial fuel that permits transnational criminal enterprises to conduct and expand their operations to the detriment of the safety and security of American citizens;

(2) money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks;

(3) money launderers subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine the integrity of United States financial institutions and of the global financial and trading systems upon which prosperity and growth depend;

(4) certain jurisdictions outside of the United States that offer "offshore" banking and related facilities designed to provide anonymity, coupled with weak financial supervisory and enforcement regimes, provide essential tools to disguise ownership and movement of criminal funds, derived from, or used to commit, offenses ranging from narcotics trafficking, terrorism, arms smuggling, and trafficking in human beings, to financial frauds that prey on law-abiding citizens;

(5) transactions involving such offshore jurisdictions make it difficult for law enforcement officials and regulators to follow the trail of money earned by criminals, organized international criminal enterprises, and global terrorist organizations;

(6) correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions;

(7) private banking services can be susceptible to manipulation by money launderers, for example corrupt foreign government officials, particularly if those services include the creation of offshore accounts and facilities for large personal funds transfers to channel funds into accounts around the globe;

(8) United States anti-money laundering efforts are impeded by outmoded and inadequate statutory provisions that make investigations, prosecutions, and forfeitures more difficult, particularly in cases in which money laundering involves foreign persons, foreign banks, or foreign countries;

(9) the ability to mount effective counter-measures to international money launderers requires national, as well as bilateral and multilateral action, using tools specially designed for that effort; and

(10) the Basle Committee on Banking Regulation and Supervisory Practices and the Financial Action Task Force on Money Laundering, of both of which the United States is a member, have each adopted international anti-money laundering principles and recommendations.

(b) PURPOSES.—The purposes of this title are—

(1) to increase the strength of United States measures to prevent, detect, and prosecute international money laundering and the financing of terrorism;

(2) to ensure that—

(A) banking transactions and financial relationships and the conduct of such transactions and relationships, do not contravene the purposes of subchapter II of chapter 53 of title 31, United States Code, section 21 of the Federal Deposit Insurance Act, or chapter 2 of title I of Public Law 91–508 (84 Stat. 1116), or facilitate the evasion of any such provision; and

(B) the purposes of such provisions of law continue to be fulfilled, and such provisions of law are effectively and efficiently administered;

(3) to strengthen the provisions put into place by the Money Laundering Control Act of 1986 (18 U.S.C. 981 note), especially with respect to crimes by non-United States nationals and foreign financial institutions;

(4) to provide a clear national mandate for subjecting to special scrutiny those foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts that pose particular, identifiable opportunities for criminal abuse;

(5) to provide the Secretary of the Treasury (in this title referred to as the "Secretary") with broad discretion, subject to the safeguards provided by the Administrative Procedure Act under title 5, United States Code, to take measures tailored to the particular money laundering problems presented by specific foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts;

(6) to ensure that the employment of such measures by the Secretary permits appropriate opportunity for comment by affected financial institutions;

(7) to provide guidance to domestic financial institutions on particular foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions that are of primary money laundering concern to the United States Government;

(8) to ensure that the forfeiture of any assets in connection with the anti-terrorist efforts of the United States permits for adequate challenge consistent with providing due process rights;

(9) to clarify the terms of the safe harbor from civil liability for filing suspicious activity reports;

(10) to strengthen the authority of the Secretary to issue and administer geographic targeting orders, and to clarify that violations of such orders or any other requirement imposed under the authority contained in chapter 2 of title I of Public Law 91–508 and subchapters II and III of chapter 53 of title 31, United States Code, may result in criminal and civil penalties;

(11) to ensure that all appropriate elements of the financial services industry are subject to appropriate requirements to report potential money laundering transactions to proper authorities, and that jurisdictional disputes do not hinder examination of compliance by financial institutions with relevant reporting requirements;

(12) to strengthen the ability of financial institutions to maintain the integrity of their employee population; and

(13) to strengthen measures to prevent the use of the United States financial system for personal gain by corrupt foreign officials and to facilitate the repatriation of any stolen assets to the citizens of countries to whom such assets belong.

<< 31 USCA § 5311 NOTE >>

SEC. 303. 4–YEAR CONGRESSIONAL REVIEW; EXPEDITED CONSIDERATION.

(a) IN GENERAL.—Effective on and after the first day of fiscal year 2005, the provisions of this title and the amendments made by this title shall terminate if the Congress enacts a joint resolution, the text after the resolving clause of which is as

follows: "That provisions of the International Money Laundering Abatement and Anti–Terrorist Financing Act of 2001, and the amendments made thereby, shall no longer have the force of law.".

(b) EXPEDITED CONSIDERATION.—Any joint resolution submitted pursuant to this section should be considered by the Congress expeditiously. In particular, it shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Control Act of 1976.

Subtitle A—International Counter Money Laundering and Related Measures

SEC. 311. SPECIAL MEASURES FOR JURISDICTIONS, FINANCIAL INSTITUTIONS, OR INTERNATIONAL TRANSACTIONS OF PRIMARY MONEY LAUNDERING CONCERN.

<< 31 USCA § 5318A >>

(a) IN GENERAL.—Subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after section 5318 the following new section:

"§ 5318A. Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern

"(a) INTERNATIONAL COUNTER–MONEY LAUNDERING REQUIREMENTS.—

"(1) IN GENERAL.—The Secretary of the Treasury may require domestic financial institutions and domestic financial agencies to take 1 or more of the special measures described in subsection (b) if the Secretary finds that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern, in accordance with subsection (c).

"(2) FORM OF REQUIREMENT.—The special measures described in—

"(A) subsection (b) may be imposed in such sequence or combination as the Secretary shall determine;

"(B) paragraphs (1) through (4) of subsection (b) may be imposed by regulation, order, or otherwise as permitted by law; and

"(C) subsection (b)(5) may be imposed only by regulation.

"(3) DURATION OF ORDERS; RULEMAKING.—Any order by which a special measure described in paragraphs (1) through (4) of subsection (b) is imposed (other than an order described in section 5326)—

"(A) shall be issued together with a notice of proposed rulemaking relating to the imposition of such special measure; and

"(B) may not remain in effect for more than 120 days, except pursuant to a rule promulgated on or before the end of the 120–day period beginning on the date of issuance of such order.

"(4) PROCESS FOR SELECTING SPECIAL MEASURES.—In selecting which special measure or measures to take under this subsection, the Secretary of the Treasury—

"(A) shall consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, as defined in section 3 of the Federal Deposit Insurance Act, the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board, and in the sole discretion of the Secretary, such other agencies and interested parties as the Secretary may find to be appropriate; and

"(B) shall consider—

"(i) whether similar action has been or is being taken by other nations or multilateral groups;

"(ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

"(iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, or class of transactions; and

"(iv) the effect of the action on United States national security and foreign policy.

"(5) NO LIMITATION ON OTHER AUTHORITY.—This section shall not be construed as superseding or otherwise restricting any other authority granted to the Secretary, or to any other agency, by this subchapter or otherwise.

"(b) SPECIAL MEASURES.—The special measures referred to in subsection (a), with respect to a jurisdiction outside of the United States, financial institution operating outside of the United States, class of transaction within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts are as follows:

"(1) RECORDKEEPING AND REPORTING OF CERTAIN FINANCIAL TRANSACTIONS.—

"(A) IN GENERAL.—The Secretary of the Treasury may require any domestic financial institution or domestic financial agency to maintain records, file reports, or both, concerning the aggregate amount of transactions, or concerning each transaction, with respect to a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or class of transactions to be of primary money laundering concern.

"(B) FORM OF RECORDS AND REPORTS.—Such records and reports shall be made and retained at such time, in such manner, and for such period of time, as the Secretary shall determine, and shall include such information as the Secretary may determine, including—

"(i) the identity and address of the participants in a transaction or relationship, including the identity of the originator of any funds transfer;

"(ii) the legal capacity in which a participant in any transaction is acting;

"(iii) the identity of the beneficial owner of the funds involved in any transaction, in accordance with such procedures as the Secretary determines to be reasonable and practicable to obtain and retain the information; and

"(iv) a description of any transaction.

"(2) INFORMATION RELATING TO BENEFICIAL OWNERSHIP.—In addition to any other requirement under any other provision of law, the Secretary may require any domestic financial institution or domestic financial agency to take such steps as the Secretary may determine to be reasonable and practicable to obtain and retain information concerning the beneficial ownership of any account opened or maintained in the United States by a foreign person (other than a foreign entity whose shares are subject to public reporting requirements or are listed and traded on a regulated exchange or trading market), or a representative of such a foreign person, that involves a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or transaction or type of account to be of primary money laundering concern.

"(3) INFORMATION RELATING TO CERTAIN PAYABLE–THROUGH ACCOUNTS.—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a payable-through account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a payable through account through which any such transaction may be conducted, as a condition of opening or maintaining such account—

"(A) to identify each customer (and representative of such customer) of such financial institution who is permitted to use, or whose transactions are routed through, such payable-through account; and

"(B) to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

"(4) INFORMATION RELATING TO CERTAIN CORRESPONDENT ACCOUNTS.—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a correspondent account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a correspondent account through which any such transaction may be conducted, as a condition of opening or maintaining such account—

"(A) to identify each customer (and representative of such customer) of any such financial institution who is permitted to use, or whose transactions are routed through, such correspondent account; and

"(B) to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

"(5) PROHIBITIONS OR CONDITIONS ON OPENING OR MAINTAINING CERTAIN CORRESPONDENT OR PAYABLE–THROUGH ACCOUNTS.—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary, in consultation with the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System, may prohibit, or impose conditions upon, the opening or maintaining in the United States of a correspondent account or payable- through account by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution, if such correspondent account or payable-through account involves any such jurisdiction or institution, or if any such transaction may be conducted through such correspondent account or payable-through account.

"(c) CONSULTATIONS AND INFORMATION TO BE CONSIDERED IN FINDING JURISDICTIONS, INSTITUTIONS, TYPES OF ACCOUNTS, OR TRANSACTIONS TO BE OF PRIMARY MONEY LAUNDERING CONCERN.—

"(1) IN GENERAL.—In making a finding that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern so as to authorize the Secretary of the Treasury to take 1 or more of the special measures described in subsection (b), the Secretary shall consult with the Secretary of State and the Attorney General.

"(2) ADDITIONAL CONSIDERATIONS.—In making a finding described in paragraph (1), the Secretary shall consider in addition such information as the Secretary determines to be relevant, including the following potentially relevant factors:

"(A) JURISDICTIONAL FACTORS.—In the case of a particular jurisdiction—

"(i) evidence that organized criminal groups, international terrorists, or both, have transacted business in that jurisdiction;

"(ii) the extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

"(iii) the substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction;

"(iv) the relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

"(v) the extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

"(vi) whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of United States law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

"(vii) the extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

"(B) INSTITUTIONAL FACTORS.—In the case of a decision to apply 1 or more of the special measures described in subsection (b) only to a financial institution or institutions, or to a transaction or class of transactions, or to a type of account, or to all 3, within or involving a particular jurisdiction—

"(i) the extent to which such financial institutions, transactions, or types of accounts are used to facilitate or promote money laundering in or through the jurisdiction;

"(ii) the extent to which such institutions, transactions, or types of accounts are used for legitimate business purposes in the jurisdiction; and

"(iii) the extent to which such action is sufficient to ensure, with respect to transactions involving the jurisdiction and institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

"(d) NOTIFICATION OF SPECIAL MEASURES INVOKED BY THE SECRETARY.—Not later than 10 days after the date of any action taken by the Secretary of the Treasury under subsection (a)(1), the Secretary shall notify, in writing, the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate of any such action.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(e) DEFINITIONS.—Notwithstanding any other provision of this subchapter, for purposes of this section and subsections (i) and (j) of section 5318, the following definitions shall apply:

"(1) BANK DEFINITIONS.—The following definitions shall apply with respect to a bank:

"(A) ACCOUNT.—The term 'account'—

"(i) means a formal banking or business relationship established to provide regular services, dealings, and other financial transactions; and

"(ii) includes a demand deposit, savings deposit, or other transaction or asset account and a credit account or other extension of credit.

"(B) CORRESPONDENT ACCOUNT.—The term 'correspondent account' means an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution.

"(C) PAYABLE–THROUGH ACCOUNT.—The term 'payable-through account' means an account, including a transaction account (as defined in section 19(b)(1)(C) of the Federal Reserve Act), opened at a depository institution by a foreign financial institution by means of which the foreign financial institution permits its customers to engage, either directly or through a subaccount, in banking activities usual in connection with the business of banking in the United States.

"(2) DEFINITIONS APPLICABLE TO INSTITUTIONS OTHER THAN BANKS.—With respect to any financial institution other than a bank, the Secretary shall, after consultation with the appropriate Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act), define by regulation the term 'account', and shall include within the meaning of that term, to the extent, if any, that the Secretary deems appropriate, arrangements similar to payable-through and correspondent accounts.

"(3) REGULATORY DEFINITION OF BENEFICIAL OWNERSHIP.—The Secretary shall promulgate regulations defining beneficial ownership of an account for purposes of this section and subsections (i) and (j) of section 5318. Such regulations shall address issues related to an individual's authority to fund, direct, or manage the account (including, without limitation, the power to direct payments into or out of the account), and an individual's material interest in the income or corpus of the account, and shall ensure that the identification of individuals under this section does not extend to any individual whose beneficial interest in the income or corpus of the account is immaterial.

"(4) OTHER TERMS.—The Secretary may, by regulation, further define the terms in paragraphs (1), (2), and (3), and define other terms for the purposes of this section, as the Secretary deems appropriate.".

<< 31 USCA prec. § 5301 >>

(b) CLERICAL AMENDMENT.—The table of sections for subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5318 the following new item:

"5318A. Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern.".

SEC. 312. SPECIAL DUE DILIGENCE FOR CORRESPONDENT ACCOUNTS AND PRIVATE BANKING ACCOUNTS.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318 of title 31, United States Code, is amended by adding at the end the following:

"(i) DUE DILIGENCE FOR UNITED STATES PRIVATE BANKING AND CORRESPONDENT BANK ACCOUNTS INVOLVING FOREIGN PERSONS.—

"(1) IN GENERAL.—Each financial institution that establishes, maintains, administers, or manages a private banking account or a correspondent account in the United States for a non-United States person, including a foreign individual visiting the United States, or a representative of a non-United States person shall establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts.

"(2) ADDITIONAL STANDARDS FOR CERTAIN CORRESPONDENT ACCOUNTS.—

"(A) IN GENERAL.—Subparagraph (B) shall apply if a correspondent account is requested or maintained by, or on behalf of, a foreign bank operating—

"(i) under an offshore banking license; or

"(ii) under a banking license issued by a foreign country that has been designated—

"(I) as noncooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member, with which designation the United States representative to the group or organization concurs; or

"(II) by the Secretary of the Treasury as warranting special measures due to money laundering concerns.

"(B) POLICIES, PROCEDURES, AND CONTROLS.—The enhanced due diligence policies, procedures, and controls required under paragraph (1) shall, at a minimum, ensure that the financial institution in the United States takes reasonable steps—

"(i) to ascertain for any such foreign bank, the shares of which are not publicly traded, the identity of each of the owners of the foreign bank, and the nature and extent of the ownership interest of each such owner;

"(ii) to conduct enhanced scrutiny of such account to guard against money laundering and report any suspicious transactions under subsection (g); and

"(iii) to ascertain whether such foreign bank provides correspondent accounts to other foreign banks and, if so, the identity of those foreign banks and related due diligence information, as appropriate under paragraph (1).

"(3) MINIMUM STANDARDS FOR PRIVATE BANKING ACCOUNTS.—If a private banking account is requested or maintained by, or on behalf of, a non-United States person, then the due diligence policies, procedures, and controls required under paragraph (1) shall, at a minimum, ensure that the financial institution takes reasonable steps—

"(A) to ascertain the identity of the nominal and beneficial owners of, and the source of funds deposited into, such account as needed to guard against money laundering and report any suspicious transactions under subsection (g); and

"(B) to conduct enhanced scrutiny of any such account that is requested or maintained by, or on behalf of, a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure that is reasonably designed to detect and report transactions that may involve the proceeds of foreign corruption.

"(4) DEFINITION.—For purposes of this subsection, the following definitions shall apply:

"(A) OFFSHORE BANKING LICENSE.—The term 'offshore banking license' means a license to conduct banking activities which, as a condition of the license, prohibits the licensed entity from conducting banking activities with the citizens of, or with the local currency of, the country which issued the license.

"(B) PRIVATE BANKING ACCOUNT.—The term 'private banking account' means an account (or any combination of accounts) that—

"(i) requires a minimum aggregate deposits of funds or other assets of not less than $1,000,000;

"(ii) is established on behalf of 1 or more individuals who have a direct or beneficial ownership interest in the account; and

"(iii) is assigned to, or is administered or managed by, in whole or in part, an officer, employee, or agent of a financial institution acting as a liaison between the financial institution and the direct or beneficial owner of the account.".

<< 31 USCA § 5318 NOTE >>

(b) REGULATORY AUTHORITY AND EFFECTIVE DATE.—

(1) REGULATORY AUTHORITY.—Not later than 180 days after the date of enactment of this Act, the Secretary, in consultation with the appropriate Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act) of the affected financial institutions, shall further delineate, by regulation, the due diligence policies, procedures, and controls required under section 5318(i)(1) of title 31, United States Code, as added by this section.

(2) EFFECTIVE DATE.—Section 5318(i) of title 31, United States Code, as added by this section, shall take effect 270 days after the date of enactment of this Act, whether or not final regulations are issued under paragraph (1), and the failure to issue such regulations shall in no way affect the enforceability of this section or the amendments made by this section. Section 5318(i) of title 31, United States Code, as added by this section, shall apply with respect to accounts covered by that section 5318(i), that are opened before, on, or after the date of enactment of this Act.

SEC. 313. PROHIBITION ON UNITED STATES CORRESPONDENT ACCOUNTS WITH FOREIGN SHELL BANKS.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(j) PROHIBITION ON UNITED STATES CORRESPONDENT ACCOUNTS WITH FOREIGN SHELL BANKS.—

"(1) IN GENERAL.—A financial institution described in subparagraphs (A) through (G) of section 5312(a)(2) (in this subsection referred to as a 'covered financial institution') shall not establish, maintain, administer, or manage a correspondent account in the United States for, or on behalf of, a foreign bank that does not have a physical presence in any country.

"(2) PREVENTION OF INDIRECT SERVICE TO FOREIGN SHELL BANKS.—A covered financial institution shall take reasonable steps to ensure that any correspondent account established, maintained, administered, or managed by that covered financial institution in the United States for a foreign bank is not being used by that foreign bank to indirectly provide banking services to another foreign bank that does not have a physical presence in any country. The Secretary of the Treasury shall, by regulation, delineate the reasonable steps necessary to comply with this paragraph.

"(3) EXCEPTION.—Paragraphs (1) and (2) do not prohibit a covered financial institution from providing a correspondent account to a foreign bank, if the foreign bank—

"(A) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and

"(B) is subject to supervision by a banking authority in the country regulating the affiliated depository institution, credit union, or foreign bank described in subparagraph (A), as applicable.

"(4) DEFINITIONS.—For purposes of this subsection—

"(A) the term 'affiliate' means a foreign bank that is controlled by or is under common control with a depository institution, credit union, or foreign bank; and

"(B) the term 'physical presence' means a place of business that—

"(i) is maintained by a foreign bank;

"(ii) is located at a fixed address (other than solely an electronic address) in a country in which the foreign bank is authorized to conduct banking activities, at which location the foreign bank—

"(I) employs 1 or more individuals on a full-time basis; and

"(II) maintains operating records related to its banking activities; and

"(iii) is subject to inspection by the banking authority which licensed the foreign bank to conduct banking activities.".

<< 31 USCA § 5318 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect at the end of the 60–day period beginning on the date of enactment of this Act.

<< 31 USCA § 5311 NOTE >>

SEC. 314. COOPERATIVE EFFORTS TO DETER MONEY LAUNDERING.

(a) COOPERATION AMONG FINANCIAL INSTITUTIONS, REGULATORY AUTHORITIES, AND LAW ENFORCEMENT AUTHORITIES.—

(1) REGULATIONS.—The Secretary shall, within 120 days after the date of enactment of this Act, adopt regulations to encourage further cooperation among financial institutions, their regulatory authorities, and law enforcement authorities, with the specific purpose of encouraging regulatory authorities and law enforcement authorities to share with financial institutions information regarding individuals, entities, and organizations engaged in or reasonably suspected based on credible evidence of engaging in terrorist acts or money laundering activities.

(2) COOPERATION AND INFORMATION SHARING PROCEDURES.—The regulations adopted under paragraph (1) may include or create procedures for cooperation and information sharing focusing on—

(A) matters specifically related to the finances of terrorist groups, the means by which terrorist groups transfer funds around the world and within the United States, including through the use of charitable organizations, nonprofit organizations, and nongovernmental organizations, and the extent to which financial institutions in the United States are unwittingly involved in such finances and the extent to which such institutions are at risk as a result;

(B) the relationship, particularly the financial relationship, between international narcotics traffickers and foreign terrorist organizations, the extent to which their memberships overlap and engage in joint activities, and the extent to which they cooperate with each other in raising and transferring funds for their respective purposes; and

(C) means of facilitating the identification of accounts and transactions involving terrorist groups and facilitating the exchange of information concerning such accounts and transactions between financial institutions and law enforcement organizations.

(3) CONTENTS.—The regulations adopted pursuant to paragraph (1) may—

(A) require that each financial institution designate 1 or more persons to receive information concerning, and to monitor accounts of individuals, entities, and organizations identified, pursuant to paragraph (1); and

(B) further establish procedures for the protection of the shared information, consistent with the capacity, size, and nature of the institution to which the particular procedures apply.

(4) RULE OF CONSTRUCTION.—The receipt of information by a financial institution pursuant to this section shall not relieve or otherwise modify the obligations of the financial institution with respect to any other person or account.

(5) USE OF INFORMATION.—Information received by a financial institution pursuant to this section shall not be used for any purpose other than identifying and reporting on activities that may involve terrorist acts or money laundering activities.

(b) COOPERATION AMONG FINANCIAL INSTITUTIONS.—Upon notice provided to the Secretary, 2 or more financial institutions and any association of financial institutions may share information with one another regarding individuals, entities, organizations, and countries suspected of possible terrorist or money laundering activities. A financial institution or association that transmits, receives, or shares such information for the purposes of identifying and reporting activities that may involve terrorist acts or money laundering activities shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision thereof, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure, or any other person identified in the disclosure, except where such transmission, receipt, or sharing violates this section or regulations promulgated pursuant to this section.

(c) RULE OF CONSTRUCTION.—Compliance with the provisions of this title requiring or allowing financial institutions and any association of financial institutions to disclose or share information regarding individuals, entities, and organizations engaged in or suspected of engaging in terrorist acts or money laundering activities shall not constitute a violation of the provisions of title V of the Gramm–Leach–Bliley Act (Public Law 106–102).

(d) REPORTS TO THE FINANCIAL SERVICES INDUSTRY ON SUSPICIOUS FINANCIAL ACTIVITIES.—At least semiannually, the Secretary shall—

(1) publish a report containing a detailed analysis identifying patterns of suspicious activity and other investigative insights derived from suspicious activity reports and investigations conducted by Federal, State, and local law enforcement agencies to the extent appropriate; and

(2) distribute such report to financial institutions (as defined in section 5312 of title 31, United States Code).

## SEC. 315. INCLUSION OF FOREIGN CORRUPTION OFFENSES AS MONEY LAUNDERING CRIMES.

Section 1956(c)(7) of title 18, United States Code, is amended—

(1) in subparagraph (B)—

<< 18 USCA § 1956 >>

(A) in clause (ii), by striking "or destruction of property by means of explosive or fire" and inserting "destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16)";

<< 18 USCA § 1956 >>

(B) in clause (iii), by striking "1978" and inserting "1978)"; and

<< 18 USCA § 1956 >>

(C) by adding at the end the following:

 "(iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

 "(v) smuggling or export control violations involving—

 "(I) an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or

 "(II) an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730–774); or

 "(vi) an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States;"; and

<< 18 USCA § 1956 >>

(2) in subparagraph (D)—

 (A) by inserting "section 541 (relating to goods falsely classified)," before "section 542";

 (B) by inserting "section 922(1) (relating to the unlawful importation of firearms), section 924(n) (relating to firearms trafficking)," before "section 956";

 (C) by inserting "section 1030 (relating to computer fraud and abuse)," before "1032"; and

 (D) by inserting "any felony violation of the Foreign Agents Registration Act of 1938," before "or any felony violation of the Foreign Corrupt Practices Act".

SEC. 316. ANTI–TERRORIST FORFEITURE PROTECTION.

<< 18 USCA § 983 NOTE >>

 (a) RIGHT TO CONTEST.—An owner of property that is confiscated under any provision of law relating to the confiscation of assets of suspected international terrorists, may contest that confiscation by filing a claim in the manner set forth in the Federal Rules of Civil Procedure (Supplemental Rules for Certain Admiralty and Maritime Claims), and asserting as an affirmative defense that—

 (1) the property is not subject to confiscation under such provision of law; or

 (2) the innocent owner provisions of section 983(d) of title 18, United States Code, apply to the case.

<< 18 USCA § 983 NOTE >>

 (b) EVIDENCE.—In considering a claim filed under this section, a court may admit evidence that is otherwise inadmissible under the Federal Rules of Evidence, if the court determines that the evidence is reliable, and that compliance with the Federal Rules of Evidence may jeopardize the national security interests of the United States.

<< 18 USCA § 983 NOTE >>

(c) CLARIFICATIONS.—

 (1) PROTECTION OF RIGHTS.—The exclusion of certain provisions of Federal law from the definition of the term "civil forfeiture statute" in section 983(i) of title 18, United States Code, shall not be construed to deny an owner of property the right to contest the confiscation of assets of suspected international terrorists under—

 (A) subsection (a) of this section;

 (B) the Constitution; or

 (C) subchapter II of chapter 5 of title 5, United States Code (commonly known as the "Administrative Procedure Act").

(2) SAVINGS CLAUSE.—Nothing in this section shall limit or otherwise affect any other remedies that may be available to an owner of property under section 983 of title 18, United States Code, or any other provision of law.

<< 18 USCA § 983 >>

(d) TECHNICAL CORRECTION.—Section 983(i)(2)(D) of title 18, United States Code, is amended by inserting "or the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. 1701 et seq.)" before the semicolon.

SEC. 317. LONG–ARM JURISDICTION OVER FOREIGN MONEY LAUNDERERS.

Section 1956(b) of title 18, United States Code, is amended—

<< 18 USCA § 1956 >>

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and moving the margins 2 ems to the right;

<< 18 USCA § 1956 >>

(2) by inserting after "(b)" the following: "PENALTIES.—
"(1) IN GENERAL.—";

<< 18 USCA § 1956 >>

(3) by inserting ", or section 1957" after "or (a)(3)"; and

<< 18 USCA § 1956 >>

(4) by adding at the end the following:
"(2) JURISDICTION OVER FOREIGN PERSONS.—For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and—
"(A) the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;
"(B) the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or
"(C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.
"(3) COURT AUTHORITY OVER ASSETS.—A court described in paragraph (2) may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.
"(4) FEDERAL RECEIVER.—
"(A) IN GENERAL.—A court described in paragraph (2) may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.
"(B) APPOINTMENT AND AUTHORITY.—A Federal Receiver described in subparagraph (A)—
"(i) may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;
"(ii) shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

"(iii) shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant—

"(I) from the Financial Crimes Enforcement Network of the Department of the Treasury; or

"(II) from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.".

<< 18 USCA § 1956 >>

## SEC. 318. LAUNDERING MONEY THROUGH A FOREIGN BANK.

Section 1956(c) of title 18, United States Code, is amended by striking paragraph (6) and inserting the following:

"(6) the term 'financial institution' includes—

"(A) any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

"(B) any foreign bank, as defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101).".

## SEC. 319. FORFEITURE OF FUNDS IN UNITED STATES INTERBANK ACCOUNTS.

<< 18 USCA § 981 >>

(a) FORFEITURE FROM UNITED STATES INTERBANK ACCOUNT.—Section 981 of title 18, United States Code, is amended by adding at the end the following:

"(k) INTERBANK ACCOUNTS.—

"(1) IN GENERAL.—

"(A) IN GENERAL.—For the purpose of a forfeiture under this section or under the Controlled Substances Act (21 U.S.C. 801 et seq.), if funds are deposited into an account at a foreign bank, and that foreign bank has an interbank account in the United States with a covered financial institution (as defined in section 5318(j)(1) of title 31), the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign bank, may be restrained, seized, or arrested.

"(B) AUTHORITY TO SUSPEND.—The Attorney General, in consultation with the Secretary of the Treasury, may suspend or terminate a forfeiture under this section if the Attorney General determines that a conflict of law exists between the laws of the jurisdiction in which the foreign bank is located and the laws of the United States with respect to liabilities arising from the restraint, seizure, or arrest of such funds, and that such suspension or termination would be in the interest of justice and would not harm the national interests of the United States.

"(2) NO REQUIREMENT FOR GOVERNMENT TO TRACE FUNDS.—If a forfeiture action is brought against funds that are restrained, seized, or arrested under paragraph (1), it shall not be necessary for the Government to establish that the funds are directly traceable to the funds that were deposited into the foreign bank, nor shall it be necessary for the Government to rely on the application of section 984.

"(3) CLAIMS BROUGHT BY OWNER OF THE FUNDS.—If a forfeiture action is instituted against funds restrained, seized, or arrested under paragraph (1), the owner of the funds deposited into the account at the foreign bank may contest the forfeiture by filing a claim under section 983.

"(4) DEFINITIONS.—For purposes of this subsection, the following definitions shall apply:

"(A) INTERBANK ACCOUNT.—The term 'interbank account' has the same meaning as in section 984(c)(2)(B).

"(B) OWNER.—

"(i) IN GENERAL.—Except as provided in clause (ii), the term 'owner'—

"(I) means the person who was the owner, as that term is defined in section 983(d)(6), of the funds that were deposited into the foreign bank at the time such funds were deposited; and

"(II) does not include either the foreign bank or any financial institution acting as an intermediary in the transfer of the funds into the interbank account.

"(ii) EXCEPTION.—The foreign bank may be considered the 'owner' of the funds (and no other person shall qualify as the owner of such funds) only if—

"(I) the basis for the forfeiture action is wrongdoing committed by the foreign bank; or

"(II) the foreign bank establishes, by a preponderance of the evidence, that prior to the restraint, seizure, or arrest of the funds, the foreign bank had discharged all or part of its obligation to the prior owner of the funds, in which case the foreign bank shall be deemed the owner of the funds to the extent of such discharged obligation.".

<< 31 USCA § 5318 >>

 (b) BANK RECORDS.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(k) BANK RECORDS RELATED TO ANTI–MONEY LAUNDERING PROGRAMS.—

"(1) DEFINITIONS.—For purposes of this subsection, the following definitions shall apply:

"(A) APPROPRIATE FEDERAL BANKING AGENCY.—The term 'appropriate Federal banking agency' has the same meaning as in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813).

"(B) INCORPORATED TERM.—The term 'correspondent account' has the same meaning as in section 5318A(f)(1)(B).

"(2) 120–HOUR RULE.—Not later than 120 hours after receiving a request by an appropriate Federal banking agency for information related to anti-money laundering compliance by a covered financial institution or a customer of such institution, a covered financial institution shall provide to the appropriate Federal banking agency, or make available at a location specified by the representative of the appropriate Federal banking agency, information and account documentation for any account opened, maintained, administered or managed in the United States by the covered financial institution.

"(3) FOREIGN BANK RECORDS.—

"(A) SUMMONS OR SUBPOENA OF RECORDS.—

"(i) IN GENERAL.—The Secretary of the Treasury or the Attorney General may issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank.

"(ii) SERVICE OF SUMMONS OR SUBPOENA.—A summons or subpoena referred to in clause (i) may be served on the foreign bank in the United States if the foreign bank has a representative in the United States, or in a foreign country pursuant to any mutual legal assistance treaty, multilateral agreement, or other request for international law enforcement assistance.

"(B) ACCEPTANCE OF SERVICE.—

"(i) MAINTAINING RECORDS IN THE UNITED STATES.—Any covered financial institution which maintains a correspondent account in the United States for a foreign bank shall maintain records in the United States identifying the owners of such foreign bank and the name and address of a person who resides in the United States and is authorized to accept service of legal process for records regarding the correspondent account.

"(ii) LAW ENFORCEMENT REQUEST.—Upon receipt of a written request from a Federal law enforcement officer for information required to be maintained under this paragraph, the covered financial institution shall provide the information to the requesting officer not later than 7 days after receipt of the request.

"(C) TERMINATION OF CORRESPONDENT RELATIONSHIP.—

"(i) TERMINATION UPON RECEIPT OF NOTICE.—A covered financial institution shall terminate any correspondent relationship with a foreign bank not later than 10 business days after receipt of written notice from the Secretary or the Attorney General (in each case, after consultation with the other) that the foreign bank has failed—

"(I) to comply with a summons or subpoena issued under subparagraph (A); or

"(II) to initiate proceedings in a United States court contesting such summons or subpoena.

"(ii) LIMITATION ON LIABILITY.—A covered financial institution shall not be liable to any person in any court or arbitration proceeding for terminating a correspondent relationship in accordance with this subsection.

"(iii) FAILURE TO TERMINATE RELATIONSHIP.—Failure to terminate a correspondent relationship in accordance with this subsection shall render the covered financial institution liable for a civil penalty of up to $10,000 per day until the correspondent relationship is so terminated.".

<< 31 USCA § 5318 NOTE >>

(c) GRACE PERIOD.—Financial institutions shall have 60 days from the date of enactment of this Act to comply with the provisions of section 5318(k) of title 31, United States Code, as added by this section.

(d) AUTHORITY TO ORDER CONVICTED CRIMINAL TO RETURN PROPERTY LOCATED ABROAD.—

<< 21 USCA § 853 >>

(1) FORFEITURE OF SUBSTITUTE PROPERTY.—Section 413(p) of the Controlled Substances Act (21 U.S.C. 853) is amended to read as follows:

"(p) FORFEITURE OF SUBSTITUTE PROPERTY.—

"(1) IN GENERAL.—Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant—

"(A) cannot be located upon the exercise of due diligence;

"(B) has been transferred or sold to, or deposited with, a third party;

"(C) has been placed beyond the jurisdiction of the court;

"(D) has been substantially diminished in value; or

"(E) has been commingled with other property which cannot be divided without difficulty.

"(2) SUBSTITUTE PROPERTY.—In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

"(3) RETURN OF PROPERTY TO JURISDICTION.—In the case of property described in paragraph (1)(C), the court may, in addition to any other action authorized by this subsection, order the defendant to return the property to the jurisdiction of the court so that the property may be seized and forfeited.".

<< 21 USCA § 853 >>

(2) PROTECTIVE ORDERS.—Section 413(e) of the Controlled Substances Act (21 U.S.C. 853(e)) is amended by adding at the end the following:

"(4) ORDER TO REPATRIATE AND DEPOSIT.—

"(A) IN GENERAL.—Pursuant to its authority to enter a pretrial restraining order under this section, the court may order a defendant to repatriate any property that may be seized and forfeited, and to deposit that property pending trial in the registry of the court, or with the United States Marshals Service or the Secretary of the Treasury, in an interest-bearing account, if appropriate.

"(B) FAILURE TO COMPLY.—Failure to comply with an order under this subsection, or an order to repatriate property under subsection (p), shall be punishable as a civil or criminal contempt of court, and may also result in an enhancement of the sentence of the defendant under the obstruction of justice provision of the Federal Sentencing Guidelines.".

<< 18 USCA § 981 >>

SEC. 320. PROCEEDS OF FOREIGN CRIMES.

Section 981(a)(1)(B) of title 18, United States Code, is amended to read as follows:

"(B) Any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense—

"(i) involves the manufacture, importation, sale, or distribution of a controlled substance (as that term is defined for purposes of the Controlled Substances Act), or any other conduct described in section 1956(c)(7)(B);

"(ii) would be punishable within the jurisdiction of the foreign nation by death or imprisonment for a term exceeding 1 year; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) would be punishable under the laws of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.".

## SEC. 321. FINANCIAL INSTITUTIONS SPECIFIED IN SUBCHAPTER II OF CHAPTER 53 OF TITLE 31, UNITED STATES CODE.

<< 31 USCA § 5312 >>

(a) CREDIT UNIONS.—Subparagraph (E) of section 5312(2) of title 31, United States Code, is amended to read as follows:
"(E) any credit union;".

<< 31 USCA § 5312 >>

(b) FUTURES COMMISSION MERCHANT; COMMODITY TRADING ADVISOR; COMMODITY POOL OPERATOR. —Section 5312 of title 31, United States Code, is amended by adding at the end the following new subsection:
"(c) ADDITIONAL DEFINITIONS.—For purposes of this subchapter, the following definitions shall apply:
"(1) CERTAIN INSTITUTIONS INCLUDED IN DEFINITION.—The term 'financial institution' (as defined in subsection (a)) includes the following:
"(A) Any futures commission merchant, commodity trading advisor, or commodity pool operator registered, or required to register, under the Commodity Exchange Act.".

<< 31 USCA § 5318 NOTE >>

(c) CFTC INCLUDED.—For purposes of this Act and any amendment made by this Act to any other provision of law, the term "Federal functional regulator" includes the Commodity Futures Trading Commission.

<< 28 USCA § 2466 >>

## SEC. 322. CORPORATION REPRESENTED BY A FUGITIVE.

Section 2466 of title 18, United States Code, is amended by designating the present matter as subsection (a), and adding at the end the following:
"(b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.".

## SEC. 323. ENFORCEMENT OF FOREIGN JUDGMENTS.

Section 2467 of title 28, United States Code, is amended—

<< 28 USCA § 2467 >>

(1) in subsection (d), by adding the following after paragraph (2):
"(3) PRESERVATION OF PROPERTY.—
"(A) IN GENERAL.—To preserve the availability of property subject to a foreign forfeiture or confiscation judgment, the Government may apply for, and the court may issue, a restraining order pursuant to section 983(j) of title 18, at any time before or after an application is filed pursuant to subsection (c)(1) of this section.
"(B) EVIDENCE.—The court, in issuing a restraining order under subparagraph (A)—
"(i) may rely on information set forth in an affidavit describing the nature of the proceeding or investigation underway in the foreign country, and setting forth a reasonable basis to believe that the property to be restrained will be named in a judgment of forfeiture at the conclusion of such proceeding; or
"(ii) may register and enforce a restraining order that has been issued by a court of competent jurisdiction in the foreign country and certified by the Attorney General pursuant to subsection (b)(2).

"(C) LIMIT ON GROUNDS FOR OBJECTION.—No person may object to a restraining order under subparagraph (A) on any ground that is the subject of parallel litigation involving the same property that is pending in a foreign court.";

<< 28 USCA § 2467 >>

(2) in subsection (b)(1)(C), by striking "establishing that the defendant received notice of the proceedings in sufficient time to enable the defendant" and inserting "establishing that the foreign nation took steps, in accordance with the principles of due process, to give notice of the proceedings to all persons with an interest in the property in sufficient time to enable such persons";

<< 28 USCA § 2467 >>

(3) in subsection (d)(1)(D), by striking "the defendant in the proceedings in the foreign court did not receive notice" and inserting "the foreign nation did not take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property"; and

<< 28 USCA § 2467 >>

(4) in subsection (a)(2)(A), by inserting ", any violation of foreign law that would constitute a violation or an offense for which property could be forfeited under Federal law if the offense were committed in the United States" after "United Nations Convention".

<< 31 USCA § 5311 NOTE >>

## SEC. 324. REPORT AND RECOMMENDATION.

Not later than 30 months after the date of enactment of this Act, the Secretary, in consultation with the Attorney General, the Federal banking agencies (as defined at section 3 of the Federal Deposit Insurance Act), the National Credit Union Administration Board, the Securities and Exchange Commission, and such other agencies as the Secretary may determine, at the discretion of the Secretary, shall evaluate the operations of the provisions of this subtitle and make recommendations to Congress as to any legislative action with respect to this subtitle as the Secretary may determine to be necessary or advisable.

<< 31 USCA § 5318 >>

## SEC. 325. CONCENTRATION ACCOUNTS AT FINANCIAL INSTITUTIONS.

Section 5318(h) of title 31, United States Code, as amended by section 202 of this title, is amended by adding at the end the following:

"(3) CONCENTRATION ACCOUNTS.—The Secretary may prescribe regulations under this subsection that govern maintenance of concentration accounts by financial institutions, in order to ensure that such accounts are not used to prevent association of the identity of an individual customer with the movement of funds of which the customer is the direct or beneficial owner, which regulations shall, at a minimum—

"(A) prohibit financial institutions from allowing clients to direct transactions that move their funds into, out of, or through the concentration accounts of the financial institution;

"(B) prohibit financial institutions and their employees from informing customers of the existence of, or the means of identifying, the concentration accounts of the institution; and

"(C) require each financial institution to establish written procedures governing the documentation of all transactions involving a concentration account, which procedures shall ensure that, any time a transaction involving a concentration account commingles funds belonging to 1 or more customers, the identity of, and specific amount belonging to, each customer is documented.".

## SEC. 326. VERIFICATION OF IDENTIFICATION.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(l) IDENTIFICATION AND VERIFICATION OF ACCOUNTHOLDERS.—

"(1) IN GENERAL.—Subject to the requirements of this subsection, the Secretary of the Treasury shall prescribe regulations setting forth the minimum standards for financial institutions and their customers regarding the identity of the customer that shall apply in connection with the opening of an account at a financial institution.

"(2) MINIMUM REQUIREMENTS.—The regulations shall, at a minimum, require financial institutions to implement, and customers (after being given adequate notice) to comply with, reasonable procedures for—

"(A) verifying the identity of any person seeking to open an account to the extent reasonable and practicable;

"(B) maintaining records of the information used to verify a person's identity, including name, address, and other identifying information; and

"(C) consulting lists of known or suspected terrorists or terrorist organizations provided to the financial institution by any government agency to determine whether a person seeking to open an account appears on any such list.

"(3) FACTORS TO BE CONSIDERED.—In prescribing regulations under this subsection, the Secretary shall take into consideration the various types of accounts maintained by various types of financial institutions, the various methods of opening accounts, and the various types of identifying information available.

"(4) CERTAIN FINANCIAL INSTITUTIONS.—In the case of any financial institution the business of which is engaging in financial activities described in section 4(k) of the Bank Holding Company Act of 1956 (including financial activities subject to the jurisdiction of the Commodity Futures Trading Commission), the regulations prescribed by the Secretary under paragraph (1) shall be prescribed jointly with each Federal functional regulator (as defined in section 509 of the Gramm–Leach–Bliley Act, including the Commodity Futures Trading Commission) appropriate for such financial institution.

"(5) EXEMPTIONS.—The Secretary (and, in the case of any financial institution described in paragraph (4), any Federal agency described in such paragraph) may, by regulation or order, exempt any financial institution or type of account from the requirements of any regulation prescribed under this subsection in accordance with such standards and procedures as the Secretary may prescribe.

"(6) EFFECTIVE DATE.—Final regulations prescribed under this subsection shall take effect before the end of the 1–year period beginning on the date of enactment of the International Money Laundering Abatement and Financial Anti–Terrorism Act of 2001.".

(b) STUDY AND REPORT REQUIRED.—Within 6 months after the date of enactment of this Act, the Secretary, in consultation with the Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act) and other appropriate Government agencies, shall submit a report to the Congress containing recommendations for—

(1) determining the most timely and effective way to require foreign nationals to provide domestic financial institutions and agencies with appropriate and accurate information, comparable to that which is required of United States nationals, concerning the identity, address, and other related information about such foreign nationals necessary to enable such institutions and agencies to comply with the requirements of this section;

(2) requiring foreign nationals to apply for and obtain, before opening an account with a domestic financial institution, an identification number which would function similarly to a Social Security number or tax identification number; and

(3) establishing a system for domestic financial institutions and agencies to review information maintained by relevant Government agencies for purposes of verifying the identities of foreign nationals seeking to open accounts at those institutions and agencies.

SEC. 327. CONSIDERATION OF ANTI–MONEY LAUNDERING RECORD.

(a) BANK HOLDING COMPANY ACT OF 1956.—

<< 12 USCA § 1842 >>

(1) IN GENERAL.—Section 3(c) of the Bank Holding Company Act of 1956 (12 U.S.C. 1842(c)) is amended by adding at the end the following new paragraph:

"(6) MONEY LAUNDERING.—In every case, the Board shall take into consideration the effectiveness of the company or companies in combatting money laundering activities, including in overseas branches.".

<< 12 USCA § 1842 NOTE >>

(2) SCOPE OF APPLICATION.—The amendment made by paragraph (1) shall apply with respect to any application submitted to the Board of Governors of the Federal Reserve System under section 3 of the Bank Holding Company Act of 1956 after December 31, 2001, which has not been approved by the Board before the date of enactment of this Act.

(b) MERGERS SUBJECT TO REVIEW UNDER FEDERAL DEPOSIT INSURANCE ACT.—

(1) IN GENERAL.—Section 18(c) of the Federal Deposit Insurance Act (12 U. S.C. 1828(c)) is amended—

<< 12 USCA § 1828 >>

(A) by redesignating paragraph (11) as paragraph (12); and

<< 12 USCA § 1828 >>

(B) by inserting after paragraph (10), the following new paragraph:

"(11) MONEY LAUNDERING.—In every case, the responsible agency, shall take into consideration the effectiveness of any insured depository institution involved in the proposed merger transaction in combatting money laundering activities, including in overseas branches.".

<< 12 USCA § 1828 NOTE >>

(2) SCOPE OF APPLICATION.—The amendment made by paragraph (1) shall apply with respect to any application submitted to the responsible agency under section 18(c) of the Federal Deposit Insurance Act after December 31, 2001, which has not been approved by all appropriate responsible agencies before the date of enactment of this Act.

<< 31 USCA § 5311 NOTE >>

SEC. 328. INTERNATIONAL COOPERATION ON IDENTIFICATION OF ORIGINATORS OF WIRE TRANSFERS.

The Secretary shall—

(1) in consultation with the Attorney General and the Secretary of State, take all reasonable steps to encourage foreign governments to require the inclusion of the name of the originator in wire transfer instructions sent to the United States and other countries, with the information to remain with the transfer from its origination until the point of disbursement; and

(2) report annually to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate on—

(A) progress toward the goal enumerated in paragraph (1), as well as impediments to implementation and an estimated compliance rate; and

(B) impediments to instituting a regime in which all appropriate identification, as defined by the Secretary, about wire transfer recipients shall be included with wire transfers from their point of origination until disbursement.

<< 31 USCA § 5311 NOTE >>

SEC. 329. CRIMINAL PENALTIES.

Any person who is an official or employee of any department, agency, bureau, office, commission, or other entity of the Federal Government, and any other person who is acting for or on behalf of any such entity, who, directly or indirectly, in connection with the administration of this title, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for—

(1) being influenced in the performance of any official act;

(2) being influenced to commit or aid in the committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) being induced to do or omit to do any act in violation of the official duty of such official or person,

shall be fined in an amount not more than 3 times the monetary equivalent of the thing of value, or imprisoned for not more than 15 years, or both. A violation of this section shall be subject to chapter 227 of title 18, United States Code, and the provisions of the United States Sentencing Guidelines.

## SEC. 330. INTERNATIONAL COOPERATION IN INVESTIGATIONS OF MONEY LAUNDERING, FINANCIAL CRIMES, AND THE FINANCES OF TERRORIST GROUPS.

(a) NEGOTIATIONS.—It is the sense of the Congress that the President should direct the Secretary of State, the Attorney General, or the Secretary of the Treasury, as appropriate, and in consultation with the Board of Governors of the Federal Reserve System, to seek to enter into negotiations with the appropriate financial supervisory agencies and other officials of any foreign country the financial institutions of which do business with United States financial institutions or which may be utilized by any foreign terrorist organization (as designated under section 219 of the Immigration and Nationality Act), any person who is a member or representative of any such organization, or any person engaged in money laundering or financial or other crimes.

(b) PURPOSES OF NEGOTIATIONS.—It is the sense of the Congress that, in carrying out any negotiations described in paragraph (1), the President should direct the Secretary of State, the Attorney General, or the Secretary of the Treasury, as appropriate, to seek to enter into and further cooperative efforts, voluntary information exchanges, the use of letters rogatory, mutual legal assistance treaties, and international agreements to—

(1) ensure that foreign banks and other financial institutions maintain adequate records of transaction and account information relating to any foreign terrorist organization (as designated under section 219 of the Immigration and Nationality Act), any person who is a member or representative of any such organization, or any person engaged in money laundering or financial or other crimes; and

(2) establish a mechanism whereby such records may be made available to United States law enforcement officials and domestic financial institution supervisors, when appropriate.

Subtitle B—Bank Secrecy Act Amendments and Related Improvements

## SEC. 351. AMENDMENTS RELATING TO REPORTING OF SUSPICIOUS ACTIVITIES.

<< 31 USCA § 5318 >>

(a) AMENDMENT RELATING TO CIVIL LIABILITY IMMUNITY FOR DISCLOSURES.—Section 5318(g)(3) of title 31, United States Code, is amended to read as follows:

"(3) LIABILITY FOR DISCLOSURES.—

"(A) IN GENERAL.—Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

"(B) RULE OF CONSTRUCTION.—Subparagraph (A) shall not be construed as creating—

"(i) any inference that the term 'person', as used in such subparagraph, may be construed more broadly than its ordinary usage so as to include any government or agency of government; or

"(ii) any immunity against, or otherwise affecting, any civil or criminal action brought by any government or agency of government to enforce any constitution, law, or regulation of such government or agency.".

<< 31 USCA § 5318 >>

(b) PROHIBITION ON NOTIFICATION OF DISCLOSURES.—Section 5318(g)(2) of title 31, United States Code, is amended to read as follows:

"(2) NOTIFICATION PROHIBITED.—

"(A) IN GENERAL.—If a financial institution or any director, officer, employee, or agent of any financial institution, voluntarily or pursuant to this section or any other authority, reports a suspicious transaction to a government agency—

"(i) the financial institution, director, officer, employee, or agent may not notify any person involved in the transaction that the transaction has been reported; and

"(ii) no officer or employee of the Federal Government or of any State, local, tribal, or territorial government within the United States, who has any knowledge that such report was made may disclose to any person involved in the transaction that the transaction has been reported, other than as necessary to fulfill the official duties of such officer or employee.

"(B) DISCLOSURES IN CERTAIN EMPLOYMENT REFERENCES.—

"(i) RULE OF CONSTRUCTION.—Notwithstanding the application of subparagraph (A) in any other context, subparagraph (A) shall not be construed as prohibiting any financial institution, or any director, officer, employee, or agent of such institution, from including information that was included in a report to which subparagraph (A) applies—

"(I) in a written employment reference that is provided in accordance with section 18(w) of the Federal Deposit Insurance Act in response to a request from another financial institution; or

"(II) in a written termination notice or employment reference that is provided in accordance with the rules of a self-regulatory organization registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission,

except that such written reference or notice may not disclose that such information was also included in any such report, or that such report was made.

"(ii) INFORMATION NOT REQUIRED.—Clause (i) shall not be construed, by itself, to create any affirmative duty to include any information described in clause (i) in any employment reference or termination notice referred to in clause (i).".

SEC. 352. ANTI–MONEY LAUNDERING PROGRAMS.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318(h) of title 31, United States Code, is amended to read as follows:

"(h) ANTI–MONEY LAUNDERING PROGRAMS.—

"(1) IN GENERAL.—In order to guard against money laundering through financial institutions, each financial institution shall establish anti-money laundering programs, including, at a minimum—

"(A) the development of internal policies, procedures, and controls;

"(B) the designation of a compliance officer;

"(C) an ongoing employee training program; and

"(D) an independent audit function to test programs.

"(2) REGULATIONS.—The Secretary of the Treasury, after consultation with the appropriate Federal functional regulator (as defined in section 509 of the Gramm–Leach–Bliley Act), may prescribe minimum standards for programs established under paragraph (1), and may exempt from the application of those standards any financial institution that is not subject to the provisions of the rules contained in part 103 of title 31, of the Code of Federal Regulations, or any successor rule thereto, for so long as such financial institution is not subject to the provisions of such rules.".

<< 31 USCA § 5318 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect at the end of the 180–day period beginning on the date of enactment of this Act.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 31 USCA § 5318 NOTE >>

(c) DATE OF APPLICATION OF REGULATIONS; FACTORS TO BE TAKEN INTO ACCOUNT.—Before the end of the 180–day period beginning on the date of enactment of this Act, the Secretary shall prescribe regulations that consider the extent to which the requirements imposed under this section are commensurate with the size, location, and activities of the financial institutions to which such regulations apply.

SEC. 353. PENALTIES FOR VIOLATIONS OF GEOGRAPHIC TARGETING ORDERS AND CERTAIN RECORDKEEPING REQUIREMENTS, AND LENGTHENING EFFECTIVE PERIOD OF GEOGRAPHIC TARGETING ORDERS.

<< 31 USCA § 5321 >>

(a) CIVIL PENALTY FOR VIOLATION OF TARGETING ORDER.—Section 5321(a)(1) of title 31, United States Code, is amended—

(1) by inserting "or order issued" after "subchapter or a regulation prescribed"; and

(2) by inserting ", or willfully violating a regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "sections 5314 and 5315)".

<< 31 USCA § 5322 >>

(b) CRIMINAL PENALTIES FOR VIOLATION OF TARGETING ORDER.—Section 5322 of title 31, United States Code, is amended—

(1) in subsection (a)—

(A) by inserting "or order issued" after "willfully violating this subchapter or a regulation prescribed"; and

(B) by inserting ", or willfully violating a regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "under section 5315 or 5324)"; and

<< 31 USCA § 5322 >>

(2) in subsection (b)—

(A) by inserting "or order issued" after "willfully violating this subchapter or a regulation prescribed"; and

(B) by inserting "or willfully violating a regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "under section 5315 or 5324),".

(c) STRUCTURING TRANSACTIONS TO EVADE TARGETING ORDER OR CERTAIN RECORDKEEPING REQUIREMENTS.—Section 5324(a) of title 31, United States Code, is amended—

<< 31 USCA § 5324 >>

(1) by inserting a comma after "shall";

<< 31 USCA § 5324 >>

(2) by striking "section—" and inserting "section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508—";

<< 31 USCA § 5324 >>

(3) in paragraph (1), by inserting ", to file a report or to maintain a record required by an order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508" after "regulation prescribed under any such section"; and

<< 31 USCA § 5324 >>

(4) in paragraph (2), by inserting ", to file a report or to maintain a record required by any order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "regulation prescribed under any such section".

<< 31 USCA § 5326 >>

(d) LENGTHENING EFFECTIVE PERIOD OF GEOGRAPHIC TARGETING ORDERS.—Section 5326(d) of title 31, United States Code, is amended by striking "more than 60" and inserting "more than 180".

<< 31 USCA § 5341 >>

SEC. 354. ANTI–MONEY LAUNDERING STRATEGY.

Section 5341(b) of title 31, United States Code, is amended by adding at the end the following:
 "(12) DATA REGARDING FUNDING OF TERRORISM.—Data concerning money laundering efforts related to the funding of acts of international terrorism, and efforts directed at the prevention, detection, and prosecution of such funding.".

<< 12 USCA § 1828 >>

SEC. 355. AUTHORIZATION TO INCLUDE SUSPICIONS OF ILLEGAL ACTIVITY IN WRITTEN EMPLOYMENT REFERENCES.

Section 18 of the Federal Deposit Insurance Act (12 U.S.C. 1828) is amended by adding at the end the following:
 "(w) WRITTEN EMPLOYMENT REFERENCES MAY CONTAIN SUSPICIONS OF INVOLVEMENT IN ILLEGAL ACTIVITY.—
 "(1) AUTHORITY TO DISCLOSE INFORMATION.—Notwithstanding any other provision of law, any insured depository institution, and any director, officer, employee, or agent of such institution, may disclose in any written employment reference relating to a current or former institution-affiliated party of such institution which is provided to another insured depository institution in response to a request from such other institution, information concerning the possible involvement of such institution-affiliated party in potentially unlawful activity.
 "(2) INFORMATION NOT REQUIRED.—Nothing in paragraph (1) shall be construed, by itself, to create any affirmative duty to include any information described in paragraph (1) in any employment reference referred to in paragraph (1).
 "(3) MALICIOUS INTENT.—Notwithstanding any other provision of this subsection, voluntary disclosure made by an insured depository institution, and any director, officer, employee, or agent of such institution under this subsection concerning potentially unlawful activity that is made with malicious intent, shall not be shielded from liability from the person identified in the disclosure.
 "(4) DEFINITION.—For purposes of this subsection, the term 'insured depository institution' includes any uninsured branch or agency of a foreign bank.".

SEC. 356. REPORTING OF SUSPICIOUS ACTIVITIES BY SECURITIES BROKERS AND DEALERS; INVESTMENT COMPANY STUDY.

<< 31 USCA § 5318 NOTE >>

(a) DEADLINE FOR SUSPICIOUS ACTIVITY REPORTING REQUIREMENTS FOR REGISTERED BROKERS AND DEALERS.—The Secretary, after consultation with the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System, shall publish proposed regulations in the Federal Register before January 1, 2002, requiring brokers and dealers registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 to

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

submit suspicious activity reports under section 5318(g) of title 31, United States Code. Such regulations shall be published in final form not later than July 1, 2002.

<< 31 USCA § 5318 NOTE >>

(b) SUSPICIOUS ACTIVITY REPORTING REQUIREMENTS FOR FUTURES COMMISSION MERCHANTS, COMMODITY TRADING ADVISORS, AND COMMODITY POOL OPERATORS.—The Secretary, in consultation with the Commodity Futures Trading Commission, may prescribe regulations requiring futures commission merchants, commodity trading advisors, and commodity pool operators registered under the Commodity Exchange Act to submit suspicious activity reports under section 5318(g) of title 31, United States Code.

(c) REPORT ON INVESTMENT COMPANIES.—

(1) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary, the Board of Governors of the Federal Reserve System, and the Securities and Exchange Commission shall jointly submit a report to the Congress on recommendations for effective regulations to apply the requirements of subchapter II of chapter 53 of title 31, United States Code, to investment companies pursuant to section 5312(a)(2)(I) of title 31, United States Code.

(2) DEFINITION.—For purposes of this subsection, the term "investment company"—

(A) has the same meaning as in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a–3); and

(B) includes any person that, but for the exceptions provided for in paragraph (1) or (7) of section 3(c) of the Investment Company Act of 1940 (15 U.S.C. 80a–3(c)), would be an investment company.

(3) ADDITIONAL RECOMMENDATIONS.—The report required by paragraph (1) may make different recommendations for different types of entities covered by this subsection.

(4) BENEFICIAL OWNERSHIP OF PERSONAL HOLDING COMPANIES.—The report described in paragraph (1) shall also include recommendations as to whether the Secretary should promulgate regulations to treat any corporation or business or other grantor trust whose assets are predominantly securities, bank certificates of deposit, or other securities or investment instruments (other than such as relate to operating subsidiaries of such corporation or trust) and that has 5 or fewer common shareholders or holders of beneficial or other equity interest, as a financial institution within the meaning of that phrase in section 5312(a)(2)(I) and whether to require such corporations or trusts to disclose their beneficial owners when opening accounts or initiating funds transfers at any domestic financial institution.

SEC. 357. SPECIAL REPORT ON ADMINISTRATION OF BANK SECRECY PROVISIONS.

(a) REPORT REQUIRED.—Not later than 6 months after the date of enactment of this Act, the Secretary shall submit a report to the Congress relating to the role of the Internal Revenue Service in the administration of subchapter II of chapter 53 of title 31, United States Code (commonly known as the "Bank Secrecy Act").

(b) CONTENTS.—The report required by subsection (a)—

(1) shall specifically address, and contain recommendations concerning—

(A) whether it is advisable to shift the processing of information reporting to the Department of the Treasury under the Bank Secrecy Act provisions to facilities other than those managed by the Internal Revenue Service; and

(B) whether it remains reasonable and efficient, in light of the objective of both anti-money-laundering programs and Federal tax administration, for the Internal Revenue Service to retain authority and responsibility for audit and examination of the compliance of money services businesses and gaming institutions with those Bank Secrecy Act provisions; and

(2) shall, if the Secretary determines that the information processing responsibility or the audit and examination responsibility of the Internal Revenue Service, or both, with respect to those Bank Secrecy Act provisions should be transferred to other agencies, include the specific recommendations of the Secretary regarding the agency or agencies to which any such function should be transferred, complete with a budgetary and resources plan for expeditiously accomplishing the transfer.

SEC. 358. BANK SECRECY PROVISIONS AND ACTIVITIES OF UNITED STATES INTELLIGENCE AGENCIES TO FIGHT INTERNATIONAL TERRORISM.

<< 31 USCA § 5311 >>

(a) AMENDMENT RELATING TO THE PURPOSES OF CHAPTER 53 OF TITLE 31, UNITED STATES CODE.—Section 5311 of title 31, United States Code, is amended by inserting before the period at the end the following: ", or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism".

<< 31 USCA § 5318 >>

(b) AMENDMENT RELATING TO REPORTING OF SUSPICIOUS ACTIVITIES.—Section 5318(g)(4)(B) of title 31, United States Code, is amended by striking "or supervisory agency" and inserting ", supervisory agency, or United States intelligence agency for use in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism".

<< 31 USCA § 5319 >>

(c) AMENDMENT RELATING TO AVAILABILITY OF REPORTS.—Section 5319 of title 31, United States Code, is amended to read as follows:

"§ 5319. Availability of reports
 "The Secretary of the Treasury shall make information in a report filed under this subchapter available to an agency, including any State financial institutions supervisory agency, United States intelligence agency or self-regulatory organization registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission, upon request of the head of the agency or organization. The report shall be available for a purpose that is consistent with this subchapter. The Secretary may only require reports on the use of such information by any State financial institutions supervisory agency for other than supervisory purposes or by United States intelligence agencies. However, a report and records of reports are exempt from disclosure under section 552 of title 5.".

<< 12 USCA § 1829b >>

(d) AMENDMENT RELATING TO THE PURPOSES OF THE BANK SECRECY ACT PROVISIONS.—Section 21(a) of the Federal Deposit Insurance Act (12 U.S.C. 1829b(a)) is amended to read as follows:
"(a) CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSE.—
 "(1) FINDINGS.—Congress finds that—
  "(A) adequate records maintained by insured depository institutions have a high degree of usefulness in criminal, tax, and regulatory investigations or proceedings, and that, given the threat posed to the security of the Nation on and after the terrorist attacks against the United States on September 11, 2001, such records may also have a high degree of usefulness in the conduct of intelligence or counterintelligence activities, including analysis, to protect against domestic and international terrorism; and
  "(B) microfilm or other reproductions and other records made by insured depository institutions of checks, as well as records kept by such institutions, of the identity of persons maintaining or authorized to act with respect to accounts therein, have been of particular value in proceedings described in subparagraph (A).
 "(2) PURPOSE.—It is the purpose of this section to require the maintenance of appropriate types of records by insured depository institutions in the United States where such records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, recognizes that, given the threat posed to the security of the Nation on and after the terrorist attacks against the United States on September 11, 2001, such records may also have a high degree of usefulness in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism.".

<< 12 USCA § 1953 >>

(e) AMENDMENT RELATING TO THE PURPOSES OF THE BANK SECRECY ACT.—Section 123(a) of Public Law 91–508 (12 U.S.C. 1953(a)) is amended to read as follows:
 "(a) REGULATIONS.—If the Secretary determines that the maintenance of appropriate records and procedures by any uninsured bank or uninsured institution, or any person engaging in the business of carrying on in the United States any of the functions referred to in subsection (b), has a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, and that, given the threat posed to the security of the Nation on and after the terrorist attacks against the United

States on September 11, 2001, such records may also have a high degree of usefulness in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism, he may by regulation require such bank, institution, or person.".

 (f) AMENDMENTS TO THE RIGHT TO FINANCIAL PRIVACY ACT.—The Right to Financial Privacy Act of 1978 is amended—

<< 12 USCA § 3412 >>

 (1) in section 1112(a) (12 U.S.C. 3412(a)), by inserting ", or intelligence or counterintelligence activity, investigation or analysis related to international terrorism" after "legitimate law enforcement inquiry";
 (2) in section 1114(a)(1) (12 U.S.C. 3414(a)(1))—

<< 12 USCA § 3414 >>

 (A) in subparagraph (A), by striking "or" at the end;

<< 12 USCA § 3414 >>

 (B) in subparagraph (B), by striking the period at the end and inserting "; or"; and

<< 12 USCA § 3414 >>

 (C) by adding at the end the following:
 "(C) a Government authority authorized to conduct investigations of, or intelligence or counterintelligence analyses related to, international terrorism for the purpose of conducting such investigations or analyses."; and

<< 12 USCA § 3420 >>

 (3) in section 1120(a)(2) (12 U.S.C. 3420(a)(2)), by inserting ", or for a purpose authorized by section 1112(a)" before the semicolon at the end.
 (g) AMENDMENT TO THE FAIR CREDIT REPORTING ACT.—

<< 15 USCA § 1681u >>

 (1) IN GENERAL.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—
 (A) by redesignating the second of the 2 sections designated as section 624 (15 U.S.C. 1681u) (relating to disclosure to FBI for counterintelligence purposes) as section 625; and

<< 15 USCA § 1681v >>

 (B) by adding at the end the following new section:

"§ 626. Disclosures to governmental agencies for counterterrorism purposes
 "(a) DISCLOSURE.—Notwithstanding section 604 or any other provision of this title, a consumer reporting agency shall furnish a consumer report of a consumer and all other information in a consumer's file to a government agency authorized to conduct investigations of, or intelligence or counterintelligence activities or analysis related to, international terrorism when presented with a written certification by such government agency that such information is necessary for the agency's conduct or such investigation, activity or analysis.
 "(b) FORM OF CERTIFICATION.—The certification described in subsection (a) shall be signed by a supervisory official designated by the head of a Federal agency or an officer of a Federal agency whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate.

"(c) CONFIDENTIALITY.—No consumer reporting agency, or officer, employee, or agent of such consumer reporting agency, shall disclose to any person, or specify in any consumer report, that a government agency has sought or obtained access to information under subsection (a).

"(d) RULE OF CONSTRUCTION.—Nothing in section 625 shall be construed to limit the authority of the Director of the Federal Bureau of Investigation under this section.

"(e) SAFE HARBOR.—Notwithstanding any other provision of this title, any consumer reporting agency or agent or employee thereof making disclosure of consumer reports or other information pursuant to this section in good-faith reliance upon a certification of a governmental agency pursuant to the provisions of this section shall not be liable to any person for such disclosure under this subchapter, the constitution of any State, or any law or regulation of any State or any political subdivision of any State.".

(2) CLERICAL AMENDMENTS.—The table of sections for the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

(A) by redesignating the second of the 2 items designated as section 624 as section 625; and

(B) by inserting after the item relating to section 625 (as so redesignated) the following new item:

"626. Disclosures to governmental agencies for counterterrorism purposes. ".

<< 12 USCA § 1829b NOTE >>

(h) APPLICATION OF AMENDMENTS.—The amendments made by this section shall apply with respect to reports filed or records maintained on, before, or after the date of enactment of this Act.

SEC. 359. REPORTING OF SUSPICIOUS ACTIVITIES BY UNDERGROUND BANKING SYSTEMS.

<< 31 USCA § 5312 >>

(a) DEFINITION FOR SUBCHAPTER.—Section 5312(a)(2)(R) of title 31, United States Code, is amended to read as follows:

"(R) a licensed sender of money or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;".

<< 31 USCA § 5330 >>

(b) MONEY TRANSMITTING BUSINESS.—Section 5330(d)(1)(A) of title 31, United States Code, is amended by inserting before the semicolon the following: "or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;".

<< 31 USCA § 5318 >>

(c) APPLICABILITY OF RULES.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(l) APPLICABILITY OF RULES.—Any rules promulgated pursuant to the authority contained in section 21 of the Federal Deposit Insurance Act (12 U. S.C. 1829b) shall apply, in addition to any other financial institution to which such rules apply, to any person that engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.".

<< 31 USCA § 5311 NOTE >>

(d) REPORT.—Not later than 1 year after the date of enactment of this Act, the Secretary of the Treasury shall report to Congress on the need for any additional legislation relating to persons who engage as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside

of the conventional financial institutions system, counter money laundering and regulatory controls relating to underground money movement and banking systems, including whether the threshold for the filing of suspicious activity reports under section 5318(g) of title 31, United States Code should be lowered in the case of such systems.

<< 22 USCA § 262p–4r >>

## SEC. 360. USE OF AUTHORITY OF UNITED STATES EXECUTIVE DIRECTORS.

(a) ACTION BY THE PRESIDENT.—If the President determines that a particular foreign country has taken or has committed to take actions that contribute to efforts of the United States to respond to, deter, or prevent acts of international terrorism, the Secretary may, consistent with other applicable provisions of law, instruct the United States Executive Director of each international financial institution to use the voice and vote of the Executive Director to support any loan or other utilization of the funds of respective institutions for such country, or any public or private entity within such country.

(b) USE OF VOICE AND VOTE.—The Secretary may instruct the United States Executive Director of each international financial institution to aggressively use the voice and vote of the Executive Director to require an auditing of disbursements at such institutions to ensure that no funds are paid to persons who commit, threaten to commit, or support terrorism.

(c) DEFINITION.—For purposes of this section, the term "international financial institution" means an institution described in section 1701(c)(2) of the International Financial Institutions Act (22 U.S.C. 262r(c)(2)).

## SEC. 361. FINANCIAL CRIMES ENFORCEMENT NETWORK.

(a) IN GENERAL.—Subchapter I of chapter 3 of title 31, United States Code, is amended—

<< 31 USCA § 310 >>

<< 31 USCA § 311 >>

(1) by redesignating section 310 as section 311; and

<< 31 USCA § 310 >>

(2) by inserting after section 309 the following new section:

"§ 310. Financial Crimes Enforcement Network

"(a) IN GENERAL.—The Financial Crimes Enforcement Network established by order of the Secretary of the Treasury (Treasury Order Numbered 105–08, in this section referred to as 'FinCEN') on April 25, 1990, shall be a bureau in the Department of the Treasury.

"(b) DIRECTOR.—

"(1) APPOINTMENT.—The head of FinCEN shall be the Director, who shall be appointed by the Secretary of the Treasury.

"(2) DUTIES AND POWERS.—The duties and powers of the Director are as follows:

"(A) Advise and make recommendations on matters relating to financial intelligence, financial criminal activities, and other financial activities to the Under Secretary of the Treasury for Enforcement.

"(B) Maintain a government-wide data access service, with access, in accordance with applicable legal requirements, to the following:

"(i) Information collected by the Department of the Treasury, including report information filed under subchapter II of chapter 53 of this title (such as reports on cash transactions, foreign financial agency transactions and relationships, foreign currency transactions, exporting and importing monetary instruments, and suspicious activities), chapter 2 of title I of Public Law 91–508, and section 21 of the Federal Deposit Insurance Act.

"(ii) Information regarding national and international currency flows.

"(iii) Other records and data maintained by other Federal, State, local, and foreign agencies, including financial and other records developed in specific cases.

"(iv) Other privately and publicly available information.

"(C) Analyze and disseminate the available data in accordance with applicable legal requirements and policies and guidelines established by the Secretary of the Treasury and the Under Secretary of the Treasury for Enforcement to—

"(i) identify possible criminal activity to appropriate Federal, State, local, and foreign law enforcement agencies;

"(ii) support ongoing criminal financial investigations and prosecutions and related proceedings, including civil and criminal tax and forfeiture proceedings;

"(iii) identify possible instances of noncompliance with subchapter II of chapter 53 of this title, chapter 2 of title I of Public Law 91–508, and section 21 of the Federal Deposit Insurance Act to Federal agencies with statutory responsibility for enforcing compliance with such provisions and other appropriate Federal regulatory agencies;

"(iv) evaluate and recommend possible uses of special currency reporting requirements under section 5326;

"(v) determine emerging trends and methods in money laundering and other financial crimes;

"(vi) support the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism; and

"(vii) support government initiatives against money laundering.

"(D) Establish and maintain a financial crimes communications center to furnish law enforcement authorities with intelligence information related to emerging or ongoing investigations and undercover operations.

"(E) Furnish research, analytical, and informational services to financial institutions, appropriate Federal regulatory agencies with regard to financial institutions, and appropriate Federal, State, local, and foreign law enforcement authorities, in accordance with policies and guidelines established by the Secretary of the Treasury or the Under Secretary of the Treasury for Enforcement, in the interest of detection, prevention, and prosecution of terrorism, organized crime, money laundering, and other financial crimes.

"(F) Assist Federal, State, local, and foreign law enforcement and regulatory authorities in combatting the use of informal, nonbank networks and payment and barter system mechanisms that permit the transfer of funds or the equivalent of funds without records and without compliance with criminal and tax laws.

"(G) Provide computer and data support and data analysis to the Secretary of the Treasury for tracking and controlling foreign assets.

"(H) Coordinate with financial intelligence units in other countries on anti-terrorism and anti-money laundering initiatives, and similar efforts.

"(I) Administer the requirements of subchapter II of chapter 53 of this title, chapter 2 of title I of Public Law 91–508, and section 21 of the Federal Deposit Insurance Act, to the extent delegated such authority by the Secretary of the Treasury.

"(J) Such other duties and powers as the Secretary of the Treasury may delegate or prescribe.

"(c) REQUIREMENTS RELATING TO MAINTENANCE AND USE OF DATA BANKS.—The Secretary of the Treasury shall establish and maintain operating procedures with respect to the government-wide data access service and the financial crimes communications center maintained by FinCEN which provide—

"(1) for the coordinated and efficient transmittal of information to, entry of information into, and withdrawal of information from, the data maintenance system maintained by the Network, including—

"(A) the submission of reports through the Internet or other secure network, whenever possible;

"(B) the cataloguing of information in a manner that facilitates rapid retrieval by law enforcement personnel of meaningful data; and

"(C) a procedure that provides for a prompt initial review of suspicious activity reports and other reports, or such other means as the Secretary may provide, to identify information that warrants immediate action; and

"(2) in accordance with section 552a of title 5 and the Right to Financial Privacy Act of 1978, appropriate standards and guidelines for determining—

"(A) who is to be given access to the information maintained by the Network;

"(B) what limits are to be imposed on the use of such information; and

"(C) how information about activities or relationships which involve or are closely associated with the exercise of constitutional rights is to be screened out of the data maintenance system.

"(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for FinCEN such sums as may be necessary for fiscal years 2002, 2003, 2004, and 2005.".

<< 31 USCA § 5314 NOTE >>

(b) COMPLIANCE WITH REPORTING REQUIREMENTS.—The Secretary of the Treasury shall study methods for improving compliance with the reporting requirements established in section 5314 of title 31, United States Code, and shall submit a report on such study to the Congress by the end of the 6–month period beginning on the date of enactment of this Act and each 1–year period thereafter. The initial report shall include historical data on compliance with such reporting requirements.

<< 31 USCA prec. § 301 >>

(c) CLERICAL AMENDMENT.—The table of sections for subchapter I of chapter 3 of title 31, United States Code, is amended—

  (1) by redesignating the item relating to section 310 as section 311; and
  (2) by inserting after the item relating to section 309 the following new item:

"310. Financial Crimes Enforcement Network.".

<< 31 USCA § 310 NOTE >>

SEC. 362. ESTABLISHMENT OF HIGHLY SECURE NETWORK.

 (a) IN GENERAL.—The Secretary shall establish a highly secure network in the Financial Crimes Enforcement Network that—

  (1) allows financial institutions to file reports required under subchapter II or III of chapter 53 of title 31, United States Code, chapter 2 of Public Law 91–508, or section 21 of the Federal Deposit Insurance Act through the secure network; and
  (2) provides financial institutions with alerts and other information regarding suspicious activities that warrant immediate and enhanced scrutiny.
 (b) EXPEDITED DEVELOPMENT.—The Secretary shall take such action as may be necessary to ensure that the secure network required under subsection (a) is fully operational before the end of the 9–month period beginning on the date of enactment of this Act.

SEC. 363. INCREASE IN CIVIL AND CRIMINAL PENALTIES FOR MONEY LAUNDERING.

<< 31 USCA § 5321 >>

(a) CIVIL PENALTIES.—Section 5321(a) of title 31, United States Code, is amended by adding at the end the following:
 "(7) PENALTIES FOR INTERNATIONAL COUNTER MONEY LAUNDERING VIOLATIONS.—The Secretary may impose a civil money penalty in an amount equal to not less than 2 times the amount of the transaction, but not more than $1,000,000, on any financial institution or agency that violates any provision of subsection (i) or (j) of section 5318 or any special measures imposed under section 5318A.".

<< 31 USCA § 5322 >>

(b) CRIMINAL PENALTIES.—Section 5322 of title 31, United States Code, is amended by adding at the end the following:
 "(d) A financial institution or agency that violates any provision of subsection (i) or (j) of section 5318, or any special measures imposed under section 5318A, or any regulation prescribed under subsection (i) or (j) of section 5318 or section 5318A, shall be fined in an amount equal to not less than 2 times the amount of the transaction, but not more than $1,000,000.".

<< 12 USCA § 248 >>

SEC. 364. UNIFORM PROTECTION AUTHORITY FOR FEDERAL RESERVE FACILITIES.

 Section 11 of the Federal Reserve Act (12 U.S.C. 248) is amended by adding at the end the following:
 "(q) UNIFORM PROTECTION AUTHORITY FOR FEDERAL RESERVE FACILITIES.—

"(1) Notwithstanding any other provision of law, to authorize personnel to act as law enforcement officers to protect and safeguard the premises, grounds, property, personnel, including members of the Board, of the Board, or any Federal reserve bank, and operations conducted by or on behalf of the Board or a reserve bank.

"(2) The Board may, subject to the regulations prescribed under paragraph (5), delegate authority to a Federal reserve bank to authorize personnel to act as law enforcement officers to protect and safeguard the bank's premises, grounds, property, personnel, and operations conducted by or on behalf of the bank.

"(3) Law enforcement officers designated or authorized by the Board or a reserve bank under paragraph (1) or (2) are authorized while on duty to carry firearms and make arrests without warrants for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States committed or being committed within the buildings and grounds of the Board or a reserve bank if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony. Such officers shall have access to law enforcement information that may be necessary for the protection of the property or personnel of the Board or a reserve bank.

"(4) For purposes of this subsection, the term 'law enforcement officers' means personnel who have successfully completed law enforcement training and are authorized to carry firearms and make arrests pursuant to this subsection.

"(5) The law enforcement authorities provided for in this subsection may be exercised only pursuant to regulations prescribed by the Board and approved by the Attorney General.".

SEC. 365. REPORTS RELATING TO COINS AND CURRENCY RECEIVED IN NONFINANCIAL TRADE OR BUSINESS.

<< 31 USCA § 5331 >>

(a) REPORTS REQUIRED.—Subchapter II of chapter 53 of title 31, United States Code, is amended by adding at the end the following new section:

"§ 5331. Reports relating to coins and currency received in nonfinancial trade or business

"(a) COIN AND CURRENCY RECEIPTS OF MORE THAN $10,000.—Any person—

"(1) who is engaged in a trade or business; and

"(2) who, in the course of such trade or business, receives more than $10,000 in coins or currency in 1 transaction (or 2 or more related transactions),

shall file a report described in subsection (b) with respect to such transaction (or related transactions) with the Financial Crimes Enforcement Network at such time and in such manner as the Secretary may, by regulation, prescribe.

"(b) FORM AND MANNER OF REPORTS.—A report is described in this subsection if such report—

"(1) is in such form as the Secretary may prescribe;

"(2) contains—

"(A) the name and address, and such other identification information as the Secretary may require, of the person from whom the coins or currency was received;

"(B) the amount of coins or currency received;

"(C) the date and nature of the transaction; and

"(D) such other information, including the identification of the person filing the report, as the Secretary may prescribe.

"(c) EXCEPTIONS.—

"(1) AMOUNTS RECEIVED BY FINANCIAL INSTITUTIONS.—Subsection (a) shall not apply to amounts received in a transaction reported under section 5313 and regulations prescribed under such section.

"(2) TRANSACTIONS OCCURRING OUTSIDE THE UNITED STATES.—Except to the extent provided in regulations prescribed by the Secretary, subsection (a) shall not apply to any transaction if the entire transaction occurs outside the United States.

"(d) CURRENCY INCLUDES FOREIGN CURRENCY AND CERTAIN MONETARY INSTRUMENTS.—

"(1) IN GENERAL.—For purposes of this section, the term 'currency' includes—

"(A) foreign currency; and

"(B) to the extent provided in regulations prescribed by the Secretary, any monetary instrument (whether or not in bearer form) with a face amount of not more than $10,000.

"(2) SCOPE OF APPLICATION.—Paragraph (1)(B) shall not apply to any check drawn on the account of the writer in a financial institution referred to in subparagraph (A), (B), (C), (D), (E), (F), (G), (J), (K), (R), or (S) of section 5312(a)(2).".

(b) PROHIBITION ON STRUCTURING TRANSACTIONS.—

(1) IN GENERAL.—Section 5324 of title 31, United States Code, is amended—

<< 31 USCA § 5324 >>

(A) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

<< 31 USCA § 5324 >>

(B) by inserting after subsection (a) the following new subsection:

"(b) DOMESTIC COIN AND CURRENCY TRANSACTIONS INVOLVING NONFINANCIAL TRADES OR BUSINESSES.—No person shall, for the purpose of evading the report requirements of section 5333 or any regulation prescribed under such section—

"(1) cause or attempt to cause a nonfinancial trade or business to fail to file a report required under section 5333 or any regulation prescribed under such section;

"(2) cause or attempt to cause a nonfinancial trade or business to file a report required under section 5333 or any regulation prescribed under such section that contains a material omission or misstatement of fact; or

"(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with 1 or more nonfinancial trades or businesses.".

(2) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 31 USCA § 5324 >>

(A) The heading for subsection (a) of section 5324 of title 31, United States Code, is amended by inserting "INVOLVING FINANCIAL INSTITUTIONS" after "TRANSACTIONS".

<< 31 USCA § 5317 >>

(B) Section 5317(c) of title 31, United States Code, is amended by striking "5324(b)" and inserting "5324(c)".

(c) DEFINITION OF NONFINANCIAL TRADE OR BUSINESS.—

(1) IN GENERAL.—Section 5312(a) of title 31, United States Code, is amended—

<< 31 USCA § 5312 >>

(A) by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), respectively; and

<< 31 USCA § 5312 >>

(B) by inserting after paragraph (3) the following new paragraph:

"(4) NONFINANCIAL TRADE OR BUSINESS.—The term 'nonfinancial trade or business' means any trade or business other than a financial institution that is subject to the reporting requirements of section 5313 and regulations prescribed under such section.".

(2) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 31 USCA § 5312 >>

(A) Section 5312(a)(3)(C) of title 31, United States Code, is amended by striking "section 5316," and inserting "sections 5333 and 5316,".

<< 31 USCA §§ 5318, 5321, 5326, 5328 >>

AR.01216

(B) Subsections (a) through (f) of section 5318 of title 31, United States Code, and sections 5321, 5326, and 5328 of such title are each amended—

(i) by inserting "or nonfinancial trade or business" after "financial institution" each place such term appears; and

(ii) by inserting "or nonfinancial trades or businesses" after "financial institutions" each place such term appears.

<< 31 USCA prec. § 5301 >>

(c) CLERICAL AMENDMENT.—The table of sections for chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5332 (as added by section 112 of this title) the following new item:

"5331. Reports relating to coins and currency received in nonfinancial trade or business.".

<< 31 USCA § 5331 NOTE >>

(f) REGULATIONS.—Regulations which the Secretary determines are necessary to implement this section shall be published in final form before the end of the 6–month period beginning on the date of enactment of this Act.

<< 31 USCA § 5313 NOTE >>

SEC. 366. EFFICIENT USE OF CURRENCY TRANSACTION REPORT SYSTEM.

(a) FINDINGS.—The Congress finds the following:

(1) The Congress established the currency transaction reporting requirements in 1970 because the Congress found then that such reports have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings and the usefulness of such reports has only increased in the years since the requirements were established.

(2) In 1994, in response to reports and testimony that excess amounts of currency transaction reports were interfering with effective law enforcement, the Congress reformed the currency transaction report exemption requirements to provide—

(A) mandatory exemptions for certain reports that had little usefulness for law enforcement, such as cash transfers between depository institutions and cash deposits from government agencies; and

(B) discretionary authority for the Secretary of the Treasury to provide exemptions, subject to criteria and guidelines established by the Secretary, for financial institutions with regard to regular business customers that maintain accounts at an institution into which frequent cash deposits are made.

(3) Today there is evidence that some financial institutions are not utilizing the exemption system, or are filing reports even if there is an exemption in effect, with the result that the volume of currency transaction reports is once again interfering with effective law enforcement.

(b) STUDY AND REPORT.—

(1) STUDY REQUIRED.—The Secretary shall conduct a study of—

(A) the possible expansion of the statutory exemption system in effect under section 5313 of title 31, United States Code; and

(B) methods for improving financial institution utilization of the statutory exemption provisions as a way of reducing the submission of currency transaction reports that have little or no value for law enforcement purposes, including improvements in the systems in effect at financial institutions for regular review of the exemption procedures used at the institution and the training of personnel in its effective use.

(2) REPORT REQUIRED.—The Secretary of the Treasury shall submit a report to the Congress before the end of the 1–year period beginning on the date of enactment of this Act containing the findings and conclusions of the Secretary with regard to the study required under subsection (a), and such recommendations for legislative or administrative action as the Secretary determines to be appropriate.

Subtitle C—Currency Crimes and Protection

SEC. 371. BULK CASH SMUGGLING INTO OR OUT OF THE UNITED STATES.

<< 31 USCA § 5332 NOTE >>

(a) FINDINGS.—The Congress finds the following:

  (1) Effective enforcement of the currency reporting requirements of subchapter II of chapter 53 of title 31, United States Code, and the regulations prescribed under such subchapter, has forced drug dealers and other criminals engaged in cash-based businesses to avoid using traditional financial institutions.

  (2) In their effort to avoid using traditional financial institutions, drug dealers and other criminals are forced to move large quantities of currency in bulk form to and through the airports, border crossings, and other ports of entry where the currency can be smuggled out of the United States and placed in a foreign financial institution or sold on the black market.

  (3) The transportation and smuggling of cash in bulk form may now be the most common form of money laundering, and the movement of large sums of cash is one of the most reliable warning signs of drug trafficking, terrorism, money laundering, racketeering, tax evasion and similar crimes.

  (4) The intentional transportation into or out of the United States of large amounts of currency or monetary instruments, in a manner designed to circumvent the mandatory reporting provisions of subchapter II of chapter 53 of title 31, United States Code,, is the equivalent of, and creates the same harm as, the smuggling of goods.

  (5) The arrest and prosecution of bulk cash smugglers are important parts of law enforcement's effort to stop the laundering of criminal proceeds, but the couriers who attempt to smuggle the cash out of the United States are typically low-level employees of large criminal organizations, and thus are easily replaced. Accordingly, only the confiscation of the smuggled bulk cash can effectively break the cycle of criminal activity of which the laundering of the bulk cash is a critical part.

  (6) The current penalties for violations of the currency reporting requirements are insufficient to provide a deterrent to the laundering of criminal proceeds. In particular, in cases where the only criminal violation under current law is a reporting offense, the law does not adequately provide for the confiscation of smuggled currency. In contrast, if the smuggling of bulk cash were itself an offense, the cash could be confiscated as the corpus delicti of the smuggling offense.

<< 31 USCA § 5332 NOTE >>

(b) PURPOSES.—The purposes of this section are—
  (1) to make the act of smuggling bulk cash itself a criminal offense;
  (2) to authorize forfeiture of any cash or instruments of the smuggling offense; and
  (3) to emphasize the seriousness of the act of bulk cash smuggling.

<< 31 USCA § 5332 >>

  (c) ENACTMENT OF BULK CASH SMUGGLING OFFENSE.—Subchapter II of chapter 53 of title 31, United States Code, is amended by adding at the end the following:

"§ 5332. Bulk cash smuggling into or out of the United States
  "(a) CRIMINAL OFFENSE.—
    "(1) IN GENERAL.—Whoever, with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States, or from a place outside the United States to a place within the United States, shall be guilty of a currency smuggling offense and subject to punishment pursuant to subsection (b).

    "(2) CONCEALMENT ON PERSON.—For purposes of this section, the concealment of currency on the person of any individual includes concealment in any article of clothing worn by the individual or in any luggage, backpack, or other container worn or carried by such individual.

  "(b) PENALTY.—
    "(1) TERM OF IMPRISONMENT.—A person convicted of a currency smuggling offense under subsection (a), or a conspiracy to commit such offense, shall be imprisoned for not more than 5 years.

    "(2) FORFEITURE.—In addition, the court, in imposing sentence under paragraph (1), shall order that the defendant forfeit to the United States, any property, real or personal, involved in the offense, and any property traceable to such property, subject to subsection (d) of this section.

"(3) PROCEDURE.—The seizure, restraint, and forfeiture of property under this section shall be governed by section 413 of the Controlled Substances Act.

"(4) PERSONAL MONEY JUDGMENT.—If the property subject to forfeiture under paragraph (2) is unavailable, and the defendant has insufficient substitute property that may be forfeited pursuant to section 413(p) of the Controlled Substances Act, the court shall enter a personal money judgment against the defendant for the amount that would be subject to forfeiture.

"(c) CIVIL FORFEITURE.—

"(1) IN GENERAL.—Any property involved in a violation of subsection (a), or a conspiracy to commit such violation, and any property traceable to such violation or conspiracy, may be seized and, subject to subsection (d) of this section, forfeited to the United States.

"(2) PROCEDURE.—The seizure and forfeiture shall be governed by the procedures governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code.

"(3) TREATMENT OF CERTAIN PROPERTY AS INVOLVED IN THE OFFENSE.—For purposes of this subsection and subsection (b), any currency or other monetary instrument that is concealed or intended to be concealed in violation of subsection (a) or a conspiracy to commit such violation, any article, container, or conveyance used, or intended to be used, to conceal or transport the currency or other monetary instrument, and any other property used, or intended to be used, to facilitate the offense, shall be considered property involved in the offense.".

<< 31 USCA prec. § 5301 >>

(c) CLERICAL AMENDMENT.—The table of sections for subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5331, as added by this Act, the following new item:

"5332. Bulk cash smuggling into or out of the United States.".

SEC. 372. FORFEITURE IN CURRENCY REPORTING CASES.

<< 31 USCA § 5317 >>

(a) IN GENERAL.—Subsection (c) of section 5317 of title 31, United States Code, is amended to read as follows:

"(c) FORFEITURE.—

"(1) CRIMINAL FORFEITURE.—

"(A) IN GENERAL.—The court in imposing sentence for any violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit such violation, shall order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto.

"(B) PROCEDURE.—Forfeitures under this paragraph shall be governed by the procedures established in section 413 of the Controlled Substances Act.

"(2) CIVIL FORFEITURE.—Any property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy, may be seized and forfeited to the United States in accordance with the procedures governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code.".

(b) CONFORMING AMENDMENTS.—

<< 18 USCA § 981 >>

(1) Section 981(a)(1)(A) of title 18, United States Code, is amended—

(A) by striking "of section 5313(a) or 5324(a) of title 31, or"; and

(B) by striking "However" and all that follows through the end of the subparagraph.

<< 18 USCA § 982 >>

(2) Section 982(a)(1) of title 18, United States Code, is amended—

(A) by striking "of section 5313(a), 5316, or 5324 of title 31, or"; and

(B) by striking "However" and all that follows through the end of the paragraph.

SEC. 373. ILLEGAL MONEY TRANSMITTING BUSINESSES.

<< 18 USCA § 1960 >>

(a) SCIENTER REQUIREMENT FOR SECTION 1960 VIOLATION.—Section 1960 of title 18, United States Code, is amended to read as follows:

"§ 1960. Prohibition of unlicensed money transmitting businesses

"(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

"(b) As used in this section—

"(1) the term 'unlicensed money transmitting business' means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—

"(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

"(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

"(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to be used to promote or support unlawful activity;

"(2) the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and

"(3) the term 'State' means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.".

<< 18 USCA § 981 >>

(b) SEIZURE OF ILLEGALLY TRANSMITTED FUNDS.—Section 981(a)(1)(A) of title 18, United States Code, is amended by striking "or 1957" and inserting ", 1957 or 1960".

<< 18 USCA prec. § 1951 >>

(c) CLERICAL AMENDMENT.—The table of sections for chapter 95 of title 18, United States Code, is amended in the item relating to section 1960 by striking "illegal" and inserting "unlicensed".

SEC. 374. COUNTERFEITING DOMESTIC CURRENCY AND OBLIGATIONS.

(a) COUNTERFEIT ACTS COMMITTED OUTSIDE THE UNITED STATES.—Section 470 of title 18, United States Code, is amended—

<< 18 USCA § 470 >>

(1) in paragraph (2), by inserting "analog, digital, or electronic image," after "plate, stone,"; and

<< 18 USCA § 470 >>

(2) by striking "shall be fined under this title, imprisoned not more than 20 years, or both" and inserting "shall be punished as is provided for the like offense within the United States".

<< 18 USCA § 471 >>

(b) OBLIGATIONS OR SECURITIES OF THE UNITED STATES.—Section 471 of title 18, United States Code, is amended by striking "fifteen years" and inserting "20 years".

<< 18 USCA § 472 >>

(c) UTTERING COUNTERFEIT OBLIGATIONS OR SECURITIES.—Section 472 of title 18, United States Code, is amended by striking "fifteen years" and inserting "20 years".

<< 18 USCA § 473 >>

(d) DEALING IN COUNTERFEIT OBLIGATIONS OR SECURITIES.—Section 473 of title 18, United States Code, is amended by striking "ten years" and inserting "20 years".

(e) PLATES, STONES, OR ANALOG, DIGITAL, OR ELECTRONIC IMAGES FOR COUNTERFEITING OBLIGATIONS OR SECURITIES.—

<< 18 USCA § 474 >>

(1) IN GENERAL.—Section 474(a) of title 18, United States Code, is amended by inserting after the second paragraph the following new paragraph:

"Whoever, with intent to defraud, makes, executes, acquires, scans, captures, records, receives, transmits, reproduces, sells, or has in such person's control, custody, or possession, an analog, digital, or electronic image of any obligation or other security of the United States; or".

<< 18 USCA § 474 >>

(2) AMENDMENT TO DEFINITION.—Section 474(b) of title 18, United States Code, is amended by striking the first sentence and inserting the following new sentence: "For purposes of this section, the term 'analog, digital, or electronic image' includes any analog, digital, or electronic method used for the making, execution, acquisition, scanning, capturing, recording, retrieval, transmission, or reproduction of any obligation or security, unless such use is authorized by the Secretary of the Treasury.".

<< 18 USCA § 474 >>

(3) TECHNICAL AND CONFORMING AMENDMENT.—The heading for section 474 of title 18, United States Code, is amended by striking "**or stones**" and inserting ", **stones, or analog, digital, or electronic images**".

<< 18 USCA prec. § 470 >>

(4) CLERICAL AMENDMENT.—The table of sections for chapter 25 of title 18, United States Code, is amended in the item relating to section 474 by striking "or stones" and inserting ", stones, or analog, digital, or electronic images".

<< 18 USCA § 476 >>

(f) TAKING IMPRESSIONS OF TOOLS USED FOR OBLIGATIONS OR SECURITIES.—Section 476 of title 18, United States Code, is amended—

(1) by inserting "analog, digital, or electronic image," after "impression, stamp,"; and

(2) by striking "ten years" and inserting "25 years".

<< 18 USCA § 477 >>

(g) POSSESSING OR SELLING IMPRESSIONS OF TOOLS USED FOR OBLIGATIONS OR SECURITIES.—Section 477 of title 18, United States Code, is amended—

(1) in the first paragraph, by inserting "analog, digital, or electronic image," after "imprint, stamp,";

(2) in the second paragraph, by inserting "analog, digital, or electronic image," after "imprint, stamp,"; and

AR.01221

(3) in the third paragraph, by striking "ten years" and inserting "25 years".

<< 18 USCA § 484 >>

(h) CONNECTING PARTS OF DIFFERENT NOTES.—Section 484 of title 18, United States Code, is amended by striking "five years" and inserting "10 years".

<< 18 USCA § 493 >>

(i) BONDS AND OBLIGATIONS OF CERTAIN LENDING AGENCIES.—The first and second paragraphs of section 493 of title 18, United States Code, are each amended by striking "five years" and inserting "10 years".

SEC. 375. COUNTERFEITING FOREIGN CURRENCY AND OBLIGATIONS.

<< 18 USCA § 478 >>

(a) FOREIGN OBLIGATIONS OR SECURITIES.—Section 478 of title 18, United States Code, is amended by striking "five years" and inserting "20 years".

<< 18 USCA § 479 >>

(b) UTTERING COUNTERFEIT FOREIGN OBLIGATIONS OR SECURITIES.—Section 479 of title 18, United States Code, is amended by striking "three years" and inserting "20 years".

<< 18 USCA § 480 >>

(c) POSSESSING COUNTERFEIT FOREIGN OBLIGATIONS OR SECURITIES.—Section 480 of title 18, United States Code, is amended by striking "one year" and inserting "20 years".
(d) PLATES, STONES, OR ANALOG, DIGITAL, OR ELECTRONIC IMAGES FOR COUNTERFEITING FOREIGN OBLIGATIONS OR SECURITIES.—

<< 18 USCA § 481 >>

(1) IN GENERAL.—Section 481 of title 18, United States Code, is amended by inserting after the second paragraph the following new paragraph:
"Whoever, with intent to defraud, makes, executes, acquires, scans, captures, records, receives, transmits, reproduces, sells, or has in such person's control, custody, or possession, an analog, digital, or electronic image of any bond, certificate, obligation, or other security of any foreign government, or of any treasury note, bill, or promise to pay, lawfully issued by such foreign government and intended to circulate as money; or".

<< 18 USCA § 481 >>

(2) INCREASED SENTENCE.—The last paragraph of section 481 of title 18, United States Code, is amended by striking "five years" and inserting "25 years".

<< 18 USCA § 481 >>

(3) TECHNICAL AND CONFORMING AMENDMENT.—The heading for section 481 of title 18, United States Code, is amended by striking "**or stones**" and inserting ", **stones, or analog, digital, or electronic images**".

<< 18 USCA prec. § 470 >>

(4) CLERICAL AMENDMENT.—The table of sections for chapter 25 of title 18, United States Code, is amended in the item relating to section 481 by striking "or stones" and inserting ", stones, or analog, digital, or electronic images".

<< 18 USCA § 482 >>

(e) FOREIGN BANK NOTES.—Section 482 of title 18, United States Code, is amended by striking "two years" and inserting "20 years".

<< 18 USCA § 483 >>

(f) UTTERING COUNTERFEIT FOREIGN BANK NOTES.—Section 483 of title 18, United States Code, is amended by striking "one year" and inserting "20 years".

<< 18 USCA § 1956 >>

SEC. 376. LAUNDERING THE PROCEEDS OF TERRORISM.

Section 1956(c)(7)(D) of title 18, United States Code, is amended by inserting "or 2339B" after "2339A".

<< 18 USCA § 1029 >>

SEC. 377. EXTRATERRITORIAL JURISDICTION.

Section 1029 of title 18, United States Code, is amended by adding at the end the following:
"(h) Any person who, outside the jurisdiction of the United States, engages in any act that, if committed within the jurisdiction of the United States, would constitute an offense under subsection (a) or (b) of this section, shall be subject to the fines, penalties, imprisonment, and forfeiture provided in this title if—

"(1) the offense involves an access device issued, owned, managed, or controlled by a financial institution, account issuer, credit card system member, or other entity within the jurisdiction of the United States; and

"(2) the person transports, delivers, conveys, transfers to or through, or otherwise stores, secrets, or holds within the jurisdiction of the United States, any article used to assist in the commission of the offense or the proceeds of such offense or property derived therefrom.".

TITLE IV—PROTECTING THE BORDER

Subtitle A—Protecting the Northern Border

SEC. 401. ENSURING ADEQUATE PERSONNEL ON THE NORTHERN BORDER.

The Attorney General is authorized to waive any FTE cap on personnel assigned to the Immigration and Naturalization Service on the Northern border.

SEC. 402. NORTHERN BORDER PERSONNEL.

There are authorized to be appropriated—

(1) such sums as may be necessary to triple the number of Border Patrol personnel (from the number authorized under current law), and the necessary personnel and facilities to support such personnel, in each State along the Northern Border;

(2) such sums as may be necessary to triple the number of Customs Service personnel (from the number authorized under current law), and the necessary personnel and facilities to support such personnel, at ports of entry in each State along the Northern Border;

(3) such sums as may be necessary to triple the number of INS inspectors (from the number authorized on the date of the enactment of this Act), and the necessary personnel and facilities to support such personnel, at ports of entry in each State along the Northern Border; and

(4) an additional $50,000,000 each to the Immigration and Naturalization Service and the United States Customs Service for purposes of making improvements in technology for monitoring the Northern Border and acquiring additional equipment at the Northern Border.

SEC. 403. ACCESS BY THE DEPARTMENT OF STATE AND THE INS TO CERTAIN IDENTIFYING INFORMATION IN THE CRIMINAL HISTORY RECORDS OF VISA APPLICANTS AND APPLICANTS FOR ADMISSION TO THE UNITED STATES.

(a) AMENDMENT OF THE IMMIGRATION AND NATIONALITY ACT.—Section 105 of the Immigration and Nationality Act (8 U.S.C. 1105) is amended—

<< 8 USCA § 1105 >>

(1) in the section heading, by inserting "; DATA EXCHANGE" after "SECURITY OFFICERS";

<< 8 USCA § 1105 >>

(2) by inserting "(a)" after "SEC. 105.";

<< 8 USCA § 1105 >>

(3) in subsection (a), by inserting "and border" after "internal" the second place it appears; and
(4) by adding at the end the following:

<< 8 USCA § 1105 >>

"(b)(1) The Attorney General and the Director of the Federal Bureau of Investigation shall provide the Department of State and the Service access to the criminal history record information contained in the National Crime Information Center's Interstate Identification Index (NCIC–III), Wanted Persons File, and to any other files maintained by the National Crime Information Center that may be mutually agreed upon by the Attorney General and the agency receiving the access, for the purpose of determining whether or not a visa applicant or applicant for admission has a criminal history record indexed in any such file.

"(2) Such access shall be provided by means of extracts of the records for placement in the automated visa lookout or other appropriate database, and shall be provided without any fee or charge.

"(3) The Federal Bureau of Investigation shall provide periodic updates of the extracts at intervals mutually agreed upon with the agency receiving the access. Upon receipt of such updated extracts, the receiving agency shall make corresponding updates to its database and destroy previously provided extracts.

"(4) Access to an extract does not entitle the Department of State to obtain the full content of the corresponding automated criminal history record. To obtain the full content of a criminal history record, the Department of State shall submit the applicant's fingerprints and any appropriate fingerprint processing fee authorized by law to the Criminal Justice Information Services Division of the Federal Bureau of Investigation.

"(c) The provision of the extracts described in subsection (b) may be reconsidered by the Attorney General and the receiving agency upon the development and deployment of a more cost-effective and efficient means of sharing the information.

"(d) For purposes of administering this section, the Department of State shall, prior to receiving access to NCIC data but not later than 4 months after the date of enactment of this subsection, promulgate final regulations—

"(1) to implement procedures for the taking of fingerprints; and

"(2) to establish the conditions for the use of the information received from the Federal Bureau of Investigation, in order—

"(A) to limit the redissemination of such information;

"(B) to ensure that such information is used solely to determine whether or not to issue a visa to an alien or to admit an alien to the United States;

"(C) to ensure the security, confidentiality, and destruction of such information; and

"(D) to protect any privacy rights of individuals who are subjects of such information.".

<< 8 USCA § 1105 NOTE >>

(b) REPORTING REQUIREMENT.—Not later than 2 years after the date of enactment of this Act, the Attorney General and the Secretary of State jointly shall report to Congress on the implementation of the amendments made by this section.

<< 8 USCA § 1379 >>

(c) TECHNOLOGY STANDARD TO CONFIRM IDENTITY.—

  (1) IN GENERAL.—The Attorney General and the Secretary of State jointly, through the National Institute of Standards and Technology (NIST), and in consultation with the Secretary of the Treasury and other Federal law enforcement and intelligence agencies the Attorney General or Secretary of State deems appropriate and in consultation with Congress, shall within 2 years after the date of the enactment of this section, develop and certify a technology standard that can be used to verify the identity of persons applying for a United States visa or such persons seeking to enter the United States pursuant to a visa for the purposes of conducting background checks, confirming identity, and ensuring that a person has not received a visa under a different name or such person seeking to enter the United States pursuant to a visa.

  (2) INTEGRATED.—The technology standard developed pursuant to paragraph (1), shall be the technological basis for a cross-agency, cross-platform electronic system that is a cost-effective, efficient, fully integrated means to share law enforcement and intelligence information necessary to confirm the identity of such persons applying for a United States visa or such person seeking to enter the United States pursuant to a visa.

  (3) ACCESSIBLE.—The electronic system described in paragraph (2), once implemented, shall be readily and easily accessible to—

    (A) all consular officers responsible for the issuance of visas;

    (B) all Federal inspection agents at all United States border inspection points; and

    (C) all law enforcement and intelligence officers as determined by regulation to be responsible for investigation or identification of aliens admitted to the United States pursuant to a visa.

  (4) REPORT.—Not later than 18 months after the date of the enactment of this Act, and every 2 years thereafter, the Attorney General and the Secretary of State shall jointly, in consultation with the Secretary of Treasury, report to Congress describing the development, implementation, efficacy, and privacy implications of the technology standard and electronic database system described in this subsection.

  (5) FUNDING.—There is authorized to be appropriated to the Secretary of State, the Attorney General, and the Director of the National Institute of Standards and Technology such sums as may be necessary to carry out the provisions of this subsection.

<< 8 USCA § 1105 NOTE >>

  (d) STATUTORY CONSTRUCTION.—Nothing in this section, or in any other law, shall be construed to limit the authority of the Attorney General or the Director of the Federal Bureau of Investigation to provide access to the criminal history record information contained in the National Crime Information Center's (NCIC) Interstate Identification Index (NCIC–III), or to any other information maintained by the NCIC, to any Federal agency or officer authorized to enforce or administer the immigration laws of the United States, for the purpose of such enforcement or administration, upon terms that are consistent with the National Crime Prevention and Privacy Compact Act of 1998 (subtitle A of title II of Public Law 105–251; 42 U.S.C. 14611–16) and section 552a of title 5, United States Code.

SEC. 404. LIMITED AUTHORITY TO PAY OVERTIME.

  The matter under the headings "Immigration And Naturalization Service: Salaries and Expenses, Enforcement And Border Affairs" and "Immigration And Naturalization Service: Salaries and Expenses, Citizenship And Benefits, Immigration And Program Direction" in the Department of Justice Appropriations Act, 2001 (as enacted into law by Appendix B (H.R. 5548) of Public Law 106–553 (114 Stat. 2762A–58 to 2762A–59)) is amended by striking the following each place it occurs: "*Provided,* That none of the funds available to the Immigration and Naturalization Service shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 2001:".

<< 8 USCA § 1379 NOTE >>

SEC. 405. REPORT ON THE INTEGRATED AUTOMATED FINGERPRINT IDENTIFICATION SYSTEM FOR PORTS OF ENTRY AND OVERSEAS CONSULAR POSTS.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(a) IN GENERAL.—The Attorney General, in consultation with the appropriate heads of other Federal agencies, including the Secretary of State, Secretary of the Treasury, and the Secretary of Transportation, shall report to Congress on the feasibility of enhancing the Integrated Automated Fingerprint Identification System (IAFIS) of the Federal Bureau of Investigation and other identification systems in order to better identify a person who holds a foreign passport or a visa and may be wanted in connection with a criminal investigation in the United States or abroad, before the issuance of a visa to that person or the entry or exit from the United States by that person.

 (b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated not less than $2,000,000 to carry out this section.

<div style="text-align:center">Subtitle B—Enhanced Immigration Provisions</div>

SEC. 411. DEFINITIONS RELATING TO TERRORISM.

 (a) GROUNDS OF INADMISSIBILITY.—Section 212(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)) is amended—

 (1) in subparagraph (B)—
 (A) in clause (i)—

<div style="text-align:center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(i) by amending subclause (IV) to read as follows:
 "(IV) is a representative (as defined in clause (v)) of—
 "(aa) a foreign terrorist organization, as designated by the Secretary of State under section 219, or
 "(bb) a political, social or other similar group whose public endorsement of acts of terrorist activity the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities,";

<div style="text-align:center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(ii) in subclause (V), by inserting "or" after "section 219,"; and

<div style="text-align:center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(iii) by adding at the end the following new subclauses:
 "(VI) has used the alien's position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities, or
 "(VII) is the spouse or child of an alien who is inadmissible under this section, if the activity causing the alien to be found inadmissible occurred within the last 5 years,";

<div style="text-align:center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(B) by redesignating clauses (ii), (iii), and (iv) as clauses (iii), (iv), and (v), respectively;

<div style="text-align:center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(C) in clause (i)(II), by striking "clause (iii)" and inserting "clause (iv)";

<div style="text-align:center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(D) by inserting after clause (i) the following:
 "(ii) EXCEPTION.—Subclause (VII) of clause (i) does not apply to a spouse or child—
 "(I) who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

AR.01226

"(II) whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.";

(E) in clause (iii) (as redesignated by subparagraph (B))—

<< 8 USCA § 1182 >>

(i) by inserting "it had been" before "committed in the United States"; and

<< 8 USCA § 1182 >>

(ii) in subclause (V)(b), by striking "or firearm" and inserting ", firearm, or other weapon or dangerous device";

<< 8 USCA § 1182 >>

(F) by amending clause (iv) (as redesignated by subparagraph (B)) to read as follows:

"(iv) ENGAGE IN TERRORIST ACTIVITY DEFINED.—As used in this chapter, the term 'engage in terrorist activity' means, in an individual capacity or as a member of an organization—

"(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

"(II) to prepare or plan a terrorist activity;

"(III) to gather information on potential targets for terrorist activity;

"(IV) to solicit funds or other things of value for—

"(aa) a terrorist activity;

"(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate that he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity;

"(V) to solicit any individual—

"(aa) to engage in conduct otherwise described in this clause;

"(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) for membership in a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate that he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity; or

"(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

"(aa) for the commission of a terrorist activity;

"(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

"(cc) to a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(dd) to a terrorist organization described in clause (vi)(III), unless the actor can demonstrate that he did not know, and should not reasonably have known, that the act would further the organization's terrorist activity.

This clause shall not apply to any material support the alien afforded to an organization or individual that has committed terrorist activity, if the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, concludes in his sole unreviewable discretion, that this clause should not apply.'; and

<< 8 USCA § 1182 >>

(G) by adding at the end the following new clause:

"(vi) TERRORIST ORGANIZATION DEFINED.—As used in clause (i)(VI) and clause (iv), the term 'terrorist organization' means an organization—

"(I) designated under section 219;

"(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General, as a terrorist organization, after finding that the organization engages in the activities described in subclause (I), (II), or (III) of clause (iv), or that the organization provides material support to further terrorist activity; or

"(III) that is a group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II), or (III) of clause (iv)."; and

<< 8 USCA § 1182 >>

(2) by adding at the end the following new subparagraph:

"(F) ASSOCIATION WITH TERRORIST ORGANIZATIONS.—Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.".

(b) CONFORMING AMENDMENTS.—

<< 8 USCA § 1227 >>

(1) Section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)) is amended by striking "section 212(a)(3)(B)(iii)" and inserting "section 212(a)(3)(B)(iv)".

<< 8 USCA § 1158 >>

(2) Section 208(b)(2)(A)(v) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(2)(A)(v)) is amended by striking "or (IV)" and inserting "(IV), or (VI)".

<< 8 USCA § 1182 NOTE >>

(c) RETROACTIVE APPLICATION OF AMENDMENTS.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to—

(A) actions taken by an alien before, on, or after such date; and

(B) all aliens, without regard to the date of entry or attempted entry into the United States—

(i) in removal proceedings on or after such date (except for proceedings in which there has been a final administrative decision before such date); or

(ii) seeking admission to the United States on or after such date.

(2) SPECIAL RULE FOR ALIENS IN EXCLUSION OR DEPORTATION PROCEEDINGS.—Notwithstanding any other provision of law, sections 212(a)(3)(B) and 237(a)(4)(B) of the Immigration and Nationality Act, as amended by this Act, shall apply to all aliens in exclusion or deportation proceedings on or after the date of the enactment of this Act (except for proceedings in which there has been a final administrative decision before such date) as if such proceedings were removal proceedings.

(3) SPECIAL RULE FOR SECTION 219 ORGANIZATIONS AND ORGANIZATIONS DESIGNATED UNDER SECTION 212(a)(3)(B)(vi)(II)—

(A) IN GENERAL.—Notwithstanding paragraphs (1) and (2), no alien shall be considered inadmissible under section 212(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)), or deportable under section 237(a)(4)(B) of such Act (8 U.S.C. 1227(a)(4)(B)), by reason of the amendments made by subsection (a), on the ground that the alien engaged in a terrorist activity described in subclause (IV)(bb), (V)(bb), or (VI)(cc) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a group at any time when the group was not a terrorist organization designated by the Secretary of State under section 219 of such Act (8 U.S.C. 1189) or otherwise designated under section 212(a)(3)(B)(vi)(II) of such Act (as so amended).

(B) STATUTORY CONSTRUCTION.—Subparagraph (A) shall not be construed to prevent an alien from being considered inadmissible or deportable for having engaged in a terrorist activity—

(i) described in subclause (IV)(bb), (V)(bb), or (VI)(cc) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a terrorist organization at any time when such organization was designated by the Secretary of State under section 219 of such Act or otherwise designated under section 212(a)(3)(B)(vi)(II) of such Act (as so amended); or

(ii) described in subclause (IV)(cc), (V)(cc), or (VI)(dd) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a terrorist organization described in section 212(a)(3)(B)(vi)(III) of such Act (as so amended).

(4) EXCEPTION.—The Secretary of State, in consultation with the Attorney General, may determine that the amendments made by this section shall not apply with respect to actions by an alien taken outside the United States before the date of the enactment of this Act upon the recommendation of a consular officer who has concluded that there is not reasonable ground to believe that the alien knew or reasonably should have known that the actions would further a terrorist activity.

(c) DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS.—Section 219(a) of the Immigration and Nationality Act (8 U.S.C. 1189(a)) is amended—

<< 8 USCA § 1189 >>

(1) in paragraph (1)(B), by inserting "or terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. 2656f(d)(2)), or retains the capability and intent to engage in terrorist activity or terrorism" after "212(a)(3)(B)";

<< 8 USCA § 1189 >>

(2) in paragraph (1)(C), by inserting "or terrorism" after "terrorist activity";

<< 8 USCA § 1189 >>

(3) by amending paragraph (2)(A) to read as follows:

"(A) NOTICE.—

"(i) TO CONGRESSIONAL LEADERS.—Seven days before making a designation under this subsection, the Secretary shall, by classified communication, notify the Speaker and Minority Leader of the House of Representatives, the President pro tempore, Majority Leader, and Minority Leader of the Senate, and the members of the relevant committees of the House of Representatives and the Senate, in writing, of the intent to designate an organization under this subsection, together with the findings made under paragraph (1) with respect to that organization, and the factual basis therefor.

"(ii) PUBLICATION IN FEDERAL REGISTER.—The Secretary shall publish the designation in the Federal Register seven days after providing the notification under clause (i).";

<< 8 USCA § 1189 >>

(4) in paragraph (2)(B)(i), by striking "subparagraph (A)" and inserting "subparagraph (A)(ii)";

<< 8 USCA § 1189 >>

(5) in paragraph (2)(C), by striking "paragraph (2)" and inserting "paragraph (2)(A)(i)";

<< 8 USCA § 1189 >>

(6) in paragraph (3)(B), by striking "subsection (c)" and inserting "subsection (b)";

<< 8 USCA § 1189 >>

(7) in paragraph (4)(B), by inserting after the first sentence the following: "The Secretary also may redesignate such organization at the end of any 2–year redesignation period (but not sooner than 60 days prior to the termination of such period) for an additional 2–year period upon a finding that the relevant circumstances described in paragraph (1) still exist. Any redesignation shall be effective immediately following the end of the prior 2–year designation or redesignation period unless a different effective date is provided in such redesignation.";

AR.01229

(8) in paragraph (6)(A)—

<< 8 USCA § 1189 >>

(A) by inserting "or a redesignation made under paragraph (4)(B)" after "paragraph (1)";

<< 8 USCA § 1189 >>

(B) in clause (i)—
  (i) by inserting "or redesignation" after "designation" the first place it appears; and
  (ii) by striking "of the designation"; and

<< 8 USCA § 1189 >>

(C) in clause (ii), by striking "of the designation";

<< 8 USCA § 1189 >>

(9) in paragraph (6)(B)—
  (A) by striking "through (4)" and inserting "and (3)"; and
  (B) by inserting at the end the following new sentence: "Any revocation shall take effect on the date specified in the revocation or upon publication in the Federal Register if no effective date is specified.";

<< 8 USCA § 1189 >>

(10) in paragraph (7), by inserting ", or the revocation of a redesignation under paragraph (6)," after "paragraph (5) or (6)"; and

<< 8 USCA § 1189 >>

(11) in paragraph (8)—
  (A) by striking "paragraph (1)(B)" and inserting "paragraph (2)(B), or if a redesignation under this subsection has become effective under paragraph (4)(B)";
  (B) by inserting "or an alien in a removal proceeding" after "criminal action"; and
  (C) by inserting "or redesignation" before "as a defense".

SEC. 412. MANDATORY DETENTION OF SUSPECTED TERRORISTS; HABEAS CORPUS; JUDICIAL REVIEW.

<< 8 USCA § 1226a >>

 (a) IN GENERAL.—The Immigration and Nationality Act (8 U.S.C. 1101 et seq.) is amended by inserting after section 236 the following:

    "MANDATORY DETENTION OF SUSPECTED TERRORISTS; HABEAS CORPUS; JUDICIAL REVIEW
"SEC. 236A. (a) DETENTION OF TERRORIST ALIENS—
 "(1) CUSTODY.—The Attorney General shall take into custody any alien who is certified under paragraph (3).
 "(2) RELEASE.—Except as provided in paragraphs (5) and (6), the Attorney General shall maintain custody of such an alien until the alien is removed from the United States. Except as provided in paragraph (6), such custody shall be maintained irrespective of any relief from removal for which the alien may be eligible, or any relief from removal granted the alien, until the Attorney General determines that the alien is no longer an alien who may be certified under paragraph (3). If the alien is finally determined not to be removable, detention pursuant to this subsection shall terminate.
 "(3) CERTIFICATION.—The Attorney General may certify an alien under this paragraph if the Attorney General has reasonable grounds to believe that the alien—
 "(A) is described in section 212(a)(3)(A)(i), 212(a)(3)(A)(iii), 212(a)(3)(B), 237(a)(4)(A)(i), 237(a)(4)(A)(iii), or 237(a)(4)(B); or

"(B) is engaged in any other activity that endangers the national security of the United States.

"(4) NONDELEGATION.—The Attorney General may delegate the authority provided under paragraph (3) only to the Deputy Attorney General. The Deputy Attorney General may not delegate such authority.

"(5) COMMENCEMENT OF PROCEEDINGS.—The Attorney General shall place an alien detained under paragraph (1) in removal proceedings, or shall charge the alien with a criminal offense, not later than 7 days after the commencement of such detention. If the requirement of the preceding sentence is not satisfied, the Attorney General shall release the alien.

"(6) LIMITATION ON INDEFINITE DETENTION.—An alien detained solely under paragraph (1) who has not been removed under section 241(a)(1)(A), and whose removal is unlikely in the reasonably foreseeable future, may be detained for additional periods of up to six months only if the release of the alien will threaten the national security of the United States or the safety of the community or any person.

"(7) REVIEW OF CERTIFICATION.—The Attorney General shall review the certification made under paragraph (3) every 6 months. If the Attorney General determines, in the Attorney General's discretion, that the certification should be revoked, the alien may be released on such conditions as the Attorney General deems appropriate, unless such release is otherwise prohibited by law. The alien may request each 6 months in writing that the Attorney General reconsider the certification and may submit documents or other evidence in support of that request.

"(b) HABEAS CORPUS AND JUDICIAL REVIEW.—

"(1) IN GENERAL.—Judicial review of any action or decision relating to this section (including judicial review of the merits of a determination made under subsection (a)(3) or (a)(6)) is available exclusively in habeas corpus proceedings consistent with this subsection. Except as provided in the preceding sentence, no court shall have jurisdiction to review, by habeas corpus petition or otherwise, any such action or decision.

"(2) APPLICATION.—

"(A) IN GENERAL.—Notwithstanding any other provision of law, including section 2241(a) of title 28, United States Code, habeas corpus proceedings described in paragraph (1) may be initiated only by an application filed with—

"(i) the Supreme Court;

"(ii) any justice of the Supreme Court;

"(iii) any circuit judge of the United States Court of Appeals for the District of Columbia Circuit; or

"(iv) any district court otherwise having jurisdiction to entertain it.

"(B) APPLICATION TRANSFER.—Section 2241(b) of title 28, United States Code, shall apply to an application for a writ of habeas corpus described in subparagraph (A).

"(3) APPEALS.—Notwithstanding any other provision of law, including section 2253 of title 28, in habeas corpus proceedings described in paragraph (1) before a circuit or district judge, the final order shall be subject to review, on appeal, by the United States Court of Appeals for the District of Columbia Circuit. There shall be no right of appeal in such proceedings to any other circuit court of appeals.

"(4) RULE OF DECISION.—The law applied by the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit shall be regarded as the rule of decision in habeas corpus proceedings described in paragraph (1).

"(c) STATUTORY CONSTRUCTION.—The provisions of this section shall not be applicable to any other provision of this Act.".

(b) CLERICAL AMENDMENT.—The table of contents of the Immigration and Nationality Act is amended by inserting after the item relating to section 236 the following:

"Sec. 236A. Mandatory detention of suspected terrorist; habeas corpus; judicial review.".

<< 8 USCA § 1226a NOTE >>

(c) REPORTS.—Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate, with respect to the reporting period, on—

(1) the number of aliens certified under section 236A(a)(3) of the Immigration and Nationality Act, as added by subsection (a);

(2) the grounds for such certifications;

(3) the nationalities of the aliens so certified;

(4) the length of the detention for each alien so certified; and

(5) the number of aliens so certified who—

(A) were granted any form of relief from removal;

(B) were removed;

(C) the Attorney General has determined are no longer aliens who may be so certified; or

(D) were released from detention.

SEC. 413. MULTILATERAL COOPERATION AGAINST TERRORISTS.

Section 222(f) of the Immigration and Nationality Act (8 U.S.C. 1202(f)) is amended—

<< 8 USCA § 1202 >>

(1) by striking "except that in the discretion of" and inserting the following: "except that—

"(1) in the discretion of"; and

<< 8 USCA § 1202 >>

(2) by adding at the end the following:

"(2) the Secretary of State, in the Secretary's discretion and on the basis of reciprocity, may provide to a foreign government information in the Department of State's computerized visa lookout database and, when necessary and appropriate, other records covered by this section related to information in the database—

"(A) with regard to individual aliens, at any time on a case-by-case basis for the purpose of preventing, investigating, or punishing acts that would constitute a crime in the United States, including, but not limited to, terrorism or trafficking in controlled substances, persons, or illicit weapons; or

"(B) with regard to any or all aliens in the database, pursuant to such conditions as the Secretary of State shall establish in an agreement with the foreign government in which that government agrees to use such information and records for the purposes described in subparagraph (A) or to deny visas to persons who would be inadmissible to the United States.".

SEC. 414. VISA INTEGRITY AND SECURITY.

<< 8 USCA § 1365a NOTE >>

(a) SENSE OF CONGRESS REGARDING THE NEED TO EXPEDITE IMPLEMENTATION OF INTEGRATED ENTRY AND EXIT DATA SYSTEM.—

(1) SENSE OF CONGRESS.—In light of the terrorist attacks perpetrated against the United States on September 11, 2001, it is the sense of the Congress that—

(A) the Attorney General, in consultation with the Secretary of State, should fully implement the integrated entry and exit data system for airports, seaports, and land border ports of entry, as specified in section 110 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1365a), with all deliberate speed and as expeditiously as practicable; and

(B) the Attorney General, in consultation with the Secretary of State, the Secretary of Commerce, the Secretary of the Treasury, and the Office of Homeland Security, should immediately begin establishing the Integrated Entry and Exit Data System Task Force, as described in section 3 of the Immigration and Naturalization Service Data Management Improvement Act of 2000 (Public Law 106–215).

(2) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated such sums as may be necessary to fully implement the system described in paragraph (1)(A).

(b) DEVELOPMENT OF THE SYSTEM.—In the development of the integrated entry and exit data system under section 110 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1365a), the Attorney General and the Secretary of State shall particularly focus on—

(1) the utilization of biometric technology; and

(2) the development of tamper-resistant documents readable at ports of entry.

(c) INTERFACE WITH LAW ENFORCEMENT DATABASES.—The entry and exit data system described in this section shall be able to interface with law enforcement databases for use by Federal law enforcement to identify and detain individuals who pose a threat to the national security of the United States.

(d) REPORT ON SCREENING INFORMATION.—Not later than 12 months after the date of enactment of this Act, the Office of Homeland Security shall submit a report to Congress on the information that is needed from any United States agency to effectively screen visa applicants and applicants for admission to the United States to identify those affiliated with terrorist organizations or those that pose any threat to the safety or security of the United States, including the type of information currently received by United States agencies and the regularity with which such information is transmitted to the Secretary of State and the Attorney General.

<< 8 USCA § 1365a NOTE >>

SEC. 415. PARTICIPATION OF OFFICE OF HOMELAND SECURITY ON ENTRY–EXIT TASK FORCE.

Section 3 of the Immigration and Naturalization Service Data Management Improvement Act of 2000 (Public Law 106–215) is amended by striking "and the Secretary of the Treasury," and inserting "the Secretary of the Treasury, and the Office of Homeland Security".

SEC. 416. FOREIGN STUDENT MONITORING PROGRAM.

<< 8 USCA § 1372 NOTE >>

(a) FULL IMPLEMENTATION AND EXPANSION OF FOREIGN STUDENT VISA MONITORING PROGRAM REQUIRED.—The Attorney General, in consultation with the Secretary of State, shall fully implement and expand the program established by section 641(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372(a)).

<< 8 USCA § 1372 NOTE >>

(b) INTEGRATION WITH PORT OF ENTRY INFORMATION.—For each alien with respect to whom information is collected under section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372), the Attorney General, in consultation with the Secretary of State, shall include information on the date of entry and port of entry.

(c) EXPANSION OF SYSTEM TO INCLUDE OTHER APPROVED EDUCATIONAL INSTITUTIONS.—Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C.1372) is amended—

<< 8 USCA § 1372 >>

(1) in subsection (a)(1), subsection (c)(4)(A), and subsection (d)(1) (in the text above subparagraph (A)), by inserting ", other approved educational institutions," after "higher education" each place it appears;

<< 8 USCA § 1372 >>

(2) in subsections (c)(1)(C), (c)(1)(D), and (d)(1)(A), by inserting ", or other approved educational institution," after "higher education" each place it appears;

<< 8 USCA § 1372 >>

(3) in subsections (d)(2), (e)(1), and (e)(2), by inserting ", other approved educational institution," after "higher education" each place it appears; and

<< 8 USCA § 1372 >>

(4) in subsection (h), by adding at the end the following new paragraph:

"(3) OTHER APPROVED EDUCATIONAL INSTITUTION.—The term 'other approved educational institution' includes any air flight school, language training school, or vocational school, approved by the Attorney General, in consultation with the

AR.01233

Secretary of Education and the Secretary of State, under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act.".

 (d) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Department of Justice $36,800,000 for the period beginning on the date of enactment of this Act and ending on January 1, 2003, to fully implement and expand prior to January 1, 2003, the program established by section 641(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372(a)).

SEC. 417. MACHINE READABLE PASSPORTS.

<< 8 USCA § 1187 NOTE >>

 (a) AUDITS.—The Secretary of State shall, each fiscal year until September 30, 2007—

  (1) perform annual audits of the implementation of section 217(c)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1187(c)(2)(B));

  (2) check for the implementation of precautionary measures to prevent the counterfeiting and theft of passports; and

  (3) ascertain that countries designated under the visa waiver program have established a program to develop tamper-resistant passports.

<< 8 USCA § 1187 NOTE >>

 (b) PERIODIC REPORTS.—Beginning one year after the date of enactment of this Act, and every year thereafter until 2007, the Secretary of State shall submit a report to Congress setting forth the findings of the most recent audit conducted under subsection (a)(1).

<< 8 USCA § 1187 >>

 (c) ADVANCING DEADLINE FOR SATISFACTION OF REQUIREMENT.—Section 217(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1187(a)(3)) is amended by striking "2007" and inserting "2003".

 (d) WAIVER.—Section 217(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1187(a)(3)) is amended—

<< 8 USCA § 1187 >>

 (1) by striking "On or after" and inserting the following:

  "(A) IN GENERAL.—Except as provided in subparagraph (B), on or after"; and

<< 8 USCA § 1187 >>

 (2) by adding at the end the following:

  "(B) LIMITED WAIVER AUTHORITY.—For the period beginning October 1, 2003, and ending September 30, 2007, the Secretary of State may waive the requirement of subparagraph (A) with respect to nationals of a program country (as designated under subsection (c)), if the Secretary of State finds that the program country—

  "(i) is making progress toward ensuring that passports meeting the requirement of subparagraph (A) are generally available to its nationals; and

  "(ii) has taken appropriate measures to protect against misuse of passports the country has issued that do not meet the requirement of subparagraph (A).".

SEC. 418. PREVENTION OF CONSULATE SHOPPING.

<< 8 USCA § 1201 NOTE >>

 (a) REVIEW.—The Secretary of State shall review how consular officers issue visas to determine if consular shopping is a problem.

AR.01234

(b) ACTIONS TO BE TAKEN.—If the Secretary of State determines under subsection (a) that consular shopping is a problem, the Secretary shall take steps to address the problem and shall submit a report to Congress describing what action was taken.

Subtitle C—Preservation of Immigration Benefits for Victims of Terrorism

SEC. 421. SPECIAL IMMIGRANT STATUS.

(a) IN GENERAL.—For purposes of the Immigration and Nationality Act (8 U. S.C. 1101 et seq.), the Attorney General may provide an alien described in subsection (b) with the status of a special immigrant under section 101(a)(27) of such Act (8 U.S.C. 1101(a(27)), if the alien—

(1) files with the Attorney General a petition under section 204 of such Act (8 U.S.C. 1154) for classification under section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4)); and

(2) is otherwise eligible to receive an immigrant visa and is otherwise admissible to the United States for permanent residence, except in determining such admissibility, the grounds for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4)) shall not apply.

(b) ALIENS DESCRIBED.—

(1) PRINCIPAL ALIENS.—An alien is described in this subsection if—

(A) the alien was the beneficiary of—

(i) a petition that was filed with the Attorney General on or before September 11, 2001—

(I) under section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) to classify the alien as a family-sponsored immigrant under section 203(a) of such Act (8 U.S.C. 1153(a)) or as an employment-based immigrant under section 203(b) of such Act (8 U.S.C. 1153(b)); or

(II) under section 214(d) (8 U.S.C. 1184(d)) of such Act to authorize the issuance of a nonimmigrant visa to the alien under section 101(a)(15)(K) of such Act (8 U.S.C. 1101(a)(15)(K)); or

(ii) an application for labor certification under section 212(a)(5)(A) of such Act (8 U.S.C. 1182(a)(5)(A)) that was filed under regulations of the Secretary of Labor on or before such date; and

(B) such petition or application was revoked or terminated (or otherwise rendered null), either before or after its approval, due to a specified terrorist activity that directly resulted in—

(i) the death or disability of the petitioner, applicant, or alien beneficiary; or

(ii) loss of employment due to physical damage to, or destruction of, the business of the petitioner or applicant.

(2) SPOUSES AND CHILDREN.—

(A) IN GENERAL.—An alien is described in this subsection if—

(i) the alien was, on September 10, 2001, the spouse or child of a principal alien described in paragraph (1); and

(ii) the alien—

(I) is accompanying such principal alien; or

(II) is following to join such principal alien not later than September 11, 2003.

(B) CONSTRUCTION.—For purposes of construing the terms "accompanying" and "following to join" in subparagraph (A)(ii), any death of a principal alien that is described in paragraph (1)(B)(i) shall be disregarded.

(3) GRANDPARENTS OF ORPHANS.—An alien is described in this subsection if the alien is a grandparent of a child, both of whose parents died as a direct result of a specified terrorist activity, if either of such deceased parents was, on September 10, 2001, a citizen or national of the United States or an alien lawfully admitted for permanent residence in the United States.

(c) PRIORITY DATE.—Immigrant visas made available under this section shall be issued to aliens in the order in which a petition on behalf of each such alien is filed with the Attorney General under subsection (a)(1), except that if an alien was assigned a priority date with respect to a petition described in subsection (b)(1)(A)(i), the alien may maintain that priority date.

(d) NUMERICAL LIMITATIONS.—For purposes of the application of sections 201 through 203 of the Immigration and Nationality Act (8 U.S.C. 1151–1153) in any fiscal year, aliens eligible to be provided status under this section shall be treated as special immigrants described in section 101(a)(27) of such Act (8 U.S.C. 1101(a)(27)) who are not described in subparagraph (A), (B), (C), or (K) of such section.

SEC. 422. EXTENSION OF FILING OR REENTRY DEADLINES.

AR.01235

(a) AUTOMATIC EXTENSION OF NONIMMIGRANT STATUS.—

  (1) IN GENERAL.—Notwithstanding section 214 of the Immigration and Nationality Act (8 U.S.C. 1184), in the case of an alien described in paragraph (2) who was lawfully present in the United States as a nonimmigrant on September 10, 2001, the alien may remain lawfully in the United States in the same nonimmigrant status until the later of—

    (A) the date such lawful nonimmigrant status otherwise would have terminated if this subsection had not been enacted; or

    (B) 1 year after the death or onset of disability described in paragraph (2).

  (2) ALIENS DESCRIBED.—

    (A) PRINCIPAL ALIENS.—An alien is described in this paragraph if the alien was disabled as a direct result of a specified terrorist activity.

    (B) SPOUSES AND CHILDREN.—An alien is described in this paragraph if the alien was, on September 10, 2001, the spouse or child of—

      (i) a principal alien described in subparagraph (A); or

      (ii) an alien who died as a direct result of a specified terrorist activity.

  (3) AUTHORIZED EMPLOYMENT.—During the period in which a principal alien or alien spouse is in lawful nonimmigrant status under paragraph (1), the alien shall be provided an "employment authorized" endorsement or other appropriate document signifying authorization of employment not later than 30 days after the alien requests such authorization.

(b) NEW DEADLINES FOR EXTENSION OR CHANGE OF NONIMMIGRANT STATUS.—

  (1) FILING DELAYS.—In the case of an alien who was lawfully present in the United States as a nonimmigrant on September 10, 2001, if the alien was prevented from filing a timely application for an extension or change of nonimmigrant status as a direct result of a specified terrorist activity, the alien's application shall be considered timely filed if it is filed not later than 60 days after it otherwise would have been due.

  (2) DEPARTURE DELAYS.—In the case of an alien who was lawfully present in the United States as a nonimmigrant on September 10, 2001, if the alien is unable timely to depart the United States as a direct result of a specified terrorist activity, the alien shall not be considered to have been unlawfully present in the United States during the period beginning on September 11, 2001, and ending on the date of the alien's departure, if such departure occurs on or before November 11, 2001.

  (3) SPECIAL RULE FOR ALIENS UNABLE TO RETURN FROM ABROAD.—

    (A) PRINCIPAL ALIENS.—In the case of an alien who was in a lawful nonimmigrant status on September 10, 2001, but who was not present in the United States on such date, if the alien was prevented from returning to the United States in order to file a timely application for an extension of nonimmigrant status as a direct result of a specified terrorist activity—

      (i) the alien's application shall be considered timely filed if it is filed not later than 60 days after it otherwise would have been due; and

      (ii) the alien's lawful nonimmigrant status shall be considered to continue until the later of—

        (I) the date such status otherwise would have terminated if this subparagraph had not been enacted; or

        (II) the date that is 60 days after the date on which the application described in clause (i) otherwise would have been due.

    (B) SPOUSES AND CHILDREN.—In the case of an alien who is the spouse or child of a principal alien described in subparagraph (A), if the spouse or child was in a lawful nonimmigrant status on September 10, 2001, the spouse or child may remain lawfully in the United States in the same nonimmigrant status until the later of—

      (i) the date such lawful nonimmigrant status otherwise would have terminated if this subparagraph had not been enacted; or

      (ii) the date that is 60 days after the date on which the application described in subparagraph (A) otherwise would have been due.

  (4) CIRCUMSTANCES PREVENTING TIMELY ACTION.—

    (A) FILING DELAYS.—For purposes of paragraph (1), circumstances preventing an alien from timely acting are—

      (i) office closures;

      (ii) mail or courier service cessations or delays; and

      (iii) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

    (B) DEPARTURE AND RETURN DELAYS.—For purposes of paragraphs (2) and (3), circumstances preventing an alien from timely acting are—

      (i) office closures;

      (ii) airline flight cessations or delays; and

(iii) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(c) DIVERSITY IMMIGRANTS.—

(1) WAIVER OF FISCAL YEAR LIMITATION.—Notwithstanding section 203(e)(2) of the Immigration and Nationality Act (8 U.S.C. 1153(e)(2)), an immigrant visa number issued to an alien under section 203(c) of such Act for fiscal year 2001 may be used by the alien during the period beginning on October 1, 2001, and ending on April 1, 2002, if the alien establishes that the alien was prevented from using it during fiscal year 2001 as a direct result of a specified terrorist activity.

(2) WORLDWIDE LEVEL.—In the case of an alien entering the United States as a lawful permanent resident, or adjusting to that status, under paragraph (1) or (3), the alien shall be counted as a diversity immigrant for fiscal year 2001 for purposes of section 201(e) of the Immigration and Nationality Act (8 U.S.C. 1151(e)), unless the worldwide level under such section for such year has been exceeded, in which case the alien shall be counted as a diversity immigrant for fiscal year 2002.

(3) TREATMENT OF FAMILY MEMBERS OF CERTAIN ALIENS.—In the case of a principal alien issued an immigrant visa number under section 203(c) of the Immigration and Nationality Act (8 U.S.C. 1153(c)) for fiscal year 2001, if such principal alien died as a direct result of a specified terrorist activity, the aliens who were, on September 10, 2001, the spouse and children of such principal alien shall, until June 30, 2002, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c) of section 203 of such Act, be entitled to the same status, and the same order of consideration, that would have been provided to such alien spouse or child under section 203(d) of such Act as if the principal alien were not deceased and as if the spouse or child's visa application had been adjudicated by September 30, 2001.

(4) CIRCUMSTANCES PREVENTING TIMELY ACTION.—For purposes of paragraph (1), circumstances preventing an alien from using an immigrant visa number during fiscal year 2001 are—

(A) office closures;

(B) mail or courier service cessations or delays;

(C) airline flight cessations or delays; and

(D) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(d) EXTENSION OF EXPIRATION OF IMMIGRANT VISAS.—

(1) IN GENERAL.—Notwithstanding the limitations under section 221(c) of the Immigration and Nationality Act (8 U.S.C. 1201(c)), in the case of any immigrant visa issued to an alien that expires or expired before December 31, 2001, if the alien was unable to effect entry into the United States as a direct result of a specified terrorist activity, then the period of validity of the visa is extended until December 31, 2001, unless a longer period of validity is otherwise provided under this subtitle.

(2) CIRCUMSTANCES PREVENTING ENTRY.—For purposes of this subsection, circumstances preventing an alien from effecting entry into the United States are—

(A) office closures;

(B) airline flight cessations or delays; and

(C) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(e) GRANTS OF PAROLE EXTENDED.—

(1) IN GENERAL.—In the case of any parole granted by the Attorney General under section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)) that expires on a date on or after September 11, 2001, if the alien beneficiary of the parole was unable to return to the United States prior to the expiration date as a direct result of a specified terrorist activity, the parole is deemed extended for an additional 90 days.

(2) CIRCUMSTANCES PREVENTING RETURN.—For purposes of this subsection, circumstances preventing an alien from timely returning to the United States are—

(A) office closures;

(B) airline flight cessations or delays; and

(C) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(f) VOLUNTARY DEPARTURE.—Notwithstanding section 240B of the Immigration and Nationality Act (8 U.S.C. 1229c), if a period for voluntary departure under such section expired during the period beginning on September 11, 2001, and ending on October 11, 2001, such voluntary departure period is deemed extended for an additional 30 days.

SEC. 423. HUMANITARIAN RELIEF FOR CERTAIN SURVIVING SPOUSES AND CHILDREN.

(a) TREATMENT AS IMMEDIATE RELATIVES.—

(1) SPOUSES.—Notwithstanding the second sentence of section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)), in the case of an alien who was the spouse of a citizen of the United States at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, if the citizen died as a direct result of a specified terrorist activity, the alien (and each child of the alien) shall be considered, for purposes of section 201(b) of such Act, to remain an immediate relative after the date of the citizen's death, but only if the alien files a petition under section 204(a)(1)(A)(ii) of such Act within 2 years after such date and only until the date the alien remarries. For purposes of such section 204(a)(1)(A)(ii), an alien granted relief under the preceding sentence shall be considered an alien spouse described in the second sentence of section 201(b)(2)(A)(i) of such Act.

(2) CHILDREN.—

(A) IN GENERAL.—In the case of an alien who was the child of a citizen of the United States at the time of the citizen's death, if the citizen died as a direct result of a specified terrorist activity, the alien shall be considered, for purposes of section 201(b) of the Immigration and Nationality Act (8 U.S.C. 1151(b)), to remain an immediate relative after the date of the citizen's death (regardless of changes in age or marital status thereafter), but only if the alien files a petition under subparagraph (B) within 2 years after such date.

(B) PETITIONS.—An alien described in subparagraph (A) may file a petition with the Attorney General for classification of the alien under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)). For purposes of such Act, such a petition shall be considered a petition filed under section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)).

(b) SPOUSES, CHILDREN, UNMARRIED SONS AND DAUGHTERS OF LAWFUL PERMANENT RESIDENT ALIENS.—

(1) IN GENERAL.—Any spouse, child, or unmarried son or daughter of an alien described in paragraph (3) who is included in a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1153(a)(2)) that was filed by such alien before September 11, 2001, shall be considered (if the spouse, child, son, or daughter has not been admitted or approved for lawful permanent residence by such date) a valid petitioner for preference status under such section with the same priority date as that assigned prior to the death described in paragraph (3)(A). No new petition shall be required to be filed. Such spouse, child, son, or daughter may be eligible for deferred action and work authorization.

(2) SELF–PETITIONS.—Any spouse, child, or unmarried son or daughter of an alien described in paragraph (3) who is not a beneficiary of a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act may file a petition for such classification with the Attorney General, if the spouse, child, son, or daughter was present in the United States on September 11, 2001. Such spouse, child, son, or daughter may be eligible for deferred action and work authorization.

(3) ALIENS DESCRIBED.—An alien is described in this paragraph if the alien—

(A) died as a direct result of a specified terrorist activity; and

(B) on the day of such death, was lawfully admitted for permanent residence in the United States.

(c) APPLICATIONS FOR ADJUSTMENT OF STATUS BY SURVIVING SPOUSES AND CHILDREN OF EMPLOYMENT–BASED IMMIGRANTS.—

(1) IN GENERAL.—Any alien who was, on September 10, 2001, the spouse or child of an alien described in paragraph (2), and who applied for adjustment of status prior to the death described in paragraph (2)(A), may have such application adjudicated as if such death had not occurred.

(2) ALIENS DESCRIBED.—An alien is described in this paragraph if the alien—

(A) died as a direct result of a specified terrorist activity; and

(B) on the day before such death, was—

(i) an alien lawfully admitted for permanent residence in the United States by reason of having been allotted a visa under section 203(b) of the Immigration and Nationality Act (8 U.S.C. 1153(b)); or

(ii) an applicant for adjustment of status to that of an alien described in clause (i), and admissible to the United States for permanent residence.

(d) WAIVER OF PUBLIC CHARGE GROUNDS.—In determining the admissibility of any alien accorded an immigration benefit under this section, the grounds for inadmissibility specified in section 212(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(4)) shall not apply.

SEC. 424. "AGE–OUT" PROTECTION FOR CHILDREN.

For purposes of the administration of the Immigration and Nationality Act (8 U.S.C. 1101 et seq.), in the case of an alien—

(1) whose 21st birthday occurs in September 2001, and who is the beneficiary of a petition or application filed under such Act on or before September 11, 2001, the alien shall be considered to be a child for 90 days after the alien's 21st birthday for purposes of adjudicating such petition or application; and

(2) whose 21st birthday occurs after September 2001, and who is the beneficiary of a petition or application filed under such Act on or before September 11, 2001, the alien shall be considered to be a child for 45 days after the alien's 21st birthday for purposes of adjudicating such petition or application.

SEC. 425. TEMPORARY ADMINISTRATIVE RELIEF.

The Attorney General, for humanitarian purposes or to ensure family unity, may provide temporary administrative relief to any alien who—

(1) was lawfully present in the United States on September 10, 2001;

(2) was on such date the spouse, parent, or child of an individual who died or was disabled as a direct result of a specified terrorist activity; and

(3) is not otherwise entitled to relief under any other provision of this subtitle.

SEC. 426. EVIDENCE OF DEATH, DISABILITY, OR LOSS OF EMPLOYMENT.

(a) IN GENERAL.—The Attorney General shall establish appropriate standards for evidence demonstrating, for purposes of this subtitle, that any of the following occurred as a direct result of a specified terrorist activity:

(1) Death.

(2) Disability.

(3) Loss of employment due to physical damage to, or destruction of, a business.

(b) WAIVER OF REGULATIONS.—The Attorney General shall carry out subsection (a) as expeditiously as possible. The Attorney General is not required to promulgate regulations prior to implementing this subtitle.

SEC. 427. NO BENEFITS TO TERRORISTS OR FAMILY MEMBERS OF TERRORISTS.

Notwithstanding any other provision of this subtitle, nothing in this subtitle shall be construed to provide any benefit or relief to—

(1) any individual culpable for a specified terrorist activity; or

(2) any family member of any individual described in paragraph (1).

SEC. 428. DEFINITIONS.

(a) APPLICATION OF IMMIGRATION AND NATIONALITY ACT PROVISIONS.—Except as otherwise specifically provided in this subtitle, the definitions used in the Immigration and Nationality Act (excluding the definitions applicable exclusively to title III of such Act) shall apply in the administration of this subtitle.

(b) SPECIFIED TERRORIST ACTIVITY.—For purposes of this subtitle, the term "specified terrorist activity" means any terrorist activity conducted against the Government or the people of the United States on September 11, 2001.

TITLE V—REMOVING OBSTACLES TO INVESTIGATING TERRORISM

<< 18 USCA § 3071 NOTE >>

SEC. 501. ATTORNEY GENERAL'S AUTHORITY TO PAY REWARDS TO COMBAT TERRORISM.

(a) PAYMENT OF REWARDS TO COMBAT TERRORISM.—Funds available to the Attorney General may be used for the payment of rewards pursuant to public advertisements for assistance to the Department of Justice to combat terrorism and defend the Nation against terrorist acts, in accordance with procedures and regulations established or issued by the Attorney General.

(b) CONDITIONS.—In making rewards under this section—

(1) no such reward of $250,000 or more may be made or offered without the personal approval of either the Attorney General or the President;

(2) the Attorney General shall give written notice to the Chairmen and ranking minority members of the Committees on Appropriations and the Judiciary of the Senate and of the House of Representatives not later than 30 days after the approval of a reward under paragraph (1);

(3) any executive agency or military department (as defined, respectively, in sections 105 and 102 of title 5, United States Code) may provide the Attorney General with funds for the payment of rewards;

(4) neither the failure of the Attorney General to authorize a payment nor the amount authorized shall be subject to judicial review; and

(5) no such reward shall be subject to any per—or aggregate reward spending limitation established by law, unless that law expressly refers to this section, and no reward paid pursuant to any such offer shall count toward any such aggregate reward spending limitation.

## SEC. 502. SECRETARY OF STATE'S AUTHORITY TO PAY REWARDS.

Section 36 of the State Department Basic Authorities Act of 1956 (Public Law 885, August 1, 1956; 22 U.S.C. 2708) is amended—

(1) in subsection (b)—

<< 22 USCA § 2708 >>

(A) in paragraph (4), by striking "or" at the end;

<< 22 USCA § 2708 >>

(B) in paragraph (5), by striking the period at the end and inserting ", including by dismantling an organization in whole or significant part; or"; and

<< 22 USCA § 2708 >>

(C) by adding at the end the following:

"(6) the identification or location of an individual who holds a key leadership position in a terrorist organization.";

<< 22 USCA § 2708 >>

(2) in subsection (d), by striking paragraphs (2) and (3) and redesignating paragraph (4) as paragraph (2); and

<< 22 USCA § 2708 >>

(3) in subsection (e)(1), by inserting ", except as personally authorized by the Secretary of State if he determines that offer or payment of an award of a larger amount is necessary to combat terrorism or defend the Nation against terrorist acts." after "$5,000,000".

<< 42 USCA § 14135a >>

## SEC. 503. DNA IDENTIFICATION OF TERRORISTS AND OTHER VIOLENT OFFENDERS.

Section 3(d)(2) of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a(d)(2)) is amended to read as follows:

"(2) In addition to the offenses described in paragraph (1), the following offenses shall be treated for purposes of this section as qualifying Federal offenses, as determined by the Attorney General:

"(A) Any offense listed in section 2332b(g)(5)(B) of title 18, United States Code.

"(B) Any crime of violence (as defined in section 16 of title 18, United States Code).

"(C) Any attempt or conspiracy to commit any of the above offenses.".

SEC. 504. COORDINATION WITH LAW ENFORCEMENT.

<< 50 USCA § 1806 >>

 (a) INFORMATION ACQUIRED FROM AN ELECTRONIC SURVEILLANCE.—Section 106 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1806), is amended by adding at the end the following:

"(k)(1) Federal officers who conduct electronic surveillance to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against—

"(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

"(2) Coordination authorized under paragraph (1) shall not preclude the certification required by section 104(a)(7)(B) or the entry of an order under section 105.".

<< 50 USCA § 1825 >>

 (b) INFORMATION ACQUIRED FROM A PHYSICAL SEARCH.—Section 305 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1825) is amended by adding at the end the following:

"(k)(1) Federal officers who conduct physical searches to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against—

"(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

"(2) Coordination authorized under paragraph (1) shall not preclude the certification required by section 303(a)(7) or the entry of an order under section 304.".

SEC. 505. MISCELLANEOUS NATIONAL SECURITY AUTHORITIES.

 (a) TELEPHONE TOLL AND TRANSACTIONAL RECORDS.—Section 2709(b) of title 18, United States Code, is amended—

<< 18 USCA § 2709 >>

 (1) in the matter preceding paragraph (1), by inserting "at Bureau headquarters or a Special Agent in Charge in a Bureau field office designated by the Director" after "Assistant Director";

<< 18 USCA § 2709 >>

(2) in paragraph (1)—

 (A) by striking "in a position not lower than Deputy Assistant Director"; and

 (B) by striking "made that" and all that follows and inserting the following: "made that the name, address, length of service, and toll billing records sought are relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely on the basis of activities protected by the first amendment to the Constitution of the United States; and"; and

<< 18 USCA § 2709 >>

(3) in paragraph (2)—

(A) by striking "in a position not lower than Deputy Assistant Director"; and

(B) by striking "made that" and all that follows and inserting the following: "made that the information sought is relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.".

<< 12 USCA § 3414 >>

(b) FINANCIAL RECORDS.—Section 1114(a)(5)(A) of the Right to Financial Privacy Act of 1978 (12 U.S.C. 3414(a)(5) (A)) is amended—

(1) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge in a Bureau field office designated by the Director" after "designee"; and

(2) by striking "sought" and all that follows and inserting "sought for foreign counter intelligence purposes to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.".

(c) CONSUMER REPORTS.—Section 624 of the Fair Credit Reporting Act (15 U. S.C. 1681u) is amended—

<< 15 USCA § 1681u >>

(1) in subsection (a)—

(A) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge of a Bureau field office designated by the Director" after "designee" the first place it appears; and

(B) by striking "in writing that" and all that follows through the end and inserting the following: "in writing, that such information is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.";

<< 15 USCA § 1681u >>

(2) in subsection (b)—

(A) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge of a Bureau field office designated by the Director" after "designee" the first place it appears; and

(B) by striking "in writing that" and all that follows through the end and inserting the following: "in writing that such information is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States."; and

<< 15 USCA § 1681u >>

(3) in subsection (c)—

(A) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge in a Bureau field office designated by the Director" after "designee of the Director"; and

(B) by striking "in camera that" and all that follows through "States. " and inserting the following: "in camera that the consumer report is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.".

SEC. 506. EXTENSION OF SECRET SERVICE JURISDICTION.

<< 18 USCA § 1030 >>

(a) Concurrent Jurisdiction Under 18 U.S.C. 1030—Section 1030(d) of title 18, United States Code, is amended to read as follows:

"(d)(1) The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

"(2) The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

"(3) Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.".

<< 18 USCA § 3056 >>

(b) Reauthorization of Jurisdiction under 18 U.S.C. 1344—Section 3056(b)(3) of title 18, United States Code, is amended by striking "credit and debit card frauds, and false identification documents or devices" and inserting "access device frauds, false identification documents or devices, and any fraud or other criminal or unlawful activity in or against any federally insured financial institution".

SEC. 507. DISCLOSURE OF EDUCATIONAL RECORDS.

<< 20 USCA § 1232g >>

Section 444 of the General Education Provisions Act (20 U.S.C. 1232g), is amended by adding after subsection (i) a new subsection (j) to read as follows:

"(j) INVESTIGATION AND PROSECUTION OF TERRORISM.—

"(1) IN GENERAL.—Notwithstanding subsections (a) through (i) or any provision of State law, the Attorney General (or any Federal officer or employee, in a position not lower than an Assistant Attorney General, designated by the Attorney General) may submit a written application to a court of competent jurisdiction for an ex parte order requiring an educational agency or institution to permit the Attorney General (or his designee) to—

"(A) collect education records in the possession of the educational agency or institution that are relevant to an authorized investigation or prosecution of an offense listed in section 2332b(g)(5)(B) of title 18 United States Code, or an act of domestic or international terrorism as defined in section 2331 of that title; and

"(B) for official purposes related to the investigation or prosecution of an offense described in paragraph (1)(A), retain, disseminate, and use (including as evidence at trial or in other administrative or judicial proceedings) such records, consistent with such guidelines as the Attorney General, after consultation with the Secretary, shall issue to protect confidentiality.

"(2) APPLICATION AND APPROVAL.—

"(A) IN GENERAL.—An application under paragraph (1) shall certify that there are specific and articulable facts giving reason to believe that the education records are likely to contain information described in paragraph (1)(A).

"(B) The court shall issue an order described in paragraph (1) if the court finds that the application for the order includes the certification described in subparagraph (A).

"(3) PROTECTION OF EDUCATIONAL AGENCY OR INSTITUTION.—An educational agency or institution that, in good faith, produces education records in accordance with an order issued under this subsection shall not be liable to any person for that production.

"(4) RECORD–KEEPING.—Subsection (b)(4) does not apply to education records subject to a court order under this subsection.".

SEC. 508. DISCLOSURE OF INFORMATION FROM NCES SURVEYS.

<< 20 USCA § 9007 >>

Section 408 of the National Education Statistics Act of 1994 (20 U.S.C. 9007), is amended by adding after subsection (b) a new subsection (c) to read as follows:

"(c) INVESTIGATION AND PROSECUTION OF TERRORISM.—

"(1) IN GENERAL.—Notwithstanding subsections (a) and (b), the Attorney General (or any Federal officer or employee, in a position not lower than an Assistant Attorney General, designated by the Attorney General) may submit a written application to a court of competent jurisdiction for an ex parte order requiring the Secretary to permit the Attorney General (or his designee) to—

"(A) collect reports, records, and information (including individually identifiable information) in the possession of the center that are relevant to an authorized investigation or prosecution of an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, or an act of domestic or international terrorism as defined in section 2331 of that title; and

"(B) for official purposes related to the investigation or prosecution of an offense described in paragraph (1)(A), retain, disseminate, and use (including as evidence at trial or in other administrative or judicial proceedings) such information, consistent with such guidelines as the Attorney General, after consultation with the Secretary, shall issue to protect confidentiality.

"(2) APPLICATION AND APPROVAL.—

"(A) IN GENERAL.—An application under paragraph (1) shall certify that there are specific and articulable facts giving reason to believe that the information sought is described in paragraph (1)(A).

"(B) The court shall issue an order described in paragraph (1) if the court finds that the application for the order includes the certification described in subparagraph (A).

"(3) PROTECTION.—An officer or employee of the Department who, in good faith, produces information in accordance with an order issued under this subsection does not violate subsection (b)(2) and shall not be liable to any person for that production.".

TITLE VI—PROVIDING FOR VICTIMS OF TERRORISM, PUBLIC SAFETY OFFICERS, AND THEIR FAMILIES

Subtitle A—Aid to Families of Public Safety Officers

<< 42 USCA § 3796c–1 >>

SEC. 611. EXPEDITED PAYMENT FOR PUBLIC SAFETY OFFICERS INVOLVED IN THE PREVENTION, INVESTIGATION, RESCUE, OR RECOVERY EFFORTS RELATED TO A TERRORIST ATTACK.

(a) IN GENERAL.—Notwithstanding the limitations of subsection (b) of section 1201 or the provisions of subsections (c), (d), and (e) of such section or section 1202 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796, 3796a), upon certification (containing identification of all eligible payees of benefits pursuant to section 1201 of such Act) by a public agency that a public safety officer employed by such agency was killed or suffered a catastrophic injury producing permanent and total disability as a direct and proximate result of a personal injury sustained in the line of duty as described in section 1201 of such Act in connection with prevention, investigation, rescue, or recovery efforts related to a terrorist attack, the Director of the Bureau of Justice Assistance shall authorize payment to qualified beneficiaries, said payment to be made not later than 30 days after receipt of such certification, benefits described under subpart 1 of part L of such Act (42 U.S.C. 3796 et seq.).

(b) DEFINITIONS.—For purposes of this section, the terms "catastrophic injury", "public agency", and "public safety officer" have the same meanings given such terms in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796b).

SEC. 612. TECHNICAL CORRECTION WITH RESPECT TO EXPEDITED PAYMENTS FOR HEROIC PUBLIC SAFETY OFFICERS.

Section 1 of Public Law 107–37 (an Act to provide for the expedited payment of certain benefits for a public safety officer who was killed or suffered a catastrophic injury as a direct and proximate result of a personal injury sustained in the line of duty in connection with the terrorist attacks of September 11, 2001) is amended by—

(1) inserting before "by a" the following: "(containing identification of all eligible payees of benefits pursuant to section 1201)";

(2) inserting "producing permanent and total disability" after "suffered a catastrophic injury"; and

(3) striking "1201(a)" and inserting "1201".

## SEC. 613. PUBLIC SAFETY OFFICERS BENEFIT PROGRAM PAYMENT INCREASE.

<< 42 USCA § 3796 >>

(a) PAYMENTS.—Section 1201(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796) is amended by striking "$100,000" and inserting "$250,000".

<< 42 USCA § 3796 NOTE >>

(b) APPLICABILITY.—The amendment made by subsection (a) shall apply to any death or disability occurring on or after January 1, 2001.

## SEC. 614. OFFICE OF JUSTICE PROGRAMS.

Section 112 of title I of section 101(b) of division A of Public Law 105–277 and section 108(a) of appendix A of Public Law 106–113 (113 Stat. 1501A–20) are amended—

(1) after "that Office", each place it occurs, by inserting "(including, notwithstanding any contrary provision of law (unless the same should expressly refer to this section), any organization that administers any program established in title 1 of Public Law 90–351)"; and

(2) by inserting "functions, including any" after "all".

### Subtitle B—Amendments to the Victims of Crime Act of 1984

## SEC. 621. CRIME VICTIMS FUND.

(a) DEPOSIT OF GIFTS IN THE FUND.—Section 1402(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(b)) is amended—

<< 42 USCA § 10601 >>

(1) in paragraph (3), by striking "and" at the end;

<< 42 USCA § 10601 >>

(2) in paragraph (4), by striking the period at the end and inserting "; and"; and

<< 42 USCA § 10601 >>

(3) by adding at the end the following:

"(5) any gifts, bequests, or donations to the Fund from private entities or individuals.".

<< 42 USCA § 10601 >>

(b) FORMULA FOR FUND DISTRIBUTIONS.—Section 1402(c) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(c)) is amended to read as follows:

"(c) FUND DISTRIBUTION; RETENTION OF SUMS IN FUND; AVAILABILITY FOR EXPENDITURE WITHOUT FISCAL YEAR LIMITATION.—

"(1) Subject to the availability of money in the Fund, in each fiscal year, beginning with fiscal year 2003, the Director shall distribute not less than 90 percent nor more than 110 percent of the amount distributed from the Fund in the previous fiscal year, except the Director may distribute up to 120 percent of the amount distributed in the previous fiscal year in any fiscal year that the total amount available in the Fund is more than 2 times the amount distributed in the previous fiscal year.

"(2) In each fiscal year, the Director shall distribute amounts from the Fund in accordance with subsection (d). All sums not distributed during a fiscal year shall remain in reserve in the Fund to be distributed during a subsequent fiscal year. Notwithstanding any other provision of law, all sums deposited in the Fund that are not distributed shall remain in reserve in the Fund for obligation in future fiscal years, without fiscal year limitation.".

(c) ALLOCATION OF FUNDS FOR COSTS AND GRANTS.—Section 1402(d)(4) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)(4)) is amended—

<< 42 USCA § 10601 >>

(1) by striking "deposited in" and inserting "to be distributed from";

<< 42 USCA § 10601 >>

(2) in subparagraph (A), by striking "48.5" and inserting "47.5";

<< 42 USCA § 10601 >>

(3) in subparagraph (B), by striking "48.5" and inserting "47.5"; and

<< 42 USCA § 10601 >>

(4) in subparagraph (C), by striking "3" and inserting "5".

<< 42 USCA § 10601 >>

(d) ANTITERRORISM EMERGENCY RESERVE.—Section 1402(d)(5) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)(5)) is amended to read as follows:

"(5)(A) In addition to the amounts distributed under paragraphs (2), (3), and (4), the Director may set aside up to $50,000,000 from the amounts transferred to the Fund in response to the airplane hijackings and terrorist acts that occurred on September 11, 2001, as an antiterrorism emergency reserve. The Director may replenish any amounts expended from such reserve in subsequent fiscal years by setting aside up to 5 percent of the amounts remaining in the Fund in any fiscal year after distributing amounts under paragraphs (2), (3) and (4). Such reserve shall not exceed $50,000,000.

"(B) The antiterrorism emergency reserve referred to in subparagraph (A) may be used for supplemental grants under section 1404B and to provide compensation to victims of international terrorism under section 1404C.

"(C) Amounts in the antiterrorism emergency reserve established pursuant to subparagraph (A) may be carried over from fiscal year to fiscal year. Notwithstanding subsection (c) and section 619 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2001 (and any similar limitation on Fund obligations in any future Act, unless the same should expressly refer to this section), any such amounts carried over shall not be subject to any limitation on obligations from amounts deposited to or available in the Fund.".

<< 42 USCA § 10601 NOTE >>

(e) VICTIMS OF SEPTEMBER 11, 2001.—Amounts transferred to the Crime Victims Fund for use in responding to the airplane hijackings and terrorist acts (including any related search, rescue, relief, assistance, or other similar activities) that occurred on September 11, 2001, shall not be subject to any limitation on obligations from amounts deposited to or available in the Fund, notwithstanding—

(1) section 619 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2001, and any similar limitation on Fund obligations in such Act for Fiscal Year 2002; and

(2) subsections (c) and (d) of section 1402 of the Victims of Crime Act of 1984 (42 U.S.C. 10601).

SEC. 622. CRIME VICTIM COMPENSATION.

<< 42 USCA § 10602 >>

(a) ALLOCATION OF FUNDS FOR COMPENSATION AND ASSISTANCE.—Paragraphs (1) and (2) of section 1403(a) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(a)) are amended by inserting "in fiscal year 2002 and of 60 percent in subsequent fiscal years" after "40 percent".

<< 42 USCA § 10602 >>

(b) LOCATION OF COMPENSABLE CRIME.—Section 1403(b)(6)(B) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(b)(6)(B)) is amended by striking "are outside the United States (if the compensable crime is terrorism, as defined in section 2331 of title 18), or".

<< 42 USCA § 10602 >>

(c) RELATIONSHIP OF CRIME VICTIM COMPENSATION TO MEANS–TESTED FEDERAL BENEFIT PROGRAMS.—Section 1403 of the Victims of Crime Act of 1984 (42 U.S.C. 10602) is amended by striking subsection (c) and inserting the following:

"(c) EXCLUSION FROM INCOME, RESOURCES, AND ASSETS FOR PURPOSES OF MEANS TESTS.—Notwithstanding any other law (other than title IV of Public Law 107–42), for the purpose of any maximum allowed income, resource, or asset eligibility requirement in any Federal, State, or local government program using Federal funds that provides medical or other assistance (or payment or reimbursement of the cost of such assistance), any amount of crime victim compensation that the applicant receives through a crime victim compensation program under this section shall not be included in the income, resources, or assets of the applicant, nor shall that amount reduce the amount of the assistance available to the applicant from Federal, State, or local government programs using Federal funds, unless the total amount of assistance that the applicant receives from all such programs is sufficient to fully compensate the applicant for losses suffered as a result of the crime.".

(d) DEFINITIONS OF "COMPENSABLE CRIME" AND "STATE".—Section 1403(d) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(d)) is amended—

<< 42 USCA § 10602 >>

(1) in paragraph (3), by striking "crimes involving terrorism,"; and

<< 42 USCA § 10602 >>

(2) in paragraph (4), by inserting "the United States Virgin Islands," after "the Commonwealth of Puerto Rico,".

(e) RELATIONSHIP OF ELIGIBLE CRIME VICTIM COMPENSATION PROGRAMS TO THE SEPTEMBER 11TH VICTIM COMPENSATION FUND.—

<< 42 USCA § 10602 >>

(1) IN GENERAL.—Section 1403(e) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(e)) is amended by inserting "including the program established under title IV of Public Law 107–42," after "Federal program,".

<< 49 USCA § 40101 NOTE >>

AR.01247

(2) COMPENSATION.—With respect to any compensation payable under title IV of Public Law 107–42, the failure of a crime victim compensation program, after the effective date of final regulations issued pursuant to section 407 of Public Law 107–42, to provide compensation otherwise required pursuant to section 1403 of the Victims of Crime Act of 1984 (42 U.S.C. 10602) shall not render that program ineligible for future grants under the Victims of Crime Act of 1984.

SEC. 623. CRIME VICTIM ASSISTANCE.

<< 42 USCA § 10603 >>

(a) ASSISTANCE FOR VICTIMS IN THE DISTRICT OF COLUMBIA, PUERTO RICO, AND OTHER TERRITORIES AND POSSESSIONS.—Section 1404(a) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(a)) is amended by adding at the end the following:

"(6) An agency of the Federal Government performing local law enforcement functions in and on behalf of the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, or any other territory or possession of the United States may qualify as an eligible crime victim assistance program for the purpose of grants under this subsection, or for the purpose of grants under subsection (c)(1).".

(b) PROHIBITION ON DISCRIMINATION AGAINST CERTAIN VICTIMS.—Section 1404(b)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(b)(1)) is amended—

<< 42 USCA § 10603 >>

(1) in subparagraph (D), by striking "and" at the end;

<< 42 USCA § 10603 >>

(2) in subparagraph (E), by striking the period at the end and inserting "; and"; and

<< 42 USCA § 10603 >>

(3) by adding at the end the following:

"(F) does not discriminate against victims because they disagree with the way the State is prosecuting the criminal case.".

<< 42 USCA § 10603 >>

(c) GRANTS FOR PROGRAM EVALUATION AND COMPLIANCE EFFORTS.—Section 1404(c)(1)(A) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(1)(A)) is amended by inserting ", program evaluation, compliance efforts," after "demonstration projects".

(d) ALLOCATION OF DISCRETIONARY GRANTS.—Section 1404(c)(2) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(2)) is amended—

<< 42 USCA § 10603 >>

(1) in subparagraph (A), by striking "not more than" and inserting "not less than"; and

<< 42 USCA § 10603 >>

(2) in subparagraph (B), by striking "not less than" and inserting "not more than".

(e) FELLOWSHIPS AND CLINICAL INTERNSHIPS.—Section 1404(c)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(3)) is amended—

<< 42 USCA § 10603 >>

(1) in subparagraph (C), by striking "and" at the end;

<< 42 USCA § 10603 >>

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

<< 42 USCA § 10603 >>

(3) by adding at the end the following:

"(E) use funds made available to the Director under this subsection—

"(i) for fellowships and clinical internships; and

"(ii) to carry out programs of training and special workshops for the presentation and dissemination of information resulting from demonstrations, surveys, and special projects.".

SEC. 624. VICTIMS OF TERRORISM.

<< 42 USCA § 10603b >>

(a) COMPENSATION AND ASSISTANCE TO VICTIMS OF DOMESTIC TERRORISM.—Section 1404B(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10603b(b)) is amended to read as follows:

"(b) VICTIMS OF TERRORISM WITHIN THE UNITED STATES.—The Director may make supplemental grants as provided in section 1402(d)(5) to States for eligible crime victim compensation and assistance programs, and to victim service organizations, public agencies (including Federal, State, or local governments) and nongovernmental organizations that provide assistance to victims of crime, which shall be used to provide emergency relief, including crisis response efforts, assistance, compensation, training and technical assistance, and ongoing assistance, including during any investigation or prosecution, to victims of terrorist acts or mass violence occurring within the United States.".

<< 42 USCA § 10603b >>

(b) ASSISTANCE TO VICTIMS OF INTERNATIONAL TERRORISM.—Section 1404B(a)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10603b(a)(1)) is amended by striking "who are not persons eligible for compensation under title VIII of the Omnibus Diplomatic Security and Antiterrorism Act of 1986".

<< 42 USCA § 10603c >>

(c) COMPENSATION TO VICTIMS OF INTERNATIONAL TERRORISM.—Section 1404C(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10603c(b)) is amended by adding at the end the following: "The amount of compensation awarded to a victim under this subsection shall be reduced by any amount that the victim received in connection with the same act of international terrorism under title VIII of the Omnibus Diplomatic Security and Antiterrorism Act of 1986.".

TITLE VII—INCREASED INFORMATION SHARING FOR CRITICAL INFRASTRUCTURE PROTECTION

SEC. 701. EXPANSION OF REGIONAL INFORMATION SHARING SYSTEM TO FACILITATE FEDERAL–STATE–LOCAL LAW ENFORCEMENT RESPONSE RELATED TO TERRORIST ATTACKS.

Section 1301 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796h) is amended—

<< 42 USCA § 3796h >>

(1) in subsection (a), by inserting "and terrorist conspiracies and activities" after "activities";

(2) in subsection (b)—

<< 42 USCA § 3796h >>

(A) in paragraph (3), by striking "and" after the semicolon;

<< 42 USCA § 3796h >>

(B) by redesignating paragraph (4) as paragraph (5); and

<< 42 USCA § 3796h >>

(C) by inserting after paragraph (3) the following:

"(4) establishing and operating secure information sharing systems to enhance the investigation and prosecution abilities of participating enforcement agencies in addressing multi-jurisdictional terrorist conspiracies and activities; and (5)'; and

<< 42 USCA § 3796h >>

(3) by inserting at the end the following:

"(d) AUTHORIZATION OF APPROPRIATION TO THE BUREAU OF JUSTICE ASSISTANCE. — There are authorized to be appropriated to the Bureau of Justice Assistance to carry out this section $50,000,000 for fiscal year 2002 and $100,000,000 for fiscal year 2003.".

TITLE VIII—STRENGTHENING THE CRIMINAL LAWS AGAINST TERRORISM

SEC. 801. TERRORIST ATTACKS AND OTHER ACTS OF VIOLENCE AGAINST MASS TRANSPORTATION SYSTEMS.

<< 18 USCA § 1993 >>

Chapter 97 of title 18, United States Code, is amended by adding at the end the following:

"§ 1993. Terrorist attacks and other acts of violence against mass transportation systems

"(a) GENERAL PROHIBITIONS.—Whoever willfully—

"(1) wrecks, derails, sets fire to, or disables a mass transportation vehicle or ferry;

"(2) places or causes to be placed any biological agent or toxin for use as a weapon, destructive substance, or destructive device in, upon, or near a mass transportation vehicle or ferry, without previously obtaining the permission of the mass transportation provider, and with intent to endanger the safety of any passenger or employee of the mass transportation provider, or with a reckless disregard for the safety of human life;

"(3) sets fire to, or places any biological agent or toxin for use as a weapon, destructive substance, or destructive device in, upon, or near any garage, terminal, structure, supply, or facility used in the operation of, or in support of the operation of, a mass transportation vehicle or ferry, without previously obtaining the permission of the mass transportation provider, and knowing or having reason to know such activity would likely derail, disable, or wreck a mass transportation vehicle or ferry used, operated, or employed by the mass transportation provider;

"(4) removes appurtenances from, damages, or otherwise impairs the operation of a mass transportation signal system, including a train control system, centralized dispatching system, or rail grade crossing warning signal without authorization from the mass transportation provider;

"(5) interferes with, disables, or incapacitates any dispatcher, driver, captain, or person while they are employed in dispatching, operating, or maintaining a mass transportation vehicle or ferry, with intent to endanger the safety of any passenger or employee of the mass transportation provider, or with a reckless disregard for the safety of human life;

"(6) commits an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to an employee or passenger of a mass transportation provider or any other person while any of the foregoing are on the property of a mass transportation provider;

"(7) conveys or causes to be conveyed false information, knowing the information to be false, concerning an attempt or alleged attempt being made or to be made, to do any act which would be a crime prohibited by this subsection; or

"(8) attempts, threatens, or conspires to do any of the aforesaid acts,

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shall be fined under this title or imprisoned not more than twenty years, or both, if such act is committed, or in the case of a threat or conspiracy such act would be committed, on, against, or affecting a mass transportation provider engaged in or affecting interstate or foreign commerce, or if in the course of committing such act, that person travels or communicates across a State line in order to commit such act, or transports materials across a State line in aid of the commission of such act.

"(b) AGGRAVATED OFFENSE.—Whoever commits an offense under subsection (a) in a circumstance in which—

"(1) the mass transportation vehicle or ferry was carrying a passenger at the time of the offense; or

"(2) the offense has resulted in the death of any person, shall be guilty of an aggravated form of the offense and shall be fined under this title or imprisoned for a term of years or for life, or both.

"(c) DEFINITIONS.—In this section—

"(1) the term 'biological agent' has the meaning given to that term in section 178(1) of this title;

"(2) the term 'dangerous weapon' has the meaning given to that term in section 930 of this title;

"(3) the term 'destructive device' has the meaning given to that term in section 921(a)(4) of this title;

"(4) the term 'destructive substance' has the meaning given to that term in section 31 of this title;

"(5) the term 'mass transportation' has the meaning given to that term in section 5302(a)(7) of title 49, United States Code, except that the term shall include schoolbus, charter, and sightseeing transportation;

"(6) the term 'serious bodily injury' has the meaning given to that term in section 1365 of this title;

"(7) the term 'State' has the meaning given to that term in section 2266 of this title; and

"(8) the term 'toxin' has the meaning given to that term in section 178(2) of this title.".

<< 18 USCA prec. § 1991 >>

(f) CONFORMING AMENDMENT.—The analysis of chapter 97 of title 18, United States Code, is amended by adding at the end:

"1993. Terrorist attacks and other acts of violence against mass transportation systems.".

SEC. 802. DEFINITION OF DOMESTIC TERRORISM.

(a) DOMESTIC TERRORISM DEFINED.—Section 2331 of title 18, United States Code, is amended—

<< 18 USCA § 2331 >>

(1) in paragraph (1)(B)(iii), by striking "by assassination or kidnapping" and inserting "by mass destruction, assassination, or kidnapping";

<< 18 USCA § 2331 >>

(2) in paragraph (3), by striking "and";

<< 18 USCA § 2331 >>

(3) in paragraph (4), by striking the period at the end and inserting "; and"; and

<< 18 USCA § 2331 >>

(4) by adding at the end the following:

"(5) the term 'domestic terrorism' means activities that—

"(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

"(B) appear to be intended—

"(i) to intimidate or coerce a civilian population;

"(ii) to influence the policy of a government by intimidation or coercion; or

"(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

"(C) occur primarily within the territorial jurisdiction of the United States.".

<< 18 USCA § 3077 >>

(b) CONFORMING AMENDMENT.—Section 3077(1) of title 18, United States Code, is amended to read as follows:

"(1) 'act of terrorism' means an act of domestic or international terrorism as defined in section 2331;".

SEC. 803. PROHIBITION AGAINST HARBORING TERRORISTS.

<< 18 USCA § 2339 >>

(a) IN GENERAL.—Chapter 113B of title 18, United States Code, is amended by adding after section 2338 the following new section:

"§ 2339. Harboring or concealing terrorists

"(a) Whoever harbors or conceals any person who he knows, or has reasonable grounds to believe, has committed, or is about to commit, an offense under section 32 (relating to destruction of aircraft or aircraft facilities), section 175 (relating to biological weapons), section 229 (relating to chemical weapons), section 831 (relating to nuclear materials), paragraph (2) or (3) of section 844(f) (relating to arson and bombing of government property risking or causing injury or death), section 1366(a) (relating to the destruction of an energy facility), section 2280 (relating to violence against maritime navigation), section 2332a (relating to weapons of mass destruction), or section 2332b (relating to acts of terrorism transcending national boundaries) of this title, section 236(a) (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284(a)), or section 46502 (relating to aircraft piracy) of title 49, shall be fined under this title or imprisoned not more than ten years, or both.".

"(b) A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.".

<< 18 USCA prec. § 2331 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 113B of title 18, United States Code, is amended by inserting after the item for section 2338 the following:

"2339. Harboring or concealing terrorists.".

SEC. 804. JURISDICTION OVER CRIMES COMMITTED AT U.S. FACILITIES ABROAD.

<< 18 USCA § 7 >>

Section 7 of title 18, United States Code, is amended by adding at the end the following:

"(9) With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act—

"(A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and

"(B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.".

SEC. 805. MATERIAL SUPPORT FOR TERRORISM.

(a) IN GENERAL.—Section 2339A of title 18, United States Code, is amended—

<< 18 USCA § 2339A >>

(1) in subsection (a)—
(A) by striking ", within the United States,";
(B) by inserting "229," after "175,";
(C) by inserting "1993," after "1992,";
(D) by inserting ", section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284)," after "of this title";
(E) by inserting "or 60123(b)" after "46502"; and
(F) by inserting at the end the following: "A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law."; and

<< 18 USCA § 2339A >>

(2) in subsection (b)—
(A) by striking "or other financial securities" and inserting "or monetary instruments or financial securities"; and
(B) by inserting "expert advice or assistance," after "training,".

<< 18 USCA § 1956 >>

(b) TECHNICAL AMENDMENT.—Section 1956(c)(7)(D) of title 18, United States Code, is amended by inserting "or 2339B" after "2339A".

SEC. 806. ASSETS OF TERRORIST ORGANIZATIONS.

<< 18 USCA § 981 >>

Section 981(a)(1) of title 18, United States Code, is amended by inserting at the end the following:
"(G) All assets, foreign or domestic—
"(i) of any individual, entity, or organization engaged in planning or perpetrating any act of domestic or international terrorism (as defined in section 2331) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization;
"(ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing an act of domestic or international terrorism (as defined in section 2331) against the United States, citizens or residents of the United States, or their property; or
"(iii) derived from, involved in, or used or intended to be used to commit any act of domestic or international terrorism (as defined in section 2331) against the United States, citizens or residents of the United States, or their property.".

<< 22 USCA § 7211 >>

SEC. 807. TECHNICAL CLARIFICATION RELATING TO PROVISION OF MATERIAL SUPPORT TO TERRORISM.

No provision of the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX of Public Law 106–387) shall be construed to limit or otherwise affect section 2339A or 2339B of title 18, United States Code.

SEC. 808. DEFINITION OF FEDERAL CRIME OF TERRORISM.

Section 2332b of title 18, United States Code, is amended—

<< 18 USCA § 2332b >>

(1) in subsection (f), by inserting "and any violation of section 351(e), 844(e), 844(f)(1), 956(b), 1361, 1366(b), 1366(c), 1751(e), 2152, or 2156 of this title," before "and the Secretary"; and

<< 18 USCA § 2332b >>

(2) in subsection (g)(5)(B), by striking clauses (i) through (iii) and inserting the following:

"(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 or 175b (relating to biological weapons), 229 (relating to chemical weapons), subsection (a), (b), (c), or (d) of section 351 (relating to congressional, cabinet, and Supreme Court assassination and kidnaping), 831 (relating to nuclear materials), 842(m) or (n) (relating to plastic explosives), 844(f) (2) or (3) (relating to arson and bombing of Government property risking or causing death), 844(i) (relating to arson and bombing of property used in interstate commerce), 930(c) (relating to killing or attempted killing during an attack on a Federal facility with a dangerous weapon), 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), 1030(a)(1) (relating to protection of computers), 1030(a)(5)(A)(i) resulting in damage as defined in 1030(a)(5)(B)(ii) through (v) (relating to protection of computers), 1114 (relating to killing or attempted killing of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons), 1203 (relating to hostage taking), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States), 1366(a) (relating to destruction of an energy facility), 1751(a), (b), (c), or (d) (relating to Presidential and Presidential staff assassination and kidnaping), 1992 (relating to wrecking trains), 1993 (relating to terrorist attacks and other acts of violence against mass transportation systems), 2155 (relating to destruction of national defense materials, premises, or utilities), 2280 (relating to violence against maritime navigation), 2281 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2339 (relating to harboring terrorists), 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture) of this title;

"(ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

"(iii) section 46502 (relating to aircraft piracy), the second sentence of section 46504 (relating to assault on a flight crew with a dangerous weapon), section 46505(b)(3) or (c) (relating to explosive or incendiary devices, or endangerment of human life by means of weapons, on aircraft), section 46506 if homicide or attempted homicide is involved (relating to application of certain criminal laws to acts on aircraft), or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.".

SEC. 809. NO STATUTE OF LIMITATION FOR CERTAIN TERRORISM OFFENSES.

<< 18 USCA § 3286 >>

(a) IN GENERAL.—Section 3286 of title 18, United States Code, is amended to read as follows:

"§ 3286. Extension of statute of limitation for certain terrorism offenses

"(a) EIGHT–YEAR LIMITATION.—Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for any noncapital offense involving a violation of any provision listed in section 2332b(g)(5)(B), or a violation of section 112, 351(e), 1361, or 1751(e) of this title, or section 46504, 46505, or 46506 of title 49, unless the indictment is found or the information is instituted within 8 years after the offense was committed. Notwithstanding the preceding sentence, offenses listed in section 3295 are subject to the statute of limitations set forth in that section.

"(b) NO LIMITATION.—Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a forseeable risk of, death or serious bodily injury to another person.".

<< 18 USCA § 3286 NOTE >>

(b) APPLICATION.—The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section.

## SEC. 810. ALTERNATE MAXIMUM PENALTIES FOR TERRORISM OFFENSES.

<< 18 USCA § 81 >>

 (a) ARSON.—Section 81 of title 18, United States Code, is amended in the second undesignated paragraph by striking "not more than twenty years" and inserting "for any term of years or for life".

 (b) DESTRUCTION OF AN ENERGY FACILITY.—Section 1366 of title 18, United States Code, is amended—

<< 18 USCA § 1366 >>

 (1) in subsection (a), by striking "ten" and inserting "20"; and

<< 18 USCA § 1366 >>

 (2) by adding at the end the following:

 "(d) Whoever is convicted of a violation of subsection (a) or (b) that has resulted in the death of any person shall be subject to imprisonment for any term of years or life.".

<< 18 USCA § 2339A >>

 (c) MATERIAL SUPPORT TO TERRORISTS.—Section 2339A(a) of title 18, United States Code, is amended—

 (1) by striking "10" and inserting "15"; and

 (2) by striking the period and inserting ", and, if the death of any person results, shall be imprisoned for any term of years or for life.".

<< 18 USCA § 2339B >>

 (d) MATERIAL SUPPORT TO DESIGNATED FOREIGN TERRORIST ORGANIZATIONS.—Section 2339B(a)(1) of title 18, United States Code, is amended—

 (1) by striking "10" and inserting "15"; and

 (2) by striking the period after "or both" and inserting ", and, if the death of any person results, shall be imprisoned for any term of years or for life.".

<< 18 USCA § 2155 >>

 (e) DESTRUCTION OF NATIONAL–DEFENSE MATERIALS.—Section 2155(a) of title 18, United States Code, is amended—

 (1) by striking "ten" and inserting "20"; and

 (2) by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

 (f) SABOTAGE OF NUCLEAR FACILITIES OR FUEL.—Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), is amended—

<< 42 USCA § 2284 >>

 (1) by striking "ten" each place it appears and inserting "20";

<< 42 USCA § 2284 >>

 (2) in subsection (a), by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life."; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 42 USCA § 2284 >>

(3) in subsection (b), by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

<< 49 USCA § 46505 >>

(g) SPECIAL AIRCRAFT JURISDICTION OF THE UNITED STATES.—Section 46505(c) of title 49, United States Code, is amended—

(1) by striking "15" and inserting "20"; and

(2) by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

<< 49 USCA § 60123 >>

(h) DAMAGING OR DESTROYING AN INTERSTATE GAS OR HAZARDOUS LIQUID PIPELINE FACILITY.—Section 60123(b) of title 49, United States Code, is amended—

(1) by striking "15" and inserting "20"; and

(2) by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

SEC. 811. PENALTIES FOR TERRORIST CONSPIRACIES.

<< 18 USCA § 81 >>

(a) ARSON.—Section 81 of title 18, United States Code, is amended in the first undesignated paragraph—

(1) by striking ", or attempts to set fire to or burn"; and

(2) by inserting "or attempts or conspires to do such an act," before "shall be imprisoned".

<< 18 USCA § 930 >>

(b) KILLINGS IN FEDERAL FACILITIES.—Section 930(c) of title 18, United States Code, is amended—

(1) by striking "or attempts to kill";

(2) by inserting "or attempts or conspires to do such an act," before "shall be punished"; and

(3) by striking "and 1113" and inserting "1113, and 1117".

<< 18 USCA § 1362 >>

(c) COMMUNICATIONS LINES, STATIONS, OR SYSTEMS.—Section 1362 of title 18, United States Code, is amended in the first undesignated paragraph—

(1) by striking "or attempts willfully or maliciously to injure or destroy"; and

(2) by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 18 USCA § 1363 >>

(d) BUILDINGS OR PROPERTY WITHIN SPECIAL MARITIME AND TERRITORIAL JURISDICTION.—Section 1363 of title 18, United States Code, is amended—

(1) by striking "or attempts to destroy or injure"; and

(2) by inserting "or attempts or conspires to do such an act," before "shall be fined" the first place it appears.

<< 18 USCA § 1992 >>

(e) WRECKING TRAINS.—Section 1992 of title 18, United States Code, is amended by adding at the end the following:

"(c) A person who conspires to commit any offense defined in this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.".

<< 18 USCA § 2339A >>

(f) MATERIAL SUPPORT TO TERRORISTS.—Section 2339A of title 18, United States Code, is amended by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 18 USCA § 2340A >>

(g) TORTURE.—Section 2340A of title 18, United States Code, is amended by adding at the end the following:

"(c) CONSPIRACY.—A person who conspires to commit an offense under this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.".

(h) SABOTAGE OF NUCLEAR FACILITIES OR FUEL.—Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), is amended—

<< 42 USCA § 2284 >>

(1) in subsection (a)—
   (A) by striking ", or who intentionally and willfully attempts to destroy or cause physical damage to";
   (B) in paragraph (4), by striking the period at the end and inserting a comma; and
   (C) by inserting "or attempts or conspires to do such an act," before "shall be fined"; and

<< 42 USCA § 2284 >>

(2) in subsection (b)—
   (A) by striking "or attempts to cause"; and
   (B) by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 49 USCA § 46504 >>

(i) INTERFERENCE WITH FLIGHT CREW MEMBERS AND ATTENDANTS.—Section 46504 of title 49, United States Code, is amended by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 49 USCA § 46505 >>

(j) SPECIAL AIRCRAFT JURISDICTION OF THE UNITED STATES.—Section 46505 of title 49, United States Code, is amended by adding at the end the following:

"(e) CONSPIRACY.—If two or more persons conspire to violate subsection (b) or (c), and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as provided in such subsection.".

<< 49 USCA § 60123 >>

(k) DAMAGING OR DESTROYING AN INTERSTATE GAS OR HAZARDOUS LIQUID PIPELINE FACILITY.—Section 60123(b) of title 49, United States Code, is amended—
   (1) by striking ", or attempting to damage or destroy,"; and
   (2) by inserting ", or attempting or conspiring to do such an act," before "shall be fined".

<< 18 USCA § 3583 >>

SEC. 812. POST–RELEASE SUPERVISION OF TERRORISTS.

Section 3583 of title 18, United States Code, is amended by adding at the end the following:

"(j) SUPERVISED RELEASE TERMS FOR TERRORISM PREDICATES.—Notwithstanding subsection (b), the authorized term of supervised release for any offense listed in section 2332b(g)(5)(B), the commission of which resulted in, or created a foreseeable risk of, death or serious bodily injury to another person, is any term of years or life.".

## SEC. 813. INCLUSION OF ACTS OF TERRORISM AS RACKETEERING ACTIVITY.

<< 18 USCA § 1961 >>

Section 1961(1) of title 18, United States Code, is amended—
   (1) by striking "or (F)" and inserting "(F)"; and
   (2) by inserting before the semicolon at the end the following: ", or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B)".

## SEC. 814. DETERRENCE AND PREVENTION OF CYBERTERRORISM.

 (a) CLARIFICATION OF PROTECTION OF PROTECTED COMPUTERS.—Section 1030(a)(5) of title 18, United States Code, is amended—

<< 18 USCA § 1030 >>

(1) by inserting "(i)" after "(A)";

<< 18 USCA § 1030 >>

(2) by redesignating subparagraphs (B) and (C) as clauses (ii) and (iii), respectively;

<< 18 USCA § 1030 >>

(3) by adding "and" at the end of clause (iii), as so redesignated; and

<< 18 USCA § 1030 >>

(4) by adding at the end the following:
 "(B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused)—
   "(i) loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
   "(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
   "(iii) physical injury to any person;
   "(iv) a threat to public health or safety; or
   "(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security;".

<< 18 USCA § 1030 >>

 (b) PROTECTION FROM EXTORTION.—Section 1030(a)(7) of title 18, United States Code, is amended by striking ", firm, association, educational institution, financial institution, government entity, or other legal entity,".
 (c) PENALTIES.—Section 1030(c) of title 18, United States Code, is amended—

<< 18 USCA § 1030 >>

 (1) in paragraph (2)—

(A) in subparagraph (A)—

  (i) by inserting "except as provided in subparagraph (B)," before "a fine";

  (ii) by striking "(a)(5)(C)" and inserting "(a)(5)(A)(iii)"; and

  (iii) by striking "and" at the end;

<< 18 USCA § 1030 >>

 (B) in subparagraph (B), by inserting "or an attempt to commit an offense punishable under this subparagraph," after "subsection (a)(2)," in the matter preceding clause (i); and

<< 18 USCA § 1030 >>

(C) in subparagraph (C), by striking "and" at the end;

<< 18 USCA § 1030 >>

(2) in paragraph (3)—

  (A) by striking ", (a)(5)(A), (a)(5)(B)," both places it appears; and

  (B) by striking "(a)(5)(C)" and inserting "(a)(5)(A)(iii)"; and

<< 18 USCA § 1030 >>

(3) by adding at the end the following:

  "(4)(A) a fine under this title, imprisonment for not more than 10 years, or both, in the case of an offense under subsection (a)(5)(A)(i), or an attempt to commit an offense punishable under that subsection;

  "(B) a fine under this title, imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(5) (A)(ii), or an attempt to commit an offense punishable under that subsection;

  "(C) a fine under this title, imprisonment for not more than 20 years, or both, in the case of an offense under subsection (a) (5)(A)(i) or (a)(5)(A)(ii), or an attempt to commit an offense punishable under either subsection, that occurs after a conviction for another offense under this section.".

(d) DEFINITIONS.—Section 1030(e) of title 18, United States Code is amended—

<< 18 USCA § 1030 >>

 (1) in paragraph (2)(B), by inserting ", including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States" before the semicolon;

<< 18 USCA § 1030 >>

(2) in paragraph (7), by striking "and" at the end;

<< 18 USCA § 1030 >>

(3) by striking paragraph (8) and inserting the following:

"(8) the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information;";

<< 18 USCA § 1030 >>

(4) in paragraph (9), by striking the period at the end and inserting a semicolon; and

<< 18 USCA § 1030 >>

(5) by adding at the end the following:

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(10) the term 'conviction' shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

"(11) the term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

"(12) the term 'person' means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity.".

<< 18 USCA § 1030 >>

(e) DAMAGES IN CIVIL ACTIONS.—Section 1030(g) of title 18, United States Code is amended—

(1) by striking the second sentence and inserting the following: "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages."; and

(2) by adding at the end the following: "No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.".

<< 28 USCA § 994 NOTE >>

(f) AMENDMENT OF SENTENCING GUIDELINES RELATING TO CERTAIN COMPUTER FRAUD AND ABUSE.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall amend the Federal sentencing guidelines to ensure that any individual convicted of a violation of section 1030 of title 18, United States Code, can be subjected to appropriate penalties, without regard to any mandatory minimum term of imprisonment.

<< 18 USCA § 2707 >>

SEC. 815. ADDITIONAL DEFENSE TO CIVIL ACTIONS RELATING TO PRESERVING RECORDS IN RESPONSE TO GOVERNMENT REQUESTS.

Section 2707(e)(1) of title 18, United States Code, is amended by inserting after "or statutory authorization" the following: "(including a request of a governmental entity under section 2703(f) of this title)".

<< 28 USCA § 509 NOTE >>

SEC. 816. DEVELOPMENT AND SUPPORT OF CYBERSECURITY FORENSIC CAPABILITIES.

(a) IN GENERAL.—The Attorney General shall establish such regional computer forensic laboratories as the Attorney General considers appropriate, and provide support to existing computer forensic laboratories, in order that all such computer forensic laboratories have the capability—

(1) to provide forensic examinations with respect to seized or intercepted computer evidence relating to criminal activity (including cyberterrorism);

(2) to provide training and education for Federal, State, and local law enforcement personnel and prosecutors regarding investigations, forensic analyses, and prosecutions of computer-related crime (including cyberterrorism);

(3) to assist Federal, State, and local law enforcement in enforcing Federal, State, and local criminal laws relating to computer-related crime;

(4) to facilitate and promote the sharing of Federal law enforcement expertise and information about the investigation, analysis, and prosecution of computer-related crime with State and local law enforcement personnel and prosecutors, including the use of multijurisdictional task forces; and

(5) to carry out such other activities as the Attorney General considers appropriate.

(b) AUTHORIZATION OF APPROPRIATIONS.—

(1) AUTHORIZATION.—There is hereby authorized to be appropriated in each fiscal year $50,000,000 for purposes of carrying out this section.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) AVAILABILITY.—Amounts appropriated pursuant to the authorization of appropriations in paragraph (1) shall remain available until expended.

SEC. 817. EXPANSION OF THE BIOLOGICAL WEAPONS STATUTE.

  Chapter 10 of title 18, United States Code, is amended—
  (1) in section 175—

<< 18 USCA § 175 >>

  (A) in subsection (b)—
   (i) by striking "does not include" and inserting "includes";
   (ii) by inserting "other than" after "system for"; and
   (iii) by inserting "bona fide research" after "protective";

<< 18 USCA § 175 >>

  (B) by redesignating subsection (b) as subsection (c); and

<< 18 USCA § 175 >>

  (C) by inserting after subsection (a) the following:
  "(b) ADDITIONAL OFFENSE.—Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be fined under this title, imprisoned not more than 10 years, or both. In this subsection, the terms 'biological agent' and 'toxin' do not encompass any biological agent or toxin that is in its naturally occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source.";

<< 18 USCA § 175b >>

  (2) by inserting after section 175a the following:

"SEC. 175b. POSSESSION BY RESTRICTED PERSONS.
  "(a) No restricted person described in subsection (b) shall ship or transport interstate or foreign commerce, or possess in or affecting commerce, any biological agent or toxin, or receive any biological agent or toxin that has been shipped or transported in interstate or foreign commerce, if the biological agent or toxin is listed as a select agent in subsection (j) of section 72.6 of title 42, Code of Federal Regulations, pursuant to section 511(d)(l) of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), and is not exempted under subsection (h) of such section 72.6, or appendix A of part 72 of the Code of Regulations.
  "(b) In this section:
  "(1) The term 'select agent' does not include any such biological agent or toxin that is in its naturally-occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source.
  "(2) The term 'restricted person' means an individual who—
  "(A) is under indictment for a crime punishable by imprisonment for a term exceeding 1 year;
  "(B) has been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year;
  "(C) is a fugitive from justice;
  "(D) is an unlawful user of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));
  "(E) is an alien illegally or unlawfully in the United States;
  "(F) has been adjudicated as a mental defective or has been committed to any mental institution;
  "(G) is an alien (other than an alien lawfully admitted for permanent residence) who is a national of a country as to which the Secretary of State, pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A

of chapter 1 of part M of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), or section 40(d) of chapter 3 of the Arms Export Control Act (22 U.S.C. 2780(d)), has made a determination (that remains in effect) that such country has repeatedly provided support for acts of international terrorism; or

"(H) has been discharged from the Armed Services of the United States under dishonorable conditions.

"(3) The term 'alien' has the same meaning as in section 1010(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(3)).

"(4) The term 'lawfully admitted for permanent residence' has the same meaning as in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)).

"(c) Whoever knowingly violates this section shall be fined as provided in this title, imprisoned not more than 10 years, or both, but the prohibition contained in this section shall not apply with respect to any duly authorized United States governmental activity.'; and

<< 18 USCA prec. § 175 >>

(3) in the chapter analysis, by inserting after the item relating to section 175a the following:

"175b. Possession by restricted persons.".

TITLE IX—IMPROVED INTELLIGENCE

SEC. 901. RESPONSIBILITIES OF DIRECTOR OF CENTRAL INTELLIGENCE REGARDING FOREIGN INTELLIGENCE COLLECTED UNDER FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978.

Section 103(c) of the National Security Act of 1947 (50 U.S.C. 403–3(c)) is amended—

<< 50 USCA § 403–3 >>

(1) by redesignating paragraphs (6) and (7) as paragraphs (7) and (8), respectively; and

<< 50 USCA § 403–3 >>

(2) by inserting after paragraph (5) the following new paragraph (6):

"(6) establish requirements and priorities for foreign intelligence information to be collected under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.), and provide assistance to the Attorney General to ensure that information derived from electronic surveillance or physical searches under that Act is disseminated so it may be used efficiently and effectively for foreign intelligence purposes, except that the Director shall have no authority to direct, manage, or undertake electronic surveillance or physical search operations pursuant to that Act unless otherwise authorized by statute or Executive order;".

SEC. 902. INCLUSION OF INTERNATIONAL TERRORIST ACTIVITIES WITHIN SCOPE OF FOREIGN INTELLIGENCE UNDER NATIONAL SECURITY ACT OF 1947.

Section 3 of the National Security Act of 1947 (50 U.S.C. 401a) is amended—

<< 50 USCA § 401a >>

(1) in paragraph (2), by inserting before the period the following: ", or international terrorist activities"; and

<< 50 USCA § 401a >>

(2) in paragraph (3), by striking "and activities conducted" and inserting ", and activities conducted,".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 903. SENSE OF CONGRESS ON THE ESTABLISHMENT AND MAINTENANCE OF INTELLIGENCE RELATIONSHIPS TO ACQUIRE INFORMATION ON TERRORISTS AND TERRORIST ORGANIZATIONS.

 It is the sense of Congress that officers and employees of the intelligence community of the Federal Government, acting within the course of their official duties, should be encouraged, and should make every effort, to establish and maintain intelligence relationships with any person, entity, or group for the purpose of engaging in lawful intelligence activities, including the acquisition of information on the identity, location, finances, affiliations, capabilities, plans, or intentions of a terrorist or terrorist organization, or information on any other person, entity, or group (including a foreign government) engaged in harboring, comforting, financing, aiding, or assisting a terrorist or terrorist organization.

SEC. 904. TEMPORARY AUTHORITY TO DEFER SUBMITTAL TO CONGRESS OF REPORTS ON INTELLIGENCE AND INTELLIGENCE–RELATED MATTERS.

 (a) AUTHORITY TO DEFER.—The Secretary of Defense, Attorney General, and Director of Central Intelligence each may, during the effective period of this section, defer the date of submittal to Congress of any covered intelligence report under the jurisdiction of such official until February 1, 2002.

 (b) COVERED INTELLIGENCE REPORT.—Except as provided in subsection (c), for purposes of subsection (a), a covered intelligence report is as follows:

  (1) Any report on intelligence or intelligence-related activities of the United States Government that is required to be submitted to Congress by an element of the intelligence community during the effective period of this section.

  (2) Any report or other matter that is required to be submitted to the Select Committee on Intelligence of the Senate and Permanent Select Committee on Intelligence of the House of Representatives by the Department of Defense or the Department of Justice during the effective period of this section.

 (c) EXCEPTION FOR CERTAIN REPORTS.—For purposes of subsection (a), any report required by section 502 or 503 of the National Security Act of 1947 (50 U.S.C. 413a, 413b) is not a covered intelligence report.

 (d) NOTICE TO CONGRESS.—Upon deferring the date of submittal to Congress of a covered intelligence report under subsection (a), the official deferring the date of submittal of the covered intelligence report shall submit to Congress notice of the deferral. Notice of deferral of a report shall specify the provision of law, if any, under which the report would otherwise be submitted to Congress.

 (e) EXTENSION OF DEFERRAL.—(1) Each official specified in subsection (a) may defer the date of submittal to Congress of a covered intelligence report under the jurisdiction of such official to a date after February 1, 2002, if such official submits to the committees of Congress specified in subsection (b)(2) before February 1, 2002, a certification that preparation and submittal of the covered intelligence report on February 1, 2002, will impede the work of officers or employees who are engaged in counterterrorism activities.

 (2) A certification under paragraph (1) with respect to a covered intelligence report shall specify the date on which the covered intelligence report will be submitted to Congress.

 (f) EFFECTIVE PERIOD.—The effective period of this section is the period beginning on the date of the enactment of this Act and ending on February 1, 2002.

 (g) ELEMENT OF THE INTELLIGENCE COMMUNITY DEFINED.—In this section, the term "element of the intelligence community" means any element of the intelligence community specified or designated under section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)).

SEC. 905. DISCLOSURE TO DIRECTOR OF CENTRAL INTELLIGENCE OF FOREIGN INTELLIGENCE–RELATED INFORMATION WITH RESPECT TO CRIMINAL INVESTIGATIONS.

 (a) IN GENERAL.—Title I of the National Security Act of 1947 (50 U.S.C. 402 et seq.) is amended—

<< 50 USCA § 403–5b >>

<< 50 USCA § 403–5c >>

AR.01263

(1) by redesignating subsection 105B as section 105C; and

<< 50 USCA § 403–5b >>

(2) by inserting after section 105A the following new section 105B:

"DISCLOSURE OF FOREIGN INTELLIGENCE ACQUIRED IN CRIMINAL INVESTIGATIONS;
NOTICE OF CRIMINAL INVESTIGATIONS OF FOREIGN INTELLIGENCE SOURCES

"SEC. 105B. (a) DISCLOSURE OF FOREIGN INTELLIGENCE—(1) Except as otherwise provided by law and subject to paragraph (2), the Attorney General, or the head of any other department or agency of the Federal Government with law enforcement responsibilities, shall expeditiously disclose to the Director of Central Intelligence, pursuant to guidelines developed by the Attorney General in consultation with the Director, foreign intelligence acquired by an element of the Department of Justice or an element of such department or agency, as the case may be, in the course of a criminal investigation.

"(2) The Attorney General by regulation and in consultation with the Director of Central Intelligence may provide for exceptions to the applicability of paragraph (1) for one or more classes of foreign intelligence, or foreign intelligence with respect to one or more targets or matters, if the Attorney General determines that disclosure of such foreign intelligence under that paragraph would jeopardize an ongoing law enforcement investigation or impair other significant law enforcement interests.

"(b) PROCEDURES FOR NOTICE OF CRIMINAL INVESTIGATIONS.—Not later than 180 days after the date of enactment of this section, the Attorney General, in consultation with the Director of Central Intelligence, shall develop guidelines to ensure that after receipt of a report from an element of the intelligence community of activity of a foreign intelligence source or potential foreign intelligence source that may warrant investigation as criminal activity, the Attorney General provides notice to the Director of Central Intelligence, within a reasonable period of time, of his intention to commence, or decline to commence, a criminal investigation of such activity.

"(c) PROCEDURES.—The Attorney General shall develop procedures for the administration of this section, including the disclosure of foreign intelligence by elements of the Department of Justice, and elements of other departments and agencies of the Federal Government, under subsection (a) and the provision of notice with respect to criminal investigations under subsection (b).".

(b) CLERICAL AMENDMENT.—The table of contents in the first section of that Act is amended by striking the item relating to section 105B and inserting the following new items:

"Sec. 105B. Disclosure of foreign intelligence acquired in criminal investigations; notice of criminal investigations of foreign intelligence sources.

"Sec. 105C. Protection of the operational files of the National Imagery and Mapping Agency.".

SEC. 906. FOREIGN TERRORIST ASSET TRACKING CENTER.

(a) REPORT ON RECONFIGURATION.—Not later than February 1, 2002, the Attorney General, the Director of Central Intelligence, and the Secretary of the Treasury shall jointly submit to Congress a report on the feasibility and desirability of reconfiguring the Foreign Terrorist Asset Tracking Center and the Office of Foreign Assets Control of the Department of the Treasury in order to establish a capability to provide for the effective and efficient analysis and dissemination of foreign intelligence relating to the financial capabilities and resources of international terrorist organizations.

(b) REPORT REQUIREMENTS.—(1) In preparing the report under subsection (a), the Attorney General, the Secretary, and the Director shall consider whether, and to what extent, the capacities and resources of the Financial Crimes Enforcement Center of the Department of the Treasury may be integrated into the capability contemplated by the report.

(2) If the Attorney General, Secretary, and the Director determine that it is feasible and desirable to undertake the reconfiguration described in subsection (a) in order to establish the capability described in that subsection, the Attorney General, the Secretary, and the Director shall include with the report under that subsection a detailed proposal for legislation to achieve the reconfiguration.

SEC. 907. NATIONAL VIRTUAL TRANSLATION CENTER.

(a) REPORT ON ESTABLISHMENT.—(1) Not later than February 1, 2002, the Director of Central Intelligence shall, in consultation with the Director of the Federal Bureau of Investigation, submit to the appropriate committees of Congress a report on the establishment and maintenance within the intelligence community of an element for purposes of providing timely and accurate translations of foreign intelligence for all other elements of the intelligence community. In the report, the element shall be referred to as the "National Virtual Translation Center".

(2) The report on the element described in paragraph (1) shall discuss the use of state-of-the-art communications technology, the integration of existing translation capabilities in the intelligence community, and the utilization of remote-connection capacities so as to minimize the need for a central physical facility for the element.

(b) RESOURCES.—The report on the element required by subsection (a) shall address the following:

(1) The assignment to the element of a staff of individuals possessing a broad range of linguistic and translation skills appropriate for the purposes of the element.

(2) The provision to the element of communications capabilities and systems that are commensurate with the most current and sophisticated communications capabilities and systems available to other elements of intelligence community.

(3) The assurance, to the maximum extent practicable, that the communications capabilities and systems provided to the element will be compatible with communications capabilities and systems utilized by the Federal Bureau of Investigation in securing timely and accurate translations of foreign language materials for law enforcement investigations.

(4) The development of a communications infrastructure to ensure the efficient and secure use of the translation capabilities of the element.

(c) SECURE COMMUNICATIONS.—The report shall include a discussion of the creation of secure electronic communications between the element described by subsection (a) and the other elements of the intelligence community.

(d) DEFINITIONS.—In this section:

(1) FOREIGN INTELLIGENCE.—The term "foreign intelligence" has the meaning given that term in section 3(2) of the National Security Act of 1947 (50 U.S.C. 401a(2)).

(2) ELEMENT OF THE INTELLIGENCE COMMUNITY.—The term "element of the intelligence community" means any element of the intelligence community specified or designated under section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)).

<< 28 USCA § 509 NOTE >>

SEC. 908. TRAINING OF GOVERNMENT OFFICIALS REGARDING IDENTIFICATION AND USE OF FOREIGN INTELLIGENCE.

(a) PROGRAM REQUIRED.—The Attorney General shall, in consultation with the Director of Central Intelligence, carry out a program to provide appropriate training to officials described in subsection (b) in order to assist such officials in—

(1) identifying foreign intelligence information in the course of their duties; and

(2) utilizing foreign intelligence information in the course of their duties, to the extent that the utilization of such information is appropriate for such duties.

(b) OFFICIALS.—The officials provided training under subsection (a) are, at the discretion of the Attorney General and the Director, the following:

(1) Officials of the Federal Government who are not ordinarily engaged in the collection, dissemination, and use of foreign intelligence in the performance of their duties.

(2) Officials of State and local governments who encounter, or may encounter in the course of a terrorist event, foreign intelligence in the performance of their duties.

(c) AUTHORIZATION OF APPROPRIATIONS.—There is hereby authorized to be appropriated for the Department of Justice such sums as may be necessary for purposes of carrying out the program required by subsection (a).

TITLE X—MISCELLANEOUS

<< 5 USCA App. 3 § 8E NOTE >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## SEC. 1001. REVIEW OF THE DEPARTMENT OF JUSTICE.

The Inspector General of the Department of Justice shall designate one official who shall—

  (1) review information and receive complaints alleging abuses of civil rights and civil liberties by employees and officials of the Department of Justice;

  (2) make public through the Internet, radio, television, and newspaper advertisements information on the responsibilities and functions of, and how to contact, the official; and

  (3) submit to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate on a semi-annual basis a report on the implementation of this subsection and detailing any abuses described in paragraph (1), including a description of the use of funds appropriations used to carry out this subsection.

## SEC. 1002. SENSE OF CONGRESS.

  (a) FINDINGS.—Congress finds that—

  (1) all Americans are united in condemning, in the strongest possible terms, the terrorists who planned and carried out the attacks against the United States on September 11, 2001, and in pursuing all those responsible for those attacks and their sponsors until they are brought to justice;

  (2) Sikh–Americans form a vibrant, peaceful, and law-abiding part of America's people;

  (3) approximately 500,000 Sikhs reside in the United States and are a vital part of the Nation;

  (4) Sikh–Americans stand resolutely in support of the commitment of our Government to bring the terrorists and those that harbor them to justice;

  (5) the Sikh faith is a distinct religion with a distinct religious and ethnic identity that has its own places of worship and a distinct holy text and religious tenets;

  (6) many Sikh–Americans, who are easily recognizable by their turbans and beards, which are required articles of their faith, have suffered both verbal and physical assaults as a result of misguided anger toward Arab–Americans and Muslim–Americans in the wake of the September 11, 2001 terrorist attack;

  (7) Sikh–Americans, as do all Americans, condemn acts of prejudice against any American; and

  (8) Congress is seriously concerned by the number of crimes against Sikh–Americans and other Americans all across the Nation that have been reported in the wake of the tragic events that unfolded on September 11, 2001.

  (b) SENSE OF CONGRESS.—Congress—

  (1) declares that, in the quest to identify, locate, and bring to justice the perpetrators and sponsors of the terrorist attacks on the United States on September 11, 2001, the civil rights and civil liberties of all Americans, including Sikh–Americans, should be protected;

  (2) condemns bigotry and any acts of violence or discrimination against any Americans, including Sikh–Americans;

  (3) calls upon local and Federal law enforcement authorities to work to prevent crimes against all Americans, including Sikh–Americans; and

  (4) calls upon local and Federal law enforcement authorities to prosecute to the fullest extent of the law all those who commit crimes.

<< 50 USCA § 1801 >>

## SEC. 1003. DEFINITION OF "ELECTRONIC SURVEILLANCE".

  Section 101(f)(2) of the Foreign Intelligence Surveillance Act (50 U.S.C. 1801(f)(2)) is amended by adding at the end before the semicolon the following: ", but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511(2)(i) of title 18, United States Code".

## SEC. 1004. VENUE IN MONEY LAUNDERING CASES.

<< 18 USCA § 1956 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Section 1956 of title 18, United States Code, is amended by adding at the end the following:

"(i) VENUE.—(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in—

  "(A) any district in which the financial or monetary transaction is conducted; or

  "(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

"(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

"(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.".

<< 28 USCA § 509 NOTE >>

SEC. 1005. FIRST RESPONDERS ASSISTANCE ACT.

  (a) GRANT AUTHORIZATION.—The Attorney General shall make grants described in subsections (b) and (c) to States and units of local government to improve the ability of State and local law enforcement, fire department and first responders to respond to and prevent acts of terrorism.

  (b) TERRORISM PREVENTION GRANTS.—Terrorism prevention grants under this subsection may be used for programs, projects, and other activities to—

    (1) hire additional law enforcement personnel dedicated to intelligence gathering and analysis functions, including the formation of full-time intelligence and analysis units;

    (2) purchase technology and equipment for intelligence gathering and analysis functions, including wire-tap, pen links, cameras, and computer hardware and software;

    (3) purchase equipment for responding to a critical incident, including protective equipment for patrol officers such as quick masks;

    (4) purchase equipment for managing a critical incident, such as communications equipment for improved interoperability among surrounding jurisdictions and mobile command posts for overall scene management; and

    (5) fund technical assistance programs that emphasize coordination among neighboring law enforcement agencies for sharing resources, and resources coordination among law enforcement agencies for combining intelligence gathering and analysis functions, and the development of policy, procedures, memorandums of understanding, and other best practices.

  (c) ANTITERRORISM TRAINING GRANTS.—Antiterrorism training grants under this subsection may be used for programs, projects, and other activities to address—

    (1) intelligence gathering and analysis techniques;

    (2) community engagement and outreach;

    (3) critical incident management for all forms of terrorist attack;

    (4) threat assessment capabilities;

    (5) conducting followup investigations; and

    (6) stabilizing a community after a terrorist incident.

  (d) APPLICATION.—

    (1) IN GENERAL.—Each eligible entity that desires to receive a grant under this section shall submit an application to the Attorney General, at such time, in such manner, and accompanied by such additional information as the Attorney General may reasonably require.

    (2) CONTENTS.—Each application submitted pursuant to paragraph (1) shall—

      (A) describe the activities for which assistance under this section is sought; and

      (B) provide such additional assurances as the Attorney General determines to be essential to ensure compliance with the requirements of this section.

 (e) MINIMUM AMOUNT.—If all applications submitted by a State or units of local government within that State have not been funded under this section in any fiscal year, that State, if it qualifies, and the units of local government within that State, shall receive in that fiscal year not less than 0.5 percent of the total amount appropriated in that fiscal year for grants under this section.

 (f) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated $25,000,000 for each of the fiscal years 2003 through 2007.

SEC. 1006. INADMISSIBILITY OF ALIENS ENGAGED IN MONEY LAUNDERING.

<< 8 USCA § 1182 >>

 (a) AMENDMENT TO IMMIGRATION AND NATIONALITY ACT.—Section 212(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(2)) is amended by adding at the end the following:
  "(I) MONEY LAUNDERING.—Any alien—
   "(i) who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of title 18, United States Code (relating to laundering of monetary instruments); or
   "(ii) who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section;

 is inadmissible.".

<< 8 USCA § 1182 NOTE >>

 (b) MONEY LAUNDERING WATCHLIST.—Not later than 90 days after the date of the enactment of this Act, the Secretary of State shall develop, implement, and certify to the Congress that there has been established a money laundering watchlist, which identifies individuals worldwide who are known or suspected of money laundering, which is readily accessible to, and shall be checked by, a consular or other Federal official prior to the issuance of a visa or admission to the United States. The Secretary of State shall develop and continually update the watchlist in cooperation with the Attorney General, the Secretary of the Treasury, and the Director of Central Intelligence.

SEC. 1007. AUTHORIZATION OF FUNDS FOR DEA POLICE TRAINING IN SOUTH AND CENTRAL ASIA.

 In addition to amounts otherwise available to carry out section 481 of the Foreign Assistance Act of 1961 (22 U.S.C. 2291), there is authorized to be appropriated to the President not less than $5,000,000 for fiscal year 2002 for regional antidrug training in the Republic of Turkey by the Drug Enforcement Administration for police, as well as increased precursor chemical control efforts in the South and Central Asia region.

SEC. 1008. FEASIBILITY STUDY ON USE OF BIOMETRIC IDENTIFIER SCANNING SYSTEM WITH ACCESS TO THE FBI INTEGRATED AUTOMATED FINGERPRINT IDENTIFICATION SYSTEM AT OVERSEAS CONSULAR POSTS AND POINTS OF ENTRY TO THE UNITED STATES.

 (a) IN GENERAL.—The Attorney General, in consultation with the Secretary of State and the Secretary of Transportation, shall conduct a study on the feasibility of utilizing a biometric identifier (fingerprint) scanning system, with access to the database of the Federal Bureau of Investigation Integrated Automated Fingerprint Identification System, at consular offices abroad and at points of entry into the United States to enhance the ability of State Department and immigration officials to identify aliens who may be wanted in connection with criminal or terrorist investigations in the United States or abroad prior to the issuance of visas or entry into the United States.

 (b) REPORT TO CONGRESS.—Not later than 90 days after the date of the enactment of this Act, the Attorney General shall submit a report summarizing the findings of the study authorized under subsection (a) to the Committee on International Relations and the Committee on the Judiciary of the House of Representatives and the Committee on Foreign Relations and the Committee on the Judiciary of the Senate.

SEC. 1009. STUDY OF ACCESS.

(a) IN GENERAL.—Not later than 120 days after enactment of this Act, the Federal Bureau of Investigation shall study and report to Congress on the feasibility of providing to airlines access via computer to the names of passengers who are suspected of terrorist activity by Federal officials.

(b) AUTHORIZATION.—There are authorized to be appropriated not more than $250,000 to carry out subsection (a).

<< 10 USCA § 2465 NOTE >>

SEC. 1010. TEMPORARY AUTHORITY TO CONTRACT WITH LOCAL AND STATE GOVERNMENTS FOR PERFORMANCE OF SECURITY FUNCTIONS AT UNITED STATES MILITARY INSTALLATIONS.

(a) IN GENERAL.—Notwithstanding section 2465 of title 10, United States Code, during the period of time that United States armed forces are engaged in Operation Enduring Freedom, and for the period of 180 days thereafter, funds appropriated to the Department of Defense may be obligated and expended for the purpose of entering into contracts or other agreements for the performance of security functions at any military installation or facility in the United States with a proximately located local or State government, or combination of such governments, whether or not any such government is obligated to provide such services to the general public without compensation.

(b) TRAINING.—Any contract or agreement entered into under this section shall prescribe standards for the training and other qualifications of local government law enforcement personnel who perform security functions under this section in accordance with criteria established by the Secretary of the service concerned.

(c) REPORT.—One year after the date of enactment of this section, the Secretary of Defense shall submit a report to the Committees on Armed Services of the Senate and the House of Representatives describing the use of the authority granted under this section and the use by the Department of Defense of other means to improve the performance of security functions on military installations and facilities located within the United States.

SEC. 1011. CRIMES AGAINST CHARITABLE AMERICANS.

<< 15 USCA § 6101 NOTE >>

(a) SHORT TITLE.—This section may be cited as the "Crimes Against Charitable Americans Act of 2001".

(b) TELEMARKETING AND CONSUMER FRAUD ABUSE.—The Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. 6101 et seq.) is amended—

<< 15 USCA § 6102 >>

(1) in section 3(a)(2), by inserting after "practices" the second place it appears the following: "which shall include fraudulent charitable solicitations, and";

(2) in section 3(a)(3)—

<< 15 USCA § 6102 >>

(A) in subparagraph (B), by striking "and" at the end;

<< 15 USCA § 6102 >>

(B) in subparagraph (C), by striking the period at the end and inserting "; and"; and

<< 15 USCA § 6102 >>

(C) by adding at the end the following:

"(D) a requirement that any person engaged in telemarketing for the solicitation of charitable contributions, donations, or gifts of money or any other thing of value, shall promptly and clearly disclose to the person receiving the call that the purpose of

the call is to solicit charitable contributions, donations, or gifts, and make such other disclosures as the Commission considers appropriate, including the name and mailing address of the charitable organization on behalf of which the solicitation is made.'; and

<< 15 USCA § 6106 >>

(3) in section 7(4), by inserting ", or a charitable contribution, donation, or gift of money or any other thing of value," after "services".

<< 18 USCA § 917 >>

(c) RED CROSS MEMBERS OR AGENTS.—Section 917 of title 18, United States Code, is amended by striking "one year" and inserting "5 years".

(d) TELEMARKETING FRAUD.—Section 2325(1) of title 18, United States Code, is amended—

<< 18 USCA § 2325 >>

(1) in subparagraph (A), by striking "or" at the end;

<< 18 USCA § 2325 >>

(2) in subparagraph (B), by striking the comma at the end and inserting "; or";

<< 18 USCA § 2325 >>

(3) by inserting after subparagraph (B) the following:

  "(C) a charitable contribution, donation, or gift of money or any other thing of value,'; and

<< 18 USCA § 2325 >>

(4) in the flush language, by inserting "or charitable contributor, or donor" after "participant".

SEC. 1012. LIMITATION ON ISSUANCE OF HAZMAT LICENSES.

(a) LIMITATION.—

<< 49 USCA § 5103a >>

(1) IN GENERAL.—Chapter 51 of title 49, United States Code, is amended by inserting after section 5103 the following new section:

"§ 5103a. Limitation on issuance of hazmat licenses

"(a) LIMITATION.—

  "(1) ISSUANCE OF LICENSES.—A State may not issue to any individual a license to operate a motor vehicle transporting in commerce a hazardous material unless the Secretary of Transportation has first determined, upon receipt of a notification under subsection (c)(1)(B), that the individual does not pose a security risk warranting denial of the license.

  "(2) RENEWALS INCLUDED.—For the purposes of this section, the term 'issue', with respect to a license, includes renewal of the license.

"(b) HAZARDOUS MATERIALS DESCRIBED.—The limitation in subsection (a) shall apply with respect to—

  "(1) any material defined as a hazardous material by the Secretary of Transportation; and

  "(2) any chemical or biological material or agent determined by the Secretary of Health and Human Services or the Attorney General as being a threat to the national security of the United States.

"(c) BACKGROUND RECORDS CHECK.—

"(1) IN GENERAL.—Upon the request of a State regarding issuance of a license described in subsection (a)(1) to an individual, the Attorney General—

"(A) shall carry out a background records check regarding the individual; and

"(B) upon completing the background records check, shall notify the Secretary of Transportation of the completion and results of the background records check.

"(2) SCOPE.—A background records check regarding an individual under this subsection shall consist of the following:

"(A) A check of the relevant criminal history data bases.

"(B) In the case of an alien, a check of the relevant data bases to determine the status of the alien under the immigration laws of the United States.

"(C) As appropriate, a check of the relevant international data bases through Interpol–U.S. National Central Bureau or other appropriate means.

"(d) REPORTING REQUIREMENT.—Each State shall submit to the Secretary of Transportation, at such time and in such manner as the Secretary may prescribe, the name, address, and such other information as the Secretary may require, concerning—

"(1) each alien to whom the State issues a license described in subsection (a); and

"(2) each other individual to whom such a license is issued, as the Secretary may require.

"(e) ALIEN DEFINED.—In this section, the term 'alien' has the meaning given the term in section 101(a)(3) of the Immigration and Nationality Act.".

<< 49 USCA prec. § 5101 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 5103 the following new item:

"5103a. Limitation on issuance of hazmat licenses.".

(b) REGULATION OF DRIVER FITNESS.—Section 31305(a)(5) of title 49, United States Code, is amended—

<< 49 USCA § 31305 >>

(1) by striking "and" at the end of subparagraph (A);

<< 49 USCA § 31305 >>

(2) by inserting "and" at the end of subparagraph (B); and

<< 49 USCA § 31305 >>

(3) by adding at the end the following new subparagraph:

"(C) is licensed by a State to operate the vehicle after having first been determined under section 5103a of this title as not posing a security risk warranting denial of the license.".

<< 49 USCA § 5103a >>

(c) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated for the Department of Transportation and the Department of Justice such amounts as may be necessary to carry out section 5103a of title 49, United States Code, as added by subsection (a).

SEC. 1013. EXPRESSING THE SENSE OF THE SENATE CONCERNING THE PROVISION OF FUNDING FOR BIOTERRORISM PREPAREDNESS AND RESPONSE.

(a) FINDINGS.—The Senate finds the following:

(1) Additional steps must be taken to better prepare the United States to respond to potential bioterrorism attacks.

(2) The threat of a bioterrorist attack is still remote, but is increasing for a variety of reasons, including—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(A) public pronouncements by Osama bin Laden that it is his religious duty to acquire weapons of mass destruction, including chemical and biological weapons;

(B) the callous disregard for innocent human life as demonstrated by the terrorists' attacks of September 11, 2001;

(C) the resources and motivation of known terrorists and their sponsors and supporters to use biological warfare;

(D) recent scientific and technological advances in agent delivery technology such as aerosolization that have made weaponization of certain germs much easier; and

(E) the increasing access to the technologies and expertise necessary to construct and deploy chemical and biological weapons of mass destruction.

(3) Coordination of Federal, State, and local terrorism research, preparedness, and response programs must be improved.

(4) States, local areas, and public health officials must have enhanced resources and expertise in order to respond to a potential bioterrorist attack.

(5) National, State, and local communication capacities must be enhanced to combat the spread of chemical and biological illness.

(6) Greater resources must be provided to increase the capacity of hospitals and local health care workers to respond to public health threats.

(7) Health care professionals must be better trained to recognize, diagnose, and treat illnesses arising from biochemical attacks.

(8) Additional supplies may be essential to increase the readiness of the United States to respond to a bio-attack.

(9) Improvements must be made in assuring the safety of the food supply.

(10) New vaccines and treatments are needed to assure that we have an adequate response to a biochemical attack.

(11) Government research, preparedness, and response programs need to utilize private sector expertise and resources.

(12) Now is the time to strengthen our public health system and ensure that the United States is adequately prepared to respond to potential bioterrorist attacks, natural infectious disease outbreaks, and other challenges and potential threats to the public health.

(b) SENSE OF THE SENATE.—It is the sense of the Senate that the United States should make a substantial new investment this year toward the following:

(1) Improving State and local preparedness capabilities by upgrading State and local surveillance epidemiology, assisting in the development of response plans, assuring adequate staffing and training of health professionals to diagnose and care for victims of bioterrorism, extending the electronics communications networks and training personnel, and improving public health laboratories.

(2) Improving hospital response capabilities by assisting hospitals in developing plans for a bioterrorist attack and improving the surge capacity of hospitals.

(3) Upgrading the bioterrorism capabilities of the Centers for Disease Control and Prevention through improving rapid identification and health early warning systems.

(4) Improving disaster response medical systems, such as the National Disaster Medical System and the Metropolitan Medical Response System and Epidemic Intelligence Service.

(5) Targeting research to assist with the development of appropriate therapeutics and vaccines for likely bioterrorist agents and assisting with expedited drug and device review through the Food and Drug Administration.

(6) Improving the National Pharmaceutical Stockpile program by increasing the amount of necessary therapies (including smallpox vaccines and other post-exposure vaccines) and ensuring the appropriate deployment of stockpiles.

(7) Targeting activities to increase food safety at the Food and Drug Administration.

(8) Increasing international cooperation to secure dangerous biological agents, increase surveillance, and retrain biological warfare specialists.

<< 42 USCA § 3714 >>

SEC. 1014. GRANT PROGRAM FOR STATE AND LOCAL DOMESTIC PREPAREDNESS SUPPORT.

(a) IN GENERAL.—The Office for State and Local Domestic Preparedness Support of the Office of Justice Programs shall make a grant to each State, which shall be used by the State, in conjunction with units of local government, to enhance the

capability of State and local jurisdictions to prepare for and respond to terrorist acts including events of terrorism involving weapons of mass destruction and biological, nuclear, radiological, incendiary, chemical, and explosive devices.

(b) USE OF GRANT AMOUNTS.—Grants under this section may be used to purchase needed equipment and to provide training and technical assistance to State and local first responders.

(c) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—There is authorized to be appropriated to carry out this section such sums as necessary for each of fiscal years 2002 through 2007.

(2) LIMITATIONS.—Of the amount made available to carry out this section in any fiscal year not more than 3 percent may be used by the Attorney General for salaries and administrative expenses.

(3) MINIMUM AMOUNT.—Each State shall be allocated in each fiscal year under this section not less than 0.75 percent of the total amount appropriated in the fiscal year for grants pursuant to this section, except that the United States Virgin Islands, America Samoa, Guam, and the Northern Mariana Islands each shall be allocated 0.25 percent.

SEC. 1015. EXPANSION AND REAUTHORIZATION OF THE CRIME IDENTIFICATION TECHNOLOGY ACT FOR ANTITERRORISM GRANTS TO STATES AND LOCALITIES.

Section 102 of the Crime Identification Technology Act of 1998 (42 U.S.C. 14601) is amended—

(1) in subsection (b)—

<< 42 USCA § 14601 >>

(A) in paragraph (16), by striking "and" at the end;

<< 42 USCA § 14601 >>

(B) in paragraph (17), by striking the period and inserting "; and"; and

<< 42 USCA § 14601 >>

(C) by adding at the end the following:

"(18) notwithstanding subsection (c), antiterrorism purposes as they relate to any other uses under this section or for other antiterrorism programs.'; and

<< 42 USCA § 14601 >>

(2) in subsection (e)(1), by striking "this section" and all that follows and inserting "this section $250,000,000 for each of fiscal years 2002 through 2007.".

SEC. 1016. CRITICAL INFRASTRUCTURES PROTECTION.

<< 42 USCA § 5195c >>

(a) SHORT TITLE.—This section may be cited as the "Critical Infrastructures Protection Act of 2001".

(b) FINDINGS.—Congress makes the following findings:

(1) The information revolution has transformed the conduct of business and the operations of government as well as the infrastructure relied upon for the defense and national security of the United States.

(2) Private business, government, and the national security apparatus increasingly depend on an interdependent network of critical physical and information infrastructures, including telecommunications, energy, financial services, water, and transportation sectors.

(3) A continuous national effort is required to ensure the reliable provision of cyber and physical infrastructure services critical to maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States.

(4) This national effort requires extensive modeling and analytic capabilities for purposes of evaluating appropriate mechanisms to ensure the stability of these complex and interdependent systems, and to underpin policy recommendations, so as to achieve the continuous viability and adequate protection of the critical infrastructure of the Nation.

(c) POLICY OF THE UNITED STATES.—It is the policy of the United States—

(1) that any physical or virtual disruption of the operation of the critical infrastructures of the United States be rare, brief, geographically limited in effect, manageable, and minimally detrimental to the economy, human and government services, and national security of the United States;

(2) that actions necessary to achieve the policy stated in paragraph (1) be carried out in a public-private partnership involving corporate and non-governmental organizations; and

(3) to have in place a comprehensive and effective program to ensure the continuity of essential Federal Government functions under all circumstances.

(d) ESTABLISHMENT OF NATIONAL COMPETENCE FOR CRITICAL INFRASTRUCTURE PROTECTION.—

(1) SUPPORT OF CRITICAL INFRASTRUCTURE PROTECTION AND CONTINUITY BY NATIONAL INFRASTRUCTURE SIMULATION AND ANALYSIS CENTER.—There shall be established the National Infrastructure Simulation and Analysis Center (NISAC) to serve as a source of national competence to address critical infrastructure protection and continuity through support for activities related to counterterrorism, threat assessment, and risk mitigation.

(2) PARTICULAR SUPPORT.—The support provided under paragraph (1) shall include the following:

(A) Modeling, simulation, and analysis of the systems comprising critical infrastructures, including cyber infrastructure, telecommunications infrastructure, and physical infrastructure, in order to enhance understanding of the large-scale complexity of such systems and to facilitate modification of such systems to mitigate the threats to such systems and to critical infrastructures generally.

(B) Acquisition from State and local governments and the private sector of data necessary to create and maintain models of such systems and of critical infrastructures generally.

(C) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide education and training to policymakers on matters relating to—

(i) the analysis conducted under that subparagraph;

(ii) the implications of unintended or unintentional disturbances to critical infrastructures; and

(iii) responses to incidents or crises involving critical infrastructures, including the continuity of government and private sector activities through and after such incidents or crises.

(D) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide recommendations to policymakers, and to departments and agencies of the Federal Government and private sector persons and entities upon request, regarding means of enhancing the stability of, and preserving, critical infrastructures.

(3) RECIPIENT OF CERTAIN SUPPORT.—Modeling, simulation, and analysis provided under this subsection shall be provided, in particular, to relevant Federal, State, and local entities responsible for critical infrastructure protection and policy.

(e) CRITICAL INFRASTRUCTURE DEFINED.—In this section, the term "critical infrastructure" means systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters.

(f) AUTHORIZATION OF APPROPRIATIONS.—There is hereby authorized for the Department of Defense for fiscal year 2002, $20,000,000 for the Defense Threat Reduction Agency for activities of the National Infrastructure Simulation and Analysis Center under this section in that fiscal year.

Approved October 26, 2001.

PL 107–56, 2001 HR 3162

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.01274  115

PL 104–208, September 30, 1996, 110 Stat 3009

UNITED STATES PUBLIC LAWS

104th Congress - Second Session

Convening January 3, 1996

Additions and Deletions are not identified in this document.

PL 104–208 (HR 3610)

September 30, 1996

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997

An Act making omnibus consolidated appropriations for the fiscal year ending September 30, 1997, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

[THIS ACT IS FROM THE HAND ENROLLED BILL.]

## DIVISION A

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1997, and for other purposes, namely:

## TITLE I—OMNIBUS APPROPRIATIONS

SEC. 101. (a) For programs, projects or activities in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Departments of Commerce, Justice, and State, the Judiciary, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—DEPARTMENT OF JUSTICE

### GENERAL ADMINISTRATION

### SALARIES AND EXPENSES

For expenses necessary for the administration of the Department of Justice, $75,773,000 of which not to exceed $3,317,000 is for the Facilities Program 2000, to remain available until expended: Provided, That not to exceed 43 permanent positions and 44 full-time equivalent workyears and $7,477,000 shall be expended for the Department Leadership Program exclusive of augmentation that occurred in these offices in fiscal year 1996: Provided further, That not to exceed 41 permanent positions and 48 full-time equivalent workyears and $4,660,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or non-reimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount, for enhancements for the Office of Intelligence Policy and Review and security measures, $3,600,000; of which $2,170,000 is for security enhancements: Provided, That the entire amount is designated by Congress

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## COUNTERTERRORISM FUND

For necessary expenses, as determined by the Attorney General, $9,450,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City or any domestic or international terrorist incident, (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities, and (3) the costs of conducting a terrorism threat assessment of Federal agencies and their facilities: Provided, That funds provided under this heading shall be available only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

For an additional amount for necessary expenses, as determined by the Attorney General, $20,000,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of any domestic or international terrorist incident, or (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## ADMINISTRATIVE REVIEW AND APPEALS

For expenses necessary for the administration of pardon and clemency petitions and immigration related activities, $62,000,000.

For an additional amount for security measures for the Executive Office of Immigration Review, $1,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## VIOLENT CRIME REDUCTION PROGRAMS, ADMINISTRATIVE REVIEW AND APPEALS

For activities authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $48,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $31,960,000; including not to exceed $10,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and for the acquisition, lease, maintenance, and operation of motor vehicles, without regard to the general purchase price limitation for the current fiscal year.

## UNITED STATES PAROLE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the United States Parole Commission as authorized by law, $4,845,000.

## LEGAL ACTIVITIES

### SALARIES AND EXPENSES, GENERAL LEGAL ACTIVITIES

For expenses, necessary for the legal activities of the Department of Justice, not otherwise provided for, including not to exceed $20,000 for expenses of collecting evidence, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and rent of private or Government-owned space in the District of Columbia; 420,793,000; of which not to exceed $10,000,000 for litigation support contracts shall remain available until expended: Provided, That of

the funds available in this appropriation, not to exceed $17,525,000 shall remain available until expended for office automation systems for the legal divisions covered by this appropriation, and for the United States Attorneys, the Antitrust Division, and offices funded through "Salaries and Expenses", General Administration: Provided further, That of the total amount appropriated, not to exceed $1,000 shall be available to the United States National Central Bureau, INTERPOL, for official reception and representation expenses: Provided further, That notwithstanding 31 U.S.C. 1342, the Attorney General may accept on behalf of the United States, and credit to this appropriation, gifts of money, personal property and services, for the purposes of hosting the International Criminal Police Organization's (INTERPOL) American Regional Conference in the United States during fiscal year 1997: Provided further, That not to exceed 8 permanent positions and 10 full-time equivalent workyears and $987,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

In addition, for reimbursement of expenses of the Department of Justice associated with processing cases under the National Childhood Vaccine Injury Act of 1986 as amended, not to exceed $4,028,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

For an additional amount for expenses of the Criminal Division relating to terrorism, $1,719,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, GENERAL LEGAL ACTIVITIES

For the expeditious deportation of denied asylum applicants, as authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $7,750,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### SALARIES AND EXPENSES, ANTITRUST DIVISION

For expenses necessary for the enforcement of antitrust and kindred laws, $76,447,000: Provided, That notwithstanding any other provision of law, not to exceed $58,905,000 of offsetting collections derived from fees collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at not more than $17,542,000: Provided further, That any fees received in excess of $58,905,000 in fiscal year 1997, shall remain available until expended, but shall not be available for obligation until October 1, 1997.

### SALARIES AND EXPENSES, UNITED STATES ATTORNEYS

For necessary expenses of the Office of the United States Attorneys, including intergovernmental agreements, $923,340,000 of which not to exceed $2,500,000 shall be available until September 30, 1998, for the purposes of (1) providing training of personnel of the Department of Justice in debt collection, (2) providing services to the Department of Justice related to locating debtors and their property, such as title searches, debtor skiptracing, asset searches, credit reports and other investigations, (3) paying the costs of the Department of Justice for the sale of property not covered by the sale proceeds, such as auctioneers' fees and expenses, maintenance and protection of property and businesses, advertising and title search and surveying costs, and (4) paying the costs of processing and tracking debts owed to the United States Government: Provided, That of the total amount appropriated, not to exceed $8,000 shall be available for official reception and representation expenses: Provided further, That not to exceed $10,000,000 of those funds available for automated litigation support contracts shall remain available until expended: Provided further, That $1,900,000 for supervision of the International Brotherhood of Teamsters national election, shall remain available until expended: Provided further, That in addition to reimbursable full-time equivalent workyears available to the Office of the United States Attorneys, not to exceed 8,652 positions and 8,936 full-time equivalent workyears shall be supported from the funds appropriated in this Act for the United States Attorneys.

For an additional amount for expenses relating to terrorism and security needs, $10,900,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, UNITED STATES ATTORNEYS

For activities authorized by sections 40114, 130005, 190001(b), 190001(d) and 250005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 815 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), $43,876,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, of which $28,602,000 shall be available to help meet the increased demands for litigation and related activities, $4,641,000 for Southwest Border Control, $1,000,000 for Federal victim counselors, and $9,633,000 for expeditious deportation of denied asylum applicants.

### UNITED STATES TRUSTEE SYSTEM FUND

For necessary expenses of the United States Trustee Program, as authorized by 28 U.S.C. 589a(a), $107,950,000, to remain available until expended and to be derived from the United States Trustee System Fund: Provided, That notwithstanding any other provision of law, deposits to the Fund shall be available in such amounts as may be necessary to pay refunds due depositors: Provided further, That notwithstanding any other provision of law, $107,950,000 of offsetting collections derived from fees collected pursuant to 28 U.S.C. 589a(b) shall be retained and used for necessary expenses in this appropriation and remain available until expended: Provided further, That the sum herein appropriated from the Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the Fund estimated at $0: Provided further, That any such fees collected in excess of $107,950,000 in fiscal year 1997 shall remain available until expended but shall not be available for obligation until October 1, 1997.

### SALARIES AND EXPENSES, FOREIGN CLAIMS SETTLEMENT COMMISSION

For expenses necessary to carry out the activities of the Foreign Claims Settlement Commission, including services as authorized by 5 U.S.C. 3109, $953,000.

### SALARIES AND EXPENSES, UNITED STATES MARSHALS SERVICE

For necessary expenses of the United States Marshals Service; including the acquisition, lease, maintenance, and operation of vehicles and aircraft, and the purchase of passenger motor vehicles for police-type use, without regard to the general purchase price limitation for the current fiscal year, $457,495,000, as authorized by 28 U.S.C. 561(i); of which not to exceed $6,000 shall be available for official reception and representation expenses; and of which not to exceed $4,000,000 for development, implementation, maintenance and support, and training for an automated prisoner information system, and $2,200,000 to support the Justice Prisoner and Alien Transportation System, shall remain available until expended: Provided, That, with respect to the amounts appropriated above, the service of maintaining and transporting State, local, or territorial prisoners shall be considered a specialized or technical service for purposes of 31 U.S.C. 6505, and any prisoners so transported shall be considered persons (transported for other than commercial purposes) whose presence is associated with the performance of a governmental function for purposes of 49 U.S.C. 40102: Provided further, That not to exceed 12 permanent positions and 12 full-time equivalent workyears and $700,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

### VIOLENT CRIME REDUCTION PROGRAMS, UNITED STATES MARSHALS SERVICE

For activities authorized by section 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $25,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### FEDERAL PRISONER DETENTION

For expenses, related to United States prisoners in the custody of the United States Marshals Service as authorized in 18 U.S.C. 4013, but not including expenses otherwise provided for in appropriations available to the Attorney General, $405,262,000,

as authorized by 28 U.S.C. 561(i), to remain available until expended: Provided, That this appropriation hereafter shall not be available for expenses authorized under 18 U.S.C. 4013(a)(4).

## FEES AND EXPENSES OF WITNESSES

For expenses, mileage, compensation, and per diems of witnesses, for expenses of contracts for the procurement and supervision of expert witnesses, for private counsel expenses, and for per diems in lieu of subsistence, as authorized by law, including advances, $100,702,000, to remain available until expended; of which not to exceed $4,750,000 may be made available for planning, construction, renovations, maintenance, remodeling, and repair of buildings, and the purchase of equipment incident thereto, for protected witness safesites; of which not to exceed $1,000,000 may be made available for the purchase and maintenance of armored vehicles for transportation of protected witnesses; and of which not to exceed $4,000,000 may be made available for the purchase, installation and maintenance of a secure, automated information network to store and retrieve the identities and locations of protected witnesses.

## SALARIES AND EXPENSES, COMMUNITY RELATIONS SERVICE

For necessary expenses of the Community Relations Service, established by title X of the Civil Rights Act of 1964, $5,319,000: Provided, That notwithstanding any other provision of law, upon a determination by the Attorney General that emergent circumstances require additional funding for conflict prevention and resolution activities of the Community Relations Service, the Attorney General may transfer such amounts to the Community Relations Service, from available appropriations for the current fiscal year for the Department of Justice, as may be necessary to respond to such circumstances: Provided further, That any transfer pursuant to this paragraph shall be treated as a reprogramming under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## ASSETS FORFEITURE FUND

For expenses authorized by 28 U.S.C. 524(c)(1)(A)(ii), (B), (C), (F), and (G), as amended, $23,000,000, to be derived from the Department of Justice Assets Forfeiture Fund.

## RADIATION EXPOSURE COMPENSATION

### ADMINISTRATIVE EXPENSES

For necessary administrative expenses in accordance with the Radiation Exposure Compensation Act, $2,000,000.

### PAYMENT TO RADIATION EXPOSURE COMPENSATION TRUST FUND

For payments to the Radiation Exposure Compensation Trust Fund, $13,736,000, not to be available for obligation until September 30, 1997.

## INTERAGENCY LAW ENFORCEMENT

### INTERAGENCY CRIME AND DRUG ENFORCEMENT

For necessary expenses for the detection, investigation, and prosecution of individuals involved in organized crime drug trafficking not otherwise provided for, to include intergovernmental agreements with State and local law enforcement agencies engaged in the investigation and prosecution of individuals involved in organized crime drug trafficking, $359,430,000, of which $50,000,000 shall remain available until expended: Provided, That any amounts obligated from appropriations under this heading may be used under authorities available to the organizations reimbursed from this appropriation: Provided further, That any unobligated balances remaining available at the end of the fiscal year shall revert to the Attorney General for reallocation among participating organizations in succeeding fiscal years, subject to the reprogramming procedures described in section 605 of this Act.

## FEDERAL BUREAU OF INVESTIGATION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Bureau of Investigation for detection, investigation, and prosecution of crimes against the United States; including purchase for police-type use of not to exceed 2,706 passenger motor vehicles, of which 1,945 will be for

replacement only, without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance, and operation of aircraft; and not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; $2,451,361,000, of which not to exceed $50,000,000 for automated data processing and telecommunications and technical investigative equipment and $1,000,000 for undercover operations shall remain available until September 30, 1998; of which not less than $147,081,000 shall be for counterterrorism investigations, foreign counterintelligence, and other activities related to our national security; of which not to exceed $98,400,000 shall remain available until expended; and of which not to exceed $10,000,000 is authorized to be made available for making payments or advances for expenses arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to violent crime, terrorism, organized crime, and drug investigations; and of which $1,500,000 shall be available to maintain an independent program office dedicated solely to the relocation of the Criminal Justice Information Services Division and the automation of fingerprint identification services: Provided, That not to exceed $45,000 shall be available for official reception and representation expenses: Provided further, That not to exceed 81 permanent positions and 85 full-time equivalent workyears and $5,959,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount for necessary expenses of the Federal Bureau of Investigation to prevent and investigate terrorism activities and incidents; provide for additional agents and support staff; protect key physical assets; establish a capability for chemical, biological and nuclear research; improve domestic intelligence; and improve security at Federal Bureau of Investigation offices, $115,610,000, as authorized by the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132): Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2) (D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) as amended ("the 1994 Act"), and the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"), $169,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $76,356,000 shall be for activities authorized by section 190001(c) of the 1994 Act and section 811 of the Antiterrorism Act; $53,404,000 shall be for activities authorized by section 190001(b) of the 1994 Act, of which $20,240,000 shall be for activities authorized by section 103 of the Brady Handgun Violence Prevention (Public Law 103–159), as amended; $4,000,000 shall be for training and investigative assistance authorized by section 210501 of the 1994 Act; $9,500,000 shall be for grants to States, as authorized by section 811(b) of the Antiterrorism Act; and $5,500,000 shall be for establishing DNA quality-assurance and proficiency-testing standards, establishing an index to facilitate law enforcement exchange of DNA identification information, and related activities authorized by section 210501 of the 1994 Act.

## TELECOMMUNICATIONS CARRIER COMPLIANCE FUND

For necessary expenses, as determined by the Attorney General, $60,000,000, to remain available until expended, to be deposited in the Telecommunications Carrier Compliance Fund for making payments to telecommunications carriers, equipment manufacturers, and providers of telecommunications support services pursuant to section 110 of this Act: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the entire amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

## CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $41,639,000, to remain available until expended.

## DRUG ENFORCEMENT ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Drug Enforcement Administration, including not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; expenses for conducting drug education and training programs, including travel and related expenses for participants in such programs and the distribution of items of token value that promote the goals of such programs; purchase of not to exceed 1,158 passenger motor vehicles, of which 1,032 will be for replacement only, for policetype use without regard to the general purchase price limitation for the current fiscal year; and acquisition, lease, maintenance, and operation of aircraft; $745,388,000, of which not to exceed $1,800,000 for research and $15,000,000 for transfer to the Drug Diversion Control Fee Account for operating expenses shall remain available until expended, and of which not to exceed $4,000,000 for purchase of evidence and payments for information, not to exceed $4,000,000 for contracting for automated data processing and telecommunications equipment, and not to exceed $2,000,000 for laboratory equipment, $4,000,000 for technical equipment, and $2,000,000 for aircraft replacement retrofit and parts, shall remain available until September 30, 1998; and of which not to exceed $50,000 shall be available for official reception and representation expenses: Provided, That not to exceed 25 permanent positions and 25 full-time equivalent workyears and $1,828,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount for security measures for domestic and foreign Drug Enforcement Administration offices, $5,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by sections 180104 and 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 814 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), and for the purchase of passenger motor vehicles for police-type use, as otherwise authorized in this title, $220,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $30,806,000, to remain available until expended.

## IMMIGRATION AND NATURALIZATION SERVICE

### SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, including not to exceed $50,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; purchase for police-type use (not to exceed 2,691, of which 1,711 are for replacement only), without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance and operation of aircraft; and research related to immigration enforcement; $1,590,159,000 of which not to exceed $400,000 for research shall remain available until expended; and of which not to exceed $10,000,000 shall be available for costs associated with the training program for basic officer training, and $5,000,000 is for payments or advances arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to immigration: Provided, That none of the funds available to the Immigration and Naturalization Service shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 1997: Provided

further, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That not to exceed $5,000 shall be available for official reception and representation expenses: Provided further, That none of the funds provided in this or any other Act shall be used for the continued operation of the San Clemente and Temecula checkpoints unless the checkpoints are open and traffic is being checked on a continuous 24–hour basis: Provided further, That the Land Border Fee Pilot Project scheduled to end September 30, 1996, is extended to September 30, 1999, for projects on both the northern and southern borders of the United States, except that no pilot program may implement a universal land border crossing toll: Provided further, That obligated and unobligated balances available to "Salaries and Expenses, Community Relations Service" under section 501(c) of the Refugee Education Assistance Act of 1980 are transferred to this account and shall remain available until expended: Provided further, That not to exceed 48 permanent positions and 48 full-time equivalent workyears and $4,628,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount to support the detention and removal of aliens with ties to terrorist organizations and expand the detention and removal of illegal aliens and enhance the intelligence of the Immigration and Naturalization Service, $15,000,000, of which $10,000,000 shall be for detention and removal of aliens: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by sections 130002, 130005, 130006, 130007, and 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 813 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), $500,000,000, to remain available until expended, which will be derived from the Violent Crime Reduction Trust Fund, of which $66,217,000 shall be for expeditious deportation of denied asylum applicants, $317,256,000 shall be for improving border controls, and $116,527,000 shall be for detention and deportation proceedings: Provided, That amounts not required for asylum processing provided under the expeditious deportation of denied asylum applicants shall also be available for other deportation program activities.

## CONSTRUCTION

For planning, construction, renovation, equipping, and maintenance of buildings and facilities necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, not otherwise provided for, $9,841,000, to remain available until expended.

## FEDERAL PRISON SYSTEM

## SALARIES AND EXPENSES

<< 42 USCA § 250a >>

<< 18 USCA § 4352 NOTE >>

For expenses necessary for the administration, operation, and maintenance of Federal penal and correctional institutions, including purchase (not to exceed 836, of which 572 are for replacement only) and hire of law enforcement and passenger motor vehicles, and for the provision of technical assistance and advice on corrections related issues to foreign governments; $2,768,316,000: Provided, That the Attorney General may transfer to the Health Resources and Services Administration such amounts as may be necessary for direct expenditures by that Administration for medical relief for inmates of Federal penal and correctional institutions: Provided further, That the Director of the Federal Prison System (FPS), where necessary, may enter into contracts with a fiscal agent/fiscal intermediary claims processor to determine the amounts payable to persons who, on behalf of the FPS, furnish health services to individuals committed to the custody of the FPS: Provided further, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That not to exceed $6,000 shall be available for official reception and representation expenses: Provided further, That not to exceed

$90,000,000 for the activation of new facilities shall remain available until September 30, 1998: Provided further, That of the amounts provided for Contract Confinement, not to exceed $20,000,000 shall remain available until expended to make payments in advance for grants, contracts and reimbursable agreements, and other expenses authorized by section 501(c) of the Refugee Education Assistance Act of 1980, as amended, for the care and security in the United States of Cuban and Haitian entrants: Provided further, That notwithstanding section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), FPS may enter into contracts and other agreements with private entities for periods of not to exceed 3 years and 7 additional option years for the confinement of Federal prisoners: Provided further, That the National Institute of Corrections hereafter shall be included in the FPS Salaries and Expenses budget, in the Contract Confinement program and shall continue to perform its current functions under 18 U.S.C. 4351, et seq., with the exception of its grant program and shall collect reimbursement for services whenever possible: Provided further, That any unexpended balances available to the "National Institute of Corrections" account shall be credited to and merged with this appropriation, to remain available until expended.

### VIOLENT CRIME REDUCTION PROGRAMS

For substance abuse treatment in Federal prisons as authorized by section 32001(e) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $25,224,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### BUILDINGS AND FACILITIES

For planning, acquisition of sites and construction of new facilities; leasing the Oklahoma City Airport Trust Facility; purchase and acquisition of facilities and remodeling, and equipping of such facilities for penal and correctional use, including all necessary expenses incident thereto, by contract or force account; and constructing, remodeling, and equipping necessary buildings and facilities at existing penal and correctional institutions, including all necessary expenses incident thereto, by contract or force account; $395,700,000, to remain available until expended, of which not to exceed $14,074,000 shall be available to construct areas for inmate work programs: Provided, That labor of United States prisoners may be used for work performed under this appropriation: Provided further, That not to exceed 10 percent of the funds appropriated to "Buildings and Facilities" in this Act or any other Act may be transferred to "Salaries and Expenses", Federal Prison System, upon notification by the Attorney General to the Committees on Appropriations of the House of Representatives and the Senate in compliance with provisions set forth in section 605 of this Act: Provided further, That of the total amount appropriated, not to exceed $36,570,000 shall be available for the renovation and construction of United States Marshals Service prisoner-holding facilities.

### FEDERAL PRISON INDUSTRIES, INCORPORATED

The Federal Prison Industries, Incorporated, is hereby authorized to make such expenditures, within the limits of funds and borrowing authority available, and in accord with the law, and to make such contracts and commitments, without regard to fiscal year limitations as provided by section 9104 of title 31, United States Code, as may be necessary in carrying out the program set forth in the budget for the current fiscal year for such corporation, including purchase of (not to exceed five for replacement only) and hire of passenger motor vehicles.

### LIMITATION ON ADMINISTRATIVE EXPENSES, FEDERAL PRISON INDUSTRIES, INCORPORATED

Not to exceed $3,042,000 of the funds of the corporation shall be available for its administrative expenses, and for services as authorized by 5 U.S.C. 3109, to be computed on an accrual basis to be determined in accordance with the corporation's current prescribed accounting system, and such amounts shall be exclusive of depreciation, payment of claims, and expenditures which the said accounting system requires to be capitalized or charged to cost of commodities acquired or produced, including selling and shipping expenses, and expenses in connection with acquisition, construction, operation, maintenance, improvement, protection, or disposition of facilities and other property belonging to the corporation or in which it has an interest.

### OFFICE OF JUSTICE PROGRAMS

### JUSTICE ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and the Missing Children's Assistance Act, as amended, including salaries and expenses in connection therewith, and with the Victims of Crime Act of 1984, as amended, $101,429,000, to remain available until

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

expended, as authorized by section 1001 of title I of the Omnibus Crime Control and Safe Streets Act, as amended by Public Law 102–534 (106 Stat. 3524).

For an additional amount, $17,000,000, to remain available until expended; of which $5,000,000 shall be for Local Firefighter and Emergency Services Training Grants as authorized by section 819 of the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"); of which $10,000,000 shall be for development of counterterrorism technologies to help State and local law enforcement combat terrorism, as authorized by section 821 of the Antiterrorism Act; of which $2,000,000 shall be for specialized multi-agency response training: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the entire amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

## STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, for State and Local Narcotics Control and Justice Assistance Improvements, notwithstanding the provisions of section 511 of said Act, $361,000,000, to remain available until expended, as authorized by section 1001 of title I of said Act, as amended by Public Law 102–534 (106 Stat. 3524), of which $60,000,000 shall be available to carry out the provisions of chapter A of subpart 2 of part E of title I of said Act, for discretionary grants under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs.

## VIOLENT CRIME REDUCTION PROGRAMS, STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

<< 42 USCA § 13703 NOTE >>

For assistance (including amounts for administrative costs for management and administration, which amounts shall be transferred to and merged with the "Justice Assistance" account) authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended ("the 1994 Act"); the Omnibus Crime Control and Safe Streets Act of 1968, as amended ("the 1968 Act"); and the Victims of Child Abuse Act of 1990, as amended ("the 1990 Act"); $2,036,150,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $523,000,000 shall be for Local Law Enforcement Block Grants, pursuant to H.R. 728 as passed by the House of Representatives on February 14, 1995, except that for purposes of this Act, the Commonwealth of Puerto Rico shall be considered a "unit of local government" as well as a "State", for the purposes set forth in paragraphs (A), (B), (D), (F), and (I) of section 101(a)(2) of H.R. 728 and for establishing crime prevention programs involving cooperation between community residents and law enforcement personnel in order to control, detect, or investigate crime or the prosecution of criminals: Provided, That no funds provided under this heading may be used as matching funds for any other Federal grant program: Provided further, That $20,000,000 of this amount shall be for Boys and Girls Clubs in public housing facilities and other areas in cooperation with State and local law enforcement: Provided further, That funds may also be used to defray the costs of indemnification insurance for law enforcement officers; of which $50,000,000 shall be for grants to upgrade criminal records, as authorized by section 106(b) of the Brady Handgun Violence Prevention Act of 1993, as amended, and section 4(b) of the National Child Protection Act of 1993; of which $199,000,000 shall be available as authorized by section 1001 of title I of the 1968 Act, to carry out the provisions of subpart 1, part E of title I of the 1968 Act, notwithstanding section 511 of said Act, for the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs; of which $330,000,000 shall be for the State Criminal Alien Assistance Program, as authorized by section 242(j) of the Immigration and Nationality Act, as amended; of which $670,000,000 shall be for Violent Offender Incarceration and Truth in Sentencing Incentive Grants pursuant to subtitle A of title II of the 1994 Act, of which $170,000,000 shall be available for payments to States for incarceration of criminal aliens, and of which $12,500,000 shall be available for the Cooperative Agreement Program: Provided further, That funds made available for Violent Offender Incarceration and Truth in Sentencing Incentive Grants to the State of California may, at the discretion of the recipient, be used for payments for the incarceration of criminal aliens: Provided further, That beginning in fiscal year 1999, and thereafter, no funds shall be available to make grants to a State pursuant to section 20103 or section 20104 of the Violent Crime Control and Law Enforcement Act of 1994 unless

no later than September 1, 1998, such State has implemented a program of controlled substance testing and intervention for appropriate categories of convicted offenders during periods of incarceration and criminal justice supervision, with sanctions including denial or revocation of release for positive controlled substance tests, consistent with guidelines issued by the Attorney General; of which $6,000,000 shall be for the Court Appointed Special Advocate Program, as authorized by section 218 of the 1990 Act; of which $1,000,000 shall be for Child Abuse Training Programs for Judicial Personnel and Practitioners, as authorized by section 224 of the 1990 Act; of which $145,000,000 shall be for Grants to Combat Violence Against Women, to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(18) of the 1968 Act; of which $33,000,000 shall be for Grants to Encourage Arrest Policies to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(19) of the 1968 Act; of which $8,000,000 shall be for Rural Domestic Violence and Child Abuse Enforcement Assistance Grants, as authorized by section 40295 of the 1994 Act; of which $1,000,000 shall be for training programs to assist probation and parole officers who work with released sex offenders, as authorized by section 40152(c) of the 1994 Act; of which $550,000 shall be for grants for televised testimony, as authorized by section 1001(a)(7) of the 1968 Act; of which $1,750,000 shall be for national stalker and domestic violence reduction, as authorized by section 40603 of the 1994 Act; of which $30,000,000 shall be for grants for residential substance abuse treatment for State prisoners as authorized by section 1001(a)(17) of the 1968 Act; of which $3,000,000 shall be for grants to States and units of local government for projects to improve DNA analysis, as authorized by section 1001(a)(22) of the 1968 Act; of which $900,000 shall be for the Missing Alzheimer's Disease Patient Alert Program, as authorized by section 240001(c) of the 1994 Act; of which $750,000 shall be for Motor Vehicle Theft Prevention Programs, as authorized by section 220002(h) of the 1994 Act; of which $200,000 shall be for a National Baseline Study on Campus Sexual Assault, as authorized by section 40506(e) of the 1994 Act; of which $30,000,000 shall be for Drug Courts, as authorized by title V of the 1994 Act; of which $1,000,000 shall be for Law Enforcement Family Support Programs, as authorized by section 1001(a)(21) of the 1968 Act; and of which $2,000,000 shall be for public awareness programs addressing marketing scams aimed at senior citizens, as authorized by section 250005(3) of the 1994 Act: Provided further, That funds made available in fiscal year 1997 under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, may be obligated for programs to assist States in the litigation processing of death penalty Federal habeas corpus petitions and for drug testing initiatives: Provided further, That any 1996 balances for these programs shall be transferred to and merged with this appropriation: Provided further, That if a unit of local government uses any of the funds made available under this title to increase the number of law enforcement officers, the unit of local government will achieve a net gain in the number of law enforcement officers who perform nonadministrative public safety service.

## WEED AND SEED PROGRAM FUND

For necessary expenses, including salaries and related expenses of the Executive Office for Weed and Seed, to implement "Weed and Seed" program activities, $28,500,000, which shall be derived from discretionary grants provided under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs, to remain available until expended for intergovernmental agreements, including grants, cooperative agreements, and contracts, with State and local law enforcement agencies engaged in the investigation and prosecution of violent crimes and drug offenses in "Weed and Seed" designated communities, and for either reimbursements or transfers to appropriation accounts of the Department of Justice and other Federal agencies which shall be specified by the Attorney General to execute the "Weed and Seed" program strategy: Provided, That funds designated by Congress through language for other Department of Justice appropriation accounts for "Weed and Seed" program activities shall be managed and executed by the Attorney General through the Executive Office for Weed and Seed: Provided further, That the Attorney General may direct the use of other Department of Justice funds and personnel in support of "Weed and Seed" program activities only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

## COMMUNITY ORIENTED POLICING SERVICES

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103–322 ("the 1994 Act") (including administrative costs), $1,400,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, for Public Safety and Community Policing Grants pursuant to title I of the 1994 Act:

AR.01285

Provided, That not to exceed 186 permanent positions and 174 full-time equivalent workyears and $19,800,000 shall be expended for program management and administration.

In addition, for programs of Police Corps education, training and service as set forth in sections 200101–200113 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), $20,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### JUVENILE JUSTICE PROGRAMS

For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, including salaries and expenses in connection therewith to be transferred to and merged with the appropriations for Justice Assistance, $170,000,000, to remain available until expended, as authorized by section 299 of part I of title II and section 506 of title V of the Act, as amended by Public Law 102–586, of which (1) notwithstanding any other provision of law, $5,000,000 shall be available for expenses authorized by part A of title II of the Act, $86,500,000 shall be available for expenses authorized by part B of title II of the Act, and $29,500,000 shall be available for expenses authorized by part C of title II of the Act: Provided, That $16,500,000 of the amounts provided for part B of title II of the Act, as amended, is for the purpose of providing additional formula grants under part B, for innovative local law enforcement and community policing programs, to States that provide assurances to the Administrator that the State has in effect (or will have in effect no later than 1 year after date of application) policies and programs, that ensure that juveniles are subject to accountability-based sanctions for every act for which they are adjudicated delinquent; (2) $12,000,000 shall be available for expenses authorized by sections 281 and 282 of part D of title II of the Act for prevention and treatment programs relating to juvenile gangs; (3) $10,000,000 shall be available for expenses authorized by section 285 of part E of title II of the Act; (4) $7,000,000 shall be available for expenses authorized by part G of title II of the Act for juvenile mentoring programs; and (5) $20,000,000 shall be available for expenses authorized by title V of the Act for incentive grants for local delinquency prevention programs: Provided, That upon the enactment of reauthorization legislation for Juvenile Justice Programs under the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, funding provided in this Act shall from that date be subject to the provisions of that legislation and any provisions in this Act that are inconsistent with that legislation shall no longer have effect.

In addition, for grants, contracts, cooperative agreements, and other assistance authorized by the Victims of Child Abuse Act of 1990, as amended, $4,500,000, to remain available until expended, as authorized by sections 214B of the Act.

### PUBLIC SAFETY OFFICERS BENEFITS

For payments authorized by part L of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796), as amended, such sums as are necessary, to remain available until expended, as authorized by section 6093 of Public Law 100–690 (102 Stat. 4339–4340), and, in addition, $2,200,000, to remain available until expended, for payments as authorized by section 1201(b) of said Act.

### GENERAL PROVISIONS—DEPARTMENT OF JUSTICE

SEC. 101. In addition to amounts otherwise made available in this title for official reception and representation expenses, a total of not to exceed $45,000 from funds appropriated to the Department of Justice in this title shall be available to the Attorney General for official reception and representation expenses in accordance with distributions, procedures, and regulations established by the Attorney General.

SEC. 102. Authorities contained in the Department of Justice Appropriation Authorization Act, Fiscal Year 1980 (Pub.L. 96–132, 93 Stat. 1040 (1979)), as amended, shall remain in effect until the termination date of this Act or until the effective date of a Department of Justice Appropriation Authorization Act, whichever is earlier.

SEC. 103. None of the funds appropriated by this title shall be available to pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape: Provided, That should this prohibition be declared unconstitutional by a court of competent jurisdiction, this section shall be null and void.

SEC. 104. None of the funds appropriated under this title shall be used to require any person to perform, or facilitate in any way the performance of, any abortion.

SEC. 105. Nothing in the preceding section shall remove the obligation of the Director of the Bureau of Prisons to provide escort services necessary for a female inmate to receive such service outside the Federal facility: Provided, That nothing in this

section in any way diminishes the effect of section 104 intended to address the philosophical beliefs of individual employees of the Bureau of Prisons.

<< 18 USCA § 3059 NOTE >>

SEC. 106. Notwithstanding any other provision of law, not to exceed $10,000,000 of the funds made available in this Act may be used to establish and publicize a program under which publicly-advertised, extraordinary rewards may be paid, which shall not be subject to spending limitations contained in sections 3059 and 3072 of title 18, United States Code: Provided, That any reward of $100,000 or more, up to a maximum of $2,000,000, may not be made without the personal approval of the President or the Attorney General and such approval may not be delegated.

SEC. 107. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Justice in this Act, including those derived from the Violent Crime Reduction Trust Fund, may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation except in compliance with the procedures set forth in that section.

<< 28 USCA § 524 >>

SEC. 108. Section 524(c)(8)(E) of title 28, United States Code, is amended by striking the year in the date therein contained and replacing the same with "1996".

<< 28 USCA § 1930 >>

SEC. 109. (a) Section 1930(a) of title 28, United States Code, is amended in paragraph (3), by inserting "$" before "800", and in paragraph (6), by striking everything after "total less than $15,000;" and inserting in lieu thereof: "$500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $5,000 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.".

<< 28 USCA § 589a >>

(b) Section 589a of title 28, United States Code, is amended to read as follows:

"§ 589a. United States Trustee System Fund

"(a) There is hereby established in the Treasury of the United States a special fund to be known as the 'United States Trustee System Fund' (hereinafter in this section referred to as the 'Fund'). Monies in the Fund shall be available to the Attorney General without fiscal year limitation in such amounts as may be specified in appropriations Acts for the following purposes in connection with the operations of United States trustees—

"(1) salaries and related employee benefits;

"(2) travel and transportation;

"(3) rental of space;

"(4) communication, utilities, and miscellaneous computer charges;

"(5) security investigations and audits;

"(6) supplies, books, and other materials for legal research;

"(7) furniture and equipment;

"(8) miscellaneous services, including those obtained by contract; and

"(9) printing.

"(b) For the purpose of recovering the cost of services of the United States Trustee System, there shall be deposited as offsetting collections to the appropriation 'United States Trustee System Fund', to remain available until expended, the following—

"(1) 23.08 percent of the fees collected under section 1930(a)(1) of this title;

"(2) one-half of the fees collected under section 1930(a)(3) of this title;

"(3) one-half of the fees collected under section 1930(a)(4) of this title;

"(4) one-half of the fees collected under section 1930(a)(5) of this title;

"(5) 100 percent of the fees collected under section 1930(a)(6) of this title;

"(6) three-fourths of the fees collected under the last sentence of section 1930(a) of this title;

"(7) the compensation of trustees received under section 330(d) of title 11 by the clerks of the bankruptcy courts; and

"(8) excess fees collected under section 586(e)(2) of this title.

"(c) Amounts in the Fund which are not currently needed for the purposes specified in subsection (a) shall be kept on deposit or invested in obligations of, or guaranteed by, the United States.

"(d) The Attorney General shall transmit to the Congress, not later than 120 days after the end of each fiscal year, a detailed report on the amounts deposited in the Fund and a description of expenditures made under this section.

"(e) There are authorized to be appropriated to the Fund for any fiscal year such sums as may be necessary to supplement amounts deposited under subsection (b) for the purposes specified in subsection (a).".

<< 28 USCA § 589a NOTE >>

(c) Notwithstanding any other provision of law or of this Act, the amendments to 28 U.S.C. 589a made by subsection (b) of this section shall take effect upon enactment of this Act.

<< 28 USCA § 1930 NOTE >>

(d) Section 101(a) of Public Law 104–91, as amended by section 211 of Public Law 104–99, is further amended by inserting ": Provided further, That, notwithstanding any other provision of law, the fees under 28 U.S.C. 1930(a)(6) shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans" after "enacted into law".

SEC. 110. Public Law 103–414 (108 Stat. 4279) is amended by inserting at its conclusion a new title IV, as follows:

<< 47 USCA Ch. 9 >>

"TITLE IV—TELECOMMUNICATIONS CARRIER COMPLIANCE PAYMENTS

<< 47 USCA § 1021 >>

"SEC. 401. DEPARTMENT OF JUSTICE TELECOMMUNICATIONS CARRIER COMPLIANCE FUND.

"(a) ESTABLISHMENT OF FUND.—There is hereby established in the United States Treasury a fund to be known as the Department of Justice Telecommunications Carrier Compliance Fund (hereafter referred to as 'the Fund'), which shall be available without fiscal year limitation to the Attorney General for making payments to telecommunications carriers, equipment manufacturers, and providers of telecommunications support services pursuant to section 109 of this Act.

"(b) DEPOSITS TO THE FUND.—Notwithstanding any other provision of law, any agency of the United States with law enforcement or intelligence responsibilities may deposit as offsetting collections to the Fund any unobligated balances that are available until expended, upon compliance with any Congressional notification requirements for reprogrammings of funds applicable to the appropriation from which the deposit is to be made.

"(c) TERMINATION.—

"(1) The Attorney General may terminate the Fund at such time as the Attorney General determines that the Fund is no longer necessary.

"(2) Any balance in the Fund at the time of its termination shall be deposited in the General Fund of the Treasury.

"(3) A decision of the Attorney General to terminate the Fund shall not be subject to judicial review.

"(d) AVAILABILITY OF FUNDS FOR EXPENDITURE.—Funds shall not be available for obligation unless an implementation plan as set forth in subsection (e) is submitted to each member of the Committees on the Judiciary and Appropriations of both the House of Representatives and the Senate and the Congress does not by law block or prevent the obligation of such funds. Such funds shall be treated as a reprogramming of funds under section 605 of the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section and this section.

"(e) IMPLEMENTATION PLAN.—The implementation plan shall include:

  "(1) the law enforcement assistance capability requirements and an explanation of law enforcement's recommended interface;

  "(2) the proposed actual and maximum capacity requirements for the number of simultaneous law enforcement communications intercepts, pen registers, and trap and trace devices that authorized law enforcement agencies may seek to conduct, set forth on a county-by-county basis for wireline services and on a market service area basis for wireless services, and the historical baseline of electronic surveillance activity upon which such capacity requirements are based;

  "(3) a prioritized list of carrier equipment, facilities, and services deployed on or before January 1, 1995, to be modified by carriers at the request of law enforcement based on its investigative needs;

  "(4) a projected reimbursement plan that estimates the cost for the coming fiscal year and for each fiscal year thereafter, based on the prioritization of law enforcement needs as outlined in (3), of modification by carriers of equipment, facilities and services, installed on or before January 1, 1995.

"(f) ANNUAL REPORT TO THE CONGRESS.—The Attorney General shall submit to the Congress each year a report specifically detailing all deposits and expenditures made pursuant to this Act in each fiscal year. This report shall be submitted to each member of the Committees on the Judiciary and Appropriations of both the House of Representatives and the Senate, and to the Speaker and minority leader of the House of Representatives and to the majority and minority leaders of the Senate, no later than 60 days after the end of each fiscal year.".

  SEC. 111. It is the sense of the Congress that the Drug Enforcement Administration, together with other appropriate Federal agencies, should take such actions as may be necessary to end the illegal importation into the United States of Rohypnol (flunitrazepam), a drug frequently distributed with the intent to facilitate sexual assault and rape.

<< 42 USCA § 10601 >>

  SEC. 112. Section 1402 of the Victims of Crime Act of 1984, as amended (42 U.S.C. 10601), is amended at subsection (e) by deleting "2" and inserting "3", and at subsection (d) by adding a new paragraph (5) as follows:

  "(5) The Director may set aside up to $500,000 of the reserve fund described in paragraph (4) to make supplemental grants to United States Attorneys Offices to provide necessary assistance to victims of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, to facilitate observation of and/or participation by such victims in trial proceedings arising therefrom, including, without limitation, provision of lodging and travel assistance, and to pay such other, related expenses determined to be necessary by the Director.".

<< 18 USCA § 841 NOTE >>

  SEC. 113. Section 732 of Public Law 104–132 (110 Stat. 1303; 18 U.S.C. 841 note) is amended—

  (1) in subsection (a), by adding at the end the following new paragraph:

  "(3) NEW PREVENTION TECHNOLOGIES.—In addition to the study of taggants as provided herein, the Secretary, in consultation with the Attorney General, shall concurrently report to the Congress on the possible use, and exploitation of technologies such as vapor detection devices, computed tomography, nuclear quadropole resonance, thermal neutron analysis, pulsed fast-neutron analysis, and other technologies upon which recommendations to the Congress may be made for further study, funding, and use of the same in preventing and solving acts of terrorism involving explosive devices."; and

  (2) by adding at the end the following new subsection:

"(f) SPECIAL STUDY.—

  "(1) IN GENERAL.—Notwithstanding subsection (a), the Secretary of the Treasury shall enter into a contract with the National Academy of Sciences (referred to in this section as the 'Academy') to conduct a study of the tagging of smokeless

and black powder by any viable technology for purposes of detection and identification. The study shall be conducted by an independent panel of 5 experts appointed by the Academy.

 "(2) STUDY ELEMENTS.—The study conducted under this subsection shall—

 "(A) indicate whether the tracer elements, when added to smokeless and black powder—

 "(i) will pose a risk to human life or safety;

 "(ii) will substantially assist law enforcement officers in their investigative efforts;

 "(iii) will impair the quality and performance of the powders (which shall include a broad and comprehensive sampling of all available powders) for their intended lawful use, including, but not limited to the sporting, defense, and handloading uses of the powders, as well as their use in display and lawful consumer pyrotechnics;

 "(iv) will have a substantially adverse effect on the environment;

 "(v) will incur costs which outweigh the benefits of their inclusion, including an evaluation of the probable production and regulatory cost of compliance to the industry, and the costs and effects on consumers, including the effect on the demand for ammunition; and

 "(vi) can be evaded, and with what degree of difficulty, by terrorists or terrorist organizations, including evading tracer elements by the use of precursor chemicals to make black or other powders; and

 "(B) provide for consultation on the study with Federal, State, and local officials, non-governmental organizations, including all national police organizations, national sporting organizations, and national industry associations with expertise in this area and such other individuals as shall be deemed necessary.

 "(3) REPORT AND COSTS.—The study conducted under this subsection shall be presented to Congress 12 months after the enactment of this subsection and be made available to the public, including any data tapes or data used to form such recommendations. There are authorized to be appropriated such sums as may be necessary to carry out the study.".

<< 28 USCA § 524 >>

 Sec. 114. (a) Section 524(c)(1) of title 28, United States Code, is amended in the first sentence following the second subparagraph (I) by deleting "(C),".

 (b) Section 524(c)(8)(A) is amended by deleting "(C),".

<< 28 USCA § 509 NOTE >>

 Sec. 115. Effective with the enactment of this Act and in any fiscal year hereafter, under policies established by the Attorney General, the Department of Justice may reimburse employees who are paid by an appropriation account within the Department of Justice and are traveling on behalf of the United States in temporary duty status to investigate, prosecute, or litigate (including the provision of support therefor) a criminal or civil matter, or for other similar special circumstances, for Federal, State, and local taxes heretofore and hereafter resulting from any reimbursement of travel expenses from an appropriation account within the Department of Justice: Provided, That such reimbursement may include an amount equal to all income taxes for which the employee would be liable due to such reimbursement.

<< 28 USCA § 524 >>

 Sec. 116. Section 524 of title 28, United States Code, is amended by adding a new subsection (d) as follows:

 "(d)(1) The Attorney General may accept, hold, administer, and use gifts, devises, and bequests of any property for the purpose of aiding or facilitating the work of the Department of Justice.

 "(2) Gifts, devises, and bequests of money, the proceeds of sale or liquidation of any other property accepted hereunder, and any income accruing from any property accepted hereunder—

 "(A) shall be deposited in the Treasury in a separate fund and held in trust by the Secretary of the Treasury for the benefit of the Department of Justice; and

 "(B) are hereby appropriated, without fiscal year limitation, and shall be disbursed on order of the Attorney General.

 "(3) Upon request of the Attorney General, the Secretary of the Treasury may invest and reinvest the fund described herein in public debt securities with maturities suitable for the needs of the fund and bearing interest at rates determined by the Secretary

of the Treasury, taking into consideration the current average market yield on outstanding marketable obligations of the United States or comparable maturities.

"(4) Evidences of any intangible personal property (other than money) accepted hereunder shall be deposited with the Secretary of the Treasury, who may hold or liquidate them, except that they shall be liquidated upon the request of the Attorney General.

"(5) For purposes of federal income, estate, and gift taxes, property accepted hereunder shall be considered a gift, devise, or bequest to, or for the use of, the United States.".

<< 28 USCA § 524 >>

Sec. 117. Section 524(c)(9), of title 28, United States Code, is amended to read as follows:

"(9)(A) Following the completion of procedures for the forfeiture of property pursuant to any law enforced or administered by the Department, the Attorney General is authorized, in her discretion, to warrant clear title to any subsequent purchaser or transferee of such property.

"(B) For fiscal year 1997, the Attorney General is authorized to transfer, under such terms and conditions as the Attorney General shall specify, real or personal property of limited or marginal value, to a State or local government agency, or its designated contractor or transferee, for use to support drug abuse treatment, drug and crime prevention and education, housing, job skills, and other community-based public health and safety programs. Such transfer shall not create or confer any private right of action in any person against the United States.".

<< 28 USCA § 594 >>

Sec. 118. Section 594(b)(3)(A) of title 28, United States Code, is amended in the second sentence by—

(a) striking "by 6 months" and inserting "for successive 6–month periods";

(b) striking the phrase "employee assigned duties under subsection (l)(1)(A)(iii) certifies" and inserting "independent counsel and the division of the court certify";

(c) striking "such employee" and inserting "the independent counsel" and "the division of the court".

<< 29 USCA § 621 NOTE >>

Sec. 119. This section may be cited as the "Age Discrimination in Employment Amendments of 1996".

Subsection 1. AGE DISCRIMINATION AMENDMENT.

<< 29 USCA § 623 NOTE >>

(a) REPEAL OF REPEALER.—Section 3(b) of the Age Discrimination in Employment Amendments of 1986 (29 U.S.C. 623 note) is repealed.

<< 29 USCA § 623 >>

(b) EXEMPTION.—Section 4(j) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 623(j)), as in effect immediately before December 31, 1993—

(1) is reenacted as such section; and

(2) as so reenacted, is amended in paragraph (1) by striking "and the individual has attained the age" and all that follows through "1983, and" and inserting the following: ", the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained—

"(A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or

"(B)(i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996; or

"(ii) if applicable State or local law was enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996 and the individual was discharged, the higher of—

"(I) the age of retirement in effect on the date of such discharge under such law; and

"(II) age 55; and".

<< 29 USCA § 623 NOTE >>

(c) CONSTRUCTION.—Nothing in the repeal, reenactment, and amendment made by subsections (a) and (b) shall be construed to make lawful the failure or refusal to hire, or the discharge of, an individual pursuant to a law that—

(1) was enacted after March 3, 1983 and before the date of enactment of the Age Discrimination in Employment Amendments of 1996; and

(2) lowered the age of hiring or retirement, respectively, for firefighters or law enforcement officers that was in effect under applicable State or local law on March 3, 1983.

<< 29 USCA § 623 NOTE >>

Subsection 2. STUDY AND GUIDELINES FOR PERFORMANCE TESTS.

(a) STUDY.—Not later than 3 years after the date of enactment of this Act, the Secretary of Health and Human Services, acting through the Director of the National Institute for Occupational Safety and Health (referred to in this section as the "Secretary"), shall conduct, directly or by contract, a study, and shall submit to the appropriate committees of Congress a report based on the results of the study that shall include—

(1) a list and description of all tests available for the assessment of abilities important for the completion of public safety tasks performed by law enforcement officers and firefighters;

(2) a list of the public safety tasks for which adequate tests described in paragraph (1) do not exist;

(3) a description of the technical characteristics that the tests shall meet to be in compliance with applicable Federal civil rights law and policies;

(4) a description of the alternative methods that are available for determining minimally acceptable performance standards on the tests;

(5) a description of the administrative standards that should be met in the administration, scoring, and score interpretation of the tests; and

(6) an examination of the extent to which the tests are cost-effective, are safe, and comply with the Federal civil rights law and policies.

(b) CONSULTATION REQUIREMENT; OPPORTUNITY FOR PUBLIC COMMENT.—

(1) CONSULTATION.—The Secretary shall, during the conduct of the study required by subsection (a), consult with—

(A) the Deputy Administrator of the United States Fire Administration;

(B) the Director of the Federal Emergency Management Agency;

(C) organizations that represent law enforcement officers, firefighters, and employers of the officers and firefighters; and

(D) organizations that represent older individuals.

(2) PUBLIC COMMENT.—Prior to issuing the advisory guidelines required in subsection (c), the Secretary shall provide an opportunity for public comment on the proposed advisory guidelines.

(c) ADVISORY GUIDELINES.—Not later than 4 years after the date of enactment of this Act, the Secretary shall develop and issue, based on the results of the study required by subsection (a), advisory guidelines for the administration and use of physical and mental fitness tests to measure the ability and competency of law enforcement officers and firefighters to perform the requirements of the jobs of the officers and firefighters.

(d) JOB PERFORMANCE TESTS.—

(1) IDENTIFICATION OF TESTS.—After issuance of the advisory guidelines described in subsection (c), the Secretary shall issue regulations identifying valid, nondiscriminatory job performance tests that shall be used by employers seeking the exemption described in section 4(j) of the Age Discrimination in Employment Act of 1967 with respect to firefighters or law enforcement officers who have attained an age of retirement described in such section 4(j).

(2) USE OF TESTS.—Effective on the date of issuance of the regulations described in paragraph (1), any employer seeking such exemption with respect to a firefighter or law enforcement officer who has attained such age shall provide to each

AR.01292

firefighter or law enforcement officer who has attained such age an annual opportunity to demonstrate physical and mental fitness by passing a test described in paragraph (1), in order to continue employment.

(e) DEVELOPMENT OF STANDARDS FOR WELLNESS PROGRAMS.—Not later than 2 years after the date of enactment of this Act, the Secretary shall propose advisory standards for wellness programs for law enforcement officers and firefighters.

(f) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $5,000,000 to carry out this section.

<< 29 USCA § 623 NOTE >>

SUBSECTION 3. EFFECTIVE DATES.

(a) GENERAL EFFECTIVE DATE.—Except as provided in subsection (b), this title and the amendments made by this title shall take effect on the date of enactment of this Act.

(b) SPECIAL EFFECTIVE DATE.—The repeal made by section 2(a) and the reenactment made by section 2(b)(1) shall take effect on December 31, 1993.

<< 28 USCA RULES FRE Rule 413 NOTE >>

Sec. 120. Section 320935(e) of the Violent Crime Control and Law Enforcement Act of 1994 is amended by inserting ", including all trials commenced on or after the effective date of such amendments" after "such amendments".

<< 18 USCA § 2251 NOTE >>

Sec. 121. This section may be cited as the "Child Pornography Prevention Act of 1996".

<< 18 USCA § 2251 NOTE >>

SUBSECTION 1. FINDINGS.

Congress finds that—

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer;

(5) new photographic and computer imaging technologies make it possible to produce by electronic, mechanical, or other means, visual depictions of what appear to be children engaging in sexually explicit conduct that are virtually indistinguishable to the unsuspecting viewer from unretouched photographic images of actual children engaging in sexually explicit conduct;

(6) computers and computer imaging technology can be used to—

(A) alter sexually explicit photographs, films, and videos in such a way as to make it virtually impossible for unsuspecting viewers to identify individuals, or to determine if the offending material was produced using children;

(B) produce visual depictions of child sexual activity designed to satisfy the preferences of individual child molesters, pedophiles, and pornography collectors; and

(C) alter innocent pictures of children to create visual depictions of those children engaging in sexual conduct;

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come;

(8) the effect of visual depictions of child sexual activity on a child molester or pedophile using that material to stimulate or whet his own sexual appetites, or on a child where the material is being used as a means of seducing or breaking down the child's inhibitions to sexual abuse or exploitation, is the same whether the child pornography consists of photographic depictions of actual children or visual depictions produced wholly or in part by electronic, mechanical, or other means, including by computer, which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children;

(9) the danger to children who are seduced and molested with the aid of child sex pictures is just as great when the child pornographer or child molester uses visual depictions of child sexual activity produced wholly or in part by electronic, mechanical, or other means, including by computer, as when the material consists of unretouched photographic images of actual children engaging in sexually explicit conduct;

(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

<< 18 USCA § 2256 >>

SUBSECTION 2. DEFINITIONS.

Section 2256 of title 18, United States Code, is amended—

(1) in paragraph (5), by inserting before the semicolon the following: ", and data stored on computer disk or by electronic means which is capable of conversion into a visual image";

(2) in paragraph (6), by striking "and";

(3) in paragraph (7), by striking the period and inserting a semicolon; and

(4) by adding at the end the following new paragraphs:

"(8) 'child pornography' means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—

"(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

"(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;

"(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

"(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct; and

"(9) 'identifiable minor'—

"(A) means a person—

"(i)(I) who was a minor at the time the visual depiction was created, adapted, or modified; or

"(II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and

"(ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and

"(B) shall not be construed to require proof of the actual identity of the identifiable minor.".

SUBSECTION 3. PROHIBITED ACTIVITIES RELATING TO MATERIAL CONSTITUTING OR CONTAINING CHILD PORNOGRAPHY.

<< 18 USCA § 2252A >>

(a) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by adding after section 2252 the following:

"§ 2252A. Certain activities relating to material constituting or containing child pornography

"(a) Any person who—

"(1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;

"(2) knowingly receives or distributes—

"(A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

"(B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

"(3) knowingly reproduces any child pornography for distribution through the mails, or in interstate or foreign commerce by any means, including by computer;

"(4) either—

"(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly sells or possesses with the intent to sell any child pornography; or

"(B) knowingly sells or possesses with the intent to sell any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

"(5) either—

"(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography; or

"(B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer,

shall be punished as provided in subsection (b).

"(b)(1) Whoever violates, or attempts or conspires to violate, paragraphs (1), (2), (3), or (4) of subsection (a) shall be fined under this title or imprisoned not more than 15 years, or both, but, if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 5 years nor more than 30 years.

"(2) Whoever violates, or attempts or conspires to violate, subsection (a)(5) shall be fined under this title or imprisoned not more than 5 years, or both, but, if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the possession of child pornography, such person shall be fined under this title and imprisoned for not less than 2 years nor more than 10 years.

"(c) It shall be an affirmative defense to a charge of violating paragraphs (1), (2), (3), or (4) of subsection (a) that—

"(1) the alleged child pornography was produced using an actual person or persons engaging in sexually explicit conduct;

"(2) each such person was an adult at the time the material was produced; and

"(3) the defendant did not advertise, promote, present, describe, or distribute the material in such a manner as to convey the impression that it is or contains a visual depiction of a minor engaging in sexually explicit conduct.".

<< 18 USCA Ch. 110 >>

(b) TECHNICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by adding after the item relating to section 2252 the following:

"2252A. Certain activities relating to material constituting or containing child pornography.".

<< 18 USCA § 2251 >>

SUBSECTION 4. PENALTIES FOR SEXUAL EXPLOITATION OF CHILDREN.

Section 2251(d) of title 18, United States Code, is amended to read as follows:

"(d) Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title or imprisoned not less than 10 years nor more than 20 years, and both, but if such person has one prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned for not less than 15 years nor more than 30 years, but if such person has 2 or more prior convictions under this chapter or chapter 109A, or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 30 years nor more than life. Any organization that violates, or attempts or conspires to violate, this section shall be fined under this title. Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for any term of years or for life.".

<< 18 USCA § 2252 >>

SUBSECTION 5. MATERIAL INVOLVING SEXUAL EXPLOITATION OF MINORS.

Section 2252 of title 18, United States Code, is amended—by striking subsection (b) and inserting the following:

"(b)(1) Whoever violates, or attempts or conspires to violate, paragraphs (1), (2), or (3) of subsection (a) shall be fined under this title or imprisoned not more than 15 years, or both, but if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 5 years nor more than 30 years.

"(2) Whoever violates, or attempts or conspires to violate, paragraph (4) of subsection (a) shall be fined under this title or imprisoned not more than 5 years, or both, but if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the possession of child pornography, such person shall be fined under this title and imprisoned for not less than 2 years nor more than 10 years.".

<< 42 USCA § 2000aa >>

SUBSECTION 6. PRIVACY PROTECTION ACT AMENDMENTS.

Section 101 of the Privacy Protection Act of 1980 (42 U.S.C. 2000aa) is amended—

(1) in subsection (a)(1), by inserting before the parenthesis at the end the following: ", or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code"; and

(2) in subsection (b)(1), by inserting before the parenthesis at the end the following: ", or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code".

SUBSECTION 7. AMBER HAGERMAN CHILD PROTECTION ACT OF 1996.

<< 18 USCA § 2241 NOTE >>

(a) SHORT TITLE.—This section may be cited as the "Amber Hagerman Child Protection Act of 1996".

<< 18 USCA § 2241 >>

(b) AGGRAVATED SEXUAL ABUSE OF A MINOR.—Section 2241(c) of title 18, United States Code, is amended to read as follows:

"(c) WITH CHILDREN.—Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than that person), or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both. If the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison.".

<< 18 USCA § 2243 >>

(c) SEXUAL ABUSE OF A MINOR.—Section 2243(a) of title 18, United States Code, is amended by inserting "crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or" after "Whoever".

<< 18 USCA § 2251 NOTE >>

SUBSECTION 8. SEVERABILITY.

If any provision of this Act, including any provision or section of the definition of the term child pornography, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this Act, including any other provision or section of the definition of the term child pornography, the amendments made by this Act, and the application of such to any other person or circumstance shall not be affected thereby.

This title may be cited as the "Department of Justice Appropriations Act, 1997".

TITLE II—DEPARTMENT OF COMMERCE AND RELATED AGENCIES

TRADE AND INFRASTRUCTURE DEVELOPMENT

RELATED AGENCIES

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

SALARIES AND EXPENSES

For necessary expenses of the Office of the United States Trade Representative, including the hire of passenger motor vehicles and the employment of experts and consultants as authorized by 5 U.S.C. 3109, $21,449,000, of which $2,500,000 shall remain available until expended: Provided, That not to exceed $98,000 shall be available for official reception and representation expenses.

INTERNATIONAL TRADE COMMISSION

SALARIES AND EXPENSES

For necessary expenses of the International Trade Commission, including hire of passenger motor vehicles, and services as authorized by 5 U.S.C. 3109, and not to exceed $2,500 for official reception and representation expenses, $40,850,000, to remain available until expended.

DEPARTMENT OF COMMERCE

INTERNATIONAL TRADE ADMINISTRATION

## OPERATIONS AND ADMINISTRATION

For necessary expenses for international trade activities of the Department of Commerce provided for by law, and engaging in trade promotional activities abroad, including expenses of grants and cooperative agreements for the purpose of promoting exports of United States firms, without regard to 44 U.S.C. 3702 and 3703; full medical coverage for dependent members of immediate families of employees stationed overseas and employees temporarily posted overseas; travel and transportation of employees of the United States and Foreign Commercial Service between two points abroad, without regard to 49 U.S.C. 1517; employment of Americans and aliens by contract for services; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; purchase or construction of temporary demountable exhibition structures for use abroad; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $327,000 for official representation expenses abroad; purchase of passenger motor vehicles for official use abroad, not to exceed $30,000 per vehicle; obtain insurance on official motor vehicles; and rent tie lines and teletype equipment; $270,000,000, to remain available until expended: Provided, That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities without regard to section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912); and that for the purpose of this Act, contributions under the provisions of the Mutual Educational and Cultural Exchange Act shall include payment for assessments for services provided as part of these activities.

## EXPORT ADMINISTRATION

## OPERATIONS AND ADMINISTRATION

For necessary expenses for export administration and national security activities of the Department of Commerce, including costs associated with the performance of export administration field activities both domestically and abroad; full medical coverage for dependent members of immediate families of employees stationed overseas; employment of Americans and aliens by contract for services abroad; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $15,000 for official representation expenses abroad; awards of compensation to informers under the Export Administration Act of 1979, and as authorized by 22 U.S.C. 401(b); purchase of passenger motor vehicles for official use and motor vehicles for law enforcement use with special requirement vehicles eligible for purchase without regard to any price limitation otherwise established by law; $36,000,000, to remain available until expended: Provided, That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities: Provided further, That payments and contributions collected and accepted for materials or services provided as part of such activities may be retained for use in covering the cost of such activities, and for providing information to the public with respect to the export administration and national security activities of the Department of Commerce and other export control programs of the United States and other governments.

For an additional amount for nonproliferation efforts to prevent illegal exports of chemical weapon precursors, biological agents, nuclear weapons and missile development equipment, $3,900,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## ECONOMIC DEVELOPMENT ADMINISTRATION

## ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For grants for economic development assistance as provided by the Public Works and Economic Development Act of 1965, as amended, Public Law 91–304, and such laws that were in effect immediately before September 30, 1982, and for trade adjustment assistance, $328,500,000: Provided, That none of the funds appropriated or otherwise made available under this heading may be used directly or indirectly for attorneys' or consultants' fees in connection with securing grants and contracts made by the Economic Development Administration: Provided further, That, notwithstanding any other provision of law, the Secretary of Commerce may provide financial assistance for projects to be located on military installations closed or scheduled for closure or realignment to grantees eligible for assistance under the Public Works and Economic Development Act of 1965,

as amended, without it being required that the grantee have title or ability to obtain a lease for the property, for the useful life of the project, when in the opinion of the Secretary of Commerce, such financial assistance is necessary for the economic development of the area: Provided further, That the Secretary of Commerce may, as the Secretary considers appropriate, consult with the Secretary of Defense regarding the title to land on military installations closed or scheduled for closure or realignment.

## SALARIES AND EXPENSES

For necessary expenses of administering the economic development assistance programs as provided for by law, $20,036,000: Provided, That these funds may be used to monitor projects approved pursuant to title I of the Public Works Employment Act of 1976, as amended, title II of the Trade Act of 1974, as amended, and the Community Emergency Drought Relief Act of 1977.

## MINORITY BUSINESS DEVELOPMENT AGENCY

## MINORITY BUSINESS DEVELOPMENT

For necessary expenses of the Department of Commerce in fostering, promoting, and developing minority business enterprise, including expenses of grants, contracts, and other agreements with public or private organizations, $28,000,000: Provided, That of the total amount provided, $2,000,000 shall be available for obligation and expenditure only for projects jointly developed, implemented and administered with the Small Business Administration.

## ECONOMIC AND INFORMATION INFRASTRUCTURE

## ECONOMIC AND STATISTICAL ANALYSIS

## SALARIES AND EXPENSES

For necessary expenses, as authorized by law, of economic and statistical analysis programs of the Department of Commerce, $45,900,000, to remain available until September 30, 1998.

## ECONOMICS AND STATISTICS ADMINISTRATION

## REVOLVING FUND

### << 15 USCA § 1527a NOTE >>

The Secretary of Commerce is authorized to disseminate economic and statistical data products as authorized by sections 1, 2, and 4 of Public Law 91–412 (15 U.S.C. 1525–1527) and, notwithstanding section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912), charge fees necessary to recover the full costs incurred in their production. Notwithstanding 31 U.S.C. 3302, receipts received from these data dissemination activities shall be credited to this account, to be available for carrying out these purposes without further appropriation.

## BUREAU OF THE CENSUS

## SALARIES AND EXPENSES

For expenses necessary for collecting, compiling, analyzing, preparing, and publishing statistics, provided for by law, $135,000,000.

## PERIODIC CENSUSES AND PROGRAMS

For expenses necessary to collect and publish statistics for periodic censuses and programs provided for by law, $210,500,000, to remain available until expended.

## NATIONAL TELECOMMUNICATIONS AND INFORMATION

## ADMINISTRATION

## SALARIES AND EXPENSES

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 1323 of 3864

## << 47 USCA § 903 NOTE >>

For necessary expenses, as provided for by law, of the National Telecommunications and Information Administration (NTIA), $15,000,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 1535(d), the Secretary of Commerce shall charge Federal agencies for costs incurred in spectrum management, analysis, and operations, and related services and such fees shall be retained and used as offsetting collections for costs of such spectrum services, to remain available until expended: Provided further, That hereafter, notwithstanding any other provision of law, NTIA shall not authorize spectrum use or provide any spectrum functions pursuant to the NTIA Organization Act, 47 U.S.C. §§ 902–903, to any Federal entity without reimbursement as required by NTIA for such spectrum management costs, and Federal entities withholding payment of such cost shall not use spectrum: Provided further, That the Secretary of Commerce is authorized to retain and use as offsetting collections all funds transferred, or previously transferred, from other Government agencies for all costs incurred in telecommunications research, engineering, and related activities by the Institute for Telecommunication Sciences of the NTIA, in furtherance of its assigned functions under this paragraph, and such funds received from other Government agencies shall remain available until expended.

### PUBLIC BROADCASTING FACILITIES, PLANNING AND CONSTRUCTION

For grants authorized by section 392 of the Communications Act of 1934, as amended, $15,250,000, to remain available until expended as authorized by section 391 of the Act, as amended: Provided, That not to exceed $1,500,000 shall be available for program administration as authorized by section 391 of the Act: Provided further, That notwithstanding the provisions of section 391 of the Act, the prior year unobligated balances may be made available for grants for projects for which applications have been submitted and approved during any fiscal year.

### INFORMATION INFRASTRUCTURE GRANTS

For grants authorized by section 392 of the Communications Act of 1934, as amended, $21,490,000, to remain available until expended as authorized by section 391 of the Act, as amended: Provided, That not to exceed $3,000,000 shall be available for program administration and other support activities as authorized by section 391: Provided further, That of the funds appropriated herein, not to exceed 5 percent may be available for telecommunications research activities for projects related directly to the development of a national information infrastructure: Provided further, That notwithstanding the requirements of section 392(a) and 392(c) of the Act, these funds may be used for the planning and construction of telecommunications networks for the provision of educational, cultural, health care, public information, public safety, or other social services.

### PATENT AND TRADEMARK OFFICE

### SALARIES AND EXPENSES

For necessary expenses of the Patent and Trademark Office provided for by law, including defense of suits instituted against the Commissioner of Patents and Trademarks, $61,252,000, to remain available until expended: Provided, That the funds made available under this heading are to be derived from deposits in the Patent and Trademark Office Fee Surcharge Fund as authorized by law: Provided further, That the amounts made available under the Fund shall not exceed amounts deposited; and such fees as shall be collected pursuant to 15 U.S.C. 1113 and 35 U.S.C. 41 and 376, shall remain available until expended.

### TECHNOLOGY ADMINISTRATION

### UNDER SECRETARY FOR TECHNOLOGY/OFFICE OF TECHNOLOGY POLICY

### SALARIES AND EXPENSES

For necessary expenses for the Under Secretary for Technology/Office of Technology Policy, $9,500,000: Provided, That $2,500,000 of the total amount provided under this heading shall be available to support the United States–Israel Science and Technology Commission.

### SCIENCE AND TECHNOLOGY

## NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

### SCIENTIFIC AND TECHNICAL RESEARCH AND SERVICES

For necessary expenses of the National Institute of Standards and Technology, $268,000,000, to remain available until expended, of which not to exceed $1,625,000 may be transferred to the "Working Capital Fund".

### INDUSTRIAL TECHNOLOGY SERVICES

<< 15 USCA § 278k NOTE >>

For necessary expenses of the Manufacturing Extension Partnership of the National Institute of Standards and Technology, $95,000,000, to remain available until expended, of which not to exceed $300,000 may be transferred to the "Working Capital Fund": Provided, That notwithstanding the time limitations imposed by 15 U.S.C. 278k(c)(1) and (5) on the duration of Federal financial assistance that may be awarded by the Secretary of Commerce to Regional Centers for the transfer of Manufacturing Technology ("Centers"), such Federal financial assistance for a Center may continue beyond six years and may be renewed for additional periods, not to exceed one year, at a rate not to exceed one-third of the Center's total annual costs, subject before any such renewal to a positive evaluation of the Center and to a finding by the Secretary of Commerce that continuation of Federal funding to the Center is in the best interest of the Regional Centers for the transfer of Manufacturing Technology Program.

In addition, for necessary expenses of the Advanced Technology Program of the National Institute of Standards and Technology, $225,000,000, to remain available until expended, of which not to exceed $500,000 may be transferred to the "Working Capital Fund."

## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

### OPERATIONS, RESEARCH, AND FACILITIES (INCLUDING TRANSFER OF FUNDS)

<< 33 USCA § 851 NOTE >>

For necessary expenses of activities authorized by law for the National Oceanic and Atmospheric Administration, including acquisition, maintenance, operation, and hire of aircraft; not to exceed 299 commissioned officers on the active list as of September 30, 1997; grants, contracts, or other payments to nonprofit organizations for the purposes of conducting activities pursuant to cooperative agreements; and alteration, modernization, and relocation of facilities as authorized by 33 U.S.C. 883i; $1,854,067,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 3302 but consistent with other existing law, fees shall be assessed, collected, and credited to this appropriation as offsetting collections to be available until expended, to recover the costs of administering aeronautical charting programs: Provided further, That the sum herein appropriated from the general fund shall be reduced as such additional fees are received during fiscal year 1997, so as to result in a final general fund appropriation estimated at not more than $1,851,067,000: Provided further, That any such additional fees received in excess of $3,000,000 in fiscal year 1997 shall not be available for obligation until October 1, 1997: Provided further, That fees and donations received by the National Ocean Service for the management of the national marine sanctuaries may be retained and used for the salaries and expenses associated with those activities, notwithstanding 31 U.S.C. 3302: Provided further, That in addition, $66,000,000 shall be derived by transfer from the fund entitled "Promote and Develop Fishery Products and Research Pertaining to American Fisheries": Provided further, That grants to States pursuant to sections 306 and 306A of the Coastal Zone Management Act of 1972, as amended, shall not exceed $2,000,000: Provided further, That not later than November 15, 1996, the Department of Commerce, in conjunction with the National Oceanic and Atmospheric Administration, shall submit to the appropriate committees of the Congress, a long-term plan and a legislative proposal necessary to implement such plan regarding the continuation of a National Oceanic and Atmospheric Administration commissioned corps.

### COASTAL ZONE MANAGEMENT FUND

Of amounts collected pursuant to section 308 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1456a), not to exceed $7,800,000, for purposes set forth in sections 308(b)(2)(A), 308(b)(2)(B)(v), and 315(e) of such Act.

## CONSTRUCTION

For repair and modification of, and additions to, existing facilities and construction of new facilities, and for facility planning and design and land acquisition not otherwise provided for the National Oceanic and Atmospheric Administration, $58,250,000, to remain available until expended, of which $8,500,000 shall be available only for a grant to the University of New Hampshire for construction and related expenses for an environmental technology facility.

## FLEET MODERNIZATION, SHIPBUILDING AND CONVERSION

For expenses necessary for the repair, acquisition, leasing, or conversion of vessels, including related equipment to maintain and modernize the existing fleet and to continue planning the modernization of the fleet, for the National Oceanic and Atmospheric Administration, $8,000,000, to remain available until expended.

## FISHING VESSEL AND GEAR DAMAGE COMPENSATION FUND

For carrying out the provisions of section 3 of Public Law 95–376, not to exceed $200,000, to be derived from receipts collected pursuant to subsections (b) and (f) of section 10 of the Fishermen's Protective Act of 1967 (22 U.S.C. 1980), to remain available until expended.

## FISHERMEN'S CONTINGENCY FUND

For carrying out the provisions of title IV of Public Law 95–372, not to exceed $1,000,000, to be derived from receipts collected pursuant to that Act, to remain available until expended.

## FOREIGN FISHING OBSERVER FUND

For expenses necessary to carry out the provisions of the Atlantic Tunas Convention Act of 1975, as amended (Public Law 96–339), the Magnuson Fishery Conservation and Management Act of 1976, as amended (Public Law 100–627), and the American Fisheries Promotion Act (Public Law 96–561), to be derived from the fees imposed under the foreign fishery observer program authorized by these Acts, not to exceed $196,000, to remain available until expended.

## FISHING VESSEL OBLIGATIONS GUARANTEES

For the cost of guaranteed loans, $250,000, as authorized by the Merchant Marine Act of 1936, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That none of the funds made available under this heading may be used to guarantee loans for any new fishing vessel that will increase the harvesting capacity in any United States fishery.

## GENERAL ADMINISTRATION

### SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of Commerce provided for by law, including not to exceed $3,000 for official entertainment, $28,490,000.

### OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App. 1–11 as amended by Public Law 100–504), $20,140,000.

## NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

### CONSTRUCTION OF RESEARCH FACILITIES

### (RESCISSION)

Of the obligated and unobligated balances available under this heading, $16,000,000 are rescinded.

## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

### OPERATIONS, RESEARCH, AND FACILITIES

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(RESCISSION)

Of the unobligated balances available under this heading, $20,000,000 are rescinded.

GENERAL PROVISIONS—DEPARTMENT OF COMMERCE

SEC. 201. During the current fiscal year, applicable appropriations and funds made available to the Department of Commerce by this Act shall be available for the activities specified in the Act of October 26, 1949 (15 U.S.C. 1514), to the extent and in the manner prescribed by the Act, and, notwithstanding 31 U.S.C. 3324, may be used for advanced payments not otherwise authorized only upon the certification of officials designated by the Secretary that such payments are in the public interest.

SEC. 202. During the current fiscal year, appropriations made available to the Department of Commerce by this Act for salaries and expenses shall be available for hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; services as authorized by 5 U.S.C. 3109; and uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902).

SEC. 203. None of the funds made available by this Act may be used to support the hurricane reconnaissance aircraft and activities that are under the control of the United States Air Force or the United States Air Force Reserve.

<< 13 USCA § 23 NOTE >>

SEC. 204. None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce, shall be available to reimburse the Unemployment Trust Fund or any other fund or account of the Treasury to pay for any expenses paid before October 1, 1992, as authorized by section 8501 of title 5, United States Code, for services performed after April 20, 1990, by individuals appointed to temporary positions within the Bureau of the Census for purposes relating to the 1990 decennial census of population.

SEC. 205. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Commerce in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 206. (a) Should legislation be enacted to dismantle or reorganize the Department of Commerce, the Secretary of Commerce, no later than 90 days thereafter, shall submit to the Committees on Appropriations of the House and the Senate a plan for transferring funds provided in this Act to the appropriate successor organizations: Provided, That the plan shall include a proposal for transferring or rescinding funds appropriated herein for agencies or programs terminated under such legislation: Provided further, That such plan shall be transmitted in accordance with section 605 of this Act.

(b) The Secretary of Commerce or the appropriate head of any successor organization(s) may use any available funds to carry out legislation dismantling or reorganizing the Department of Commerce to cover the costs of actions relating to the abolishment, reorganization, or transfer of functions and any related personnel action, including voluntary separation incentives if authorized by such legislation: Provided, That the authority to transfer funds between appropriations accounts that may be necessary to carry out this section is provided in addition to authorities included under section 205 of this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 207. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

<< 16 USCA § 1851 NOTE >>

SEC. 208. None of the funds appropriated under this Act or any other Act henceforth may be used to develop new fishery management plans, amendments, or regulations which create new individual fishing quota programs (whether such quotas are transferable or not) or to implement any such plans, amendments or regulations approved by a Regional Fishery Management

Council or the Secretary after January 4, 1995, until offsetting fees to pay for the cost of administering such plans, amendments, or regulations are expressly authorized under the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.). This restriction shall also apply to any program relating to the Gulf of Mexico commercial red snapper fishery that authorizes the consolidation of licenses permits or endorsements that result in different trip limits for vessels in the same class. This restriction shall not apply in any way to the North Pacific halibut and sablefish, South Atlantic wreckfish, or the Mid–Atlantic surfclam and ocean (including mahogany) quohog individual fishing quota programs. The term "individual fishing quota" does not include a community development quota.

SEC. 209. The Secretary may award contracts for hydrographic, geodetic, and photogrammetric surveying and mapping services in accordance with title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.).

<< 13 USCA § 11 NOTE >>

SEC. 210. There is hereby established the Bureau of the Census Working Capital Fund, which shall be available without fiscal year limitation, for expenses and equipment necessary for the maintenance and operation of such services and projects as the Director of the Census Bureau determines may be performed more advantageously when centralized: Provided, That such central services shall, to the fullest extent practicable, be used to make unnecessary the maintenance of separate like services in the divisions and offices of the Bureau: Provided further, That a separate schedule of expenditures and reimbursements, and a statement of the current assets and liabilities of the Working Capital Fund as of the close of the last completed fiscal year, shall be prepared each year: Provided further, That notwithstanding 31 U.S.C. 3302, the Working Capital Fund may be credited with advances and reimbursements from applicable appropriations of the Bureau and from funds of other agencies or entities for services furnished pursuant to law: Provided further, That any inventories, equipment, and other assets pertaining to the services to be provided by such funds, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made hereafter for the purpose of providing capital, shall be used to capitalize the Working Capital Fund: Provided further, That the Working Capital Fund shall provide for centralized services at rates which will return in full all expenses of operation, including depreciation of fund plant and equipment, amortization of automated data processing software and hardware systems, and an amount necessary to maintain a reasonable operating reserve as determined by the Director.

<< 16 USCA § 1801 NOTE >>

SEC. 211. (a) Effective 15 days after the enactment of the Sustainable Fisheries Act, section 1 of the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801) shall be amended to read as follows: "That this Act may be cited as the 'Magnuson–Stevens Fishery Conservation and Management Act'."

(b) Effective 15 days after the enactment of the Sustainable Fisheries Act, all references to the Magnuson Fishery Conservation and Management Act shall be redesignated as references to the Magnuson–Stevens Fishery Conservation and Management Act.

This title may be cited as the "Department of Commerce and Related Agencies Appropriations Act, 1997".

TITLE III—THE JUDICIARY

SUPREME COURT OF THE UNITED STATES

SALARIES AND EXPENSES

For expenses necessary for the operation of the Supreme Court, as required by law, excluding care of the building and grounds, including purchase or hire, driving, maintenance, and operation of an automobile for the Chief Justice, not to exceed $10,000 for the purpose of transporting Associate Justices, and hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; not to exceed $10,000 for official reception and representation expenses; and for miscellaneous expenses, to be expended as the Chief Justice may approve; $27,157,000.

CARE OF THE BUILDING AND GROUNDS

For such expenditures as may be necessary to enable the Architect of the Capitol to carry out the duties imposed upon him by the Act approved May 7, 1934 (40 U.S.C. 13a–13b), $2,800,000, of which $260,000 shall remain available until expended.

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## SALARIES AND EXPENSES

For salaries of the chief judge, judges, and other officers and employees, and for necessary expenses of the court, as authorized by law, $15,013,000.

### UNITED STATES COURT OF INTERNATIONAL TRADE

## SALARIES AND EXPENSES

For salaries of the chief judge and eight judges, salaries of the officers and employees of the court, services as authorized by 5 U.S.C. 3109, and necessary expenses of the court, as authorized by law, $11,114,000.

### COURTS OF APPEALS, DISTRICT COURTS, AND OTHER JUDICIAL SERVICES

## SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For the salaries of circuit and district judges (including judges of the territorial courts of the United States), justices and judges retired from office or from regular active service, judges of the United States Court of Federal Claims, bankruptcy judges, magistrate judges, and all other officers and employees of the Federal Judiciary not otherwise specifically provided for, and necessary expenses of the courts, as authorized by law, $2,556,000,000 (including the purchase of firearms and ammunition); of which not to exceed $13,454,000 shall remain available until expended for space alteration projects; of which $500,000 shall be transferred to the Commission on Structural Alternatives for the Federal Courts of Appeals only after legislation is enacted to establish the Commission; of which not to exceed $10,000,000 shall remain available until expended for furniture and furnishings related to new space alteration and construction projects; and of which $500,000 is to remain available until expended for acquisition of books, periodicals, and newspapers, and all other legal reference materials, including subscriptions.

In addition, for expenses of the United States Court of Federal Claims associated with processing cases under the National Childhood Vaccine Injury Act of 1986, not to exceed $2,390,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

For an additional amount for expenses relating to additional workload from the Antiterrorism and Effective Death Penalty Act of 1996, and for Court Security needs, $10,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

### VIOLENT CRIME REDUCTION PROGRAMS

For activities of the Federal Judiciary as authorized by law, $30,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as authorized by section 190001(a) of Public Law 103–322.

### DEFENDER SERVICES

For the operation of Federal Public Defender and Community Defender organizations; the compensation and reimbursement of expenses of attorneys appointed to represent persons under the Criminal Justice Act of 1964, as amended; the compensation and reimbursement of expenses of persons furnishing investigative, expert and other services under the Criminal Justice Act (18 U.S.C. 3006A(e)); the compensation (in accordance with Criminal Justice Act maximums) and reimbursement of expenses of attorneys appointed to assist the court in criminal cases where the defendant has waived representation by counsel; the compensation and reimbursement of travel expenses of guardians ad litem acting on behalf of financially eligible minor or incompetent offenders in connection with transfers from the United States to foreign countries with which the United States has a treaty for the execution of penal sentences; and the compensation of attorneys ap-[sic]

### FEES OF JURORS AND COMMISSIONERS

For fees and expenses of jurors as authorized by 28 U.S.C. 1871 and 1876; compensation of jury commissioners as authorized by 28 U.S.C. 1863; and compensation of commissioners appointed in condemnation cases pursuant to rule 71A(h) of the Federal Rules of Civil Procedure (28 U.S.C. Appendix Rule 71A(h)); $67,000,000, to remain available until expended: Provided, That the compensation of land commissioners shall not exceed the daily equivalent of the highest rate payable under section 5332 of title 5, United States Code.

## COURT SECURITY

For necessary expenses, not otherwise provided for, incident to the procurement, installation, and maintenance of security equipment and protective services for the United States Courts in courtrooms and adjacent areas, including building ingress-egress control, inspection of packages, directed security patrols, and other similar activities as authorized by section 1010 of the Judicial Improvement and Access to Justice Act (Public Law 100–702); $127,000,000, to be expended directly or transferred to the United States Marshals Service which shall be responsible for administering elements of the Judicial Security Program consistent with standards or guidelines agreed to by the Director of the Administrative Office of the United States Courts and the Attorney General.

## ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

### SALARIES AND EXPENSES

For necessary expenses of the Administrative Office of the United States Courts as authorized by law, including travel as authorized by 31 U.S.C. 1345, hire of a passenger motor vehicle as authorized by 31 U.S.C. 1343(b), advertising and rent in the District of Columbia and elsewhere, $49,450,000, of which not to exceed $7,500 is authorized for official reception and representation expenses.

## FEDERAL JUDICIAL CENTER

### SALARIES AND EXPENSES

For necessary expenses of the Federal Judicial Center, as authorized by Public Law 90–219, $17,495,000; of which $1,800,000 shall remain available through September 30, 1998, to provide education and training to Federal court personnel; and of which not to exceed $1,000 is authorized for official reception and representation expenses.

## JUDICIAL RETIREMENT FUNDS

### PAYMENT TO JUDICIARY TRUST FUNDS

For payment to the Judicial Officers' Retirement Fund, as authorized by 28 U.S.C. 377(o), $21,000,000, to the Judicial Survivors' Annuities Fund, as authorized by 28 U.S.C. 376(c), $7,300,000, and to the United States Court of Federal Claims Judges' Retirement Fund, as authorized by 28 U.S.C. 178(l), $1,900,000.

## UNITED STATES SENTENCING COMMISSION

### SALARIES AND EXPENSES

For the salaries and expenses necessary to carry out the provisions of chapter 58 of title 28, United States Code, $8,490,000, of which not to exceed $1,000 is authorized for official reception and representation expenses.

## GENERAL PROVISIONS—THE JUDICIARY

SEC. 301. Appropriations and authorizations made in this title which are available for salaries and expenses shall be available for services as authorized by 5 U.S.C. 3109.

SEC. 302. Appropriations made in this title shall be available for salaries and expenses of the Special Court established under the Regional Rail Reorganization Act of 1973, Public Law 93–236.

SEC. 303. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Judiciary in this Act may be transferred between such appropriations, but no such appropriation, except "Courts of Appeals, District Courts, and other Judicial Services, Defender Services" and "Courts of Appeals, District Courts, and other Judicial Services, Fees of Jurors and Commissioners", shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to

this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 304. Notwithstanding any other provision of law, the salaries and expenses appropriation for district courts, courts of appeals, and other judicial services shall be available for official reception and representation expenses of the Judicial Conference of the United States: Provided, That such available funds shall not exceed $10,000 and shall be administered by the Director of the Administrative Office of the United States Courts in his capacity as Secretary of the Judicial Conference.

<< 28 USCA § 612 >>

SEC. 305. Section 612(l) of title 28, United States Code, shall be amended as follows: strike "1997", and insert in lieu thereof "1998".

<< 18 USCA § 3626 NOTE >>

SEC. 306. None of the funds available to the Judiciary in fiscal years 1996 and 1997 and hereafter shall be available for expenses authorized pursuant to section 802(a) of title VIII of section 101(a) of title I of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Public Law 104–134, for costs related to the appointment of Special Masters prior to April 26, 1996.

Sec. 307. The United States courthouse at 310 West Sixth Street in Medford, Oregon, shall be known and designated as the "James A. Redden Federal Courthouse".

Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States courthouse at 310 West Sixth Street in Medford, Oregon, shall be deemed to be a reference to the "James A. Redden Federal Courthouse".

This title may be cited as "The Judiciary Appropriations Act, 1997".

TITLE IV—DEPARTMENT OF STATE AND RELATED AGENCIES

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

DIPLOMATIC AND CONSULAR PROGRAMS

<< 8 USCA § 1351 NOTE >>

<< 22 USCA § 2695b >>

For necessary expenses of the Department of State and the Foreign Service not otherwise provided for, including expenses authorized by the State Department Basic Authorities Act of 1956, as amended; representation to certain international organizations in which the United States participates pursuant to treaties, ratified pursuant to the advice and consent of the Senate, or specific Acts of Congress; acquisition by exchange or purchase of passenger motor vehicles as authorized by 31 U.S.C. 1343, 40 U.S.C. 481(c) and 22 U.S.C. 2674; and for expenses of general administration; $1,700,450,000: Provided, That notwithstanding section 140(a)(5), and the second sentence of section 140(a)(3), of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236), not to exceed $150,000,000 of fees may be collected during fiscal year 1997 under the authority of section 140(a)(1) of that Act: Provided further, That all fees collected under the preceding proviso shall be deposited in fiscal year 1997 as an offsetting collection to appropriations made under this heading to recover the costs of providing consular services and shall remain available until expended: Provided further, That in fiscal year 1998, a system shall be in place that allocates to each department and agency the full cost of its presence outside of the United States.

Of the funds provided under this heading, $24,856,000 shall be available only for the Diplomatic Telecommunications Service for operation of existing base services and not to exceed $17,230,000 shall be available only for the enhancement of the Diplomatic Telecommunications Service and shall remain available until expended. Of the latter amount, $2,500,000 shall not be made available until expiration of the 15 day period beginning on the date when the Secretary of State and the Director of the Diplomatic Telecommunications Service submit the pilot program report required by section 507 of Public Law 103–317.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In addition, not to exceed $700,000 in registration fees collected pursuant to section 38 of the Arms Export Control Act, as amended, may be used in accordance with section 45 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2717); and in addition not to exceed $1,223,000 shall be derived from fees collected from other executive agencies for lease or use of facilities located at the International Center in accordance with section 4 of the International Center Act (Public Law 90–553), as amended; and in addition, as authorized by section 5 of such Act, $450,000, to be derived from the reserve authorized by that section, to be used for the purposes set out in that section; and in addition not to exceed $15,000 which shall be derived from reimbursements, surcharges, and fees for use of Blair House facilities in accordance with section 46 of the State of Department Basic Authorities Act of 1956 (22 U.S.C. 2718(a)).

Notwithstanding section 402 of this Act, not to exceed 20 percent of the amounts made available in this Act in the appropriation accounts "Diplomatic and Consular Programs" and "Salaries & Expenses" under the heading "Administration of Foreign Affairs" may be transferred between such appropriation accounts: Provided, That any transfer pursuant to this sentence shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

For an additional amount for counterterrorism requirements overseas, including security guards and equipment, $23,700,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of State and the Foreign Service, provided for by law, including expenses authorized by section 9 of the Act of August 31, 1964, as amended (31 U.S.C. 3721), and the State Department Basic Authorities Act of 1956, as amended, $352,300,000.

## CAPITAL INVESTMENT FUND

For necessary expenses of the Capital Investment Fund, $24,600,000, to remain available until expended, as authorized in Public Law 103–236: Provided, That section 135(e) of Public Law 103–236 shall not apply to funds appropriated under this heading.

## OFFICE OF INSPECTOR GENERAL

<< 5 USCA App. 3 § 11 NOTE >>

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App.), $27,495,000, notwithstanding section 209(a)(1) of the Foreign Service Act of 1980, as amended (Public Law 96–465), as it relates to post inspections: Provided, That notwithstanding any other provision of law, the merger of the Office of Inspector General of the United States Information Agency with the Office of Inspector General of the Department of State provided for in the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1996, contained in Public Law 104–134, is effective hereafter.

## REPRESENTATION ALLOWANCES

For representation allowances as authorized by section 905 of the Foreign Service Act of 1980, as amended (22 U.S.C. 4085), $4,490,000.

## PROTECTION OF FOREIGN MISSIONS AND OFFICIALS

For expenses, not otherwise provided, to enable the Secretary of State to provide for extraordinary protective services in accordance with the provisions of section 214 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4314) and 3 U.S.C. 208, $8,332,000, to remain available until September 30, 1998.

## SECURITY AND MAINTENANCE OF UNITED STATES MISSIONS

For necessary expenses for carrying out the Foreign Service Buildings Act of 1926, as amended (22 U.S.C. 292–300), and the Diplomatic Security Construction Program as authorized by title IV of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (22 U.S.C. 4851), $364,495,000, to remain available until expended as authorized by section 24(c) of the State

Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)): Provided, That none of the funds appropriated in this paragraph shall be available for acquisition of furniture and furnishings and generators for other departments and agencies.

For an additional amount for security improvements, necessary relocation expenses, and security equipment for United States diplomatic facilities and missions overseas, $24,825,000, to remain available until expended: Provided, That of this amount $9,400,000 is for security projects on behalf of United States and Foreign Commercial Service missions and $1,125,000 is for security projects on behalf of United States Information Agency missions: Provided further, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

### EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

For expenses necessary to enable the Secretary of State to meet unforeseen emergencies arising in the Diplomatic and Consular Service pursuant to the requirement of 31 U.S.C. 3526(e), $5,800,000, to remain available until expended as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)), of which not to exceed $1,000,000 may be transferred to and merged with the Repatriation Loans Program Account, subject to the same terms and conditions.

### REPATRIATION LOANS PROGRAM ACCOUNT

For the cost of direct loans, $593,000, as authorized by section 4 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2671): Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974. In addition, for administrative expenses necessary to carry out the direct loan program, $663,000 which may be transferred to and merged with the Salaries and Expenses account under Administration of Foreign Affairs.

### PAYMENT TO THE AMERICAN INSTITUTE IN TAIWAN

For necessary expenses to carry out the Taiwan Relations Act, Public Law 96–8 (93 Stat. 14), $14,490,000.

### PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the Foreign Service Retirement and Disability Fund, as authorized by law, $126,491,000.

### INTERNATIONAL ORGANIZATIONS AND CONFERENCES

### CONTRIBUTIONS TO INTERNATIONAL ORGANIZATIONS

<< 22 USCA § 269a NOTE >>

For expenses, not otherwise provided for, necessary to meet annual obligations of membership in international multilateral organizations, pursuant to treaties ratified pursuant to the advice and consent of the Senate, conventions or specific Acts of Congress, $892,000,000: Provided, That any payment of arrearages shall be directed toward special activities that are mutually agreed upon by the United States and the respective international organization: Provided further, That 20 percent of the funds appropriated in this paragraph for the assessed contribution of the United States to the United Nations shall be withheld from obligation and expenditure until a certification is made under section 401(b) of Public Law 103–236 for fiscal year 1997: Provided further, That certification under section 401(b) of Public Law 103–236 for fiscal year 1997 may only be made if the Committees on Appropriations and Foreign Relations of the Senate and the Committees on Appropriations and International Relations of the House of Representatives are notified of the steps taken, and anticipated, to meet the requirements of section 401(b) of Public Law 103–236 at least 15 days in advance of the proposed certification: Provided further, That none of the funds appropriated in this paragraph shall be available for a United States contribution to an international organization for the United States share of interest costs made known to the United States Government by such organization for loans incurred on or after October 1, 1984, through external borrowings: Provided further, That of the funds appropriated in this paragraph, $100,000,000 may be made available only pursuant to a certification by the Secretary of State by no later than January 30, 1997,

that the United Nations has taken no action during calendar year 1996 to increase funding for any United Nations program without identifying an offsetting decrease elsewhere in the United Nations budget and cause the United Nations to exceed its no growth budget for the biennium 1996–1997 adopted in December, 1995: Provided further, That if the Secretary of State is unable to make the aforementioned certification, the $100,000,000 is to be applied to paying the current year assessment for other international organizations for which the assessment has not been paid in full or to paying the assessment due in the next fiscal year for such organizations, subject to the reprogramming procedures contained in Section 605 of this Act: Provided further, That notwithstanding section 402 of this Act, not to exceed $10,000,000 may be transferred from the funds made available under this heading to the "International Conferences and Contingencies" account for assessed contributions to new or provisional international organizations or for travel expenses of official delegates to international conferences: Provided further, That any transfer pursuant to this paragraph shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## CONTRIBUTIONS FOR INTERNATIONAL PEACEKEEPING ACTIVITIES

For necessary expenses to pay assessed and other expenses of international peacekeeping activities directed to the maintenance or restoration of international peace and security, $352,400,000, of which $50,000,000 is for payment of arrearages accumulated in 1995, and which shall be available only upon certification by the Secretary of State that at least two of the following have been achieved: (1) savings of at least $100,000,000 will be achieved in the biennial expenses of the following United Nations divisions and activities—the United Nations Conference on Trade and Development, the Regional Economic Commissions, the Department of Public Information, and the Department of Conference Services, travel and overtime; (2) the number of professional and general service staff employed by the United Nations Secretariat at the conclusion of the 1996–1997 biennium will be at least ten percent below the number of such positions on January 1, 1996; and (3) the United Nations has adopted a budget outline for the 1998–1999 biennium that is below $2,608,000,000; as part of a five-year program to achieve major cost-saving reforms in the United Nations and specialized agencies: Provided, That none of the funds made available under this Act shall be obligated or expended for any new or expanded United Nations peacekeeping mission unless, at least fifteen days in advance of voting for the new or expanded mission in the United Nations Security Council (or in an emergency, as far in advance as is practicable), (1) the Committees on Appropriations of the House of Representatives and the Senate and other appropriate Committees of the Congress are notified of the estimated cost and length of the mission, the vital national interest that will be served, and the planned exit strategy; and (2) a reprogramming of funds pursuant to section 605 of this Act is submitted, and the procedures therein followed, setting forth the source of funds that will be used to pay for the cost of the new or expanded mission: Provided further, That funds shall be available for peacekeeping expenses only upon a certification by the Secretary of State to the appropriate committees of the Congress that American manufacturers and suppliers are being given opportunities to provide equipment, services, and material for United Nations peacekeeping activities equal to those being given to foreign manufacturers and suppliers.

## INTERNATIONAL COMMISSIONS

<< 22 USCA § 269a NOTE >>

For necessary expenses, not otherwise provided for, to meet obligations of the United States arising under treaties, or specific Acts of Congress, as follows:

## INTERNATIONAL BOUNDARY AND WATER COMMISSION, UNITED STATES AND MEXICO

For necessary expenses for the United States Section of the International Boundary and Water Commission, United States and Mexico, and to comply with laws applicable to the United States Section, including not to exceed $6,000 for representation; as follows:

## SALARIES AND EXPENSES

For salaries and expenses, not otherwise provided for, $15,490,000.

## CONSTRUCTION

For detailed plan preparation and construction of authorized projects, $6,463,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

## AMERICAN SECTIONS, INTERNATIONAL COMMISSIONS

For necessary expenses, not otherwise provided for the International Joint Commission and the International Boundary Commission, United States and Canada, as authorized by treaties between the United States and Canada or Great Britain, and for the Border Environment Cooperation Commission as authorized by Public Law 103–182; $5,490,000, of which not to exceed $9,000 shall be available for representation expenses incurred by the International Joint Commission.

## INTERNATIONAL FISHERIES COMMISSIONS

For necessary expenses for international fisheries commissions, not otherwise provided for, as authorized by law, $14,549,000: Provided, That the United States' share of such expenses may be advanced to the respective commissions, pursuant to 31 U.S.C. 3324.

## OTHER

## PAYMENT TO THE ASIA FOUNDATION

For a grant to the Asia Foundation, as authorized by section 501 of Public Law 101–246, $8,000,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

## RELATED AGENCIES

## ARMS CONTROL AND DISARMAMENT AGENCY

## ARMS CONTROL AND DISARMAMENT ACTIVITIES

For necessary expenses not otherwise provided, for arms control, nonproliferation, and disarmament activities, $41,500,000, of which not to exceed $50,000 shall be for official reception and representation expenses as authorized by the Act of September 26, 1961, as amended (22 U.S.C. 2551 et seq.).

## UNITED STATES INFORMATION AGENCY

## SALARIES AND EXPENSES

For expenses, not otherwise provided for, necessary to enable the United States Information Agency, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), to carry out international communication, educational and cultural activities; and to carry out related activities authorized by law, including employment, without regard to civil service and classification laws, of persons on a temporary basis (not to exceed $700,000 of this appropriation), as authorized by section 801 of such Act of 1948 (22 U.S.C. 1471), and entertainment, including official receptions, within the United States, not to exceed $25,000 as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)); $440,000,000: Provided, That not to exceed $1,400,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085): Provided further, That not to exceed $7,615,000, to remain available until expended, may be credited to this appropriation from fees or other payments received from or in connection with English teaching, library, motion pictures, and publication programs as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e) and, notwithstanding any other law, fees from student advising and counseling: Provided further That not to exceed $1,100,000 to remain available until expended may be used to carry out projects involving security construction and related improvements for agency facilities not physically located together with Department of State facilities abroad.

For an additional amount for necessary expenses relating to security, $1,375,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## TECHNOLOGY FUND

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For expenses necessary to enable the United States Information Agency to provide for the procurement of information technology improvements, as authorized by the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $5,050,000, to remain available until expended.

## EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS

For expenses of educational and cultural exchange programs, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $185,000,000, to remain available until expended as authorized by section 105 of such Act of 1961 (22 U.S.C. 2455).

## EISENHOWER EXCHANGE FELLOWSHIP PROGRAM TRUST FUND

For necessary expenses of Eisenhower Exchange Fellowships, Incorporated, as authorized by sections 4 and 5 of the Eisenhower Exchange Fellowship Act of 1990 (20 U.S.C. 5204–5205), all interest and earnings accruing to the Eisenhower Exchange Fellowship Program Trust Fund on or before September 30, 1997, to remain available until expended: Provided, That none of the funds appropriated herein shall be used to pay any salary or other compensation, or to enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376; or for purposes which are not in accordance with OMB Circulars A–110 (Uniform Administrative Requirements) and A–122 (Cost Principles for Non-profit Organizations), including the restrictions on compensation for personal services.

## ISRAELI ARAB SCHOLARSHIP PROGRAM

For necessary expenses of the Israeli Arab Scholarship Program as authorized by section 214 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 2452), all interest and earnings accruing to the Israeli Arab Scholarship Fund on or before September 30, 1997, to remain available until expended.

## INTERNATIONAL BROADCASTING OPERATIONS

For expenses necessary to enable the United States Information Agency, as authorized by the United States Information and Educational Exchange Act of 1948, as amended, the United States International Broadcasting Act of 1994, as amended, and Reorganization Plan No. 2 of 1977, to carry out international communication activities; $325,000,000, of which not to exceed $16,000 may be used for official receptions within the United States as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)), not to exceed $35,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085), and not to exceed $39,000 may be used for official reception and representation expenses of Radio Free Europe/Radio Liberty; and in addition, not to exceed $250,000 from fees as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e), to remain available until expended for carrying out authorized purposes; and in addition, notwithstanding any other provision of law, not to exceed $1,000,000 in monies received (including receipts from advertising, if any) by or for the use of the United States Information Agency from or in connection with broadcasting resources owned by or on behalf of the Agency, to be available until expended for carrying out authorized purposes.

## BROADCASTING TO CUBA

For expenses necessary to enable the United States Information Agency to carry out the Radio Broadcasting to Cuba Act, as amended, the Television Broadcasting to Cuba Act, and the International Broadcasting Act of 1994, including the purchase, rent, construction, and improvement of facilities for radio and television transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception, $25,000,000, to remain available until expended.

## RADIO CONSTRUCTION

For the purchase, rent, construction, and improvement of facilities for radio transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception as authorized by section 801 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1471), $35,490,000, to remain available until expended, as authorized by section 704(a) of such Act of 1948 (22 U.S.C. 1477b(a)).

## EAST–WEST CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the Center for Cultural and Technical Interchange Between East and West Act of 1960 (22 U.S.C. 2054–2057), by grant to the Center for Cultural and Technical Interchange Between East and West in the State of Hawaii, $10,000,000: Provided, That none of the funds appropriated herein shall be used to pay any salary, or enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376.

### NORTH/SOUTH CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the North/South Center Act of 1991 (22 U.S.C. 2075), by grant to an educational institution in Florida known as the North/South Center, $1,495,000, to remain available until expended.

### NATIONAL ENDOWMENT FOR DEMOCRACY

For grants made by the United States Information Agency to the National Endowment for Democracy as authorized by the National Endowment for Democracy Act, $30,000,000, to remain available until expended.

### GENERAL PROVISIONS—DEPARTMENT OF STATE AND RELATED AGENCIES

SEC. 401. Funds appropriated under this title shall be available, except as otherwise provided, for allowances and differentials as authorized by subchapter 59 of 5 U.S.C.; for services as authorized by 5 U.S.C. 3109; and hire of passenger transportation pursuant to 31 U.S.C. 1343(b).

SEC. 402. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of State in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided, That not to exceed 5 percent of any appropriation made available for the current fiscal year for the United States Information Agency in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided further, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

<< 22 USCA § 268c >>

SEC. 403. Funds hereafter appropriated or otherwise made available under this Act or any other Act may be expended for compensation of the United States Commissioner of the International Boundary Commission, United States and Canada, only for actual hours worked by such Commissioner.

SEC. 404. Funds appropriated by this Act for the United States Information Agency, the Arms Control and Disarmament Agency, and the Department of State may be obligated and expended notwithstanding section 701 of the United States Information and Educational Exchange Act of 1948 and section 313 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, section 53 of the Arms Control and Disarmament Act, and section 15 of the State Department Basic Authorities Act of 1956.

SEC. 405. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 406. Starting sixty days after enactment of this Act, none of the funds made available by this Act may be made available to support the activities of the Standing Consultative Commission (SCC) unless the President provides to the Congress a report containing a detailed analysis of whether the Memorandum of Understanding on Succession and the Agreed Statement regarding Demarcation agreed to by the Standing Consultative Commission on June 24, 1996, which was reaffirmed by Secretary of State Warren Christopher and Minister of Foreign Affairs Evgeny Primakov on September 23, 1996, represent substantive changes to the Anti–Ballistic Missile Treaty of 1972 and whether these agreements will require the advice and consent of the Senate of the United States.

<< 22 USCA § 214 >>

SEC. 407. Section 1 of the Act of June 4, 1920 (41 Stat. 750; 22 U.S.C. 214) is amended by—

(1) inserting before the period at the end of the first sentence the following: "; except that the Secretary of State may by regulation authorize State officials or the United States Postal Service to collect and retain the execution fee for each application for a passport accepted by such officials or by that Service"; and

(2) striking the second sentence.

This title may be cited as the "Department of State and Related Agencies Appropriations Act, 1997".

TITLE V—RELATED AGENCIES

DEPARTMENT OF TRANSPORTATION

MARITIME ADMINISTRATION

OPERATING–DIFFERENTIAL SUBSIDIES

(LIQUIDATION OF CONTRACT AUTHORITY)

For the payment of obligations incurred for operating-differential subsidies, as authorized by the Merchant Marine Act, 1936, as amended, $148,430,000, to remain available until expended.

MARITIME SECURITY PROGRAM

For necessary expenses to maintain and preserve a U.S.-flag merchant fleet to serve the national security needs of the United States, $54,000,000, to remain available until expended: Provided, That these funds will be available only upon enactment of an authorization for this program.

OPERATIONS AND TRAINING

For necessary expenses of operations and training activities authorized by law, $65,000,000: Provided, That reimbursements may be made to this appropriation from receipts to the "Federal Ship Financing Fund" for administrative expenses in support of that program in addition to any amount heretofore appropriated.

MARITIME GUARANTEED LOAN (TITLE XI) PROGRAM ACCOUNT

For the cost of guaranteed loans, as authorized by the Merchant Marine Act, 1936, $37,450,000, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974, as amended: Provided further, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $1,000,000,000.

In addition, for administrative expenses to carry out the guaranteed loan program, not to exceed $3,450,000, which shall be transferred to and merged with the appropriation for Operations and Training.

ADMINISTRATIVE PROVISIONS—MARITIME ADMINISTRATION

Notwithstanding any other provision of this Act, the Maritime Administration is authorized to furnish utilities and services and make necessary repairs in connection with any lease, contract, or occupancy involving Government property under control of the Maritime Administration, and payments received therefor shall be credited to the appropriation charged with the cost thereof: Provided, That rental payments under any such lease, contract, or occupancy for items other than such utilities, services, or repairs shall be covered into the Treasury as miscellaneous receipts.

No obligations shall be incurred during the current fiscal year from the construction fund established by the Merchant Marine Act, 1936, or otherwise, in excess of the appropriations and limitations contained in this Act or in any prior appropriation Act, and all receipts which otherwise would be deposited to the credit of said fund shall be covered into the Treasury as miscellaneous receipts.

COMMISSION FOR THE PRESERVATION OF AMERICA'S HERITAGE ABROAD

## SALARIES AND EXPENSES

For expenses for the Commission for the Preservation of America's Heritage Abroad, $206,000, as authorized by Public Law 99–83, section 1303.

## COMMISSION ON CIVIL RIGHTS

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Civil Rights, including hire of passenger motor vehicles, $8,740,000: Provided, That not to exceed $50,000 may be used to employ consultants: Provided further, That none of the funds appropriated in this paragraph shall be used to employ in excess of four full-time individuals under Schedule C of the Excepted Service exclusive of one special assistant for each Commissioner: Provided further, That none of the funds appropriated in this paragraph shall be used to reimburse Commissioners for more than 75 billable days, with the exception of the Chairperson who is permitted 125 billable days.

## COMMISSION ON IMMIGRATION REFORM

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Immigration Reform pursuant to section 141(f) of the Immigration Act of 1990, $2,196,000, to remain available until expended.

## COMMISSION ON SECURITY AND COOPERATION IN EUROPE

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Security and Cooperation in Europe, as authorized by Public Law 94–304, $1,090,000, to remain available until expended as authorized by section 3 of Public Law 99–7.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Equal Employment Opportunity Commission as authorized by title VII of the Civil Rights Act of 1964, as amended (29 U.S.C. 206(d) and 621–634), the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991, including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); non-monetary awards to private citizens; not to exceed $27,500,000, for payments to State and local enforcement agencies for services to the Commission pursuant to title VII of the Civil Rights Act of 1964, as amended, sections 6 and 14 of the Age Discrimination in Employment Act, the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991; $239,740,000; Provided, That the Commission is authorized to make available for official reception and representation expenses not to exceed $2,500 from available funds.

## FEDERAL COMMUNICATIONS COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Communications Commission, as authorized by law, including uniforms and allowances therefor, as authorized by 5 U.S.C. 5901–02; not to exceed $600,000 for land and structure; not to exceed $500,000 for improvement and care of grounds and repair to buildings; not to exceed $4,000 for official reception and representation expenses; purchase (not to exceed sixteen) and hire of motor vehicles; special counsel fees; and services as authorized by 5 U.S.C. 3109; $189,079,000, of which not to exceed $300,000 shall remain available until September 30, 1998, for research and policy studies: Provided, That $152,523,000 of offsetting collections shall be assessed and collected pursuant to section 9 of title I of the Communications Act of 1934, as amended, and shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated shall be reduced as such offsetting collections are received during fiscal year 1997 so as to result in a final fiscal year 1997 appropriation estimated at $36,556,000:

Provided further, That any offsetting collections received in excess of $152,523,000 in fiscal year 1997 shall remain available until expended, but shall not be available for obligation until October 1, 1997.

### FEDERAL MARITIME COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Maritime Commission as authorized by section 201(d) of the Merchant Marine Act of 1936, as amended (46 App. U.S.C. 1111), including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); and uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–02; $14,000,000: Provided, That not to exceed $2,000 shall be available for official reception and representation expenses.

### FEDERAL TRADE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Trade Commission, including uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–5902; services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles; and not to exceed $2,000 for official reception and representation expenses; $85,930,000: Provided, That not to exceed $300,000 shall be available for use to contract with a person or persons for collection services in accordance with the terms of 31 U.S.C. 3718, as amended: Provided further, That notwithstanding any other provision of law, not to exceed $58,905,000 of offsetting collections derived from fees collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at not more than $27,025,000, to remain available until expended: Provided further, That any fees received in excess of $58,905,000 in fiscal year 1997 shall remain available until expended, but shall not be available for obligation until October 1, 1997: Provided further, That none of the funds made available to the Federal Trade Commission shall be available for obligation for expenses authorized by section 151 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (Public Law 102–242, 105 Stat. 2282–2285).

### GAMBLING IMPACT STUDY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the National Gambling Impact Study Commission, $4,000,000 to remain available until expended: Provided, That these funds will be available only upon enactment of an authorization for this Commission.

### LEGAL SERVICES CORPORATION

### PAYMENT TO THE LEGAL SERVICES CORPORATION

For payment to the Legal Services Corporation to carry out the purposes of the Legal Services Corporation Act of 1974, as amended, $283,000,000, of which $274,400,000 is for basic field programs and required independent audits; $1,500,000 is for the Office of Inspector General, of which such amounts as may be necessary may be used to conduct additional audits of recipients; and $7,100,000 is for management and administration.

### ADMINISTRATIVE PROVISIONS—LEGAL SERVICES CORPORATION

SEC. 501. (a) CONTINUATION OF COMPETITIVE SELECTION PROCESS.—None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any person or entity except through a competitive selection process conducted in accordance with regulations promulgated by the Corporation in accordance with the criteria set forth in subsections (c), (d), and (e) of section 503 of Public Law 104–134 (110 Stat. 1321–52 et seq.).

(b) INAPPLICABILITY OF NONCOMPETITIVE PROCEDURES.—For purposes of the funding provided in this Act, rights under sections 1007(a)(9) and 1011 of the Legal Services Corporation Act (42 U.S.C. 2996f(a)(9) and 42 U.S.C. 2996j) shall not apply.

SEC. 502. (a) CONTINUATION OF REQUIREMENTS AND RESTRICTIONS.—None of the funds appropriated in this Act to the Legal Services Corporation shall be expended for any purpose prohibited or limited by, or contrary to any of the provisions of—

  (1) sections 501, 502, 505, 506, and 507 of Public Law 104–134 (110 Stat. 1321–51 et seq.), and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions as set forth in such sections, except that all references in such sections to 1995 and 1996 shall be deemed to refer instead to 1996 and 1997, respectively; and

  (2) section 504 of Public Law 104–134 (110 Stat. 1321–53 et seq.), and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions set forth in such section, except that—

  (A) subsection (c) of such section 504 shall not apply;

  (B) paragraph (3) of section 508(b) of Public Law 104–134 (110 Stat. 1321–58) shall apply with respect to the requirements of subsection (a)(13) of such section 504, except that all references in such section 508(b) to the date of enactment shall be deemed to refer to April 26, 1996; and

  (C) subsection (a)(11) of such section 504 shall not be construed to prohibit a recipient from using funds derived from a source other than the Corporation to provide related legal assistance to—

  (i) an alien who has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty; or

  (ii) an alien whose child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, and the alien did not actively participate in such battery or cruelty.

(b) DEFINITIONS.—For purposes of subsection (a)(2)(C):

  (1) The term "battered or subjected to extreme cruelty" has the meaning given such term under regulations issued pursuant to subtitle G of the Violence Against Women Act of 1994 (Pub.L. 103–322; 108 Stat. 1953).

  (2) The term "related legal assistance" means legal assistance directly related to the prevention of, or obtaining of relief from, the battery or cruelty described in such subsection.

SEC. 503. (a) CONTINUATION OF AUDIT REQUIREMENTS.—The requirements of section 509 of Public Law 104–134 (110 Stat. 1321–58 et seq.), other than subsection (l) of such section, shall apply during fiscal year 1997.

  (b) REQUIREMENT OF ANNUAL AUDIT.—An annual audit of each person or entity receiving financial assistance from the Legal Services Corporation under this Act shall be conducted during fiscal year 1997 in accordance with the requirements referred to in subsection (a).

## MARINE MAMMAL COMMISSION

### SALARIES AND EXPENSES

  For necessary expenses of the Marine Mammal Commission as authorized by title II of Public Law 92–522, as amended, $1,189,000.

## NATIONAL BANKRUPTCY REVIEW COMMISSION

### SALARIES AND EXPENSES

  For necessary expenses of the National Bankruptcy Review Commission, as authorized by the Bankruptcy Reform Act of 1994, $494,000.

## OUNCE OF PREVENTION COUNCIL

  For activities authorized by sections 30101 and 30102 of Public Law 103–322 (including administrative costs), $1,500,000, to remain available until expended, for the Ounce of Prevention Grant Program: Provided, That the Council may accept and use gifts and donations, both real and personal, for the purpose of aiding or facilitating the authorized activities of the Council, of which not to exceed $5,000 may be used for official reception and representation expenses.

## SECURITIES AND EXCHANGE COMMISSION

## SALARIES AND EXPENSES

<< 15 USCA § 77f NOTE, 78ee NOTE >>

For necessary expenses for the Securities and Exchange Commission, including services as authorized by 5 U.S.C. 3109, the rental of space (to include multiple year leases) in the District of Columbia and elsewhere, and not to exceed $3,000 for official reception and representation expenses, $260,400,000, of which not to exceed $10,000 may be used toward funding a permanent secretariat for the International Organization of Securities Commissions, and of which not to exceed $100,000 shall be available for expenses for consultations and meetings hosted by the Commission with foreign governmental and other regulatory officials, members of their delegations, appropriate representatives and staff to exchange views concerning developments relating to securities matters, development and implementation of cooperation agreements concerning securities matters and provision of technical assistance for the development of foreign securities markets, such expenses to include necessary logistic and administrative expenses and the expenses of Commission staff and foreign invitees in attendance at such consultations and meetings including (1) such incidental expenses as meals taken in the course of such attendance, (2) any travel and transportation to or from such meetings, and (3) any other related lodging or subsistence: Provided, That immediately upon enactment of this Act, the rate of fees under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)) shall increase from one-fiftieth of one percentum to one-thirty-third of one percentum, and such increase shall be deposited as an offsetting collection to this appropriation, to remain available until expended, to recover costs of services of the securities registration process: Provided further, That effective January 1, 1997, every national securities association shall pay to the Commission a fee at a rate of one-three-hundredth of one percentum of the aggregate dollar amount of sales transacted by or through any member of such association otherwise than on a national securities exchange (other than bonds, debentures, and other evidences of indebtedness) subject to prompt last sale reporting pursuant to the rules of the Commission or a registered national securities association, excluding any sales for which a fee is paid under section 31 of the Securities Exchange Act of 1934 (15 U.S.C. 78ee), and such increase shall be deposited as an offsetting collection to this appropriation, to remain available until expended, to recover the costs to the Government of the supervision and regulation of securities markets and securities professionals: Provided further, That the fee due from every national securities association shall be paid on or before September 30, 1997, with respect to transactions and sales occurring during the period beginning on January 1, 1997, and ending at the close of August 31, 1997: Provided further, That the total amount appropriated for fiscal year 1997 under this heading shall be reduced as all such offsetting fees are deposited to this appropriation so as to result in a final total fiscal year 1997 appropriation from the General Fund estimated at not more than $37,778,000: Provided further, That any such fees collected in excess of $222,622,000 shall remain available until expended but shall not be available for obligation until October 1, 1997.

## SMALL BUSINESS ADMINISTRATION

## SALARIES AND EXPENSES

For necessary expenses, not otherwise provided for, of the Small Business Administration as authorized by Public Law 103–403, including hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344, and not to exceed $3,500 for official reception and representation expenses, $223,547,000, of which $1,000,000 shall only be available for obligation and expenditure for projects jointly developed, implemented and administered with the Minority Business Development Agency of the Department of Commerce: Provided, That the Administrator is authorized to charge fees to cover the cost of publications developed by the Small Business Administration, and certain loan servicing activities: Provided further, That notwithstanding 31 U.S.C. 3302, revenues received from all such activities shall be credited to this account, to be available for carrying out these purposes without further appropriations: Provided further, That $75,500,000 shall be available to fund grants for performance in fiscal year 1997 or fiscal year 1998 as authorized by section 21 of the Small Business Act, as amended. In addition, for expenses not otherwise provided for, of the Small Business Administration, $11,500,000, of which: $3,000,000 shall be available for a grant to continue the WVHTC Foundation outreach program to assist small business development; $7,000,000 shall be available for a grant to the Center for Rural Development in Somerset, Kentucky, for small business and rural technology development assistance; $1,000,000 shall be available for a grant to Indiana State University for the renovation and equipping of a training facility, to assist in creating small business and economic development opportunities; and $500,000 shall be available for a

continuation grant to the Center for Entrepreneurial Opportunity in Greensburg, Pennsylvania, to provide for small business consulting and assistance.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App. 1–11, as amended by Public Law 100–504), $9,000,000.

## BUSINESS LOANS PROGRAM ACCOUNT

For the cost of direct loans, $1,691,000, and for the cost of guaranteed loans, $182,017,000, as authorized by 15 U.S.C. 631 note, of which $2,317,000, to be available until expended, shall be for the Microloan Guarantee Program, and of which $40,510,000 shall remain available until September 30, 1998: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That during fiscal year 1997, commitments to guarantee loans under section 503 of the Small Business Investment Act of 1958, as amended, shall not exceed the amount of financings authorized under section 20(n)(2)(B) of the Small Business Act, as amended.

In addition, for administrative expenses to carry out the direct and guaranteed loan programs, $94,000,000, which may be transferred to and merged with the appropriations for Salaries and Expenses.

## DISASTER LOANS PROGRAM ACCOUNT

For the cost of direct loans authorized by section 7(b) of the Small Business Act, as amended, $105,432,000, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974.

In addition, for administrative expenses to carry out the direct loan program, $86,500,000, including not to exceed $500,000 for the Office of Inspector General of the Small Business Administration for audits and reviews of disaster loans and the disaster loan program, and said sums may be transferred to and merged with appropriations for Salaries and Expenses and Office of Inspector General.

## SURETY BOND GUARANTEES REVOLVING FUND

For additional capital for the "Surety Bond Guarantees Revolving Fund", authorized by the Small Business Investment Act, as amended, $3,730,000, to remain available without fiscal year limitation as authorized by 15 U.S.C. 631 note.

## ADMINISTRATIVE PROVISION—SMALL BUSINESS ADMINISTRATION

SEC. 504. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Small Business Administration in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## STATE JUSTICE INSTITUTE

## SALARIES AND EXPENSES

For necessary expenses of the State Justice Institute, as authorized by the State Justice Institute Authorization Act of 1992 (Public Law 102–572 (106 Stat. 4515–4516)), $6,000,000, to remain available until expended: Provided, That not to exceed $2,500 shall be available for official reception and representation expenses.

## TITLE VI—GENERAL PROVISIONS

SEC. 601. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

SEC. 602. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 603. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available

for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

SEC. 604. If any provision of this Act or the application of such provision to any person or circumstances shall be held invalid, the remainder of the Act and the application of each provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

SEC. 605. (a) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds which (1) creates new programs; (2) eliminates a program, project, or activity; (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (4) relocates an office or employees; (5) reorganizes offices, programs, or activities; or (6) contracts out or privatizes any functions, or activities presently performed by Federal employees; unless the Appropriations Committees of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

(b) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for activities, programs, or projects through a reprogramming of funds in excess of $500,000 or 10 percent, whichever is less, that (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress; or (3) results from any general savings from a reduction in personnel which would result in a change in existing programs, activities, or projects as approved by Congress; unless the Appropriations Committees of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

SEC. 606. None of the funds made available in this Act may be used for the construction, repair (other than emergency repair), overhaul, conversion, or modernization of vessels for the National Oceanic and Atmospheric Administration in shipyards located outside of the United States.

SEC. 607. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 608. None of the funds made available in this Act may be used to implement, administer, or enforce any guidelines of the Equal Employment Opportunity Commission covering harassment based on religion, when it is made known to the Federal entity or official to which such funds are made available that such guidelines do not differ in any respect from the proposed guidelines published by the Commission on October 1, 1993 (58 Fed.Reg. 51266).

SEC. 609. None of the funds appropriated or otherwise made available by this Act may be obligated or expended to pay for any cost incurred for (1) opening or operating any United States diplomatic or consular post in the Socialist Republic of Vietnam that was not operating on July 11, 1995; (2) expanding any United States diplomatic or consular post in the Socialist Republic of Vietnam that was operating on July 11, 1995; or (3) increasing the total number of personnel assigned to United States diplomatic or consular posts in the Socialist Republic of Vietnam above the levels existing on July 11, 1995, unless the President certifies within 60 days, based upon all information available to the United States Government that the Government of the Socialist Republic of Vietnam is cooperating in full faith with the United States in the following four areas:

(1) Resolving discrepancy cases, live sightings and field activities,

(2) Recovering and repatriating American remains,

(3) Accelerating efforts to provide documents that will help lead to fullest possible accounting of POW/MIA's.

(4) Providing further assistance in implementing trilateral investigations with Laos.

SEC. 610. None of the funds made available by this Act may be used for any United Nations undertaking when it is made known to the Federal official having authority to obligate or expend such funds (1) that the United Nations undertaking is a peacekeeping mission, (2) that such undertaking will involve United States Armed Forces under the command or operational control of a foreign national, and (3) that the President's military advisors have not submitted to the President a recommendation that such involvement is in the national security interests of the United States and the President has not submitted to the Congress such a recommendation.

SEC. 611. None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system—

(1) in-cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

(2) the viewing of R, X, and NC–17 rated movies, through whatever medium presented;

(3) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(4) possession of in-cell coffee pots, hot plates, or heating elements; or

(5) the use or possession of any electric or electronic musical instrument.

Sec. 612. None of the funds made available in title II for the National Oceanic and Atmospheric Administration (NOAA) under the heading "Fleet Modernization, Shipbuilding and Conversion" may be used to implement sections 603, 604, and 605 of Public Law 102–567: Provided, That NOAA may develop a modernization plan for its fisheries research vessels that takes fully into account opportunities for contracting for fisheries surveys.

SEC. 613. Any costs incurred by a Department or agency funded under this Act resulting from personnel actions taken in response to funding reductions included in this Act shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 614. None of the funds made available in this Act to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity.

SEC. 615. Of the funds appropriated in this Act under the heading "OFFICE OF JUSTICE PROGRAMS—STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE" and "Community Oriented Policing Services Program", not more than ninety percent of the amount to be awarded to an entity under the Local Law Enforcement Block Grant and part Q of title I of the Omnibus Crime Control and Safe Streets Act of 1968 shall be made available to such an entity when it is made known to the Federal official having authority to obligate or expend such funds that the entity that employs a public safety officer (as such term is defined in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968) does not provide such a public safety officer who retires or is separated from service due to injury suffered as the direct and proximate result of a personal injury sustained in the line of duty while responding to an emergency situation or a hot pursuit (as such terms are defined by State law) with the same or better level of health insurance benefits that are paid by the entity at the time of retirement or separation.

<< 35 USCA § 287 >>

SEC. 616. LIMITATION ON PATENT INFRINGEMENTS RELATING TO A MEDICAL PRACTITIONER'S PERFORMANCE OF A MEDICAL ACTIVITY.

Section 287 of title 35, United States Code, is amended by adding at the end the following new subsection:

(c)(1) With respect to a medical practitioner's performance of a medical activity that constitutes an infringement under section 271(a) or (b) of this title, the provisions of sections 281, 283, 284, and 285 of this title shall not apply against the medical practitioner or against a related health care entity with respect to such medical activity.

(2) For the purposes of this subsection:

(A) the term "medical activity" means the performance of a medical or surgical procedure on a body, but shall not include (i) the use of a patented machine, manufacture, or composition of matter in violation of such patent, (ii) the practice of a patented use of a composition of matter in violation of such patent, or (iii) the practice of a process in violation of a biotechnology patent.

(B) the term "medical practitioner" means any natural person who is licensed by a State to provide the medical activity described in subsection (c)(1) or who is acting under the direction of such person in the performance of the medical activity.

(C) the term "related health care entity" shall mean an entity with which a medical practitioner has a professional affiliation under which the medical practitioner performs the medical activity, including but not limited to a nursing home, hospital, university, medical school, health maintenance organization, group medical practice, or a medical clinic.

(D) the term "professional affiliation" shall mean staff privileges, medical staff membership, employment or contractual relationship, partnership or ownership interest, academic appointment, or other affiliation under which a medical practitioner provides the medical activity on behalf of, or in association with, the health care entity.

(E) the term "body" shall mean a human body, organ or cadaver, or a nonhuman animal used in medical research or instruction directly relating to the treatment of humans.

(F) the term "patented use of a composition of matter" does not include a claim for a method of performing a medical or surgical procedure on a body that recites the use of a composition of matter where the use of that composition of matter does not directly contribute to achievement of the objective of the claimed method.

(G) the term "State" shall mean any state or territory of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

(3) This subsection does not apply to the activities of any person, or employee or agent of such person (regardless of whether such person is a tax exempt organization under section 501(c) of the Internal Revenue Code), who is engaged in the commercial development, manufacture, sale, importation, or distribution of a machine, manufacture, or composition of matter or the provision of pharmacy or clinical laboratory services (other than clinical laboratory services provided in a physician's office), where such activities are:

(A) directly related to the commercial development, manufacture, sale, importation, or distribution of a machine, manufacture, or composition of matter or the provision of pharmacy or clinical laboratory services (other than clinical laboratory services provided in a physician's office), and

(B) regulated under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, or the Clinical Laboratories Improvement Act.

(4) This subsection shall not apply to any patent issued before the date of enactment of this subsection.

SEC. 617. Effective with the enactment of this Act and in any fiscal year hereafter, section 8 of Public Law 96–132 is hereby repealed.

<< 46 App. USCA § 1273a NOTE >>

SEC. 618. (a) IN GENERAL.—The Secretary may issue a guarantee or a commitment to guarantee obligations under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.), upon such terms as the Secretary may prescribe, to assist in the reactivation and modernization of any shipyard in the United States that is closed on the date of the enactment of this Act, if the Secretary finds that—

(1) the closed shipyard historically built military vessels and responsible entities now seek to reopen it as an internationally competitive commercial shipyard;

(2)(A) the closed shipyard has been designated by the President as a public-private partnership project; or

(B) has a reuse plan approved by the Navy in which commercial shipbuilding and repair are primary activities and has a revolving economic conversion fund approved by the Department of Defense; and

(3) the State in which the shipyard is located, and each other involved State, or a State-chartered agency, is making a significant financial investment in the overall cost of reactivation and modernization as its contribution to the reactivation and modernization project, in addition to the funds required by subsection (d)(2) of this section.

(b) WAIVERS.—Notwithstanding any other provision of title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.), the Secretary shall not apply the requirements of section 1104A(d) of that Act when issuing a guarantee or a commitment to guarantee an obligation under this section.

(c) CONDITIONS.—The Secretary shall impose such conditions on the issuance of a guarantee or a commitment to guarantee under this section as are necessary to protect the interests of the United States from the risk of a default. The Secretary shall consider the interdependency of such shipyard modernization and reactivation projects and related vessel loan guarantee requests pending under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.) before issuing a guarantee or a commitment to guarantee under this section.

(d) FUNDING PROVISIONS.—

(1) The Secretary may not guarantee or commit to guarantee obligations under this section that exceed $50,000,000 in the aggregate.

(2) The amount of appropriated funds required by the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.) in advance of the Secretary's issuance of a guarantee or a commitment to guarantee under this section shall be provided by the State in which the shipyard is located, and other involved States, or by a State-chartered agency, and deposited by the Secretary in the financing account established under the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.) for loan guarantees issued by the Secretary under title XI of the Merchant Marine Act of 1936 (46 App.U.S.C. 1271 et seq.). No federally appropriated funds shall be available for this purpose. The funds deposited into that financing account shall be held and applied by the Secretary in accordance with the provisions of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.), except that, unless the Secretary shall have earlier paid an obligee or been required to pay an obligee pursuant to the terms of a loan guarantee, the funds deposited in that financing account shall be returned, upon the expiration of the Secretary's loan guarantee, to the State, States, or State-chartered agency which originally provided the funds to the Secretary.

(3) Notwithstanding the provisions of any other law or regulation, the cost (as that term is defined by the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.)) of a guarantee or commitment to guarantee issued under this section—

(A) may only be determined with reference to the merits of the specific closed shipyard reactivation project which is the subject of that guarantee or commitment to guarantee, without reference to any other project, type of project, or averaged risk; and

(B) may not be used in determining the cost of any other project, type of project, or averaged risk applicable to guarantees or commitments to guarantee issued under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.).

(e) SUNSET.—No commitment to guarantee obligations under this section shall be issued by the Secretary after one year after the date of enactment of this section.

(f) DEFINITION.—As used in this section, the term "Secretary" means the Secretary of Transportation.

## TITLE VII—RESCISSIONS

### DEPARTMENT OF JUSTICE

### GENERAL ADMINISTRATION

### WORKING CAPITAL FUND

#### (RESCISSION)

Of the unobligated balances available under this heading on October 31, 1996, $30,000,000 are rescinded.

### IMMIGRATION AND NATURALIZATION SERVICE

### IMMIGRATION EMERGENCY FUND

#### (RESCISSION)

Of the unobligated balances available under this heading $34,779,000 are rescinded.

## TITLE VIII—FISCAL YEAR 1996 SUPPLEMENTAL AND RESCISSION

### DEPARTMENT OF JUSTICE

### FEDERAL PRISON SYSTEM

## SALARIES AND EXPENSES

In addition to funds made available under this heading, $40,000,000, which shall remain available until September 30, 1997: Provided, That these funds shall be available upon enactment of this Act: Provided further, That these funds shall only be available if enacted by September 30, 1996.

### (RESCISSION)

Of the unobligated balances made available under this heading until September 30, 1996, $40,000,000 are rescinded: Provided, That these funds shall only be available for rescission if enacted by September 30, 1996.

## TITLE IX—SUPPLEMENTAL APPROPRIATIONS

## DEPARTMENT OF COMMERCE

## ECONOMIC DEVELOPMENT ADMINISTRATION

## ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For an additional amount for "Economic Development Assistance Programs" for emergency infrastructure expenses resulting from Hurricane Fran and Hurricane Hortense and other natural disasters, $25,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## RELATED AGENCY

## SMALL BUSINESS ADMINISTRATION

## DISASTER LOANS PROGRAM ACCOUNT

For an additional amount for "Disaster Loans Program Account" for emergency expenses resulting from Hurricanes Fran and Hortense and other disasters, $113,000,000 for the cost of direct loans, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974; and for administrative expenses to carry out the disaster loan program, $22,000,000, to remain available until expended, which may be transferred to and merged with "Salaries and Expenses": Provided further, That both amounts are hereby designated by Congress as emergency requirements pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

This Act may be cited as the "Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997".

(b) For programs, projects or activities in the Department of Defense Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Department of Defense for the fiscal year ending September 30, 1997, and for other purposes

## TITLE I

## MILITARY PERSONNEL

## MILITARY PERSONNEL, ARMY

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Army on active duty (except members of reserve components provided for elsewhere), cadets, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $20,633,998,000.

## MILITARY PERSONNEL, NAVY

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Navy on active duty (except members of the Reserve provided for elsewhere), midshipmen, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $16,986,976,000.

## MILITARY PERSONNEL, MARINE CORPS

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Marine Corps on active duty (except members of the Reserve provided for elsewhere); and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $6,111,728,000.

## MILITARY PERSONNEL, AIR FORCE

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Air Force on active duty (except members of reserve components provided for elsewhere), cadets, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $17,069,490,000.

## RESERVE PERSONNEL, ARMY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Army Reserve on active duty under sections 10211, 10302, and 3038 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty or other duty, and for members of the Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $2,073,479,000.

## RESERVE PERSONNEL, NAVY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Navy Reserve on active duty under section 10211 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty, and for members of the Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $1,405,606,000.

## RESERVE PERSONNEL, MARINE CORPS

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Marine Corps Reserve on active duty under section 10211 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty, and for members of the Marine Corps platoon leaders class, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $388,643,000.

## RESERVE PERSONNEL, AIR FORCE

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Air Force Reserve on active duty under sections 10211, 10305, and 8038 of title 10, United States Code, or while serving on active duty under section

12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty or other duty, and for members of the Air Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $783,697,000.

## NATIONAL GUARD PERSONNEL, ARMY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Army National Guard while on duty under section 10211, 10302, or 12402 of title 10 or section 708 of title 32, United States Code, or while serving on duty under section 12301(d) of title 10 or section 502(f) of title 32, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing training, or while performing drills or equivalent duty or other duty, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $3,266,393,000.

## NATIONAL GUARD PERSONNEL, AIR FORCE

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Air National Guard on duty under section 10211, 10305, or 12402 of title 10 or section 708 of title 32, United States Code, or while serving on duty under section 12301(d) of title 10 or section 502(f) of title 32, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing training, or while performing drills or equivalent duty or other duty, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $1,296,490,000.

## TITLE II

## OPERATION AND MAINTENANCE

## OPERATION AND MAINTENANCE, ARMY

## (INCLUDING TRANSFER OF FUNDS)

### << 43 USCA § 1471g >>

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Army, as authorized by law; and not to exceed $11,437,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Army, and payments may be made on his certificate of necessity for confidential military purposes; $17,519,340,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund: Provided, That during the current fiscal year and hereafter, funds appropriated under this paragraph may be made available to the Department of the Interior to support the Memorial Day and Fourth of July ceremonies and activities in the National Capital Region: Provided further, That of the funds appropriated in this paragraph, not less than $300,000,000 shall be made available only for conventional ammunition care and maintenance.

## OPERATION AND MAINTENANCE, NAVY

## (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Navy and the Marine Corps, as authorized by law; and not to exceed $3,995,000, can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Navy, and payments may be made on his certificate of necessity for confidential military purposes; $20,061,961,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund.

## OPERATION AND MAINTENANCE, MARINE CORPS

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Marine Corps, as authorized by law; $2,254,119,000.

## OPERATION AND MAINTENANCE, AIR FORCE

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Air Force, as authorized by law; and not to exceed $8,362,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Air Force, and payments may be made on his certificate of necessity for confidential military purposes; $17,263,193,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund.

## OPERATION AND MAINTENANCE, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of activities and agencies of the Department of Defense (other than the military departments), as authorized by law; $10,044,200,000, of which not to exceed $25,000,000 may be available for the CINC initiative fund account; and of which not to exceed $28,500,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of Defense, and payments may be made on his certificate of necessity for confidential military purposes: Provided, That of the funds appropriated under this heading, $20,000,000 shall be made available only for use in federally owned education facilities located on military installations for the purpose of transferring title of such facilities to the local education agency: Provided further, That of the funds appropriated under this heading, $1,000,000 is available, by grant or other transfer, to the Harnett County School Board, Lillington, North Carolina, for use by the school board for the education of dependents of members of the Armed Forces and employees of the Department of Defense located at Fort Bragg and Pope Air Force Base, North Carolina.

## OPERATION AND MAINTENANCE, ARMY RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Army Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $1,119,436,000.

## OPERATION AND MAINTENANCE, NAVY RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Navy Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $886,027,000.

## OPERATION AND MAINTENANCE, MARINE CORPS RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Marine Corps Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $109,667,000.

## OPERATION AND MAINTENANCE, AIR FORCE RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Air Force Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $1,496,553,000.

## OPERATION AND MAINTENANCE, ARMY NATIONAL GUARD

For expenses of training, organizing, and administering the Army National Guard, including medical and hospital treatment and related expenses in non-Federal hospitals; maintenance, operation, and repairs to structures and facilities; hire of passenger motor vehicles; personnel services in the National Guard Bureau; travel expenses (other than mileage), as authorized by law

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

for Army personnel on active duty, for Army National Guard division, regimental, and battalion commanders while inspecting units in compliance with National Guard Bureau regulations when specifically authorized by the Chief, National Guard Bureau; supplying and equipping the Army National Guard as authorized by law; and expenses of repair, modification, maintenance, and issue of supplies and equipment (including aircraft); $2,254,477,000.

## OPERATION AND MAINTENANCE, AIR NATIONAL GUARD

  For operation and maintenance of the Air National Guard, including medical and hospital treatment and related expenses in non-Federal hospitals; maintenance, operation, repair, and other necessary expenses of facilities for the training and administration of the Air National Guard, including repair of facilities, maintenance, operation, and modification of aircraft; transportation of things, hire of passenger motor vehicles; supplies, materials, and equipment, as authorized by law for the Air National Guard; and expenses incident to the maintenance and use of supplies, materials, and equipment, including such as may be furnished from stocks under the control of agencies of the Department of Defense; travel expenses (other than mileage) on the same basis as authorized by law for Air National Guard personnel on active Federal duty, for Air National Guard commanders while inspecting units in compliance with National Guard Bureau regulations when specifically authorized by the Chief, National Guard Bureau; $2,716,379,000.

## OVERSEAS CONTINGENCY OPERATIONS TRANSFER FUND

### (INCLUDING TRANSFER OF FUNDS)

  For expenses directly relating to Overseas Contingency Operations by United States military forces; $1,140,157,000: Provided, That the Secretary of Defense may transfer these funds only to operation and maintenance accounts within this title: Provided further, That the funds transferred shall be merged with and shall be available for the same purposes and for the same time period, as the appropriation to which transferred: Provided further, That the transfer authority provided in this paragraph is in addition to any other transfer authority contained elsewhere in this Act.

## UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

  For salaries and expenses necessary for the United States Court of Appeals for the Armed Forces; $6,797,000, of which not to exceed $2,500 can be used for official representation purposes.

## ENVIRONMENTAL RESTORATION, ARMY

### (INCLUDING TRANSFER OF FUNDS)

  For the Department of the Army, $339,109,000, to remain available until transferred: Provided, That the Secretary of the Army shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Army, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Army, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: Provided further, That not more than twenty-five percent of funds provided under this heading may be obligated for environmental remediation by the Corps of Engineers under total environmental remediation contracts.

## ENVIRONMENTAL RESTORATION, NAVY

### (INCLUDING TRANSFER OF FUNDS)

  For the Department of the Navy, $287,788,000, to remain available until transferred: Provided, That the Secretary of the Navy shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Navy, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Navy, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a

determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

### ENVIRONMENTAL RESTORATION, AIR FORCE

#### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Air Force, $394,010,000, to remain available until transferred: Provided, That the Secretary of the Air Force shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Air Force, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Air Force, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

### ENVIRONMENTAL RESTORATION, DEFENSE–WIDE

#### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Defense, $36,722,000, to remain available until transferred: Provided, That the Secretary of Defense shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of Defense, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of Defense, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

### ENVIRONMENTAL RESTORATION, FORMERLY USED DEFENSE SITES

#### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Army, $256,387,000, to remain available until transferred: Provided, That the Secretary of the Army shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris at sites formerly used by the Department of Defense, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Army, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

### OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID

For expenses relating to the Overseas Humanitarian, Disaster, and Civic Aid programs of the Department of Defense (consisting of the programs provided under sections 401, 402, 404, 2547, and 2551 of title 10, United States Code); $49,000,000, to remain available until September 30, 1998.

### FORMER SOVIET UNION THREAT REDUCTION

For assistance to the republics of the former Soviet Union, including assistance provided by contract or by grants, for facilitating the elimination and the safe and secure transportation and storage of nuclear, chemical and other weapons; for establishing programs to prevent the proliferation of weapons, weapons components, and weapon-related technology and expertise; for programs relating to the training and support of defense and military personnel for demilitarization and protection of weapons, weapons components and weapons technology and expertise; $327,900,000, to remain available until expended.

### QUALITY OF LIFE ENHANCEMENTS, DEFENSE

For expenses, not otherwise provided for, resulting from unfunded shortfalls in the repair and maintenance of real property of the Department of Defense (including military housing and barracks); $600,000,000, for the maintenance of real property

AR.01329

of the Department of Defense (including minor construction and major maintenance and repair), which shall remain available for obligation until September 30, 1998, as follows:

Army, $149,000,000;

Navy, $108,000,000;

Marine Corps, $45,000,000;

Air Force, $108,000,000;

Army Reserve, $18,000,000;

Navy Reserve, $18,000,000;

Marine Corps Reserve, $9,000,000;

Air Force Reserve, $15,000,000;

Army National Guard, $86,000,000; and

Air National Guard, $44,000,000.

## TITLE III

## PROCUREMENT

### AIRCRAFT PROCUREMENT, ARMY

For construction, procurement, production, modification, and modernization of aircraft, equipment, including ordnance, ground handling equipment, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,348,434,000, to remain available for obligation until September 30, 1999.

### MISSILE PROCUREMENT, ARMY

For construction, procurement, production, modification, and modernization of missiles, equipment, including ordnance, ground handling equipment, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,041,867,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY

For construction, procurement, production, and modification of weapons and tracked combat vehicles, equipment, including ordnance, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,470,286,000, to remain available for obligation until September 30, 1999: Provided, That of the funds appropriated in this paragraph and notwithstanding the provisions of title 31, United States Code, Section 1502(a), not to exceed $33,100,000 may be obligated for future year V903 diesel engine requirements to maintain the industrial base.

### PROCUREMENT OF AMMUNITION, ARMY

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment,

appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,127,149,000, to remain available for obligation until September 30, 1999.

## OTHER PROCUREMENT, ARMY

For construction, procurement, production, and modification of vehicles, including tactical, support, and non-tracked combat vehicles; the purchase of not to exceed 14 passenger motor vehicles for replacement only; communications and electronic equipment; other support equipment; spare parts, ordnance, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $3,172,485,000, to remain available for obligation until September 30, 1999: Provided, That of the funds appropriated in this paragraph and notwithstanding the provisions of title 31, United States Code, Section 1502(a), not to exceed $2,400,000 may be obligated for future year V903 diesel engine requirements to maintain the industrial base.

## AIRCRAFT PROCUREMENT, NAVY

For construction, procurement, production, modification, and modernization of aircraft, equipment, including ordnance, spare parts, and accessories therefor; specialized equipment; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $7,027,010,000, to remain available for obligation until September 30, 1999.

## WEAPONS PROCUREMENT, NAVY

For construction, procurement, production, modification, and modernization of missiles, torpedoes, other weapons, and related support equipment including spare parts, and accessories therefor; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $1,389,913,000, to remain available for obligation until September 30, 1999: Provided, That in addition to the foregoing purposes, the funds appropriated above under this heading shall be available to liquidate reported deficiencies in appropriations provided under this heading in prior Department of Defense appropriations acts, to the extent such deficiencies cannot otherwise be liquidated pursuant to 31 U.S.C. 1553(b).

## PROCUREMENT OF AMMUNITION, NAVY AND MARINE CORPS

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $289,695,000, to remain available for obligation until September 30, 1999.

## SHIPBUILDING AND CONVERSION, NAVY

For expenses necessary for the construction, acquisition, or conversion of vessels as authorized by law, including armor and armament thereof, plant equipment, appliances, and machine tools and installation thereof in public and private plants; reserve plant and Government and contractor-owned equipment layaway; procurement of critical, long leadtime components and designs for vessels to be constructed or converted in the future; and expansion of public and private plants, including land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title, as follows:

For continuation of the SSN–21 attack submarine program, $649,071,000;

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

NSSN–1 (AP), $296,186,000;
NSSN–2 (AP), $501,000,000;
CVN Refuelings, $237,029,000;
DDG–51 destroyer program, $3,609,072,000;
Oceanographic ship program, $54,400,000;
Oceanographic ship SWATH, $45,000,000;
LCAC landing craft air cushion program (AP–CY), $3,000,000; and
For craft, outfitting, post delivery, conversions, and first destination transportation, $218,907,000;

In all: $5,613,665,000, to remain available for obligation until September 30, 2001: Provided, That additional obligations may be incurred after September 30, 2001, for engineering services, tests, evaluations, and other such budgeted work that must be performed in the final stage of ship construction: Provided further, That none of the funds herein provided for the construction or conversion of any naval vessel to be constructed in shipyards in the United States shall be expended in foreign facilities for the construction of major components of such vessel: Provided further, That none of the funds herein provided shall be used for the construction of any naval vessel in foreign shipyards.

### OTHER PROCUREMENT, NAVY

For procurement, production, and modernization of support equipment and materials not otherwise provided for, Navy ordnance (except ordnance for new aircraft, new ships, and ships authorized for conversion); expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $3,067,944,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT, MARINE CORPS

For expenses necessary for the procurement, manufacture, and modification of missiles, armament, military equipment, spare parts, and accessories therefor; plant equipment, appliances, and machine tools, and installation thereof in public and private plants; reserve plant and Government and contractor-owned equipment layaway; vehicles for the Marine Corps, including the purchase of not to exceed 88 passenger motor vehicles for replacement only; and expansion of public and private plants, including land necessary therefor, and such lands and interests therein, may be acquired and construction prosecuted thereon prior to approval of title; $569,073,000, to remain available for obligation until September 30, 1999.

### AIRCRAFT PROCUREMENT, AIR FORCE

For construction, procurement, and modification of aircraft and equipment, including armor and armament, specialized ground handling equipment, and training devices, spare parts, and accessories therefor; specialized equipment; expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes including rents and transportation of things; $6,404,980,000, to remain available for obligation until September 30, 1999.

### MISSILE PROCUREMENT, AIR FORCE

For construction, procurement, and modification of missiles, spacecraft, rockets, and related equipment, including spare parts and accessories therefor, ground handling equipment, and training devices; expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes including rents and transportation of things; $2,297,145,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT OF AMMUNITION, AIR FORCE

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $293,153,000, to remain available for obligation until September 30, 1999.

### OTHER PROCUREMENT, AIR FORCE

For procurement and modification of equipment (including ground guidance and electronic control equipment, and ground electronic and communication equipment), and supplies, materials, and spare parts therefor, not otherwise provided for; the purchase of not to exceed 506 passenger motor vehicles for replacement only; the purchase of 1 vehicle required for physical security of personnel, notwithstanding price limitations applicable to passenger vehicles but not to exceed $287,000 per vehicle; and expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon, prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; $5,944,680,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT, DEFENSE–WIDE

For expenses of activities and agencies of the Department of Defense (other than the military departments) necessary for procurement, production, and modification of equipment, supplies, materials, and spare parts therefor, not otherwise provided for; the purchase of not to exceed 389 passenger motor vehicles for replacement only; expansion of public and private plants, equipment, and installation thereof in such plants, erection of structures, and acquisition of land for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; $1,978,005,000, to remain available for obligation until September 30, 1999.

### NATIONAL GUARD AND RESERVE EQUIPMENT

For procurement of aircraft, missiles, tracked combat vehicles, ammunition, other weapons, and other procurement for the reserve components of the Armed Forces; $780,000,000, to remain available for obligation until September 30, 1999: Provided, That the Chiefs of the Reserve and National Guard components shall, not later than 30 days after the enactment of this Act, individually submit to the congressional defense committees the modernization priority assessment for their respective Reserve or National Guard component.

### TITLE IV

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, ARMY

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $5,062,763,000, to remain available for obligation until September 30, 1998.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, NAVY

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $8,208,946,000, to remain available for obligation until September 30, 1998: Provided, That funds appropriated in this paragraph which are available for the V–22 may be used to meet unique requirements of the Special Operations Forces.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, AIR FORCE

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $14,499,606,000, to remain available for obligation until September 30, 1998: Provided, That not less than $1,000,000 of the funds appropriated in this paragraph shall be made available only to assess the budgetary, cost, technical, operational, training, and safety issues associated with a decision to eliminate development of the F–22B two-seat training variant of the F–22 advanced tactical fighter: Provided further, That the assessment required by the preceding proviso shall be submitted, in classified and unclassified versions, by the Secretary of the Air Force to the congressional defense committees not later than February 15, 1997: Provided further, That of the funds made available in this paragraph, $10,000,000 shall be only for development of reusable launch vehicle technologies.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, DEFENSE–WIDE

For expenses of activities and agencies of the Department of Defense (other than the military departments), necessary for basic and applied scientific research, development, test and evaluation; advanced research projects as may be designated and determined by the Secretary of Defense, pursuant to law; maintenance, rehabilitation, lease, and operation of facilities and equipment; $9,362,800,000, to remain available for obligation until September 30, 1998: Provided, That not less than $304,171,000 of the funds appropriated in this paragraph shall be made available only for the Sea–Based Wide Area Defense (Navy Upper–Tier) program.

### DEVELOPMENTAL TEST AND EVALUATION, DEFENSE

For expenses, not otherwise provided for, of independent activities of the Director, Test and Evaluation in the direction and supervision of developmental test and evaluation, including performance and joint developmental testing and evaluation; and administrative expenses in connection therewith; $282,038,000, to remain available for obligation until September 30, 1998.

### OPERATIONAL TEST AND EVALUATION, DEFENSE

For expenses, not otherwise provided for, necessary for the independent activities of the Director, Operational Test and Evaluation in the direction and supervision of operational test and evaluation, including initial operational test and evaluation which is conducted prior to, and in support of, production decisions; joint operational testing and evaluation; and administrative expenses in connection therewith; $24,968,000, to remain available for obligation until September 30, 1998.

### TITLE V—REVOLVING AND MANAGEMENT FUNDS

### DEFENSE BUSINESS OPERATIONS FUND

For the Defense Business Operations Fund; $947,900,000.

### NATIONAL DEFENSE SEALIFT FUND

For National Defense Sealift Fund programs, projects, and activities, and for expenses of the National Defense Reserve Fleet, as established by section 11 of the Merchant Ship Sales Act of 1946 (50 U.S.C.App. 1744); $1,428,002,000, to remain available until expended: Provided, That none of the funds provided in this paragraph shall be used to award a new contract that provides for the acquisition of any of the following major components unless such components are manufactured in the United States: auxiliary equipment, including pumps, for all ship-board services; propulsion system components (that is; engines, reduction gears, and propellers); shipboard cranes; and spreaders for shipboard cranes: Provided further, That the exercise of an option in a contract awarded through the obligation of previously appropriated funds shall not be considered to be the award of a new contract: Provided further, That the Secretary of the military department responsible for such procurement may waive these restrictions on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate, that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes.

### TITLE VI—OTHER DEPARTMENT OF DEFENSE PROGRAMS

### DEFENSE HEALTH PROGRAM

For expenses, not otherwise provided for, for medical and health care programs of the Department of Defense, as authorized by law; $10,207,308,000, of which $9,937,838,000 shall be for Operation and maintenance, of which not to exceed three percent

shall remain available until September 30, 1998; and of which $269,470,000, to remain available for obligation until September 30, 1999, shall be for Procurement: Provided, That of the funds appropriated under this heading, $14,500,000 shall be made available for obtaining emergency communications services for members of the Armed Forces and their families from the American National Red Cross: Provided further, That notwithstanding any other provision of law, of the funds provided under this heading, the Secretary of Defense is directed to use and obligate, within thirty days of enactment of this Act, not less than $3,400,000 only to permit private sector or non-Federal physicians who have used and will use the antibacterial treatment method based upon the excretion of dead and decaying spherical bacteria to work in conjunction with the Walter Reed Army Medical Center on a treatment protocol and related studies for Desert Storm Syndrome affected veterans.

### CHEMICAL AGENTS AND MUNITIONS DESTRUCTION, DEFENSE

For expenses, not otherwise provided for, necessary for the destruction of the United States stockpile of lethal chemical agents and munitions in accordance with the provisions of section 1412 of the Department of Defense Authorization Act, 1986 (50 U.S.C. 1521), and for the destruction of other chemical warfare materials that are not in the chemical weapon stockpile, $758,447,000, of which $478,947,000 shall be for Operation and maintenance, $191,200,000 shall be for Procurement to remain available until September 30, 1999, and $88,300,000 shall be for Research, development, test and evaluation to remain available until September 30, 1998: Provided, That of the funds made available under this heading, $1,000,000 shall be available until expended only for a Johnston Atoll off-island leave program: Provided further, That notwithstanding any other provision of law, the Secretaries concerned may, pursuant to uniform regulations prescribe travel and transportation allowances for travel by participants in the off-island leave program.

### DRUG INTERDICTION AND COUNTER–DRUG ACTIVITIES, DEFENSE

#### (INCLUDING TRANSFER OF FUNDS)

For drug interdiction and counter-drug activities of the Department of Defense, for transfer to appropriations available to the Department of Defense for military personnel of the reserve components serving under the provisions of title 10 and title 32, United States Code; for Operation and maintenance; for Procurement; and for Research, development, test and evaluation; $807,800,000: Provided, That the funds appropriated by this paragraph shall be available for obligation for the same time period and for the same purpose as the appropriation to which transferred: Provided further, That the transfer authority provided in this paragraph is in addition to any transfer authority contained elsewhere in this Act.

### OFFICE OF THE INSPECTOR GENERAL

For expenses and activities of the Office of the Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended; $139,157,000, of which $137,157,000 shall be for Operation and maintenance, of which not to exceed $500,000 is available for emergencies and extraordinary expenses to be expended on the approval or authority of the Inspector General, and payments may be made on his certificate of necessity for confidential military purposes; and of which $2,000,000, to remain available until September 30, 1999, shall be for Procurement.

### TITLE VII

### RELATED AGENCIES

### CENTRAL INTELLIGENCE AGENCY RETIREMENT AND DISABILITY SYSTEM FUND

For payment to the Central Intelligence Agency Retirement and Disability System Fund, to maintain proper funding level for continuing the operation of the Central Intelligence Agency Retirement and Disability System; $196,400,000.

### INTELLIGENCE COMMUNITY MANAGEMENT ACCOUNT

For necessary expenses of the Intelligence Community Management Account; $129,164,000: Provided, That of the funds appropriated under this heading, $27,000,000 shall be transferred to the Department of Justice for the National Drug Intelligence Center to support the Department of Defense's counterdrug monitoring and detection responsibilities.

### PAYMENT TO KAHO'OLAWE ISLAND CONVEYANCE,
### REMEDIATION, AND ENVIRONMENTAL RESTORATION FUND

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For payment to Kaho'olawe Island Conveyance, Remediation, and Environmental Restoration Fund, as authorized by law; $10,000,000, to remain available until expended.

### NATIONAL SECURITY EDUCATION TRUST FUND

For the purposes of title VIII of Public Law 102–183, $5,100,000, to be derived from the National Security Education Trust Fund, to remain available until expended.

### TITLE VIII

### GENERAL PROVISIONS

SEC. 8001. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

<< 10 USCA § 1584 NOTE >>

SEC. 8002. During the current fiscal year, provisions of law prohibiting the payment of compensation to, or employment of, any person not a citizen of the United States shall not apply to personnel of the Department of Defense: Provided, That salary increases granted to direct and indirect hire foreign national employees of the Department of Defense funded by this Act shall not be at a rate in excess of the percentage increase authorized by law for civilian employees of the Department of Defense whose pay is computed under the provisions of section 5332 of title 5, United States Code, or at a rate in excess of the percentage increase provided by the appropriate host nation to its own employees, whichever is higher: Provided further, That this section shall not apply to Department of Defense foreign service national employees serving at United States diplomatic missions whose pay is set by the Department of State under the Foreign Service Act of 1980: Provided further, That the limitations of this provision shall not apply to foreign national employees of the Department of Defense in the Republic of Turkey.

SEC. 8003. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year, unless expressly so provided herein.

SEC. 8004. No more than 20 per centum of the appropriations in this Act which are limited for obligation during the current fiscal year shall be obligated during the last two months of the fiscal year: Provided, That this section shall not apply to obligations for support of active duty training of reserve components or summer camp training of the Reserve Officers' Training Corps.

### (TRANSFER OF FUNDS)

SEC. 8005. Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $2,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: Provided, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by Congress: Provided further, That the Secretary of Defense shall notify the Congress promptly of all transfers made pursuant to this authority or any other authority in this Act: Provided further, That no part of the funds in this Act shall be available to prepare or present a request to the Committees on Appropriations for reprogramming of funds, unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which reprogramming is requested has been denied by the Congress.

### (TRANSFER OF FUNDS)

SEC. 8006. During the current fiscal year, cash balances in working capital funds of the Department of Defense established pursuant to section 2208 of title 10, United States Code, may be maintained in only such amounts as are necessary at any time for cash disbursements to be made from such funds: Provided, That transfers may be made between such funds and the "Foreign Currency Fluctuations, Defense" and "Operation and Maintenance" appropriation accounts in such amounts as may be determined by the Secretary of Defense, with the approval of the Office of Management and Budget, except that such transfers

may not be made unless the Secretary of Defense has notified the Congress of the proposed transfer. Except in amounts equal to the amounts appropriated to working capital funds in this Act, no obligations may be made against a working capital fund to procure or increase the value of war reserve material inventory, unless the Secretary of Defense has notified the Congress prior to any such obligation.

SEC. 8007. Funds appropriated by this Act may not be used to initiate a special access program without prior notification 30 calendar days in session in advance to the congressional defense committees.

SEC. 8008. None of the funds contained in this Act available for the Civilian Health and Medical Program of the Uniformed Services shall be available for payments to physicians and other non-institutional health care providers in excess of the amounts allowed in fiscal year 1996 for similar services, except that: (a) for services for which the Secretary of Defense determines an increase is justified by economic circumstances, the allowable amounts may be increased in accordance with appropriate economic index data similar to that used pursuant to title XVIII of the Social Security Act; and (b) for services the Secretary determines are overpriced based on allowable payments under title XVIII of the Social Security Act, the allowable amounts shall be reduced by not more than 15 percent (except that the reduction may be waived if the Secretary determines that it would impair adequate access to health care services for beneficiaries). The Secretary shall solicit public comment prior to promulgating regulations to implement this section. Such regulations shall include a limitation, similar to that used under title XVIII of the Social Security Act, on the extent to which a provider may bill a beneficiary an actual charge in excess of the allowable amount.

SEC. 8009. None of the funds provided in this Act shall be available to initiate (1) a multiyear contract that employs economic order quantity procurement in excess of $20,000,000 in any one year of the contract or that includes an unfunded contingent liability in excess of $20,000,000, or (2) a contract for advance procurement leading to a multiyear contract that employs economic order quantity procurement in excess of $20,000,000 in any one year, unless the congressional defense committees have been notified at least thirty days in advance of the proposed contract award: Provided, That no part of any appropriation contained in this Act shall be available to initiate a multiyear contract for which the economic order quantity advance procurement is not funded at least to the limits of the Government's liability: Provided further, That no part of any appropriation contained in this Act shall be available to initiate multiyear procurement contracts for any systems or component thereof if the value of the multiyear contract would exceed $500,000,000 unless specifically provided in this Act: Provided further, That no multiyear procurement contract can be terminated without 10–day prior notification to the congressional defense committees: Provided further, That the execution of multiyear authority shall require the use of a present value analysis to determine lowest cost compared to an annual procurement: Provided further, That notwithstanding Section 8010 of Public Law 104–61, funds appropriated for the DDG–51 destroyer program in Public Law 104–61 may be used to initiate a multiyear contract for the Arleigh Burke class destroyer program.

Funds appropriated in title III of this Act may be used for multiyear procurement contracts as follows:

Javelin missiles;

Army Tactical Missile System (ATACMS);

MK19–3 grenade machine guns;

M16A2 rifles;

M249 Squad Automatic Weapons;

M4 carbine rifles;

M240B machine guns; and

Arleigh Burke (DDG–51) class destroyers.

<< 10 USCA § 401 NOTE >>

SEC. 8010. Within the funds appropriated for the operation and maintenance of the Armed Forces, funds are hereby appropriated pursuant to section 401 of title 10, United States Code, for humanitarian and civic assistance costs under chapter 20 of title 10, United States Code. Such funds may also be obligated for humanitarian and civic assistance costs incidental to authorized operations and pursuant to authority granted in section 401 of chapter 20 of title 10, United States Code, and these obligations shall be reported to Congress on September 30 of each year: Provided, That funds available for operation and maintenance shall be available for providing humanitarian and similar assistance by using Civic Action Teams in the Trust Territories of the Pacific Islands and freely associated states of Micronesia, pursuant to the Compact of Free Association as authorized by Public Law 99–239: Provided further, That upon a determination by the Secretary of the Army that such

action is beneficial for graduate medical education programs conducted at Army medical facilities located in Hawaii, the Secretary of the Army may authorize the provision of medical services at such facilities and transportation to such facilities, on a nonreimbursable basis, for civilian patients from American Samoa, the Commonwealth of the Northern Mariana Islands, the Marshall Islands, the Federated States of Micronesia, Palau, and Guam.

SEC. 8011. (a) During fiscal year 1997, the civilian personnel of the Department of Defense may not be managed on the basis of any end-strength, and the management of such personnel during that fiscal year shall not be subject to any constraint or limitation (known as an end-strength) on the number of such personnel who may be employed on the last day of such fiscal year.

(b) The fiscal year 1998 budget request for the Department of Defense as well as all justification material and other documentation supporting the fiscal year 1998 Department of Defense budget request shall be prepared and submitted to the Congress as if subsections (a) and (b) of this provision were effective with regard to fiscal year 1998.

(c) Nothing in this section shall be construed to apply to military (civilian) technicians.

SEC. 8012. Notwithstanding any other provision of law, none of the funds made available by this Act shall be used by the Department of Defense to exceed, outside the fifty United States, its territories, and the District of Columbia, 125,000 civilian workyears: Provided, That workyears shall be applied as defined in the Federal Personnel Manual: Provided further, That workyears expended in dependent student hiring programs for disadvantaged youths shall not be included in this workyear limitation.

SEC. 8013. None of the funds made available by this Act shall be used in any way, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before the Congress.

SEC. 8014. (a) None of the funds appropriated by this Act shall be used to make contributions to the Department of Defense Education Benefits Fund pursuant to section 2006(g) of title 10, United States Code, representing the normal cost for future benefits under section 3015(c) of title 38, United States Code, for any member of the armed services who, on or after the date of enactment of this Act—

(1) enlists in the armed services for a period of active duty of less than three years; or

(2) receives an enlistment bonus under section 308a or 308f of title 37, United States Code,

nor shall any amounts representing the normal cost of such future benefits be transferred from the Fund by the Secretary of the Treasury to the Secretary of Veterans Affairs pursuant to section 2006(d) of title 10, United States Code; nor shall the Secretary of Veterans Affairs pay such benefits to any such member: Provided, That in the case of a member covered by clause (1), these limitations shall not apply to members in combat arms skills or to members who enlist in the armed services on or after July 1, 1989, under a program continued or established by the Secretary of Defense in fiscal year 1991 to test the cost-effective use of special recruiting incentives involving not more than nineteen noncombat arms skills approved in advance by the Secretary of Defense: Provided further, That this subsection applies only to active components of the Army.

(b) None of the funds appropriated by this Act shall be available for the basic pay and allowances of any member of the Army participating as a full-time student and receiving benefits paid by the Secretary of Veterans Affairs from the Department of Defense Education Benefits Fund when time spent as a full-time student is credited toward completion of a service commitment: Provided, That this subsection shall not apply to those members who have reenlisted with this option prior to October 1, 1987: Provided further, That this subsection applies only to active components of the Army.

SEC. 8015. None of the funds appropriated by this Act shall be available to convert to contractor performance an activity or function of the Department of Defense that, on or after the date of enactment of this Act, is performed by more than ten Department of Defense civilian employees until a most efficient and cost-effective organization analysis is completed on such activity or function and certification of the analysis is made to the Committees on Appropriations of the House of Representatives and the Senate: Provided, That this section shall not apply to a commercial or industrial type function of the Department of Defense that: (1) is included on the procurement list established pursuant to section 2 of the Act of June 25, 1938 (41 U.S.C. 47), popularly referred to as the Javits–Wagner–O'Day Act; (2) is planned to be converted to performance by a qualified nonprofit agency for the blind or by a qualified nonprofit agency for other severely handicapped individuals in accordance with that Act; or (3) is planned to be converted to performance by a qualified firm under 51 percent Native American ownership.

(TRANSFER OF FUNDS)

SEC. 8016. Funds appropriated in title III of this Act for the Department of Defense Pilot Mentor–Protege Program may be transferred to any other appropriation contained in this Act solely for the purpose of implementing a Mentor–Protege Program

developmental assistance agreement pursuant to section 831 of the National Defense Authorization Act for Fiscal Year 1991 (Public Law 101–510; 10 U.S.C. 2301 note), as amended, under the authority of this provision or any other transfer authority contained in this Act.

SEC. 8017. None of the funds in this Act may be available for the purchase by the Department of Defense (and its departments and agencies) of welded shipboard anchor and mooring chain 4 inches in diameter and under unless the anchor and mooring chain are manufactured in the United States from components which are substantially manufactured in the United States: Provided, That for the purpose of this section manufactured will include cutting, heat treating, quality control, testing of chain and welding (including the forging and shot blasting process): Provided further, That for the purpose of this section substantially all of the components of anchor and mooring chain shall be considered to be produced or manufactured in the United States if the aggregate cost of the components produced or manufactured in the United States exceeds the aggregate cost of the components produced or manufactured outside the United States: Provided further, That when adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis, the Secretary of the service responsible for the procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations that such an acquisition must be made in order to acquire capability for national security purposes.

SEC. 8018. None of the funds appropriated by this Act available for the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) shall be available for the reimbursement of any health care provider for inpatient mental health service for care received when a patient is referred to a provider of inpatient mental health care or residential treatment care by a medical or health care professional having an economic interest in the facility to which the patient is referred: Provided, That this limitation does not apply in the case of inpatient mental health services provided under the program for the handicapped under subsection (d) of section 1079 of title 10, United States Code, provided as partial hospital care, or provided pursuant to a waiver authorized by the Secretary of Defense because of medical or psychological circumstances of the patient that are confirmed by a health professional who is not a Federal employee after a review, pursuant to rules prescribed by the Secretary, which takes into account the appropriate level of care for the patient, the intensity of services required by the patient, and the availability of that care.

SEC. 8019. Funds available in this Act may be used to provide transportation for the next-of-kin of individuals who have been prisoners of war or missing in action from the Vietnam era to an annual meeting in the United States, under such regulations as the Secretary of Defense may prescribe.

<< 10 USCA § 2687 NOTE >>

SEC. 8020. Notwithstanding any other provision of law, during the current fiscal year, the Secretary of Defense may, by Executive Agreement, establish with host nation governments in NATO member states a separate account into which such residual value amounts negotiated in the return of United States military installations in NATO member states may be deposited, in the currency of the host nation, in lieu of direct monetary transfers to the United States Treasury: Provided, That such credits may be utilized only for the construction of facilities to support United States military forces in that host nation, or such real property maintenance and base operating costs that are currently executed through monetary transfers to such host nations: Provided further, That the Department of Defense's budget submission for fiscal year 1998 shall identify such sums anticipated in residual value settlements, and identify such construction, real property maintenance or base operating costs that shall be funded by the host nation through such credits: Provided further, That all military construction projects to be executed from such accounts must be previously approved in a prior Act of Congress: Provided further, That each such Executive Agreement with a NATO member host nation shall be reported to the congressional defense committees, the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate thirty days prior to the conclusion and endorsement of any such agreement established under this provision.

SEC. 8021. None of the funds available to the Department of Defense may be used to demilitarize or dispose of M–1 Carbines, M–1 Garand rifles, M–14 rifles, .22 caliber rifles, .30 caliber rifles, or M–1911 pistols.

SEC. 8022. Notwithstanding any other provision of law, none of the funds appropriated by this Act shall be available to pay more than 50 percent of an amount paid to any person under section 308 of title 37, United States Code, in a lump sum.

SEC. 8023. None of the funds appropriated by this Act shall be available for payments under the Department of Defense contract with the Louisiana State University Medical Center involving the use of cats for Brain Missile Wound Research, and the Department of Defense shall not make payments under such contract from funds obligated prior to the date of the enactment

of this Act, except as necessary for costs incurred by the contractor prior to the enactment of this Act: Provided, That funds necessary for the care of animals covered by this contract are allowed.

SEC. 8024. Of the funds made available by this Act in title III, Procurement, $8,000,000, drawn pro rata from each appropriations account in title III, shall be available for incentive payments authorized by section 504 of the Indian Financing Act of 1974, 25 U.S.C. 1544. These payments shall be available only to contractors which have submitted subcontracting plans pursuant to 15 U.S.C. 637(d), and according to regulations which shall be promulgated by the Secretary of Defense within 90 days of the passage of this Act.

SEC. 8025. None of the funds provided in this Act or any other Act shall be available to conduct bone trauma research at any Army Research Laboratory until the Secretary of the Army certifies that the synthetic compound to be used in the experiments is of such a type that its use will result in a significant medical finding, the research has military application, the research will be conducted in accordance with the standards set by an animal care and use committee, and the research does not duplicate research already conducted by a manufacturer or any other research organization.

SEC. 8026. During the current fiscal year, none of the funds available to the Department of Defense may be used to procure or acquire (1) defensive handguns unless such handguns are the M9 or M11 9 mm Department of Defense standard handguns, or (2) offensive handguns except for the Special Operations Forces: Provided, That the foregoing shall not apply to handguns and ammunition for marksmanship competitions.

SEC. 8027. No more than $500,000 of the funds appropriated or made available in this Act shall be used for any single relocation of an organization, unit, activity or function of the Department of Defense into or within the National Capital Region: Provided, That the Secretary of Defense may waive this restriction on a case-by-case basis by certifying in writing to the Congressional defense committees that such a relocation is required in the best interest of the Government.

SEC. 8028. During the current fiscal year, funds appropriated or otherwise available for any Federal agency, the Congress, the judicial branch, or the District of Columbia may be used for the pay, allowances, and benefits of an employee as defined by section 2105 of title 5 or an individual employed by the government of the District of Columbia, permanent or temporary indefinite, who—

  (1) is a member of a Reserve component of the Armed Forces, as described in section 261 of title 10, or the National Guard, as described in section 101 of title 32;

  (2) performs, for the purpose of providing military aid to enforce the law or providing assistance to civil authorities in the protection or saving of life or property or prevention of injury—

   (A) Federal service under sections 331, 332, 333, or 12406 of title 10, or other provision of law, as applicable, or

   (B) full-time military service for his or her State, the District of Columbia, the Commonwealth of Puerto Rico, or a territory of the United States; and

  (3) requests and is granted—

   (A) leave under the authority of this section; or

   (B) annual leave, which may be granted without regard to the provisions of sections 5519 and 6323(b) of title 5, if such employee is otherwise entitled to such annual leave:

Provided, That any employee who requests leave under subsection (3)(A) for service described in subsection (2) of this section is entitled to such leave, subject to the provisions of this section and of the last sentence of section 6323(b) of title 5, and such leave shall be considered leave under section 6323(b) of title 5.

SEC. 8029. None of the funds appropriated by this Act shall be available to perform any cost study pursuant to the provisions of OMB Circular A–76 if the study being performed exceeds a period of twenty-four months after initiation of such study with respect to a single function activity or forty-eight months after initiation of such study for a multi-function activity.

SEC. 8030. Funds appropriated by this Act for the American Forces Information Service shall not be used for any national or international political or psychological activities.

SEC. 8031. Notwithstanding any other provision of law or regulation, the Secretary of Defense may adjust wage rates for civilian employees hired for certain health care occupations as authorized for the Secretary of Veterans Affairs by section 7455 of title 38, United States Code.

SEC. 8032. None of the funds appropriated or made available in this Act shall be used to reduce or disestablish the operation of the 53rd Weather Reconnaissance Squadron of the Air Force Reserve, if such action would reduce the WC–130 Weather Reconnaissance mission below the levels funded in this Act.

SEC. 8033. (a) Of the funds for the procurement of supplies or services appropriated by this Act, qualified nonprofit agencies for the blind or other severely handicapped shall be afforded the maximum practicable opportunity to participate as subcontractors and suppliers in the performance of contracts let by the Department of Defense.

(b) During the current fiscal year, a business concern which has negotiated with a military service or defense agency a subcontracting plan for the participation by small business concerns pursuant to section 8(d) of the Small Business Act (15 U.S.C. 637(d)) shall be given credit toward meeting that subcontracting goal for any purchases made from qualified nonprofit agencies for the blind or other severely handicapped.

(c) For the purpose of this section, the phrase "qualified nonprofit agency for the blind or other severely handicapped" means a nonprofit agency for the blind or other severely handicapped that has been approved by the Committee for the Purchase from the Blind and Other Severely Handicapped under the Javits–Wagner–O'Day Act (41 U.S.C. 46–48).

SEC. 8034. During the current fiscal year, net receipts pursuant to collections from third party payers pursuant to section 1095 of title 10, United States Code, shall be made available to the local facility of the uniformed services responsible for the collections and shall be over and above the facility's direct budget amount.

SEC. 8035. During the current fiscal year, the Department of Defense is authorized to incur obligations of not to exceed $350,000,000 for purposes specified in section 2350j(c) of title 10, United States Code, in anticipation of receipt of contributions, only from the Government of Kuwait, under that section: Provided, That, upon receipt, such contributions from the Government of Kuwait shall be credited to the appropriation or fund which incurred such obligations.

SEC. 8036. Of the funds made available in this Act, not less than $23,626,000 shall be available for the Civil Air Patrol, of which $19,926,000 shall be available for Operation and maintenance.

SEC. 8037. (a) None of the funds appropriated in this Act are available to establish a new Department of Defense (department) federally funded research and development center (FFRDC), either as a new entity, or as a separate entity administered by an organization managing another FFRDC, or as a nonprofit membership corporation consisting of a consortium of other FFRDCs and other non-profit entities.

(b) LIMITATION ON COMPENSATION.—No member of a Board of Directors, Trustees, Overseers, Advisory Group, Special Issues Panel, Visiting Committee, or any similar entity of a defense FFRDC, and no paid consultant to any defense FFRDC, may be compensated for his or her services as a member of such entity, or as a paid consultant, except under the same conditions, and to the same extent, as members of the Defense Science Board: Provided, That a member of any such entity referred to previously in this subsection shall be allowed travel expenses and per diem as authorized under the Federal Joint Travel Regulations, when engaged in the performance of membership duties.

(c) Notwithstanding any other provision of law, none of the funds available to the department from any source during fiscal year 1997 may be used by a defense FFRDC, through a fee or other payment mechanism, for charitable contributions, for construction of new buildings, for payment of cost sharing for projects funded by government grants, or for absorption of contract overruns.

(d) Notwithstanding any other provision of law, of the funds available to the department during fiscal year 1997, not more than 5,975 staff years of technical effort (staff years) may be funded for defense FFRDCs: Provided, That of the specific amount referred to previously in this subsection, not more than 1,088 staff years may be funded for the defense studies and analysis FFRDCs.

(e) Notwithstanding any other provision of law, the Secretary of Defense shall control the total number of staff years to be performed by defense FFRDCs during fiscal year 1997 so as to reduce the total amounts appropriated in titles II, III, and IV of this Act by $52,286,000: Provided, That the total amounts appropriated in titles II, III, and IV of this Act are hereby reduced by $52,286,000 to reflect savings from the use of defense FFRDCs by the department.

(f) Within 60 days after enactment of this Act, the Secretary of Defense shall submit to the Congressional defense committees a report presenting the specific amounts of staff years of technical effort to be allocated by the department for each defense FFRDC during fiscal year 1997: Provided, That, after the submission of the report required by this subsection, the department may not reallocate more than five percent of an FFRDC's staff years among other defense FFRDCs until 30 days after a detailed justification for any such reallocation is submitted to the Congressional defense committees.

(g) The Secretary of Defense shall, with the submission of the department's fiscal year 1998 budget request, submit a report presenting the specific amounts of staff years of technical effort to be allocated for each defense FFRDC during that fiscal year.

(h) The total amounts appropriated to or for the use of the department in titles II, III, and IV of this Act are hereby further reduced by $102,286,000 to reflect savings from the decreased use of non-FFRDC consulting services by the department.

(i) No part of the reductions contained in subsections (e) and (h) of this section may be applied against any budget activity, activity group, subactivity group, line item, program element, program, project, subproject or activity which does not fund defense FFRDC activities or non-FFRDC consulting services within each appropriation account.

(j) Not later than 90 days after enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report listing the specific funding reductions allocated to each category listed in subsection (i) above pursuant to this section.

SEC. 8038. None of the funds in this or any other Act shall be available for the preparation of studies on—

  (a) the feasibility of removal and transportation of unitary chemical weapons or agents from the eight chemical storage sites within the continental United States to Johnston Atoll: Provided, That this prohibition shall not apply to General Accounting Office studies requested by a Member of Congress or a Congressional Committee; and

  (b) the potential future uses of the nine chemical disposal facilities other than for the destruction of stockpile chemical munitions and as limited by section 1412(c)(2), Public Law 99–145: Provided, That this prohibition does not apply to future use studies for the CAMDS facility at Tooele, Utah.

SEC. 8039. None of the funds appropriated or made available in this Act shall be used to procure carbon, alloy or armor steel plate for use in any Government-owned facility or property under the control of the Department of Defense which were not melted and rolled in the United States or Canada: Provided, That these procurement restrictions shall apply to any and all Federal Supply Class 9515, American Society of Testing and Materials (ASTM) or American Iron and Steel Institute (AISI) specifications of carbon, alloy or armor steel plate: Provided further, That the Secretary of the military department responsible for the procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes: Provided further, That these restrictions shall not apply to contracts which are in being as of the date of enactment of this Act.

SEC. 8040. For the purposes of this Act, the term "congressional defense committees" means the National Security Committee of the House of Representatives, the Armed Services Committee of the Senate, the subcommittee on Defense of the Committee on Appropriations of the Senate, and the subcommittee on National Security of the Committee on Appropriations of the House of Representatives.

SEC. 8041. During the current fiscal year, the Department of Defense may acquire the modification, depot maintenance and repair of aircraft, vehicles and vessels as well as the production of components and other Defense-related articles, through competition between Department of Defense depot maintenance activities and private firms: Provided, That the Senior Acquisition Executive of the military department or defense agency concerned, with power of delegation, shall certify that successful bids include comparable estimates of all direct and indirect costs for both public and private bids: Provided further, That Office of Management and Budget Circular A–76 shall not apply to competitions conducted under this section.

<< 41 USCA § 10b–2 >>

SEC. 8042. (a)(1) If the Secretary of Defense, after consultation with the United States Trade Representative, determines that a foreign country which is party to an agreement described in paragraph (2) has violated the terms of the agreement by discriminating against certain types of products produced in the United States that are covered by the agreement, the Secretary of Defense shall rescind the Secretary's blanket waiver of the Buy American Act with respect to such types of products produced in that foreign country.

(2) An agreement referred to in paragraph (1) is any reciprocal defense procurement memorandum of understanding, between the United States and a foreign country pursuant to which the Secretary of Defense has prospectively waived the Buy American Act for certain products in that country.

(b) The Secretary of Defense shall submit to Congress a report on the amount of Department of Defense purchases from foreign entities in fiscal year 1997. Such report shall separately indicate the dollar value of items for which the Buy American Act was waived pursuant to any agreement described in subsection (a)(2), the Trade Agreement Act of 1979 (19 U.S.C. 2501 et seq.), or any international agreement to which the United States is a party.

AR.01342

(c) For purposes of this section, the term "Buy American Act" means title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved March 3, 1933 (41 U.S.C. 10a et seq.).

SEC. 8043. Appropriations contained in this Act that remain available at the end of the current fiscal year as a result of energy cost savings realized by the Department of Defense shall remain available for obligation for the next fiscal year to the extent, and for the purposes, provided in section 2865 of title 10, United States Code.

<< 10 USCA § 1175 NOTE >>

SEC. 8044. During the current fiscal year and hereafter, voluntary separation incentives payable under 10 U.S.C. 1175 may be paid in such amounts as are necessary from the assets of the Voluntary Separation Incentive Fund established by section 1175(h)(1).

(INCLUDING TRANSFER OF FUNDS)

SEC. 8045. Amounts deposited during the current fiscal year to the special account established under 40 U.S.C. 485(h)(2) and to the special account established under 10 U.S.C. 2667(d)(1) are appropriated and shall be available until transferred by the Secretary of Defense to current applicable appropriations or funds of the Department of Defense under the terms and conditions specified by 40 U.S.C. 485(h)(2) (A) and (B) and 10 U.S.C. 2667(d)(1)(B), to be merged with and to be available for the same time period and the same purposes as the appropriation to which transferred.

SEC. 8046. During the current fiscal year, appropriations available to the Department of Defense may be used to reimburse a member of a reserve component of the Armed Forces who is not otherwise entitled to travel and transportation allowances and who occupies transient government housing while performing active duty for training or inactive duty training: Provided, That such members may be provided lodging in kind if transient government quarters are unavailable as if the member was entitled to such allowances under subsection (a) of section 404 of title 37, United States Code: Provided further, That if lodging in kind is provided, any authorized service charge or cost of such lodging may be paid directly from funds appropriated for operation and maintenance of the reserve component of the member concerned.

<< 10 USCA § 221 NOTE >>

SEC. 8047. The President shall include with each budget for a fiscal year submitted to the Congress under section 1105 of title 31, United States Code, materials that shall identify clearly and separately the amounts requested in the budget for appropriation for that fiscal year for salaries and expenses related to administrative activities of the Department of Defense, the military departments, and the Defense Agencies.

SEC. 8048. Notwithstanding any other provision of law, funds available for "Drug Interdiction and Counter–Drug Activities, Defense" may be obligated for the Young Marines program.

SEC. 8049. During the current fiscal year, amounts contained in the Department of Defense Overseas Military Facility Investment Recovery Account established by section 2921(c)(1) of the National Defense Authorization Act of 1991 (Public Law 101–510; 10 U.S.C. 2687 note) shall be available until expended for the payments specified by section 2921(c)(2) of that Act.

<< 10 USCA § 12681 NOTE >>

SEC. 8050. During the current fiscal year and hereafter, annual payments granted under the provisions of section 4416 of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 106 Stat. 2714) shall be made from appropriations in this Act which are available for the pay of reserve component personnel.

SEC. 8051. Of the funds appropriated or otherwise made available by this Act, not more than $119,200,000 shall be available for payment of the operating costs of NATO Headquarters: Provided, That the Secretary of Defense may waive this section for Department of Defense support provided to NATO forces in and around the former Yugoslavia.

SEC. 8052. During the current fiscal year, appropriations which are available to the Department of Defense for operation and maintenance may be used to purchase items having an investment item unit cost of not more than $100,000.

<< 10 USCA § 1293 NOTE >>

SEC. 8053. During the current fiscal year and hereafter, appropriations available for the pay and allowances of active duty members of the Armed Forces shall be available to pay the retired pay which is payable pursuant to section 4403 of Public Law 102–484 (10 U.S.C. 1293 note) under the terms and conditions provided in section 4403.

SEC. 8054. (a) During the current fiscal year, none of the appropriations or funds available to the Defense Business Operations Fund shall be used for the purchase of an investment item for the purpose of acquiring a new inventory item for sale or anticipated sale during the current fiscal year or a subsequent fiscal year to customers of the Defense Business Operations Fund if such an item would not have been chargeable to the Defense Business Operations Fund during fiscal year 1994 and if the purchase of such an investment item would be chargeable during the current fiscal year to appropriations made to the Department of Defense for procurement.

(b) The fiscal year 1998 budget request for the Department of Defense as well as all justification material and other documentation supporting the fiscal year 1998 Department of Defense budget shall be prepared and submitted to the Congress on the basis that any equipment which was classified as an end item and funded in a procurement appropriation contained in this Act shall be budgeted for in a proposed fiscal year 1998 procurement appropriation and not in the supply management business area or any other area or category of the Defense Business Operations Fund.

SEC. 8055. None of the funds provided in this Act shall be available for use by a Military Department to modify an aircraft, weapon, ship or other item of equipment, that the Military Department concerned plans to retire or otherwise dispose of within five years after completion of the modification: Provided, That this prohibition shall not apply to safety modifications: Provided further, That this prohibition may be waived by the Secretary of a Military Department if the Secretary determines it is in the best national security interest of the United States to provide such waiver and so notifies the congressional defense committees in writing.

SEC. 8056. None of the funds appropriated by this Act for programs of the Central Intelligence Agency shall remain available for obligation beyond the current fiscal year, except for funds appropriated for the Reserve for Contingencies, which shall remain available until September 30, 1998.

SEC. 8057. Notwithstanding any other provision of law, funds made available in this Act for the Defense Intelligence Agency may be used for the design, development, and deployment of General Defense Intelligence Program intelligence communications and intelligence information systems for the Services, the Unified and Specified Commands, and the component commands.

SEC. 8058. (a) Notwithstanding any other provision of law, funds appropriated in this Act for the High Performance Computing Modernization Program shall be made available only for the acquisition, modernization and sustainment of supercomputing capability and capacity at Department of Defense (DoD) science and technology sites under the cognizance of the Director of Defense Research and Engineering and DoD test and evaluation facilities under the Director of Test and Evaluation, OUSD (A&T): Provided, That these funds shall be awarded based on user-defined requirements.

(b) Of the funds appropriated in this Act under the heading "Procurement, Defense–Wide", $124,735,000 shall be made available for the High Performance Computing Modernization Program. Of the total funds made available for the program pursuant to this subsection, $20,000,000 shall be for the Army High Performance Computing Research Center.

SEC. 8059. Of the funds appropriated by the Department of Defense under the heading "Operation and Maintenance, Defense–Wide", not less than $8,000,000 shall be made available only for the mitigation of environmental impacts, including training and technical assistance to tribes, related administrative support, the gathering of information, documenting of environmental damage, and developing a system for prioritization of mitigation, on Indian lands resulting from Department of Defense activities.

SEC. 8060. Amounts collected for the use of the facilities of the National Science Center for Communications and Electronics during the current fiscal year pursuant to section 1459(g) of the Department of Defense Authorization Act, 1986 and deposited to the special account established under subsection 1459(g)(2) of that Act are appropriated and shall be available until expended for the operation and maintenance of the Center as provided for in subsection 1459(g)(2).

SEC. 8061. None of the funds appropriated in this Act may be used to fill the commander's position at any military medical facility with a health care professional unless the prospective candidate can demonstrate professional administrative skills.

SEC. 8062. (a) None of the funds appropriated in this Act may be expended by an entity of the Department of Defense unless the entity, in expending the funds, complies with Buy American Act. For purposes of this subsection, the term "Buy American

Act" means title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved March 3, 1933 (41 U.S.C. 10a et seq.).

(b) If the Secretary of Defense determines that a person has been convicted of intentionally affixing a label bearing a "Made in America" inscription to any product sold in or shipped to the United States that is not made in America, the Secretary shall determine, in accordance with section 2410f of title 10, United States Code, whether the person should be debarred from contracting with the Department of Defense.

(c) In the case of any equipment or products purchased with appropriations provided under this Act, it is the sense of the Congress that any entity of the Department of Defense, in expending the appropriation, purchase only American-made equipment and products, provided that American-made equipment and products are cost-competitive, quality-competitive, and available in a timely fashion.

SEC. 8063. None of the funds appropriated by this Act shall be available for a contract for studies, analyses, or consulting services entered into without competition on the basis of an unsolicited proposal unless the head of the activity responsible for the procurement determines—

(1) as a result of thorough technical evaluation, only one source is found fully qualified to perform the proposed work, or

(2) the purpose of the contract is to explore an unsolicited proposal which offers significant scientific or technological promise, represents the product of original thinking, and was submitted in confidence by one source, or

(3) the purpose of the contract is to take advantage of unique and significant industrial accomplishment by a specific concern, or to insure that a new product or idea of a specific concern is given financial support:

Provided, That this limitation shall not apply to contracts in an amount of less than $25,000, contracts related to improvements of equipment that is in development or production, or contracts as to which a civilian official of the Department of Defense, who has been confirmed by the Senate, determines that the award of such contract is in the interest of the national defense.

SEC. 8064. Funds appropriated by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

<< 50 USCA § 1521 NOTE >>

SEC. 8065. Notwithstanding section 142 of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, of the funds provided in title VI of this Act, under the heading "Chemical Agents and Munitions Destruction, Defense", $40,000,000 shall only be available for the conduct of a pilot program to identify and demonstrate not less than two alternatives to the baseline incineration process for the demilitarization of assembled chemical munitions: Provided, That the Under Secretary of Defense for Acquisition and Technology shall, not later than December 1, 1996, designate a program manager who is not, nor has been, in direct or immediate control of the baseline reverse assembly incineration demilitarization program to carry out the pilot program: Provided further, That the Under Secretary of Defense for Acquisition and Technology shall evaluate the effectiveness of each alternative chemical munitions demilitarization technology identified and demonstrated under the pilot program to demilitarize munitions and assembled chemical munitions while meeting all applicable Federal and State environmental and safety requirements: Provided further, That the Under Secretary of Defense for Acquisition and Technology shall transmit, by December 15 of each year, a report to the congressional defense committees on the activities carried out under the pilot program during the preceding fiscal year in which the report is to be made: Provided further, That section 142(f)(3) of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, is repealed: Provided further, That no funds may be obligated for the construction of a baseline incineration facility at the Lexington Blue Grass Army Depot or the Pueblo Depot activity until 180 days after the Secretary of Defense has submitted to the congressional defense committees a report detailing the effectiveness of each alternative chemical munitions demilitarization technology identified and demonstrated under the pilot program and its ability to meet the applicable safety and environmental requirements: Provided further, That none of the funds in this or any other Act may be obligated for the preparation of studies, assessments, or planning of the removal and transportation of stockpile assembled unitary chemical weapons or neutralized chemical agent to any of the eight chemical weapons storage sites within the continental United States.

SEC. 8066. (a) None of the funds made available by this Act may be obligated for design, development, acquisition, or operation of more than 47 Titan IV expendable launch vehicles, or for satellite mission-model planning for a Titan IV requirement beyond 47 vehicles.

(b) $59,600,000 made available in this Act for Research, Development, Test and Evaluation, Air Force, may only be obligated for development of a new family of medium-lift and heavy-lift expendable launch vehicles evolved from existing technologies.

SEC. 8067. None of the funds available to the Department of Defense in this Act may be used to establish additional field operating agencies of any element of the Department during fiscal year 1997, except for field operating agencies funded within the National Foreign Intelligence Program: Provided, That the Secretary of Defense may waive this section by certifying to the House and Senate Committees on Appropriations that the creation of such field operating agencies will reduce either the personnel and/or financial requirements of the Department of Defense.

SEC. 8068. Notwithstanding section 303 of Public Law 96–487 or any other provision of law, the Secretary of the Navy is authorized to lease real and personal property at Naval Air Facility, Adak, Alaska, pursuant to 10 U.S.C. 2667(f), for commercial, industrial or other purposes.

<< 10 USCA Ch. 108 >>

SEC. 8069. Notwithstanding any other provision of law, for resident classes entering the war colleges after September 30, 1997, the Department of Defense shall require that not less than 20 percent of the total of United States military students at each war college shall be from military departments other than the hosting military department: Provided, That each military department will recognize the attendance at a sister military department war college as the equivalent of attendance at its own war college for promotion and advancement of personnel.

(RESCISSIONS)

SEC. 8070. Of the funds provided in Department of Defense Appropriations Acts, the following funds are hereby rescinded from the following accounts in the specified amounts:

"Procurement of Ammunition, Army, 1995/1997", $4,500,000;

"Aircraft Procurement, Navy, 1995/1997", $8,000,000;

"Procurement of Ammunition, Navy and Marine Corps, 1995/1997", $2,000,000;

"Other Procurement, Navy, 1995/1997", $10,000,000;

"Aircraft Procurement, Air Force, 1995/1997", $3,100,000;

"Missile Procurement, Air Force, 1995/1997", $31,900,000;

"Aircraft Procurement, Navy, 1996/1998", $5,400,000;

"Procurement of Ammunition, Navy and Marine Corps, 1996/1998", $12,708,000;

"Aircraft Procurement, Air Force, 1996/1998", $9,000,000;

"Missile Procurement, Air Force, 1996/1998", $20,000,000;

"Other Procurement, Air Force, 1996/1998", $26,000,000;

"Research, Development, Test and Evaluation, Navy 1996/1997", $4,500,000.

SEC. 8071. None of the funds provided in this Act may be obligated for payment on new contracts on which allowable costs charged to the government include payments for individual compensation at a rate in excess of $250,000 per year.

SEC. 8072. Of the funds appropriated in the Department of Defense Appropriations Act, 1996 (Public Law 104–61), under the heading "Other Procurement, Army", the Department of the Army shall grant $477,000 to the Kansas Unified School District 207 for the purpose of integrating schools at Fort Leavenworth into the existing fiber optic network on post.

SEC. 8073. None of the funds available in this Act may be used to reduce the authorized positions for military (civilian) technicians of the Army National Guard, the Air National Guard, Army Reserve and Air Force Reserve for the purpose of applying any administratively imposed civilian personnel ceiling, freeze, or reduction on military (civilian) technicians, unless such reductions are a direct result of a reduction in military force structure.

SEC. 8074. None of the funds appropriated or otherwise made available in this Act may be obligated or expended for assistance to the Democratic People's Republic of North Korea unless specifically appropriated for that purpose.

SEC. 8075. During the current fiscal year, funds appropriated in this Act are available to compensate members of the National Guard for duty performed pursuant to a plan submitted by a Governor of a State and approved by the Secretary of Defense under section 112 of title 32, United States Code: Provided, That during the performance of such duty, the members of the National Guard shall be under State command and control: Provided further, That such duty shall be treated as full-time National Guard duty for purposes of sections 12602(a)(2) and (b)(2) of title 10, United States Code.

SEC. 8076. Funds appropriated in this Act for operation and maintenance of the Military Departments, Unified and Specified Commands and Defense Agencies shall be available for reimbursement of pay, allowances and other expenses which would otherwise be incurred against appropriations for the National Guard and Reserve when members of the National Guard and Reserve provide intelligence support to Unified Commands, Defense Agencies and Joint Intelligence Activities, including the activities and programs included within the General Defense Intelligence Program and the Consolidated Cryptologic Program: Provided, That nothing in this section authorizes deviation from established Reserve and National Guard personnel and training procedures.

SEC. 8077. During the current fiscal year, none of the funds appropriated in this Act may be used to reduce the civilian medical and medical support personnel assigned to military treatment facilities below the September 30, 1996 level: Provided, That the Service Surgeons General may waive this section by certifying to the congressional defense committees that the beneficiary population is declining in some catchment areas and civilian strength reductions may be consistent with responsible resource stewardship and capitation-based budgeting.

SEC. 8078. All refunds or other amounts collected in the administration of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) shall be credited to current year appropriations.

(INCLUDING TRANSFER OF FUNDS)

SEC. 8079. None of the funds appropriated in this Act may be transferred to or obligated from the Pentagon Reservation Maintenance Revolving Fund, unless the Secretary of Defense certifies that the total cost for the planning, design, construction and installation of equipment for the renovation of the Pentagon Reservation will not exceed $1,118,000,000.

<< 10 USCA § 374 NOTE >>

SEC. 8080. (a) None of the funds available to the Department of Defense for any fiscal year for drug interdiction or counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law.

<< 50 USCA § 403f NOTE >>

(b) None of the funds available to the Central Intelligence Agency for any fiscal year for drug interdiction and counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law.

(TRANSFER OF FUNDS)

SEC. 8081. Appropriations available in this Act under the heading "Operation and Maintenance, Defense–Wide" for increasing energy and water efficiency in Federal buildings may, during their period of availability, be transferred to other appropriations or funds of the Department of Defense for projects related to increasing energy and water efficiency, to be merged with and to be available for the same general purposes, and for the same time period, as the appropriation or fund to which transferred.

SEC. 8082. None of the funds appropriated by this Act may be used for the procurement of ball and roller bearings other than those produced by a domestic source and of domestic origin: Provided, That the Secretary of the military department responsible for such procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate, that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes.

SEC. 8083. Notwithstanding any other provision of law, funds available to the Department of Defense shall be made available to provide transportation of medical supplies and equipment, on a nonreimbursable basis, to American Samoa: Provided, That notwithstanding any other provision of law, funds available to the Department of Defense shall be made available to provide transportation of medical supplies and equipment, on a nonreimbursable basis, to the Indian Health Service when it is in conjunction with a civil-military project.

SEC. 8084. None of the funds in this Act may be used to purchase any supercomputer which is not manufactured in the United States, unless the Secretary of Defense certifies to the congressional defense committees that such an acquisition must be made in order to acquire capability for national security purposes that is not available from United States manufacturers.

SEC. 8085. Notwithstanding any other provision of law, the Naval shipyards of the United States shall be eligible to participate in any manufacturing extension program financed by funds appropriated in this or any other Act.

SEC. 8086. None of the funds appropriated by this Act shall be available to lease or charter a vessel in excess of seventeen months (inclusive of any option periods) to transport fuel or oil for the Department of Defense if the vessel was constructed after October 1, 1995 unless the Secretary of Defense requires that the vessel be constructed in the United States with a double hull under the long-term lease or charter authority provided in section 2401 note of title 10, United States Code: Provided, That this limitation shall not apply to contracts in force on the date of enactment of this Act: Provided further, That by 1997 at least 20 percent of annual leases and charters must be for ships of double hull design constructed after October 1, 1995 if available in numbers sufficient to satisfy this requirement: Provided further, That the Military Sealift Command shall plan to achieve the goal of eliminating single hull ship leases by the year 2015.

(TRANSFER OF FUNDS)

SEC. 8087. In addition to amounts appropriated or otherwise made available by this Act, $300,000,000 is hereby appropriated to the Department of Defense and shall be available only for transfer to the United States Coast Guard.

SEC. 8088. Notwithstanding any other provision in this Act, the total amount appropriated in this Act is hereby reduced by $150,000,000 to reflect savings from reduced carryover of activities funded through the Defense Business Operations Fund, to be distributed as follows: "Operation and Maintenance, Army", $60,000,000; and "Operation and Maintenance, Navy", $90,000,000.

SEC. 8089. Notwithstanding any other provision of law, each contract awarded by the Department of Defense during the current fiscal year for construction or service performed in whole or in part in a State which is not contiguous with another State and has an unemployment rate in excess of the national average rate of unemployment as determined by the Secretary of Labor, shall include a provision requiring the contractor to employ, for the purpose of performing that portion of the contract in such State that is not contiguous with another State, individuals who are residents of such State and who, in the case of any craft or trade, possess or would be able to acquire promptly the necessary skills: Provided, That the Secretary of Defense may waive the requirements of this section, on a case-by-case basis, in the interest of national security.

SEC. 8090. During the current fiscal year, the Army shall use the former George Air Force Base as the airhead for the National Training Center at Fort Irwin: Provided, That none of the funds in this Act shall be obligated or expended to transport Army personnel into Edwards Air Force Base for training rotations at the National Training Center.

SEC. 8091. (a) The Secretary of Defense shall submit, on a quarterly basis, a report to the congressional defense committees, the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate setting forth all costs (including incremental costs) incurred by the Department of Defense during the preceding quarter in implementing or supporting resolutions of the United Nations Security Council, including any such resolution calling for international sanctions, international peacekeeping operations, and humanitarian missions undertaken by the Department of Defense. The quarterly report shall include an aggregate of all such Department of Defense costs by operation or mission.

(b) The Secretary of Defense shall detail in the quarterly reports all efforts made to seek credit against past United Nations expenditures and all efforts made to seek compensation from the United Nations for costs incurred by the Department of Defense in implementing and supporting United Nations activities.

SEC. 8092. (a) LIMITATION ON TRANSFER OF DEFENSE ARTICLES AND SERVICES.—Notwithstanding any other provision of law, none of the funds available to the Department of Defense for the current fiscal year may be obligated or expended to transfer to another nation or an international organization any defense articles or services (other than intelligence services) for use in the activities described in subsection (b) unless the congressional defense committees, the Committee on International Relations of the House of Representatives, and the Committee on Foreign Relations of the Senate are notified 15 days in advance of such transfer.

(b) COVERED ACTIVITIES.—(1) This section applies to—

(A) any international peacekeeping or peace-enforcement operation under the authority of chapter VI or chapter VII of the United Nations Charter under the authority of a United Nations Security Council resolution; and

(B) any other international peacekeeping, peace-enforcement, or humanitarian assistance operation.

(c) REQUIRED NOTICE.—A notice under subsection (a) shall include the following:

(1) A description of the equipment, supplies, or services to be transferred.

(2) A statement of the value of the equipment, supplies, or services to be transferred.

(3) In the case of a proposed transfer of equipment or supplies—

(A) a statement of whether the inventory requirements of all elements of the Armed Forces (including the reserve components) for the type of equipment or supplies to be transferred have been met; and

(B) a statement of whether the items proposed to be transferred will have to be replaced and, if so, how the President proposes to provide funds for such replacement.

SEC. 8093. To the extent authorized by subchapter VI of Chapter 148 of title 10, United States Code, the Secretary of Defense shall issue loan guarantees in support of U.S. defense exports not otherwise provided for: Provided, That the total contingent liability of the United States for guarantees issued under the authority of this section may not exceed $15,000,000,000: Provided further, That the exposure fees charged and collected by the Secretary for each guarantee, shall be paid by the country involved and shall not be financed as part of a loan guaranteed by the United States: Provided further, That the Secretary shall provide quarterly reports to the Committees on Appropriations, Armed Services and Foreign Relations of the Senate and the Committees on Appropriations, National Security and International Relations in the House of Representatives on the implementation of this program: Provided further, That amounts charged for administrative fees and deposited to the special account provided for under section 2540c(d) of title 10, shall be available for paying the costs of administrative expenses of the Department of Defense that are attributable to the loan guarantee program under subchapter VI of Chapter 148 of title 10.

SEC. 8094. None of the funds available to the Department of Defense shall be obligated or expended to make a financial contribution to the United Nations for the cost of an United Nations peacekeeping activity (whether pursuant to assessment or a voluntary contribution) or for payment of any United States arrearage to the United Nations.

SEC. 8095. None of the funds available to the Department of Defense under this Act shall be obligated or expended to pay a contractor under a contract with the Department of Defense for costs of any amount paid by the contractor to an employee when—

(1) such costs are for a bonus or otherwise in excess of the normal salary paid by the contractor to the employee; and

(2) such bonus is part of restructuring costs associated with a business combination.

SEC. 8096. The amount otherwise provided by this Act for "Operation and Maintenance, Air Force" is hereby reduced by $194,500,000, to reflect a reduction in the pass-through to the Air Force business areas of the Defense Business Operations Fund.

SEC. 8097. (a) None of the funds appropriated or otherwise made available in this Act may be used to transport or provide for the transportation of chemical munitions or agents to the Johnston Atoll for the purpose of storing or demilitarizing such munitions or agents.

(b) The prohibition in subsection (a) shall not apply to any obsolete World War II chemical munition or agent of the United States found in the World War II Pacific Theater of Operations.

(c) The President may suspend the application of subsection (a) during a period of war in which the United States is a party.

SEC. 8098. None of the funds provided in title II of this Act for "Former Soviet Union Threat Reduction" may be obligated or expended to finance housing for any individual who was a member of the military forces of the Soviet Union or for any individual who is or was a member of the military forces of the Russian Federation.

SEC. 8099. During the current fiscal year, no more than $15,000,000 of appropriations made in this Act under the heading "Operation and Maintenance, Defense–Wide" may be transferred to appropriations available for the pay of military personnel, to be merged with, and to be available for the same time period as the appropriations to which transferred, to be used in support of such personnel in connection with support and services for eligible organizations and activities outside the Department of Defense pursuant to section 2012 of title 10, United States Code.

<< 18 USCA § 3056 NOTE >>

SEC. 8100. Beginning in fiscal year 1997 and thereafter, and notwithstanding any other provision of law, fixed and mobile telecommunications support shall be provided by the White House Communications Agency (WHCA) to the United States Secret Service (USSS), without reimbursement, in connection with the Secret Service's duties directly related to the protection of the President or the Vice President or other officer immediately next in order of succession to the office of the President at the White House Security Complex in the Washington, D.C. Metropolitan Area and Camp David, Maryland. For these purposes, the White House Security Complex includes the White House, the White House grounds, the Old Executive Office Building, the New Executive Office Building, the Blair House, the Treasury Building, and the Vice President's Residence at the Naval Observatory.

SEC. 8101. None of the funds provided in this Act may be obligated or expended for the sale of zinc in the National Defense Stockpile if zinc commodity prices decline more than five percent below the London Metals Exchange market price reported on the date of enactment of this Act.

SEC. 8102. For purposes of section 1553(b) of title 31, United States Code, any subdivision of appropriations made in this Act under the heading "Shipbuilding and Conversion, Navy" shall be considered to be for the same purpose as any subdivision under the heading "Shipbuilding and Conversion, Navy" appropriations in any prior year, and the one percent limitation shall apply to the total amount of the appropriation.

SEC. 8103. During the current fiscal year, and notwithstanding 31 U.S.C. 1552(a), not more than $107,000,000 appropriated under the heading "Aircraft Procurement, Air Force" in Public Law 101–511 and not more than $15,000,000 appropriated under the heading "Aircraft Procurement, Air Force" in Public Law 102–172 which were available and obligated for the B–2 Aircraft Program shall remain available for expenditure and for adjusting obligations for such Program until September 30, 2002.

SEC. 8104. During the current fiscal year, in the case of an appropriation account of the Department of Defense for which the period of availability for obligation has expired or which has closed under the provisions of section 1552 of title 31, United States Code, and which has a negative unliquidated or unexpended balance, an obligation or an adjustment of an obligation may be charged to any current appropriation account for the same purpose as the expired or closed account if—

(1) the obligation would have been properly chargeable (except as to amount) to the expired or closed account before the end of the period of availability or closing of that account;

(2) the obligation is not otherwise properly chargeable to any current appropriation account of the Department of Defense; and

(3) in the case of an expired account, the obligation is not chargeable to a current appropriation of the Department of Defense under the provisions of section 1405(b)(8) of the National Defense Authorization Act for Fiscal Year 1991, Public Law 101–510, as amended (31 U.S.C. 1551 note): Provided, That in the case of an expired account, if subsequent review or investigation discloses that there was not in fact a negative unliquidated or unexpended balance in the account, any charge to a current account under the authority of this section shall be reversed and recorded against the expired account: Provided further, That the total amount charged to a current appropriation under this section may not exceed an amount equal to one percent of the total appropriation for that account.

(TRANSFER OF FUNDS)

SEC. 8105. Upon enactment of this Act, the Secretary of Defense shall make the following transfers of funds: Provided, That the amounts transferred shall be available for the same purposes as the appropriations to which transferred, and for the same time period as the appropriation from which transferred: Provided further, That the amounts shall be transferred between the following appropriations in the amount specified:

From:

Under the heading, "Shipbuilding and Conversion, Navy, 1985/1995":

CG–47 cruiser program, $4,300,000;

For craft, outfitting, and post delivery, $2,000,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1985/1995":

DDG–51 destroyer program, $6,300,000;

From:

Under the heading, "Shipbuilding and Conversion, Navy, 1986/1996":

LHD–1 amphibious assault ship program, $2,154,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1986/1996":

For craft, outfitting and post delivery, $2,154,000;

From:

Under the heading, "Shipbuilding and Conversion, Navy, 1987/1996":

T–AO fleet oiler program, $1,095,000;

Oceanographic ship program, $735,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1987/1996":

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For craft, outfitting, and post delivery, $1,830,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1989/2000":

   T–AO fleet oiler program, $6,571,000;

To:

  Under the heading, "Shipbuilding and Conversion, Navy, 1989/2000":

   SSN–21 attack submarine program, $6,571,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1991/2001":

   DDG–51 destroyer program, $12,687,000;

To:

  Under the heading, "Shipbuilding and Conversion, Navy, 1991/2001":

   LHD–1 amphibious assault ship program, $9,387,000;

   MHC coastal mine hunter program, $3,300,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1992/1996":

   For escalation, $1,600,000;

To:

  Under the heading, "Shipbuilding and Conversion, Navy, 1992/1996":

   MHC coastal mine hunter program, $1,600,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":

   DDG–51 destroyer program, $5,000,000;

   LSD–41 cargo variant ship program, $2,700,000;

   For craft, outfitting, post delivery, and first destination transportation, and inflation adjustments, $1,577,000;

To:

  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":

   AOE combat support ship program, $9,277,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":

   Carrier replacement program, $18,023,000;

To:

  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":

   MHC coastal mine hunter program, $6,700,000;

   AOE combat support ship program, $11,323,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1994/1998":

   LHD–1 amphibious assault ship program, $4,100,000;

   Mine warfare command and control ship, $1,000,000;

   For craft, outfitting, post delivery, and first destination transportation, $2,000,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":

   Carrier replacement program, $9,477,000;

From:

  Under the heading, "Shipbuilding and Conversion, Navy, 1996/2000":

   NSSN–1 (AP), $3,791,000;

   DDG–51 destroyer program, $4,075,000;

   CVN Refuelings, $5,212,000;

   LHD–1 amphibious ship program, $16,800,000;

  T–AGS–64 multi-purpose oceanographic survey ship, $375,000;

  For craft, outfitting, post delivery, conversions and first destination transportation, $11,770,000;

To:

 Under the heading, "Shipbuilding and Conversion, Navy, 1994/1998":

  DDG–51 destroyer program, $41,800,000; and

 Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":

  For craft, outfitting, post delivery, conversions and first destination transportation, $16,800,000.

<< 10 USCA § 113 NOTE >>

 SEC. 8106. (a) The Secretary of Defense shall require not later than June 30, 1997, each disbursement by the Department of Defense in an amount in excess of $3,000,000 be matched to a particular obligation before the disbursement is made.

 (b) The Secretary shall ensure that a disbursement in excess of the threshold amount applicable under section (a) is not divided into multiple disbursements of less than that amount for the purpose of avoiding the applicability of such section to that disbursement.

 SEC. 8107. Notwithstanding any other provision of law, the Air Force shall not introduce any new supplier for the remaining production units for the AN/ALE–47 Countermeasures Dispenser System without conducting a full and open competition that will include, but not be limited to, small businesses.

 SEC. 8108. The Under Secretary of Defense (Comptroller) shall submit to the congressional defense committees a detailed report identifying, by amount and by separate budget activity, activity group, subactivity group, line item, program element, program, project, subproject, and activity, any activity for which the fiscal year 1998 budget request was reduced because Congress appropriated funds above the President's budget request for that specific activity for fiscal year 1997.

<< 10 USCA § 2241 NOTE >>

 SEC. 8109. In applying section 9005 of the Department of Defense Appropriations Act, 1993, Public Law 102–396 (10 U.S.C. 2241 note), during the current fiscal year and thereafter—

  (1) the term "synthetic fabric and coated synthetic fabric" shall be deemed to include all textile fibers and yarns that are for use in such fabrics; and

  (2) such section shall be treated, notwithstanding section 34 of Public Law 93–400 (41 U.S.C. 430), as being applicable to contracts and subcontracts for the procurement of commercial items that are articles or items, specialty metals, or tools covered by that section 9005.

 SEC. 8110. Notwithstanding any other provision of law, including Section 2304(j) of title 10, United States Code, of the funds appropriated under the heading "Aircraft Procurement, Navy" in Public Law 104–61, $45,000,000 shall be made available only for acquisition of T–39N aircraft, associated ground-based training system (GBTS), service life extension related components and parts, associated equipment, and data that meet the Undergraduate Flight Officer (UNFO) training requirements by procurement of the T–39N aircraft currently being used by the Navy for UNFO training under a services contract.

SEC. 8111. TRADEOFF STUDY OF CURRENT AND FUTURE DEEP–STRIKE CAPABILITIES.—

  (1) The Secretary of Defense shall carry out the deep-strike tradeoff study announced by the President to study tradeoffs between bombers, land and sea-based tactical aircraft, and missiles capable of striking targets in an enemy's rear area.

  (2) The Secretary of Defense shall establish an ad hoc review committee under the auspices of the Defense Science Board to establish the methodological approach to the tradeoff study, to establish a broad range of stressing scenarios of interest, and to review assumptions regarding the analyses to be conducted.

  (3) The ad hoc review committee to be established under paragraph (2) shall include among its members analysts who have performed or participated in bomber tradeoff analysis, retired military personnel with broad experience in recent conventional warfare operations, and experts on the logistics of both initial deployment and sustaining support. These members shall be selected without regard for current service on the Defense Science Board.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(4) After submitting its recommendations for the conduct of the deep-strike tradeoff study to the Secretary of Defense, the ad hoc review committee shall continue to meet regularly to review preliminary results of the analysis and to recommend additional variations in assumptions that may be required to illuminate particular force tradeoff issues.

SEC. 8112. Notwithstanding 31 U.S.C. 1552(a), of the funds provided in Department of Defense Appropriations Acts, not more than the specified amounts of funds from the following accounts shall remain available for the payment of satellite on-orbit incentive fees until the fees are paid:

"Missile Procurement, Air Force, 1990/1992", $17,800,000;

"Missile Procurement, Air Force, 1991/1993", $19,330,000;

"Missile Procurement, Air Force, 1992/1994", $23,570,000;

"Missile Procurement, Air Force, 1993/1995", $16,780,000;

"Missile Procurement, Air Force, 1994/1996", $16,780,000.

SEC. 8113. TACTICAL AIRCRAFT REQUIREMENT STUDY.—The Secretary of Defense and the Chairman of the Joint Chiefs of Staff shall carry out a joint study under the direct supervision of the Joint Requirements Oversight Council (JROC) assessing future tactical aircraft requirements across service jurisdictions. This study shall determine the best and most affordable mix of weapon systems to carry out different mission areas and shall include recommendations for changes to the planned numbers and types of tactical aircraft to be developed and procured over the next ten years if appropriate. Such report shall be submitted to the congressional defense committees no later than March 30, 1997.

SEC. 8114. None of the funds available to the Department of the Navy may be used to enter into any contract for the overhaul, repair, or maintenance of any naval vessel homeported on the West Coast of the United States which includes charges for interport differential as an evaluation factor for award.

SEC. 8115. (a) None of the funds available to the Department of Defense under this Act may be obligated or expended to reimburse a defense contractor for restructuring costs associated with a business combination of the defense contractor that occurs after the date of enactment of this Act unless:

(1) the auditable savings for the Department of Defense resulting from the restructuring will exceed the costs allowed by a factor of at least two to one, or

(2) the savings for the Department of Defense resulting from the restructuring will exceed the costs allowed and the Secretary of Defense determines that the business combination will result in the preservation of a critical capability that might otherwise be lost to the Department, and

(3) the report required by Section 818(e) of Public Law 103–337 to be submitted to Congress in 1996 is submitted.

(b) Not later than April 1, 1997, the Comptroller General shall, in consultation with the Inspector General of the Department of Defense, the Secretary of Defense, and the Secretary of Labor, submit to Congress a report which shall include the following:

(1) an analysis and breakdown of the restructuring costs paid by or submitted to the Department of Defense to companies involved in business combinations since 1993;

(2) an analysis of the specific costs associated with workforce reductions;

(3) an analysis of the services provided to the workers affected by business combinations;

(4) an analysis of the effectiveness of the restructuring costs used to assist laid off workers in gaining employment;

(5) in accordance with section 818 of Public Law 103–337, an analysis of the savings reached from the business combination relative to the restructuring costs paid by the Department of Defense.

(c) The report should set forth recommendations to make this program more effective for workers affected by business combinations and more efficient in terms of the use of Federal dollars.

SEC. 8116. Notwithstanding any other provision of law, none of the funds appropriated in this Act may be used to purchase, install, replace, or otherwise repair any lock on a safe or security container which protects information critical to national security or any other classified materials and which has not been certified as passing the security lock specifications contained in regulation FF–L–2740 dated October 12, 1989, and has not passed all testing criteria and procedures established through February 28, 1992: Provided, That the Director of Central Intelligence may waive this provision, on a case-by-case basis only, upon certification that the above cited locks are not adequate for the protection of sensitive intelligence information.

SEC. 8117. Section 8110 of Public Law 104–61 (109 Stat. 674) is hereby repealed.

SEC. 8118. The Secretary of Defense, in conjunction with the Secretary of Labor, shall take such steps as required to ensure that those Department of Defense contractors and other entities subject to section 4212(d) of title 38, United States Code are

aware of, and in compliance with, the requirements of that section regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans: Provided, That the Secretary of Defense shall ensure that those Department of Defense contractors and other entities subject to section 4212(d) of title 38, United States Code which have contracts with the Department of Defense are notified of the potential penalties associated with failure to comply with these annual reporting requirements (including potential suspension or debarment from federal contracting): Provided further, That within 180 days of enactment of this Act the Secretary of Labor and the Secretary of Defense shall submit a report to Congress which—

(1) using the most recent reporting data, details the number of reports received from Department of Defense contractors and the estimated number of Department of Defense contractors which are not in compliance with these annual reporting requirements;

(2) describes the steps taken by the Departments of Labor and Defense in order to ensure compliance with section 4212(d) of title 38, United States Code;

(3) describes any additional measures taken or planned to be taken by the Departments of Labor and Defense to improve compliance with section 4212(d) of title 38, United States Code pursuant to this section; and

(4) any further recommendations regarding additional action (including changes in existing law) which may be necessary to improve compliance with section 4212(d) of title 38, United States Code.

SEC. 8119. Funds appropriated in title II of this Act for supervision and administration costs for facilities maintenance and repair, minor construction, or design projects may be obligated at the time the reimbursable order is accepted by the performing activity: Provided, That for the purpose of this section, supervision and administration costs includes all in-house Government cost.

SEC. 8120. (a) LIMITATION ON ADVANCE BILLING.—During fiscal year 1997, advance billing for services provided or work performed by the Defense Business Operations Fund activities of the Department of the Navy in excess of $1,000,000,000 is prohibited.

(b) REVISED RATES; ADDITIONAL SURCHARGES.—In conjunction with the Under Secretary of Defense (Comptroller), the Secretary of the Navy shall develop a plan to revise fiscal year 1997 customer rates or establish additional surcharges so as to increase revenues to the Defense Business Operations Fund by at least an additional $500,000,000 in executing orders accepted during fiscal year 1997.

(c) TRANSFER AUTHORITY.—To the extent necessary to comply with any rate increase or new surcharge on rates in fiscal year 1997 established under subsection (b), the Secretary of the Navy shall transfer at least $500,000,000, from funds made available under subsection (d), into customer accounts of the Navy used to reimburse the Defense Business Operations Fund so as to provide customers with sufficient resources to pay the increased customer rates and additional surcharges. The transfer authority provided by this subsection is in addition to other transfer authority provided in this Act. The funds transferred shall be merged with and available for the same purposes, and for the same time period, as the appropriation to which transferred.

(d) SOURCE OF FUNDS.—To provide funds for transfer under subsection (c), the amounts appropriated elsewhere in this Act for the following appropriation accounts are reduced by 2.0 percent: Aircraft Procurement, Navy; Weapons Procurement, Navy; Procurement of Ammunition, Navy and Marine Corps; Shipbuilding and Conversion, Navy; Other Procurement, Navy; and Research, Development, Test and Evaluation, Navy. These reductions shall be applied on a pro-rata basis to each line item, program element, program, project, subproject, and activity within each appropriation account.

SEC. 8121. The Secretary of Defense may waive reimbursement of the cost of conferences, seminars, courses of instruction, or similar educational activities of the Asia–Pacific Center for Security Studies for military officers and civilian officials of foreign nations if the Secretary determines that attendance by such personnel, without reimbursement, is in the national security interest of the United States: Provided, That costs for which reimbursement is waived pursuant to this subsection shall be paid from appropriations available for the Asia–Pacific Center.

SEC. 8122. (a) Of the amounts appropriated or otherwise made available by this Act for the Department of the Air Force, $2,000,000 shall be available only for a facility at Lackland Air Force Base, Texas to provide comprehensive care and rehabilitation services to children with disabilities who are dependents of members of the Armed Forces.

(b) Subject to subsection (c), the Secretary of the Air Force shall grant the funds made available under subsection (a) to the Children's Association for Maximum Potential (CAMP) for use by the association to defray the costs of designing and constructing the facility referred to in subsection (a).

(c)(1) The Secretary may not make a grant of funds under subsection (b) until the Secretary and the association enter into an agreement under which the Secretary leases to the association the facility to be constructed using the funds.

AR.01354

(2) The term of the lease under subsection (c)(1) may not be less than 25 years.

(3) The Secretary may require such additional terms and conditions in connection with the lease as the Secretary considers appropriate to protect the interests of the United States.

SEC. 8123. None of the funds appropriated by this Act may be obligated or expended—

(1) to reduce the number of units of special operations forces of the Army National Guard during fiscal year 1997;

(2) to reduce the authorized strength of any such unit below the strength authorized for the unit as of September 30, 1996; or

(3) to apply any administratively imposed limitation on the assigned strength of any such unit at less than the strength authorized for that unit as of September 30, 1996.

SEC. 8124. (a) The Secretary of the Army shall ensure that solicitations for contracts for unrestricted procurement to be entered into using funds appropriated for the Army by this Act include, where appropriate, specific goals for subcontracts with small businesses, small disadvantaged businesses, and women owned small businesses.

(b) The Secretary shall ensure that any subcontract entered into pursuant to a solicitation referred to in subsection (a) that meets a specific goal referred to in that subsection is credited toward the overall goal of the Army for subcontracts with the businesses referred to in that subsection.

SEC. 8125. (a) The Secretary of the Air Force and the Director of the Office of Personnel Management shall submit a joint report describing in detail the benefits, allowances, services, and any other forms of assistance which may or shall be provided to any civilian employee of the Federal Government or to any private citizen, or to the family of such an individual, who is injured or killed while traveling on an aircraft owned, leased, chartered, or operated by the Government of the United States.

(b) The report required by subsection (a) above shall be submitted to the congressional defense committees and to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives not later than December 15, 1996.

SEC. 8126. (a) Not later than March 1, 1997, the Deputy Secretary of Defense shall submit to the congressional defense committees a report on Department of Defense procurements of propellant raw materials.

(b) The report shall include the following:

(1) The projected future requirements of the Department of Defense for propellant raw materials, such as nitrocellulose.

(2) The capacity, ability, and production cost rates of the national technology and industrial base, including Government-owned, contractor-operated facilities, contractor-owned and operated facilities, and Government-owned, Government-operated facilities, for meeting such requirements.

(3) The national security benefits of preserving in the national technology and industrial base contractor-owned and operated facilities for producing propellant raw materials, including nitrocellulose.

(4) The extent to which the cost rates for production of nitrocellulose in Government-owned, contractor-operated facilities is lower because of the relationship of those facilities with the Department of Defense than such rates would be without that relationship.

(5) The advantages and disadvantages of permitting commercial facilities to compete for award of Department of Defense contracts for procurement of propellant raw materials, such as nitrocellulose.

SEC. 8127. Not later than six months after the date of the enactment of this Act, the Secretary of the Air Force shall submit to Congress a cost-benefit analysis of consolidating the ground station infrastructure of the Air Force that supports polar orbiting satellites.

(INCLUDING TRANSFER OF FUNDS)

SEC. 8128. In addition to the amounts appropriated elsewhere in this Act, $100,000,000 is appropriated for defense against weapons of mass destruction: Provided, That the funds appropriated under this section may be transferred to and merged with funds appropriated elsewhere in this Act and that this transfer authority shall be in addition to any other transfer authority provided under this Act: Provided further, That of the funds made available by this section, $10,000,000 shall be transferred to and merged with funds appropriated in this Act for "Procurement, Marine Corps" and shall be available only for the procurement of equipment that enhances the capability of the Chemical–Biological Incident Response Force to respond to incidents of terrorism.

SEC. 8129. The Secretary of Defense, in consultation with the Secretary of Health and Human Services and the Director of the Office of Personnel Management, shall submit a report to the congressional defense committees by February 1, 1997 containing recommendations regarding the establishment of a demonstration program under which covered beneficiaries under chapter 55

of title 10, United States Code, who are entitled to benefits under part A of the medicare program and who do not have access to TRICARE, would be permitted to enroll in a health benefits program offered through the Federal Employee Health Benefits Program under chapter 89 of title 5, United States Code.

SEC. 8130. (a) Section 203 of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, is hereby amended by repealing section 203(a), section 203(c), and section 203(e).

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 as if section 203 of such Act had been enacted as so amended.

<< 10 USCA § 1073 NOTE >>

SEC. 8131. (a) Section 722(c) of the National Defense Authorization Act for Fiscal Year 1997 is amended—

(1) by striking out paragraph (2);

(2) by striking out "(1)"; and

(3) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively.

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 as if section 722 of such Act had been enacted as so amended.

SEC. 8132. The Secretary of Defense shall complete a cost/benefit analysis on the establishment of a National Missile Defense Joint Program Office: Provided, That the Secretary of Defense shall submit a report on this analysis to the congressional defense committees no later than March 31, 1997: Provided further, That the Department of Defense shall take no action to establish any National Missile Defense Joint Program Office, to reassign service National Missile Defense roles and missions under any National Missile Defense Joint Program Office strategy or to relocate people under such a strategy prior to March 31, 1997.

SEC. 8133. (a) Notwithstanding any other provision of law, the Chief of the National Guard Bureau may permit the use of equipment of the National Guard Distance Learning Project by any person or entity on a space-available, reimbursable basis. The Chief of the National Guard Bureau shall establish the amount of reimbursement for such use on a case-by-case basis.

(b) Amounts collected under subsection (a) shall be credited to funds available for the National Guard Distance Learning Project and be available to defray the costs associated with the use of equipment of the project under that subsection. Such funds shall be available for such purposes without fiscal year limitation.

SEC. 8134. Using funds available by this Act or any other Act, the Secretary of the Air Force, pursuant to a determination under section 2690 of title 10, United States Code, may implement cost-effective agreements for required heating facility modernization in the Kaiserslautern Military Community in the Federal Republic of Germany: Provided, That in the City of Kaiserslautern such agreements will include the use of United States anthracite as the base load energy for municipal district heat to the United States Defense installations: Provided further, That at Landstuhl Army Regional Medical Center and Ramstein Air Base, furnished heat may be obtained from private, regional or municipal services, if provisions are included for the consideration of United States coal as an energy source.

SEC. 8135. (a) Section 2867 of the National Defense Authorization Act for Fiscal Year 1997 is amended—

(1) by striking out "Michael O'Callaghan Military Hospital" both places it appears in the text of such section and inserting in lieu thereof "Mike O'Callaghan Federal Hospital"; and

(2) in the section heading, by striking out "MICHAEL O'CALLAGHAN MILITARY HOSPITAL" and inserting in lieu thereof "MIKE O'CALLAGHAN FEDERAL HOSPITAL".

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 and shall apply as if such amendments had been included in section 2867 of such Act when enacted.

SEC. 8136. (a) In addition to any other reductions required by this Act, the following funds are hereby reduced from the following accounts in title IV of this Act in the specified amounts:

"Research, Development, Test and Evaluation, Army", $101,257,000;

"Research, Development, Test and Evaluation, Navy", $164,179,000;

"Research, Development, Test and Evaluation, Air Force", $289,992,000;

"Research, Development, Test and Evaluation, Defense–Wide", $119,483,000; and

"Developmental Test and Evaluation, Defense", $5,641,000.

(b) The reductions taken pursuant to subsection (a) shall be applied on a pro-rata basis by subproject within each R–1 program element as modified by this Act, except that no reduction may be taken against the funds made available to the Department of Defense for Ballistic Missile Defense.

(c) Unless expressly exempted by subsection (b), each program element, program, project, subproject, and activity funded by title IV of this Act shall be allocated a pro-rata share of any of the reductions made by this section.

(d) Not later than 60 days after enactment of this Act, the Secretary of Defense shall submit to the Congressional defense committees a report listing the specific funding reductions allocated to each category listed in subsection (c) above pursuant to this section.

Sec. 8137. In addition to amounts appropriated or otherwise made available in this Act, $230,680,000 is hereby appropriated to the Department of Defense for anti-terrorism, counter-terrorism, and security enhancement programs and activities, as follows:

"Operation and Maintenance, Army", $15,249,000;

"Operation and Maintenance, Navy", $23,956,000;

"Operation and Maintenance, Marine Corps", $600,000;

"Operation and Maintenance, Air Force", $10,750,000;

"Operation and Maintenance, Defense–Wide", $29,534,000;

"Operation and Maintenance, Navy Reserve", $517,000;

"Other Procurement, Army", $5,252,000;

"Other Procurement, Air Force", $101,472,000;

"Procurement, Defense–Wide", $35,350,000;

"Research, Development, Test and Evaluation, Defense–Wide", $8,000,000:

Provided, That such amounts in their entirety are designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended; Provided further, That funds appropriated in this section, or made available by transfer of such funds, for programs and activities of the Central Intelligence Agency shall remain available until September 30, 1997; Provided further, That funds appropriated in this section or made available by transfer of such funds, to any intelligence agency or activity of the United States Government shall be deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

Sec. 8138. Of the amounts provided in Titles I through VIII of this Act, $230,680,000 are permanently canceled: Provided, That the Secretary of Defense shall allocate the amount of budgetary resources canceled by this section on a pro-rata basis among each budget activity, activity group and subactivity group and each program, project or activity within each appropriations account.

Titles I through VIII of this Act may be cited as the "Department of Defense Appropriations Act, 1997".

TITLE IX—FISCAL YEAR 1996 SUPPLEMENTAL APPROPRIATIONS AND RESCISSIONS FOR
ANTI–TERRORISM, COUNTER–TERRORISM, AND SECURITY ENHANCEMENT ACTIVITIES

The following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to provide emergency supplemental appropriations for the Department of Defense for the fiscal year ending September 30, 1996, namely:

DEPARTMENT OF DEFENSE—MILITARY

MILITARY PERSONNEL

Military Personnel, Army

For an additional amount for "Military Personnel, Army", $4,800,000: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

Military Personnel, Air Force

For an additional amount for "Military Personnel, Air Force", $4,000,000: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## OPERATION AND MAINTENANCE

### Operation and Maintenance, Army

For an additional amount for "Operation and Maintenance, Army", $21,200,000, to remain available until September 30, 1997: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Operation and Maintenance, Air Force

For an additional amount for "Operation and Maintenance, Air Force", $67,400,000, to remain available until September 30, 1997: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That these funds may be used to liquidate obligations incurred by the Air Force during fiscal year 1996 for costs incurred under the authority of the Feed and Forage Act (41 U.S.C. 11).

## PROCUREMENT

### Other Procurement, Army

For an additional amount for "Other Procurement, Army", $11,600,000, to remain available until September 30, 1998: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Other Procurement, Air Force

For an additional amount for "Other Procurement, Air Force", $13,600,000, to remain available until September 30, 1998: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## GENERAL PROVISIONS

### (Rescissions)

Sec. 9001. Of the funds provided in Department of Defense Appropriations Acts, the following funds are hereby rescinded, as of the date of enactment of this Act, from the following accounts in the specified amounts:

"Procurement of Ammunition, Army, 1994/1996", $1,000,000;

"Other Procurement, Army, 1994/1996", $6,000,000;

"Research, Development, Test and Evaluation, Army, 1995/1996", $2,055,000;

"Aircraft Procurement, Navy, 1994/1996", $10,157,000;

"Weapons Procurement, Navy, 1994/1996", $10,688,000;

"Other Procurement, Navy, 1994/1996", $4,000,000;

"Research, Development, Test and Evaluation, Navy, 1995/1996", $6,909,000;

"Aircraft Procurement, Air Force, 1994/1996", $18,771,000;

"Missile Procurement, Air Force, 1994/1996", $10,156,000;

"Other Procurement, Air Force, 1994/1996", $14,395,000;

"Research, Development, Test and Evaluation, Air Force, 1995/1996", $4,918,000;

"Procurement, Defense–Wide, 1994/1996", $9,954,000;

"Research, Development, Test and Evaluation, Defense–Wide, 1995/1996", $23,597,000.

Sec. 9002. Funds appropriated by this title, or made available by transfer of such funds, for programs and activities of the Central Intelligence Agency shall remain available until September 30, 1997: Provided, That funds appropriated by this title, or made available by transfer of such funds, to any intelligence agency or intelligence activity of the United States Government shall be deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

(c) For programs, projects or activities in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the foreign operations, export financing, and related programs for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—EXPORT AND INVESTMENT ASSISTANCE

### EXPORT–IMPORT BANK OF THE UNITED STATES

The Export–Import Bank of the United States is authorized to make such expenditures within the limits of funds and borrowing authority available to such corporation, and in accordance with law, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 104 of the Government Corporation Control Act, as may be necessary in carrying out the program for the current fiscal year for such corporation: Provided, That none of the funds available during the current fiscal year may be used to make expenditures, contracts, or commitments for the export of nuclear equipment, fuel, or technology to any country other than a nuclear-weapon State as defined in Article IX of the Treaty on the Non–Proliferation of Nuclear Weapons eligible to receive economic or military assistance under this Act that has detonated a nuclear explosive after the date of enactment of this Act.

### SUBSIDY APPROPRIATION

For the cost of direct loans, loan guarantees, insurance, and tied-aid grants as authorized by section 10 of the Export–Import Bank Act of 1945, as amended, $726,000,000 to remain available until September 30, 1998: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That such sums shall remain available until 2012 for the disbursement of direct loans, loan guarantees, insurance and tied-aid grants obligated in fiscal years 1997 and 1998: Provided further, That up to $50,000,000 of funds appropriated by this paragraph shall remain available until expended and may be used for tied-aid grant purposes: Provided further, That none of the funds appropriated by this paragraph may be used for tied-aid credits or grants except through the regular notification procedures of the Committees on Appropriations: Provided further, That funds appropriated by this paragraph are made available notwithstanding section 2(b)(2) of the Export–Import Bank Act of 1945, in connection with the purchase or lease of any product by any East European country, any Baltic State, or any agency or national thereof.

### ADMINISTRATIVE EXPENSES

<< 12 USCA § 635a NOTE >>

For administrative expenses to carry out the direct and guaranteed loan and insurance programs (to be computed on an accrual basis), including hire of passenger motor vehicles and services as authorized by 5 U.S.C. 3109, and not to exceed $20,000 for official reception and representation expenses for members of the Board of Directors, $46,614,000: Provided, That necessary expenses (including special services performed on a contract or fee basis, but not including other personal services) in connection with the collection of moneys owed the Export–Import Bank, repossession or sale of pledged collateral or other assets acquired by the Export–Import Bank in satisfaction of moneys owed the Export–Import Bank, or the investigation or appraisal of any property, or the evaluation of the legal or technical aspects of any transaction for which an application for a loan, guarantee or insurance commitment has been made, shall be considered nonadministrative expenses for the purposes of this heading: Provided further, That, effective July 21, 1997, notwithstanding any other provision of law, none of the funds made available by this or any other Act may be made available to compensate the incumbent Chairman and President of the Export–Import

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Bank Provided further, That, notwithstanding subsection (b) of section 117 of the Export Enhancement Act of 1992, subsection (a) thereof shall remain in effect until October 1, 1997.

## OVERSEAS PRIVATE INVESTMENT CORPORATION

### NONCREDIT ACCOUNT

The Overseas Private Investment Corporation is authorized to make, without regard to fiscal year limitations, as provided by 31 U.S.C. 9104, such expenditures and commitments within the limits of funds available to it and in accordance with law as may be necessary: Provided, That the amount available for administrative expenses to carry out the credit and insurance programs (including an amount for official reception and representation expenses which shall not exceed $35,000) shall not exceed $32,000,000: Provided further, That project-specific transaction costs, including direct and indirect costs incurred in claims settlements, and other direct costs associated with services provided to specific investors or potential investors pursuant to section 234 of the Foreign Assistance Act of 1961, shall not be considered administrative expenses for the purposes of this heading.

### PROGRAM ACCOUNT

<< 22 USCA § 2195 >>

For the cost of direct and guaranteed loans, $72,000,000, as authorized by section 234 of the Foreign Assistance Act of 1961: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That such sums shall be available for direct loan obligations and loan guaranty commitments incurred or made during fiscal years 1997 and 1998: Provided further, That such sums shall remain available through fiscal year 2005 for the disbursement of direct and guaranteed loans obligated in fiscal year 1997, and through fiscal year 2006 for the disbursement of direct and guaranteed loans obligated in fiscal year 1998: Provided further, That section 235(a)(3) of the Foreign Assistance Act of 1961 (22 U.S.C. 2195(a)(3)) is amended by striking out "1996" and inserting in lieu thereof "1997" and, notwithstanding section 235(a)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2195(a)(1)), the maximum contingent liability of issuing authority for insurance and financing shall not in the aggregate exceed the amounts provided in section 235(a)(1) and (2) of that Act. In addition, such sums as may be necessary for administrative expenses to carry out the credit program may be derived from amounts available for administrative expenses to carry out the credit and insurance programs in the Overseas Private Investment Corporation Noncredit Account and merged with said account.

## FUNDS APPROPRIATED TO THE PRESIDENT

### TRADE AND DEVELOPMENT AGENCY

For necessary expenses to carry out the provisions of section 661 of the Foreign Assistance Act of 1961, $40,000,000: Provided, That the Trade and Development Agency may receive reimbursements from corporations and other entities for the costs of grants for feasibility studies and other project planning services, to be deposited as an offsetting collection to this account and to be available for obligation until September 30, 1998, for necessary expenses under this paragraph: Provided further, That such reimbursements shall not cover, or be allocated against, direct or indirect administrative costs of the agency.

## TITLE II—BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

For expenses necessary to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes, to remain available until September 30, 1997, unless otherwise specified herein, as follows:

### AGENCY FOR INTERNATIONAL DEVELOPMENT

### CHILD SURVIVAL AND DISEASE PROGRAMS FUND

For necessary expenses to carry out the provisions of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, for child survival, basic education, assistance to combat tropical and other diseases, and related activities, in addition to funds

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

otherwise available for such purposes, $600,000,000, to remain available until expended: Provided, That this amount shall be made available for such activities as (1) immunization programs, (2) oral rehydration programs, (3) health and nutrition programs, and related education programs, which address the needs of mothers and children, (4) water and sanitation programs, (5) assistance for displaced and orphaned children, (6) programs for the prevention, treatment, and control of, and research on, tuberculosis, HIV/AIDS, polio, malaria and other diseases, (7) not to exceed $98,000,000 for basic education programs for children, and (8) a contribution on a grant basis to the United Nations Children's Fund (UNICEF) pursuant to section 301 of the Foreign Assistance Act of 1961.

## DEVELOPMENT ASSISTANCE

### (INCLUDING TRANSFER OF FUNDS)

 For necessary expenses to carry out the provisions of sections 103 through 106 and chapter 10 of part I of the Foreign Assistance Act of 1961, title V of the International Security and Development Cooperation Act of 1980 (Public Law 96–533) and the provisions of section 401 of the Foreign Assistance Act of 1969, $1,181,500,000, to remain available until September 30, 1998: Provided, That of the amount appropriated under this heading, up to $20,000,000 may be made available for the Inter–American Foundation and shall be apportioned directly to that agency: Provided further, That of the amount appropriated under this heading, up to $11,500,000 may be made available for the African Development Foundation and shall be apportioned directly to that agency: Provided further, That of the funds appropriated under title II of this Act that are administered by the Agency for International Development and made available for family planning assistance, not less than 65 percent shall be made available directly to the agency's central Office of Population and shall be programmed by that office for family planning activities: Provided further, That of the funds appropriated under this heading and under the heading "Child Survival and Disease Programs Fund" that are made available by the Agency for International Development for development assistance activities, the amount made available to carry out chapter 10 of part I of the Foreign Assistance Act of 1961 (relating to the Development Fund for Africa) and the amount made available for activities in the Latin America and Caribbean region should be in at least the same proportion as the amount identified in the fiscal year 1997 draft congressional presentation document for development assistance for each such region is to the total amount requested for development assistance for such fiscal year: Provided further, That funds appropriated under this heading may be made available, notwithstanding any other provision of law except section 515 of this Act, to assist Vietnam to reform its trade regime (such as through reform of its commercial and investment legal codes): Provided further, That none of the funds made available in this Act nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization: Provided further, That none of the funds made available under this heading may be used to pay for the performance of abortion as a method of family planning or to motivate or coerce any person to practice abortions; and that in order to reduce reliance on abortion in developing nations, funds shall be available only to voluntary family planning projects which offer, either directly or through referral to, or information about access to, a broad range of family planning methods and services: Provided further, That in awarding grants for natural family planning under section 104 of the Foreign Assistance Act of 1961 no applicant shall be discriminated against because of such applicant's religious or conscientious commitment to offer only natural family planning; and, additionally, all such applicants shall comply with the requirements of the previous proviso: Provided further, That for purposes of this or any other Act authorizing or appropriating funds for foreign operations, export financing, and related programs, the term "motivate", as it relates to family planning assistance, shall not be construed to prohibit the provision, consistent with local law, of information or counseling about all pregnancy options: Provided further, That nothing in this paragraph shall be construed to alter any existing statutory prohibitions against abortion under section 104 of the Foreign Assistance Act of 1961: Provided further, That, notwithstanding section 109 of the Foreign Assistance Act of 1961, of the funds appropriated under this heading in this Act, and of the unobligated balances of funds previously appropriated under this heading, up to $17,500,000 may be transferred to "International Organizations and Programs" for a contribution to the International Fund for Agricultural Development (IFAD), and that any such transfer of funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That of the funds appropriated under this heading that are made available for assistance programs for displaced and orphaned children and victims of war, not to exceed $25,000, in addition to funds otherwise available for such purposes, may be used to monitor and provide oversight of such programs: Provided further, That not less than $500,000 of the funds made available under this heading shall be available only for support of the United States Telecommunications Training Institute.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## CYPRUS

Of the funds appropriated under the headings "Development Assistance" and "Economic Support Fund", not less than $15,000,000 shall be made available for Cyprus to be used only for scholarships, administrative support of the scholarship program, bicommunal projects, and measures aimed at reunification of the island and designed to reduce tensions and promote peace and cooperation between the two communities on Cyprus.

## BURMA

Of the funds appropriated by this Act to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, not less than $2,500,000 shall be made available to support activities in Burma, along the Burma–Thailand border, and for activities of Burmese student groups and other organizations located outside Burma, for the purposes of fostering democracy in Burma, supporting the provision of medical supplies and other humanitarian assistance to Burmese located in Burma or displaced Burmese along the borders, and for other purposes: Provided, That of this amount, not less than $200,000 shall be made available to support newspapers, publications, and other media activities promoting democracy inside Burma: Provided further, That funds made available under this heading may be made available notwithstanding any other provision of law: Provided further, That provision of such funds shall be made available subject to the regular notification procedures of the Committees on Appropriations.

## PRIVATE AND VOLUNTARY ORGANIZATIONS

### << 22 USCA § 2151u NOTE >>

None of the funds appropriated or otherwise made available by this Act for development assistance may be made available to any United States private and voluntary organization, except any cooperative development organization, which obtains less than 20 per centum of its total annual funding for international activities from sources other than the United States Government: Provided, That the requirements of the provisions of section 123(g) of the Foreign Assistance Act of 1961 and the provisions on private and voluntary organizations in title II of the "Foreign Assistance and Related Programs Appropriations Act, 1985" (as enacted in Public Law 98–473) shall be superseded by the provisions of this section, except that the authority contained in the last sentence of section 123(g) may be exercised by the Administrator with regard to the requirements of this paragraph.

Funds appropriated or otherwise made available under title II of this Act should be made available to private and voluntary organizations at a level which is equivalent to the level provided in fiscal year 1995. Such private and voluntary organizations shall include those which operate on a not-for-profit basis, receive contributions from private sources, receive voluntary support from the public and are deemed to be among the most cost-effective and successful providers of development assistance.

## INTERNATIONAL DISASTER ASSISTANCE

For necessary expenses for international disaster relief, rehabilitation, and reconstruction assistance pursuant to section 491 of the Foreign Assistance Act of 1961, as amended, $190,000,000, to remain available until expended.

## DEBT RESTRUCTURING

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of modifying direct loans and loan guarantees, as the President may determine, for which funds have been appropriated or otherwise made available for programs within the International Affairs Budget Function 150, including the cost of selling, reducing, or canceling amounts, through debt buybacks and swaps, owed to the United States as a result of concessional loans made to eligible Latin American and Caribbean countries, pursuant to part IV of the Foreign Assistance Act of 1961, and of modifying concessional loans authorized under title I of the Agricultural Trade Development and Assistance Act of 1954, as amended, as authorized under subsection (a) under the heading "Debt Reduction for Jordan" in title VI of Public Law 103–306; $27,000,000, to remain available until expended: Provided, That none of the funds appropriated under this heading shall be obligated except as provided through the regular notification procedures of the Committees on Appropriations.

## MICRO AND SMALL ENTERPRISE DEVELOPMENT PROGRAM ACCOUNT

For the cost of direct loans and loan guarantees, $1,500,000, as authorized by section 108 of the Foreign Assistance Act of 1961, as amended: Provided, That such costs shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That guarantees of loans made under this heading in support of microenterprise activities may guarantee up to 70 percent of the principal amount of any such loans notwithstanding section 108 of the Foreign Assistance Act of 1961. In addition, for administrative expenses to carry out programs under this heading, $500,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: Provided further, That funds made available under this heading shall remain available until September 30, 1998.

## HOUSING GUARANTY PROGRAM ACCOUNT

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of guaranteed loans authorized by sections 221 and 222 of the Foreign Assistance Act of 1961, $3,500,000, to remain available until September 30, 1998: Provided, That these funds are available to subsidize loan principal, 100 percent of which shall be guaranteed, pursuant to the authority of such sections. In addition, for administrative expenses to carry out guaranteed loan programs, $6,000,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: Provided further, That commitments to guarantee loans under this heading may be entered into notwithstanding the second and third sentences of section 222(a) and, with regard to programs for Central and Eastern Europe and programs for the benefit of South Africans disadvantaged by apartheid, section 223(j) of the Foreign Assistance Act of 1961.

## PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the "Foreign Service Retirement and Disability Fund", as authorized by the Foreign Service Act of 1980, $43,826,000.

## OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT

For necessary expenses to carry out the provisions of section 667, $470,750,000: Provided, That none of the funds appropriated by this Act for programs administered by the Agency for International Development may be used to finance printing costs of any report or study (except feasibility, design, or evaluation reports or studies) in excess of $25,000 without the approval of the Administrator of the Agency or the Administrator's designee

## OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT OFFICE OF INSPECTOR GENERAL

For necessary expenses to carry out the provisions of section 667, $30,000,000, to remain available until September 30, 1998, which sum shall be available for the Office of the Inspector General of the Agency for International Development.

## OTHER BILATERAL ECONOMIC ASSISTANCE

## ECONOMIC SUPPORT FUND

For necessary expenses to carry out the provisions of chapter 4 of part II, $2,343,000,000, to remain available until September 30, 1998: Provided, That of the funds appropriated under this heading, not less than $1,200,000,000 shall be available only for Israel, which sum shall be available on a grant basis as a cash transfer and shall be disbursed within thirty days of enactment of this Act or by October 31, 1996, whichever is later: Provided further, That not less than $815,000,000 shall be available only for Egypt, which sum shall be provided on a grant basis, and of which sum cash transfer assistance may be provided, with the understanding that Egypt will undertake significant economic reforms which are additional to those which were undertaken in previous fiscal years, and of which not less than $200,000,000 shall be provided as Commodity Import Program assistance: Provided further, That in exercising the authority to provide cash transfer assistance for Israel and Egypt, the President shall ensure that the level of such assistance does not cause an adverse impact on the total level of nonmilitary exports from the United States to each such country: Provided further, That it is the sense of the Congress that the recommended levels of assistance for Egypt and Israel are based in great measure upon their continued participation in the Camp David Accords and upon the Egyptian–Israeli peace treaty: Provided further, That none of the funds appropriated under this heading shall be made available for Zaire.

## INTERNATIONAL FUND FOR IRELAND

For necessary expenses to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, $19,600,000, which shall be available for the United States contribution to the International Fund for Ireland and shall be made available in accordance with the provisions of the Anglo–Irish Agreement Support Act of 1986 (Public Law 99–415): Provided, That such amount shall be expended at the minimum rate necessary to make timely payment for projects and activities: Provided further, That funds made available under this heading shall remain available until September 30, 1998.

### ASSISTANCE FOR EASTERN EUROPE AND THE BALTIC STATES

(a) For necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961 and the Support for East European Democracy (SEED) Act of 1989, $475,000,000, to remain available until September 30, 1998, which shall be available, notwithstanding any other provision of law, for economic assistance and for related programs for Eastern Europe and the Baltic States.

(b) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the Fund's disbursement of such funds for program purposes. The Fund may retain for such program purposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

(c) Funds appropriated under this heading shall be considered to be economic assistance under the Foreign Assistance Act of 1961 for purposes of making available the administrative authorities contained in that Act for the use of economic assistance.

(d) None of the funds appropriated under this heading may be made available for new housing construction or repair or reconstruction of existing housing in Bosnia and Herzegovina unless directly related to the efforts of United States troops to promote peace in said country.

(e) With regard to funds appropriated or otherwise made available under this heading for the economic revitalization program in Bosnia and Herzegovina, and local currencies generated by such funds (including the conversion of funds appropriated under this heading into currency used by Bosnia and Herzegovina as local currency and local currency returned or repaid under such program)—

(1) the Administrator of the Agency for International Development shall provide written approval for grants and loans prior to the obligation and expenditure of funds for such purposes, and prior to the use of funds that have been returned or repaid to any lending facility or grantee; and

(2) the provisions of section 531 of this Act shall apply.

(f) With regard to funds appropriated under this heading that are made available for economic revitalization programs in Bosnia and Herzegovina, 50 percent of such funds shall not be available for obligation unless the President determines and certifies to the Committees on Appropriations that the Federation of Bosnia and Herzegovina has complied with article III of annex 1–A of the General Framework Agreement for Peace in Bosnia and Herzegovina concerning the withdrawal of foreign forces, and that intelligence cooperation on training, investigations, and related activities between Iranian officials and Bosnian officials has been terminated.

### ASSISTANCE FOR THE NEW INDEPENDENT STATES OF THE FORMER SOVIET UNION

(a) For necessary expenses to carry out the provisions of chapter 11 of part I of the Foreign Assistance Act of 1961 and the FREEDOM Support Act, for assistance for the new independent states of the former Soviet Union and for related programs, $625,000,000, to remain available until September 30, 1998: Provided, That the provisions of such chapter shall apply to funds appropriated by this paragraph.

(b) None of the funds appropriated under this heading shall be transferred to the Government of Russia—

(1) unless that Government is making progress in implementing comprehensive economic reforms based on market principles, private ownership, negotiating repayment of commercial debt, respect for commercial contracts, and equitable treatment of foreign private investment; and

(2) if that Government applies or transfers United States assistance to any entity for the purpose of expropriating or seizing ownership or control of assets, investments, or ventures.

(c) Funds may be furnished without regard to subsection (b) if the President determines that to do so is in the national interest.

<< 22 USCA § 5814 NOTE >>

(d) None of the funds appropriated under this heading shall be made available to any government of the new independent states of the former Soviet Union if that government directs any action in violation of the territorial integrity or national sovereignty of any other new independent state, such as those violations included in the Helsinki Final Act: Provided, That such funds may be made available without regard to the restriction in this subsection if the President determines that to do so is in the national security interest of the United States: Provided further, That the restriction of this subsection shall not apply to the use of such funds for the provision of assistance for purposes of humanitarian, disaster and refugee relief.

(e) None of the funds appropriated under this heading for the new independent states of the former Soviet Union shall be made available for any state to enhance its military capability: Provided, That this restriction does not apply to demilitarization or nonproliferation programs.

(f) Funds appropriated under this heading shall be subject to the regular notification procedures of the Committees on Appropriations.

(g) Funds made available in this Act for assistance to the new independent states of the former Soviet Union shall be subject to the provisions of section 117 (relating to environment and natural resources) of the Foreign Assistance Act of 1961.

(h)(1) Of the funds appropriated under title II of this Act, including funds appropriated under this heading, not less than $10,000,000 shall be available only for assistance for Mongolia, of which amount not less than $6,000,000 shall be available only for the Mongolian energy sector.

(2) Funds made available for assistance for Mongolia may be made available in accordance with the purposes and utilizing the authorities provided in chapter 11 of part I of the Foreign Assistance Act of 1961.

(i) Funds made available in this Act for assistance to the New Independent States of the former Soviet Union shall be provided to the maximum extent feasible through the private sector, including small- and medium-size businesses, entrepreneurs, and others with indigenous private enterprises in the region, intermediary development organizations committed to private enterprise, and private voluntary organizations: Provided, That grantees and contractors should, to the maximum extent possible, place in key staff positions specialists with prior on the ground expertise in the region of activity and fluency in one of the local languages.

(j) In issuing new task orders, entering into contracts, or making grants, with funds appropriated under this heading or in prior appropriations Acts, for projects or activities that have as one of their primary purposes the fostering of private sector development, the Coordinator for United States Assistance to the New Independent States and the implementing agency shall encourage the participation of and give significant weight to contractors and grantees who propose investing a significant amount of their own resources (including volunteer services and in-kind contributions) in such projects and activities.

(k) Of the funds made available under this heading, not less than $225,000,000 shall be made available for Ukraine, of which funds not less than $25,000,000 shall be made available to carry out United States decommissioning obligations regarding the Chornobyl plant made in the Memorandum of Understanding between the Government of Ukraine and the G–7 Group: Provided, That not less than $35,000,000 shall be made available for agricultural projects, including those undertaken through the Food Systems Restructuring Program, which leverage private sector resources with United States Government assistance: Provided further, That $5,000,000 shall be available for a small business incubator project: Provided further, That $5,000,000 shall be made available for screening and treatment of childhood mental and physical illnesses related to Chornobyl radiation: Provided further, That $5,000,000 shall be available only for a land and resource management institute to identify nuclear contamination at Chornobyl: Provided further, That $15,000,000 shall be available for the legal restructuring necessary to support a decentralized market-oriented economic system, including enactment of necessary substantive commercial law, implementation of reforms necessary to establish an independent judiciary and bar, legal education for judges, attorneys, and law students, and education of the public designed to promote understanding of a law-based economy.

(l) Of the funds made available for Ukraine, under this Act and Public Law 104–107, not less than $50,000,000 shall be made available to improve safety at nuclear reactors: Provided, That of this amount $20,000,000 shall be provided for the purchase and installation of, and training for, safety parameter display or control systems at all operational nuclear reactors: Provided further, That of this amount, $20,000,000 shall be made available for the purchase, construction, installation and training for Full Scope and Analytical/Engineering simulators: Provided further, That of this amount funds shall be made available to conduct Safety Analysis Reports at all operational nuclear reactors.

(m) Of the funds made available by this Act, not less than $95,000,000 shall be made available for Armenia.

AR.01365

(n) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the disbursement of such funds by the Fund for program purposes. The Fund may retain for such program proposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

(o)(1) None of the funds appropriated under this heading may be made available for Russia unless the President determines and certifies in writing to the Committees on Appropriations that the Government of Russia has terminated implementation of arrangements to provide Iran with technical expertise, training, technology, or equipment necessary to develop a nuclear reactor or related nuclear research facilities or programs.

(2) Paragraph (1) shall not apply if the President determines that making such funds available is important to the national security interest of the United States. Any such determination shall cease to be effective six months after being made unless the President determines that its continuation is important to the national security interest of the United States.

(p) Of the funds made available under this heading, not less than $10,000,000 shall be made available for a United States contribution to the Trans–Caucasus Enterprise Fund: Provided, That to further the development of the private sector in the Trans–Caucasus, such amount and amounts appropriated for purposes of subsection (t) under the heading "Assistance for the New Independent States of the Former Soviet Union" in Public Law 104–107 may be invested in a Trans–Caucasus Enterprise Fund or, notwithstanding the provisions of such subsection, invested in other funds established by public or private organizations, or transferred to the Overseas Private Investment Corporation to be available, subject to the requirements of the Federal Credit Reform Act, to subsidize the costs of direct and guaranteed loans.

(q)(1) Funds appropriated under this heading may not be made available for the Government of Ukraine if the President determines and reports to the Committees on Appropriations that the Government of Ukraine is engaged in military cooperation with the Government of Libya.

(2) Paragraph (1) shall not apply if the President determines that making such funds available is important to the national security interest of the United States. Any such determination shall cease to be effective six months after being made unless the President determines that its continuation is important to the national security interest of the United States.

(r) Of the funds appropriated under this heading, not less than $15,000,000 should be available only for a family planning program for the New Independent States of the former Soviet Union comparable to the family planning program currently administered by the Agency for International Development in the Central Asian Republics and focusing on population assistance which provides an alternative to abortion.

(s) Funds made available under this Act or any other Act (other than assistance under title V of the FREEDOM Support Act and section 1424 of the "National Defense Authorization Act for Fiscal Year 1997") may not be provided for assistance to the Government of Azerbaijan until the President determines, and so reports to the Congress, that the Government of Azerbaijan is taking demonstrable steps to cease all blockades and other offensive uses of force against Armenia and Nagorno–Karabakh.

(t) Of the funds appropriated under this heading, not less than $2,500,000 shall be made available for the American–Russian Center.

## INDEPENDENT AGENCY

## PEACE CORPS

For expenses necessary to carry out the provisions of the Peace Corps Act (75 Stat. 612), $208,000,000, including the purchase of not to exceed five passenger motor vehicles for administrative purposes for use outside of the United States: Provided, That none of the funds appropriated under this heading shall be used to pay for abortions: Provided further, That funds appropriated under this heading shall remain available until September 30, 1998.

## DEPARTMENT OF STATE

## INTERNATIONAL NARCOTICS CONTROL

For necessary expenses to carry out section 481 of the Foreign Assistance Act of 1961, $213,000,000: Provided, That during fiscal year 1997, the Department of State may also use the authority of section 608 of the Foreign Assistance Act of 1961, without regard to its restrictions, to receive non-lethal excess property from an agency of the United States Government for the

purpose of providing it to a foreign country under chapter 8 of part I of that Act subject to the regular notification procedures of the Committees on Appropriations: Provided further, That none of the funds made available under this heading may be provided to any unit of the security forces of a foreign country if the Secretary of State has credible evidence to believe such unit has committed gross violations of human rights unless the Secretary determines and reports to the Committees on Appropriations that the government of such country is taking steps to bring the responsible members of the security forces unit to justice.

### MIGRATION AND REFUGEE ASSISTANCE

For expenses, not otherwise provided for, necessary to enable the Secretary of State to provide, as authorized by law, a contribution to the International Committee of the Red Cross, assistance to refugees, including contributions to the International Organization for Migration and the United Nations High Commissioner for Refugees, and other activities to meet refugee and migration needs; salaries and expenses of personnel and dependents as authorized by the Foreign Service Act of 1980; allowances as authorized by sections 5921 through 5925 of title 5, United States Code; purchase and hire of passenger motor vehicles; and services as authorized by section 3109 of title 5, United States Code, $650,000,000: Provided, That not more than $12,000,000 shall be available for administrative expenses: Provided further, That not less than $80,000,000 shall be made available for refugees from the former Soviet Union and Eastern Europe and other refugees resettling in Israel.

### REFUGEE RESETTLEMENT ASSISTANCE

For necessary expenses for the targeted assistance program authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 and administered by the Office of Refugee Resettlement of the Department of Health and Human Services, in addition to amounts otherwise available for such purposes, $5,000,000.

### UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For necessary expenses to carry out the provisions of section 2(c) of the Migration and Refugee Assistance Act of 1962, as amended (22 U.S.C. 260(c)), $50,000,000, to remain available until expended: Provided, That the funds made available under this heading are appropriated notwithstanding the provisions contained in section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 which would limit the amount of funds which could be appropriated for this purpose.

### NONPROLIFERATION, ANTI–TERRORISM, DEMINING AND RELATED PROGRAMS

For necessary expenses for nonproliferation, anti-terrorism and related programs and activities, $133,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance, section 504 of the FREEDOM Support Act for the Nonproliferation and Disarmament Fund, section 23 of the Arms Export Control Act for demining activities, notwithstanding any other provision of law, including activities implemented through non-governmental and international organizations, section 301 of the Foreign Assistance Act of 1961 for a voluntary contribution to the International Atomic Energy Agency (IAEA) and a voluntary contribution to the Korean Peninsula Energy Development Organization (KEDO), and for the acquisition and provision of goods and services, or for grants to Israel necessary to support the eradication of terrorism in and around Israel: Provided, That of this amount not to exceed $15,000,000, to remain available until expended, may be made available for the Nonproliferation and Disarmament Fund, notwithstanding any other provision of law, to promote bilateral and multilateral activities relating to nonproliferation and disarmament: Provided further, That such funds may also be used for such countries other than the new independent states of the former Soviet Union and international organizations when it is in the national security interest of the United States to do so: Provided further, That such funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That funds appropriated under this heading may be made available for the International Atomic Energy Agency only if the Secretary of State determines (and so reports to the Congress) that Israel is not being denied its right to participate in the activities of that Agency: Provided further, That not to exceed $25,000,000 may be made available to the Korean Peninsula Energy Development Organization (KEDO) only for the administrative expenses and heavy fuel oil costs associated with the Agreed Framework: Provided further, That such funds may be obligated to KEDO only if, prior to such obligation of funds, the President certifies and so reports to Congress that (1)(A) the United States is taking steps to assure that progress is made on the implementation of the January 1, 1992, Joint Declaration on the Denuclearization of the Korean Peninsula and the implementation of the North–South dialogue, and (B) North Korea is complying with the other provisions of the Agreed Framework between North Korea and the United States and with the Confidential Minute; (2) North Korea is cooperating fully in the canning and safe storage of all spent fuel

from its graphite-moderated nuclear reactors and that such canning and safe storage is scheduled to be completed by the end of fiscal year 1997; and (3) North Korea has not significantly diverted assistance provided by the United States for purposes for which it was not intended: Provided further, That the President may waive the certification requirements of the preceding proviso if the President determines that it is vital to the national security interests of the United States: Provided further, That no funds may be obligated for KEDO until 30 calendar days after submission to Congress of the waiver permitted under the preceding proviso: Provided further, That before obligating any funds for KEDO, the President shall report to Congress on (1) the cooperation of North Korea in the process of returning to the United States the remains of United States military personnel who are listed as missing in action as a result of the Korean conflict (including conducting joint field activities with the United States); (2) violations of the military armistice agreement of 1953; (3) the actions which the United States is taking to assure that North Korea is consistently taking steps to implement the Joint Declaration on Denuclearization of the Korean Peninsula and engage in North–South dialogue; and (4) all instances of non-compliance with the Agreed Framework between North Korea and the United States and the Confidential Minute, including diversion of heavy fuel oil: Provided further, That the obligation of such funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That the Secretary of State shall submit to the appropriate congressional committees an annual report (to be submitted with the annual presentation for appropriations) providing a full and detailed accounting of the fiscal year request for the United States contribution to KEDO, the expected operating budget of the Korean Peninsula Energy Development Organization, to include proposed annual costs associated with heavy fuel oil purchases and other related activities, and the amount of funds pledged by other donor nations and organizations to support KEDO activities on a per country basis.

### TITLE III—MILITARY ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT INTERNATIONAL MILITARY EDUCATION AND TRAINING

For necessary expenses to carry out the provisions of section 541 of the Foreign Assistance Act of 1961, $43,475,000: Provided, That none of the funds appropriated under this heading shall be available for Zaire and Guatemala: Provided further, That funds appropriated under this heading for grant financed military education and training for Indonesia may only be available for expanded international military education and training.

### FOREIGN MILITARY FINANCING PROGRAM

For expenses necessary for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $3,164,000,000: Provided, That of the funds appropriated by this paragraph not less than $1,800,000,000 shall be available for grants only for Israel, and not less than $1,300,000,000 shall be available for grants only for Egypt: Provided further, That the funds appropriated by this paragraph for Israel shall be disbursed within thirty days of enactment of this Act or by October 31, 1996, whichever is later: Provided further, That to the extent that the Government of Israel requests that funds be used for such purposes, grants made available for Israel by this paragraph shall, as agreed by Israel and the United States, be available for advanced weapons systems, of which not less than $475,000,000 shall be for the procurement in Israel of defense articles and defense services, including research and development: Provided further, That of the funds made available under this paragraph, $30,000,000 shall be available for assistance on a grant basis for Poland, Hungary, and the Czech Republic to carry out title II of Public Law 103–477 and section 585 of Public Law 104–107: Provided further, That funds made available under this paragraph shall be nonrepayable notwithstanding any requirement in section 23 of the Arms Export Control Act: Provided further, That, for the purpose only of providing support for NATO expansion and the Warsaw Initiative Program, of the funds appropriated by this Act under the headings "Assistance for Eastern Europe and the Baltic States" and "Assistance for the New Independent States of the Former Soviet Union", up to a total of $7,000,000 may be transferred, notwithstanding any other provision of law, to the funds appropriated under this paragraph: Provided further, That none of the funds made available under this heading shall be available for any non-NATO country participating in the Partnership for Peace Program except through the regular notification procedures of the Committees on Appropriations.

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of direct loans authorized by section 23 of the Arms Export Control Act as follows: cost of direct loans, $60,000,000: Provided, That these funds are available to subsidize gross obligations for the principal amount of direct loans of not to exceed $540,000,000: Provided further, That the rate of interest charged on such loans shall be not less than the current average market yield on outstanding marketable obligations of the United States of comparable maturities: Provided further, That of the funds appropriated under this paragraph $20,000,000

AR.01368

shall be made available to Poland, Hungary, and the Czech Republic: Provided further, That funds appropriated under this heading shall be made available for Greece and Turkey only on a loan basis, and the principal amount of direct loans for each country shall not exceed the following: $122,500,000 only for Greece and $175,000,000 only for Turkey.

  None of the funds made available under this heading shall be available to finance the procurement of defense articles, defense services, or design and construction services that are not sold by the United States Government under the Arms Export Control Act unless the foreign country proposing to make such procurements has first signed an agreement with the United States Government specifying the conditions under which such procurements may be financed with such funds: Provided, That all country and funding level increases in allocations shall be submitted through the regular notification procedures of section 515 of this Act: Provided further, That funds made available under this heading shall be obligated upon apportionment in accordance with paragraph (5)(C) of title 31, United States Code, section 1501(a): Provided further, That none of the funds appropriated under this heading shall be available for Zaire, Sudan, Liberia, and Guatemala: Provided further, That funds made available under this heading may be used, notwithstanding any other provision of law, for activities related to the clearance of landmines and unexploded ordnance, and may include activities implemented through nongovernmental and international organizations: Provided further, That only those countries for which assistance was justified for the "Foreign Military Sales Financing Program" in the fiscal year 1989 congressional presentation for security assistance programs may utilize funds made available under this heading for procurement of defense articles, defense services or design and construction services that are not sold by the United States Government under the Arms Export Control Act: Provided further, That, subject to the regular notification procedures of the Committees on Appropriations, funds made available under this heading for the cost of direct loans may also be used to supplement the funds available under this heading for grants, and funds made available under this heading for grants may also be used to supplement the funds available under this heading for the cost of direct loans: Provided further, That funds appropriated under this heading shall be expended at the minimum rate necessary to make timely payment for defense articles and services: Provided further, That not more than $23,250,000 of the funds appropriated under this heading may be obligated for necessary expenses, including the purchase of passenger motor vehicles for replacement only for use outside of the United States, for the general costs of administering military assistance and sales: Provided further, That not more than $355,000,000 of funds realized pursuant to section 21(e)(1)(A) of the Arms Export Control Act may be obligated for expenses incurred by the Department of Defense during fiscal year 1997 pursuant to section 43(b) of the Arms Export Control Act, except that this limitation may be exceeded only through the regular notification procedures of the Committees on Appropriations.

TITLE IV—MULTILATERAL ECONOMIC ASSISTANCE

FUNDS APPROPRIATED TO THE PRESIDENT INTERNATIONAL FINANCIAL INSTITUTIONS
CONTRIBUTION TO THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT

  For payment to the International Bank for Reconstruction and Development by the Secretary of the Treasury, for the United States contribution to the Global Environment Facility (GEF), $35,000,000, to remain available until September 30, 1998.

CONTRIBUTION TO THE INTERNATIONAL DEVELOPMENT ASSOCIATION

  For payment to the International Development Association by the Secretary of the Treasury, $700,000,000, for the United States contribution to the tenth replenishment, to remain available until expended: Provided, That none of the funds may be obligated before March 1, 1997: Provided further, That not less than twenty days before such funds are obligated, the Secretary of the Treasury shall submit a report to the Committees on Appropriations on his efforts to reach agreement with the other IDA–11 donors, including at the February 1997 IDA–11 donors review meeting, that the procurement restrictions in the Interim Trust Fund will be lifted.

CONTRIBUTION TO THE INTERNATIONAL FINANCE CORPORATION

  For payment to the International Finance Corporation by the Secretary of the Treasury, $6,656,000, for the United States share of the increase in subscriptions to capital stock, to remain available until expended.

CONTRIBUTION TO THE INTER–AMERICAN DEVELOPMENT BANK

  For payment to the Inter–American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in share portion of the increase in capital stock, $25,610,667, and for the United States share of the increase in the resources of the Fund for Special Operations, $10,000,000, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Inter–American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $1,503,718,910.

### CONTRIBUTION TO THE ENTERPRISE FOR THE AMERICAS MULTILATERAL INVESTMENT FUND

For payment to the Enterprise for the Americas Multilateral Investment Fund by the Secretary of the Treasury, for the United States contribution to the Fund to be administered by the Inter–American Development Bank, $27,500,000 to remain available until expended.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT BANK

For payment to the Asian Development Bank by the Secretary of the Treasury for the United States share of the paid-in portion of the increase in capital stock, $13,221,596, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Asian Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $647,858,204.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increases in resources of the Asian Development Fund, as authorized by the Asian Development Bank Act, as amended (Public Law 89–369), $100,000,000, to remain available until expended.

### CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the European Bank for Reconstruction and Development by the Secretary of the Treasury, $11,916,447, for the United States share of the paid-in share portion of the initial capital subscription, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the European Bank for Reconstruction and Development may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $27,805,043.

### NORTH AMERICAN DEVELOPMENT BANK

For payment to the North American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in portion of the capital stock, $56,000,000, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the North American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of the capital stock of the North American Development Bank in an amount not to exceed $318,750,000.

### INTERNATIONAL ORGANIZATIONS AND PROGRAMS

For necessary expenses to carry out the provisions of section 301 of the Foreign Assistance Act of 1961, and of section 2 of the United Nations Environment Program Participation Act of 1973, $169,950,000: Provided, That none of the funds appropriated under this heading shall be made available for the United Nations Fund for Science and Technology: Provided further, That none of the funds appropriated under this heading that are made available to the United Nations Population Fund (UNFPA) shall be made available for activities in the People's Republic of China: Provided further, That not more than $25,000,000 of the funds appropriated under this heading may be made available to the UNFPA: Provided further, That not more than one-half of this amount may be provided to UNFPA before March 1, 1997, and that no later than February 15, 1997, the Secretary of State shall submit a report to the Committees on Appropriations indicating the amount UNFPA is budgeting for the People's Republic of China in 1997: Provided further, That any amount UNFPA plans to spend in the People's Republic of China in 1997 shall be deducted from the amount of funds provided to UNFPA after March 1, 1997, pursuant to the previous provisos: Provided further, That with respect to any funds appropriated under this heading that are made available to UNFPA, UNFPA

shall be required to maintain such funds in a separate account and not commingle them with any other funds: Provided further, That none of the funds appropriated under this heading may be made available to the Korean Peninsula Energy Development Organization (KEDO) or the International Atomic Energy Agency (IAEA).

## TITLE V—GENERAL PROVISIONS

### OBLIGATIONS DURING LAST MONTH OF AVAILABILITY

SEC. 501. Except for the appropriations entitled "International Disaster Assistance", and "United States Emergency Refugee and Migration Assistance Fund", not more than 15 per centum of any appropriation item made available by this Act shall be obligated during the last month of availability.

### PROHIBITION OF BILATERAL FUNDING FOR INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 502. None of the funds contained in title II of this Act may be used to carry out the provisions of section 209(d) of the Foreign Assistance Act of 1961.

### LIMITATION ON RESIDENCE EXPENSES

SEC. 503. Of the funds appropriated or made available pursuant to this Act, not to exceed $126,500 shall be for official residence expenses of the Agency for International Development during the current fiscal year: Provided, That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars.

### LIMITATION ON EXPENSES

SEC. 504. Of the funds appropriated or made available pursuant to this Act, not to exceed $5,000 shall be for entertainment expenses of the Agency for International Development during the current fiscal year.

### LIMITATION ON REPRESENTATIONAL ALLOWANCES

SEC. 505. Of the funds appropriated or made available pursuant to this Act, not to exceed $95,000 shall be available for representation allowances for the Agency for International Development during the current fiscal year: Provided, That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars: Provided further, That of the funds made available by this Act for general costs of administering military assistance and sales under the heading "Foreign Military Financing Program", not to exceed $2,000 shall be available for entertainment expenses and not to exceed $50,000 shall be available for representation allowances: Provided further, That of the funds made available by this Act under the heading "International Military Education and Training", not to exceed $50,000 shall be available for entertainment allowances: Provided further, That of the funds made available by this Act for the Inter–American Foundation, not to exceed $2,000 shall be available for entertainment and representation allowances: Provided further, That of the funds made available by this Act for the Peace Corps, not to exceed a total of $4,000 shall be available for entertainment expenses: Provided further, That of the funds made available by this Act under the heading "Trade and Development Agency", not to exceed $2,000 shall be available for representation and entertainment allowances.

### PROHIBITION ON FINANCING NUCLEAR GOODS

SEC. 506. None of the funds appropriated or made available (other than funds for "Nonproliferation, Anti-terrorism, Demining and Related Programs") pursuant to this Act, for carrying out the Foreign Assistance Act of 1961, may be used, except for purposes of nuclear safety, to finance the export of nuclear equipment, fuel, or technology.

### PROHIBITION AGAINST DIRECT FUNDING FOR CERTAIN COUNTRIES

SEC. 507. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance or reparations to Cuba, Iraq, Libya, North Korea, Iran, Sudan, or Syria: Provided, That for purposes of this section, the prohibition on obligations or expenditures shall include direct loans, credits, insurance and guarantees of the Export–Import Bank or its agents.

### MILITARY COUPS

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 1395 of 3864

SEC. 508. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance to any country whose duly elected Head of Government is deposed by military coup or decree: Provided, That assistance may be resumed to such country if the President determines and reports to the Committees on Appropriations that subsequent to the termination of assistance a democratically elected government has taken office.

## TRANSFERS BETWEEN ACCOUNTS

SEC. 509. None of the funds made available by this Act may be obligated under an appropriation account to which they were not appropriated, except for transfers specifically provided for in this Act, unless the President, prior to the exercise of any authority contained in the Foreign Assistance Act of 1961 to transfer funds, consults with and provides a written policy justification to the Committees on Appropriations of the House of Representatives and the Senate.

## DEOBLIGATION/REOBLIGATION AUTHORITY

SEC. 510. (a) Amounts certified pursuant to section 1311 of the Supplemental Appropriations Act, 1955, as having been obligated against appropriations heretofore made under the authority of the Foreign Assistance Act of 1961 for the same general purpose as any of the headings under title II of this Act are, if deobligated, hereby continued available for the same period as the respective appropriations under such headings or until September 30, 1997, whichever is later, and for the same general purpose, and for countries within the same region as originally obligated: Provided, That the Appropriations Committees of both Houses of the Congress are notified fifteen days in advance of the reobligation of such funds in accordance with regular notification procedures of the Committees on Appropriations.

(b) Obligated balances of funds appropriated to carry out section 23 of the Arms Export Control Act as of the end of the fiscal year immediately preceding the current fiscal year are, if deobligated, hereby continued available during the current fiscal year for the same purpose under any authority applicable to such appropriations under this Act: Provided, That the authority of this subsection may not be used in fiscal year 1997.

## AVAILABILITY OF FUNDS

SEC. 511. No part of any appropriation contained in this Act shall remain available for obligation after the expiration of the current fiscal year unless expressly so provided in this Act: Provided, That funds appropriated for the purposes of chapters 1, 8, and 11 of part I, section 667, and chapter 4 of part II of the Foreign Assistance Act of 1961, as amended, and funds provided under the heading "Assistance for Eastern Europe and the Baltic States", shall remain available until expended if such funds are initially obligated before the expiration of their respective periods of availability contained in this Act: Provided further, That, notwithstanding any other provision of this Act, any funds made available for the purposes of chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated or obligated for cash disbursements in order to address balance of payments or economic policy reform objectives, shall remain available until expended: Provided further, That the report required by section 653(a) of the Foreign Assistance Act of 1961 shall designate for each country, to the extent known at the time of submission of such report, those funds allocated for cash disbursement for balance of payment and economic policy reform purposes.

## LIMITATION ON ASSISTANCE TO COUNTRIES IN DEFAULT

SEC. 512. No part of any appropriation contained in this Act shall be used to furnish assistance to any country which is in default during a period in excess of one calendar year in payment to the United States of principal or interest on any loan made to such country by the United States pursuant to a program for which funds are appropriated under this Act: Provided, That this section and section 620(q) of the Foreign Assistance Act of 1961 shall not apply to funds made available in this Act or during the current fiscal year for Nicaragua, and for any narcotics-related assistance for Columbia, Bolivia, and Peru authorized by the Foreign Assistance Act of 1961 or the Arms Export Control Act.

## COMMERCE AND TRADE

SEC. 513. (a) None of the funds appropriated or made available pursuant to this Act for direct assistance and none of the funds otherwise made available pursuant to this Act to the Export–Import Bank and the Overseas Private Investment Corporation shall be obligated or expended to finance any loan, any assistance or any other financial commitments for establishing or expanding production of any commodity for export by any country other than the United States, if the commodity is likely to be in surplus on world markets at the time the resulting productive capacity is expected to become operative and if the assistance will cause

substantial injury to United States producers of the same, similar, or competing commodity: Provided, That such prohibition shall not apply to the Export–Import Bank if in the judgment of its Board of Directors the benefits to industry and employment in the United States are likely to outweigh the injury to United States producers of the same, similar, or competing commodity, and the Chairman of the Board so notifies the Committees on Appropriations.

 (b) None of the funds appropriated by this or any other Act to carry out chapter 1 of part I of the Foreign Assistance Act of 1961 shall be available for any testing or breeding feasibility study, variety improvement or introduction, consultancy, publication, conference, or training in connection with the growth or production in a foreign country of an agricultural commodity for export which would compete with a similar commodity grown or produced in the United States: Provided, That this subsection shall not prohibit—

   (1) activities designed to increase food security in developing countries where such activities will not have a significant impact in the export of agricultural commodities of the United States; or

   (2) research activities intended primarily to benefit American producers.

### SURPLUS COMMODITIES

<< 22 USCA § 262h NOTE >>

 SEC. 514. The Secretary of the Treasury shall instruct the United States Executive Directors of the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Inter–American Development Bank, the International Monetary Fund, the Asian Development Bank, the Inter–American Investment Corporation, the North American Development Bank, the European Bank for Reconstruction and Development, the African Development Bank, and the African Development Fund to use the voice and vote of the United States to oppose any assistance by these institutions, using funds appropriated or made available pursuant to this Act, for the production or extraction of any commodity or mineral for export, if it is in surplus on world markets and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity.

### NOTIFICATION REQUIREMENTS

 SEC. 515. For the purposes of providing the Executive Branch with the necessary administrative flexibility, none of the funds made available under this Act for "Child Survival and Disease Programs Fund", "Development Assistance", "Debt restructuring", "International organizations and programs", "Trade and Development Agency", "International narcotics control", "Assistance for Eastern Europe and the Baltic States", "Assistance for the New Independent States of the Former Soviet Union", "Economic Support Fund", "Peacekeeping operations", "Operating expenses of the Agency for International Development", "Operating expenses of the Agency for International Development Office of Inspector General", "Nonproliferation, anti-terrorism, demining and related programs", "Foreign Military Financing Program", "International military education and training", "Inter–American Foundation", "African Development Foundation", "Peace Corps", "Migration and refugee assistance", shall be available for obligation for activities, programs, projects, type of materiel assistance, countries, or other operations not justified or in excess of the amount justified to the Appropriations Committees for obligation under any of these specific headings unless the Appropriations Committees of both Houses of Congress are previously notified fifteen days in advance: Provided, That the President shall not enter into any commitment of funds appropriated for the purposes of section 23 of the Arms Export Control Act for the provision of major defense equipment, other than conventional ammunition, or other major defense items defined to be aircraft, ships, missiles, or combat vehicles, not previously justified to Congress or 20 per centum in excess of the quantities justified to Congress unless the Committees on Appropriations are notified fifteen days in advance of such commitment: Provided further, That this section shall not apply to any reprogramming for an activity, program, or project under chapter 1 of part I of the Foreign Assistance Act of 1961 of less than 10 per centum of the amount previously justified to the Congress for obligation for such activity, program, or project for the current fiscal year: Provided further, That the requirements of this section or any similar provision of this Act or any other Act, including any prior Act requiring notification in accordance with the regular notification procedures of the Committees on Appropriations, may be waived if failure to do so would pose a substantial risk to human health or welfare: Provided further, That in case of any such waiver, notification to the Congress, or the appropriate congressional committees, shall be provided as early as practicable, but in no event later than three days after taking the action to which such notification requirement was applicable, in the context of

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the circumstances necessitating such waiver: Provided further, That any notification provided pursuant to such a waiver shall contain an explanation of the emergency circumstances.

Drawdowns made pursuant to section 506(a)(2) of the Foreign Assistance Act of 1961 shall be subject to the regular notification procedures of the Committees on Appropriations.

LIMITATION ON AVAILABILITY OF FUNDS FOR INTERNATIONAL ORGANIZATIONS AND PROGRAMS

SEC. 516. Notwithstanding any other provision of law or of this Act, none of the funds provided for "International Organizations and Programs" shall be available for the United States proportionate share, in accordance with section 307(c) of the Foreign Assistance Act of 1961, for any programs identified in section 307, or for Libya, Iran, or, at the discretion of the President, Communist countries listed in section 620(f) of the Foreign Assistance Act of 1961, as amended: Provided, That, subject to the regular notification procedures of the Committees on Appropriations, funds appropriated under this Act or any previously enacted Act making appropriations for foreign operations, export financing, and related programs, which are returned or not made available for organizations and programs because of the implementation of this section or any similar provision of law, shall remain available for obligation through September 30, 1998.

ECONOMIC SUPPORT FUND ASSISTANCE FOR ISRAEL

SEC. 517. The Congress finds that progress on the peace process in the Middle East is vitally important to United States security interests in the region. The Congress recognizes that, in fulfilling its obligations under the Treaty of Peace Between the Arab Republic of Egypt and the State of Israel, done at Washington on March 26, 1979, Israel incurred severe economic burdens. Furthermore, the Congress recognizes that an economically and militarily secure Israel serves the security interests of the United States, for a secure Israel is an Israel which has the incentive and confidence to continue pursuing the peace process. Therefore, the Congress declares that, subject to the availability of appropriations, it is the policy and the intention of the United States that the funds provided in annual appropriations for the Economic Support Fund which are allocated to Israel shall not be less than the annual debt repayment (interest and principal) from Israel to the United States Government in recognition that such a principle serves United States interests in the region.

PROHIBITION ON FUNDING FOR ABORTIONS AND INVOLUNTARY STERILIZATION

SEC. 518. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for any biomedical research which relates in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be obligated or expended for any country or organization if the President certifies that the use of these funds by any such country or organization would violate any of the above provisions related to abortions and involuntary sterilizations: Provided, That none of the funds made available under this Act may be used to lobby for or against abortion.

AUTHORIZATION FOR POPULATION PLANNING

SEC. 518A. (a) None of the funds made available in title II of this Act for population planning activities or other population assistance pursuant to section 104(b) of the Foreign Assistance Act or any other provision of law may be obligated or expended prior to July 1, 1997.

(b) Not to exceed $385,000,000 of the funds appropriated in title II of this Act may be made available for population planning activities or other population assistance.

(c) Such funds may be apportioned only on a monthly basis, and such monthly apportionments may not exceed 8 percent of the total available for such activities.

(d) Not later than February 1, 1997, the President shall submit a finding to the Congress regarding the impact of the limitation on obligations imposed by subsection (a) of this section on the proper functioning of the population planning program. If such Presidential finding indicates that the limitation is having a negative impact on the proper functioning of the population

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

planning program, funds for population planning activities and other population assistance referred to in subsection (a) may be made available beginning March 1, 1997, notwithstanding the July 1, 1997, limitation set forth in subsection (a), if the Congress approves such finding by adoption of a joint resolution of approval not later than February 28, 1997, in accordance with subsection (e).

(e) CONGRESSIONAL REVIEW PROCEDURE.—

(1) This subsection is enacted by Congress—

(A) as an exercise of the rulemaking power of the House of Representatives and the Senate, respectively, and as such it is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraph (2) of this subsection; and it supersedes other rules only to the extent that it is inconsistent therewith; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as those rules relate to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of such House.

(2) For purposes of this section, the term "resolution" means a joint resolution, the text of which is as follows: "That the House of Representatives and Senate approve the Presidential finding, submitted to the Congress on XXXXX, that the limitation on obligations imposed by section 518A(a) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, is having a negative impact on the proper functioning of the population planning program.". The blank space therein shall be filled with the date on which the President submits his finding to the House of Representatives and the Senate.

(3) On the day on which the President submits a finding under this section to the Congress, a joint resolution described in paragraph (2) shall be introduced (by request) in the House by the majority leader of the House, for himself and the minority leader of the House, or by Members of the House designated by the majority leader and minority leader of the House; and shall be introduced (by request) in the Senate by the majority leader of the Senate, for himself and the minority leader of the Senate, or by Members of the Senate designated by the majority leader and minority leader of the Senate. If either House is not in session on the day on which the President submits such finding, the resolution shall be introduced in that House, as provided in the preceding sentence, on the first day thereafter on which that House is in session. A resolution once introduced in the House with respect to a Presidential finding under this section shall be referred to 1 or more committees (and all resolutions with respect to the same Presidential finding shall be referred to the same committee or committees) by the Speaker of the House of Representatives. A resolution once introduced in the Senate with respect to a Presidential finding under this section shall be referred to the appropriate committee (and all resolutions with respect to the same Presidential finding shall be referred to the same committee) by the President of the Senate.

(4) No amendment to a resolution introduced under this section shall be in order in either the House of Representatives or the Senate; and no motion to suspend the application of this subsection shall be in order in either House, nor shall it be in order in either House for the presiding officer to entertain a request to suspend the application of this subsection by unanimous consent.

(5)(A) If any committee to which a resolution with respect to a Presidential finding under this section has been referred has not reported it at the end of 5 calendar days after its introduction, such committee shall be automatically discharged from further consideration of the resolution and it shall be placed on the appropriate calendar. A vote on final passage of the resolution, shall be taken in each House on or before February 28, 1997. If prior to the passage by 1 House of a resolution of that House under this section, that House receives the same resolution from the other House, then—

(i) the procedure in that House shall be the same as if no resolution had been received from the other House, but

(ii) the vote on final passage shall be on the resolution of the other House.

(6)(A) A motion in the House of Representatives to proceed to the consideration of a resolution under this section shall be highly privileged and not debatable. An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the House of Representatives on the resolution described in paragraph (2) of this subsection shall be limited to not more than 2 hours, which shall be divided equally between those favoring and those opposing such resolution. A motion to further limit debate shall not be debatable. It shall not be in order to move to recommit a resolution or to move to reconsider the vote by which such resolution was agreed to or disagreed to.

(C) Appeals from the decision of the Chair relating to the application of the rules of the House of Representatives to the procedures relating to a resolution under this section shall be decided without debate.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(D) Except to the extent specifically provided in preceding provisions of this subsection, consideration in the House of Representatives of a resolution under this subsection shall be governed by the rules of the House of Representatives applicable to other resolutions in similar circumstances.

(7)(A) A motion in the Senate to proceed to the consideration of a resolution under this section shall not be debatable. It shall not be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the Senate on the resolution described in paragraph (2) of this subsection, and all debatable motions and appeals in connection therewith, shall be limited to not more than 2 hours. The time shall be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(C) A motion in the Senate to further limit debate is not debatable. A motion to recommit a resolution is not in order.

### REPORTING REQUIREMENT

SEC. 519. The President shall submit to the Committees on Appropriations the reports required by section 25(a)(1) of the Arms Export Control Act.

### SPECIAL NOTIFICATION REQUIREMENTS

SEC. 520. None of the funds appropriated in this Act shall be obligated or expended for Colombia, Guatemala (except that this provision shall not apply to development assistance for Guatemala), Dominican Republic, Haiti, Liberia, Pakistan, Peru, Serbia, Sudan, or Zaire except as provided through the regular notification procedures of the Committees on Appropriations.

### DEFINITION OF PROGRAM, PROJECT, AND ACTIVITY

SEC. 521. For the purpose of this Act, "program, project, and activity" shall be defined at the Appropriations Act account level and shall include all Appropriations and Authorizations Acts earmarks, ceilings, and limitations with the exception that for the following accounts: Economic Support Fund and Foreign Military Financing Program, "program, project, and activity" shall also be considered to include country, regional, and central program level funding within each such account; for the development assistance accounts of the Agency for International Development "program, project, and activity" shall also be considered to include central program level funding, either as (1) justified to the Congress, or (2) allocated by the executive branch in accordance with a report, to be provided to the Committees on Appropriations within thirty days of enactment of this Act, as required by section 653(a) of the Foreign Assistance Act of 1961.

### CHILD SURVIVAL AND AIDS ACTIVITIES

SEC. 522. Up to $8,000,000 of the funds made available by this Act for assistance for family planning, health, child survival, and AIDS, may be used to reimburse United States Government agencies, agencies of State governments, institutions of higher learning, and private and voluntary organizations for the full cost of individuals (including for the personal services of such individuals) detailed or assigned to, or contracted by, as the case may be, the Agency for International Development for the purpose of carrying out family planning activities, child survival activities and activities relating to research on, and the treatment and control of acquired immune deficiency syndrome in developing countries: Provided, That funds appropriated by this Act that are made available for child survival activities or activities relating to research on, and the treatment and control of, acquired immune deficiency syndrome may be made available notwithstanding any provision of law that restricts assistance to foreign countries: Provided further, That funds appropriated by this Act that are made available for family planning activities may be made available notwithstanding section 512 of this Act and section 620(q) of the Foreign Assistance Act of 1961.

### PROHIBITION AGAINST INDIRECT FUNDING TO CERTAIN COUNTRIES

SEC. 523. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated to finance indirectly any assistance or reparations to Cuba, Iraq, Libya, Iran, Syria, North Korea, or the People's Republic of China, unless the President of the United States certifies that the withholding of these funds is contrary to the national interest of the United States.

### RECIPROCAL LEASING

<< 22 USCA § 2796 >>

SEC. 524. Section 61(a) of the Arms Export Control Act is amended by striking out "1996" and inserting in lieu thereof "1997".

### NOTIFICATION ON EXCESS DEFENSE EQUIPMENT

SEC. 525. Prior to providing excess Department of Defense articles in accordance with section 516(a) of the Foreign Assistance Act of 1961, the Department of Defense shall notify the Committees on Appropriations to the same extent and under the same conditions as are other committees pursuant to subsection (c) of that section: Provided, That before issuing a letter of offer to sell excess defense articles under the Arms Export Control Act, the Department of Defense shall notify the Committees on Appropriations in accordance with the regular notification procedures of such Committees: Provided further, That such Committees shall also be informed of the original acquisition cost of such defense articles.

### AUTHORIZATION REQUIREMENT

SEC. 526. Funds appropriated by this Act may be obligated and expended notwithstanding section 10 of Public Law 91–672 and section 15 of the State Department Basic Authorities Act of 1956.

### PROHIBITION ON BILATERAL ASSISTANCE TO TERRORIST COUNTRIES

SEC. 527. (a) Notwithstanding any other provision of law, funds appropriated for bilateral assistance under any heading of this Act and funds appropriated under any such heading in a provision of law enacted prior to enactment of this Act, shall not be made available to any country which the President determines—

(1) grants sanctuary from prosecution to any individual or group which has committed an act of international terrorism, or

(2) otherwise supports international terrorism.

(b) The President may waive the application of subsection (a) to a country if the President determines that national security or humanitarian reasons justify such waiver. The President shall publish each waiver in the Federal Register and, at least fifteen days before the waiver takes effect, shall notify the Committees on Appropriations of the waiver (including the justification for the waiver) in accordance with the regular notification procedures of the Committees on Appropriations.

### COMMERCIAL LEASING OF DEFENSE ARTICLES

<< 22 USCA § 2763 NOTE >>

SEC. 528. Notwithstanding any other provision of law, and subject to the regular notification procedures of the Committees on Appropriations, the authority of section 23(a) of the Arms Export Control Act may be used to provide financing to Israel, Egypt and NATO and major non-NATO allies for the procurement by leasing (including leasing with an option to purchase) of defense articles from United States commercial suppliers, not including Major Defense Equipment (other than helicopters and other types of aircraft having possible civilian application), if the President determines that there are compelling foreign policy or national security reasons for those defense articles being provided by commercial lease rather than by government-to-government sale under such Act.

### COMPETITIVE INSURANCE

SEC. 528A. All Agency for International Development contracts and solicitations, and subcontracts entered into under such contracts, shall include a clause requiring that United States insurance companies have a fair opportunity to bid for insurance when such insurance is necessary or appropriate.

### STINGERS IN THE PERSIAN GULF REGION

SEC. 529. Except as provided in section 581 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, the United States may not sell or otherwise make available any Stingers to any country bordering the Persian Gulf under the Arms Export Control Act or chapter 2 of part II of the Foreign Assistance Act of 1961.

### DEBT–FOR–DEVELOPMENT

SEC. 530. In order to enhance the continued participation of nongovernmental organizations in economic assistance activities under the Foreign Assistance Act of 1961, including endowments, debt-for-development and debt-for-nature exchanges, a nongovernmental organization which is a grantee or contractor of the Agency for International Development may place in interest bearing accounts funds made available under this Act or prior Acts or local currencies which accrue to that organization as a result of economic assistance provided under title II of this Act and any interest earned on such investment shall be used for the purpose for which the assistance was provided to that organization.

SEPARATE ACCOUNTS

<< 22 USCA § 2359 NOTE >>

SEC. 531. (a) SEPARATE ACCOUNTS FOR LOCAL CURRENCIES.—(1) If assistance is furnished to the government of a foreign country under chapters 1 and 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961 under agreements which result in the generation of local currencies of that country, the Administrator of the Agency for International Development shall—

  (A) require that local currencies be deposited in a separate account established by that government;

  (B) enter into an agreement with that government which sets forth—

  (i) the amount of the local currencies to be generated, and

  (ii) the terms and conditions under which the currencies so deposited may be utilized, consistent with this section; and

  (C) establish by agreement with that government the responsibilities of the Agency for International Development and that government to monitor and account for deposits into and disbursements from the separate account.

(2) USES OF LOCAL CURRENCIES.—As may be agreed upon with the foreign government, local currencies deposited in a separate account pursuant to subsection (a), or an equivalent amount of local currencies, shall be used only—

  (A) to carry out chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), for such purposes as—

  (i) project and sector assistance activities, or

  (ii) debt and deficit financing; or

  (B) for the administrative requirements of the United States Government.

(3) PROGRAMMING ACCOUNTABILITY.—The Agency for International Development shall take all necessary steps to ensure that the equivalent of the local currencies disbursed pursuant to subsection (a)(2)(A) from the separate account established pursuant to subsection (a)(1) are used for the purposes agreed upon pursuant to subsection (a)(2).

(4) TERMINATION OF ASSISTANCE PROGRAMS.—Upon termination of assistance to a country under chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), any unencumbered balances of funds which remain in a separate account established pursuant to subsection (a) shall be disposed of for such purposes as may be agreed to by the government of that country and the United States Government.

(5) CONFORMING AMENDMENTS.—The provisions of this subsection shall supersede the tenth and eleventh provisos contained under the heading "Sub–Saharan Africa, Development Assistance" as included in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 and sections 531(d) and 609 of the Foreign Assistance Act of 1961.

(6) REPORTING REQUIREMENT.—The Administrator of the Agency for International Development shall report on an annual basis as part of the justification documents submitted to the Committees on Appropriations on the use of local currencies for the administrative requirements of the United States Government as authorized in subsection (a)(2)(B), and such report shall include the amount of local currency (and United States dollar equivalent) used and/or to be used for such purpose in each applicable country.

(b) SEPARATE ACCOUNTS FOR CASH TRANSFERS.—(1) If assistance is made available to the government of a foreign country, under chapters 1 or 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961, as cash transfer assistance or as nonproject sector assistance, that country shall be required to maintain such funds in a separate account and not commingle them with any other funds.

(2) APPLICABILITY OF OTHER PROVISIONS OF LAW.—Such funds may be obligated and expended notwithstanding provisions of law which are inconsistent with the nature of this assistance including provisions which are referenced in the Joint Explanatory Statement of the Committee of Conference accompanying House Joint Resolution 648 (H. Report No. 98–1159).

(3) NOTIFICATION.—At least fifteen days prior to obligating any such cash transfer or nonproject sector assistance, the President shall submit a notification through the regular notification procedures of the Committees on Appropriations, which shall include a detailed description of how the funds proposed to be made available will be used, with a discussion of the United States interests that will be served by the assistance (including, as appropriate, a description of the economic policy reforms that will be promoted by such assistance).

(4) EXEMPTION.—Nonproject sector assistance funds may be exempt from the requirements of subsection (b)(1) only through the notification procedures of the Committees on Appropriations.

## COMPENSATION FOR UNITED STATES EXECUTIVE DIRECTORS TO INTERNATIONAL FINANCING INSTITUTIONS

SEC. 532. (a) No funds appropriated by this Act may be made as payment to any international financial institution while the United States Executive Director to such institution is compensated by the institution at a rate which, together with whatever compensation such Director receives from the United States, is in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while any alternate United States Director to such institution is compensated by the institution at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

(b) For purposes of this section, "international financial institutions" are: the International Bank for Reconstruction and Development, the Inter–American Development Bank, the Asian Development Bank, the Asian Development Fund, the African Development Bank, the African Development Fund, the International Monetary Fund, the North American Development Bank, and the European Bank for Reconstruction and Development.

## COMPLIANCE WITH UNITED NATIONS SANCTIONS AGAINST IRAQ

<< 50 USCA § 1701 NOTE >>

SEC. 533. (a) DENIAL OF ASSISTANCE.—None of the funds appropriated or otherwise made available pursuant to this Act to carry out the Foreign Assistance Act of 1961 (including title IV of chapter 2 of part I, relating to the Overseas Private Investment Corporation) or the Arms Export Control Act may be used to provide assistance to any country that is not in compliance with the United Nations Security Council sanctions against Iraq, Serbia or Montenegro unless the President determines and so certifies to the Congress that—

(1) such assistance is in the national interest of the United States;

(2) such assistance will directly benefit the needy people in that country; or

(3) the assistance to be provided will be humanitarian assistance for foreign nationals who have fled Iraq and Kuwait.

(b) IMPORT SANCTIONS.—If the President considers that the taking of such action would promote the effectiveness of the economic sanctions of the United Nations and the United States imposed with respect to Iraq, Serbia, or Montenegro, as the case may be, and is consistent with the national interest, the President may prohibit, for such a period of time as he considers appropriate, the importation into the United States of any or all products of any foreign country that has not prohibited—

(1) the importation of products of Iraq, Serbia, or Montenegro into its customs territory, and

(2) the export of its products to Iraq, Serbia, or Montenegro, as the case may be.

## COMPETITIVE PRICING FOR SALES OF DEFENSE ARTICLES

<< 22 USCA § 2762 NOTE >>

SEC. 533A. Direct costs associated with meeting a foreign customer's additional or unique requirements will continue to be allowable under contracts under section 22(d) of the Arms Export Control Act. Loadings applicable to such direct costs shall be permitted at the same rates applicable to procurement of like items purchased by the Department of Defense for its own use.

## POW/MIA MILITARY DRAWDOWN

SEC. 534. (a) Notwithstanding any other provision of law, the President may direct the drawdown, without reimbursement by the recipient, of defense articles from the stocks of the Department of Defense, defense services of the Department of Defense,

and military education and training, of an aggregate value not to exceed $15,000,000 in fiscal year 1997, as may be necessary to carry out subsection (b).

(b) Such defense articles, services and training may be provided to Vietnam, Cambodia and Laos, under subsection (a) as the President determines are necessary to support efforts to locate and repatriate members of the United States Armed Forces and civilians employed directly or indirectly by the United States Government who remain unaccounted for from the Vietnam War, and to ensure the safety of United States Government personnel engaged in such cooperative efforts and to support United States Department of Defense-sponsored humanitarian projects associated with the POW/MIA efforts. Any aircraft shall be provided under this section only to Laos and only on a lease or loan basis, but may be provided at no cost notwithstanding section 61 of the Arms Export Control Act and may be maintained with defense articles, services and training provided under this section.

(c) The President shall, within sixty days of the end of any fiscal year in which the authority of subsection (a) is exercised, submit a report to the Congress which identifies the articles, services, and training drawn down under this section.

## MEDITERRANEAN EXCESS DEFENSE ARTICLES

<< 22 USCA § 2321j NOTE >>

SEC. 535. For the four-year period beginning on October 1, 1996, the President shall ensure that excess defense articles will be made available under section 516 and 519 of the Foreign Assistance Act of 1961 consistent with the manner in which the President made available excess defense articles under those sections during the four-year period that began on October 1, 1992, pursuant to section 573(e) of the Foreign Operations, Export Financing, Related Programs Appropriations Act, 1990.

## CASH FLOW FINANCING

SEC. 536. For each country that has been approved for cash flow financing (as defined in section 25(d) of the Arms Export Control Act, as added by section 112(b) of Public Law 99–83) under the Foreign Military Financing Program, any Letter of Offer and Acceptance or other purchase agreement, or any amendment thereto, for a procurement in excess of $100,000,000 that is to be financed in whole or in part with funds made available under this Act shall be submitted through the regular notification procedures to the Committees on Appropriations.

## AUTHORITIES FOR THE PEACE CORPS, THE INTER–AMERICAN FOUNDATION AND THE AFRICAN DEVELOPMENT FOUNDATION

SEC. 537. Unless expressly provided to the contrary, provisions of this or any other Act, including provisions contained in prior Acts authorizing or making appropriations for foreign operations, export financing, and related programs, shall not be construed to prohibit activities authorized by or conducted under the Peace Corps Act, the Inter–American Foundation Act, or the African Development Foundation Act. The appropriate agency shall promptly report to the Committees on Appropriations whenever it is conducting activities or is proposing to conduct activities in a country for which assistance is prohibited.

## IMPACT ON JOBS IN THE UNITED STATES

SEC. 538. None of the funds appropriated by this Act may be obligated or expended to provide—

(a) any financial incentive to a business enterprise currently located in the United States for the purpose of inducing such an enterprise to relocate outside the United States if such incentive or inducement is likely to reduce the number of employees of such business enterprise in the United States because United States production is being replaced by such enterprise outside the United States;

(b) assistance for the purpose of establishing or developing in a foreign country any export processing zone or designated area in which the tax, tariff, labor, environment, and safety laws of that country do not apply, in part or in whole, to activities carried out within that zone or area, unless the President determines and certifies that such assistance is not likely to cause a loss of jobs within the United States; or

(c) assistance for any project or activity that contributes to the violation of internationally recognized workers rights, as defined in section 502(a)(4) of the Trade Act of 1974, of workers in the recipient country, including any designated zone or area in that country: Provided, That in recognition that the application of this subsection should be commensurate with the level of development of the recipient country and sector, the provisions of this subsection shall not preclude assistance for the informal sector in such country, micro and small-scale enterprise, and smallholder agriculture.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## AUTHORITY TO ASSIST BOSNIA AND HERZEGOVINA

SEC. 539. (a) The President is authorized to direct the transfer, subject to prior notification of the Committees on Appropriations, to the Government of Bosnia and Herzegovina, without reimbursement, of defense articles from the stocks of the Department of Defense and defense services of the Department of Defense of an aggregate value of not to exceed $100,000,000 in fiscal years 1996 and 1997: Provided, That the President certifies in a timely fashion to the Congress that the transfer of such articles would assist that nation in self-defense and thereby promote the security and stability of the region.

(b) Within 60 days of any transfer under the authority provided in subsection (a), and every 60 days thereafter, the President shall report in writing to the Speaker of the House of Representatives and the President pro tempore of the Senate concerning the articles transferred and the disposition thereof.

(c) There are authorized to be appropriated to the President such sums as may be necessary to reimburse the applicable appropriation, fund, or account for defense articles provided under this section.

## RESTRICTIONS ON THE TERMINATION OF SANCTIONS AGAINST SERBIA AND MONTENEGRO

<< 50 USCA § 1701 NOTE >>

SEC. 540. (a) RESTRICTIONS.—Notwithstanding any other provision of law, no sanction, prohibition, or requirement described in section 1511 of the National Defense Authorization Act for Fiscal Year 1994 (Public Law 103–160), with respect to Serbia or Montenegro, may cease to be effective, unless—

(1) the President first submits to the Congress a certification described in subsection (b); and

(2) the requirements of section 1511 of that Act are met.

(b) CERTIFICATION.—A certification described in this subsection is a certification that—

(1) there is substantial progress toward—

(A) the realization of a separate identity for Kosova and the right of the people of Kosova to govern themselves; or

(B) the creation of an international protectorate for Kosova;

(2) there is substantial improvement in the human rights situation in Kosova;

(3) international human rights observers are allowed to return to Kosova; and

(4) the elected government of Kosova is permitted to meet and carry out its legitimate mandate as elected representatives of the people of Kosova.

(c) WAIVER AUTHORITY.—The President may waive the application in whole or in part, of subsection (a) if the President certifies to the Congress that the President has determined that the waiver is necessary to meet emergency humanitarian needs or to achieve a negotiated settlement of the conflict in Bosnia and Herzegovina that is acceptable to the parties.

## SPECIAL AUTHORITIES

SEC. 541. (a) Funds appropriated in title II of this Act that are made available for Afghanistan, Lebanon, and Cambodia, and for victims of war, displaced children, displaced Burmese, humanitarian assistance for Romania, and humanitarian assistance for the peoples of Bosnia and Herzegovina, Croatia, and Kosova, may be made available notwithstanding any other provision of law: Provided, That any such funds that are made available for Cambodia shall be subject to the provisions of section 531(e) of the Foreign Assistance Act of 1961 and section 906 of the International Security and Development Cooperation Act of 1985: Provided further, That none of the funds appropriated by this Act may be made available for assistance for any country or organization that the Secretary of State determines is cooperating, tactically or strategically, with the Khmer Rouge in their military operations, or to the military of any country that is not acting vigorously to prevent its members from facilitating the export of timber from Cambodia by the Khmer Rouge: Provided further, That the Secretary of State shall submit a report to the Committees on Appropriations by February 1, 1997, on whether there are any countries, organizations, or militaries for which assistance is prohibited under the previous proviso, the basis for such conclusions and, if appropriate, the steps being taken to terminate assistance: Provided further, That the prohibition on assistance to the military of any country that is not acting vigorously to prevent its members from facilitating the export of timber from Cambodia by the Khmer Rouge may be waived by the President if he determines and reports to the Committees on Appropriations that it is important to the national security interest of the United States to do so.

(b) Funds appropriated by this Act to carry out the provisions of sections 103 through 106 of the Foreign Assistance Act of 1961 may be used, notwithstanding any other provision of law, for the purpose of supporting tropical forestry and energy programs aimed at reducing emissions of greenhouse gases, and for the purpose of supporting biodiversity conservation activities: Provided, That such assistance shall be subject to sections 116, 502B, and 620A of the Foreign Assistance Act of 1961.

(c) During fiscal year 1997, the President may use up to $40,000,000 under the authority of section 451 of the Foreign Assistance Act of 1961, notwithstanding the funding ceiling contained in subsection (a) of that section.

(d) The Agency for International Development may employ personal services contractors, notwithstanding any other provision of law, for the purpose of administering programs for the West Bank and Gaza.

## POLICY ON TERMINATING THE ARAB LEAGUE BOYCOTT OF ISRAEL

SEC. 542. It is the sense of the Congress that—

(1) the Arab League countries should immediately and publicly renounce the primary boycott of Israel and the secondary and tertiary boycott of American firms that have commercial ties with Israel; and

(2) the President should—

(A) take more concrete steps to encourage vigorously Arab League countries to renounce publicly the primary boycotts of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel as a confidence-building measure;

(B) take into consideration the participation of any recipient country in the primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel when determining whether to sell weapons to said county;

(C) report to Congress on the specific steps being taken by the President to bring about a public renunciation of the Arab primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel; and

(D) encourage the allies and trading partners of the United States to enact laws prohibiting businesses from complying with the boycott and penalizing businesses that do comply.

## ANTI–NARCOTICS ACTIVITIES

SEC. 543. (a) Of the funds appropriated or otherwise made available by this Act for "Economic Support Fund", assistance may be provided to strengthen the administration of justice in countries in Latin America and the Caribbean and in other regions consistent with the provisions of section 534(b) of the Foreign Assistance Act of 1961, except that programs to enhance protection of participants in judicial cases may be conducted notwithstanding section 660 of that Act.

(b) Funds made available pursuant to this section may be made available notwithstanding section 534(c) and the second and third sentences of section 534(e) of the Foreign Assistance Act of 1961. Funds made available pursuant to subsection (a) for Bolivia, Colombia and Peru may be made available notwithstanding section 534(c) and the second sentence of section 534(e) of the Foreign Assistance Act of 1961.

## ELIGIBILITY FOR ASSISTANCE

SEC. 544. (a) ASSISTANCE THROUGH NONGOVERNMENTAL ORGANIZATIONS.—Restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance in support of programs of nongovernmental organizations from funds appropriated by this Act to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961: Provided, That the President shall take into consideration, in any case in which a restriction on assistance would be applicable but for this subsection, whether assistance in support of programs of nongovernmental organizations is in the national interest of the United States: Provided further, That before using the authority of this subsection to furnish assistance in support of programs of nongovernmental organizations, the President shall notify the Committees on Appropriations under the regular notification procedures of those committees, including a description of the program to be assisted, the assistance to be provided, and the reasons for furnishing such assistance: Provided further, That nothing in this subsection shall be construed to alter any existing statutory prohibitions against abortion or involuntary sterilizations contained in this or any other Act.

(b) PUBLIC LAW 480.—During fiscal year 1997, restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance under the Agricultural Trade Development and Assistance Act of 1954:

Provided, That none of the funds appropriated to carry out title I of such Act and made available pursuant to this subsection may be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

(c) EXCEPTION.—This section shall not apply—

(1) with respect to section 620A of the Foreign Assistance Act or any comparable provision of law prohibiting assistance to countries that support international terrorism; or

(2) with respect to section 116 of the Foreign Assistance Act of 1961 or any comparable provision of law prohibiting assistance to countries that violate internationally recognized human rights.

## EARMARKS

SEC. 544A. (a) Funds appropriated by this Act which are earmarked may be reprogrammed for other programs within the same account notwithstanding the earmark if compliance with the earmark is made impossible by operation of any provision of this or any other Act or, with respect to a country with which the United States has an agreement providing the United States with base rights or base access in that country, if the President determines that the recipient for which funds are earmarked has significantly reduced its military or economic cooperation with the United States since enactment of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1991; however, before exercising the authority of this subsection with regard to a base rights or base access country which has significantly reduced its military or economic cooperation with the United States, the President shall consult with, and shall provide a written policy justification to the Committees on Appropriations: Provided, That any such reprogramming shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That assistance that is reprogrammed pursuant to this subsection shall be made available under the same terms and conditions as originally provided.

(b) In addition to the authority contained in subsection (a), the original period of availability of funds appropriated by this Act and administered by the Agency for International Development that are earmarked for particular programs or activities by this or any other Act shall be extended for an additional fiscal year if the Administrator of such agency determines and reports promptly to the Committees on Appropriations that the termination of assistance to a country or a significant change in circumstances makes it unlikely that such earmarked funds can be obligated during the original period of availability: Provided, That such earmarked funds that are continued available for an additional fiscal year shall be obligated only for the purpose of such earmark.

## CEILINGS AND EARMARKS

SEC. 545. Ceilings and earmarks contained in this Act shall not be applicable to funds or authorities appropriated or otherwise made available by any subsequent Act unless such Act specifically so directs.

## PROHIBITION ON PUBLICITY OR PROPAGANDA

SEC. 546. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not authorized before the date of enactment of this Act by the Congress: Provided, That not to exceed $750,000 may be made available to carry out the provisions of section 316 of Public Law 96–533.

## USE OF AMERICAN RESOURCES

SEC. 547. To the maximum extent possible, assistance provided under this Act should make full use of American resources, including commodities, products, and services.

## PROHIBITION OF PAYMENTS TO UNITED NATIONS MEMBERS

SEC. 548. None of the funds appropriated or made available pursuant to this Act for carrying out the Foreign Assistance Act of 1961, may be used to pay in whole or in part any assessments, arrearages, or dues of any member of the United Nations.

## CONSULTING SERVICES

SEC. 549. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to section 3109 of title 5, United States Code, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order pursuant to existing law.

## PRIVATE VOLUNTARY ORGANIZATIONS—DOCUMENTATION

AR.01383

SEC. 550. None of the funds appropriated or made available pursuant to this Act shall be available to a private voluntary organization which fails to provide upon timely request any document, file, or record necessary to the auditing requirements of the Agency for International Development.

<div align="center">

PROHIBITION ON ASSISTANCE TO FOREIGN GOVERNMENTS THAT EXPORT LETHAL
MILITARY EQUIPMENT TO COUNTRIES SUPPORTING INTERNATIONAL TERRORISM

</div>

SEC. 551. (a) None of the funds appropriated or otherwise made available by this Act may be available to any foreign government which provides lethal military equipment to a country the government of which the Secretary of State has determined is a terrorist government for purposes of section 40(d) of the Arms Export Control Act. The prohibition under this section with respect to a foreign government shall terminate 12 months after that government ceases to provide such military equipment. This section applies with respect to lethal military equipment provided under a contract entered into after the date of enactment of this Act.

(b) Assistance restricted by subsection (a) or any other similar provision of law, may be furnished if the President determines that furnishing such assistance is important to the national interests of the United States.

(c) Whenever the waiver of subsection (b) is exercised, the President shall submit to the appropriate congressional committees a report with respect to the furnishing of such assistance. Any such report shall include a detailed explanation of the assistance to be provided, including the estimated dollar amount of such assistance, and an explanation of how the assistance furthers United States national interests.

<div align="center">

WITHHOLDING OF ASSISTANCE FOR PARKING FINES OWED BY FOREIGN COUNTRIES

</div>

SEC. 552. (a) IN GENERAL.—Of the funds made available for a foreign country under part I of the Foreign Assistance Act of 1961, an amount equivalent to 110 percent of the total unpaid fully adjudicated parking fines and penalties owed to the District of Columbia by such country as of the date of enactment of this Act shall be withheld from obligation for such country until the Secretary of State certifies and reports in writing to the appropriate congressional committees that such fines and penalties are fully paid to the government of the District of Columbia.

(b) DEFINITION.—For purposes of this section, the term "appropriate congressional committees" means the Committee on Foreign Relations and the Committee on Appropriations of the Senate and the Committee on International Relations and the Committee on Appropriations of the House of Representatives.

<div align="center">

LIMITATION ON ASSISTANCE FOR THE PLO FOR THE WEST BANK AND GAZA

</div>

SEC. 553. None of the funds appropriated by this Act may be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza unless the President has exercised the authority under section 604(a) of the Middle East Peace Facilitation Act of 1995 (title VI of Public Law 104–107) or any other legislation to suspend or make inapplicable section 307 of the Foreign Assistance Act of 1961 and that suspension is still in effect: Provided, That if the President fails to make the certification under section 604(b)(2) of the Middle East Peace Facilitation Act of 1995 or to suspend the prohibition under other legislation, funds appropriated by this Act may not be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza.

<div align="center">

EXPORT FINANCING TRANSFER AUTHORITIES

</div>

SEC. 554. Not to exceed 5 percent of any appropriation other than for administrative expenses made available for fiscal year 1997 for programs under title I of this Act may be transferred between such appropriations for use for any of the purposes, programs and activities for which the funds in such receiving account may be used, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 25 percent by any such transfer: Provided, That the exercise of such authority shall be subject to the regular notification procedures of the Committees on Appropriations.

<div align="center">

WAR CRIMES TRIBUNALS

<< 22 USCA § 2656 NOTE >>

</div>

SEC. 555. If the President determines that doing so will contribute to a just resolution of charges regarding genocide or other violations of international humanitarian law, the President may direct a drawdown pursuant to section 552(c) of the Foreign

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Assistance Act of 1961, as amended, of up to $25,000,000 of commodities and services for the United Nations War Crimes Tribunal established with regard to the former Yugoslavia by the United Nations Security Council or such other tribunals or commissions as the Council may establish to deal with such violations, without regard to the ceiling limitation contained in paragraph (2) thereof: Provided, That the determination required under this section shall be in lieu of any determinations otherwise required under section 552(c): Provided further, That 60 days after the date of enactment of this Act, and every 180 days thereafter, the Secretary of State shall submit a report to the Committees on Appropriations describing the steps the United States Government is taking to collect information regarding allegations of genocide or other violations of international law in the former Yugoslavia and to furnish that information to the United Nations War Crimes Tribunal for the former Yugoslavia.

LANDMINES

<< 22 USCA § 2778 NOTE >>

 SEC. 556. Notwithstanding any other provision of law, demining equipment available to the Agency for International Development and the Department of State and used in support of the clearing of landmines and unexploded ordnance for humanitarian purposes may be disposed of on a grant basis in foreign countries, subject to such terms and conditions as the President may prescribe: Provided, That section 1365(c) of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 22 U.S.C., 2778 note) is amended by striking out "During the five-year period beginning on October 23, 1992" and inserting in lieu thereof "During the eight-year period beginning on October 23, 1992".

RESTRICTIONS CONCERNING THE PALESTINIAN AUTHORITY

 SEC. 557. None of the funds appropriated by this Act may be obligated or expended to create in any part of Jerusalem a new office of any department or agency of the United States Government for the purpose of conducting official United States Government business with the Palestinian Authority over Gaza and Jericho or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles: Provided, That this restriction shall not apply to the acquisition of additional space for the existing Consulate General in Jerusalem: Provided further, That meetings between officers and employees of the United States and officials of the Palestinian Authority, or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles, for the purpose of conducting official United States Government business with such authority should continue to take place in locations other than Jerusalem. As has been true in the past, officers and employees of the United States Government may continue to meet in Jerusalem on other subjects with Palestinians (including those who now occupy positions in the Palestinian Authority), have social contacts, and have incidental discussions.

PROHIBITION OF PAYMENT OF CERTAIN EXPENSES

 SEC. 558. None of the funds appropriated or otherwise made available by this Act under the heading "INTERNATIONAL MILITARY EDUCATION AND TRAINING" or "FOREIGN MILITARY FINANCING PROGRAM" for Informational Program activities may be obligated or expended to pay for—

  (1) alcoholic beverages;

  (2) food (other than food provided at a military installation) not provided in conjunction with Informational Program trips where students do not stay at a military installation; or

  (3) entertainment expenses for activities that are substantially of a recreational character, including entrance fees at sporting events and amusement parks.

HUMANITARIAN CORRIDORS

<< 22 USCA § 2378–1 >>

 SEC. 559. The Foreign Assistance Act of 1961 is amended by adding immediately after section 620H the following new section:

"SEC. 620I. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT RESTRICT UNITED STATES HUMANITARIAN
    ASSISTANCE.—

"(a) IN GENERAL.—No assistance shall be furnished under this Act or the Arms Export Control Act to any country when it is made known to the President that the government of such country prohibits or otherwise restricts, directly or indirectly, the transport or delivery of United States humanitarian assistance.

"(b) EXCEPTION.—Assistance may be furnished without regard to the restriction in subsection (a) if the President determines that to do so is in the national security interest of the United States.

"(c) NOTICE.—Prior to making any determination under subsection (b), the President shall notify the Committee on International Relations, the Committee on Foreign Relations, and the Committees on Appropriations of the Senate and House of Representatives of his intention to make such a determination, the effective date of the determination, and the reasons for making the determination.".

## EQUITABLE ALLOCATION OF FUNDS

SEC. 560. Not more than 20 percent of the funds appropriated by this Act to carry out the provisions of sections 103 through 106 and chapter 4 of part II of the Foreign Assistance Act of 1961, that are made available for Latin America and the Caribbean region may be made available, through bilateral and Latin America and the Caribbean regional programs, to provide assistance for any country in such region.

## PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS

SEC. 561. (a) SENSE OF CONGRESS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

## LIMITATION OF FUNDS FOR NORTH AMERICAN DEVELOPMENT BANK

SEC. 562. None of the Funds appropriated in this Act under the heading "North American Development Bank" and made available for the Community Adjustment and Investment Program shall be used for purposes other than those set out in the binational agreement establishing the Bank.

## INTERNATIONAL DEVELOPMENT ASSOCIATION

SEC. 563. In order to pay for the United States contribution to the tenth replenishment of the resources of the International Development Association authorized in section 526 of Public Law 103–87, there is authorized to be appropriated, without fiscal year limitation, $700,000,000 for payment by the Secretary of the Treasury.

## SPECIAL DEBT RELIEF FOR THE POOREST

SEC. 564. (a) AUTHORITY TO REDUCE DEBT.—The President may reduce amounts owed to the United States (or any agency of the United States) by an eligible country as a result of—

(1) guarantees issued under sections 221 and 222 of the Foreign Assistance Act of 1961; or

(2) credits extended or guarantees issued under the Arms Export Control Act.

(b) LIMITATIONS.—

(1) The authority provided by subsection (a) may be exercised only to implement multilateral official debt relief and referendum agreements, commonly referred to as "Paris Club Agreed Minutes".

(2) The authority provided by subsection (a) may be exercised only in such amounts or to such extent as is provided in advance by appropriations Acts.

(3) The authority provided by subsection (a) may be exercised only with respect to countries with heavy debt burdens that are eligible to borrow from the International Development Association, but not from the International Bank for Reconstruction and Development, commonly referred to as "IDA-only" countries.

(c) CONDITIONS—The authority provided by subsection (a) may be exercised only with respect to a country whose government—

(1) does not have an excessive level of military expenditures;

(2) has not repeatedly provided support for acts of international terrorism;

(3) is not failing to cooperate on international narcotics control matters;

AR.01386

12

(4) (including its military or other security forces) does not engage in a consistent pattern of gross violations of internationally recognized human rights; and

(5) is not ineligible for assistance because of the application of section 527 of the Foreign Relations Authorization Act, fiscal years 1994 and 1995.

(d) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

(e) CERTAIN PROHIBITIONS INAPPLICABLE.—A reduction of debt pursuant to subsection (a) shall not be considered assistance for purposes of any provision of law limiting assistance to a country. The authority provided by subsection (a) may be exercised notwithstanding section 620(r) of the Foreign Assistance Act of 1961.

## AUTHORITY TO ENGAGE IN DEBT BUYBACKS OR SALES

SEC. 565. (a) LOANS ELIGIBLE FOR SALE, REDUCTION, OR CANCELLATION.—

(1) AUTHORITY TO SELL, REDUCE, OR CANCEL CERTAIN LOANS.—Notwithstanding any other provision of law, the President may, in accordance with this section, sell to any eligible purchaser any concessional loan or portion thereof made before January 1, 1995, pursuant to the Foreign Assistance Act of 1961, to the government of any eligible country as defined in section 702(6) of that Act or on receipt of payment from an eligible purchaser, reduce or cancel such loan or portion thereof, only for the purpose of facilitating—

(A) debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps; or

(B) a debt buyback by an eligible country of its own qualified debt, only if the eligible country uses an additional amount of the local currency of the eligible country, equal to not less than 40 percent of the price paid for such debt by such eligible country, or the difference between the price paid for such debt and the face value of such debt, to support activities that link conservation and sustainable use of natural resources with local community development, and child survival and other child development, in a manner consistent with sections 707 through 710 of the Foreign Assistance Act of 1961, if the sale, reduction, or cancellation would not contravene any term or condition of any prior agreement relating to such loan.

(2) TERMS AND CONDITIONS.—Notwithstanding any other provision of law, the President shall, in accordance with this section, establish the terms and conditions under which loans may be sold, reduced, or canceled pursuant to this section.

(3) ADMINISTRATION.—The Facility, as defined in section 702(8) of the Foreign Assistance Act of 1961, shall notify the administrator of the agency primarily responsible for administering part I of the Foreign Assistance Act of 1961 of purchasers that the President has determined to be eligible, and shall direct such agency to carry out the sale, reduction, or cancellation of a loan pursuant to this section. Such agency shall make an adjustment in its accounts to reflect the sale, reduction, or cancellation.

(4) LIMITATION.—The authorities of this subsection shall be available only to the extent that appropriations for the cost of the modification, as defined in section 502 of the Congressional Budget Act of 1974, are made in advance.

(b) DEPOSIT OF PROCEEDS.—The proceeds from the sale, reduction, or cancellation of any loan sold, reduced, or canceled pursuant to this section shall be deposited in the United States Government account or accounts established for the repayment of such loan.

(c) ELIGIBLE PURCHASERS.—A loan may be sold pursuant to subsection (a)(1)(A) only to a purchaser who presents plans satisfactory to the President for using the loan for the purpose of engaging in debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(d) DEBTOR CONSULTATIONS.—Before the sale to any eligible purchaser, or any reduction or cancellation pursuant to this section, of any loan made to an eligible country, the President should consult with the country concerning the amount of loans to be sold, reduced, or canceled and their uses for debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(e) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

## LIBERIA

SEC. 566. Funds appropriated by this Act may be made available for assistance for Liberia notwithstanding section 620(q) of the Foreign Assistance Act of 1961 and section 512 of this Act.

## GUATEMALA

SEC. 567. (a) Funds provided in this Act may be made available for the Guatemalan military forces, and the restrictions on Guatemala under the headings "International Military Education and Training" and "Foreign Military Financing Program" shall not apply, only if the President determines and certifies to the Congress that the Guatemalan military is cooperating fully with efforts to resolve human rights abuses which elements of the Guatemalan military forces are alleged to have committed, ordered or attempted to thwart the investigation of, and with efforts to negotiate a peace settlement.

(b) The prohibition contained in subsection (a) shall not apply to funds made available to implement a ceasefire or peace agreement.

(c) Any funds made available pursuant to subsections (a) or (b) shall be subject to the regular notification procedures of the Committees on Appropriations.

(d) Any funds made available pursuant to subsections (a) and (b) for international military education and training may only be for expanded international military education and training.

## SANCTIONS AGAINST COUNTRIES HARBORING WAR CRIMINALS

SEC. 568. (a) BILATERAL ASSISTANCE.—The President is authorized to withhold funds appropriated by this Act under the Foreign Assistance Act of 1961 or the Arms Export Control Act for any country described in subsection (c).

(b) MULTILATERAL ASSISTANCE.—The Secretary of the Treasury should instruct the United States executive directors of the international financial institutions to work in opposition to, and vote against, any extension by such institutions of financing or financial or technical assistance to any country described in subsection (c).

(c) SANCTIONED COUNTRIES.—A country described in this subsection is a country the government of which knowingly grants sanctuary to persons in its territory for the purpose of evading prosecution, where such persons—

(1) have been indicted by the International Criminal Tribunal for the former Yugoslavia, the International Criminal Tribunal for Rwanda, or any other international tribunal with similar standing under international law, or

(2) have been indicted for war crimes or crimes against humanity committed during the period beginning March 23, 1933 and ending on May 8, 1945 under the direction of, or in association with—

(A) the Nazi government of Germany;

(B) any government in any area occupied by the military forces of the Nazi government of Germany;

(C) any government which was established with the assistance or cooperation of the Nazi government; or

(D) any government which was an ally of the Nazi government of Germany.

## LIMITATION ON ASSISTANCE FOR HAITI

SEC. 569. (a) LIMITATION.—None of the funds appropriated or otherwise made available by this Act, may be provided to the Government of Haiti until the President reports to Congress that—

(1) the Government is conducting thorough investigations of extrajudicial and political killings; and

(2) the Government is cooperating with United States authorities in the investigations of political and extrajudicial killings.

(b) Nothing in this section shall be construed to restrict the provision of humanitarian, development, or electoral assistance.

(c) The President may waive the requirements of this section on a semiannual basis if he determines and certifies to the appropriate committees of Congress that it is in the national interest of the United States.

## POLICY TOWARD BURMA

SEC. 570. (a) Until such time as the President determines and certifies to Congress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government, the following sanctions shall be imposed on Burma:

(1) BILATERAL ASSISTANCE.—There shall be no United States assistance to the Government of Burma, other than:

(A) humanitarian assistance,

(B) subject to the regular notification procedures of the Committees on Appropriations, counter-narcotics assistance under chapter 8 of part I of the Foreign Assistance Act of 1961, or crop substitution assistance, if the Secretary of State certifies to the appropriate congressional committees that—

(i) the Government of Burma is fully cooperating with United States counter-narcotics efforts, and

(ii) the programs are fully consistent with United States human rights concerns in Burma and serve the United States national interest, and

14

(C) assistance promoting human rights and democratic values.

(2) MULTILATERAL ASSISTANCE.—The Secretary of the Treasury shall instruct the United States executive director of each international financial institution to vote against any loan or other utilization of funds of the respective bank to or for Burma.

(3) VISAS.—Except as required by treaty obligations or to staff the Burmese mission to the United States, the United States should not grant entry visas to any Burmese government official.

(b) CONDITIONAL SANCTIONS.—The President is hereby authorized to prohibit, and shall prohibit United States persons from new investment in Burma, if the President determines and certifies to Congress that, after the date of enactment of this Act, the Government of Burma has physically harmed, rearrested for political acts, or exiled Daw Aung San Suu Kyi or has committed large-scale repression of or violence against the Democratic opposition.

(c) MULTILATERAL STRATEGY.—The President shall seek to develop, in coordination with members of ASEAN and other countries having major trading and investment interests in Burma, a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma, including the development of a dialogue between the State Law and Order Restoration Council (SLORC) and democratic opposition groups within Burma.

(d) PRESIDENTIAL REPORTS.—Every six months following the enactment of this Act, the President shall report to the Chairmen of the Committee on Foreign Relations, the Committee on International Relations and the House and Senate Appropriations Committees on the following:

(1) progress toward democratization in Burma;

(2) progress on improving the quality of life of the Burmese people, including progress on market reforms, living standards, labor standards, use of forced labor in the tourism industry, and environmental quality; and

(3) progress made in developing the strategy referred to in subsection (c).

(e) WAIVER AUTHORITY.—The President shall have the authority to waive, temporarily or permanently, any sanction referred to in subsection (a) or subsection (b) if he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States.

(f) DEFINITIONS.—

(1) The term "international financial institutions" shall include the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Multilateral Investment Guarantee Agency, the Asian Development Bank, and the International Monetary Fund.

(2) The term "new investment" shall mean any of the following activities if such an activity is undertaken pursuant to an agreement, or pursuant to the exercise of rights under such an agreement, that is entered into with the Government of Burma or a nongovernmental entity in Burma, on or after the date of the certification under subsection (b):

(A) the entry into a contract that includes the economical development of resources located in Burma, or the entry into a contract providing for the general supervision and guarantee of another person's performance of such a contract;

(B) the purchase of a share of ownership, including an equity interest, in that development;

(C) the entry into a contract providing for the participation in royalties, earnings, or profits in that development, without regard to the form of the participation:

Provided, That the term "new investment" does not include the entry into, performance of, or financing of a contract to sell or purchase goods, services, or technology.

## REPORT REGARDING HONG KONG

<< 22 USCA § 5731 NOTE >>

SEC. 571. In light of the deficiencies in reports submitted to the Congress pursuant to section 301 of the United States–Hong Kong Policy Act (22 U.S.C. 5731), the Congress directs that the additional report required to be submitted during 1997 under such section include detailed information on the status of, and other developments affecting, implementation of the Sino–British Joint Declaration on the Question of Hong Kong, including—

(1) the Basic Law and its consistency with the Joint Declaration;

(2) Beijing's plans to replace the elected legislature with an appointed body;

(3) the openness and fairness of the election of the chief executive and the executive's accountability to the legislature;

(4) the treatment of political parties;

(5) the independence of the Judiciary and its ability to exercise the power of final judgment over Hong Kong law; and

(6) the Bill of Rights.

## USE OF FUNDS FOR PURCHASE OF PRODUCTS NOT MADE IN AMERICA

SEC. 572. The Administrator of the Agency for International Development shall provide a report to the appropriate committees of the Congress on the ability of the United States Government to implement a provision of law (and on the foreign policy implications of such a provision of law) which would require that United States funds could be made available to the government of a foreign country for the purchase of any equipment or products only if such purchases were to occur in such foreign country or the United States, and substantially similar equipment and products were made in the United States and available for purchase at a price that is not more than 10 percent higher than that in other countries.

## CONFLICT IN CHECHNYA

SEC. 573. The Secretary of State shall provide to the Committees on Appropriations no later than 30 days from the date of enactment of this Act a detailed report on actions undertaken by the United States Government to resolve the conflict in Chechnya.

## EXTENSION OF CERTAIN ADJUDICATION PROVISIONS

SEC. 575. The Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990 (Public Law 101–167) is amended—

<< 8 USCA § 1157 NOTE >>

(1) in section 599D (8 U.S.C. 1157 note)—

(A) in subsection (b)(3), by striking "and 1996" and inserting "1996, and 1997"; and

(B) in subsection (e), by striking out "October 1, 1996" each place it appears and inserting "October 1, 1997"; and

<< 8 USCA § 1255 NOTE >>

(2) in section 599E (8 U.S.C. 1255 note) in subsection (b)(2), by striking out "September 30, 1996" and inserting "September 30, 1997".

## TRANSPARENCY OF BUDGETS

<< 22 USCA § 262k–1 >>

SEC. 576. (a) LIMITATION.—Beginning three years after the date of the enactment of this Act, the Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to use the voice and vote of the United States to oppose any loan or other utilization of the funds of their respective institution, other than to address basic human needs, for the government of any country which the Secretary of the Treasury determines—

(1) does not have in place a functioning system for a civilian audit of all receipts and expenditures that fund activities of the armed forces and security forces;

(2) has not provided a summary of a current audit to the institution.

(b) DEFINITION.—For purposes of this section, the term "international financial institution" shall include the institutions identified in section 532(b) of this Act.

## GUARANTEES

<< 2 USCA § 901 >>

SEC. 577. Section 251(b)(2)(G) of the Balanced Budget and Emergency Deficit Control Act of 1985 is amended by striking "fiscal year 1994 and 1995" and inserting in lieu thereof "fiscal years 1994, 1995, and 1997" in both places that this appears.

INFORMATION ON COOPERATION WITH UNITED STATES ANTI–
TERRORISM EFFORTS IN ANNUAL COUNTRY REPORTS ON TERRORISM

<< 22 USCA § 2656f >>

SEC. 578. Section 140 of the Foreign Relations Authorization Act, fiscal years 1988 and 1989 (22 U.S.C. 2656f) is amended—

(1) in subsection (a)—

(A) by striking "and" at the end of paragraph (1);

(B) by striking the period at the end of paragraph (2) and inserting a semicolon; and

(C) by adding at the end the following:

"(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on—

"(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and

"(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and

"(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B)."; and

(2) in subsection (c)—

(A) by striking "The report" and inserting "(1) Except as provided in paragraph (2), the report";

(B) by indenting the margin of paragraph (1) as so designated, 2 ems; and

(C) by adding at the end the following:

"(2) If the Secretary of State determines that the transmittal of the information with respect to a foreign country under paragraph (3) or (4) of subsection (a) in classified form would make more likely the cooperation of the government of the foreign country as specified in such paragraph, the Secretary may transmit the information under such paragraph in classified form.".

FEMALE GENITAL MUTILATION

<< 22 USCA § 262k–2 >>

SEC. 579. (a) LIMITATION.—Beginning 1 year after the date of the enactment of this Act, the Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to use the voice and vote of the United States to oppose any loan or other utilization of the funds of their respective institution, other than to address basic human needs, for the government of any country which the Secretary of the Treasury determines—

(1) has, as a cultural custom, a known history of the practice of female genital mutilation; and

(2) has not taken steps to implement educational programs designed to prevent the practice of female genital mutilation.

(b) DEFINITION.—For purposes of this section, the term "international financial institution" shall include the institutions identified in section 532(b) of this Act.

REQUIREMENT FOR DISCLOSURE OF FOREIGN AID IN REPORT OF SECRETARY OF STATE

<< 22 USCA § 2414a NOTE >>

SEC. 580. (a) FOREIGN AID REPORTING REQUIREMENT.—In addition to the voting practices of a foreign country, the report required to be submitted to Congress under section 406(a) of the Foreign Relations Authorization Act, fiscal years 1990 and 1991 (22 U.S.C. 2414a), shall include a side-by-side comparison of individual countries' overall support for the United States at the United Nations and the amount of United States assistance provided to such country in fiscal year 1996.

(b) UNITED STATES ASSISTANCE.—For purposes of this section, the term "United States assistance" has the meaning given the term in section 481(e)(4) of the Foreign Assistance Act of 1961 (22 U.S.C. 2291(e)(4)).

RESTRICTIONS ON VOLUNTARY CONTRIBUTIONS TO UNITED NATIONS AGENCIES

SEC. 581. (a) PROHIBITION ON VOLUNTARY CONTRIBUTIONS FOR THE UNITED NATIONS.—None of the funds appropriated or otherwise made available by this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) if the United Nations implements or imposes any taxation on any United States persons.

(b) CERTIFICATION REQUIRED FOR DISBURSEMENT OF FUNDS.—None of the funds appropriated or otherwise made available under this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) unless the President certifies to the Congress 15 days in advance of such payment that the United Nations is not engaged in any effort to implement or impose any taxation on United States persons in order to raise revenue for the United Nations or any of its specialized agencies.

(c) DEFINITIONS.—As used in this section the term "United States person" refers to—

  (1) a natural person who is a citizen or national of the United States; or

  (2) a corporation, partnership, or other legal entity organized under the United States or any State, territory, possession, or district of the United States.

HAITI

SEC. 582. The Government of Haiti shall be eligible to purchase defense articles and services under the Arms Export Control Act (22 U.S.C. 2751 et seq.), for the civilian-led Haitian National Police and Coast Guard: Provided, That the authority provided by this section shall be subject to the regular notification procedures of the Committees on Appropriations.

REFUGEE STATUS FOR ADULT CHILDREN OF FORMER VIETNAMESE REEDUCATION
CAMP INTERNEES RESETTLED UNDER THE ORDERLY DEPARTURE PROGRAM

SEC. 584. (a) ELIGIBILITY FOR ORDERLY DEPARTURE PROGRAM.—For purposes of eligibility for the Orderly Departure Program for nationals of Vietnam, during fiscal year 1997, an alien described in subsection (b) shall be considered to be a refugee of special humanitarian concern to the United States within the meaning of section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) and shall be admitted to the United States for resettlement if the alien would be admissible as an immigrant under the Immigration and Nationality Act (except as provided in section 207(c)(3) of that Act).

(b) ALIENS COVERED.—An alien described in this subsection is an alien who—

  (1) is the son or daughter of a national of Vietnam who—

    (A) was formerly interned in a reeducation camp in Vietnam by the Government of the Socialist Republic of Vietnam; and

    (B) has been accepted for resettlement as a refugee under the Orderly Departure Program on or after April 1, 1995;

  (2) is 21 years of age or older; and

  (3) was unmarried as of the date of acceptance of the alien's parent for resettlement under the Orderly Departure Program.

(c) SUPERSEDES EXISTING LAW.—This section supersedes any other provision of law.

NORTH KOREA

<< 22 USCA § 2656 NOTE >>

SEC. 585. Ninety days after the date of enactment of this Act, and every 180 days thereafter, the Secretary of State, in consultation with the Secretary of Defense, shall provide a report in a classified or unclassified form to the Committee on Appropriations including the following information:

(a) a best estimate on fuel used by the military forces of the Democratic People's Republic of Korea (DPRK);

(b) the deployment position and military training and activities of the DPRK forces and best estimate of the associated costs of these activities;

(c) steps taken to reduce the DPRK level of forces; and

(d) cooperation, training, or exchanges of information, technology or personnel between the DPRK and any other nation supporting the development or deployment of a ballistic missile capability.

LIMITATION ON ASSISTANCE TO MEXICO

SEC. 587. Not less than $2,500,000 of the funds appropriated or otherwise made available by this Act for the Government of Mexico shall be withheld from obligation until the President has determined and reported to Congress that—

(1) the Government of Mexico is taking actions to reduce the amount of illegal drugs entering the United States from Mexico; and

(2) the Government of Mexico—

(A) is taking effective actions to apply vigorously all law enforcement resources to investigate, track, capture, incarcerate, and prosecute individuals controlling, supervising, or managing international narcotics cartels or other similar entities and the accomplices of such individuals, individuals responsible for, or otherwise involved in, corruption, and individuals involved in money-laundering;

(B) is pursuing international anti-drug trafficking initiatives;

(C) is cooperating fully with international efforts at narcotics interdiction; and

(D) is cooperating fully with requests by the United States for assistance in investigations of money-laundering violations and is making progress toward implementation of effective laws to prohibit money-laundering.

LIMITATION OF ASSISTANCE TO TURKEY

SEC. 588. Not more than $22,000,000 of the funds appropriated in this Act under the heading "Economic Support Fund" may be made available to the Government of Turkey.

<< 28 USCA § 1605 NOTE >>

CIVIL LIABILITY FOR ACTS OF STATE SPONSORED TERRORISM

SEC. 589. (a) an official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).

(b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. 1605(f) and (g) shall also apply to actions brought under this section.

No action shall be maintained under this action if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.

Titles I through V of this Act may be cited as the "Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997".

<< 22 USCA § 1928 NOTE >>

TITLE VI—NATO ENLARGEMENT FACILITATION ACT OF 1996

SEC. 601. SHORT TITLE.

This title may be cited as the "NATO Enlargement Facilitation Act of 1996".

SEC. 602. FINDINGS.

The Congress makes the following findings:

(1) Since 1949, the North Atlantic Treaty Organization (NATO) has played an essential role in guaranteeing the security, freedom, and prosperity of the United States and its partners in the Alliance.

(2) The NATO Alliance is, and has been since its inception, purely defensive in character, and it poses no threat to any nation. The enlargement of the NATO Alliance to include as full and equal members emerging democracies in Central and Eastern Europe will serve to reinforce stability and security in Europe by fostering their integration into the structures which have

created and sustained peace in Europe since 1945. Their admission into NATO will not threaten any nation. America's security, freedom, and prosperity remain linked to the security of the countries of Europe.

(3) The sustained commitment of the member countries of NATO to a mutual defense has made possible the democratic transformation of Central and Eastern Europe. Members of the Alliance can and should play a critical role in addressing the security challenges of the post-Cold War era and in creating the stable environment needed for those emerging democracies in Central and Eastern Europe to successfully complete political and economic transformation.

(4) The United States continues to regard the political independence and territorial integrity of all emerging democracies in Central and Eastern Europe as vital to European peace and security.

(5) The active involvement by the countries of Central and Eastern Europe has made the Partnership for Peace program an important forum to foster cooperation between NATO and those countries seeking NATO membership.

(6) NATO has enlarged its membership on 3 different occasions since 1949.

(7) Congress supports the admission of qualified new members to NATO and the European Union at an early date and has sought to facilitate the admission of qualified new members into NATO.

(8) Lasting security and stability in Europe requires not only the military integration of emerging democracies in Central and Eastern Europe into existing European structures, but also the eventual economic and political integration of these countries into existing European structures.

(9) As new members of NATO assume the responsibilities of Alliance membership, the costs of maintaining stability in Europe should be shared more widely. Facilitation of the enlargement process will require current members of NATO, and the United States in particular, to demonstrate the political will needed to build on successful ongoing programs such as the Warsaw Initiative and the Partnership for Peace by making available the resources necessary to supplement efforts prospective new members are themselves undertaking.

(10) New members will be full members of the Alliance, enjoying all rights and assuming all the obligations under the North Atlantic Treaty, signed at Washington on April 4, 1949 (hereafter in this Act referred to as the "Washington Treaty").

(11) In order to assist emerging democracies in Central and Eastern Europe that have expressed interest in joining NATO to be prepared to assume the responsibilities of NATO membership, the United States should encourage and support efforts by such countries to develop force structures and force modernization priorities that will enable such countries to contribute to the full range of NATO missions, including, most importantly, territorial defense of the Alliance.

(12) Cooperative regional peacekeeping initiatives involving emerging democracies in Central and Eastern Europe that have expressed interest in joining NATO, such as the Baltic Peacekeeping Battalion, the Polish–Lithuanian Joint Peacekeeping Force, and the Polish–Ukrainian Peacekeeping Force, can make an important contribution to European peace and security and international peacekeeping efforts, can assist those countries preparing to assume the responsibilities of possible NATO membership, and accordingly should receive appropriate support from the United States.

(13) NATO remains the only multilateral security organization capable of conducting effective military operations and preserving security and stability of the Euro–Atlantic region.

(14) NATO is an important diplomatic forum and has played a positive role in defusing tensions between members of the Alliance and, as a result, no military action has occurred between two Alliance member states since the inception of NATO in 1949.

(15) The admission to NATO of emerging democracies in Central and Eastern Europe which are found to be in a position to further the principles of the Washington Treaty would contribute to international peace and enhance the security of the region. Countries which have become democracies and established market economies, which practice good neighborly relations, and which have established effective democratic civilian control over their defense establishments and attained a degree of interoperability with NATO, should be evaluated for their potential to further the principles of the Washington Treaty.

(16) Democratic civilian control of defense forces is an essential element in the process of preparation for those states interested in possible NATO membership.

(17) Protection and promotion of fundamental freedoms and human rights is an integral aspect of genuine security, and in evaluating requests for membership in NATO, the human rights records of the emerging democracies in Central and Eastern Europe should be evaluated according to their commitments to fulfill in good faith the human rights obligations of the Charter of the United Nations, the principles of the Universal Declaration on Human Rights, and the Helsinki Final Act.

AR.01394

(18) A number of Central and Eastern European countries have expressed interest in NATO membership, and have taken concrete steps to demonstrate this commitment, including their participation in Partnership for Peace activities.

(19) The Caucasus region remains important geographically and politically to the future security of Central Europe. As NATO proceeds with the process of enlargement, the United States and NATO should continue to examine means to strengthen the sovereignty and enhance the security of United Nations recognized countries in that region.

(20) In recognition that not all countries which have requested membership in NATO will necessarily qualify at the same pace, the accession date for each new member will vary.

(21) The provision of additional NATO transition assistance should include those emerging democracies most ready for closer ties with NATO and should be designed to assist other countries meeting specified criteria of eligibility to move forward toward eventual NATO membership.

(22) The Congress of the United States finds in particular that Poland, Hungary, and the Czech Republic have made significant progress toward achieving the criteria set forth in section 203(d)(3) of the NATO Participation Act of 1994 and should be eligible for the additional assistance described in this Act.

(23) The evaluation of future membership in NATO for emerging democracies in Central and Eastern Europe should be based on the progress of those nations in meeting criteria for NATO membership, which require enhancement of NATO's security and the approval of all NATO members.

(24) The process of NATO enlargement entails the consensus agreement of the governments of all 16 NATO members and ratification in accordance with their constitutional procedures.

(25) Some NATO members, such as Spain and Norway, do not allow the deployment of nuclear weapons on their territory although they are accorded the full collective security guarantees provided by Article 5 of the Washington Treaty. There is no a priori requirement for the stationing of nuclear weapons on the territory of new NATO members, particularly in the current security climate. However, NATO retains the right to alter its security posture at any time as circumstances warrant.

## SEC. 603. UNITED STATES POLICY.

It is the policy of the United States—

(1) to join with the NATO allies of the United States to adapt the role of the NATO Alliance in the post-Cold War world;

(2) to actively assist the emerging democracies in Central and Eastern Europe in their transition so that such countries may eventually qualify for NATO membership;

(3) to support the enlargement of NATO in recognition that enlargement will benefit the interests of the United States and the Alliance and to consider these benefits in any analysis of the costs of NATO enlargement;

(4) to ensure that all countries in Central and Eastern Europe are fully aware of and capable of assuming the costs and responsibilities of NATO membership, including the obligation set forth in Article 10 of the Washington Treaty that new members be able to contribute to the security of the North Atlantic area; and

(5) to work to define a constructive and cooperative political and security relationship between an enlarged NATO and the Russian Federation.

## SEC. 604. SENSE OF THE CONGRESS REGARDING FURTHER ENLARGEMENT OF NATO.

It is the sense of the Congress that in order to promote economic stability and security in Slovakia, Estonia, Latvia, Lithuania, Romania, Bulgaria, Albania, Moldova, and Ukraine—

(1) the United States should continue and expand its support for the full and active participation of these countries in activities appropriate for qualifying for NATO membership;

(2) the United States Government should use all diplomatic means available to press the European Union to admit as soon as possible any country which qualifies for membership;

(3) the United States Government and the North Atlantic Treaty Organization should continue and expand their support for military exercises and peacekeeping initiatives between and among these nations, nations of the North Atlantic Treaty Organization, and Russia; and

(4) the process of enlarging NATO to include emerging democracies in Central and Eastern Europe should not be limited to consideration of admitting Poland, Hungary, the Czech Republic, and Slovenia as full members of the NATO Alliance.

SEC. 605. SENSE OF THE CONGRESS REGARDING ESTONIA, LATVIA AND LITHUANIA.

  In view of the forcible incorporation of Estonia, Latvia, Lithuania into the Soviet Union in 1940 under the Molotov–Ribbentrop Pact and the refusal of the United States and other countries to recognize that incorporation for over 50 years, it is the sense of the Congress that—

  (1) Estonia, Latvia, and Lithuania have valid historical security concerns that must be taken into account by the United States; and

  (2) Estonia, Latvia, and Lithuania should not be disadvantaged in seeking to join NATO by virtue of their forcible incorporation into the Soviet Union.

SEC. 606. DESIGNATION OF COUNTRIES ELIGIBLE FOR NATO ENLARGEMENT ASSISTANCE.

  (a) IN GENERAL.—The following countries are designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994 and shall be deemed to have been so designated pursuant to section 203(d)(1) of such Act: Poland, Hungary, and the Czech Republic.

  (b) DESIGNATION OF SLOVENIA.—Effective 90 days after the date of enactment of this Act, Slovenia is designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994, and shall be deemed to have been so designated pursuant to section 203(d) of such Act, unless the President certifies to Congress prior to such effective date that Slovenia fails to meet the criteria under section 203(d)(3) of such Act.

  (c) DESIGNATION OF OTHER COUNTRIES.—The President shall designate other emerging democracies in Central and Eastern Europe as eligible to receive assistance under the program established under section 203(a) of such Act if such countries—

  (1) have expressed a clear desire to join NATO;

  (2) have begun an individualized dialogue with NATO in preparation for accession;

  (3) are strategically significant to an effective NATO defense; and

  (4) meet the other criteria outlined in section 203(d)(3) of the NATO Participation Act of 1994 (title II of Public Law 103–447; 22 U.S.C. 1928 note).

  (d) RULE OF CONSTRUCTION.—Nothing in this section precludes the designation by the President of Estonia, Latvia, Lithuania, Romania, Slovakia, Bulgaria, Albania, Moldova, Ukraine, or any other emerging democracy in Central and Eastern Europe pursuant to section 203(d) of the NATO Participation Act of 1994 as eligible to receive assistance under the program established under section 203(a) of such Act.

SEC. 607. AUTHORIZATION OF APPROPRIATIONS FOR NATO ENLARGEMENT ASSISTANCE.

  (a) IN GENERAL.—There are authorized to be appropriated $60,000,000 for fiscal year 1997 for the program established under section 203(a) of the NATO Participation Act of 1994.

  (b) AVAILABILITY.—Of the funds authorized to be appropriated by subsection (a)—

  (1) not less than $20,000,000 shall be available for the cost, as defined in section 502(5) of the Credit Reform Act of 1990, of direct loans pursuant to the authority of section 203(c)(4) of the NATO Participation Act of 1994 (relating to the "Foreign Military Financing Program");

  (2) not less than $30,000,000 shall be available for assistance on a grant basis pursuant to the authority of section 203(c)(4) of the NATO Participation Act of 1994 (relating to the "Foreign Military Financing Program"); and

  (3) not more than $10,000,000 shall be available for assistance pursuant to the authority of section 203(c)(3) of the NATO Participation Act of 1994 (relating to international military education and training).

  (c) RULE OF CONSTRUCTION.—Amounts authorized to be appropriated under this section are authorized to be appropriated in addition to such amounts as otherwise may be available for such purposes.

SEC. 608. REGIONAL AIRSPACE INITIATIVE AND PARTNERSHIP FOR PEACE INFORMATION MANAGEMENT SYSTEM.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(a) IN GENERAL.—To the extent provided in advance in appropriations acts for such purposes, funds described in subsection (b) are authorized to be made available to support the implementation of the Regional Airspace Initiative and the Partnership for Peace Information Management System, including—

  (1) the procurement of items in support of these programs; and

  (2) the transfer of such items to countries participating in these programs.

  (b) FUNDS DESCRIBED.—Funds described in this subsection are funds that are available—

  (1) during any fiscal year under the NATO Participation Act of 1994 with respect to countries eligible for assistance under that Act; or

  (2) during fiscal year 1997 under any Act to carry out the Warsaw Initiative.

SEC. 609. EXCESS DEFENSE ARTICLES.

  (a) PRIORITY DELIVERY.—Notwithstanding any other provision of law, the delivery of excess defense articles under the authority of section 203(c)(1) and (2) of the NATO Participation Act of 1994 and section 516 of the Foreign Assistance Act of 1961 shall be given priority to the maximum extent feasible over the delivery of such excess defense articles to all other countries except those countries referred to in section 541 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1995 (Public Law 103–306; 108 Stat. 1640).

  (b) COOPERATIVE REGIONAL PEACEKEEPING INITIATIVES.—The Congress encourages the President to provide excess defense articles and other appropriate assistance to cooperative regional peacekeeping initiatives involving emerging democracies in Central and Eastern Europe that have expressed an interest in joining NATO in order to enhance their ability to contribute to European peace and security and international peacekeeping efforts.

SEC. 610. MODERNIZATION OF DEFENSE CAPABILITY.

  The Congress endorses efforts by the United States to modernize the defense capability of Poland, Hungary, the Czech Republic, Slovenia, and any other countries designated by the President pursuant to section 203(d) of the NATO Participation Act of 1994, by exploring with such countries options for the sale or lease to such countries of weapons systems compatible with those used by NATO members, including air defense systems, advanced fighter aircraft, and telecommunications infrastructure.

SEC. 611. TERMINATION OF ELIGIBILITY.

  (a) TERMINATION OF ELIGIBILITY.—The eligibility of a country designated pursuant to subsection (a) or (b) of section 606 or pursuant to section 203(d) of the NATO Participation Act of 1994 may be terminated upon a determination by the President that such country does not meet the criteria set forth in section 203(d)(3) of the NATO Participation Act of 1994.

  (b) NOTIFICATION.—At least 15 days before terminating the eligibility of any country pursuant to subsection (a), the President shall notify the congressional committees specified in section 634A of the Foreign Assistance Act of 1961 in accordance with the procedures applicable to reprogramming notifications under that section.

SEC. 612. CONFORMING AMENDMENTS TO THE NATO PARTICIPATION ACT.

  The NATO Participation Act of 1994 (title II of Public Law 103–447; 22 U.S.C. 1928 note) is amended in sections 203(a), 203(d)(1), and 203(d)(2) by striking "countries emerging from communist domination" each place it appears and inserting "emerging democracies in Central and Eastern Europe".

<< 22 USCA Ch. 7 >>

TITLE VII—MIDDLE EAST DEVELOPMENT BANK

<< 22 USCA § 290*o* NOTE >>

SEC. 701. SHORT TITLE.

  This title may be cited as the "Bank for Economic Cooperation and Development in the Middle East and North Africa Act".

<< 22 USCA § 290*o* >>

SEC. 702. ACCEPTANCE OF MEMBERSHIP.

 The President is hereby authorized to accept membership for the United States in the Bank for Economic Cooperation and Development in the Middle East and North Africa (in this title referred to as the "Bank") provided for by the agreement establishing the Bank (in this title referred to as the "Agreement"), signed on May 31, 1996.

<< 22 USCA § 290*o*–1 >>

SEC. 703. GOVERNOR AND ALTERNATE GOVERNOR.

 (a) APPOINTMENT.—At the inaugural meeting of the Board of Governors of the Bank, the Governor and the alternate for the Governor of the International Bank for Reconstruction and Development, appointed pursuant to section 3 of the Bretton Woods Agreements Act, shall serve ex-officio as a Governor and the alternate for the Governor, respectively, of the Bank. The President, by and with the advice and consent of the Senate, shall appoint a Governor of the Bank and an alternate for the Governor.
 (b) COMPENSATION.—Any person who serves as a governor of the Bank or as an alternate for the Governor may not receive any salary or other compensation from the United States by reason of such service.

<< 22 USCA § 290*o*–2 >>

SEC. 704. APPLICABILITY OF CERTAIN PROVISIONS OF THE BRETTON WOODS AGREEMENTS ACT.

 Section 4 of the Bretton Woods Agreements Act shall apply to the Bank in the same manner in which such section applies to the International Bank for Reconstruction and Development and the International Monetary Fund.

<< 22 USCA § 290*o*–3 >>

SEC. 705. FEDERAL RESERVE BANKS AS DEPOSITORIES.

 Any Federal Reserve Bank which is requested to do so by the Bank may act as its depository, or as its fiscal agent, and the Board of Governors of the Federal Reserve System shall exercise general supervision over the carrying out of these functions.

<< 22 USCA § 290*o*–4 >>

SEC. 706. SUBSCRIPTION OF STOCK.

 (a) SUBSCRIPTION AUTHORITY.—
  (1) IN GENERAL.—The Secretary of the Treasury may subscribe on behalf of the United States to not more than 7,011,270 shares of the capital stock of the Bank.
  (2) EFFECTIVENESS OF SUBSCRIPTION COMMITMENT.—Any commitment to make such subscription shall be effective only to such extent or in such amounts as are provided for in advance by appropriations Acts.
 (b) LIMITATIONS ON AUTHORIZATION OF APPROPRIATIONS.—For payment by the Secretary of the Treasury of the subscription of the United States for shares described in subsection (a), there are authorized to be appropriated $1,050,007,800 without fiscal year limitation.
 (c) LIMITATIONS ON OBLIGATION OF APPROPRIATED AMOUNTS FOR SHARES OF CAPITAL STOCK.—
  (1) PAID–IN CAPITAL STOCK.—
   (A) IN GENERAL.—Not more than $105,000,000 of the amounts appropriated pursuant to subsection (b) may be obligated for subscription to shares of paid-in capital stock.
   (B) FISCAL YEAR 1997.—Not more than $52,500,000 of the amounts appropriated pursuant to subsection (b) for fiscal year 1997 may be obligated for subscription to shares of paid-in capital stock.

(2) CALLABLE CAPITAL STOCK.—Not more than $787,505,852 of the amounts appropriated pursuant to subsection (b) may be obligated for subscription to shares of callable capital stock.

(d) DISPOSITION OF NET INCOME DISTRIBUTIONS BY THE BANK.—Any payment made to the United States by the Bank as a distribution of net income shall be covered into the Treasury as a miscellaneous receipt.

<< 22 USCA § 290*o*–5 >>

SEC. 707. JURISDICTION AND VENUE OF CIVIL ACTIONS BY OR AGAINST THE BANK.

(a) JURISDICTION.—The United States district courts shall have original and exclusive jurisdiction of any civil action brought in the United States by or against the Bank.

(b) VENUE.—For purposes of section 1391(b) of title 28, United States Code, the Bank shall be deemed to be a resident of the judicial district in which the principal office of the Bank in the United States, or its agent appointed for the purpose of accepting service or notice of service, is located.

<< 22 USCA § 290*o*–6 >>

SEC. 708. EFFECTIVENESS OF AGREEMENT.

The Agreement shall have full force and effect in the United States, its territories and possessions, and the Commonwealth of Puerto Rico, upon acceptance of membership by the United States in the Bank and the entry into force of the Agreement.

<< 22 USCA § 290*o*–7 >>

SEC. 709. EXEMPTION FROM SECURITIES LAWS FOR CERTAIN SECURITIES ISSUED BY THE BANK; REPORTS REQUIRED.

(a) EXEMPTION FROM SECURITIES LAWS; REPORTS TO SECURITIES AND EXCHANGE COMMISSION.—Any securities issued by the Bank (including any guaranty by the Bank, whether or not limited in scope) in connection with borrowing of funds, or the guarantee of securities as to both principal and interest, shall be deemed to be exempted securities within the meaning of section 3(a)(2) of the Securities Act of 1933 and section 3(a)(12) of the Securities Exchange Act of 1934. The Bank shall file with the Securities and Exchange Commission such annual and other reports with regard to such securities as the Commission shall determine to be appropriate in view of the special character of the Bank and its operations and necessary in the public interest or for the protection of investors.

(b) AUTHORITY OF SECURITIES AND EXCHANGE COMMISSION TO SUSPEND EXEMPTION; REPORTS TO THE CONGRESS.—The Securities and Exchange Commission, acting in consultation with such agency or officer as the President shall designate, may suspend the provisions of subsection (a) at any time as to any or all securities issued or guaranteed by the Bank during the period of such suspension. The Commission shall include in its annual reports to the Congress such information as it shall deem advisable with regard to the operations and effect of this section.

SEC. 710. TECHNICAL AMENDMENTS.

<< 22 USCA § 262r >>

(a) ANNUAL REPORT REQUIRED ON PARTICIPATION OF THE UNITED STATES IN THE BANK.—Section 1701(c)(2) of the International Financial Institutions Act (22 U.S.C. 262r(c)(2)) is amended by inserting "Bank for Economic Cooperation and Development in the Middle East and North Africa," after "Inter–American Development Bank".

<< 12 USCA § 24 >>

(b) EXEMPTION FROM LIMITATIONS AND RESTRICTIONS ON POWER OF NATIONAL, BANKING ASSOCIATIONS TO DEAL IN AND UNDERWRITE INVESTMENT SECURITIES OF THE BANK.—The seventh sentence

of paragraph 7 of section 5136 of the Revised Statutes of the United States (12 U.S.C. 24) is amended by inserting "Bank for Economic Cooperation and Development in the Middle East and North Africa," after "the Inter–American Development Bank".

<< 22 USCA § 276c–2 >>

 (c) BENEFITS FOR UNITED STATES CITIZEN–REPRESENTATIVES TO THE BANK.—Section 51 of Public Law 91–599 (22 U.S.C. 276c–2) is amended by inserting "the Bank for Economic Cooperation and Development in the Middle East and North Africa," after "the Inter–American Development Bank,".
 (d) For programs, projects or activities in the Department of the Interior and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

 Making appropriations for the Department of the Interior, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

TITLE I—DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

<< 43 USCA § 1734a >>

 For expenses necessary for protection, use, improvement, development, disposal, cadastral surveying, classification, acquisition of easements and other interests in lands, and performance of other functions, including maintenance of facilities, as authorized by law, in the management of lands and their resources under the jurisdiction of the Bureau of Land Management, including the general administration of the Bureau, and assessment of mineral potential of public lands pursuant to Public Law 96–487 (16 U.S.C. 3150(a)), $572,164,000, to remain available until expended, of which $2,010,000 shall be available for assessment of the mineral potential of public lands in Alaska pursuant to section 1010 of Public Law 96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived from the special receipt account established by the Land and Water Conservation Act of 1965, as amended (16 U.S.C. 460*l*–6a(i)); and of which $1,000,000 shall be available in fiscal year 1997 subject to a match by at least an equal amount by the National Fish and Wildlife Foundation, to such Foundation for challenge cost share projects supporting fish and wildlife conservation affecting Bureau lands; in addition, $27,300,000 for Mining Law Administration program operations, to remain available until expended, to be reduced by amounts collected by the Bureau and credited to this appropriation from annual mining claim fees so as to result in a final appropriation estimated at not more than $572,164,000; and in addition, not to exceed $5,000,000, to remain available until expended, from annual mining claim fees; which shall be credited to this account for the costs of administering the mining claim fee program, and $2,000,000 from communication site rental fees established by the Bureau for the cost of administering communication site activities: Provided, That appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors: Provided further, That in fiscal year 1997 and thereafter, all fees, excluding mining claim fees, in excess of the fiscal year 1996 collections established by the Secretary of the Interior under the authority of 43 U.S.C. 1734 for processing, recording, or documenting authorizations to use public lands or public land natural resources (including cultural, historical, and mineral) and for providing specific services to public land users, and which are not presently being covered into any Bureau of Land Management appropriation accounts, and not otherwise dedicated by law for a specific distribution, shall be made immediately available for program operations in this account and remain available until expended.

WILDLAND FIRE MANAGEMENT

 For necessary expenses for fire use and management, fire preparedness, suppression operations, and emergency rehabilitation by the Department of the Interior, $252,042,000, to remain available until expended, of which not to exceed $5,025,000 shall be for the renovation or construction of fire facilities: Provided, That such funds are also available for repayment of advances to other appropriation accounts from which funds were previously transferred for such purposes: Provided further, That persons hired pursuant to 43 U.S.C. 1469 may be furnished subsistence and lodging without costs from funds available from this

appropriation: *Provided further,* That unobligated balances of amounts previously appropriated to the "Fire Protection" and "Emergency Department of the Interior Firefighting Fund" may be transferred to this appropriation.

### CENTRAL HAZARDOUS MATERIALS FUND

For necessary expenses of the Department of the Interior and any of its component offices and bureaus for the remedial action, including associated activities, of hazardous waste substances, pollutants, or contaminants pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended (42 U.S.C. 9601 et seq.), $12,000,000, to remain available until expended: *Provided,* That notwithstanding 31 U.S.C. 3302, sums recovered from or paid by a party in advance of or as reimbursement for remedial action or response activities conducted by the Department pursuant to sections 107 or 113(f) of such Act, shall be credited to this account to be available until expended without further appropriation: *Provided further,* That such sums recovered from or paid by any party are not limited to monetary payments and may include stocks, bonds or other personal or real property, which may be retained, liquidated, or otherwise disposed of by the Secretary and which shall be credited to this account.

### CONSTRUCTION

For construction of buildings, recreation facilities, roads, trails, and appurtenant facilities, $4,333,000, to remain available until expended.

### PAYMENTS IN LIEU OF TAXES

For expenses necessary to implement the Act of October 20, 1976, as amended (31 U.S.C. 6901–07), $113,500,000, of which not to exceed $400,000 shall be available for administrative expenses.

### LAND ACQUISITION

For expenses necessary to carry out sections 205, 206, and 318(d) of Public Law 94–579 including administrative expenses and acquisition of lands or waters, or interests therein, $10,410,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

### OREGON AND CALIFORNIA GRANT LANDS

For expenses necessary for management, protection, and development of resources and for construction, operation, and maintenance of access roads, reforestation, and other improvements on the revested Oregon and California Railroad grant lands, on other Federal lands in the Oregon and California land-grant counties of Oregon, and on adjacent rights-of-way; and acquisition of lands or interests therein including existing connecting roads on or adjacent to such grant lands; $100,515,000, to remain available until expended: *Provided,* That 25 per centum of the aggregate of all receipts during the current fiscal year from the revested Oregon and California Railroad grant lands is hereby made a charge against the Oregon and California land-grant fund and shall be transferred to the General Fund in the Treasury in accordance with the second paragraph of subsection (b) of title II of the Act of August 28, 1937 (50 Stat. 876).

### RANGE IMPROVEMENTS

For rehabilitation, protection, and acquisition of lands and interests therein, and improvement of Federal rangelands pursuant to section 401 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701), notwithstanding any other Act, sums equal to 50 per centum of all moneys received during the prior fiscal year under sections 3 and 15 of the Taylor Grazing Act (43 U.S.C. 315 et seq.) and the amount designated for range improvements from grazing fees and mineral leasing receipts from Bankhead–Jones lands transferred to the Department of the Interior pursuant to law, but not less than $9,113,000, to remain available until expended: *Provided,* That not to exceed $600,000 shall be available for administrative expenses.

### SERVICE CHARGES, DEPOSITS, AND FORFEITURES

<< 43 USCA § 1735 NOTE >>

For administrative expenses and other costs related to processing application documents and other authorizations for use and disposal of public lands and resources, for costs of providing copies of official public land documents, for monitoring construction, operation, and termination of facilities in conjunction with use authorizations, and for rehabilitation of damaged

AR.01401

127

property, such amounts as may be collected under Public Law 94–579, as amended, and Public Law 93–153, to remain available until expended: Provided, That notwithstanding any provision to the contrary of section 305(a) of Public Law 94–579 (43 U.S.C. 1735(a)), any moneys that have been or will be received pursuant to that section, whether as a result of forfeiture, compromise, or settlement, if not appropriate for refund pursuant to section 305(c) of that Act (43 U.S.C. 1735(c)), shall be available and may be expended under the authority of this Act by the Secretary to improve, protect, or rehabilitate any public lands administered through the Bureau of Land Management which have been damaged by the action of a resource developer, purchaser, permittee, or any unauthorized person, without regard to whether all moneys collected from each such action are used on the exact lands damaged which led to the action: Provided further, That any such moneys that are in excess of amounts needed to repair damage to the exact land for which funds were collected may be used to repair other damaged public lands.

## MISCELLANEOUS TRUST FUNDS

In addition to amounts authorized to be expended under existing laws, there is hereby appropriated such amounts as may be contributed under section 307 of the Act of October 21, 1976 (43 U.S.C. 1701), and such amounts as may be advanced for administrative costs, surveys, appraisals, and costs of making conveyances of omitted lands under section 211(b) of that Act, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Land Management shall be available for purchase, erection, and dismantlement of temporary structures, and alteration and maintenance of necessary buildings and appurtenant facilities to which the United States has title; up to $100,000 for payments, at the discretion of the Secretary, for information or evidence concerning violations of laws administered by the Bureau; miscellaneous and emergency expenses of enforcement activities authorized or approved by the Secretary and to be accounted for solely on his certificate, not to exceed $10,000: Provided, That notwithstanding 44 U.S.C. 501, the Bureau may, under cooperative cost-sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly-produced publications for which the cooperators share the cost of printing either in cash or in services, and the Bureau determines the cooperator is capable of meeting accepted quality standards.

The Bureau of Land Management's Visitor Center in Rand, Oregon is hereby named the "William B. Smullin Visitor Center".

## UNITED STATES FISH AND WILDLIFE SERVICE

## RESOURCE MANAGEMENT

### << 16 USCA § 742b NOTE >>

For expenses necessary for scientific and economic studies, conservation, management, investigations, protection, and utilization of fishery and wildlife resources, except whales, seals, and sea lions, and for the performance of other authorized functions related to such resources; for the general administration of the United States Fish and Wildlife Service; for maintenance of the herd of long-horned cattle on the Wichita Mountains Wildlife Refuge; and not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended, $523,947,000, to remain available until September 30, 1998, of which $11,557,000 shall remain available until expended for operation and maintenance of fishery mitigation facilities constructed by the Corps of Engineers under the Lower Snake River Compensation Plan, authorized by the Water Resources Development Act of 1976, to compensate for loss of fishery resources from water development projects on the Lower Snake River, and of which $2,000,000 shall be provided to local governments in southern California for planning associated with the Natural Communities Conservation Planning (NCCP) program and shall remain available until expended: Provided, That hereafter, pursuant to 31 U.S.C. 9701, the Secretary shall charge reasonable fees for the full costs of providing training by the National Education and Training Center, to be credited to this account, notwithstanding 31 U.S.C. 3302, for the direct costs of providing such training.

## CONSTRUCTION

For construction and acquisition of buildings and other facilities required in the conservation, management, investigation, protection, and utilization of fishery and wildlife resources, and the acquisition of lands and interests therein; $43,365,000, to remain available until expended.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## NATURAL RESOURCE DAMAGE ASSESSMENT FUND

To conduct natural resource damage assessment activities by the Department of the Interior necessary to carry out the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. 9601, et seq.), Federal Water Pollution Control Act, as amended (33 U.S.C. 1251, et seq.), the Oil Pollution Act of 1990 (Public Law 101–380), and Public Law 101–337; $4,000,000, to remain available until expended.

## LAND ACQUISITION

### << 16 USCA § 668dd NOTE >>

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the United States Fish and Wildlife Service, $44,479,000, of which $3,000,000 is authorized to be appropriated and shall be used to establish the Clarks River National Wildlife Refuge in Kentucky, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## COOPERATIVE ENDANGERED SPECIES CONSERVATION FUND

For expenses necessary to carry out the provisions of the Endangered Species Act of 1973 (16 U.S.C. 1531–1543), as amended, $14,085,000, for grants to States, to be derived from the Cooperative Endangered Species Conservation Fund, and to remain available until expended.

## NATIONAL WILDLIFE REFUGE FUND

For expenses necessary to implement the Act of October 17, 1978 (16 U.S.C. 715s), $10,779,000.

## REWARDS AND OPERATIONS

For expenses necessary to carry out the provisions of the African Elephant Conservation Act (16 U.S.C. 4201–4203, 4211–4213, 4221–4225, 4241–4245, and 1538), $1,000,000, to remain available until expended.

## NORTH AMERICAN WETLANDS CONSERVATION FUND

For expenses necessary to carry out the provisions of the North American Wetlands Conservation Act, Public Law 101–233, as amended, $9,750,000, to remain available until expended.

## RHINOCEROS AND TIGER CONSERVATION FUND

For deposit to the Rhinoceros and Tiger Conservation Fund, $400,000, to remain available until expended, to carry out the Rhinoceros and Tiger Conservation Act of 1994 (Public Law 103–391).

## WILDLIFE CONSERVATION AND APPRECIATION FUND

For deposit to the Wildlife Conservation and Appreciation Fund, $800,000, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

### << 16 USCA § 460*l*–6a NOTE >>

Appropriations and funds available to the United States Fish and Wildlife Service shall be available for purchase of not to exceed 83 passenger motor vehicles of which 73 are for replacement only (including 43 for police-type use); not to exceed $400,000 for payment, at the discretion of the Secretary, for information, rewards, or evidence concerning violations of laws administered by the Service, and miscellaneous and emergency expenses of enforcement activities, authorized or approved by the Secretary and to be accounted for solely on his certificate; repair of damage to public roads within and adjacent to reservation areas caused by operations of the Service; options for the purchase of land at not to exceed $1 for each option; facilities incident to such public recreational uses on conservation areas as are consistent with their primary purpose; and the maintenance and improvement of aquaria, buildings, and other facilities under the jurisdiction of the Service and to which the United States has title, and which are utilized pursuant to law in connection with management and investigation of fish

and wildlife resources: Provided, That notwithstanding 44 U.S.C. 501, the Service may, under cooperative cost sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly-produced publications for which the cooperators share at least one-half the cost of printing either in cash or services and the Service determines the cooperator is capable of meeting accepted quality standards: Provided further, That the Service may accept donated aircraft as replacements for existing aircraft: Provided further, That notwithstanding any other provision of law, the Secretary of the Interior may not spend any of the funds appropriated in this Act for the purchase of lands or interests in lands to be used in the establishment of any new unit of the National Wildlife Refuge System unless the purchase is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 103–551: Provided further, That section 101(c) of the Omnibus Consolidated Rescissions and Appropriations Act of 1996 is amended in section 315(c)(1)(E) (110 Stat. 1321–201; 16 U.S.C. 460*l*–6a note) by striking "distributed in accordance with section 201(c) of the Emergency Wetlands Resources Act" and inserting "available to the Secretary of the Interior until expended to be used in accordance with clauses (i), (ii), and (iii) of section 201(c)(A) of the Emergency Wetlands Resources Act of 1986 (16 U.S.C. 3911(c)(A))".

## NATIONAL PARK SERVICE

### OPERATION OF THE NATIONAL PARK SYSTEM

For expenses necessary for the management, operation, and maintenance of areas and facilities administered by the National Park Service (including special road maintenance service to trucking permittees on a reimbursable basis), and for the general administration of the National Park Service, including not to exceed $1,593,000 for the Volunteers-in-Parks program, and not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by 16 U.S.C. 1706, $1,152,311,000, without regard to 16 U.S.C. 451, of which $8,000,000 for research, planning and interagency coordination in support of land acquisition for Everglades restoration shall remain available until expended, and of which not to exceed $72,000,000, to remain available until expended, is to be derived from the special fee account established pursuant to title V, section 5201, of Public Law 100–203.

### NATIONAL RECREATION AND PRESERVATION

For expenses necessary to carry out recreation programs, natural programs, cultural programs, environmental compliance and review, international park affairs, statutory or contractual aid for other activities, and grant administration, not otherwise provided for, $37,976,000.

### HISTORIC PRESERVATION FUND

For expenses necessary in carrying out the Historic Preservation Act of 1966, as amended (16 U.S.C. 470), $36,612,000, to be derived from the Historic Preservation Fund, to remain available until September 30, 1998.

### CONSTRUCTION

For construction, improvements, repair or replacement of physical facilities including the modifications authorized by section 104 of the Everglades National Park Protection and Expansion Act of 1989, $163,444,000, to remain available until expended, of which $270,000 shall be used for appropriate fish restoration projects not related to dam removal including reimbursement to the State of Washington for emergency actions taken to protect the 1996 run of fall chinook salmon on the Elwha River: Provided, That funds previously provided under this heading that had been made available to the City of Hot Springs, Arkansas, to be used for a flood protection feasibility study, are now made available to the City of Hot Springs for the rehabilitation of the Federally-constructed Hot Springs Creek Arch, including the portion within Hot Springs National Park.

### LAND AND WATER CONSERVATION FUND (RESCISSION)

<< 16 USCA § 460*l*–10a NOTE >>

The contract authority provided for fiscal year 1997 by 16 U.S.C. 460*l*–10a is rescinded.

### LAND ACQUISITION AND STATE ASSISTANCE

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of lands or waters, or interest therein, in accordance with statutory authority applicable to the National Park Service, $53,915,000, to be derived from the Land and Water Conservation Fund, to remain available until expended, of which $1,500,000 is to administer the State assistance program: Provided, That any funds made available for the purpose of acquisition of the Elwha and Glines dams shall be used solely for acquisition, and shall not be expended until the full purchase amount has been appropriated by the Congress: Provided further, That of the funds provided herein, $9,000,000 is available for acquisition of the Sterling Forest, subject to authorization.

## ADMINISTRATIVE PROVISIONS

Appropriations for the National Park Service shall be available for the purchase of not to exceed 404 passenger motor vehicles, of which 287 shall be for replacement only, including not to exceed 320 for police-type use, 13 buses, and 6 ambulances: Provided, That none of the funds appropriated to the National Park Service may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: Provided further, That none of the funds appropriated to the National Park Service may be used to implement an agreement for the redevelopment of the southern end of Ellis Island until such agreement has been submitted to the Congress and shall not be implemented prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full and comprehensive report on the development of the southern end of Ellis Island, including the facts and circumstances relied upon in support of the proposed project.

None of the funds in this Act may be spent by the National Park Service for activities taken in direct response to the United Nations Biodiversity Convention.

<< 16 USCA § 1g >>

The National Park Service may in fiscal year 1997 and thereafter enter into cooperative agreements that involve the transfer of National Park Service appropriated funds to State, local and tribal governments, other public entities, educational institutions, and private nonprofit organizations for the public purpose of carrying out National Park Service programs pursuant to 31 U.S.C. 6305 to carry out public purposes of National Park Service programs.

Notwithstanding any other provision of law, remaining balances, including interest, from funds granted to the National Park Foundation pursuant to the National Park System Visitor Facilities Fund Act of 1983 (Public Law 97–433, 96 Stat. 2277) shall be available to the National Park Foundation for expenditure in units of the National Park System for the purpose of improving visitor facilities.

## UNITED STATES GEOLOGICAL SURVEY

### SURVEYS, INVESTIGATIONS, AND RESEARCH

<< 43 USCA § 31j >>

<< 43 USCA § 50 >>

For expenses necessary for the United States Geological Survey to perform surveys, investigations, and research covering topography, geology, hydrology, and the mineral and water resources of the United States, its Territories and possessions, and other areas as authorized by 43 U.S.C. 31, 1332 and 1340; classify lands as to their mineral and water resources; give engineering supervision to power permittees and Federal Energy Regulatory Commission licensees; administer the minerals exploration program (30 U.S.C. 641); and publish and disseminate data relative to the foregoing activities; and to conduct inquiries into the economic conditions affecting mining and materials processing industries (30 U.S.C. 3, 21a, and 1603; 50 U.S.C. 98g(1)) and related purposes as authorized by law and to publish and disseminate data; $738,913,000, of which $64,559,000 shall be available only for cooperation with States or municipalities for water resources investigations; and of which $16,000,000 shall remain available until expended for conducting inquiries into the economic conditions affecting mining and materials processing industries; and of which $137,500,000 shall be available until September 30, 1998 for the biological research activity and the

AR.01405

operation of the Cooperative Research Units: Provided, That none of these funds provided for the biological research activity shall be used to conduct new surveys on private property, unless specifically authorized in writing by the property owner: Provided further, That beginning in fiscal year 1998 and once every five years thereafter, the National Academy of Sciences shall review and report on the biological research activity of the Survey: Provided further, That no part of this appropriation shall be used to pay more than one-half the cost of topographic mapping or water resources data collection and investigations carried on in cooperation with States and municipalities.

## ADMINISTRATIVE PROVISIONS

The amount appropriated for the United States Geological Survey shall be available for the purchase of not to exceed 53 passenger motor vehicles, of which 48 are for replacement only; reimbursement to the General Services Administration for security guard services; contracting for the furnishing of topographic maps and for the making of geophysical or other specialized surveys when it is administratively determined that such procedures are in the public interest; construction and maintenance of necessary buildings and appurtenant facilities; acquisition of lands for gauging stations and observation wells; expenses of the United States National Committee on Geology; and payment of compensation and expenses of persons on the rolls of the Survey duly appointed to represent the United States in the negotiation and administration of interstate compacts: Provided, That activities funded by appropriations herein made may be accomplished through the use of contracts, grants, or cooperative agreements as defined in 31 U.S.C. 6302, et seq.

## MINERALS MANAGEMENT SERVICE

### ROYALTY AND OFFSHORE MINERALS MANAGEMENT

For expenses necessary for minerals leasing and environmental studies, regulation of industry operations, and collection of royalties, as authorized by law; for enforcing laws and regulations applicable to oil, gas, and other minerals leases, permits, licenses and operating contracts; and for matching grants or cooperative agreements; including the purchase of not to exceed eight passenger motor vehicles for replacement only; $156,955,000, of which not less than $70,063,000 shall be available for royalty management activities; and an amount not to exceed $41,000,000 for the Technical Information Management System and activities of the Outer Continental Shelf (OCS) Lands Activity, to be credited to this appropriation and to remain available until expended, from additions to receipts resulting from increases to rates in effect on August 5, 1993, from rate increases to fee collections for OCS administrative activities performed by the Minerals Management Service over and above the rates in effect on September 30, 1993, and from additional fees for OCS administrative activities established after September 30, 1993: Provided, That $1,500,000 for computer acquisitions shall remain available until September 30, 1998: Provided further, That funds appropriated under this Act shall be available for the payment of interest in accordance with 30 U.S.C. 1721(b) and (d): Provided further, That not to exceed $3,000 shall be available for reasonable expenses related to promoting volunteer beach and marine cleanup activities: Provided further, That notwithstanding any other provision of law, $15,000 under this head shall be available for refunds of overpayments in connection with certain Indian leases in which the Director of the Minerals Management Service concurred with the claimed refund due, to pay amounts owed to Indian allottees or Tribes, or to correct prior unrecoverable erroneous payments.

### OIL SPILL RESEARCH

For necessary expenses to carry out title I, section 1016, title IV, sections 4202 and 4303, title VII, and title VIII, section 8201 of the Oil Pollution Act of 1990, $6,440,000, which shall be derived from the Oil Spill Liability Trust Fund, to remain available until expended.

## OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT

### REGULATION AND TECHNOLOGY

<< 30 USCA § 1211 NOTE >>

For necessary expenses to carry out the provisions of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not to exceed 10 passenger motor vehicles, for replacement only; $94,172,000,

and notwithstanding 31 U.S.C. 3302, an additional amount shall be credited to this account, to remain available until expended, from performance bond forfeitures in fiscal year 1997: Provided, That the Secretary of the Interior, pursuant to regulations, may utilize directly or through grants to States, moneys collected in fiscal year 1997 for civil penalties assessed under section 518 of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1268), to reclaim lands adversely affected by coal mining practices after August 3, 1977, to remain available until expended: Provided further, That appropriations for the Office of Surface Mining Reclamation and Enforcement may provide for the travel and per diem expenses of State and tribal personnel attending Office of Surface Mining Reclamation and Enforcement sponsored training.

### ABANDONED MINE RECLAMATION FUND

For necessary expenses to carry out title IV of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not more than 10 passenger motor vehicles for replacement only, $177,085,000, to be derived from receipts of the Abandoned Mine Reclamation Fund and to remain available until expended; of which up to $4,000,000 shall be for supplemental grants to States for the reclamation of abandoned sites with acid mine rock drainage from coal mines through the Appalachian Clean Streams Initiative: Provided, That grants to minimum program States will be $1,500,000 per State in fiscal year 1997: Provided further, That of the funds herein provided up to $18,000,000 may be used for the emergency program authorized by section 410 of Public Law 95–87, as amended, of which no more than 25 per centum shall be used for emergency reclamation projects in any one State and funds for federally-administered emergency reclamation projects under this proviso shall not exceed $11,000,000: Provided further, That prior year unobligated funds appropriated for the emergency reclamation program shall not be subject to the 25 per centum limitation per State and may be used without fiscal year limitation for emergency projects: Provided further, That pursuant to Public Law 97–365, the Department of the Interior is authorized to use up to 20 per centum from the recovery of the delinquent debt owed to the United States Government to pay for contracts to collect these debts: Provided further, That funds made available to States under title IV of Public Law 95–87 may be used, at their discretion, for any required non-Federal share of the cost of projects funded by the Federal Government for the purpose of environmental restoration related to treatment or abatement of acid mine drainage from abandoned mines: Provided further, That such projects must be consistent with the purposes and priorities of the Surface Mining Control and Reclamation Act: Provided further, That the State of Maryland may set aside the greater of $1,000,000 or 10 percent of the total of the grants made available to the State under title IV of the Surface Mining Control and Reclamation Act of 1977, as amended (30 U.S.C. 1231 et. seq.), if the amount set aside is deposited in an acid mine drainage abatement and treatment fund established under a State law, pursuant to which law the amount (together with all interest earned on the amount) is expended by the State to undertake acid mine drainage abatement and treatment projects, except that before any amounts greater than 10 percent of its title IV grants are deposited in an acid mine drainage abatement and treatment fund, the State of Maryland must first complete all Surface Mining Control and Reclamation Act priority one projects.

### BUREAU OF INDIAN AFFAIRS

### OPERATION OF INDIAN PROGRAMS

<< 25 USCA § 2012 NOTE >>

For operation of Indian programs by direct expenditure, contracts, cooperative agreements, compacts, and grants including expenses necessary to provide education and welfare services for Indians, either directly or in cooperation with States and other organizations, including payment of care, tuition, assistance, and other expenses of Indians in boarding homes, or institutions, or schools; grants and other assistance to needy Indians; maintenance of law and order; management, development, improvement, and protection of resources and appurtenant facilities under the jurisdiction of the Bureau, including payment of irrigation assessments and charges; acquisition of water rights; advances for Indian industrial and business enterprises; operation of Indian arts and crafts shops and museums; development of Indian arts and crafts, as authorized by law; for the general administration of the Bureau, including such expenses in field offices; maintaining of Indian reservation roads as defined in 23 U.S.C. 101; and construction, repair, and improvement of Indian housing, $1,436,902,000, of which not to exceed $86,520,000 shall be for welfare assistance payments and not to exceed $90,829,000 shall be for payments to tribes and tribal organizations for contract support costs associated with ongoing contracts or grants or compacts entered into with the Bureau prior to fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975, as amended, and up to $5,000,000 shall be for the Indian Self–

Determination Fund, which shall be available for the transitional cost of initial or expanded tribal contracts, grants, compacts, or cooperative agreements with the Bureau under such Act; and of which not to exceed $365,124,000 for school operations costs of Bureau-funded schools and other education programs shall become available on July 1, 1997, and shall remain available until September 30, 1998; and of which not to exceed $53,805,000 for higher education scholarships, adult vocational training, and assistance to public schools under 25 U.S.C. 452 et seq., shall remain available until September 30, 1998; and of which not to exceed $54,973,000 shall remain available until expended for housing improvement, road maintenance, attorney fees, litigation support, self-governance grants, the Indian Self–Determination Fund, and the Navajo–Hopi Settlement Program: Provided, That tribes and tribal contractors may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants or compact agreements and for unmet welfare assistance costs: Provided further, That funds made available to tribes and tribal organizations through contracts or grants obligated during fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975, or grants authorized by the Indian Education Amendments of 1988 (25 U.S.C. 2001 and 2008A) shall remain available until expended by the contractor or grantee: Provided further, That to provide funding uniformity within a Self–Governance Compact, any funds provided in this Act with availability for more than one year may be reprogrammed to one year availability but shall remain available within the Compact until expended: Provided further, That notwithstanding any other provision of law, Indian tribal governments may, by appropriate changes in eligibility criteria or by other means, change eligibility for general assistance or change the amount of general assistance payments for individuals within the service area of such tribe who are otherwise deemed eligible for general assistance payments so long as such changes are applied in a consistent manner to individuals similarly situated: Provided further, That any savings realized by such changes shall be available for use in meeting other priorities of the tribes: Provided further, That any net increase in costs to the Federal Government which result solely from tribally increased payment levels for general assistance shall be met exclusively from funds available to the tribe from within its tribal priority allocation: Provided further, That any forestry funds allocated to a tribe which remain unobligated as of September 30, 1997, may be transferred during fiscal year 1998 to an Indian forest land assistance account established for the benefit of such tribe within the tribe's trust fund account: Provided further, That any such unobligated balances not so transferred shall expire on September 30, 1998: Provided further, That notwithstanding any other provision of law, no funds available to the Bureau, other than the amounts provided herein for assistance to public schools under 25 U.S.C. 452 et seq., shall be available to support the operation of any elementary or secondary school in the State of Alaska in fiscal year 1997: Provided further, That funds made available in this or any other Act for expenditure through September 30, 1998 for schools funded by the Bureau shall be available only to the schools in the Bureau school system as of September 1, 1995: Provided further, That no funds available to the Bureau shall be used to support expanded grades for any school or dormitory beyond the grade structure in place or approved by the Secretary of the Interior at each school in the Bureau school system as of October 1, 1995: Provided further, That in fiscal year 1997 and thereafter, notwithstanding the provisions of 25 U.S.C. 2012(h)(1)(A) and (B), upon the recommendation of either (i) a local school board and school supervisor for an education position in a Bureau of Indian Affairs operated school, or (ii) an Agency school board and education line officer for an Agency education position, the Secretary shall establish adjustments to the rates of basic compensation or annual salary rates established under 25 U.S.C. 2012(h)(1)(A) and (B) for education positions at the school or the Agency, at a level not less than that for comparable positions in the nearest public school district, and the adjustment shall be deemed to be a change to basic pay and shall not be subject to collective bargaining: Provided further, That any reduction to rates of basic compensation or annual salary rates below the rates established under 25 U.S.C. 2012(h)(1)(A) and (B) shall apply only to educators appointed after June 30, 1997, and shall not affect the right of an individual employed on June 30, 1997, in an education position, to receive the compensation attached to such position under 25 U.S.C. 2012(h)(1)(A) and (B) so long as the individual remains in the same position at the same school: Provided further, That notwithstanding 25 U.S.C. 2012(h)(1)(B), when the rates of basic compensation for teachers and counselors at Bureau-operated schools are established at the rates of basic compensation applicable to comparable positions in overseas schools under the Defense Department Overseas Teachers Pay and Personnel Practices Act, such rates shall become effective with the start of the next academic year following the issuance of the Department of Defense salary schedule and shall not be effected retroactively.

## CONSTRUCTION

For construction, major repair, and improvement of irrigation and power systems, buildings, utilities, and other facilities, including architectural and engineering services by contract; acquisition of lands, and interests in lands; and preparation of lands for farming, and for construction of the Navajo Indian Irrigation Project pursuant to Public Law 87–483, $94,531,000, to remain available until expended: Provided, That such amounts as may be available for the construction of the Navajo Indian

Irrigation Project may be transferred to the Bureau of Reclamation: Provided further, That not to exceed 6 per centum of contract authority available to the Bureau of Indian Affairs from the Federal Highway Trust Fund may be used to cover the road program management costs of the Bureau: Provided further, That any funds provided for the Safety of Dams program pursuant to 25 U.S.C. 13 shall be made available on a non-reimbursable basis: Provided further, That for fiscal year 1997, in implementing new construction or facilities improvement and repair project grants in excess of $100,000 that are provided to tribally controlled grant schools under Public Law 100–297, as amended, the Secretary of the Interior shall use the Administrative and Audit Requirements and Cost Principles for Assistance Programs contained in 43 CFR part 12 of the regulatory requirements: Provided further, That such grants shall not be subject to section 12.61 of 43 CFR; the Secretary and the grantee shall negotiate and determine a schedule of payments for the work to be performed: Provided further, That in considering applications, the Secretary shall consider whether the Indian tribe or tribal organization would be deficient in assuring that the construction projects conform to applicable building standards and codes and Federal, tribal, or State health and safety standards as required by 25 U.S.C. 2005(a), with respect to organizational and financial management capabilities: Provided further, That if the Secretary declines an application, the Secretary shall follow the requirements contained in 25 U.S.C. 2505(f): Provided further, That any disputes between the Secretary and any grantee concerning a grant shall be subject to the disputes provision in 25 U.S.C. 2508(e).

### INDIAN LAND AND WATER CLAIM SETTLEMENTS AND MISCELLANEOUS PAYMENTS TO INDIANS

For miscellaneous payments to Indian tribes and individuals and for necessary administrative expenses, $69,241,000, to remain available until expended; of which $68,400,000 shall be available for implementation of enacted Indian land and water claim settlements pursuant to Public Laws 101–618, 102–374, 102–575, and for implementation of other enacted water rights settlements, including not to exceed $8,000,000, which shall be for the Federal share of the Catawba Indian Tribe of South Carolina Claims Settlement, as authorized by section 5(a) of Public Law 103–116; and of which $841,000 shall be available pursuant to Public Laws 98–500, 99–264, and 100–580.

### INDIAN GUARANTEED LOAN PROGRAM ACCOUNT

For the cost of guaranteed loans, $4,500,000, as authorized by the Indian Financing Act of 1974, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $34,615,000.

In addition, for administrative expenses to carry out the guaranteed loan programs, $500,000.

### ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Indian Affairs (except the revolving fund for loans, the Indian loan guarantee and insurance fund, the Technical Assistance of Indian Enterprises account, the Indian Direct Loan Program account, and the Indian Guaranteed Loan Program account) shall be available for expenses of exhibits, and purchase of not to exceed 229 passenger motor vehicles, of which not to exceed 187 shall be for replacement only.

Notwithstanding any other provision of law, no funds available to the Bureau of Indian Affairs for central office operations or pooled overhead general administration shall be available for tribal contracts, grants, compacts, or cooperative agreements with the Bureau of Indian Affairs under the provisions of the Indian Self–Determination Act or the Tribal Self–Governance Act of 1994 (Public Law 103–413).

### DEPARTMENTAL OFFICES

### INSULAR AFFAIRS

### ASSISTANCE TO TERRITORIES

<< 48 USCA § 1469b >>

<< 48 USCA § 1801 NOTE >>

For expenses necessary for assistance to territories under the jurisdiction of the Department of the Interior, $65,188,000, of which (1) $61,339,000 shall be available until expended for technical assistance, including maintenance assistance, disaster

assistance, insular management controls, and brown tree snake control and research; grants to the judiciary in American Samoa for compensation and expenses, as authorized by law (48 U.S.C. 1661(c)); grants to the Government of American Samoa, in addition to current local revenues, for construction and support of governmental functions; grants to the Government of the Virgin Islands as authorized by law; grants to the Government of Guam, as authorized by law; and grants to the Government of the Northern Mariana Islands as authorized by law (Public Law 94–241; 90 Stat. 272); and (2) $3,849,000 shall be available for salaries and expenses of the Office of Insular Affairs: Provided, That all financial transactions of the territorial and local governments herein provided for, including such transactions of all agencies or instrumentalities established or utilized by such governments, may be audited by the General Accounting Office, at its discretion, in accordance with chapter 35 of title 31, United States Code: Provided further, That Northern Mariana Islands Covenant grant funding shall be provided according to those terms of the Agreement of the Special Representatives on Future United States Financial Assistance for the Northern Mariana Islands approved by Public Law 99–396, or any subsequent legislation related to Commonwealth of the Northern Mariana Islands grant funding: Provided further, That section 703(a) of Public Law 94–241, as amended, is hereby amended by striking "of the Government of the Northern Mariana Islands": Provided further, That of the amounts provided for technical assistance, sufficient funding shall be made available for a grant to the Close Up Foundation: Provided further, That the funds for the program of operations and maintenance improvement are appropriated to institutionalize routine operations and maintenance improvement of capital infrastructure in American Samoa, Guam, the Virgin Islands, the Commonwealth of the Northern Mariana Islands, the Republic of Palau, the Republic of the Marshall Islands, and the Federated States of Micronesia through assessments of long-range operations maintenance needs, improved capability of local operations and maintenance institutions and agencies (including management and vocational education training), and project-specific maintenance (with territorial participation and cost sharing to be determined by the Secretary based on the individual territory's commitment to timely maintenance of its capital assets): Provided further, That any appropriation for disaster assistance under this head in this Act or previous appropriations Acts may be used as non-Federal matching funds for the purpose of hazard mitigation grants provided pursuant to section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170c).

## COMPACT OF FREE ASSOCIATION

For economic assistance and necessary expenses for the Federated States of Micronesia and the Republic of the Marshall Islands as provided for in sections 122, 221, 223, 232, and 233 of the Compacts of Free Association, and for economic assistance and necessary expenses for the Republic of Palau as provided for in sections 122, 221, 223, 232, and 233 of the Compact of Free Association, $23,538,000, to remain available until expended, as authorized by Public Law 99–239 and Public Law 99–658.

## DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

For necessary expenses for management of the Department of the Interior, $58,286,00, [1] of which not to exceed $7,500 may be for official reception and representation expenses, and of which up to $2,000,000 shall be available for workers compensation payments and unemployment compensation payments associated with the orderly closure of the United States Bureau of Mines

[1] Remainder of figure missing, complete figure probably should read '$58,286,000".

### OFFICE OF THE SOLICITOR

### SALARIES AND EXPENSES

For necessary expenses of the Office of the Solicitor, $35,443,000.

### OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General, $24,439,000, together with any funds or property transferred to the Office of Inspector General through forfeiture proceedings or from the Department of Justice Assets Forfeiture Fund or the Department of the Treasury Assets Forfeiture Fund, that represent an equitable share from the forfeiture of property

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

in investigations in which the Office of Inspector General participated, with such transferred funds to remain available until expended.

## NATIONAL INDIAN GAMING COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the National Indian Gaming Commission, pursuant to Public Law 100–497, $1,000,000.

### OFFICE OF SPECIAL TRUSTEE FOR AMERICAN INDIANS

### FEDERAL TRUST PROGRAMS

For operation of trust programs for Indians by direct expenditure, contracts, cooperative agreements, compacts, and grants, $32,126,000, to remain available until expended for trust funds management: Provided, That funds made available to tribes and tribal organizations through contracts or grants obligated during fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975 (25 U.S.C. 450 et seq.), shall remain available until expended by the contractor or grantee: Provided further, That notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss: Provided further, That unobligated balances previously made available (1) to liquidate obligations owed tribal and individual Indian payees of any checks canceled pursuant to section 1003 of the Competitive Equality Banking Act of 1987 (Public Law 100–86; 31 U.S.C. 3334(b)), (2) to restore Individual Indian Monies trust funds, Indian Irrigation Systems, and Indian Power Systems accounts amounts invested in credit unions or defaulted savings and loan associations and which where not Federally insured, including any interest on these amounts that may have been earned, but was not because of the default, and (3) to reimburse Indian trust fund account holders for losses to their respective accounts where the claim for said loss has been reduced to a judgement or settlement agreement approved by the Department of Justice, under the heading "Indian Land and Water Claim Settlements and Miscellaneous Payments to Indians", Bureau of Indian Affairs in fiscal years 1995 and 1996, are hereby transferred to and merged with this appropriation and may only be used for the operation of trust programs, in accordance with this appropriation.

### ADMINISTRATIVE PROVISIONS

There is hereby authorized for acquisition from available resources within the Working Capital Fund, 15 aircraft, 10 of which shall be for replacement and which may be obtained by donation, purchase or through available excess surplus property: Provided, That notwithstanding any other provision of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft: Provided further, That no programs funded with appropriated funds in "Departmental Management", "Office of the Solicitor", and "Office of Inspector General" may be augmented through the Working Capital Fund or the Consolidated Working Fund.

### GENERAL PROVISIONS, DEPARTMENT OF THE INTERIOR

SEC. 101. Appropriations made in this title shall be available for expenditure or transfer (within each bureau or office), with the approval of the Secretary, for the emergency reconstruction, replacement, or repair of aircraft, buildings, utilities, or other facilities or equipment damaged or destroyed by fire, flood, storm, or other unavoidable causes: Provided, That no funds shall be made available under this authority until funds specifically made available to the Department of the Interior for emergencies shall have been exhausted: Provided further, That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible.

SEC. 102. The Secretary may authorize the expenditure or transfer of any no year appropriation in this title, in addition to the amounts included in the budget programs of the several agencies, for the suppression or emergency prevention of forest or range fires on or threatening lands under the jurisdiction of the Department of the Interior; for the emergency rehabilitation of burned-over lands under its jurisdiction; for emergency actions related to potential or actual earthquakes, floods, volcanoes, storms, or other unavoidable causes; for contingency planning subsequent to actual oilspills; response and natural resource damage assessment activities related to actual oilspills; for the prevention, suppression, and control of actual or potential grasshopper

and Mormon cricket outbreaks on lands under the jurisdiction of the Secretary, pursuant to the authority in section 1773(b) of Public Law 99–198 (99 Stat. 1658); for emergency reclamation projects under section 410 of Public Law 95–87; and shall transfer, from any no year funds available to the Office of Surface Mining Reclamation and Enforcement, such funds as may be necessary to permit assumption of regulatory authority in the event a primacy State is not carrying out the regulatory provisions of the Surface Mining Act: Provided, That appropriations made in this title for fire suppression purposes shall be available for the payment of obligations incurred during the preceding fiscal year, and for reimbursement to other Federal agencies for destruction of vehicles, aircraft, or other equipment in connection with their use for fire suppression purposes, such reimbursement to be credited to appropriations currently available at the time of receipt thereof: Provided further, That for emergency rehabilitation and wildfire suppression activities, no funds shall be made available under this authority until funds appropriated to "Wildland Fire Management" shall have been exhausted: Provided further, That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible: Provided further, That such replenishment funds shall be used to reimburse, on a pro rata basis, accounts from which emergency funds were transferred.

  SEC. 103. Appropriations made in this title shall be available for operation of warehouses, garages, shops, and similar facilities, wherever consolidation of activities will contribute to efficiency or economy, and said appropriations shall be reimbursed for services rendered to any other activity in the same manner as authorized by sections 1535 and 1536 of title 31, United States Code: Provided, That reimbursements for costs and supplies, materials, equipment, and for services rendered may be credited to the appropriation current at the time such reimbursements are received.

  SEC. 104. Appropriations made to the Department of the Interior in this title shall be available for services as authorized by 5 U.S.C. 3109, when authorized by the Secretary, in total amount not to exceed $500,000; hire, maintenance, and operation of aircraft; hire of passenger motor vehicles; purchase of reprints; payment for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and the payment of dues, when authorized by the Secretary, for library membership in societies or associations which issue publications to members only or at a price to members lower than to subscribers who are not members.

  SEC. 105. Appropriations available to the Department of the Interior for salaries and expenses shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902 and D.C. Code 4–204).

  SEC. 106. Appropriations made in this title shall be available for obligation in connection with contracts issued for services or rentals for periods not in excess of twelve months beginning at any time during the fiscal year.

  SEC. 107. Prior to the transfer of Presidio properties to the Presidio Trust, when authorized, the Secretary may not obligate in any calendar month more than $1/12$ of the fiscal year 1997 appropriation for operation of the Presidio: Provided, That prior to the transfer of any Presidio property to the Presidio Trust, the Secretary shall transfer such funds as the Trust deems necessary to initiate leasing and other authorized activities of the Trust: Provided further, That this section shall expire on December 31, 1996.

  SEC. 108. No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act.

  SEC. 109. No funds provided in this title may be expended by the Department of the Interior for the conduct of offshore leasing and related activities placed under restriction in the President's moratorium statement of June 26, 1990, in the areas of Northern, Central, and Southern California; the North Atlantic; Washington and Oregon; and the Eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude.

  SEC. 110. No funds provided in this title may be expended by the Department of the Interior for the conduct of leasing, or the approval or permitting of any drilling or other exploration activity, on lands within the North Aleutian Basin planning area.

  SEC. 111. No funds provided in this title may be expended by the Department of the Interior for the conduct of preleasing and leasing activities in the Eastern Gulf of Mexico for Outer Continental Shelf Lease Sale 151 in the Outer Continental Shelf Natural Gas and Oil Resource Management Comprehensive Program, 1992–1997.

  SEC. 112. No funds provided in this title may be expended by the Department of the Interior for the conduct of preleasing and leasing activities in the Atlantic for Outer Continental Shelf Lease Sale 164 in the Outer Continental Shelf Natural Gas and Oil Resource Management Comprehensive Program, 1992–1997.

AR.01412

138

<< 31 USCA § 501 NOTE >>

SEC. 113. There is hereby established in the Treasury a franchise fund pilot, as authorized by section 403 of Public Law 103–356, to be available as provided in such section for costs of capitalizing and operating administrative services as the Secretary determines may be performed more advantageously as central services: Provided, That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made prior to the current year for the purpose of providing capital shall be used to capitalize such fund: Provided further, That such fund shall be paid in advance from funds available to the Department and other Federal agencies for which such centralized services are performed, at rates which will return in full all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of automatic data processing (ADP) software and systems (either acquired or donated) and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary: Provided further, That such fund shall provide services on a competitive basis: Provided further, That an amount not to exceed four percent of the total annual income to such fund may be retained in the fund for fiscal year 1997 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment, and for the improvement and implementation of Department financial management, ADP, and other support systems: Provided further, That no later than thirty days after the end of each fiscal year amounts in excess of this reserve limitation shall be transferred to the Treasury: Provided further, That such franchise fund pilot shall terminate pursuant to section 403(f) of Public Law 103–356.

Sec. 114. Public Law 102–495 is amended by adding the following new section:

"Sec. 10. Washington State Removal Option.

"(a) Upon appropriation of $29,500,000 for the Federal government to acquire the projects in the State of Washington pursuant to this Act, the State of Washington may, upon the submission to Congress of a binding agreement to remove the projects within a reasonable period of time, purchase the projects from the Federal government for $2. Such a binding agreement shall provide for the full restoration of the Elwha River ecosystem and native anadromous fisheries, for protection of the existing quality and availability of water from the Elwha River for municipal and industrial uses from possible adverse impacts of dam removal, and for fulfillment by the State of each of the other obligations of the Secretary under this Act.

"(b) Upon receipt of the payment pursuant to subsection (a), the Federal government shall relinquish ownership and title of the projects to the State of Washington.

"(c) Upon the purchase of the projects by the State of Washington, section 3(a), (c), and (d), and Sections 4, 7, and 9 of this Act are hereby repealed, and the remaining sections renumbered accordingly.".

<< 16 USCA § 461 NOTE >>

SEC. 115. Section 7 of Public Law 99–647 (16 U.S.C. 461 note) is amended to read as follows:

"SEC. 7. TERMINATION OF COMMISSION.

"The Commission shall terminate on November 10, 1997.".

SEC. 116. The Congress of the United States hereby designates and ratifies the assignment to the University of Utah as successor to, and beneficiary of, all the existing assets, revenues, funds and rights granted to the State of Utah under the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and the School of Mines Grant (July 26, 1894, 28 Stat. 110). Further, the Secretary of the Interior is authorized and directed to accept such relinquishment of all remaining and unconveyed entitlement for quantity grants owed the State of Utah for the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and any unconveyed entitlement that may remain for the University of Utah School of Mines Grant (July 26, 1894, 28 Stat. 110).

<< 25 USCA § 458bb >>

SEC. 117. Section 402(b)(1) of The Indian Self–Determination and Education Assistance Act (25 U.S.C. 458bb) is amended to read as follows: "(1) In addition to those Indian tribes participating in self-governance under subsection (a) of this section,

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the Secretary, acting through the Director of the Office of Self–Governance, may select up to 50 new tribes per year from the applicant pool described in subsection (c) of this section to participate in self-governance.".

<< 25 USCA § 305a–1 >>

SEC. 118. In fiscal year 1997 and thereafter, the Indian Arts and Crafts Board may charge admission fees at its museums; charge rent and/or franchise fees for shops located in its museums; publish and sell publications; sell or rent or license use of photographs or other images in hard copy or other forms; license the use of designs, in whole or in part, by others; charge for consulting services provided to others; and may accept the services of volunteers to carry out its mission: Provided, That all revenue derived from such activities is covered into the special fund established by section 4 of Public Law 74–355 (25 U.S.C. 305c).

SEC. 119. TRANSFER OF CERTAIN BUREAU OF LAND MANAGEMENT FACILITIES.—

(a) BATTLE MOUNTAIN, NEVADA.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall transfer to Lander County, Nevada, without consideration, title to the former Bureau of Land Management administrative site and associated buildings in Battle Mountain, Nevada.

(b) WINNEMUCCA, NEVADA.—

(1) TRANSFER.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall transfer to the State of Nevada, without consideration, title to the surplus Bureau of Land Management District Office building in Winnemucca, Nevada.

(2) USE.—The transfer under paragraph (1) is made with the intent that the building shall be available to meet the needs of the Department of Conservation and Natural Resources of the State of Nevada.

SEC. 120. ALASKA AVIATION HERITAGE.—

(a) FINDINGS.—The Congress finds that—

(1) the Department of the Interior's Grumman Goose G21–A aircraft number N789 is to be retired from several decades of active service in the State of Alaska in 1996; and

(2) the aircraft is of significant historic value to the people of the State of Alaska.

(b) DONATION OF AIRCRAFT.—The Secretary of the Interior shall transfer the Grumman Goose G21–A aircraft number N789 to the Alaska Aviation Heritage Museum in Anchorage, Alaska, at no cost to the museum, for permanent display.

SEC. 121. The Mesquite Lands Act of 1988 is amended by adding the following at the end of section 3:

"(d) FOURTH AREA.—(1) No later than ten years after the date of enactment of this Act, the City of Mesquite shall notify the Secretary as to which if any of the public lands identified in paragraph (2) of this subsection the city wishes to purchase.

"(2) For a period of twelve years after the date of enactment of this Act, the city shall have exclusive right to purchase the following parcels of public lands:

"Parcel A—East ½ Sec. 6, T. 13 S., R. 71 E., Mount Diablo Meridian; Sec. 5, T. 13 S., R. 71 E., Mount Diablo Meridian; West ½ Sec. 4, T. 13 S., R. 71 E, Mount Diablo Meridian; East ½, West ½ Sec. 4, T. 13 S., R. 71 E., Mount Diablo Meridian.

"Parcel B—North ½ Sec. 7, T. 13 S., R. 71 E., Mount Diablo Meridian; South East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, West ½ North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian.

"Parcel C—West ½ Sec. 6, T. 13 S., R. 71 E., Mount Diablo Meridian; Sec. 1, T. 13 S., R. 70 E., Mount Diablo Meridian; West ½, West ½, North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; North West ¼ Sec. 13, S., R. 70 E., Mount Diablo Meridian; West ½ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, South East ¼, Sec. 11, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½ North East ¼, Sec. 14, T. 13 S., R. 70 E., Mount Diablo Meridian.

"Parcel D—South ½ Sec. 14, T. 13 S., R. 70 E., Mount Diablo Meridian; South West ¼, Sec. 13, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 23, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 24, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 26, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian."

SEC. 122. FATHER AULL SITE TRANSFER.—

(a) This section may be cited as the "Father Aull Site Transfer Act of 1996".

(b) FINDINGS.—Congress finds that—

(1) the buildings and grounds developed by Father Roger Aull located on public domain land near Silver City, New Mexico, are historically significant to the citizens of the community;

(2) vandalism at the site has become increasingly destructive and frequent in recent years;

(3) because of the isolated location and the distance from other significant resources and agency facilities, the Bureau of Land Management has been unable to devote sufficient resources to restore and protect the site from further damage; and

(4) St. Vincent DePaul Parish in Silver City, New Mexico, has indicated an interest in, and developed a sound proposal for the restoration of, the site, such that the site could be permanently occupied and used by the community.

(c) CONVEYANCE OF PROPERTY.—Subject to valid existing rights, all right, title and interest of the United States in and to the land (including improvements on the land), consisting of approximately 43.06 acres, located approximately 10 miles east of Silver City, New Mexico, and described as follows: T. 17 S., R. 12 W., Section 30: Lot 13, and Section 31: Lot 27 (as generally depicted on the map dated July 1995) is hereby conveyed by operation of law to St. Vincent DePaul Parish in Silver City, New Mexico, without consideration.

(d) RELEASE.—Upon the conveyance of any land or interest in land identified in this section of St. Vincent DePaul Parish, St. Vincent DePaul Parish shall assume any liability for any claim relating to the land or interest in the land arising after the date of the conveyance.

(e) MAP.—The map referred to in this section shall be on file and available for public inspection in—

(1) the State of New Mexico Office of the Bureau of Land Management, Santa Fe, New Mexico; and

(2) the Las Cruces District Office of the Bureau of Land Management, Las Cruces, New Mexico.

SEC. 123. The second proviso under the heading "Bureau of Mines, Administrative Provisions" of Public Law 104–134 is amended by inserting after the word "authorized" the word "hereafter".

<< 16 USCA § 1011 >>

SEC. 124. Watershed Restoration and Enhancement Agreements.

(a) IN GENERAL.—For fiscal year 1997 and each fiscal year thereafter, appropriations made for the Bureau of Land Management may be used by the Secretary of the Interior for the purpose of entering into cooperative agreements with willing private landowners for restoration and enhancement of fish, wildlife, and other biotic resources on public or private land or both that benefit these resources on public lands within the watershed.

(b) DIRECT AND INDIRECT WATERSHED AGREEMENTS.—The Secretary of the Interior may enter into a watershed restoration and enhancement agreement—

(1) directly with a willing private landowner; or

(2) indirectly through an agreement with a state, local, or tribal government or other public entity, educational institution, or private nonprofit organization.

(c) TERMS AND CONDITIONS.—In order for the Secretary to enter into a watershed restoration and enhancement agreement—

(1) the agreement shall—

(A) include such terms and conditions mutually agreed to by the Secretary and the landowner;

(B) improve the viability of and otherwise benefit the fish, wildlife, and other biotic resources on public land in the watershed;

(C) authorize the provision of technical assistance by the Secretary in the planning of management activities that will further the purposes of the agreement;

(D) provide for the sharing of costs of implementing the agreement among the Federal government, the landowner, and other entities, as mutually agreed on by the affected interests; and

(E) ensure that any expenditure by the Secretary pursuant to the agreement is determined by the Secretary to be in the public interest; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) the Secretary may require such other terms and conditions as are necessary to protect the public investment on private lands, provided such terms and conditions are mutually agreed to by the Secretary and the landowner.

<< 16 USCA § 410ff NOTE >>

SEC. 125. Visitor Center Designation at Channel Islands National Park.

(a) The visitor center at Channel Islands National Park, California, is hereby designated as the "Robert J. Lagomarsino Visitor Center".

(b) Any reference in law, regulation, paper, record, map, or any other document in the United States to the visitor center referred to in subsection (a) shall be deemed to be a reference to the "Robert J. Lagomarsino Visitor Center".

TITLE II—RELATED AGENCIES

DEPARTMENT OF AGRICULTURE

FOREST SERVICE

FOREST AND RANGELAND RESEARCH

For necessary expenses of forest and rangeland research as authorized by law, $179,786,000, to remain available until expended.

STATE AND PRIVATE FORESTRY

For necessary expenses of cooperating with, and providing technical and financial assistance to States, Territories, possessions, and others and for forest pest management activities, cooperative forestry and education and land conservation activities, $155,461,000, to remain available until expended, as authorized by law: Provided That of funds available under this heading for Pacific Northwest Assistance in this or prior appropriations Acts. $750,000 shall be provided to the World Forestry Center for purposes of continuing scientific research and other authorized efforts regarding the land exchange efforts in the Umpqua River Basin region.

NATIONAL FOREST SYSTEM

For necessary expenses of the Forest Service, not otherwise provided for, for management, protection, improvement, and utilization of the National Forest System, for ecosystem planning, inventory, and monitoring, and for administrative expenses associated with the management of funds provided under the heads "Forest and Rangeland Research," "State and Private Forestry," "National Forest System," "Wildland Fire Management," "Reconstruction and Construction," and "Land Acquisition," $1,274,781,000, to remain available until expended, and including 50 per centum of all monies received during the prior fiscal year as fees collected under the Land and Water Conservation Fund Act of 1965, as amended, in accordance with section 4 of the Act (16 U.S.C. 460*l*–6a(i)): Provided, That up to $5,000,000 of the funds provided herein for road maintenance shall be available for the planned obliteration of roads which are no longer needed.

WILDLAND FIRE MANAGEMENT

For necessary expenses for forest fire presuppression activities on National Forest System lands, for emergency fire suppression on or adjacent to such lands or other lands under fire protection agreement, and for emergency rehabilitation of burned over National Forest System lands, $530,016,000, to remain available until expended: Provided, That unexpended balances of amounts previously appropriated under any other headings for Forest Service fire activities are transferred to and merged with this appropriation and subject to the same terms and conditions: Provided, further, That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes.

RECONSTRUCTION AND CONSTRUCTION

For necessary expenses of the Forest Service, not otherwise provided for, $174,974,000, to remain available until expended for construction, reconstruction and acquisition of buildings and other facilities, and for construction, reconstruction and repair of forest roads and trails by the Forest Service as authorized by 16 U.S.C. 532–538 and 23 U.S.C. 101 and 205: Provided, That not to exceed $50,000,000, to remain available until expended, may be obligated for the construction of forest roads by

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

timber purchasers: Provided further, That funds appropriated under this head for the construction of the Wayne National Forest Supervisor's Office may be granted to the Ohio State Highway Patrol as the federal share of the cost of construction of a new facility to be occupied jointly by the Forest Service and the Ohio State Highway Patrol: Provided further, That an agreed upon lease of space in the new facility shall be provided to the Forest Service without charge for the life of the building.

## LAND ACQUISITION

For expenses necessary to carry out the provisions of the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the Forest Service, $40,575,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## ACQUISITION OF LANDS FOR NATIONAL FORESTS SPECIAL ACTS

For acquisition of lands within the exterior boundaries of the Cache, Uinta, and Wasatch National Forests, Utah; the Toiyabe National Forest, Nevada; and the Angeles, San Bernardino, Sequoia, and Cleveland National Forests, California, as authorized by law, $1,069,000, to be derived from forest receipts.

## ACQUISITION OF LANDS TO COMPLETE LAND EXCHANGES

For acquisition of lands, such sums, to be derived from funds deposited by State, county, or municipal governments, public school districts, or other public school authorities pursuant to the Act of December 4, 1967, as amended (16 U.S.C. 484a), to remain available until expended.

## RANGE BETTERMENT FUND

For necessary expenses of range rehabilitation, protection, and improvement, 50 per centum of all moneys received during the prior fiscal year, as fees for grazing domestic livestock on lands in National Forests in the sixteen Western States, pursuant to section 401(b)(1) of Public Law 94–579, as amended, to remain available until expended, of which not to exceed 6 per centum shall be available for administrative expenses associated with on-the-ground range rehabilitation, protection, and improvements.

## GIFTS, DONATIONS AND BEQUESTS FOR FOREST AND RANGELAND RESEARCH

For expenses authorized by 16 U.S.C. 1643(b), $92,000, to remain available until expended, to be derived from the fund established pursuant to the above Act.

## ADMINISTRATIVE PROVISIONS, FOREST SERVICE

Appropriations to the Forest Service for the current fiscal year shall be available for: (a) purchase of not to exceed 159 passenger motor vehicles of which 14 will be used primarily for law enforcement purposes and of which 149 shall be for replacement; acquisition of 10 passenger motor vehicles from excess sources, and hire of such vehicles; operation and maintenance of aircraft, the purchase of not to exceed two for replacement only, and acquisition of 20 aircraft from excess sources; notwithstanding other provisions of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft; (b) services pursuant to 7 U.S.C. 2225, and not to exceed $100,000 for employment under 5 U.S.C. 3109; (c) purchase, erection, and alteration of buildings and other public improvements (7 U.S.C. 2250); (d) acquisition of land, waters, and interests therein, pursuant to 7 U.S.C. 428a; (e) for expenses pursuant to the Volunteers in the National Forest Act of 1972 (16 U.S.C. 558a, 558d, 558a note); and (f) for debt collection contracts in accordance with 31 U.S.C. 3718(c).

None of the funds made available under this Act shall be obligated or expended to change the boundaries of any region, to abolish any region, to move or close any regional office for research, State and private forestry, or National Forest System administration of the Forest Service, Department of Agriculture, or to implement any reorganization, "reinvention" or other type of organizational restructuring of the Forest Service, other than the relocation of the Regional Office for Region 5 of the Forest Service from San Francisco to excess military property at Mare Island, Vallejo, California, without the consent of the House and Senate Committees on Appropriations.

Any funds available to the Forest Service may be used for retrofitting Mare Island facilities to accommodate the relocation: Provided, That funds for the move must come from funds otherwise available to Region 5: Provided further, That any funds to be provided for such purposes shall only be available upon approval of the House and Senate Committees on Appropriations.

Any appropriations or funds available to the Forest Service may be advanced to the Wildland Fire Management appropriation and may be used for forest firefighting and the emergency rehabilitation of burned-over lands under its jurisdiction.

Funds appropriated to the Forest Service shall be available for assistance to or through the Agency for International Development and the Foreign Agricultural Service in connection with forest and rangeland research, technical information, and assistance in foreign countries, and shall be available to support forestry and related natural resource activities outside the United States and its territories and possessions, including technical assistance, education and training, and cooperation with United States and international organizations.

None of the funds made available to the Forest Service under this Act shall be subject to transfer under the provisions of section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or 7 U.S.C. 147b unless the proposed transfer is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 103–551.

None of the funds available to the Forest Service may be reprogrammed without the advance approval of the House and Senate Committees on Appropriations in accordance with the procedures contained in House Report 103–551.

No funds appropriated to the Forest Service shall be transferred to the Working Capital Fund of the Department of Agriculture without the approval of the Chief of the Forest Service.

Notwithstanding any other provision of the law, any appropriations or funds available to the Forest Service may be used to disseminate program information to private and public individuals and organizations through the use of nonmonetary items of nominal value and to provide nonmonetary awards of nominal value and to incur necessary expenses for the nonmonetary recognition of private individuals and organizations that make contributions to Forest Service programs.

Notwithstanding any other provision of law, money collected, in advance or otherwise, by the Forest Service under authority of section 101 of Public Law 93–153 (30 U.S.C. 185(l)) as reimbursement of administrative and other costs incurred in processing pipeline right-of-way or permit applications and for costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities, may be used to reimburse the applicable appropriation to which such costs were originally charged.

Funds available to the Forest Service shall be available to conduct a program of not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended by Public Law 93–408.

None of the funds available in this Act shall be used for timber sale preparation using clearcutting in hardwood stands in excess of 25 percent of the fiscal year 1989 harvested volume in the Wayne National Forest, Ohio: Provided, That this limitation shall not apply to hardwood stands damaged by natural disaster: Provided further, That landscape architects shall be used to maintain a visually pleasing forest.

Any money collected from the States for fire suppression assistance rendered by the Forest Service on non-Federal lands not in the vicinity of National Forest System lands shall be used to reimburse the applicable appropriation and shall remain available until expended as the Secretary may direct in conducting activities authorized by 16 U.S.C. 2101 (note), 2101–2110, 1606, and 2111.

Of the funds available to the Forest Service, $1,500 is available to the Chief of the Forest Service for official reception and representation expenses.

Notwithstanding any other provision of law, the Forest Service is authorized to employ or otherwise contract with persons at regular rates of pay, as determined by the Service, to perform work occasioned by emergencies such as fires, storms, floods, earthquakes or any other unavoidable cause without regard to Sundays, Federal holidays, and the regular workweek.

To the greatest extent possible, and in accordance with the Final Amendment to the Shawnee National Forest Plan, none of the funds available in this Act shall be used for preparation of timber sales using clearcutting or other forms of even aged management in hardwood stands in the Shawnee National Forest, Illinois.

Pursuant to sections 405(b) and 410(b) of Public Law 101–593, funds up to $1,000,000 for matching funds shall be available for the National Forest Foundation on a one-for-one basis to match private contributions for projects on or benefitting National Forest System lands or related to Forest Service programs.

Pursuant to section 2(b)(2) of Public Law 98–244, up to $1,000,000 of the funds available to the Forest Service shall be available for matching funds, as authorized in 16 U.S.C. 3701–3709, on a one-for-one basis to match private contributions for projects on or benefitting National Forest System lands or related to Forest Service programs.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Funds appropriated to the Forest Service shall be available for interactions with and providing technical assistance to rural communities for sustainable rural development purposes.

Notwithstanding any other provision of law, 80 percent of the funds appropriated to the Forest Service in the National Forest System and Construction accounts and planned to be allocated to activities under the "Jobs in the Woods" program for projects on National Forest land in the State of Washington may be granted directly to the Washington State Department of Fish and Wildlife for accomplishment of planned projects. Twenty percent of said funds shall be retained by the Forest Service for planning and administering projects. Project selection and prioritization shall be accomplished by the Forest Service with such consultation with the State of Washington as the Forest Service deems appropriate.

Funds appropriated to the Forest Service shall be available for payments to counties within the Columbia River Gorge National Scenic Area, pursuant to sections 14(c)(1) and (2), and section 16(a)(2) of Public Law 99–663.

The Secretary of Agriculture shall by March 31, 1997 report to the Committees on Appropriations of the House of Representatives and the Senate on the status and disposition of all salvage timber sales started under the authority of Section 2001 of Public Law 104–19 and subsequently withdrawn or delayed and completed under different authorities as a consequence of the July 2, 1996 directive on the implementation of Section 2001 issued by the Secretary.

The Pacific Northwest Research Station Silviculture Laboratory in Bend, Oregon is hereby named the "Robert W. Chandler Building".

For purposes of the Southeast Alaska Economic Disaster Fund as set forth in section 101(c) of Public Law 104–134, the direct grants provided in subsection (c) shall be considered direct payments for purposes of all applicable law except that these direct grants may not be used for lobbying activities.

No employee of the Department of Agriculture may be detailed or assigned from an agency or office funded by this Act to any other agency or office of the Department for more than 30 days unless the individual's employing agency or office is fully reimbursed by the receiving agency or office for the salary and expenses of the employee for the period of assignment.

## DEPARTMENT OF ENERGY

## CLEAN COAL TECHNOLOGY

### (RESCISSION)

Of the funds made available under this heading for obligation in fiscal year 1997 or prior years, $123,000,000 are rescinded: Provided, That funds made available in previous appropriations Acts shall be available for any ongoing project regardless of the separate request for proposal under which the project was selected.

## FOSSIL ENERGY RESEARCH AND DEVELOPMENT

For necessary expenses in carrying out fossil energy research and development activities, under the authority of the Department of Energy Organization Act (Public Law 95–91), including the acquisition of interest, including defeasible and equitable interests in any real property or any facility or for plant or facility acquisition or expansion, and for conducting inquiries, technological investigations and research concerning the extraction, processing, use, and disposal of mineral substances without objectionable social and environmental costs (30 U.S.C. 3, 1602, and 1603), performed under the minerals and materials science programs at the Albany Research Center in Oregon, $364,704,000 to remain available until expended: Provided, That no part of the sum herein made available shall be used for the field testing of nuclear explosives in the recovery of oil and gas.

## ALTERNATIVE FUELS PRODUCTION

### (INCLUDING TRANSFER AND RESCISSION OF FUNDS)

Monies received as investment income on the principal amount in the Great Plains Project Trust at the Norwest Bank of North Dakota, in such sums as are earned as of October 1, 1996, shall be deposited in this account and immediately transferred to the General Fund of the Treasury. Monies received as revenue sharing from the operation of the Great Plains Gasification Plant shall be immediately transferred to the General Fund of the Treasury. Funds are hereby rescinded in the amount of $2,500,000 from unobligated balances under this head.

## NAVAL PETROLEUM AND OIL SHALE RESERVES

<< 10 USCA § 7430 NOTE >>

For necessary expenses in carrying out naval petroleum and oil shale reserve activities, $143,786,000, to remain available until expended: Provided, That the requirements of 10 U.S.C. 7430(b)(2)(B) shall not apply to fiscal year 1997.

## ENERGY CONSERVATION

For necessary expenses in carrying out energy conservation activities, $569,762,000, to remain available until expended, including, notwithstanding any other provision of law, the excess amount for fiscal year 1997 determined under the provisions of section 3003(d) of Public Law 99–509 (15 U.S.C. 4502): Provided, That $149,845,000 shall be for use in energy conservation programs as defined in section 3008(3) of Public Law 99–509 (15 U.S.C. 4507) and shall not be available until excess amounts are determined under the provisions of section 3003(d) of Public Law 99–509 (15 U.S.C. 4502): Provided further, That notwithstanding section 3003(d)(2) of Public Law 99–509 such sums shall be allocated to the eligible programs as follows: $120,845,000 for weatherization assistance grants and $29,000,000 for State energy conservation grants.

## ECONOMIC REGULATION

For necessary expenses in carrying out the activities of the Office of Hearing and Appeals, $2,725,000, to remain available until expended.

## STRATEGIC PETROLEUM RESERVE

## (INCLUDING TRANSFER OF FUNDS)

For necessary expenses for Strategic Petroleum Reserve facility development and operations and program management activities pursuant to the Energy Policy and Conservation Act of 1975, as amended (42 U.S.C. 6201 et seq.), $220,000,000, to remain available until expended, of which $220,000,000 shall be repaid from the "SPR Operating Fund" from amounts made available from the sale of oil from the Reserve: Provided, That notwithstanding section 161 of the Energy Policy and Conservation Act, the Secretary shall draw down and sell in fiscal year 1997 $220,000,000 worth of oil from the Strategic Petroleum Reserve: Provided further, That the proceeds from the sale shall be deposited into a special account in the Treasury, to be established and known as the "SPR Operating Fund", and shall, upon receipt, be transferred to the Strategic Petroleum Reserve account for operations of the Strategic Petroleum Reserve.

## SPR PETROLEUM ACCOUNT

Notwithstanding 42 U.S.C. 6240(d) the United States share of crude oil in Naval Petroleum Reserve Numbered 1 (Elk Hills) may be sold or otherwise disposed of to other than the Strategic Petroleum Reserve: Provided, That outlays in fiscal year 1997 resulting from the use of funds in this account shall not exceed $5,000,000.

## ENERGY INFORMATION ADMINISTRATION

For necessary expenses in carrying out the activities of the Energy Information Administration, $66,120,000 to remain available until expended.

## ADMINISTRATIVE PROVISIONS, DEPARTMENT OF ENERGY

Appropriations under this Act for the current fiscal year shall be available for hire of passenger motor vehicles; hire, maintenance, and operation of aircraft; purchase, repair, and cleaning of uniforms; and reimbursement to the General Services Administration for security guard services.

From appropriations under this Act, transfers of sums may be made to other agencies of the Government for the performance of work for which the appropriation is made.

None of the funds made available to the Department of Energy under this Act shall be used to implement or finance authorized price support or loan guarantee programs unless specific provision is made for such programs in an appropriations Act.

The Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, private or foreign: Provided, That revenues and other moneys received by or for the account of the Department of Energy or otherwise generated by sale of products in connection with projects of the Department appropriated under this Act may be retained by the Secretary of Energy, to be available until

expended, and used only for plant construction, operation, costs, and payments to cost-sharing entities as provided in appropriate cost-sharing contracts or agreements: Provided further, That the remainder of revenues after the making of such payments shall be covered into the Treasury as miscellaneous receipts: Provided further, That any contract, agreement, or provision thereof entered into by the Secretary pursuant to this authority shall not be executed prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full comprehensive report on such project, including the facts and circumstances relied upon in support of the proposed project.

No funds provided in this Act may be expended by the Department of Energy to prepare, issue, or process procurement documents for programs or projects for which appropriations have not been made.

In addition to other authorities set forth in this Act, the Secretary may accept fees and contributions from public and private sources, to be deposited in a contributed funds account, and prosecute projects using such fees and contributions in cooperation with other Federal, State or private agencies or concerns.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## INDIAN HEALTH SERVICE

### INDIAN HEALTH SERVICES

For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self–Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,806,269,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 238(b) for services furnished by the Indian Health Service: Provided, That funds made available to tribes and tribal organizations through contracts, grant agreements, or any other agreements or compacts authorized by the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), shall be deemed to be obligated at the time of the grant or contract award and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: Provided further, That $12,000,000 shall remain available until expended, for the Indian Catastrophic Health Emergency Fund: Provided further, That $356,325,000 for contract medical care shall remain available for obligation until September 30, 1998: Provided further, That of the funds provided, not less than $11,706,000 shall be used to carry out the loan repayment program under section 108 of the Indian Health Care Improvement Act: Provided further, That funds provided in this Act may be used for one-year contracts and grants which are to be performed in two fiscal years, so long as the total obligation is recorded in the year for which the funds are appropriated: Provided further, That the amounts collected by the Secretary of Health and Human Services under the authority of title IV of the Indian Health Care Improvement Act shall remain available until expended for the purpose of achieving compliance with the applicable conditions and requirements of titles XVIII and XIX of the Social Security Act (exclusive of planning, design, or construction of new facilities): Provided further, That of the funds provided, $7,500,000 shall remain available until expended, for the Indian Self–Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts, compacts, grants or cooperative agreements with the Indian Health Service under the provisions of the Indian Self–Determination Act: Provided further, That funding contained herein, and in any earlier appropriations Acts for scholarship programs under the Indian Health Care Improvement Act (25 U.S.C. 1613) shall remain available for obligation until September 30, 1998: Provided further, That amounts received by tribes and tribal organizations under title IV of the Indian Health Care Improvement Act shall be reported and accounted for and available to the receiving tribes and tribal organizations until expended.

### INDIAN HEALTH FACILITIES

For construction, repair, maintenance, improvement, and equipment of health and related auxiliary facilities, including quarters for personnel; preparation of plans, specifications, and drawings; acquisition of sites, purchase and erection of modular buildings, and purchases of trailers; and for provision of domestic and community sanitation facilities for Indians, as authorized by section 7 of the Act of August 5, 1954 (42 U.S.C. 2004a), the Indian Self–Determination Act, and the Indian Health Care Improvement Act, and for expenses necessary to carry out such Acts and titles II and III of the Public Health Service Act with respect to environmental health and facilities support activities of the Indian Health Service, $247,731,000, to remain available until expended: Provided, That notwithstanding any other provision of law, funds appropriated for the planning, design,

construction or renovation of health facilities for the benefit of an Indian tribe or tribes may be used to purchase land for sites to construct, improve, or enlarge health or related facilities.

## ADMINISTRATIVE PROVISIONS, INDIAN HEALTH SERVICE

Appropriations in this Act to the Indian Health Service shall be available for services as authorized by 5 U.S.C. 3109 but at rates not to exceed the per diem rate equivalent to the maximum rate payable for senior-level positions under 5 U.S.C. 5376; hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation and erection of modular buildings and renovation of existing facilities; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and for uniforms or allowances therefore as authorized by 5 U.S.C. 5901–5902; and for expenses of attendance at meetings which are concerned with the functions or activities for which the appropriation is made or which will contribute to improved conduct, supervision, or management of those functions or activities: Provided, That in accordance with the provisions of the Indian Health Care Improvement Act, non-Indian patients may be extended health care at all tribally administered or Indian Health Service facilities, subject to charges, and the proceeds along with funds recovered under the Federal Medical Care Recovery Act (42 U.S.C. 2651–53) shall be credited to the account of the facility providing the service and shall be available without fiscal year limitation: Provided further, That notwithstanding any other law or regulation, funds transferred from the Department of Housing and Urban Development to the Indian Health Service shall be administered under Public Law 86–121 (the Indian Sanitation Facilities Act) and Public Law 93–638, as amended: Provided further, That funds appropriated to the Indian Health Service in this Act, except those used for administrative and program direction purposes, shall not be subject to limitations directed at curtailing Federal travel and transportation: Provided further, That notwithstanding any other provision of law, funds previously or herein made available to a tribe or tribal organization through a contract, grant, or agreement authorized by title I or title III of the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), may be deobligated and reobligated to a self-determination contract under title I, or a self-governance agreement under title III of such Act and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: Provided further, That none of the funds made available to the Indian Health Service in this Act shall be used to implement the final rule published in the Federal Register on September 16, 1987, by the Department of Health and Human Services, relating to the eligibility for the health care services of the Indian Health Service until the Indian Health Service has submitted a budget request reflecting the increased costs associated with the proposed final rule, and such request has been included in an appropriations Act and enacted into law: Provided further, That funds made available in this Act are to be apportioned to the Indian Health Service as appropriated in this Act, and accounted for in the appropriation structure set forth in this Act: Provided further, That funds received from any source, including tribal contractors and compactors for previously transferred functions which tribal contractors and compactors no longer wish to retain, for services, goods, or training and technical assistance, shall be retained by the Indian Health Service and shall remain available until expended by the Indian Health Service: Provided further, That reimbursements for training, technical assistance, or services provided by the Indian Health Service will contain total costs, including direct, administrative, and overhead associated with the provision of goods, services, or technical assistance: Provided further, That the appropriation structure for the Indian Health Service may not be altered without advance approval of the House and Senate Committees on Appropriations.

## DEPARTMENT OF EDUCATION

## OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

## INDIAN EDUCATION

For necessary expenses to carry out, to the extent not otherwise provided, title IX, part A of the Elementary and Secondary Education Act of 1965, as amended, and section 215 of the Department of Education Organization Act, $61,000,000.

## OTHER RELATED AGENCIES

## OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION

## SALARIES AND EXPENSES

For necessary expenses of the Office of Navajo and Hopi Indian Relocation as authorized by Public Law 93–531, $19,345,000, to remain available until expended: Provided, That funds provided in this or any other appropriations Act are to be used to relocate eligible individuals and groups including evictees from District 6, Hopi-partitioned lands residents, those in significantly substandard housing, and all others certified as eligible and not included in the preceding categories: Provided further, That none of the funds contained in this or any other Act may be used by the Office of Navajo and Hopi Indian Relocation to evict any single Navajo or Navajo family who, as of November 30, 1985, was physically domiciled on the lands partitioned to the Hopi Tribe unless a new or replacement home is provided for such household: Provided further, That no relocatee will be provided with more than one new or replacement home: Provided further, That the Office shall relocate any certified eligible relocatees who have selected and received an approved homesite on the Navajo reservation or selected a replacement residence off the Navajo reservation or on the land acquired pursuant to 25 U.S.C. 640d–10.

### INSTITUTE OF AMERICAN INDIAN AND ALASKA NATIVE CULTURE AND ARTS DEVELOPMENT

#### PAYMENT TO THE INSTITUTE

For payment to the Institute of American Indian and Alaska Native Culture and Arts Development, as authorized by title XV of Public Law 99–498, as amended (20 U.S.C. 56, part A), $5,500,000.

### SMITHSONIAN INSTITUTION

#### SALARIES AND EXPENSES

For necessary expenses of the Smithsonian Institution, as authorized by law, including research in the fields of art, science, and history; development, preservation, and documentation of the National Collections; presentation of public exhibits and performances; collection, preparation, dissemination, and exchange of information and publications; conduct of education, training, and museum assistance programs; maintenance, alteration, operation, lease (for terms not to exceed thirty years), and protection of buildings, facilities, and approaches; not to exceed $100,000 for services as authorized by 5 U.S.C. 3109; up to 5 replacement passenger vehicles; purchase, rental, repair, and cleaning of uniforms for employees; $317,557,000, of which not to exceed $30,665,000 for the instrumentation program, collections acquisition, Museum Support Center equipment and move, exhibition reinstallation, the National Museum of the American Indian, the repatriation of skeletal remains program, research equipment, information management, and Latino programming shall remain available until expended, and including such funds as may be necessary to support American overseas research centers and a total of $125,000 for the Council of American Overseas Research Centers: Provided, That funds appropriated herein are available for advance payments to independent contractors performing research services or participating in official Smithsonian presentations.

#### CONSTRUCTION AND IMPROVEMENTS, NATIONAL ZOOLOGICAL PARK

For necessary expenses of planning, construction, remodeling, and equipping of buildings and facilities at the National Zoological Park, by contract or otherwise, $3,850,000, to remain available until expended.

#### REPAIR AND RESTORATION OF BUILDINGS

For necessary expenses of repair and restoration of buildings owned or occupied by the Smithsonian Institution, by contract or otherwise, as authorized by section 2 of the Act of August 22, 1949 (63 Stat. 623), including not to exceed $10,000 for services as authorized by 5 U.S.C. 3109, $39,000,000, to remain available until expended: Provided, That contracts awarded for environmental systems, protection systems, and exterior repair or restoration of buildings of the Smithsonian Institution may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

#### CONSTRUCTION

For necessary expenses for construction, $10,000,000, to remain available until expended.

### NATIONAL GALLERY OF ART

#### SALARIES AND EXPENSES

For the upkeep and operations of the National Gallery of Art, the protection and care of the works of art therein, and administrative expenses incident thereto, as authorized by the Act of March 24, 1937 (50 Stat. 51), as amended by the public

resolution of April 13, 1939 (Public Resolution 9, Seventy-sixth Congress), including services as authorized by 5 U.S.C. 3109; payment in advance when authorized by the treasurer of the Gallery for membership in library, museum, and art associations or societies whose publications or services are available to members only, or to members at a price lower than to the general public; purchase, repair, and cleaning of uniforms for guards, and uniforms, or allowances therefor, for other employees as authorized by law (5 U.S.C. 5901–5902); purchase or rental of devices and services for protecting buildings and contents thereof, and maintenance, alteration, improvement, and repair of buildings, approaches, and grounds; and purchase of services for restoration and repair of works of art for the National Gallery of Art by contracts made, without advertising, with individuals, firms, or organizations at such rates or prices and under such terms and conditions as the Gallery may deem proper, $53,899,000, of which not to exceed $3,026,000 for the special exhibition program shall remain available until expended.

### REPAIR, RESTORATION AND RENOVATION OF BUILDINGS

For necessary expenses of repair, restoration and renovation of buildings, grounds and facilities owned or occupied by the National Gallery of Art, by contract or otherwise, as authorized, $5,942,000, to remain available until expended: Provided, That contracts awarded for environmental systems, protection systems, and exterior repair or renovation of buildings of the National Gallery of Art may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

### JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

### OPERATIONS AND MAINTENANCE

For necessary expenses for the operation, maintenance and security of the John F. Kennedy Center for the Performing Arts, $10,875,000.

### CONSTRUCTION

For necessary expenses of capital repair and rehabilitation of the existing features of the building and site of the John F. Kennedy Center for the Performing Arts, $9,000,000, to remain available until expended.

### WOODROW WILSON INTERNATIONAL CENTER FOR SCHOLARS

### SALARIES AND EXPENSES

For expenses necessary in carrying out the provisions of the Woodrow Wilson Memorial Act of 1968 (82 Stat. 1356) including hire of passenger vehicles and services as authorized by 5 U.S.C. 3109, $5,840,000.

### NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

### NATIONAL ENDOWMENT FOR THE ARTS

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $82,734,000, shall be available to the National Endowment for the Arts for the support of projects and productions in the arts through assistance to organizations and individuals pursuant to section 5(c) of the Act, and for administering the functions of the Act, to remain available until expended.

### MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $16,760,000, to remain available until expended, to the National Endowment for the Arts: Provided, That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the Chairman or by grantees of the Endowment under the provisions of section 10(a)(2), subsections 11(a)(2)(A) and 11(a)(3)(A) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

### NATIONAL ENDOWMENT FOR THE HUMANITIES

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $96,100,000 shall be available to the National Endowment for the Humanities for support of activities in the humanities, pursuant to section 7(c) of the Act, and for administering the functions of the Act, to remain available until expended.

## MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $13,900,000, to remain available until expended, of which $8,000,000 shall be available to the National Endowment for the Humanities for the purposes of section 7(h): Provided, That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the Chairman or by grantees of the Endowment under the provisions of subsections 11(a)(2)(B) and 11(a)(3)(B) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

## INSTITUTE OF MUSEUM SERVICES

## GRANTS AND ADMINISTRATION

For carrying out title II of the Arts, Humanities, and Cultural Affairs Act of 1976, as amended, $22,000,000, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

None of the funds appropriated to the National Foundation on the Arts and the Humanities may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: Provided, That none of the funds appropriated to the National Foundation on the Arts and the Humanities may be used for official reception and representation expenses.

## COMMISSION OF FINE ARTS

## SALARIES AND EXPENSES

For expenses made necessary by the Act establishing a Commission of Fine Arts (40 U.S.C. 104), $867,000.

## NATIONAL CAPITAL ARTS AND CULTURAL AFFAIRS

For necessary expenses as authorized by Public Law 99–190 (20 U.S.C. 956(a)), as amended, $6,000,000.

## ADVISORY COUNCIL ON HISTORIC PRESERVATION

## SALARIES AND EXPENSES

For necessary expenses of the Advisory Council on Historic Preservation (Public Law 89–665, as amended), $2,500,000: Provided, That none of these funds shall be available for the compensation of Executive Level V or higher position.

## NATIONAL CAPITAL PLANNING COMMISSION

## SALARIES AND EXPENSES

For necessary expenses, as authorized by the National Capital Planning Act of 1952 (40 U.S.C. 71–71i), including services as authorized by 5 U.S.C. 3109, $5,390,000: Provided, That all appointed members will be compensated at a rate not to exceed the rate for Executive Schedule Level IV.

## FRANKLIN DELANO ROOSEVELT MEMORIAL COMMISSION

## SALARIES AND EXPENSES

For necessary expenses of the Franklin Delano Roosevelt Memorial Commission, established by the Act of August 11, 1955 (69 Stat. 694), as amended by Public Law 92–332 (86 Stat. 401), $500,000 to remain available until expended.

## UNITED STATES HOLOCAUST MEMORIAL COUNCIL

## HOLOCAUST MEMORIAL COUNCIL

For expenses of the Holocaust Memorial Council, as authorized by Public Law 96–388 (36 U.S.C. 1401), as amended, $30,707,000, of which $1,575,000 for the Museum's repair and rehabilitation program and $1,264,000 for the Museum's exhibitions program shall remain available until expended.

## TITLE III—GENERAL PROVISIONS

SEC. 301. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive Order issued pursuant to existing law.

SEC. 302. No part of any appropriation under this Act shall be available to the Secretary of the Interior or the Secretary of Agriculture for the leasing of oil and natural gas by noncompetitive bidding on publicly owned lands within the boundaries of the Shawnee National Forest, Illinois: Provided, That nothing herein is intended to inhibit or otherwise affect the sale, lease, or right to access to minerals owned by private individuals.

SEC. 303. No part of any appropriation contained in this Act shall be available for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which congressional action is not complete.

SEC. 304. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 305. None of the funds provided in this Act to any department or agency shall be obligated or expended to provide a personal cook, chauffeur, or other personal servants to any officer or employee of such department or agency except as otherwise provided by law.

SEC. 306. No assessments may be levied against any program, budget activity, subactivity, or project funded by this Act unless advance notice of such assessments and the basis therefor are presented to the Committees on Appropriations and are approved by such Committees.

SEC. 307. (a) COMPLIANCE WITH BUY AMERICAN ACT.—None of the funds made available in this Act may be expended by an entity unless the entity agrees that in expending the funds the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c; popularly known as the "Buy American Act").

(b) SENSE OF CONGRESS; REQUIREMENT REGARDING NOTICE.—

(1) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products.

(2) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance using funds made available in this Act, the head of each Federal agency shall provide to each recipient of the assistance a notice describing the statement made in paragraph (1) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 308. None of the funds in this Act may be used to plan, prepare, or offer for sale timber from trees classified as giant sequoia (Sequoiadendron giganteum) which are located on National Forest System or Bureau of Land Management lands in a manner different than such sales were conducted in fiscal year 1995.

SEC. 309. None of the funds made available by this Act may be obligated or expended by the National Park Service to enter into or implement a concession contract which permits or requires the removal of the underground lunchroom at the Carlsbad Caverns National Park.

SEC. 310. Where the actual costs of construction projects under self-determination contracts, compacts, or grants, pursuant to Public Laws 93–638, 103–413, or 100–297, are less than the estimated costs thereof, use of the resulting excess funds shall be determined by the appropriate Secretary after consultation with the tribes.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 311. Notwithstanding Public Law 103–413, quarterly payments of funds to tribes and tribal organizations under annual funding agreements pursuant to section 108 of Public Law 93–638, as amended, may be made on the first business day following the first day of a fiscal quarter.

SEC. 312. None of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps program, unless the relevant agencies of the Department of the Interior and/or Agriculture follow appropriate reprogramming guidelines: Provided, That if no funds are provided for the AmeriCorps program by the VA–HUD and Independent Agencies fiscal year 1997 appropriations bill, then none of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps programs.

SEC. 313. None of the funds made available in this Act may be used (1) to demolish the bridge between Jersey City, New Jersey, and Ellis Island; or (2) to prevent pedestrian use of such bridge, when it is made known to the Federal official having authority to obligate or expend such funds that such pedestrian use is consistent with generally accepted safety standards.

SEC. 314. (a) None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to accept or process applications for a patent for any mining or mill site claim located under the general mining laws.

(b) The provisions of subsection (a) shall not apply if the Secretary of the Interior determines that, for the claim concerned: (1) a patent application was filed with the Secretary on or before September 30, 1994, and (2) all requirements established under sections 2325 and 2326 of the Revised Statutes (30 U.S.C. 29 and 30) for vein or lode claims and sections 2329, 2330, 2331, and 2333 of the Revised Statutes (30 U.S.C. 35, 36, and 37) for placer claims, and section 2337 of the Revised Statutes (30 U.S.C. 42) for mill site claims, as the case may be, were fully complied with by the applicant by that date.

(c) PROCESSING SCHEDULE.—For those applications for patents pursuant to subsection (b) which were filed with the Secretary of the Interior, prior to September 30, 1994, the Secretary of the Interior shall—

(1) Within three months of the enactment of this Act, file with the House and Senate Committees on Appropriations and the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the United States Senate a plan which details how the Department of the Interior will make a final determination as to whether or not an applicant is entitled to a patent under the general mining laws on at least 90 percent of such applications within five years of the enactment of this Act and file reports annually thereafter with the same committees detailing actions taken by the Department of the Interior to carry out such plan; and

(2) Take such actions as may be necessary to carry out such plan.

(d) MINERAL EXAMINATIONS.—In order to process patent applications in a timely and responsible manner, upon the request of a patent applicant, the Secretary of the Interior shall allow the applicant to fund a qualified third-party contractor to be selected by the Bureau of Land Management to conduct a mineral examination of the mining claims or mill sites contained in a patent application as set forth in subsection (b). The Bureau of Land Management shall have the sole responsibility to choose and pay the third-party contractor in accordance with the standard procedures employed by the Bureau of Land Management in the retention of third-party contractors.

SEC. 315. None of the funds appropriated or otherwise made available by this Act may be used for the purposes of acquiring lands in the counties of Gallia, Lawrence, Monroe, or Washington, Ohio, for the Wayne National Forest.

SEC. 316. Of the funds provided to the National Endowment for the Arts:

(a) The Chairperson shall only award a grant to an individual if such grant is awarded to such individual for a literature fellowship, National Heritage Fellowship, or American Jazz Masters Fellowship.

(b) The Chairperson shall establish procedures to ensure that no funding provided through a grant, except a grant made to a State or local arts agency, or regional group, may be used to make a grant to any other organization or individual to conduct activity independent of the direct grant recipient. Nothing in this subsection shall prohibit payments made in exchange for goods and services.

(c) No grant shall be used for seasonal support to a group, unless the application is specific to the contents of the season, including identified programs and/or projects.

Sec. 317. None of the funds available to the Department of the Interior or the Department of Agriculture by this or any other Act may be used to prepare, promulgate, implement, or enforce any interim or final rule or regulation pursuant to Title VIII of the Alaska National Interest Lands Conservation Act to assert jurisdiction, management, or control over any waters (other than non-navigable waters on Federal lands), non-Federal lands, or lands selected by, but not conveyed to, the State of Alaska

153

pursuant to the Submerged Lands Act of 1953 or the Alaska Statehood Act, or an Alaska Native Corporation pursuant to the Alaska Native Claims Settlement Act.

<< 16 USCA § 620c NOTE >>

SEC. 318. No funds appropriated under this or any other Act shall be used to review or modify sourcing areas previously approved under section 490(c)(3) of the Forest Resources Conservation and Shortage Relief Act of 1990 (Public Law 101–382) or to enforce or implement Federal regulations 36 CFR part 223 promulgated on September 8, 1995. The regulations and interim rules in effect prior to September 8, 1995 (36 CFR 223.48, 36 CFR 223.87, 36 CFR 223 subpart D, 36 CFR 223 subpart F, and 36 CFR 261.6) shall remain in effect. The Secretary of Agriculture or the Secretary of the Interior shall not adopt any policies concerning Public Law 101–382 or existing regulations that would restrain domestic transportation or processing of timber from private lands or impose additional accountability requirements on any timber. The Secretary of Commerce shall extend until September 30, 1997, the order issued under section 491(b)(2)(A) of Public Law 101–382 and shall issue an order under section 491(b)(2)(B) of such law that will be effective October 1, 1997.

<< 16 USCA § 460*l*–6a NOTE >>

SEC. 319. Section 101(c) of Public Law 104–134 is amended as follows: Under the heading "Title III—General Provisions" amend section 315(b) by striking "50, areas," and inserting in lieu thereof "100, areas," and amend section 315(f) by striking "September 30, 1998" and inserting in lieu thereof "September 30, 1999" and by striking "September 30, 2001" and inserting in lieu thereof "September 30, 2002".

SEC. 320. None of the amounts made available by this Act may be used for design, planning, implementation, engineering, construction, or any other activity in connection with a scenic shoreline drive in Pictured Rocks National Lakeshore.

SEC. 321. LAND TRANSFER, BEND SILVICULTURE LAB, DESCHUTES NATIONAL FOREST, OREGON.—

(a) TRANSFER OF REAL PROPERTY AND ALL IMPROVEMENTS LOCATED THEREON.—Notwithstanding any other provisions of law, there is hereby transferred, without consideration and subject to existing valid rights, all right, title and interest of the United States in and to approximately 5.73 acres of land as described by plat dated July 7, 1977, (which is on file and available for public inspection in the Office of the Chief, USDA Forest Service, Washington, D.C.), as well as all improvements, including the Bend Silviculture Lab located thereon, to the Central Oregon Community College, Bend, Oregon; this being a portion of the same tract acquired by donation from the City of Bend on August 10, 1960, through a Bargain and Sale deed to the USDA Forest Service for use as a research lab, and recorded in volume 125, page 508 of the Deschutes County, Oregon, Deed Records.

(b) CONDITIONS OF TRANSFER.—The transfer effected by subsection (a) is made subject to no special terms or conditions.

SEC. 322. No part of any appropriation contained in this Act or any other Act shall be expended or obligated to fund the activities of the Office of Forestry and Economic Assistance, or any successor office after December 31, 1996.

SEC. 323. (a) The Secretary of the Interior is authorized to accept title to approximately 84 acres of land located in Prince Georges County, Maryland, adjacent to Oxon Cove Park, and bordered generally by the Potomac River, Interstate 295 and the Woodrow Wilson Bridge, or any interest therein, and in exchange therefor may convey to the Corrections Corporation of America approximately 50 acres of land located in Oxon Cove Park in the District of Columbia and bordered generally by Oxon Cove, Interstate 295 and the District of Columbia Impound Lot, or any interest therein.

(b) Before proceeding with an exchange, the Secretary shall determine if the federal property is suitable for exchange under the criteria normally used by the National Park Service. The exchange shall comply with applicable regulations and National Park Service policies for land exchanges.

(c)(1) The Secretary shall not acquire any lands under this section if the Secretary determines that the lands or any portion thereof have become contaminated with hazardous substances (as defined in the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 960*l*)).

(2) Notwithstanding any other provision of law, the United States shall have no responsibility or liability with respect to any hazardous wastes or other substances placed on any of the lands covered by this section after their transfer to the ownership of any party, but nothing in this section shall be construed as either diminishing or increasing any responsibility or liability of

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SL    Document 58-3    Filed 11/10/20    Page 1452 of 3864

the United States based on the condition of such lands on the date of their transfer to the ownership of another party: Provided, That the Corrections Corporation of America shall indemnify the United States for liabilities arising under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 960*l*) and the Resource Conservation Recovery Act (42 U.S.C. 690l, et seq.).

(d) The properties so exchanged either shall be approximately equal in fair market value or if they are not approximately equal, shall be equalized by the payment of cash to the Corporation or to the Secretary as required or in the event the value of the Corporation's lands is greater, the acreage may be reduced so that the fair market value is approximately equal: Provided, That the Secretary shall order appraisals made of the fair market value for improvements thereon: Provided further, That any such cash payment received by the Secretary shall be deposited to "Miscellaneous Trust Funds, National Park Service" and shall be available without further appropriation until expended for the acquisition of land within the National Park System.

(e) Costs of conducting necessary land surveys, preparing the legal descriptions of the lands to be conveyed, performing the appraisals, and administrative costs incurred in completing the exchange shall be borne by the Corporation.

(f) Following any exchange authorized by this provision, the boundaries of Oxon Cove Park shall be expanded to include the land acquired by the United States.

SEC. 324. SECTION 1. LAND EXCHANGE.—

(a) EXCHANGE.—Subject to subsection (c), the Secretary of Agriculture (referred to in this section as the "Secretary") shall convey all right, title, and interest of the United States in and to the National Forest System lands described in subsection (b)(1) to Public Utility District No. 1 of Chelan County, Washington (referred to in this section as the "Public Utility District"), in exchange for the conveyance to the Department of Agriculture by the Public Utility District of all right, title, and interest of the Public Utility District in and to the lands described in subsection (b)(2).

(b) DESCRIPTION OF LANDS.—

(1) NATIONAL FOREST SYSTEM LANDS.—The National Forest System lands referred to in subsection (a) are 122 acres, more or less, that are partially occupied by a wastewater treatment facility referred to in subsection (c)(4)(A) with the following legal description:

(A) The NE¼ of SW¼ of section 27 of township 27 north, range 17 east, Willamette Meridian, Chelan County, Washington.

(B) The N½ of SE¼ of SW¼ of such section 27.

(C) The W½ of NW¼ of SE¼ of such section 27.

(D) The NW¼ of SW¼ of SE¼ of such section 27.

(E) The E½ of NW¼ of the SE¼ of such section 27.

(F) That portion of the S½ of SE¼ of SW¼ lying north of the northerly edge of Highway 209 right-of-way of such section 27.

(2) PUBLIC UTILITY DISTRICT LANDS.—The lands owned by the Public Utility District are 109.15 acres, more or less, with the following legal description:

(A) S½ of SW¼ of section 35 of township 26 north, range 17 east, Willamette Meridian, Chelan County, Washington.

(B) The area specified by Public Utility District No. 1 as Government Lot 5 in such section 35.

(c) REQUIREMENTS FOR EXCHANGE.—

(1) TITLE ACCEPTANCE AND CONVEYANCE.—Upon offer by the Public Utility District of all right, title and interest in and to the lands described in subsection (b)(2), if the title is found acceptable by the Secretary, the Secretary shall accept title to such lands and interests therein and shall convey to the Public Utility District all right, title, and interest of the United States in and to the lands described in subsection (b)(1).

(2) APPRAISALS REQUIRED.—Before making an exchange pursuant to subsection (a), the Secretary shall conduct appraisals of the lands that are subject to the exchange to determine the fair market value of the lands. Such appraisals shall not include the value of the wastewater treatment facility referred to in paragraph (4)(A).

(3) ADDITIONAL CONSIDERATION.—If, on the basis of the appraisals made under paragraph (1), the Secretary determines that the fair market value of the lands to be conveyed by one party under subsection (a) is less than the fair market value of the lands to be conveyed by the other party under subsection (a), then, as a condition of making the exchange under subsection (a), the party conveying the lands with the lesser value shall pay the other party the amount by which the fair market value of the lands of greater value exceeds the fair market value of the lands of lesser value.

(4) CONVEYANCE OF WASTEWATER TREATMENT FACILITY.—(A) As part of an exchange made under subsection (a), the Secretary shall convey to the Public Utility District of Chelan County, Washington, all right, title and interest of the United States in and to the wastewater treatment facility (including the wastewater treatment plant and associated lagoons) located on the lands described in subsection (b)(1) that is in existence on the date of the exchange.

(B) As a condition for the exchange under subsection (a), the Public Utility District shall provide for a credit equal to the fair market value of the wastewater treatment facility conveyed pursuant to subparagraph (A) (determined as of November 4, 1991), that shall be applied to the United States' share of any new wastewater treatment facility constructed by the Public Utility District after such date.

(d) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions in connection with the exchange under this section as the Secretary determines appropriate to protect the interests of the United States.

SEC. 325. "Snoqualmie National Forest Boundary Adjustment Act of 1996."

(a) IN GENERAL.—The Secretary of Agriculture is hereby directed to modify the boundary of the Snoqualmie National Forest to include and encompass 10,589.47 acres, more or less, as generally depicted on a map entitled "Snoqualmie National Forest Proposed 1996 Boundary Modification" dated July, 1996. Such map, together with a legal description of all lands included in the boundary adjustment, shall be on file and available for public inspection in the Office of the Chief of the Forest Service in Washington, District of Columbia.

(b) RULE FOR LAND AND WATER CONSERVATION FUND.—For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundary of the Snoqualmie National Forest, as modified pursuant to subsection (a), shall be considered to be the boundary of that National Forest as of January 1, 1965.

SEC. 326. Sugarbush Land Exchange Act of 1996.

(a) EXCHANGE OR SALE OF LAND.—

(1) If Sugarbush Resort Holdings, Inc. conveys to the United States land acceptable to the Secretary of Agriculture that is at least equal in value to the value of the land described in subsection (a)(2), makes a payment of cash at least equal to that value, or conveys land and makes a payment of cash that in combination are at least equal to that value, the Secretary, subject to valid existing rights, shall, under such terms and conditions as the Secretary may prescribe, convey all right, title, and interest of the United States in and to the land described in subsection (a)(2).

(2) FEDERAL LAND TO BE EXCHANGED.—The Federal land to be exchanged is approximately 57 acres of federally owned land in the Green Mountain National Forest depicted on the map entitled "Green Mountain National Forest, Sugarbush Exchange," dated December 1995.

(3) Lands acquired from Sugarbush Resort Holdings, Inc.—Any land conveyed to the United States in an exchange under subsection (a)(1) shall be subject to such valid existing rights of record as may be acceptable to the Secretary, and the title to the parcel shall conform with the title approval standards applicable to federal land acquisitions.

(b) ADMINISTRATION OF LAND.—

(1) ADDITION TO GREEN MOUNTAIN NATIONAL FOREST.—On approval and acceptance of title by the Secretary, the land acquired by the United States through an exchange or with proceeds from a sale under subsection (a) shall become part of the Green Mountain National Forest, and the boundaries of the National Forest shall be adjusted to include the land.

(2) ADMINISTRATION.—Land acquired under this Act shall be administered by the Secretary in accordance with the laws (including regulations) pertaining to the National Forest System.

(3) AUTHORITY OF THE SECRETARY.—This section does not limit the authority of the Secretary to adjust the boundaries of the Green Mountain National Forest pursuant to section 11 of the Act of March 1, 1911 (36 Stat. 963, chapter 186; 16 U.S.C. 521) (commonly known as the "Weeks Law").

(4) For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundaries of the Green Mountain National Forest, as adjusted under this Act, shall be considered to be the boundaries of the Green Mountain National Forest as of January 1, 1965.

AR.01430

156

SEC. 327. Snowbird Wilderness Study Area.

  (a) In General.—Section 6(a)(4) of the North Carolina Wilderness Act of 1984 (Public Law 98–324) is amended—
   (1) by striking "eight thousand four hundred and ninety acres" and inserting "8,390 acres"; and
   (2) by striking "July 1983" and inserting "July 1996".
  (b) Management.—The Secretary of Agriculture shall manage the area removed from wilderness study status by the amendments made by subsection (a) in accordance with the provisions of law applicable to adjacent areas outside the wilderness study area.

<< 16 USCA § 1132 NOTE >>

SEC. 328. Renaming of Wilderness Area.

  (a) The Columbia Wilderness, created by the Oregon Wilderness Act of 1984, Public Law 98–328, located in the Mt. Hood National Forest, Oregon, shall be known and designated as the "Mark O. Hatfield Wilderness".
  (b) Any references in a law, map, regulation, document, paper, or other record of the United States to the Columbia Wilderness shall be deemed to be a reference to the "Mark O. Hatfield Wilderness".
  SEC. 329. Notwithstanding any other provision of law, for fiscal year 1997 the Secretaries of Agriculture and Interior are authorized to limit competition for watershed restoration project contracts as part of the "Jobs in the Woods" component of the President's Forest Plan for the Pacific Northwest to individuals and entities in historically timber-dependent areas in the States of Washington, Oregon, and northern California that have been affected by reduced timber harvesting on Federal lands.

<< 25 USCA § 1708 >>

SEC. 330. Section 9 of the Rhode Island Indian Claims Settlement Act (25 U.S.C. 1708) is amended—
  (1) by striking "Sec. 9. Except as"; and inserting the following:
  "(a) In General.—Except as";
  (2) by striking the section heading and inserting the following:
  "Sec. 9. Applicability of State Law; Treatment of Settlement Lands Under the Indian Gaming Regulatory Act."; and
  (3) by adding at the end the following new subsection:
  "(b) Treatment of Settlement Lands Under the Indian Gaming Regulatory Act.—For purposes of the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.), settlement lands shall not be treated as Indian lands.".

TITLE IV—EMERGENCY APPROPRIATIONS

DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

  For an additional amount for management of lands and resources, $3,500,000, to remain available until expended, to restore public lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

WILDLAND FIRE MANAGEMENT

  For an additional amount for wildland fire management, $100,000,000, to remain available until expended, for emergency rehabilitation and wildfire suppression activities of the Department of the Interior: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget

request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OREGON AND CALIFORNIA GRANT LANDS

For an additional amount for Oregon and California grant lands, $2,500,000, to remain available until expended, to restore public lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## United States Fish and Wildlife Service

## RESOURCE MANAGEMENT

For an additional amount for resource management, $2,100,000, to remain available until expended, of which $600,000 is to restore public lands damaged by fire and $1,500,000 is address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## CONSTRUCTION

For an additional amount for construction, $15,891,000, to remain available until expended, to repair damage caused by hurricanes, floods and other acts of nature: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## NATIONAL PARK SERVICE

## OPERATION OF THE NATIONAL PARK SYSTEM

For an additional amount for operation of the National park system, $2,300,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## CONSTRUCTION

For an additional amount for construction, $9,300,000, to remain available until expended, of which $3,000,000 is to repair damage caused by hurricanes and $6,300,000 is to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## UNITED STATES GEOLOGICAL SURVEY

## SURVEYS, INVESTIGATIONS, AND RESEARCH

For an additional amount for surveys, investigations, and research, $1,138,000, to remain available until expended, to address damage caused by hurricanes and floods: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## BUREAU OF INDIAN AFFAIRS

### OPERATION OF INDIAN PROGRAMS

For an additional amount for operation of Indian programs, $6,600,000, to remain available until expended, to repair damage caused by floods and to restore Indian lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $6,000,000, to remain available until expended, to repair damage caused by floods: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## DEPARTMENT OF AGRICULTURE

### FOREST SERVICE

### NATIONAL FOREST SYSTEM

For an additional amount for the National Forest System, $3,395,000, to remain available until expended, to repair damage caused by hurricanes: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### WILDLAND FIRE MANAGEMENT

For an additional amount for wildland fire management, $550,000,000, to remain available until expended, for presuppression due to emergencies for emergency fire suppression on or adjacent to National Forest System lands or other lands under fire protection agreement and for emergency rehabilitation of burned over National Forest System lands: Provided, That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes: Provided further, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### RECONSTRUCTION AND CONSTRUCTION

For an additional amount for reconstruction and construction, $5,210,000, to remain available until expended, to repair damage caused by hurricanes: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section

251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OTHER RELATED AGENCIES

## SMITHSONIAN INSTITUTION

### SALARIES AND EXPENSES

For an additional amount for salaries and expenses, $935,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

### OPERATIONS AND MAINTENANCE

For an additional amount for operations and maintenance, $1,600,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $3,400,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## NATIONAL GALLERY OF ART

### SALARIES AND EXPENSES

For an additional amount for salaries and expenses, $382,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## UNITED STATES HOLOCAUST MEMORIAL COUNCIL

### HOLOCAUST MEMORIAL COUNCIL

For an additional amount for the Holocaust Memorial Council, $1,000,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes

designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

This Act may be cited as the "Department of the Interior and Related Agencies Appropriations Act, 1997".

(e) For programs, projects or activities in the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

Making appropriations for the Departments of Labor, Health and Human Services, and Education, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

TITLE I—DEPARTMENT OF LABOR

EMPLOYMENT AND TRAINING ADMINISTRATION

TRAINING AND EMPLOYMENT SERVICES

<< 29 USCA § 1732 NOTE >>

For expenses necessary to carry into effect the Job Training Partnership Act, as amended, including the purchase and hire of passenger motor vehicles, the construction, alteration, and repair of buildings and other facilities, and the purchase of real property for training centers as authorized by the Job Training Partnership Act; the Women in Apprenticeship and Nontraditional Occupations Act; the National Skill Standards Act of 1994; and the School-to-Work Opportunities Act; $4,719,703,000 plus reimbursements, of which $3,559,408,000 is available for obligation for the period July 1, 1997 through June 30, 1998; of which $88,685,000 is available for the period July 1, 1997 through June 30, 2000 for necessary expenses of construction, rehabilitation, and acquisition of Job Corps centers; and of which $200,000,000 shall be available from July 1, 1997 through September 30, 1998, for carrying out activities of the School-to-Work Opportunities Act: Provided, That $52,502,000 shall be for carrying out section 401 of the Job Training Partnership Act, $69,285,000 shall be for carrying out section 402 of such Act, $7,300,000 shall be for carrying out section 441 of such Act, $8,000,000 shall be for all activities conducted by and through the National Occupational Information Coordinating Committee under such Act, $895,000,000 shall be for carrying out title II, part A of such Act, and $126,672,000 shall be for carrying out title II, part C of such Act: Provided further, That no funds from any other appropriation shall be used to provide meal services at or for Job Corps centers: Provided further, That funds provided to carry out title III of the Job Training Partnership Act shall not be subject to the limitation contained in subsection (b) of section 315 of such Act; that the waiver allowing a reduction in the cost limitation relating to retraining services described in subsection (a)(2) of such section 315 may be granted with respect to funds from this Act if a substate grantee demonstrates to the Governor that such waiver is appropriate due to the availability of low-cost retraining services, is necessary to facilitate the provision of needs-related payments to accompany long-term training, or is necessary to facilitate the provision of appropriate basic readjustment services; and that funds provided to carry out the Secretary's discretionary grants under part B of such title III may be used to provide needs-related payments to participants who, in lieu of meeting the requirements relating to enrollment in training under section 314(e) of such Act, are enrolled in training by the end of the sixth week after grant funds have been awarded: Provided further, That service delivery areas may transfer funding provided herein under authority of titles II–B and II–C of the Job Training Partnership Act between the programs authorized by those titles of that Act, if such transfer is approved by the Governor: Provided further, That service delivery areas and substate areas may transfer up to 20 percent of the funding provided herein under authority of title II–A and title III of the Job Training Partnership Act between the programs authorized by those titles of the Act, if such transfer is approved by the Governor: Provided further, That, notwithstanding any other provision of law, any proceeds from the sale of Job Corps center facilities shall be retained by the Secretary of Labor to carry out the Job Corps program: Provided further, That notwithstanding any other provision of law, the Secretary of Labor may waive any of the statutory or regulatory requirements of titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, worker rights, participation and protection, grievance procedures and judicial review, nondiscrimination, allocation of funds to local areas, eligibility, review and approval of plans, the establishment and functions of service delivery areas and private industry councils, and the basic purposes of the Act), and any of the statutory or regulatory requirements

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), only for funds available for expenditure in program year 1997, pursuant to a request submitted by a State which identifies the statutory or regulatory requirements that are requested to be waived and the goals which the State or local service delivery areas intend to achieve, describes the actions that the State or local service delivery areas have undertaken to remove State or local statutory or regulatory barriers, describes the goals of the waiver and the expected programmatic outcomes if the request is granted, describes the individuals impacted by the waiver, and describes the process used to monitor the progress in implementing a waiver, and for which notice and an opportunity to comment on such request has been provided to the organizations identified in section 105(a)(1) of the Job Training Partnership Act, if and only to the extent that the Secretary determines that such requirements impede the ability of the State to implement a plan to improve the workforce development system and the State has executed a Memorandum of Understanding with the Secretary requiring such State to meet agreed upon outcomes and implement other appropriate measures to ensure accountability: Provided further, That the Secretary of Labor shall establish a workforce flexibility (work-flex) partnership demonstration program under which the Secretary shall authorize not more than six States, of which at least three States shall each have populations not in excess of 3,500,000, with a preference given to those States that have been designated Ed–Flex Partnership States under section 311(e) of Public Law 103–227, to waive any statutory or regulatory requirement applicable to service delivery areas or substate areas within the State under titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, grievance procedures and judicial review, nondiscrimination, allotment of funds, and eligibility), and any of the statutory or regulatory requirements of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), for a duration not to exceed the waiver period authorized under section 311(e) of Public Law 103–227, pursuant to a plan submitted by such States and approved by the Secretary for the provision of workforce employment and training activities in the States, which includes a description of the process by which service delivery areas and substate areas may apply for and have waivers approved by the State, the requirements of the Wagner–Peyser Act to be waived, the outcomes to be achieved and other measures to be taken to ensure appropriate accountability for federal funds.

## COMMUNITY SERVICE EMPLOYMENT FOR OLDER AMERICANS

### (TRANSFER OF FUNDS)

To carry out the activities for national grants or contracts with public agencies and public or private nonprofit organizations under paragraph (1)(A) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $361,140,000, including $21,840,000 which shall be available for the period ending June 30, 1997.

To carry out the activities for grants to States under paragraph (3) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $101,860,000, including $6,160,000 which shall be available for the period ending June 30, 1997.

The funds appropriated under this heading shall be transferred to the Department of Health and Human Services, "Aging Services Programs" following the enactment of legislation authorizing the administration of the program by that Department.

## FEDERAL UNEMPLOYMENT BENEFITS AND ALLOWANCES

For payments during the current fiscal year of trade adjustment benefit payments and allowances under part I, and for training, for allowances for job search and relocation, and for related State administrative expenses under part II, subchapters B and D, chapter 2, title II of the Trade Act of 1974, as amended, $324,500,000, together with such amounts as may be necessary to be charged to the subsequent appropriation for payments for any period subsequent to September 15 of the current year.

## STATE UNEMPLOYMENT INSURANCE AND EMPLOYMENT

### SERVICE OPERATIONS

For authorized administrative expenses, $173,452,000, together with not to exceed $3,146,826,000 (including not to exceed $1,653,000 which may be used for amortization payments to States which had independent retirement plans in their State employment service agencies prior to 1980, and including not to exceed $2,000,000 which may be obligated in contracts with

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

non-State entities for activities such as occupational and test research activities which benefit the Federal–State Employment Service System), which may be expended from the Employment Security Administration account in the Unemployment Trust Fund including the cost of administering section 1201 of the Small Business Job Protection Act of 1996, section 7(d) of the Wagner–Peyser Act, as amended, the Trade Act of 1974, as amended, the Immigration Act of 1990, and the Immigration and Nationality Act, as amended, and of which the sums available in the allocation for activities authorized by title III of the Social Security Act, as amended (42 U.S.C. 502–504), and the sums available in the allocation for necessary administrative expenses for carrying out 5 U.S.C. 8501–8523, shall be available for obligation by the States through December 31, 1997, except that funds used for automation acquisitions shall be available for obligation by States through September 30, 1999; and of which $23,452,000, together with not to exceed $738,283,000 of the amount which may be expended from said trust fund, shall be available for obligation for the period July 1, 1997 through June 30, 1998, to fund activities under the Act of June 6, 1933, as amended, including the cost of penalty mail authorized under 39 U.S.C. 3202(a)(1)(E) made available to States in lieu of allotments for such purpose, and of which $216,333,000 shall be available only to the extent necessary for additional State allocations to administer unemployment compensation laws to finance increases in the number of unemployment insurance claims filed and claims paid or changes in a State law: Provided, That to the extent that the Average Weekly Insured Unemployment (AWIU) for fiscal year 1997 is projected by the Department of Labor to exceed 2,828,000 an additional $28,600,000 shall be available for obligation for every 100,000 increase in the AWIU level (including a pro rata amount for any increment less than 100,000) from the Employment Security Administration Account of the Unemployment Trust Fund: Provided further, That funds appropriated in this Act which are used to establish a national one-stop career center network may be obligated in contracts, grants or agreements with non-State entities: Provided further, That funds appropriated under this Act for activities authorized under the Wagner–Peyser Act, as amended, and title III of the Social Security Act, may be used by the States to fund integrated Employment Service and Unemployment Insurance automation efforts, notwithstanding cost allocation principles prescribed under Office of Management and Budget Circular A–87.

### ADVANCES TO THE UNEMPLOYMENT TRUST FUND AND OTHER FUNDS

For repayable advances to the Unemployment Trust Fund as authorized by sections 905(d) and 1203 of the Social Security Act, as amended, and to the Black Lung Disability Trust Fund as authorized by section 9501(c)(1) of the Internal Revenue Code of 1954, as amended; and for nonrepayable advances to the Unemployment Trust Fund as authorized by section 8509 of title 5, United States Code, section 104(d) of Public Law 102–164, and section 5 of Public Law 103–6, and to the "Federal unemployment benefits and allowances" account, to remain available until September 30, 1998, $373,000,000.

In addition, for making repayable advances to the Black Lung Disability Trust Fund in the current fiscal year after September 15, 1997, for costs incurred by the Black Lung Disability Trust Fund in the current fiscal year, such sums as may be necessary.

### PROGRAM ADMINISTRATION

For expenses of administering employment and training programs and for carrying out section 908 of the Social Security Act, $81,393,000, together with not to exceed $39,977,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

### PENSION AND WELFARE BENEFITS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for Pension and Welfare Benefits Administration, $77,083,000, of which $6,000,000 shall remain available through September 30, 1998 for expenses of revising the processing of employee benefit plan returns.

### PENSION BENEFIT GUARANTY CORPORATION

### PENSION BENEFIT GUARANTY CORPORATION FUND

The Pension Benefit Guaranty Corporation is authorized to make such expenditures, including financial assistance authorized by section 104 of Public Law 96–364, within limits of funds and borrowing authority available to such Corporation, and in accord with law, and to make such contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act, as amended (31 U.S.C. 9104), as may be necessary in carrying out the program through September 30, 1997, for such Corporation: Provided, That not to exceed $10,345,000 shall be available for administrative

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

expenses of the Corporation: Provided further, That expenses of such Corporation in connection with the termination of pension plans, for the acquisition, protection or management, and investment of trust assets, and for benefits administration services shall be considered as non-administrative expenses for the purposes hereof, and excluded from the above limitation.

## EMPLOYMENT STANDARDS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for the Employment Standards Administration, including reimbursement to State, Federal, and local agencies and their employees for inspection services rendered, $290,422,000, together with $983,000 which may be expended from the Special Fund in accordance with sections 39(c) and 44(j) of the Longshore and Harbor Workers' Compensation Act: Provided, That the Secretary of Labor is authorized to accept, retain, and spend, until expended, in the name of the Department of Labor, all sums of money ordered to be paid to the Secretary of Labor, in accordance with the terms of the Consent Judgment in Civil Action No. 91–0027 of the United States District Court for the District of the Northern Mariana Islands (May 21, 1992): Provided further, That the Secretary of Labor is authorized to establish and, in accordance with 31 U.S.C. 3302, collect and deposit in the Treasury fees for processing applications and issuing certificates under sections 11(d) and 14 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 211(d) and 214) and for processing applications and issuing registrations under Title I of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. 1801 et seq.

### SPECIAL BENEFITS

### (INCLUDING TRANSFER OF FUNDS)

For the payment of compensation, benefits, and expenses (except administrative expenses) accruing during the current or any prior fiscal year authorized by title 5, chapter 81 of the United States Code; continuation of benefits as provided for under the head "Civilian War Benefits" in the Federal Security Agency Appropriation Act, 1947; the Employees' Compensation Commission Appropriation Act, 1944; and sections 4(c) and 5(f) of the War Claims Act of 1948 (50 U.S.C.App. 2012); and 50 per centum of the additional compensation and benefits required by section 10(h) of the Longshore and Harbor Workers' Compensation Act, as amended, $213,000,000 together with such amounts as may be necessary to be charged to the subsequent year appropriation for the payment of compensation and other benefits for any period subsequent to August 15 of the current year: Provided, That such sums as are necessary may be used under section 8104 of title 5, United States Code, by the Secretary to reimburse an employer, who is not the employer at the time of injury, for portions of the salary of a reemployed, disabled beneficiary: Provided further, That balances of reimbursements unobligated on September 30, 1996, shall remain available until expended for the payment of compensation, benefits, and expenses: Provided further, That in addition there shall be transferred to this appropriation from the Postal Service and from any other corporation or instrumentality required under section 8147(c) of title 5, United States Code, to pay an amount for its fair share of the cost of administration, such sums as the Secretary of Labor determines to be the cost of administration for employees of such fair share entities through September 30, 1997: Provided further, That of those funds transferred to this account from the fair share entities to pay the cost of administration, $11,390,000 shall be made available to the Secretary of Labor for expenditures relating to capital improvements in support of Federal Employees' Compensation Act administration, and the balance of such funds shall be paid into the Treasury as miscellaneous receipts: Provided further, That the Secretary may require that any person filing a notice of injury or a claim for benefits under Subchapter 5, U.S.C., chapter 81, or under subchapter 33, U.S.C. 901, et seq. (the Longshore and Harbor Workers' Compensation Act, as amended), provide as part of such notice and claim, such identifying information (including Social Security account number) as such regulations may prescribe.

### BLACK LUNG DISABILITY TRUST FUND

### (INCLUDING TRANSFER OF FUNDS)

For payments from the Black Lung Disability Trust Fund, $1,007,644,000, of which $961,665,000 shall be available until September 30, 1998, for payment of all benefits as authorized by section 9501(d)(1), (2), (4), and (7) of the Internal Revenue Code of 1954, as amended, and interest on advances as authorized by section 9501(c)(2) of that Act, and of which $26,071,000 shall be available for transfer to Employment Standards Administration, Salaries and Expenses, $19,621,000 for transfer to Departmental Management, Salaries and Expenses, and $287,000 for transfer to Departmental Management, Office of Inspector

General, for expenses of operation and administration of the Black Lung Benefits program as authorized by section 9501(d)(5)(A) of that Act: Provided, That, in addition, such amounts as may be necessary may be charged to the subsequent year appropriation for the payment of compensation, interest, or other benefits for any period subsequent to August 15 of the current year: Provided further, That in addition such amounts shall be paid from this fund into miscellaneous receipts as the Secretary of the Treasury determines to be the administrative expenses of the Department of the Treasury for administering the fund during the current fiscal year, as authorized by section 9501(d)(5)(B) of that Act.

## OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

### SALARIES AND EXPENSES

<< 29 USCA § 670 NOTE >>

 For necessary expenses for the Occupational Safety and Health Administration, $325,734,000, including not to exceed $77,354,000 which shall be the maximum amount available for grants to States under section 23(g) of the Occupational Safety and Health Act, which grants shall be no less than fifty percent of the costs of State occupational safety and health programs required to be incurred under plans approved by the Secretary under section 18 of the Occupational Safety and Health Act of 1970; and, in addition, notwithstanding 31 U.S.C. 3302, the Occupational Safety and Health Administration may retain up to $750,000 per fiscal year of training institute course tuition fees, otherwise authorized by law to be collected, and may utilize such sums for occupational safety and health training and education grants: Provided, That, notwithstanding 31 U.S.C. 3302, the Secretary of Labor is authorized, during the fiscal year ending September 30, 1997, to collect and retain fees for services provided to Nationally Recognized Testing Laboratories, and may utilize such sums, in accordance with the provisions of 29 U.S.C. 9a, to administer national and international laboratory recognition programs that ensure the safety of equipment and products used by workers in the workplace: Provided further, That none of the funds appropriated under this paragraph shall be obligated or expended to prescribe, issue, administer, or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 which is applicable to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees: Provided further, That no funds appropriated under this paragraph shall be obligated or expended to administer or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 with respect to any employer of ten or fewer employees who is included within a category having an occupational injury lost workday case rate, at the most precise Standard Industrial Classification Code for which such data are published, less than the national average rate as such rates are most recently published by the Secretary, acting through the Bureau of Labor Statistics, in accordance with section 24 of that Act (29 U.S.C. 673), except—

   (1) to provide, as authorized by such Act, consultation, technical assistance, educational and training services, and to conduct surveys and studies;

   (2) to conduct an inspection or investigation in response to an employee complaint, to issue a citation for violations found during such inspection, and to assess a penalty for violations which are not corrected within a reasonable abatement period and for any willful violations found;

   (3) to take any action authorized by such Act with respect to imminent dangers;

   (4) to take any action authorized by such Act with respect to health hazards;

   (5) to take any action authorized by such Act with respect to a report of an employment accident which is fatal to one or more employees or which results in hospitalization of two or more employees, and to take any action pursuant to such investigation authorized by such Act; and

   (6) to take any action authorized by such Act with respect to complaints of discrimination against employees for exercising rights under such Act: Provided further, That the foregoing proviso shall not apply to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees.

## MINE SAFETY AND HEALTH ADMINISTRATION

### SALARIES AND EXPENSES

## << 30 USCA § 962 >>

For necessary expenses for the Mine Safety and Health Administration, $197,810,000, including purchase and bestowal of certificates and trophies in connection with mine rescue and first-aid work, and the hire of passenger motor vehicles; the Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, or private; the Mine Safety and Health Administration is authorized to promote health and safety education and training in the mining community through cooperative programs with States, industry, and safety associations; and any funds available to the Department may be used, with the approval of the Secretary, to provide for the costs of mine rescue and survival operations in the event of a major disaster: Provided, That none of the funds appropriated under this paragraph shall be obligated or expended to carry out section 115 of the Federal Mine Safety and Health Act of 1977 or to carry out that portion of section 104(g)(1) of such Act relating to the enforcement of any training requirements, with respect to shell dredging, or with respect to any sand, gravel, surface stone, surface clay, colloidal phosphate, or surface limestone mine.

### BUREAU OF LABOR STATISTICS

### SALARIES AND EXPENSES

For necessary expenses for the Bureau of Labor Statistics, including advances or reimbursements to State, Federal, and local agencies and their employees for services rendered, $309,647,000, of which $16,145,000 shall be for expenses of revising the Consumer Price Index and shall remain available until September 30, 1998, together with not to exceed $52,053,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

### DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

## << 33 USCA § 921 NOTE >>

For necessary expenses for Departmental Management, including the hire of three sedans, and including up to $4,358,000 for the President's Committee on Employment of People With Disabilities, $144,211,000; together with not to exceed $297,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund: Provided, That no funds made available by this Act may be used by the Solicitor of Labor to participate in a review in any United States court of appeals of any decision made by the Benefits Review Board under section 21 of the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 921) where such participation is precluded by the decision of the United States Supreme Court in Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding, 115 S.Ct. 1278 (1995): Provided further, That no funds made available by this Act may be used by the Secretary of Labor to review a decision under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 901 et seq.) that has been appealed and that has been pending before the Benefits Review Board for more than 12 months: Provided further, That any such decision pending a review by the Benefits Review Board for more than one year shall be considered affirmed by the Benefits Review Board on that date, and shall be considered the final order of the Board for purposes of obtaining a review in the United States courts of appeals: Provided further, That these provisions shall not be applicable to the review of any decision issued under the Black Lung Benefits Act (30 U.S.C. 901 et seq.).

### ASSISTANT SECRETARY FOR VETERANS EMPLOYMENT AND TRAINING

Not to exceed $181,949,000 may be derived from the Employment Security Administration account in the Unemployment Trust Fund to carry out the provisions of 38 U.S.C. 4100–4110A and 4321–4327, and Public Law 103–353, and which shall be available for obligation by the States through December 31, 1997.

### OFFICE OF INSPECTOR GENERAL

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For salaries and expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $42,938,000, together with not to exceed $3,543,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

## GENERAL PROVISIONS

Sec. 101. None of the funds appropriated in this title for the Job Corps shall be used to pay the compensation of an individual, either as direct costs or any proration as an indirect cost, at a rate in excess of $125,000.

### (TRANSFER OF FUNDS)

Sec. 102. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Labor in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

Sec. 103. Funds shall be available for carrying out title IV–B of the Job Training Partnership Act, notwithstanding section 427(c) of that Act, if a Job Corps center fails to meet national performance standards established by the Secretary.

Sec. 104. Effective January 1, 1997, no funds appropriated or otherwise made available to the Department of Labor in this title shall be disbursed without the approval of the Department's Chief Financial Officer or his delegatee.

Sec. 105. Notwithstanding any other provision of law, the Secretary of Labor may waive any of the requirements contained in sections 4, 104, 105, 107, 108, 121, 164, 204, 253, 254, 264, 301, 311, 313, 314, and 315 of the Job Training Partnership Act in order to assist States in improving State workforce development systems, pursuant to a request submitted by a State that has prior to the date of enactment of this Act executed a Memorandum of Understanding with the United States requiring such State to meet agreed upon outcomes.

This title may be cited as the "Department of Labor Appropriations Act, 1997".

## TITLE II—DEPARTMENT OF HEALTH AND HUMAN SERVICES

### HEALTH RESOURCES AND SERVICES ADMINISTRATION

### HEALTH RESOURCES AND SERVICES

For carrying out titles II, III, VII, VIII, X, XII, XVI, XIX, and XXVI of the Public Health Service Act, section 427(a) of the Federal Coal Mine Health and Safety Act, title V of the Social Security Act, the Health Care Quality Improvement Act of 1986, as amended, and the Native Hawaiian Health Care Act of 1988, as amended, $3,405,019,000, of which $297,000 shall remain available until expended for interest subsidies on loan guarantees made prior to fiscal year 1981 under part B of title VII of the Public Health Service Act: Provided, That the Division of Federal Occupational Health may utilize personal services contracting to employ professional management/administrative and occupational health professionals: Provided further, That of the funds made available under this heading, $828,000 shall be available until expended for facilities renovations at the Gillis W. Long Hansen's Disease Center: Provided further, That in addition to fees authorized by section 427(b) of the Health Care Quality Improvement Act of 1986, fees shall be collected for the full disclosure of information under the Act sufficient to recover the full costs of operating the National Practitioner Data Bank, and shall remain available until expended to carry out that Act: Provided further, That no more than $5,000,000 is available for carrying out the provisions of Public Law 104–73: Provided further, That of the funds made available under this heading, $198,452,000 shall be for the program under title X of the Public Health Service Act to provide for voluntary family planning projects: Provided further, That amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office: Provided further, That $167,000,000 shall be for State AIDS Drug Assistance Programs authorized by section 2616 of the Public Health Service Act and shall be distributed to States as authorized by section 2618(b)(2) of such Act: Provided further, That notwithstanding any other provision of law, funds made available under this heading may be used to continue operating the Council on Graduate Medical Education established by section 301 of Public Law 102–408: Provided further, That, of the funds made available under this heading, not more than $8,000,000 shall be made available and shall remain available until expended for loan guarantees for loans made by non-Federal lenders for the construction, renovation, and modernization of medical facilities that are owned

and operated by health centers funded under part A of title XVI of the Public Health Service Act as amended, and, subject to authorization, for loans made to health centers for the costs of developing and operating managed care networks or plans, and that such funds be available to subsidize guarantees of total loan principal in an amount not to exceed $80,000,000: Provided further, That notwithstanding section 502(a)(1) of the Social Security Act, not to exceed $103,609,000 is available for carrying out special projects of regional and national significance pursuant to section 501(a)(2) of such Act.

## MEDICAL FACILITIES GUARANTEE AND LOAN FUND

### FEDERAL INTEREST SUBSIDIES FOR MEDICAL FACILITIES

For carrying out subsections (d) and (e) of section 1602 of the Public Health Service Act, $7,000,000, together with any amounts received by the Secretary in connection with loans and loan guarantees under title VI of the Public Health Service Act, to be available without fiscal year limitation for the payment of interest subsidies. During the fiscal year, no commitments for direct loans or loan guarantees shall be made.

### HEALTH EDUCATION ASSISTANCE LOANS PROGRAM

For the cost of guaranteed loans, such sums as may be necessary to carry out the purpose of the program, as authorized by title VII of the Public Health Service Act, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That these funds are available to subsidize gross obligations for the total loan principal any part of which is to be guaranteed at not to exceed $140,000,000. In addition, for administrative expenses to carry out the guaranteed loan program, $2,688,000.

### VACCINE INJURY COMPENSATION PROGRAM TRUST FUND

For payments from the Vaccine Injury Compensation Program Trust Fund, such sums as may be necessary for claims associated with vaccine-related injury or death with respect to vaccines administered after September 30, 1988, pursuant to subtitle 2 of title XXI of the Public Health Service Act, to remain available until expended: Provided, That for necessary administrative expenses, not to exceed $3,000,000 shall be available from the Trust Fund to the Secretary of Health and Human Services.

### VACCINE INJURY COMPENSATION

For payment of claims resolved by the United States Court of Federal Claims related to the administration of vaccines before October 1, 1988, $110,000,000, to remain available until expended.

## CENTERS FOR DISEASE CONTROL AND PREVENTION

### DISEASE CONTROL, RESEARCH, AND TRAINING

<< 30 USCA § 1 NOTE >>

To carry out titles II, III, VII, XI, XV, XVII, and XIX of the Public Health Service Act, sections 101, 102, 103, 201, 202, 203, 301, and 501 of the Federal Mine Safety and Health Act of 1977, and sections 20, 21 and 22 of the Occupational Safety and Health Act of 1970, title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980; including insurance of official motor vehicles in foreign countries; and hire, maintenance, and operation of aircraft, $2,262,698,000, of which $30,553,000 shall remain available until expended for equipment and construction and renovation of facilities, and of which $32,000,000 shall remain available until September 30, 1998 for mine safety and health activities, and in addition, such sums as may be derived from authorized user fees, which shall be credited to this account: Provided, That in addition to amounts provided herein, up to $48,400,000 shall be available from amounts available under section 241 of the Public Health Service Act, to carry out the National Center for Health Statistics surveys: Provided further, That none of the funds made available for injury prevention and control at the Centers for Disease Control and Prevention may be used to advocate or promote gun control: Provided further, That the Director may redirect the total amount made available under authority of Public Law 101–502, section 3, dated November 3, 1990, to activities the Director may so designate: Provided further, That the Congress is to be notified promptly of any such transfer: Provided further, That the functions described in clause (1) of the first proviso under the subheading "mines and minerals" under the heading "Bureau of Mines" in the text of title I of the Department of the Interior and Related Agencies Appropriations Act, 1996, as enacted by section 101(c) of

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134), are hereby transferred to, and vested in, the Secretary of Health and Human Services, subject to section 1531 of title 31, United States Code: Provided further, That of the amount provided, $23,000,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

 In addition, $41,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40151 and 40261 of Public Law 103–322.

## NATIONAL INSTITUTES OF HEALTH

### NATIONAL CANCER INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cancer, $2,382,532,000.

### NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cardiovascular, lung, and blood diseases, and blood and blood products, $1,433,001,000.

### NATIONAL INSTITUTE OF DENTAL RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to dental disease, $195,997,000.

### NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to diabetes and digestive and kidney disease, $815,982,000.

### NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to neurological disorders and stroke, $726,746,000.

### NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to allergy and infectious diseases, $1,257,234,000.

### NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to general medical sciences, $998,470,000.

### NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT

 For carrying out section 301 and title IV of the Public Health Service Act with respect to child health and human development, $631,703,000.

### NATIONAL EYE INSTITUTE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to eye diseases and visual disorders, $332,735,000.

### NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES

 For carrying out sections 301 and 311 and title IV of the Public Health Service Act with respect to environmental health sciences, $308,819,000.

### NATIONAL INSTITUTE ON AGING

For carrying out section 301 and title IV of the Public Health Service Act with respect to aging, $486,047,000.

### NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to arthritis and musculoskeletal and skin diseases, $257,111,000.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS

For carrying out section 301 and title IV of the Public Health Service Act with respect to deafness and other communication disorders, $188,422,000.

## NATIONAL INSTITUTE OF NURSING RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to nursing research, $59,743,000.

## NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

For carrying out section 301 and title IV of the Public Health Service Act with respect to alcohol abuse and alcoholism, $212,004,000.

## NATIONAL INSTITUTE ON DRUG ABUSE

For carrying out section 301 and title IV of the Public Health Service Act with respect to drug abuse, $489,375,000.

## NATIONAL INSTITUTE OF MENTAL HEALTH

For carrying out section 301 and title IV of the Public Health Service Act with respect to mental health, $701,585,000.

## NATIONAL CENTER FOR RESEARCH RESOURCES

For carrying out section 301 and title IV of the Public Health Service Act with respect to research resources and general research support grants, $415,145,000: Provided, That none of these funds shall be used to pay recipients of the general research support grants program any amount for indirect expenses in connection with such grants: Provided further, That $20,000,000 shall be for extramural facilities construction grants.

## NATIONAL CENTER FOR HUMAN GENOME RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to human genome research, $189,657,000.

## JOHN E. FOGARTY INTERNATIONAL CENTER

For carrying out the activities at the John E. Fogarty International Center, $26,586,000.

## NATIONAL LIBRARY OF MEDICINE

For carrying out section 301 and title IV of the Public Health Service Act with respect to health information communications, $151,103,000, of which $4,000,000 shall be available until expended for improvement of information systems: Provided, That in fiscal year 1997, the Library may enter into personal services contracts for the provision of services in facilities owned, operated, or constructed under the jurisdiction of the National Institutes of Health.

## OFFICE OF THE DIRECTOR

## (INCLUDING TRANSFER OF FUNDS)

For carrying out the responsibilities of the Office of the Director, National Institutes of Health, $287,206,000, of which $35,589,000 shall be for the Office of AIDS Research: Provided, That funding shall be available for the purchase of not to exceed five passenger motor vehicles for replacement only: Provided further, That the Director may direct up to 1 percent of the total amount made available in this Act to all National Institutes of Health appropriations to activities the Director may so designate: Provided further, That no such appropriation shall be increased or decreased by more than 1 percent by any such transfers and that the Congress is promptly notified of the transfer: Provided further, That NIH is authorized to collect third party payments for the cost of clinical services that are incurred in National Institutes of Health research facilities and that such payments shall be credited to the National Institutes of Health Management Fund: Provided further, That all funds credited to the NIH Management Fund shall remain available for one fiscal year after the fiscal year in which they are deposited: Provided further, That up to $200,000 shall be available to carry out section 499 of the Public Health Service Act.

## BUILDINGS AND FACILITIES

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For the study of, construction of, and acquisition of equipment for, facilities of or used by the National Institutes of Health, including the acquisition of real property, $200,000,000, to remain available until expended, of which $90,000,000 shall be for the clinical research center: Provided, That, notwithstanding any other provision of law, a single contract or related contracts for the development and construction of the clinical research center may be employed which collectively include the full scope of the project: Provided further, That the solicitation and contract shall contain the clause "availability of funds" found at 48 CFR 52.232–18.

## SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION

### SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES

For carrying out titles V and XIX of the Public Health Service Act with respect to substance abuse and mental health services, the Protection and Advocacy for Mentally Ill Individuals Act of 1986, section 30401 of Public Law 103–322 and section 301 of the Public Health Service Act with respect to program management, $2,134,743,000, of which $5,000,000 shall be for grants to rural and Native American projects and $12,800,000 shall be for activities authorized by section 30401 of Public Law 103–322.

### RETIREMENT PAY AND MEDICAL BENEFITS FOR COMMISSIONED OFFICERS

For retirement pay and medical benefits of Public Health Service Commissioned Officers as authorized by law, and for payments under the Retired Serviceman's Family Protection Plan and Survivor Benefit Plan and for medical care of dependents and retired personnel under the Dependents' Medical Care Act (10 U.S.C. ch. 55), and for payments pursuant to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), such amounts as may be required during the current fiscal year.

## AGENCY FOR HEALTH CARE POLICY AND RESEARCH

### HEALTH CARE POLICY AND RESEARCH

For carrying out titles III and IX of the Public Health Service Act, and part A of title XI of the Social Security Act, $96,175,000; in addition, amounts received from Freedom of Information Act fees, reimbursable and interagency agreements, and the sale of data tapes shall be credited to this appropriation and shall remain available until expended: Provided, That the amount made available pursuant to section 926(b) of the Public Health Service Act shall not exceed $47,412,000.

## HEALTH CARE FINANCING ADMINISTRATION

### GRANTS TO STATES FOR MEDICAID

For carrying out, except as otherwise provided, titles XI and XIX of the Social Security Act, $75,056,618,000, to remain available until expended.

For making, after May 31, 1997, payments to States under title XIX of the Social Security Act for the last quarter of fiscal year 1997 for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States under title XIX of the Social Security Act for the first quarter of fiscal year 1998, $27,988,993,000, to remain available until expended.

Payment under title XIX may be made for any quarter with respect to a State plan or plan amendment in effect during such quarter, if submitted in or prior to such quarter and approved in that or any subsequent quarter.

### PAYMENTS TO HEALTH CARE TRUST FUNDS

For payment to the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as provided under sections 217(g) and 1844 of the Social Security Act, sections 103(c) and 111(d) of the Social Security Amendments of 1965, section 278(d) of Public Law 97–248, and for administrative expenses incurred pursuant to section 201(g) of the Social Security Act, $60,079,000,000.

### PROGRAM MANAGEMENT

For carrying out, except as otherwise provided, titles XI, XVIII, and XIX of the Social Security Act, title XIII of the Public Health Service Act, and the Clinical Laboratory Improvement Amendments of 1988, not to exceed $1,735,125,000 to be transferred from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the Public Health

Service Act, the latter funds to remain available until expended, together with such sums as may be collected from authorized user fees and the sale of data, which shall remain available until expended: Provided, That all funds derived in accordance with 31 U.S.C. 9701 from organizations established under title XIII of the Public Health Service Act are to be credited to and available for carrying out the purposes of this appropriation.

### HEALTH MAINTENANCE ORGANIZATION LOAN AND LOAN GUARANTEE FUND

For carrying out subsections (d) and (e) of section 1308 of the Public Health Service Act, any amounts received by the Secretary in connection with loans and loan guarantees under title XIII of the Public Health Service Act, to be available without fiscal year limitation for the payment of outstanding obligations. During fiscal year 1997, no commitments for direct loans or loan guarantees shall be made.

### ADMINISTRATION FOR CHILDREN AND FAMILIES

### FAMILY SUPPORT PAYMENTS TO STATES

For making payments of such sums as necessary to each State for carrying out the program of Aid to Families with Dependent Children under title IV–A of the Social Security Act in fiscal year 1997 before the effective date of the program of Temporary Assistance to Needy Families (TANF) with respect to such State: Provided, That the sum of the amounts available to a State with respect to expenditures under such title IV–A in fiscal year 1997 under this appropriation and under such title IV–A as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 shall not exceed the limitations under section 116(b) of such Act.

For making payments to States for carrying out title IV–A (other than section 402(g)(6)) of the Social Security Act in calendar quarters prior to October 1, 1996, such sums as may be necessary.

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9), $2,158,000,000 to remain available until expended.

For making, after May 31 of the current fiscal year, payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act, for the last three months of the current year for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9) for the first quarter of fiscal year 1998, $607,000,000, to remain available until expended.

### JOB OPPORTUNITIES AND BASIC SKILLS

For carrying out aid to families with dependent children work programs, as authorized by part F of title IV of the Social Security Act, $1,000,000,000.

### LOW INCOME HOME ENERGY ASSISTANCE

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,000,000,000.

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,000,000,000, to be available for obligation in the period October 1, 1997 through September 30, 1998.

### REFUGEE AND ENTRANT ASSISTANCE

For making payments for refugee and entrant assistance activities authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 (Public Law 96–422), $412,076,000: Provided, That funds appropriated pursuant to section 414(a) of the Immigration and Nationality Act under Public Law 103–333 for fiscal year 1995 shall be available for the costs of assistance provided and other activities conducted in such year and in fiscal years 1996 and 1997.

### CHILD CARE AND DEVELOPMENT BLOCK GRANT

### (INCLUDING TRANSFER OF FUNDS)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For carrying out sections 658A through 658R of the Omnibus Budget Reconciliation Act of 1981 (The Child Care and Development Block Grant Act of 1990), $956,120,000, of which $937,000,000 shall become available on October 1, 1997 and shall remain available through September 30, 1998: Provided, That $19,120,000 shall become available for obligation on October 1, 1996 for child care resource and referral and school-age child care activities, of which $6,120,000 shall be derived from an amount that shall be transferred from the amount appropriated under section 452(j) of the Social Security Act (42 U.S.C. 652(j)) for fiscal year 1996 and remaining available for expenditure.

## SOCIAL SERVICES BLOCK GRANT

For making grants to States pursuant to section 2002 of the Social Security Act, $2,500,000,000: Provided, That notwithstanding section 2003(c) of such Act, as amended, the amount specified for allocation under such section for fiscal year 1997 shall be $2,500,000,000.

## CHILDREN AND FAMILIES SERVICES PROGRAMS

### (INCLUDING RESCISSIONS)

For carrying out, except as otherwise provided, the Runaway and Homeless Youth Act, the Developmental Disabilities Assistance and Bill of Rights Act, the Head Start Act, the Child Abuse Prevention and Treatment Act, the Temporary Child Care for Children with Disabilities and Crisis Nurseries Act of 1986, section 429A, part B of title IV of the Social Security Act, section 413 of the Social Security Act, the Family Violence Prevention and Services Act, the Native American Programs Act of 1974, title II of Public Law 95–266 (adoption opportunities), the Abandoned Infants Assistance Act of 1988, and part B(1) of title IV of the Social Security Act; for making payments under the Community Services Block Grant Act; and for necessary administrative expenses to carry out said Acts and titles I, IV, X, XI, XIV, XVI, and XX of the Social Security Act, the Act of July 5, 1960 (24 U.S.C. ch. 9), the Omnibus Budget Reconciliation Act of 1981, title IV of the Immigration and Nationality Act, section 501 of the Refugee Education Assistance Act of 1980, and section 126 and titles IV and V of Public Law 100–485, $5,363,569,000, of which $536,432,000 shall be for making payments under the Community Services Block Grant Act: Provided, That to the extent Community Services Block Grant funds are distributed as grant funds by a State to an eligible entity as provided under the Act, and have not been expended by such entity, they shall remain with such entity for carryover into the next fiscal year for expenditure by such entity consistent with program purposes: Provided further, That of the amount appropriated for fiscal year 1997 under section 672(a) of the Community Services Block Grant Act, the Secretary shall use up to one percent of the funds available to correct allocation errors that occurred in fiscal year 1995 and fiscal year 1996 to ensure that the minimum allotment to each State for each of fiscal years 1995 and 1996 would be $2,222,460: Provided further, That no more than one-half of one percent of the funds available under section 672(a) shall be used for the purposes of section 674(a) of the Community Services Block Grant Act.

In addition, $20,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40155, 40211 and 40241 of Public Law 103–322.

Funds appropriated for fiscal year 1996 and fiscal year 1997 under section 429A(e), part B of title IV of the Social Security Act shall be reduced by $6,000,000 in each such year.

Funds appropriated for fiscal year 1997 under section 413(h)(1) of the Social Security Act shall be reduced by $15,000,000.

## FAMILY PRESERVATION AND SUPPORT

For carrying out section 430 of the Social Security Act, $240,000,000.

## PAYMENTS TO STATES FOR FOSTER CARE AND ADOPTION ASSISTANCE

For making payments to States or other non-Federal entities, under title IV–E of the Social Security Act, $4,445,031,000.

For making payments to States or other non-Federal entities, under title IV–E of the Social Security Act, for the first quarter of fiscal year 1998, $1,111,000,000.

## ADMINISTRATION ON AGING

## AGING SERVICES PROGRAMS

For carrying out, to the extent not otherwise provided, the Older Americans Act of 1965, as amended, $830,168,000: Provided, That notwithstanding section 308(b)(1) of such Act, the amounts available to each State for administration of the State plan under title III of such Act shall be reduced not more than 5 percent below the amount that was available to such State for such purpose for fiscal year 1995: Provided further, That in considering grant applications for nutrition services for elder Indian recipients, the Assistant Secretary shall provide maximum flexibility to applicants who seek to take into account subsistence, local customs and other characteristics that are appropriate to the unique cultural, regional and geographic needs of the American Indian, Alaskan and Hawaiian native communities to be served.

## OFFICE OF THE SECRETARY

### GENERAL DEPARTMENTAL MANAGEMENT

For necessary expenses, not otherwise provided, for general departmental management, including hire of six sedans, and for carrying out titles III, XVII, and XX of the Public Health Service Act, $174,523,000, together with $5,851,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund: Provided, That of the funds made available under this heading for carrying out title XVII of the Public Health Service Act, $11,500,000 shall be available until expended for extramural construction: Provided further, That notwithstanding section 2010(b) and (c) under title XX of the Public Health Service Act, as amended, of the funds made available under this heading, $10,879,000 shall be for activities specified under section 2003(b)(2) of title XX of the Public Health Service Act, as amended, and of which $9,011,000 shall be for prevention grants under section 510(b)(2) of title V of the Social Security Act, as amended: Provided further, That of the amount provided, $5,775,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $32,999,000, together with any funds, to remain available until expended, that represent the equitable share from the forfeiture of property in investigations in which the Office of Inspector General participated, and which are transferred to the Office of Inspector General by the Department of Justice, the Department of the Treasury, or the United States Postal Service.

### OFFICE FOR CIVIL RIGHTS

For expenses necessary for the Office for Civil Rights, $16,216,000, together with not to exceed $3,314,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund.

### POLICY RESEARCH

For carrying out, to the extent not otherwise provided, research studies under section 1110 of the Social Security Act and section 301(l) of Public Law 104–191, $18,500,000: Provided, That $9,500,000, to remain available until September 30, 1998, shall be for carrying out section 301(l) of Public Law 104–191.

### GENERAL PROVISIONS

Sec. 201. Funds appropriated in this title shall be available for not to exceed $37,000 for official reception and representation expenses when specifically approved by the Secretary.

Sec. 202. The Secretary shall make available through assignment not more than 60 employees of the Public Health Service to assist in child survival activities and to work in AIDS programs through and with funds provided by the Agency for International Development, the United Nations International Children's Emergency Fund or the World Health Organization.

Sec. 203. None of the funds appropriated under this Act may be used to implement section 399L(b) of the Public Health Service Act or section 1503 of the National Institutes of Health Revitalization Act of 1993, Public Law 103–43.

Sec. 204. None of the funds made available by this Act may be used to withhold payment to any State under the Child Abuse Prevention and Treatment Act by reason of a determination that the State is not in compliance with section 1340.2(d)(2)(ii) of title 45 of the Code of Federal Regulations. This provision expires upon the date of enactment of the reauthorization of the Child Abuse Prevention and Treatment Act.

Sec. 205. None of the funds appropriated in this Act for the National Institutes of Health and the Substance Abuse and Mental Health Services Administration shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of $125,000 per year.

Sec. 206. None of the funds appropriated in this Act may be expended pursuant to section 241 of the Public Health Service Act, except for funds specifically provided for in this Act, or for other taps and assessments made by any office located in the Department of Health and Human Services, prior to the Secretary's preparation and submission of a report to the Committee on Appropriations of the Senate and of the House detailing the planned uses of such funds.

(TRANSFER OF FUNDS)

Sec. 207. Of the funds appropriated or otherwise made available for the Department of Health and Human Services, General Departmental Management, for fiscal year 1997, the Secretary of Health and Human Services shall transfer to the Office of the Inspector General such sums as may be necessary for any expenses with respect to the provision of security protection for the Secretary of Health and Human Services.

Sec. 208. None of the funds appropriated in this Act may be obligated or expended for the Federal Council on Aging under the Older Americans Act or the Advisory Board on Child Abuse and Neglect under the Child Abuse Prevention and Treatment Act.

(TRANSFER OF FUNDS)

Sec. 209. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Health and Human Services in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

(TRANSFER OF FUNDS)

Sec. 210. The Director of the National Institutes of Health, jointly with the Director of the Office of AIDS Research, may transfer up to 3 percent among institutes, centers, and divisions from the total amounts identified by these two Directors as funding for research pertaining to the human immunodeficiency virus: Provided, That the Congress is promptly notified of the transfer.

(TRANSFER OF FUNDS)

Sec. 211. Of the amounts made available in this Act for the National Institutes of Health, the amount for research related to the human immunodeficiency virus, as jointly determined by the Director of NIH and the Director of the Office of AIDS Research, shall be made available to the "Office of AIDS Research" account. The Director of the Office of AIDS Research shall transfer from such account amounts necessary to carry out section 2353(d)(3) of the Public Health Service Act.

Sec. 212. Not later than January 1, 1997, the Administrator of the Health Care Financing Administration, with the advice and technical assistance of the Agency for Health Care Policy and Research, shall transmit to the appropriate committees of the Congress a report including—

  (1) a review of all available studies and research data on the treatment of end-stage emphysema and chronic obstructive pulmonary disease by both unilateral and bilateral lung volume reduction surgery, involving both invasive and noninvasive surgery and supplemental surgical methods, including laser applications; and

  (2) a recommendation, based on such review, as to the appropriateness of Medicare coverage of such procedures and the conditions, if necessary, that facilities and physicians should be required to meet, to ensure the efficacy of such procedures, as more detailed clinical studies are conducted.

<< 42 USCA § 10403 >>

Sec. 213. Section 304(a)(1) of the Family Violence Prevention and Services Act (42 U.S.C. 10403(a)(1)) is amended by striking "$200,000" and inserting "$400,000".

Sec. 214. The new clinical research center at the National Institutes of Health is hereby named the Mark O. Hatfield Clinical Research Center.

<< 42 USCA §§ 652, 653 >>

<< 42 USCA §§ 652 NOTE,653 nt >>

Sec. 215. Section 345 of Public Law 104–193 is amended by replacing "section 457(a)" wherever it appears with "a plan approved under this part". Amounts available under such section shall be calculated as though such section were effective October 1, 1995.

This title may be cited as the "Department of Health and Human Services Appropriations Act, 1997".

## TITLE III—DEPARTMENT OF EDUCATION

### EDUCATION REFORM

For carrying out activities authorized by titles III and IV of the Goals 2000: Educate America Act and the School-to-Work Opportunities Act, $691,000,000, of which $476,000,000 for the Goals 2000: Educate America Act and $200,000,000 for the School-to-Work Opportunities Act shall become available on July 1, 1997, and remain available through September 30, 1998: Provided, That none of the funds appropriated under this heading shall be obligated or expended to carry out section 304(a)(2)(A) of the Goals 2000: Educate America Act.

### EDUCATION FOR THE DISADVANTAGED

For carrying out title I of the Elementary and Secondary Education Act of 1965, and section 418A of the Higher Education Act, $7,698,469,000, of which $6,380,114,000 shall become available on July 1, 1997, and shall remain available through September 30, 1998, and of which $1,298,386,000 shall become available on October 1, 1997 and shall remain available through September 30, 1998, for academic year 1997–1998: Provided, That $6,194,850,000 shall be available for basic grants under section 1124: Provided further, That up to $3,500,000 of these funds shall be available to the Secretary on October 1, 1996, to obtain updated local-educational-agency-level census poverty data from the Bureau of the Census: Provided further, That $999,249,000 shall be available for concentration grants under section 1124(A) and $7,000,000 shall be available for evaluations under section 1501.

### IMPACT AID

For carrying out programs of financial assistance to federally affected schools authorized by title VIII of the Elementary and Secondary Education Act of 1965, $730,000,000, of which $615,500,000 shall be for basic support payments under section 8003(b), $40,000,000 shall be for payments for children with disabilities under section 8003(d), $52,000,000, to remain available until expended, shall be for payments under section 8003(f), $5,000,000 shall be for construction under section 8007, and $17,500,000 shall be for Federal property payments under section 8002.

### SCHOOL IMPROVEMENT PROGRAMS

For carrying out school improvement activities authorized by titles II, IV–A–1, V–A and B, VI, IX, X and XIII of the Elementary and Secondary Education Act of 1965; the Stewart B. McKinney Homeless Assistance Act; and the Civil Rights Act of 1964; $1,425,631,000, of which $1,202,478,000 shall become available on July 1, 1997, and remain available through September 30, 1998: Provided, That of the amount appropriated, $310,000,000 shall be for Eisenhower professional development State grants under title II–B and $310,000,000 shall be for innovative education program strategies State grants under title VI–A.

### BILINGUAL AND IMMIGRANT EDUCATION

For carrying out, to the extent not otherwise provided, bilingual, foreign language and immigrant education activities authorized by parts A and C and section 7203 of title VII of the Elementary and Secondary Education Act, without regard to section 7103(b), $261,700,000, of which $100,000,000 shall be for immigrant education programs authorized by part C: Provided, That State educational agencies may use all, or any part of, their part C allocation for competitive grants to local educational agencies: Provided further, That the Department of Education should only support instructional programs which ensure that students completely master English in a timely fashion (a period of three to five years) while meeting rigorous achievement standards in the academic content areas.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### SPECIAL EDUCATION

For carrying out parts B, C, D, E, F, G, and H and section 610(j)(2)(C) of the Individuals with Disabilities Education Act, $4,036,000,000, of which $3,783,685,000 shall become available for obligation on July 1, 1997, and shall remain available through September 30, 1998: Provided, That the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall continue to be eligible to receive funds under the Individuals with Disabilities Education Act consistent with the provisions of Public Law 104–134: Provided further, That the entities that received competitive awards for direct services to children under section 611 of the Individuals with Disabilities Education Act in accordance with the competition required in Public Law 104–134 shall continue to be funded, without competition, in the same amounts as under Public Law 104–134.

### REHABILITATION SERVICES AND DISABILITY RESEARCH

For carrying out, to the extent not otherwise provided, the Rehabilitation Act of 1973, the Technology–Related Assistance for Individuals with Disabilities Act, and the Helen Keller National Center Act, as amended, $2,509,447,000.

### SPECIAL INSTITUTIONS FOR PERSONS WITH DISABILITIES

### AMERICAN PRINTING HOUSE FOR THE BLIND

For carrying out the Act of March 3, 1879, as amended (20 U.S.C. 101 et seq.), $6,680,000.

### NATIONAL TECHNICAL INSTITUTE FOR THE DEAF

For the National Technical Institute for the Deaf under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $43,041,000: Provided, That from the amount available, the Institute may at its discretion use funds for the endowment program as authorized under section 207.

### GALLAUDET UNIVERSITY

For the Kendall Demonstration Elementary School, the Model Secondary School for the Deaf, and the partial support of Gallaudet University under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $79,182,000: Provided, That from the amount available, the University may at its discretion use funds for the endowment program as authorized under section 207.

### VOCATIONAL AND ADULT EDUCATION

For carrying out, to the extent not otherwise provided, the Carl D. Perkins Vocational and Applied Technology Education Act, the Adult Education Act, and the National Literacy Act of 1991, $1,486,531,000, of which $4,500,000 shall be for the National Institute for Literacy; and of which $1,483,612,000 shall become available on July 1, 1997 and shall remain available through September 30, 1998: Provided, That, of the amounts made available for title II of the Carl D. Perkins Vocational and Applied Technology Education Act, $4,500,000 shall be used by the Secretary for national programs under title IV, without regard to section 451: Provided further, That, in addition, the Secretary may reserve up to $9,000,000 under section 101(a)(1)(A) of the Carl D. Perkins Vocational and Applied Technology Education Act, without regard to section 451: Provided further, That the Secretary may reserve up to $5,000,000 under section 313(d) of the Adult Education Act for activities carried out under section 383 of that Act: Provided further, That no funds shall be awarded to a State Council under section 112(f) of the Carl D. Perkins Vocational and Applied Technology Education Act, and no State shall be required to operate such a Council.

### STUDENT FINANCIAL ASSISTANCE

For carrying out subparts 1, 3, and 4 of part A, part C and part E of title IV of the Higher Education Act of 1965, as amended, $7,560,407,000, which shall remain available through September 30, 1998.

<< 20 USCA § 1070a NOTE >>

The maximum Pell Grant for which a student shall be eligible during award year 1997–1998 shall be $2,700: Provided, That notwithstanding section 401(g) of the Act, if the Secretary determines, prior to publication of the payment schedule for such award year, that the amount included within this appropriation for Pell Grant awards in such award year, and any funds available

from the fiscal year 1996 appropriation for Pell Grant awards, are insufficient to satisfy fully all such awards for which students are eligible, as calculated under section 401(b) of the Act, the amount paid for each such award shall be reduced by either a fixed or variable percentage, or by a fixed dollar amount, as determined in accordance with a schedule of reductions established by the Secretary for this purpose.

## FEDERAL FAMILY EDUCATION LOAN PROGRAM ACCOUNT

For Federal administrative expenses to carry out guaranteed student loans authorized by title IV, part B, of the Higher Education Act, as amended, $46,572,000.

## HIGHER EDUCATION

For carrying out, to the extent not otherwise provided, parts A and B of title III, without regard to section 360(a)(1)(B)(ii), titles IV, V, VI, VII, and IX, part A and subpart 1 of part B of title X, and title XI of the Higher Education Act of 1965, as amended, Public Law 102–423 and the Mutual Educational and Cultural Exchange Act of 1961; $879,054,000, of which $15,673,000 for interest subsidies under title VII of the Higher Education Act, as amended, shall remain available until expended: Provided, That funds available for part D of title IX of the Higher Education Act shall be available to fund noncompeting continuation awards for academic year 1997–1998 for fellowships awarded originally under part B of title IX of said Act, under the terms and conditions of part B: Provided further, That $5,931,000 of the funds available for part D of title IX of the Higher Education Act shall be available to fund new and noncompeting continuation awards for academic year 1997–1998 for fellowships awarded under part C of title IX of said Act, under the terms and conditions of part C: Provided further, That notwithstanding sections 419D, 419E, and 419H of the Higher Education Act, as amended, scholarships made under title IV, part A, subpart 6 shall be prorated to maintain the same number of new scholarships in fiscal year 1997 as in fiscal year 1996: Provided further, That $3,000,000, to remain available until expended, shall be for the George H.W. Bush fellowship program, if authorized by April 1, 1997: Provided further, That $3,000,000, to remain available until expended, shall be for the Edmund S. Muskie Foundation to establish an endowment fund to provide income to support such foundation on a continuing basis, if authorized by April 1, 1997: Provided further, That $3,000,000, to remain available until expended, shall be for the Claiborne Pell Institute for International Relations and Public Policy at Salve Regina University in Newport, Rhode Island, if authorized by April 1, 1997: Provided further, That $1,000,000, to remain available until expended, shall be for the Calvin Coolidge Memorial Foundation, if authorized by April 1, 1997: Provided further, That, of the amounts made available under title X, part A of the Higher Education Act, $2,000,000 shall be awarded to the Pennsylvania Educational Telecommunications Exchange Network.

## HOWARD UNIVERSITY

For partial support of Howard University (20 U.S.C. 121 et seq.), $196,000,000: Provided, That from the amount available, the University may at its discretion use funds for the endowment program as authorized under the Howard University Endowment Act (Public Law 98–480).

## HIGHER EDUCATION FACILITIES LOANS

The Secretary is hereby authorized to make such expenditures, within the limits of funds available under this heading and in accord with law, and to make such contracts and commitments without regard to fiscal year limitation, as provided by section 104 of the Government Corporation Control Act (31 U.S.C. 9104), as may be necessary in carrying out the program for the current fiscal year.

## COLLEGE HOUSING AND ACADEMIC FACILITIES LOANS PROGRAM

For administrative expenses to carry out the existing direct loan program of college housing and academic facilities loans entered into pursuant to title VII, part C, of the Higher Education Act, as amended, $698,000.

## COLLEGE HOUSING LOANS

Pursuant to title VII, part C of the Higher Education Act, as amended, for necessary expenses of the college housing loans program, the Secretary shall make expenditures and enter into contracts without regard to fiscal year limitation using loan repayments and other resources available to this account. Any unobligated balances becoming available from fixed fees paid into this account pursuant to 12 U.S.C. 1749d, relating to payment of costs for inspections and site visits, shall be available for the operating expenses of this account.

## HISTORICALLY BLACK COLLEGE AND UNIVERSITY

### CAPITAL FINANCING, PROGRAM ACCOUNT

The total amount of bonds insured pursuant to section 724 of title VII, part B of the Higher Education Act shall not exceed $357,000,000, and the cost, as defined in section 502 of the Congressional Budget Act of 1974, of such bonds shall not exceed zero.

For administrative expenses to carry out the Historically Black College and University Capital Financing Program entered into pursuant to title VII, part B of the Higher Education Act, as amended, $104,000.

### EDUCATION RESEARCH, STATISTICS, AND IMPROVEMENT

For carrying out activities authorized by the Educational Research, Development, Dissemination, and Improvement Act of 1994, including part E; the National Education Statistics Act of 1994; section 2102, sections 3132, 3136 and 3141, parts B, C, and D of title III and parts A, B, I, and K and section 10601 of title X, and part C of title XIII of the Elementary and Secondary Education Act of 1965, as amended, and title VI of Public Law 103–227, $598,350,000: Provided, That $200,000,000 shall be for section 3132, $56,965,000 shall be for section 3136 and $10,000,000 shall be for section 3141 of the Elementary and Secondary Education Act: Provided further, That notwithstanding any other provision of law, one-half of one percent of the amount available for section 3132 of the Elementary and Secondary Education Act of 1965, as amended, shall be set aside for the outlying areas to be distributed among the outlying areas on the basis of their relative need as determined by the Secretary in accordance with the purposes of the program: Provided further, That, notwithstanding section 3131(b) of said Act, if any State educational agency does not apply for a grant under section 3132, that State's allotment under section 3131 shall be reserved by the Secretary for grants to local educational agencies in the State that apply directly to the Secretary according to the terms and conditions announced by the Secretary in the Federal Register: Provided further, That, of the amount available for title III, part B of the Elementary and Secondary Education Act of 1965, as amended, funds shall be awarded to continue the Iowa Communication Network statewide fiber optic demonstration and $2,000,000 shall be awarded to the Southeastern Pennsylvania Consortium for Higher Education for the establishment of local and wide area computer networks to provide instructional resources to students and faculty: Provided further, That none of the funds appropriated in this paragraph may be obligated or expended for the Goals 2000 Community Partnerships Program.

### LIBRARIES

Notwithstanding title VII of this Act, for carrying out titles I, II, III, and IV of the Library Services and Construction Act, and title II–B of the Higher Education Act, $136,369,000, of which $16,369,000 shall be used to carry out the provisions of title II of the Library Services and Construction Act and shall remain available until expended; and $2,500,000 shall be for section 222 and $5,000,000 shall be for section 223 of the Higher Education Act: Provided, That $1,000,000 shall be competitively awarded to a nonprofit regional social tolerance resource center, operating tolerance tools and prejudice reduction programs and multimedia tolerance and genocide exhibits: Provided further, That $1,500,000 shall be for the continuation of a demonstration project making information available for public use by connecting Internet to a multistate consortium and a historical society: Provided further, That $1,000,000 shall be for continuation of catalog conversion of research and doctoral institutions and networking of local libraries under the fiber optics demonstration initiated in Public Law 102–394 under section 223 of the Higher Education Act: Provided further, That each State or local recipient of funds under titles I, II, III, and IV of the Library Services and Construction Act may use any such funds to plan for any library program or activity authorized under title VII of this Act and conduct any other activity reasonably necessary to provide for an orderly and effective transition to the operation of library programs or activities under title VII of this Act.

### DEPARTMENTAL MANAGEMENT

### PROGRAM ADMINISTRATION

For carrying out, to the extent not otherwise provided, the Department of Education Organization Act, including rental of conference rooms in the District of Columbia and hire of two passenger motor vehicles, $327,000,000.

### OFFICE FOR CIVIL RIGHTS

For expenses necessary for the Office for Civil Rights, as authorized by section 203 of the Department of Education Organization Act, $55,000,000.

## OFFICE OF THE INSPECTOR GENERAL

For expenses necessary for the Office of the Inspector General, as authorized by section 212 of the Department of Education Organization Act, $30,000,000.

## GENERAL PROVISIONS

Sec. 301. No funds appropriated in this Act may be used for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system, or for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to carry out a plan of racial desegregation of any school or school system.

Sec. 302. None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, to the school offering such special education, in order to comply with title VI of the Civil Rights Act of 1964. For the purpose of this section an indirect requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructuring, pairing or clustering. The prohibition described in this section does not include the establishment of magnet schools.

Sec. 303. No funds appropriated under this Act may be used to prevent the implementation of programs of voluntary prayer and meditation in the public schools.

Sec. 304. Notwithstanding any other provision of law, funds available under section 458 of the Higher Education Act shall not exceed $491,000,000 for fiscal year 1997. The Department of Education shall use $80,000,000 of the amounts provided for payment of administrative cost allowances to guaranty agencies for fiscal year 1996. For fiscal year 1997, the Department of Education shall pay administrative costs to guaranty agencies, calculated on the basis of 0.85 percent of the total principal amount of loans upon which insurance was issued on or after October 1, 1996: Provided, That such administrative costs shall be paid only on the first $8,200,000,000 of the principal amount of loans upon which insurance was issued on or after October 1, 1996 by such guaranty agencies, and shall not exceed a total of $70,000,000. Such payments are to be paid quarterly, and receipt of such funds and uses of such funds shall be in accordance with section 428(f) of the Higher Education Act.

## << 20 USCA § 1087h NOTE >>

Notwithstanding section 458 of the Higher Education Act, the Secretary may not use funds available under that section or any other section for subsequent fiscal years for administrative expenses of the William D. Ford Direct Loan Program. The Secretary may not require the return of guaranty agency reserve funds during fiscal year 1997, except after consultation with both the Chairmen and ranking members of the House Economic and Educational Opportunities Committee and the Senate Labor and Human Resources Committee. Any reserve funds recovered by the Secretary shall be returned to the Treasury of the United States for purposes of reducing the Federal deficit.

No funds available to the Secretary may be used for (1) the hiring of advertising agencies or other third parties to provide advertising services for student loan programs prior to January 1, 1997, or (2) payment of administrative fees relating to the William D. Ford Direct Loan Program to institutions of higher education.

Sec. 305. None of the funds appropriated in this Act may be obligated or expended to carry out section 621(b) of Public Law 101–589.

## (TRANSFER OF FUNDS)

Sec. 306. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Education in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sec. 307. (a) Section 8003(f)(3)(A)(i) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7703(f)(3)(A)(i)) is amended—

<< 20 USCA § 7703 >>

(1) in the matter preceding subclause (I), by striking "The Secretary" and all that follows through "greater of—" and inserting the following: "The Secretary, in conjunction with the local educational agency, shall first determine each of the following:";
(2) in each of subclauses (I) through (III), by striking "the average" each place it appears the first time in each such subclause and inserting "The average";
(3) in subclause (I), by striking the semicolon and inserting a period;
(4) in subclause (II), by striking ": or" and inserting a period; and
(5) by adding at the end the following:
"The local educational agency shall select one of the amounts determined under subclause (I), (II), or (III) for purposes of the remaining computations under this subparagraph.".

<< 20 USCA § 7703 NOTE >>

(b) The amendments made by subsection (a) shall apply with respect to fiscal years beginning with fiscal year 1995.

<< 20 USCA § 1092 >>

Sec. 308. Section 485(e)(9) of the Higher Education Act of 1965 is amended by striking out "June 30" in the second sentence of such section and inserting "August 30".
This title may be cited as the "Department of Education Appropriations Act, 1997".

TITLE IV–RELATED AGENCIES

ARMED FORCES RETIREMENT HOME

For expenses necessary for the Armed Forces Retirement Home to operate and maintain the United States Soldiers' and Airmen's Home and the United States Naval Home, to be paid from funds available in the Armed Forces Retirement Home Trust Fund, $56,204,000, of which $432,000 shall remain available until expended for construction and renovation of the physical plants at the United States Soldiers' and Airmen's Home and the United States Naval Home: Provided, That this appropriation shall not be available for the payment of hospitalization of members of the Soldiers' and Airmen's Home in United States Army hospitals at rates in excess of those prescribed by the Secretary of the Army upon recommendation of the Board of Commissioners and the Surgeon General of the Army.

CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

DOMESTIC VOLUNTEER SERVICE PROGRAMS, OPERATING EXPENSES

For expenses necessary for the Corporation for National and Community Service to carry out the provisions of the Domestic Volunteer Service Act of 1973, as amended, $213,969,000.

CORPORATION FOR PUBLIC BROADCASTING

For payment to the Corporation for Public Broadcasting, as authorized by the Communications Act of 1934, an amount which shall be available within limitations specified by that Act, for the fiscal year 1999, $250,000,000: Provided, That no funds made available to the Corporation for Public Broadcasting by this Act shall be used to pay for receptions, parties, or similar forms of entertainment for Government officials or employees: Provided further, That none of the funds contained in this paragraph shall be available or used to aid or support any program or activity from which any person is excluded, or is denied benefits, or is discriminated against, on the basis of race, color, national origin, religion, or sex.

FEDERAL MEDIATION AND CONCILIATION SERVICE

SALARIES AND EXPENSES

For expenses necessary for the Federal Mediation and Conciliation Service to carry out the functions vested in it by the Labor Management Relations Act, 1947 (29 U.S.C. 171–180, 182–183), including hire of passenger motor vehicles; and for expenses necessary for the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a); and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, Public Law 95–454 (5 U.S.C. chapter 71), $32,579,000 including $1,500,000, to remain available through September 30, 1998, for activities authorized by the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a): Provided, That notwithstanding 31 U.S.C. 3302, fees charged, up to full-cost recovery, for special training activities and for arbitration services shall be credited to and merged with this account, and shall remain available until expended: Provided further, That fees for arbitration services shall be available only for education, training, and professional development of the agency workforce: Provided further, That the Director of the Service is authorized to accept on behalf of the United States gifts of services and real, personal, or other property in the aid of any projects or functions within the Director's jurisdiction.

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Federal Mine Safety and Health Review Commission (30 U.S.C. 801 et seq.), $6,060,000.

## NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE

### SALARIES AND EXPENSES

For necessary expenses for the National Commission on Libraries and Information Science, established by the Act of July 20, 1970 (Public Law 91–345, as amended by Public Law 102–95), $897,000.

## NATIONAL COUNCIL ON DISABILITY

### SALARIES AND EXPENSES

For expenses necessary for the National Council on Disability as authorized by title IV of the Rehabilitation Act of 1973, as amended, $1,793,000.

## NATIONAL EDUCATION GOALS PANEL

For expenses necessary for the National Education Goals Panel, as authorized by title II, part A of the Goals 2000: Educate America Act, $1,500,000.

## NATIONAL LABOR RELATIONS BOARD

### SALARIES AND EXPENSES

For expenses necessary for the National Labor Relations Board to carry out the functions vested in it by the Labor–Management Relations Act, 1947, as amended (29 U.S.C. 141–167), and other laws, $175,000,000: Provided, That no part of this appropriation shall be available to organize or assist in organizing agricultural laborers or used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers as referred to in section 2(3) of the Act of July 5, 1935 (29 U.S.C. 152), and as amended by the Labor–Management Relations Act, 1947, as amended, and as defined in section 3(f) of the Act of June 25, 1938 (29 U.S.C. 203), and including in said definition employees engaged in the maintenance and operation of ditches, canals, reservoirs, and waterways when maintained or operated on a mutual, nonprofit basis and at least 95 per centum of the water stored or supplied thereby is used for farming purposes: Provided further, That none of the funds made available by this Act shall be used in any way to promulgate a final rule (altering 29 CFR part 103) regarding single location bargaining units in representation cases.

## NATIONAL MEDIATION BOARD

### SALARIES AND EXPENSES

For expenses necessary to carry out the provisions of the Railway Labor Act, as amended (45 U.S.C. 151–188), including emergency boards appointed by the President, $8,300,000: Provided, That unobligated balances at the end of fiscal year 1997 not needed for emergency boards shall remain available for other statutory purposes through September 30, 1998.

## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Occupational Safety and Health Review Commission (29 U.S.C. 661), $7,753,000.

## PHYSICIAN PAYMENT REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1845(a) of the Social Security Act, $3,263,000, to be transferred to this appropriation from the Federal Supplementary Medical Insurance Trust Fund.

## PROSPECTIVE PAYMENT ASSESSMENT COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1886(e) of the Social Security Act, $3,263,000, to be transferred to this appropriation from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds.

## SOCIAL SECURITY ADMINISTRATION

### PAYMENTS TO SOCIAL SECURITY TRUST FUNDS

For payment to the Federal Old–Age and Survivors Insurance and the Federal Disability Insurance trust funds, as provided under sections 201(m), 228(g), and 1131(b)(2) of the Social Security Act, $20,923,000.

In addition, to reimburse these trust funds for administrative expenses to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986, $10,000,000, to remain available until expended.

### SPECIAL BENEFITS FOR DISABLED COAL MINERS

For carrying out title IV of the Federal Mine Safety and Health Act of 1977, $460,070,000, to remain available until expended.

For making, after July 31 of the current fiscal year, benefit payments to individuals under title IV of the Federal Mine Safety and Health Act of 1977, for costs incurred in the current fiscal year, such amounts as may be necessary.

For making benefit payments under title IV of the Federal Mine Safety and Health Act 1977 for the first quarter of fiscal year 1998, $160,000,000, to remain available until expended.

### SUPPLEMENTAL SECURITY INCOME PROGRAM

For carrying out titles XI and XVI of the Social Security Act, section 401 of Public Law 92–603, section 212 of Public Law 93–66, as amended, and section 405 of Public Law 95–216, including payment to the Social Security trust funds for administrative expenses incurred pursuant to section 201(g)(1) of the Social Security Act, $19,372,010,000, to remain available until expended: Provided, That any portion of the funds provided to a State in the current fiscal year and not obligated by the State during that year shall be returned to the Treasury.

From funds provided under the previous paragraph, not less than $100,000,000 shall be available for payment to the Social Security trust funds for administrative expenses for conducting continuing disability reviews.

In addition, $175,000,000, to remain available until September 30, 1998, for payment to the Social Security trust funds for administrative expenses for continuing disability reviews as authorized by section 103 of Public Law 104–121 and Supplemental Security Income administrative work as authorized by Public Law 104–193. The term "continuing disability reviews" means reviews and redetermination as defined under section 201(g)(1)(A) of the Social Security Act as amended, and reviews and redeterminations authorized under section 211 of Public Law 104–193.

For making, after June 15 of the current fiscal year, benefit payments to individuals under title XVI of the Social Security Act, for unanticipated costs incurred for the current fiscal year, such sums as may be necessary.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For carrying out title XVI of the Social Security Act for the first quarter of fiscal year 1998, $9,690,000,000, to remain available until expended.

## LIMITATION ON ADMINISTRATIVE EXPENSES

For necessary expenses, including the hire of two passenger motor vehicles, and not to exceed $10,000 for official reception and representation expenses, not more than $5,873,382,000 may be expended, as authorized by section 201(g)(1) of the Social Security Act or as necessary to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986 from any one or all of the trust funds referred to therein: Provided, That reimbursement to the trust funds under this heading for administrative expenses to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986 shall be made, with interest, not later than September 30, 1998: Provided further, That not less than $1,268,000 shall be for the Social Security Advisory Board: Provided further, That unobligated balances at the end of fiscal year 1997 not needed for fiscal year 1997 shall remain available until expended for a state-of-the-art computing network, including related equipment and administrative expenses associated solely with this network.

From funds provided under the previous paragraph, not less than $200,000,000 shall be available for conducting continuing disability reviews.

In addition to funding already available under this heading, and subject to the same terms and conditions, $310,000,000, to remain available until September 30, 1998, for continuing disability reviews as authorized by section 103 of Public Law 104–121 and Supplemental Security Income administrative work as authorized by Public Law 104–193. The term "continuing disability reviews" means reviews and redeterminations as defined under section 201(g)(1)(A) of the Social Security Act as amended, and reviews and redeterminations authorized under section 211 of Public Law 104–193.

In addition to funding already available under this heading, and subject to the same terms and conditions, $234,895,000, which shall remain available until expended, to invest in a state-of-the-art computing network, including related equipment and administrative expenses associated solely with this network, for the Social Security Administration and the State Disability Determination Services, may be expended from any or all of the trust funds as authorized by section 201(g)(1) of the Social Security Act.

## OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $6,335,000, together with not to exceed $31,089,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Federal Old–Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust Fund.

## RAILROAD RETIREMENT BOARD

### DUAL BENEFITS PAYMENTS ACCOUNT

For payment to the Dual Benefits Payments Account, authorized under section 15(d) of the Railroad Retirement Act of 1974, $223,000,000, which shall include amounts becoming available in fiscal year 1997 pursuant to section 224(c)(1)(B) of Public Law 98–76; and in addition, an amount, not to exceed 2 percent of the amount provided herein, shall be available proportional to the amount by which the product of recipients and the average benefit received exceeds $223,000,000: Provided, That the total amount provided herein shall be credited in 12 approximately equal amounts on the first day of each month in the fiscal year.

### FEDERAL PAYMENTS TO THE RAILROAD RETIREMENT ACCOUNTS

For payment to the accounts established in the Treasury for the payment of benefits under the Railroad Retirement Act for interest earned on unnegotiated checks, $300,000, to remain available through September 30, 1998, which shall be the maximum amount available for payment pursuant to section 417 of Public Law 98–76.

### LIMITATION ON ADMINISTRATION

For necessary expenses for the Railroad Retirement Board for administration of the Railroad Retirement Act and the Railroad Unemployment Insurance Act, $87,898,000, to be derived in such amounts as determined by the Board from the railroad retirement accounts and from moneys credited to the railroad unemployment insurance administration fund.

## LIMITATION ON THE OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General for audit, investigatory and review activities, as authorized by the Inspector General Act of 1978, as amended, not more than $5,404,000, to be derived from the railroad retirement accounts and railroad unemployment insurance account: *Provided*, That none of the funds made available in this Act may be transferred to the Office from the Department of Health and Human Services, or used to carry out any such transfer: *Provided further*, That none of the funds made available in this paragraph may be used for any audit, investigation, or review of the Medicare program.

## UNITED STATES INSTITUTE OF PEACE

### OPERATING EXPENSES

For necessary expenses of the United States Institute of Peace as authorized in the United States Institute of Peace Act, $11,160,000.

## TITLE V—GENERAL PROVISIONS

SEC. 501. The Secretaries of Labor, Health and Human Services, and Education are authorized to transfer unexpended balances of prior appropriations to accounts corresponding to current appropriations provided in this Act: *Provided*, That such transferred balances are used for the same purpose, and for the same periods of time, for which they were originally appropriated.

SEC. 502. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 503. (a) No part of any appropriation contained in this Act shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television, or video presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself or any State legislature, except in presentation to the Congress or any State legislative body itself.

(b) No part of any appropriation contained in this Act shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

SEC. 504. The Secretaries of Labor and Education are each authorized to make available not to exceed $15,000 from funds available for salaries and expenses under titles I and III, respectively, for official reception and representation expenses; the Director of the Federal Mediation and Conciliation Service is authorized to make available for official reception and representation expenses not to exceed $2,500 from the funds available for "Salaries and expenses, Federal Mediation and Conciliation Service"; and the Chairman of the National Mediation Board is authorized to make available for official reception and representation expenses not to exceed $2,500 from funds available for "Salaries and expenses, National Mediation Board".

Sec. 505. Notwithstanding any other provision of this Act, no funds appropriated under this Act shall be used to carry out any program of distributing sterile needles for the hypodermic injection of any illegal drug unless the Secretary of Health and Human Services determines that such programs are effective in preventing the spread of HIV and do not encourage the use of illegal drugs.

Sec. 506. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA.—If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 507. When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds included in this Act, including but not limited to State and local governments and recipients of Federal research grants, shall clearly state (1) the percentage of the total costs of the program or project which will be financed with Federal money, (2) the dollar amount of Federal funds for the project or program, and (3) percentage and dollar amount of the total costs of the project or program that will be financed by nongovernmental sources.

SEC. 508. None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.

<< 5 USCA § 3341 nt >>

<< 31 USCA § 1301 NOTE >>

SEC. 509. Notwithstanding any other provision of law—

  (1) no amount may be transferred from an appropriation account for the Departments of Labor, Health and Human Services, and Education except as authorized in this or any subsequent appropriation Act, or in the Act establishing the program or activity for which funds are contained in this Act;

  (2) no department, agency, or other entity, other than the one responsible for administering the program or activity for which an appropriation is made in this Act, may exercise authority for the timing of the obligation and expenditure of such appropriation, or for the purpose for which it is obligated and expended, except to the extent and in the manner otherwise provided in sections 1512 and 1513 of title 31, United States Code; and

  (3) no funds provided under this Act shall be available for the salary (or any part thereof) of an employee who is reassigned on a temporary detail basis to another position in the employing agency or department or in any other agency or department, unless the detail is independently approved by the head of the employing department or agency.

SEC. 510. None of the funds made available in this Act may be used for the expenses of an electronic benefit transfer (EBT) task force.

SEC. 511. None of the funds made available in this Act may be used to enforce the requirements of section 428(b)(1)(U)(iii) of the Higher Education Act of 1965 with respect to any lender when it is made known to the Federal official having authority to obligate or expend such funds that the lender has a loan portfolio under part B of title IV of such Act that is equal to or less than $5,000,000.

SEC. 512. (a) None of the funds made available in this Act may be used for—

  (1) the creation of a human embryo or embryos for research purposes; or

  (2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.208(a)(2) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term "human embryo or embryos" include any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes.

SEC. 513. (a) Limitation on Use of Funds for Promotion of Legalization of Controlled Substances.—None of the funds made available in this Act may be used for any activity when it is made known to the Federal official having authority to obligate or expend such funds that the activity promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act (21 U.S.C. 812).

(b) Exceptions.—The limitation in subsection (a) shall not apply when it is made known to the Federal official having authority to obligate or expend such funds that there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that Federally-sponsored clinical trials are being conducted to determine therapeutic advantage.

<< 10 USCA § 503 NOTE >>

SEC. 514. (a) Denial of Funds for Preventing ROTC Access to Campus.—None of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any

fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid) to a covered educational entity if the Secretary of Defense determines that the covered educational entity has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) the maintaining, establishing, or operation of a unit of the Senior Reserve Officer Training Corps (in accordance with section 654 of title 10, United States Code, and other applicable Federal laws) at the covered educational entity; or

(2) a student at the covered educational entity from enrolling in a unit of the Senior Reserve Officer Training Corps at another institution of higher education.

(b) Denial of Funds for Preventing Federal Military Recruiting on Campus.—None of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid) to a covered educational entity if the Secretary of Defense determines that the covered educational entity has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of Federal military recruiting; or

(2) access by military recruiters for purposes of Federal military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at the covered educational entity:

(A) student names, addresses, and telephone listings; and

(B) if known, student ages, levels of education, and majors.

(c) Exceptions.—The limitation established in subsection (a) or (b) shall not apply to a covered educational entity if the Secretary of Defense determines that—

(1) the covered educational entity has ceased the policy or practice described in such subsection;

(2) the institution of higher education involved has a longstanding policy of pacifism based on historical religious affiliation; or

(3) the institution of higher education involved is prohibited by the law of any State, or by the order of any State court, from allowing Senior Reserve Officer Training Corps activities or Federal military recruiting on campus, except that this paragraph shall apply only during the one-year period beginning on the effective date of this section.

(d) Notice of Determinations.—Whenever the Secretary of Defense makes a determination under subsection (a), (b), or (c), the Secretary—

(1) shall transmit a notice of the determination to the Secretary of Education and to the Congress; and

(2) shall publish in the Federal Register a notice of the determination and the effect of the determination on the eligibility of the covered educational entity for contracts and grants.

(e) Semiannual Notice in Federal Register.—The Secretary of Defense shall publish in the Federal Register once every 6 months a list of each covered educational entity that is currently ineligible for contracts and grants by reason of a determination of the Secretary under subsection (a) or (b).

(f) Covered Educational Entity.—For purposes of this section, the term "covered educational entity" means an institution of higher education, or a subelement of an institution of higher education.

(g) Effective Date.—This section shall take effect upon the expiration of the 180–day period beginning on the date of the enactment of this Act, by which date the Secretary of Defense shall have published final regulations in consultation with the Secretary of Education to carry out this section.

Sec. 515. (a) Technical Amendment to Other ROTC and Military Recruiting Provisions.—Sections 508 and 509 of the Energy and Water Development Appropriations Act, 1997, are amended by striking "when it is made known to the Federal official having authority to obligate or expend such funds" each place it appears and inserting "if the Secretary of Defense determines".

(b) Effective Date.—Sections 508 and 509 of the Energy and Water Development Appropriations Act, 1997, shall not take effect until the expiration of the 180–day period beginning on the date of the enactment of this Act, by which date the Secretary of Defense shall have published final regulations to carry out such sections (as amended by subsection (a)).

SEC. 516. None of the funds made available in this Act may be obligated or expended to enter into or renew a contract with an entity when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such entity is otherwise a contractor with the United States and is subject to the requirement in section 4212(d) of title 38, United States Code, regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans; and

(2) such entity has not submitted a report as required by that section for the most recent year for which such requirement was applicable to such entity.

SEC. 517. (a) Notwithstanding any provision of the Carl D. Perkins Vocational and Applied Technology Act (as such Act was in effect on September 24, 1990), a State shall be deemed to have met the requirements of section 503 of such Act with respect to decisions appealed by applications filed on April 30, 1993 and October 29, 1993 under section 452(b) of the General Education Provisions Act.

(b) Subsection (a) shall take effect on October 1, 1996.

SEC. 518. None of the funds appropriated in this Act may be made available to any entity under title X of the Public Health Service Act unless it is made known to the Federal official having authority to obligate or expend such funds that the applicant for the award certifies to the Secretary that it encourages family participation in the decision of the minor to seek family planning services.

Sec. 519. Of the budgetary resources available to agencies in this Act for salaries and expenses during fiscal year 1997, $30,500,000, to be allocated by the Office of Management and Budget, are permanently canceled: Provided, That the foregoing provision shall not apply to the Food and Drug Administration and the Indian Health Service: Provided further, That amounts available in this Act for congressional and legislative affairs, public affairs, and intergovernmental affairs activities are hereby reduced by $2,000,000.

<< 5 USCA § 5597 NOTE >>

SEC. 520. Voluntary Separation Incentives for Employees of Certain Federal Agencies.—(a) Definitions.—For the purposes of this section—

(1) the term "agency" means the Railroad Retirement Board and the Office of Inspector General of the Railroad Retirement Board;

(2) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who is employed by an agency, is serving under an appointment without time limitation, and has been currently employed for a continuous period of at least 3 years, but does not include—

(A) a reemployed annuitant under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(B) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(C) an employee who is in receipt of a specific notice of involuntary separation for misconduct or unacceptable performance;

(D) an employee who, upon completing an additional period of service as referred to in section 3(b)(2)(B)(ii) of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 5597 note), would qualify for a voluntary separation incentive payment under section 3 of such Act;

(E) an employee who has previously received any voluntary separation incentive payment by the Federal Government under this section or any other authority and has not repaid such payment;

(F) an employee covered by statutory reemployment rights who is on transfer to another organization; or

(G) any employee who, during the twenty-four-month period preceding the date of separation, has received a recruitment or relocation bonus under section 5753 of title 5, United States Code, or who, within the twelve-month period preceding the date of separation, received a retention allowance under section 5754 of title 5, United States Code.

(b) Agency Strategic Plan.—

(1) In general.—The three-member Railroad Retirement Board, prior to obligating any resources for voluntary separation incentive payments, shall submit to the House and Senate Committees on Appropriations and the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives a strategic plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

(2) Contents.—The agency's plan shall include—

(A) the positions and functions to be reduced or eliminated, identified by organizational unit, geographic location, occupational category and grade level;

(B) the number and amounts of voluntary separation incentive payments to be offered; and

(C) a description of how the agency will operate without the eliminated positions and functions.

(c) Authority to Provide Voluntary Separation Incentive Payments.—

(1) In general.—A voluntary separation incentive payment under this section may be paid by an agency to any employee only to the extent necessary to eliminate the positions and functions identified by the strategic plan.

(2) Amount and treatment of payments.—A voluntary separation incentive payment—

(A) shall be paid in a lump sum after the employee's separation;

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employees;

(C) shall be equal to the lesser of—

(i) an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(ii) an amount determined by the agency head not to exceed $25,000;

(D) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before September 30, 1997;

(E) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(F) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) Additional Agency Contributions to the Retirement Fund.—

(1) In general.—In addition to any other payments which it is required to make under subchapter III of chapter 83 of title 5, United States Code, an agency shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the agency who is covered under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, to whom a voluntary separation incentive has been paid under this section.

2) Definition.—For the purpose of paragraph (1), the term "final basic pay", with respect to an employee, means the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

e) Effect of Subsequent Employment With the Government.—An individual who has received a voluntary separation incentive payment under this section and accepts any employment for compensation with the Government of the United States, or who works for any agency of the United States Government through a personal services contract, within 5 years after the date of the separation on which the payment is based shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

(f) Reduction of Agency Employment Levels.—

(1) In general.—The total number of funded employee positions in the agency shall be reduced by one position for each vacancy created by the separation of any employee who has received, or is due to receive, a voluntary separation incentive payment under this section. For the purposes of this subsection, positions shall be counted on a full-time-equivalent basis.

(2) Enforcement.—The President, through the Office of Management and Budget, shall monitor the agency and take any action necessary to ensure that the requirements of this subsection are met.

(g) Effective Date.—This section shall take effect October 1, 1996.

<< 42 USCA § 233 NOTE >>

SEC. 521. Correction of Effective Date.—Effective on the day after the date of enactment of the Health Centers Consolidation Act of 1996, section 5 of that Act is amended by striking "October 1, 1997" and inserting "October 1, 1996".

TITLE VI—REORGANIZATION AND PRIVATIZATION OF SALLIE MAE AND CONNIE LEE

<< 20 USCA § 1001 NOTE >>

SEC. 601. SHORT TITLE.

This title may be cited as the "Student Loan Marketing Association Reorganization Act of 1996".

SEC. 602. REORGANIZATION OF THE STUDENT LOAN MARKETING ASSOCIATION THROUGH THE FORMATION OF A HOLDING COMPANY.

<< 20 USCA § 1087–3 >>

(a) AMENDMENT.—Part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) is amended by inserting after section 439 (20 U.S.C. 1087–2) the following new section:

"SEC. 440. REORGANIZATION OF THE STUDENT LOAN MARKETING ASSOCIATION THROUGH THE FORMATION OF A HOLDING COMPANY.

"(a) ACTIONS BY THE ASSOCIATION'S BOARD OF DIRECTORS.—The Board of Directors of the Association shall take or cause to be taken all such action as the Board of Directors deems necessary or appropriate to effect, upon the shareholder approval described in subsection (b), a restructuring of the common stock ownership of the Association, as set forth in a plan of reorganization adopted by the Board of Directors (the terms of which shall be consistent with this section) so that all of the outstanding common shares of the Association shall be directly owned by a Holding Company. Such actions may include, in the Board of Director's discretion, a merger of a wholly owned subsidiary of the Holding Company with and into the Association, which would have the effect provided in the plan of reorganization and the law of the jurisdiction in which such subsidiary is incorporated. As part of the restructuring, the Board of Directors may cause—

"(1) the common shares of the Association to be converted, on the reorganization effective date, to common shares of the Holding Company on a one for one basis, consistent with applicable State or District of Columbia law; and

"(2) Holding Company common shares to be registered with the Securities and Exchange Commission.

"(b) SHAREHOLDER APPROVAL.—The plan of reorganization adopted by the Board of Directors pursuant to subsection (a) shall be submitted to common shareholders of the Association for their approval. The reorganization shall occur on the reorganization effective date, provided that the plan of reorganization has been approved by the affirmative votes, cast in person or by proxy, of the holders of a majority of the issued and outstanding shares of the Association common stock.

"(c) TRANSITION.—In the event the shareholders of the Association approve the plan of reorganization under subsection (b), the following provisions shall apply beginning on the reorganization effective date:

"(1) IN GENERAL.—Except as specifically provided in this section, until the dissolution date the Association shall continue to have all of the rights, privileges and obligations set forth in, and shall be subject to all of the limitations and restrictions of, section 439, and the Association shall continue to carry out the purposes of such section. The Holding Company and any subsidiary of the Holding Company (other than the Association) shall not be entitled to any of the rights, privileges, and obligations, and shall not be subject to the limitations and restrictions, applicable to the Association under section 439, except as specifically provided in this section. The Holding Company and any subsidiary of the Holding Company (other than the Association or a subsidiary of the Association) shall not purchase loans insured under this Act until such time as the Association ceases acquiring such loans, except that the Holding Company may purchase such loans if the Association is merely continuing to acquire loans as a lender of last resort pursuant to section 439(q) or under an agreement with the Secretary described in paragraph (6).

"(2) TRANSFER OF CERTAIN PROPERTY.—

"(A) IN GENERAL.—Except as provided in this section, on the reorganization effective date or as soon as practicable thereafter, the Association shall use the Association's best efforts to transfer to the Holding Company or any subsidiary of the Holding Company (or both), as directed by the Holding Company, all real and personal property of the Association (both tangible and intangible) other than the remaining property. Subject to the preceding sentence, such transferred property shall include all right, title, and interest in—

"(i) direct or indirect subsidiaries of the Association (excluding special purpose funding companies in existence on the date of enactment of this section and any interest in any government-sponsored enterprise);

"(ii) contracts, leases, and other agreements of the Association;

"(iii) licenses and other intellectual property of the Association; and

"(iv) any other property of the Association.

"(B) CONSTRUCTION.—Nothing in this paragraph shall be construed to prohibit the Association from transferring remaining property from time to time to the Holding Company or any subsidiary of the Holding Company, subject to the provisions of paragraph (4).

"(3) TRANSFER OF PERSONNEL.—On the reorganization effective date, employees of the Association shall become employees of the Holding Company (or any subsidiary of the Holding Company), and the Holding Company (or any subsidiary of the Holding Company) shall provide all necessary and appropriate management and operational support (including loan servicing) to the Association, as requested by the Association. The Association, however, may obtain such management and operational support from persons or entities not associated with the Holding Company.

"(4) DIVIDENDS.—The Association may pay dividends in the form of cash or noncash distributions so long as at the time of the declaration of such dividends, after giving effect to the payment of such dividends as of the date of such declaration by the Board of Directors of the Association, the Association's capital would be in compliance with the capital standards and requirements set forth in section 439(r). If, at any time after the reorganization effective date, the Association fails to comply with such capital standards, the Holding Company shall transfer with due diligence to the Association additional capital in such amounts as are necessary to ensure that the Association again complies with the capital standards.

"(5) CERTIFICATION PRIOR TO DIVIDEND.—Prior to the payment of any dividend under paragraph (4), the Association shall certify to the Secretary of the Treasury that the payment of the dividend will be made in compliance with paragraph (4) and shall provide copies of all calculations needed to make such certification.

"(6) RESTRICTIONS ON NEW BUSINESS ACTIVITY OR ACQUISITION OF ASSETS BY ASSOCIATION.—

"(A) IN GENERAL.—After the reorganization effective date, the Association shall not engage in any new business activities or acquire any additional program assets described in section 439(d) other than in connection with—

"(i) student loan purchases through September 30, 2007;

"(ii) contractual commitments for future warehousing advances, or pursuant to letters of credit or standby bond purchase agreements, which are outstanding as of the reorganization effective date;

"(iii) the Association serving as a lender-of-last-resort pursuant to section 439(q); and

"(iv) the Association's purchase of loans insured under this part, if the Secretary, with the approval of the Secretary of the Treasury, enters into an agreement with the Association for the continuation or resumption of the Association's secondary market purchase program because the Secretary determines there is inadequate liquidity for loans made under this part.

"(B) AGREEMENT.—The Secretary is authorized to enter into an agreement described in clause (iv) of subparagraph (A) with the Association covering such secondary market activities. Any agreement entered into under such clause shall cover a period of 12 months, but may be renewed if the Secretary determines that liquidity remains inadequate. The fee provided under section 439(h)(7) shall not apply to loans acquired under any such agreement with the Secretary.

"(7) ISSUANCE OF DEBT OBLIGATIONS DURING THE TRANSITION PERIOD; ATTRIBUTES OF DEBT OBLIGATIONS.—After the reorganization effective date, the Association shall not issue debt obligations which mature later than September 30, 2008, except in connection with serving as a lender-of-last-resort pursuant to section 439(q) or with purchasing loans under an agreement with the Secretary as described in paragraph (6). Nothing in this section shall modify the attributes accorded the debt obligations of the Association by section 439, regardless of whether such debt obligations are incurred prior to, or at any time following, the reorganization effective date or are transferred to a trust in accordance with subsection (d).

"(8) MONITORING OF SAFETY AND SOUNDNESS.—

"(A) OBLIGATION TO OBTAIN, MAINTAIN, AND REPORT INFORMATION.—The Association shall obtain such information and make and keep such records as the Secretary of the Treasury may from time to time prescribe concerning—

"(i) the financial risk to the Association resulting from the activities of any associated person, to the extent such activities are reasonably likely to have a material impact on the financial condition of the Association, including the Association's capital ratio, the Association's liquidity, or the Association's ability to conduct and finance the Association's operations; and

"(ii) the Association's policies, procedures, and systems for monitoring and controlling any such financial risk.

"(B) SUMMARY REPORTS.—The Secretary of the Treasury may require summary reports of the information described in subparagraph (A) to be filed no more frequently than quarterly. If, as a result of adverse market conditions or based on reports provided pursuant to this subparagraph or other available information, the Secretary of the Treasury has concerns regarding the financial or operational condition of the Association, the Secretary of the Treasury may, notwithstanding the

preceding sentence and subparagraph (A), require the Association to make reports concerning the activities of any associated person whose business activities are reasonably likely to have a material impact on the financial or operational condition of the Association.

"(C) SEPARATE OPERATION OF CORPORATIONS.—

"(i) IN GENERAL.—The funds and assets of the Association shall at all times be maintained separately from the funds and assets of the Holding Company or any subsidiary of the Holding Company and may be used by the Association solely to carry out the Association's purposes and to fulfill the Association's obligations.

"(ii) BOOKS AND RECORDS.—The Association shall maintain books and records that clearly reflect the assets and liabilities of the Association, separate from the assets and liabilities of the Holding Company or any subsidiary of the Holding Company.

"(iii) CORPORATE OFFICE.—The Association shall maintain a corporate office that is physically separate from any office of the Holding Company or any subsidiary of the Holding Company.

"(iv) DIRECTOR.—No director of the Association who is appointed by the President pursuant to section 439(c)(1)(A) may serve as a director of the Holding Company.

"(v) ONE OFFICER REQUIREMENT.—At least one officer of the Association shall be an officer solely of the Association.

"(vi) TRANSACTIONS.—Transactions between the Association and the Holding Company or any subsidiary of the Holding Company, including any loan servicing arrangements, shall be on terms no less favorable to the Association than the Association could obtain from an unrelated third party offering comparable services.

"(vii) CREDIT PROHIBITION.—The Association shall not extend credit to the Holding Company or any subsidiary of the Holding Company nor guarantee or provide any credit enhancement to any debt obligations of the Holding Company or any subsidiary of the Holding Company.

"(viii) AMOUNTS COLLECTED.—Any amounts collected on behalf of the Association by the Holding Company or any subsidiary of the Holding Company with respect to the assets of the Association, pursuant to a servicing contract or other arrangement between the Association and the Holding Company or any subsidiary of the Holding Company, shall be collected solely for the benefit of the Association and shall be immediately deposited by the Holding Company or such subsidiary to an account under the sole control of the Association.

"(D) ENCUMBRANCE OF ASSETS.—Notwithstanding any Federal or State law, rule, or regulation, or legal or equitable principle, doctrine, or theory to the contrary, under no circumstances shall the assets of the Association be available or used to pay claims or debts of or incurred by the Holding Company. Nothing in this subparagraph shall be construed to limit the right of the Association to pay dividends not otherwise prohibited under this subparagraph or to limit any liability of the Holding Company explicitly provided for in this section.

"(E) HOLDING COMPANY ACTIVITIES.—After the reorganization effective date and prior to the dissolution date, all business activities of the Holding Company shall be conducted through subsidiaries of the Holding Company.

"(F) CONFIDENTIALITY.—Any information provided by the Association pursuant to this section shall be subject to the same confidentiality obligations contained in section 439(r)(12).

"(G) DEFINITION.—For purposes of this paragraph, the term 'associated person' means any person, other than a natural person, who is directly or indirectly controlling, controlled by, or under common control with, the Association.

"(9) ISSUANCE OF STOCK WARRANTS.—

"(A) IN GENERAL.—On the reorganization effective date, the Holding Company shall issue to the District of Columbia Financial Responsibility and Management Assistance Authority a number of stock warrants that is equal to one percent of the outstanding shares of the Association, determined as of the last day of the fiscal quarter preceding the date of enactment of this section, with each stock warrant entitling the holder of the stock warrant to purchase from the Holding Company one share of the registered common stock of the Holding Company or the Holding Company's successors or assigns, at any time on or before September 30, 2008. The exercise price for such warrants shall be an amount equal to the average closing price of the common stock of the Association for the 20 business days prior to the date of enactment of this section on the exchange or market which is then the primary exchange or market for the common stock of the Association. The number of shares of Holding Company common stock subject to each stock warrant and the exercise price of each stock warrant shall be adjusted as necessary to reflect—

"(i) the conversion of Association common stock into Holding Company common stock as part of the plan of reorganization approved by the Association's shareholders; and

"(ii) any issuance or sale of stock (including issuance or sale of treasury stock), stock split, recapitalization, reorganization, or other corporate event, if agreed to by the Secretary of the Treasury and the Association.

"(B) AUTHORITY TO SELL OR EXERCISE STOCK WARRANTS; DEPOSIT OF PROCEEDS.—The District of Columbia Financial Responsibility and Management Assistance Authority is authorized to sell or exercise the stock warrants described in subparagraph (A). The District of Columbia Financial Responsibility and Management Assistance Authority shall deposit into the account established under section 3(e) of the Student Loan Marketing Association Reorganization Act of 1996 amounts collected from the sale and proceeds resulting from the exercise of the stock warrants pursuant to this subparagraph.

"(10) RESTRICTIONS ON TRANSFER OF ASSOCIATION SHARES AND BANKRUPTCY OF ASSOCIATION.—After the reorganization effective date, the Holding Company shall not sell, pledge, or otherwise transfer the outstanding shares of the Association, or agree to or cause the liquidation of the Association or cause the Association to file a petition for bankruptcy under title 11, United States Code, without prior approval of the Secretary of the Treasury and the Secretary of Education.

"(d) TERMINATION OF THE ASSOCIATION.—In the event the shareholders of the Association approve a plan of reorganization under subsection (b), the Association shall dissolve, and the Association's separate existence shall terminate on September 30, 2008, after discharge of all outstanding debt obligations and liquidation pursuant to this subsection. The Association may dissolve pursuant to this subsection prior to such date by notifying the Secretary of Education and the Secretary of the Treasury of the Association's intention to dissolve, unless within 60 days after receipt of such notice the Secretary of Education notifies the Association that the Association continues to be needed to serve as a lender of last resort pursuant to section 439(q) or continues to be needed to purchase loans under an agreement with the Secretary described in subsection (c) (6). On the dissolution date, the Association shall take the following actions:

"(1) ESTABLISHMENT OF A TRUST.—The Association shall, under the terms of an irrevocable trust agreement that is in form and substance satisfactory to the Secretary of the Treasury, the Association and the appointed trustee, irrevocably transfer all remaining obligations of the Association to the trust and irrevocably deposit or cause to be deposited into such trust, to be held as trust funds solely for the benefit of holders of the remaining obligations, money or direct noncallable obligations of the United States or any agency thereof for which payment the full faith and credit of the United States is pledged, maturing as to principal and interest in such amounts and at such times as are determined by the Secretary of the Treasury to be sufficient, without consideration of any significant reinvestment of such interest, to pay the principal of, and interest on, the remaining obligations in accordance with their terms. To the extent the Association cannot provide money or qualifying obligations in the amount required, the Holding Company shall be required to transfer money or qualifying obligations to the trust in the amount necessary to prevent any deficiency.

"(2) USE OF TRUST ASSETS.—All money, obligations, or financial assets deposited into the trust pursuant to this subsection shall be applied by the trustee to the payment of the remaining obligations assumed by the trust.

"(3) OBLIGATIONS NOT TRANSFERRED TO THE TRUST.—The Association shall make proper provision for all other obligations of the Association not transferred to the trust, including the repurchase or redemption, or the making of proper provision for the repurchase or redemption, of any preferred stock of the Association outstanding. Any obligations of the Association which cannot be fully satisfied shall become liabilities of the Holding Company as of the date of dissolution.

"(4) TRANSFER OF REMAINING ASSETS.—After compliance with paragraphs (1) and (3), any remaining assets of the trust shall be transferred to the Holding Company or any subsidiary of the Holding Company, as directed by the Holding Company.

"(e) OPERATION OF THE HOLDING COMPANY.—In the event the shareholders of the Association approve the plan of reorganization under subsection (b), the following provisions shall apply beginning on the reorganization effective date:

"(1) HOLDING COMPANY BOARD OF DIRECTORS.—The number of members and composition of the Board of Directors of the Holding Company shall be determined as set forth in the Holding Company's charter or like instrument (as amended from time to time) or bylaws (as amended from time to time) and as permitted under the laws of the jurisdiction of the Holding Company's incorporation.

"(2) HOLDING COMPANY NAME.—The names of the Holding Company and any subsidiary of the Holding Company (other than the Association)—

"(A) may not contain the name 'Student Loan Marketing Association'; and

"(B) may contain, to the extent permitted by applicable State or District of Columbia law, 'Sallie Mae' or variations thereof, or such other names as the Board of Directors of the Association or the Holding Company deems appropriate.

"(3) USE OF SALLIE MAE NAME.—Subject to paragraph (2), the Association may assign to the Holding Company, or any subsidiary of the Holding Company, the 'Sallie Mae' name as a trademark or service mark, except that neither the Holding Company nor any subsidiary of the Holding Company (other than the Association or any subsidiary of the Association) may use the 'Sallie Mae' name on, or to identify the issuer of, any debt obligation or other security offered or sold by the Holding Company or any subsidiary of the Holding Company (other than a debt obligation or other security issued to and held by the Holding Company or any subsidiary of the Holding Company). The Association shall remit to the account established under section 3(e) of the Student Loan Marketing Association Reorganization Act of 1996, $5,000,000, within 60 days of the reorganization effective date as compensation for the right to assign the 'Sallie Mae' name as a trademark or service mark.

"(4) DISCLOSURE REQUIRED.—Until 3 years after the dissolution date, the Holding Company, and any subsidiary of the Holding Company (other than the Association), shall prominently display—

"(A) in any document offering the Holding Company's securities, a statement that the obligations of the Holding Company and any subsidiary of the Holding Company are not guaranteed by the full faith and credit of the United States; and

"(B) in any advertisement or promotional materials which use the 'Sallie Mae' name or mark, a statement that neither the Holding Company nor any subsidiary of the Holding Company is a government-sponsored enterprise or instrumentality of the United States.

"(f) STRICT CONSTRUCTION.—Except as specifically set forth in this section, nothing in this section shall be construed to limit the authority of the Association as a federally chartered corporation, or of the Holding Company as a State or District of Columbia chartered corporation.

"(g) RIGHT TO ENFORCE.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of this section, or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with this section.

"(h) DEADLINE FOR REORGANIZATION EFFECTIVE DATE.—This section shall be of no further force and effect in the event that the reorganization effective date does not occur on or before 18 months after the date of enactment of this section.

"(i) DEFINITIONS.—For purposes of this section:

"(1) ASSOCIATION.—The term 'Association' means the Student Loan Marketing Association.

"(2) DISSOLUTION DATE.—The term 'dissolution date' means September 30, 2008, or such earlier date as the Secretary of Education permits the transfer of remaining obligations in accordance with subsection (d).

"(3) HOLDING COMPANY.—The term 'Holding Company' means the new business corporation established pursuant to this section by the Association under the laws of any State of the United States or the District of Columbia for the purposes of the reorganization and restructuring described in subsection (a).

"(4) REMAINING OBLIGATIONS.—The term 'remaining obligations' means the debt obligations of the Association outstanding as of the dissolution date.

"(5) REMAINING PROPERTY.—The term 'remaining property' means the following assets and liabilities of the Association which are outstanding as of the reorganization effective date:

"(A) Debt obligations issued by the Association.

"(B) Contracts relating to interest rate, currency, or commodity positions or protections.

"(C) Investment securities owned by the Association.

"(D) Any instruments, assets, or agreements described in section 439(d) (including, without limitation, all student loans and agreements relating to the purchase and sale of student loans, forward purchase and lending commitments, warehousing advances, academic facilities obligations, letters of credit, standby bond purchase agreements, liquidity agreements, and student loan revenue bonds or other loans).

"(E) Except as specifically prohibited by this section or section 439, any other nonmaterial assets or liabilities of the Association which the Association's Board of Directors determines to be necessary or appropriate to the Association's operations.

"(6) REORGANIZATION.—The term 'reorganization' means the restructuring event or events (including any merger event) giving effect to the Holding Company structure described in subsection (a).

"(7) REORGANIZATION EFFECTIVE DATE.—The term 'reorganization effective date' means the effective date of the reorganization as determined by the Board of Directors of the Association, which shall not be earlier than the date that shareholder approval is obtained pursuant to subsection (b) and shall not be later than the date that is 18 months after the date of enactment of this section.

"(8) SUBSIDIARY.—The term 'subsidiary' means one or more direct or indirect subsidiaries.".

(b) TECHNICAL AMENDMENTS.—

(1) ELIGIBLE LENDER.—

(A) AMENDMENTS TO THE HIGHER EDUCATION ACT.—

<< 20 USCA § 1085 >>

(i) DEFINITION OF ELIGIBLE LENDER.—Section 435(d)(1)(F) of the Higher Education Act of 1965 (20 U.S.C. 1085(d)(1)(F)) is amended by inserting after "Student Loan Marketing Association" the following: "or the Holding Company of the Student Loan Marketing Association, including any subsidiary of the Holding Company, created pursuant to section 440,".

<< 20 USCA §§ 1078–3, 1085 >>

(ii) DEFINITION OF ELIGIBLE LENDER AND FEDERAL CONSOLIDATION LOANS.—Sections 435(d)(1)(G) and 428C(a)(1)(A) of such Act (20 U.S.C. 1085(d)(1)(G) and 1078–3(a)(1)(A)) are each amended by inserting after "Student Loan Marketing Association" the following: "or the Holding Company of the Student Loan Marketing Association, including any subsidiary of the Holding Company, created pursuant to section 440".

<< 20 USCA § 1078–3 NOTE >>

(B) EFFECTIVE DATE.—The amendments made by this paragraph shall take effect on the reorganization effective date as defined in section 440(h) of the Higher Education Act of 1965 (as added by subsection (a)).

<< 20 USCA § 1087–2 >>

(2) ENFORCEMENT OF SAFETY AND SOUNDNESS REQUIREMENTS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is amended—

(A) in the first sentence of paragraph (12), by inserting "or the Association's associated persons" after "by the Association";

(B) by redesignating paragraph (13) as paragraph (15); and

(C) by inserting after paragraph (12) the following new paragraph:

"(13) ENFORCEMENT OF SAFETY AND SOUNDNESS REQUIREMENTS.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of this section, or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with this section.".

(3) FINANCIAL SAFETY AND SOUNDNESS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is further amended—

(A) in paragraph (1)—

(i) by striking "and" at the end of subparagraph (A);

(ii) by striking the period at the end of subparagraph (B) and inserting "; and"; and

(iii) by adding at the end the following new subparagraph:

"(C)(i) financial statements of the Association within 45 days of the end of each fiscal quarter; and

"(ii) reports setting forth the calculation of the capital ratio of the Association within 45 days of the end of each fiscal quarter.";

(B) in paragraph (2)—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(i) by striking clauses (i) and (ii) of subparagraph (A) and inserting the following:

"(i) appoint auditors or examiners to conduct audits of the Association from time to time to determine the condition of the Association for the purpose of assessing the Association's financial safety and soundness and to determine whether the requirements of this section and section 440 are being met; and

"(ii) obtain the services of such experts as the Secretary of the Treasury determines necessary and appropriate, as authorized by section 3109 of title 5, United States Code, to assist in determining the condition of the Association for the purpose of assessing the Association's financial safety and soundness, and to determine whether the requirements of this section and section 440 are being met."; and

(ii) by adding at the end the following new subparagraph:

"(D) ANNUAL ASSESSMENT.—

"(i) IN GENERAL.—For each fiscal year beginning on or after October 1, 1996, the Secretary of the Treasury may establish and collect from the Association an assessment (or assessments) in amounts sufficient to provide for reasonable costs and expenses of carrying out the duties of the Secretary of the Treasury under this section and section 440 during such fiscal year. In no event may the total amount so assessed exceed, for any fiscal year, $800,000, adjusted for each fiscal year ending after September 30, 1997, by the ratio of the Consumer Price Index for All Urban Consumers (issued by the Bureau of Labor Statistics) for the final month of the fiscal year preceding the fiscal year for which the assessment is made to the Consumer Price Index for All Urban Consumers for September 1997.

"(ii) DEPOSIT.—Amounts collected from assessments under this subparagraph shall be deposited in an account within the Treasury of the United States as designated by the Secretary of the Treasury for that purpose. The Secretary of the Treasury is authorized and directed to pay out of any funds available in such account the reasonable costs and expenses of carrying out the duties of the Secretary of the Treasury under this section and section 440. None of the funds deposited into such account shall be available for any purpose other than making payments for such costs and expenses."; and

(C) by inserting after paragraph (13) (as added by paragraph (2)(C)) the following new paragraph:

"(14) ACTIONS BY SECRETARY.—

"(A) IN GENERAL.—For any fiscal quarter ending after January 1, 2000, the Association shall have a capital ratio of at least 2.25 percent. The Secretary of the Treasury may, whenever such capital ratio is not met, take any one or more of the actions described in paragraph (7), except that—

"(i) the capital ratio to be restored pursuant to paragraph (7)(D) shall be 2.25 percent; and

"(ii) if the relevant capital ratio is in excess of or equal to 2 percent for such quarter, the Secretary of the Treasury shall defer taking any of the actions set forth in paragraph (7) until the next succeeding quarter and may then proceed with any such action only if the capital ratio of the Association remains below 2.25 percent.

"(B) APPLICABILITY.—The provisions of paragraphs (4), (5), (6), (8), (9), (10), and (11) shall be of no further application to the Association for any period after January 1, 2000.".

(4) INFORMATION REQUIRED; DIVIDENDS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is further amended—

(A) by adding at the end of paragraph (2) (as amended in paragraph (3)(B)(ii)) the following new subparagraph:

"(E) OBLIGATION TO OBTAIN, MAINTAIN, AND REPORT INFORMATION.—

"(i) IN GENERAL.—The Association shall obtain such information and make and keep such records as the Secretary of the Treasury may from time to time prescribe concerning—

"(I) the financial risk to the Association resulting from the activities of any associated person, to the extent such activities are reasonably likely to have a material impact on the financial condition of the Association, including the Association's capital ratio, the Association's liquidity, or the Association's ability to conduct and finance the Association's operations; and

"(II) the Association's policies, procedures, and systems for monitoring and controlling any such financial risk.

"(ii) SUMMARY REPORTS.—The Secretary of the Treasury may require summary reports of such information to be filed no more frequently than quarterly. If, as a result of adverse market conditions or based on reports provided pursuant to this subparagraph or other available information, the Secretary of the Treasury has concerns regarding the financial or operational condition of the Association, the Secretary of the Treasury may, notwithstanding the preceding sentence and clause (i), require the Association to make reports concerning the activities of any associated person, whose business activities are reasonably likely to have a material impact on the financial or operational condition of the Association.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) DEFINITION.—For purposes of this subparagraph, the term 'associated person' means any person, other than a natural person, directly or indirectly controlling, controlled by, or under common control with the Association."; and

(B) by adding at the end the following new paragraphs:

"(16) DIVIDENDS.—The Association may pay dividends in the form of cash or noncash distributions so long as at the time of the declaration of such dividends, after giving effect to the payment of such dividends as of the date of such declaration by the Board of Directors of the Association, the Association's capital would be in compliance with the capital standards set forth in this section.

"(17) CERTIFICATION PRIOR TO PAYMENT OF DIVIDEND.—Prior to the payment of any dividend under paragraph (16), the Association shall certify to the Secretary of the Treasury that the payment of the dividend will be made in compliance with paragraph (16) and shall provide copies of all calculations needed to make such certification.".

(c) SUNSET OF THE ASSOCIATION'S CHARTER IF NO REORGANIZATION PLAN OCCURS.—Section 439 of the Higher Education Act of 1965 (20 U.S.C. 1087–2) is amended by adding at the end the following new subsection:

"(s) CHARTER SUNSET.—

"(1) APPLICATION OF PROVISIONS.—This subsection applies beginning 18 months and one day after the date of enactment of this subsection if no reorganization of the Association occurs in accordance with the provisions of section 440.

"(2) SUNSET PLAN.—

"(A) PLAN SUBMISSION BY THE ASSOCIATION.—Not later than July 1, 2007, the Association shall submit to the Secretary of the Treasury and to the Chairman and Ranking Member of the Committee on Labor and Human Resources of the Senate and the Chairman and Ranking Member of the Committee on Economic and Educational Opportunities of the House of Representatives, a detailed plan for the orderly winding up, by July 1, 2013, of business activities conducted pursuant to the charter set forth in this section. Such plan shall—

"(i) ensure that the Association will have adequate assets to transfer to a trust, as provided in this subsection, to ensure full payment of remaining obligations of the Association in accordance with the terms of such obligations;

"(ii) provide that all assets not used to pay liabilities shall be distributed to shareholders as provided in this subsection; and

"(iii) provide that the operations of the Association shall remain separate and distinct from that of any entity to which the assets of the Association are transferred.

"(B) AMENDMENT OF THE PLAN BY THE ASSOCIATION.—The Association shall from time to time amend such plan to reflect changed circumstances, and submit such amendments to the Secretary of the Treasury and to the Chairman and Ranking Minority Member of the Committee on Labor and Human Resources of the Senate and Chairman and Ranking Minority Member of the Committee on Economic and Educational Opportunities of the House of Representatives. In no case may any amendment extend the date for full implementation of the plan beyond the dissolution date provided in paragraph (3).

"(C) PLAN MONITORING.—The Secretary of the Treasury shall monitor the Association's compliance with the plan and shall continue to review the plan (including any amendments thereto).

"(D) AMENDMENT OF THE PLAN BY THE SECRETARY OF THE TREASURY.—The Secretary of the Treasury may require the Association to amend the plan (including any amendments to the plan), if the Secretary of the Treasury deems such amendments necessary to ensure full payment of all obligations of the Association.

"(E) IMPLEMENTATION BY THE ASSOCIATION.—The Association shall promptly implement the plan (including any amendments to the plan, whether such amendments are made by the Association or are required to be made by the Secretary of the Treasury).

"(3) DISSOLUTION OF THE ASSOCIATION.—The Association shall dissolve and the Association's separate existence shall terminate on July 1, 2013, after discharge of all outstanding debt obligations and liquidation pursuant to this subsection. The Association may dissolve pursuant to this subsection prior to such date by notifying the Secretary of Education and the Secretary of the Treasury of the Association's intention to dissolve, unless within 60 days of receipt of such notice the Secretary of Education notifies the Association that the Association continues to be needed to serve as a lender of last resort pursuant to subsection (q) or continues to be needed to purchase loans under an agreement with the Secretary described in paragraph (4) (A). On the dissolution date, the Association shall take the following actions:

"(A) ESTABLISHMENT OF A TRUST.—The Association shall, under the terms of an irrevocable trust agreement in form and substance satisfactory to the Secretary of the Treasury, the Association, and the appointed trustee, irrevocably transfer all remaining obligations of the Association to a trust and irrevocably deposit or cause to be deposited into such trust, to be held

as trust funds solely for the benefit of holders of the remaining obligations, money or direct noncallable obligations of the United States or any agency thereof for which payment the full faith and credit of the United States is pledged, maturing as to principal and interest in such amounts and at such times as are determined by the Secretary of the Treasury to be sufficient, without consideration of any significant reinvestment of such interest, to pay the principal of, and interest on, the remaining obligations in accordance with their terms.

"(B) USE OF TRUST ASSETS.—All money, obligations, or financial assets deposited into the trust pursuant to this subsection shall be applied by the trustee to the payment of the remaining obligations assumed by the trust. Upon the fulfillment of the trustee's duties under the trust, any remaining assets of the trust shall be transferred to the persons who, at the time of the dissolution, were the shareholders of the Association, or to the legal successors or assigns of such persons.

"(C) OBLIGATIONS NOT TRANSFERRED TO THE TRUST.—The Association shall make proper provision for all other obligations of the Association, including the repurchase or redemption, or the making of proper provision for the repurchase or redemption, of any preferred stock of the Association outstanding.

"(D) TRANSFER OF REMAINING ASSETS.—After compliance with subparagraphs (A) and (C), the Association shall transfer to the shareholders of the Association any remaining assets of the Association.

"(4) RESTRICTIONS RELATING TO WINDING UP.—

"(A) RESTRICTIONS ON NEW BUSINESS ACTIVITY OR ACQUISITION OF ASSETS BY THE ASSOCIATION.—

"(i) IN GENERAL.—Beginning on July 1, 2009, the Association shall not engage in any new business activities or acquire any additional program assets (including acquiring assets pursuant to contractual commitments) described in subsection (d) other than in connection with the Association—

"(I) serving as a lender of last resort pursuant to subsection (q); and

"(II) purchasing loans insured under this part, if the Secretary, with the approval of the Secretary of the Treasury, enters into an agreement with the Association for the continuation or resumption of the Association's secondary market purchase program because the Secretary determines there is inadequate liquidity for loans made under this part.

"(ii) AGREEMENT.—The Secretary is authorized to enter into an agreement described in subclause (II) of clause (i) with the Association covering such secondary market activities. Any agreement entered into under such subclause shall cover a period of 12 months, but may be renewed if the Secretary determines that liquidity remains inadequate. The fee provided under subsection (h)(7) shall not apply to loans acquired under any such agreement with the Secretary.

"(B) ISSUANCE OF DEBT OBLIGATIONS DURING THE WIND UP PERIOD; ATTRIBUTES OF DEBT OBLIGATIONS.—The Association shall not issue debt obligations which mature later than July 1, 2013, except in connection with serving as a lender of last resort pursuant to subsection (q) or with purchasing loans under an agreement with the Secretary as described in subparagraph (A). Nothing in this subsection shall modify the attributes accorded the debt obligations of the Association by this section, regardless of whether such debt obligations are transferred to a trust in accordance with paragraph (3).

"(C) USE OF ASSOCIATION NAME.—The Association may not transfer or permit the use of the name 'Student Loan Marketing Association', 'Sallie Mae', or any variation thereof, to or by any entity other than a subsidiary of the Association.".

(d) REPEALS.—

<< 20 USCA §§ 1087–2, 1087–3 >>

(1) IN GENERAL.—Sections 439 of the Higher Education Act of 1965 (20 U.S.C. 1087–2) and 440 of such Act (as added by subsection (a) of this section) are repealed.

<< 20 USCA § 1087–2 NOTE >>

(2) EFFECTIVE DATE.—The repeals made by paragraph (1) shall be effective one year after—

(A) the date on which all of the obligations of the trust established under section 440(d)(1) of the Higher Education Act of 1965 (as added by subsection (a)) have been extinguished, if a reorganization occurs in accordance with section 440 of such Act; or

(B) the date on which all of the obligations of the trust established under subsection 439(s)(3)(A) of such Act (as added by subsection (c)) have been extinguished, if a reorganization does not occur in accordance with section 440 of such Act.

(e) ASSOCIATION NAMES.—Upon dissolution in accordance with section 439(s) of the Higher Education Act of 1965 (20 U.S.C. 1087–2), the names "Student Loan Marketing Association", "Sallie Mae", and any variations thereof may not be used by any entity engaged in any business similar to the business conducted pursuant to section 439 of such Act (as such section was in effect on the date of enactment of this Act) without the approval of the Secretary of the Treasury.

(f) RIGHT TO ENFORCE.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of subsection (e), or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with subsection (e).

<< 20 USCA § 1132f–10 >>

SEC. 603. CONNIE LEE PRIVATIZATION.

(a) STATUS OF THE CORPORATION AND CORPORATE POWERS; OBLIGATIONS NOT FEDERALLY GUARANTEED.—

(1) STATUS OF THE CORPORATION.—The Corporation shall not be an agency, instrumentality, or establishment of the United States Government, nor a Government corporation, nor a Government controlled corporation, as such terms are defined in section 103 of title 5, United States Code. No action under section 1491 of title 28, United States Code (commonly known as the Tucker Act) shall be allowable against the United States based on the actions of the Corporation.

(2) CORPORATE POWERS.—The Corporation shall be subject to the provisions of this section, and, to the extent not inconsistent with this section, to the District of Columbia Business Corporation Act (or the comparable law of another State, if applicable). The Corporation shall have the powers conferred upon a corporation by the District of Columbia Business Corporation Act (or such other applicable State law) as from time to time in effect in order to conduct the Corporation's affairs as a private, for-profit corporation and to carry out the Corporation's purposes and activities incidental thereto. The Corporation shall have the power to enter into contracts, to execute instruments, to incur liabilities, to provide products and services, and to do all things as are necessary or incidental to the proper management of the Corporation's affairs and the efficient operation of a private, for-profit business.

(3) LIMITATION ON OWNERSHIP OF STOCK.—

(A) STUDENT LOAN MARKETING ASSOCIATION.—The Student Loan Marketing Association shall not increase its share of the ownership of the Corporation in excess of 42 percent of the shares of stock of the Corporation outstanding on the date of enactment of this Act. The Student Loan Marketing Association shall not control the operation of the Corporation, except that the Student Loan Marketing Association may participate in the election of directors as a shareholder, and may continue to exercise the Student Loan Marketing Association's right to appoint directors under section 754 of the Higher Education Act of 1965 (20 U.S.C. 1132f–3) as long as that section is in effect.

(B) PROHIBITION.—Until such time as the Secretary of the Treasury sells the stock of the Corporation owned by the Secretary of Education pursuant to subsection (c), the Student Loan Marketing Association shall not provide financial support or guarantees to the Corporation.

(C) FINANCIAL SUPPORT OR GUARANTEES.—After the Secretary of the Treasury sells the stock of the Corporation owned by the Secretary of Education pursuant to subsection (c), the Student Loan Marketing Association may provide financial support or guarantees to the Corporation, if such support or guarantees are subject to terms and conditions that are no more advantageous to the Corporation than the terms and conditions the Student Loan Marketing Association provides to other entities, including, where applicable, other monoline financial guaranty corporations in which the Student Loan Marketing Association has no ownership interest.

(4) NO FEDERAL GUARANTEE.—

(A) OBLIGATIONS INSURED BY THE CORPORATION.—

(i) FULL FAITH AND CREDIT OF THE UNITED STATES.—No obligation that is insured, guaranteed, or otherwise backed by the Corporation shall be deemed to be an obligation that is guaranteed by the full faith and credit of the United States.

(ii) STUDENT LOAN MARKETING ASSOCIATION.—No obligation that is insured, guaranteed, or otherwise backed by the Corporation shall be deemed to be an obligation that is guaranteed by the Student Loan Marketing Association.

(iii) SPECIAL RULE.—This paragraph shall not affect the determination of whether such obligation is guaranteed for purposes of Federal income taxes.

(B) SECURITIES OFFERED BY THE CORPORATION.—No debt or equity securities of the Corporation shall be deemed to be guaranteed by the full faith and credit of the United States.

(5) DEFINITION.—The term "Corporation" as used in this section means the College Construction Loan Insurance Association as in existence on the day before the date of enactment of this Act, and any successor corporation.

(b) RELATED PRIVATIZATION REQUIREMENTS.—

(1) NOTICE REQUIREMENTS.—

(A) IN GENERAL.—During the six-year period following the date of enactment of this Act, the Corporation shall include, in each of the Corporation's contracts for the insurance, guarantee, or reinsurance of obligations, and in each document offering debt or equity securities of the Corporation, a prominent statement providing notice that—

(i) such obligations or such securities, as the case may be, are not obligations of the United States, nor are such obligations or such securities, as the case may be, guaranteed in any way by the full faith and credit of the United States; and

(ii) the Corporation is not an instrumentality of the United States.

(B) ADDITIONAL NOTICE.—During the five-year period following the sale of stock pursuant to subsection (c)(1), in addition to the notice requirements in subparagraph (A), the Corporation shall include, in each of the contracts and documents referred to in such subparagraph, a prominent statement providing notice that the United States is not an investor in the Corporation.

(2) CORPORATE CHARTER.—The Corporation's charter shall be amended as necessary and without delay to conform to the requirements of this section.

(3) CORPORATE NAME.—The name of the Corporation, or of any direct or indirect subsidiary thereof, may not contain the term "College Construction Loan Insurance Association", or any substantially similar variation thereof.

(4) ARTICLES OF INCORPORATION.—The Corporation shall amend the Corporation's articles of incorporation without delay to reflect that one of the purposes of the Corporation shall be to guarantee, insure, and reinsure bonds, leases, and other evidences of debt of educational institutions, including Historically Black Colleges and Universities and other academic institutions which are ranked in the lower investment grade category using a nationally recognized credit rating system.

(5) REQUIREMENTS UNTIL STOCK SALE.—Notwithstanding subsection (d), the requirements of sections 754 and 760 of the Higher Education Act of 1965 (20 U.S.C. 1132f–3 and 1132f–9), as such sections were in effect on the day before the date of enactment of this Act, shall continue to be effective until the day immediately following the date of closing of the purchase of the Secretary of Education's stock (or the date of closing of the final purchase, in the case of multiple transactions) pursuant to subsection (c)(1) of this Act.

(c) SALE OF FEDERALLY OWNED STOCK.—

(1) PURCHASE BY THE CORPORATION.—The Secretary of the Treasury shall sell and the Corporation shall purchase, within 90 days after the date of enactment of this Act, the stock of the Corporation held by the Secretary of Education at a price determined by the binding, independent appraisal of a nationally recognized financial firm, except that the 90–day period may be extended by mutual agreement of the Secretary of the Treasury and the Corporation to not more than 150 days after the date of enactment of this Act. The appraiser shall be jointly selected by the Secretary of the Treasury and the Corporation. In the event that the Secretary of the Treasury and the Corporation cannot agree on the appraiser, then the Secretary of the Treasury and the Corporation shall name an independent third party to select the appraiser.

(2) REIMBURSEMENT OF COSTS AND EXPENSES OF SALE.—The Secretary of the Treasury shall be reimbursed from the proceeds of the sale of the stock under this subsection for all reasonable costs and expenses related to such sale, except that one-half of all reasonable costs and expenses relating to the independent appraisal under paragraph (1) shall be borne by the Corporation.

(3) DEPOSIT INTO ACCOUNT.—Amounts collected from the sale of stock pursuant to this subsection that are not used to reimburse the Secretary of the Treasury pursuant to paragraph (2) shall be deposited into the account established under subsection (e).

(4) ASSISTANCE BY THE CORPORATION.—The Corporation shall provide such assistance as the Secretary of the Treasury and the Secretary of Education may require to facilitate the sale of the stock under this subsection.

AR.01474

200

(5) REPORT TO CONGRESS.—Not later than 6 months after the date of enactment of this Act, the Secretary of the Treasury shall report to the appropriate committees of Congress on the completion and terms of the sale of stock of the Corporation pursuant to this subsection.

<< 20 USCA §§ 1132f, 1132f–1, 1132f–2, 1132f–3, 1132f–4, 1132f–5, 1132f–6, 1132f–7, 1132f–8, 1132f–9 >>

<< 20 USCA § 1132f–10 >>

(d) REPEAL OF STATUTORY RESTRICTIONS AND RELATED PROVISIONS.—Part D of title VII of the Higher Education Act of 1965 (20 U.S.C. 1132f et seq.) is repealed.

<< 20 USCA § 1132f–10 >>

(e) ESTABLISHMENT OF ACCOUNT.—
(1) IN GENERAL.—Notwithstanding any other provision of law, the District of Columbia Financial Responsibility and Management Assistance Authority shall establish an account to receive—
(A) amounts collected from the sale and proceeds resulting from the exercise of stock warrants pursuant to section 440(c)(9) of the Higher Education Act of 1965;
(B) amounts and proceeds remitted as compensation for the right to assign the "Sallie Mae" name as a trademark or service mark pursuant to section 440(e)(3) of the Higher Education Act of 1965; and
(C) amounts and proceeds collected from the sale of the stock of the Corporation and deposited pursuant to subsection (c)(3).
(2) AMOUNTS AND PROCEEDS.—
(A) AMOUNTS AND PROCEEDS RELATING TO SALLIE MAE.—The amounts and proceeds described in subparagraphs (A) and (B) of paragraph (1) shall be used to finance public elementary and secondary school facility construction and repair within the District of Columbia or to carry out the District of Columbia School Reform Act of 1995.
(B) AMOUNTS AND PROCEEDS RELATING TO CONNIE LEE.—The amounts and proceeds described in subparagraph (C) of paragraph (1) shall be used to finance public elementary and secondary school facility construction and repair within the District of Columbia.

<< 20 USCA § 1087–4 >>

SEC. 604. DISCRIMINATION IN SECONDARY MARKETS PROHIBITED.

Part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) is amended by adding after section 440 (as added by section 602) the following new section:

"SEC. 440A. DISCRIMINATION IN SECONDARY MARKETS PROHIBITED.

"The Student Loan Marketing Association (and, if the Association is privatized under section 440, any successor entity functioning as a secondary market for loans under this part, including the Holding Company described in such section) shall not engage directly or indirectly in any pattern or practice that results in a denial of a borrower's access to loans under this part because of the borrower's race, sex, color, religion, national origin, age, disability status, income, attendance at a particular eligible institution, length of the borrower's educational program, or the borrower's academic year at an eligible institution.".

TITLE VII—MUSEUM AND LIBRARY SERVICES ACT OF 1996

<< 20 USCA § 9101 NOTE >>

SECTION 701. SHORT TITLE.

This title may be cited as the "Museum and Library Services Act of 1996".

<< 20 USCA §§ 961, 962, 963, 964, 965, 966, 967, 968, 969 >>

<< 20 USCA § 961 NOTE >>

SEC. 702. MUSEUM AND LIBRARY SERVICES.

  The Museum Services Act (20 U.S.C. 961 et seq.) is amended to read as follows:

"TITLE II—MUSEUM AND LIBRARY SERVICES

<< 20 USCA Ch. 72 >>

"Subtitle A—General Provisions

<< 20 USCA § 9101 NOTE >>

"SEC. 201. SHORT TITLE.

  "This title may be cited as the 'Museum and Library Services Act'.

<< 20 USCA § 9101 >>

"SEC. 202. GENERAL DEFINITIONS.

  "As used in this title:
  "(1) COMMISSION.—The term 'Commission' means the National Commission on Libraries and Information Science established under section 3 of the National Commission on Libraries and Information Sciences Act (20 U.S.C. 1502).
  "(2) DIRECTOR.—The term 'Director' means the Director of the Institute appointed under section 204.
  "(3) INSTITUTE.—The term 'Institute' means the Institute of Museum and Library Services established under section 203.
  "(4) MUSEUM BOARD.—The term 'Museum Board' means the National Museum Services Board established under section 275.

<< 20 USCA § 9102 >>

"SEC. 203. INSTITUTE OF MUSEUM AND LIBRARY SERVICES.

  "(a) ESTABLISHMENT.—There is established, within the National Foundation on the Arts and the Humanities, an Institute of Museum and Library Services.
  "(b) OFFICES.—The Institute shall consist of an Office of Museum Services and an Office of Library Services. There shall be a National Museum Services Board in the Office of Museum Services.

<< 20 USCA § 9103 >>

"SEC. 204. DIRECTOR OF THE INSTITUTE.

  "(a) APPOINTMENT.—
  "(1) IN GENERAL.—The Institute shall be headed by a Director, appointed by the President, by and with the advice and consent of the Senate.
  "(2) TERM.—The Director shall serve for a term of 4 years.
  "(3) QUALIFICATIONS.—Beginning with the first individual appointed to the position of Director after the date of enactment of the Museum and Library Services Act of 1996, every second individual so appointed shall be appointed from among individuals who have special competence with regard to library and information services. Beginning with the second individual appointed to the position of Director after the date of enactment of the Museum and Library Services Act of 1996, every second individual so appointed shall be appointed from among individuals who have special competence with regard to museum services.

"(b) COMPENSATION.—The Director may be compensated at the rate provided for level III of the Executive Schedule under section 5314 of title 5, United States Code.

"(c) DUTIES AND POWERS.—The Director shall perform such duties and exercise such powers as may be prescribed by law, including awarding financial assistance for activities described in this title.

"(d) NONDELEGATION.—The Director shall not delegate any of the functions of the Director to any person who is not an officer or employee of the Institute.

"(e) COORDINATION.—The Director shall ensure coordination of the policies and activities of the Institute with the policies and activities of other agencies and offices of the Federal Government having interest in and responsibilities for the improvement of museums and libraries and information services.

<< 20 USCA § 9104 >>

"SEC. 205. DEPUTY DIRECTORS.

"The Office of Library Services shall be headed by a Deputy Director, who shall be appointed by the Director from among individuals who have a graduate degree in library science and expertise in library and information services. The Office of Museum Services shall be headed by a Deputy Director, who shall be appointed by the Director from among individuals who have expertise in museum services.

<< 20 USCA § 9105 >>

"SEC. 206. PERSONNEL.

"(a) IN GENERAL.—The Director may, in accordance with applicable provisions of title 5, United States Code, appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute.

"(b) VOLUNTARY SERVICES.—The Director may accept and utilize the voluntary services of individuals and reimburse the individuals for travel expenses, including per diem in lieu of subsistence, in the same amounts and to the same extent as authorized under section 5703 of title 5, United States Code, for persons employed intermittently in Federal Government service.

<< 20 USCA § 9106 >>

"SEC. 207. CONTRIBUTIONS.

"The Institute is authorized to solicit, accept, receive, and invest in the name of the United States, gifts, bequests, or devises of money and other property or services and to use such property or services in furtherance of the functions of the Institute. Any proceeds from such gifts, bequests, or devises, after acceptance by the Institute, shall be paid by the donor or the representative of the donor to the Director. The Director shall enter the proceeds in a special-interest bearing account to the credit of the Institute for the purposes specified in each case.

<< 20 USCA Ch. 72 >>

"Subtitle B—Library Services and Technology

<< 20 USCA § 9101 NOTE >>

"SEC. 211. SHORT TITLE.

"This subtitle may be cited as the 'Library Services and Technology Act'.

<< 20 USCA § 9121 >>

"SEC. 212. PURPOSE.

"It is the purpose of this subtitle—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(1) to consolidate Federal library service programs;

"(2) to stimulate excellence and promote access to learning and information resources in all types of libraries for individuals of all ages;

"(3) to promote library services that provide all users access to information through State, regional, national and international electronic networks;

"(4) to provide linkages among and between libraries; and

"(5) to promote targeted library services to people of diverse geographic, cultural, and socioeconomic backgrounds, to individuals with disabilities, and to people with limited functional literacy or information skills.

<< 20 USCA § 9122 >>

"SEC. 213. DEFINITIONS.

"As used in this subtitle:

"(1) INDIAN TRIBE.—The term 'Indian tribe' means any tribe, band, nation, or other organized group or community, including any Alaska native village, regional corporation, or village corporation, as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), which is recognized by the Secretary of the Interior as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"(2) LIBRARY.—The term 'library' includes—

"(A) a public library;

"(B) a public elementary school or secondary school library;

"(C) an academic library;

"(D) a research library, which for the purposes of this subtitle means a library that—

"(i) makes publicly available library services and materials suitable for scholarly research and not otherwise available to the public; and

"(ii) is not an integral part of an institution of higher education; and

"(E) a private library, but only if the State in which such private library is located determines that the library should be considered a library for purposes of this subtitle.

"(3) LIBRARY CONSORTIUM.—The term 'library consortium' means any local, statewide, regional, interstate, or international cooperative association of library entities which provides for the systematic and effective coordination of the resources of school, public, academic, and special libraries and information centers, for improved services for the clientele of such library entities.

"(4) STATE.—The term 'State', unless otherwise specified, includes each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

"(5) STATE LIBRARY ADMINISTRATIVE AGENCY.—The term 'State library administrative agency' means the official agency of a State charged by the law of the State with the extension and development of public library services throughout the State.

"(6) STATE PLAN.—The term 'State plan' means the document which gives assurances that the officially designated State library administrative agency has the fiscal and legal authority and capability to administer all aspects of this subtitle, provides assurances for establishing the State's policies, priorities, criteria, and procedures necessary to the implementation of all programs under this subtitle, submits copies for approval as required by regulations promulgated by the Director, identifies a State's library needs, and sets forth the activities to be taken toward meeting the identified needs supported with the assistance of Federal funds made available under this subtitle.

<< 20 USCA § 9123 >>

"SEC. 214. AUTHORIZATION OF APPROPRIATIONS.

"(a) AUTHORIZATION OF APPROPRIATIONS.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(1) IN GENERAL.—There are authorized to be appropriated $150,000,000 for fiscal year 1997 and such sums as may be necessary for each of the fiscal years 1998 through 2002 to carry out this subtitle.

"(2) TRANSFER.—The Secretary of Education shall—

"(A) transfer promptly to the Director any funds appropriated under the authority of paragraph (1), to enable the Director to carry out this subtitle; and

"(B) not exercise any authority concerning the administration of this title other than the transfer described in subparagraph (A).

"(b) FORWARD FUNDING.—

"(1) IN GENERAL.—To the end of affording the responsible Federal, State, and local officers adequate notice of available Federal financial assistance for carrying out ongoing library activities and projects, appropriations for grants, contracts, or other payments under any program under this subtitle are authorized to be included in the appropriations Act for the fiscal year preceding the fiscal year during which such activities and projects shall be carried out.

"(2) ADDITIONAL AUTHORIZATION OF APPROPRIATIONS.—In order to effect a transition to the timing of appropriation action authorized by subsection (a), the application of this section may result in the enactment, in a fiscal year, of separate appropriations for a program under this subtitle (whether in the same appropriations Act or otherwise) for two consecutive fiscal years.

"(c) ADMINISTRATION.—Not more than 3 percent of the funds appropriated under this section for a fiscal year may be used to pay for the Federal administrative costs of carrying out this subtitle.

<< 20 USCA Ch. 72 >>

"CHAPTER 1—BASIC PROGRAM REQUIREMENTS

<< 20 USCA § 9131 >>

"SEC. 221. RESERVATIONS AND ALLOTMENTS.

"(a) RESERVATIONS.—

"(1) IN GENERAL.—From the amount appropriated under the authority of section 214 for any fiscal year, the Director—

"(A) shall reserve 1½ percent to award grants in accordance with section 261; and

"(B) shall reserve 4 percent to award national leadership grants or contracts in accordance with section 262.

"(2) SPECIAL RULE.—If the funds reserved pursuant to paragraph (1)(B) for a fiscal year have not been obligated by the end of such fiscal year, then such funds shall be allotted in accordance with subsection (b) for the fiscal year succeeding the fiscal year for which the funds were so reserved.

"(b) ALLOTMENTS.—

"(1) IN GENERAL.—From the sums appropriated under the authority of section 214 and not reserved under subsection (a) for any fiscal year, the Director shall award grants from minimum allotments, as determined under paragraph (3), to each State. Any sums remaining after minimum allotments are made for such year shall be allotted in the manner set forth in paragraph (2).

"(2) REMAINDER.—From the remainder of any sums appropriated under the authority of section 214 that are not reserved under subsection (a) and not allotted under paragraph (1) for any fiscal year, the Director shall award grants to each State in an amount that bears the same relation to such remainder as the population of the State bears to the population of all States.

"(3) MINIMUM ALLOTMENT.—

"(A) IN GENERAL.—For the purposes of this subsection, the minimum allotment for each State shall be $340,000, except that the minimum allotment shall be $40,000 in the case of the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

"(B) RATABLE REDUCTIONS.—If the sum appropriated under the authority of section 214 and not reserved under subsection (a) for any fiscal year is insufficient to fully satisfy the aggregate of the minimum allotments for all States for that purpose for such year, each of such minimum allotments shall be reduced ratably.

"(C) SPECIAL RULE.—

"(i) IN GENERAL.—Notwithstanding any other provision of this subsection and using funds allotted for the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau under this subsection, the Director shall award grants to Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, or the Republic of Palau to carry out activities described in this subtitle in accordance with the provisions of this subtitle that the Director determines are not inconsistent with this subparagraph.

"(ii) AWARD BASIS.—The Director shall award grants pursuant to clause (i) on a competitive basis and pursuant to recommendations from the Pacific Region Educational Laboratory in Honolulu, Hawaii.

"(iii) TERMINATION OF ELIGIBILITY.—Notwithstanding any other provision of law, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall not receive any funds under this subtitle for any fiscal year that begins after September 30, 2001.

"(iv) ADMINISTRATIVE COSTS.—The Director may provide not more than 5 percent of the funds made available for grants under this subparagraph to pay the administrative costs of the Pacific Region Educational Laboratory regarding activities assisted under this subparagraph.

"(4) DATA.—The population of each State and of all the States shall be determined by the Director on the basis of the most recent data available from the Bureau of the Census.

<< 20 USCA § 9132 >>

"SEC. 222. ADMINISTRATION.

"(a) IN GENERAL.—Not more than 4 percent of the total amount of funds received under this subtitle for any fiscal year by a State may be used for administrative costs.

"(b) CONSTRUCTION.—Nothing in this section shall be construed to limit spending for evaluation costs under section 224(c) from sources other than this subtitle.

<< 20 USCA § 9133 >>

"SEC. 223. PAYMENTS; FEDERAL SHARE; AND MAINTENANCE OF EFFORT REQUIREMENTS.

"(a) PAYMENTS.—Subject to appropriations provided pursuant to section 214, the Director shall pay to each State library administrative agency having a State plan approved under section 224 the Federal share of the cost of the activities described in the State plan.

"(b) FEDERAL SHARE.—

"(1) IN GENERAL.—The Federal share shall be 66 percent.

"(2) NON–FEDERAL SHARE.—The non-Federal share of payments shall be provided from non-Federal, State, or local sources.

"(c) MAINTENANCE OF EFFORT.—

"(1) STATE EXPENDITURES.—

"(A) REQUIREMENT.—

"(i) IN GENERAL.—The amount otherwise payable to a State for a fiscal year pursuant to an allotment under this chapter shall be reduced if the level of State expenditures, as described in paragraph (2), for the previous fiscal year is less than the average of the total of such expenditures for the 3 fiscal years preceding that previous fiscal year. The amount of the reduction in allotment for any fiscal year shall be equal to the amount by which the level of such State expenditures for the fiscal year for which the determination is made is less than the average of the total of such expenditures for the 3 fiscal years preceding the fiscal year for which the determination is made.

"(ii) CALCULATION.—Any decrease in State expenditures resulting from the application of subparagraph (B) shall be excluded from the calculation of the average level of State expenditures for any 3–year period described in clause (i).

"(B) DECREASE IN FEDERAL SUPPORT.—If the amount made available under this subtitle for a fiscal year is less than the amount made available under this subtitle for the preceding fiscal year, then the expenditures required by subparagraph (A) for such preceding fiscal year shall be decreased by the same percentage as the percentage decrease in the amount so made available.

  "(2) LEVEL OF STATE EXPENDITURES.—The level of State expenditures for the purposes of paragraph (1) shall include all State dollars expended by the State library administrative agency for library programs that are consistent with the purposes of this subtitle. All funds included in the maintenance of effort calculation under this subsection shall be expended during the fiscal year for which the determination is made, and shall not include capital expenditures, special one-time project costs, or similar windfalls.

  "(3) WAIVER.—The Director may waive the requirements of paragraph (1) if the Director determines that such a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State.

<< 20 USCA § 9134 >>

"SEC. 224. STATE PLANS.

  "(a) STATE PLAN REQUIRED.—

  "(1) IN GENERAL.—In order to be eligible to receive a grant under this subtitle, a State library administrative agency shall submit a State plan to the Director not later than April 1, 1997.

  "(2) DURATION.—The State plan shall cover a period of 5 fiscal years.

  "(3) REVISIONS.—If a State library administrative agency makes a substantive revision to its State plan, then the State library administrative agency shall submit to the Director an amendment to the State plan containing such revision not later than April 1 of the fiscal year preceding the fiscal year for which the amendment will be effective.

"(b) CONTENTS.—The State plan shall—

  "(1) establish goals, and specify priorities, for the State consistent with the purposes of this subtitle;

  "(2) describe activities that are consistent with the goals and priorities established under paragraph (1), the purposes of this subtitle, and section 231, that the State library administrative agency will carry out during such year using such grant;

  "(3) describe the procedures that such agency will use to carry out the activities described in paragraph (2);

  "(4) describe the methodology that such agency will use to evaluate the success of the activities established under paragraph (2) in achieving the goals and meeting the priorities described in paragraph (1);

  "(5) describe the procedures that such agency will use to involve libraries and library users throughout the State in policy decisions regarding implementation of this subtitle; and

  "(6) provide assurances satisfactory to the Director that such agency will make such reports, in such form and containing such information, as the Director may reasonably require to carry out this subtitle and to determine the extent to which funds provided under this subtitle have been effective in carrying out the purposes of this subtitle.

"(c) EVALUATION AND REPORT.—Each State library administrative agency receiving a grant under this subtitle shall independently evaluate, and report to the Director regarding, the activities assisted under this subtitle, prior to the end of the 5–year plan.

"(d) INFORMATION.—Each library receiving assistance under this subtitle shall submit to the State library administrative agency such information as such agency may require to meet the requirements of subsection (c).

  "(e) APPROVAL.—

  "(1) IN GENERAL.—The Director shall approve any State plan under this subtitle that meets the requirements of this subtitle and provides satisfactory assurances that the provisions of such plan will be carried out.

  "(2) PUBLIC AVAILABILITY.—Each State library administrative agency receiving a grant under this subtitle shall make the State plan available to the public.

  "(3) ADMINISTRATION.—If the Director determines that the State plan does not meet the requirements of this section, the Director shall—

    "(A) immediately notify the State library administrative agency of such determination and the reasons for such determination;

    "(B) offer the State library administrative agency the opportunity to revise its State plan;

    "(C) provide technical assistance in order to assist the State library administrative agency in meeting the requirements of this section; and

    "(D) provide the State library administrative agency the opportunity for a hearing.

<< 20 USCA Ch. 72 >>

"CHAPTER 2—LIBRARY PROGRAMS

<< 20 USCA § 9141 >>

"SEC. 231. GRANTS TO STATES.

 "(a) IN GENERAL.—Of the funds provided to a State library administrative agency under section 214, such agency shall expend, either directly or through subgrants or cooperative agreements, at least 96 percent of such funds for—
  "(1)(A) establishing or enhancing electronic linkages among or between libraries;
  "(B) electronically linking libraries with educational, social, or information services;
  "(C) assisting libraries in accessing information through electronic networks;
  "(D) encouraging libraries in different areas, and encouraging different types of libraries, to establish consortia and share resources; or
  "(E) paying costs for libraries to acquire or share computer systems and telecommunications technologies; and
  "(2) targeting library and information services to persons having difficulty using a library and to underserved urban and rural communities, including children (from birth through age 17) from families with incomes below the poverty line (as defined by the Office of Management and Budget and revised annually in accordance with section 673(2) of the Community Services Block Grant Act (42 U.S.C. 9902(2)) applicable to a family of the size involved.
 "(b) SPECIAL RULE.—Each State library administrative agency receiving funds under this chapter may apportion the funds available for the purposes described in subsection (a) between the two purposes described in paragraphs (1) and (2) of such subsection, as appropriate, to meet the needs of the individual State.

<< 20 USCA Ch. 72 >>

"CHAPTER 3—ADMINISTRATIVE PROVISIONS

"Subchapter A—State Requirements

<< 20 USCA § 9151 >>

"SEC. 251. STATE ADVISORY COUNCILS.

 "Each State desiring assistance under this subtitle may establish a State advisory council which is broadly representative of the library entities in the State, including public, school, academic, special, and institutional libraries, and libraries serving individuals with disabilities.

<< 20 USCA Ch. 72 >>

"Subchapter B—Federal Requirements

<< 20 USCA § 9161 >>

"SEC. 261. SERVICES FOR INDIAN TRIBES.

 "From amounts reserved under section 221(a)(1)(A) for any fiscal year the Director shall award grants to organizations primarily serving and representing Indian tribes to enable such organizations to carry out the activities described in section 231.

<< 20 USCA § 9162 >>

"SEC. 262. NATIONAL LEADERSHIP GRANTS OR CONTRACTS.

"(a) IN GENERAL.—From the amounts reserved under section 221(a)(1)(B) for any fiscal year the Director shall establish and carry out a program awarding national leadership grants or contracts to enhance the quality of library services nationwide and to provide coordination between libraries and museums. Such grants or contracts shall be used for activities that may include—

   "(1) education and training of persons in library and information science, particularly in areas of new technology and other critical needs, including graduate fellowships, traineeships, institutes, or other programs;

   "(2) research and demonstration projects related to the improvement of libraries, education in library and information science, enhancement of library services through effective and efficient use of new technologies, and dissemination of information derived from such projects;

   "(3) preservation or digitization of library materials and resources, giving priority to projects emphasizing coordination, avoidance of duplication, and access by researchers beyond the institution or library entity undertaking the project; and

   "(4) model programs demonstrating cooperative efforts between libraries and museums.

"(b) GRANTS OR CONTRACTS.—

   "(1) IN GENERAL.—The Director may carry out the activities described in subsection (a) by awarding grants to, or entering into contracts with, libraries, agencies, institutions of higher education, or museums, where appropriate.

   "(2) COMPETITIVE BASIS.—Grants and contracts under this section shall be awarded on a competitive basis.

"(c) SPECIAL RULE.—The Director shall make every effort to ensure that activities assisted under this section are administered by appropriate library and museum professionals or experts.

<< 20 USCA § 9163 >>

"SEC. 263. STATE AND LOCAL INITIATIVES.

   "Nothing in this subtitle shall be construed to interfere with State and local initiatives and responsibility in the conduct of library services. The administration of libraries, the selection of personnel and library books and materials, and insofar as consistent with the purposes of this subtitle, the determination of the best uses of the funds provided under this subtitle, shall be reserved for the States and their local subdivisions.

<< 20 USCA Ch. 72 >>

"Subtitle C—Museum Services

<< 20 USCA § 9171 >>

"SEC. 271. PURPOSE.

   "It is the purpose of this subtitle—

   "(1) to encourage and assist museums in their educational role, in conjunction with formal systems of elementary, secondary, and postsecondary education and with programs of nonformal education for all age groups;

   "(2) to assist museums in modernizing their methods and facilities so that the museums are better able to conserve the cultural, historic, and scientific heritage of the United States; and

   "(3) to ease the financial burden borne by museums as a result of their increasing use by the public.

<< 20 USCA § 9172 >>

"SEC. 272. DEFINITIONS.

   "As used in this subtitle:

   "(1) MUSEUM.—The term 'museum' means a public or private nonprofit agency or institution organized on a permanent basis for essentially educational or aesthetic purposes, that utilizes a professional staff, owns or utilizes tangible objects, cares for the tangible objects, and exhibits the tangible objects to the public on a regular basis.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) STATE.—The term 'State' means each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

<< 20 USCA § 9173 >>

"SEC. 273. MUSEUM SERVICES ACTIVITIES.

"(a) GRANTS.—The Director, subject to the policy direction of the Museum Board, may make grants to museums to pay for the Federal share of the cost of increasing and improving museum services, through such activities as—

"(1) programs that enable museums to construct or install displays, interpretations, and exhibitions in order to improve museum services provided to the public;

"(2) assisting museums in developing and maintaining professionally trained or otherwise experienced staff to meet the needs of the museums;

"(3) assisting museums in meeting the administrative costs of preserving and maintaining the collections of the museums, exhibiting the collections to the public, and providing educational programs to the public through the use of the collections;

"(4) assisting museums in cooperating with each other in developing traveling exhibitions, meeting transportation costs, and identifying and locating collections available for loan;

"(5) assisting museums in the conservation of their collections;

"(6) developing and carrying out specialized programs for specific segments of the public, such as programs for urban neighborhoods, rural areas, Indian reservations, and penal and other State institutions; and

"(7) model programs demonstrating cooperative efforts between libraries and museums.

"(b) CONTRACTS AND COOPERATIVE AGREEMENTS.—

"(1) PROJECTS TO STRENGTHEN MUSEUM SERVICES.—The Director, subject to the policy direction of the Museum Board, is authorized to enter into contracts and cooperative agreements with appropriate entities, as determined by the Director, to pay for the Federal share of enabling the entities to undertake projects designed to strengthen museum services, except that any contracts or cooperative agreements entered into pursuant to this subsection shall be effective only to such extent or in such amounts as are provided in appropriations Acts.

"(2) LIMITATION ON AMOUNT.—The aggregate amount of financial assistance made available under this subsection for a fiscal year shall not exceed 15 percent of the amount appropriated under this subtitle for such fiscal year.

"(3) OPERATIONAL EXPENSES.—No financial assistance may be provided under this subsection to pay for operational expenses.

"(c) FEDERAL SHARE.—

"(1) 50 PERCENT.—Except as provided in paragraph (2), the Federal share described in subsections (a) and (b) shall be not more than 50 percent.

"(2) GREATER THAN 50 PERCENT.—The Director may use not more than 20 percent of the funds made available under this subtitle for a fiscal year to make grants under subsection (a), or enter into contracts or agreements under subsection (b), for which the Federal share may be greater than 50 percent.

"(d) REVIEW AND EVALUATION.—The Director shall establish procedures for reviewing and evaluating grants, contracts, and cooperative agreements made or entered into under this subtitle. Procedures for reviewing grant applications or contracts and cooperative agreements for financial assistance under this subtitle shall not be subject to any review outside of the Institute.

<< 20 USCA § 9174 >>

"SEC. 274. AWARD.

"The Director, with the advice of the Museum Board, may annually award a National Award for Museum Service to outstanding museums that have made significant contributions in service to their communities.

<< 20 USCA § 9175 >>

"SEC. 275. NATIONAL MUSEUM SERVICES BOARD.

"(a) ESTABLISHMENT.—There is established in the Institute a National Museum Services Board.

"(b) COMPOSITION AND QUALIFICATIONS.—

"(1) COMPOSITION.—The Museum Board shall consist of the Director and 14 members appointed by the President, by and with the advice and consent of the Senate.

"(2) QUALIFICATIONS.—The appointive members of the Museum Board shall be selected from among citizens of the United States—

"(A) who are members of the general public;

"(B) who are or have been affiliated with—

"(i) resources that, collectively, are broadly representative of the curatorial, conservation, educational, and cultural resources of the United States; or

"(ii) museums that, collectively, are broadly representative of various types of museums, including museums relating to science, history, technology, art, zoos, and botanical gardens; and

"(C) who are recognized for their broad knowledge, expertise, or experience in museums or commitment to museums.

"(3) GEOGRAPHIC AND OTHER REPRESENTATION.—Members of the Museum Board shall be appointed to reflect persons from various geographic regions of the United States. The Museum Board may not include, at any time, more than 3 members from a single State. In making such appointments, the President shall give due regard to equitable representation of women, minorities, and persons with disabilities who are involved with museums.

"(c) TERMS.—

"(1) IN GENERAL.—Each appointive member of the Museum Board shall serve for a term of 5 years, except that—

"(A) of the members first appointed, 3 shall serve for terms of 5 years, 3 shall serve for terms of 4 years, 3 shall serve for terms of 3 years, 3 shall serve for terms of 2 years, and 2 shall serve for terms of 1 year, as designated by the President at the time of nomination for appointment; and

"(B) any member appointed to fill a vacancy shall serve for the remainder of the term for which the predecessor of the member was appointed.

"(2) REAPPOINTMENT.—No member of the Museum Board who has been a member for more than 7 consecutive years shall be eligible for reappointment.

"(3) SERVICE UNTIL SUCCESSOR TAKES OFFICE.—Notwithstanding any other provision of this subsection, a member of the Museum Board shall serve after the expiration of the term of the member until the successor to the member takes office.

"(d) DUTIES AND POWERS.—The Museum Board shall have the responsibility to advise the Director on general policies with respect to the duties, powers, and authority of the Institute relating to museum services, including general policies with respect to—

"(1) financial assistance awarded under this subtitle for museum services; and

"(2) projects described in section 262(a)(4).

"(e) CHAIRPERSON.—The President shall designate 1 of the appointive members of the Museum Board as Chairperson of the Museum Board.

"(f) MEETINGS.—

"(1) IN GENERAL.—The Museum Board shall meet—

"(A) not less than 3 times each year, including—

"(i) not less than 2 times each year separately; and

"(ii) not less than 1 time each year in a joint meeting with the Commission, convened for purposes of making general policies with respect to financial assistance for projects described in section 262(a)(4); and

"(B) at the call of the Director.

"(2) VOTE.—All decisions by the Museum Board with respect to the exercise of the duties and powers of the Museum Board shall be made by a majority vote of the members of the Museum Board who are present. All decisions by the Commission and the Museum Board with respect to the policies described in paragraph (1)(A)(ii) shall be made by a $^2/_3$ majority vote of the total number of the members of the Commission and the Museum Board who are present.

"(g) QUORUM.—A majority of the members of the Museum Board shall constitute a quorum for the conduct of business at official meetings of the Museum Board, but a lesser number of members may hold hearings. A majority of the members of the Commission and a majority of the members of the Museum Board shall constitute a quorum for the conduct of business at official joint meetings of the Commission and the Museum Board.

"(h) COMPENSATION AND TRAVEL EXPENSES.—

"(1) COMPENSATION.—Each member of the Museum Board who is not an officer or employee of the Federal Government may be compensated at a rate to be fixed by the President, but not to exceed the daily equivalent of the maximum rate authorized for a position above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code, for each day (including travel time) during which such member is engaged in the performance of the duties of the Museum Board. All members of the Museum Board who are officers or employees of the Federal Government shall serve without compensation in addition to compensation received for their services as officers or employees of the Federal Government.

"(2) TRAVEL EXPENSES.—The members of the Museum Board may be allowed travel expenses, including per diem in lieu of subsistence, in the same amounts and to the same extent, as authorized under section 5703 of title 5, United States Code, for persons employed intermittently in Federal Government service.

"(i) COORDINATION.—The Museum Board, with the advice of the Director, shall take steps to ensure that the policies and activities of the Institute are coordinated with other activities of the Federal Government.

<< 20 USCA § 9176 >>

"SEC. 276. AUTHORIZATION OF APPROPRIATIONS.

"(a) GRANTS.—For the purpose of carrying out this subtitle, there are authorized to be appropriated to the Director $28,700,000 for the fiscal year 1997, and such sums as may be necessary for each of the fiscal years 1998 through 2002.

"(b) ADMINISTRATION.—Not more than 10 percent of the funds appropriated under this section for a fiscal year may be used to pay for the administrative costs of carrying out this subtitle.

"(c) SUMS REMAINING AVAILABLE.—Sums appropriated pursuant to subsection (a) for any fiscal year shall remain available for obligation until expended.".

SEC. 703. NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE.

<< 20 USCA § 1504 >>

(a) FUNCTIONS.—Section 5 of the National Commission on Libraries and Information Science Act (20 U.S.C. 1504) is amended—

(1) by redesignating subsections (b) through (d) as subsections (d) through (f), respectively; and

(2) by inserting after subsection (a) the following:

"(b) The Commission shall have the responsibility to advise the Director of the Institute of Museum and Library Services on general policies with respect to the duties, powers, and authority of the Institute of Museum and Library Services relating to library services, including—

"(1) general policies with respect to—

"(A) financial assistance awarded under the Museum and Library Services Act for library services; and

"(B) projects described in section 262(a)(4) of such Act; and

"(2) measures to ensure that the policies and activities of the Institute of Museum and Library Services are coordinated with other activities of the Federal Government.

"(c)(1) The Commission shall meet not less than 1 time each year in a joint meeting with the National Museum Services Board, convened for purposes of providing advice on general policy with respect to financial assistance for projects described in section 262(a)(4) of such Act.

"(2) All decisions by the Commission and the National Museum Services Board with respect to the advice on general policy described in paragraph (1) shall be made by a $2/3$ majority vote of the total number of the members of the Commission and the National Museum Services Board who are present.

"(3) A majority of the members of the Commission and a majority of the members of the National Museum Services Board shall constitute a quorum for the conduct of business at official joint meetings of the Commission and the National Museum Services Board.".

<< 20 USCA § 1505 >>

(b) MEMBERSHIP.—Section 6 of the National Commission on Libraries and Information Science Act (20 U.S.C. 1505) is amended—

(1) in subsection (a)—

(A) in the first sentence, by striking "Librarian of Congress" and inserting "Librarian of Congress, the Director of the Institute of Museum and Library Services (who shall serve as an ex officio, nonvoting member),";

(B) in the second sentence—

(i) by striking "special competence or interest in" and inserting "special competence in or knowledge of; and

(ii) by inserting before the period the following: "and at least one other of whom shall be knowledgeable with respect to the library and information service and science needs of the elderly";

(C) in the third sentence, by inserting "appointive" before "members"; and

(D) in the last sentence, by striking "term and at least" and all that follows and inserting "term."; and

(2) in subsection (b), by striking "the rate specified" and all that follows through "and while" and inserting "the daily equivalent of the maximum rate authorized for a position above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code, for each day (including travel-time) during which the members are engaged in the business of the Commission. While".

<< 20 USCA § 9102 NOTE >>

SEC. 704. TRANSFER OF FUNCTIONS FROM INSTITUTE OF MUSEUM SERVICES.

(a) DEFINITIONS.—For purposes of this section, unless otherwise provided or indicated by the context—

(1) the term "Federal agency" has the meaning given to the term "agency" by section 551(1) of title 5, United States Code;

(2) the term "function" means any duty, obligation, power, authority, responsibility, right, privilege, activity, or program; and

(3) the term "office" includes any office, administration, agency, institute, unit, organizational entity, or component thereof.

(b) TRANSFER OF FUNCTIONS FROM THE INSTITUTE OF MUSEUM SERVICES AND THE LIBRARY PROGRAM OFFICE.—There are transferred to the Director of the Institute of Museum and Library Services established under section 203 of the Museum and Library Services Act—

(1) all functions that the Director of the Institute of Museum Services exercised before the date of enactment of this section (including all related functions of any officer or employee of the Institute of Museum Services); and

(2) all functions that the Director of Library Programs in the Office of Educational Research and Improvement in the Department of Education exercised before the date of enactment of this section and any related function of any officer or employee of the Department of Education.

(c) DETERMINATIONS OF CERTAIN FUNCTIONS BY THE OFFICE OF MANAGEMENT AND BUDGET.—If necessary, the Office of Management and Budget shall make any determination of the functions that are transferred under subsection (b).

(d) DELEGATION AND ASSIGNMENT.—Except where otherwise expressly prohibited by law or otherwise provided by this section, the Director of the Institute of Museum and Library Services may delegate any of the functions transferred to the Director of the Institute of Museum and Library Services by this section and any function transferred or granted to such Director of the Institute of Museum and Library Services after the effective date of this section to such officers and employees of the Institute of Museum and Library Services as the Director of the Institute of Museum and Library Services may designate, and may authorize successive redelegations of such functions as may be necessary or appropriate, except that any delegation of any such functions with respect to libraries shall be made to the Deputy Director of the Office of Library Services and with respect to museums shall be made to the Deputy Director of the Office of Museum Services. No delegation of functions by the Director of the Institute of Museum and Library Services under this section or under any other provision of this section shall relieve such Director of the Institute of Museum and Library Services of responsibility for the administration of such functions.

(e) REORGANIZATION.—The Director of the Institute of Museum and Library Services may allocate or reallocate any function transferred under subsection (b) among the officers of the Institute of Museum and Library Services, and may establish, consolidate, alter, or discontinue such organizational entities in the Institute of Museum and Library Services as may be necessary or appropriate.

(f) RULES.—The Director of the Institute of Museum and Library Services may prescribe, in accordance with chapters 5 and 6 of title 5, United States Code, such rules and regulations as the Director of the Institute of Museum and Library Services determines to be necessary or appropriate to administer and manage the functions of the Institute of Museum and Library Services.

(g) TRANSFER AND ALLOCATIONS OF APPROPRIATIONS AND PERSONNEL.—Except as otherwise provided in this section, the personnel employed in connection with, and the assets, liabilities, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds employed, used, held, arising from, available to, or to be made available in connection with the functions transferred by this section, subject to section 1531 of title 31, United States Code, shall be transferred to the Institute of Museum and Library Services. Unexpended funds transferred pursuant to this subsection shall be used only for the purposes for which the funds were originally authorized and appropriated.

(h) INCIDENTAL TRANSFERS.—The Director of the Office of Management and Budget, at such time or times as the Director shall provide, may make such determinations as may be necessary with regard to the functions transferred by this section, and make such additional incidental dispositions of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds held, used, arising from, available to, or to be made available in connection with such functions, as may be necessary to carry out this section. The Director of the Office of Management and Budget shall provide for the termination of the affairs of all entities terminated by this section and for such further measures and dispositions as may be necessary to effectuate the purposes of this section.

(i) EFFECT ON PERSONNEL.—

(1) IN GENERAL.—Except as otherwise provided by this section, the transfer pursuant to this section of full-time personnel (except special Government employees) and part-time personnel holding permanent positions shall not cause any such employee to be separated or reduced in grade or compensation for 1 year after the date of transfer of such employee under this section.

(2) EXECUTIVE SCHEDULE POSITIONS.—Except as otherwise provided in this section, any person who, on the day preceding the effective date of this section, held a position compensated in accordance with the Executive Schedule prescribed in chapter 53 of title 5, United States Code, and who, without a break in service, is appointed in the Institute of Museum and Library Services to a position having duties comparable to the duties performed immediately preceding such appointment shall continue to be compensated in such new position at not less than the rate provided for such previous position, for the duration of the service of such person in such new position.

(j) SAVINGS PROVISIONS.—

(1) CONTINUING EFFECT OF LEGAL DOCUMENTS.—All orders, determinations, rules, regulations, permits, agreements, grants, contracts, certificates, licenses, registrations, privileges, and other administrative actions—

(A) that have been issued, made, granted, or allowed to become effective by the President, any Federal agency or official of a Federal agency, or by a court of competent jurisdiction, in the performance of functions that are transferred under this section; and

(B) that were in effect before the effective date of this section, or were final before the effective date of this section and are to become effective on or after the effective date of this section;

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the President, the Director of the Institute of Museum and Library Services or other authorized official, a court of competent jurisdiction, or by operation of law.

(2) PROCEEDINGS NOT AFFECTED.—This section shall not affect any proceedings, including notices of proposed rulemaking, or any application for any license, permit, certificate, or financial assistance pending before the Institute of Museum Services on the effective date of this section, with respect to functions transferred by this section. Such proceedings and applications shall be continued. Orders shall be issued in such proceedings, appeals shall be taken from the orders, and payments shall be made pursuant to the orders, as if this section had not been enacted, and orders issued in any such proceedings shall continue in effect until modified, terminated, superseded, or revoked by a duly authorized official, by a court of competent

jurisdiction, or by operation of law. Nothing in this paragraph shall be construed to prohibit the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that such proceeding could have been discontinued or modified if this section had not been enacted.

(3) SUITS NOT AFFECTED.—This section shall not affect suits commenced before the effective date of this section, and in all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this section had not been enacted.

(4) NONABATEMENT OF ACTIONS.—No suit, action, or other proceeding commenced by or against the Institute of Museum Services, or by or against any individual in the official capacity of such individual as an officer of the Institute of Museum Services, shall abate by reason of the enactment of this section.

(5) ADMINISTRATIVE ACTIONS RELATING TO PROMULGATION OF REGULATIONS.—Any administrative action relating to the preparation or promulgation of a regulation by the Institute of Museum Services relating to a function transferred under this section may be continued by the Institute of Museum and Library Services with the same effect as if this section had not been enacted.

(k) TRANSITION.—The Director of the Institute of Museum and Library Services may utilize—

(1) the services of such officers, employees, and other personnel of the Institute of Museum Services with respect to functions transferred to the Institute of Museum and Library Services by this section; and

(2) funds appropriated to such functions for such period of time as may reasonably be needed to facilitate the orderly implementation of this section.

(l) REFERENCES.—A reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or relating to—

(1) the Director of the Institute of Museum Services with regard to functions transferred under subsection (b), shall be deemed to refer to the Director of the Institute of Museum and Library Services; and

(2) the Institute of Museum Services with regard to functions transferred under subsection (b), shall be deemed to refer to the Institute of Museum and Library Services.

(m) ADDITIONAL CONFORMING AMENDMENTS.—

(1) RECOMMENDED LEGISLATION.—After consultation with the appropriate committees of Congress and the Director of the Office of Management and Budget, the Director of the Institute of Museum and Library Services shall prepare and submit to the appropriate committees of Congress recommended legislation containing technical and conforming amendments to reflect the changes made by this section.

(2) SUBMISSION TO CONGRESS.—Not later than 6 months after the effective date of this section, the Director of the Institute of Museum and Library Services shall submit to the appropriate committees of Congress the recommended legislation referred to under paragraph (1).

<< 20 USCA § 9103 NOTE >>

SEC. 705. SERVICE OF INDIVIDUALS SERVING ON DATE OF ENACTMENT.

Notwithstanding section 204 of the Museum and Library Services Act, the individual who was appointed to the position of Director of the Institute of Museum Services under section 205 of the Museum Services Act (as such section was in effect on the day before the date of enactment of this Act) and who is serving in such position on the day before the date of enactment of this Act shall serve as the first Director of the Institute of Museum and Library Services under section 204 of the Museum and Library Services Act (as added by section 2 of this Act), and shall serve at the pleasure of the President.

<< 20 USCA § 9105 NOTE >>

SEC. 706. CONSIDERATION.

Consistent with title 5, United States Code, in appointing employees of the Office of Library Services, the Director of the Institute of Museum and Library Services shall give strong consideration to individuals with experience in administering State-based and national library and information services programs.

<< 20 USCA § 9102 NOTE >>

SEC. 707. TRANSITION AND TRANSFER OF FUNDS.

(a) TRANSITION.—The Director of the Office of Management and Budget shall take appropriate measures to ensure an orderly transition from the activities previously administered by the Director of Library Programs in the Office of Educational Research and Improvement in the Department of Education to the activities administered by the Institute for Museum and Library Services under this Act. Such measures may include the transfer of appropriated funds.

(b) TRANSFER.—From any amounts available to the Secretary of Education for salaries and expenses at the Department of Education, the Secretary of Education shall transfer to the Director the amount of funds necessary to ensure the orderly transition from activities previously administered by the Director of the Office of Library Programs in the Office of Educational Research and Improvement in the Department of Education to the activities administered by the Institute for Museum and Library Services. In no event shall the amount of funds transferred pursuant to the preceding sentence be less than $200,000.

SEC. 708. REPEALS.

<< 20 USCA §§ 351, 351a, 351b, 351c, 351d, 351e, 351f, 351g, 352, 353, 354, 355, 355a, 355b, 355c, 355d, 355e, 355e–1, 355e–2, 355e–3, 355e–4, 361, 362, 363, 364, 365, 366, 371, 375, 381, 385, 385a, 385b, 385c, 385d, 385e, 386, 386a, 386b, 386c, 386d, 386e, 386f, 386g >>

<< 20 USCA § 351 NOTE >>

(a) LIBRARY SERVICES AND CONSTRUCTION ACT.—The Library Services and Construction Act (20 U.S.C. 351 et seq.) is repealed.

<< 20 USCA §§ 1021, 1022, 1023, 1029, 1031, 1032, 1033, 1034, 1041, 1042, 1047 >>

(b) TITLE II OF THE HIGHER EDUCATION ACT OF 1965.—Title II of the Higher Education Act of 1965 (20 U.S.C. 1021 et seq.), relating to academic libraries and information services, is repealed.

<< 20 USCA § 1029 NOTE >>

(c) PART D OF TITLE XIII OF THE HIGHER EDUCATION AMENDMENTS OF 1986.—Part D of title XIII of the Higher Education Amendments of 1986 (20 U.S.C. 1029 note), relating to library resources, is repealed.

<< 20 USCA § 1221i >>

(d) SECTION 519 OF THE EDUCATION AMENDMENTS OF 1974.—Section 519 of the Education Amendments of 1974 (20 U.S.C. 1221i) is repealed.

<< 20 USCA §§ 7001, 7002, 7003, 7004, 7005 >>

(e) PART F OF THE TECHNOLOGY FOR EDUCATION ACT OF 1994.—Part F of the Technology for Education Act of 1994 (20 U.S.C. 7001 et seq.), contained in title III of the Elementary and Secondary Education Act of 1965, is repealed.

SEC. 709. CONFORMING AMENDMENTS.

(a) REFERENCES TO LIBRARY SERVICES AND CONSTRUCTION ACT.—

<< 20 USCA § 6813 >>

(1) TECHNOLOGY FOR EDUCATION ACT OF 1994.—Section 3113(10) of the Technology for Education Act of 1994 (20 U.S.C. 6813(10)) is amended by striking "section 3 of the Library Services and Construction Act;" and inserting "section 213 of the Library Services and Technology Act;".

<< 20 USCA § 3489 >>

(2) OMNIBUS EDUCATION RECONCILIATION ACT OF 1981.—Section 528 of the Omnibus Education Reconciliation Act of 1981 (20 U.S.C. 3489) is amended—
(A) by striking paragraph (12); and
(B) by redesignating paragraphs (13) through (15) as paragraphs (12) through (14), respectively.

<< 20 USCA § 6813 >>

(3) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—Section 3113(10) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6813(10)) is amended by striking "section 3 of the Library Services and Construction Act" and inserting "section 213 of the Library Services and Technology Act".

<< 40 USCA § 276d–3 >>

(4) COMMUNITY IMPROVEMENT VOLUNTEER ACT OF 1994.—Section 7305 of the Community Improvement Volunteer Act of 1994 (40 U.S.C. 276d–3) is amended—
(A) by striking paragraph (1); and
(B) by redesignating paragraphs (2) through (6) as paragraphs (1) through (5), respectively.

<< 40 App. USCA § 214 >>

(5) APPALACHIAN REGIONAL DEVELOPMENT ACT OF 1965.—Section 214(c) of the Appalachian Regional Development Act of 1965 (40 U.S.C. App. 214(c)) is amended by striking "Library Services and Construction Act;".

<< 42 USCA § 3338 >>

(6) DEMONSTRATION CITIES AND METROPOLITAN DEVELOPMENT ACT OF 1966.—Section 208(2) of the Demonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. 3338(2)) is amended by striking "title II of the Library Services and Construction Act;".

<< 48 USCA § 1666 >>

(7) PUBLIC LAW 87–688.—Subsection (c) of the first section of the Act entitled "An Act to extend the application of certain laws to American Samoa", approved September 25, 1962 (48 U.S.C. 1666(c)) is amended by striking "the Library Services Act (70 Stat. 293; 20 U.S.C. 351 et seq.),".

<< 47 USCA § 254 >>

(8) COMMUNICATIONS ACT OF 1934.—Paragraph (4) of section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)(4)) is amended by striking "library not eligible for participation in State-based plans for funds under title III of the Library Services and Construction Act (20 U.S.C. 335c et seq.)" and inserting "library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act".
(b) REFERENCES TO INSTITUTE OF MUSEUM SERVICES.—

<< 5 USCA § 5315 >>

(1) TITLE 5, UNITED STATES CODE.—Section 5315 of title 5, United States Code, is amended by striking the following:
"Director of the Institute of Museum Services." and inserting the following:
"Director of the Institute of Museum and Library Services.".

<< 20 USCA § 3441 >>

(2) DEPARTMENT OF EDUCATION ORGANIZATION ACT.—Section 301 of the Department of Education Organization Act (20 U.S.C. 3441) is amended—

(A) in subsection (a)—

(i) by striking paragraph (5); and

(ii) by redesignating paragraphs (6) and (7) as paragraphs (5) and (6), respectively; and

(B) in subsection (b)—

(i) by striking paragraph (4); and

(ii) by redesignating paragraphs (5) through (7) as paragraphs (4) through (6), respectively.

(3) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—

<< 20 USCA §§ 6621, 6645, 6648, 6649, 8091 >>

(A) Sections 2101(b), 2205(c)(1)(D), 2208(d)(1)(H)(v), and 2209(b)(1)(C)(iv), and subsection (d)(6) and (e)(2) of section 10401 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6621(b), 6645(c)(1)(D), 6648(d)(1)(H)(v), 6649(b) (1)(C)(vi), and 8091(d)(6) and (e)(2)) are amended by striking "the Institute of Museum Services" and inserting "the Institute of Museum and Library Services".

<< 20 USCA § 8102 >>

(B) Section 10412(b) of such Act (20 U.S.C. 8102(b)) is amended—

(i) in paragraph (2), by striking "the Director of the Institute of Museum Services," and inserting "the Director of the Institute of Museum and Library Services,"; and

(ii) in paragraph (7), by striking "the Director of the Institute of Museum Services," and inserting "the director of the Institute of Museum and Library Services,".

<< 20 USCA § 8104 >>

(C) Section 10414(a)(2)(B) of such Act (20 U.S.C. 8104(a)(2)(B)) is amended by striking clause (iii) and inserting the following new clause:

"(iii) the Institute of Museum and Library Services.".

<< 20 USCA § 3473 >>

(c) REFERENCE TO OFFICE OF LIBRARIES AND LEARNING RESOURCES.—Section 413(b)(1) of the Department of Education Organization Act (20 U.S.C. 3473(b)(1)) is amended—

(1) by striking subparagraph (H); and

(2) by redesignating subparagraphs (I) through (M) as subparagraphs (H) through (L), respectively.

<< 20 USCA § 1069b >>

(d) REFERENCES TO STATE POSTSECONDARY REVIEW ENTITY PROGRAMS.—Section 356(b)(2) of the Higher Education Act of 1965 (20 U.S.C. 10696(b)) is amended by striking "II,".

This Act may be cited as the "Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1997".

(f) For programs, projects or activities in the Treasury, Postal Service, and General Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

Making appropriations for the Treasury Department, the United States Postal Service, the Executive Office of the President, and certain Independent Agencies, for the fiscal year ending September 30, 1997, and for other purposes.

AR.01492

## TITLE I—DEPARTMENT OF THE TREASURY

### DEPARTMENTAL OFFICES

### SALARIES AND EXPENSES

For necessary expenses of the Departmental Offices including operation and maintenance of the Treasury Building and Annex; hire of passenger motor vehicles; maintenance, repairs, and improvements of, and purchase of commercial insurance policies for, real properties leased or owned overseas, when necessary for the performance of official business; not to exceed $2,900,000 for official travel expenses; not to exceed $150,000 for official reception and representation expenses; not to exceed $258,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Secretary of the Treasury and to be accounted for solely on his certificate; $111,760,000.

### AUTOMATION ENHANCEMENT

### INCLUDING TRANSFER OF FUNDS

For the development and acquisition of automatic data processing equipment, software, and services for the Department of the Treasury, $27,100,000, of which $15,000,000 shall be available to the United States Customs Service for the Automated Commercial Environment project, and of which $5,600,000 shall be available to the United States Customs Service for the International Trade Data System: Provided, That these funds shall remain available until September 30, 1999: Provided further, That these funds shall be transferred to accounts and in amounts as necessary to satisfy the requirements of the Department's offices, bureaus, and other organizations: Provided further, That this transfer authority shall be in addition to any other transfer authority provided in this Act: Provided further, That none of the funds shall be used to support or supplement Internal Revenue Service appropriations for Information Systems and Tax Systems Modernization: Provided further, That of the funds appropriated for the Automated Commercial Environment, $3,475,000 may not be obligated until the Commissioner of Customs consults with the Committees on Appropriations regarding deficiencies identified by the General Accounting Office.

### OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, not to exceed $2,000,000 for official travel expenses; including hire of passenger motor vehicles; and not to exceed $100,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Inspector General of the Treasury; $29,736,000.

### OFFICE OF PROFESSIONAL RESPONSIBILITY

### SALARIES AND EXPENSES

For necessary expenses of the Office of Professional Responsibility, including purchase and hire of passenger motor vehicles, $1,500,000.

### TREASURY BUILDINGS AND ANNEX REPAIR AND RESTORATION

### INCLUDING TRANSFER OF FUNDS

For the repair, alteration, and improvement of the Treasury Building and Annex, $28,213,000, to remain available until expended: Provided, That funds previously made available under this title for the Secret Service Headquarter's building shall be transferred to the Secret Service Acquisition, Construction, Improvement and Related Expenses appropriation.

### FINANCIAL CRIMES ENFORCEMENT NETWORK

### SALARIES AND EXPENSES

For necessary expenses of the Financial Crimes Enforcement Network, including hire of passenger motor vehicles; travel expenses of non-Federal law enforcement personnel to attend meetings concerned with financial intelligence activities, law

enforcement, and financial regulation; not to exceed $14,000 for official reception and representation expenses; and for assistance to Federal law enforcement agencies, with or without reimbursement; $22,387,000: Provided, That notwithstanding any other provision of law, the Director of the Financial Crimes Enforcement Network may procure up to $500,000 in specialized, unique, or novel automatic data processing equipment, ancillary equipment, software, services, and related resources from commercial vendors without regard to otherwise applicable procurement laws and regulations and without full and open competition, utilizing procedures best suited under the circumstances of the procurement to efficiently fulfill the agency's requirements: Provided further, That funds appropriated in this account may be used to procure personal services contracts.

## DEPARTMENT OF THE TREASURY FORFEITURE FUND

For necessary expenses of the Treasury Forfeiture Fund, as authorized by Public Law 102–393, not to exceed $10,000,000, to be derived from deposits in the fund: Provided, That notwithstanding any other provision of law, not to exceed $7,500,000 shall be made available for the development of a Federal wireless communication system: Provided further, That the Secretary of the Treasury is authorized to receive all unavailable collections transferred from the Special Forfeiture Fund established by section 6073 of the Anti–Drug Abuse Act of 1988 (21 U.S.C. 1509) by the Director of the Office of Drug Control Policy as a deposit into the Treasury Forfeiture Fund (31 U.S.C. 9703(a)).

## VIOLENT CRIME REDUCTION PROGRAMS

### INCLUDING TRANSFER OF FUNDS

For activities authorized by Public Law 103–322, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as follows:

(a) As authorized by section 190001(e), $89,000,000, of which $36,595,000 shall be available to the Bureau of Alcohol, Tobacco and Firearms, of which $3,000,000 shall be available for administering the Gang Resistance Education and Training program, of which $3,662,000 shall be available for ballistics technologies, including the purchase, maintenance and upgrading of equipment and of which $29,133,000 shall be available to enhance training and purchase equipment and services, and of which $800,000 shall be available for project LEAD; of which $18,300,000 shall be available to the Secretary as authorized by section 732 of Public Law 104–132 as amended by Section 113 of the Fiscal Year 1997 Department of Commerce, Justice and State, and the Judiciary, and Related Agencies Appropriations Act; of which $1,000,000 shall be available to the Financial Crimes Enforcement Network; of which $20,000,000 shall be available to the United States Secret Service, of which no less than $1,400,000 shall be available for a grant for activities related to the investigations of missing and exploited children; and of which $13,105,000 shall be available to the Federal Drug Control Programs, High Intensity Drug Trafficking Areas program.

(b) As authorized by section 32401, $8,000,000, for disbursement through grants, cooperative agreements or contracts, to local governments for Gang Resistance Education and Training: Provided, That notwithstanding sections 32401 and 310001, such funds shall be allocated only to the affected State and local law enforcement and prevention organizations participating in such projects.

## TREASURY FRANCHISE FUND

### << 31 USCA § 501 NOTE >>

There is hereby established in the Treasury a franchise fund pilot, as authorized by section 403 of Public Law 103–356, to be available as provided in such section for expenses and equipment necessary for the maintenance and operation of such financial and administrative support services as the Secretary determines may be performed more advantageously as central services: Provided, That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made for the purpose of providing capital, shall be used to capitalize such fund: Provided further, That such fund shall be reimbursed or credited with the payments, including advanced payments, from applicable appropriations and funds available to the Department and other Federal agencies for which such administrative and financial services are performed, at rates which will recover all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of Automatic Data Processing (ADP) software and systems, and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary:

Provided further, That such fund shall provide services on a competitive basis: Provided further, That an amount not to exceed 4 percent of the total annual income to such fund may be retained in the fund for fiscal year 1997 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment and for the improvement and implementation of Treasury financial management, ADP, and other support systems: Provided further, That no later than 30 days after the end of each fiscal year, amounts in excess of this reserve limitation shall be deposited as miscellaneous receipts in the Treasury: Provided further, That such franchise fund pilot shall terminate pursuant to section 403(f) of Public Law 103–356.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

<< 42 USCA § 3771 NOTE >>

  For necessary expenses of the Federal Law Enforcement Training Center, as a bureau of the Department of the Treasury, including materials and support costs of Federal law enforcement basic training; purchase (not to exceed 52 for police-type use, without regard to the general purchase price limitation) and hire of passenger motor vehicles; for expenses for student athletic and related activities; uniforms without regard to the general purchase price limitation for the current fiscal year; the conducting of and participating in firearms matches and presentation of awards; for public awareness and enhancing community support of law enforcement training; not to exceed $9,500 for official reception and representation expenses; room and board for student interns; and services as authorized by 5 U.S.C. 3109; $54,831,000, of which up to $13,034,000 for materials and support costs of Federal law enforcement basic training shall remain available until September 30, 1999: Provided, That the Center is authorized to accept and use gifts of property, both real and personal, and to accept services, for authorized purposes, including funding of a gift of intrinsic value which shall be awarded annually by the Director of the Center to the outstanding student who graduated from a basic training program at the Center during the previous fiscal year, which shall be funded only by gifts received through the Center's gift authority: Provided further, That notwithstanding any other provision of law, students attending training at any Federal Law Enforcement Training Center site shall reside in on-Center or Center-provided housing, insofar as available and in accordance with Center policy: Provided further, That funds appropriated in this account shall be available, at the discretion of the Director, for: training United States Postal Service law enforcement personnel and Postal police officers; State and local government law enforcement training on a space-available basis; training of foreign law enforcement officials on a space-available basis with reimbursement of actual costs to this appropriation; training of private sector security officials on a space-available basis with reimbursement of actual costs to this appropriation; and travel expenses of non-Federal personnel to attend course development meetings and training at the Center: Provided further, That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training at the Federal Law Enforcement Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available at the end of the fiscal year: Provided further, That the Federal Law Enforcement Training Center is authorized to provide short term medical services for students undergoing training at the Center.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

  For expansion of the Federal Law Enforcement Training Center, for acquisition of necessary additional real property and facilities, and for ongoing maintenance, facility improvements, and related expenses, $18,884,000, to remain available until expended.

## FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

  For necessary expenses of the Financial Management Service, $196,069,000, of which not to exceed $14,277,000 shall remain available until expended for systems modernization initiatives. In addition, $90,000, to be derived from the Oil Spill Liability Trust Fund, to reimburse the Service for administrative and personnel expenses for financial management of the Fund, as authorized by section 1012 of Public Law 101–380: Provided, That none of the funds made available for systems modernization initiatives may not be obligated until the Commissioner of the Financial Management Service has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems

investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, including purchase of not to exceed 650 vehicles for police-type use for replacement only and hire of passenger motor vehicles; hire of aircraft; and services of expert witnesses at such rates as may be determined by the Director; for payment of per diem and/or subsistence allowances to employees where an assignment to the National Response Team during the investigation of a bombing or arson incident requires an employee to work 16 hours or more per day or to remain overnight at his or her post of duty; not to exceed $12,500 for official reception and representation expenses; for training of State and local law enforcement agencies with or without reimbursement, including training in connection with the training and acquisition of canines for explosives and fire accelerants detection; provision of laboratory assistance to State and local agencies, with or without reimbursement; $393,971,000, of which $12,011,000, to remain available until expended, shall be available for arson investigations, with priority assigned to any arson, explosion or violence against religious institutions; which not to exceed $1,000,000 shall be available for the payment of attorneys' fees as provided by 18 U.S.C. 924(d)(2); and of which $1,000,000 shall be available for the equipping of any vessel, vehicle, equipment, or aircraft available for official use by a State or local law enforcement agency if the conveyance will be used in drug-related joint law enforcement operations with the Bureau of Alcohol, Tobacco and Firearms and for the payment of overtime salaries, travel, fuel, training, equipment, and other similar costs of State and local law enforcement officers that are incurred in joint operations with the Bureau of Alcohol, Tobacco and Firearms: Provided, That no funds made available by this or any other Act may be used to transfer the functions, missions, or activities of the Bureau of Alcohol, Tobacco and Firearms to other agencies or Departments in the fiscal year ending on September 30, 1997: Provided further, That no funds appropriated herein shall be available for salaries or administrative expenses in connection with consolidating or centralizing, within the Department of the Treasury, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees: Provided further, That no funds appropriated herein shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to implement an amendment or amendments to 27 CFR 178.118 or to change the definition of "Curios or relics" in 27 CFR 178.11 or remove any item from ATF Publication 5300.11 as it existed on January 1, 1994: Provided further, That none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c): Provided further, That such funds shall be available to investigate and act upon applications filed by corporations for relief from Federal firearms disabilities under 18 U.S.C. 925(c): Provided further, That no funds in this Act may be used to provide ballistics imaging equipment to any State or local authority who has obtained similar equipment through a Federal grant or subsidy unless the State or local authority agrees to return that equipment or to repay that grant or subsidy to the Federal Government: Provided further, That no funds available for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations: Provided further, That no funds under this Act may be used to electronically retrieve information gathered pursuant to 18 U.S.C. 923(g)(4) by name or any personal identification code.

### LABORATORY FACILITIES

For necessary expenses for design of a new facility or facilities, to house the Bureau of Alcohol, Tobacco and Firearms National Laboratory Center and the Fire Investigation Research and Development Center, not to exceed 185,000 occupiable square feet, $6,978,000, to remain available until expended: Provided, That these funds shall not be available until a prospectus of authorization for the Laboratory Facilities is approved by the House Committee on Transportation and Infrastructure and the Senate Committee on Environment and Public Works.

### UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the United States Customs Service, including purchase of up to 1,000 motor vehicles of which 960 are for replacement only, including 990 for police-type use and commercial operations; hire of motor vehicles; contracting with individuals for personal services abroad; not to exceed $30,000 for official reception and representation expenses; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

awards of compensation to informers, as authorized by any Act enforced by the United States Customs Service; $1,487,250,000; of which $65,000,000 shall be available until expended for Operation Hardline; of which $28,000,000 shall remain available until expended for acquisition of aircraft and related operations and maintenance associated with Operation Gateway; and of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Reconciliation Act of 1985, as amended (19 U.S.C. 58c(f)(3)), shall be derived from that Account; of the total, not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations, and not to exceed $4,000,000 shall be available until expended for research and not to exceed $1,000,000 shall be available until expended for conducting special operations pursuant to 19 U.S.C. 2081 and up to $6,000,000 shall be available until expended for the procurement of automation infrastructure items, including hardware, software, and installation: Provided, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That the United States Custom Service shall implement the General Aviation Telephonic Entry program within 30 days of enactment of this Act: Provided further, That no funds available for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations: Provided further, That the Spirit of St. Louis Airport in St. Louis County, Missouri, shall be designated a port of entry: Provided further, That no funds under this Act may be used to provide less than 30 days public notice for any change in apparel regulations: Provided further, That $750,000 shall be available for additional part-time and temporary positions in the Honolulu Customs District: Provided further, That of the funds appropriated $2,500,000 may be made available for the Western Hemisphere Trade Center authorized by Public Law 103–182.

## OPERATION AND MAINTENANCE, AIR AND MARINE INTERDICTION PROGRAMS

For expenses, not otherwise provided for, necessary for the operation and maintenance of marine vessels, aircraft, and other related equipment of the Air and Marine Programs, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include: the interdiction of narcotics and other goods; the provision of support to Customs and other Federal, State, and local agencies in the enforcement or administration of laws enforced by the Customs Service; and, at the discretion of the Commissioner of Customs, the provision of assistance to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts; $83,363,000, which shall remain available until expended: Provided, That no aircraft or other related equipment, with the exception of aircraft which is one of a kind and has been identified as excess to Customs requirements and aircraft which has been damaged beyond repair, shall be transferred to any other Federal agency, Department, or office outside of the Department of the Treasury, during fiscal year 1997 without the prior approval of the House and Senate Committees on Appropriations.

## CUSTOMS SERVICES AT SMALL AIRPORTS

### (TO BE DERIVED FROM FEES COLLECTED)

Such sums as may be necessary for expenses for the provision of Customs services at certain small airports or other facilities when authorized by law and designated by the Secretary of the Treasury, including expenditures for the salary and expenses of individuals employed to provide such services, to be derived from fees collected by the Secretary pursuant to section 236 of Public Law 98–573 for each of these airports or other facilities when authorized by law and designated by the Secretary, and to remain available until expended.

## HARBOR MAINTENANCE FEE COLLECTION

For administrative expenses related to the collection of the Harbor Maintenance Fee, pursuant to Public Law 103–182, $3,000,000, to be derived from the Harbor Maintenance Trust Fund and to be transferred to and merged with the Customs "Salaries and Expenses" account for such purposes.

## BUREAU OF THE PUBLIC DEBT

## ADMINISTERING THE PUBLIC DEBT

For necessary expenses connected with any public-debt issues of the United States; $169,735,000: Provided, That the sum appropriated herein from the General Fund for fiscal year 1997 shall be reduced by not more than $4,400,000 as definitive

security issue fees and Treasury Direct Investor Account Maintenance fees are collected, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at $165,335,000.

## INTERNAL REVENUE SERVICE

### PROCESSING, ASSISTANCE, AND MANAGEMENT

For necessary expenses of the Internal Revenue Service, not otherwise provided for; including processing tax returns; revenue accounting; providing assistance to taxpayers, management services, and inspection; including purchase (not to exceed 150 for replacement only for police-type use) and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner; $1,779,840,000, of which up to $3,700,000 shall be for the Tax Counseling for the Elderly Program, and of which not to exceed $25,000 shall be for official reception and representation expenses.

### TAX LAW ENFORCEMENT

For necessary expenses of the Internal Revenue Service for determining and establishing tax liabilities; tax and enforcement litigation; technical rulings; examining employee plans and exempt organizations; investigation and enforcement activities; securing unfiled tax returns; collecting unpaid accounts; statistics of income and compliance research; the purchase (for police-type use, not to exceed 850), and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner $4,104,211,000, of which not to exceed $1,000,000 shall remain available until September 30, 1999, for research.

### INFORMATION SYSTEMS

For necessary expenses for data processing and telecommunications support for Internal Revenue Service activities, including tax systems modernization and operational information systems; the hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner, $1,323,075,000, of which no less than $130,075,000 shall be available for Tax Systems Modernization (TSM) development and deployment which shall be available until September 30, 1999, and of which no less than $206,200,000 shall be available for TSM Operational Systems: Provided, That none of the funds made available for TSM Operational Systems shall be available after July 31, 1997, unless the Department of the Treasury has prepared a Request for Proposal which could be used as a base for a solicitation of a contract with an alternative or new Prime Contractor to manage, integrate, test and implement the TSM program: Provided further, That all activities associated with the development of a request for proposal, contract solicitation, and contract award for private sector assistance on TSM (both operational systems and development and deployment systems), beyond private sector assistance which is currently under contract, shall be conducted by the Department of the Treasury's Modernization Management Board: Provided further, That if the Internal Revenue Service determines that it is unable to meet deadlines established herein, the Secretary of the Treasury shall notify the Committees on Appropriations of the House and the Senate of the delay Provided further, That the Internal Revenue Service shall submit, by February 1, 1997, a timetable for implementing, by October 1, 1997, recommendations made by the General Accounting Office in its July 1995 report, entitled: "Tax Systems Modernization: Management and Technical Weaknesses Must Be Corrected If Modernization Is To Succeed": Provided further, That the Internal Revenue Service shall submit, by December 1, 1996, a schedule to transfer, not later than July 31, 1997, a majority of Tax Systems Modernization development, deployment, management, integration, and testing, from the Internal Revenue Service to the private sector.

### INFORMATION SYSTEMS

#### (RESCISSION)

Of the funds made available under this heading for Information Systems in Public Law 104–52, $115,000,000 are rescinded, in Public Law 103–123, $17,447,000 are rescinded, in Public Law 102–393, $15,000,000 are rescinded, and in Public Law 102–141, $27,000,000 are rescinded.

### ADMINISTRATIVE PROVISIONS—INTERNAL REVENUE SERVICE

SECTION 101. Not to exceed 5 percent of any appropriation made available in this Act to the Internal Revenue Service may be transferred to any other Internal Revenue Service appropriation upon the advance approval of the House and Senate Committees on Appropriations.

<< 26 USCA § 7803 NOTE >>

SEC. 102. The Internal Revenue Service shall maintain a training program to insure that Internal Revenue Service employees are trained in taxpayers' rights, in dealing courteously with the taxpayers, and in cross-cultural relations.

SEC. 103. The funds provided in this Act for the Internal Revenue Service shall be used to provide as a minimum, the fiscal year 1995 level of service, staffing, and funding for Taxpayer Services.

SEC. 104. No funds available in this Act to the Internal Revenue Service for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations.

Sec. 105. The Internal Revenue Service (IRS) may proceed with its field support reorganization in fiscal year 1997 after it submits its report, no earlier than March 1, 1997, to the Committees on Appropriations of the House and Senate only if the IRS maintains, in fiscal year 1997, the current level of taxpayer service employees that work on cases generated through walk in visits and telephone calls to IRS offices.

SEC. 106. Funds made available by this or any other Act to the Internal Revenue Service shall be available for improved facilities and increased manpower to provide sufficient and effective 1–800 help line for taxpayers. The Commissioner shall make the improvement of the IRS 1–800 help line service a priority and allocate resources necessary to increase phone lines and staff to improve the IRS 1–800 help line service.

SEC. 107. No funds made available by this Act, or any other Act, to the Internal Revenue Service may be used to pay for the design and printing of more than two ink colors on the covers of income tax packages, and such ink colors must be the same colors as used to print the balance of the material in each package.

SEC. 108. Notwithstanding any other provision of law, no field support reorganization of the Internal Revenue Service shall be undertaken in Aberdeen, South Dakota until the Internal Revenue Service toll-free help phone line assistance program reaches at least an 80 percent service level. The Commissioner shall submit to Congress a report and the GAO shall certify to Congress that the 80 percent service level has been met.

UNITED STATES SECRET SERVICE

SALARIES AND EXPENSES

<< 3 USCA § 203 >>

For necessary expenses of the United States Secret Service, including purchase (not to exceed 702 vehicles for police-type use, of which 665 shall be for replacement only), and hire of passenger motor vehicles; hire of aircraft; training and assistance requested by State and local governments, which may be provided without reimbursement; services of expert witnesses at such rates as may be determined by the Director; rental of buildings in the District of Columbia, and fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; for payment of per diem and/or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee require an employee to work 16 hours per day or to remain overnight at his or her post of duty; the conducting of and participating in firearms matches; presentation of awards; and for travel of Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act: Provided, That approval is obtained in advance from the House and Senate Committees on Appropriations; for repairs, alterations, and minor construction at the James J. Rowley Secret Service Training Center; for research and development; for making grants to conduct behavioral research in support of protective research and operations; not to exceed $20,000 for official reception and representation expenses; not to exceed $50,000 to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; for payment in advance for commercial accommodations as may be necessary to perform protective functions; and for uniforms without regard to the general purchase price limitation for the current fiscal year: Provided further, That 3 U.S.C. 203(a) is amended by deleting "but not exceeding twelve hundred in number"; $528,262,000,

of which $1,200,000 shall be available as a grant for activities related to the investigations of missing and exploited children and shall remain available until expended.

SALARIES AND EXPENSES

(RESCISSION)

Of the funds made available under this heading in Public Law 104–52, $7,600,000 are rescinded.

ACQUISITION, CONSTRUCTION, IMPROVEMENT, AND RELATED EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses of construction, repair, alteration, and improvement of facilities, $37,365,000, of which $8,200,000 shall be available for the Rowley Secret Service Training Center, to remain available until expended: Provided, That funds previously provided under the title, "Treasury Buildings and Annex Repair and Restoration," for the Secret Service's Headquarters Building, shall be transferred to this account: Provided further, That funds for the Rowley Secret Service Training Center shall not be available until a prospectus authorizing such facilities is approved in accordance with the Public Buildings Act of 1959, as amended, except that funds may be expended for required expenses in connection with the development of a proposed prospectus.

GENERAL PROVISIONS—DEPARTMENT OF THE TREASURY

SECTION 111. Any obligation or expenditure by the Secretary in connection with law enforcement activities of a Federal agency or a Department of the Treasury law enforcement organization in accordance with 31 U.S.C. 9703(g)(4)(B) from unobligated balances remaining in the Fund on September 30, 1997, shall be made in compliance with the reprogramming guidelines contained in the House and Senate reports accompanying this Act.

SEC. 112. Appropriations to the Treasury Department in this Act shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901), including maintenance, repairs, and cleaning; purchase of insurance for official motor vehicles operated in foreign countries; purchase of motor vehicles without regard to the general purchase price limitations for vehicles purchased and used overseas for the current fiscal year; entering into contracts with the Department of State for the furnishing of health and medical services to employees and their dependents serving in foreign countries; and services authorized by 5 U.S.C. 3109.

SEC. 113. None of the funds appropriated by this title shall be used in connection with the collection of any underpayment of any tax imposed by the Internal Revenue Code of 1986 unless the conduct of officers and employees of the Internal Revenue Service in connection with such collection, including any private sector employees under contract to the Internal Revenue Service, complies with subsection (a) of section 805 (relating to communications in connection with debt collection), and section 806 (relating to harassment or abuse), of the Fair Debt Collection Practices Act (15 U.S.C. 1692).

<< 26 USCA § 6103 NOTE >>

SEC. 114. The Internal Revenue Service shall institute policies and procedures which will safeguard the confidentiality of taxpayer information.

SEC. 115. The funds provided to the Bureau of Alcohol Tobacco and Firearms for fiscal year 1997 in this Act for the enforcement of the Federal Alcohol Administration Act shall be expended in a manner so as not to diminish enforcement efforts with respect to section 105 of the Federal Alcohol Administration Act.

<< 31 USCA § 9703 >>

SEC. 116. Paragraph (3)(C) of section 9703(g) of title 31, United States Code, is amended—

(1) by striking in the third sentence "and at the end of each fiscal year thereafter";

(2) by inserting in lieu thereof "1994, 1995, and 1996"; and

(3) by adding at the end the following new sentence: "At the end of fiscal year 1997, and at the end of each fiscal year thereafter, the Secretary shall reserve any amounts that are required to be retained in the Fund to ensure the availability of amounts in the subsequent fiscal year for purposes authorized under subsection (a)."

SEC. 117. Of the funds available to the Internal Revenue Service, $13,000,000 shall be made available to continue the private sector debt collection program which was initiated in fiscal year 1996 and $13,000,000 shall be transferred to the Departmental Offices appropriation to initiate a new private sector debt collection program: Provided, That the transfer provided herein shall be in addition to any other transfer authority contained in this Act.

<< 18 USCA § 923 >>

SEC. 118. Section 923(j) of title 18, United States Code, is amended by striking the period after the last sentence, and inserting the following: ", including the right of a licensee to conduct 'curios or relics' firearms transfers and business away from their business premises with another licensee without regard as to whether the location of where the business is conducted is located in the State specified on the license of either licensee.".

This title may be cited as the "Treasury Department Appropriations Act, 1997".

TITLE II—POSTAL SERVICE

PAYMENTS TO THE POSTAL SERVICE

PAYMENT TO THE POSTAL SERVICE FUND

<< 39 USCA § 403 NOTE >>

For payment to the Postal Service Fund for revenue forgone on free and reduced rate mail, pursuant to subsections (c) and (d) of section 2401 of title 39, United States Code, $85,080,000: Provided, That mail for overseas voting and mail for the blind shall continue to be free: Provided further, That 6–day delivery and rural delivery of mail shall continue at not less than the 1983 level: Provided further, That none of the funds made available to the Postal Service by this Act shall be used to implement any rule, regulation, or policy of charging any officer or employee of any State or local child support enforcement agency, or any individual participating in a State or local program of child support enforcement, a fee for information requested or provided concerning an address of a postal customer: Provided further, That none of the funds provided in this Act shall be used to consolidate or close small rural and other small post offices in the fiscal year ending on September 30, 1997.

PAYMENT TO THE POSTAL SERVICE FUND FOR NONFUNDED LIABILITIES

For payment to the Postal Service Fund for meeting the liabilities of the former Post Office Department to the Employees' Compensation Fund pursuant to 39 United States Code 2004, $35,536,000.

TITLE III—EXECUTIVE OFFICE OF THE PRESIDENT AND FUNDS APPROPRIATED TO THE PRESIDENT

COMPENSATION OF THE PRESIDENT AND THE WHITE HOUSE OFFICE

COMPENSATION OF THE PRESIDENT

<< 3 USCA § 102 NOTE >>

For compensation of the President, including an expense allowance at the rate of $50,000 per annum as authorized by 3 U.S.C. 102, $250,000: Provided, That none of the funds made available for official expenses shall be expended for any other purpose and any unused amount shall revert to the Treasury pursuant to section 1552 of title 31, United States Code: Provided further, That none of the funds made available for official expenses shall be considered as taxable to the President.

SALARIES AND EXPENSES

For necessary expenses for the White House as authorized by law, including not to exceed $3,850,000 for services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 105; including subsistence expenses as authorized by 3 U.S.C. 105, which shall be expended and accounted for as provided in that section; hire of passenger motor vehicles, newspapers, periodicals, teletype news service, and travel (not to exceed $100,000 to be expended and accounted for as provided by 3 U.S.C. 103); not to exceed $19,000 for official entertainment expenses, to be available for allocation within the Executive Office of the President; $40,193,000:

Provided, That $420,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

### EXECUTIVE RESIDENCE AT THE WHITE HOUSE

#### OPERATING EXPENSES

For the care, maintenance, repair and alteration, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the Executive Residence at the White House and official entertainment expenses of the President, $7,827,000, to be expended and accounted for as provided by 3 U.S.C. 105, 109–110, 112–114.

### SPECIAL ASSISTANCE TO THE PRESIDENT AND THE OFFICIAL RESIDENCE OF THE VICE PRESIDENT

#### SALARIES AND EXPENSES

For necessary expenses to enable the Vice President to provide assistance to the President in connection with specially assigned functions, services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 106, including subsistence expenses as authorized by 3 U.S.C. 106, which shall be expended and accounted for as provided in that section; and hire of passenger motor vehicles; $3,280,000: Provided, That $150,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

#### OPERATING EXPENSES

For the care, operation, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the official residence of the Vice President, the hire of passenger motor vehicles, and not to exceed $90,000 for official entertainment expenses of the Vice President, to be accounted for solely on his certificate; $324,000: Provided, That advances or repayments or transfers from this appropriation may be made to any department or agency for expenses of carrying out such activities: Provided further, That $8,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted for approval to the Committees on Appropriations of the House and Senate a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

### COUNCIL OF ECONOMIC ADVISERS

#### SALARIES AND EXPENSES

For necessary expenses of the Council in carrying out its functions under the Employment Act of 1946 (15 U.S.C. 1021), $3,439,000.

### OFFICE OF POLICY DEVELOPMENT

#### SALARIES AND EXPENSES

For necessary expenses of the Office of Policy Development, including services as authorized by 5 U.S.C. 3109, and 3 U.S.C. 107; $3,867,000: Provided, That $45,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

### NATIONAL SECURITY COUNCIL

#### SALARIES AND EXPENSES

For necessary expenses of the National Security Council, including services as authorized by 5 U.S.C. 3109, $6,648,000: Provided, That $3,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## OFFICE OF ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Office of Administration, $26,100,000, including services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 107, and hire of passenger motor vehicles: Provided, That $340,700 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## OFFICE OF MANAGEMENT AND BUDGET

### SALARIES AND EXPENSES

For necessary expenses of the Office of Management and Budget, including hire of passenger motor vehicles, services as authorized by 5 U.S.C. 3109, $55,573,000, of which not to exceed $5,000,000 shall be available to carry out the provisions of 44 U.S.C. chapter 35: Provided, That, as provided in 31 U.S.C. 1301(a), appropriations shall be applied only to the objects for which appropriations were made except as otherwise provided by law: Provided further, That none of the funds appropriated in this Act for the Office of Management and Budget may be used for the purpose of reviewing any agricultural marketing orders or any activities or regulations under the provisions of the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. 601 et seq.): Provided further, That none of the funds made available for the Office of Management and Budget by this Act may be expended for the altering of the transcript of actual testimony of witnesses, except for testimony of officials of the Office of Management and Budget, before the House and Senate Committees on Appropriations or the House and Senate Committees on Veterans' Affairs or their subcommittees: Provided further, That this proviso shall not apply to printed hearings released by the House and Senate Committees on Appropriations or the House and Senate Committees on Veterans' Affairs.

## OFFICE OF NATIONAL DRUG CONTROL POLICY

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy; for research activities pursuant to title I of Public Law 100–690; not to exceed $8,000 for official reception and representation expenses; and for participation in joint projects or in the provision of services on matters of mutual interest with nonprofit, research, or public organizations or agencies, with or without reimbursement; $35,838,000, of which $19,000,000 shall remain available until expended, consisting of $1,000,000 for policy research and evaluation and $18,000,000 for the Counter–Drug Technology Assessment Center for counternarcotics research and development projects of which $1,000,000 shall be obligated for state conferences on model state drug laws: Provided, That the $17,000,000 for the Counter–Drug Technology Assessment Center shall be available for transfer to other Federal departments or agencies: Provided further, That the Office is authorized to accept, hold, administer, and utilize gifts, both real and personal, for the purpose of aiding or facilitating the work of the Office: Provided further, That not before January 31, 1997, the Director of the Office of National Drug Control Policy shall transfer all balances in the Special Forfeiture Fund established by section 6073 of the Anti–Drug Abuse Act of 1988 (21 U.S.C. § 1509) to the Treasury Forfeiture Fund (31 U.S.C. 9703(a)).

## FEDERAL DRUG CONTROL PROGRAMS

### HIGH INTENSITY DRUG TRAFFICKING AREAS PROGRAM

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy's High Intensity Drug Trafficking Areas Program, $127,102,000 for drug control activities consistent with the approved strategy for each of the designated High Intensity Drug Trafficking Areas, of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in Lake County, Indiana; of which $6,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area for the Gulf Coast States of Louisiana, Alabama, and Mississippi; of which $8,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area dedicated to combating methamphetamine use, production and trafficking in a five State area including Iowa, Missouri, Nebraska, South Dakota, and Kansas; of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in the State of Colorado; of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in the Pacific Northwest; of the total amount appropriated, including transferred funds, no less than $71,000,000 shall be transferred to State and local entities for drug control activities, and up to $69,207,000 may be transferred to Federal agencies and departments at a rate to be determined by the Director: Provided, That the funds made available under this head shall be obligated within 90 days of the date of enactment of this Act.

This title may be cited as the "Executive Office Appropriations Act, 1997".

### TITLE IV—INDEPENDENT AGENCIES

### COMMITTEE FOR PURCHASE FROM PEOPLE WHO ARE BLIND OR SEVERELY DISABLED

### SALARIES AND EXPENSES

For necessary expenses of the Committee for Purchase From People Who Are Blind or Severely Disabled established by the Act of June 23, 1971, Public Law 92–28; $1,800,000.

### FEDERAL ELECTION COMMISSION

### SALARIES AND EXPENSES

For necessary expenses to carry out the provisions of the Federal Election Campaign Act of 1971, as amended, $28,165,000, of which no less than $2,500,000 shall be available for internal automated data processing systems, and of which not to exceed $5,000 shall be available for reception and representation expenses.

### FEDERAL LABOR RELATIONS AUTHORITY

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Federal Labor Relations Authority, pursuant to Reorganization Plan Numbered 2 of 1978, and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, including hire of experts and consultants, hire of passenger motor vehicles, rental of conference rooms in the District of Columbia and elsewhere; $21,588,000: Provided, That public members of the Federal Service Impasses Panel may be paid travel expenses and per diem in lieu of subsistence as authorized by law (5 U.S.C. 5703) for persons employed intermittently in the Government service, and compensation as authorized by 5 U.S.C. 3109: Provided further, That notwithstanding 31 U.S.C. 3302, funds received from fees charged to non-Federal participants at labor-management relations conferences shall be credited to and merged with this account, to be available without further appropriation for the costs of carrying out these conferences.

### GENERAL SERVICES ADMINISTRATION

### FEDERAL BUILDINGS FUND

### LIMITATIONS ON AVAILABILITY OF REVENUE

### (INCLUDING TRANSFER OF FUNDS)

For additional expenses necessary to carry out the purpose of the Fund established pursuant to section 210(f) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)), $400,544,000, to be deposited into said Fund. The revenues and collections deposited into the Fund shall be available for necessary expenses of real property management

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and related activities not otherwise provided for, including operation, maintenance, and protection of federally owned and leased buildings; rental of buildings in the District of Columbia; restoration of leased premises; moving governmental agencies (including space adjustments and telecommunications relocation expenses) in connection with the assignment, allocation and transfer of space; contractual services incident to cleaning or servicing buildings, and moving; repair and alteration of federally owned buildings including grounds, approaches and appurtenances; care and safeguarding of sites; maintenance, preservation, demolition, and equipment; acquisition of buildings and sites by purchase, condemnation, or as otherwise authorized by law; acquisition of options to purchase buildings and sites; conversion and extension of federally owned buildings; preliminary planning and design of projects by contract or otherwise; construction of new buildings (including equipment for such buildings); and payment of principal, interest, taxes, and any other obligations for public buildings acquired by installment purchase and purchase contract, in the aggregate amount of $5,555,544,000 of which (1) not to exceed $657,711,000 shall remain available until expended for construction of additional projects and at maximum construction improvement costs (including funds for sites and expenses and associated design and construction services) as follows:

New Construction:

California:

 Fresno, Federal Building and U.S. Courthouse, $6,595,000

Colorado:

 Denver, Rogers Federal Building–U.S. Courthouse, $9,545,000

District of Columbia:

 U.S. Courthouse Annex, $5,703,000

Florida:

 Miami, U.S. Courthouse, $24,990,000

 Orlando, U.S. Courthouse, $9,514,000

Kentucky:

 Covington, U.S. Courthouse, $17,134,000

 London, U.S. Courthouse, $13,732,000

Montana:

 Babb, Piegan Border Station, $333,000

 Sweetgrass, Border Station, $1,059,000

Nevada:

 Las Vegas, U.S. Courthouse, $83,719,000

New York:

 Brooklyn, U.S. Courthouse, $169,000,000

Ohio:

 Cleveland, U.S. Courthouse, $128,559,000

 Youngstown, U.S. Courthouse, $15,813,000

Oregon:

 Portland, Consolidated Law Federal Office Building, $4,750,000

Pennsylvania:

 Erie, U.S. Courthouse Annex, $3,300,000

 Philadelphia, DVA–Federal Complex, Phase II, $13,765,000

South Carolina:

 Columbia, U.S. Courthouse Annex, $43,848,000

Texas:

 Corpus Christi, U.S. Courthouse, $24,161,000

Utah:

 Salt Lake City, Moss U.S. Courthouse Annex and Alteration, $11,474,000

Washington:

 Blaine, U.S. Border Station, $13,978,000

 Oroville, U.S. Border Station, $1,452,000

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.01505

Seattle, U.S. Courthouse, $16,853,000

Sumas, U.S. Border Station (Claim), $1,177,000

Nationwide:

Non-prospectus construction projects, $10,000,000

Security Enhancements, $27,256,000:

Provided, That each of the immediately foregoing limits of costs on new construction projects may be exceeded to the extent that savings are affected in other such projects, but not to exceed 10 percent unless advance approval is obtained from the House and Senate Committees on Appropriations of a greater amount: Provided further, That the cost of future U.S. Courthouse annex projects shall reflect savings through improving design efficiencies, curtailing planned interior finishes, requiring more efficient use of courtroom and library space, and by otherwise limiting space requirements: Providing further, That from funds available in the Federal Buildings Fund, $20,000,000 shall be available until expended for environmental clean up activities at the Southeast Federal Center in the District of Columbia and $81,000,000 shall be available until expended for design and construction activities at the Consolidated Law Federal Office Building in Portland, Oregon: Provided further, That from funds available for non-prospectus construction projects, $250,000 may be available until expended for the acquisition, lease, construction, and equipping of flexiplace work telecommuting centers in West Virginia: Provided further, That all funds for direct construction projects shall expire on September 30, 1999: (2) not to exceed $639,000,000 shall remain available until expended, for repairs and alterations which includes associated design and construction services: Provided further, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the amount by project as follows, except each project may be increased by an amount not to exceed 10 per centum unless advance approval is obtained from the Committees on Appropriations of the House and Senate of a greater amount:

Repairs and alterations:

District of Columbia:

Ariel Rios Building, $62,740,000

Justice Department, Phase 1 of 3, $50,000,000

Lafayette Building, $5,166,000

Hawaii:

Honolulu, Prince Jonah Kuhio Kalanianaole Federal Building and U.S. Courthouse, $4,140,000

Illinois:

Chicago, Everett M. Dirksen Federal Building, $18,844,000

Chicago, John C. Kluczynski, Jr. Federal Building (IRS), $13,414,000

Louisiana:

New Orleans, Customhouse, $3,500,000

Maryland:

Montgomery County, White Oak environmental clean up activities, $10,000,000

Massachusetts:

Andover, IRS Regional Service Center, $812,000

New Hampshire:

Concord, J.C. Cleveland Federal Building, $8,251,000

New Jersey:

Camden, U.S. Post Office–Courthouse $11,096,000

New York:

Albany, James T. Foley Post Office–Courthouse, $3,880,000

Brookhaven, IRS Service Center, $2,272,000

New York, Jacob K. Javits Federal Building, $13,651,000

Pennsylvania:

Scranton, Federal Building–U.S. Courthouse, $10,610,000

Rhode Island:

Providence, Federal Building–U.S. Courthouse, $8,209,000

Texas:

Fort Worth, Federal Center, $11,259,000

Nationwide:

Chlorofluorocarbons Program, $23,456,000

Elevator Program, $10,000,000

Energy Program, $20,000,000

Security Enhancements, various buildings, $2,700,000

Basic Repairs and Alterations, $345,000,000:

<< 40 USCA § 872 NOTE >>

Provided further, That additional projects for which prospectuses have been fully approved may be funded under this category only if advance approval is obtained from the Committees on Appropriations of the House and Senate: Provided further, That the amounts provided in this or any prior Act for Repairs and Alterations may be used to fund costs associated with implementing security improvements to buildings necessary to meet the minimum standards for security in accordance with current law and in compliance with the reprogramming guidelines of the appropriate Committees of the House and Senate: Provided further, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the originally authorized amount, except each project may be increased by an amount not to exceed 10 percent when advance approval is obtained from the Committees on Appropriations of the House and Senate of a greater amount: Provided further, That the difference between the funds appropriated and expended on any projects in this or any prior Act, under the heading "Repairs and Alterations", may be transferred to Basic Repairs and Alterations or used to fund authorized increases in prospectus projects: Provided further, That from funds made available for Basic Repairs and Alterations, $8,000,000 shall be made available for renovation of the Agricultural Research Service Laboratory in Ames, Iowa, which is currently occupied by the Animal and Plant Health Inspection Service: Provided further, That from funds made available for Basic Repairs Alterations, $1,450,000 may be available for the renovation of the Pioneer Courthouse located at 520 SW Morrison, in Portland, Oregon: Provided further, That from funds made available for Basic Repairs and Alterations, $6,000,000 shall be used for necessary expenses associated with ongoing construction of the U.S. Courthouse in Montgomery, Alabama: Provided further, That from funds made available for Basic Repairs and Alterations, $100,000 shall be transferred to the National Park Service "Construction" appropriation for restoration and maintenance of the multi-purpose field at Wallenberg Place in Washington, DC: Provided further, That all funds for repairs and alterations prospectus projects shall expire on September 30, 1999, and remain in the Federal Buildings Fund except funds for projects as to which funds for design or other funds have been obligated in whole or in part prior to such date: Provided further, That the amount provided in this or any prior Act for Basic Repairs and Alterations may be used to pay claims against the Government arising from any projects under the heading "Repairs and Alterations" or used to fund authorized increases in prospectus projects: Provided further, That $5,700,000 of the funds provided under this heading in Public Law 103–329, for the IRS Service Center, Holtsville, New York, shall be available until September 30, 1998; (3) not to exceed $173,075,000 for installment acquisition payments including payments on purchase contracts which shall remain available until expended: Provided further, That up to $1,500,000 shall be available for a design prospectus of the Federal Building and U.S. Courthouse located at 811 Grand Avenue in Kansas City, Missouri; (4) not to exceed $2,343,795,000 for rental of space which shall remain available until expended; and (5) not to exceed $1,552,651,000 for building operations which shall remain available until expended and of which $8,000,000 shall be transferred to the "Policy and Operations" appropriation: Provided further, That funds available to the General Services Administration shall not be available for expenses in connection with any construction, repair, alteration, and acquisition project for which a prospectus, if required by the Public Buildings Act of 1959, as amended, has not been approved, except that necessary funds may be expended for each project for required expenses in connection with the development of a proposed prospectus: Provided further, That the Administrator of General Services shall, at the earliest practicable date, initiate discussions with the Smithsonian Institution on the feasibility of transferring Federal Building 10B located at 600 Independence Avenue SW., Washington, DC to the Smithsonian Institution at such price and under such terms and conditions as determined appropriate by the Administrator and subject to the prior approval of the appropriate authorizing and appropriations committees of the Congress: Provided further, That funds provided in this Act under the heading "Security Enhancements, various buildings" may be used, by project in accordance with an approved prospectus: Provided further, That the Administrator is authorized in fiscal year 1997 and thereafter, to enter into and perform such leases, contracts, or other transactions with any agency or instrumentality of the United States, the several States, or the District of Columbia, or with any

person, firm, association, or corporation, as may be necessary to implement the trade center plan at the Federal Triangle Project and is hereby granted all the rights and authorities of the former Pennsylvania Avenue Development Corporation (PADC) with regard to property transferred from the PADC to the General Services Administration in fiscal year 1996: *Provided further,* That notwithstanding any other provision of law, the Administrator of General Services is hereby authorized to use all funds transferred from the PADC or income earned on PADC properties for activities associated with carrying out the responsibilities of the PADC transferred to the Administrator of General Services and that any such income earned on or after April 1, 1996, shall be deposited to the Pennsylvania Avenue Activities account and shall remain available until expended: *Provided further,* That any funds or income as may be deemed by the Administrator as excess to the amount needed to fulfill the PADC responsibilities transferred to the Administrator of General Services, shall be applied to any outstanding debt, with the exception of debt associated with the Ronald Reagan Building and International Trade Center, incurred by the PADC in the course of acquiring real estate: *Provided further,* That with respect to real property transferred from the PADC to the General Services Administration pursuant to section 313 of Public Law 104–134, Title III, General Provisions, the Administrator of General Services is hereafter authorized and directed to make payments required by section 10(b) of the PADC Act of 1972, Public Law 92–578 in the same manner as previously paid by the PADC: *Provided further,* That for the purposes of this authorization, buildings constructed pursuant to the purchase contract authority of the Public Buildings Amendments of 1972 (40 U.S.C. 602a), buildings occupied pursuant to installment purchase contracts, and buildings under the control of another department or agency where alterations of such buildings are required in connection with the moving of such other department or agency from buildings then, or thereafter to be, under the control of the General Services Administration shall be considered to be federally owned buildings: *Provided further,* That funds available in the Federal Buildings Fund may be expended for emergency repairs when advance approval is obtained from the Committees on Appropriations of the House and Senate: *Provided further,* That amounts necessary to provide reimbursable special services to other agencies under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)(6)) and amounts to provide such reimbursable fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control as may be appropriate to enable the United States Secret Service to perform its protective functions pursuant to 18 U.S.C. 3056, as amended, shall be available from such revenues and collections: *Provided further,* That revenues and collections and any other sums accruing to this Fund during fiscal year 1997, excluding reimbursements under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490(f)(6)) in excess of $5,555,544,000 shall remain in the Fund and shall not be available for expenditure except as authorized in appropriations Acts.

## POLICY AND OPERATIONS

For expenses authorized by law, not otherwise provided for, for Government-wide policy and oversight activities associated with asset management activities; utilization and donation of surplus personal property; transportation management activities; procurement and supply management activities; Government-wide and internal responsibilities relating to automated data management, telecommunications, information resources management, and related technology activities; utilization survey, deed compliance inspection, appraisal, environmental and cultural analysis, and land use planning functions pertaining to excess and surplus real property; agency-wide policy direction; Board of Contract Appeals; accounting, records management, and other support services incident to adjudication of Indian Tribal Claims by the United States Court of Federal Claims; services as authorized by 5 U.S.C. 3109; and not to exceed $5,000 for official reception and representation expenses; $110,173,000.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General and services authorized by 5 U.S.C. 3109, $33,863,000: *Provided,* That not to exceed $5,000 shall be available for payment for information and detection of fraud against the Government, including payment for recovery of stolen Government property: *Provided further,* That not to exceed $2,500 shall be available for awards to employees of other Federal agencies and private citizens in recognition of efforts and initiatives resulting in enhanced Office of Inspector General effectiveness.

## ALLOWANCES AND OFFICE STAFF FOR FORMER PRESIDENTS

For carrying out the provisions of the Act of August 25, 1958, as amended (3 U.S.C. 102 note), and Public Law 95–138, $2,180,000: *Provided,* That the Administrator of General Services shall transfer to the Secretary of the Treasury such sums as may be necessary to carry out the provisions of such Acts.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXPENSES, PRESIDENTIAL TRANSITION

For expenses necessary to carry out the Presidential Transition Act of 1963, as amended (3 U.S.C. 102 note), $5,600,000.

GENERAL PROVISIONS—GENERAL SERVICES

ADMINISTRATION

SECTION 401. The appropriate appropriation or fund available to the General Services Administration shall be credited with the cost of operation, protection, maintenance, upkeep, repair, and improvement, included as part of rentals received from Government corporations pursuant to law (40 U.S.C. 129).

SEC. 402. Funds available to the General Services Administration shall be available for the hire of passenger motor vehicles.

SEC. 403. Funds in the Federal Buildings Fund made available for fiscal year 1997 for Federal Buildings Fund activities may be transferred between such activities only to the extent necessary to meet program requirements: Provided, That any proposed transfers shall be approved in advance by the Committees on Appropriations of the House and Senate.

SEC. 404. No funds made available by this Act shall be used to transmit a fiscal year 1998 request for United States Courthouse construction that does not meet the design guide standards for construction as established by the General Services Administration, the Judicial Conference of the United States, and the Office of Management and Budget and does not reflect the priorities of the Judicial Conference of the United States as set out in its approved 5–year construction plan: Provided, That the request must be accompanied by a standardized courtroom utilization study of each facility to be replaced or expanded.

SEC. 405. None of the funds provided in this Act may be used to increase the amount of occupiable square feet, provide cleaning services, security enhancements, or any other service usually provided through the Federal Buildings Fund, to any agency which does not pay the requested rate per square foot assessment for space and services as determined by the General Services Administration in compliance with the Public Buildings Amendments Act of 1972 (Public Law 92–313).

SEC. 406. The Administrator of the General Services is directed to ensure that the materials used for the fascade on the United States Courthouse Annex, Savannah, Georgia project are compatible with the existing Savannah Federal Building–U.S. Courthouse fascade, in order to ensure compatibility of this new facility with the Savannah historic district and to ensure that the Annex will not endanger the National Landmark status of the Savannah historic district.

SEC. 407. (a) Section 210 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490) is amended by adding at the end the following new subsection:

<< 40 USCA § 490 >>

"(l)(1) The Administrator may establish, acquire space for, and equip flexiplace work telecommuting centers (in this subsection referred to as 'telecommuting centers') for use by employees of Federal agencies, State and local governments, and the private sector in accordance with this subsection.

"(2) The Administrator may make any telecommuting center available for use by individuals who are not Federal employees to the extent the center is not being fully utilized by Federal employees. The Administrator shall give Federal employees priority in using the telecommuting centers.

"(3)(A) The Administrator shall charge user fees for the use of any telecommuting center. The amount of the user fee shall approximate commercial charges for comparable space and services except that in no instance shall such fee be less than that necessary to pay the cost of establishing and operating the center, including the reasonable cost of renovation and replacement of furniture, fixtures, and equipment.

"(B) Amounts received by the Administrator after September 30, 1993, as user fees for use of any telecommuting center may be deposited into the Fund established under subsection (f) of this section and may be used by the Administrator to pay costs incurred in the establishment and operation of the center.

"(4) The Administrator may provide guidance, assistance, and oversight to any person regarding establishment and operation of alternative workplace arrangements, such as telecommuting, hoteling, virtual offices, and other distributive work arrangements.

"(5) In considering whether to acquire any space, quarters, buildings, or other facilities for use by employees of any executive agency, the head of that agency shall consider whether the need for the facilities can be met using alternative workplace arrangements referred to in paragraph (4).".

(b) Section 13 of the Public Building Act of 1959, as amended, (107 Stat. 438; 40 U.S.C. 612) is amended—

AR.01509

235

<< 40 USCA § 612 >>

(1) by striking "(xi)" and inserting in lieu thereof "(xii)"; and

(2) by striking "and (x)" and inserting in lieu thereof "(x) telecommuting centers and (xi)".

SEC. 408. Notwithstanding any other provision of law, the Administrator of General Services is authorized and directed to acquire the land bounded by S.W. First Avenue, S.W. Second Avenue, S.W. Main Street, and S.W. Madison Street, Portland, Oregon, for the purposes of constructing the proposed Law Enforcement Center on the site.

SEC. 409. Section 2815 of Public Law 103–160, relating to the conveyance of real property at the Iowa Army Ammunition Plant, is amended—

(1) in subsection (a), by striking "may convey to" and inserting "shall convey, without reimbursement and if requested by,"; and

(2) by striking subsection (b) and inserting the following new subsection:

"(b) USE OF WATER AND SEWER LINES.—As part of the conveyance under subsection (a), the Secretary shall permit the City to use existing water and sewer lines and sewage system at the Iowa Army Ammunition Plant for a three-year period beginning on the date of the conveyance.".

SEC. 410. (a) CONVEYANCE OF LAND.—

(1) ADMINISTRATOR OF GENERAL SERVICES.—Subject to subsections (b) and (c), the Administrator of General Services (hereinafter in this section referred to as the "Administrator") shall convey, without compensation, to a nonprofit organization known as the "Beaver County Corporation for Economic Development" all right, title, and interest of the United States in and to those pieces or parcels of land in Hopewell Township, Pennsylvania, described in subsection (b), together with all improvements thereon and appurtenances thereto. The purpose of the conveyance is to provide a site for economic development in Hopewell Township.

(2) PROPERTY DESCRIPTION.—The land referred to in paragraph (1) is the parcel of land in the township of Hopewell, county of Beaver, Pennsylvania, bounded and described as follows:

(A) Beginning at the southwest corner at a point common to Lot No. 1, same plan, lands now or formerly of Frank and Catherine Wutter, and the easterly right-of-way line of Pennsylvania Legislative Route No. 60 (Beaver Valley Expressway); thence proceeding by the easterly right-of-way of Pennsylvania Legislative Route No. 60 by the following three courses and distances:

(i) North 17 degrees, 14 minutes, 20 seconds West, 213.10 feet to a point.

(ii) North 72 degrees, 45 minutes, 40 seconds East, 30.00 feet to a point.

(iii) North 17 degrees, 14 minutes, 20 seconds West, 252.91 feet to a point; on a line dividing Lot No. 1 from the other part of Lot No. 1, said part now called Lot No. 5, same plan; thence by last mentioned dividing line, North 78 degrees, 00 minutes, 00 seconds East; 135.58 feet to a point, a cul-de-sac on Industrial Drive; thence by said cul-de-sac and the southerly side of Industrial Drive by the following courses and distances:

(I) By a curve to the right having a radius of 100.00 feet for an arc distance of 243.401 feet to a point.

(II) Thence by a curve to the right having a radius of 100.00 feet for an arc distance of 86.321 feet to a point.

(III) Thence by 78 degrees, 00 minutes, 00 seconds East, 777.78 feet to a point.

(IV) Thence, North 12 degrees, 00 minutes, 00 seconds West, 74.71 feet to a point.

(V) Thence by a curve to the right, having a radius of 50.00 feet for an arc distance of 78.54 feet to a point.

(VI) Thence North 78 degrees, 00 minutes, 00 seconds East, 81.24 feet to a point.

(VII) Thence by a curve to the right, having a radius of 415.00 feet for an arc distance of 140.64 feet to a point.

(VIII) Thence, South 82 degrees, 35 minutes, 01 second East, 125.00 feet to a point.

(IX) Thence, South 7 degrees, 24 minutes, 59 seconds West, 5.00 feet to a point.

(X) Thence by a curve to the right, having a radius of 320.00 feet for an arc distance of 256.85 feet to a point.

(XI) Thence by a curve to the right having a radius of 50.00 feet for an arc distance of 44.18 feet to a point on the northerly side of Airport Road.

(B) Thence by the northerly side thereof by the following:

(i) South 14 degrees, 01 minutes, 54 seconds, West, 56.94 feet to a point.

(ii) Thence by a curve to the right having a radius of 225.00 feet for an arc distance of 207.989 feet to a point.

(iii) Thence South 66 degrees, 59 minutes, 45 seconds West, 192.08 feet to a point on the southern boundary of Lot No. 1, which line is also the line dividing Lot No. 1 from lands now or formerly, of Frank and Catherine Wutter.

(C) Thence by the same, South 75 degrees, 01 minutes, 00 seconds West, 1,351.23 feet to a point at the place of beginning.

(3) DATE OF CONVEYANCE.—The date of the conveyance of property required under paragraph (1) shall be not later than the 90th day following the date of the enactment of this Act.

(4) CONVEYANCE TERMS.—

(A) TERMS AND CONDITIONS.—The conveyance of property required under paragraph (1) shall be subject to such terms and conditions as may be determined by the Administrator to be necessary to safeguard the interests of the United States. Such terms and conditions shall be consistent with the terms and conditions set forth in this section.

(B) QUITCLAIM DEED.—The conveyance of property required under paragraph (1) shall be by quitclaim deed.

(b) LIMITATION ON CONVEYANCE.—No part of any land conveyed under subsection (a) may be used, during the 30–year period beginning on the date of conveyance for any purpose other than economic development.

(c) REVERSIONARY INTEREST.—

(1) IN GENERAL.—The property conveyed under subsection (a) shall revert to the United States on any date in the 30–year period beginning on the date of such conveyance on which the property is used for a purpose other than economic development.

(2) ENFORCING REVERSION.—The Administrator shall perform all acts necessary to enforce any reversion of property to the United States under this subsection.

(3) INVENTORY OF PUBLIC BUILDINGS SERVICE.—Property that reverts to the United States under this subsection shall be under the control of the General Services Administration.

SEC. 411. Notwithstanding any other provision of law, the land contained in block 111 in the Federal District, Denver, Colorado, obtained pursuant to paragraphs (6) and (7) of section 12 of Public Law 94–204 (43 U.S.C. 1611 note) shall not be subject to condemnation by any agency or instrumentality of the Federal Government, without the consent of the owner of that land.

## JOHN F. KENNEDY ASSASSINATION RECORDS REVIEW BOARD

For necessary expenses to carry out the John F. Kennedy Assassination Records Collection Act of 1992, $2,150,000.

## MERIT SYSTEMS PROTECTION BOARD

### SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses to carry out functions of the Merit Systems Protection Board pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and direct procurement of survey printing, $23,923,000, together with not to exceed $2,430,000 for administrative expenses to adjudicate retirement appeals to be transferred from the Civil Service Retirement and Disability Fund in amounts determined by the Merit Systems Protection Board.

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### OPERATING EXPENSES

For necessary expenses in connection with the administration of the National Archives (including the Information Security Oversight Office) and records and related activities, as provided by law, and for expenses necessary for the review and declassification of documents, and for the hire of passenger motor vehicles, $196,963,000: Provided, That the Archivist of the United States is authorized to use any excess funds available from the amount borrowed for construction of the National Archives facility, for expenses necessary to move into the facility.

### ARCHIVES FACILITIES AND PRESIDENTIAL LIBRARIES

### REPAIRS AND RESTORATION

For the repair, alteration, and improvement of archives facilities and presidential libraries, and to provide adequate storage for holdings, $16,229,000 to remain available until expended.

## NATIONAL HISTORICAL PUBLICATIONS AND RECORDS COMMISSION

### GRANTS PROGRAM

For necessary expenses for allocations and grants for historical publications and records as authorized by 44 U.S.C. 2504, as amended, $5,000,000 to remain available until expended.

## OFFICE OF GOVERNMENT ETHICS

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Government Ethics pursuant to the Ethics in Government Act of 1978, as amended by Public Law 100–598, and the Ethics Reform Act of 1989, Public Law 101–194, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and not to exceed $1,500 for official reception and representation expenses; $8,078,000.

## OFFICE OF PERSONNEL MANAGEMENT

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses to carry out functions of the Office of Personnel Management pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109; medical examinations performed for veterans by private physicians on a fee basis; rental of conference rooms in the District of Columbia and elsewhere; hire of passenger motor vehicles; not to exceed $2,500 for official reception and representation expenses; advances for reimbursements to applicable funds of the Office of Personnel Management and the Federal Bureau of Investigation for expenses incurred under Executive Order 10422 of January 9, 1953, as amended; and payment of per diem and/or subsistence allowances to employees where Voting Rights Act activities require an employee to remain overnight at his or her post of duty; $87,076,000, of which not to exceed $1,000,000 shall be available for the establishment of health promotion and disease prevention programs for Federal employees; and in addition $94,736,000 for administrative expenses, to be transferred from the appropriate trust funds of the Office of Personnel Management without regard to other statutes, including direct procurement of printing materials for annuitants, for the retirement and insurance programs, of which $3,500,000 shall be transferred at such times as the Office of Personnel Management deems appropriate, and shall remain available until expended for the costs of automating the retirement recordkeeping systems, together with remaining amounts authorized in previous Acts for the recordkeeping systems: Provided, That the provisions of this appropriation shall not affect the authority to use applicable trust funds as provided by section 8348(a)(1)(B) of title 5, United States Code: Provided further, That, except as may be consistent with 5 U.S.C. 8902a(f)(1) and (i), no payment may be made from the Employees Health Benefits Fund to any physician, hospital, or other provider of health care services or supplies who is, at the time such services or supplies are provided to an individual covered under chapter 89 of title 5, United States Code, excluded, pursuant to section 1128 or 1128A of the Social Security Act (42 U.S.C. 1320a–7–1320a–7a), from participation in any program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.): Provided further, That no part of this appropriation shall be available for salaries and expenses of the Legal Examining Unit of the Office of Personnel Management established pursuant to Executive Order 9358 of July 1, 1943, or any successor unit of like purpose: Provided further, That the President's Commission on White House Fellows, established by Executive Order 11183 of October 3, 1964, may, during the fiscal year ending September 30, 1997, accept donations of money, property, and personal services in connection with the development of a publicity brochure to provide information about the White House Fellows, except that no such donations shall be accepted for travel or reimbursement of travel expenses, or for the salaries of employees of such Commission.

## GENERAL PROVISIONS—OFFICE OF PERSONNEL

## MANAGEMENT

<< 5 USCA § 1304 >>

SEC. 421. The first sentence of section 1304(e)(1) of title 5, United States Code, is amended by inserting after "basis" the following ", including personnel management services performed at the request of individual agencies (which would otherwise be the responsibility of such agencies), or at the request of nonappropriated fund instrumentalities".

<< 5 USCA § 8906 >>

SEC. 422. Paragraph (1) of section 8906(e) of title 5, United States Code, is amended—
 (1) by striking the last sentence of that paragraph and redesignating the remainder of that paragraph as (1)(A);
 (2) by adding at the end of paragraph (1)(A) (as so designated) the following:
  "(B) During each pay period in which an enrollment continues under subparagraph (A)—
   "(i) employee and Government contributions required by this section shall be paid on a current basis; and
   "(ii) if necessary, the head of the employing agency shall approve advance payment, recoverable in the same manner as under section 5524a(c), of a portion of basic pay sufficient to pay current employee contributions.
  "(C) Each agency shall establish procedures for accepting direct payments of employee contributions for the purposes of this paragraph.".

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF TRUST FUNDS)

 For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act, as amended, including services as authorized by 5 U.S.C. 3109, hire of passenger motor vehicles, $960,000; and in addition, not to exceed $8,645,000 for administrative expenses to audit the Office of Personnel Management's retirement and insurance programs, to be transferred from the appropriate trust funds of the Office of Personnel Management, as determined by the Inspector General: Provided, That the Inspector General is authorized to rent conference rooms in the District of Columbia and elsewhere.

GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEES HEALTH BENEFITS

 For payment of Government contributions with respect to retired employees, as authorized by chapter 89 of title 5, United States Code, and the Retired Federal Employees Health Benefits Act (74 Stat. 849), as amended, such sums as may be necessary.

GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEE LIFE INSURANCE

 For payment of Government contributions with respect to employees retiring after December 31, 1989, as required by chapter 87 of title 5, United States Code, such sums as may be necessary.

PAYMENT TO CIVIL SERVICE RETIREMENT AND DISABILITY FUND

<< 33 USCA § 776 >>

 For financing the unfunded liability of new and increased annuity benefits becoming effective on or after October 20, 1969, as authorized by 5 U.S.C. 8348, and annuities under special Acts to be credited to the Civil Service Retirement and Disability Fund, such sums as may be necessary: Provided, That annuities authorized by the Act of May 29, 1944, as amended, and the Act of August 19, 1950, as amended (33 U.S.C. 771–75), may hereafter be paid out of the Civil Service Retirement and Disability Fund.

OFFICE OF SPECIAL COUNSEL

SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Special Counsel pursuant to Reorganization Plan Numbered 2 of 1978, the Civil Service Reform Act of 1978 (Public Law 95–454), the Whistleblower Protection Act of 1989 (Public Law 101–

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

12), Public Law 103–424, and the Uniformed Services Employment and Reemployment Act of 1994 (Public Law 103–353), including services as authorized by 5 U.S.C. 3109, payment of fees and expenses for witnesses, rental of conference rooms in the District of Columbia and elsewhere, and hire of passenger motor vehicles; $8,116,000.

### UNITED STATES TAX COURT

### SALARIES AND EXPENSES

<< 26 USCA § 7443 NOTE >>

For necessary expenses, including contract reporting and other services as authorized by 5 U.S.C. 3109, $33,781,000: Provided, That travel expenses of the judges shall be paid upon the written certificate of the judge.

This title may be cited as the "Independent Agencies Appropriations Act, 1997".

### TITLE V—GENERAL PROVISIONS

### THIS ACT

SECTION 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

<< 31 USCA § 5131 >>

SEC. 503. Section 5131 of title 31, United States Code, is amended—

(1) by striking subsection (c); and

(2) by redesignating subsection (d) as subsection (c).

SEC. 504. None of the funds made available by this Act shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would prohibit the enforcement of section 307 of the Tariff Act of 1930.

SEC. 505. None of the funds made available by this Act shall be available for the purpose of transferring control over the Federal Law Enforcement Training Center located at Glynco, Georgia, and Artesia, New Mexico, out of the Treasury Department.

SEC. 506. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

SEC. 507. No part of any appropriation contained in this Act shall be available for the payment of the salary of any officer or employee of the United States Postal Service, who—

(1) prohibits or prevents, or attempts or threatens to prohibit or prevent, any officer or employee of the United States Postal Service from having any direct oral or written communication or contact with any Member or committee of Congress in connection with any matter pertaining to the employment of such officer or employee or pertaining to the United States Postal Service in any way, irrespective of whether such communication or contact is at the initiative of such officer or employee or in response to the request or inquiry of such Member or committee; or

(2) removes, suspends from duty without pay, demotes, reduces in rank, seniority, status, pay, or performance of efficiency rating, denies promotion to, relocates, reassigns, transfers, disciplines, or discriminates in regard to any employment right, entitlement, or benefit, or any term or condition of employment of, any officer or employee of the United States Postal Service, or attempts or threatens to commit any of the foregoing actions with respect to such officer or employee, by reason of any communication or contact of such officer or employee with any Member or committee of Congress as described in paragraph (1).

SEC. 508. The Office of Personnel Management may, during the fiscal year ending September 30, 1997, accept donations of supplies, services, land, and equipment for the Federal Executive Institute and Management Development Centers to assist in enhancing the quality of Federal management.

<< 18 USCA § 3056 NOTE >>

SEC. 509. The United States Secret Service may, during the fiscal year ending September 30, 1997, and hereafter, accept donations of money to off-set costs incurred while protecting former Presidents and spouses of former Presidents when the former President or spouse travels for the purpose of making an appearance or speech for a payment of money or any thing of value.

SEC. 510. No part of any appropriation contained in this Act shall be available to pay the salary for any person filling a position, other than a temporary position, formerly held by an employee who has left to enter the Armed Forces of the United States and has satisfactorily completed his period of active military or naval service and has within 90 days after his release from such service or from hospitalization continuing after discharge for a period of not more than 1 year made application for restoration to his former position and has been certified by the Office of Personnel Management as still qualified to perform the duties of his former position and has not been restored thereto.

SEC. 511. None of the funds made available in this Act may be used to provide any non-public information such as mailing or telephone lists to any person or any organization outside of the Federal Government without the approval of the House and Senate Committees on Appropriations.

SEC. 512. No funds appropriated pursuant to this Act may be expended by an entity unless the entity agrees that in expending the assistance the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c, popularly known as the "Buy American Act").

SEC. 513. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or products that may be authorized to be purchased with financial assistance provided under this Act, it is the sense of the Congress that entities receiving such assistance should, in expending the assistance, purchase only American-made equipment and products.

(b) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance under this Act, the Secretary of the Treasury shall provide to each recipient of the assistance a notice describing the statement made in subsection (a) by the Congress.

SEC. 514. If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, such person shall be ineligible to receive any contract or subcontract made with funds provided pursuant to this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 515. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 1997 from appropriations made available for salaries and expenses for fiscal year 1997 in this Act, shall remain available through September 30, 1998, for each such account for the purposes authorized: Provided, That a request shall be submitted to the House and Senate Committees on Appropriations for approval prior to the expenditure of such funds.

SEC. 516. Where appropriations in this Act are expendable for travel expenses of employees and no specific limitation has been placed thereon, the expenditures for such travel expenses may not exceed the amount set forth in the budget estimates submitted for appropriations without the advance approval of the House and Senate Committees on Appropriations: Provided, That this section shall not apply to travel performed by uncompensated officials of local boards and appeal boards in the Selective Service System; to travel performed directly in connection with care and treatment of medical beneficiaries of the Department of Veterans Affairs; to travel of the Office of Personnel Management in carrying out its observation responsibilities of the Voting Rights Act; or to payments to interagency motor pools separately set forth in the budget schedules: Provided further, That this provision does not apply to accounts that do not contain an object identification for travel.

<< 31 USCA § 5141 NOTE >>

SEC. 517. Notwithstanding any other provision of law or regulation during the fiscal year ending September 30, 1997, and thereafter:

(1) The authority of the special police officers of the Bureau of Engraving and Printing, in the Washington, DC Metropolitan area, extends to buildings and land under the custody and control of the Bureau; to buildings and land acquired by or for the Bureau through lease, unless otherwise provided by the acquisition agency; to the streets, sidewalks and open areas immediately adjacent to the Bureau along Wallenberg Place (15th Street) and 14th Street between Independence and Maine Avenues and C and D Streets between 12th and 14th Streets; to areas which include surrounding parking facilities used by Bureau employees, including the lots at 12th and C Streets, SW, Maine Avenue and Water Streets, SW, Maiden Lane, the Tidal Basin and East Potomac Park; to the protection in transit of United States securities, plates and dies used in the production of United States securities, or other products or implements of the Bureau of Engraving and Printing which the Director of that agency so designates.

<< 31 USCA §§ 5131 nt, 5141 NOTE >>

(2) The authority of the special police officers of the United States Mint extends to the buildings and land under the custody and control of the Mint; to the streets, sidewalks and open areas in the vicinity to such facilities; to surrounding parking facilities used by Mint employees; and to the protection in transit of bullion, coins, dies, and other property and assets of, or in the custody of, the Mint.

(3) The exercise of police authority by Bureau or Mint officers, with the exception of the exercise of authority upon property under the custody and control of the Bureau or the Mint, respectively, shall be deemed supplementary to the Federal police force with primary jurisdictional responsibility. This authority shall be in addition to any other law enforcement authority which has been provided to these officers under other provisions of law or regulations.

SEC. 518. No funds appropriated by this Act shall be available to pay for an abortion, or the administrative expenses in connection with any health plan under the Federal employees health benefit program which provides any benefits or coverage for abortions.

SEC. 519. The provision of section 518 shall not apply where the life of the mother would be endangered if the fetus were carried to term, or the pregnancy is the result of an act of rape or incest.

SEC. 520. No part of any appropriation made available in this Act shall be used to implement Bureau of Alcohol, Tobacco and Firearms Ruling TD ATF–360; Re: Notice Nos. 782, 780, 91F009P.

SEC. 521. Notwithstanding title 5, United States Code, Personal Service Contractors (PSC) employed by the Department of the Treasury shall be considered as Federal Government employees for purposes of making available Federal employee health and life insurance.

<< 31 USCA § 5131 >>

SEC. 522. Section 5131 of title 31, United States Code, is amended by striking subsection (c); and by redesignating subsection (d) as subsection (c).

<< 31 USCA § 5112 >>

<< 31 USCA 5112 NOTE >>

SEC. 523. Section 5112(i)(4) of title 31, United States Code, is amended by adding at the end the following new subparagraph:

"(C) The Secretary may continue to mint and issue coins in accordance with the specifications contained in paragraphs (7), (8), (9), and (10) of subsection (a) and paragraph (1)(A) of this subsection at the same time the Secretary in minting and issuing other bullion and proof gold coins under this subsection in accordance with such program procedures and coin specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, in the Secretary's discretion, may prescribe from time to time.": Provided, That profits generated from the sale of gold to the United States Mint for this program shall be considered as a receipt to be deposited into the General Fund of the Treasury.

<< 31 USCA § 5112 >>

<< 31 USCA § 5112 NOTE >>

SEC. 524. Section 5112 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(k) The Secretary may mint and issue bullion and proof platinum coins in accordance with such specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, in the Secretary's discretion, may prescribe from time to time.": Provided, That the Secretary is authorized to use Government platinum reserves stockpiled at the United States Mint as working inventory and shall ensure that reserves utilized are replaced by the Mint.

SEC. 526. (a) REIMBURSEMENT OF CERTAIN ATTORNEY FEES AND COSTS.—

(1) IN GENERAL.—The Secretary of the Treasury shall pay from amounts appropriated in title I of this Act under the heading, "Departmental Offices, Salaries and Expenses", up to $500,000 to reimburse former employees of the White House Travel Office whose employment in that Office was terminated on May 19, 1993, for any attorney fees and costs they incurred with respect to that termination.

(2) VERIFICATION REQUIRED.—The Secretary shall pay an individual in full under paragraph (1) upon submission by the individual of documentation verifying the attorney fees and costs.

(3) NO INFERENCE OF LIABILITY.—Liability of the United States shall not be inferred from enactment of or payment under this subsection.

(b) LIMITATION ON FILING OF CLAIMS.—The Secretary of the Treasury shall not pay any claim filed under this section that is filed later than 120 days after the date of the enactment of this Act.

(c) LIMITATION.—Payments under subsection (a) shall not include attorney fees or costs incurred with respect to any Congressional hearing or investigation into the termination of employment of the former employees of the White House Travel Office.

(d) REDUCTION.—The amount paid pursuant to this section to an individual for attorney fees and costs described in subsection (a) shall be reduced by any amount received before the date of the enactment of this Act, without obligation for repayment by the individual, for payment of such attorney fees and costs (including any amount received from the funds appropriated for the individual in the matter relating to the "Office of the General Counsel" under the heading "Office of the Secretary" in title I of the Department of Transportation and Related Agencies Appropriations Act, 1994).

(e) PAYMENT IN FULL SETTLEMENT OF CLAIMS AGAINST THE UNITED STATES.—Payment under this section, when accepted by an individual described in subsection (a), shall be in full satisfaction of all claims of, or on behalf of, the individual against the United States that arose out of the termination of the White House Travel Office employment of that individual on May 19, 1993.

SEC. 527. None of the funds made available in this Act may be used by the Executive Office of the President to request from the Federal Bureau of Investigation any official background investigation report on any individual, except when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such individual has given his or her express written consent for such request not more than 6 months prior to the date of such request and during the same presidential administration; or

(2) such request is required due to extraordinary circumstances involving national security.

SEC. 528. (a) CLOSING OF ALLEY.—The alley bisecting the property on which a facility is being constructed for use by the United States Government at 930 H Street, N.W., Washington, District of Columbia, is closed to the public, without regard to any contingencies.

(b) JURISDICTION.—The Administrator of General Services shall have administrative jurisdiction over, and shall hold title on behalf of the United States in, the alley, property, and facility referred to in subsection (a).

SEC. 529. (a) COMMEMORATIVE COIN PROGRAM RESTRICTIONS.—Section 5112 of title 31, United States Code, as amended by sections 524 and 530 of this Act, is amended by adding at the end the following new subsection:

<< 31 USCA § 5112 >>

"(m) COMMEMORATIVE COIN PROGRAM RESTRICTIONS.—

"(1) MAXIMUM NUMBER.—Beginning January 1, 1999, the Secretary may mint and issue commemorative coins under this section during any calendar year with respect to not more than 2 commemorative coin programs.

"(2) MINTAGE LEVELS.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), in carrying out any commemorative coin program, the Secretary shall mint—

"(i) not more than 750,000 clad half-dollar coins;

"(ii) not more than 500,000 silver one-dollar coins; and

"(iii) not more than 100,000 gold five-dollar or ten-dollar coins.

"(B) EXCEPTION.—If the Secretary determines, based on independent, market-based research conducted by a designated recipient organization of a commemorative coin program, that the mintage levels described in subparagraph (A) are not adequate to meet public demand for that commemorative coin, the Secretary may waive one or more of the requirements of subparagraph (A) with respect to that commemorative coin program.

"(C) DESIGNATED RECIPIENT ORGANIZATION DEFINED.—For purposes of this paragraph, the term 'designated recipient organization' means any organization designated, under any provision of law, as the recipient of any surcharge imposed on the sale of any numismatic item.".

(b) RECOVERY OF MINT EXPENSES REQUIRED BEFORE PAYMENT OF SURCHARGES TO ANY RECIPIENT ORGANIZATION.—

<< 31 USCA § 5134 >>

(1) CLARIFICATION OF LAW RELATING TO DEPOSIT OF SURCHARGES IN THE NUMISMATIC PUBLIC ENTERPRISE FUND.—Section 5134(c)(2) of title 31, United States Code, is amended by inserting ", including amounts attributable to any surcharge imposed with respect to the sale of any numismatic item" before the period.

(2) CONDITIONS ON PAYMENT OF SURCHARGES TO RECIPIENT ORGANIZATIONS.—Section 5134 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(f) CONDITIONS ON PAYMENT OF SURCHARGES TO RECIPIENT ORGANIZATIONS.—

"(1) PAYMENT OF SURCHARGES.—Notwithstanding any other provision of law, no amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall be paid from the fund to any designated recipient organization unless—

"(A) all numismatic operation and program costs allocable to the program under which such numismatic item is produced and sold have been recovered; and

"(B) the designated recipient organization submits an audited financial statement that demonstrates to the satisfaction of the Secretary of the Treasury that, with respect to all projects or purposes for which the proceeds of such surcharge may be used, the organization has raised funds from private sources for such projects and purposes in an amount that is equal to or greater than the maximum amount the organization may receive from the proceeds of such surcharge.

"(2) ANNUAL AUDITS.—

"(A) ANNUAL AUDITS OF RECIPIENTS REQUIRED.—Each designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall provide, as a condition for receiving any such amount, for an annual audit, in accordance with generally accepted government auditing standards by an independent public accountant selected by the organization, of all such payments to the organization beginning in the first fiscal year of the organization in which any such amount is received and continuing until all amounts received by such organization from the fund with respect to such surcharges are fully expended or placed in trust.

"(B) MINIMUM REQUIREMENTS FOR ANNUAL AUDITS.—At a minimum, each audit of a designated recipient organization pursuant to subparagraph (A) shall report—

"(i) the amount of payments received by the designated recipient organization from the fund during the fiscal year of the organization for which the audit is conducted that are derived from the proceeds of any surcharge imposed on the sale of any numismatic item;

"(ii) the amount expended by the designated recipient organization from the proceeds of such surcharges during the fiscal year of the organization for which the audit is conducted; and

"(iii) whether all expenditures by the designated recipient organization during the fiscal year of the organization for which the audit is conducted from the proceeds of such surcharges were for authorized purposes.

"(C) RESPONSIBILITY OF ORGANIZATION TO ACCOUNT FOR EXPENDITURES OF SURCHARGES.—Each designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall take appropriate steps, as a condition for receiving any such payment, to ensure that the receipt of the payment and the expenditure of the proceeds of such surcharge by the organization in each fiscal year of the organization can be accounted for separately from all other revenues and expenditures of the organization.

"(D) SUBMISSION OF AUDIT REPORT.—Not later than 90 days after the end of any fiscal year of a designated recipient organization for which an audit is required under subparagraph (A), the organization shall—

"(i) submit a copy of the report to the Secretary of the Treasury; and

"(ii) make a copy of the report available to the public.

"(E) USE OF SURCHARGES FOR AUDITS.—Any designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item may use the amount received to pay the cost of an audit required under subparagraph (A).

"(F) WAIVER OF PARAGRAPH.—The Secretary of the Treasury may waive the application of any subparagraph of this paragraph to any designated recipient organization for any fiscal year after taking into account the amount of surcharges that such organization received or expended during such year.

"(G) NONAPPLICABILITY TO FEDERAL ENTITIES.—This paragraph shall not apply to any Federal agency or department or any independent establishment in the executive branch that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item.

"(H) AVAILABILITY OF BOOKS AND RECORDS.—An organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall provide, as a condition for receiving any such payment, to the Inspector General of the Department of the Treasury or the Comptroller General of the United States, upon the request of such Inspector General or the Comptroller General, all books, records, and work papers belonging to or used by the organization, or by any independent public accountant who audited the organization in accordance with subparagraph (A), which may relate to the receipt or expenditure of any such amount by the organization.

"(3) USE OF AGENTS OR ATTORNEYS TO INFLUENCE COMMEMORATIVE COIN LEGISLATION.—No portion of any payment from the fund to any designated recipient organization of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item may be used, directly or indirectly, by the organization to compensate any agent or attorney for services rendered to support or influence in any way legislative action of the Congress relating to such numismatic item.

"(4) DESIGNATED RECIPIENT ORGANIZATION DEFINED.—For purposes of this subsection, the term 'designated recipient organization' means any organization designated, under any provision of law, as the recipient of any surcharge imposed on the sale of any numismatic item.".

<< 31 USCA § 5134 NOTE >>

(3) SCOPE OF APPLICATION.—The amendments made by this section shall apply with respect to the proceeds of any surcharge imposed on the sale of any numismatic item that are deposited in the Numismatic Public Enterprise Fund after the date of the enactment of this Act.

<< 31 USCA § 5112 NOTE >>

(4) REPEAL OF EXISTING RECIPIENT REPORT REQUIREMENT.—Section 303 of Public Law 103–186 (31 U.S.C. 5112 note) is repealed.

<< 31 USCA § 5134 >>

(c) QUARTERLY FINANCIAL REPORTS.—Section 5134 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(g) QUARTERLY FINANCIAL REPORTS.—

AR.01519

"(1) IN GENERAL.—Not later than the 30th day of each month following each calendar quarter through and including the final period of sales with respect to any commemorative coin program authorized on or after the date of enactment of the Treasury, Postal Service, and General Government Appropriations Act, 1997, the Mint shall submit to the Congress a quarterly financial report in accordance with this subsection.

"(2) REQUIREMENTS.—Each report submitted under paragraph (1) shall include, with respect to the calendar quarter at issue—

"(A) a detailed financial statement, prepared in accordance with generally accepted accounting principles, that includes financial information specific to that quarter, as well as cumulative financial information relating to the entire program;

"(B) a detailed accounting of—

"(i) all costs relating to marketing efforts;

"(ii) all funds projected for marketing use;

"(iii) all costs for employee travel relating to the promotion of commemorative coin programs;

"(iv) all numismatic items minted, sold, not sold, and rejected during the production process; and

"(v) the costs of melting down all rejected and unsold products;

"(C) adequate market-based research for all commemorative coin programs; and

"(D) a description of the efforts of the Mint in keeping the sale price of numismatic items as low as practicable.".

<< 31 USCA § 5135 >>

(d) CITIZENS COMMEMORATIVE COIN ADVISORY COMMITTEE.—

(1) FIXED TERMS FOR MEMBERS.—Section 5135(a)(4) of title 31, United States Code, is amended to read as follows:

"(4) TERMS.—Each member appointed under clause (i) or (iii) of paragraph (3)(A) shall be appointed for a term of 4 years.".

(2) CHAIRPERSON.—Section 5135(a) of title 31, United States Code, is amended by adding at the end the following new paragraph:

"(7) CHAIRPERSON.—

"(A) IN GENERAL.—Subject to subparagraph (B), the Chairperson of the Advisory Committee shall be elected by the members of the Advisory Committee from among such members.

"(B) EXCEPTION.—The member appointed pursuant to paragraph (3)(A)(ii) (or the alternate to that member) may not serve as the Chairperson of the Advisory Committee, beginning on June 1, 1999.".

<< 31 USCA §§ 5112 NOTE, 5134 nt, 5135 nt >>

(e) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date of enactment of this Act.

## TITLE VI—GENERAL PROVISIONS

### DEPARTMENTS, AGENCIES, AND CORPORATIONS

SECTION 601. Funds appropriated in this or any other Act may be used to pay travel to the United States for the immediate family of employees serving abroad in cases of death or life threatening illness of said employee.

SEC. 602. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1997 shall obligate or expend any such funds, unless such department, agency, or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from the illegal use, possession, or distribution of controlled substances (as defined in the Controlled Substances Act) by the officers and employees of such department, agency, or instrumentality.

SEC. 603. Notwithstanding 31 U.S.C. 1345, any agency, department or instrumentality of the United States which provides or proposes to provide child care services for Federal employees may reimburse any Federal employee or any person employed to provide such services for travel, transportation, and subsistence expenses incurred for training classes, conferences or other meetings in connection with the provision of such services: Provided, That any per diem allowance made pursuant to this section shall not exceed the rate specified in regulations prescribed pursuant to section 5707 of title 5, United States Code.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 31 USCA § 1343 NOTE >>

SEC. 604. Unless otherwise specifically provided, the maximum amount allowable during the current fiscal year in accordance with section 16 of the Act of August 2, 1946 (60 Stat. 810), for the purchase of any passenger motor vehicle (exclusive of buses, ambulances, law enforcement, and undercover surveillance vehicles), is hereby fixed at $8,100 except station wagons for which the maximum shall be $9,100: Provided, That these limits may be exceeded by not to exceed $3,700 for police-type vehicles, and by not to exceed $4,000 for special heavy-duty vehicles: Provided further, That the limits set forth in this section may not be exceeded by more than 5 percent for electric or hybrid vehicles purchased for demonstration under the provisions of the Electric and Hybrid Vehicle Research, Development, and Demonstration Act of 1976: Provided further, That the limits set forth in this section may be exceeded by the incremental cost of clean alternative fuels vehicles acquired pursuant to Public Law 101–549 over the cost of comparable conventionally fueled vehicles.

SEC. 605. Appropriations of the executive departments and independent establishments for the current fiscal year available for expenses of travel or for the expenses of the activity concerned, are hereby made available for quarters allowances and cost-of-living allowances, in accordance with 5 U.S.C. 5922–24.

<< 5 USCA § 3101 NOTE >>

SEC. 606. Unless otherwise specified during the current fiscal year, no part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States (including any agency the majority of the stock of which is owned by the Government of the United States) whose post of duty is in the continental United States unless such person (1) is a citizen of the United States, (2) is a person in the service of the United States on the date of enactment of this Act who, being eligible for citizenship, has filed a declaration of intention to become a citizen of the United States prior to such date and is actually residing in the United States, (3) is a person who owes allegiance to the United States, (4) is an alien from Cuba, Poland, South Vietnam, the countries of the former Soviet Union, or the Baltic countries lawfully admitted to the United States for permanent residence, (5) is a South Vietnamese, Cambodian, or Laotian refugee paroled in the United States after January 1, 1975, or (6) is a national of the People's Republic of China who qualifies for adjustment of status pursuant to the Chinese Student Protection Act of 1992: Provided, That for the purpose of this section, an affidavit signed by any such person shall be considered prima facie evidence that the requirements of this section with respect to his or her status have been complied with: Provided further, That any person making a false affidavit shall be guilty of a felony, and, upon conviction, shall be fined no more than $4,000 or imprisoned for not more than 1 year, or both: Provided further, That the above penal clause shall be in addition to, and not in substitution for, any other provisions of existing law: Provided further, That any payment made to any officer or employee contrary to the provisions of this section shall be recoverable in action by the Federal Government. This section shall not apply to citizens of Ireland, Israel, or the Republic of the Philippines, or to nationals of those countries allied with the United States in the current defense effort, or to international broadcasters employed by the United States Information Agency, or to temporary employment of translators, or to temporary employment in the field service (not to exceed 60 days) as a result of emergencies.

SEC. 607. Appropriations available to any department or agency during the current fiscal year for necessary expenses, including maintenance or operating expenses, shall also be available for payment to the General Services Administration for charges for space and services and those expenses of renovation and alteration of buildings and facilities which constitute public improvements performed in accordance with the Public Buildings Act of 1959 (73 Stat. 749), the Public Buildings Amendments of 1972 (87 Stat. 216), or other applicable law.

SEC. 608. In addition to funds provided in this or any other Act, all Federal agencies are authorized to receive and use funds resulting from the sale of materials, including Federal records disposed of pursuant to a records schedule recovered through recycling or waste prevention programs. Such funds shall be available until expended for the following purposes:

(1) Acquisition, waste reduction and prevention, and recycling programs as described in Executive Order 12873 (October 20, 1993), including any such programs adopted prior to the effective date of the Executive Order.

(2) Other Federal agency environmental management programs, including, but not limited to, the development and implementation of hazardous waste management and pollution prevention programs.

(3) Other employee programs as authorized by law or as deemed appropriate by the head of the Federal agency.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 609. Funds made available by this or any other Act for administrative expenses in the current fiscal year of the corporations and agencies subject to chapter 91 of title 31, United States Code, shall be available, in addition to objects for which such funds are otherwise available, for rent in the District of Columbia; services in accordance with 5 U.S.C. 3109; and the objects specified under this head, all the provisions of which shall be applicable to the expenditure of such funds unless otherwise specified in the Act by which they are made available: Provided, That in the event any functions budgeted as administrative expenses are subsequently transferred to or paid from other funds, the limitations on administrative expenses shall be correspondingly reduced.

SEC. 610. No part of any appropriation for the current fiscal year contained in this or any other Act shall be paid to any person for the filling of any position for which he or she has been nominated after the Senate has voted not to approve the nomination of said person.

<< 40 USCA § 486a >>

SEC. 611. For the fiscal year ending September 30, 1997, and thereafter, any department or agency to which the Administrator of General Services has delegated the authority to operate, maintain or repair any building or facility pursuant to section 205(d) of the Federal Property and Administrative Services Act of 1949, as amended, shall retain that portion of the GSA rental payment available for operation, maintenance or repair of the building or facility, as determined by the Administrator, and expend such funds directly for the operation, maintenance or repair of the building or facility. Any funds retained under this section shall remain available until expended for such purposes.

SEC. 612. (a) IN GENERAL.—Section 1306 of title 31, United States Code, is amended to read as follows:

<< 31 USCA § 1306 >>

"§ 1306. Use of foreign credits

"(a) IN GENERAL.—Foreign credits (including currencies) owed to or owned by the United States may be used by any agency for any purpose for which appropriations are made for the agency for the current fiscal year (including the carrying out of Acts requiring or authorizing the use of such credits), but only when reimbursement therefor is made to the Treasury from applicable appropriations of the agency.

"(b) EXCEPTION TO REIMBURSEMENT REQUIREMENT.—Credits described in subsection (a) that are received as exchanged allowances, or as the proceeds of the sale of personal property, may be used in whole or partial payment for the acquisition of similar items, to the extent and in the manner authorized by law, without reimbursement to the Treasury.".

<< 31 USCA § 1306 NOTE >>

(b) APPLICABILITY.—The amendment made by this section shall take effect on the date of the enactment of this Act and shall apply thereafter.

SEC. 613. No part of any appropriation contained in this or any other Act shall be available for interagency financing of boards (except Federal Executive Boards), commissions, councils, committees, or similar groups (whether or not they are interagency entities) which do not have a prior and specific statutory approval to receive financial support from more than one agency or instrumentality.

SEC. 614. Funds made available by this or any other Act to the "Postal Service Fund" (39 U.S.C. 2003) shall be available for employment of guards for all buildings and areas owned or occupied by the Postal Service and under the charge and control of the Postal Service, and such guards shall have, with respect to such property, the powers of special policemen provided by the first section of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318), and, as to property owned or occupied by the Postal Service, the Postmaster General may take the same actions as the Administrator of General Services may take under the provisions of sections 2 and 3 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318a, 318b), attaching thereto penal consequences under the authority and within the limits provided in section 4 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318c).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 615. None of the funds made available pursuant to the provisions of this Act shall be used to implement, administer, or enforce any regulation which has been disapproved pursuant to a resolution of disapproval duly adopted in accordance with the applicable law of the United States.

<< 5 USCA § 5343 NOTE >>

SEC. 616. (a) Notwithstanding any other provision of law, and except as otherwise provided in this section, no part of any of the funds appropriated for the fiscal year ending on September 30, 1997, by this or any other Act, may be used to pay any prevailing rate employee described in section 5342(a)(2)(A) of title 5, United States Code—

(1) during the period from the date of expiration of the limitation imposed by section 616 of the Treasury, Postal Service and General Government Appropriations Act, 1996, until the normal effective date of the applicable wage survey adjustment that is to take effect in fiscal year 1997, in an amount that exceeds the rate payable for the applicable grade and step of the applicable wage schedule in accordance with such section 616; and

(2) during the period consisting of the remainder of fiscal year 1997, in an amount that exceeds, as a result of a wage survey adjustment, the rate payable under paragraph (1) by more than the sum of—

(A) the percentage adjustment taking effect in fiscal year 1997 under section 5303 of title 5, United States Code, in the rates of pay under the General Schedule; and

(B) the difference between the overall average percentage of the locality-based comparability payments taking effect in fiscal year 1997 under section 5304 of such title (whether by adjustment or otherwise), and the overall average percentage of such payments which was effective in fiscal year 1996 under such section.

(b) Notwithstanding any other provision of law, no prevailing rate employee described in subparagraph (B) or (C) of section 5342(a)(2) of title 5, United States Code, and no employee covered by section 5348 of such title, may be paid during the periods for which subsection (a) is in effect at a rate that exceeds the rates that would be payable under subsection (a) were subsection (a) applicable to such employee.

(c) For the purposes of this section, the rates payable to an employee who is covered by this section and who is paid from a schedule not in existence on September 30, 1996, shall be determined under regulations prescribed by the Office of Personnel Management.

(d) Notwithstanding any other provision of law, rates of premium pay for employees subject to this section may not be changed from the rates in effect on September 30, 1996, except to the extent determined by the Office of Personnel Management to be consistent with the purpose of this section.

(e) This section shall apply with respect to pay for service performed after September 30, 1996.

(f) For the purpose of administering any provision of law (including section 8431 of title 5, United States Code, and any rule or regulation that provides premium pay, retirement, life insurance, or any other employee benefit) that requires any deduction or contribution, or that imposes any requirement or limitation on the basis of a rate of salary or basic pay, the rate of salary or basic pay payable after the application of this section shall be treated as the rate of salary or basic pay.

(g) Nothing in this section shall be considered to permit or require the payment to any employee covered by this section at a rate in excess of the rate that would be payable were this section not in effect.

(h) The Office of Personnel Management may provide for exceptions to the limitations imposed by this section if the Office determines that such exceptions are necessary to ensure the recruitment or retention of qualified employees.

SEC. 617. During the period in which the head of any department or agency, or any other officer or civilian employee of the Government appointed by the President of the United States, holds office, no funds may be obligated or expended in excess of $5,000 to furnish or redecorate the office of such department head, agency head, officer or employee, or to purchase furniture or make improvements for any such office, unless advance notice of such furnishing or redecoration is expressly approved by the Committees on Appropriations of the House and Senate. For the purposes of this section, the word "office" shall include the entire suite of offices assigned to the individual, as well as any other space used primarily by the individual or the use of which is directly controlled by the individual.

SEC. 618. Notwithstanding any other provision of law, no executive branch agency shall purchase, construct, and/or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the House and Senate Committees on Appropriations.

SEC. 619. Notwithstanding section 1346 of title 31, United States Code, or section 613 of this Act, funds made available for fiscal year 1997 by this or any other Act shall be available for the interagency funding of national security and emergency preparedness telecommunications initiatives which benefit multiple Federal departments, agencies, or entities, as provided by Executive Order Numbered 12472 (April 3, 1984).

SEC. 620. (a) None of the funds appropriated by this or any other Act may be obligated or expended by any Federal department, agency, or other instrumentality for the salaries or expenses of any employee appointed to a position of a confidential or policy-determining character excepted from the competitive service pursuant to section 3302 of title 5, United States Code, without a certification to the Office of Personnel Management from the head of the Federal department, agency, or other instrumentality employing the Schedule C appointee that the Schedule C position was not created solely or primarily in order to detail the employee to the White House.

(b) The provisions of this section shall not apply to Federal employees or members of the armed services detailed to or from—

(1) the Central Intelligence Agency;

(2) the National Security Agency;

(3) the Defense Intelligence Agency;

(4) the offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs;

(5) the Bureau of Intelligence and Research of the Department of State;

(6) any agency, office, or unit of the Army, Navy, Air Force, and Marine Corps, the Federal Bureau of Investigation and the Drug Enforcement Administration of the Department of Justice, the Department of Transportation, the Department of the Treasury, and the Department of Energy performing intelligence functions; and

(7) the Director of Central Intelligence.

SEC. 621. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1997 shall obligate or expend any such funds, unless such department, agency or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from discrimination and sexual harassment and that all of its workplaces are not in violation of title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the Rehabilitation Act of 1973.

SEC. 622. No part of any appropriation contained in this Act may be used to pay for the expenses of travel of employees, including employees of the Executive Office of the President, not directly responsible for the discharge of official governmental tasks and duties: *Provided,* That this restriction shall not apply to the family of the President, Members of Congress or their spouses, Heads of State of a foreign country or their designees, persons providing assistance to the President for official purposes, or other individuals so designated by the President.

<< 5 USCA § 7301 NOTE >>

SEC. 623. Notwithstanding any provision of law, the President, or his designee, must certify to Congress, annually, that no person or persons with direct or indirect responsibility for administering the Executive Office of the President's Drug–Free Workplace Plan are themselves subject to a program of individual random drug testing.

SEC. 624. (a) None of the funds made available in this Act or any other Act may be obligated or expended for any employee training when it is made known to the Federal official having authority to obligate or expend such funds that such employee training—

(1) does not meet identified needs for knowledge, skills, and abilities bearing directly upon the performance of official duties;

(2) contains elements likely to induce high levels of emotional response or psychological stress in some participants;

(3) does not require prior employee notification of the content and methods to be used in the training and written end of course evaluation;

(4) contains any methods or content associated with religious or quasi-religious belief systems or "new age" belief systems as defined in Equal Employment Opportunity Commission Notice N–915.022, dated September 2, 1988;

(5) is offensive to, or designed to change, participants' personal values or lifestyle outside the workplace; or

(6) includes content related to human immunodeficiency virus/acquired immune deficiency syndrome (HIV/AIDS) other than that necessary to make employees more aware of the medical ramifications of HIV/AIDS and the workplace rights of HIV-positive employees.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) Nothing in this section shall prohibit, restrict, or otherwise preclude an agency from conducting training bearing directly upon the performance of official duties.

SEC. 625. No funds appropriated in this or any other Act for fiscal year 1997 may be used to implement or enforce the agreements in Standard Forms 312 and 4355 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These restrictions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by Executive Order 12356; section 7211 of title 5, United States Code (governing disclosures to Congress); section 1034 of title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that could expose confidential Government agents); and the statutes which protect against disclosure that may compromise the national security, including sections 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. section 783(b)). The definitions, requirements, obligations, rights, sanctions, and liabilities created by said Executive Order and listed statutes are incorporated into this agreement and are controlling.": *Provided,* That notwithstanding the preceding paragraph, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress or to an authorized official of an executive agency or the Department of Justice that are essential to reporting a substantial violation of law.

SEC. 626. (a) None of the funds appropriated by this or any other Act may be expended by any Federal Agency to procure any product or service subject to section 5124 of Public Law 104–106 and that will be available under the procurement by the Administrator of General Services known as "FTS2000" unless—

(1) such product or service is procured by the Administrator of General Services as part of the procurement known as "FTS2000"; or

(2) that agency establishes to the satisfaction of the Administrator of General Services that—

(A) that agency's requirements for such procurement are unique and cannot be satisfied by property and service procured by the Administrator of General Services as part of the procurement known as "FTS2000"; and

(B) the agency procurement, pursuant to such delegation, would be cost-effective and would not adversely affect the cost-effectiveness of the FTS2000 procurement.

(b) After December 31, 1998, subsection (a) shall apply only if the Administrator of General Services has reported that the FTS2000 procurement is producing prices that allow the Government to satisfy its requirements for such procurement in the most cost-effective manner.

<< 31 USCA § 501 NOTE >>

SEC. 627. Subsection (f) of section 403 of Public Law 103–356 is amended by deleting "October 1, 1999" and inserting "October 1, 2001".

SEC. 628. (a) IN GENERAL.—Notwithstanding any other provision of law, none of the funds made available by this Act for the Department of the Treasury shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would permit the Secretary of the Treasury to make any loan or extension of credit under section 5302 of title 31, United States Code, with respect to a single foreign entity or government of a foreign country (including agencies or other entities of that government)—

(1) with respect to a loan or extension of credit for more than 60 days, unless the President certifies to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Banking and Financial Services of the House of Representatives that—

(A) there is no projected cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the United States from the proposed loan or extension of credit; and

AR.01525

(B) any proposed obligation or expenditure of United States funds to or on behalf of the foreign government is adequately backed by an assured source of repayment to ensure that all United States funds will be repaid; and

(2) other than as provided by an Act of Congress, if that loan or extension of credit would result in expenditures and obligations, including contingent obligations, aggregating more than $1,000,000,000 with respect to that foreign country for more than 180 days during the 12–month period beginning on the date on which the first such action is taken.

(b) WAIVER OF LIMITATIONS.—The President may exceed the dollar and time limitations in subsection (a)(2) if he certifies in writing to the Congress that a financial crisis in that foreign country poses a threat to vital United States economic interests or to the stability of the international financial system.

(c) EXPEDITED PROCEDURES FOR A RESOLUTION OF DISAPPROVAL.—A presidential certification pursuant to subsection (b) shall not take effect, if the Congress, within 30 calendar days after receiving such certification, enacts a joint resolution of disapproval, as described in paragraph (5) of this subsection.

(1) REFERENCE TO COMMITTEES.—All joint resolutions introduced in the Senate to disapprove the certification shall be referred to the Committee on Banking, Housing, and Urban Affairs, and in the House of Representatives, to the appropriate committees.

(2) DISCHARGE OF COMMITTEES.—(A) If the committee of either House to which a resolution has been referred has not reported it at the end of 15 days after its introduction, it is in order to move either to discharge the committee from further consideration of the joint resolution or to discharge the committee from further consideration of any other resolution introduced with respect to the same matter, except no motion to discharge shall be in order after the committee has reported a joint resolution with respect to the same matter.

(B) A motion to discharge may be made only by an individual favoring the resolution, and is privileged in the Senate; and debate thereon shall be limited to not more than 1 hour, the time to be divided in the Senate equally between, and controlled by, the majority leader and the minority leader or their designees.

(3) FLOOR CONSIDERATION IN THE SENATE.—(A) A motion in the Senate to proceed to the consideration of a resolution shall be privileged.

(B) Debate in the Senate on a resolution, and all debatable motions and appeals in connection therewith, shall be limited to not more than 4 hours, to be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

(C) Debate in the Senate on any debatable motion or appeal in connection with a resolution shall be limited to not more than 20 minutes, to be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto, shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(D) A motion in the Senate to further limit debate on a resolution, debatable motion, or appeal is not debatable. No amendment to, or motion to recommit, a resolution is in order in the Senate.

(4) In the case of a resolution, if prior to the passage by one House of a resolution of that House, that House receives a resolution with respect to the same matter from the other House, then—

(A) the procedure in that House shall be the same as if no resolution had been received from the other House; but

(B) the vote on final passage shall be on the resolution of the other House.

(5) For purposes of this subsection, the term "joint resolution" means only a joint resolution of the 2 Houses of Congress, the matter after the resolving clause of which is as follows: "That the Congress disapproves the action of the President under section 628(c) of the Treasury, Postal Service, and General Government Appropriations Act, 1997, notice of which was submitted to the Congress on _____.", with the blank space being filled with the appropriate date.

(d) APPLICABILITY.—This section—

(1) shall not apply to any action taken as part of the program of assistance to Mexico announced by the President on January 31, 1995; and

(2) shall remain in effect through fiscal year 1997.

<< 5 USCA § 8401 NOTE >>

AR.01526

SEC. 629. (a) TECHNICAL AMENDMENT.—Section 640 of Public Law 104–52 (109 Stat. 513) is amended by striking "Service performed" and inserting "Hereafter, service performed".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in Public Law 104–52 on the date of its enactment.

SEC. 630. Notwithstanding any other provision of law, no part of any appropriation contained in this Act for any fiscal year shall be available for paying Sunday premium or differential pay to any employee unless such employee actually performed work during the time corresponding to such premium or differential pay.

SEC. 631. No part of any funds appropriated in this or any other Act shall be used by an agency of the executive branch, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, and for the preparation, distribution or use of any kit, pamphlet, booklet, publication, radio, television or film presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself.

SEC. 632. (a) The United States Courthouse under construction at 1030 Southwest 3d Avenue in Portland, Oregon, shall be known and designated as the "Mark O. Hatfield United States Courthouse".

(b) Any reference in a law, map, regulation, document, paper, or other record of the United States to the courthouse referred to in section 901 shall be deemed to be a reference to the "Mark O. Hatfield United States Courthouse".

(c) This section shall take effect on January 2, 1997.

SEC. 633. SURVIVOR ANNUITY RESUMPTION UPON TERMINATION OF MARRIAGE.—(a) AMENDMENTS.—

<< 5 USCA § 8341 >>

(1) CIVIL SERVICE RETIREMENT SYSTEM.—Section 8341(e) of title 5, United States Code, is amended by adding at the end the following:

"(4) If the annuity of a child under this subchapter terminates under paragraph (3)(E) because of marriage, then, if such marriage ends, such annuity shall resume on the first day of the month in which it ends, but only if—

"(A) any lump sum paid is returned to the Fund; and

"(B) that individual is not otherwise ineligible for such annuity.".

<< 5 USCA § 8443 >>

(2) FEDERAL EMPLOYEES' RETIREMENT SYSTEM.—Section 8443(b) of such title is amended by adding at the end the following: "If the annuity of a child under this subchapter terminates under subparagraph (E) because of marriage, then, if such marriage ends, such annuity shall resume on the first day of the month in which it ends, but only if any lump sum paid is returned to the Fund, and that individual is not otherwise ineligible for such annuity.".

<< 5 USCA § 8908 >>

(3) FEDERAL EMPLOYEES HEALTH BENEFITS.—Section 8908 of title 5, United States Code, is amended by adding at the end of the following new subsection:

"(d) A surviving child whose survivor annuity under section 8341(e) or 8443(b) was terminated and is later restored under paragraph (4) of section 8341(e) or the last sentence of section 8443(b) may, under regulations prescribed by the Office, enroll in a health benefits plan described by section 8903 or 8903a if such surviving child was covered by any such plan immediately before such annuity was terminated.".

<< 5 USCA § 8341 NOTE >>

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to any termination of marriage taking effect before, on, or after the date of enactment of this Act, except that benefits shall be payable only with respect to amounts accruing for periods beginning on the first day of the month beginning after the later of such termination of marriage or such date of enactment.

<< 5 USCA § 6302 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 1551 of 3864

SEC. 634. AVAILABILITY OF ANNUAL LEAVE FOR EMPLOYEES AFFECTED BY REDUCTION IN FORCE.—Section 6302 of title 5, United States Code, is amended by adding at the end of the following new subsection:

"(g) An employee who is being involuntarily separated from an agency due to a reduction in force or transfer of function under subchapter I of chapter 35 may elect to use annual leave to the employee's credit to remain on the agency's rolls after the date the employee would otherwise have been separated if, and only to the extent that, such additional time in a pay status will enable the employee to qualify for an immediate annuity under section 8336, 8412, 8414, or to qualify to carry health benefits coverage into retirement under section 8905(b).".

<< 18 USCA § 207 >>

SEC. 635. Section 207(e)(6)(B) of title 18, United States Code, is amended by striking "level V of the Executive Schedule" and inserting "level 5 of the Senior Executive Service".

<< 5 USCA Ch. 59 NOTE >>

SEC. 636. REIMBURSEMENTS RELATING TO PROFESSIONAL LIABILITY INSURANCE.—(a) AUTHORITY.—Notwithstanding any other provision of law, amounts appropriated by this Act (or any other Act for fiscal year 1997 or any fiscal year thereafter) for salaries and expenses may be used to reimburse any qualified employee for not to exceed one-half the costs incurred by such employee for professional liability insurance. A payment under this section shall be contingent upon the submission of such information or documentation as the employing agency may require.

(b) QUALIFIED EMPLOYEE.—For purposes of this section, the term "qualified employee" means an agency employee whose position is that of—

　(1) a law enforcement officer; or

　(2) a supervisor or management official.

(c) DEFINITIONS.—For purposes of this section—

　(1) the term "agency" means an Executive agency, as defined by section 105 of title 5, United States Code, and any agency of the Legislative Branch of Government including any office or committee of the Senate or the House of Representatives;

　(2) the term "law enforcement officer" means an employee, the duties of whose position are primarily the investigation, apprehension, prosecution, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including any law enforcement officer under section 8331(20) or 8401(17) of such title 5, or under section 4823 of title 22, United States Code;

　(3) the terms "supervisor" and "management official" have the respective meanings given them by section 7103(a) of such title 5, and

　(4) the term "professional liability insurance" means insurance which provides coverage for—

　(A) legal liability for damages due to injuries to other persons, damage to their property, or other damage or loss to such other persons (including the expenses of litigation and settlement) resulting from or arising out of any tortious act, error, or omission of the covered individual (whether common law, statutory, or constitutional) while in the performance of such individual's official duties as a qualified employee; and

　(B) the cost of legal representation for the covered individual in connection with any administrative or judicial proceeding (including any investigation or disciplinary proceeding) relating to any act, error, or omission of the covered individual while in the performance of such individual's official duties as a qualified employee, and other legal costs and fees relating to any such administrative or judicial proceeding.

(d) APPLICABILITY.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply thereafter.

<< 5 USCA § 5303 NOTE >>

SEC. 637. For purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989 (5 U.S.C. 5318 note), no adjustment under section 5303 of title 5, United States Code, shall be considered to have taken effect in fiscal year 1997 in the rates of basic pay for the statutory pay systems.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.01528   254

Case 3:20-cv-07721-SL    Document 58-3    Filed 11/10/20    Page 1552 of 3864

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

SEC. 638. For FY 1997, the Secretary of the Treasury is authorized to use funds made available to the FSLIC Resolution Fund under P.L. 103–327, not to exceed $26.1 million, to reimburse the Department of Justice for the reasonable expenses of litigation that are incurred in the defense of claims against the U.S. arising from FIRREA and its implementation.

SEC. 639. Section 608 of Public Law 104–52 is amended in the first sentence by inserting before the period, ", including Federal records disposed of pursuant to a records schedule".

<< 40 USCA § 1411 NOTE >>

SEC. 640. In reviewing and analyzing the contracting out, outsourcing or privatization of business and administrative functions, and in implementing 40 U.S.C. sections 1413 and 1423, and other provisions, in title LI of the National Defense Authorization Act for fiscal year 1996 (the Information Technology Management Reform Act)—

(1) the Director of the Office of Management and Budget and the heads of the executive agencies may have studies, analyses, reviews and other management assistance performed by the private sector;

(2) the reviews, analyses, and studies called for by 40 U.S.C. section 1413(b)(2)(B) and (C) shall be completed and reported to the Agency Head within 180 days, or less measured from when a study analysis or review is initiated unless the Agency Head determines additional time is needed;

(3) in accordance with principles and rules governing organizational conflicts of interest, persons involved in a particular study may not compete for any work that is to be or is outsourced as a result of that study; and

(4) this section will apply with respect to studies occurring on or after the date of enactment of this subsection and completed before September 1, 1999 and the Comptroller General of the United States shall review and provide an assessment of this program by January 1, 1999.

<< 5 USCA § 5509 NOTE >>

SEC. 641. (a) SECTION 1—AUTHORIZATION OF APPROPRIATIONS.—Section 8(a)(1) of the Whistleblower Protection Act of 1989 (5 U.S.C. 5509 note, Public Law 101–12, April 10, 1989, 103 Stat. 34, as amended Public Law 103–424, Section 1, October 29, 1994, 108 Stat. 4361), is amended by striking the words: "1993, 1994, 1995, 1996, and 1997," and inserting in lieu thereof "1998, 1999, 2000, 2001, and 2002".

(b) SECTION 2—EFFECTIVE DATE.—This Act shall take effect on October 1, 1998.

<< 5 USCA § 5509 NOTE >>

SEC. 642. (a) SECTION 1.—AUTHORIZATION OF APPROPRIATIONS.—Section 8(a)(1) of the Whistleblower Protection Act of 1989 (5 U.S.C. 5509 note; Public Law 103–424; 103 Stat. 34) is amended by striking out: "1993, 1994, 1995, 1996, and 1997," and inserting in lieu thereof "1998, 1999, 2000, 2001, and 2002".

(b) SECTION 2—EFFECTIVE DATE.—This Act shall take effect on October 1, 1998.

<< 26 USCA § 7801 NOTE >>

SEC. 643. MODIFICATIONS OF NATIONAL COMMISSION ON RESTRUCTURING THE INTERNAL REVENUE SERVICE.—(a) QUORUM.—Paragraph (4) of section 637(b) of the Treasury, Postal Service, and General Government Appropriations Act, 1996 (Public Law 104–52, 109 Stat. 510) is amended by striking "Seven" and inserting "Nine".

(b) CO–CHAIRS.—

(1) IN GENERAL.—Paragraph (3) of section 637(b) of such Act is amended—

(A) by striking "a Chairman" and inserting "Co–Chairs", and

(B) by striking "Chairman" in the heading and inserting "Co–Chairs".

(2) CONFORMING AMENDMENTS.—(A) Paragraph (5)(B) of section 637(b) of such Act is amended by striking "a Chairman" and inserting "Co–Chairs".

(B) Subsections (b)(4), (d)(1)(B), (d)(3), and (e)(1) of section 637 of such Act are each amended by striking "Chairman" each place it appears and inserting "Co–Chairs".

(c) GIFTS.—Section 637(d) of such Act is amended by adding at the end the following new paragraph:

"(6) GIFTS.—The Commission may accept, use, and dispose of gifts or donations of services or property in carrying out its duties under this section."

(d) TRAVEL EXPENSES.—Section 637(f)(2) of such Act is amended by striking "shall" and inserting "may".

(e) TIME FOR FILING REPORT.—

(1) IN GENERAL.—Paragraph (1) of section 637(g) of such Act is amended by striking "one year" and inserting "15 months".

(2) CONFORMING AMENDMENT.—Subparagraph (A) of section 637(c)(1) of such Act is amended by striking "one year" and inserting "15 months".

(f) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the provisions of the Treasury, Postal Service, and General Government Appropriations Act, 1996.

<< 39 USCA § 202 >>

SEC. 644. (a) IN GENERAL.—Section 202(a) of title 39, United States Code, is amended by striking "$10,000 a year" and inserting "$30,000 a year".

<< 39 USCA § 202 NOTE >>

(b) EFFECTIVE DATE.—Subsection (a) shall take effect at the beginning of the next applicable pay period beginning after the date of the enactment of this Act.

SEC. 645. (a) IN GENERAL.—No later than September 30, 1997, the Director of the Office of Management and Budget shall submit to the Congress a report that provides—

(1) estimates of the total annual costs and benefits of Federal regulatory programs, including quantitative and nonquantitative measures of regulatory costs and benefits;

(2) estimates of the costs and benefits (including quantitative and nonquantitative measures) of each rule that is likely to have a gross annual effect on the economy of $100,000,000 or more in increased costs;

(3) an assessment of the direct and indirect impacts of Federal rules on the private sector, State and local government, and the Federal Government; and

(4) recommendations from the Director and a description of significant public comments to reform or eliminate any Federal regulatory program or program element that is inefficient, ineffective, or is not a sound use of the Nation's resources.

(b) NOTICE.—The Director shall provide public notice and an opportunity to comment on the report under subsection (a) before the report is issued in final form.

<< 31 USCA § 501 NOTE >>

SEC. 646. Subsection (b) of section 404 of Public Law 103–356 is amended by deleting "September 30, 1997" and inserting "December 31, 1999".

SEC. 647. (a) Notwithstanding any other provision of law, the Secretary shall, on behalf of the United States, transfer to the University of Miami, without charge, title to the real property and improvements that as of the date of the enactment of this Act constitute the Federal facility known as the Perrine Primate Center, subject to the condition that, during the 10–year period beginning on the date of the transfer—

(1) the University will provide for the continued use of the real property and improvements as an animal research facility, including primates, and such use will be the exclusive use of the property (with such incidental exceptions as the Secretary may approve); or

(2) the real property and improvements will be used for research-related purposes other than the purpose specified in paragraph (1) (or for both of such purposes), if the Secretary and the University enter into an agreement accordingly.

(b) The conveyance under subsection (a) shall not become effective unless the conveyance specifies that, if the University of Miami engages in a material breach of the conditions specified in such subsection, title to the real property and improvements involved reverts to the United States at the election of the Secretary.

(c) The real property referred to in subsections (a) and (b) is located in the county of Dade in the State of Florida, and is a parcel consisting of the northernmost 30 acre-parcel of the area. The exact acreage and legal description used for purposes of the transfer under subsection (a) shall be in accordance with a survey that is satisfactory to the Secretary.

(d) For the purposes of this section—

(1) the term "Secretary" means the Secretary of Health and Human Services; and

(2) the term "University of Miami" means the University of Miami located in the State of Florida.

<< 18 USCA §§ 474, 474A >>

SEC. 648. (a) INCREASED PENALTIES FOR COUNTERFEITING VIOLATIONS.—Sections 474 and 474A of title 18, United States Code, are amended by striking "class C felony" each place that term appears and inserting "class B felony".

(b) CRIMINAL PENALTY FOR PRODUCTION, SALE, TRANSPORTATION, POSSESSION OF FICTITIOUS FINANCIAL INSTRUMENTS PURPORTING TO BE THOSE OF THE STATES, OF POLITICAL SUBDIVISIONS, AND OF PRIVATE ORGANIZATIONS.—

<< 18 USCA § 514 >>

(1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by inserting after section 513, the following new section:

"§ 514. Fictitious obligations

"(a) Whoever, with the intent to defraud—

"(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;

"(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or

"(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

"(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c).

"(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section."

<< 18 USCA Ch. 25 >>

(2) TECHNICAL AMENDMENT.—The analysis for chapter 25 of title 18, United States Code, is amended by inserting after the item relating to section 513 the following:

"514. Fictitious obligations.".

<< 18 USCA § 474 NOTE >>

(c) PERIOD OF EFFECT.—This section and the amendments made by this section shall become effective on the date of enactment of this Act and shall remain in effect during each fiscal year following that date of enactment.

SEC. 649. None of the funds appropriated by this Act may be used by an agency to provide a Federal employee's home address to any labor organization except when it is made known to the Federal official having authority to obligate or expend such funds that the employee has authorized such disclosure or that such disclosure has been ordered by a court of competent jurisdiction.

SEC. 650. (a) No later than 45 days after the date of the enactment of this Act, the Inspector General of each Federal department or agency that uses administratively uncontrollable overtime in the pay of any employee shall—

(1) conduct an audit on the use of administratively uncontrollable overtime by employees of such department or agency, which shall include—

(A) an examination of the policies, extent, costs, and other relevant aspects of the use of administratively uncontrollable overtime at the department or agency; and

(B) a determination of whether the eligibility criteria of the department or agency and payment of administratively uncontrollable overtime comply with Federal statutory and regulatory requirements; and

(2) submit a report of the findings and conclusions of such audit to—

(A) the Office of Personnel Management;

(B) the Governmental Affairs Committee of the Senate; and

(C) the Government Reform and Oversight Committee of the House of Representatives.

(b) No later than 30 days after the submission of the report under subsection (a), the Office of Personnel Management shall issue revised guidelines to all Federal departments and agencies that—

(1) limit the use of administratively uncontrollable overtime to employees meeting the statutory intent of section 5545(c)(2) of title 5, United States Code; and

(2) expressly prohibit the use of administratively uncontrollable overtime for—

(A) customary or routine work duties; and

(B) work duties that are primarily administrative in nature, or occur in noncompelling circumstances.

<< 5 USCA § 8133 NOTE >>

SEC. 651. Notwithstanding section 8116 of title 5, United States Code, and in addition to any payment made under 5 U.S.C. 8101 et seq., beginning in fiscal year 1997 and thereafter, the head of any department or agency is authorized to pay from appropriations made available to the department or agency a death gratuity to the personal representative (as that term is defined by applicable law) of a civilian employee of that department or agency whose death resulted from an injury sustained in the line of duty on or after August 2, 1990: Provided, That payments made pursuant to this section, in combination with the payments made pursuant to sections 8133(f) and 8134(a) of such title 5 and section 312 of Public Law 103–332 (108 Stat. 2537), may not exceed a total of $10,000 per employee.

<< 18 USCA § 846 NOTE >>

SEC. 653. (a) AUTHORIZATION.—

The Secretary of the Treasury is authorized to establish scientific certification standards for explosives detection canines, and shall provide, on a reimbursable basis, for the certification of explosives detection canines employed by Federal agencies, or other persons providing explosives detection services at airports in the United States.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out the purposes of this section.

SEC. 654. NATIONAL REPOSITORY FOR INFORMATION ON EXPLOSIVES INCIDENTS AND ARSON.

<< 18 USCA § 846 >>

(a) Section 846 of title 18, United States Code, is amended by—

(1) designating the existing section as subsection (a); and

(2) by adding the following new subsection (b) to read as follows:

"(b) The Secretary is authorized to establish a national repository of information on incidents involving arson and the suspected criminal misuse of explosives. All Federal agencies having information concerning such incidents shall report the information to the Secretary pursuant to such regulations as deemed necessary to carry out the provisions of this subsection. The repository shall also contain information on incidents voluntarily reported to the Secretary by State and local authorities."

<< 18 USCA § 846 NOTE >>

(b) There is authorized to be appropriated such sums as may be necessary to carry out the provisions of this subsection.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 20 USCA § 5603 >>

SEC. 655. Section 5(c)(1) of Public Law 102–259 (20 U.S.C. 5603(c)(1)) is amended—

(1) in subparagraph (A)(iii), by striking "and" after the semicolon;

(2) in subparagraph (B), by striking the period and inserting "; and"; and

(3) by adding after subparagraph (B) the following:

"(C) a Trustee may serve after the expiration of the Trustee's term until a successor has been chosen.".

SEC. 656. Notwithstanding any other provision of law, the Secretary of the Interior, through the Bureau of Indian Affairs, may directly transfer to Indian tribes in North and South Dakota portable housing units at the Grand Forks Air Force base in North Dakota which have been declared excess by the Department of Defense and requested for transfer by the Department of the Interior.

<< 18 USCA § 922 >>

SEC. 657. Section 922(q) of title 18, United States Code, is amended to read as follows:

"(q)(1) The Congress finds and declares that—

"(A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

"(B) crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

"(C) firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the House of Representatives and the Committee on the Judiciary of the Senate;

"(D) in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

"(E) while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

"(F) the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

"(G) this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

"(H) States, localities, and school systems find it almost impossible to handle gun-related crime by themselves—even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

"(I) the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

"(2)(A) It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

"(B) Subparagraph (A) does not apply to the possession of a firearm—

"(i) on private property not part of school grounds;

"(ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

"(iii) that is—

"(I) not loaded; and

"(II) in a locked container, or a locked firearms rack that is on a motor vehicle;

"(iv) by an individual for use in a program approved by a school in the school zone;

"(v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

"(vi) by a law enforcement officer acting in his or her official capacity; or

AR.01533

"(vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

"(3)(A) Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

"(B) Subparagraph (A) does not apply to the discharge of a firearm—

"(i) on private property not part of school grounds;

"(ii) as part of a program approved by a school in the school zone, by an individual who is participating in the program;

"(iii) by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

"(iv) by a law enforcement officer acting in his or her official capacity.

"(4) Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.".

SEC. 658. GUN BAN FOR INDIVIDUALS CONVICTED OF A MISDEMEANOR CRIME OF DOMESTIC VIOLENCE.

<< 18 USCA § 921 >>

(a) DEFINITION.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following:

"(33)(A) Except as provided in subparagraph (C), the term 'misdemeanor crime of domestic violence' means an offense that—

"(i) is a misdemeanor under Federal or State law; and

"(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim

"(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless—

"(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

"(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

"(aa) the case was tried by a jury, or

"(bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

"(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.".

<< 18 USCA § 922 >>

(b) PROHIBITIONS.—

(1) Section 922(d) of such title is amended—

(A) by striking "or" at the end of paragraph (7);

(B) by striking the period at the end of paragraph (8) and inserting "; or"; and

(C) by inserting after paragraph (8) the following:

"(9) has been convicted in any court of a misdemeanor crime of domestic violence.".

(2) Section 922(g) of such title is amended—

(A) by striking "or" at the end of paragraph (7);

(B) by striking the comma at the end of paragraph (8) and inserting "; or"; and

(C) by inserting after paragraph (8) the following:

"(9) who has been convicted in any court of a misdemeanor crime of domestic violence,".

(3) Section 922(s)(3)(B)(i) of such title is amended by inserting ", and has not been convicted in any court of a misdemeanor crime of domestic violence" before this semicolon.

<< 18 USCA § 925 >>

(c) GOVERNMENT ENTITIES NOT EXCEPTED.—Section 925(a)(1) of such title is amended by inserting "sections 922(d)(9) and 922(g)(9) and" after "except for".

SEC. 659. THRIFT SAVINGS PLAN.

TITLE I—ADDITIONAL INVESTMENT FUNDS FOR THE THRIFT SAVINGS PLAN

<< 5 USCA § 8401 NOTE >>

SEC. 101. SHORT TITLE

This title may be cited as the "Thrift Savings Investment Funds Act of 1996".

<< 5 USCA § 8438 >>

SEC. 102. ADDITIONAL INVESTMENT FUNDS FOR THE THRIFT SAVINGS PLAN

Section 8438 of title 5, United States Code, is amended—
 (1) in subsection (a)—
 (A) by redesignating paragraphs (5) through (8) as paragraphs (6) through (9), respectively;
 (B) by inserting after paragraph (4) the following new paragraph:
 "(5) the term 'International Stock Index Investment Fund' means the International Stock Index Investment Fund established under subsection (b)(1)(E);";
 (C) in paragraph (8) (as redesignated by subparagraph (A) of this paragraph) by striking out "and" at the end thereof;
 (D) in paragraph (9) (as redesignated by subparagraph (A) of this paragraph)—
  (i) by striking out "paragraph (7)(D)" in each place it appears and inserting in each such place "paragraph (8)(D)"; and
  (ii) by striking out the period and inserting in lieu thereof a semicolon and "and"; and
 (E) by adding at the end thereof the following new paragraph:
 "(10) the term 'Small Capitalization Stock Index Investment Fund' means the Small Capitalization Stock Index Investment Fund established under subsection (b)(1)(D)."; and
 (2) in subsection (b)—
 (A) in paragraph (1)—
  (i) in subparagraph (B) by striking out "and" at the end thereof;
  (ii) in subparagraph (C) by striking out the period and inserting in lieu thereof a semicolon; and
  (iii) by adding at the end thereof the following new subparagraphs:
 "(D) a Small Capitalization Stock Index Investment Fund as provided in paragraph (3); and
 "(E) an International Stock Index Investment Fund as provided in paragraph (4)."; and
 (B) by adding at the end thereof the following new paragraphs:
 "(3)(A) The Board shall select an index which is a commonly recognized index comprised of common stock the aggregate market value of which represents the United States equity markets excluding the common stocks included in the Common Stock Index Investment Fund.
 "(B) The Small Capitalization Stock Index Investment Fund shall be invested in a portfolio designed to replicate the performance of the index in subparagraph (A). The portfolio shall be designed such that, to the extent practicable, the percentage of the Small Capitalization Stock Index Investment Fund that is invested in each stock is the same as the percentage determined by dividing the aggregate market value of all shares of that stock by the aggregate market value of all shares of all stocks included in such index.

AR.01535

"(4)(A) The Board shall select an index which is a commonly recognized index comprised of stock the aggregate market value of which is a reasonably complete representation of the international equity markets excluding the United States equity markets.

"(B) The International Stock Index Investment Fund shall be invested in a portfolio designed to replicate the performance of the index in subparagraph (A). The portfolio shall be designed such that, to the extent practicable, the percentage of the International Stock Index Investment Fund that is invested in each stock is the same as the percentage determined by dividing the aggregate market value of all shares of that stock by the aggregate market value of all shares of all stocks included in such index.".

<< 5 USCA § 8439 >>

## SEC. 103. ACKNOWLEDGEMENT OF INVESTMENT RISK

Section 8439(d) of title 5, United States Code, is amended by striking out "Each employee, Member, former employee, or former Member who elects to invest in the Common Stock Index Investment Fund or the Fixed Income Investment Fund described in paragraphs (1) and (3)," and inserting in lieu thereof "Each employee, Member, former employee, or former Member who elects to invest in the Common Stock Index Investment Fund, the Fixed Income Investment Fund, the International Stock Index Investment Fund, or the Small Capitalization Stock Index Investment Fund, defined in paragraphs (1), (3), (5), and (10),".

<< 5 USCA § 8438 NOTE >>

## SEC. 104. EFFECTIVE DATE

This title shall take effect on the date of enactment of this Act, and the Funds established under this title shall be offered for investment at the earliest practicable election period (described in section 8432(b) of title 5, United States Code) as determined by the Executive Director in regulations.

## TITLE II—THRIFT SAVINGS ACCOUNTS LIQUIDITY

<< 5 USCA § 8401 NOTE >>

## SEC. 201. SHORT TITLE

This title may be cited as the "Thrift Savings Plan Act of 1996".

<< 5 USCA § 8351 >>

## SEC. 202. NOTICE TO SPOUSES FOR IN–SERVICE WITHDRAWALS; DE MINIMUS ACCOUNTS; CIVIL SERVICE RETIREMENT SYSTEM PARTICIPANTS

Section 8351(b) of title 5, United States Code, is amended—

(1) in paragraph (5)—

(A) in subparagraph (B)—

(i) by striking out "An election, change of election, or modification (relating to the commencement date of a deferred annuity)" and inserting in lieu thereof "An election or change of election";

(ii) by inserting "or withdrawal" after "and a loan";

(iii) by inserting "and (h)" after "8433(g)";

(iv) by striking out "the election, change of election, or modification" and inserting in lieu thereof "the election or change of election"; and

(v) by inserting "or withdrawal" after "for such loan"; and

(B) in subparagraph (D)—

(i) by inserting "or withdrawals" after "of loans"; and

(ii) by inserting "or (h)" after "8433(g)"; and

(2) in paragraph (6)—

(A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(B) by striking out "unless the employee or Member elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b)".

## SEC. 203. IN–SERVICE WITHDRAWALS; WITHDRAWAL ELECTIONS, FEDERAL EMPLOYEES RETIREMENT SYSTEM PARTICIPANTS

<< 5 USCA § 8433 >>

(a) IN GENERAL.—Section 8433 of title 5, United States Code, is amended—

(1) by striking out subsections (b) and (c) and inserting in lieu thereof the following:

"(b) Subject to section 8435 of this title, any employee or Member who separates from Government employment is entitled and may elect to withdraw from the Thrift Savings Fund the balance of the employee's or Member's account as—

"(1) an annuity;

"(2) a single payment;

"(3) 2 or more substantially equal payments to be made not less frequently than annually; or

"(4) any combination of payments as provided under paragraphs (1) through (3) as the Executive Director may prescribe by regulation.

"(c)(1) In addition to the right provided under subsection (b) to withdraw the balance of the account, an employee or Member who separates from Government service and who has not made a withdrawal under subsection (h)(1)(A) may make one withdrawal of any amount as a single payment in accordance with subsection (b)(2) from the employee's or Member's account.

"(2) An employee or Member may request that the amount withdrawn from the Thrift Savings Fund in accordance with subsection (b)(2) be transferred to an eligible retirement plan.

"(3) The Executive Director shall make each transfer elected under paragraph (2) directly to an eligible retirement plan or plans (as defined in section 402(c)(8) of the Internal Revenue Code of 1986) identified by the employee, Member, former employee, or former Member for whom the transfer is made.

"(4) A transfer may not be made for an employee, Member, former employee, or former Member under paragraph (2) until the Executive Director receives from that individual the information required by the Executive Director specifically to identify the eligible retirement plan or plans to which the transfer is to be made.";

(2) in subsection (d)—

(A) in paragraph (1) by striking out "Subject to paragraph (3)(A)" and inserting in lieu thereof "Subject to paragraph (3)";

(B) by striking out paragraph (2) and redesignating paragraph (3) as paragraph (2); and

(C) in paragraph (2) (as redesignated under subparagraph (B) of this paragraph)—

(i) in subparagraph (A) by striking out "(A)"; and

(ii) by striking out subparagraph (B);

(3) in subsection (f)(1)—

(A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation; and

(B) by striking out "unless the employee or Member elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b), or" and inserting a comma;

(4) in subsection (f)(2)—

(A) by striking out "February 1" and inserting in lieu thereof "April 1";

(B) in subparagraph (A)—

(i) by striking out "65" and inserting in lieu thereof "70½"; and

(ii) by inserting "or" after the semi-colon;

(C) by striking out subparagraph (B); and

(D) by redesignating subparagraph (C) as subparagraph (B);

(5) in subsection (g)—

(A) in paragraph (1) by striking out "after December 31, 1987, and", and by adding at the end of the paragraph the following sentence: "Before a loan is issued, the Executive Director shall provide in writing the employee or Member with appropriate information concerning the cost of the loan relative to other sources of financing, as well as the lifetime cost of the loan, including the difference in interest rates between the funds offered by the Thrift Savings Fund, and any other effect of such loan on the employee's or Member's final account balance."; and

(B) by striking out paragraph (2) and redesignating paragraphs (3) through (5) as paragraphs (2) through (4), respectively; and

(6) by adding after subsection (g) the following new subsection:

"(h)(1) An employee or Member may apply, before separation, to the Board for permission to withdraw an amount from the employee's or Member's account based upon—

"(A) the employee or Member having attained age 59½; or

"(B) financial hardship.

"(2) A withdrawal under paragraph (1)(A) shall be available to each eligible participant one time only.

"(3) A withdrawal under paragraph (1)(B) shall be available only for an amount not exceeding the value of that portion of such account which is attributable to contributions made by the employee or Member under section 8432(a) of this title.

"(4) Withdrawals under paragraph (1) shall be subject to such other conditions as the Executive Director may prescribe by regulation.

"(5) A withdrawal may not be made under this subsection unless the requirements of section 8435(e) of this title are satisfied.".

<< 5 USCA § 8433 NOTE >>

(b) INVALIDITY OF CERTAIN PRIOR ELECTIONS.—Any election made under section 8433(b)(2) of title 5, United States Code (as in effect before the effective date of this title), with respect to an annuity which has not commenced before the implementation date of this title as provided by regulation by the Executive Director in accordance with section 207 of this title, shall be invalid.

<< 5 USCA § 8435 >>

SEC. 204. SURVIVOR ANNUITIES FOR FORMER SPOUSES; NOTICE TO FEDERAL EMPLOYEES RETIREMENT SYSTEM SPOUSES FOR IN–SERVICE WITHDRAWALS

Section 8435 of title 5, United States Code, is amended—

(1) in subsection (a)(1)(A)—

(A) by striking out "may make an election under subsection (b)(3) or (b)(4) of section 8433 of this title or change an election previously made under subsection (b)(1) or (b)(2) of such section" and inserting in lieu thereof "may withdraw all or part of a Thrift Savings Fund account under subsection (b)(2), (3), or (4) of section 8433 of this title or change a withdrawal election"; and

(B) by adding at the end thereof "A married employee or Member (or former employee or Member) may make a withdrawal from a Thrift Savings Fund account under subsection (c)(1) of section 8433 of this title only if the employee or Member (or former employee or Member) satisfies the requirements of subparagraph (B).";

(2) in subsection (c)—

(A) in paragraph (1)—

(i) by striking out "An election, change of election, or modification of the commencement date of a deferred annuity" and inserting in lieu thereof "An election or change of election"; and

(ii) by striking out "modification, or transfer" and inserting in lien thereof "or transfer"; and

(B) in paragraph (2) in the matter following subparagraph (B)(ii) by striking out "modification,";

(3) in subsection (e)—

(A) in paragraph (1)—

(i) in subparagraph (A)—

(I) by inserting "or withdrawal" after "A loan";

(II) by inserting "and (h)" after "8433(g)"; and

(III) by inserting "or withdrawal" after "such loan";

(ii) in subparagraph (B) by inserting "or withdrawal" after "loan"; and

(iii) in subparagraph (C)—

(I) by inserting "or withdrawal" after "to a loan"; and

(II) by inserting "or withdrawal" after "for such loan"; and

(B) in paragraph (2)—

(i) by inserting "or withdrawal" after "loan"; and

(ii) by inserting "and (h)" after "8344(g)"; and

(4) in subsection (g)—

(A) by inserting "or withdrawals" after "loans"; and

(B) by inserting "and (h)" after "8344(g)".

## SEC. 205. DE MINIMUS ACCOUNTS RELATING TO THE JUDICIARY

<< 5 USCA § 8440a >>

(a) JUSTICES AND JUDGES.—Section 8440a(b)(7) of title 5, United States Code, is amended—

(1) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(2) by striking out "unless the justice or judge elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under section 8433(b)".

<< 5 USCA § 8440b >>

(b) BANKRUPTCY JUDGES AND MAGISTRATES.—Section 8440b(b) of title 5, United States Code, is amended—

(1) in paragraph (7) in the first sentence by inserting "of the distribution" after "equal to the amount"; and

(2) in paragraph (8)—

(A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(B) by striking out "unless the bankruptcy judge or magistrate elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b)".

<< 5 USCA § 8440c >>

(c) FEDERAL CLAIMS JUDGES.—Section 8440c(b) of title 5, United States Code, is amended—

(1) in paragraph (7) in the first sentence by inserting "of the distribution" after "equal to the amount"; and

(2) in paragraph (8)—

(A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(B) by striking out "unless the judge elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under section 8433(b)".

## SEC. 206. DEFINITION OF BASIC PAY

<< 5 USCA § 8401 >>

(a) IN GENERAL.—(1) Section 8401(4) of title 5, United States Code, is amended by striking out "except as provided in subchapter III of this chapter,".

<< 5 USCA § 8431 >>

(2) Section 8431 of title 5, United States Code, is repealed.

<< 5 USCA Ch. 84 >>

(b) TECHNICAL AND CONFORMING AMENDMENTS.—(1) The table of sections for chapter 84 of title 5, United States Code, is amended by striking out the item relating to section 8431.

<< 5 USCA § 5545a >>

(2) Section 5545a(h)(2)(A) of title 5, United States Code, is amended by striking out "8431,".

<< 5 USCA § 5343 NOTE >>

(3) Section 615(f) of the Treasury, Postal Service, and General Government Appropriations Act, 1996 (Public Law 104–52; 109 Stat. 500; 5 U.S.C. 5343 note) is amended by striking out "section 8431 of title 5, United States Code,".

<< 5 USCA § 5545a NOTE >>

SEC. 207. EFFECTIVE DATE

This title shall take effect on the date of the enactment of this Act and withdrawals and elections as provided under the amendments made by this title shall be made at the earliest practicable date as determined by the Executive Director in regulations.

Sec. 660. Notwithstanding Section 613, interagency financing is authorized to carry out the purposes of the National Bioethics Advisory Commission.

SEC. 661. (a) DESIGNATION.—The United States courthouse to be constructed at 111 South 18th Plaza, Omaha, Nebraska, shall be known and designated as the "Roman L. Hruska United States Courthouse".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States courthouse referred to in section 1 shall be deemed to be a reference to the "Roman L. Hruska United States Courthouse".

SEC. 662. (a) PROVISIONS RELATING TO TITLE 39, UNITED STATES CODE.—

<< 39 USCA § 202 >>

"(1) APPOINTMENT AND REMOVAL OF INSPECTOR GENERAL.—Section 202 of title 39, United States Code, is amended by adding at the end the following:

"(e)(1) The Governors shall appoint and shall have the power to remove the Inspector General.

"(2) The Inspector General shall be appointed—

"(A) for a term of 7 years;

"(B) without regard to political affiliation; and

"(C) solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations.

"(3) The Inspector General may at any time be removed upon the written concurrence of at least 7 Governors, but only for cause. Nothing in this subsection shall be considered to exempt the Governors from the requirements of section 8G(e) of the Inspector General Act of 1978.".

<< 39 USCA § 102 >>

(2) DEFINITION.—Section 102 of title 39, United States Code, is amended—

(A) by striking "and" at the end of paragraph (2);

(B) by striking the period at the end of paragraph (3) and inserting "; and"; and

(C) by adding at the end the following:

"(4) 'Inspector General' means the Inspector General appointed under section 202(e) of this title.".

<< 39 USCA § 2009 NOTE >>

(3) SEPARATE ITEM IN ANNUAL BUDGET.—For purposes of the fifth sentence of section 2009 of title 39, United States Code, the operations of the Office of Inspector General of the United States Postal Service shall be considered a major type of activity.

(b) AMENDMENTS TO THE INSPECTOR GENERAL ACT OF 1978.—

<< 5 USCA App. 3 § 8G >>

(1) GOVERNORS AS HEAD OF THE POSTAL SERVICE.—Section 8G(a)(4) of the Inspector General Act of 1978 (5 U.S.C.App.) is amended by striking "except that" and all that follows through the semicolon and inserting "except that—

"(A) with respect to the National Science Foundation, such term means the National Science Board; and

"(B) with respect to the United States Postal Service, such term means the Governors (within the meaning of section 102(3) of title 39, United States Code);".

(2) SPECIAL RULES RELATING TO THE UNITED STATES POSTAL SERVICE.—Subsection (f) of section 8G of such Act is amended to read as follows:

"(f)(1) For purposes of carrying out subsection (c) with respect to the United States Postal Service, the appointment provisions of section 202(e) of title 39, United States Code, shall be applied.

"(2) In carrying out the duties and responsibilities specified in this Act, the Inspector General of the United States Postal Service (hereinafter in this subsection referred to as the 'Inspector General') shall have oversight responsibility for all activities of the Postal Inspection Service, including any internal investigation performed by the Postal Inspection Service. The Chief Postal Inspector shall promptly report the significant activities being carried out by the Postal Inspection Service to such Inspector General.

"(3)(A)(i) Notwithstanding subsection (d), the Inspector General shall be under the authority, direction, and control of the Governors with respect to audits or investigations, or the issuance of subpoenas, which require access to sensitive information concerning—

"(I) ongoing civil or criminal investigations or proceedings;

"(II) undercover operations;

"(III) the identity of confidential sources, including protected witnesses;

"(IV) intelligence or counterintelligence matters; or

"(V) other matters the disclosure of which would constitute a serious threat to national security.

"(ii) With respect to the information described under clause (i), the Governors may prohibit the Inspector General from carrying out or completing any audit or investigation, or from issuing any subpoena, after such Inspector General has decided to initiate, carry out, or complete such audit or investigation or to issue such subpoena, if the Governors determine that such prohibition is necessary to prevent the disclosure of any information described under clause (i) or to prevent the significant impairment to the national interests of the United States.

"(iii) If the Governors exercise any power under clause (i) or (ii), the Governors shall notify the Inspector General in writing stating the reasons for such exercise. Within 30 days after receipt of any such notice, the Inspector General shall transmit a copy of such notice to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives, and to other appropriate committees or subcommittees of the Congress.

"(B) In carrying out the duties and responsibilities specified in this Act, the Inspector General—

"(i) may initiate, conduct and supervise such audits and investigations in the United States Postal Service as the Inspector General considers appropriate; and

"(ii) shall give particular regard to the activities of the Postal Inspection Service with a view toward avoiding duplication and insuring effective coordination and cooperation.

"(C) Any report required to be transmitted by the Governors to the appropriate committees or subcommittees of the Congress under section 5(d) shall also be transmitted, within the seven-day period specified under such section, to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives.

"(3) Nothing in this Act shall restrict, eliminate, or otherwise adversely affect any of the rights, privileges, or benefits of either employees of the United States Postal Service, or labor organizations representing employees of the United States Postal Service, under chapter 12 of title 39, United States Code, the National Labor Relations Act, any handbook or manual affecting employee labor relations with the United States Postal Service, or any collective bargaining agreement.

"(4) As used in this subsection, the term 'Governors' has the meaning given such term by section 102(3) of title 39, United States Code.".

<< 5 USCA App. 3 § 8H >>

(3) TECHNICAL CORRECTION.—The Inspector General Act of 1978 is amended by redesignating the second section which is designated as section 8G as section 8H.

(c) PROVISIONS RELATING TO COMPENSATION.—

(1) INSPECTOR GENERAL.—Section 5315 of title 5, United States Code, is amended by adding at the end the following:

<< 5 USCA § 5315 >>

"Inspector General, United States Postal Service.".

<< 5 USCA § 5315 NOTE >>

The amendment made by the preceding sentence shall apply notwithstanding section 410 or any other provision of title 39, United States Code.

<< 39 USCA § 1003 >>

(2) OFFICERS AND EMPLOYEES OF THE OFFICE OF INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE; POSTAL INSPECTORS.—

(A) IN GENERAL.—Section 1003 of title 39, United States Code, is amended—

(i) by redesignating subsection (b) as subsection (d); and

(ii) by inserting after subsection (a) the following:

"(b) Compensation and benefits for all officers and employees serving in or under the Office of Inspector General of the United States Postal Service shall be maintained on a standard of comparability to the compensation and benefits paid for comparable levels of work in the respective Offices of Inspector General of the various establishments named in section 11(2) of the Inspector General Act of 1978.

"(c) Compensation and benefits for all Postal Inspectors shall be maintained on a standard of comparability to the compensation and benefits paid for comparable levels of work in the executive branch of the Government outside of the Postal Service. As used in this subsection, the term 'Postal Inspector' included any agent to whom any investigative powers are granted under section 3061 of title 18.".

(B) CONFORMING AMENDMENT.—The first sentence of section 1003(a) of title 39, United States Code, is amended by striking "chapters 2 and 12 of this title" and inserting "chapters 2 and 12 of this title, section 8G of the Inspector General Act of 1978,".

<< 39 USCA § 2802 NOTE >>

(d) STRATEGIC PLANS.—

(1) OFFICE OF INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE.—

(A) IN GENERAL.—Strategic plans shall be prepared under this paragraph addressing staffing requirements, general goals and objectives for major functions and operations of the Office of Inspector General of the United States Postal Service, and how goals and objectives of the Office are to be achieved, including a description of operational processes, skills and technology, and the human, capital, information, and other resources required to meet those goals and objectives.

(B) SPECIFIC REQUIREMENTS.—Plans under this paragraph—

(i) shall be prepared by the Inspector General of the United States Postal Service;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(ii) shall each cover a 5–year period (the beginning and ending dates of which shall be specified in each such plan); and

(iii) shall be included, as part of the annual budget required under section 2009 of title 39, United States Code, at least every 3 years.

(C) FIRST SUBMISSION.—The first plan under this paragraph shall be prepared in time to be included with the annual budget under section 2009 of title 39, United States Code, next due to be submitted after the end of the 6–month period beginning on the date of the appointment of the first Inspector General to be appointed pursuant to the amendments made by this section.

(2) POSTAL INSPECTION SERVICE.—The Chief Postal Inspector shall, with respect to the Postal Inspection Service, prepare a strategic plan similar in content to that required under paragraph (1)(A) with respect to the Office of Inspector General of the United States Postal Service. Such plan shall be prepared in time to be included with the annual budget under section 2009 of such title 39 next due to be submitted after the end of the 30–day period beginning on the date of the enactment of this Act.

<center>&lt;&lt; 39 USCA § 201 NOTE &gt;&gt;</center>

(e) FIRST APPOINTMENT; TRANSFERS; TRANSITION PROVISION.—

(1) FIRST APPOINTMENT.—The first Inspector General of the United States Postal Service appointed pursuant to the amendments made by this section shall be appointed before the end of the 90–day period beginning on the date of the enactment of this Act.

(2) TRANSFERS.—

(A) IN GENERAL.—All measures described in section 8G(b) of the Inspector General Act of 1978 necessary to establish an Office of Inspector General within the United States Postal Service pursuant to this section, including all appropriate transfers, shall occur—

(i) no earlier than the date the appointment under paragraph (1) is made; and

(ii) no later than 60 days after the date the appointment under paragraph (1) is made.

(B) PROVISIONS RELATING TO PERSONNEL.—

(i) CONSULTATION.—Decisions concerning which personnel are to be transferred pursuant to subparagraph (A) shall be made by the Governors (within the meaning of section 102(3) of title 39, United States Code) in consultation with the Inspector General appointed under paragraph (1).

(ii) TRANSFERRED PERSONNEL.—Personnel transferred pursuant to subparagraph (A) shall, to the extent not inconsistent with other provisions of this subsection, be transferred in accordance with applicable laws and regulations relating to the transfer of functions within the United States Postal Service, except that, notwithstanding any provision of section 1003(b) of title 39, United States Code, as amended by this section, the classification and compensation of such personnel shall not be reduced, by reason of having been transferred, for 1 year after being so transferred.

(3) TRANSITION PROVISION.—The Chief Postal Inspector may continue to serve as Inspector General of the United States Postal Service until the date on which an Inspector General is appointed under paragraph (1) or, if earlier, the end of the period referred to in such paragraph. Compensation for any service under this paragraph shall be determined as if this section had not been enacted.

(f) TECHNICAL AND CONFORMING AMENDMENTS.—

<center>&lt;&lt; 39 USCA § 410 &gt;&gt;</center>

(1) Section 410(b) of title 39, United States Code, is amended—

(A) by striking "and" at the end of paragraph (9); and

(B) by amending paragraph (10) to read as follows:

"(10) the Inspector General Act of 1978; and".

<center>&lt;&lt; 39 USCA § 204 &gt;&gt;</center>

(2)(A) Section 204 of such title 39 is amended—

(i) by amending the section heading to read as follows:

"§ 204. General Counsel; Judicial Officer; Chief Postal Inspector";

(ii) in the first sentence by striking "and a Judicial Officer." and inserting "a Judicial Officer, and a Chief Postal Inspector.";
(iii) in the second sentence by striking "and the Judicial Officer" and inserting "the Judicial Officer, and the Chief Postal Inspector"; and
(iv) by adding at the end the following: "The Chief Postal Inspector shall report to, and be under the general supervision of, the Postmaster General. The Postmaster General shall promptly notify the Governors and both Houses of Congress in writing if he or she removes the Chief Postal Inspector or transfers the Chief Postal Inspector to another position or location within the Postal Service, and shall include in any such notification the reasons for the removal or transfer.".

<< 39 USCA Ch. 2 >>

(B) The table of sections for chapter 2 of such title 39 is amended by striking the item relating to section 204 and inserting the following:

"204. General Counsel; Judicial Officer; Chief Postal Inspector.".

<< 5 USCA § 5597 NOTE >>

SEC. 663. VOLUNTARY SEPARATION INCENTIVES FOR EMPLOYEES OF CERTAIN FEDERAL AGENCIES.—(a) DEFINITIONS.—For the purposes of this section—

(1) the term "agency" means any Executive agency (as defined in section 105 of title 5, United States Code), other than an Executive agency (except an agency receiving such authority in the Department of Transportation Appropriations Act, 1997) that is authorized by any other provision of this Act or any other Act to provide voluntary separation incentive payments during all, or any part of, fiscal year 1997; and

(2) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who is employed by an agency, is serving under an appointment without time limitation, and has been currently employed for a continuous period of at least 3 years, but does not include—

(A) a reemployed annuitant under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(B) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(C) an employee who is in receipt of a specific notice of involuntary separation for misconduct or unacceptable performance;

(D) an employee who, upon completing an additional period of service as referred to in section 3(b)(2)(B)(ii) of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 5597 note), would qualify for a voluntary separation incentive payment under section 3 of such Act;

(E) an employee who has previously received any voluntary separation incentive payment by the Federal Government under this section or any other authority and has not repaid such payment;

(F) an employee covered by statutory reemployment rights who is on transfer to another organization; or

(G) any employee who, during the twenty four month period preceding the date of separation, has received a recruitment or relocation bonus under section 5753 of title 5, United States Code, or who, within the twelve month period preceding the date of separation, received a retention allowance under section 5754 of title 5, United States Code.

(b) AGENCY STRATEGIC PLAN.—

(1) IN GENERAL.—The head of each agency, prior to obligating any resources for voluntary separation incentive payments, shall submit to the House and Senate Committees on Appropriations and the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives a strategic plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

(2) CONTENTS.—The agency's plan shall include—

Case 3:20-cv-07721-SL    Document 58-3    Filed 11/10/20    Page 1568 of 3864

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

(A) the positions and functions to be reduced or eliminated, identified by organizational unit, geographic location, occupational category and grade level;

(B) the number and amounts of voluntary separation incentive payments to be offered; and

(C) a description of how the agency will operate without the eliminated positions and functions.

(c) AUTHORITY TO PROVIDE VOLUNTARY SEPARATION INCENTIVE PAYMENTS.—

(1) IN GENERAL.—A voluntary separation incentive payment under this section may be paid by an agency to any employee only to the extent necessary to eliminate the positions and functions identified by the strategic plan.

(2) AMOUNT AND TREATMENT OF PAYMENTS.—A voluntary separation incentive payment—

(A) shall be paid in a lump sum after the employee's separation;

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employees;

(C) shall be equal to the lesser of—

(i) an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(ii) an amount determined by the agency head not to exceed $25,000;

(D) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before December 31, 1997;

(E) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(F) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) ADDITIONAL AGENCY CONTRIBUTIONS TO THE RETIREMENT FUND.—

(1) IN GENERAL.—In addition to any other payments which it is required to make under subchapter III of chapter 83 of title 5, United States Code, an agency shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the agency who is covered under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, to whom a voluntary separation incentive has been paid under this section.

(2) DEFINITION.—For the purpose of paragraph (1), the term "final basic pay", with respect to an employee, means the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

(e) EFFECT OF SUBSEQUENT EMPLOYMENT WITH THE GOVERNMENT.—An individual who has received a voluntary separation incentive payment under this section and accepts any employment for compensation with the Government of the United States, or who works for any agency of the United States Government through a personal services contract, within 5 years after the date of the separation on which the payment is based shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

(f) REDUCTION OF AGENCY EMPLOYMENT LEVELS.—

(1) IN GENERAL.—The total number of funded employee positions in the agency shall be reduced by one position for each vacancy created by the separation of any employee who has received, or is due to receive, a voluntary separation incentive payment under this section. For the purposes of this subsection, positions shall be counted on a full-time-equivalent basis.

(2) ENFORCEMENT.—The President, through the Office of Management and Budget, shall monitor the agency and take any action necessary to ensure that the requirements of this subsection are met.

(g) EFFECTIVE DATE.—This section shall take effect October 1, 1996.

<< 31 USCA § 3336 >>

SECTION 664. ELECTRONIC BENEFIT TRANSFER PILOT.

Title 31, United States Code, is amended by inserting after section 3335 the following new section:

"SEC. 3336. Electronic benefit transfer pilot

(a) The Congress finds that:

AR.01545

"(1) Electronic benefit transfer (EBT) is a safe, reliable, and economical way to provide benefit payments to individuals who do not have an account at a financial institution.

"(2) The designation of financial institutions as financial agents of the Federal Government for EBT is an appropriate and reasonable use of the Secretary's authority to designate financial agents.

"(3) A joint federal-state EBT system offers convenience and economies of scale for those states (and their citizens) that wish to deliver state-administered benefits on a single card by entering into a partnership with the federal government.

"(4) The Secretary's designation of a financial agent to deliver EBT is a specialized service not available through ordinary business channels and may be offered to the states pursuant to section 6501 et seq. of this title.

"(b) The Secretary shall continue to carry out the existing EBT pilot to disburse benefit payments electronically to recipients who do not have an account at a financial institution, which shall include the designation of one or more financial institution as a financial agent of the Government, and the offering to the participating states of the opportunity to contract with the financial agent selected by the Secretary, as described in the Invitation for Expressions of Interest to Acquire EBT Services for the Southern Alliance of States dated March 9, 1995, as amended as of June 30, 1995, July 7, 1995, and August 1, 1995.

["(c) The selection and designation of financial agents, the design of the pilot program, and any other matter associated with or related to the EBT pilot described in subsection (b) shall not be subject to judicial review."]

SECTION 2. DESIGNATION OF FINANCIAL AGENTS

<< 12 USCA § 90 >>

1. 12 U.S.C. 90 is amended by adding at the end thereof the following:

"Notwithstanding the Federal Property and Administrative Services Act of 1949, as amended, the Secretary may select associations as financial agents in accordance with any process the Secretary deems appropriate and their reasonable duties may include the provision of electronic benefit transfer services (including State-administered benefits with the consent of the States), as defined by the Secretary.".

2. Make conforming amendments to 12 U.S.C. 265, 266, 391, 1452(d), 1767, 1789a, 2013, 2122 and to 31 U.S.C. 3122 and 3303.

TITLE VII—COUNTER–TERRORISM AND DRUG LAW ENFORCEMENT

DEPARTMENT OF THE TREASURY

DEPARTMENTAL OFFICES

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Foreign Assets Control, $288,000: Provided, That of the amount provided, $288,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Inspector General $34,000, to remain available until expended: Provided, That of the amount provided, $34,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

COUNTERTERRORISM FUND

For necessary expenses, as determined by the Secretary, $15,000,000, to remain available until expended, to reimburse any Department of the Treasury organization for the costs of providing support to counter, investigate, or prosecute terrorism, including payment of rewards in connection with these activities: Provided, That the entire amount of this appropriation shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of

1985, is transmitted by the President to Congress: Provided further, That the entire amount is designated by Congress as an emergency appropriation pursuant to section 251(b)(2)(D)(i) of such Act.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Federal Law Enforcement Training Center, $1,354,000, to remain available until expended: Provided, That of the amount provided, $1,354,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For an additional amount for the necessary expenses for the acquisition, construction, improvement, and related expenses, $2,700,000, to remain available until expended: Provided, That of the amount provided, $2,700,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Financial Management Service, $449,000, to remain available until expended: Provided, That of the amount provided, $449,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, $66,423,000; of which $3,500,000 shall be available for the construction and expansion of a canine training facility, to remain available until expended; of which $3,000,000 shall be available for conducting a study of car bomb explosives, to remain available until expended; and of which $6,700,000, to remain available until expended, for relocation of the bureau's headquarters building and laboratory facilities; Provided, That of the amount provided, $66,423,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For an additional amount for the necessary expense of the United States Customs Service, $62,335,000; of which not to exceed $26,400,000 shall be available until expended for funding noncompetitive cooperative agreements with air carriers, airports, or other cargo authorities, which provide for the Customs Service to purchase and assist in installing advanced air cargo inspection equipment for the joint use of such entities and the United States Customs Service: Provided, That of the amount provided, $62,335,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## INTERNAL REVENUE SERVICE

### PROCESSING, ASSISTANCE AND MANAGEMENT

For an additional amount for the necessary expenses for the processing, assistance and management, $10,488,000, to remain available until expended: Provided, That of the amount provided, $10,488,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNITED STATES SECRET SERVICE

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the United States Secret Service $3,026,000, to remain available until expended: Provided, That of the amount provided, $3,026,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### INDEPENDENT AGENCIES

### OFFICE OF PERSONNEL MANAGEMENT

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Personnel Management $210,000, to remain available until expended: Provided, That of the amount provided, $210,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### FUNDS APPROPRIATED TO THE PRESIDENT

### FEDERAL DRUG CONTROL PROGRAMS

### SPECIAL FORFEITURE FUND

### (INCLUDING TRANSFER OF FUNDS)

For activities authorized by Public Law 100–690, as amended, $112,900,000, of which $42,000,000 shall be transferred to the United States Customs Service for the conversion of one P–3AEW aircraft for the air interdiction program; of which $10,000,000 shall be available for transfer to other Federal agencies for methamphetamine reduction efforts; and of which $60,900,000 shall be available to the Director of the Office of National Drug Control Policy for enhancing other drug control activities, including transfer to other Federal agencies: Provided, That of the amount provided, $112,900,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended to become available only upon receipt by the Congress of a supplemental request from the President requesting such designation.

### TITLE VIII—FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT

<< 31 USCA § 3512 NOTE >>

### SEC. 801. SHORT TITLE

This title may be cited as the "Federal Financial Management Improvement Act of 1996."

<< 31 USCA § 3512 NOTE >>

### SEC. 802. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds the following:

(1) Much effort has been devoted to strengthening Federal internal accounting controls in the past. Although progress has been made in recent years, Federal accounting standards have not been uniformly implemented in financial management systems for agencies.

(2) Federal financial management continues to be seriously deficient, and Federal financial management and fiscal practices have failed to—

(A) identify costs fully;

(B) reflect the total liabilities of congressional actions; and

(C) accurately report the financial condition of the Federal Government.

(3) Current Federal accounting practices do not accurately report financial results of the Federal Government or the full costs of programs and activities. The continued use of these practices undermines the Government's ability to provide credible and reliable financial data and encourages already widespread Government waste, and will not assist in achieving a balanced budget.

(4) Waste and inefficiency in the Federal Government undermine the confidence of the American people in the government and reduce the federal Government's ability to address vital public needs adequately.

(5) To rebuild the accountability and credibility of the Federal Government, and restore public confidence in the Federal Government, agencies must incorporate accounting standards and reporting objectives established for the Federal Government into their financial management systems so that all the assets and liabilities, revenues, and expenditures or expenses, and the full costs of programs and activities of the Federal Government can be consistently and accurately recorded, monitored, and uniformly reported throughout the Federal Government.

(6) Since its establishment in October 1990, the Federal Accounting Standards Advisory Board (hereinafter referred to as the "FASAB") has made substantial progress toward developing and recommending a comprehensive set of accounting concepts and standards for the Federal Government. When the accounting concepts and standards developed by FASAB are incorporated into Federal financial management systems, agencies will be able to provide cost and financial information that will assist the Congress and financial managers to evaluate the cost and performance of Federal programs and activities, and will therefore provide important information that has been lacking, but is needed for improved decision making by financial managers and the Congress.

(7) The development of financial management systems with the capacity to support these standards and concepts will, over the long term, improve Federal financial management.

(b) PURPOSE—The purposes of this Act are to—

(1) provide for consistency of accounting by an agency from one fiscal year to the next, and uniform accounting standards throughout the Federal Government;

(2) require Federal financial management systems to support full disclosure of Federal financial data, including the full costs of Federal programs and activities, to the citizens, the Congress, the President, and agency management, so that programs and activities can be considered based on their full costs and merits;

(3) increase the accountability and credibility of federal financial management;

(4) improve performance, productivity and efficiency of Federal Government financial management;

(5) establish financial management systems to support controlling the cost of Federal Government;

(6) build upon and complement the Chief Financial Officers Act of 1990 (Public Law 101–576; 104 Stat 2838), the Government Performance and Results Act of 1993 (Public Law 103–62 107 Stat. 285) and the Government Management Reform Act of 1994 (Public Law 103–356; 108 Stat. 3410); and

(7) increase the capability of agencies to monitor execution of the budget by more readily permitting reports that compare spending of resources to results of activities.

<< 31 USCA § 3512 NOTE >>

SEC. 803 IMPLEMENTATION OF FEDERAL FINANCIAL MANAGEMENT IMPROVEMENTS.

(a) IN GENERAL.—Each agency shall implement and maintain financial management systems that comply substantially with Federal financial management systems requirements, applicable Federal accounting standards, and the United States Government Standard General Ledger at the transaction level.

(b) AUDIT COMPLIANCE FINDING.—

(1) IN GENERAL.—Each audit required by section 3521(e) of title 31, United States Code, shall report whether the agency financial management systems comply with the requirements of subsection (a).

(2) CONTENT OF REPORTS.—When the person performing the audit required by section 3521(e) of title 31, United States Code, reports that the agency financial management systems do not comply with the requirements of subsection (a), the person performing the audit shall include in the report on the audit—

(A) the entity or organization responsible for the financial management systems that have been found not to comply with the requirements of subsection (a);

(B) all facts pertaining to the failure to comply with the requirements of subsection (a), including—

 (i) the nature and extent of the noncompliance including areas in which there is substantial but not full compliance;

 (ii) the primary reason or cause of the noncompliance;

 (iii) the entity or organization responsible for the non-compliance[sic]; and

 (iv) any relevant comments from any responsible officer or employee; and

 (C) a statement with respect to the recommended remedial actions and the time frames to implement such actions.

(c) COMPLIANCE IMPLEMENTATION.—

 (1) DETERMINATION.—No later than the date described under paragraph (2), the Head of an agency shall determine whether the financial management systems of the agency comply with the requirements of subsection (a). Such determination shall be based on—

 (A) a review of the report on the applicable agency-wide audited financial statement;

 (B) any other information the Head of the agency considers relevant and appropriate.

 (2) DATE OF DETERMINATION.—The determination under paragraph (1) shall be made no later than 120 days after the earlier of—

 (A) the date of the receipt of an agency-wide audited financial statement; or

 (B) the last day of the fiscal year following the year covered by such statement.

 (3) REMEDIATION PLAN.—

 (A) If the Head of an agency determines that the agency's financial management systems do not comply with the requirements of subsection (a), the head of the agency, in consultation with the Director, shall establish a remediation plan that shall include resources, remedies, and intermediate target dates necessary to bring the agency's financial management systems into substantial compliance.

 (B) If the determination of the head of the agency differs from the audit compliance findings required in subsection (b), the Director shall review such determinations and provide a report on the findings to the appropriate committees of the Congress.

 (4) TIME PERIOD FOR COMPLIANCE.—A remediation plan shall bring the agency's financial management systems into substantial compliance no later than 3 years after the date a determination is made under paragraph (1), unless the agency, with concurrence of the Director—

 (A) determines that the agency's financial management systems cannot comply with the requirements of subsection (a) within 3 years;

 (B) specifies the most feasible date for bringing the agency's financial management systems into compliance with the requirements of subsection (a); and

 (C) designates an official of the agency who shall be responsible for bringing the agency's financial management systems into compliance with the requirements of subsection (a) by the date specified under subparagraph (B).

<< 31 USCA § 3512 NOTE >>

SEC. 804. REPORTING REQUIREMENTS.

 (a) REPORTS BY THE DIRECTOR.—No later than March 31 of each year, the Director shall submit a report to the Congress regarding implementation of this Act. The Director may include the report in the financial management status report and the 5–year financial management plan submitted under section 3512(a)(1) of title 31, United States Code.

 (b) REPORTS BY THE INSPECTOR GENERAL.—Each Inspector General who prepares a report under section 5(a) of the Inspector General Act of 1978 (5 U.S.C.App.) shall report to Congress instances and reasons when an agency has not met the intermediate target dates established in the remediation plan required under section 3(c). Specifically the report shall include—

 (1) the entity or organization responsible for the non-compliance;

 (2) the facts pertaining to the failure to comply with the requirements of subsection (a), including the nature and extent of the non-compliance, the primary reason or cause for the failure to comply, and any extenuating circumstances; and

 (3) a statement of the remedial actions needed to comply.

 (c) REPORTS BY THE COMPTROLLER GENERAL.—No later than October 1, 1997, and October 1, of each year thereafter, the Comptroller General of the United States shall report to the appropriate committees of the Congress concerning—

(1) compliance with the requirements of section 3(a) of this Act, including whether the financial statements of the Federal Government have been prepared in accordance with applicable accounting standards; and

(2) the adequacy of applicable accounting standards for the Federal Government.

<< 31 USCA § 3512 NOTE >>

SEC. 805. CONFORMING AMENDMENTS.

<< 31 USCA § 3521 >>

(a) AUDITS BY AGENCIES.—Section 3521(f)(1) of title 31, United States Code, is amended in the first sentence by inserting "and the Controller of the Office of Federal Financial Management" before the period.

<< 31 USCA § 3512 >>

(b) FINANCIAL MANAGEMENT STATUS REPORT.—Section 3512(a)(2) of title 31, United States Code, is amended by—

(1) in subparagraph (D) by striking "and' after the semicolon;

(2) by redesignating subparagraph (E) as subparagraph (F); and

(3) by inserting after subparagraph (D) the following:

"(E) a listing of agencies whose financial management systems do not comply substantially with the requirements of Section 3(a) the Federal Financial Management Improvement Act of 1996, and a summary statement of the efforts underway to remedy the noncompliance; and"

<< 5 USCA App. 3 § 5 >>

(c) INSPECTOR GENERAL ACT OF 1978.—Section 5(a) of the Inspector General Act of 1978 is amended—

(1) in paragraph (11) by striking "and" after the semicolon;

(2) in paragraph (12) by striking the period and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(13) the information described under section 05(b) of the Federal Financial Management Improvement Act of 1996."

<< 31 USCA § 3512 NOTE >>

SEC. 806. DEFINITIONS.

For purposes of this title:

(1) AGENCY.—The term "agency" means a department or agency of the United States Government as defined in section 901(b) of title 31, United States Code.

(2) DIRECTOR.—The term "Director" means the Director of the Office of Management and Budget.

(3) FEDERAL ACCOUNTING STANDARDS.—The term "Federal accounting standards" means applicable accounting principles, standards, and requirements consistent with section 902(a)(3)(A) of title 31, United States Code.

(4) FINANCIAL MANAGEMENT SYSTEMS.—The term "financial management systems" includes the financial systems and the financial portions of mixed systems necessary to support financial management, including automated and manual processes, procedures, controls, data, hardware, software, and support personnel dedicated to the operation and maintenance of system functions.

(5) FINANCIAL SYSTEM.—The term "financial system" includes an information system, comprised of one or more applications, that is used for—

(A) collecting, processing, maintaining, transmitting, or reporting data about financial events;

(B) supporting financial planning or budgeting activities;

(C) accumulating and reporting costs information; or

(D) supporting the preparation of financial statements.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(6) MIXED SYSTEM.—The term "mixed system' means an information system that supports both financial and nonfinancial functions of the Federal Government or components thereof.

<< 31 USCA § 3512 NOTE >>

SEC. 807. EFFECTIVE DATE.

 This title shall take effect for the fiscal year ending September 30, 1997.

SEC. 808. REVISION OF SHORT TITLES.—

<< 31 USCA § 3512 NOTE >>

<< 41 USCA § 251 NOTE >>

 (a) Section 4001 of Public Law 104–106 (110 Stat. 642; 41 U.S.C. 251 note) is amended to read as follows:

"SEC. 4001. SHORT TITLE.

 "This division and division E may be cited as the 'Clinger–Cohen Act of 1996'.".

<< 31 USCA 3512 NOTE >>

<< 41 USCA § 1401 NOTE >>

 (b) Section 5001 of Public Law 104–106 (110 Stat. 679; 40 U.S.C. 1401 note) is amended to read as follows:

"SEC. 5001. SHORT TITLE.

 "This division and division D may be cited as the 'Clinger–Cohen Act of 1996'.".

<< 10 USCA § 113 nt >>

<< 10 USCA § 2315 >>

<< 15 USCA § 278g–3 >>

<< 28 USCA § 612 >>

<< 31 USCA § 3512 NOTE >>

<< 38 USCA § 310 >>

<< 40 USCA §§ 1411 nt, 1441 nt >>

<< 44 USCA §§ 3502, 3504, 3518 >>

 (c) Any reference in any law, regulation, document, record, or other paper of the United States to the Federal Acquisition Reform Act of 1996 or to the Information Technology Management Reform Act of 1996 shall be considered to be a reference to the Clinger–Cohen Act of 1996.
 This Act may be cited as the "Treasury, Postal Service, and General Government Appropriations Act, 1997".

TITLE II—ECONOMIC GROWTH AND REGULATORY PAPERWORK REDUCTION

SEC. 2001. SHORT TITLE; TABLE OF CONTENTS; DEFINITIONS

<< 12 USCA § 226 NOTE >>

(a) SHORT TITLE.—This title may be cited as the "Economic Growth and Regulatory Paperwork Reduction Act of 1996".

(b) TABLE OF CONTENTS.—The table of contents for this title is as follows:

TITLE II—ECONOMIC GROWTH AND REGULATORY PAPERWORK REDUCTION

Sec. 2001. Short title; table of contents; definitions

Subtitle A—Streamlining the Home Mortgage Lending Process

Sec. 2101. Simplification and unification of disclosures required under RESPA and TILA for mortgage transactions.

Sec. 2102. General exemption authority for loans.

Sec. 2103. Reductions in Real Estate Settlement Procedures Act of 1974 regulatory burdens.

Sec. 2104. Waiver for certain borrowers.

Sec. 2105. Alternative disclosures for adjustable rate mortgages.

Sec. 2106. Restitution for violations of the Truth in Lending Act.

Sec. 2107. Limitation on liability under the Truth in Lending Act.

Subtitle B—Streamlining Government Regulation

CHAPTER 1—ELIMINATING UNNECESSARY REGULATORY REQUIREMENTS AND PROCEDURES

Sec. 2201. Elimination of redundant approval requirement for Oakar transactions.

Sec. 2202. Elimination of duplicative requirements imposed upon bank holding companies.

Sec. 2203. Elimination of the per branch capital requirement for national banks and State member banks.

Sec. 2204. Elimination of branch application requirements for automatic teller machines.

Sec. 2205. Elimination of requirement for approval of investments in bank premises for well capitalized and well managed banks.

Sec. 2206. Elimination of approval requirement for divestitures.

Sec. 2207. Streamlined nonbanking acquisitions by well capitalized and well managed banking organizations.

Sec. 2208. Elimination of unnecessary filing for officer and director appointments.

Sec. 2209. Amendments to the Depository Institution Management Interlocks Act.

Sec. 2210. Elimination of recordkeeping and reporting requirements for officers.

Sec. 2211. Repayment of Treasury loan.

Sec. 2212. Branch closures.

Sec. 2213. Foreign banks.

Sec. 2214. Disposition of foreclosed assets.

Sec. 2215. Exemption authority for antitying provision.

Sec. 2216. FDIC approval of new State bank powers.

CHAPTER 2—ELIMINATING UNNECESSARY REGULATORY BURDENS

Sec. 2221. Small bank examination cycle.

Sec. 2222. Required review of regulations.

Sec. 2223. Repeal of identification of nonbank financial institution customers.

Sec. 2224. Repeal of certain reporting requirements.

Sec. 2225. Increase in home mortgage disclosure exemption threshold.

Sec. 2226. Elimination of stock loan reporting requirement.

Sec. 2227. Credit availability assessment.

CHAPTER 3—REGULATORY MICROMANAGEMENT

Sec. 2241. National bank directors.

Sec. 2242. Paperwork reduction review.

Sec. 2243. State bank representation on Board of Directors of the FDIC.

Sec. 2244. Consultation among examiners.

Subtitle C—Regulatory Impact on Cost of Credit and Credit Availability

Sec. 2301. Audit costs.

Sec. 2302. Incentives for self-testing.

Sec. 2303. Qualified thrift investment amendments.

Sec. 2304. Limited purpose banks.

Sec. 2305. Amendment to Fair Debt Collection Practices Act.

Sec. 2306. Increase in certain credit union loan ceilings.

Sec. 2307. Bank investments in Edge Act and agreement corporations.

Subtitle D—Consumer Credit

CHAPTER 1—CREDIT REPORTING REFORM

Sec. 2401. Short title.

Sec. 2402. Definitions.

Sec. 2403. Furnishing consumer reports; use for employment purposes.

Sec. 2404. Use of consumer reports for prescreening and direct marketing; prohibition on unauthorized or uncertified use of information.

Sec. 2405. Consumer consent required to furnish consumer report containing medical information.

Sec. 2406. Obsolete information and information contained in consumer reports.

Sec. 2407. Compliance procedures.

Sec. 2408. Consumer disclosures.

Sec. 2409. Procedures in case of the disputed accuracy of any information in a consumer's file.

Sec. 2410. Charges for certain disclosures.

Sec. 2411. Duties of users of consumer reports.

Sec. 2412. Civil liability.

Sec. 2413. Responsibilities of persons who furnish information to consumer reporting agencies.

Sec. 2414. Investigative consumer reports.

Sec. 2415. Increased criminal penalties for obtaining information under false pretenses.

Sec. 2416. Administrative enforcement.

Sec. 2417. State enforcement of Fair Credit Reporting Act.

Sec. 2418. Federal Reserve Board authority.

Sec. 2419. Preemption of State law.

Sec. 2420. Effective date.

Sec. 2421. Relationship to other law.

Sec. 2422. Federal Reserve Board study.

CHAPTER 2—CREDIT REPAIR ORGANIZATIONS

Sec. 2451. Regulation of credit repair organizations.

Sec. 2452. Credit worthiness.

Subtitle E—Asset Conservation, Lender Liability, and Deposit Insurance Protection

Sec. 2501. Short title.

Sec. 2502. CERCLA lender and fiduciary liability limitations amendments.

Sec. 2503. Conforming amendment.

Sec. 2504. Lender liability rule.

Sec. 2505. Effective date.

Subtitle F—Miscellaneous

Sec. 2601. Federal Reserve Board study.

Sec. 2602. Treatment of claims arising from breach of contracts executed by the receiver or conservator.

Sec. 2603. Criminal sanctions for fictitious financial instruments and counterfeiting.

Sec. 2604. Amendments to the Truth in Savings Act.

Sec. 2605. Consumer Leasing Act amendments.

Sec. 2606. Study of corporate credit unions.

Sec. 2607. Report on the reconciliation of differences between regulatory accounting principles and generally accepted accounting principles.

Sec. 2608. State-by-State and metropolitan area-by-metropolitan area study of bank fees.

Sec. 2609. Prospective application of gold clauses in contracts.

Sec. 2610. Qualified family partnerships.

Sec. 2611. Cooperative efforts between depository institutions and farmers and ranchers in drought-stricken areas.

Sec. 2612. Streamlining process for determining new nonbanking activities.

Sec. 2613. Authorizing bank service companies to organize as limited liability partnerships.

Sec. 2614. Retirement certificates of deposits.

Sec. 2615. Prohibitions on certain depository institution associations with Government-sponsored enterprises.

Subtitle G—Deposit Insurance Funds

Sec. 2701. Short title.

Sec. 2702. Special assessment to capitalize SAIF.

Sec. 2703. Financing corporation funding.

Sec. 2704. Merger of BIF and SAIF.

Sec. 2705. Creation of SAIF special reserve.

Sec. 2706. Refund of amounts in deposit insurance fund in excess of designated reserve amount.

Sec. 2707. Assessment rates for SAIF members may not be less than assessment rates for BIF members.

Sec. 2708. Assessments authorized only if needed to maintain the reserve ratio of a deposit insurance fund.

Sec. 2709. Treasury study of common depository institution charter.

Sec. 2710. Definitions.

Sec. 2711. Deductions for special assessments.

<< 12 USCA § 252 NOTE >>

(c) DEFINITIONS.—Except as otherwise specified in this title, the following definitions shall apply for purposes of this title:

(1) APPRAISAL SUBCOMMITTEE.—The term "Appraisal Subcommittee" means the Appraisal Subcommittee established under section 1011 of the Federal Financial Institutions Examination Council Act of 1978 (as in existence on the day before the date of enactment of this Act).

(2) APPROPRIATE FEDERAL BANKING AGENCY.—The term "appropriate Federal banking agency" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

(3) BOARD.—The term "Board" means the Board of Governors of the Federal Reserve System.

(4) CORPORATION.—The term "Corporation" means the Federal Deposit Insurance Corporation.

(5) COUNCIL.—The term "Council" means the Financial Institutions Examination Council established under section 1004 of the Federal Financial Institutions Examination Council Act of 1978.

(6) INSURED CREDIT UNION.—The term "insured credit union" has the same meaning as in section 101 of the Federal Credit Union Act.

(7) INSURED DEPOSITORY INSTITUTION.—The term "insured depository institution" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

Subtitle A—Streamlining the Home Mortgage Lending Process

<< 12 USCA § 2601 NOTE >>

SEC. 2101. SIMPLIFICATION AND UNIFICATION OF DISCLOSURES REQUIRED UNDER RESPA AND TILA FOR MORTGAGE TRANSACTIONS.

(a) IN GENERAL.—With respect to credit transactions which are subject to the Real Estate Settlement Procedures Act of 1974 and the Truth in Lending Act, the Board of Governors of the Federal Reserve System (hereafter in this section referred to as the "Board") and the Secretary of Housing and Urban Development (hereafter in this section referred to as the "Secretary") shall take such action as may be necessary before the end of the 6–month period beginning on the date of enactment of this Act—

(1) to simplify and improve the disclosures applicable to such transactions under such Acts, including the timing of the disclosures; and

(2) to provide a single format for such disclosures which will satisfy the requirements of each such Act with respect to such transactions.

(b) REGULATIONS.—To the extent that it is necessary to prescribe any regulation in order to effect any changes required to be made under subsection (a), the proposed regulation shall be published in the Federal Register before the end of the 6–month period referred to in subsection (a).

(c) RECOMMENDATIONS FOR LEGISLATION.—If the Board and the Secretary find that legislative action may be necessary or appropriate in order to simplify and unify the disclosure requirements under the Real Estate Settlement Procedures Act of 1974 and the Truth in Lending Act, the Board and the Secretary shall submit a report containing recommendations to the Congress concerning such action.

SEC. 2102. GENERAL EXEMPTION AUTHORITY FOR LOANS.

<< 15 USCA § 1603 >>

(a) REGULATORY FLEXIBILITY.—Section 104 of the Truth in Lending Act (15 U.S.C. 1603) is amended—

(1) by redesignating paragraphs (5) and (6) as paragraphs (6) and (7), respectively; and

(2) by inserting after paragraph (4) the following new paragraph:

"(5) Transactions for which the Board, by rule, determines that coverage under this title is not necessary to carry out the purposes of this title.".

<< 15 USCA § 1604 >>

(b) EXEMPTION AUTHORITY.—Section 105 of the Truth in Lending Act (15 U.S.C. 1604) is amended by adding at the end the following new subsection:

"(f) EXEMPTION AUTHORITY.—

"(1) IN GENERAL.—The Board may exempt, by regulation, from all or part of this title any class of transactions, other than transactions involving any mortgage described in section 103(aa), for which, in the determination of the Board, coverage under all or part of this title does not provide a meaningful benefit to consumers in the form of useful information or protection.

"(2) FACTORS FOR CONSIDERATION.—In determining which classes of transactions to exempt in whole or in part under paragraph (1), the Board shall consider the following factors and publish its rationale at the time a proposed exemption is published for comment:

"(A) The amount of the loan and whether the disclosures, right of rescission, and other provisions provide a benefit to the consumers who are parties to such transactions, as determined by the Board.

"(B) The extent to which the requirements of this title complicate, hinder, or make more expensive the credit process for the class of transactions.

"(C) The status of the borrower, including—

"(i) any related financial arrangements of the borrower, as determined by the Board;

"(ii) the financial sophistication of the borrower relative to the type of transaction; and

"(iii) the importance to the borrower of the credit, related supporting property, and coverage under this title, as determined by the Board;

"(D) whether the loan is secured by the principal residence of the consumer; and

"(E) whether the goal of consumer protection would be undermined by such an exemption.".

SEC. 2103. REDUCTIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT OF 1974 REGULATORY BURDENS.

<< 12 USCA § 2605 >>

(a) UNNECESSARY DISCLOSURE.—Section 6(a) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2605(a)) is amended to read as follows:

"(a) DISCLOSURE TO APPLICANT RELATING TO ASSIGNMENT, SALE, OR TRANSFER OF LOAN SERVICING.—Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.".

<< 12 USCA § 2606 >>

(b) CONSISTENCY OF REAL ESTATE SETTLEMENT PROCEDURES ACT AND TRUTH IN LENDING ACT EXEMPTION OF BUSINESS LOANS.—Section 7 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2606) is amended—

(1) by striking "This Act" and inserting the following:

"(a) IN GENERAL.—This Act"; and

(2) by adding at the end the following new subsection:

"(b) INTERPRETATION.—In prescribing regulations under section 19(a), the Secretary shall ensure that, with respect to subsection (a) of this section, the exemption for credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, as provided in section 7(1) of the Real Estate Settlement Procedures Act of 1974 shall be the same as the exemption for such credit transactions under section 104(1) of the Truth in Lending Act.".

(c) REDESIGNATION OF CONTROLLED BUSINESS ARRANGEMENTS AS AFFILIATED BUSINESS ARRANGEMENTS.—The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.) is amended—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 2602 >>

(1) in section 3(7), by striking "controlled business arrangement" and inserting "affiliated business arrangement"; and

<< 12 USCA § 2607 >>

(2) in subsections (c)(4) and (d)(6) of section 8, by striking "controlled business arrangements" and inserting "affiliated business arrangements".

(d) DISCLOSURES BY TELEPHONE OR ELECTRONIC MEDIA.—Section 8(c)(4) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2607(c)(4)(A)) is amended by striking subparagraph (A) and inserting the following "(A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred (i) in the case of a face-to-face referral or a referral made in writing or by electronic media, at or before the time of the referral (and compliance with this requirement in such case may be evidenced by a notation in a written, electronic, or similar system of records maintained in the regular course of business); (ii) in the case of a referral made by telephone, within 3 business days after the referral by telephone, (and in such case an abbreviated verbal disclosure of the existence of the arrangement and the fact that a written disclosure will be provided within 3 business days shall be made to the person being referred during the telephone referral); or (iii) in the case of a referral by a lender (including a referral by a lender to an affiliated lender), at the time the estimates required under section 5(c) are provided (notwithstanding clause (i) or (ii)); and any required written receipt of such disclosure (without regard to the manner of the disclosure under clause (i), (ii), or (iii)) may be obtained at the closing or settlement (except that a person making a face-to-face referral who provides the written disclosure at or before the time of the referral shall attempt to obtain any required written receipt of such disclosure at such time and if the person being referred chooses not to acknowledge the receipt of the disclosure at that time, that fact shall be noted in the written, electronic, or similar system of records maintained in the regular course of business by the person making the referral),".

<< 12 USCA § 2614 >>

(e) LIMITATION ON CLAIMS ARISING FROM VIOLATIONS OF REQUIREMENTS FOR SERVICING MORTGAGES AND ADMINISTERING ESCROW ACCOUNTS.—Section 16 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2614) is amended—

(1) by striking "section 8 or 9" and inserting "section 6, 8, or 9"; and

(2) by striking "within one year" and inserting "within 3 years in the case of a violation of section 6 and 1 year in the case of a violation of section 8 or 9".

<< 12 USCA § 2617 >>

(f) DELAY OF EFFECTIVENESS OF RECENT FINAL REGULATION RELATING TO PAYMENTS TO EMPLOYEES. —Section 19 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2617) is amended by adding at the end the following new subsection:

"(d) DELAY OF EFFECTIVENESS OF RECENT FINAL REGULATION RELATING TO PAYMENTS TO EMPLOYEES. —

"(1) IN GENERAL.—The amendment to part 3500 of title 24 of the Code of Federal Regulations contained in the final regulation prescribed by the Secretary and published in the Federal Register on June 7, 1996, which will, as of the effective date of such amendment—

"(A) eliminate the exemption for payments by an employer to employees of such employer for referral activities which is currently codified as section 3500.14(g)(1)(vii) of such title 24; and

"(B) replace such exemption with a more limited exemption in new clauses (vii), (viii), and (ix) of section 3500.14 of such title 24,

shall not take effect before July 31, 1997.

AR.01559

"(2) CONTINUATION OF PRIOR RULE.—The regulation codified as section 3500.14(g)(1)(vii) of title 24 of the Code of Federal Regulations, relating to employer-employee payments, as in effect on May 1, 1996, shall remain in effect until the date the amendment referred to in paragraph (1) takes effect in accordance with such paragraph.

"(3) PUBLIC NOTICE OF EFFECTIVE DATE.—The Secretary shall provide public notice of the date on which the amendment referred to in paragraph (1) will take effect in accordance with such paragraph not less than 90 days and not more than 180 days before such effective date.".

(g) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 12 USCA § 2603 >>

(1) Section 4(a) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2603(a)) is amended by striking "Federal Home Loan Bank Board" and inserting "Director of the Office of Thrift Supervision".

<< 12 USCA § 2609 >>

(2) Section 10(c)(1)(C) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2609(c)(1)(C)) is amended by striking "Not later than the expiration of the 90-day period beginning on the date of the enactment of the Cranston–Gonzalez National Affordable Housing Act, the" and inserting "The".

<< 12 USCA §§ 2611, 2612, 2613 >>

(h) REPEAL OF OBSOLETE PROVISIONS.—The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.) is amended by striking sections 13, 14 and 15.

<< 15 USCA § 1604 >>

SEC. 2104. WAIVER FOR CERTAIN BORROWERS.

Section 105 of the Truth in Lending Act (15 U.S.C. 1604) is amended by adding at the end the following new subsection:

"(g) WAIVER FOR CERTAIN BORROWERS.—

"(1) IN GENERAL.—The Board, by regulation, may exempt from the requirements of this title certain credit transactions if—

"(A) the transaction involves a consumer—

"(i) with an annual earned income of more than $200,000; or

"(ii) having net assets in excess of $1,000,000 at the time of the transaction; and

"(B) a waiver that is handwritten, signed, and dated by the consumer is first obtained from the consumer.

"(2) ADJUSTMENTS BY THE BOARD.—The Board, at its discretion, may adjust the annual earned income and net asset requirements of paragraph (1) for inflation.".

<< 15 USCA § 1638 >>

SEC. 2105. ALTERNATIVE DISCLOSURES FOR ADJUSTABLE RATE MORTGAGES.

Section 128(a) of the Truth in Lending Act (15 U.S.C. 1638(a)) is amended by adding at the end the following new paragraph:

"(14) In the case of any variable interest rate residential mortgage transaction, in disclosures provided at application as prescribed by the Board for a variable rate transaction secured by the consumer's principal dwelling, at the option of the creditor, a statement that the periodic payments may increase or decrease substantially, and the maximum interest rate and payment for a $10,000 loan originated at a recent interest rate, as determined by the Board, assuming the maximum periodic increases in rates and payments under the program, or a historical example illustrating the effects of interest rate changes implemented according to the loan program.".

<< 15 USCA § 1607 >>

## SEC. 2106. RESTITUTION FOR VIOLATIONS OF THE TRUTH IN LENDING ACT.

Section 108(e)(3) of the Truth in Lending Act (15 U.S.C. 2602(3)) is amended—

(1) by striking "ordered (A) if" and inserting the following: "ordered—

 "(A) if";

(2) by striking "may require a partial" and inserting "may—

 "(i) require a partial";

(3) by striking ", except that with respect" and all that follows through "Act, the agency shall require" and inserting "; or

 "(ii) require";

(4) by striking "reasonable, (B) the" and inserting the following: "reasonable, if (in the case of an agency referred to in paragraph (1), (2), or (3) of subsection (a)), the agency determines that a partial adjustment or making partial payments over an extended period is necessary to avoid causing the creditor to become undercapitalized pursuant to section 38 of the Federal Deposit Insurance Act;

 "(B) the"; and

(5) by striking "(C) except" and inserting the following:

 "(C) except".

## SEC. 2107. LIMITATION ON LIABILITY UNDER THE TRUTH IN LENDING ACT.

<< 15 USCA § 1649 >>

(a) IN GENERAL.—Section 139(a) of the Truth in Lending Act (15 U.S.C. 1649(a)) is amended by striking "For any consumer credit transaction subject to this title" and inserting "For any closed end consumer credit transaction that is secured by real property or a dwelling, that is subject to this title, and".

<< 15 USCA § 1649 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as of September 30, 1995.

Subtitle B—Streamlining Government Regulation

CHAPTER 1—ELIMINATING UNNECESSARY REGULATORY REQUIREMENTS AND PROCEDURES

## SEC. 2201. ELIMINATION OF REDUNDANT APPROVAL REQUIREMENT FOR OAKAR TRANSACTIONS.

<< 12 USCA § 1815 >>

(a) IN GENERAL.—Section 5(d)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1815(d)(3)) is amended—

(1) in subparagraph (A), by striking "with the prior written approval of" and inserting "if the transaction is approved by";

(2) in subparagraph (E)—

 (A) by striking clauses (i) and (iv);

 (B) by redesignating clauses (ii) and (iii) as clauses (i) and (ii), respectively; and

 (C) by adding at the end the following new clause:

  "(iii) CAPITAL REQUIREMENTS.—A transaction described in this paragraph shall not be approved under section 18(c) (2) unless the acquiring, assuming, or resulting depository institution will meet all applicable capital requirements upon consummation of the transaction.";

(3) by striking subparagraph (G); and

(4) by redesignating subparagraphs (H) through (J) as subparagraphs (G) through (I), respectively.

(b) CONFORMING AMENDMENTS.—

<< 12 USCA § 215c >>

(1) REVISED STATUTES.—Section 5156A(b)(1) of the Revised Statutes of the United States (12 U.S.C. 215c(b)(1)) is amended by striking "by section 5(d)(3) of the Federal Deposit Insurance Act or any other" and inserting "under any".

<< 12 USCA § 1467a >>

(2) HOME OWNERS' LOAN ACT.—Section 10(s)(2)(A) of the Home Owners' Loan Act (12 U.S.C. 1467a(s)(2)(A)) is amended by striking "under section 5(d)(3) of the Federal Deposit Insurance Act or any other" and inserting "under any".

SEC. 2203. ELIMINATION OF DUPLICATIVE REQUIREMENTS IMPOSED UPON BANK HOLDING COMPANIES.

<< 12 USCA § 1467a >>

(a) EXEMPTION FOR BANK HOLDING COMPANIES.—Section 10 of the Home Owners' Loan Act (12 U.S.C. 1467a) is amended by adding at the end the following new subsection:

"(t) EXEMPTION FOR BANK HOLDING COMPANIES.—This section shall not apply to a bank holding company that is subject to the Bank Holding Company Act of 1956, or any company controlled by such bank holding company.".

<< 12 USCA § 1467a >>

(b) DEFINITION.—Section 10(a)(1)(D) of the Home Owners' Loan Act (12 U.S.C. 1467a(a)(1)(D)) is amended to read as follows:

"(D) SAVINGS AND LOAN HOLDING COMPANY.—

"(i) IN GENERAL.—Except as provided in clause (ii), the term 'savings and loan holding company' means any company that directly or indirectly controls a savings association or that controls any other company that is a savings and loan holding company.

"(ii) EXCLUSION.—The term 'savings and loan holding company' does not include a bank holding company that is registered under, and subject to, the Bank Holding Company Act of 1956, or to any company directly or indirectly controlled by such company (other than a savings association).".

(c) ACQUISITIONS.—Section 10(e)(1) of the Home Owners' Loan Act (12 U.S.C. 1467a(e)(1)) is amended—

(1) in subparagraph (A)(iii)(VII), by inserting "or" at the end;

(2) in subparagraph (A)(iv), by inserting "and" at the end; and

(3) in subparagraph (B)—

(A) by striking "or (ii)" and inserting "(ii)"; and

(B) by inserting before the first period ", or (iii) acquired by a bank holding company that is registered under, and subject to, the Bank Holding Company Act of 1956, or any company controlled by such bank holding company".

<< 12 USCA § 1843 >>

(d) AMENDMENTS TO THE BANK HOLDING COMPANY ACT OF 1956.—Section 4(i) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(i)) is amended by adding at the end the following new paragraphs:

"(4) SOLICITATION OF VIEWS.—

"(A) NOTICE TO DIRECTOR.—Upon receiving any application or notice by a bank holding company to acquire, directly or indirectly, a savings association under subsection (c)(8), the Board shall solicit comments and recommendations from the Director with respect to such acquisition.

"(B) COMMENT PERIOD.—The comments and recommendations of the Director under subparagraph (A) with respect to any acquisition subject to such subparagraph shall be transmitted to the Board not later than 30 days after the receipt by the Director of the notice relating to such acquisition (or such shorter period as the Board may specify if the Board advises the Director that an emergency exists that requires expeditious action).

"(5) EXAMINATION.—

"(A) SCOPE.—The Board shall consult with the Director, as appropriate, in establishing the scope of an examination by the Board of a bank holding company that directly or indirectly controls a savings association.

"(B) ACCESS TO INSPECTION REPORTS.—Upon the request of the Director, the Board shall furnish the Director with a copy of any inspection report, additional examination materials, or supervisory information relating to any bank holding company that directly or indirectly controls a savings association.

"(6) COORDINATION OF ENFORCEMENT EFFORTS.—The Board and the Director shall cooperate in any enforcement action against any bank holding company that controls a savings association, if the relevant conduct involves such association.

"(7) DIRECTOR DEFINED.—For purposes of this section, the term 'Director' means the Director of the Office of Thrift Supervision.".

<< 12 USCA § 36 >>

## SEC. 2204. ELIMINATION OF THE PER BRANCH CAPITAL REQUIREMENT FOR NATIONAL BANKS AND STATE MEMBER BANKS.

Section 5155(h) of the Revised Statutes of the United States (12 U.S.C. 36(h)) is amended to read as follows:
"(h) [Repealed]".

## SEC. 2205. ELIMINATION OF BRANCH APPLICATION REQUIREMENTS FOR AUTOMATIC TELLER MACHINES.

<< 12 USCA § 36 >>

(a) "BRANCH" UNDER NATIONAL BANK ACT.—Section 5155(j) of the Revised Statutes of the United States (12 U.S.C. 36(j)) is amended by adding at the end the following: "The term 'branch', as used in this section, does not include an automated teller machine or a remote service unit.".

<< 12 USCA § 1813 >>

(b) "DOMESTIC BRANCH" UNDER THE FEDERAL DEPOSIT INSURANCE ACT.—Section 3(o) of the Federal Deposit Insurance Act (12 U.S.C. 1813(o)) is amended by striking "lent; and the" and inserting "lent. The term 'domestic branch' does not include an automated teller machine or a remote service unit. The".

<< 12 USCA § 371d >>

## SEC. 2206. ELIMINATION OF REQUIREMENT FOR APPROVAL OF INVESTMENTS IN BANK PREMISES FOR WELL CAPITALIZED AND WELL MANAGED BANKS.

Section 24A of the Federal Reserve Act (12 U.S.C. 371d) is amended to read as follows:

"SEC. 24A. INVESTMENT IN BANK PREMISES OR STOCK OF CORPORATION HOLDING PREMISES.

"(a) CONDITIONS OF INVESTMENT.—No national bank or State member bank shall invest in bank premises, or in the stock, bonds, debentures, or other such obligations of any corporation holding the premises of such bank, or make loans to or upon the security of any such corporation—

"(1) unless the bank receives the prior approval of the Comptroller of the Currency (with respect to a national bank) or the Board (with respect to a State member bank);

"(2) unless the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation that is an affiliate of the bank, is less than or equal to the amount of the capital stock of such bank; or

"(3) unless—

"(A) the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation that is an affiliate of the bank, is less than or equal to 150 percent of the capital and surplus of the bank; and

"(B) the bank—

"(i) has a CAMEL composite rating of 1 or 2 under the Uniform Financial Institutions Rating System (or an equivalent rating under a comparable rating system) as of the most recent examination of such bank;

"(ii) is well capitalized and will continue to be well capitalized after the investment or loan; and

"(iii) provides notification to the Comptroller of the Currency (with respect to a national bank) or to the Board (with respect to a State member bank) not later than 30 days after making the investment or loan.

"(b) DEFINITIONS.—For purposes of this section—

"(1) the term 'affiliate' has the same meaning as in section 2 of the Banking Act of 1933; and

"(2) the term 'well capitalized' has the same meaning as in section 38(b) of the Federal Deposit Insurance Act.".

<< 12 USCA § 1841 >>

SEC. 2207. ELIMINATION OF APPROVAL REQUIREMENT FOR DIVESTITURES.

Section 2(g) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(g)) is amended—

(1) in paragraph (1), by adding "and" at the end;

(2) in paragraph (2), by striking "; and" and inserting a period; and

(3) by striking paragraph (3).

SEC. 2208. STREAMLINED NONBANKING ACQUISITIONS BY WELL CAPITALIZED AND WELL MANAGED BANKING ORGANIZATIONS.

<< 12 USCA § 1843 >>

(a) NOTICE REQUIREMENTS.—Section 4(j) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(j)) is amended—

(1) in paragraph (1)(A), by striking "No" and inserting "Except as provided in paragraph (3), no"; and

(2) by adding at the end the following new paragraphs:

"(3) NO NOTICE REQUIRED FOR CERTAIN TRANSACTIONS.—No notice under paragraph (1) of this subsection or under subsection (c)(8) or (a)(2)(B) is required for a proposal by a bank holding company to engage in any activity or acquire the shares or assets of any company, other than an insured depository institution, if the proposal qualifies under paragraph (4).

"(4) CRITERIA FOR STATUTORY APPROVAL.—A proposal qualifies under this paragraph if all of the following criteria are met:

"(A) FINANCIAL CRITERIA.—Both before and immediately after the proposed transaction—

"(i) the acquiring bank holding company is well capitalized;

"(ii) the lead insured depository institution of such holding company is well capitalized;

"(iii) well capitalized insured depository institutions control at least 80 percent of the aggregate total risk-weighted assets of insured depository institutions controlled by such holding company; and

"(iv) no insured depository institution controlled by such holding company is undercapitalized.

"(B) MANAGERIAL CRITERIA.—

"(i) WELL MANAGED.—At the time of the transaction, the acquiring bank holding company, its lead insured depository institution, and insured depository institutions that control at least 90 percent of the aggregate total risk-weighted assets of insured depository institutions controlled by such holding company are well managed.

"(ii) LIMITATION ON POORLY MANAGED INSTITUTIONS.—Except as provided in paragraph (6), no insured depository institution controlled by the acquiring bank holding company has received 1 of the 2 lowest composite ratings at the later of the institution's most recent examination or subsequent review.

"(C) ACTIVITIES PERMISSIBLE.—Following consummation of the proposal, the bank holding company engages directly or through a subsidiary solely in—

"(i) activities that are permissible under subsection (c)(8), as determined by the Board by regulation or order thereunder, subject to all of the restrictions, terms, and conditions of such subsection and such regulation or order; and

"(ii) such other activities as are otherwise permissible under this section, subject to the restrictions, terms and conditions, including any prior notice or approval requirements, provided in this section.

"(D) SIZE OF ACQUISITION.—

"(i) ASSET SIZE.—The book value of the total assets to be acquired does not exceed 10 percent of the consolidated total risk-weighted assets of the acquiring bank holding company.

"(ii) CONSIDERATION.—The gross consideration to be paid for the securities or assets does not exceed 15 percent of the consolidated Tier 1 capital of the acquiring bank holding company.

"(E) NOTICE NOT OTHERWISE WARRANTED.—For proposals described in paragraph (5)(B), the Board has not, before the conclusion of the period provided in paragraph (5)(B), advised the bank holding company that a notice under paragraph (1) is required.

"(F) COMPLIANCE CRITERION.—During the 12–month period ending on the date on which the bank holding company proposes to commence an activity or acquisition, no administrative enforcement action has been commenced, and no cease and desist order has been issued pursuant to section 8 of the Federal Deposit Insurance Act, against the bank holding company or any depository institution subsidiary of the holding company, and no such enforcement action, order, or other administrative enforcement proceeding is pending as of such date.

"(5) NOTIFICATION.—

"(A) COMMENCEMENT OF ACTIVITIES APPROVED BY RULE.—A bank holding company that qualifies under paragraph (4) and that proposes to engage de novo, directly or through a subsidiary, in any activity that is permissible under subsection (c)(8), as determined by the Board by regulation, may commence that activity without prior notice to the Board and must provide written notification to the Board not later than 10 business days after commencing the activity.

"(B) ACTIVITIES PERMITTED BY ORDER AND ACQUISITIONS.—

"(i) IN GENERAL.—At least 12 business days before commencing any activity pursuant to paragraph (3) (other than an activity described in subparagraph (A) of this paragraph) or acquiring shares or assets of any company pursuant to paragraph (3), the bank holding company shall provide written notice of the proposal to the Board, unless the Board determines that no notice or a shorter notice period is appropriate.

"(ii) DESCRIPTION OF ACTIVITIES AND TERMS.—A notification under this subparagraph shall include a description of the proposed activities and the terms of any proposed acquisition.

"(6) RECENTLY ACQUIRED INSTITUTIONS.—Any insured depository institution which has been acquired by a bank holding company during the 12–month period preceding the date on which the company proposes to commence an activity or acquisition pursuant to paragraph (3) may be excluded for purposes of paragraph (4)(B)(ii) if—

"(A) the bank holding company has developed a plan for the institution to restore the capital and management of the institution which is acceptable to the appropriate Federal banking agency; and

"(B) all such insured depository institutions represent, in the aggregate, less than 10 percent of the aggregate total risk-weighted assets of all insured depository institutions controlled by the bank holding company.

"(7) ADJUSTMENT OF PERCENTAGES.—The Board may, by regulation, adjust the percentages and the manner in which the percentages of insured depository institutions are calculated under paragraph (4)(B)(i), (4)(D), or (6)(B) if the Board determines that any such adjustment is consistent with safety and soundness and the purposes of this Act.".

<< 12 USCA § 1841 >>

(b) DEFINITIONS.—Section 2(o) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(o)) is amended—

(1) by striking paragraph (1) and inserting the following new paragraph:

"(1) CAPITAL TERMS.—

"(A) INSURED DEPOSITORY INSTITUTIONS.—With respect to insured depository institutions, the terms 'well capitalized', 'adequately capitalized', and 'undercapitalized' have the same meanings as in section 38(b) of the Federal Deposit Insurance Act.

"(B) BANK HOLDING COMPANY.—

"(i) ADEQUATELY CAPITALIZED.—With respect to a bank holding company, the term 'adequately capitalized' means a level of capitalization which meets or exceeds all applicable Federal regulatory capital standards.

"(ii) WELL CAPITALIZED.—A bank holding company is 'well capitalized' if it meets the required capital levels for well capitalized bank holding companies established by the Board.

"(C) OTHER CAPITAL TERMS.—The terms 'Tier 1' and 'risk-weighted assets' have the meanings given those terms in the capital guidelines or regulations established by the Board for bank holding companies."; and

(2) by adding at the end the following new paragraphs:

"(8) LEAD INSURED DEPOSITORY INSTITUTIONS.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) IN GENERAL.—The term 'lead insured depository institution' means the largest insured depository institution controlled by the subject bank holding company at any time, based on a comparison of the average total risk-weighted assets controlled by each insured depository institution during the previous 12–month period.

"(B) BRANCH OR AGENCY.—For purposes of this paragraph and section 4(j)(4), the term 'insured depository institution' includes any branch or agency operated in the United States by a foreign bank.

"(9) WELL MANAGED.—The term 'well managed' means—

"(A) in the case of any company or depository institution which receives examinations, the achievement of—

"(i) a CAMEL composite rating of 1 or 2 (or an equivalent rating under an equivalent rating system) in connection with the most recent examination or subsequent review of such company or institution; and

"(ii) at least a satisfactory rating for management, if such rating is given; or

"(B) in the case of a company or depository institution that has not received an examination rating, the existence and use of managerial resources which the Board determines are satisfactory.".

<< 12 USCA § 1831i >>

SEC. 2209. ELIMINATION OF UNNECESSARY FILING FOR OFFICER AND DIRECTOR APPOINTMENTS.

Section 32 of the Federal Deposit Insurance Act (12 U.S.C. 1831i) is amended—

(1) in subsection (a)—

(A) by inserting "(or such other period, as determined by the appropriate Federal banking agency)" after "30 days";

(B) by striking "if the insured depository institution or depository institution holding company" and inserting "if";

(C) by striking paragraphs (1) and (2);

(D) by redesignating paragraph (3) as paragraph (1);

(E) in paragraph (1), as redesignated—

(i) by inserting "the insured depository institution or depository institution holding company" before "is not in compliance"; and

(ii) by striking the period at the end and inserting "; or"; and

(F) by adding at the end the following new paragraph:

"(2) the agency determines, in connection with the review by the agency of the plan required under section 38 or otherwise, that such prior notice is appropriate."; and

(2) in subsection (b), by striking "30–day period" and inserting "notice period, not to exceed 90 days,".

SEC. 2210. AMENDMENTS TO THE DEPOSITORY INSTITUTION MANAGEMENT INTERLOCKS ACT.

<< 12 USCA § 3203 >>

(a) DUAL SERVICE AMONG LARGER ORGANIZATIONS—Section 204 of the Depository Institution Management Interlocks Act (12 U.S.C. 3203) is amended—

(1) by striking "$1,000,000,000" and inserting "$2,500,000,000";

(2) by striking "$500,000,000" and inserting "$1,500,000,000"; and

(3) by adding at the end the following: "In order to allow for inflation or market changes, the appropriate Federal depository institutions regulatory agencies may, by regulation, adjust, as necessary, the amount of total assets required for depository institutions or depository holding companies under this section.".

<< 12 USCA § 3205 >>

(b) EXTENSION OF GRANDFATHER EXEMPTION.—Section 206 of the Depository Institution Management Interlocks Act (12 U.S.C. 3205) is amended—

(1) in subsection (a), by striking "for a period of, subject to the requirements of subsection (c), 20 years after the date of enactment of this title";

(2) in subsection (b), by striking the second sentence; and

AR.01566

(3) by striking subsection (c).

<< 12 USCA § 3207 >>

(c) REGULATIONS.—Section 209 of the Depository Institution Management Interlocks Act (12 U.S.C. 3207) is amended—
(1) in subsection (a)—
  (A) by striking "(a) IN GENERAL.—Rules and regulations" and inserting "Regulations";
  (B) by inserting ", including regulations that permit service by a management official that would otherwise be prohibited by section 203 or section 204, if such service would not result in a monopoly or substantial lessening of competition," after "title";
  (C) in paragraph (4)—
    (i) by striking "Federal Home Loan Bank Board" and inserting "Director of the Office of Thrift Supervision"; and
    (ii) by striking "Savings and Loan" and inserting "Deposit"; and
(2) by striking subsections (b) and (c).

<< 12 USCA § 375b >>

SEC. 2211. ELIMINATION OF RECORDKEEPING AND REPORTING REQUIREMENTS FOR OFFICERS.

(a) EMPLOYEE BENEFIT PLANS.—Section 22(h)(2) of the Federal Reserve Act (12 U.S.C. 375b(2)) is amended—
(1) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively, and indenting appropriately;
(2) by striking "(2) PREFERENTIAL TERMS PROHIBITED.—" and inserting the following:
"(2) PREFERENTIAL TERMS PROHIBITED.—
  "(A) IN GENERAL.—"; and
(3) by adding at the end the following new subparagraph:
  "(B) EXCEPTION.—Nothing in this paragraph shall prohibit any extension of credit made pursuant to a benefit or compensation program—
    "(i) that is widely available to employees of the member bank; and
    "(ii) that does not give preference to any officer, director, or principal shareholder of the member bank, or to any related interest of such person, over other employees of the member bank.".
(b) EXCEPTION FOR EXTENSIONS OF CREDIT TO EXECUTIVE OFFICERS AND DIRECTORS OF AFFILIATES.
—Section 22(h)(8)(B) of the Federal Reserve Act (12 U.S.C. 375b(8)(B)) is amended to read as follows:
"(B) EXCEPTION.—The Board may, by regulation, make exceptions to subparagraph (A) for any executive officer or director of a subsidiary of a company that controls the member bank if—
  "(i) the executive officer or director does not have authority to participate, and does not participate, in major policymaking functions of the member bank; and
  "(ii) the assets of such subsidiary do not exceed 10 percent of the consolidated assets of a company that controls the member bank and such subsidiary (and is not controlled by any other company).".

<< 12 USCA § 3337 >>

SEC. 2212. REPAYMENT OF TREASURY LOAN.

Section 1108 of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 3337) is amended by adding at the end the following new subsection.—
"(c) REPAYMENT OF TREASURY LOAN.—Not later than September 30, 1998, the Appraisal Subcommittee shall repay to the Secretary of the Treasury the unpaid portion of the $5,000,000 paid to the Appraisal Subcommittee pursuant to this section.".

<< 12 USCA § 1831r–1 >>

SEC. 2213. BRANCH CLOSURES.

Section 42 of the Federal Deposit Insurance Act (12 U.S.C. 1831r–1) is amended by adding at the end the following new subsection:

"(e) SCOPE OF APPLICATION.—This section shall not apply with respect to—

"(1) an automated teller machine;

"(2) the relocation of a branch or consolidation of one or more branches into another branch, if the relocation or consolidation—

"(A) occurs within the immediate neighborhood; and

"(B) does not substantially affect the nature of the business or customers served; or

"(3) a branch that is closed in connection with—

"(A) an emergency acquisition under—

"(i) section 11(n); or

"(ii) subsection (f) or (k) of section 13; or

"(B) any assistance provided by the Corporation under section 13(c).".

<< 12 USCA § 3105 >>

SEC. 2214. FOREIGN BANKS.

(a) EXAMINATION OF BRANCHES AND AGENCIES BY BOARD.—Section 7(c) of the International Banking Act of 1978 (12 U.S.C. 3105(c)) is amended—

(1) by striking "(c)" and inserting the following:

"(c) FOREIGN BANK EXAMINATIONS AND REPORTING.—";

(2) in paragraph (1)(B), by adding at the end the following new clause:

"(iii) AVOIDANCE OF DUPLICATION.—In exercising its authority under this paragraph, the Board shall take all reasonable measures to reduce burden and avoid unnecessary duplication of examinations.";

(3) by striking subparagraph (C) of paragraph (1) and inserting the following:

"(C) ON–SITE EXAMINATION.—Each Federal branch or agency, and each State branch or agency, of a foreign bank shall be subject to on-site examination by an appropriate Federal banking agency or State bank supervisor as frequently as would a national bank or a State bank, respectively, by the appropriate Federal banking agency."; and

(4) in paragraph (1)(D), by inserting before the period at the end the following: ", only to the same extent that fees are collected by the Board for examination of any State member bank".

(b) ESTABLISHMENT OF FOREIGN BANK OFFICES IN THE UNITED STATES.—Section 7(d) of the International Banking Act of 1978 (12 U.S.C. 3105(d)) is amended—

(1) in paragraph (2), by striking "The Board" and inserting "Except as provided in paragraph (6), the Board";

(2) in paragraph (5), by striking "Consistent with the standards for approval in paragraph (2), the"; and inserting "The"; and

(3) by adding at the end the following new paragraphs:

"(6) EXCEPTION.—

"(A) IN GENERAL.—If the Board is unable to find, under paragraph (2), that a foreign bank is subject to comprehensive supervision or regulation on a consolidated basis by the appropriate authorities in its home country, the Board may nevertheless approve an application by such foreign bank under paragraph (1) if—

"(i) the appropriate authorities in the home country of the foreign bank are actively working to establish arrangements for the consolidated supervision of such bank; and

"(ii) all other factors are consistent with approval.

"(B) OTHER CONSIDERATIONS.—In deciding whether to use its discretion under subparagraph (A), the Board shall also consider whether the foreign bank has adopted and implements procedures to combat money laundering. The Board may also take into account whether the home country of the foreign bank is developing a legal regime to address money laundering or is participating in multilateral efforts to combat money laundering.

"(C) ADDITIONAL CONDITIONS.—In approving an application under this paragraph, the Board, after requesting and taking into consideration the views of the appropriate State bank supervisor or the Comptroller of the Currency, as the case may be, may impose such conditions or restrictions relating to the activities or business operations of the proposed branch, agency,

or commercial lending company subsidiary, including restrictions on sources of funding, as are considered appropriate. The Board shall coordinate with the appropriate State bank supervisor or the Comptroller of the Currency, as appropriate, in the implementation of such conditions or restrictions.

"(D) MODIFICATION OF CONDITIONS.—Any condition or restriction imposed by the Board in connection with the approval of an application under authority of this paragraph may be modified or withdrawn.

"(7) TIME PERIOD FOR BOARD ACTION.—

"(A) FINAL ACTION.—The Board shall take final action on any application under paragraph (1) not later than 180 days after receipt of the application, except that the Board may extend for an additional 180 days the period within which to take final action on such application after providing notice of, and the reasons for, the extension to the applicant foreign bank and any appropriate State bank supervisor or the Comptroller of the Currency, as appropriate.

"(B) FAILURE TO SUBMIT INFORMATION.—The Board may deny any application if it does not receive information requested from the applicant foreign bank or appropriate authorities in the home country of the foreign bank in sufficient time to permit the Board to evaluate such information adequately within the time periods for final action set forth in subparagraph (A).

"(C) WAIVER.—A foreign bank may waive the applicability of this paragraph with respect to any application under paragraph (1).".

(c) TERMINATION OF FOREIGN BANK OFFICES IN THE UNITED STATES.—Section 7(e)(1)(A) of the International Banking Act of 1978 (12 U.S.C. 3105(e)(1)(A)) is amended—

(1) by inserting "(i)" after "(A)";

(2) by striking "or" at the end and inserting "and"; and

(3) by adding at the end the following new clause:

"(ii) the appropriate authorities in the home country of the foreign bank are not making demonstrable progress in establishing arrangements for the comprehensive supervision or regulation of such foreign bank on a consolidated basis; or".

<< 12 USCA § 1843 >>

SEC. 2215. DISPOSITION OF FORECLOSED ASSETS.

Section 4(c)(2) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(2)) is amended—

(1) by striking "for not more than one year at a time"; and

(2) by striking "but no such extensions shall extend beyond a date five years" and inserting "and, in the case of a bank holding company which has not disposed of such shares within 5 years after the date on which such shares were acquired, the Board may, upon the application of such company, grant additional exemptions if, in the judgment of the Board, such extension would not be detrimental to the public interest and, either the bank holding company has made a good faith attempt to dispose of such shares during such 5–year period, or the disposal of such shares during such 5–year period would have been detrimental to the company, except that the aggregate duration of such extensions shall not extend beyond 10 years".

SEC. 2216. EXEMPTION AUTHORITY FOR ANTITYING PROVISION.

<< 12 USCA § 1972 >>

(a) FEDERAL RESERVE BOARD AUTHORITY.—Section 106(b)(1) of the Bank Holding Company Act Amendments of 1970 (12 U.S.C. 1972(1)) is amended in the last sentence, by inserting "and the prohibitions of section 4(f)(9) and 4(h)(2) of the Bank Holding Company Act of 1956" after "prohibition".

<< 12 USCA § 1464 >>

(b) OTS AUTHORITY.—Section 5(q) of the Home Owners' Loan Act (12 U.S.C. 1464(q)) is amended by adding at the end the following new paragraph:

"(6) EXCEPTIONS.—The Director may, by regulation or order, permit such exceptions to the prohibitions of this subsection as the Director considers will not be contrary to the purposes of this subsection and which conform to exceptions granted

by the Board of Governors of the Federal Reserve System pursuant to section 106(b) of the Bank Holding Company Act Amendments of 1970.".

<< 12 USCA § 1831a >>

SEC. 2217. FDIC APPROVAL OF NEW STATE BANK POWERS.

Section 24 of the Federal Deposit Insurance Act (12 U.S.C. 1831a) is amended—
  (1) in subsection (a)—
    (A) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and indenting appropriately;
    (B) by striking "IN GENERAL.—" and inserting the following: "PERMISSIBLE ACTIVITIES.—
"(1) IN GENERAL.—"; and
    (C) by adding at the end the following new paragraph:
"(2) PROCESSING PERIOD.—
    "(A) IN GENERAL.—The Corporation shall make a determination under paragraph (1)(A) not later than 60 days after receipt of a completed application that may be required under this subsection.
    "(B) EXTENSION OF TIME PERIOD.—The Corporation may extend the 60–day period referred to in subparagraph (A) for not more than 30 additional days, and shall notify the applicant of any such extension."; and
  (2) in subsection (d), by adding at the end the following new paragraph:
"(3) PROCESSING PERIOD.—
    "(A) IN GENERAL.—The Corporation shall make a determination under paragraph (1)(A) not later than 60 days after receipt of a completed application that may be required under this subsection.
    "(B) EXTENSION OF TIME PERIOD.—The Corporation may extend the 60–day period referred to in subparagraph (A) for not more than 30 additional days, and shall notify the applicant of any such extension.".

CHAPTER 2—ELIMINATING UNNECESSARY REGULATORY BURDENS

<< 12 USCA § 1820 >>

SEC. 2221. SMALL BANK EXAMINATION CYCLE.

Section 10(d) of the Federal Deposit Insurance Act (12 U.S.C. 1820(d)) is amended—
  (1) by redesignating the second paragraph designated as paragraph (8) as paragraph (10), and by inserting that paragraph, as redesignated, immediately after paragraph (9); and
  (2) in paragraph (10), as redesignated, by striking "$175,000,000" and inserting "$250,000,000".

<< 12 USCA § 3311 >>

SEC. 2222. REQUIRED REVIEW OF REGULATIONS.

 (a) IN GENERAL.—Not less frequently than once every 10 years, the Council and each appropriate Federal banking agency represented on the Council shall conduct a review of all regulations prescribed by the Council or by any such appropriate Federal banking agency, respectively, in order to identify outdated or otherwise unnecessary regulatory requirements imposed on insured depository institutions.
 (b) PROCESS.—In conducting the review under subsection (a), the Council or the appropriate Federal banking agency shall—
   (1) categorize the regulations described in subsection (a) by type (such as consumer regulations, safety and soundness regulations, or such other designations as determined by the Council, or the appropriate Federal banking agency); and
   (2) at regular intervals, provide notice and solicit public comment on a particular category or categories of regulations, requesting commentators to identify areas of the regulations that are outdated, unnecessary, or unduly burdensome.
 (c) COMPLETE REVIEW.—The Council or the appropriate Federal banking agency shall ensure that the notice and comment period described in subsection (b)(2) is conducted with respect to all regulations described in subsection (a) not less frequently than once every 10 years.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(d) REGULATORY RESPONSE.—The Council or the appropriate Federal banking agency shall—

(1) publish in the Federal Register a summary of the comments received under this section, identifying significant issues raised and providing comment on such issues; and

(2) eliminate unnecessary regulations to the extent that such action is appropriate.

(e) REPORT TO CONGRESS.—Not later than 30 days after carrying out subsection (d)(1), the Council shall submit to the Congress a report, which shall include—

(1) a summary of any significant issues raised by public comments received by the Council and the appropriate Federal banking agencies under this section and the relative merits of such issues; and

(2) an analysis of whether the appropriate Federal banking agency involved is able to address the regulatory burdens associated with such issues by regulation, or whether such burdens must be addressed by legislative action.

SEC. 2223. REPEAL OF IDENTIFICATION OF NONBANK FINANCIAL INSTITUTION CUSTOMERS.

Subchapter II of chapter 53 of title 31, United States Code, is amended—

<< 31 USCA § 5327 >>

(1) by striking section 5327;

<< 31 USCA Ch. 53 >>

(2) in the chapter analysis, by striking the item relating to section 5327; and

<< 31 USCA § 5321 >>

(3) in section 5321(a), by striking paragraph (7).

SEC. 2224. REPEAL OF CERTAIN REPORTING REQUIREMENTS.

<< 12 USCA § 251 >>

(a) FDIA.—Section 477 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 251) is repealed.

<< 12 USCA § 1833 >>

(b) FIRREA.—Section 918 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 1833 note) is repealed.

<< 12 USCA § 3912 >>

(c) ILS.—Section 913 of the International Lending Supervision Act of 1983 (12 U.S.C. 3912) is repealed.

SEC. 2225. INCREASE IN HOME MORTGAGE DISCLOSURE EXEMPTION THRESHOLD.

<< 12 USCA § 2808 >>

(a) IN GENERAL.—Section 309 of the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2808) is amended—

(1) by striking "This title" and inserting "(a) IN GENERAL.—This title";

(2) in the 3d sentence, by inserting "(as determined without regard to the adjustment made by subsection (b))" before the period; and

(2) by adding at the end the following new subsection:

"(b) CPI ADJUSTMENTS.—

"(1) IN GENERAL.—Subject to paragraph (2), the dollar amount applicable with respect to institutions described in section 303(2)(A) under the 2d sentence of subsection (a) shall be adjusted annually after December 31, 1996, by the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers published by the Bureau of Labor Statistics.

"(2) 1–TIME ADJUSTMENT FOR PRIOR INFLATION.—The first adjustment made under paragraph (1) after the date of the enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996 shall be the percentage by which—

"(A) the Consumer Price Index described in such paragraph for the calendar year 1996, exceeds

"(B) such Consumer Price Index for the calendar year 1975.

"(3) ROUNDING.—The dollar amount applicable under paragraph (1) for any calendar year shall be the amount determined in accordance with subparagraphs (A) and (B) of paragraph (2) and rounded to the nearest multiple of $1,000,000.".

<< 12 USCA § 2803 >>

(b) OPPORTUNITY TO REDUCE COMPLIANCE BURDEN.—Section 304 of the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2803) is amended by adding at the end the following new subsection:

"(m) OPPORTUNITY TO REDUCE COMPLIANCE BURDEN.—

"(1) IN GENERAL.—

"(A) SATISFACTION OF PUBLIC AVAILABILITY REQUIREMENTS.—A depository institution shall be deemed to have satisfied the public availability requirements of subsection (a) if the institution compiles the information required under that subsection at the home office of the institution and provides notice at the branch locations specified in subsection (a) that such information is available from the home office of the institution upon written request.

"(B) PROVISION OF INFORMATION UPON REQUEST.—Not later than 15 days after the receipt of a written request for any information required to be compiled under subsection (a), the home office of the depository institution receiving the request shall provide the information pertinent to the location of the branch in question to the person requesting the information.

"(2) FORM OF INFORMATION.—In complying with paragraph (1), a depository institution shall, in the sole discretion of the institution, provide the person requesting the information with—

"(A) a paper copy of the information requested; or

"(B) if acceptable to the person, the information through a form of electronic medium, such as a computer disk.".

<< 21 USCA § 1817 >>

SEC. 2226. ELIMINATION OF STOCK LOAN REPORTING REQUIREMENT.

Section 7(j) of the Federal Deposit Insurance Act (12 U.S.C. 1817(j)) is amended—

(1) in paragraph (9)(A)—

(A) by striking "financial institution and any affiliate of any financial institution" and inserting "foreign bank, or any affiliate thereof,"; and

(B) by striking "by the financial institution and such institution's affiliates" and inserting "by the foreign bank or any affiliate thereof";

(2) in paragraph (9)(B)—

(A) by striking "paragraph—" and inserting "paragraph, the following definitions shall apply:";

(B) by striking clause (i) and inserting the following:

"(i) FOREIGN BANK.—The terms 'foreign bank' and 'affiliate' have the same meanings as in section 1 of the International Banking Act of 1978."; and

(C) in clause (iii), by striking "financial institution" and inserting "foreign bank or any affiliate thereof";

(3) in paragraph (9)(C)—

(A) by striking "financial institution or any of its affiliates" and inserting "foreign bank or any affiliate thereof"; and

(B) by striking "financial institution or its affiliates" and inserting "foreign bank or any affiliate thereof";

(4) in paragraph (9)(D)—

(A) in clause (i)—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(i) by striking "the financial institution and all affiliates of the institution" and inserting "the foreign bank and all affiliates thereof"; and

(ii) by striking "financial institution or any such affiliate" and inserting "foreign bank or affiliate thereof";

(B) in clause (ii), by striking "financial institution and any affiliate of such institution" and inserting "foreign bank and any affiliate thereof"; and

(C) in clause (iii), by striking "financial institution" and inserting "foreign bank or any affiliate thereof"; and

(5) in paragraph (9)(E)—

(A) in clause (i)—

(i) by striking "a financial institution and the affiliates of such institution" and inserting "a foreign bank or any affiliate thereof"; and

(ii) by striking "institution or affiliate" each place such term appears and inserting "foreign bank or any affiliate thereof"; and

(B) in clause (ii), by striking "financial institution and any affiliate of such institution" and inserting "foreign bank and any affiliate thereof".

<< 12 USCA § 252 >>

## SEC. 2227. CREDIT AVAILABILITY ASSESSMENT.

(a) STUDY.—

(1) IN GENERAL.—Not later than 12 months after the date of enactment of this Act, and once every 60 months thereafter, the Board, in consultation with the Director of the Office of Thrift Supervision, the Comptroller of the Currency, the Board of Directors of the Corporation, the Administrator of the National Credit Union Administration, the Administrator of the Small Business Administration, and the Secretary of Commerce, shall conduct a study and submit a report to the Congress detailing the extent of small business lending by all creditors.

(2) CONTENTS OF STUDY.—The study required under paragraph (1) shall identify, to the extent practicable, those factors which provide policymakers with insights into the small business credit market, including—

(A) the demand for small business credit, including consideration of the impact of economic cycles on the levels of such demand;

(B) the availability of credit to small businesses;

(C) the range of credit options available to small businesses, such as those available from insured depository institutions and other providers of credit;

(D) the types of credit products used to finance small business operations, including the use of traditional loans, leases, lines of credit, home equity loans, credit cards, and other sources of financing;

(E) the credit needs of small businesses, including, if appropriate, the extent to which such needs differ, based upon product type, size of business, cash flow requirements, characteristics of ownership or investors, or other aspects of such business;

(F) the types of risks to creditors in providing credit to small businesses; and

(G) such other factors as the Board deems appropriate.

(b) USE OF EXISTING DATA.—The studies required by this section shall not increase the regulatory or paperwork burden on regulated financial institutions, other sources of small business credit, or small businesses.

CHAPTER 3—REGULATORY MICROMANAGEMENT RELIEF

<< 12 USCA § 72 >>

## SEC. 2241. NATIONAL BANK DIRECTORS.

Section 5146 of the Revised Statutes of the United States (12 U.S.C. 72) is amended in the first sentence, by striking "except" and all that follows through the end of the sentence and inserting the following: "except that the Comptroller may, in the discretion of the Comptroller, waive the requirement of residency.".

<< 12 USCA § 4803 >>

SEC. 2242. PAPERWORK REDUCTION REVIEW.

  Section 303(a) of the Riegle Community Development and Regulatory Improvement Act of 1994 (12 U.S.C. 4803(a)) is amended—

    (1) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

    (2) by inserting after paragraph (1) the following new paragraph:

  "(2) review the extent to which existing regulations require insured depository institutions and insured credit unions to produce unnecessary internal written policies and eliminate such requirements, where appropriate;".

<< 12 USCA § 1812 >>

SEC. 2243. STATE BANK REPRESENTATION ON BOARD OF DIRECTORS OF THE FDIC.

  Section 2(a)(1)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1812(a)(1)(C)) is amended by inserting before the period ", 1 of whom shall have State bank supervisory experience".

<< 12 USCA § 1820 >>

SEC. 2244. CONSULTATION AMONG EXAMINERS.

  (a) IN GENERAL.—Section 10 of the Federal Deposit Insurance Act (12 U.S.C. 1820) is amended by adding at the end the following new subsection:

  "(j) CONSULTATION AMONG EXAMINERS.—

  "(1) IN GENERAL.—Each appropriate Federal banking agency shall take such action as may be necessary to ensure that examiners employed by the agency—

    "(A) consult on examination activities with respect to any depository institution; and

    "(B) achieve an agreement and resolve any inconsistencies in the recommendations to be given to such institution as a consequence of any examinations.

  "(2) EXAMINER–IN–CHARGE.—Each appropriate Federal banking agency shall consider appointing an examiner-in-charge with respect to a depository institution to ensure consultation on examination activities among all of the examiners of that agency involved in examinations of the institution.".

  (b) COORDINATED AND UNIFIED EXAMINATION FLEXIBILITY.—Section 10(d)(6)(B) of the Federal Deposit Insurance Act (12 U.S.C. 1820(d)(6)(B)) is amended by inserting "or State bank supervisors" after "one of the Federal agencies".

Subtitle C—Regulatory Impact on Cost of Credit and Credit Availability

<< 12 USCA § 1831m >>

SEC. 2301. AUDIT COSTS.

  (a) AUDITOR ATTESTATIONS.—Section 36 of the Federal Deposit Insurance Act (12 U.S.C. 1831m) is amended by striking subsection (e) and inserting the following:

  "(e) [Repealed]".

  (b) INDEPENDENT AUDIT COMMITTEES.—Section 36(g)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1831m(g)(1)) is amended—

    (1) in subparagraph (A), by inserting ", except as provided in subparagraph (D)" after "management of the institution"; and

    (2) by adding at the end the following new subparagraph:

    "(D) EXEMPTION AUTHORITY.—

      "(i) IN GENERAL.—An appropriate Federal banking agency may, by order or regulation, permit the independent audit committee of an insured depository institution to be made up of less than all, but no fewer than a majority of, outside directors, if the agency determines that the institution has encountered hardships in retaining and recruiting a sufficient number of competent outside directors to serve on the internal audit committee of the institution.

AR.01574

"(ii) FACTORS TO BE CONSIDERED.—In determining whether an insured depository institution has encountered hardships referred to in clause (i), the appropriate Federal banking agency shall consider factors such as the size of the institution, and whether the institution has made a good faith effort to elect or name additional competent outside directors to the board of directors of the institution who may serve on the internal audit committee.".

(c) PUBLIC AVAILABILITY.—Section 36(a)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1831m(a)(3)) is amended by adding at the end the following: "Notwithstanding the preceding sentence, the Corporation and the appropriate Federal banking agencies may designate certain information as privileged and confidential and not available to the public.".

SEC. 2302. INCENTIVES FOR SELF–TESTING.

(a) EQUAL CREDIT OPPORTUNITY.—

<< 15 USCA § 1691c–1 >>

(1) IN GENERAL.—The Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) is amended by inserting after section 704 the following new section:

"SEC. 704A. INCENTIVES FOR SELF–TESTING AND SELF–CORRECTION.

"(a) PRIVILEGED INFORMATION.—

"(1) CONDITIONS FOR PRIVILEGE.—A report or result of a self-test (as that term is defined by regulations of the Board) shall be considered to be privileged under paragraph (2) if a creditor—

"(A) conducts, or authorizes an independent third party to conduct, a self-test of any aspect of a credit transaction by a creditor, in order to determine the level or effectiveness of compliance with this title by the creditor; and

"(B) has identified any possible violation of this title by the creditor and has taken, or is taking, appropriate corrective action to address any such possible violation.

"(2) PRIVILEGED SELF–TEST.—If a creditor meets the conditions specified in subparagraphs (A) and (B) of paragraph (1) with respect to a self-test described in that paragraph, any report or results of that self-test—

"(A) shall be privileged; and

"(B) may not be obtained or used by any applicant, department, or agency in any—

"(i) proceeding or civil action in which one or more violations of this title are alleged; or

"(ii) examination or investigation relating to compliance with this title.

"(b) RESULTS OF SELF–TESTING.—

"(1) IN GENERAL.—No provision of this section may be construed to prevent an applicant, department, or agency from obtaining or using a report or results of any self-test in any proceeding or civil action in which a violation of this title is alleged, or in any examination or investigation of compliance with this title if—

"(A) the creditor or any person with lawful access to the report or results—

"(i) voluntarily releases or discloses all, or any part of, the report or results to the applicant, department, or agency, or to the general public; or

"(ii) refers to or describes the report or results as a defense to charges of violations of this title against the creditor to whom the self-test relates; or

"(B) the report or results are sought in conjunction with an adjudication or admission of a violation of this title for the sole purpose of determining an appropriate penalty or remedy.

"(2) DISCLOSURE FOR DETERMINATION OF PENALTY OR REMEDY.—Any report or results of a self-test that are disclosed for the purpose specified in paragraph (1)(B)—

"(A) shall be used only for the particular proceeding in which the adjudication or admission referred to in paragraph (1)(B) is made; and

"(B) may not be used in any other action or proceeding.

"(c) ADJUDICATION.—An applicant, department, or agency that challenges a privilege asserted under this section may seek a determination of the existence and application of that privilege in—

"(1) a court of competent jurisdiction; or

AR.01575

301

"(2) an administrative law proceeding with appropriate jurisdiction.".

<< 15 USCA § 1691c–1 NOTE >>

(2) REGULATIONS.—

  (A) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, in consultation with the Secretary of Housing and Urban Development and the agencies referred to in section 704 of the Equal Credit Opportunity Act, and after providing notice and an opportunity for public comment, the Board shall prescribe final regulations to implement section 704A of the Equal Credit Opportunity Act, as added by this section.

  (B) SELF–TEST.—

  (i) DEFINITION.—The regulations prescribed under subparagraph (A) shall include a definition of the term "self-test" for purposes of section 704A of the Equal Credit Opportunity Act, as added by this section.

  (ii) REQUIREMENT FOR SELF–TEST.—The regulations prescribed under subparagraph (A) shall specify that a self-test shall be sufficiently extensive to constitute a determination of the level and effectiveness of compliance by a creditor with the Equal Credit Opportunity Act.

  (iii) SUBSTANTIAL SIMILARITY TO CERTAIN FAIR HOUSING ACT REGULATIONS.—The regulations prescribed under subparagraph (A) shall be substantially similar to the regulations prescribed by the Secretary of Housing and Urban Development to carry out section 814A(d) of the Fair Housing Act, as added by this section.

  (3) CLERICAL AMENDMENT.—The table of sections for title VII of the Consumer Credit Protection Act is amended by inserting after the item relating to section 704 the following new item:

"704A. Incentives for self-testing and self-correction.".

  (b) FAIR HOUSING.—

<< 42 USCA § 3614–1 >>

  (1) IN GENERAL.—The Fair Housing Act (42 U.S.C. 3601 et seq.) is amended by inserting after section 814 the following new section:

"SEC. 814A. INCENTIVES FOR SELF–TESTING AND SELF–CORRECTION.

  "(a) PRIVILEGED INFORMATION.—

  "(1) CONDITIONS FOR PRIVILEGE.—A report or result of a self-test (as that term is defined by regulation of the Secretary) shall be considered to be privileged under paragraph (2) if any person—

    "(A) conducts, or authorizes an independent third party to conduct, a self-test of any aspect of a residential real estate related lending transaction of that person, or any part of that transaction, in order to determine the level or effectiveness of compliance with this title by that person; and

    "(B) has identified any possible violation of this title by that person and has taken, or is taking, appropriate corrective action to address any such possible violation.

  "(2) PRIVILEGED SELF–TEST.—If a person meets the conditions specified in subparagraphs (A) and (B) of paragraph (1) with respect to a self-test described in that paragraph, any report or results of that self-test—

    "(A) shall be privileged; and

    "(B) may not be obtained or used by any applicant, department, or agency in any—

      "(i) proceeding or civil action in which one or more violations of this title are alleged; or

      "(ii) examination or investigation relating to compliance with this title.

  "(b) RESULTS OF SELF–TESTING.—

  "(1) IN GENERAL.—No provision of this section may be construed to prevent an aggrieved person, complainant, department, or agency from obtaining or using a report or results of any self-test in any proceeding or civil action in which a violation of this title is alleged, or in any examination or investigation of compliance with this title if—

    "(A) the person to whom the self-test relates or any person with lawful access to the report or the results—

      "(i) voluntarily releases or discloses all, or any part of, the report or results to the aggrieved person, complainant, department, or agency, or to the general public; or

"(ii) refers to or describes the report or results as a defense to charges of violations of this title against the person to whom the self-test relates; or

"(B) the report or results are sought in conjunction with an adjudication or admission of a violation of this title for the sole purpose of determining an appropriate penalty or remedy.

"(2) DISCLOSURE FOR DETERMINATION OF PENALTY OR REMEDY.—Any report or results of a self-test that are disclosed for the purpose specified in paragraph (1)(B)—

"(A) shall be used only for the particular proceeding in which the adjudication or admission referred to in paragraph (1)(B) is made; and

"(B) may not be used in any other action or proceeding.

"(c) ADJUDICATION.—An aggrieved person, complainant, department, or agency that challenges a privilege asserted under this section may seek a determination of the existence and application of that privilege in—

"(1) a court of competent jurisdiction; or

"(2) an administrative law proceeding with appropriate jurisdiction.".

<< 42 USCA § 3614–1 NOTE >>

(2) REGULATIONS.—

(A) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, in consultation with the Board and after providing notice and an opportunity for public comment, the Secretary of Housing and Urban Development shall prescribe final regulations to implement section 814A of the Fair Housing Act, as added by this section.

(B) SELF–TEST.—

(i) DEFINITION.—The regulations prescribed by the Secretary under subparagraph (A) shall include a definition of the term "self-test" for purposes of section 814A of the Fair Housing Act, as added by this section.

(ii) REQUIREMENT FOR SELF–TEST.—The regulations prescribed by the Secretary under subparagraph (A) shall specify that a self-test shall be sufficiently extensive to constitute a determination of the level and effectiveness of the compliance by a person engaged in residential real estate related lending activities with the Fair Housing Act.

(iii) SUBSTANTIAL SIMILARITY TO CERTAIN EQUAL CREDIT OPPORTUNITY ACT REGULATIONS.—The regulations prescribed under subparagraph (A) shall be substantially similar to the regulations prescribed by the Board to carry out section 704A of the Equal Credit Opportunity Act, as added by this section.

<< 15 USCA § 1691c–1 NOTE >>

(c) APPLICABILITY.—

(1) IN GENERAL.—Except as provided in paragraph (2), the privilege provided for in section 704A of the Equal Credit Opportunity Act or section 814A of the Fair Housing Act (as those sections are added by this section) shall apply to a self-test (as that term is defined pursuant to the regulations prescribed under subsection (a)(2) or (b)(2) of this section, as appropriate) conducted before, on, or after the effective date of the regulations prescribed under subsection (a)(2) or (b)(2), as appropriate.

(2) EXCEPTION.—The privilege referred to in paragraph (1) does not apply to such a self-test conducted before the effective date of the regulations prescribed under subsection (a) or (b), as appropriate, if—

(A) before that effective date, a complaint against the creditor or person engaged in residential real estate related lending activities (as the case may be) was—

(i) formally filed in any court of competent jurisdiction; or

(ii) the subject of an ongoing administrative law proceeding;

(B) in the case of section 704A of the Equal Credit Opportunity Act, the creditor has waived the privilege pursuant to subsection (b)(1)(A)(i) of that section; or

(C) in the case of section 814A of the Fair Housing Act, the person engaged in residential real estate related lending activities has waived the privilege pursuant to subsection (b)(1)(A)(i) of that section.

SEC. 2303. QUALIFIED THRIFT INVESTMENT AMENDMENTS.

<< 12 USCA § 1464 >>

(a) CREDIT CARDS.—Section 5(b) of the Home Owners' Loan Act (12 U.S.C. 1464(b)) is amended—

(1) by striking paragraph (4); and

(2) by redesignating paragraph (5) as paragraph (4).

(b) LOANS OR INVESTMENTS WITHOUT PERCENTAGE OF ASSETS LIMITATION.—Section 5(c)(1) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(1)) is amended by adding at the end the following new subparagraphs:

"(T) CREDIT CARD LOANS.—Loans made through credit cards or credit card accounts.

"(U) EDUCATIONAL LOANS.—Loans made for the payment of educational expenses.".

(c) COMMERCIAL AND OTHER LOANS.—Section 5(c)(2)(A) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(2)(A)) is amended to read as follows:

"(A) COMMERCIAL AND OTHER LOANS.—Secured or unsecured loans for commercial, corporate, business, or agricultural purposes. The aggregate amount of loans made under this subparagraph may not exceed 20 percent of the total assets of the Federal savings association, and amounts in excess of 10 percent of such total assets may be used under this subparagraph only for small business loans, as that term is defined by the Director.".

(d) LOANS OR INVESTMENTS LIMITED TO 5 PERCENT OF ASSETS.—Section 5(c)(3) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(3)) is amended—

(1) by striking subparagraph (A); and

(2) by redesignating subparagraphs (B), (C), and (D) as subparagraphs (A), (B), and (C), respectively.

<< 12 USCA § 1467a >>

(e) QUALIFIED THRIFT LENDER TEST.—Section 10(m)(1) of the Home Owners' Loan Act (12 U.S.C. 1467a(m)(1)) is amended—

(1) by redesignating subparagraph (B) as clause (ii);

(2) in subparagraph (A), by striking "(A) the savings" and inserting "(B)(i) the savings"; and

(3) by inserting after "if—" the following new subparagraph:

"(A) the savings association qualifies as a domestic building and loan association, as such term is defined in section 7701(a)(19) of the Internal Revenue Code of 1986; or".

<< 12 USCA § 1464 >>

(f) BRANCHING.—Section 5(r) of the Home Owners' Loan Act (12 U.S.C. 1464(r)) is amended—

(1) in paragraph (1)—

(A) in the first sentence—

(i) by inserting before the period ", or qualifies as a qualified thrift lender, as determined under section 10(m) of this Act"; and

(ii) by striking "(c)" and inserting "(C)"; and

(B) in the second sentence, by inserting before the period "or as a qualified thrift lender, as determined under section 10(m) of this Act, as applicable"; and

(2) in paragraph (2), by striking subparagraph (C) and inserting the following:

"(C) the law of the State where the branch is located, or is to be located, would permit establishment of the branch if the association was a savings association or savings bank chartered by the State in which its home office is located; or".

<< 12 USCA § 1467a >>

(g) DEFINITION.—Section 10(m)(4) of the Home Owners' Loan Act (12 U.S.C. 1467a(m)(4)) is amended—

(1) by striking "subsection—" and inserting "subsection, the following definitions shall apply:";

(2) in subparagraph (C)—

(A) in clause (ii), by adding at the end the following new subclause:

"(VII) Loans for educational purposes, loans to small businesses, and loans made through credit cards or credit card accounts."; and

(B) in clause (iii), by striking subclause (VI) and inserting the following:

"(VI) Loans for personal, family, or household purposes (other than loans for personal, family, or household purposes described in clause (ii)(VII))."; and

(3) by adding at the end the following new subparagraphs:

"(D) CREDIT CARD.—The Director shall issue such regulations as may be necessary to define the term 'credit card'.

"(E) SMALL BUSINESS.—The Director shall issue such regulations as may be necessary to define the term 'small business'.".

SEC. 2304. LIMITED PURPOSE BANKS.

<< 12 USCA § 1843 >>

(a) GROWTH CAP RELIEF.—Section 4(f)(3)(B) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(f)(3)(B)) is amended—

(1) in clause (ii), by adding "or" at the end;

(2) in clause (iii), by striking "; or" at the end and inserting a period; and

(3) by striking clause (iv).

<< 12 USCA § 1841 >>

(b) LIMITED PURPOSE BANK EXCEPTION.—Section 2(c)(2)(F) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(c)(2)(F)) is amended by inserting ", including an institution that accepts collateral for extensions of credit by holding deposits under $100,000, and by other means" after "An institution".

SEC. 2305. AMENDMENT TO FAIR DEBT COLLECTION PRACTICES ACT.

<< 15 USCA § 1692e >>

(a) IN GENERAL.—Section 807(11) of the Fair Debt Collection Practices Act (15 U.S.C. 1692e(11)) is amended to read as follows:

"(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.".

<< 15 USCA § 1692e NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 90 days after the date of enactment of this Act and shall apply to all communications made after that date of enactment.

<< 12 USCA § 1757 >>

SEC. 2306. INCREASE IN CERTAIN CREDIT UNION LOAN CEILINGS.

Section 107(5)(A) of the Federal Credit Union Act (12 U.S.C. 1757(5)(A)) is amended—

(1) in clause (iv), by striking "$10,000" and inserting "$20,000"; and

(2) in clause (v), by striking "$10,000" and inserting "$20,000".

<< 12 USCA § 618 >>

## SEC. 2307. BANK INVESTMENTS IN EDGE ACT AND AGREEMENT CORPORATIONS.

The 10th undesignated paragraph of section 25A of the Federal Reserve Act (12 U.S.C. 618) is amended by striking the last sentence and inserting the following: "Any national bank may invest in the stock of any corporation organized under this section. The aggregate amount of stock held by any national bank in all corporations engaged in business of the kind described in this section or section 25 shall not exceed an amount equal to 10 percent of the capital and surplus of such bank unless the Board determines that the investment of an additional amount by the bank would not be unsafe or unsound and, in any case, shall not exceed an amount equal to 20 percent of the capital and surplus of such bank.".

Subtitle D—Consumer Credit

CHAPTER 1—CREDIT REPORTING REFORM

<< 15 USCA § 1601 NOTE >>

## SEC. 2401. SHORT TITLE.

This chapter may be cited as the "Consumer Credit Reporting Reform Act of 1996".

<< 15 USCA § 1681a >>

## SEC. 2402. DEFINITIONS.

(a) ADVERSE ACTION.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(k) ADVERSE ACTION.—

"(1) ACTIONS INCLUDED.—The term 'adverse action'—

"(A) has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act; and

"(B) means—

"(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;

"(ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

"(iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D); and

"(iv) an action taken or determination that is—

"(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii); and

"(II) adverse to the interests of the consumer.

"(2) APPLICABLE FINDINGS, DECISIONS, COMMENTARY, AND ORDERS.—For purposes of any determination of whether an action is an adverse action under paragraph (1)(A), all appropriate final findings, decisions, commentary, and orders issued under section 701(d)(6) of the Equal Credit Opportunity Act by the Board of Governors of the Federal Reserve System or any court shall apply.".

(b) FIRM OFFER OF CREDIT OR INSURANCE.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(*l*) FIRM OFFER OF CREDIT OR INSURANCE.—The term 'firm offer of credit or insurance' means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:

"(1) The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established—

AR.01580

"(A) before selection of the consumer for the offer; and

"(B) for the purpose of determining whether to extend credit or insurance pursuant to the offer.

"(2) Verification—

"(A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

"(B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

"(3) The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was—

"(A) established before selection of the consumer for the offer of credit or insurance; and

"(B) disclosed to the consumer in the offer of credit or insurance.".

(c) CREDIT OR INSURANCE TRANSACTION THAT IS NOT INITIATED BY THE CONSUMER.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (b) of this section) is amended by adding at the end the following new subsection:

"(m) CREDIT OR INSURANCE TRANSACTION THAT IS NOT INITIATED BY THE CONSUMER.—The term 'credit or insurance transaction that is not initiated by the consumer' does not include the use of a consumer report by a person with which the consumer has an account or insurance policy, for purposes of—

"(1) reviewing the account or insurance policy; or

"(2) collecting the account.".

(d) STATE.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (c) of this section) is amended by adding at the end the following new subsection:

"(n) STATE.—The term 'State' means any State, the Commonwealth of Puerto Rico, the District of Columbia, and any territory or possession of the United States.".

(e) DEFINITION OF CONSUMER REPORT.—Section 603(d) of the Fair Credit Reporting Act (15 U.S.C. 1681a(d)) is amended—

(1) by striking "(d) The term" and inserting the following:

"(d) CONSUMER REPORT.—

"(1) IN GENERAL.—The term";

(2) by striking "for (1) credit" and inserting the following: "for—

"(A) credit";

(3) by striking "purposes, or (2)" and all that follows through "section 604." and inserting the following: "purposes;

"(B) employment purposes; or

"(C) any other purpose authorized under section 604."; and

(4) by striking the second sentence and inserting the following:

"(2) EXCLUSIONS.—The term 'consumer report' does not include—

"(A) any—

"(i) report containing information solely as to transactions or experiences between the consumer and the person making the report;

"(ii) communication of that information among persons related by common ownership or affiliated by corporate control; or

"(iii) any communication of other information among persons related by common ownership or affiliated by corporate control, if it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons and the consumer is given the opportunity, before the time that the information is initially communicated, to direct that such information not be communicated among such persons;

"(B) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device;

"(C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his or her decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures to the consumer required under section 615; or

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(D) a communication described in subsection (o).".

(f) EXCLUSION OF CERTAIN COMMUNICATIONS BY EMPLOYMENT AGENCIES FROM DEFINITION OF CONSUMER REPORT.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(o) EXCLUDED COMMUNICATIONS.—A communication is described in this subsection if it is a communication—

"(1) that, but for subsection (d)(2)(E), would be an investigative consumer report;

"(2) that is made to a prospective employer for the purpose of—

"(A) procuring an employee for the employer; or

"(B) procuring an opportunity for a natural person to work for the employer;

"(3) that is made by a person who regularly performs such procurement;

"(4) that is not used by any person for any purpose other than a purpose described in subparagraph (A) or (B) of paragraph (2); or

"(5) with respect to which—

"(A) the consumer who is the subject of the communication—

"(i) consents orally or in writing to the nature and scope of the communication, before the collection of any information for the purpose of making the communication;

"(ii) consents orally or in writing to the making of the communication to a prospective employer, before the making of the communication; and

"(iii) in the case of consent under clause (i) or (ii) given orally, is provided written confirmation of that consent by the person making the communication, not later than 3 business days after the receipt of the consent by that person;

"(B) the person who makes the communication does not, for the purpose of making the communication, make any inquiry that if made by a prospective employer of the consumer who is the subject of the communication would violate any applicable Federal or State equal employment opportunity law or regulation; and

"(C) the person who makes the communication—

"(i) discloses in writing to the consumer who is the subject of the communication, not later than 5 business days after receiving any request from the consumer for such disclosure, the nature and substance of all information in the consumer's file at the time of the request, except that the sources of any information that is acquired solely for use in making the communication and is actually used for no other purpose, need not be disclosed other than under appropriate discovery procedures in any court of competent jurisdiction in which an action is brought; and

"(ii) notifies the consumer who is the subject of the communication, in writing, of the consumer's right to request the information described in clause (i).".

(g) CONSUMER REPORTING AGENCY THAT COMPILES AND MAINTAINS FILES ON A NATIONWIDE BASIS. —Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (f) of this section) is amended by adding at the end the following new subsection:

"(p) CONSUMER REPORTING AGENCY THAT COMPILES AND MAINTAINS FILES ON CONSUMERS ON A NATIONWIDE BASIS.—The term 'consumer reporting agency that compiles and maintains files on consumers on a nationwide basis' means a consumer reporting agency that regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide:

"(1) Public record information.

"(2) Credit account information from persons who furnish that information regularly and in the ordinary course of business.".

<< 15 USCA § 1681b >>

SEC. 2403. FURNISHING CONSUMER REPORTS; USE FOR EMPLOYMENT PURPOSES.

(a) FURNISHING CONSUMER REPORTS FOR BUSINESS TRANSACTIONS.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended—

(1) by inserting "(a) IN GENERAL.—" before "A consumer reporting agency"; and

(2) in subsection (a)(3) (as so designated by paragraph (1) of this subsection), by striking subparagraph (E) and inserting the following:

"(E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

"(F) otherwise has a legitimate business need for the information—

"(i) in connection with a business transaction that is initiated by the consumer; or

"(ii) to review an account to determine whether the consumer continues to meet the terms of the account.".

(b) FURNISHING AND USING CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended by adding at the end the following new subsection:

"(b) CONDITIONS FOR FURNISHING AND USING CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.—

"(1) CERTIFICATION FROM USER.—A consumer reporting agency may furnish a consumer report for employment purposes only if—

"(A) the person who obtains such report from the agency certifies to the agency that—

"(i) the person has complied with paragraph (2) with respect to the consumer report, and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable; and

"(ii) information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation; and

"(B) the consumer reporting agency provides with the report a summary of the consumer's rights under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).

"(2) DISCLOSURE TO CONSUMER.—A person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—

"(A) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and

"(B) the consumer has authorized in writing the procurement of the report by that person.

"(3) CONDITIONS ON USE FOR ADVERSE ACTIONS.—In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—

"(A) a copy of the report; and

"(B) a description in writing of the rights of the consumer under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).".

## SEC. 2404. USE OF CONSUMER REPORTS FOR PRESCREENING; PROHIBITION ON UNAUTHORIZED OR UNCERTIFIED USE OF INFORMATION.

<< 15 USCA § 1681b >>

(a) IN GENERAL.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) (as amended by section 2403 of this chapter) is amended—

(1) in subsection (a), by striking "A consumer reporting agency" and inserting "Subject to subsections (c), any consumer reporting agency"; and

(2) by adding at the end the following new subsections:

"(c) FURNISHING REPORTS IN CONNECTION WITH CREDIT OR INSURANCE TRANSACTIONS THAT ARE NOT INITIATED BY THE CONSUMER.—

"(1) IN GENERAL.—A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) in connection with any credit or insurance transaction that is not initiated by the consumer only if—

"(A) the consumer authorizes the agency to provide such report to such person; or

"(B)(i) the transaction consists of a firm offer of credit or insurance;

"(ii) the consumer reporting agency has complied with subsection (e); and

"(iii) there is not in effect an election by the consumer, made in accordance with subsection (e), to have the consumer's name and address excluded from lists of names provided by the agency pursuant to this paragraph.

"(2) LIMITS ON INFORMATION RECEIVED UNDER PARAGRAPH (1)(B).—A person may receive pursuant to paragraph (1)(B) only—

"(A) the name and address of a consumer;

"(B) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer; and

"(C) other information pertaining to a consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity.

"(3) INFORMATION REGARDING INQUIRIES.—Except as provided in section 609(a)(5), a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer.

"(d) Reserved

"(e) ELECTION OF CONSUMER TO BE EXCLUDED FROM LISTS.—

"(1) IN GENERAL.—A consumer may elect to have the consumer's name and address excluded from any list provided by a consumer reporting agency under subsection (c)(1)(B) in connection with a credit or insurance transaction that is not initiated by the consumer, by notifying the agency in accordance with paragraph (2) that the consumer does not consent to any use of a consumer report relating to the consumer in connection with any credit or insurance transaction that is not initiated by the consumer.

"(2) MANNER OF NOTIFICATION.—A consumer shall notify a consumer reporting agency under paragraph (1)—

"(A) through the notification system maintained by the agency under paragraph (5); or

"(B) by submitting to the agency a signed notice of election form issued by the agency for purposes of this subparagraph.

"(3) RESPONSE OF AGENCY AFTER NOTIFICATION THROUGH SYSTEM.—Upon receipt of notification of the election of a consumer under paragraph (1) through the notification system maintained by the agency under paragraph (5), a consumer reporting agency shall—

"(A) inform the consumer that the election is effective only for the 2–year period following the election if the consumer does not submit to the agency a signed notice of election form issued by the agency for purposes of paragraph (2)(B); and

"(B) provide to the consumer a notice of election form, if requested by the consumer, not later than 5 business days after receipt of the notification of the election through the system established under paragraph (5), in the case of a request made at the time the consumer provides notification through the system.

"(4) EFFECTIVENESS OF ELECTION.—An election of a consumer under paragraph (1)—

"(A) shall be effective with respect to a consumer reporting agency beginning 5 business days after the date on which the consumer notifies the agency in accordance with paragraph (2);

"(B) shall be effective with respect to a consumer reporting agency—

"(i) subject to subparagraph (C), during the 2–year period beginning 5 business days after the date on which the consumer notifies the agency of the election, in the case of an election for which a consumer notifies the agency only in accordance with paragraph (2)(A); or

"(ii) until the consumer notifies the agency under subparagraph (C), in the case of an election for which a consumer notifies the agency in accordance with paragraph (2)(B);

"(C) shall not be effective after the date on which the consumer notifies the agency, through the notification system established by the agency under paragraph (5), that the election is no longer effective; and

"(D) shall be effective with respect to each affiliate of the agency.

"(5) NOTIFICATION SYSTEM.—

"(A) IN GENERAL.—Each consumer reporting agency that, under subsection (c)(1)(B), furnishes a consumer report in connection with a credit or insurance transaction that is not initiated by a consumer, shall—

"(i) establish and maintain a notification system, including a toll-free telephone number, which permits any consumer whose consumer report is maintained by the agency to notify the agency, with appropriate identification, of the consumer's election to have the consumer's name and address excluded from any such list of names and addresses provided by the agency for such a transaction; and

"(ii) publish by not later than 365 days after the date of enactment of the Consumer Credit Reporting Reform Act of 1996, and not less than annually thereafter, in a publication of general circulation in the area served by the agency—

"(I) a notification that information in consumer files maintained by the agency may be used in connection with such transactions; and

"(II) the address and toll-free telephone number for consumers to use to notify the agency of the consumer's election under clause (i).

"(B) ESTABLISHMENT AND MAINTENANCE AS COMPLIANCE.—Establishment and maintenance of a notification system (including a toll-free telephone number) and publication by a consumer reporting agency on the agency's own behalf and on behalf of any of its affiliates in accordance with this paragraph is deemed to be compliance with this paragraph by each of those affiliates.

"(6) NOTIFICATION SYSTEM BY AGENCIES THAT OPERATE NATIONWIDE.—Each consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall establish and maintain a notification system for purposes of paragraph (5) jointly with other such consumer reporting agencies.".

(b) USE OF INFORMATION OBTAINED FROM REPORTS.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(f) CERTAIN USE OR OBTAINING OF INFORMATION PROHIBITED.—A person shall not use or obtain a consumer report for any purpose unless—

"(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

"(2) the purpose is certified in accordance with section 607 by a prospective user of the report through a general or specific certification.".

<< 15 USCA § 1681b NOTE >>

(c) FTC GUIDELINES REGARDING PRESCREENING FOR INSURANCE TRANSACTIONS.—The Federal Trade Commission may issue such guidelines as it deems necessary with respect to the use of consumer reports in connection with insurance transactions that are not initiated by the consumer pursuant to section 604(c) of the Fair Credit Reporting Act, as added by subsection (a) of this section.

<< 15 USCA § 1681b >>

SEC. 2405. CONSUMER CONSENT REQUIRED TO FURNISH CONSUMER REPORT CONTAINING MEDICAL INFORMATION.

Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended by adding at the end the following new subsection:

"(g) FURNISHING REPORTS CONTAINING MEDICAL INFORMATION.—A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction or a direct marketing transaction, a consumer report that contains medical information about a consumer, unless the consumer consents to the furnishing of the report.".

SEC. 2406. OBSOLETE INFORMATION AND INFORMATION CONTAINED IN CONSUMER REPORTS.

<< 15 USCA § 1681c >>

(a) AMENDMENT TO LARGE–DOLLAR EXCEPTION.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended—

(1) by inserting "INFORMATION EXCLUDED FROM CONSUMER REPORTS.—" after "(a)";

(2) in subsection (b)—

(A) in paragraph (1), by striking "$50,000" and inserting "$150,000";

(B) in paragraph (2), by striking "$50,000" and inserting "$150,000"; and

(C) in paragraph (3), by striking "$20,000" and inserting "$75,000".

(b) CLARIFICATION OF REPORTING PERIOD.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(c) RUNNING OF REPORTING PERIOD.—

"(1) IN GENERAL.—The 7–year period referred to in paragraphs (4) and (6) of subsection (a) shall begin, with respect to any delinquent account that is placed for collection (internally or by referral to a third party, whichever is earlier), charged to profit and loss, or subjected to any similar action, upon the expiration of the 180–day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit and loss, or similar action.

"(2) EFFECTIVE DATE.—Paragraph (1) shall apply only to items of information added to the file of a consumer on or after the date that is 455 days after the date of enactment of the Consumer Credit Reporting Reform Act of 1996.".

(c) ADDITIONAL INFORMATION ON BANKRUPTCY FILINGS REQUIRED.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended by adding at the end the following new subsection:

"(d) INFORMATION REQUIRED TO BE DISCLOSED.—Any consumer reporting agency that furnishes a consumer report that contains information regarding any case involving the consumer that arises under title 11, United States Code, shall include in the report an identification of the chapter of such title 11 under which such case arises if provided by the source of the information. If any case arising or filed under title 11, United States Code, is withdrawn by the consumer before a final judgment, the consumer reporting agency shall include in the report that such case or filing was withdrawn upon receipt of documentation certifying such withdrawal.".

(d) INDICATION OF CLOSURE OF ACCOUNT; INDICATION OF DISPUTE BY CONSUMER.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended by adding at the end the following new subsections:

"(e) INDICATION OF CLOSURE OF ACCOUNT BY CONSUMER.—If a consumer reporting agency is notified pursuant to section 623(a)(4) that a credit account of a consumer was voluntarily closed by the consumer, the agency shall indicate that fact in any consumer report that includes information related to the account.

"(f) INDICATION OF DISPUTE BY CONSUMER.—If a consumer reporting agency is notified pursuant to section 623(a)(3) that information regarding a consumer who was furnished to the agency is disputed by the consumer, the agency shall indicate that fact in each consumer report that includes the disputed information.".

(e) CONFORMING AMENDMENTS.—

(1) Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended in the section heading, by striking "OBSOLETE INFORMATION" and inserting "REQUIREMENTS RELATING TO INFORMATION CONTAINED IN CONSUMER REPORTS".

(2) The table of sections for the Fair Credit Reporting Act (15 U.S.C. 1681a et seq.) is amended by striking the item relating to section 605 and inserting the following:

"605. Requirements relating to information contained in consumer reports.".

<< 15 USCA § 1681e >>

SEC. 2407. COMPLIANCE PROCEDURES.

(a) DISCLOSURE OF CONSUMER REPORTS BY USERS.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding at the end the following new subsection:

"(c) DISCLOSURE OF CONSUMER REPORTS BY USERS ALLOWED.—A consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report.".

(b) NOTICE TO USERS AND PROVIDERS OF INFORMATION TO ENSURE COMPLIANCE.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding after subsection (c) (as added by subsection (a) of this section) the following new subsection:

"(d) NOTICE TO USERS AND FURNISHERS OF INFORMATION.—

"(1) NOTICE REQUIREMENT.—A consumer reporting agency shall provide to any person—

"(A) who regularly and in the ordinary course of business furnishes information to the agency with respect to any consumer; or

"(B) to whom a consumer report is provided by the agency;

a notice of such person's responsibilities under this title.

"(2) CONTENT OF NOTICE.—The Federal Trade Commission shall prescribe the content of notices under paragraph (1), and a consumer reporting agency shall be in compliance with this subsection if it provides a notice under paragraph (1) that is substantially similar to the Federal Trade Commission prescription under this paragraph.".

(c) RECORD OF IDENTITY OF USERS AND PURPOSES CERTIFIED BY USERS OF REPORTS.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding after subsection (d) (as added by subsection (b) of this section) the following new subsection:

"(e) PROCUREMENT OF CONSUMER REPORT FOR RESALE.—

"(1) DISCLOSURE.—A person may not procure a consumer report for purposes of reselling the report (or any information in the report) unless the person discloses to the consumer reporting agency that originally furnishes the report—

"(A) the identity of the end-user of the report (or information); and

"(B) each permissible purpose under section 604 for which the report is furnished to the end-user of the report (or information).

"(2) RESPONSIBILITIES OF PROCURERS FOR RESALE.—A person who procures a consumer report for purposes of reselling the report (or any information in the report) shall—

"(A) establish and comply with reasonable procedures designed to ensure that the report (or information) is resold by the person only for a purpose for which the report may be furnished under section 604, including by requiring that each person to which the report (or information) is resold and that resells or provides the report (or information) to any other person—

"(i) identifies each end user of the resold report (or information);

"(ii) certifies each purpose for which the report (or information) will be used; and

"(iii) certifies that the report (or information) will be used for no other purpose; and

"(B) before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).".

SEC. 2408. CONSUMER DISCLOSURES.

<< 15 USCA § 1681g >>

(a) ALL INFORMATION IN CONSUMER'S FILE REQUIRED TO BE DISCLOSED.—Section 609(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)(1)) is amended to read as follows:

"(1) All information in the consumer's file at the time of the request, except that nothing in this paragraph shall be construed to require a consumer reporting agency to disclose to a consumer any information concerning credit scores or any other risk scores or predictors relating to the consumer.".

(b) MORE INFORMATION CONCERNING RECIPIENTS OF REPORTS REQUIRED.—Section 609(a)(3) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)) is amended to read as follows:

"(3)(A) Identification of each person (including each end-user identified under section 607(e)(1)) that procured a consumer report—

"(i) for employment purposes, during the 2–year period preceding the date on which the request is made; or

"(ii) for any other purpose, during the 1–year period preceding the date on which the request is made.

"(B) An identification of a person under subparagraph (A) shall include—

"(i) the name of the person or, if applicable, the trade name (written in full) under which such person conducts business; and

"(ii) upon request of the consumer, the address and telephone number of the person.".

(c) INFORMATION REGARDING INQUIRIES.—Section 609(a) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)) is amended by adding at the end the following new paragraph:

"(5) A record of all inquiries received by the agency during the 1–year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer.".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(d) SUMMARY OF RIGHTS REQUIRED TO BE INCLUDED WITH DISCLOSURE.—

  (1) IN GENERAL.—Section 609 of the Fair Credit Reporting Act (15 U.S.C. 1681g) is amended by adding at the end the following new subsection:

"(c) SUMMARY OF RIGHTS REQUIRED TO BE INCLUDED WITH DISCLOSURE.—

  "(1) SUMMARY OF RIGHTS.—A consumer reporting agency shall provide to a consumer, with each written disclosure by the agency to the consumer under this section—

    "(A) a written summary of all of the rights that the consumer has under this title; and

    "(B) in the case of a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, a toll-free telephone number established by the agency, at which personnel are accessible to consumers during normal business hours.

  "(2) SPECIFIC ITEMS REQUIRED TO BE INCLUDED.—The summary of rights required under paragraph (1) shall include—

    "(A) a brief description of this title and all rights of consumers under this title;

    "(B) an explanation of how the consumer may exercise the rights of the consumer under this title;

    "(C) a list of all Federal agencies responsible for enforcing any provision of this title and the address and any appropriate phone number of each such agency, in a form that will assist the consumer in selecting the appropriate agency;

    "(D) a statement that the consumer may have additional rights under State law and that the consumer may wish to contact a State or local consumer protection agency or a State attorney general to learn of those rights; and

    "(E) a statement that a consumer reporting agency is not required to remove accurate derogatory information from a consumer's file, unless the information is outdated under section 605 or cannot be verified.

  "(3) FORM OF SUMMARY OF RIGHTS.—For purposes of this subsection and any disclosure by a consumer reporting agency required under this title with respect to consumers' rights, the Federal Trade Commission (after consultation with each Federal agency referred to in section 621(b)) shall prescribe the form and content of any such disclosure of the rights of consumers required under this title. A consumer reporting agency shall be in compliance with this subsection if it provides disclosures under paragraph (1) that are substantially similar to the Federal Trade Commission prescription under this paragraph.

  "(4) EFFECTIVENESS.—No disclosures shall be required under this subsection until the date on which the Federal Trade Commission prescribes the form and content of such disclosures under paragraph (3).".

<< 15 USCA § 1681d >>

  (2) TECHNICAL AMENDMENT.—Section 606(a)(1)(B) of the Fair Credit Reporting Act (15 U.S.C. 1681d(a)(1)(B)) is amended by inserting "and the written summary of the rights of the consumer prepared pursuant to section 609(c)" before the semicolon.

(e) FORM OF DISCLOSURES.—

<< 15 USCA § 1681h >>

  (1) IN GENERAL.—Subsections (a) and (b) of section 610 of the Fair Credit Reporting Act (15 U.S.C. 1681h) are amended to read as follows:

"(a) IN GENERAL.—

  "(1) PROPER IDENTIFICATION.—A consumer reporting agency shall require, as a condition of making the disclosures required under section 609, that the consumer furnish proper identification.

  "(2) DISCLOSURE IN WRITING.—Except as provided in subsection (b), the disclosures required to be made under section 609 shall be provided under that section in writing.

"(b) OTHER FORMS OF DISCLOSURE.—

  "(1) IN GENERAL.—If authorized by a consumer, a consumer reporting agency may make the disclosures required under 609—

    "(A) other than in writing; and

    "(B) in such form as may be—

"(i) specified by the consumer in accordance with paragraph (2); and

"(ii) available from the agency.

"(2) FORM.—A consumer may specify pursuant to paragraph (1) that disclosures under section 609 shall be made—

"(A) in person, upon the appearance of the consumer at the place of business of the consumer reporting agency where disclosures are regularly provided, during normal business hours, and on reasonable notice;

"(B) by telephone, if the consumer has made a written request for disclosure by telephone;

"(C) by electronic means, if available from the agency; or

"(D) by any other reasonable means that is available from the agency.".

<< 15 USCA § 1681g NOTE >>

(2) SIMPLIFIED DISCLOSURE.—Not later than 90 days after the date of enactment of this Act, each consumer reporting agency shall develop a form on which such consumer reporting agency shall make the disclosures required under section 609(a) of the Fair Credit Reporting Act, for the purpose of maximizing the comprehensibility and standardization of such disclosures.

(3) GOALS.—The Federal Trade Commission shall take appropriate action to assure that the goals of comprehensibility and standardization are achieved in accordance with paragraph (2).

<< 15 USCA § 1681h >>

(4) DEFAMATION.—Section 610(e) of the Fair Credit Reporting Act (15 U.S.C. 1681h(e)) is amended by inserting "or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report" before "except".

(5) CONFORMING AMENDMENTS.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

<< 15 USCA § 1681g >>

(A) in section 609(a), in the matter preceding paragraph (1), by striking "and proper identification of any consumer" and inserting ", and subject to section 610(a)(1)";

<< 15 USCA § 1681h >>

(B) in section 610, in the section heading, by inserting "AND FORM" after "CONDITIONS"; and

(C) in the table of sections at the beginning of that Act, in the item relating to section 610, by inserting "and form" after "conditions".

<< 15 USCA § 1681i >>

SEC. 2409. PROCEDURES IN CASE OF THE DISPUTED ACCURACY OF ANY INFORMATION IN A CONSUMER'S FILE.

(a) IN GENERAL.—Section 611(a) of the Fair Credit Reporting Act (15 U.S.C. 1681i(a)) is amended to read as follows:

"(a) REINVESTIGATIONS OF DISPUTED INFORMATION.—

"(1) REINVESTIGATION REQUIRED.—

"(A) IN GENERAL.—If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

"(B) EXTENSION OF PERIOD TO REINVESTIGATE.—Except as provided in subparagraph (C), the 30–day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30–day period that is relevant to the reinvestigation.

"(C) LIMITATIONS ON EXTENSION OF PERIOD TO REINVESTIGATE.—Subparagraph (B) shall not apply to any reinvestigation in which, during the 30–day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

"(2) PROMPT NOTICE OF DISPUTE TO FURNISHER OF INFORMATION.—

  "(A) IN GENERAL.—Before the expiration of the 5–business–day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

  "(B) PROVISION OF OTHER INFORMATION FROM CONSUMER.—The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

"(3) DETERMINATION THAT DISPUTE IS FRIVOLOUS OR IRRELEVANT.—

  "(A) IN GENERAL.—Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

  "(B) NOTICE OF DETERMINATION.—Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

  "(C) CONTENTS OF NOTICE.—A notice under subparagraph (B) shall include—

    "(i) the reasons for the determination under subparagraph (A); and

    "(ii) identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

"(4) CONSIDERATION OF CONSUMER INFORMATION.—In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

"(5) TREATMENT OF INACCURATE OR UNVERIFIABLE INFORMATION.—

  "(A) IN GENERAL.—If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation.

  "(B) REQUIREMENTS RELATING TO REINSERTION OF PREVIOUSLY DELETED MATERIAL.—

    "(i) CERTIFICATION OF ACCURACY OF INFORMATION.—If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

    "(ii) NOTICE TO CONSUMER.—If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

    "(iii) ADDITIONAL INFORMATION.—As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion—

      "(I) a statement that the disputed information has been reinserted;

      "(II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

AR.01590

"(III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

"(C) PROCEDURES TO PREVENT REAPPEARANCE.—A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).

"(D) AUTOMATED REINVESTIGATION SYSTEM.—Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

"(6) NOTICE OF RESULTS OF REINVESTIGATION.—

"(A) IN GENERAL.—A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.

"(B) CONTENTS.—As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5–day period referred to in subparagraph (A)—

"(i) a statement that the reinvestigation is completed;

"(ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

"(iii) a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

"(iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

"(v) a notice that the consumer has the right to request under subsection (d) that the consumer reporting agency furnish notifications under that subsection.

"(7) DESCRIPTION OF REINVESTIGATION PROCEDURE.—A consumer reporting agency shall provide to a consumer a description referred to in paragraph (6)(B)(iv) by not later than 15 days after receiving a request from the consumer for that description.

"(8) EXPEDITED DISPUTE RESOLUTION.—If a dispute regarding an item of information in a consumer's file at a consumer reporting agency is resolved in accordance with paragraph (5)(A) by the deletion of the disputed information by not later than 3 business days after the date on which the agency receives notice of the dispute from the consumer in accordance with paragraph (1)(A), then the agency shall not be required to comply with paragraphs (2), (6), and (7) with respect to that dispute if the agency—

"(A) provides prompt notice of the deletion to the consumer by telephone;

"(B) includes in that notice, or in a written notice that accompanies a confirmation and consumer report provided in accordance with subparagraph (C), a statement of the consumer's right to request under subsection (d) that the agency furnish notifications under that subsection; and

"(C) provides written confirmation of the deletion and a copy of a consumer report on the consumer that is based on the consumer's file after the deletion, not later than 5 business days after making the deletion.".

(b) CONFORMING AMENDMENT.—Section 611(d) of the Fair Credit Reporting Act (15 U.S.C. 1681i(d)) is amended by striking "The consumer reporting agency shall clearly" and all that follows through the end of the subsection.

<< 15 USCA § 1681j >>

SEC. 2410. CHARGES FOR CERTAIN DISCLOSURES.

Section 612 of the Fair Credit Reporting Act (15 U.S.C. 1681j) is amended to read as follows:

"SEC. 612. CHARGES FOR CERTAIN DISCLOSURES.

"(a) REASONABLE CHARGES ALLOWED FOR CERTAIN DISCLOSURES.—

"(1) IN GENERAL.—Except as provided in subsections (b), (c), and (d), a consumer reporting agency may impose a reasonable charge on a consumer—

"(A) for making a disclosure to the consumer pursuant to section 609, which charge—

"(i) shall not exceed $8; and

"(ii) shall be indicated to the consumer before making the disclosure; and

"(B) for furnishing, pursuant to section 611(d), following a reinvestigation under section 611(a), a statement, codification, or summary to a person designated by the consumer under that section after the 30–day period beginning on the date of notification of the consumer under paragraph (6) or (8) of section 611(a) with respect to the reinvestigation, which charge—

"(i) shall not exceed the charge that the agency would impose on each designated recipient for a consumer report; and

"(ii) shall be indicated to the consumer before furnishing such information.

"(2) MODIFICATION OF AMOUNT.—The Federal Trade Commission shall increase the amount referred to in paragraph (1)(A)(i) on January 1 of each year, based proportionally on changes in the Consumer Price Index, with fractional changes rounded to the nearest fifty cents.

"(b) FREE DISCLOSURE AFTER ADVERSE NOTICE TO CONSUMER.—Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to section 609 without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to section 615, or of a notification from a debt collection agency affiliated with that consumer reporting agency stating that the consumer's credit rating may be or has been adversely affected, the consumer makes a request under section 609.

"(c) FREE DISCLOSURE UNDER CERTAIN OTHER CIRCUMSTANCES.—Upon the request of the consumer, a consumer reporting agency shall make all disclosures pursuant to section 609 once during any 12–month period without charge to that consumer if the consumer certifies in writing that the consumer—

"(1) is unemployed and intends to apply for employment in the 60–day period beginning on the date on which the certification is made;

"(2) is a recipient of public welfare assistance; or

"(3) has reason to believe that the file on the consumer at the agency contains inaccurate information due to fraud.

"(d) OTHER CHARGES PROHIBITED.—A consumer reporting agency shall not impose any charge on a consumer for providing any notification required by this title or making any disclosure required by this title, except as authorized by subsection (a).".

SEC. 2411. DUTIES OF USERS OF CONSUMER REPORTS.

<< 15 USCA § 1681m >>

(a) DUTIES OF USERS TAKING ADVERSE ACTIONS.—Section 615(a) of the Fair Credit Reporting Act (15 U.S.C. 1681m(a)) is amended to read as follows:

"(a) DUTIES OF USERS TAKING ADVERSE ACTIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER REPORTS.—If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—

"(1) provide oral, written, or electronic notice of the adverse action to the consumer;

"(2) provide to the consumer orally, in writing, or electronically—

"(A) the name, address, and telephone number of the consumer reporting agency (including a toll-free telephone number established by the agency if the agency compiles and maintains files on consumers on a nationwide basis) that furnished the report to the person; and

"(B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

"(3) provide to the consumer an oral, written, or electronic notice of the consumer's right—

"(A) to obtain, under section 612, a free copy of a consumer report on the consumer from the consumer reporting agency referred to in paragraph (2), which notice shall include an indication of the 60–day period under that section for obtaining such a copy; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) to dispute, under section 611, with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.".

(b) DUTIES OF USERS MAKING CERTAIN CREDIT SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(d) DUTIES OF USERS MAKING WRITTEN CREDIT OR INSURANCE SOLICITATIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER FILES.—

"(1) IN GENERAL.—Any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, that is provided to that person under section 604(c)(1)(B), shall provide with each written solicitation made to the consumer regarding the transaction a clear and conspicuous statement that—

"(A) information contained in the consumer's consumer report was used in connection with the transaction;

"(B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer;

"(C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral;

"(D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer; and

"(E) the consumer may exercise the right referred to in subparagraph (D) by notifying a notification system established under section 604(e).

"(2) DISCLOSURE OF ADDRESS AND TELEPHONE NUMBER.—A statement under paragraph (1) shall include the address and toll-free telephone number of the appropriate notification system established under section 604(e).

"(3) MAINTAINING CRITERIA ON FILE.—A person who makes an offer of credit or insurance to a consumer under a credit or insurance transaction described in paragraph (1) shall maintain on file the criteria used to select the consumer to receive the offer, all criteria bearing on credit worthiness or insurability, as applicable, that are the basis for determining whether or not to extend credit or insurance pursuant to the offer, and any requirement for the furnishing of collateral as a condition of the extension of credit or insurance, until the expiration of the 3–year period beginning on the date on which the offer is made to the consumer.

"(4) AUTHORITY OF FEDERAL AGENCIES REGARDING UNFAIR OR DECEPTIVE ACTS OR PRACTICES NOT AFFECTED.—This section is not intended to affect the authority of any Federal or State agency to enforce a prohibition against unfair or deceptive acts or practices, including the making of false or misleading statements in connection with a credit or insurance transaction that is not initiated by the consumer.".

(c) DUTIES OF USERS MAKING OTHER SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(e)

(d) CONFORMING AMENDMENT.—Section 615(c) of the Fair Credit Reporting Act (15 U.S.C. 1681m(c)) is amended by striking "subsections (a) and (b)" and inserting "this section".

(e) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—Section 615(b) of the Fair Credit Reporting Act (15 U.S.C. 1681m(b)) is amended—

(1) by striking "(b) Whenever credit" and inserting the following:

"(b) ADVERSE ACTION BASED ON INFORMATION OBTAINED FROM THIRD PARTIES OTHER THAN CONSUMER REPORTING AGENCIES.—

"(1) IN GENERAL.—Whenever credit";

(2) by adding at the end the following new paragraph:

"(2) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—

"(A) DUTIES, GENERALLY.—If a person takes an action described in subparagraph (B) with respect to a consumer, based in whole or in part on information described in subparagraph (C), the person shall—

"(i) notify the consumer of the action, including a statement that the consumer may obtain the information in accordance with clause (ii); and

AR.01593

"(ii) upon a written request from the consumer received within 60 days after transmittal of the notice required by clause (i), disclose to the consumer the nature of the information upon which the action is based by not later than 30 days after receipt of the request.

"(B) ACTION DESCRIBED.—An action referred to in subparagraph (A) is an adverse action described in section 603(k)(1)(A), taken in connection with a transaction initiated by the consumer, or any adverse action described in clause (i) or (ii) of section 603(k)(1)(B).

"(C) INFORMATION DESCRIBED.—Information referred to in subparagraph (A)—

"(i) except as provided in clause (ii), is information that—

"(I) is furnished to the person taking the action by a person related by common ownership or affiliated by common corporate control to the person taking the action; and

"(II) bears on the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the consumer; and

"(ii) does not include—

"(I) information solely as to transactions or experiences between the consumer and the person furnishing the information; or

"(II) information in a consumer report.".

SEC. 2412. CIVIL LIABILITY.

<< 15 USCA § 1681n >>

(a) CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL.—Any person who".

(b) MINIMUM CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681n(1)), as so designated by subsection (a) of this section, is amended to read as follows:

"(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

"(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;".

(c) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(b) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Any person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater.".

<< 15 USCA § 1681o >>

(d) CIVIL LIABILITY FOR NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681o) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL.—Any person who".

(e) ATTORNEY'S FEES.—

<< 15 USCA § 1681n >>

(1) WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(c) ATTORNEY'S FEES.—Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

<< 15 USCA § 1681*o* >>

(2) NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681*o*) is amended by adding at the end the following new subsection:

"(b) ATTORNEY'S FEES.—On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

SEC. 2413. RESPONSIBILITIES OF PERSONS WHO FURNISH INFORMATION TO CONSUMER REPORTING AGENCIES.

(a) IN GENERAL.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

<< 15 USCA § 1681t >>

(1) by redesignating section 623 as section 624; and

<< 15 USCA § 1681s–2 >>

(2) by inserting after section 622 the following:

"SEC. 623. RESPONSIBILITIES OF FURNISHERS OF INFORMATION TO CONSUMER REPORTING AGENCIES.

"(a) DUTY OF FURNISHERS OF INFORMATION TO PROVIDE ACCURATE INFORMATION.—

"(1) PROHIBITION.—

"(A) REPORTING INFORMATION WITH ACTUAL KNOWLEDGE OF ERRORS.—A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

"(B) REPORTING INFORMATION AFTER NOTICE AND CONFIRMATION OF ERRORS.—A person shall not furnish information relating to a consumer to any consumer reporting agency if—

"(i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and

"(ii) the information is, in fact, inaccurate.

"(C) NO ADDRESS REQUIREMENT.—A person who clearly and conspicuously specifies to the consumer an address for notices referred to in subparagraph (B) shall not be subject to subparagraph (A); however, nothing in subparagraph (B) shall require a person to specify such an address.

"(2) DUTY TO CORRECT AND UPDATE INFORMATION.—A person who—

"(A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

"(B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate,

shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

"(3) DUTY TO PROVIDE NOTICE OF DISPUTE.—If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

"(4) DUTY TO PROVIDE NOTICE OF CLOSED ACCOUNTS.—A person who regularly and in the ordinary course of business furnishes information to a consumer reporting agency regarding a consumer who has a credit account with that person

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shall notify the agency of the voluntary closure of the account by the consumer, in information regularly furnished for the period in which the account is closed.

"(5) DUTY TO PROVIDE NOTICE OF DELINQUENCY OF ACCOUNTS.—A person who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall, not later than 90 days after furnishing the information, notify the agency of the month and year of the commencement of the delinquency that immediately preceded the action.

"(b) DUTIES OF FURNISHERS OF INFORMATION UPON NOTICE OF DISPUTE.—

"(1) IN GENERAL.—After receiving notice pursuant to section 611(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

  "(A) conduct an investigation with respect to the disputed information;

  "(B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2);

  "(C) report the results of the investigation to the consumer reporting agency; and

  "(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

"(2) DEADLINE.—A person shall complete all investigations, reviews, and reports required under paragraph (1) regarding information provided by the person to a consumer reporting agency, before the expiration of the period under section 611(a)(1) within which the consumer reporting agency is required to complete actions required by that section regarding that information.

"(c) LIMITATION ON LIABILITY.—Sections 616 and 617 do not apply to any failure to comply with subsection (a), except as provided in section 621(c)(1)(B).

"(d) LIMITATION ON ENFORCEMENT.—Subsection (a) shall be enforced exclusively under section 621 by the Federal agencies and officials and the State officials identified in that section.".

  (b) CONFORMING AMENDMENT.—The table of sections at the beginning of the Fair Credit Reporting Act (15 U.S.C. 1681a et seq.) is amended by striking the item relating to section 623 and inserting the following:

"623. Responsibilities of furnishers of information to consumer reporting agencies.

"624. Relation to State laws.".

<< 15 USCA § 1681d >>

SEC. 2414. INVESTIGATIVE CONSUMER REPORTS.

  Section 606 of the Fair Credit Reporting Act (15 U.S.C. 1681d) is amended—

  (1) in subsection (a)(1), by striking "or" at the end and inserting "and";

  (2) by striking subsection (a)(2) and inserting the following:

  "(2) the person certifies or has certified to the consumer reporting agency that—

    "(A) the person has made the disclosures to the consumer required by paragraph (1); and

    "(B) the person will comply with subsection (b).";

  (3) in subsection (b), by striking "shall" the second place such term appears; and

  Sec. 2414(4)

  (4) by adding at the end the following new subsection:

"(d) PROHIBITIONS.—

  "(1) CERTIFICATION.—A consumer reporting agency shall not prepare or furnish an investigative consumer report unless the agency has received a certification under subsection (a)(2) from the person who requested the report.

  "(2) INQUIRIES.—A consumer reporting agency shall not make an inquiry for the purpose of preparing an investigative consumer report on a consumer for employment purposes if the making of the inquiry by an employer or prospective employer of the consumer would violate any applicable Federal or State equal employment opportunity law or regulation.

  "(3) CERTAIN PUBLIC RECORD INFORMATION.—Except as otherwise provided in section 613, a consumer reporting agency shall not furnish an investigative consumer report that includes information that is a matter of public record and that

relates to an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment, unless the agency has verified the accuracy of the information during the 30–day period ending on the date on which the report is furnished.

"(4) CERTAIN ADVERSE INFORMATION.—A consumer reporting agency shall not prepare or furnish an investigative consumer report on a consumer that contains information that is adverse to the interest of the consumer and that is obtained through a personal interview with a neighbor, friend, or associate of the consumer or with another person with whom the consumer is acquainted or who has knowledge of such item of information, unless—

"(A) the agency has followed reasonable procedures to obtain confirmation of the information, from an additional source that has independent and direct knowledge of the information; or

"(B) the person interviewed is the best possible source of the information.".

## SEC. 2415. INCREASED CRIMINAL PENALTIES FOR OBTAINING INFORMATION UNDER FALSE PRETENSES.

<< 15 USCA § 1681q >>

(a) OBTAINING INFORMATION UNDER FALSE PRETENSES.—Section 619 of the Fair Credit Reporting Act (15 U.S.C. 1681q) is amended by striking "fined not more than $5,000 or imprisoned not more than one year, or both" and inserting "fined under title 18, United States Code, imprisoned for not more than 2 years, or both".

<< 15 USCA § 1681r >>

(b) UNAUTHORIZED DISCLOSURES BY OFFICERS OR EMPLOYEES.—Section 620 of the Fair Credit Reporting Act (15 U.S.C. 1681r) is amended by striking "fined not more than $5,000 or imprisoned not more than one year, or both" and inserting "fined under title 18, United States Code, imprisoned for not more than 2 years, or both".

<< 15 USCA § 1681s >>

## SEC. 2416. ADMINISTRATIVE ENFORCEMENT.

(a) AVAILABLE ENFORCEMENT POWERS.—Section 621(a) of the Fair Credit Reporting Act (15 U.S.C. 1681s(a)) is amended—

(1) by inserting "(1)" after "(a)";

(2) by adding at the end the following new paragraph:

"(2)(A) In the event of a knowing violation, which constitutes a pattern or practice of violations of this title, the Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person that violates this title. In such action, such person shall be liable for a civil penalty of not more than $2,500 per violation.

"(B) In determining the amount of a civil penalty under subparagraph (A), the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

"(3) Notwithstanding paragraph (2), a court may not impose any civil penalty on a person for a violation of section 623(a)(1) unless the person has been enjoined from committing the violation, or ordered not to commit the violation, in an action or proceeding brought by or on behalf of the Federal Trade Commission, and has violated the injunction or order, and the court may not impose any civil penalty for any violation occurring before the date of the violation of the injunction or order.

"(4) Neither the Commission nor any other agency referred to in subsection (b) may prescribe trade regulation rules or other regulations with respect to this title.".

(b) AGENCIES RESPONSIBLE FOR ENFORCEMENT.—Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended—

(1) in subsection (a), by inserting "ENFORCEMENT BY FEDERAL TRADE COMMISSION.—" before "Compliance with the requirements";

(2) in subsection (b), by striking the matter preceding paragraph (1) and inserting the following:

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(b) ENFORCEMENT BY OTHER AGENCIES.—Compliance with the requirements imposed under this title with respect to consumer reporting agencies, persons who use consumer reports from such agencies, persons who furnish information to such agencies, and users of information that are subject to subsection (d) or (e) of section 615 shall be enforced under—"; and

(3) in subsection (c), by adding at the end the following: "Notwithstanding the preceding, no agency referred to in subsection (b) may conduct an examination of a bank, savings association, or credit union regarding compliance with the provisions of this title, except in response to a complaint (or if the agency otherwise has knowledge) that the bank, savings association, or credit union has violated a provision of this title, in which case, the agency may conduct an examination as necessary to investigate the complaint. If an agency determines during an investigation in response to a complaint that a violation of this title has occurred, the agency may, during its next 2 regularly scheduled examinations of the bank, savings association, or credit union, examine for compliance with this title.".

<< 15 USCA § 1681s >>

SEC. 2417. STATE ENFORCEMENT OF FAIR CREDIT REPORTING ACT.

Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended—
(1) by redesignating subsection (c) as subsection (d); and
(2) by inserting after subsection (b) the following new subsection:
"(c) STATE ACTION FOR VIOLATIONS.—
"(1) AUTHORITY OF STATES.—In addition to such other remedies as are provided under State law, if the chief law enforcement officer of a State, or an official or agency designated by a State, has reason to believe that any person has violated or is violating this title, the State—
"(A) may bring an action to enjoin such violation in any appropriate United States district court or in any other court of competent jurisdiction;
"(B) subject to paragraph (5), may bring an action on behalf of the residents of the State to recover—
"(i) damages for which the person is liable to such residents under sections 616 and 617 as a result of the violation;
"(ii) in the case of a violation of section 623(a), damages for which the person would, but for section 623(c), be liable to such residents as a result of the violation; or
"(iii) damages of not more than $1,000 for each willful or negligent violation; and
"(C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.
"(2) RIGHTS OF FEDERAL REGULATORS.—The State shall serve prior written notice of any action under paragraph (1) upon the Federal Trade Commission or the appropriate Federal regulator determined under subsection (b) and provide the Commission or appropriate Federal regulator with a copy of its complaint, except in any case in which such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Federal Trade Commission or appropriate Federal regulator shall have the right—
"(A) to intervene in the action;
"(B) upon so intervening, to be heard on all matters arising therein;
"(C) to remove the action to the appropriate United States district court; and
"(D) to file petitions for appeal.
"(3) INVESTIGATORY POWERS.—For purposes of bringing any action under this subsection, nothing in this subsection shall prevent the chief law enforcement officer, or an official or agency designated by a State, from exercising the powers conferred on the chief law enforcement officer or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.
"(4) LIMITATION ON STATE ACTION WHILE FEDERAL ACTION PENDING.—If the Federal Trade Commission or the appropriate Federal regulator has instituted a civil action or an administrative action under section 8 of the Federal Deposit Insurance Act for a violation of this title, no State may, during the pendency of such action, bring an action under this section against any defendant named in the complaint of the Commission or the appropriate Federal regulator for any violation of this title that is alleged in that complaint.
"(5) LIMITATIONS ON STATE ACTIONS FOR VIOLATION OF SECTION 623(a)(1).—

"(A) VIOLATION OF INJUNCTION REQUIRED.—A State may not bring an action against a person under paragraph (1) (B) for a violation of section 623(a)(1), unless—

"(i) the person has been enjoined from committing the violation, in an action brought by the State under paragraph (1) (A); and

"(ii) the person has violated the injunction.

"(B) LIMITATION ON DAMAGES RECOVERABLE.—In an action against a person under paragraph (1)(B) for a violation of section 623(a)(1), a State may not recover any damages incurred before the date of the violation of an injunction on which the action is based.".

<< 15 USCA § 1681s >>

## SEC. 2418. FEDERAL RESERVE BOARD AUTHORITY.

Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended by adding at the end the following new subsection:

"(e) INTERPRETIVE AUTHORITY.—The Board of Governors of the Federal Reserve System may issue interpretations of any provision of this title as such provision may apply to any persons identified under paragraph (1), (2), and (3) of subsection (b), or to the holding companies and affiliates of such persons, in consultation with Federal agencies identified in paragraphs (1), (2), and (3) of subsection (b).".

<< 15 USCA § 1681t >>

## SEC. 2419. PREEMPTION OF STATE LAW.

Section 624 of the Fair Credit Reporting Act (as redesignated by section 2413(a) of this chapter) is amended—

(1) by striking "This title" and inserting "(a) IN GENERAL.—Except as provided in subsections (b) and (c), this title"; and
(2) by adding at the end the following new subsection:

"(b) GENERAL EXCEPTIONS.—No requirement or prohibition may be imposed under the laws of any State—

"(1) with respect to any subject matter regulated under—

"(A) subsection (c) or (e) of section 604, relating to the prescreening of consumer reports;

"(B) section 611, relating to the time by which a consumer reporting agency must take any action, including the provision of notification to a consumer or other person, in any procedure related to the disputed accuracy of information in a consumer's file, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996;

"(C) subsections (a) and (b) of section 615, relating to the duties of a person who takes any adverse action with respect to a consumer;

"(D) section 615(d), relating to the duties of persons who use a consumer report of a consumer in connection with any credit or insurance transaction that is not initiated by the consumer and that consists of a firm offer of credit or insurance;

"(E) section 605, relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996; or

"(F) section 623, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—

"(i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996); or

"(ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996);

"(2) with respect to the exchange of information among persons affiliated by common ownership or common corporate control, except that this paragraph shall not apply with respect to subsection (a) or (c)(1) of section 2480e of title 9, Vermont Statutes Annotated (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996); or

"(3) with respect to the form and content of any disclosure required to be made under section 609(c).

"(c) DEFINITION OF FIRM OFFER OF CREDIT OR INSURANCE.—Notwithstanding any definition of the term 'firm offer of credit or insurance' (or any equivalent term) under the laws of any State, the definition of that term contained in section 603(l) shall be construed to apply in the enforcement and interpretation of the laws of any State governing consumer reports.

"(d) LIMITATIONS.—Subsections (b) and (c)—

"(1) do not affect any settlement, agreement, or consent judgment between any State Attorney General and any consumer reporting agency in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996; and

"(2) do not apply to any provision of State law (including any provision of a State constitution) that—

"(A) is enacted after January 1, 2004;

"(B) states explicitly that the provision is intended to supplement this title; and

"(C) gives greater protection to consumers than is provided under this title.".

<< 15 USCA § 1681a NOTE >>

SEC. 2420. EFFECTIVE DATE.

(a) IN GENERAL.—Except as otherwise specifically provided in this chapter, the amendments made by this chapter shall become effective 365 days after the date of enactment of this Act.

(b) EARLY COMPLIANCE.—Any person or other entity that is subject to the requirements of this chapter may, at its option, comply with any provision of this chapter before the date on which that provision becomes effective under this chapter, in which case, each of the corresponding provisions of this chapter shall be fully applicable to such person or entity.

<< 15 USCA § 1681a NOTE >>

SEC. 2421. RELATIONSHIP TO OTHER LAW.

Nothing in this chapter or the amendments made by this chapter shall be considered to supersede or otherwise affect section 2721 of title 18, United States Code, with respect to motor vehicle records for surveys, marketing, or solicitations.

SEC. 2422. FEDERAL RESERVE BOARD STUDY.

(a) STUDY REQUIRED.—The Board of Governors of the Federal Reserve System, in consultation with the other Federal banking agencies (as defined in section 3 of the Federal Deposit Insurance Act) and the Federal Trade Commission, shall conduct a study of whether organizations which, as of the date of the enactment of this Act, are not subject to the Fair Credit Reporting Act as consumer reporting agencies (as defined in section 603 of such Act) are engaged in the business of making sensitive consumer identification information, including social security numbers, mothers' maiden names, prior addresses, and dates of birth, available to the general public.

(b) DETERMINATION OF POTENTIAL FOR FRAUD.—If the Board of Governors of the Federal Reserve System determines that organizations referred to in subsection (a) are engaged in the business of making sensitive consumer identification information available to the general public, the Board shall determine—

(1) whether such activities create undue potential for fraud and risk of loss to insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act); and

(2) if so, whether changes in Federal law are necessary to address such risks of fraud and loss.

(c) REPORT TO CONGRESS.—Before the end of the 6–month period beginning on the date of the enactment of this Act, the Board of Governors of the Federal Reserve System shall submit a report to the Congress containing—

(1) the findings and conclusion of the Board in connection with the study required under subsections (a) and (b); and

(2) recommendations for such legislative or administrative action as the Board determines to be appropriate.

CHAPTER 2—CREDIT REPAIR ORGANIZATIONS

SEC. 2451. REGULATION OF CREDIT REPAIR ORGANIZATIONS.

Title IV of the Consumer Credit Protection Act (Public Law 90–321, 82 Stat. 164) is amended to read as follows:

<< 15 USCA Ch. 41 >>

## "TITLE IV—CREDIT REPAIR ORGANIZATIONS

"Sec.

"401. Short title.

"402. Findings and purposes.

"403. Definitions.

"404. Prohibited practices.

"405. Disclosures.

"406. Credit repair organizations contracts.

"407. Right to cancel contract.

"408. Noncompliance with this title.

"409. Civil liability.

"410. Administrative enforcement.

"411. Statute of limitations.

"412. Relation to State law.

"413. Effective date.

<< 15 USCA § 1601 NOTE >>

"SEC. 401. SHORT TITLE.

"This title may be cited as the 'Credit Repair Organizations Act'.

<< 15 USCA § 1679 >>

"SEC. 402. FINDINGS AND PURPOSES.

"(a) FINDINGS.—The Congress makes the following findings:
  "(1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.
  "(2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.
"(b) PURPOSES.—The purposes of this title are—
  "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and
  "(2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

<< 15 USCA § 1679a >>

"SEC. 403. DEFINITIONS.

"For purposes of this title, the following definitions apply:

"(1) CONSUMER.—The term 'consumer' means an individual.

"(2) CONSUMER CREDIT TRANSACTION.—The term 'consumer credit transaction' means any transaction in which credit is offered or extended to an individual for personal, family, or household purposes.

"(3) CREDIT REPAIR ORGANIZATION.—The term 'credit repair organization'—

"(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

"(i) improving any consumer's credit record, credit history, or credit rating; or

"(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

"(B) does not include—

"(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986;

"(ii) any creditor (as defined in section 103 of the Truth in Lending Act), with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or

"(iii) any depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act) or any Federal or State credit union (as those terms are defined in section 101 of the Federal Credit Union Act), or any affiliate or subsidiary of such a depository institution or credit union.

"(4) CREDIT.—The term 'credit' has the meaning given to such term in section 103(e) of this Act.

<< 15 USCA § 1679b >>

"SEC. 404. PROHIBITED PRACTICES.

"(a) IN GENERAL.—No person may—

"(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to—

"(A) any consumer reporting agency (as defined in section 603(f) of this Act); or

"(B) any person—

"(i) who has extended credit to the consumer; or

"(ii) to whom the consumer has applied or is applying for an extension of credit;

"(2) make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to—

"(A) any consumer reporting agency;

"(B) any person—

"(i) who has extended credit to the consumer; or

"(ii) to whom the consumer has applied or is applying for an extension of credit;

"(3) make or use any untrue or misleading representation of the services of the credit repair organization; or

"(4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

"(b) PAYMENT IN ADVANCE.—No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

<< 15 USCA § 1679c >>

"SEC. 405. DISCLOSURES.

 "(a) DISCLOSURE REQUIRED.—Any credit repair organization shall provide any consumer with the following written statement before any contract or agreement between the consumer and the credit repair organization is executed:

" 'Consumer Credit File Rights Under State and Federal Law

 " 'You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any "credit repair" company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

 " 'You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

 " 'You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

 " 'You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

 " 'Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

 " 'You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

 " 'If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

 " 'The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:

 " 'The Public Reference Branch

 " 'Federal Trade Commission

 " 'Washington, D.C. 20580'.

 "(b) SEPARATE STATEMENT REQUIREMENT.—The written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.

 "(c) RETENTION OF COMPLIANCE RECORDS.—

  "(1) IN GENERAL.—The credit repair organization shall maintain a copy of the statement signed by the consumer acknowledging receipt of the statement.

  "(2) MAINTENANCE FOR 2 YEARS.—The copy of any consumer's statement shall be maintained in the organization's files for 2 years after the date on which the statement is signed by the consumer.

<< 15 USCA § 1679d >>

"SEC. 406. CREDIT REPAIR ORGANIZATIONS CONTRACTS.

 "(a) WRITTEN CONTRACTS REQUIRED.—No services may be provided by any credit repair organization for any consumer—

"(1) unless a written and dated contract (for the purchase of such services) which meets the requirements of subsection (b) has been signed by the consumer; or

"(2) before the end of the 3–business–day period beginning on the date the contract is signed.

"(b) TERMS AND CONDITIONS OF CONTRACT.—No contract referred to in subsection (a) meets the requirements of this subsection unless such contract includes (in writing)—

"(1) the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person;

"(2) a full and detailed description of the services to be performed by the credit repair organization for the consumer, including—

"(A) all guarantees of performance; and

"(B) an estimate of—

"(i) the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete; or

"(ii) the length of the period necessary to perform such services;

"(3) the credit repair organization's name and principal business address; and

"(4) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'.

<< 15 USCA § 1679e >>

"SEC. 407. RIGHT TO CANCEL CONTRACT.

"(a) IN GENERAL.—Any consumer may cancel any contract with any credit repair organization without penalty or obligation by notifying the credit repair organization of the consumer's intention to do so at any time before midnight of the 3rd business day which begins after the date on which the contract or agreement between the consumer and the credit repair organization is executed or would, but for this subsection, become enforceable against the parties.

"(b) CANCELLATION FORM AND OTHER INFORMATION.—Each contract shall be accompanied by a form, in duplicate, which has the heading 'Notice of Cancellation' and contains in bold face type the following statement:

" 'You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.

" 'To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]

" 'I hereby cancel this transaction,

[date]

[purchaser's signature].'.

"(c) CONSUMER COPY OF CONTRACT REQUIRED.—Any consumer who enters into any contract with any credit repair organization shall be given, by the organization—

"(1) a copy of the completed contract and the disclosure statement required under section 405; and

"(2) a copy of any other document the credit repair organization requires the consumer to sign, at the time the contract or the other document is signed.

<< 15 USCA § 1679f >>

"SEC. 408. NONCOMPLIANCE WITH THIS TITLE.

"(a) CONSUMER WAIVERS INVALID.—Any waiver by any consumer of any protection provided by or any right of the consumer under this title—

"(1) shall be treated as void; and

"(2) may not be enforced by any Federal or State court or any other person.

"(b) ATTEMPT TO OBTAIN WAIVER.—Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this title shall be treated as a violation of this title.

"(c) CONTRACTS NOT IN COMPLIANCE.—Any contract for services which does not comply with the applicable provisions of this title—

"(1) shall be treated as void; and

"(2) may not be enforced by any Federal or State court or any other person.

<< 15 USCA § 1679g >>

"SEC. 409. CIVIL LIABILITY.

"(a) LIABILITY ESTABLISHED.—Any person who fails to comply with any provision of this title with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

"(1) ACTUAL DAMAGES.—The greater of—

"(A) the amount of any actual damage sustained by such person as a result of such failure; or

"(B) any amount paid by the person to the credit repair organization.

"(2) PUNITIVE DAMAGES.—

"(A) INDIVIDUAL ACTIONS.—In the case of any action by an individual, such additional amount as the court may allow.

"(B) CLASS ACTIONS.—In the case of a class action, the sum of—

"(i) the aggregate of the amount which the court may allow for each named plaintiff; and

"(ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

"(3) ATTORNEYS' FEES.—In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

"(b) FACTORS TO BE CONSIDERED IN AWARDING PUNITIVE DAMAGES.—In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors—

"(1) the frequency and persistence of noncompliance by the credit repair organization;

"(2) the nature of the noncompliance;

"(3) the extent to which such noncompliance was intentional; and

"(4) in the case of any class action, the number of consumers adversely affected.

<< 15 USCA § 1679h >>

"SEC. 410. ADMINISTRATIVE ENFORCEMENT.

"(a) IN GENERAL.—Compliance with the requirements imposed under this title with respect to credit repair organizations shall be enforced under the Federal Trade Commission Act by the Federal Trade Commission.

"(b) VIOLATIONS OF THIS TITLE TREATED AS VIOLATIONS OF FEDERAL TRADE COMMISSION ACT.—

"(1) IN GENERAL.—For the purpose of the exercise by the Federal Trade Commission of the Commission's functions and powers under the Federal Trade Commission Act, any violation of any requirement or prohibition imposed under this title with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act.

"(2) ENFORCEMENT AUTHORITY UNDER OTHER LAW.—All functions and powers of the Federal Trade Commission under the Federal Trade Commission Act shall be available to the Commission to enforce compliance with this title by any person subject to enforcement by the Federal Trade Commission pursuant to this subsection, including the power to enforce the provisions of this title in the same manner as if the violation had been a violation of any Federal Trade Commission trade regulation rule, without regard to whether the credit repair organization—

"(A) is engaged in commerce; or

"(B) meets any other jurisdictional tests in the Federal Trade Commission Act.

"(c) STATE ACTION FOR VIOLATIONS.—

"(1) AUTHORITY OF STATES.—In addition to such other remedies as are provided under State law, whenever the chief law enforcement officer of a State, or an official or agency designated by a State, has reason to believe that any person has violated or is violating this title, the State—

  "(A) may bring an action to enjoin such violation;

  "(B) may bring an action on behalf of its residents to recover damages for which the person is liable to such residents under section 409 as a result of the violation; and

  "(C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.

  "(2) RIGHTS OF COMMISSION.—

  "(A) NOTICE TO COMMISSION.—The State shall serve prior written notice of any civil action under paragraph (1) upon the Federal Trade Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action.

  "(B) INTERVENTION.—The Commission shall have the right—

  "(i) to intervene in any action referred to in subparagraph (A);

  "(ii) upon so intervening, to be heard on all matters arising in the action; and

  "(iii) to file petitions for appeal.

  "(3) INVESTIGATORY POWERS.—For purposes of bringing any action under this subsection, nothing in this subsection shall prevent the chief law enforcement officer, or an official or agency designated by a State, from exercising the powers conferred on the chief law enforcement officer or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

  "(4) LIMITATION.—Whenever the Federal Trade Commission has instituted a civil action for violation of this title, no State may, during the pendency of such action, bring an action under this section against any defendant named in the complaint of the Commission for any violation of this title that is alleged in that complaint.

<< 15 USCA § 1679i >>

"SEC. 411. STATUTE OF LIMITATIONS.

 "Any action to enforce any liability under this title may be brought before the later of—

  "(1) the end of the 5–year period beginning on the date of the occurrence of the violation involved; or

  "(2) in any case in which any credit repair organization has materially and willfully misrepresented any information which—

  "(A) the credit repair organization is required, by any provision of this title, to disclose to any consumer; and

  "(B) is material to the establishment of the credit repair organization's liability to the consumer under this title,

 the end of the 5–year period beginning on the date of the discovery by the consumer of the misrepresentation.

<< 15 USCA § 1679j >>

"SEC. 412. RELATION TO STATE LAW.

 "This title shall not annul, alter, affect, or exempt any person subject to the provisions of this title from complying with any law of any State except to the extent that such law is inconsistent with any provision of this title, and then only to the extent of the inconsistency.

<< 15 USCA §§ 1679 NOTE, 1679a nt, 1679b nt, 1679c nt, 1679d
nt, 1679e nt, 1679f nt, 1679g nt, 1679h nt, 1679i nt, 1679j nt >>

"SEC. 413. EFFECTIVE DATE.

 "This title shall apply after the end of the 6–month period beginning on the date of the enactment of the Credit Repair Organizations Act, except with respect to contracts entered into by a credit repair organization before the end of such period.".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## SEC. 2452. CREDIT WORTHINESS.

It is the sense of the Senate that—

(1) individuals should generally be judged for credit worthiness based on their own credit worthiness and not on the zip code or neighborhood in which they live; and

(2) the Federal Trade Commission, after consultation with the appropriate Federal banking agency, should report to the Committee on Banking, Housing, and Urban Affairs of the Senate as to whether and how the location of the residence of an applicant for unsecured credit is considered by many companies and financial institutions in deciding whether an applicant should be granted credit.

Subtitle E—Asset Conservation, Lender Liability, and Deposit Insurance Protection

<< 42 USCA § 9601 NOTE >>

## SEC. 2501. SHORT TITLE.

This subtitle may be cited as the "Asset Conservation, Lender Liability, and Deposit Insurance Protection Act of 1996".

## SEC. 2502. CERCLA LENDER AND FIDUCIARY LIABILITY LIMITATIONS AMENDMENTS.

(a) IN GENERAL.—Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9607) is amended by adding at the end the following:

<< 42 USCA § 9607 >>

"(n) LIABILITY OF FIDUCIARIES.—

"(1) IN GENERAL.—The liability of a fiduciary under any provision of this Act for the release or threatened release of a hazardous substance at, from, or in connection with a vessel or facility held in a fiduciary capacity shall not exceed the assets held in the fiduciary capacity.

"(2) EXCLUSION.—Paragraph (1) does not apply to the extent that a person is liable under this Act independently of the person's ownership of a vessel or facility as a fiduciary or actions taken in a fiduciary capacity.

"(3) LIMITATION.—Paragraphs (1) and (4) do not limit the liability pertaining to a release or threatened release of a hazardous substance if negligence of a fiduciary causes or contributes to the release or threatened release.

"(4) SAFE HARBOR.—A fiduciary shall not be liable in its personal capacity under this Act for—

"(A) undertaking or directing another person to undertake a response action under subsection (d)(1) or under the direction of an on scene coordinator designated under the National Contingency Plan;

"(B) undertaking or directing another person to undertake any other lawful means of addressing a hazardous substance in connection with the vessel or facility;

"(C) terminating the fiduciary relationship;

"(D) including in the terms of the fiduciary agreement a covenant, warranty, or other term or condition that relates to compliance with an environmental law, or monitoring, modifying or enforcing the term or condition;

"(E) monitoring or undertaking 1 or more inspections of the vessel or facility;

"(F) providing financial or other advice or counseling to other parties to the fiduciary relationship, including the settlor or beneficiary;

"(G) restructuring, renegotiating, or otherwise altering the terms and conditions of the fiduciary relationship;

"(H) administering, as a fiduciary, a vessel or facility that was contaminated before the fiduciary relationship began; or

"(I) declining to take any of the actions described in subparagraphs (B) through (H).

"(5) DEFINITIONS.—As used in this Act:

"(A) FIDUCIARY.—The term 'fiduciary'—

"(i) means a person acting for the benefit of another party as a bona fide—

"(I) trustee;

"(II) executor;

"(III) administrator;

"(IV) custodian;

"(V) guardian of estates or guardian ad litem;

"(VI) receiver;

"(VII) conservator;

"(VIII) committee of estates of incapacitated persons;

"(IX) personal representative;

"(X) trustee (including a successor to a trustee) under an indenture agreement, trust agreement, lease, or similar financing agreement, for debt securities, certificates of interest or certificates of participation in debt securities, or other forms of indebtedness as to which the trustee is not, in the capacity of trustee, the lender; or

"(XI) representative in any other capacity that the Administrator, after providing public notice, determines to be similar to the capacities described in subclauses (I) through (X); and

"(ii) does not include—

"(I) a person that is acting as a fiduciary with respect to a trust or other fiduciary estate that was organized for the primary purpose of, or is engaged in, actively carrying on a trade or business for profit, unless the trust or other fiduciary estate was created as part of, or to facilitate, 1 or more estate plans or because of the incapacity of a natural person; or

"(II) a person that acquires ownership or control of a vessel or facility with the objective purpose of avoiding liability of the person or of any other person.

"(B) FIDUCIARY CAPACITY.—The term 'fiduciary capacity' means the capacity of a person in holding title to a vessel or facility, or otherwise having control of or an interest in the vessel or facility, pursuant to the exercise of the responsibilities of the person as a fiduciary.

"(6) SAVINGS CLAUSE.—Nothing in this subsection—

"(A) affects the rights or immunities or other defenses that are available under this Act or other law that is applicable to a person subject to this subsection; or

"(B) creates any liability for a person or a private right of action against a fiduciary or any other person.

"(7) NO EFFECT ON CERTAIN PERSONS.—Nothing in this subsection applies to a person if the person—

"(A)(i) acts in a capacity other than that of a fiduciary or in a beneficiary capacity; and

"(ii) in that capacity, directly or indirectly benefits from a trust or fiduciary relationship; or

"(B)(i) is a beneficiary and a fiduciary with respect to the same fiduciary estate; and

"(ii) as a fiduciary, receives benefits that exceed customary or reasonable compensation, and incidental benefits, permitted under other applicable law.

"(8) LIMITATION.—This subsection does not preclude a claim under this Act against—

"(A) the assets of the estate or trust administered by the fiduciary; or

"(B) a nonemployee agent or independent contractor retained by a fiduciary.".

<< 42 USCA § 9601 >>

(b) DEFINITION OF OWNER OR OPERATOR.—Section 101(20) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601(20)) is amended by adding at the end the following:

"(E) EXCLUSION OF LENDERS NOT PARTICIPANTS IN MANAGEMENT.—

"(i) INDICIA OF OWNERSHIP TO PROTECT SECURITY.—The term 'owner or operator' does not include a person that is a lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility.

"(ii) FORECLOSURE.—The term 'owner or operator' does not include a person that is a lender that did not participate in management of a vessel or facility prior to foreclosure, notwithstanding that the person—

"(I) forecloses on the vessel or facility; and

"(II) after foreclosure, sells, re-leases (in the case of a lease finance transaction), or liquidates the vessel or facility, maintains business activities, winds up operations, undertakes a response action under section 107(d)(1) or under the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

direction of an on-scene coordinator appointed under the National Contingency Plan, with respect to the vessel or facility, or takes any other measure to preserve, protect, or prepare the vessel or facility prior to sale or disposition,

if the person seeks to sell, re-lease (in the case of a lease finance transaction), or otherwise divest the person of the vessel or facility at the earliest practicable, commercially reasonable time, on commercially reasonable terms, taking into account market conditions and legal and regulatory requirements.

"(F) PARTICIPATION IN MANAGEMENT.—For purposes of subparagraph (E)—

"(i) the term 'participate in management'—

"(I) means actually participating in the management or operational affairs of a vessel or facility; and

"(II) does not include merely having the capacity to influence, or the unexercised right to control, vessel or facility operations;

"(ii) a person that is a lender and that holds indicia of ownership primarily to protect a security interest in a vessel or facility shall be considered to participate in management only if, while the borrower is still in possession of the vessel or facility encumbered by the security interest, the person—

"(I) exercises decisionmaking control over the environmental compliance related to the vessel or facility, such that the person has undertaken responsibility for the hazardous substance handling or disposal practices related to the vessel or facility; or

"(II) exercises control at a level comparable to that of a manager of the vessel or facility, such that the person has assumed or manifested responsibility—

"(aa) for the overall management of the vessel or facility encompassing day-to-day decisionmaking with respect to environmental compliance; or

"(bb) over all or substantially all of the operational functions (as distinguished from financial or administrative functions) of the vessel or facility other than the function of environmental compliance;

"(iii) the term 'participate in management' does not include performing an act or failing to act prior to the time at which a security interest is created in a vessel or facility; and

"(iv) the term 'participate in management' does not include—

"(I) holding a security interest or abandoning or releasing a security interest;

"(II) including in the terms of an extension of credit, or in a contract or security agreement relating to the extension, a covenant, warranty, or other term or condition that relates to environmental compliance;

"(III) monitoring or enforcing the terms and conditions of the extension of credit or security interest;

"(IV) monitoring or undertaking 1 or more inspections of the vessel or facility;

"(V) requiring a response action or other lawful means of addressing the release or threatened release of a hazardous substance in connection with the vessel or facility prior to, during, or on the expiration of the term of the extension of credit;

"(VI) providing financial or other advice or counseling in an effort to mitigate, prevent, or cure default or diminution in the value of the vessel or facility;

"(VII) restructuring, renegotiating, or otherwise agreeing to alter the terms and conditions of the extension of credit or security interest, exercising forbearance;

"(VIII) exercising other remedies that may be available under applicable law for the breach of a term or condition of the extension of credit or security agreement; or

"(IX) conducting a response action under section 107(d) or under the direction of an on-scene coordinator appointed under the National Contingency Plan,

if the actions do not rise to the level of participating in management (within the meaning of clauses (i) and (ii)).

"(G) OTHER TERMS.—As used in this Act:

"(i) EXTENSION OF CREDIT.—The term 'extension of credit' includes a lease finance transaction—

"(I) in which the lessor does not initially select the leased vessel or facility and does not during the lease term control the daily operations or maintenance of the vessel or facility; or

"(II) that conforms with regulations issued by the appropriate Federal banking agency or the appropriate State bank supervisor (as those terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813) or with regulations issued by the National Credit Union Administration Board, as appropriate.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(ii) FINANCIAL OR ADMINISTRATIVE FUNCTION.—The term 'financial or administrative function' includes a function such as that of a credit manager, accounts payable officer, accounts receivable officer, personnel manager, comptroller, or chief financial officer, or a similar function.

"(iii) FORECLOSURE; FORECLOSE.—The terms 'foreclosure' and 'foreclose' mean, respectively, acquiring, and to acquire, a vessel or facility through—

"(I)(aa) purchase at sale under a judgment or decree, power of sale, or nonjudicial foreclosure sale;

"(bb) a deed in lieu of foreclosure, or similar conveyance from a trustee; or

"(cc) repossession,

if the vessel or facility was security for an extension of credit previously contracted;

"(II) conveyance pursuant to an extension of credit previously contracted, including the termination of a lease agreement; or

"(III) any other formal or informal manner by which the person acquires, for subsequent disposition, title to or possession of a vessel or facility in order to protect the security interest of the person.

"(iv) LENDER.—The term 'lender' means—

"(I) an insured depository institution (as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813));

"(II) an insured credit union (as defined in section 101 of the Federal Credit Union Act (12 U.S.C. 1752));

"(III) a bank or association chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.);

"(IV) a leasing or trust company that is an affiliate of an insured depository institution;

"(V) any person (including a successor or assignee of any such person) that makes a bona fide extension of credit to or takes or acquires a security interest from a nonaffiliated person;

"(VI) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Federal Agricultural Mortgage Corporation, or any other entity that in a bona fide manner buys or sells loans or interests in loans;

"(VII) a person that insures or guarantees against a default in the repayment of an extension of credit, or acts as a surety with respect to an extension of credit, to a nonaffiliated person; and

"(VIII) a person that provides title insurance and that acquires a vessel or facility as a result of assignment or conveyance in the course of underwriting claims and claims settlement.

"(v) OPERATIONAL FUNCTION.—The term 'operational function' includes a function such as that of a facility or plant manager, operations manager, chief operating officer, or chief executive officer.

"(vi) SECURITY INTEREST.—The term 'security interest' includes a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person.".

<< 42 USCA § 6991b >>

SEC. 2503. CONFORMING AMENDMENT.

Section 9003(h) of the Solid Waste Disposal Act (42 U.S.C. 6991b(h)) is amended by striking paragraph (9) and inserting the following:

"(9) DEFINITION OF OWNER OR OPERATOR.—

"(A) IN GENERAL.—As used in this subtitle, the terms 'owner' and 'operator' do not include a person that, without participating in the management of an underground storage tank and otherwise not engaged in petroleum production, refining, or marketing, holds indicia of ownership primarily to protect the person's security interest.

"(B) SECURITY INTEREST HOLDERS.—The provisions regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) and the provisions regarding fiduciaries at section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 shall apply in determining a person's liability as an owner or operator of an underground storage tank for the purposes of this subtitle.

"(C) EFFECT ON RULE.—Nothing in subparagraph (B) shall be construed as modifying or affecting the final rule issued by the Administrator on September 7, 1995 (60 Fed.Reg. 46,692), or as limiting the authority of the Administrator to amend the final rule, in accordance with applicable law. The final rule in effect on the date of enactment of this subparagraph shall

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

prevail over any inconsistent provision regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) or any inconsistent provision regarding fiduciaries in section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. Any amendment to the final rule shall be consistent with the provisions regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) and the provisions regarding fiduciaries in section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. This subparagraph does not preclude judicial review of any amendment of the final rule made after the date of enactment of this subparagraph.".

SEC. 2504. LENDER LIABILITY RULE.

 (a) IN GENERAL.—Effective on the date of enactment of this Act, the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344), prescribing section 300.1105 of title 40, Code of Federal Regulations, shall be deemed to have been validly issued under authority of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) and to have been effective according to the terms of the final rule. No additional judicial proceedings shall be necessary or may be held with respect to such portion of the final rule. Any reference in that portion of the final rule to section 300.1100 of title 40, Code of Federal Regulations, shall be deemed to be a reference to the amendments made by this subtitle.

 (b) JUDICIAL REVIEW.—Notwithstanding section 113(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9613(a)), no court shall have jurisdiction to review the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344) that prescribed section 300.1105 of title 40, Code of Federal Regulations.

 (c) AMENDMENT.—No provision of this section shall be construed as limiting the authority of the President or a delegee of the President to amend the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344), prescribing section 300.1105 of title 40, Code of Federal Regulations, consistent with the amendments made by this subtitle and other applicable law.

 (d) JUDICIAL REVIEW.—No provision of this section shall be construed as precluding judicial review of any amendment of section 300.1105 of title 40, Code of Federal Regulations, made after the date of enactment of this Act.

<< 42 USCA §§ 6991b NOTE, 9601 nt, 9607 nt >>

SEC. 2505. EFFECTIVE DATE.

 The amendments made by this subtitle shall be applicable with respect to any claim that has not been finally adjudicated as of the date of enactment of this Act.

Subtitle F—Miscellaneous

SEC. 2601. FEDERAL RESERVE BOARD STUDY.

 (a) STUDY OF ELECTRONIC STORED VALUE PRODUCTS.—

 (1) STUDY.—The Board shall conduct a study of electronic stored value products which evaluates whether provisions of the Electronic Fund Transfer Act could be applied to such products without adversely impacting the cost, development, and operation of such products.

 (2) CONSIDERATIONS.—In conducting its study under paragraph (1), the Board shall consider whether alternatives to regulation under the Electronic Fund Transfer Act, such as allowing competitive market forces to shape the development and operation of electronic stored value products, could more efficiently achieve the objectives embodied in that Act.

 (b) REPORT.—The Board shall submit a report of its study under subsection (a) to the Congress not later than 6 months after the date of enactment of this Act.

 (c) ACTION TO FINALIZE.—The Board shall take no action to finalize any amendments to regulations under the Electronic Fund Transfer Act that would regulate electronic stored value products until the later of—

 (1) 3 months after the date on which the report is submitted to the Congress under subsection (b); or

 (2) 9 months after the date of enactment of this Act.

<< 12 USCA § 1821 >>

SEC. 2602. TREATMENT OF CLAIMS ARISING FROM BREACH OF CONTRACTS EXECUTED BY THE RECEIVER OR CONSERVATOR.

Section 11(d) of the Federal Deposit Insurance Act (12 U.S.C. 1821(d)) is amended by adding at the end the following new paragraph:

"(20) TREATMENT OF CLAIMS ARISING FROM BREACH OF CONTRACTS EXECUTED BY THE RECEIVER OR CONSERVATOR.—Notwithstanding any other provision of this subsection, any final and unappealable judgment for monetary damages entered against a receiver or conservator for an insured depository institution for the breach of an agreement executed or approved by such receiver or conservator after the date of its appointment shall be paid as an administrative expense of the receiver or conservator. Nothing in this paragraph shall be construed to limit the power of a receiver or conservator to exercise any rights under contract or law, including to terminate, breach, cancel, or otherwise discontinue such agreement.".

SEC. 2603. CRIMINAL SANCTIONS FOR FICTITIOUS FINANCIAL INSTRUMENTS AND COUNTERFEITING.

<< 18 USCA §§ 474, 474A >>

(a) INCREASED PENALTIES FOR COUNTERFEITING VIOLATIONS.—Sections 474 and 474A of title 18, United States Code, are amended by striking "class C felony" each place that term appears and inserting "class B felony".

(b) CRIMINAL PENALTY FOR PRODUCTION, SALE, TRANSPORTATION, POSSESSION OF FICTITIOUS FINANCIAL INSTRUMENTS PURPORTING TO BE THOSE OF THE STATES, OF POLITICAL SUBDIVISIONS, AND OF PRIVATE ORGANIZATIONS.—

<< 18 USCA § 514 >>

(1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by inserting after section 513, the following new section:

"§ 514. Fictitious obligations

"(a) Whoever, with the intent to defraud—

"(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;

"(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or

"(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

"(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c).

"(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section.".

<< 18 USCA Ch. 25 >>

(2) TECHNICAL AMENDMENT.—The analysis for chapter 25 of title 18, United States Code, is amended by inserting after the item relating to section 513 the following:

"514. Fictitious obligations.".

SEC. 2604. AMENDMENTS TO THE TRUTH IN SAVINGS ACT.

<< 12 USCA § 4310 >>

<< 12 USCA § 4310 NOTE >>

 (a) REPEAL.—Effective as of the end of the 5–year period beginning on the date of the enactment of this Act, section 271 of the Truth in Savings Act (12 U.S.C. 4310) is repealed.

<< 12 USCA § 4302 >>

 (b) ON–PREMISES DISPLAYS.—Section 263(c) of the Truth in Savings Act (12 U.S.C. 4302(c)) is amended—
 (1) by striking paragraph (2);
 (2) by striking "(1) IN GENERAL.—"; and
 (3) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively, and indenting appropriately.

<< 12 USCA § 4313 >>

 (c) DEPOSITORY INSTITUTION DEFINITION.—Section 274(6) of the Truth in Savings Act (12 U.S.C. 4313(6)) is amended by inserting before the period ", but does not include any nonautomated credit union that was not required to comply with the requirements of this title as of the date of enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996, pursuant to the determination of the National Credit Union Administration Board".

<< 12 USCA § 4305 >>

 (d) TIME DEPOSITS.—Section 266(a)(3) of the Truth in Savings Act (12 U.S.C. 4305(a)(3)) is amended by inserting "has a maturity of more than 30 days" after "deposit which".

SEC. 2605. CONSUMER LEASING ACT AMENDMENTS.

<< 15 USCA § 1667f NOTE >>

 (a) CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSES.—
 (1) FINDINGS.—The Congress finds that—
 (A) competition among the various financial institutions and other firms engaged in the business of consumer leasing is greatest when there is informed use of leasing;
 (B) the informed use of leasing results from an awareness of the cost of leasing by consumers; and
 (C) there has been a continued trend toward leasing automobiles and other durable goods for consumer use as an alternative to installment credit sales and that leasing product advances have occurred such that lessors have been unable to provide consistent industry-wide disclosures to fully account for the competitive progress that has occurred.
 (2) PURPOSES.—The purposes of this section are—
 (A) to assure a simple, meaningful disclosure of leasing terms so that the consumer will be able to compare more readily the various leasing terms available to the consumer and avoid the uninformed use of leasing, and to protect the consumer against inaccurate and unfair leasing practices;
 (B) to provide for adequate cost disclosures that reflect the marketplace without impairing competition and the development of new leasing products; and
 (C) to provide the Board with the regulatory authority to assure a simplified, meaningful definition and disclosure of the terms of certain leases of personal property for personal, family, or household purposes so as to—
 (i) enable the lessee to compare more readily the various lease terms available to the lessee;
 (ii) enable comparison of lease terms with credit terms, as appropriate; and

(iii) assure meaningful and accurate disclosures of lease terms in advertisements.

(b) REGULATIONS.—

<< 15 USCA § 1667f >>

(1) IN GENERAL.—Chapter 5 of the Truth in Lending Act (15 U.S.C. 1667 et seq.) is amended by adding at the end the following new section:

"SEC. 187. REGULATIONS.

"(a) REGULATIONS AUTHORIZED.—

"(1) IN GENERAL.—The Board shall prescribe regulations to update and clarify the requirements and definitions applicable to lease disclosures and contracts, and any other issues specifically related to consumer leasing, to the extent that the Board determines such action to be necessary—

"(A) to carry out this chapter;

"(B) to prevent any circumvention of this chapter; or

"(C) to facilitate compliance with the requirements of the chapter.

"(2) CLASSIFICATIONS, ADJUSTMENTS.—Any regulations prescribed under paragraph (1) may contain classifications and differentiations, and may provide for adjustments and exceptions for any class of transactions, as the Board considers appropriate.

"(b) MODEL DISCLOSURE.—

"(1) PUBLICATION.—The Board shall establish and publish model disclosure forms to facilitate compliance with the disclosure requirements of this chapter and to aid the consumer in understanding the transaction to which the subject disclosure form relates.

"(2) USE OF AUTOMATED EQUIPMENT.—In establishing model forms under this subsection, the Board shall consider the use by lessors of data processing or similar automated equipment.

"(3) USE OPTIONAL.—A lessor may utilize a model disclosure form established by the Board under this subsection for purposes of compliance with this chapter, at the discretion of the lessor.

"(4) EFFECT OF USE.—Any lessor who properly uses the material aspects of any model disclosure form established by the Board under this subsection shall be deemed to be in compliance with the disclosure requirements to which the form relates.".

<< 15 USCA § 1667f NOTE >>

(2) EFFECTIVE DATE.—

(A) IN GENERAL.—Any regulation of the Board, or any amendment or interpretation of any regulation of the Board issued pursuant to section 187 of the Truth in Lending Act (as added by paragraph (1) of this subsection), shall become effective on the first October 1 that follows the date of promulgation of that regulation, amendment, or interpretation by not less than 6 months.

(B) LONGER PERIOD.—The Board may, at the discretion of the Board, extend the time period referred to in subparagraph (A) in accordance with subparagraph (C), to permit lessors to adjust their disclosure forms to accommodate the requirements of section 127 of the Truth in Lending Act (as added by paragraph (1) of this subsection).

(C) SHORTER PERIOD.—The Board may shorten the time period referred to in subparagraph (A), if the Board makes a specific finding that such action is necessary to comply with the findings of a court or to prevent an unfair or deceptive practice.

(D) COMPLIANCE BEFORE EFFECTIVE DATE.—Any lessor may comply with any means of disclosure provided for in section 127 of the Truth in Lending Act (as added by paragraph (1) of this subsection) before the effective date of such requirement.

(E) DEFINITIONS.—For purposes of this subsection, the term "lessor" has the same meaning as in section 181 of the Truth in Lending Act.

(3) CLERICAL AMENDMENT.—The table of sections for chapter 5 of title I of the Truth in Lending Act (15 U.S.C. 1601 et seq.) is amended by inserting after the item relating to section 186 the following new item:

"187. Regulations.".

<< 15 USCA § 1667c >>

(c) CONSUMER LEASE ADVERTISING.—Section 184 of the Truth in Lending Act (15 U.S.C. 1667c) is amended—

(1) by striking subsections (a) and (c);

(2) by redesignating subsection (b) as subsection (c); and

(3) by inserting before subsection (c), as so redesignated, the following:

"(a) IN GENERAL.—If an advertisement for a consumer lease includes a statement of the amount of any payment or a statement that any or no initial payment is required, the advertisement shall clearly and conspicuously state, as applicable—

"(1) the transaction advertised is a lease;

"(2) the total amount of any initial payments required on or before consummation of the lease or delivery of the property, whichever is later;

"(3) that a security deposit is required;

"(4) the number, amount, and timing of scheduled payments; and

"(5) with respect to a lease in which the liability of the consumer at the end of the lease term is based on the anticipated residual value of the property, that an extra charge may be imposed at the end of the lease term.

"(b) ADVERTISING MEDIUM NOT LIABLE.—No owner or employee of any entity that serves as a medium in which an advertisement appears or through which an advertisement is disseminated, shall be liable under this section.".

<< 12 USCA § 1752a NOTE >>

SEC. 2606. STUDY OF CORPORATE CREDIT UNIONS.

(a) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

(1) ADMINISTRATION.—The term "Administration" means the National Credit Union Administration.

(2) BOARD.—The term "Board" means the National Credit Union Administration Board.

(3) CORPORATE CREDIT UNION.—The term "corporate credit union" has the meaning given such term by rule or regulation of the Board.

(4) FUND.—The term "Fund" means the National Credit Union Share Insurance Fund established under section 203 of the Federal Credit Union Act.

(5) SECRETARY.—The term "Secretary" means the Secretary of the Treasury.

(b) STUDY.—

(1) IN GENERAL.—The Secretary, in consultation with the Board, the Corporation, the Comptroller of the Currency, and the Administration, shall conduct a study and evaluation of—

(A) the oversight and supervisory practices of the Administration concerning the Fund, including the treatment of amounts deposited in the Fund pursuant to section 202(c) of the Federal Credit Union Act, including analysis of—

(i) whether those amounts should be—

(I) refundable; or

(II) treated as expenses; and

(ii) the use of those amounts in determining equity capital ratios;

(B) the potential for, and potential effects of, administration of the Fund by an entity other than the Administration;

(C) the 10 largest corporate credit unions in the United States, conducted in cooperation with appropriate employees of other Federal agencies with expertise in the examination of federally insured financial institutions, including—

(i) the investment practices of those credit unions; and

(ii) the financial stability, financial operations, and financial controls of those credit unions;

(D) the regulations of the Administration; and

(E) the supervision of corporate credit unions by the Administration.

(c) REPORT.—Not later than 12 months after the date of enactment of this Act, the Secretary shall submit to the appropriate committees of the Congress, a report that includes the results of the study and evaluation conducted under subsection (b), together with any recommendations that the Secretary considers to be appropriate.

SEC. 2607. REPORT ON THE RECONCILIATION OF DIFFERENCES BETWEEN REGULATORY ACCOUNTING PRINCIPLES AND GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

Not later than 180 days after the date of enactment of this Act, each appropriate Federal banking agency shall submit to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate, a report describing both the actions that have been taken by the agency and the actions that will be taken by the agency to eliminate or conform inconsistent or duplicative accounting and reporting requirements applicable to reports or statements filed with any such agency by insured depository institutions, as required by section 121 of the Federal Deposit Insurance Corporation Improvement Act of 1991.

<< 12 USCA § 1811 NOTE >>

SEC. 2608. STATE–BY–STATE AND METROPOLITAN AREA–BY–METROPOLITAN AREA STUDY OF BANK FEES.

Section 1002(b)(2)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 1811 note) is amended to read as follows:

"(A) a description of any discernible trend, in the Nation as a whole, in each of the 50 States, and in each consolidated metropolitan statistical area or primary metropolitan statistical area (as defined by the Director of the Office of Management and Budget), in the cost and availability of retail banking services (including fees imposed for providing such services), that delineates differences between insured depository institutions on the basis of both the size of the institution and any engagement of the institution in multistate activity; and".

<< 31 USCA § 5118 >>

SEC. 2609. PROSPECTIVE APPLICATION OF GOLD CLAUSES IN CONTRACTS.

Section 5118(d)(2) of title 31, United States Code, is amended by adding at the end the following: "This paragraph shall apply to any obligation issued on or before October 27, 1977, notwithstanding any assignment or novation of such obligation after October 27, 1977, unless all parties to the assignment or novation specifically agree to include a gold clause in the new agreement. Nothing in the preceding sentence shall be construed to affect the enforceability of a Gold Clause contained in any obligation issued after October 27, 1977 if the enforceability of that Gold Clause has been finally adjudicated before the date of enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996.".

<< 12 USCA § 1841 >>

SEC. 2610. QUALIFIED FAMILY PARTNERSHIPS.

Section 2 of the Bank Holding Company Act of 1956 (12 U.S.C. 1841) is amended—

(1) in subsection (b), by inserting ", and shall not include a qualified family partnership" after "by any State"; and

(2) in subsection (o), by adding at the end the following:

"(10) QUALIFIED FAMILY PARTNERSHIP.—The term 'qualified family partnership' means a general or limited partnership that the Board determines—

"(A) does not directly control any bank, except through a registered bank holding company;

"(B) does not control more than 1 registered bank holding company;

"(C) does not engage in any business activity, except indirectly through ownership of other business entities;

"(D) has no investments other than those permitted for a bank holding company pursuant to section 4(c);

"(E) is not obligated on any debt, either directly or as a guarantor;

"(F) has partners, all of whom are either—

AR.01616

"(i) individuals related to each other by blood, marriage (including former marriage), or adoption; or

"(ii) trusts for the primary benefit of individuals related as described in clause (i); and

"(G) has filed with the Board a statement that includes—

"(i) the basis for the eligibility of the partnership under subparagraph (F);

"(ii) a list of the existing activities and investments of the partnership;

"(iii) a commitment to comply with this paragraph;

"(iv) a commitment to comply with section 7 of the Federal Deposit Insurance Act with respect to any acquisition of control of an insured depository institution occurring after date of enactment of this paragraph; and

"(v) a commitment to be subject, to the same extent as if the qualified family partnership were a bank holding company—

"(I) to examination by the Board to assure compliance with this paragraph; and

"(II) to section 8 of the Federal Deposit Insurance Act.".

## SEC. 2611. COOPERATIVE EFFORTS BETWEEN DEPOSITORY INSTITUTIONS AND FARMERS AND RANCHERS IN DROUGHT–STRICKEN AREAS.

(a) FINDINGS.—The Congress hereby finds the following:

(1) Severe drought is being experienced in the Plains and the Southwest portions of our country.

(2) Soil erosion is becoming a critical issue as the dry season approaches and summer winds may rob these fields of nutrient-rich topsoil.

(3) Without immediate assistance, ranchers and farmers would be forced to cull their herds bringing tremendous volatility in the beef market.

(4) The American people will feel the impact of this drought in their pocketbooks through higher prices for grain products.

(5) The communities in drought-stricken areas are suffering and borrowers may have difficulty meeting their obligations to financial institutions.

(6) Congress has already passed the Depository Institutions Disaster Relief Act of 1992 which allows financial institutions to make emergency exceptions to the appraisal requirement in times of national disasters.

(b) SENSE OF THE CONGRESS.—It is the sense of the Congress that financial institutions and Federal bank regulators should work cooperatively with farmers and ranchers in communities affected by drought conditions to allow financial obligations to be met without imposing undue burdens.

<< 12 USCA § 1843 >>

## SEC. 2612. STREAMLINING PROCESS FOR DETERMINING NEW NONBANKING ACTIVITIES.

Section 4(c)(8) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(8)) is amended by striking "and opportunity for hearing" and inserting the following: "(and opportunity for hearing in the case of an acquisition of a savings association)".

## SEC. 2613. AUTHORIZING BANK SERVICE COMPANIES TO ORGANIZE AS LIMITED LIABILITY COMPANIES.

<< 12 USCA § 1861 >>

(a) AMENDMENT TO SHORT TITLE.—Section 1 of the Bank Service Corporation Act (12 U.S.C. 1861(a)) is amended by striking subsection (a) and inserting the following new subsection:

"(a) SHORT TITLE.—This Act may be cited as the 'Bank Service Company Act'.";

(b) AMENDMENTS TO DEFINITIONS.—Section 1(b) of the Bank Service Corporation Act (12 U.S.C. 1861(b)) is amended—

(1) by striking paragraph (2) and inserting the following new paragraph:

"(2) the term 'bank service company' means—

"(A) any corporation—

"(i) which is organized to perform services authorized by this Act; and

"(ii) all of the capital stock of which is owned by 1 or more insured banks; and

"(B) any limited liability company—

   "(i) which is organized to perform services authorized by this Act; and

   "(ii) all of the members of which are 1 or more insured banks.";

(2) in paragraph (6)—

   (A) by striking "corporation" and inserting "company"; and

   (B) by striking "and" after the semicolon;

(3) by redesignating paragraph (7) as paragraph (8) and inserting after paragraph (6) the following new paragraph:

   "(7) the term 'limited liability company' means any company, partnership, trust, or similar business entity organized under the law of a State (as defined in section 3 of the Federal Deposit Insurance Act) which provides that a member or manager of such company is not personally liable for a debt, obligation, or liability of the company solely by reason of being, or acting as, a member or manager of such company; and"; and

(4) in paragraph (8) (as so redesignated)—

   (A) by striking "corporation" each place such term appears and inserting "company"; and

   (B) by striking "capital stock" and inserting "equity".

<< 12 USCA § 1862 >>

(c) AMENDMENTS TO SECTION 2.—Section 2 of the Bank Service Corporation Act (12 U.S.C. 1862) is amended—

(1) by striking "corporation" and inserting "company";

(2) by striking "corporations" and inserting "companies"; and

(3) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1863 >>

(d) AMENDMENTS TO SECTION 3.—Section 3 of the Bank Service Corporation Act (12 U.S.C. 1863) is amended—

(1) by striking "corporation" each place such term appears and inserting "company"; and

(2) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1864 >>

(e) AMENDMENTS TO SECTION 4.—Section 4 of the Bank Service Corporation Act (12 U.S.C. 1864) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) in subsection (b), by inserting "or members" after "shareholders" each place such term appears;

(3) in subsections (c) and (d), by inserting "or member" after "shareholder" each place such term appears;

(4) in subsection (e)—

   (A) by inserting "or members" after "national bank and State bank shareholders";

   (B) by striking "its national bank shareholder or shareholders" and inserting "any shareholder or member of the company which is a national bank";

   (C) by striking "its State bank shareholder or shareholders" and inserting "any shareholder or member of the company which is a State bank";

   (D) by striking "such State bank or banks" and inserting "any such State bank"; and

   (E) by inserting "or members" after "State bank and national bank shareholders"; and

(5) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1865 >>

(f) AMENDMENTS TO SECTION 5.—Section 5 of the Bank Service Corporation Act (12 U.S.C. 1865) is amended—

(1) by striking "corporation" each place such term appears and inserting "company"; and

(2) in the heading for such section, by striking "CORPORATIONS" and inserting "COMPANIES".

<< 12 USCA § 1866 >>

(g) AMENDMENTS TO SECTION 6.—Section 6 of the Bank Service Corporation Act (12 U.S.C. 1866) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) by inserting "or is not a member of" after "does not own stock in";

(3) by striking "the nonstockholding institution" and inserting "such depository institution";

(4) by inserting "or is a member of" after "that owns stock in";

(5) in paragraphs (1) and (2), by inserting "or nonmember" after "nonstockholding"; and

(6) in the heading for such section by inserting "OR NONMEMBERS" after "NONSTOCKHOLDERS".

<< 12 USCA § 1867 >>

(h) AMENDMENTS TO SECTION 7.—Section 7 of the Bank Service Corporation Act (12 U.S.C. 1867) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) in subsection (a)—

 (A) by inserting "or principal member" after "principal shareholder"; and

 (B) by inserting "or member" after "other shareholder"; and

(3) in the heading for such section, by striking "CORPORATIONS" and inserting "COMPANIES".

SEC. 2614. RETIREMENT CERTIFICATES OF DEPOSITS.

<< 12 USCA § 1813 >>

(a) IN GENERAL.—Section 3(l)(5) of the Federal Deposit Insurance Act (12 U.S.C. 1813(l)(5) is amended—

(1) in subparagraph (A), by striking "and" at the end;

(2) in subparagraph (B), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

 "(C) any liability of an insured depository institution that arises under an annuity contract, the income of which is tax deferred under section 72 of the Internal Revenue Code of 1986.".

<< 12 USCA § 1813 NOTE >>

 (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to any liability of an insured depository that arises under an annuity contract issued on or after the date of enactment of this Act.

SEC. 2615. PROHIBITIONS ON CERTAIN DEPOSITORY INSTITUTION ASSOCIATIONS WITH GOVERNMENT–SPONSORED ENTERPRISES.

<< 12 USCA § 1781 >>

 (a) CREDIT UNIONS.—Section 201 of the Federal Credit Union Act (12 U.S.C. 1781) is amended by adding at the end the following new subsection:

"(e) PROHIBITION ON CERTAIN ASSOCIATIONS.—

 "(1) IN GENERAL.—No insured credit union may be sponsored by or accept financial support, directly or indirectly, from any Government-sponsored enterprise, if the credit union includes the customers of the Government-sponsored enterprise in the field of membership of the credit union.

 "(2) ROUTINE BUSINESS FINANCING.—Paragraph (1) shall not apply with respect to advances or other forms of financial assistance generally provided by a Government-sponsored enterprise in the ordinary course of business of the enterprise.

 "(3) GOVERNMENT–SPONSORED ENTERPRISE DEFINED.—For purposes of this subsection, the term 'Government-sponsored enterprise' has the meaning given to such term in section 1404(e)(1)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

 "(4) EMPLOYEE CREDIT UNION.—No provision of this subsection shall be construed as prohibiting any employee of a Government-sponsored enterprise from becoming a member of a credit union whose field of membership is the employees of such enterprise.".

<< 12 USCA § 1828 >>

(b) BANKS AND SAVINGS ASSOCIATIONS.—Section 18 of the Federal Deposit Insurance Act (12 U.S.C. 1828) is amended by adding at the end the following new subsection:

"(s) PROHIBITION ON CERTAIN AFFILIATIONS.—

"(1) IN GENERAL.—No depository institution may be an affiliate of, be sponsored by, or accept financial support, directly or indirectly, from any Government-sponsored enterprise.

"(2) EXCEPTION FOR MEMBERS OF A FEDERAL HOME LOAN BANK.—Paragraph (1) shall not apply with respect to the membership of a depository institution in a Federal home loan bank.

"(3) ROUTINE BUSINESS FINANCING.—Paragraph (1) shall not apply with respect to advances or other forms of financial assistance provided by a Government-sponsored enterprise pursuant to the statutes governing such enterprise.

"(4) GOVERNMENT–SPONSORED ENTERPRISE DEFINED.—For purposes of this subsection, the term 'Government-sponsored enterprise' has the meaning given to such term in section 1404(e)(1)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.".

<< 12 USCA § 1781 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply on and after January 1, 1996.

Subtitle G—Deposit Insurance Funds

<< 12 USCA § 1811 NOTE >>

SEC. 2701. SHORT TITLE.

This subtitle may be cited as the "Deposit Insurance Funds Act of 1996".

SEC. 2702. SPECIAL ASSESSMENT TO CAPITALIZE SAIF.

<< 12 USCA § 1817 NOTE >>

(a) IN GENERAL.—Except as provided in subsection (f), the Board of Directors of the Federal Deposit Insurance Corporation shall impose a special assessment on the SAIF-assessable deposits of each insured depository institution in accordance with assessment regulations of the Corporation at a rate applicable to all such institutions that the Board of Directors, in its sole discretion, determines (after taking into account the adjustments described in subsections (g), (h), and (j)) will cause the Savings Association Insurance Fund to achieve the designated reserve ratio on the first business day of the 1st month beginning after the date of the enactment of this Act.

(b) FACTORS TO BE CONSIDERED.—In carrying out subsection (a), the Board of Directors shall base its determination on—

(1) the monthly Savings Association Insurance Fund balance most recently calculated;

(2) data on insured deposits reported in the most recent reports of condition filed not later than 70 days before the date of enactment of this Act by insured depository institutions; and

(3) any other factors that the Board of Directors deems appropriate.

(c) DATE OF DETERMINATION.—For purposes of subsection (a), the amount of the SAIF-assessable deposits of an insured depository institution shall be determined as of March 31, 1995.

(d) DATE PAYMENT DUE.—Except as provided in subsection (g), the special assessment imposed under this section shall be—

(1) due on the first business day of the 1st month beginning after the date of the enactment of this Act; and

(2) paid to the Corporation on the later of—

(A) the first business day of the 1st month beginning after the date of enactment of this Act; or

(B) such other date as the Corporation shall prescribe, but not later than 60 days after the date of enactment of this Act.

(e) ASSESSMENT DEPOSITED IN SAIF.—Notwithstanding any other provision of law, the proceeds of the special assessment imposed under this section shall be deposited in the Savings Association Insurance Fund.

(f) EXEMPTIONS FOR CERTAIN INSTITUTIONS.—

(1) EXEMPTION FOR WEAK INSTITUTIONS.—The Board of Directors may, by order, in its sole discretion, exempt any insured depository institution that the Board of Directors determines to be weak, from paying the special assessment imposed under this section if the Board of Directors determines that the exemption would reduce risk to the Savings Association Insurance Fund.

(2) GUIDELINES REQUIRED.—Not later than 30 days after the date of enactment of this Act, the Board of Directors shall prescribe guidelines setting forth the criteria that the Board of Directors will use in exempting institutions under paragraph (1). Such guidelines shall be published in the Federal Register.

(3) EXEMPTION FOR CERTAIN NEWLY CHARTERED AND OTHER DEFINED INSTITUTIONS.—

(A) IN GENERAL.—In addition to the institutions exempted from paying the special assessment under paragraph (1), the Board of Directors shall exempt any insured depository institution from payment of the special assessment if the institution—

(i) was in existence on October 1, 1995, and held no SAIF-assessable deposits before January 1, 1993;

(ii) is a Federal savings bank which—

(I) was established de novo in April 1994 in order to acquire the deposits of a savings association which was in default or in danger of default; and

(II) received minority interim capital assistance from the Resolution Trust Corporation under section 21A(w) of the Federal Home Loan Bank Act in connection with the acquisition of any such savings association; or

(iii) is a savings association, the deposits of which are insured by the Savings Association Insurance Fund, which—

(I) before January 1, 1987, was chartered as a Federal savings bank insured by the Federal Savings and Loan Insurance Corporation for the purpose of acquiring all or substantially all of the assets and assuming all or substantially all of the deposit liabilities of a national bank in a transaction consummated after July 1, 1986; and

(II) as of the date of that transaction, had assets of less than $150,000,000.

(B) DEFINITION.—For purposes of this paragraph, an institution shall be deemed to have held SAIF-assessable deposits before January 1, 1993, if—

(i) it directly held SAIF-assessable deposits before that date; or

(ii) it succeeded to, acquired, purchased, or otherwise holds any SAIF-assessable deposits as of the date of enactment of this Act that were SAIF-assessable deposits before January 1, 1993.

(4) EXEMPT INSTITUTIONS REQUIRED TO PAY ASSESSMENTS AT FORMER RATES.—

(A) PAYMENTS TO SAIF AND DIF.—Any insured depository institution that the Board of Directors exempts under this subsection from paying the special assessment imposed under this section shall pay semiannual assessments—

(i) during calendar years 1996, 1997, and 1998, into the Savings Association Insurance Fund, based on SAIF-assessable deposits of that institution, at assessment rates calculated under the schedule in effect for Savings Association Insurance Fund members on June 30, 1995; and

(ii) during calendar year 1999—

(I) into the Deposit Insurance Fund, based on SAIF-assessable deposits of that institution as of December 31, 1998, at assessment rates calculated under the schedule in effect for Savings Association Insurance Fund members on June 30, 1995; or

(II) in accordance with clause (i), if the Bank Insurance Fund and the Savings Association Insurance Fund are not merged into the Deposit Insurance Fund.

(B) OPTIONAL PRO RATA PAYMENT OF SPECIAL ASSESSMENT.—This paragraph shall not apply with respect to any insured depository institution (or successor insured depository institution) that has paid, during any calendar year from 1997 through 1999, upon such terms as the Corporation may announce, an amount equal to the product of—

(i) 16.7 percent of the special assessment that the institution would have been required to pay under subsection (a), if the Board of Directors had not exempted the institution; and

(ii) the number of full semiannual periods remaining between the date of the payment and December 31, 1999.

(g) SPECIAL ELECTION FOR CERTAIN INSTITUTIONS FACING HARDSHIP AS A RESULT OF THE SPECIAL ASSESSMENT.—

(1) ELECTION AUTHORIZED.—If—

(A) an insured depository institution, or any depository institution holding company which, directly or indirectly, controls such institution, is subject to terms or covenants in any debt obligation or preferred stock outstanding on September 13, 1995; and

(B) the payment of the special assessment under subsection (a) would pose a significant risk of causing such depository institution or holding company to default or violate any such term or covenant,

the depository institution may elect, with the approval of the Corporation, to pay such special assessment in accordance with paragraphs (2) and (3) in lieu of paying such assessment in the manner required under subsection (a).

(2) 1ST ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay an assessment in an amount equal to 50 percent of the amount of the special assessment that would otherwise apply under subsection (a), by the date on which such special assessment is payable under subsection (d).

(3) 2D ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay a 2d assessment, by the date established by the Board of Directors in accordance with paragraph (4), in an amount equal to the product of 51 percent of the rate determined by the Board of Directors under subsection (a) for determining the amount of the special assessment and the SAIF-assessable deposits of the institution on March 31, 1996, or such other date in calendar year 1996 as the Board of Directors determines to be appropriate.

(4) DUE DATE OF 2D ASSESSMENT.—The date established by the Board of Directors for the payment of the assessment under paragraph (3) by a depository institution shall be the earliest practicable date which the Board of Directors determines to be appropriate, which is at least 15 days after the date used by the Board of Directors under paragraph (3).

(5) SUPPLEMENTAL SPECIAL ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay a supplemental special assessment, at the same time the payment under paragraph (3) is made, in an amount equal to the product of—

(A) 50 percent of the rate determined by the Board of Directors under subsection (a) for determining the amount of the special assessment; and

(B) 95 percent of the amount by which the SAIF-assessable deposits used by the Board of Directors for determining the amount of the 1st assessment under paragraph (2) exceeds, if any, the SAIF-assessable deposits used by the Board for determining the amount of the 2d assessment under paragraph (3).

(h) ADJUSTMENT OF SPECIAL ASSESSMENT FOR CERTAIN BANK INSURANCE FUND MEMBER BANKS.—

(1) IN GENERAL.—For purposes of computing the special assessment imposed under this section with respect to a Bank Insurance Fund member bank, the amount of any deposits of any insured depository institution which section 5(d)(3) of the Federal Deposit Insurance Act treats as insured by the Savings Association Insurance Fund shall be reduced by 20 percent—

(A) if the adjusted attributable deposit amount of the Bank Insurance Fund member bank is less than 50 percent of the total domestic deposits of that member bank as of June 30, 1995; or

(B) if, as of June 30, 1995, the Bank Insurance Fund member—

(i) had an adjusted attributable deposit amount equal to less than 75 percent of the total assessable deposits of that member bank;

(ii) had total assessable deposits greater than $5,000,000,000; and

(iii) was owned or controlled by a bank holding company that owned or controlled insured depository institutions having an aggregate amount of deposits insured or treated as insured by the Bank Insurance Fund greater than the aggregate amount of deposits insured or treated as insured by the Savings Association Insurance Fund.

(2) ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT.—For purposes of this subsection, the "adjusted attributable deposit amount" shall be determined in accordance with section 5(d)(3)(C) of the Federal Deposit Insurance Act.

<< 12 USCA § 1815 >>

<< 12 USCA § 1817 NOTE >>

(i) ADJUSTMENT TO THE ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT FOR CERTAIN BANK INSURANCE FUND MEMBER BANKS.—Section 5(d)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1815(d)(3)) is amended—

(1) in subparagraph (C), by striking "The adjusted attributable deposit amount" and inserting "Except as provided in subparagraph (K), the adjusted attributable deposit amount"; and

(2) by adding at the end the following new subparagraph:

"(K) ADJUSTMENT OF ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT.—The amount determined under subparagraph (C)(i) for deposits acquired by March 31, 1995, shall be reduced by 20 percent for purposes of computing the adjusted attributable deposit amount for the payment of any assessment for any semiannual period that begins after the date of the enactment of the Deposit Insurance Funds Act of 1996 (other than the special assessment imposed under section 2702(a) of such Act), for a Bank Insurance Fund member bank that, as of June 30, 1995—

"(i) had an adjusted attributable deposit amount that was less than 50 percent of the total deposits of that member bank; or

"(ii)(I) had an adjusted attributable deposit amount equal to less than 75 percent of the total assessable deposits of that member bank;

"(II) had total assessable deposits greater than $5,000,000,000; and

"(III) was owned or controlled by a bank holding company that owned or controlled insured depository institutions having an aggregate amount of deposits insured or treated as insured by the Bank Insurance Fund greater than the aggregate amount of deposits insured or treated as insured by the Savings Association Insurance Fund.".

<< 12 USCA § 1817 NOTE >>

(j) ADJUSTMENT OF SPECIAL ASSESSMENT FOR CERTAIN SAVINGS ASSOCIATIONS.—

(1) SPECIAL ASSESSMENT REDUCTION.—For purposes of computing the special assessment imposed under this section, in the case of any converted association, the amount of any deposits of such association which were insured by the Savings Association Insurance Fund as of March 31, 1995, shall be reduced by 20 percent.

(2) CONVERTED ASSOCIATION.—For purposes of this subsection, the term "converted association" means—

(A) any Federal savings association—

(i) that is a member of the Savings Association Insurance Fund and that has deposits subject to assessment by that fund which did not exceed $4,000,000,000, as of March 31, 1995; and

(ii) that had been, or is a successor by merger, acquisition, or otherwise to an institution that had been, a State savings bank, the deposits of which were insured by the Federal Deposit Insurance Corporation before August 9, 1989, that converted to a Federal savings association pursuant to section 5(i) of the Home Owners' Loan Act before January 1, 1985;

(B) a State depository institution that is a member of the Savings Association Insurance Fund that had been a State savings bank before October 15, 1982, and was a Federal savings association on August 9, 1989;

(C) an insured bank that—

(i) was established de novo in order to acquire the deposits of a savings association in default or in danger of default;

(ii) did not open for business before acquiring the deposits of such savings association; and

(iii) was a Savings Association Insurance Fund member before the date of enactment of this Act; and

(D) an insured bank that—

(i) resulted from a savings association before December 19, 1991, in accordance with section 5(d)(2)(G) of the Federal Deposit Insurance Act; and

(ii) had an increase in its capital in conjunction with the conversion in an amount equal to more than 75 percent of the capital of the institution on the day before the date of the conversion.

SEC. 2703. FINANCING CORPORATION FUNDING.

<< 12 USCA § 1441 >>

(a) IN GENERAL.—Section 21 of the Federal Home Loan Bank Act (12 U.S.C. 1441) is amended—

(1) in subsection (f)(2)—

(A) in the matter immediately preceding subparagraph (A)—

(i) by striking "To the extent the amounts available pursuant to paragraph (1) are insufficient to cover the amount of interest payments, issuance costs, and custodial fees," and inserting "In addition to the amounts obtained pursuant to paragraph (1),";

(ii) by striking "Savings Association Insurance Fund member" and inserting "insured depository institution"; and

(iii) by striking "members" and inserting "institutions"; and

(B) by striking ", except that—" and all that follows through the end of the paragraph and inserting ", except that—

"(A) the assessments imposed on insured depository institutions with respect to any BIF-assessable deposit shall be assessed at a rate equal to $\frac{1}{5}$ of the rate of the assessments imposed on insured depository institutions with respect to any SAIF assessable deposit; and

"(B) no limitation under clause (i) or (iii) of section 7(b)(2)(A) of the Federal Deposit Insurance Act shall apply for purposes of this paragraph."; and

(2) in subsection (k)—

(A) by striking "section—" and inserting "section, the following definitions shall apply:";

(B) by striking paragraph (1);

(C) by redesignating paragraphs (2) and (3) as paragraphs (1) and (2), respectively; and

(D) by adding at the end the following new paragraphs:

"(3) INSURED DEPOSITORY INSTITUTION.—The term 'insured depository institution' has the same meaning as in section 3 of the Federal Deposit Insurance Act

"(4) DEPOSIT TERMS.—

"(A) BIF–ASSESSABLE DEPOSITS.—The term 'BIF-assessable deposit' means a deposit that is subject to assessment for purposes of the Bank Insurance Fund under the Federal Deposit Insurance Act (including a deposit that is treated as a deposit insured by the Bank Insurance Fund under section 5(d)(3) of the Federal Deposit Insurance Act).

"(B) SAIF–ASSESSABLE DEPOSIT.—The term 'SAIF-assessable deposit' has the meaning given to such term in section 2710 of the Deposit Insurance Funds Act of 1996.".

<< 12 USCA § 1817 >>

(b) CONFORMING AMENDMENT.—Section 7(b)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)) is amended by striking subparagraph (D).

<< 12 USCA 1441 NOTE >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Subsections (a) and (c) and the amendments made by such subsections shall apply with respect to semiannual periods which begin after December 31, 1996.

(2) TERMINATION OF CERTAIN ASSESSMENT RATES.—Subparagraph (A) of section 21(f)(2) of the Federal Home Loan Bank Act (as amended by subsection (a)) shall not apply after the earlier of—

(A) December 31, 1999; or

(B) the date as of which the last savings association ceases to exist.

(d) PROHIBITION ON DEPOSIT SHIFTING.—

(1) IN GENERAL.—Effective as of the date of the enactment of this Act and ending on the date provided in subsection (c)(2) of this section, the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Director of the Office of Thrift Supervision shall take appropriate actions, including enforcement actions, denial of applications, or imposition of entrance and exit fees as if such transactions qualified as conversion transactions pursuant to section 5(d) of the Federal Deposit Insurance Act, to prevent insured depository institutions and depository institution holding companies from facilitating or encouraging the shifting of deposits from SAIF-assessable deposits to BIF-assessable deposits (as defined in section 21(k) of the Federal Home Loan Bank Act) for the purpose of evading the assessments imposed on insured depository institutions with respect to SAIF-assessable deposits under section 7(b) of the Federal Deposit Insurance Act and section 21(f)(2) of the Federal Home Loan Bank Act.

(2) REGULATIONS.—The Board of Directors of the Federal Deposit Insurance Corporation may issue regulations, including regulations defining terms used in paragraph (1), to prevent the shifting of deposits described in such paragraph.

(3) RULE OF CONSTRUCTION.—No provision of this subsection shall be construed as prohibiting conduct or activity of any insured depository institution which—

(A) is undertaken in the ordinary course of business of such depository institution; and

(B) is not directed towards the depositors of an insured depository institution affiliate (as defined in section 2(k) of the Bank Holding Company Act of 1956) of such depository institution.

SEC. 2704. MERGER OF BIF AND SAIF.

<< 12 USCA § 1821 NOTE >>

(a) IN GENERAL.—

(1) MERGER.—The Bank Insurance Fund and the Savings Association Insurance Fund shall be merged into the Deposit Insurance Fund established by section 11(a)(4) of the Federal Deposit Insurance Act, as amended by this section.

(2) DISPOSITION OF ASSETS AND LIABILITIES.—All assets and liabilities of the Bank Insurance Fund and the Savings Association Insurance Fund shall be transferred to the Deposit Insurance Fund.

(3) NO SEPARATE EXISTENCE.—The separate existence of the Bank Insurance Fund and the Savings Association Insurance Fund shall cease.

(b) SPECIAL RESERVE OF THE DEPOSIT INSURANCE FUND.—

(1) IN GENERAL.—Immediately before the merger of the Bank Insurance Fund and the Savings Association Insurance Fund, if the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, the amount by which that reserve ratio exceeds the designated reserve ratio shall be placed in the Special Reserve of the Deposit Insurance Fund, established under section 11(a)(5) of the Federal Deposit Insurance Act, as amended by this section.

(2) DEFINITION.—For purposes of this subsection, the term "reserve ratio" means the ratio of the net worth of the Savings Association Insurance Fund to the aggregate estimated amount of deposits insured by the Savings Association Insurance Fund.

(c) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on January 1, 1999, if no insured depository institution is a savings association on that date.

(d) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 12 USCA § 1821 >>

(1) DEPOSIT INSURANCE FUND.—Section 11(a)(4) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)) is amended—

(A) by redesignating subparagraph (B) as subparagraph (C);

(B) by striking subparagraph (A) and inserting the following:

"(A) ESTABLISHMENT.—There is established the Deposit Insurance Fund, which the Corporation shall—

"(i) maintain and administer;

"(ii) use to carry out its insurance purposes in the manner provided by this subsection; and

"(iii) invest in accordance with section 13(a).

"(B) USES.—The Deposit Insurance Fund shall be available to the Corporation for use with respect to Deposit Insurance Fund members."; and

(C) by striking "(4) GENERAL PROVISIONS RELATING TO FUNDS.—" and inserting the following:

"(4) ESTABLISHMENT OF THE DEPOSIT INSURANCE FUND.—".

(2) OTHER REFERENCES.—Section 11(a)(4)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)(C), as redesignated by paragraph (1) of this subsection) is amended by striking "Bank Insurance Fund and the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund".

(3) DEPOSITS INTO FUND.—Section 11(a)(4) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)) is amended by adding at the end the following new subparagraph:

"(D) DEPOSITS.—All amounts assessed against insured depository institutions by the Corporation shall be deposited in the Deposit Insurance Fund.".

(4) SPECIAL RESERVE OF DEPOSITS.—Section 11(a)(5) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(5)) is amended to read as follows:

"(5) SPECIAL RESERVE OF DEPOSIT INSURANCE FUND.—

"(A) ESTABLISHMENT.—

"(i) IN GENERAL.—There is established a Special Reserve of the Deposit Insurance Fund, which shall be administered by the Corporation and shall be invested in accordance with section 13(a).

"(ii) LIMITATION.—The Corporation shall not provide any assessment credit, refund, or other payment from any amount in the Special Reserve.

"(B) EMERGENCY USE OF SPECIAL RESERVE.—Notwithstanding subparagraph (A)(ii), the Corporation may, in its sole discretion, transfer amounts from the Special Reserve to the Deposit Insurance Fund, for the purposes set forth in paragraph (4), only if—

"(i) the reserve ratio of the Deposit Insurance Fund is less than 50 percent of the designated reserve ratio; and

"(ii) the Corporation expects the reserve ratio of the Deposit Insurance Fund to remain at less than 50 percent of the designated reserve ratio for each of the next 4 calendar quarters.

"(C) EXCLUSION OF SPECIAL RESERVE IN CALCULATING RESERVE RATIO.—Notwithstanding any other provision of law, any amounts in the Special Reserve shall be excluded in calculating the reserve ratio of the Deposit Insurance Fund under section 7.".

<< 12 USCA § 1441b >>

(5) FEDERAL HOME LOAN BANK ACT.—Section 21B(f)(2)(C)(ii) of the Federal Home Loan Bank Act (12 U.S.C. 1441b(f)(2)(C)(ii)) is amended—

(A) in subclause (I), by striking "to Savings Associations Insurance Fund members" and inserting "to insured depository institutions, and their successors, which were Savings Association Insurance Fund members on September 1, 1995"; and

(B) in subclause (II), by striking "to Savings Associations Insurance Fund members" and inserting "to insured depository institutions, and their successors, which were Savings Association Insurance Fund members on September 1, 1995".

(6) REPEALS.—

<< 12 USCA § 1813 >>

(A) SECTION 3.—Section 3(y) of the Federal Deposit Insurance Act (12 U.S.C. 1813(y)) is amended to read as follows:

"(y) DEFINITIONS RELATING TO THE DEPOSIT INSURANCE FUND.—

"(1) DEPOSIT INSURANCE FUND.—The term 'Deposit Insurance Fund' means the fund established under section 11(a)(4).

"(2) RESERVE RATIO.—The term 'reserve ratio' means the ratio of the net worth of the Deposit Insurance Fund to aggregate estimated insured deposits held in all insured depository institutions.

"(3) DESIGNATED RESERVE RATIO.—The designated reserve ratio of the Deposit Insurance Fund for each year shall be—

"(A) 1.25 percent of estimated insured deposits; or

"(B) a higher percentage of estimated insured deposits that the Board of Directors determines to be justified for that year by circumstances raising a significant risk of substantial future losses to the fund.

<< 12 USCA § 1817 >>

(B) SECTION 7.—Section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817) is amended—

(i) by striking subsection (l);

(ii) by redesignating subsections (m) and (n) as subsections (l) and (m), respectively;

(iii) in subsection (b)(2), by striking subparagraphs (B) and (F), and by redesignating subparagraphs (C), (E), (G), and (H) as subparagraphs (B) through (E), respectively.

<< 12 USCA § 1821 >>

(C) SECTION 11.—Section 11(a) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)) is amended—

(i) by striking paragraphs (6) and (7); and

(ii) by redesignating paragraph (8) as paragraph (6).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 24 >>

(7) SECTION 5136 OF THE REVISED STATUTES.—The paragraph designated the "Eleventh" of section 5136 of the Revised Statutes of the United States (12 U.S.C. 24) is amended in the 5th sentence, by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 338a >>

(8) INVESTMENTS PROMOTING PUBLIC WELFARE; LIMITATIONS ON AGGREGATE INVESTMENTS.—The 23d undesignated paragraph of section 9 of the Federal Reserve Act (12 U.S.C. 338a) is amended in the 4th sentence, by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 347b >>

(9) ADVANCES TO CRITICALLY UNDERCAPITALIZED DEPOSITORY INSTITUTIONS.—Section 10B(b)(3)(A)(ii) of the Federal Reserve Act (12 U.S.C. 347b(b)(3)(A)(ii)) is amended by striking "any deposit insurance fund in" and inserting "the Deposit Insurance Fund of".

<< 2 USCA § 905 >>

(10) AMENDMENTS TO THE BALANCED BUDGET AND EMERGENCY DEFICIT CONTROL ACT OF 1985.—Section 255(g)(1)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 905(g)(1)(A)) is amended—

(A) by striking "Bank Insurance Fund" and inserting "Deposit Insurance Fund"; and
(B) by striking "Federal Deposit Insurance Corporation, Savings Association Insurance Fund;".
(11) FURTHER AMENDMENTS TO THE FEDERAL HOME LOAN BANK ACT.—The Federal Home Loan Bank Act (12 U.S.C. 1421 et seq.) is amended—

<< 12 USCA § 1431 >>

(A) in section 11(k) (12 U.S.C. 1431(k))—
(i) in the subsection heading, by striking "SAIF" and inserting "THE DEPOSIT INSURANCE FUND"; and
(ii) by striking "Savings Association Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1441a >>

(B) in section 21A(b)(4)(B) (12 U.S.C. 1441a(b)(4)(B)), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";
(C) in section 21A(b)(6)(B) (12 U.S.C. 1441a(b)(6)(B))—
(i) in the subparagraph heading, by striking "SAIF–INSURED BANKS" and inserting "CHARTER CONVERSIONS"; and
(ii) by striking "Savings Association Insurance Fund member" and inserting "savings association";
(D) in section 21A(b)(10)(A)(iv)(II) (12 U.S.C. 1441a(b)(10)(A)(iv)(II)), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1441b >>

(E) in section 21B(e) (12 U.S.C. 1441b(e))—
(i) in paragraph (5), by inserting "as of the date of funding" after "Savings Association Insurance Fund members" each place such term appears;
(ii) by striking paragraph (7); and
(iii) by redesignating paragraph (8) as paragraph (7); and
(F) in section 21B(k) (12 U.S.C. 1441b(k))—

(i) by striking paragraph (8); and

(ii) by redesignating paragraphs (9) and (10) as paragraphs (8) and (9), respectively.

(12) AMENDMENTS TO THE HOME OWNERS' LOAN ACT.—The Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended—

<< 12 USCA § 1464 >>

(A) in section 5—

(i) in subsection (c)(5)(A), by striking "that is a member of the Bank Insurance Fund";

(ii) in subsection (c)(6), by striking "As used in this subsection—" and inserting "For purposes of this subsection, the following definitions shall apply:";

(iii) in subsection (o)(1), by striking "that is a Bank Insurance Fund member";

(iv) in subsection (o)(2)(A), by striking "a Bank Insurance Fund member until such time as it changes its status to a Savings Association Insurance Fund member" and inserting "insured by the Deposit Insurance Fund";

(v) in subsection (t)(5)(D)(iii)(II), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";

(vi) in subsection (t)(7)(C)(i)(I), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund"; and

(vii) in subsection (v)(2)(A)(i), by striking ", the Savings Association Insurance Fund" and inserting "or the Deposit Insurance Fund"; and

<< 12 USCA § 1467a >>

(B) in section 10—

(i) in subsection (e)(1)(A)(iii)(VII), by adding "or" at the end;

(ii) in subsection (e)(1)(A)(iv), by adding "and" at the end;

(iii) in subsection (e)(1)(B), by striking "Savings Association Insurance Fund or Bank Insurance Fund" and inserting "Deposit Insurance Fund";

(iv) in subsection (e)(2), by striking "Savings Association Insurance Fund or the Bank Insurance Fund" and inserting "Deposit Insurance Fund"; and

(v) in subsection (m)(3), by striking subparagraph (E), and by redesignating subparagraphs (F), (G), and (H) as subparagraphs (E), (F), and (G), respectively.

(13) AMENDMENTS TO THE NATIONAL HOUSING ACT.—The National Housing Act (12 U.S.C. 1701 et seq.) is amended—

<< 12 USCA § 1723i >>

(A) in section 317(b)(1)(B) (12 U.S.C. 1723i(b)(1)(B)), by striking "Bank Insurance Fund for banks or through the Savings Association Insurance Fund for savings associations" and inserting "Deposit Insurance Fund"; and

<< 12 USCA § 1735f–14 >>

(B) in section 526(b)(1)(B)(ii) (12 U.S.C. 1735f–14(b)(1)(B)(ii)), by striking "Bank Insurance Fund for banks and through the Savings Association Insurance Fund for savings associations" and inserting "Deposit Insurance Fund".

(14) FURTHER AMENDMENTS TO THE FEDERAL DEPOSIT INSURANCE ACT.—The Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.) is amended—

<< 12 USCA § 1813 >>

(A) in section 3(a)(1) (12 U.S.C. 1813(a)(1)), by striking subparagraph (B) and inserting the following:

"(B) includes any former savings association.";

<< 12 USCA § 1815 >>

(B) in section 5(b)(5) (12 U.S.C. 1815(b)(5)), by striking "the Bank Insurance Fund or the Savings Association Insurance Fund;" and inserting "Deposit Insurance Fund,";

(C) in section 5(d) (12 U.S.C. 1815(d)), by striking paragraphs (2) and (3);

(D) in section 5(d)(1) (12 U.S.C. 1815(d)(1))—

(i) in subparagraph (A), by striking "reserve ratios in the Bank Insurance Fund and the Savings Association Insurance Fund" and inserting "the reserve ratio of the Deposit Insurance Fund";

(ii) by striking subparagraph (B) and inserting the following:

"(2) FEE CREDITED TO THE DEPOSIT INSURANCE FUND.—The fee paid by the depository institution under paragraph (1) shall be credited to the Deposit Insurance Fund.";

(iii) by striking "(1) UNINSURED INSTITUTIONS.—"; and

(iv) by redesignating subparagraphs (A) and (C) as paragraphs (1) and (3), respectively, and moving the margins 2 ems to the left;

(E) in section 5(e) (12 U.S.C. 1815(e))—

(i) in paragraph (5)(A), by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

(ii) by striking paragraph (6); and

(iii) by redesignating paragraphs (7), (8), and (9) as paragraphs (6), (7), and (8), respectively;

<< 12 USCA § 1816 >>

(F) in section 6(5) (12 U.S.C. 1816(5)), by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1817 >>

(G) in section 7(b) (12 U.S.C. 1817(b))—

(i) in paragraph (1)(D), by striking "each deposit insurance fund" and inserting "the Deposit Insurance Fund";

(ii) in clauses (i)(I) and (iv) of paragraph (2)(A), by striking "each deposit insurance fund" each place such term appears and inserting "the Deposit Insurance Fund";

(iii) in paragraph (2)(A)(iii), by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund";

(iv) by striking clause (iv) of paragraph (2)(A);

(v) in paragraph (2)(C) (as redesignated by paragraph (6)(B) of this subsection)—

(I) by striking "any deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(II) by striking "that fund" each place such term appears and inserting "the Deposit Insurance Fund";

(vi) in paragraph (2)(D) (as redesignated by paragraph (6)(B) of this subsection)—

(I) in the subparagraph heading, by striking "FUNDS ACHIEVE" and inserting "FUND ACHIEVES"; and

(II) by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund";

(vii) in paragraph (3)—

(I) in the paragraph heading, by striking "FUNDS" and inserting "FUND";

(II) by striking "members of that fund" where such term appears in the portion of subparagraph (A) which precedes clause (i) of such subparagraph and inserting "insured depository institutions";

(III) by striking "that fund" each place such term appears (other than in connection with term amended in subclause (II) of this clause) and inserting "the Deposit Insurance Fund";

(IV) in subparagraph (A), by striking "Except as provided in paragraph (2)(F), if" and inserting "If";

(V) in subparagraph (A), by striking "any deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(VI) by striking subparagraphs (C) and (D) and inserting the following:

"(C) AMENDING SCHEDULE.—The Corporation may, by regulation, amend a schedule prescribed under subparagraph (B)."; and

(viii) in paragraph (6)—

(I) by striking "any such assessment" and inserting "any such assessment is necessary";

AR.01629

(II) by striking "(A) is necessary—";

(III) by striking subparagraph (B);

(IV) by redesignating clauses (i), (ii), and (iii) as subparagraphs (A), (B), and (C), respectively, and moving the margins 2 ems to the left; and

(V) in subparagraph (C) (as redesignated), by striking "; and" and inserting a period;

<< 12 USCA § 1821 >>

(H) in section 11(f)(1) (12 U.S.C. 1821(f)(1)), by striking ", except that—" and all that follows through the end of the paragraph and inserting a period;

(I) in section 11(i)(3) (12 U.S.C. 1821(i)(3))—

(i) by striking subparagraph (B);

(ii) by redesignating subparagraph (C) as subparagraph (B); and

(iii) in subparagraph (B) (as redesignated), by striking "subparagraphs (A) and (B)" and inserting "subparagraph (A)";

<< 12 USCA § 1821a >>

(J) in section 11A(a) (12 U.S.C. 1821a(a))—

(i) in paragraph (2), by striking "LIABILITIES.—" and all that follows through "Except" and inserting "LIABILITIES. —Except";

(ii) by striking paragraph (2)(B); and

(iii) in paragraph (3), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "the Deposit Insurance Fund";

(K) in section 11A(b) (12 U.S.C. 1821a(b)), by striking paragraph (4);

(L) in section 11A(f) (12 U.S.C. 1821a(f)), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1823 >>

(M) in section 13 (12 U.S.C. 1823)—

(i) in subsection (a)(1), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund, the Special Reserve of the Deposit Insurance Fund,";

(ii) in subsection (c)(4)(E)—

(I) in the subparagraph heading, by striking "FUNDS" and inserting "FUND"; and

(II) in clause (i), by striking "any insurance fund" and inserting "the Deposit Insurance Fund";

(iii) in subsection (c)(4)(G)(ii)—

(I) by striking "appropriate insurance fund" and inserting "Deposit Insurance Fund";

(II) by striking "the members of the insurance fund (of which such institution is a member)" and inserting "insured depository institutions";

(III) by striking "each member's" and inserting "each insured depository institution's"; and

(IV) by striking "the member's" each place such term appears and inserting "the institution's";

(iv) in subsection (c), by striking paragraph (11);

(v) in subsection (h), by striking "Bank Insurance Fund" and inserting "Deposit Insurance Fund";

(vi) in subsection (k)(4)(B)(i), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund"; and

(vii) in subsection (k)(5)(A), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1824 >>

(N) in section 14(a) (12 U.S.C. 1824(a)) in the 5th sentence—

(i) by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund"; and

(ii) by striking "each such fund" and inserting "the Deposit Insurance Fund";

(O) in section 14(b) (12 U.S.C. 1824(b)), by striking "Bank Insurance Fund or Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

(P) in section 14(c) (12 U.S.C. 1824(c)), by striking paragraph (3);

(Q) in section 14(d) (12 U.S.C. 1824(d))—

(i) by striking "BIF" each place such term appears and inserting "DIF"; and

(ii) by striking "Bank Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1825 >>

(R) in section 15(c)(5) (12 U.S.C. 1825(c)(5))—

(i) by striking "the Bank Insurance Fund or Savings Association Insurance Fund, respectively" each place such term appears and inserting "the Deposit Insurance Fund"; and

(ii) in subparagraph (B), by striking "the Bank Insurance Fund or the Savings Association Insurance Fund, respectively" and inserting "the Deposit Insurance Fund";

<< 12 USCA § 1827 >>

(S) in section 17(a) (12 U.S.C. 1827(a))—

(i) in the subsection heading, by striking "BIF, SAIF," and inserting "THE DEPOSIT INSURANCE FUND"; and

(ii) in paragraph (1), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," each place such term appears and inserting "the Deposit Insurance Fund";

(T) in section 17(d) (12 U.S.C. 1827(d)), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," each place such term appears and inserting "the Deposit Insurance Fund";

<< 12 USCA § 1828 >>

(U) in section 18(m)(3) (12 U.S.C. 1828(m)(3))—

(i) by striking "Savings Association Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund"; and

(ii) in subparagraph (C), by striking "or the Bank Insurance Fund";

(V) in section 18(p) (12 U.S.C. 1828(p)), by striking "deposit insurance funds" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831a >>

(W) in section 24 (12 U.S.C. 1831a) in subsections (a)(1) and (d)(1)(A), by striking "appropriate deposit insurance fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831e >>

(X) in section 28 (12 U.S.C. 1831e), by striking "affected deposit insurance fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831h >>

(Y) by striking section 31 (12 U.S.C. 1831h);

<< 12 USCA § 1831m >>

(Z) in section 36(i)(3) (12 U.S.C. 1831m(i)(3)) by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831*o* >>

(AA) in section 38(a) (12 U.S.C. 1831*o*(a)) in the subsection heading, by striking "FUNDS" and inserting "FUND";

(BB) in section 38(k) (12 U.S.C. 1831*o*(k))—

 (i) in paragraph (1), by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

 (ii) in paragraph (2)(A)—

  (I) by striking "A deposit insurance fund" and inserting "The Deposit Insurance Fund"; and

  (II) by striking "the deposit insurance fund's outlays" and inserting "the outlays of the Deposit Insurance Fund"; and

(CC) in section 38(o) (12 U.S.C. 1831*o*(o))—

 (i) by striking "ASSOCIATIONS.—" and all that follows through "Subsections (e)(2)" and inserting "ASSOCIATIONS.—Subsections (e)(2)";

 (ii) by redesignating subparagraphs (A), (B), and (C) as paragraphs (1), (2), and (3), respectively, and moving the margins 2 ems to the left; and

 (iii) in paragraph (1) (as redesignated), by redesignating clauses (i) and (ii) as subparagraphs (A) and (B), respectively, and moving the margins 2 ems to the left.

(15) AMENDMENTS TO THE FINANCIAL INSTITUTIONS REFORM, RECOVERY, AND ENFORCEMENT ACT OF 1989.—The Financial Institutions Reform, Recovery, and Enforcement Act is amended—

<< 12 USCA § 1833a >>

(A) in section 951(b)(3)(B) (12 U.S.C. 1833a(b)(3)(B)), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund"; and

<< 12 USCA § 3341 >>

(B) in section 1112(c)(1)(B) (12 U.S.C. 3341(c)(1)(B)), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund".

<< 12 USCA § 1834 >>

(16) AMENDMENT TO THE BANK ENTERPRISE ACT OF 1991.—Section 232(a)(1) of the Bank Enterprise Act of 1991 (12 U.S.C. 1834(a)(1)) is amended by striking "section 7(b)(2)(H)" and inserting "section 7(b)(2)(G)".

<< 12 USCA § 1841 >>

(17) AMENDMENT TO THE BANK HOLDING COMPANY ACT OF 1956.—Section 2(j)(2) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(j)(2)) is amended by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 1821 >>

SEC. 2705. CREATION OF SAIF SPECIAL RESERVE.

Section 11(a)(6) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(6)) is amended by adding at the end the following new subparagraph:

"(L) ESTABLISHMENT OF SAIF SPECIAL RESERVE.—

"(i) ESTABLISHMENT.—If, on January 1, 1999, the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, there is established a Special Reserve of the Savings Association Insurance Fund, which shall be administered by the Corporation and shall be invested in accordance with section 13(a).

"(ii) AMOUNTS IN SPECIAL RESERVE.—If, on January 1, 1999, the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, the amount by which the reserve ratio exceeds the designated reserve ratio shall be placed in the Special Reserve of the Savings Association Insurance Fund established by clause (i).

"(iii) LIMITATION.—The Corporation shall not provide any assessment credit, refund, or other payment from any amount in the Special Reserve of the Savings Association Insurance Fund.

"(iv) EMERGENCY USE OF SPECIAL RESERVE.—Notwithstanding clause (iii), the Corporation may, in its sole discretion, transfer amounts from the Special Reserve of the Savings Association Insurance Fund to the Savings Association Insurance Fund for the purposes set forth in paragraph (4), only if—

"(I) the reserve ratio of the Savings Association Insurance Fund is less than 50 percent of the designated reserve ratio; and

"(II) the Corporation expects the reserve ratio of the Savings Association Insurance Fund to remain at less than 50 percent of the designated reserve ratio for each of the next 4 calendar quarters.

"(v) EXCLUSION OF SPECIAL RESERVE IN CALCULATING RESERVE RATIO.—Notwithstanding any other provision of law, any amounts in the Special Reserve of the Savings Association Insurance Fund shall be excluded in calculating the reserve ratio of the Savings Association Insurance Fund.".

<< 12 USCA § 1817 >>

SEC. 2706. REFUND OF AMOUNTS IN DEPOSIT INSURANCE FUND IN EXCESS OF DESIGNATED RESERVE AMOUNT.

Subsection (e) of section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817(e)) is amended to read as follows:

"(e) REFUNDS.—

"(1) OVERPAYMENTS.—In the case of any payment of an assessment by an insured depository institution in excess of the amount due to the Corporation, the Corporation may—

"(A) refund the amount of the excess payment to the insured depository institution; or

"(B) credit such excess amount toward the payment of subsequent semiannual assessments until such credit is exhausted.

"(2) BALANCE IN INSURANCE FUND IN EXCESS OF DESIGNATED RESERVE.—

"(A) IN GENERAL.—Subject to subparagraphs (B) and (C), if, as of the end of any semiannual assessment period beginning after the date of the enactment of the Deposit Insurance Funds Act of 1996, the amount of the actual reserves in—

"(i) the Bank Insurance Fund (until the merger of such fund into the Deposit Insurance Fund pursuant to section 2704 of the Deposit Insurance Funds Act of 1996); or

"(ii) the Deposit Insurance Fund (after the establishment of such fund),

exceeds the balance required to meet the designated reserve ratio applicable with respect to such fund, such excess amount shall be refunded to insured depository institutions by the Corporation on such basis as the Board of Directors determines to be appropriate, taking into account the factors considered under the risk-based assessment system.

"(B) REFUND NOT TO EXCEED PREVIOUS SEMIANNUAL ASSESSMENT.—The amount of any refund under this paragraph to any member of a deposit insurance fund for any semiannual assessment period may not exceed the total amount of assessments paid by such member to the insurance fund with respect to such period.

"(C) REFUND LIMITATION FOR CERTAIN INSTITUTIONS.—No refund may be made under this paragraph with respect to the amount of any assessment paid for any semiannual assessment period by any insured depository institution described in clause (v) of subsection (b)(2)(A).".

<< 12 USCA § 1817 >>

SEC. 2707. ASSESSMENT RATES FOR SAIF MEMBERS MAY NOT BE LESS THAN ASSESSMENT RATES FOR BIF MEMBERS.

Section 7(b)(2)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(E), as redesignated by section 2704(d)(6) of this subtitle) is amended—

(1) by striking "and" at the end of clause (i);

(2) by striking the period at the end of clause (ii) and inserting "; and"; and

(3) by adding at the end the following new clause:

"(iii) notwithstanding any other provision of this subsection, during the period beginning on the date of enactment of the Deposit Insurance Funds Act of 1996, and ending on December 31, 1998, the assessment rate for a Savings Association Insurance Fund member may not be less than the assessment rate for a Bank Insurance Fund member that poses a comparable risk to the deposit insurance fund.".

<< 12 USCA § 1817 >>

SEC. 2708. ASSESSMENTS AUTHORIZED ONLY IF NEEDED TO MAINTAIN THE RESERVE RATIO OF A DEPOSIT INSURANCE FUND.

(a) IN GENERAL.—Section 7(b)(2)(A)(i) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)(i)) is amended in the matter preceding subclause (I) by inserting "when necessary, and only to the extent necessary" after "insured depository institutions".

(b) LIMITATION ON ASSESSMENT.—Section 7(b)(2)(A)(iii) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2) (A)(iii)) is amended to read as follows:

"(iii) LIMITATION ON ASSESSMENT.—Except as provided in clause (v), the Board of Directors shall not set semiannual assessments with respect to a deposit insurance fund in excess of the amount needed—

"(I) to maintain the reserve ratio of the fund at the designated reserve ratio; or

"(II) if the reserve ratio is less than the designated reserve ratio, to increase the reserve ratio to the designated reserve ratio.".

(c) EXCEPTION TO LIMITATION ON ASSESSMENTS.—Section 7(b)(2)(A) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)) is amended by adding at the end the following new clause:

"(v) EXCEPTION TO LIMITATION ON ASSESSMENTS.—The Board of Directors may set semiannual assessments in excess of the amount permitted under clauses (i) and (iii) with respect to insured depository institutions that exhibit financial, operational, or compliance weaknesses ranging from moderately severe to unsatisfactory, or are not well capitalized, as that term is defined in section 38.".

SEC. 2709. TREASURY STUDY OF COMMON DEPOSITORY INSTITUTION CHARTER.

(a) STUDY REQUIRED.—The Secretary of the Treasury shall conduct a study of all issues which the Secretary considers to be relevant with respect to the development of a common charter for all insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act) and the abolition of separate and distinct charters between banks and savings associations.

(b) REPORT TO THE CONGRESS.—

(1) IN GENERAL.—The Secretary of the Treasury shall submit a report to the Congress on or before March 31, 1997, containing the findings and conclusions of the Secretary in connection with the study conducted pursuant to subsection (a).

(2) DETAILED ANALYSIS AND RECOMMENDATIONS.—The report under paragraph (1) shall include—

(A) a detailed analysis of each issue the Secretary considered relevant to the subject of the study;

(B) recommendations of the Secretary with regard to the establishment of a common charter for insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act); and

(C) such recommendations for legislative and administrative action as the Secretary determines to be appropriate to implement the recommendations of the Secretary under subparagraph (B).

<< 12 USCA § 1821 NOTE >>

SEC. 2710. DEFINITIONS.

For purposes of this subtitle, the following definitions shall apply:

(1) BANK INSURANCE FUND.—The term "Bank Insurance Fund" means the fund established pursuant to section (11)(a)(5)(A) of the Federal Deposit Insurance Act, as that section existed on the day before the date of enactment of this Act.

(2) BIF MEMBER, SAIF MEMBER.—The terms "Bank Insurance Fund member" and "Savings Association Insurance Fund member" have the same meanings as in section 7(l) of the Federal Deposit Insurance Act.

AR.01634

(3) VARIOUS BANKING TERMS.—The terms "bank", "Board of Directors", "Corporation", "deposit", "insured depository institution", "Federal savings association", "savings association", "State savings bank", and "State depository institution" have the same meanings as in section 3 of the Federal Deposit Insurance Act.

(4) DEPOSIT INSURANCE FUND.—The term "Deposit Insurance Fund" means the fund established under section 11(a)(4) of the Federal Deposit Insurance Act (as amended by section 2704(d) of this subtitle).

(5) DEPOSITORY INSTITUTION HOLDING COMPANY.—The term "depository institution holding company" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

(6) DESIGNATED RESERVE RATIO.—The term "designated reserve ratio" has the same meaning as in section 7(b)(2)(A)(iv) of the Federal Deposit Insurance Act.

(7) SAIF.—The term "Savings Association Insurance Fund" means the fund established pursuant to section 11(a)(6)(A) of the Federal Deposit Insurance Act, as that section existed on the day before the date of enactment of this Act.

(8) SAIF–ASSESSABLE DEPOSIT.—The term "SAIF-assessable deposit"—

 (A) means a deposit that is subject to assessment for purposes of the Savings Association Insurance Fund under the Federal Deposit Insurance Act (including a deposit that is treated as insured by the Savings Association Insurance Fund under section 5(d)(3) of the Federal Deposit Insurance Act); and

 (B) includes any deposit described in subparagraph (A) which is assumed after March 31, 1995, if the insured depository institution, the deposits of which are assumed, is not an insured depository institution when the special assessment is imposed under section 2702(a).

<< 26 USCA § 162 NOTE >>

SEC. 2711. DEDUCTION FOR SPECIAL ASSESSMENTS.

For purposes of subtitle A of the Internal Revenue Code of 1986—

 (1) the amount allowed as a deduction under section 162 of such Code for a taxable year shall include any amount paid during such year by reason of an assessment under section 2702 of this subtitle, and

 (2) section 172(f) of such Code shall not apply to any deduction described in paragraph (1).

TITLE III—SPECTRUM ALLOCATION PROVISIONS

SEC. 3001. COMPETITIVE BIDDING FOR SPECTRUM.

 (a) COMMISSION OBLIGATION TO MAKE ADDITIONAL SPECTRUM AVAILABLE.—The Federal Communications Commission shall—

 (1) reallocate the use of frequencies at 2305–2320 megahertz and 2345–2360 megahertz to wireless services that are consistent with international agreements concerning spectrum allocations; and

 (2) assign the use of such frequencies by competitive bidding pursuant to section 309(j) of the Communications Act of 1934 (47 U.S.C. 309(j)).

 (b) ADDITIONAL REQUIREMENTS.—In making the bands of frequencies described in subsection (a) available for competitive bidding, the Commission shall—

 (1) seek to promote the most efficient use of the spectrum; and

 (2) take into account the needs of public safety radio services.

 (c) EXPEDITED PROCEDURES.—The Commission shall commence the competitive bidding for the assignment of the frequencies described in subsection (a)(1) no later than April 15, 1997. The rules governing such frequencies shall be effective immediately upon publication in the Federal Register notwithstanding section 553(d), 801(a)(3), and 806(a) of title 5, United States Code. Chapter 6 of such title, and sections 3507 and 3512 of title 44, United States Code, shall not apply to the rules and competitive bidding procedures governing such frequencies. Notwithstanding section 309(b) of the Communications Act of 1934 (47 U.S.C. 309(b)), no application for an instrument of authorization for such frequencies shall be granted by the Commission earlier than 7 days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereto. Notwithstanding section 309(d)(1) of such Act (47 U.S.C. 309(d)(1)), the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Commission may specify a period (no less than 5 days following issuance of such public notice) for the filing of petitions to deny any application for an instrument of authorization for such frequencies.

  (d) DEADLINE FOR COLLECTION.—The Commission shall conduct the competitive bidding under subsection (a)(2) in a manner that ensures that all proceeds of the bidding are deposited in accordance with section 309(j)(8) of the Communications Act of 1934 not later September 30, 1997.

## TITLE IV—ADJUSTMENT OF PAYGO BALANCES

SEC. 4001. ADJUSTMENT OF PAYGO BALANCES.

  For purposes of section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985, on the calendar day after the Director of the Office of Management and Budget issues the final sequestration report for fiscal year 1997, the Director and the Director of the Congressional Budget Office shall change the balances (as computed pursuant to section 252(b) of that Act) of direct spending and receipts legislation—

  (1) for fiscal year 1997 to zero if such balance for the fiscal year is not an increase in the deficit.

## TITLE V—ADDITIONAL APPROPRIATIONS

### CHAPTER 1

DEPARTMENT OF AGRICULTURE, RURAL DEVELOPMENT,
FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES

DEPARTMENT OF AGRICULTURE

Cooperative State Research, Education, and Extension Service

Extension Activities

  For an additional amount for payments for cooperative extension work by the colleges receiving the benefits of the second Morrill Act (7 U.S.C. 321–326, 328) and Tuskegee University, $753,000.

Natural Resources Conservation Service

Watershed and Flood Prevention Operations

  For an additional amount to repair damages to the waterways and watersheds resulting from the effects of Hurricanes Fran and Hortense and other natural disasters, $63,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

Farm Service Agency

Emergency Conservation Program

  For an additional amount for emergency expenses resulting from the effects of Hurricanes Fran and Hortense and other natural disasters, $25,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### CHAPTER 2

DISTRICT OF COLUMBIA

EDUCATION FACILITIES IMPROVEMENT IN THE DISTRICT OF COLUMBIA

(BY TRANSFER)

SEC. 5201. The District of Columbia Financial Responsibility and Management Assistance Authority (referred to in this section as the "Authority") shall have the authority to contract with a private entity (or entities) to carry out a program of school facility repair of public schools and public charter schools located in public school facilities in the District of Columbia, in consultation with the General Services Administration: Provided, That an amount estimated to be $40,700,000 is hereby transferred and otherwise made available to the Authority until expended for contracting as provided under this section, to be derived from transfers and reallocations as follows: (1) funds made available under the heading "PUBLIC EDUCATION SYSTEM" in Public Law 104–194 for school repairs in a restricted line item; (2) all capital financing authority made available for public school capital improvements in Public Law 104–194; and (3) all capital financing authority made available for public school capital improvements which are or remain available from Public Law 104–134 or any previous appropriations Act for the District of Columbia: Provided further, That the General Services Administration, in consultation with the District of Columbia Public Schools and the District of Columbia Council and subject to the approval of the Authority and the Committees on Appropriations of the Senate and the House of Representatives, shall provide program management services to assist in the short-term management of the repairs and capital improvements: Provided further, That contracting authorized under this section shall be conducted in accordance with Federal procurement rules and regulations and guidelines or such guidelines as prescribed by the Authority.

### SPECIAL RULES REGARDING GENERAL OBLIGATION BOND ACT

SEC. 5202. WAIVER OF CONGRESSIONAL REVIEW.—Notwithstanding section 602(c)(1) of the District of Columbia Self–Government and Governmental Reorganization Act (sec. 1–233(c)(1), D.C.Code), the General Obligation Bond Act of 1996 (D.C.Bill 11–840), if enacted by the Council of the District of Columbia, shall take effect on the date of the enactment of such Act or the date of the enactment of this Act, whichever is later.

### AMENDMENTS TO FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE ACT

SEC. 5203. (a) CALCULATION OF 7–DAY REVIEW PERIOD FOR COUNCIL ACTS.—Section 203(a)(5) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 (sec. 47–392.3(a)(5), D.C.Code) is amended—

(1) by inserting "(excluding Saturdays, Sundays, and legal holidays)" after "7–day period" the first place it appears; and

(2) by striking "the date the Council submits the Act to the Authority" and inserting "the first day (excluding Saturdays, Sundays, and legal holidays) after the Authority receives the Act from the Council".

(b) SPECIFICATION OF PENALTY FOR PROHIBITED ACTS.—Section 103(i)(1) of such Act (sec. 47–391.3(i)(1), D.C.Code) is amended by striking the period at the end and inserting the following: ", and shall be fined not more than $1,000, imprisoned for not more than 1 year, or both.".

(c) WAIVER OF PRIVACY ACT REQUIREMENTS FOR OBTAINING OFFICIAL DATA.—Section 103(c)(1) of such Act (sec. 47–391.3(c)(1), D.C.Code) is amended by striking "Act) and 552b" and inserting "Act), 552a (the Privacy Act of 1974), and 552b".

(d) PERMITTING AUTHORITY REVIEW OF RULEMAKING.—Section 203(b) of such Act (sec. 47–392.3(b), D.C.Code) is amended by adding at the end the following new paragraph:

"(5) APPLICATION TO RULES AND REGULATIONS.—The provisions of this subsection shall apply with respect to a rule or regulation issued or proposed to be issued by the Mayor (or the head of any department or agency of the District government) in the same manner as such provisions apply to a contract or lease.".

(e) DEPOSIT OF ALL DISTRICT BORROWING WITH AUTHORITY.—

(1) IN GENERAL.—Section 204 of such Act (sec. 47–392.4, D.C.Code) is amended—

(A) by redesignating subsections (d) and (e) as subsections (e) and (f); and

(B) by inserting after subsection (c) the following new subsection:

"(d) DEPOSIT OF BORROWED FUNDS WITH AUTHORITY.—If the District government borrows funds during a control year, the funds shall be deposited into an escrow account held by the Authority, to be allocated by the Authority to the Mayor at such intervals and in accordance with such terms and conditions as it considers appropriate, consistent with the financial plan and budget for the year and with any other withholding of funds by the Authority pursuant to this Act.".

(2) CONFORMING AMENDMENTS.—(A) Section 204(e) of such Act, as redesignated by paragraph (1)(A), is amended by inserting after "(b)(1)" the following: "or the escrow account described in subsection (d)".

(B) Section 206(d)(1) of such Act is amended by striking "204(b)" and inserting "204(b), section 204(d),".

AR.01637

(f) GRANTING AUTHORITY POWER TO ISSUE GENERAL ORDERS.—Section 207 of such Act (sec. 47–392.7, D.C.Code) is amended by adding at the end the following new subsection:

"(d) ADDITIONAL POWER TO ISSUE ORDERS, RULES, AND REGULATIONS.—

"(1) IN GENERAL.—In addition to the authority described in subsection (c), the Authority may at any time issue such orders, rules, or regulations as it considers appropriate to carry out the purposes of this Act and the amendments made by this Act, to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule, or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency.

"(2) NOTIFICATION.—Upon issuing an order, rule, or regulation pursuant to this subsection, the Authority shall notify the Mayor, the Council, the President, and Congress.

"(3) NO JUDICIAL REVIEW OF DECISION TO ISSUE ORDER.—The decision by the Authority to issue an order, rule, or regulation pursuant to this subsection shall be final and shall not be subject to judicial review.".

## PROHIBITING FUNDING FOR TERMINATED EMPLOYEES OR CONTRACTORS

SEC. 5204. (a) IN GENERAL.—Except as provided in subsection (b), none of the funds made available to the District of Columbia during any fiscal year (beginning with fiscal year 1996) may be used to pay the salary or wages of any individual whose employment by the District government is no longer required as determined by the District of Columbia Financial Responsibility and Management Assistance Authority, or to pay any expenses associated with a contractor or consultant of the District government whose contract or arrangement with the District government is no longer required as determined by the Authority.

(b) EXCEPTION FOR PAYMENTS FOR SERVICES ALREADY PROVIDED.—Funds made available to the District of Columbia may be used to pay an individual for employment already performed at the time of the Authority's determination, or to pay a contractor or consultant for services already provided at the time of the Authority's determination, to the extent permitted by the District of Columbia Financial Responsibility and Management Assistance Authority.

(c) DISTRICT GOVERNMENT DEFINED.—In this section, the term "District government" has the meaning given such term in section 305(5) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995.

## AMENDMENTS TO DISTRICT OF COLUMBIA SCHOOL REFORM ACT OF 1995.

Sec. 5205. (a) PROCESS FOR FILING CHARTER PETITIONS.—Section 2201 of the District of Columbia School Reform Act of 1995 (Public Law 104–134; 110 Stat. 1321–115) is amended by adding at the end the following:

"(d) LIMITATIONS ON FILING.—

"(1) MULTIPLE CHARTERING AUTHORITIES.—An eligible applicant may not file the same petition to establish a public charter school with more than 1 eligible chartering authority during a calendar year.

"(2) MULTIPLE PETITIONS.—An eligible applicant may not file more than 1 petition to establish a public charter school during a calendar year.".

(b) CONTENTS OF PETITION.—Section 2202(6)(B) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–116) is amended to read as follows:

"(B) either—

"(i)(I) an identification of a facility for the school, including a description of the site where the school will be located, any buildings on the site, and any buildings proposed to be constructed on the site, and (II) information demonstrating that the eligible applicant has acquired title to, or otherwise secured the use of, the facility; or

"(ii) a timetable by which an identification described in clause (i)(I) will be made, and the information described in clause (i)(II) will be submitted, to the eligible chartering authority;".

(c) PROCESS FOR APPROVING OR DENYING PUBLIC CHARTER SCHOOL PETITIONS.—Section 2203 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–118) is amended—

(1) by amending subsection (d) to read as follows:

"(d) APPROVAL.—

"(1) IN GENERAL.—Subject to subsection (i) and paragraph (2), an eligible chartering authority shall approve a petition to establish a public charter school, if—

"(A) the eligible chartering authority determines that the petition satisfies the requirements of this subtitle;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) the eligible applicant who filed the petition agrees to satisfy any condition or requirement, consistent with this subtitle and other applicable law, that is set forth in writing by the eligible chartering authority as an amendment to the petition;

"(C) the eligible chartering authority determines that the public charter school has the ability to meet the educational objectives outlined in the petition; and

"(D) the approval will not cause the eligible chartering authority to exceed a limit under subsection (i).

"(2) CONDITIONAL APPROVAL.—

"(A) IN GENERAL.—In the case of a petition that does not contain the identification and information required under section 2202(6)(B)(i), but does contain the timetable required under section 2202(6)(B)(ii), an eligible chartering authority may only approve the petition on a conditional basis, subject to the eligible applicant's submitting the identification and information described in section 2202(6)(B)(i) in accordance with such timetable, or any other timetable specified in writing by the eligible chartering authority in an amendment to the petition.

"(B) EFFECT OF CONDITIONAL APPROVAL.—For purposes of subsections (e), (h), (i), and (j), a petition conditionally approved under this paragraph shall be treated the same as a petition approved under paragraph (1), except that on the date that such a conditionally approved petition ceases to be conditionally approved because the eligible applicant has not timely submitted the identification and information described in section 2202(6)(B)(i), the approval of the petition shall cease to be counted for purposes of subsection (i).";

(2) in subsection (h), by striking "(d)(2)," each place such term appears and inserting "(d),";

(3) by amending subsection (i) to read as follows:

"(i) NUMBER OF PETITIONS.—

"(1) FIRST YEAR.—During calendar year 1996, not more than 10 petitions to establish public charter schools may be approved under this subtitle.

"(2) SUBSEQUENT YEARS.—

"(A) IN GENERAL.—Subject to subparagraph (B), during calendar year 1997, and during each subsequent calendar year, each eligible chartering authority shall not approve more than 10 petitions to establish a public charter school under this subtitle. Any such petition shall be approved during the period that begins on January 1 and ends on April 1.

"(B) EXCEPTION.—If, by April 1 of any calendar year after 1996, an eligible chartering authority has approved fewer than 10 petitions during such calendar year, any other eligible chartering authority may approve more than 10 petitions during such calendar year, but only if—

"(i) the eligible chartering authority completes the approval of any such additional petition before June 1 of the year; and

"(ii) the approval of any such additional petition will not cause the total number of petitions approved by all eligible chartering authorities during the calendar year to exceed 20."; and

(4) by amending subsection (j) to read as follows:

"(j) AUTHORITY OF ELIGIBLE CHARTERING AUTHORITY.—

"(1) IN GENERAL.—Except as provided in paragraph (2), and except for officers or employees of the eligible chartering authority with which a petition to establish a public charter school is filed, no governmental entity, elected official, or employee of the District of Columbia shall make, participate in making, or intervene in the making of, the decision to approve or deny such a petition.

"(2) AVAILABILITY OF REVIEW.—A decision by an eligible chartering authority to deny a petition to establish a public charter school shall be subject to judicial review by an appropriate court of the District of Columbia.".

(d) DISTRICT OF COLUMBIA PUBLIC SCHOOL SERVICES TO PUBLIC CHARTER SCHOOLS.—Section 2209 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–125) is amended—

(1) by inserting "(a) IN GENERAL.—" before "The Superintendent"; and

(2) by adding at the end the following:

"(b) PREFERENCE IN LEASING OR PURCHASING PUBLIC SCHOOL FACILITIES.—

"(1) FORMER PUBLIC SCHOOL PROPERTY.—

"(A) IN GENERAL.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subparagraph (B), the Mayor and the District of Columbia Government shall give preference to an eligible applicant whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2), or a Board of Trustees, with respect to the purchase or lease of a facility or property described in subparagraph (B), provided

that doing so will not result in a significant loss of revenue that might be obtained from other dispositions or uses of the facility or property.

"(B) PROPERTY DESCRIBED.—A facility or property referred to in subparagraph (A) is a facility, or real property—

"(i) that formerly was under the jurisdiction of the Board of Education;

"(ii) that the Board of Education has determined is no longer needed for purposes of operating a District of Columbia public school; and

"(iii) with respect to which the Board of Education has transferred jurisdiction to the Mayor.

"(2) CURRENT PUBLIC SCHOOL PROPERTY.—

"(A) IN GENERAL.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subparagraph (B), the Mayor and the District of Columbia Government shall give preference to an eligible applicant whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2), or a Board of Trustees, in leasing, or otherwise contracting for the use of, a facility or property described in subparagraph (B).

"(B) PROPERTY DESCRIBED.—A facility or property referred to in subparagraph (A) is a facility, real property, or a designated area of a facility or real property, that—

"(i) is under the jurisdiction of the Board of Education; and

"(ii) is available for use because the Board of Education is not using, for educational, administrative, or other purposes, the facility, real property, or designated area.".

(e) CHARTER RENEWAL.—Section 2212 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–129) is amended—

(1) by amending subsection (a) to read as follows:

"(a) TERMS.—

"(1) INITIAL TERM.—A charter granted to a public charter school shall remain in force for a 15–year period.

"(2) RENEWALS.—A charter may be renewed for an unlimited number of times, each time for a 15–year period.

"(3) REVIEW.—An eligible chartering authority that grants or renews a charter pursuant to paragraph (1) or (2) shall review the charter—

"(A) at least once every 5 years to determine whether the charter should be revoked for the reasons described in subsection (a)(1)(A) or (b) of section 2213 in accordance with the procedures for such revocation established under section 2213(c); and

"(B) once every 5 years, beginning on the date that is 5 years after the date on which the charter is granted or renewed, to determine whether the charter should be revoked for the reasons described in section 2213(a)(1)(B) in accordance with the procedures for such revocation established under section 2213(c).", and

(2) by amending subsection (d)(6) to read as follows:

"(6) JUDICIAL REVIEW.—A decision by an eligible chartering authority to deny an application to renew a charter shall be subject to judicial review by an appropriate court of the District of Columbia.".

(f) CHARTER REVOCATION.—Section 2213(a) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–130) is amended to read as follows:

"(a) CHARTER OR LAW VIOLATIONS; FAILURE TO MEET GOALS.—

"(1) IN GENERAL.—Subject to paragraph (2), an eligible chartering authority that has granted a charter to a public charter school may revoke the charter if the eligible chartering authority determines that the school—

"(A) committed a violation of applicable laws or a material violation of the conditions, terms, standards, or procedures set forth in the charter, including violations relating to the education of children with disabilities; or

"(B) failed to meet the goals and student academic achievement expectations set forth in the charter.

"(2) SPECIAL RULE.—An eligible chartering authority may not revoke a charter under paragraph (1)(B), except pursuant to a determination made through a review conducted under section 2212(a)(3)(B).".

(g) PUBLIC CHARTER SCHOOL BOARD.—Paragraphs (3) and (4) of section 2214(a) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–132) are amended to read as follows:

"(3) VACANCIES.—

"(A) OTHER THAN FROM EXPIRATION OF TERM.—Where a vacancy occurs in the membership of the Board for reasons other than the expiration of the term of a member of the Board, the Secretary of Education, not later than 30 days after the vacancy occurs, shall present to the Mayor a list of 3 people the Secretary determines are qualified to serve on the

AR.01640

Board. The Mayor, in consultation with the District of Columbia Council, shall appoint 1 person from the list to serve on the Board. The Secretary shall recommend, and the Mayor shall appoint, such member of the Board taking into consideration the criteria described in paragraph (2). Any member appointed to fill a vacancy occurring prior to the expiration of the term of a predecessor shall be appointed only for the remainder of the term.

"(B) EXPIRATION OF TERM.—Not later than the date that is 60 days before the expiration of the term of a member of the Board, the Secretary of Education shall present to the Mayor, with respect to each such impending vacancy, a list of 3 people the Secretary determines are qualified to serve on the Board. The Mayor, in consultation with the District of Columbia Council, shall appoint 1 person from each such list to serve on the Board. The Secretary shall recommend, and the Mayor shall appoint, any member of the Board taking into consideration the criteria described in paragraph (2).

"(4) TIME LIMIT FOR APPOINTMENTS.—If, at any time, the Mayor does not appoint members to the Board sufficient to bring the Board's membership to 7 within 30 days after receiving a recommendation from the Secretary of Education under paragraph (2) or (3), the Secretary, not later than 10 days after the final date for such mayoral appointment, shall make such appointments as are necessary to bring the membership of the Board to 7.".

(h) TECHNICAL AMENDMENT.—Section 2561(b) of the District of Columbia School Reform Act of 1995 (Public Law 104–134), as amended by section 148 of the District of Columbia Appropriations Act, 1997 (Public Law 104–194), is amended to read as follows:

"(b) LIMITATION.—A waiver under subsection (a) shall not apply to the Davis–Bacon Act (40 U.S.C. 276a et seq.) or Executive Order 11246 or other civil rights standards.".

<div align="center">DISPOSITION OF CERTAIN SCHOOL PROPERTY BY AUTHORITY</div>

SEC. 5206. (a) IN GENERAL.—Subtitle C of title II of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 is amended by adding at the end the following new section:

"SEC. 225. DISPOSITION OF CERTAIN SCHOOL PROPERTY.

"(a) POWER TO DISPOSE.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subsection (d), the Authority may dispose (by sale, lease, or otherwise) of any facility or property described in subsection (d).

"(b) PREFERENCE FOR PUBLIC CHARTER SCHOOLS.—In disposing of a facility or property under this section, the Authority shall give preference to an eligible applicant (as defined in section 2002 of the District of Columbia School Reform Act of 1995) whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2) of such Act, or a Board of Trustees (as defined in section 2002 of such Act) of such a public charter school, if doing so will not result in a significant loss of revenue that might be obtained from other dispositions or uses of the facility or property.

"(c) USE OF PROCEEDS FROM DISPOSITION FOR SCHOOL REPAIR AND MAINTENANCE.—

"(1) IN GENERAL.—The Authority shall deposit any proceeds of the disposition of a facility or property under this section in the Board of Education Real Property Maintenance and Improvement Fund (as established by the Real Property Disposal Act of 1990), to be used for the construction, maintenance, improvement, rehabilitation, or repair of buildings and grounds which are used for educational purposes for public and public charter school students in the District of Columbia.

"(2) CONSULTATION.—In disposing of a facility or property under this section, the Authority shall consult with the Superintendent of Schools of the District of Columbia, the Mayor, the Council, the Administrator of General Services, and education and community leaders involved in planning for an agency or authority that will design and administer a comprehensive long-term program for repair and improvement of District of Columbia public school facilities (as described in section 2552(a) of the District of Columbia School Reform Act of 1995).

"(3) LEGAL EFFECT OF SALE.—The Authority may dispose of a facility or property under this section by executing a proper deed and any other legal instrument for conveyance of title to the facility or property, and such deed shall convey good and valid title to the purchaser of the facility or property.

"(d) FACILITY OR PROPERTY DESCRIBED.—A facility or property described in this subsection is a facility or property which is described in section 2209(b)(1)(B) of the District of Columbia School Reform Act of 1995 and with respect to which the Authority has made the following determinations:

AR.01641

"(1) The property is no longer needed for purposes of operating a District of Columbia public school (as defined in section 2002 of the District of Columbia School Reform Act of 1995).

"(2) The disposition of the property is in the best interests of education in the District of Columbia.

"(3) The Mayor (or any other department or agency of the District government) has failed to make substantial progress toward disposing the property during the 90–day period which begins on the date the Board of Education transfers jurisdiction over the property to the Mayor (or, in the case of property which is described in section 2209(b)(1)(B) of such Act as of the date of the enactment of this section, during the 90–day period which begins on the date of the enactment of this section).".

(b) CONTROL OVER BOARD OF EDUCATION REAL PROPERTY MAINTENANCE AND IMPROVEMENT FUND.—

(1) IN GENERAL.—Section 2(b) of the Board of Education Real Property Disposal Act of 1990 (sec. 9–402(b), D.C.Code) is amended—

(A) by amending the second sentence to read as follows: "Subject to paragraph (6), the District of Columbia Financial Responsibility and Management Assistance Authority shall administer the Fund and receive all payments into the Fund that are required by law."; and

(B) by adding at the end the following new paragraph:

"(6) Upon the establishment of an agency or authority within the District of Columbia government to administer a public schools facilities revitalization plan pursuant to section 2552(a)(2) of the District of Columbia School Reform Act of 1995, such agency or authority shall administer the Fund and receive all payments into the Fund that are required by law.".

(2) CONFORMING AMENDMENTS.—Section 2(b) of the Board of Education Real Property Disposal Act of 1990 (sec. 9–402(b), D.C.Code) is amended—

(A) in the third sentence of paragraph (1), by striking "; provided that the Board" and all that follows and inserting a period; and

(B) by striking paragraph (5).

(c) CLERICAL AMENDMENT.—The table of contents of subtitle C of title II of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 is amended by adding at the end the following new item:

**"Sec. 225. Disposition of certain school property.".**

## CHAPTER 3

## ENERGY AND WATER DEVELOPMENT

## DEPARTMENT OF DEFENSE—CIVIL

## DEPARTMENT OF THE ARMY

### Corps of Engineers—Civil

### Operation and Maintenance, General

For an additional amount for "Operation and Maintenance, General" for emergency expenses resulting from Hurricane Fran and other natural disasters of 1996, $19,000,000, to remain available until expended: Provided: That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISION

SEC. 5301. None of the funds appropriated in the Energy and Water Development Appropriations Act, 1997 may be made available to the Tennessee Valley Authority if the Tennessee Valley Authority is imposing a performance deposit in connection with residential shoreline alteration permits.

## CHAPTER 4

## LEGISLATIVE BRANCH

## HOUSE OF REPRESENTATIVES

## SALARIES AND EXPENSES

### (RESCISSION)

Immediately upon enactment of this Act, of the funds appropriated in the Legislative Branch Appropriations Act, 1996, for the House of Representatives under the heading "SALARIES AND EXPENSES", there is rescinded $500,000, specified for the following heading and account:

  (1) "ALLOWANCES AND EXPENSES", $500,000, as follows: (A)"Government contributions to employees' life insurance fund, retirement funds, Social Security fund, Medicare fund, health benefits fund, and worker's and unemployment compensation."

## JOINT ITEMS

## CAPITOL POLICE BOARD

## CAPITOL POLICE

## SALARIES

### (RESCISSION)

Immediately upon enactment of this Act, of the funds appropriated under this heading in Public Law 104–53, $3,000,000 are rescinded.

## GENERAL EXPENSES

For an additional amount for the Capitol Police Board for necessary expenses for the design and installation of security systems for the Capitol buildings and grounds, $3,250,000, which shall remain available until expended.

## ARCHITECT OF THE CAPITOL

## CAPITOL BUILDINGS AND GROUNDS

## CAPITOL BUILDINGS

For an additional amount for "Capitol Buildings and Grounds, Capitol Buildings", $250,000, to remain available until expended, for architectural and engineering services related to the design and installation of security systems for Capitol buildings and grounds.

## SENATE OFFICE BUILDINGS

Of the funds appropriated under the heading, "ARCHITECT OF THE CAPITOL, Capitol Buildings and Grounds, Senate office buildings" in Public Law 104–53, $650,000 shall remain available until September 30, 1997 for furniture, furnishings, and equipment for the Senate employees' child care center.

## GENERAL PROVISIONS

## CONGRESSIONAL AWARD ACT AMENDMENTS OF 1996

<< 2 USCA § 804 >>

SEC. 5401. (a) EXTENSION OF REQUIREMENTS REGARDING FINANCIAL OPERATIONS OF CONGRESSIONAL AWARD PROGRAM; NONCOMPLIANCE WITH REQUIREMENTS.—Section 5(c)(2)(A) of the Congressional Award Act (2 U.S.C. 804(c)(2)(A)) is amended by striking "and 1994" and inserting "1994, 1995, 1996, 1997, and 1998".

<< 2 USCA § 808 >>

(b) TERMINATION.—Section 9 of the Congressional Award Act (2 U.S.C. 808) is amended by striking "October 1, 1995" and inserting "October 1, 1999".

<< 2 USCA § 808 NOTE >>

(c) SAVINGS PROVISIONS.—During the period of October 1, 1995, through the date of the enactment of this section, all actions and functions of the Congressional Award Board under the Congressional Award Act shall have the same effect as though no lapse or termination of the Congressional Award Board ever occurred.

BILL EMERSON HALL IN THE HOUSE OF REPRESENTATIVES PAGE SCHOOL

<< 2 USCA § 141 NOTE >>

SEC. 5402. The Founders Hall instructional area in the House of Representatives Page School, located in the Thomas Jefferson Building of the Library of Congress, shall be known and designated as "Bill Emerson Hall".

CHAPTER 5

DEPARTMENT OF TRANSPORTATION

FEDERAL AVIATION ADMINISTRATION

OPERATIONS

(Airport and Airway Trust Fund)

For additional operating expenses of the Federal Aviation Administration for airport security activities, $57,900,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1998: Provided, That of the funds provided, $8,900,000 shall be for establishment of additional explosive detection K–9 teams at airports; $5,500,000 shall be for airport vulnerability assessments; $18,000,000 shall be for the hire of additional aviation security personnel: and $25,500,000 shall be for the hire of additional aviation safety inspectors and contract weather observers, air traffic controller training, and implementation of recommendations of the Federal Aviation Administration's "Ninety Day Safety Review", dated September 16, 1996: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

FACILITIES AND EQUIPMENT

(Airport and Airway Trust Fund)

For additional necessary expenses for "Facilities and Equipment", $147,700,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1999: Provided, That of the funds provided, $144,200,000 shall only be for non-competitive contracts or cooperative agreements with air carriers and airport authorities, which provide for the Federal Aviation Administration to purchase and assist in installation of advanced security equipment for the use of such entities and $3,500,000 shall be for accelerated development and deployment of the Online Aviation Safety Information System: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

RESEARCH, ENGINEERING, AND DEVELOPMENT

(Airport and Airway Trust Fund)

For an additional amount for "Research, Engineering, and Development", $21,000,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1999: Provided, That the funds provided shall only be for aviation security research and operational testing of document trace scanners and explosive detection portals for airport passengers: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

GRANTS–IN–AID FOR AIRPORTS

(Airport and Airway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $50,000,000 are rescinded.

FEDERAL HIGHWAY ADMINISTRATION

HIGHWAY–RELATED SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $9,100,000 are rescinded.

FEDERAL–AID HIGHWAYS

(Highway Trust Fund)

For an additional amount for "Emergency Relief Program" for emergency expenses resulting from Hurricanes Fran and Hortense and for other disasters, as authorized by 23 U.S.C. 125, $82,000,000, to be derived from the Highway Trust Fund and to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

MOTOR CARRIER SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $12,300,000 are rescinded.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

HIGHWAY TRAFFIC SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $11,800,000 are rescinded.

FEDERAL RAILROAD ADMINISTRATION

Northeast Corridor Improvement Program

For additional necessary expenses related to Northeast Corridor improvements authorized by title VII of the Railroad Revitalization and Regulatory Reform Act of 1976, as amended (45 U.S.C. 851 et seq.) and 49 U.S.C. 24909, $60,000,000, to remain available until September 30, 1999.

DIRECT LOAN FINANCING PROGRAM

Notwithstanding any other provision of law, $58,680,000, for direct loans not to exceed $400,000,000 consistent with the purposes of section 505 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825) as in effect on September 30, 1988, to the Alameda Corridor Transportation Authority to continue the Alameda Corridor Project, including replacement of at-grade rail lines with a below-grade corridor and widening of the adjacent major highway: Provided, That loans not to exceed the following amounts shall be made on or after the first day of the fiscal year indicated:

Fiscal year 1997 $140,000,000

Fiscal year 1998 $140,000,000

Fiscal year 1999 $120,000,000

Provided further, That any loan authorized under this section shall be structured with a maximum 30–year repayment after completion of construction at an annual interest rate of not to exceed the 30–year United States Treasury rate and on such terms and conditions as deemed appropriate by the Secretary of Transportation: Provided further, That specific provisions of section 505(a), (b) and (d) through (h) shall not apply: Provided further, That the Alameda Corridor Transportation Authority shall be deemed to be a financially responsible person for purposes of section 505 of the Act.

### GRANTS TO THE NATIONAL RAILROAD PASSENGER CORPORATION

For additional expenses necessary for "Grants to the National Railroad Passenger Corporation", $22,500,000 for operating losses, to remain available until September 30, 1997: Provided, That amounts made available shall only be used to continue service on routes the National Railroad Passenger Corporation currently plans to terminate.

### RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION

### RESEARCH AND SPECIAL PROGRAMS

For additional expenses necessary for "Research and Special Programs" to conduct vulnerability and threat assessments of the nation's transportation system, $3,000,000, to remain available until September 30, 1999: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### NATIONAL TRANSPORTATION SAFETY BOARD

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $6,000,000, to reimburse other federal agencies for previously incurred costs of recovering wreckage from TWA flight 800, and for other costs related to the TWA 800 accident investigation: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### EMERGENCY FUND

For necessary expenses of the National Transportation Safety Board for accident investigations, including hire of passenger motor vehicles and aircraft; services as authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for a GS–18; uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902), $1,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISIONS

Sec. 5501. In fiscal year 1997, the Administrator of the Federal Aviation Administration may establish at individual airports such consortia of government and aviation industry representatives as the Administrator may designate to provide advice on matters related to aviation security and safety: Provided, That such consortia shall not be considered Federal advisory committees.

Sec. 5502. In cases where an emergency ocean condition causes erosion of a bank protecting a scenic highway or byway, fiscal year 1996 or fiscal year 1997 Federal Highway Administration Emergency Relief funds can be used to halt the erosion and stabilize the bank if such action is necessary to protect the highway from imminent failure and is less expensive than highway relocation.

Sec. 5503. Of the funds deducted under 23 U.S.C. subsection 104(a) for fiscal year 1997, $30,000,000 shall be available for allocation to States authorized by section 1069(y) of Public Law 102–240.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## SEC. 5504. CONVEYANCE OF PROPERTY IN TRAVERSE CITY, MICHIGAN.

(a) AUTHORITY TO CONVEY.—The Secretary of Transportation (or any other official having control over the property described in subsection (b)) shall expeditiously convey to the Traverse City Area Public School District in Traverse City, Michigan, without consideration, all right, title, and interest of the United States in and to the property identified, described, and determined by the Secretary under subsection (b), subject to all easements and other interests in the property held by any other person.

(b) IDENTIFICATION OF PROPERTY.—The Secretary shall identify, describe, and determine the property to be conveyed pursuant to this section.

(c) REVERSIONARY INTEREST.—In addition to any term or condition established pursuant to subsection (a) or (d), any conveyance of property described in subsection (b) shall be subject to the condition that all right, title, and interest in and to the property so conveyed shall immediately revert to the United States if the property, or any part thereof, ceases to be used by the Traverse City Area Public School District.

(d) TERMS OF CONVEYANCE.—The conveyance of property under this section shall be subject to such conditions as the Secretary considers to be necessary to assure that—

(1) the pump room located on the property shall continue to be operated and maintained by the United States for as long as it is needed for this purpose;

(2) the United States shall have an easement of access to the property for the purpose of operating and maintaining the pump room; and

(3) the United States shall have the right, at any time, to enter the property without notice for the purpose of operating and maintaining the pump room.

## SEC. 5505. AUTHORITY TO CONVEY WHITEFISH POINT LIGHT STATION LAND.

(a) AUTHORITY TO CONVEY.—

(1) IN GENERAL.—Except as otherwise provided in this section, the Secretary of the Interior (in this section referred to as the "Secretary") may convey, by an appropriate means of conveyance, all right, title, and interest of the United States in 1 of the 3 parcels comprising the land on which the United States Coast Guard Whitefish Point Light Station is situated (in this section referred to as the "Property"), to each of the Great Lakes Shipwreck Historical Society, located in Sault Ste. Marie, Michigan, the United States Fish and Wildlife Service, and the Michigan Audubon Society (each of which is referred to in this section as a "recipient"), subject to all easements, conditions, reservations, exceptions, and restrictions contained in prior conveyances of record.

(2) LIMITATION.—Notwithstanding paragraph (1), the Secretary shall retain for the United States all right, title, and interest in—

(A) any historical artifact, including any lens or lantern, and

(B) the light, antennas, sound signal, towers, associated lighthouse equipment, and any electronic navigation equipment, which are active aids to navigation,

which is located on the Property, or which relates to the Property.

(3) IDENTIFICATION OF THE PROPERTY.—The Secretary may identify, describe, and determine the parcels to be conveyed pursuant to this section.

(4) RIGHTS OF ACCESS.—If necessary to ensure access to a public roadway for a parcel conveyed under this section, the Secretary shall convey with the parcel an appropriate appurtenant easement over another parcel conveyed under this section.

(5) EASEMENT FOR PUBLIC ALONG SHORELINE.—In each conveyance under this section of property located on the shoreline of Lake Superior, the Secretary shall retain for the public, for public walkway purposes, a right-of-way along the shoreline that extends 30 feet inland from the mean high water line.

(b) TERMS AND CONDITIONS.—

(1) IN GENERAL.—Any conveyance pursuant to subsection (a) shall be made—

(A) without payment of consideration; and

(B) subject to such terms and conditions as the Secretary considers appropriate.

(2) MAINTENANCE OF NAVIGATION FUNCTONS.—The Secretary shall ensure that any conveyance pursuant to this section is subject to such conditions as the Secretary considers to be necessary to assure that—

(A) the light, antennas, sound signal, towers, and associated lighthouse equipment, and any electronic navigation equipment, which are located on the Property and which are active aids to navigation shall continue to be operated and maintained by the United States for as long as they are needed for this purpose;

(B) the recipients may not interfere or allow interference in any manner with such aids to navigation without express written permission from the United States;

(C) there is reserved to the United States the right to relocate, replace, or add any aids to navigation, or make any changes on any portion of the Property as may be necessary for navigation purposes;

(D) the United States shall have the right, at any time, to enter the Property without notice for the purpose of maintaining aids to navigation;

(E) the United States shall have—

(i) an easement of access to and across the Property for the purpose of maintaining the aids to navigation and associated equipment in use on the Property; and

(ii) an easement for an arc of visibility; and

(F) the United States shall not be responsible for the cost and expense of maintenance, repair, and upkeep of the Property.

(3) MAINTENANCE OBLIGATION.—The recipients shall not have any obligation to maintain any active aid to navigation equipment on any parcel conveyed pursuant to this section.

(c) PROPERTY TO BE MAINTAINED IN ACCORDANCE WITH CERTAIN LAWS.—Each recipient shall maintain the parcel conveyed to the recipient pursuant to subsection (a) in accordance with the provisions of the National Historic Preservation Act (16 U.S.C. 470 et seq.), and other applicable laws.

(d) MAINTENANCE STANDARD.—Each recipient shall maintain the parcel conveyed to the recipient pursuant to subsection (a), at its own cost and expense, in a proper, substantial, and workmanlike manner, including the easements of access, the easement for an arc of visibility, the nuisance easement, and the underground easement.

(e) SHARED USE AND OCCUPANCY AGREEMENT.—The Secretary shall require, as a condition of each conveyance of property under this section, that all of the recipients have entered into the same agreement governing the shared use and occupancy of the existing Whitefish Point Light Station facilities. The agreement shall be drafted by the recipients and shall include—

(1) terms governing building occupancy and access of recipient staff and public visitors to public restrooms, the auditorium, and the parking lot; and

(2) terms requiring that each recipient shall be responsible for paying a pro rata share of the costs of operating and maintaining the existing Whitefish Point Light Station facilities, that is based on the level of use and occupancy of the facilities by the recipient.

(f) LIMITATIONS ON DEVELOPMENT AND IMPAIRING USES.—It shall be a term of each conveyance under this section that—

(1) no development of new facilities or expansion of existing facilities or infrastructure on property conveyed under this section may occur, except for purposes of implementing the Whitefish Point Comprehensive Plan of October 1992 or for a gift shop, unless—

(A) each of the recipients consents to the development or expansion in writing;

(B) there has been a reasonable opportunity for public comment on the development or expansion, and full consideration has been given to such public comment as is provided; and

(C) the development or expansion is consistent with preservation of the Property in its predominantly natural, scenic, historic, and forested condition; and

(2) any use of the Property or any structure located on the property which may impair or interfere with the conservation values of the Property is expressly prohibited.

(g) REVISIONARY INTEREST.—

(1) IN GENERAL.—All right, title, and interests in and to property and interests conveyed under this section shall revert to the United States and thereafter be administered by the Secretary of Interior acting through the Director of the United States Fish and Wildlife Service, if—

(A) in the case of such property and interests conveyed to the Great Lakes Shipwreck Historical Society, the property or interests cease to be used for the purpose of historical interpretation;

(B) in the case of such property and interests conveyed to the Michigan Audubon Society, the property or interests cease to be used for the purpose of environmental protection, research, and interpretation; or

(C) in the case any property and interests conveyed to a recipient referred to in subparagraph (A) or (B)—

(i) there is any violation of any term or condition of the conveyance to that recipient; or

(ii) the recipient has ceased to exist.

(2) AUTHORITY TO ENFORCE REVERSIONARY INTEREST.—The Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall have the authority—

(A) to determine for the United States Government whether any act or omission of a recipient results in a reversion of property and interests under paragraph (1); and

(B) to initiate a civil action to enforce that reversion, after notifying the recipient of the intent of the Secretary of the Interior to initiate that action.

(3) MAINTENANCE OF NAVIGATION FUNCTIONS.—In the event of a reversion of property under this subsection, the Secretary of the Interior shall administer the property subject to any conditions the Secretary of Transportation considers to be necessary to maintain the navigation functions.

SEC. 5506. CONVEYANCE OF LIGHTHOUSES.

(a) AUTHORITY TO CONVEY.—

(1) IN GENERAL.—The Secretary of Transportation or the Secretary of the Interior, as appropriate, shall convey, by an appropriate means of conveyance, all right, title, and interest of the United States in and to each of the following properties:

(A) Saint Helena Island Light Station, located in MacKinac County, Moran Township, Michigan, to the Great Lakes Lighthouse Keepers Association.

(B) Presque Isle Light Station, located in Presque Isle Township, Michigan, to Presque Isle Township, Presque Isle County, Michigan.

(2) IDENTIFICATION OF PROPERTY.—The Secretary may identify, describe, and determine the property to be conveyed under this subsection.

(3) EXCEPTION.—The Secretary may not convey any historical artifact, including any lens or lantern, located on the property at or before the time of the conveyance.

(b) TERMS OF CONVEYANCE.—

(1) IN GENERAL.—The conveyance of property under this section shall be made—

(A) without payment of consideration; and

(B) subject to the conditions required by this section and other terms and conditions the Secretary may consider appropriate.

(2) REVERSIONARY INTEREST.—In addition to any term or condition established under this section, the conveyance of property under this subsection shall be subject to the condition that all right, title, and interest in the property shall immediately revert to the United States if—

(A) the property, or any part of the property—

(i) ceases to be used as a nonprofit center for the interpretation and preservation of maritime history;

(ii) ceases to be maintained in a manner that ensures its present or future use as a Coast Guard aid to navigation; or

(iii) ceases to be maintained in a manner consistent with the provisions of the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); or

(B) at least 30 days before that reversion, the Secretary of Transportation provides written notice to the owner that the property is needed for national security purposes.

(3) MAINTENANCE OF NAVIGATION FUNCTIONS.—A conveyance of property under this section shall be made subject to the conditions that the Secretary of Transportation considers to be necessary to assure that—

(A) the lights, antennas, sound signal, electronic navigation equipment, and associated lighthouse equipment located on the property conveyed, which are active aids to navigation, shall continue to be operated and maintained by the United States for as long as they are needed for this purpose;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) the owner of the property may not interfere or allow interference in any manner with aids to navigation without express written permission from the Secretary of Transportation;

(C) there is reserved to the United States the right to relocate, replace or add any aid to navigation or make any changes to the property as may be necessary for navigational purposes;

(D) the United States shall have the right, at any time, to enter the property without notice for the purpose of maintaining aids to navigation; and

(E) the United States shall have an easement of access to and across the property for the purpose of maintaining the aids to navigation in use on the property.

(4) OBLIGATION LIMITATION.—The owner of property conveyed under this section is not required to maintain any active aid to navigation equipment on the property.

(5) PROPERTY TO BE MAINTAINED IN ACCORDANCE WITH CERTAIN LAWS.—The owner of property conveyed under this section shall maintain the property in accordance with the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.) and other applicable laws.

(c) MAINTENANCE STANDARD.—The owner of any property conveyed under this section, at its own cost and expense, shall maintain the property in a proper, substantial, and workmanlike manner.

(d) DEFINITIONS.—For purposes of this section:

(1) the term "owner" means the person identified in subsection a(1)(A) and (B), and includes any successor of assign of that person.

(2) The term "Presque Isle Light Station" includes the light tower, attached dwelling, detached dwelling, 3–car garage, and any other improvements on that parcel of land.

## CHAPTER 6

## DEPARTMENT OF THE TREASURY

## COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS

### COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND PROGRAM ACCOUNT

For an additional amount for "Community Development Financial Institutions Fund Program Account" for grants, loans, and technical assistance to qualifying community development lenders, $5,000,000, to remain available until September 30, 1998, of which $850,000 may be used for the cost of direct loans: Provided, That the cost of direct loans, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974.

## ENVIRONMENTAL PROTECTION AGENCY

### SCIENCE AND TECHNOLOGY

For an additional amount for "Science and Technology", $10,000,000, to remain available until September 30, 1998, to conduct health effects research to carry out the purposes of the Safe Drinking Water Act Amendments of 1996, Public Law 104–182.

### ENVIRONMENTAL PROGRAMS AND MANAGEMENT

For an additional amount for "Environmental Programs and Management", $42,221,000, to remain available until September 30, 1998, of which $30,000,000 is to carry out the purposes of the Safe Drinking Water Act Amendments of 1996, Public Law 104–182, and the purposes of the Food Quality Protection Act of 1996, Public Law 104–170, and of which $10,221,000 is for pesticide residue data collection for use in risk assessment activities.

### STATE AND TRIBAL ASSISTANCE GRANTS

For an additional amount for "State and Tribal Assistance Grants", $35,000,000, to remain available until expended, for a grant to the City of Boston, Massachusetts, subject to an appropriate cost share as determined by the Administrator, for the construction of wastewater treatment facilities.

## FEDERAL EMERGENCY MANAGEMENT AGENCY

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses" to increase Federal, State, and local preparedness for mitigating and responding to the consequences of terrorism, $3,000,000.

## EMERGENCY MANAGEMENT PLANNING AND ASSISTANCE

For an additional amount for "Emergency Management Planning and Assistance" to increase Federal, State, and local preparedness for mitigating and responding to the consequences of terrorism, $12,000,000.

## NATIONAL FLOOD INSURANCE FUND

<< 42 USCA § 4016 >>

Section 1309(a)(2) of the National Flood Insurance Act (42 U.S.C. 4016(a)(2)), is amended by striking "$1,000,000,000" and inserting in lieu thereof "$1,500,000,000 through September 30, 1997, and $1,000,000,000 thereafter".

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### OFFICE OF CONSUMER AFFAIRS

For necessary expenses of the Office of Consumer Affairs, including services authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for GS–18, $1,500,000: Provided, That none of the funds provided under this heading may be made available for any other activities within the Department of Health and Human Services.

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

### SCIENCE, AERONAUTICS AND TECHNOLOGY

For an additional amount for "Science, Aeronautics and Technology", $5,000,000, to remain available until September 30, 1998.

## CHAPTER 7

## INTERNATIONAL SECURITY ASSISTANCE

### NONPROLIFERATION, ANTI-TERRORISM, DEMINING AND RELATED PROGRAMS

For an additional amount for nonproliferation, anti-terrorism and related programs and activities, $18,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance.

### FOREIGN MILITARY FINANCING PROGRAM

For an additional amount for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $60,000,000.

### PEACEKEEPING OPERATIONS

For necessary expenses to carry out the provisions of section 551 of the Foreign Assistance Act of 1961, $65,000,000: Provided, That none of the funds appropriated under this paragraph shall be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

## CHAPTER 8

## GENERAL PROVISIONS

SEC. 5801. Of the amounts made available in Title IV of the Department of Defense Appropriations Act, 1997, under the heading "Research, Development, Test and Evaluation, Defense–Wide", $56,232,000 shall be made available only for the Corps Surface-to-Air Missile (CORPS SAM) program.

<< 10 USCA § 2012 NOTE >>

SEC. 5802. There is hereby established on the books of the Treasury an account, "Support for International Sporting Competitions, Defense" (hereinafter referred to in this section as the "Account") to be available until expended for logistical and security support for international sporting competitions (other than pay and non-travel-related allowances of members of the Armed Forces of the United States, except for members of the reserve components thereof called or ordered to active duty in connection with providing such support): Provided, That there shall be credited to the Account: (a) unobligated balances of the funds appropriated in Public Laws 103–335 and 104–61 under the headings "Summer Olympics"; (b) any reimbursements received by the Department of Defense in connection with support to the 1993 World University Games; the 1994 World Cup Games; and the 1996 Games of the XXVI Olympiad held in Atlanta, Georgia; (c) any reimbursements received by the Department of Defense after the date of enactment of this Act for logistical and security support provided to international sporting competitions; and (d) amounts specifically appropriated to the Account, all to remain available until expended: Provided further, That none of the funds made available to the Account may be obligated until 45 days after the congressional defense committees have been notified in writing by the Secretary of Defense as to the purpose for which these funds will be obligated.

SEC. 5803. In addition to the amounts made available in Title IV of the Department of Defense Appropriations Act, 1997, under the heading "Research, Development, Test and Evaluation, Defense–Wide", $100,000,000 is hereby appropriated and made available only for the Dual–Use Applications Program.

## DIVISION B—OREGON RESOURCE CONSERVATION ACT OF 1996

SECTION 1. SHORT TITLE.

This Act may be cited as the "Oregon Resource Conservation Act of 1996".

## TITLE I—OPAL CREEK WILDERNESS AND SCENIC RECREATION AREA

<< 16 USCA § 545b NOTE >>

SEC. 101. SHORT TITLE.

This title may be cited as the "Opal Creek Wilderness and Opal Creek Scenic Recreation Area Act of 1996".

<< 16 USCA § 545b NOTE >>

SEC. 102. DEFINITIONS.

In this title:

(1) BULL OF THE WOODS WILDERNESS.—The term "Bull of the Woods Wilderness" means the land designated as wilderness by section 3(4) of the Oregon Wilderness Act of 1984 (Public Law 98–328; 16 U.S.C. 1132 note).

(2) OPAL CREEK WILDERNESS.—The term "Opal Creek Wilderness" means certain land in the Willamette National Forest in the State of Oregon comprising approximately 12,800 acres, as generally depicted on the map entitled "Proposed Opal Creek Wilderness and Scenic Recreation Area", dated July 1996.

(3) SCENIC RECREATION AREA.—The term "Scenic Recreation Area" means the Opal Creek Scenic Recreation Area, comprising approximately 13,000 acres, as generally depicted on the map entitled "Proposed Opal Creek Wilderness and Scenic Recreation Area", dated July 1996 and established under section 104(a)(3) of this title.

(4) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

<< 16 USCA § 545b NOTE >>

SEC. 103. PURPOSES.

The purposes of this title are:

(1) to establish a wilderness and scenic recreation area to protect and provide for the enhancement of the natural, scenic, recreational, historic, and cultural resources of the area in the vicinity of Opal Creek;

(2) to protect and support the economy of the communities in the Santiam Canyon; and

(3) to provide increased protection for an important drinking water source for communities served by the north Santiam River.

<< 16 USCA § 545b NOTE >>

<< 16 USCA § 1132 NOTE >>

SEC. 104. ESTABLISHMENT OF OPAL CREEK WILDERNESS AND SCENIC RECREATION AREA.

(a) ESTABLISHMENT.—On a determination by the Secretary under subsection (b)—

(1) the Opal Creek Wilderness, as depicted on the map described in section 102(2), is hereby designated as wilderness, subject to the provisions of the Wilderness Act of 1964, shall become a component of the National Wilderness System, and shall be known as the Opal Creek Wilderness;

(2) the part of the Bull of the Woods Wilderness that is located in the Willamette National Forest shall be incorporated into the Opal Creek Wilderness; and

(3) the Secretary shall establish the Opal Creek Scenic Recreation Area in the Willamette National Forest in the State of Oregon, comprising approximately 13,000 acres, as generally depicted on the map described in section 102(3).

(b) CONDITIONS.—The designations in subsection (a) shall not take effect unless the Secretary makes a determination, not later than 2 years after the date of enactment of this title, that the following conditions have been met:

(1) the following have been donated to the United States in an acceptable condition and without encumbrances—

(A) all right, title, and interest in the following patented parcels of land—

(i) Santiam number 1, mineral survey number 992, as described in patent number 39–92–0002, dated December 11, 1991;

(ii) Ruth Quartz Mine number 2, mineral survey number 994, as described in patent number 39–91–0012, dated February 12, 1991;

(iii) Morning Star Lode, mineral survey number 993, as described in patent number 36–91–0011, dated February 12, 1991;

(B) all right, title, and interest held by any entity other than the Times Mirror Land and Timber Company, its successors and assigns, in and to lands located in section 18, township 8 south, range 5 east, Marion County, Oregon, Eureka numbers 6, 7, 8, and 13 mining claims; and

(C) an easement across the Hewitt, Starvation, and Poor Boy Mill Sites, mineral survey number 990, as described in patent number 36–91–0017, dated May 9, 1991. In the sole discretion of the Secretary, such easement may be limited to administrative use if an alternative access route, adequate and appropriate for public use, is provided.

(2) a binding agreement has been executed by the Secretary and the owners of record as of March 29, 1996, of the following interests, specifying the terms and conditions for the disposition of such interests to the United States Government—

(A) the lode mining claims known as Princess Lode, Black Prince Lode, and King number 4 Lode, embracing portions of sections 29 and 32, township 8 south, range 5 east, Willamette Meridian, Marion County, Oregon, the claims being more particularly described in the field notes and depicted on the plat of mineral survey number 887, Oregon; and

(B) Ruth Quartz Mine number 1, mineral survey number 994, as described in patent number 39–91–0012, dated February 12, 1991.

(c) ADDITIONS TO THE WILDERNESS AND SCENIC RECREATION AREAS.—

(1) Lands or interests in lands conveyed to the United States under this section shall be included in and become part of, as appropriate, Opal Creek Wilderness or the Opal Creek Scenic Recreation Area.

(2) On acquiring all or substantially all of the land located in section 36, township 8 south, range 4 east, of the Willamette Meridian, Marion County, Oregon, commonly known as the Rosboro section, by exchange, purchase from a willing seller, or by donation, the Secretary shall expand the boundary of the Scenic Recreation Area to include such land.

(3) On acquiring all or substantially all of the land located in section 18, township 8 south, range 5 east, Marion County, Oregon, commonly known as the Times Mirror property, by exchange, purchase from a willing seller, or by donation, such land shall be included in and become a part of the Opal Creek Wilderness.

AR.01653

<< 16 USCA § 545b NOTE >>

SEC. 105. ADMINISTRATION OF THE SCENIC RECREATION AREA.

(a) IN GENERAL.—The Secretary shall administer the Scenic Recreation Area in accordance with this title and the laws (including regulations) applicable to the National Forest System.

(b) OPAL CREEK MANAGEMENT PLAN.—

(1) IN GENERAL.—Not later than 2 years after the date of establishment of the Scenic Recreation Area, the Secretary, in consultation with the advisory committee established under section 106(a), shall prepare a comprehensive Opal Creek Management Plan (Management Plan) for the Scenic Recreation Area.

(2) INCORPORATION IN LAND AND RESOURCE MANAGEMENT PLAN.—Upon its completion, the Opal Creek Management Plan shall become part of the land and resource management plan for the Willamette National Forest and supersede any conflicting provision in such land and resource management plan. Nothing in this paragraph shall be construed to supersede the requirements of the Endangered Species Act or the National Forest Management Act or regulations promulgated under those Acts, or any other law.

(3) REQUIREMENTS.—The Opal Creek Management Plan shall provide for a broad range of land uses, including—

(A) recreation;

(B) harvesting of nontraditional forest products, such as gathering mushrooms and material to make baskets; and

(C) educational and research opportunities.

(4) PLAN AMENDMENTS.—The Secretary may amend the Opal Creek Management Plan as the Secretary may determine to be necessary, consistent with the procedures and purposes of this title.

(c) RECREATION.—

(1) RECOGNITION.—Congress recognizes recreation as an appropriate use of the Scenic Recreation Area.

(2) MINIMUM LEVELS.—The management plan shall permit recreation activities at not less than the levels in existence on the date of enactment of this title.

(3) HIGHER LEVELS.—The management plan may provide for levels of recreation use higher than the levels in existence on the date of enactment of this title if such uses are consistent with the protection of the resource values of Scenic Recreation Area.

(4) The management plan may include public trail access through section 28, township 8 south, range 5 east, Willamette Meridian, to Battle Axe Creek, Opal Pool and other areas in the Opal Creek Wilderness and the Opal Creek Scenic Recreation Area.

(d) TRANSPORTATION PLANNING.—

(1) IN GENERAL.—Except as provided in this subparagraph, motorized vehicles shall not be permitted in the Scenic Recreation Area. To maintain reasonable motorized and other access to recreation sites and facilities in existence on the date of enactment of this title, the Secretary shall prepare a transportation plan for the Scenic Recreation Area that:

(A) evaluates the road network within the Scenic Recreation Area to determine which roads should be retained and which roads should be closed;

(B) provides guidelines for transportation and access consistent with this title;

(C) considers the access needs of persons with disabilities in preparing the transportation plan for the Scenic Recreation Area;

(D) allows forest road 2209 beyond the gate to the Scenic Recreation Area, as depicted on the map described in 102(2), to be used by motorized vehicles only for administrative purposes and for access by private inholders, subject to such terms and conditions as the Secretary may determine to be necessary; and

(E) restricts construction on or improvements to forest road 2209 beyond the gate to the Scenic Recreation Area to maintaining the character of the road as it existed upon the date of enactment of this title, which shall not include paving or widening. In order to comply with subsection 107(b) of this title, the Secretary may make improvements to forest road 2209 and its bridge structures consistent with the character of the road as it existed on the date of enactment of this title.

(e) HUNTING AND FISHING.—

(1) IN GENERAL.—Subject to applicable Federal and State law, the Secretary shall permit hunting and fishing in the Scenic Recreation Area.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) LIMITATION.—The Secretary may designate zones in which, and establish periods when, no hunting or fishing shall be permitted for reasons of public safety, administration, or public use and enjoyment of the Scenic Recreation Area.

(3) CONSULTATION.—Except during an emergency, as determined by the Secretary, the Secretary shall consult with the Oregon State Department of Fish and Wildlife before issuing any regulation under this subsection.

(f) TIMBER CUTTING.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall prohibit the cutting and/or selling of trees in the Scenic Recreation Area.

(2) PERMITTED CUTTING.—

(A) IN GENERAL.—Subject to subparagraph (B), the Secretary may allow the cutting of trees in the Scenic Recreation Area only—

(i) for public safety, such as to control the continued spread of a forest fire in the Scenic Recreation Area or on land adjacent to the Scenic Recreation Area;

(ii) for activities related to administration of the Scenic Recreation Area, consistent with the Opal Creek Management Plan; or

(iii) for removal of hazard trees along trails and roadways.

(B) SALVAGE SALES.—The Secretary may not allow a salvage sale in the Scenic Recreation Area.

(g) WITHDRAWAL.—

(1) Subject to valid existing rights, all lands in the Scenic Recreation Area are withdrawn from—

(i) any form of entry, appropriation, or disposal under the public land laws;

(ii) location, entry, and patent under the mining laws; and

(iii) disposition under the mineral and geothermal leasing laws.

(h) BORNITE PROJECT.—

(1) Nothing in this title shall be construed to interfere with or approve any exploration, mining, or mining-related activity in the Bornite Project Area, depicted on the map described in subsection 102(3), conducted in accordance with applicable laws.

(2) Nothing in this title shall be construed to interfere with the ability of the Secretary to approve and issue, or deny, special use permits in connection with exploration, mining, and mining-related activities in the Bornite Project Area.

(3) Motorized vehicles, roads, structures, and utilities (including but not limited to power lines and water lines) may be allowed inside the Scenic Recreation Area to serve the activities conducted on land within the Bornite Project.

(4) After the date of enactment of this title, no patent or claim shall be issued for any mining claim under the general mining laws located within the Bornite Project Area.

(i) WATER IMPOUNDMENTS.—Notwithstanding the Federal Power Act (16 U.S.C. 791a et seq.), the Federal Energy Regulatory Commission may not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project work in the Scenic Recreation Area, except as may be necessary to comply with the provisions of subsection 105(h) with regard to the Bornite Project.

(j) CULTURAL AND HISTORIC RESOURCE INVENTORY.—

(1) IN GENERAL.—Not later than 1 year after the date of establishment of the Scenic Recreation Area, the Secretary shall review and revise the inventory of the cultural and historic resources on the public land in the Scenic Recreation Area developed pursuant to the Oregon Wilderness Act of 1984 (Public Law 98–328; 16 U.S.C. 1132).

(2) INTERPRETATION.—Interpretive activities shall be developed under the management plan in consultation with State and local historic preservation organizations and shall include a balanced and factual interpretation of the cultural, ecological, and industrial history of forestry and mining in the Scenic Recreation Area.

(k) PARTICIPATION.—So that the knowledge, expertise, and views of all agencies and groups may contribute affirmatively to the most sensitive present and future use of the Scenic Recreation Area and its various subareas for the benefit of the public:

(1) ADVISORY COUNCIL.—The Secretary shall consult on a periodic and regular basis with the advisory council established under section 106 with respect to matters relating to management of the Scenic Recreation Area.

(2) PUBLIC PARTICIPATION.—The Secretary shall seek the views of private groups, individuals, and the public concerning the Scenic Recreation Area.

(3) OTHER AGENCIES.—The Secretary shall seek the views and assistance of, and cooperate with, any other Federal, State, or local agency with any responsibility for the zoning, planning, or natural resources of the Scenic Recreation Area.

(4) NONPROFIT AGENCIES AND ORGANIZATIONS.—The Secretary shall seek the views of any nonprofit agency or organization that may contribute information or expertise about the resources and the management of the Scenic Recreation Area.

<< 16 USCA § 545b NOTE >>

SEC. 106. ADVISORY COUNCIL.

(a) ESTABLISHMENT.—Not later than 90 days after the establishment of the Scenic Recreation Area, the Secretary shall establish an advisory council for the Scenic Recreation Area.

(b) MEMBERSHIP.—The advisory council shall consist of not more than 13 members, of whom—

(1) 1 member shall represent Marion County, Oregon, and shall be designated by the governing body of the county;

(2) 1 member shall represent the State of Oregon and shall be designated by the Governor of Oregon; and

(3) 1 member shall represent the city of Salem, and shall be designated by the mayor of Salem, Oregon;

(4) 1 member from a city within a 25–mile radius of the Opal Creek Scenic Recreation Area, to be designated by the Governor of the State of Oregon from a list of candidates provided by the mayors of the cities located within a 25–mile radius of the Opal Creek Scenic Recreation Area; and

(5) not more than 9 members shall be appointed by the Secretary from among persons who, individually or through association with a national or local organization, have an interest in the administration of the Scenic Recreation Area, including, but not limited to, representatives of the timber industry, environmental organizations, the mining industry, inholders in the Opal Creek Wilderness and Scenic Recreation Area, economic development interests and Indian Tribes.

(c) STAGGERED TERMS.—Members of the advisory council shall serve for staggered terms of three years.

(d) CHAIRMAN.—The Secretary shall designate one member of the advisory council as chairman.

(e) VACANCIES.—The Secretary shall fill a vacancy on the advisory council in the same manner as the original appointment.

(f) COMPENSATION.—Members of the advisory council shall receive no compensation for service on the advisory council.

<< 16 USCA § 545b NOTE >>

SEC. 107. GENERAL PROVISIONS.

(a) LAND ACQUISITION.—

(1) IN GENERAL.—Subject to the other provisions of this title the Secretary may acquire any lands or interests in land in the Scenic Recreation Area or the Opal Creek Wilderness that the Secretary determines are needed to carry out this title.

(2) PUBLIC LAND.—Any lands or interests in land owned by a State or a political subdivision of a State may be acquired only by donation or exchange.

(3) CONDEMNATION.—Within the boundaries of the Opal Creek Wilderness or the Scenic Recreation Area, the Secretary may not acquire any privately owned land or interest in land without the consent of the owner unless the Secretary finds that—

(A) the nature of land use has changed significantly, or the landowner has demonstrated intent to change the land use significantly, from the use that existed on the date of the enactment of this title; and

(B) acquisition by the Secretary of the land or interest in land is essential to ensure use of the land or interest in land in accordance with the purposes of this title or the management plan prepared under section 105(b).

(4) Nothing in this title shall be construed to enhance or diminish the condemnation authority available to the Secretary outside the boundaries of the Opal Creek Wilderness or the Scenic Recreation Area.

(b) ENVIRONMENTAL RESPONSE ACTIONS AND COST RECOVERY.—

(1) RESPONSE ACTIONS.—Nothing in this title shall limit the authority of the Secretary or a responsible party to conduct an environmental response action in the Scenic Recreation Area in connection with the release, threatened release, or cleanup of a hazardous substance, pollutant, or contaminant, including a response action conducted under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.).

(2) LIABILITY.—Nothing in this title shall limit the authority of the Secretary or a responsible party to recover costs related to the release, threatened release, or cleanup of any hazardous substance or pollutant or contaminant in the Scenic Recreation Area.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(c) MAPS AND DESCRIPTION.—

 (1) IN GENERAL.—As soon as practicable after the date of enactment of this title, the Secretary shall file a map and a boundary description for the Opal Creek Wilderness and for the Scenic Recreation Area with the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

 (2) FORCE AND EFFECT.—The boundary description and map shall have the same force and effect as if the description and map were included in this title, except that the Secretary may correct clerical and typographical errors in the boundary description and map.

 (3) AVAILABILITY.—The map and boundary description shall be on file and available for public inspection in the Office of the Chief of the Forest Service, Department of Agriculture.

 (d) Nothing in this title shall interfere with any activity for which a special use permit has been issued, has not been revoked, and has not expired, before the date of enactment of this title, subject to the terms of the permit.

<< 16 USCA § 545b NOTE >>

SEC. 108. ROSBORO LAND EXCHANGE.

 (a) AUTHORIZATION.—Notwithstanding any other law, if the Rosboro Lumber Company (referred to in this section as "Rosboro") offers and conveys marketable title to the United States to the land described in subsection (b), the Secretary of Agriculture shall convey all right, title and interest held by the United States to sufficient lands described in subsection (c) to Rosboro, in the order in which they appear in subsection (c), as necessary to satisfy the equal value requirements of subsection (d).

 (b) LAND TO BE OFFERED BY ROSBORO.—The land referred to in subsection (a) as the land to be offered by Rosboro shall comprise Section 36, Township 8 South, range 4 east, Willamette Meridian.

 (c) LAND TO BE CONVEYED BY THE UNITED STATES.—The land referred to in subsection (a) as the land to be conveyed by the United States shall comprise sufficient land from the following prioritized list to be of equal value under subparagraph (d):

 (1) Section 5, Township 17 South, Range 4 East, Lot 7 (37.63 acres).

 (2) Section 2, Township 17 South, Range 4 East, Lot 3 (29.28 acres).

 (3) Section 13, Township 17 South, Range 4 East, S 1/2 SE 1/4 (80 acres).

 (4) Section 2, Township 17 South, Range 4 East, SW 1/4 SW 1/4 (40 acres).

 (5) Section 2, Township 17 South, Range 4 East, NW 1/4 SE 1/4 (40 acres).

 (6) Section 8, Township 17 South, Range 4 East, SE 1/4 SW 1/4 (40 acres).

 (7) Section 11, Township 17 South, Range 4 East, W 1/2 NW 1/4 (80 acres).

 (d) EQUAL VALUE.—The land and interests in land exchanged under this section shall be of equal market value as determined by nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Standards for Federal Land Acquisition, the Uniform Standards of Professional Appraisal Practice, or shall be equalized by way of payment of cash pursuant to the provisions of section 206(d) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(d)), and other applicable law. The appraisal shall consider access costs for the parcels involved.

 (e) TIMETABLE.—

 (1) The exchange directed by this section shall be consummated not later than 120 days after the date Rosboro offers and conveys the property described in subsection (b) to the United States.

 (2) The authority provided by this section shall lapse if Rosboro fails to offer the land described in subsection (b) within two years after the date of enactment of this title.

 (f) Rosboro shall have the right to challenge in United States District Court for the District of Oregon a determination of marketability under subsection (a) and a determination of value for the lands described in subsections (b) and (c) by the Secretary of Agriculture. The Court shall have the authority to order the Secretary to complete the transaction contemplated in this Section.

 (g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

<< 16 USCA § 545b NOTE >>

<< 16 USCA § 1274 >>

SEC. 109. DESIGNATION OF ELKHORN CREEK AS A WILD AND SCENIC RIVER.

Section 3(a) of the Wild and Scenic Rivers Act (16 U.S.C. 1274(a)) is amended by adding at the end the following:

"( )(A) ELKHORN CREEK.—The 6.4 mile segment traversing federally administered lands from that point along the Willamette National Forest boundary on the common section line between Sections 12 and 13, Township 9 South, Range 4 East, Willamette Meridian, to that point where the segment leaves federal ownership along the Bureau of Land Management boundary in Section 1, Township 9 South, Range 3 East, Willamette Meridian, in the following classes:

"(i) a 5.8–mile wild river area, extending from that point along the Willamette National Forest boundary on the common section line between Sections 12 and 13, Township 9 South, Range 4 East, Willamette Meridian, to its confluence with Buck Creek in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to be administered as agreed on by the Secretaries of Agriculture and the Interior, or as directed by the President; and

"(ii) a 0.6–mile scenic river area, extending from the confluence with Buck Creek in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to that point where the segment leaves federal ownership along the Bureau of Land Management boundary in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to be administered by the Secretary of Interior, or as directed by the President.

"(B) Notwithstanding section 3(b) of this Act, the lateral boundaries of both the wild river area and the scenic river area along Elkhorn Creek shall include an average of not more than 640 acres per mile measured from the ordinary high water mark on both sides of the river."

<< 16 USCA § 545b NOTE >>

SEC. 110. ECONOMIC DEVELOPMENT.

(a) ECONOMIC DEVELOPMENT PLAN.—As a condition for receiving funding under subsection (b) of this section, the State of Oregon, in consultation with Marion County and the Secretary of Agriculture, shall develop a plan for economic development projects for which grants under this section may be used in a manner consistent with this title and to benefit local communities in the vicinity of the Opal Creek area. Such plan shall be based on an economic opportunity study and other appropriate information.

(b) FUNDS PROVIDED TO THE STATES FOR GRANTS.—Upon completion of the Opal Creek Management Plan, and receipt of the plan referred to in subsection (a) of this section, the Secretary shall provide, subject to appropriations, $15,000,000, to the State of Oregon. Such funds shall be used to make grants or loans for economic development projects that further the purposes of this title and benefit the local communities in the vicinity of Opal Creek.

(c) REPORT.—The State of Oregon shall—

(1) prepare and provide the Secretary and Congress with an annual report on the use of the funds made available under this section;

(2) make available to the Secretary and to Congress, upon request, all accounts, financial records, and other information related to grants and loans made available pursuant to this section; and

(3) as loans are repaid, make additional grants and loans with the money made available for obligation by such repayments.

TITLE II—UPPER KLAMATH BASIN

SEC. 201. UPPER KLAMATH BASIN ECOLOGICAL RESTORATION PROJECTS.

(a) DEFINITIONS.—In this section:

(1) ECOSYSTEM RESTORATION OFFICE.—The term "Ecosystem Restoration Office" means the Klamath Basin Ecosystem Restoration Office operated cooperatively by the United States Fish and Wildlife Service, Bureau of Reclamation, Bureau of Land Management, and Forest Service.

(2) WORKING GROUP.—The term "Working Group" means the Upper Klamath Basin Working Group, established before the date of enactment of this title, consisting of members nominated by their represented groups, including:

AR.01658

384

(A) 3 tribal members;

(B) 1 representative of the city of Klamath Falls, Oregon;

(C) 1 representative of Klamath County, Oregon;

(D) 1 representative of institutions of higher education in the Upper Klamath Basin;

(E) 4 representatives of the environmental community, including at least one such representative from the State of California with interests in the Klamath Basin National Wildlife Refuge Complex;

(F) 4 representatives of local businesses and industries, including at least one representative of the wood products industry and one representative of the ocean commercial fishing industry and/or the recreational fishing industry based in either Oregon or California;

(G) 4 representatives of the ranching and farming community, including representatives of Federal lease-land farmers and ranchers and of private land farmers and ranchers in the Upper Klamath Basin;

(H) 2 representatives from State of Oregon agencies with authority and responsibility in the Klamath River Basin, including one from the Oregon Department of Fish and Wildlife and one from the Oregon Water Resources Department;

(I) 4 representatives from the local community;

(J) 1 representative each from the following Federal resource management agencies in the Upper Klamath Basin: Fish and Wildlife Service, Bureau of Reclamation, Bureau of Land Management, Bureau of Indian Affairs, Forest Service, Natural Resources Conservation Service, National Marine Fisheries Service and Ecosystem Restoration Office; and

(K) 1 representative of the Klamath County Soil and Water Conservation District.

(3) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(4) TASK FORCE.—The term "Task Force" means the Klamath River Basin Fisheries Task Force as established by the Klamath River Basin Fishery Resource Restoration Act (Public Law 99–552, 16 U.S.C. 460ss–3, et. seq.).

(5) COMPACT COMMISSION.—The term "Compact Commission" means the Klamath River Basin Compact Commission created pursuant to the Klamath River Compact Act of 1954.

(6) CONSENSUS.—The term "consensus" means a unanimous agreement by the Working Group members present and consisting of at least a quorum at a regularly scheduled business meeting.

(7) QUORUM.—The term "quorum" means one more than half of those qualified Working Group members appointed and eligible to serve.

(8) TRINITY TASK FORCE.—The term "Trinity Task Force" means the Trinity River Restoration Task Force created by Public Law 98–541, as amended by Public Law 104–143.

(b) IN GENERAL.—

(1) The Working Group through the Ecosystem Restoration Office, with technical assistance from the Secretary, will propose ecological restoration projects, economic development and stability projects, and projects designed to reduce the impacts of drought conditions to be undertaken in the Upper Klamath Basin based on a consensus of the Working Group membership.

(2) The Secretary shall pay, to the greatest extent feasible, up to 50 percent of the cost of performing any project approved by the Secretary or his designee, up to a total amount of $1,000,000 during each of fiscal years 1997 through 2001.

(3) Funds made available under this title through the Department of the Interior or the Department of Agriculture shall be distributed through the Ecosystem Restoration Office.

(4) The Ecosystem Restoration Office may utilize not more than 15 percent of all Federal funds administered under this section for administrative costs relating to the implementation of this title.

(5) All funding recommendations developed by the Working Group shall be based on a consensus of Working Group members.

(c) COORDINATION.—

(1) The Secretary shall formulate a cooperative agreement among the Working Group, the Task Force, the Trinity Task Force and the Compact Commission for the purposes of ensuring that projects proposed and funded through the Working Group are consistent with other basin-wide fish and wildlife restoration and conservation plans, including but not limited to plans developed by the Task Force and the Compact Commission.

(2) To the greatest extent practicable, the Working Group shall provide notice to, and accept input from, two members each of the Task Force, the Trinity Task Force, and the Compact Commission, so appointed by those entities, for the express purpose of facilitating better communication and coordination regarding additional basin-wide fish and wildlife and ecosystem restoration and planning efforts. The roles and relationships of the entities involved shall be clarified in the cooperative agreement.

(d) PUBLIC MEETINGS.—The Working Group shall conduct all meetings subject to applicable open meeting and public participation laws. The chartering requirements of 5 U.S.C. App 2 ss 1–15 are hereby deemed to have been met by this section.

(e) TERMS AND VACANCIES.—Working Group members shall serve for 3–year terms, beginning on the date of enactment of this title. Vacancies which occur for any reason after the date of enactment of this title shall be filled by direct appointment of the governor of the State of Oregon, in consultation with the Secretary of the Interior and the Secretary of Agriculture, in accordance with nominations from the appropriate groups, interests, and government agencies outlined in subsection (a)(2).

(f) RIGHTS, DUTIES AND AUTHORITIES UNAFFECTED.—The Working Group will supplement, rather than replace, existing efforts to manage the natural resources of the Klamath Basin. Nothing in this title affects any legal right, duty or authority of any person or agency, including any member of the working group.

(g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this title $1,000,000 for each of fiscal years 1997 through 2002.

TITLE III—DESCHUTES BASIN

SEC. 301. DESCHUTES BASIN ECOSYSTEM RESTORATION PROJECTS.

(a) DEFINITIONS.—In this section:

(1) WORKING GROUP.—The term "Working Group" means the Deschutes River Basin Working Group established before the date of enactment of this title, consisting of members nominated by their represented groups, including:

(A) 5 representatives of private interests including one each from hydroelectric production, livestock grazing, timber, land development, and recreation/tourism;

(B) 4 representatives of private interests including two each from irrigated agriculture and the environmental community;

(C) 2 representatives from the Confederated Tribes of the Warm Springs Reservation of Oregon;

(D) 2 representatives from Federal agencies with authority and responsibility in the Deschutes River Basin, including one from the Department of the Interior and one from the Agriculture Department;

(E) 2 representatives from the State of Oregon agencies with authority and responsibility in the Deschutes River Basin, including one from the Oregon Department of Fish and Wildlife and one from the Oregon Water Resources Department; and

(F) 4 representatives from county or city governments within the Deschutes River Basin county and/or city governments.

(2) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(3) FEDERAL AGENCIES.—The term "Federal agencies" means agencies and departments of the United States, including, but not limited to, the Bureau of Reclamation, Bureau of Indian Affairs, Bureau of Land Management, Fish and Wildlife Service, Forest Service, Natural Resources Conservation Service, Farm Services Agency, the National Marine Fisheries Service, and the Bonneville Power Administration.

(4) CONSENSUS.—The term "consensus" means a unanimous agreement by the Working Group members present and constituting at least a quorum at a regularly scheduled business meeting.

(5) QUORUM.—The term "quorum" means one more than half of those qualified Working Group members appointed and eligible to serve.

(b) IN GENERAL.—

(1) The Working Group will propose ecological restoration projects on both Federal and non-Federal lands and waters to be undertaken in the Deschutes River Basin based on a consensus of the Working Group, provided that such projects, when involving Federal land or funds, shall be proposed to the Bureau of Reclamation in the Department of the Interior and any other Federal agency with affected land or funds.

(2) The Working Group will accept donations, grants or other funds and place such funds received into a trust fund, to be expended on ecological restoration projects which, when involving Federal land or funds, are approved by the affected Federal agency.

(3) The Bureau of Reclamation shall pay from funds authorized under subsection (h) of this title up to 50 percent of the cost of performing any project proposed by the Working Group and approved by the Secretary, up to a total amount of $1,000,000 during each of the fiscal years 1997 through 2001.

(4) Non–Federal contributions to project costs for purposes of computing the Federal matching share under paragraph (3) of this subsection may include in-kind contributions.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(5) Funds authorized in subsection (h) of this title shall be maintained in and distributed by the Bureau of Reclamation in the Department of the Interior. The Bureau of Reclamation shall not expend more than 5 percent of amounts appropriated pursuant to subsection (h) for Federal administration of such appropriations pursuant to this title.

(6) The Bureau of Reclamation is authorized to provide by grant to the Working Group not more than 5 percent of funds appropriated pursuant to subsection (h) of this title for not more than 50 percent of administrative costs relating to the implementation of this title.

(7) The Federal agencies with authority and responsibility in the Deschutes River Basin shall provide technical assistance to the Working Group and shall designate representatives to serve as members of the Working Group.

(8) All funding recommendations developed by the Working Group shall be based on a consensus of the Working Group members.

(c) PUBLIC NOTICE AND PARTICIPATION.—The Working Group shall conduct all meetings subject to applicable open meeting and public participation laws. The chartering requirements of 5 U.S.C. App 2 ss 1–15 are hereby deemed to have been met by this section.

(d) PRIORITIES.—The Working Group shall give priority to voluntary market-based economic incentives for ecosystem restoration including, but not limited to, water leases and purchases; land leases and purchases; tradable discharge permits; and acquisition of timber, grazing, and land development rights to implement plans, programs, measures, and projects.

(e) TERMS AND VACANCIES.—Members of the Working Group representing governmental agencies or entities shall be named by the represented government agency. Members of the Working Group representing private interests shall be named in accordance with the articles of incorporation and bylaws of the Working Group. Representatives from Federal agencies will serve for terms of 3 years. Vacancies which occur for any reason after the date of enactment of this title shall be filled in accordance with this title.

(f) ADDITIONAL PROJECTS.—Where existing authority and appropriations permit, Federal agencies may contribute to the implementation of projects recommended by the Working Group and approved by the Secretary.

(g) RIGHTS, DUTIES AND AUTHORITIES UNAFFECTED.—The Working Group will supplement, rather than replace, existing efforts to manage the natural resources of the Deschutes Basin. Nothing in this title affects any legal right, duty or authority of any person or agency, including any member of the working group.

(h) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this title $1,000,000 for each of fiscal years 1997 through 2001.

TITLE IV—MOUNT HOOD CORRIDOR

SEC. 401. LAND EXCHANGE.

(a) AUTHORIZATION.—Notwithstanding any other law, if Longview Fibre Company (referred to in this section as "Longview") offers and conveys title that is acceptable to the United States to some or all of the land described in subsection (b), the Secretary of the Interior (referred to in this section as the "Secretary") shall convey to Longview title to some or all of the land described in subsection (c), as necessary to satisfy the requirements of subsection (d).

(b) LAND TO BE OFFERED BY LONGVIEW.—The land referred to in subsection (a) as the land to be offered by Longview are those lands depicted on the map entitled "Mt. Hood Corridor Land Exchange Map", dated July 18, 1996.

(c) LAND TO BE CONVEYED BY THE SECRETARY.—The land referred to in subsection (a) as the land to be conveyed by the Secretary are those lands depicted on the map entitled "Mt. Hood Corridor Land Exchange Map", dated July 18, 1996.

(d) EQUAL VALUE.—The land and interests in land exchanged under this section shall be of equal market value as determined by nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Standards for Federal Land Acquisition, the Uniform Standards of Professional Appraisal Practice, or shall be equalized by way of payment of cash pursuant to the provisions of section 206(d) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(d)), and other applicable law.

(e) REDESIGNATION OF LAND TO MAINTAIN REVENUE FLOW.—So as to maintain the current flow of revenue from land subject to the Act entitled "An Act relating to the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant land situated in the State of Oregon", approved August 28, 1937 (43 U.S.C. 1181a et seq.), the Secretary may redesignate public domain land located in and west of Range 9 East, Willamette Meridian, Oregon, as land subject to that Act.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 1685 of 3864

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

(f) TIMETABLE.—The exchange directed by this section shall be consummated not later than 1 year after the date of enactment of this title.

(g) WITHDRAWAL OF LANDS.—All lands managed by the Department of the Interior, Bureau of Land Management, located in Townships 2 and 3 South, Ranges 6 and 7 East, Willamette Meridian, which can be seen from the right-of-way of U.S. Highway 26 (in this section, such lands are referred to as the "Mt. Hood Corridor Lands"), shall be managed primarily for the protection or enhancement of scenic qualities. Management prescriptions for other resource values associated with these lands shall be planned and conducted for purposes other than timber harvest, so as not to impair the scenic qualities of the area.

(h) TIMBER CUTTING.—Timber cutting may be conducted on Mt. Hood Corridor Lands following a resource-damaging catastrophic event. Such cutting may only be conducted to achieve the following resource management objectives, in compliance with the current land use plans—

  (1) to maintain safe conditions for the visiting public;

  (2) to control the continued spread of forest fire;

  (3) for activities related to administration of the Mt. Hood Corridor Lands; or

  (4) for removal of hazard trees along trails and roadways.

(i) ROAD CLOSURE.—The forest road gate located on Forest Service Road 2503, located in T. 2 S., R. 6 E., sec. 14, shall remain closed and locked to protect resources and prevent illegal dumping and vandalism. Access to this road shall be limited to—

  (1) Federal and State officers and employees acting in an official capacity;

  (2) employees and contractors conducting authorized activities associated with the telecommunication sites located in T. 2 S., R. 6 E., sec. 14; and

  (3) the general public for recreational purposes, except that all motorized vehicles will be prohibited.

(j) NEPA EXEMPTION.—The National Environmental Policy Act of 1969 (P.L. 91–190) shall not apply to this section for one year after the date of enactment of this title.

(k) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

<< 25 USCA § 715c >>

TITLE V—COQUILLE TRIBAL FOREST

SEC. 501. CREATION OF THE COQUILLE FOREST.

(a) The Coquille Restoration Act (P.L. 101–42) is amended by inserting at the end of section 5 the following:

"(d) CREATION OF THE COQUILLE FOREST.—

"(1) DEFINITIONS.—In this subsection:

  "(A) the term 'Coquille Forest' means certain lands in Coos County, Oregon, comprising approximately 5,400 acres, as generally depicted on the map entitled 'Coquille Forest Proposal', dated July 8, 1996.

  "(B) the term 'Secretary' means the Secretary of the Interior.

  "(C) the term 'the Tribe' means the Coquille Tribe of Coos County, Oregon.

"(2) MAP.—The map described in subparagraph (d)(1)(A), and such additional legal descriptions which are applicable, shall be placed on file at the local District Office of the Bureau of Land Management, the Agency Office of the Bureau of Indian Affairs, and with the Senate Committee on Energy and Natural Resources and the House Committee on Resources.

"(3) INTERIM PERIOD.—From the date of enactment of this subsection until two years after the date of enactment of this subsection, the Bureau of Land Management shall:

  "(A) retain Federal jurisdiction for the management of lands designated under this subsection as the Coquille Forest and continue to distribute revenues from such lands in a manner consistent with existing law; and,

  "(B) prior to advertising, offering or awarding any timber sale contract on lands designated under this subsection as the Coquille Forest, obtain the approval of the Assistant Secretary for Indian Affairs, acting on behalf of and in consultation with the Tribe.

"(4) TRANSITION PLANNING AND DESIGNATION.—

"(A) During the two year interim period provided for in paragraph (3), the Assistant Secretary for Indian Affairs, acting on behalf of and in consultation with the Tribe, is authorized to initiate development of a forest management plan for the Coquille Forest. The Secretary, acting through the Director of the Bureau of Land Management, shall cooperate and assist in the development of such plan and in the transition of forestry management operations for the Coquille Forest to the Assistant Secretary for Indian Affairs.

"(B) Two years after the date of enactment of this subsection, the Secretary shall take the lands identified under subparagraph (d)(1)(A) into trust, and shall hold such lands in trust, in perpetuity, for the Coquille Tribe. Such lands shall be thereafter designated as the Coquille Forest.

"(C) So as to maintain the current flow of revenue from land subject to the Act entitled 'An Act relating to the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant land situated in the State of Oregon' (the O & C Act), approved August 28, 1937 (43 U.S.C. 1181a et seq.), the Secretary shall redesignate, from public domain lands within the tribe's service area, as defined in this Act, certain lands to be subject to the O & C Act. Lands redesignated under this subparagraph shall not exceed lands sufficient to constitute equivalent timber value as compared to lands constituting the Coquille Forest.

"(5) MANAGEMENT.—The Secretary of Interior, acting through the Assistant Secretary for Indian Affairs, shall manage the Coquille Forest under applicable State and Federal forestry and environmental protection laws, and subject to critical habitat designations under the Endangered Species Act, and subject to the standards and guidelines of Federal forest plans on adjacent or nearby Federal lands, now and in the future. The Secretary shall otherwise manage the Coquille Forest in accordance with the laws pertaining to the management of Indian Trust lands and shall distribute revenues in accord with Public Law 101–630, 25 U.S.C. 3107.

"(A) Unprocessed logs harvested from the Coquille Forest shall be subject to the same Federal statutory restrictions on export to foreign Nations that apply to unprocessed logs harvested from Federal lands.

"(B) Notwithstanding any other provision of law, all sales of timber from land subject to this subsection shall be advertised, offered and awarded according to competitive bidding practices, with sales being awarded to the highest responsible bidder.

"(6) INDIAN SELF DETERMINATION ACT AGREEMENT.—No sooner than two years after the date of enactment of this subsection, the Secretary may, upon a satisfactory showing of management competence and pursuant to the Indian Self–Determination Act (25 U.S.C. 450 et seq.), enter into a binding Indian self-determination agreement (agreement) with the Coquille Indian Tribe. Such agreement may provide for the tribe to carry out all or a portion of the forest management for the Coquille Forest.

"(A) Prior to entering such an agreement, and as a condition of maintaining such an agreement, the Secretary must find that the Coquille Tribe has entered into a binding memorandum of agreement (MOA) with the State of Oregon, as required under paragraph 7.

"(B) The authority of the Secretary to rescind the Indian self-determination agreement shall not be encumbered.

"(i) The Secretary shall rescind the agreement upon a demonstration that the tribe and the State of Oregon are no longer engaged in a memorandum of agreement as required under paragraph 7.

"(ii) The Secretary may rescind the agreement on a showing that the Tribe has managed the Coquille Forest in a manner inconsistent with this subsection, or the Tribe is no longer managing, or capable of managing, the Coquille Forest in a manner consistent with this subsection.

"(7) MEMORANDUM OF AGREEMENT.—The Coquille Tribe shall enter into a memorandum of agreement (MOA) with the State of Oregon relating to the establishment and management of the Coquille Forest. The MOA shall include, but not be limited to, the terms and conditions for managing the Coquille Forest in a manner consistent with paragraph (5) of this subsection, preserving public access, advancing jointly-held resource management goals, achieving tribal restoration objectives and establishing a coordinated management framework. Further, provisions set forth in the MOA shall be consistent with federal trust responsibility requirements applicable to Indian trust lands and paragraph (5) of this subsection.

"(8) PUBLIC ACCESS.—The Coquille Forest shall remain open to public access for purposes of hunting, fishing, recreation and transportation, except when closure is required by state or federal law, or when the Coquille Indian Tribe and the State of Oregon agree in writing that restrictions on access are necessary or appropriate to prevent harm to natural resources, cultural resources or environmental quality; *Provided,* That the State of Oregon's agreement shall not be required when immediate action is necessary to protect archeological resources.

"(9) JURISDICTION.—

"(A) The United States District Court for the District of Oregon shall have jurisdiction over actions against the Secretary arising out of claims that this subsection has been violated. Consistent with existing precedents on standing to sue, any affected citizen may bring suit against the Secretary for violations of this subsection, except that suit may not be brought against the Secretary for claims that the MOA has been violated. The Court has the authority to hold unlawful and set aside actions pursuant to this subsection that are arbitrary and capricious, an abuse of discretion, or otherwise an abuse of law.

"(B) The United States District Court for the District of Oregon shall have jurisdiction over actions between the State of Oregon and the Tribe arising out of claims of breach of the MOA.

"(C) Unless otherwise provided for by law, remedies available under this subsection shall be limited to equitable relief and shall not include damages.

"(10) STATE REGULATORY AND CIVIL JURISDICTION.—In addition to the jurisdiction described in paragraph 7 of this subsection, the State of Oregon may exercise exclusive regulatory civil jurisdiction, including but not limited to adoption and enforcement of administrative rules and orders, over the following subjects:

"(A) management, allocation and administration of fish and wildlife resources, including but not limited to establishment and enforcement of hunting and fishing seasons, bag limits, limits on equipment and methods, issuance of permits and licenses, and approval or disapproval of hatcheries, game farms, and other breeding facilities; Provided, That nothing herein shall be construed to permit the State of Oregon to manage fish or wildlife habitat on Coquille Forest lands;

"(B) allocation and administration of water rights, appropriation of water and use of water;

"(C) regulation of boating activities, including equipment and registration requirements, and protection of the public's right to use the waterways for purposes of boating or other navigation;

"(D) fills and removals from waters of the State, as defined in Oregon law;

"(E) protection and management of the State's proprietary interests in the beds and banks of navigable waterways;

"(F) regulation of mining, mine reclamation activities, and exploration and drilling for oil and gas deposits;

"(G) regulation of water quality, air quality (including smoke management), solid and hazardous waste, and remediation of releases of hazardous substances;

"(H) regulation of the use of herbicides and pesticides; and

"(I) enforcement of public health and safety standards, including standards for the protection of workers, well construction and codes governing the construction of bridges, buildings, and other structures.

"(11) SAVINGS CLAUSE, STATE AUTHORITY.—

"(A) Nothing in this subsection shall be construed to grant tribal authority over private or State-owned lands.

"(B) To the extend that the State of Oregon is regulating the foregoing areas pursuant to a delegated Federal authority or a Federal program, nothing in this subsection shall be construed to enlarge or diminish the State's authority under such law.

"(C) Where both the State of Oregon and the United States are regulating, nothing herein shall be construed to alter their respective authorities.

"(D) To the extent that Federal law authorizes the Coquille Indian Tribe to assume regulatory authority over an area, nothing herein shall be construed to enlarge or diminish the tribe's authority to do so under such law.

"(E) Unless and except to the extent that the tribe has assumed jurisdiction over the Coquille Forest pursuant to Federal law, or otherwise with the consent of the State, the State of Oregon shall have jurisdiction and authority to enforce its laws addressing the subjects listed in subparagraph 10 of this subsection on the Coquille Forest against the Coquille Indian Tribe, its members and all other persons and entities, in the same manner and with the same remedies and protections and appeal rights as otherwise provided by general Oregon law. Where the State of Oregon and Coquille Indian Tribe agree regarding the exercise of tribal civil regulatory jurisdiction over activities on the Coquille Forest lands, the tribe may exercise such jurisdiction as is agreed upon.

"(12) In the event of a conflict between Federal and State law under this subsection, Federal law shall control."

<div align="center">

TITLE VI—BULL RUN WATERSHED PROTECTION

<< 16 USCA § 482b NOTE >>

</div>

SEC. 601. The first sentence of section 2(a) of Public Law 95–200 is amended after "referred to in this subsection (a)" by striking "2(b)" and inserting in lieu thereof "2(c)".

<< 16 USCA § 482b NOTE >>

SEC. 602. The first sentence of section 2(b) of Public Law 95–200 is amended after "the policy set forth in subsection (a)" by inserting "and (b)".

<< 16 USCA § 482b NOTE >>

SEC. 603. Section 2(b) of Public Law 95–200 is redesignated as "2(c)".

<< 16 USCA § 482b NOTE >>

SEC. 604(a) Public Law 95–200 is amended by adding a new subsection 2(b) immediately after subsection 2(a), as follows: "(b) TIMBER CUTTING.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary of Agriculture shall prohibit the cutting of trees in that part of the unit consisting of the hydrographic boundary of the Bull Run River Drainage, including certain lands within the unit and located below the headworks of the city of Portland, Oregon's water storage and delivery project, and as depicted in a map dated July 22, 1996 and entitled "Bull Run River Drainage".

(2) PERMITTED CUTTING.—

(A) IN GENERAL.—Subject to subparagraph (B), the Secretary of Agriculture shall prohibit the cutting of trees in the area described in paragraph (1).

(B) PERMITTED CUTTING.—Subject to subparagraph (C), the Secretary may only allow the cutting of trees in the area described in paragraph (1)—

(i) for the protection or enhancement of water quality in the area described in paragraph (1); or

(ii) for the protection, enhancement, or maintenance of water quantity available from the area described in paragraph (1); or

(iii) for the construction, expansion, protection or maintenance of municipal water supply facilities; or

(iv) for the construction, expansion, protection or maintenance of facilities for the transmission of energy through and over the unit or previously authorized hydroelectric facilities or hydroelectric projects associated with municipal water supply facilities.

(C) SALVAGE SALES.—The Secretary of Agriculture may not authorize a salvage sale in the area described in paragraph (1)."

(b) Redesignate subsequent subsections of Public Law 95–200 accordingly.

SEC. 605. REPORT TO CONGRESS.

(a) The Secretary of Agriculture shall, in consultation with the city of Portland and other affected parties, undertake a study of that part of the Little Sandy Watershed that is within the unit (hereinafter referred to as the "study area"), as depicted on the map described in section 604 of this title.

(b) The study referred to in (a) shall determine—

(1) the impact of management activities within the study area on the quality of drinking water provided to the Portland Metropolitan area;

(2) the identity and location of certain ecological features within the study area, including late successional forest characteristics, aquatic and terrestrial wildlife habitat, significant hydrological values, or other outstanding natural features; and

(3) the location and extent of any significant cultural or other values within the study area.

(c) The study referred to in subsection (a) shall include both legislative and regulatory recommendations to Congress on the future management of the study area. In formulating such recommendations, the Secretary shall consult with the city of Portland and other affected parties.

(d) To the greatest extent possible, the Secretary shall use existing data and processes to carry out this study and report.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(e) The study referred to in subsection (a) shall be submitted to the Senate Committees on Energy and Natural Resources and Agriculture and the House Committees on Resources and Agriculture not later than one year from the date of enactment of this section.

(f) The Secretary is prohibited from advertising, offering or awarding any timber sale within the study area for a period of two years after the date of enactment of this section.

(g) Nothing in this section shall in any way affect any State or Federal law governing appropriation, use of or Federal right to water on or flowing through National Forest System lands. Nothing in this section is intended to influence the relative strength of competing claims to the waters of the Little Sandy River. Nothing in this section shall be construed to expand or diminish Federal, State, or local jurisdiction, responsibility, interests, or rights in water resources development or control, including rights in and current uses of water resources in the unit.

SEC. 606. Lands within the Bull Run Management Unit, as defined in Public Law 95–200, but not contained within the Bull Run River Drainage, as defined by this title and as depicted on the map dated July 1996 described in Section 604 of this title, shall continue to be managed in accordance with Public Law 95–200.

<< 16 USCA § 1132 NOTE >>

TITLE VII—OREGON ISLANDS WILDERNESS, ADDITIONS

SEC. 701. OREGON ISLANDS WILDERNESS, ADDITIONS.

(a) In furtherance of the purposes of the Wilderness Act of 1964, certain lands within the boundaries of the Oregon Islands National Wildlife Refuge, Oregon, comprising approximately ninety-five acres and as generally depicted on a map entitled "Oregon Island Wilderness Additions—Proposed" dated August 1996, are hereby designated as wilderness. The map shall be on file and available for public inspection in the offices of the Fish and Wildlife Service, Department of the Interior.

(b) All other federally owned named, unnamed, surveyed and unsurveyed rocks, reefs, islets and islands lying within three geographic miles off the coast of Oregon and above mean high tide, not currently designated as wilderness and also within the Oregon Islands National Wildlife Refuge boundaries under the administration of the United States Fish and Wildlife Service, Department of the Interior, as designated by Executive Order 7035, Proclamation 2416, Public Land Orders 4395, 4475 and 6287, and Public Laws 91–504 and 95–450, are hereby designated as wilderness.

(c) All federally owned named, unnamed, surveyed and unsurveyed rocks, reefs, islets and islands lying within three geographic miles off the coast of Oregon and above mean high tide, and presently under the jurisdiction of the Bureau of Land Management, except Chiefs Island, are hereby designated as wilderness, shall become part of the Oregon Islands National Wildlife Refuge and the Oregon Islands Wilderness and shall be under the jurisdiction of the United States Fish and Wildlife Service, Department of the Interior.

(d) As soon as practicable after this title takes effect, a map of the wilderness area and a description of its boundaries shall be filed with the Senate Committee on Energy and Natural Resources and the House Committee on Resources, and such map shall have the same force and effect as if included in this title: Provided, however, That correcting clerical and typographical errors in the map and land descriptions may be made.

(e) Public Land Order 6287 of June 16, 1982, which withdrew certain rocks, reefs, islets and islands lying within three geographical miles off the coast of Oregon and above mean high tide, including the ninety-five acres described in subsection (a), as an addition to the Oregon Islands National Wildlife Refuge is hereby made permanent.

TITLE VIII—UMPQUA RIVER LAND EXCHANGE STUDY

SEC. 801. UMPQUA RIVER LAND EXCHANGE STUDY: POLICY AND DIRECTION.

(a) IN GENERAL.—The Secretaries of the Interior and Agriculture (Secretaries) are hereby authorized and directed to consult, coordinate, and cooperate with the Umpqua Land Exchange Project (ULEP), affected units and agencies of State and local government, and, as appropriate, the World Forestry Center and National Fish and Wildlife Foundation, to assist ULEP's ongoing efforts in studying and analyzing land exchange opportunities in the Umpqua River basin and to provide scientific, technical,

research, mapping and other assistance and information to such entities. Such consultation, coordination, and cooperation shall at a minimum include, but not be limited to:

(1) working with ULEP to develop or assemble comprehensive scientific and other information (including comprehensive and integrated mapping) concerning the Umpqua River Basin's resources of forest, plants, wildlife, fisheries (anadromous and other), recreational opportunities, wetlands, riparian habitat, and other physical or natural resources;

(2) working with ULEP to identify general or specific areas within the basin where land exchanges could promote consolidation of forestland ownership for long-term, sustained timber production; protection and restoration of habitat for plants, fish, and wildlife (including any federally listed threatened or endangered species); protection of drinking water supplies; recovery of threatened and endangered species; protection and restoration of wetlands, riparian lands, and other environmentally sensitive areas; consolidation of land ownership for improved public access and a broad array of recreational uses; and consolidation of land ownership to achieve management efficiency and reduced costs of administration; and

(3) developing a joint report for submission to the Congress which discusses land exchange opportunities in the basin and outlines either a specific land exchange proposal or proposals which may merit consideration by the Secretaries or the Congress, or ideas and recommendations for new authorizations, direction, or changes in existing law or policy to expedite and facilitate the consummation of beneficial land exchanges in the basin via administrative means.

(b) MATTERS FOR SPECIFIC STUDY.—In analyzing land exchange opportunities with ULEP, the Secretaries shall give priority to assisting ULEP's ongoing efforts in:

(1) studying, identifying, and mapping areas where the consolidation of land ownership via land exchanges could promote the goals of long term species and watershed protection and utilization, including but not limited to the goals of the Endangered Species Act of 1973 more effectively than current land ownership patterns and whether any changes in law or policy applicable to such lands after consummation of an exchange would be advisable or necessary to achieve such goals;

(2) studying, identifying and mapping areas where land exchanges might be utilized to better satisfy the goals of sustainable timber harvest, including studying whether changes in existing law or policy applicable to such lands after consummation of an exchange would be advisable or necessary to achieve such goals;

(3) identifying issues and studying options and alternatives, including possible changes in existing law or policy, to insure that combined post-exchange revenues to units of local government from State and local property, severance, and other taxes or levies and shared Federal land receipts will approximate pre-exchange revenues;

(4) identifying issues and studying whether possible changes in law, special appraisal instruction, or changes in certain Federal appraisal procedures might be advisable or necessary to facilitate the appraisal of potential exchange lands which may have special characteristics or restrictions affecting land values;

(5) identifying issues and studying options and alternatives, including changes in existing laws or policy, for achieving land exchanges without reducing the net supply of timber available to small businesses;

(6) identifying, mapping, and recommending potential changes in land use plans, land classifications, or other actions which might be advisable or necessary to expedite, facilitate or consummate land exchanges in certain areas;

(7) analyzing potential sources for new or enhanced Federal, State, or other funding to promote improved resource protection, species recovery, and management in the basin; and

(8) identifying and analyzing whether increased efficiency and better land and resource management could occur through either consolidation of Federal forest management under one agency or exchange lands between the Forest Service and the Bureau of Land Management.

## SEC. 802. REPORT TO CONGRESS.

No later than February 1, 1998, ULEP and the Secretaries shall submit a joint report to the Committee on Resources of the United States House of Representatives and to the Committee on Energy and Natural Resources of the United States Senate concerning their studies, findings, recommendations, mapping and other activities conducted pursuant to this title.

## SEC. 803. AUTHORIZATION OF APPROPRIATIONS.

In furtherance of the purposes of this title, there is hereby authorized to be appropriated the sum of $2 million, to remain available until expended.

DIVISION C—ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

SEC. 1. SHORT TITLE OF DIVISION; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; APPLICATION OF DEFINITIONS OF SUCH ACT; TABLE OF CONTENTS OF DIVISION; SEVERABILITY.

<< 8 USCA § 1101 NOTE >>

(a) SHORT TITLE.—This division may be cited as the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—

(1) whenever in this division an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered to be made to that section or provision in the Immigration and Nationality Act; and

(2) amendments to a section or other provision are to such section or other provision before any amendment made to such section or other provision elsewhere in this division.

(c) APPLICATION OF CERTAIN DEFINITIONS.—Except as otherwise specifically provided in this division, for purposes of titles I and VI of this division, the terms "alien", "Attorney General", "border crossing identification card", "entry", "immigrant", "immigrant visa", "lawfully admitted for permanent residence", "national", "naturalization", "refugee", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act.

(d) TABLE OF CONTENTS OF DIVISION.—The table of contents of this division is as follows:

Sec. 1. Short title of division; amendments to Immigration and Nationality Act; application of definitions of such Act; table of contents of division; severability.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

Subtitle A—Improved Enforcement at the Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Hiring and training standards.
Sec. 107. Report on border strategy.
Sec. 108. Criminal penalties for high speed flights from immigration checkpoints.
Sec. 109. Joint study of automated data collection.
Sec. 110. Automated entry-exit control system.
Sec. 111. Submission of final plan on realignment of border patrol positions from interior stations.
Sec. 112. Nationwide fingerprinting of apprehended aliens.

Subtitle B—Facilitation of Legal Entry

Sec. 121. Land border inspectors.
Sec. 122. Land border inspection and automated permit pilot projects.
Sec. 123. Preinspection at foreign airports.
Sec. 124. Training of airline personnel in detection of fraudulent documents.
Sec. 125. Preclearance authority.

Subtitle C—Interior Enforcement

Sec. 131. Authorization of appropriations for increase in number of certain investigators.
Sec. 132. Authorization of appropriations for increase in number of investigators of visa overstayers.
Sec. 133. Acceptance of State services to carry out immigration enforcement.

Sec. 134. Minimum State INS presence.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

Sec. 201. Wiretap authority for investigations of alien smuggling or document fraud.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

Subtitle B—Deterrence of Document Fraud

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New document fraud offenses; new civil penalties for document fraud.
Sec. 213. New criminal penalty for failure to disclose role as preparer of false application for immigration benefits.
Sec. 214. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 215. Criminal penalty for false claim to citizenship.
Sec. 216. Criminal penalty for voting by aliens in Federal election.
Sec. 217. Criminal forfeiture for passport and visa related offenses.
Sec. 218. Penalties for involuntary servitude.
Sec. 219. Admissibility of videotaped witness testimony.
Sec. 220. Subpoena authority in document fraud enforcement.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary departure (revised and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

Subtitle B—Criminal Alien Provisions

Sec. 321. Amended definition of aggravated felony.
Sec. 322. Definition of conviction and term of imprisonment.
Sec. 323. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 324. Penalty for reentry of deported aliens.
Sec. 325. Change in filing requirement.
Sec. 326. Criminal alien identification system.
Sec. 327. Appropriations for criminal alien tracking center.
Sec. 328. Provisions relating to State criminal alien assistance program.
Sec. 329. Demonstration project for identification of illegal aliens in incarceration facility of Anaheim, California.
Sec. 330. Prisoner transfer treaties.
Sec. 331. Prisoner transfer treaties study.
Sec. 332. Annual report on criminal aliens.

Sec. 333. Penalties for conspiring with or assisting an alien to commit an offense under the Controlled Substances Import and Export Act.
Sec. 334. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.

Subtitle C—Revision of Grounds for Exclusion and Deportation
Sec. 341. Proof of vaccination requirement for immigrants.
Sec. 342. Incitement of terrorist activity and provision of false documentation to terrorists as a basis for exclusion from the United States.
Sec. 343. Certification requirements for foreign health-care workers.
Sec. 344. Removal of aliens falsely claiming United States citizenship.
Sec. 345. Waiver of exclusion and deportation ground for certain section 274C violators.
Sec. 346. Inadmissibility of certain student visa abusers.
Sec. 347. Removal of aliens who have unlawfully voted.
Sec. 348. Waivers for immigrants convicted of crimes.
Sec. 349. Waiver of misrepresentation ground of inadmissibility for certain alien.
Sec. 350. Offenses of domestic violence and stalking as ground for deportation.
Sec. 351. Clarification of date as of which relationship required for waiver from exclusion or deportation for smuggling.
Sec. 352. Exclusion of former citizens who renounced citizenship to avoid United States taxation.
Sec. 353. References to changes elsewhere in division.

Subtitle D—Changes in Removal of Alien Terrorist Provisions
Sec. 354. Treatment of classified information.
Sec. 355. Exclusion of representatives of terrorist organizations.
Sec. 356. Standard for judicial review of terrorist organization designations.
Sec. 357. Removal of ancillary relief for voluntary departure.
Sec. 358. Effective date.

Subtitle E—Transportation of Aliens
Sec. 361. Definition of stowaway.
Sec. 362. Transportation contracts.

Subtitle F—Additional Provisions
Sec. 371. Immigration judges and compensation.
Sec. 372. Delegation of immigration enforcement authority.
Sec. 373. Powers and duties of the Attorney General and the Commissioner.
Sec. 374. Judicial deportation.
Sec. 375. Limitation on adjustment of status.
Sec. 376. Treatment of certain fees.
Sec. 377. Limitation on legalization litigation.
Sec. 378. Rescission of lawful permanent resident status.
Sec. 379. Administrative review of orders.
Sec. 380. Civil penalties for failure to depart.
Sec. 381. Clarification of district court jurisdiction.
Sec. 382. Application of additional civil penalties to enforcement.
Sec. 383. Exclusion of certain aliens from family unity program.
Sec. 384. Penalties for disclosure of information.
Sec. 385. Authorization of additional funds for removal of aliens.
Sec. 386. Increase in INS detention facilities; report on detention space.
Sec. 387. Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.
Sec. 388. Report on interior repatriation program.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.01670
396

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Subtitle A—Pilot Programs for Employment Eligibility Confirmation

Sec. 401. Establishment of programs.
Sec. 402. Voluntary election to participate in a pilot program.
Sec. 403. Procedures for participants in pilot programs.
Sec. 404. Employment eligibility confirmation system.
Sec. 405. Reports.

Subtitle B—Other Provisions Relating to Employer Sanctions

Sec. 411. Limiting liability for certain technical violations of paperwork requirements.
Sec. 412. Paperwork and other changes in the employer sanctions program.
Sec. 413. Report on additional authority or resources needed for enforcement of employer sanctions provisions.
Sec. 414. Reports on earnings of aliens not authorized to work.
Sec. 415. Authorizing maintenance of certain information on aliens.
Sec. 416. Subpoena authority.

Subtitle C—Unfair Immigration–Related Employment Practices

Sec. 421. Treatment of certain documentary practices as unfair immigration-related employment practices.

TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

Subtitle A—Eligibility of Aliens for Public Assistance and Benefits

Sec. 501. Exception to ineligibility for public benefits for certain battered aliens.
Sec. 502. Pilot programs on limiting issuance of driver's licenses to illegal aliens.
Sec. 503. Ineligibility of aliens not lawfully present for Social Security benefits.
Sec. 504. Procedures for requiring proof of citizenship for Federal public benefits.
Sec. 505. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits.
Sec. 506. Study and report on alien student eligibility for postsecondary Federal student financial assistance.
Sec. 507. Verification of immigration status for purposes of Social Security and higher educational assistance.
Sec. 508. No verification requirement for nonprofit charitable organizations.
Sec. 509. GAO study of provision of means-tested public benefits to aliens who are not qualified aliens on behalf of eligible individuals.
Sec. 510. Transition for aliens currently receiving benefits under the Food Stamp program.

Subtitle B—Public Charge Exclusion

Sec. 531. Ground for exclusion.

Subtitle C—Affidavits of Support

Sec. 551. Requirements for sponsor's affidavit of support.
Sec. 552. Indigence and battered spouse and child exceptions to Federal attribution of income rule.
Sec. 553. Authority of States and political subdivisions of States to limit assistance to aliens and to distinguish among classes of aliens in providing general cash public assistance.

Subtitle D—Miscellaneous Provisions

Sec. 561. Increased maximum criminal penalties for forging or counterfeiting seal of a Federal department or agency to facilitate benefit fraud by an unlawful alien.
Sec. 562. Treatment of expenses subject to emergency medical services exception.
Sec. 563. Reimbursement of States and localities for emergency ambulance services.
Sec. 564. Pilot programs to require bonding.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Sec. 565. Reports.

Subtitle E—Housing Assistance

Sec. 571. Short title.
Sec. 572. Prorating of financial assistance.
Sec. 573. Actions in cases of termination of financial assistance.
Sec. 574. Verification of immigration status and eligibility for financial assistance.
Sec. 575. Prohibition of sanctions against entities making financial assistance eligibility determinations.
Sec. 576. Eligibility for public and assisted housing.
Sec. 577. Regulations.

Subtitle F—General Provisions

Sec. 591. Effective dates.
Sec. 592. Not applicable to foreign assistance.
Sec. 593. Notification.
Sec. 594. Definitions.

TITLE VI—MISCELLANEOUS PROVISIONS

Subtitle A—Refugees, Parole, and Asylum

Sec. 601. Persecution for resistance to coercive population control methods.
Sec. 602. Limitation on use of parole.
Sec. 603. Treatment of long-term parolees in applying worldwide numerical limitations.
Sec. 604. Asylum reform.
Sec. 605. Increase in asylum officers.
Sec. 606. Conditional repeal of Cuban Adjustment Act.

Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act

Sec. 621. Alien witness cooperation.
Sec. 622. Waiver of foreign country residence requirement with respect to international medical graduates.
Sec. 623. Use of legalization and special agricultural worker information.
Sec. 624. Continued validity of labor certifications and classification petitions for professional athletes.
Sec. 625. Foreign students.
Sec. 626. Services to family members of certain officers and agents killed in the line of duty.

Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency

Sec. 631. Validity of period of visas.
Sec. 632. Elimination of consulate shopping for visa overstays.
Sec. 633. Authority to determine visa processing procedures.
Sec. 634. Changes regarding visa application process.
Sec. 635. Visa waiver program.
Sec. 636. Fee for diversity immigrant lottery.
Sec. 637. Eligibility for visas for certain Polish applicants for the 1995 diversity immigrant program.

Subtitle D—Other Provisions

Sec. 641. Program to collect information relating to nonimmigrant foreign students.
Sec. 642. Communication between government agencies and the Immigration and Naturalization Service.
Sec. 643. Regulations regarding habitual residence.
Sec. 644. Information regarding female genital mutilation.
Sec. 645. Criminalization of female genital mutilation.
Sec. 646. Adjustment of status for certain Polish and Hungarian parolees.

Sec. 647. Support of demonstration projects.

Sec. 648. Sense of Congress regarding American-made products; requirements regarding notice.

Sec. 649. Vessel movement controls during immigration emergency.

Sec. 650. Review of practices of testing entities.

Sec. 651. Designation of a United States customs administrative building.

Sec. 652. Mail-order bride business.

Sec. 653. Review and report on H–2A nonimmigrant workers program.

Sec. 654. Report on allegations of harassment by Canadian customs agents.

Sec. 655. Sense of Congress on discriminatory application of New Brunswick provincial sales tax.

Sec. 656. Improvements in identification-related documents.

Sec. 657. Development of prototype of counterfeit-resistant Social Security card.

Sec. 658. Border Patrol Museum.

Sec. 659. Sense of the Congress regarding the mission of the Immigration and Naturalization Service.

Sec. 660. Authority for National Guard to assist in transportation of certain aliens.

Subtitle E—Technical Corrections

Sec. 671. Miscellaneous technical corrections.

<< 7 USCA § 2015 nt >>

<< 8 USCA §§ 1101 NOTE, 1102 nt, 1103 nt, 1105a nt, 1151 nt, 1152 nt, 1154 nt, 1155 nt, 1156 nt, 1157 nt, 1158 nt, 1159 nt, 1160 nt, 1182 nt, 1183 nt, 1183a nt, 1184 nt, 1186a nt, 1186b nt, 1187 nt, 1189 nt, 1201 nt, 1202 nt, 1206 nt, 1221 nt, 1222 nt, 1223 nt, 1224 nt, 1225 nt, 1226 nt, 1227 nt, 1228 nt, 1230 nt, 1251 nt, 1252 nt, 1252a nt, 1252b nt, 1253 nt, 1254 nt, 1254a nt, 1255 nt, 1255a nt, 1256 nt, 1257 nt, 1258 nt, 1259 nt, 1282 nt, 1284 nt, 1288 nt, 1303 nt, 1304 nt, 1306 nt, 1321 nt, 1322 nt, 1323 nt, 1324 nt, 1324a nt, 1324b nt, 1324c nt, 1325 nt, 1326 nt, 1327 nt, 1329 nt, 1330 nt, 1356 nt, 1357 nt, 1360 nt, 1361 nt, 1362 nt, 1364 nt, 1427 nt, 1429 nt, 1483 nt, 1503 nt, 1522 nt, 1531 nt, 1532 nt, 1534 nt, 1535 nt, 1537 nt, 1612 nt, 1631 nt, 1632 nt, 1641 nt, 1642 nt >>

<< 8 USCA §§ 1225a nt, 1229 nt, 1229a nt, 1229b nt, 1229c nt, 1231 nt, 1324d nt, 1363a nt, 1363b nt, 1366 nt, 1367 nt, 1368 nt, 1369 nt, 1370 nt, 1371 nt, 1372 nt, 1373 nt, 1374 nt, 1375 nt, 1623 nt, 1624 nt >>

<< 18 USCA §§ 506 nt, 982 nt, 1015 nt, 1028 nt, 1425 nt, 1426 nt, 1427 nt, 1541 nt, 1542 nt, 1543 nt, 1544 nt, 1546 nt, 1581 nt, 1583 nt, 1584 nt, 1588 nt, 1961 nt, 2424 nt, 2516 nt, 3563 nt, 4113 nt >>

<< 18 USCA §§ 116 nt, 611 nt, 758 nt >>

<< 20 USCA § 1091 nt >>

<< 22 USCA §§ 618 nt, 2508 nt >>

<< 28 USCA § 1821 nt >>

<< 32 USCA § 112 nt >>

<< 42 USCA §§ 402 nt, 1320b–7, 1436a >>

<< 50 USCA §§ 47c, 191, 503h, 855 >>

 (e) SEVERABILITY.—If any provision of this division or the application of such provision to any person or circumstances is held to be unconstitutional, the remainder of this division and the application of the provisions of this division to any person or circumstance shall not be affected thereby.

### TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

#### Subtitle A—Improved Enforcement at the Border

## SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.

(a) INCREASED NUMBER OF BORDER PATROL AGENTS.—The Attorney General in each of fiscal years 1997, 1998, 1999, 2000, and 2001 shall increase by not less than 1,000 the number of positions for full-time, active-duty border patrol agents within the Immigration and Naturalization Service above the number of such positions for which funds were allotted for the preceding fiscal year.

(b) INCREASE IN BORDER PATROL SUPPORT PERSONNEL.—The Attorney General, in each of fiscal years 1997, 1998, 1999, 2000, and 2001, may increase by 300 the number of positions for personnel in support of border patrol agents above the number of such positions for which funds were allotted for the preceding fiscal year.

(c) DEPLOYMENT OF BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that additional border patrol agents shall be deployed among Immigration and Naturalization Service sectors along the border in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis. The previous sentence shall not apply to border patrol agents located at checkpoints.

(2) PRESERVATION OF LAW ENFORCEMENT FUNCTIONS AND CAPABILITIES IN INTERIOR STATES.—The Attorney General shall, when deploying border patrol personnel from interior stations to border stations, coordinate with, and act in conjunction with, State and local law enforcement agencies to ensure that such deployment does not degrade or compromise the law enforcement capabilities and functions currently performed at interior border patrol stations.

(3) REPORT.—Not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on—

(A) the progress and effectiveness of the forward deployment under paragraph (1); and

(B) the measures taken to comply with paragraph (2).

## SEC. 102. IMPROVEMENT OF BARRIERS AT BORDER.

### << 8 USCA § 1103 NOTE >>

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

<< 8 USCA § 1103 >>

(d) LAND ACQUISITION AUTHORITY.—

(1) IN GENERAL.—Section 103 (8 U.S.C. 1103) is amended—

(A) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively; and

(B) by inserting after subsection (a) the following:

"(b)(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act.

"(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

"(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

"(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).".

(2) CONFORMING AMENDMENT.—Section 103(e) (as so redesignated by paragraph (1)(A)) is amended by striking "subsection (c)" and inserting "subsection (d)".

<< 8 USCA § 1103 NOTE >>

SEC. 103. IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.

The Attorney General is authorized to acquire and use, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

<< 8 USCA § 1101 NOTE >>

(b) EFFECTIVE DATES.—

(1) CLAUSE A.—Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 18 months after the date of the enactment of this Act.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) CLAUSE B.—Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

## SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.

<< 8 USCA § 1325 >>

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

(2) by inserting after subsection (a) the following:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

"(1) at least $50 and not more than $250 for each such entry (or attempted entry); or

"(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.

Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.".

<< 8 USCA § 1325 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to illegal entries or attempts to enter occurring on or after the first day of the sixth month beginning after the date of the enactment of this Act.

<< 8 USCA § 1103 NOTE >>

## SEC. 106. HIRING AND TRAINING STANDARDS.

(a) REVIEW OF HIRING STANDARDS.—Not later than 60 days after the date of the enactment of this Act, the Attorney General shall complete a review of all prescreening and hiring standards used by the Commissioner of Immigration and Naturalization, and, where necessary, revise such standards to ensure that they are consistent with relevant standards of professionalism.

(b) CERTIFICATION.—At the conclusion of each of fiscal years 1997, 1998, 1999, 2000, and 2001, the Attorney General shall certify in writing to the Committees on the Judiciary of the House of Representatives and of the Senate that all personnel hired by the Commissioner of Immigration and Naturalization for such fiscal year were hired pursuant to the appropriate standards, as revised under subsection (a).

(c) REVIEW OF TRAINING STANDARDS.—

(1) REVIEW.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall complete a review of the sufficiency of all training standards used by the Commissioner of Immigration and Naturalization.

(2) REPORT.—

(A) IN GENERAL.—Not later than 90 days after the completion of the review under paragraph (1), the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the review, including—

(i) a description of the status of efforts to update and improve training throughout the Immigration and Naturalization Service; and

(ii) an estimate of when such efforts are expected to be completed.

(B) AREAS REQUIRING FUTURE REVIEW.—The report shall disclose those areas of training that the Attorney General determines require further review in the future.

<< 8 USCA § 1103 NOTE >>

## SEC. 107. REPORT ON BORDER STRATEGY.

(a) EVALUATION OF STRATEGY.—The Comptroller General of the United States shall track, monitor, and evaluate the Attorney General's strategy to deter illegal entry in the United States to determine the efficacy of such strategy.

(b) COOPERATION.—The Attorney General, the Secretary of State, and the Secretary of Defense shall cooperate with the Comptroller General of the United States in carrying out subsection (a).

(c) REPORT.—Not later than one year after the date of the enactment of this Act, and every year thereafter for the succeeding 5 years, the Comptroller General of the United States shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the activities undertaken under subsection (a) during the previous year. Each such report shall include an analysis of the degree to which the Attorney General's strategy has been effective in reducing illegal entry. Each such report shall include a collection and systematic analysis of data, including workload indicators, related to activities to deter illegal entry and recommendations to improve and increase border security at the border and ports of entry.

SEC. 108. CRIMINAL PENALTIES FOR HIGH SPEED FLIGHTS FROM IMMIGRATION CHECKPOINTS.

<< 18 USCA § 758 NOTE >>

(a) FINDINGS.—The Congress finds as follows:

(1) Immigration checkpoints are an important component of the national strategy to prevent illegal immigration.

(2) Individuals fleeing immigration checkpoints and leading law enforcement officials on high speed vehicle chases endanger law enforcement officers, innocent bystanders, and the fleeing individuals themselves.

(3) The pursuit of suspects fleeing immigration checkpoints is complicated by overlapping jurisdiction among Federal, State, and local law enforcement officers.

(b) HIGH SPEED FLIGHT FROM IMMIGRATION CHECKPOINTS.—

<< 18 USCA § 758 >>

(1) IN GENERAL.—Chapter 35 of title 18, United States Code, is amended by adding at the end the following:

"§ 758. High speed flight from immigration checkpoint

"Whoever flees or evades a checkpoint operated by the Immigration and Naturalization Service, or any other Federal law enforcement agency, in a motor vehicle and flees Federal, State, or local law enforcement agents in excess of the legal speed limit shall be fined under this title, imprisoned not more than five years, or both.".

<< 18 USCA Ch. 35 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 757 the following:

"758. High speed flight from immigration checkpoint.".

<< 8 USCA § 1251 >>

(c) GROUNDS FOR DEPORTATION.—Section 241(a)(2)(A) (8 U.S.C. 1251(a)(2)(A)) is amended—

(1) by redesignating clause (iv) as clause (v);

(2) by inserting after clause (iii) the following:

"(iv) HIGH SPEED FLIGHT.—Any alien who is convicted of a violation of section 758 of title 18, United States Code, (relating to high speed flight from an immigration checkpoint) is deportable."; and

(3) in clause (v) (as so redesignated by paragraph (1)), by striking "and (iii)" and inserting "(iii), and (iv)".

SEC. 109. JOINT STUDY OF AUTOMATED DATA COLLECTION.

(a) STUDY.—The Attorney General, together with the Secretary of State, the Secretary of Agriculture, the Secretary of the Treasury, and appropriate representatives of the air transport industry, shall jointly undertake a study to develop a plan for making the transition to automated data collection at ports of entry.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) REPORT.—Nine months after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives on the outcome of the joint initiative under subsection (a), noting specific areas of agreement and disagreement, and recommending further steps to be taken, including any suggestions for legislation.

<< 8 USCA § 1221 NOTE >>

SEC. 110. AUTOMATED ENTRY–EXIT CONTROL SYSTEM.

(a) SYSTEM.—Not later than 2 years after the date of the enactment of this Act, the Attorney General shall develop an automated entry and exit control system that will—

(1) collect a record of departure for every alien departing the United States and match the records of departure with the record of the alien's arrival in the United States; and

(2) enable the Attorney General to identify, through on-line searching procedures, lawfully admitted nonimmigrants who remain in the United States beyond the period authorized by the Attorney General.

(b) REPORT.—

(1) DEADLINE.—Not later than December 31 of each year following the development of the system under subsection (a), the Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and of the Senate on such system.

(2) INFORMATION.—The report shall include the following information:

(A) The number of departure records collected, with an accounting by country of nationality of the departing alien.

(B) The number of departure records that were successfully matched to records of the alien's prior arrival in the United States, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant.

(C) The number of aliens who arrived as nonimmigrants, or as a visitor under the visa waiver program under section 217 of the Immigration and Nationality Act, for whom no matching departure record has been obtained through the system or through other means as of the end of the alien's authorized period of stay, with an accounting by the alien's country of nationality and date of arrival in the United States.

(c) USE OF INFORMATION ON OVERSTAYS.—Information regarding aliens who have remained in the United States beyond their authorized period of stay identified through the system shall be integrated into appropriate data bases of the Immigration and Naturalization Service and the Department of State, including those used at ports of entry and at consular offices.

SEC. 111. SUBMISSION OF FINAL PLAN ON REALIGNMENT OF BORDER PATROL POSITIONS FROM INTERIOR STATIONS.

Not later than November 30, 1996, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a final plan regarding the redeployment of border patrol personnel from interior locations to the front lines of the border. The final plan shall be consistent with the following:

(1) The preliminary plan regarding such redeployment submitted by the Attorney General on May 17, 1996, to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate.

(2) The direction regarding such redeployment provided in the joint explanatory statement of the committee of conference in the conference report to accompany the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134).

SEC. 112. NATIONWIDE FINGERPRINTING OF APPREHENDED ALIENS.

There are authorized to be appropriated such additional sums as may be necessary to ensure that the "IDENT" program (operated by the Immigration and Naturalization Service) is expanded to apply to illegal or criminal aliens apprehended nationwide.

Subtitle B—Facilitation of Legal Entry

SEC. 121. LAND BORDER INSPECTORS.

  In order to eliminate undue delay in the thorough inspection of persons and vehicles lawfully attempting to enter the United States, the Attorney General and the Secretary of the Treasury each shall increase, by approximately equal numbers in each of fiscal years 1997 and 1998, the number of full-time land border inspectors assigned to active duty by the Immigration and Naturalization Service and the United States Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes currently in use, under construction, or whose construction has been authorized by the Congress, except such low-use lanes as the Attorney General may designate.

SEC. 122. LAND BORDER INSPECTION AND AUTOMATED PERMIT PILOT PROJECTS.

<< 8 USCA § 1356 >>

  (a) EXTENSION OF LAND BORDER INSPECTION PROJECT AUTHORITY; ESTABLISHMENT OF AUTOMATED PERMIT PILOT PROJECTS.—Section 286(q) is amended—
  (1) by striking the matter preceding paragraph (2) and inserting the following:
  "(q) LAND BORDER INSPECTION FEE ACCOUNT.—(1)(A)(i) Notwithstanding any other provision of law, the Attorney General is authorized to establish, by regulation, not more than 6 projects under which a fee may be charged and collected for inspection services provided at one or more land border points of entry. Such projects may include the establishment of commuter lanes to be made available to qualified United States citizens and aliens, as determined by the Attorney General.
  "(ii) The program authorized in this subparagraph shall terminate on September 30, 2000, unless further authorized by an Act of Congress.
  "(iii) This subparagraph shall take effect, with respect to any project described in clause (1) that was not authorized to be commenced before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 30 days after submission of a written plan by the Attorney General detailing the proposed implementation of such project.
  "(iv) The Attorney General shall prepare and submit on a quarterly basis, until September 30, 2000, a status report on each land border inspection project implemented under this subparagraph.
  "(B) The Attorney General, in consultation with the Secretary of the Treasury, may conduct pilot projects to demonstrate the use of designated ports of entry after working hours through the use of card reading machines or other appropriate technology."; and
  (2) by striking paragraph (5).

<< 8 USCA § 1356 NOTE >>

  (b) CONFORMING AMENDMENT.—The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1994 (Public Law 103–121, 107 Stat. 1161) is amended by striking the fourth proviso under the heading "Immigration and Naturalization Service, Salaries and Expenses".

SEC. 123. PREINSPECTION AT FOREIGN AIRPORTS.

<< 8 USCA § 1225a >>

  (a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 235 the following:

"PREINSPECTION AT FOREIGN AIRPORTS

"SEC. 235A. (a) ESTABLISHMENT OF PREINSPECTION STATIONS.—
  "(1) NEW STATIONS.—Subject to paragraph (5), not later than October 31, 1998, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of inadmissible alien passengers who arrive from abroad by air at ports of entry within the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of such Act.

"(2) REPORT.—Not later than October 31, 1998, the Attorney General shall report to the Committees on the Judiciary of the House of Representatives and of the Senate on the implementation of paragraph (1).

"(3) DATA COLLECTION.—Not later than November 1, 1997, and each subsequent November 1, the Attorney General shall compile data identifying—

  "(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years;

  "(B) the number and nationality of such aliens arriving from each such foreign airport; and

  "(C) the primary routes such aliens followed from their country of origin to the United States.

"(4) ADDITIONAL STATIONS.—Subject to paragraph (5), not later than October 31, 2000, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines, based on the data compiled under paragraph (3) and such other information as may be available, would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States who are inadmissible to the United States. Such preinspection stations shall be in addition to those established prior to the date of the enactment of such Act or pursuant to paragraph (1).

"(5) CONDITIONS.—Prior to the establishment of a preinspection station, the Attorney General, in consultation with the Secretary of State, shall ensure that—

  "(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection;

  "(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety; and

  "(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967), or that an alien in the country otherwise has recourse to avenues of protection from return to persecution.

"(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(3), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.".

  (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 235 the following:

"Sec. 235A. Preinspection at foreign airports.".

SEC. 124. TRAINING OF AIRLINE PERSONNEL IN DETECTION OF FRAUDULENT DOCUMENTS.

  (a) USE OF FUNDS.—

<< 8 USCA § 1356 >>

  (1) IN GENERAL.—Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

  (A) in clause (iv), by inserting ", including training of, and technical assistance to, commercial airline personnel regarding such detection" after "United States"; and

  (B) by adding at the end the following:

"The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.".

<< 8 USCA § 1356 NOTE >>

  (2) APPLICABILITY.—The amendments made by paragraph (1) shall apply to expenses incurred during or after fiscal year 1997.

  (b) COMPLIANCE WITH DETECTION REGULATIONS.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(f) (8 U.S.C. 1182(f)) is amended by adding at the end the following: "Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.".

<< 8 USCA § 1182 NOTE >>

(2) DEADLINE.—The Attorney General shall first issue, in proposed form, regulations referred to in the second sentence of section 212(f) of the Immigration and Nationality Act, as added by the amendment made by paragraph (1), not later than 90 days after the date of the enactment of this Act.

<< 8 USCA § 1103 >>

SEC. 125. PRECLEARANCE AUTHORITY.

Section 103(a) of the Immigration and Nationality Act (8 U.S.C. 1103(a)) is amended by adding at the end the following: "After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws. Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.".

Subtitle C—Interior Enforcement

SEC. 131. AUTHORIZATION OF APPROPRIATIONS FOR INCREASE IN NUMBER OF CERTAIN INVESTIGATORS.

(a) AUTHORIZATION.—There are authorized to be appropriated such funds as may be necessary to enable the Commissioner of Immigration and Naturalization to increase the number of investigators and support personnel to investigate potential violations of sections 274 and 274A of the Immigration and Nationality Act by a number equivalent to 300 full-time active-duty investigators in each of fiscal years 1997, 1998, and 1999.

(b) ALLOCATION OF INVESTIGATORS.—At least one-half of the investigators hired with funds made available under subsection (a) shall be assigned to investigate potential violations of section 274A of the Immigration and Nationality Act.

(c) LIMITATION ON OVERTIME.—None of the funds made available under subsection (a) shall be available for administrative expenses to pay any employee overtime pay in an amount in excess of $25,000 for any fiscal year.

SEC. 132. AUTHORIZATION OF APPROPRIATIONS FOR INCREASE IN NUMBER OF INVESTIGATORS OF VISA OVERSTAYERS.

There are authorized to be appropriated such funds as may be necessary to enable the Commissioner of Immigration and Naturalization to increase the number of investigators and support personnel to investigate visa overstayers by a number equivalent to 300 full-time active-duty investigators in fiscal year 1997.

<< 8 USCA § 1357 >>

SEC. 133. ACCEPTANCE OF STATE SERVICES TO CARRY OUT IMMIGRATION ENFORCEMENT.

Section 287 (8 U.S.C. 1357) is amended by adding at the end the following:

"(g)(1) Notwithstanding section 1342 of title 31, United States Code, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

"(2) An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

"(3) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General.

"(4) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State may use Federal property or facilities, as provided in a written agreement between the Attorney General and the State or subdivision.

"(5) With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

"(6) The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

"(7) Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of title 5, United States Code, (relating to compensation for injury) and sections 2671 through 2680 of title 28, United States Code (relating to tort claims).

"(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

"(9) Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

"(10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

"(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

"(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.".

SEC. 134. MINIMUM STATE INS PRESENCE.

<< 8 USCA § 1103 >>

(a) IN GENERAL.—Section 103 (8 U.S.C. 1103), as amended by section 102(e) of this division, is further amended by adding at the end the following:

"(f) The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this Act.".

<< 8 USCA § 1103 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 90 days after the date of the enactment of this Act.

AR.01682

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

<< 18 USCA § 2516 >>

## SEC. 201. WIRETAP AUTHORITY FOR INVESTIGATIONS OF ALIEN SMUGGLING OR DOCUMENT FRAUD.

Section 2516(1) of title 18, United States Code, is amended—

(1) in paragraph (c), by striking "or section 1992 (relating to wrecking trains)" and inserting "section 1992 (relating to wrecking trains), a felony violation of section 1028 (relating to production of false identification documentation), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passports), section 1544 (relating to misuse of passports), or section 1546 (relating to fraud and misuse of visas, permits, and other documents)";

(2) by striking "or" at the end of paragraph (l);

(3) by redesignating paragraphs (m), (n), and (o) as paragraphs (n), (o), and (p), respectively; and

(4) by inserting after paragraph (l) the following new paragraph:

"(m) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (8 U.S.C. 1324, 1327, or 1328) (relating to the smuggling of aliens);".

<< 18 USCA § 1961 >>

## SEC. 202. RACKETEERING OFFENSES RELATING TO ALIEN SMUGGLING.

Section 1961(1) of title 18, United States Code, as amended by section 433 of Public Law 104–132, is amended—

(1) by striking "if the act indictable under section 1028 was committed for the purpose of financial gain";

(2) by inserting "section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers)," after "section 1344 (relating to financial institution fraud),";

(3) by striking "if the act indictable under section 1542 was committed for the purpose of financial gain";

(4) by striking "if the act indictable under section 1543 was committed for the purpose of financial gain";

(5) by striking "if the act indictable under section 1544 was committed for the purpose of financial gain"; and

(6) by striking "if the act indictable under section 1546 was committed for the purpose of financial gain".

## SEC. 203. INCREASED CRIMINAL PENALTIES FOR ALIEN SMUGGLING.

<< 8 USCA § 1324 >>

(a) COMMERCIAL ADVANTAGE.—Section 274(a)(1)(B)(i) (8 U.S.C. 1324(a)(1)(B)(i)) is amended by inserting "or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain" after "subparagraph (A)(i)".

(b) ADDITIONAL OFFENSES.—Section 274(a) (8 U.S.C. 1324(a)) is amended—

(1) in paragraph (1)(A)—

(A) by striking "or" at the end of clause (iii);

(B) by striking the comma at the end of clause (iv) and inserting "; or"; and

(C) by adding at the end the following new clause:

"(v)(I) engages in any conspiracy to commit any of the preceding acts, or

"(II) aids or abets the commission of any of the preceding acts,";

(2) in paragraph (1)(B)—

(A) in clause (i), by inserting "or (v)(I)" after "(A)(i)";

(B) in clause (ii), by striking "or (iv)" and inserting "(iv), or (v)(II)";

(C) in clause (iii), by striking "or (iv)" and inserting "(iv), or (v)"; and

(D) in clause (iv), by striking "or (iv)" and inserting "(iv), or (v)";

(3) in paragraph (2)(B), by striking "be fined" and all that follows and inserting the following: "be fined under title 18, United States Code, and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years."; and

(4) by adding at the end the following new paragraph:

"(3)(A) Any person who, during any 12–month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18, United States Code, or imprisoned for not more than 5 years, or both.

"(B) An alien described in this subparagraph is an alien who—

"(i) is an unauthorized alien (as defined in section 274A(h)(3)), and

"(ii) has been brought into the United States in violation of this subsection.".

(c) SMUGGLING OF ALIENS WHO WILL COMMIT CRIMES.—Clause (i) of section 274(a)(2)(B) (8 U.S.C. 1324(a)(2)(B)) is amended to read as follows:

"(i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,".

(d) APPLYING CERTAIN PENALTIES ON A PER ALIEN BASIS.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended by striking "for each transaction constituting a violation of this paragraph, regardless of the number of aliens involved" and inserting "for each alien in respect to whom a violation of this paragraph occurs".

<< 28 USCA § 994 NOTE >>

(e) SENTENCING GUIDELINES.—

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines for offenders convicted of offenses related to smuggling, transporting, harboring, or inducing aliens in violation of section 274(a) (1)(A) or (2) of the Immigration and Nationality Act (8 U.S.C. 1324(a)(1)(A), (2)(B)) in accordance with this subsection.

(2) REQUIREMENTS.—In carrying out this subsection, the Commission shall, with respect to the offenses described in paragraph (1)—

(A) increase the base offense level for such offenses at least 3 offense levels above the applicable level in effect on the date of the enactment of this Act;

(B) review the sentencing enhancement for the number of aliens involved (U.S.S.G. 2L1.1(b)(2)), and increase the sentencing enhancement by at least 50 percent above the applicable enhancement in effect on the date of the enactment of this Act;

(C) impose an appropriate sentencing enhancement upon an offender with 1 prior felony conviction arising out of a separate and prior prosecution for an offense that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(D) impose an additional appropriate sentencing enhancement upon an offender with 2 or more prior felony convictions arising out of separate and prior prosecutions for offenses that involved the same or similar underling conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(E) impose an appropriate sentencing enhancement on a defendant who, in the course of committing an offense described in this subsection—

(i) murders or otherwise causes death, bodily injury, or serious bodily injury to an individual;

(ii) uses or brandishes a firearm or other dangerous weapon; or

(iii) engages in conduct that consciously or recklessly places another in serious danger of death or serious bodily injury;

AR.01684
410

(F) consider whether a downward adjustment is appropriate if the offense is a first offense and involves the smuggling only of the alien's spouse or child; and

(G) consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments.

(3) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 8 USCA § 1324 NOTE >>

(f) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

SEC. 204. INCREASED NUMBER OF ASSISTANT UNITED STATES ATTORNEYS.

(a) IN GENERAL.—The number of Assistant United States Attorneys employed by the Department of Justice for the fiscal year 1997 shall be increased by at least 25 above the number of Assistant United States Attorneys that were authorized to be employed as of September 30, 1996.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall prosecute persons who bring into the United States or harbor illegal aliens or violate other criminal statutes involving illegal aliens.

SEC. 205. UNDERCOVER INVESTIGATION AUTHORITY.

<< 8 USCA § 1363a >>

(a) IN GENERAL.—Title II is amended by adding at the end the following new section:

"UNDERCOVER INVESTIGATION AUTHORITY

"SEC. 294. (a) IN GENERAL.—With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—

"(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

"(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),

"(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),

"(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),

"(D) the third undesignated paragraph under the heading 'Miscellaneous' of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),

"(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),

"(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and

"(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254(a) and (c));

"(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);

"(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and

"(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

 "(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

 "(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection (a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

 "(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.".

 (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 293 the following:

 "Sec. 294. Undercover investigation authority.".

Subtitle B—Deterrence of Document Fraud

SEC. 211. INCREASED CRIMINAL PENALTIES FOR FRAUDULENT USE OF GOVERNMENT–ISSUED DOCUMENTS.

 (a) FRAUD AND MISUSE OF GOVERNMENT–ISSUED IDENTIFICATION DOCUMENTS.—(1) Section 1028(b) of title 18, United States Code, is amended—

<< 18 USCA § 1028 >>

 (A) in paragraph (1), by inserting "except as provided in paragraphs (3) and (4)," after "(1)" and by striking "five years" and inserting "15 years";

 (B) in paragraph (2), by inserting "except as provided in paragraphs (3) and (4)," after "(2)" and by striking "and" at the end;

 (C) by redesignating paragraph (3) as paragraph (5); and

 (D) by inserting after paragraph (2) the following new paragraphs:

 "(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);

 "(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and".

<< 18 USCA §§ 1425, 1426, 1427, 1541, 1542, 1543, 1544, 1546 >>

 (2) Sections 1425 through 1427, sections 1541 through 1544, and section 1546(a) of title 18, United States Code, are each amended by striking "imprisoned not more" and all that follows through "years" each place it appears and inserting the following: "imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facility such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense)".

<< 28 USCA § 994 NOTE >>

 (b) CHANGES TO THE SENTENCING LEVELS.—

(1) IN GENERAL.—Pursuant to the Commission's authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines for offenders convicted of violating, or conspiring to violate, sections 1028(b)(1), 1425 through 1427, 1541 through 1544, and 1546(a) of title 18, United States Code, in accordance with this subsection.

(2) REQUIREMENTS.—In carrying out this subsection, the Commission shall, with respect to the offenses referred to in paragraph (1)—

(A) increase the base offense level for such offenses at least 2 offense levels above the level in effect on the date of the enactment of this Act;

(B) review the sentencing enhancement for number of documents or passports involved (U.S.S.G. 2L2.1(b)(2)), and increase the upward adjustment by at least 50 percent above the applicable enhancement in effect on the date of the enactment of this Act;

(C) impose an appropriate sentencing enhancement upon an offender with 1 prior felony conviction arising out of a separate and prior prosecution for an offense that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(D) impose an additional appropriate sentencing enhancement upon an offender with 2 or more prior felony convictions arising out of separate and prior prosecutions for offenses that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category; and

(E) consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments.

(3) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 18 USCA § 1028 NOTE >>

(c) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

SEC. 212. NEW DOCUMENT FRAUD OFFENSES; NEW CIVIL PENALTIES FOR DOCUMENT FRAUD.

<< 8 USCA § 1324c >>

(a) ACTIVITIES PROHIBITED.—Section 274C(a) (8 U.S.C. 1324c(a)) is amended—

(1) in paragraph (1), by inserting before the comma at the end the following: "or to obtain a benefit under this Act";

(2) in paragraph (2), by inserting before the comma at the end the following: "or to obtain a benefit under this Act";

(3) in paragraph (3)—

(A) by inserting "or with respect to" after "issued to";

(B) by adding before the comma at the end the following: "or obtaining a benefit under this Act"; and

(C) by striking "or" at the end;

(4) in paragraph (4)—

(A) by inserting "or with respect to" after "issued to";

(B) by adding before the period at the end the following: "or obtaining a benefit under this Act"; and

(C) by striking the period at the end and inserting ", or"; and

(5) by adding at the end the following new paragraphs:

"(5) to prepare, file, or assist another in preparing or filing, any application for benefits under this Act, or any document required under this Act, or any document submitted in connection with such application or document, with knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted, or

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(6)(A) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States, and (B) to fail to present such document to an immigration officer upon arrival at a United States port of entry.".

(b) DEFINITION OF FALSELY MAKE.—Section 274C (8 U.S.C. 1324c), as amended by section 213 of this division, is further amended by adding at the end the following new subsection:

"(f) FALSELY MAKE.—For purposes of this section, the term 'falsely make' means to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a fact which is material to the purpose for which it was submitted.".

(c) CONFORMING AMENDMENT.—Section 274C(d)(3) (8 U.S.C. 1324c(d)(3)) is amended by striking "each document used, accepted, or created and each instance of use, acceptance, or creation" each place it appears and inserting "each document that is the subject of a violation under subsection (a)".

(d) WAIVER BY ATTORNEY GENERAL.—Section 274C(d) (8 U.S.C. 1324c(d)) is amended by adding at the end the following new paragraph:

"(7) WAIVER BY ATTORNEY GENERAL.—The Attorney General may waive the penalties imposed by this section with respect to an alien who knowingly violates subsection (a)(6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).".

<< 8 USCA § 1324c NOTE >>

(e) EFFECTIVE DATE.—Section 274C(f) of the Immigration and Nationality Act, as added by subsection (b), applies to the preparation of applications before, on, or after the date of the enactment of this Act.

<< 8 USCA § 1324c >>

## SEC. 213. NEW CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS PREPARER OF FALSE APPLICATION FOR IMMIGRATION BENEFITS.

Section 274C (8 U.S.C. 1324c) is amended by adding at the end the following new subsection:

"(e) CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS DOCUMENT PREPARER.—(1) Whoever, in any matter within the jurisdiction of the Service, knowingly and willfully fails to disclose, conceals, or covers up the fact that they have, on behalf of any person and for a fee or other remuneration, prepared or assisted in preparing an application which was falsely made (as defined in subsection (f)) for immigration benefits, shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both, and prohibited from preparing or assisting in preparing, whether or not for a fee or other remuneration, any other such application.

"(2) Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for immigration benefits pursuant to this Act, or the regulations promulgated thereunder, whether or not for a fee or other remuneration and regardless of whether in any matter within the jurisdiction of the Service, shall be fined in accordance with title 18, United States Code, imprisoned for not more than 15 years, or both, and prohibited from preparing or assisting in preparing any other such application.".

<< 18 USCA § 1546 >>

## SEC. 214. CRIMINAL PENALTY FOR KNOWINGLY PRESENTING DOCUMENT WHICH FAILS TO CONTAIN REASONABLE BASIS IN LAW OR FACT.

The fourth paragraph of section 1546(a) of title 18, United States Code, is amended by striking "containing any such false statement" and inserting "which contains any such false statement or which fails to contain any reasonable basis in law or fact".

<< 18 USCA § 1015 >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### SEC. 215. CRIMINAL PENALTY FOR FALSE CLAIM TO CITIZENSHIP.

Section 1015 of title 18, United States Code, is amended—

(1) by striking the dash at the end of paragraph (d) and inserting "; or", and

(2) by inserting after paragraph (d) the following:

"(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal or State benefit or service, or to engage unlawfully in employment in the United States; or

"(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—".

### SEC. 216. CRIMINAL PENALTY FOR VOTING BY ALIENS IN FEDERAL ELECTION.

<< 18 USCA § 611 >>

(a) IN GENERAL.—Title 18, United States Code, is amended by inserting after section 610 the following:

"§ 611. Voting by aliens

"(a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless—

"(1) the election is held partly for some other purpose;

"(2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and

"(3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

"(b) Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.".

<< 18 USCA Ch. 29 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 29 of title 18, United States Code, is amended by inserting after the item relating to section 610 the following new item:

"611. Voting by aliens.".

<< 18 USCA § 982 >>

### SEC. 217. CRIMINAL FORFEITURE FOR PASSPORT AND VISA RELATED OFFENSES.

Section 982(a) of title 18, United States Code, is amended by inserting after paragraph (5) the following new paragraph:

"(6)(A) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law—

"(i) any conveyance, including any vessel, vehicle, or aircraft used in the commission of a violation of, or a conspiracy to violate, subsection (a); and

"(ii) any property real or personal—

"(I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of a violation of, or a conspiracy to violate, subsection (a), section 274A(a)(1) or 274A(a)(2) of the Immigration and Nationality Act, or section 1028, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title; or

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(II) that is used to facilitate, or is intended to be used to facilitate, the commission of a violation of, or a conspiracy to violate, subsection (a), section 274A(a)(1) or 274A(a)(2) of the Immigration and Nationality Act, or section 1028, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title.

The court, in imposing sentence on such person, shall order that the person forfeit to the United States all property described in this subparagraph.

"(B) The criminal forfeiture of property under subparagraph (A), including any seizure and disposition of the property and any related administrative or judicial proceeding, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), other than subsections (a) and (d) of such section 413.".

SEC. 218. CRIMINAL PENALTIES FOR INVOLUNTARY SERVITUDE.

<< 18 USCA §§ 1581, 1583, 1584, 1588 >>

(a) AMENDMENTS TO TITLE 18.—Sections 1581, 1583, 1584, and 1588 of title 18, United States Code, are amended by striking "five" each place it appears and inserting "10".

<< 28 USCA § 994 NOTE >>

(b) REVIEW OF SENTENCING GUIDELINES.—The United States Sentencing Commission shall ascertain whether there exists an unwarranted disparity—

(1) between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for kidnapping offenses in effect on the date of the enactment of this Act; and

(2) between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for alien smuggling offenses in effect on the date of the enactment of this Act and after the amendment made by subsection (a).

(c) AMENDMENT OF SENTENCING GUIDELINES.—

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall review its guidelines on sentencing for peonage, involuntary servitude, and slave trade offenses under sections 1581 through 1588 of title 18, United States Code, and shall amend such guidelines as necessary to—

(A) reduce or eliminate any unwarranted disparity found under subsection (b) that exists between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for kidnapping offenses and alien smuggling offenses;

(B) ensure that the applicable guidelines for defendants convicted of peonage, involuntary servitude, and slave trade offenses are sufficiently stringent to deter such offenses and adequately reflect the heinous nature of such offenses; and

(C) ensure that the guidelines reflect the general appropriateness of enhanced sentences for defendants whose peonage, involuntary servitude, or slave trade offenses involve—

(i) a large number of victims;

(ii) the use or threatened use of a dangerous weapon; or

(iii) a prolonged period of peonage or involuntary servitude.

(2) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 18 USCA § 1581 NOTE >>

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

<< 8 USCA § 1324 >>

SEC. 219. ADMISSIBILITY OF VIDEOTAPED WITNESS TESTIMONY.

Section 274 (8 U.S.C. 1324) is amended by adding at the end thereof the following new subsection:

"(d) Notwithstanding any provision of the Federal Rules of Evidence, the videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation if the witness was available for cross examination and the deposition otherwise complies with the Federal Rules of Evidence.".

<< 8 USCA § 1324c >>

SEC. 220. SUBPOENA AUTHORITY IN DOCUMENT FRAUD ENFORCEMENT.

Section 274C(d)(1) (8 U.S.C. 1324c(d)(1)) is amended—
(1) by striking "and" at the end of subparagraph (A);
(2) by striking the period at the end of subparagraph (B) and inserting ", and"; and
(3) by inserting after subparagraph (B) the following:
"(C) immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).".

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

SEC. 301. TREATING PERSONS PRESENT IN THE UNITED STATES WITHOUT AUTHORIZATION AS NOT ADMITTED.

<< 8 USCA § 1101 >>

(a) "ADMISSION" DEFINED.—Paragraph (13) of section 101(a) (8 U.S.C. 1101(a)) is amended to read as follows:
"(13)(A) The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.
"(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.
"(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—
"(i) has abandoned or relinquished that status,
"(ii) has been absent from the United States for a continuous period in excess of 180 days,
"(iii) has engaged in illegal activity after having departed the United States,
"(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,
"(v) has committed an offense identified in section 212(a)(2), unless since such offense the alien has been granted relief under section 212(h) or 240A(a), or
"(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.".
(b) INADMISSIBILITY OF ALIENS PREVIOUSLY REMOVED AND UNLAWFULLY PRESENT.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(a) (8 U.S.C. 1182(a)) is amended by redesignating paragraph (9) as paragraph (10) and by inserting after paragraph (8) the following new paragraph:
"(9) ALIENS PREVIOUSLY REMOVED.—
"(A) CERTAIN ALIENS PREVIOUSLY REMOVED.—
"(i) ARRIVING ALIENS.—Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of

the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(ii) OTHER ALIENS.—Any alien not described in clause (i) who—

"(I) has been ordered removed under section 240 or any other provision of law, or

"(II) departed the United States while an order of removal was outstanding,

and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(iii) EXCEPTION.—Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

"(B) ALIENS UNLAWFULLY PRESENT.—

"(i) IN GENERAL.—Any alien (other than an alien lawfully admitted for permanent residence) who—

"(I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 244(e)) prior to the commencement of proceedings under section 235(b)(1) or section 240, and again seeks admission within 3 years of the date of such alien's departure or removal, or

"(II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

"(ii) CONSTRUCTION OF UNLAWFUL PRESENCE.—For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

"(iii) EXCEPTIONS.—

"(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

"(III) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(IV) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if 'violation of the terms of the alien's nonimmigrant visa' were substituted for 'unlawful entry into the United States' in subclause (III) of that paragraph.

"(iv) TOLLING FOR GOOD CAUSE.—In the case of an alien who—

"(I) has been lawfully admitted or paroled into the United States,

"(II) has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

"(III) has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

"(v) WAIVER.—The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

"(C) ALIENS UNLAWFULLY PRESENT AFTER PREVIOUS IMMIGRATION VIOLATIONS.—

"(i) IN GENERAL.—Any alien who—

"(I) has been unlawfully present in the United States for an aggregate period of more than 1 year, or

"(II) has been ordered removed under section 235(b)(1), section 240, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

"(ii) EXCEPTION.—Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.".

<< 8 USCA § 1258 >>

(2) LIMITATION ON CHANGE OF STATUS.—Section 248 (8 U.S.C. 1258) is amended by inserting "and who is not inadmissible under section 212(a)(9)(B)(i) (or whose inadmissibility under such section is waived under section 212(a)(9)(B) (v))" after "maintain that status".

<< 8 USCA § 1182 NOTE >>

(3) TREATMENT OF UNLAWFUL PRESENCE BEFORE EFFECTIVE DATE.—In applying section 212(a)(9)(B) of the Immigration and Nationality Act, as inserted by paragraph (1), no period before the title III–A effective date shall be included in a period of unlawful presence in the United States.

(c) REVISION TO GROUND OF INADMISSIBILITY FOR ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Subparagraphs (A) and (B) of section 212(a)(6) (8 U.S.C. 1182(a)(6)) are amended to read as follows:

"(A) ALIENS PRESENT WITHOUT ADMISSION OR PAROLE.—

"(i) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

"(ii) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien who demonstrates that—

"(I) the alien qualifies for immigrant status under subparagraph (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),

"(II)(a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

"(III) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

"(B) FAILURE TO ATTEND REMOVAL PROCEEDING.—Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.".

<< 8 USCA § 1182 NOTE >>

(2) TRANSITION FOR BATTERED SPOUSE OR CHILD PROVISION.—The requirements of subclauses (II) and (III) of section 212(a)(6)(A)(ii) of the Immigration and Nationality Act, as inserted by paragraph (1), shall not apply to an alien who demonstrates that the alien first arrived in the United States before the title III–A effective date (described in section 309(a) of this division).

AR.01693

<< 8 USCA § 1251 >>

(d) ADJUSTMENT IN GROUNDS FOR DEPORTATION.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended—

(1) in the matter before paragraph (1) of subsection (a), by striking "in the United States" and inserting "in and admitted to the United States";

(2) in subsection (a)(1), by striking "EXCLUDABLE" each place it appears and inserting "INADMISSIBLE";

(3) in subsection (a)(1)(A), by striking "excludable" and inserting "inadmissible"; and

(4) by amending subparagraph (B) of subsection (a)(1) to read as follows:

"(B) PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.

SEC. 302. INSPECTION OF ALIENS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING (REVISED SECTION 235).

<< 8 USCA § 1225 >>

(a) IN GENERAL.—Section 235 (8 U.S.C. 1225) is amended to read as follows:

"INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL
OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING

"SEC. 235. (a) INSPECTION.—

"(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this Act an applicant for admission.

"(2) STOWAWAYS.—An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1) (B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.

"(3) INSPECTION.—All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

"(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

"(5) STATEMENTS.—An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

"(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

"(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES AND CERTAIN OTHER ALIENS WHO HAVE NOT BEEN ADMITTED OR PAROLED.—

"(A) SCREENING.—

"(i) IN GENERAL.—If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7), the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution.

"(ii) CLAIMS FOR ASYLUM.—If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)

(C) or 212(a)(7) and the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

"(iii) APPLICATION TO CERTAIN OTHER ALIENS.—

"(I) IN GENERAL.—The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

"(II) ALIENS DESCRIBED.—An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2–year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

"(B) ASYLUM INTERVIEWS.—

"(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

"(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

"(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

"(I) IN GENERAL.—Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

"(II) RECORD OF DETERMINATION.—The officer shall prepare a written record of a determination under subclause (I). Such record shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution. A copy of the officer's interview notes shall be attached to the written summary.

"(III) REVIEW OF DETERMINATION.—The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution. Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I).

"(IV) MANDATORY DETENTION.—Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.

"(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.

"(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

"(C) LIMITATION ON ADMINISTRATIVE REVIEW.—Except as provided in subparagraph (B)(iii)(III), a removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 207, or to have been granted asylum under section 208.

"(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii).

"(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term 'asylum officer' means an immigration officer who—

"(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and

"(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

"(F) EXCEPTION.—Subparagraph (A) shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry.

"(2) INSPECTION OF OTHER ALIENS.—

"(A) IN GENERAL.—Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 240.

"(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(C) TREATMENT OF ALIENS ARRIVING FROM CONTIGUOUS TERRITORY.—In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 240.

"(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 240.

"(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

"(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

"(A) order the alien removed, subject to review under paragraph (2);

"(B) report the order of removal to the Attorney General; and

"(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

"(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

"(B) If the Attorney General—

"(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

"(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

"(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

"(3) SUBMISSION OF STATEMENT AND INFORMATION.—The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

"(d) AUTHORITY RELATING TO INSPECTIONS.—

"(1) AUTHORITY TO SEARCH CONVEYANCES.—Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

"(2) AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.—Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

"(A) to detain the alien on the vessel or at the airport of arrival, and

"(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(3) ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.—The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.

"(4) SUBPOENA AUTHORITY.—(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.

"(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.".

<< 8 USCA § 1225 NOTE >>

(b) GAO STUDY ON OPERATION OF EXPEDITED REMOVAL PROCEDURES.—

(1) STUDY.—The Comptroller General shall conduct a study on the implementation of the expedited removal procedures under section 235(b)(1) of the Immigration and Nationality Act, as amended by subsection (a). The study shall examine—

(A) the effectiveness of such procedures in deterring illegal entry,

(B) the detention and adjudication resources saved as a result of the procedures,

(C) the administrative and other costs expended to comply with the provision,

(D) the effectiveness of such procedures in processing asylum claims by undocumented aliens who assert a fear of persecution, including the accuracy of credible fear determinations, and

(E) the cooperation of other countries and air carriers in accepting and returning aliens removed under such procedures.

(2) REPORT.—By not later than 18 months after the date of the enactment of this Act, the Comptroller General shall submit to the Committees on the Judiciary of the House of Representatives and the Senate a report on the study conducted under paragraph (1).

SEC. 303. APPREHENSION AND DETENTION OF ALIENS (REVISED SECTION 236).

<< 8 USCA § 1226 >>

(a) IN GENERAL.—Section 236 (8 U.S.C. 1226) is amended to read as follows:

"APPREHENSION AND DETENTION OF ALIENS

"SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole; but

"(3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

"(b) REVOCATION OF BOND OR PAROLE.—The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

"(c) DETENTION OF CRIMINAL ALIENS.—

"(1) CUSTODY.—The Attorney General shall take into custody any alien who—

"(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),

"(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),

"(C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or

"(D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) RELEASE.—The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

"(d) IDENTIFICATION OF CRIMINAL ALIENS.—(1) The Attorney General shall devise and implement a system—

"(A) to make available, daily (on a 24–hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

"(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

"(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

"(2) The record under paragraph (1)(C) shall be made available—

"(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

"(B) to officials of the Department of State for use in its automated visa lookout system.

"(3) Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

"(e) JUDICIAL REVIEW.—The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.".

<< 8 USCA § 1226 NOTE >>

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendment made by subsection (a) shall become effective on the title III–A effective date.

<< 8 USCA § 1226 NOTE, 1252 nt >>

(2) NOTIFICATION REGARDING CUSTODY.—If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and Immigration and Naturalization Service personnel available to carry out section 236(c) of the Immigration and Nationality Act, as amended by subsection (a), or the amendments made by section 440(c) of Public Law 104–132, the provisions in paragraph (3) shall be in effect for a 1–year period beginning on the date of such notification, instead of such section or such amendments. The Attorney General may extend such 1–year period for an additional year if the Attorney General provides the same notice not later than 10 days before the end of the first 1–year period. After the end of such 1–year or 2–year periods, the provisions of such section 236(c) shall apply to individuals released after such periods.

AR.01698

<< 8 USCA § 1226 NOTE >>

(3) TRANSITION PERIOD CUSTODY RULES.—

(A) IN GENERAL.—During the period in which this paragraph is in effect pursuant to paragraph (2), the Attorney General shall take into custody any alien who—

(i) has been convicted of an aggravated felony (as defined under section 101(a)(43) of the Immigration and Nationality Act, as amended by section 321 of this division),

(ii) is inadmissible by reason of having committed any offense covered in section 212(a)(2) of such Act,

(iii) is deportable by reason of having committed any offense covered in section 241(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of such Act (before redesignation under this subtitle), or

(iv) is inadmissible under section 212(a)(3)(B) of such Act or deportable under section 241(a)(4)(B) of such Act (before redesignation under this subtitle),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(B) RELEASE.—The Attorney General may release the alien only if the alien is an alien described in subparagraph (A) (ii) or (A)(iii) and—

(i) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding, or

(ii) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

SEC. 304. REMOVAL PROCEEDINGS; CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS; VOLUNTARY DEPARTURE (REVISED AND NEW SECTIONS 239 TO 240C).

(a) IN GENERAL.—Chapter 4 of title II is amended—

<< 1 USCA § 1229 >>

<< 1 USCA § 1224 >>

(1) by redesignating section 239 (8 U.S.C. 1229) as section 234 and by moving such section to immediately follow section 233;

<< 8 USCA § 1230 >>

(2) by redesignating section 240 (8 U.S.C. 1230) as section 240C; and

(3) by inserting after section 238 the following new sections:

<< 8 USCA § 1229 >>

"INITIATION OF REMOVAL PROCEEDINGS

"SEC. 239. (a) NOTICE TO APPEAR.—

"(1) IN GENERAL.—In removal proceedings under section 240, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged to have been violated.

"(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.

"(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

"(iii) The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.

"(G)(i) The time and place at which the proceedings will be held.

"(ii) The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.

"(2) NOTICE OF CHANGE IN TIME OR PLACE OF PROCEEDINGS.—

"(A) IN GENERAL.—In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—

"(i) the new time or place of the proceedings, and

"(ii) the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.

"(B) EXCEPTION.—In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F).

"(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

"(b) SECURING OF COUNSEL.—

"(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.

"(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

"(3) RULE OF CONSTRUCTION.—Nothing in this subsection may be construed to prevent the Attorney General from proceeding against an alien pursuant to section 240 if the time period described in paragraph (1) has elapsed and the alien has failed to secure counsel.

"(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).

"(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.

"(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

<< 8 USCA § 1229a >>

"REMOVAL PROCEEDINGS

"SEC. 240. (a) PROCEEDING.—

"(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

"(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).

"(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.

"(b) CONDUCT OF PROCEEDING.—

"(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this Act.

"(2) FORM OF PROCEEDING.—

"(A) IN GENERAL.—The proceeding may take place—

"(i) in person,

"(ii) where agreed to by the parties, in the absence of the alien,

"(iii) through video conference, or

"(iv) subject to subparagraph (B), through telephone conference.

"(B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

"(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

"(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

"(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

"(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this Act, and

"(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

"(5) CONSEQUENCES OF FAILURE TO APPEAR.—

"(A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

"(B) NO NOTICE OF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

"(C) RESCISSION OF ORDER.—Such an order may be rescinded only—

"(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

"(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 239(a) or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion by the immigration judge.

"(D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

"(E) ADDITIONAL APPLICATION TO CERTAIN ALIENS IN CONTIGUOUS TERRITORY.—The preceding provisions of this paragraph shall apply to all aliens placed in proceedings under this section, including any alien who remains in a contiguous foreign territory pursuant to section 235(b)(2)(C).

"(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

"(A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

AR.01701

"(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

"(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

"(7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

"(c) DECISION AND BURDEN OF PROOF.—

"(1) DECISION.—

"(A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

"(B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

"(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

"(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or

"(B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

"(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—

"(A) IN GENERAL.—In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"(B) PROOF OF CONVICTIONS.—In any proceeding under this Act, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

"(i) An official record of judgment and conviction.

"(ii) An official record of plea, verdict, and sentence.

"(iii) A docket entry from court records that indicates the existence of the conviction.

"(iv) Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

"(v) An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

"(vi) Any document or record prepared by, or under the direction of, the court in which the conviction was entered that indicates the existence of a conviction.

"(vii) Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

"(C) ELECTRONIC RECORDS.—In any proceeding under this Act, any record of conviction or abstract that has been submitted by electronic means to the Service from a State or court shall be admissible as evidence to prove a criminal conviction if it is—

"(i) certified by a State official associated with the State's repository of criminal justice records as an official record from its repository or by a court official from the court in which the conviction was entered as an official record from its repository, and

"(ii) certified in writing by a Service official as having been received electronically from the State's record repository or the court's record repository.

A certification under clause (i) may be by means of a computer-generated signature and statement of authenticity.

"(4) NOTICE.—If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

"(5) MOTIONS TO RECONSIDER.—

"(A) IN GENERAL.—The alien may file one motion to reconsider a decision that the alien is removable from the United States.

"(B) DEADLINE.—The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

"(C) CONTENTS.—The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

"(6) MOTIONS TO REOPEN.—

"(A) IN GENERAL.—An alien may file one motion to reopen proceedings under this section.

"(B) CONTENTS.—The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

"(C) DEADLINE.—

"(i) IN GENERAL.—Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

"(ii) ASYLUM.—There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

"(iii) FAILURE TO APPEAR.—The filing of a motion to reopen an order entered pursuant to subsection (b)(5) is subject to the deadline specified in subparagraph (C) of such subsection.

"(d) STIPULATED REMOVAL.—The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.

"(e) DEFINITIONS.—In this section and section 240A:

"(1) EXCEPTIONAL CIRCUMSTANCES.—The term 'exceptional circumstances' refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.

"(2) REMOVABLE.—The term 'removable' means—

"(A) in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or

"(B) in the case of an alien admitted to the United States, that the alien is deportable under section 237.

<< 8 USCA § 1229b >>

"CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS

"SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

"(2) has resided in the United States continuously for 7 years after having been admitted in any status, and

"(3) has not been convicted of any aggravated felony.

"(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(1) IN GENERAL.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

"(B) has been a person of good moral character during such period;

"(C) has not been convicted of an offense under section 212(a)(2), 237(a)(2), or 237(a)(3); and

"(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

"(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien demonstrates that—

"(A) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);

"(B) the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

"(C) the alien has been a person of good moral character during such period;

"(D) the alien is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and

"(E) the removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

"(3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

"(c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

"(1) An alien who entered the United States as a crewman subsequent to June 30, 1964.

"(2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

"(3) An alien who—

"(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

"(B) is subject to the two-year foreign residence requirement of section 212(e), and

"(C) has not fulfilled that requirement or received a waiver thereof.

"(4) An alien who is inadmissible under section 212(a)(3) or deportable under section 237(a)(4).

"(5) An alien who is described in section 241(b)(3)(B)(i).

"(6) An alien whose removal has previously been cancelled under this section or whose deportation was suspended under section 244(a) or who has been granted relief under section 212(c), as such sections were in effect before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

"(d) SPECIAL RULES RELATING TO CONTINUOUS RESIDENCE OR PHYSICAL PRESENCE.—

"(1) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

"(2) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

"(3) CONTINUITY NOT REQUIRED BECAUSE OF HONORABLE SERVICE IN ARMED FORCES AND PRESENCE UPON ENTRY INTO SERVICE.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

"(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

"(B) at the time of the alien's enlistment or induction was in the United States.

"(e) ANNUAL LIMITATION.—The Attorney General may not cancel the removal and adjust the status under this section, nor suspend the deportation and adjust the status under section 244(a) (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996), of a total of more than 4,000 aliens in any fiscal year. The previous sentence shall apply regardless of when an alien applied for such cancellation and adjustment and whether such an alien had previously applied for suspension of deportation under such section 244(a).

<< 8 USCA § 1229c >>

"VOLUNTARY DEPARTURE

"SEC. 240B. (a) CERTAIN CONDITIONS.—

"(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

"(3) BOND.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(4) TREATMENT OF ALIENS ARRIVING IN THE UNITED STATES.—In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

"(b) AT CONCLUSION OF PROCEEDINGS.—

"(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the immigration judge enters an order granting voluntary departure in lieu of removal and finds that—

"(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);

"(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

"(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and

"(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.

"(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(6)(A).

"(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249. The order permitting the alien to depart voluntarily shall inform the alien of the penalties under this subsection.

"(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens. No court may review any regulation issued under this subsection.

"(f) JUDICIAL REVIEW.—No court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure under subsection (b), nor shall any court order a stay of an alien's removal pending consideration of any claim with respect to voluntary departure.".

<< 8 USCA § 1182 >>

(b) REPEAL OF SECTION 212(c).—Section 212(c) (8 U.S.C. 1182(c)) is repealed.
(c) STREAMLINING REMOVAL OF CRIMINAL ALIENS.—

<< 8 USCA § 1252a >>

(1) IN GENERAL.—Section 242A(b)(4) (8 U.S.C. 1252a(b)(4)), as amended by section 442(a) of Public Law 104–132 and before redesignation by section 308(b)(5) of this division, is amended—
(A) by striking subparagraph (D);
(B) by amending subparagraph (E) to read as follows:
"(D) a determination is made for the record that the individual upon whom the notice for the proceeding under this section is served (either in person or by mail) is, in fact, the alien named in such notice;"; and
(C) by redesignating subparagraphs (F) and (G) as subparagraph (E) and (F), respectively.

<< 8 USCA § 1252a NOTE >>

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall be effective as if included in the enactment of section 442(a) of Public Law 104–132.

SEC. 305. DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED (NEW SECTION 241).

(a) IN GENERAL.—Title II is further amended—

<< 8 USCA § 1227 >>

(1) by striking section 237 (8 U.S.C. 1227),

<< 8 USCA § 1251 >>

<< 8 USCA § 1227 >>

(2) by redesignating section 241 (8 U.S.C. 1251) as section 237 and by moving such section to immediately follow section 236, and

<< 8 USCA § 1231 >>

(3) by inserting after section 240C (as redesignated by section 304(a)(2)) of this division the following new section:

"DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED
"SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS ORDERED REMOVED.—
"(1) REMOVAL PERIOD.—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) IN GENERAL.—Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').

"(B) BEGINNING OF PERIOD.—The removal period begins on the latest of the following:

"(i) The date the order of removal becomes administratively final.

"(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

"(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

"(C) SUSPENSION OF PERIOD.—The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

"(2) DETENTION.—During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 212(a)(2) or 212(a)(3)(B) or deportable under section 237(a)(2) or 237(a)(4)(B).

"(3) SUPERVISION AFTER 90–DAY PERIOD.—If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

"(A) to appear before an immigration officer periodically for identification;

"(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

"(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

"(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

"(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPERVISED RELEASE, OR PROBATION.—

"(A) IN GENERAL.—Except as provided in section 343(a) of the Public Health Service Act (42 U.S.C. 259(a)) and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

"(B) EXCEPTION FOR REMOVAL OF NONVIOLENT OFFENDERS PRIOR TO COMPLETION OF SENTENCE OF IMPRISONMENT.—The Attorney General is authorized to remove an alien in accordance with applicable procedures under this Act before the alien has completed a sentence of imprisonment—

"(i) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 101(a)(43)(B), (C), (E), (I), or (L) and (II) the removal of the alien is appropriate and in the best interest of the United States; or

"(ii) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 101(a)(43)(C) or (E)), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

"(C) NOTICE.—Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

"(D) NO PRIVATE RIGHT.—No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

"(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS ILLEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this Act, and the alien shall be removed under the prior order at any time after the reentry.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(6) INADMISSIBLE OR CRIMINAL ALIENS.—An alien ordered removed who is inadmissible under section 212, removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

"(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—

"(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

"(B) the removal of the alien is otherwise impracticable or contrary to the public interest.

"(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—

"(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—

"(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

"(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

"(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

"(i) The country of which the alien is a citizen, subject, or national.

"(ii) The country in which the alien was born.

"(iii) The country in which the alien has a residence.

"(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

"(2) OTHER ALIENS.—Subject to paragraph (3)—

"(A) SELECTION OF COUNTRY BY ALIEN.—Except as otherwise provided in this paragraph—

"(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

"(ii) the Attorney General shall remove the alien to the country the alien so designates.

"(B) LIMITATION ON DESIGNATION.—An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

"(C) DISREGARDING DESIGNATION.—The Attorney General may disregard a designation under subparagraph (A)(i) if—

"(i) the alien fails to designate a country promptly;

"(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

"(iii) the government of the country is not willing to accept the alien into the country; or

"(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

"(D) ALTERNATIVE COUNTRY.—If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—

"(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

AR.01708

"(ii) is not willing to accept the alien into the country.

"(E) ADDITIONAL REMOVAL COUNTRIES.—If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

"(i) The country from which the alien was admitted to the United States.

"(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

"(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

"(iv) The country in which the alien was born.

"(v) The country that had sovereignty over the alien's birthplace when the alien was born.

"(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

"(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

"(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

"(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

"(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

"(3) RESTRICTION ON REMOVAL TO A COUNTRY WHERE ALIEN'S LIFE OR FREEDOM WOULD BE THREATENED.—

"(A) IN GENERAL.—Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

"(B) EXCEPTION.—Subparagraph (A) does not apply to an alien deportable under section 237(a)(4)(D) or if the Attorney General decides that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

"(iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or

"(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section 237(a)(4)(B) shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States.

"(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—

"(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(b)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—

"(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

"(B) the alien is a stowaway—

"(i) who has been ordered removed in accordance with section 235(a)(1),

"(ii) who has requested asylum, and

"(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

"(2) STAY OF REMOVAL.—

"(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—

"(i) immediate removal is not practicable or proper; or

"(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

"(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'—

"(i) the cost of maintenance of the alien; and

"(ii) a witness fee of $1 a day.

"(C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

"(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

"(ii) condition that the alien appear when required as a witness and for removal; and

"(iii) other conditions the Attorney General may prescribe.

"(3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

"(i) while the alien is detained under subsection (d)(1), and

"(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

"(I) subsection (d)(2)(A) or (d)(2)(B)(i),

"(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

"(III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

"(B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

"(i) the alien is a crewmember;

"(ii) the alien has an immigrant visa;

"(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

"(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

"(v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

"(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

"(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

"(vi) the individual claims to be a national of the United States and has a United States passport.

"(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

"(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

"(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

"(B) take the alien to the foreign country to which the alien is ordered removed.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

"(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

"(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

"(i) for medical treatment,

"(ii) for detention of the stowaway by the Attorney General, or

"(iii) for departure or removal of the stowaway; and

"(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if the requester has obtained any travel documents necessary for departure or repatriation of the stowaway and removal of the stowaway will not be unreasonably delayed.

"(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

"(e) PAYMENT OF EXPENSES OF REMOVAL.—

"(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—

"(A) pay the cost from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'; and

"(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

"(2) COSTS OF REMOVAL TO PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

"(A) THROUGH APPROPRIATION.—Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(B) THROUGH OWNER.—

"(i) IN GENERAL.—In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

"(ii) ALIENS DESCRIBED.—An alien described in this clause is an alien who—

"(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or

"(II) is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.

"(C) COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.

"(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

"(1) IN GENERAL.—If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

"(2) COSTS.—The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

"(g) PLACES OF DETENTION.—

"(1) IN GENERAL.—The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses', without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

"(2) DETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

"(h) STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1326 >>

(b) REENTRY OF ALIEN REMOVED PRIOR TO COMPLETION OF TERM OF IMPRISONMENT.—Section 276(b) (8 U.S.C. 1326(b)), as amended by section 321(b) of this division, is amended—

(1) by striking "or" at the end of paragraph (2),

(2) by adding "or" at the end of paragraph (3), and

(3) by inserting after paragraph (3) the following new paragraph:

"(4) who was removed from the United States pursuant to section 241(a)(4)(B) who thereafter, without the permission of the Attorney General, enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be fined under title 18, United States Code, imprisoned for not more than 10 years, or both.

<< 8 USCA § 1182 >>

(c) MISCELLANEOUS CONFORMING AMENDMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a) of this division, is amended by striking "241(a)(5)(B)" each place it appears and inserting "237(a)(5)(B)".

SEC. 306. APPEALS FROM ORDERS OF REMOVAL (NEW SECTION 242).

(a) IN GENERAL.—Section 242 (8 U.S.C. 1252) is amended—

<< 8 USCA § 1252 >>

<< 8 USCA § 1231 >>

(1) by redesignating subsection (j) as subsection (i) and by moving such subsection and adding it at the end of section 241, as inserted by section 305(a)(3) of this division; and

<< 8 USCA § 1252 >>

(2) by amending the remainder of section 242 to read as follows:

"JUDICIAL REVIEW OF ORDERS OF REMOVAL

"SEC. 242. (a) APPLICABLE PROVISIONS.—

"(1) GENERAL ORDERS OF REMOVAL.—Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) MATTERS NOT SUBJECT TO JUDICIAL REVIEW.—

"(A) REVIEW RELATING TO SECTION 235(b)(1).—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

"(ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

"(iii) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

"(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

"(B) DENIALS OF DISCRETIONARY RELIEF.—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(i) any judgment regarding the granting of relief under section 212(h), 212(i), 240A, 240B, or 245, or

"(ii) any other decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General, other than the granting of relief under section 208(a).

"(C) ORDERS AGAINST CRIMINAL ALIENS.—Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 212(a)(2) or 237(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 237(a)(2)(A) (ii) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 237(a) (2)(A)(i).

"(3) TREATMENT OF CERTAIN DECISIONS.—No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).

"(b) REQUIREMENTS FOR REVIEW OF ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

"(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

"(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

"(3) SERVICE.—

"(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 240 was entered.

"(B) STAY OF ORDER.—Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

"(C) ALIEN'S BRIEF.—The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause shown. If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

"(4) SCOPE AND STANDARD FOR REVIEW.—Except as provided in paragraph (5)(B)—

"(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

"(B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

"(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

"(D) the Attorney General's discretionary judgment whether to grant relief under section 208(a) shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

"(5) TREATMENT OF NATIONALITY CLAIMS.—

"(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

"(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

"(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

"(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.—When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

"(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

"(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

"(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

"(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

"(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

"(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

"(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

"(8) CONSTRUCTION.—This subsection—

"(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

"(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

"(C) does not require the Attorney General to defer removal of the alien.

"(9) CONSOLIDATION OF QUESTIONS FOR JUDICIAL REVIEW.—Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section.

"(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal—

"(1) shall attach a copy of such order, and

"(2) shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

"(d) REVIEW OF FINAL ORDERS.—A court may review a final order of removal only if—

"(1) the alien has exhausted all administrative remedies available to the alien as of right, and

"(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

"(e) JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).—

"(1) LIMITATIONS ON RELIEF.—Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—

"(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 235(b)(1) except as specifically authorized in a subsequent paragraph of this subsection, or

"(B) certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

"(2) HABEAS CORPUS PROCEEDINGS.—Judicial review of any determination made under section 235(b)(1) is available in habeas corpus proceedings, but shall be limited to determinations of—

"(A) whether the petitioner is an alien,

"(B) whether the petitioner was ordered removed under such section, and

"(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207, or has been granted asylum under section 208, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

"(3) CHALLENGES ON VALIDITY OF THE SYSTEM.—

"(A) IN GENERAL.—Judicial review of determinations under section 235(b) and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

"(i) whether such section, or any regulation issued to implement such section, is constitutional; or

"(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this title or is otherwise in violation of law.

"(B) DEADLINES FOR BRINGING ACTIONS.—Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

"(C) NOTICE OF APPEAL.—A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

"(D) EXPEDITIOUS CONSIDERATION OF CASES.—It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

"(4) DECISION.—In any case where the court determines that the petitioner—

"(A) is an alien who was not ordered removed under section 235(b)(1), or

"(B) has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207, or has been granted asylum under section 208, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

"(5) SCOPE OF INQUIRY.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

"(f) LIMIT ON INJUNCTIVE RELIEF.—

"(1) IN GENERAL.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

"(2) PARTICULAR CASES.—Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

"(g) EXCLUSIVE JURISDICTION.—Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.".

<< 8 USCA § 1105a >>

(b) REPEAL OF SECTION 106.—Section 106 (8 U.S.C. 1105a) is repealed.

<< 8 USCA § 1252 NOTE >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Subject to paragraph (2), the amendments made by subsections (a) and (b) shall apply to all final orders of deportation or removal and motions to reopen filed on or after the date of the enactment of this Act and subsection (g) of section 242 of the Immigration and Nationality Act (as added by subsection (a)), shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act.

(2) LIMITATION.—Paragraph (1) shall not be considered to invalidate or to require the reconsideration of any judgment or order entered under section 106 of the Immigration and Nationality Act, as amended by section 440 of Public Law 104–132.

<< 8 USCA §§ 1105a, 1182, 1252, 1252a >>

<< 8 USCA § 1182 NOTE >>

(d) TECHNICAL AMENDMENT.—Effective as if included in the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), subsections (a), (c), (d), (g), and (h) of section 440 of such Act are amended by striking "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i)" and inserting "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i)".

<< 8 USCA § 1253 >>

SEC. 307. PENALTIES RELATING TO REMOVAL (REVISED SECTION 243).

(a) IN GENERAL.—Section 243 (8 U.S.C. 1253) is amended to read as follows:

"PENALTIES RELATED TO REMOVAL

"SEC. 243. (a) PENALTY FOR FAILURE TO DEPART.—

"(1) IN GENERAL.—Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—

"(A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

"(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

"(C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

"(D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

"(2) EXCEPTION.—It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

"(3) SUSPENSION.—The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—

"(A) the age, health, and period of detention of the alien;

"(B) the effect of the alien's release upon the national security and public peace or safety;

"(C) the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;

"(D) the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;

"(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

"(F) the eligibility of the alien for discretionary relief under the immigration laws.

"(b) WILLFUL FAILURE TO COMPLY WITH TERMS OF RELEASE UNDER SUPERVISION.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

"(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—

"(1) CIVIL PENALTIES.—

"(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.

"(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

"(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.

"(2) CLEARING VESSELS AND AIRCRAFT.—

"(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

"(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

"(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.".

SEC. 308. REDESIGNATION AND REORGANIZATION OF OTHER PROVISIONS; ADDITIONAL CONFORMING AMENDMENTS.

(a) CONFORMING AMENDMENT TO TABLE OF CONTENTS; OVERVIEW OF REORGANIZED CHAPTERS.—The table of contents, as amended by sections 123(b) and 671(e)(1) of this division, is amended—

(1) by striking the item relating to section 106, and

(2) by striking the item relating to chapter 4 of title II and all that follows through the item relating to section 244A and inserting the following:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL

"Sec. 231. Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.

"Sec. 232. Detention of aliens for physical and mental examination.

"Sec. 233. Entry through or from foreign territory and adjacent islands; landing stations.

"Sec. 234. Designation of ports of entry for aliens arriving by civil aircraft.

"Sec. 235. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.

"Sec. 235A. Preinspection at foreign airports.

"Sec. 236. Apprehension and detention of aliens not lawfully in the United States.

"Sec. 237. General classes of deportable aliens.

"Sec. 238. Expedited removal of aliens convicted of committing aggravated felonies.

"Sec. 239. Initiation of removal proceedings.

"Sec. 240. Removal proceedings.

"Sec. 240A. Cancellation of removal; adjustment of status.

"Sec. 240B. Voluntary departure.

"Sec. 240C. Records of admission.

"Sec. 241. Detention and removal of aliens ordered removed.

"Sec. 242. Judicial review of orders of removal.

"Sec. 243. Penalties relating to removal.

"Sec. 244. Temporary protected status.

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".
(b) REORGANIZATION OF OTHER PROVISIONS.—Chapters 4 and 5 of title II are amended as follows:

<< 8 USCA Ch. 12 >>

(1) AMENDING CHAPTER HEADING.—Amend the heading for chapter 4 of title II to read as follows:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL".

<< 8 USCA § 1222 >>

(2) REDESIGNATING SECTION 232 AS SECTION 232(a).—Amend section 232 (8 U.S.C. 1222)—
(A) by inserting "(a) DETENTION OF ALIENS.—" after "SEC. 232.", and
(B) by amending the section heading to read as follows:

"DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION".
(3) REDESIGNATING SECTION 234 AS SECTION 232(b).—Amend section 234 (8 U.S.C. 1224)—

<< 8 USCA § 1224 >>

(A) by striking the heading,
(B) by striking "SEC. 234." and inserting the following: "(b) PHYSICAL AND MENTAL EXAMINATION.—", and

<< 8 USCA §§ 1222, 1224 >>

(C) by moving such provision to the end of section 232.

<< 8 USCA § 1228 >>

<< 8 USCA § 1223 >>

(4) REDESIGNATING SECTION 238 AS SECTION 233.—Redesignate section 238 (8 U.S.C. 1228) as section 233 and move the section to immediately follow section 232.

<< 8 USCA § 1252a >>

<< 8 USCA § 1228 >>

(5) REDESIGNATING SECTION 242A AS SECTION 238.—Redesignate section 242A as section 238, strike "DEPORTATION" in its heading and insert "REMOVAL", and move the section to immediately follow section 237 (as redesignated by section 305(a)(2)).

<< 8 USCA § 1252b >>

(6) STRIKING SECTION 242B.—Strike section 242B (8 U.S.C. 1252b).

<< 8 USCA § 1254 >>

<< 8 USCA § 1254a >>

(7) STRIKING SECTION 244 AND REDESIGNATING SECTION 244A AS SECTION 244.—Strike section 244 (8 U.S.C. 1254) and redesignate section 244A as section 244.

<< 8 USCA Ch. 12 >>

(8) AMENDING CHAPTER HEADING.—Amend the heading for chapter 5 of title II to read as follows:

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".

(c) ADDITIONAL CONFORMING AMENDMENTS.—

(1) EXPEDITED PROCEDURES FOR AGGRAVATED FELONS (FORMER SECTION 242A).—Section 238 (which, previous to redesignation under section 308(b)(5) of this division, was section 242A) is amended—

<< 8 USCA § 1228 >>

(A) in subsection (a)(1), by striking "section 242" and inserting "section 240";

(B) in subsection (a)(2), by striking "section 242(a)(2)" and inserting "section 236(c)"; and

(C) in subsection (b)(1), by striking "section 241(a)(2)(A)(iii)" and inserting "section 237(a)(2)(A)(iii)".

(2) TREATMENT OF CERTAIN HELPLESS ALIENS.—

<< 8 USCA § 1222 >>

(A) CERTIFICATION OF HELPLESS ALIENS.—Section 232 (8 U.S.C. 1222), as amended by section 308(b)(2) of this division, is further amended by adding at the end the following new subsection:

"(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.—If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.".

<< 8 USCA § 1182 >>

(B) GROUND OF INADMISSIBILITY FOR PROTECTION AND GUARDIANSHIP OF ALIENS DENIED ADMISSION FOR HEALTH OR INFANCY.—Subparagraph (B) of section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(a)(1) of this division, is amended to read as follows:

"(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—

"(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and

"(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.".

<< 8 USCA § 1323 >>

(3) CONTINGENT CONSIDERATION IN RELATION TO REMOVAL OF ALIENS.—Section 273(a) (8 U.S.C. 1323(a)) is amended—

(A) by inserting "(1)" after "(a)", and

(B) by adding at the end the following new paragraph:

"(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.".

<< 8 USCA § 1228 >>

(4) CLARIFICATION.—(A) Section 238(a)(1), which, previous to redesignation under section 308(b)(5) of this division, was section 242A(a)(1), is amended by adding at the end the following: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1101 NOTE >>

(B) Section 225 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) is amended by striking "and nothing in" and all that follows up to "shall".

(d) ADDITIONAL CONFORMING AMENDMENTS RELATING TO EXCLUSION AND INADMISSIBILITY.—

(1) SECTION 212.—Section 212 (8 U.S.C. 1182(a)) is amended—

<< 8 USCA § 1182 >>

(A) in the heading, by striking "EXCLUDED FROM" and inserting "INELIGIBLE FOR";

(B) in the matter in subsection (a) before paragraph (1), by striking all that follows "(a)" and inserting the following: "CLASSES OF ALIENS INELIGIBLE FOR VISAS OR ADMISSION.—Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:";

(C) in subsection (a), by striking "is excludable" and inserting "is inadmissible" each place it appears;

(D) in subsections (a)(5)(C) (before redesignation by section 343(c)(1) of this division), (d)(1), and (k), by striking "exclusion" and inserting "inadmissibility";

(E) In subsections (b), (d)(3), (h)(1)(A)(i), and (k), by striking "excludable" each place it appears and inserting "inadmissible";

(F) in subsection (b)(2), by striking "or ineligible for entry";

(G) in subsection (d)(7), by striking "excluded from" and inserting "denied"; and

(H) in subsection (h)(1)(B), by striking "exclusion" and inserting "denial of admission".

(2) SECTION 241.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended—

<< 8 USCA § 1251 >>

(A) in subsection (a)(1)(H), by striking "excludable" and inserting "inadmissible";
(B) in subsection (a)(4)(C)(ii), by striking "excludability" and inserting "inadmissibility";
(C) in subsection (c), by striking "exclusion" and inserting "inadmissibility"; and

<< 8 USCA § 1251 >>

<< 8 USCA § 1227 NOTE >>

(D) effective upon enactment of this Act, by striking subsection (d), as added by section 414(a) of the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132).
(3) OTHER GENERAL REFERENCES.—The following provisions are amended by striking "excludability" and "excludable" each place each appears and inserting "inadmissibility" and "inadmissible", respectively:

<< 8 USCA §§ 1101, 1183, 1224, 1251, 1322, 1327, 1356 >>

<< 8 USCA § 1182 NOTE >>

(A) Sections 101(f)(3), 213, 234 (before redesignation by section 308(b) of this division), 241(a)(1) (before redesignation by section 305(a)(2) of this division), 272(a), 277, 286(h)(2)(A)(v), and 286(h)(2)(A)(vi).

<< 8 USCA § 1182 NOTE >>

(B) Section 601(c) of the Immigration Act of 1990.

<< 8 USCA § 1182 NOTE >>

(C) Section 128 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138).
(D) Section 1073 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337).

<< 8 USCA § 1182 NOTE >>

(E) Section 221 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).
(4) RELATED TERMS.—

<< 8 USCA § 1101 >>

(A) Section 101(a)(17) (8 U.S.C. 1101(a)(17)) is amended by striking "or expulsion" and inserting "expulsion, or removal".

<< 8 USCA § 1102 >>

(B) Section 102 (8 U.S.C. 1102) is amended by striking "exclusion or deportation" and inserting "removal".

<< 8 USCA § 1103 >>

(C) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "been excluded or deported" and inserting "not been admitted or have been removed".

<< 8 USCA § 1156 >>

(D) Section 206 (8 U.S.C. 1156) is amended by striking "excluded from admission to the United States and deported" and inserting "denied admission to the United States and removed".

<< 8 USCA § 1186a >>

(E) Section 216(f) (8 U.S.C. 1186a) is amended by striking "exclusion" and inserting "inadmissibility".

<< 8 USCA § 1187 >>

(F) Section 217 (8 U.S.C. 1187) is amended by striking "excluded from admission" and inserting "denied admission at the time of arrival" each place it appears.

<< 8 USCA § 1201 >>

(G) Section 221(f) (8 U.S.C. 1201) is amended by striking "exclude" and inserting "deny admission to".

<< 8 USCA § 1222 >>

(H) Section 232(a) (8 U.S.C. 1222(a)), as redesignated by subsection (b)(2), is amended by striking "excluded by" and "the excluded classes" and inserting "inadmissible under" and "inadmissible classes", respectively.

<< 8 USCA § 1322 >>

(I)(i) Section 272 (8 U.S.C. 1322) is amended—
 (I) by striking "EXCLUSION" in the heading and inserting "DENIAL OF ADMISSION",
 (II) in subsection (a), by striking "excluding condition" and inserting "condition causing inadmissibility", and
 (III) in subsection (c), by striking "excluding".
 (ii) The item in the table of contents relating to such section is amended by striking "exclusion" and inserting "denial of admission".

<< 8 USCA § 1326 >>

(J) Section 276(a) (8 U.S.C. 1326(a)) is amended—
 (i) in paragraph (1), as amended by section 324(a) of this division—
  (I) by striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed", and
  (II) by striking "exclusion or deportation" and inserting "exclusion, deportation, or removal"; and
 (ii) in paragraph (2)(B), by striking "excluded and deported" and inserting "denied admission and removed".

<< 8 USCA § 1356 >>

(K) Section 286(h)(2)(A)(vi) (8 U.S.C. 1356(h)(2)(A)(vi)) is amended by striking "exclusion" each place it appears and inserting "removal".

<< 8 USCA § 1357 >>

(L) Section 287 (8 U.S.C. 1357) is amended—
 (i) in subsection (a), by striking "or expulsion" each place it appears and inserting "expulsion, or removal", and
 (ii) in subsection (c), by striking "exclusion from" and inserting "denial of admission to".

<< 8 USCA § 1360 >>

(M) Section 290(a) (8 U.S.C. 1360(a)) is amended by striking "admitted to the United States, or excluded therefrom" each place it appears and inserting "admitted or denied admission to the United States".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1361 >>

(N) Section 291 (8 U.S.C. 1361) is amended by striking "subject to exclusion" and inserting "inadmissible" each place it appears.

<< 8 USCA § 1362 >>

(O) Section 292 (8 U.S.C. 1362) is amended by striking "exclusion or deportation" each place it appears and inserting "removal".

<< 8 USCA § 1503 >>

(P) Section 360 (8 U.S.C. 1503) is amended—
  (i) in subsection (a), by striking "exclusion" each place it appears and inserting "removal", and
  (ii) in subsection (c), by striking "excluded from" and inserting "denied".

<< 8 USCA § 1537 >>

(Q) Section 507(b)(2)(D) (8 U.S.C. 1537(b)(2)(D)) is amended by striking "exclusion because such alien is excludable" and inserting "removal because such alien is inadmissible".

<< 8 USCA § 1255a NOTE >>

(R) Section 301(a)(1) of the Immigration Act of 1990 is amended by striking "exclusion" and inserting "inadmissibility".

<< 8 USCA § 1522 NOTE >>

(S) Section 401(c) of the Refugee Act of 1980 is amended by striking "deportation or exclusion" and inserting "removal".

<< 8 USCA § 1522 NOTE >>

(T) Section 501(e)(2) of the Refugee Education Assistance Act of 1980 (Public Law 96–422) is amended—
  (i) by striking "exclusion or deportation" each place it appears and inserting "removal", and
  (ii) by striking "deportation or exclusion" each place it appears and inserting "removal".

<< 18 USCA § 4113 >>

(U) Section 4113(c) of title 18, United States Code, is amended by striking "exclusion and deportation" and inserting "removal".

<< 8 USCA §§ 1225, 1227 >>

<< 8 USCA § 1225 NOTE >>

(5) REPEAL OF SUPERSEDED PROVISION.—Effective as of the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, section 422 of such Act is repealed and the Immigration and Nationality Act shall be applied as if such section had not been enacted.
(e) REVISION OF TERMINOLOGY RELATING TO DEPORTATION.—
  (1) Each of the following is amended by striking "deportation" each place it appears and inserting "removal":

<< 8 USCA § 1154 >>

(A) Subparagraphs (A)(iii)(II), (A)(iv)(II), and (B)(iii)(II) of section 204(a)(1) (8 U.S.C. 1154(a)(1)).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1182 >>

(B) Section 212(d)(1) (8 U.S.C. 1182(d)(1)).

(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)).

<< 8 USCA § 1184 >>

(D) Section 214(k)(4)(C) (8 U.S.C. 1184(k)(4)(C)), as redesignated by section 671(a)(3)(A) of this division.

<< 8 USCA § 1251 >>

(E) Section 241(a)(1)(H) (8 U.S.C. 1251(a)(1)(H)), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1252a >>

(F) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(5).

<< 8 USCA § 1254a >>

(G) Subsections (a)(3) and (b)(5)(B) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by subsection (b)(7).

<< 8 USCA § 1256 >>

(H) Section 246(a) (8 U.S.C. 1256(a)).

<< 8 USCA § 1284 >>

(I) Section 254 (8 U.S.C. 1284).

<< 8 USCA § 1303 >>

(J) Section 263(a)(4) (8 U.S.C. 1303(a)(4)).

<< 8 USCA § 1326 >>

(K) Section 276(b) (8 U.S.C. 1326(b)).

<< 8 USCA § 1356 >>

(L) Section 286(h)(2)(A)(v) (8 U.S.C. 1356(h)(2)(A)(v)).

<< 8 USCA § 1357 >>

(M) Section 287(g) (8 U.S.C. 1357(g)) (as added by section 122 of this division).

<< 8 USCA § 1361 >>

(N) Section 291 (8 U.S.C. 1361).

<< 8 USCA § 1429 >>

(O) Section 318 (8 U.S.C. 1429).

<< 8 USCA § 1158 >>

<< 8 USCA § 1158 NOTE >>

(P) Section 130005(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322).

<< 18 USCA § 4113 >>

(Q) Section 4113(b) of title 18, United States Code.

(2) Each of the following is amended by striking "deported" each place it appears and inserting "removed":

<< 8 USCA § 1182 >>

(A) Section 212(d)(7) (8 U.S.C. 1182(d)(7)).

<< 8 USCA § 1184 >>

(B) Section 214(d) (8 U.S.C. 1184(d)).

<< 8 USCA § 1251 >>

(C) Section 241(a) (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1252a >>

(D) Section 242A(c)(2)(D)(iv) (8 U.S.C. 1252a(c)(2)(D)(iv)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5).

<< 8 USCA § 1282 >>

(E) Section 252(b) (8 U.S.C. 1282(b)).

<< 8 USCA § 1284 >>

(F) Section 254 (8 U.S.C. 1284).

<< 8 USCA § 1306 >>

(G) Subsections (b) and (c) of section 266 (8 U.S.C. 1306).

<< 8 USCA § 1255a NOTE >>

(H) Section 301(a)(1) of the Immigration Act of 1990.

<< 18 USCA § 4113 >>

(I) Section 4113 of title 18, United States Code.

<< 8 USCA § 1101 >>

(3) Section 101(g) (8 U.S.C. 1101(g)) is amended by inserting "or removed" after "deported" each place it appears.

<< 8 USCA § 1103 >>

(4) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "suspension of deportation" and inserting "cancellation of removal".

<< 8 USCA § 1151 >>

(5) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) is amended by striking "deportation is suspended" and inserting "removal is canceled".

<< 8 USCA § 1182 >>

(6) Section 212(l)(2)(B) (8 U.S.C. 1182(l)(2)(B)) is amended by striking "deportation against" and inserting "removal of".

<< 8 USCA § 1186a >>

(7) Subsections (b)(2), (c)(2)(B), (c)(3)(D), (c)(4)(A), and (d)(2)(C) of section 216 (8 U.S.C. 1186a) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" each place each appears and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

<< 8 USCA § 1186b >>

(8) Subsections (b)(2), (c)(2)(B), (c)(3)(D), and (d)(2)(C) of section 216A (8 U.S.C. 1186b) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

<< 8 USCA § 1187 >>

(9) Section 217(b)(2) (8 U.S.C. 1187(b)(2)) is amended by striking "deportation against" and inserting "removal of".

<< 8 USCA § 1252a >>

(10) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(6), is amended, in the headings to various subdivisions, by striking "DEPORTATION" and "DEPORTATION" and inserting "REMOVAL" and "REMOVAL", respectively.

(11) Section 244A(a)(1)(A) (8 U.S.C. 1254a(a)(1)(A)), before redesignation as section 244 by subsection (b)(8), is amended—

<< 8 USCA § 1254a >>

(A) in subsection (a)(1)(A), by striking "deport" and inserting "remove", and
(B) in subsection (e), by striking "SUSPENSION OF DEPORTATION" and inserting "CANCELLATION OF REMOVAL".

<< 8 USCA § 1284 >>

(12) Section 254 (8 U.S.C. 1284) is amended by striking "deport" each place it appears and inserting "remove".

<< 8 USCA § 1323 >>

(13) Section 273(d) (8 U.S.C. 1323(d)) is repealed.

<< 8 USCA § 1326 >>

(14)(A) Section 276 (8 U.S.C. 1326) is amended by striking "DEPORTED" and inserting "REMOVED".
(B) The item in the table of contents relating to such section is amended by striking "deported" and inserting "removed".

<< 8 USCA § 1429 >>

(15) Section 318 (8 U.S.C. 1429) is amended by striking "suspending" and inserting "canceling".

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1255a NOTE >>

(16) Section 301(a) of the Immigration Act of 1990 is amended by striking "DEPORTATION" and inserting "REMOVAL".

<< 8 USCA § 1158 NOTE >>

(17) The heading of section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended by striking "DEPORTATION" and inserting "REMOVAL".

<< 22 USCA § 2508 >>

(18) Section 9 of the Peace Corps Act (22 U.S.C. 2508) is amended by striking "deported" and all that follows through "Deportation" and inserting "removed pursuant to chapter 4 of title II of the Immigration and Nationality Act".

<< 22 USCA § 618 >>

(19) Section 8(c) of the Foreign Agents Registration Act (22 U.S.C. 618(c)) is amended by striking "deportation" and all that follows and inserting "removal pursuant to chapter 4 of title II of the Immigration and Nationality Act".

(f) REVISION OF REFERENCES TO ENTRY.—

(1) The following provisions are amended by striking "entry" and inserting "admission" each place it appears:

<< 8 USCA § 1101 >>

(A) Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)).
(B) Section 101(a)(30) (8 U.S.C. 1101(a)(30)).

<< 8 USCA § 1182 >>

(C) Section 212(a)(2)(D) (8 U.S.C. 1182(a)(2)(D)).
(D) Section 212(a)(6)(C)(i) (8 U.S.C. 1182(a)(6)(C)(i)).
(E) Section 212(h)(1)(A)(i) (8 U.S.C. 1182(h)(1)(A)(i)).
(F) Section 212(j)(1)(D) (8 U.S.C. 1182(j)(1)(D)).

<< 8 USCA § 1184 >>

(G) Section 214(c)(2)(A) (8 U.S.C. 1184(c)(2)(A)).
(H) Section 214(d) (8 U.S.C. 1184(d)).

<< 8 USCA § 1186a >>

(I) Section 216(b)(1)(A)(i) (8 U.S.C. 1186a(b)(1)(A)(i)).
(J) Section 216(d)(1)(A)(i)(III) (8 U.S.C. 1186a(d)(1)(A)(i)(III)).

<< 8 USCA § 1230 >>

(K) Subsection (b) of section 240 (8 U.S.C. 1230), before redesignation as section 240C by section 304(a)(2) of this division.

<< 8 USCA § 1251 >>

(L) Subsection (a)(1)(G) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division.
(M) Subsection (a)(1)(H) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, other than the last time it appears.

(N) Paragraphs (2) and (4) of subsection (a) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1255 >>

(O) Section 245(e)(3) (8 U.S.C. 1255(e)(3)).

<< 8 USCA § 1257 >>

(P) Section 247(a) (8 U.S.C. 1257(a)).

<< 8 USCA § 1182 NOTE >>

(Q) Section 601(c)(2) of the Immigration Act of 1990.

(2) The following provisions are amended by striking "enter" and inserting "be admitted":

<< 8 USCA § 1154 >>

(A) Section 204(e) (8 U.S.C. 1154(e)).

<< 8 USCA § 1201 >>

(B) Section 221(h) (8 U.S.C. 1201(h)).

<< 8 USCA § 1255 >>

(C) Section 245(e)(2) (8 U.S.C. 1255(e)(2)).

(3) The following provisions are amended by striking "enters" and inserting "is admitted to":

<< 8 USCA § 1182 >>

(A) Section 212(j)(1)(D)(ii) (8 U.S.C. 1154(e)).

<< 8 USCA § 1184 >>

(B) Section 214(c)(5)(B) (8 U.S.C. 1184(c)(5)(B)).

<< 8 USCA § 1228 >>

(4) Subsection (a) of section 238 (8 U.S.C. 1228), before redesignation as section 233 by section 308(b)(4) of this division, is amended by striking "entry and inspection" and inserting "inspection and admission".

<< 8 USCA § 1251 >>

(5) Subsection (a)(1)(H)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended by striking "at entry".

<< 50 USCA § 403h >>

(6) Section 7 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 403h) is amended by striking "that the entry", "given entry into", and "entering" and inserting "that the admission", "admitted to", and "admitted to".

<< 50 USCA § 47c >>

(7) Section 4 of the Atomic Weapons and Special Nuclear Materials Rewards Act (50 U.S.C. 47c) is amended by striking "entry" and inserting "admission".

(g) CONFORMING REFERENCES TO REORGANIZED SECTIONS.—

<< 8 USCA §§ 1182, 1221, 1252a, 1321, 1356, 1364, 1531 >>

<< 8 USCA §§ 1224 NOTE, 1254a NOTE, 1255a NOTE >>

<< 42 USCA § 402 >>

 (1) REFERENCES TO SECTIONS 232, 234, 238, 239, 240, 241, 242A, AND 244A.—Any reference in law in effect on the day before the date of the enactment of this Act to section 232, 234, 238, 239, 240, 241, 242A, or 244A of the Immigration and Nationality Act (or a subdivision of such section) is deemed, as of the title III–A effective date, to refer to section 232(a), 232(b), 233, 234, 234A, 237, 238, or 244 of such Act (or the corresponding subdivision of such section), as redesignated by this subtitle. Any reference in law to section 241 (or a subdivision of such section) of the Immigration and Nationality Act in an amendment made by a subsequent subtitle of this title is deemed a reference (as of the title III–A effective date) to section 237 (or the corresponding subdivision of such section), as redesignated by this subtitle.
 (2) REFERENCES TO SECTION 106.—

<< 8 USCA § 1252a >>

 (A) Sections 242A(b)(3) and 242A(c)(3)(A)(ii) (8 U.S.C. 1252a(b)(3), 1252a(c)(3)(A)(ii), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), are each amended by striking "106" and inserting "242".

<< 8 USCA § 1160 >>

 (B) Sections 210(e)(3)(A) and 245A(f)(4)(A) (8 U.S.C. 1160(e)(3)(A), 1255a(f)(4)(A)) are amended by inserting "(as in effect before October 1, 1996)" after "106".

<< 8 USCA § 1252a >>

 (C) Section 242A(c)(3)(A)(iii) (8 U.S.C. 1252a(c)(3)(A)(iii)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), is amended by striking "106(a)(1)" and inserting "242(b)(1)".
 (3) REFERENCES TO SECTION 236.—

<< 8 USCA §§ 1155, 1159 >>

 (A) Sections 205 and 209(a)(1) (8 U.S.C. 1155, 1159(a)(1)) are each amended by striking "236" and inserting "240".

<< 18 USCA § 4113 >>

 (B) Section 4113(c) of title 18, United States Code, is amended by striking "1226 of title 8, United States Code" and inserting "240 of the Immigration and Nationality Act".
 (4) REFERENCES TO SECTION 237.—

<< 8 USCA § 1159 >>

 (A) Section 209(a)(1) (8 U.S.C. 1159(a)(1)) is amended by striking "237" and inserting "241".

<< 8 USCA § 1182 >>

 (B) Section 212(d)(7) (8 U.S.C. 1182(d)(7)) is amended by striking "237(a)" and inserting "241(c)".

<< 8 USCA § 1330 >>

 (C) Section 280(a) (8 U.S.C. 1330(a)) is amended by striking "237, 239, 243" and inserting "234, 243(c)(2)".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(5) REFERENCES TO SECTION 242.—

<< 8 USCA §§ 1184, 1282, 1357 >>

(A)(i) Sections 214(d), 252(b), and 287(f)(1) (8 U.S.C. 1184(d), 1282(b), 1357(f)(1)) are each amended by striking "242" and inserting "240".

<< 8 USCA § 1252a >>

(ii) Subsection (c)(4) of section 242A (8 U.S.C. 1252a), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), are each amended by striking "242" and inserting "240".

<< 8 USCA § 1255a >>

(iii) Section 245A(a)(1)(B) (8 U.S.C. 1255a(a)(1)(B)) is amended by inserting "(as in effect before October 1, 1996)" after "242".
(iv) Section 4113 of title 18, United States Code, is amended—

<< 18 USCA § 4113 >>

(I) in subsection (a), by striking "section 1252(b) or section 1254(e) of title 8, United States Code," and inserting "section 240B of the Immigration and Nationality Act"; and
(II) in subsection (b), by striking "section 1252 of title 8, United States Code," and inserting "section 240 of the Immigration and Nationality Act".

<< 8 USCA § 1252 NOTE >>

(B) Section 130002(a) of Public Law 103–322, as amended by section 345 of this division, is amended by striking "242(a)(3)(A)" and inserting "236(d)".

<< 8 USCA § 1252a >>

(C) Section 242A(b)(1) (8 U.S.C. 1252a(b)(1)), before redesignation as section 238 by section 308(b)(5) of this division, is amended by striking "242(b)" and inserting "240".
(D) Section 242A(c)(2)(D)(ii) (8 U.S.C. 1252a(c)(2)(D)(ii)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), is amended by striking "242(b)" and inserting "240".

<< 28 USCA § 1821 >>

(E) Section 1821(e) of title 28, United States Code, is amended by striking "242(b)" and inserting "240".

<< 8 USCA § 1252 NOTE >>

(F) Section 130007(a) of Public Law 103–322 is amended by striking "242(i)" and inserting "239(d)".
(G) Section 20301(c) of Public Law 103–322 is amended by striking "242(j)(5)" and "242(j)" and inserting "241(h)(5)" and "241(h)", respectively.
(6) REFERENCES TO SECTION 242B.—

<< 8 USCA § 1254a NOTE >>

(A) Section 303(d)(2) of the Immigration Act of 1990 is amended by striking "242B" and inserting "240(b)(5)".

<< 8 USCA § 1252b NOTE >>

(B) Section 545(g)(1)(B) of the Immigration Act of 1990 is amended by striking "242B(a)(4)" and inserting "239(a)(4)".

(7) REFERENCES TO SECTION 243.—

<< 8 USCA § 1184 >>

(A) Section 214(d) (8 U.S.C. 1184(d)) is amended by striking "243" and inserting "241".

<< 8 USCA § 1534 >>

(B) Section 504(k)(2) (8 U.S.C. 1534(k)(2)) is amended by striking "withholding of deportation under section 243(h)" and inserting "by withholding of removal under section 241(b)(3)".

<< 8 USCA § 1253 NOTE >>

(C)(i) Section 315(c) of the Immigration Reform and Control Act of 1986 is amended by striking "243(g)" and "1253(g)" and inserting "243(d)" and "1253(d)" respectively.

<< 8 USCA § 1201 NOTE >>

(ii) Section 702(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1988 is amended by striking "243(g)" and inserting "243(d)".
(iii) Section 903(b) of Public Law 100–204 is amended by striking "243(g)" and inserting "243(d)".

<< 7 USCA § 2015 >>

(D)(i) Section 6(f)(2)(F) of the Food Stamp Act of 1977 (7 U.S.C. 2015(f)(2)(F)) is amended by striking "243(h)" and inserting "241(b)(3)".

<< 42 USCA § 1436a >>

(ii) Section 214(a)(5) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(a)(5)) is amended by striking "243(h)" and inserting "241(b)(3)".

<< 8 USCA § 1254a >>

(E)(i) Subsection (c)(2)(B)(ii) of section 244A (8 U.S.C. 1254a), before redesignated as section 244 by section 308(b)(7), is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

<< 8 USCA § 1255a NOTE >>

(ii) Section 301(e)(2) of the Immigration Act of 1990 is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

<< 8 USCA § 1427 >>

(F) Section 316(f) (8 U.S.C. 1427(f)) is amended by striking "subparagraphs (A) through (D) of paragraph 243(h)(2)" and inserting "clauses (i) through (v) of section 208(b)(2)(A)".
(8) REFERENCES TO SECTION 244.—

<< 8 USCA § 1151 >>

(A)(i) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) and subsection (e) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by section 308(b)(7) of this division, are each amended by striking "244(a)" and inserting "240A(a)".

<< 8 USCA § 1254a NOTE >>

(ii) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(a)" and inserting "240A(a)".

<< 8 USCA § 1534 >>

(B) Section 504(k)(3) (8 U.S.C. 1534(k)(3)) is amended by striking "suspension of deportation under subsection (a) or (e) of section 244" and inserting "cancellation of removal under section 240A".

<< 8 USCA § 1254a NOTE >>

(C) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(b)(2)" and inserting "240A(b)(2)".

<< 8 USCA § 1367 >>

(D) Section 364(a)(2) of this division is amended by striking "244(a)(3)" and inserting "240A(a)(3)".

<< 8 USCA § 1641 >>

(E) Section 431(c)(1)(B)(iii) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as added by section 501 of this division, is amended by striking "suspension of deportation and adjustment of status pursuant to section 244(a)(3) of such Act" and inserting "cancellation of removal under section 240A of such Act".
(9) REFERENCES TO CHAPTER 5.—

<< 8 USCA § 1206 >>

(A) Sections 266(b), 266(c), and 291 (8 U.S.C. 1306(b), 1306(c), 1361) are each amended by striking "chapter 5" and inserting "chapter 4".

<< 50 USCA § 855 >>

(B) Section 6(b) of the Act of August 1, 1956 (50 U.S.C. 855(b)) is amended by striking "chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)" and inserting "chapter 4 of title II of the Immigration and Nationality Act".
(10) MISCELLANEOUS CROSS–REFERENCE CORRECTIONS FOR NEWLY ADDED PROVISIONS.—

<< 8 USCA § 1182 >>

(A) Section 212(h), as amended by section 301(h) of this division, is amended by striking "section 212(c)" and inserting "paragraphs (1) and (2) of section 240A(a)".

<< 8 USCA § 1255 >>

(B) Section 245(c)(6), as amended by section 332(d) of this division, is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

<< 8 USCA § 1259 >>

(C) Section 249(d), as amended by section 332(e) of this division, is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

<< 8 USCA § 1324c >>

(D) Section 274C(d)(7), as added by section 212(d) of this division, is amended by striking "withholding of deportation under section 243(h)" and inserting "withholding of removal under section 241(b)(3)".

<< 18 USCA § 3563 >>

(E) Section 3563(b)(21) of title 18, United States Code, as inserted by section 374(b) of this division, is amended by striking "242A(d)(5)" and inserting "238(d)(5)".

<< 8 USCA § 1252 NOTE >>

(F) Section 130007(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 671(a)(6) of this division, is amended by striking "242A(a)(3)" and inserting "238(a)(3)".

<< 8 USCA § 1368 >>

(G) Section 386(b) of this division is amended by striking "excludable" and "EXCLUDABLE" and inserting "inadmissible" and "INADMISSIBLE", respectively, each place each appears.

<< 8 USCA §§ 1105a, 1182, 1252, 1252a >>

(H) Subsections (a), (c), (d), (g), and (h) of section 440 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), as amended by section 306(d) of this division, are amended by striking "241(a)(2)(A)(ii)" and "241(a)(2)(A)(i)" and inserting "237(a)(2)(A)(ii)" and "237(a)(2)(A)(i)", respectively.

<< 8 USCA § 1101 NOTE >>

SEC. 309. EFFECTIVE DATES; TRANSITION.

(a) IN GENERAL.—Except as provided in this section and sections 303(b)(2), 306(c), 308(d)(2)(D), or 308(d)(5) of this division, this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act (in this title referred to as the "title III–A effective date").

(b) PROMULGATION OF REGULATIONS.—The Attorney General shall first promulgate regulations to carry out this subtitle by not later than 30 days before the title III–A effective date.

(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

(2) ATTORNEY GENERAL OPTION TO ELECT TO APPLY NEW PROCEDURES.—In a case described in paragraph (1) in which an evidentiary hearing under section 236 or 242 and 242B of the Immigration and Nationality Act has not commenced as of the title III–A effective date, the Attorney General may elect to proceed under chapter 4 of title II of such Act (as amended by this subtitle). The Attorney General shall provide notice of such election to the alien involved not later than 30 days before the date any evidentiary hearing is commenced. If the Attorney General makes such election, the notice of hearing provided to the alien under section 235 or 242(a) of such Act shall be valid as if provided under section 239 of such Act (as amended by this subtitle) to confer jurisdiction on the immigration judge.

(3) ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1), the Attorney General may elect to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings under chapter 4 of title II the Immigration and Nationality Act (as amended by this subtitle). Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding.

(4) TRANSITIONAL CHANGES IN JUDICIAL REVIEW.—In the case described in paragraph (1) in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act, notwithstanding any provision of section 106 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act) to the contrary—

(A) in the case of judicial review of a final order of exclusion, subsection (b) of such section shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of such in the same manner as they apply to judicial review of orders of deportation;

(B) a court may not order the taking of additional evidence under section 2347(c) of title 28, United States Code;

(C) the petition for judicial review must be filed not later than 30 days after the date of the final order of exclusion or deportation;

(D) the petition for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed;

(E) there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(i), 244, or 245 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act);

(F) service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise; and

(G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(i) of such Act (as so in effect).

(5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

(6) TRANSITION FOR CERTAIN FAMILY UNITY ALIENS.—The Attorney General may waive the application of section 212(a)(9) of the Immigration and Nationality Act, as inserted by section 301(b)(1) of this division, in the case of an alien who is provided benefits under the provisions of section 301 of the Immigration Act of 1990 (relating to family unity).

(7) LIMITATION ON SUSPENSION OF DEPORTATION.—The Attorney General may not suspend the deportation and adjust the status under section 244 of the Immigration and Nationality Act of more than 4,000 aliens in any fiscal year (beginning after the date of the enactment of this Act). The previous sentence shall apply regardless of when an alien applied for such suspension and adjustment.

(d) TRANSITIONAL REFERENCES.—For purposes of carrying out the Immigration and Nationality Act, as amended by this subtitle—

(1) any reference in section 212(a)(1)(A) of such Act to the term "inadmissible" is deemed to include a reference to the term "excludable", and

(2) any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation.

(e) TRANSITION.—No period of time before the date of the enactment of this Act shall be included in the period of 1 year described in section 212(a)(6)(B)(i) of the Immigration and Nationality Act (as amended by section 301(c) of this division).

Subtitle B—Criminal Alien Provisions

SEC. 321. AMENDED DEFINITION OF AGGRAVATED FELONY.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 441(e) of the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132), is amended—

(1) in subparagraph (A), by inserting ", rape, or sexual abuse of a minor" after "murder";

(2) in subparagraph (D), by striking "$100,000" and inserting "$10,000";

(3) in subparagraphs (F), (G), (N), and (P), by striking "is at least 5 years" each place it appears and inserting "at least one year";

(4) in subparagraph (J), by striking "sentence of 5 years' imprisonment" and inserting "sentence of one year imprisonment";

(5) in subparagraph (K)(ii), by inserting "if committed" before "for commercial advantage";

AR.01734
460

(6) in subparagraph (L)—

 (A) by striking "or" at the end of clause (i),

 (B) by inserting "or" at the end of clause (ii), and

 (C) by adding at the end the following new clause:

  "(iii) section 601 of the National Security Act of 1947 (relating to protecting the identity of undercover agents);";

 (7) in subparagraph (M), by striking "$200,000" each place it appears and inserting "$10,000";

 (8) in subparagraph (N), by striking "for which the term" and all that follows and inserting the following: ", except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act";

 (9) in subparagraph (P), by striking "18 months" and inserting "12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act";

 (10) in subparagraph (R), by striking "for which a sentence of 5 years' imprisonment or more may be imposed" and inserting "for which the term of imprisonment is at least one year"; and

 (11) in subparagraph (S), by striking "for which a sentence of 5 years' imprisonment or more may be imposed" and inserting "for which the term of imprisonment is at least one year".

 (b) EFFECTIVE DATE OF DEFINITION.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended by adding at the end the following new sentence: "Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph.".

<< 8 USCA § 1101 NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by this section shall apply to actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred, and shall apply under section 276(b) of the Immigration and Nationality Act only to violations of section 276(a) of such Act occurring on or after such date.

SEC. 322. DEFINITION OF CONVICTION AND TERM OF IMPRISONMENT.

 (a) DEFINITION.—

<< 8 USCA § 1101 >>

 (1) IN GENERAL.—Section 101(a) (8 U.S.C. 1101(a)) is amended by adding at the end the following new paragraph:

"(48)(A) The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

 "(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

 "(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

"(B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.".

 (2) CONFORMING AMENDMENTS.—

<< 8 USCA § 1101 >>

 (A) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended by striking "imposed (regardless of any suspension of imprisonment)" each place it appears in subparagraphs (F), (G), (N), and (P).

<< 8 USCA § 1182 >>

 (B) Section 212(a)(2)(B) (8 U.S.C. 1182(a)(2)(B)) is amended by striking "actually imposed".

(b) REFERENCE TO PROOF PROVISIONS.—For provisions relating to proof of convictions, see subparagraphs (B) and (C) of section 240(c)(3) of the Immigration and Nationality Act, as inserted by section 304(a)(3) of this division.

<< 8 USCA § 1101 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to convictions and sentences entered before, on, or after the date of the enactment of this Act. Subparagraphs (B) and (C) of section 240(c)(3) of the Immigration and Nationality Act, as inserted by section 304(a)(3) of this division, shall apply to proving such convictions.

<< 8 USCA § 1303 >>

SEC. 323. AUTHORIZING REGISTRATION OF ALIENS ON CRIMINAL PROBATION OR CRIMINAL PAROLE.

Section 263(a) (8 U.S.C. 1303(a)) is amended by striking "and (5)" and inserting "(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)".

SEC. 324. PENALTY FOR REENTRY OF DEPORTED ALIENS.

<< 8 USCA § 1326 >>

(a) IN GENERAL.—Section 276(a)(1) (8 U.S.C. 1326(a)(1)) is amended to read as follows:
"(1) has been arrested and deported, has been excluded and deported, or has departed the United States while an order of exclusion or deportation is outstanding, and thereafter".
(b) TREATMENT OF STIPULATIONS.—The last sentence of section 276(b) (8 U.S.C. 1326(b)) is amended by inserting "(or not during)" after "during".

<< 8 USCA § 1326 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to departures that occurred before, on, or after the date of the enactment of this Act, but only with respect to entries (and attempted entries) occurring on or after such date.

<< 18 USCA § 2424 >>

SEC. 325. CHANGE IN FILING REQUIREMENT.

Section 2424 of title 18, United States Code, is amended—
(1) in the first undesignated paragraph of subsection (a)—
  (A) by striking "alien" each place it appears;
  (B) by inserting after "individual" the first place it appears the following: ", knowing or in reckless disregard of the fact that the individual is an alien"; and
  (C) by striking "within three years after that individual has entered the United States from any country, party to the arrangement adopted July 25, 1902, for the suppression of the white-slave traffic";
(2) in the second undesignated paragraph of subsection (a)—
  (A) by striking "thirty" and inserting "five business"; and
  (B) by striking "within three years after that individual has entered the United States from any country, party to the said arrangement for the suppression of the white-slave traffic,"; and
(3) in the text following the third undesignated paragraph of subsection (a), by striking "two" and inserting "10".

<< 8 USCA § 1252 NOTE >>

SEC. 326. CRIMINAL ALIEN IDENTIFICATION SYSTEM.

Subsection (a) of section 130002 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 432 of Public Law 104–132, is amended to read as follows:

"(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.".

<< 8 USCA § 1252 NOTE >>

SEC. 327. APPROPRIATIONS FOR CRIMINAL ALIEN TRACKING CENTER.

Section 130002(b) of the Violent Crime Control and Law Enforcement Act of 1994 (8 U.S.C. 1252 note) is amended—
(1) by inserting "and" after "1996;", and
(2) by striking paragraph (2) and all that follows through the period at the end and inserting the following:
"(2) $5,000,000 for each of fiscal years 1997 through 2001.".

SEC. 328. PROVISIONS RELATING TO STATE CRIMINAL ALIEN ASSISTANCE PROGRAM.

(a) MODIFICATION OF AUTHORITY.—

<< 8 USCA § 1231 >>

(1) IN GENERAL.—Section 241(i), as redesignated by section 306(a)(1) of this division, is amended—
 (A) in paragraph (3)(A), by striking "felony and sentenced to a term of imprisonment" and inserting "felony or two or more misdemeanors", and
 (B) by adding at the end the following new paragraph:
"(6) To the extent of available appropriations, funds otherwise made available under this section with respect to a State (or political subdivision, including a municipality) for incarceration of an undocumented criminal alien may, at the discretion of the recipient of the funds, be used for the costs of imprisonment of such alien in a State, local, or municipal prison or jail.".

<< 8 USCA § 1231 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply beginning with fiscal year 1997.
(b) SENSE OF THE CONGRESS WITH RESPECT TO PROGRAM.—
(1) FINDINGS.—The Congress finds as follows:
 (A) Of the $130,000,000 appropriated in fiscal year 1995 for the State Criminal Alien Assistance Program, the Department of Justice disbursed the first $43,000,000 to States on October 6, 1994, 32 days before the 1994 general election, and then failed to disburse the remaining $87,000,000 until January 31, 1996, 123 days after the end of fiscal year 1995.
 (B) While H.R. 2880, the continuing appropriation measure funding certain operations of the Federal Government from January 26, 1996 to March 15, 1996, included $66,000,000 to reimburse States for the cost of incarcerating documented illegal immigrant felons, the Department of Justice failed to disburse any of the funds to the States during the period of the continuing appropriation.
(2) SENSE OF THE CONGRESS.—It is the sense of the Congress that—
 (A) the Department of Justice was disturbingly slow in disbursing fiscal year 1995 funds under the State Criminal Alien Assistance Program to States after the initial grants were released just prior to the 1994 election; and
 (B) the Attorney General should make it a high priority to expedite the disbursement of Federal funds intended to reimburse States for the cost of incarcerating illegal immigrants, aiming for all State Criminal Alien Assistance Program funds to be disbursed during the fiscal year for which they are appropriated.

SEC. 329. DEMONSTRATION PROJECT FOR IDENTIFICATION OF ILLEGAL ALIENS IN INCARCERATION FACILITY OF ANAHEIM, CALIFORNIA.

 (a) AUTHORITY.—The Attorney General shall conduct a project demonstrating the feasibility of identifying, from among the individuals who are incarcerated in local governmental prison facilities prior to arraignment on criminal charges, those individuals who are aliens unlawfully present in the United States.

 (b) DESCRIPTION OF PROJECT.—The project authorized by subsection (a) shall include—

  (1) the detail to incarceration facilities within the city of Anaheim, California and the county of Ventura, California, of an employee of the Immigration and Naturalization Service who has expertise in the identification of aliens unlawfully in the United States, and

  (2) provision of funds sufficient to provide for—

   (A) access for such employee to records of the Service necessary to identify such aliens, and

   (B) in the case of an individual identified as such an alien, pre-arraignment reporting to the court regarding the Service's intention to remove the alien from the United States.

 (c) TERMINATION.—The authority under this section shall cease to be effective 6 months after the date of the enactment of this Act.

<< 18 USCA § 4100 NOTE >>

SEC. 330. PRISONER TRANSFER TREATIES.

 (a) NEGOTIATIONS WITH OTHER COUNTRIES.—(1) Congress advises the President to begin to negotiate and renegotiate, not later than 90 days after the date of enactment of this Act, bilateral prisoner transfer treaties, providing for the incarceration, in the country of the alien's nationality, of any alien who—

  (A) is a national of a country that is a party to such a treaty; and

  (B) has been convicted of a criminal offense under Federal or State law and who—

   (i) is not in lawful immigration status in the United States, or

   (ii) on the basis of conviction for a criminal offense under Federal or State law, or on any other basis, is subject to deportation or removal under the Immigration and Nationality Act,

for the duration of the prison term to which the alien was sentenced for the offense referred to in subparagraph (B). Any such agreement may provide for the release of such alien pursuant to parole procedures of that country.

 (2) In entering into negotiations under paragraph (1), the President may consider providing for appropriate compensation, subject to the availability of appropriations, in cases where the United States is able to independently verify the adequacy of the sites where aliens will be imprisoned and the length of time the alien is actually incarcerated in the foreign country under such a treaty.

 (b) SENSE OF CONGRESS.—It is the sense of the Congress that—

  (1) the focus of negotiations for such agreements should be—

   (A) to expedite the transfer of aliens unlawfully in the United States who are (or are about to be) incarcerated in United States prisons,

   (B) to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States courts,

   (C) to eliminate any requirement of prisoner consent to such a transfer, and

   (D) to allow the Federal Government or the States to keep their original prison sentences in force so that transferred prisoners who return to the United States prior to the completion of their original United States sentences can be returned to custody for the balance of their prison sentences;

  (2) the Secretary of State should give priority to concluding an agreement with any country for which the President determines that the number of aliens described in subsection (a) who are nationals of that country in the United States represents a significant percentage of all such aliens in the United States; and

  (3) no new treaty providing for the transfer of aliens from Federal, State, or local incarceration facilities to a foreign incarceration facility should permit the alien to refuse the transfer.

(c) PRISONER CONSENT.—Notwithstanding any other provision of law, except as required by treaty, the transfer of an alien from a Federal, State, or local incarceration facility under an agreement of the type referred to in subsection (a) shall not require consent of the alien.

(d) ANNUAL REPORT.—Not later than 90 days after the date of the enactment of this Act, and annually thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate stating whether each prisoner transfer treaty to which the United States is a party has been effective in the preceding 12 months in bringing about the return of deportable incarcerated aliens to the country of which they are nationals and in ensuring that they serve the balance of their sentences.

(e) TRAINING FOREIGN LAW ENFORCEMENT PERSONNEL.—(1) Subject to paragraph (2), the President shall direct the Border Patrol Academy and the Customs Service Academy to enroll for training an appropriate number of foreign law enforcement personnel, and shall make appointments of foreign law enforcement personnel to such academies, as necessary to further the following United States law enforcement goals:

(A) Preventing of drug smuggling and other cross-border criminal activity.

(B) Preventing illegal immigration.

(C) Preventing the illegal entry of goods into the United States (including goods the sale of which is illegal in the United States, the entry of which would cause a quota to be exceeded, or the appropriate duty or tariff for which has not been paid).

(2) The appointments described in paragraph (1) shall be made only to the extent there is capacity in such academies beyond what is required to train United States citizens needed in the Border Patrol and Customs Service, and only of personnel from a country with which the prisoner transfer treaty has been stated to be effective in the most recent report referred to in subsection (d).

(f) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.

## SEC. 331. PRISONER TRANSFER TREATIES STUDY.

(a) REPORT TO CONGRESS.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State and the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report that describes the use and effectiveness of the prisoner transfer treaties with the three countries with the greatest number of their nationals incarcerated in the United States in removing from the United States such incarcerated nationals.

(b) USE OF TREATY.—The report under subsection (a) shall include—

(1) the number of aliens convicted of a criminal offense in the United States since November 30, 1977, who would have been or are eligible for transfer pursuant to the treaties;

(2) the number of aliens described in paragraph (1) who have been transferred pursuant to the treaties;

(3) the number of aliens described in paragraph (2) who have been incarcerated in full compliance with the treaties;

(4) the number of aliens who are incarcerated in a penal institution in the United States who are eligible for transfer pursuant to the treaties; and

(5) the number of aliens described in paragraph (4) who are incarcerated in Federal, State, and local penal institutions in the United States.

(c) RECOMMENDATIONS.—The report under subsection (a) shall include the recommendations of the Secretary of State and the Attorney General to increase the effectiveness and use of, and full compliance with, the treaties. In considering the recommendations under this subsection, the Secretary and the Attorney General shall consult with such State and local officials in areas disproportionately impacted by aliens convicted of criminal offenses as the Secretary and the Attorney General consider appropriate. Such recommendations shall address—

(1) changes in Federal laws, regulations, and policies affecting the identification, prosecution, and deportation of aliens who have committed criminal offenses in the United States;

(2) changes in State and local laws, regulations, and policies affecting the identification, prosecution, and deportation of aliens who have committed a criminal offense in the United States;

(3) changes in the treaties that may be necessary to increase the number of aliens convicted of criminal offenses who may be transferred pursuant to the treaties;

(4) methods for preventing the unlawful reentry into the United States of aliens who have been convicted of criminal offenses in the United States and transferred pursuant to the treaties;

(5) any recommendations by appropriate officials of the appropriate government agencies of such countries regarding programs to achieve the goals of, and ensure full compliance with, the treaties;

(6) whether the recommendations under this subsection require the renegotiation of the treaties; and

(7) the additional funds required to implement each recommendation under this subsection.

<< 8 USCA § 1366 >>

## SEC. 332. ANNUAL REPORT ON CRIMINAL ALIENS.

Not later than 12 months after the date of the enactment of this Act, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—

(1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;

(2) the number of illegal aliens convicted of felonies in any Federal or State court, but not sentenced to incarceration, in the year before the report was submitted, stating the number convicted for each type of offense;

(3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal; and

(4) methods for identifying and preventing the unlawful reentry of aliens who have been convicted of criminal offenses in the United States and removed from the United States.

<< 28 USCA § 994 NOTE >>

## SEC. 333. PENALTIES FOR CONSPIRING WITH OR ASSISTING AN ALIEN TO COMMIT AN OFFENSE UNDER THE CONTROLLED SUBSTANCES IMPORT AND EXPORT ACT.

(a) REVIEW OF GUIDELINES.—Not later than 6 months after the date of the enactment of this Act, the United States Sentencing Commission shall conduct a review of the guidelines applicable to an offender who conspires with, or aids or abets, a person who is not a citizen or national of the United States in committing any offense under section 1010 of the Controlled Substance Import and Export Act (21 U.S.C. 960).

(b) REVISION OF GUIDELINES.—Following such review, pursuant to section 994(p) of title 28, United States Code, the Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines to ensure an appropriately stringent sentence for such offenders.

<< 28 USCA § 994 NOTE >>

## SEC. 334. ENHANCED PENALTIES FOR FAILURE TO DEPART, ILLEGAL REENTRY, AND PASSPORT AND VISA FRAUD.

(a) FAILING TO DEPART.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under section 242(e) and 276(b) of the Immigration and Nationality Act (8 U.S.C. 1252(e) and 1326(b)) to reflect the amendments made by section 130001 of the Violent Crime Control and Law Enforcement Act of 1994.

(b) PASSPORT AND VISA OFFENSES.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under chapter 75 of title 18, United States Code to reflect the amendments made by section 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

Subtitle C—Revision of Grounds for Exclusion and Deportation

## SEC. 341. PROOF OF VACCINATION REQUIREMENT FOR IMMIGRANTS.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(1)(A) (8 U.S.C. 1182(a)(1)(A)) is amended—

(1) by redesignating clauses (ii) and (iii) as clauses (iii) and (iv), respectively, and

(2) by inserting after clause (i) the following new clause:

"(ii) who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,".

(b) WAIVER.—Section 212(g) (8 U.S.C. 1182(g)) is amended by striking ", or" at the end of paragraph (1) and all that follows and inserting a semicolon and the following:

"in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

"(2) subsection (a)(1)(A)(ii) in the case of any alien—

"(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

"(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

"(C) under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

"(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to applications for immigrant visas or for adjustment of status filed after September 30, 1996.

SEC. 342. INCITEMENT OF TERRORIST ACTIVITY AND PROVISION OF FALSE DOCUMENTATION TO TERRORISTS AS A BASIS FOR EXCLUSION FROM THE UNITED STATES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(3)(B) (8 U.S.C. 1182(a)(3)(B)) is amended—

(1) by redesignating subclauses (III) and (IV) of clause (i) as subclauses (IV) and (V), respectively;

(2) by inserting after subclause (II) of clause (i) the following new subclause:

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity,"; and

(3) in clause (iii)(III), by inserting "documentation or" before "identification";

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of the enactment of this Act and shall apply to incitement regardless of when it occurs.

<< 8 USCA § 1182 >>

## SEC. 343. CERTIFICATION REQUIREMENTS FOR FOREIGN HEALTH–CARE WORKERS.

Section 212(a)(5) (8 U.S.C. 1182(a)(5)) is amended—

(1) by redesignating subparagraph (C) as subparagraph (D), and

(2) by inserting after subparagraph (B) the following new subparagraph:

"(C) UNCERTIFIED FOREIGN HEALTH–CARE WORKERS.—Any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is excludable unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that—

"(i) the alien's education, training, license, and experience—

"(I) meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

"(II) are comparable with that required for an American health-care worker of the same type; and

"(III) are authentic and, in the case of a license, unencumbered;

"(ii) the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

"(iii) if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.".

## SEC. 344. REMOVAL OF ALIENS FALSELY CLAIMING UNITED STATES CITIZENSHIP.

<< 8 USCA § 1182 >>

(a) EXCLUSION OF ALIENS WHO HAVE FALSELY CLAIMED UNITED STATES CITIZENSHIP.—Section 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)) is amended—

(1) by redesignating clause (ii) as clause (iii), and

(2) by inserting after clause (i) the following new clause:

"(ii) FALSELY CLAIMING CITIZENSHIP.—Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this Act (including section 274A) or any other Federal or State law is excludable.".

<< 8 USCA § 1251 >>

(b) DEPORTATION OF ALIENS WHO HAVE FALSELY CLAIMED UNITED STATES CITIZENSHIP.—Section 241(a)(3) (8 U.S.C. 1251(a)(3)) is amended by adding at the end the following new subparagraph:

"(D) FALSELY CLAIMING CITIZENSHIP.—Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this Act (including section 274A) or any Federal or State law is deportable.".

<< 8 USCA §§ 1182 NOTE, 1251 nt >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to representations made on or after the date of the enactment of this Act.

SEC. 345. WAIVER OF EXCLUSION AND DEPORTATION GROUND FOR CERTAIN SECTION 274C VIOLATORS.

<< 8 USCA § 1182 >>

(a) EXCLUSION GROUNDS.—Section 212 (8 U.S.C. 1182) is amended—

(1) by amending subparagraph (F) of subsection (a)(6) to read as follows:

"(F) SUBJECT OF CIVIL PENALTY.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.

"(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12)."; and

(2) by adding at the end of subsection (d) the following new paragraph:

"(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)—

"(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 211(b), and

"(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),

if no previous civil money penalty was imposed against the alien under section 274C and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.".

<< 8 USCA § 1251 >>

(b) GROUND OF DEPORTATION.—Subparagraph (C) of section 241(a)(3) (8 U.S.C. 1251(a)(3)), before redesignation by section 305(a)(2) of this division, is amended to read as follows:

"(C) DOCUMENT FRAUD.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.

"(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 274C and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.".

SEC. 346. INADMISSIBILITY OF CERTAIN STUDENT VISA ABUSERS.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(6) (8 U.S.C. 1182(a)(6)) is amended by adding at the end the following new subparagraph:

"(G) STUDENT VISA ABUSERS.—An alien who obtains the status of a nonimmigrant under section 101(a)(15)(F)(i) and who violates a term or condition of such status under section 214(l) is excludable until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to aliens who obtain the status of a nonimmigrant under section 101(a)(15)(F) of the Immigration and Nationality Act after the end of the 60–day period beginning on the date of the enactment of this Act, including aliens whose status as such a nonimmigrant is extended after the end of such period.

SEC. 347. REMOVAL OF ALIENS WHO HAVE UNLAWFULLY VOTED.

<< 8 USCA § 1182 >>

(a) EXCLUSION OF ALIENS WHO HAVE UNLAWFULLY VOTED.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(b) of this division, is amended by adding at the end the following new subparagraph:

"(D) UNLAWFUL VOTERS.—Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is excludable.".

<< 8 USCA § 1251 >>

(b) DEPORTATION OF ALIENS WHO HAVE UNLAWFULLY VOTED.—Section 241(a) (8 U.S.C. 1251(a)), before redesignation by section 305(a)(2) of this division, is amended by adding at the end the following new paragraph:

"(6) UNLAWFUL VOTERS.—Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to voting occurring before, on, or after the date of the enactment of this Act.

SEC. 348. WAIVERS FOR IMMIGRANTS CONVICTED OF CRIMES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(h) (8 U.S.C. 1182(h)) is amended by adding at the end the following: "No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective on the date of the enactment of this Act and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date.

<< 8 USCA § 1182 >>

SEC. 349. WAIVER OF MISREPRESENTATION GROUND OF INADMISSIBILITY FOR CERTAIN ALIEN.

Subsection (i) of section 212 (8 U.S.C. 1182) is amended to read as follows:

"(i)(1) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien.

"(2) No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).".

SEC. 350. OFFENSES OF DOMESTIC VIOLENCE AND STALKING AS GROUND FOR DEPORTATION.

<< 8 USCA § 1251 >>

(a) IN GENERAL.—Section 241(a)(2) (8 U.S.C. 1251(a)(2)) is amended by adding at the end the following:

"(E) CRIMES OF DOMESTIC VIOLENCE, STALKING, OR VIOLATION OF PROTECTION ORDER, CRIMES AGAINST CHILDREN AND.—

"(i) DOMESTIC VIOLENCE, STALKING, AND CHILD ABUSE.—Any alien who at any time after entry is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term 'crime of domestic violence' means any crime of violence (as defined in section 16 of title 18, United States Code) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

"(ii) VIOLATORS OF PROTECTION ORDERS.—Any alien who at any time after entry is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term 'protection order' means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.".

<< 8 USCA § 1227 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to convictions, or violations of court orders, occurring after the date of the enactment of this Act.

SEC. 351. CLARIFICATION OF DATE AS OF WHICH RELATIONSHIP REQUIRED FOR WAIVER FROM EXCLUSION OR DEPORTATION FOR SMUGGLING.

<< 8 USCA § 1182 >>

(a) EXCLUSION.—Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by inserting "an individual who at the time of such action was" after "aided only".

<< 8 USCA § 1251 >>

(b) DEPORTATION.—Section 241(a)(1)(E)(iii) (8 U.S.C. 1251(a)(1)(E)(iii) is amended by inserting "an individual who at the time of the offense was" after "aided only".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications for waivers filed before, on, or after the date of the enactment of this Act, but shall not apply to such an application for which a final determination has been made as of the date of the enactment of this Act.

SEC. 352. EXCLUSION OF FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID UNITED STATES TAXATION.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(b) of this division and as amended by section 347(a) of this division, is amended by adding at the end the following:

"(E) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to individuals who renounce United States citizenship on and after the date of the enactment of this Act.

SEC. 353. REFERENCES TO CHANGES ELSEWHERE IN DIVISION.

(a) DEPORTATION FOR HIGH SPEED FLIGHT.—For provision making high speed flight from an immigration checkpoint subject to deportation, see section 108(c) of this division.

(b) INADMISSIBILITY OF ALIENS PREVIOUSLY REMOVED AND UNLAWFULLY PRESENT.—For provision making aliens previously removed and unlawfully present in the United States inadmissible, see section 301(b) of this division.

(c) INADMISSIBILITY OF ILLEGAL ENTRANTS.—For provision revising the ground of inadmissibility for illegal entrants and immigration violators, see section 301(c) of this division.

(d) DEPORTATION FOR VISA VIOLATORS.—For provision revising the ground of deportation for illegal entrants, see section 301(d) of this division.

(e) LABOR CERTIFICATIONS FOR PROFESSIONAL ATHLETES.—For provision providing for continued validity of labor certifications and classification petitions for professional athletes, see section 624 of this division.

Subtitle D—Changes in Removal of Alien Terrorist Provisions

SEC. 354. TREATMENT OF CLASSIFIED INFORMATION.

(a) LIMITATION ON PROVISION OF SUMMARIES; USE OF SPECIAL ATTORNEYS IN CHALLENGES TO CLASSIFIED INFORMATION.—

<< 8 USCA § 1534 >>

(1) NO PROVISION OF SUMMARY IN CERTAIN CASES.—Section 504(e)(3)(D) (8 U.S.C. 1534(e)(3)(D)) is amended—

(A) in clause (ii), by inserting before the period at the end the following: "unless the judge makes the findings under clause (iii)", and

(B) by adding at the end the following new clause:

"(iii) FINDINGS.—The findings described in this clause are, with respect to an alien, that—

"(I) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

"(II) the provision of the summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.".

(2) SPECIAL CHALLENGE PROCEDURES.—Section 504(e)(3) (8 U.S.C. 1534(e)(3)) is amended by adding at the end the following new subparagraphs:

"(E) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in subparagraph (D)(iii)—

"(i) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subparagraph (F) shall apply; and

"(ii) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to this paragraph.

"(F) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

"(i) IN GENERAL.—The procedures described in this subparagraph are that the judge (under rules of the removal court) shall designate a special attorney to assist the alien—

"(I) by reviewing in camera the classified information on behalf of the alien, and

"(II) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

"(ii) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under clause (i)—

"(I) shall not disclose the information to the alien or to any other attorney representing the alien, and

"(II) who discloses such information in violation of subclause (I) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.".

<< 8 USCA § 1535 >>

(3) APPEALS.—Section 505(c) (8 U.S.C. 1535(c)) is amended—

(A) in paragraph (1), by striking "The decision" and inserting "Subject to paragraph (2), the decision";

(B) in paragraph (3)(D), by inserting before the period at the end the following: ", except that in the case of a review under paragraph (2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 504(c)(3), the Court of Appeals shall review questions of fact de novo";

(C) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

(D) by inserting after paragraph (1) the following new paragraph:

"(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

"(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 504(e)(3) and with respect to which the procedures described in section 504(e)(3)(F) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

"(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 504(e)(3)(F)(i) on behalf of the alien.".

<< 8 USCA § 1532 >>

(4) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—Section 502 (8 U.S.C. 1532) is amended by adding at the end the following new subsection:

"(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The removal court shall provide for the designation of a panel of attorneys each of whom—

"(1) has a security clearance which affords the attorney access to classified information, and

"(2) has agreed to represent permanent resident aliens with respect to classified information under section 504(e)(3) in accordance with (and subject to the penalties under) this title.".

<< 8 USCA § 1531 >>

(5) DEFINITION OF SPECIAL ATTORNEY.—Section 501 (8 U.S.C. 1531) is amended—

(A) by striking "and" at the end of paragraph (5),

(B) by striking the period at the end of paragraph (6) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(7) the term 'special attorney' means an attorney who is on the panel established under section 502(e).".

<< 8 USCA § 1534 >>

(b) OTHER PROVISIONS RELATING TO CLASSIFIED INFORMATION.—

(1) INTRODUCTION OF CLASSIFIED INFORMATION.—Section 504(e) (8 U.S.C. 1534(e)) is amended—

(A) in paragraph (1)—

(i) by inserting after "(A)" the following: "the Government is authorized to use in a removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act and", and

(ii) by striking "the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.)" and inserting "such Act"; and

(B) by striking the period at the end of paragraph (3)(A) and inserting the following: "and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to this paragraph. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.".

(2) MAINTENANCE OF CONFIDENTIALITY OF CLASSIFIED INFORMATION IN ARGUMENTS.—Section 504(f) (8 U.S.C. 1534(f)) is amended by adding at the end the following: "The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.".

(3) MAINTENANCE OF CONFIDENTIALITY OF CLASSIFIED INFORMATION IN ORDERS.—Section 504(j) (8 U.S.C. 1534(j)) is amended by adding at the end the following: "Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.".

<< 8 USCA § 1182 >>

SEC. 355. EXCLUSION OF REPRESENTATIVES OF TERRORISTS ORGANIZATIONS.

Section 212(a)(3)(B)(i)(IV) (8 U.S.C. 1182(a)(3)(B)(i)(VI)), as inserted by section 411(1)(C) of Public Law 104–132, is amended by inserting "which the alien knows or should have known is a terrorist organization" after "219,".

<< 8 USCA § 1189 >>

SEC. 356. STANDARD FOR JUDICIAL REVIEW OF TERRORIST ORGANIZATION DESIGNATIONS.

Section 219(b)(3) (8 U.S.C. 1189(b)(3)), as added by section 302(a) of Public Law 104–132, is amended—
(1) by striking "or" at the end of subparagraph (B),
(2) by striking the period at the end of subparagraph (C) and inserting a semicolon, and
(3) by adding at the end the following:
"(D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2), or
"(E) not in accord with the procedures required by law.".

<< 8 USCA § 1534 >>

SEC. 357. REMOVAL OF ANCILLARY RELIEF FOR VOLUNTARY DEPARTURE.

Section 504(k) (8 U.S.C. 1534(k)) is amended—
(1) by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), and
(2) by inserting after paragraph (3) the following new paragraph:
"(4) voluntary departure under section 244(e);".

<< 8 USCA § 1182 NOTE >>

SEC. 358. EFFECTIVE DATE.

The amendments made by this subtitle shall be effective as if included in the enactment of subtitle A of title IV of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132).

SUBTITLE E—Transportation of Aliens

SEC. 361. DEFINITION OF STOWAWAY.

<< 8 USCA § 1101 >>

(a) STOWAWAY DEFINED.—Section 101(a) (8 U.S.C. 1101(a)), as amended by section 322(a)(1) of this division, is amended by adding at the end the following new paragraph:

"(49) The term 'stowaway' means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.".

<< 8 USCA § 1101 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1228 >>

SEC. 362. TRANSPORTATION CONTRACTS.

(a) COVERAGE OF NONCONTIGUOUS TERRITORY.—Section 238 (8 U.S.C. 1228), before redesignation as section 233 under section 308(b)(4) of this division, is amended—

(1) in the heading, by striking "CONTIGUOUS", and

(2) by striking "contiguous" each place it appears in subsections (a), (b), and (d).

(b) COVERAGE OF RAILROAD TRAIN.—Subsection (d) of such section is further amended by inserting "or railroad train" after "aircraft".

SUBTITLE F—Additional Provisions

SEC. 371. IMMIGRATION JUDGES AND COMPENSATION.

<< 8 USCA § 1101 >>

(a) DEFINITION OF TERM.—Paragraph (4) of section 101(b) (8 U.S.C. 1101(b)) is amended to read as follows:

"(4) The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.".

(b) SUBSTITUTION FOR TERM "SPECIAL INQUIRY OFFICER".—The Immigration and Nationality Act is amended by striking "a special inquiry officer", "A special inquiry officer", "special inquiry officer", and "special inquiry officers" and inserting "an immigration judge", "An immigration judge", "immigration judge", and "immigration judges", respectively, each place it appears in the following sections:

<< 8 USCA § 1105a >>

(1) Section 106(a)(2) (8 U.S.C. 1105a(a)(2)), before its repeal by section 306(c) of this division.

<< 8 USCA § 1159 >>

(2) Section 209(a)(2) (8 U.S.C. 1159(a)(2)).

<< 8 USCA § 1224 >>

(3) Section 234 (8 U.S.C. 1224), before redesignation by section 308(b) of this division.

<< 8 USCA § 1225 >>

(4) Section 235 (8 U.S.C. 1225), before amendment by section 302(a) of this division.

<< 8 USCA § 1226 >>

(5) Section 236 (8 U.S.C. 1226), before amendment by section 303 of this division.

<< 8 USCA § 1252 >>

(6) Section 242(b) (8 U.S.C. 1252(b)), before amendment by section 306(a)(2) of this division.

<< 8 USCA § 1252b >>

(7) Section 242B(d)(1) (8 U.S.C. 1252b(d)(1)), before repeal by section 306(b)(6) of this division.

<< 8 USCA § 1323 >>

(8) Section 273(d) (8 U.S.C. 1323(d)), before its repeal by section 308(e)(13) of this division.

<< 8 USCA § 1362 >>

(9) Section 292 (8 U.S.C. 1362).

<< 8 USCA § 1103 NOTE >>

(c) COMPENSATION FOR IMMIGRATION JUDGES.—
 (1) IN GENERAL.—There shall be four levels of pay for immigration judges, under the Immigration Judge Schedule (designated as IJ–1, 2, 3 and 4, respectively), and each such judge shall be paid at one of those levels, in accordance with the provisions of this subsection.
 (2) RATES OF PAY.—
  (A) The rates of basic pay for the levels established under paragraph (1) shall be as follows:

IJ-1 .......... 70% of the next to highest rate of basic pay for the Senior Executive Service

IJ-2 .......... 80% of the next to highest rate of basic pay for the Senior Executive Service

IJ-3 .......... 90% of the next to highest rate of basic pay for the Senior Executive Service

IJ-4 .......... 92% of the next to highest rate of basic pay for the Senior Executive Service.

  (B) Locality pay, where applicable, shall be calculated into the basic pay for immigration judges.
 (3) APPOINTMENT.—
  (A) Upon appointment, an immigration judge shall be paid at IJ–1, and shall be advanced to IJ–2 upon completion of 104 weeks of service, to IJ–3 upon completion of 104 weeks of service in the next lower rate, and to IJ–4 upon completion of 52 weeks of service in the next lower rate.
  (B) Notwithstanding subparagraph (A), the Attorney General may provide for appointment of an immigration judge at an advanced rate under such circumstances as the Attorney General may determine appropriate.
 (4) TRANSITION.—Immigration judges serving as of the effective date shall be paid at the rate that corresponds to the amount of time, as provided under paragraph (3)(A), that they have served as an immigration judge, and in no case shall be paid less after the effective date than the rate of pay prior to the effective date.
(d) EFFECTIVE DATES.—

<< 8 USCA § 1101 NOTE >>

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1103 NOTE >>

(2) Subsection (c) shall take effect 90 days after the date of the enactment of this Act.

<< 8 USCA § 1103 >>

SEC. 372. DELEGATION OF IMMIGRATION ENFORCEMENT AUTHORITY.

Section 103(a) (8 U.S.C. 1103(a)) is amended—
(1) inserting "(1)" after "(a)",
(2) By designating each sentence (after the first sentence) as a separate paragraph with appropriate consecutive numbering and initial indentation,
(3) by adding at the end the following new paragraph:
"(8) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this Act or regulations issued thereunder upon officers or employees of the Service.".

<< 8 USCA § 1103 >>

SEC. 373. POWERS AND DUTIES OF THE ATTORNEY GENERAL AND THE COMMISSIONER.

Section 103 (8 U.S.C. 1103) is amended—
(1) by adding at the end of subsection (a) the following new paragraph:
"(9) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—
"(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and
"(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service."; and
(2) by adding at the end of subsection (c), as redesignated by section 102(d)(1) of this division, the following: "The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.".

SEC. 374. JUDICIAL DEPORTATION.

<< 8 USCA § 1252a >>

(a) IN GENERAL.—Section 242A(d) (8 U.S.C. 1252a(d)), as added by section 224(a) of Immigration and Nationality Technical Corrections Act of 1994 and before redesignation by section 308(b)(5) of this division, is amended—
(1) in paragraph (1), by striking "whose criminal conviction causes such alien to be deportable under section 241(a)(2)(A)" and inserting "who is deportable";
(2) in paragraph (4), by striking "without a decision on the merits"; and
(3) by adding at the end the following new paragraph:
"(5) STIPULATED JUDICIAL ORDER OF DEPORTATION.—The United States Attorney, with the concurrence of the Commissioner, may, pursuant to Federal Rule of Criminal Procedure 11, enter into a plea agreement which calls for the alien, who is deportable under this Act, to waive the right to notice and a hearing under this section, and stipulate to the entry of

a judicial order of deportation from the United States as a condition of the plea agreement or as a condition of probation or supervised release, or both. The United States district court, in both felony and misdemeanor cases, and a United States magistrate judge in misdemeanor cases, may accept such a stipulation and shall have jurisdiction to enter a judicial order of deportation pursuant to the terms of such stipulation.".

<< 18 USCA § 3563 >>

(b) DEPORTATION AS A CONDITION OF PROBATION.—Section 3563(b) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (20);

(2) by redesignating paragraph (21) as paragraph (22); and

(3) by inserting after paragraph (20) the following new paragraph:

"(21) be ordered deported by a United States district court, or United States magistrate judge, pursuant to a stipulation entered into by the defendant and the United States under section 242A(d)(5) of the Immigration and Nationality Act, except that, in the absence of a stipulation, the United States district court or a United States magistrate judge, may order deportation as a condition of probation, if, after notice and hearing pursuant to such section, the Attorney General demonstrates by clear and convincing evidence that the alien is deportable; or".

<< 18 USCA § 1228 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a)(2) shall be effective as if included in the enactment of section 224(a) of the Immigration and Nationality Technical Corrections Act of 1994.

<< 8 USCA § 1255 >>

SEC. 375. LIMITATION ON ADJUSTMENT OF STATUS.

Section 245(c) (8 U.S.C. 1255(c)) is amended—

(1) by striking "or (6)" and inserting "(6)"; and

(2) by inserting before the period at the end the following: "; (7) any alien who seeks adjustment of status to that of an immigrant under section 203(b) and is not in a lawful nonimmigrant status; or (8) any alien who was employed while the alien was an unauthorized alien, as defined in section 274A(h)(3), or who has otherwise violated the terms of a nonimmigrant visa".

SEC. 376. TREATMENT OF CERTAIN FEES.

<< 8 USCA § 1255 >>

(a) INCREASE IN FEE.—Section 245(i) (8 U.S.C. 1255(i)), as added by section 506(b) of Public Law 103–317, is amended—

(1) in paragraph (1), by striking "five times the fee required for the processing of applications under this section" and inserting "$1,000"; and

(2) by amending paragraph (3) to read as follows:

"(3)(A) The portion of each application fee (not to exceed $200) that the Attorney General determines is required to process an application under this section and is remitted to the Attorney General pursuant to paragraphs (1) and (2) of this subsection shall be disposed of by the Attorney General as provided in subsections (m), (n), and (o) of section 286.

"(B) Any remaining portion of such fees remitted under such paragraphs shall be deposited by the Attorney General into the Immigration Detention Account established under section 286(s).".

<< 8 USCA § 1256 >>

(b) IMMIGRATION DETENTION ACCOUNT.—Section 286 (8 U.S.C. 1356) is amended by adding at the end the following new subsection:

"(s) IMMIGRATION DETENTION ACCOUNT.—(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Detention Account'. Notwithstanding any other section of this title, there

shall be deposited as offsetting receipts into the Immigration Detention Account amounts described in section 245(i)(3)(B) to remain available until expended.

"(2)(A) The Secretary of the Treasury shall refund out of the Immigration Detention Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for the detention of aliens under sections 236(c) and 241(a).

"(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

"(C) The amounts required to be refunded from the Immigration Detention Account for fiscal year 1997 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years. Any proposed changes in the amounts designated in such budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of Public Law 104–134.

"(D) The Attorney General shall prepare and submit annually to the Congress statements of financial condition of the Immigration Detention Account, including beginning account balance, revenues, withdrawals, and ending account balance and projection for the ensuing fiscal year.".

<< 8 USCA § 1255 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications made on or after the end of the 90–day period beginning on the date of the enactment of this Act.

SEC. 377. LIMITATION ON LEGALIZATION LITIGATION.

<< 8 USCA § 1255a >>

(a) LIMITATION ON COURT JURISDICTION.—Section 245A(f)(4) (8 U.S.C. 1255a(f)(4)) is amended by adding at the end the following new subparagraph:

"(C) JURISDICTION OF COURTS.—Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person in fact filed an application under this section within the period specified by subsection (a)(1), or attempted to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer.".

<< 8 USCA § 1255a NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as if included in the enactment of the Immigration Reform and Control Act of 1986.

SEC. 378. RESCISSION OF LAWFUL PERMANENT RESIDENT STATUS.

<< 8 USCA § 1256 >>

(a) IN GENERAL.—Section 246(a) (8 U.S.C. 1256(a)) is amended by adding at the end the following sentence: "Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.".

<< 8 USCA § 1256 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the title III–A effective date (as defined in section 309(a) of this division).

SEC. 379. ADMINISTRATIVE REVIEW OF ORDERS.

<< 8 USCA §§ 1324a, 1324c >>

 (a) IN GENERAL.—Sections 274A(e)(7) and 274C(d)(4) (8 U.S.C. 1324a(e)(7), 1324c(d)(4)) are each amended—
 (1) by striking "unless, within 30 days, the Attorney General modifies or vacates the decision and order" and inserting "unless either (A) within 30 days, an official delegated by regulation to exercise review authority over the decision and order modifies or vacates the decision and order, or (B) within 30 days of the date of such a modification or vacation (or within 60 days of the date of decision and order of an administrative law judge if not so modified or vacated) the decision and order is referred to the Attorney General pursuant to regulations"; and
 (2) by striking "a final order" and inserting "the final agency decision and order".

<< 8 USCA § 1324a NOTE >>

 (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to orders issued on or after the date of the enactment of this Act.

SEC. 380. CIVIL PENALTIES FOR FAILURE TO DEPART.

<< 8 USCA § 1324d >>

 (a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 274C the following new section:

"CIVIL PENALTIES FOR FAILURE TO DEPART

 "SEC. 274D. (a) IN GENERAL.—Any alien subject to a final order of removal who—
 "(1) willfully fails or refuses to—
  "(A) depart from the United States pursuant to the order,
  "(B) make timely application in good faith for travel or other documents necessary for departure, or
  "(C) present for removal at the time and place required by the Attorney General; or
 "(2) conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,

shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.
 "(b) CONSTRUCTION.—Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.".
 (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 274C the following new item:

"Sec. 274D. Civil penalties for failure to depart.".

<< 8 USCA § 1324d NOTE >>

 (c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to actions occurring on or after the title III–A effective date (as defined in section 309(a) of this division).

SEC. 381. CLARIFICATION OF DISTRICT COURT JURISDICTION.

<< 8 USCA § 1329 >>

 (a) IN GENERAL.—Section 279 (8 U.S.C. 1329) is amended—
 (1) by amending the first sentence to read as follows: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this title.", and

(2) by adding at the end the following new sentence: "Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.".

<< 8 USCA § 1329 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions filed after the date of the enactment of this Act.

SEC. 382. APPLICATION OF ADDITIONAL CIVIL PENALTIES TO ENFORCEMENT.

<< 8 USCA § 1330 >>

(a) IN GENERAL.—Subsection (b) of section 280 (8 U.S.C. 1330) is amended to read as follows:

"(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Enforcement Account'. Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.

"(2) The amounts described in this paragraph are the following:

"(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.

"(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).

"(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title. Such activities include—

"(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;

"(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and

"(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.

"(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

"(C) The amounts required to be refunded from the Immigration Enforcement Account for fiscal year 1996 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years. Any proposed changes in the amounts designated in such budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of Public Law 104–134.

"(D) The Attorney General shall prepare and submit annually to the Congress statements of financial condition of the Immigration Enforcement Account, including beginning account balance, revenues, withdrawals, and ending account balance and projection for the ensuing fiscal year.".

<< 8 USCA § 1356 >>

(b) IMMIGRATION USER FEE ACCOUNT.—Section 286(h)(1)(B) (8 U.S.C. 1356(h)(1)(B)) is amended by striking "271" and inserting "243(c), 271,".

<< 8 USCA § 1330 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to fines and penalties collected on or after the date of the enactment of this Act.

<< 8 USCA § 1255a NOTE >>

## SEC. 383. EXCLUSION OF CERTAIN ALIENS FROM FAMILY UNITY PROGRAM.

(a) IN GENERAL.—Section 301(e) of the Immigration Act of 1990 (8 U.S.C. 1255a note) is amended—

(1) by striking "or" at the end of paragraph (1),

(2) by striking the period at the end of paragraph (2) and inserting ", or", and

(3) by adding at the end the following new paragraph:

"(3) has committed an act of juvenile delinquency which if committed by an adult would be classified as—

"(A) a felony crime of violence that has an element the use or attempted use of physical force against another individual, or

"(B) a felony offense that by its nature involves a substantial risk that physical force against another individual may be used in the course of committing the offense.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to benefits granted or extended after the date of the enactment of this Act.

<< 8 USCA § 1367 >>

## SEC. 384. PENALTIES FOR DISCLOSURE OF INFORMATION.

(a) IN GENERAL.—Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice (including any bureau or agency of such Department)—

(1) make an adverse determination of admissibility or deportability of an alien under the Immigration and Nationality Act using information furnished solely by—

(A) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty,

(B) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty,

(C) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty), or

(D) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

unless the alien has been convicted of a crime or crimes listed in section 241(a)(2) of the Immigration and Nationality Act; or

(2) permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under clause (iii) or (iv) of section 204(a)(1)(A), clause (ii) or (iii) of section 204(a)(1)(B), section 216(c)(4)(C), or section 244(a)(3) of such Act as an alien (or the parent of a child) who has been battered or subjected to extreme cruelty.

The limitation under paragraph (2) ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

(b) EXCEPTIONS.—

(1) The Attorney General may provide, in the Attorney General's discretion, for the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

(2) The Attorney General may provide in the discretion of the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.

(3) Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information.

(4) Subsection (a)(2) shall not apply if all the battered individuals in the case are adults and they have all waived the restrictions of such subsection.

(c) PENALTIES FOR VIOLATIONS.—Anyone who willfully uses, publishes, or permits information to be disclosed in violation of this section shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation.

(d) CONFORMING AMENDMENTS TO OTHER DISCLOSURE RESTRICTIONS.—

<< 8 USCA §§ 1160, 1255a >>

<< 8 USCA § 1367 >>

(1) IN GENERAL.—The last sentence of section 210(b)(6) and the second sentence of section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) are each amended to read as follows: "Anyone who uses, publishes, or permits information to be examined in violation of this paragraph shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each violation.".

<< 8 USCA § 1367 >>

<< 8 USCA § 1160 NOTE >>

(2) EFFECTIVE DATE.—The amendments made by this subsection shall apply to offenses occurring on or after the date of the enactment of this Act.

SEC. 385. AUTHORIZATION OF ADDITIONAL FUNDS FOR REMOVAL OF ALIENS.

In addition to the amounts otherwise authorized to be appropriated for each fiscal year beginning with fiscal year 1996, there are authorized to be appropriated to the Attorney General $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal, the hiring of more investigators, and the hiring of more detention and deportation officers.

<< 8 USCA § 1368 >>

SEC. 386. INCREASE IN INS DETENTION FACILITIES; REPORT ON DETENTION SPACE.

(a) INCREASE IN DETENTION FACILITIES.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the detention facilities of the Immigration and Naturalization Service to at least 9,000 beds before the end of fiscal year 1997.

(b) REPORT ON DETENTION SPACE.—

(1) IN GENERAL.—Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate estimating the amount of detention space that will be required, during the fiscal year in which the report is submitted and the succeeding fiscal year, to detain—

(A) all aliens subject to detention under section 236(c) of the Immigration and Nationality Act (as amended by section 303 of this title) and section 241(a) of the Immigration and Nationality Act (as inserted by section 305(a)(3) of this title);

(B) all excludable or deportable aliens subject to proceedings under section 238 of the Immigration and Nationality Act (as redesignated by section 308(b)(5) of this title) or section 235(b)(2)(A) or 240 of the Immigration and Nationality Act; and

(C) other excludable or deportable aliens in accordance with the priorities established by the Attorney General.

(2) ESTIMATE OF NUMBER OF ALIENS RELEASED INTO THE COMMUNITY.—

(A) CRIMINAL ALIENS.—

(i) IN GENERAL.—The first report submitted under paragraph (1) shall include an estimate of the number of criminal aliens who, in each of the 3 fiscal years concluded prior to the date of the report—

(I) were released from detention facilities of the Immigration and Naturalization Service (whether operated directly by the Service or through contract with other persons or agencies); or

(II) were not taken into custody or detention by the Service upon completion of their incarceration.

(ii) ALIENS CONVICTED OF AGGRAVATED FELONIES.—The estimate under clause (i) shall estimate separately, with respect to each year described in such clause, the number of criminal aliens described in such clause who were convicted of an aggravated felony.

(B) ALL EXCLUDABLE OR DEPORTABLE ALIENS.—The first report submitted under paragraph (1) shall also estimate the number of excludable or deportable aliens who were released into the community due to a lack of detention facilities in each of the 3 fiscal years concluded prior to the date of the report notwithstanding circumstances that the Attorney General believed justified detention (for example, a significant probability that the released alien would not appear, as agreed, at subsequent exclusion or deportation proceedings).

(C) SUBSEQUENT REPORTS.—Each report under paragraph (1) following the first such report shall include the estimates under subparagraphs (A) and (B), made with respect to the 6–month period immediately preceding the date of the submission of the report.

<< 8 USCA § 1231 NOTE >>

SEC. 387. PILOT PROGRAM ON USE OF CLOSED MILITARY BASES FOR THE DETENTION OF INADMISSIBLE OR DEPORTABLE ALIENS.

(a) ESTABLISHMENT.—The Attorney General and the Secretary of Defense shall establish one or more pilot programs for up to 2 years each to determine the feasibility of the use of military bases, available because of actions under a base closure law, as detention centers by the Immigration and Naturalization Service. In selecting real property at a military base for use as a detention center under the pilot program, the Attorney General and the Secretary shall consult with the redevelopment authority established for the military base and give substantial deference to the redevelopment plan prepared for the military base.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of Defense, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, and the Committees on Armed Services of the House of Representatives and of the Senate, on the feasibility of using military bases closed under a base closure law as detention centers by the Immigration and Naturalization Service.

(c) DEFINITION.—For purposes of this section, the term "base closure law" means each of the following:

(1) The Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note).

(2) Title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).

(3) Section 2687 of title 10, United States Code.

(4) Any other similar law enacted after the date of the enactment of this Act.

<< 8 USCA § 1231 NOTE >>

SEC. 388. REPORT ON INTERIOR REPATRIATION PROGRAM.

Not later than 30 months after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of the program of interior repatriation developed under section 437 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132).

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Subtitle A—Pilot Programs for Employment Eligibility Confirmation

<< 8 USCA § 1324a NOTE >>

SEC. 401. ESTABLISHMENT OF PROGRAMS.

(a) IN GENERAL.—The Attorney General shall conduct 3 pilot programs of employment eligibility confirmation under this subtitle.

(b) IMPLEMENTATION DEADLINE; TERMINATION.—The Attorney General shall implement the pilot programs in a manner that permits persons and other entities to have elections under section 402 of this division made and in effect no later than 1 year after the date of the enactment of this Act. Unless the Congress otherwise provides, the Attorney General shall terminate a pilot program at the end of the 4–year period beginning on the first day the pilot program is in effect.

(c) SCOPE OF OPERATION OF PILOT PROGRAMS.—The Attorney General shall provide for the operation—

(1) of the basic pilot program (described in section 403(a) of this division) in, at a minimum, 5 of the 7 States with the highest estimated population of aliens who are not lawfully present in the United States;

(2) of the citizen attestation pilot program (described in section 403(b) of this division) in at least 5 States (or, if fewer, all of the States) that meet the condition described in section 403(b)(2)(A) of this division; and

(3) of the machine-readable-document pilot program (described in section 403(c) of this division) in at least 5 States (or, if fewer, all of the States) that meet the condition described in section 403(c)(2) of this division.

(d) REFERENCES IN SUBTITLE.—In this subtitle—

(1) PILOT PROGRAM REFERENCES.—The terms "program" or "pilot program" refer to any of the 3 pilot programs provided for under this subtitle.

(2) CONFIRMATION SYSTEM.—The term "confirmation system" means the confirmation system established under section 404 of this division.

(3) REFERENCES TO SECTION 274A.—Any reference in this subtitle to section 274A (or a subdivision of such section) is deemed a reference to such section (or subdivision thereof) of the Immigration and Nationality Act.

(4) I–9 OR SIMILAR FORM.—The term "I–9 or similar form" means the form used for purposes of section 274A(b)(1)(A) or such other form as the Attorney General determines to be appropriate.

(5) LIMITED APPLICATION TO RECRUITERS AND REFERRERS.—Any reference to recruitment or referral (or a recruiter or referrer) in relation to employment is deemed a reference only to such recruitment or referral (or recruiter or referrer) that is subject to section 274A(a)(1)(B)(ii).

(6) UNITED STATES CITIZENSHIP.—The term "United States citizenship" includes United States nationality.

(7) STATE.—The term "State" has the meaning given such term in section 101(a)(36) of the Immigration and Nationality Act.

<< 8 USCA § 1324a note >>

## SEC. 402. VOLUNTARY ELECTION TO PARTICIPATE IN A PILOT PROGRAM.

(a) VOLUNTARY ELECTION.—Subject to subsection (c)(3)(B), any person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program. Except as specifically provided in subsection (e), the Attorney General may not require any person or other entity to participate in a pilot program.

(b) BENEFIT OF REBUTTABLE PRESUMPTION.—

(1) IN GENERAL.—If a person or other entity is participating in a pilot program and obtains confirmation of identity and employment eligibility in compliance with the terms and conditions of the program with respect to the hiring (or recruitment or referral) of an individual for employment in the United States, the person or entity has established a rebuttable presumption that the person or entity has not violated section 274A(a)(1)(A) with respect to such hiring (or such recruitment or referral).

(2) CONSTRUCTION.—Paragraph (1) shall not be construed as preventing a person or other entity that has an election in effect under subsection (a) from establishing an affirmative defense under section 274A(a)(3) if the person or entity complies with the requirements of section 274A(a)(1)(B) but fails to obtain confirmation under paragraph (1).

(c) GENERAL TERMS OF ELECTIONS.—

(1) IN GENERAL.—An election under subsection (a) shall be in such form and manner, under such terms and conditions, and shall take effect, as the Attorney General shall specify. The Attorney General may not impose any fee as a condition of making an election or participating in a pilot program.

(2) SCOPE OF ELECTION.—

(A) IN GENERAL.—Subject to paragraph (3), any electing person or other entity may provide that the election under subsection (a) shall apply (during the period in which the election is in effect)—

  (i) to all its hiring (and all recruitment or referral) in the State (or States) in which the pilot program is operating, or

  (ii) to its hiring (or recruitment or referral) in one or more pilot program States or one or more places of hiring (or recruitment or referral, as the case may be) in the pilot program States.

 (B) APPLICATION OF PROGRAMS IN NON–PILOT PROGRAM STATES.—In addition, the Attorney General may permit a person or entity electing—

  (i) the basic pilot program (described in section 403(a) of this division) to provide that the election applies to its hiring (or recruitment or referral) in one or more States or places of hiring (or recruitment or referral) in which the pilot program is not otherwise operating, or

  (ii) the citizen attestation pilot program (described in 403(b) of this division) or the machine-readable-document pilot program (described in section 403(c) of this division) to provide that the election applies to its hiring (or recruitment or referral) in one or more States or places of hiring (or recruitment or referral) in which the pilot program is not otherwise operating but only if such States meet the requirements of 403(b)(2)(A) and 403(c)(2) of this division, respectively.

 (3) ACCEPTANCE AND REJECTION OF ELECTIONS.—

  (A) IN GENERAL.—Except as provided in subparagraph (B), the Attorney General shall accept all elections made under subsection (a).

  (B) REJECTION OF ELECTIONS.—The Attorney General may reject an election by a person or other entity under this section or limit its applicability to certain States or places of hiring (or recruitment or referral) if the Attorney General has determined that there are insufficient resources to provide appropriate services under a pilot program for the person's or entity's hiring (or recruitment or referral) in any or all States or places of hiring.

 (4) TERMINATION OF ELECTIONS.—The Attorney General may terminate an election by a person or other entity under this section because the person or entity has substantially failed to comply with its obligations under the pilot program. A person or other entity may terminate an election in such form and manner as the Attorney General shall specify.

 (d) CONSULTATION, EDUCATION, AND PUBLICITY.—

 (1) CONSULTATION.—The Attorney General shall closely consult with representatives of employers (and recruiters and referrers) in the development and implementation of the pilot programs, including the education of employers (and recruiters and referrers) about such programs.

 (2) PUBLICITY.—The Attorney General shall widely publicize the election process and pilot programs, including the voluntary nature of the pilot programs and the advantages to employers (and recruiters and referrers) of making an election under this section.

 (3) ASSISTANCE THROUGH DISTRICT OFFICES.—The Attorney General shall designate one or more individuals in each District office of the Immigration and Naturalization Service for a Service District in which a pilot program is being implemented—

  (A) to inform persons and other entities that seek information about pilot programs of the voluntary nature of such programs, and

  (B) to assist persons and other entities in electing and participating in any pilot programs in effect in the District, in complying with the requirements of section 274A, and in facilitating confirmation of the identity and employment eligibility of individuals consistent with such section.

 (e) SELECT ENTITIES REQUIRED TO PARTICIPATE IN A PILOT PROGRAM.—

 (1) FEDERAL GOVERNMENT.—

  (A) EXECUTIVE DEPARTMENTS.—

  (i) IN GENERAL.—Each Department of the Federal Government shall elect to participate in a pilot program and shall comply with the terms and conditions of such an election.

  (ii) ELECTION.—Subject to clause (iii), the Secretary of each such Department—

   (I) shall elect the pilot program (or programs) in which the Department shall participate, and

   (II) may limit the election to hiring occurring in certain States (or geographic areas) covered by the program (or programs) and in specified divisions within the Department, so long as all hiring by such divisions and in such locations is covered.

(iii) ROLE OF ATTORNEY GENERAL.—The Attorney General shall assist and coordinate elections under this subparagraph in such manner as assures that—

(I) a significant portion of the total hiring within each Department within States covered by a pilot program is covered under such a program, and

(II) there is significant participation by the Federal Executive branch in each of the pilot programs.

(B) LEGISLATIVE BRANCH.—Each Member of Congress, each officer of Congress, and the head of each agency of the legislative branch, that conducts hiring in a State in which a pilot program is operating shall elect to participate in a pilot program, may specify which pilot program or programs (if there is more than one) in which the Member, officer, or agency will participate, and shall comply with the terms and conditions of such an election.

(2) APPLICATION TO CERTAIN VIOLATORS.—An order under section 274A(e)(4) or section 274B(g) of the Immigration and Nationality Act may require the subject of the order to participate in, and comply with the terms of, a pilot program with respect to the subject's hiring (or recruitment or referral) of individuals in a State covered by such a program.

(3) CONSEQUENCE OF FAILURE TO PARTICIPATE.—If a person or other entity is required under this subsection to participate in a pilot program and fails to comply with the requirements of such program with respect to an individual—

(A) such failure shall be treated as a violation of section 274A(a)(1)(B) with respect to that individual, and

(B) a rebuttable presumption is created that the person or entity has violated section 274A(a)(1)(A).

Subparagraph (B) shall not apply in any prosecution under section 274A(f)(1).

(f) CONSTRUCTION.—This subtitle shall not affect the authority of the Attorney General under any other law (including section 274A(d)(4)) to conduct demonstration projects in relation to section 274A.

<< 8 USCA § 1324a note >>

SEC. 403. PROCEDURES FOR PARTICIPANTS IN PILOT PROGRAMS.

(a) BASIC PILOT PROGRAM.—A person or other entity that elects to participate in the basic pilot program described in this subsection agrees to conform to the following procedures in the case of the hiring (or recruitment or referral) for employment in the United States of each individual covered by the election:

(1) PROVISION OF ADDITIONAL INFORMATION.—The person or entity shall obtain from the individual (and the individual shall provide) and shall record on the I–9 or similar form—

(A) the individual's social security account number, if the individual has been issued such a number, and

(B) if the individual does not attest to United States citizenship under section 274A(b)(2), such identification or authorization number established by the Immigration and Naturalization Service for the alien as the Attorney General shall specify,

and shall retain the original form and make it available for inspection for the period and in the manner required of I–9 forms under section 274A(b)(3).

(2) PRESENTATION OF DOCUMENTATION.—

(A) IN GENERAL.—The person or other entity, and the individual whose identity and employment eligibility are being confirmed, shall, subject to subparagraph (B), fulfill the requirements of section 274A(b) with the following modifications:

(i) A document referred to in section 274A(b)(1)(B)(ii) (as redesignated by section 412(a) of this division) must be designated by the Attorney General as suitable for the purpose of identification in a pilot program.

(ii) A document referred to in section 274A(b)(1)(D) must contain a photograph of the individual.

(iii) The person or entity has complied with the requirements of section 274A(b)(1) with respect to examination of a document if the document reasonably appears on its face to be genuine and it reasonably appears to pertain to the individual whose identity and work eligibility is being confirmed.

(B) LIMITATION OF REQUIREMENT TO EXAMINE DOCUMENTATION.—If the Attorney General finds that a pilot program would reliably determine with respect to an individual whether—

(i) the person with the identity claimed by the individual is authorized to work in the United States, and

(ii) the individual is claiming the identity of another person,

if a person or entity could fulfill the requirement to examine documentation contained in subparagraph (A) of section 274A(b)(1) by examining a document specified in either subparagraph (B) or (D) of such section, the Attorney General may provide that, for purposes of such requirement, only such a document need be examined. In such case, any reference in section 274A(b)(1)(A) to a verification that an individual is not an unauthorized alien shall be deemed to be a verification of the individual's identity.

(3) SEEKING CONFIRMATION.—

  (A) IN GENERAL.—The person or other entity shall make an inquiry, as provided in section 404(a)(1) of this division, using the confirmation system to seek confirmation of the identity and employment eligibility of an individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring (or recruitment or referral, as the case may be).

  (B) EXTENSION OF TIME PERIOD.—If the person or other entity in good faith attempts to make an inquiry during such 3 working days and the confirmation system has registered that not all inquiries were received during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation system registers that it has received all inquiries. If the confirmation system cannot receive inquiries at all times during a day, the person or entity merely has to assert that the entity attempted to make the inquiry on that day for the previous sentence to apply to such an inquiry, and does not have to provide any additional proof concerning such inquiry.

(4) CONFIRMATION OR NONCONFIRMATION.—

  (A) CONFIRMATION UPON INITIAL INQUIRY.—If the person or other entity receives an appropriate confirmation of an individual's identity and work eligibility under the confirmation system within the time period specified under section 404(b) of this division, the person or entity shall record on the I–9 or similar form an appropriate code that is provided under the system and that indicates a final confirmation of such identity and work eligibility of the individual.

  (B) NONCONFIRMATION UPON INITIAL INQUIRY AND SECONDARY VERIFICATION.—

   (i) NONCONFIRMATION.—If the person or other entity receives a tentative nonconfirmation of an individual's identity or work eligibility under the confirmation system within the time period specified under 404(b) of this division, the person or entity shall so inform the individual for whom the confirmation is sought.

   (ii) NO CONTEST.—If the individual does not contest the nonconfirmation within the time period specified in section 404(c) of this division, the nonconfirmation shall be considered final. The person or entity shall then record on the I–9 or similar form an appropriate code which has been provided under the system to indicate a tentative nonconfirmation.

   (iii) CONTEST.—If the individual does contest the nonconfirmation, the individual shall utilize the process for secondary verification provided under section 404(c) of this division. The nonconfirmation will remain tentative until a final confirmation or nonconfirmation is provided by the confirmation system within the time period specified in such section. In no case shall an employer terminate employment of an individual because of a failure of the individual to have identity and work eligibility confirmed under this section until a nonconfirmation becomes final. Nothing in this clause shall apply to a termination of employment for any reason other than because of such a failure.

   (iv) RECORDING OF CONCLUSION ON FORM.—If a final confirmation or nonconfirmation is provided by the confirmation system under section 404(c) of this division regarding an individual, the person or entity shall record on the I–9 or similar form an appropriate code that is provided under the system and that indicates a confirmation or nonconfirmation of identity and work eligibility of the individual.

  (C) CONSEQUENCES OF NONCONFIRMATION.—

   (i) TERMINATION OR NOTIFICATION OF CONTINUED EMPLOYMENT.—If the person or other entity has received a final nonconfirmation regarding an individual under subparagraph (B), the person or entity may terminate employment (or recruitment or referral) of the individual. If the person or entity does not terminate employment (or recruitment or referral) of the individual, the person or entity shall notify the Attorney General of such fact through the confirmation system or in such other manner as the Attorney General may specify.

   (ii) FAILURE TO NOTIFY.—If the person or entity fails to provide notice with respect to an individual as required under clause (i), the failure is deemed to constitute a violation of section 274A(a)(1)(B) with respect to that individual and the applicable civil monetary penalty under section 274A(e)(5) shall be (notwithstanding the amounts specified in such section) no less than $500 and no more than $1,000 for each individual with respect to whom such violation occurred.

(iii) CONTINUED EMPLOYMENT AFTER FINAL NONCONFIRMATION.—If the person or other entity continues to employ (or to recruit or refer) an individual after receiving final nonconfirmation, a rebuttable presumption is created that the person or entity has violated section 274A(a)(1)(A). The previous sentence shall not apply in any prosecution under section 274A(f)(1).

(b) CITIZEN ATTESTATION PILOT PROGRAM.—

(1) IN GENERAL.—Except as provided in paragraphs (3) through (5), the procedures applicable under the citizen attestation pilot program under this subsection shall be the same procedures as those under the basic pilot program under subsection (a).

(2) RESTRICTIONS.—

(A) STATE DOCUMENT REQUIREMENT TO PARTICIPATE IN PILOT PROGRAM.—The Attorney General may not provide for the operation of the citizen attestation pilot program in a State unless each driver's license or similar identification document described in section 274A(b)(1)(D)(i) issued by the State—

(i) contains a photograph of the individual involved, and

(ii) has been determined by the Attorney General to have security features, and to have been issued through application and issuance procedures, which make such document sufficiently resistant to counterfeiting, tampering, and fraudulent use that it is a reliable means of identification for purposes of this section.

(B) AUTHORIZATION TO LIMIT EMPLOYER PARTICIPATION.—The Attorney General may restrict the number of persons or other entities that may elect to participate in the citizen attestation pilot program under this subsection as the Attorney General determines to be necessary to produce a representative sample of employers and to reduce the potential impact of fraud.

(3) NO CONFIRMATION REQUIRED FOR CERTAIN INDIVIDUALS ATTESTING TO U.S. CITIZENSHIP.—In the case of a person or other entity hiring (or recruiting or referring) an individual under the citizen attestation pilot program, if the individual attests to United States citizenship (under penalty of perjury on an I–9 or similar form which form states on its face the criminal and other penalties provided under law for a false representation of United States citizenship)—

(A) the person or entity may fulfill the requirement to examine documentation contained in subparagraph (A) of section 274A(b)(1) by examining a document specified in either subparagraph (B)(i) or (D) of such section; and

(B) the person or other entity is not required to comply with respect to such individual with the procedures described in paragraphs (3) and (4) of subsection (a), but only if the person or entity retains the form and makes it available for inspection in the same manner as in the case of an I–9 form under section 274A(b)(3).

(4) WAIVER OF DOCUMENT PRESENTATION REQUIREMENT IN CERTAIN CASES.—

(A) IN GENERAL.—In the case of a person or entity that elects, in a manner specified by the Attorney General consistent with subparagraph (B), to participate in the pilot program under this paragraph, if an individual being hired (or recruited or referred) attests (in the manner described in paragraph (3)) to United States citizenship and the person or entity retains the form on which the attestation is made and makes it available for inspection in the same manner as in the case of an I–9 form under section 274A(b)(3), the person or entity is not required to comply with the procedures described in section 274A(b).

(B) RESTRICTION.—The Attorney General shall restrict the election under this paragraph to no more than 1,000 employers and, to the extent practicable, shall select among employers seeking to make such election in a manner that provides for such an election by a representative sample of employers.

(5) NONREVIEWABLE DETERMINATIONS.—The determinations of the Attorney General under paragraphs (2) and (4) are within the discretion of the Attorney General and are not subject to judicial or administrative review.

(c) MACHINE–READABLE–DOCUMENT PILOT PROGRAM.—

(1) IN GENERAL.—Except as provided in paragraph (3), the procedures applicable under the machine-readable-document pilot program under this subsection shall be the same procedures as those under the basic pilot program under subsection (a).

(2) STATE DOCUMENT REQUIREMENT TO PARTICIPATE IN PILOT PROGRAM.—The Attorney General may not provide for the operation of the machine-readable-document pilot program in a State unless driver's licenses and similar identification documents described in section 274A(b)(1)(D)(i) issued by the State include a machine-readable social security account number.

(3) USE OF MACHINE–READABLE DOCUMENTS.—If the individual whose identity and employment eligibility must be confirmed presents to the person or entity hiring (or recruiting or referring) the individual a license or other document described in paragraph (2) that includes a machine-readable social security account number, the person or entity must make

an inquiry through the confirmation system by using a machine-readable feature of such document. If the individual does not attest to United States citizenship under section 274A(b)(2), the individual's identification or authorization number described in subsection (a)(1)(B) shall be provided as part of the inquiry.

(d) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE CONFIRMATION SYSTEM.—No person or entity participating in a pilot program shall be civilly or criminally liable under any law for any action taken in good faith reliance on information provided through the confirmation system.

<< 8 USCA § 1324a note >>

SEC. 404. EMPLOYMENT ELIGIBILITY CONFIRMATION SYSTEM.

 (a) IN GENERAL.—The Attorney General shall establish a pilot program confirmation system through which the Attorney General (or a designee of the Attorney General, which may be a nongovernmental entity)—

 (1) responds to inquiries made by electing persons and other entities (including those made by the transmittal of data from machine-readable documents under the machine-readable pilot program) at any time through a toll-free telephone line or other toll-free electronic media concerning an individual's identity and whether the individual is authorized to be employed, and

 (2) maintains records of the inquiries that were made, of confirmations provided (or not provided), and of the codes provided to inquirers as evidence of their compliance with their obligations under the pilot programs.

To the extent practicable, the Attorney General shall seek to establish such a system using one or more nongovernmental entities.

 (b) INITIAL RESPONSE.—The confirmation system shall provide confirmation or a tentative nonconfirmation of an individual's identity and employment eligibility within 3 working days of the initial inquiry. If providing confirmation or tentative nonconfirmation, the confirmation system shall provide an appropriate code indicating such confirmation or such nonconfirmation.

 (c) SECONDARY VERIFICATION PROCESS IN CASE OF TENTATIVE NONCONFIRMATION.—In cases of tentative nonconfirmation, the Attorney General shall specify, in consultation with the Commissioner of Social Security and the Commissioner of the Immigration and Naturalization Service, an available secondary verification process to confirm the validity of information provided and to provide a final confirmation or nonconfirmation within 10 working days after the date of the tentative nonconfirmation. When final confirmation or nonconfirmation is provided, the confirmation system shall provide an appropriate code indicating such confirmation or nonconfirmation.

 (d) DESIGN AND OPERATION OF SYSTEM.—The confirmation system shall be designed and operated—

 (1) to maximize its reliability and ease of use by persons and other entities making elections under section 402(a) of this division consistent with insulating and protecting the privacy and security of the underlying information;

 (2) to respond to all inquiries made by such persons and entities on whether individuals are authorized to be employed and to register all times when such inquiries are not received;

 (3) with appropriate administrative, technical, and physical safeguards to prevent unauthorized disclosure of personal information; and

 (4) to have reasonable safeguards against the system's resulting in unlawful discriminatory practices based on national origin or citizenship status, including—

  (A) the selective or unauthorized use of the system to verify eligibility;

  (B) the use of the system prior to an offer of employment; or

  (C) the exclusion of certain individuals from consideration for employment as a result of a perceived likelihood that additional verification will be required, beyond what is required for most job applicants.

 (e) RESPONSIBILITIES OF THE COMMISSIONER OF SOCIAL SECURITY.—As part of the confirmation system, the Commissioner of Social Security, in consultation with the entity responsible for administration of the system, shall establish a reliable, secure method, which, within the time periods specified under subsections (b) and (c), compares the name and social security account number provided in an inquiry against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided regarding an individual whose identity and employment eligibility must be confirmed, the correspondence of the name and number, and whether the individual has presented a social security

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

account number that is not valid for employment. The Commissioner shall not disclose or release social security information (other than such confirmation or nonconfirmation).

 (f) RESPONSIBILITIES OF THE COMMISSIONER OF THE IMMIGRATION AND NATURALIZATION SERVICE.— As part of the confirmation system, the Commissioner of the Immigration and Naturalization Service, in consultation with the entity responsible for administration of the system, shall establish a reliable, secure method, which, within the time periods specified under subsections (b) and (c), compares the name and alien identification or authorization number described in section 403(a)(1)(B) of this division which are provided in an inquiry against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided, the correspondence of the name and number, and whether the alien is authorized to be employed in the United States.

 (g) UPDATING INFORMATION.—The Commissioners of Social Security and the Immigration and Naturalization Service shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information, including instances in which it is brought to their attention in the secondary verification process described in subsection (c).

 (h) LIMITATION ON USE OF THE CONFIRMATION SYSTEM AND ANY RELATED SYSTEMS.—

  (1) IN GENERAL.—Notwithstanding any other provision of law, nothing in this subtitle shall be construed to permit or allow any department, bureau, or other agency of the United States Government to utilize any information, data base, or other records assembled under this subtitle for any other purpose other than as provided for under a pilot program.

  (2) NO NATIONAL IDENTIFICATION CARD.—Nothing in this subtitle shall be construed to authorize, directly or indirectly, the issuance or use of national identification cards or the establishment of a national identification card.

<< 8 USCA § 1324a note >>

SEC. 405. REPORTS.

 The Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate reports on the pilot programs within 3 months after the end of the third and fourth years in which the programs are in effect. Such reports shall—

  (1) assess the degree of fraudulent attesting of United States citizenship,

  (2) include recommendations on whether or not the pilot programs should be continued or modified, and

  (3) assess the benefits of the pilot programs to employers and the degree to which they assist in the enforcement of section 274A.

Subtitle B—Other Provisions Relating to Employer Sanctions

SEC. 411. LIMITING LIABILITY FOR CERTAIN TECHNICAL VIOLATIONS OF PAPERWORK REQUIREMENTS.

<< 8 USCA § 1324a >>

 (a) IN GENERAL.—Section 274A(b) (8 U.S.C. 1324a(b)) is amended by adding at the end the following new paragraph:

 "(6) GOOD FAITH COMPLIANCE.—

  "(A) IN GENERAL.—Except as provided in subparagraphs (B) and (C), a person or entity is considered to have complied with a requirement of this subsection notwithstanding a technical or procedural failure to meet such requirement if there was a good faith attempt to comply with the requirement.

  "(B) EXCEPTION IF FAILURE TO CORRECT AFTER NOTICE.—Subparagraph (A) shall not apply if—

   "(i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure,

   "(ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and

   "(iii) the person or entity has not corrected the failure voluntarily within such period.

  "(C) EXCEPTION FOR PATTERN OR PRACTICE VIOLATORS.—Subparagraph (A) shall not apply to a person or entity that has or is engaging in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).".

<< 8 USCA § 1324a NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to failures occurring on or after the date of the enactment of this Act.

SEC. 412. PAPERWORK AND OTHER CHANGES IN THE EMPLOYER SANCTIONS PROGRAM.

<< 8 USCA § 1324a >>

 (a) REDUCING THE NUMBER OF DOCUMENTS ACCEPTED FOR EMPLOYMENT VERIFICATION.—Section 274A(b)(1) (8 U.S.C. 1324a(b)(1)) is amended—

 (1) in subparagraph (B)—

 (A) by striking clauses (ii) through (iv),

 (B) in clause (v), by striking "or other alien registration card, if the card" and inserting ", alien registration card, or other document designated by the Attorney General, if the document" and redesignating such clause as clause (ii), and

 (C) in clause (ii), as so redesignated—

 (i) in subclause (I), by striking "or" before "such other personal identifying information" and inserting "and",

 (ii) by striking "and" at the end of subclause (I),

 (iii) by striking the period at the end of subclause (II) and inserting ", and", and

 (iv) by adding at the end the following new subclause:

 "(III) contains security features to make it resistant to tampering, counterfeiting, and fraudulent use.";

 (2) in subparagraph (C)—

 (A) by adding "or" at the end of clause (i),

 (B) by striking clause (ii), and

 (C) by redesignating clause (iii) as clause (ii); and

 (3) by adding at the end the following new subparagraph:

 "(E) AUTHORITY TO PROHIBIT USE OF CERTAIN DOCUMENTS.—If the Attorney General finds, by regulation, that any document described in subparagraph (B), (C), or (D) as establishing employment authorization or identity does not reliably establish such authorization or identity or is being used fraudulently to an unacceptable degree, the Attorney General may prohibit or place conditions on its use for purposes of this subsection.".

 (b) REDUCTION OF PAPERWORK FOR CERTAIN EMPLOYEES.—Section 274A(a) (8 U.S.C. 1324a(a)) is amended by adding at the end the following new paragraph:

 "(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOYEES.—

 "(A) IN GENERAL.—For purposes of this section, if—

 "(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

 "(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

 "(B) PERIOD.—The period described in this subparagraph is 3 years, or, if less, the period of time that the individual is authorized to be employed in the United States.

 "(C) LIABILITY.—

 "(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an alien not authorized to work in the United States, then for the purposes of paragraph (1)(A), subject to clause

(ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an alien not authorized to work in the United States.

"(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and could not reasonably have known) that the individual at the time of hiring or afterward was an alien not authorized to work in the United States.

"(iii) EXCEPTION.—Clause (i) shall not apply in any prosecution under subsection (f)(1).".

(c) ELIMINATION OF DATED PROVISIONS.—Section 274A (8 U.S.C. 1324a) is amended by striking subsections (i) through (n).

(d) CLARIFICATION OF APPLICATION TO FEDERAL GOVERNMENT.—Section 274A(a) (8 U.S.C. 1324a(a)), as amended by subsection (b), is amended by adding at the end the following new paragraph:

"(7) APPLICATION TO FEDERAL GOVERNMENT.—For purposes of this section, the term 'entity' includes an entity in any branch of the Federal Government.".

<< 8 USCA § 1324a NOTE >>

(e) EFFECTIVE DATES.—

(1) The amendments made by subsection (a) shall apply with respect to hiring (or recruitment or referral) occurring on or after such date (not later than 12 months after the date of the enactment of this Act) as the Attorney General shall designate.

(2) The amendment made by subsection (b) shall apply to individuals hired on or after 60 days after the date of the enactment of this Act.

(3) The amendment made by subsection (c) shall take effect on the date of the enactment of this Act.

(4) The amendment made by subsection (d) applies to hiring occurring before, on, or after the date of the enactment of this Act, but no penalty shall be imposed under subsection (e) or (f) of section 274A of the Immigration and Nationality Act for such hiring occurring before such date.

SEC. 413. REPORT ON ADDITIONAL AUTHORITY OR RESOURCES NEEDED FOR ENFORCEMENT OF EMPLOYER SANCTIONS PROVISIONS.

<< 8 USCA § 1324a NOTE >>

(a) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on any additional authority or resources needed—

(1) by the Immigration and Naturalization Service in order to enforce section 274A of the Immigration and Nationality Act, or

(2) by Federal agencies in order to carry out the Executive Order of February 13, 1996 (entitled "Economy and Efficiency in Government Procurement Through Compliance with Certain Immigration and Naturalization Act Provisions") and to expand the restrictions in such order to cover agricultural subsidies, grants, job training programs, and other Federally subsidized assistance programs.

(b) REFERENCE TO INCREASED AUTHORIZATION OF APPROPRIATIONS.—For provision increasing the authorization of appropriations for investigators for violations of sections 274 and 274A of the Immigration and Nationality Act, see section 131 of this division.

SEC. 414. REPORTS ON EARNINGS OF ALIENS NOT AUTHORIZED TO WORK.

<< 8 USCA § 1360 >>

(a) IN GENERAL.—Subsection (c) of section 290 (8 U.S.C. 1360) is amended to read as follows:

"(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1996), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate quantity of social security account numbers issued to aliens not authorized to be employed, with respect to which, in such fiscal year, earnings were reported to the Social Security Administration.

AR.01767

"(2) If earnings are reported on or after January 1, 1997, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.".

<< 8 USCA § 1360 NOTE >>

(b) REPORT ON FRAUDULENT USE OF SOCIAL SECURITY ACCOUNT NUMBERS.—The Commissioner of Social Security shall transmit to the Attorney General, by not later than 1 year after the date of the enactment of this Act, a report on the extent to which social security account numbers and cards are used by aliens for fraudulent purposes.

<< 8 USCA § 1304 >>

SEC. 415. AUTHORIZING MAINTENANCE OF CERTAIN INFORMATION ON ALIENS.

Section 264 (8 U.S.C. 1304) is amended by adding at the end the following new subsection:
"(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.".

<< 8 USCA § 1324a >>

SEC. 416. SUBPOENA AUTHORITY.

Section 274A(e)(2) (8 U.S.C. 1324a(e)(2)) is amended—
(1) by striking "and" at the end of subparagraph (A);
(2) by striking the period at the end of subparagraph (B) and inserting ", and"; and
(3) by inserting after subparagraph (B) the following:
"(C) immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).".

Subtitle C—Unfair Immigration–Related Employment Practices

SEC. 421. TREATMENT OF CERTAIN DOCUMENTARY PRACTICES AS UNFAIR IMMIGRATION–RELATED EMPLOYMENT PRACTICES.

<< 8 USCA § 1324b >>

(a) IN GENERAL.—Section 274B(a)(6) (8 U.S.C. 1324b(a)(6)) is amended—
(1) by striking "For purposes of paragraph (1), a" and inserting "A"; and
(2) by striking "relating to the hiring of individuals" and inserting the following: "if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1)".

<< 8 USCA § 1324b NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to requests made on or after the date of the enactment of this Act.

TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

Subtitle A—Eligibility of Aliens for Public Assistance and Benefits

<< 8 USCA § 1641 >>

SEC. 501. EXCEPTION TO INELIGIBILITY FOR PUBLIC BENEFITS FOR CERTAIN BATTERED ALIENS.

Section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641) is amended by adding at the end the following new subsection:

"(c) TREATMENT OF CERTAIN BATTERED ALIENS AS QUALIFIED ALIENS.—For purposes of this title, the term 'qualified alien' includes—

"(1) an alien who—

"(A) has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to, or acquiesced in, such battery or cruelty, but only if (in the opinion of the Attorney General, which opinion is not subject to review by any court) there is a substantial connection between such battery or cruelty and the need for the benefits to be provided; and

"(B) has been approved or has a petition pending which sets forth a prima facie case for—

"(i) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A) of the Immigration and Nationality Act,

"(ii) classification pursuant to clause (ii) or (iii) of section 204(a)(1)(B) of the Act,

"(iii) suspension of deportation and adjustment of status pursuant to section 244(a)(3) of such Act, or

"(iv) status as a spouse or child of a United States citizen pursuant to clause (i) of section 204(a)(1)(A) of such Act, or classification pursuant to clause (i) of section 204(a)(1)(B) of such Act; or

"(2) an alien—

"(A) whose child has been battered or subjected to extreme cruelty in the United States by a spouse or a parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, and the alien did not actively participate in such battery or cruelty, but only if (in the opinion of the Attorney General, which opinion is not subject to review by any court) there is a substantial connection between such battery or cruelty and the need for the benefits to be provided; and

"(B) who meets the requirement of clause (ii) of subparagraph (A).

This subsection shall not apply to an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual subjected to such battery or cruelty.".

<< 8 USCA § 1621 NOTE >>

SEC. 502. PILOT PROGRAMS ON LIMITING ISSUANCE OF DRIVER'S LICENSES TO ILLEGAL ALIENS.

(a) IN GENERAL.—Pursuant to guidelines prescribed by the Attorney General not later than 6 months after the date of the enactment of this Act, all States may conduct pilot programs within their State to determine the viability, advisability, and cost-effectiveness of the State's denying driver's licenses to aliens who are not lawfully present in the United States. Under a pilot program a State may deny a driver's license to aliens who are not lawfully present in the United States. Such program shall be conducted in cooperation with relevant State and local authorities.

(b) REPORT.—Not later than 3 years after the date of the enactment of this Act, the Attorney General shall submit a report to the Judiciary Committees of the House of Representatives and of the Senate on the results of the pilot programs conducted under subsection (a).

<< 42 USCA § 402 >>

SEC. 503. INELIGIBILITY OF ALIENS NOT LAWFULLY PRESENT FOR SOCIAL SECURITY BENEFITS.

(a) IN GENERAL.—Section 202 of the Social Security Act (42 U.S.C. 402) is amended by adding at the end the following new subsection:

"Limitation on Payments to Aliens

"(y) Notwithstanding any other provision of law, no monthly benefit under this title shall be payable to any alien in the United States for any month during which such alien is not lawfully present in the United States as determined by the Attorney General.".

<< 42 USCA § 402 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to benefits for which applications are filed on or after the first day of the first month that begins at least 60 days after the date of the enactment of this Act.

<< 8 USCA § 1642 >>

SEC. 504. PROCEDURES FOR REQUIRING PROOF OF CITIZENSHIP FOR FEDERAL PUBLIC BENEFITS.

Section 432(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1642) is amended—
(1) by inserting "(1)" after the dash, and
(2) by adding at the end the following:
"(2) Not later than 18 months after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of Health and Human Services, shall also establish procedures for a person applying for a Federal public benefit (as defined in section 401(c)) to provide proof of citizenship in a fair and nondiscriminatory manner.".

<< 8 USCA § 1623 >>

SEC. 505. LIMITATION ON ELIGIBILITY FOR PREFERENTIAL TREATMENT OF ALIENS NOT LAWFULLY PRESENT ON BASIS OF RESIDENCE FOR HIGHER EDUCATION BENEFITS.

(a) IN GENERAL.—Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.
(b) EFFECTIVE DATE.—This section shall apply to benefits provided on or after July 1, 1998.

<< 8 USCA § 1611 NOTE >>

SEC. 506. STUDY AND REPORT ON ALIEN STUDENT ELIGIBILITY FOR POSTSECONDARY FEDERAL STUDENT FINANCIAL ASSISTANCE.

(a) GAO STUDY AND REPORT.—
(1) STUDY.—The Comptroller General shall conduct a study to determine the extent to which aliens who are not lawfully admitted for permanent residence are receiving postsecondary Federal student financial assistance.
(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Comptroller General shall submit a report to the appropriate committees of the Congress on the study conducted under paragraph (1).
(b) REPORT ON COMPUTER MATCHING PROGRAM.—
(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Education and the Commissioner of Social Security shall jointly submit to the appropriate committees of the Congress a report on the computer matching program of the Department of Education under section 484(p) of the Higher Education Act of 1965.
(2) REPORT ELEMENTS.—The report under paragraph (1) shall include the following:
(A) An assessment by the Secretary and the Commissioner of the effectiveness of the computer matching program, and a justification for such assessment.
(B) The ratio of successful matches under the program to inaccurate matches.
(C) Such other information as the Secretary and the Commissioner jointly consider appropriate.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(c) APPROPRIATE COMMITTEES OF THE CONGRESS.—For purposes of this section the term "appropriate committees of the Congress" means the Committee on Economic and Educational Opportunities and the Committee on the Judiciary of the House of Representatives and the Committee on Labor and Human Resources and the Committee on the Judiciary of the Senate.

SEC. 507. VERIFICATION OF IMMIGRATION STATUS FOR PURPOSES OF SOCIAL SECURITY AND HIGHER EDUCATIONAL ASSISTANCE.

<< 42 USCA § 1320b–7 >>

(a) SOCIAL SECURITY ACT STATE INCOME AND ELIGIBILITY VERIFICATION SYSTEMS.—Section 1137(d)(4)(B)(i)) of the Social Security Act (42 U.S.C. 1320b–7(d)(4)(B)(i)) is amended to read as follows:

   "(i) the State shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,".

<< 20 USCA § 1091 >>

(b) ELIGIBILITY FOR ASSISTANCE UNDER HIGHER EDUCATION ACT OF 1965.—Section 484(g)(4)(B)(i) of the Higher Education Act of 1965 (20 U.S.C. 1091(g)(4)(B)(i)) is amended to read as follows:

   "(i) the institution shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,".

<< 8 USCA § 1642 >>

SEC. 508. NO VERIFICATION REQUIREMENT FOR NONPROFIT CHARITABLE ORGANIZATIONS.

   Section 432 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1642) is amended by adding at the end the following new subsection:

   "(d) NO VERIFICATION REQUIREMENT FOR NONPROFIT CHARITABLE ORGANIZATIONS.—Subject to subsection (a), a nonprofit charitable organization, in providing any Federal public benefit (as defined in section 401(c)) or any State or local public benefit (as defined in section 411(c)), is not required under this title to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits.".

SEC. 509. GAO STUDY OF PROVISION OF MEANS–TESTED PUBLIC BENEFITS TO ALIENS WHO ARE NOT QUALIFIED ALIENS ON BEHALF OF ELIGIBLE INDIVIDUALS.

   Not later than 180 days after the date of the enactment of this Act, the Comptroller General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate and to the Inspector General of the Department of Justice a report on the extent to which means-tested public benefits are being paid or provided to aliens who are not qualified aliens (as defined in section 431(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) in order to provide such benefits to individuals who are United States citizens or qualified aliens (as so defined). Such report shall address the locations in which such benefits are provided and the incidence of fraud or misrepresentation in connection with the provision of such benefits.

SEC. 510. TRANSITION FOR ALIENS CURRENTLY RECEIVING BENEFITS UNDER THE FOOD STAMP PROGRAM.

<< 8 USCA § 1612 NOTE >>

   Effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, subclause (I) of section 402(a)(2)(D)(ii) (8 U.S.C. 1612(a)(2)(D)(ii)) is amended to read as follows:

<< 8 USCA § 1612 >>

"(I) IN GENERAL.—With respect to the specified Federal program described in paragraph (3)(B), ineligibility under paragraph (1) shall not apply until April 1, 1997, to an alien who received benefits under such program on the date of enactment of this Act, unless such alien is determined to be ineligible to receive such benefits under the Food Stamp Act of 1977. The State agency shall recertify the eligibility of all such aliens during the period beginning April 1, 1997, and ending August 22, 1997.".

Subtitle B—Public Charge Exclusion

SEC. 531. GROUND FOR EXCLUSION.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Paragraph (4) of section 212(a) (8 U.S.C. 1182(a)) is amended to read as follows:
"(4) PUBLIC CHARGE.—
  "(A) IN GENERAL.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable.
  "(B) FACTORS TO BE TAKEN INTO ACCOUNT.—(i) In determining whether an alien is excludable under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's—
    "(I) age;
    "(II) health;
    "(III) family status;
    "(IV) assets, resources, and financial status; and
    "(V) education and skills.
  "(ii) In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 213A for purposes of exclusion under this paragraph.
  "(C) FAMILY–SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 201(b)(2) or 203(a) is excludable under this paragraph unless—
    "(i) the alien has obtained—
      "(I) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A), or
      "(II) classification pursuant to clause (ii) or (iii) of section 204(a)(1)(B); or
    "(ii) the person petitioning for the alien's admission (including any additional sponsor required under section 213A(f)) has executed an affidavit of support described in section 213A with respect to such alien.
  "(D) CERTAIN EMPLOYMENT–BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is excludable under this paragraph unless such relative has executed an affidavit of support described in section 213A with respect to such alien.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications submitted on or after such date, not earlier than 30 days and not later than 60 days after the date the Attorney General promulgates under section 551(c)(2) of this division a standard form for an affidavit of support, as the Attorney General shall specify, but subparagraphs (C) and (D) of section 212(a)(4) of the Immigration and Nationality Act, as so amended, shall not apply to applications with respect to which an official interview with an immigration officer was conducted before such effective date.

Subtitle C—Affidavits of Support

SEC. 551. REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT.

<< 8 USCA § 1183a >>

(a) IN GENERAL.—Section 213A (8 U.S.C. 1183a), as inserted by section 423(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, is amended to read as follows:

"REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT

"SEC. 213A. (a) ENFORCEABILITY.—

"(1) TERMS OF AFFIDAVIT.—No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not excludable as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—

"(A) in which the sponsor agrees to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line during the period in which the affidavit is enforceable;

"(B) that is legally enforceable against the sponsor by the sponsored alien, the Federal Government, any State (or any political subdivision of such State), or by any other entity that provides any means-tested public benefit (as defined in subsection (e)), consistent with the provisions of this section; and

"(C) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).

"(2) PERIOD OF ENFORCEABILITY.—An affidavit of support shall be enforceable with respect to benefits provided for an alien before the date the alien is naturalized as a citizen of the United States, or, if earlier, the termination date provided under paragraph (3).

"(3) TERMINATION OF PERIOD OF ENFORCEABILITY UPON COMPLETION OF REQUIRED PERIOD OF EMPLOYMENT, ETC.—

"(A) IN GENERAL.—An affidavit of support is not enforceable after such time as the alien (i) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters as provided under subparagraph (B), and (ii) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) during any such period.

"(B) QUALIFYING QUARTERS.—For purposes of this section, in determining the number of qualifying quarters of coverage under title II of the Social Security Act an alien shall be credited with—

"(i) all of the qualifying quarters of coverage as defined under title II of the Social Security Act worked by a parent of such alien while the alien was under age 18, and

"(ii) all of the qualifying quarters worked by a spouse of such alien during their marriage and the alien remains married to such spouse or such spouse is deceased.

No such qualifying quarter of coverage that is creditable under title II of the Social Security Act for any period beginning after December 31, 1996, may be credited to an alien under clause (i) or (ii) if the parent or spouse (as the case may be) of such alien received any Federal means-tested public benefit (as provided under section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) during the period for which such qualifying quarter of coverage is so credited.

"(C) PROVISION OF INFORMATION TO SAVE SYSTEM.—The Attorney General shall ensure that appropriate information regarding the application of this paragraph is provided to the system for alien verification of eligibility (SAVE) described in section 1137(d)(3) of the Social Security Act.

"(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—

"(1) REQUEST FOR REIMBURSEMENT.—

"(A) REQUIREMENT.—Upon notification that a sponsored alien has received any means-tested public benefit, the appropriate nongovernmental entity which provided such benefit or the appropriate entity of the Federal Government, a State, or any political subdivision of a State shall request reimbursement by the sponsor in an amount which is equal to the unreimbursed costs of such benefit.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) REGULATIONS.—The Attorney General, in consultation with the heads of other appropriate Federal agencies, shall prescribe such regulations as may be necessary to carry out subparagraph (A).

"(2) ACTIONS TO COMPEL REIMBURSEMENT.—

"(A) IN CASE OF NONRESPONSE.—If within 45 days after a request for reimbursement under paragraph (1)(A), the appropriate entity has not received a response from the sponsor indicating a willingness to commence payment an action may be brought against the sponsor pursuant to the affidavit of support.

"(B) IN CASE OF FAILURE TO PAY.—If the sponsor fails to abide by the repayment terms established by the appropriate entity, the entity may bring an action against the sponsor pursuant to the affidavit of support.

"(C) LIMITATION ON ACTIONS.—No cause of action may be brought under this paragraph later than 10 years after the date on which the sponsored alien last received any means-tested public benefit to which the affidavit of support applies.

"(3) USE OF COLLECTION AGENCIES.—If the appropriate entity under paragraph (1)(A) requests reimbursement from the sponsor or brings an action against the sponsor pursuant to the affidavit of support, the appropriate entity may appoint or hire an individual or other person to act on behalf of such entity acting under the authority of law for purposes of collecting any amounts owed.

"(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.

"(d) NOTIFICATION OF CHANGE OF ADDRESS.—

"(1) GENERAL REQUIREMENT.—The sponsor shall notify the Attorney General and the State in which the sponsored alien is currently a resident within 30 days of any change of address of the sponsor during the period in which an affidavit of support is enforceable.

"(2) PENALTY.—Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall, after notice and opportunity to be heard, be subject to a civil penalty of—

"(A) not less than $250 or more than $2,000, or

"(B) if such failure occurs with knowledge that the sponsored alien has received any means-tested public benefits (other than benefits described in section 401(b), 403(c)(2), or 411(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) not less than $2,000 or more than $5,000.


The Attorney General shall enforce this paragraph under appropriate regulations.

"(e) JURISDICTION.—An action to enforce an affidavit of support executed under subsection (a) may be brought against the sponsor in any appropriate court—

"(1) by a sponsored alien, with respect to financial support; or

"(2) by the appropriate entity of the Federal Government, a State or any political subdivision of a State, or by any other nongovernmental entity under subsection (b)(2), with respect to reimbursement.

"(f) SPONSOR DEFINED.—

"(1) IN GENERAL.—For purposes of this section the term 'sponsor' in relation to a sponsored alien means an individual who executes an affidavit of support with respect to the sponsored alien and who—

"(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

"(B) is at least 18 years of age;

"(C) is domiciled in any of the several States of the United States, the District of Columbia, or any territory or possession of the United States;

"(D) is petitioning for the admission of the alien under section 204; and

"(E) demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

"(2) INCOME REQUIREMENT CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(E) but accepts joint and several liability together with an individual under paragraph (5).

AR.01774
500

"(3) ACTIVE DUTY ARMED SERVICES CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(E) but is on active duty (other than active duty for training) in the Armed Forces of the United States, is petitioning for the admission of the alien under section 204 as the spouse or child of the individual, and demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 100 percent of the Federal poverty line.

"(4) CERTAIN EMPLOYMENT–BASED IMMIGRANTS CASE.—Such term also includes an individual—

"(A) who does not meet the requirement of paragraph (1)(D), but is the relative of the sponsored alien who filed a classification petition for the sponsored alien as an employment-based immigrant under section 203(b) or who has a significant ownership interest in the entity that filed such a petition; and

"(B)(i) who demonstrates (as provided under paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line, or

"(ii) does not meet the requirement of paragraph (1)(E) but accepts joint and several liability together with an individual under paragraph (5).

"(5) NON–PETITIONING CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(D) but who accepts joint and several liability with a petitioning sponsor under paragraph (2) or relative of an employment-based immigrant under paragraph (4) and who demonstrates (as provided under paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

"(6) DEMONSTRATION OF MEANS TO MAINTAIN INCOME.—

"(A) IN GENERAL.—

"(i) METHOD OF DEMONSTRATION.—For purposes of this section, a demonstration of the means to maintain income shall include provision of a certified copy of the individual's Federal income tax return for the individual's 3 most recent taxable years and a written statement, executed under oath or as permitted under penalty of perjury under section 1746 of title 28, United States Code, that the copies are certified copies of such returns.

"(ii) FLEXIBILITY.—For purposes of this section, aliens may demonstrate the means to maintain income through demonstration of significant assets of the sponsored alien or of the sponsor, if such assets are available for the support of the sponsored alien.

"(iii) PERCENT OF POVERTY.—For purposes of this section, a reference to an annual income equal to at least a particular percentage of the Federal poverty line means an annual income equal to at least such percentage of the Federal poverty line for a family unit of a size equal to the number of members of the sponsor's household (including family and non-family dependents) plus the total number of other dependents and aliens sponsored by that sponsor.

"(B) LIMITATION.—The Secretary of State, or the Attorney General in the case of adjustment of status, may provide that the demonstration under subparagraph (A) applies only to the most recent taxable year.

"(h) FEDERAL POVERTY LINE DEFINED.—For purposes of this section, the term 'Federal poverty line' means the level of income equal to the official poverty line (as defined by the Director of the Office of Management and Budget, as revised annually by the Secretary of Health and Human Services, in accordance with section 673(2) of the Omnibus Budget Reconciliation Act of 1981 (42 U.S.C. 9902)) that is applicable to a family of the size involved.

"(i) SPONSOR'S SOCIAL SECURITY ACCOUNT NUMBER REQUIRED TO BE PROVIDED.—(1) An affidavit of support shall include the social security account number of each sponsor.

"(2) The Attorney General shall develop an automated system to maintain the social security account number data provided under paragraph (1).

"(3) The Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and the Senate setting forth—

"(A) for the most recent fiscal year for which data are available the number of sponsors under this section and the number of sponsors in compliance with the financial obligations of this section; and

"(B) a comparison of such numbers with the numbers of such sponsors for the preceding fiscal year.".

(b) CONFORMING AMENDMENTS.—

<< 8 USCA §§ 1631, 1632 >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) Section 421(a)(1) and section 422(a)(1) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631(a)(1), 1632(a)(1)) are each amended by inserting "and as amended by section 551(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996" after "section 423".

<< 8 USCA § 1183a NOTE >>

(2) Section 423 of such Act (8 U.S.C. 1138a note) is amended by striking subsection (c).

<< 8 USCA § 1183a NOTE >>

(c) EFFECTIVE DATE; PROMULGATION OF FORM.—

(1) IN GENERAL.—The amendments made by this section shall apply to affidavits of support executed on or after a date specified by the Attorney General, which date shall be not earlier than 60 days (and not later than 90 days) after the date the Attorney General formulates the form for such affidavits under paragraph (2).

(2) PROMULGATION OF FORM.—Not later than 90 days after the date of the enactment of this Act, the Attorney General, in consultation with the heads of other appropriate agencies, shall promulgate a standard form for an affidavit of support consistent with the provisions of section 213A of the Immigration and Nationality Act, as amended by subsection (a).

<< 8 USCA § 1631 >>

SEC. 552. INDIGENCE AND BATTERED SPOUSE AND CHILD EXCEPTIONS TO FEDERAL ATTRIBUTION OF INCOME RULE.

Section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631) is amended by adding at the end the following new subsection:

"(e) INDIGENCE EXCEPTION.—

"(1) IN GENERAL.—For an alien for whom an affidavit of support under section 213A of the Immigration and Nationality Act has been executed, if a determination described in paragraph (2) is made, the amount of income and resources of the sponsor or the sponsor's spouse which shall be attributed to the sponsored alien shall not exceed the amount actually provided for a period beginning on the date of such determination and ending 12 months after such date.

"(2) DETERMINATION DESCRIBED.—A determination described in this paragraph is a determination by an agency that a sponsored alien would, in the absence of the assistance provided by the agency, be unable to obtain food and shelter, taking into account the alien's own income, plus any cash, food, housing, or other assistance provided by other individuals, including the sponsor. The agency shall notify the Attorney General of each such determination, including the names of the sponsor and the sponsored alien involved.

"(f) SPECIAL RULE FOR BATTERED SPOUSE AND CHILD.—

"(1) IN GENERAL.—Subject to paragraph (2) and notwithstanding any other provision of this section, subsection (a) shall not apply to benefits—

"(A) during a 12 month period if the alien demonstrates that (i) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to or acquiesced to such battery or cruelty, or (ii) the alien's child has been battered or subjected to extreme cruelty in the United States by the spouse or parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the battery or cruelty described in clause (i) or (ii) (in the opinion of the agency providing such public benefits, which opinion is not subject to review by any court) has a substantial connection to the need for the public benefits applied for; and

"(B) after a 12 month period (regarding the batterer's income and resources only) if the alien demonstrates that such battery or cruelty under subparagraph (A) has been recognized in an order of a judge or administrative law judge or a prior determination of the Immigration and Naturalization Service, and that such battery or cruelty (in the opinion of the agency providing such public benefits, which opinion is not subject to review by any court) has a substantial connection to the need for the benefits.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) LIMITATION.—The exception under paragraph (1) shall not apply to benefits for an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual who was subjected to such battery or cruelty.".

<< 8 USCA § 1624 >>

SEC. 553. AUTHORITY OF STATES AND POLITICAL SUBDIVISIONS OF STATES TO LIMIT ASSISTANCE TO ALIENS AND TO DISTINGUISH AMONG CLASSES OF ALIENS IN PROVIDING GENERAL CASH PUBLIC ASSISTANCE.

(a) IN GENERAL.—Subject to subsection (b) and notwithstanding any other provision of law, a State or political subdivision of a State is authorized to prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance furnished under the law of the State or a political subdivision of a State.

(b) LIMITATION.—The authority provided for under subsection (a) may be exercised only to the extent that any prohibitions, limitations, or restrictions imposed by a State or political subdivision of a State are not more restrictive than the prohibitions, limitations, or restrictions imposed under comparable Federal programs. For purposes of this section, attribution to an alien of a sponsor's income and resources (as described in section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631)) for purposes of determining eligibility for, and the amount of, benefits shall be considered less restrictive than a prohibition of eligibility for such benefits.

Subtitle D—Miscellaneous Provisions

<< 18 USCA § 506 >>

SEC. 561. INCREASED MAXIMUM CRIMINAL PENALTIES FOR FORGING OR COUNTERFEITING SEAL OF A FEDERAL DEPARTMENT OR AGENCY TO FACILITATE BENEFIT FRAUD BY AN UNLAWFUL ALIEN.

Section 506 of title 18, United States Code, is amended to read as follows:

"§ 506. Seals of departments or agencies

"(a) Whoever—

"(1) falsely makes, forges, counterfeits, mutilates, or alters the seal of any department or agency of the United States, or any facsimile thereof;

"(2) knowingly uses, affixes, or impresses any such fraudulently made, forged, counterfeited, mutilated, or altered seal or facsimile thereof to or upon any certificate, instrument, commission, document, or paper of any description; or

"(3) with fraudulent intent, possesses, sells, offers for sale, furnishes, offers to furnish, gives away, offers to give away, transports, offers to transport, imports, or offers to import any such seal or facsimile thereof, knowing the same to have been so falsely made, forged, counterfeited, mutilated, or altered,

shall be fined under this title, or imprisoned not more than 5 years, or both.

"(b) Notwithstanding subsection (a) or any other provision of law, if a forged, counterfeited, mutilated, or altered seal of a department or agency of the United States, or any facsimile thereof, is—

"(1) so forged, counterfeited, mutilated, or altered;

"(2) used, affixed, or impressed to or upon any certificate, instrument, commission, document, or paper of any description; or

"(3) with fraudulent intent, possessed, sold, offered for sale, furnished, offered to furnish, given away, offered to give away, transported, offered to transport, imported, or offered to import,

with the intent or effect of facilitating an alien's application for, or receipt of, a Federal benefit to which the alien is not entitled, the penalties which may be imposed for each offense under subsection (a) shall be two times the maximum fine, and 3 times the maximum term of imprisonment, or both, that would otherwise be imposed for an offense under subsection (a).

"(c) For purposes of this section—

"(1) the term 'Federal benefit' means—

"(A) the issuance of any grant, contract, loan, professional license, or commercial license provided by any agency of the United States or by appropriated funds of the United States; and

"(B) any retirement, welfare, Social Security, health (including treatment of an emergency medical condition in accordance with section 1903(v) of the Social Security Act (19 U.S.C. 1396b(v))), disability, veterans, public housing, education, food stamps, or unemployment benefit, or any similar benefit for which payments or assistance are provided by an agency of the United States or by appropriated funds of the United States; and

"(2) each instance of forgery, counterfeiting, mutilation, or alteration shall constitute a separate offense under this section.".

<< 8 USCA § 1369 >>

SEC. 562. TREATMENT OF EXPENSES SUBJECT TO EMERGENCY MEDICAL SERVICES EXCEPTION.

 (a) IN GENERAL.—Subject to such amounts as are provided in advance in appropriation Acts, each State or political subdivision of a State that provides medical assistance for care and treatment of an emergency medical condition (as defined in subsection (d)) through a public hospital or other public facility (including a nonprofit hospital that is eligible for an additional payment adjustment under section 1886 of the Social Security Act) or through contract with another hospital or facility to an individual who is an alien not lawfully present in the United States is eligible for payment from the Federal Government of its costs of providing such services, but only to the extent that such costs are not otherwise reimbursed through any other Federal program and cannot be recovered from the alien or another person.

 (b) CONFIRMATION OF IMMIGRATION STATUS REQUIRED.—No payment shall be made under this section with respect to services furnished to an individual unless the immigration status of the individual has been verified through appropriate procedures established by the Secretary of Health and Human Services and the Attorney General.

 (c) ADMINISTRATION.—This section shall be administered by the Attorney General, in consultation with the Secretary of Health and Human Services.

 (d) EMERGENCY MEDICAL CONDITION DEFINED.—For purposes of this section, the term "emergency medical condition" means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

   (1) placing the patient's health in serious jeopardy,

   (2) serious impairment to bodily functions, or

   (3) serious dysfunction of any bodily organ or part.

 (e) EFFECTIVE DATE.—Subsection (a) shall apply to medical assistance for care and treatment of an emergency medical condition furnished on or after January 1, 1997.

<< 8 USCA § 1370 >>

SEC. 563. REIMBURSEMENT OF STATES AND LOCALITIES FOR EMERGENCY AMBULANCE SERVICES.

 Subject to the availability of appropriations, the Attorney General shall fully reimburse States and political subdivisions of States for costs incurred by such a State or subdivision for emergency ambulance services provided to any alien who—

   (1) is injured while crossing a land or sea border of the United States without inspection or at any time or place other than as designated by the Attorney General; and

   (2) is under the custody of the State or subdivision pursuant to a transfer, request, or other action by a Federal authority.

SEC. 564. PILOT PROGRAMS TO REQUIRE BONDING.

<< 8 USCA § 1183a NOTE >>

(a) IN GENERAL.—

 (1) The Attorney General of the United States shall establish a pilot program in 5 district offices of the Immigration and Naturalization Service to require aliens to post a bond in addition to the affidavit requirements under section 213A of the

AR.01778

Immigration and Nationality Act and the deeming requirements under section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631). Any pilot program established pursuant to this subsection shall require an alien to post a bond in an amount sufficient to cover the cost of benefits described in section 213A(d)(2)(B) of the Immigration and Nationality Act (as amended by section 551(a) of this division) for the alien and the alien's dependents and shall remain in effect until the departure, naturalization, or death of the alien.

 (2) Suit on any such bonds may be brought under the terms and conditions set forth in section 213A of the Immigration and Nationality Act.

 (b) REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall issue regulations for establishing the pilot programs, including—

  (1) criteria and procedures for—

   (A) certifying bonding companies for participation in the program, and

   (B) debarment of any such company that fails to pay a bond, and

  (2) criteria for setting the amount of the bond to assure that the bond is in an amount that is not less than the cost of providing benefits under the programs described in subsection (a)(1) for the alien and the alien's dependents for 6 months.

 (c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.

 (d) ANNUAL REPORTING REQUIREMENT.—Beginning 9 months after the date of implementation of the pilot program, the Attorney General shall submit annually to the Committees on the Judiciary of the House of Representatives and the Senate a report on the effectiveness of the program. The Attorney General shall submit a final evaluation of the program not later than 1 year after termination.

 (e) SUNSET.—The pilot program under this section shall terminate after 3 years of operation.

<< 8 USCA § 1183 >>

<< 8 USCA § 1183a NOTE >>

 (f) BONDS IN ADDITION TO SPONSORSHIP AND DEEMING REQUIREMENTS.—Section 213 (8 U.S.C. 1183) is amended by inserting "(subject to the affidavit of support requirement and attribution of sponsor's income and resources under section 213A)" after "in the discretion of the Attorney General".

<< 8 USCA § 1371 >>

SEC. 565. REPORTS.

 Not later than 180 days after the end of each fiscal year, the Attorney General shall submit a report to the Inspector General of the Department of Justice and the Committees on the Judiciary of the House of Representatives and of the Senate describing the following:

  (1) PUBLIC CHARGE DEPORTATIONS.—The number of aliens deported on public charge grounds under section 241(a)(5) of the Immigration and Nationality Act during the previous fiscal year.

  (2) INDIGENT SPONSORS.—The number of determinations made under section 421(e) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (as added by section 552 of this division) during the previous fiscal year.

  (3) REIMBURSEMENT ACTIONS.—The number of actions brought, and the amount of each action, for reimbursement under section 213A of the Immigration and Nationality Act (including private collections) for the costs of providing public benefits.

Subtitle E—Housing Assistance

<< 42 USCA § 1436a NOTE >>

SEC. 571. SHORT TITLE.

 This subtitle may be cited as the "Use of Assisted Housing by Aliens Act of 1996".

<< 42 USCA § 1436a >>

## SEC. 572. PRORATING OF FINANCIAL ASSISTANCE.

Section 214(b) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(b)) is amended—

(1) by inserting "(1)" after "(b)"; and

(2) by adding at the end the following new paragraph:

"(2) If the eligibility for financial assistance of at least one member of a family has been affirmatively established under the program of financial assistance and under this section, and the ineligibility of one or more family members has not been affirmatively established under this section, any financial assistance made available to that family by the Secretary of Housing and Urban Development shall be prorated, based on the number of individuals in the family for whom eligibility has been affirmatively established under the program of financial assistance and under this section, as compared with the total number of individuals who are members of the family.".

<< 42 USCA § 1436a >>

## SEC. 573. ACTIONS IN CASES OF TERMINATION OF FINANCIAL ASSISTANCE.

Section 214(c)(1) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(c)(1)) is amended—

(1) in the matter preceding subparagraph (A), by striking "may, in its discretion," and inserting "shall";

(2) in subparagraph (A), by adding at the end the following: "Financial assistance continued under this subparagraph for a family may be provided only on a prorated basis, under which the amount of financial assistance is based on the percentage of the total number of members of the family that are eligible for that assistance under the program of financial assistance and under this section."; and

(3) in subparagraph (B)—

(A) by striking "3 years" and inserting "18-months";

(B) by inserting "(i)" after "(B)";

(C) by striking "Any deferral" and inserting the following:

"(ii) Except as provided in clause (iii), any deferral"; and

(D) by adding at the end the following new clauses:

"(iii) The time period described in clause (ii) shall not apply in the case of a refugee under section 207 of the Immigration and Nationality Act or an individual seeking asylum under section 208 of that Act.".

<< 42 USCA § 1436a >>

## SEC. 574. VERIFICATION OF IMMIGRATION STATUS AND ELIGIBILITY FOR FINANCIAL ASSISTANCE.

Section 214(d) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(d)) is amended—

(1) in the matter preceding paragraph (1), by inserting "or to be" after "being";

(2) in paragraph (1)(A), by adding at the end the following: "If the declaration states that the individual is not a citizen or national of the United States and that the individual is younger than 62 years of age, the declaration shall be verified by the Immigration and Naturalization Service. If the declaration states that the individual is a citizen or national of the United States, the Secretary of Housing and Urban Development, or the agency administering assistance covered by this section, may request verification of the declaration by requiring presentation of documentation that the Secretary considers appropriate, including a United States passport, resident alien card, alien registration card, social security card, or other documentation.";

(3) in paragraph (2)—

(A) in the matter preceding subparagraph (A), by striking "on the date of the enactment of the Housing and Community Development Act of 1987" and inserting "on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996 or applying for financial assistance on or after that date"; and

(B) by adding at the end the following:

"In the case of an individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, the Secretary may not provide any such assistance for the benefit of that individual before documentation is presented and verified under paragraph (3) or (4).";

(4) in paragraph (4)—

(A) in the matter preceding subparagraph (A), by striking "on the date of the enactment of the Housing and Community Development Act of 1987" and inserting "on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996 or applying for financial assistance on or after that date";

(B) in subparagraph (A)—

(i) in clause (i)—

(I) by inserting ", not to exceed 30 days," after "reasonable opportunity"; and

(II) by striking "and" at the end; and

(ii) by striking clause (ii) and inserting the following:

"(ii) in the case of any individual receiving assistance on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, may not delay, deny, reduce, or terminate the eligibility of that individual for financial assistance on the basis of the immigration status of that individual until the expiration of that 30–day period; and

"(iii) in the case of any individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, may not deny the application for such assistance on the basis of the immigration status of that individual until the expiration of that 30–day period; and"; and

(C) in subparagraph (B), by striking clause (ii) and inserting the following:

"(ii) pending such verification or appeal, the Secretary may not—

"(I) in the case of any individual receiving assistance on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, delay, deny, reduce, or terminate the eligibility of that individual for financial assistance on the basis of the immigration status of that individual; and

"(II) in the case of any individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, deny the application for such assistance on the basis of the immigration status of that individual; and";

(5) in paragraph (5), by striking "status—" and all that follows through the end of the paragraph and inserting the following: "status, the Secretary shall—

"(A) deny the application of that individual for financial assistance or terminate the eligibility of that individual for financial assistance, as applicable;

"(B) provide that the individual may request a fair hearing during the 30–day period beginning upon receipt of the notice under subparagraph (C); and

"(C) provide to the individual written notice of the determination under this paragraph, the right to a fair hearing process, and the time limitation for requesting a hearing under subparagraph (C)."; and

(6) by striking paragraph (6) and inserting the following:

"(6) The Secretary shall terminate the eligibility for financial assistance of an individual and the members of the household of the individual, for a period of not less than 24 months, upon determining that such individual has knowingly permitted another individual who is not eligible for such assistance to reside in the public or assisted housing unit of the individual. This provision shall not apply to a family if the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family.".

<< 42 USCA § 1436a >>

SEC. 575. PROHIBITION OF SANCTIONS AGAINST ENTITIES MAKING FINANCIAL ASSISTANCE ELIGIBILITY DETERMINATIONS.

Section 214(e) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(e)) is amended—

(1) in paragraph (2), by adding "or" at the end;

(2) in paragraph (3), by adding at the end the following: "the response from the Immigration and Naturalization Service to the appeal of that individual."; and

(3) by striking paragraph (4).

<< 42 USCA § 1436a >>

SEC. 576. ELIGIBILITY FOR PUBLIC AND ASSISTED HOUSING.

Section 214 of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a) is amended by adding at the end the following new subsection:

"(h) VERIFICATION OF ELIGIBILITY.—

"(1) IN GENERAL.—Except in the case of an election under paragraph (2)(A), no individual or family applying for financial assistance may receive such financial assistance prior to the affirmative establishment and verification of eligibility of at least the individual or one family member under this section by the Secretary or other appropriate entity.

"(2) RULES APPLICABLE TO PUBLIC HOUSING AGENCIES.—A public housing agency (as that term is defined in section 3 of the United States Housing Act of 1937)—

"(A) may elect not to comply with this section; and

"(B) in complying with this section—

"(i) may initiate procedures to affirmatively establish or verify the eligibility of an individual or family under this section at any time at which the public housing agency determines that such eligibility is in question, regardless of whether or not that individual or family is at or near the top of the waiting list of the public housing agency;

"(ii) may affirmatively establish or verify the eligibility of an individual or family under this section in accordance with the procedures set forth in section 274A(b)(1) of the Immigration and Nationality Act; and

"(iii) shall have access to any relevant information contained in the SAVE system (or any successor thereto) that relates to any individual or family applying for financial assistance.

"(3) ELIGIBILITY OF FAMILIES.—For purposes of this subsection, with respect to a family, the term 'eligibility' means the eligibility of each family member.".

<< 42 USCA § 1436a NOTE >>

SEC. 577. REGULATIONS.

(a) ISSUANCE.—Not later than the 60 days after the date of enactment of this Act, the Secretary of Housing and Urban Development shall issue any regulations necessary to implement the amendments made by this part. Such regulations shall be issued in the form of an interim final rule, which shall take effect upon issuance and shall not be subject to the provisions of section 533 of title 5, United States Code, regarding notice or opportunity for comment.

(b) FAILURE TO ISSUE.—If the Secretary fails to issue the regulations required under subsection (a) before the date specified in that subsection, the regulations relating to restrictions on assistance to noncitizens, contained in the final rule issued by the Secretary of Housing and Urban Development in RIN–2501–AA63 (Docket No. R–95–1409; FR–2383–F–050), published in the Federal Register on March 20, 1995 (Vol. 60, No. 53; pp. 14824–14861), shall not apply after that date.

Subtitle F—General Provisions

<< 8 USCA § 1101 NOTE >>

SEC. 591. EFFECTIVE DATES.

Except as provided in this title, this title and the amendments made by this title shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1101 NOTE >>

SEC. 592. NOT APPLICABLE TO FOREIGN ASSISTANCE.

This title does not apply to any Federal, State, or local governmental program, assistance, or benefits provided to an alien under any program of foreign assistance as determined by the Secretary of State in consultation with the Attorney General.

<< 8 USCA § 1101 NOTE >>

SEC. 593. NOTIFICATION.

(a) IN GENERAL.—Each agency of the Federal Government or a State or political subdivision that administers a program affected by the provisions of this title, shall, directly or through the States, provide general notification to the public and to program recipients of the changes regarding eligibility for any such program pursuant to this title.

(b) FAILURE TO GIVE NOTICE.—Nothing in this section shall be construed to require or authorize continuation of eligibility if the notice under this section is not provided.

<< 8 USCA § 1101 NOTE >>

SEC. 594. DEFINITIONS.

Except as otherwise provided in this title, for purposes of this title—

(1) the terms "alien", "Attorney General", "national", "naturalization", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act; and

(2) the term "child" shall have the meaning given such term in section 101(c) of the Immigration and Nationality Act.

TITLE VI—MISCELLANEOUS PROVISIONS

Subtitle A—Refugees, Parole, and Asylum

SEC. 601. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.

(a) DEFINITION OF REFUGEE.—

<< 8 USCA § 1101 >>

(1) Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended by adding at the end the following: "For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.".

<< 8 USCA § 1101 NOTE >>

(2) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and countries of origin of aliens granted refugee status or asylum under determinations pursuant to the amendment made by paragraph (1). Each such report shall also contain projections regarding the number and countries of origin of aliens that are likely to be granted refugee status or asylum for the subsequent 2 fiscal years.

<< 8 USCA § 1157 >>

(b) NUMERICAL LIMITATION.—Section 207(a) (8 U.S.C. 1157(a)) is amended by adding at the end the following new paragraph:

AR.01783

"(5) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the third sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).".

SEC. 602. LIMITATION ON USE OF PAROLE

<< 8 USCA § 1182 >>

(a) PAROLE AUTHORITY.—Section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)) is amended by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit".

<< 8 USCA § 1182 NOTE >>

(b) REPORT TO CONGRESS.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and categories of aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act. Each such report shall provide the total number of aliens paroled into and residing in the United States and shall contain information and data for each country of origin concerning the number and categories of aliens paroled, the duration of parole, the current status of aliens paroled, and the number and categories of aliens returned to the custody from which they were paroled during the preceding fiscal year.

<< 8 USCA § 1151 >>

SEC. 603. TREATMENT OF LONG–TERM PAROLEES IN APPLYING WORLDWIDE NUMERICAL LIMITATIONS.

Section 201(c) (8 U.S.C. 1151(c)) is amended—

(1) by amending paragraph (1)(A)(ii) to read as follows:

"(ii) the sum of the number computed under paragraph (2) and the number computed under paragraph (4), plus"; and

(2) by adding at the end the following new paragraphs:

"(4) The number computed under this paragraph for a fiscal year (beginning with fiscal year 1999) is the number of aliens who were paroled into the United States under section 212(d)(5) in the second preceding fiscal year—

"(A) who did not depart from the United States (without advance parole) within 365 days; and

"(B) who (i) did not acquire the status of aliens lawfully admitted to the United States for permanent residence in the two preceding fiscal years, or (ii) acquired such status in such years under a provision of law (other than section 201(b)) which exempts such adjustment from the numerical limitation on the worldwide level of immigration under this section.

"(5) If any alien described in paragraph (4) (other than an alien described in paragraph (4)(B)(ii)) is subsequently admitted as an alien lawfully admitted for permanent residence, such alien shall not again be considered for purposes of paragraph (1).".

SEC. 604. ASYLUM REFORM.

<< 8 USCA § 1158 >>

(a) ASYLUM REFORM.—Section 208 (8 U.S.C. 1158) is amended to read as follows:

"ASYLUM

"SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

"(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b).

"(2) EXCEPTIONS.—

AR.01784

"(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

"(B) TIME LIMIT.—Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States.

"(C) PREVIOUS ASYLUM APPLICATIONS.—Subject to subparagraph (D), paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

"(D) CHANGED CIRCUMSTANCES.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

"(3) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2).

"(b) CONDITIONS FOR GRANTING ASYLUM.—

"(1) IN GENERAL.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

"(2) EXCEPTIONS.—

"(A) IN GENERAL.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

"(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

"(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

"(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

"(vi) the alien was firmly resettled in another country prior to arriving in the United States.

"(B) SPECIAL RULES.—

"(i) CONVICTION OF AGGRAVATED FELONY.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

"(ii) OFFENSES.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

"(C) ADDITIONAL LIMITATIONS.—The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1).

"(D) NO JUDICIAL REVIEW.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

"(3) TREATMENT OF SPOUSE AND CHILDREN.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

"(c) ASYLUM STATUS.—

"(1) IN GENERAL.—In the case of an alien granted asylum under subsection (b), the Attorney General—

"(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

"(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

"(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

"(2) TERMINATION OF ASYLUM.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

"(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

"(B) the alien meets a condition described in subsection (b)(2);

"(C) the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

"(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

"(E) the alien has acquired a new nationality and enjoys the protection of the country of his or her new nationality.

"(3) REMOVAL WHEN ASYLUM IS TERMINATED.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

"(d) ASYLUM PROCEDURE.—

"(1) APPLICATIONS.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). The Attorney General may require applicants to submit fingerprints and a photograph at such time and in such manner to be determined by regulation by the Attorney General.

"(2) EMPLOYMENT.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

"(3) FEES.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

"(4) NOTICE OF PRIVILEGE OF COUNSEL AND CONSEQUENCES OF FRIVOLOUS APPLICATION.—At the time of filing an application for asylum, the Attorney General shall—

"(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

"(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

"(5) CONSIDERATION OF ASYLUM APPLICATIONS.—

"(A) PROCEDURES.—The procedure established under paragraph (1) shall provide that—

"(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

"(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

"(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

"(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and

"(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

"(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.

"(6) FRIVOLOUS APPLICATIONS.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.

"(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) CONFORMING AND CLERICAL AMENDMENTS.—

(1) The item in the table of contents relating to section 208 is amended to read as follows:

"Sec. 208. Asylum.".

<< 8 USCA § 1159 NOTE >>

(2) Section 104(d)(1)(A) of the Immigration Act of 1990 (Public Law 101–649) is amended by striking "208(b)" and inserting "208".

<< 8 USCA § 1158 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications for asylum filed on or after the first day of the first month beginning more than 180 days after the date of the enactment of this Act.

SEC. 605. INCREASE IN ASYLUM OFFICERS.

Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of asylum officers to at least 600 asylum officers by fiscal year 1997.

<< 8 USCA § 1255 NOTE >>

SEC. 606. CONDITIONAL REPEAL OF CUBAN ADJUSTMENT ACT.

(a) IN GENERAL.—Public Law 89–732 is repealed effective only upon a determination by the President under section 203(c)(3) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (Public Law 104–114) that a democratically elected government in Cuba is in power.

(b) LIMITATION.—Subsection (a) shall not apply to aliens for whom an application for adjustment of status is pending on such effective date.

Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act

<< 8 USCA § 1184 >>

SEC. 621. ALIEN WITNESS COOPERATION.

Section 214(j)(1) (8 U.S.C. 1184(j)(1)) (as added by section 130003(b)(2) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 2025)) (relating to numerical limitations on the number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S) of the Immigration and Nationality Act) is amended—

(1) by striking "100." and inserting "200."; and

(2) by striking "25." and inserting "50.".

## SEC. 622. WAIVER OF FOREIGN COUNTRY RESIDENCE REQUIREMENT WITH RESPECT TO INTERNATIONAL MEDICAL GRADUATES.

<< 8 USCA § 1182 NOTE >>

(a) EXTENSION OF WAIVER PROGRAM.—Section 220(c) of the Immigration and Nationality Technical Corrections Act of 1994 (8 U.S.C. 1182 note) is amended by striking "1996." and inserting "2002.".

<< 8 USCA § 1182 >>

(b) CONDITIONS ON FEDERALLY REQUESTED WAIVERS.—Section 212(e) (8 U.S.C. 1182(e)) is amended by inserting after "except that in the case of a waiver requested by a State Department of Public Health, or its equivalent" the following: ", or in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii),".

<< 8 USCA § 1184 >>

(c) RESTRICTIONS ON FEDERALLY REQUESTED WAIVERS.—Section 214(k) (8 U.S.C. 1184(k)) (as added by section 220(b) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416; 108 Stat. 4319)) is amended to read as follows:

"(k)(1) In the case of a request by an interested State agency, or by an interested Federal agency, for a waiver of the 2–year foreign residence requirement under section 212(e) on behalf of an alien described in clause (iii) of such section, the Attorney General shall not grant such waiver unless—

"(A) in the case of an alien who is otherwise contractually obligated to return to a foreign country, the government of such country furnishes the Director of the United States Information Agency with a statement in writing that it has no objection to such waiver;

"(B) in the case of a request by an interested State agency, the grant of such waiver would not cause the number of waivers allotted for that State for that fiscal year to exceed 20;

"(C) in the case of a request by an interested Federal agency or by an interested State agency—

"(i) the alien demonstrates a bona fide offer of full-time employment at a health facility or health care organization, which employment has been determined by the Attorney General to be in the public interest; and

"(ii) the alien agrees to begin employment with the health facility or health care organization within 90 days of receiving such waiver, and agrees to continue to work for a total of not less than 3 years (unless the Attorney General determines that extenuating circumstances exist, such as closure of the facility or hardship to the alien, which would justify a lesser period of employment at such health facility or health care organization, in which case the alien must demonstrate another bona fide offer of employment at a health facility or health care organization for the remainder of such 3–year period); and

"(D) in the case of a request by an interested Federal agency (other than a request by an interested Federal agency to employ the alien full-time in medical research or training) or by an interested State agency, the alien agrees to practice medicine in accordance with paragraph (2) for a total of not less than 3 years only in the geographic area or areas which are designated by the Secretary of Health and Human Services as having a shortage of health care professionals.

"(2)(A) Notwithstanding section 248(2), the Attorney General may change the status of an alien who qualifies under this subsection and section 212(e) to that of an alien described in section 101(a)(15)(H)(i)(b).

"(B) No person who has obtained a change of status under subparagraph (A) and who has failed to fulfill the terms of the contract with the health facility or health care organization named in the waiver application shall be eligible to apply for an immigrant visa, for permanent residence, or for any other change of nonimmigrant status, until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least 2 years following departure from the United States.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(3) Notwithstanding any other provision of this subsection, the 2–year foreign residence requirement under section 212(e) shall apply with respect to an alien described in clause (iii) of such section, who has not otherwise been accorded status under section 101(a)(27)(H), if—

"(A) at any time the alien ceases to comply with any agreement entered into under subparagraph (C) or (D) of paragraph (1); or

"(B) the alien's employment ceases to benefit the public interest at any time during the 3–year period described in paragraph (1)(C).".

SEC. 623. USE OF LEGALIZATION AND SPECIAL AGRICULTURAL WORKER INFORMATION.

<< 8 USCA § 1255a >>

(a) CONFIDENTIALITY OF INFORMATION.—Section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) is amended to read as follows:
"(5) CONFIDENTIALITY OF INFORMATION.—

"(A) IN GENERAL.—Except as provided in this paragraph, neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

"(i) use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, for enforcement of paragraph (6), or for the preparation of reports to Congress under section 404 of the Immigration Reform and Control Act of 1986;

"(ii) make any publication whereby the information furnished by any particular applicant can be identified; or

"(iii) permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

"(B) REQUIRED DISCLOSURES.—The Attorney General shall provide the information furnished under this section, and any other information derived from such furnished information, to a duly recognized law enforcement entity in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

"(C) AUTHORIZED DISCLOSURES.—The Attorney General may provide, in the Attorney General's discretion, for the furnishing of information furnished under this section in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

"(D) CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

"(ii) CRIMINAL CONVICTIONS.—Information concerning whether the applicant has at any time been convicted of a crime may be used or released for immigration enforcement or law enforcement purposes.

"(E) CRIME.—Whoever knowingly uses, publishes, or permits information to be examined in violation of this paragraph shall be fined not more than $10,000.".

<< 8 USCA § 1160 >>

(b) SPECIAL AGRICULTURAL WORKERS.—Section 210(b)(6) (8 U.S.C. 1160(b)(6)) is amended to read as follows:
"(6) CONFIDENTIALITY OF INFORMATION.—

"(A) IN GENERAL.—Except as provided in this paragraph, neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

"(i) use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, including a determination under subsection (a)(3)(B), or for enforcement of paragraph (7);

"(ii) make any publication whereby the information furnished by any particular individual can be identified; or

AR.01789

"(iii) permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

"(B) REQUIRED DISCLOSURES.—The Attorney General shall provide information furnished under this section, and any other information derived from such furnished information, to a duly recognized law enforcement entity in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

"(C) CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

"(ii) CRIMINAL CONVICTIONS.—Information concerning whether the applicant has at any time been convicted of a crime may be used or released for immigration enforcement or law enforcement purposes.

"(D) CRIME.—Whoever knowingly uses, publishes, or permits information to be examined in violation of this paragraph shall be fined not more than $10,000.".

## SEC. 624. CONTINUED VALIDITY OF LABOR CERTIFICATIONS AND CLASSIFICATION PETITIONS FOR PROFESSIONAL ATHLETES.

<< 8 USCA § 1182 >>

(a) LABOR CERTIFICATION.—Section 212(a)(5)(A) (8 U.S.C. 1182(a)(5)(A)) is amended by adding at the end the following:

"(iii) PROFESSIONAL ATHLETES.—

"(I) IN GENERAL.—A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

"(II) DEFINITION.—For purposes of subclause (I), the term 'professional athlete' means an individual who is employed as an athlete by—

"(aa) a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

"(bb) any minor league team that is affiliated with such an association.".

<< 8 USCA § 1154 >>

(b) CLASSIFICATION PETITIONS.—Section 204 (8 U.S.C. 1154) is amended by adding at the end the following:

"(i) PROFESSIONAL ATHLETES.—

"(1) IN GENERAL.—A petition under subsection (a)(4)(D) for classification of a professional athlete shall remain valid for the athlete after the athlete changes employers, if the new employer is a team in the same sport as the team which was the employer who filed the petition.

"(2) DEFINITION.—For purposes of paragraph (1), the term 'professional athlete' means an individual who is employed as an athlete by—

"(A) a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

"(B) any minor league team that is affiliated with such an association.".

## SEC. 625. FOREIGN STUDENTS.

(a) LIMITATIONS.—

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

516

<< 8 USCA § 1184 >>

(1) IN GENERAL.—Section 214 (8 U.S.C. 1184) is amended by adding at the end the following new subsection:

"(l)(1) An alien may not be accorded status as a nonimmigrant under section 101(a)(15)(F)(i) in order to pursue a course of study—

"(A) at a public elementary school or in a publicly funded adult education program; or

"(B) at a public secondary school unless—

"(i) the aggregate period of such status at such a school does not exceed 12 months with respect to any alien, and (ii) the alien demonstrates that the alien has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at such school for the period of the alien's attendance.

"(2) An alien who obtains the status of a nonimmigrant under section 101(a)(15)(F)(i) in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such status, and the alien's visa under section 101(a)(15)(F) shall be void, if the alien terminates or abandons such course of study at such a school and undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of paragraph (1)(B) are met).".

<< 8 USCA § 1101 >>

(2) CONFORMING AMENDMENT.—Section 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)) is amended by inserting "consistent with section 214(l)" after "such a course of study".

(b) REFERENCE TO NEW GROUND OF EXCLUSION FOR STUDENT VISA ABUSERS.—For addition of ground of inadmissibility for certain nonimmigrant student abusers, see section 347 of this division.

<< 8 USCA §§ 1101 NOTE, 1184 nt >>

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to individuals who obtain the status of a nonimmigrant under section 101(a)(15)(F) of the Immigration and Nationality Act after the end of the 60–day period beginning on the date of the enactment of this Act, including aliens whose status as such a nonimmigrant is extended after the end of such period.

SEC. 626. SERVICES TO FAMILY MEMBERS OF CERTAIN OFFICERS AND AGENTS KILLED IN THE LINE OF DUTY.

<< 8 USCA § 1363b >>

(a) IN GENERAL.—Title II, as amended by section 205(a) of this division, is amended by adding at the end the following new section:

"TRANSPORTATION OF REMAINS OF IMMIGRATION OFFICERS
AND BORDER PATROL AGENTS KILLED IN THE LINE OF DUTY

"SEC. 295. (a) IN GENERAL.—To the extent provided in appropriation Acts, when an immigration officer or border patrol agent is killed in the line of duty, the Attorney General may pay from appropriations available for the activity in which the officer or agent was engaged—

"(1) the actual and necessary expenses of transportation of the remains of the officer or agent to a place of burial located in any State, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, or the Republic of Palau;

"(2) travel expenses, including per diem in lieu of subsistence, of the decedent's spouse and minor children to and from such site at rates not greater than those established for official government travel under subchapter I of chapter 57 of title 5, United States Code; and

"(3) any other memorial service authorized by the Attorney General.

"(b) PREPAYMENT.—The Attorney General may prepay any expense authorized to be paid under this section.".

(b) CLERICAL AMENDMENT.—The table of contents, as amended by section 205(b) of this division, is amended by inserting after the item relating to section 294 the following new item:

"Sec. 295. Transportation of remains of immigration officers and border patrol agents killed in the line of duty.".

Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency

<< 8 USCA § 1201 >>

SEC. 631. VALIDITY OF PERIOD OF VISAS.

(a) EXTENSION OF VALIDITY OF IMMIGRANT VISAS TO 6 MONTHS.—Section 221(c) (8 U.S.C. 1201(c)) is amended by striking "four months" and inserting "six months".

(b) AUTHORIZING APPLICATION OF RECIPROCITY RULE FOR NONIMMIGRANT VISA IN CASE OF REFUGEES AND PERMANENT RESIDENTS.—Such section is further amended by inserting before the period at the end of the third sentence the following: "; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States".

SEC. 632. ELIMINATION OF CONSULATE SHOPPING FOR VISA OVERSTAYS.

<< 8 USCA § 1202 >>

(a) IN GENERAL.—Section 222 (8 U.S.C. 1202) is amended by adding at the end the following:

"(g)(1) In the case of an alien who has been admitted on the basis of a nonimmigrant visa and remained in the United States beyond the period of stay authorized by the Attorney General, such visa shall be void beginning after the conclusion of such period of stay.

"(2) An alien described in paragraph (1) shall be ineligible to be readmitted to the United States as a nonimmigrant, except—

"(A) on the basis of a visa (other than the visa described in paragraph (1)) issued in a consular office located in the country of the alien's nationality (or, if there is no office in such country, in such other consular office as the Secretary of State shall specify); or

"(B) where extraordinary circumstances are found by the Secretary of State to exist.".

<< 8 USCA § 1202 NOTE >>

(b) APPLICABILITY.—

(1) VISAS.—Section 222(g)(1) of the Immigration and Nationality Act, as added by subsection (a), shall apply to a visa issued before, on, or after the date of the enactment of this Act.

(2) ALIENS SEEKING READMISSION.—Section 222(g)(2) of the Immigration and Nationality Act, as added by subsection (a), shall apply to any alien applying for readmission to the United States after the date of the enactment of this Act, except an alien applying for readmission on the basis of a visa that—

(A) was issued before such date; and

(B) is not void through the application of section 222(g)(1) of the Immigration and Nationality Act, as added by subsection (a).

<< 8 USCA § 1152 >>

SEC. 633. AUTHORITY TO DETERMINE VISA PROCESSING PROCEDURES.

Section 202(a)(1) (8 U.S.C. 1152(a)(1)) is amended—

(1) by inserting "(A)" after "NONDISCRIMINATION.—"; and

(2) by adding at the end the following:

"(B) Nothing in this paragraph shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.".

<< 8 USCA § 1202 >>

## SEC. 634. CHANGES REGARDING VISA APPLICATION PROCESS.

(a) NONIMMIGRANT APPLICATIONS.—Section 222(c) (8 U.S.C. 1202(c)) is amended—

(1) by striking "personal description" through "marks of identification);";

(2) by striking "applicant" and inserting "applicant, the determination of his eligibility for a nonimmigrant visa,"; and

(3) by adding at the end the following: "At the discretion of the Secretary of State, application forms for the various classes of nonimmigrant admissions described in section 101(a)(15) may vary according to the class of visa being requested.".

(b) DISPOSITION OF APPLICATIONS.—Section 222(e) (8 U.S.C. 1202(e)) is amended—

(1) in the first sentence, by striking "required by this section" and inserting "for an immigrant visa"; and

(2) in the fourth sentence—

  (A) by striking "stamp" and inserting "stamp, or other

  (B) by striking "by the consular officer".

## SEC. 635. VISA WAIVER PROGRAM.

<< 8 USCA § 1187 >>

(a) ELIMINATION OF JOINT ACTION REQUIREMENT.—Section 217 (8 U.S.C. 1187) is amended—

(1) in subsection (a), by striking "Attorney General and the Secretary of State, acting jointly" and inserting "Attorney General, in consultation with the Secretary of State";

(2) in subsection (c)(1), by striking "Attorney General and the Secretary of State acting jointly" and inserting "Attorney General, in consultation with the Secretary of State,"; and

(3) in subsection (d), by striking "Attorney General and the Secretary of State, acting jointly," and inserting "Attorney General, in consultation with the Secretary of State,".

(b) EXTENSION OF PROGRAM.—Section 217(f) (8 U.S.C. 1187(f)) is amended by striking "1996" and inserting "1997.".

(c) DURATION AND TERMINATION OF DESIGNATION OF PILOT PROGRAM COUNTRIES.—

(1) IN GENERAL.—Section 217(g) (8 U.S.C. 1187(g)) is amended to read as follows:

"(g) DURATION AND TERMINATION OF DESIGNATION.—

"(1) IN GENERAL.—

  "(A) DETERMINATION AND NOTIFICATION OF DISQUALIFICATION RATE.—Upon determination by the Attorney General that a pilot program country's disqualification rate is 2 percent or more, the Attorney General shall notify the Secretary of State.

  "(B) PROBATIONARY STATUS.—If the program country's disqualification rate is greater than 2 percent but less than 3.5 percent, the Attorney General shall place the program country in probationary status for a period not to exceed 2 full fiscal years following the year in which the determination under subparagraph (A) is made.

  "(C) TERMINATION OF DESIGNATION.—Subject to paragraph (3), if the program country's disqualification rate is 3.5 percent or more, the Attorney General shall terminate the country's designation as a pilot program country effective at the beginning of the second fiscal year following the fiscal year in which the determination under subparagraph (A) is made.

"(2) TERMINATION OF PROBATIONARY STATUS.—

  "(A) IN GENERAL.—If the Attorney General determines at the end of the probationary period described in paragraph (1)(B) that the program country placed in probationary status under such paragraph has failed to develop a machine-readable passport program as required by section (c)(2)(C), or has a disqualification rate of 2 percent or more, the Attorney General shall terminate the designation of the country as a pilot program country. If the Attorney General determines that the program country has developed a machine-readable passport program and has a disqualification rate of less than 2 percent, the Attorney General shall redesignate the country as a pilot program country.

"(B) EFFECTIVE DATE.—A termination of the designation of a country under subparagraph (A) shall take effect on the first day of the first fiscal year following the fiscal year in which the determination under such subparagraph is made. Until such date, nationals of the country shall remain eligible for a waiver under subsection (a).

"(3) NONAPPLICABILITY OF CERTAIN PROVISIONS.—Paragraph (1)(C) shall not apply unless the total number of nationals of a pilot program country described in paragraph (4)(A) exceeds 100.

"(4) DEFINITION.—For purposes of this subsection, the term 'disqualification rate' means the percentage which—

"(A) the total number of nationals of the pilot program country who were—

"(i) excluded from admission or withdrew their application for admission during the most recent fiscal year for which data are available; and

"(ii) admitted as nonimmigrant visitors during such fiscal year and who violated the terms of such admission; bears to

"(B) the total number of nationals of such country who applied for admission as nonimmigrant visitors during such fiscal year.".

<< 8 USCA § 1187 NOTE >>

(2) TRANSITION.—A country designated as a pilot program country with probationary status under section 217(g) of the Immigration and Nationality Act (as in effect on the day before the date of the enactment of this Act) shall be considered to be designated as a pilot program country on and after such date, subject to placement in probationary status or termination of such designation under such section (as amended by paragraph (1)).

<< 8 USCA § 1187 >>

(3) CONFORMING AMENDMENT.—Section 217(a)(2)(B) (8 U.S.C. 1187(a)(2)(B)) is amended by striking "or is" through "subsection (g)." and inserting a period.

<< 8 USCA § 1153 NOTE >>

SEC. 636. FEE FOR DIVERSITY IMMIGRANT LOTTERY.

The Secretary of State may establish a fee to be paid by each applicant for an immigrant visa described in section 203(c) of the Immigration and Nationality Act. Such fee may be set at a level that will ensure recovery of the cost to the Department of State of allocating visas under such section, including the cost of processing all applications thereunder. All fees collected under this section shall be used for providing consular services. All fees collected under this section shall be deposited as an offsetting collection to any Department of State appropriation and shall remain available for obligations until expended. The provisions of the Act of August 18, 1856 (11 Stat. 58; 22 U.S.C. 4212–4214), concerning accounting for consular fees, shall not apply to fees collected under this section.

<< 8 USCA § 1153 NOTE >>

SEC. 637. ELIGIBILITY FOR VISAS FOR CERTAIN POLISH APPLICANTS FOR THE 1995 DIVERSITY IMMIGRANT PROGRAM.

(a) IN GENERAL.—The Attorney General, in consultation with the Secretary of State, shall include among the aliens selected for diversity immigrant visas for fiscal year 1997 pursuant to section 203(c) of the Immigration and Nationality Act any alien who, on or before September 30, 1995—

(1) was selected as a diversity immigrant under such section for fiscal year 1995;

(2) applied for adjustment of status to that of an alien lawfully admitted for permanent residence pursuant to section 245 of such Act during fiscal year 1995, and whose application, and any associated fees, were accepted by the Attorney General, in accordance with applicable regulations;

(3) was not determined by the Attorney General to be excludable under section 212 of such Act or ineligible under section 203(c)(2) of such Act; and

(4) did not become an alien lawfully admitted for permanent residence during fiscal year 1995.

(b) PRIORITY.—The aliens selected under subsection (a) shall be considered to have been selected for diversity immigrant visas for fiscal year 1997 prior to any alien selected under any other provision of law.

(c) REDUCTION OF IMMIGRANT VISA NUMBER.—For purposes of applying the numerical limitations in sections 201 and 203(c) of the Immigration and Nationality Act, aliens selected under subsection (a) who are granted an immigrant visa shall be treated as aliens granted a visa under section 203(c) of such Act.

Subtitle D—Other Provisions

<< 8 USCA § 1372 >>

SEC. 641. PROGRAM TO COLLECT INFORMATION RELATING TO NONIMMIGRANT FOREIGN STUDENTS AND OTHER EXCHANGE PROGRAM PARTICIPANTS.

(a) IN GENERAL.—

(1) PROGRAM.—The Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall develop and conduct a program to collect from approved institutions of higher education and designated exchange visitor programs in the United States the information described in subsection (c) with respect to aliens who—

(A) have the status, or are applying for the status, of nonimmigrants under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act; and

(B) are nationals of the countries designated under subsection (b).

(2) DEADLINE.—The program shall commence not later than January 1, 1998.

(b) COVERED COUNTRIES.—The Attorney General, in consultation with the Secretary of State, shall designate countries for purposes of subsection (a)(1)(B). The Attorney General shall initially designate not less than 5 countries and may designate additional countries at any time while the program is being conducted.

(c) INFORMATION TO BE COLLECTED.—

(1) IN GENERAL.—The information for collection under subsection (a) with respect to an alien consists of—

(A) the identity and current address in the United States of the alien;

(B) the nonimmigrant classification of the alien and the date on which a visa under the classification was issued or extended or the date on which a change to such classification was approved by the Attorney General;

(C) in the case of a student at an approved institution of higher education, the current academic status of the alien, including whether the alien is maintaining status as a full-time student or, in the case of a participant in a designated exchange visitor program, whether the alien is satisfying the terms and conditions of such program; and

(D) in the case of a student at an approved institution of higher education, any disciplinary action taken by the institution against the alien as a result of the alien's being convicted of a crime or, in the case of a participant in a designated exchange visitor program, any change in the alien's participation as a result of the alien's being convicted of a crime.

(2) FERPA.—The Family Educational Rights and Privacy Act of 1974 shall not apply to aliens described in subsection (a) to the extent that the Attorney General determines necessary to carry out the program under subsection (a).

(3) ELECTRONIC COLLECTION.—The information described in paragraph (1) shall be collected electronically, where practicable.

(4) COMPUTER SOFTWARE.—

(A) COLLECTING INSTITUTIONS.—To the extent practicable, the Attorney General shall design the program in a manner that permits approved institutions of higher education and designated exchange visitor programs to use existing software for the collection, storage, and data processing of information described in paragraph (1).

(B) ATTORNEY GENERAL.—To the extent practicable, the Attorney General shall use or enhance existing software for the collection, storage, and data processing of information described in paragraph (1).

(d) PARTICIPATION BY INSTITUTIONS OF HIGHER EDUCATION AND EXCHANGE VISITOR PROGRAMS.—

(1) CONDITION.—The information described in subsection (c) shall be provided by as a condition of—

(A) in the case of an approved institution of higher education, the continued approval of the institution under subparagraph (F) or (M) of section 101(a)(15) of the Immigration and Nationality Act; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) in the case of an approved institution of higher education or a designated exchange visitor program, the granting of authority to issue documents to an alien demonstrating the alien's eligibility for a visa under subparagraph (F), (J), or (M) of section 101(a)(15) of such Act.

(2) EFFECT OF FAILURE TO PROVIDE INFORMATION.—If an approved institution of higher education or a designated exchange visitor program fails to provide the specified information, such approvals and such issuance of visas shall be revoked or denied.

(e) FUNDING.—

(1) IN GENERAL.—Beginning on April 1, 1997, an approved institution of higher education and a designated exchange visitor program shall impose on, and collect from, each alien described in paragraph (3), with respect to whom the institution or program is required by subsection (a) to collect information, a fee established by the Attorney General under paragraph (4) at the time—

(A) when the alien first registers with the institution or program after entering the United States; or

(B) in a case where a registration under subparagraph (A) does not exist, when the alien first commences activities in the United States with the institution or program.

(2) REMITTANCE.—An approved institution of higher education and a designated exchange visitor program shall remit the fees collected under paragraph (1) to the Attorney General pursuant to a schedule established by the Attorney General.

(3) ALIENS DESCRIBED.—An alien referred to in paragraph (1) is an alien who has nonimmigrant status under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act (other than a nonimmigrant under section 101(a)(15)(J) of such Act who has come to the United States as a participant in a program sponsored by the Federal Government).

(4) AMOUNT AND USE OF FEES.—

(A) ESTABLISHMENT OF AMOUNT.—The Attorney General shall establish the amount of the fee to be imposed on, and collected from, an alien under paragraph (1). Except as provided in subsection (g)(2), the fee imposed on any individual may not exceed $100. The amount of the fee shall be based on the Attorney General's estimate of the cost per alien of conducting the information collection program described in this section.

(B) USE.—Fees collected under paragraph (1) shall be deposited as offsetting receipts into the Immigration Examinations Fee Account (established under section 286(m) of the Immigration and Nationality Act) and shall remain available until expended for the Attorney General to reimburse any appropriation the amount paid out of which is for expenses in carrying out this section.

(f) JOINT REPORT.—Not later than 4 years after the commencement of the program established under subsection (a), the Attorney General, the Secretary of State, and the Secretary of Education shall jointly submit to the Committees on the Judiciary of the Senate and the House of Representatives a report on the operations of the program and the feasibility of expanding the program to cover the nationals of all countries.

(g) WORLDWIDE APPLICABILITY OF THE PROGRAM.—

(1) EXPANSION OF PROGRAM.—

(A) IN GENERAL.—Not later than 6 months after the submission of the report required by subsection (f), the Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall commence expansion of the program to cover the nationals of all countries.

(B) DEADLINE.—Such expansion shall be completed not later than 1 year after the date of the submission of the report referred to in subsection (f).

(2) REVISION OF FEE.—After the program has been expanded, as provided in paragraph (1), the Attorney General may, on a periodic basis, revise the amount of the fee imposed and collected under subsection (e) in order to take into account changes in the cost of carrying out the program.

(h) DEFINITIONS.—As used in this section:

(1) APPROVED INSTITUTION OF HIGHER EDUCATION.—The term "approved institution of higher education" means a college or university approved by the Attorney General, in consultation with the Secretary of Education, under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act.

(2) DESIGNATED EXCHANGE VISITOR PROGRAM.—The term "designated exchange visitor program" means a program that has been—

(A) designated by the Director of the United States Information Agency for purposes of section 101(a)(15)(J) of the Immigration and Nationality Act; and

(B) selected by the Attorney General for purposes of the program under this section.

<< 8 USCA § 1373 >>

## SEC. 642. COMMUNICATION BETWEEN GOVERNMENT AGENCIES AND THE IMMIGRATION AND NATURALIZATION SERVICE.

(a) IN GENERAL.—Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES.—Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) OBLIGATION TO RESPOND TO INQUIRIES.—The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

<< 48 USCA § 1901 NOTE >>

## SEC. 643. REGULATIONS REGARDING HABITUAL RESIDENCE.

Not later than 6 months after the date of the enactment of this Act, the Commissioner of Immigration and Naturalization shall issue regulations governing rights of "habitual residence" in the United States under the terms of the following:

(1) The Compact of Free Association between the Government of the United States and the Governments of the Marshall Islands and the Federated States of Micronesia (48 U.S.C. 1901 note).

(2) The Compact of Free Association between the Government of the United States and the Government of Palau (48 U.S.C. 1931 note).

<< 8 USCA § 1374 >>

## SEC. 644. INFORMATION REGARDING FEMALE GENITAL MUTILATION.

(a) PROVISION OF INFORMATION REGARDING FEMALE GENITAL MUTILATION.—The Immigration and Naturalization Service (in cooperation with the Department of State) shall make available for all aliens who are issued immigrant or nonimmigrant visas, prior to or at the time of entry into the United States, the following information:

(1) Information on the severe harm to physical and psychological health caused by female genital mutilation which is compiled and presented in a manner which is limited to the practice itself and respectful to the cultural values of the societies in which such practice takes place.

(2) Information concerning potential legal consequences in the United States for (A) performing female genital mutilation, or (B) allowing a child under his or her care to be subjected to female genital mutilation, under criminal or child protection statutes or as a form of child abuse.

(b) LIMITATION.—In consultation with the Secretary of State, the Commissioner of Immigration and Naturalization shall identify those countries in which female genital mutilation is commonly practiced and, to the extent practicable, limit the provision of information under subsection (a) to aliens from such countries.

 (c) DEFINITION.—For purposes of this section, the term "female genital mutilation" means the removal or infibulation (or both) of the whole or part of the clitoris, the labia minora, or labia majora.

SEC. 645. CRIMINALIZATION OF FEMALE GENITAL MUTILATION.

<< 18 USCA § 116 NOTE >>

 (a) FINDINGS.—The Congress finds that—

  (1) the practice of female genital mutilation is carried out by members of certain cultural and religious groups within the United States;

  (2) the practice of female genital mutilation often results in the occurrence of physical and psychological health effects that harm the women involved;

  (3) such mutilation infringes upon the guarantees of rights secured by Federal and State law, both statutory and constitutional;

  (4) the unique circumstances surrounding the practice of female genital mutilation place it beyond the ability of any single State or local jurisdiction to control;

  (5) the practice of female genital mutilation can be prohibited without abridging the exercise of any rights guaranteed under the first amendment to the Constitution or under any other law; and

  (6) Congress has the affirmative power under section 8 of article I, the necessary and proper clause, section 5 of the fourteenth Amendment, as well as under the treaty clause, to the Constitution to enact such legislation.

 (b) CRIME.—

<< 18 USCA § 116 >>

 (1) IN GENERAL.—Chapter 7 of title 18, United States Code, is amended by adding at the end the following:

"§ 116. Female genital mutilation

 "(a) Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned not more than 5 years, or both.

 "(b) A surgical operation is not a violation of this section if the operation is—

  "(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

  "(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

 "(c) In applying subsection (b)(1), no account shall be taken of the effect on the person on whom the operation is to be performed of any belief on the part of that person, or any other person, that the operation is required as a matter of custom or ritual.".

<< 18 USCA Ch. 7 >>

 (2) CONFORMING AMENDMENT.—The table of sections at the beginning of chapter 7 of title 18, United States Code, is amended by adding at the end the following new item:

"116. Female genital mutilation.".

<< 18 USCA § 116 NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by subsection (b) shall take effect on the date that is 180 days after the date of the enactment of this Act.

<< 8 USCA § 1255 NOTE >>

SEC. 646. ADJUSTMENT OF STATUS FOR CERTAIN POLISH AND HUNGARIAN PAROLEES.

(a) IN GENERAL.—The Attorney General shall adjust the status of an alien described in subsection (b) to that of an alien lawfully admitted for permanent residence if the alien—

(1) applies for such adjustment;

(2) has been physically present in the United States for at least 1 year and is physically present in the United States on the date the application for such adjustment is filed;

(3) is admissible to the United States as an immigrant, except as provided in subsection (c); and

(4) pays a fee (determined by the Attorney General) for the processing of such application.

(b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided in subsection (a) shall only apply to an alien who—

(1) was a national of Poland or Hungary; and

(2) was inspected and granted parole into the United States during the period beginning on November 1, 1989, and ending on December 31, 1991, after being denied refugee status.

(c) WAIVER OF CERTAIN GROUNDS FOR INADMISSIBILITY.—The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) of the Immigration and Nationality Act shall not apply to adjustment of status under this section and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) and subparagraphs (A), (B), (C), or (E) of paragraph (3)) with respect to such an adjustment for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

(d) DATE OF APPROVAL.—Upon the approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission as an alien lawfully admitted for permanent residence as of the date of the alien's inspection and parole described in subsection (b)(2).

(e) NO OFFSET IN NUMBER OF VISAS AVAILABLE.—When an alien is granted the status of having been lawfully admitted for permanent residence under this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act.

<< 8 USCA § 1448 NOTE >>

SEC. 647. SUPPORT OF DEMONSTRATION PROJECTS.

(a) IN GENERAL.—The Attorney General shall make available funds under this section, in each of fiscal years 1997 through 2001, to the Commissioner of Immigration and Naturalization or to other public or private nonprofit entities to support demonstration projects under this section at 10 sites throughout the United States. Each such project shall be designed to provide for the administration of the oath of allegiance under section 337(a) of the Immigration and Nationality Act on a business day around Independence Day to approximately 500 people whose application for naturalization has been approved. Each project shall provide for appropriate outreach and ceremonial and celebratory activities.

(b) SELECTION OF SITES.—The Attorney General shall, in the Attorney General's discretion, select diverse locations for sites on the basis of the number of naturalization applicants living in proximity to each site and the degree of local community participation and support in the project to be held at the site. Not more than 2 sites may be located in the same State. The Attorney General shall consider changing the sites selected from year to year.

(c) AMOUNTS AVAILABLE; USE OF FUNDS.—

(1) AMOUNT.—The amount made available under this section with respect to any single site for a year shall not exceed $5,000.

(2) USE.—Funds made available under this section may be used only to cover expenses incurred in carrying out oath administration ceremonies at the demonstration sites under subsection (a), including expenses for—

(A) cost of personnel of the Immigration and Naturalization Service (including travel and overtime expenses);

(B) rental of space; and

(C) costs of printing appropriate brochures and other information about the ceremonies.

(3) AVAILABILITY OF FUNDS.—Funds that are otherwise available to the Immigration and Naturalization Service to carry out naturalization activities shall be available, to the extent provided in appropriation Acts, to carry out this section.

(d) APPLICATION.—In the case of an entity other than the Immigration and Naturalization Service seeking to conduct a demonstration project under this section, no amounts may be made available to the entity under this section unless an appropriate application has been made to, and approved by, the Attorney General, in a form and manner specified by the Attorney General.

<< 8 USCA § 1101 NOTE >>

SEC. 648. SENSE OF CONGRESS REGARDING AMERICAN–MADE PRODUCTS; REQUIREMENTS REGARDING NOTICE.

 (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this division should be American-made.
 (b) NOTICE TO RECIPIENTS OF GRANTS.—In providing grants under this division, the Attorney General, to the greatest extent practicable, shall provide to each recipient of a grant a notice describing the statement made in subsection (a) by the Congress.

<< 50 USCA § 191 >>

SEC. 649. VESSEL MOVEMENT CONTROLS DURING IMMIGRATION EMERGENCY.

 Section 1 of the Act of June 15, 1917 (50 U.S.C. 191) is amended in the first sentence by inserting "or whenever the Attorney General determines that an actual or anticipated mass migration of aliens en route to, or arriving off the coast of, the United States presents urgent circumstances requiring an immediate Federal response," after "United States," the first place such term appears.

SEC. 650. REVIEW OF PRACTICES OF TESTING ENTITIES.

 (a) IN GENERAL.—The Attorney General shall investigate, and submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate regarding, the practices of entities authorized to administer standardized citizenship tests pursuant to section 312.3(a) of title 8, Code of Federal Regulations. The report shall include any findings of fraudulent practices by such entities.
 (b) PRELIMINARY AND FINAL REPORTS.—Not later than 90 days after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a preliminary report on the investigation conducted under subsection (a). The Attorney General shall submit to such Committees a final report on such investigation not later than 275 days after the submission of the preliminary report.

SEC. 651. DESIGNATION OF A UNITED STATES CUSTOMS ADMINISTRATIVE BUILDING.

 (a) DESIGNATION.—The United States Customs Administrative Building at the Ysleta/Zaragoza Port of Entry located at 797 South Zaragosa Road in El Paso, Texas, is designated as the "Timothy C. McCaghren Customs Administrative Building".
 (b) LEGAL REFERENCES.—Any reference in any law, regulation, document, record, map, or other paper of the United States to the building referred to in subsection (a) is deemed to be a reference to the "Timothy C. McCaghren Customs Administrative Building".

<< 8 USCA § 1375 >>

SEC. 652. MAIL–ORDER BRIDE BUSINESS.

 (a) FINDINGS.—The Congress finds as follows:
 (1) There is a substantial "mail-order bride" business in the United States. With approximately 200 companies in the United States, an estimated 2,000 to 3,500 men in the United States find wives through mail-order bride catalogs each year. However, there are no official statistics available on the number of mail-order brides entering the United States each year.
 (2) The companies engaged in the mail-order bride business earn substantial profits.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) Although many of these mail-order marriages work out, in many other cases, anecdotal evidence suggests that mail-order brides find themselves in abusive relationships. There is also evidence to suggest that a substantial number of mail-order marriages are fraudulent under United States law.

(4) Many mail-order brides come to the United States unaware or ignorant of United States immigration law. Mail-order brides who are battered often think that if they flee an abusive marriage, they will be deported. Often the citizen spouse threatens to have them deported if they report the abuse.

(5) The Immigration and Naturalization Service estimates that the rate of marriage fraud between foreign nationals and United States citizens or aliens lawfully admitted for permanent residence is 8 percent. It is unclear what percentage of these marriage fraud cases originate as mail-order marriages.

(b) INFORMATION DISSEMINATION.—

(1) REQUIREMENT.—Each international matchmaking organization doing business in the United States shall disseminate to recruits, upon recruitment, such immigration and naturalization information as the Immigration and Naturalization Service deems appropriate, in the recruit's native language, including information regarding conditional permanent residence status and the battered spouse waiver under such status, permanent resident status, marriage fraud penalties, the unregulated nature of the business engaged in by such organizations, and the study required under subsection (c).

(2) CIVIL PENALTY.—

(A) VIOLATION.—Any international matchmaking organization that the Attorney General determines has violated subsection (b) shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $20,000 for each such violation.

(B) PROCEDURES FOR IMPOSITION OF PENALTY.—Any penalty under subparagraph (A) may be imposed only after notice and opportunity for an agency hearing on the record in accordance with sections 554 through 557 of title 5, United States Code.

(c) STUDY.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization and the Director of the Violence Against Women Initiative of the Department of Justice, shall conduct a study of mail-order marriages to determine, among other things—

(1) the number of such marriages;

(2) the extent of marriage fraud in such marriages, including an estimate of the extent of marriage fraud arising from the services provided by international matchmaking organizations;

(3) the extent to which mail-order spouses utilize section 244(a)(3) of the Immigration and Nationality Act (providing for suspension of deportation in certain cases involving abuse), or section 204(a)(1)(A)(iii) of such Act (providing for certain aliens who have been abused to file a classification petition on their own behalf);

(4) the extent of domestic abuse in mail-order marriages; and

(5) the need for continued or expanded regulation and education to implement the objectives of the Violence Against Women Act of 1994 and the Immigration Marriage Fraud Amendments of 1986 with respect to mail-order marriages.

(d) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate setting forth the results of the study conducted under subsection (c).

(e) DEFINITIONS.—As used in this section:

(1) INTERNATIONAL MATCHMAKING ORGANIZATION.—

(A) IN GENERAL.—The term "international matchmaking organization" means a corporation, partnership, business, or other legal entity, whether or not organized under the laws of the United States or any State, that does business in the United States and for profit offers to United States citizens or aliens lawfully admitted for permanent residence, dating, matrimonial, or social referral services to nonresident noncitizens, by—

(i) an exchange of names, telephone numbers, addresses, or statistics;

(ii) selection of photographs; or

(iii) a social environment provided by the organization in a country other than the United States.

(B) EXCEPTION.—Such term does not include a traditional matchmaking organization of a religious nature that otherwise operates in compliance with the laws of the countries of the recruits of such organization and the laws of the United States.

AR.01801

(2) RECRUIT.—The term "recruit" means a noncitizen, nonresident person, recruited by the international matchmaking organization for the purpose of providing dating, matrimonial, or social referral services to United States citizens or aliens lawfully admitted for permanent residence.

SEC. 653. REVIEW AND REPORT ON H–2A NONIMMIGRANT WORKERS PROGRAM.

(a) SENSE OF THE CONGRESS.—It is the sense of the Congress that the H2–A nonimmigrant worker program should be reviewed and may need improvement in order to meet the need of producers of labor-intensive agricultural commodities and livestock in the United States for an adequate workforce.

(b) REVIEW.—The Comptroller General shall review the effectiveness of the H–2A nonimmigrant worker program to ensure that the program provides a sufficient supply of agricultural labor in the event of future shortages of domestic workers after the enactment of this Act. Among other things, the Comptroller General shall review the H–2A nonimmigrant worker program to determine—

(1) whether the program ensures that an adequate supply of qualified United States workers is available at the time and place needed for employers seeking such workers after the date of enactment of this Act;

(2) whether the program ensures that there is timely approval of applications for temporary foreign workers under the program in the event of shortages of United States workers after the date of the enactment of this Act;

(3) whether the program ensures that implementation of the program is not displacing United States agricultural workers or diminishing the terms and conditions of employment of United States agricultural workers;

(4) if, and to what extent, the program is contributing to the problem of illegal immigration; and

(5) that the program adequately meets the needs of agricultural employers for all types of temporary foreign agricultural workers, including higher-skilled workers in occupations which require a level of specific vocational preparation of 4 or higher (as described in the 4th edition of the Dictionary of Occupational Title, published by the Department of Labor).

(c) REPORT.—Not later than December 31, 1996, or 3 months after the date of the enactment of this Act, whichever occurs earlier, the Comptroller General shall submit a report to the appropriate committees of the Congress setting forth the conclusions of the Comptroller General from the review conducted under subsection (b).

(d) DEFINITIONS.—As used in this section:

(1) The term "Comptroller General" means the Comptroller General of the United States.

(2) The term "H–2A nonimmigrant worker program" means the program for the admission of nonimmigrant aliens described in section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act.

SEC. 654. REPORT ON ALLEGATIONS OF HARASSMENT BY CANADIAN CUSTOMS AGENTS.

(a) STUDY AND REVIEW.—

(1) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act, the Commissioner of the United States Customs Service shall initiate a study of harassment by Canadian customs agents allegedly undertaken for the purpose of deterring cross-border commercial activity along the United States–New Brunswick border. Such study shall include a review of the possible connection between any incidents of harassment and the discriminatory imposition of the New Brunswick provincial sales tax on goods purchased in the United States by New Brunswick residents, and with any other actions taken by the Canadian provincial governments to deter cross-border commercial activities.

(2) CONSULTATION.—In conducting the study under paragraph (1), the Commissioner of the United States Customs Service shall consult with representatives of the State of Maine, local governments, local businesses, and any other knowledgeable persons who the Commissioner considers to be important to the completion of the study.

(b) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Commissioner of the United States Customs Service shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on the study and review conducted under subsection (a). The report shall include recommendations for steps that the United States Government can take to help end any harassment by Canadian customs agents that is found to have occurred.

SEC. 655. SENSE OF CONGRESS ON DISCRIMINATORY APPLICATION OF NEW BRUNSWICK PROVINCIAL SALES TAX.

(a) FINDINGS.—The Congress finds as follows:

 (1) In July 1993, Canadian customs officers began collecting an 11 percent New Brunswick provincial sales tax on goods purchased in the United States by New Brunswick residents, an action that has caused severe economic harm to United States businesses located in proximity to the border with New Brunswick.

 (2) This impediment to cross-border trade compounds the damage already done from the Canadian Government's imposition of a 7 percent tax on all goods bought by Canadians in the United States.

 (3) Collection of the New Brunswick provincial sales tax on goods purchased outside of New Brunswick is effected only along the United States–Canadian border, not along New Brunswick's borders with other Canadian provinces; the tax is thus being administered by Canadian authorities in a manner uniquely discriminatory to Canadians shopping in the United States.

 (4) In February 1994, the United States Trade Representative publicly stated an intention to seek redress from the discriminatory application of the New Brunswick provincial sales tax under the dispute resolution process in chapter 20 of the North American Free Trade Agreement (NAFTA), but the United States Government has still not made such a claim under NAFTA procedures.

 (5) Initially, the United States Trade Representative argued that filing a New Brunswick provincial sales tax claim was delayed only because the dispute mechanism under NAFTA had not yet been finalized, but more than a year after such mechanism has been put in place, the claim has still not been put forward by the United States Trade Representative.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

 (1) the provincial sales tax levied by the Canadian province of New Brunswick on Canadian citizens of that province who purchase goods in the United States—

  (A) raises questions about a possible violation of the North American Free Trade Agreement in the discriminatory application of the tax to cross-border trade with the United States; and

  (B) damages good relations between the United States and Canada; and

 (2) the United States Trade Representative should move forward without further delay in seeking redress under the dispute resolution process in chapter 20 of the North American Free Trade Agreement for the violation.

<< 5 USCA § 301 NOTE >>

## SEC. 656. IMPROVEMENTS IN IDENTIFICATION–RELATED DOCUMENTS.

 (a) BIRTH CERTIFICATES.—

 (1) STANDARDS FOR ACCEPTANCE BY FEDERAL AGENCIES.—

  (A) IN GENERAL.—

  (i) GENERAL RULE.—Subject to clause (ii), a Federal agency may not accept for any official purpose a certificate of birth, unless the certificate—

   (I) is a birth certificate (as defined in paragraph (3)); and

   (II) conforms to the standards set forth in the regulation promulgated under subparagraph (B).

  (ii) APPLICABILITY.—Clause (i) shall apply only to a certificate of birth issued after the day that is 3 years after the date of the promulgation of a final regulation under subparagraph (B). Clause (i) shall not be construed to prevent a Federal agency from accepting for official purposes any certificate of birth issued on or before such day.

  (B) REGULATION.—

  (i) CONSULTATION WITH GOVERNMENT AGENCIES.—The President shall select 1 or more Federal agencies to consult with State vital statistics offices, and with other appropriate Federal agencies designated by the President, for the purpose of developing appropriate standards for birth certificates that may be accepted for official purposes by Federal agencies, as provided in subparagraph (A).

  (ii) SELECTION OF LEAD AGENCY.—Of the Federal agencies selected under clause (i), the President shall select 1 agency to promulgate, upon the conclusion of the consultation conducted under such clause, a regulation establishing standards of the type described in such clause.

  (iii) DEADLINE.—The agency selected under clause (ii) shall promulgate a final regulation under such clause not later than the date that is 1 year after the date of the enactment of this Act.

  (iv) MINIMUM REQUIREMENTS.—The standards established under this subparagraph—

AR.01803

  (I) at a minimum, shall require certification of the birth certificate by the State or local custodian of record that issued the certificate, and shall require the use of safety paper, the seal of the issuing custodian of record, and other features designed to limit tampering, counterfeiting, and photocopying, or otherwise duplicating, the birth certificate for fraudulent purposes;

  (II) may not require a single design to which birth certificates issued by all States must conform; and

  (III) shall accommodate the differences between the States in the manner and form in which birth records are stored and birth certificates are produced from such records.

(2) GRANTS TO STATES.—

(A) ASSISTANCE IN MEETING FEDERAL STANDARDS.—

(i) IN GENERAL.—Beginning on the date a final regulation is promulgated under paragraph (1)(B), the Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics and after consulting with the head of any other agency designated by the President, shall make grants to States to assist them in issuing birth certificates that conform to the standards set forth in the regulation.

(ii) ALLOCATION OF GRANTS.—The Secretary shall provide grants to States under this subparagraph in proportion to the populations of the States applying to receive a grant and in an amount needed to provide a substantial incentive for States to issue birth certificates that conform to the standards described in clause (i).

(B) ASSISTANCE IN MATCHING BIRTH AND DEATH RECORDS.—

(i) IN GENERAL.—The Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics and after consulting with the head of any other agency designated by the President, shall make grants to States to assist them in developing the capability to match birth and death records, within each State and among the States, and to note the fact of death on the birth certificates of deceased persons. In developing the capability described in the preceding sentence, a State that receives a grant under this subparagraph shall focus first on individuals born after 1950.

(ii) ALLOCATION AND AMOUNT OF GRANTS.—The Secretary shall provide grants to States under this subparagraph in proportion to the populations of the States applying to receive a grant and in an amount needed to provide a substantial incentive for States to develop the capability described in clause (i).

(C) DEMONSTRATION PROJECTS.—The Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics, shall make grants to States for a project in each of 5 States to demonstrate the feasibility of a system under which persons otherwise required to report the death of individuals to a State would be required to provide to the State's office of vital statistics sufficient information to establish the fact of death of every individual dying in the State within 24 hours of acquiring the information.

(3) BIRTH CERTIFICATE.—As used in this subsection, the term "birth certificate" means a certificate of birth—

(A) of

(i) an individual born in the United States; or

(ii) an individual born abroad—

  (I) who is a citizen or national of the United States at birth; and

  (II) whose birth is registered in the United States; and

(B) that—

(i) is a copy, issued by a State or local authorized custodian of record, of an original certificate of birth issued by such custodian of record; or

(ii) was issued by a State or local authorized custodian of record and was produced from birth records maintained by such custodian of record.

(b) STATE–ISSUED DRIVERS LICENSES AND COMPARABLE IDENTIFICATION DOCUMENTS.—

(1) STANDARDS FOR ACCEPTANCE BY FEDERAL AGENCIES.—

(A) IN GENERAL.—A Federal agency may not accept for any identification-related purpose a driver's license, or other comparable identification document, issued by a State, unless the license or document satisfies the following requirements:

(i) APPLICATION PROCESS.—The application process for the license or document shall include the presentation of such evidence of identity as is required by regulations promulgated by the Secretary of Transportation after consultation with the American Association of Motor Vehicle Administrators.

(ii) SOCIAL SECURITY NUMBER.—Except as provided in subparagraph (B), the license or document shall contain a social security account number that can be read visually or by electronic means.

AR.01804

(iii) FORM.—The license or document otherwise shall be in a form consistent with requirements set forth in regulations promulgated by the Secretary of Transportation after consultation with the American Association of Motor Vehicle Administrators. The form shall contain security features designed to limit tampering, counterfeiting, photocopying, or otherwise duplicating, the license or document for fraudulent purposes and to limit use of the license or document by impostors.

(B) EXCEPTION.—The requirement in subparagraph (A)(ii) shall not apply with respect to a driver's license or other comparable identification document issued by a State, if the State—

(i) does not require the license or document to contain a social security account number; and

(ii) requires—

(I) every applicant for a driver's license, or other comparable identification document, to submit the applicant's social security account number; and

(II) an agency of the State to verify with the Social Security Administration that such account number is valid.

(C) DEADLINE.—The Secretary of Transportation shall promulgate the regulations referred to in clauses (i) and (iii) of subparagraph (A) not later than 1 year after the date of the enactment of this Act.

(2) GRANTS TO STATES.—Beginning on the date final regulations are promulgated under paragraph (1), the Secretary of Transportation shall make grants to States to assist them in issuing driver's licenses and other comparable identification documents that satisfy the requirements under such paragraph.

(3) EFFECTIVE DATES.—

(A) IN GENERAL.—Except as otherwise provided in this paragraph, this subsection shall take effect on the date of the enactment of this Act.

(B) PROHIBITION ON FEDERAL AGENCIES.—Subparagraphs (A) and (B) of paragraph (1) shall take effect beginning on October 1, 2000, but shall apply only to licenses or documents issued to an individual for the first time and to replacement or renewal licenses or documents issued according to State law.

(c) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary of Health and Human Services shall submit a report to the Congress on ways to reduce the fraudulent obtaining and the fraudulent use of birth certificates, including any such use to obtain a social security account number or a State or Federal document related to identification or immigration.

(d) FEDERAL AGENCY DEFINED.—For purposes of this section, the term "Federal agency" means any of the following:

(1) An Executive agency (as defined in section 105 of title 5, United States Code).

(2) A military department (as defined in section 102 of such title).

(3) An agency in the legislative branch of the Government of the United States.

(4) An agency in the judicial branch of the Government of the United States.

<< 42 USCA § 405 NOTE >>

## SEC. 657. DEVELOPMENT OF PROTOTYPE OF COUNTERFEIT–RESISTANT SOCIAL SECURITY CARD.

(a) DEVELOPMENT.—

(1) IN GENERAL.—The Commissioner of Social Security (in this section referred to as the "Commissioner") shall, in accordance with the provisions of this section, develop a prototype of a counterfeit-resistant social security card. Such prototype card—

(A) shall be made of a durable, tamper-resistant material such as plastic or polyester;

(B) shall employ technologies that provide security features, such as magnetic stripes, holograms, and integrated circuits; and

(C) shall be developed so as to provide individuals with reliable proof of citizenship or legal resident alien status.

(2) ASSISTANCE BY ATTORNEY GENERAL.—The Attorney General shall provide such information and assistance as the Commissioner deems necessary to achieve the purposes of this section.

(b) STUDIES AND REPORTS.—

(1) IN GENERAL.—The Comptroller General and the Commissioner of Social Security shall each conduct a study, and issue a report to the Congress, that examines different methods of improving the social security card application process.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) ELEMENTS OF STUDIES.—The studies shall include evaluations of the cost and work load implications of issuing a counterfeit-resistant social security card for all individuals over a 3, 5, and 10 year period. The studies shall also evaluate the feasibility and cost implications of imposing a user fee for replacement cards and cards issued to individuals who apply for such a card prior to the scheduled 3, 5, and 10 year phase-in options.

(3) DISTRIBUTION OF REPORTS.—Copies of the reports described in this subsection, along with facsimiles of the prototype cards as described in subsection (a), shall be submitted to the Committees on Ways and Means and Judiciary of the House of Representatives and the Committees on Finance and Judiciary of the Senate not later than 1 year after the date of the enactment of this Act.

SEC. 658. BORDER PATROL MUSEUM.

(a) AUTHORITY.—Notwithstanding section 203 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 484) or any other provision of law, the Attorney General is authorized to transfer and convey to the Border Patrol Museum and Memorial Library Foundation, incorporated in the State of Texas, such equipment, artifacts, and memorabilia held by the Immigration and Naturalization Service as the Attorney General may determine is necessary to further the purposes of the Museum and Foundation.

(b) TECHNICAL ASSISTANCE.—The Attorney General is authorized to provide technical assistance, through the detail of personnel of the Immigration and Naturalization Service, to the Border Patrol Museum and Memorial Library Foundation for the purpose of demonstrating the use of the items transferred under subsection (a).

SEC. 659. SENSE OF THE CONGRESS REGARDING THE MISSION OF THE IMMIGRATION AND NATURALIZATION SERVICE.

It is the sense of the Congress that the mission statement of the Immigration and Naturalization Service should include a statement that it is the responsibility of the Service to detect, apprehend, and remove those aliens unlawfully present in the United States, particularly those aliens involved in drug trafficking or other criminal activity.

<< 32 USCA § 112 >>

SEC. 660. AUTHORITY FOR NATIONAL GUARD TO ASSIST IN TRANSPORTATION OF CERTAIN ALIENS.

Section 112(d)(1) of title 32, United States Code, is amended by adding at the end the following new sentence: "The plan as approved by the Secretary may provide for the use of personnel and equipment of the National Guard of that State to assist the Immigration and Naturalization Service in the transportation of aliens who have violated a Federal or State law prohibiting or regulating the possession, use, or distribution of a controlled substance.".

Subtitle E—Technical Corrections

SEC. 671. MISCELLANEOUS TECHNICAL CORRECTIONS.

(a) AMENDMENTS RELATING TO PUBLIC LAW 103–322 (VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994).—

<< 8 USCA § 1324 >>

(1) Section 60024(1)(F) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) (in this subsection referred to as "VCCLEA") is amended by inserting "United States Code," after "title 18,".

<< 8 USCA § 1258 >>

(2) Section 130003(b)(3) of VCCLEA is amended by striking "Naturalization" and inserting "Nationality".

<< 8 USCA § 1184 >>

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3)(A) Section 214 (8 U.S.C. 1184) is amended by redesignating the subsection (j), added by section 130003(b)(2) of VCCLEA (108 Stat. 2025), and the subsection (k), as amended by section 622(c) of this division, as subsections (k) and (l), respectively.

<< 8 USCA § 1101 >>

(B) Section 101(a)(15)(S) (8 U.S.C. 1101(a)(15)(S)) is amended by striking "214(j)" and inserting "214(k)".

<< 8 USCA § 1255 >>

(4)(A) Section 245 (8 U.S.C. 1255) is amended by redesignating the subsection (i) added by section 130003(c)(1) of VCCLEA as subsection (j).

<< 8 USCA § 1251 >>

(B) Section 241(a)(2)(A)(i)(I) (8 U.S.C. 1251(a)(2)(A)(i)(I)), as amended by section 130003(d) of VCCLEA and before redesignation by section 305(a)(2) of this division, is amended by striking "245(i)" and inserting "245(j)".

<< 8 USCA § 1255 >>

(5) Section 245(j)(3), as added by section 130003(c)(1) of VCCLEA and as redesignated by paragraph (4)(A), is amended by striking "paragraphs (1) or (2)" and inserting "paragraph (1) or (2)".

<< 8 USCA § 1252 NOTE >>

(6) Section 130007(a) of VCCLEA is amended by striking "242A(d)" and inserting "242A(a)(3)".

<< 8 USCA § 1101 NOTE >>

(7) The amendments made by this subsection shall be effective as if included in the enactment of the VCCLEA.
(b) AMENDMENTS RELATING TO IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994.—

<< 8 USCA § 1401 NOTE >>

(1) Section 101(d) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) (in this subsection referred to as "INTCA") is amended—
 (A) by striking "APPLICATION" and all that follows through "This" and inserting "APPLICABILITY OF TRANSMISSION REQUIREMENTS. This";
 (B) by striking "any residency or other retention requirements for" and inserting "the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States"; and
 (C) by striking "as in effect" and all that follows through the end and inserting "to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.".

<< 8 USCA § 1433 NOTE >>

(2) Section 102 of INTCA is amended by adding at the end the following:
 "(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to 'five years, at least two of which' is deemed a reference to '10 years, at least 5 of which'.".

<< 8 USCA § 1483 >>

(3) Section 351(a) (8 U.S.C. 1483(a)), as amended by section 105(a)(2)(A) of INTCA, is amended by striking the comma after "nationality".

<< 8 USCA § 1255b >>

(4) Section 207(2) of INTCA is amended by inserting a comma after "specified".

<< 8 USCA § 1101 >>

(5) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended in subparagraph (K)(ii), by striking the comma after "1588".

<< 8 USCA § 1323 >>

(6) Section 273(b) (8 U.S.C. 1323(b)), as amended by section 209(a) of INTCA, is amended by striking "remain" and inserting "remains".

(7) Section 209(a)(1) of INTCA is amended by striking "$3000" and inserting "$3,000".

<< 8 USCA § 1323 NOTE >>

(8) Section 209(b) of INTCA is amended by striking "subsection" and inserting "section".

<< 8 USCA § 1255a NOTE >>

(9) Section 219(cc) of INTCA is amended by striking " 'year 1993 the first place it appears' " and inserting " 'year 1993' the first place it appears".

<< 8 USCA § 1161 NOTE >>

(10) Section 219(ee) of INTCA is amended by adding at the end the following:

"(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.".

<< 8 USCA § 1356 >>

(11) Paragraphs (4) and (6) of section 286(r) (8 U.S.C. 1356(r)) are amended by inserting "the" before "Fund" each place it appears.

<< 8 USCA § 1101 NOTE >>

(12) Section 221 of INTCA is amended—

  (A) by striking each semicolon and inserting a comma;

  (B) by striking "disasters." and inserting "disasters,"; and

  (C) by striking "The official" and inserting "the official".

<< 8 USCA § 1252a >>

(13) Section 242A (8 U.S.C. 1252a), as added by section 224(a) of INTCA and before redesignation as section 238 by section 308(b)(5) of this division, is amended by redesignating subsection (d) as subsection (c).

<< 8 USCA § 1101 NOTE >>

(14) Except as otherwise provided in this subsection, the amendments made by this subsection shall take effect as if included in the enactment of INTCA.

(c) AMENDMENTS RELATING TO PUBLIC LAW 104–132 (ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996).—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1189 >>

(1) Section 219 (8 U.S.C. 1189), as added by section 302(a) of Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132) (in this subsection referred to as "AEDPA"), is amended by striking the heading and all that follows through "(a)" and inserting the following:

"DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS

"SEC. 219. (a)".

(2) Section 302(b) of AEDPA is amended by striking ", relating to terrorism,".

<< 8 USCA § 1105a >>

(3) Section 106(a) (8 U.S.C. 1105a(a)), as amended by sections 401(e) and 440(a) of AEDPA, is amended—

  (A) by striking "and" at the end of paragraph (8);

  (B) by striking the period at the end of paragraph (9) and inserting "; and"; and

  (C) in paragraph (10), by striking "Any" and inserting "any".

(4) Section 440(a) of the AEDPA is amended by striking "Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a(a)(10)) is amended to read as follows:" and inserting "Section 106(a) of the Immigration and Nationality Act (8 U.S.C. 1105a(a)) is amended by adding at the end the following:".

<< 8 USCA § 1252a >>

(5) Section 440(g)(1)(A) of AEDPA is amended—

  (A) by striking "of this title"; and

  (B) by striking the period after "241(a)(2)(A)(i)".

(6) Section 440(g) of AEDPA is amended by striking paragraph (2).

<< 8 USCA § 1189 NOTE >>

(7) The amendments made by this subsection shall take effect as if included in the enactment of subtitle A of title IV of AEPDA.

(d) STRIKING REFERENCES TO SECTION 210A.—

<< 8 USCA § 1151 >>

(1)(A) Section 201(b)(1)(C) (8 U.S.C. 1151(b)(1)(C)) is amended by striking ", 210A,".

<< 8 USCA § 1324b >>

(B) Section 274B(a)(3)(B) (8 U.S.C. 1324b(a)(3)(B)) is amended by striking ", 210A(a),".

<< 8 USCA § 1251 >>

(C) Section 241(a)(1) (8 U.S.C. 1251(a)(1)), before redesignation by section 305(a)(2) of this division, is amended by striking subparagraph (F).

<< 8 USCA § 1255a NOTE >>

(2) Sections 204(c)(1)(D)(i) and 204(j)(4) of Immigration Reform and Control Act of 1986 are each amended by striking ", 210A,".

(e) MISCELLANEOUS CHANGES IN THE IMMIGRATION AND NATIONALITY ACT.—

(1) Before being amended by section 308(a)(2) of this division, the item in the table of contents relating to section 242A is amended to read as follows:

"Sec. 242A. Expedited deportation of aliens convicted of committing aggravated felonies.".

<< 8 USCA § 1101 >>

(2) Section 101(c)(1) (8 U.S.C. 1101(c)(1)) is amended by striking ", 321, and 322" and inserting "and 321".

<< 8 USCA § 1182 >>

(3) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by inserting a comma after "(4) thereof)".
(4) Pursuant to section 6(b) of Public Law 103–272 (108 Stat. 1378)—

<< 8 USCA § 1184 >>

 (A) section 214(f)(1) (8 U.S.C. 1184(f)(1)) is amended by striking "section 101(3) of the Federal Aviation Act of 1958" and inserting "section 40102(a)(2) of title 49, United States Code"; and

<< 8 USCA § 1288 >>

 (B) section 258(b)(2) (8 U.S.C. 1288(b)(2)) is amended by striking "section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)" and inserting "section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code".

<< 8 USCA § 1356 >>

(5) Section 286(h)(1)(A) (8 U.S.C. 1356(h)(1)(A)) is amended by inserting a period after "expended".
(6) Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—
 (A) by striking "and" at the end of clause (iv);
 (B) by moving clauses (v) and (vi) 2 ems to the left;
 (C) by striking "; and" in clauses (v) and (vi) and inserting "and for";
 (D) by striking the colons in clauses (v) and (vi); and
 (E) by striking the period at the end of clause (v) and inserting "; and".

<< 8 USCA § 1522 >>

 (7) Section 412(b) (8 U.S.C. 1522(b)) is amended by striking the comma after "is authorized" in paragraph (3) and after "The Secretary" in paragraph (4).

<< 8 USCA § 1101 NOTE >>

 (f) MISCELLANEOUS CHANGE IN THE IMMIGRATION ACT OF 1990.—Section 161(c)(3) of the Immigration Act of 1990 is amended by striking "an an" and inserting "of an".
 (g) MISCELLANEOUS CHANGES IN OTHER ACTS.—

<< 8 USCA § 1430 NOTE >>

 (1) Section 506(a) of the Intelligence Authorization Act, Fiscal Year 1990 (Public Law 101–193) is amended by striking "this section" and inserting "such section".

<< 8 USCA § 1182 NOTE >>

 (2) Section 140 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, as amended by section 505(2) of Public Law 103–317, is amended—
 (A) by moving the indentation of subsections (f) and (g) 2 ems to the left; and
 (B) in subsection (g), by striking "(g)" and all that follows through "shall" and inserting "(g) Subsections (d) and (e) shall".

AR.01810

DIVISION D

SMALL BUSINESS PROGRAMS IMPROVEMENT ACT

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

<< 15 USCA §§ 6313 NOTE, 634 nt, 636 nt, 638 nt, 644 nt, 648 nt, 687*l* nt, 695 nt, 696 nt, 697 nt, 697b nt >>

(a) SHORT TITLE.—This division may be cited as the "Small Business Programs Improvement Act of 1996".
(b) TABLE OF CONTENTS.—

Sec. 1. Short title; table of contents.

Sec. 2. Administrator defined.

Sec. 3. Effective date.

TITLE I—AMENDMENTS TO SMALL BUSINESS ACT

Sec. 101. References.

Sec. 102. Risk management database.

Sec. 103. Section 7(a) loan program.

Sec. 104. Disaster loans.

Sec. 105. Microloan demonstration program.

Sec. 106. Small business development center program.

Sec. 107. Miscellaneous authorities to provide loans and other financial assistance.

Sec. 108. Small business competitiveness demonstration program.

Sec. 109. Amendment to Small Business Guaranteed Credit Enhancement Act of 1993.

Sec. 110. STTR program extension.

Sec. 111. Level of participation for export working capital loans.

TITLE II—AMENDMENTS TO SMALL BUSINESS INVESTMENT ACT

Sec. 201. References.

Sec. 202. Modifications to development company debenture program.

Sec. 203. Required actions upon default.

Sec. 204. Loan liquidation pilot program.

Sec. 205. Registration of certificates.

Sec. 206. Preferred surety bond guarantee program.

Sec. 207. Sense of the Congress.

Sec. 208. Small business investment company improvements.

<< 15 USCA § 631 NOTE >>

SEC. 2. ADMINISTRATOR DEFINED.

  For purposes of this Act, the term "Administrator" means the Administrator of the Small Business Administration.

<< 15 USCA § 633 NOTE >>

SEC. 3. EFFECTIVE DATE.

  Except as otherwise expressly provided, this Act and the amendments made by this Act shall take effect on October 1, 1996.

TITLE I—AMENDMENTS TO SMALL BUSINESS ACT

SEC. 101. REFERENCES.

  Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Small Business Act (15 U.S.C. 631 et seq.).

<< 15 USCA § 633 >>

SEC. 102. RISK MANAGEMENT DATABASE.

  Section 4(b) (15 U.S.C. 633) is amended by inserting after paragraph (2) the following:
  "(3) RISK MANAGEMENT DATABASE.—
    "(A) ESTABLISHMENT.—The Administration shall establish, within the management system for the loan programs authorized by subsections (a) and (b) of section 7 of this Act and title V of the Small Business Investment Act of 1958, a management information system that will generate a database capable of providing timely and accurate information in order to identify loan underwriting, collections, recovery, and liquidation problems.
    "(B) INFORMATION TO BE MAINTAINED.—In addition to such other information as the Administration considers appropriate, the database established under subparagraph (A) shall, with respect to each loan program described in subparagraph (A), include information relating to—
    "(i) the identity of the institution making the guaranteed loan or issuing the debenture;
    "(ii) the identity of the borrower;
    "(iii) the total dollar amount of the loan or debenture;
    "(iv) the total dollar amount of government exposure in each loan;
    "(v) the district of the Administration in which the borrower has its principal office;
    "(vi) the principal line of business of the borrower, as identified by Standard Industrial Classification Code (or any successor to that system);
    "(vii) the delinquency rate for each program (including number of instances and days overdue);
    "(viii) the number and amount of repurchases, losses, and recoveries in each program;
    "(ix) the number of deferrals or forbearances in each program (including days and number of instances);
    "(x) comparisons on the basis of loan program, lender, Administration district and region, for all the data elements maintained; and
    "(xi) underwriting characteristics of each loan that has entered into default, including term, amount and type of collateral, loan-to-value and other actual and projected ratios, line of business, credit history, and type of loan.
    "(C) DEADLINE FOR OPERATIONAL CAPABILITY.—The database established under subparagraph (A) shall—

"(i) be operational not later than June 30, 1997; and

"(ii) capture data beginning on the first day of the second quarter of fiscal year 1997 beginning after such date and thereafter.".

SEC. 103. SECTION 7(a) LOAN PROGRAM.

<< 15 USCA § 636 >>

(a) SERVICING AND LIQUIDATION OF LOANS BY PREFERRED LENDERS.—Section 7(a)(2)(C)(ii)(II) (15 U.S.C. 636(a)(2)(C)(ii)(II)) is amended to read as follows:

"(II) complete authority to service and liquidate such loans without obtaining the prior specific approval of the Administration for routine servicing and liquidation activities, but shall not take any actions creating an actual or apparent conflict of interest.".

(b) CERTIFIED LENDERS PROGRAM.—Section 7(a)(19) (15 U.S.C. 636(a)(19)) is amended by adding at the end the following new subparagraph:

"(C) AUTHORITY TO LIQUIDATE LOANS.—

"(i) IN GENERAL.—The Administrator may permit lenders participating in the Certified Lenders Program to liquidate loans made with a guarantee from the Administration pursuant to a liquidation plan approved by the Administrator.

"(ii) AUTOMATIC APPROVAL.—If the Administrator does not approve or deny a request for approval of a liquidation plan within 10 business days of the date on which the request is made (or with respect to any routine liquidation activity under such a plan, within 5 business days) such request shall be deemed to be approved.".

(c) LIMITATION ON CONDUCTING PILOT PROJECTS.—Section 7(a) (15 U.S.C. 636(a)) is amended by adding at the end the following new paragraph:

"(25) LIMITATION ON CONDUCTING PILOT PROJECTS.—

"(A) IN GENERAL.—Not more than 10 percent of the total number of loans guaranteed in any fiscal year under this subsection may be awarded as part of a pilot program which is commenced by the Administrator on or after October 1, 1996.

"(B) PILOT PROGRAM DEFINED.—In this paragraph, the term 'pilot program' means any lending program initiative, project, innovation, or other activity not specifically authorized by law.

"(C) LOW DOCUMENTATION LOAN PROGRAM.—The Administrator may carry out the low documentation loan program for loans of $100,000 or less only through lenders with significant experience in making small business loans. Not later than 90 days after the date of enactment of this subsection, the Administrator shall promulgate regulations defining the experience necessary for participation as a lender in the low documentation loan program.".

(d) CALCULATION OF SUBSIDY RATE.—Section 7(a) (15 U.S.C. 636(a)) is amended by adding at the end the following new paragraph:

"(26) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this subsection shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing loans under this Act.".

<< 15 USCA § 634 >>

(e) SALE OF UNGUARANTEED PORTIONS OF SBA LOANS.—Section 5(f)(3) (15 U.S.C. 634(f)(3)) is amended by adding at the end the following: "Beginning on March 31, 1997, the sale of the unguaranteed portion of any loan made under section 7(a) shall not be permitted until a final regulation that applies uniformly to both depository institutions and other lenders is promulgated by the Administration setting forth the terms and conditions under which such sales can be permitted, including maintenance of appropriate reserve requirements and other safeguards to protect the safety and soundness of the program."

<< 15 USCA § 636 >>

(f) CONDITIONS ON PURCHASE OF LOANS.—Section 7(a)(4) (15 U.S.C. 636(a)(4)) is amended—

(1) by striking "(4) Notwithstanding" and inserting the following:

"(4) INTEREST RATES AND FEES.—

"(A) INTEREST RATES.—Notwithstanding"; and

(2) by adding at the end the following new subparagraph:

"(B) PAYMENT OF ACCRUED INTEREST.—

"(i) IN GENERAL.—Any bank or other lending institution making a claim for payment on the guaranteed portion of a loan made under this subsection shall be paid the accrued interest due on the loan from the earliest date of default to the date of payment of the claim at a rate not to exceed the rate of interest on the loan on the date of default, minus one percent.

"(ii) LOANS SOLD ON SECONDARY MARKET.—If a loan described in clause (i) is sold on the secondary market, the amount of interest paid to a bank or other lending institution described in that clause from the earliest date of default to the date of payment of the claim shall be no more than the agreed upon rate, minus one percent.".

(g) PLAN FOR TRANSFER OF LOAN SERVICING FUNCTIONS TO CENTRALIZED CENTERS.—

(1) IMPLEMENTATION PLAN REQUIRED.—The Administrator shall submit a detailed plan for completing the consolidation, in one or more centralized centers, of the performance of the various functions relating to the servicing of loans directly made or guaranteed by the Administration pursuant to the Small Business Act, addressing the matters described in paragraph (2) by the deadline specified in paragraph (3).

(2) CONTENTS OF PLAN.—In addition to such other matters as the Administrator may deem appropriate, the plan required by paragraph (1) shall include—

(A) the proposed number and location of such centralized loan servicing centers;

(B) the proposed workload (identified by type and numbers of loans and their geographic origin by the Small Business Administration district office) and staffing of each such center;

(C) a detailed, time-phased plan for the transfer of the identified loan servicing functions to each proposed center; and

(D) any identified impediments to the timely execution of the proposed plan (including adequacy of available financial resources, availability of needed personnel, facilities, and related equipment) and the recommendations of the Administrator for addressing such impediments.

(3) DEADLINE FOR SUBMISSION.—Not later than February 28, 1997, the plan required by paragraph (1) shall be submitted to the Committees on Small Business of the House of Representatives and Senate.

<< 15 USCA § 634 NOTE >>

(h) PREFERRED LENDER STANDARD REVIEW PROGRAM.—Not later than 90 days after the date of enactment of this Act, the Administrator shall commence a standard review program for the Preferred Lender Program established by section 5(b)(7) of the Small Business Act (15 U.S.C. 634(b)(7)), which shall include annual or more frequent assessments of the participation of the lender in the program, including defaults, loans, and recoveries of loans made by that lender under the authority of this section. The Administrator shall require such standard review for each new entrant to the Preferred Lender Program.

(i) INDEPENDENT STUDY OF LOAN PROGRAMS.—

(1) STUDY REQUIRED.—The Administrator shall contract with one or more private sector parties to conduct a comprehensive assessment of the performance of the loan programs authorized by section 7(a) of the Small Business Act (15 U.S.C. 636(a)) and title V of the Small Business Investment Act of 1958 (15 U.S.C. 661) addressing the matters described in paragraph (2) and resulting in a report to the Congress pursuant to paragraph (5).

(2) MATTERS TO BE ASSESSED.—In addition to such other matters as the Administrator considers appropriate, the assessment required by paragraph (1) shall address, with respect to each loan program described in paragraph (1) for each of the fiscal years described in paragraph (3)—

(A) the number and frequency of deferrals and defaults;

(B) default rates;

(C) comparative loss rates, by—

(i) type of lender (separately addressing preferred lenders, certified lenders, and general participation lenders);

(ii) term of the loan;

(iii) dollar value of the loan at disbursement; and

(iv) underwriting characteristics of each loan that has entered into default, including term, amount and type of collateral, loan-to-value and other actual and projected ratios, line of business, credit history, and type of loan; and

(D) the economic models used by the Office of Management and Budget to calculate the credit subsidy rate applicable to the loan programs.

(3) PERIOD OF ASSESSMENT.—The assessments undertaken pursuant to paragraph (2) shall address data for the period beginning with fiscal year 1986 of each loan program described in paragraph (1).

(4) ACCESS TO INFORMATION.—The Administrator shall provide to the contractor access to any information collected by or available to the Administration with regard to the loan programs being assessed. The contractor shall preserve the confidentiality of any information for which confidentiality is protected by law or properly asserted by the person submitting such information.

(5) CONTRACT FUNDING.—The Administrator shall fund the cost of the contract from the amounts appropriated for the salaries and expenses of the Administration for fiscal year 1997.

(6) REPORT TO THE CONGRESS.—

(A) CONTENTS.—The contractor shall prepare a report of—

(i) its analyses of the matters to be assessed pursuant to paragraph (2); and

(ii) its independent recommendations for improving program performance with respect to each loan program, regarding—

(I) improving the timely collection and subsequent management by the Administration of data to measure the performance of each loan program described in paragraph (1); and

(II) reducing loss rates for and improving the performance of each such loan program.

(B) SUBMISSION TO THE CONGRESS.—Not later than June 30, 1997, the Administrator shall submit the report prepared under subparagraph (A) to the Committees on Small Business of the House of Representatives and the Senate. The Administrator shall append his comments, and those of the Office of Management and Budget, if any, to the report.

SEC. 104. DISASTER LOANS.

<< 15 USCA § 636 NOTE >>

(a) PRIVATE SECTOR LOAN SERVICING DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—

(A) DEMONSTRATION PROGRAM REQUIRED.—Notwithstanding any other provision of law, the Administration shall conduct a demonstration program, within the parameters described in paragraph (2), to evaluate the comparative costs and benefits of having the Administration's portfolio of disaster loans serviced under contract rather than directly by employees of the Administration. All costs of the demonstration program shall be paid from amounts made available for the Salaries and Expenses Account of the Administration.

(B) INITIATION DATE.—Not later than 90 days after the date of enactment of this Act, the Administration shall issue a request for proposals for the program parameters described in paragraph (2).

(2) DEMONSTRATION PROGRAM PARAMETERS.—

(A) LOAN SAMPLE.—The sample of loans for the demonstration program shall be randomly drawn from the Administration's portfolio of loans made pursuant to section 7(b) of the Small Business Act and shall include a representative group of not less than 30 percent of all loans for residential properties, including 30 percent of all loans made during the demonstration program after the date of enactment of this Act, which loans shall be selected by the Administration on the basis of geographic distribution and such other factors as the Administration determines to be appropriate.

(B) CONTRACT AND OPTIONS.—The Administration shall solicit and competitively award one or more contracts to service the loans included in the sample of loans described in subparagraph (A) for a term of not less than one year, with 3 one-year contract renewal options, each of which shall be exercised by the Administration unless the Administration terminates the contractor or contractors for good cause.

(3) TERM OF DEMONSTRATION PROGRAM.—The demonstration program shall commence not later than October 1, 1997.

(4) REPORTS.—

(A) INTERIM REPORTS.—Not later than 120 days before the expiration of the initial 4–year contract performance period, the Administrator shall submit to the Committees on Small Business of the House of Representatives and the Senate an interim report on the conduct of the demonstration program. The contractor shall be afforded a reasonable opportunity to attach comments to each such report.

(B) FINAL REPORT.—Not later than 120 days after the termination of the demonstration program, the Administrator shall submit to the Committees on Small Business of the House of Representatives and the Senate a final report on the performance of the demonstration program, together with the recommendations of the Administrator for continuation, termination, or modification of the demonstration program.

(b) DEFINITION OF DISASTER.—

<< 15 USCA § 632 >>

(1) IN GENERAL.—Section 3(k) (15 U.S.C. 632(k)) is amended by inserting "commercial fishery failures or fishery resource disasters (as determined by the Secretary of Commerce under section 308(b) of the Interjurisdictional Fisheries Act of 1986)," after "tidal waves,".

<< 15 USCA § 632 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall be effective with respect to any disaster occurring on or after March 1, 1994.

<< 15 USCA § 636 >>

## SEC. 105. MICROLOAN DEMONSTRATION PROGRAM.

Section 7(m)(7)(B) (15 U.S.C. 636(m)(4)) is amended by adding at the end the following: "If, however, at the beginning of the fourth quarter of a fiscal year the Administration determines that a portion of appropriated microloan funds are unlikely to be awarded during that year, the Administration may make additional funds available to a State in excess of 125 percent of the pro rata share of that State.".

<< 15 USCA § 648 >>

## SEC. 106. SMALL BUSINESS DEVELOPMENT CENTER PROGRAM.

(a) ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS DEVELOPMENT CENTERS.—

(1) DUTIES.—Section 21(h) (15 U.S.C. 648(h)) is amended to read as follows:

"(h) ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS DEVELOPMENT CENTERS.—

"(1) APPOINTMENT AND COMPENSATION.—The Administrator shall appoint an Associate Administrator for Small Business Development Centers who shall report to an official who is not more than one level below the Office of the Administrator and who shall serve without regard to the provisions of title 5 governing appointments in the competitive service, and without regard to chapter 51, and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at a rate not less than the rate of GS–17 of the General Schedule.

"(2) DUTIES.—

"(A) IN GENERAL.—The sole responsibility of the Associate Administrator for Small Business Development Centers shall be to administer the small business development center program. Duties of the position shall include recommending the annual program budget, reviewing the annual budgets submitted by each applicant, establishing appropriate funding levels therefore, selecting applicants to participate in this program, implementing the provisions of this section, maintaining a clearinghouse to provide for the dissemination and exchange of information between small business development centers and conducting audits of recipients of grants under this section.

"(B) CONSULTATION REQUIREMENTS.—In carrying out the duties described in this subsection, the Associate Administrator shall confer with and seek the advice of the Board established by subsection (i) and Administration officials in areas served by the small business development centers; however, the Associate Administrator shall be responsible for the management and administration of the program and shall not be subject to the approval or concurrence of such Administration officials.".

(2) REFERENCES TO ASSOCIATE ADMINISTRATOR.—Section 21 (15 U.S.C. 648) is amended—

(A) in subsection (c)(7), by striking "Deputy Associate Administrator of the Small Business Development Center program" and inserting "Associate Administrator for Small Business Development Centers"; and

(B) in subsection (i)(2), by striking "Deputy Associate Administrator for Management Assistance" and inserting "Associate Administrator for Small Business Development Centers".

(b) EXTENSION OR RENEWAL OF COOPERATIVE AGREEMENTS.—Section 21(k)(3) (15 U.S.C. 648(k)(3)) is amended to read as follows:

"(3) EXTENSION OR RENEWAL OF COOPERATIVE AGREEMENTS.—

"(A) IN GENERAL.—In extending or renewing a cooperative agreement of a small business development center, the Administration shall consider the results of the examination and certification program conducted pursuant to paragraphs (1) and (2).

"(B) CERTIFICATION REQUIREMENT.—After September 30, 2000, the Administration may not renew or extend any cooperative agreement with a small business development center unless the center has been approved under the certification program conducted pursuant to this subsection, except that the Associate Administrator for Small Business Development Centers may waive such certification requirement, in the discretion of the Associate Administrator, upon a showing that the center is making a good faith effort to obtain certification.".

(c) TECHNICAL CORRECTION.—Section 21(l) (15 U.S.C. 648(l)) is amended to read as follows:

"(l) CONTRACT AUTHORITY.—The authority to enter into contracts shall be in effect for each fiscal year only to the extent and in the amounts as are provided in advance in appropriations Acts. After the administration has entered a contract, either as a grant or a cooperative agreement, with any applicant under this section, it shall not suspend, terminate, or fail to renew or extend any such contract unless the Administration provides the applicant with written notification setting forth the reasons therefore and affording the applicant an opportunity for a hearing, appeal, or other administrative proceeding under the provisions of chapter 5 of title 5, United States Code.".

<< 15 USCA § 636 >>

SEC. 107. MISCELLANEOUS AUTHORITIES TO PROVIDE LOANS AND OTHER FINANCIAL ASSISTANCE.

(a) FUNDING LIMITATION; SEMINARS.—Section 7(d) (15 U.S.C. 636(d)) is amended—

(1) by striking "(d)(1)" and inserting "(d)"; and

(2) by striking paragraph (2).

(b) TRADE ADJUSTMENT LOANS.—Section 7(e) (15 U.S.C. 636(e)) is amended to read as follows:

"(e) [RESERVED].".

(c) WAIVER OF CREDIT ELSEWHERE TEST FOR COLLEGES AND UNIVERSITIES.—Section 7(f) (15 U.S.C. 636(f)) is amended to read as follows:

"(f) [RESERVED].".

(d) LOANS TO SMALL BUSINESS CONCERNS FOR SOLAR ENERGY AND ENERGY CONSERVATION MEASURES.—Section 7(l) (15 U.S.C. 636(l)) is amended to read as follows:

"(l) [RESERVED].".

SEC. 108. SMALL BUSINESS COMPETITIVENESS DEMONSTRATION PROGRAM.

<< 15 USCA § 644 NOTE >>

(a) EXTENSION OF DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—Section 711(c) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3890) is amended by striking "September 30, 1996" and inserting "September 30, 1997".

(2) REPEAL.—Section 717(f) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note) is repealed.

(b) REPORTING OF SUBCONTRACT PARTICIPATION IN CONTRACTS FOR ARCHITECTURAL AND ENGINEERING SERVICES.—Section 714(b)(5) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3892) is amended to read as follows:

AR.01817

"(5) DURATION.—The system described in subsection (a) shall be established not later than October 1, 1996 (or as soon as practicable thereafter on the first day of a subsequent quarter of fiscal year 1997), and shall terminate on September 30, 1997.".

(c) REPORTS TO THE CONGRESS.—

(1) IN GENERAL.—Section 716 of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3893 is amended—

(A) in subsection (a), by striking "fiscal year 1991 and 1995" and inserting "each of fiscal years 1991 through 1996";

(B) in subsection (b), by striking "results" and inserting "cumulative results"; and

(C) in subsection (c), by striking "1996" and inserting "1997".

(2) CUMULATIVE REPORT THROUGH FISCAL YEAR 1995.—A cumulative report of the results of the Small Business Competitiveness Demonstration Program for fiscal years 1991 through 1995 shall be submitted not later than February 28, 1997 pursuant to section 716(a) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3893), as amended by paragraph (1) of this subsection.

## SEC. 109. AMENDMENT TO SMALL BUSINESS GUARANTEED CREDIT ENHANCEMENT ACT OF 1993.

<< 15 USCA §§ 634 NOTE, 636 nt >>

(a) IN GENERAL.—Section 7 of the Small Business Guaranteed Credit Enhancement Act of 1993 (Public Law 103–81; 15 U.S.C. 634 note) is repealed effective September 29, 1996.

(b) CLERICAL AMENDMENT.—The table of contents for the Small Business Guaranteed Credit Enhancement Act of 1993 (Public Law 103–81; 15 U.S.C. 631 note) is amended by striking the item relating to section 7.

<< 15 USCA § 638 >>

## SEC. 110. STTR PROGRAM EXTENSION.

Section 9(n)(1)(C) (15 U.S.C. 638(n)(1)(C)) is amended by striking "fiscal year 1996" and inserting "fiscal years 1996 and 1997".

<< 15 USCA § 636 >>

## SEC. 111. LEVEL OF PARTICIPATION FOR EXPORT WORKING CAPITAL LOANS.

Section 7(a)(2) (15 U.S.C. 636(a)(2)) is amended by adding at the end the following:

"(D) PARTICIPATION UNDER EXPORT WORKING CAPITAL PROGRAM.—Notwithstanding subparagraph (A), in an agreement to participate in a loan on a deferred basis under the Export Working Capital Program established pursuant to paragraph (14)(A), such participation by the Administration shall not exceed 90 percent.".

### TITLE II—AMENDMENTS TO SMALL BUSINESS INVESTMENT ACT

## SEC. 201. REFERENCES.

Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Small Business Investment Act of 1958 (15 U.S.C. 661 et seq.).

## SEC. 202. MODIFICATIONS TO DEVELOPMENT COMPANY DEBENTURE PROGRAM.

<< 15 USCA § 696 >>

(a) DECREASED LOAN TO VALUE RATIOS.—Section 502(3) (15 U.S.C. 696(3)) is amended to read as follows:

"(3) CRITERIA FOR ASSISTANCE.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) IN GENERAL.—Any development company assisted under this section or section 503 of this title must meet the criteria established by the Administration, including the extent of participation to be required or amount of paid-in capital to be used in each instance as is determined to be reasonable by the Administration.

"(B) COMMUNITY INJECTION FUNDS.—

"(i) SOURCES OF FUNDS.—Community injection funds may be derived, in whole or in part, from—

"(I) State or local governments;

"(II) banks or other financial institutions;

"(III) foundations or other not-for-profit institutions; or

"(IV) the small business concern (or its owners, stockholders, or affiliates) receiving assistance through a body authorized by this title.

"(ii) FUNDING FROM INSTITUTIONS.—Not less than 50 percent of the total cost of any project financed pursuant to clauses (i), (ii), or (iii) of subparagraph (C) shall come from the institutions described in subclauses (I), (II), and (III) of clause (i).

"(C) FUNDING FROM A SMALL BUSINESS CONCERN.—The small business concern (or its owners, stockholders, or affiliates) receiving assistance through a body authorized by this title shall provide—

"(i) at least 15 percent of the total cost of the project financed, if the small business concern has been in operation for a period of 2 years or less;

"(ii) at least 15 percent of the total cost of the project financed if the project involves the construction of a limited or single purpose building or structure;

"(iii) at least 20 percent of the total cost of the project financed if the project involves both of the conditions set forth in clauses (i) and (ii); or

"(iv) at least 10 percent of the total cost of the project financed, in all other circumstances, at the discretion of the development company.".

<< 15 USCA § 697 >>

(b) GUARANTEE FEE FOR DEVELOPMENT COMPANY DEBENTURES.—Section 503(b)(7)(A) (15 U.S.C. 697(b)(7)(A)) is amended by striking "equal to 0.125 percent" and all that follows before the semicolon and inserting the following: "equal to the lesser of—

"(i) 0.9375 percent per year of the outstanding balance of the loan; or

"(ii) such percentage per year of the outstanding balance of the loan as the Administrator may determine to be necessary to reduce the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures under this Act to an amount that, taking into consideration any available appropriated funds, would permit the Administration to purchase or guarantee $2,000,000,000 of debentures in fiscal year 1997".

(c) FEES TO OFFSET SUBSIDY COST.—Section 503(d) (15 U.S.C. 697(d)) is amended to read as follows:

"(d) CHARGES FOR ADMINISTRATION EXPENSES.—

"(1) LEVEL OF CHARGES.—The Administration may impose an additional charge for administrative expenses with respect to each debenture for which payment of principal and interest is guaranteed under subsection (a).

"(2) PARTICIPATION FEE.—The Administration shall collect a one-time fee in an amount equal to 50 basis points on the total participation in any project of any institution described in subclause (I), (II), or (III) of section 502(3)(B)(i). Such fee shall be imposed only when the participation of the institution will occupy a senior credit position to that of the development company. All proceeds of the fee shall be used to offset the cost (as that term is defined in section 502 of the Credit Reform Act of 1990) to the Administration of making guarantees under subsection (a).

"(3) DEVELOPMENT COMPANY FEE.—The Administration shall collect annually from each development company a fee of 0.125 percent of the outstanding principal balance of any guaranteed debenture authorized by the Administration after September 30, 1996. Such fee shall be derived from the servicing fees collected by the development company pursuant to regulation, and shall not be derived from any additional fees imposed on small business concerns. All proceeds of the fee shall be used to offset the cost (as that term is defined in section 502 of the Credit Reform Act of 1990) to the Administration of making guarantees under subsection (a).".

(d) EFFECTIVE DATE.—Section 503 (15 U.S.C. 697) is amended by adding at the end the following new subsection:

"(f) EFFECTIVE DATE.—The fees authorized by subsections (b) and (c) shall apply to financings approved by the Administration on or after October 1, 1996, but shall not apply to financings approved by the Administration on or after October 1, 1997.".

(e) CALCULATION OF SUBSIDY RATE.—Section 503 (15 U.S.C. 697(a) is amended by adding at the end of the following new subsection:

"(g) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this section shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures under this Act.".

<< 15 USCA § 697 >>

SEC. 203. REQUIRED ACTIONS UPON DEFAULT.

Section 503 (15 U.S.C. 697) is amended by adding at the end the following new subsection:

"(h) REQUIRED ACTIONS UPON DEFAULT.—

"(1) INITIAL ACTIONS.—Not later than the 45th day after the date on which a payment on a loan funded through a debenture guaranteed under this section is due and not received, the Administration shall—

"(A) take all necessary steps to bring such a loan current; or

"(B) implement a formal written deferral agreement.

"(2) PURCHASE OR ACCELERATION OF DEBENTURE.—Not later than the 65th day after the date on which a payment on a loan described in paragraph (1) is due and not received, and absent a formal written deferral agreement, the administration shall take all necessary steps to purchase or accelerate the debenture.

"(3) PREPAYMENT PENALTIES.—With respect to the portion of any project derived from funds set forth in section 502(3), the Administration—

"(A) shall negotiate the elimination of any prepayment penalties or late fees on defaulted loans made prior to September 30, 1996;

"(B) shall not pay any prepayment penalty or late fee on the default based purchase of loans issued after September 30, 1996; and

"(C) for any project financed after September 30, 1996, shall not pay any default interest rate higher than the interest rate on the note prior to the date of default.".

<< 15 USCA § 695 NOTE >>

SEC. 204. LOAN LIQUIDATION PILOT PROGRAM.

(a) IN GENERAL.—The Administrator shall carry out a loan liquidation pilot program (in this section referred to as the "pilot program") in accordance with the requirements of this section.

(b) SELECTION OF DEVELOPMENT COMPANIES.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Administrator shall establish a pilot program under which certain development companies authorized to make loans and issue debentures under title V of the Small Business Investment Act of 1958 are selected by the Administrator in accordance with this subsection to carry out loan liquidations.

(2) CONFLICTS OF INTEREST.—The development companies selected under paragraph (1) shall agree not to take any action that would create a potential conflict of interest involving the development company, the third party lender, or an associate of the third party lender.

(3) QUALIFICATIONS.—In order to qualify to participate in the pilot program under this section, each development company shall—

(A) have not less than 6 years of experience in the program established by title V of the Small Business Investment Act of 1958;

(B) have made, during the 6 most recent fiscal years, an average of not less than 10 loans per year through the program established by such title V of the Small Business Investment Act of 1958;

(C) have not less than 2 years of experience in liquidating loans under the authority of a Federal, State, or other lending program; and

(D) meet such other requirements as the Administration may establish.

(c) AUTHORITY OF DEVELOPMENT COMPANIES.—The development companies selected under subsection (b) shall, for loans in their portfolio of loans made through debentures guaranteed under title V of the Small Business Investment Act of 1958 that are in default after the date of enactment of this Act, be authorized to—

(1) perform all liquidation and foreclosure functions, including the acceleration or purchase of community injection funds, subject to such company obtaining prior written approval from the Administrator before committing the agency to purchase any other indebtedness secured by the property: Provided, That the Administrator shall approve or deny a request for such purchase within a period of 10 business days; and

(2) liquidate such loans in a reasonable and sound manner and according to commercially accepted practices pursuant to a liquidation plan approved by the administrator in advance of its implementation. If the administrator does not approve or deny a request for approval of a liquidation plan within 10 business days of the date on which the request is made (or with respect to any routine liquidation activity under such a plan, within 5 business days) such request shall be deemed to be approved.

(d) AUTHORITY OF THE ADMINISTRATOR.—In carrying out the pilot program, the Administrator shall—

(1) have full authority to rescind the authority granted any development company under this section upon a 10–day written notice stating the reasons for the rescission; and

(2) not later than 90 days after the admission of the development companies specified in subsection (b), implement the pilot program.

(e) REPORT.—

(1) IN GENERAL.—The Administrator shall issue a report on the results of the pilot program to the Committees on Small Business of the House of Representatives and the Senate. The report shall include information relating to—

(A) the total dollar amount of each loan and project liquidated;

(B) the total dollar amount guaranteed by the Administration;

(C) total dollar losses;

(D) total recoveries both as percentage of the amount guaranteed and the total cost of the project; and

(E) a comparison of the pilot program information with the same information for liquidation conducted outside the pilot program over the period of time.

(2) REPORTING PERIOD.—The report shall be based on data from, and issued not later than 90 days after the close of, the first eight 8 fiscal quarters of the pilot program's operation after the date of implementation.

SEC. 205. REGISTRATION OF CERTIFICATES.

<< 15 USCA § 634 >>

(a) CERTIFICATES SOLD PURSUANT TO SMALL BUSINESS ACT.—Section 5(h) of the Small Business Act (15 U.S.C. 634(h)) is amended—

(1) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D);

(2) by striking "(h)" and inserting "(h)(1)";

(3) by striking subparagraph (A), as redesignated by paragraph (1) of this subsection, and inserting the following:

"(A) provide for a central registration of all loans and trust certificates sold pursuant to subsections (f) and (g) of this section;"; and

(4) by adding at the end the following:

"(2) Nothing in this subsection shall prohibit the utilization of a book-entry or other electronic form of registration for trust certificates. The Administration may, with the consent of the Secretary of the Treasury, use the book-entry system of the Federal Reserve System.".

<< 15 USCA § 687*l* >>

(b) CERTIFICATES SOLD PURSUANT TO SMALL BUSINESS INVESTMENT COMPANY PROGRAM.—Section 321(f) (15 U.S.C. 687*l*(f)) is amended—

(1) in paragraph (1), by striking "Such central registration shall include" and all that follows through the period at the end of the paragraph; and

(2) by adding at the end the following:

"(5) Nothing in this subsection shall prohibit the use of a book-entry or other electronic form of registration for trust certificates.".

<< 15 USCA § 697b >>

(c) CERTIFICATES SOLD PURSUANT TO DEVELOPMENT COMPANY PROGRAM.—Section 505(f) (15 U.S.C. 697b(f)) is amended—

(1) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D);

(2) by striking "(f)" and inserting "(f)(1)";

(3) by striking subparagraph (A), as redesignated by paragraph (1) of this subsection, and inserting the following:

"(A) provide for a central registration of all trust certificates sold pursuant to this section;" and

(4) by adding at the end the following:

"(2) Nothing in this subsection shall prohibit the utilization of a book-entry or other electronic form of registration for trust certificates.".

SEC. 206. PREFERRED SURETY BOND GUARANTEE PROGRAM.

<< 15 USCA § 694b >>

(a) ADMISSIONS OF ADDITIONAL PROGRAM PARTICIPANTS.—Section 411(a) (15 U.S.C. 694(a)) is amended by adding a new paragraph (5), as follows:

"(5)(A) The Administration shall promptly act upon an application from a surety to participate in the Preferred Surety Bond Guarantee Program, authorized by paragraph (3), in accordance with criteria and procedures established in regulations pursuant to subsection (d).

"(B) The Administration is authorized to reduce the allotment of bond guarantee authority or terminate the participation of a surety in the Preferred Surety Bond Guarantee Program based on the rate of participation of such surety during the 4 most recent fiscal year quarters compared to the median rate of participation by the other sureties in the program.".

<< 15 USCA § 694b NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply with respect to applications received (or pending substantive evaluation) on or after October 1, 1995.

SEC. 207. SENSE OF THE CONGRESS.

(a) IN GENERAL.—It is the sense of the Congress that the subsidy models prepared by the Office of Management and Budget relative to loan programs sponsored by the United States Small Business Administration have a tendency to—

(1) overestimate potential risks of loss; and

(2) overemphasize historical losses that may be anomalous and do not truly reflect the success of the programs as a whole.

(b) INDEPENDENT STUDY.—Consequently, the Congress mandates the independent study in section 103(h) in an attempt to improve the ability of the Office of Management and Budget to reflect more accurately the budgetary implications of such programs.

SEC. 208. SMALL BUSINESS INVESTMENT COMPANY IMPROVEMENTS.

<< 15 USCA § 662 >>

(a) DEFINITIONS.—

(1) SMALL BUSINESS CONCERN.—Section 103(5) (15 U.S.C. 662(5)) is amended by inserting before the semicolon the following: ", except that, for purposes of this Act, an investment by a venture capital firm, investment company (including a small business investment company) employee welfare benefit plan or pension plan, or trust, foundation, or endowment that is exempt from Federal income taxation—

"(A) shall not cause a business concern to be deemed not independently owned and operated;

"(B) shall be disregarded in determining whether a business concern satisfies size standards established pursuant to section 3(a)(2) of the Small Business Act; and

"(C) shall be disregarded in determining whether a small business concern is a smaller enterprise".

(2) PRIVATE CAPITAL.—Section 103(9) (15 U.S.C. 662(9)) is amended to read as follows:

"(9) the term 'private capital'—

"(A) means the sum of—

"(i) the paid-in capital and paid-in surplus of a corporate licensee, the contributed capital of the partners of a partnership licensee, or the equity investment of the members of a limited liability company licensee; and

"(ii) unfunded binding commitments, from investors that meet criteria established by the Administrator, to contribute capital to the licensee: Provided, That such unfunded commitments may be counted as private capital for purposes of approval by the Administrator of any request for leverage, but leverage shall not be funded based on such commitments; and

"(B) does not include any—

"(i) funds borrowed by a licensee from any source;

"(ii) funds obtained through the issuance of leverage; or

"(iii) funds obtained directly or indirectly from any Federal, State, or local government, or any government agency or instrumentality, except for—

"(I) funds invested by an employee welfare benefit plan or pension plan; and

"(II) any qualified nonprivate funds (if the investors of the qualified nonprivate funds do not control, directly or indirectly, the management, board of directors, general partners, or members of the licensee);".

(3) NEW DEFINITIONS.—Section 103 (15 U.S.C. 662) is amended by striking paragraph (10) and inserting the following:

"(10) the term 'leverage' includes—

"(A) debentures purchased or guaranteed by the Administration;

"(B) participating securities purchased or guaranteed by the Administration; and

"(C) preferred securities outstanding as of October 1, 1995;

"(11) the term 'third party debt' means any indebtedness for borrowed money, other than indebtedness owed to the Administration;

"(12) the term 'smaller enterprise' means any small business concern that, together with its affiliates—

"(A) has—

"(i) a net financial worth of not more than $6,000,000, as of the date on which assistance is provided under this Act to that business concern; and

"(ii) an average net income for the 2–year period preceding the date on which assistance is provided under this Act to that business concern, of not more than $2,000,000, after Federal income taxes (excluding any carryover losses); or

"(B) satisfies the standard industrial classification size standards established by the Administration for the industry in which the small business concern is primarily engaged;

"(13) the term 'qualified nonprivate funds' means any—

"(A) funds directly or indirectly invested in any applicant or licensee on or before August 16, 1982, by any Federal agency, other than the Administration, under a provision of law explicitly mandating the inclusion of those funds in the definition of the term 'private capital';

"(B) funds directly or indirectly invested in any applicant or licensee by any Federal agency under a provision of law enacted after September 4, 1992, explicitly mandating the inclusion of those funds in the definition of the term 'private capital'; and

"(C) funds invested in any applicant or licensee by one or more State or local government entities (including any guarantee extended by those entities) in an aggregate amount that does not exceed 33 percent of the private capital of the applicant or licensee;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(14) the terms 'employee welfare benefit plan' and 'pension plan' have the same meanings as in section 3 of the Employee Retirement Income Security Act of 1974, and are intended to include—

"(A) public and private pension or retirement plans subject to such Act; and

"(B) similar plans not covered by such Act that have been established and that are maintained by the Federal Government or any State or political subdivision, or any agency or instrumentality thereof, for the benefit of employees;

"(15) the term 'member' means, with respect to a licensee that is a limited liability company, a holder of an ownership interest or a person otherwise admitted to membership in the limited liability company; and

"(16) the term 'limited liability company' means a business entity that is organized and operating in accordance with a State limited liability company statute approved by the Administration.".

(b) ORGANIZATION OF SMALL BUSINESS INVESTMENT COMPANIES.—

<< 15 USCA § 681 >>

(1) LIMITED LIABILITY COMPANIES.—Section 301(a) (15 U.S.C. 681(a)) is amended in the first sentence, by striking "body or" and inserting "body, a limited liability company, or".

(2) ISSUANCE OF LICENSE.—Section 301(c) (15 U.S.C. 681(c)) is amended to read as follows:

"(c) ISSUANCE OF LICENSE.—

"(1) SUBMISSION OF APPLICATION.—Each applicant for a license to operate as a small business investment company under this Act shall submit to the Administrator an application, in a form and including such documentation as may be prescribed by the Administrator.

"(2) PROCEDURES.—

"(A) STATUS.—Not later than 90 days after the initial receipt by the Administrator of an application under this subsection, the Administrator shall provide the applicant with a written report detailing the status of the application and any requirements remaining for completion of the application.

"(B) APPROVAL OR DISAPPROVAL.—Within a reasonable time after receiving a completed application submitted in accordance with this subsection and in accordance with such requirements as the Administrator may prescribe by regulation, the Administrator shall—

"(i) approve the application and issue a license for such operation to the applicant if the requirements of this section are satisfied; or

"(ii) disapprove the application and notify the applicant in writing of the disapproval.

"(3) MATTERS CONSIDERED.—In reviewing and processing any application under this subsection, the Administrator—

"(A) shall determine whether—

"(i) the applicant meets the requirements of subsections (a) and (c) of section 302; and

"(ii) the management of the applicant is qualified and has the knowledge, experience, and capability necessary to comply with this Act;

"(B) shall take into consideration—

"(i) the need for and availability of financing for small business concerns in the geographic area in which the applicant is to commence business;

"(ii) the general business reputation of the owners and management of the applicant; and

"(iii) the probability of successful operations of the applicant, including adequate profitability and financial soundness; and

"(C) shall not take into consideration any projected shortage or unavailability of leverage.

"(4) EXCEPTION.—

"(A) IN GENERAL.—Notwithstanding any other provision of this Act, the Administrator may, in the discretion of the Administrator and based on a showing of special circumstances and good cause, approve an application and issue a license under this subsection with respect to any applicant that—

"(i) has private capital of not less than $3,000,000;

"(ii) would otherwise be issued a license under this subsection, except that the applicant does not satisfy the requirements of section 302(a); and

"(iii) has a viable business plan reasonably projecting profitable operations and a reasonable timetable for achieving a level of private capital that satisfies the requirements of section 302(a).

AR.01824

"(B) LEVERAGE.—An applicant licensed pursuant to the exception provided in this paragraph shall not be eligible to receive leverage as a licensee until the applicant satisfies the requirements of section 302(a).".

(3) SPECIALIZED SMALL BUSINESS INVESTMENT COMPANIES.—

(A) REPEAL.—Section 301(d) (15 U.S.C. 681(d)) is repealed.

<< 15 USCA § 681 NOTE >>

(B) EFFECT ON EXISTING LICENSES.—The repeal under subparagraph (A) shall not be construed to require the Administrator to cancel, revoke, withdraw, or modify any license issued under section 301(d) of the Small Business Investment Act of 1958 before the date of enactment of this Act.

<< 15 USCA § 682 >>

(c) CAPITAL REQUIREMENTS.—

(1) INCREASED MINIMUM CAPITAL REQUIREMENTS.—Section 302(a) (15 U.S.C. 682(a)) is amended by striking "(a)" and all that follows through "The Administration shall also determine the ability of the company," and inserting the following:

"(a) AMOUNT.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the private capital of each licensee shall be not less than—

"(A) $5,000,000, or

"(B) $10,000,000, with respect to each licensee authorized or seeking authority to issue participating securities to be purchased or guaranteed by the Administration under this Act.

"(2) EXCEPTION.—The Administrator may, in the discretion of the Administrator and based on a showing of special circumstances and good cause, permit the private capital of a licensee authorized or seeking authorization to issue participating securities to be purchased or guaranteed by the Administration to be less than $10,000,000, but not less than $5,000,000, if the Administrator determines that such action would not create or otherwise contribute to an unreasonable risk of default or loss to the Federal Government.

"(3) ADEQUACY.—In addition to the requirements of paragraph (1), the Administrator shall—

"(A) determine whether the private capital of each licensee is adequate to assure a reasonable prospect that the licensee will be operated soundly and profitably, and managed actively and prudently in accordance with its articles; and

"(B) determine that the licensee will be able".

(2) EXEMPTION FOR CERTAIN LICENSEES.—Section 302(a) (15 U.S.C. 682(a)) is amended by adding at the end the following new paragraph:

"(4) EXEMPTION FROM CAPITAL REQUIREMENTS.—The Administrator may, in the discretion of the Administrator, approve leverage for any licensee licensed under subsection (c) or (d) of section 301 before the date of enactment of the Small Business Program Improvement Act of 1996 that does not meet the capital requirements of paragraph (1), if—

"(A) the licensee certifies in writing that not less than 50 percent of the aggregate dollar amount of its financings after the date of enactment of the Small Business Program Improvement Act of 1996 will be provided to smaller enterprises; and

"(B) the Administrator determines that such action would not create or otherwise contribute to an unreasonable risk of default or loss to the United States Government.".

(3) DIVERSIFICATION OF OWNERSHIP.—Section 302(c) (15 U.S.C. 682(c)) is amended to read as follows:

"(c) DIVERSIFICATION OF OWNERSHIP.—The Administrator shall ensure that the management of each licensee licensed after the date of enactment of the Small Business Program Improvement Act of 1996 is sufficiently diversified from and unaffiliated with the ownership of the licensee in a manner that ensures independence and objectivity in the financial management and oversight of the investments and operations of the licensee.".

(d) BORROWING.—

<< 15 USCA § 683 >>

(1) DEBENTURES.—Section 303(b) (15 U.S.C. 683(b)) is amended in the first sentence, by striking "(but only" and all that follows through "terms)".

(2) THIRD PARTY DEBT.—Section 303(c) (15 U.S.C. 683(c)) is amended to read as follows:

"(c) THIRD PARTY DEBT.—The Administrator—

"(1) shall not permit a licensee having outstanding leverage to incur third party debt that would create or contribute to an unreasonable risk of default or loss to the Federal Government; and

"(2) shall permit such licensees to incur third party debt only on such terms and subject to such conditions as may be established by the Administrator, by regulation or otherwise.".

(3) REQUIREMENT TO FINANCE SMALLER ENTERPRISES.—Section 303(d) (15 U.S.C. 683(d)) is amended to read as follows:

"(d) REQUIREMENT TO FINANCE SMALLER ENTERPRISES.—The Administrator shall require each licensee, as a condition of approval of an application for leverage, to certify in writing that not less than 20 percent of the aggregate dollar amount of the financings of the licensee will be provided to smaller enterprises.".

(4) CAPITAL IMPAIRMENT REQUIREMENTS.—

(A) IN GENERAL.—Section 303(e) (15 U.S.C. 683(e)) is amended to read as follows:

"(e) CAPITAL IMPAIRMENT.—Before approving any application for leverage submitted by a licensee under this Act, the Administrator—

"(1) shall determine that the private capital of the licensee meets the requirements of section 302(a); and

"(2) shall determine, taking into account the nature of the assets of the licensee, the amount and terms of any third party debt owed by such licensee, and any other factors determined to be relevant by the Administrator, that the private capital of the licensee has not been impaired to such an extent that the issuance of additional leverage would create or otherwise contribute to an unreasonable risk of default or loss to the Federal Government.".

<< 15 USCA § 683 NOTE >>

(B) REGULATIONS.—

(i) UNIFORM APPLICABILITY.—Any regulation issued by the Administration to implement section 303(e) of the Small Business Investment Act of 1958 that applies to any licensee with outstanding leverage obtained before the effective date of that regulation, shall apply uniformly to all licensees with outstanding leverage obtained before that effective date.

(ii) DEFINITIONS.—For purposes of this subparagraph, the terms "Administration", "leverage" and "licensee" have the same meanings as in section 103 of the Small Business Investment Act of 1958.

<< 15 USCA § 683 >>

(5) EQUITY INVESTMENT REQUIREMENT.—Section 303(g)(4) (15 U.S.C. 683(g)(4)) is amended by striking "and maintain".

(6) FEES.—Section 303 (15 U.S.C. 683) is amended—

(A) in subsection (b), in the fifth sentence, by striking "1 per centum", and all that follows before the period at the end of the sentence and inserting the following: "1 percent, plus an additional charge of 1 percent per annum which shall be paid to and retained by the Administration";

(B) in subsection (g)(2), by striking "1 per centum," and all that follows before the period at the end of the paragraph and inserting the following: "1 percent, plus an additional charge of 1 percent per annum which shall be paid to and retained by the Administration"; and

(C) by adding at the end the following new subsections:

"(i) LEVERAGE FEE.—With respect to leverage granted by the Administration to a licensee, the Administration shall collect from the licensee a nonrefundable fee in an amount equal to 3 percent of the face amount of leverage granted to the licensee, payable upon the earlier of the date of entry into any commitment for such leverage or the date on which the leverage is drawn by the licensee.

"(j) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this section shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures and participating securities under this Act.".

<< 15 USCA § 687 >>

(e) LIABILITY OF THE UNITED STATES.—Section 308(e) (15 U.S.C. 687(e)) is amended by striking "Nothing" and inserting "Except as expressly provided otherwise in this Act, nothing".

<< 15 USCA § 687b >>

(f) EXAMINATIONS; VALUATIONS.—

 (1) EXAMINATIONS.—Section 310(b) (15 U.S.C. 687b(b)) is amended in the first sentence by inserting "which may be conducted with the assistance of a private sector entity that has both the qualifications to conduct and expertise in conducting such examinations," after "Investment Division of the Administration,".

 (2) VALUATIONS.—Section 310(d) (15 U.S.C. 687b(d)) is amended to read as follows:

"(d) VALUATIONS.—

 "(1) FREQUENCY OF VALUATIONS.—

  "(A) IN GENERAL.—Each licensee shall submit to the Administrator a written valuation of the loans and investments of the licensee not less often than semiannually or otherwise upon the request of the Administrator, except that any licensee with no leverage outstanding shall submit such valuations annually, unless the Administrator determines otherwise.

  "(B) MATERIAL ADVERSE CHANGES.—Not later than 30 days after the end of a fiscal quarter of a licensee during which a material adverse change in the aggregate valuation of the loans and investments or operations of the licensee occurs, the licensee shall notify the Administrator in writing of the nature and extent of that change.

  "(C) INDEPENDENT CERTIFICATION.—

   "(i) IN GENERAL.—Not less than once during each fiscal year, each licensee shall submit to the Administrator the financial statements of the licensee, audited by an independent certified public accountant approved by the Administrator.

   "(ii) AUDIT REQUIREMENTS.—Each audit conducted under clause (i) shall include—

    "(I) a review of the procedures and documentation used by the licensee in preparing the valuations required by this section; and

    "(II) a statement by the independent certified public accountant that such valuations were prepared in conformity with the valuation criteria applicable to the licensee established in accordance with paragraph (2).

 "(2) VALUATION CRITERIA.—Each valuation submitted under this subsection shall be prepared by the licensee in accordance with valuation criteria, which shall—

  "(A) be established or approved by the Administrator; and

  "(B) include appropriate safeguards to ensure that the noncash assets of a licensee are not overvalued.".

(g) TRUSTEE OR RECEIVERSHIP OVER LICENSEES.—

 (1) FINDING.—It is the finding of the Congress that increased recoveries on assets in liquidation under the Small Business Investment Act of 1958 are in the best interests of the Federal Government.

 (2) DEFINITIONS.—For purposes of this subsection—

  (A) the term "Administrator" means the Administrator of the Small Business Administration;

  (B) the term "Administration" means the Small Business Administration; and

  (C) the term "licensee" has the same meaning as in section 103.

 (3) LIQUIDATION PLAN.—

  (A) IN GENERAL.—Not later than October 15, 1996, the Administrator shall submit to the Committees on Small Business of the Senate and the House of Representatives a detailed plan to expedite the orderly liquidation of all licensee assets in liquidation, including assets of licensees in receivership or in trust held by or under the control of the Administration or its agents.

  (B) CONTENTS.—The plan submitted under paragraph (1) shall include a timetable for liquidating the liquidation portfolio of small business investment company assets owned by the Administration, and shall contain the findings and recommendations of the Administrator on various options providing for the fair and expeditious liquidation of such assets within a reasonable period of time, giving due consideration to the option of entering into one or more contracts with private sector entities having the capability to carry out the orderly liquidation of similar assets.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(h) TECHNICAL AND CONFORMING AMENDMENTS.—

 (1) SMALL BUSINESS INVESTMENT ACT OF 1958.—The Small Business Investment Act of 1958 (15 U.S.C. 661 et seq.) is amended—

<< 15 USCA § 683 >>

 (A) in section 303—

 (i) in subsection (a), by striking "debenture bonds," and inserting "securities,";

 (ii) by striking subsection (f) and inserting the following:

"(f) REDEMPTION OR REPURCHASE OF PREFERRED STOCK.—Notwithstanding any other provision of law—

 "(1) the Administrator may allow the issuer of any preferred stock sold to the Administration before November 1, 1989 to redeem or repurchase such stock, upon the payment to the Administration of an amount less than the par value of such stock, for a repurchase price determined by the Administrator after consideration of all relevant factors, including—

 "(A) the market value of the stock;

 "(B) the value of benefits provided and anticipated to accrue to the issuer;

 "(C) the amount of dividends paid, accrued, and anticipated; and

 "(D) the estimate of the Administrator of any anticipated redemption; and

 "(2) any moneys received by the Administration from the repurchase of preferred stock shall be available solely to provide debenture leverage to licensees having 50 percent or more in aggregate dollar amount of their financings invested in smaller enterprises."; and

 (iii) in subsection (g)(8)—

 (I) by striking "partners or shareholders" and inserting "partners, shareholders, or members";

 (II) by striking "partner's or shareholder's" and inserting "partner's, shareholder's, or member's"; and

 (III) by striking "partner or shareholder" and inserting "partner, shareholder, or member";

<< 15 USCA § 687 >>

 (B) in section 308(h), by striking "subsection (c) or (d) of section 301" each place that term appears and inserting "section 301";

<< 15 USCA § 687b >>

 (C) in section 310(c)(4), by striking "not less than four years in the case of section 301(d) licensees and in all other cases,";

<< 15 USCA § 687d >>

 (D) in section 312—

(i) by striking "shareholders or partners" and inserting "shareholders, partners, or members"; and

(ii) by striking "shareholder, or partner" each place that term appears and inserting "shareholder, partner, or member";

<< 15 USCA §§ 687i, 687j >>

<< 15 USCA §§ 687k, 687*l*, 687m, 80a–18 >>

 (E) by striking sections 317 and 318, and redesignating sections 319 through 322 as sections 317 through 320, respectively;

<< 15 USCA § 687*l* >>

 (F) in section 319, as redesignated—

(i) in subsection (a), by striking ", including companies operating under the authority of section 301(d),"; and

(ii) in subsection (f)(2), by inserting "or investments in obligations of the United States" after "accounts";

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 1852 of 3864

<< 15 USCA § 687m >>

(G) in section 320, as redesignated, by striking "section 321" and inserting "section 319"; and

<< 15 USCA § 697f >>

(H) in section 509—
(i) in subsection (a)(1), by striking the second sentence; and
(ii) in subsection (e)(1)(B), by striking "subsection (c) or (d) of section 301" and inserting "section 301".

<< 12 USCA § 1431 >>

(2) AMENDMENT IN OTHER LAW.—Section 11(h) of the Federal Home Loan Bank Act (12 U.S.C. 1431(h)) is amended by striking "301(d)" and inserting "301".
(i) AMENDMENTS TO THE SMALL BUSINESS ACT.—

<< 15 USCA § 634 >>

(1) POWERS OF THE ADMINISTRATOR.—Section 5(b)(7) of the Small Business Act (15 U.S.C. 634(b)(7)) is amended by striking the colon and all that follows before the semicolon at the end of the paragraph and inserting the following: ": Provided, That with respect to deferred participation loans, the Administrator may, in the discretion of and pursuant to regulations promulgated by the Administrator, authorize participating lending institutions to take actions relating to loan servicing on behalf of the Administrator, including determining eligibility and creditworthiness and loan monitoring, collection, and liquidation".

<< 15 USCA § 631 NOTE >>

(2) AUTHORIZATION OF APPROPRIATIONS.—Section 20(p)(3) of the Small Business Act (15 U.S.C. 631 note) is amended by striking subparagraph (B) and inserting the following:
"(B) $300,000,000 in guarantees of debentures; and".

<< 15 USCA §§ 80a–18 nt, 631 nt, 634 NOTE, 662 nt, 681 nt, 683 nt, 687 nt, 687b nt, 687c nt, 687d nt, 687i nt, 687j nt, 687k nt, 687*l* nt, 687m nt, 697 nt >>

(j) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on the date of enactment of this Act.

DIVISION E

TITLE I—CALIFORNIA BAY–DELTA ENVIRONMENTAL ENHANCEMENT AND WATER SECURITY ACT
Sec. 101. Short Title.
This title may be cited as the "California Bay–Delta Environmental Enhancement and Water Security Act."
Sec. 102. Program Funding.
(a) Authorization of Appropriations.—For each of the fiscal years 1998, 1999 and 2000, there are authorized to be appropriated an additional $143,300,000 for both (1) the initial Federal share of the cost of developing and implementing that portion of an ecosystem protection plan for the Bay–Delta, referred to as "the Category III program" emanating out of the document entitled "Principles for Agreement on Bay–Delta Standards Between the State of California and the Federal Government," dated December 15, 1994, and, (2) the initial Federal share of the cost of developing and implementing the ecosystem restoration elements of the long-term CALFED Bay–Delta Program, pursuant to the cost-sharing agreement required by Section 78684.10 of California Senate Bill 900, Chapter 135, Statutes of 1996, signed by the Governor of California on July 11, 1996. Funds appropriated pursuant to this section shall remain available until expended and shall be administered in accordance with procedures established by CALFED Bay–Delta Program until Congress authorizes another entity that is recommended by CALFED Bay–Delta Program to carry out this section.

(b) Funds authorized to be appropriated pursuant to this section to those agencies that are currently or subsequently become participants in the CALFED Bay–Delta Program shall be in addition to the baseline funding levels established pursuant to section 103 of this title, for currently authorized projects and programs under the Central Valley Project Improvement Act, Title 34 of Public Law 102–575 and other currently authorized Federal programs for the purpose of Bay–Delta ecosystem protection and restoration.

(c) Nothing in this title shall be deemed to diminish the Federal interest in and responsibility for working with the State of California through the CALFED Bay–Delta Program in developing, funding and implementing a balanced, long-term solution to the problems of ecosystem quality, water quality, water supply and reliability, and system vulnerability affecting the San Francisco Bay/Sacramento–San Joaquin Delta Watershed in California. Participation in such long-term solution shall only be undertaken pursuant to authorization provided by law other than this title, and shall be based on the equitable allocation of program costs among beneficiary groups that the CALFED Bay–Delta programs shall develop.

(d) To the extent not otherwise authorized, those agencies and departments that are currently or subsequently become participants in the CALFED Bay–Delta Program are hereby authorized to undertake the activities and programs for which Federal cost sharing is provided by this section. The United States shall immediately initiate coordinated consultations and negotiations with the State of California to expeditiously execute the cost-sharing agreement required by Section 78684.10 of California Senate Bill 900, Chapter 135, Statutes of 1996, signed by the Governor of California on July 11, 1996. Such activities shall include, but not be limited to, planning, design, technical assistance and construction for ecosystem restoration programs and projects.

SEC. 103. BUDGET CROSSCUT.—The Office of Management and Budget is directed to submit to the House and Senate Committees on Appropriations, as part of the President's Fiscal Year 1998 Budget, an interagency budget crosscut that displays Federal spending for fiscal years 1993 through 1998 on ecosystem restoration and other purposes in the Bay–Delta region, separately showing funding provided previously or requested under both preexisting authorities and new authorities granted by this title.

SEC. 104. EFFECTIVE DATE.—Section 102 of this title shall take effect on the date of passage of California State Proposition 204.

This Act may be cited as the "Omnibus Consolidated Appropriations Act, 1997".

Approved September 30, 1996.

PL 104–208, 1996 HR 3610

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 104–13, May 22, 1995, 109 Stat 163

UNITED STATES PUBLIC LAWS

104th Congress - First Session

Convening January 4, 1995

Additions and Deletions are not identified in this document.
8848

PL 104–13 (S 244)

May 22, 1995

PAPERWORK REDUCTION ACT OF 1995

An Act to further the goals of the Paperwork Reduction Act to have Federal agencies become more responsible and publicly accountable for reducing the burden of Federal paperwork on the public, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 44 USCA § 101 Note >>

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Paperwork Reduction Act of 1995".

## SEC. 2. COORDINATION OF FEDERAL INFORMATION POLICY.

Chapter 35 of title 44, United States Code, is amended to read as follows:

<< 44 USCA Ch. 35 >>

"CHAPTER 35—COORDINATION OF FEDERAL INFORMATION POLICY

"Sec.
"3501. Purposes.
"3502. Definitions.
"3503. Office of Information and Regulatory Affairs.
"3504. Authority and functions of Director.
"3505. Assignment of tasks and deadlines.
"3506. Federal agency responsibilities.
"3507. Public information collection activities; submission to Director; approval and delegation.
"3508. Determination of necessity for information; hearing.
"3509. Designation of central collection agency.
"3510. Cooperation of agencies in making information available.
"3511. Establishment and operation of Government Information Locator Service.
"3512. Public protection.
"3513. Director review of agency activities; reporting; agency response.
"3514. Responsiveness to Congress.
"3515. Administrative powers.
"3516. Rules and regulations.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"3517. Consultation with other agencies and the public.

"3518. Effect on existing laws and regulations.

"3519. Access to information.

"3520. Authorization of appropriations.

<< 44 USCA § 3501 >>

## "§ 3501. Purposes

"The purposes of this chapter are to—

  "(1) minimize the paperwork burden for individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government;

  "(2) ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government;

  "(3) coordinate, integrate, and to the extent practicable and appropriate, make uniform Federal information resources management policies and practices as a means to improve the productivity, efficiency, and effectiveness of Government programs, including the reduction of information collection burdens on the public and the improvement of service delivery to the public;

  "(4) improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society;

  "(5) minimize the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information;

  "(6) strengthen the partnership between the Federal Government and State, local, and tribal governments by minimizing the burden and maximizing the utility of information created, collected, maintained, used, disseminated, and retained by or for the Federal Government;

  "(7) provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology;

  "(8) ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to—

    "(A) privacy and confidentiality, including section 552a of title 5;

    "(B) security of information, including the Computer Security Act of 1987 (Public Law 100–235); and

    "(C) access to information, including section 552 of title 5;

  "(9) ensure the integrity, quality, and utility of the Federal statistical system;

  "(10) ensure that information technology is acquired, used, and managed to improve performance of agency missions, including the reduction of information collection burdens on the public; and

  "(11) improve the responsibility and accountability of the Office of Management and Budget and all other Federal agencies to Congress and to the public for implementing the information collection review process, information resources management, and related policies and guidelines established under this chapter.

<< 44 USCA § 3502 >>

## "§ 3502. Definitions

"As used in this chapter—

  "(1) the term 'agency' means any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency, but does not include—

    "(A) the General Accounting Office;

    "(B) Federal Election Commission;

"(C) the governments of the District of Columbia and of the territories and possessions of the United States, and their various subdivisions; or

"(D) Government-owned contractor-operated facilities, including laboratories engaged in national defense research and production activities;

"(2) the term 'burden' means time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency, including the resources expended for—

"(A) reviewing instructions;

"(B) acquiring, installing, and utilizing technology and systems;

"(C) adjusting the existing ways to comply with any previously applicable instructions and requirements;

"(D) searching data sources;

"(E) completing and reviewing the collection of information; and

"(F) transmitting, or otherwise disclosing the information;

"(3) the term 'collection of information'—

"(A) means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either—

"(i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or

"(ii) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes; and

"(B) shall not include a collection of information described under section 3518(c)(1);

"(4) the term 'Director' means the Director of the Office of Management and Budget;

"(5) the term 'independent regulatory agency' means the Board of Governors of the Federal Reserve System, the Commodity Futures Trading Commission, the Consumer Product Safety Commission, the Federal Communications Commission, the Federal Deposit Insurance Corporation, the Federal Energy Regulatory Commission, the Federal Housing Finance Board, the Federal Maritime Commission, the Federal Trade Commission, the Interstate Commerce Commission, the Mine Enforcement Safety and Health Review Commission, the National Labor Relations Board, the Nuclear Regulatory Commission, the Occupational Safety and Health Review Commission, the Postal Rate Commission, the Securities and Exchange Commission, and any other similar agency designated by statute as a Federal independent regulatory agency or commission;

"(6) the term 'information resources' means information and related resources, such as personnel, equipment, funds, and information technology;

"(7) the term 'information resources management' means the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public;

"(8) the term 'information system' means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information;

"(9) the term 'information technology' has the same meaning as the term 'automatic data processing equipment' as defined by section 111(a)(2) and (3)(C)(i) through (v) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(a)(2) and (3)(C)(i) through (v));

"(10) the term 'person' means an individual, partnership, association, corporation, business trust, or legal representative, an organized group of individuals, a State, territorial, tribal, or local government or branch thereof, or a political subdivision of a State, territory, tribal, or local government or a branch of a political subdivision;

"(11) the term 'practical utility' means the ability of an agency to use information, particularly the capability to process such information in a timely and useful fashion;

"(12) the term 'public information' means any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public;

"(13) the term 'recordkeeping requirement' means a requirement imposed by or for an agency on persons to maintain specified records, including a requirement to—

"(A) retain such records;

"(B) notify third parties, the Federal Government, or the public of the existence of such records;

"(C) disclose such records to third parties, the Federal Government, or the public; or

"(D) report to third parties, the Federal Government, or the public regarding such records; and

"(14) the term 'penalty' includes the imposition by an agency or court of a fine or other punishment; a judgment for monetary damages or equitable relief; or the revocation, suspension, reduction, or denial of a license, privilege, right, grant, or benefit.

<< 44 USCA § 3503 >>

"§ 3503. Office of Information and Regulatory Affairs

"(a) There is established in the Office of Management and Budget an office to be known as the Office of Information and Regulatory Affairs.

"(b) There shall be at the head of the Office an Administrator who shall be appointed by the President, by and with the advice and consent of the Senate. The Director shall delegate to the Administrator the authority to administer all functions under this chapter, except that any such delegation shall not relieve the Director of responsibility for the administration of such functions. The Administrator shall serve as principal adviser to the Director on Federal information resources management policy.

<< 44 USCA § 3504 >>

"§ 3504. Authority and functions of Director

"(a)(1) The Director shall oversee the use of information resources to improve the efficiency and effectiveness of governmental operations to serve agency missions, including burden reduction and service delivery to the public. In performing such oversight, the Director shall—

"(A) develop, coordinate and oversee the implementation of Federal information resources management policies, principles, standards, and guidelines; and

"(B) provide direction and oversee—

"(i) the review and approval of the collection of information and the reduction of the information collection burden;

"(ii) agency dissemination of and public access to information;

"(iii) statistical activities;

"(iv) records management activities;

"(v) privacy, confidentiality, security, disclosure, and sharing of information; and

"(vi) the acquisition and use of information technology.

"(2) The authority of the Director under this chapter shall be exercised consistent with applicable law.

"(b) With respect to general information resources management policy, the Director shall—

"(1) develop and oversee the implementation of uniform information resources management policies, principles, standards, and guidelines;

"(2) foster greater sharing, dissemination, and access to public information, including through—

"(A) the use of the Government Information Locator Service; and

"(B) the development and utilization of common standards for information collection, storage, processing and communication, including standards for security, interconnectivity and interoperability;

"(3) initiate and review proposals for changes in legislation, regulations, and agency procedures to improve information resources management practices;

"(4) oversee the development and implementation of best practices in information resources management, including training; and

"(5) oversee agency integration of program and management functions with information resources management functions.

"(c) With respect to the collection of information and the control of paperwork, the Director shall—

"(1) review and approve proposed agency collections of information;

"(2) coordinate the review of the collection of information associated with Federal procurement and acquisition by the Office of Information and Regulatory Affairs with the Office of Federal Procurement Policy, with particular emphasis on applying information technology to improve the efficiency and effectiveness of Federal procurement, acquisition and payment, and to reduce information collection burdens on the public;

"(3) minimize the Federal information collection burden, with particular emphasis on those individuals and entities most adversely affected;

"(4) maximize the practical utility of and public benefit from information collected by or for the Federal Government; and

"(5) establish and oversee standards and guidelines by which agencies are to estimate the burden to comply with a proposed collection of information.

"(d) With respect to information dissemination, the Director shall develop and oversee the implementation of policies, principles, standards, and guidelines to—

"(1) apply to Federal agency dissemination of public information, regardless of the form or format in which such information is disseminated; and

"(2) promote public access to public information and fulfill the purposes of this chapter, including through the effective use of information technology.

"(e) With respect to statistical policy and coordination, the Director shall—

"(1) coordinate the activities of the Federal statistical system to ensure—

"(A) the efficiency and effectiveness of the system; and

"(B) the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes;

"(2) ensure that budget proposals of agencies are consistent with system-wide priorities for maintaining and improving the quality of Federal statistics and prepare an annual report on statistical program funding;

"(3) develop and oversee the implementation of Governmentwide policies, principles, standards, and guidelines concerning—

"(A) statistical collection procedures and methods;

"(B) statistical data classification;

"(C) statistical information presentation and dissemination;

"(D) timely release of statistical data; and

"(E) such statistical data sources as may be required for the administration of Federal programs;

"(4) evaluate statistical program performance and agency compliance with Governmentwide policies, principles, standards and guidelines;

"(5) promote the sharing of information collected for statistical purposes consistent with privacy rights and confidentiality pledges;

"(6) coordinate the participation of the United States in international statistical activities, including the development of comparable statistics;

"(7) appoint a chief statistician who is a trained and experienced professional statistician to carry out the functions described under this subsection;

"(8) establish an Interagency Council on Statistical Policy to advise and assist the Director in carrying out the functions under this subsection that shall—

"(A) be headed by the chief statistician; and

"(B) consist of—

"(i) the heads of the major statistical programs; and

"(ii) representatives of other statistical agencies under rotating membership; and

"(9) provide opportunities for training in statistical policy functions to employees of the Federal Government under which—

"(A) each trainee shall be selected at the discretion of the Director based on agency requests and shall serve under the chief statistician for at least 6 months and not more than 1 year; and

"(B) all costs of the training shall be paid by the agency requesting training.

"(f) With respect to records management, the Director shall—

"(1) provide advice and assistance to the Archivist of the United States and the Administrator of General Services to promote coordination in the administration of chapters 29, 31, and 33 of this title with the information resources management policies, principles, standards, and guidelines established under this chapter;

"(2) review compliance by agencies with—

"(A) the requirements of chapters 29, 31, and 33 of this title; and

"(B) regulations promulgated by the Archivist of the United States and the Administrator of General Services; and

"(3) oversee the application of records management policies, principles, standards, and guidelines, including requirements for archiving information maintained in electronic format, in the planning and design of information systems.

"(g) With respect to privacy and security, the Director shall—

"(1) develop and oversee the implementation of policies, principles, standards, and guidelines on privacy, confidentiality, security, disclosure and sharing of information collected or maintained by or for agencies;

"(2) oversee and coordinate compliance with sections 552 and 552a of title 5, the Computer Security Act of 1987 (40 U.S.C. 759 note), and related information management laws; and

"(3) require Federal agencies, consistent with the Computer Security Act of 1987 (40 U.S.C. 759 note), to identify and afford security protections commensurate with the risk and magnitude of the harm resulting from the loss, misuse, or unauthorized access to or modification of information collected or maintained by or on behalf of an agency.

"(h) With respect to Federal information technology, the Director shall—

"(1) in consultation with the Director of the National Institute of Standards and Technology and the Administrator of General Services—

"(A) develop and oversee the implementation of policies, principles, standards, and guidelines for information technology functions and activities of the Federal Government, including periodic evaluations of major information systems; and

"(B) oversee the development and implementation of standards under section 111(d) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(d));

"(2) monitor the effectiveness of, and compliance with, directives issued under sections 110 and 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 757 and 759);

"(3) coordinate the development and review by the Office of Information and Regulatory Affairs of policy associated with Federal procurement and acquisition of information technology with the Office of Federal Procurement Policy;

"(4) ensure, through the review of agency budget proposals, information resources management plans and other means—

"(A) agency integration of information resources management plans, program plans and budgets for acquisition and use of information technology; and

"(B) the efficiency and effectiveness of inter-agency information technology initiatives to improve agency performance and the accomplishment of agency missions; and

"(5) promote the use of information technology by the Federal Government to improve the productivity, efficiency, and effectiveness of Federal programs, including through dissemination of public information and the reduction of information collection burdens on the public.

<< 44 USCA § 3505 >>

"§ 3505. Assignment of tasks and deadlines

"(a) In carrying out the functions under this chapter, the Director shall—

"(1) in consultation with agency heads, set an annual Governmentwide goal for the reduction of information collection burdens by at least 10 percent during each of fiscal years 1996 and 1997 and 5 percent during each of fiscal years 1998, 1999, 2000, and 2001, and set annual agency goals to—

"(A) reduce information collection burdens imposed on the public that—

"(i) represent the maximum practicable opportunity in each agency; and

"(ii) are consistent with improving agency management of the process for the review of collections of information established under section 3506(c); and

"(B) improve information resources management in ways that increase the productivity, efficiency and effectiveness of Federal programs, including service delivery to the public;

"(2) with selected agencies and non-Federal entities on a voluntary basis, conduct pilot projects to test alternative policies, practices, regulations, and procedures to fulfill the purposes of this chapter, particularly with regard to minimizing the Federal information collection burden; and

"(3) in consultation with the Administrator of General Services, the Director of the National Institute of Standards and Technology, the Archivist of the United States, and the Director of the Office of Personnel Management, develop and maintain a Governmentwide strategic plan for information resources management, that shall include—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) a description of the objectives and the means by which the Federal Government shall apply information resources to improve agency and program performance;

"(B) plans for—

"(i) reducing information burdens on the public, including reducing such burdens through the elimination of duplication and meeting shared data needs with shared resources;

"(ii) enhancing public access to and dissemination of, information, using electronic and other formats; and

"(iii) meeting the information technology needs of the Federal Government in accordance with the purposes of this chapter; and

"(C) a description of progress in applying information resources management to improve agency performance and the accomplishment of missions.

"(b) For purposes of any pilot project conducted under subsection (a)(2), the Director may, after consultation with the agency head, waive the application of any administrative directive issued by an agency with which the project is conducted, including any directive requiring a collection of information, after giving timely notice to the public and the Congress regarding the need for such waiver.

<< 44 USCA § 3506 >>

"§ 3506. Federal agency responsibilities

"(a)(1) The head of each agency shall be responsible for—

"(A) carrying out the agency's information resources management activities to improve agency productivity, efficiency, and effectiveness; and

"(B) complying with the requirements of this chapter and related policies established by the Director.

"(2)(A) Except as provided under subparagraph (B), the head of each agency shall designate a senior official who shall report directly to such agency head to carry out the responsibilities of the agency under this chapter.

"(B) The Secretary of the Department of Defense and the Secretary of each military department may each designate senior officials who shall report directly to such Secretary to carry out the responsibilities of the department under this chapter. If more than one official is designated, the respective duties of the officials shall be clearly delineated.

"(3) The senior official designated under paragraph (2) shall head an office responsible for ensuring agency compliance with and prompt, efficient, and effective implementation of the information policies and information resources management responsibilities established under this chapter, including the reduction of information collection burdens on the public. The senior official and employees of such office shall be selected with special attention to the professional qualifications required to administer the functions described under this chapter.

"(4) Each agency program official shall be responsible and accountable for information resources assigned to and supporting the programs under such official. In consultation with the senior official designated under paragraph (2) and the agency Chief Financial Officer (or comparable official), each agency program official shall define program information needs and develop strategies, systems, and capabilities to meet those needs.

"(b) With respect to general information resources management, each agency shall—

"(1) manage information resources to—

"(A) reduce information collection burdens on the public;

"(B) increase program efficiency and effectiveness; and

"(C) improve the integrity, quality, and utility of information to all users within and outside the agency, including capabilities for ensuring dissemination of public information, public access to government information, and protections for privacy and security;

"(2) in accordance with guidance by the Director, develop and maintain a strategic information resources management plan that shall describe how information resources management activities help accomplish agency missions;

"(3) develop and maintain an ongoing process to—

"(A) ensure that information resources management operations and decisions are integrated with organizational planning, budget, financial management, human resources management, and program decisions;

"(B) in cooperation with the agency Chief Financial Officer (or comparable official), develop a full and accurate accounting of information technology expenditures, related expenses, and results; and

"(C) establish goals for improving information resources management's contribution to program productivity, efficiency, and effectiveness, methods for measuring progress towards those goals, and clear roles and responsibilities for achieving those goals;

"(4) in consultation with the Director, the Administrator of General Services, and the Archivist of the United States, maintain a current and complete inventory of the agency's information resources, including directories necessary to fulfill the requirements of section 3511 of this chapter; and

"(5) in consultation with the Director and the Director of the Office of Personnel Management, conduct formal training programs to educate agency program and management officials about information resources management.

"(c) With respect to the collection of information and the control of paperwork, each agency shall—

"(1) establish a process within the office headed by the official designated under subsection (a), that is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved under this chapter, to—

"(A) review each collection of information before submission to the Director for review under this chapter, including—

"(i) an evaluation of the need for the collection of information;

"(ii) a functional description of the information to be collected;

"(iii) a plan for the collection of the information;

"(iv) a specific, objectively supported estimate of burden;

"(v) a test of the collection of information through a pilot program, if appropriate; and

"(vi) a plan for the efficient and effective management and use of the information to be collected, including necessary resources;

"(B) ensure that each information collection—

"(i) is inventoried, displays a control number and, if appropriate, an expiration date;

"(ii) indicates the collection is in accordance with the clearance requirements of section 3507; and

"(iii) informs the person receiving the collection of information of—

"(I) the reasons the information is being collected;

"(II) the way such information is to be used;

"(III) an estimate, to the extent practicable, of the burden of the collection;

"(IV) whether responses to the collection of information are voluntary, required to obtain a benefit, or mandatory; and

"(V) the fact that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number; and

"(C) assess the information collection burden of proposed legislation affecting the agency;

"(2)(A) except as provided under subparagraph (B) or section 3507(j), provide 60–day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to—

"(i) evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility;

"(ii) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information;

"(iii) enhance the quality, utility, and clarity of the information to be collected; and

"(iv) minimize the burden of the collection of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology; and

"(B) for any proposed collection of information contained in a proposed rule (to be reviewed by the Director under section 3507(d)), provide notice and comment through the notice of proposed rulemaking for the proposed rule and such notice shall have the same purposes specified under subparagraph (A)(i) through (iv); and

"(3) certify (and provide a record supporting such certification, including public comments received by the agency) that each collection of information submitted to the Director for review under section 3507—

"(A) is necessary for the proper performance of the functions of the agency, including that the information has practical utility;

AR.01838

"(B) is not unnecessarily duplicative of information otherwise reasonably accessible to the agency;

"(C) reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, including with respect to small entities, as defined under section 601(6) of title 5, the use of such techniques as—

  "(i) establishing differing compliance or reporting requirements or timetables that take into account the resources available to those who are to respond;

  "(ii) the clarification, consolidation, or simplification of compliance and reporting requirements; or

  "(iii) an exemption from coverage of the collection of information, or any part thereof;

"(D) is written using plain, coherent, and unambiguous terminology and is understandable to those who are to respond;

"(E) is to be implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of those who are to respond;

"(F) indicates for each recordkeeping requirement the length of time persons are required to maintain the records specified;

"(G) contains the statement required under paragraph (1)(B)(iii);

"(H) has been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public;

"(I) uses effective and efficient statistical survey methodology appropriate to the purpose for which the information is to be collected; and

"(J) to the maximum extent practicable, uses information technology to reduce burden and improve data quality, agency efficiency and responsiveness to the public.

"(d) With respect to information dissemination, each agency shall—

"(1) ensure that the public has timely and equitable access to the agency's public information, including ensuring such access through—

  "(A) encouraging a diversity of public and private sources for information based on government public information;

  "(B) in cases in which the agency provides public information maintained in electronic format, providing timely and equitable access to the underlying data (in whole or in part); and

  "(C) agency dissemination of public information in an efficient, effective, and economical manner;

"(2) regularly solicit and consider public input on the agency's information dissemination activities;

"(3) provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products; and

"(4) not, except where specifically authorized by statute—

  "(A) establish an exclusive, restricted, or other distribution arrangement that interferes with timely and equitable availability of public information to the public;

  "(B) restrict or regulate the use, resale, or redissemination of public information by the public;

  "(C) charge fees or royalties for resale or redissemination of public information; or

  "(D) establish user fees for public information that exceed the cost of dissemination.

"(e) With respect to statistical policy and coordination, each agency shall—

"(1) ensure the relevance, accuracy, timeliness, integrity, and objectivity of information collected or created for statistical purposes;

"(2) inform respondents fully and accurately about the sponsors, purposes, and uses of statistical surveys and studies;

"(3) protect respondents' privacy and ensure that disclosure policies fully honor pledges of confidentiality;

"(4) observe Federal standards and practices for data collection, analysis, documentation, sharing, and dissemination of information;

"(5) ensure the timely publication of the results of statistical surveys and studies, including information about the quality and limitations of the surveys and studies; and

"(6) make data available to statistical agencies and readily accessible to the public.

"(f) With respect to records management, each agency shall implement and enforce applicable policies and procedures, including requirements for archiving information maintained in electronic format, particularly in the planning, design and operation of information systems.

"(g) With respect to privacy and security, each agency shall—

"(1) implement and enforce applicable policies, procedures, standards, and guidelines on privacy, confidentiality, security, disclosure and sharing of information collected or maintained by or for the agency;

"(2) assume responsibility and accountability for compliance with and coordinated management of sections 552 and 552a of title 5, the Computer Security Act of 1987 (40 U.S.C. 759 note), and related information management laws; and

"(3) consistent with the Computer Security Act of 1987 (40 U.S.C. 759 note), identify and afford security protections commensurate with the risk and magnitude of the harm resulting from the loss, misuse, or unauthorized access to or modification of information collected or maintained by or on behalf of an agency.

"(h) With respect to Federal information technology, each agency shall—

"(1) implement and enforce applicable Governmentwide and agency information technology management policies, principles, standards, and guidelines;

"(2) assume responsibility and accountability for information technology investments;

"(3) promote the use of information technology by the agency to improve the productivity, efficiency, and effectiveness of agency programs, including the reduction of information collection burdens on the public and improved dissemination of public information;

"(4) propose changes in legislation, regulations, and agency procedures to improve information technology practices, including changes that improve the ability of the agency to use technology to reduce burden; and

"(5) assume responsibility for maximizing the value and assessing and managing the risks of major information systems initiatives through a process that is—

"(A) integrated with budget, financial, and program management decisions; and

"(B) used to select, control, and evaluate the results of major information systems initiatives.

<< 44 USCA § 3507 >>

"§ 3507. Public information collection activities; submission to Director; approval and delegation

"(a) An agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information—

"(1) the agency has—

"(A) conducted the review established under section 3506(c)(1);

"(B) evaluated the public comments received under section 3506(c)(2);

"(C) submitted to the Director the certification required under section 3506(c)(3), the proposed collection of information, copies of pertinent statutory authority, regulations, and other related materials as the Director may specify; and

"(D) published a notice in the Federal Register—

"(i) stating that the agency has made such submission; and

"(ii) setting forth—

"(I) a title for the collection of information;

"(II) a summary of the collection of information;

"(III) a brief description of the need for the information and the proposed use of the information;

"(IV) a description of the likely respondents and proposed frequency of response to the collection of information;

"(V) an estimate of the burden that shall result from the collection of information; and

"(VI) notice that comments may be submitted to the agency and Director;

"(2) the Director has approved the proposed collection of information or approval has been inferred, under the provisions of this section; and

"(3) the agency has obtained from the Director a control number to be displayed upon the collection of information.

"(b) The Director shall provide at least 30 days for public comment prior to making a decision under subsection (c), (d), or (h), except as provided under subsection (j).

"(c)(1) For any proposed collection of information not contained in a proposed rule, the Director shall notify the agency involved of the decision to approve or disapprove the proposed collection of information.

"(2) The Director shall provide the notification under paragraph (1), within 60 days after receipt or publication of the notice under subsection (a)(1)(D), whichever is later.

"(3) If the Director does not notify the agency of a denial or approval within the 60–day period described under paragraph (2)—

"(A) the approval may be inferred;

"(B) a control number shall be assigned without further delay; and

"(C) the agency may collect the information for not more than 1 year.

"(d)(1) For any proposed collection of information contained in a proposed rule—

"(A) as soon as practicable, but no later than the date of publication of a notice of proposed rulemaking in the Federal Register, each agency shall forward to the Director a copy of any proposed rule which contains a collection of information and any information requested by the Director necessary to make the determination required under this subsection; and

"(B) within 60 days after the notice of proposed rulemaking is published in the Federal Register, the Director may file public comments pursuant to the standards set forth in section 3508 on the collection of information contained in the proposed rule;

"(2) When a final rule is published in the Federal Register, the agency shall explain—

"(A) how any collection of information contained in the final rule responds to the comments, if any, filed by the Director or the public; or

"(B) the reasons such comments were rejected.

"(3) If the Director has received notice and failed to comment on an agency rule within 60 days after the notice of proposed rulemaking, the Director may not disapprove any collection of information specifically contained in an agency rule.

"(4) No provision in this section shall be construed to prevent the Director, in the Director's discretion—

"(A) from disapproving any collection of information which was not specifically required by an agency rule;

"(B) from disapproving any collection of information contained in an agency rule, if the agency failed to comply with the requirements of paragraph (1) of this subsection;

"(C) from disapproving any collection of information contained in a final agency rule, if the Director finds within 60 days after the publication of the final rule that the agency's response to the Director's comments filed under paragraph (2) of this subsection was unreasonable; or

"(D) from disapproving any collection of information contained in a final rule, if—

"(i) the Director determines that the agency has substantially modified in the final rule the collection of information contained in the proposed rule; and

"(ii) the agency has not given the Director the information required under paragraph (1) with respect to the modified collection of information, at least 60 days before the issuance of the final rule.

"(5) This subsection shall apply only when an agency publishes a notice of proposed rulemaking and requests public comments.

"(6) The decision by the Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review.

"(e)(1) Any decision by the Director under subsection (c), (d), (h), or (j) to disapprove a collection of information, or to instruct the agency to make substantive or material change to a collection of information, shall be publicly available and include an explanation of the reasons for such decision.

"(2) Any written communication between the Administrator of the Office of Information and Regulatory Affairs, or any employee of the Office of Information and Regulatory Affairs, and an agency or person not employed by the Federal Government concerning a proposed collection of information shall be made available to the public.

"(3) This subsection shall not require the disclosure of—

"(A) any information which is protected at all times by procedures established for information which has been specifically authorized under criteria established by an Executive order or an Act of Congress to be kept secret in the interest of national defense or foreign policy; or

"(B) any communication relating to a collection of information which is not approved under this chapter, the disclosure of which could lead to retaliation or discrimination against the communicator.

"(f)(1) An independent regulatory agency which is administered by 2 or more members of a commission, board, or similar body, may by majority vote void—

"(A) any disapproval by the Director, in whole or in part, of a proposed collection of information of that agency; or

"(B) an exercise of authority under subsection (d) of section 3507 concerning that agency.

AR.01841

"(2) The agency shall certify each vote to void such disapproval or exercise to the Director, and explain the reasons for such vote. The Director shall without further delay assign a control number to such collection of information, and such vote to void the disapproval or exercise shall be valid for a period of 3 years.

"(g) The Director may not approve a collection of information for a period in excess of 3 years.

"(h)(1) If an agency decides to seek extension of the Director's approval granted for a currently approved collection of information, the agency shall—

"(A) conduct the review established under section 3506(c), including the seeking of comment from the public on the continued need for, and burden imposed by the collection of information; and

"(B) after having made a reasonable effort to seek public comment, but no later than 60 days before the expiration date of the control number assigned by the Director for the currently approved collection of information, submit the collection of information for review and approval under this section, which shall include an explanation of how the agency has used the information that it has collected.

"(2) If under the provisions of this section, the Director disapproves a collection of information contained in an existing rule, or recommends or instructs the agency to make a substantive or material change to a collection of information contained in an existing rule, the Director shall—

"(A) publish an explanation thereof in the Federal Register; and

"(B) instruct the agency to undertake a rulemaking within a reasonable time limited to consideration of changes to the collection of information contained in the rule and thereafter to submit the collection of information for approval or disapproval under this chapter.

"(3) An agency may not make a substantive or material modification to a collection of information after such collection has been approved by the Director, unless the modification has been submitted to the Director for review and approval under this chapter.

"(i)(1) If the Director finds that a senior official of an agency designated under section 3506(a) is sufficiently independent of program responsibility to evaluate fairly whether proposed collections of information should be approved and has sufficient resources to carry out this responsibility effectively, the Director may, by rule in accordance with the notice and comment provisions of chapter 5 of title 5, United States Code, delegate to such official the authority to approve proposed collections of information in specific program areas, for specific purposes, or for all agency purposes.

"(2) A delegation by the Director under this section shall not preclude the Director from reviewing individual collections of information if the Director determines that circumstances warrant such a review. The Director shall retain authority to revoke such delegations, both in general and with regard to any specific matter. In acting for the Director, any official to whom approval authority has been delegated under this section shall comply fully with the rules and regulations promulgated by the Director.

"(j)(1) The agency head may request the Director to authorize a collection of information, if an agency head determines that—

"(A) a collection of information—

"(i) is needed prior to the expiration of time periods established under this chapter; and

"(ii) is essential to the mission of the agency; and

"(B) the agency cannot reasonably comply with the provisions of this chapter because—

"(i) public harm is reasonably likely to result if normal clearance procedures are followed;

"(ii) an unanticipated event has occurred; or

"(iii) the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed.

"(2) The Director shall approve or disapprove any such authorization request within the time requested by the agency head and, if approved, shall assign the collection of information a control number. Any collection of information conducted under this subsection may be conducted without compliance with the provisions of this chapter for a maximum of 90 days after the date on which the Director received the request to authorize such collection.

<< 44 USCA § 3508 >>

"§ 3508. Determination of necessity for information; hearing

"Before approving a proposed collection of information, the Director shall determine whether the collection of information by the agency is necessary for the proper performance of the functions of the agency, including whether the information shall have

practical utility. Before making a determination the Director may give the agency and other interested persons an opportunity to be heard or to submit statements in writing. To the extent, if any, that the Director determines that the collection of information by an agency is unnecessary for any reason, the agency may not engage in the collection of information.

<< 44 USCA § 3509 >>

"§ 3509. Designation of central collection agency

  "The Director may designate a central collection agency to obtain information for two or more agencies if the Director determines that the needs of such agencies for information will be adequately served by a single collection agency, and such sharing of data is not inconsistent with applicable law. In such cases the Director shall prescribe (with reference to the collection of information) the duties and functions of the collection agency so designated and of the agencies for which it is to act as agent (including reimbursement for costs). While the designation is in effect, an agency covered by the designation may not obtain for itself information for the agency which is the duty of the collection agency to obtain. The Director may modify the designation from time to time as circumstances require. The authority to designate under this section is subject to the provisions of section 3507(f) of this chapter.

<< 44 USCA § 3510 >>

"§ 3510. Cooperation of agencies in making information available

  "(a) The Director may direct an agency to make available to another agency, or an agency may make available to another agency, information obtained by a collection of information if the disclosure is not inconsistent with applicable law.

  "(b)(1) If information obtained by an agency is released by that agency to another agency, all the provisions of law (including penalties) that relate to the unlawful disclosure of information apply to the officers and employees of the agency to which information is released to the same extent and in the same manner as the provisions apply to the officers and employees of the agency which originally obtained the information.

  "(2) The officers and employees of the agency to which the information is released, in addition, shall be subject to the same provisions of law, including penalties, relating to the unlawful disclosure of information as if the information had been collected directly by that agency.

<< 44 USCA § 3511 >>

"§ 3511. Establishment and operation of Government Information Locator Service

  "(a) In order to assist agencies and the public in locating information and to promote information sharing and equitable access by the public, the Director shall—

  "(1) cause to be established and maintained a distributed agency-based electronic Government Information Locator Service (hereafter in this section referred to as the 'Service'), which shall identify the major information systems, holdings, and dissemination products of each agency;

  "(2) require each agency to establish and maintain an agency information locator service as a component of, and to support the establishment and operation of the Service;

  "(3) in cooperation with the Archivist of the United States, the Administrator of General Services, the Public Printer, and the Librarian of Congress, establish an interagency committee to advise the Secretary of Commerce on the development of technical standards for the Service to ensure compatibility, promote information sharing, and uniform access by the public;

  "(4) consider public access and other user needs in the establishment and operation of the Service;

  "(5) ensure the security and integrity of the Service, including measures to ensure that only information which is intended to be disclosed to the public is disclosed through the Service; and

  "(6) periodically review the development and effectiveness of the Service and make recommendations for improvement, including other mechanisms for improving public access to Federal agency public information.

"(b) This section shall not apply to operational files as defined by the Central Intelligence Agency Information Act (50 U.S.C. 431 et seq.).

<< 44 USCA § 3512 >>

"§ 3512. Public protection

  "(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this chapter if—
  "(1) the collection of information does not display a valid control number assigned by the Director in accordance with this chapter; or
  "(2) the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.
  "(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

<< 44 USCA § 3513 >>

"§ 3513. Director review of agency activities; reporting; agency response

  "(a) In consultation with the Administrator of General Services, the Archivist of the United States, the Director of the National Institute of Standards and Technology, and the Director of the Office of Personnel Management, the Director shall periodically review selected agency information resources management activities to ascertain the efficiency and effectiveness of such activities to improve agency performance and the accomplishment of agency missions.
  "(b) Each agency having an activity reviewed under subsection (a) shall, within 60 days after receipt of a report on the review, provide a written plan to the Director describing steps (including milestones) to—
  "(1) be taken to address information resources management problems identified in the report; and
  "(2) improve agency performance and the accomplishment of agency missions.

<< 44 USCA § 3514 >>

"§ 3514. Responsiveness to Congress

  "(a)(1) The Director shall—
  "(A) keep the Congress and congressional committees fully and currently informed of the major activities under this chapter; and
  "(B) submit a report on such activities to the President of the Senate and the Speaker of the House of Representatives annually and at such other times as the Director determines necessary.
  "(2) The Director shall include in any such report a description of the extent to which agencies have—
  "(A) reduced information collection burdens on the public, including—
  "(i) a summary of accomplishments and planned initiatives to reduce collection of information burdens;
  "(ii) a list of all violations of this chapter and of any rules, guidelines, policies, and procedures issued pursuant to this chapter;
  "(iii) a list of any increase in the collection of information burden, including the authority for each such collection; and
  "(iv) a list of agencies that in the preceding year did not reduce information collection burdens in accordance with section 3505(a)(1), a list of the programs and statutory responsibilities of those agencies that precluded that reduction, and recommendations to assist those agencies to reduce information collection burdens in accordance with that section;
  "(B) improved the quality and utility of statistical information;
  "(C) improved public access to Government information; and
  "(D) improved program performance and the accomplishment of agency missions through information resources management.
  "(b) The preparation of any report required by this section shall be based on performance results reported by the agencies and shall not increase the collection of information burden on persons outside the Federal Government.

<< 44 USCA § 3515 >>

"§ 3515. Administrative powers

"Upon the request of the Director, each agency (other than an independent regulatory agency) shall, to the extent practicable, make its services, personnel, and facilities available to the Director for the performance of functions under this chapter.

<< 44 USCA § 3516 >>

"§ 3516. Rules and regulations

"The Director shall promulgate rules, regulations, or procedures necessary to exercise the authority provided by this chapter.

<< 44 USCA § 3517 >>

"§ 3517. Consultation with other agencies and the public

"(a) In developing information resources management policies, plans, rules, regulations, procedures, and guidelines and in reviewing collections of information, the Director shall provide interested agencies and persons early and meaningful opportunity to comment.

"(b) Any person may request the Director to review any collection of information conducted by or for an agency to determine, if, under this chapter, a person shall maintain, provide, or disclose the information to or for the agency. Unless the request is frivolous, the Director shall, in coordination with the agency responsible for the collection of information—

"(1) respond to the request within 60 days after receiving the request, unless such period is extended by the Director to a specified date and the person making the request is given notice of such extension; and

"(2) take appropriate remedial action, if necessary.

<< 44 USCA § 3518 >>

"§ 3518. Effect on existing laws and regulations

"(a) Except as otherwise provided in this chapter, the authority of an agency under any other law to prescribe policies, rules, regulations, and procedures for Federal information resources management activities is subject to the authority of the Director under this chapter.

"(b) Nothing in this chapter shall be deemed to affect or reduce the authority of the Secretary of Commerce or the Director of the Office of Management and Budget pursuant to Reorganization Plan No. 1 of 1977 (as amended) and Executive order, relating to telecommunications and information policy, procurement and management of telecommunications and information systems, spectrum use, and related matters.

"(c)(1) Except as provided in paragraph (2), this chapter shall not apply to the collection of information—

"(A) during the conduct of a Federal criminal investigation or prosecution, or during the disposition of a particular criminal matter;

"(B) during the conduct of—

"(i) a civil action to which the United States or any official or agency thereof is a party; or

"(ii) an administrative action or investigation involving an agency against specific individuals or entities;

"(C) by compulsory process pursuant to the Antitrust Civil Process Act and section 13 of the Federal Trade Commission Improvements Act of 1980; or

"(D) during the conduct of intelligence activities as defined in section 3.4(e) of Executive Order No. 12333, issued December 4, 1981, or successor orders, or during the conduct of cryptologic activities that are communications security activities.

"(2) This chapter applies to the collection of information during the conduct of general investigations (other than information collected in an antitrust investigation to the extent provided in subparagraph (C) of paragraph (1)) undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry.

"(d) Nothing in this chapter shall be interpreted as increasing or decreasing the authority conferred by Public Law 89–306 on the Administrator of the General Services Administration, the Secretary of Commerce, or the Director of the Office of Management and Budget.

"(e) Nothing in this chapter shall be interpreted as increasing or decreasing the authority of the President, the Office of Management and Budget or the Director thereof, under the laws of the United States, with respect to the substantive policies and programs of departments, agencies and offices, including the substantive authority of any Federal agency to enforce the civil rights laws.

<< 44 USCA § 3519 >>

"§ 3519. Access to information

"Under the conditions and procedures prescribed in section 716 of title 31, the Director and personnel in the Office of Information and Regulatory Affairs shall furnish such information as the Comptroller General may require for the discharge of the responsibilities of the Comptroller General. For the purpose of obtaining such information, the Comptroller General or representatives thereof shall have access to all books, documents, papers and records, regardless of form or format, of the Office.

<< 44 USCA § 3520 >>

"§ 3520. Authorization of appropriations

"There are authorized to be appropriated to the Office of Information and Regulatory Affairs to carry out the provisions of this chapter, and for no other purpose, $8,000,000 for each of the fiscal years 1996, 1997, 1998, 1999, 2000, and 2001.".

<< 13 USCA § 91 >>

SEC. 3. BURDEN REDUCTION REGARDING QUARTERLY FINANCIAL REPORT PROGRAM AT BUREAU OF THE CENSUS.

Section 91 of title 13, United States Code, is amended by adding at the end the following new subsection:

"(d)(1) The Secretary shall not select an organization or entity for participation in a survey, if—

"(A) the organization or entity—

"(i) has assets of less than $50,000,000;

"(ii) completed participation in a prior survey in the preceding 10–year period, as determined by the Secretary; and

"(iii) was selected for that prior survey participation after September 30, 1990; or

"(B) the organization or entity—

"(i) has assets of more than $50,000,000 and less than $100,000,000;

"(ii) completed participation in a prior survey in the preceding 2–year period, as determined by the Secretary; and

"(iii) was selected for that prior survey participation after September 30, 1995.

"(2)(A) The Secretary shall furnish advice and similar assistance to ease the burden of a small business concern which is attempting to compile and furnish the business information required of organizations and entities participating in the survey.

"(B) To facilitate the provision of the assistance under subparagraph (A), the Secretary shall establish a toll-free telephone number.

"(C) The Secretary shall expand the use of statistical sampling techniques to select organizations and entities having assets less than $100,000,000 to participate in the survey.

"(3) The Secretary may undertake such additional paperwork burden reduction initiatives with respect to the conduct of the survey as may be deemed appropriate by the Secretary.

"(4) For purposes of this subsection:

"(A) The term 'small business concern' means a business concern that meets the requirements of section 3(a) of the Small Business Act and the regulations promulgated pursuant thereto.

"(B) The term 'survey' means the collection of information by the Secretary pursuant to this section for the purpose of preparing the publication entitled 'Quarterly Financial Report for Manufacturing, Mining, and Trade Corporations'.".

<< 44 USCA § 3501 Note >>

SEC. 4. EFFECTIVE DATE.

  (a) IN GENERAL.—Except as otherwise provided in this section, this Act and the amendments made by this Act shall take effect on October 1, 1995.

  (b) AUTHORIZATION OF APPROPRIATIONS.—Section 3520 of title 44, United States Code, as amended by this Act, shall take effect on the date of enactment of this Act.

  (c) DELAYED APPLICATION.—In the case of a collection of information for which there is in effect on September 30, 1995, a control number issued by the Office of Management and Budget under chapter 35 of title 44, United States Code—

    (1) the amendments made by this Act shall apply to the collection of information beginning on the earlier of—

    (A) the first renewal or modification of that collection of information after September 30, 1995; or

    (B) the expiration of its control number after September 30, 1995.

    (2) prior to such renewal, modification, or expiration, the collection of information shall be subject to chapter 35 of title 44, United States Code, as in effect on September 30, 1995.

Approved May 22, 1995.

PL 104–13, 1995 S 244

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 103–322, September 13, 1994, 108 Stat 1796

UNITED STATES PUBLIC LAWS

103rd Congress - Second Session

Convening January 25, 1994

Additions and Deletions are not identified in this document.
8848

PL 103–322 (HR 3355)

September 13, 1994
VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

An Act to control and prevent crime.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 42 USCA § 13701 NOTE >>

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Violent Crime Control and Law Enforcement Act of 1994".

## SEC. 2. TABLE OF CONTENTS.

The following is the table of contents for this Act:
Sec. 1. Short title.
Sec. 2. Table of contents.

### TITLE I—PUBLIC SAFETY AND POLICING

Sec. 10001. Short title.
Sec. 10002. Purposes.
Sec. 10003. Community policing; "Cops on the Beat".

### TITLE II—PRISONS

#### Subtitle A—Violent Offender Incarceration and Truth in Sentencing Incentive Grants
Sec. 20101. Grants for correctional facilities.
Sec. 20102. Truth in sentencing incentive grants.
Sec. 20103. Violent offender incarceration grants.
Sec. 20104. Matching requirement.
Sec. 20105. Rules and regulations.
Sec. 20106. Technical assistance and training.
Sec. 20107. Evaluation.
Sec. 20108. Definitions.
Sec. 20109. Authorization of appropriations.

#### Subtitle B—Punishment for Young Offenders
Sec. 20201. Certain punishment for young offenders.

AR.01848

Subtitle C—Alien Incarceration

Sec. 20301. Incarceration of undocumented criminal aliens.

Subtitle D—Miscellaneous Provisions

Sec. 20401. Prisoner's place of imprisonment.
Sec. 20402. Prison impact assessments.
Sec. 20403. Sentences to account for costs to the Government of imprisonment, release, and probation.
Sec. 20404. Application to prisoners to which prior law applies.
Sec. 20405. Crediting of "good time".
Sec. 20406. Task force on prison construction standardization and techniques.
Sec. 20407. Efficiency in law enforcement and corrections.
Sec. 20408. Amendments to the Department of Education Organization Act and the National Literacy Act of 1991.
Sec. 20409. Appropriate remedies for prison overcrowding.
Sec. 20410. Congressional approval of any expansion at Lorton and congressional hearings on future needs.
Sec. 20411. Awards of Pell Grants to prisoners prohibited.
Sec. 20412. Education requirement for early release.
Sec. 20413. Conversion of closed military installations into Federal prison facilities.
Sec. 20414. Post-conviction release drug testing—Federal offenders.
Sec. 20415. Reporting of cash received by criminal court clerks.
Sec. 20416. Civil rights of institutionalized persons.
Sec. 20417. Notification of release of prisoners.
Sec. 20418. Correctional job training and placement.

TITLE III—CRIME PREVENTION

Subtitle A—Ounce of Prevention Council

Sec. 30101. Ounce of Prevention Council.
Sec. 30102. Ounce of prevention grant program.
Sec. 30103. Definition.
Sec. 30104. Authorization of appropriations.

Subtitle B—Local Crime Prevention Block Grant Program

Sec. 30201. Payments to local governments.
Sec. 30202. Authorization of appropriations.
Sec. 30203. Qualification for payment.
Sec. 30204. Allocation and distribution of funds.
Sec. 30205. Utilization of private sector.
Sec. 30206. Public participation.
Sec. 30207. Administrative provisions.
Sec. 30208. Definitions.

Subtitle C—Model Intensive Grant Programs

Sec. 30301. Grant authorization.
Sec. 30302. Uses of funds.
Sec. 30303. Program requirements.
Sec. 30304. Applications.
Sec. 30305. Reports.
Sec. 30306. Definitions.
Sec. 30307. Authorization of appropriations.

### Subtitle D—Family and Community Endeavor Schools Grant Program

Sec. 30401. Community schools youth services and supervision grant program.
Sec. 30402. Family and community endeavor schools grant program.
Sec. 30403. Authorization of appropriations.

### Subtitle G—Assistance for Delinquent and At-Risk Youth

Sec. 30701. Grant authority.
Sec. 30702. Authorization of appropriations.

### Subtitle H—Police Recruitment

Sec. 30801. Grant authority.
Sec. 30802. Authorization of appropriations.

### Subtitle J—Local Partnership Act

Sec. 31001. Establishment of payment program.
Sec. 31002. Technical amendment.

### Subtitle K—National Community Economic Partnership

Sec. 31101. Short title.

### Chapter 1—Community Economic Partnership Investment Funds

Sec. 31111. Purpose.
Sec. 31112. Provision of assistance.
Sec. 31113. Approval of applications.
Sec. 31114. Availability of lines of credit and use.
Sec. 31115. Limitations on use of funds.
Sec. 31116. Program priority for special emphasis programs.

### Chapter 2—Emerging Community Development Corporations

Sec. 31121. Community development corporation improvement grants.
Sec. 31122. Emerging community development corporation revolving loan funds.

### Chapter 3—Miscellaneous Provisions

Sec. 31131. Definitions.
Sec. 31132. Authorization of appropriations.
Sec. 31133. Prohibition.

### Subtitle O—Urban Recreation and At-Risk Youth

Sec. 31501. Purpose of assistance.
Sec. 31502. Definitions.
Sec. 31503. Criteria for selection.
Sec. 31504. Park and recreation action recovery programs.
Sec. 31505. Miscellaneous and technical amendments.

### Subtitle Q—Community-Based Justice Grants for Prosecutors

Sec. 31701. Grant authorization.
Sec. 31702. Use of funds.
Sec. 31703. Applications.
Sec. 31704. Allocation of funds; limitations on grants.
Sec. 31705. Award of grants.
Sec. 31706. Reports.

Sec. 31707. Authorization of appropriations.
Sec. 31708. Definitions.

Subtitle S—Family Unity Demonstration Project
Sec. 31901. Short title.
Sec. 31902. Purpose.
Sec. 31903. Definitions.
Sec. 31904. Authorization of appropriations.

Chapter 1—Grants To States
Sec. 31911. Authority to make grants.
Sec. 31912. Eligibility to receive grants.
Sec. 31913. Reports.

Chapter 2—Family Unity Demonstration Project for Federal Prisoners
Sec. 31921. Authority of the Attorney General.
Sec. 31922. Requirements.

Subtitle T—Substance Abuse Treatment in Federal Prisons
Sec. 32001. Substance abuse treatment in Federal prisons.

Subtitle U—Residential Substance Abuse Treatment for State Prisoners
Sec. 32101. Residential substance abuse treatment for State prisoners.

Subtitle V—Prevention, Diagnosis, and Treatment of Tuberculosis in Correctional Institutions
Sec. 32201. Prevention, diagnosis, and treatment of tuberculosis in correctional institutions.

Subtitle X—Gang Resistance Education and Training
Sec. 32401. Gang resistance education and training projects.

TITLE IV—VIOLENCE AGAINST WOMEN
Sec. 40001. Short title.

Subtitle A—Safe Streets for Women
Sec. 40101. Short title.

Chapter 1—Federal Penalties for Sex Crimes
Sec. 40111. Repeat offenders.
Sec. 40112. Federal penalties.
Sec. 40113. Mandatory restitution for sex crimes.
Sec. 40114. Authorization for Federal victim's counselors.

Chapter 2—Law Enforcement and Prosecution Grants to Reduce Violent Crimes Against Women
Sec. 40121. Grants to combat violent crimes against women.

Chapter 3—Safety For Women in Public Transit and Public Parks
Sec. 40131. Grants for capital improvements to prevent crime in public transportation.
Sec. 40132. Grants for capital improvements to prevent crime in national parks.
Sec. 40133. Grants for capital improvements to prevent crime in public parks.

Chapter 4—New Evidentiary Rules
Sec. 40141. Sexual history in criminal and civil cases.

Chapter 5—Assistance To Victims of Sexual Assault

Sec. 40151. Education and prevention grants to reduce sexual assaults against women.
Sec. 40152. Training programs.
Sec. 40153. Confidentiality of communications between sexual assault or domestic violence victims and their counselors.
Sec. 40154. Information programs.
Sec. 40155. Education and prevention grants to reduce sexual abuse of runaway, homeless, and street youth.
Sec. 40156. Victims of child abuse programs.

Subtitle B—Safe Homes for Women

Sec. 40201. Short title.

Chapter 1—National Domestic Violence Hotline

Sec. 40211. Grant for a national domestic violence hotline.

Chapter 2—Interstate Enforcement

Sec. 40221. Interstate enforcement.

Chapter 3—Arrest Policies in Domestic Violence Cases

Sec. 40231. Encouraging arrest policies.

Chapter 4—Shelter Grants

Sec. 40241. Grants for battered women's shelters.

Chapter 5—Youth Education

Sec. 40251. Youth education and domestic violence.

Chapter 6—Community Programs on Domestic Violence

Sec. 40261. Establishment of community programs on domestic violence.

Chapter 7—Family Violence Prevention and Services Act Amendments

Sec. 40271. Grantee reporting.
Sec. 40272. Technical amendments.

Chapter 8—Confidentiality For Abused Persons

Sec. 40281. Confidentiality of abused person's address.

Chapter 9—Data And Research

Sec. 40291. Research agenda.
Sec. 40292. State databases.
Sec. 40293. Number and cost of injuries.

Chapter 10—Rural Domestic Violence and Child Abuse Enforcement

Sec. 40295. Rural domestic violence and child abuse enforcement assistance.

Subtitle C—Civil Rights for Women

Sec. 40301. Short title.
Sec. 40302. Civil rights.
Sec. 40303. Attorney's fees.
Sec. 40304. Sense of the Senate concerning protection of the privacy of rape victims.

Subtitle D—Equal Justice for Women in the Courts Act

Sec. 40401. Short title.

### Chapter 1—Education And Training for Judges and Court Personnel in State Courts

Sec. 40411. Grants authorized.
Sec. 40412. Training provided by grants.
Sec. 40413. Cooperation in developing programs in making grants under this title.
Sec. 40414. Authorization of appropriations.

### Chapter 2—Education And Training for Judges and Court Personnel in Federal Courts

Sec. 40421. Authorizations of circuit studies; education and training grants.
Sec. 40422. Authorization of appropriations.

### Subtitle E—Violence Against Women Act Improvements

Sec. 40501. Pre-trial detention in sex offense cases.
Sec. 40502. Increased penalties for sex offenses against victims below the age of 16.
Sec. 40503. Payment of cost of testing for sexually transmitted diseases.
Sec. 40504. Extension and strengthening of restitution.
Sec. 40505. Enforcement of restitution orders through suspension of Federal benefits.
Sec. 40506. National baseline study on campus sexual assault.
Sec. 40507. Report on battered women's syndrome.
Sec. 40508. Report on confidentiality of addresses for victims of domestic violence.
Sec. 40509. Report on recordkeeping relating to domestic violence.

### Subtitle F—National Stalker and Domestic Violence Reduction

Sec. 40601. Authorizing access to Federal criminal information databases.
Sec. 40602. Grant program.
Sec. 40603. Authorization of appropriations.
Sec. 40604. Application requirements.
Sec. 40605. Disbursement.
Sec. 40606. Technical assistance, training, and evaluations.
Sec. 40607. Training programs for judges.
Sec. 40608. Recommendations on intrastate communication.
Sec. 40609. Inclusion in national incident-based reporting system.
Sec. 40610. Report to Congress.
Sec. 40611. Definitions.

### Subtitle G—Protections for Battered Immigrant Women and Children

Sec. 40701. Alien petitioning rights for immediate relative or second preference status.
Sec. 40702. Use of credible evidence in spousal waiver applications.
Sec. 40703. Suspension of deportation.

### TITLE V—DRUG COURTS

Sec. 50001. Drug courts.
Sec. 50002. Study by the General Accounting Office.

### TITLE VI—DEATH PENALTY

Sec. 60001. Short title.
Sec. 60002. Constitutional procedures for the imposition of the sentence of death.
Sec. 60003. Specific offenses for which death penalty is authorized.
Sec. 60004. Applicability to Uniform Code of Military Justice.
Sec. 60005. Death penalty for murder by a Federal prisoner.
Sec. 60006. Death penalty for civil rights murders.

Sec. 60007. Death penalty for the murder of Federal law enforcement officials.
Sec. 60008. New offense for the indiscriminate use of weapons to further drug conspiracies.
Sec. 60009. Foreign murder of United States nationals.
Sec. 60010. Death penalty for rape and child molestation murders.
Sec. 60011. Death penalty for sexual exploitation of children.
Sec. 60012. Murder by escaped prisoners.
Sec. 60013. Death penalty for gun murders during Federal crimes of violence and drug trafficking crimes.
Sec. 60014. Homicides and attempted homicides involving firearms in Federal facilities.
Sec. 60015. Death penalty for the murder of State or local officials assisting Federal law enforcement officials and State correctional officers.
Sec. 60016. Protection of court officers and jurors.
Sec. 60017. Prohibition of retaliatory killings of witnesses, victims, and informants.
Sec. 60018. Death penalty for murder of Federal witnesses.
Sec. 60019. Offenses of violence against maritime navigation or fixed platforms.
Sec. 60020. Torture.
Sec. 60021. Violence at airports serving international civil aviation.
Sec. 60022. Terrorist Death Penalty Act.
Sec. 60023. Weapons of mass destruction.
Sec. 60024. Enhanced penalties for alien smuggling.
Sec. 60025. Protection of jurors and witnesses in capital cases.
Sec. 60026. Appointment of Counsel.

TITLE VII—MANDATORY LIFE IMPRISONMENT FOR PERSONS CONVICTED OF CERTAIN FELONIES
Sec. 70001. Mandatory life imprisonment for persons convicted of certain felonies.
Sec. 70002. Limited grant of authority to Bureau of Prisons.

TITLE VIII—APPLICABILITY OF MANDATORY MINIMUM PENALTIES IN CERTAIN CASES
Sec. 80001. Limitation on applicability of mandatory minimum penalties in certain cases.

TITLE IX—DRUG CONTROL

Subtitle A—Enhanced Penalties and General Provisions
Sec. 90101. Enhancement of penalties for drug trafficking in prisons.
Sec. 90102. Increased penalties for drug-dealing in "drug-free" zones.
Sec. 90103. Enhanced penalties for illegal drug use in Federal prisons and for smuggling drugs into Federal prisons.
Sec. 90104. Clarification of narcotic or other dangerous drugs under RICO.
Sec. 90105. Conforming amendments to recidivist penalty provisions of the Controlled Substances Act and the Controlled Substances Import and Export Act.
Sec. 90106. Advertising.
Sec. 90107. Violent crime and drug emergency areas.

Subtitle B—National Narcotics Leadership Act Amendments
Sec. 90201. Implementation of National Drug Control Strategy.
Sec. 90202. Report on reprogramming; office personnel restriction.
Sec. 90203. National Drug Control Strategy outcome measures.
Sec. 90204. Counter-Drug Technology Assessment Center.
Sec. 90205. Special Forfeiture Fund amendments.
Sec. 90206. Authorization of appropriations.
Sec. 90207. Adequate staffing of the Office of National Drug Control Policy.
Sec. 90208. Termination of Office of National Drug Control Policy.

AR.01854

TITLE X—DRUNK DRIVING PROVISIONS

Sec. 100001. Short title.
Sec. 100002. State laws applied in areas of Federal jurisdiction.
Sec. 100003. Driving while intoxicated prosecution program.

TITLE XI—FIREARMS

Subtitle A—Assault Weapons

Sec. 110101. Short title.
Sec. 110102. Restriction on manufacture, transfer, and possession of certain semiautomatic assault weapons.
Sec. 110103. Ban of large capacity ammunition feeding devices.
Sec. 110104. Study by Attorney General.
Sec. 110105. Effective date.
Sec. 110106. Appendix A to section 922 of title 18.

Subtitle B—Youth Handgun Safety

Sec. 110201. Prohibition of the possession of a handgun or ammunition by, or the private transfer of a handgun or ammunition to, a juvenile.

Subtitle C—Licensure

Sec. 110301. Firearms licensure and registration to require a photograph and fingerprints.
Sec. 110302. Compliance with State and local law as a condition to license.
Sec. 110303. Action on firearms license application.
Sec. 110304. Inspection of firearms licensees' inventory and records.
Sec. 110305. Reports of theft or loss of firearms.
Sec. 110306. Responses to requests for information.
Sec. 110307. Notification of names and addresses of firearms licensees.

Subtitle D—Domestic Violence

Sec. 110401. Prohibition against disposal of firearms to, or receipt of firearms by, persons who have committed domestic abuse.

Subtitle E—Gun Crime Penalties

Sec. 110501. Enhanced penalty for use of a semiautomatic firearm during a crime of violence or a drug trafficking crime.
Sec. 110502. Enhanced penalty for second offense of using an explosive to commit a felony.
Sec. 110503. Smuggling firearms in aid of drug trafficking.
Sec. 110504. Theft of firearms and explosives.
Sec. 110505. Revocation of supervised release after imprisonment.
Sec. 110506. Revocation of probation.
Sec. 110507. Increased penalty for knowingly making false, material Statement in connection with the acquisition of a firearm from a licensed dealer.
Sec. 110508. Possession of explosives by felons and others.
Sec. 110509. Summary destruction of explosives subject to forfeiture.
Sec. 110510. Elimination of outmoded language relating to parole.
Sec. 110511. Prohibition against transactions involving stolen firearms which have moved in interstate or foreign commerce.
Sec. 110512. Using a firearm in the commission of counterfeiting or forgery.
Sec. 110513. Enhanced penalties for firearms possession by violent felons and serious drug offenders.
Sec. 110514. Receipt of firearms by nonresident.
Sec. 110515. Theft of firearms or explosives from licensee.
Sec. 110516. Disposing of explosives to prohibited persons.
Sec. 110517. Increased penalty for interstate gun trafficking.

Sec. 110518. Firearms and explosives conspiracy.
Sec. 110519. Definition of armor piercing ammunition.

TITLE XII—TERRORISM

Sec. 120001. Extension of the statute of limitation for certain terrorism offenses.
Sec. 120002. Jurisdiction over crimes against United States nationals on certain foreign ships.
Sec. 120003. Counterfeiting United States currency abroad.
Sec. 120004. Sentencing guidelines increase for terrorist crimes.
Sec. 120005. Providing material support to terrorists.

TITLE XIII—CRIMINAL ALIENS AND IMMIGRATION ENFORCEMENT

Sec. 130001. Enhancement of penalties for failing to depart, or reentering, after final order of deportation.
Sec. 130002. Criminal alien tracking center.
Sec. 130003. Alien witness cooperation and counterterrorism information.
Sec. 130004. Deportation procedures for certain criminal aliens who are not permanent residents.
Sec. 130005. Expeditious deportation for denied asylum applicants.
Sec. 130006. Improving border controls.
Sec. 130007. Expanded special deportation proceedings.
Sec. 130008. Authority to accept certain assistance.
Sec. 130009. Passport and visa offenses penalties improvement.
Sec. 130010. Asylum.

TITLE XIV—YOUTH VIOLENCE

Sec. 140001. Prosecution as adults of certain juveniles for crimes of violence.
Sec. 140002. Commencement of juvenile proceeding.
Sec. 140003. Separation of juvenile from adult offenders.
Sec. 140004. Bindover system for certain violent juveniles
Sec. 140005. Amendment concerning records of crimes committed by juveniles.
Sec. 140006. Increased penalties for employing children to distribute drugs near schools and playgrounds.
Sec. 140007. Increased penalties for Travel Act crimes involving violence and conspiracy to commit contract killings.
Sec. 140008. Solicitation of minor to commit crime.

TITLE XV—CRIMINAL STREET GANGS

Sec. 150001. Criminal street gangs.
Sec. 150002. Adult prosecution of serious juvenile offenders.
Sec. 150003. Addition of anti-gang Byrne grant funding objective.
Sec. 150006. Mentoring program.
Sec. 150007. Juvenile anti-drug and anti-gang grants in federally assisted low-income housing.
Sec. 150008. Gang investigation coordination and information collection.
Sec. 150009. Multijurisdictional gang task forces.

TITLE XVI—CHILD PORNOGRAPHY

Sec. 160001. Penalties for international trafficking in child pornography.
Sec. 160002. Sense of Congress concerning State legislation regarding child pornography.
Sec. 160003. Confirmation of intent of Congress in enacting sections 2252 and 2256 of title 18, United States Code.

TITLE XVII—CRIMES AGAINST CHILDREN

Subtitle A—Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act
Sec. 170101. Establishment of program.

Subtitle B—Assaults Against Children
Sec. 170201. Assaults against children.

Subtitle C—Missing and Exploited Children
Sec. 170301. Short title.
Sec. 170302. Purpose.
Sec. 170303. Establishment of task force.


TITLE XVIII—RURAL CRIME

Subtitle A—Drug Trafficking in Rural Areas
Sec. 180101. Authorizations for rural law enforcement agencies.
Sec. 180102. Rural crime and drug enforcement task forces.
Sec. 180103. Rural drug enforcement training.
Sec. 180104. More agents for the Drug Enforcement Administration.

Subtitle B—Drug Free Truck Stops and Safety Rest Areas
Sec. 180201. Drug free truck stops and safety rest areas.

Subtitle C—Sense of Congress Regarding Funding for Rural Areas
Sec. 180301. Funding for rural areas.

TITLE XIX—FEDERAL LAW ENFORCEMENT
Sec. 190001. Federal judiciary and Federal law enforcement.

TITLE XX—POLICE CORPS AND LAW ENFORCEMENT OFFICERS TRAINING AND EDUCATION

Subtitle A—Police Corps
Sec. 200101. Short title.
Sec. 200102. Purposes.
Sec. 200103. Definitions.
Sec. 200104. Establishment of office of the police corps and law enforcement education.
Sec. 200105. Designation of lead agency and submission of State plan.
Sec. 200106. Scholarship assistance.
Sec. 200107. Selection of participants.
Sec. 200108. Police corps training.
Sec. 200109. Service obligation.
Sec. 200110. State plan requirements.
Sec. 200111. Assistance to States and localities employing police corps officers.
Sec. 200112. Authorization of appropriations.
Sec. 200113. Reports to congress.

Subtitle B—Law Enforcement Scholarship Program
Sec. 200201. Short title.
Sec. 200202. Definitions.
Sec. 200203. Allotment.
Sec. 200204. Establishment of program.
Sec. 200205. Scholarships.
Sec. 200206. Eligibility.
Sec. 200207. State application.
Sec. 200208. Local application.

Sec. 200209. Scholarship agreement.
Sec. 200210. Authorization of appropriations.

TITLE XXI—STATE AND LOCAL LAW ENFORCEMENT

Subtitle A—Byrne Program
Sec. 210101. Extension of Byrne Grant funding.

Subtitle B—Law Enforcement Family Support
Sec. 210201. Law enforcement family support.

Subtitle C—DNA Identification
Sec. 210301. Short title.
Sec. 210302. Funding to improve the quality and availability of DNA analyses for law enforcement identification purposes.
Sec. 210303. Quality assurance and proficiency testing standards.
Sec. 210304. Index to facilitate law enforcement exchange of DNA identification information.
Sec. 210305. Federal Bureau of Investigation.
Sec. 210306. Authorization of appropriations.

Subtitle D—Police Pattern or Practice
Sec. 210401. Cause of action.
Sec. 210402. Data on use of excessive force.

Subtitle E—Improved Training and Technical Automation
Sec. 210501. Improved training and technical automation.

Subtitle F—Other State and Local Aid
Sec. 210601. Reauthorization of Office of Justice Programs.
Sec. 210602. Federal assistance to ease the increased burdens on State court systems resulting from enactment of this Act.
Sec. 210603. Availability of violent crime reduction trust fund to fund activities authorized by the Brady Handgun Violence Prevention Act and the National Child Protection Act of 1993.

TITLE XXII—MOTOR VEHICLE THEFT PREVENTION
Sec. 220001. Short title.
Sec. 220002. Motor vehicle theft prevention program.
Sec. 220003. Altering or removing motor vehicle identification numbers.

TITLE XXIII—VICTIMS OF CRIME

Subtitle A—Victims of Crime
Sec. 230101. Victim's right of allocution in sentencing.
Sec. 230102. Sense of the Senate concerning the right of a victim of a violent crime or sexual abuse to speak at an offender's sentencing hearing and any parole hearing.

Subtitle B—Crime Victims' Fund
Sec. 230201. Allocation of funds for costs and grants.
Sec. 230202. Relationship of crime victim compensation to certain Federal programs.
Sec. 230203. Administrative costs for crime victim compensation.
Sec. 230204. Grants for demonstration projects.
Sec. 230205. Administrative costs for crime victim assistance.
Sec. 230206. Maintenance of effort.
Sec. 230207. Change of due date for required report.

Sec. 230208. Amendment of the Victims of Crime Act.

TITLE XXIV—PROTECTIONS FOR THE ELDERLY

Sec. 240001. Missing Alzheimer's Disease Patient Alert Program.
Sec. 240002. Crimes against the elderly.

TITLE XXV—SENIOR CITIZENS AGAINST MARKETING SCAMS

Sec. 250001. Short title.
Sec. 250002. Enhanced penalties for telemarketing fraud.
Sec. 250003. Increased penalties for fraud against older victims.
Sec. 250004. Rewards for information leading to prosecution and conviction.
Sec. 250005. Authorization of appropriations.
Sec. 250006. Broadening application of mail fraud statute.
Sec. 250007. Fraud and related activity in connection with access devices.
Sec. 250008. Information network.

TITLE XXVI—COMMISSION MEMBERSHIP AND APPOINTMENT

Sec. 260001. Commission membership and appointment.
Sec. 260002. Conforming amendment.

TITLE XXVII—PRESIDENTIAL SUMMIT ON VIOLENCE AND
NATIONAL COMMISSION ON CRIME PREVENTION AND CONTROL

Sec. 270001. Presidential summit.
Sec. 270002. Establishment; committees and task forces; representation.
Sec. 270003. Purposes.
Sec. 270004. Responsibilities of the commission.
Sec. 270005. Administrative matters.
Sec. 270006. Staff and support services.
Sec. 270007. Powers.
Sec. 270008. Report; termination.
Sec. 270009. Authorization of appropriations.

TITLE XXVIII—SENTENCING PROVISIONS

Sec. 280001. Imposition of sentence.
Sec. 280002. Technical amendment to mandatory conditions of probation.
Sec. 280003. Direction to United States Sentencing Commission regarding sentencing enhancements for hate crimes.
Sec. 280004. Authorization of probation for petty offenses in certain cases.
Sec. 280005. Full-time vice chairs of the United States Sentencing Commission.
Sec. 280006. Cocaine penalty study.

TITLE XXIX—COMPUTER CRIME

Sec. 290001. Computer Abuse Amendments Act of 1994.

TITLE XXX—PROTECTION OF PRIVACY OF INFORMATION IN STATE MOTOR VEHICLE RECORDS

Sec. 300001. Short title.
Sec. 300002. Prohibition on release and use of certain personal information from State motor vehicle records.
Sec. 300003. Effective date.

TITLE XXXI—VIOLENT CRIME REDUCTION TRUST FUND

Sec. 310001. Creation of Violent Crime Reduction Trust Fund.
Sec. 310002. Conforming reduction in discretionary spending limits.

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 1883 of 3864

Sec. 310003. Extension of authorizations of appropriations for fiscal years for which the full amount authorized is not appropriated.
Sec. 310004. Flexibility in making of appropriations.

TITLE XXXII—MISCELLANEOUS

Subtitle A—Increases in Penalties

Sec. 320101. Increased penalties for assault.
Sec. 320102. Increased penalties for manslaughter.
Sec. 320103. Increased penalties for civil rights violations.
Sec. 320104. Penalties for trafficking in counterfeit goods and services.
Sec. 320105. Increased penalty for conspiracy to commit murder for hire.
Sec. 320106. Increased penalties for arson.
Sec. 320107. Increased penalties for drug trafficking near public housing.
Sec. 320108. Task force and criminal penalties relating to the introduction of nonindigenous species.
Sec. 320109. Military medals and decorations.

Subtitle B—Extension of Protection of Civil Rights Statutes

Sec. 320201. Extension of protection of civil rights statutes.

Subtitle C—Audit and Report

Sec. 320301. Audit requirement for State and local law enforcement agencies receiving Federal asset forfeiture funds.
Sec. 320302. Report to Congress on administrative and contracting expenses.

Subtitle D—Coordination

Sec. 320401. Coordination of substance abuse treatment and prevention programs.

Subtitle E—Gambling

Sec. 320501. Clarifying amendment regarding scope of prohibition against gambling on ships in international waters.

Subtitle F—White Collar Crime Amendments

Sec. 320601. Receiving the proceeds of extortion or kidnapping.
Sec. 320602. Receiving the proceeds of a postal robbery.
Sec. 320603. Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce.
Sec. 320604. Miscellaneous amendments to title 18, United States Code.
Sec. 320605. Federal Deposit Insurance Act amendment.
Sec. 320606. Federal Credit Union Act amendments.
Sec. 320607. Addition of predicate offenses to financial institutions rewards statute.
Sec. 320608. Definition of "savings and loan association" for purposes of the offense of bank robbery and related offenses.
Sec. 320609. Definition of 1-year period for purposes of the offense of obstruction of a Federal audit.

Subtitle G—Safer Streets and Neighborhoods

Sec. 320701. Short title.
Sec. 320702. Limitation on grant distribution.

Subtitle H—Recreational Hunting Safety

Sec. 320801. Short title.
Sec. 320802. Obstruction of a lawful hunt.
Sec. 320803. Civil penalties.
Sec. 320804. Other relief.
Sec. 320805. Relationship to State and local law and civil actions.
Sec. 320806. Regulations.

Sec. 320807. Rule of construction.
Sec. 320808. Definitions.

Subtitle I—Other Provisions

Sec. 320901. Wiretaps.
Sec. 320902. Theft of major artwork.
Sec. 320903. Addition of attempted robbery, kidnapping, smuggling, and property damage offenses to eliminate inconsistencies and gaps in coverage.
Sec. 320904. Gun-free school zones.
Sec. 320905. Interstate wagering.
Sec. 320906. Sense of Congress with respect to violence against truckers.
Sec. 320907. Sense of the Senate regarding a study on out-of-wedlock births.
Sec. 320908. Sense of the Senate regarding the role of the United Nations in international organized crime control.
Sec. 320909. Optional venue for espionage and related offenses.
Sec. 320910. Undercover operations.
Sec. 320911. Misuse of initials "DEA".
Sec. 320912. Definition of livestock.
Sec. 320913. Asset forfeiture.
Sec. 320914. Clarification of definition of a "court of the United States" to include the district courts for Guam, the Northern Mariana Islands, and the Virgin Islands.
Sec. 320915. Law enforcement personnel.
Sec. 320916. Authority to investigate violent crimes against travelers.
Sec. 320917. Extension of statute of limitations for arson.
Sec. 320918. Sense of Congress concerning child custody and visitation rights.
Sec. 320919. Edward Byrne Memorial Formula Grant Program.
Sec. 320920. Sense of the Senate regarding Law Day U.S.A.
Sec. 320921. First time domestic violence offender rehabilitation program.
Sec. 320922. Display of flags at halfstaff.
Sec. 320923. Financial institution fraud.
Sec. 320924. Definition of parent for the purposes of the offense of kidnapping.
Sec. 320925. Hate Crime Statistics Act.
Sec. 320927. Exemption from Brady background check requirement of return of handgun to owner.
Sec. 320928. Amendment of the National Child Protection Act of 1993.
Sec. 320929. Tennessee Valley Authority law enforcement personnel.
Sec. 320932. Assistant United States attorney residency.
Sec. 320933. Labels on products.
Sec. 320934. Non-dischargeability of payment of restitution order.
Sec. 320935. Admissability of evidence of similar crimes in sex offense cases.

TITLE XXXIII—TECHNICAL CORRECTIONS

Sec. 330001. Amendments relating to Federal financial assistance for law enforcement.
Sec. 330002. General title 18 corrections.
Sec. 330003. Corrections of erroneous cross references and misdesignations.
Sec. 330004. Repeal of obsolete provisions in title 18.
Sec. 330005. Correction of drafting error in the Foreign Corrupt Practices Act.
Sec. 330006. Elimination of redundant penalty provision in 18 U.S.C. 1116.
Sec. 330007. Elimination of redundant penalty.
Sec. 330008. Corrections of misspellings and grammatical errors.
Sec. 330009. Other technical amendments.
Sec. 330010. Correction of errors found during codification.

Sec. 330011. Problems related to execution of prior amendments.

Sec. 330012. Amendment to section 1956 of title 18 to eliminate duplicate predicate crimes.

Sec. 330013. Amendments to part V of title 18.

Sec. 330014. Update of cross reference.

Sec. 330015. Correction of error in amendatory language.

Sec. 330016. Correction of misleading and outmoded fine amounts in offenses under title 18.

Sec. 330017. Technical corrections to title 31 crimes.

Sec. 330018. Repeal of superfluous statute of limitation and transfer of child abuse statute of limitation.

Sec. 330019. Technical errors in section 1956.

Sec. 330020. Technical error.

Sec. 330021. Conforming spelling of variants of "kidnap".

Sec. 330022. Margin error.

Sec. 330023. Technical corrections relating to section 248 of title 18, United States Code.

Sec. 330024. Technical amendments necessitated by the enactment of the Domestic Chemical Diversion Control Act of 1993.

Sec. 330025. Victims of Crime Act.

<< 42 USCA § 3711 NOTE >>

TITLE I—PUBLIC SAFETY AND POLICING

SEC. 10001. SHORT TITLE.

This title may be cited as the "Public Safety Partnership and Community Policing Act of 1994".

<< 42 USCA § 3796dd NOTE >>

SEC. 10002. PURPOSES.

The purposes of this title are to—

   (1) substantially increase the number of law enforcement officers interacting directly with members of the community ("cops on the beat");

   (2) provide additional and more effective training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community;

   (3) encourage the development and implementation of innovative programs to permit members of the community to assist State, Indian tribal government, and local law enforcement agencies in the prevention of crime in the community; and

   (4) encourage the development of new technologies to assist State, Indian tribal government, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime,

by establishing a program of grants and assistance in furtherance of these objectives, including the authorization for a period of 6 years of grants for the hiring and rehiring of additional career law enforcement officers.

SEC. 10003. COMMUNITY POLICING; "COPS ON THE BEAT".

   (a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.) is amended—

<< 42 USCA Ch. 46 >>

   (1) by redesignating part Q as part R;

<< 42 USCA § 3797 >>

   (2) by redesignating section 1701 as section 1801; and

<< 42 USCA Ch. 46 >>

(3) by inserting after part P the following new part:

"PART Q—PUBLIC SAFETY AND COMMUNITY POLICING; 'COPS ON THE BEAT"

<< 42 USCA § 3796dd >>

"SEC. 1701. AUTHORITY TO MAKE PUBLIC SAFETY AND COMMUNITY POLICING GRANTS.

"(a) GRANT AUTHORIZATION.—The Attorney General may make grants to States, units of local government, Indian tribal governments, other public and private entities, and multi-jurisdictional or regional consortia thereof to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety.

"(b) REHIRING, HIRING, AND INITIAL REDEPLOYMENT GRANT PROJECTS.—

"(1) IN GENERAL.—Grants made under subsection (a) may be used for programs, projects, and other activities to—

"(A) rehire law enforcement officers who have been laid off as a result of State and local budget reductions for deployment in community-oriented policing;

"(B) hire and train new, additional career law enforcement officers for deployment in community-oriented policing across the Nation; and

"(C) procure equipment, technology, or support systems, or pay overtime, if the applicant for such a grant demonstrates to the satisfaction of the Attorney General that expenditures for such purposes would result in an increase in the number of officers deployed in community-oriented policing equal to or greater than the increase in the number of officers that would result from a grant for a like amount for the purposes specified in subparagraph (A) or (B).

"(2) GRANTS FOR EQUIPMENT, TECHNOLOGY, AND SUPPORT SYSTEMS.—Grants pursuant to paragraph (1)(C)—

"(A) may not exceed—

"(i) 20 percent of the funds available for grants pursuant to this subsection in fiscal year 1995;

"(ii) 20 percent of the funds available for grants pursuant to this subsection in fiscal year 1996; or

"(iii) 10 percent of the funds available for grants pursuant to this subsection in fiscal years 1997, 1998, 1999, and 2000; and

"(B) may not be awarded in fiscal years 1998, 1999, or 2000 unless the Attorney General has certified that grants awarded in fiscal years 1995, 1996, and 1997 pursuant to subparagraph (1)(C) have resulted in an increase in the number of officers deployed in community-oriented policing equal to or greater than the increase in the number of officers that have resulted from the grants in like amounts awarded in fiscal years 1995, 1996, and 1997 pursuant to paragraph (1) (A) and (B).

"(c) TROOPS-TO-COPS PROGRAMS.—

"(1) IN GENERAL.—Grants made under subsection (a) may be used to hire former members of the Armed Forces to serve as career law enforcement officers for deployment in community-oriented policing, particularly in communities that are adversely affected by a recent military base closing.

"(2) DEFINITION.—In this subsection, 'former member of the Armed Forces' means a member of the Armed Forces of the United States who is involuntarily separated from the Armed Forces within the meaning of section 1141 of title 10, United States Code.

"(d) ADDITIONAL GRANT PROJECTS.—Grants made under subsection (a) may include programs, projects, and other activities to—

"(1) increase the number of law enforcement officers involved in activities that are focused on interaction with members of the community on proactive crime control and prevention by redeploying officers to such activities;

"(2) provide specialized training to law enforcement officers to enhance their conflict resolution, mediation, problem solving, service, and other skills needed to work in partnership with members of the community;

"(3) increase police participation in multidisciplinary early intervention teams;

"(4) develop new technologies to assist State and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime;

"(5) develop and implement innovative programs to permit members of the community to assist State and local law enforcement agencies in the prevention of crime in the community, such as a citizens' police academy, including programs designed to increase the level of access to the criminal justice system enjoyed by victims, witnesses, and ordinary citizens by establishing decentralized satellite offices (including video facilities) of principal criminal courts buildings;

"(6) establish innovative programs to reduce, and keep to a minimum, the amount of time that law enforcement officers must be away from the community while awaiting court appearances;

"(7) establish and implement innovative programs to increase and enhance proactive crime control and prevention programs involving law enforcement officers and young persons in the community;

"(8) develop and establish new administrative and managerial systems to facilitate the adoption of community-oriented policing as an organization-wide philosophy;

"(9) establish, implement, and coordinate crime prevention and control programs (involving law enforcement officers working with community members) with other Federal programs that serve the community and community members to better address the comprehensive needs of the community and its members; and

"(10) support the purchase by a law enforcement agency of no more than 1 service weapon per officer, upon hiring for deployment in community-oriented policing or, if necessary, upon existing officers' initial redeployment to community-oriented policing.

"(e) PREFERENTIAL CONSIDERATION OF APPLICATIONS FOR CERTAIN GRANTS.—In awarding grants under this part, the Attorney General may give preferential consideration, where feasible, to applications for hiring and rehiring additional career law enforcement officers that involve a non-Federal contribution exceeding the 25 percent minimum under subsection (i).

"(f) TECHNICAL ASSISTANCE.—

"(1) IN GENERAL.—The Attorney General may provide technical assistance to States, units of local government, Indian tribal governments, and to other public and private entities, in furtherance of the purposes of the Public Safety Partnership and Community Policing Act of 1994.

"(2) MODEL.—The technical assistance provided by the Attorney General may include the development of a flexible model that will define for State and local governments, and other public and private entities, definitions and strategies associated with community or problem-oriented policing and methodologies for its implementation.

"(3) TRAINING CENTERS AND FACILITIES.—The technical assistance provided by the Attorney General may include the establishment and operation of training centers or facilities, either directly or by contracting or cooperative arrangements. The functions of the centers or facilities established under this paragraph may include instruction and seminars for police executives, managers, trainers, supervisors, and such others as the Attorney General considers to be appropriate concerning community or problem-oriented policing and improvements in police-community interaction and cooperation that further the purposes of the Public Safety Partnership and Community Policing Act of 1994.

"(g) UTILIZATION OF COMPONENTS.—The Attorney General may utilize any component or components of the Department of Justice in carrying out this part.

"(h) MINIMUM AMOUNT.—Unless all applications submitted by any State and grantee within the State pursuant to subsection (a) have been funded, each qualifying State, together with grantees within the State, shall receive in each fiscal year pursuant to subsection (a) not less than 0.5 percent of the total amount appropriated in the fiscal year for grants pursuant to that subsection. In this subsection, 'qualifying State' means any State which has submitted an application for a grant, or in which an eligible entity has submitted an application for a grant, which meets the requirements prescribed by the Attorney General and the conditions set out in this part.

"(i) MATCHING FUNDS.—The portion of the costs of a program, project, or activity provided by a grant under subsection (a) may not exceed 75 percent, unless the Attorney General waives, wholly or in part, the requirement under this subsection of a non-Federal contribution to the costs of a program, project, or activity. In relation to a grant for a period exceeding 1 year for hiring or rehiring career law enforcement officers, the Federal share shall decrease from year to year for up to 5 years, looking toward the continuation of the increased hiring level using State or local sources of funding following the conclusion of Federal support, as provided in an approved plan pursuant to section 1702(c)(8).

"(j) ALLOCATION OF FUNDS.—The funds available under this part shall be allocated as provided in section 1001(a)(11)(B).

"(k) TERMINATION OF GRANTS FOR HIRING OFFICERS.—The authority under subsection (a) of this section to make grants for the hiring and rehiring of additional career law enforcement officers shall lapse at the conclusion of 6 years from

the date of enactment of this part. Prior to the expiration of this grant authority, the Attorney General shall submit a report to Congress concerning the experience with and effects of such grants. The report may include any recommendations the Attorney General may have for amendments to this part and related provisions of law in light of the termination of the authority to make grants for the hiring and rehiring of additional career law enforcement officers.

<< 42 USCA § 3796dd–1 >>

"SEC. 1702. APPLICATIONS.

"(a) IN GENERAL.—No grant may be made under this part unless an application has been submitted to, and approved by, the Attorney General.

"(b) APPLICATION.—An application for a grant under this part shall be submitted in such form, and contain such information, as the Attorney General may prescribe by regulation or guidelines.

"(c) CONTENTS.—In accordance with the regulations or guidelines established by the Attorney General, each application for a grant under this part shall—

"(1) include a long-term strategy and detailed implementation plan that reflects consultation with community groups and appropriate private and public agencies and reflects consideration of the statewide strategy under section 503(a)(1);

"(2) demonstrate a specific public safety need;

"(3) explain the applicant's inability to address the need without Federal assistance;

"(4) identify related governmental and community initiatives which complement or will be coordinated with the proposal;

"(5) certify that there has been appropriate coordination with all affected agencies;

"(6) outline the initial and ongoing level of community support for implementing the proposal including financial and in-kind contributions or other tangible commitments;

"(7) specify plans for obtaining necessary support and continuing the proposed program, project, or activity following the conclusion of Federal support;

"(8) if the application is for a grant for hiring or rehiring additional career law enforcement officers, specify plans for the assumption by the applicant of a progressively larger share of the cost in the course of time, looking toward the continuation of the increased hiring level using State or local sources of funding following the conclusion of Federal support;

"(9) assess the impact, if any, of the increase in police resources on other components of the criminal justice system;

"(10) explain how the grant will be utilized to reorient the affected law enforcement agency's mission toward community-oriented policing or enhance its involvement in or commitment to community-oriented policing; and

"(11) provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency.

"(d) SPECIAL PROVISIONS.—

"(1) SMALL JURISDICTIONS.—Notwithstanding any other provision of this part, in relation to applications under this part of units of local government or law enforcement agencies having jurisdiction over areas with populations of less than 50,000, the Attorney General may waive 1 or more of the requirements of subsection (c) and may otherwise make special provisions to facilitate the expedited submission, processing, and approval of such applications.

"(2) SMALL GRANT AMOUNT.—Notwithstanding any other provision of this part, in relation to applications under section 1701(d) for grants of less than $1,000,000, the Attorney General may waive 1 or more of the requirements of subsection (c) and may otherwise make special provisions to facilitate the expedited submission, processing, and approval of such applications.

<< 42 USCA § 3796dd–2 >>

"SEC. 1703. RENEWAL OF GRANTS.

"(a) IN GENERAL.—Except for grants made for hiring or rehiring additional career law enforcement officers, a grant under this part may be renewed for up to 2 additional years after the first fiscal year during which a recipient receives its initial grant, if the Attorney General determines that the funds made available to the recipient were used in a manner required under an approved application and if the recipient can demonstrate significant progress in achieving the objectives of the initial application.

"(b) GRANTS FOR HIRING.—Grants made for hiring or rehiring additional career law enforcement officers may be renewed for up to 5 years, subject to the requirements of subsection (a), but notwithstanding the limitation in that subsection concerning the number of years for which grants may be renewed.

"(c) MULTIYEAR GRANTS.—A grant for a period exceeding 1 year may be renewed as provided in this section, except that the total duration of such a grant including any renewals may not exceed 3 years, or 5 years if it is a grant made for hiring or rehiring additional career law enforcement officers.

<< 42 USCA § 3796dd–3 >>

"SEC. 1704. LIMITATION ON USE OF FUNDS.

"(a) NONSUPPLANTING REQUIREMENT.—Funds made available under this part to States or units of local government shall not be used to supplant State or local funds, or, in the case of Indian tribal governments, funds supplied by the Bureau of Indian Affairs, but shall be used to increase the amount of funds that would, in the absence of Federal funds received under this part, be made available from State or local sources, or in the case of Indian tribal governments, from funds supplied by the Bureau of Indian Affairs.

"(b) NON-FEDERAL COSTS.—

"(1) IN GENERAL.—States and units of local government may use assets received through the Assets Forfeiture equitable sharing program to provide the non-Federal share of the cost of programs, projects, and activities funded under this part.

"(2) INDIAN TRIBAL GOVERNMENTS.—Funds appropriated by the Congress for the activities of any agency of an Indian tribal government or the Bureau of Indian Affairs performing law enforcement functions on any Indian lands may be used to provide the non-Federal share of the cost of programs or projects funded under this part.

"(c) HIRING COSTS.—Funding provided under this part for hiring or rehiring a career law enforcement officer may not exceed $75,000, unless the Attorney General grants a waiver from this limitation.

<< 42 USCA § 3796dd–4 >>

"SEC. 1705. PERFORMANCE EVALUATION.

"(a) MONITORING COMPONENTS.—Each program, project, or activity funded under this part shall contain a monitoring component, developed pursuant to guidelines established by the Attorney General. The monitoring required by this subsection shall include systematic identification and collection of data about activities, accomplishments, and programs throughout the life of the program, project, or activity and presentation of such data in a usable form.

"(b) EVALUATION COMPONENTS.—Selected grant recipients shall be evaluated on the local level or as part of a national evaluation, pursuant to guidelines established by the Attorney General. Such evaluations may include assessments of individual program implementations. In selected jurisdictions that are able to support outcome evaluations, the effectiveness of funded programs, projects, and activities may be required. Outcome measures may include crime and victimization indicators, quality of life measures, community perceptions, and police perceptions of their own work.

"(c) PERIODIC REVIEW AND REPORTS.—The Attorney General may require a grant recipient to submit to the Attorney General the results of the monitoring and evaluations required under subsections (a) and (b) and such other data and information as the Attorney General deems reasonably necessary.

<< 42 USCA § 3796dd–5 >>

"SEC. 1706. REVOCATION OR SUSPENSION OF FUNDING.

"If the Attorney General determines, as a result of the reviews required by section 1705, or otherwise, that a grant recipient under this part is not in substantial compliance with the terms and requirements of an approved grant application submitted under section 1702, the Attorney General may revoke or suspend funding of that grant, in whole or in part.

<< 42 USCA § 3796dd–6 >>

AR.01866

"SEC. 1707. ACCESS TO DOCUMENTS.

  "(a) BY THE ATTORNEY GENERAL.—The Attorney General shall have access for the purpose of audit and examination to any pertinent books, documents, papers, or records of a grant recipient under this part and to the pertinent books, documents, papers, or records of State and local governments, persons, businesses, and other entities that are involved in programs, projects, or activities for which assistance is provided under this part.

  "(b) BY THE COMPTROLLER GENERAL.—Subsection (a) shall apply with respect to audits and examinations conducted by the Comptroller General of the United States or by an authorized representative of the Comptroller General.

<< 42 USCA § 3796dd–7 >>

"SEC. 1708. GENERAL REGULATORY AUTHORITY.

  "The Attorney General may promulgate regulations and guidelines to carry out this part.

<< 42 USCA § 3796dd–8 >>

"SEC. 1709. DEFINITIONS.

  "In this part—

  "'career law enforcement officer' means a person hired on a permanent basis who is authorized by law or by a State or local public agency to engage in or supervise the prevention, detection, or investigation of violations of criminal laws.

  "'citizens' police academy' means a program by local law enforcement agencies or private non profit organizations in which citizens, especially those who participate in neighborhood watch programs, are trained in ways of facilitating communication between the community and local law enforcement in the prevention of crime.

  "'Indian tribe' means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.".

  (b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711, et seq.) is amended by striking the item relating to part Q and inserting the following:

"Part Q—Public Safety and Community Policing; 'Cops on the Beat'
"Sec. 1701. Authority to make public safety and community policing grants.
"Sec. 1702. Applications.
"Sec. 1703. Renewal of grants.
"Sec. 1704. Limitation on use of funds.
"Sec. 1705. Performance evaluation.
"Sec. 1706. Revocation or suspension of funding.
"Sec. 1707. Access to documents.
"Sec. 1708. General regulatory authority.
"Sec. 1709. Definition.

"Part R—Transition; Effective Date; Repealer
"Sec.1801. Continuation of rules, authorities, and proceedings.".

<< 42 USCA § 3793 >>

  (c) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793) is amended—

  (1) in paragraph (3) by striking "and O" and inserting "O, P, and Q"; and

  (2) by adding at the end the following new paragraph:

AR.01867

"(11)(A) There are authorized to be appropriated to carry out part Q, to remain available until expended—

"(i) $1,332,000,000 for fiscal year 1995;

"(ii) $1,850,000,000 for fiscal year 1996;

"(iii) $1,950,000,000 for fiscal year 1997;

"(iv) $1,700,000,000 for fiscal year 1998;

"(v) $1,700,000,000 for fiscal year 1999; and

"(vi) $268,000,000 for fiscal year 2000.

"(B) Of funds available under part Q in any fiscal year, up to 3 percent may be used for technical assistance under section 1701(f) or for evaluations or studies carried out or commissioned by the Attorney General in furtherance of the purposes of part Q. Of the remaining funds, 50 percent shall be allocated for grants pursuant to applications submitted by units of local government or law enforcement agencies having jurisdiction over areas with populations exceeding 150,000 or by public and private entities that serve areas with populations exceeding 150,000, and 50 percent shall be allocated for grants pursuant to applications submitted by units of local government or law enforcement agencies having jurisdiction over areas with populations 150,000 or less or by public and private entities that serve areas with populations 150,000 or less. Of the funds available in relation to grants under part Q, at least 85 percent shall be applied to grants for the purposes specified in section 1701(b), and no more than 15 percent may be applied to other grants in furtherance of the purposes of part Q. In view of the extraordinary need for law enforcement assistance in Indian country, an appropriate amount of funds available under part Q shall be made available for grants to Indian tribal governments or tribal law enforcement agencies.".

<< 42 USCA Ch. 136 >>

TITLE II—PRISONS

Subtitle A—Violent Offender Incarceration and Truth in Sentencing Incentive Grants

<< 42 USCA § 13701 >>

SEC. 20101. GRANTS FOR CORRECTIONAL FACILITIES.

(a) GRANT AUTHORIZATION.—The Attorney General may make grants to individual States and to States organized as multi-State compacts to construct, develop, expand, modify, operate, or improve correctional facilities, including boot camp facilities and other alternative correctional facilities that can free conventional prison space for the confinement of violent offenders, to ensure that prison cell space is available for the confinement of violent offenders and to implement truth in sentencing laws for sentencing violent offenders.

(b) ELIGIBILITY.—To be eligible to receive a grant under this subtitle, a State or States organized as multi-State compacts shall submit an application to the Attorney General which includes—

(1) assurances that the State or States have implemented, or will implement, correctional policies and programs, including truth in sentencing laws that ensure that violent offenders serve a substantial portion of the sentences imposed, that are designed to provide sufficiently severe punishment for violent offenders, including violent juvenile offenders, and that the prison time served is appropriately related to the determination that the inmate is a violent offender and for a period of time deemed necessary to protect the public;

(2) assurances that the State or States have implemented policies that provide for the recognition of the rights and needs of crime victims;

(3) assurances that funds received under this section will be used to construct, develop, expand, modify, operate, or improve correctional facilities to ensure that prison cell space is available for the confinement of violent offenders;

(4) assurances that the State or States have a comprehensive correctional plan which represents an integrated approach to the management and operation of correctional facilities and programs and which includes diversion programs, particularly drug diversion programs, community corrections programs, a prisoner screening and security classification system, appropriate professional training for corrections officers in dealing with violent offenders, prisoner rehabilitation and treatment programs, prisoner work activities (including, to the extent practicable, activities relating to the development, expansion, modification,

AR.01868

or improvement of correctional facilities) and job skills programs, educational programs, a pre-release prisoner assessment to provide risk reduction management, post-release assistance, and an assessment of recidivism rates;

(5) assurances that the State or States have involved counties and other units of local government, when appropriate, in the construction, development, expansion, modification, operation or improvement of correctional facilities designed to ensure the incarceration of violent offenders, and that the State or States will share funds received under this section with counties and other units of local government, taking into account the burden placed on these units of government when they are required to confine sentenced prisoners because of overcrowding in State prison facilities;

(6) assurances that funds received under this section will be used to supplement, not supplant, other Federal, State, and local funds;

(7) assurances that the State or States have implemented, or will implement within 18 months after the date of the enactment of this Act, policies to determine the veteran status of inmates and to ensure that incarcerated veterans receive the veterans benefits to which they are entitled;

(8) if applicable, documentation of the multi-State compact agreement that specifies the construction, development, expansion, modification, operation, or improvement of correctional facilities; and

(9) if applicable, a description of the eligibility criteria for prisoner participation in any boot camp that is to be funded.

(c) CONSIDERATION.—The Attorney General, in making such grants, shall give consideration to the special burden placed on States which incarcerate a substantial number of inmates who are in the United States illegally.

<< 42 USCA § 13702 >>

SEC. 20102. TRUTH IN SENTENCING INCENTIVE GRANTS.

(a) TRUTH IN SENTENCING GRANT PROGRAM.—Fifty percent of the total amount of funds appropriated to carry out this subtitle for each of fiscal years 1995, 1996, 1997, 1998, 1999, and 2000 shall be made available for Truth in Sentencing Incentive Grants. To be eligible to receive such a grant, a State must meet the requirements of section 20101(b) and shall demonstrate that the State—

(1) has in effect laws which require that persons convicted of violent crimes serve not less than 85 percent of the sentence imposed; or

(2) since 1993—

(A) has increased the percentage of convicted violent offenders sentenced to prison;

(B) has increased the average prison time which will be served in prison by convicted violent offenders sentenced to prison;

(C) has increased the percentage of sentence which will be served in prison by violent offenders sentenced to prison; and

(D) has in effect at the time of application laws requiring that a person who is convicted of a violent crime shall serve not less than 85 percent of the sentence imposed if—

(i) the person has been convicted on 1 or more prior occasions in a court of the United States or of a State of a violent crime or a serious drug offense; and

(ii) each violent crime or serious drug offense was committed after the defendant's conviction of the preceding violent crime or serious drug offense.

(b) ALLOCATION OF TRUTH IN SENTENCING INCENTIVE FUNDS.—

(1) FORMULA ALLOCATION.—The amount available to carry out this section for any fiscal year under subsection (a) shall be allocated to each eligible State in the ratio that the number of part 1 violent crimes reported by such State to the Federal Bureau of Investigation for 1993 bears to the number of part 1 violent crimes reported by all States to the Federal Bureau of Investigation for 1993.

(2) TRANSFER OF UNUSED FUNDS.—On September 30 of each of fiscal years 1996, 1998, 1999, and 2000, the Attorney General shall transfer to the funds to be allocated under section 20103(b)(1) any funds made available to carry out this section that are not allocated to an eligible State under paragraph (1).

<< 42 USCA § 13703 >>

SEC. 20103. VIOLENT OFFENDER INCARCERATION GRANTS.

(a) VIOLENT OFFENDER INCARCERATION GRANT PROGRAM.—Fifty percent of the total amount of funds appropriated to carry out this subtitle for each of fiscal years 1995, 1996, 1997, 1998, 1999, and 2000 shall be made available for Violent Offender Incarceration Grants. To be eligible to receive such a grant, a State or States must meet the requirements of section 20101(b).

(b) ALLOCATION OF VIOLENT OFFENDER INCARCERATION FUNDS.—

(1) FORMULA ALLOCATION.—Eighty-five percent of the sum of the amount available for Violent Offender Incarceration Grants for any fiscal year under subsection (a) and any amount transferred under section 20102(b)(2) for that fiscal year shall be allocated as follows:

(A) 0.25 percent shall be allocated to each eligible State except that the United States Virgin Islands, American Samoa, Guam and the Northern Mariana Islands each shall be allocated 0.05 percent.

(B) The amount remaining after application of subparagraph (A) shall be allocated to each eligible State in the ratio that the number of part 1 violent crimes reported by such State to the Federal Bureau of Investigation for 1993 bears to the number of part 1 violent crimes reported by all States to the Federal Bureau of Investigation for 1993.

(2) DISCRETIONARY ALLOCATION.—Fifteen percent of the sum of the amount available for Violent Offender Incarceration Grants for any fiscal year under subsection (a) and any amount transferred under section 20103(b)(3) for that fiscal year shall be allocated at the discretion of the Attorney General to States that have demonstrated the greatest need for such grants and the ability to best utilize the funds to meet the objectives of the grant program and ensure that prison cell space is available for the confinement of violent offenders.

(3) TRANSFER OF UNUSED FORMULA FUNDS.—On September 30 of each of fiscal years 1996, 1997, 1998, 1999, and 2000, the Attorney General shall transfer to the discretionary program under paragraph (2) any funds made available for allocation under paragraph (1) that are not allocated to an eligible State under paragraph (1).

<< 42 USCA § 13704 >>

SEC. 20104. MATCHING REQUIREMENT.

The Federal share of a grant received under this subtitle may not exceed 75 percent of the costs of a proposal described in an application approved under this subtitle.

<< 42 USCA § 13705 >>

SEC. 20105. RULES AND REGULATIONS.

(a) The Attorney General shall issue rules and regulations regarding the uses of grant funds received under this subtitle not later than 90 days after the date of enactment of this Act.

(b) If data regarding part 1 violent crimes in any State for 1993 is unavailable or substantially inaccurate, the Attorney General shall utilize the best available comparable data regarding the number of violent crimes for 1993 for that State for the purposes of allocation of any funds under this subtitle.

<< 42 USCA § 13706 >>

SEC. 20106. TECHNICAL ASSISTANCE AND TRAINING.

The Attorney General may request that the Director of the National Institute of Corrections and the Director of the Federal Bureau of Prisons provide technical assistance and training to a State or States that receive a grant under this subtitle to achieve the purposes of this subtitle.

<< 42 USCA § 13707 >>

SEC. 20107. EVALUATION.

The Attorney General may request the Director of the National Institute of Corrections to assist with an evaluation of programs established with funds under this subtitle.

AR.01870

<< 42 USCA § 13708 >>

SEC. 20108. DEFINITIONS.

In this subtitle—

"boot camp" means a correctional program of not more than 6 months' incarceration involving—

(A) assignment for participation in the program, in conformity with State law, by prisoners other than prisoners who have been convicted at any time of a violent felony;

(B) adherence by inmates to a highly regimented schedule that involves strict discipline, physical training, and work;

(C) participation by inmates in appropriate education, job training, and substance abuse counseling or treatment; and

(D) post-incarceration aftercare services for participants that are coordinated with the program carried out during the period of imprisonment.

"part 1 violent crimes" means murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault as reported to the Federal Bureau of Investigation for purposes of the Uniform Crime Reports.

"State" or "States" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.

<< 42 USCA § 13709 >>

SEC. 20109. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to carry out this subtitle—

(1) $175,000,000 for fiscal year 1995;

(2) $750,000,000 for fiscal year 1996;

(3) $1,000,000,000 for fiscal year 1997;

(4) $1,900,000,000 for fiscal year 1998;

(5) $2,000,000,000 for fiscal year 1999; and

(6) $2,070,000,000 for fiscal year 2000.

Subtitle B—Punishment for Young Offenders

SEC. 20201. CERTAIN PUNISHMENT FOR YOUNG OFFENDERS.

(a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 10003(a), is amended—

<< 42 USCA Ch. 46 >>

(1) by redesignating part R as part S;

<< 42 USCA § 3797 >>

(2) by redesignating section 1801 as section 1901; and

<< 42 USCA Ch. 46 >>

(3) by inserting after part Q the following new part:

"PART R—CERTAIN PUNISHMENT FOR YOUNG OFFENDERS

<< 42 USCA § 3796ee >>

AR.01871

"SEC. 1801. GRANT AUTHORIZATION.

"(a) IN GENERAL.—The Attorney General may make grants under this part to States, for the use by States and units of local government, for the purpose of developing alternative methods of punishment for young offenders to traditional forms of incarceration and probation.

"(b) ALTERNATIVE METHODS.—The alternative methods of punishment referred to in subsection (a) should ensure certain punishment for young offenders and promote reduced recidivism, crime prevention, and assistance to victims, particularly for young offenders who can be punished more effectively in an environment other than a traditional correctional facility, including —

"(1) alternative sanctions that create accountability and certain punishment for young offenders;

"(2) restitution programs for young offenders;

"(3) innovative projects, such as projects consisting of education and job training activities for incarcerated young offenders, modeled, to the extent practicable, after activities carried out under part B of title IV of the Job Training Partnership Act (relating to Job Corps) (29 U.S.C. 1691 et seq.) and projects that provide family counseling;

"(4) correctional options, such as community-based incarceration, weekend incarceration, and electronic monitoring of offenders;

"(5) community service programs that provide work service placement for young offenders at non-profit, private organizations and community organizations;

"(6) innovative methods that address the problems of young offenders convicted of serious substance abuse (including alcohol abuse) and gang-related offenses; and

"(7) adequate and appropriate after care programs for young offenders, such as substance abuse treatment, education programs, vocational training, job placement counseling, family counseling and other support programs upon release.

<< 42 USCA § 3796ee–1 >>

"SEC. 1802. STATE APPLICATIONS.

"(a) IN GENERAL.—

"(1) SUBMISSION OF APPLICATION.—To request a grant under this part, the chief executive of a State shall submit an application to the Attorney General in such form and containing such information as the Attorney General may reasonably require.

"(2) ASSURANCES.—An application under paragraph (1) shall include assurances that Federal funds received under this part shall be used to supplement, not supplant, non-Federal funds that would otherwise be available for activities funded under this part.

"(b) STATE OFFICE.—The office designated under section 507—

"(1) shall prepare the application as required under subsection (a); and

"(2) shall administer grant funds received under this part, including review of spending, processing, progress, financial reporting, technical assistance, grant adjustments, accounting, auditing, and fund disbursement.

<< 42 USCA § 3796ee–2 >>

"SEC. 1803. REVIEW OF STATE APPLICATIONS.

"(a) IN GENERAL.—The Attorney General shall make a grant under section 1801(a) to carry out the projects described in the application submitted by such applicant under section 1802 upon determining that—

"(1) the application is consistent with the requirements of this part; and

"(2) before the approval of the application, the Attorney General has made an affirmative finding in writing that the proposed project has been reviewed in accordance with this part.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(b) APPROVAL.—Each application submitted under section 1802 shall be considered approved, in whole or in part, by the Attorney General not later than 45 days after first received unless the Attorney General informs the applicant of specific reasons for disapproval.

"(c) RESTRICTION.—Grant funds received under this part shall not be used for land acquisition or construction projects, other than alternative facilities described in section 1801(b).

"(d) DISAPPROVAL NOTICE AND RECONSIDERATION.—The Attorney General shall not disapprove any application without first affording the applicant reasonable notice and an opportunity for reconsideration.

<< 42 USCA § 3796ee–3 >>

"SEC. 1804. LOCAL APPLICATIONS.

"(a) IN GENERAL.—

"(1) SUBMISSION OF APPLICATION.—To request funds under this part from a State, the chief executive of a unit of local government shall submit an application to the office designated under section 1802(b).

"(2) APPROVAL.—An application under paragraph (1) shall be considered to have been approved, in whole or in part, by the State not later than 45 days after such application is first received unless the State informs the applicant in writing of specific reasons for disapproval.

"(3) DISAPPROVAL.—The State shall not disapprove any application submitted to the State without first affording the applicant reasonable notice and an opportunity for reconsideration.

"(4) EFFECT OF APPROVAL.—If an application under subsection (a) is approved, the unit of local government is eligible to receive funds under this part.

"(b) DISTRIBUTION TO UNITS OF LOCAL GOVERNMENT.—A State that receives funds under section 1801 in a fiscal year shall make such funds available to units of local government with an application that has been submitted and approved by the State within 45 days after the Attorney General has approved the application submitted by the State and has made funds available to the State. The Attorney General may waive the 45-day requirement in this section upon a finding that the State is unable to satisfy such requirement under State statutes.

<< 42 USCA § 3796ee–4 >>

"SEC. 1805. ALLOCATION AND DISTRIBUTION OF FUNDS.

"(a) STATE DISTRIBUTION.—Of the total amount appropriated under this part in any fiscal year—

"(1) 0.4 percent shall be allocated to each of the participating States; and

"(2) of the total funds remaining after the allocation under paragraph (1), there shall be allocated to each of the participating States an amount which bears the same ratio to the amount of remaining funds described in this paragraph as the number of young offenders of such State bears to the number of young offenders in all the participating States.

"(b) LOCAL DISTRIBUTION.—

"(1) IN GENERAL.—A State that receives funds under this part in a fiscal year shall distribute to units of local government in such State for the purposes specified under section 1801 that portion of such funds which bears the same ratio to the aggregate amount of such funds as the amount of funds expended by all units of local government for correctional programs in the preceding fiscal year bears to the aggregate amount of funds expended by the State and all units of local government in such State for correctional programs in such preceding fiscal year.

"(2) UNDISTRIBUTED FUNDS.—Any funds not distributed to units of local government under paragraph (1) shall be available for expenditure by such State for purposes specified under section 1801.

"(3) UNUSED FUNDS.—If the Attorney General determines, on the basis of information available during any fiscal year, that a portion of the funds allocated to a State for such fiscal year will not be used by such State or that a State is not eligible to receive funds under section 1801, the Attorney General shall award such funds to units of local government in such State giving priority to the units of local government that the Attorney General considers to have the greatest need.

"(c) GENERAL REQUIREMENT.—Notwithstanding subsections (a) and (b), not less than two-thirds of funds received by a State under this part shall be distributed to units of local government unless the State applies for and receives a waiver from the Attorney General.

"(d) FEDERAL SHARE.—The Federal share of a grant made under this part may not exceed 75 percent of the total costs of the projects described in the application submitted under section 1802(a) for the fiscal year for which the projects receive assistance under this part.

"(e) CONSIDERATION.—Notwithstanding subsections (a) and (b), in awarding grants under this part, the Attorney General shall consider as a factor whether a State has in effect throughout such State a law or policy that requires that a juvenile who is in possession of a firearm or other weapon on school property or convicted of a crime involving the use of a firearm or weapon on school property—

"(1) be suspended from school for a reasonable period of time; and

"(2) lose driving license privileges for a reasonable period of time.

"(f) DEFINITION.—For purposes of this part, 'juvenile' means a person 18 years of age or younger.

<< 42 USCA § 3796ee–5 >>

"SEC. 1806. EVALUATION.

"(a) IN GENERAL.—

"(1) SUBMISSION TO THE DIRECTOR.—Each State and unit of local government that receives a grant under this part shall submit to the Attorney General an evaluation not later than March 1 of each year in accordance with guidelines issued by the Attorney General. Such evaluation shall include an appraisal by representatives of the community of the programs funded by the grant.

"(2) WAIVER.—The Attorney General may waive the requirement specified in paragraph (1) if the Attorney General determines that such evaluation is not warranted in the case of the State or unit of local government involved.

"(b) DISTRIBUTION.—The Attorney General shall make available to the public on a timely basis evaluations received under subsection (a).

"(c) ADMINISTRATIVE COSTS.—A State or unit of local government may use not more than 5 percent of funds it receives under this part to develop an evaluation program under this section.".

(b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 10003(a), is amended by striking the matter relating to part R and inserting the following:

"Part R—Certain Punishments for Young Offenders

"Sec.1801. Grant authorization.
"Sec.1802. State applications.
"Sec.1803. Review of State applications.
"Sec.1804. Local applications.
"Sec.1805. Allocation and distribution of funds.
"Sec.1806. Evaluation.

"Part S—Transition—Effective Date—Repealer

"Sec.1901. Continuation of rules, authorities, and proceedings.".

<< 42 USCA § 3791 >>

(c) DEFINITION.—Section 901(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3791(a)), is amended—

(1) by adding a semicolon at the end of paragraph (21);

(2) by striking "and" at the end of paragraph (22);

(3) by striking the period at the end of paragraph (23) and inserting a semicolon; and

(4) by adding after paragraph (23) the following:

"(24) the term 'young offender' means a non-violent first-time offender or a non-violent offender with a minor criminal record who is 22 years of age or younger (including juveniles).".

<< 42 USCA § 3793 >>

(d) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793), as amended by section 10003(c), is amended—

(1) in paragraph (3) by striking "and Q" and inserting "Q, or R"; and

(2) by adding at the end the following new paragraph:

"(16) There are authorized to be appropriated to carry out projects under part R—

"(A) $20,000,000 for fiscal year 1996;

"(B) $25,000,000 for fiscal year 1997;

"(C) $30,000,000 for fiscal year 1998;

"(D) $35,000,000 for fiscal year 1999; and

"(E) $40,000,000 for fiscal year 2000.".

Subtitle C—Alien Incarceration

SEC. 20301. INCARCERATION OF UNDOCUMENTED CRIMINAL ALIENS.

<< 8 USCA § 1252 >>

(a) INCARCERATION.—Section 242 of the Immigration and Nationality Act (8 U.S.C. 1252) is amended by adding at the end the following new subsection:

"(j) INCARCERATION.—

"(1) If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General—

"(A) enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

"(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

"(2) Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

"(3) For purposes of this subsection, the term 'undocumented criminal alien' means an alien who—

"(A) has been convicted of a felony and sentenced to a term of imprisonment; and

"(B)(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General;

"(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

"(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 248, or to comply with the conditions of any such status.

"(4)(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

"(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

"(5) There are authorized to be appropriated such sums as may be necessary to carry out this subsection, of which the following amounts may be appropriated from the Violent Crime Reduction Trust Fund:

"(A) $130,000,000 for fiscal year 1995;

"(B) $300,000,000 for fiscal year 1996;

"(C) $330,000,000 for fiscal year 1997;

"(D) $350,000,000 for fiscal year 1998;
"(E) $350,000,000 for fiscal year 1999; and
"(F) $340,000,000 for fiscal year 2000."

<< 8 USCA § 1252 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect October 1, 1994.

<< 8 USCA § 1252 NOTE >>

(c) TERMINATION OF LIMITATION.—Notwithstanding section 242(j)(5) of the Immigration and Nationality Act, as added by subsection (a), the requirements of section 242(j) of the Immigration and Nationality Act, as added by subsection (a), shall not be subject to the availability of appropriations on and after October 1, 2004.

<< 42 USCA Ch. 136 >>

Subtitle D—Miscellaneous Provisions

<< 18 USCA § 3621 >>

SEC. 20401. PRISONER'S PLACE OF IMPRISONMENT.

Paragraph (b) of section 3621 of title 18, United States Code, is amended by inserting after subsection (5) the following: "In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status.".

SEC. 20402. PRISON IMPACT ASSESSMENTS.

<< 18 USCA § 4047 >>

(a) IN GENERAL.—Chapter 303 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 4047. Prison impact assessments

"(a) Any submission of legislation by the Judicial or Executive branch which could increase or decrease the number of persons incarcerated in Federal penal institutions shall be accompanied by a prison impact statement (as defined in subsection (b)).

"(b) The Attorney General shall, in consultation with the Sentencing Commission and the Administrative Office of the United States Courts, prepare and furnish prison impact assessments under subsection (c) of this section, and in response to requests from Congress for information relating to a pending measure or matter that might affect the number of defendants processed through the Federal criminal justice system. A prison impact assessment on pending legislation must be supplied within 21 days of any request. A prison impact assessment shall include—

"(1) projections of the impact on prison, probation, and post prison supervision populations;

"(2) an estimate of the fiscal impact of such population changes on Federal expenditures, including those for construction and operation of correctional facilities for the current fiscal year and 5 succeeding fiscal years;

"(3) an analysis of any other significant factor affecting the cost of the measure and its impact on the operations of components of the criminal justice system; and

"(4) a statement of the methodologies and assumptions utilized in preparing the assessment.

"(c) The Attorney General shall prepare and transmit to the Congress, by March 1 of each year, a prison impact assessment reflecting the cumulative effect of all relevant changes in the law taking effect during the preceding calendar year.".

<< 18 USCA Ch. 303 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 303 is amended by adding at the end the following new item:

"4047. Prison impact assessments.".

SEC. 20403. SENTENCES TO ACCOUNT FOR COSTS TO THE GOVERNMENT OF IMPRISONMENT, RELEASE, AND PROBATION.

<< 18 USCA § 3572 >>

(a) IMPOSITION OF SENTENCE.—Section 3572(a) of title 18, United States Code, is amended—
  (1) by redesignating paragraphs (6) and (7) as paragraphs (7) and (8), respectively; and
  (2) by inserting after paragraph (5) the following new paragraph:
  "(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;".

<< 28 USCA § 994 >>

(b) DUTIES OF THE SENTENCING COMMISSION.—Section 994 of title 28, United States Code, is amended by adding at the end the following new subsection:
  "(y) The Commission, in promulgating guidelines pursuant to subsection (a)(1), may include, as a component of a fine, the expected costs to the Government of any imprisonment, supervised release, or probation sentence that is ordered.".

<< 18 USCA § 4042 NOTE >>

SEC. 20404. APPLICATION TO PRISONERS TO WHICH PRIOR LAW APPLIES.

  In the case of a prisoner convicted of an offense committed prior to November 1, 1987, the reference to supervised release in section 4042(b) of title 18, United States Code, shall be deemed to be a reference to probation or parole.

<< 18 USCA § 3624 >>

SEC. 20405. CREDITING OF "GOOD TIME".

  Section 3624 of title 18, United States Code, is amended—
  (1) by striking "he" each place it appears and inserting "the prisoner";
  (2) by striking "his" each place it appears and inserting "the prisoner's";
  (3) in subsection (d) by striking "him" and inserting "the prisoner"; and
  (4) in subsection (b)—
    (A) in the first sentence by inserting "(other than a prisoner serving a sentence for a crime of violence)" after "A prisoner"; and
    (B) by inserting after the first sentence the following: "A prisoner who is serving a term of imprisonment of more than 1 year for a crime of violence, other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with such institutional disciplinary regulations.".

<< 42 USCA § 13721 >>

SEC. 20406. TASK FORCE ON PRISON CONSTRUCTION STANDARDIZATION AND TECHNIQUES.

  (a) TASK FORCE.—The Director of the National Institute of Corrections shall, subject to availability of appropriations, establish a task force composed of Federal, State, and local officials expert in prison construction, and of at least an equal number of engineers, architects, and construction experts from the private sector with expertise in prison design and construction, including the use of cost-cutting construction standardization techniques and cost-cutting new building materials and technologies.
  (b) COOPERATION.—The task force shall work in close cooperation and communication with other State and local officials responsible for prison construction in their localities.

(c) PERFORMANCE REQUIREMENTS.—The task force shall work to—

(1) establish and recommend standardized construction plans and techniques for prison and prison component construction; and

(2) evaluate and recommend new construction technologies, techniques, and materials,

to reduce prison construction costs at the Federal, State, and local levels and make such construction more efficient.

(d) DISSEMINATION.—The task force shall disseminate information described in subsection (c) to State and local officials involved in prison construction, through written reports and meetings.

(e) PROMOTION AND EVALUATION.—The task force shall—

(1) work to promote the implementation of cost-saving efforts at the Federal, State, and local levels;

(2) evaluate and advise on the results and effectiveness of such cost-saving efforts as adopted, broadly disseminating information on the results; and

(3) to the extent feasible, certify the effectiveness of the cost-savings efforts.

<< 42 USCA § 13722 >>

SEC. 20407. EFFICIENCY IN LAW ENFORCEMENT AND CORRECTIONS.

(a) IN GENERAL.—In the administration of each grant program funded by appropriations authorized by this Act or by an amendment made by this Act, the Attorney General shall encourage—

(1) innovative methods for the low-cost construction of facilities to be constructed, converted, or expanded and the low-cost operation of such facilities and the reduction of administrative costs and overhead expenses; and

(2) the use of surplus Federal property.

(b) ASSESSMENT OF CONSTRUCTION COMPONENTS AND DESIGNS.—The Attorney General may make an assessment of the cost efficiency and utility of using modular, prefabricated, precast, and pre-engineered construction components and designs for housing nonviolent criminals.

SEC. 20408. AMENDMENTS TO THE DEPARTMENT OF EDUCATION ORGANIZATION ACT AND THE NATIONAL LITERACY ACT OF 1991.

<< 20 USCA § 3423a >>

(a) TECHNICAL AMENDMENT.—The matter preceding paragraph (1) of section 214(d) of the Department of Education Organization Act (20 U.S.C. 3423a(d)) is amended by striking "under subsection (a)" and inserting "under subsection (c)".

<< 20 USCA § 1211–2 >>

(b) ESTABLISHMENT OF A PANEL AND USE OF FUNDS.—Section 601 of the National Literacy Act of 1991 (20 U.S.C. 1211–2) is amended—

(1) by redesignating subsection (g) as subsection (i); and

(2) by inserting after subsection (f) the following new subsections:

"(g) PANEL.—The Secretary is authorized to consult with and convene a panel of experts in correctional education, including program administrators and field-based professionals in adult corrections, juvenile services, jails, and community corrections programs, to—

"(1) develop measures for evaluating the effectiveness of the programs funded under this section; and

"(2) evaluate the effectiveness of such programs.

"(h) USE OF FUNDS.—Notwithstanding any other provision of law, the Secretary may use not more than five percent of funds appropriated under subsection (i) in any fiscal year to carry out grant-related activities such as monitoring, technical assistance, and replication and dissemination.".

SEC. 20409. APPROPRIATE REMEDIES FOR PRISON OVERCROWDING.

<< 18 USCA § 3626 >>

(a) AMENDMENT OF TITLE 18, UNITED STATES CODE.—Subchapter C of chapter 229 of part 2 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 3626. Appropriate remedies with respect to prison crowding

"(a) REQUIREMENT OF SHOWING WITH RESPECT TO THE PLAINTIFF IN PARTICULAR.—

  "(1) HOLDING.—A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate.

  "(2) RELIEF.—The relief in a case described in paragraph (1) shall extend no further than necessary to remove the conditions that are causing the cruel and unusual punishment of the plaintiff inmate.

"(b) INMATE POPULATION CEILINGS.—

  "(1) REQUIREMENT OF SHOWING WITH RESPECT TO PARTICULAR PRISONERS.—A Federal court shall not place a ceiling on the inmate population of any Federal, State, or local detention facility as an equitable remedial measure for conditions that violate the eighth amendment unless crowding is inflicting cruel and unusual punishment on particular identified prisoners.

  "(2) RULE OF CONSTRUCTION.—Paragraph (1) shall not be construed to have any effect on Federal judicial power to issue equitable relief other than that described in paragraph (1), including the requirement of improved medical or health care and the imposition of civil contempt fines or damages, where such relief is appropriate.

"(c) PERIODIC REOPENING.—Each Federal court order or consent decree seeking to remedy an eighth amendment violation shall be reopened at the behest of a defendant for recommended modification at a minimum of 2-year intervals.".

<< 18 USCA § 3626 NOTE >>

(b) APPLICATION OF AMENDMENT.—Section 3626 of title 18, United States Code, as added by paragraph (1), shall apply to all outstanding court orders on the date of enactment of this Act. Any State or municipality shall be entitled to seek modification of any outstanding eighth amendment decree pursuant to that section.

<< 18 USCA Ch. 229 >>

(c) TECHNICAL AMENDMENT.—The subchapter analysis for subchapter C of chapter 229 of title 18, United States Code, is amended by adding at the end the following new item:

  "3626. Appropriate remedies with respect to prison crowding.".

<< 18 USCA § 3626 >>

<< 18 USCA § 3626 NOTE >>

(d) SUNSET PROVISION.—This section and the amendments made by this section are repealed effective as of the date that is 5 years after the date of enactment of this Act.

<< 42 USCA § 13723 >>

SEC. 20410. CONGRESSIONAL APPROVAL OF ANY EXPANSION AT LORTON AND CONGRESSIONAL HEARINGS ON FUTURE NEEDS.

(a) CONGRESSIONAL APPROVAL.—Notwithstanding any other provision of law, the existing prison facilities and complex at the District of Columbia Corrections Facility at Lorton, Virginia, shall not be expanded unless such expansion has been approved by the Congress under the authority provided to Congress in section 446 of the District of Columbia Self-Government and Governmental Reorganization Act.

(b) SENATE HEARINGS.—The Senate directs the Subcommittee on the District of Columbia of the Committee on Appropriations of the Senate to conduct hearings regarding expansion of the prison complex in Lorton, Virginia, prior to any approval granted pursuant to subsection (a). The subcommittee shall permit interested parties, including appropriate officials from the County of Fairfax, Virginia, to testify at such hearings.

 (c) DEFINITION.—For purposes of this section, the terms "expanded" and "expansion" mean any alteration of the physical structure of the prison complex that is made to increase the number of inmates incarcerated at the prison.

## SEC. 20411. AWARDS OF PELL GRANTS TO PRISONERS PROHIBITED.

<< 20 USCA § 1070a >>

 (a) IN GENERAL.—Section 401(b)(8) of the Higher Education Act of 1965 (20 U.S.C. 1070a(b)(8)) is amended to read as follows:
 "(8) No basic grant shall be awarded under this subpart to any individual who is incarcerated in any Federal or State penal institution.".

<< 20 USCA § 1070a NOTE >>

 (b) APPLICATION OF AMENDMENT.—The amendment made by this section shall apply with respect to periods of enrollment beginning on or after the date of enactment of this Act.

<< 18 USCA § 3624 >>

## SEC. 20412. EDUCATION REQUIREMENT FOR EARLY RELEASE.

 Section 3624(b) of title 18, United States Code, is amended—
 (1) by inserting "(1)" after "behavior.—";
 (2) by striking "Such credit toward service of sentence vests at the time that it is received. Credit that has vested may not later be withdrawn, and credit that has not been earned may not later be granted." and inserting "Credit that has not been earned may not later be granted."; and
 (3) by adding at the end the following:
 "(2) Credit toward a prisoner's service of sentence shall not be vested unless the prisoner has earned or is making satisfactory progress toward a high school diploma or an equivalent degree.
 "(3) The Attorney General shall ensure that the Bureau of Prisons has in effect an optional General Educational Development program for inmates who have not earned a high school diploma or its equivalent.
 "(4) Exemptions to the General Educational Development requirement may be made as deemed appropriate by the Director of the Federal Bureau of Prisons.".

<< 42 USCA § 13724 >>

## SEC. 20413. CONVERSION OF CLOSED MILITARY INSTALLATIONS INTO FEDERAL PRISON FACILITIES.

 (a) STUDY OF SUITABLE BASES.—The Secretary of Defense and the Attorney General shall jointly conduct a study of all military installations selected before the date of enactment of this Act to be closed pursuant to a base closure law for the purpose of evaluating the suitability of any of these installations, or portions of these installations, for conversion into Federal prison facilities. As part of the study, the Secretary and the Attorney General shall identify the military installations so evaluated that are most suitable for conversion into Federal prison facilities.
 (b) SUITABILITY FOR CONVERSION.—In evaluating the suitability of a military installation for conversion into a Federal prison facility, the Secretary of Defense and the Attorney General shall consider the estimated cost to convert the installation into a prison facility and such other factors as the Secretary and the Attorney General consider to be appropriate.
 (c) TIME FOR STUDY.—The study required by subsection (a) shall be completed not later than the date that is 180 days after the date of enactment of this Act.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(d) CONSTRUCTION OF FEDERAL PRISONS.—

  (1) IN GENERAL.—In determining where to locate any new Federal prison facility, and in accordance with the Department of Justice's duty to review and identify a use for any portion of an installation closed pursuant to title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526) and the Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510), the Attorney General shall—

    (A) consider whether using any portion of a military installation closed or scheduled to be closed in the region pursuant to a base closure law provides a cost-effective alternative to the purchase of real property or construction of new prison facilities;

    (B) consider whether such use is consistent with a reutilization and redevelopment plan; and

    (C) give consideration to any installation located in a rural area the closure of which will have a substantial adverse impact on the economy of the local communities and on the ability of the communities to sustain an economic recovery from such closure.

  (2) CONSENT.—With regard to paragraph (1)(B), consent must be obtained from the local re-use authority for the military installation, recognized and funded by the Secretary of Defense, before the Attorney General may proceed with plans for the design or construction of a prison at the installation.

  (3) REPORT ON BASIS OF DECISION.—Before proceeding with plans for the design or construction of a Federal prison, the Attorney General shall submit to Congress a report explaining the basis of the decision on where to locate the new prison facility.

  (4) REPORT ON COST-EFFECTIVENESS.—If the Attorney General decides not to utilize any portion of a closed military installation or an installation scheduled to be closed for locating a prison, the report shall include an analysis of why installations in the region, the use of which as a prison would be consistent with a reutilization and redevelopment plan, does not provide a cost-effective alternative to the purchase of real property or construction of new prison facilities.

(e) DEFINITION.—In this section, "base closure law" means—

  (1) the Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note); and

  (2) title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).

SEC. 20414. POST-CONVICTION RELEASE DRUG TESTING—FEDERAL OFFENDERS.

(a) DRUG TESTING PROGRAM.—

<< 18 USCA § 3608 >>

  (1) IN GENERAL.—Subchapter A of chapter 229 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 3608. Drug testing of Federal offenders on post-conviction release

  "The Director of the Administrative Office of the United States Courts, in consultation with the Attorney General and the Secretary of Health and Human Services, shall, subject to the availability of appropriations, establish a program of drug testing of Federal offenders on post-conviction release. The program shall include such standards and guidelines as the Director may determine necessary to ensure the reliability and accuracy of the drug testing programs. In each judicial district the chief probation officer shall arrange for the drug testing of defendants on post-conviction release pursuant to a conviction for a felony or other offense described in section 3563(a)(4).".

<< 18 USCA Ch. 229 >>

  (2) TECHNICAL AMENDMENT.—The subchapter analysis for subchapter A of chapter 229 of title 18, United States Code, is amended by adding at the end the following new item:
"3608. Drug testing of Federal offenders on post-conviction release.".

<< 18 USCA § 3563 >>

(b) CONDITIONS OF PROBATION.—Section 3563(a) of title 18, United States Code, is amended—

(1) in paragraph (2) by striking "and" after the semicolon;

(2) in paragraph (3) by striking the period and inserting "; and";

(3) by adding at the end the following new paragraph:

"(4) for a felony, a misdemeanor, or an infraction, that the defendant refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance, but the condition stated in this paragraph may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable sentencing information indicates a low risk of future substance abuse by the defendant."; and

(4) by adding at the end the following: "The results of a drug test administered in accordance with paragraph (4) shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test. A defendant who tests positive may be detained pending verification of a positive drug test result. A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy. The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3565(b), when considering any action against a defendant who fails a drug test administered in accordance with paragraph (4).".

<< 18 USCA § 3583 >>

(c) CONDITIONS OF SUPERVISED RELEASE.—Section 3583(d) of title 18, United States Code, is amended by inserting after the first sentence the following: "The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance. The condition stated in the preceding sentence may be ameliorated or suspended by the court as provided in section 3563(a)(4). The results of a drug test administered in accordance with the preceding subsection shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test. A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy. The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.".

<< 18 USCA § 4209 >>

(d) CONDITIONS OF PAROLE.—Section 4209(a) of title 18, United States Code, is amended by inserting after the first sentence the following: "In every case, the Commission shall also impose as a condition of parole that the parolee pass a drug test prior to release and refrain from any unlawful use of a controlled substance and submit to at least 2 periodic drug tests (as determined by the Commission) for use of a controlled substance. The condition stated in the preceding sentence may be ameliorated or suspended by the Commission for any individual parolee if it determines that there is good cause for doing so. The results of a drug test administered in accordance with the provisions of the preceding sentence shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test. A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human

Services may determine to be of equivalent accuracy. The Commission shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 4214(f) when considering any action against a defendant who fails a drug test.".

SEC. 20415. REPORTING OF CASH RECEIVED BY CRIMINAL COURT CLERKS.

<< 26 USCA § 6050I >>

(a) IN GENERAL.—Section 6050I of the Internal Revenue Code of 1986 (relating to returns relating to cash received in trade or business) is amended by adding at the end the following new subsection:

"(g) CASH RECEIVED BY CRIMINAL COURT CLERKS.—

"(1) IN GENERAL.—Every clerk of a Federal or State criminal court who receives more than $10,000 in cash as bail for any individual charged with a specified criminal offense shall make a return described in paragraph (2) (at such time as the Secretary may by regulations prescribe) with respect to the receipt of such bail.

"(2) RETURN.—A return is described in this paragraph if such return—

"(A) is in such form as the Secretary may prescribe, and

"(B) contains—

"(i) the name, address, and TIN of—

"(I) the individual charged with the specified criminal offense, and

"(II) each person posting the bail (other than a person licensed as a bail bondsman),

"(ii) the amount of cash received,

"(iii) the date the cash was received, and

"(iv) such other information as the Secretary may prescribe.

"(3) SPECIFIED CRIMINAL OFFENSE.—For purposes of this subsection, the term 'specified criminal offense' means—

"(A) any Federal criminal offense involving a controlled substance,

"(B) racketeering (as defined in section 1951, 1952, or 1955 of title 18, United States Code),

"(C) money laundering (as defined in section 1956 or 1957 of such title), and

"(D) any State criminal offense substantially similar to an offense described in subparagraph (A), (B), or (C).

"(4) INFORMATION TO FEDERAL PROSECUTORS.—Each clerk required to include on a return under paragraph (1) the information described in paragraph (2)(B) with respect to an individual described in paragraph (2)(B)(i)(I) shall furnish (at such time as the Secretary may by regulations prescribe) a written statement showing such information to the United States Attorney for the jurisdiction in which such individual resides and the jurisdiction in which the specified criminal offense occurred.

"(5) INFORMATION TO PAYORS OF BAIL.—Each clerk required to make a return under paragraph (1) shall furnish (at such time as the Secretary may by regulations prescribe) to each person whose name is required to be set forth in such return by reason of paragraph (2)(B)(i)(II) a written statement showing—

"(A) the name and address of the clerk's office required to make the return, and

"(B) the aggregate amount of cash described in paragraph (1) received by such clerk.".

(b) CONFORMING AMENDMENTS.—

<< 26 USCA § 6724 >>

(1) Clause (iv) of section 6724(d)(1)(B) of the Internal Revenue Code of 1986 is amended to read as follows:

"(iv) section 6050I (a) or (g)(1) (relating to cash received in trade or business, etc.),".

<< 26 USCA § 6724 >>

(2) Subparagraph (K) of section 6724(d)(2) of the Internal Revenue Code of 1986 is amended to read as follows:

"(K) section 6050I(e) or paragraph (4) or (5) of section 6050I(g) (relating to cash received in trade or business, etc.),".

<< 26 USCA § 6050I >>

(3) The heading for section 6050I of the Internal Revenue Code of 1986 is amended by striking "BUSINESS" and inserting "BUSINESS, ETC.".

<< 26 USCA Ch. 61 >>

(4) The table of sections for subpart B of part III of subchapter A of chapter A of chapter 61 of the Internal Revenue Code of 1986 is amended by striking "business" and inserting "business, etc." in the item relating to section 6050I.

<< 26 USCA § 6050I NOTE >>

(c) REGULATIONS.—The Secretary of the Treasury or the Secretary's delegate shall prescribe temporary regulations under the amendments made by this section within 90 days after the date of enactment of this Act.

<< 26 USCA § 6050I NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the 60th day after the date on which the temporary regulations are prescribed under subsection (c).

SEC. 20416. CIVIL RIGHTS OF INSTITUTIONALIZED PERSONS.

<< 42 USCA § 1997e >>

(a) EXHAUSTION OF ADMINISTRATIVE REMEDIES.—Section 7 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997e) is amended—
  (1) in subsection (a)—
  (A) in paragraph (1), by striking "ninety days" and inserting "180 days"; and
  (B) in paragraph (2), by inserting before the period at the end the following: "or are otherwise fair and effective"; and
  (2) in subsection (c)—
  (A) in paragraph (1) by inserting before the period at the end the following: "or are otherwise fair and effective"; and
  (B) in paragraph (2) by inserting before the period at the end the following: "or is no longer fair and effective".

<< 42 USCA § 1997e NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of enactment of this Act.

<< 18 USCA § 4042 >>

SEC. 20417. NOTIFICATION OF RELEASE OF PRISONERS.

Section 4042 of title 18, United States Code, is amended—
  (1) by striking "The Bureau" and inserting "(a) IN GENERAL.—The Bureau";
  (2) by striking "This section" and inserting "(c) APPLICATION OF SECTION.—This section";
  (3) in paragraph (4) of subsection (a), as designated by paragraph (1)—
  (A) by striking "Provide" and inserting "provide"; and
  (B) by striking the period at the end and inserting "; and";
  (4) by inserting after paragraph (4) of subsection (a), as designated by paragraph (1), the following new paragraph:
  "(5) provide notice of release of prisoners in accordance with subsection (b)."; and
  (5) by inserting after subsection (a), as designated by paragraph (1), the following new subsection:
  "(b) NOTICE OF RELEASE OF PRISONERS.—(1) At least 5 days prior to the date on which a prisoner described in paragraph (3) is to be released on supervised release, or, in the case of a prisoner on supervised release, at least 5 days prior to the date on which the prisoner changes residence to a new jurisdiction, written notice of the release or change of residence shall be provided to the chief law enforcement officer of the State and of the local jurisdiction in which the prisoner will reside. Notice prior to release shall be provided by the Director of the Bureau of Prisons. Notice concerning a change of residence following release

shall be provided by the probation officer responsible for the supervision of the released prisoner, or in a manner specified by the Director of the Administrative Office of the United States Courts. The notice requirements under this subsection do not apply in relation to a prisoner being protected under chapter 224.

"(2) A notice under paragraph (1) shall disclose—

"(A) the prisoner's name;

"(B) the prisoner's criminal history, including a description of the offense of which the prisoner was convicted; and

"(C) any restrictions on conduct or other conditions to the release of the prisoner that are imposed by law, the sentencing court, or the Bureau of Prisons or any other Federal agency.

"(3) A prisoner is described in this paragraph if the prisoner was convicted of—

"(A) a drug trafficking crime, as that term is defined in section 924(c)(2); or

"(B) a crime of violence (as defined in section 924(c)(3)).

"(4) The notice provided under this section shall be used solely for law enforcement purposes.".

<< 42 USCA § 13725 >>

SEC. 20418. CORRECTIONAL JOB TRAINING AND PLACEMENT.

(a) PURPOSE.—It is the purpose of this section to encourage and support job training programs, and job placement programs, that provide services to incarcerated persons or ex-offenders.

(b) DEFINITIONS.—As used in this section:

(1) CORRECTIONAL INSTITUTION.—The term "correctional institution" means any prison, jail, reformatory, work farm, detention center, or halfway house, or any other similar institution designed for the confinement or rehabilitation of criminal offenders.

(2) CORRECTIONAL JOB TRAINING OR PLACEMENT PROGRAM.—The term "correctional job training or placement program" means an activity that provides job training or job placement services to incarcerated persons or ex-offenders, or that assists incarcerated persons or ex-offenders in obtaining such services.

(3) EX-OFFENDER.—The term "ex-offender" means any individual who has been sentenced to a term of probation by a Federal or State court, or who has been released from a Federal, State, or local correctional institution.

(4) INCARCERATED PERSON.—The term "incarcerated person" means any individual incarcerated in a Federal or State correctional institution who is charged with or convicted of any criminal offense.

(c) ESTABLISHMENT OF OFFICE.—

(1) IN GENERAL.—The Attorney General shall establish within the Department of Justice an Office of Correctional Job Training and Placement. The Office shall be headed by a Director, who shall be appointed by the Attorney General.

(2) TIMING.—The Attorney General shall carry out this subsection not later than 6 months after the date of enactment of this section.

(d) FUNCTIONS OF OFFICE.—The Attorney General, acting through the Director of the Office of Correctional Job Training and Placement, in consultation with the Secretary of Labor, shall—

(1) assist in coordinating the activities of the Federal Bonding Program of the Department of Labor, the activities of the Department of Labor related to the certification of eligibility for targeted jobs credits under section 51 of the Internal Revenue Code of 1986 with respect to ex-offenders, and any other correctional job training or placement program of the Department of Justice or Department of Labor;

(2) provide technical assistance to State and local employment and training agencies that—

(A) receive financial assistance under this Act; or

(B) receive financial assistance through other programs carried out by the Department of Justice or Department of Labor, for activities related to the development of employability;

(3) prepare and implement the use of special staff training materials, and methods, for developing the staff competencies needed by State and local agencies to assist incarcerated persons and ex-offenders in gaining marketable occupational skills and job placement;

(4) prepare and submit to Congress an annual report on the activities of the Office of Correctional Job Training and Placement, and the status of correctional job training or placement programs in the United States;

(5) cooperate with other Federal agencies carrying out correctional job training or placement programs to ensure coordination of such programs throughout the United States;

(6) consult with, and provide outreach to—

  (A) State job training coordinating councils, administrative entities, and private industry councils, with respect to programs carried out under this Act; and

  (B) other State and local officials, with respect to other employment or training programs carried out by the Department of Justice or Department of Labor;

(7) collect from States information on the training accomplishments and employment outcomes of a sample of incarcerated persons and ex-offenders who were served by employment or training programs carried out, or that receive financial assistance through programs carried out, by the Department of Justice or Department of Labor; and

(8)(A) collect from States and local governments information on the development and implementation of correctional job training or placement programs; and

(B) disseminate such information, as appropriate.

<< 42 USCA Ch. 136 >>

TITLE III—CRIME PREVENTION

Subtitle A—Ounce of Prevention Council

<< 42 USCA § 13741 >>

SEC. 30101. OUNCE OF PREVENTION COUNCIL.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—There is established an Ounce of Prevention Council (referred to in this title as the "Council"), the members of which—

  (A) shall include the Attorney General, the Secretary of Education, the Secretary of Health and Human Services, the Secretary of Housing and Urban Development, the Secretary of Labor, the Secretary of Agriculture, the Secretary of the Treasury, the Secretary of the Interior, and the Director of the Office of National Drug Control Policy; and

  (B) may include other officials of the executive branch as directed by the President.

(2) CHAIR.—The President shall designate the Chair of the Council from among its members (referred to in this title as the "Chair").

(3) STAFF.—The Council may employ any necessary staff to carry out its functions, and may delegate any of its functions or powers to a member or members of the Council.

(b) PROGRAM COORDINATION.—For any program authorized under the Violent Crime Control and Law Enforcement Act of 1994, the Ounce of Prevention Council Chair, only at the request of the Council member with jurisdiction over that program, may coordinate that program, in whole or in part, through the Council.

(c) ADMINISTRATIVE RESPONSIBILITIES AND POWERS.—In addition to the program coordination provided in subsection (b), the Council shall be responsible for such functions as coordinated planning, development of a comprehensive crime prevention program catalogue, provision of assistance to communities and community-based organizations seeking information regarding crime prevention programs and integrated program service delivery, and development of strategies for program integration and grant simplification. The Council shall have the authority to audit the expenditure of funds received by grantees under programs administered by or coordinated through the Council. In consultation with the Council, the Chair may issue regulations and guidelines to carry out this subtitle and programs administered by or coordinated through the Council.

<< 42 USCA § 13742 >>

SEC. 30102. OUNCE OF PREVENTION GRANT PROGRAM.

(a) IN GENERAL.—The Council may make grants for—

(1) summer and after-school (including weekend and holiday) education and recreation programs;

(2) mentoring, tutoring, and other programs involving participation by adult role models (such as D.A.R.E. America);

(3) programs assisting and promoting employability and job placement; and

(4) prevention and treatment programs to reduce substance abuse, child abuse, and adolescent pregnancy, including outreach programs for at-risk families.

(b) APPLICANTS.—Applicants may be Indian tribal governments, cities, counties, or other municipalities, school boards, colleges and universities, private nonprofit entities, or consortia of eligible applicants. Applicants must show that a planning process has occurred that has involved organizations, institutions, and residents of target areas, including young people, and that there has been cooperation between neighborhood-based entities, municipality-wide bodies, and local private-sector representatives. Applicants must demonstrate the substantial involvement of neighborhood-based entities in the carrying out of the proposed activities. Proposals must demonstrate that a broad base of collaboration and coordination will occur in the implementation of the proposed activities, involving cooperation among youth-serving organizations, schools, health and social service providers, employers, law enforcement professionals, local government, and residents of target areas, including young people. Applications shall be geographically based in particular neighborhoods or sections of municipalities or particular segments of rural areas, and applications shall demonstrate how programs will serve substantial proportions of children and youth resident in the target area with activities designed to have substantial impact on their lives.

(c) PRIORITY.—In making such grants, the Council shall give preference to coalitions consisting of a broad spectrum of community-based and social service organizations that have a coordinated team approach to reducing gang membership and the effects of substance abuse, and providing alternatives to at-risk youth.

(d) FEDERAL SHARE.—

(1) IN GENERAL.—The Federal share of a grant made under this part may not exceed 75 percent of the total costs of the projects described in the applications submitted under subsection (b) for the fiscal year for which the projects receive assistance under this title.

(2) WAIVER.—The Council may waive the 25 percent matching requirement under paragraph (1) upon making a determination that a waiver is equitable in view of the financial circumstances affecting the ability of the applicant to meet that requirement.

(3) NON-FEDERAL SHARE.—The non-Federal share of such costs may be in cash or in kind, fairly evaluated, including plant, equipment, and services.

(4) NONSUPPLANTING REQUIREMENT.—Funds made available under this title to a governmental entity shall not be used to supplant State or local funds, or in the case of Indian tribal governments, funds supplied by the Bureau of Indian Affairs, but shall be used to increase the amount of funds that would, in the absence of Federal funds received under this title, be made available from State or local sources, or in the case of Indian tribal governments, from funds supplied by the Bureau of Indian Affairs.

(5) EVALUATION.—The Council shall conduct a thorough evaluation of the programs assisted under this title.

<< 42 USCA § 13743 >>

SEC. 30103. DEFINITION.

In this subtitle, "Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

<< 42 USCA § 13744 >>

SEC. 30104. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to carry out this subtitle—

(1) $1,500,000 for fiscal year 1995;

(2) $14,700,000 for fiscal year 1996;

(3) $18,000,000 for fiscal year 1997;

(4) $18,000,000 for fiscal year 1998;

(5) $18,900,000 for fiscal year 1999; and

(6) $18,900,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

Subtitle B—Local Crime Prevention Block Grant Program

<< 42 USCA § 13751 >>

SEC. 30201. PAYMENTS TO LOCAL GOVERNMENTS.

(a) PAYMENT AND USE.—

(1) PAYMENT.—The Attorney General, shall pay to each unit of general local government which qualifies for a payment under this subtitle an amount equal to the sum of any amounts allocated to the government under this subtitle for each payment period. The Attorney General shall pay such amount from amounts appropriated under section 30202.

(2) USE.—Amounts paid to a unit of general local government under this section shall be used by that unit for carrying out one or more of the following purposes:

(A) Education, training, research, prevention, diversion, treatment, and rehabilitation programs to prevent juvenile violence, juvenile gangs, and the use and sale of illegal drugs by juveniles.

(B) Programs to prevent crimes against the elderly based on the concepts of the Triad model.

(C) Programs that prevent young children from becoming gang involved, including the award of grants or contracts to community-based service providers that have a proven track record of providing services to children ages 5 to 18.

(D) Saturation jobs programs, offered either separately or in conjunction with the services provided for under the Youth Fair Chance Program, that provide employment opportunities leading to permanent unsubsidized employment for disadvantaged young adults 16 through 25 years of age.

(E) Midnight sports league programs that shall require each player in the league to attend employment counseling, job training, and other educational classes provided under the program, which shall be held in conjunction with league sports games at or near the site of the games.

(F) Supervised sports and recreation programs, including Olympic Youth Development Centers established in cooperation with the United States Olympic Committee, that are offered—

(i) after school and on weekends and holidays, during the school year; and

(ii) as daily (or weeklong) full-day programs (to the extent available resources permit) or as part-day programs, during the summer months.

(G) Prevention and enforcement programs to reduce—

(i) the formation or continuation of juvenile gangs; and

(ii) the use and sale of illegal drugs by juveniles.

(H) Youth anticrime councils to give intermediate and secondary school students a structured forum through which to work with community organizations, law enforcement officials, government and media representatives, and school administrators and faculty to address issues regarding youth and violence.

(I) Award of grants or contracts to the Boys and Girls Clubs of America, a national nonprofit youth organization, to establish Boys and Girls Clubs in public housing.

(J) Supervised visitation centers for children who have been removed from their parents and placed outside the home as a result of abuse or neglect or other risk of harm to them and for children whose parents are separated or divorced and the children are at risk because—

(i) there is documented sexual, physical, or emotional abuse as determined by a court of competent jurisdiction;

(ii) there is suspected or elevated risk of sexual, physical, or emotional abuse, or there have been threats of parental abduction of the child;

(iii) due to domestic violence, there is an ongoing risk of harm to a parent or child;

(iv) a parent is impaired because of substance abuse or mental illness;

(v) there are allegations that a child is at risk for any of the reasons stated in clauses (i), (ii), (iii), and (iv), pending an investigation of the allegations; or

(vi) other circumstances, as determined by a court of competent jurisdiction, point to the existence of such a risk.

(K) Family Outreach Teams which provide a youth worker, a parent worker, and a school-parent organizer to provide training in outreach, mentoring, community organizing and peer counseling and mentoring to locally recruited volunteers in a particular area.

(L) To establish corridors of safety for senior citizens by increasing the numbers, presence, and watchfulness of law enforcement officers, community groups, and business owners and employees.

(M) Teams or units involving both specially trained law enforcement professionals and child or family services professionals that on a 24-hour basis respond to or deal with violent incidents in which a child is involved as a perpetrator, witness, or victim.

(N) Dwelling units to law enforcement officers without charge or at a substantially reduced rent for the purpose of providing greater security for residents of high crime areas.

(b) TIMING OF PAYMENTS.—The Attorney General shall pay each amount allocated under this subtitle to a unit of general local government for a payment period by the later of 90 days after the date the amount is available or the first day of the payment period if the unit of general local government has provided the Attorney General with the assurances required by section 30203(d).

(c) ADJUSTMENTS.—

(1) IN GENERAL.—Subject to paragraph (2), the Attorney General shall adjust a payment under this subtitle to a unit of general local government to the extent that a prior payment to the government was more or less than the amount required to be paid.

(2) CONSIDERATIONS.—The Attorney General may increase or decrease under this subsection a payment to a unit of general local government only if the Attorney General determines the need for the increase or decrease, or the unit requests the increase or decrease, within one year after the end of the payment period for which the payment was made.

(d) RESERVATION FOR ADJUSTMENTS.—The Attorney General may reserve a percentage of not more than 2 percent of the amount under this section for a payment period for all units of general local government in a State if the Attorney General considers the reserve is necessary to ensure the availability of sufficient amounts to pay adjustments after the final allocation of amounts among the units of general local government in the State.

(e) REPAYMENT OF UNEXPENDED AMOUNTS.—

(1) REPAYMENT REQUIRED.—A unit of general local government shall repay to the Attorney General, by not later than 15 months after receipt from the Attorney General, any amount that is—

(A) paid to the unit from amounts appropriated under the authority of this section; and

(B) not expended by the unit within one year after receipt from the Attorney General.

(2) PENALTY FOR FAILURE TO REPAY.—If the amount required to be repaid is not repaid, the Attorney General shall reduce payments in future payment periods accordingly.

(3) DEPOSIT OF AMOUNTS REPAID.—Amounts received by the Attorney General as repayments under this subsection shall be deposited in a designated fund for future payments to units of general local government.

(f) NONSUPPLANTING REQUIREMENT.—Funds made available under this subtitle to units of local government shall not be used to supplant State or local funds, but will be used to increase the amount of funds that would, in the absence of funds under this subtitle, be made available from State or local sources.

<< 42 USCA § 13752 >>

SEC. 30202. AUTHORIZATION OF APPROPRIATIONS.

(a) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subtitle—

(1) $75,940,000 for fiscal year 1996;

(2) $75,940,000 for fiscal year 1997;

(3) $75,940,000 for fiscal year 1998;

(4) $75,940,000 for fiscal year 1999; and

(5) $73,240,000 for fiscal year 2000.

Such sums are to remain available until expended.

(b) ADMINISTRATIVE COSTS.—Up to 2.5 percent of the amount authorized to be appropriated under subsection (b) is authorized to be appropriated for the period fiscal year 1995 through fiscal year 2000 to be available for administrative costs by the Attorney General in furtherance of the purposes of the program. Such sums are to remain available until expended.

<< 42 USCA § 13753 >>

SEC. 30203. QUALIFICATION FOR PAYMENT.

(a) IN GENERAL.—The Attorney General shall issue regulations establishing procedures under which eligible units of general local government are required to provide notice to the Attorney General of the units' proposed use of assistance under this subtitle.

(b) GENERAL REQUIREMENTS FOR QUALIFICATION.—A unit of general local government qualifies for a payment under this subtitle for a payment period only after establishing to the satisfaction of the Attorney General that—

(1) the government will establish a trust fund in which the government will deposit all payments received under this subtitle;

(2) the government will use amounts in the trust fund (including interest) during a reasonable period;

(3) the government will expend the payments so received, in accordance with the laws and procedures that are applicable to the expenditure of revenues of the government;

(4) if at least 25 percent of the pay of individuals employed by the government in a public employee occupation is paid out of the trust fund, individuals in the occupation any part of whose pay is paid out of the trust fund will receive pay at least equal to the prevailing rate of pay for individuals employed in similar public employee occupations by the government;

(5) the government will use accounting, audit, and fiscal procedures that conform to guidelines which shall be prescribed by the Attorney General after consultation with the Comptroller General of the United States. As applicable, amounts received under this subtitle shall be audited in compliance with the Single Audit Act of 1984;

(6) after reasonable notice to the government, the government will make available to the Attorney General and the Comptroller General of the United States, with the right to inspect, records the Attorney General reasonably requires to review compliance with this subtitle or the Comptroller General of the United States reasonably requires to review compliance and operations;

(7) the government will make reports the Attorney General reasonably requires, in addition to the annual reports required under this subtitle; and

(8) the government will spend the funds only for the purposes set forth in section 30201(a)(2).

(c) REVIEW BY GOVERNORS.—A unit of general local government shall give the chief executive officer of the State in which the government is located an opportunity for review and comment before establishing compliance with subsection (d).

(d) SANCTIONS FOR NONCOMPLIANCE.—

(1) IN GENERAL.—If the Attorney General decides that a unit of general local government has not complied substantially with subsection (b) or regulations prescribed under subsection (b), the Attorney General shall notify the government. The notice shall state that if the government does not take corrective action by the 60th day after the date the government receives the notice, the Attorney General will withhold additional payments to the government for the current payment period and later payment periods until the Attorney General is satisfied that the government—

(A) has taken the appropriate corrective action; and

(B) will comply with subsection (b) and regulations prescribed under subsection (b).

(2) NOTICE.—Before giving notice under paragraph (1), the Attorney General shall give the chief executive officer of the unit of general local government reasonable notice and an opportunity for comment.

(3) PAYMENT CONDITIONS.—The Attorney General may make a payment to a unit of general local government notified under paragraph (1) only if the Attorney General is satisfied that the government—

(A) has taken the appropriate corrective action; and

(B) will comply with subsection (b) and regulations prescribed under subsection (b).

<< 42 USCA § 13754 >>

AR.01890

43

SEC. 30204. ALLOCATION AND DISTRIBUTION OF FUNDS.

(a) STATE DISTRIBUTION.—For each payment period, the Attorney General shall allocate out of the amount appropriated for the period under the authority of section 30202—

(1) 0.25 percent to each State; and

(2) Of the total amount of funds remaining after allocation under paragraph (1), an amount that is equal to the ratio that the number of part 1 violent crimes reported by such State to the Federal Bureau of Investigation for 1993 bears to the number of part 1 violent crimes reported by all States to the Federal Bureau of Investigation for 1993

(b) LOCAL DISTRIBUTION.—(1) The Attorney General shall allocate among the units of general local government in a State the amount allocated to the State under paragraphs (1) and (2) of subsection (a).

(2) The Attorney General shall allocate to each unit of general local government an amount which bears the ratio that the number of part 1 violent crimes reported by such unit to the Federal Bureau of Investigation for 1993 bears to the number of part 1 violent crimes reported by all units in the State in which the unit is located to the Federal Bureau of Investigation for 1993 multiplied by the ratio of the population living in all units in the State in which the unit is located that reported part 1 violent crimes to the Federal Bureau of Investigation for 1993 bears to the population of the State; or if such data are not available for a unit, the ratio that the population of such unit bears to the population of all units in the State in which the unit is located for which data are not available multiplied by the ratio of the population living in units in the State in which the unit is located for which data are not available bears to the population of the State.

(3) If under paragraph (2) a unit is allotted less than $5,000 for the payment period, the amount allotted shall be transferred to the Governor of the State who shall equitably distribute the allocation to all such units or consortia thereof.

(4) If there is in a State a unit of general local government that has been incorporated since the date of the collection of the data used by the Attorney General in making allocations pursuant to this section, the Attorney General shall allocate to this newly incorporated local government, out of the amount allocated to the State under this section, an amount bearing the same ratio to the amount allocated to the State as the population of the newly incorporated local government bears to the population of the State. If there is in the State a unit of general local government that has been annexed since the date of the collection of the data used by the Attorney General in making allocations pursuant to this section, the Attorney General shall pay the amount that would have been allocated to this local government to the unit of general local government that annexed it.

(c) UNAVAILABILITY OF INFORMATION.—For purposes of this section, if data regarding part 1 violent crimes in any State for 1993 is unavailable or substantially inaccurate, the Attorney General shall utilize the best available comparable data regarding the number of violent crimes for 1993 for such State for the purposes of allocation of any funds under this subtitle.

<< 42 USCA § 13755 >>

SEC. 30205. UTILIZATION OF PRIVATE SECTOR.

Funds or a portion of funds allocated under this subtitle may be utilized to contract with private, nonprofit entities or community-based organizations to carry out the uses specified under section 30201(a)(2).

<< 42 USCA § 13756 >>

SEC. 30206. PUBLIC PARTICIPATION.

A unit of general local government expending payments under this subtitle shall hold at least one public hearing on the proposed use of the payment in relation to its entire budget. At the hearing, persons shall be given an opportunity to provide written and oral views to the governmental authority responsible for enacting the budget and to ask questions about the entire budget and the relation of the payment to the entire budget. The government shall hold the hearing at a time and a place that allows and encourages public attendance and participation.

<< 42 USCA § 13757 >>

SEC. 30207. ADMINISTRATIVE PROVISIONS.

  The administrative provisions of part H of the Omnibus Crime Control and Safe Streets Act of 1968, shall apply to the Attorney General for purposes of carrying out this subtitle.

<< 42 USCA § 13758 >>

SEC. 30208. DEFINITIONS.

  For purposes of this subtitle:
  (1) The term "unit of general local government" means—
    (A) a county, township, city, or political subdivision of a county, township, or city, that is a unit of general local government as determined by the Secretary of Commerce for general statistical purposes; and
    (B) the District of Columbia and the recognized governing body of an Indian tribe or Alaskan Native village that carries out substantial governmental duties and powers.
  (2) The term "payment period" means each 1-year period beginning on October 1 of the years 1995 through 2000.
  (3) The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands, except that American Samoa, Guam, and the Northern Mariana Islands shall be considered as one State and that, for purposes of section 30204(a), 33 per centum of the amounts allocated shall be allocated to American Samoa, 50 per centum to Guam, and 17 per centum to the Northern Mariana Islands.
  (4) The term "children" means persons who are not younger than 5 and not older than 18 years old.
  (5) The term "part 1 violent crimes" means murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault as reported to the Federal Bureau of Investigation for purposes of the Uniform Crime Reports.

<< 42 USCA Ch. 136 >>

Subtitle C—Model Intensive Grant Programs

<< 42 USCA § 13771 >>

SEC. 30301. GRANT AUTHORIZATION.

  (a) ESTABLISHMENT.—
  (1) IN GENERAL.—The Attorney General may award grants to not more than 15 chronic high intensive crime areas to develop comprehensive model crime prevention programs that—
    (A) involve and utilize a broad spectrum of community resources, including nonprofit community organizations, law enforcement organizations, and appropriate State and Federal agencies, including the State educational agencies;
    (B) attempt to relieve conditions that encourage crime; and
    (C) provide meaningful and lasting alternatives to involvement in crime.
  (2) CONSULTATION WITH THE OUNCE OF PREVENTION COUNCIL.—The Attorney General may consult with the Ounce of Prevention Council in awarding grants under paragraph (1).
  (b) PRIORITY.—In awarding grants under subsection (a), the Attorney General shall give priority to proposals that—
  (1) are innovative in approach to the prevention of crime in a specific area;
  (2) vary in approach to ensure that comparisons of different models may be made; and
  (3) coordinate crime prevention programs funded under this program with other existing Federal programs to address the overall needs of communities that benefit from grants received under this title.

<< 42 USCA § 13772 >>

SEC. 30302. USES OF FUNDS.

(a) IN GENERAL.—Funds awarded under this subtitle may be used only for purposes described in an approved application. The intent of grants under this subtitle is to fund intensively comprehensive crime prevention programs in chronic high intensive crime areas.

(b) GUIDELINES.—The Attorney General shall issue and publish in the Federal Register guidelines that describe suggested purposes for which funds under approved programs may be used.

(c) EQUITABLE DISTRIBUTION OF FUNDS.—In disbursing funds under this subtitle, the Attorney General shall ensure the distribution of awards equitably on a geographic basis, including urban and rural areas of varying population and geographic size.

<< 42 USCA § 13773 >>

SEC. 30303. PROGRAM REQUIREMENTS.

(a) DESCRIPTION.—An applicant shall include a description of the distinctive factors that contribute to chronic violent crime within the area proposed to be served by the grant. Such factors may include lack of alternative activities and programs for youth, deterioration or lack of public facilities, inadequate public services such as public transportation, street lighting, community-based substance abuse treatment facilities, or employment services offices, and inadequate police or public safety services, equipment, or facilities.

(b) COMPREHENSIVE PLAN.—An applicant shall include a comprehensive, community-based plan to attack intensively the principal factors identified in subsection (a). Such plans shall describe the specific purposes for which funds are proposed to be used and how each purpose will address specific factors. The plan also shall specify how local nonprofit organizations, government agencies, private businesses, citizens groups, volunteer organizations, and interested citizens will cooperate in carrying out the purposes of the grant.

(c) EVALUATION.—An applicant shall include an evaluation plan by which the success of the plan will be measured, including the articulation of specific, objective indicia of performance, how the indicia will be evaluated, and a projected timetable for carrying out the evaluation.

<< 42 USCA § 13774 >>

SEC. 30304. APPLICATIONS.

To request a grant under this subtitle the chief local elected official of an area shall—

(1) prepare and submit to the Attorney General an application in such form, at such time, and in accordance with such procedures, as the Attorney General shall establish; and

(2) provide an assurance that funds received under this subtitle shall be used to supplement, not supplant, non-Federal funds that would otherwise be available for programs funded under this subtitle.

<< 42 USCA § 13775 >>

SEC. 30305. REPORTS.

Not later than December 31, 1998, the Attorney General shall prepare and submit to the Committees on the Judiciary of the House and Senate an evaluation of the model programs developed under this subtitle and make recommendations regarding the implementation of a national crime prevention program.

<< 42 USCA § 13776 >>

SEC. 30306. DEFINITIONS.

In this subtitle—

"chief local elected official" means an official designated under regulations issued by the Attorney General. The criteria used by the Attorney General in promulgating such regulations shall ensure administrative efficiency and accountability in the expenditure of funds and execution of funded projects under this subtitle.

"chronic high intensity crime area" means an area meeting criteria adopted by the Attorney General by regulation that, at a minimum, define areas with—

    (A) consistently high rates of violent crime as reported in the Federal Bureau of Investigation's "Uniform Crime Reports", and

    (B) chronically high rates of poverty as determined by the Bureau of the Census.

"State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.

<< 42 USCA § 13777 >>

SEC. 30307. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to carry out this subtitle—

    (1) $100,000,000 for fiscal year 1996;

    (2) $125,100,000 for fiscal year 1997;

    (3) $125,100,000 for fiscal year 1998;

    (4) $125,100,000 for fiscal year 1999; and

    (5) $150,200,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

Subtitle D—Family and Community Endeavor Schools Grant Program

<< 42 USCA § 13791 >>

SEC. 30401. COMMUNITY SCHOOLS YOUTH SERVICES AND SUPERVISION GRANT PROGRAM.

(a) SHORT TITLE.—This section may be cited as the "Community Schools Youth Services and Supervision Grant Program Act of 1994".

(b) DEFINITIONS.—In this section—

"child" means a person who is not younger than 5 and not older than 18 years old.

"community-based organization" means a private, locally initiated, community-based organization that—

    (A) is a nonprofit organization, as defined in section 103(23) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5603(23)); and

    (B) is operated by a consortium of service providers, consisting of representatives of 5 or more of the following categories of persons:

        (i) Residents of the community.

        (ii) Business and civic leaders actively involved in providing employment and business development opportunities in the community.

        (iii) Educators.

        (iv) Religious organizations (which shall not provide any sectarian instruction or sectarian worship in connection with an activity funded under this title).

        (v) Law enforcement agencies.

        (vi) Public housing agencies.

        (vii) Other public agencies.

        (viii) Other interested parties.

"eligible community" means an area identified pursuant to subsection (e).

"Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"poverty line" means the income official poverty line (as defined by the Office of Management and Budget, and revised annually in accordance with section 673(2) of the Community Services Block Grant Act (42 U.S.C. 9902(2)) applicable to a family of the size involved.

"public school" means a public elementary school, as defined in section 1201(i) of the Higher Education Act of 1965 (20 U.S.C. 1141(i)), and a public secondary school, as defined in section 1201(d) of that Act.

"Secretary" means the Secretary of Health and Human Services, in consultation and coordination with the Attorney General.

"State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, and the United States Virgin Islands.

(c) PROGRAM AUTHORITY.—

 (1) IN GENERAL.—

 (A) ALLOCATIONS FOR STATES AND INDIAN COUNTRY.—For any fiscal year in which the sums appropriated to carry out this section equal or exceed $20,000,000, from the sums appropriated to carry out this subsection, the Secretary shall allocate, for grants under subparagraph (B) to community-based organizations in each State, an amount bearing the same ratio to such sums as the number of children in the State who are from families with incomes below the poverty line bears to the number of children in all States who are from families with incomes below the poverty line. In view of the extraordinary need for assistance in Indian country, an appropriate amount of funds available under this subtitle shall be made available for such grants in Indian country.

 (B) GRANTS TO COMMUNITY-BASED ORGANIZATIONS FROM ALLOCATIONS.—For such a fiscal year, the Secretary may award grants from the appropriate State or Indian country allocation determined under subparagraph (A) on a competitive basis to eligible community-based organizations to pay for the Federal share of assisting eligible communities to develop and carry out programs in accordance with this section.

 (C) REALLOCATION.—If, at the end of such a fiscal year, the Secretary determines that funds allocated for community-based organizations in a State or Indian country under subparagraph (B) remain unobligated, the Secretary may use such funds to award grants to eligible community-based organizations in another State or Indian country to pay for such Federal share. In awarding such grants, the Secretary shall consider the need to maintain geographic diversity among the recipients of such grants. Amounts made available through such grants shall remain available until expended.

 (2) OTHER FISCAL YEARS.—For any fiscal year in which the sums appropriated to carry out this section are less than $20,000,000, the Secretary may award grants on a competitive basis to eligible community-based organizations to pay for the Federal share of assisting eligible communities to develop and carry out programs in accordance with this section.

 (3) ADMINISTRATIVE COSTS.—The Secretary may use not more than 3 percent of the funds appropriated to carry out this section in any fiscal year for administrative costs.

(d) PROGRAM REQUIREMENTS.—

 (1) LOCATION.—A community-based organization that receives a grant under this section to assist in carrying out such a program shall ensure that the program is carried out—

 (A) when appropriate, in the facilities of a public school during nonschool hours; or

 (B) in another appropriate local facility in a State or Indian country, such as a college or university, a local or State park or recreation center, church, or military base, that is—

 (i) in a location that is easily accessible to children in the community; and

 (ii) in compliance with all applicable local ordinances.

 (2) USE OF FUNDS.—Such community-based organization—

 (A) shall use funds made available through the grant to provide, to children in the eligible community, services and activities that—

 (i) shall include supervised sports programs, and extracurricular and academic programs, that are offered—

 (I) after school and on weekends and holidays, during the school year; and

 (II) as daily full-day programs (to the extent available resources permit) or as part-day programs, during the summer months;

 (B) in providing such extracurricular and academic programs, shall provide programs such as curriculum-based supervised educational, work force preparation, entrepreneurship, cultural, health programs, social activities, arts and crafts programs, dance programs, tutorial and mentoring programs, and other related activities;

AR.01895

(C) may use—

 (i) such funds for minor renovation of facilities that are in existence prior to the operation of the program and that are necessary for the operation of the program for which the organization receives the grant, purchase of sporting and recreational equipment and supplies, reasonable costs for the transportation of participants in the program, hiring of staff, provision of meals for such participants, provision of health services consisting of an initial basic physical examination, provision of first aid and nutrition guidance, family counselling, parental training, and substance abuse treatment where appropriate; and

 (ii) not more than 5 percent of such funds to pay for the administrative costs of the program; and

 (D) may not use such funds to provide sectarian worship or sectarian instruction.

(e) ELIGIBLE COMMUNITY IDENTIFICATION.—

 (1) IDENTIFICATION.—To be eligible to receive a grant under this section, a community-based organization shall identify an eligible community to be assisted under this section.

 (2) CRITERIA.—Such eligible community shall be an area that meets such criteria with respect to significant poverty and significant juvenile delinquency, and such additional criteria, as the Secretary may by regulation require.

(f) APPLICATIONS.—

 (1) APPLICATION REQUIRED.—To be eligible to receive a grant under this section, a community-based organization shall submit an application to the Secretary at such time, in such manner, and accompanied by such information, as the Secretary may reasonably require, and obtain approval of such application.

 (2) CONTENTS OF APPLICATION.—Each application submitted pursuant to paragraph (1) shall—

 (A) describe the activities and services to be provided through the program for which the grant is sought;

 (B) contain an assurance that the community-based organization will spend grant funds received under this section in a manner that the community-based organization determines will best accomplish the objectives of this section;

 (C) contain a comprehensive plan for the program that is designed to achieve identifiable goals for children in the eligible community;

 (D) set forth measurable goals and outcomes for the program that—

 (i) will—

 (I) where appropriate, make a public school the focal point of the eligible community; or

 (II) make a local facility described in subsection (d)(1)(B) such focal point; and

 (ii) may include reducing the percentage of children in the eligible community that enter the juvenile justice system, increasing the graduation rates, school attendance, and academic success of children in the eligible community, and improving the skills of program participants;

 (E) provide evidence of support for accomplishing such goals and outcomes from—

 (i) community leaders;

 (ii) businesses;

 (iii) local educational agencies;

 (iv) local officials;

 (v) State officials;

 (vi) Indian tribal government officials; and

 (vii) other organizations that the community-based organization determines to be appropriate;

 (F) contain an assurance that the community-based organization will use grant funds received under this section to provide children in the eligible community with activities and services that shall include supervised sports programs, and extracurricular and academic programs, in accordance with subparagraphs (A) and (B) of subsection (d)(2);

 (G) contain a list of the activities and services that will be offered through the program for which the grant is sought and sponsored by private nonprofit organizations, individuals, and groups serving the eligible community, including—

 (i) extracurricular and academic programs, such as programs described in subsection (d)(2)(B); and

 (ii) activities that address specific needs in the community;

 (H) demonstrate the manner in which the community-based organization will make use of the resources, expertise, and commitment of private entities in carrying out the program for which the grant is sought;

 (I) include an estimate of the number of children in the eligible community expected to be served pursuant to the program;

(J) include a description of charitable private resources, and all other resources, that will be made available to achieve the goals of the program;

(K) contain an assurance that the community-based organization will use competitive procedures when purchasing, contracting, or otherwise providing for goods, activities, or services to carry out programs under this section;

(L) contain an assurance that the program will maintain a staff-to-participant ratio (including volunteers) that is appropriate to the activity or services provided by the program;

(M) contain an assurance that the program will maintain an average attendance rate of not less than 75 percent of the participants enrolled in the program, or will enroll additional participants in the program;

(N) contain an assurance that the community-based organization will comply with any evaluation under subsection (m), any research effort authorized under Federal law, and any investigation by the Secretary;

(O) contain an assurance that the community-based organization shall prepare and submit to the Secretary an annual report regarding any program conducted under this section;

(P) contain an assurance that the program for which the grant is sought will, to the maximum extent possible, incorporate services that are provided solely through non-Federal private or nonprofit sources; and

(Q) contain an assurance that the community-based organization will maintain separate accounting records for the program.

(3) PRIORITY.—In awarding grants to carry out programs under this section, the Secretary shall give priority to community-based organizations who submit applications that demonstrate the greatest effort in generating local support for the programs.

(g) ELIGIBILITY OF PARTICIPANTS.—

(1) IN GENERAL.—To the extent possible, each child who resides in an eligible community shall be eligible to participate in a program carried out in such community that receives assistance under this section.

(2) ELIGIBILITY.—To be eligible to participate in a program that receives assistance under this section, a child shall provide the express written approval of a parent or guardian, and shall submit an official application and agree to the terms and conditions of participation in the program.

(3) NONDISCRIMINATION.—In selecting children to participate in a program that receives assistance under this section, a community-based organization shall not discriminate on the basis of race, color, religion, sex, national origin, or disability.

(h) PEER REVIEW PANEL.—

(1) ESTABLISHMENT.—The Secretary may establish a peer review panel that shall be comprised of individuals with demonstrated experience in designing and implementing community-based programs.

(2) COMPOSITION.—A peer review panel shall include at least 1 representative from each of the following:

(A) A community-based organization.

(B) A local government.

(C) A school district.

(D) The private sector.

(E) A charitable organization.

(F) A representative of the United States Olympic Committee, at the option of the Secretary.

(3) FUNCTIONS.—A peer review panel shall conduct the initial review of all grant applications received by the Secretary under subsection (f), make recommendations to the Secretary regarding—

(A) grant funding under this section; and

(B) a design for the evaluation of programs assisted under this section.

(i) INVESTIGATIONS AND INSPECTIONS.—The Secretary may conduct such investigations and inspections as may be necessary to ensure compliance with the provisions of this section.

(j) PAYMENTS; FEDERAL SHARE; NON-FEDERAL SHARE.—

(1) PAYMENTS.—The Secretary shall, subject to the availability of appropriations, pay to each community-based organization having an application approved under subsection (f) the Federal share of the costs of developing and carrying out programs described in subsection (c).

(2) FEDERAL SHARE.—The Federal share of such costs shall be no more than—

(A) 75 percent for each of fiscal years 1995 and 1996;

(B) 70 percent for fiscal year 1997; and

(C) 60 percent for fiscal year 1998 and thereafter.

(3) NON-FEDERAL SHARE.—

(A) IN GENERAL.—The non-Federal share of such costs may be in cash or in kind, fairly evaluated, including plant, equipment, and services (including the services described in subsection (f)(2)(P)), and funds appropriated by the Congress for the activity of any agency of an Indian tribal government or the Bureau of Indian Affairs on any Indian lands may be used to provide the non-Federal share of the costs of programs or projects funded under this subtitle.

(B) SPECIAL RULE.—At least 15 percent of the non-Federal share of such costs shall be provided from private or nonprofit sources.

(k) EVALUATION.—The Secretary shall conduct a thorough evaluation of the programs assisted under this section, which shall include an assessment of—

(1) the number of children participating in each program assisted under this section;

(2) the academic achievement of such children;

(3) school attendance and graduation rates of such children; and

(4) the number of such children being processed by the juvenile justice system.

<< 42 USCA § 13792 >>

SEC. 30402. FAMILY AND COMMUNITY ENDEAVOR SCHOOLS GRANT PROGRAM.

(a) SHORT TITLE.—This section may be cited as the "Family and Community Endeavor Schools Act".

(b) PURPOSE.—It is the purpose of this section to improve the overall development of at-risk children who reside in eligible communities as defined in subsection (l)(3).

(c) PROGRAM AUTHORITY.—The Secretary may award grants on a competitive basis to eligible local entities to pay for the Federal share of assisting eligible communities to develop and carry out programs in accordance with this section. No local entity shall receive a grant of less than $250,000 in a fiscal year. Amounts made available through such grants shall remain available until expended.

(d) PROGRAM REQUIREMENTS.—

(1) IMPROVEMENT PROGRAMS.—A local entity that receives funds under this section shall develop or expand programs that are designed to improve academic and social development by instituting a collaborative structure that trains and coordinates the efforts of teachers, administrators, social workers, guidance counselors, parents, and school volunteers to provide concurrent social services for at-risk students at selected public schools in eligible communities.

(2) OPTIONAL ACTIVITIES.—A local entity that receives funds under this section may develop a variety of programs to serve the comprehensive needs of students, including—

(A) homework assistance and after-school programs, including educational, social, and athletic activities;

(B) nutrition services;

(C) mentoring programs;

(D) family counseling; and

(E) parental training programs.

(e) ELIGIBLE COMMUNITY IDENTIFICATION.—The Secretary through regulation shall define the criteria necessary to qualify as an eligible community as defined in subsection (l)(3).

(f) GRANT ELIGIBILITY.—To be eligible to receive a grant under this section, a local entity shall—

(1) identify an eligible community to be assisted;

(2) develop a community planning process that includes—

(A) parents and family members;

(B) local school officials;

(C) teachers employed at schools within the eligible community;

(D) public housing resident organization members, where applicable; and

(E) public and private nonprofit organizations that provide education, child protective services, or other human services to low-income, at-risk children and their families; and

(3) develop a concentrated strategy for implementation of the community planning process developed under paragraph (2) that targets clusters of at-risk children in the eligible community.

(g) APPLICATIONS.—

  (1) APPLICATION REQUIRED.—To be eligible to receive a grant under this section, a local entity shall submit an application to the Secretary at such time, in such manner, and accompanied by such information, as the Secretary may reasonably require, and obtain approval of such application.

  (2) CONTENTS OF APPLICATION.—Each application submitted under paragraph (1) shall—

    (A) contain a comprehensive plan for the program that is designed to improve the academic and social development of at-risk children in schools in the eligible community;

    (B) provide evidence of support for accomplishing the objectives of such plan from—

      (i) community leaders;

      (ii) a school district;

      (iii) local officials; and

      (iv) other organizations that the local entity determines to be appropriate;

    (C) provide an assurance that the local entity will use grant funds received under this subsection to implement the program requirements listed in subsection (d);

    (D) include an estimate of the number of children in the eligible community expected to be served under the program;

    (E) provide an assurance that the local entity will comply with any evaluation requested under subsection (k), any research effort authorized under Federal law, and any investigation by the Secretary;

    (F) provide an assurance that the local entity shall prepare and submit to the Secretary an annual report regarding any program conducted under this section;

    (G) provide an assurance that funds made available under this section shall be used to supplement, not supplant, other Federal funds that would otherwise be available for activities funded under this section; and

    (H) provide an assurance that the local entity will maintain separate accounting records for the program.

  (3) PRIORITY.—In awarding grants to carry out programs under this section, the Secretary shall give priority to local entities which submit applications that demonstrate the greatest effort in generating local support for the programs.

(h) PEER REVIEW PANEL.—

  (1) ESTABLISHMENT.—The Secretary shall establish a peer review panel not to exceed 8 members that shall be comprised of individuals with demonstrated experience in designing and implementing programs to improve the academic and social development of at-risk children.

  (2) FUNCTIONS.—Such panel shall make recommendations to the Secretary regarding—

    (A) an illustrative model that effectively achieves the program requirements indicated in subsection (d) and a process whereby local entities can request such model; and

    (B) a design for the evaluation of programs assisted under this section.

(i) INVESTIGATIONS AND INSPECTIONS.—The Secretary may conduct such investigations and inspections as may be necessary to ensure compliance with the provisions of this section.

(j) FEDERAL SHARE.—

  (1) PAYMENTS.—The Secretary shall, subject to the availability of appropriations, pay to each local entity having an application approved under subsection (g) the Federal share of the costs of developing and carrying out programs referred to in subsection (d).

  (2) FEDERAL SHARE.—The Federal share of such costs shall be 70 percent.

  (3) NON-FEDERAL SHARE.—

    (A) IN GENERAL.—The non-Federal share of such costs may be in cash or in kind, fairly evaluated, including personnel, plant, equipment, and services.

    (B) SPECIAL RULE.—Not less than 15 percent of the non-Federal share of such costs shall be provided from private or nonprofit sources.

(k) EVALUATION.—The Secretary shall require a thorough evaluation of the programs assisted under this section, which shall include an assessment of the academic and social achievement of children assisted with funds provided under this section.

(l) DEFINITIONS.—For purposes of this section—

  (1) the term "Secretary" means the Secretary of the Department of Education;

  (2) the term "local entity" means—

(A) a local educational agency, or

(B) a community-based organization as defined in section 1471(3) of the Elementary and Secondary Education Act of 1965;

(3) the term "eligible community" means an area which meets criteria with respect to significant poverty and significant violent crime, and such additional criteria, as the Secretary may by regulation require; and

(4) the term "public school" means an elementary school (as defined in section 1471(8) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 2891(8))) and a secondary school (as defined in section 1471(21) of that Act).

<< 42 USCA § 13793 >>

SEC. 30403. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.—There are authorized to be appropriated to carry out this subtitle—

(1) $37,000,000 for fiscal year 1995;

(2) $103,500,000 for fiscal year 1996;

(3) $121,500,000 for fiscal year 1997;

(4) $153,000,000 for fiscal year 1998;

(5) $193,500,000 for fiscal year 1999; and

(6) $201,500,000 for fiscal year 2000.

(b) PROGRAMS.—Of the amounts appropriated under subsection (a) for any fiscal year—

(1) 70 percent shall be made available to carry out section 30401; and

(2) 30 percent shall be made available to carry out section 30402.

<< 42 USCA Ch. 136 >>

Subtitle G—Assistance for Delinquent and At-Risk Youth

<< 42 USCA § 13801 >>

SEC. 30701. GRANT AUTHORITY.

(a) GRANTS.—

(1) IN GENERAL.—In order to prevent the commission of crimes or delinquent acts by juveniles, the Attorney General may make grants to public or private nonprofit organizations to support the development and operation of projects to provide residential services to youth, aged 11 to 19, who—

(A) have dropped out of school;

(B) have come into contact with the juvenile justice system; or

(C) are at risk of dropping out of school or coming into contact with the juvenile justice system.

(2) CONSULTATION WITH THE OUNCE OF PREVENTION COUNCIL.—The Attorney General may consult with the Ounce of Prevention Council in making grants under paragraph (1).

(3) SERVICES.—Such services shall include activities designed to—

(A) increase the self-esteem of such youth;

(B) assist such youth in making healthy and responsible choices;

(C) improve the academic performance of such youth pursuant to a plan jointly developed by the applicant and the school which each such youth attends or should attend; and

(D) provide such youth with vocational and life skills.

(b) APPLICATIONS.—

(1) IN GENERAL.—A public agency or private nonprofit organization which desires a grant under this section shall submit an application at such time and in such manner as the Attorney General may prescribe.

(2) CONTENTS.—An application under paragraph (1) shall include—

(A) a description of the program developed by the applicant, including the activities to be offered;

(B) a detailed discussion of how such program will prevent youth from committing crimes or delinquent acts;

(C) evidence that such program—

(i) will be carried out in facilities which meet applicable State and local laws with regard to safety;

(ii) will include academic instruction, approved by the State, Indian tribal government, or local educational agency, which meets or exceeds State, Indian tribal government, and local standards and curricular requirements; and

(iii) will include instructors and other personnel who possess such qualifications as may be required by applicable State or local laws; and

(D) specific, measurable outcomes for youth served by the program.

(c) CONSIDERATION OF APPLICATIONS.—Not later than 60 days following the submission of applications, the Attorney General shall—

(1) approve each application and disburse the funding for each such application; or

(2) disapprove the application and inform the applicant of such disapproval and the reasons therefor.

(d) REPORTS.—A grantee under this section shall annually submit a report to the Attorney General that describes the activities and accomplishments of such program, including the degree to which the specific youth outcomes are met.

(e) DEFINITIONS.—In this subtitle—

"Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.

<< 42 USCA § 13802 >>

## SEC. 30702. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated for grants under section 30701—

(1) $5,400,000 for fiscal year 1996;

(2) $6,300,000 for fiscal year 1997;

(3) $7,200,000 for fiscal year 1998;

(4) $8,100,000 for fiscal year 1999; and

(5) $9,000,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

Subtitle H—Police Recruitment

<< 42 USCA § 13811 >>

## SEC. 30801. GRANT AUTHORITY.

(a) GRANTS.—

(1) IN GENERAL.—The Attorney General may make grants to qualified community organizations to assist in meeting the costs of qualified programs which are designed to recruit and retain applicants to police departments.

(2) CONSULTATION WITH THE OUNCE OF PREVENTION COUNCIL.—The Attorney General may consult with the Ounce of Prevention Council in making grants under paragraph (1).

(b) QUALIFIED COMMUNITY ORGANIZATIONS.—An organization is a qualified community organization which is eligible to receive a grant under subsection (a) if the organization—

(1) is a nonprofit organization; and

(2) has training and experience in—

(A) working with a police department and with teachers, counselors, and similar personnel,

(B) providing services to the community in which the organization is located,

(C) developing and managing services and techniques to recruit individuals to become members of a police department and to assist such individuals in meeting the membership requirements of police departments,

(D) developing and managing services and techniques to assist in the retention of applicants to police departments, and

(E) developing other programs that contribute to the community.

(c) QUALIFIED PROGRAMS.—A program is a qualified program for which a grant may be made under subsection (a) if the program is designed to recruit and train individuals from underrepresented neighborhoods and localities and if—

(1) the overall design of the program is to recruit and retain applicants to a police department;

(2) the program provides recruiting services which include tutorial programs to enable individuals to meet police force academic requirements and to pass entrance examinations;

(3) the program provides counseling to applicants to police departments who may encounter problems throughout the application process; and

(4) the program provides retention services to assist in retaining individuals to stay in the application process of a police department.

(d) APPLICATIONS.—To qualify for a grant under subsection (a), a qualified organization shall submit an application to the Attorney General in such form as the Attorney General may prescribe. Such application shall—

(1) include documentation from the applicant showing—

(A) the need for the grant;

(B) the intended use of grant funds;

(C) expected results from the use of grant funds; and

(D) demographic characteristics of the population to be served, including age, disability, race, ethnicity, and languages used; and

(2) contain assurances satisfactory to the Attorney General that the program for which a grant is made will meet the applicable requirements of the program guidelines prescribed by the Attorney General under subsection (i).

(e) ACTION BY THE ATTORNEY GENERAL.—Not later than 60 days after the date that an application for a grant under subsection (a) is received, the Attorney General shall consult with the police department which will be involved with the applicant and shall—

(1) approve the application and disburse the grant funds applied for; or

(2) disapprove the application and inform the applicant that the application is not approved and provide the applicant with the reasons for the disapproval.

(f) GRANT DISBURSEMENT.—The Attorney General shall disburse funds under a grant under subsection (a) in accordance with regulations of the Attorney General which shall ensure—

(1) priority is given to applications for areas and organizations with the greatest showing of need;

(2) that grant funds are equitably distributed on a geographic basis; and

(3) the needs of underserved populations are recognized and addressed.

(g) GRANT PERIOD.—A grant under subsection (a) shall be made for a period not longer than 3 years.

(h) GRANTEE REPORTING.—(1) For each year of a grant period for a grant under subsection (a), the recipient of the grant shall file a performance report with the Attorney General explaining the activities carried out with the funds received and assessing the effectiveness of such activities in meeting the purpose of the recipient's qualified program.

(2) If there was more than one recipient of a grant, each recipient shall file such report.

(3) The Attorney General shall suspend the funding of a grant, pending compliance, if the recipient of the grant does not file the report required by this subsection or uses the grant for a purpose not authorized by this section.

(i) GUIDELINES.—The Attorney General shall, by regulation, prescribe guidelines on content and results for programs receiving a grant under subsection (a). Such guidelines shall be designed to establish programs which will be effective in training individuals to enter instructional programs for police departments and shall include requirements for—

(1) individuals providing recruiting services;

(2) individuals providing tutorials and other academic assistance programs;

(3) individuals providing retention services; and

(4) the content and duration of recruitment, retention, and counseling programs and the means and devices used to publicize such programs.

<< 42 USCA § 13812 >>

SEC. 30802. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated for grants under section 30801—
  (1) $2,000,000 for fiscal year 1996;
  (2) $4,000,000 for fiscal year 1997;
  (3) $5,000,000 for fiscal year 1998;
  (4) $6,000,000 for fiscal year 1999; and
  (5) $7,000,000 for fiscal year 2000.

Subtitle J—Local Partnership Act

SEC. 31001. ESTABLISHMENT OF PAYMENT PROGRAM.

(a) ESTABLISHMENT OF PROGRAM.—Title 31, United States Code, is amended by inserting after chapter 65 the following new chapter:

<< 31 USCA Ch. 67 >>

"CHAPTER 67—FEDERAL PAYMENTS

"Sec.
"6701. Payments to local governments.
"6702. Local Government Fiscal Assistance Fund.
"6703. Qualification for payment.
"6704. State area allocations; allocations and payments to territorial governments.
"6705. Local government allocations.
"6706. Income gap multiplier.
"6707. State variation of local government allocations.
"6708. Adjustments of local government allocations.
"6709. Information used in allocation formulas.
"6710. Public participation.
"6711. Prohibited discrimination.
"6712. Discrimination proceedings.
"6713. Suspension and termination of payments in discrimination proceedings.
"6714. Compliance agreements.
"6715. Enforcement by the Attorney General of prohibitions on discrimination.
"6716. Civil action by a person adversely affected.
"6717. Judicial review.
"6718. Investigations and reviews.
"6719. Reports.
"6720. Definitions, application, and administration.

<< 31 USCA § 6701 >>

"§ 6701. Payments to local governments

"(a) PAYMENT AND USE.—
  "(1) PAYMENT.—The Secretary shall pay to each unit of general local government which qualifies for a payment under this chapter an amount equal to the sum of any amounts allocated to the government under this chapter for each payment period. The Secretary shall pay such amount out of the Local Government Fiscal Assistance Fund under section 6702.

AR.01903

"(2) USE.—Amounts paid to a unit of general local government under this section shall be used by that unit for carrying out one or more programs of the unit related to—

"(A) education to prevent crime;

"(B) substance abuse treatment to prevent crime; or

"(C) job programs to prevent crime.

"(3) COORDINATION.—Programs funded under this title shall be coordinated with other existing Federal programs to meet the overall needs of communities that benefit from funds received under this section.

"(b) TIMING OF PAYMENTS.—The Secretary shall pay each amount allocated under this chapter to a unit of general local government for a payment period by the later of 90 days after the date the amount is available or the first day of the payment period provided that the unit of general local government has provided the Secretary with the assurances required by section 6703(d).

"(c) ADJUSTMENTS.—

"(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall adjust a payment under this chapter to a unit of general local government to the extent that a prior payment to the government was more or less than the amount required to be paid.

"(2) CONSIDERATIONS.—The Secretary may increase or decrease under this subsection a payment to a unit of local government only if the Secretary determines the need for the increase or decrease, or the unit requests the increase or decrease, within one year after the end of the payment period for which the payment was made.

"(d) RESERVATION FOR ADJUSTMENTS.—The Secretary may reserve a percentage of not more than 2 percent of the amount under this section for a payment period for all units of general local government in a State if the Secretary considers the reserve is necessary to ensure the availability of sufficient amounts to pay adjustments after the final allocation of amounts among the units of general local government in the State.

"(e) REPAYMENT OF UNEXPENDED AMOUNTS.—

"(1) REPAYMENT REQUIRED.—A unit of general local government shall repay to the Secretary, by not later than 15 months after receipt from the Secretary, any amount that is—

"(A) paid to the unit from amounts appropriated under the authority of this section; and

"(B) not expended by the unit within one year after receipt from the Secretary.

"(2) PENALTY FOR FAILURE TO REPAY.—If the amount required to be repaid is not repaid, the Secretary shall reduce payments in future payment periods accordingly.

"(3) DEPOSIT OF AMOUNTS REPAID.—Amounts received by the Secretary as repayments under this subsection shall be deposited in the Local Government Fiscal Assistance Fund for future payments to units of general local government.

"(f) EXPENDITURE WITH DISADVANTAGED BUSINESS ENTERPRISES.—

"(1) GENERAL RULE.—Of amounts paid to a unit of general local government under this chapter for a payment period, not less than 10 percent of the total combined amounts obligated by the unit for contracts and subcontracts shall be expended with—

"(A) small business concerns controlled by socially and economically disadvantaged individuals and women; and

"(B) historically Black colleges and universities and colleges and universities having a student body in which more than 20 percent of the students are Hispanic Americans or Native Americans.

"(2) EXCEPTION.—Paragraph (1) shall not apply to amounts paid to a unit of general local government to the extent the unit determines that the paragraph does not apply through a process that provides for public participation.

"(3) DEFINITIONS.—For purposes of this subsection—

"(A) the term 'small business concern' has the meaning such term has under section 3 of the Small Business Act; and

"(B) the term 'socially and economically disadvantaged individuals' has the meaning such term has under section 8(d) of the Small Business Act and relevant subcontracting regulations promulgated pursuant to that section.

"(g) NONSUPPLANTING REQUIREMENT.—

"(1) IN GENERAL.—Funds made available under this chapter to units of local government shall not be used to supplant State or local funds, but will be used to increase the amount of funds that would, in the absence of funds under this chapter, be made available from State or local sources.

"(2) BASE LEVEL AMOUNT.—The total level of funding available to a unit of local government for accounts serving eligible purposes under this chapter in the fiscal year immediately preceding receipt of a grant under this chapter shall be designated the 'base level account' for the fiscal year in which a grant is received. Grants under this chapter in a given fiscal

AR.01904

year shall be reduced on a dollar for dollar basis to the extent that a unit of local government reduces its base level account in that fiscal year.

<< 31 USCA § 6702 >>

"§ 6702. Local Government Fiscal Assistance Fund

  "(a) ADMINISTRATION OF FUND.—The Department of the Treasury has a Local Government Fiscal Assistance Fund, which consists of amounts appropriated to the Fund.
  "(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Fund—
  "(1) $270,000,000 for fiscal year 1996;
  "(2) $283,500,000 for fiscal year 1997;
  "(3) $355,500,000 for fiscal year 1998;
  "(4) $355,500,000 for fiscal year 1999; and
  "(5) $355,500,000 for fiscal year 2000.

Such sums are to remain available until expended.
  "(c) ADMINISTRATIVE COSTS.—Up to 2.5 percent of the amount authorized to be appropriated under subsection (b) is authorized to be appropriated for the period fiscal year 1995 through fiscal year 2000 to be available for administrative costs by the Secretary in furtherance of the purposes of the program. Such sums are to remain available until expended.

<< 31 USCA § 6703 >>

"§ 6703. Qualification for payment

  "(a) IN GENERAL.—The Secretary shall issue regulations establishing procedures under which eligible units of general local government are required to provide notice to the Secretary of the units' proposed use of assistance under this chapter. Subject to subsection (c), the assistance provided shall be used, in amounts determined by the unit, for activities under, or for activities that are substantially similar to an activity under, 1 or more of the following programs and the notice shall identify 1 or more of the following programs for each such use:
  "(1) The Drug Abuse Resistance Education Program under section 5122 of the Elementary and Secondary Education Act of 1965.
  "(2) The National Youth Sports Program under section 682 of the Community Services Block Grant Act (Public Law 97–35) as amended by section 205, Public Law 103–252.
  "(3) The Gang Resistance Education and Training Program under the Act entitled 'An Act making appropriations for the Treasury Department, the United States Postal Service, the Executive Office of the President, and certain Independent Agencies, for the fiscal year ending September 30, 1991, and for other purposes', approved November 5, 1990 (Public Law 101–509).
  "(4) Programs under title II or IV of the Job Training Partnership Act (29 U.S.C. 1601 et seq.).
  "(5) Programs under subtitle C of title I of the National and Community Service Act of 1990 (42 U.S.C. 12571 et seq.) as amended.
  "(6) Programs under the School to Work Opportunities Act (Public Law 103–239).
  "(7) Substance Abuse Treatment and Prevention programs authorized under title V or XIX of the Public Health Services Act (43 U.S.C. 201 et seq.).
  "(8) Programs under the Head Start Act (42 U.S.C. 9831 et seq.).
  "(9) Programs under part A or B of chapter 1 of title I of the Elementary and Secondary Education Act of 1965.
  "(10) The TRIO programs under part A of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.).
  "(11) Programs under the National Literacy Act of 1991.
  "(12) Programs under the Carl Perkins Vocational Educational and Applied Technology Education Act (20 U.S.C. 2301 et seq.).

"(13) The demonstration partnership programs including the community initiative targeted to minority youth under section 203 of the Human Services Reauthorization Act of 1994 (Public Law 103–252).

"(14) The runaway and homeless youth program and the transitional living program for homeless youth under title III of the Juvenile Justice and Delinquency Prevention Act (Public Law 102–586).

"(15) The family support program under subtitle F of title VII of the Stewart B. McKinney Homeless Assistance Act (42 U.S.C. 1148 et seq.).

"(16) After-school activities for school aged children under the Child Care and Development Block Grant Act (42 U.S.C. 9858 et seq.).

"(17) The community-based family resource programs under section 401 of the Human Services Reauthorization Act of 1994 (Public Law 103–232).

"(18) The family violence programs under the Child Abuse Prevention and Treatment Act Amendments of 1984.

"(19) Job training programs administered by the Department of Agriculture, the Department of Defense, or the Department of Housing and Urban Development.

"(b) NOTICE TO AGENCY.—Upon receipt of notice under subsection (a) from an eligible unit of general local government, the Secretary shall notify the head of the appropriate Federal agency for each program listed in subsection (a) that is identified in the notice as a program under which an activity will be conducted with assistance under this chapter. The notification shall state that the unit has elected to use some or all of its assistance under this chapter for activities under that program. The head of a Federal agency that receives such a notification shall ensure that such use is in compliance with the laws and regulations applicable to that program, except that any requirement to provide matching funds shall not apply to that use.

"(c) ALTERNATIVE USES OF FUNDS.—

"(1) ALTERNATIVE USES AUTHORIZED.—In lieu of, or in addition to, use for an activity described in subsection (a) and notice for that use under subsection (a), an eligible unit of general local government may use assistance under this chapter, and shall provide notice of that use to the Secretary under subsection (a), for any other activity that is consistent with 1 or more of the purposes described in section 6701(a)(2).

"(2) NOTICE DEEMED TO DESCRIBE CONSISTENT USE.—Notice by a unit of general local government that it intends to use assistance under this chapter for an activity other than an activity described in subsection (a) is deemed to describe an activity that is consistent with 1 or more of the purposes described in section 6701(a)(2) unless the Secretary provides to the unit, within 30 days after receipt of that notice of intent from the unit, written notice (including an explanation) that the use is not consistent with those purposes.

"(d) GENERAL REQUIREMENTS FOR QUALIFICATION.—A unit of general local government qualifies for a payment under this chapter for a payment period only after establishing to the satisfaction of the Secretary that—

"(1) the government will establish a trust fund in which the government will deposit all payments received under this chapter;

"(2) the government will use amounts in the trust fund (including interest) during a reasonable period;

"(3) the government will expend the payments so received, in accordance with the laws and procedures that are applicable to the expenditure of revenues of the government;

"(4) if at least 25 percent of the pay of individuals employed by the government in a public employee occupation is paid out of the trust fund, individuals in the occupation any part of whose pay is paid out of the trust fund will receive pay at least equal to the prevailing rate of pay for individuals employed in similar public employee occupations by the government;

"(5) All laborers and mechanics employed by contractors or subcontractors in the performance of any contract and subcontract for the repair, renovation, alteration, or construction, including painting and decorating, of any building or work that is financed in whole or in part by a grant under this title, shall be paid wages not less than those determined by the Secretary of Labor in accordance with the Act of March 3, 1931 (commonly known as the Davis-Bacon Act); as amended (40 U.S.C. 276a–276a–5). The Secretary of Labor shall have the authority and functions set forth in reorganization plan of No. 14 of 1950 (15 FR 3176; 64 Stat. 1267) and section 2 of the Act of June 1, 1934 (commonly known as the Copeland Anti-Kickback Act) as amended (40 U.S.C. 276c, 48 Stat. 948).

"(6) the government will use accounting, audit, and fiscal procedures that conform to guidelines which shall be prescribed by the Secretary after consultation with the Comptroller General of the United States. As applicable, amounts received under this chapter shall be audited in compliance with the Single Audit Act of 1984;

"(7) after reasonable notice to the government, the government will make available to the Secretary and the Comptroller General of the United States, with the right to inspect, records the Secretary reasonably requires to review compliance with this chapter or the Comptroller General of the United States reasonably requires to review compliance and operations under section 6718(b);

"(8) the government will make reports the Secretary reasonably requires, in addition to the annual reports required under section 6719(b); and

"(9) the government will spend the funds only for the purposes set forth in section 6701(a)(2).

"(e) REVIEW BY GOVERNORS.—A unit of general local government shall give the chief executive officer of the State in which the government is located an opportunity for review and comment before establishing compliance with subsection (d).

"(f) SANCTIONS FOR NONCOMPLIANCE.—

"(1) IN GENERAL.—If the Secretary decides that a unit of general local government has not complied substantially with subsection (d) or regulations prescribed under subsection (d), the Secretary shall notify the government. The notice shall state that if the government does not take corrective action by the 60th day after the date the government receives the notice, the Secretary will withhold additional payments to the government for the current payment period and later payment periods until the Secretary is satisfied that the government—

"(A) has taken the appropriate corrective action; and

"(B) will comply with subsection (d) and regulations prescribed under subsection (d).

"(2) NOTICE.—Before giving notice under paragraph (1), the Secretary shall give the chief executive officer of the unit of general local government reasonable notice and an opportunity for comment.

"(3) PAYMENT CONDITIONS.—The Secretary may make a payment to a unit of general local government notified under paragraph (1) only if the Secretary is satisfied that the government—

"(A) has taken the appropriate corrective action; and

"(B) will comply with subsection (d) and regulations prescribed under subsection (d).

<< 31 USCA § 6704 >>

"§ 6704. State area allocations; allocations and payments to territorial governments

"(a) FORMULA ALLOCATION BY STATE.—For each payment period, the Secretary shall allocate to each State out of the amount appropriated for the period under the authority of section 6702(b) (minus the amounts allocated to territorial governments under subsection (e) for the payment period) an amount bearing the same ratio to the amount appropriated (minus such amounts allocated under subsection (e)) as the amount allocated to the State under this section bears to the total amount allocated to all States under this section. The Secretary shall—

"(1) determine the amount allocated to the State under subsection (b) or (c) of this section and allocate the larger amount to the State; and

"(2) allocate the amount allocated to the State to units of general local government in the State under sections 6705 and 6706.

"(b) GENERAL FORMULA.—

"(1) IN GENERAL.—For the payment period beginning October 1, 1994, the amount allocated to a State under this subsection for a payment period is the amount bearing the same ratio to $5,300,000,000 as—

"(A) the population of the State, multiplied by the general tax effort factor of the State (determined under paragraph (2)), multiplied by the relative income factor of the State (determined under paragraph (3)), multiplied by the relative rate of the labor force unemployed in the State (determined under paragraph (4)); bears to

"(B) the sum of the products determined under subparagraph (A) of this paragraph for all States.

"(2) GENERAL TAX EFFORT FACTOR.—The general tax effort factor of a State for a payment period is—

"(A) the net amount of State and local taxes of the State collected during the year 1991 as reported by the Bureau of the Census in the publication Government Finances 1990–1991; divided by

"(B) the total income of individuals, as determined by the Secretary of Commerce for national accounts purposes for 1992 as reported in the publication Survey of Current Business (August 1993), attributed to the State for the same year.

"(3) RELATIVE INCOME FACTOR.—The relative income factor of a State is a fraction in which—

"(A) the numerator is the per capita income of the United States; and

"(B) the denominator is the per capita income of the State.

"(4) RELATIVE RATE OF LABOR FORCE.—The relative rate of the labor force unemployed in a State is a fraction in which—

"(A) the numerator is the percentage of the labor force of the State that is unemployed in the calendar year preceding the payment period (as determined by the Secretary of Labor for general statistical purposes); and

"(B) the denominator is the percentage of the labor force of the United States that is unemployed in the calendar year preceding the payment period (as determined by the Secretary of Labor for general statistical purposes).

"(c) ALTERNATIVE FORMULA.—For the payment period beginning October 1, 1994, the amount allocated to a State under this subsection for a payment period is the total amount the State would receive if—

"(1) $1,166,666,667 were allocated among the States on the basis of population by allocating to each State an amount bearing the same ratio to the total amount to be allocated under this paragraph as the population of the State bears to the population of all States;

"(2) $1,166,666,667 were allocated among the States on the basis of population inversely weighted for per capita income, by allocating to each State an amount bearing the same ratio to the total amount to be allocated under this paragraph as—

"(A) the population of the State, multiplied by a fraction in which—

"(i) the numerator is the per capita income of all States; and

"(ii) the denominator is the per capita income of the State; bears to

"(B) the sum of the products determined under subparagraph (A) for all States;

"(3) $600,000,000 were allocated among the States on the basis of income tax collections by allocating to each State an amount bearing the same ratio to the total amount to be allocated under this paragraph as the income tax amount of the State (determined under subsection (d)(1)) bears to the sum of the income tax amounts of all States;

"(4) $600,000,000 were allocated among the States on the basis of general tax effort by allocating to each State an amount bearing the same ratio to the total amount to be allocated under this paragraph as the general tax effort amount of the State (determined under subsection (d)(2)) bears to the sum of the general tax effort amounts of all States;

"(5) $600,000,000 were allocated among the States on the basis of unemployment by allocating to each State an amount bearing the same ratio to the total amount to be allocated under this paragraph as—

"(A) the labor force of the State, multiplied by a fraction in which—

"(i) the numerator is the percentage of the labor force of the State that is unemployed in the calendar year preceding the payment period (as determined by the Secretary of Labor for general statistical purposes); and

"(ii) the denominator is the percentage of the labor force of the United States that is unemployed in the calendar year preceding the payment period (as determined by the Secretary of Labor for general statistical purposes)

bears to

"(B) the sum of the products determined under subparagraph (A) for all States; and

"(6) $1,166,666,667 were allocated among the States on the basis of urbanized population by allocating to each State an amount bearing the same ratio to the total amount to be allocated under this paragraph as the urbanized population of the State bears to the urbanized population of all States. In this paragraph, the term 'urbanized population' means the population of an area consisting of a central city or cities of at least 50,000 inhabitants and the surrounding closely settled area for the city or cities considered as an urbanized area as published by the Bureau of the Census for 1990 in the publication General Population Characteristics for Urbanized Areas.

"(d) INCOME TAX AMOUNT AND TAX EFFORT AMOUNT.—

"(1) INCOME TAX AMOUNT.—The income tax amount of a State for a payment period is 15 percent of the net amount collected during the calendar year ending before the beginning of the payment period from the tax imposed on the income of individuals by the State and described as a State income tax under section 164(a)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 164(a)(3)). The income tax amount for a payment period shall be at least 1 percent but not more than 6 percent of the United States Government individual income tax liability attributed to the State for the taxable year ending during the last calendar year ending before the beginning of the payment period. The Secretary shall determine the Government income tax liability attributed to the State by using the data published by the Secretary for 1991 in the publication Statistics of Income Bulletin (Winter 1993–1994).

"(2) GENERAL TAX EFFORT AMOUNT.—The general tax effort amount of a State for a payment period is the amount determined by multiplying—

"(A) the net amount of State and local taxes of the State collected during the year 1991 as reported in the Bureau of Census in the publication Government Finances 1990–1991; and

"(B) the general tax effort factor of the State determined under subsection (b)(2).

"(e) ALLOCATION FOR PUERTO RICO, GUAM, AMERICAN SAMOA, AND THE VIRGIN ISLANDS.—

"(1) IN GENERAL.—(A) For each payment period for which funds are available for allocation under this chapter, the Secretary shall allocate to each territorial government an amount equal to the product of 1 percent of the amount of funds available for allocation multiplied by the applicable territorial percentage.

"(B) For the purposes of this paragraph, the applicable territorial percentage of a territory is equal to the quotient resulting from the division of the territorial population of such territory by the sum of the territorial population for all territories.

"(2) PAYMENTS TO LOCAL GOVERNMENTS.—The governments of the territories shall make payments to local governments within their jurisdiction from sums received under this subsection as they consider appropriate.

"(3) DEFINITIONS.—For purposes of this subsection—

"(A) the term 'territorial government' means the government of a territory;

"(B) the term 'territory' means Puerto Rico, Guam, American Samoa, and the Virgin Islands; and

"(C) the term 'territorial population' means the most recent population for each territory as determined by the Bureau of Census.

<< 31 USCA § 6705 >>

"§ 6705. Local government allocations

"(a) INDIAN TRIBES AND ALASKAN NATIVES VILLAGES.—If there is in a State an Indian tribe or Alaskan native village having a recognized governing body carrying out substantial governmental duties and powers, the Secretary shall allocate to the tribe or village, out of the amount allocated to the State under section 6704, an amount bearing the same ratio to the amount allocated to the State as the population of the tribe or village bears to the population of the State. The Secretary shall allocate amounts under this subsection to Indian tribes and Alaskan native villages in a State before allocating amounts to units of general local government in the State under subsection (c). For the payment period beginning October 1, 1994, the Secretary shall use as the population of each Indian tribe or Alaskan native village the population for 1991 as reported by the Bureau of Indian Affairs in the publication Indian Service Population and Labor Force Estimates (January 1991). In addition to uses authorized under section 6701(a)(2), amounts allocated under this subsection and paid to an Indian tribe or Alaskan native village under this chapter may be used for renovating or building prisons or other correctional facilities.

"(b) NEWLY INCORPORATED LOCAL GOVERNMENTS AND ANNEXED GOVERNMENTS.—If there is in a State a unit of general local government that has been incorporated since the date of the collection of the data used by the Secretary in making allocations pursuant to sections 6704 through 6706 and 6708, the Secretary shall allocate to this newly incorporated local government, out of the amount allocated to the State under section 6704, an amount bearing the same ratio to the amount allocated to the State as the population of the newly incorporated local government bears to the population of the State. If there is in the State a unit of general local government that has been annexed since the date of the collection of the data used by the Secretary in making allocations pursuant to sections 6704 through 6706 and 6708, the Secretary shall pay the amount that would have been allocated to this local government to the unit of general local government that annexed it.

"(c) OTHER LOCAL GOVERNMENT ALLOCATIONS.—

"(1) IN GENERAL.—The Secretary shall allocate among the units of general local government in a State (other than units receiving allocations under subsection (a)) the amount allocated to the State under section 6704 (as that amount is reduced by allocations under subsection (a)). Of the amount to be allocated, the Secretary shall allocate a portion equal to ½ of such amount in accordance with section 6706(1), and shall allocate a portion equal to ½ of such amount in accordance with section 6706(2). A unit of general local government shall receive an amount equal to the sum of amounts allocated to the unit from each portion.

"(2) RATIO.—From each portion to be allocated to units of local government in a State under paragraph (1), the Secretary shall allocate to a unit an amount bearing the same ratio to the funds to be allocated as—

"(A) the population of the unit, multiplied by the general tax effort factor of the unit (determined under paragraph (3)), multiplied by the income gap of the unit (determined under paragraph (4)), bears to

"(B) the sum of the products determined under subparagraph (A) for all units in the State for which the income gap for that portion under paragraph (4) is greater than zero.

"(3) GENERAL TAX EFFORT FACTOR.—(A) Except as provided in subparagraph (C), the general tax effort factor of a unit of general local government for a payment period is—

"(i) the adjusted taxes of the unit; divided by

"(ii) the total income attributed to the unit.

"(B) If the amount determined under subparagraphs (A)(i) and (ii) for a unit of general local government is less than zero, the general tax effort factor of the unit is deemed to be zero.

"(C)(i) Except as otherwise provided in this subparagraph, for the payment period beginning October 1, 1994, the adjusted taxes of a unit of general local government are the taxes imposed by the unit for public purposes (except employee and employer assessments and contributions to finance retirement and social insurance systems and other special assessments for capital outlay), as determined by the Bureau of the Census for the 1987 Census of Governments and adjusted as follows:

"(I) Adjusted taxes equals total taxes times a fraction in which the numerator is the sum of unrestricted revenues and revenues dedicated for spending on education minus total education spending and the denominator is total unrestricted revenues.

"(II) Total taxes is the sum of property tax; general sales tax; alcoholic beverage tax; amusement tax; insurance premium tax; motor fuels tax; parimutuels tax; public utilities tax; tobacco tax; other selective sales tax; alcoholic beverage licenses; amusement licenses; corporation licenses; hunting and fishing licenses; motor vehicle licenses; motor vehicle operator licenses; public utility licenses; occupation and business licenses, not elsewhere classified; other licenses; individual income tax; corporation net income tax; death and gift tax; documentary and stock transfer tax; severance tax; and taxes not elsewhere classified.

"(III) Unrestricted revenues is the sum of total taxes and intergovernmental revenue from Federal Government, general revenue sharing; intergovernmental revenue from Federal Government, other general support; intergovernmental revenue from Federal Government, other; intergovernmental revenue from State government, other general support; intergovernmental revenue from State government, other; intergovernmental revenue from local governments, other general support; intergovernmental revenue from local governments, other; miscellaneous general revenue, property sale-housing and community development; miscellaneous general revenue, property sale-other property; miscellaneous general revenue, interest earnings on investments; miscellaneous general revenue, fines and forfeits; miscellaneous general revenue, rents; miscellaneous general revenues, royalties; miscellaneous general revenue, donations from private sources; miscellaneous general revenue, net lottery revenue (after prizes and administrative expenses); miscellaneous general revenue, other miscellaneous general revenue; and all other general charges, not elsewhere classified.

"(IV) Revenues dedicated for spending on education is the sum of elementary and secondary education, school lunch; elementary and secondary education, tuition; elementary and secondary education, other; higher education, auxiliary enterprises; higher education, other; other education, not elsewhere classified; intergovernmental revenue from Federal Government, education; intergovernmental revenue from State government, education; intergovernmental revenue from local governments, interschool system revenue; intergovernmental revenue from local governments, education; interest earnings, higher education; interest earnings, elementary and secondary education; miscellaneous revenues, higher education; and miscellaneous revenues, elementary and secondary education.

"(V) Total education spending is the sum of elementary and secondary education, current operations; elementary and secondary education, construction; elementary and secondary education, other capital outlays; elementary and secondary education, to State governments; elementary and secondary education, to local governments, not elsewhere classified; elementary and secondary education, to counties; elementary and secondary education, to municipalities; elementary and secondary education, to townships; elementary and secondary education, to school districts; elementary and secondary education, to special districts; higher education-auxiliary enterprises, current operations; higher education-auxiliary enterprises, construction; higher education, auxiliary enterprises, other capital outlays; other higher education, current operations; other higher education, construction; other higher education, other capital outlays; other higher education, to State government; other higher education, to local governments, not elsewhere classified; other higher education, to counties; other higher education, to municipalities; other higher education, to townships; other higher education, to school

districts; other higher education, to special districts; education assistance and subsidies; education, not elsewhere classified, current operations; education, not elsewhere classified, construction education, not elsewhere classified, other capital outlays; education, not elsewhere classified, to State government; education, not elsewhere classified, to local governments, not elsewhere classified; education, not elsewhere classified, to counties; education, not elsewhere classified, to municipalities; education, not elsewhere classified, to townships; education, not elsewhere classified, to school districts; education, not elsewhere classified, to special districts; and education, not elsewhere classified, to Federal Government.

"(VI) If the amount of adjusted taxes is less than zero, the amount of adjusted tax shall be deemed to be zero.

"(VII) If the amount of adjusted taxes exceeds the amount of total taxes, the amount of adjusted taxes is deemed to equal the amount of total taxes.

"(ii) The Secretary shall, for purposes of clause (i), include that part of sales taxes transferred to a unit of general local government that are imposed by a county government in the geographic area of which is located the unit of general local government as taxes imposed by the unit for public purposes if—

"(I) the county government transfers any part of the revenue from the taxes to the unit of general local government without specifying the purpose for which the unit of general local government may expend the revenue; and

"(II) the chief executive officer of the State notifies the Secretary that the taxes satisfy the requirements of this clause.

"(iii) The adjusted taxes of a unit of general local government shall not exceed the maximum allowable adjusted taxes for that unit.

"(iv) The maximum allowable adjusted taxes for a unit of general local government is the allowable adjusted taxes of the unit minus the excess adjusted taxes of the unit.

"(v) The allowable adjusted taxes of a unit of general government is the greater of—

"(I) the amount equal to 2.5, multiplied by the per capita adjusted taxes of all units of general local government of the same type in the State, multiplied by the population of the unit; or

"(II) the amount equal to the population of the unit, multiplied by the sum of the adjusted taxes of all units of municipal local government in the State, divided by the sum of the populations of all the units of municipal local government in the State.

"(vi) The excess adjusted taxes of a unit of general local government is the amount equal to—

"(I) the adjusted taxes of the unit, minus

"(II) 1.5 multiplied by the allowable adjusted taxes of the unit;

except that if this amount is less than zero then the excess adjusted taxes of the unit is deemed to be zero.

"(vii) For purposes of this subparagraph—

"(I) the term 'per capita adjusted taxes of all units of general local government of the same type' means the sum of the adjusted taxes of all units of general local government of the same type divided by the sum of the populations of all units of general local government of the same type; and

"(II) the term 'units of general local government of the same type' means all townships if the unit of general local government is a township, all municipalities if the unit of general local government is a municipality, all counties if the unit of general local government is a county, or all unified city/county governments if the unit of general local government is a unified city/county government.

"(4) INCOME GAP.—(A) Except as provided in subparagraph (B), the income gap of a unit of general local government is—

"(i) the number which applies under section 6706, multiplied by the per capita income of the State in which the unit is located; minus

"(ii) the per capita income of the geographic area of the unit.

"(B) If the amount determined under subparagraph (A) for a unit of general local government is less than zero, then the relative income factor of the unit is deemed to be zero.

"(d) SMALL GOVERNMENT ALLOCATIONS.—If the Secretary decides that information available for a unit of general local government with a population below a number (of not more than 500) prescribed by the Secretary is inadequate, the Secretary may allocate to the unit, in lieu of any allocation under subsection (b) for a payment period, an amount bearing the same ratio to the total amount to be allocated under subsection (b) for the period for all units of general local government in the State as the population of the unit bears to the population of all units in the State.

<< 31 USCA § 6706 >>

"§ 6706. Income gap multiplier

"For purposes of determining the income gap of a unit of general local government under section 6705(b)(4)(A), the number which applies is—

"(1) 1.6, with respect to ½ of any amount allocated under section 6704 to the State in which the unit is located; and

"(2) 1.2, with respect to the remainder of such amount.

<< 31 USCA § 6707 >>

"§ 6707. State variation of local government allocations

"(a) STATE FORMULA.—A State government may provide by law for the allocation of amounts among units of general local government in the State on the basis of population multiplied by the general tax effort factors or income gaps of the units of general local government determined under sections 6705 (a) and (b) or a combination of those factors. A State government providing for a variation of an allocation formula provided under sections 6705 (a) and (b) shall notify the Secretary of the variation by the 30th day before the beginning of the first payment period in which the variation applies. A variation shall—

"(1) provide for allocating the total amount allocated under sections 6705 (a) and (b); and

"(2) apply uniformly in the State.

"(b) CERTIFICATION.—A variation by a State government under this section may apply only if the Secretary certifies that the variation complies with this section. The Secretary may certify a variation only if the Secretary is notified of the variation at least 30 days before the first payment period in which the variation applies.

<< 31 USCA § 6708 >>

"§ 6708. Adjustments of local government allocations

"(a) MAXIMUM AMOUNT.—The amount allocated to a unit of general local government for a payment period may not exceed the adjusted taxes imposed by the unit of general local government as determined under section 6705(b)(3). Amounts in excess of adjusted taxes shall be paid to the Governor of the State in which the unit of local government is located.

"(b) DE MINIMIS ALLOCATIONS TO UNITS OF GENERAL LOCAL GOVERNMENT.—If the amount allocated to a unit of general local government (except an Indian tribe or an Alaskan native village) for a payment period would be less than $5,000 but for this subsection or is waived by the governing authority of the unit of general local government, the Secretary shall pay the amount to the Governor of the State in which the unit is located.

"(c) USE OF PAYMENTS TO STATES.—The Governor of a State shall use all amounts paid to the Governor under subsections (a) and (b) for programs described in section 6701(a)(2) in areas of the State where are located the units of general local government with respect to which amounts are paid under subsection (b).

"(d) DE MINIMIS ALLOCATIONS TO INDIAN TRIBES AND ALASKAN NATIVE VILLAGES.—

"(1) AGGREGATION OF DE MINIMIS ALLOCATIONS.—If the amount allocated to an Indian tribe or an Alaskan native village for a payment period would be less than $5,000 but for this subsection or is waived by the chief elected official of the tribe or village, the amount—

"(A) shall not be paid to the tribe or village (except under paragraph (2)); and

"(B) shall be aggregated with other such amounts and available for use by the Attorney General under paragraph (2).

"(2) USE OF AGGREGATED AMOUNTS.—Amounts aggregated under paragraph (1) for a payment period shall be available for use by the Attorney General to make grants in the payment period on a competitive basis to Indian Tribes and Alaskan native village for—

"(A) programs described in section 6701(a)(2); or

"(B) renovating or building prisons or other correctional facilities.

AR.01912

<< 31 USCA § 6709 >>

"§ 6709. Information used in allocation formulas

"(a) POPULATION DATA FOR PAYMENT PERIOD BEGINNING OCTOBER 1, 1994.—For the payment period beginning October 1, 1994, the Secretary, in making allocations pursuant to sections 6704 through 6706 and 6708, shall use for the population of the States the population for 1992 as reported by the Bureau of the Census in the publication Current Population Reports, Series P–25, No. 1045 (July 1992) and for the population of units of general local government the Secretary shall use the population for 1990 as reported by the Bureau of the Census in the publication Summary Social, Economic, and Housing Characteristics.

"(b) DATA FOR PAYMENT PERIODS BEGINNING AFTER SEPTEMBER 30, 1995.—For any payment period beginning after September 30, 1995, the Secretary, in making allocations pursuant to sections 6704 through 6706 and 6708, shall use information more recent than the information used for the payment period beginning October 1, 1994, provided the Secretary notifies the Committee on Government Operations of the House of Representatives at least 90 days prior to the beginning of the payment period that the Secretary has determined that the more recent information is more reliable than the information used for the payment period beginning October 1, 1994.

<< 31 USCA § 6710 >>

"§ 6710. Public participation

"(a) HEARINGS.—

"(1) IN GENERAL.—A unit of general local government expending payments under this chapter shall hold at least one public hearing on the proposed use of the payment in relation to its entire budget. At the hearing, persons shall be given an opportunity to provide written and oral views to the governmental authority responsible for enacting the budget and to ask questions about the entire budget and the relation of the payment to the entire budget. The government shall hold the hearing at a time and a place that allows and encourages public attendance and participation.

"(2) SENIOR CITIZENS.—A unit of general local government holding a hearing required under this subsection or by the budget process of the government shall try to provide senior citizens and senior citizen organizations with an opportunity to present views at the hearing before the government makes a final decision on the use of the payment.

"(b) DISCLOSURE OF INFORMATION.—

"(1) IN GENERAL.—By the 10th day before a hearing required under subsection (a)(1) is held, a unit of general local government shall—

"(A) make available for inspection by the public at the principal office of the government a statement of the proposed use of the payment and a summary of the proposed budget of the government; and

"(B) publish in at least one newspaper of general circulation the proposed use of the payment with the summary of the proposed budget and a notice of the time and place of the hearing.

"(2) AVAILABILITY.—By the 30th day after adoption of the budget under State or local law, the government shall—

"(A) make available for inspection by the public at the principal office of the government a summary of the adopted budget, including the proposed use of the payment; and

"(B) publish in at least one newspaper of general circulation a notice that the information referred to in subparagraph (A) is available for inspection.

"(c) WAIVERS OF REQUIREMENTS.—A requirement—

"(1) under subsection (a)(1) may be waived if the budget process required under the applicable State or local law or charter provisions—

"(A) ensures the opportunity for public attendance and participation contemplated by subsection (a); and

"(B) includes a hearing on the proposed use of a payment received under this chapter in relation to the entire budget of the government; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) under subsection (b)(1)(B) and paragraph (2)(B) may be waived if the cost of publishing the information would be unreasonably burdensome in relation to the amount allocated to the government from amounts available for payment under this chapter, or if publication is otherwise impracticable.

"(d) EXCEPTION TO 10–DAY LIMITATION.—If the Secretary is satisfied that a unit of general local government will provide adequate notice of the proposed use of a payment received under this chapter, the 10-day period under subsection (b)(1) may be changed to the extent necessary to comply with applicable State or local law.

<< 31 USCA § 6711 >>

"§ 6711. Prohibited discrimination

 "(a) GENERAL PROHIBITION.—No person in the United States shall be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a program or activity of a unit of general local government because of race, color, national origin, or sex if the government receives a payment under this chapter.

"(b) ADDITIONAL PROHIBITIONS.—The following prohibitions and exemptions also apply to a program or activity of a unit of general local government if the government receives a payment under this chapter:

 "(1) A prohibition against discrimination because of age under the Age Discrimination Act of 1975.

 "(2) A prohibition against discrimination against an otherwise qualified handicapped individual under section 504 of the Rehabilitation Act of 1973.

 "(3) A prohibition against discrimination because of religion, or an exemption from that prohibition, under the Civil Rights Act of 1964 or title VIII of the Act of April 11, 1968 (popularly known as the Civil Rights Act of 1968).

"(c) LIMITATIONS ON APPLICABILITY OF PROHIBITIONS.—Subsections (a) and (b) do not apply if the government shows, by clear and convincing evidence, that a payment received under this chapter is not used to pay for any part of the program or activity with respect to which the allegation of discrimination is made.

"(d) INVESTIGATION AGREEMENTS.—The Secretary shall try to make agreements with heads of agencies of the United States Government and State agencies to investigate noncompliance with this section. An agreement shall—

 "(1) describe the cooperative efforts to be taken (including sharing civil rights enforcement personnel and resources) to obtain compliance with this section; and

 "(2) provide for notifying immediately the Secretary of actions brought by the United States Government or State agencies against a unit of general local government alleging a violation of a civil rights law or a regulation prescribed under a civil rights law.

<< 31 USCA § 6712 >>

"§ 6712. Discrimination proceedings

 "(a) NOTICE OF NONCOMPLIANCE.—By the 10th day after the Secretary makes a finding of discrimination or receives a holding of discrimination about a unit of general local government, the Secretary shall submit a notice of noncompliance to the government. The notice shall state the basis of the finding or holding.

"(b) INFORMAL PRESENTATION OF EVIDENCE.—A unit of general local government may present evidence informally to the Secretary within 30 days after the government receives a notice of noncompliance from the Secretary. Except as provided in subsection (e), the government may present evidence on whether—

 "(1) a person in the United States has been excluded or denied benefits of, or discriminated against under, the program or activity of the government, in violation of section 6711(a);

 "(2) the program or activity of the government violated a prohibition described in section 6711(b); and

 "(3) any part of that program or activity has been paid for with a payment received under this chapter.

"(c) TEMPORARY SUSPENSION OF PAYMENTS.—By the end of the 30-day period under subsection (b), the Secretary shall decide whether the unit of general local government has not complied with section 6711(a) or (b), unless the government has entered into a compliance agreement under section 6714. If the Secretary decides that the government has not complied, the Secretary shall notify the government of the decision and shall suspend payments to the government under this chapter unless, within 10 days after the government receives notice of the decision, the government—

"(1) enters into a compliance agreement under section 6714; or

"(2) requests a proceeding under subsection (d)(1).

"(d) ADMINISTRATIVE REVIEW OF SUSPENSIONS.—

"(1) PROCEEDING.—A proceeding requested under subsection (c)(2) shall begin by the 30th day after the Secretary receives a request for the proceeding. The proceeding shall be before an administrative law judge appointed under section 3105 of title 5, United States Code. By the 30th day after the beginning of the proceeding, the judge shall issue a preliminary decision based on the record at the time on whether the unit of general local government is likely to prevail in showing compliance with section 6711(a) or (b).

"(2) DECISION.—If the administrative law judge decides at the end of a proceeding under paragraph (1) that the unit of general local government has—

"(A) not complied with section 6711(a) or (b), the judge may order payments to the government under this chapter terminated; or

"(B) complied with section 6711(a) or (b), a suspension under section 6713(a)(1)(A) shall be discontinued promptly.

"(3) LIKELIHOOD OF PREVAILING.—An administrative law judge may not issue a preliminary decision that the government is not likely to prevail if the judge has issued a decision described in paragraph (2)(A).

"(e) BASIS FOR REVIEW.—In a proceeding under subsections (b) through (d) on a program or activity of a unit of general local government about which a holding of discrimination has been made, the Secretary or administrative law judge may consider only whether a payment under this chapter was used to pay for any part of the program or activity. The holding of discrimination is conclusive. If the holding is reversed by an appellate court, the Secretary or judge shall end the proceeding.

<< 31 USCA § 6713 >>

"§ 6713. Suspension and termination of payments in discrimination proceedings

"(a) IMPOSITION AND CONTINUATION OF SUSPENSIONS.—

"(1) IN GENERAL.—The Secretary shall suspend payment under this chapter to a unit of general local government—

"(A) if an administrative law judge appointed under section 3105 of title 5, United States Code, issues a preliminary decision in a proceeding under section 6712(d)(1) that the government is not likely to prevail in showing compliance with section 6711(a) and (b);

"(B) if the administrative law judge decides at the end of the proceeding that the government has not complied with section 6711(a) or (b), unless the government makes a compliance agreement under section 6714 by the 30th day after the decision; or

"(C) if required under section 6712(c).

"(2) EFFECTIVENESS.—A suspension already ordered under paragraph (1)(A) continues in effect if the administrative law judge makes a decision under paragraph (1)(B).

"(b) LIFTING OF SUSPENSIONS AND TERMINATIONS.—If a holding of discrimination is reversed by an appellate court, a suspension or termination of payments in a proceeding based on the holding shall be discontinued.

"(c) RESUMPTION OF PAYMENTS UPON ATTAINING COMPLIANCE.—The Secretary may resume payment to a unit of general local government of payments suspended by the Secretary only—

"(1) as of the time of, and under the conditions stated in—

"(A) the approval by the Secretary of a compliance agreement under section 6714(a)(1); or

"(B) a compliance agreement entered into by the Secretary under section 6714(a)(2);

"(2) if the government complies completely with an order of a United States court, a State court, or administrative law judge that covers all matters raised in a notice of noncompliance submitted by the Secretary under section 6712(a);

"(3) if a United States court, a State court, or an administrative law judge decides (including a judge in a proceeding under section 6712(d)(1)), that the government has complied with sections 6711 (a) and (b); or

"(4) if a suspension is discontinued under subsection (b).

"(d) PAYMENT OF DAMAGES AS COMPLIANCE.—For purposes of subsection (c)(2), compliance by a government may consist of the payment of restitution to a person injured because the government did not comply with section 6711 (a) or (b).

"(e) RESUMPTION OF PAYMENTS UPON REVERSAL BY COURT.—The Secretary may resume payment to a unit of general local government of payments terminated under section 6712(d)(2)(A) only if the decision resulting in the termination is reversed by an appellate court.

<< 31 USCA § 6714 >>

"§ 6714. Compliance agreements

"(a) TYPES OF COMPLIANCE AGREEMENTS.—A compliance agreement is an agreement—

"(1) approved by the Secretary, between the governmental authority responsible for prosecuting a claim or complaint that is the basis of a holding of discrimination and the chief executive officer of the unit of general local government that has not complied with section 6711 (a) or (b); or

"(2) between the Secretary and the chief executive officer.

"(b) CONTENTS OF AGREEMENTS.—A compliance agreement—

"(1) shall state the conditions the unit of general local government has agreed to comply with that would satisfy the obligations of the government under sections 6711 (a) and (b);

"(2) shall cover each matter that has been found not to comply, or would not comply, with section 6711 (a) or (b); and

"(3) may be a series of agreements that dispose of those matters.

"(c) AVAILABILITY OF AGREEMENTS TO PARTIES.—The Secretary shall submit a copy of a compliance agreement to each person who filed a complaint referred to in section 6716(b), or, if an agreement under subsection (a)(1), each person who filed a complaint with a governmental authority, about a failure to comply with section 6711 (a) or (b). The Secretary shall submit the copy by the 15th day after an agreement is made. However, if the Secretary approves an agreement under subsection (a)(1) after the agreement is made, the Secretary may submit the copy by the 15th day after approval of the agreement.

<< 31 USCA § 6715 >>

"§ 6715. Enforcement by the Attorney General of prohibitions on discrimination

"The Attorney General may bring a civil action in an appropriate district court of the United States against a unit of general local government that the Attorney General has reason to believe has engaged or is engaging in a pattern or practice in violation of section 6711 (a) or (b). The court may grant—

"(1) a temporary restraining order;

"(2) an injunction; or

"(3) an appropriate order to ensure enjoyment of rights under section 6711 (a) or (b), including an order suspending, terminating, or requiring repayment of, payments under this chapter or placing additional payments under this chapter in escrow pending the outcome of the action.

<< 31 USCA § 6716 >>

"§ 6716. Civil action by a person adversely affected

"(a) AUTHORITY FOR PRIVATE SUITS IN FEDERAL OR STATE COURT.—If a unit of general local government, or an officer or employee of a unit of general local government acting in an official capacity, engages in a practice prohibited by this chapter, a person adversely affected by the practice may bring a civil action in an appropriate district court of the United States or a State court of general jurisdiction. Before bringing an action under this section, the person must exhaust administrative remedies under subsection (b).

"(b) ADMINISTRATIVE REMEDIES REQUIRED TO BE EXHAUSTED.—A person adversely affected shall file an administrative complaint with the Secretary or the head of another agency of the United States Government or the State agency with which the Secretary has an agreement under section 6711(d). Administrative remedies are deemed to be exhausted by the person after the 90th day after the complaint was filed if the Secretary, the head of the Government agency, or the State agency—

"(1) issues a decision that the government has not failed to comply with this chapter; or

"(2) does not issue a decision on the complaint.

"(c) AUTHORITY OF COURT.—In an action under this section, the court—

"(1) may grant—

"(A) a temporary restraining order;

"(B) an injunction; or

"(C) another order, including suspension, termination, or repayment of, payments under this chapter or placement of additional payments under this chapter in escrow pending the outcome of the action; and

"(2) to enforce compliance with section 6711 (a) or (b), may allow a prevailing party (except the United States Government) a reasonable attorney's fee.

"(d) INTERVENTION BY ATTORNEY GENERAL.—In an action under this section to enforce compliance with section 6711 (a) or (b), the Attorney General may intervene in the action if the Attorney General certifies that the action is of general public importance. The United States Government is entitled to the same relief as if the Government had brought the action and is liable for the same fees and costs as a private person.

<< 31 USCA § 6717 >>

"§ 6717. Judicial review

"(a) APPEALS IN FEDERAL COURT OF APPEALS.—A unit of general local government which receives notice from the Secretary about withholding payments under section 6703(f), suspending payments under section 6713(a)(1)(B), or terminating payments under section 6712(d)(2)(A), may apply for review of the action of the Secretary by filing a petition for review with the court of appeals of the United States for the circuit in which the government is located. The petition shall be filed by the 60th day after the date the notice is received. The clerk of the court shall immediately send a copy of the petition to the Secretary.

"(b) FILING OF RECORD OF ADMINISTRATIVE PROCEEDING.—The Secretary shall file with the court a record of the proceeding on which the Secretary based the action. The court may consider only objections to the action of the Secretary that were presented before the Secretary.

"(c) COURT ACTION.—The court may affirm, change, or set aside any part of the action of the Secretary. The findings of fact by the Secretary are conclusive if supported by substantial evidence in the record. If a finding is not supported by substantial evidence in the record, the court may remand the case to the Secretary to take additional evidence. Upon such a remand, the Secretary may make new or modified findings and shall certify additional proceedings to the court.

"(d) REVIEW ONLY BY SUPREME COURT.—A judgment of a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28, United States Code.

<< 31 USCA § 6718 >>

"§ 6718. Investigations and reviews

"(a) INVESTIGATIONS BY SECRETARY.—

"(1) IN GENERAL.—The Secretary shall within a reasonable time limit—

"(A) carry out an investigation and make a finding after receiving a complaint referred to in section 6716(b), a determination by a State or local administrative agency, or other information about a possible violation of this chapter;

"(B) carry out audits and reviews (including investigations of allegations) about possible violations of this chapter; and

"(C) advise a complainant of the status of an audit, investigation, or review of an allegation by the complainant of a violation of section 6711 (a) or (b) or other provision of this chapter.

"(2) TIME LIMIT.—The maximum time limit under paragraph (1)(A) is 120 days.

"(b) REVIEWS BY COMPTROLLER GENERAL.—The Comptroller General of the United States shall carry out reviews of the activities of the Secretary, State governments, and units of general local government necessary for the Congress to evaluate compliance and operations under this chapter. These reviews shall include a comparison of the waste and inefficiency of local governments using funds under this chapter compared to waste and inefficiency with other comparable Federal programs.

<< 31 USCA § 6719 >>

"§ 6719. Reports

"(a) REPORTS BY SECRETARY TO CONGRESS.—Before June 2 of each year prior to 2002, the Secretary personally shall report to the Congress on—

"(1) the status and operation of the Local Government Fiscal Assistance Fund during the prior fiscal year; and

"(2) the administration of this chapter, including a complete and detailed analysis of—

"(A) actions taken to comply with sections 6711 through 6715, including a description of the kind and extent of noncompliance and the status of pending complaints;

"(B) the extent to which units of general local government receiving payments under this chapter have complied with the requirements of this chapter;

"(C) the way in which payments under this chapter have been distributed in the jurisdictions receiving payments; and

"(D) significant problems in carrying out this chapter and recommendations for legislation to remedy the problems.

"(b) REPORTS BY UNITS OF GENERAL LOCAL GOVERNMENT TO SECRETARY.—

"(1) IN GENERAL.—At the end of each fiscal year, each unit of general local government which received a payment under this chapter for the fiscal year shall submit a report to the Secretary. The report shall be submitted in the form and at a time prescribed by the Secretary and shall be available to the public for inspection. The report shall state—

"(A) the amounts and purposes for which the payment has been appropriated, expended, or obligated in the fiscal year;

"(B) the relationship of the payment to the relevant functional items in the budget of the government; and

"(C) the differences between the actual and proposed use of the payment.

"(2) AVAILABILITY OF REPORT.—The Secretary shall provide a copy of a report submitted under paragraph (1) by a unit of general local government to the chief executive officer of the State in which the government is located. The Secretary shall provide the report in the manner and form prescribed by the Secretary.

<< 31 USCA § 6720 >>

"§ 6720. Definitions, application, and administration

"(a) DEFINITIONS.—In this chapter—

"(1) 'unit of general local government' means—

"(A) a county, township, city, or political subdivision of a county, township, or city, that is a unit of general local government as determined by the Secretary of Commerce for general statistical purposes; and

"(B) the District of Columbia and the recognized governing body of an Indian tribe or Alaskan Native village that carries out substantial governmental duties and powers;

"(2) 'payment period' means each 1-year period beginning on October 1 of the years 1994 through 2000;

"(3) 'State and local taxes' means taxes imposed by a State government or unit of general local government or other political subdivision of a State government for public purposes (except employee and employer assessments and contributions to finance retirement and social insurance systems and other special assessments for capital outlay) as determined by the Secretary of Commerce for general statistical purposes;

"(4) 'State' means any of the several States and the District of Columbia;

"(5) 'income' means the total money income received from all sources as determined by the Secretary of Commerce for general statistical purposes, which for units of general local government is reported by the Bureau of the Census for 1990 in the publication Summary Social, Economic, and Housing Characteristics;

"(6) 'per capita income' means—

"(A) in the case of the United States, the income of the United States divided by the population of the United States;

"(B) in the case of a State, the income of that State, divided by the population of that State; and

"(C) in the case of a unit of general local government, the income of that unit of general local government divided by the population of the unit of general local government;

"(7) 'finding of discrimination' means a decision by the Secretary about a complaint described in section 6716(b), a decision by a State or local administrative agency, or other information (under regulations prescribed by the Secretary) that it is more likely than not that a unit of general local government has not complied with section 6711 (a) or (b);

"(8) 'holding of discrimination' means a holding by a United States court, a State court, or an administrative law judge appointed under section 3105 of title 5, United States Code, that a unit of general local government expending amounts received under this chapter has—

"(A) excluded a person in the United States from participating in, denied the person the benefits of, or subjected the person to discrimination under, a program or activity because of race, color, national origin, or sex; or

"(B) violated a prohibition against discrimination described in section 6711(b); and

"(9) 'Secretary' means the Secretary of Housing and Urban Development.

"(b) DELEGATION OF ADMINISTRATION.—The Secretary may enter into agreements with other executive branch departments and agencies to delegate to that department or agency all or part of the Secretary's responsibility for administering this chapter.

"(c) TREATMENT OF SUBSUMED AREAS.—If the entire geographic area of a unit of general local government is located in a larger entity, the unit of general local government is deemed to be located in the larger entity. If only part of the geographic area of a unit is located in a larger entity, each part is deemed to be located in the larger entity and to be a separate unit of general local government in determining allocations under this chapter. Except as provided in regulations prescribed by the Secretary, the Secretary shall make all data computations based on the ratio of the estimated population of the part to the population of the entire unit of general local government.

"(d) BOUNDARY AND OTHER CHANGES.—If a boundary line change, a State statutory or constitutional change, annexation, a governmental reorganization, or other circumstance results in the application of sections 6704 through 6708 in a way that does not carry out the purposes of sections 6701 through 6708, the Secretary shall apply sections 6701 through 6708 under regulations of the Secretary in a way that is consistent with those purposes.".

<< 31 USCA § 6701 NOTE >>

(b) ISSUANCE OF REGULATIONS.—Within 90 days of the date of enactment of this Act the Secretary shall issue regulations, which may be interim regulations, to implement subsection (a), modifying the regulations for carrying into effect the Revenue Sharing Act that were in effect as of July 1, 1987, and that were published in 31 C.F.R. part 51. The Secretary need not hold a public hearing before issuing these regulations.

<< 31 USCA § 6702 NOTE >>

(c) DEFICIT NEUTRALITY.—Any appropriation to carry out the amendment made by this subtitle to title 31, United States Code, for fiscal year 1995 or 1996 shall be offset by cuts elsewhere in appropriations for that fiscal year.

<< 31 USCA Ch. 65 >>

SEC. 31002. TECHNICAL AMENDMENT.

The table of chapters at the beginning of subtitle V of title 31, United States Code, is amended by adding after the item relating to chapter 65 the following:

"67.    Federal payments..................................................................................................................... ...........6701".

<< 42 USCA Ch. 136 >>

Subtitle K—National Community Economic Partnership

<< 42 USCA § 13701 NOTE >>

SEC. 31101. SHORT TITLE.

This subtitle may be cited as the "National Community Economic Partnership Act of 1994".

<< 42 USCA § 13821 >>

CHAPTER 1—COMMUNITY ECONOMIC PARTNERSHIP INVESTMENT FUNDS

SEC. 31111. PURPOSE.

It is the purpose of this chapter to increase private investment in distressed local communities and to build and expand the capacity of local institutions to better serve the economic needs of local residents through the provision of financial and technical assistance to community development corporations.

<< 42 USCA § 13822 >>

SEC. 31112. PROVISION OF ASSISTANCE.

(a) AUTHORITY.—The Secretary of Health and Human Services (referred to in this subtitle as the "Secretary") may, in accordance with this chapter, provide nonrefundable lines of credit to community development corporations for the establishment, maintenance or expansion of revolving loan funds to be utilized to finance projects intended to provide business and employment opportunities for low-income, unemployed, or underemployed individuals and to improve the quality of life in urban and rural areas.

(b) REVOLVING LOAN FUNDS.—

(1) COMPETITIVE ASSESSMENT OF APPLICATIONS.—In providing assistance under subsection (a), the Secretary shall establish and implement a competitive process for the solicitation and consideration of applications from eligible entities for lines of credit for the capitalization of revolving funds.

(2) ELIGIBLE ENTITIES.—To be eligible to receive a line of credit under this chapter an applicant shall—

(A) be a community development corporation;

(B) prepare and submit an application to the Secretary that shall include a strategic investment plan that identifies and describes the economic characteristics of the target area to be served, the types of business to be assisted and the impact of such assistance on low-income, underemployed, and unemployed individuals in the target area;

(C) demonstrate previous experience in the development of low-income housing or community or business development projects in a low-income community and provide a record of achievement with respect to such projects; and

(D) have secured one or more commitments from local sources for contributions (either in cash or in kind, letters of credit or letters of commitment) in an amount that is at least equal to the amount requested in the application submitted under subparagraph (B).

(3) EXCEPTION.—Notwithstanding the provisions of paragraph (2)(D), the Secretary may reduce local contributions to not less than 25 percent of the amount of the line of credit requested by the community development corporation if the Secretary determines such to be appropriate in accordance with section 31116.

<< 42 USCA § 13823 >>

SEC. 31113. APPROVAL OF APPLICATIONS.

(a) IN GENERAL.—In evaluating applications submitted under section 31112(b)(2)(B), the Secretary shall ensure that—

(1) the residents of the target area to be served (as identified under the strategic development plan) would have an income that is less than the median income for the area (as determined by the Secretary);

(2) the applicant community development corporation possesses the technical and managerial capability necessary to administer a revolving loan fund and has past experience in the development and management of housing, community and economic development programs;

(3) the applicant community development corporation has provided sufficient evidence of the existence of good working relationships with—

(A) local businesses and financial institutions, as well as with the community the corporation proposes to serve; and

(B) local and regional job training programs;

(4) the applicant community development corporation will target job opportunities that arise from revolving loan fund investments under this chapter so that 75 percent of the jobs retained or created under such investments are provided to—

(A) individuals with—

(i) incomes that do not exceed the Federal poverty line; or

(ii) incomes that do not exceed 80 percent of the median income of the area;

(B) individuals who are unemployed or underemployed;

(C) individuals who are participating or have participated in job training programs authorized under the Job Training Partnership Act (29 U.S.C. 1501 et seq.) or the Family Support Act of 1988 (Public Law 100–485);

(D) individuals whose jobs may be retained as a result of the provision of financing available under this chapter; or

(E) individuals who have historically been underrepresented in the local economy; and

(5) a representative cross section of applicants are approved, including large and small community development corporations, urban and rural community development corporations and community development corporations representing diverse populations.

(b) PRIORITY.—In determining which application to approve under this chapter the Secretary shall give priority to those applicants proposing to serve a target area—

(1) with a median income that does not exceed 80 percent of the median for the area (as determined by the Secretary); and

(2) with a high rate of unemployment, as determined by the Secretary or in which the population loss is at least 7 percent from April 1, 1980, to April 1, 1990, as reported by the Bureau of the Census.

<< 42 USCA § 13824 >>

SEC. 31114. AVAILABILITY OF LINES OF CREDIT AND USE.

(a) APPROVAL OF APPLICATION.—The Secretary shall provide a community development corporation that has an application approved under section 31113 with a line of credit in an amount determined appropriate by the Secretary, subject to the limitations contained in subsection (b).

(b) LIMITATIONS ON AVAILABILITY OF AMOUNTS.—

(1) MAXIMUM AMOUNT.—The Secretary shall not provide in excess of $2,000,000 in lines of credit under this chapter to a single applicant.

(2) PERIOD OF AVAILABILITY.—A line of credit provided under this chapter shall remain available over a period of time established by the Secretary, but in no event shall any such period of time be in excess of 3 years from the date on which such line of credit is made available.

(3) EXCEPTION.—Notwithstanding paragraphs (1) and (2), if a recipient of a line of credit under this chapter has made full and productive use of such line of credit, can demonstrate the need and demand for additional assistance, and can meet the requirements of section 31112(b)(2), the amount of such line of credit may be increased by not more than $1,500,000.

(c) AMOUNTS DRAWN FROM LINE OF CREDIT.—Amounts drawn from each line of credit under this chapter shall be used solely for the purposes described in section 31111 and shall only be drawn down as needed to provide loans, investments, or to defray administrative costs related to the establishment of a revolving loan fund.

(d) USE OF REVOLVING LOAN FUNDS.—Revolving loan funds established with lines of credit provided under this chapter may be used to provide technical assistance to private business enterprises and to provide financial assistance in the form of loans, loan guarantees, interest reduction assistance, equity shares, and other such forms of assistance to business enterprises in target areas and who are in compliance with section 31113(a)(4).

<< 42 USCA § 13825 >>

SEC. 31115. LIMITATIONS ON USE OF FUNDS.

(a) MATCHING REQUIREMENT.—Not to exceed 50 percent of the total amount to be invested by an entity under this chapter may be derived from funds made available from a line of credit under this chapter.

(b) TECHNICAL ASSISTANCE AND ADMINISTRATION.—Not to exceed 10 percent of the amounts available from a line of credit under this chapter shall be used for the provision of training or technical assistance and for the planning,

development, and management of economic development projects. Community development corporations shall be encouraged by the Secretary to seek technical assistance from other community development corporations, with expertise in the planning, development and management of economic development projects. The Secretary shall assist in the identification and facilitation of such technical assistance.

(c) LOCAL AND PRIVATE SECTOR CONTRIBUTIONS.—To receive funds available under a line of credit provided under this chapter, an entity, using procedures established by the Secretary, shall demonstrate to the community development corporation that such entity agrees to provide local and private sector contributions in accordance with section 31112(b)(2)(D), will participate with such community development corporation in a loan, guarantee or investment program for a designated business enterprise, and that the total financial commitment to be provided by such entity is at least equal to the amount to be drawn from the line of credit.

(d) USE OF PROCEEDS FROM INVESTMENTS.—Proceeds derived from investments made using funds made available under this chapter may be used only for the purposes described in section 31111 and shall be reinvested in the community in which they were generated.

<< 42 USCA § 13826 >>

SEC. 31116. PROGRAM PRIORITY FOR SPECIAL EMPHASIS PROGRAMS.

(a) IN GENERAL.—The Secretary shall give priority in providing lines of credit under this chapter to community development corporations that propose to undertake economic development activities in distressed communities that target women, Native Americans, at risk youth, farmworkers, population-losing communities, very low-income communities, single mothers, veterans, and refugees; or that expand employee ownership of private enterprises and small businesses, and to programs providing loans of not more than $35,000 to very small business enterprises.

(b) RESERVATION OF FUNDS.—Not less than 5 percent of the amounts made available under section 31112(a)(2)(A) may be reserved to carry out the activities described in subsection (a).

<< 42 USCA § 13841 >>

CHAPTER 2—EMERGING COMMUNITY DEVELOPMENT CORPORATIONS

SEC. 31121. COMMUNITY DEVELOPMENT CORPORATION IMPROVEMENT GRANTS.

(a) PURPOSE.—It is the purpose of this section to provide assistance to community development corporations to upgrade the management and operating capacity of such corporations and to enhance the resources available to enable such corporations to increase their community economic development activities.

(b) SKILL ENHANCEMENT GRANTS.—

(1) IN GENERAL.—The Secretary shall award grants to community development corporations to enable such corporations to attain or enhance the business management and development skills of the individuals that manage such corporations to enable such corporations to seek the public and private resources necessary to develop community economic development projects.

(2) USE OF FUNDS.—A recipient of a grant under paragraph (1) may use amounts received under such grant—

(A) to acquire training and technical assistance from agencies or institutions that have extensive experience in the development and management of low-income community economic development projects; or

(B) to acquire such assistance from other highly successful community development corporations.

(c) OPERATING GRANTS.—

(1) IN GENERAL.—The Secretary shall award grants to community development corporations to enable such corporations to support an administrative capacity for the planning, development, and management of low-income community economic development projects.

(2) USE OF FUNDS.—A recipient of a grant under paragraph (1) may use amounts received under such grant—

(A) to conduct evaluations of the feasibility of potential low-income community economic development projects that address identified needs in the low-income community and that conform to those projects and activities permitted under subtitle A;

(B) to develop a business plan related to such a potential project; or

AR.01922

(C) to mobilize resources to be contributed to a planned low-income community economic development project or strategy.

(d) APPLICATIONS.—A community development corporation that desires to receive a grant under this section shall prepare and submit to the Secretary an application at such time, in such manner, and containing such information as the Secretary may require.

(e) AMOUNT AVAILABLE FOR A COMMUNITY DEVELOPMENT CORPORATION.—Amounts provided under this section to a community development corporation shall not exceed $75,000 per year. Such corporations may apply for grants under this section for up to 3 consecutive years, except that such corporations shall be required to submit a new application for each grant for which such corporation desires to receive and compete on the basis of such applications in the selection process.

<< 42 USCA § 13842 >>

SEC. 31122. EMERGING COMMUNITY DEVELOPMENT CORPORATION REVOLVING LOAN FUNDS.

(a) AUTHORITY.—The Secretary may award grants to emerging community development corporations to enable such corporations to establish, maintain or expand revolving loan funds, to make or guarantee loans, or to make capital investments in new or expanding local businesses.

(b) ELIGIBILITY.—To be eligible to receive a grant under subsection (a), an entity shall—

(1) be a community development corporation;

(2) have completed not less than one nor more than two community economic development projects or related projects that improve or provide job and employment opportunities to low-income individuals;

(3) prepare and submit to the Secretary an application at such time, in such manner, and containing such information as the Secretary may require, including a strategic investment plan that identifies and describes the economic characteristics of the target area to be served, the types of business to be assisted using amounts received under the grant and the impact of such assistance on low-income individuals; and

(4) have secured one or more commitments from local sources for contributions (either in cash or in kind, letters of credit, or letters of commitment) in an amount that is equal to at least 10 percent of the amounts requested in the application submitted under paragraph (2).

(c) USE OF THE REVOLVING LOAN FUND.—

(1) IN GENERAL.—A revolving loan fund established or maintained with amounts received under this section may be utilized to provide financial and technical assistance, loans, loan guarantees or investments to private business enterprises to—

(A) finance projects intended to provide business and employment opportunities for low-income individuals and to improve the quality of life in urban and rural areas; and

(B) build and expand the capacity of emerging community development corporations and serve the economic needs of local residents.

(2) TECHNICAL ASSISTANCE.—The Secretary shall encourage emerging community development corporations that receive grants under this section to seek technical assistance from established community development corporations, with expertise in the planning, development and management of economic development projects and shall facilitate the receipt of such assistance.

(3) LIMITATION.—Not to exceed 10 percent of the amounts received under this section by a grantee shall be used for training, technical assistance and administrative purposes.

(d) USE OF PROCEEDS FROM INVESTMENTS.—Proceeds derived from investments made with amounts provided under this section may be utilized only for the purposes described in this subtitle and shall be reinvested in the community in which they were generated.

(e) AMOUNTS AVAILABLE.—Amounts provided under this section to a community development corporation shall not exceed $500,000 per year.

<< 42 USCA § 13851 >>

CHAPTER 3—MISCELLANEOUS PROVISIONS

SEC. 31131. DEFINITIONS.

As used in this subtitle:

 (1) COMMUNITY DEVELOPMENT CORPORATION.—The term "community development corporation" means a private, nonprofit corporation whose board of directors is comprised of business, civic and community leaders, and whose principal purpose includes the provision of low-income housing or community economic development projects that primarily benefit low-income individuals and communities.

 (2) LOCAL AND PRIVATE SECTOR CONTRIBUTION.—The term "local and private sector contribution" means the funds available at the local level (by private financial institutions, State and local governments) or by any private philanthropic organization and private, nonprofit organizations that will be committed and used solely for the purpose of financing private business enterprises in conjunction with amounts provided under this subtitle.

 (3) POPULATION–LOSING COMMUNITY.—The term "population-losing community" means any county in which the net population loss is at least 7 percent from April 1, 1980 to April 1, 1990, as reported by the Bureau of the Census.

 (4) PRIVATE BUSINESS ENTERPRISE.—The term "private business enterprise" means any business enterprise that is engaged in the manufacture of a product, provision of a service, construction or development of a facility, or that is involved in some other commercial, manufacturing or industrial activity, and that agrees to target job opportunities stemming from investments authorized under this subtitle to certain individuals.

 (5) TARGET AREA.—The term "target area" means any area defined in an application for assistance under this subtitle that has a population whose income does not exceed the median for the area within which the target area is located.

 (6) VERY LOW–INCOME COMMUNITY.—The term "very low-income community" means a community in which the median income of the residents of such community does not exceed 50 percent of the median income of the area.

<< 42 USCA § 13852 >>

SEC. 31132. AUTHORIZATION OF APPROPRIATIONS.

 (a) IN GENERAL.—There are authorized to be appropriated to carry out chapters 1 and 2—
  (1) $45,000,000 for fiscal year 1996;
  (2) $72,000,000 for fiscal year 1997;
  (3) $76,500,000 for fiscal year 1998; and
  (4) $76,500,000 for fiscal year 1999.
 (b) EARMARKS.—Of the aggregate amount appropriated under subsection (a) for each fiscal year—
  (1) 60 percent shall be available to carry out chapter 1; and
  (2) 40 percent shall be available to carry out chapter 2.
 (c) AMOUNTS.—Amounts appropriated under subsection (a) shall remain available for expenditure without fiscal year limitation.

<< 42 USCA § 13853 >>

SEC. 31133. PROHIBITION.

 None of the funds authorized under this subtitle shall be used to finance the construction of housing.

<< 16 USCA § 2502 >>

Subtitle O—Urban Recreation and At-Risk Youth

SEC. 31501. PURPOSE OF ASSISTANCE.

 Section 1003 of the Urban Park and Recreation Recovery Act of 1978 is amended by adding the following at the end: "It is further the purpose of this title to improve recreation facilities and expand recreation services in urban areas with a high incidence of crime and to help deter crime through the expansion of recreation opportunities for at-risk youth. It is the further

purpose of this section to increase the security of urban parks and to promote collaboration between local agencies involved in parks and recreation, law enforcement, youth social services, and juvenile justice system.".

<< 16 USCA § 2503 >>

SEC. 31502. DEFINITIONS.

  Section 1004 of the Urban Park and Recreation Recovery Act of 1978 is amended by inserting the following new subsection after subsection (c) and by redesignating subsections (d) through (j) as (e) through (k), respectively:
  "(d) 'at-risk youth recreation grants' means—
   "(1) rehabilitation grants,
   "(2) innovation grants, or
   "(3) matching grants for continuing program support for programs of demonstrated value or success in providing constructive alternatives to youth at risk for engaging in criminal behavior, including grants for operating, or coordinating recreation programs and services;

in neighborhoods and communities with a high prevalence of crime, particularly violent crime or crime committed by youthful offenders; in addition to the purposes specified in subsection (b), rehabilitation grants referred to in paragraph (1) of this subsection may be used for the provision of lighting, emergency phones or other capital improvements which will improve the security of urban parks;".

<< 16 USCA § 2504 >>

SEC. 31503. CRITERIA FOR SELECTION.

  Section 1005 of the Urban Park and Recreation Recovery Act of 1978 is amended by striking "and" at the end of paragraph (6), by striking the period at the end of paragraph (7) and inserting "; and" and by adding the following at the end:
  "(8) in the case of at-risk youth recreation grants, the Secretary shall give a priority to each of the following criteria:
   "(A) Programs which are targeted to youth who are at the greatest risk of becoming involved in violence and crime.
   "(B) Programs which teach important values and life skills, including teamwork, respect, leadership, and self-esteem.
   "(C) Programs which offer tutoring, remedial education, mentoring, and counseling in addition to recreation opportunities.
   "(D) Programs which offer services during late night or other nonschool hours.
   "(E) Programs which demonstrate collaboration between local park and recreation, juvenile justice, law enforcement, and youth social service agencies and nongovernmental entities, including the private sector and community and nonprofit organizations.
   "(F) Programs which leverage public or private recreation investments in the form of services, materials, or cash.
   "(G) Programs which show the greatest potential of being continued with non-Federal funds or which can serve as models for other communities.".

<< 16 USCA § 2506 >>

SEC. 31504. PARK AND RECREATION ACTION RECOVERY PROGRAMS.

  Section 1007(b) of the Urban Park and Recreation Recovery Act of 1978 is amended by adding the following at the end: "In order to be eligible to receive 'at-risk youth recreation grants' a local government shall amend its 5-year action program to incorporate the goal of reducing crime and juvenile delinquency and to provide a description of the implementation strategies to achieve this goal. The plan shall also address how the local government is coordinating its recreation programs with crime prevention efforts of law enforcement, juvenile corrections, and youth social service agencies.".

SEC. 31505. MISCELLANEOUS AND TECHNICAL AMENDMENTS.

<< 16 USCA § 2512 >>

(a) PROGRAM SUPPORT.—Section 1013 of the Urban Park and Recreation Recovery Act of 1978 is amended by inserting "(a) IN GENERAL.—" after "1013" and by adding the following new subsection at the end:

"(b) PROGRAM SUPPORT.—Not more than 25 percent of the amounts made available under this title to any local government may be used for program support.".

<< 16 USCA § 2502 >>

(b) EXTENSION.—Section 1003 of the Urban Park and Recreation Recovery Act of 1978 is amended by striking "for a period of five years" and by striking "short-term".

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subtitle—

(1) $2,700,000 for fiscal year 1996;

(2) $450,000 for fiscal year 1997;

(3) $450,000 for fiscal year 1998;

(4) $450,000 for fiscal year 1999; and

(5) $450,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

Subtitle Q—Community-Based Justice Grants for Prosecutors

<< 42 USCA § 13861 >>

SEC. 31701. GRANT AUTHORIZATION.

(a) IN GENERAL.—The Attorney General may make grants to State, Indian tribal, or local prosecutors for the purpose of supporting the creation or expansion of community-based justice programs.

(b) CONSULTATION.—The Attorney General may consult with the Ounce of Prevention Council in making grants under subsection (a).

<< 42 USCA § 13862 >>

SEC. 31702. USE OF FUNDS.

Grants made by the Attorney General under this section shall be used—

(1) to fund programs that require the cooperation and coordination of prosecutors, school officials, police, probation officers, youth and social service professionals, and community members in the effort to reduce the incidence of, and increase the successful identification and speed of prosecution of, young violent offenders;

(2) to fund programs in which prosecutors focus on the offender, not simply the specific offense, and impose individualized sanctions, designed to deter that offender from further antisocial conduct, and impose increasingly serious sanctions on a young offender who continues to commit offenses;

(3) to fund programs that coordinate criminal justice resources with educational, social service, and community resources to develop and deliver violence prevention programs, including mediation and other conflict resolution methods, treatment, counselling, educational, and recreational programs that create alternatives to criminal activity; and

(4) in rural States (as defined in section 1501(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796bb(B)), to fund cooperative efforts between State and local prosecutors, victim advocacy and assistance groups, social and community service providers, and law enforcement agencies to investigate and prosecute child abuse cases, treat youthful victims of child abuse, and work in cooperation with the community to develop education and prevention strategies directed toward the issues with which such entities are concerned.

<< 42 USCA § 13863 >>

SEC. 31703. APPLICATIONS.

(a) ELIGIBILITY.—In order to be eligible to receive a grant under this part for any fiscal year, a State, Indian tribal, or local prosecutor, in conjunction with the chief executive officer of the jurisdiction in which the program will be placed, shall submit an application to the Attorney General in such form and containing such information as the Attorney General may reasonably require.

(b) REQUIREMENTS.—Each applicant shall include—

(1) a request for funds for the purposes described in section 31702;

(2) a description of the communities to be served by the grant, including the nature of the youth crime, youth violence, and child abuse problems within such communities;

(3) assurances that Federal funds received under this part shall be used to supplement, not supplant, non-Federal funds that would otherwise be available for activities funded under this section; and

(4) statistical information in such form and containing such information that the Attorney General may require.

(c) COMPREHENSIVE PLAN.—Each applicant shall include a comprehensive plan that shall contain—

(1) a description of the youth violence or child abuse crime problem;

(2) an action plan outlining how the applicant will achieve the purposes as described in section 31702;

(3) a description of the resources available in the community to implement the plan together with a description of the gaps in the plan that cannot be filled with existing resources; and

(4) a description of how the requested grant will be used to fill gaps.

<< 42 USCA § 13864 >>

SEC. 31704. ALLOCATION OF FUNDS; LIMITATIONS ON GRANTS.

(a) ADMINISTRATIVE COST LIMITATION.—The Attorney General shall use not more than 5 percent of the funds available under this program for the purposes of administration and technical assistance.

(b) RENEWAL OF GRANTS.—A grant under this part may be renewed for up to 2 additional years after the first fiscal year during which the recipient receives its initial grant under this part, subject to the availability of funds, if—

(1) the Attorney General determines that the funds made available to the recipient during the previous years were used in a manner required under the approved application; and

(2) the Attorney General determines that an additional grant is necessary to implement the community prosecution program described in the comprehensive plan required by section 31703.

<< 42 USCA § 13865 >>

SEC. 31705. AWARD OF GRANTS.

The Attorney General shall consider the following facts in awarding grants:

(1) Demonstrated need and evidence of the ability to provide the services described in the plan required under section 31703.

(2) The Attorney General shall attempt, to the extent practicable, to achieve an equitable geographic distribution of grant awards.

<< 42 USCA § 13866 >>

SEC. 31706. REPORTS.

(a) REPORT TO ATTORNEY GENERAL.—State and local prosecutors that receive funds under this subtitle shall submit to the Attorney General a report not later than March 1 of each year that describes progress achieved in carrying out the plan described under section 31703(c).

(b) REPORT TO CONGRESS.—The Attorney General shall submit to the Congress a report by October 1 of each year in which grants are made available under this subtitle which shall contain a detailed statement regarding grant awards, activities of grant recipients, a compilation of statistical information submitted by applicants, and an evaluation of programs established under this subtitle.

<< 42 USCA § 13867 >>

SEC. 31707. AUTHORIZATION OF APPROPRIATIONS.

 There are authorized to be appropriated to carry out this subtitle—
  (1) $7,000,000 for fiscal year 1996;
  (2) $10,000,000 for fiscal year 1997;
  (3) $10,000,000 for fiscal year 1998;
  (4) $11,000,000 for fiscal year 1999; and
  (5) $12,000,000 for fiscal year 2000.

<< 42 USCA § 13868 >>

SEC. 31708. DEFINITIONS.

 In this subtitle—
  "Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.
  "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, and the United States Virgin Islands.
  "Young violent offenders" means individuals, ages 7 through 22, who have committed crimes of violence, weapons offenses, drug distribution, hate crimes and civil rights violations, and offenses against personal property of another.

<< 42 USCA Ch. 136 >>

Subtitle S—Family Unity Demonstration Project

<< 42 USCA § 13701 NOTE >>

SEC. 31901. SHORT TITLE.

 This subtitle may be cited as the "Family Unity Demonstration Project Act".

<< 42 USCA § 13881 >>

SEC. 31902. PURPOSE.

 The purpose of this subtitle is to evaluate the effectiveness of certain demonstration projects in helping to—
  (1) alleviate the harm to children and primary caretaker parents caused by separation due to the incarceration of the parents;
  (2) reduce recidivism rates of prisoners by encouraging strong and supportive family relationships; and
  (3) explore the cost effectiveness of community correctional facilities.

<< 42 USCA § 13882 >>

SEC. 31903. DEFINITIONS.

 In this subtitle—
  "child" means a person who is less than 7 years of age.
  "community correctional facility" means a residential facility that—
   (A) is used only for eligible offenders and their children under 7 years of age;
   (B) is not within the confines of a jail or prison;

(C) houses no more than 50 prisoners in addition to their children; and

(D) provides to inmates and their children—

 (i) a safe, stable, environment for children;

 (ii) pediatric and adult medical care consistent with medical standards for correctional facilities;

 (iii) programs to improve the stability of the parent-child relationship, including educating parents regarding—

  (I) child development; and

  (II) household management;

 (iv) alcoholism and drug addiction treatment for prisoners; and

 (v) programs and support services to help inmates—

  (I) to improve and maintain mental and physical health, including access to counseling;

  (II) to obtain adequate housing upon release from State incarceration;

  (III) to obtain suitable education, employment, or training for employment; and

  (IV) to obtain suitable child care.

"eligible offender" means a primary caretaker parent who—

 (A) has been sentenced to a term of imprisonment of not more than 7 years or is awaiting sentencing for a conviction punishable by such a term of imprisonment; and

 (B) has not engaged in conduct that—

 (i) knowingly resulted in death or serious bodily injury;

 (ii) is a felony for a crime of violence against a person; or

 (iii) constitutes child neglect or mental, physical, or sexual abuse of a child.

"primary caretaker parent" means—

 (A) a parent who has consistently assumed responsibility for the housing, health, and safety of a child prior to incarceration; or

 (B) a woman who has given birth to a child after or while awaiting her sentencing hearing and who expresses a willingness to assume responsibility for the housing, health, and safety of that child,

a parent who, in the best interest of a child, has arranged for the temporary care of the child in the home of a relative or other responsible adult shall not for that reason be excluded from the category "primary caretaker".

 "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.

<< 42 USCA § 13883 >>

SEC. 31904. AUTHORIZATION OF APPROPRIATIONS.

 (a) AUTHORIZATION.—There are authorized to be appropriated to carry out this subtitle—

  (1) $3,600,000 for fiscal year 1996;

  (2) $3,600,000 for fiscal year 1997;

  (3) $3,600,000 for fiscal year 1998;

  (4) $3,600,000 for fiscal year 1999; and

  (5) $5,400,000 for fiscal year 2000.

 (b) AVAILABILITY OF APPROPRIATIONS.—Of the amount appropriated under subsection (a) for any fiscal year—

  (1) 90 percent shall be available to carry out chapter 1; and

  (2) 10 percent shall be available to carry out chapter 2.

<< 42 USCA Ch. 136 >>

CHAPTER 1—GRANTS TO STATES

<< 42 USCA § 13891 >>

SEC. 31911. AUTHORITY TO MAKE GRANTS.

(a) GENERAL AUTHORITY.—The Attorney General may make grants, on a competitive basis, to States to carry out in accordance with this subtitle family unity demonstration projects that enable eligible offenders to live in community correctional facilities with their children.

(b) PREFERENCES.—For the purpose of making grants under subsection (a), the Attorney General shall give preference to a State that includes in the application required by section 31912 assurances that if the State receives a grant—

(1) both the State corrections agency and the State health and human services agency will participate substantially in, and cooperate closely in all aspects of, the development and operation of the family unity demonstration project for which such a grant is requested;

(2) boards made up of community members, including residents, local businesses, corrections officials, former prisoners, child development professionals, educators, and maternal and child health professionals will be established to advise the State regarding the operation of such project;

(3) the State has in effect a policy that provides for the placement of all prisoners, whenever possible, in correctional facilities for which they qualify that are located closest to their respective family homes;

(4) unless the Attorney General determines that a longer timeline is appropriate in a particular case, the State will implement the project not later than 180 days after receiving a grant under subsection (a) and will expend all of the grant during a 1-year period;

(5) the State has the capacity to continue implementing a community correctional facility beyond the funding period to ensure the continuity of the work;

(6) unless the Attorney General determines that a different process for selecting participants in a project is desirable, the State will—

(A) give written notice to a prisoner, not later than 30 days after the State first receives a grant under subsection (a) or 30 days after the prisoner is sentenced to a term of imprisonment of not more than 7 years (whichever is later), of the proposed or current operation of the project;

(B) accept at any time at which the project is in operation an application by a prisoner to participate in the project if, at the time of application, the remainder of the prisoner's sentence exceeds 180 days;

(C) review applications by prisoners in the sequence in which the State receives such applications; and

(D) not more than 50 days after reviewing such applications approve or disapprove the application; and

(7) for the purposes of selecting eligible offenders to participate in such project, the State has authorized State courts to sentence an eligible offender directly to a community correctional facility, provided that the court gives assurances that the offender would have otherwise served a term of imprisonment.

(c) SELECTION OF GRANTEES.—The Attorney General shall make grants under subsection (a) on a competitive basis, based on such criteria as the Attorney General shall issue by rule and taking into account the preferences described in subsection (b).

<< 42 USCA § 13892 >>

SEC. 31912. ELIGIBILITY TO RECEIVE GRANTS.

To be eligible to receive a grant under section 31911, a State shall submit to the Attorney General an application at such time, in such form, and containing such information as the Attorney General reasonably may require by rule.

<< 42 USCA § 13893 >>

SEC. 31913. REPORT.

(a) IN GENERAL.—A State that receives a grant under this title shall, not later than 90 days after the 1-year period in which the grant is required to be expended, submit a report to the Attorney General regarding the family unity demonstration project for which the grant was expended.

(b) CONTENTS.—A report under subsection (a) shall—

(1) state the number of prisoners who submitted applications to participate in the project and the number of prisoners who were placed in community correctional facilities;

(2) state, with respect to prisoners placed in the project, the number of prisoners who are returned to that jurisdiction and custody and the reasons for such return;

(3) describe the nature and scope of educational and training activities provided to prisoners participating in the project;

(4) state the number, and describe the scope of, contracts made with public and nonprofit private community-based organizations to carry out such project; and

(5) evaluate the effectiveness of the project in accomplishing the purposes described in section 31902.

<< 42 USCA Ch. 136 >>

CHAPTER 2—FAMILY UNITY DEMONSTRATION PROJECT FOR FEDERAL PRISONERS

<< 42 USCA § 13901 >>

SEC. 31921. AUTHORITY OF THE ATTORNEY GENERAL.

(a) IN GENERAL.—With the funds available to carry out this subtitle for the benefit of Federal prisoners, the Attorney General, acting through the Director of the Bureau of Prisons, shall select eligible prisoners to live in community correctional facilities with their children.

(b) GENERAL CONTRACTING AUTHORITY.—In implementing this title, the Attorney General may enter into contracts with appropriate public or private agencies to provide housing, sustenance, services, and supervision of inmates eligible for placement in community correctional facilities under this title.

(c) USE OF STATE FACILITIES.—At the discretion of the Attorney General, Federal participants may be placed in State projects as defined in chapter 1. For such participants, the Attorney General shall, with funds available under section 31904(b)(2), reimburse the State for all project costs related to the Federal participant's placement, including administrative costs.

<< 42 USCA § 13902 >>

SEC. 31922. REQUIREMENTS.

For the purpose of placing Federal participants in a family unity demonstration project under section 31921, the Attorney General shall consult with the Secretary of Health and Human Services regarding the development and operation of the project.

<< 18 USCA § 3621 >>

Subtitle T—Substance Abuse Treatment in Federal Prisons

SEC. 32001. SUBSTANCE ABUSE TREATMENT IN FEDERAL PRISONS.

Section 3621 of title 18, United States Code, is amended—

(1) in the last sentence of subsection (b), by striking ", to the extent practicable,"; and

(2) by adding at the end the following new subsection:

"(e) Substance Abuse Treatment.—

"(1) PHASE–IN.—In order to carry out the requirement of the last sentence of subsection (b) of this section, that every prisoner with a substance abuse problem have the opportunity to participate in appropriate substance abuse treatment, the Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)—

"(A) for not less than 50 percent of eligible prisoners by the end of fiscal year 1995, with priority for such treatment accorded based on an eligible prisoner's proximity to release date;

"(B) for not less than 75 percent of eligible prisoners by the end of fiscal year 1996, with priority for such treatment accorded based on an eligible prisoner's proximity to release date; and

"(C) for all eligible prisoners by the end of fiscal year 1997 and thereafter, with priority for such treatment accorded based on an eligible prisoner's proximity to release date.

"(2) INCENTIVE FOR PRISONERS' SUCCESSFUL COMPLETION OF TREATMENT PROGRAM.—

"(A) GENERALLY.—Any prisoner who, in the judgment of the Director of the Bureau of Prisons, has successfully completed a program of residential substance abuse treatment provided under paragraph (1) of this subsection, shall remain in the custody of the Bureau under such conditions as the Bureau deems appropriate. If the conditions of confinement are different from those the prisoner would have experienced absent the successful completion of the treatment, the Bureau shall periodically test the prisoner for substance abuse and discontinue such conditions on determining that substance abuse has recurred.

"(B) PERIOD OF CUSTODY.—The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

"(3) REPORT.—The Bureau of Prisons shall transmit to the Committees on the Judiciary of the Senate and the House of Representatives on January 1, 1995, and on January 1 of each year thereafter, a report. Such report shall contain—

"(A) a detailed quantitative and qualitative description of each substance abuse treatment program, residential or not, operated by the Bureau;

"(B) a full explanation of how eligibility for such programs is determined, with complete information on what proportion of prisoners with substance abuse problems are eligible; and

"(C) a complete statement of to what extent the Bureau has achieved compliance with the requirements of this title.

"(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection—

"(A) $13,500,000 for fiscal year 1996;

"(B) $18,900,000 for fiscal year 1997;

"(C) $25,200,000 for fiscal year 1998;

"(D) $27,000,000 for fiscal year 1999; and

"(E) $27,900,000 for fiscal year 2000.

"(5) DEFINITIONS.—As used in this subsection—

"(A) the term 'residential substance abuse treatment' means a course of individual and group activities, lasting between 6 and 12 months, in residential treatment facilities set apart from the general prison population—

"(i) directed at the substance abuse problems of the prisoner; and

"(ii) intended to develop the prisoner's cognitive, behavioral, social, vocational, and other skills so as to solve the prisoner's substance abuse and related problems;

"(B) the term 'eligible prisoner' means a prisoner who is—

"(i) determined by the Bureau of Prisons to have a substance abuse problem; and

"(ii) willing to participate in a residential substance abuse treatment program; and

"(C) the term 'aftercare' means placement, case management and monitoring of the participant in a community-based substance abuse treatment program when the participant leaves the custody of the Bureau of Prisons.

"(6) COORDINATION OF FEDERAL ASSISTANCE.—The Bureau of Prisons shall consult with the Department of Health and Human Services concerning substance abuse treatment and related services and the incorporation of applicable components of existing comprehensive approaches including relapse prevention and aftercare services.".

Subtitle U—Residential Substance Abuse Treatment for State Prisoners

SEC. 32101. RESIDENTIAL SUBSTANCE ABUSE TREATMENT FOR STATE PRISONERS.

(a) RESIDENTIAL SUBSTANCE ABUSE TREATMENT FOR PRISONERS.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 20201(a), is amended—

<< 42 USCA Ch. 46 >>

(1) by redesignating part S as part T;

<< 42 USCA § 3797 >>

(2) by redesignating section 1901 as section 2001; and

AR.01932

<< 42 USCA Ch. 46 >>

(3) by inserting after part R the following new part:

"PART S—RESIDENTIAL SUBSTANCE ABUSE TREATMENT FOR STATE PRISONERS

<< 42 USCA § 3796ff >>

"SEC. 1901. GRANT AUTHORIZATION.

  "(a) The Attorney General may make grants under this part to States, for use by States and units of local government for the purpose of developing and implementing residential substance abuse treatment programs within State correctional facilities, as well as within local correctional and detention facilities in which inmates are incarcerated for a period of time sufficient to permit substance abuse treatment.

  "(b) CONSULTATION.—The Attorney General shall consult with the Secretary of Health and Human Services to ensure that projects of substance abuse treatment and related services for State prisoners incorporate applicable components of existing comprehensive approaches including relapse prevention and after care services.

<< 42 USCA § 3796ff–1 >>

"SEC. 1902. STATE APPLICATIONS.

  "(a) IN GENERAL.—(1) To request a grant under this part the chief executive of a State shall submit an application to the Attorney General in such form and containing such information as the Attorney General may reasonably require.

  "(2) Such application shall include assurances that Federal funds received under this part shall be used to supplement, not supplant, non-Federal funds that would otherwise be available for activities funded under this part.

  "(3) Such application shall coordinate the design and implementation of treatment programs between State correctional representatives and the State Alcohol and Drug Abuse agency (and, if appropriate, between representatives of local correctional agencies and representatives of either the State alcohol and drug abuse agency or any appropriate local alcohol and drug abuse agency).

  "(b) SUBSTANCE ABUSE TESTING REQUIREMENT.—To be eligible to receive funds under this part, a State must agree to implement or continue to require urinalysis or other proven reliable forms of testing of individuals in correctional residential substance abuse treatment programs. Such testing shall include individuals released from residential substance abuse treatment programs who remain in the custody of the State.

  "(c) ELIGIBILITY FOR PREFERENCE WITH AFTER CARE COMPONENT.—

  "(1) To be eligible for a preference under this part, a State must ensure that individuals who participate in the substance abuse treatment program established or implemented with assistance provided under this part will be provided with aftercare services.

  "(2) State aftercare services must involve the coordination of the correctional facility treatment program with other human service and rehabilitation programs, such as educational and job training programs, parole supervision programs, half-way house programs, and participation in self-help and peer group programs, that may aid in the rehabilitation of individuals in the substance abuse treatment program.

  "(3) To qualify as an aftercare program, the head of the substance abuse treatment program, in conjunction with State and local authorities and organizations involved in substance abuse treatment, shall assist in placement of substance abuse treatment program participants with appropriate community substance abuse treatment facilities when such individuals leave the correctional facility at the end of a sentence or on parole.

  "(d) COORDINATION OF FEDERAL ASSISTANCE.—Each application submitted for a grant under this section shall include a description of how the funds made available under this section will be coordinated with Federal assistance for substance abuse treatment and aftercare services currently provided by the Department of Health and Human Services' Substance Abuse and Mental Health Services Administration.

  "(e) STATE OFFICE.—The Office designated under section 507—

  "(1) shall prepare the application as required under this section; and

AR.01933

"(2) shall administer grant funds received under this part, including review of spending, processing, progress, financial reporting, technical assistance, grant adjustments, accounting, auditing, and fund disbursement.

<< 42 USCA § 3796ff–2 >>

"SEC. 1903. REVIEW OF STATE APPLICATIONS.

  "(a) IN GENERAL.—The Attorney General shall make a grant under section 1901 to carry out the projects described in the application submitted under section 1902 upon determining that—

   "(1) the application is consistent with the requirements of this part; and

   "(2) before the approval of the application the Attorney General has made an affirmative finding in writing that the proposed project has been reviewed in accordance with this part.

  "(b) APPROVAL.—Each application submitted under section 1902 shall be considered approved, in whole or in part, by the Attorney General not later than 90 days after first received unless the Attorney General informs the applicant of specific reasons for disapproval.

  "(c) RESTRICTION.—Grant funds received under this part shall not be used for land acquisition or construction projects.

  "(d) DISAPPROVAL NOTICE AND RECONSIDERATION.—The Attorney General shall not disapprove any application without first affording the applicant reasonable notice and an opportunity for reconsideration.

<< 42 USCA § 3796ff–3 >>

"SEC. 1904. ALLOCATION AND DISTRIBUTION OF FUNDS.

  "(a) ALLOCATION.—Of the total amount appropriated under this part in any fiscal year—

   "(1) 0.4 percent shall be allocated to each of the participating States; and

   "(2) of the total funds remaining after the allocation under paragraph (1), there shall be allocated to each of the participating States an amount which bears the same ratio to the amount of remaining funds described in this paragraph as the State prison population of such State bears to the total prison population of all the participating States.

  "(b) FEDERAL SHARE.—The Federal share of a grant made under this part may not exceed 75 percent of the total costs of the projects described in the application submitted under section 1902 for the fiscal year for which the projects receive assistance under this part.

<< 42 USCA § 3796ff–4 >>

"SEC. 1905. EVALUATION.

  "Each State that receives a grant under this part shall submit to the Attorney General an evaluation not later than March 1 of each year in such form and containing such information as the Attorney General may reasonably require.".

  (b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 20201(b), is amended by inserting after the matter relating to part R the following new part:

"Part S—Residential Substance Abuse Treatment for State Prisoners

"Sec. 1901. Grant authorization.
"Sec. 1902. State applications.
"Sec. 1903. Review of State applications.
"Sec. 1904. Allocation and distribution of funds.
"Sec. 1905. Evaluation.

"Part T—Transition–Effective Date–Repealer

"Sec. 2001. Confirmation of rules, authorities, and proceedings.".

<< 42 USCA § 3791 >>

(c) DEFINITIONS.—Section 901(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3791(a)), as amended by section 20201(c), is amended—

(1) by striking "and" at the end of paragraph (23);

(2) by striking the period at the end of paragraph (24) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(25) the term 'residential substance abuse treatment program' means a course of individual and group activities, lasting between 6 and 12 months, in residential treatment facilities set apart from the general prison population—

"(A) directed at the substance abuse problems of the prisoner; and

"(B) intended to develop the prisoner's cognitive, behavioral, social, vocational, and other skills so as to solve the prisoner's substance abuse and related problems.".

<< 42 USCA § 3793 >>

(d) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793), as amended by section 20201(d), is amended—

(1) in paragraph (3) by striking "and R" and inserting "R, or S"; and

(2) by adding at the end the following new paragraph:

"(17) There are authorized to be appropriated to carry out the projects under part S—

"(A) $27,000,000 for fiscal year 1996;

"(B) $36,000,000 for fiscal year 1997;

"(C) $63,000,000 for fiscal year 1998;

"(D) $72,000,000 for fiscal year 1999; and

"(E) $72,000,000 for fiscal year 2000.".

<< 42 USCA Ch. 136 >>

Subtitle V—Prevention, Diagnosis, and Treatment of Tuberculosis in Correctional Institutions

<< 42 USCA § 13911 >>

SEC. 32201. PREVENTION, DIAGNOSIS, AND TREATMENT OF TUBERCULOSIS IN CORRECTIONAL INSTITUTIONS.

(a) GUIDELINES.—The Attorney General, in consultation with the Secretary of Health and Human Services and the Director of the National Institute of Corrections, shall develop and disseminate to appropriate entities, including State, Indian tribal, and local correctional institutions and the Immigration and Naturalization Service, guidelines for the prevention, diagnosis, treatment, and followup care of tuberculosis among inmates of correctional institutions and persons held in holding facilities operated by or under contract with the Immigration and Naturalization Service.

(b) COMPLIANCE.—The Attorney General shall ensure that prisons in the Federal prison system and holding facilities operated by or under contract with the Immigration and Naturalization Service comply with the guidelines described in subsection (a).

(c) GRANTS.—

(1) IN GENERAL.—The Attorney General shall make grants to State, Indian tribal, and local correction authorities and public health authorities to assist in establishing and operating programs for the prevention, diagnosis, treatment, and followup care of tuberculosis among inmates of correctional institutions.

(2) FEDERAL SHARE.—The Federal share of funding of a program funded with a grant under paragraph (1) shall not exceed 50 percent.

(3) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

(A) $700,000 for fiscal year 1996;

(B) $1,000,000 for fiscal year 1997;

(C) $1,000,000 for fiscal year 1998;

(D) $1,100,000 for fiscal year 1999; and

(E) $1,200,000 for fiscal year 2000.

(d) DEFINITIONS.—In this section—

"Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, and the United States Virgin Islands.

<< 42 USCA Ch. 136 >>

Subtitle X—Gang Resistance Education and Training

<< 42 USCA § 13921 >>

SEC. 32401. GANG RESISTANCE EDUCATION AND TRAINING PROJECTS.

(a) ESTABLISHMENT OF PROJECTS.—

(1) IN GENERAL.—The Secretary of the Treasury shall establish not less than 50 Gang Resistance Education and Training (GREAT) projects, to be located in communities across the country, in addition to the number of projects currently funded.

(2) SELECTION OF COMMUNITIES.—Communities identified for such GREAT projects shall be selected by the Secretary of the Treasury on the basis of gang-related activity in that particular community.

(3) AMOUNT OF ASSISTANCE PER PROJECT; ALLOCATION.—The Secretary of the Treasury shall make available not less than $800,000 per project, subject to the availability of appropriations, and such funds shall be allocated—

(A) 50 percent to the affected State and local law enforcement and prevention organizations participating in such projects; and

(B) 50 percent to the Bureau of Alcohol, Tobacco and Firearms for salaries, expenses, and associated administrative costs for operating and overseeing such projects.

(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to carry out this section—

(1) $9,000,000 for fiscal year 1995;

(2) $7,200,000 for fiscal year 1996;

(3) $7,200,000 for fiscal year 1997;

(4) $7,200,000 for fiscal year 1998;

(5) $7,200,000 for fiscal year 1999; and

(6) $7,720,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

TITLE IV—VIOLENCE AGAINST WOMEN

<< 42 USCA § 13701 NOTE >>

SEC. 40001. SHORT TITLE.

This title may be cited as the "Violence Against Women Act of 1994".

<< 42 USCA Ch. 136 >>

Subtitle A—Safe Streets for Women

AR.01936

<< 42 USCA § 13701 NOTE >>

SEC. 40101. SHORT TITLE.

 This subtitle may be cited as the "Safe Streets for Women Act of 1994".

CHAPTER 1—FEDERAL PENALTIES FOR SEX CRIMES

SEC. 40111. REPEAT OFFENDERS.

<< 18 USCA § 2247 >>

 (a) IN GENERAL.—Chapter 109A of title 18, United States Code, is amended by adding at the end the following new section:

"§ 2247. Repeat offenders

 "Any person who violates a provision of this chapter, after one or more prior convictions for an offense punishable under this chapter, or after one or more prior convictions under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual contact have become final, is punishable by a term of imprisonment up to twice that otherwise authorized.".

<< 28 USCA § 994 NOTE >>

 (b) AMENDMENT OF SENTENCING GUIDELINES.—The Sentencing Commission shall implement the amendment made by subsection (a) by promulgating amendments, if appropriate, in the sentencing guidelines applicable to chapter 109A offenses.

<< 18 USCA Ch. 109A >>

 (c) CHAPTER ANALYSIS.—The chapter analysis for chapter 109A of title 18, United States Code, is amended by adding at the end the following new item:

"2247. Repeat offenders.".

<< 28 USCA § 994 NOTE >>

SEC. 40112. FEDERAL PENALTIES.

 (a) AMENDMENT OF SENTENCING GUIDELINES.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall review and amend, where necessary, its sentencing guidelines on aggravated sexual abuse under section 2241 of title 18, United States Code, or sexual abuse under section 2242 of title 18, United States Code, as follows:
  (1) The Commission shall review and promulgate amendments to the guidelines, if appropriate, to enhance penalties if more than 1 offender is involved in the offense.
  (2) The Commission shall review and promulgate amendments to the guidelines, if appropriate, to reduce unwarranted disparities between the sentences for sex offenders who are known to the victim and sentences for sex offenders who are not known to the victim.
  (3) The Commission shall review and promulgate amendments to the guidelines to enhance penalties, if appropriate, to render Federal penalties on Federal territory commensurate with penalties for similar offenses in the States.
  (4) The Commission shall review and promulgate amendments to the guidelines, if appropriate, to account for the general problem of recidivism in cases of sex offenses, the severity of the offense, and its devastating effects on survivors.
 (b) REPORT.—Not later than 180 days after the date of enactment of this Act, the United States Sentencing Commission shall review and submit to Congress a report containing an analysis of Federal rape sentencing, accompanied by comment from independent experts in the field, describing—

(1) comparative Federal sentences for cases in which the rape victim is known to the defendant and cases in which the rape victim is not known to the defendant;

(2) comparative Federal sentences for cases on Federal territory and sentences in surrounding States; and

(3) an analysis of the effect of rape sentences on populations residing primarily on Federal territory relative to the impact of other Federal offenses in which the existence of Federal jurisdiction depends upon the offense's being committed on Federal territory.

SEC. 40113. MANDATORY RESTITUTION FOR SEX CRIMES.

(a) SEXUAL ABUSE.—

<< 18 USCA § 2248 >>

(1) IN GENERAL.—Chapter 109A of title 18, United States Code, is amended by adding at the end the following new section:

"§ 2248. Mandatory restitution

"(a) IN GENERAL.—Notwithstanding section 3663, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.

"(b) SCOPE AND NATURE OF ORDER.—

"(1) DIRECTIONS.—The order of restitution under this section shall direct that—

"(A) the defendant pay to the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court, pursuant to paragraph (3); and

"(B) the United States Attorney enforce the restitution order by all available and reasonable means.

"(2) ENFORCEMENT BY VICTIM.—An order of restitution also may be enforced by a victim named in the order to receive the restitution in the same manner as a judgment in a civil action.

"(3) DEFINITION.—For purposes of this subsection, the term 'full amount of the victim's losses' includes any costs incurred by the victim for—

"(A) medical services relating to physical, psychiatric, or psychological care;

"(B) physical and occupational therapy or rehabilitation;

"(C) necessary transportation, temporary housing, and child care expenses;

"(D) lost income;

"(E) attorneys' fees, plus any costs incurred in obtaining a civil protection order; and

"(F) any other losses suffered by the victim as a proximate result of the offense.

"(4) ORDER MANDATORY.—(A) The issuance of a restitution order under this section is mandatory.

"(B) A court may not decline to issue an order under this section because of—

"(i) the economic circumstances of the defendant; or

"(ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.

"(C)(i) Notwithstanding subparagraph (A), the court may take into account the economic circumstances of the defendant in determining the manner in which and the schedule according to which the restitution is to be paid.

"(ii) For purposes of this subparagraph, the term 'economic circumstances' includes—

"(I) the financial resources and other assets of the defendant;

"(II) projected earnings, earning capacity, and other income of the defendant; and

"(III) any financial obligations of the defendant, including obligations to dependents.

"(D) Subparagraph (A) does not apply if—

"(i) the court finds on the record that the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of the amount of a restitution order in the foreseeable future (under any reasonable schedule of payments); and

"(ii) the court enters in its order the amount of the victim's losses, and provides a nominal restitution award.

AR.01938

"(5) MORE THAN 1 OFFENDER.—When the court finds that more than 1 offender has contributed to the loss of a victim, the court may make each offender liable for payment of the full amount of restitution or may apportion liability among the offenders to reflect the level of contribution and economic circumstances of each offender.

"(6) MORE THAN 1 VICTIM.—When the court finds that more than 1 victim has sustained a loss requiring restitution by an offender, the court shall order full restitution of each victim but may provide for different payment schedules to reflect the economic circumstances of each victim.

"(7) PAYMENT SCHEDULE.—An order under this section may direct the defendant to make a single lump-sum payment or partial payments at specified intervals.

"(8) SETOFF.—Any amount paid to a victim under this section shall be set off against any amount later recovered as compensatory damages by the victim from the defendant in—

  "(A) any Federal civil proceeding; and

  "(B) any State civil proceeding, to the extent provided by the law of the State.

"(9) EFFECT ON OTHER SOURCES OF COMPENSATION.—The issuance of a restitution order shall not affect the entitlement of a victim to receive compensation with respect to a loss from insurance or any other source until the payments actually received by the victim under the restitution order fully compensate the victim for the loss.

"(10) CONDITION OF PROBATION OR SUPERVISED RELEASE.—Compliance with a restitution order issued under this section shall be a condition of any probation or supervised release of a defendant. If an offender fails to comply with a restitution order, the court may, after a hearing, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, or hold the defendant in contempt pursuant to section 3583(e). In determining whether to revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release or hold a defendant serving a term of supervised release in contempt, the court shall consider the defendant's employment status, earning ability and financial resources, the willfulness of the defendant's failure to comply, and any other circumstances that may have a bearing on the defendant's ability to comply.

"(c) PROOF OF CLAIM.—

  "(1) AFFIDAVIT.—Within 60 days after conviction and, in any event, not later than 10 days prior to sentencing, the United States Attorney (or the United States Attorney's delegee), after consulting with the victim, shall prepare and file an affidavit with the court listing the amounts subject to restitution under this section. The affidavit shall be signed by the United States Attorney (or the United States Attorney's delegee) and the victim. Should the victim object to any of the information included in the affidavit, the United States Attorney (or the United States Attorney's delegee) shall advise the victim that the victim may file a separate affidavit and shall provide the victim with an affidavit form which may be used to do so.

  "(2) OBJECTION.—If, after the defendant has been notified of the affidavit, no objection is raised by the defendant, the amounts attested to in the affidavit filed pursuant to paragraph (1) shall be entered in the court's restitution order. If objection is raised, the court may require the victim or the United States Attorney (or the United States Attorney's delegee) to submit further affidavits or other supporting documents, demonstrating the victim's losses.

  "(3) ADDITIONAL DOCUMENTATION AND TESTIMONY.—If the court concludes, after reviewing the supporting documentation and considering the defendant's objections, that there is a substantial reason for doubting the authenticity or veracity of the records submitted, the court may require additional documentation or hear testimony on those questions. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

  "(4) FINAL DETERMINATION OF LOSSES.—If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing as provided in paragraph (1), the United States Attorney (or the United States Attorney's delegee) shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

"(d) MODIFICATION OF ORDER.—A victim or the offender may petition the court at any time to modify a restitution order as appropriate in view of a change in the economic circumstances of the offender.

"(e) REFERENCE TO MAGISTRATE OR SPECIAL MASTER.—The court may refer any issue arising in connection with a proposed order of restitution to a magistrate or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

"(f) DEFINITION.—For purposes of this section, the term 'victim' means the individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian.".

<< 18 USCA Ch. 109A >>

(2) TECHNICAL AMENDMENT.—The chapter analysis for chapter 109A of title 18, United States Code, is amended by adding at the end the following new item:
"2248. Mandatory restitution.".
(b) SEXUAL EXPLOITATION AND OTHER ABUSE OF CHILDREN.—

<< 18 USCA § 2259 >>

(1) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 2259. Mandatory restitution

"(a) IN GENERAL.—Notwithstanding section 3663, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.
"(b) SCOPE AND NATURE OF ORDER.—
"(1) DIRECTIONS.—The order of restitution under this section shall direct that—
"(A) the defendant pay to the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court, pursuant to paragraph (3); and
"(B) the United States Attorney enforce the restitution order by all available and reasonable means.
"(2) ENFORCEMENT BY VICTIM.—An order of restitution may also be enforced by a victim named in the order to receive the restitution in the same manner as a judgment in a civil action.
"(3) DEFINITION.—For purposes of this subsection, the term 'full amount of the victim's losses' includes any costs incurred by the victim for—
"(A) medical services relating to physical, psychiatric, or psychological care;
"(B) physical and occupational therapy or rehabilitation;
"(C) necessary transportation, temporary housing, and child care expenses;
"(D) lost income;
"(E) attorneys' fees, as well as other costs incurred; and
"(F) any other losses suffered by the victim as a proximate result of the offense.
"(4) ORDER MANDATORY.—(A) The issuance of a restitution order under this section is mandatory.
"(B) A court may not decline to issue an order under this section because of—
"(i) the economic circumstances of the defendant; or
"(ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.
"(C)(i) Notwithstanding subparagraph (A), the court may take into account the economic circumstances of the defendant in determining the manner in which and the schedule according to which the restitution is to be paid.
"(ii) For purposes of this subparagraph, the term 'economic circumstances' includes—
"(I) the financial resources and other assets of the defendant;
"(II) projected earnings, earning capacity, and other income of the defendant; and
"(III) any financial obligations of the defendant, including obligations to dependents.
"(D) Subparagraph (A) does not apply if—

"(i) the court finds on the record that the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of the amount of a restitution order in the foreseeable future (under any reasonable schedule of payments); and

"(ii) the court enters in its order the amount of the victim's losses, and provides a nominal restitution award.

"(5) MORE THAN 1 OFFENDER.—When the court finds that more than 1 offender has contributed to the loss of a victim, the court may make each offender liable for payment of the full amount of restitution or may apportion liability among the offenders to reflect the level of contribution and economic circumstances of each offender.

"(6) MORE THAN 1 VICTIM.—When the court finds that more than 1 victim has sustained a loss requiring restitution by an offender, the court shall order full restitution of each victim but may provide for different payment schedules to reflect the economic circumstances of each victim.

"(7) PAYMENT SCHEDULE.—An order under this section may direct the defendant to make a single lump-sum payment or partial payments at specified intervals.

"(8) SETOFF.—Any amount paid to a victim under this section shall be set off against any amount later recovered as compensatory damages by the victim from the defendant in—

"(A) any Federal civil proceeding; and

"(B) any State civil proceeding, to the extent provided by the law of the State.

"(9) EFFECT ON OTHER SOURCES OF COMPENSATION.—The issuance of a restitution order shall not affect the entitlement of a victim to receive compensation with respect to a loss from insurance or any other source until the payments actually received by the victim under the restitution order fully compensate the victim for the loss.

"(10) CONDITION OF PROBATION OR SUPERVISED RELEASE.—Compliance with a restitution order issued under this section shall be a condition of any probation or supervised release of a defendant. If an offender fails to comply with a restitution order, the court may, after a hearing, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, or hold the defendant in contempt pursuant to section 3583(e). In determining whether to revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release or hold a defendant serving a term of supervised release in contempt, the court shall consider the defendant's employment status, earning ability and financial resources, the willfulness of the defendant's failure to comply, and any other circumstances that may have a bearing on the defendant's ability to comply.

"(c) PROOF OF CLAIM.—

"(1) AFFIDAVIT.—Within 60 days after conviction and, in any event, not later than 10 days prior to sentencing, the United States Attorney (or the United States Attorney's delegee), after consulting with the victim, shall prepare and file an affidavit with the court listing the amounts subject to restitution under this section. The affidavit shall be signed by the United States Attorney (or the United States Attorney's delegee) and the victim. Should the victim object to any of the information included in the affidavit, the United States Attorney (or the United States Attorney's delegee) shall advise the victim that the victim may file a separate affidavit and shall provide the victim with an affidavit form which may be used to do so.

"(2) OBJECTION.—If, after the defendant has been notified of the affidavit, no objection is raised by the defendant, the amounts attested to in the affidavit filed pursuant to paragraph (1) shall be entered in the court's restitution order. If objection is raised, the court may require the victim or the United States Attorney (or the United States Attorney's delegee) to submit further affidavits or other supporting documents, demonstrating the victim's losses.

"(3) ADDITIONAL DOCUMENTATION AND TESTIMONY.—If the court concludes, after reviewing the supporting documentation and considering the defendant's objections, that there is a substantial reason for doubting the authenticity or veracity of the records submitted, the court may require additional documentation or hear testimony on those questions. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

"(4) FINAL DETERMINATION OF LOSSES.—If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing as provided in paragraph (1), the United States Attorney (or the United States Attorney's delegee) shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

"(d) MODIFICATION OF ORDER.—A victim or the offender may petition the court at any time to modify a restitution order as appropriate in view of a change in the economic circumstances of the offender.

"(e) REFERENCE TO MAGISTRATE OR SPECIAL MASTER.—The court may refer any issue arising in connection with a proposed order of restitution to a magistrate or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

"(f) DEFINITION.—For purposes of this section, the term 'victim' means the individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian.".

<< 18 USCA Ch. 110 >>

(2) TECHNICAL AMENDMENT.—The chapter analysis for chapter 110 of title 18, United States Code, is amended by adding at the end the following new item:

"2259. Mandatory restitution.".

SEC. 40114. AUTHORIZATION FOR FEDERAL VICTIM'S COUNSELORS.

There are authorized to be appropriated for the United States Attorneys for the purpose of appointing Victim/Witness Counselors for the prosecution of sex crimes and domestic violence crimes where applicable (such as the District of Columbia)—

(1) $500,000 for fiscal year 1996;

(2) $500,000 for fiscal year 1997; and

(3) $500,000 for fiscal year 1998.

CHAPTER 2—LAW ENFORCEMENT AND PROSECUTION
GRANTS TO REDUCE VIOLENT CRIMES AGAINST WOMEN

SEC. 40121. GRANTS TO COMBAT VIOLENT CRIMES AGAINST WOMEN.

(a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 32101(a), is amended—

<< 42 USCA Ch. 46 >>

(1) by redesignating part T as part U;

<< 42 USCA § 3797 >>

(2) by redesignating section 2001 as section 2101; and

<< 42 USCA Ch. 46 >>

(3) by inserting after part S the following new part:

"Part T—Grants To Combat Violent Crimes Against Women

<< 42 USCA § 3796gg >>

"SEC. 2001. PURPOSE OF THE PROGRAM AND GRANTS.

"(a) GENERAL PROGRAM PURPOSE.—The purpose of this part is to assist States, Indian tribal governments, and units of local government to develop and strengthen effective law enforcement and prosecution strategies to combat violent crimes against women, and to develop and strengthen victim services in cases involving violent crimes against women.

AR.01942

"(b) PURPOSES FOR WHICH GRANTS MAY BE USED.—Grants under this part shall provide personnel, training, technical assistance, data collection and other equipment for the more widespread apprehension, prosecution, and adjudication of persons committing violent crimes against women, and specifically, for the purposes of—

  "(1) training law enforcement officers and prosecutors to more effectively identify and respond to violent crimes against women, including the crimes of sexual assault and domestic violence;

  "(2) developing, training, or expanding units of law enforcement officers and prosecutors specifically targeting violent crimes against women, including the crimes of sexual assault and domestic violence;

  "(3) developing and implementing more effective police and prosecution policies, protocols, orders, and services specifically devoted to preventing, identifying, and responding to violent crimes against women, including the crimes of sexual assault and domestic violence;

  "(4) developing, installing, or expanding data collection and communication systems, including computerized systems, linking police, prosecutors, and courts or for the purpose of identifying and tracking arrests, protection orders, violations of protection orders, prosecutions, and convictions for violent crimes against women, including the crimes of sexual assault and domestic violence;

  "(5) developing, enlarging, or strengthening victim services programs, including sexual assault and domestic violence programs, developing or improving delivery of victim services to racial, cultural, ethnic, and language minorities, providing specialized domestic violence court advocates in courts where a significant number of protection orders are granted, and increasing reporting and reducing attrition rates for cases involving violent crimes against women, including crimes of sexual assault and domestic violence;

  "(6) developing, enlarging, or strengthening programs addressing stalking; and

  "(7) developing, enlarging, or strengthening programs addressing the needs and circumstances of Indian tribes in dealing with violent crimes against women, including the crimes of sexual assault and domestic violence.

<< 42 USCA § 3796gg–1 >>

"SEC. 2002. STATE GRANTS.

  "(a) GENERAL GRANTS.—The Attorney General may make grants to States, for use by States, units of local government, nonprofit nongovernmental victim services programs, and Indian tribal governments for the purposes described in section 2001(b).

  "(b) AMOUNTS.—Of the amounts appropriated for the purposes of this part—

  "(1) 4 percent shall be available for grants to Indian tribal governments;

  "(2) $500,000 shall be available for grants to applicants in each State; and

  "(3) the remaining funds shall be available for grants to applicants in each State in an amount that bears the same ratio to the amount of remaining funds as the population of the State bears to the population of all of the States that results from a distribution among the States on the basis of each State's population in relation to the population of all States (not including populations of Indian tribes).

  "(c) QUALIFICATION.—Upon satisfying the terms of subsection (d), any State shall be qualified for funds provided under this part upon certification that—

  "(1) the funds shall be used for any of the purposes described in section 2001(b);

  "(2) grantees and subgrantees shall develop a plan for implementation and shall consult and coordinate with nonprofit, nongovernmental victim services programs, including sexual assault and domestic violence victim services programs;

  "(3) at least 25 percent of the amount granted shall be allocated, without duplication, to each of the following 3 areas: prosecution, law enforcement, and victim services; and

  "(4) any Federal funds received under this part shall be used to supplement, not supplant, non-Federal funds that would otherwise be available for activities funded under this subtitle.

  "(d) APPLICATION REQUIREMENTS.—The application requirements provided in section 513 shall apply to grants made under this part. In addition, each application shall include the certifications of qualification required by subsection (c), including documentation from nonprofit, nongovernmental victim services programs, describing their participation in developing the plan required by subsection (c)(2). An application shall include—

"(1) documentation from the prosecution, law enforcement, and victim services programs to be assisted, demonstrating—

"(A) need for the grant funds;

"(B) intended use of the grant funds;

"(C) expected results from the use of grant funds; and

"(D) demographic characteristics of the populations to be served, including age, marital status, disability, race, ethnicity and language background;

"(2) proof of compliance with the requirements for the payment of forensic medical exams provided in section 2005; and

"(3) proof of compliance with the requirements for paying filing and service fees for domestic violence cases provided in section 2006.

"(e) DISBURSEMENT.—

"(1) IN GENERAL.—Not later than 60 days after the receipt of an application under this part, the Attorney General shall—

"(A) disburse the appropriate sums provided for under this part; or

"(B) inform the applicant why the application does not conform to the terms of section 513 or to the requirements of this section.

"(2) REGULATIONS.—In disbursing monies under this part, the Attorney General shall issue regulations to ensure that States will—

"(A) give priority to areas of varying geographic size with the greatest showing of need based on the availability of existing domestic violence and sexual assault programs in the population and geographic area to be served in relation to the availability of such programs in other such populations and geographic areas;

"(B) determine the amount of subgrants based on the population and geographic area to be served;

"(C) equitably distribute monies on a geographic basis including nonurban and rural areas of various geographic sizes; and

"(D) recognize and address the needs of underserved populations.

"(f) FEDERAL SHARE.—The Federal share of a grant made under this subtitle may not exceed 75 percent of the total costs of the projects described in the application submitted.

"(g) INDIAN TRIBES.—Funds appropriated by the Congress for the activities of any agency of an Indian tribal government or of the Bureau of Indian Affairs performing law enforcement functions on any Indian lands may be used to provide the non-Federal share of the cost of programs or projects funded under this part.

"(h) GRANTEE REPORTING.—

"(1) IN GENERAL.—Upon completion of the grant period under this part, a State or Indian tribal grantee shall file a performance report with the Attorney General explaining the activities carried out, which report shall include an assessment of the effectiveness of those activities in achieving the purposes of this part.

"(2) CERTIFICATION BY GRANTEE AND SUBGRANTEES.—A section of the performance report shall be completed by each grantee and subgrantee that performed the direct services contemplated in the application, certifying performance of direct services under the grant.

"(3) SUSPENSION OF FUNDING.—The Attorney General shall suspend funding for an approved application if—

"(A) an applicant fails to submit an annual performance report;

"(B) funds are expended for purposes other than those described in this part; or

"(C) a report under paragraph (1) or accompanying assessments demonstrate to the Attorney General that the program is ineffective or financially unsound.

<< 42 USCA § 3796gg–2 >>

"SEC. 2003. DEFINITIONS.

"In this part—

"(1) the term 'domestic violence' includes felony or misdemeanor crimes of violence committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabitated with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other adult person against a victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction receiving grant monies;

AR.01944

"(2) the term 'Indian country' has the meaning stated in section 1151 of title 18, United States Code;

"(3) the term 'Indian tribe' means a tribe, band, pueblo, nation, or other organized group or community of Indians, including any Alaska Native village or regional or village corporation (as defined in, or established pursuant to, the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians;

"(4) the term 'law enforcement' means a public agency charged with policing functions, including any of its component bureaus (such as governmental victim services programs);

"(5) the term 'prosecution' means any public agency charged with direct responsibility for prosecuting criminal offenders, including such agency's component bureaus (such as governmental victim services programs);

"(6) the term 'sexual assault' means any conduct proscribed by chapter 109A of title 18, United States Code, whether or not the conduct occurs in the special maritime and territorial jurisdiction of the United States or in a Federal prison and includes both assaults committed by offenders who are strangers to the victim and assaults committed by offenders who are known or related by blood or marriage to the victim;

"(7) the term 'underserved populations' includes populations underserved because of geographic location (such as rural isolation), underserved racial or ethnic populations, and populations underserved because of special needs, such as language barriers or physical disabilities; and

"(8) the term 'victim services' means a nonprofit, nongovernmental organization that assists domestic violence or sexual assault victims, including rape crisis centers, battered women's shelters, and other sexual assault or domestic violence programs, including nonprofit, nongovernmental organizations assisting domestic violence or sexual assault victims through the legal process.

<< 42 USCA § 3796gg–3 >>

"SEC. 2004. GENERAL TERMS AND CONDITIONS.

"(a) NONMONETARY ASSISTANCE.—In addition to the assistance provided under this part, the Attorney General may request any Federal agency to use its authorities and the resources granted to it under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) in support of State, tribal, and local assistance efforts.

"(b) REPORTING.—Not later than 180 days after the end of each fiscal year for which grants are made under this part, the Attorney General shall submit to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate a report that includes, for each State and for each grantee Indian tribe—

"(1) the number of grants made and funds distributed under this part;

"(2) a summary of the purposes for which those grants were provided and an evaluation of their progress;

"(3) a statistical summary of persons served, detailing the nature of victimization, and providing data on age, sex, relationship of victim to offender, geographic distribution, race, ethnicity, language, and disability; and

"(4) an evaluation of the effectiveness of programs funded under this part.

"(c) REGULATIONS OR GUIDELINES.—Not later than 120 days after the date of enactment of this part, the Attorney General shall publish proposed regulations or guidelines implementing this part. Not later than 180 days after the date of enactment, the Attorney General shall publish final regulations or guidelines implementing this part.

<< 42 USCA § 3796gg–4 >>

"SEC. 2005. RAPE EXAM PAYMENTS.

"(a) RESTRICTION OF FUNDS.—

"(1) IN GENERAL.—A State, Indian tribal government, or unit of local government, shall not be entitled to funds under this part unless the State, Indian tribal government, unit of local government, or another governmental entity incurs the full out-of-pocket cost of forensic medical exams described in subsection (b) for victims of sexual assault.

AR.01945

"(2) REDISTRIBUTION.—Funds withheld from a State or unit of local government under paragraph (1) shall be distributed to other States or units of local government pro rata. Funds withheld from an Indian tribal government under paragraph (1) shall be distributed to other Indian tribal governments pro rata.

"(b) MEDICAL COSTS.—A State, Indian tribal government, or unit of local government shall be deemed to incur the full out-of-pocket cost of forensic medical exams for victims of sexual assault if any government entity—

"(1) provides such exams to victims free of charge to the victim;

"(2) arranges for victims to obtain such exams free of charge to the victims; or

"(3) reimburses victims for the cost of such exams if—

"(A) the reimbursement covers the full cost of such exams, without any deductible requirement or limit on the amount of a reimbursement;

"(B) the reimbursing governmental entity permits victims to apply for reimbursement for not less than one year from the date of the exam;

"(C) the reimbursing governmental entity provides reimbursement not later than 90 days after written notification of the victim's expense; and

"(D) the State, Indian tribal government, unit of local government, or reimbursing governmental entity provides information at the time of the exam to all victims, including victims with limited or no English proficiency, regarding how to obtain reimbursement.

<< 42 USCA § 3796gg–5 >>

"SEC. 2006. FILING COSTS FOR CRIMINAL CHARGES.

"(a) IN GENERAL.—A State, Indian tribal government, or unit of local government, shall not be entitled to funds under this part unless the State, Indian tribal government, or unit of local government—

"(1) certifies that its laws, policies, and practices do not require, in connection with the prosecution of any misdemeanor or felony domestic violence offense, that the abused bear the costs associated with the filing of criminal charges against the domestic violence offender, or the costs associated with the issuance or service of a warrant, protection order, or witness subpoena; or

"(2) gives the Attorney General assurances that its laws, policies and practices will be in compliance with the requirements of paragraph (1) within the later of—

"(A) the period ending on the date on which the next session of the State legislature ends; or

"(B) 2 years.

"(b) REDISTRIBUTION.—Funds withheld from a State, unit of local government, or Indian tribal government under subsection (a) shall be distributed to other States, units of local government, and Indian tribal government, respectively, pro rata.".

(b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 32101(b), is amended by striking the matter relating to part T and inserting the following:

"Part T—Grants To Combat Violent Crimes Against Women

"Sec. 2001. Purpose of the program and grants.

"Sec. 2002. State grants.

"Sec. 2003. General definitions.

"Sec. 2004. General terms and conditions.

"Sec. 2005. Rape exam payments.

"Sec. 2006. Filing costs for criminal charges.

"Part U—Transition—Effective Date—Repealer

"Sec. 2101. Continuation of rules, authorities, and proceedings.".

<< 42 USCA § 3793 >>

(c) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793), as amended by section 32101(d), is amended—

(1) in paragraph (3) by striking "and S" and inserting "S, and T"; and

(2) by adding at the end the following new paragraph:

"(18) There are authorized to be appropriated to carry out part T—

"(A) $26,000,000 for fiscal year 1995;

"(B) $130,000,000 for fiscal year 1996;

"(C) $145,000,000 for fiscal year 1997;

"(D) $160,000,000 for fiscal year 1998;

"(E) $165,000,000 for fiscal year 1999; and

"(F) $174,000,000 for fiscal year 2000.".

CHAPTER 3—SAFETY FOR WOMEN IN PUBLIC TRANSIT AND PUBLIC PARKS

<< 42 USCA § 13931 >>

SEC. 40131. GRANTS FOR CAPITAL IMPROVEMENTS TO PREVENT CRIME IN PUBLIC TRANSPORTATION.

(a) GENERAL PURPOSE.—There is authorized to be appropriated not to exceed $10,000,000, for the Secretary of Transportation (referred to in this section as the "Secretary") to make capital grants for the prevention of crime and to increase security in existing and future public transportation systems. None of the provisions of this Act may be construed to prohibit the financing of projects under this section where law enforcement responsibilities are vested in a local public body other than the grant applicant.

(b) GRANTS FOR LIGHTING, CAMERA SURVEILLANCE, AND SECURITY PHONES.—

(1) From the sums authorized for expenditure under this section for crime prevention, the Secretary is authorized to make grants and loans to States and local public bodies or agencies for the purpose of increasing the safety of public transportation by—

(A) increasing lighting within or adjacent to public transportation systems, including bus stops, subway stations, parking lots, or garages;

(B) increasing camera surveillance of areas within and adjacent to public transportation systems, including bus stops, subway stations, parking lots, or garages;

(C) providing emergency phone lines to contact law enforcement or security personnel in areas within or adjacent to public transportation systems, including bus stops, subway stations, parking lots, or garages; or

(D) any other project intended to increase the security and safety of existing or planned public transportation systems.

(2) From the sums authorized under this section, at least 75 percent shall be expended on projects of the type described in subsection (b)(1) (A) and (B).

(c) REPORTING.—All grants under this section are contingent upon the filing of a report with the Secretary and the Department of Justice, Office of Victims of Crime, showing crime rates in or adjacent to public transportation before, and for a 1-year period after, the capital improvement. Statistics shall be compiled on the basis of the type of crime, sex, race, ethnicity, language, and relationship of victim to the offender.

(d) INCREASED FEDERAL SHARE.—Notwithstanding any other provision of law, the Federal share under this section for each capital improvement project that enhances the safety and security of public transportation systems and that is not required by law (including any other provision of this Act) shall be 90 percent of the net project cost of the project.

(e) SPECIAL GRANTS FOR PROJECTS TO STUDY INCREASING SECURITY FOR WOMEN.—From the sums authorized under this section, the Secretary shall provide grants and loans for the purpose of studying ways to reduce violent crimes against women in public transit through better design or operation of public transit systems.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(f) GENERAL REQUIREMENTS.—All grants or loans provided under this section shall be subject to the same terms, conditions, requirements, and provisions applicable to grants and loans as specified in section 5321 of title 49, United States Code.

<< 16 USCA § 1a–7a >>

SEC. 40132. GRANTS FOR CAPITAL IMPROVEMENTS TO PREVENT CRIME IN NATIONAL PARKS.

Public Law 91–383 (16 U.S.C. 1a–1 et seq.) is amended by adding at the end the following new section:

"SEC. 13. NATIONAL PARK SYSTEM CRIME PREVENTION ASSISTANCE.

"(a) AVAILABILITY OF FUNDS.—There are authorized to be appropriated out of the Violent Crime Reduction Trust Fund, not to exceed $10,000,000 for the Secretary of the Interior to take all necessary actions to seek to reduce the incidence of violent crime in the National Park System.

"(b) RECOMMENDATIONS FOR IMPROVEMENT.—The Secretary shall direct the chief official responsible for law enforcement within the National Park Service to—

"(1) compile a list of areas within the National Park System with the highest rates of violent crime;

"(2) make recommendations concerning capital improvements, and other measures, needed within the National Park System to reduce the rates of violent crime, including the rate of sexual assault; and

"(3) publish the information required by paragraphs (1) and (2) in the Federal Register.

"(c) DISTRIBUTION OF FUNDS.—Based on the recommendations and list issued pursuant to subsection (b), the Secretary shall distribute the funds authorized by subsection (a) throughout the National Park System. Priority shall be given to those areas with the highest rates of sexual assault.

"(d) USE OF FUNDS.—Funds provided under this section may be used—

"(1) to increase lighting within or adjacent to National Park System units;

"(2) to provide emergency phone lines to contact law enforcement or security personnel in areas within or adjacent to National Park System units;

"(3) to increase security or law enforcement personnel within or adjacent to National Park System units; or

"(4) for any other project intended to increase the security and safety of National Park System units.".

<< 16 USCA § 460l–8 >>

SEC. 40133. GRANTS FOR CAPITAL IMPROVEMENTS TO PREVENT CRIME IN PUBLIC PARKS.

Section 6 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460l–8) is amended by adding at the end the following new subsection:

"(h) CAPITAL IMPROVEMENT AND OTHER PROJECTS TO REDUCE CRIME.—

"(1) AVAILABILITY OF FUNDS.—In addition to assistance for planning projects, and in addition to the projects identified in subsection (e), and from amounts appropriated out of the Violent Crime Reduction Trust Fund, the Secretary may provide financial assistance to the States, not to exceed $15,000,000, for projects or combinations thereof for the purpose of making capital improvements and other measures to increase safety in urban parks and recreation areas, including funds to—

"(A) increase lighting within or adjacent to public parks and recreation areas;

"(B) provide emergency phone lines to contact law enforcement or security personnel in areas within or adjacent to public parks and recreation areas;

"(C) increase security personnel within or adjacent to public parks and recreation areas; and

"(D) fund any other project intended to increase the security and safety of public parks and recreation areas.

"(2) ELIGIBILITY.—In addition to the requirements for project approval imposed by this section, eligibility for assistance under this subsection shall be dependent upon a showing of need. In providing funds under this subsection, the Secretary shall give priority to projects proposed for urban parks and recreation areas with the highest rates of crime and, in particular, to urban parks and recreation areas with the highest rates of sexual assault.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(3) FEDERAL SHARE.—Notwithstanding subsection (c), the Secretary may provide 70 percent improvement grants for projects undertaken by any State for the purposes described in this subsection, and the remaining share of the cost shall be borne by the State.".

<div align="center">

CHAPTER 4—NEW EVIDENTIARY RULES

</div>

SEC. 40141. SEXUAL HISTORY IN CRIMINAL AND CIVIL CASES.

<div align="center">

<< 28 USCA § 2074 NOTE >>

</div>

(a) MODIFICATION OF PROPOSED AMENDMENT.—The proposed amendments to the Federal Rules of Evidence that are embraced by an order entered by the Supreme Court of the United States on April 29, 1994, shall take effect on December 1, 1994, as otherwise provided by law, but with the amendment made by subsection (b).

<div align="center">

<< 28 USCA § 2074 NOTE >>

</div>

<div align="center">

<< FRE Rule 412 >>

</div>

(b) RULE.—Rule 412 of the Federal Rules of Evidence is amended to read as follows:

"Rule 412. Sex Offense Cases; Relevance of Alleged Victim's Past Sexual Behavior or Alleged Sexual Predisposition

"(a) EVIDENCE GENERALLY INADMISSIBLE.—The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):

"(1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.

"(2) Evidence offered to prove any alleged victim's sexual predisposition.

"(b) EXCEPTIONS.—

"(1) In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:

"(A) evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury or other physical evidence;

"(B) evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and

"(C) evidence the exclusion of which would violate the constitutional rights of the defendant.

"(2) In a civil case, evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. Evidence of an alleged victim's reputation is admissible only if it has been placed in controversy by the alleged victim.

"(c) PROCEDURE TO DETERMINE ADMISSIBILITY.—

"(1) A party intending to offer evidence under subdivision (b) must—

"(A) file a written motion at least 14 days before trial specifically describing the evidence and stating the purpose for which it is offered unless the court, for good cause requires a different time for filing or permits filing during trial; and

"(B) serve the motion on all parties and notify the alleged victim or, when appropriate, the alleged victim's guardian or representative.

"(2) Before admitting evidence under this rule the court must conduct a hearing in camera and afford the victim and parties a right to attend and be heard. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise.".

<div align="center">

<< 28 USCA § 2074 NOTE >>

</div>

(c) TECHNICAL AMENDMENT.—The table of contents for the Federal Rules of Evidence is amended by amending the item relating to rule 412 to read as follows:

"412. Sex Offense Cases; Relevance of Alleged Victim's Past Sexual Behavior or Alleged Sexual Predisposition:

AR.01949

"(a) Evidence generally inadmissible.
"(b) Exceptions.
"(c) Procedure to determine admissibility.".

<< 42 USCA Ch. 136 >>

CHAPTER 5—ASSISTANCE TO VICTIMS OF SEXUAL ASSAULT

SEC. 40151. EDUCATION AND PREVENTION GRANTS TO REDUCE SEXUAL ASSAULTS AGAINST WOMEN.

Part A of title XIX of the Public Health and Human Services Act (42 U.S.C. 300w et seq.) is amended by adding at the end the following new section:

<< 42 USCA § 300w–10 >>

"SEC. 1910A. USE OF ALLOTMENTS FOR RAPE PREVENTION EDUCATION.

"(a) PERMITTED USE.—Notwithstanding section 1904(a)(1), amounts transferred by the State for use under this part may be used for rape prevention and education programs conducted by rape crisis centers or similar nongovernmental nonprofit entities for—
"(1) educational seminars;
"(2) the operation of hotlines;
"(3) training programs for professionals;
"(4) the preparation of informational materials; and
"(5) other efforts to increase awareness of the facts about, or to help prevent, sexual assault, including efforts to increase awareness in underserved racial, ethnic, and language minority communities.
"(b) TARGETING OF EDUCATION PROGRAMS.—States providing grant monies must ensure that at least 25 percent of the monies are devoted to education programs targeted for middle school, junior high school, and high school students.
"(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—
"(1) $35,000,000 for fiscal year 1996;
"(2) $35,000,000 for fiscal year 1997;
"(3) $45,000,000 for fiscal year 1998;
"(4) $45,000,000 for fiscal year 1999; and
"(5) $45,000,000 for fiscal year 2000.
"(d) LIMITATION.—Funds authorized under this section may only be used for providing rape prevention and education programs.
"(e) DEFINITION.—For purposes of this section, the term 'rape prevention and education' includes education and prevention efforts directed at offenses committed by offenders who are not known to the victim as well as offenders who are known to the victim.
"(f) TERMS.—The Secretary shall make allotments to each State on the basis of the population of the State, and subject to the conditions provided in this section and sections 1904 through 1909.".

<< 42 USCA § 13941 >>

SEC. 40152. TRAINING PROGRAMS.

(a) IN GENERAL.—The Attorney General, after consultation with victim advocates and individuals who have expertise in treating sex offenders, shall establish criteria and develop training programs to assist probation and parole officers and other personnel who work with released sex offenders in the areas of—
(1) case management;
(2) supervision; and
(3) relapse prevention.

AR.01950

(b) TRAINING PROGRAMS.—The Attorney General shall ensure, to the extent practicable, that training programs developed under subsection (a) are available in geographically diverse locations throughout the country.

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

(1) $1,000,000 for fiscal year 1996; and

(2) $1,000,000 for fiscal year 1997.

<< 42 USCA § 13942 >>

SEC. 40153. CONFIDENTIALITY OF COMMUNICATIONS BETWEEN SEXUAL ASSAULT OR DOMESTIC VIOLENCE VICTIMS AND THEIR COUNSELORS.

(a) STUDY AND DEVELOPMENT OF MODEL LEGISLATION.—The Attorney General shall—

(1) study and evaluate the manner in which the States have taken measures to protect the confidentiality of communications between sexual assault or domestic violence victims and their therapists or trained counselors;

(2) develop model legislation that will provide the maximum protection possible for the confidentiality of such communications, within any applicable constitutional limits, taking into account the following factors:

(A) the danger that counseling programs for victims of sexual assault and domestic violence will be unable to achieve their goal of helping victims recover from the trauma associated with these crimes if there is no assurance that the records of the counseling sessions will be kept confidential;

(B) consideration of the appropriateness of an absolute privilege for communications between victims of sexual assault or domestic violence and their therapists or trained counselors, in light of the likelihood that such an absolute privilege will provide the maximum guarantee of confidentiality but also in light of the possibility that such an absolute privilege may be held to violate the rights of criminal defendants under the Federal or State constitutions by denying them the opportunity to obtain exculpatory evidence and present it at trial; and

(C) consideration of what limitations on the disclosure of confidential communications between victims of these crimes and their counselors, short of an absolute privilege, are most likely to ensure that the counseling programs will not be undermined, and specifically whether no such disclosure should be allowed unless, at a minimum, there has been a particularized showing by a criminal defendant of a compelling need for records of such communications, and adequate procedural safeguards are in place to prevent unnecessary or damaging disclosures; and

(3) prepare and disseminate to State authorities the findings made and model legislation developed as a result of the study and evaluation.

(b) REPORT AND RECOMMENDATIONS.—Not later than the date that is 1 year after the date of enactment of this Act, the Attorney General shall report to the Congress—

(1) the findings of the study and the model legislation required by this section; and

(2) recommendations based on the findings on the need for and appropriateness of further action by the Federal Government.

(c) REVIEW OF FEDERAL EVIDENTIARY RULES.—The Judicial Conference of the United States shall evaluate and report to Congress its views on whether the Federal Rules of Evidence should be amended, and if so, how they should be amended, to guarantee that the confidentiality of communications between sexual assault victims and their therapists or trained counselors will be adequately protected in Federal court proceedings.

<< 42 USCA § 13943 >>

SEC. 40154. INFORMATION PROGRAMS.

The Attorney General shall compile information regarding sex offender treatment programs and ensure that information regarding community treatment programs in the community into which a convicted sex offender is released is made available to each person serving a sentence of imprisonment in a Federal penal or correctional institution for a commission of an offense under chapter 109A of title 18, United States Code, or for the commission of a similar offense, including halfway houses and psychiatric institutions.

SEC. 40155. EDUCATION AND PREVENTION GRANTS TO REDUCE SEXUAL ABUSE OF RUNAWAY, HOMELESS, AND STREET YOUTH.

Part A of the Runaway and Homeless Youth Act (42 U.S.C. 5711 et seq.) is amended—
  (1) by redesignating sections 316 and 317 as sections 317 and 318, respectively; and
  (2) by inserting after section 315 the following new section:

<< 42 USCA § 5712d >>

"GRANTS FOR PREVENTION OF SEXUAL ABUSE AND EXPLOITATION

"SEC. 316. (a) IN GENERAL.—The Secretary shall make grants under this section to private, nonprofit agencies for street-based outreach and education, including treatment, counseling, provision of information, and referral for runaway, homeless, and street youth who have been subjected to or are at risk of being subjected to sexual abuse.

"(b) PRIORITY.—In selecting among applicants for grants under subsection (a), the Secretary shall give priority to agencies that have experience in providing services to runaway, homeless, and street youth.

"(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—
  "(1) $7,000,000 for fiscal year 1996;
  "(2) $8,000,000 for fiscal year 1997; and
  "(3) $15,000,000 for fiscal year 1998.

"(d) DEFINITIONS.—For the purposes of this section—
  "(1) the term 'street-based outreach and education' includes education and prevention efforts directed at offenses committed by offenders who are not known to the victim as well as offenders who are known to the victim; and
  "(2) the term 'street youth' means a juvenile who spends a significant amount of time on the street or in other areas of exposure to encounters that may lead to sexual abuse.".

SEC. 40156. VICTIMS OF CHILD ABUSE PROGRAMS.

(a) COURT–APPOINTED SPECIAL ADVOCATE PROGRAM.—

<< 42 USCA § 13014 >>

(1) REAUTHORIZATION.—Section 218(a) of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13014(a)) is amended to read as follows:
"(a) AUTHORIZATION.—There are authorized to be appropriated to carry out this subtitle—
  "(1) $6,000,000 for fiscal year 1996;
  "(2) $6,000,000 for fiscal year 1997;
  "(3) $7,000,000 for fiscal year 1998;
  "(4) $9,000,000 for fiscal year 1999; and
  "(5) $10,000,000 for fiscal year 2000.".

<< 42 USCA § 13012 >>

(2) TECHNICAL AMENDMENT.—Section 216 of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13012) is amended by striking "this chapter" and inserting "this subtitle".
(b) CHILD ABUSE TRAINING PROGRAMS FOR JUDICIAL PERSONNEL AND PRACTITIONERS.—

<< 42 USCA § 13024 >>

(1) REAUTHORIZATION.—Section 224(a) of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13024(a)) is amended to read as follows:
"(a) AUTHORIZATION.—There are authorized to be appropriated to carry out this subtitle—
  "(1) $750,000 for fiscal year 1996;

"(2) $1,000,000 for fiscal year 1997;

"(3) $2,000,000 for fiscal year 1998;

"(4) $2,000,000 for fiscal year 1999; and

"(5) $2,300,000 for fiscal year 2000.".

<< 42 USCA § 13021 >>

(2) TECHNICAL AMENDMENT.—Section 221(b) of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13021(b)) is amended by striking "this chapter" and inserting "this subtitle".

(c) GRANTS FOR TELEVISED TESTIMONY.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended—

<< 42 USCA § 3793 >>

(1) by amending section 1001(a)(7) (42 U.S.C. 3793(a)(7)) to read as follows:

"(7) There are authorized to be appropriated to carry out part N—

"(A) $250,000 for fiscal year 1996;

"(B) $1,000,000 for fiscal year 1997;

"(C) $1,000,000 for fiscal year 1998;

"(D) $1,000,000 for fiscal year 1999; and

"(E) $1,000,000 for fiscal year 2000.";

<< 42 USCA § 3796aa–1 >>

(2) in section 1402 (42 U.S.C. 3796aa–1) by striking "to States, for the use of States and units of local government in the States";

<< 42 USCA § 3796aa–2 >>

(3) in section 1403 (42 U.S.C. 3796aa–2)—

(A) by inserting "or unit of local government" after "of a State";

(B) by inserting "and" after paragraph (1);

(C) in paragraph (2) by striking the semicolon at the end and inserting a period; and

(D) by striking paragraphs (3) and (4);

<< 42 USCA § 3796aa–3 >>

(4) in section 1404 (42 U.S.C. 3796aa–3)—

(A) in subsection (a)—

(i) by striking "The Bureau" and all that follows through "determining that" and inserting "An applicant is eligible to receive a grant under this part if—";

(ii) in paragraph (1) by striking "there is in effect in such State" and inserting "the applicant certifies and the Director determines that there is in effect in the State";

(iii) in paragraph (2) by striking "such State law shall meet" and inserting "the applicant certifies and the Director determines that State law meets";

(iv) by inserting "and" after subparagraph (E);

(v) in paragraph (3)—

(I) by inserting "the Director determines that" before "the application"; and

(II) by striking "; and" and inserting a period;

(vi) by striking paragraph (4);

(vii) by striking "Each application" and inserting the following:

"(b) Each application"; and

AR.01953

(viii) by striking "the Bureau" each place it appears and inserting "the Director"; and

(B) by redesignating subsection (b) as subsection (c) and by striking "The Bureau" and inserting "The Director";

<< 42 USCA § 3796aa–4 >>

(5) by striking section 1405 (42 U.S.C. 3796aa–4);

<< 42 USCA § 3796aa–5 >>

(6) in section 1406 (42 U.S.C. 3796aa–5)—

(A) in subsection (a)—

(i) by striking "State which" and inserting "State or unit of local government that";

(ii) by striking "title" and inserting "part"; and

(iii) in paragraph (1) by striking "State"; and

(B) in subsection (b)(1) by striking "such State" and inserting "the State and units of local government in the State";

<< 42 USCA § 3796aa–6 >>

(7) in section 1407 (42 U.S.C. 3796aa–6)—

(A) in subsection (c)—

(i) by striking "Each State" and all that follows through "effective audit" and inserting "Grant recipients (or private organizations with which grant recipients have contracted to provide equipment or training using grant funds) shall keep such records as the Director may require by rule to facilitate such an audit."; and

(ii) in paragraph (2) by striking "States which receive grants, and of units of local government which receive any part of a grant made under this part" and inserting "grant recipients (or private organizations with which grant recipients have contracted to provide equipment or training using grant funds)"; and

(B) by adding at the end the following new subsection:

"(d) UTILIZATION OF PRIVATE SECTOR.—Nothing in this part shall prohibit the utilization of any grant funds to contract with a private organization to provide equipment or training for the televising of testimony as contemplated by the application submitted by an applicant.";

<< 42 USCA § 3796aa–7 >>

(8) by striking section 1408 (42 U.S.C. 3796aa–7); and

(9) in the table of contents—

(A) in the item relating to section 1405 by striking "Allocation and distribution of funds under formula grants" and inserting "(Repealed)"; and

(B) in the item relating to section 1408 by striking "State office" and inserting "(Repealed)".

<< 42 USCA Ch. 136 >>

Subtitle B—Safe Homes for Women

<< 42 USCA § 13701 NOTE >>

SEC. 40201. SHORT TITLE.

This title may be cited as the "Safe Homes for Women Act of 1994".

CHAPTER 1—NATIONAL DOMESTIC VIOLENCE HOTLINE

<< 42 USCA § 10416 >>

SEC. 40211. GRANT FOR A NATIONAL DOMESTIC VIOLENCE HOTLINE.

The Family Violence Prevention and Services Act (42 U.S.C. 10401 et seq.) is amended by adding at the end the following new section:

"SEC. 316. NATIONAL DOMESTIC VIOLENCE HOTLINE GRANT.

"(a) IN GENERAL.—The Secretary may award a grant to a private, nonprofit entity to provide for the operation of a national, toll-free telephone hotline to provide information and assistance to victims of domestic violence.

"(b) DURATION.—A grant under this section may extend over a period of not more than 5 years.

"(c) ANNUAL APPROVAL.—The provision of payments under a grant under this section shall be subject to annual approval by the Secretary and subject to the availability of appropriations for each fiscal year to make the payments.

"(d) ACTIVITIES.—Funds received by an entity under this section shall be used to establish and operate a national, toll-free telephone hotline to provide information and assistance to victims of domestic violence. In establishing and operating the hotline, a private, nonprofit entity shall—

"(1) contract with a carrier for the use of a toll-free telephone line;

"(2) employ, train, and supervise personnel to answer incoming calls and provide counseling and referral services to callers on a 24-hour-a-day basis;

"(3) assemble and maintain a current database of information relating to services for victims of domestic violence to which callers may be referred throughout the United States, including information on the availability of shelters that serve battered women; and

"(4) publicize the hotline to potential users throughout the United States.

"(e) APPLICATION.—A grant may not be made under this section unless an application for such grant has been approved by the Secretary. To be approved by the Secretary under this subsection an application shall—

"(1) contain such agreements, assurances, and information, be in such form and be submitted in such manner as the Secretary shall prescribe through notice in the Federal Register;

"(2) include a complete description of the applicant's plan for the operation of a national domestic violence hotline, including descriptions of—

"(A) the training program for hotline personnel;

"(B) the hiring criteria for hotline personnel;

"(C) the methods for the creation, maintenance and updating of a resource database;

"(D) a plan for publicizing the availability of the hotline;

"(E) a plan for providing service to non-English speaking callers, including hotline personnel who speak Spanish; and

"(F) a plan for facilitating access to the hotline by persons with hearing impairments;

"(3) demonstrate that the applicant has nationally recognized expertise in the area of domestic violence and a record of high quality service to victims of domestic violence, including a demonstration of support from advocacy groups, such as domestic violence State coalitions or recognized national domestic violence groups;

"(4) demonstrates that the applicant has a commitment to diversity, and to the provision of services to ethnic, racial, and non-English speaking minorities, in addition to older individuals and individuals with disabilities; and

"(5) contain such other information as the Secretary may require.

"(f) AUTHORIZATION OF APPROPRIATIONS.—

"(1) IN GENERAL.—There are authorized to be appropriated to carry out this section—

"(A) $1,000,000 for fiscal year 1995;

"(B) $400,000 for fiscal year 1996;

"(C) $400,000 for fiscal year 1997;

"(D) $400,000 for fiscal year 1998;

"(E) $400,000 for fiscal year 1999; and

"(F) $400,000 for fiscal year 2000.

"(2) AVAILABILITY.—Funds authorized to be appropriated under paragraph (1) shall remain available until expended.".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

CHAPTER 2—INTERSTATE ENFORCEMENT

SEC. 40221. INTERSTATE ENFORCEMENT.

(a) IN GENERAL.—Part 1 of title 18, United States Code, is amended by inserting after chapter 110 the following new chapter:

<< 18 USCA Ch. 110 >>

"CHAPTER 110A—DOMESTIC VIOLENCE

"Sec. 2261. Interstate domestic violence.
"Sec. 2262. Interstate violation of protection order.
"Sec. 2263. Pretrial release of defendant.
"Sec. 2264. Restitution.
"Sec. 2265. Full faith and credit given to protection orders.
"Sec. 2266. Definitions.

<< 18 USCA § 2261 >>

"§ 2261. Interstate domestic violence

"(a) OFFENSES.—

  "(1) CROSSING A STATE LINE.—A person who travels across a State line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b).

  "(2) CAUSING THE CROSSING OF A STATE LINE.—A person who causes a spouse or intimate partner to cross a State line or to enter or leave Indian country by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commits a crime of violence and thereby causes bodily injury to the person's spouse or intimate partner, shall be punished as provided in subsection (b).

"(b) PENALTIES.—A person who violates this section shall be fined under this title, imprisoned—

  "(1) for life or any term of years, if death of the offender's spouse or intimate partner results;

  "(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the offender's spouse or intimate partner results;

  "(3) for not more than 10 years, if serious bodily injury to the offender's spouse or intimate partner results or if the offender uses a dangerous weapon during the offense;

  "(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

  "(5) for not more than 5 years, in any other case,

or both fined and imprisoned.

<< 18 USCA § 2262 >>

"§ 2262. Interstate violation of protection order

"(a) OFFENSES.—

  "(1) CROSSING A STATE LINE.—A person who travels across a State line or enters or leaves Indian country with the intent to engage in conduct that—

    "(A)(i) violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued; or

    "(ii) would violate subparagraph (A) if the conduct occurred in the jurisdiction in which the order was issued; and

"(B) subsequently engages in such conduct,

shall be punished as provided in subsection (b).

"(2) CAUSING THE CROSSING OF A STATE LINE.—A person who causes a spouse or intimate partner to cross a State line or to enter or leave Indian country by force, coercion, duress, or fraud, and, in the course or as a result of that conduct, intentionally commits an act that injures the person's spouse or intimate partner in violation of a valid protection order issued by a State shall be punished as provided in subsection (b).

"(b) PENALTIES.—A person who violates this section shall be fined under this title, imprisoned—

"(1) for life or any term of years, if death of the offender's spouse or intimate partner results;

"(2) for not more than 20 years if permanent disfigurement or life threatening bodily injury to the offender's spouse or intimate partner results;

"(3) for not more than 10 years, if serious bodily injury to the offender's spouse or intimate partner results or if the offender uses a dangerous weapon during the offense;

"(4) as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

"(5) for not more than 5 years, in any other case,

or both fined and imprisoned.

<< 18 USCA § 2263 >>

"§ 2263. Pretrial release of defendant

"In any proceeding pursuant to section 3142 for the purpose of determining whether a defendant charged under this chapter shall be released pending trial, or for the purpose of determining conditions of such release, the alleged victim shall be given an opportunity to be heard regarding the danger posed by the defendant.

<< 18 USCA § 2264 >>

"§ 2264. Restitution

"(a) IN GENERAL.—Notwithstanding section 3663, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.

"(b) SCOPE AND NATURE OF ORDER.—

"(1) DIRECTIONS.—The order of restitution under this section shall direct that—

"(A) the defendant pay to the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court, pursuant to paragraph (3); and

"(B) the United States Attorney enforce the restitution order by all available and reasonable means.

"(2) ENFORCEMENT BY VICTIM.—An order of restitution also may be enforced by a victim named in the order to receive the restitution in the same manner as a judgment in a civil action.

"(3) DEFINITION.—For purposes of this subsection, the term 'full amount of the victim's losses' includes any costs incurred by the victim for—

"(A) medical services relating to physical, psychiatric, or psychological care;

"(B) physical and occupational therapy or rehabilitation;

"(C) necessary transportation, temporary housing, and child care expenses;

"(D) lost income;

"(E) attorneys' fees, plus any costs incurred in obtaining a civil protection order; and

"(F) any other losses suffered by the victim as a proximate result of the offense.

"(4) ORDER MANDATORY.—(A) The issuance of a restitution order under this section is mandatory.

"(B) A court may not decline to issue an order under this section because of—

"(i) the economic circumstances of the defendant; or

"(ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.

"(C)(i) Notwithstanding subparagraph (A), the court may take into account the economic circumstances of the defendant in determining the manner in which and the schedule according to which the restitution is to be paid.

"(ii) For purposes of this subparagraph, the term 'economic circumstances' includes—

"(I) the financial resources and other assets of the defendant;

"(II) projected earnings, earning capacity, and other income of the defendant; and

"(III) any financial obligations of the defendant, including obligations to dependents.

"(D) Subparagraph (A) does not apply if—

"(i) the court finds on the record that the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of the amount of a restitution order in the foreseeable future (under any reasonable schedule of payments); and

"(ii) the court enters in its order the amount of the victim's losses, and provides a nominal restitution award.

"(5) MORE THAN 1 OFFENDER.—When the court finds that more than 1 offender has contributed to the loss of a victim, the court may make each offender liable for payment of the full amount of restitution or may apportion liability among the offenders to reflect the level of contribution and economic circumstances of each offender.

"(6) MORE THAN 1 VICTIM.—When the court finds that more than 1 victim has sustained a loss requiring restitution by an offender, the court shall order full restitution of each victim but may provide for different payment schedules to reflect the economic circumstances of each victim.

"(7) PAYMENT SCHEDULE.—An order under this section may direct the defendant to make a single lump-sum payment or partial payments at specified intervals.

"(8) SETOFF.—Any amount paid to a victim under this section shall be set off against any amount later recovered as compensatory damages by the victim from the defendant in—

"(A) any Federal civil proceeding; and

"(B) any State civil proceeding, to the extent provided by the law of the State.

"(9) EFFECT ON OTHER SOURCES OF COMPENSATION.—The issuance of a restitution order shall not affect the entitlement of a victim to receive compensation with respect to a loss from insurance or any other source until the payments actually received by the victim under the restitution order fully compensate the victim for the loss.

"(10) CONDITION OF PROBATION OR SUPERVISED RELEASE.—Compliance with a restitution order issued under this section shall be a condition of any probation or supervised release of a defendant. If an offender fails to comply with a restitution order, the court may, after a hearing, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, or hold the defendant in contempt pursuant to section 3583(e). In determining whether to revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release or hold a defendant serving a term of supervised release in contempt, the court shall consider the defendant's employment status, earning ability and financial resources, the willfulness of the defendant's failure to comply, and any other circumstances that may have a bearing on the defendant's ability to comply.

"(c) AFFIDAVIT.—Within 60 days after conviction and, in any event, not later than 10 days before sentencing, the United States Attorney (or such Attorney's delegate), after consulting with the victim, shall prepare and file an affidavit with the court listing the amounts subject to restitution under this section. The affidavit shall be signed by the United States Attorney (or the delegate) and the victim. Should the victim object to any of the information included in the affidavit, the United States Attorney (or the delegate) shall advise the victim that the victim may file a separate affidavit and assist the victim in the preparation of the affidavit.

"(d) OBJECTION.—If, after the defendant has been notified of the affidavit, no objection is raised by the defendant, the amounts attested to in the affidavit filed pursuant to subsection (a) shall be entered in the court's restitution order. If objection is raised, the court may require the victim or the United States Attorney (or the United States Attorney's delegate) to submit further affidavits or other supporting documents, demonstrating the victim's losses.

"(e) ADDITIONAL DOCUMENTATION AND TESTIMONY.—If the court concludes, after reviewing the supporting documentation and considering the defendant's objections, that there is a substantial reason for doubting the authenticity or

veracity of the records submitted, the court may require additional documentation or hear testimony on those questions. The privacy of any records filed, or testimony heard, pursuant to this section, shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

"(f) FINAL DETERMINATION OF LOSSES.—If the victim's losses are not ascertainable 10 days before sentencing as provided in subsection (c), the United States Attorney (or the United States Attorney's delegate) shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 90 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

"(g) RESTITUTION IN ADDITION TO PUNISHMENT.—An award of restitution to the victim of an offense under this chapter is not a substitute for imposition of punishment under this chapter.

<< 18 USCA § 2265 >>

"§ 2265. Full faith and credit given to protection orders

"(a) FULL FAITH AND CREDIT.—Any protection order issued that is consistent with subsection (b) of this section by the court of one State or Indian tribe (the issuing State or Indian tribe) shall be accorded full faith and credit by the court of another State or Indian tribe (the enforcing State or Indian tribe) and enforced as if it were the order of the enforcing State or tribe.

"(b) PROTECTION ORDER.—A protection order issued by a State or tribal court is consistent with this subsection if—

"(1) such court has jurisdiction over the parties and matter under the law of such State or Indian tribe; and

"(2) reasonable notice and opportunity to be heard is given to the person against whom the order is sought sufficient to protect that person's right to due process. In the case of ex parte orders, notice and opportunity to be heard must be provided within the time required by State or tribal law, and in any event within a reasonable time after the order is issued, sufficient to protect the respondent's due process rights.

"(c) CROSS OR COUNTER PETITION.—A protection order issued by a State or tribal court against one who has petitioned, filed a complaint, or otherwise filed a written pleading for protection against abuse by a spouse or intimate partner is not entitled to full faith and credit if—

"(1) no cross or counter petition, complaint, or other written pleading was filed seeking such a protection order; or

"(2) a cross or counter petition has been filed and the court did not make specific findings that each party was entitled to such an order.

<< 18 USCA § 2266 >>

"§ 2266. Definitions

"In this chapter—

"'bodily injury' means any act, except one done in self-defense, that results in physical injury or sexual abuse.

"'Indian country' has the meaning stated in section 1151.

"'protection order' includes any injunction or other order issued for the purpose of preventing violent or threatening acts or harassment against, or contact or communication with or physical proximity to, another person, including temporary and final orders issued by civil and criminal courts (other than support or child custody orders) whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil order was issued in response to a complaint, petition or motion filed by or on behalf of a person seeking protection.

"'spouse or intimate partner' includes—

"(A) a spouse, a former spouse, a person who shares a child in common with the abuser, and a person who cohabits or has cohabited with the abuser as a spouse; and

"(B) any other person similarly situated to a spouse who is protected by the domestic or family violence laws of the State in which the injury occurred or where the victim resides.

"'State' includes a State of the United States, the District of Columbia, a commonwealth, territory, or possession of the United States.

AR.01959

12

"'travel across State lines' does not include travel across State lines by an individual who is a member of an Indian tribe when such individual remains at all times in the territory of the Indian tribe of which the individual is a member.".

<< 18 USCA Ch. 110 >>

(b) TECHNICAL AMENDMENT.—The part analysis for part I of title 18, United States Code, is amended by inserting after the item for chapter 110 the following new item:

"**110A.    Domestic violence**.................................................................................................................... ...........**2261.**".


CHAPTER 3—ARREST POLICIES IN DOMESTIC VIOLENCE CASES

SEC. 40231. ENCOURAGING ARREST POLICIES.

(a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 40121(a), is amended—

<< 42 USCA Ch. 46 >>

(1) by redesignating part U as part V;

<< 42 USCA § 3797 >>

(2) by redesignating section 2101 as section 2201; and

<< 42 USCA Ch. 46 >>

(3) by inserting after part T the following new part:

"PART U—GRANTS TO ENCOURAGE ARREST POLICIES

<< 42 USCA § 3796hh >>

"SEC. 2101. GRANTS.

"(a) PURPOSE.—The purpose of this part is to encourage States, Indian tribal governments, and units of local government to treat domestic violence as a serious violation of criminal law.

"(b) GRANT AUTHORITY.—The Attorney General may make grants to eligible States, Indian tribal governments, or units of local government for the following purposes:

"(1) To implement mandatory arrest or proarrest programs and policies in police departments, including mandatory arrest programs and policies for protection order violations.

"(2) To develop policies and training in police departments to improve tracking of cases involving domestic violence.

"(3) To centralize and coordinate police enforcement, prosecution, or judicial responsibility for domestic violence cases in groups or units of police officers, prosecutors, or judges.

"(4) To coordinate computer tracking systems to ensure communication between police, prosecutors, and both criminal and family courts.

"(5) To strengthen legal advocacy service programs for victims of domestic violence.

"(6) To educate judges in criminal and other courts about domestic violence and to improve judicial handling of such cases.

"(c) ELIGIBILITY.—Eligible grantees are States, Indian tribal governments, or units of local government that—

"(1) certify that their laws or official policies—

"(A) encourage or mandate arrests of domestic violence offenders based on probable cause that an offense has been committed; and

"(B) encourage or mandate arrest of domestic violence offenders who violate the terms of a valid and outstanding protection order;

"(2) demonstrate that their laws, policies, or practices and their training programs discourage dual arrests of offender and victim;

"(3) certify that their laws, policies, or practices prohibit issuance of mutual restraining orders of protection except in cases where both spouses file a claim and the court makes detailed findings of fact indicating that both spouses acted primarily as aggressors and that neither spouse acted primarily in self-defense; and

"(4) certify that their laws, policies, or practices do not require, in connection with the prosecution of any misdemeanor or felony domestic violence offense, that the abused bear the costs associated with the filing of criminal charges or the service of such charges on an abuser, or that the abused bear the costs associated with the issuance or service of a warrant, protection order, or witness subpoena.

<< 42 USCA § 3796hh–1 >>

"SEC. 2102. APPLICATIONS.

"(a) APPLICATION.—An eligible grantee shall submit an application to the Attorney General that—

"(1) contains a certification by the chief executive officer of the State, Indian tribal government, or local government entity that the conditions of section 2101(c) are met or will be met within the later of—

"(A) the period ending on the date on which the next session of the State or Indian tribal legislature ends; or

"(B) 2 years of the date of enactment of this part;

"(2) describes plans to further the purposes stated in section 2101(a);

"(3) identifies the agency or office or groups of agencies or offices responsible for carrying out the program; and

"(4) includes documentation from nonprofit, private sexual assault and domestic violence programs demonstrating their participation in developing the application, and identifying such programs in which such groups will be consulted for development and implementation.

"(b) PRIORITY.—In awarding grants under this part, the Attorney General shall give priority to applicants that—

"(1) do not currently provide for centralized handling of cases involving domestic violence by police, prosecutors, and courts; and

"(2) demonstrate a commitment to strong enforcement of laws, and prosecution of cases, involving domestic violence.

<< 42 USCA § 3796hh–2 >>

"SEC. 2103. REPORTS.

"Each grantee receiving funds under this part shall submit a report to the Attorney General evaluating the effectiveness of projects developed with funds provided under this part and containing such additional information as the Attorney General may prescribe.

<< 42 USCA § 3796hh–3 >>

"SEC. 2104. REGULATIONS OR GUIDELINES.

"Not later than 120 days after the date of enactment of this part, the Attorney General shall publish proposed regulations or guidelines implementing this part. Not later than 180 days after the date of enactment of this part, the Attorney General shall publish final regulations or guidelines implementing this part.

<< 42 USCA § 3796hh–4 >>

"SEC. 2105. DEFINITIONS.

"For purposes of this part—

"(1) the term 'domestic violence' includes felony or misdemeanor crimes of violence committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabitated with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other adult person against a victim who is protected from that person's acts under the domestic or family violence laws of the eligible State, Indian tribal government, or unit of local government that receives a grant under this part; and

"(2) the term 'protection order' includes any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary and final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.".

(b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 40121(b), is amended by striking the matter relating to part U and inserting the following:

"Part U—Grants to Encourage Arrest Policies

"Sec. 2101. Grants.
"Sec. 2102. Applications.
"Sec. 2103. Reports.
"Sec. 2104. Regulations or guidelines.
"Sec. 2105. Definitions.

"Part V—Transition—Effective Date—Repealer

"Sec. 2201. Continuation of rules, authorities, and proceedings.".

<< 42 USCA § 3793 >>

(c) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793), as amended by section 40121(c), is amended—

(1) in paragraph (3) by striking "and T" and inserting "T, and U"; and

(2) by adding at the end the following new paragraph:

"(19) There are authorized to be appropriated to carry out part U—

"(A) $28,000,000 for fiscal year 1996;

"(B) $33,000,000 for fiscal year 1997; and

"(C) $59,000,000 for fiscal year 1998.

(d) ADMINISTRATIVE PROVISIONS.—

<< 42 USCA § 3782 >>

(1) REGULATIONS.—Section 801(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3782(b)), is amended by striking "and O" and inserting "O, and U".

<< 42 USCA § 3783 >>

(2) DENIAL OF APPLICATION.—Section 802(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3783(b)) is amended in the first sentence by striking "or O" and inserting "O, or U".

CHAPTER 4—SHELTER GRANTS

<< 42 USCA § 10409 >>

SEC. 40241. GRANTS FOR BATTERED WOMEN'S SHELTERS.

Section 310(a) of the Family Violence Prevention and Services Act (42 U.S.C. 10409(a)) is amended to read as follows:

"(a) IN GENERAL.—There are authorized to be appropriated to carry out this title—

"(1) $50,000,000 for fiscal year 1996;

"(2) $60,000,000 for fiscal year 1997;

"(3) $70,000,000 for fiscal year 1998;

"(4) $72,500,000 for fiscal year 1999; and

"(5) $72,500,000 for fiscal year 2000.".

## CHAPTER 5—YOUTH EDUCATION

<< 42 USCA § 10417 >>

## SEC. 40251. YOUTH EDUCATION AND DOMESTIC VIOLENCE.

The Family Violence Prevention and Services Act (42 U.S.C. 10401 et seq.), as amended by section 40211, is amended by adding at the end the following new section:

"SEC. 317. YOUTH EDUCATION AND DOMESTIC VIOLENCE.

"(a) GENERAL PURPOSE.—For purposes of this section, the Secretary may, in consultation with the Secretary of Education, select, implement and evaluate 4 model programs for education of young people about domestic violence and violence among intimate partners.

"(b) NATURE OF PROGRAM.—The Secretary shall select, implement and evaluate separate model programs for 4 different audiences: primary schools, middle schools, secondary schools, and institutions of higher education. The model programs shall be selected, implemented, and evaluated in consultation with educational experts, legal and psychological experts on battering, and victim advocate organizations such as battered women's shelters, State coalitions and resource centers.

"(c) REVIEW AND DISSEMINATION.—Not later than 2 years after the date of enactment of this section, the Secretary shall transmit the design and evaluation of the model programs, along with a plan and cost estimate for nationwide distribution, to the relevant committees of Congress for review.

"(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section $400,000 for fiscal year 1996.

<< 42 USCA § 10418 >>

## CHAPTER 6—COMMUNITY PROGRAMS ON DOMESTIC VIOLENCE

## SEC. 40261. ESTABLISHMENT OF COMMUNITY PROGRAMS ON DOMESTIC VIOLENCE.

The Family Violence Prevention and Services Act (42 U.S.C. 10401 et seq.), as amended by section 40251, is amended by adding at the end the following new section:

"SEC. 318. DEMONSTRATION GRANTS FOR COMMUNITY INITIATIVES.

"(a) IN GENERAL.—The Secretary shall provide grants to nonprofit private organizations to establish projects in local communities involving many sectors of each community to coordinate intervention and prevention of domestic violence.

"(b) ELIGIBILITY.—To be eligible for a grant under this section, an entity—

"(1) shall be a nonprofit organization organized for the purpose of coordinating community projects for the intervention in and prevention of domestic violence; and

"(2) shall include representatives of pertinent sectors of the local community, which may include—

"(A) health care providers;

"(B) the education community;

"(C) the religious community;

"(D) the justice system;

"(E) domestic violence program advocates;

"(F) human service entities such as State child services divisions;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(G) business and civic leaders; and

"(H) other pertinent sectors.

"(c) APPLICATIONS.—An organization that desires to receive a grant under this section shall submit to the Secretary an application, in such form and in such manner as the Secretary shall prescribe through notice in the Federal Register, that—

"(1) demonstrates that the applicant will serve a community leadership function, bringing together opinion leaders from each sector of the community to develop a coordinated community consensus opposing domestic violence;

"(2) demonstrates a community action component to improve and expand current intervention and prevention strategies through increased communication and coordination among all affected sectors;

"(3) includes a complete description of the applicant's plan for the establishment and operation of the community project, including a description of—

"(A) the method for identification and selection of an administrative committee made up of persons knowledgeable in domestic violence to oversee the project, hire staff, assure compliance with the project outline, and secure annual evaluation of the project;

"(B) the method for identification and selection of project staff and a project evaluator;

"(C) the method for identification and selection of a project council consisting of representatives of the community sectors listed in subsection (b)(2);

"(D) the method for identification and selection of a steering committee consisting of representatives of the various community sectors who will chair subcommittees of the project council focusing on each of the sectors; and

"(E) a plan for developing outreach and public education campaigns regarding domestic violence; and

"(4) contains such other information, agreements, and assurances as the Secretary may require.

"(d) TERM.—A grant provided under this section may extend over a period of not more than 3 fiscal years.

"(e) CONDITIONS ON PAYMENT.—Payments under a grant under this section shall be subject to—

"(1) annual approval by the Secretary; and

"(2) availability of appropriations.

"(f) GEOGRAPHICAL DISPERSION.—The Secretary shall award grants under this section to organizations in communities geographically dispersed throughout the country.

"(g) USE OF GRANT MONIES.—

"(1) IN GENERAL.—A grant made under subsection (a) shall be used to establish and operate a community project to coordinate intervention and prevention of domestic violence.

"(2) REQUIREMENTS.—In establishing and operating a project, a nonprofit private organization shall—

"(A) establish protocols to improve and expand domestic violence intervention and prevention strategies among all affected sectors;

"(B) develop action plans to direct responses within each community sector that are in conjunction with development in all other sectors; and

"(C) provide for periodic evaluation of the project with a written report and analysis to assist application of this concept in other communities.

"(h) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

"(1) $4,000,000 for fiscal year 1996; and

"(2) $6,000,000 for fiscal year 1997.

"(i) REGULATIONS.—Not later than 60 days after the date of enactment of this section, the Secretary shall publish proposed regulations implementing this section. Not later than 120 days after the date of enactment, the Secretary shall publish final regulations implementing this section.".

<< 42 USCA § 10402 >>

CHAPTER 7—FAMILY VIOLENCE PREVENTION AND SERVICES ACT AMENDMENTS

SEC. 40271. GRANTEE REPORTING.

(a) SUBMISSION OF APPLICATION.—Section 303(a)(2)(C) of the Family Violence Prevention and Services Act (42 U.S.C. 10402(a)(2)(C)) is amended by inserting "and a plan to address the needs of underserved populations, including populations underserved because of ethnic, racial, cultural, language diversity or geographic isolation" after "such State".

(b) APPROVAL OF APPLICATION.—Section 303(a) of the Family Violence Prevention and Services Act (42 U.S.C. 10402(a)) is amended by adding at the end the following new paragraph:

"(4) Upon completion of the activities funded by a grant under this subpart, the State grantee shall file a performance report with the Director explaining the activities carried out together with an assessment of the effectiveness of those activities in achieving the purposes of this subpart. A section of this performance report shall be completed by each grantee or subgrantee that performed the direct services contemplated in the application certifying performance of direct services under the grant. The Director shall suspend funding for an approved application if an applicant fails to submit an annual performance report or if the funds are expended for purposes other than those set forth under this subpart, after following the procedures set forth in paragraph (3). Federal funds may be used only to supplement, not supplant, State funds.".

SEC. 40272. TECHNICAL AMENDMENTS.

<< 42 USCA § 10408 >>

(a) DEFINITIONS.—Section 309(5)(B) of the Family Violence Prevention and Services Act (42 U.S.C. 10408(5)(B)) is amended by inserting "or other supportive services" before "by peers individually or in groups,".

<< 42 USCA § 10407 >>

(b) SPECIAL ISSUE RESOURCE CENTERS.—

(1) GRANTS.—Section 308(a)(2) of the Family Violence Prevention and Services Act (42 U.S.C. 10407(a)(2)) is amended by striking "six" and inserting "seven".

(2) FUNCTIONS.—Section 308(c) of the Family Violence Prevention and Services Act (42 U.S.C. 10407(c)) is amended—

(A) by striking the period at the end of paragraph (6) and inserting ", including the issuance and enforcement of protection orders."; and

(B) by adding at the end the following new paragraph:

"(7) Providing technical assistance and training to State domestic violence coalitions.".

<< 42 USCA § 10410 >>

(c) STATE DOMESTIC VIOLENCE COALITIONS.—Section 311(a) of the Family Violence Prevention and Services Act (42 U.S.C. 10410(a)) is amended—

(1) by redesignating paragraphs (1), (2), (3), and (4) as paragraphs (2), (3), (4), and (5);

(2) by inserting before paragraph (2), as redesignated by paragraph (1), the following new paragraph:

"(1) working with local domestic violence programs and providers of direct services to encourage appropriate responses to domestic violence within the State, including—

"(A) training and technical assistance for local programs and professionals working with victims of domestic violence;

"(B) planning and conducting State needs assessments and planning for comprehensive services;

"(C) serving as an information clearinghouse and resource center for the State; and

"(D) collaborating with other governmental systems which affect battered women;";

(3) in paragraph (2)(K), as redesignated by paragraph (1), by striking "and court officials and other professionals" and inserting ", judges, court officers and other criminal justice professionals,";

(4) in paragraph (3), as redesignated by paragraph (1)—

(A) by inserting ", criminal court judges," after "family law judges," each place it appears;

(B) in subparagraph (F), by inserting "custody" after "temporary"; and

(C) in subparagraph (H), by striking "supervised visitations that do not endanger victims and their children," and inserting "supervised visitations or denial of visitation to protect against danger to victims or their children"; and

(5) in paragraph (4), as redesignated by paragraph (1), by inserting ", including information aimed at underserved racial, ethnic or language-minority populations" before the semicolon.

<< 42 USCA Ch. 136 >>

CHAPTER 8—CONFIDENTIALITY FOR ABUSED PERSONS

<< 42 USCA § 13951 >>

SEC. 40281. CONFIDENTIALITY OF ABUSED PERSON'S ADDRESS.

 (a) REGULATIONS.—Not later than 90 days after the date of enactment of this Act, the United States Postal Service shall promulgate regulations to secure the confidentiality of domestic violence shelters and abused persons' addresses.
 (b) REQUIREMENTS.—The regulations under subsection (a) shall require—
  (1) in the case of an individual, the presentation to an appropriate postal official of a valid, outstanding protection order; and
  (2) in the case of a domestic violence shelter, the presentation to an appropriate postal authority of proof from a State domestic violence coalition that meets the requirements of section 311 of the Family Violence Prevention and Services Act (42 U.S.C. 10410)) verifying that the organization is a domestic violence shelter.
 (c) DISCLOSURE FOR CERTAIN PURPOSES.—The regulations under subsection (a) shall not prohibit the disclosure of addresses to State or Federal agencies for legitimate law enforcement or other governmental purposes.
 (d) EXISTING COMPILATIONS.—Compilations of addresses existing at the time at which order is presented to an appropriate postal official shall be excluded from the scope of the regulations under subsection (a).

<< 42 USCA Ch. 136 >>

CHAPTER 9—DATA AND RESEARCH

<< 42 USCA § 13961 >>

SEC. 40291. RESEARCH AGENDA.

 (a) REQUEST FOR CONTRACT.—The Attorney General shall request the National Academy of Sciences, through its National Research Council, to enter into a contract to develop a research agenda to increase the understanding and control of violence against women, including rape and domestic violence. In furtherance of the contract, the National Academy shall convene a panel of nationally recognized experts on violence against women, in the fields of law, medicine, criminal justice, and direct services to victims and experts on domestic violence in diverse, ethnic, social, and language minority communities and the social sciences. In setting the agenda, the Academy shall focus primarily on preventive, educative, social, and legal strategies, including addressing the needs of underserved populations.
 (b) DECLINATION OF REQUEST.—If the National Academy of Sciences declines to conduct the study and develop a research agenda, it shall recommend a nonprofit private entity that is qualified to conduct such a study. In that case, the Attorney General shall carry out subsection (a) through the nonprofit private entity recommended by the Academy. In either case, whether the study is conducted by the National Academy of Sciences or by the nonprofit group it recommends, the funds for the contract shall be made available from sums appropriated for the conduct of research by the National Institute of Justice.
 (c) REPORT.—The Attorney General shall ensure that no later than 1 year after the date of enactment of this Act, the study required under subsection (a) is completed and a report describing the findings made is submitted to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives.

<< 42 USCA § 13962 >>

SEC. 40292. STATE DATABASES.

 (a) IN GENERAL.—The Attorney General shall study and report to the States and to Congress on how the States may collect centralized databases on the incidence of sexual and domestic violence offenses within a State.

(b) CONSULTATION.—In conducting its study, the Attorney General shall consult persons expert in the collection of criminal justice data, State statistical administrators, law enforcement personnel, and nonprofit nongovernmental agencies that provide direct services to victims of domestic violence. The final report shall set forth the views of the persons consulted on the recommendations.

(c) REPORT.—The Attorney General shall ensure that no later than 1 year after the date of enactment of this Act, the study required under subsection (a) is completed and a report describing the findings made is submitted to the Committees on the Judiciary of the Senate and the House of Representatives.

(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section— $200,000 for fiscal year 1996.

<< 42 USCA § 13963 >>

SEC. 40293. NUMBER AND COST OF INJURIES.

(a) STUDY.—The Secretary of Health and Human Services, acting through the Centers for Disease Control Injury Control Division, shall conduct a study to obtain a national projection of the incidence of injuries resulting from domestic violence, the cost of injuries to health care facilities, and recommend health care strategies for reducing the incidence and cost of such injuries.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section— $100,000 for fiscal year 1996.

<< 42 USCA Ch. 136 >>

CHAPTER 10—RURAL DOMESTIC VIOLENCE AND CHILD ABUSE ENFORCEMENT

<< 42 USCA § 13971 >>

SEC. 40295. RURAL DOMESTIC VIOLENCE AND CHILD ABUSE ENFORCEMENT ASSISTANCE.

(a) GRANTS.—The Attorney General may make grants to States, Indian tribal governments, and local governments of rural States, and to other public or private entities of rural States—

(1) to implement, expand, and establish cooperative efforts and projects between law enforcement officers, prosecutors, victim advocacy groups, and other related parties to investigate and prosecute incidents of domestic violence and child abuse;

(2) to provide treatment and counseling to victims of domestic violence and child abuse; and

(3) to work in cooperation with the community to develop education and prevention strategies directed toward such issues.

(b) DEFINITIONS.—In this section—

"Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"rural State" has the meaning stated in section 1501(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796bb(B)).

(c) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—There are authorized to be appropriated to carry out this section—

(A) $7,000,000 for fiscal year 1996;

(B) $8,000,000 for fiscal year 1997; and

(C) $15,000,000 for fiscal year 1998.

(2) ADDITIONAL FUNDING.—In addition to funds received under a grant under subsection (a), a law enforcement agency may use funds received under a grant under section 103 to accomplish the objectives of this section.

<< 42 USCA Ch. 136 >>

Subtitle C—Civil Rights for Women

<< 42 USCA § 13701 NOTE >>

SEC. 40301. SHORT TITLE.

This subtitle may be cited as the "Civil Rights Remedies for Gender-Motivated Violence Act".

<< 42 USCA § 13981 >>

SEC. 40302. CIVIL RIGHTS.

(a) PURPOSE.—Pursuant to the affirmative power of Congress to enact this subtitle under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution, it is the purpose of this subtitle to protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce by establishing a Federal civil rights cause of action for victims of crimes of violence motivated by gender.

(b) RIGHT TO BE FREE FROM CRIMES OF VIOLENCE.—All persons within the United States shall have the right to be free from crimes of violence motivated by gender (as defined in subsection (d)).

(c) CAUSE OF ACTION.—A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

(d) DEFINITIONS.—For purposes of this section—

(1) the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender; and

(2) the term "crime of violence" means—

(A) an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of title 18, United States Code, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken.

(e) Limitation and Procedures.—

(1) LIMITATION.—Nothing in this section entitles a person to a cause of action under subsection (c) for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender (within the meaning of subsection (d)).

(2) NO PRIOR CRIMINAL ACTION.—Nothing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c).

(3) CONCURRENT JURISDICTION.—The Federal and State courts shall have concurrent jurisdiction over actions brought pursuant to this subtitle.

(4) SUPPLEMENTAL JURISDICTION.—Neither section 1367 of title 28, United States Code, nor subsection (c) of this section shall be construed, by reason of a claim arising under such subsection, to confer on the courts of the United States jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree.

<< 28 USCA § 1445 >>

<< 42 USCA § 13981 >>

(5) LIMITATION ON REMOVAL.—Section 1445 of title 28, United States Code, is amended by adding at the end the following new subsection:

"(d) A civil action in any State court arising under section 40302 of the Violence Against Women Act of 1994 may not be removed to any district court of the United States.".

<< 42 USCA § 1988 >>

## SEC. 40303. ATTORNEY'S FEES.

Section 722 of the Revised Statutes (42 U.S.C. 1988) is amended in the last sentence—
  (1) by striking "or" after "Public Law 92–318,"; and
  (2) by inserting ", or section 40302 of the Violence Against Women Act of 1994," after "1964".

## SEC. 40304. SENSE OF THE SENATE CONCERNING PROTECTION OF THE PRIVACY OF RAPE VICTIMS.

It is the sense of the Senate that news media, law enforcement officers, and other persons should exercise restraint and respect a rape victim's privacy by not disclosing the victim's identity to the general public or facilitating such disclosure without the consent of the victim.

<< 42 USCA Ch. 136 >>

Subtitle D—Equal Justice for Women in the Courts Act

<< 42 USCA § 13701 NOTE >>

## SEC. 40401. SHORT TITLE.

This subtitle may be cited as the "Equal Justice for Women in the Courts Act of 1994".

<< 42 USCA Ch. 136 >>

CHAPTER 1—EDUCATION AND TRAINING FOR JUDGES AND COURT PERSONNEL IN STATE COURTS

<< 42 USCA § 13991 >>

## SEC. 40411. GRANTS AUTHORIZED.

The State Justice Institute may award grants for the purpose of developing, testing, presenting, and disseminating model programs to be used by States (as defined in section 202 of the State Justice Institute Act of 1984 (42 U.S.C. 10701)) in training judges and court personnel in the laws of the States and by Indian tribes in training tribal judges and court personnel in the laws of the tribes on rape, sexual assault, domestic violence, and other crimes of violence motivated by the victim's gender.

<< 42 USCA § 13992 >>

## SEC. 40412. TRAINING PROVIDED BY GRANTS.

Training provided pursuant to grants made under this subtitle may include current information, existing studies, or current data on—
  (1) the nature and incidence of rape and sexual assault by strangers and nonstrangers, marital rape, and incest;
  (2) the underreporting of rape, sexual assault, and child sexual abuse;
  (3) the physical, psychological, and economic impact of rape and sexual assault on the victim, the costs to society, and the implications for sentencing;
  (4) the psychology of sex offenders, their high rate of recidivism, and the implications for sentencing;
  (5) the historical evolution of laws and attitudes on rape and sexual assault;
  (6) sex stereotyping of female and male victims of rape and sexual assault, racial stereotyping of rape victims and defendants, and the impact of such stereotypes on credibility of witnesses, sentencing, and other aspects of the administration of justice;

(7) application of rape shield laws and other limits on introduction of evidence that may subject victims to improper sex stereotyping and harassment in both rape and nonrape cases, including the need for sua sponte judicial intervention in inappropriate cross-examination;

(8) the use of expert witness testimony on rape trauma syndrome, child sexual abuse accommodation syndrome, post-traumatic stress syndrome, and similar issues;

(9) the legitimate reasons why victims of rape, sexual assault, and incest may refuse to testify against a defendant;

(10) the nature and incidence of domestic violence;

(11) the physical, psychological, and economic impact of domestic violence on the victim, the costs to society, and the implications for court procedures and sentencing;

(12) the psychology and self-presentation of batterers and victims and the implications for court proceedings and credibility of witnesses;

(13) sex stereotyping of female and male victims of domestic violence, myths about presence or absence of domestic violence in certain racial, ethnic, religious, or socioeconomic groups, and their impact on the administration of justice;

(14) historical evolution of laws and attitudes on domestic violence;

(15) proper and improper interpretations of the defenses of self-defense and provocation, and the use of expert witness testimony on battered woman syndrome;

(16) the likelihood of retaliation, recidivism, and escalation of violence by batterers, and the potential impact of incarceration and other meaningful sanctions for acts of domestic violence including violations of orders of protection;

(17) economic, psychological, social and institutional reasons for victims' inability to leave the batterer, to report domestic violence or to follow through on complaints, including the influence of lack of support from police, judges, and court personnel, and the legitimate reasons why victims of domestic violence may refuse to testify against a defendant;

(18) the need for orders of protection, and the implications of mutual orders of protection, dual arrest policies, and mediation in domestic violence cases; and

(19) recognition of and response to gender-motivated crimes of violence other than rape, sexual assault and domestic violence, such as mass or serial murder motivated by the gender of the victims.

<< 42 USCA § 13993 >>

SEC. 40413. COOPERATION IN DEVELOPING PROGRAMS IN MAKING GRANTS UNDER THIS TITLE.

The State Justice Institute shall ensure that model programs carried out pursuant to grants made under this subtitle are developed with the participation of law enforcement officials, public and private nonprofit victim advocates, legal experts, prosecutors, defense attorneys, and recognized experts on gender bias in the courts.

<< 42 USCA § 13994 >>

SEC. 40414. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.—There are authorized to be appropriated to carry out this chapter $600,000 for fiscal year 1996.

(b) MODEL PROGRAMS.—Of amounts appropriated under this section, the State Justice Institute shall expend not less than 40 percent on model programs regarding domestic violence and not less than 40 percent on model programs regarding rape and sexual assault.

<< 42 USCA Ch. 136 >>

CHAPTER 2—EDUCATION AND TRAINING FOR JUDGES AND COURT PERSONNEL IN FEDERAL COURTS

<< 42 USCA § 14001 >>

SEC. 40421. AUTHORIZATIONS OF CIRCUIT STUDIES; EDUCATION AND TRAINING GRANTS.

(a) STUDIES.—In order to gain a better understanding of the nature and the extent of gender bias in the Federal courts, the circuit judicial councils are encouraged to conduct studies of the instances, if any, of gender bias in their respective circuits and to implement recommended reforms.

(b) MATTERS FOR EXAMINATION.—The studies under subsection (a) may include an examination of the effects of gender on—

(1) the treatment of litigants, witnesses, attorneys, jurors, and judges in the courts, including before magistrate and bankruptcy judges;

(2) the interpretation and application of the law, both civil and criminal;

(3) treatment of defendants in criminal cases;

(4) treatment of victims of violent crimes in judicial proceedings;

(5) sentencing;

(6) sentencing alternatives and the nature of supervision of probation and parole;

(7) appointments to committees of the Judicial Conference and the courts;

(8) case management and court sponsored alternative dispute resolution programs;

(9) the selection, retention, promotion, and treatment of employees;

(10) appointment of arbitrators, experts, and special masters;

(11) the admissibility of the victim's past sexual history in civil and criminal cases; and

(12) the aspects of the topics listed in section 40412 that pertain to issues within the jurisdiction of the Federal courts.

(c) CLEARINGHOUSE.—The Administrative Office of the United States Courts shall act as a clearinghouse to disseminate any reports and materials issued by the gender bias task forces under subsection (a) and to respond to requests for such reports and materials. The gender bias task forces shall provide the Administrative Office of the Courts of the United States with their reports and related material.

(d) MODEL PROGRAMS.—The Federal Judicial Center, in carrying out section 620(b)(3) of title 28, United States Code, may—

(1) include in the educational programs it presents and prepares, including the training programs for newly appointed judges, information on issues related to gender bias in the courts including such areas as are listed in subsection (a) along with such other topics as the Federal Judicial Center deems appropriate;

(2) prepare materials necessary to implement this subsection; and

(3) take into consideration the findings and recommendations of the studies conducted pursuant to subsection (a), and to consult with individuals and groups with relevant expertise in gender bias issues as it prepares or revises such materials.

<< 42 USCA § 14002 >>

SEC. 40422. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated—

(1) to the Salaries and Expenses Account of the Courts of Appeals, District Courts, and other Judicial Services to carry out section 40421(a) $500,000 for fiscal year 1996;

(2) to the Federal Judicial Center to carry out section 40421(d) $100,000 for fiscal year 1996; and

(3) to the Administrative Office of the United States Courts to carry out section 40421(c) $100,000 for fiscal year 1996.

<< 42 USCA Ch. 136 >>

Subtitle E—Violence Against Women Act Improvements

<< 18 USCA § 3156 >>

SEC. 40501. PRE–TRIAL DETENTION IN SEX OFFENSE CASES.

Section 3156(a)(4) of title 18, United States Code, is amended—

(1) by striking "or" at the end of subparagraph (A);

(2) by striking the period at the end of subparagraph (B) and inserting "; or"; and

(3) by adding after subparagraph (B) the following new subparagraph:

"(C) any felony under chapter 109A or chapter 110.".

<< 18 USCA § 2245 >>

SEC. 40502. INCREASED PENALTIES FOR SEX OFFENSES AGAINST VICTIMS BELOW THE AGE OF 16.

Section 2245(2) of title 18, United States Code, is amended—

(1) by striking "or" at the end of subparagraph (B);

(2) by striking "; and" at the end of subparagraph (C) and inserting "; or"; and

(3) by inserting after subparagraph (C) the following new subparagraph:

"(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person;".

SEC. 40503. PAYMENT OF COST OF TESTING FOR SEXUALLY TRANSMITTED DISEASES.

<< 42 USCA § 10607 >>

<< 42 USCA § 14011 >>

(a) FOR VICTIMS IN SEX OFFENSE CASES.—Section 503(c)(7) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)(7)) is amended by adding at the end the following: "The Attorney General shall provide for the payment of the cost of up to 2 anonymous and confidential tests of the victim for sexually transmitted diseases, including HIV, gonorrhea, herpes, chlamydia, and syphilis, during the 12 months following sexual assaults that pose a risk of transmission, and the cost of a counseling session by a medically trained professional on the accuracy of such tests and the risk of transmission of sexually transmitted diseases to the victim as the result of the assault. A victim may waive anonymity and confidentiality of any tests paid for under this section.".

<< 42 USCA § 14011 >>

(b) LIMITED TESTING OF DEFENDANTS.—

(1) COURT ORDER.—The victim of an offense of the type referred to in subsection (a) may obtain an order in the district court of the United States for the district in which charges are brought against the defendant charged with the offense, after notice to the defendant and an opportunity to be heard, requiring that the defendant be tested for the presence of the etiologic agent for acquired immune deficiency syndrome, and that the results of the test be communicated to the victim and the defendant. Any test result of the defendant given to the victim or the defendant must be accompanied by appropriate counseling.

(2) SHOWING REQUIRED.—To obtain an order under paragraph (1), the victim must demonstrate that—

(A) the defendant has been charged with the offense in a State or Federal court, and if the defendant has been arrested without a warrant, a probable cause determination has been made;

(B) the test for the etiologic agent for acquired immune deficiency syndrome is requested by the victim after appropriate counseling; and

(C) the test would provide information necessary for the health of the victim of the alleged offense and the court determines that the alleged conduct of the defendant created a risk of transmission, as determined by the Centers for Disease Control, of the etiologic agent for acquired immune deficiency syndrome to the victim.

(3) FOLLOW–UP TESTING.—The court may order follow-up tests and counseling under paragraph (b)(1) if the initial test was negative. Such follow-up tests and counseling shall be performed at the request of the victim on dates that occur six months and twelve months following the initial test.

(4) TERMINATION OF TESTING REQUIREMENTS.—An order for follow-up testing under paragraph (3) shall be terminated if the person obtains an acquittal on, or dismissal of, all charges of the type referred to in subsection (a).

(5) CONFIDENTIALITY OF TEST.—The results of any test ordered under this subsection shall be disclosed only to the victim or, where the court deems appropriate, to the parent or legal guardian of the victim, and to the person tested. The

victim may disclose the test results only to any medical professional, counselor, family member or sexual partner(s) the victim may have had since the attack. Any such individual to whom the test results are disclosed by the victim shall maintain the confidentiality of such information.

  (6) DISCLOSURE OF TEST RESULTS.—The court shall issue an order to prohibit the disclosure by the victim of the results of any test performed under this subsection to anyone other than those mentioned in paragraph (5). The contents of the court proceedings and test results pursuant to this section shall be sealed. The results of such test performed on the defendant under this section shall not be used as evidence in any criminal trial.

  (7) CONTEMPT FOR DISCLOSURE.—Any person who discloses the results of a test in violation of this subsection may be held in contempt of court.

(c) PENALTIES FOR INTENTIONAL TRANSMISSION OF HIV.—Not later than 6 months after the date of enactment of this Act, the United States Sentencing Commission shall conduct a study and prepare and submit to the committees on the Judiciary of the Senate and the House of Representatives a report concerning recommendations for the revision of sentencing guidelines that relate to offenses in which an HIV infected individual engages in sexual activity if the individual knows that he or she is infected with HIV and intends, through such sexual activity, to expose another to HIV.

<< 18 USCA § 3663 >>

SEC. 40504. EXTENSION AND STRENGTHENING OF RESTITUTION.

  Section 3663(b) of title 18, United States Code, is amended—
  (1) in paragraph (2) by inserting "including an offense under chapter 109A or chapter 110" after "an offense resulting in bodily injury to a victim";
  (2) by striking "and" at the end of paragraph (3);
  (3) by redesignating paragraph (4) as paragraph (5); and
  (4) by inserting after paragraph (3) the following new paragraph:
  "(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense; and".

<< 18 USCA § 3663 >>

SEC. 40505. ENFORCEMENT OF RESTITUTION ORDERS THROUGH SUSPENSION OF FEDERAL BENEFITS.

  Section 3663 of title 18, United States Code, is amended by adding at the end the following new subsection:
  "(i)(1) A Federal agency shall immediately suspend all Federal benefits provided by the agency to the defendant, and shall terminate the defendant's eligibility for Federal benefits administered by that agency, upon receipt of a certified copy of a written judicial finding that the defendant is delinquent in making restitution in accordance with any schedule of payments or any requirement of immediate payment imposed under this section.
  "(2) Any written finding of delinquency described in paragraph (1) shall be made by a court, after a hearing, upon motion of the victim named in the order to receive the restitution or upon motion of the United States.
  "(3) A defendant found to be delinquent may subsequently seek a written finding from the court that the defendant has rectified the delinquency or that the defendant has made and will make good faith efforts to rectify the delinquency. The defendant's eligibility for Federal benefits shall be reinstated upon receipt by the agency of a certified copy of such a finding.
  "(4) In this subsection, 'Federal benefit' means a grant, contract, loan, professional license, or commercial license provided by an agency of the United States.".

<< 42 USCA § 14012 >>

SEC. 40506. NATIONAL BASELINE STUDY ON CAMPUS SEXUAL ASSAULT.

  (a) STUDY.—The Attorney General, in consultation with the Secretary of Education, shall provide for a national baseline study to examine the scope of the problem of campus sexual assaults and the effectiveness of institutional and legal policies in

addressing such crimes and protecting victims. The Attorney General may utilize the Bureau of Justice Statistics, the National Institute of Justice, and the Office for Victims of Crime in carrying out this section.

(b) REPORT.—Based on the study required by subsection (a) and data collected under the Student Right-To-Know and Campus Security Act (20 U.S.C. 1001 note; Public Law 101–542) and amendments made by that Act, the Attorney General shall prepare a report including an analysis of—

(1) the number of reported allegations and estimated number of unreported allegations of campus sexual assaults, and to whom the allegations are reported (including authorities of the educational institution, sexual assault victim service entities, and local criminal authorities);

(2) the number of campus sexual assault allegations reported to authorities of educational institutions which are reported to criminal authorities;

(3) the number of campus sexual assault allegations that result in criminal prosecution in comparison with the number of non-campus sexual assault allegations that result in criminal prosecution;

(4) Federal and State laws or regulations pertaining specifically to campus sexual assaults;

(5) the adequacy of policies and practices of educational institutions in addressing campus sexual assaults and protecting victims, including consideration of—

(A) the security measures in effect at educational institutions, such as utilization of campus police and security guards, control over access to grounds and buildings, supervision of student activities and student living arrangements, control over the consumption of alcohol by students, lighting, and the availability of escort services;

(B) the articulation and communication to students of the institution's policies concerning sexual assaults;

(C) policies and practices that may prevent or discourage the reporting of campus sexual assaults to local criminal authorities, or that may otherwise obstruct justice or interfere with the prosecution of perpetrators of campus sexual assaults;

(D) the nature and availability of victim services for victims of campus sexual assaults;

(E) the ability of educational institutions' disciplinary processes to address allegations of sexual assault adequately and fairly;

(F) measures that are taken to ensure that victims are free of unwanted contact with alleged assailants, and disciplinary sanctions that are imposed when a sexual assault is determined to have occurred; and

(G) the grounds on which educational institutions are subject to lawsuits based on campus sexual assaults, the resolution of these cases, and measures that can be taken to avoid the likelihood of lawsuits and civil liability;

(6) in conjunction with the report produced by the Department of Education in coordination with institutions of education under the Student Right-To-Know and Campus Security Act (20 U.S.C. 1001 note; Public Law 101–542) and amendments made by that Act, an assessment of the policies and practices of educational institutions that are of greatest effectiveness in addressing campus sexual assaults and protecting victims, including policies and practices relating to the particular issues described in paragraph (5); and

(7) any recommendations the Attorney General may have for reforms to address campus sexual assaults and protect victims more effectively, and any other matters that the Attorney General deems relevant to the subject of the study and report required by this section.

(c) SUBMISSION OF REPORT.—The report required by subsection (b) shall be submitted to the Congress no later than September 1, 1996.

(d) DEFINITION.—For purposes of this section, "campus sexual assaults" includes sexual assaults occurring at institutions of postsecondary education and sexual assaults committed against or by students or employees of such institutions.

(e) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out the study required by this section—$200,000 for fiscal year 1996.

<< 42 USCA § 14013 >>

SEC. 40507. REPORT ON BATTERED WOMEN'S SYNDROME.

(a) REPORT.—Not less than 1 year after the date of enactment of this Act, the Attorney General and the Secretary of Health and Human Services shall transmit to the House Committee on Energy and Commerce, the Senate Committee on Labor and Human Resources, and the Committees on the Judiciary of the Senate and the House of Representatives a report on the medical and

psychological basis of "battered women's syndrome" and on the extent to which evidence of the syndrome has been considered in criminal trials.

(b) COMPONENTS.—The report under subsection (a) shall include—

(1) medical and psychological testimony on the validity of battered women's syndrome as a psychological condition;

(2) a compilation of State, tribal, and Federal court cases in which evidence of battered women's syndrome was offered in criminal trials; and

(3) an assessment by State, tribal, and Federal judges, prosecutors, and defense attorneys of the effects that evidence of battered women's syndrome may have in criminal trials.

<< 42 USCA § 14014 >>

SEC. 40508. REPORT ON CONFIDENTIALITY OF ADDRESSES FOR VICTIMS OF DOMESTIC VIOLENCE.

(a) REPORT.—The Attorney General shall conduct a study of the means by which abusive spouses may obtain information concerning the addresses or locations of estranged or former spouses, notwithstanding the desire of the victims to have such information withheld to avoid further exposure to abuse. Based on the study, the Attorney General shall transmit a report to Congress including—

(1) the findings of the study concerning the means by which information concerning the addresses or locations of abused spouses may be obtained by abusers; and

(2) analysis of the feasibility of creating effective means of protecting the confidentiality of information concerning the addresses and locations of abused spouses to protect such persons from exposure to further abuse while preserving access to such information for legitimate purposes.

(b) USE OF COMPONENTS.—The Attorney General may use the National Institute of Justice and the Office for Victims of Crime in carrying out this section.

<< 42 USCA § 14015 >>

SEC. 40509. REPORT ON RECORDKEEPING RELATING TO DOMESTIC VIOLENCE.

Not later than 1 year after the date of enactment of this Act, the Attorney General shall complete a study of, and shall submit to Congress a report and recommendations on, problems of recordkeeping of criminal complaints involving domestic violence. The study and report shall examine—

(1) the efforts that have been made by the Department of Justice, including the Federal Bureau of Investigation, to collect statistics on domestic violence; and

(2) the feasibility of requiring that the relationship between an offender and victim be reported in Federal records of crimes of aggravated assault, rape, and other violent crimes.

<< 42 USCA Ch. 136 >>

Subtitle F—National Stalker and Domestic Violence Reduction

SEC. 40601. AUTHORIZING ACCESS TO FEDERAL CRIMINAL INFORMATION DATABASES.

<< 28 USCA § 534 >>

(a) ACCESS AND ENTRY.—Section 534 of title 28, United States Code, is amended by adding at the end the following:

"(e)(1) Information from national crime information databases consisting of identification records, criminal history records, protection orders, and wanted person records may be disseminated to civil or criminal courts for use in domestic violence or stalking cases. Nothing in this subsection shall be construed to permit access to such records for any other purpose.

"(2) Federal and State criminal justice agencies authorized to enter information into criminal information databases may include—

"(A) arrests, convictions, and arrest warrants for stalking or domestic violence or for violations of protection orders for the protection of parties from stalking or domestic violence; and

"(B) protection orders for the protection of persons from stalking or domestic violence, provided such orders are subject to periodic verification.

"(3) As used in this subsection—

"(A) the term 'national crime information databases' means the National Crime Information Center and its incorporated criminal history databases, including the Interstate Identification Index; and

"(B) the term 'protection order' includes an injunction or any other order issued for the purpose of preventing violent or threatening acts or harassment against, or contact or communication with or physical proximity to, another person, including temporary and final orders issued by civil or criminal courts (other than support or child custody orders) whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection.".

<< 28 USCA § 534 NOTE >>

(b) RULEMAKING.—The Attorney General may make rules to carry out the subsection added to section 534 of title 28, United States Code, by subsection (a), after consultation with the officials charged with managing the National Crime Information Center and the Criminal Justice Information Services Advisory Policy Board.

<< 42 USCA § 14031 >>

SEC. 40602. GRANT PROGRAM.

(a) IN GENERAL.—The Attorney General is authorized to provide grants to States and units of local government to improve processes for entering data regarding stalking and domestic violence into local, State, and national crime information databases.

(b) ELIGIBILITY.—To be eligible to receive a grant under subsection (a), a State or unit of local government shall certify that it has or intends to establish a program that enters into the National Crime Information Center records of—

(1) warrants for the arrest of persons violating protection orders intended to protect victims from stalking or domestic violence;

(2) arrests or convictions of persons violating protection or domestic violence; and

(3) protection orders for the protection of persons from stalking or domestic violence.

<< 42 USCA § 14032 >>

SEC. 40603. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to carry out this subtitle—

(1) $1,500,000 for fiscal year 1996;

(2) $1,750,000 for fiscal year 1997; and

(3) $2,750,000 for fiscal year 1998.

<< 42 USCA § 14033 >>

SEC. 40604. APPLICATION REQUIREMENTS.

An application for a grant under this subtitle shall be submitted in such form and manner, and contain such information, as the Attorney General may prescribe. In addition, applications shall include documentation showing—

(1) the need for grant funds and that State or local funding, as the case may be, does not already cover these operations;

(2) intended use of the grant funds, including a plan of action to increase record input; and

(3) an estimate of expected results from the use of the grant funds.

<< 42 USCA § 14034 >>

SEC. 40605. DISBURSEMENT.

 Not later than 90 days after the receipt of an application under this subtitle, the Attorney General shall either provide grant funds or shall inform the applicant why grant funds are not being provided.

<< 42 USCA § 14035 >>

SEC. 40606. TECHNICAL ASSISTANCE, TRAINING, AND EVALUATIONS.

 The Attorney General may provide technical assistance and training in furtherance of the purposes of this subtitle, and may provide for the evaluation of programs that receive funds under this subtitle, in addition to any evaluation requirements that the Attorney General may prescribe for grantees. The technical assistance, training, and evaluations authorized by this section may be carried out directly by the Attorney General, or through contracts or other arrangements with other entities.

<< 42 USCA § 14036 >>

SEC. 40607. TRAINING PROGRAMS FOR JUDGES.

 The State Justice Institute, after consultation with nationally recognized nonprofit organizations with expertise in stalking and domestic violence cases, shall conduct training programs for State (as defined in section 202 of the State Justice Institute Authorization Act of 1984 (42 U.S.C. 10701)) and Indian tribal judges to ensure that a judge issuing an order in a stalking or domestic violence case has all available criminal history and other information, whether from State or Federal sources.

<< 42 USCA § 14037 >>

SEC. 40608. RECOMMENDATIONS ON INTRASTATE COMMUNICATION.

 The State Justice Institute, after consultation with nationally recognized nonprofit associations with expertise in data sharing among criminal justice agencies and familiarity with the issues raised in stalking and domestic violence cases, shall recommend proposals regarding how State courts may increase intrastate communication between civil and criminal courts.

<< 42 USCA § 14038 >>

SEC. 40609. INCLUSION IN NATIONAL INCIDENT–BASED REPORTING SYSTEM.

 Not later than 2 years after the date of enactment of this Act, the Attorney General, in accordance with the States, shall compile data regarding domestic violence and intimidation (including stalking) as part of the National Incident-Based Reporting System (NIBRS).

<< 42 USCA § 14039 >>

SEC. 40610. REPORT TO CONGRESS.

 The Attorney General shall submit to the Congress an annual report, beginning one year after the date of the enactment of this Act, that provides information concerning the incidence of stalking and domestic violence, and evaluates the effectiveness of State antistalking efforts and legislation.

<< 42 USCA § 14040 >>

SEC. 40611. DEFINITIONS.

 As used in this subtitle—

 (1) the term "national crime information databases" refers to the National Crime Information Center and its incorporated criminal history databases, including the Interstate Identification Index; and

(2) the term "protection order" includes an injunction or any other order issued for the purpose of preventing violent or threatening acts or harassment against, or contact or communication with or physical proximity to, another person, including temporary and final orders issued by civil or criminal courts (other than support or child custody orders) whether obtained by filing an independent action or as a pendente lite order in another proceeding so long as any civil order was issued in response to a complaint, petition, or motion filed by or on behalf of a person seeking protection.

Subtitle G—Protections for Battered Immigrant Women and Children

SEC. 40701. ALIEN PETITIONING RIGHTS FOR IMMEDIATE RELATIVE OR SECOND PREFERENCE STATUS.

<< 8 USCA § 1154 >>

(a) IN GENERAL.—Section 204(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)) is amended—

(1) in subparagraph (A)—

(A) by inserting "(i)" after "(A)",

(B) by redesignating the second sentence as clause (ii), and

(C) by adding at the end the following new clauses:

"(iii) An alien who is the spouse of a citizen of the United States, who is a person of good moral character, who is eligible to be classified as an immediate relative under section 201(b)(2)(A)(i), and who has resided in the United States with the alien's spouse may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien if such a child has not been classified under clause (iv)) under such section if the alien demonstrates to the Attorney General that—

"(I) the alien is residing in the United States, the marriage between the alien and the spouse was entered into in good faith by the alien, and during the marriage the alien or a child of the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's spouse; and

"(II) the alien is a person whose deportation, in the opinion of the Attorney General, would result in extreme hardship to the alien or a child of the alien.

"(iv) An alien who is the child of a citizen of the United States, who is a person of good moral character, who is eligible to be classified as an immediate relative under section 201(b)(2)(A)(i), and who has resided in the United States with the citizen parent may file a petition with the Attorney General under this subparagraph for classification of the alien under such section if the alien demonstrates to the Attorney General that—

"(I) the alien is residing in the United States and during the period of residence with the citizen parent the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's citizen parent; and

"(II) the alien is a person whose deportation, in the opinion of the Attorney General, would result in extreme hardship to the alien.";

(2) in subparagraph (B)—

(A) by inserting "(i)" after "(B)"; and

(B) by adding at the end the following new clauses:

"(ii) An alien who is the spouse of an alien lawfully admitted for permanent residence, who is a person of good moral character, who is eligible for classification under section 203(a)(2)(A), and who has resided in the United States with the alien's legal permanent resident spouse may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien if such a child has not been classified under clause (iii)) under such section if the alien demonstrates to the Attorney General that the conditions described in subclauses (I) and (II) of subparagraph (A)(iii) are met with respect to the alien.

"(iii) An alien who is the child of an alien lawfully admitted for permanent residence, who is a person of good moral character, who is eligible for classification under section 203(a)(2)(A), and who has resided in the United States with the alien's permanent resident alien parent may file a petition with the Attorney General under this subparagraph for classification of the alien under such section if the alien demonstrates to the Attorney General that—

"(I) the alien is residing in the United States and during the period of residence with the permanent resident parent the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's permanent resident parent; and

"(II) the alien is a person whose deportation, in the opinion of the Attorney General, would result in extreme hardship to the alien."; and

(3) by adding at the end the following new subparagraph:

"(H) In acting on petitions filed under clause (iii) or (iv) of subparagraph (A) or clause (ii) or (iii) of subparagraph (B), the Attorney General shall consider any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.".

(b) CONFORMING AMENDMENTS.—(1) Section 204(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(2)) is amended—

(A) in subparagraph (A) by striking "filed by an alien who," and inserting "for the classification of the spouse of an alien if the alien,"; and

(B) in subparagraph (B) by striking "by an alien whose prior marriage" and inserting "for the classification of the spouse of an alien if the prior marriage of the alien".

(2) Section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) is amended by striking "204(a)(1)(A)" and inserting "204(a)(1)(A)(ii)".

(c) SURVIVAL RIGHTS TO PETITION.—Section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) is amended by adding at the end the following new subsection:

"(h) The legal termination of a marriage may not be the sole basis for revocation under section 205 of a petition filed under subsection (a)(1)(A)(iii) or a petition filed under subsection (a)(1)(B)(ii) pursuant to conditions described in subsection (a)(1)(A)(iii)(I).".

<< 8 USCA § 1151 NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect January 1, 1995.

SEC. 40702. USE OF CREDIBLE EVIDENCE IN SPOUSAL WAIVER APPLICATIONS.

<< 8 USCA § 1186a >>

(a) IN GENERAL.—Section 216(c)(4) of the Immigration and Nationality Act (8 U.S.C. 1186a(c)(4)) is amended by inserting after the second sentence the following: "In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.".

<< 8 USCA § 1186a NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of enactment of this Act and shall apply to applications made before, on, or after such date.

<< 8 USCA § 1254 >>

SEC. 40703. SUSPENSION OF DEPORTATION.

(a) BATTERED SPOUSE OR CHILD.—Section 244(a) of the Immigration and Nationality Act (8 U.S.C. 1254(a)) is amended—

(1) by striking "or" at the end of paragraph (1);

(2) by striking the period at the end of paragraph (2) and inserting "; or"; and

(3) by inserting after paragraph (2) the following:

"(3) is deportable under any law of the United States except section 241(a)(1)(G) and the provisions specified in paragraph (2); has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application; has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent

resident parent); and proves that during all of such time in the United States the alien was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or the alien's parent or child.".

(b) CONSIDERATION OF EVIDENCE.—Section 244 of the Immigration and Nationality Act (8 U.S.C. 1254) is amended by adding at the end the following new subsection:

"(g) In acting on applications under subsection (a)(3), the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.".

<div style="text-align:center">

TITLE V—DRUG COURTS

</div>

SEC. 50001. DRUG COURTS.

(a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 40231(a), is amended—

<div style="text-align:center">

<< 42 USCA Ch. 46 >>

</div>

(1) by redesignating part V as part W;

<div style="text-align:center">

<< 42 USCA § 3797 >>

</div>

(2) by redesignating section 2201 as section 2301; and
(3) by inserting after part U the following new part:

<div style="text-align:center">

<< 42 USCA § Ch. 46 >>

"PART V—DRUG COURTS

<< 42 USCA § 3796ii >>

</div>

"SEC. 2201. GRANT AUTHORITY.

"The Attorney General may make grants to States, State courts, local courts, units of local government, and Indian tribal governments, acting directly or through agreements with other public or private entities, for programs that involve—

"(1) continuing judicial supervision over offenders with substance abuse problems who are not violent offenders; and
"(2) the integrated administration of other sanctions and services, which shall include—

"(A) mandatory periodic testing for the use of controlled substances or other addictive substances during any period of supervised release or probation for each participant;

"(B) substance abuse treatment for each participant;

"(C) diversion, probation, or other supervised release involving the possibility of prosecution, confinement, or incarceration based on noncompliance with program requirements or failure to show satisfactory progress; and

"(D) programmatic, offender management, and aftercare services such as relapse prevention, health care, education, vocational training, job placement, housing placement, and child care or other family support services for each participant who requires such services.

<div style="text-align:center">

<< 42 USCA § 3796ii–1 >>

</div>

"SEC. 2202. PROHIBITION OF PARTICIPATION BY VIOLENT OFFENDERS.

"The Attorney General shall—

"(1) issue regulations and guidelines to ensure that the programs authorized in this part do not permit participation by violent offenders; and

"(2) immediately suspend funding for any grant under this part, pending compliance, if the Attorney General finds that violent offenders are participating in any program funded under this part.

<< 42 USCA § 3796ii–2 >>

"SEC. 2203. DEFINITION.

"In this part, 'violent offender' means a person who—
  "(1) is charged with or convicted of an offense, during the course of which offense or conduct—
    "(A) the person carried, possessed, or used a firearm or dangerous weapon;
    "(B) there occurred the death of or serious bodily injury to any person; or
    "(C) there occurred the use of force against the person of another,

without regard to whether any of the circumstances described in subparagraph (A), (B), or (C) is an element of the offense or conduct of which or for which the person is charged or convicted; or
  "(2) has one or more prior convictions for a felony crime of violence involving the use or attempted use of force against a person with the intent to cause death or serious bodily harm.

<< 42 USCA § 3796ii–3 >>

"SEC. 2204. ADMINISTRATION.

  "(a) CONSULTATION.—The Attorney General shall consult with the Secretary of Health and Human Services and any other appropriate officials in carrying out this part.
  "(b) USE OF COMPONENTS.—The Attorney General may utilize any component or components of the Department of Justice in carrying out this part.
  "(c) REGULATORY AUTHORITY.—The Attorney General may issue regulations and guidelines necessary to carry out this part.
  "(d) APPLICATIONS.—In addition to any other requirements that may be specified by the Attorney General, an application for a grant under this part shall—
  "(1) include a long-term strategy and detailed implementation plan;
  "(2) explain the applicant's inability to fund the program adequately without Federal assistance;
  "(3) certify that the Federal support provided will be used to supplement, and not supplant, State, Indian tribal, and local sources of funding that would otherwise be available;
  "(4) identify related governmental or community initiatives which complement or will be coordinated with the proposal;
  "(5) certify that there has been appropriate consultation with all affected agencies and that there will be appropriate coordination with all affected agencies in the implementation of the program;
  "(6) certify that participating offenders will be supervised by one or more designated judges with responsibility for the drug court program;
  "(7) specify plans for obtaining necessary support and continuing the proposed program following the conclusion of Federal support; and
  "(8) describe the methodology that will be used in evaluating the program.

<< 42 USCA § 3796ii–4 >>

"SEC. 2205. APPLICATIONS.

  "To request funds under this part, the chief executive or the chief justice of a State or the chief executive or chief judge of a unit of local government or Indian tribal government shall submit an application to the Attorney General in such form and containing such information as the Attorney General may reasonably require.

<< 42 USCA § 3796ii–5 >>

"SEC. 2206. FEDERAL SHARE.

"The Federal share of a grant made under this part may not exceed 75 percent of the total costs of the program described in the application submitted under section 2205 for the fiscal year for which the program receives assistance under this part, unless the Attorney General waives, wholly or in part, the requirement of a matching contribution under this section. In-kind contributions may constitute a portion of the non-Federal share of a grant.

<< 42 USCA § 3796ii–6 >>

"SEC. 2207. GEOGRAPHIC DISTRIBUTION.

"The Attorney General shall ensure that, to the extent practicable, an equitable geographic distribution of grant awards is made.

<< 42 USCA § 3796ii–7 >>

"SEC. 2208. REPORT.

"A State, Indian tribal government, or unit of local government that receives funds under this part during a fiscal year shall submit to the Attorney General a report in March of the following year regarding the effectiveness of this part.

<< 42 USCA § 3796ii–8 >>

"SEC. 2209. TECHNICAL ASSISTANCE, TRAINING, AND EVALUATION.

"(a) TECHNICAL ASSISTANCE AND TRAINING.—The Attorney General may provide technical assistance and training in furtherance of the purposes of this part.

"(b) EVALUATIONS.—In addition to any evaluation requirements that may be prescribed for grantees, the Attorney General may carry out or make arrangements for evaluations of programs that receive support under this part.

"(c) ADMINISTRATION.—The technical assistance, training, and evaluations authorized by this section may be carried out directly by the Attorney General, in collaboration with the Secretary of Health and Human Services, or through grants, contracts, or other cooperative arrangements with other entities.".

(b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 40231(b), is amended by striking the matter relating to part V and inserting the following:

"Part V—Drug Courts

"Sec. 2201. Grant authority.
"Sec. 2202. Prohibition of participation by violent offenders.
"Sec. 2203. Definition.
"Sec. 2204. Administration.
"Sec. 2205. Applications.
"Sec. 2206. Federal share.
"Sec. 2207. Geographic distribution.
"Sec. 2208. Report.
"Sec. 2209. Technical assistance, training, and evaluation.

"Part W—Transition-Effective Date-Repealer

"Sec. 2301. Continuation of rules, authorities, and proceedings.".

<< 42 USCA § 3793 >>

(c) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793), as amended by section 40231(c), is amended—

 (1) in paragraph (3) by striking "and U" and inserting "U, and V"; and

 (2) by adding at the end the following new paragraph:

"(20) There are authorized to be appropriated to carry out part V—

 "(A) $100,000,000 for fiscal year 1995;

 "(B) $150,000,000 for fiscal year 1996;

 "(C) $150,000,000 for fiscal year 1997;

 "(D) $200,000,000 for fiscal year 1998;

 "(E) $200,000,000 for fiscal year 1999; and

 "(F) $200,000,000 for fiscal year 2000.".

<< 42 USCA § 3796ii NOTE >>

SEC. 50002. STUDY BY THE GENERAL ACCOUNTING OFFICE.

 (a) IN GENERAL.—The Comptroller General of the United States shall study and assess the effectiveness and impact of grants authorized by part V of title I of the Omnibus Crime Control and Safe Streets Act of 1968 as added by section 50001(a) and report to Congress the results of the study on or before January 1, 1997.

 (b) DOCUMENTS AND INFORMATION.—The Attorney General and grant recipients shall provide the Comptroller General with all relevant documents and information that the Comptroller General deems necessary to conduct the study under subsection (a), including the identities and criminal records of program participants.

 (c) CRITERIA.—In assessing the effectiveness of the grants made under programs authorized by part V of the Omnibus Crime Control and Safe Streets Act of 1968, the Comptroller General shall consider, among other things—

 (1) recidivism rates of program participants;

 (2) completion rates among program participants;

 (3) drug use by program participants; and

 (4) the costs of the program to the criminal justice system.

<< 18 USCA § 3591 NOTE >>

TITLE VI—DEATH PENALTY

SEC. 60001. SHORT TITLE.

 This title may be cited as the "Federal Death Penalty Act of 1994".

SEC. 60002. CONSTITUTIONAL PROCEDURES FOR THE IMPOSITION OF THE SENTENCE OF DEATH.

 (a) IN GENERAL.—Part II of title 18, United States Code, is amended by inserting after chapter 227 the following new chapter:

<< 18 USCA Ch. 228 >>

"CHAPTER 228—DEATH SENTENCE

"Sec.

"3591. Sentence of death.

"3592. Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified.

"3593. Special hearing to determine whether a sentence of death is justified.

"3594. Imposition of a sentence of death.

"3595. Review of a sentence of death.

"3596. Implementation of a sentence of death.

"3597. Use of State facilities.

"3598. Special provisions for Indian country.

<< 18 USCA § 3591 >>

"§ 3591. Sentence of death

"(a) A defendant who has been found guilty of—

"(1) an offense described in section 794 or section 2381; or

"(2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the hearing under section 3593—

"(A) intentionally killed the victim;

"(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

"(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

"(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.

"(b) A defendant who has been found guilty of—

"(1) an offense referred to in section 408(c)(1) of the Controlled Substances Act (21 U.S.C. 848(c)(1)), committed as part of a continuing criminal enterprise offense under the conditions described in subsection (b) of that section which involved not less than twice the quantity of controlled substance described in subsection (b)(2)(A) or twice the gross receipts described in subsection (b)(2)(B); or

"(2) an offense referred to in section 408(c)(1) of the Controlled Substances Act (21 U.S.C. 848(c)(1)), committed as part of a continuing criminal enterprise offense under that section, where the defendant is a principal administrator, organizer, or leader of such an enterprise, and the defendant, in order to obstruct the investigation or prosecution of the enterprise or an offense involved in the enterprise, attempts to kill or knowingly directs, advises, authorizes, or assists another to attempt to kill any public officer, juror, witness, or members of the family or household of such a person,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.

<< 18 USCA § 3592 >>

"§ 3592. Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified

"(a) MITIGATING FACTORS.—In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

"(1) IMPAIRED CAPACITY.—The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

"(2) DURESS.—The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

"(3) MINOR PARTICIPATION.—The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

AR.01984

137

"(4) EQUALLY CULPABLE DEFENDANTS.—Another defendant or defendants, equally culpable in the crime, will not be punished by death.

"(5) NO PRIOR CRIMINAL RECORD.—The defendant did not have a significant prior history of other criminal conduct.

"(6) DISTURBANCE.—The defendant committed the offense under severe mental or emotional disturbance.

"(7) VICTIM'S CONSENT.—The victim consented to the criminal conduct that resulted in the victim's death.

"(8) OTHER FACTORS.—Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

"(b) AGGRAVATING FACTORS FOR ESPIONAGE AND TREASON.—In determining whether a sentence of death is justified for an offense described in section 3591(a)(1), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

"(1) PRIOR ESPIONAGE OR TREASON OFFENSE.—The defendant has previously been convicted of another offense involving espionage or treason for which a sentence of either life imprisonment or death was authorized by law.

"(2) GRAVE RISK TO NATIONAL SECURITY.—In the commission of the offense the defendant knowingly created a grave risk of substantial danger to the national security.

"(3) GRAVE RISK OF DEATH.—In the commission of the offense the defendant knowingly created a grave risk of death to another person.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

"(c) AGGRAVATING FACTORS FOR HOMICIDE.—In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

"(1) DEATH DURING COMMISSION OF ANOTHER CRIME.—The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under section 32 (destruction of aircraft or aircraft facilities), section 33 (destruction of motor vehicles or motor vehicle facilities), section 36 (violence at international airports), section 351 (violence against Members of Congress, Cabinet officers, or Supreme Court Justices), an offense under section 751 (prisoners in custody of institution or officer), section 794 (gathering or delivering defense information to aid foreign government), section 844(d) (transportation of explosives in interstate commerce for certain purposes), section 844(f) (destruction of Government property by explosives), section 1118 (prisoners serving life term), section 1201 (kidnaping), section 844(i) (destruction of property affecting interstate commerce by explosives), section 1116 (killing or attempted killing of diplomats), section 1203 (hostage taking), section 1992 (wrecking trains), section 2280 (maritime violence), section 2281 (maritime platform violence), section 2332 (terrorist acts abroad against United States nationals), section 2339 (use of weapons of mass destruction), or section 2381 (treason) of this title, or section 46502 of title 49, United States Code (aircraft piracy).

"(2) PREVIOUS CONVICTION OF VIOLENT FELONY INVOLVING FIREARM.—For any offense, other than an offense for which a sentence of death is sought on the basis of section 924(c), the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.

"(3) PREVIOUS CONVICTION OF OFFENSE FOR WHICH A SENTENCE OF DEATH OR LIFE IMPRISONMENT WAS AUTHORIZED.—The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.

"(4) PREVIOUS CONVICTION OF OTHER SERIOUS OFFENSES.—The defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.

"(5) GRAVE RISK OF DEATH TO ADDITIONAL PERSONS.—The defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense.

"(6) HEINOUS, CRUEL, OR DEPRAVED MANNER OF COMMITTING OFFENSE.—The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.

"(7) PROCUREMENT OF OFFENSE BY PAYMENT.—The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

"(8) PECUNIARY GAIN.—The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

"(9) SUBSTANTIAL PLANNING AND PREMEDITATION.—The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

"(10) CONVICTION FOR TWO FELONY DRUG OFFENSES.—The defendant has previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

"(11) VULNERABILITY OF VICTIM.—The victim was particularly vulnerable due to old age, youth, or infirmity.

"(12) CONVICTION FOR SERIOUS FEDERAL DRUG OFFENSES.—The defendant had previously been convicted of violating title II or III of the Controlled Substances Act for which a sentence of 5 or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

"(13) CONTINUING CRIMINAL ENTERPRISE INVOLVING DRUG SALES TO MINORS.—The defendant committed the offense in the course of engaging in a continuing criminal enterprise in violation of section 408(c) of the Controlled Substances Act (21 U.S.C. 848(c)), and that violation involved the distribution of drugs to persons under the age of 21 in violation of section 418 of that Act (21 U.S.C. 859).

"(14) HIGH PUBLIC OFFICIALS.—The defendant committed the offense against—

"(A) the President of the United States, the President-elect, the Vice President, the Vice President-elect, the Vice President-designate, or, if there is no Vice President, the officer next in order of succession to the office of the President of the United States, or any person who is acting as President under the Constitution and laws of the United States;

"(B) a chief of state, head of government, or the political equivalent, of a foreign nation;

"(C) a foreign official listed in section 1116(b)(3)(A), if the official is in the United States on official business; or

"(D) a Federal public servant who is a judge, a law enforcement officer, or an employee of a United States penal or correctional institution—

"(i) while he or she is engaged in the performance of his or her official duties;

"(ii) because of the performance of his or her official duties; or

"(iii) because of his or her status as a public servant.

For purposes of this subparagraph, a 'law enforcement officer' is a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, or prosecution or adjudication of an offense, and includes those engaged in corrections, parole, or probation functions.

"(15) PRIOR CONVICTION OF SEXUAL ASSAULT OR CHILD MOLESTATION.—In the case of an offense under chapter 109A (sexual abuse) or chapter 110 (sexual abuse of children), the defendant has previously been convicted of a crime of sexual assault or crime of child molestation.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

"(d) AGGRAVATING FACTORS FOR DRUG OFFENSE DEATH PENALTY.—In determining whether a sentence of death is justified for an offense described in section 3591(b), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

"(1) PREVIOUS CONVICTION OF OFFENSE FOR WHICH A SENTENCE OF DEATH OR LIFE IMPRISONMENT WAS AUTHORIZED.—The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute.

"(2) PREVIOUS CONVICTION OF OTHER SERIOUS OFFENSES.—The defendant has previously been convicted of two or more Federal or State offenses, each punishable by a term of imprisonment of more than one year, committed on different occasions, involving the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) or the infliction of, or attempted infliction of, serious bodily injury or death upon another person.

"(3) PREVIOUS SERIOUS DRUG FELONY CONVICTION.—The defendant has previously been convicted of another Federal or State offense involving the manufacture, distribution, importation, or possession of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which a sentence of five or more years of imprisonment was authorized by statute.

"(4) USE OF FIREARM.—In committing the offense, or in furtherance of a continuing criminal enterprise of which the offense was a part, the defendant used a firearm or knowingly directed, advised, authorized, or assisted another to use a firearm to threaten, intimidate, assault, or injure a person.

"(5) DISTRIBUTION TO PERSONS UNDER 21.—The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 418 of the Controlled Substances Act (21 U.S.C. 859) which was committed directly by the defendant.

"(6) DISTRIBUTION NEAR SCHOOLS.—The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 419 of the Controlled Substances Act (21 U.S.C. 860) which was committed directly by the defendant.

"(7) USING MINORS IN TRAFFICKING.—The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 420 of the Controlled Substances Act (21 U.S.C. 861) which was committed directly by the defendant.

"(8) LETHAL ADULTERANT.—The offense involved the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), mixed with a potentially lethal adulterant, and the defendant was aware of the presence of the adulterant.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

<< 18 USCA § 3593 >>

"§ 3593. Special hearing to determine whether a sentence of death is justified

"(a) NOTICE BY THE GOVERNMENT.—If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—

"(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

"(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

"(b) HEARING BEFORE A COURT OR JURY.—If the attorney for the government has filed a notice as required under subsection (a) and the defendant is found guilty of or pleads guilty to an offense described in section 3591, the judge who presided at the trial or before whom the guilty plea was entered, or another judge if that judge is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—

"(1) before the jury that determined the defendant's guilt;

"(2) before a jury impaneled for the purpose of the hearing if—

"(A) the defendant was convicted upon a plea of guilty;

"(B) the defendant was convicted after a trial before the court sitting without a jury;

"(C) the jury that determined the defendant's guilt was discharged for good cause; or

"(D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary; or

"(3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government.

A jury impaneled pursuant to paragraph (2) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with the approval of the court, that it shall consist of a lesser number.

  "(c) PROOF OF MITIGATING AND AGGRAVATING FACTORS.—Notwithstanding rule 32(c) of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads guilty to an offense under section 3591, no presentence report shall be prepared. At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death. The government shall open the argument. The defendant shall be permitted to reply. The government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

  "(d) RETURN OF SPECIAL FINDINGS.—The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law.

  "(e) RETURN OF A FINDING CONCERNING A SENTENCE OF DEATH.—If, in the case of—

  "(1) an offense described in section 3591(a)(1), an aggravating factor required to be considered under section 3592(b) is found to exist;

  "(2) an offense described in section 3591(a)(2), an aggravating factor required to be considered under section 3592(c) is found to exist; or

  "(3) an offense described in section 3591(b), an aggravating factor required to be considered under section 3592(d) is found to exist,

the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

  "(f) SPECIAL PRECAUTION TO ENSURE AGAINST DISCRIMINATION.—In a hearing held before a jury, the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 3594 >>

"§ 3594. Imposition of a sentence of death

  "Upon a recommendation under section 3593(e) that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly. Otherwise, the court shall impose any lesser sentence that is authorized by law. Notwithstanding any other law, if the maximum term of imprisonment for the offense is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release.

<< 18 USCA § 3595 >>

"§ 3595. Review of a sentence of death

  "(a) APPEAL.—In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal. An appeal under this section may be consolidated with an appeal of the judgment of conviction and shall have priority over all other cases.
  "(b) REVIEW.—The court of appeals shall review the entire record in the case, including—
    "(1) the evidence submitted during the trial;
    "(2) the information submitted during the sentencing hearing;
    "(3) the procedures employed in the sentencing hearing; and
    "(4) the special findings returned under section 3593(d).
  "(c) DECISION AND DISPOSITION.—
    "(1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592.
    "(2) Whenever the court of appeals finds that—
      "(A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
      "(B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or
      "(C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure,

the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.
    "(3) The court of appeals shall state in writing the reasons for its disposition of an appeal of a sentence of death under this section.

<< 18 USCA § 3596 >>

"§ 3596. Implementation of a sentence of death

  "(a) IN GENERAL.—A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall

designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

"(b) PREGNANT WOMAN.—A sentence of death shall not be carried out upon a woman while she is pregnant.

"(c) MENTAL CAPACITY.—A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

<< 18 USCA § 3597 >>

"§ 3597. Use of State facilities

"(a) IN GENERAL.—A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General.

"(b) EXCUSE OF AN EMPLOYEE ON MORAL OR RELIGIOUS GROUNDS.—No employee of any State department of corrections, the United States Department of Justice, the Federal Bureau of Prisons, or the United States Marshals Service, and no employee providing services to that department, bureau, or service under contract shall be required, as a condition of that employment or contractual obligation, to be in attendance at or to participate in any prosecution or execution under this section if such participation is contrary to the moral or religious convictions of the employee. In this subsection, 'participation in executions' includes personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities.

<< 18 USCA § 3598 >>

"§ 3598. Special provisions for Indian country

"Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.".

<< 18 USCA Ch. 227 >>

(b) TECHNICAL AMENDMENT.—The part analysis for part II of title 18, United States Code, is amended by inserting after the item relating to chapter 227 the following new item:

"228.     Death sentence.................................................................................................................................................3591".

SEC. 60003. SPECIFIC OFFENSES FOR WHICH DEATH PENALTY IS AUTHORIZED.

(a) CONFORMING CHANGES IN TITLE 18.—Title 18, United States Code, is amended as follows:

<< 18 USCA § 34 >>

(1) AIRCRAFT AND MOTOR VEHICLES.—Section 34 of title 18, United States Code, is amended by striking the comma after "imprisonment for life", inserting a period, and striking the remainder of the section.

<< 18 USCA § 794 >>

(2) ESPIONAGE.—Section 794(a) of title 18, United States Code, is amended by striking the period at the end of the section and inserting ", except that the sentence of death shall not be imposed unless the jury or, if there is no jury, the court, further finds that the offense resulted in the identification by a foreign power (as defined in section 101(a) of the Foreign Intelligence Surveillance Act of 1978) of an individual acting as an agent of the United States and consequently in the death of that

individual, or directly concerned nuclear weaponry, military spacecraft or satellites, early warning systems, or other means of defense or retaliation against large-scale attack; war plans; communications intelligence or cryptographic information; or any other major weapons system or major element of defense strategy.".

<< 18 USCA § 844 >>

(3) EXPLOSIVE MATERIALS.—(A) Section 844(d) of title 18, United States Code, is amended by striking "as provided in section 34 of this title".

(B) Section 844(f) of title 18, United States Code, is amended by striking "as provided in section 34 of this title".

(C) Section 844(i) of title 18, United States Code, is amended by striking "as provided in section 34 of this title".

<< 18 USCA § 1111 >>

(4) MURDER.—The second undesignated paragraph of section 1111(b) of title 18, United States Code, is amended to read as follows:

"Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;".

<< 18 USCA § 1116 >>

(5) KILLING OF FOREIGN OFFICIAL.—Section 1116(a) of title 18, United States Code, is amended by striking "any such person who is found guilty of murder in the first degree shall be sentenced to imprisonment for life, and"

<< 18 USCA § 1201 >>

(6) KIDNAPPING.—Section 1201(a) of title 18, United States Code, is amended by inserting after "or for life" the following: "and, if the death of any person results, shall be punished by death or life imprisonment".

<< 18 USCA § 1716 >>

(7) NONMAILABLE INJURIOUS ARTICLES.—The last paragraph of section 1716 of title 18, United States Code, is amended by striking the comma after "imprisonment for life" and inserting a period and striking the remainder of the paragraph.

<< 18 USCA § 1992 >>

(8) WRECKING TRAINS.—The second to the last undesignated paragraph of section 1992 of title 18, United States Code, is amended by striking the comma after "imprisonment for life", inserting a period, and striking the remainder of the section.

<< 18 USCA § 2113 >>

(9) BANK ROBBERY.—Section 2113(e) of title 18, United States Code, is amended by striking "or punished by death if the verdict of the jury shall so direct" and inserting "or if death results shall be punished by death or life imprisonment".

<< 18 USCA § 1203 >>

(10) HOSTAGE TAKING.—Section 1203(a) of title 18, United States Code, is amended by inserting after "or for life" the following: "and, if the death of any person results, shall be punished by death or life imprisonment".

<< 18 USCA § 1958 >>

(11) MURDER FOR HIRE.—Section 1958 of title 18, United States Code, is amended by striking "and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both" and inserting "and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both".

<< 18 USCA § 1959 >>

(12) RACKETEERING.—Section 1959(a)(1) of title 18, United States Code, is amended to read as follows:

"(1) for murder, by death or life imprisonment, or a fine of not more than $250,000, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine of not more than $250,000, or both;".

<< 18 USCA § 1091 >>

(13) GENOCIDE.—Section 1091(b)(1) of title 18, United States Code, is amended by striking "a fine of not more than $1,000,000 or imprisonment for life," and inserting ", where death results, by death or imprisonment for life and a fine of not more than $1,000,000, or both;".

<< 18 USCA § 2119 >>

(14) CARJACKING.—Section 2119(3) of title 18, United States Code, is amended by striking the period after "both" and inserting ", or sentenced to death."; and by striking ", possessing a firearm as defined in section 921 of this title," and inserting ", with the intent to cause death or serious bodily harm".

(b) CONFORMING AMENDMENT TO FEDERAL AVIATION ACT OF 1954.—Chapter 465 of title 49, United States Code, is amended—

<< 49 USCA Ch. 465 >>

(1) in the chapter analysis by striking "Death penalty sentencing procedure for aircraft piracy" and inserting "Repealed"; and

<< 49 USCA § 46503 >>

(2) by striking section 46503.

<< 18 USCA §§ 3591 NOTE, 3592 nt, 3593 nt, 3594 nt, 3595 nt, 3596 nt, 3597 nt, 3598 nt >>

SEC. 60004. APPLICABILITY TO UNIFORM CODE OF MILITARY JUSTICE.

Chapter 228 of title 18, United States Code, as added by this title, shall not apply to prosecutions under the Uniform Code of Military Justice (10 U.S.C. 801).

SEC. 60005. DEATH PENALTY FOR MURDER BY A FEDERAL PRISONER.

<< 18 USCA § 1118 >>

(a) IN GENERAL.—Chapter 51 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 1118. Murder by a Federal prisoner

"(a) OFFENSE.—A person who, while confined in a Federal correctional institution under a sentence for a term of life imprisonment, commits the murder of another shall be punished by death or by life imprisonment.

"(b) DEFINITIONS.—In this section—

"'Federal correctional institution' means any Federal prison, Federal correctional facility, Federal community program center, or Federal halfway house.

"'murder' means a first degree or second degree murder (as defined in section 1111).

"'term of life imprisonment' means a sentence for the term of natural life, a sentence commuted to natural life, an indeterminate term of a minimum of at least fifteen years and a maximum of life, or an unexecuted sentence of death.".

<< 18 USCA Ch. 51 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 51 of title 18, United States Code, is amended by adding at the end the following new item:

"1118. Murder by a Federal prisoner.".

SEC. 60006. DEATH PENALTY FOR CIVIL RIGHTS MURDERS.

<< 18 USCA § 241 >>

 (a) CONSPIRACY AGAINST RIGHTS.—Section 241 of title 18, United States Code, is amended by striking the period at the end of the last sentence and inserting ", or may be sentenced to death.".

<< 18 USCA § 242 >>

 (b) DEPRIVATION OF RIGHTS UNDER COLOR OF LAW.—Section 242 of title 18, United States Code, is amended by striking the period at the end of the last sentence and inserting ", or may be sentenced to death.".

<< 18 USCA § 245 >>

 (c) FEDERALLY PROTECTED ACTIVITIES.—Section 245(b) of title 18, United States Code, is amended in the matter following paragraph (5) by inserting ", or may be sentenced to death" after "or for life".

<< 18 USCA § 247 >>

 (d) DAMAGE TO RELIGIOUS PROPERTY; OBSTRUCTION OF THE FREE EXERCISE OF RELIGIOUS RIGHTS.—Section 247(c)(1) of title 18, United States Code, is amended by inserting ", or may be sentenced to death" after "or both".

<< 18 USCA § 1114 >>

SEC. 60007. DEATH PENALTY FOR THE MURDER OF FEDERAL LAW ENFORCEMENT OFFICIALS.

 Section 1114 of title 18, United States Code, is amended by striking "punished as provided under sections 1111 and 1112 of this title," and inserting "punished, in the case of murder, as provided under section 1111, or, in the case of manslaughter, as provided under section 1112.".

SEC. 60008. NEW OFFENSE FOR THE INDISCRIMINATE USE OF WEAPONS TO FURTHER DRUG CONSPIRACIES.

<< 18 USCA § 36 NOTE >>

 (a) SHORT TITLE.—This section may be cited as the "Drive-By Shooting Prevention Act of 1994".

<< 18 USCA § 36 >>

 (b) IN GENERAL.—Chapter 2 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 36. Drive-by shooting

 "(a) DEFINITION.—In this section, 'major drug offense' means—
  "(1) a continuing criminal enterprise punishable under section 403(c) of the Controlled Substances Act (21 U.S.C. 848(c));
  "(2) a conspiracy to distribute controlled substances punishable under section 406 of the Controlled Substances Act (21 U.S.C. 846) section 1013 of the Controlled Substances Import and Export Control Act (21 U.S.C. 963); or
  "(3) an offense involving major quantities of drugs and punishable under section 401(b)(1)(A) of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A)) or section 1010(b)(1) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)(1)).
 "(b) OFFENSE AND PENALTIES.—(1) A person who, in furtherance or to escape detection of a major drug offense and with the intent to intimidate, harass, injure, or maim, fires a weapon into a group of two or more persons and who, in the course of such conduct, causes grave risk to any human life shall be punished by a term of no more than 25 years, by fine under this title, or both.

"(2) A person who, in furtherance or to escape detection of a major drug offense and with the intent to intimidate, harass, injure, or maim, fires a weapon into a group of 2 or more persons and who, in the course of such conduct, kills any person shall, if the killing—

  "(A) is a first degree murder (as defined in section 1111(a)), be punished by death or imprisonment for any term of years or for life, fined under this title, or both; or

  "(B) is a murder other than a first degree murder (as defined in section 1111(a)), be fined under this title, imprisoned for any term of years or for life, or both.".

<< 18 USCA Ch. 2 >>

 (c) TECHNICAL AMENDMENT.—The chapter analysis for chapter 2 of title 18, United States Code, is amended by adding at the end the following new item:
 "36. Drive-by shooting.".

## SEC. 60009. FOREIGN MURDER OF UNITED STATES NATIONALS.

<< 18 USCA § 1119 >>

 (a) IN GENERAL.—Chapter 51 of title 18, United States Code, as amended by section 60005(a), is amended by adding at the end the following new section:

"§ 1119. Foreign murder of United States nationals

 "(a) DEFINITION.—In this section, 'national of the United States' has the meaning stated in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).
 "(b) OFFENSE.—A person who, being a national of the United States, kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113.
 "(c) LIMITATIONS ON PROSECUTION.—(1) No prosecution may be instituted against any person under this section except upon the written approval of the Attorney General, the Deputy Attorney General, or an Assistant Attorney General, which function of approving prosecutions may not be delegated. No prosecution shall be approved if prosecution has been previously undertaken by a foreign country for the same conduct.
 "(2) No prosecution shall be approved under this section unless the Attorney General, in consultation with the Secretary of State, determines that the conduct took place in a country in which the person is no longer present, and the country lacks the ability to lawfully secure the person's return. A determination by the Attorney General under this paragraph is not subject to judicial review.".

<< 18 USCA § 1117 >>

 (b) TECHNICAL AMENDMENTS.—(1) Section 1117 of title 18, United States Code, is amended by striking "or 1116" and inserting "1116, or 1119".

<< 18 USCA Ch. 51 >>

 (2) The chapter analysis for chapter 51 of title 18, United States Code, as amended by section 60005(a), is amended by adding at the end the following new item:
 "1119. Foreign murder of United States nationals.".

## SEC. 60010. DEATH PENALTY FOR RAPE AND CHILD MOLESTATION MURDERS.

 (a) OFFENSE.—Chapter 109A of title 18, United States Code, is amended—

<< 18 USCA § 2245 >>

<< 18 USCA § 2246 >>

(1) by redesignating section 2245 as section 2246; and

<< 18 USCA § 2245 >>

(2) by inserting after section 2244 the following new section:

"§ 2245. Sexual abuse resulting in death

"A person who, in the course of an offense under this chapter, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for any term of years or for life.".

<< 18 USCA Ch. 109A >>

(b) TECHNICAL AMENDMENTS.—The chapter analysis for chapter 109A of title 18, United States Code, is amended by striking the item for section 2245 and inserting the following:
"2245. Sexual abuse resulting in death.
"2246. Definitions for chapter.".

<< 18 USCA § 2251 >>

SEC. 60011. DEATH PENALTY FOR SEXUAL EXPLOITATION OF CHILDREN.

Section 2251(d) of title 18, United States Code, is amended by adding at the end the following: "Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for any term of years or for life.".

SEC. 60012. MURDER BY ESCAPED PRISONERS.

<< 18 USCA § 1120 >>

(a) IN GENERAL.—Chapter 51 of title 18, United States Code, as amended by section 60009(a), is amended by adding at the end the following new section:

"§ 1120. Murder by escaped prisoners

"(a) DEFINITION.—In this section, 'Federal prison' and 'term of life imprisonment' have the meanings stated in section 1118.
"(b) OFFENSE AND PENALTY.—A person, having escaped from a Federal prison where the person was confined under a sentence for a term of life imprisonment, kills another shall be punished as provided in sections 1111 and 1112.".

<< 18 USCA Ch. 51 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 51 of title 18, United States Code, as amended by section 60009(b)(2), is amended by adding at the end the following new item:
"1120. Murder by escaped prisoners.".

<< 18 USCA § 924 >>

SEC. 60013. DEATH PENALTY FOR GUN MURDERS DURING FEDERAL CRIMES OF VIOLENCE AND DRUG TRAFFICKING CRIMES.

Section 924 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(i) A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall—

"(1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and

"(2) if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.".

<< 18 USCA § 930 >>

SEC. 60014. HOMICIDES AND ATTEMPTED HOMICIDES INVOLVING FIREARMS IN FEDERAL FACILITIES.

Section 930 of title 18, United States Code, is amended—

(1) by redesignating subsections (c), (d), (e), and (f) as subsections (d), (e), (f), and (g), respectively;

(2) in subsection (a) by striking "(c)" and inserting "(d)"; and

(3) by inserting after subsection (b) the following new subsection:

"(c) A person who kills or attempts to kill any person in the course of a violation of subsection (a) or (b), or in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, shall be punished as provided in sections 1111, 1112, and 1113.".

SEC. 60015. DEATH PENALTY FOR THE MURDER OF STATE OR LOCAL OFFICIALS ASSISTING FEDERAL LAW ENFORCEMENT OFFICIALS AND STATE CORRECTIONAL OFFICERS.

<< 18 USCA § 1121 >>

(a) IN GENERAL.—Chapter 51 of title 18, United States Code, as amended by section 60012(a), is amended by adding at the end the following new section:

" 1121. Killing persons aiding Federal investigations or State correctional officers

"(a) Whoever intentionally kills—

"(1) a State or local official, law enforcement officer, or other officer or employee while working with Federal law enforcement officials in furtherance of a Federal criminal investigation—

"(A) while the victim is engaged in the performance of official duties;

"(B) because of the performance of the victim's official duties; or

"(C) because of the victim's status as a public servant; or

"(2) any person assisting a Federal criminal investigation, while that assistance is being rendered and because of it,

shall be sentenced according to the terms of section 1111, including by sentence of death or by imprisonment for life.

"(b)(1) Whoever, in a circumstance described in paragraph (3) of this subsection, while incarcerated, intentionally kills any State correctional officer engaged in, or on account of the performance of such officer's official duties, shall be sentenced to a term of imprisonment which shall not be less than 20 years, and may be sentenced to life imprisonment or death.

"(2) As used in this section, the term, 'State correctional officer' includes any officer or employee of any prison, jail, or other detention facility, operated by, or under contract to, either a State or local governmental agency, whose job responsibilities include providing for the custody of incarcerated individuals.

"(3) The circumstance referred to in paragraph (1) is that—

"(A) the correctional officer is engaged in transporting the incarcerated person interstate; or

"(B) the incarcerated person is incarcerated pursuant to a conviction for an offense against the United States.".

<< 18 USCA Ch. 51 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 51 of title 18, United States Code, as amended by section 60012(b), is amended by adding at the end the following new item:

"1121. Killing persons aiding Federal investigations or State correctional officers.".

<< 18 USCA § 1503 >>

SEC. 60016. PROTECTION OF COURT OFFICERS AND JURORS.

 Section 1503 of title 18, United States Code, is amended—
  (1) by inserting "(a)" before "Whoever";
  (2) by striking "fined not more than $5,000 or imprisoned not more than five years, or both." and inserting "punished as provided in subsection (b).";
  (3) by adding at the end the following new subsection:
 "(b) The punishment for an offense under this section is—
  "(1) in the case of a killing, the punishment provided in sections 1111 and 1112;
  "(2) in the case of an attempted killing, or a case in which the offense was committed against a petit juror and in which a class A or B felony was charged, imprisonment for not more than 20 years, a fine under this title, or both; and
  "(3) in any other case, imprisonment for not more than 10 years, a fine under this title, or both."; and
  (4) in subsection (a), as designated by paragraph (1), by striking "commissioner" each place it appears and inserting "magistrate judge".

<< 18 USCA § 1513 >>

SEC. 60017. PROHIBITION OF RETALIATORY KILLINGS OF WITNESSES, VICTIMS, AND INFORMANTS.

 Section 1513 of title 18, United States Code, is amended—
  (1) by redesignating subsections (a) and (b) as subsections (b) and (c), respectively; and
  (2) by inserting after the section heading the following new subsection:
 "(a)(1) Whoever kills or attempts to kill another person with intent to retaliate against any person for—
  "(A) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or
  "(B) providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings,

shall be punished as provided in paragraph (2).
 "(2) The punishment for an offense under this subsection is—
  "(A) in the case of a killing, the punishment provided in sections 1111 and 1112; and
  "(B) in the case of an attempt, imprisonment for not more than 20 years.".

<< 18 USCA § 1512 >>

SEC. 60018. DEATH PENALTY FOR MURDER OF FEDERAL WITNESSES.

 Section 1512(a)(2)(A) of title 18, United States Code, is amended to read as follows:
  "(A) in the case of murder (as defined in section 1111), the death penalty or imprisonment for life, and in the case of any other killing, the punishment provided in section 1112;".

SEC. 60019. OFFENSES OF VIOLENCE AGAINST MARITIME NAVIGATION OR FIXED PLATFORMS.

 (a) IN GENERAL.—Chapter 111 of title 18, United States Code, is amended by adding at the end the following new sections:

<< 18 USCA § 2280 >>

"§ 2280. Violence against maritime navigation

 "(a) OFFENSES.—

"(1) IN GENERAL.—A person who unlawfully and intentionally—

"(A) seizes or exercises control over a ship by force or threat thereof or any other form of intimidation;

"(B) performs an act of violence against a person on board a ship if that act is likely to endanger the safe navigation of that ship;

"(C) destroys a ship or causes damage to a ship or to its cargo which is likely to endanger the safe navigation of that ship;

"(D) places or causes to be placed on a ship, by any means whatsoever, a device or substance which is likely to destroy that ship, or cause damage to that ship or its cargo which endangers or is likely to endanger the safe navigation of that ship;

"(E) destroys or seriously damages maritime navigational facilities or seriously interferes with their operation, if such act is likely to endanger the safe navigation of a ship;

"(F) communicates information, knowing the information to be false and under circumstances in which such information may reasonably be believed, thereby endangering the safe navigation of a ship;

"(G) injures or kills any person in connection with the commission or the attempted commission of any of the offenses set forth in subparagraphs (A) through (F); or

"(H) attempts to do any act prohibited under subparagraphs (A) through (G),

shall be fined under this title, imprisoned not more than 20 years, or both; and if the death of any person results from conduct prohibited by this paragraph, shall be punished by death or imprisoned for any term of years or for life.

"(2) THREAT TO NAVIGATION.—A person who threatens to do any act prohibited under paragraph (1) (B), (C) or (E), with apparent determination and will to carry the threat into execution, if the threatened act is likely to endanger the safe navigation of the ship in question, shall be fined under this title, imprisoned not more than 5 years, or both.

"(b) JURISDICTION.—There is jurisdiction over the activity prohibited in subsection (a)—

"(1) in the case of a covered ship, if—

"(A) such activity is committed—

"(i) against or on board a ship flying the flag of the United States at the time the prohibited activity is committed;

"(ii) in the United States and the activity is not prohibited as a crime by the State in which the activity takes place; or

"(iii) the activity takes place on a ship flying the flag of a foreign country or outside the United States, by a national of the United States or by a stateless person whose habitual residence is in the United States;

"(B) during the commission of such activity, a national of the United States is seized, threatened, injured or killed; or

"(C) the offender is later found in the United States after such activity is committed;

"(2) in the case of a ship navigating or scheduled to navigate solely within the territorial sea or internal waters of a country other than the United States, if the offender is later found in the United States after such activity is committed; and

"(3) in the case of any vessel, if such activity is committed in an attempt to compel the United States to do or abstain from doing any act.

"(c) BAR TO PROSECUTION.—It is a bar to Federal prosecution under subsection (a) for conduct that occurred within the United States that the conduct involved was during or in relation to a labor dispute, and such conduct is prohibited as a felony under the law of the State in which it was committed. For purposes of this section, the term 'labor dispute' has the meaning set forth in section 2(c) of the Norris-LaGuardia Act, as amended (29 U.S.C. 113(c)).

"(d) DELIVERY OF SUSPECTED OFFENDER.—The master of a covered ship flying the flag of the United States who has reasonable grounds to believe that there is on board that ship any person who has committed an offense under Article 3 of the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation may deliver such person to the authorities of a State Party to that Convention. Before delivering such person to the authorities of another country, the master shall notify in an appropriate manner the Attorney General of the United States of the alleged offense and await instructions from the Attorney General as to what action to take. When delivering the person to a country which is a State Party to the Convention, the master shall, whenever practicable, and if possible before entering the territorial sea of such country, notify the authorities of such country of the master's intention to deliver such person and the reasons therefor. If the master delivers such person, the master shall furnish to the authorities of such country the evidence in the master's possession that pertains to the alleged offense.

"(e) DEFINITIONS.—In this section—

"'covered ship' means a ship that is navigating or is scheduled to navigate into, through or from waters beyond the outer limit of the territorial sea of a single country or a lateral limit of that country's territorial sea with an adjacent country.

"'national of the United States' has the meaning stated in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

"'territorial sea of the United States' means all waters extending seaward to 12 nautical miles from the baselines of the United States determined in accordance with international law.

"'ship' means a vessel of any type whatsoever not permanently attached to the sea-bed, including dynamically supported craft, submersibles or any other floating craft, but does not include a warship, a ship owned or operated by a government when being used as a naval auxiliary or for customs or police purposes, or a ship which has been withdrawn from navigation or laid up.

"'United States', when used in a geographical sense, includes the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands and all territories and possessions of the United States.

<< 18 USCA § 2281 >>

"§ 2281. Violence against maritime fixed platforms

"(a) OFFENSES.—

"(1) IN GENERAL.—A person who unlawfully and intentionally—

"(A) seizes or exercises control over a fixed platform by force or threat thereof or any other form of intimidation;

"(B) performs an act of violence against a person on board a fixed platform if that act is likely to endanger its safety;

"(C) destroys a fixed platform or causes damage to it which is likely to endanger its safety;

"(D) places or causes to be placed on a fixed platform, by any means whatsoever, a device or substance which is likely to destroy that fixed platform or likely to endanger its safety;

"(E) injures or kills any person in connection with the commission or the attempted commission of any of the offenses set forth in subparagraphs (A) through (D); or

"(F) attempts to do anything prohibited under subparagraphs (A) through (E),

shall be fined under this title, imprisoned not more than 20 years, or both; and if death results to any person from conduct prohibited by this paragraph, shall be punished by death or imprisoned for any term of years or for life.

"(2) THREAT TO SAFETY.—A person who threatens to do anything prohibited under paragraph (1)(B) or (C), with apparent determination and will to carry the threat into execution, if the threatened act is likely to endanger the safety of the fixed platform, shall be fined under this title, imprisoned not more than 5 years, or both.

"(b) JURISDICTION.—There is jurisdiction over the activity prohibited in subsection (a) if—

"(1) such activity is committed against or on board a fixed platform—

"(A) that is located on the continental shelf of the United States;

"(B) that is located on the continental shelf of another country, by a national of the United States or by a stateless person whose habitual residence is in the United States; or

"(C) in an attempt to compel the United States to do or abstain from doing any act;

"(2) during the commission of such activity against or on board a fixed platform located on a continental shelf, a national of the United States is seized, threatened, injured or killed; or

"(3) such activity is committed against or on board a fixed platform located outside the United States and beyond the continental shelf of the United States and the offender is later found in the United States.

"(c) BAR TO PROSECUTION.—It is a bar to Federal prosecution under subsection (a) for conduct that occurred within the United States that the conduct involved was during or in relation to a labor dispute, and such conduct is prohibited as a felony under the law of the State in which it was committed. For purposes of this section, the term 'labor dispute' has the meaning set forth in section 2(c) of the Norris-LaGuardia Act, as amended (29 U.S.C. 113(c)).

"(d) DEFINITIONS.—In this section—

"'continental shelf' means the sea-bed and subsoil of the submarine areas that extend beyond a country's territorial sea to the limits provided by customary international law as reflected in Article 76 of the 1982 Convention on the Law of the Sea.

"'fixed platform' means an artificial island, installation or structure permanently attached to the sea-bed for the purpose of exploration or exploitation of resources or for other economic purposes.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"'national of the United States' has the meaning stated in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

"'territorial sea of the United States' means all waters extending seaward to 12 nautical miles from the baselines of the United States determined in accordance with international law.

"'United States', when used in a geographical sense, includes the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands and all territories and possessions of the United States.".

<< 18 USCA Ch. 111 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 111 of title 18, United States Code, is amended by adding at the end the following new items:

"2280. Violence against maritime navigation.

"2281. Violence against maritime fixed platforms.".

<< 18 USCA §§ 2280 NOTE, 2281 nt >>

(c) EFFECTIVE DATES.—This section and the amendments made by this section shall take effect on the later of—

(1) the date of the enactment of this Act; or

(2)(A) in the case of section 2280 of title 18, United States Code, the date the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation has come into force and the United States has become a party to that Convention; and

(B) in the case of section 2281 of title 18, United States Code, the date the Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf has come into force and the United States has become a party to that Protocol.

<< 18 USCA § 2340A >>

SEC. 60020. TORTURE.

Section 2340A(a) of title 18, United States Code, is amended by inserting "punished by death or" before "imprisoned for any term of years or for life.".

SEC. 60021. VIOLENCE AT AIRPORTS SERVING INTERNATIONAL CIVIL AVIATION.

<< 18 USCA § 37 >>

(a) OFFENSE.—Chapter 2 of title 18, United States Code, as amended by section 60008(b), is amended by adding at the end the following new section:

"§ 37. Violence at international airports

"(a) OFFENSE.—A person who unlawfully and intentionally, using any device, substance, or weapon—

"(1) performs an act of violence against a person at an airport serving international civil aviation that causes or is likely to cause serious bodily injury (as defined in section 1365 of this title) or death; or

"(2) destroys or seriously damages the facilities of an airport serving international civil aviation or a civil aircraft not in service located thereon or disrupts the services of the airport,

if such an act endangers or is likely to endanger safety at that airport, or attempts to do such an act, shall be fined under this title, imprisoned not more than 20 years, or both; and if the death of any person results from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life.

"(b) JURISDICTION.—There is jurisdiction over the prohibited activity in subsection (a) if—

"(1) the prohibited activity takes place in the United States; or

"(2) the prohibited activity takes place outside the United States and the offender is later found in the United States.

"(c) It is a bar to Federal persecution under subsection (a) for conduct that occurred within the United States that the conduct involved was during or in relation to a labor dispute, and such conduct is prohibited as a felony under the law of the State in which it was committed. For purposes of this section, the term 'labor dispute' has the meaning set forth in section 2(c) of the Norris-LaGuardia Act, as amended (29 U.S.C. 113(c)).

<< 18 USCA Ch. 2 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 2 of title 18, United States Code, as amended by section 60008(c), is amended by adding at the end the following new item:

"37. Violence at international airports.".

<< 18 USCA § 37 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the later of—

(1) the date of enactment of this Act; or

(2) the date on which the Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, Supplementary to the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal on 23 September 1971, has come into force and the United States has become a party to the Protocol.

<< 18 USCA § 2332 >>

SEC. 60022. TERRORIST DEATH PENALTY ACT.

Section 2332(a)(1) of title 18, United States Code is amended to read as follows:

"(1) if the killing is murder (as defined in section 1111(a)), be fined under this title, punished by death or imprisonment for any term of years or for life, or both;".

<< 18 USCA § 2332a >>

SEC. 60023. WEAPONS OF MASS DESTRUCTION.

(a) OFFENSE.—Chapter 113A of title 18, United States Code, is amended by inserting after section 2332 the following new section:

"§ 2332a. Use of weapons of mass destruction

"(a) OFFENSE.—A person who uses, or attempts or conspires to use, a weapon of mass destruction—

"(1) against a national of the United States while such national is outside of the United States;

"(2) against any person within the United States; or

"(3) against any property that is owned, leased or used by the United States or by any department or agency of the United States, whether the property is within or outside of the United States,

shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years or for life.

"(b) DEFINITIONS.—For purposes of this section—

"(1) the term 'national of the United States' has the meaning given in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)); and

"(2) the term 'weapon of mass destruction' means—

"(A) any destructive device as defined in section 921 of this title;

"(B) poison gas;

"(C) any weapon involving a disease organism; or

"(D) any weapon that is designed to release radiation or radioactivity at a level dangerous to human life.".

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA Ch. 113A >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 113A of title 18, United States Code, is amended by inserting after the item relating to section 2332 the following:

"2332a. Use of weapons of mass destruction.".

<< 8 USCA § 1324 >>

## SEC. 60024. ENHANCED PENALTIES FOR ALIEN SMUGGLING.

Section 274(a) of the Immigration and Nationality Act (8 U.S.C. 1324(a)) is amended—

(1) in paragraph (1)—

(A) by striking "(1) Any person" and inserting "(1)(A) Any person";

(B) by striking "(A) knowing" and inserting "(i) knowing";

(C) by striking "(B) knowing" and inserting "(ii) knowing";

(D) by striking "(C) knowing" and inserting "(iii) knowing";

(E) by striking "(D) encourages" and inserting "(iv) encourages";

(F) by striking "shall be fined in accordance with title 18, or imprisoned not more than five years, or both, for each alien in respect to whom any violation of this paragraph occurs" and inserting "shall be punished as provided in subparagraph (B)"; and

(G) by adding at the end the following new subparagraph:

"(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

"(i) in the case of a violation of subparagraph (A)(i), be fined under title 18, United States Code, imprisoned not more than 10 years, or both;

"(ii) in the case of a violation of subparagraph (A) (ii), (iii), or (iv), be fined under title 18, United States Code, imprisoned not more than 5 years, or both;

"(iii) in the case of a violation of subparagraph (A) (i), (ii), (iii), or (iv) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18, United States Code) to, or places in jeopardy the life of, any person, be fined under title 18, United States Code, imprisoned not more than 20 years, or both; and

"(iv) in the case of a violation of subparagraph (A) (i), (ii), (iii), or (iv) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, United States Code, or both."; and

(2) in paragraph (2) by striking "or imprisoned not more than five years, or both" and inserting "or in the case of a violation of subparagraph (B)(ii), imprisoned not more than 10 years, or both; or in the case of a violation of subparagraph (B)(i) or (B)(iii), imprisoned not more than 5 years, or both.".

<< 18 USCA § 3432 >>

## SEC. 60025. PROTECTION OF JURORS AND WITNESSES IN CAPITAL CASES.

Section 3432 of title 18, United States Code, is amended by inserting before the period the following: ", except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person".

<< 18 USCA § 3005 >>

## SEC. 60026. APPOINTMENT OF COUNSEL.

Section 3005 of title 18, United States Code, is amended by striking "learned in the law" and all that follows through "He shall" and inserting "; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. The defendant shall".

<< 18 USCA § 3559 >>

TITLE VII—MANDATORY LIFE IMPRISONMENT FOR PERSONS CONVICTED OF CERTAIN FELONIES

SEC. 70001. MANDATORY LIFE IMPRISONMENT FOR PERSONS CONVICTED OF CERTAIN FELONIES.

Section 3559 of title 18, United States Code, is amended—

(1) in subsection (b), by striking "An" and inserting "Except as provided in subsection (c), an" in lieu thereof; and

(2) by adding the following new subsection at the end:

"(c) IMPRISONMENT OF CERTAIN VIOLENT FELONS.—

"(1) MANDATORY LIFE IMPRISONMENT.—Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if—

"(A) the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of—

"(i) 2 or more serious violent felonies; or

"(ii) one or more serious violent felonies and one or more serious drug offenses; and

"(B) each serious violent felony or serious drug offense used as a basis for sentencing under this subsection, other than the first, was committed after the defendant's conviction of the preceding serious violent felony or serious drug offense.

"(2) DEFINITIONS.—For purposes of this subsection—

"(A) the term 'assault with intent to commit rape' means an offense that has as its elements engaging in physical contact with another person or using or brandishing a weapon against another person with intent to commit aggravated sexual abuse or sexual abuse (as described in sections 2241 and 2242);

"(B) the term 'arson' means an offense that has as its elements maliciously damaging or destroying any building, inhabited structure, vehicle, vessel, or real property by means of fire or an explosive;

"(C) the term 'extortion' means an offense that has as its elements the extraction of anything of value from another person by threatening or placing that person in fear of injury to any person or kidnapping of any person;

"(D) the term 'firearms use' means an offense that has as its elements those described in section 924(c) or 929(a), if the firearm was brandished, discharged, or otherwise used as a weapon and the crime of violence or drug trafficking crime during and relation to which the firearm was used was subject to prosecution in a court of the United States or a court of a State, or both;

"(E) the term 'kidnapping' means an offense that has as its elements the abduction, restraining, confining, or carrying away of another person by force or threat of force;

"(F) the term 'serious violent felony' means—

"(i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as described in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244 (a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); robbery (as described in section 2111, 2113, or 2118); carjacking (as described in section 2119); extortion; arson; firearms use; or attempt, conspiracy, or solicitation to commit any of the above offenses; and

"(ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense;

"(G) the term 'State' means a State of the United States, the District of Columbia, and a commonwealth, territory, or possession of the United States; and

"(H) the term 'serious drug offense' means—

"(i) an offense that is punishable under section 401(b)(1)(A) or 408 of the Controlled Substances Act (21 U.S.C. 841(b)(1) (A), 848) or section 1010(b)(1)(A) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)(1)(A)); or

"(ii) an offense under State law that, had the offense been prosecuted in a court of the United States, would have been punishable under section 401(b)(1)(A) or 408 of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A), 848) or section 1010(b)(1)(A) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)(1)(A)).

"(3) NONQUALIFYING FELONIES.—

"(A) ROBBERY IN CERTAIN CASES.—Robbery, an attempt, conspiracy, or solicitation to commit robbery; or an offense described in paragraph (2)(F)(ii) shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that—

"(i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and

"(ii) the offense did not result in death or serious bodily injury (as defined in section 1365) to any person.

"(B) ARSON IN CERTAIN CASES.—Arson shall not serve as a basis for sentencing under this subsection if the defendant establishes by clear and convincing evidence that—

"(i) the offense posed no threat to human life; and

"(ii) the defendant reasonably believed the offense posed no threat to human life.

"(4) INFORMATION FILED BY UNITED STATES ATTORNEY.—The provisions of section 411(a) of the Controlled Substances Act (21 U.S.C. 851(a)) shall apply to the imposition of sentence under this subsection.

"(5) RULE OF CONSTRUCTION.—This subsection shall not be construed to preclude imposition of the death penalty.

"(6) SPECIAL PROVISION FOR INDIAN COUNTRY.—No person subject to the criminal jurisdiction of an Indian tribal government shall be subject to this subsection for any offense for which Federal jurisdiction is solely predicated on Indian country (as defined in section 1151) and which occurs within the boundaries of such Indian country unless the governing body of the tribe has elected that this subsection have effect over land and persons subject to the criminal jurisdiction of the tribe.

"(7) RESENTENCING UPON OVERTURNING OF PRIOR CONVICTION.—If the conviction for a serious violent felony or serious drug offense that was a basis for sentencing under this subsection is found, pursuant to any appropriate State or Federal procedure, to be unconstitutional or is vitiated on the explicit basis of innocence, or if the convicted person is pardoned on the explicit basis of innocence, the person serving a sentence imposed under this subsection shall be resentenced to any sentence that was available at the time of the original sentencing.".

SEC. 70002. LIMITED GRANT OF AUTHORITY TO BUREAU OF PRISONS.

<< 18 USCA § 3582 >>

Section 3582(c)(1)(A) of title 18, United States Code, is amended—

(1) so that the margin of the matter starting with "extraordinary" and ending with "reduction" the first place it appears is indented an additional two ems;

(2) by inserting a one-em dash after "that" the second place it appears;

(3) by inserting a semicolon after "reduction" the first place it appears;

(4) by indenting the first line of the matter referred to in paragraph (1) and designating that matter as clause (i); and

(5) by inserting after such matter the following:

"(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);".

TITLE VIII—APPLICABILITY OF MANDATORY MINIMUM PENALTIES IN CERTAIN CASES

SEC. 80001. LIMITATION ON APPLICABILITY OF MANDATORY MINIMUM PENALTIES IN CERTAIN CASES.

<< 18 USCA § 3553 >>

(a) IN GENERAL.—Section 3553 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(f) LIMITATION ON APPLICABILITY OF STATUTORY MINIMUMS IN CERTAIN CASES.—Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 961, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

"(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

"(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

"(3) the offense did not result in death or serious bodily injury to any person;

"(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. 848; and

"(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

<< 28 USCA § 994 NOTE >>

(b) SENTENCING COMMISSION AUTHORITY.—

(1) IN GENERAL.—(A) The United States Sentencing Commission (referred to in this subsection as the "Commission"), under section 994(a)(1) and (p) of title 28—

(i) shall promulgate guidelines, or amendments to guidelines, to carry out the purposes of this section and the amendment made by this section; and

(ii) may promulgate policy statements, or amendments to policy statements, to assist in the application of this section and that amendment.

(B) In the case of a defendant for whom the statutorily required minimum sentence is 5 years, such guidelines and amendments to guidelines issued under subparagraph (A) shall call for a guideline range in which the lowest term of imprisonment is at least 24 months.

(2) PROCEDURES.—If the Commission determines that it is necessary to do so in order that the amendments made under paragraph (1) may take effect on the effective date of the amendment made by subsection (a), the Commission may promulgate the amendments made under paragraph (1) in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired.

<< 18 USCA § 3553 NOTE >>

(c) EFFECTIVE DATE AND APPLICATION.—The amendment made by subsection (a) shall apply to all sentences imposed on or after the 10th day beginning after the date of enactment of this Act.

<< 42 USCA Ch. 136 >>

TITLE IX—DRUG CONTROL

Subtitle A—Enhanced Penalties and General Provisions

<< 18 USCA § 1791 >>

SEC. 90101. ENHANCEMENT OF PENALTIES FOR DRUG TRAFFICKING IN PRISONS.

Section 1791 of title 18, United States Code, is amended—

(1) in subsection (c), by inserting before "Any" the following new sentence: "Any punishment imposed under subsection (b) for a violation of this section involving a controlled substance shall be consecutive to any other sentence imposed by any court for an offense involving such a controlled substance.";

(2) in subsection (d)(1)(A), by inserting after "a firearm or destructive device" the following: "or a controlled substance in schedule I or II, other than marijuana or a controlled substance referred to in subparagraph (C) of this subsection";

(3) in subsection (d)(1)(B), by inserting before "ammunition," the following: "marijuana or a controlled substance in schedule III, other than a controlled substance referred to in subparagraph (C) of this subsection,";

(4) in subsection (d)(1)(C), by inserting "methamphetamine, its salts, isomers, and salts of its isomers," after "a narcotic drug,";

(5) in subsection (d)(1)(D), by inserting "(A), (B), or" before "(C)"; and

(6) in subsection (b), by striking "(c)" each place it appears and inserting "(d)".

<< 42 USCA § 14051 >>

SEC. 90102. INCREASED PENALTIES FOR DRUG–DEALING IN "DRUG–FREE" ZONES.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall amend its sentencing guidelines to provide an appropriate enhancement for a defendant convicted of violating section 419 of the Controlled Substances Act (21 U.S.C. 860).

<< 42 USCA § 14052 >>

SEC. 90103. ENHANCED PENALTIES FOR ILLEGAL DRUG USE IN FEDERAL PRISONS AND FOR SMUGGLING DRUGS INTO FEDERAL PRISONS.

(a) DECLARATION OF POLICY.—It is the policy of the Federal Government that the use or distribution of illegal drugs in the Nation's Federal prisons will not be tolerated and that such crimes shall be prosecuted to the fullest extent of the law.

(b) SENTENCING GUIDELINES.—Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall amend its sentencing guidelines to appropriately enhance the penalty for a person convicted of an offense—

(1) under section 404 of the Controlled Substances Act involving simple possession of a controlled substance within a Federal prison or other Federal detention facility; or

(2) under section 401(b) of the Controlled Substances Act involving the smuggling of a controlled substance into a Federal prison or other Federal detention facility or the distribution or intended distribution of a controlled substance within a Federal prison or other Federal detention facility.

(c) NO PROBATION.—Notwithstanding any other law, the court shall not sentence a person convicted of an offense described in subsection (b) to probation.

<< 18 USCA § 1961 >>

SEC. 90104. CLARIFICATION OF NARCOTIC OR OTHER DANGEROUS DRUGS UNDER RICO.

Section 1961(1) of title 18, United States Code, is amended by striking "narcotic or other dangerous drugs" each place it appears and inserting "a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)".

SEC. 90105. CONFORMING AMENDMENTS TO RECIDIVIST PENALTY PROVISIONS OF THE CONTROLLED SUBSTANCES ACT AND THE CONTROLLED SUBSTANCES IMPORT AND EXPORT ACT.

<< 21 USCA § 841 >>

(a) Sections 401(b)(1) (B), (C), and (D) of the Controlled Substances Act (21 U.S.C. 841(b)(1) (B), (C), and (D)) and sections 1010(b) (1), (2), and (3) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b) (1), (2), and (3)) are each

AR.02006

amended in the sentence or sentences beginning "If any person commits" by striking "one or more prior convictions" through "have become final" and inserting "a prior conviction for a felony drug offense has become final".

<< 21 USCA § 962 >>

(b) Section 1012(b) of the Controlled Substances Import and Export Act (21 U.S.C. 962(b)) is amended by striking "one or more prior convictions of him for a felony under any provision of this title or title II or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant drugs, have become final" and inserting "one or more prior convictions of such person for a felony drug offense have become final".

<< 21 USCA § 841 >>

(c) Section 401(b)(1)(A) of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A)) is amended by striking the sentence beginning "For purposes of this subparagraph, the term 'felony drug offense' means".

<< 21 USCA § 802 >>

(d) Section 102 of the Controlled Substances Act (21 U.S.C. 802) is amended by adding at the end the following new paragraph:
"(43) The term 'felony drug offense' means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances.".

<< 21 USCA § 843 >>

SEC. 90106. ADVERTISING.

Section 403 of the Controlled Substances Act (21 U.S.C. 843) is amended—
  (1) by redesignating subsections (c) and (d) as subsections (d) and (e), respectively; and
  (2) by inserting after subsection (b) the following new subsection:
"(c) It shall be unlawful for any person to place in any newspaper, magazine, handbill, or other publications, any written advertisement knowing that it has the purpose of seeking or offering illegally to receive, buy, or distribute a Schedule I controlled substance. As used in this section the term 'advertisement' includes, in addition to its ordinary meaning, such advertisements as those for a catalog of Schedule I controlled substances and any similar written advertisement that has the purpose of seeking or offering illegally to receive, buy, or distribute a Schedule I controlled substance. The term 'advertisement' does not include material which merely advocates the use of a similar material, which advocates a position or practice, and does not attempt to propose or facilitate an actual transaction in a Schedule I controlled substance.".

<< 42 USCA § 14053 >>

SEC. 90107. VIOLENT CRIME AND DRUG EMERGENCY AREAS.

(a) DEFINITIONS.—In this section—
  "major violent crime or drug-related emergency" means an occasion or instance in which violent crime, drug smuggling, drug trafficking, or drug abuse violence reaches such levels, as determined by the President, that Federal assistance is needed to supplement State and local efforts and capabilities to save lives, and to protect property and public health and safety.
  "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.
(b) DECLARATION OF VIOLENT CRIME AND DRUG EMERGENCY AREAS.—If a major violent crime or drug-related emergency exists throughout a State or a part of a State, the President may declare the State or part of a State to be a violent crime or drug emergency area and may take appropriate actions authorized by this section.
(c) PROCEDURE.—
  (1) IN GENERAL.—A request for a declaration designating an area to be a violent crime or drug emergency area shall be made, in writing, by the chief executive officer of a State or local government, respectively (or in the case of the District of

Columbia, the mayor), and shall be forwarded to the Attorney General in such form as the Attorney General may by regulation require. One or more cities, counties, States, or the District of Columbia may submit a joint request for designation as a major violent crime or drug emergency area under this subsection.

 (2) FINDING.—A request made under paragraph (1) shall be based on a written finding that the major violent crime or drug-related emergency is of such severity and magnitude that Federal assistance is necessary to ensure an effective response to save lives and to protect property and public health and safety.

 (d) IRRELEVANCY OF POPULATION DENSITY.—The President shall not limit declarations made under this section to highly populated centers of violent crime or drug trafficking, drug smuggling, or drug use, but shall also consider applications from governments of less populated areas where the magnitude and severity of such activities is beyond the capability of the State or local government to respond.

 (e) REQUIREMENTS.—As part of a request for a declaration under this section, and as a prerequisite to Federal violent crime or drug emergency assistance under this section, the chief executive officer of a State or local government shall—

  (1) take appropriate action under State or local law and furnish information on the nature and amount of State and local resources that have been or will be committed to alleviating the major violent crime- or drug-related emergency;

  (2) submit a detailed plan outlining that government's short- and long-term plans to respond to the violent crime or drug emergency, specifying the types and levels of Federal assistance requested and including explicit goals (including quantitative goals) and timetables; and

  (3) specify how Federal assistance provided under this section is intended to achieve those goals.

 (f) REVIEW PERIOD.—The Attorney General shall review a request submitted pursuant to this section, and the President shall decide whether to declare a violent crime or drug emergency area, within 30 days after receiving the request.

 (g) FEDERAL ASSISTANCE.—The President may—

  (1) direct any Federal agency, with or without reimbursement, to utilize its authorities and the resources granted to it under Federal law (including personnel, equipment, supplies, facilities, financial assistance, and managerial, technical, and advisory services) in support of State and local assistance efforts; and

  (2) provide technical and advisory assistance, including communications support and law enforcement-related intelligence information.

 (h) DURATION OF FEDERAL ASSISTANCE.—

  (1) IN GENERAL.—Federal assistance under this section shall not be provided to a violent crime or drug emergency area for more than 1 year.

  (2) EXTENSION.—The chief executive officer of a jurisdiction may apply to the President for an extension of assistance beyond 1 year. The President may extend the provision of Federal assistance for not more than an additional 180 days.

 (i) REGULATIONS.—Not later than 120 days after the date of enactment of this Act, the Attorney General shall issue regulations to implement this section.

 (j) NO EFFECT ON EXISTING AUTHORITY.—Nothing in this section shall diminish or detract from existing authority possessed by the President or Attorney General.

Subtitle B—National Narcotics Leadership Act Amendments

<< 21 USCA § 1502 >>

SEC. 90201. IMPLEMENTATION OF NATIONAL DRUG CONTROL STRATEGY.

 (a) PROGRAM BUDGET.—Section 1003(c) of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502(c)) is amended—

  (1) by redesignating paragraphs (5), (6), and (7), as paragraphs (6), (7), and (8), respectively; and

  (2) by inserting after paragraph (4) the following new paragraph:

 "(5) The Director shall request the head of a department or agency to include in the department's or agency's budget submission to the Office of Management and Budget funding requests for specific initiatives that are consistent with the President's priorities for the National Drug Control Strategy and certifications made pursuant to paragraph (3), and the head of the department or agency shall comply with such a request.".

(b) BUDGET RECOMMENDATION.—Section 1003(b) of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502(b)) is amended—

(1) by striking "and" at the end of paragraph (6);

(2) by striking the period at the end of paragraph (7) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(8) provide, by July 1 of each year, budget recommendations to the heads of departments and agencies with responsibilities under the National Drug Control Program, which recommendations shall apply to the second following fiscal year and address funding priorities developed in the annual National Drug Control Strategy.".

(c) CONTROL OF DRUG–RELATED RESOURCES.—Section 1003 of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502) is amended—

(1) in subsection (d)—

(A) by amending paragraph (2) to read as follows:

"(2) request the head of a department or agency or program to place department, agency, or program personnel who are engaged in drug control activities on temporary detail to another department or agency in order to implement the National Drug Control Strategy, and the head of the department or agency shall comply with such a request;

(B) by striking "and" at the end of paragraph (6);

(C) by striking the period at the end of paragraph (7) and inserting a semicolon; and

(D) by adding after paragraph (7) the following new paragraphs:

"(8) except to the extent that the Director's authority under this paragraph is limited in an annual appropriations Act, transfer funds appropriated to a National Drug Control Program agency account to a different National Drug Control Program agency account in an amount that does not exceed 2 percent of the amount appropriated to either account, upon advance approval of the Committees on Appropriations of each House of Congress; and

"(9) in order to ensure compliance with the National Drug Control Program, issue to the head of a National Drug Control Program agency a funds control notice described in subsection (f).''; and

(2) by adding at the end the following new subsections:

"(f) FUNDS CONTROL NOTICES.—(1) A funds control notice may direct that all or part of an amount appropriated to the National Drug Control Program agency account be obligated by—

"(A) months, fiscal year quarters, or other time periods; and

"(B) activities, functions, projects, or object classes.

"(2) An officer or employee of a National Drug Control Program agency shall not make or authorize an expenditure or obligation contrary to a funds control notice issued by the Director.

"(3) In the case of a violation of paragraph (2) by an officer or employee of a National Drug Control Program agency, the head of the agency, upon the request of and in consultation with the Director, may subject the officer or employee to appropriate administrative discipline, including, when circumstances warrant, suspension from duty without pay or removal from office.''.

(d) CERTIFICATION OF ADEQUACY OF BUDGET REQUEST.—Section 1003(c)(3)(B) of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502(c)(3)(B)) is amended—

(1) by inserting "in whole or in part" after "adequacy of such request"; and

(2) by striking the semicolon at the end and inserting "and, with respect to a request that is not certified as adequate to implement the objectives of the National Drug Control Strategy, include in the certification an initiative or funding level that would make the request adequate;''.

<< 21 USCA § 1502 >>

SEC. 90202. OFFICE PERSONNEL RESTRICTION.

Section 1003 of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502) is amended by adding at the end the following new subsection:

"(f) PROHIBITION ON POLITICAL CAMPAIGNING.—A Federal officer in the Office of National Drug Control Policy who is appointed by the President, by and with the advice and consent of the Senate, may not participate in Federal election campaign activities, except that such an official is not prohibited by this subsection from making contributions to individual candidates.''.

<< 21 USCA § 1504 >>

SEC. 90203. NATIONAL DRUG CONTROL STRATEGY OUTCOME MEASURES.

Section 1005(a) of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1504(a)) is amended—

(1) in paragraph (2)(A) by inserting "and the consequences of drug abuse" after "drug abuse"; and

(2) by amending paragraph (4) to read as follows:

"(4) The Director shall include with each National Drug Control Strategy an evaluation of the effectiveness of Federal drug control during the preceding year. The evaluation shall include an assessment of Federal drug control efforts, including—

"(A) assessment of the reduction of drug use, including estimates of drug prevalence and frequency of use as measured by national, State, and local surveys of illicit drug use and by other special studies of—

"(i) high-risk populations, including school dropouts, the homeless and transient, arrestees, parolees, and probationers, and juvenile delinquents; and

"(ii) drug use in the workplace and the productivity lost by such use;

"(B) assessment of the reduction of drug availability, as measured by—

"(i) the quantities of cocaine, heroin, and marijuana available for consumption in the United States;

"(ii) the amount of cocaine and heroin entering the United States;

"(iii) the number of hectares of poppy and coca cultivated and destroyed;

"(iv) the number of metric tons of heroin and cocaine seized;

"(v) the number of cocaine processing labs destroyed;

"(vi) changes in the price and purity of heroin and cocaine;

"(vii) the amount and type of controlled substances diverted from legitimate retail and wholesale sources; and

"(viii) the effectiveness of Federal technology programs at improving drug detection capabilities at United States ports of entry;

"(C) assessment of the reduction of the consequences of drug use and availability, which shall include estimation of—

"(i) burdens drug users placed on hospital emergency rooms in the United States, such as the quantity of drug-related services provided;

"(ii) the annual national health care costs of drug use, including costs associated with people becoming infected with the human immunodeficiency virus and other communicable diseases as a result of drug use;

"(iii) the extent of drug-related crime and criminal activity; and

"(iv) the contribution of drugs to the underground economy, as measured by the retail value of drugs sold in the United States; and

"(D) determination of the status of drug treatment in the United States, by assessing—

"(i) public and private treatment capacity within each State, including information on the number of treatment slots available in relation to the number actually used, including data on intravenous drug users and pregnant women;

"(ii) the extent, within each State, to which treatment is available, on demand, to intravenous drug users and pregnant women;

"(iii) the number of drug users the Director estimates could benefit from treatment; and

"(iv) the success of drug treatment programs, including an assessment of the effectiveness of the mechanisms in place federally, and within each State, to determine the relative quality of substance abuse treatment programs, the qualifications of treatment personnel, and the mechanism by which patients are admitted to the most appropriate and cost effective treatment setting.

"(5) The Director shall include with the National Drug Control Strategy required to be submitted not later than February 1, 1995, and with every second such strategy submitted thereafter—

"(A) an assessment of the quality of current drug use measurement instruments and techniques to measure supply reduction and demand reduction activities;

"(B) an assessment of the adequacy of the coverage of existing national drug use measurement instruments and techniques to measure the casual drug user population and groups at-risk for drug use;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(C) an assessment of the actions the Director shall take to correct any deficiencies and limitations identified pursuant to subparagraphs (A) and (B); and

"(D) identification of the specific factors that restrict the availability of treatment services to those seeking it and proposed administrative or legislative remedies to make treatment available to those individuals.

"(6) Federal agencies responsible for the collection or estimation of drug-related information required by the Director shall cooperate with the Director, to the fullest extent possible, to enable the Director to satisfy the requirements of sections 4 and 5.

"(7) With each National Drug Control Strategy, the Director shall report to the President and the Congress on the Director's assessment of drug use and availability in the United States, including an estimate of the effectiveness of interdiction, treatment, prevention, law enforcement, and international programs under the National Drug Control Strategy in effect in the preceding year in reducing drug use and availability.".

## SEC. 90204. COUNTER–DRUG TECHNOLOGY ASSESSMENT CENTER.

<< 21 USCA § 1502a >>

(a) DRUG ABUSE ADDICTION AND REHABILITATION CENTER.—Section 1003A of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502a(c)(1)) is amended—

(1) by redesignating subparagraphs (B), (C), and (D) as subparagraphs (C), (D), and (E), respectively; and

(2) by inserting after subparagraph (A) the following:

"(B) in consultation with the National Institute on Drug Abuse, and through interagency agreements or grants, examine addiction and rehabilitation research and the application of technology to expanding the effectiveness or availability of drug treatment;".

(b) ASSISTANCE FROM THE ADVANCED RESEARCH PROJECT AGENCY.—Section 1003A of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502a) is amended by adding at the end the following:

"(f) ASSISTANCE AND SUPPORT TO OFFICE OF NATIONAL DRUG CONTROL POLICY.—The Director of the Advanced Research Project Agency shall, to the fullest extent possible, render assistance and support to the Office of National Drug Control Policy and its Director.".

(c) REPEAL AND REDESIGNATION.—The National Narcotics Leadership Act of 1988 is amended by—

<< 21 USCA § 1505 >>

(1) repealing section 1008 (21 U.S.C. 1505), as in effect on the date of the enactment of this Act;

<< 21 USCA § 1502a >>

(2) redesignating section 1003A, as amended by subsection (b) of this section, as section 1008; and

<< 21 USCA §§ 1502a, 1505 >>

(3) moving such section, as redesignated, so as to follow section 1007.

## SEC. 90205. SPECIAL FORFEITURE FUND AMENDMENTS.

<< 21 USCA § 1509 >>

(a) DEPOSITS INTO SPECIAL FORFEITURE FUND.—Section 6073 of the Asset Forfeiture Amendments Act of 1988 (21 U.S.C. 1509) is amended to read as follows:

"(b) DEPOSITS.—There shall be deposited into the Fund the amounts specified by section 524(c)(9) of title 28, United States Code, and section 9307(g) of title 31, United States Code, and any earnings on the investments authorized by subsection (d).".

<< 28 USCA § 524 >>

AR.02011

(b) TRANSFERS FROM DEPARTMENT OF JUSTICE ASSETS FORFEITURE FUND.—Section 524(c)(9) of title 28, United States Code, is amended by amending subparagraphs (B), (C), and (D) to read as follows:

"(B) Subject to subparagraphs (C) and (D), at the end of each of fiscal years 1994, 1995, 1996, and 1997, the Attorney General shall transfer from the Fund not more than $100,000,000 to the Special Forfeiture Fund established by section 6073 of the Anti-Drug Abuse Act of 1988.

"(C) Transfers under subparagraph (B) may be made only from the excess unobligated balance and may not exceed one-half of the excess unobligated balance for any year. In addition, transfers under subparagraph (B) may be made only to the extent that the sum of the transfers in a fiscal year and one-half of the unobligated balance at the beginning of that fiscal year for the Special Forfeiture Fund does not exceed $100,000,000.

"(D) For the purpose of determining amounts available for distribution at year end for any fiscal year, 'excess unobligated balance' means the unobligated balance of the Fund generated by that fiscal year's operations, less any amounts that are required to be retained in the Fund to ensure the availability of amounts in the subsequent fiscal year for purposes authorized under paragraph (1).".

<< 31 USCA § 9703 >>

(c) TRANSFERS FROM DEPARTMENT OF THE TREASURY FORFEITURE FUND.— Section 9703(g) of title 31, United States Code, is amended—

(1) in paragraph (3)—

(A) by amending subparagraph (A) to read as follows:

"(A) Subject to subparagraphs (B) and (C), at the end of each of fiscal years 1994, 1995, 1996, and 1997, the Secretary shall transfer from the Fund not more than $100,000,000 to the Special Forfeiture Fund established by section 6073 of the Anti-Drug Abuse Act of 1988."; and

(B) in subparagraph (B) by adding the following at the end: "Further, transfers under subparagraph (A) may not exceed one-half of the excess unobligated balance for a year. In addition, transfers under subparagraph (A) may be made only to the extent that the sum of the transfers in a fiscal year and one-half of the unobligated balance at the beginning of that fiscal year for the Special Forfeiture Fund does not exceed $100,000,000."; and

(2) in subparagraph (4)(A)—

(A) in clause (i) by striking "(i)"; and

(B) by striking clause (ii).

<< 21 USCA § 1509 >>

(d) SURPLUS FUNDS.—Section 6073 of the Asset Forfeiture Amendments Act of 1988 (21 U.S.C. 1509) is amended—

(1) by redesignating subsections (c), (d), (e), and (f), as subsections (d), (e), (f), and (g), respectively; and

(2) by inserting after subsection (b) the following new subsection:

"(c) SUPER SURPLUS.—(1) Any unobligated balance up to $20,000,000 remaining in the Fund on September 30 of a fiscal year shall be available to the Director, subject to paragraph (2), to transfer to, and for obligation and expenditure in connection with drug control activities of, any Federal agency or State or local entity with responsibilities under the National Drug Control Strategy.

"(2) A transfer may be made under paragraph (1) only with the advance written approval of the Committees on Appropriations of each House of Congress.".

<< 21 USCA § 1508 >>

SEC. 90206. AUTHORIZATION OF APPROPRIATIONS.

Section 1011 of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1508) is amended by striking "4" and inserting "8".

<< 21 USCA § 1502 >>

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 90207. ADEQUATE STAFFING OF THE OFFICE OF NATIONAL DRUG CONTROL POLICY.

Section 1008(d)(1) of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1502(d)(1)) is amended by striking "such" and inserting "up to 75 and such additional".

SEC. 90208. TERMINATION OF OFFICE OF NATIONAL DRUG CONTROL POLICY.

<< 21 USCA § 1506 >>

(a) REAUTHORIZATION.—Section 1009 of the National Narcotics Leadership Act of 1988 (21 U.S.C. 1506) is amended by striking "the date which is 5 years after the date of the enactment of this subtitle" and inserting "September 30, 1997".

<< 21 USCA § 1506 NOTE >>

(b) CONTINUED EFFECTIVENESS.—The National Narcotics Leadership Act of 1988 (21 U.S.C. 1501 et seq.) shall be considered not to have been repealed by operation of section 1009 of that Act, but shall remain in effect as if the amendment made by subsection (a) had been included in that Act on the date of its enactment.

<< 18 USCA § 1 NOTE >>

TITLE X—DRUNK DRIVING PROVISIONS

SEC. 100001. SHORT TITLE.

This title may be cited as the "Drunk Driving Child Protection Act of 1994".

<< 18 USCA § 13 >>

SEC. 100002. STATE LAWS APPLIED IN AREAS OF FEDERAL JURISDICTION.

Section 13(b) of title 18, United States Code, is amended—
  (1) by striking "For purposes" and inserting "(1) Subject to paragraph (2) and for purposes"; and
  (2) by adding at the end the following new paragraph:
"(2)(A) In addition to any term of imprisonment provided for operating a motor vehicle under the influence of a drug or alcohol imposed under the law of a State, territory, possession, or district, the punishment for such an offense under this section shall include an additional term of imprisonment of not more than 1 year, or if serious bodily injury of a minor is caused, not more than 5 years, or if death of a minor is caused, not more than 10 years, and an additional fine of not more than $1,000, or both, if—
  "(i) a minor (other than the offender) was present in the motor vehicle when the offense was committed; and
  "(ii) the law of the State, territory, possession, or district in which the offense occurred does not provide an additional term of imprisonment under the circumstances described in clause (i).
"(B) For the purposes of subparagraph (A), the term 'minor' means a person less than 18 years of age.".

<< 42 USCA § 3751 >>

SEC. 100003. DRIVING WHILE INTOXICATED PROSECUTION PROGRAM.

Section 501(b) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751) is amended—
  (1) by striking "and" at the end of paragraph (20);
  (2) by striking the period at the end of paragraph (21) and inserting "; and"; and
  (3) by adding at the end the following new paragraph:
  "(22) programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles.".

<< 18 USCA § 921 NOTE >>

TITLE XI—FIREARMS

Subtitle A—Assault Weapons

## SEC. 110101. SHORT TITLE.

This subtitle may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

## SEC. 110102. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS.

<< 18 USCA § 922 >>

(a) RESTRICTION.—Section 922 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed under Federal law on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to—

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that—

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this subsection is in effect.

"(4) Paragraph (1) shall not apply to—

"(A) the manufacture for, transfer to, or possession by the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty);

"(B) the transfer to a licensee under title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by Federal law, or possession by an employee or contractor of such licensee on-site for such purposes or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

<< 18 USCA § 921 >>

(b) DEFINITION OF SEMIAUTOMATIC ASSAULT WEAPON.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following new paragraph:

"(30) The term 'semiautomatic assault weapon' means—

"(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as—

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) a semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a fixed magazine capacity in excess of 5 rounds; and

"(iv) an ability to accept a detachable magazine.".

<< 18 USCA § 924 >>

(c) PENALTIES.—

 (1) VIOLATION OF SECTION 922(v).—Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".

 (2) USE OR POSSESSION DURING CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.—Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

<< 18 USCA § 923 >>

 (d) IDENTIFICATION MARKINGS FOR SEMIAUTOMATIC ASSAULT WEAPONS.—Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

SEC. 110103. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.

<< 18 USCA § 922 >>

 (a) PROHIBITION.—Section 922 of title 18, United States Code, as amended by section 110102(a), is amended by adding at the end the following new subsection:

 "(w)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

AR.02015

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on or before the date of the enactment of this subsection.

"(3) This subsection shall not apply to—

  "(A) the manufacture for, transfer to, or possession by the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty);

  "(B) the transfer to a licensee under title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by Federal law, or possession by an employee or contractor of such licensee on-site for such purposes or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

  "(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

  "(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary."

"(4) If a person charged with violating paragraph (1) asserts that paragraph (1) does not apply to such person because of paragraph (2) or (3), the Government shall have the burden of proof to show that such paragraph (1) applies to such person. The lack of a serial number as described in section 923(i) of title 18, United States Code, shall be a presumption that the large capacity ammunition feeding device is not subject to the prohibition of possession in paragraph (1).".

<< 18 USCA § 921 >>

(b) DEFINITION OF LARGE CAPACITY AMMUNITION FEEDING DEVICE.—Section 921(a) of title 18, United States Code, as amended by section 110102(b), is amended by adding at the end the following new paragraph:

"(31) The term 'large capacity ammunition feeding device'—

  "(A) means a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; but

  "(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

<< 18 USCA § 924 >>

(c) PENALTY.—Section 924(a)(1)(B) of title 18, United States Code, as amended by section 110102(c)(1), is amended by striking "or (v)" and inserting "(v), or (w)".

<< 18 USCA § 923 >>

(d) IDENTIFICATION MARKINGS FOR LARGE CAPACITY AMMUNITION FEEDING DEVICES.—Section 923(i) of title 18, United States Code, as amended by section 110102(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

<< 18 USCA § 921 NOTE >>

SEC. 110104. STUDY BY ATTORNEY GENERAL.

(a) STUDY.—The Attorney General shall investigate and study the effect of this subtitle and the amendments made by this subtitle, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) REPORT.—Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

SEC. 110105. EFFECTIVE DATE.

This subtitle and the amendments made by this subtitle—

<< 18 USCA § 921 NOTE >>

(1) shall take effect on the date of the enactment of this Act; and

<< 18 USCA §§ 921, 922, 923, 924 >>

<< 18 USCA § 921 NOTE >>

(2) are repealed effective as of the date that is 10 years after that date.

<< 18 USCA § 922 >>

SEC. 110106. APPENDIX A TO SECTION 922 OF TITLE 18.

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

"APPENDIX A

Centerfire Rifles—Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M–1 Carbine
Iver Johnson 50th Anniversary M–1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

Centerfire Rifles—Lever & Slide

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30″ Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions

E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine
Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rilfe
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

Centerfire Rifles—Bolt Action

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand

Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle
Krico Model 700 Bolt-Action Rifles
Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle
Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle

Parker-Hale Model 2800 Midland Rifle

Remington Model Seven Bolt-Action Rifle

Remington Model Seven Youth Rifle

Remington Model Seven Custom KS

Remington Model Seven Custom MS Rifle

Remington 700 ADL Bolt-Action Rifle

Remington 700 BDL Bolt-Action Rifle

Remington 700 BDL Varmint Special

Remington 700 BDL European Bolt-Action Rifle

Remington 700 Varmint Synthetic Rifle

Remington 700 BDL SS Rifle

Remington 700 Stainless Synthetic Rifle

Remington 700 MTRSS Rifle

Remington 700 BDL Left Hand

Remington 700 Camo Synthetic Rifle

Remington 700 Safari

Remington 700 Mountain Rifle

Remington 700 Custom KS Mountain Rifle

Remington 700 Classic Rifle

Ruger M77 Mark II Rifle

Ruger M77 Mark II Magnum Rifle

Ruger M77RL Ultra Light

Ruger M77 Mark II All-Weather Stainless Rifle

Ruger M77 RSI International Carbine

Ruger M77 Mark II Express Rifle

Ruger M77VT Target Rifle

Sako Hunter Rifle

Sako Fiberclass Sporter

Sako Safari Grade Bolt Action

Sako Hunter Left-Hand Rifle

Sako Classic Bolt Action

Sako Hunter LS Rifle

Sako Deluxe Lightweight

Sako Super Deluxe Sporter

Sako Mannlicher-Style Carbine

Sako Varmint Heavy Barrel

Sako TRG–S Bolt-Action Rifle

Sauer 90 Bolt-Action Rifle

Savage 110G Bolt-Action Rifle

Savage 110CY Youth/Ladies Rifle

Savage 110WLE One of One Thousand Limited Edition Rifle

Savage 110GXP3 Bolt-Action Rifle

Savage 110F Bolt-Action Rifle

Savage 110FXP3 Bolt-Action Rifle

Savage 110GV Varmint Rifle

Savage 112FV Varmint Rifle

Savage Model 112FVS Varmint Rifle

Savage Model 112BV Heavy Barrel Varmint Rifle

Savage 116FSS Bolt-Action Rifle

Savage Model 116FSK Kodiak Rifle
Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter
Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade
Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

Centerfire Rifles—Single Shot

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle

Browning Model 1885 Single Shot Rifle

Dakota Single Shot Rifle

Desert Industries G–90 Single Shot Rifle

Harrington & Richardson Ultra Varmint Rifle

Model 1885 High Wall Rifle

Navy Arms Rolling Block Buffalo Rifle

Navy Arms #2 Creedmoor Rifle

Navy Arms Sharps Cavalry Carbine

Navy Arms Sharps Plains Rifle

New England Firearms Handi-Rifle

Red Willow Armory Ballard No. 5 Pacific

Red Willow Armory Ballard No. 1.5 Hunting Rifle

Red Willow Armory Ballard No. 8 Union Hill Rifle

Red Willow Armory Ballard No. 4.5 Target Rifle

Remington-Style Rolling Block Carbine

Ruger No. 1B Single Shot

Ruger No. 1A Light Sporter

Ruger No. 1H Tropical Rifle

Ruger No. 1S Medium Sporter

Ruger No. 1 RSI International

Ruger No. 1V Special Varminter

C. Sharps Arms New Model 1874 Old Reliable

C. Sharps Arms New Model 1875 Rifle

C. Sharps Arms 1875 Classic Sharps

C. Sharps Arms New Model 1875 Target & Long Range

Shiloh Sharps 1874 Long Range Express

Shiloh Sharps 1874 Montana Roughrider

Shiloh Sharps 1874 Military Carbine

Shiloh Sharps 1874 Business Rifle

Shiloh Sharps 1874 Military Rifle

Sharps 1874 Old Reliable

Thompson/Center Contender Carbine

Thompson/Center Stainless Contender Carbine

Thompson/Center Contender Carbine Survival System

Thompson/Center Contender Carbine Youth Model

Thompson/Center TCR '87 Single Shot Rifle

Uberti Rolling Block Baby Carbine

<center>Drillings, Combination Guns, Double Rifles</center>

Beretta Express SSO O/U Double Rifles

Beretta Model 455 SxS Express Rifle

Chapuis RGExpress Double Rifle

Auguste Francotte Sidelock Double Rifles

Auguste Francotte Boxlock Double Rifle

Heym Model 55B O/U Double Rifle

Heym Model 55FW O/U Combo Gun

Heym Model 88b Side-by-Side Double Rifle

Kodiak Mk. IV Double Rifle

Kreighoff Teck O/U Combination Gun

Kreighoff Trumpf Drilling

Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

<div align="center">Rimfire Rifles—Autoloaders</div>

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990*l* Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR–7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

<div align="center">Rimfire Rifles—Lever & Slide Action</div>

Browning BL–22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM–321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

<div align="center">Rimfire Rifles—Bolt Actions & Single Shots</div>

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles

AR.02023

Anschutz 1418D/1518D Mannlicher Rifles

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700 FWT Bolt-Action Rifle

Anschutz 1700D Graphite Custom Rifle

Anschutz 1700D Bavarian Bolt-Action Rifle

Armscor Model 14P Bolt-Action Rifle

Armscor Model 1500 Rifle

BRNO ZKM–452 Deluxe Bolt-Action Rifle

BRNO ZKM 452 Deluxe

Beeman/HW 60–J–ST Bolt-Action Rifle

Browning A-Bolt 22 Bolt-Action Rifle

Browning A-Bolt Gold Medallion

Cabanas Phaser Rifle

Cabanas Master Bolt-Action Rifle

Cabanas Espronceda IV Bolt-Action Rifle

Cabanas Leyre Bolt-Action Rifle

Chipmunk Single Shot Rifle

Cooper Arms Model 36S Sporter Rifle

Dakota 22 Sporter Bolt-Action Rifle

Krico Model 300 Bolt-Action Rifles

Lakefield Arms Mark II Bolt-Action Rifle

Lakefield Arms Mark I Bolt-Action Rifle

Magtech Model MT–22C Bolt-Action Rifle

Marlin Model 880 Bolt-Action Rifle

Marlin Model 881 Bolt-Action Rifle

Marlin Model 882 Bolt-Action Rifle

Marlin Model 883 Bolt-Action Rifle

Marlin Model 883SS Bolt-Action Rifle

Marlin Model 25MN Bolt-Action Rifle

Marlin Model 25N Bolt-Action Repeater

Marlin Model 15YN "Little Buckaroo"

Mauser Model 107 Bolt-Action Rifle

Mauser Model 201 Bolt-Action Rifle

Navy Arms TU–KKW Training Rifle

Navy Arms TU–33/40 Carbine

Navy Arms TU–KKW Sniper Trainer

Norinco JW–27 Bolt-Action Rifle

Norinco JW–15 Bolt-Action Rifle

Remington 541–T

Remington 40–XR Rimfire Custom Sporter

Remington 541–T HB Bolt-Action Rifle

Remington 581–S Sportsman Rifle

Ruger 77/22 Rimfire Bolt-Action Rifle

Ruger K77/22 Varmint Rifle

Ultra Light Arms Model 20 RF Bolt-Action Rifle

Winchester Model 52B Sporting Rifle


Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette

Anschutz 1808D RT Super Match 54 Target

Anschutz 1827B Biathlon Rifle

Anschutz 1903D Match Rifle

Anschutz 1803D Intermediate Match

Anschutz 1911 Match Rifle

Anschutz 54.18MS REP Deluxe Silhouette Rifle

Anschutz 1913 Super Match Rifle

Anschutz 1907 Match Rifle

Anschutz 1910 Super Match II

Anschutz 54.18MS Silhouette Rifle

Anschutz Super Match 54 Target Model 2013

Anschutz Super Match 54 Target Model 2007

Beeman/Feinwerkbau 2600 Target Rifle

Cooper Arms Model TRP–1 ISU Standard Rifle

E.A.A./Weihrauch HW 60 Target Rifle

E.A.A./HW 660 Match Rifle

Finnish Lion Standard Target Rifle

Krico Model 360 S2 Biathlon Rifle

Krico Model 400 Match Rifle

Krico Model 360S Biathlon Rifle

Krico Model 500 Kricotronic Match Rifle

Krico Model 600 Sniper Rifle

Krico Model 600 Match Rifle

Lakefield Arms Model 90B Target Rifle

Lakefield Arms Model 91T Target Rifle

Lakefield Arms Model 92S Silhouette Rifle

Marlin Model 2000 Target Rifle

Mauser Model 86–SR Specialty Rifle

McMillan M–86 Sniper Rifle

McMillan Combo M–87/M–88 50-Caliber Rifle

McMillan 300 Phoenix Long Range Rifle

McMillan M–89 Sniper Rifle

McMillan National Match Rifle

McMillan Long Range Rifle

Parker-Hale M–87 Target Rifle

Parker-Hale M–85 Sniper Rifle

Remington 40–XB Rangemaster Target Centerfire

Remington 40–XR KS Rimfire Position Rifle

Remington 40–XBBR KS

Remington 40–XC KS National Match Course Rifle

Sako TRG–21 Bolt-Action Rifle

Steyr-Mannlicher Match SPG–UIT Rifle

Steyr-Mannlicher SSG P–I Rifle

Steyr-Mannlicher SSG P–III Rifle

Steyr-Mannlicher SSG P–IV Rifle

Tanner Standard UIT Rifle

Tanner 50 Meter Free Rifle

Tanner 300 Meter Free Rifle

Wichita Silhouette Rifle

Shotguns—Autoloaders

American Arms/Franchi Black Magic 48/AL

Benelli Super Black Eagle Shotgun

Benelli Super Black Eagle Slug Gun

Benelli M1 Super 90 Field Auto Shotgun

Benelli Montefeltro Super 90 20-Gauge Shotgun

Benelli Montefeltro Super 90 Shotgun

Benelli M1 Sporting Special Auto Shotgun

Benelli Black Eagle Competition Auto Shotgun

Beretta A–303 Auto Shotgun

Beretta 390 Field Auto Shotgun

Beretta 390 Super Trap, Super Skeet Shotguns

Beretta Vittoria Auto Shotgun

Beretta Model 1201F Auto Shotgun

Browning BSA 10 Auto Shotgun

Browning BSA 10 Stalker Auto Shotgun

Browning A–500R Auto Shotgun

Browning A–500G Auto Shotgun

Browning A–500G Sporting Clays

Browning Auto-5 Light 12 and 20

Browning Auto-5 Stalker

Browning Auto-5 Magnum 20

Browning Auto-5 Magnum 12

Churchill Turkey Automatic Shotgun

Cosmi Automatic Shotgun

Maverick Model 60 Auto Shotgun

Mossberg Model 5500 Shotgun

Mossberg Model 9200 Regal Semi-Auto Shotgun

Mossberg Model 9200 USST Auto Shotgun

Mossberg Model 9200 Camo Shotgun

Mossberg Model 6000 Auto Shotgun

Remington Model 1100 Shotgun

Remington 11–87 Premier Shotgun

Remington 11–87 Sporting Clays

Remington 11–87 Premier Skeet

Remington 11–87 Premier Trap

Remington 11–87 Special Purpose Magnum

Remington 11–87 SPS–T Camo Auto Shotgun

Remington 11–87 Special Purpose Deer Gun

Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun

Remington 11–87 SPS-Deer Shotgun

Remington 11–87 Special Purpose Synthetic Camo

Remington SP–10 Magnum-Camo Auto Shotgun

Remington SP–10 Magnum Auto Shotgun

Remington SP–10 Magnum Turkey Combo

Remington 1100 LT–20 Auto

Remington 1100 Special Field

Remington 1100 20-Gauge Deer Gun

Remington 1100 LT–20 Tournament Skeet

Winchester Model 1400 Semi-Auto Shotgun

Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U

American Arms Silver I O/U

American Arms Silver II Shotgun

American Arms Silver Skeet O/U

American Arms/Franchi Sporting 2000 O/U

American Arms Silver Sporting O/U

American Arms Silver Trap O/U

American Arms WS/OU 12, TS/OU 12 Shotguns

American Arms WT/OU 10 Shotgun

Armsport 2700 O/U Goose Gun

Armsport 2700 Series O/U

Armsport 2900 Tri-Barrel Shotgun

Baby Bretton Over/Under Shotgun

Beretta Model 686 Ultralight O/U

Beretta ASE 90 Competition O/U Shotgun

Beretta Over/Under Field Shotguns

Beretta Onyx Hunter Sport O/U Shotgun

Beretta Model SO5, SO6, SO9 Shotguns

Beretta Sporting Clay Shotguns

Beretta 687EL Sporting O/U

Beretta 682 Super Sporting O/U

Beretta Series 682 Competition Over/Unders

Browning Citori O/U Shotgun

Browning Superlight Citori Over/Under

Browning Lightning Sporting Clays

Browning Micro Citori Lightning

Browning Citori Plus Trap Combo

Browning Citori Plus Trap Gun

Browning Citori O/U Skeet Models

Browning Citori O/U Trap Models

Browning Special Sporting Clays

Browning Citori GTI Sporting Clays

Browning 325 Sporting Clays

Centurion Over/Under Shotgun

Chapuis Over/Under Shotgun

Connecticut Valley Classics Classic Sporter O/U

Connecticut Valley Classics Classic Field Waterfowler

Charles Daly Field Grade O/U

Charles Daly Lux Over/Under

E.A.A./Sabatti Sporting Clays Pro-Gold O/U

E.A.A/Sabatti Falcon-Mon Over/Under

Kassnar Grade I O/U Shotgun

Krieghoff K–80 Sporting Clays O/U

Krieghoff K–80 Skeet Shotgun

Krieghoff K–80 International Skeet

Krieghoff K–80 Four-Barrel Skeet Set

Krieghoff K–80/RT Shotguns

Krieghoff K–80 O/U Trap Shotgun

Laurona Silhouette 300 Sporting Clays

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM–6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun
Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U
Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun

American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkel Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side
Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

Shotguns—Bolt Actions & Single Shots

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun
Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS–5 Trap Gun
Krieghoff KS–5 Special
Krieghoff K–80 Single Barrel Trap Gun

Ljutic Mono Gun Single Barrel

Ljutic LTX Super Deluxe Mono Gun

Ljutic Recoilless Space Gun Shotgun

Marlin Model 55 Goose Gun Bolt Action

New England Firearms Turkey and Goose Gun

New England Firearms N.W.T.F. Shotgun

New England Firearms Tracker Slug Gun

New England Firearms Standard Pardner

New England Firearms Survival Gun

Perazzi TM1 Special Single Trap

Remington 90–T Super Single Shotgun

Snake Charmer II Shotgun

Stoeger/IGA Reuna Single Barrel Shotgun

Thompson/Center TCR '87 Hunter Shotgun.".

Subtitle B—Youth Handgun Safety

## SEC. 110201. PROHIBITION OF THE POSSESSION OF A HANDGUN OR AMMUNITION BY, OR THE PRIVATE TRANSFER OF A HANDGUN OR AMMUNITION TO, A JUVENILE.

<< 18 USCA § 922 >>

 (a) OFFENSE.—Section 922 of title 18, United States Code, as amended by section 110103(a), is amended by adding at the end the following new subsection:

"(x)(1) It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile—

 "(A) a handgun; or

 "(B) ammunition that is suitable for use only in a handgun.

"(2) It shall be unlawful for any person who is a juvenile to knowingly possess—

 "(A) a handgun; or

 "(B) ammunition that is suitable for use only in a handgun.

"(3) This subsection does not apply to—

 "(A) a temporary transfer of a handgun or ammunition to a juvenile or to the possession or use of a handgun or ammunition by a juvenile if the handgun and ammunition are possessed and used by the juvenile—

 "(i) in the course of employment, in the course of ranching or farming related to activities at the residence of the juvenile (or on property used for ranching or farming at which the juvenile, with the permission of the property owner or lessee, is performing activities related to the operation of the farm or ranch), target practice, hunting, or a course of instruction in the safe and lawful use of a handgun;

 "(ii) with the prior written consent of the juvenile's parent or guardian who is not prohibited by Federal, State, or local law from possessing a firearm, except—

 "(I) during transportation by the juvenile of an unloaded handgun in a locked container directly from the place of transfer to a place at which an activity described in clause (i) is to take place and transportation by the juvenile of that handgun, unloaded and in a locked container, directly from the place at which such an activity took place to the transferor; or

 "(II) with respect to ranching or farming activities as described in clause (i), a juvenile may possess and use a handgun or ammunition with the prior written approval of the juvenile's parent or legal guardian and at the direction of an adult who is not prohibited by Federal, State or local law from possessing a firearm;

 "(iii) the juvenile has the prior written consent in the juvenile's possession at all times when a handgun is in the possession of the juvenile; and

 "(iv) in accordance with State and local law;

"(B) a juvenile who is a member of the Armed Forces of the United States or the National Guard who possesses or is armed with a handgun in the line of duty;

"(C) a transfer by inheritance of title (but not possession) of a handgun or ammunition to a juvenile; or

"(D) the possession of a handgun or ammunition by a juvenile taken in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest.

"(4) A handgun or ammunition, the possession of which is transferred to a juvenile in circumstances in which the transferor is not in violation of this subsection shall not be subject to permanent confiscation by the Government if its possession by the juvenile subsequently becomes unlawful because of the conduct of the juvenile, but shall be returned to the lawful owner when such handgun or ammunition is no longer required by the Government for the purposes of investigation or prosecution.

"(5) For purposes of this subsection, the term 'juvenile' means a person who is less than 18 years of age.

"(6)(A) In a prosecution of a violation of this subsection, the court shall require the presence of a juvenile defendant's parent or legal guardian at all proceedings.

"(B) The court may use the contempt power to enforce subparagraph (A).

"(C) The court may excuse attendance of a parent or legal guardian of a juvenile defendant at a proceeding in a prosecution of a violation of this subsection for good cause shown.".

<< 18 USCA § 924 >>

(b) PENALTIES.—Section 924(a) of title 18, United States Code, is amended—

(1) in paragraph (1) by striking "paragraph (2) or (3) of"; and

(2) by adding at the end the following new paragraph:

"(5)(A)(i) A juvenile who violates section 922(x) shall be fined under this title, imprisoned not more than 1 year, or both, except that a juvenile described in clause (ii) shall be sentenced to probation on appropriate conditions and shall not be incarcerated unless the juvenile fails to comply with a condition of probation.

"(ii) A juvenile is described in this clause if—

"(I) the offense of which the juvenile is charged is possession of a handgun or ammunition in violation of section 922(x)(2); and

"(II) the juvenile has not been convicted in any court of an offense (including an offense under section 922(x) or a similar State law, but not including any other offense consisting of conduct that if engaged in by an adult would not constitute an offense) or adjudicated as a juvenile delinquent for conduct that if engaged in by an adult would constitute an offense.

"(B) A person other than a juvenile who knowingly violates section 922(x)—

"(i) shall be fined under this title, imprisoned not more than 1 year, or both; and

"(ii) if the person sold, delivered, or otherwise transferred a handgun or ammunition to a juvenile knowing or having reasonable cause to know that the juvenile intended to carry or otherwise possess or discharge or otherwise use the handgun or ammunition in the commission of a crime of violence, shall be fined under this title, imprisoned not more than 10 years, or both.".

(c) TECHNICAL AMENDMENT OF JUVENILE DELINQUENCY PROVISIONS IN TITLE 18, UNITED STATES CODE.—

<< 18 USCA § 5031 >>

(1) SECTION 5031.—Section 5031 of title 18, United States Code, is amended by inserting "or a violation by such a person of section 922(x)" before the period at the end.

<< 18 USCA § 5032 >>

(2) SECTION 5032.—Section 5032 of title 18, United States Code, is amended—

(A) in the first undesignated paragraph by inserting "or (x)" after "922(p)"; and

(B) in the fourth undesignated paragraph by inserting "or section 922(x) of this title," before "criminal prosecution on the basis".

AR.02032

<< 42 USCA § 5633 >>

(d) TECHNICAL AMENDMENT OF THE JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT OF 1974.—Section 223(a)(12)(A) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5633(a)(12)(A)) is amended by striking "which do not constitute violations of valid court orders" and inserting "(other than an offense that constitutes a violation of a valid court order or a violation of section 922(x) of title 18, United States Code, or a similar State law)."

<< 42 USCA § 5653 NOTE >>

(e) MODEL LAW.—The Attorney General, acting through the Director of the National Institute for Juvenile Justice and Delinquency Prevention, shall—

(1) evaluate existing and proposed juvenile handgun legislation in each State;

(2) develop model juvenile handgun legislation that is constitutional and enforceable;

(3) prepare and disseminate to State authorities the findings made as the result of the evaluation; and

(4) report to Congress by December 31, 1995, findings and recommendations concerning the need or appropriateness of further action by the Federal Government.

Subtitle C—Licensure

SEC. 110301. FIREARMS LICENSURE AND REGISTRATION TO REQUIRE A PHOTOGRAPH AND FINGERPRINTS.

<< 18 USCA § 923 >>

(a) FIREARMS LICENSURE.—Section 923(a) of title 18, United States Code, is amended in the second sentence by inserting "and shall include a photograph and fingerprints of the applicant" before the period.

<< 26 USCA § 5802 >>

(b) REGISTRATION.—Section 5802 of the Internal Revenue Code of 1986 is amended by inserting after the first sentence the following: "An individual required to register under this section shall include a photograph and fingerprints of the individual with the initial application.".

<< 18 USCA § 923 >>

SEC. 110302. COMPLIANCE WITH STATE AND LOCAL LAW AS A CONDITION TO LICENSE.

Section 923(d)(1) of title 18, United States Code, is amended—

(1) by striking "and" at the end of subparagraph (D);

(2) by striking the period at the end of subparagraph (E) and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

"(F) the applicant certifies that—

"(i) the business to be conducted under the license is not prohibited by State or local law in the place where the licensed premise is located;

"(ii)(I) within 30 days after the application is approved the business will comply with the requirements of State and local law applicable to the conduct of the business; and

"(II) the business will not be conducted under the license until the requirements of State and local law applicable to the business have been met; and

"(iii) that the applicant has sent or delivered a form to be prescribed by the Secretary, to the chief law enforcement officer of the locality in which the premises are located, which indicates that the applicant intends to apply for a Federal firearms license.".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 923 >>

SEC. 110303. ACTION ON FIREARMS LICENSE APPLICATION.

 Section 923(d)(2) of title 18, United States Code, is amended by striking "forty-five-day" and inserting "60-day".

<< 18 USCA § 923 >>

SEC. 110304. INSPECTION OF FIREARMS LICENSEES' INVENTORY AND RECORDS.

 Section 923(g)(1)(B)(ii) of title 18, United States Code, is amended to read as follows:
   "(ii) for ensuring compliance with the record keeping requirements of this chapter—
    "(I) not more than once during any 12-month period; or
    "(II) at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee.".

<< 18 USCA § 923 >>

SEC. 110305. REPORTS OF THEFT OR LOSS OF FIREARMS.

 Section 923(g) of title 18, United States Code, is amended by adding at the end the following new paragraph:
  "(6) Each licensee shall report the theft or loss of a firearm from the licensee's inventory or collection, within 48 hours after the theft or loss is discovered, to the Secretary and to the appropriate local authorities.".

<< 18 USCA § 923 >>

SEC. 110306. RESPONSES TO REQUESTS FOR INFORMATION.

 Section 923(g) of title 18, United States Code, as amended by section 110405, is amended by adding at the end the following new paragraph:
  "(7) Each licensee shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Secretary for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation. The requested information shall be provided orally or in writing, as the Secretary may require. The Secretary shall implement a system whereby the licensee can positively identify and establish that an individual requesting information via telephone is employed by and authorized by the agency to request such information.".

<< 18 USCA § 923 >>

SEC. 110307. NOTIFICATION OF NAMES AND ADDRESSES OF FIREARMS LICENSEES.

 Section 923 of title 18, United States Code, is amended by adding at the end the following new subsection:
  "(1) The Secretary of the Treasury shall notify the chief law enforcement officer in the appropriate State and local jurisdictions of the names and addresses of all persons in the State to whom a firearms license is issued.".

Subtitle D—Domestic Violence

SEC. 110401. PROHIBITION AGAINST DISPOSAL OF FIREARMS TO, OR RECEIPT OF FIREARMS BY, PERSONS
  WHO HAVE COMMITTED DOMESTIC ABUSE.

<< 18 USCA § 921 >>

(a) INTIMATE PARTNER DEFINED.—Section 921(a) of title 18, United States Code, as amended by section 110103(b), is amended by inserting at the end the following new paragraph:

"(32) The term 'intimate partner' means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person.".

<< 18 USCA § 922 >>

(b) PROHIBITION AGAINST DISPOSAL OF FIREARMS.—Section 922(d) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (6);

(2) by striking the period at the end of paragraph (7) and inserting "; or"; and

(3) by inserting after paragraph (7) the following new paragraph:

"(8) is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that—

  "(A) was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

  "(B)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

  "(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.".

(c) PROHIBITION AGAINST RECEIPT OF FIREARMS.—Section 922(g) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (6);

(2) by inserting "or" at the end of paragraph (7); and

(3) by inserting after paragraph (7) the following:

"(8) who is subject to a court order that—

  "(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

  "(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

  "(C)(i) includes a finding that such person represents a credible threat to the physical Œsafety of such intimate partner or child; or

  "(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury,".

<< 18 USCA § 926 >>

(d) STORAGE OF FIREARMS.—Section 926(a) of title 18, United States Code, is amended—

(1) by striking "and" at the end of paragraph (1);

(2) by striking the period at the end of paragraph (2) and inserting "; and"; and

(3) by inserting after paragraph (2) the following:

"(3) regulations providing for effective receipt and secure storage of firearms relinquished by or seized from persons described in subsection (d)(8) or (g)(8) of section 922.".

<< 18 USCA § 924 >>

(e) RETURN OF FIREARMS.—Section 924(d)(1) of title 18, United States Code, is amended by striking "the seized" and inserting "or lapse of or court termination of the restraining order to which he is subject, the seized or relinquished".

<< 28 USCA § 994 NOTE >>

Subtitle E—Gun Crime Penalties

SEC. 110501. ENHANCED PENALTY FOR USE OF A SEMIAUTOMATIC FIREARM DURING A CRIME OF VIOLENCE OR A DRUG TRAFFICKING CRIME.

(a) AMENDMENT TO SENTENCING GUIDELINES.—Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall amend its sentencing guidelines to provide an appropriate enhancement of the punishment for a crime of violence (as defined in section 924(c)(3) of title 18, United States Code) or a drug trafficking crime (as defined in section 924(c)(2) of title 18, United States Code) if a semiautomatic firearm is involved.

(b) SEMIAUTOMATIC FIREARM.—In subsection (a), "semiautomatic firearm" means any repeating firearm that utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round and that requires a separate pull of the trigger to fire each cartridge.

<< 28 USCA § 994 NOTE >>

SEC. 110502. ENHANCED PENALTY FOR SECOND OFFENSE OF USING AN EXPLOSIVE TO COMMIT A FELONY.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall promulgate amendments to the sentencing guidelines to appropriately enhance penalties in a case in which a defendant convicted under section 844(h) of title 18, United States Code, has previously been convicted under that section.

<< 18 USCA § 924 >>

SEC. 110503. SMUGGLING FIREARMS IN AID OF DRUG TRAFFICKING.

Section 924 of title 18, United States Code, as amended by section 60013, is amended by adding at the end the following new subsection:

"(j) A person who, with intent to engage in or to promote conduct that—

"(1) is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.);

"(2) violates any law of a State relating to any controlled substance (as defined in section 102 of the Controlled Substances Act, 21 U.S.C. 802); or

"(3) constitutes a crime of violence (as defined in subsection (c)(3),

smuggles or knowingly brings into the United States a firearm, or attempts to do so, shall be imprisoned not more than 10 years, fined under this title, or both.".

SEC. 110504. THEFT OF FIREARMS AND EXPLOSIVES.

<< 18 USCA § 924 >>

(a) FIREARMS.—Section 924 of title 18, United States Code, as amended by section 110203(a), is amended by adding at the end the following new subsection:

"(k) A person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.".

<< 18 USCA § 844 >>

(b) EXPLOSIVES.—Section 844 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(k) A person who steals any explosives materials which are moving as, or are a part of, or which have moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.".

<< 18 USCA § 3583 >>

SEC. 110505. REVOCATION OF SUPERVISED RELEASE AFTER IMPRISONMENT.

  Section 3583 of title 18, United States Code, is amended—

  (1) in subsection (d) by striking "possess illegal controlled substances" and inserting "unlawfully possess a controlled substance";

  (2) in subsection (e)—

  (A) by striking "person" each place such term appears in such subsection and inserting "defendant"; and

  (B) by amending paragraph (3) to read as follows:

  "(3) revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case; or"; and

  (3) by striking subsection (g) and inserting the following:

  "(g) MANDATORY REVOCATION FOR POSSESSION OF CONTROLLED SUBSTANCE OR FIREARM OR FOR REFUSAL TO COMPLY WITH DRUG TESTING.—If the defendant—

  "(1) possesses a controlled substance in violation of the condition set forth in subsection (d);

  "(2) possesses a firearm, as such term is defined in section 921 of this title, in violation of Federal law, or otherwise violates a condition of supervised release prohibiting the defendant from possessing a firearm; or

  "(3) refuses to comply with drug testing imposed as a condition of supervised release;

the court shall revoke the term of supervised release and require the defendant to serve a term of imprisonment not to exceed the maximum term of imprisonment authorized under subsection (e)(3).

  "(h) SUPERVISED RELEASE FOLLOWING REVOCATION.—When a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized under subsection (e)(3), the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release.

  "(i) DELAYED REVOCATION.—The power of the court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment and, subject to the limitations in subsection (h), a further term of supervised release, extends beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation.".

<< 18 USCA § 3565 >>

SEC. 110506. REVOCATION OF PROBATION.

  (a) IN GENERAL.—Section 3565(a) of title 18, United States Code, is amended—

  (1) in paragraph (2) by striking "impose any other sentence that was available under subchapter A at the time of the initial sentencing" and inserting "resentence the defendant under subchapter A"; and

  (2) by striking the last sentence.

  (b) MANDATORY REVOCATION.—Section 3565(b) of title 18, United States Code, is amended to read as follows:

"(b) MANDATORY REVOCATION FOR POSSESSION OF CONTROLLED SUBSTANCE OR FIREARM OR REFUSAL TO COMPLY WITH DRUG TESTING.—If the defendant—

  "(1) possesses a controlled substance in violation of the condition set forth in section 3563(a)(3);

  "(2) possesses a firearm, as such term is defined in section 921 of this title, in violation of Federal law, or otherwise violates a condition of probation prohibiting the defendant from possessing a firearm; or

  "(3) refuses to comply with drug testing, thereby violating the condition imposed by section 3563(a)(4),

the court shall revoke the sentence of probation and resentence the defendant under subchapter A to a sentence that includes a term of imprisonment.".

<< 18 USCA § 924 >>

SEC. 110507. INCREASED PENALTY FOR KNOWINGLY MAKING FALSE, MATERIAL STATEMENT IN CONNECTION WITH THE ACQUISITION OF A FIREARM FROM A LICENSED DEALER.

  Section 924(a) of title 18, United States Code, is amended—

  (1) in subsection (a)(1)(B) by striking "(a)(6),"; and

  (2) in subsection (a)(2) by inserting "(a)(6)," after "subsections".

<< 18 USCA § 842 >>

SEC. 110508. POSSESSION OF EXPLOSIVES BY FELONS AND OTHERS.

  Section 842(i) of title 18, United States Code, is amended by inserting "or possess" after "to receive".

<< 18 USCA § 844 >>

SEC. 110509. SUMMARY DESTRUCTION OF EXPLOSIVES SUBJECT TO FORFEITURE.

  Section 844(c) of title 18, United States Code, is amended—

  (1) by inserting "(1)" after "(c)"; and

  (2) by adding at the end the following new paragraphs:

  "(2) Notwithstanding paragraph (1), in the case of the seizure of any explosive materials for any offense for which the materials would be subject to forfeiture in which it would be impracticable or unsafe to remove the materials to a place of storage or would be unsafe to store them, the seizing officer may destroy the explosive materials forthwith. Any destruction under this paragraph shall be in the presence of at least 1 credible witness. The seizing officer shall make a report of the seizure and take samples as the Secretary may by regulation prescribe.

  "(3) Within 60 days after any destruction made pursuant to paragraph (2), the owner of (including any person having an interest in) the property so destroyed may make application to the Secretary for reimbursement of the value of the property. If the claimant establishes to the satisfaction of the Secretary that—

  "(A) the property has not been used or involved in a violation of law; or

  "(B) any unlawful involvement or use of the property was without the claimant's knowledge, consent, or willful blindness,

the Secretary shall make an allowance to the claimant not exceeding the value of the property destroyed.".

<< 18 USCA § 924 >>

SEC. 110510. ELIMINATION OF OUTMODED LANGUAGE RELATING TO PAROLE.

  (a) SECTION 924(e)(1) OF TITLE 18.—Section 924(e)(1) of title 18, United States Code, is amended by striking ", and such person shall not be eligible for parole with respect to the sentence imposed under this subsection".

  (b) SECTION 924(c)(1) OF TITLE 18.—Section 924(c)(1) of title 18, United States Code, is amended by striking "No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed under this subsection.".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 922 >>

SEC. 10511. PROHIBITION AGAINST TRANSACTIONS INVOLVING STOLEN FIREARMS WHICH HAVE MOVED
IN INTERSTATE OR FOREIGN COMMERCE.

Section 922(j) of title 18, United States Code, is amended to read as follows:
"(j) It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen
ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a
part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it
was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.".

<< 28 USCA § 994 NOTE >>

SEC. 110512. USING A FIREARM IN THE COMMISSION OF COUNTERFEITING OR FORGERY.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall
amend its sentencing guidelines to provide an appropriate enhancement of the punishment for a defendant convicted of a felony
under chapter 25 of title 18, United States Code, if the defendant used or carried a firearm (as defined in section 921(a)(3) of
title 18, United States Code) during and in relation to the felony.

<< 28 USCA § 994 NOTE >>

SEC. 110513. ENHANCED PENALTIES FOR FIREARMS POSSESSION BY VIOLENT FELONS AND SERIOUS DRUG
OFFENDERS.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall
amend its sentencing guidelines to—
  (1) appropriately enhance penalties in cases in which a defendant convicted under section 922(g) of title 18, United States
Code, has 1 prior conviction by any court referred to in section 922(g)(1) of title 18 for a violent felony (as defined in section
924(e)(2)(B) of that title) or a serious drug offense (as defined in section 924(e)(2)(A) of that title); and
  (2) appropriately enhance penalties in cases in which such a defendant has 2 prior convictions for a violent felony (as so
defined) or a serious drug offense (as so defined).

<< 18 USCA § 922 >>

SEC. 110514. RECEIPT OF FIREARMS BY NONRESIDENT.

Section 922(a) of title 18, United States Code, is amended—
  (1) by striking "and" at the end of paragraph (7);
  (2) by striking the period at the end of paragraph (8) and inserting "; and"; and
  (3) by adding at the end the following new paragraph:
  "(9) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does
not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.".

SEC. 110515. THEFT OF FIREARMS OR EXPLOSIVES FROM LICENSEE.

<< 18 USCA § 924 >>

  (a) FIREARMS.—Section 924 of title 18, United States Code, as amended by section 110504(a), is amended by adding at
the end the following new subsection:
  "(l) A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector
shall be fined under this title, imprisoned not more than 10 years, or both.".

<< 18 USCA § 844 >>

(b) EXPLOSIVES.—Section 844 of title 18, United States Code, as amended by section 110204(b), is amended by adding at the end the following new subsection:

"(l) A person who steals any explosive material from a licensed importer, licensed manufacturer, or licensed dealer, or from any permittee shall be fined under this title, imprisoned not more than 10 years, or both.".

<< 18 USCA § 842 >>

SEC. 110516. DISPOSING OF EXPLOSIVES TO PROHIBITED PERSONS.

Section 842(d) of title 18, United States Code, is amended by striking "licensee" and inserting "person".

<< 18 USCA § 924 >>

SEC. 110517. INCREASED PENALTY FOR INTERSTATE GUN TRAFFICKING.

Section 924 of title 18, United States Code, as amended by section 110515(a), is amended by adding at the end the following new subsection:

"(m) A person who, with the intent to engage in conduct that constitutes a violation of section 922(a)(1)(A), travels from any State or foreign country into any other State and acquires, or attempts to acquire, a firearm in such other State in furtherance of such purpose shall be imprisoned for not more than 10 years.".

SEC. 110518. FIREARMS AND EXPLOSIVES CONSPIRACY.

<< 18 USCA § 924 >>

(a) FIREARMS.—Section 924 of title 18, United States Code, as amended by section 110517(a), is amended by adding at the end the following new subsection:

"(n) A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.".

<< 18 USCA § 844 >>

(b) EXPLOSIVES.—Section 844 of title 18, United States Code, as amended by section 110515(b), is amended by adding at the end the following new subsection:

"(m) A person who conspires to commit an offense under subsection (h) shall be imprisoned for any term of years not exceeding 20, fined under this title, or both.

<< 18 USCA § 921 >>

SEC. 110519. DEFINITION OF ARMOR PIERCING AMMUNITION.

Section 921(a)(17) of title 18, United States Code, is amended by revising subparagraph (B) and adding a new subparagraph (C) to read as follows:

"(B) The term 'armor piercing ammunition' means—

"(i) a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

"(ii) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

AR.02040

"(C) The term 'armor piercing ammunition' does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Secretary finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Secretary finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.".

## TITLE XII—TERRORISM

## SEC. 120001. EXTENSION OF THE STATUTE OF LIMITATION FOR CERTAIN TERRORISM OFFENSES.

<< 18 USCA § 3286 >>

(a) IN GENERAL.—Chapter 213 of title 18, United States Code, is amended by inserting after section 3285 the following new section:

"§ 3286. Extension of statute of limitation for certain terrorism offenses

"Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for any offense involving a violation of section 32 (aircraft destruction), section 36 (airport violence), section 112 (assaults upon diplomats), section 351 (crimes against Congressmen or Cabinet officers), section 1116 (crimes against diplomats), section 1203 (hostage taking), section 1361 (willful injury to government property), section 1751 (crimes against the President), section 2280 (maritime violence), section 2281 (maritime platform violence), section 2331 (terrorist acts abroad against United States nationals), section 2339 (use of weapons of mass destruction), or section 2340A (torture) of this title or section 46502, 46504, 46505, or 46506 of title 49, unless the indictment is found or the information is instituted within 8 years after the offense was committed.".

<< 18 USCA § 3286 NOTE >>

(b) APPLICATION OF AMENDMENT.—The amendment made by subsection (a) shall not apply to any offense committed more than 5 years prior to the date of enactment of this Act.

<< 18 USCA Ch. 213 >>

(c) TECHNICAL AMENDMENT.—The chapter analysis for chapter 213 of title 18, United States Code, is amended by inserting after the item relating to section 3285 the following new item:
"3286. Extension of statute of limitation for certain terrorism offenses.".

<< 18 USCA § 7 >>

## SEC. 120002. JURISDICTION OVER CRIMES AGAINST UNITED STATES NATIONALS ON CERTAIN FOREIGN SHIPS.

Section 7 of title 18, United States Code (relating to the special maritime and territorial jurisdiction of the United States), is amended by inserting at the end thereof the following new paragraph:
"(8) To the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.".

## SEC. 120003. COUNTERFEITING UNITED STATES CURRENCY ABROAD.

<< 18 USCA § 470 >>

(a) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by adding before section 471 the following new section:

"§ 470. Counterfeit acts committed outside the United States

"A person who, outside the United States, engages in the act of—

  "(1) making, dealing, or possessing any counterfeit obligation or other security of the United States; or

  "(2) making, dealing, or possessing any plate, stone, or other thing, or any part thereof, used to counterfeit such obligation or security,

if such act would constitute a violation of section 471, 473, or 474 if committed within the United States, shall be fined under this title, imprisoned not more than 20 years, or both.".

  (b) TECHNICAL AMENDMENTS.—

<< 18 USCA Ch. 25 >>

  (1) CHAPTER ANALYSIS.—The chapter analysis for chapter 25 of title 18, United States Code, is amended by adding before section 471 the following new item:

"470. Counterfeit acts committed outside the United States.".

<< 18 USCA Ch. 1 >>

  (2) PART ANALYSIS.—The part analysis for part I of title 18, United States Code, is amended by amending the item for chapter 25 to read as follows:

**"25.   Counterfeiting and forgery**....................................................................................................................... ..............**470".**

<< 28 USCA § 994 NOTE >>

SEC. 120004. SENTENCING GUIDELINES INCREASE FOR TERRORIST CRIMES.

  The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.

SEC. 120005. PROVIDING MATERIAL SUPPORT TO TERRORISTS.

<< 18 USCA § 2339A >>

  (a) OFFENSE.—Chapter 113A of title 18, United States Code, is amended by adding the following new section:

"§ 2339A. Providing material support to terrorists

  "(a) DEFINITION.—In this section, 'material support or resources' means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, but does not include humanitarian assistance to persons not directly involved in such violations.

  "(b) OFFENSE.—A person who, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 36, 351, 844 (f) or (i), 1114, 1116, 1203, 1361, 1363, 1751, 2280, 2281, 2331, or 2339 of this title or section 46502 of title 49, or in preparation for or carrying out the concealment of an escape from the commission of any such violation, shall be fined under this title, imprisoned not more than 10 years, or both.

  "(c) INVESTIGATIONS.—

  "(1) IN GENERAL.—Within the United States, an investigation may be initiated or continued under this section only when facts reasonably indicate that—

    "(A) in the case of an individual, the individual knowingly or intentionally engages, has engaged, or is about to engage in the violation of this or any other Federal criminal law; and

"(B) in the case of a group of individuals, the group knowingly or intentionally engages, has engaged, or is about to engage in the violation of this or any other Federal criminal law.

"(2) ACTIVITIES PROTECTED BY THE FIRST AMENDMENT.—An investigation may not be initiated or continued under this section based on activities protected by the First Amendment to the Constitution, including expressions of support or the provision of financial support for the nonviolent political, religious, philosophical, or ideological goals or beliefs of any person or group.".

<< 18 USCA Ch. 113A >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 113A of title 18, United States Code, is amended by adding the following new item:

"2339A. Providing material support to terrorists.".

TITLE XIII—CRIMINAL ALIENS AND IMMIGRATION ENFORCEMENT

SEC. 130001. ENHANCEMENT OF PENALTIES FOR FAILING TO DEPART, OR REENTERING, AFTER FINAL ORDER OF DEPORTATION.

<< 8 USCA § 1252 >>

(a) FAILURE TO DEPART.—Section 242(e) of the Immigration and Nationality Act (8 U.S.C. 1252(e)) is amended—

(1) by striking "paragraph (2), (3), or (4) of" the first time it appears; and

(2) by striking "shall be imprisoned not more than ten years" and inserting "shall be imprisoned not more than four years, or shall be imprisoned not more than ten years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 241(a).".

<< 8 USCA § 1326 >>

(b) REENTRY.—Section 276(b) of the Immigration and Nationality Act (8 U.S.C. 1326(b)) is amended—

(1) in paragraph (1)—

(A) by inserting after "commission of" the following: "three or more misdemeanors involving drugs, crimes against the person, or both, or"; and

(B) by striking "5" and inserting "10";

(2) in paragraph (2), by striking "15" and inserting "20"; and

(3) by adding at the end the following sentence:

"For the purposes of this subsection, the term 'deportation' includes any agreement in which an alien stipulates to deportation during a criminal trial under either Federal or State law.".

<< 8 USCA § 1252 NOTE >>

SEC. 130002. CRIMINAL ALIEN TRACKING CENTER.

(a) OPERATION.—The Attorney General shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien tracking center.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

(1) $3,400,000 for fiscal year 1996;

(2) $3,600,000 for fiscal year 1997;

(3) $3,700,000 for fiscal year 1998;

(4) $3,800,000 for fiscal year 1999; and

(5) $3,900,000 for fiscal year 2000.

SEC. 130003. ALIEN WITNESS COOPERATION AND COUNTERTERRORISM INFORMATION.

<< 8 USCA § 1101 >>

(a) ESTABLISHMENT OF NEW NONIMMIGRANT CLASSIFICATION.—Section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)) is amended—

(1) by striking "or" at the end of subparagraph (Q),

(2) by striking the period at the end of subparagraph (R) and inserting "; or", and

(3) by adding at the end the following new subparagraph:

"(S) subject to section 214(j), an alien—

"(i) who the Attorney General determines—

"(I) is in possession of critical reliable information concerning a criminal organization or enterprise;

"(II) is willing to supply or has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and

"(III) whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual involved in the criminal organization or enterprise; or

"(ii) who the Secretary of State and the Attorney General jointly determine—

"(I) is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

"(II) is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

"(III) will be or has been placed in danger as a result of providing such information; and

"(IV) is eligible to receive a reward under section 36(a) of the State Department Basic Authorities Act of 1956,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien.".

(b) CONDITIONS OF ENTRY.—

<< 8 USCA § 1182 >>

(1) WAIVER OF GROUNDS FOR EXCLUSION.—Section 212(d) of the Immigration and Nationality Act (8 U.S.C. 1182(d)) is amended by inserting at the beginning the following new paragraph:

"(1) The Attorney General shall determine whether a ground for exclusion exists with respect to a nonimmigrant described in section 101(a)(15)(S). The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 101(a)(15)(S), if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting deportation proceedings against an alien admitted as a nonimmigrant under section 101(a)(15)(S) for conduct committed after the alien's admission into the United States, or for conduct or a condition that was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 101(a)(15)(S).".

<< 8 USCA § 1184 >>

(2) NUMERICAL LIMITATIONS; PERIOD OF ADMISSION; ETC.—Section 214 of the Immigration and Nationality Act (8 U.S.C. 1184) is amended by adding at the end the following new subsection:

"(j)(1) The number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S)(i) in any fiscal year may not exceed 100. The number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S)(ii) in any fiscal year may not exceed 25.

"(2) No alien may be admitted into the United States as such a nonimmigrant more than 5 years after the date of the enactment of this subsection.

"(3) The period of admission of an alien as such a nonimmigrant may not exceed 3 years. Such period may not be extended by the Attorney General.

"(4) As a condition for the admission, and continued stay in lawful status, of such a nonimmigrant, the nonimmigrant—

  "(A) shall report not less often than quarterly to the Attorney General such information concerning the alien's whereabouts and activities as the Attorney General may require;

  "(B) may not be convicted of any criminal offense punishable by a term of imprisonment of 1 year or more after the date of such admission;

  "(C) must have executed a form that waives the nonimmigrant's right to contest, other than on the basis of an application for withholding of deportation, any action for deportation of the alien instituted before the alien obtains lawful permanent resident status; and

  "(D) shall abide by any other condition, limitation, or restriction imposed by the Attorney General.

"(5) The Attorney General shall submit a report annually to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate concerning—

  "(A) the number of such nonimmigrants admitted;

  "(B) the number of successful criminal prosecutions or investigations resulting from cooperation of such aliens;

  "(C) the number of terrorist acts prevented or frustrated resulting from cooperation of such aliens;

  "(D) the number of such nonimmigrants whose admission or cooperation has not resulted in successful criminal prosecution or investigation or the prevention or frustration of a terrorist act; and

  "(E) the number of such nonimmigrants who have failed to report quarterly (as required under paragraph (4)) or who have been convicted of crimes in the United States after the date of their admission as such a nonimmigrant.".

<< 8 USCA § 1258 >>

  (3) PROHIBITION OF CHANGE OF STATUS.—Section 248(1) of the Immigration and Naturalization Act (8 U.S.C. 1258(1)) is amended by striking "or (K)" and inserting "(K), or (S)".

<< 8 USCA § 1255 >>

(c) ADJUSTMENT TO PERMANENT RESIDENT STATUS.—

  (1) IN GENERAL.—Section 245 of the Immigration and Nationality Act (8 U.S.C. 1255) is amended by adding at the end the following new subsection:

"(i)(1) If, in the opinion of the Attorney General—

  "(A) a nonimmigrant admitted into the United States under section 101(a)(15)(S)(i) has supplied information described in subclause (I) of such section; and

  "(B) the provision of such information has substantially contributed to the success of an authorized criminal investigation or the prosecution of an individual described in subclause (III) of that section,

the Attorney General may adjust the status of the alien (and the spouse, married and unmarried sons and daughters, and parents of the alien if admitted under that section) to that of an alien lawfully admitted for permanent residence if the alien is not described in section 212(a)(3)(E).

"(2) If, in the sole discretion of the Attorney General—

  "(A) a nonimmigrant admitted into the United States under section 101(a)(15)(S)(ii) has supplied information described in subclause (I) of such section, and

  "(B) the provision of such information has substantially contributed to—

    "(i) the prevention or frustration of an act of terrorism against a United States person or United States property, or

    "(ii) the success of an authorized criminal investigation of, or the prosecution of, an individual involved in such an act of terrorism, and

  "(C) the nonimmigrant has received a reward under section 36(a) of the State Department Basic Authorities Act of 1956,

the Attorney General may adjust the status of the alien (and the spouse, married and unmarried sons and daughters, and parents of the alien if admitted under such section) to that of an alien lawfully admitted for permanent residence if the alien is not described in section 212(a)(3)(E).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(3) Upon the approval of adjustment of status under paragraphs (1) or (2), the Attorney General shall record the alien's lawful admission for permanent residence as of the date of such approval and the Secretary of State shall reduce by one the number of visas authorized to be issued under sections 201(d) and 203(b)(4) for the fiscal year then current.".

(2) EXCLUSIVE MEANS OF ADJUSTMENT.—Section 245(c) of the Immigration and Nationality Act (8 U.S.C. 1255(c)) is amended by striking "or" before "(4)" and by inserting before the period at the end the following: "; or (5) an alien who was admitted as a nonimmigrant described in section 101(a)(15)(S)".

<< 8 USCA § 1251 >>

(d) EXTENSION OF PERIOD OF DEPORTATION FOR CONVICTION OF A CRIME.—Section 241(a)(2)(A)(i)(I) of the Immigration and Nationality Act (8 U.S.C. 1251(a)(2)(A)(i)(I)) is amended by inserting "(or 10 years in the case of an alien provided lawful permanent resident status under section 245(i))" after "five years".

SEC. 130004. DEPORTATION PROCEDURES FOR CERTAIN CRIMINAL ALIENS WHO ARE NOT PERMANENT RESIDENTS.

<< 8 USCA § 1252a >>

(a) ELIMINATION OF ADMINISTRATIVE HEARING FOR CERTAIN CRIMINAL ALIENS.—Section 242A of the Immigration and Nationality Act (8 U.S.C. 1252a) is amended by adding at the end the following new subsection:

"(b) DEPORTATION OF ALIENS WHO ARE NOT PERMANENT RESIDENTS.—

"(1) The Attorney General may, in the case of an alien described in paragraph (2), determine the deportability of such alien under section 241(a)(2)(A)(iii) (relating to conviction of an aggravated felony) and issue an order of deportation pursuant to the procedures set forth in this subsection or section 242(b).

"(2) An alien is described in this paragraph if the alien—

"(A) was not lawfully admitted for permanent residence at the time at which proceedings under this section commenced; and

"(B) is not eligible for any relief from deportation under this Act.

"(3) The Attorney General may not execute any order described in paragraph (1) until 30 calendar days have passed from the date that such order was issued, unless waived by the alien, in order that the alien has an opportunity to apply for judicial review under section 106.

"(4) Proceedings before the Attorney General under this subsection shall be in accordance with such regulations as the Attorney General shall prescribe. The Attorney General shall provide that—

"(A) the alien is given reasonable notice of the charges and of the opportunity described in subparagraph (C);

"(B) the alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose;

"(C) the alien has a reasonable opportunity to inspect the evidence and rebut the charges;

"(D) the determination of deportability is supported by clear, convincing, and unequivocal evidence and a record is maintained for judicial review; and

"(E) the final order of deportation is not entered by the same person who issues the charges.".

<< 8 USCA § 1105a >>

(b) LIMITED JUDICIAL REVIEW.—Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a) is amended—

(1) in the first sentence of subsection (a), by inserting "or pursuant to section 242A" after "under section 242(b)";

(2) in subsection (a)(1) and subsection (a)(3), by inserting "(including an alien described in section 242A)" after "aggravated felony"; and

(3) by adding at the end the following new subsection:

"(d)(1) A petition for review or for habeas corpus on behalf of an alien against whom a final order of deportation has been issued pursuant to section 242A(b) may challenge only—

"(A) whether the alien is in fact the alien described in the order;

"(B) whether the alien is in fact an alien described in section 242A(b)(2);

"(C) whether the alien has been convicted of an aggravated felony and such conviction has become final; and

"(D) whether the alien was afforded the procedures required by section 242A(b)(5).

"(2) No court shall have jurisdiction to review any issue other than an issue described in paragraph (1).".

<< 8 USCA § 1252a >>

(c) TECHNICAL AMENDMENTS.—Section 242A of the Immigration and Nationality Act (8 U.S.C. 1252a) is amended—

(1) by amending the heading to read as follows:

"EXPEDITED DEPORTATION OF ALIENS CONVICTED OF COMMITTING AGGRAVATED FELONIES";

(2) in subsection (a), as designated prior to enactment of this Act, by striking "(a) IN GENERAL.—" and inserting the following:

"(a) DEPORTATION OF CRIMINAL ALIENS.—

"(1) IN GENERAL.—";

(3) in subsection (b), as designated prior to enactment of this Act, by striking "(b) IMPLEMENTATION.—" and inserting "(2) IMPLEMENTATION.—";

(4) by striking subsection (c);

(5) in subsection (d)—

(A) by striking "(d) EXPEDITED PROCEEDINGS.—(1)" and inserting "(3) EXPEDITED PROCEEDINGS.—(A)"; and

(B) by striking "(2)" and inserting "(B)"; and

(6) in subsection (e)—

(A) by striking "(e) REVIEW.—(1)" and inserting "(4) REVIEW.—(A)";

(B) by striking the second sentence; and

(C) by striking "(2)" and inserting "(B)".

<< 8 USCA § 1105a NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to all aliens against whom deportation proceedings are initiated after the date of enactment of this Act.

SEC. 130005. EXPEDITIOUS DEPORTATION FOR DENIED ASYLUM APPLICANTS.

<< 8 USCA § 1158 NOTE >>

(a) IN GENERAL.—The Attorney General may provide for the expeditious adjudication of asylum claims and the expeditious deportation of asylum applicants whose applications have been finally denied, unless the applicant remains in an otherwise valid nonimmigrant status.

<< 8 USCA § 1158 >>

<< 8 USCA § 1158 NOTE >>

(b) EMPLOYMENT AUTHORIZATION.—Section 208 of the Immigration and Nationality Act (8 U.S.C. 1158) is amended by adding at the end the following new subsection:

"(e) An applicant for asylum is not entitled to employment authorization except as may be provided by regulation in the discretion of the Attorney General.".

<< 8 USCA § 1158 NOTE >>

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

(1) $64,000,000 for fiscal year 1995;

(2) $90,000,000 for fiscal year 1996;

(3) $93,000,000 for fiscal year 1997; and

(4) $91,000,000 for fiscal year 1998.

<< 8 USCA § 1101 NOTE >>

## SEC. 130006. IMPROVING BORDER CONTROLS.

(a) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for the Immigration and Naturalization Service to increase the resources for the Border Patrol, the Inspections Program, and the Deportation Branch to apprehend illegal aliens who attempt clandestine entry into the United States or entry into the United States with fraudulent documents or who remain in the country after their nonimmigrant visas expire—

(1) $228,000,000 for fiscal year 1995;

(2) $185,000,000 for fiscal year 1996;

(3) $204,000,000 for fiscal year 1997; and

(4) $58,000,000 for fiscal year 1998.

Of the sums authorized in this section, all necessary funds shall, subject to the availability of appropriations, be allocated to increase the number of agent positions (and necessary support personnel positions) in the Border Patrol by not less than 1,000 full-time equivalent positions in each of fiscal years 1995, 1996, 1997, and 1998 beyond the number funded as of October 1, 1994.

(b) REPORT.—By September 30, 1996 and September 30, 1998, the Attorney General shall report to the Congress on the programs described in this section. The report shall include an evaluation of the programs, an outcome-based measurement of performance, and an analysis of the cost effectiveness of the additional resources provided under this Act.

<< 8 USCA § 1252 NOTE >>

## SEC. 130007. EXPANDED SPECIAL DEPORTATION PROCEEDINGS.

(a) IN GENERAL.—Subject to the availability of appropriations, the Attorney General may expand the program authorized by section 242A(d) and 242(i) of the Immigration and Nationality Act to ensure that such aliens are immediately deportable upon their release from incarceration.

(b) DETENTION AND REMOVAL OF CRIMINAL ALIENS.—Subject to the availability of appropriations, the Attorney General may—

(1) construct or contract for the construction of 2 Immigration and Naturalization Service Processing Centers to detain criminal aliens; and

(2) provide for the detention and removal of such aliens.

(c) REPORT.—By September 30, 1996, and September 30, 1998 the Attorney General shall report to the Congress on the programs referred to in subsections (a) and (b). The report shall include an evaluation of the programs, an outcome-based measurement of performance, and an analysis of the cost effectiveness of the additional resources provided under this Act.

(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

(1) $55,000,000 for fiscal year 1995;

(2) $54,000,000 for fiscal year 1996;

(3) $49,000,000 for fiscal year 1997; and

(4) $2,000,000 for fiscal year 1998.

<< 8 USCA § 1252 NOTE >>

## SEC. 130008. AUTHORITY TO ACCEPT CERTAIN ASSISTANCE.

(a) IN GENERAL.—Subject to subsection (b) and notwithstanding any other provision of law, the Attorney General, in the discretion of the Attorney General, may accept, hold, administer, and utilize gifts of property and services (which may not include cash assistance) from State and local governments for the purpose of assisting the Immigration and Naturalization Service in the transportation of deportable aliens who are arrested for misdemeanor or felony crimes under State or Federal

law and who are either unlawfully within the United States or willing to submit to voluntary departure under safeguards. Any property acquired pursuant to this section shall be acquired in the name of the United States.

 (b) LIMITATION.—The Attorney General shall terminate or rescind the exercise of the authority under subsection (a) if the Attorney General determines that the exercise of such authority has resulted in discrimination by law enforcement officials on the basis of race, color, or national origin.

## SEC. 130009. PASSPORT AND VISA OFFENSES PENALTIES IMPROVEMENT.

 (a) IN GENERAL.—Chapter 75 of title 18, United States Code, is amended—

<< 18 USCA § 1541 >>

 (1) in section 1541 by striking "not more than $500 or imprisoned not more than one year" and inserting "under this title, imprisoned not more than 10 years";

<< 18 USCA §§ 1542, 1543, 1544 >>

 (2) in each of sections 1542, 1543, and 1544 by striking "not more than $2,000 or imprisoned not more than five years" and inserting "under this title, imprisoned not more than 10 years";

<< 18 USCA § 1545 >>

 (3) in section 1545 by striking "not more than $2,000 or imprisoned not more than three years" and inserting "under this title, imprisoned not more than 10 years";

<< 18 USCA § 1546 >>

 (4) in section 1546(a) by striking "five years" and inserting "10 years";
 (5) in section 1546(b) by striking "in accordance with this title, or imprisoned not more than two years" and inserting "under this title, imprisoned not more than 5 years"; and

<< 18 USCA § 1547 >>

 (6) by adding at the end the following new section:

"§ 1547. Alternative imprisonment maximum for certain offenses

 "Notwithstanding any other provision of this title, the maximum term of imprisonment that may be imposed for an offense under this chapter (other than an offense under section 1545)—
 "(1) if committed to facilitate a drug trafficking crime (as defined in 929(a)) is 15 years; and
 "(2) if committed to facilitate an act of international terrorism (as defined in section 2331) is 20 years.".

<< 18 USCA Ch. 75 >>

 (b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 75 of title 18, United States Code, is amended by adding at the end the following new item:
 "1547. Alternative imprisonment maximum for certain offenses.".

## SEC. 130010. ASYLUM.

 (a) FINDINGS.—The Senate finds that—

 (1) in the last decade applications for asylum have greatly exceeded the original 5,000 annual limit provided in the Refugee Act of 1980, with more than 150,000 asylum applications filed in fiscal year 1993, and the backlog of cases growing to 340,000;
 (2) this flood of asylum claims has swamped the system, creating delays in the processing of applications of up to several years;

AR.02049

(3) the delay in processing asylum claims due to the overwhelming numbers has contributed to numerous problems, including —

(A) an abuse of the asylum laws by fraudulent applicants whose primary interest is obtaining work authority in the United States while their claim languishes in the backlogged asylum processing system;

(B) the growth of alien smuggling operations, often involving organized crime;

(C) a drain on limited resources resulting from the high cost of processing frivolous asylum claims through our multilayered system; and

(D) an erosion of public support for asylum, which is a treaty obligation.

(4) asylum, a safe haven protection for aliens abroad who cannot return home, has been perverted by some aliens who use asylum claims to circumvent our immigration and refugee laws and procedures; and

(5) a comprehensive revision of our asylum law and procedures is required to address these problems.

(b) POLICY.—It is the sense of the Senate that—

(1) asylum is a process intended to protect aliens in the United States who cannot safely return home;

(2) persons outside their country of nationality who have a well-founded fear of persecution if they return should apply for refugee status at one of our refugee processing offices abroad; and

(3) the immigration, refugee and asylum laws of the United States should be reformed to provide—

(A) a procedure for the expeditious exclusion of any asylum applicant who arrives at a port-of-entry with fraudulent documents, or no documents, and makes a noncredible claim of asylum; and

(B) the immigration, refugee and asylum laws of the United States should be reformed to provide for a streamlined affirmative asylum processing system for asylum applicants who make their application after they have entered the United States.

<< 18 USCA § 5032 >>

TITLE XIV—YOUTH VIOLENCE

SEC. 140001. PROSECUTION AS ADULTS OF CERTAIN JUVENILES FOR CRIMES OF VIOLENCE.

The 4th undesignated paragraph of section 5032 of title 18, United States Code, is amended by striking "; however" and inserting ". In the application of the preceding sentence, if the crime of violence is an offense under section 113(a), 113(b), 113(c), 1111, 1113, or, if the juvenile possessed a firearm during the offense, section 2111, 2113, 2241(a), or 2241(c), 'thirteen' shall be substituted for 'fifteen' and 'thirteenth' shall be substituted for 'fifteenth'. Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to the preceding sentence for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151), and which has occurred within the boundaries of such Indian country, unless the governing body of the tribe has elected that the preceding sentence have effect over land and persons subject to its criminal jurisdiction. However".

<< 18 USCA § 5032 >>

SEC. 140002. COMMENCEMENT OF JUVENILE PROCEEDING.

Section 5032 of title 18, United States Code, is amended by striking "Any proceedings against a juvenile under this chapter or as an adult shall not be commenced until" and inserting "A juvenile shall not be transferred to adult prosecution nor shall a hearing be held under section 5037 (disposition after a finding of juvenile delinquency) until".

<< 18 USCA § 5039 >>

SEC. 140003. SEPARATION OF JUVENILE FROM ADULT OFFENDERS.

Section 5039 of title 18, United States Code, is amended by inserting ", whether pursuant to an adjudication of delinquency or conviction for an offense," after "committed" the first place it appears.

<< 42 USCA § 3751 >>

SEC. 140004. BINDOVER SYSTEM FOR CERTAIN VIOLENT JUVENILES.

Section 501(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751), as amended by section 100003, is amended—

(1) by striking "and" at the end of paragraph (21);

(2) by striking the period at the end of paragraph (22) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(23) programs that address the need for effective bindover systems for the prosecution of violent 16- and 17-year-old juveniles in courts with jurisdiction over adults for the crimes of—

"(A) murder in the first degree;

"(B) murder in the second degree;

"(C) attempted murder;

"(D) armed robbery when armed with a firearm;

"(E) aggravated battery or assault when armed with a firearm;

"(F) criminal sexual penetration when armed with a firearm; and

"(G) drive-by shootings as described in section 36 of title 18, United States Code.".

<< 18 USCA § 5038 >>

SEC. 140005. AMENDMENT CONCERNING RECORDS OF CRIMES COMMITTED BY JUVENILES.

Section 5038 of title 18, United States Code, is amended in subsection (f) by adding "or whenever a juvenile has been found guilty of committing an act after his 13th birthday which if committed by an adult would be an offense described in the second sentence of the fourth paragraph of section 5032 of this title," after "title 21,".

<< 21 USCA § 860 >>

SEC. 140006. INCREASED PENALTIES FOR EMPLOYING CHILDREN TO DISTRIBUTE DRUGS NEAR SCHOOLS AND PLAYGROUNDS.

Section 419 of the Controlled Substances Act (21 U.S.C. 860) is amended—

(1) by redesignating subsections (c) and (d) as subsections (d) and (e), respectively; and

(2) by inserting after subsection (b) the following new subsection:

"(c) Notwithstanding any other law, any person at least 21 years of age who knowingly and intentionally—

"(1) employs, hires, uses, persuades, induces, entices, or coerces a person under 18 years of age to violate this section; or

"(2) employs, hires, uses, persuades, induces, entices, or coerces a person under 18 years of age to assist in avoiding detection or apprehension for any offense under this section by any Federal, State, or local law enforcement official,

is punishable by a term of imprisonment, a fine, or both, up to triple those authorized by section 401.".

SEC. 140007. INCREASED PENALTIES FOR TRAVEL ACT CRIMES INVOLVING VIOLENCE AND CONSPIRACY TO COMMIT CONTRACT KILLINGS.

<< 18 USCA § 1952 >>

(a) TRAVEL ACT PENALTIES.—Section 1952(a) of title 18, United States Code, is amended by striking "and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both." and inserting "and thereafter performs or attempts to perform—

"(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or

"(B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.".

<< 18 USCA § 1958 >>

(b) MURDER CONSPIRACY PENALTIES.—Section 1958(a) of title 18, United States Code, is amended by inserting "or who conspires to do so" before "shall be fined" the first place it appears.

<< 28 USCA § 994 NOTE >>

SEC. 140008. SOLICITATION OF MINOR TO COMMIT CRIME.

(a) DIRECTIVE TO SENTENCING COMMISSION.—(1) The United States Sentencing Commission shall promulgate guidelines or amend existing guidelines to provide that a defendant 21 years of age or older who has been convicted of an offense shall receive an appropriate sentence enhancement if the defendant involved a minor in the commission of the offense.

(2) The Commission shall provide that the guideline enhancement promulgated pursuant to paragraph (1) shall apply for any offense in relation to which the defendant has solicited, procured, recruited, counseled, encouraged, trained, directed, commanded, intimidated, or otherwise used or attempted to use any person less than 18 years of age with the intent that the minor would commit a Federal offense.

(b) RELEVANT CONSIDERATIONS.—In implementing the directive in subsection (a), the Sentencing Commission shall consider—

(1) the severity of the crime that the defendant intended the minor to commit;

(2) the number of minors that the defendant used or attempted to use in relation to the offense;

(3) the fact that involving a minor in a crime of violence is frequently of even greater seriousness than involving a minor in a drug trafficking offense, for which the guidelines already provide a two-level enhancement; and

(4) the possible relevance of the proximity in age between the offender and the minor(s) involved in the offense.

<< 42 USCA Ch. 136 >>

TITLE XV—CRIMINAL STREET GANGS

SEC. 150001. CRIMINAL STREET GANGS.

(a) IN GENERAL.—Part I of title 18, United States Code, is amended by inserting after chapter 25 the following new chapter:

<< 18 USCA Ch. 25 >>

"CHAPTER 26—CRIMINAL STREET GANGS

<< 18 USCA § 521 >>

"§ 521. Criminal street gangs

"(a) DEFINITIONS.—

" 'conviction' includes a finding, under State or Federal law, that a person has committed an act of juvenile delinquency involving a violent or controlled substances felony.

" 'criminal street gang' means an ongoing group, club, organization, or association of 5 or more persons—

"(A) that has as 1 of its primary purposes the commission of 1 or more of the criminal offenses described in subsection (c);

"(B) the members of which engage, or have engaged within the past 5 years, in a continuing series of offenses described in subsection (c); and

"(C) the activities of which affect interstate or foreign commerce.

"(b) PENALTY.—The sentence of a person convicted of an offense described in subsection (c) shall be increased by up to 10 years if the offense is committed under the circumstances described in subsection (d).

"(c) OFFENSES.—The offenses described in this section are—

"(1) a Federal felony involving a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which the maximum penalty is not less than 5 years;

"(2) a Federal felony crime of violence that has as an element the use or attempted use of physical force against the person of another; and

"(3) a conspiracy to commit an offense described in paragraph (1) or (2).

"(d) CIRCUMSTANCES.—The circumstances described in this section are that the offense described in subsection (c) was committed by a person who—

"(1) participates in a criminal street gang with knowledge that its members engage in or have engaged in a continuing series of offenses described in subsection (c);

"(2) intends to promote or further the felonious activities of the criminal street gang or maintain or increase his or her position in the gang; and

"(3) has been convicted within the past 5 years for—

"(A) an offense described in subsection (c);

"(B) a State offense—

"(i) involving a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which the maximum penalty is not less than 5 years' imprisonment; or

"(ii) that is a felony crime of violence that has as an element the use or attempted use of physical force against the person of another;

"(C) any Federal or State felony offense that by its nature involves a substantial risk that physical force against the person of another may be used in the course of committing the offense; or

"(D) a conspiracy to commit an offense described in subparagraph (A), (B), or (C).".

<< 18 USCA Ch. 1 >>

(b) TECHNICAL AMENDMENT.—The part analysis for part I of title 18, United States Code, is amended by inserting after the item relating to chapter 25 the following new item:

"26.   Criminal street gangs........................................................................................................................ ..............521".

<< 18 USCA § 5032 >>

SEC. 150002. ADULT PROSECUTION OF SERIOUS JUVENILE OFFENDERS.

Section 5032 of title 18, United States Code, is amended—

(1) in the first undesignated paragraph by striking "922(p)" and inserting "924(b), (g), or (h)";

(2) in the fourth undesignated paragraph by inserting "or in section 924(b), (g), or (h) of this title," before "criminal prosecution" the first place it appears; and

(3) in the fifth undesignated paragraph by adding at the end the following: "In considering the nature of the offense, as required by this paragraph, the court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms. Such a factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer.".

<< 42 USCA § 3751 >>

SEC. 150003. ADDITION OF ANTI–GANG BYRNE GRANT FUNDING OBJECTIVE.

Section 501(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751(4)), as amended by section 140004, is amended—

(1) by striking "and" at the end of paragraph (22);

(2) by striking the period at the end of paragraph (23) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(24) law enforcement and prevention programs relating to gangs, or to youth who are involved or at risk of involvement in gangs.".

<< 42 USCA § 5667e–3 >>

SEC. 150006. MENTORING PROGRAM.

Section 288C of part G of title II of the Juvenile Justice and Delinquency Prevention Act of 1974 is amended to read as follows:

"REGULATIONS AND GUIDELINES

"SEC. 288C. (a) PROGRAM GUIDELINES.—The Administrator shall issue program guidelines to implement this part. The program guidelines shall be effective only after a period for public notice and comment.

"(b) MODEL SCREENING GUIDELINES.—The Administrator shall develop and distribute to program participants specific model guidelines for the screening of prospective program mentors.".

<< 42 USCA § 14061 >>

SEC. 150007. JUVENILE ANTI–DRUG AND ANTI–GANG GRANTS IN FEDERALLY ASSISTED LOW–INCOME HOUSING.

Grants authorized in this Act to reduce or prevent juvenile drug and gang-related activity in "public housing" may be used for such purposes in federally assisted, low-income housing.

<< 42 USCA § 14062 >>

SEC. 150008. GANG INVESTIGATION COORDINATION AND INFORMATION COLLECTION.

(a) COORDINATION.—The Attorney General (or the Attorney General's designee), in consultation with the Secretary of the Treasury (or the Secretary's designee), shall develop a national strategy to coordinate gang-related investigations by Federal law enforcement agencies.

(b) DATA COLLECTION.—The Director of the Federal Bureau of Investigation shall acquire and collect information on incidents of gang violence for inclusion in an annual uniform crime report.

(c) REPORT.—The Attorney General shall prepare a report on national gang violence outlining the strategy developed under subsection (a) to be submitted to the President and Congress by January 1, 1996.

(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section $1,000,000 for fiscal year 1996.

<< 42 USCA § 3754 >>

SEC. 150009. MULTIJURISDICTIONAL GANG TASK FORCES.

Section 504(f) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended by inserting "victims assistance programs, or multijurisdictional gang task forces" after "drug task forces".

TITLE XVI—CHILD PORNOGRAPHY

SEC. 160001. PENALTIES FOR INTERNATIONAL TRAFFICKING IN CHILD PORNOGRAPHY.

<< 18 USCA § 2258 >>

(a) IMPORT RELATED OFFENSE.—Chapter 110 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 2258. Production of sexually explicit depictions of a minor for importation into the United States

"(a) USE OF MINOR.—A person who, outside the United States, employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor with the intent that the minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, intending that the visual depiction will be imported into the United States or into waters within 12 miles of the coast of the United States, shall be punished as provided in subsection (c).

"(b) USE OF VISUAL DEPICTION.—A person who, outside the United States, knowingly receives, transports, ships, distributes, sells, or possesses with intent to transport, ship, sell, or distribute any visual depiction of a minor engaging in sexually explicit conduct (if the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct), intending that the visual depiction will be imported into the United States or into waters within a distance of 12 miles of the coast of the United States, shall be punished as provided in subsection (c).

"(c) PENALTIES.—A person who violates subsection (a) or (b), or conspires or attempts to do so—

"(1) shall be fined under this title, imprisoned not more than 10 years, or both; and

"(2) if the person has a prior conviction under this chapter or chapter 109A, shall be fined under this title, imprisoned not more than 20 years, or both.".

(b) TECHNICAL AMENDMENT.—

<< 18 USCA Ch. 110 >>

(1) CHAPTER ANALYSIS.—The chapter analysis for chapter 110 of title 18, United States Code, is amended by adding at the end the following new item:

"2258. Production of sexually explicit depictions of a minor for importation into the United States.".

<< 18 USCA § 2251 >>

(2) FINE PROVISIONS.—Section 2251(d) of title 18, United States Code, is amended—

(A) by striking "not more than $100,000, or" and inserting "under this title,";

(B) by striking "not more than $200,000, or" and inserting "under this title,"; and

(C) by striking "not more than $250,000" and inserting "under this title".

(c) SECTION 2251 PENALTY ENHANCEMENT.—Section 2251(d) of title 18, United States Code, is amended by striking "this section" the second place it appears and inserting "this chapter or chapter 109A".

<< 18 USCA § 2252 >>

(d) SECTION 2252 PENALTY ENHANCEMENT.—Section 2252(b)(1) of title 18, United States Code, is amended by striking "this section" and inserting "this chapter or chapter 109A".

<< 18 USCA §§ 2251, 2252 >>

(e) CONSPIRACY AND ATTEMPT.—Sections 2251(d) and 2252(b) of title 18, United States Code, are each amended by inserting ", or attempts or conspires to violate," after "violates" each place it appears.

<< 18 USCA § 1961 >>

(f) RICO AMENDMENT.—Section 1961(l) of title 18, United States Code, is amended by striking "2251–2252" and inserting "2251, 2251A, 2252, and 2258".

<< 18 USCA § 2423 >>

(g) TRANSPORTATION OF MINORS.—Section 2423 of title 18, United States Code, is amended—

(1) by striking "(a) Whoever" and inserting "(a) TRANSPORTATION WITH INTENT TO ENGAGE IN CRIMINAL SEXUAL ACTIVITY.—A person who"; and

(2) by adding at the end the following new subsection:

"(b) TRAVEL WITH INTENT TO ENGAGE IN SEXUAL ACT WITH A JUVENILE.—A person who travels in interstate commerce, or conspires to do so, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, or conspires to do so, for the purpose of engaging in any sexual act (as defined in section 2245) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States shall be fined under this title, imprisoned not more than 10 years, or both.".

SEC. 160002. SENSE OF CONGRESS CONCERNING STATE LEGISLATION REGARDING CHILD PORNOGRAPHY.

It is the sense of the Congress that each State that has not yet done so should enact legislation prohibiting the production, distribution, receipt, or simple possession of materials depicting a person under 18 years of age engaging in sexually explicit conduct (as defined in section 2256 of title 18, United States Code) and providing for a maximum imprisonment of at least 1 year and for the forfeiture of assets used in the commission or support of, or gained from, such offenses.

SEC. 160003. CONFIRMATION OF INTENT OF CONGRESS IN ENACTING SECTIONS 2252 AND 2256 OF TITLE 18, UNITED STATES CODE.

<< 18 USCA § 2252 NOTE >>

(a) DECLARATION.—The Congress declares that in enacting sections 2252 and 2256 of title 18, United States Code, it was and is the intent of Congress that—

(1) the scope of "exhibition of the genitals or pubic area" in section 2256(2)(E), in the definition of "sexually explicit conduct", is not limited to nude exhibitions or exhibitions in which the outlines of those areas were discernible through clothing; and

(2) the requirements in section 2252(a)(1)(A), (2)(A), (3)(B)(i), and (4)(B)(i) that the production of a visual depiction involve the use of a minor engaging in "sexually explicit conduct" of the kind described in section 2256(2)(E) are satisfied if a person photographs a minor in such a way as to exhibit the child in a lascivious manner.

(b) SENSE OF THE CONGRESS.—It is the sense of the Congress that in filing its brief in United States v. Knox, No. 92–1183, and thereby depriving the United States Supreme Court of the adverseness necessary for full and fair presentation of the issues arising in the case, the Department of Justice did not accurately reflect the intent of Congress in arguing that "the videotapes in [the Knox case] constitute 'lascivious exhibition[s] of the genitals or pubic area' only if those body parts are visible in the tapes and the minors posed or acted lasciviously.".

<< 42 USCA Ch. 136 >>

TITLE XVII—CRIMES AGAINST CHILDREN

Subtitle A—Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act

<< 42 USCA § 14071 >>

SEC. 170101. ESTABLISHMENT OF PROGRAM.

(a) IN GENERAL.—

(1) STATE GUIDELINES.—The Attorney General shall establish guidelines for State programs that require—

(A) a person who is convicted of a criminal offense against a victim who is a minor or who is convicted of a sexually violent offense to register a current address with a designated State law enforcement agency for the time period specified in subparagraph (A) of subsection (b)(6); and

(B) a person who is a sexually violent predator to register a current address with a designated State law enforcement agency unless such requirement is terminated under subparagraph (B) of subsection (b)(6).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) COURT DETERMINATION.—A determination that a person is a sexually violent predator and a determination that a person is no longer a sexually violent predator shall be made by the sentencing court after receiving a report by a State board composed of experts in the field of the behavior and treatment of sexual offenders.

(3) DEFINITIONS.—For purposes of this section:

   (A) The term "criminal offense against a victim who is a minor" means any criminal offense that consists of—

   (i) kidnapping of a minor, except by a parent;

   (ii) false imprisonment of a minor, except by a parent;

   (iii) criminal sexual conduct toward a minor;

   (iv) solicitation of a minor to engage in sexual conduct;

   (v) use of a minor in a sexual performance;

   (vi) solicitation of a minor to practice prostitution;

   (vii) any conduct that by its nature is a sexual offense against a minor; or

   (viii) an attempt to commit an offense described in any of clauses (i) through (vii), if the State—

     (I) makes such an attempt a criminal offense; and

     (II) chooses to include such an offense in those which are criminal offenses against a victim who is a minor for the purposes of this section.

For purposes of this subparagraph conduct which is criminal only because of the age of the victim shall not be considered a criminal offense if the perpetrator is 18 years of age or younger.

   (B) The term "sexually violent offense" means any criminal offense that consists of aggravated sexual abuse or sexual abuse (as described in sections 2241 and 2242 of title 18, United States Code, or as described in the State criminal code) or an offense that has as its elements engaging in physical contact with another person with intent to commit aggravated sexual abuse or sexual abuse (as described in such sections of title 18, United States Code, or as described in the State criminal code).

   (C) The term "sexually violent predator" means a person who has been convicted of a sexually violent offense and who suffers from a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses.

   (D) The term "mental abnormality" means a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons.

   (E) The term "predatory" means an act directed at a stranger, or a person with whom a relationship has been established or promoted for the primary purpose of victimization.

(b) REGISTRATION REQUIREMENT UPON RELEASE, PAROLE, SUPERVISED RELEASE, OR PROBATION.—An approved State registration program established under this section shall contain the following elements:

(1) DUTY OF STATE PRISON OFFICIAL OR COURT.—

   (A) If a person who is required to register under this section is released from prison, or placed on parole, supervised release, or probation, a State prison officer, or in the case of probation, the court, shall—

   (i) inform the person of the duty to register and obtain the information required for such registration;

   (ii) inform the person that if the person changes residence address, the person shall give the new address to a designated State law enforcement agency in writing within 10 days;

   (iii) inform the person that if the person changes residence to another State, the person shall register the new address with the law enforcement agency with whom the person last registered, and the person is also required to register with a designated law enforcement agency in the new State not later than 10 days after establishing residence in the new State, if the new State has a registration requirement;

   (iv) obtain fingerprints and a photograph of the person if these have not already been obtained in connection with the offense that triggers registration; and

   (v) require the person to read and sign a form stating that the duty of the person to register under this section has been explained.

   (B) In addition to the requirements of subparagraph (A), for a person required to register under subparagraph (B) of subsection (a)(1), the State prison officer or the court, as the case may be, shall obtain the name of the person, identifying

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

factors, anticipated future residence, offense history, and documentation of any treatment received for the mental abnormality or personality disorder of the person.

(2) TRANSFER OF INFORMATION TO STATE AND THE FBI.—The officer, or in the case of a person placed on probation, the court, shall, within 3 days after receipt of information described in paragraph (1), forward it to a designated State law enforcement agency. The State law enforcement agency shall immediately enter the information into the appropriate State law enforcement record system and notify the appropriate law enforcement agency having jurisdiction where the person expects to reside. The State law enforcement agency shall also immediately transmit the conviction data and fingerprints to the Federal Bureau of Investigation.

(3) VERIFICATION.—

(A) For a person required to register under subparagraph (A) of subsection (a)(1), on each anniversary of the person's initial registration date during the period in which the person is required to register under this section the following applies:

(i) The designated State law enforcement agency shall mail a nonforwardable verification form to the last reported address of the person.

(ii) The person shall mail the verification form to the designated State law enforcement agency within 10 days after receipt of the form.

(iii) The verification form shall be signed by the person, and state that the person still resides at the address last reported to the designated State law enforcement agency.

(iv) If the person fails to mail the verification form to the designated State law enforcement agency within 10 days after receipt of the form, the person shall be in violation of this section unless the person proves that the person has not changed the residence address.

(B) The provisions of subparagraph (A) shall be applied to a person required to register under subparagraph (B) of subsection (a)(1), except that such person must verify the registration every 90 days after the date of the initial release or commencement of parole.

(4) NOTIFICATION OF LOCAL LAW ENFORCEMENT AGENCIES OF CHANGES IN ADDRESS.—A change of address by a person required to register under this section reported to the designated State law enforcement agency shall be immediately reported to the appropriate law enforcement agency having jurisdiction where the person is residing. The designated law enforcement agency shall, if the person changes residence to another State, notify the law enforcement agency with which the person must register in the new State, if the new State has a registration requirement.

(5) REGISTRATION FOR CHANGE OF ADDRESS TO ANOTHER STATE.—A person who has been convicted of an offense which requires registration under this section shall register the new address with a designated law enforcement agency in another State to which the person moves not later than 10 days after such person establishes residence in the new State, if the new State has a registration requirement.

(6) LENGTH OF REGISTRATION.—

(A) A person required to register under subparagraph (A) of subsection (a)(1) shall continue to comply with this section until 10 years have elapsed since the person was released from prison, placed on parole, supervised release, or probation.

(B) The requirement of a person to register under subparagraph (B) of subsection (a)(1) shall terminate upon a determination, made in accordance with paragraph (2) of subsection (a), that the person no longer suffers from a mental abnormality or personality disorder that would make the person likely to engage in a predatory sexually violent offense.

(c) PENALTY.—A person required to register under a State program established pursuant to this section who knowingly fails to so register and keep such registration current shall be subject to criminal penalties in any State in which the person has so failed.

(d) RELEASE OF INFORMATION.—The information collected under a State registration program shall be treated as private data except that—

(1) such information may be disclosed to law enforcement agencies for law enforcement purposes;

(2) such information may be disclosed to government agencies conducting confidential background checks; and

(3) the designated State law enforcement agency and any local law enforcement agency authorized by the State agency may release relevant information that is necessary to protect the public concerning a specific person required to register under this section, except that the identity of a victim of an offense that requires registration under this section shall not be released.

(e) IMMUNITY FOR GOOD FAITH CONDUCT.—Law enforcement agencies, employees of law enforcement agencies, and State officials shall be immune from liability for good faith conduct under this section.

AR.02058

(f) COMPLIANCE.—

(1) COMPLIANCE DATE.—Each State shall have not more than 3 years from the date of enactment of this Act in which to implement this section, except that the Attorney General may grant an additional 2 years to a State that is making good faith efforts to implement this section.

(2) INELIGIBILITY FOR FUNDS.—

(A) A State that fails to implement the program as described in this section shall not receive 10 percent of the funds that would otherwise be allocated to the State under section 506 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3765).

(B) REALLOCATION OF FUNDS.—Any funds that are not allocated for failure to comply with this section shall be reallocated to States that comply with this section.

Subtitle B—Assaults Against Children

SEC. 170201. ASSAULTS AGAINST CHILDREN.

<< 18 USCA § 113 >>

(a) SIMPLE ASSAULT.—Section 113(e) of title 18, United States Code, is amended by inserting ", or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both" before the period.

(b) ASSAULTS RESULTING IN SUBSTANTIAL BODILY INJURY.—Section 113 of title 18, United States Code, is amended by adding at the end the following:

"(7) Assault resulting in substantial bodily injury to an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 5 years, or both.".

(c) TECHNICAL AND STYLISTIC CHANGES TO SECTION 113.—Section 113 of title 18, United States Code, is amended—

(1) in paragraph (b), by striking "of not more than $3,000" and inserting "under this title";

(2) in paragraph (c), by striking "of not more than $1,000" and inserting "under this title";

(3) in paragraph (d), by striking "of not more than $500" and inserting "under this title";

(4) by modifying the left margin of each of paragraphs (a) through (f) so that they are indented 2 ems;

(5) by redesignating paragraphs (a) through (f) as paragraphs (1) through (6); and

(6) by inserting "(a)" before "Whoever".

(d) DEFINITIONS.—Section 113 of title 18, United States Code, is amended by adding at the end the following:

"(b) As used in this subsection—

"(1) the term 'substantial bodily injury' means bodily injury which involves—

"(A) a temporary but substantial disfigurement; or

"(B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty; and

"(2) the term 'serious bodily injury' has the meaning given that term in section 1365 of this title.".

<< 18 USCA § 1153 >>

(e) ASSAULTS IN INDIAN COUNTRY.—Section 1153(a) of title 18, United States Code, is amended by inserting "(as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years" after "serious bodily injury".

<< 42 USCA § 5601 NOTE >>

Subtitle C—Missing and Exploited Children

SEC. 170301. SHORT TITLE.

This subtitle may be cited as the "Morgan P. Hardiman Task Force on Missing and Exploited Children Act".

<< 42 USCA § 5776a NOTE >>

SEC. 170302. PURPOSE.

  The purpose of this subtitle is to establish a task force comprised of law enforcement officers from pertinent Federal agencies to work with the National Center for Missing and Exploited Children (referred to as the "Center") and coordinate the provision of Federal law enforcement resources to assist State and local authorities in investigating the most difficult cases of missing and exploited children.

SEC. 170303. ESTABLISHMENT OF TASK FORCE.

  Title IV of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5771 et seq.) is amended—

<< 42 USCA §§ 5777, 5778 >>

  (1) by redesignating sections 407 and 408 as sections 408 and 409, respectively; and

<< 42 USCA § 5776a >>

  (2) by inserting after section 406 the following new section:

"TASK FORCE

  "SEC. 407. (a) ESTABLISHMENT.—There is established a Missing and Exploited Children's Task Force (referred to as the "Task Force").
  "(b) MEMBERSHIP.—
    "(1) IN GENERAL.—The Task Force shall include at least 2 members from each of—
      "(A) the Federal Bureau of Investigation;
      "(B) the Secret Service;
      "(C) the Bureau of Alcohol, Tobacco and Firearms;
      "(D) the United States Customs Service;
      "(E) the Postal Inspection Service;
      "(F) the United States Marshals Service; and
      "(G) the Drug Enforcement Administration.
    "(2) CHIEF.—A representative of the Federal Bureau of Investigation (in addition to the members of the Task Force selected under paragraph (1)(A)) shall act as chief of the Task Force.
    "(3) SELECTION.—(A) The Director of the Federal Bureau of Investigation shall select the chief of the Task Force.
    "(B) The heads of the agencies described in paragraph (1) shall submit to the chief of the Task Force a list of at least 5 prospective Task Force members, and the chief shall select 2, or such greater number as may be agreeable to an agency head, as Task Force members.
    "(4) PROFESSIONAL QUALIFICATIONS.—The members of the Task Force shall be law enforcement personnel selected for their expertise that would enable them to assist in the investigation of cases of missing and exploited children.
    "(5) STATUS.—A member of the Task Force shall remain an employee of his or her respective agency for all purposes (including the purpose of performance review), and his or her service on the Task Force shall be without interruption or loss of civil service privilege or status and shall be on a nonreimbursable basis.
    "(6) PERIOD OF SERVICE.—(A) Subject to subparagraph (B), 1 member from each agency shall initially serve a 1-year term, and the other member from the same agency shall serve a 1-year term, and may be selected to a renewal of service for 1 additional year; thereafter, each new member to serve on the Task Force shall serve for a 2-year period with the member's term of service beginning and ending in alternate years with the other member from the same agency; the period of service for the chief of the Task Force shall be 3 years.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) The chief of the Task Force may at any time request the head of an agency described in paragraph (1) to submit a list of 5 prospective Task Force members to replace a member of the Task Force, for the purpose of maintaining a Task Force membership that will be able to meet the demands of its caseload.

"(c) SUPPORT.—

"(1) IN GENERAL.—The Administrator of the General Services Administration, in coordination with the heads of the agencies described in subsection (b)(1), shall provide the Task Force office space and administrative and support services, such office space to be in close proximity to the office of the Center, so as to enable the Task Force to coordinate its activities with that of the Center on a day-to-day basis.

"(2) LEGAL GUIDANCE.—The Attorney General shall assign an attorney to provide legal guidance, as needed, to members of the Task Force.

"(d) PURPOSE.—

"(1) IN GENERAL.—The purpose of the Task Force shall be to make available the combined resources and expertise of the agencies described in paragraph (1) to assist State and local governments in the most difficult missing and exploited child cases nationwide, as identified by the chief of the Task Force from time to time, in consultation with the Center, and as many additional cases as resources permit, including the provision of assistance to State and local investigators on location in the field.

"(2) TECHNICAL ASSISTANCE.—The role of the Task Force in any investigation shall be to provide advice and technical assistance and to make available the resources of the agencies described in subsection (b)(1); the Task Force shall not take a leadership role in any such investigation.

"(e) CROSS–DESIGNATION OF TASK FORCE MEMBERS.—The Attorney General may cross-designate the members of the Task Force with jurisdiction to enforce Federal law related to child abduction to the extent necessary to accomplish the purposes of this section.".

<< 42 USCA Ch. 136 >>

TITLE XVIII—RURAL CRIME

Subtitle A—Drug Trafficking in Rural Areas

SEC. 180101. AUTHORIZATIONS FOR RURAL LAW ENFORCEMENT AGENCIES.

<< 42 USCA § 3793 >>

(a) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a)(9) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended to read as follows:

"(9) There are authorized to be appropriated to carry out part O—

"(A) $24,000,000 for fiscal year 1996;

"(B) $40,000,000 for fiscal year 1997;

"(C) $50,000,000 for fiscal year 1998;

"(D) $60,000,000 for fiscal year 1999; and

"(E) $66,000,000 for fiscal year 2000.".

<< 42 USCA § 3796bb >>

(b) AMENDMENT TO BASE ALLOCATION.—Section 1501(a)(2)(A) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended by striking "$100,000" and inserting "$250,000".

(c) CLARIFICATION.—Section 1501(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3796bb(b)) is amended by inserting ", based on the decennial census of 1990 through fiscal year 1997" before the period.

<< 42 USCA § 14081 >>

SEC. 180102. RURAL CRIME AND DRUG ENFORCEMENT TASK FORCES.

(a) ESTABLISHMENT.—The Attorney General, in consultation with the Governors, mayors, and chief executive officers of State and local law enforcement agencies, may establish a Rural Crime and Drug Enforcement Task Force in judicial districts that encompass significant rural lands. Assets seized as a result of investigations initiated by a Rural Crime and Drug Enforcement Task Force and forfeited under Federal law shall be used, consistent with the guidelines on equitable sharing established by the Attorney General and of the Secretary of the Treasury, primarily to enhance the operations of the task force and its participating State and local law enforcement agencies.

(b) TASK FORCE MEMBERSHIP.—The Task Forces established under subsection (a) shall be carried out under policies and procedures established by the Attorney General. The Attorney General may deputize State and local law enforcement officers and may cross-designate up to 100 Federal law enforcement officers, when necessary to undertake investigations pursuant to section 503(a) of the Controlled Substances Act (21 U.S.C. 873(a)) or offenses punishable by a term of imprisonment of 10 years or more under title 18, United States Code. The task forces—

(1) shall include representatives from—

(A) State and local law enforcement agencies;

(B) the office of the United States Attorney for the judicial district; and

(C) the Federal Bureau of Investigation, the Drug Enforcement Administration, the Immigration and Naturalization Service, and the United States Marshals Service; and

(2) may include representatives of other Federal law enforcement agencies, such as the United States Customs Service, United States Park Police, United States Forest Service, Bureau of Alcohol, Tobacco, and Firearms, and Bureau of Land Management.

<< 42 USCA § 14082 >>

SEC. 180103. RURAL DRUG ENFORCEMENT TRAINING.

(a) SPECIALIZED TRAINING FOR RURAL OFFICERS.—The Director of the Federal Law Enforcement Training Center shall develop a specialized course of instruction devoted to training law enforcement officers from rural agencies in the investigation of drug trafficking and related crimes.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out subsection (a)—

(1) $1,000,000 for fiscal year 1996;

(2) $1,000,000 for fiscal year 1997;

(3) $1,000,000 for fiscal year 1998;

(4) $1,000,000 for fiscal year 1999; and

(5) $1,000,000 for fiscal year 2000.

<< 42 USCA § 14083 >>

SEC. 180104. MORE AGENTS FOR THE DRUG ENFORCEMENT ADMINISTRATION.

There are authorized to be appropriated for the hiring of additional Drug Enforcement Administration agents—

(1) $12,000,000 for fiscal year 1996;

(2) $20,000,000 for fiscal year 1997;

(3) $30,000,000 for fiscal year 1998;

(4) $40,000,000 for fiscal year 1999; and

(5) $48,000,000 for fiscal year 2000.

Subtitle B—Drug Free Truck Stops and Safety Rest Areas

SEC. 180201. DRUG FREE TRUCK STOPS AND SAFETY REST AREAS.

<< 21 USCA § 801 NOTE >>

(a) SHORT TITLE.—This section may be cited as the "Drug Free Truck Stop Act".

(b) AMENDMENT TO CONTROLLED SUBSTANCES ACT.—

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2086 of 3864

<< 21 USCA § 849 >>

(1) IN GENERAL.—Part D of the Controlled Substances Act (21 U.S.C. 801 et seq.) is amended by inserting after section 408 the following new section:

"TRANSPORTATION SAFETY OFFENSES

"SEC. 409. (a) DEFINITIONS.—In this section—

"'safety rest area' means a roadside facility with parking facilities for the rest or other needs of motorists.

"'truck stop' means a facility (including any parking lot appurtenant thereto) that—

"(A) has the capacity to provide fuel or service, or both, to any commercial motor vehicle (as defined in section 31301 of title 49, United States Code), operating in commerce (as defined in that section); and

"(B) is located within 2,500 feet of the National System of Interstate and Defense Highways or the Federal-Aid Primary System.

"(b) FIRST OFFENSE.—A person who violates section 401(a)(1) or section 416 by distributing or possessing with intent to distribute a controlled substance in or on, or within 1,000 feet of, a truck stop or safety rest area is (except as provided in subsection (b)) subject to—

"(1) twice the maximum punishment authorized by section 401(b); and

"(2) twice any term of supervised release authorized by section 401(b) for a first offense.

"(c) SUBSEQUENT OFFENSE.—A person who violates section 401(a)(1) or section 416 by distributing or possessing with intent to distribute a controlled substance in or on, or within 1,000 feet of, a truck stop or a safety rest area after a prior conviction or convictions under subsection (a) have become final is subject to—

"(1) 3 times the maximum punishment authorized by section 401(b); and

"(2) 3 times any term of supervised release authorized by section 401(b) for a first offense.".

(2) TECHNICAL AMENDMENTS.—

<< 21 USCA § 841 >>

(A) CROSS REFERENCE.—Section 401(b) of the Controlled Substances Act (21 U.S.C. 841(b)) is amended by inserting "409," before "418," each place it appears.

(B) TABLE OF CONTENTS.—The table of contents of the Comprehensive Drug Abuse Prevention and Control Act of 1970 is amended by striking the item relating to section 409 and inserting the following new item:

"Sec. 409. Transportation safety offenses.".

<< 28 USCA § 994 NOTE >>

(c) SENTENCING GUIDELINES.—Pursuant to its authority under section 994 of title 28, United States Code, and section 21 of the Sentencing Act of 1987 (28 U.S.C. 994 note), the United States Sentencing Commission shall promulgate guidelines, or shall amend existing guidelines, to provide an appropriate enhancement of punishment for a defendant convicted of violating section 409 of the Controlled Substances Act, as added by subsection (b).

Subtitle C—Sense of Congress Regarding Funding for Rural Areas

SEC. 180301. FUNDING FOR RURAL AREAS.

It is the sense of Congress that—

(1) the Attorney General should ensure that funding for programs authorized by the provisions of this Act and amendments made by this Act is distributed in such a manner that rural areas continue to receive comparable support for their broad-based crime fighting initiatives;

(2) rural communities should not receive less funding than they received in fiscal year 1994 for anti-crime initiatives as a result of any legislative or administrative actions; and

(3) to the maximum extent possible, funding for the Edward Byrne Memorial State and Local Law Enforcement Assistance Program should be maintained at its fiscal year 1994 level.

## TITLE XIX—FEDERAL LAW ENFORCEMENT

SEC. 190001. FEDERAL JUDICIARY AND FEDERAL LAW ENFORCEMENT.

(a) AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR THE FEDERAL JUDICIARY.—

FEDERAL JUDICIARY.—There are authorized to be appropriated for the activities of the Federal Judiciary to help meet the increased demands for judicial activities, including supervised release, pre-trial and probation services, that will result from enactment into law of this Act—

(A) $30,000,000 for fiscal year 1996;

(B) $35,000,000 for fiscal year 1997;

(C) $40,000,000 for fiscal year 1998;

(D) $40,000,000 for fiscal year 1999; and

(E) $55,000,000 for fiscal year 2000.

(b) AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR THE DEPARTMENT OF JUSTICE.—There is authorized to be appropriated for the activities and agencies of the Department of Justice, in addition to sums authorized elsewhere in this section, to help meet the increased demands for Department of Justice activities that will result from enactment into law of this Act—

(A) $40,000,000 for fiscal year 1996;

(B) $40,000,000 for fiscal year 1997;

(C) $40,000,000 for fiscal year 1998;

(D) $40,000,000 for fiscal year 1999; and

(E) $39,000,000 for fiscal year 2000.

(c) AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR THE FEDERAL BUREAU OF INVESTIGATION.—There is authorized to be appropriated for the activities of the Federal Bureau of Investigation, to help meet the increased demands for Federal Bureau of Investigation activities that will result from enactment into law of this Act—

(A) $35,000,000 for fiscal year 1996;

(B) $40,000,000 for fiscal year 1997;

(C) $50,000,000 for fiscal year 1998;

(D) $60,000,000 for fiscal year 1999; and

(E) $60,000,000 for fiscal year 2000.

(d) AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR UNITED STATES ATTORNEYS.—There is authorized to be appropriated for the account Department of Justice, Legal Activities, "Salaries and expenses, United States Attorneys", to help meet the increased demands for litigation and related activities which will result from enactment into law of this Act—

(A) $5,000,000 for fiscal year 1996;

(B) $8,000,000 for fiscal year 1997;

(C) $10,000,000 for fiscal year 1998;

(D) $12,000,000 for fiscal year 1999; and

(E) $15,000,000 for fiscal year 2000.

(e) AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR THE DEPARTMENT OF THE TREASURY.—There is authorized to be appropriated for the activities of the Bureau of Alcohol, Tobacco, and Firearms, the United States Customs Service, the Financial Crimes Enforcement Network, the Federal Law Enforcement Training Center, the Criminal Investigation Division of the Internal Revenue Service, and the United States Secret Service to help meet the increased demands for Department of the Treasury activities that will result from enactment into law of this Act—

(A) $30,000,000 for fiscal year 1995;

(B) $70,000,000 for fiscal year 1996;

(C) $90,000,000 for fiscal year 1997;

(D) $110,000,000 for fiscal year 1998;
(E) $125,000,000 for fiscal year 1999; and
(F) $125,000,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

TITLE XX—POLICE CORPS AND LAW ENFORCEMENT OFFICERS TRAINING AND EDUCATION

Subtitle A—Police Corps

<< 42 USCA § 13701 >>

SEC. 200101. SHORT TITLE.

This subtitle may be cited as the "Police Corps Act".

<< 42 USCA § 14091 >>

SEC. 200102. PURPOSES.

The purposes of this subtitle are to—
 (1) address violent crime by increasing the number of police with advanced education and training on community patrol; and
 (2) provide educational assistance to law enforcement personnel and to students who possess a sincere interest in public service in the form of law enforcement.

<< 42 USCA § 14092 >>

SEC. 200103. DEFINITIONS.

In this subtitle—
 "academic year" means a traditional academic year beginning in August or September and ending in the following May or June.
 "dependent child" means a natural or adopted child or stepchild of a law enforcement officer who at the time of the officer's death—
  (A) was no more than 21 years old; or
  (B) if older than 21 years, was in fact dependent on the child's parents for at least one-half of the child's support (excluding educational expenses), as determined by the Director.
 "Director" means the Director of the Office of the Police Corps and Law Enforcement Education appointed under section 200104.
 "educational expenses" means expenses that are directly attributable to—
  (A) a course of education leading to the award of the baccalaureate degree in legal- or criminal justice-related studies; or
  (B) a course of graduate study legal or criminal justice studies following award of a baccalaureate degree,

including the cost of tuition, fees, books, supplies, transportation, room and board and miscellaneous expenses.
 "institution of higher education" has the meaning stated in the first sentence of section 1201(a) of the Higher Education Act of 1965 (20 U.S.C. 1141(a)).
 "participant" means a participant in the Police Corps program selected pursuant to section 200106.
 "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands.
 "State Police Corps program" means a State police corps program that meets the requirements of section 200110.

<< 42 USCA § 14093 >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 200104. ESTABLISHMENT OF OFFICE OF THE POLICE CORPS AND LAW ENFORCEMENT EDUCATION.

  There is established in the Department of Justice, under the general authority of the Attorney General, an Office of the Police Corps and Law Enforcement Education.

<< 42 USCA § 14094 >>

SEC. 200105. DESIGNATION OF LEAD AGENCY AND SUBMISSION OF STATE PLAN.

  (a) LEAD AGENCY.—A State that desires to participate in the Police Corps program under this subtitle shall designate a lead agency that will be responsible for—
    (1) submitting to the Director a State plan described in subsection (b); and
    (2) administering the program in the State.
  (b) STATE PLANS.—A State plan shall—
    (1) contain assurances that the lead agency shall work in cooperation with the local law enforcement liaisons, representatives of police labor organizations and police management organizations, and other appropriate State and local agencies to develop and implement interagency agreements designed to carry out the program;
    (2) contain assurances that the State shall advertise the assistance available under this subtitle;
    (3) contain assurances that the State shall screen and select law enforcement personnel for participation in the program; and
    (4) meet the requirements of section 200110.

<< 42 USCA § 14095 >>

SEC. 200106. SCHOLARSHIP ASSISTANCE.

  (a) SCHOLARSHIPS AUTHORIZED.—(1) The Director may award scholarships to participants who agree to work in a State or local police force in accordance with agreements entered into pursuant to subsection (d).
  (2)(A) Except as provided in subparagraph (B), each scholarship payment made under this section for each academic year shall not exceed—
    (i) $7,500; or
    (ii) the cost of the educational expenses related to attending an institution of higher education.
  (B) In the case of a participant who is pursuing a course of educational study during substantially an entire calendar year, the amount of scholarship payments made during such year shall not exceed $10,000.
  (C) The total amount of scholarship assistance received by any one student under this section shall not exceed $30,000.
  (3) Recipients of scholarship assistance under this section shall continue to receive such scholarship payments only during such periods as the Director finds that the recipient is maintaining satisfactory progress as determined by the institution of higher education the recipient is attending.
  (4)(A) The Director shall make scholarship payments under this section directly to the institution of higher education that the student is attending.
  (B) Each institution of higher education receiving a payment on behalf of a participant pursuant to subparagraph (A) shall remit to such student any funds in excess of the costs of tuition, fees, and room and board payable to the institution.
  (b) REIMBURSEMENT AUTHORIZED.—(1) The Director may make payments to a participant to reimburse such participant for the costs of educational expenses if the student agrees to work in a State or local police force in accordance with the agreement entered into pursuant to subsection (d).
  (2)(A) Each payment made pursuant to paragraph (1) for each academic year of study shall not exceed—
    (i) $7,500; or
    (ii) the cost of educational expenses related to attending an institution of higher education.
  (B) In the case of a participant who is pursuing a course of educational study during substantially an entire calendar year, the amount of scholarship payments made during such year shall not exceed $10,000.
  (C) The total amount of payments made pursuant to subparagraph (A) to any 1 student shall not exceed $30,000.

(c) USE OF SCHOLARSHIP.—Scholarships awarded under this subsection shall only be used to attend a 4-year institution of higher education, except that—

  (1) scholarships may be used for graduate and professional study; and

  (2) if a participant has enrolled in the program upon or after transfer to a 4-year institution of higher education, the Director may reimburse the participant for the participant's prior educational expenses.

 (d)  AGREEMENT.—(1)(A) Each participant receiving a scholarship or a payment under this section shall enter into an agreement with the Director.

 (B) An agreement under subparagraph (A) shall contain assurances that the participant shall—

  (i) after successful completion of a baccalaureate program and training as prescribed in section 200108, work for 4 years in a State or local police force without there having arisen sufficient cause for the participant's dismissal under the rules applicable to members of the police force of which the participant is a member;

  (ii) complete satisfactorily—

   (I) an educational course of study and receipt of a baccalaureate degree (in the case of undergraduate study) or the reward of credit to the participant for having completed one or more graduate courses (in the case of graduate study); and

   (II) Police Corps training and certification by the Director that the participant has met such performance standards as may be established pursuant to section 200108; and

  (iii) repay all of the scholarship or payment received plus interest at the rate of 10 percent if the conditions of clauses (i) and (ii) are not complied with.

 (2)(A) A recipient of a scholarship or payment under this section shall not be considered to be in violation of the agreement entered into pursuant to paragraph (1) if the recipient—

  (i) dies; or

  (ii) becomes permanently and totally disabled as established by the sworn affidavit of a qualified physician.

 (B) If a scholarship recipient is unable to comply with the repayment provision set forth in paragraph (1)(B)(ii) because of a physical or emotional disability or for good cause as determined by the Director, the Director may substitute community service in a form prescribed by the Director for the required repayment.

 (C) The Director shall expeditiously seek repayment from a participant who violates an agreement described in paragraph (1).

 (e) DEPENDENT CHILD.—A dependent child of a law enforcement officer—

  (1) who is a member of a State or local police force or is a Federal criminal investigator or uniformed police officer,

  (2) who is not a participant in the Police Corps program, but

  (3) who serves in a State for which the Director has approved a Police Corps plan, and

  (4) who is killed in the course of performing police duties,

shall be entitled to the scholarship assistance authorized in this section for any course of study in any accredited institution of higher education. Such dependent child shall not incur any repayment obligation in exchange for the scholarship assistance provided in this section.

 (f)  APPLICATION.—Each participant desiring a scholarship or payment under this section shall submit an application as prescribed by the Director in such manner and accompanied by such information as the Director may reasonably require.

<< 42 USCA § 14096 >>

SEC. 200107. SELECTION OF PARTICIPANTS.

 (a) IN GENERAL.—Participants in State Police Corps programs shall be selected on a competitive basis by each State under regulations prescribed by the Director.

 (b) SELECTION CRITERIA AND QUALIFICATIONS.—(1) In order to participate in a State Police Corps program, a participant shall—

  (A) be a citizen of the United States or an alien lawfully admitted for permanent residence in the United States;

  (B) meet the requirements for admission as a trainee of the State or local police force to which the participant will be assigned pursuant to section 200110(5), including achievement of satisfactory scores on any applicable examination, except that failure

to meet the age requirement for a trainee of the State or local police shall not disqualify the applicant if the applicant will be of sufficient age upon completing an undergraduate course of study;

(C) possess the necessary mental and physical capabilities and emotional characteristics to discharge effectively the duties of a law enforcement officer;

(D) be of good character and demonstrate sincere motivation and dedication to law enforcement and public service;

(E) in the case of an undergraduate, agree in writing that the participant will complete an educational course of study leading to the award of a baccalaureate degree and will then accept an appointment and complete 4 years of service as an officer in the State police or in a local police department within the State;

(F) in the case of a participant desiring to undertake or continue graduate study, agree in writing that the participant will accept an appointment and complete 4 years of service as an officer in the State police or in a local police department within the State before undertaking or continuing graduate study;

(G) contract, with the consent of the participant's parent or guardian if the participant is a minor, to serve for 4 years as an officer in the State police or in a local police department, if an appointment is offered; and

(H) except as provided in paragraph (2), be without previous law enforcement experience.

(2)(A) Until the date that is 5 years after the date of enactment of this Act, up to 10 percent of the applicants accepted into the Police Corps program may be persons who—

(i) have had some law enforcement experience; and

(ii) have demonstrated special leadership potential and dedication to law enforcement.

(B)(i) The prior period of law enforcement of a participant selected pursuant to subparagraph (A) shall not be counted toward satisfaction of the participant's 4-year service obligation under section 200109, and such a participant shall be subject to the same benefits and obligations under this subtitle as other participants, including those stated in section (b)(1) (E) and (F).

(ii) Clause (i) shall not be construed to preclude counting a participant's previous period of law enforcement experience for purposes other than satisfaction of the requirements of section 200109, such as for purposes of determining such a participant's pay and other benefits, rank, and tenure.

(3) It is the intent of this subtitle that there shall be no more than 20,000 participants in each graduating class. The Director shall approve State plans providing in the aggregate for such enrollment of applicants as shall assure, as nearly as possible, annual graduating classes of 20,000. In a year in which applications are received in a number greater than that which will produce, in the judgment of the Director, a graduating class of more than 20,000, the Director shall, in deciding which applications to grant, give preference to those who will be participating in State plans that provide law enforcement personnel to areas of greatest need.

(c) RECRUITMENT OF MINORITIES.—Each State participating in the Police Corps program shall make special efforts to seek and recruit applicants from among members of all racial, ethnic or gender groups. This subsection does not authorize an exception from the competitive standards for admission established pursuant to subsections (a) and (b).

(d) ENROLLMENT OF APPLICANT.—(1) An applicant shall be accepted into a State Police Corps program on the condition that the applicant will be matriculated in, or accepted for admission at, a 4-year institution of higher education—

(A) as a full-time student in an undergraduate program; or

(B) for purposes of taking a graduate course.

(2) If the applicant is not matriculated or accepted as set forth in paragraph (1), the applicant's acceptance in the program shall be revoked.

(e) LEAVE OF ABSENCE.—(1) A participant in a State Police Corps program who requests a leave of absence from educational study, training or service for a period not to exceed 1 year (or 18 months in the aggregate in the event of multiple requests) due to temporary physical or emotional disability shall be granted such leave of absence by the State.

(2) A participant who requests a leave of absence from educational study, training or service for a period not to exceed 1 year (or 18 months in the aggregate in the event of multiple requests) for any reason other than those listed in paragraph (1) may be granted such leave of absence by the State.

(3) A participant who requests a leave of absence from educational study or training for a period not to exceed 30 months to serve on an official church mission may be granted such leave of absence.

(f) ADMISSION OF APPLICANTS.—An applicant may be admitted into a State Police Corps program either before commencement of or during the applicant's course of educational study.

<< 42 USCA § 14097 >>

SEC. 200108. POLICE CORPS TRAINING.

(a) IN GENERAL.—(1) The Director shall establish programs of training for Police Corps participants. Such programs may be carried out at up to 3 training centers established for this purpose and administered by the Director, or by contracting with existing State training facilities. The Director shall contract with a State training facility upon request of such facility if the Director determines that such facility offers a course of training substantially equivalent to the Police Corps training program described in this subtitle.

(2) The Director may enter into contracts with individuals, institutions of learning, and government agencies (including State and local police forces) to obtain the services of persons qualified to participate in and contribute to the training process.

(3) The Director may enter into agreements with agencies of the Federal Government to utilize on a reimbursable basis space in Federal buildings and other resources.

(4) The Director may authorize such expenditures as are necessary for the effective maintenance of the training centers, including purchases of supplies, uniforms, and educational materials, and the provision of subsistence, quarters, and medical care to participants.

(b) TRAINING SESSIONS.—A participant in a State Police Corps program shall attend two 8-week training sessions at a training center, one during the summer following completion of sophomore year and one during the summer following completion of junior year. If a participant enters the program after sophomore year, the participant shall complete 16 weeks of training at times determined by the Director.

(c) FURTHER TRAINING.—The 16 weeks of Police Corps training authorized in this section is intended to serve as basic law enforcement training but not to exclude further training of participants by the State and local authorities to which they will be assigned. Each State plan approved by the Director under section 10 shall include assurances that following completion of a participant's course of education each participant shall receive appropriate additional training by the State or local authority to which the participant is assigned. The time spent by a participant in such additional training, but not the time spent in Police Corps training, shall be counted toward fulfillment of the participant's 4-year service obligation.

(d) COURSE OF TRAINING.—The training sessions at training centers established under this section shall be designed to provide basic law enforcement training, including vigorous physical and mental training to teach participants self-discipline and organizational loyalty and to impart knowledge and understanding of legal processes and law enforcement.

(e) EVALUATION OF PARTICIPANTS.—A participant shall be evaluated during training for mental, physical, and emotional fitness, and shall be required to meet performance standards prescribed by the Director at the conclusion of each training session in order to remain in the Police Corps program.

(f) STIPEND.—The Director shall pay participants in training sessions a stipend of $250 a week during training.

<< 42 USCA § 14098 >>

SEC. 200109. SERVICE OBLIGATION.

(a) SWEARING IN.—Upon satisfactory completion of the participant's course of education and training program established in section 200108 and meeting the requirements of the police force to which the participant is assigned, a participant shall be sworn in as a member of the police force to which the participant is assigned pursuant to the State Police Corps plan, and shall serve for 4 years as a member of that police force.

(b) RIGHTS AND RESPONSIBILITIES.—A participant shall have all of the rights and responsibilities of and shall be subject to all rules and regulations applicable to other members of the police force of which the participant is a member, including those contained in applicable agreements with labor organizations and those provided by State and local law.

(c) DISCIPLINE.—If the police force of which the participant is a member subjects the participant to discipline such as would preclude the participant's completing 4 years of service, and result in denial of educational assistance under section 200106, the Director may, upon a showing of good cause, permit the participant to complete the service obligation in an equivalent alternative law enforcement service and, if such service is satisfactorily completed, section 200106(d)(1)(B)(iii) shall not apply.

(d) LAYOFFS.—If the police force of which the participant is a member lays off the participant such as would preclude the participant's completing 4 years of service, and result in denial of educational assistance under section 200106, the Director may permit the participant to complete the service obligation in an equivalent alternative law enforcement service and, if such service is satisfactorily completed, section 200106(d)(1)(B)(iii) shall not apply.

<< 42 USCA § 14099 >>

SEC. 200110. STATE PLAN REQUIREMENTS.

A State Police Corps plan shall—

(1) provide for the screening and selection of participants in accordance with the criteria set out in section 200107;

(2) state procedures governing the assignment of participants in the Police Corps program to State and local police forces (no more than 10 percent of all the participants assigned in each year by each State to be assigned to a statewide police force or forces);

(3) provide that participants shall be assigned to those geographic areas in which—

  (A) there is the greatest need for additional law enforcement personnel; and

  (B) the participants will be used most effectively;

(4) provide that to the extent consistent with paragraph (3), a participant shall be assigned to an area near the participant's home or such other place as the participant may request;

(5) provide that to the extent feasible, a participant's assignment shall be made at the time the participant is accepted into the program, subject to change—

  (A) prior to commencement of a participant's fourth year of undergraduate study, under such circumstances as the plan may specify; and

  (B) from commencement of a participant's fourth year of undergraduate study until completion of 4 years of police service by participant, only for compelling reasons or to meet the needs of the State Police Corps program and only with the consent of the participant;

(6) provide that no participant shall be assigned to serve with a local police force—

  (A) whose size has declined by more than 5 percent since June 21, 1989; or

  (B) which has members who have been laid off but not retired;

(7) provide that participants shall be placed and to the extent feasible kept on community and preventive patrol;

(8) ensure that participants will receive effective training and leadership;

(9) provide that the State may decline to offer a participant an appointment following completion of Federal training, or may remove a participant from the Police Corps program at any time, only for good cause (including failure to make satisfactory progress in a course of educational study) and after following reasonable review procedures stated in the plan; and

(10) provide that a participant shall, while serving as a member of a police force, be compensated at the same rate of pay and benefits and enjoy the same rights under applicable agreements with labor organizations and under State and local law as other police officers of the same rank and tenure in the police force of which the participant is a member.

<< 42 USCA § 14100 >>

SEC. 200111. ASSISTANCE TO STATES AND LOCALITIES EMPLOYING POLICE CORPS OFFICERS.

Each jurisdiction directly employing Police Corps participants during the 4-year term of service prescribed by section 200109 shall receive $10,000 on account of each such participant at the completion of each such year of service, but—

(1) no such payment shall be made on account of service in any State or local police force—

  (A) whose average size, in the year for which payment is to be made, not counting Police Corps participants assigned under section 106, has declined by more than 2 percent since January 1, 1993; or

  (B) which has members who have been laid off but not retired; and

(2) no such payment shall be made on account of any Police Corps participant for years of service after the completion of the term of service prescribed in section 200109.

<< 42 USCA § 14101 >>

SEC. 200112. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to carry out this subtitle $20,000 for each of the fiscal years 1996 through 2000.

<< 42 USCA § 14102 >>

SEC. 200113. REPORTS TO CONGRESS.

(a) IN GENERAL.—Not later than April 1 of each year, the Director shall submit a report to the Attorney General, the President, the Speaker of the House of Representatives, and the President of the Senate.
(b) CONTENTS.—A report under subsection (a) shall—
   (1) state the number of current and past participants in the Police Corps program, broken down according to the levels of educational study in which they are engaged and years of service they have served on police forces (including service following completion of the 4-year service obligation);
   (2) describe the geographic, racial, and gender dispersion of participants in the Police Corps program; and
   (3) describe the progress of the Police Corps program and make recommendations for changes in the program.

<< 42 USCA Ch. 136 >>

Subtitle B—Law Enforcement Scholarship Program

<< 42 USCA § 13701 NOTE >>

SEC. 200201. SHORT TITLE.

This subtitle may be cited as the "Law Enforcement Scholarships and Recruitment Act".

<< 42 USCA § 14111 >>

SEC. 200202. DEFINITIONS.

In this subtitle—
   "Director" means the Director of the Office of the Police Corps and Law Enforcement Education appointed under section 200104.
   "educational expenses" means expenses that are directly attributable to—
      (A) a course of education leading to the award of an associate degree;
      (B) a course of education leading to the award of a baccalaureate degree; or
      (C) a course of graduate study following award of a baccalaureate degree,

including the cost of tuition, fees, books, supplies, and related expenses.
   "institution of higher education" has the meaning stated in the first sentence of section 1201(a) of the Higher Education Act of 1965 (20 U.S.C. 1141(a)).
   "law enforcement position" means employment as an officer in a State or local police force, or correctional institution.
   "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands.

<< 42 USCA § 14112 >>

SEC. 200203. ALLOTMENT.

From amounts appropriated under section 200210, the Director shall allot—

(1) 80 percent of such amounts to States on the basis of the number of law enforcement officers in each State compared to the number of law enforcement officers in all States; and

(2) 20 percent of such amounts to States on the basis of the shortage of law enforcement personnel and the need for assistance under this subtitle in the State compared to the shortage of law enforcement personnel and the need for assistance under this subtitle in all States.

<< 42 USCA § 14113 >>

SEC. 200204. ESTABLISHMENT OF PROGRAM.

(a) USE OF ALLOTMENT.—

(1) IN GENERAL.—A State that receives an allotment pursuant to section 200203 shall use the allotment to pay the Federal share of the costs of—

(A) awarding scholarships to in-service law enforcement personnel to enable such personnel to seek further education; and

(B) providing—

(i) full-time employment in summer; or

(ii) part-time (not to exceed 20 hours per week) employment for a period not to exceed 1 year.

(2) EMPLOYMENT.—The employment described in paragraph (1)(B)—

(A) shall be provided by State and local law enforcement agencies for students who are juniors or seniors in high school or are enrolled in an institution of higher education and who demonstrate an interest in undertaking a career in law enforcement;

(B) shall not be in a law enforcement position; and

(C) shall consist of performing meaningful tasks that inform students of the nature of the tasks performed by law enforcement agencies.

(b) PAYMENTS; FEDERAL SHARE; NON–FEDERAL SHARE.—

(1) PAYMENTS.—Subject to the availability of appropriations, the Director shall pay to each State that receives an allotment under section 200203 the Federal share of the cost of the activities described in the application submitted pursuant to section 200203.

(2) FEDERAL SHARE.—The Federal share shall not exceed 60 percent.

(3) NON–FEDERAL SHARE.—The non-Federal share of the cost of scholarships and student employment provided under this subtitle shall be supplied from sources other than the Federal Government.

(c) RESPONSIBILITIES OF DIRECTOR.—The Director shall be responsible for the administration of the programs conducted pursuant to this subtitle and shall, in consultation with the Assistant Secretary for Postsecondary Education, issue rules to implement this subtitle.

(d) ADMINISTRATIVE EXPENSES.—A State that receives an allotment under section 200203 may reserve not more than 8 percent of the allotment for administrative expenses.

(e) SPECIAL RULE.—A State that receives an allotment under section 200203 shall ensure that each scholarship recipient under this subtitle be compensated at the same rate of pay and benefits and enjoy the same rights under applicable agreements with labor organizations and under State and local law as other law enforcement personnel of the same rank and tenure in the office of which the scholarship recipient is a member.

(f) SUPPLEMENTATION OF FUNDING.—Funds received under this subtitle shall only be used to supplement, and not to supplant, Federal, State, or local efforts for recruitment and education of law enforcement personnel.

<< 42 USCA § 14114 >>

SEC. 200205. SCHOLARSHIPS.

(a) PERIOD OF AWARD.—Scholarships awarded under this subtitle shall be for a period of 1 academic year.

(b) USE OF SCHOLARSHIPS.—Each individual awarded a scholarship under this subtitle may use the scholarship for educational expenses at an institution of higher education.

<< 42 USCA § 14115 >>

SEC. 200206. ELIGIBILITY.

 (a) SCHOLARSHIPS.—A person shall be eligible to receive a scholarship under this subtitle if the person has been employed in law enforcement for the 2-year period immediately preceding the date on which assistance is sought.
 (b) INELIGIBILITY FOR STUDENT EMPLOYMENT.—A person who has been employed as a law enforcement officer is ineligible to participate in a student employment program carried out under this subtitle.

<< 42 USCA § 14116 >>

SEC. 200207. STATE APPLICATION.

 (a) IN GENERAL.—Each State desiring an allotment under section 200203 shall submit an application to the Director at such time, in such manner, and accompanied by such information as the Director may reasonably require.
 (b) CONTENTS.—An application under subsection (a) shall—
 (1) describe the scholarship program and the student employment program for which assistance under this subtitle is sought;
 (2) contain assurances that the lead agency will work in cooperation with the local law enforcement liaisons, representatives of police labor organizations and police management organizations, and other appropriate State and local agencies to develop and implement interagency agreements designed to carry out this subtitle;
 (3) contain assurances that the State will advertise the scholarship assistance and student employment it will provide under this subtitle and that the State will use such programs to enhance recruitment efforts;
 (4) contain assurances that the State will screen and select law enforcement personnel for participation in the scholarship program under this subtitle;
 (5) contain assurances that under such student employment program the State will screen and select, for participation in such program, students who have an interest in undertaking a career in law enforcement;
 (6) contain assurances that under such scholarship program the State will make scholarship payments to institutions of higher education on behalf of persons who receive scholarships under this subtitle;
 (7) with respect to such student employment program, identify—
  (A) the employment tasks that students will be assigned to perform;
  (B) the compensation that students will be paid to perform such tasks; and
  (C) the training that students will receive as part of their participation in the program;
 (8) identify model curriculum and existing programs designed to meet the educational and professional needs of law enforcement personnel; and
 (9) contain assurances that the State will promote cooperative agreements with educational and law enforcement agencies to enhance law enforcement personnel recruitment efforts in institutions of higher education.

<< 42 USCA § 14117 >>

SEC. 200208. LOCAL APPLICATION.

 (a) IN GENERAL.—A person who desires a scholarship or employment under this subtitle shall submit an application to the State at such time, in such manner, and accompanied by such information as the State may reasonably require.
 (b) CONTENTS.—An application under subsection (a) shall describe—
  (1) the academic courses for which a scholarship is sought; or
  (2) the location and duration of employment that is sought.
 (c) PRIORITY.—In awarding scholarships and providing student employment under this subtitle, each State shall give priority to applications from persons who are—
  (1) members of racial, ethnic, or gender groups whose representation in the law enforcement agencies within the State is substantially less than in the population eligible for employment in law enforcement in the State;
  (2) pursuing an undergraduate degree; and

AR.02073

(3) not receiving financial assistance under the Higher Education Act of 1965.

<< 42 USCA § 14118 >>

SEC. 200209. SCHOLARSHIP AGREEMENT.

(a) IN GENERAL.—A person who receives a scholarship under this subtitle shall enter into an agreement with the Director.

(b) CONTENTS.—An agreement described in subsection (a) shall—

(1) provide assurances that the scholarship recipient will work in a law enforcement position in the State that awarded the scholarship in accordance with the service obligation described in subsection (c) after completion of the scholarship recipient's academic courses leading to an associate, bachelor, or graduate degree;

(2) provide assurances that the scholarship recipient will repay the entire scholarship in accordance with such terms and conditions as the Director shall prescribe if the requirements of the agreement are not complied with, unless the scholarship recipient—

(A) dies;

(B) becomes physically or emotionally disabled, as established by the sworn affidavit of a qualified physician; or

(C) has been discharged in bankruptcy; and

(3) set forth the terms and conditions under which the scholarship recipient may seek employment in the field of law enforcement in a State other than the State that awarded the scholarship.

(c) SERVICE OBLIGATION.—

(1) IN GENERAL.—Except as provided in paragraph (2), a person who receives a scholarship under this subtitle shall work in a law enforcement position in the State that awarded the scholarship for a period of 1 month for each credit hour for which funds are received under the scholarship.

(2) SPECIAL RULE.—For purposes of satisfying the requirement of paragraph (1), a scholarship recipient shall work in a law enforcement position in the State that awarded the scholarship for not less than 6 months but shall not be required to work in such a position for more than 2 years.

<< 42 USCA § 14119 >>

SEC. 200210. AUTHORIZATION OF APPROPRIATIONS.

(a) GENERAL AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subtitle—

(1) $20,000,000 for fiscal year 1996;

(2) $20,000,000 for fiscal year 1997;

(3) $20,000,000 for fiscal year 1998;

(4) $20,000,000 for fiscal year 1999; and

(5) $20,000,000 for fiscal year 2000.

(b) USES OF FUNDS.—Of the funds appropriated under subsection (a) for a fiscal year—

(1) 80 percent shall be available to provide scholarships described in section 200204(a)(1)(A); and

(2) 20 percent shall be available to provide employment described in sections 200204(a)(1)(B) and 200204(a)(2).

<< 42 USCA Ch. 136 >>

TITLE XXI—STATE AND LOCAL LAW ENFORCEMENT

Subtitle A—Byrne Program

SEC. 210101. EXTENSION OF BYRNE GRANT FUNDING.

There is authorized to be appropriated for fiscal years 1995 through 2000 such sums as may be necessary to carry out the programs under parts D and E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, of which the following amounts may be appropriated from the Violent Crime Reduction Trust Fund:

(1) $580,000,000 for fiscal year 1995;
(2) $130,000,000 for fiscal year 1996;
(3) $100,000,000 for fiscal year 1997;
(4) $75,000,000 for fiscal year 1998;
(5) $70,000,000 for fiscal year 1999; and
(6) $45,000,000 for fiscal year 2000.

Subtitle B—Law Enforcement Family Support

SEC. 210201. LAW ENFORCEMENT FAMILY SUPPORT.

(a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 50001(a), is amended—

<< 42 USCA Ch. 46 >>

(1) by redesignating part W as part X;

<< 42 USCA § 3797 >>

(2) by redesignating section 2301 as 2401; and
(3) by inserting after part V the following new part:

<< 42 USCA Ch. 46 >>

"PART W—FAMILY SUPPORT

<< 42 USCA § 3796jj >>

"SEC. 2301. DUTIES.

"The Attorney General shall—

"(1) establish guidelines and oversee the implementation of family-friendly policies within law enforcement-related offices and divisions in the Department of Justice;

"(2) study the effects of stress on law enforcement personnel and family well-being and disseminate the findings of such studies to Federal, State, and local law enforcement agencies, related organizations, and other interested parties;

"(3) identify and evaluate model programs that provide support services to law enforcement personnel and families;

"(4) provide technical assistance and training programs to develop stress reduction and family support to State and local law enforcement agencies;

"(5) collect and disseminate information regarding family support, stress reduction, and psychological services to Federal, State, and local law enforcement agencies, law enforcement-related organizations, and other interested entities; and

"(6) determine issues to be researched by the Department of Justice and by grant recipients.

<< 42 USCA § 3796jj–1 >>

"SEC. 2302. GENERAL AUTHORIZATION.

"The Attorney General may make grants to States and local law enforcement agencies and to organizations representing State or local law enforcement personnel to provide family support services to law enforcement personnel.

<< 42 USCA § 3796jj–2 >>

"SEC. 2303. USES OF FUNDS.

"(a) IN GENERAL.—A State or local law enforcement agency or organization that receives a grant under this Act shall use amounts provided under the grant to establish or improve training and support programs for law enforcement personnel.

"(b) REQUIRED ACTIVITIES.—A law enforcement agency or organization that receives funds under this part shall provide at least one of the following services:

"(1) Counseling for law enforcement family members.

"(2) Child care on a 24-hour basis.

"(3) Marital and adolescent support groups.

"(4) Stress reduction programs.

"(5) Stress education for law enforcement recruits and families.

"(6) Technical assistance and training programs to support any or all of the services described in paragraphs (1), (2), (3), (4), and (5).

"(c) OPTIONAL ACTIVITIES.—A law enforcement agency or organization that receives funds under this part may provide the following services:

"(1) Post-shooting debriefing for officers and their spouses.

"(2) Group therapy.

"(3) Hypertension clinics.

"(4) Critical incident response on a 24-hour basis.

"(5) Law enforcement family crisis telephone services on a 24-hour basis.

"(6) Counseling for law enforcement personnel exposed to the human immunodeficiency virus.

"(7) Counseling for peers.

"(8) Counseling for families of personnel killed in the line of duty.

"(9) Seminars regarding alcohol, drug use, gambling, and overeating.

"(10) Technical assistance and training to support any or all of the services described in paragraphs (1), (2), (3), (4), (5), (6), (7), (8), and (9).

<< 42 USCA § 3796jj–3 >>

"SEC. 2304. APPLICATIONS.

"A law enforcement agency or organization desiring to receive a grant under this part shall submit to the Attorney General an application at such time, in such manner, and containing or accompanied by such information as the Attorney General may reasonably require. Such application shall—

"(1) certify that the law enforcement agency shall match all Federal funds with an equal amount of cash or in-kind goods or services from other non-Federal sources;

"(2) include a statement from the highest ranking law enforcement official from the State or locality or from the highest ranking official from the organization applying for the grant that attests to the need and intended use of services to be provided with grant funds; and

"(3) assure that the Attorney General or the Comptroller General of the United States shall have access to all records related to the receipt and use of grant funds received under this part.

<< 42 USCA § 3796jj–4 >>

"SEC. 2305. AWARD OF GRANTS; LIMITATION.

"(a) GRANT DISTRIBUTION.—In approving grants under this part, the Attorney General shall assure an equitable distribution of assistance among the States, among urban and rural areas of the United States, and among urban and rural areas of a State.

"(b) DURATION.—The Attorney General may award a grant each fiscal year, not to exceed $100,000 to a State or local law enforcement agency or $250,000 to a law enforcement organization for a period not to exceed 5 years. In any application from a State or local law enforcement agency or organization for a grant to continue a program for the second, third, fourth, or fifth fiscal year following the first fiscal year in which a grant was awarded to such agency, the Attorney General shall review the progress made toward meeting the objectives of the program. The Attorney General may refuse to award a grant if the Attorney General finds sufficient progress has not been made toward meeting such objectives, but only after affording the applicant notice and an opportunity for reconsideration.

 "(c) LIMITATION.—Not more than 5 percent of grant funds received by a State or a local law enforcement agency or organization may be used for administrative purposes.

<< 42 USCA § 3796jj–5 >>

"SEC. 2306. DISCRETIONARY RESEARCH GRANTS.

 "The Attorney General may reserve 10 percent of funds to award research grants to a State or local law enforcement agency or organization to study issues of importance in the law enforcement field as determined by the Attorney General.

<< 42 USCA § 3796jj–6 >>

"SEC. 2307. REPORTS.

 "A State or local law enforcement agency or organization that receives a grant under this part shall submit to the Attorney General an annual report that includes—
  "(1) program descriptions;
  "(2) the number of staff employed to administer programs;
  "(3) the number of individuals who participated in programs; and
  "(4) an evaluation of the effectiveness of grant programs.

<< 42 USCA § 3796jj–7 >>

"SEC. 2308. DEFINITIONS.

 "For purposes of this part—
  "(1) the term 'family-friendly policy' means a policy to promote or improve the morale and well being of law enforcement personnel and their families; and
  "(2) the term 'law enforcement personnel' means individuals employed by Federal, State, and local law enforcement agencies.".
 (b) TECHNICAL AMENDMENT.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 50001(b), is amended by striking the matter relating to part V and inserting the following:

"Part W—Family Support
"Sec. 2301. Duties.
"Sec. 2302. General authorization.
"Sec. 2303. Uses of funds.
"Sec. 2304. Applications.
"Sec. 2305. Award of grants; limitation.
"Sec. 2306. Discretionary research grants.
"Sec. 2307. Reports.
"Sec. 2308. Definitions.

"Part V—Transition–Effective Date–Repeals

"Sec. 2301. Continuation of rules, authorities, and privileges.".

<< 42 USCA § 3793 >>

(c) AUTHORIZATION OF APPROPRIATIONS.—Section 1001(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 50001(c), is amended—

(1) in paragraph (3) by striking "and V" and inserting "V, and W"; and

(2) by adding at the end the following new paragraph:

"(21) There are authorized to be appropriated to carry out part W—

"(1) $2,500,000 for fiscal year 1996;

"(2) $4,000,000 for fiscal year 1997;

"(3) $5,000,000 for fiscal year 1998;

"(4) $6,000,000 for fiscal year 1999; and

"(5) $7,500,000 for fiscal year 2000.".

<< 42 USCA Ch. 136 >>

Subtitle C—DNA Identification

<< 42 USCA § 13701 NOTE >>

SEC. 210301. SHORT TITLE.

This subtitle may be cited as the "DNA Identification Act of 1994".

SEC. 210302. FUNDING TO IMPROVE THE QUALITY AND AVAILABILITY OF DNA ANALYSES FOR LAW ENFORCEMENT IDENTIFICATION PURPOSES.

<< 42 USCA § 3751 >>

(a) DRUG CONTROL AND SYSTEM IMPROVEMENT GRANT PROGRAM.—Section 501(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751(b)) as amended by section 150003, is amended—

(1) by striking "and" at the end of paragraph (23);

(2) by striking the period at the end of paragraph (24) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(25) developing or improving in a forensic laboratory a capability to analyze deoxyribonucleic acid (hereinafter in this title referred to as 'DNA') for identification purposes.".

<< 42 USCA § 3753 >>

(b) STATE APPLICATIONS.—Section 503(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3753(a)) is amended by adding at the end the following new paragraph:

"(12) If any part of funds received from a grant made under this part is to be used to develop or improve a DNA analysis capability in a forensic laboratory, a certification that—

"(A) DNA analyses performed at such laboratory will satisfy or exceed then current standards for a quality assurance program for DNA analysis, issued by the Director of the Federal Bureau of Investigation under section 210303 of the DNA Identification Act of 1994;

"(B) DNA samples obtained by, and DNA analyses performed at, such laboratory will be accessible only—

"(i) to criminal justice agencies for law enforcement identification purposes;

"(ii) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules;

"(iii) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged; or

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(iv) if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes; and

"(C) such laboratory, and each analyst performing DNA analyses at such laboratory, will undergo, at regular intervals of not to exceed 180 days, external proficiency testing by a DNA proficiency testing program meeting the standards issued under section 210303 of the DNA Identification Act of 1994.".

(c) DNA IDENTIFICATION GRANTS.—

(1) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 210201(a), is amended—

<< 42 USCA Ch. 46 >>

(A) by redesignating part X as part Y;

<< 42 USCA § 3797 >>

(B) by redesignating section 2401 as section 2501; and
(C) by inserting after part W the following new part:

<< 42 USCA Ch. 46 >>

"PART X—DNA IDENTIFICATION GRANTS

<< 42 USCA § 3796kk >>

"SEC. 2401. GRANT AUTHORIZATION.

"The Attorney General may make funds available under this part to States and units of local government, or combinations thereof, to carry out all or a substantial part of a program or project intended to develop or improve the capability to analyze deoxyribonucleic acid (referred to in this part as 'DNA') in a forensic laboratory.

<< 42 USCA § 3796kk–1 >>

"SEC. 2402. APPLICATIONS.

"To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application in such form as the Attorney General may require.

<< 42 USCA § 3796kk–2 >>

"SEC. 2403. APPLICATION REQUIREMENTS.

"No grant may be made under this part unless an application has been submitted to the Attorney General in which the applicant certifies that—

"(1) DNA analyses performed at the laboratory will satisfy or exceed then current standards for a quality assurance program for DNA analysis issued by the Director of the Federal Bureau of Investigation under section 210303 of the DNA Identification Act of 1994.

"(2) DNA samples obtained by and DNA analyses performed at the laboratory shall be made available only—

"(A) to criminal justice agencies for law enforcement identification purposes;

"(B) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules;

"(C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which the defendant is charged; or

"(D) if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes; and

"(3) the laboratory and each analyst performing DNA analyses at the laboratory shall undergo, at regular intervals not exceeding 180 days, external proficiency testing by a DNA proficiency testing program that meets the standards issued under section 210303 of the DNA Identification Act of 1994.

<< 42 USCA § 3796kk–3 >>

"SEC. 2404. ADMINISTRATIVE PROVISIONS.

"(a) REGULATION AUTHORITY.—The Attorney General may promulgate guidelines, regulations, and procedures, as necessary to carry out the purposes of this part, including limitations on the number of awards made during each fiscal year, the submission and review of applications, selection criteria, and the extension or continuation of awards.

"(b) AWARD AUTHORITY.—The Attorney General shall have final authority over all funds awarded under this part.

"(c) TECHNICAL ASSISTANCE.—To assist and measure the effectiveness and performance of programs and activities funded under this part, the Attorney General may provide technical assistance as required.

<< 42 USCA § 3796kk–4 >>

"SEC. 2405. RESTRICTIONS ON USE OF FUNDS.

"(a) FEDERAL SHARE.—The Federal share of a grant, contract, or cooperative agreement made under this part may not exceed 75 percent of the total costs of the project described in the application submitted for the fiscal year for which the project receives assistance.

"(b) ADMINISTRATIVE COSTS.—A State or unit of local government may not use more than 10 percent of the funds it receives from this part for administrative expenses.

<< 42 USCA § 3796kk–5 >>

"SEC. 2406. REPORTS.

"(a) REPORTS TO ATTORNEY GENERAL.—Each State or unit of local government which receives a grant under this part shall submit to the Attorney General, for each year in which funds from a grant received under this part is expended, a report at such time and in such manner as the Attorney General may reasonably require which contains—

"(1) a summary of the activities carried out under the grant and an assessment of whether such activities are meeting the needs identified in the application submitted under section 2402; and

"(2) such other information as the Attorney General may require.

"(b) REPORTS TO CONGRESS.—Not later than 90 days after the end of each fiscal year for which grants are made under this part, the Attorney General shall submit to the Speaker of the House of Representatives and the President pro tempore of the Senate, a report that includes—

"(1) the aggregate amount of grants made under this part to each State or unit of local government for such fiscal year; and

"(2) a summary of the information provided in compliance with subsection (a)(1).

"SEC. 2407. EXPENDITURE RECORDS.

<< 42 USCA § 3796kk–6 >>

"(a) RECORDS.—Each State or unit of local government which receives a grant under this part shall keep records as the Attorney General may require to facilitate an effective audit.

"(b) ACCESS.—The Attorney General, the Comptroller General, or their designated agents shall have access, for the purpose of audit and examination, to any books, documents, and records of States and units of local government which receive grants made under this part if, in the opinion of the Attorney General, the Comptroller General, or their designated agents, such books, documents, and records are related to the receipt or use of any such grant.".

(2) TABLE OF CONTENTS.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.), as amended by section 210201(b), is amended by striking the matter relating to part X and inserting the following:

"Part X—DNA Identification Grants

"Sec. 2401. Grant authorization.
"Sec. 2402. Applications.
"Sec. 2403. Application requirements.
"Sec. 2404. Administrative provisions.
"Sec. 2405. Restrictions on use of funds.
"Sec. 2406. Reports.
"Sec. 2407. Expenditure records.

"Part Y—Transition–Effective Date–Repealer

"Sec. 2501. Continuation of rules, authorities, and proceedings.".

<< 42 USCA § 3793 >>

(3) AUTHORIZATION OF APPROPRIATIONS.—Section 1001 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793), as amended by section 210201(c), is amended—

 (A) in paragraph (3) by striking "and W" and inserting "W, and X"; and

 (B) adding at the end the following new paragraph:

"(22) There are authorized to be appropriated to carry out part X—

 "(1) $1,000,000 for fiscal year 1996;
 "(2) $3,000,000 for fiscal year 1997;
 "(3) $5,000,000 for fiscal year 1998;
 "(4) $13,500,000 for fiscal year 1999; and
 "(5) $17,500,000 for fiscal year 2000.".

<< 42 USCA § 3751 NOTE >>

(4) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date that is 60 days after the date of enactment of this Act.

<< 42 USCA § 14131 >>

SEC. 210303. QUALITY ASSURANCE AND PROFICIENCY TESTING STANDARDS.

 (a) PUBLICATION OF QUALITY ASSURANCE AND PROFICIENCY TESTING STANDARDS.—(1)(A) Not later than 180 days after the date of enactment of this Act, the Director of the Federal Bureau of Investigation shall appoint an advisory board on DNA quality assurance methods from among nominations proposed by the head of the National Academy of Sciences and professional societies of crime laboratory officials.

 (B) The advisory board shall include as members scientists from State, local, and private forensic laboratories, molecular geneticists and population geneticists not affiliated with a forensic laboratory, and a representative from the National Institute of Standards and Technology.

 (C) The advisory board shall develop, and if appropriate, periodically revise, recommended standards for quality assurance, including standards for testing the proficiency of forensic laboratories, and forensic analysts, in conducting analyses of DNA.

 (2) The Director of the Federal Bureau of Investigation, after taking into consideration such recommended standards, shall issue (and revise from time to time) standards for quality assurance, including standards for testing the proficiency of forensic laboratories, and forensic analysts, in conducting analyses of DNA.

(3) The standards described in paragraphs (1) and (2) shall specify criteria for quality assurance and proficiency tests to be applied to the various types of DNA analyses used by forensic laboratories. The standards shall also include a system for grading proficiency testing performance to determine whether a laboratory is performing acceptably.

(4) Until such time as the advisory board has made recommendations to the Director of the Federal Bureau of Investigation and the Director has acted upon those recommendations, the quality assurance guidelines adopted by the technical working group on DNA analysis methods shall be deemed the Director's standards for purposes of this section.

(b) ADMINISTRATION OF THE ADVISORY BOARD.—(1) For administrative purposes, the advisory board appointed under subsection (a) shall be considered an advisory board to the Director of the Federal Bureau of Investigation.

(2) Section 14 of the Federal Advisory Committee Act (5 U.S.C. App.) shall not apply with respect to the advisory board appointed under subsection (a).

(3) The DNA advisory board established under this section shall be separate and distinct from any other advisory board administered by the FBI, and is to be administered separately.

(4) The board shall cease to exist on the date 5 years after the initial appointments are made to the board, unless the existence of the board is extended by the Director of the Federal Bureau of Investigation.

(c) PROFICIENCY TESTING PROGRAM.—(1) Not later than 1 year after the effective date of this Act, the Director of the National Institute of Justice shall certify to the Committees on the Judiciary of the House and Senate that—

(A) the Institute has entered into a contract with, or made a grant to, an appropriate entity for establishing, or has taken other appropriate action to ensure that there is established, not later than 2 years after the date of enactment of this Act, a blind external proficiency testing program for DNA analyses, which shall be available to public and private laboratories performing forensic DNA analyses;

(B) a blind external proficiency testing program for DNA analyses is already readily available to public and private laboratories performing forensic DNA analyses; or

(C) it is not feasible to have blind external testing for DNA forensic analyses.

(2) As used in this subsection, the term "blind external proficiency test" means a test that is presented to a forensic laboratory through a second agency and appears to the analysts to involve routine evidence.

(3) Notwithstanding any other provision of law, the Attorney General shall make available to the Director of the National Institute of Justice during the first fiscal year in which funds are distributed under this subtitle up to $250,000 from the funds available under part X of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 to carry out this subsection.

<< 42 USCA § 14132 >>

SEC. 210304. INDEX TO FACILITATE LAW ENFORCEMENT EXCHANGE OF DNA IDENTIFICATION INFORMATION.

(a) ESTABLISHMENT OF INDEX.—The Director of the Federal Bureau of Investigation may establish an index of—

(1) DNA identification records of persons convicted of crimes;

(2) analyses of DNA samples recovered from crime scenes; and

(3) analyses of DNA samples recovered from unidentified human remains.

(b) INFORMATION.—The index described in subsection (a) shall include only information on DNA identification records and DNA analyses that are—

(1) based on analyses performed by or on behalf of a criminal justice agency in accordance with publicly available standards that satisfy or exceed the guidelines for a quality assurance program for DNA analysis, issued by the Director of the Federal Bureau of Investigation under section 210303;

(2) prepared by laboratories, and DNA analysts, that undergo, at regular intervals of not to exceed 180 days, external proficiency testing by a DNA proficiency testing program meeting the standards issued under section 210303; and

(3) maintained by Federal, State, and local criminal justice agencies pursuant to rules that allow disclosure of stored DNA samples and DNA analyses only—

(A) to criminal justice agencies for law enforcement identification purposes;

(B) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules;

(C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged; or

(D) if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes.

(c) FAILURE TO COMPLY.—Access to the index established by this section is subject to cancellation if the quality control and privacy requirements described in subsection (b) are not met.

<< 42 USCA § 14133 >>

## SEC. 210305. FEDERAL BUREAU OF INVESTIGATION.

(a) PROFICIENCY TESTING REQUIREMENTS.—

(1) GENERALLY.—(A) Personnel at the Federal Bureau of Investigation who perform DNA analyses shall undergo, at regular intervals of not to exceed 180 days, external proficiency testing by a DNA proficiency testing program meeting the standards issued under section 210303.

(B) Within 1 year after the date of enactment of this Act, the Director of the Federal Bureau of Investigation shall arrange for periodic blind external tests to determine the proficiency of DNA analysis performed at the Federal Bureau of Investigation laboratory.

(C) In this paragraph, "blind external test" means a test that is presented to the laboratory through a second agency and appears to the analysts to involve routine evidence.

(2) REPORT.—For 5 years after the date of enactment of this Act, the Director of the Federal Bureau of Investigation shall submit to the Committees on the Judiciary of the House and Senate an annual report on the results of each of the tests described in paragraph (1).

(b) PRIVACY PROTECTION STANDARDS.—

(1) GENERALLY.—Except as provided in paragraph (2), the results of DNA tests performed for a Federal law enforcement agency for law enforcement purposes may be disclosed only—

(A) to criminal justice agencies for law enforcement identification purposes;

(B) in judicial proceedings, if otherwise admissible pursuant to applicable statues or rules; and

(C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged.

(2) EXCEPTION.—If personally identifiable information is removed, test results may be disclosed for a population statistics database, for identification research and protocol development purposes, or for quality control purposes.

(c) CRIMINAL PENALTY.—(1) A person who—

(A) by virtue of employment or official position, has possession of, or access to, individually identifiable DNA information indexed in a database created or maintained by any Federal law enforcement agency; and

(B) knowingly discloses such information in any manner to any person or agency not authorized to receive it,

shall be fined not more than $100,000.

(2) A person who, without authorization, knowingly obtains DNA samples or individually identifiable DNA information indexed in a database created or maintained by any Federal law enforcement agency shall be fined not more than $100,000.

<< 42 USCA § 14134 >>

## SEC. 210306. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to the Federal Bureau of Investigation to carry out sections 210303, 210304, and 210305—

(1) $5,500,000 for fiscal year 1996;

(2) $8,000,000 for fiscal year 1997;

(3) $8,000,000 for fiscal year 1998;

(4) $2,500,000 for fiscal year 1999; and

(5) $1,000,000 for fiscal year 2000.

<< 42 USCA Ch. 136 >>

Subtitle D—Police Pattern or Practice

<< 42 USCA § 14141 >>

## SEC. 210401. CAUSE OF ACTION.

(a) UNLAWFUL CONDUCT.—It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

(b) CIVIL ACTION BY ATTORNEY GENERAL.—Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1) has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

<< 42 USCA § 14142 >>

## SEC. 210402. DATA ON USE OF EXCESSIVE FORCE.

(a) ATTORNEY GENERAL TO COLLECT.—The Attorney General shall, through appropriate means, acquire data about the use of excessive force by law enforcement officers.

(b) LIMITATION ON USE OF DATA.—Data acquired under this section shall be used only for research or statistical purposes and may not contain any information that may reveal the identity of the victim or any law enforcement officer.

(c) ANNUAL SUMMARY.—The Attorney General shall publish an annual summary of the data acquired under this section.

<< 42 USCA Ch. 136 >>

Subtitle E—Improved Training and Technical Automation

<< 42 USCA § 14151 >>

## SEC. 210501. IMPROVED TRAINING AND TECHNICAL AUTOMATION.

(a) GRANTS.—

(1) IN GENERAL.—The Attorney General shall, subject to the availability of appropriations, make grants to State, Indian tribal, and local criminal justice agencies and to nonprofit organizations for the purposes of improving criminal justice agency efficiency through computerized automation and technological improvements.

(2) TYPES OF PROGRAMS.—Grants under this section may include programs to—

(A) increase use of mobile digital terminals;

(B) improve communications systems, such as computer-aided dispatch and incident reporting systems;

(C) accomplish paper-flow reduction;

(D) establish or improve ballistics identification programs;

(E) increase the application of automated fingerprint identification systems and their communications on an interstate and intrastate basis; and

(F) improve computerized collection of criminal records.

(3) FUNDING.—No funds under this subtitle may be used to implement any cryptographic or digital telephony programs.

(b) TRAINING AND INVESTIGATIVE ASSISTANCE.—

(1) IN GENERAL.—The Attorney General shall, subject to the availability of appropriations—

(A) expand and improve investigative and managerial training courses for State, Indian tribal, and local law enforcement agencies; and

(B) develop and implement, on a pilot basis with no more than 10 participating cities, an intelligent information system that gathers, integrates, organizes, and analyzes information in active support of investigations by Federal, State, and local law enforcement agencies of violent serial crimes.

(2) IMPROVEMENT OF FACILITIES.—The improvement described in subsection (a) shall include improvements of the training facilities of the Federal Bureau of Investigation Academy at Quantico, Virginia.

(3) INTELLIGENT INFORMATION SYSTEM.—The intelligent information system described in paragraph (1)(B) shall be developed and implemented by the Federal Bureau of Investigation and shall utilize the resources of the Violent Criminal Apprehension Program.

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated—

(1) to carry out subsection (a)—

(A) $10,000,000 for fiscal year 1996;

(B) $20,000,000 for fiscal year 1997;

(C) $23,000,000 for fiscal year 1998;

(D) $23,000,000 for fiscal year 1999; and

(E) $24,000,000 for fiscal year 2000.

(2) to carry out subsection (b)(1)—

(A) $4,000,000 for fiscal year 1996;

(B) $2,000,000 for fiscal year 1997;

(C) $3,000,000 for fiscal year 1998;

(D) $5,000,000 for fiscal year 1999; and

(E) $6,000,000 for fiscal year 2000.

(3) to carry out subsection (b)(2)—

$10,000,000 for fiscal year 1996.

(d) DEFINITIONS.—In this section—

"Indian tribe" means a tribe, band, pueblo, nation, or other organized group or community of Indians, including an Alaska Native village (as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, and the United States Virgin Islands.

<< 42 USCA Ch. 136 >>

Subtitle F—Other State and Local Aid

<< 42 USCA § 3793 >>

SEC. 210601. REAUTHORIZATION OF OFFICE OF JUSTICE PROGRAMS.

Section 1001(a) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793(a)) is amended—

(1) in paragraph (1) by striking "1993 and 1994" and inserting "1994 and 1995";

(2) in paragraph (2) by striking "1993 and 1994" and inserting "1994 and 1995";

(3) in paragraph (3) by striking "1993 and 1994" and inserting "1994 and 1995";

(4) in paragraph (5) by striking "1993 and 1994" and inserting "1994 and 1995";

(5) in paragraph (6) by inserting "and 1995" after "1994";

(6) in paragraph (7) by striking "1991, 1992, 1993, and 1994," and inserting "1994 and 1995";

(7) in paragraph (8) by inserting "and 1995" after "1994"; and

(8) in paragraph (9) by inserting "and 1995" after "1994".

<< 42 USCA § 14161 >>

SEC. 210602. FEDERAL ASSISTANCE TO EASE THE INCREASED BURDENS ON STATE COURT SYSTEMS RESULTING FROM ENACTMENT OF THIS ACT.

 (a) IN GENERAL.—The Attorney General shall, subject to the availability of appropriation, make grants for States and units of local government to pay the costs of providing increased resources for courts, prosecutors, public defenders, and other criminal justice participants as necessary to meet the increased demands for judicial activities resulting from the provisions of this Act and amendments made by this Act.

 (b) APPLICATIONS.—In carrying out this section, the Attorney General may make grants to, or enter into contracts with public or private agencies, institutions, or organizations or individuals to carry out any purpose specified in this section. The Attorney General shall have final authority over all funds awarded under this section.

 (c) RECORDS.—Each recipient that receives a grant under this section shall keep such records as the Attorney General may require to facilitate an effective audit.

 (d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

 (1) $23,000,000 for fiscal year 1996;

 (2) $30,000,000 for fiscal year 1997;

 (3) $30,000,000 for fiscal year 1998;

 (4) $32,000,000 for fiscal year 1999; and

 (5) $35,000,000 for fiscal year 2000,

to remain available for obligation until expended.

<< 18 USCA § 922 NOTE >>

SEC. 210603. AVAILABILITY OF VIOLENT CRIME REDUCTION TRUST FUND TO FUND ACTIVITIES AUTHORIZED BY THE BRADY HANDGUN VIOLENCE PREVENTION ACT AND THE NATIONAL CHILD PROTECTION ACT OF 1993.

 (a) APPROPRIATIONS.—Of the amounts authorized in Sections 103(k) and 106(b)(2) of the Brady Handgun Violence Prevention Act (18 U.S.C. 922 note) and in section 4(b) of the National Child Protection Act of 1993 (42 U.S.C. 5119b(b)), a total of $100,000,000 for fiscal year 1995, $25,000,000 for fiscal year 1996, and $25,000,000 for fiscal year 1997 may be appropriated from the Violent Crime Reduction Trust Fund established by this Act.

 (b) TECHNICAL AMENDMENT.—Sections 103(k) and 106(b) of the Brady Handgun Violence Prevention Act (18 U.S.C. 922 note) are each amended by striking ", which may be appropriated from the Violent Crime Reduction Trust Fund,".

<< 42 USCA Ch. 136 >>

TITLE XXII—MOTOR VEHICLE THEFT PREVENTION

<< 42 USCA § 13701 >>

SEC. 220001. SHORT TITLE.

 This title may be cited as the "Motor Vehicle Theft Prevention Act".

<< 42 USCA § 14171 >>

SEC. 220002. MOTOR VEHICLE THEFT PREVENTION PROGRAM.

AR.02086

(a) IN GENERAL.—Not later than 180 days after the date of enactment of this section, the Attorney General shall develop, in cooperation with the States, a national voluntary motor vehicle theft prevention program (in this section referred to as the "program") under which—

  (1) the owner of a motor vehicle may voluntarily sign a consent form with a participating State or locality in which the motor vehicle owner—

    (A) states that the vehicle is not normally operated under certain specified conditions; and

    (B) agrees to—

     (i) display program decals or devices on the owner's vehicle; and

     (ii) permit law enforcement officials in any State to stop the motor vehicle and take reasonable steps to determine whether the vehicle is being operated by or with the permission of the owner, if the vehicle is being operated under the specified conditions; and

  (2) participating States and localities authorize law enforcement officials in the State or locality to stop motor vehicles displaying program decals or devices under specified conditions and take reasonable steps to determine whether the vehicle is being operated by or with the permission of the owner.

(b) Uniform Decal or Device Designs.—

  (1) IN GENERAL.—The motor vehicle theft prevention program developed pursuant to this section shall include a uniform design or designs for decals or other devices to be displayed by motor vehicles participating in the program.

  (2) TYPE OF DESIGN.—The uniform design shall—

    (A) be highly visible; and

    (B) explicitly state that the motor vehicle to which it is affixed may be stopped under the specified conditions without additional grounds for establishing a reasonable suspicion that the vehicle is being operated unlawfully.

(c) VOLUNTARY CONSENT FORM.—The voluntary consent form used to enroll in the program shall—

  (1) clearly state that participation in the program is voluntary;

  (2) clearly explain that participation in the program means that, if the participating vehicle is being operated under the specified conditions, law enforcement officials may stop the vehicle and take reasonable steps to determine whether it is being operated by or with the consent of the owner, even if the law enforcement officials have no other basis for believing that the vehicle is being operated unlawfully;

  (3) include an express statement that the vehicle is not normally operated under the specified conditions and that the operation of the vehicle under those conditions would provide sufficient grounds for a prudent law enforcement officer to reasonably believe that the vehicle was not being operated by or with the consent of the owner; and

  (4) include any additional information that the Attorney General may reasonably require.

(d) SPECIFIED CONDITIONS UNDER WHICH STOPS MAY BE AUTHORIZED.—

  (1) IN GENERAL.—The Attorney General shall promulgate rules establishing the conditions under which participating motor vehicles may be authorized to be stopped under this section. These conditions may not be based on race, creed, color, national origin, gender, or age. These conditions may include—

    (A) the operation of the vehicle during certain hours of the day; or

    (B) the operation of the vehicle under other circumstances that would provide a sufficient basis for establishing a reasonable suspicion that the vehicle was not being operated by the owner, or with the consent of the owner.

  (2) MORE THAN ONE SET OF CONDITIONS.—The Attorney General may establish more than one set of conditions under which participating motor vehicles may be stopped. If more than one set of conditions is established, a separate consent form and a separate design for program decals or devices shall be established for each set of conditions. The Attorney General may choose to satisfy the requirement of a separate design for program decals or devices under this paragraph by the use of a design color that is clearly distinguishable from other design colors.

  (3) NO NEW CONDITIONS WITHOUT CONSENT.—After the program has begun, the conditions under which a vehicle may be stopped if affixed with a certain decal or device design may not be expanded without the consent of the owner.

  (4) LIMITED PARTICIPATION BY STATES AND LOCALITIES.—A State or locality need not authorize the stopping of motor vehicles under all sets of conditions specified under the program in order to participate in the program.

(e) MOTOR VEHICLES FOR HIRE.—

AR.02087

240

(1) NOTIFICATION TO LESSEES.—Any person who is in the business of renting or leasing motor vehicles and who rents or leases a motor vehicle on which a program decal or device is affixed shall, prior to transferring possession of the vehicle, notify the person to whom the motor vehicle is rented or leased about the program.

(2) TYPE OF NOTICE.—The notice required by this subsection shall—

(A) be in writing;

(B) be in a prominent format to be determined by the Attorney General; and

(C) explain the possibility that if the motor vehicle is operated under the specified conditions, the vehicle may be stopped by law enforcement officials even if the officials have no other basis for believing that the vehicle is being operated unlawfully.

(3) FINE FOR FAILURE TO PROVIDE NOTICE.—Failure to provide proper notice under this subsection shall be punishable by a fine not to exceed $5,000.

(f) NOTIFICATION OF POLICE.—As a condition of participating in the program, a State or locality must agree to take reasonable steps to ensure that law enforcement officials throughout the State or locality are familiar with the program, and with the conditions under which motor vehicles may be stopped under the program.

(g) REGULATIONS.—The Attorney General shall promulgate regulations to implement this section.

(h) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to carry out this section.

(1) $1,500,000 for fiscal year 1996;

(2) $1,700,000 for fiscal year 1997; and

(3) $1,800,000 for fiscal year 1998.

SEC. 220003. ALTERING OR REMOVING MOTOR VEHICLE IDENTIFICATION NUMBERS.

<< 18 USCA § 511 >>

(a) BASIC OFFENSE.—Subsection (a) of section 511 of title 18, United States Code, is amended to read as follows:

"(a) A person who—

"(1) knowingly removes, obliterates, tampers with, or alters an identification number for a motor vehicle or motor vehicle part; or

"(2) with intent to further the theft of a motor vehicle, knowingly removes, obliterates, tampers with, or alters a decal or device affixed to a motor vehicle pursuant to the Motor Vehicle Theft Prevention Act,

shall be fined under this title, imprisoned not more than 5 years, or both.".

(b) EXCEPTED PERSONS.—Paragraph (2) of section 511(b) of title 18, United States Code, is amended—

(1) by striking "and" after the semicolon in subparagraph (B);

(2) by striking the period at the end of subparagraph (C) and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

"(D) a person who removes, obliterates, tampers with, or alters a decal or device affixed to a motor vehicle pursuant to the Motor Vehicle Theft Prevention Act, if that person is the owner of the motor vehicle, or is authorized to remove, obliterate, tamper with or alter the decal or device by—

"(i) the owner or his authorized agent;

"(ii) applicable State or local law; or

"(iii) regulations promulgated by the Attorney General to implement the Motor Vehicle Theft Prevention Act.".

(c) DEFINITION.—Section 511 of title 18, United States Code, is amended by adding at the end thereof the following:

"(d) For purposes of subsection (a) of this section, the term 'tampers with' includes covering a program decal or device affixed to a motor vehicle pursuant to the Motor Vehicle Theft Prevention Act for the purpose of obstructing its visibility.".

(d) UNAUTHORIZED APPLICATION OF A DECAL OR DEVICE.—

<< 18 USCA § 511A >>

(1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by adding after section 511 the following new section:

AR.02088

"§ 511A. Unauthorized application of theft prevention decal or device

"(a) Whoever affixes to a motor vehicle a theft prevention decal or other device, or a replica thereof, unless authorized to do so pursuant to the Motor Vehicle Theft Prevention Act, shall be punished by a fine not to exceed $1,000.

"(b) For purposes of this section, the term 'theft prevention decal or device' means a decal or other device designed in accordance with a uniform design for such devices developed pursuant to the Motor Vehicle Theft Prevention Act.".

<< 18 USCA Ch. 25 >>

(2) TECHNICAL AMENDMENT.—The chapter analysis for chapter 25 of title 18, United States Code, is amended by adding after the item relating to section 511 the following new item:

"511A. Unauthorized application of theft prevention decal or device.".

TITLE XXIII—VICTIMS OF CRIME

Subtitle A—Victims of Crime

SEC. 230101. VICTIM'S RIGHT OF ALLOCUTION IN SENTENCING.

<< 28 USCA § 2074 NOTE >>

(a) MODIFICATION OF PROPOSED AMENDMENTS.—The proposed amendments to the Federal Rules of Criminal Procedure which are embraced by an order entered by the Supreme Court of the United States on April 29, 1994, shall take effect on December 1, 1994, as otherwise provided by law, but with the following amendments:

<< 28 USCA § 2074 NOTE >>

<< 18 USCA FRCRP Rule 32 >>

(b) IN GENERAL.—Rule 32 of the Federal Rules of Criminal Procedure is amended by—

(1) striking "and" following the semicolon in subdivision (c)(3)(C);

(2) striking the period at the end of subdivision (c)(3)(D) and inserting "; and";

(3) inserting after subdivision (c)(3)(D) the following:

"(E) if sentence is to be imposed for a crime of violence or sexual abuse, address the victim personally if the victim is present at the sentencing hearing and determine if the victim wishes to make a statement or present any information in relation to the sentence.";

(4) in subdivision (c)(3)(D), striking "equivalent opportunity" and inserting in lieu thereof "opportunity equivalent to that of the defendant's counsel";

(5) in the last sentence of subdivision (c)(4), striking "and (D)" and inserting "(D), and (E)";

(6) in the last sentence of subdivision (c)(4), inserting "the victim," before "or the attorney for the Government."; and

(7) adding at the end the following:

"(f) DEFINITIONS.—For purposes of this rule—

"(1) 'victim' means any individual against whom an offense has been committed for which a sentence is to be imposed, but the right of allocution under subdivision (c)(3)(E) may be exercised instead by—

"(A) a parent or legal guardian if the victim is below the age of eighteen years or incompetent; or

"(B) one or more family members or relatives designated by the court if the victim is deceased or incapacitated;

if such person or persons are present at the sentencing hearing, regardless of whether the victim is present; and

"(2) 'crime of violence or sexual abuse' means a crime that involved the use or attempted or threatened use of physical force against the person or property of another, or a crime under chapter 109A of title 18, United States Code.".

<< 28 USCA § 2074 NOTE >>

<< 18 USCA FRCRP Rule 32 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (b) shall become effective on December 1, 1994.

## SEC. 230102. SENSE OF THE SENATE CONCERNING THE RIGHT OF A VICTIM OF A VIOLENT CRIME OR SEXUAL ABUSE TO SPEAK AT AN OFFENDER'S SENTENCING HEARING AND ANY PAROLE HEARING.

It is the sense of the Senate that—

  (1) the law of a State should provide for a victim's right of allocution at a sentencing hearing and at any parole hearing if the offender has been convicted of a crime of violence or sexual abuse;

  (2) such a victim should have an opportunity equivalent to the opportunity accorded to the offender to address the sentencing court or parole board and to present information in relation to the sentence imposed or to the early release of the offender; and

  (3) if the victim is not able to or chooses not to testify at a sentencing hearing or parole hearing, the victim's parents, legal guardian, or family members should have the right to address the court or board.

<< 42 USCA § 10601 >>

Subtitle B—Crime Victims' Fund

## SEC. 230201. ALLOCATION OF FUNDS FOR COSTS AND GRANTS.

(a) GENERALLY.—Section 1402(d) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)) is amended by—

  (1) striking paragraph (2) and inserting the following:

  "(2) the next $10,000,000 deposited in the Fund shall be available for grants under section 1404A.";

  (2) striking paragraph (3) and inserting the following:

  "(3) Of the remaining amount deposited in the Fund in a particular fiscal year—

   "(A) 48.5 percent shall be available for grants under section 1403;

   "(B) 48.5 percent shall be available for grants under section 1404(a); and

   "(C) 3 percent shall be available for grants under section 1404(c).";

  (3) striking paragraph (4) and inserting the following:

  "(4) The Director may retain any portion of the Fund that was deposited during a fiscal year that is in excess of 110 percent of the total amount deposited in the Fund during the preceding fiscal year as a reserve for use in a year in which the Fund falls below the amount available in the previous year. Such reserve may not exceed $20,000,000."; and

  (4) striking paragraph (5).

(b) CONFORMING CROSS REFERENCE.—Section 1402(g)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(g)(1)) is amended by striking "(d)(2)(D)" and inserting "(d)(2)".

<< 42 USCA § 10602 >>

## SEC. 230202. RELATIONSHIP OF CRIME VICTIM COMPENSATION TO CERTAIN FEDERAL PROGRAMS.

Section 1403 of the Victims of Crime Act of 1984 (42 U.S.C. 10602) is amended by adding at the end the following new subsection:

  "(e) Notwithstanding any other law, if the compensation paid by an eligible crime victim compensation program would cover costs that a Federal program, or a federally financed State or local program, would otherwise pay,—

   "(1) such crime victim compensation program shall not pay that compensation; and

   "(2) the other program shall make its payments without regard to the existence of the crime victim compensation program.".

<< 42 USCA § 10602 >>

SEC. 230203. ADMINISTRATIVE COSTS FOR CRIME VICTIM COMPENSATION.

(a) CREATION OF EXCEPTION.—The final sentence of section 1403(a)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(a)(1)) is amended by striking "A grant" and inserting "Except as provided in paragraph (3), a grant".

(b) REQUIREMENTS OF EXCEPTION.—Section 1403(a) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(a)) is amended by adding at the end the following new paragraph:

"(3) Not more than 5 percent of a grant made under this section may be used for the administration of the State crime victim compensation program receiving the grant.".

<< 42 USCA § 10603 >>

SEC. 230204. GRANTS FOR DEMONSTRATION PROJECTS.

Section 1404(c)(1)(A) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(1)(A)) is amended by inserting "demonstration projects and" before "training".

<< 42 USCA § 10603 >>

SEC. 230205. ADMINISTRATIVE COSTS FOR CRIME VICTIM ASSISTANCE.

(a) CREATION OF EXCEPTION.—Section 1404(b)(2) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(b)(2)) is amended by striking "An eligible" and inserting "Except as provided in paragraph (3), an eligible".

(b) REQUIREMENTS OF EXCEPTION.—Section 1404(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(b)) is amended by adding at the end the following new subsection:

"(3) Not more than 5 percent of sums received under subsection (a) may be used for the administration of the State crime victim assistance program receiving such sums.".

<< 42 USCA § 10604 >>

SEC. 230206. MAINTENANCE OF EFFORT.

Section 1407 of the Victims of Crime Act of 1984 (42 U.S.C. 10604) is amended by adding at the end the following new subsection:

"(h) Each entity receiving sums made available under this Act for administrative purposes shall certify that such sums will not be used to supplant State or local funds, but will be used to increase the amount of such funds that would, in the absence of Federal funds, be made available for these purposes.".

<< 42 USCA § 10604 >>

SEC. 230207. CHANGE OF DUE DATE FOR REQUIRED REPORT.

Section 1407(g) of the Victims of Crime Act of 1984 (42 U.S.C. 10604(g)) is amended by striking "and on December 31 every two years thereafter", and inserting "and on June 30 every two years thereafter".

<< 42 USCA § 10603 >>

SEC. 230208. AMENDMENT OF THE VICTIMS OF CRIME ACT.

Section 1404(a)(5)(B) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(a)(5)(B)) is amended to read as follows:
"(B) $200,000 thereafter.".

<< 42 USCA Ch. 136 >>

## TITLE XXIV—PROTECTIONS FOR THE ELDERLY

<< 42 USCA § 14181 >>

SEC. 240001. MISSING ALZHEIMER'S DISEASE PATIENT ALERT PROGRAM.

  (a) GRANT.—The Attorney General shall, subject to the availability of appropriations, award a grant to an eligible organization to assist the organization in paying for the costs of planning, designing, establishing, and operating a Missing Alzheimer's Disease Patient Alert Program, which shall be a locally based, proactive program to protect and locate missing patients with Alzheimer's disease and related dementias.

  (b) APPLICATION.—To be eligible to receive a grant under subsection (a), an organization shall submit an application to the Attorney General at such time, in such manner, and containing such information as the Attorney General may require, including, at a minimum, an assurance that the organization will obtain and use assistance from private nonprofit organizations to support the program.

  (c) ELIGIBLE ORGANIZATION.—The Attorney General shall award the grant described in subsection (a) to a national voluntary organization that has a direct link to patients, and families of patients, with Alzheimer's disease and related dementias.

  (d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this section—

    (1) $900,000 for fiscal year 1996;

    (2) $900,000 for fiscal year 1997; and

    (3) $900,000 for fiscal year 1998.

<< 28 USCA § 994 NOTE >>

SEC. 240002. CRIMES AGAINST THE ELDERLY.

  (a) IN GENERAL.—Pursuant to its authority under the Sentencing Reform Act of 1984 and section 21 of the Sentencing Act of 1987 (including its authority to amend the sentencing guidelines and policy statements) and its authority to make such amendments on an emergency basis, the United States Sentencing Commission shall ensure that the applicable guideline range for a defendant convicted of a crime of violence against an elderly victim is sufficiently stringent to deter such a crime, to protect the public from additional crimes of such a defendant, and to adequately reflect the heinous nature of such an offense.

  (b) CRITERIA.—In carrying out subsection (a), the United States Sentencing Commission shall ensure that—

    (1) the guidelines provide for increasingly severe punishment for a defendant commensurate with the degree of physical harm caused to the elderly victim;

    (2) the guidelines take appropriate account of the vulnerability of the victim; and

    (3) the guidelines provide enhanced punishment for a defendant convicted of a crime of violence against an elderly victim who has previously been convicted of a crime of violence against an elderly victim, regardless of whether the conviction occurred in Federal or State court.

  (c) DEFINITIONS.—In this section—

    "crime of violence" means an offense under section 113, 114, 1111, 1112, 1113, 1117, 2241, 2242, or 2244 of title 18, United States Code.

    "elderly victim" means a victim who is 65 years of age or older at the time of an offense.

<< 18 USCA § 2325 NOTE >>

## TITLE XXV—SENIOR CITIZENS AGAINST MARKETING SCAMS

SEC. 250001. SHORT TITLE.

  This Act may be cited as the "Senior Citizens Against Marketing Scams Act of 1994".

SEC. 250002. ENHANCED PENALTIES FOR TELEMARKETING FRAUD.

(a) OFFENSE.—Part I of title 18, United States Code, is amended—

<< 18 USCA Ch. 113A >>

  (1) by redesignating chapter 113A as chapter 113B; and
  (2) by inserting after chapter 113 the following new chapter:

"CHAPTER 113A—TELEMARKETING FRAUD

"Sec.
"2325. Definition.
"2326. Enhanced penalties.
"2327. Mandatory restitution.

<< 18 USCA § 2325 >>

"§ 2325. Definition

"In this chapter, 'telemarketing'—
  "(1) means a plan, program, promotion, or campaign that is conducted to induce—
  "(A) purchases of goods or services; or
  "(B) participation in a contest or sweepstakes,

by use of 1 or more interstate telephone calls initiated either by a person who is conducting the plan, program, promotion, or campaign or by a prospective purchaser or contest or sweepstakes participant; but
  "(2) does not include the solicitation of sales through the mailing of a catalog that—
  "(A) contains a written description or illustration of the goods or services offered for sale;
  "(B) includes the business address of the seller;
  "(C) includes multiple pages of written material or illustration; and
  "(D) has been issued not less frequently than once a year,

if the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders without further solicitation.

<< 18 USCA § 2326 >>

"§ 2326. Enhanced penalties

"A person who is convicted of an offense under section 1028, 1029, 1341, 1342, 1343, or 1344 in connection with the conduct of telemarketing—
  "(1) may be imprisoned for a term of up to 5 years in addition to any term of imprisonment imposed under any of those sections, respectively; and
  "(2) in the case of an offense under any of those sections that—
  "(A) victimized ten or more persons over the age of 55; or
  "(B) targeted persons over the age of 55,

may be imprisoned for a term of up to 10 years in addition to any term of imprisonment imposed under any of those sections, respectively.

<< 18 USCA § 2327 >>

"§ 2327. Mandatory restitution

"(a) IN GENERAL.—Notwithstanding section 3663, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.

"(b) SCOPE AND NATURE OF ORDER.—

"(1) DIRECTIONS.—The order of restitution under this section shall direct that—

"(A) the defendant pay to the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court, pursuant to paragraph (3); and

"(B) the United States Attorney enforce the restitution order by all available and reasonable means.

"(2) ENFORCEMENT BY VICTIM.—An order of restitution may be enforced by a victim named in the order to receive the restitution as well as by the United States Attorney, in the same manner as a judgment in a civil action.

"(3) DEFINITION.—For purposes of this subsection, the term 'full amount of the victim's losses' means all losses suffered by the victim as a proximate result of the offense.

"(4) ORDER MANDATORY.—(A) The issuance of a restitution order under this section is mandatory.

"(B) A court may not decline to issue an order under this section because of—

"(i) the economic circumstances of the defendant; or

"(ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.

"(C)(i) Notwithstanding subparagraph (A), the court may take into account the economic circumstances of the defendant in determining the manner in which and the schedule according to which the restitution is to be paid.

"(ii) For purposes of this subparagraph, the term 'economic circumstances' includes—

"(I) the financial resources and other assets of the defendant;

"(II) projected earnings, earning capacity, and other income of the defendant; and

"(III) any financial obligations of the defendant, including obligations to dependents.

"(D) Subparagraph (A) does not apply if—

"(i) the court finds on the record that the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of the amount of a restitution order in the foreseeable future (under any reasonable schedule of payments); and

"(ii) the court enters in its order the amount of the victim's losses, and provides a nominal restitution award.

"(5) MORE THAN 1 OFFENDER.—When the court finds that more than 1 offender has contributed to the loss of a victim, the court may make each offender liable for payment of the full amount of restitution or may apportion liability among the offenders to reflect the level of contribution and economic circumstances of each offender.

"(6) MORE THAN 1 VICTIM.—When the court finds that more than 1 victim has sustained a loss requiring restitution by an offender, the court shall order full restitution of each victim but may provide for different payment schedules to reflect the economic circumstances of each victim.

"(7) PAYMENT SCHEDULE.—An order under this section may direct the defendant to make a single lump-sum payment or partial payments at specified intervals.

"(8) SETOFF.—Any amount paid to a victim under this section shall be set off against any amount later recovered as compensatory damages by the victim from the defendant in—

"(A) any Federal civil proceeding; and

"(B) any State civil proceeding, to the extent provided by the law of the State.

"(9) EFFECT ON OTHER SOURCES OF COMPENSATION.—The issuance of a restitution order shall not affect the entitlement of a victim to receive compensation with respect to a loss from insurance or any other source until the payments actually received by the victim under the restitution order fully compensate the victim for the loss.

"(10) CONDITION OF PROBATION OR SUPERVISED RELEASE.—Compliance with a restitution issued under this section shall be a condition of any probation or supervised release of a defendant. The court may revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, hold the defendant in contempt pursuant to section 3583(e), or suspend the offender's eligibility for any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or with appropriated funds of the United States if the defendant fails to comply with the order. In determining whether to revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release or hold a defendant serving a term of supervised release in contempt, the court

AR.02094

shall consider the defendant's employment status, earning ability and financial resources, the willfulness of the defendant's failure to comply, and any other circumstances that may have a bearing on the defendant's ability to comply.

"(c) PROOF OF CLAIM.—

 "(1) AFFIDAVIT.—Within 60 days after conviction and, in any event, not later than 10 days prior to sentencing, the United States Attorney (or the United States Attorney's delegee), after consulting with the victim, shall prepare and file an affidavit with the court listing the amounts subject to restitution under this section. The affidavit shall be signed by the United States Attorney (or the United States Attorney's delegee) and the victim. Should the victim object to any of the information included in the affidavit, the United States Attorney (or the United States Attorney's delegee) shall advise the victim that the victim may file a separate affidavit and shall provide the victim with an affidavit form which may be used to do so.

 "(2) OBJECTION.—If, after the defendant has been notified of the affidavit, no objection is raised by the defendant, the amounts attested to in the affidavit filed pursuant to paragraph (1) shall be entered in the court's restitution order. If objection is raised, the court may require the victim or the United States Attorney (or the United States Attorney's delegee) to submit further affidavits or other supporting documents, demonstrating the victim's losses.

 "(3) ADDITIONAL DOCUMENTATION AND TESTIMONY.—If the court concludes, after reviewing the supporting documentation and considering the defendant's objections, that there is a substantial reason for doubting the authenticity or veracity of the records submitted, the court may require additional documentation or hear testimony on those questions. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

 "(4) FINAL DETERMINATION OF LOSSES.—If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing as provided in paragraph (1), the United States Attorney (or the United States Attorney's delegee) shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

"(d) MODIFICATION OF ORDER.—A victim or the offender may petition the court at any time to modify a restitution order as appropriate in view of a change in the economic circumstances of the offender.

"(e) REFERENCE TO MAGISTRATE OR SPECIAL MASTER.—The court may refer any issue arising in connection with a proposed order of restitution to a magistrate or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

"(f) DEFINITION.—For purposes of this section, the term 'victim' includes the individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian.".

 (b) TECHNICAL AMENDMENTS.—

<< 18 USCA Ch. 1 >>

 (1) PART ANALYSIS.—The part analysis for part I of title 18, United States Code, is amended by striking the item relating to chapter 113A and inserting the following:

"113A.    Telemarketing fraud..................................................................................................................... ...............2325

"113B.    Terrorism.................................................................................................................................. ............2331".

<< 18 USCA Ch. 113B >>

 (2) CHAPTER 113B.—The chapter heading for chapter 113B of title 18, United States Code, as redesignated by subsection (a)(1), is amended to read as follows:

"CHAPTER 113B—TERRORISM".

<< 28 USCA § 994 NOTE >>

SEC. 250003. INCREASED PENALTIES FOR FRAUD AGAINST OLDER VICTIMS.

 (a) REVIEW.—The United States Sentencing Commission shall review and, if necessary, amend the sentencing guidelines to ensure that victim related adjustments for fraud offenses against older victims over the age of 55 are adequate.
 (b) REPORT.—Not later than 180 days after the date of enactment of this Act, the Sentencing Commission shall report to Congress the result of its review under subsection (a).

<< 18 USCA § 3059 >>

SEC. 250004. REWARDS FOR INFORMATION LEADING TO PROSECUTION AND CONVICTION.

 Section 3059 of title 18, United States Code, is amended by adding at the end the following new subsection:
 "(c)(1) In special circumstances and in the Attorney General's sole discretion, the Attorney General may make a payment of up to $10,000 to a person who furnishes information unknown to the Government relating to a possible prosecution under section 2326 which results in a conviction.
 "(2) A person is not eligible for a payment under paragraph (1) if—
 "(A) the person is a current or former officer or employee of a Federal, State, or local government agency or instrumentality who furnishes information discovered or gathered in the course of government employment;
 "(B) the person knowingly participated in the offense;
 "(C) the information furnished by the person consists of an allegation or transaction that has been disclosed to the public—
 "(i) in a criminal, civil, or administrative proceeding;
 "(ii) in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or
 "(iii) by the news media, unless the person is the original source of the information; or
 "(D) when, in the judgment of the Attorney General, it appears that a person whose illegal activities are being prosecuted or investigated could benefit from the award.
 "(3) For the purposes of paragraph (2)(C)(iii), the term 'original source' means a person who has direct and independent knowledge of the information that is furnished and has voluntarily provided the information to the Government prior to disclosure by the news media.
 "(4) Neither the failure of the Attorney General to authorize a payment under paragraph (1) nor the amount authorized shall be subject to judicial review.".

SEC. 250005. AUTHORIZATION OF APPROPRIATIONS.

 There are authorized to be appropriated for the purposes of carrying out this Act and the amendments made by this Act—
 (1) for the Federal Bureau of Investigation to hire, equip, and train special agents and support staff to investigate telemarketing fraud cases—
 (A) $750,000 for fiscal year 1996;
 (B) $1,500,000 for fiscal year 1997;
 (C) $1,500,000 for fiscal year 1998;
 (D) $1,800,000 for fiscal year 1999; and
 (E) $1,950,000 for fiscal year 2000;
 (2) to hire, equip, and train Department of Justice attorneys, assistant United States Attorneys, and support staff to prosecute telemarketing fraud cases—
 (A) $250,000 for fiscal year 1996;
 (B) $500,000 for fiscal year 1997;
 (C) $500,000 for fiscal year 1998;
 (D) $600,000 for fiscal year 1999; and
 (E) $650,000 for fiscal year 2000; and

(3) for the Department of Justice to conduct, in cooperation with State and local law enforcement agencies and senior citizen advocacy organizations, public awareness and prevention initiatives for senior citizens, such as seminars and training—

(A) $1,000,000 for fiscal year 1996;

(B) $2,000,000 for fiscal year 1997;

(C) $2,000,000 for fiscal year 1998;

(D) $2,500,000 for fiscal year 1999; and

(E) $2,500,000 for fiscal year 2000.

<< 18 USCA § 1341 >>

SEC. 250006. BROADENING APPLICATION OF MAIL FRAUD STATUTE.

Section 1341 of title 18, United States Code, is amended—

(1) by inserting "or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier," after "Postal Service,"; and

(2) by inserting "or such carrier" after "causes to be delivered by mail".

<< 18 USCA § 1029 >>

SEC. 250007. FRAUD AND RELATED ACTIVITY IN CONNECTION WITH ACCESS DEVICES.

Section 1029 of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) by striking "or" at the end of paragraph (3); and

(B) by inserting after paragraph (4) the following new paragraphs:

"(5) knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000;

"(6) without the authorization of the issuer of the access device, knowingly and with intent to defraud solicits a person for the purpose of—

"(A) offering an access device; or

"(B) selling information regarding or an application to obtain an access device; or

"(7) without the authorization of the credit card system member or its agent, knowingly and with intent to defraud causes or arranges for another person to present to the member or its agent, for payment, 1 or more evidences or records of transactions made by an access device;";

(2) in subsection (c)(1) by striking "(a)(2) or (a)(3)" and inserting "(a) (2), (3), (5), (6), or (7)"; and

(3) in subsection (e)—

(A) by striking "and" at the end of paragraph (5);

(B) by striking the period at the end of paragraph (6) and inserting "; and"; and

(C) by adding at the end the following new paragraph:

"(7) the term 'credit card system member' means a financial institution or other entity that is a member of a credit card system, including an entity, whether affiliated with or identical to the credit card issuer, that is the sole member of a credit card system.".

<< 18 USCA § 2325 NOTE >>

SEC. 250008. INFORMATION NETWORK.

(a) HOTLINE.—The Attorney General shall, subject to the availability of appropriations, establish a national toll-free hotline for the purpose of—

(1) providing general information on telemarketing fraud to interested persons; and

(2) gathering information related to possible violations of this Act.

(b) ACTION ON INFORMATION GATHERED.—The Attorney General shall work in cooperation with the Federal Trade Commission to ensure that information gathered through the hotline shall be acted on in an appropriate manner.

<< 42 USCA § 3721 NOTE >>

TITLE XXVI—COMMISSION MEMBERSHIP AND APPOINTMENT

SEC. 260001. COMMISSION MEMBERSHIP AND APPOINTMENT.

(a) MEMBERSHIP.—Section 211(B)(f) of Public Law 101–515 (104 Stat. 2123) is amended to read as follows:
"(f) NUMBER AND APPOINTMENT.—
"(1) IN GENERAL.—The Commission shall be composed of 29 members as follows:
 "(A) Nine individuals appointed from national law enforcement organizations representing law enforcement officers, of whom—
  "(i) two shall be appointed by the Speaker of the House of Representatives;
  "(ii) two shall be appointed by the majority leader of the Senate;
  "(iii) two shall be appointed by the minority leader of the House of Representatives;
  "(iv) two shall be appointed by the minority leader of the Senate; and
  "(v) one shall be appointed by the President.
 "(B) Nine individuals appointed from national law enforcement organizations representing law enforcement management, of whom—
  "(i) two shall be appointed by the Speaker of the House of Representatives;
  "(ii) two shall be appointed by the majority leader of the Senate;
  "(iii) two shall be appointed by the minority leader of the House of Representatives;
  "(iv) two shall be appointed by the minority leader of the Senate; and
  "(v) one shall be appointed by the President.
 "(C) Two individuals appointed with academic expertise regarding law enforcement issues, of whom—
  "(i) one shall be appointed by the Speaker of the House of Representatives and the majority leader of the Senate; and
  "(ii) one shall be appointed by the minority leader of the Senate and the minority leader of the House of Representatives.
 "(D) Two Members of the House of Representatives, appointed by the Speaker and the minority leader of the House of Representatives.
 "(E) Two Members of the Senate, appointed by the majority leader and the minority leader of the Senate.
 "(F) One individual from the Department of Justice, appointed by the President.
 "(G) Two individuals representing a State or local governmental entity, such as a Governor, mayor, or State attorney general, to be appointed jointly by the majority leader and the minority leader of the Senate.
 "(H) Two individuals representing a State or local governmental entity, such as a Governor, mayor, or State attorney general, to be appointed jointly by the Speaker and the minority leader of the House of Representatives.
"(2) COMPTROLLER GENERAL.—The Comptroller General shall serve in an advisory capacity and shall oversee the methodology and approve of the Commission study.
"(3) CHAIRPERSON.—Upon their appointment the members of the Commission shall select one of their number to act as chairperson.
"(4) APPOINTMENT DATE.—Members of the Commission shall be appointed no later than 90 days after the enactment of this Act.".
(b) REPORT.—Section 211(B)(p) of Public Law 101–515 (104 Stat. 2124) is amended by striking "the expiration" and all that follows through "this Act," and inserting "March 31, 1996,".
(c) REIMBURSEMENT.—
 (1) Section 211(B)(i) of Public Law 101–515 (104 Stat. 2124) is amended by striking "non-reimbursable" and inserting "a reimbursable".
 (2) Section 211(b)(j) of Public Law 101–515 (104 Stat. 2124) is amended by adding after "Commission" the following: ", on a reimbursable basis,".

<< 42 USCA § 3721 NOTE >>

## SEC. 260002. CONFORMING AMENDMENT.

Section 3404(a) of Public Law 101–647 (42 U.S.C. 3721 note) is repealed.

<< 42 USCA Ch. 136 >>

TITLE XXVII—PRESIDENTIAL SUMMIT ON VIOLENCE AND
NATIONAL COMMISSION ON CRIME PREVENTION AND CONTROL

<< 42 USCA § 14191 >>

## SEC. 270001. PRESIDENTIAL SUMMIT.

Congress calls on the President to convene a national summit on violence in America prior to convening the Commission established under this title.

<< 42 USCA § 14192 >>

## SEC. 270002. ESTABLISHMENT; COMMITTEES AND TASK FORCES; REPRESENTATION.

(a) ESTABLISHMENT AND APPOINTMENT OF MEMBERS.—There is established a commission to be known as the "National Commission on Crime Control and Prevention". The Commission shall be composed of 28 members appointed as follows:

(1) 10 persons by the President, not more than 6 of whom shall be of the same major political party.

(2) 9 persons by the President pro tempore of the Senate, 5 of whom shall be appointed on the recommendation of the Majority Leader of the Senate and the chairman of the Committee on the Judiciary of the Senate, and 4 of whom shall be appointed on the recommendation of the Minority Leader of the Senate and the ranking minority member of the Committee on the Judiciary of the Senate.

(3) 9 persons appointed by the Speaker of the House of Representatives, in consultation with the chairman of the Committee on the Judiciary of the House of Representatives, and 4 of whom shall be appointed on the recommendation of the Minority Leader of the House of Representatives, in consultation with the ranking member of the Committee on the Judiciary.

(b) COMMITTEES AND TASK FORCES.—The Commission shall establish committees or task forces from among its members for the examination of specific subject areas and the carrying out of other functions or responsibilities of the Commission, including committees or task forces for the examination of the subject areas of crime and violence generally, the causes of the demand for drugs, violence in schools, and violence against women, as described in subsections (b) through (e) of section 270004.

(c) REPRESENTATION.—(1) At least 1 member of the Commission appointed by the President, at least 2 members of the Commission appointed by the President pro tempore of the Senate, and at least 2 members of the Commission appointed by the Speaker of the House of Representatives shall be persons well-qualified to participate in the Commission's examination of the subject area of crime and violence generally, with education, training, expertise, or experience in such areas as law enforcement, law, sociology, psychology, social work, and ethnography and urban poverty (including health care, housing, education, and employment).

(2) At least 1 member of the Commission appointed by the President, at least 2 members of the Commission appointed by the President pro tempore of the Senate, and at least 2 members of the Commission appointed by the Speaker of the House of Representatives shall be persons well-qualified to participate in the Commission's examination of the subject area of the causes of the demand for drugs, with education, training, expertise, or experience in such areas as addiction, biomedicine, sociology, psychology, law, and ethnography and urban poverty (including health care, housing, education, and employment).

(3) At least 1 member of the Commission appointed by the President, at least 2 members of the Commission appointed by the President pro tempore of the Senate, and at least 2 members of the Commission appointed by the Speaker of the House of

Representatives shall be persons well-qualified to participate in the Commission's examination of the subject area of violence in schools, with education, training, expertise, or experience in such areas as law enforcement, education, school governance policy and teaching, law, sociology, psychology, and ethnography and urban poverty (including health care, housing, education, and employment).

(4) At least 1 member of the Commission appointed by the President, at least 2 members of the Commission appointed by the President pro tempore of the Senate, and at least 2 members of the Commission appointed by the Speaker of the House of Representatives shall be persons well-qualified to participate in the Commission's examination of the subject area of violence against women, as survivors of violence, or as persons with education, training, expertise, or experience in such areas as law enforcement, law, judicial administration, prosecution, defense, victim services or advocacy in sexual assault or domestic violence cases (including medical services and counseling), and protection of victims' rights.

<< 42 USCA § 14193 >>

SEC. 270003. PURPOSES.

The purposes of the Commission are as follows:

(1) To develop a comprehensive proposal for preventing and controlling crime and violence in the United States, including cost estimates for implementing any recommendations made by the Commission.

(2) To bring attention to successful models and programs in crime prevention and crime control.

(3) To reach out beyond the traditional criminal justice community for ideas for controlling and preventing crime.

(4) To recommend improvements in the coordination of local, State, Federal, and international crime control and prevention efforts, including efforts relating to crime near international borders.

(5) To make a comprehensive study of the economic and social factors leading to or contributing to crime and violence, including the causes of illicit drug use and other substance abuse, and to develop specific proposals for legislative and administrative actions to reduce crime and violence and the factors that contribute to it.

(6) To recommend means of utilizing criminal justice resources as effectively as possible, including targeting finite correctional facility space to the most serious and violent offenders, and considering increased use of intermediate sanctions for offenders who can be dealt with adequately by such means.

(7) To examine distinctive crime problems and the impact of crime on members of minority groups, Indians living on reservations, and other groups defined by race, ethnicity, religion, age, disability, or other characteristics, and to recommend specific responses to the distinctive crime problems of such groups.

(8) To examine the problem of sexual assaults, domestic violence, and other criminal and unlawful acts that particularly affect women, and to recommend Federal, State, and local strategies for more effectively preventing and punishing such crimes and acts.

(9) To examine the treatment of victims in Federal, State, and local criminal justice systems, and to develop recommendations to enhance and protect the rights of victims.

(10) To examine the ability of Federal, State, and local criminal justice systems to administer criminal law and criminal sanctions impartially without discrimination on the basis of race, ethnicity, religion, gender, or other legally proscribed grounds, and to make recommendations for correcting any deficiencies in the impartial administration of justice on these grounds.

(11) To examine the nature, scope, causes, and complexities of violence in schools and to recommend a comprehensive response to that problem.

<< 42 USCA § 14194 >>

SEC. 270004. RESPONSIBILITIES OF THE COMMISSION.

(a) IN GENERAL.—The responsibilities of the Commission shall include such study and consultation as may be necessary or appropriate to carry out the purposes set forth in section 270003, including the specific measures described in subsections (b) through (e) in relation to the subject areas addressed in those subsections.

(b) CRIME AND VIOLENCE GENERALLY.—In addressing the subject of crime and violence generally, the activities of the Commission shall include the following:

(1) Reviewing the effectiveness of traditional criminal justice approaches in preventing and controlling crime and violence.

(2) Examining the impact that changes in Federal and State law have had in controlling crime and violence.

(3) Examining the impact of changes in Federal immigration laws and policies and increased development and growth along United States international borders on crime and violence in the United States, particularly among the Nation's youth.

(4) Examining the problem of youth gangs and providing recommendations as to how to reduce youth involvement in violent crime.

(5) Examining the extent to which the use of dangerous weapons in the commission of crime has contributed to violence and murder in the United States.

(6) Convening field hearings in various regions of the country to receive testimony from a cross section of criminal justice professionals, business leaders, elected officials, medical doctors, and other persons who wish to participate.

(7) Reviewing all segments of the Nation's criminal justice systems, including the law enforcement, prosecution, defense, judicial, and corrections components in developing the crime control and prevention proposal.

(c) CAUSES OF THE DEMAND FOR DRUGS.—In addressing the subject of the causes of the demand for drugs, the activities of the Commission shall include the following:

(1) Examining the root causes of illicit drug use and abuse in the United States, including by compiling existing research regarding those root causes, and including consideration of the following factors:

(A) The characteristics of potential illicit drug users and abusers or drug traffickers, including age and social, economic, and educational backgrounds.

(B) Environmental factors that contribute to illicit drug use and abuse, including the correlation between unemployment, poverty, and homelessness and drug experimentation and abuse.

(C) The effects of substance use and abuse by a relative or friend in contributing to the likelihood and desire of an individual to experiment with illicit drugs.

(D) Aspects of, and changes in cultural values, attitudes and traditions that contribute to illicit drug use and abuse.

(E) The physiological and psychological factors that contribute to the desire for illicit drugs.

(2) Evaluating Federal, State, and local laws and policies on the prevention of drug abuse, control of unlawful production, distribution and use of controlled substances, and the efficacy of sentencing policies with regard to those laws.

(3) Analyzing the allocation of resources among interdiction of controlled substances entering the United States, enforcement of Federal laws relating to the unlawful production, distribution, and use of controlled substances, education with regard to and the prevention of the unlawful use of controlled substances, and treatment and rehabilitation of drug abusers.

(4) Analyzing current treatment and rehabilitation methods and making recommendations for improvements.

(5) Identifying any existing gaps in drug abuse policy that result from the lack of attention to the root causes of drug abuse.

(6) Assessing the needs of government at all levels for resources and policies for reducing the overall desire of individuals to experiment with and abuse illicit drugs.

(7) Making recommendations regarding necessary improvements in policies for reducing the use of illicit drugs in the United States.

(d) VIOLENCE IN SCHOOLS.—In addressing the subject of violence in schools, the activities of the Commission shall include the following:

(1) Defining the causes of violence in schools.

(2) Defining the scope of the national problem of violence in schools.

(3) Providing statistics and data on the problem of violence in schools on a State-by-State basis.

(4) Investigating the problem of youth gangs and their relation to violence in schools and providing recommendations on how to reduce youth involvement in violent crime in schools.

(5) Examining the extent to which dangerous weapons have contributed to violence and murder in schools.

(6) Exploring the extent to which the school environment has contributed to violence in schools.

(7) Reviewing the effectiveness of current approaches in preventing violence in schools.

(e) VIOLENCE AGAINST WOMEN.—In addressing the subject of sexual assault, domestic violence, and other criminal and unlawful acts that particularly affect women, the activities of the Commission shall include the following:

(1) Evaluating the adequacy of, and making recommendations regarding, current law enforcement efforts at the Federal, State, and local levels to reduce the incidence of such crimes and acts, and to punish those responsible for such crimes and acts.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) Evaluating the adequacy of, and making recommendations regarding, the responsiveness of prosecutors and courts to such crimes and acts.

(3) Evaluating the adequacy of rules of evidence, practice, and procedure to ensure the effective prosecution and conviction of perpetrators of such crimes and acts and to protect victims of such crimes and acts from abuse in legal proceedings, making recommendations, where necessary, to improve those rules.

(4) Evaluating the adequacy of pretrial release, sentencing, incarceration, and post-conviction release in relation to such crimes and acts.

(5) Evaluating the adequacy of, and making recommendations regarding, the adequacy of Federal and State laws on sexual assault and the need for a more uniform statutory response to sex offenses, including sexual assaults and other sex offenses committed by offenders who are known or related by blood or marriage to the victim.

(6) Evaluating the adequacy of, and making recommendations regarding, the adequacy of Federal and State laws on domestic violence and the need for a more uniform statutory response to domestic violence.

(7) Evaluating the adequacy of, and making recommendations regarding, the adequacy of current education, prevention, and protective services for victims of such crimes and acts.

(8) Assessing the issuance, formulation, and enforcement of protective orders, whether or not related to a criminal proceeding, and making recommendations for their more effective use in domestic violence and stalking cases.

(9) Assessing the problem of stalking and recommending effective means of response to the problem.

(10) Evaluating the adequacy of, and making recommendations regarding, programs for public awareness and public dissemination of information to prevent such crimes and acts.

(11) Evaluating the treatment of victims of such crimes and acts in Federal, State, and local criminal justice systems, and making recommendations designed to improve such treatment.

<< 42 USCA § 14195 >>

SEC. 270005. ADMINISTRATIVE MATTERS.

(a) CHAIR.—The President shall designate a member of the Commission to chair the Commission.

(b) NO ADDITIONAL PAY OR BENEFITS; PER DIEM.—Members of the Commission shall receive no pay or benefits by reason of their service on the Commission, but shall receive travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under sections 5702 and 5703 of title 5, United States Code.

(c) VACANCIES.—Vacancies on the Commission shall be filled in the same manner as initial appointments.

(d) MEETINGS OPEN TO THE PUBLIC.—The Commission shall be considered to be an agency for the purposes of section 552b of title 5, United States Code, relating to the requirement that meetings of Federal agencies be open to the public.

<< 42 USCA § 14196 >>

SEC. 270006. STAFF AND SUPPORT SERVICES.

(a) DIRECTOR.—With the approval of the Commission, the chairperson shall appoint a staff director for the Commission.

(b) STAFF.—With the approval of the Commission, the staff director may appoint and fix the compensation of staff personnel for the Commission.

(c) CIVIL SERVICE LAWS.—The staff of the Commission shall be appointed without regard to the provisions of title 5, United States Code, governing appointments in the competitive service. Staff compensation may be set without regard to the provisions of chapter 51 and subchapter III of chapter 53 of that title relating to classification and General Schedule pay rates, but in no event shall any such personnel be compensated at a rate greater than the rate of basic pay for level ES–4 of the Senior Executive Service Schedule under section 5382 of that title. The staff director shall be paid at a rate not to exceed the rate of basic pay for level V of the Executive Schedule.

(d) CONSULTANTS.—With the approval of the Commission, the staff director may procure temporary and intermittent services under section 3109(b) of title 5, United States Code.

(e) STAFF OF FEDERAL AGENCIES.—Upon the request of the Commission, the head of any Federal agency may detail, on a reimbursable basis, personnel of that agency to the Commission to assist in carrying out its duties.

AR.02102

(f) PHYSICAL FACILITIES.—The Administrator of the General Service Administration shall provide suitable office space for the operation of the Commission. The facilities shall serve as the headquarters of the Commission and shall include all necessary equipment and incidentals required for proper functioning.

<< 42 USCA § 14197 >>

SEC. 270007. POWERS.

 (a) HEARINGS.—For the purposes of carrying out this title, the Commission may conduct such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Commission considers appropriate. The Commission may administer oaths before the Commission.
 (b) DELEGATION.—Any committee, task force, member, or agent, of the Commission may, if authorized by the Commission, take any action that the Commission is authorized to take under this title.
 (c) ACCESS TO INFORMATION.—The Commission may request directly from any Federal agency or entity in the executive or legislative branch such information as is needed to carry out its functions.
 (d) MAIL.—The Commission may use the United States mails in the same manner and under the same conditions as other Federal agencies.

<< 42 USCA § 14198 >>

SEC. 270008. REPORT; TERMINATION.

 Not later than 2 years after the date on which the Commission is fully constituted under section 270001, the Commission shall submit a detailed report to the Congress and the President containing its findings and recommendations. The Commission shall terminate 30 days after the submission of its report.

<< 42 USCA § 14199 >>

SEC. 270009. AUTHORIZATION OF APPROPRIATIONS.

 There are authorized to be appropriated to carry out this title—
  (1) $1,000,000 for fiscal year 1996.

<< 18 USCA § 3553 >>

TITLE XXVIII—SENTENCING PROVISIONS

SEC. 280001. IMPOSITION OF SENTENCE.

 Section 3553(a)(4) of title 18, United States Code, is amended to read as follows:
  "(4) the kinds of sentence and the sentencing range established for—
   "(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced; or
   "(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code;".

<< 18 USCA § 3563 >>

SEC. 280002. TECHNICAL AMENDMENT TO MANDATORY CONDITIONS OF PROBATION.

 Section 3563(a)(3) of title 18, United States Code, is amended by striking "possess illegal controlled substances" and inserting "unlawfully possess a controlled substance".

<< 28 USCA § 994 NOTE >>

SEC. 280003. DIRECTION TO UNITED STATES SENTENCING COMMISSION REGARDING SENTENCING ENHANCEMENTS FOR HATE CRIMES.

 (a) DEFINITION.—In this section, "hate crime" means a crime in which the defendant intentionally selects a victim, or in the case of a property crime, the property that is the object of the crime, because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person.

 (b) SENTENCING ENHANCEMENT.—Pursuant to section 994 of title 28, United States Code, the United States Sentencing Commission shall promulgate guidelines or amend existing guidelines to provide sentencing enhancements of not less than 3 offense levels for offenses that the finder of fact at trial determines beyond a reasonable doubt are hate crimes. In carrying out this section, the United States Sentencing Commission shall ensure that there is reasonable consistency with other guidelines, avoid duplicative punishments for substantially the same offense, and take into account any mitigating circumstances that might justify exceptions.

<< 18 USCA § 3561 >>

SEC. 280004. AUTHORIZATION OF PROBATION FOR PETTY OFFENSES IN CERTAIN CASES.

 Section 3561(a)(3) of title 18, United States Code, is amended by inserting "that is not a petty offense" before the period.

SEC. 280005. FULL-TIME VICE CHAIRS OF THE UNITED STATES SENTENCING COMMISSION.

<< 28 USCA § 991 >>

(a) ESTABLISHMENT OF POSITIONS.—Section 991(a) of title 28, United States Code, is amended—

 (1) in the second sentence by striking the period and inserting "and three of whom shall be designated by the President as Vice Chairs.";

 (2) in the fourth sentence by striking the period and inserting ", and of the three Vice Chairs, no more than two shall be members of the same political party."; and

 (3) in the sixth sentence by striking "Chairman" and inserting "Chair, Vice Chairs,".

<< 28 USCA § 992 >>

(b) TERMS AND COMPENSATION.—Section 992(c) of title 28, United States Code, is amended—

 (1) by amending the first sentence to read as follows: "The Chair and Vice Chairs of the Commission shall hold full-time positions and shall be compensated during their terms of office at the annual rate at which judges of the United States courts of appeals are compensated.";

 (2) in the second sentence by striking "Chairman" and inserting "Chair and Vice Chairs"; and

 (3) in the third sentence by striking "Chairman" and inserting "Chair and Vice Chairs,".

(c) TECHNICAL AMENDMENTS.—Chapter 58 of title 28, United States Code, is amended—

<< 28 USCA Ch. 58 >>

<< 28 USCA §§ 991, 992, 993, 995 >>

 (1) by striking "Chairman" each place it appears and inserting "Chair";

<< 28 USCA § 991 >>

 (2) in the fifth sentence of section 991(a) by striking "his" and inserting "the Attorney General's";

<< 28 USCA § 992 >>

(3) in the fourth sentence of section 992(c) by striking "his" and inserting "the judge's";

<< 28 USCA § 994 >>

(4) in section 994(i)(2) by striking "he" and inserting "the defendant" and striking "his" and inserting "the defendant's"; and

<< 28 USCA § 996 >>

(5) in section 996(a) by striking "him" and inserting "the Staff Director".

SEC. 280006. COCAINE PENALTY STUDY.

 Not later than December 31, 1994, the United States Sentencing Commission shall submit a report to Congress on issues relating to sentences applicable to offenses involving the possession or distribution of all forms of cocaine. The report shall address the differences in penalty levels that apply to different forms of cocaine and include any recommendations that the Commission may have for retention or modification of such differences in penalty levels.

TITLE XXIX—COMPUTER CRIME

SEC. 290001. COMPUTER ABUSE AMENDMENTS ACT OF 1994.

<< 18 USCA § 1001 NOTE >>

 (a) SHORT TITLE.—This subtitle may be cited as the "Computer Abuse Amendments Act of 1994".

<< 18 USCA § 1030 >>

 (b) PROHIBITION.—Section 1030(a)(5) of title 18, United States Code, is amended to read as follows:
  "(5)(A) through means of a computer used in interstate commerce or communications, knowingly causes the transmission of a program, information, code, or command to a computer or computer system if—
   "(i) the person causing the transmission intends that such transmission will—
    "(I) damage, or cause damage to, a computer, computer system, network, information, data, or program; or
    "(II) withhold or deny, or cause the withholding or denial, of the use of a computer, computer services, system or network, information, data or program; and
   "(ii) the transmission of the harmful component of the program, information, code, or command—
    "(I) occurred without the authorization of the persons or entities who own or are responsible for the computer system receiving the program, information, code, or command; and
    "(II)(aa) causes loss or damage to one or more other persons of value aggregating $1,000 or more during any 1-year period; or
    "(bb) modifies or impairs, or potentially modifies or impairs, the medical examination, medical diagnosis, medical treatment, or medical care of one or more individuals; or
  "(B) through means of a computer used in interstate commerce or communication, knowingly causes the transmission of a program, information, code, or command to a computer or computer system—
   "(i) with reckless disregard of a substantial and unjustifiable risk that the transmission will—
    "(I) damage, or cause damage to, a computer, computer system, network, information, data or program; or
    "(II) withhold or deny or cause the withholding or denial of the use of a computer, computer services, system, network, information, data or program; and
   "(ii) if the transmission of the harmful component of the program, information, code, or command—
    "(I) occurred without the authorization of the persons or entities who own or are responsible for the computer system receiving the program, information, code, or command; and

"(II)(aa) causes loss or damage to one or more other persons of a value aggregating $1,000 or more during any 1-year period; or

"(bb) modifies or impairs, or potentially modifies or impairs, the medical examination, medical diagnosis, medical treatment, or medical care of one or more individuals;".

(c) PENALTY.—Section 1030(c) of title 18, United States Code is amended—

(1) in paragraph (2)(B) by striking "and" after the semicolon;

(2) in paragraph (3)(A) by inserting "(A)" after "(a)(5)";

(3) in paragraph (3)(B) by striking the period at the end thereof and inserting "; and"; and

(4) by adding at the end the following new paragraph:

"(4) a fine under this title or imprisonment for not more than 1 year, or both, in the case of an offense under subsection (a)(5)(B).".

(d) CIVIL ACTION.—Section 1030 of title 18, United States Code, is amended by adding at the end thereof the following new subsection:

"(g) Any person who suffers damage or loss by reason of a violation of the section, other than a violation of subsection (a)(5)(B), may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. Damages for violations of any subsection other than subsection (a)(5)(A)(ii)(II)(bb) or (a)(5)(B)(ii)(II)(bb) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage.".

(e) REPORTING REQUIREMENTS.—Section 1030 of title 18 United States Code, is amended by adding at the end the following new subsection:

"(h) The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection, concerning investigations and prosecutions under section 1030(a)(5) of title 18, United States Code.".

(f) PROHIBITION.—Section 1030(a)(3) of title 18, United States Code, is amended by inserting "adversely" before "affects the use of the Government's operation of such computer".

<< 18 USCA § 2721 NOTE >>

TITLE XXX—PROTECTION OF PRIVACY OF INFORMATION IN STATE MOTOR VEHICLE RECORDS

SEC. 300001. SHORT TITLE.

This title may be cited as the "Driver's Privacy Protection Act of 1994".

SEC. 300002. PROHIBITION ON RELEASE AND USE OF CERTAIN PERSONAL INFORMATION FROM STATE MOTOR VEHICLE RECORDS.

(a) IN GENERAL.—Title 18, United States Code, is amended by inserting after chapter 121 the following new chapter:

<< 18 USCA Ch. 123 >>

"CHAPTER 123—PROHIBITION ON RELEASE AND USE OF CERTAIN PERSONAL INFORMATION FROM STATE MOTOR VEHICLE RECORDS

<< 18 USCA § 2721 >>

"§ 2721. Prohibition on release and use of certain personal information from State motor vehicle records

"(a) IN GENERAL.—Except as provided in subsection (b), a State department of motor vehicles, and any officer, employee, or contractor, thereof, shall not knowingly disclose or otherwise make available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record.

"(b) PERMISSIBLE USES.—Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of the Automobile Information Disclosure Act, the Motor Vehicle Information and Cost Saving Act, the National Traffic and Motor Vehicle Safety Act of 1966, the Anti-Car Theft Act of 1992, and the Clean Air Act, and may be disclosed as follows:

"(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

"(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers.

"(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only—

"(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

"(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

"(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

"(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

"(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

"(7) For use in providing notice to the owners of towed or impounded vehicles.

"(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

"(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under the Commercial Motor Vehicle Safety Act of 1986 (49 U.S.C. App. 2710 et seq.).

"(10) For use in connection with the operation of private toll transportation facilities.

"(11) For any other use in response to requests for individual motor vehicle records if the motor vehicle department has provided in a clear and conspicuous manner on forms for issuance or renewal of operator's permits, titles, registrations, or identification cards, notice that personal information collected by the department may be disclosed to any business or person, and has provided in a clear and conspicuous manner on such forms an opportunity to prohibit such disclosures.

"(12) For bulk distribution for surveys, marketing or solicitations if the motor vehicle department has implemented methods and procedures to ensure that—

"(A) individuals are provided an opportunity, in a clear and conspicuous manner, to prohibit such uses; and

"(B) the information will be used, rented, or sold solely for bulk distribution for surveys, marketing, and solicitations, and that surveys, marketing, and solicitations will not be directed at those individuals who have requested in a timely fashion that they not be directed at them.

"(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

"(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

"(c) RESALE OR REDISCLOSURE.—An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b) (11) or (12)). An authorized recipient under subsection (b)(11) may resell or redisclose personal information for any purpose. An authorized recipient under subsection (b)(12) may resell or redisclose personal information pursuant to

subsection (b)(12). Any authorized recipient (except a recipient under subsection (b) (11)) that resells or rediscloses personal information covered by this title must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request.

  "(d) WAIVER PROCEDURES.—A State motor vehicle department may establish and carry out procedures under which the department or its agents, upon receiving a request for personal information that does not fall within one of the exceptions in subsection (b), may mail a copy of the request to the individual about whom the information was requested, informing such individual of the request, together with a statement to the effect that the information will not be released unless the individual waives such individual's right to privacy under this section.

<< 18 USCA § 2722 >>

"§ 2722. Additional unlawful acts

  "(a) PROCUREMENT FOR UNLAWFUL PURPOSE.—It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title.
  "(b) FALSE REPRESENTATION.—It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record.

<< 18 USCA § 2723 >>

"§ 2723. Penalties

  "(a) CRIMINAL FINE.—A person who knowingly violates this chapter shall be fined under this title.
  "(b) VIOLATIONS BY STATE DEPARTMENT OF MOTOR VEHICLES.—Any State department of motor vehicles that has a policy or practice of substantial noncompliance with this chapter shall be subject to a civil penalty imposed by the Attorney General of not more than $5,000 a day for each day of substantial noncompliance.

<< 18 USCA § 2724 >>

"§ 2724. Civil action

  "(a) CAUSE OF ACTION.—A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.
  "(b) REMEDIES.—The court may award—
  "(1) actual damages, but not less than liquidated damages in the amount of $2,500;
  "(2) punitive damages upon proof of willful or reckless disregard of the law;
  "(3) reasonable attorneys' fees and other litigation costs reasonably incurred; and
  "(4) such other preliminary and equitable relief as the court determines to be appropriate.

<< 18 USCA § 2725 >>

"§ 2725. Definitions

"In this chapter—
  "(1) 'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles;
  "(2) 'person' means an individual, organization or entity, but does not include a State or agency thereof; and
  "(3) 'personal information' means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.".

AR.02108

<< 18 USCA Ch. 1 >>

(b) CLERICAL AMENDMENT.—The table of parts at the beginning of part I of title 18, United States Code, is amended by adding at the end the following new item:

"123.     Prohibition on release and use of certain personal information from State motor vehicle records....... .............2271"

<< 18 USCA §§ 2721 NOTE, 2722 nt, 2723 nt, 2724 nt, 2725 nt >>

SEC. 300003. EFFECTIVE DATE.

The amendments made by section 300002 shall become effective on the date that is 3 years after the date of enactment of this Act. After the effective date, if a State has implemented a procedure under section 2721(b) (11) and (12) of title 18, United States Code, as added by section 2902, for prohibiting disclosures or uses of personal information, and the procedure otherwise meets the requirements of subsection (b) (11) and (12), the State shall be in compliance with subsection (b) (11) and (12) even if the procedure is not available to individuals until they renew their license, title, registration or identification card, so long as the State provides some other procedure for individuals to contact the State on their own initiative to prohibit such uses or disclosures. Prior to the effective date, personal information covered by the amendment made by section 300002 may be released consistent with State law or practice.

<< 42 USCA Ch. 136 >>

TITLE XXXI—VIOLENT CRIME REDUCTION TRUST FUND

SEC. 310001. CREATION OF VIOLENT CRIME REDUCTION TRUST FUND.

<< 42 USCA § 14211 >>

(a) VIOLENT CRIME REDUCTION TRUST FUND.—There is established a separate account in the Treasury, known as the "Violent Crime Reduction Trust Fund" (referred to in this section as the "Fund") into which shall be transferred, in accordance with subsection (b), savings realized from implementation of section 5 of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 3101 note; Public Law 103–226).

(b) TRANSFERS INTO THE FUND.—On the first day of the following fiscal years (or as soon thereafter as possible for fiscal year 1995), the following amounts shall be transferred from the general fund to the Fund—

   (1) for fiscal year 1995, $2,423,000,000;
   (2) for fiscal year 1996, $4,287,000,000;
   (3) for fiscal year 1997, $5,000,000,000;
   (4) for fiscal year 1998, $5,500,000,000;
   (5) for fiscal year 1999, $6,500,000,000; and
   (6) for fiscal year 2000, $6,500,000,000.

(c) APPROPRIATIONS FROM THE FUND.—(1) Amounts in the Fund may be appropriated exclusively for the purposes authorized in this Act and for those expenses authorized by any Act enacted before this Act that are expressly qualified for expenditure from the Fund.

(2) Amounts appropriated under paragraph (1) and outlays flowing from such appropriations shall not be taken into account for purposes of any budget enforcement procedures under the Balanced Budget and Emergency Deficit Control Act of 1985 except section 251A of that Act as added by subsection (g), or for purposes of section 605(b) of the Congressional Budget Act of 1974. Amounts of new budget authority and outlays under paragraph (1) that are included in concurrent resolutions on the budget shall not be taken into account for purposes of sections 601(b), 606(b), and 606(c) of the Congressional Budget Act of 1974, or for purposes of section 24 of House Concurrent Resolution 218 (One Hundred Third Congress).

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 2133 of 3864

<< 31 USCA § 1321 >>

(d) LISTING OF THE FUND AMONG GOVERNMENT TRUST FUNDS.—Section 1321(a) of title 31, United States Code, is amended by inserting at the end the following new paragraph:

"(91) Violent Crime Reduction Trust Fund.".

<< 31 USCA § 1105 >>

(e) REQUIREMENT FOR THE PRESIDENT TO REPORT ANNUALLY ON THE STATUS OF THE TRUST FUND.— Section 1105(a) of title 31, United States Code, is amended by adding at the end the following new paragraphs:

"(30) information about the Violent Crime Reduction Trust Fund, including a separate statement of amounts in that Trust Fund.

"(31) an analysis displaying, by agency, proposed reductions in full-time equivalent positions compared to the current year's level in order to comply with section 5 of the Federal Workforce Restructuring Act of 1994.".

(f) ALLOCATION AND SUBALLOCATION OF AMOUNTS IN THE FUND.—

<< 2 USCA § 665a >>

(1) IN GENERAL.—Section 602(a) of the Congressional Budget Act of 1974 is amended—

(A) in paragraph (1)(A) by striking "and" at the end of clause (ii), by striking the semicolon and inserting a comma at the end of clause (iii), and by adding after clause (iii) the following:

"(iv) new budget authority from the Violent Crime Reduction Trust Fund, and

"(v) outlays from the Violent Crime Reduction Trust Fund;";

(B) in paragraph (2) by striking "and" at the end of subparagraph (B) and by adding after subparagraph (C) the following:

"(D) new budget authority from the Violent Crime Reduction Trust Fund; and

"(E) outlays from the Violent Crime Reduction Trust Fund;"; and

(C) by adding at the end the following new paragraph:

"(4) NO DOUBLE COUNTING.—Amounts allocated among committees under clause (iv) or (v) of paragraph (1)(A) or under subparagraph (D) or (E) of paragraph (2) shall not be included within any other allocation under that paragraph.".

(2) FISCAL YEAR 1995.—The chairman of the Committee on the Budget shall submit to the House of Representatives or the Senate, as the case may be, appropriately revised allocations under clauses (iv) and (v) of paragraph (1)(A) or subparagraphs (D) and (E) of paragraph (2) of section 602(a) of the Congressional Budget Act of 1974 for fiscal year 1995 to carry out subsection (b)(1).

(g) VIOLENT CRIME REDUCTION TRUST FUND SEQUESTRATION.—

<< 2 USCA § 901a >>

(1) SEQUESTRATION.—Part C of the Balanced Budget and Emergency Deficit Control Act of 1985 is amended by adding after section 251 the following new section:

"SEC. 251A. SEQUESTRATION WITH RESPECT TO VIOLENT CRIME REDUCTION TRUST FUND.

"(a) SEQUESTRATION.—Within 15 days after Congress adjourns to end a session, there shall be a sequestration to eliminate any budgetary excess in the Violent Crime Reduction Trust Fund as described in subsection (b).

"(b) ELIMINATING A BUDGETARY EXCESS.—

"(1) IN GENERAL.—Except as provided by paragraph (2), appropriations from the Violent Crime Reduction Trust Fund shall be reduced by a uniform percentage necessary to eliminate any amount by which estimated outlays in the budget year from the Fund exceed the following levels of outlays:

"(A) For fiscal year 1995, $703,000,000.

"(B) For fiscal year 1996, $2,334,000,000.

"(C) For fiscal year 1997, $3,936,000,000.

"(D) For fiscal year 1998, $4,904,000,000.

For fiscal year 1999, the comparable level for budgetary purposes shall be deemed to be $5,639,000,000. For fiscal year 2000, the comparable level for budgetary purposes shall be deemed to be $6,225,000,000.

"(2) SPECIAL OUTLAY ALLOWANCE.—If estimated outlays from the Fund for a fiscal year exceed the level specified in paragraph (1) for that year, that level shall be increased by the lesser of that excess or 0.5 percent of that level.

"(c) LOOK-BACK.—If, after June 30, an appropriation for the fiscal year in progress is enacted that causes a budgetary excess in the Violent Crime Reduction Trust Fund as described in subsection (b) for that year (after taking into account any sequestration of amounts under this section), the level set forth in subsection (b) for the next fiscal year shall be reduced by the amount of that excess.

"(d) WITHIN-SESSION SEQUESTRATION.—If an appropriation for a fiscal year in progress is enacted (after Congress adjourns to end the session for the budget year and before July 1 of that fiscal year) that causes a budgetary excess in the Violent Crime Reduction Trust Fund as described in subsection (b) for that year (after taking into account any prior sequestration of amounts under this section), 15 days later there shall be a sequestration to eliminate that excess following the procedures set forth in subsection (b).

"(e) PART-YEAR APPROPRIATIONS AND OMB ESTIMATES.—Paragraphs (4) and (7) of section 251(a) shall apply to appropriations from, and sequestration of amounts appropriated from, the Violent Crime Reduction Trust Fund under this section in the same manner as those paragraphs apply to discretionary appropriations and sequestrations under that section.".

<< 2 USCA § 904 >>

(2) REPORTS.—Section 254(g) of the Balanced Budget and Emergency Deficit Control Act of 1985 is amended by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), respectively, and by inserting after paragraph (3) the following new paragraph:

"(4) REPORTS ON SEQUESTRATION TO REDUCE THE VIOLENT CRIME REDUCTION TRUST FUND.—The final reports shall set forth for the budget year estimates for each of the following:

"(A) The amount of budget authority appropriated from the Violent Crime Reduction Trust Fund and outlays resulting from those appropriations.

"(B) The sequestration percentage and reductions, if any, required under section 251A.".

<< 42 USCA § 14212 >>

SEC. 310002. CONFORMING REDUCTION IN DISCRETIONARY SPENDING LIMITS.

Upon enactment of this Act, the discretionary spending limits set forth in section 601(a)(2) of the Congressional Budget Act of 1974 (2 U.S.C. 665(a)(2)) (as adjusted in conformance with section 251 of the Balanced Budget and Emergency Deficit Control Act of 1985, and in the Senate, with section 24 of House Concurrent Resolution 218 (103d Congress)) for fiscal years 1995 through 1998 are reduced as follows:

(1) for fiscal year 1995, for the discretionary category: $2,423,000,000 in new budget authority and $703,000,000 in outlays;

(2) for fiscal year 1996, for the discretionary category: $4,287,000,000 in new budget authority and $2,334,000,000 in outlays;

(3) for fiscal year 1997, for the discretionary category: $5,000,000,000 in new budget authority and $3,936,000,000 in outlays; and

(4) for fiscal year 1998, for the discretionary category: $5,500,000,000 in new budget authority and $4,904,000,000 in outlays.

For fiscal year 1999, the comparable amount for budgetary purposes shall be deemed to be $6,500,000,000 in new budget authority and $5,639,000,000 in outlays. For fiscal year 2000, the comparable amount for budgetary purposes shall be deemed to be $6,500,000,000 in new budget authority and $6,225,000,000 in outlays.

<< 42 USCA § 14213 >>

SEC. 310003. EXTENSION OF AUTHORIZATIONS OF APPROPRIATIONS FOR FISCAL YEARS FOR WHICH THE FULL AMOUNT AUTHORIZED IS NOT APPROPRIATED.

AR.02111

If, in making an appropriation under any provision of this Act or amendment made by this Act that authorizes the making of an appropriation for a certain purpose for a certain fiscal year in a certain amount, the Congress makes an appropriation for that purpose for that fiscal year in a lesser amount, that provision or amendment shall be considered to authorize the making of appropriations for that purpose for later fiscal years in an amount equal to the difference between the amount authorized to be appropriated and the amount that has been appropriated.

<< 42 USCA § 14214 >>

## SEC. 310004. FLEXIBILITY IN MAKING OF APPROPRIATIONS.

(a) FEDERAL LAW ENFORCEMENT.—In the making of appropriations under any provision of this Act or amendment made by this Act that authorizes the making of an appropriation for a Federal law enforcement program for a certain fiscal year in a certain amount out of the Violent Crime Reduction Trust Fund, not to exceed 10 percent of that amount is authorized to be appropriated for that fiscal year for any other Federal law enforcement program for which appropriations are authorized by any other Federal law enforcement provision of this Act or amendment made by this Act. The aggregate reduction in the authorization for any particular Federal law enforcement program may not exceed 10 percent of the total amount authorized to be appropriated from the Violent Crime Reduction Trust Fund for that program in this Act or amendment made by this Act.

(b) STATE AND LOCAL LAW ENFORCEMENT.—In the making of appropriations under any provision of this Act or amendment made by this Act that authorizes the making of an appropriation for a State and local law enforcement program for a certain fiscal year in a certain amount out of the Violent Crime Reduction Trust Fund, not to exceed 10 percent of that amount is authorized to be appropriated for that fiscal year for any other State and local law enforcement program for which appropriations are authorized by any other State and local law enforcement provision of this Act or amendment made by this Act. The aggregate reduction in the authorization for any particular State and local law enforcement program may not exceed 10 percent of the total amount authorized to be appropriated from the Violent Crime Reduction Trust Fund for that program in this Act or amendment made by this Act.

(c) PREVENTION.—In the making of appropriations under any provision of this Act or amendment made by this Act that authorizes the making of an appropriation for a prevention program for a certain fiscal year in a certain amount out of the Violent Crime Reduction Trust Fund, not to exceed 10 percent of that amount is authorized to be appropriated for that fiscal year for any other prevention program for which appropriations are authorized by any other prevention provision of this Act or amendment made by this Act. The aggregate reduction in the authorization for any particular prevention program may not exceed 10 percent of the total amount authorized to be appropriated from the Violent Crime Reduction Trust Fund for that program in this Act or amendment made by this Act.

(d) DEFINITIONS.—In this section—"Federal law enforcement program" means a program authorized in any of the following sections:

(1) section 190001(a);

(2) section 190001(b);

(3) section 190001(c);

(4) section 190001(d);

(5) section 190001(e);

(6) section 320925;

(7) section 150008;

(8) section 220002;

(9) section 130002;

(10) section 130005;

(11) section 130006;

(12) section 130007;

(13) section 250005;

(14) sections 210303–210306;

(15) section 180104; and

(16) section 270009.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.02112

"State and local law enforcement program" means a program authorized in any of the following sections:

(1) sections 10001–10003;

(2) section 210201;

(3) section 210603;

(4) section 180101;

(5) section 180103;

(6) sections 31701–31708;

(7) section 210602;

(8) sections 30801–30802;

(9) section 210302;

(10) section 210501;

(11) section 210101;

(12) section 320930;

(13) sections 20101–20109;

(14) section 20301;

(15) section 32201; and

(16) section 20201.

"prevention program" means a program authorized in any of the following sections:

(1) section 50001;

(2) sections 30101–30104;

(3) sections 30201–30208;

(4) sections 30301–30307;

(5) sections 30401–30403;

(6) sections 30701–30702;

(7) sections 31001–31002;

(8) sections 31101–31133;

(9) sections 31501–31505;

(10) sections 31901–31922;

(11) section 32001;

(12) section 32101;

(13) section 32401;

(14) section 40114;

(15) section 40121;

(16) section 40151;

(17) section 40152;

(18) section 40155;

(19) section 40156;

(20) section 40211;

(21) section 40231;

(22) section 40241;

(23) section 40251;

(24) section 40261;

(25) section 40292;

(26) section 40293;

(27) section 40295;

(28) sections 40411–40414;

(29) sections 40421–40422;

(30) section 40506;

(31) sections 40601–40611; and

(32) section 24001.

<< 42 USCA Ch. 136 >>

TITLE XXXII—MISCELLANEOUS

Subtitle A—Increases in Penalties

SEC. 320101. INCREASED PENALTIES FOR ASSAULT.

<< 18 USCA § 111 >>

(a) CERTAIN OFFICERS AND EMPLOYEES.—Section 111 of title 18, United States Code, is amended—
  (1) in subsection (a) by inserting ", where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases," after "shall"; and
  (2) in subsection (b) by inserting "or inflicts bodily injury" after "weapon".

<< 18 USCA § 112 >>

(b) FOREIGN OFFICIALS, OFFICIAL GUESTS, AND INTERNATIONALLY PROTECTED PERSONS.—Section 112(a) of title 18, United States Code, is amended—
  (1) by striking "not more than $5,000" and inserting "under this title";
  (2) by inserting ", or inflicts bodily injury," after "weapon"; and
  (3) by striking "not more than $10,000" and inserting "under this title".

<< 18 USCA § 113 >>

(c) MARITIME AND TERRITORIAL JURISDICTION.—Section 113 of title 18, United States Code, is amended—
  (1) in subsection (c)—
    (A) by striking "of not more than $1,000" and inserting "under this title"; and
    (B) by striking "five" and inserting "ten"; and
  (2) in subsection (e)—
    (A) by striking "of not more than $300" and inserting "under this title"; and
    (B) by striking "three" and inserting "six".

<< 18 USCA § 351 >>

(d) CONGRESS, CABINET, OR SUPREME COURT.—Section 351(e) of title 18, United States Code, is amended—
  (1) by striking "not more than $5,000," and inserting "under this title,";
  (2) by inserting "the assault involved in the use of a dangerous weapon, or" after "if";
  (3) by striking "not more than $10,000" and inserting "under this title"; and
  (4) by striking "for".

<< 18 USCA § 1751 >>

(e) PRESIDENT AND PRESIDENT'S STAFF.—Section 1751(e) of title 18, United States Code, is amended—
  (1) by striking "not more than $10,000," both places it appears and inserting "under this title,";
  (2) by striking "not more than $5,000," and inserting "under this title,"; and
  (3) by inserting "the assault involved the use of a dangerous weapon, or" after "if".

<< 18 USCA § 1112 >>

SEC. 320102. INCREASED PENALTIES FOR MANSLAUGHTER.

AR.02114

Section 1112 of title 18, United States Code, is amended—

(1) in subsection (b)—

(A) by inserting "fined under this title or" after "shall be" in the first undesignated paragraph; and

(B) by inserting ", or both" after "years";

(2) by striking "not more than $1,000" and inserting "under this title"; and

(3) by striking "three" and inserting "six".

## SEC. 320103. INCREASED PENALTIES FOR CIVIL RIGHTS VIOLATIONS.

<< 18 USCA § 241 >>

(a) CONSPIRACY AGAINST RIGHTS.—Section 241 of title 18, United States Code, is amended—

(1) by striking "not more than $10,000" and inserting "under this title";

(2) by inserting "from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill" after "results";

(3) by striking "subject to imprisonment" and inserting "fined under this title or imprisoned"; and

(4) by inserting ", or both" after "life".

<< 18 USCA § 242 >>

(b) DEPRIVATION OF RIGHTS.—Section 242 of title 18, United States Code, is amended—

(1) by striking "not more than $1,000" and inserting "under this title";

(2) by inserting "from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire," after "bodily injury results";

(3) by inserting "from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or" after "death results";

(4) by striking "shall be subject to imprisonment" and inserting "imprisoned"; and

(5) by inserting ", or both" after "life".

<< 18 USCA § 245 >>

(c) FEDERALLY PROTECTED ACTIVITIES.—Section 245(b) of title 18, United States Code, is amended in the matter following paragraph (5)—

(1) by striking "not more than $1,000" and inserting "under this title";

(2) by inserting "from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire" after "bodily injury results";

(3) by striking "not more than $10,000" and inserting "under this title";

(4) by inserting "from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill," after "death results";

(5) by striking "subject to imprisonment" and inserting "fined under this title or imprisoned"; and

(6) by inserting ", or both" after "life".

<< 18 USCA § 247 >>

(d) DAMAGE TO RELIGIOUS PROPERTY.—Section 247 of title 18, United States Code, is amended—

(1) in subsection (c)(1) by inserting "from acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill" after "death results";

(2) in subsection (c)(2)—

(A) by striking "serious"; and

AR.02115

(B) by inserting "from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire" after "bodily injury results"; and

(3) by amending subsection (e) to read as follows:

"(e) As used in this section, the term 'religious property' means any church, synagogue, mosque, religious cemetery, or other religious property.".

<< 42 USCA § 3631 >>

(e) FAIR HOUSING ACT.—Section 901 of the Fair Housing Act (42 U.S.C. 3631) is amended—

(1) in the caption by striking "bodily injury; death;";

(2) by striking "not more than $1,000," and inserting "under this title";

(3) by inserting "from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire" after "bodily injury results";

(4) by striking "not more than $10,000," and inserting "under this title";

(5) by inserting "from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill," after "death results";

(6) by striking "subject to imprisonment" and inserting "fined under this title or imprisoned"; and

(7) by inserting ", or both" after "life".

SEC. 320104. PENALTIES FOR TRAFFICKING IN COUNTERFEIT GOODS AND SERVICES.

<< 18 USCA § 2320 >>

(a) IN GENERAL.—Section 2320(a) of title 18, United States Code, is amended—

(1) in the first sentence—

(A) by striking "$250,000 or imprisoned not more than five years" and inserting "$2,000,000 or imprisoned not more than 10 years"; and

(B) by striking "$1,000,000" and inserting "$5,000,000"; and

(2) in the second sentence—

(A) by striking "$1,000,000 or imprisoned not more than fifteen years" and inserting "$5,000,000 or imprisoned not more than 20 years"; and

(B) by striking "$5,000,000" and inserting "$15,000,000".

<< 18 USCA § 1956 >>

(b) LAUNDERING MONETARY INSTRUMENTS.—Section 1956(c)(7)(D) of title 18, United States Code, is amended by striking "or section 2319 (relating to copyright infringement)," and inserting "section 2319 (relating to copyright infringement), or section 2320 (relating to trafficking in counterfeit goods and services),".

<< 18 USCA § 1958 >>

SEC. 320105. INCREASED PENALTY FOR CONSPIRACY TO COMMIT MURDER FOR HIRE.

Section 1958(a) of title 18, United States Code, is amended by inserting "or who conspires to do so" before "shall be fined" the first place it appears.

<< 18 USCA § 844 >>

SEC. 320106. INCREASED PENALTIES FOR ARSON.

Section 844 of title 18, United States Code, is amended—

(1) in subsection (f)—

(A) by striking "not more than ten years, or fined not more than $10,000" and inserting "not more than 20 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed,"; and

(B) by striking "not more than twenty years, or fined not more than $10,000" and inserting "not more than 40 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed,";

(2) in subsection (h)—

(A) in the first sentence by striking "five years" and inserting "5 years but not more than 15 years"; and

(B) in the second sentence by striking "ten years" and inserting "10 years but not more than 25 years"; and

(3) in subsection (i)—

(A) by striking "not more than ten years or fined not more than $10,000" and inserting "not more than 20 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed,"; and

(B) by striking "not more than twenty years or fined not more than $20,000" and inserting "not more than 40 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed,".

<< 21 USCA § 860 >>

SEC. 320107. INCREASED PENALTIES FOR DRUG TRAFFICKING NEAR PUBLIC HOUSING.

Section 419 of the Controlled Substances Act (21 U.S.C. 860) is amended—

(1) in subsection (a) by striking "playground, or within" and inserting "playground, or housing facility owned by a public housing authority, or within"; and

(2) in subsection (b) by striking "playground, or within" and inserting "playground, or housing facility owned by a public housing authority, or within".

SEC. 320108. TASK FORCE AND CRIMINAL PENALTIES RELATING TO THE INTRODUCTION OF NONINDIGENOUS SPECIES.

<< 42 USCA § 14221 >>

(a) TASK FORCE.—

(1) IN GENERAL.—The Attorney General is authorized to convene a law enforcement task force in Hawaii to facilitate the prosecution of violations of Federal laws, and laws of the State of Hawaii, relating to the wrongful conveyance, sale, or introduction of nonindigenous plant and animal species.

(2) MEMBERSHIP.—(A) The task force shall be composed of representatives of—

(i) the Office of the United States Attorney for the District of Hawaii;

(ii) the United States Customs Service;

(iii) the Animal and Plant Health Inspection Service;

(iv) the Fish and Wildlife Service;

(v) the National Park Service;

(vi) the United States Forest Service;

(vii) the Military Customs Inspection Office of the Department of Defense;

(viii) the United States Postal Service;

(ix) the office of the Attorney General of the State of Hawaii;

(x) the Hawaii Department of Agriculture;

(xi) the Hawaii Department of Land and Natural Resources; and

(xii) such other individuals as the Attorney General deems appropriate.

(B) The Attorney General shall, to the extent practicable, select individuals to serve on the task force who have experience with the enforcement of laws relating to the wrongful conveyance, sale, or introduction of nonindigenous plant and animal species.

(3) DUTIES.—The task force shall—

(A) facilitate the prosecution of violations of Federal and State laws relating to the conveyance, sale, or introduction of nonindigenous plant and animal species into Hawaii; and

(B) make recommendations on ways to strengthen Federal and State laws and law enforcement strategies designed to prevent the introduction of nonindigenous plant and animal species.

(4) REPORT.—The task force shall report to the Attorney General, the Secretary of Agriculture, the Secretary of the Interior, and to the Committee on the Judiciary and Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on the Judiciary, Committee on Agriculture, and Committee on Merchant Marine and Fisheries of the House of Representatives on—

(A) the progress of its enforcement efforts; and

(B) the adequacy of existing Federal laws and laws of the State of Hawaii that relate to the introduction of nonindigenous plant and animal species.

Thereafter, the task force shall make such reports as the task force deems appropriate.

(5) CONSULTATION.—The task force shall consult with Hawaii agricultural interests and representatives of Hawaii conservation organizations about methods of preventing the wrongful conveyance, sale, or introduction of nonindigenous plant and animal species into Hawaii.

(b) CRIMINAL PENALTY.—

<< 18 USCA § 1716D >>

(1) IN GENERAL.—Chapter 83 of title 18, United States Code, is amended by inserting after section 1716C the following new section:

"§ 1716D. Nonmailable injurious animals, plant pests, plants, and illegally taken fish, wildlife, and plants

"A person who knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon, or at any place at which it is directed to be delivered by the person to whom it is addressed, anything that section 3015 of title 39 declares to be nonmailable matter shall be fined under this title, imprisoned not more than 1 year, or both.".

<< 18 USCA Ch. 83 >>

(2) TECHNICAL AMENDMENT.—The chapter analysis for chapter 83 of title 18, United States Code, is amended by inserting after the item relating to section 1716C the following new item:

"1716D. Nonmailable injurious animals, plant pests, plants, and illegally taken fish, wildlife, and plants.".

<< 18 USCA § 704 >>

SEC. 320109. MILITARY MEDALS AND DECORATIONS.

Section 704 of title 18, United States Code, is amended—

(1) by striking "Whoever" and inserting (a) IN GENERAL.—Whoever";

(2) by striking "not more than $250" and inserting "under this title"; and

(3) by adding at the end the following new subsection:

"(b) CONGRESSIONAL MEDAL OF HONOR.—

"(1) IN GENERAL.—If a decoration or medal involved in an offense under subsection (a) is a Congressional Medal of Honor, in lieu of the punishment provided in that subsection, the offender shall be fined under this title, imprisoned not more than 1 year, or both.

"(2) DEFINITIONS.—(A) As used in subsection (a) with respect to a Congressional Medal of Honor, 'sells' includes trades, barters, or exchanges for anything of value.

"(B) As used in this subsection, 'Congressional Medal of Honor' means a medal awarded under section 3741 of title 10.".

Subtitle B—Extension of Protection of Civil Rights Statutes

SEC. 320201. EXTENSION OF PROTECTION OF CIVIL RIGHTS STATUTES.

<< 18 USCA § 241 >>

(a) CONSPIRACY AGAINST RIGHTS.—Section 241 of title 18, United States Code, is amended by striking "inhabitant of" and inserting "person in".

<< 18 USCA § 242 >>

(b) DEPRIVATION OF RIGHTS UNDER COLOR OF LAW.—Section 242 of title 18, United States Code, is amended—
  (1) by striking "inhabitant of" and inserting "person in"; and
  (2) by striking "such inhabitant" and inserting "such person".

<< 28 USCA § 524 >>

Subtitle C—Audit and Report

SEC. 320301. AUDIT REQUIREMENT FOR STATE AND LOCAL LAW ENFORCEMENT AGENCIES RECEIVING FEDERAL ASSET FORFEITURE FUNDS.

(a) STATE REQUIREMENT.—Section 524(c)(7) of title 28, United States Code, is amended to read as follows:
  "(7)(A) The Fund shall be subject to annual audit by the Comptroller General.
  "(B) The Attorney General shall require that any State or local law enforcement agency receiving funds conduct an annual audit detailing the uses and expenses to which the funds were dedicated and the amount used for each use or expense and report the results of the audit to the Attorney General.".
(b) INCLUSION IN ATTORNEY GENERAL'S REPORT.—Section 524(c)(6)(C) of title 28, United States Code, is amended by adding at the end the following flush sentence: "The report should also contain all annual audit reports from State and local law enforcement agencies required to be reported to the Attorney General under subparagraph (B) of paragraph (7).".

<< 28 USCA § 524 >>

SEC. 320302. REPORT TO CONGRESS ON ADMINISTRATIVE AND CONTRACTING EXPENSES.

Section 524(c)(6) of title 28, United States Code, is amended—
  (1) by striking "and" at the end of subparagraph (B);
  (2) by striking the period at the end of subparagraph (C) and inserting "; and"; and
  (3) by adding at the end the following new subparagraph:
  "(D) a report for such fiscal year containing a description of the administrative and contracting expenses paid from the Fund under paragraph (1)(A).".

<< 42 USCA § 14222 >>

Subtitle D—Coordination

SEC. 320401. COORDINATION OF SUBSTANCE ABUSE TREATMENT AND PREVENTION PROGRAMS.

The Attorney General shall consult with the Secretary of the Department of Health and Human Services in establishing and carrying out the substance abuse treatment and prevention components of the programs authorized under this Act, to assure coordination of programs, eliminate duplication of efforts and enhance the effectiveness of such services.

<< 18 USCA § 1081 >>

Subtitle E—Gambling

## SEC. 320501. CLARIFYING AMENDMENT REGARDING SCOPE OF PROHIBITION AGAINST GAMBLING ON SHIPS IN INTERNATIONAL WATERS.

  The paragraph of section 1081 of title 18, United States Code, defining the term "gambling ship" is amended by adding at the end the following: "Such term does not include a vessel with respect to gambling aboard such vessel beyond the territorial waters of the United States during a covered voyage (as defined in section 4472 of the Internal Revenue Code of 1986 as in effect on January 1, 1994).".

<div align="center">Subtitle F—White Collar Crime Amendments</div>

## SEC. 320601. RECEIVING THE PROCEEDS OF EXTORTION OR KIDNAPPING.

  (a) PROCEEDS OF EXTORTION.—Chapter 41 of title 18, United States Code, is amended—

<div align="center">&lt;&lt; 18 USCA § 880 &gt;&gt;</div>

  (1) by adding at the end the following new section:

"§ 880. Receiving the proceeds of extortion

  "A person who receives, possesses, conceals, or disposes of any money or other property which was obtained from the commission of any offense under this chapter that is punishable by imprisonment for more than 1 year, knowing the same to have been unlawfully obtained, shall be imprisoned not more than 3 years, fined under this title, or both."; and

<div align="center">&lt;&lt; 18 USCA Ch. 41 &gt;&gt;</div>

  (2) in the table of sections, by adding at the end the following new item:
"880. Receiving the proceeds of extortion.".

<div align="center">&lt;&lt; 18 USCA § 1202 &gt;&gt;</div>

  (b) RANSOM MONEY.—Section 1202 of title 18, United States Code, is amended—
  (1) by designating the existing matter as subsection "(a)"; and
  (2) by adding the following new subsections:
  "(b) A person who transports, transmits, or transfers in interstate or foreign commerce any proceeds of a kidnapping punishable under State law by imprisonment for more than 1 year, or receives, possesses, conceals, or disposes of any such proceeds after they have crossed a State or United States boundary, knowing the proceeds to have been unlawfully obtained, shall be imprisoned not more than 10 years, fined under this title, or both.
  "(c) For purposes of this section, the term 'State' has the meaning set forth in section 245(d) of this title.".

<div align="center">&lt;&lt; 18 USCA § 2114 &gt;&gt;</div>

## SEC. 320602. RECEIVING THE PROCEEDS OF A POSTAL ROBBERY.

  Section 2114 of title 18, United States Code, is amended—
  (1) by striking "whoever" and inserting:
"(a) ASSAULT.—A person who"; and
  (2) by adding at the end the following new subsection:
  "(b) RECEIPT, POSSESSION, CONCEALMENT, OR DISPOSAL OF PROPERTY.—A person who receives, possesses, conceals, or disposes of any money or other property that has been obtained in violation of this section, knowing the same to have been unlawfully obtained, shall be imprisoned not more than 10 years, fined under this title, or both.".

SEC. 320603. CRIMES BY OR AFFECTING PERSONS ENGAGED IN THE BUSINESS OF INSURANCE WHOSE ACTIVITIES AFFECT INTERSTATE COMMERCE.

(a) IN GENERAL.—Chapter 47 of title 18, United States Code, is amended by adding at the end the following new sections:

<< 18 USCA § 1033 >>

"§ 1033. Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce

"(a)(1) Whoever is engaged in the business of insurance whose activities affect interstate commerce and knowingly, with the intent to deceive, makes any false material statement or report or willfully and materially overvalues any land, property or security—

"(A) in connection with any financial reports or documents presented to any insurance regulatory official or agency or an agent or examiner appointed by such official or agency to examine the affairs of such person, and

"(B) for the purpose of influencing the actions of such official or agency or such an appointed agent or examiner,

shall be punished as provided in paragraph (2).

"(2) The punishment for an offense under paragraph (1) is a fine as established under this title or imprisonment for not more than 10 years, or both, except that the term of imprisonment shall be not more than 15 years if the statement or report or overvaluing of land, property, or security jeopardized the safety and soundness of an insurer and was a significant cause of such insurer being placed in conservation, rehabilitation, or liquidation by an appropriate court.

"(b)(1) Whoever—

"(A) acting as, or being an officer, director, agent, or employee of, any person engaged in the business of insurance whose activities affect interstate commerce, or

"(B) is engaged in the business of insurance whose activities affect interstate commerce or is involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business,

willfully embezzles, abstracts, purloins, or misappropriates any of the moneys, funds, premiums, credits, or other property of such person so engaged shall be punished as provided in paragraph (2).

"(2) The punishment for an offense under paragraph (1) is a fine as provided under this title or imprisonment for not more than 10 years, or both, except that if such embezzlement, abstraction, purloining, or misappropriation described in paragraph (1) jeopardized the safety and soundness of an insurer and was a significant cause of such insurer being placed in conservation, rehabilitation, or liquidation by an appropriate court, such imprisonment shall be not more than 15 years. If the amount or value so embezzled, abstracted, purloined, or misappropriated does not exceed $5,000, whoever violates paragraph (1) shall be fined as provided in this title or imprisoned not more than one year, or both.

"(c)(1) Whoever is engaged in the business of insurance whose activities affect interstate commerce or is involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business, knowingly makes any false entry of material fact in any book, report, or statement of such person engaged in the business of insurance with intent to deceive any person, including any officer, employee, or agent of such person engaged in the business of insurance, any insurance regulatory official or agency, or any agent or examiner appointed by such official or agency to examine the affairs of such person, about the financial condition or solvency of such business shall be punished as provided in paragraph (2).

"(2) The punishment for an offense under paragraph (1) is a fine as provided under this title or imprisonment for not more than 10 years, or both, except that if the false entry in any book, report, or statement of such person jeopardized the safety and soundness of an insurer and was a significant cause of such insurer being placed in conservation, rehabilitation, or liquidation by an appropriate court, such imprisonment shall be not more than 15 years.

"(d) Whoever, by threats or force or by any threatening letter or communication, corruptly influences, obstructs, or impedes or endeavors corruptly to influence, obstruct, or impede the due and proper administration of the law under which any proceeding involving the business of insurance whose activities affect interstate commerce is pending before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of a person engaged

AR.02121

in the business of insurance whose activities affect interstate commerce, shall be fined as provided in this title or imprisoned not more than 10 years, or both.

"(e)(1)(A) Any individual who has been convicted of any criminal felony involving dishonesty or a breach of trust, or who has been convicted of an offense under this section, and who willfully engages in the business of insurance whose activities affect interstate commerce or participates in such business, shall be fined as provided in this title or imprisoned not more than 5 years, or both.

"(B) Any individual who is engaged in the business of insurance whose activities affect interstate commerce and who willfully permits the participation described in subparagraph (A) shall be fined as provided in this title or imprisoned not more than 5 years, or both.

"(2) A person described in paragraph (1)(A) may engage in the business of insurance or participate in such business if such person has the written consent of any insurance regulatory official authorized to regulate the insurer, which consent specifically refers to this subsection.

"(f) As used in this section—

"(1) the term 'business of insurance' means—

"(A) the writing of insurance, or

"(B) the reinsuring of risks,

by an insurer, including all acts necessary or incidental to such writing or reinsuring and the activities of persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons;

"(2) the term 'insurer' means any entity the business activity of which is the writing of insurance or the reinsuring of risks, and includes any person who acts as, or is, an officer, director, agent, or employee of that business;

"(3) the term 'interstate commerce' means—

"(A) commerce within the District of Columbia, or any territory or possession of the United States;

"(B) all commerce between any point in the State, territory, possession, or the District of Columbia and any point outside thereof;

"(C) all commerce between points within the same State through any place outside such State; or

"(D) all other commerce over which the United States has jurisdiction; and

"(4) the term 'State' includes any State, the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the Virgin Islands, American Samoa, and the Trust Territory of the Pacific Islands.

<< 18 USCA § 1034 >>

"§ 1034. Civil penalties and injunctions for violations of section 1033

"(a) The Attorney General may bring a civil action in the appropriate United States district court against any person who engages in conduct constituting an offense under section 1033 and, upon proof of such conduct by a preponderance of the evidence, such person shall be subject to a civil penalty of not more than $50,000 for each violation or the amount of compensation which the person received or offered for the prohibited conduct, whichever amount is greater. If the offense has contributed to the decision of a court of appropriate jurisdiction to issue an order directing the conservation, rehabilitation, or liquidation of an insurer, such penalty shall be remitted to the appropriate regulatory official for the benefit of the policyholders, claimants, and creditors of such insurer. The imposition of a civil penalty under this subsection does not preclude any other criminal or civil statutory, common law, or administrative remedy, which is available by law to the United States or any other person.

"(b) If the Attorney General has reason to believe that a person is engaged in conduct constituting an offense under section 1033, the Attorney General may petition an appropriate United States district court for an order prohibiting that person from engaging in such conduct. The court may issue an order prohibiting that person from engaging in such conduct if the court finds that the conduct constitutes such an offense. The filing of a petition under this section does not preclude any other remedy which is available by law to the United States or any other person.".

<< 18 USCA Ch. 47 >>

(b) CLERICAL AMENDMENT.—The table of sections for chapter 47 of such title is amended by adding at the end the following new items:

"1033. Crimes by or affecting persons engaged in the business of insurance whose activities affect interstate commerce.

"1034. Civil penalties and injunctions for violations of section 1033.".

SEC. 320604. MISCELLANEOUS AMENDMENTS TO TITLE 18, UNITED STATES CODE.

<< 18 USCA § 1515 >>

(a) TAMPERING WITH INSURANCE REGULATORY PROCEEDINGS.—Section 1515(a)(1) of title 18, United States Code, is amended—

(1) by striking "or" at the end of subparagraph (B);

(2) by inserting "or" at the end of subparagraph (C); and

(3) by adding at the end thereof the following new subparagraph:

"(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce; or".

<< 18 USCA § 3293 >>

(b) LIMITATIONS.—Section 3293 of such title is amended by inserting "1033," after "1014,".

<< 18 USCA § 1510 >>

(c) OBSTRUCTION OF CRIMINAL INVESTIGATIONS.—Section 1510 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(d)(1) Whoever—

"(A) acting as, or being, an officer, director, agent or employee of a person engaged in the business of insurance whose activities affect interstate commerce, or

"(B) is engaged in the business of insurance whose activities affect interstate commerce or is involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business,

with intent to obstruct a judicial proceeding, directly or indirectly notifies any other person about the existence or contents of a subpoena for records of that person engaged in such business or information that has been furnished to a Federal grand jury in response to that subpoena, shall be fined as provided by this title or imprisoned not more than 5 years, or both.

"(2) As used in paragraph (1), the term 'subpoena for records' means a Federal grand jury subpoena for records that has been served relating to a violation of, or a conspiracy to violate, section 1033 of this title.".

<< 12 USCA § 1829 >>

SEC. 320605. FEDERAL DEPOSIT INSURANCE ACT AMENDMENT.

Section 19(a) of the Federal Deposit Insurance Act (12 U.S.C. 1829(a)) is amended in paragraph (2)(A)(i)(I)—

(1) by striking "or 1956"; and

(2) by inserting "1517, 1956, or 1957".

<< 12 USCA § 1785 >>

SEC. 320606. FEDERAL CREDIT UNION ACT AMENDMENTS.

Section 205(d) of the Federal Credit Union Act (12 U.S.C. 1785(d)) is amended to read as follows:

"(d) PROHIBITION.—

"(1) IN GENERAL.—Except with prior written consent of the Board—

"(A) any person who has been convicted of any criminal offense involving dishonesty or a breach of trust, or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense, may not—

"(i) become, or continue as, an institution-affiliated party with respect to any insured credit union; or

"(ii) otherwise participate, directly or indirectly, in the conduct of the affairs of any insured credit union; and

"(B) any insured credit union may not permit any person referred to in subparagraph (A) to engage in any conduct or continue any relationship prohibited under such subparagraph.

"(2) MINIMUM 10-YEAR PROHIBITION PERIOD FOR CERTAIN OFFENSES.—

"(A) IN GENERAL.—If the offense referred to in paragraph (1)(A) in connection with any person referred to in such paragraph is—

"(i) an offense under—

"(I) section 215, 656, 657, 1005, 1006, 1007, 1008, 1014, 1032, 1344, 1517, 1956, or 1957 of title 18, United States Code; or

"(II) section 1341 or 1343 of such title which affects any financial institution (as defined in section 20 of such title); or

"(ii) the offense of conspiring to commit any such offense,

the Board may not consent to any exception to the application of paragraph (1) to such person during the 10-year period beginning on the date the conviction or the agreement of the person becomes final.

"(B) EXCEPTION BY ORDER OF SENTENCING COURT.—

"(i) IN GENERAL.—On motion of the Board, the court in which the conviction or the agreement of a person referred to in subparagraph (A) has been entered may grant an exception to the application of paragraph (1) to such person if granting the exception is in the interest of justice.

"(ii) PERIOD FOR FILING.—A motion may be filed under clause (i) at any time during the 10-year period described in subparagraph (A) with regard to the person on whose behalf such motion is made.

"(3) PENALTY.—Whoever knowingly violates paragraph (1) or (2) shall be fined not more than $1,000,000 for each day such prohibition is violated or imprisoned for not more than 5 years, or both.".

<< 18 USCA § 3059A >>

SEC. 320607. ADDITION OF PREDICATE OFFENSES TO FINANCIAL INSTITUTIONS REWARDS STATUTE.

Section 3059A of title 18, United States Code, is amended—

(1) by inserting "225," after "215";

(2) by striking "or" before "1344"; and

(3) by inserting ", or 1517" after "1344".

<< 18 USCA § 2113 >>

SEC. 320608. DEFINITION OF "SAVINGS AND LOAN ASSOCIATION" FOR PURPOSES OF THE OFFENSE OF BANK ROBBERY AND RELATED OFFENSES.

Section 2113 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(h) As used in this section, the term 'savings and loan association' means—

"(1) a Federal savings association or State savings association (as defined in section 3(b) of the Federal Deposit Insurance Act (12 U.S.C. 1813(b))) having accounts insured by the Federal Deposit Insurance Corporation; and

"(2) a corporation described in section 3(b)(1)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1813(b)(1)(C)) that is operating under the laws of the United States.".

<< 18 USCA § 1516 >>

SEC. 320609. DEFINITION OF 1-YEAR PERIOD FOR PURPOSES OF THE OFFENSE OF OBSTRUCTION OF A FEDERAL AUDIT.

AR.02124

Section 1516(b) of title 18, United States Code, is amended—

(1) by striking "section the term" and inserting "section—

"(1) the term";

(2) by striking the period at the end and inserting a semicolon; and

(3) by adding at the end the following new paragraph:

"(2) the term 'in any 1 year period' has the meaning given to the term 'in any one-year period' in section 666.".

<< 42 USCA § 3711 NOTE >>

Subtitle G—Safer Streets and Neighborhoods

SEC. 320701. SHORT TITLE.

This subtitle may be cited as the "Safer Streets and Neighborhoods Act of 1994".

SEC. 320702. LIMITATION ON GRANT DISTRIBUTION.

<< 42 USCA § 3760 >>

(a) AMENDMENT.—Section 510(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3760(b)) is amended by inserting "non-Federal" after "with".

<< 42 USCA § 3760 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on October 1, 1994.

<< 16 USCA § 5201 NOTE >>

Subtitle H—Recreational Hunting Safety

SEC. 320801. SHORT TITLE.

This subtitle may be cited as the "Recreational Hunting Safety and Preservation Act of 1994".

<< 16 USCA § 5201 >>

SEC. 320802. OBSTRUCTION OF A LAWFUL HUNT.

It is a violation of this section intentionally to engage in any physical conduct that significantly hinders a lawful hunt.

<< 16 USCA § 5202 >>

SEC. 320803. CIVIL PENALTIES.

(a) IN GENERAL.—A person who violates section 320802 shall be assessed a civil penalty in an amount computed under subsection (b).

(b) COMPUTATION OF PENALTY.—The penalty shall be—

(1) not more than $10,000, if the violation involved the use of force or violence, or the threatened use of force or violence, against the person or property of another person; and

(2) not more than $5,000 for any other violation.

(c) RELATIONSHIP TO OTHER PENALTIES.—The penalties established by this section shall be in addition to other criminal or civil penalties that may be levied against the person as a result of an activity in violation of section 320802.

(d) PROCEDURE.—Upon receipt of—

(1) a written complaint from an officer, employee, or agent of the Forest Service, Bureau of Land Management, National Park Service, United States Fish and Wildlife Service, or other Federal agency that a person violated section 320802; or

(2) a sworn affidavit from an individual and a determination by the Secretary that the statement contains sufficient factual allegations to create a reasonable belief that a violation of section 320802 has occurred;

the Secretary may request the Attorney General of the United States to institute a civil action for the imposition and collection of the civil penalty under this section.

(e) USE OF PENALTY MONEY COLLECTED.—After deduction of costs attributable to collection, money collected from penalties shall be—

(1) deposited into the trust fund established pursuant to the Act entitled "An Act to provide that the United States shall aid the States in wildlife-restoration projects, and for other purposes", approved September 2, 1937 (16 U.S.C. 669) (commonly known as the "Pitman-Robertson Wildlife Restoration Act"), to support the activities authorized by such Act and undertaken by State wildlife management agencies; or

(2) used in such other manner as the Secretary determines will enhance the funding and implementation of—

(A) the North American Waterfowl Management Plan signed by the Secretary of the Interior and the Minister of Environment for Canada in May 1986; or

(B) a similar program that the Secretary determines will enhance wildlife management—

(i) on Federal lands; or

(ii) on private or State-owned lands when the efforts will also provide a benefit to wildlife management objectives on Federal lands.

<< 16 USCA § 5203 >>

SEC. 320804. OTHER RELIEF.

Injunctive relief against a violation of section 320802 may be sought by—

(1) the head of a State agency with jurisdiction over fish or wildlife management;

(2) the Attorney General of the United States; or

(3) any person who is or would be adversely affected by the violation.

<< 16 USCA § 5204 >>

SEC. 320805. RELATIONSHIP TO STATE AND LOCAL LAW AND CIVIL ACTIONS.

This subtitle does not preempt a State law or local ordinance that provides for civil or criminal penalties for conduct that violates this subtitle.

<< 16 USCA § 5205 >>

SEC. 320806. REGULATIONS.

The Secretary may issue such regulations as are necessary to carry out this subtitle.

<< 16 USCA § 5206 >>

SEC. 320807. RULE OF CONSTRUCTION.

Nothing in this subtitle shall be construed to impair a right guaranteed to a person under the first article of amendment to the Constitution or limit any legal remedy for forceful interference with a person's lawful participation in speech or peaceful assembly.

<< 16 USCA § 5207 >>

## SEC. 320808. DEFINITIONS.

As used in this subtitle:

(1) FEDERAL LANDS.—The term "Federal lands" means—

(A) national forests;

(B) public lands;

(C) national parks; and

(D) wildlife refuges.

(2) LAWFUL HUNT.—The term "lawful hunt" means the taking or harvesting (or attempted taking or harvesting) of wildlife or fish, on Federal lands, which—

(A) is lawful under the laws applicable in the place it occurs; and

(B) does not infringe upon a right of an owner of private property.

(3) NATIONAL FOREST.—The term "national forest" means lands included in the National Forest System (as defined in section 11(a) of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1609(a))).

(4) NATIONAL PARK.—The term "national park" means lands and waters included in the National Park System (as defined in section 2(a) of the Act entitled "An Act to facilitate the management of the National Park System and miscellaneous areas administered in connection with that system, and for other purposes", approved August 8, 1953 (16 U.S.C. 1c(a))).

(5) PUBLIC LANDS.—The term "public lands" has the same meaning as is provided in section 103(e) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702(e)).

(6) SECRETARY.—The term "Secretary" means—

(A) the Secretary of Agriculture with respect to national forests; and

(B) the Secretary of the Interior with respect to—

(i) public lands;

(ii) national parks; and

(iii) wildlife refuges.

(7) WILDLIFE REFUGE.—The term "wildlife refuge" means lands and waters included in the National Wildlife Refuge System (as established by section 4 of the National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. 668dd)).

(8) CONDUCT.—The term "conduct" does not include speech protected by the first article of amendment to the Constitution.

<< 18 USCA § 2511 >>

Subtitle I—Other Provisions

## SEC. 320901. WIRETAPS.

Section 2511(1) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (c);

(2) by inserting "or" at the end of paragraph (d); and

(3) by adding after paragraph (d) the following new paragraph:

"(e)(i) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(A)(ii), 2511(b)–(c), 2511(e), 2516, and 2518 of this subchapter, (ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation,".

## SEC. 320902. THEFT OF MAJOR ARTWORK.

<< 18 USCA § 668 >>

(a) OFFENSE.—Chapter 31 of title 18, United States Code, is amended by adding at the end the following new section:

AR.02127

"§ 668. Theft of major artwork

 "(a) DEFINITIONS.—In this section—
  "'museum' means an organized and permanent institution, the activities of which affect interstate or foreign commerce, that—
   "(A) is situated in the United States;
   "(B) is established for an essentially educational or aesthetic purpose;
   "(C) has a professional staff; and
   "(D) owns, utilizes, and cares for tangible objects that are exhibited to the public on a regular schedule.
  "'object of cultural heritage' means an object that is—
   "(A) over 100 years old and worth in excess of $5,000; or
   "(B) worth at least $100,000.".
 "(b) OFFENSES.—A person who—
  "(1) steals or obtains by fraud from the care, custody, or control of a museum any object of cultural heritage; or
  "(2) knowing that an object of cultural heritage has been stolen or obtained by fraud, if in fact the object was stolen or obtained from the care, custody, or control of a museum (whether or not that fact is known to the person), receives, conceals, exhibits, or disposes of the object,

shall be fined under this title, imprisoned not more than 10 years, or both.".

<< 18 USCA § 3294 >>

 (b) PERIOD OF LIMITATION.—Chapter 213 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 3294. Theft of major artwork

 "No person shall be prosecuted, tried, or punished for a violation of or conspiracy to violate section 668 unless the indictment is returned or the information is filed within 20 years after the commission of the offense.".
 (d) TECHNICAL AMENDMENTS.—

<< 18 USCA Ch. 31 >>

 (1) CHAPTER 31.—The chapter analysis for chapter 31 of title 18, United States Code, is amended by adding at the end the following new item:
"668. Theft of major artwork.".

<< 18 USCA Ch. 213 >>

 (2) CHAPTER 213.—The chapter analysis for chapter 213 of title 18, United States Code, is amended by adding at the end the following new item:
"3294. Theft of major artwork.".

SEC. 320903. ADDITION OF ATTEMPTED ROBBERY, KIDNAPPING, SMUGGLING, AND PROPERTY DAMAGE OFFENSES TO ELIMINATE INCONSISTENCIES AND GAPS IN COVERAGE.

<< 18 USCA § 2111 >>

 (a) ROBBERY AND BURGLARY.—(1) Section 2111 of title 18, United States Code, is amended by inserting "or attempts to take" after "takes".

<< 18 USCA § 2112 >>

 (2) Section 2112 of title 18, United States Code, is amended by inserting "or attempts to rob" after "robs".

<< 18 USCA § 2114 >>

(3) Section 2114 of title 18, United States Code, is amended by inserting "or attempts to rob" after "robs".

<< 18 USCA § 1201 >>

(b) KIDNAPPING.—Section 1201(d) of title 18, United States Code, is amended by striking "Whoever attempts to violate subsection (a)(4) or (a)(5)" and inserting "Whoever attempts to violate subsection (a)".

<< 18 USCA § 545 >>

(c) SMUGGLING.—Section 545 of title 18, United States Code, is amended by inserting "or attempts to smuggle or clandestinely introduce" after "smuggles, or clandestinely introduces".

<< 18 USCA § 1361 >>

(d) MALICIOUS MISCHIEF.—(1) Section 1361 of title 18, United States Code, is amended—
  (A) by inserting "or attempts to commit any of the foregoing offenses" before "shall be punished", and
  (B) by inserting "or attempted damage" after "damage" each place it appears.

<< 18 USCA § 1362 >>

(2) Section 1362 of title 18, United States Code, is amended by inserting "or attempts willfully or maliciously to injure or destroy" after "willfully or maliciously injures or destroys".

<< 18 USCA § 1366 >>

(3) Section 1366 of title 18, United States Code, is amended—
  (A) by inserting "or attempts to damage" after "damages" each place it appears;
  (B) by inserting "or attempts to cause" after "causes"; and
  (C) by inserting "or would if the attempted offense had been completed have exceeded" after "exceeds" each place it appears.

<< 18 USCA § 922 >>

SEC. 320904. GUN–FREE SCHOOL ZONES.

Section 922(q) of title 18, United States Code, is amended—
  (1) by redesignating paragraphs (1), (2), and (3) as paragraphs (2), (3), and (4), respectively; and
  (2) by inserting after "(q)" the following new paragraph:
"(1) The Congress finds and declares that—
  "(A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;
  "(B) crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;
  "(C) firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Judiciary Committee of the House of Representatives and Judiciary Committee of the Senate;
  "(D) in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;
  "(E) while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;
  "(F) the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

"(G) this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

"(H) States, localities, and school systems find it almost impossible to handle gun-related crime by themselves; even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

"(I) Congress has power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.".

<< 18 USCA § 1301 >>

SEC. 320905. INTERSTATE WAGERING.

Section 1301 of title 18, United States Code, is amended by inserting "or, being engaged in the business of procuring for a person in 1 State such a ticket, chance, share, or interest in a lottery, gift, enterprise or similar scheme conducted by another State (unless that business is permitted under an agreement between the States in question or appropriate authorities of those States), knowingly transmits in interstate or foreign commerce information to be used for the purpose of procuring such a ticket, chance, share, or interest;" after "scheme;".

SEC. 320906. SENSE OF CONGRESS WITH RESPECT TO VIOLENCE AGAINST TRUCKERS.

It is the sense of Congress that—

(1) when there is Federal jurisdiction, Federal authorities should prosecute to the fullest extent of the law murders, rapes, burglaries, kidnappings and assaults committed against commercial truckers; and

(2) appropriate Federal agencies should acknowledge this problem and place a priority on evaluating how best to prevent these crimes and apprehend those involved, and continue to coordinate their activities with multi-jurisdictional authorities to combat violent crimes committed against truckers.

SEC. 320907. SENSE OF THE SENATE REGARDING A STUDY ON OUT–OF–WEDLOCK BIRTHS.

It is the sense of the Senate that—

(1) the Secretary of Health and Human Services, in consultation with the National Center for Health Statistics, should prepare an analysis of the causes of the increase in out-of-wedlock births, and determine whether there is any historical precedent for such increase, as well as any equivalent among foreign nations, and

(2) the Secretary of Health and Human Services should report to Congress within 12 months after the date of the enactment of this Act on the Secretary's analysis of the out-of-wedlock problem and its causes, as well as possible remedial measures that could be taken.

SEC. 320908. SENSE OF THE SENATE REGARDING THE ROLE OF THE UNITED NATIONS IN INTERNATIONAL ORGANIZED CRIME CONTROL.

It is the sense of the Senate that—

(1) the United States should encourage the development of a United Nations Convention on Organized Crime; and

(2) the United Nations should—

(A) provide significant additional resources to the Commission on Crime Prevention and Criminal Justice;

(B) consider an expansion of the Commission's role and authority; and

(C) seek a cohesive approach to the international organized crime problem.

SEC. 320909. OPTIONAL VENUE FOR ESPIONAGE AND RELATED OFFENSES.

<< 18 USCA § 3239 >>

(a) IN GENERAL.—Chapter 211 of title 18, United States Code, is amended by inserting after section 3238 the following new section:

AR.02130

"§ 3239. Optional venue for espionage and related offenses

  "The trial for any offense involving a violation, begun or committed upon the high seas or elsewhere out of the jurisdiction of any particular State or district, of—
    "(1) section 793, 794, 798, or section 1030(a)(1) of this title;
    "(2) section 601 of the National Security Act of 1947 (50 U.S.C. 421); or
    "(3) section 4(b) or 4(c) of the Subversive Activities Control Act of 1950 (50 U.S.C. 783 (b) or (c));

may be in the District of Columbia or in any other district authorized by law.".

<< 18 USCA Ch. 211 >>

  (b) TECHNICAL AMENDMENT.—The item relating to section 3239 in the table of sections of chapter 211 of title 18, United States Code, is amended to read as follows:
  "3239. Optional venue for espionage and related offenses.".

SEC. 320910. UNDERCOVER OPERATIONS.

<< 18 USCA § 21 >>

  (a) IN GENERAL.—Chapter 1 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 21. Stolen or counterfeit nature of property for certain crimes defined

  "(a) Wherever in this title it is an element of an offense that—
    "(1) any property was embezzled, robbed, stolen, converted, taken, altered, counterfeited, falsely made, forged, or obliterated; and
    "(2) the defendant knew that the property was of such character;

such element may be established by proof that the defendant, after or as a result of an official representation as to the nature of the property, believed the property to be embezzled, robbed, stolen, converted, taken, altered, counterfeited, falsely made, forged, or obliterated.
  "(b) For purposes of this section, the term 'official representation' means any representation made by a Federal law enforcement officer (as defined in section 115) or by another person at the direction or with the approval of such an officer.".

<< 18 USCA Ch. 1 >>

  (b) TECHNICAL AMENDMENT.—The table of sections of chapter 1 of title 18, United States Code, is amended by adding at the end the following new item:
  "21. Stolen or counterfeit nature of property for certain crimes defined.".

SEC. 320911. MISUSE OF INITIALS "DEA".

<< 18 USCA § 709 >>

  (a) AMENDMENT.—Section 709 of title 18, United States Code, is amended—
    (1) in the thirteenth unnumbered paragraph by striking "words—" and inserting "words; or"; and
    (2) by inserting after the thirteenth unnumbered paragraph the following new paragraph:
  "A person who, except with the written permission of the Administrator of the Drug Enforcement Administration, knowingly uses the words 'Drug Enforcement Administration' or the initials 'DEA' or any colorable imitation of such words or initials, in connection with any advertisement, circular, book, pamphlet, software or other publication, play, motion picture, broadcast, telecast, or other production, in a manner reasonably calculated to convey the impression that such advertisement, circular, book,

pamphlet, software or other publication, play, motion picture, broadcast, telecast, or other production is approved, endorsed, or authorized by the Drug Enforcement Administration;".

<< 18 USCA § 709 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall become effective on the date that is 90 days after the date of enactment of this Act.

<< 18 USCA § 2311 >>

SEC. 320912. DEFINITION OF LIVESTOCK.

Section 2311 of title 18, United States Code, is amended by inserting after the second paragraph relating to the definition of "cattle" the following new paragraph:

"'livestock' means any domestic animals raised for home use, consumption, or profit, such as horses, pigs, llamas, goats, fowl, sheep, buffalo, and cattle, or the carcasses thereof.".

SEC. 320913. ASSET FORFEITURE.

<< 28 USCA § 524 >>

(a) AMENDMENT.—Section 524(c)(1) of title 28, United States Code, is amended—
  (1) by redesignating subparagraph (H) as subparagraph (I); and
  (2) by inserting after subparagraph (G) the following new subparagraph:
  "(H) the payment of State and local property taxes on forfeited real property that accrued between the date of the violation giving rise to the forfeiture and the date of the forfeiture order; and".

<< 28 USCA § 524 NOTE >>

(b) APPLICATION OF AMENDMENT.—The amendment made by subsection (a) shall apply to all claims pending at the time of or commenced subsequent to the date of enactment of this Act.

SEC. 320914. CLARIFICATION OF DEFINITION OF A "COURT OF THE UNITED STATES" TO INCLUDE THE DISTRICT COURTS FOR GUAM, THE NORTHERN MARIANA ISLANDS, AND THE VIRGIN ISLANDS.

<< 18 USCA § 23 >>

(a) IN GENERAL.—Chapter 1 of title 18, United States Code, is amended by adding at the end the following new section:

"§ 23. Court of the United States defined

"As used in this title, except where otherwise expressly provided the term 'court of the United States' includes the District Court of Guam, the District Court for the Northern Mariana Islands, and the District Court of the Virgin Islands.".

<< 18 USCA Ch. 1 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 1 of title 18, United States Code, is amended by adding at the end the following new item:
  "23. Court of the United States defined.".

SEC. 320915. LAW ENFORCEMENT PERSONNEL.

  It is the sense of the Senate that law enforcement personnel should not be reduced and calls upon the President of the United States to exempt Federal law enforcement positions from Executive Order 12839 and other Executive memoranda mandating reductions in the Federal workforce.

SEC. 320916. AUTHORITY TO INVESTIGATE VIOLENT CRIMES AGAINST TRAVELERS.

<< 28 USCA § 540A >>

  (a) IN GENERAL.—Chapter 33 of title 28, United States Code, is amended by adding at the end the following new section:

"§ 540A. Investigation of violent crimes against travelers

  "(a) IN GENERAL.—At the request of an appropriate law enforcement official of a State or political subdivision, the Attorney General and Director of the Federal Bureau of Investigation may assist in the investigation of a felony crime of violence in violation of the law of any State in which the victim appears to have been selected because he or she is a traveler.
  "(b) FOREIGN TRAVELERS.—In a case in which the traveler who is a victim of a crime described in subsection (a) is from a foreign nation, the Attorney General and Director of the Federal Bureau of Investigation, and, when appropriate, the Secretary of State shall assist the prosecuting and law enforcement officials of a State or political subdivision to the fullest extent possible in securing from abroad such evidence or other information as may be needed for the effective investigation and prosecution of the crime.
  "(c) DEFINITIONS.—In this section—
  "'felony crime of violence' means an offense punishable by more than one year in prison that has as an element the use, attempted use, or threatened use of physical force against the person of another.
  "'State' means a State, the District of Columbia, and any commonwealth, territory, or possession of the United States.
  "'traveler' means a victim of a crime of violence who is not a resident of the State in which the crime of violence occurred.".

<< 28 USCA Ch. 33 >>

  (b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 33 of title 28, United States Code, is amended by adding at the end the following new item:
  "540A. Investigation of violent crimes against travelers.".

SEC. 320917. EXTENSION OF STATUTE OF LIMITATIONS FOR ARSON.

<< 18 USCA § 844 >>

  (a) IN GENERAL.—Section 844(i) of title 18, United States Code, is amended by adding at the end the following: "No person shall be prosecuted, tried, or punished for any noncapital offense under this subsection unless the indictment is found or the information is instituted within 7 years after the date on which the offense was committed.".

<< 18 USCA § 844 NOTE >>

  (b) APPLICATION OF AMENDMENT.—The amendment made by subsection (a) shall not apply to any offense described in the amendment that was committed more than 5 years prior to the date of enactment of this Act.

SEC. 320918. SENSE OF CONGRESS CONCERNING CHILD CUSTODY AND VISITATION RIGHTS.

  It is the sense of the Congress that in determining child custody and visitation rights, the courts should take into consideration the history of drunk driving that any person involved in the determination may have.

<< 42 USCA § 14223 >>

SEC. 320919. EDWARD BYRNE MEMORIAL FORMULA GRANT PROGRAM.

Nothing in this Act shall be construed to prohibit or exclude the expenditure of appropriations to grant recipients that would have been or are eligible to receive grants under subpart 1 of part E of the Omnibus Crime Control and Safe Streets Act of 1968.

SEC. 320920. SENSE OF THE SENATE REGARDING LAW DAY, U.S.A.

It is the sense of the Senate that in celebration of "Law Day, U.S.A.", May 1, 1995, the grateful people of this Nation should give special emphasis to all law enforcement personnel of the United States, and the grateful people of this Nation should acknowledge the unflinching and devoted service law enforcement personnel perform as such personnel help preserve domestic tranquillity and guarantee the legal rights of all individuals of this Nation.

SEC. 320921. FIRST TIME DOMESTIC VIOLENCE OFFENDER REHABILITATION PROGRAM.

<< 18 USCA § 3561 >>

(a) SENTENCE OF PROBATION.—Section 3561 of title 18, United States Code, is amended—
  (1) by redesignating subsection (b) as subsection (c); and
  (2) by inserting the following new subsection after subsection (a):
"(b) DOMESTIC VIOLENCE OFFENDERS.—A defendant who has been convicted for the first time of a domestic violence crime shall be sentenced to a term of probation if not sentenced to a term of imprisonment. The term 'domestic violence crime' means a crime of violence for which the defendant may be prosecuted in a court of the United States in which the victim or intended victim is the spouse, former spouse, intimate partner, former intimate partner, child, or former child of the defendant, or any relative defendant, child, or former child of the defendant, or any other relative of the defendant.".

<< 18 USCA § 3563 >>

(b) CONDITIONS OF PROBATION.—Section 3563(a) of title 18, United States Code, is amended by—
  (1) striking "and" at the end of paragraph (2);
  (2) striking the period at the end of paragraph (3) and inserting "; and"; and
  (3) by inserting the following new paragraph:
  "(4) for a domestic violence crime as defined in section 3561(b) by a defendant convicted of such an offense for the first time that the defendant attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is readily available within a 50-mile radius of the legal residence of the defendant.".

<< 18 USCA § 3583 >>

(c) SUPERVISED RELEASE.—Section 3583 of title 18, United States Code, is amended—
  (1) in subsection (a) by inserting "or if the defendant has been convicted for the first time of a domestic violence crime as defined in section 3561(b)" after "statute"; and
  (2) in subsection (d) by inserting the following after the first sentence: "The court shall order as an explicit condition of supervised release for a defendant convicted for the first time of a domestic violence crime as defined in section 3561(b) that the defendant attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is readily available within a 50-mile radius of the legal residence of the defendant.".

SEC. 320922. DISPLAY OF FLAGS AT HALFSTAFF.

<< 36 USCA § 167 >>

(a) PUBLIC LAW 87–726.—The first section of Public Law 87–726 (36 U.S.C. 167) is amended—
  (1) by striking "(2)" and inserting "(3)";

(2) by inserting after clause (1) the following new clause: "(2) directing the officials of the Government to display at halfstaff the flag of the United States on all Government buildings on such day, as provided by section 3(m) of the Act of June 22, 1942 (Chapter 435; 56 Stat. 377; 36 U.S.C. 175),";

(3) by striking "(3)" and inserting "(4)"; and

(4) by inserting in paragraph (4) ", including the display at halfstaff of the flag of the United States" after "activities".

<< 36 USCA § 175 >>

(b) ACT OF JUNE 22, 1942.—Section 3(m) of the Act of June 22, 1942 (Chapter 435; 56 Stat. 377; 36 U.S.C. 175) is amended by inserting "The flag shall be flown at halfstaff on Peace Officers Memorial Day, unless that day is also Armed Forces Day." after "a Member of Congress.".

<< 28 USCA § 509 NOTE >>

SEC. 320923. FINANCIAL INSTITUTION FRAUD.

Section 528 of Public Law 101–509, approved November 5, 1990, is amended by striking "with the authority of the Resolution Trust Corporation or its successor" at the end of subsection (b)(2) and inserting "on December 31, 2004".

<< 18 USCA § 1201 >>

SEC. 320924. DEFINITION OF "PARENT" FOR THE PURPOSES OF THE OFFENSE OF KIDNAPPING.

Section 1201 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(h) As used in this section, the term 'parent' does not include a person whose parental rights with respect to the victim of an offense under this section have been terminated by a final court order.".

<< 28 USCA § 534 NOTE >>

SEC. 320926. HATE CRIME STATISTICS ACT.

Subsection (b)(1) of the first section of the Hate Crime Statistics Act (28 U.S.C. 534 note) is amended by inserting "disability," after "religion,".

<< 18 USCA § 922 >>

SEC. 320927. EXEMPTION FROM BRADY BACKGROUND CHECK REQUIREMENT OF RETURN OF HANDGUN TO OWNER.

Section 922(s)(1) of title 18, United States Code, is amended in the first sentence by inserting "(other than the return of a handgun to the person from whom it was received)" after "handgun".

SEC. 320928. AMENDMENT OF THE NATIONAL CHILD PROTECTION ACT OF 1993.

(a) PROTECTION OF THE ELDERLY AND INDIVIDUALS WITH DISABILITIES.—

<< 42 USCA § 5119a >>

(1) BACKGROUND CHECKS.—Section 3(a)(1) of the National Child Protection Act of 1993 (42 U.S.C. 5119a) is amended by striking "an individual's fitness to have responsibility for the safety and well-being of children" and inserting "the provider's fitness to have responsibility for the safety and well-being of children, the elderly, or individuals with disabilities".

(2) GUIDELINES.—Section 3(b) of the National Child Protection Act of 1993 (42 U.S.C. 5119b(b)) is amended—

(A) in paragraph (1)(E)—

(i) by striking "child" the first place it appears and inserting "person"; and

(ii) by striking "child" the second place it appears; and

(B) in paragraph (4) by striking "an individual's fitness to have responsibility for the safety and well-being of children" and inserting "the provider's fitness to have responsibility for the safety and well-being of children, the elderly, or individuals with disabilities".

<< 42 USCA § 5119c >>

(3) DEFINITION OF CARE.—Section 5 of the National Child Protection Act of 1993 (42 U.S.C. 5119c(5)) is amended—

(A) by amending paragraph (5) to read as follows:

"(5) the term 'care' means the provision of care, treatment, education, training, instruction, supervision, or recreation to children, the elderly, or individuals with disabilities;"; and

(B) in paragraph (8) by striking "child care" each place it appears and inserting "care".

<< 42 USCA § 5119 >>

(b) INFORMATION REQUIRED TO BE REPORTED.—Section 2(a) of the National Child Protection Act of 1993 (42 U.S.C. 5119(a)) is amended by adding at the end "A criminal justice agency may satisfy the requirement of this subsection by reporting or indexing all felony and serious misdemeanor arrests and dispositions.".

<< 42 USCA § 5119a >>

(c) CLARIFICATION OF IMMUNITY PROVISION.—Section 3(d) of the National Child Protection Act of 1993 (42 U.S.C. 5119a(d)) is amended by inserting "(other than itself)" after "failure of a qualified entity".

<< 42 USCA § 5119b >>

(d) DEFRAYMENT OF COSTS TO VOLUNTEERS OF CONDUCTING BACKGROUND CHECKS.—Section 4(b) of the National Child Protection Act of 1993 (42 U.S.C. 5119b(b)) is amended—

(1) by striking "and" at the end of subparagraph (C);

(2) by striking the period at the end of subparagraph (D) and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

"(E) to assist the State in paying all or part of the cost to the State of conducting background checks on persons who are employed by or volunteer with a public, not-for-profit, or voluntary qualified entity to reduce the amount of fees charged for such background checks.".

<< 42 USCA § 5119a >>

(e) FEES.—Section 3(e) of the National Child Protection Act of 1993 is amended by striking "the actual cost" and inserting "eighteen dollars, respectively, or the actual cost, whichever is less,".

(f) COSTS OF THE FBI.—Funds authorized to be appropriated to the Federal Bureau of Investigation under section 190001(c) of this Act may be used to pay all or part of the cost to the Federal Bureau of Investigation of carrying out the National Child Protection Act of 1993, including the cost of conducting background checks on persons who are employed by or volunteer with a public, not-for-profit, or voluntary qualified entity to reduce the amount of fees charged for such background checks.

<< 42 USCA § 5119 NOTE >>

(g) GUIDELINES.—

(1) IN GENERAL.—The Attorney General, in consultation with Federal, State, and local officials, including officials responsible for criminal history record systems, and representatives of public and private care organizations and health, legal, and social welfare organizations, shall develop guidelines for the adoption of appropriate safeguards by care providers and by States for protecting children, the elderly, or individuals with disabilities from abuse.

(2) MATTERS TO BE ADDRESSED.—In developing guidelines under paragraph (1), the Attorney General shall address the availability, cost, timeliness, and effectiveness of criminal history background checks and recommend measures to ensure that fees for background checks do not discourage volunteers from participating in care programs.

(3) DISSEMINATION.—The Attorney General shall, subject to the availability of appropriations, disseminate the guidelines to State and local officials and to public and private care providers.

<< 42 USCA § 5119 >>

(h) CHANGE OF REPORT DEADLINE.—Section 2(f)(2) of the National Child Protection Act of 1993 (42 U.S.C. 5119(f)(2)) is amended by striking "1 year" and inserting "2 years".

(i) CHANGE OF IMPLEMENTATION DEADLINE.—Section 2(b)(2)(A) of the National Child Protection Act of 1993 (42 U.S.C. 5119(b)(2)(A)) is amended by striking "3 years" and inserting "5 years".

<< 42 USCA § 5119c >>

(j) DEFINITION OF CHILD ABUSE CASES AND INDIVIDUALS WITH DISABILITIES.—Section 5 of the National Child Protection Act of 1993 (42 U.S.C. 5119c) is amended—

(1) by redesignating paragraphs (6), (7), (8), and (9) as paragraphs (8), (9), (10), and (11), respectively; and

(2) by inserting after paragraph (5) the following new paragraphs:

"(6) the term 'identifiable child abuse crime case' means a case that can be identified by the authorized criminal justice agency of the State as involving a child abuse crime by reference to the statutory citation or descriptive label of the crime as it appears in the criminal history record;

"(7) the term 'individuals with disabilities' means persons with a mental or physical impairment who require assistance to perform one or more daily living tasks;".

<< 16 USCA § 831c–3 >>

SEC. 320929. TENNESSEE VALLEY AUTHORITY LAW ENFORCEMENT PERSONNEL.

The Tennessee Valley Authority Act of 1933 (16 U.S.C. 831 et seq.) is amended by inserting after section 4 the following new section:

"SEC. 4A. LAW ENFORCEMENT.—(a) DESIGNATION OF LAW ENFORCEMENT AGENTS.—The Board may designate employees of the corporation to act as law enforcement agents in the area of jurisdiction described in subsection (c).

"(b) DUTIES AND POWERS.—

"(1) DUTIES.—A law enforcement agent designated under subsection (a) shall maintain law and order and protect persons and property in the area of jurisdiction described in subsection (c) and protect property and officials and employees of the corporation outside that area.

"(2) POWERS.—In the performance of duties described in paragraph (1), a law enforcement agent designated under subsection (a) may—

"(A) make arrests without warrant for any offense against the United States committed in the agent's presence, or for any felony cognizable under the laws of the United States if the agent has probable cause to believe that the person to be arrested has committed or is committing such a felony;

"(B) execute any warrant or other process issued by a court or officer of competent jurisdiction for the enforcement of any Federal law or regulation issued pursuant to law in connection with the investigation of an offense described in subparagraph (A);

"(C) conduct an investigation of an offense described in subparagraph (A) in the absence of investigation of the offense by any Federal law enforcement agency having investigative jurisdiction over the offense or with the concurrence of that agency; and

"(D) carry firearms in carrying out any activity described in subparagraph (A), (B), or (C).

"(c) AREA OF JURISDICTION.—A law enforcement agent designated under subsection (a) shall be authorized to exercise the law enforcement duties and powers described in subsection (b)—

AR.02137

"(1) on any lands or facilities owned or leased by the corporation or within such adjoining areas in the vicinities of such lands or facilities as may be determined by the board under subsection (e); and

"(2) on other lands or facilities—

"(A) when the person to be arrested is in the process of fleeing from such lands, facilities, or adjoining areas to avoid arrest;

"(B) in conjunction with the protection of property or officials or employees of the corporation on or within lands or facilities other than those owned or leased by the corporation; or

"(C) in cooperation with other Federal, State, or local law enforcement agencies.

"(d) FEDERAL INVESTIGATIVE JURISDICTION AND STATE CIVIL AND CRIMINAL JURISDICTION NOT PREEMPTED.—Nothing in this section shall be construed to—

"(1) limit or restrict the investigative jurisdiction of any Federal law enforcement agency; or

"(2) affect any right of a State or a political subdivision thereof to exercise civil and criminal jurisdiction on or within lands or facilities owned or leased by the corporation.

"(e) DETERMINATION OF ADJOINING AREAS.—

"(1) IN GENERAL.—The board shall determine and may from time-to-time modify the adjoining areas for each facility or particular area of land, or for individual categories of such facilities or lands, for the purposes of subsection (c)(1).

"(2) NOTICE.—A notice and description of each adjoining area determination or modification of a determination made under paragraph (1) shall be published in the Federal Register.

"(f) QUALIFICATIONS AND TRAINING.—The board, in consultation with the Attorney General, shall adopt qualification and training standards for law enforcement agents designated under subsection (a).

"(g) RELATION TO OTHER LAW.—A law enforcement agent designated under subsection (a) shall not be considered to be a law enforcement officer of the United States for the purposes of any other law, and no law enforcement agent designated under subsection (a) or other employee of the corporation shall receive an increase in compensation solely on account of this section.

"(h) RELATIONSHIP WITH ATTORNEY GENERAL.—The duties and powers of law enforcement agents designated under subsection (a) that are described in subsection (b) shall be exercised in accordance with guidelines approved by the Attorney General.".

<< 28 USCA § 545 >>

SEC. 320932. ASSISTANT UNITED STATES ATTORNEY RESIDENCY.

Section 545(a) of title 28, United States Code, is amended—

(1) by striking "and assistant United States attorney"; and

(2) by inserting the following after the first sentence: "Each assistant United States attorney shall reside in the district for which he or she is appointed or within 25 miles thereof.".

<< 15 USCA § 45a >>

SEC. 320933. LABELS ON PRODUCTS.

To the extent any person introduces, delivers for introduction, sells, advertises, or offers for sale in commerce a product with a "Made in the U.S.A." or "Made in America" label, or the equivalent thereof, in order to represent that such product was in whole or substantial part of domestic origin, such label shall be consistent with decisions and orders of the Federal Trade Commission issued pursuant to section 5 of the Federal Trade Commission Act. This section only applies to such labels. Nothing in this section shall preclude the application of other provisions of law relating to labeling. The Commission may periodically consider an appropriate percentage of imported components which may be included in the product and still be reasonably consistent with such decisions and orders. Nothing in this section shall preclude use of such labels for products that contain imported components under the label when the label also discloses such information in a clear and conspicuous manner. The Commission shall administer this section pursuant to section 5 of the Federal Trade Commission Act and may from time to time issue rules pursuant to section 553 of title 5, United States Code for such purpose. If a rule is issued, such violation shall be treated by the Commission as a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) regarding unfair or

deceptive acts or practices. This section shall be effective upon publication in the Federal Register of a Notice of the provisions of this section. The Commission shall publish such notice within six months after the enactment of this section.

<< 11 USCA § 523 >>

SEC. 320934. NON–DISCHARGEABILITY OF PAYMENT OF RESTITUTION ORDER.

Section 523(a) of title 11, United States Code, is amended—
  (1) by striking "or" at the end of paragraph (11);
  (2) by striking the period at the end of paragraph (12) and inserting "; or"; and
  (3) by adding at the end the following new paragraph:
  "(13) for any payment of an order of restitution issued under title 18, United States Code."

SEC. 320935. ADMISSIBILITY OF EVIDENCE OF SIMILAR CRIMES IN SEX OFFENSE CASES.

(a) The Federal Rules of Evidence are amended by adding after Rule 412 the following new rules:

<< 28 USCA RULES FRE Rule 413 >>

"Rule 413. Evidence of Similar Crimes in Sexual Assault Cases

  "(a) In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant.
  "(b) In a case in which the Government intends to offer evidence under this rule, the attorney for the Government shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen days before the scheduled date of trial or at such later time as the court may allow for good cause.
  "(c) This rule shall not be construed to limit the admission or consideration of evidence under any other rule.
  "(d) For purposes of this rule and Rule 415, "offense of sexual assault" means a crime under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved—
    "(1) any conduct proscribed by chapter 109A of title 18, United States Code;
    "(2) contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person;
    "(3) contact, without consent, between the genitals or anus of the defendant and any part of another person's body;
    "(4) deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person; or
    "(5) an attempt or conspiracy to engage in conduct described in paragraphs (1)–(4).

<< 28 USCA RULES FRE Rule 414 >>

"Rule 414. Evidence of Similar Crimes in Child Molestation Cases

  "(a) In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.
  "(b) In a case in which the Government intends to offer evidence under this rule, the attorney for the Government shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen days before the scheduled date of trial or at such later time as the court may allow for good cause.
  "(c) This rule shall not be construed to limit the admission or consideration of evidence under any other rule.
  "(d) For purposes of this rule and Rule 415, "child" means a person below the age of fourteen, and "offense of child molestation" means a crime under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved—
    "(1) any conduct proscribed by chapter 109A of title 18, United States Code, that was committed in relation to a child;
    "(2) any conduct proscribed by chapter 110 of title 18, United States Code;
    "(3) contact between any part of the defendant's body or an object and the genitals or anus of a child;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(4) contact between the genitals or anus of the defendant and any part of the body of a child;

"(5) deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on a child; or

"(6) an attempt or conspiracy to engage in conduct described in paragraphs (1)–(5).

<< 28 USCA FRE Rule 415 >>

"Rule 415. Evidence of Similar Acts in Civil Cases Concerning Sexual Assault or Child Molestation

"(a) In a civil case in which a claim for damages or other relief is predicated on a party's alleged commission of conduct constituting an offense of sexual assault or child molestation, evidence of that party's commission of another offense or offenses of sexual assault or child molestation is admissible and may be considered as provided in Rule 413 and Rule 414 of these rules.

"(b) A party who intends to offer evidence under this Rule shall disclose the evidence to the party against whom it will be offered, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen days before the scheduled date of trial or at such later time as the court may allow for good cause.

"(c) This rule shall not be construed to limit the admission or consideration of evidence under any other rule."

<< 28 USCA RULES FRE Rule 413 NOTE >>

(b) IMPLEMENTATION.—The amendments made by subsection (a) shall become effective pursuant to subsection (d).

(c) RECOMMENDATIONS BY JUDICIAL CONFERENCE.—Not later than 150 days after the date of enactment of this Act, the Judicial Conference of the United States shall transmit to Congress a report containing recommendations for amending the Federal Rules of Evidence as they affect the admission of evidence of a defendant's prior sexual assault or child molestation crimes in cases involving sexual assault and child molestation. The Rules Enabling Act shall not apply to the recommendations made by the Judicial Conference pursuant to this section.

(d) CONGRESSIONAL ACTION.—

(1) If the recommendations described in subsection (c) are the same as the amendment made by subsection (a), then the amendments made by subsection (a) shall become effective 30 days after the transmittal of the recommendations.

(2) If the recommendations described in subsection (c) are different than the amendments made by subsection (a), the amendments made by subsection (a) shall become effective 150 days after the transmittal of the recommendations unless otherwise provided by law.

(3) If the Judicial Conference fails to comply with subsection (c), the amendments made by subsection (a) shall become effective 150 days after the date the recommendations were due under subsection (c) unless otherwise provided by law.

(e) APPLICATION.—The amendments made by subsection (a) shall apply to proceedings commenced on or after the effective date of such amendments.

TITLE XXXIII—TECHNICAL CORRECTIONS

SEC. 330001. AMENDMENTS RELATING TO FEDERAL FINANCIAL ASSISTANCE FOR LAW ENFORCEMENT.

<< 42 USCA § 3756 >>

(a) CROSS REFERENCE CORRECTIONS.—Section 506 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3756) is amended—

(1) in subsection (a) by striking "Of" and inserting "Subject to subsection (f), of";

(2) in subsection (c) by striking "subsections (b) and (c)" and inserting "subsection (b)";

(3) in subsection (e) by striking "or (e)" and inserting "or (f)"; and

(4) in subsection (f)(1)—

(A) in subparagraph (A)—

(i) by striking ", taking into consideration subsection (e) but"; and

(ii) by striking "this subsection," and inserting "this subsection"; and

(B) in subparagraph (B) by striking "amount" and inserting "funds".

<< 42 USCA § 3762a >>

(b) CORRECTIONAL OPTIONS GRANTS.—(1) Section 515(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended—

(A) by striking "subsection (a)(1) and (2)" and inserting "paragraphs (1) and (2) of subsection (a)"; and

(B) in paragraph (2) by striking "States" and inserting "public agencies".

<< 42 USCA § 3762b >>

(2) Section 516 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended—

(A) in subsection (a) by striking "for section" each place it appears and inserting "shall be used to make grants under section"; and

(B) in subsection (b) by striking "section 515(a)(1) or (a)(3)" and inserting "paragraph (1) or (3) of section 515(a)".

<< 42 USCA § 3793 >>

(3) Section 1001(a)(5) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3793(a)(5)) is amended by inserting "(other than chapter B of subpart 2)" after "and E".

<< 42 USCA § 3783 >>

(c) DENIAL OR TERMINATION OF GRANT.—Section 802(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3783(b)) is amended by striking "M,," and inserting "M,".

<< 42 USCA § 3791 >>

(d) DEFINITIONS.—Section 901(a)(21) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3791(21)) is amended by adding a semicolon at the end.

(e) PUBLIC SAFETY OFFICERS DISABILITY BENEFITS.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796) is amended—

<< 42 USCA § 3796 >>

(1) in section 1201—

(A) in subsection (a) by striking "subsection (g)" and inserting "subsection (h),"; and

(B) in subsection (b)—

(i) by striking "subsection (g)" and inserting "subsection (h)";

(ii) by striking "personal"; and

(iii) in the first proviso by striking "section" and inserting "subsection"; and

<< 42 USCA § 3796b >>

(2) in section 1204(3) by striking "who was responding to a fire, rescue or police emergency".

<< 42 USCA Ch. 46 >>

(f) HEADINGS.—(1) The heading for part M of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3797) is amended to read as follows:

"Part M—REGIONAL INFORMATION SHARING SYSTEMS".

(2) The heading for part O of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3797) is amended to read as follows:

"PART O—RURAL DRUG ENFORCEMENT".

(g) TABLE OF CONTENTS.—The table of contents of title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended—

(1) in the item relating to section 501 by striking "Drug Control and System Improvement Grant" and inserting "drug control and system improvement grant";

(2) in the item relating to section 1403 by striking "Application" and inserting "Applications"; and

(3) in the items relating to part O by redesignating sections 1401 and 1402 as sections 1501 and 1502, respectively.

(h) OTHER TECHNICAL AMENDMENTS.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 is amended—

<< 42 USCA § 3722 >>

(1) in section 202(c)(2)(E) by striking "crime,," and inserting "crime,";

<< 42 USCA § 3732 >>

(2) in section 302(c)(19) by striking a period at the end and inserting a semicolon;

<< 42 USCA § 3769a >>

(3) in section 602(a)(1) by striking "chapter 315" and inserting "chapter 319";

<< 42 USCA § 3769b >>

(4) in section 603(a)(6) by striking "605" and inserting "606";

<< 42 USCA § 3769c >>

(5) in section 605 by striking "this section" and inserting "this part";

<< 42 USCA § 3769d >>

(6) in section 606(b) by striking "and Statistics" and inserting "Statistics";

<< 42 USCA § 3782 >>

(7) in section 801(b)—

(A) by striking "parts D," and inserting "parts";

(B) by striking "part D" each place it appears and inserting "subpart 1 of part E";

(C) by striking "403(a)" and inserting "501"; and

(D) by striking "403" and inserting "503";

<< 42 USCA § 3783 >>

(8) in the first sentence of section 802(b) by striking "part D," and inserting "subpart 1 of part E or under part";

<< 42 USCA § 3785 >>

(9) in the second sentence of section 804(b) by striking "Prevention or" and inserting "Prevention, or";

<< 42 USCA § 3789 >>

(10) in section 808 by striking "408, 1308," and inserting "507";

<< 42 USCA § 3789d >>

(11) in section 809(c)(2)(H) by striking "805" and inserting "804";

<< 42 USCA § 3789f >>

(12) in section 811(e) by striking "Law Enforcement Assistance Administration" and inserting "Bureau of Justice Assistance";

<< 42 USCA § 3791 >>

(13) in section 901(a)(3) by striking "and," and inserting ", and";

<< 42 USCA § 3793 >>

(14) in section 1001(c) by striking "parts" and inserting "part".

<< 18 USCA § 4351 >>

 (i) CONFORMING AMENDMENT TO OTHER LAW.—Section 4351(b) of title 18, United States Code, is amended by striking "Administrator of the Law Enforcement Assistance Administration" and inserting "Director of the Bureau of Justice Assistance".

SEC. 330002. GENERAL TITLE 18 CORRECTIONS.

<< 18 USCA § 1031 >>

 (a) SECTION 1031.—Section 1031(g)(2) of title 18, United States Code, is amended by striking "a government" and inserting "a Government".

<< 18 USCA § 208 >>

 (b) SECTION 208.—Section 208(c)(1) of title 18, United States Code, is amended by striking "Banks" and inserting "banks".

<< 18 USCA § 1007 >>

 (c) SECTION 1007.—The heading for section 1007 of title 18, United States Code, is amended by striking "Transactions" and inserting "transactions".

<< 18 USCA § 1014 >>

 (d) SECTION 1014.—Section 1014 of title 18, United States Code, is amended by striking the comma that follows a comma.

<< 18 USCA § 3293 >>

 (e) ELIMINATION OF OBSOLETE CROSS REFERENCE.—Section 3293 of title 18, United States Code, is amended by striking "1008,".

<< 18 USCA § 1031 >>

 (f) ELIMINATION OF DUPLICATE SUBSECTION DESIGNATION.—Section 1031 of title 18, United States Code, is amended by redesignating the second subsection (g) as subsection (h).

<< 18 USCA Ch. 1 >>

(g) TECHNICAL AMENDMENT TO PART ANALYSIS FOR PART I.—The item relating to chapter 33 in the part analysis for part I of title 18, United States Code, is amended by striking "701" and inserting "700".

<< 18 USCA § 924 >>

(h) AMENDMENT TO SECTION 924(a)(1)(B).—Section 924(a)(1)(B) of title 18, United States Code, is amended by striking "(q)" and inserting "(r)".

<< 18 USCA § 207 >>

(i) PUNCTUATION CORRECTION.—Section 207(c)(2)(A)(ii) of title 18, United States Code, is amended by striking the semicolon at the end and inserting a comma.

<< 18 USCA Ch. 223 >>

(j) CHAPTER ANALYSIS CORRECTION.—The chapter analysis for chapter 223 of title 18, United States Code, is amended by adding at the end the following:
  "3509. Child Victims' and child witnesses' rights.".

<< 18 USCA § 3742 >>

(k) Elimination of Superfluous Comma.—Section 3742(b) of title 18, United States Code, is amended by striking "Government," and inserting "Government".

SEC. 330003. CORRECTIONS OF ERRONEOUS CROSS REFERENCES AND MISDESIGNATIONS.

<< 18 USCA § 1791 >>

(a) SECTION 1791 OF TITLE 18.—Section 1791(b) of title 18, United States Code, is amended by striking "(c)" each place it appears and inserting "(d)".

<< 18 USCA § 2703 >>

(b) SECTION 2703 OF TITLE 18.—Section 2703(d) of title 18, United States Code, is amended by striking "section 3126(2)(A)" and inserting "section 3127(2)(A)".

<< 18 USCA § 666 >>

(c) SECTION 666 OF TITLE 18.—Section 666(d) of title 18, United States Code, is amended—
  (1) by redesignating the second paragraph (4) as paragraph (5);
  (2) by striking "and" at the end of paragraph (3); and
  (3) by striking the period at the end of paragraph (4) and inserting "; and".

<< 18 USCA § 4247 >>

(d) SECTION 4247 OF TITLE 18.—Section 4247(h) of title 18, United States Code, is amended by striking "subsection (e) of section 4241, 4243, 4244, 4245, or 4246," and inserting "subsection (e) of section 4241, 4244, 4245, or 4246, or subsection (f) of section 4243,".

<< 21 USCA § 848 >>

(e) SECTION 408 OF THE CONTROLLED SUBSTANCES ACT.—Section 408(b)(2)(A) of the Controlled Substances Act (21 U.S.C. 848(b)(2)(A)) is amended by striking "subsection (d)(1)" and inserting "subsection (c)(1)".

<< 28 USCA § 994 >>

 (f) MARITIME DRUG LAW ENFORCEMENT ACT.—(1) Section 994(h) of title 28, United States Code, is amended by striking "section 1 of the Act of September 15, 1980 (21 U.S.C. 955a)" each place it appears and inserting "the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.)".

<< 18 USCA § 924 >>

 (2) Section 924(e) of title 18, United States Code, is amended by striking "the first section or section 3 of Public Law 96–350 (21 U.S.C. 955a et seq.)" and inserting "the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.)".

<< 12 USCA § 1833a NOTE >>

<< 12 USCA § 1833a >>

 (g) SECTION 2596 OF THE CRIME CONTROL ACT OF 1990.—Section 2596(d) of the Crime Control Act of 1990 is amended, effective retroactively to the date of enactment of such Act, by striking "951(c)(1)" and inserting "951(c)(2)".

<< 18 USCA APP. FRCRP Rule 46 >>

 (h) FEDERAL RULES OF CRIMINAL PROCEDURE.—Rule 46(i)(1) of the Federal Rules of Criminal Procedure for the United States Courts is amended by striking "18 U.S.C. § 3144" and inserting "18 U.S.C. § 3142".

SEC. 330004. REPEAL OF OBSOLETE PROVISIONS IN TITLE 18.

 Title 18, United States Code, is amended—

<< 18 USCA § 212 >>

 (1) in section 212 by striking "or of any National Agricultural Credit Corporation," and by striking "or National Agricultural Credit Corporations,";

<< 18 USCA § 213 >>

(2) in section 213 by striking "or examiner of National Agricultural Credit Corporations";

<< 18 USCA § 709 >>

(3) in section 709 by striking the seventh and thirteenth paragraphs;

<< 18 USCA § 711 >>

(4) in section 711 by striking the second paragraph;

<< 18 USCA § 754 >>

<< 18 USCA Ch. 35 >>

(5) by striking section 754 and amending the chapter analysis for chapter 35 by striking the item relating to section 754;

<< 18 USCA §§ 657, 1006 >>

(6) in sections 657 and 1006 by striking "Reconstruction Finance Corporation," and striking "Farmers' Home Corporation,";

AR.02145

<< 18 USCA § 658 >>

(7) in section 658 by striking "Farmers' Home Corporation,";

<< 18 USCA § 1013 >>

(8) in section 1013 by striking ", or by any National Agricultural Credit Corporation";

<< 18 USCA § 1160 >>

(9) in section 1160 by striking "white person" and inserting "non-Indian";

<< 18 USCA § 1698 >>

(10) in section 1698 by striking the second paragraph;

<< 18 USCA §§ 1904, 1908 >>

<< 18 USCA Ch. 93 >>

(11) by striking sections 1904 and 1908 and amending the chapter analysis for chapter 93 by striking the items relating to those sections;

<< 18 USCA § 1909 >>

(12) in section 1909 by inserting "or" before "farm credit examiner" and by striking "or an examiner of National Agricultural Credit Corporations,";

<< 18 USCA §§ 2157, 2391 >>

<< 18 USCA Chs. 105, 115 >>

(13) by striking sections 2157 and 2391 and amending the chapter analysis for chapter 105 and for 115, respectively, by striking the items relating to those sections;

<< 18 USCA § 2257 >>

(14) in section 2257 by striking the subsections (f) and (g) that were enacted by Public Law 100–690;

<< 18 USCA § 3113 >>

(15) in section 3113 by striking the third paragraph;

<< 18 USCA § 3281 >>

(16) in section 3281 by striking "except for offenses barred by the provisions of law existing on August 4, 1939";

<< 18 USCA § 443 >>

(17) in section 443 by striking "or (3) five years after 12 o'clock noon of December 31, 1946,";

<< 18 USCA §§ 542, 544, 545 >>

(18) in sections 542, 544, and 545 by striking "the Philippine Islands,"; and

<< 18 USCA § 1073 >>

(19) in section 1073—
  (A) by striking "or which, in the case of New Jersey, is a high misdemeanor under the laws of said State,"; and
  (B) by striking "or which in the case of New Jersey, is a high misdemeanor under the laws of said State,".

<< 15 USCA § 78dd–2 >>

SEC. 330005. CORRECTION OF DRAFTING ERROR IN THE FOREIGN CORRUPT PRACTICES ACT.

 Section 104(a)(3) of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd–2) is amended by striking "issuer" and inserting "domestic concern".

<< 18 USCA § 1116 >>

SEC. 330006. ELIMINATION OF REDUNDANT PENALTY PROVISION IN 18 U.S.C. 1116.

 Section 1116(a) of title 18, United States Code, is amended by striking ", and any such person who is found guilty of attempted murder shall be imprisoned for not more than twenty years".

<< 18 USCA § 1864 >>

SEC. 330007. ELIMINATION OF REDUNDANT PENALTY.

 Section 1864(c) of title 18, United States Code, is amended by striking "(b) (3), (4), or (5)" and inserting "(b)(5)".

SEC. 330008. CORRECTIONS OF MISSPELLINGS AND GRAMMATICAL ERRORS.

 Title 18, United States Code, is amended—

<< 18 USCA § 513 >>

 (1) in section 513(c)(4) by striking "association or persons" and inserting "association of persons";

<< 18 USCA § 1956 >>

 (2) in section 1956(e) by striking "Evironmental" and inserting "Environmental";

<< 18 USCA § 3125 >>

 (3) in section 3125—
  (A) in subsection (a)(2) by striking "use" and the quotation mark that immediately follows it and inserting "use;";
  (B) by realigning the matter in subsection (a)(2) that begins with "may have installed" and ends with "section 3123 of this title" so that it is flush to the left margin; and
  (C) by striking "provider for" and inserting "provider of" in subsection (d);

<< 18 USCA § 3731 >>

 (4) in section 3731 by striking "order of a district courts" and inserting "order of a district court" in the second undesignated paragraph;

<< 18 USCA § 151 >>

 (5) in section 151 by striking "mean" and inserting "means";

<< 18 USCA § 208 >>

(6) in section 208(b) by inserting "if" after "(4)";

<< 18 USCA § 209 >>

(7) in section 209(d) by striking "under the terms of the chapter 41" and inserting "under the terms of chapter 41";

<< 18 USCA § 1014 >>

(8) in section 1014 by inserting a comma after "National Credit Union Administration Board"; and

<< 18 USCA § 3291 >>

(9) in section 3291 by striking "the afore-mentioned" and inserting "such".

SEC. 330009. OTHER TECHNICAL AMENDMENTS.

<< 21 USCA § 860 >>

 (a) SECTION 419 OF CONTROLLED SUBSTANCES ACT.—Section 419(b) of the Controlled Substances Act (21 U.S.C. 860(b)) is amended by striking "years Penalties" and inserting "years. Penalties".

<< 18 USCA § 667 >>

 (b) SECTION 667.—Section 667 of title 18, United States Code, is amended by adding at the end the following: "The term 'livestock' has the meaning set forth in section 2311 of this title.".

<< 18 USCA § 1114 >>

 (c) SECTION 1114.—Section 1114 of title 18, United States Code, is amended by striking "or any other officer, agency, or employee of the United States" and inserting "or any other officer or employee of the United States or any agency thereof".

<< 21 USCA § 848 >>

 (d) Section 408 of Controlled Substances Act.—Section 408(q)(8) of the Controlled Substances Act (21 U.S.C. 848(q)(8)) is amended by striking "applications, for writ" and inserting "applications for writ".

SEC. 330010. CORRECTION OF ERRORS FOUND DURING CODIFICATION.

 Title 18, United States Code, is amended—

<< 18 USCA § 212 >>

(1) in section 212 by striking "218" and inserting "213";

<< 18 USCA § 1917 >>

(2) in section 1917—
  (A) by striking "Civil Service Commission" and inserting "Office of Personnel Management"; and
  (B) by striking "the Commission" in paragraph (1) and inserting "such Office";

<< 18 USCA Chs. 227, 229 >>

(3) by transferring the subchapter analysis for each subchapter of each of chapters 227 and 229 to follow the heading of that subchapter;

<< 18 USCA § 1170 >>

(4) so that the heading of section 1170 reads as follows:

"§ 1170. Illegal trafficking in Native American human remains and cultural items";

<< 18 USCA Ch. 53 >>

(5) so that the item relating to section 1170 in the chapter analysis for chapter 53 reads as follows:

"1170. Illegal trafficking in Native American human remains and cultural items.";

<< 18 USCA § 3509 >>

(6) in section 3509(a) by striking paragraph (11) and redesignating paragraphs (12) and (13) as paragraphs (11) and (12), respectively;

(7) in section 3509—
  (A) by striking "subdivision" each place it appears and inserting "subsection"; and
  (B) by striking "government" each place it appears and inserting "Government";

<< 18 USCA § 2252 >>

(8) in section 2252(a)(3)(B) by striking "materails" and inserting "materials";

<< 18 USCA § 14 >>

(9) in section 14 by striking "45," and "608, 611, 612,";

<< 18 USCA § 3059A >>

(10) in section 3059A—
  (A) in subsection (b) by striking "this subsection" and inserting "subsection"; and
  (B) in subsection (c) by striking "this subsection" and inserting "subsection";

<< 18 USCA § 1761 >>

(11) in section 1761(c)—
  (A) by striking "and" at the end of paragraph (1);
  (B) by inserting "and" at the end of paragraph (3); and
  (C) by striking the period at the end of paragraph (2)(B) and inserting a semicolon;

<< 18 USCA Ch. 11 >>

(12) in the chapter analysis for chapter 11—
  (A) in the item relating to section 203 by inserting a comma after "officers" and by striking the comma after "others"; and
  (B) in the item relating to section 204 by inserting "the" before "United States Court of Appeals for the Federal Circuit";

<< 18 USCA Ch. 23 >>

(13) in the chapter analysis for chapter 23, in the item relating to section 437, by striking the period immediately following "Indians";

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA Ch. 25 >>

(14) in the chapter analysis for the beginning of chapter 25, in the item relating to section 491, by striking the period immediately following "paper used as money";

<< 18 USCA § 207 >>

(15) in section 207(a)(3) by striking "Clarification of Restrictions" and inserting "Clarification of restrictions";

<< 18 USCA § 176 >>

(16) in section 176 by striking "the government" and inserting "the Government";

<< 18 USCA § 3059A >>

(17) in section 3059A(e)(2)(iii) by striking "backpay" and inserting "back pay"; and

<< 18 USCA Ch. 203 >>

(18) by adding a period at the end of the item relating to section 3059A in the chapter analysis for chapter 203.

SEC. 330011. PROBLEMS RELATED TO EXECUTION OF PRIOR AMENDMENTS.

<< 18 USCA Ch. 203 >>

(a) INCORRECT REFERENCE.—Section 2587(b) of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "The chapter heading for" and inserting "The chapter analysis for".

<< 18 USCA § 201 NOTE >>

(b) LACK OF PUNCTUATION IN STRICKEN LANGUAGE.—Section 46(b) of the Criminal Law and Procedure Technical Amendments Act of 1986 is amended, effective as of the date on which that section took effect, so that—

<< 18 USCA § 201 >>

(A) in paragraph (1), the matter proposed to be stricken from the beginning of section 201(b) of title 18, United States Code, reads "(b) Whoever, directly"; and

(B) in paragraph (2), a comma, rather than a semicolon, appears after "his lawful duty" in the matter to be stricken from paragraph (3) of section 201(b) of that title.

<< 18 USCA § 2516 >>

<< 18 USCA § 2516 NOTE >>

(c) BIOLOGICAL WEAPONS.—(1) Section 3(b) of the Biological Weapons Anti-Terrorism Act of 1989 is amended, effective as of the date on which that section took effect, by striking "2516(c)" and inserting "2516(1)(c)".

<< 18 USCA Ch. 1 >>

(2) The item in the part analysis for part I of title 18, United States Code, that relates to chapter 10 is amended by striking "Weapons" and inserting "weapons".

<< 18 USCA Ch. 10 >>

<< 18 USCA § 1169 >>

<< 18 USCA § 1169 NOTE >>

(d) PLACEMENT OF NEW SECTION.—Section 404(a) of Public Law 101–630 is amended, effective on the date such section took effect, by striking "adding at the end thereof" each place it appears and inserting "inserting after section 1169".

<< 18 USCA § 3509 >>

<< 18 USCA § 3509 NOTE >>

(e) ELIMINATION OF ERRONEOUS CHARACTERIZATION OF MATTER INSERTED.—Section 225(a) of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "new rule".

<< 18 USCA § 402 >>

<< 18 USCA § 402 NOTE >>

(f) CLARIFICATION OF PLACEMENT OF AMENDMENT.—Section 1205(c) of Public Law 101–647 is amended, effective as of the date on which that section took effect, by inserting "at the end" after "adding".

<< 18 USCA § 1114 >>

<< 18 USCA § 1114 NOTE >>

(g) ELIMINATION OF DUPLICATE AMENDMENT.—Section 1606 of Public Law 101–647 (amending section 1114 of title 18, United States Code) is repealed effective as of the date of enactment of that section.

<< 18 USCA § 3 >>

<< 18 USCA § 3 NOTE >>

(h) ERROR IN AMENDMENT PHRASING.—Section 3502 of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "10" and inserting "ten".

<< 18 USCA §§ 922, 923, 924 >>

<< 18 USCA §§ 922 NOTE, 923 nt, 924 nt >>

(i) CLARIFICATION THAT AMENDMENTS WERE TO TITLE 18.—Sections 3524, 3525, and 3528 of Public Law 101–647 are each amended, effective as of the date on which those sections took effect, by inserting "of title 18, United States Code" before "is amended".

<< 18 USCA § 924 >>

<< 18 USCA § 924 NOTE >>

(j) CORRECTION OF PARAGRAPH REFERENCE.—Section 3527 of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "4th" and inserting "5th".

<< 18 USCA § 1345 >>

<< 18 USCA § 1345 NOTE >>

(k) REPEAL OF OBSOLETE TECHNICAL CORRECTION TO SECTION 1345.—Section 3542 of Public Law 101–647 is repealed, effective as of the date of its enactment.

<< 18 USCA § 1956 >>

<< 18 USCA § 1956 NOTE >>

(l) REPEAL OF OBSOLETE TECHNICAL CORRECTION TO SECTION 1956.—Section 3557(2)(E) of Public Law 101–647 is repealed, effective as of the date of its enactment.

<< 18 USCA §§ 2253 NOTE, 2254 nt >>

(m) CLARIFICATION OF PLACEMENT OF AMENDMENTS.—Public Law 101–647 is amended, effective as of the date of its enactment—

<< 18 USCA § 2253 >>

(1) in section 3564(1) by inserting "each place it appears" after the quotation mark following "2251" the first place it appears; and

<< 18 USCA § 2254 >>

(2) in section 3565(3)(A) by inserting "each place it appears" after the quotation mark following "subchapter".

<< 18 USCA Ch. 227 >>

(n) CORRECTION OF WORD QUOTED IN AMENDMENT.—Section 3586(1) of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "fines" and inserting "fine".

<< 18 USCA § 4013 >>

<< 18 USCA § 4013 NOTE >>

(o) ELIMINATION OF OBSOLETE TECHNICAL AMENDMENT TO SECTION 4013.—Section 3599 of Public Law 101–647 is repealed, effective as of the date of its enactment.

<< 18 USCA § 1546 >>

<< 18 USCA § 1546 NOTE >>

(p) CORRECTION OF DIRECTORY LANGUAGE.—Section 3550 of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "not more than".

<< 18 USCA § 2516 >>

<< 18 USCA § 2516 NOTE >>

(q) REPEAL OF DUPLICATE PROVISIONS.—(1) Section 3568 of Public Law 101–647 is repealed, effective as of the date on which that section took effect.

<< 18 USCA § 3289 >>

<< 18 USCA § 3289 NOTE >>

(2) Section 1213 of Public Law 101–647 is repealed, effective as of the date on which that section took effect.

<< 18 USCA § 2516 >>

<< 18 USCA § 2516 NOTE >>

(r) CORRECTION OF WORDS QUOTED IN AMENDMENT.—Section 2531(3) of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "1679(c)(2)" and inserting "1679a(c)(2)".

<< 18 USCA § 982 >>

<< 18 USCA § 982 NOTE >>

(s) FORFEITURE.—(1) Section 1401 of Public Law 101–647 is amended, effective as of the date on which that section took effect—

<< 18 USCA § 982 >>

(A) by inserting a comma after ", 5316"; and
(B) by inserting "the first place it appears" after the quotation mark following "5313(a)".

<< 18 USCA § 981 >>

<< 18 USCA § 981 NOTE >>

(2) Section 2525(a)(2) of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "108(3)" and inserting "2508(3)".

<< 18 USCA § 1956 >>

SEC. 330012. AMENDMENT TO SECTION 1956 OF TITLE 18 TO ELIMINATE DUPLICATE PREDICATE CRIMES.

Section 1956 of title 18, United States Code, is amended in subsection (c)(7)(E), by striking the period that follows a period.

SEC. 330013. AMENDMENTS TO PART V OF TITLE 18.

Part V of title 18, United States Code, is amended—

<< 18 USCA Ch. 601 >>

(1) by inserting after the heading for that part the following:

"CHAPTER 601—IMMUNITY OF WITNESSES";

<< 18 USCA § 6001 >>

(2) in section 6001(1)—
(A) by striking "Atomic Energy Commission" and inserting "Nuclear Regulatory Commission"; and
(B) by striking "the Subversive Activities Control Board,"
(3) by striking "part" the first place it appears and inserting "chapter"; and

<< 18 USCA §§ 6002, 6003, 6004, 6005 >>

(4) by striking "part" each other place it appears and inserting "title".

<< 21 USCA § 848 >>

SEC. 330014. UPDATE OF CROSS REFERENCE.

Section 408(n)(11) of the Controlled Substances Act is amended by striking "section 405" and inserting "section 418".

<< 21 USCA § 333 >>

<< 21 USCA § 333 NOTE >>

SEC. 330015. CORRECTION OF ERROR IN AMENDATORY LANGUAGE.

Section 1904 of Public Law 101–647 is amended, effective as of the date on which that section took effect, by striking "by inserting a new subsection (e) as follows" and inserting "so that subsection (e) reads as follows".

SEC. 330016. CORRECTION OF MISLEADING AND OUTMODED FINE AMOUNTS IN OFFENSES UNDER TITLE 18.

Title 18, United States Code, is amended—

<< 18 USCA §§ 1693, 1694, 1695, 1696 >>

(1)(A) in sections 1693, 1694, 1695, and 1696 by striking "not more than $50" and inserting "under this title";

<< 18 USCA §§ 333, 489, 754, 1303, 1699, 1701, 1703, 1710, 1723, 1726, 1730, 2390 >>

(B) in sections 333, 489, 754, 1303, 1699, 1701, 1703, 1710, 1723, 1726, 1730, and 2390 by striking "not more than $100" and inserting "under this title";

<< 18 USCA §§ 1697, 1698 >>

(C) in sections 1697 and 1698 by striking "not more than $150" and inserting "under this title";

<< 18 USCA §§ 1165, 2279 >>

(D) in sections 1165 and 2279 by striking "not more than $200" and inserting "under this title";

<< 18 USCA §§ 701, 702, 703, 704, 705, 706, 707, 708, 710, 711, 711a, 713, 715, 1164, 1858 >>

(E) in sections 701, 702, 703, 704, 705, 706, 707, 708, 710, 711, 711a, 713, 715, 1164, and 1858 by striking "not more than $250" each place it appears and inserting "under this title";

<< 18 USCA §§ 916, 1501, 1502, 1719, 1725, 1861 >>

(F) in sections 916, 1501, 1502, 1719, 1725, and 1861 by striking "not more than $300" and inserting "under this title";

<< 18 USCA §§ 4, 41, 42, 46, 47, 112, 154, 244, 288, 290, 336, 475, 501, 502, 755, 872, 875, 876, 877, 917, 1013, 1018, 1024, 1154, 1155, 1156, 1382, 1541, 1700, 1703, 1704, 1707, 1712, 1713, 1720, 1721, 1722, 1729, 1731, 1734, 1752, 1793, 1856, 1857, 1863, 1912, 1913, 1922, 2074, 2195, 2511 >>

(G) in sections 4, 41, 42, 46, 47, 112, 154, 244, 288, 290, 336, 475, 501, 502, 755, 872, 875, 876, 877, 917, 1013, 1018, 1024, 1154, 1155, 1156, 1382, 1541, 1700, 1703, 1704, 1707, 1712, 1713, 1720, 1721, 1722, 1729, 1731, 1734, 1752, 1793, 1856, 1857, 1863, 1912, 1913, 1922, 2074, 2195, and 2511 by striking "not more than $500" each place it appears and inserting "under this title";

<< 18 USCA §§ 81, 210, 211, 215, 217, 242, 245, 291, 292, 439, 442, 480, 483, 484, 490, 491, 494, 495, 503, 507, 510, 594, 595, 596, 597, 598, 599, 604, 605, 641, 643, 645, 646, 647, 648, 649, 650, 651, 652, 653, 654, 655, 656, 657, 658, 659, 661, 662, 665, 712, 751, 752, 756, 795, 796, 797, 836, 844, 871, 875, 876, 877, 879, 911, 912, 913, 924, 957, 959, 961, 1003, >>

1012, 1021, 1025, 1026, 1071, 1112, 1163, 1262, 1263, 1264, 1301, 1302, 1304, 1306, 1341, 1342, 1343, 1361, 1363, 1384, 1504, 1508, 1509, 1657, 1705, 1706, 1707, 1711, 1715, 1716, 1733, 1738, 1761, 1762, 2276, 2277, 2278, 2382, 2389 >>

(H) in sections 81, 210, 211, 215, 217, 242, 245, 291, 292, 439, 442, 480, 483, 484, 490, 491, 494, 495, 503, 507, 510, 594, 595, 596, 597, 598, 599, 604, 605, 641, 643, 645, 646, 647, 648, 649, 650, 651, 652, 653, 654, 655, 656, 657, 658, 659, 661, 662, 665, 712, 751, 752, 756, 795, 796, 797, 836, 844, 871, 875, 876, 877, 879, 911, 912, 913, 924, 957, 959, 961, 1003, 1012, 1021, 1025, 1026, 1071, 1112, 1163, 1262, 1263, 1264, 1301, 1302, 1304, 1306, 1341, 1342, 1343, 1361, 1363, 1384, 1504, 1508, 1509, 1657, 1705, 1706, 1707, 1711, 1715, 1716, 1733, 1738, 1761, 1762, 2276, 2277, 2278, 2382, and 2389 by striking "not more than $1,000" each place it appears and inserting "under this title";

<< 18 USCA §§ 331, 482, 486, 499, 755, 873, 958, 1016, 1154, 1156, 1381, 1542, 1543, 1544, 1545, 1586, 1621, 1622, 1702, 1708, 1709, 1920, 1921, 1923, 2071, 2193, 2233, 2386, 2424 >>

(I) in sections 331, 482, 486, 499, 755, 873, 958, 1016, 1154, 1156, 1381, 1542, 1543, 1544, 1545, 1586, 1621, 1622, 1702, 1708, 1709, 1920, 1921, 1923, 2071, 2193, 2233, 2386, and 2424 by striking "not more than $2,000" each place it appears and inserting "under this title";

<< 18 USCA §§ 431, 432, 479, 960, 1859, 1901, 1911, 1959 >>

(J) in sections 431, 432, 479, 960, 1859, 1901, 1911, and 1959 by striking "not more than $3,000" and inserting "under this title";

<< 18 USCA §§ 35, 81, 112, 152, 153, 155, 212, 213, 214, 285, 334, 351, 435, 436, 438, 471, 472, 473, 476, 477, 478, 481, 485, 487, 488, 497, 498, 505, 506, 508, 509, 541, 542, 543, 544, 546, 547, 548, 549, 550, 551, 552, 592, 593, 602, 603, 606, 607, 642, 655, 658, 659, 660, 661, 663, 751, 799, 844, 872, 874, 875, 876, 877, 878, 914, 915, 924, 953, 954, 956, 1004, 1010, 1011, 1015, 1017, 1025, 1028, 1071, 1073, 1074, 1163, 1169, 1231, 1265, 1363, 1421, 1422, 1423, 1424, 1425, 1426, 1427, 1428, 1429, 1461, 1462, 1463, 1465, 1503, 1505, 1506, 1507, 1510, 1581, 1582, 1583, 1584, 1585, 1588, 1658, 1659, 1717, 1732, 1735, 1737, 1751, 1906, 1907, 1908, 1909, 1915, 1991, 2072, 2073, 2113, 2117, 2152, 2197, 2231, 2244, 2314, 2316, 2317, 2344, 2701 >>

(K) in sections 35, 81, 112, 152, 153, 155, 212, 213, 214, 285, 334, 351, 435, 436, 438, 471, 472, 473, 476, 477, 478, 481, 485, 487, 488, 497, 498, 505, 506, 508, 509, 541, 542, 543, 544, 546, 547, 548, 549, 550, 551, 552, 592, 593, 602, 603, 606, 607, 642, 655, 658, 659, 660, 661, 663, 751, 799, 844, 872, 874, 875, 876, 877, 878, 914, 915, 924, 953, 954, 956, 1004, 1010, 1011, 1015, 1017, 1025, 1028, 1071, 1073, 1074, 1163, 1169, 1231, 1265, 1363, 1421, 1422, 1423, 1424, 1425, 1426, 1427, 1428, 1429, 1461, 1462, 1463, 1465, 1503, 1505, 1506, 1507, 1510, 1581, 1582, 1583, 1584, 1585, 1588, 1658, 1659, 1717, 1732, 1735, 1737, 1751, 1906, 1907, 1908, 1909, 1915, 1991, 2072, 2073, 2113, 2217, 2152, 2197, 2231, 2244, 2314, 2316, 2317, 2344, and 2701 by striking "not more than $5,000" each place it appears and inserting "under this title";

<< 18 USCA §§ 33, 224, 231, 241, 245, 246, 286, 289, 332, 335, 337, 351, 371, 437, 440, 441, 493, 496, 500, 510, 545, 595, 599, 600, 601, 641, 664, 665, 667, 757, 792, 793, 798, 844, 892, 893, 894, 924, 952, 955, 962, 963, 964, 965, 966, 967, 970, 1001, 1002, 1003, 1019, 1020, 1022, 1023, 1027, 1082, 1084, 1115, 1202, 1361, 1362, 1364, 1365, 1385, 1461, 1462, 1464, 1587, 1623, 1654, 1656, 1735, 1737, 1751, 1902, 1903, 1904, 1910, 1951, 1952, 1953, 1954, 1958, 1992, 2101, 2113, 2153, 2154, 2155, 2156, 2231, 2232, 2271, 2274, 2275, 2314, 2315, 2383, 2386, 2387, 2388, 2512 >>

(L) in sections 33, 224, 231, 241, 245, 246, 286, 289, 332, 335, 337, 351, 371, 437, 440, 441, 493, 496, 500, 510, 545, 595, 599, 600, 601, 641, 664, 665, 667, 757, 792, 793, 798, 844, 892, 893, 894, 924, 952, 955, 962, 963, 964, 965, 966, 967, 970, 1001, 1002, 1003, 1019, 1020, 1022, 1023, 1027, 1082, 1084, 1115, 1202, 1361, 1362, 1364, 1365, 1385, 1461, 1462, 1464, 1587, 1623, 1654, 1656, 1735, 1737, 1751, 1902, 1903, 1904, 1910, 1951, 1952, 1953, 1954, 1958, 1992, 2101, 2113, 2153, 2154, 2155, 2156, 2231, 2232, 2271, 2274, 2275, 2314, 2315, 2383, 2386, 2387, 2388, and 2512 by striking "not more than $10,000" each place it appears and inserting "under this title";

AR.02155

<< 18 USCA § 1028 >>

(M) in section 1028 by striking "not more than $15,000" and inserting "under this title";

<< 18 USCA §§ 844, 878, 1728, 1955, 1958, 2321, 2384, 2385 >>

(N) in sections 844, 878, 1728, 1955, 1958, 2321, 2384, and 2385 by striking "not more than $20,000" each place it appears and inserting "under this title";

<< 18 USCA §§ 32, 114, 753, 1028, 1365, 1512, 1792, 2118 >>

(O) in sections 32, 114, 753, 1028, 1365, 1512, 1792, and 2118 by striking "not more than $25,000" each place it appears and inserting "under this title";

<< 18 USCA § 2118 >>

(P) in section 2118 by striking "not more than $35,000" and inserting "under this title";

<< 18 USCA §§ 1365, 1958, 2118 >>

(Q) in sections 1365, 1958, and 2118 by striking "not more than $50,000" and inserting "under this title";

<< 18 USCA § 951 >>

(R) in section 951 by striking "not more than $75,000" and inserting "under this title";

<< 18 USCA §§ 32, 1167, 1365, 2251, 2344 >>

(S) in sections 32, 1167, 1365, 2251, and 2344 by striking "not more than $100,000" each place it appears and inserting "under this title";

<< 18 USCA § 2251 >>

(T) in section 2251 by striking "not more than $200,000" and inserting "under this title"; and

<< 18 USCA §§ 1158, 1167, 1512, 1513, 2251, 2318, 2320, 2701 >>

(U) in sections 1158, 1167, 1512, 1513, 2251, 2318, 2320, and 2701 by striking "not more than $250,000" and inserting "under this title";

<< 18 USCA §§ 3, 373 >>

(2)(A) in sections 3 and 373 by inserting "(notwithstanding section 3571)" before "fined not more than one-half";

<< 18 USCA § 113 >>

(B) in section 113 by striking "fine of not more than" through the immediately following dollar amount each place it appears and inserting "a fine under this title";

<< 18 USCA §§ 115, 513, 709, 831, 1366, 1511, 1959 >>

(C) in sections 115, 513, 709, 831, 1366, 1511 and 1959 by striking "of not more than" through the immediately following dollar amount each place it appears and inserting "under this title";

<< 18 USCA § 201 >>

(D) in section 201 by inserting "under this title or" after "be fined"; and by inserting "whichever is greater," before "or imprisoned";

<< 18 USCA § 402 >>

(E) in section 402 by striking "fine" the first place it appears and inserting "a fine under this title";

<< 18 USCA § 443 >>

(F) in section 443 by striking "shall, if a corporation, be fined not more than $50,000, and, if a natural person, be fined not more than $10,000" and inserting "shall be fined under this title";

<< 18 USCA §§ 643, 644, 645, 647, 648, 649, 650, 651, 652, 653, 1711 >>

(G) in sections 643, 644, 645, 647, 648, 649, 650, 651, 652, 653, and 1711 by inserting "under this title or" after "be fined" the first place it appears; and by inserting ", whichever is greater," before "or imprisoned" the first place it appears;

<< 18 USCA §§ 646, 654 >>

(H) in sections 646 and 654 by inserting "under this title or" after "be fined" the first place it appears; and by inserting "whichever is greater," before "or imprisoned" the first place it appears;

<< 18 USCA § 1029 >>

(I) in section 1029 by striking "of not more than" through the immediately following dollar amount each place it appears and inserting "under this title"; and by inserting ", whichever is greater," before "or imprisonment" each place it appears;

<< 18 USCA § 2381 >>

(J) in section 2381 by inserting "under this title but" before "not less than $10,000"; and

<< 18 USCA § 3146 >>

(K) in section 3146(b)(1)(A)(iv) by striking "fine under this chapter" and inserting "fined under this title".

SEC. 330017. TECHNICAL CORRECTIONS TO TITLE 31 CRIMES.

(a) TITLE 31, U.S.C., AMENDMENTS.—

<< 31 USCA § 5321 >>

(1) Section 5321(a)(5)(A) of title 31, United States Code, is amended by inserting "any violation of" after "causing".

<< 31 USCA § 5324 >>

(2) Section 5324(a) of title 31, United States Code, is amended—
  (A) by striking "section 5313(a), section 5325, or the regulations issued thereunder or section 5325 or regulations prescribed under such section 5325" each place it appears and inserting "section 5313(a) or 5325 or any regulation prescribed under any such section"; and
  (B) by striking "with respect to such transaction".
(b) AMENDMENT RELATING TO TITLE 31, U.S.C.—

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 2181 of 3864

<< 31 USCA § 5318 >>

<< 31 USCA § 5318 NOTE >>

(1) Effective as of the date of enactment of the Annunzio-Wylie Anti-Money Laundering Act, section 1517(b) of that Act is amended by striking "5314" and inserting "5318".

<< 12 USCA § 93 >>

(2) Section 5239 of the Revised Statutes of the United States is amended by redesignating the second subsection (c) (as added by section 1502(a) of the Annunzio-Wylie Anti-Money Laundering Act) as subsection (d).

SEC. 330018. REPEAL OF SUPERFLUOUS STATUTE OF LIMITATION AND TRANSFER OF CHILD ABUSE STATUTE OF LIMITATION.

<< 18 USCA § 3283 >>

(a) IN GENERAL.—Section 3283 of title 18, United States Code, is amended to read as follows:

"§ 3283. Child abuse offenses

"No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25 years.".

<< 18 USCA § 3509 >>

(b) CONFORMING REPEAL.—Section 3509(k) of title 18, United States Code, is amended by striking the subsection heading and the first sentence and inserting "STAY OF CIVIL ACTION.—".

<< 18 USCA Ch. 213 >>

(c) TECHNICAL AMENDMENT.—The item in the chapter analysis for chapter 213 of title 18, United States Code, that relates to section 3283 is amended to read as follows:

"3283. Child abuse offenses.".

<< 18 USCA § 1956 >>

SEC. 330019. TECHNICAL ERRORS IN SECTION 1956.

(a) TECHNICAL CORRECTIONS.—Section 1956 of title 18, United States Code, is amended—
  (1) in subsection (c)(7)(B)(iii) by inserting a close parenthesis after "1978";
  (2) by redesignating the second subsection (g) as subsection (h); and
  (3) in subsection (a)(2) by inserting "not more than" before "$500,000".
(b) CROSS REFERENCE CORRECTION.—Section 1956(c)(7)(D) of title 18, United States Code, is amended by striking "section 9(c) of the Food Stamp Act of 1977" and inserting "section 15 of the Food Stamp Act of 1977".

<< 18 USCA § 1957 >>

SEC. 330020. TECHNICAL ERROR.

Section 1957(f)(1) of title 18, United States Code, is amended by striking the comma that follows a comma.

SEC. 330021. CONFORMING SPELLING OF VARIANTS OF "KIDNAP".

Title 18, United States Code, is amended—

<< 18 USCA Chs. 1, 18, 55, 84 >>

<< 18 USCA §§ 115, 351, 921, 1153, 1201, 1751, 1956, 1959, 1961, 2241, 2242, 2516, 3077, 4251 >>

<< 18 USCA § 3592 >>

(1) by striking "kidnaping" each place it appears and inserting "kidnapping"; and

<< 18 USCA §§ 876, 877, 1201 >>

(2) by striking "kidnaped" each place it appears and inserting "kidnapped".

<< 18 USCA § 2512 >>

SEC. 330022. MARGIN ERROR.

Section 2512(2) of title 18, United States Code, is amended by realigning the matter that begins with "to send through" and ends with "electronic communications" so that it is flush to the left margin.

SEC. 330023. TECHNICAL CORRECTIONS RELATING TO SECTION 248 OF TITLE 18, UNITED STATES CODE.

(a) IN GENERAL.—Chapter 13 of title 18, United States Code, is amended—

<< 18 USCA Ch. 13 >>

(1) in the chapter analysis so that the item relating to section 248 reads as follows:

"248. Freedom of access to clinic entrances.";

<< 18 USCA § 248 >>

(2) so that the heading of section 248 reads as follows:

"§ 248. Freedom of access to clinic entrances"; and

(3) in section 248(b) by inserting ", notwithstanding section 3571," before "be not more than $25,000".

<< 18 USCA § 248 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this subsection (a) shall take effect on the date of enactment of the Freedom of Access to Clinic Entrances Act of 1994.

SEC. 330024. TECHNICAL AMENDMENTS NECESSITATED BY THE ENACTMENT OF THE DOMESTIC CHEMICAL DIVERSION CONTROL ACT OF 1993.

<< 21 USCA § 802 >>

(a) MISSING CONJUNCTION.—Section 102(39)(A)(iv) of the Controlled Substances Act (21 U.S.C. 802(39)(A)(iv)) is amended by striking the period at the end and inserting "; or".

(b) PUNCTUATION AND INDENTATION CORRECTION.—Section 102(34) of the Controlled Substances Act is amended—

(1) by moving subparagraphs (V) and (W) two ems toward the left margin;

(2) in subparagraph (V) by striking "b" and inserting "B"; and

(3) in subparagraph (W) by striking "n" the first place it appears and inserting "N".

<< 21 USCA § 971 >>

(c) ERRONEOUS CROSS REFERENCES.—

(1) Section 5(a) of the Domestic Chemical Diversion Control Act of 1993 is amended by striking "section 1505(a)" and inserting "section 4".

(2) Section 9(b) of the Domestic Chemical Diversion Control Act of 1993 is amended by striking "Controlled Substances Act" and inserting "Controlled Substances Import and Export Act".

(d) CORRECTION OF AMENDATORY LANGUAGE.—

<< 21 USCA § 802 >>

(1) Section 2(a)(4)(B) of the Domestic Chemical Diversion Control Act of 1993 is amended by inserting "the first place it appears" before the semicolon.

<< 21 USCA § 960 >>

(2) Section 5(b)(3) of the Domestic Chemical Diversion Control Act of 1993 is amended by striking "at the end" and inserting "after paragraph (4)".

<< 21 USCA § 824 >>

(e) MISSING CONFORMING AMENDMENT.—Section 304(g) of the Controlled Substances Act is amended by inserting "or chemical" after "such substance" in the last sentence.

<< 21 USCA §§ 802 NOTE, 824 nt, 960 nt, 971 nt >>

(f) EFFECTIVE DATE.—The amendments made by this section shall take effect as of the date that is 120 days after the date of enactment of the Domestic Chemical Diversion Control Act of 1993.

SEC. 330025. VICTIMS OF CRIME ACT.

<< 42 USCA § 10601 >>

(a) INCORRECT SECTION REFERENCE.—Section 1402(d)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d) (3)) is amended by striking "1404(a)" and inserting "1404A".

<< 42 USCA § 10602 >>

(b) MISSING TEXT.—Section 1403(b)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(b)(1)) is amended by inserting after "domestic violence" the following: "for—

"(A) medical expenses attributable to a physical injury resulting from compensable crime, including expenses for mental health counseling and care;

"(B) loss of wages attributable to a physical injury resulting from a compensable crime; and

"(C) funeral expenses attributable to a death resulting from a compensable crime".

Approved September 13, 1994.

PL 103–322, 1994 HR 3355

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 107–296, November 25, 2002, 116 Stat 2135

UNITED STATES PUBLIC LAWS

107th Congress - Second Session

Convening January, 2002

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed

PL 107–296 (HR 5005)

November 25, 2002

HOMELAND SECURITY ACT OF 2002

An Act To establish the Department of Homeland Security, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 6 USCA § 101 NOTE >>

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

 (a) SHORT TITLE.—This Act may be cited as the "Homeland Security Act of 2002".
 (b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

Sec. 2. Definitions.

Sec. 3. Construction; severability.

Sec. 4. Effective date.

TITLE I—DEPARTMENT OF HOMELAND SECURITY

Sec. 101. Executive department; mission.

Sec. 102. Secretary; functions.

Sec. 103. Other officers.

TITLE II—INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION

Subtitle A—Directorate for Information Analysis and Infrastructure Protection; Access to Information

Sec. 201. Directorate for Information Analysis and Infrastructure Protection.

Sec. 202. Access to information.

Subtitle B—Critical Infrastructure Information

Sec. 211. Short title.

Sec. 212. Definitions.

Sec. 213. Designation of critical infrastructure protection program.

Sec. 214. Protection of voluntarily shared critical infrastructure information.

Sec. 215. No private right of action.

Subtitle C—Information Security

Sec. 221. Procedures for sharing information.

Sec. 222. Privacy Officer.

Sec. 223. Enhancement of non-Federal cybersecurity.

Sec. 224. Net guard.

Sec. 225. Cyber Security Enhancement Act of 2002.

Subtitle D—Office of Science and Technology

Sec. 231. Establishment of office; Director.

Sec. 232. Mission of office; duties.

Sec. 233. Definition of law enforcement technology.

Sec. 234. Abolishment of Office of Science and Technology of National Institute of Justice; transfer of functions.

Sec. 235. National Law Enforcement and Corrections Technology Centers.

Sec. 236. Coordination with other entities within Department of Justice.

Sec. 237. Amendments relating to National Institute of Justice.

TITLE III—SCIENCE AND TECHNOLOGY IN SUPPORT OF HOMELAND SECURITY

Sec. 301. Under Secretary for Science and Technology.

Sec. 302. Responsibilities and authorities of the Under Secretary for Science and Technology.

Sec. 303. Functions transferred.

Sec. 304. Conduct of certain public health-related activities.

Sec. 305. Federally funded research and development centers.

Sec. 306. Miscellaneous provisions.

Sec. 307. Homeland Security Advanced Research Projects Agency.

Sec. 308. Conduct of research, development, demonstration, testing and evaluation.

Sec. 309. Utilization of Department of Energy national laboratories and sites in support of homeland security activities.

Sec. 310. Transfer of Plum Island Animal Disease Center, Department of Agriculture.

Sec. 311. Homeland Security Science and Technology Advisory Committee.

Sec. 312. Homeland Security Institute.

Sec. 313. Technology clearinghouse to encourage and support innovative solutions to enhance homeland security.

TITLE IV—DIRECTORATE OF BORDER AND TRANSPORTATION SECURITY

Subtitle A—Under Secretary for Border and Transportation Security

Sec. 401. Under Secretary for Border and Transportation Security.

Sec. 402. Responsibilities.

Sec. 403. Functions transferred.

Subtitle B—United States Customs Service

Sec. 411. Establishment; Commissioner of Customs.

Sec. 412. Retention of customs revenue functions by Secretary of the Treasury.

Sec. 413. Preservation of customs funds.

Sec. 414. Separate budget request for customs.

Sec. 415. Definition.

Sec. 416. GAO report to Congress.

Sec. 417. Allocation of resources by the Secretary.

Sec. 418. Reports to Congress.

Sec. 419. Customs user fees.

Subtitle C—Miscellaneous Provisions

Sec. 421. Transfer of certain agricultural inspection functions of the Department of Agriculture.

Sec. 422. Functions of Administrator of General Services.

Sec. 423. Functions of Transportation Security Administration.

Sec. 424. Preservation of Transportation Security Administration as a distinct entity.

Sec. 425. Explosive detection systems.

Sec. 426. Transportation security.

Sec. 427. Coordination of information and information technology.

Sec. 428. Visa issuance.

Sec. 429. Information on visa denials required to be entered into electronic data system.

Sec. 430. Office for Domestic Preparedness.

Subtitle D—Immigration Enforcement Functions

Sec. 441. Transfer of functions to Under Secretary for Border and Transportation Security.

Sec. 442. Establishment of Bureau of Border Security.

Sec. 443. Professional responsibility and quality review.

Sec. 444. Employee discipline.

Sec. 445. Report on improving enforcement functions.

Sec. 446. Sense of Congress regarding construction of fencing near San Diego, California.

Subtitle E—Citizenship and Immigration Services

Sec. 451. Establishment of Bureau of Citizenship and Immigration Services.

Sec. 452. Citizenship and Immigration Services Ombudsman.

Sec. 453. Professional responsibility and quality review.

Sec. 454. Employee discipline.

Sec. 455. Effective date.

Sec. 456. Transition.

Sec. 457. Funding for citizenship and immigration services.

Sec. 458. Backlog elimination.

Sec. 459. Report on improving immigration services.

Sec. 460. Report on responding to fluctuating needs.

Sec. 461. Application of Internet-based technologies.

Sec. 462. Children's affairs.

Subtitle F—General Immigration Provisions

Sec. 471. Abolishment of INS.

Sec. 472. Voluntary separation incentive payments.

Sec. 473. Authority to conduct a demonstration project relating to disciplinary action.

Sec. 474. Sense of Congress.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.02164   4

Sec. 475. Director of Shared Services.

Sec. 476. Separation of funding.

Sec. 477. Reports and implementation plans.

Sec. 478. Immigration functions.

TITLE V—EMERGENCY PREPAREDNESS AND RESPONSE

Sec. 501. Under Secretary for Emergency Preparedness and Response.

Sec. 502. Responsibilities.

Sec. 503. Functions transferred.

Sec. 504. Nuclear incident response.

Sec. 505. Conduct of certain public health-related activities.

Sec. 506. Definition.

Sec. 507. Role of Federal Emergency Management Agency.

Sec. 508. Use of national private sector networks in emergency response.

Sec. 509. Use of commercially available technology, goods, and services.

TITLE VI—TREATMENT OF CHARITABLE TRUSTS FOR MEMBERS OF THE ARMED
FORCES OF THE UNITED STATES AND OTHER GOVERNMENTAL ORGANIZATIONS

Sec. 601. Treatment of charitable trusts for members of the Armed Forces of the United States and other governmental organizations.

TITLE VII—MANAGEMENT

Sec. 701. Under Secretary for Management.

Sec. 702. Chief Financial Officer.

Sec. 703. Chief Information Officer.

Sec. 704. Chief Human Capital Officer.

Sec. 705. Establishment of Officer for Civil Rights and Civil Liberties.

Sec. 706. Consolidation and co-location of offices.

TITLE VIII—COORDINATION WITH NON–FEDERAL ENTITIES; INSPECTOR GENERAL;
UNITED STATES SECRET SERVICE; COAST GUARD; GENERAL PROVISIONS

Subtitle A—Coordination with Non–Federal Entities

Sec. 801. Office for State and Local Government Coordination.

Subtitle B—Inspector General

Sec. 811. Authority of the Secretary.

Sec. 812. Law enforcement powers of Inspector General agents.

Subtitle C—United States Secret Service

Sec. 821. Functions transferred.

Subtitle D—Acquisitions

Sec. 831. Research and development projects.

Sec. 832. Personal services.

Sec. 833. Special streamlined acquisition authority.

Sec. 834. Unsolicited proposals.

Sec. 835. Prohibition on contracts with corporate expatriates.

Subtitle E—Human Resources Management

Sec. 841. Establishment of Human Resources Management System.

Sec. 842. Labor-management relations.

Subtitle F—Federal Emergency Procurement Flexibility

Sec. 851. Definition.

Sec. 852. Procurements for defense against or recovery from terrorism or nuclear, biological, chemical, or radiological attack.

Sec. 853. Increased simplified acquisition threshold for procurements in support of humanitarian or peacekeeping operations or contingency operations.

Sec. 854. Increased micro-purchase threshold for certain procurements.

Sec. 855. Application of certain commercial items authorities to certain procurements.

Sec. 856. Use of streamlined procedures.

Sec. 857. Review and report by Comptroller General.

Sec. 858. Identification of new entrants into the Federal marketplace.

Subtitle G—Support Anti-terrorism by Fostering Effective Technologies Act of 2002

Sec. 861. Short title.

Sec. 862. Administration.

Sec. 863. Litigation management.

Sec. 864. Risk management.

Sec. 865. Definitions.

Subtitle H—Miscellaneous Provisions

Sec. 871. Advisory committees.

Sec. 872. Reorganization.

Sec. 873. Use of appropriated funds.

Sec. 874. Future Year Homeland Security Program.

Sec. 875. Miscellaneous authorities.

Sec. 876. Military activities.

Sec. 877. Regulatory authority and preemption.

Sec. 878. Counternarcotics officer.

Sec. 879. Office of International Affairs.

Sec. 880. Prohibition of the Terrorism Information and Prevention System.

Sec. 881. Review of pay and benefit plans.

Sec. 882. Office for National Capital Region Coordination.

Sec. 883. Requirement to comply with laws protecting equal employment opportunity and providing whistleblower protections.

Sec. 884. Federal Law Enforcement Training Center.

Sec. 885. Joint Interagency Task Force.

Sec. 886. Sense of Congress reaffirming the continued importance and applicability of the Posse Comitatus Act.

Sec. 887. Coordination with the Department of Health and Human Services under the Public Health Service Act.

Sec. 888. Preserving Coast Guard mission performance.

Sec. 889. Homeland security funding analysis in President's budget.

Sec. 890. Air Transportation Safety and System Stabilization Act.

Subtitle I—Information Sharing

Sec. 891. Short title; findings; and sense of Congress.

Sec. 892. Facilitating homeland security information sharing procedures.

Sec. 893. Report.

Sec. 894. Authorization of appropriations.

Sec. 895. Authority to share grand jury information.

Sec. 896. Authority to share electronic, wire, and oral interception information.

Sec. 897. Foreign intelligence information.

Sec. 898. Information acquired from an electronic surveillance.

Sec. 899. Information acquired from a physical search.

TITLE IX—NATIONAL HOMELAND SECURITY COUNCIL

Sec. 901. National Homeland Security Council.

Sec. 902. Function.

Sec. 903. Membership.

Sec. 904. Other functions and activities.

Sec. 905. Staff composition.

Sec. 906. Relation to the National Security Council.

TITLE X—INFORMATION SECURITY

Sec. 1001. Information security.

Sec. 1002. Management of information technology.

Sec. 1003. National Institute of Standards and Technology.

Sec. 1004. Information Security and Privacy Advisory Board.

Sec. 1005. Technical and conforming amendments.

Sec. 1006. Construction.

TITLE XI—DEPARTMENT OF JUSTICE DIVISIONS

Subtitle A—Executive Office for Immigration Review

Sec. 1101. Legal status of EOIR.

Sec. 1102. Authorities of the Attorney General.

Sec. 1103. Statutory construction.

Subtitle B—Transfer of the Bureau of Alcohol, Tobacco and Firearms to the Department of Justice

Sec. 1111. Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Sec. 1112. Technical and conforming amendments.

Sec. 1113. Powers of agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Sec. 1114. Explosives training and research facility.

Sec. 1115. Personnel management demonstration project.

Subtitle C—Explosives

Sec. 1121. Short title.

Sec. 1122. Permits for purchasers of explosives.

Sec. 1123. Persons prohibited from receiving or possessing explosive materials.

Sec. 1124. Requirement to provide samples of explosive materials and ammonium nitrate.

Sec. 1125. Destruction of property of institutions receiving Federal financial assistance.

Sec. 1126. Relief from disabilities.

Sec. 1127. Theft reporting requirement.

Sec. 1128. Authorization of appropriations.

TITLE XII—AIRLINE WAR RISK INSURANCE LEGISLATION

Sec. 1201. Air carrier liability for third party claims arising out of acts of terrorism.

Sec. 1202. Extension of insurance policies.

Sec. 1203. Correction of reference.

Sec. 1204. Report.

TITLE XIII—FEDERAL WORKFORCE IMPROVEMENT

Subtitle A—Chief Human Capital Officers

Sec. 1301. Short title.

Sec. 1302. Agency Chief Human Capital Officers.

Sec. 1303. Chief Human Capital Officers Council.

Sec. 1304. Strategic human capital management.

Sec. 1305. Effective date.

Subtitle B—Reforms Relating to Federal Human Capital Management

Sec. 1311. Inclusion of agency human capital strategic planning in performance plans and programs performance reports.

Sec. 1312. Reform of the competitive service hiring process.

Sec. 1313. Permanent extension, revision, and expansion of authorities for use of voluntary separation incentive pay and voluntary early retirement.

Sec. 1314. Student volunteer transit subsidy.

Subtitle C—Reforms Relating to the Senior Executive Service

Sec. 1321. Repeal of recertification requirements of senior executives.

Sec. 1322. Adjustment of limitation on total annual compensation.

Subtitle D—Academic Training

Sec. 1331. Academic training.

Sec. 1332. Modifications to National Security Education Program.

TITLE XIV—ARMING PILOTS AGAINST TERRORISM

Sec. 1401. Short title.

Sec. 1402. Federal Flight Deck Officer Program.

Sec. 1403. Crew training.

Sec. 1404. Commercial airline security study.

Sec. 1405. Authority to arm flight deck crew with less-than-lethal weapons.

Sec. 1406. Technical amendments.

TITLE XV—TRANSITION

Subtitle A—Reorganization Plan

Sec. 1501. Definitions.

Sec. 1502. Reorganization plan.

Sec. 1503. Review of congressional committee structures.

Subtitle B—Transitional Provisions

Sec. 1511. Transitional authorities.

Sec. 1512. Savings provisions.

Sec. 1513. Terminations.

Sec. 1514. National identification system not authorized.

Sec. 1515. Continuity of Inspector General oversight.

Sec. 1516. Incidental transfers.

Sec. 1517. Reference.

TITLE XVI—CORRECTIONS TO EXISTING LAW RELATING TO AIRLINE TRANSPORTATION SECURITY

Sec. 1601. Retention of security sensitive information authority at Department of Transportation.

Sec. 1602. Increase in civil penalties.

Sec. 1603. Allowing United States citizens and United States nationals as screeners.

## TITLE XVII—CONFORMING AND TECHNICAL AMENDMENTS

Sec. 1701. Inspector General Act of 1978.

Sec. 1702. Executive Schedule.

Sec. 1703. United States Secret Service.

Sec. 1704. Coast Guard.

Sec. 1705. Strategic national stockpile and smallpox vaccine development.

Sec. 1706. Transfer of certain security and law enforcement functions and authorities.

Sec. 1707. Transportation security regulations.

Sec. 1708. National Bio–Weapons Defense Analysis Center.

Sec. 1709. Collaboration with the Secretary of Homeland Security.

Sec. 1710. Railroad safety to include railroad security.

Sec. 1711. Hazmat safety to include hazmat security.

Sec. 1712. Office of Science and Technology Policy.

Sec. 1713. National Oceanographic Partnership Program.

Sec. 1714. Clarification of definition of manufacturer.

Sec. 1715. Clarification of definition of vaccine-related injury or death.

Sec. 1716. Clarification of definition of vaccine.

Sec. 1717. Effective date.

<< 6 USCA § 101 >>

## SEC. 2. DEFINITIONS.

In this Act, the following definitions apply:
  (1) Each of the terms "American homeland" and "homeland" means the United States.
  (2) The term "appropriate congressional committee" means any committee of the House of Representatives or the Senate having legislative or oversight jurisdiction under the Rules of the House of Representatives or the Senate, respectively, over the matter concerned.
  (3) The term "assets" includes contracts, facilities, property, records, unobligated or unexpended balances of appropriations, and other funds or resources (other than personnel).
  (4) The term "critical infrastructure' has the meaning given that term in section 1016(e) of Public Law 107–56 (42 U.S.C. 5195c(e)).
  (5) The term "Department" means the Department of Homeland Security.
  (6) The term "emergency response providers" includes Federal, State, and local emergency public safety, law enforcement, emergency response, emergency medical (including hospital emergency facilities), and related personnel, agencies, and authorities.

AR.02171

(7) The term "executive agency" means an executive agency and a military department, as defined, respectively, in sections 105 and 102 of title 5, United States Code.

(8) The term "functions" includes authorities, powers, rights, privileges, immunities, programs, projects, activities, duties, and responsibilities.

(9) The term "key resources" means publicly or privately controlled resources essential to the minimal operations of the economy and government.

(10) The term "local government" means—

(A) a county, municipality, city, town, township, local public authority, school district, special district, intrastate district, council of governments (regardless of whether the council of governments is incorporated as a nonprofit corporation under State law), regional or interstate government entity, or agency or instrumentality of a local government;

(B) an Indian tribe or authorized tribal organization, or in Alaska a Native village or Alaska Regional Native Corporation; and

(C) a rural community, unincorporated town or village, or other public entity.

(11) The term "major disaster" has the meaning given in section 102(2) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122).

(12) The term "personnel" means officers and employees.

(13) The term "Secretary" means the Secretary of Homeland Security.

(14) The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any possession of the United States.

(15) The term "terrorism" means any activity that—

(A) involves an act that—

(i) is dangerous to human life or potentially destructive of critical infrastructure or key resources; and

(ii) is a violation of the criminal laws of the United States or of any State or other subdivision of the United States; and

(B) appears to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping.

(16)(A) The term "United States", when used in a geographic sense, means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, any possession of the United States, and any waters within the jurisdiction of the United States.

(B) Nothing in this paragraph or any other provision of this Act shall be construed to modify the definition of "United States" for the purposes of the Immigration and Nationality Act or any other immigration or nationality law.

<< 6 USCA § 102 >>

SEC. 3. CONSTRUCTION; SEVERABILITY.

Any provision of this Act held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to give it the maximum effect permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event such provision shall be deemed severable from this Act and shall not affect the remainder thereof, or the application of such provision to other persons not similarly situated or to other, dissimilar circumstances.

<< 6 USCA § 101 NOTE >>

SEC. 4. EFFECTIVE DATE.

This Act shall take effect 60 days after the date of enactment.

<< 6 USCA prec. § 111 >>

TITLE I—DEPARTMENT OF HOMELAND SECURITY

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 6 USCA § 111 >>

SEC. 101. EXECUTIVE DEPARTMENT; MISSION.

 (a) ESTABLISHMENT.—There is established a Department of Homeland Security, as an executive department of the United States within the meaning of title 5, United States Code.
 (b) MISSION.—
  (1) IN GENERAL.—The primary mission of the Department is to—
   (A) prevent terrorist attacks within the United States;
   (B) reduce the vulnerability of the United States to terrorism;
   (C) minimize the damage, and assist in the recovery, from terrorist attacks that do occur within the United States;
   (D) carry out all functions of entities transferred to the Department, including by acting as a focal point regarding natural and manmade crises and emergency planning;
   (E) ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress;
   (F) ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland; and
   (G) monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking.
  (2) RESPONSIBILITY FOR INVESTIGATING AND PROSECUTING TERRORISM.—Except as specifically provided by law with respect to entities transferred to the Department under this Act, primary responsibility for investigating and prosecuting acts of terrorism shall be vested not in the Department, but rather in Federal, State, and local law enforcement agencies with jurisdiction over the acts in question.

<< 6 USCA § 112 >>

SEC. 102. SECRETARY; FUNCTIONS.

 (a) SECRETARY.—
  (1) IN GENERAL.—There is a Secretary of Homeland Security, appointed by the President, by and with the advice and consent of the Senate.
  (2) HEAD OF DEPARTMENT.—The Secretary is the head of the Department and shall have direction, authority, and control over it.
  (3) FUNCTIONS VESTED IN SECRETARY.—All functions of all officers, employees, and organizational units of the Department are vested in the Secretary.
 (b) FUNCTIONS.—The Secretary—
  (1) except as otherwise provided by this Act, may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department;
  (2) shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this Act or otherwise provided by law; and
  (3) shall take reasonable steps to ensure that information systems and databases of the Department are compatible with each other and with appropriate databases of other Departments.
 (c) COORDINATION WITH NON–FEDERAL ENTITIES.—With respect to homeland security, the Secretary shall coordinate through the Office of State and Local Coordination (established under section 801) (including the provision of training and equipment) with State and local government personnel, agencies, and authorities, with the private sector, and with other entities, including by—
  (1) coordinating with State and local government personnel, agencies, and authorities, and with the private sector, to ensure adequate planning, equipment, training, and exercise activities;

AR.02173

(2) coordinating and, as appropriate, consolidating, the Federal Government's communications and systems of communications relating to homeland security with State and local government personnel, agencies, and authorities, the private sector, other entities, and the public; and

(3) distributing or, as appropriate, coordinating the distribution of, warnings and information to State and local government personnel, agencies, and authorities and to the public.

(d) MEETINGS OF NATIONAL SECURITY COUNCIL.—The Secretary may, subject to the direction of the President, attend and participate in meetings of the National Security Council.

(e) ISSUANCE OF REGULATIONS.—The issuance of regulations by the Secretary shall be governed by the provisions of chapter 5 of title 5, United States Code, except as specifically provided in this Act, in laws granting regulatory authorities that are transferred by this Act, and in laws enacted after the date of enactment of this Act.

(f) SPECIAL ASSISTANT TO THE SECRETARY.—The Secretary shall appoint a Special Assistant to the Secretary who shall be responsible for—

(1) creating and fostering strategic communications with the private sector to enhance the primary mission of the Department to protect the American homeland;

(2) advising the Secretary on the impact of the Department's policies, regulations, processes, and actions on the private sector;

(3) interfacing with other relevant Federal agencies with homeland security missions to assess the impact of these agencies' actions on the private sector;

(4) creating and managing private sector advisory councils composed of representatives of industries and associations designated by the Secretary to—

(A) advise the Secretary on private sector products, applications, and solutions as they relate to homeland security challenges; and

(B) advise the Secretary on homeland security policies, regulations, processes, and actions that affect the participating industries and associations;

(5) working with Federal laboratories, federally funded research and development centers, other federally funded organizations, academia, and the private sector to develop innovative approaches to address homeland security challenges to produce and deploy the best available technologies for homeland security missions;

(6) promoting existing public-private partnerships and developing new public-private partnerships to provide for collaboration and mutual support to address homeland security challenges; and

(7) assisting in the development and promotion of private sector best practices to secure critical infrastructure.

(g) STANDARDS POLICY.—All standards activities of the Department shall be conducted in accordance with section 12(d) of the National Technology Transfer Advancement Act of 1995 (15 U.S.C. 272 note) and Office of Management and Budget Circular A–119.

<< 6 USCA § 113 >>

SEC. 103. OTHER OFFICERS.

(a) DEPUTY SECRETARY; UNDER SECRETARIES.—There are the following officers, appointed by the President, by and with the advice and consent of the Senate:

(1) A Deputy Secretary of Homeland Security, who shall be the Secretary's first assistant for purposes of subchapter III of chapter 33 of title 5, United States Code.

(2) An Under Secretary for Information Analysis and Infrastructure Protection.

(3) An Under Secretary for Science and Technology.

(4) An Under Secretary for Border and Transportation Security.

(5) An Under Secretary for Emergency Preparedness and Response.

(6) A Director of the Bureau of Citizenship and Immigration Services.

(7) An Under Secretary for Management.

(8) Not more than 12 Assistant Secretaries.

(9) A General Counsel, who shall be the chief legal officer of the Department.

(b) INSPECTOR GENERAL.—There is an Inspector General, who shall be appointed as provided in section 3(a) of the Inspector General Act of 1978.

(c) COMMANDANT OF THE COAST GUARD.—To assist the Secretary in the performance of the Secretary's functions, there is a Commandant of the Coast Guard, who shall be appointed as provided in section 44 of title 14, United States Code, and who shall report directly to the Secretary. In addition to such duties as may be provided in this Act and as assigned to the Commandant by the Secretary, the duties of the Commandant shall include those required by section 2 of title 14, United States Code.

(d) OTHER OFFICERS.—To assist the Secretary in the performance of the Secretary's functions, there are the following officers, appointed by the President:

(1) A Director of the Secret Service.

(2) A Chief Information Officer.

(3) A Chief Human Capital Officer.

(4) A Chief Financial Officer.

(5) An Officer for Civil Rights and Civil Liberties.

(e) PERFORMANCE OF SPECIFIC FUNCTIONS.—Subject to the provisions of this Act, every officer of the Department shall perform the functions specified by law for the official's office or prescribed by the Secretary.

<< 6 USCA prec. § 121 >>

TITLE II—INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION

Subtitle A—Directorate for Information Analysis and Infrastructure Protection; Access to Information

<< 6 USCA § 121 >>

SEC. 201. DIRECTORATE FOR INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION.

(a) UNDER SECRETARY OF HOMELAND SECURITY FOR INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION.—

(1) IN GENERAL.—There shall be in the Department a Directorate for Information Analysis and Infrastructure Protection headed by an Under Secretary for Information Analysis and Infrastructure Protection, who shall be appointed by the President, by and with the advice and consent of the Senate.

(2) RESPONSIBILITIES.—The Under Secretary shall assist the Secretary in discharging the responsibilities assigned by the Secretary.

(b) ASSISTANT SECRETARY FOR INFORMATION ANALYSIS; ASSISTANT SECRETARY FOR INFRASTRUCTURE PROTECTION.—

(1) ASSISTANT SECRETARY FOR INFORMATION ANALYSIS.—There shall be in the Department an Assistant Secretary for Information Analysis, who shall be appointed by the President.

(2) ASSISTANT SECRETARY FOR INFRASTRUCTURE PROTECTION.—There shall be in the Department an Assistant Secretary for Infrastructure Protection, who shall be appointed by the President.

(3) RESPONSIBILITIES.—The Assistant Secretary for Information Analysis and the Assistant Secretary for Infrastructure Protection shall assist the Under Secretary for Information Analysis and Infrastructure Protection in discharging the responsibilities of the Under Secretary under this section.

(c) DISCHARGE OF INFORMATION ANALYSIS AND INFRASTRUCTURE PROTECTION.—The Secretary shall ensure that the responsibilities of the Department regarding information analysis and infrastructure protection are carried out through the Under Secretary for Information Analysis and Infrastructure Protection.

(d) RESPONSIBILITIES OF UNDER SECRETARY.—Subject to the direction and control of the Secretary, the responsibilities of the Under Secretary for Information Analysis and Infrastructure Protection shall be as follows:

(1) To access, receive, and analyze law enforcement information, intelligence information, and other information from agencies of the Federal Government, State and local government agencies (including law enforcement agencies), and private sector entities, and to integrate such information in order to—

(A) identify and assess the nature and scope of terrorist threats to the homeland;

(B) detect and identify threats of terrorism against the United States; and

(C) understand such threats in light of actual and potential vulnerabilities of the homeland.

(2) To carry out comprehensive assessments of the vulnerabilities of the key resources and critical infrastructure of the United States, including the performance of risk assessments to determine the risks posed by particular types of terrorist attacks within the United States (including an assessment of the probability of success of such attacks and the feasibility and potential efficacy of various countermeasures to such attacks).

(3) To integrate relevant information, analyses, and vulnerability assessments (whether such information, analyses, or assessments are provided or produced by the Department or others) in order to identify priorities for protective and support measures by the Department, other agencies of the Federal Government, State and local government agencies and authorities, the private sector, and other entities.

(4) To ensure, pursuant to section 202, the timely and efficient access by the Department to all information necessary to discharge the responsibilities under this section, including obtaining such information from other agencies of the Federal Government.

(5) To develop a comprehensive national plan for securing the key resources and critical infrastructure of the United States, including power production, generation, and distribution systems, information technology and telecommunications systems (including satellites), electronic financial and property record storage and transmission systems, emergency preparedness communications systems, and the physical and technological assets that support such systems.

(6) To recommend measures necessary to protect the key resources and critical infrastructure of the United States in coordination with other agencies of the Federal Government and in cooperation with State and local government agencies and authorities, the private sector, and other entities.

(7) To administer the Homeland Security Advisory System, including—

(A) exercising primary responsibility for public advisories related to threats to homeland security; and

(B) in coordination with other agencies of the Federal Government, providing specific warning information, and advice about appropriate protective measures and countermeasures, to State and local government agencies and authorities, the private sector, other entities, and the public.

(8) To review, analyze, and make recommendations for improvements in the policies and procedures governing the sharing of law enforcement information, intelligence information, intelligence-related information, and other information relating to homeland security within the Federal Government and between the Federal Government and State and local government agencies and authorities.

(9) To disseminate, as appropriate, information analyzed by the Department within the Department, to other agencies of the Federal Government with responsibilities relating to homeland security, and to agencies of State and local governments and private sector entities with such responsibilities in order to assist in the deterrence, prevention, preemption of, or response to, terrorist attacks against the United States.

(10) To consult with the Director of Central Intelligence and other appropriate intelligence, law enforcement, or other elements of the Federal Government to establish collection priorities and strategies for information, including law enforcement-related information, relating to threats of terrorism against the United States through such means as the representation of the Department in discussions regarding requirements and priorities in the collection of such information.

(11) To consult with State and local governments and private sector entities to ensure appropriate exchanges of information, including law enforcement-related information, relating to threats of terrorism against the United States.

(12) To ensure that—

(A) any material received pursuant to this Act is protected from unauthorized disclosure and handled and used only for the performance of official duties; and

(B) any intelligence information under this Act is shared, retained, and disseminated consistent with the authority of the Director of Central Intelligence to protect intelligence sources and methods under the National Security Act of 1947 (50 U.S.C. 401 et seq.) and related procedures and, as appropriate, similar authorities of the Attorney General concerning sensitive law enforcement information.

(13) To request additional information from other agencies of the Federal Government, State and local government agencies, and the private sector relating to threats of terrorism in the United States, or relating to other areas of responsibility assigned by the Secretary, including the entry into cooperative agreements through the Secretary to obtain such information.

(14) To establish and utilize, in conjunction with the chief information officer of the Department, a secure communications and information technology infrastructure, including data-mining and other advanced analytical tools, in order to access, receive, and analyze data and information in furtherance of the responsibilities under this section, and to disseminate information acquired and analyzed by the Department, as appropriate.

(15) To ensure, in conjunction with the chief information officer of the Department, that any information databases and analytical tools developed or utilized by the Department—

(A) are compatible with one another and with relevant information databases of other agencies of the Federal Government; and

(B) treat information in such databases in a manner that complies with applicable Federal law on privacy.

(16) To coordinate training and other support to the elements and personnel of the Department, other agencies of the Federal Government, and State and local governments that provide information to the Department, or are consumers of information provided by the Department, in order to facilitate the identification and sharing of information revealed in their ordinary duties and the optimal utilization of information received from the Department.

(17) To coordinate with elements of the intelligence community and with Federal, State, and local law enforcement agencies, and the private sector, as appropriate.

(18) To provide intelligence and information analysis and support to other elements of the Department.

(19) To perform such other duties relating to such responsibilities as the Secretary may provide.

(e) STAFF.—

(1) IN GENERAL.—The Secretary shall provide the Directorate with a staff of analysts having appropriate expertise and experience to assist the Directorate in discharging responsibilities under this section.

(2) PRIVATE SECTOR ANALYSTS.—Analysts under this subsection may include analysts from the private sector.

(3) SECURITY CLEARANCES.—Analysts under this subsection shall possess security clearances appropriate for their work under this section.

(f) DETAIL OF PERSONNEL.—

(1) IN GENERAL.—In order to assist the Directorate in discharging responsibilities under this section, personnel of the agencies referred to in paragraph (2) may be detailed to the Department for the performance of analytic functions and related duties.

(2) COVERED AGENCIES.—The agencies referred to in this paragraph are as follows:

(A) The Department of State.

(B) The Central Intelligence Agency.

(C) The Federal Bureau of Investigation.

(D) The National Security Agency.

(E) The National Imagery and Mapping Agency.

(F) The Defense Intelligence Agency.

(G) Any other agency of the Federal Government that the President considers appropriate.

(3) COOPERATIVE AGREEMENTS.—The Secretary and the head of the agency concerned may enter into cooperative agreements for the purpose of detailing personnel under this subsection.

(4) BASIS.—The detail of personnel under this subsection may be on a reimbursable or non-reimbursable basis.

(g) FUNCTIONS TRANSFERRED.—In accordance with title XV, there shall be transferred to the Secretary, for assignment to the Under Secretary for Information Analysis and Infrastructure Protection under this section, the functions, personnel, assets, and liabilities of the following:

(1) The National Infrastructure Protection Center of the Federal Bureau of Investigation (other than the Computer Investigations and Operations Section), including the functions of the Attorney General relating thereto.

(2) The National Communications System of the Department of Defense, including the functions of the Secretary of Defense relating thereto.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) The Critical Infrastructure Assurance Office of the Department of Commerce, including the functions of the Secretary of Commerce relating thereto.

(4) The National Infrastructure Simulation and Analysis Center of the Department of Energy and the energy security and assurance program and activities of the Department, including the functions of the Secretary of Energy relating thereto.

(5) The Federal Computer Incident Response Center of the General Services Administration, including the functions of the Administrator of General Services relating thereto.

(h) INCLUSION OF CERTAIN ELEMENTS OF THE DEPARTMENT AS ELEMENTS OF THE INTELLIGENCE COMMUNITY.—Section 3(4) of the National Security Act of 1947 (50 U.S.C. 401(a)) is amended—

<< 50 USCA § 401a >>

(1) by striking "and" at the end of subparagraph (I);

<< 50 USCA § 401a >>

(2) by redesignating subparagraph (J) as subparagraph (K); and

<< 50 USCA § 401a >>

(3) by inserting after subparagraph (I) the following new subparagraph:

"(J) the elements of the Department of Homeland Security concerned with the analyses of foreign intelligence information; and".

<< 6 USCA § 122 >>

## SEC. 202. ACCESS TO INFORMATION.

(a) IN GENERAL.—

(1) THREAT AND VULNERABILITY INFORMATION.—Except as otherwise directed by the President, the Secretary shall have such access as the Secretary considers necessary to all information, including reports, assessments, analyses, and unevaluated intelligence relating to threats of terrorism against the United States and to other areas of responsibility assigned by the Secretary, and to all information concerning infrastructure or other vulnerabilities of the United States to terrorism, whether or not such information has been analyzed, that may be collected, possessed, or prepared by any agency of the Federal Government.

(2) OTHER INFORMATION.—The Secretary shall also have access to other information relating to matters under the responsibility of the Secretary that may be collected, possessed, or prepared by an agency of the Federal Government as the President may further provide.

(b) MANNER OF ACCESS.—Except as otherwise directed by the President, with respect to information to which the Secretary has access pursuant to this section—

(1) the Secretary may obtain such material upon request, and may enter into cooperative arrangements with other executive agencies to provide such material or provide Department officials with access to it on a regular or routine basis, including requests or arrangements involving broad categories of material, access to electronic databases, or both; and

(2) regardless of whether the Secretary has made any request or entered into any cooperative arrangement pursuant to paragraph (1), all agencies of the Federal Government shall promptly provide to the Secretary—

(A) all reports (including information reports containing intelligence which has not been fully evaluated), assessments, and analytical information relating to threats of terrorism against the United States and to other areas of responsibility assigned by the Secretary;

(B) all information concerning the vulnerability of the infrastructure of the United States, or other vulnerabilities of the United States, to terrorism, whether or not such information has been analyzed;

(C) all other information relating to significant and credible threats of terrorism against the United States, whether or not such information has been analyzed; and

(D) such other information or material as the President may direct.

(c) TREATMENT UNDER CERTAIN LAWS.—The Secretary shall be deemed to be a Federal law enforcement, intelligence, protective, national defense, immigration, or national security official, and shall be provided with all information from law enforcement agencies that is required to be given to the Director of Central Intelligence, under any provision of the following:

(1) The USA PATRIOT Act of 2001 (Public Law 107–56).

(2) Section 2517(6) of title 18, United States Code.

(3) Rule 6(e)(3)(C) of the Federal Rules of Criminal Procedure.

(d) ACCESS TO INTELLIGENCE AND OTHER INFORMATION.—

(1) ACCESS BY ELEMENTS OF FEDERAL GOVERNMENT.—Nothing in this title shall preclude any element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)), or any other element of the Federal Government with responsibility for analyzing terrorist threat information, from receiving any intelligence or other information relating to terrorism.

(2) SHARING OF INFORMATION.—The Secretary, in consultation with the Director of Central Intelligence, shall work to ensure that intelligence or other information relating to terrorism to which the Department has access is appropriately shared with the elements of the Federal Government referred to in paragraph (1), as well as with State and local governments, as appropriate.

<< 6 USCA prec. § 131 >>

Subtitle B—Critical Infrastructure Information

<< 6 USCA § 101 NOTE >>

SEC. 211. SHORT TITLE.

This subtitle may be cited as the "Critical Infrastructure Information Act of 2002".

<< 6 USCA § 131 >>

SEC. 212. DEFINITIONS.

In this subtitle:

(1) AGENCY.—The term "agency" has the meaning given it in section 551 of title 5, United States Code.

(2) COVERED FEDERAL AGENCY.—The term "covered Federal agency" means the Department of Homeland Security.

(3) CRITICAL INFRASTRUCTURE INFORMATION.—The term "critical infrastructure information" means information not customarily in the public domain and related to the security of critical infrastructure or protected systems—

(A) actual, potential, or threatened interference with, attack on, compromise of, or incapacitation of critical infrastructure or protected systems by either physical or computer-based attack or other similar conduct (including the misuse of or unauthorized access to all types of communications and data transmission systems) that violates Federal, State, or local law, harms interstate commerce of the United States, or threatens public health or safety;

(B) the ability of any critical infrastructure or protected system to resist such interference, compromise, or incapacitation, including any planned or past assessment, projection, or estimate of the vulnerability of critical infrastructure or a protected system, including security testing, risk evaluation thereto, risk management planning, or risk audit; or

(C) any planned or past operational problem or solution regarding critical infrastructure or protected systems, including repair, recovery, reconstruction, insurance, or continuity, to the extent it is related to such interference, compromise, or incapacitation.

(4) CRITICAL INFRASTRUCTURE PROTECTION PROGRAM.—The term "critical infrastructure protection program" means any component or bureau of a covered Federal agency that has been designated by the President or any agency head to receive critical infrastructure information.

(5) INFORMATION SHARING AND ANALYSIS ORGANIZATION.—The term "Information Sharing and Analysis Organization" means any formal or informal entity or collaboration created or employed by public or private sector organizations, for purposes of—

(A) gathering and analyzing critical infrastructure information in order to better understand security problems and interdependencies related to critical infrastructure and protected systems, so as to ensure the availability, integrity, and reliability thereof;

(B) communicating or disclosing critical infrastructure information to help prevent, detect, mitigate, or recover from the effects of a interference, compromise, or a incapacitation problem related to critical infrastructure or protected systems; and

(C) voluntarily disseminating critical infrastructure information to its members, State, local, and Federal Governments, or any other entities that may be of assistance in carrying out the purposes specified in subparagraphs (A) and (B).

(6) PROTECTED SYSTEM.—The term "protected system"—

(A) means any service, physical or computer-based system, process, or procedure that directly or indirectly affects the viability of a facility of critical infrastructure; and

(B) includes any physical or computer-based system, including a computer, computer system, computer or communications network, or any component hardware or element thereof, software program, processing instructions, or information or data in transmission or storage therein, irrespective of the medium of transmission or storage.

(7) VOLUNTARY.—

(A) IN GENERAL.—The term "voluntary", in the case of any submittal of critical infrastructure information to a covered Federal agency, means the submittal thereof in the absence of such agency's exercise of legal authority to compel access to or submission of such information and may be accomplished by a single entity or an Information Sharing and Analysis Organization on behalf of itself or its members.

(B) EXCLUSIONS.—The term "voluntary"—

(i) in the case of any action brought under the securities laws as is defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47))—

(I) does not include information or statements contained in any documents or materials filed with the Securities and Exchange Commission, or with Federal banking regulators, pursuant to section 12(i) of the Securities Exchange Act of 1934 (15 U.S.C. 781(I)); and

(II) with respect to the submittal of critical infrastructure information, does not include any disclosure or writing that when made accompanied the solicitation of an offer or a sale of securities; and

(ii) does not include information or statements submitted or relied upon as a basis for making licensing or permitting determinations, or during regulatory proceedings.

<< 6 USCA § 132 >>

SEC. 213. DESIGNATION OF CRITICAL INFRASTRUCTURE PROTECTION PROGRAM.

A critical infrastructure protection program may be designated as such by one of the following:

(1) The President.

(2) The Secretary of Homeland Security.

<< 6 USCA § 133 >>

SEC. 214. PROTECTION OF VOLUNTARILY SHARED CRITICAL INFRASTRUCTURE INFORMATION.

(a) PROTECTION.—

(1) IN GENERAL.—Notwithstanding any other provision of law, critical infrastructure information (including the identity of the submitting person or entity) that is voluntarily submitted to a covered Federal agency for use by that agency regarding the security of critical infrastructure and protected systems, analysis, warning, interdependency study, recovery, reconstitution, or other informational purpose, when accompanied by an express statement specified in paragraph (2)—

(A) shall be exempt from disclosure under section 552 of title 5, United States Code (commonly referred to as the Freedom of Information Act);

(B) shall not be subject to any agency rules or judicial doctrine regarding ex parte communications with a decision making official;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(C) shall not, without the written consent of the person or entity submitting such information, be used directly by such agency, any other Federal, State, or local authority, or any third party, in any civil action arising under Federal or State law if such information is submitted in good faith;

(D) shall not, without the written consent of the person or entity submitting such information, be used or disclosed by any officer or employee of the United States for purposes other than the purposes of this subtitle, except—

(i) in furtherance of an investigation or the prosecution of a criminal act; or

(ii) when disclosure of the information would be—

(I) to either House of Congress, or to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee thereof or subcommittee of any such joint committee; or

(II) to the Comptroller General, or any authorized representative of the Comptroller General, in the course of the performance of the duties of the General Accounting Office.

(E) shall not, if provided to a State or local government or government agency—

(i) be made available pursuant to any State or local law requiring disclosure of information or records;

(ii) otherwise be disclosed or distributed to any party by said State or local government or government agency without the written consent of the person or entity submitting such information; or

(iii) be used other than for the purpose of protecting critical infrastructure or protected systems, or in furtherance of an investigation or the prosecution of a criminal act; and

(F) does not constitute a waiver of any applicable privilege or protection provided under law, such as trade secret protection.

(2) EXPRESS STATEMENT.—For purposes of paragraph (1), the term "express statement", with respect to information or records, means—

(A) in the case of written information or records, a written marking on the information or records substantially similar to the following: "This information is voluntarily submitted to the Federal Government in expectation of protection from disclosure as provided by the provisions of the Critical Infrastructure Information Act of 2002."; or

(B) in the case of oral information, a similar written statement submitted within a reasonable period following the oral communication.

(b) LIMITATION.—No communication of critical infrastructure information to a covered Federal agency made pursuant to this subtitle shall be considered to be an action subject to the requirements of the Federal Advisory Committee Act (5 U.S.C. App. 2).

(c) INDEPENDENTLY OBTAINED INFORMATION.—Nothing in this section shall be construed to limit or otherwise affect the ability of a State, local, or Federal Government entity, agency, or authority, or any third party, under applicable law, to obtain critical infrastructure information in a manner not covered by subsection (a), including any information lawfully and properly disclosed generally or broadly to the public and to use such information in any manner permitted by law.

(d) TREATMENT OF VOLUNTARY SUBMITTAL OF INFORMATION.—The voluntary submittal to the Government of information or records that are protected from disclosure by this subtitle shall not be construed to constitute compliance with any requirement to submit such information to a Federal agency under any other provision of law.

(e) PROCEDURES.—

(1) IN GENERAL.—The Secretary of the Department of Homeland Security shall, in consultation with appropriate representatives of the National Security Council and the Office of Science and Technology Policy, establish uniform procedures for the receipt, care, and storage by Federal agencies of critical infrastructure information that is voluntarily submitted to the Government. The procedures shall be established not later than 90 days after the date of the enactment of this subtitle.

(2) ELEMENTS.—The procedures established under paragraph (1) shall include mechanisms regarding—

(A) the acknowledgement of receipt by Federal agencies of critical infrastructure information that is voluntarily submitted to the Government;

(B) the maintenance of the identification of such information as voluntarily submitted to the Government for purposes of and subject to the provisions of this subtitle;

(C) the care and storage of such information; and

(D) the protection and maintenance of the confidentiality of such information so as to permit the sharing of such information within the Federal Government and with State and local governments, and the issuance of notices and warnings related to the protection of critical infrastructure and protected systems, in such manner as to protect from public disclosure the identity

of the submitting person or entity, or information that is proprietary, business sensitive, relates specifically to the submitting person or entity, and is otherwise not appropriately in the public domain.

(f) PENALTIES.—Whoever, being an officer or employee of the United States or of any department or agency thereof, knowingly publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law, any critical infrastructure information protected from disclosure by this subtitle coming to him in the course of this employment or official duties or by reason of any examination or investigation made by, or return, report, or record made to or filed with, such department or agency or officer or employee thereof, shall be fined under title 18 of the United States Code, imprisoned not more than 1 year, or both, and shall be removed from office or employment.

(g) AUTHORITY TO ISSUE WARNINGS.—The Federal Government may provide advisories, alerts, and warnings to relevant companies, targeted sectors, other governmental entities, or the general public regarding potential threats to critical infrastructure as appropriate. In issuing a warning, the Federal Government shall take appropriate actions to protect from disclosure—

(1) the source of any voluntarily submitted critical infrastructure information that forms the basis for the warning; or

(2) information that is proprietary, business sensitive, relates specifically to the submitting person or entity, or is otherwise not appropriately in the public domain.

(h) AUTHORITY TO DELEGATE.—The President may delegate authority to a critical infrastructure protection program, designated under section 213, to enter into a voluntary agreement to promote critical infrastructure security, including with any Information Sharing and Analysis Organization, or a plan of action as otherwise defined in section 708 of the Defense Production Act of 1950 (50 U.S.C. App. 2158).

<< 6 USCA § 134 >>

SEC. 215. NO PRIVATE RIGHT OF ACTION.

Nothing in this subtitle may be construed to create a private right of action for enforcement of any provision of this Act.

<< 6 USCA prec. § 141 >>

Subtitle C—Information Security

<< 6 USCA § 141 >>

SEC. 221. PROCEDURES FOR SHARING INFORMATION.

The Secretary shall establish procedures on the use of information shared under this title that—

(1) limit the redissemination of such information to ensure that it is not used for an unauthorized purpose;

(2) ensure the security and confidentiality of such information;

(3) protect the constitutional and statutory rights of any individuals who are subjects of such information; and

(4) provide data integrity through the timely removal and destruction of obsolete or erroneous names and information.

<< 6 USCA § 142 >>

SEC. 222. PRIVACY OFFICER.

The Secretary shall appoint a senior official in the Department to assume primary responsibility for privacy policy, including—

(1) assuring that the use of technologies sustain, and do not erode, privacy protections relating to the use, collection, and disclosure of personal information;

(2) assuring that personal information contained in Privacy Act systems of records is handled in full compliance with fair information practices as set out in the Privacy Act of 1974;

(3) evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(4) conducting a privacy impact assessment of proposed rules of the Department or that of the Department on the privacy of personal information, including the type of personal information collected and the number of people affected; and

(5) preparing a report to Congress on an annual basis on activities of the Department that affect privacy, including complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters.

<< 6 USCA § 143 >>

## SEC. 223. ENHANCEMENT OF NON–FEDERAL CYBERSECURITY.

In carrying out the responsibilities under section 201, the Under Secretary for Information Analysis and Infrastructure Protection shall—

(1) as appropriate, provide to State and local government entities, and upon request to private entities that own or operate critical information systems—

(A) analysis and warnings related to threats to, and vulnerabilities of, critical information systems; and

(B) in coordination with the Under Secretary for Emergency Preparedness and Response, crisis management support in response to threats to, or attacks on, critical information systems; and

(2) as appropriate, provide technical assistance, upon request, to the private sector and other government entities, in coordination with the Under Secretary for Emergency Preparedness and Response, with respect to emergency recovery plans to respond to major failures of critical information systems.

<< 6 USCA § 144 >>

## SEC. 224. NET GUARD.

The Under Secretary for Information Analysis and Infrastructure Protection may establish a national technology guard, to be known as "NET Guard", comprised of local teams of volunteers with expertise in relevant areas of science and technology, to assist local communities to respond and recover from attacks on information systems and communications networks.

<< 6 USCA § 145 >>

## SEC. 225. CYBER SECURITY ENHANCEMENT ACT OF 2002.

(a) SHORT TITLE.—This section may be cited as the "Cyber Security Enhancement Act of 2002".

<< 28 USCA § 994 NOTE >>

(b) AMENDMENT OF SENTENCING GUIDELINES RELATING TO CERTAIN COMPUTER CRIMES.—

(1) DIRECTIVE TO THE UNITED STATES SENTENCING COMMISSION.—Pursuant to its authority under section 994(p) of title 28, United States Code, and in accordance with this subsection, the United States Sentencing Commission shall review and, if appropriate, amend its guidelines and its policy statements applicable to persons convicted of an offense under section 1030 of title 18, United States Code.

(2) REQUIREMENTS.—In carrying out this subsection, the Sentencing Commission shall—

(A) ensure that the sentencing guidelines and policy statements reflect the serious nature of the offenses described in paragraph (1), the growing incidence of such offenses, and the need for an effective deterrent and appropriate punishment to prevent such offenses;

(B) consider the following factors and the extent to which the guidelines may or may not account for them—

(i) the potential and actual loss resulting from the offense;

(ii) the level of sophistication and planning involved in the offense;

(iii) whether the offense was committed for purposes of commercial advantage or private financial benefit;

(iv) whether the defendant acted with malicious intent to cause harm in committing the offense;

(v) the extent to which the offense violated the privacy rights of individuals harmed;

AR.02183

(vi) whether the offense involved a computer used by the government in furtherance of national defense, national security, or the administration of justice;

(vii) whether the violation was intended to or had the effect of significantly interfering with or disrupting a critical infrastructure; and

(viii) whether the violation was intended to or had the effect of creating a threat to public health or safety, or injury to any person;

(C) assure reasonable consistency with other relevant directives and with other sentencing guidelines;

(D) account for any additional aggravating or mitigating circumstances that might justify exceptions to the generally applicable sentencing ranges;

(E) make any necessary conforming changes to the sentencing guidelines; and

(F) assure that the guidelines adequately meet the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code.

(c) STUDY AND REPORT ON COMPUTER CRIMES.—Not later than May 1, 2003, the United States Sentencing Commission shall submit a brief report to Congress that explains any actions taken by the Sentencing Commission in response to this section and includes any recommendations the Commission may have regarding statutory penalties for offenses under section 1030 of title 18, United States Code.

(d) EMERGENCY DISCLOSURE EXCEPTION.—

(1) IN GENERAL.—Section 2702(b) of title 18, United States Code, is amended—

<< 18 USCA § 2702 >>

(A) in paragraph (5), by striking "or" at the end;

<< 18 USCA § 2702 >>

(B) in paragraph (6)(A), by inserting "or" at the end;

<< 18 USCA § 2702 >>

(C) by striking paragraph (6)(C); and

<< 18 USCA § 2702 >>

(D) by adding at the end the following:

"(7) to a Federal, State, or local governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency.".

(2) REPORTING OF DISCLOSURES.—A government entity that receives a disclosure under section 2702(b) of title 18, United States Code, shall file, not later than 90 days after such disclosure, a report to the Attorney General stating the paragraph of that section under which the disclosure was made, the date of the disclosure, the entity to which the disclosure was made, the number of customers or subscribers to whom the information disclosed pertained, and the number of communications, if any, that were disclosed. The Attorney General shall publish all such reports into a single report to be submitted to Congress 1 year after the date of enactment of this Act.

<< 18 USCA § 2520 >>

(e) GOOD FAITH EXCEPTION.—Section 2520(d)(3) of title 18, United States Code, is amended by inserting "or 2511(2)(i)" after "2511(3)".

<< 18 USCA § 2512 >>

(f) INTERNET ADVERTISING OF ILLEGAL DEVICES.—Section 2512(1)(c) of title 18, United States Code, is amended—

(1) by inserting "or disseminates by electronic means" after "or other publication"; and

(2) by inserting "knowing the content of the advertisement and" before "knowing or having reason to know".

(g) STRENGTHENING PENALTIES.—Section 1030(c) of title 18, United States Code, is amended—

<< 18 USCA § 1030 >>

(1) by striking "and" at the end of paragraph (3);

<< 18 USCA § 1030 >>

(2) in each of subparagraphs (A) and (C) of paragraph (4), by inserting "except as provided in paragraph (5)," before "a fine under this title";

<< 18 USCA § 1030 >>

(3) in paragraph (4)(C), by striking the period at the end and inserting "; and"; and

<< 18 USCA § 1030 >>

(4) by adding at the end the following:

"(5)(A) if the offender knowingly or recklessly causes or attempts to cause serious bodily injury from conduct in violation of subsection (a)(5)(A)(i), a fine under this title or imprisonment for not more than 20 years, or both; and

"(B) if the offender knowingly or recklessly causes or attempts to cause death from conduct in violation of subsection (a)(5)(A)(i), a fine under this title or imprisonment for any term of years or for life, or both.".

(h) PROVIDER ASSISTANCE.—

<< 18 USCA § 2703 >>

(1) SECTION 2703.—Section 2703(e) of title 18, United States Code, is amended by inserting ", statutory authorization" after "subpoena".

<< 18 USCA § 2511 >>

(2) SECTION 2511.—Section 2511(2)(a)(ii) of title 18, United States Code, is amended by inserting ", statutory authorization," after "court order" the last place it appears.

(i) EMERGENCIES.—Section 3125(a)(1) of title 18, United States Code, is amended—

<< 18 USCA § 3125 >>

(1) in subparagraph (A), by striking "or" at the end;

<< 18 USCA § 3125 >>

(2) in subparagraph (B), by striking the comma at the end and inserting a semicolon; and

<< 18 USCA § 3125 >>

(3) by adding at the end the following:

"(C) an immediate threat to a national security interest; or

"(D) an ongoing attack on a protected computer (as defined in section 1030) that constitutes a crime punishable by a term of imprisonment greater than one year;".

(j) PROTECTING PRIVACY.—

(1) SECTION 2511.—Section 2511(4) of title 18, United States Code, is amended—

<< 18 USCA § 2511 >>

(A) by striking paragraph (b); and

<< 18 USCA § 2511 >>

(B) by redesignating paragraph (c) as paragraph (b).
(2) SECTION 2701.—Section 2701(b) of title 18, United States Code, is amended—

<< 18 USCA § 2701 >>

(A) in paragraph (1), by inserting ", or in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or any State" after "commercial gain";

<< 18 USCA § 2701 >>

(B) in paragraph (1)(A), by striking "one year" and inserting "5 years";

<< 18 USCA § 2701 >>

(C) in paragraph (1)(B), by striking "two years" and inserting "10 years"; and

<< 18 USCA § 2701 >>

(D) by striking paragraph (2) and inserting the following:
"(2) in any other case—
   "(A) a fine under this title or imprisonment for not more than 1 year or both, in the case of a first offense under this paragraph; and
   "(B) a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under this subparagraph that occurs after a conviction of another offense under this section.".

<< 6 USCA prec. § 161 >>

Subtitle D—Office of Science and Technology

<< 6 USCA § 161 >>

SEC. 231. ESTABLISHMENT OF OFFICE; DIRECTOR.

 (a) ESTABLISHMENT.—
  (1) IN GENERAL.—There is hereby established within the Department of Justice an Office of Science and Technology (hereinafter in this title referred to as the "Office").
  (2) AUTHORITY.—The Office shall be under the general authority of the Assistant Attorney General, Office of Justice Programs, and shall be established within the National Institute of Justice.
 (b) DIRECTOR.—The Office shall be headed by a Director, who shall be an individual appointed based on approval by the Office of Personnel Management of the executive qualifications of the individual.

<< 6 USCA § 162 >>

SEC. 232. MISSION OF OFFICE; DUTIES.

 (a) MISSION.—The mission of the Office shall be—
  (1) to serve as the national focal point for work on law enforcement technology; and
  (2) to carry out programs that, through the provision of equipment, training, and technical assistance, improve the safety and effectiveness of law enforcement technology and improve access to such technology by Federal, State, and local law enforcement agencies.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2210 of 3864

(b) DUTIES.—In carrying out its mission, the Office shall have the following duties:

 (1) To provide recommendations and advice to the Attorney General.

 (2) To establish and maintain advisory groups (which shall be exempt from the provisions of the Federal Advisory Committee Act (5 U.S.C. App.)) to assess the law enforcement technology needs of Federal, State, and local law enforcement agencies.

 (3) To establish and maintain performance standards in accordance with the National Technology Transfer and Advancement Act of 1995 (Public Law 104–113) for, and test and evaluate law enforcement technologies that may be used by, Federal, State, and local law enforcement agencies.

 (4) To establish and maintain a program to certify, validate, and mark or otherwise recognize law enforcement technology products that conform to standards established and maintained by the Office in accordance with the National Technology Transfer and Advancement Act of 1995 (Public Law 104–113). The program may, at the discretion of the Office, allow for supplier's declaration of conformity with such standards.

 (5) To work with other entities within the Department of Justice, other Federal agencies, and the executive office of the President to establish a coordinated Federal approach on issues related to law enforcement technology.

 (6) To carry out research, development, testing, evaluation, and cost-benefit analyses in fields that would improve the safety, effectiveness, and efficiency of law enforcement technologies used by Federal, State, and local law enforcement agencies, including, but not limited to—

  (A) weapons capable of preventing use by unauthorized persons, including personalized guns;

  (B) protective apparel;

  (C) bullet-resistant and explosion-resistant glass;

  (D) monitoring systems and alarm systems capable of providing precise location information;

  (E) wire and wireless interoperable communication technologies;

  (F) tools and techniques that facilitate investigative and forensic work, including computer forensics;

  (G) equipment for particular use in counterterrorism, including devices and technologies to disable terrorist devices;

  (H) guides to assist State and local law enforcement agencies;

  (I) DNA identification technologies; and

  (J) tools and techniques that facilitate investigations of computer crime.

 (7) To administer a program of research, development, testing, and demonstration to improve the interoperability of voice and data public safety communications.

 (8) To serve on the Technical Support Working Group of the Department of Defense, and on other relevant interagency panels, as requested.

 (9) To develop, and disseminate to State and local law enforcement agencies, technical assistance and training materials for law enforcement personnel, including prosecutors.

 (10) To operate the regional National Law Enforcement and Corrections Technology Centers and, to the extent necessary, establish additional centers through a competitive process.

 (11) To administer a program of acquisition, research, development, and dissemination of advanced investigative analysis and forensic tools to assist State and local law enforcement agencies in combating cybercrime.

 (12) To support research fellowships in support of its mission.

 (13) To serve as a clearinghouse for information on law enforcement technologies.

 (14) To represent the United States and State and local law enforcement agencies, as requested, in international activities concerning law enforcement technology.

 (15) To enter into contracts and cooperative agreements and provide grants, which may require in-kind or cash matches from the recipient, as necessary to carry out its mission.

 (16) To carry out other duties assigned by the Attorney General to accomplish the mission of the Office.

(c) COMPETITION REQUIRED.—Except as otherwise expressly provided by law, all research and development carried out by or through the Office shall be carried out on a competitive basis.

 (d) INFORMATION FROM FEDERAL AGENCIES.—Federal agencies shall, upon request from the Office and in accordance with Federal law, provide the Office with any data, reports, or other information requested, unless compliance with such request is otherwise prohibited by law.

 (e) PUBLICATIONS.—Decisions concerning publications issued by the Office shall rest solely with the Director of the Office.

(f) TRANSFER OF FUNDS.—The Office may transfer funds to other Federal agencies or provide funding to non-Federal entities through grants, cooperative agreements, or contracts to carry out its duties under this section.

(g) ANNUAL REPORT.—The Director of the Office shall include with the budget justification materials submitted to Congress in support of the Department of Justice budget for each fiscal year (as submitted with the budget of the President under section 1105(a) of title 31, United States Code) a report on the activities of the Office. Each such report shall include the following:

(1) For the period of 5 fiscal years beginning with the fiscal year for which the budget is submitted—

(A) the Director's assessment of the needs of Federal, State, and local law enforcement agencies for assistance with respect to law enforcement technology and other matters consistent with the mission of the Office; and

(B) a strategic plan for meeting such needs of such law enforcement agencies.

(2) For the fiscal year preceding the fiscal year for which such budget is submitted, a description of the activities carried out by the Office and an evaluation of the extent to which those activities successfully meet the needs assessed under paragraph (1)(A) in previous reports.

<< 6 USCA § 163 >>

SEC. 233. DEFINITION OF LAW ENFORCEMENT TECHNOLOGY.

For the purposes of this title, the term "law enforcement technology" includes investigative and forensic technologies, corrections technologies, and technologies that support the judicial process.

<< 6 USCA § 164 >>

SEC. 234. ABOLISHMENT OF OFFICE OF SCIENCE AND TECHNOLOGY OF NATIONAL INSTITUTE OF JUSTICE; TRANSFER OF FUNCTIONS.

(a) AUTHORITY TO TRANSFER FUNCTIONS.—The Attorney General may transfer to the Office any other program or activity of the Department of Justice that the Attorney General, in consultation with the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives, determines to be consistent with the mission of the Office.

(b) TRANSFER OF PERSONNEL AND ASSETS.—With respect to any function, power, or duty, or any program or activity, that is established in the Office, those employees and assets of the element of the Department of Justice from which the transfer is made that the Attorney General determines are needed to perform that function, power, or duty, or for that program or activity, as the case may be, shall be transferred to the Office.

(c) REPORT ON IMPLEMENTATION.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report on the implementation of this title. The report shall—

(1) provide an accounting of the amounts and sources of funding available to the Office to carry out its mission under existing authorizations and appropriations, and set forth the future funding needs of the Office; and

(2) include such other information and recommendations as the Attorney General considers appropriate.

<< 6 USCA § 165 >>

SEC. 235. NATIONAL LAW ENFORCEMENT AND CORRECTIONS TECHNOLOGY CENTERS.

(a) IN GENERAL.—The Director of the Office shall operate and support National Law Enforcement and Corrections Technology Centers (hereinafter in this section referred to as "Centers") and, to the extent necessary, establish new centers through a merit-based, competitive process.

(b) PURPOSE OF CENTERS.—The purpose of the Centers shall be to—

(1) support research and development of law enforcement technology;

(2) support the transfer and implementation of technology;

(3) assist in the development and dissemination of guidelines and technological standards; and

(4) provide technology assistance, information, and support for law enforcement, corrections, and criminal justice purposes.

(c) ANNUAL MEETING.—Each year, the Director shall convene a meeting of the Centers in order to foster collaboration and communication between Center participants.

(d) REPORT.—Not later than 12 months after the date of the enactment of this Act, the Director shall transmit to the Congress a report assessing the effectiveness of the existing system of Centers and identify the number of Centers necessary to meet the technology needs of Federal, State, and local law enforcement in the United States.

<< 42 USCA § 3712 >>

SEC. 236. COORDINATION WITH OTHER ENTITIES WITHIN DEPARTMENT OF JUSTICE.

Section 102 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3712) is amended in subsection (a)(5) by inserting "coordinate and" before "provide".

SEC. 237. AMENDMENTS RELATING TO NATIONAL INSTITUTE OF JUSTICE.

Section 202(c) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3722(c)) is amended—

<< 42 USCA § 3722 >>

(1) in paragraph (3) by inserting ", including cost effectiveness where practical," before "of projects"; and

<< 42 USCA § 3722 >>

(2) by striking "and" after the semicolon at the end of paragraph (8), striking the period at the end of paragraph (9) and inserting "; and", and by adding at the end the following:

"(10) research and development of tools and technologies relating to prevention, detection, investigation, and prosecution of crime; and

"(11) support research, development, testing, training, and evaluation of tools and technology for Federal, State, and local law enforcement agencies.".

<< 6 USCA prec. § 181 >>

TITLE III—SCIENCE AND TECHNOLOGY IN SUPPORT OF HOMELAND SECURITY

<< 6 USCA § 181 >>

SEC. 301. UNDER SECRETARY FOR SCIENCE AND TECHNOLOGY.

There shall be in the Department a Directorate of Science and Technology headed by an Under Secretary for Science and Technology.

<< 6 USCA § 182 >>

SEC. 302. RESPONSIBILITIES AND AUTHORITIES OF THE UNDER SECRETARY FOR SCIENCE AND TECHNOLOGY.

The Secretary, acting through the Under Secretary for Science and Technology, shall have the responsibility for—

(1) advising the Secretary regarding research and development efforts and priorities in support of the Department's missions;

(2) developing, in consultation with other appropriate executive agencies, a national policy and strategic plan for, identifying priorities, goals, objectives and policies for, and coordinating the Federal Government's civilian efforts to identify and develop countermeasures to chemical, biological, radiological, nuclear, and other emerging terrorist threats, including the development of comprehensive, research-based definable goals for such efforts and development of annual measurable objectives and specific targets to accomplish and evaluate the goals for such efforts;

(3) supporting the Under Secretary for Information Analysis and Infrastructure Protection, by assessing and testing homeland security vulnerabilities and possible threats;

(4) conducting basic and applied research, development, demonstration, testing, and evaluation activities that are relevant to any or all elements of the Department, through both intramural and extramural programs, except that such responsibility does not extend to human health-related research and development activities;

(5) establishing priorities for, directing, funding, and conducting national research, development, test and evaluation, and procurement of technology and systems for—

(A) preventing the importation of chemical, biological, radiological, nuclear, and related weapons and material; and

(B) detecting, preventing, protecting against, and responding to terrorist attacks;

(6) establishing a system for transferring homeland security developments or technologies to Federal, State, local government, and private sector entities;

(7) entering into work agreements, joint sponsorships, contracts, or any other agreements with the Department of Energy regarding the use of the national laboratories or sites and support of the science and technology base at those facilities;

(8) collaborating with the Secretary of Agriculture and the Attorney General as provided in section 212 of the Agricultural Bioterrorism Protection Act of 2002 (7 U.S.C. 8401), as amended by section 1709(b);

(9) collaborating with the Secretary of Health and Human Services and the Attorney General in determining any new biological agents and toxins that shall be listed as "select agents" in Appendix A of part 72 of title 42, Code of Federal Regulations, pursuant to section 351A of the Public Health Service Act (42 U.S.C. 262a);

(10) supporting United States leadership in science and technology;

(11) establishing and administering the primary research and development activities of the Department, including the long-term research and development needs and capabilities for all elements of the Department;

(12) coordinating and integrating all research, development, demonstration, testing, and evaluation activities of the Department;

(13) coordinating with other appropriate executive agencies in developing and carrying out the science and technology agenda of the Department to reduce duplication and identify unmet needs; and

(14) developing and overseeing the administration of guidelines for merit review of research and development projects throughout the Department, and for the dissemination of research conducted or sponsored by the Department.

<< 6 USCA § 183 >>

SEC. 303. FUNCTIONS TRANSFERRED.

In accordance with title XV, there shall be transferred to the Secretary the functions, personnel, assets, and liabilities of the following entities:

(1) The following programs and activities of the Department of Energy, including the functions of the Secretary of Energy relating thereto (but not including programs and activities relating to the strategic nuclear defense posture of the United States):

(A) The chemical and biological national security and supporting programs and activities of the nonproliferation and verification research and development program.

(B) The nuclear smuggling programs and activities within the proliferation detection program of the nonproliferation and verification research and development program. The programs and activities described in this subparagraph may be designated by the President either for transfer to the Department or for joint operation by the Secretary and the Secretary of Energy.

(C) The nuclear assessment program and activities of the assessment, detection, and cooperation program of the international materials protection and cooperation program.

(D) Such life sciences activities of the biological and environmental research program related to microbial pathogens as may be designated by the President for transfer to the Department.

(E) The Environmental Measurements Laboratory.

(F) The advanced scientific computing research program and activities at Lawrence Livermore National Laboratory.

(2) The National Bio–Weapons Defense Analysis Center of the Department of Defense, including the functions of the Secretary of Defense related thereto.

<< 6 USCA § 184 >>

SEC. 304. CONDUCT OF CERTAIN PUBLIC HEALTH–RELATED ACTIVITIES.

(a) IN GENERAL.—With respect to civilian human health-related research and development activities relating to countermeasures for chemical, biological, radiological, and nuclear and other emerging terrorist threats carried out by the Department of Health and Human Services (including the Public Health Service), the Secretary of Health and Human Services shall set priorities, goals, objectives, and policies and develop a coordinated strategy for such activities in collaboration with the Secretary of Homeland Security to ensure consistency with the national policy and strategic plan developed pursuant to section 302(2).

(b) EVALUATION OF PROGRESS.—In carrying out subsection (a), the Secretary of Health and Human Services shall collaborate with the Secretary in developing specific benchmarks and outcome measurements for evaluating progress toward achieving the priorities and goals described in such subsection.

<< 42 USCA § 233 >>

(c) ADMINISTRATION OF COUNTERMEASURES AGAINST SMALLPOX.—Section 224 of the Public Health Service Act (42 U.S.C. 233) is amended by adding the following:

"(p) ADMINISTRATION OF SMALLPOX COUNTERMEASURES BY HEALTH PROFESSIONALS.—

"(1) IN GENERAL.—For purposes of this section, and subject to other provisions of this subsection, a covered person shall be deemed to be an employee of the Public Health Service with respect to liability arising out of administration of a covered countermeasure against smallpox to an individual during the effective period of a declaration by the Secretary under paragraph (2)(A).

"(2) DECLARATION BY SECRETARY CONCERNING COUNTERMEASURE AGAINST SMALLPOX.—

"(A) AUTHORITY TO ISSUE DECLARATION.—

"(i) IN GENERAL.—The Secretary may issue a declaration, pursuant to this paragraph, concluding that an actual or potential bioterrorist incident or other actual or potential public health emergency makes advisable the administration of a covered countermeasure to a category or categories of individuals.

"(ii) COVERED COUNTERMEASURE.—The Secretary shall specify in such declaration the substance or substances that shall be considered covered countermeasures (as defined in paragraph (8)(A)) for purposes of administration to individuals during the effective period of the declaration.

"(iii) EFFECTIVE PERIOD.—The Secretary shall specify in such declaration the beginning and ending dates of the effective period of the declaration, and may subsequently amend such declaration to shorten or extend such effective period, provided that the new closing date is after the date when the declaration is amended.

"(iv) PUBLICATION.—The Secretary shall promptly publish each such declaration and amendment in the Federal Register.

"(B) LIABILITY OF UNITED STATES ONLY FOR ADMINISTRATIONS WITHIN SCOPE OF DECLARATION.— Except as provided in paragraph (5)(B)(ii), the United States shall be liable under this subsection with respect to a claim arising out of the administration of a covered countermeasure to an individual only if—

"(i) the countermeasure was administered by a qualified person, for a purpose stated in paragraph (7)(A)(i), and during the effective period of a declaration by the Secretary under subparagraph (A) with respect to such countermeasure; and

"(ii)(I) the individual was within a category of individuals covered by the declaration; or

"(II) the qualified person administering the countermeasure had reasonable grounds to believe that such individual was within such category.

"(C) PRESUMPTION OF ADMINISTRATION WITHIN SCOPE OF DECLARATION IN CASE OF ACCIDENTAL VACCINIA INOCULATION.—

"(i) IN GENERAL.—If vaccinia vaccine is a covered countermeasure specified in a declaration under subparagraph (A), and an individual to whom the vaccinia vaccine is not administered contracts vaccinia, then, under the circumstances specified in clause (ii), the individual—

"(I) shall be rebuttably presumed to have contracted vaccinia from an individual to whom such vaccine was administered as provided by clauses (i) and (ii) of subparagraph (B); and

"(II) shall (unless such presumption is rebutted) be deemed for purposes of this subsection to be an individual to whom a covered countermeasure was administered by a qualified person in accordance with the terms of such declaration and as described by subparagraph (B).

"(ii) CIRCUMSTANCES IN WHICH PRESUMPTION APPLIES.—The presumption and deeming stated in clause (i) shall apply if—

"(I) the individual contracts vaccinia during the effective period of a declaration under subparagraph (A) or by the date 30 days after the close of such period; or

"(II) the individual resides or has resided with an individual to whom such vaccine was administered as provided by clauses (i) and (ii) of subparagraph (B) and contracts vaccinia after such date.

"(3) EXCLUSIVITY OF REMEDY.—The remedy provided by subsection (a) shall be exclusive of any other civil action or proceeding for any claim or suit this subsection encompasses.

"(4) CERTIFICATION OF ACTION BY ATTORNEY GENERAL.—Subsection (c) applies to actions under this subsection, subject to the following provisions:

"(A) NATURE OF CERTIFICATION.—The certification by the Attorney General that is the basis for deeming an action or proceeding to be against the United States, and for removing an action or proceeding from a State court, is a certification that the action or proceeding is against a covered person and is based upon a claim alleging personal injury or death arising out of the administration of a covered countermeasure.

"(B) CERTIFICATION OF ATTORNEY GENERAL CONCLUSIVE.—The certification of the Attorney General of the facts specified in subparagraph (A) shall conclusively establish such facts for purposes of jurisdiction pursuant to this subsection.

"(5) DEFENDANT TO COOPERATE WITH UNITED STATES.—

"(A) IN GENERAL.—A covered person shall cooperate with the United States in the processing and defense of a claim or action under this subsection based upon alleged acts or omissions of such person.

"(B) CONSEQUENCES OF FAILURE TO COOPERATE.—Upon the motion of the United States or any other party and upon finding that such person has failed to so cooperate—

"(i) the court shall substitute such person as the party defendant in place of the United States and, upon motion, shall remand any such suit to the court in which it was instituted if it appears that the court lacks subject matter jurisdiction;

"(ii) the United States shall not be liable based on the acts or omissions of such person; and

"(iii) the Attorney General shall not be obligated to defend such action.

"(6) RECOURSE AGAINST COVERED PERSON IN CASE OF GROSS MISCONDUCT OR CONTRACT VIOLATION.—

"(A) IN GENERAL.—Should payment be made by the United States to any claimant bringing a claim under this subsection, either by way of administrative determination, settlement, or court judgment, the United States shall have, notwithstanding any provision of State law, the right to recover for that portion of the damages so awarded or paid, as well as interest and any costs of litigation, resulting from the failure of any covered person to carry out any obligation or responsibility assumed by such person under a contract with the United States or from any grossly negligent, reckless, or illegal conduct or willful misconduct on the part of such person.

"(B) VENUE.—The United States may maintain an action under this paragraph against such person in the district court of the United States in which such person resides or has its principal place of business.

"(7) DEFINITIONS.—As used in this subsection, terms have the following meanings:

"(A) COVERED COUNTERMEASURE.—The term 'covered countermeasure' or 'covered countermeasure against smallpox', means a substance that is—

"(i)(I) used to prevent or treat smallpox (including the vaccinia or another vaccine); or

"(II) vaccinia immune globulin used to control or treat the adverse effects of vaccinia inoculation; and

"(ii) specified in a declaration under paragraph (2).

"(B) COVERED PERSON.—The term 'covered person', when used with respect to the administration of a covered countermeasure, includes any person who is—

"(i) a manufacturer or distributor of such countermeasure;

"(ii) a health care entity under whose auspices such countermeasure was administered;

"(iii) a qualified person who administered such countermeasure; or

"(iv) an official, agent, or employee of a person described in clause (i), (ii), or (iii).

"(C) QUALIFIED PERSON.—The term 'qualified person', when used with respect to the administration of a covered countermeasure, means a licensed health professional or other individual who is authorized to administer such countermeasure under the law of the State in which the countermeasure was administered.".

<< 6 USCA § 185 >>

## SEC. 305. FEDERALLY FUNDED RESEARCH AND DEVELOPMENT CENTERS.

The Secretary, acting through the Under Secretary for Science and Technology, shall have the authority to establish or contract with 1 or more federally funded research and development centers to provide independent analysis of homeland security issues, or to carry out other responsibilities under this Act, including coordinating and integrating both the extramural and intramural programs described in section 308.

<< 6 USCA § 186 >>

## SEC. 306. MISCELLANEOUS PROVISIONS.

(a) CLASSIFICATION.—To the greatest extent practicable, research conducted or supported by the Department shall be unclassified.

(b) CONSTRUCTION.—Nothing in this title shall be construed to preclude any Under Secretary of the Department from carrying out research, development, demonstration, or deployment activities, as long as such activities are coordinated through the Under Secretary for Science and Technology.

(c) REGULATIONS.—The Secretary, acting through the Under Secretary for Science and Technology, may issue necessary regulations with respect to research, development, demonstration, testing, and evaluation activities of the Department, including the conducting, funding, and reviewing of such activities.

(d) NOTIFICATION OF PRESIDENTIAL LIFE SCIENCES DESIGNATIONS.—Not later than 60 days before effecting any transfer of Department of Energy life sciences activities pursuant to section 303(1)(D) of this Act, the President shall notify the appropriate congressional committees of the proposed transfer and shall include the reasons for the transfer and a description of the effect of the transfer on the activities of the Department of Energy.

<< 6 USCA § 187 >>

## SEC. 307. HOMELAND SECURITY ADVANCED RESEARCH PROJECTS AGENCY.

(a) DEFINITIONS.—In this section:

(1) FUND.—The term "Fund" means the Acceleration Fund for Research and Development of Homeland Security Technologies established in subsection (c).

(2) HOMELAND SECURITY RESEARCH.—The term "homeland security research" means research relevant to the detection of, prevention of, protection against, response to, attribution of, and recovery from homeland security threats, particularly acts of terrorism.

(3) HSARPA.—The term "HSARPA" means the Homeland Security Advanced Research Projects Agency established in subsection (b).

(4) UNDER SECRETARY.—The term "Under Secretary" means the Under Secretary for Science and Technology.

(b) HOMELAND SECURITY ADVANCED RESEARCH PROJECTS AGENCY.—

(1) ESTABLISHMENT.—There is established the Homeland Security Advanced Research Projects Agency.

(2) DIRECTOR.—HSARPA shall be headed by a Director, who shall be appointed by the Secretary. The Director shall report to the Under Secretary.

(3) RESPONSIBILITIES.—The Director shall administer the Fund to award competitive, merit-reviewed grants, cooperative agreements or contracts to public or private entities, including businesses, federally funded research and development centers, and universities. The Director shall administer the Fund to—

(A) support basic and applied homeland security research to promote revolutionary changes in technologies that would promote homeland security;

(B) advance the development, testing and evaluation, and deployment of critical homeland security technologies; and

(C) accelerate the prototyping and deployment of technologies that would address homeland security vulnerabilities.

(4) TARGETED COMPETITIONS.—The Director may solicit proposals to address specific vulnerabilities identified by the Director.

(5) COORDINATION.—The Director shall ensure that the activities of HSARPA are coordinated with those of other relevant research agencies, and may run projects jointly with other agencies.

(6) PERSONNEL.—In hiring personnel for HSARPA, the Secretary shall have the hiring and management authorities described in section 1101 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 (5 U.S.C. 3104 note; Public Law 105–261). The term of appointments for employees under subsection (c)(1) of that section may not exceed 5 years before the granting of any extension under subsection (c)(2) of that section.

(7) DEMONSTRATIONS.—The Director, periodically, shall hold homeland security technology demonstrations to improve contact among technology developers, vendors and acquisition personnel.

(c) FUND.—

(1) ESTABLISHMENT.—There is established the Acceleration Fund for Research and Development of Homeland Security Technologies, which shall be administered by the Director of HSARPA.

(2) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated $500,000,000 to the Fund for fiscal year 2003 and such sums as may be necessary thereafter.

(3) COAST GUARD.—Of the funds authorized to be appropriated under paragraph (2), not less than 10 percent of such funds for each fiscal year through fiscal year 2005 shall be authorized only for the Under Secretary, through joint agreement with the Commandant of the Coast Guard, to carry out research and development of improved ports, waterways and coastal security surveillance and perimeter protection capabilities for the purpose of minimizing the possibility that Coast Guard cutters, aircraft, helicopters, and personnel will be diverted from non-homeland security missions to the ports, waterways and coastal security mission.

<< 6 USCA § 188 >>

SEC. 308. CONDUCT OF RESEARCH, DEVELOPMENT, DEMONSTRATION, TESTING AND EVALUATION.

(a) IN GENERAL.—The Secretary, acting through the Under Secretary for Science and Technology, shall carry out the responsibilities under section 302(4) through both extramural and intramural programs.

(b) EXTRAMURAL PROGRAMS.—

(1) IN GENERAL.—The Secretary, acting through the Under Secretary for Science and Technology, shall operate extramural research, development, demonstration, testing, and evaluation programs so as to—

(A) ensure that colleges, universities, private research institutes, and companies (and consortia thereof) from as many areas of the United States as practicable participate;

(B) ensure that the research funded is of high quality, as determined through merit review processes developed under section 302(14); and

(C) distribute funds through grants, cooperative agreements, and contracts.

(2) UNIVERSITY–BASED CENTERS FOR HOMELAND SECURITY.—

(A) ESTABLISHMENT.—The Secretary, acting through the Under Secretary for Science and Technology, shall establish within 1 year of the date of enactment of this Act a university-based center or centers for homeland security. The purpose of this center or centers shall be to establish a coordinated, university-based system to enhance the Nation's homeland security.

(B) CRITERIA FOR SELECTION.—In selecting colleges or universities as centers for homeland security, the Secretary shall consider the following criteria:

(i) Demonstrated expertise in the training of first responders.

(ii) Demonstrated expertise in responding to incidents involving weapons of mass destruction and biological warfare.

(iii) Demonstrated expertise in emergency medical services.

(iv) Demonstrated expertise in chemical, biological, radiological, and nuclear countermeasures.

(v) Strong affiliations with animal and plant diagnostic laboratories.

(vi) Demonstrated expertise in food safety.

(vii) Affiliation with Department of Agriculture laboratories or training centers.

(viii) Demonstrated expertise in water and wastewater operations.

(ix) Demonstrated expertise in port and waterway security.

(x) Demonstrated expertise in multi-modal transportation.

(xi) Nationally recognized programs in information security.

(xii) Nationally recognized programs in engineering.

(xiii) Demonstrated expertise in educational outreach and technical assistance.

(xiv) Demonstrated expertise in border transportation and security.

(xv) Demonstrated expertise in interdisciplinary public policy research and communication outreach regarding science, technology, and public policy.

(C) DISCRETION OF SECRETARY.—The Secretary shall have the discretion to establish such centers and to consider additional criteria as necessary to meet the evolving needs of homeland security and shall report to Congress concerning the implementation of this paragraph as necessary.

(D) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this paragraph.

(c) INTRAMURAL PROGRAMS.—

(1) CONSULTATION.—In carrying out the duties under section 302, the Secretary, acting through the Under Secretary for Science and Technology, may draw upon the expertise of any laboratory of the Federal Government, whether operated by a contractor or the Government.

(2) LABORATORIES.—The Secretary, acting through the Under Secretary for Science and Technology, may establish a headquarters laboratory for the Department at any laboratory or site and may establish additional laboratory units at other laboratories or sites.

(3) CRITERIA FOR HEADQUARTERS LABORATORY.—If the Secretary chooses to establish a headquarters laboratory pursuant to paragraph (2), then the Secretary shall do the following:

(A) Establish criteria for the selection of the headquarters laboratory in consultation with the National Academy of Sciences, appropriate Federal agencies, and other experts.

(B) Publish the criteria in the Federal Register.

(C) Evaluate all appropriate laboratories or sites against the criteria.

(D) Select a laboratory or site on the basis of the criteria.

(E) Report to the appropriate congressional committees on which laboratory was selected, how the selected laboratory meets the published criteria, and what duties the headquarters laboratory shall perform.

(4) LIMITATION ON OPERATION OF LABORATORIES.—No laboratory shall begin operating as the headquarters laboratory of the Department until at least 30 days after the transmittal of the report required by paragraph (3)(E).

<< 6 USCA § 189 >>

## SEC. 309. UTILIZATION OF DEPARTMENT OF ENERGY NATIONAL LABORATORIES AND SITES IN SUPPORT OF HOMELAND SECURITY ACTIVITIES.

(a) AUTHORITY TO UTILIZE NATIONAL LABORATORIES AND SITES.—

(1) IN GENERAL.—In carrying out the missions of the Department, the Secretary may utilize the Department of Energy national laboratories and sites through any 1 or more of the following methods, as the Secretary considers appropriate:

(A) A joint sponsorship arrangement referred to in subsection (b).

(B) A direct contract between the Department and the applicable Department of Energy laboratory or site, subject to subsection (c).

(C) Any "work for others" basis made available by that laboratory or site.

(D) Any other method provided by law.

(2) ACCEPTANCE AND PERFORMANCE BY LABS AND SITES.—Notwithstanding any other law governing the administration, mission, use, or operations of any of the Department of Energy national laboratories and sites, such laboratories and sites are authorized to accept and perform work for the Secretary, consistent with resources provided, and perform such work on an equal basis to other missions at the laboratory and not on a noninterference basis with other missions of such laboratory or site.

(b) JOINT SPONSORSHIP ARRANGEMENTS.—

(1) LABORATORIES.—The Department may be a joint sponsor, under a multiple agency sponsorship arrangement with the Department of Energy, of 1 or more Department of Energy national laboratories in the performance of work.

(2) SITES.—The Department may be a joint sponsor of a Department of Energy site in the performance of work as if such site were a federally funded research and development center and the work were performed under a multiple agency sponsorship arrangement with the Department.

(3) PRIMARY SPONSOR.—The Department of Energy shall be the primary sponsor under a multiple agency sponsorship arrangement referred to in paragraph (1) or (2).

(4) LEAD AGENT.—The Secretary of Energy shall act as the lead agent in coordinating the formation and performance of a joint sponsorship arrangement under this subsection between the Department and a Department of Energy national laboratory or site.

(5) FEDERAL ACQUISITION REGULATION.—Any work performed by a Department of Energy national laboratory or site under a joint sponsorship arrangement under this subsection shall comply with the policy on the use of federally funded research and development centers under the Federal Acquisition Regulations.

(6) FUNDING.—The Department shall provide funds for work at the Department of Energy national laboratories or sites, as the case may be, under a joint sponsorship arrangement under this subsection under the same terms and conditions as apply to the primary sponsor of such national laboratory under section 303(b)(1)(C) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253(b)(1)(C)) or of such site to the extent such section applies to such site as a federally funded research and development center by reason of this subsection.

(c) SEPARATE CONTRACTING.—To the extent that programs or activities transferred by this Act from the Department of Energy to the Department of Homeland Security are being carried out through direct contracts with the operator of a national laboratory or site of the Department of Energy, the Secretary of Homeland Security and the Secretary of Energy shall ensure that direct contracts for such programs and activities between the Department of Homeland Security and such operator are separate from the direct contracts of the Department of Energy with such operator.

(d) AUTHORITY WITH RESPECT TO COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENTS AND LICENSING AGREEMENTS.—In connection with any utilization of the Department of Energy national laboratories and sites under this section, the Secretary may permit the director of any such national laboratory or site to enter into cooperative research and development agreements or to negotiate licensing agreements with any person, any agency or instrumentality, of the United States, any unit of State or local government, and any other entity under the authority granted by section 12 of the Stevenson–Wydler Technology Innovation Act of 1980 (15 U.S.C. 3710a). Technology may be transferred to a non-Federal party to such an agreement consistent with the provisions of sections 11 and 12 of that Act (15 U.S.C. 3710, 3710a).

(e) REIMBURSEMENT OF COSTS.—In the case of an activity carried out by the operator of a Department of Energy national laboratory or site in connection with any utilization of such laboratory or site under this section, the Department of Homeland Security shall reimburse the Department of Energy for costs of such activity through a method under which the Secretary of Energy waives any requirement for the Department of Homeland Security to pay administrative charges or personnel costs of the Department of Energy or its contractors in excess of the amount that the Secretary of Energy pays for an activity carried out by such contractor and paid for by the Department of Energy.

(f) LABORATORY DIRECTED RESEARCH AND DEVELOPMENT BY THE DEPARTMENT OF ENERGY.—No funds authorized to be appropriated or otherwise made available to the Department in any fiscal year may be obligated or expended for laboratory directed research and development activities carried out by the Department of Energy unless such activities support the missions of the Department of Homeland Security.

(g) OFFICE FOR NATIONAL LABORATORIES.—There is established within the Directorate of Science and Technology an Office for National Laboratories, which shall be responsible for the coordination and utilization of the Department of Energy

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

national laboratories and sites under this section in a manner to create a networked laboratory system for the purpose of supporting the missions of the Department.

(h) DEPARTMENT OF ENERGY COORDINATION ON HOMELAND SECURITY RELATED RESEARCH.—The Secretary of Energy shall ensure that any research, development, test, and evaluation activities conducted within the Department of Energy that are directly or indirectly related to homeland security are fully coordinated with the Secretary to minimize duplication of effort and maximize the effective application of Federal budget resources.

<< 6 USCA § 190 >>

SEC. 310. TRANSFER OF PLUM ISLAND ANIMAL DISEASE CENTER, DEPARTMENT OF AGRICULTURE.

(a) IN GENERAL.—In accordance with title XV, the Secretary of Agriculture shall transfer to the Secretary of Homeland Security the Plum Island Animal Disease Center of the Department of Agriculture, including the assets and liabilities of the Center.

(b) CONTINUED DEPARTMENT OF AGRICULTURE ACCESS.—On completion of the transfer of the Plum Island Animal Disease Center under subsection (a), the Secretary of Homeland Security and the Secretary of Agriculture shall enter into an agreement to ensure that the Department of Agriculture is able to carry out research, diagnostic, and other activities of the Department of Agriculture at the Center.

(c) DIRECTION OF ACTIVITIES.—The Secretary of Agriculture shall continue to direct the research, diagnostic, and other activities of the Department of Agriculture at the Center described in subsection (b).

(d) NOTIFICATION.—

(1) IN GENERAL.—At least 180 days before any change in the biosafety level at the Plum Island Animal Disease Center, the President shall notify Congress of the change and describe the reasons for the change.

(2) LIMITATION.—No change described in paragraph (1) may be made earlier than 180 days after the completion of the transition period (as defined in section 1501).

<< 6 USCA § 191 >>

SEC. 311. HOMELAND SECURITY SCIENCE AND TECHNOLOGY ADVISORY COMMITTEE.

(a) ESTABLISHMENT.—There is established within the Department a Homeland Security Science and Technology Advisory Committee (in this section referred to as the "Advisory Committee"). The Advisory Committee shall make recommendations with respect to the activities of the Under Secretary for Science and Technology, including identifying research areas of potential importance to the security of the Nation.

(b) MEMBERSHIP.—

(1) APPOINTMENT.—The Advisory Committee shall consist of 20 members appointed by the Under Secretary for Science and Technology, which shall include emergency first-responders or representatives of organizations or associations of emergency first-responders. The Advisory Committee shall also include representatives of citizen groups, including economically disadvantaged communities. The individuals appointed as members of the Advisory Committee—

(A) shall be eminent in fields such as emergency response, research, engineering, new product development, business, and management consulting;

(B) shall be selected solely on the basis of established records of distinguished service;

(C) shall not be employees of the Federal Government; and

(D) shall be so selected as to provide representation of a cross-section of the research, development, demonstration, and deployment activities supported by the Under Secretary for Science and Technology.

(2) NATIONAL RESEARCH COUNCIL.—The Under Secretary for Science and Technology may enter into an arrangement for the National Research Council to select members of the Advisory Committee, but only if the panel used by the National Research Council reflects the representation described in paragraph (1).

(c) TERMS OF OFFICE.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the term of office of each member of the Advisory Committee shall be 3 years.

(2) ORIGINAL APPOINTMENTS.—The original members of the Advisory Committee shall be appointed to three classes of three members each. One class shall have a term of 1 year, 1 a term of 2 years, and the other a term of 3 years.

(3) VACANCIES.—A member appointed to fill a vacancy occurring before the expiration of the term for which the member's predecessor was appointed shall be appointed for the remainder of such term.

(d) ELIGIBILITY.—A person who has completed two consecutive full terms of service on the Advisory Committee shall thereafter be ineligible for appointment during the 1–year period following the expiration of the second such term.

(e) MEETINGS.—The Advisory Committee shall meet at least quarterly at the call of the Chair or whenever one-third of the members so request in writing. Each member shall be given appropriate notice of the call of each meeting, whenever possible not less than 15 days before the meeting.

(f) QUORUM.—A majority of the members of the Advisory Committee not having a conflict of interest in the matter being considered by the Advisory Committee shall constitute a quorum.

(g) CONFLICT OF INTEREST RULES.—The Advisory Committee shall establish rules for determining when 1 of its members has a conflict of interest in a matter being considered by the Advisory Committee.

(h) REPORTS.—

(1) ANNUAL REPORT.—The Advisory Committee shall render an annual report to the Under Secretary for Science and Technology for transmittal to Congress on or before January 31 of each year. Such report shall describe the activities and recommendations of the Advisory Committee during the previous year.

(2) ADDITIONAL REPORTS.—The Advisory Committee may render to the Under Secretary for transmittal to Congress such additional reports on specific policy matters as it considers appropriate.

(i) FEDERAL ADVISORY COMMITTEE ACT EXEMPTION.—Section 14 of the Federal Advisory Committee Act shall not apply to the Advisory Committee.

(j) TERMINATION.—The Department of Homeland Security Science and Technology Advisory Committee shall terminate 3 years after the effective date of this Act.

<< 6 USCA § 192 >>

SEC. 312. HOMELAND SECURITY INSTITUTE.

(a) ESTABLISHMENT.—The Secretary shall establish a federally funded research and development center to be known as the "Homeland Security Institute" (in this section referred to as the "Institute").

(b) ADMINISTRATION.—The Institute shall be administered as a separate entity by the Secretary.

(c) DUTIES.—The duties of the Institute shall be determined by the Secretary, and may include the following:

(1) Systems analysis, risk analysis, and simulation and modeling to determine the vulnerabilities of the Nation's critical infrastructures and the effectiveness of the systems deployed to reduce those vulnerabilities.

(2) Economic and policy analysis to assess the distributed costs and benefits of alternative approaches to enhancing security.

(3) Evaluation of the effectiveness of measures deployed to enhance the security of institutions, facilities, and infrastructure that may be terrorist targets.

(4) Identification of instances when common standards and protocols could improve the interoperability and effective utilization of tools developed for field operators and first responders.

(5) Assistance for Federal agencies and departments in establishing testbeds to evaluate the effectiveness of technologies under development and to assess the appropriateness of such technologies for deployment.

(6) Design of metrics and use of those metrics to evaluate the effectiveness of homeland security programs throughout the Federal Government, including all national laboratories.

(7) Design of and support for the conduct of homeland security-related exercises and simulations.

(8) Creation of strategic technology development plans to reduce vulnerabilities in the Nation's critical infrastructure and key resources.

(d) CONSULTATION ON INSTITUTE ACTIVITIES.—In carrying out the duties described in subsection (c), the Institute shall consult widely with representatives from private industry, institutions of higher education, nonprofit institutions, other Government agencies, and federally funded research and development centers.

(e) USE OF CENTERS.—The Institute shall utilize the capabilities of the National Infrastructure Simulation and Analysis Center.

(f) ANNUAL REPORTS.—The Institute shall transmit to the Secretary and Congress an annual report on the activities of the Institute under this section.

(g) TERMINATION.—The Homeland Security Institute shall terminate 3 years after the effective date of this Act.

<< 6 USCA § 193 >>

SEC. 313. TECHNOLOGY CLEARINGHOUSE TO ENCOURAGE AND SUPPORT INNOVATIVE SOLUTIONS TO ENHANCE HOMELAND SECURITY.

(a) ESTABLISHMENT OF PROGRAM.—The Secretary, acting through the Under Secretary for Science and Technology, shall establish and promote a program to encourage technological innovation in facilitating the mission of the Department (as described in section 101).

(b) ELEMENTS OF PROGRAM.—The program described in subsection (a) shall include the following components:

(1) The establishment of a centralized Federal clearinghouse for information relating to technologies that would further the mission of the Department for dissemination, as appropriate, to Federal, State, and local government and private sector entities for additional review, purchase, or use.

(2) The issuance of announcements seeking unique and innovative technologies to advance the mission of the Department.

(3) The establishment of a technical assistance team to assist in screening, as appropriate, proposals submitted to the Secretary (except as provided in subsection (c)(2)) to assess the feasibility, scientific and technical merits, and estimated cost of such proposals, as appropriate.

(4) The provision of guidance, recommendations, and technical assistance, as appropriate, to assist Federal, State, and local government and private sector efforts to evaluate and implement the use of technologies described in paragraph (1) or (2).

(5) The provision of information for persons seeking guidance on how to pursue proposals to develop or deploy technologies that would enhance homeland security, including information relating to Federal funding, regulation, or acquisition.

(c) MISCELLANEOUS PROVISIONS.—

(1) IN GENERAL.—Nothing in this section shall be construed as authorizing the Secretary or the technical assistance team established under subsection (b)(3) to set standards for technology to be used by the Department, any other executive agency, any State or local government entity, or any private sector entity.

(2) CERTAIN PROPOSALS.—The technical assistance team established under subsection (b)(3) shall not consider or evaluate proposals submitted in response to a solicitation for offers for a pending procurement or for a specific agency requirement.

(3) COORDINATION.—In carrying out this section, the Secretary shall coordinate with the Technical Support Working Group (organized under the April 1982 National Security Decision Directive Numbered 30).

<< 6 USCA prec. § 201 >>

TITLE IV—DIRECTORATE OF BORDER AND TRANSPORTATION SECURITY

Subtitle A—Under Secretary for Border and Transportation Security

<< 6 USCA § 201 >>

SEC. 401. UNDER SECRETARY FOR BORDER AND TRANSPORTATION SECURITY.

There shall be in the Department a Directorate of Border and Transportation Security headed by an Under Secretary for Border and Transportation Security.

<< 6 USCA § 202 >>

SEC. 402. RESPONSIBILITIES.

The Secretary, acting through the Under Secretary for Border and Transportation Security, shall be responsible for the following:

(1) Preventing the entry of terrorists and the instruments of terrorism into the United States.

(2) Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

(3) Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 441 takes effect.

(4) Establishing and administering rules, in accordance with section 428, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

(5) Establishing national immigration enforcement policies and priorities.

(6) Except as provided in subtitle C, administering the customs laws of the United States.

(7) Conducting the inspection and related administrative functions of the Department of Agriculture transferred to the Secretary of Homeland Security under section 421.

(8) In carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce.

<< 6 USCA § 203 >>

SEC. 403. FUNCTIONS TRANSFERRED.

In accordance with title XV (relating to transition provisions), there shall be transferred to the Secretary the functions, personnel, assets, and liabilities of—

(1) the United States Customs Service of the Department of the Treasury, including the functions of the Secretary of the Treasury relating thereto;

(2) the Transportation Security Administration of the Department of Transportation, including the functions of the Secretary of Transportation, and of the Under Secretary of Transportation for Security, relating thereto;

(3) the Federal Protective Service of the General Services Administration, including the functions of the Administrator of General Services relating thereto;

(4) the Federal Law Enforcement Training Center of the Department of the Treasury; and

(5) the Office for Domestic Preparedness of the Office of Justice Programs, including the functions of the Attorney General relating thereto.

<< 6 USCA prec. § 211 >>

Subtitle B—United States Customs Service

<< 6 USCA § 211 >>

SEC. 411. ESTABLISHMENT; COMMISSIONER OF CUSTOMS.

(a) ESTABLISHMENT.—There is established in the Department the United States Customs Service, under the authority of the Under Secretary for Border and Transportation Security, which shall be vested with those functions including, but not limited to those set forth in section 415(7), and the personnel, assets, and liabilities attributable to those functions.

(b) COMMISSIONER OF CUSTOMS.—

(1) IN GENERAL.—There shall be at the head of the Customs Service a Commissioner of Customs, who shall be appointed by the President, by and with the advice and consent of the Senate.

<< 5 USCA § 5314 >>

(2) COMPENSATION.—Section 5314 of title 5, United States Code, is amended by striking

"Commissioner of Customs, Department of the Treasury" and inserting "Commissioner of Customs, Department of Homeland Security.".

(3) CONTINUATION IN OFFICE.—The individual serving as the Commissioner of Customs on the day before the effective date of this Act may serve as the Commissioner of Customs on and after such effective date until a Commissioner of Customs is appointed under paragraph (1).

<< 6 USCA § 212 >>

SEC. 412. RETENTION OF CUSTOMS REVENUE FUNCTIONS BY SECRETARY OF THE TREASURY.

(a) RETENTION OF CUSTOMS REVENUE FUNCTIONS BY SECRETARY OF THE TREASURY.—

(1) RETENTION OF AUTHORITY.—Notwithstanding section 403(a)(1), authority related to Customs revenue functions that was vested in the Secretary of the Treasury by law before the effective date of this Act under those provisions of law set forth in paragraph (2) shall not be transferred to the Secretary by reason of this Act, and on and after the effective date of this Act, the Secretary of the Treasury may delegate any such authority to the Secretary at the discretion of the Secretary of the Treasury. The Secretary of the Treasury shall consult with the Secretary regarding the exercise of any such authority not delegated to the Secretary.

(2) STATUTES.—The provisions of law referred to in paragraph (1) are the following: the Tariff Act of 1930; section 249 of the Revised Statutes of the United States (19 U.S.C. 3); section 2 of the Act of March 4, 1923 (19 U.S.C. 6); section 13031 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c); section 251 of the Revised Statutes of the United States (19 U.S.C. 66); section 1 of the Act of June 26, 1930 (19 U.S. C. 68); the Foreign Trade Zones Act (19 U.S.C. 81a et seq.); section 1 of the Act of March 2, 1911 (19 U.S.C. 198); the Trade Act of 1974; the Trade Agreements Act of 1979; the North American Free Trade Area Implementation Act; the Uruguay Round Agreements Act; the Caribbean Basin Economic Recovery Act; the Andean Trade Preference Act; the African Growth and Opportunity Act; and any other provision of law vesting customs revenue functions in the Secretary of the Treasury.

(b) MAINTENANCE OF CUSTOMS REVENUE FUNCTIONS.—

(1) MAINTENANCE OF FUNCTIONS.—Notwithstanding any other provision of this Act, the Secretary may not consolidate, discontinue, or diminish those functions described in paragraph (2) performed by the United States Customs Service (as established under section 411) on or after the effective date of this Act, reduce the staffing level, or reduce the resources attributable to such functions, and the Secretary shall ensure that an appropriate management structure is implemented to carry out such functions.

(2) FUNCTIONS.—The functions referred to in paragraph (1) are those functions performed by the following personnel, and associated support staff, of the United States Customs Service on the day before the effective date of this Act: Import Specialists, Entry Specialists, Drawback Specialists, National Import Specialist, Fines and Penalties Specialists, attorneys of the Office of Regulations and Rulings, Customs Auditors, International Trade Specialists, Financial Systems Specialists.

(c) NEW PERSONNEL.—The Secretary of the Treasury is authorized to appoint up to 20 new personnel to work with personnel of the Department in performing customs revenue functions.

<< 6 USCA § 213 >>

SEC. 413. PRESERVATION OF CUSTOMS FUNDS.

Notwithstanding any other provision of this Act, no funds available to the United States Customs Service or collected under paragraphs (1) through (8) of section 13031(a) of the Consolidated Omnibus Budget Reconciliation Act of 1985 may be transferred for use by any other agency or office in the Department.

<< 6 USCA § 214 >>

SEC. 414. SEPARATE BUDGET REQUEST FOR CUSTOMS.

The President shall include in each budget transmitted to Congress under section 1105 of title 31, United States Code, a separate budget request for the United States Customs Service.

<< 6 USCA § 215 >>

SEC. 415. DEFINITION.

In this subtitle, the term "customs revenue function" means the following:

(1) Assessing and collecting customs duties (including antidumping and countervailing duties and duties imposed under safeguard provisions), excise taxes, fees, and penalties due on imported merchandise, including classifying and valuing merchandise for purposes of such assessment.

(2) Processing and denial of entry of persons, baggage, cargo, and mail, with respect to the assessment and collection of import duties.

(3) Detecting and apprehending persons engaged in fraudulent practices designed to circumvent the customs laws of the United States.

(4) Enforcing section 337 of the Tariff Act of 1930 and provisions relating to import quotas and the marking of imported merchandise, and providing Customs Recordations for copyrights, patents, and trademarks.

(5) Collecting accurate import data for compilation of international trade statistics.

(6) Enforcing reciprocal trade agreements.

(7) Functions performed by the following personnel, and associated support staff, of the United States Customs Service on the day before the effective date of this Act: Import Specialists, Entry Specialists, Drawback Specialists, National Import Specialist, Fines and Penalties Specialists, attorneys of the Office of Regulations and Rulings, Customs Auditors, International Trade Specialists, Financial Systems Specialists.

(8) Functions performed by the following offices, with respect to any function described in any of paragraphs (1) through (7), and associated support staff, of the United States Customs Service on the day before the effective date of this Act: the Office of Information and Technology, the Office of Laboratory Services, the Office of the Chief Counsel, the Office of Congressional Affairs, the Office of International Affairs, and the Office of Training and Development.

<< 6 USCA § 216 >>

SEC. 416. GAO REPORT TO CONGRESS.

Not later than 3 months after the effective date of this Act, the Comptroller General of the United States shall submit to Congress a report that sets forth all trade functions performed by the executive branch, specifying each agency that performs each such function.

<< 6 USCA § 217 >>

SEC. 417. ALLOCATION OF RESOURCES BY THE SECRETARY.

(a) IN GENERAL.—The Secretary shall ensure that adequate staffing is provided to assure that levels of customs revenue services provided on the day before the effective date of this Act shall continue to be provided.

(b) NOTIFICATION OF CONGRESS.—The Secretary shall notify the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate at least 90 days prior to taking any action which would—

(1) result in any significant reduction in customs revenue services, including hours of operation, provided at any office within the Department or any port of entry;

(2) eliminate or relocate any office of the Department which provides customs revenue services; or

(3) eliminate any port of entry.

(c) DEFINITION.—In this section, the term "customs revenue services" means those customs revenue functions described in paragraphs (1) through (6) and paragraph (8) of section 415.

<< 6 USCA § 218 >>

SEC. 418. REPORTS TO CONGRESS.

(a) CONTINUING REPORTS.—The United States Customs Service shall, on and after the effective date of this Act, continue to submit to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate any report required, on the day before such the effective date of this Act, to be so submitted under any provision of law.

(b) REPORT ON CONFORMING AMENDMENTS.—Not later than 60 days after the date of enactment of this Act, the Secretary of the Treasury shall submit a report to the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives of proposed conforming amendments to the statutes set forth under section 412(a)(2) in order to determine the appropriate allocation of legal authorities described under this subsection. The Secretary of the Treasury shall also identify those authorities vested in the Secretary of the Treasury that are exercised by the Commissioner of Customs on or before the effective date of this section.

SEC. 419. CUSTOMS USER FEES.

(a) IN GENERAL.—Section 13031(f) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(f)) is amended—

<< 19 USCA § 58c >>

(1) in paragraph (1), by striking subparagraph (B) and inserting the following:
  "(B) amounts deposited into the Customs Commercial and Homeland Security Automation Account under paragraph (5).";

<< 19 USCA § 58c >>

(2) in paragraph (4), by striking "(other than the excess fees determined by the Secretary under paragraph (5))"; and

<< 19 USCA § 58c >>

(3) by striking paragraph (5) and inserting the following:
  "(5)(A) There is created within the general fund of the Treasury a separate account that shall be known as the 'Customs Commercial and Homeland Security Automation Account'. In each of fiscal years 2003, 2004, and 2005 there shall be deposited into the Account from fees collected under subsection (a)(9)(A), $350,000,000.
  "(B) There is authorized to be appropriated from the Account in fiscal years 2003 through 2005 such amounts as are available in that Account for the development, establishment, and implementation of the Automated Commercial Environment computer system for the processing of merchandise that is entered or released and for other purposes related to the functions of the Department of Homeland Security. Amounts appropriated pursuant to this subparagraph are authorized to remain available until expended.
  "(C) In adjusting the fee imposed by subsection (a)(9)(A) for fiscal year 2006, the Secretary of the Treasury shall reduce the amount estimated to be collected in fiscal year 2006 by the amount by which total fees deposited to the Account during fiscal years 2003, 2004, and 2005 exceed total appropriations from that Account.".

<< 19 USCA § 2075 NOTE >>

(b) CONFORMING AMENDMENT.—Section 311(b) of the Customs Border Security Act of 2002 (Public Law 107–210) is amended by striking paragraph (2).

<< 6 USCA prec. § 231 >>

Subtitle C—Miscellaneous Provisions

<< 6 USCA § 231 >>

SEC. 421. TRANSFER OF CERTAIN AGRICULTURAL INSPECTION FUNCTIONS OF THE DEPARTMENT OF AGRICULTURE.

(a) TRANSFER OF AGRICULTURAL IMPORT AND ENTRY INSPECTION FUNCTIONS.—There shall be transferred to the Secretary the functions of the Secretary of Agriculture relating to agricultural import and entry inspection activities under the laws specified in subsection (b).

(b) COVERED ANIMAL AND PLANT PROTECTION LAWS.—The laws referred to in subsection (a) are the following:

  (1) The Act commonly known as the Virus–Serum–Toxin Act (the eighth paragraph under the heading "Bureau of Animal Industry" in the Act of March 4, 1913; 21 U.S.C. 151 et seq.).

  (2) Section 1 of the Act of August 31, 1922 (commonly known as the Honeybee Act; 7 U.S.C. 281).

  (3) Title III of the Federal Seed Act (7 U.S.C. 1581 et seq.).

  (4) The Plant Protection Act (7 U.S.C. 7701 et seq.).

  (5) The Animal Health Protection Act (subtitle E of title X of Public Law 107–171; 7 U.S.C. 8301 et seq.).

  (6) The Lacey Act Amendments of 1981 (16 U.S.C. 3371 et seq.).

  (7) Section 11 of the Endangered Species Act of 1973 (16 U.S.C. 1540).

(c) EXCLUSION OF QUARANTINE ACTIVITIES.—For purposes of this section, the term "functions" does not include any quarantine activities carried out under the laws specified in subsection (b).

(d) EFFECT OF TRANSFER.—

  (1) COMPLIANCE WITH DEPARTMENT OF AGRICULTURE REGULATIONS.—The authority transferred pursuant to subsection (a) shall be exercised by the Secretary in accordance with the regulations, policies, and procedures issued by the Secretary of Agriculture regarding the administration of the laws specified in subsection (b).

  (2) RULEMAKING COORDINATION.—The Secretary of Agriculture shall coordinate with the Secretary whenever the Secretary of Agriculture prescribes regulations, policies, or procedures for administering the functions transferred under subsection (a) under a law specified in subsection (b).

  (3) EFFECTIVE ADMINISTRATION.—The Secretary, in consultation with the Secretary of Agriculture, may issue such directives and guidelines as are necessary to ensure the effective use of personnel of the Department of Homeland Security to carry out the functions transferred pursuant to subsection (a).

(e) TRANSFER AGREEMENT.—

  (1) AGREEMENT REQUIRED; REVISION.—Before the end of the transition period, as defined in section 1501, the Secretary of Agriculture and the Secretary shall enter into an agreement to effectuate the transfer of functions required by subsection (a). The Secretary of Agriculture and the Secretary may jointly revise the agreement as necessary thereafter.

  (2) REQUIRED TERMS.—The agreement required by this subsection shall specifically address the following:

   (A) The supervision by the Secretary of Agriculture of the training of employees of the Secretary to carry out the functions transferred pursuant to subsection (a).

   (B) The transfer of funds to the Secretary under subsection (f).

  (3) COOPERATION AND RECIPROCITY.—The Secretary of Agriculture and the Secretary may include as part of the agreement the following:

   (A) Authority for the Secretary to perform functions delegated to the Animal and Plant Health Inspection Service of the Department of Agriculture regarding the protection of domestic livestock and plants, but not transferred to the Secretary pursuant to subsection (a).

   (B) Authority for the Secretary of Agriculture to use employees of the Department of Homeland Security to carry out authorities delegated to the Animal and Plant Health Inspection Service regarding the protection of domestic livestock and plants.

(f) PERIODIC TRANSFER OF FUNDS TO DEPARTMENT OF HOMELAND SECURITY.—

  (1) TRANSFER OF FUNDS.—Out of funds collected by fees authorized under sections 2508 and 2509 of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136, 136a), the Secretary of Agriculture shall transfer, from time to time in accordance with the agreement under subsection (e), to the Secretary funds for activities carried out by the Secretary for which such fees were collected.

  (2) LIMITATION.—The proportion of fees collected pursuant to such sections that are transferred to the Secretary under this subsection may not exceed the proportion of the costs incurred by the Secretary to all costs incurred to carry out activities funded by such fees.

(g) TRANSFER OF DEPARTMENT OF AGRICULTURE EMPLOYEES.—Not later than the completion of the transition period defined under section 1501, the Secretary of Agriculture shall transfer to the Secretary not more than 3,200 full-time equivalent positions of the Department of Agriculture.

(h) PROTECTION OF INSPECTION ANIMALS.—Title V of the Agricultural Risk Protection Act of 2000 (7 U.S.C. 2279e, 2279f) is amended—

(1) in section 501(a)—

<< 7 USCA § 2279e >>

(A) by inserting "or the Department of Homeland Security" after "Department of Agriculture"; and
(B) by inserting "or the Secretary of Homeland Security" after "Secretary of Agriculture";

<< 7 USCA § 2279e >>

<< 7 USCA § 2279f >>

(2) by striking "Secretary" each place it appears (other than in sections 501(a) and 501(e)) and inserting "Secretary concerned"; and

<< 7 USCA § 2279e >>

(3) by adding at the end of section 501 the following new subsection:
"(e) SECRETARY CONCERNED DEFINED.—In this title, the term 'Secretary concerned' means—
"(1) the Secretary of Agriculture, with respect to an animal used for purposes of official inspections by the Department of Agriculture; and
"(2) the Secretary of Homeland Security, with respect to an animal used for purposes of official inspections by the Department of Homeland Security.".

<< 6 USCA § 232 >>

SEC. 422. FUNCTIONS OF ADMINISTRATOR OF GENERAL SERVICES.

(a) OPERATION, MAINTENANCE, AND PROTECTION OF FEDERAL BUILDINGS AND GROUNDS.—Nothing in this Act may be construed to affect the functions or authorities of the Administrator of General Services with respect to the operation, maintenance, and protection of buildings and grounds owned or occupied by the Federal Government and under the jurisdiction, custody, or control of the Administrator. Except for the law enforcement and related security functions transferred under section 403(3), the Administrator shall retain all powers, functions, and authorities vested in the Administrator under chapter 10 of title 40, United States Code, and other provisions of law that are necessary for the operation, maintenance, and protection of such buildings and grounds.

(b) COLLECTION OF RENTS AND FEES; FEDERAL BUILDINGS FUND.—
(1) STATUTORY CONSTRUCTION.—Nothing in this Act may be construed—
(A) to direct the transfer of, or affect, the authority of the Administrator of General Services to collect rents and fees, including fees collected for protective services; or
(B) to authorize the Secretary or any other official in the Department to obligate amounts in the Federal Buildings Fund established by section 490(f) of title 40, United States Code.
(2) USE OF TRANSFERRED AMOUNTS.—Any amounts transferred by the Administrator of General Services to the Secretary out of rents and fees collected by the Administrator shall be used by the Secretary solely for the protection of buildings or grounds owned or occupied by the Federal Government.

<< 6 USCA § 233 >>

SEC. 423. FUNCTIONS OF TRANSPORTATION SECURITY ADMINISTRATION.

(a) CONSULTATION WITH FEDERAL AVIATION ADMINISTRATION.—The Secretary and other officials in the Department shall consult with the Administrator of the Federal Aviation Administration before taking any action that might affect aviation safety, air carrier operations, aircraft airworthiness, or the use of airspace. The Secretary shall establish a liaison office within the Department for the purpose of consulting with the Administrator of the Federal Aviation Administration.

(b) REPORT TO CONGRESS.—Not later than 60 days after the date of enactment of this Act, the Secretary of Transportation shall transmit to Congress a report containing a plan for complying with the requirements of section 44901(d) of title 49, United States Code, as amended by section 425 of this Act.

(c) LIMITATIONS ON STATUTORY CONSTRUCTION.—

(1) GRANT OF AUTHORITY.—Nothing in this Act may be construed to vest in the Secretary or any other official in the Department any authority over transportation security that is not vested in the Under Secretary of Transportation for Security, or in the Secretary of Transportation under chapter 449 of title 49, United States Code, on the day before the date of enactment of this Act.

(2) OBLIGATION OF AIP FUNDS.—Nothing in this Act may be construed to authorize the Secretary or any other official in the Department to obligate amounts made available under section 48103 of title 49, United States Code.

<< 6 USCA § 234 >>

SEC. 424. PRESERVATION OF TRANSPORTATION SECURITY ADMINISTRATION AS A DISTINCT ENTITY.

(a) IN GENERAL.—Notwithstanding any other provision of this Act, and subject to subsection (b), the Transportation Security Administration shall be maintained as a distinct entity within the Department under the Under Secretary for Border Transportation and Security.

(b) SUNSET.—Subsection (a) shall cease to apply 2 years after the date of enactment of this Act.

<< 49 USCA § 44901 >>

SEC. 425. EXPLOSIVE DETECTION SYSTEMS.

Section 44901(d) of title 49, United States Code, is amended by adding at the end the following:

"(2) DEADLINE.—

"(A) IN GENERAL.—If, in his discretion or at the request of an airport, the Under Secretary of Transportation for Security determines that the Transportation Security Administration is not able to deploy explosive detection systems required to be deployed under paragraph (1) at all airports where explosive detection systems are required by December 31, 2002, then with respect to each airport for which the Under Secretary makes that determination—

"(i) the Under Secretary shall submit to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Transportation and Infrastructure a detailed plan (which may be submitted in classified form) for the deployment of the number of explosive detection systems at that airport necessary to meet the requirements of paragraph (1) as soon as practicable at that airport but in no event later than December 31, 2003; and

"(ii) the Under Secretary shall take all necessary action to ensure that alternative means of screening all checked baggage is implemented until the requirements of paragraph (1) have been met.

"(B) CRITERIA FOR DETERMINATION.—In making a determination under subparagraph (A), the Under Secretary shall take into account—

"(i) the nature and extent of the required modifications to the airport's terminal buildings, and the technical, engineering, design and construction issues;

"(ii) the need to ensure that such installations and modifications are effective; and

"(iii) the feasibility and cost-effectiveness of deploying explosive detection systems in the baggage sorting area or other non-public area rather than the lobby of an airport terminal building.

"(C) RESPONSE.—The Under Secretary shall respond to the request of an airport under subparagraph (A) within 14 days of receiving the request. A denial of request shall create no right of appeal or judicial review.

"(D) AIRPORT EFFORT REQUIRED.—Each airport with respect to which the Under Secretary makes a determination under subparagraph (A) shall—

"(i) cooperate fully with the Transportation Security Administration with respect to screening checked baggage and changes to accommodate explosive detection systems; and

"(ii) make security projects a priority for the obligation or expenditure of funds made available under chapter 417 or 471 until explosive detection systems required to be deployed under paragraph (1) have been deployed at that airport.

"(3) REPORTS.—Until the Transportation Security Administration has met the requirements of paragraph (1), the Under Secretary shall submit a classified report every 30 days after the date of enactment of this Act to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Transportation and Infrastructure describing the progress made toward meeting such requirements at each airport.".

SEC. 426. TRANSPORTATION SECURITY.

(a) TRANSPORTATION SECURITY OVERSIGHT BOARD.—

<< 49 USCA § 115 >>

(1) ESTABLISHMENT.—Section 115(a) of title 49, United States Code, is amended by striking "Department of Transportation" and inserting "Department of Homeland Security".

(2) MEMBERSHIP.—Section 115(b)(1) of title 49, United States Code, is amended—

<< 49 USCA § 115 >>

(A) by striking subparagraph (G);

<< 49 USCA § 115 >>

(B) by redesignating subparagraphs (A) through (F) as subparagraphs (B)through (G), respectively; and

<< 49 USCA § 115 >>

(C) by inserting before subparagraph (B) (as so redesignated) the following:

"(A) The Secretary of Homeland Security, or the Secretary's designee.".

<< 49 USCA § 115 >>

(3) CHAIRPERSON.—Section 115(b)(2) of title 49, United States Code, is amended by striking "Secretary of Transportation" and inserting "Secretary of Homeland Security".

<< 49 USCA § 47106 >>

(b) APPROVAL OF AIP GRANT APPLICATIONS FOR SECURITY ACTIVITIES.—Section 47106 of title 49, United States Code, is amended by adding at the end the following:

"(g) CONSULTATION WITH SECRETARY OF HOMELAND SECURITY.—The Secretary shall consult with the Secretary of Homeland Security before approving an application under this subchapter for an airport development project grant for activities described in section 47102(3)(B)(ii) only as they relate to security equipment or section 47102(3)(B)(x) only as they relate to installation of bulk explosive detection system.".

<< 6 USCA § 235 >>

SEC. 427. COORDINATION OF INFORMATION AND INFORMATION TECHNOLOGY.

(a) DEFINITION OF AFFECTED AGENCY.—In this section, the term "affected agency" means—

(1) the Department;

(2) the Department of Agriculture;

(3) the Department of Health and Human Services; and

(4) any other department or agency determined to be appropriate by the Secretary.

(b) COORDINATION.—The Secretary, in coordination with the Secretary of Agriculture, the Secretary of Health and Human Services, and the head of each other department or agency determined to be appropriate by the Secretary, shall ensure that appropriate information (as determined by the Secretary) concerning inspections of articles that are imported or entered into the United States, and are inspected or regulated by 1 or more affected agencies, is timely and efficiently exchanged between the affected agencies.

(c) REPORT AND PLAN.—Not later than 18 months after the date of enactment of this Act, the Secretary, in consultation with the Secretary of Agriculture, the Secretary of Health and Human Services, and the head of each other department or agency determined to be appropriate by the Secretary, shall submit to Congress—

(1) a report on the progress made in implementing this section; and

(2) a plan to complete implementation of this section.

<< 6 USCA § 236 >>

SEC. 428. VISA ISSUANCE.

(a) DEFINITION.—In this subsection, the term "consular office" has the meaning given that term under section 101(a)(9) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(9)).

(b) IN GENERAL.—Notwithstanding section 104(a) of the Immigration and Nationality Act (8 U.S.C. 1104(a)) or any other provision of law, and except as provided in subsection (c) of this section, the Secretary—

(1) shall be vested exclusively with all authorities to issue regulations with respect to, administer, and enforce the provisions of such Act, and of all other immigration and nationality laws, relating to the functions of consular officers of the United States in connection with the granting or refusal of visas, and shall have the authority to refuse visas in accordance with law and to develop programs of homeland security training for consular officers (in addition to consular training provided by the Secretary of State), which authorities shall be exercised through the Secretary of State, except that the Secretary shall not have authority to alter or reverse the decision of a consular officer to refuse a visa to an alien; and

(2) shall have authority to confer or impose upon any officer or employee of the United States, with the consent of the head of the executive agency under whose jurisdiction such officer or employee is serving, any of the functions specified in paragraph (1).

(c) AUTHORITY OF THE SECRETARY OF STATE.—

(1) IN GENERAL.—Notwithstanding subsection (b), the Secretary of State may direct a consular officer to refuse a visa to an alien if the Secretary of State deems such refusal necessary or advisable in the foreign policy or security interests of the United States.

(2) CONSTRUCTION REGARDING AUTHORITY.—Nothing in this section, consistent with the Secretary of Homeland Security's authority to refuse visas in accordance with law, shall be construed as affecting the authorities of the Secretary of State under the following provisions of law:

(A) Section 101(a)(15)(A) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(A)).

(B) Section 204(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1154) (as it will take effect upon the entry into force of the Convention on Protection of Children and Cooperation in Respect to Inter–Country adoption).

(C) Section 212(a)(3)(B)(i)(IV)(bb) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(i)(IV)(bb)).

(D) Section 212(a)(3)(B)(i)(VI) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(i)(VI)).

(E) Section 212(a)(3)(B)(vi)(II) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)(II)).

(F) Section 212(a)(3)(C) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(C)).

(G) Section 212(a)(10)(C) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(10)(C)).

(H) Section 212(f) of the Immigration and Nationality Act (8 U.S.C. 1182(f)).

(I) Section 219(a) of the Immigration and Nationality Act (8 U.S.C. 1189(a)).

(J) Section 237(a)(4)(C) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(C)).

(K) Section 401 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (22 U.S.C. 6034; Public Law 104–114).

(L) Section 613 of the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1999 (as contained in section 101(b) of division A of Public Law 105–277) (Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999); 112 Stat. 2681; H.R. 4328 (originally H.R. 4276) as amended by section 617 of Public Law 106–553.

(M) Section 103(f) of the Chemical Weapon Convention Implementation Act of 1998 (112 Stat. 2681–865).

(N) Section 801 of H.R. 3427, the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001, as enacted by reference in Public Law 106–113.

(O) Section 568 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2002 (Public Law 107–115).

(P) Section 51 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2723).

(d) CONSULAR OFFICERS AND CHIEFS OF MISSIONS.—

(1) IN GENERAL.—Nothing in this section may be construed to alter or affect—

(A) the employment status of consular officers as employees of the Department of State; or

(B) the authority of a chief of mission under section 207 of the Foreign Service Act of 1980 (22 U.S.C. 3927).

(2) CONSTRUCTION REGARDING DELEGATION OF AUTHORITY.—Nothing in this section shall be construed to affect any delegation of authority to the Secretary of State by the President pursuant to any proclamation issued under section 212(f) of the Immigration and Nationality Act (8 U.S.C. 1182(f)), consistent with the Secretary of Homeland Security's authority to refuse visas in accordance with law.

(e) ASSIGNMENT OF HOMELAND SECURITY EMPLOYEES TO DIPLOMATIC AND CONSULAR POSTS.—

(1) IN GENERAL.—The Secretary is authorized to assign employees of the Department to each diplomatic and consular post at which visas are issued, unless the Secretary determines that such an assignment at a particular post would not promote homeland security.

(2) FUNCTIONS.—Employees assigned under paragraph (1) shall perform the following functions:

(A) Provide expert advice and training to consular officers regarding specific security threats relating to the adjudication of individual visa applications or classes of applications.

(B) Review any such applications, either on the initiative of the employee of the Department or upon request by a consular officer or other person charged with adjudicating such applications.

(C) Conduct investigations with respect to consular matters under the jurisdiction of the Secretary.

(3) EVALUATION OF CONSULAR OFFICERS.—The Secretary of State shall evaluate, in consultation with the Secretary, as deemed appropriate by the Secretary, the performance of consular officers with respect to the processing and adjudication of applications for visas in accordance with performance standards developed by the Secretary for these procedures.

(4) REPORT.—The Secretary shall, on an annual basis, submit a report to Congress that describes the basis for each determination under paragraph (1) that the assignment of an employee of the Department at a particular diplomatic post would not promote homeland security.

(5) PERMANENT ASSIGNMENT; PARTICIPATION IN TERRORIST LOOKOUT COMMITTEE.—When appropriate, employees of the Department assigned to perform functions described in paragraph (2) may be assigned permanently to overseas diplomatic or consular posts with country-specific or regional responsibility. If the Secretary so directs, any such employee, when present at an overseas post, shall participate in the terrorist lookout committee established under section 304 of the Enhanced Border Security and Visa Entry Reform Act of 2002 (8 U.S.C. 1733).

(6) TRAINING AND HIRING.—

(A) IN GENERAL.—The Secretary shall ensure, to the extent possible, that any employees of the Department assigned to perform functions under paragraph (2) and, as appropriate, consular officers, shall be provided the necessary training to enable them to carry out such functions, including training in foreign languages, interview techniques, and fraud detection techniques, in conditions in the particular country where each employee is assigned, and in other appropriate areas of study.

(B) USE OF CENTER.—The Secretary is authorized to use the National Foreign Affairs Training Center, on a reimbursable basis, to obtain the training described in subparagraph (A).

(7) REPORT.—Not later than 1 year after the date of enactment of this Act, the Secretary and the Secretary of State shall submit to Congress—

(A) a report on the implementation of this subsection; and

(B) any legislative proposals necessary to further the objectives of this subsection.

(8) EFFECTIVE DATE.—This subsection shall take effect on the earlier of—

(A) the date on which the President publishes notice in the Federal Register that the President has submitted a report to Congress setting forth a memorandum of understanding between the Secretary and the Secretary of State governing the implementation of this section; or

(B) the date occurring 1 year after the date of enactment of this Act.

(f) NO CREATION OF PRIVATE RIGHT OF ACTION.—Nothing in this section shall be construed to create or authorize a private right of action to challenge a decision of a consular officer or other United States official or employee to grant or deny a visa.

(g) STUDY REGARDING USE OF FOREIGN NATIONALS.—

(1) IN GENERAL.—The Secretary of Homeland Security shall conduct a study of the role of foreign nationals in the granting or refusal of visas and other documents authorizing entry of aliens into the United States. The study shall address the following:

(A) The proper role, if any, of foreign nationals in the process of rendering decisions on such grants and refusals.

(B) Any security concerns involving the employment of foreign nationals.

(C) Whether there are cost-effective alternatives to the use of foreign nationals.

(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary shall submit a report containing the findings of the study conducted under paragraph (1) to the Committee on the Judiciary, the Committee on International Relations, and the Committee on Government Reform of the House of Representatives, and the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Government Affairs of the Senate.

(h) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Director of the Office of Science and Technology Policy shall submit to Congress a report on how the provisions of this section will affect procedures for the issuance of student visas.

(i) VISA ISSUANCE PROGRAM FOR SAUDI ARABIA.—Notwithstanding any other provision of law, after the date of the enactment of this Act all third party screening programs in Saudi Arabia shall be terminated. On–site personnel of the Department of Homeland Security shall review all visa applications prior to adjudication.

<< 6 USCA § 237 >>

SEC. 429. INFORMATION ON VISA DENIALS REQUIRED TO BE ENTERED INTO ELECTRONIC DATA SYSTEM.

(a) IN GENERAL.—Whenever a consular officer of the United States denies a visa to an applicant, the consular officer shall enter the fact and the basis of the denial and the name of the applicant into the interoperable electronic data system implemented under section 202(a) of the Enhanced Border Security and Visa Entry Reform Act of 2002 (8 U.S.C. 1722(a)).

(b) PROHIBITION.—In the case of any alien with respect to whom a visa has been denied under subsection (a)—

(1) no subsequent visa may be issued to the alien unless the consular officer considering the alien's visa application has reviewed the information concerning the alien placed in the interoperable electronic data system, has indicated on the alien's application that the information has been reviewed, and has stated for the record why the visa is being issued or a waiver of visa ineligibility recommended in spite of that information; and

(2) the alien may not be admitted to the United States without a visa issued in accordance with the procedures described in paragraph (1).

<< 6 USCA § 238 >>

SEC. 430. OFFICE FOR DOMESTIC PREPAREDNESS.

(a) IN GENERAL.—The Office for Domestic Preparedness shall be within the Directorate of Border and Transportation Security.

(b) DIRECTOR.—There shall be a Director of the Office for Domestic Preparedness, who shall be appointed by the President, by and with the advice and consent of the Senate. The Director of the Office for Domestic Preparedness shall report directly to the Under Secretary for Border and Transportation Security.

(c) RESPONSIBILITIES.—The Office for Domestic Preparedness shall have the primary responsibility within the executive branch of Government for the preparedness of the United States for acts of terrorism, including—

(1) coordinating preparedness efforts at the Federal level, and working with all State, local, tribal, parish, and private sector emergency response providers on all matters pertaining to combating terrorism, including training, exercises, and equipment support;

(2) coordinating or, as appropriate, consolidating communications and systems of communications relating to homeland security at all levels of government;

(3) directing and supervising terrorism preparedness grant programs of the Federal Government (other than those programs administered by the Department of Health and Human Services) for all emergency response providers;

(4) incorporating the Strategy priorities into planning guidance on an agency level for the preparedness efforts of the Office for Domestic Preparedness;

(5) providing agency-specific training for agents and analysts within the Department, other agencies, and State and local agencies and international entities;

(6) as the lead executive branch agency for preparedness of the United States for acts of terrorism, cooperating closely with the Federal Emergency Management Agency, which shall have the primary responsibility within the executive branch to prepare for and mitigate the effects of nonterrorist-related disasters in the United States;

(7) assisting and supporting the Secretary, in coordination with other Directorates and entities outside the Department, in conducting appropriate risk analysis and risk management activities of State, local, and tribal governments consistent with the mission and functions of the Directorate; and

(8) those elements of the Office of National Preparedness of the Federal Emergency Management Agency which relate to terrorism, which shall be consolidated within the Department in the Office for Domestic Preparedness established under this section.

(d) FISCAL YEARS 2003 and 2004—During fiscal year 2003 and fiscal year 2004, the Director of the Office for Domestic Preparedness established under this section shall manage and carry out those functions of the Office for Domestic Preparedness of the Department of Justice (transferred under this section) before September 11, 2001, under the same terms, conditions, policies, and authorities, and with the required level of personnel, assets, and budget before September 11, 2001.

<< 6 USCA prec. § 251 >>

Subtitle D—Immigration Enforcement Functions

<< 6 USCA § 251 >>

## SEC. 441. TRANSFER OF FUNCTIONS TO UNDER SECRETARY FOR BORDER AND TRANSPORTATION SECURITY.

In accordance with title XV (relating to transition provisions), there shall be transferred from the Commissioner of Immigration and Naturalization to the Under Secretary for Border and Transportation Security all functions performed under the following programs, and all personnel, assets, and liabilities pertaining to such programs, immediately before such transfer occurs:

(1) The Border Patrol program.

(2) The detention and removal program.

(3) The intelligence program.

(4) The investigations program.

(5) The inspections program.

<< 6 USCA § 252 >>

## SEC. 442. ESTABLISHMENT OF BUREAU OF BORDER SECURITY.

(a) ESTABLISHMENT OF BUREAU.—

(1) IN GENERAL.—There shall be in the Department of Homeland Security a bureau to be known as the "Bureau of Border Security".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) ASSISTANT SECRETARY.—The head of the Bureau of Border Security shall be the Assistant Secretary of the Bureau of Border Security, who—

(A) shall report directly to the Under Secretary for Border and Transportation Security; and

(B) shall have a minimum of 5 years professional experience in law enforcement, and a minimum of 5 years of management experience.

(3) FUNCTIONS.—The Assistant Secretary of the Bureau of Border Security—

(A) shall establish the policies for performing such functions as are—

(i) transferred to the Under Secretary for Border and Transportation Security by section 441 and delegated to the Assistant Secretary by the Under Secretary for Border and Transportation Security; or

(ii) otherwise vested in the Assistant Secretary by law;

(B) shall oversee the administration of such policies; and

(C) shall advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau of Border Security that may affect the Bureau of Citizenship and Immigration Services established under subtitle E, including potentially conflicting policies or operations.

(4) PROGRAM TO COLLECT INFORMATION RELATING TO FOREIGN STUDENTS.—The Assistant Secretary of the Bureau of Border Security shall be responsible for administering the program to collect information relating to nonimmigrant foreign students and other exchange program participants described in section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372), including the Student and Exchange Visitor Information System established under that section, and shall use such information to carry out the enforcement functions of the Bureau.

(5) MANAGERIAL ROTATION PROGRAM.—

(A) IN GENERAL.—Not later than 1 year after the date on which the transfer of functions specified under section 441 takes effect, the Assistant Secretary of the Bureau of Border Security shall design and implement a managerial rotation program under which employees of such bureau holding positions involving supervisory or managerial responsibility and classified, in accordance with chapter 51 of title 5, United States Code, as a GS–14 or above, shall—

(i) gain some experience in all the major functions performed by such bureau; and

(ii) work in at least one local office of such bureau.

(B) REPORT.—Not later than 2 years after the date on which the transfer of functions specified under section 441 takes effect, the Secretary shall submit a report to the Congress on the implementation of such program.

(b) CHIEF OF POLICY AND STRATEGY.—

(1) IN GENERAL.—There shall be a position of Chief of Policy and Strategy for the Bureau of Border Security.

(2) FUNCTIONS.—In consultation with Bureau of Border Security personnel in local offices, the Chief of Policy and Strategy shall be responsible for—

(A) making policy recommendations and performing policy research and analysis on immigration enforcement issues; and

(B) coordinating immigration policy issues with the Chief of Policy and Strategy for the Bureau of Citizenship and Immigration Services (established under subtitle E), as appropriate.

(c) LEGAL ADVISOR.—There shall be a principal legal advisor to the Assistant Secretary of the Bureau of Border Security. The legal advisor shall provide specialized legal advice to the Assistant Secretary of the Bureau of Border Security and shall represent the bureau in all exclusion, deportation, and removal proceedings before the Executive Office for Immigration Review.

<< 6 USCA § 253 >>

SEC. 443. PROFESSIONAL RESPONSIBILITY AND QUALITY REVIEW.

The Under Secretary for Border and Transportation Security shall be responsible for—

(1) conducting investigations of noncriminal allegations of misconduct, corruption, and fraud involving any employee of the Bureau of Border Security that are not subject to investigation by the Inspector General for the Department;

(2) inspecting the operations of the Bureau of Border Security and providing assessments of the quality of the operations of such bureau as a whole and each of its components; and

(3) providing an analysis of the management of the Bureau of Border Security.

<< 6 USCA § 254 >>

SEC. 444. EMPLOYEE DISCIPLINE.

  The Under Secretary for Border and Transportation Security may, notwithstanding any other provision of law, impose disciplinary action, including termination of employment, pursuant to policies and procedures applicable to employees of the Federal Bureau of Investigation, on any employee of the Bureau of Border Security who willfully deceives the Congress or agency leadership on any matter.

<< 6 USCA § 255 >>

SEC. 445. REPORT ON IMPROVING ENFORCEMENT FUNCTIONS.

  (a) IN GENERAL.—The Secretary, not later than 1 year after being sworn into office, shall submit to the Committees on Appropriations and the Judiciary of the House of Representatives and of the Senate a report with a plan detailing how the Bureau of Border Security, after the transfer of functions specified under section 441 takes effect, will enforce comprehensively, effectively, and fairly all the enforcement provisions of the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) relating to such functions.
  (b) CONSULTATION.—In carrying out subsection (a), the Secretary of Homeland Security shall consult with the Attorney General, the Secretary of State, the Director of the Federal Bureau of Investigation, the Secretary of the Treasury, the Secretary of Labor, the Commissioner of Social Security, the Director of the Executive Office for Immigration Review, and the heads of State and local law enforcement agencies to determine how to most effectively conduct enforcement operations.

<< 6 USCA § 256 >>

SEC. 446. SENSE OF CONGRESS REGARDING CONSTRUCTION OF FENCING NEAR SAN DIEGO, CALIFORNIA.

  It is the sense of the Congress that completing the 14–mile border fence project required to be carried out under section 102(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) should be a priority for the Secretary.

<< 6 USCA prec. § 271 >>

Subtitle E—Citizenship and Immigration Services

<< 6 USCA § 271 >>

SEC. 451. ESTABLISHMENT OF BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES.

  (a) ESTABLISHMENT OF BUREAU.—
   (1) IN GENERAL.—There shall be in the Department a bureau to be known as the "Bureau of Citizenship and Immigration Services".
   (2) DIRECTOR.—The head of the Bureau of Citizenship and Immigration Services shall be the Director of the Bureau of Citizenship and Immigration Services, who—
    (A) shall report directly to the Deputy Secretary;
    (B) shall have a minimum of 5 years of management experience; and
    (C) shall be paid at the same level as the Assistant Secretary of the Bureau of Border Security.
   (3) FUNCTIONS.—The Director of the Bureau of Citizenship and Immigration Services—
    (A) shall establish the policies for performing such functions as are transferred to the Director by this section or this Act or otherwise vested in the Director by law;
    (B) shall oversee the administration of such policies;

(C) shall advise the Deputy Secretary with respect to any policy or operation of the Bureau of Citizenship and Immigration Services that may affect the Bureau of Border Security of the Department, including potentially conflicting policies or operations;

 (D) shall establish national immigration services policies and priorities;

 (E) shall meet regularly with the Ombudsman described in section 452 to correct serious service problems identified by the Ombudsman; and

 (F) shall establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress within 3 months after its submission to Congress.

(4) MANAGERIAL ROTATION PROGRAM.—

 (A) IN GENERAL.—Not later than 1 year after the effective date specified in section 455, the Director of the Bureau of Citizenship and Immigration Services shall design and implement a managerial rotation program under which employees of such bureau holding positions involving supervisory or managerial responsibility and classified, in accordance with chapter 51 of title 5, United States Code, as a GS–14 or above, shall—

  (i) gain some experience in all the major functions performed by such bureau; and

  (ii) work in at least one field office and one service center of such bureau.

 (B) REPORT.—Not later than 2 years after the effective date specified in section 455, the Secretary shall submit a report to Congress on the implementation of such program.

(5) PILOT INITIATIVES FOR BACKLOG ELIMINATION.—The Director of the Bureau of Citizenship and Immigration Services is authorized to implement innovative pilot initiatives to eliminate any remaining backlog in the processing of immigration benefit applications, and to prevent any backlog in the processing of such applications from recurring, in accordance with section 204(a) of the Immigration Services and Infrastructure Improvements Act of 2000 (8 U.S.C. 1573(a)). Such initiatives may include measures such as increasing personnel, transferring personnel to focus on areas with the largest potential for backlog, and streamlining paperwork.

 (b) TRANSFER OF FUNCTIONS FROM COMMISSIONER.—In accordance with title XV (relating to transition provisions), there are transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services the following functions, and all personnel, infrastructure, and funding provided to the Commissioner in support of such functions immediately before the effective date specified in section 455:

 (1) Adjudications of immigrant visa petitions.

 (2) Adjudications of naturalization petitions.

 (3) Adjudications of asylum and refugee applications.

 (4) Adjudications performed at service centers.

 (5) All other adjudications performed by the Immigration and Naturalization Service immediately before the effective date specified in section 455.

(c) CHIEF OF POLICY AND STRATEGY.—

 (1) IN GENERAL.—There shall be a position of Chief of Policy and Strategy for the Bureau of Citizenship and Immigration Services.

 (2) FUNCTIONS.—In consultation with Bureau of Citizenship and Immigration Services personnel in field offices, the Chief of Policy and Strategy shall be responsible for—

  (A) making policy recommendations and performing policy research and analysis on immigration services issues; and

  (B) coordinating immigration policy issues with the Chief of Policy and Strategy for the Bureau of Border Security of the Department.

(d) LEGAL ADVISOR.—

 (1) IN GENERAL.—There shall be a principal legal advisor to the Director of the Bureau of Citizenship and Immigration Services.

 (2) FUNCTIONS.—The legal advisor shall be responsible for—

  (A) providing specialized legal advice, opinions, determinations, regulations, and any other assistance to the Director of the Bureau of Citizenship and Immigration Services with respect to legal matters affecting the Bureau of Citizenship and Immigration Services; and

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 2238 of 3864

(B) representing the Bureau of Citizenship and Immigration Services in visa petition appeal proceedings before the Executive Office for Immigration Review.

(e) BUDGET OFFICER.—

(1) IN GENERAL.—There shall be a Budget Officer for the Bureau of Citizenship and Immigration Services.

(2) FUNCTIONS.—

(A) IN GENERAL.—The Budget Officer shall be responsible for—

(i) formulating and executing the budget of the Bureau of Citizenship and Immigration Services;

(ii) financial management of the Bureau of Citizenship and Immigration Services; and

(iii) collecting all payments, fines, and other debts for the Bureau of Citizenship and Immigration Services.

(f) CHIEF OF OFFICE OF CITIZENSHIP.—

(1) IN GENERAL.—There shall be a position of Chief of the Office of Citizenship for the Bureau of Citizenship and Immigration Services.

(2) FUNCTIONS.—The Chief of the Office of Citizenship for the Bureau of Citizenship and Immigration Services shall be responsible for promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials.

<< 6 USCA § 272 >>

SEC. 452. CITIZENSHIP AND IMMIGRATION SERVICES OMBUDSMAN.

(a) IN GENERAL.—Within the Department, there shall be a position of Citizenship and Immigration Services Ombudsman (in this section referred to as the "Ombudsman"). The Ombudsman shall report directly to the Deputy Secretary. The Ombudsman shall have a background in customer service as well as immigration law.

(b) FUNCTIONS.—It shall be the function of the Ombudsman—

(1) to assist individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services;

(2) to identify areas in which individuals and employers have problems in dealing with the Bureau of Citizenship and Immigration Services; and

(3) to the extent possible, to propose changes in the administrative practices of the Bureau of Citizenship and Immigration Services to mitigate problems identified under paragraph (2).

(c) ANNUAL REPORTS.—

(1) OBJECTIVES.—Not later than June 30 of each calendar year, the Ombudsman shall report to the Committee on the Judiciary of the House of Representatives and the Senate on the objectives of the Office of the Ombudsman for the fiscal year beginning in such calendar year. Any such report shall contain full and substantive analysis, in addition to statistical information, and—

(A) shall identify the recommendations the Office of the Ombudsman has made on improving services and responsiveness of the Bureau of Citizenship and Immigration Services;

(B) shall contain a summary of the most pervasive and serious problems encountered by individuals and employers, including a description of the nature of such problems;

(C) shall contain an inventory of the items described in subparagraphs (A) and (B) for which action has been taken and the result of such action;

(D) shall contain an inventory of the items described in subparagraphs (A) and (B) for which action remains to be completed and the period during which each item has remained on such inventory;

(E) shall contain an inventory of the items described in subparagraphs (A) and (B) for which no action has been taken, the period during which each item has remained on such inventory, the reasons for the inaction, and shall identify any official of the Bureau of Citizenship and Immigration Services who is responsible for such inaction;

(F) shall contain recommendations for such administrative action as may be appropriate to resolve problems encountered by individuals and employers, including problems created by excessive backlogs in the adjudication and processing of immigration benefit petitions and applications; and

(G) shall include such other information as the Ombudsman may deem advisable.

(2) REPORT TO BE SUBMITTED DIRECTLY.—Each report required under this subsection shall be provided directly to the committees described in paragraph (1) without any prior comment or amendment from the Secretary, Deputy Secretary, Director of the Bureau of Citizenship and Immigration Services, or any other officer or employee of the Department or the Office of Management and Budget.

(d) OTHER RESPONSIBILITIES.—The Ombudsman—

(1) shall monitor the coverage and geographic allocation of local offices of the Ombudsman;

(2) shall develop guidance to be distributed to all officers and employees of the Bureau of Citizenship and Immigration Services outlining the criteria for referral of inquiries to local offices of the Ombudsman;

(3) shall ensure that the local telephone number for each local office of the Ombudsman is published and available to individuals and employers served by the office; and

(4) shall meet regularly with the Director of the Bureau of Citizenship and Immigration Services to identify serious service problems and to present recommendations for such administrative action as may be appropriate to resolve problems encountered by individuals and employers.

(e) PERSONNEL ACTIONS.—

(1) IN GENERAL.—The Ombudsman shall have the responsibility and authority—

(A) to appoint local ombudsmen and make available at least 1 such ombudsman for each State; and

(B) to evaluate and take personnel actions (including dismissal) with respect to any employee of any local office of the Ombudsman.

(2) CONSULTATION.—The Ombudsman may consult with the appropriate supervisory personnel of the Bureau of Citizenship and Immigration Services in carrying out the Ombudsman's responsibilities under this subsection.

(f) RESPONSIBILITIES OF BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES.—The Director of the Bureau of Citizenship and Immigration Services shall establish procedures requiring a formal response to all recommendations submitted to such director by the Ombudsman within 3 months after submission to such director.

(g) OPERATION OF LOCAL OFFICES.—

(1) IN GENERAL.—Each local ombudsman—

(A) shall report to the Ombudsman or the delegate thereof;

(B) may consult with the appropriate supervisory personnel of the Bureau of Citizenship and Immigration Services regarding the daily operation of the local office of such ombudsman;

(C) shall, at the initial meeting with any individual or employer seeking the assistance of such local office, notify such individual or employer that the local offices of the Ombudsman operate independently of any other component of the Department and report directly to Congress through the Ombudsman; and

(D) at the local ombudsman's discretion, may determine not to disclose to the Bureau of Citizenship and Immigration Services contact with, or information provided by, such individual or employer.

(2) MAINTENANCE OF INDEPENDENT COMMUNICATIONS.—Each local office of the Ombudsman shall maintain a phone, facsimile, and other means of electronic communication access, and a post office address, that is separate from those maintained by the Bureau of Citizenship and Immigration Services, or any component of the Bureau of Citizenship and Immigration Services.

<< 6 USCA § 273 >>

SEC. 453. PROFESSIONAL RESPONSIBILITY AND QUALITY REVIEW.

(a) IN GENERAL.—The Director of the Bureau of Citizenship and Immigration Services shall be responsible for—

(1) conducting investigations of noncriminal allegations of misconduct, corruption, and fraud involving any employee of the Bureau of Citizenship and Immigration Services that are not subject to investigation by the Inspector General for the Department;

(2) inspecting the operations of the Bureau of Citizenship and Immigration Services and providing assessments of the quality of the operations of such bureau as a whole and each of its components; and

(3) providing an analysis of the management of the Bureau of Citizenship and Immigration Services.

(b) SPECIAL CONSIDERATIONS.—In providing assessments in accordance with subsection (a)(2) with respect to a decision of the Bureau of Citizenship and Immigration Services, or any of its components, consideration shall be given to—

  (1) the accuracy of the findings of fact and conclusions of law used in rendering the decision;

  (2) any fraud or misrepresentation associated with the decision; and

  (3) the efficiency with which the decision was rendered.

<< 6 USCA § 274 >>

SEC. 454. EMPLOYEE DISCIPLINE.

  The Director of the Bureau of Citizenship and Immigration Services may, notwithstanding any other provision of law, impose disciplinary action, including termination of employment, pursuant to policies and procedures applicable to employees of the Federal Bureau of Investigation, on any employee of the Bureau of Citizenship and Immigration Services who willfully deceives Congress or agency leadership on any matter.

<< 6 USCA § 271 NOTE >>

SEC. 455. EFFECTIVE DATE.

  Notwithstanding section 4, sections 451 through 456, and the amendments made by such sections, shall take effect on the date on which the transfer of functions specified under section 441 takes effect.

<< 6 USCA § 275 >>

SEC. 456. TRANSITION.

  (a) REFERENCES.—With respect to any function transferred by this subtitle to, and exercised on or after the effective date specified in section 455 by, the Director of the Bureau of Citizenship and Immigration Services, any reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or pertaining to a component of government from which such function is transferred—

  (1) to the head of such component is deemed to refer to the Director of the Bureau of Citizenship and Immigration Services; or

  (2) to such component is deemed to refer to the Bureau of Citizenship and Immigration Services.

  (b) OTHER TRANSITION ISSUES.—

  (1) EXERCISE OF AUTHORITIES.—Except as otherwise provided by law, a Federal official to whom a function is transferred by this subtitle may, for purposes of performing the function, exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function immediately before the effective date specified in section 455.

  (2) TRANSFER AND ALLOCATION OF APPROPRIATIONS AND PERSONNEL.—The personnel of the Department of Justice employed in connection with the functions transferred by this subtitle (and functions that the Secretary determines are properly related to the functions of the Bureau of Citizenship and Immigration Services), and the assets, liabilities, contracts, property, records, and unexpended balance of appropriations, authorizations, allocations, and other funds employed, held, used, arising from, available to, or to be made available to, the Immigration and Naturalization Service in connection with the functions transferred by this subtitle, subject to section 202 of the Budget and Accounting Procedures Act of 1950, shall be transferred to the Director of the Bureau of Citizenship and Immigration Services for allocation to the appropriate component of the Department. Unexpended funds transferred pursuant to this paragraph shall be used only for the purposes for which the funds were originally authorized and appropriated. The Secretary shall have the right to adjust or realign transfers of funds and personnel effected pursuant to this subtitle for a period of 2 years after the effective date specified in section 455.

<< 8 USCA § 1356 >>

SEC. 457. FUNDING FOR CITIZENSHIP AND IMMIGRATION SERVICES.

Section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)) is amended by striking "services, including the costs of similar services provided without charge to asylum applicants or other immigrants." and inserting "services.".

<< 8 USCA § 1573 >>

SEC. 458. BACKLOG ELIMINATION.

Section 204(a)(1) of the Immigration Services and Infrastructure Improvements Act of 2000 (8 U.S.C. 1573(a)(1)) is amended by striking "not later than one year after the date of enactment of this Act;" and inserting "1 year after the date of the enactment of the Homeland Security Act of 2002;".

<< 6 USCA § 276 >>

SEC. 459. REPORT ON IMPROVING IMMIGRATION SERVICES.

(a) IN GENERAL.—The Secretary, not later than 1 year after the effective date of this Act, shall submit to the Committees on the Judiciary and Appropriations of the House of Representatives and of the Senate a report with a plan detailing how the Bureau of Citizenship and Immigration Services, after the transfer of functions specified in this subtitle takes effect, will complete efficiently, fairly, and within a reasonable time, the adjudications described in paragraphs (1) through (5) of section 451(b).

(b) CONTENTS.—For each type of adjudication to be undertaken by the Director of the Bureau of Citizenship and Immigration Services, the report shall include the following:

(1) Any potential savings of resources that may be implemented without affecting the quality of the adjudication.

(2) The goal for processing time with respect to the application.

(3) Any statutory modifications with respect to the adjudication that the Secretary considers advisable.

(c) CONSULTATION.—In carrying out subsection (a), the Secretary shall consult with the Secretary of State, the Secretary of Labor, the Assistant Secretary of the Bureau of Border Security of the Department, and the Director of the Executive Office for Immigration Review to determine how to streamline and improve the process for applying for and making adjudications described in section 451(b) and related processes.

<< 6 USCA § 277 >>

SEC. 460. REPORT ON RESPONDING TO FLUCTUATING NEEDS.

Not later than 30 days after the date of the enactment of this Act, the Attorney General shall submit to Congress a report on changes in law, including changes in authorizations of appropriations and in appropriations, that are needed to permit the Immigration and Naturalization Service, and, after the transfer of functions specified in this subtitle takes effect, the Bureau of Citizenship and Immigration Services of the Department, to ensure a prompt and timely response to emergent, unforeseen, or impending changes in the number of applications for immigration benefits, and otherwise to ensure the accommodation of changing immigration service needs.

<< 6 USCA § 278 >>

SEC. 461. APPLICATION OF INTERNET–BASED TECHNOLOGIES.

(a) ESTABLISHMENT OF TRACKING SYSTEM.—The Secretary, not later than 1 year after the effective date of this Act, in consultation with the Technology Advisory Committee established under subsection (c), shall establish an Internet-based system, that will permit a person, employer, immigrant, or nonimmigrant who has filings with the Secretary for any benefit under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.), access to online information about the processing status of the filing involved.

(b) FEASIBILITY STUDY FOR ONLINE FILING AND IMPROVED PROCESSING.—

(1) ONLINE FILING.—The Secretary, in consultation with the Technology Advisory Committee established under subsection (c), shall conduct a feasibility study on the online filing of the filings described in subsection (a). The study shall include a review of computerization and technology of the Immigration and Naturalization Service relating to the immigration

services and processing of filings related to immigrant services. The study shall also include an estimate of the timeframe and cost and shall consider other factors in implementing such a filing system, including the feasibility of fee payment online.

(2) REPORT.—A report on the study under this subsection shall be submitted to the Committees on the Judiciary of the House of Representatives and the Senate not later than 1 year after the effective date of this Act.

(c) TECHNOLOGY ADVISORY COMMITTEE.—

(1) ESTABLISHMENT.—The Secretary shall establish, not later than 60 days after the effective date of this Act, an advisory committee (in this section referred to as the "Technology Advisory Committee") to assist the Secretary in—

(A) establishing the tracking system under subsection (a); and

(B) conducting the study under subsection (b).

The Technology Advisory Committee shall be established after consultation with the Committees on the Judiciary of the House of Representatives and the Senate.

(2) COMPOSITION.—The Technology Advisory Committee shall be composed of representatives from high technology companies capable of establishing and implementing the system in an expeditious manner, and representatives of persons who may use the tracking system described in subsection (a) and the online filing system described in subsection (b)(1).

<< 6 USCA § 279 >>

SEC. 462. CHILDREN'S AFFAIRS.

(a) TRANSFER OF FUNCTIONS.—There are transferred to the Director of the Office of Refugee Resettlement of the Department of Health and Human Services functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the effective date specified in subsection (d).

(b) FUNCTIONS.—

(1) IN GENERAL.—Pursuant to the transfer made by subsection (a), the Director of the Office of Refugee Resettlement shall be responsible for—

(A) coordinating and implementing the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status, including developing a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child, consistent with the law regarding appointment of counsel that is in effect on the date of the enactment of this Act;

(B) ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child;

(C) making placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status;

(D) implementing the placement determinations;

(E) implementing policies with respect to the care and placement of unaccompanied alien children;

(F) identifying a sufficient number of qualified individuals, entities, and facilities to house unaccompanied alien children;

(G) overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside;

(H) reuniting unaccompanied alien children with a parent abroad in appropriate cases;

(I) compiling, updating, and publishing at least annually a state-by-state list of professionals or other entities qualified to provide guardian and attorney representation services for unaccompanied alien children;

(J) maintaining statistical information and other data on unaccompanied alien children for whose care and placement the Director is responsible, which shall include—

(i) biographical information, such as a child's name, gender, date of birth, country of birth, and country of habitual residence;

(ii) the date on which the child came into Federal custody by reason of his or her immigration status;

(iii) information relating to the child's placement, removal, or release from each facility in which the child has resided;

(iv) in any case in which the child is placed in detention or released, an explanation relating to the detention or release; and

(v) the disposition of any actions in which the child is the subject;

(K) collecting and compiling statistical information from the Department of Justice, the Department of Homeland Security, and the Department of State on each department's actions relating to unaccompanied alien children; and

(L) conducting investigations and inspections of facilities and other entities in which unaccompanied alien children reside.

(2) COORDINATION WITH OTHER ENTITIES; NO RELEASE ON OWN RECOGNIZANCE.—In making determinations described in paragraph (1)(C), the Director of the Office of Refugee Resettlement—

(A) shall consult with appropriate juvenile justice professionals, the Director of the Bureau of Citizenship and Immigration Services, and the Assistant Secretary of the Bureau of Border Security to ensure that such determinations ensure that unaccompanied alien children described in such subparagraph—

(i) are likely to appear for all hearings or proceedings in which they are involved;

(ii) are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity; and

(iii) are placed in a setting in which they are not likely to pose a danger to themselves or others; and

(B) shall not release such children upon their own recognizance.

(3) DUTIES WITH RESPECT TO FOSTER CARE.—In carrying out the duties described in paragraph (1)(G), the Director of the Office of Refugee Resettlement is encouraged to use the refugee children foster care system established pursuant to section 412(d) of the Immigration and Nationality Act (8 U.S.C. 1522(d)) for the placement of unaccompanied alien children.

(c) RULE OF CONSTRUCTION.—Nothing in this section may be construed to transfer the responsibility for adjudicating benefit determinations under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) from the authority of any official of the Department of Justice, the Department of Homeland Security, or the Department of State.

(d) EFFECTIVE DATE.—Notwithstanding section 4, this section shall take effect on the date on which the transfer of functions specified under section 441 takes effect.

(e) REFERENCES.—With respect to any function transferred by this section, any reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or pertaining to a component of government from which such function is transferred—

(1) to the head of such component is deemed to refer to the Director of the Office of Refugee Resettlement; or

(2) to such component is deemed to refer to the Office of Refugee Resettlement of the Department of Health and Human Services.

(f) OTHER TRANSITION ISSUES.—

(1) EXERCISE OF AUTHORITIES.—Except as otherwise provided by law, a Federal official to whom a function is transferred by this section may, for purposes of performing the function, exercise all authorities under any other provision of law that were available with respect to the performance of that function to the official responsible for the performance of the function immediately before the effective date specified in subsection (d).

(2) SAVINGS PROVISIONS.—Subsections (a), (b), and (c) of section 1512 shall apply to a transfer of functions under this section in the same manner as such provisions apply to a transfer of functions under this Act to the Department of Homeland Security.

(3) TRANSFER AND ALLOCATION OF APPROPRIATIONS AND PERSONNEL.—The personnel of the Department of Justice employed in connection with the functions transferred by this section, and the assets, liabilities, contracts, property, records, and unexpended balance of appropriations, authorizations, allocations, and other funds employed, held, used, arising from, available to, or to be made available to, the Immigration and Naturalization Service in connection with the functions transferred by this section, subject to section 202 of the Budget and Accounting Procedures Act of 1950, shall be transferred to the Director of the Office of Refugee Resettlement for allocation to the appropriate component of the Department of Health and Human Services. Unexpended funds transferred pursuant to this paragraph shall be used only for the purposes for which the funds were originally authorized and appropriated.

(g) DEFINITIONS.—As used in this section—

(1) the term "placement" means the placement of an unaccompanied alien child in either a detention facility or an alternative to such a facility; and

(2) the term "unaccompanied alien child" means a child who—

(A) has no lawful immigration status in the United States;

(B) has not attained 18 years of age; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(C) with respect to whom—
  (i) there is no parent or legal guardian in the United States; or
  (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

<< 6 USCA prec. § 291 >>

Subtitle F—General Immigration Provisions

<< 6 USCA § 291 >>

SEC. 471. ABOLISHMENT OF INS.

 (a) IN GENERAL.—Upon completion of all transfers from the Immigration and Naturalization Service as provided for by this Act, the Immigration and Naturalization Service of the Department of Justice is abolished.
 (b) PROHIBITION.—The authority provided by section 1502 may be used to reorganize functions or organizational units within the Bureau of Border Security or the Bureau of Citizenship and Immigration Services, but may not be used to recombine the two bureaus into a single agency or otherwise to combine, join, or consolidate functions or organizational units of the two bureaus with each other.

<< 6 USCA § 292 >>

SEC. 472. VOLUNTARY SEPARATION INCENTIVE PAYMENTS.

 (a) DEFINITIONS.—For purposes of this section—
 (1) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who—
  (A) has completed at least 3 years of current continuous service with 1 or more covered entities; and
  (B) is serving under an appointment without time limitation,

but does not include any person under subparagraphs (A)–(G) of section 663(a)(2) of Public Law 104–208 (5 U.S.C. 5597 note);
 (2) the term "covered entity" means—
  (A) the Immigration and Naturalization Service;
  (B) the Bureau of Border Security of the Department of Homeland Security; and
  (C) the Bureau of Citizenship and Immigration Services of the Department of Homeland Security; and
 (3) the term "transfer date" means the date on which the transfer of functions specified under section 441 takes effect.
 (b) STRATEGIC RESTRUCTURING PLAN.—Before the Attorney General or the Secretary obligates any resources for voluntary separation incentive payments under this section, such official shall submit to the appropriate committees of Congress a strategic restructuring plan, which shall include—
 (1) an organizational chart depicting the covered entities after their restructuring pursuant to this Act;
 (2) a summary description of how the authority under this section will be used to help carry out that restructuring; and
 (3) the information specified in section 663(b)(2) of Public Law 104–208 (5 U.S.C. 5597 note).

As used in the preceding sentence, the "appropriate committees of Congress" are the Committees on Appropriations, Government Reform, and the Judiciary of the House of Representatives, and the Committees on Appropriations, Governmental Affairs, and the Judiciary of the Senate.
 (c) AUTHORITY.—The Attorney General and the Secretary may, to the extent necessary to help carry out their respective strategic restructuring plan described in subsection (b), make voluntary separation incentive payments to employees. Any such payment—
 (1) shall be paid to the employee, in a lump sum, after the employee has separated from service;
 (2) shall be paid from appropriations or funds available for the payment of basic pay of the employee;
 (3) shall be equal to the lesser of—
  (A) the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(B) an amount not to exceed $25,000, as determined by the Attorney General or the Secretary;

(4) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before the end of—

(A) the 3–month period beginning on the date on which such payment is offered or made available to such employee; or

(B) the 3–year period beginning on the date of the enactment of this Act, whichever occurs first;

(5) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(6) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) ADDITIONAL AGENCY CONTRIBUTIONS TO THE RETIREMENT FUND.—

(1) IN GENERAL.—In addition to any payments which it is otherwise required to make, the Department of Justice and the Department of Homeland Security shall, for each fiscal year with respect to which it makes any voluntary separation incentive payments under this section, remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund the amount required under paragraph (2).

(2) AMOUNT REQUIRED.—The amount required under this paragraph shall, for any fiscal year, be the amount under subparagraph (A) or (B), whichever is greater.

(A) FIRST METHOD.—The amount under this subparagraph shall, for any fiscal year, be equal to the minimum amount necessary to offset the additional costs to the retirement systems under title 5, United States Code (payable out of the Civil Service Retirement and Disability Fund) resulting from the voluntary separation of the employees described in paragraph (3), as determined under regulations of the Office of Personnel Management.

(B) SECOND METHOD.—The amount under this subparagraph shall, for any fiscal year, be equal to 45 percent of the sum total of the final basic pay of the employees described in paragraph (3).

(3) COMPUTATIONS TO BE BASED ON SEPARATIONS OCCURRING IN THE FISCAL YEAR INVOLVED.—The employees described in this paragraph are those employees who receive a voluntary separation incentive payment under this section based on their separating from service during the fiscal year with respect to which the payment under this subsection relates.

(4) FINAL BASIC PAY DEFINED.—In this subsection, the term "final basic pay" means, with respect to an employee, the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

(e) EFFECT OF SUBSEQUENT EMPLOYMENT WITH THE GOVERNMENT.—An individual who receives a voluntary separation incentive payment under this section and who, within 5 years after the date of the separation on which the payment is based, accepts any compensated employment with the Government or works for any agency of the Government through a personal services contract, shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment. Such payment shall be made to the covered entity from which the individual separated or, if made on or after the transfer date, to the Deputy Secretary or the Under Secretary for Border and Transportation Security (for transfer to the appropriate component of the Department of Homeland Security, if necessary).

(f) EFFECT ON EMPLOYMENT LEVELS.—

(1) INTENDED EFFECT.—Voluntary separations under this section are not intended to necessarily reduce the total number of full-time equivalent positions in any covered entity.

(2) USE OF VOLUNTARY SEPARATIONS.—A covered entity may redeploy or use the full-time equivalent positions vacated by voluntary separations under this section to make other positions available to more critical locations or more critical occupations.

<< 6 USCA § 293 >>

SEC. 473. AUTHORITY TO CONDUCT A DEMONSTRATION PROJECT RELATING TO DISCIPLINARY ACTION.

(a) IN GENERAL.—The Attorney General and the Secretary may each, during a period ending not later than 5 years after the date of the enactment of this Act, conduct a demonstration project for the purpose of determining whether one or more changes in the policies or procedures relating to methods for disciplining employees would result in improved personnel management.

(b) SCOPE.—A demonstration project under this section—

(1) may not cover any employees apart from those employed in or under a covered entity; and

(2) shall not be limited by any provision of chapter 43, 75, or 77 of title 5, United States Code.

(c) PROCEDURES.—Under the demonstration project—

(1) the use of alternative means of dispute resolution (as defined in section 571 of title 5, United States Code) shall be encouraged, whenever appropriate; and

(2) each covered entity under the jurisdiction of the official conducting the project shall be required to provide for the expeditious, fair, and independent review of any action to which section 4303 or subchapter II of chapter 75 of such title 5 would otherwise apply (except an action described in section 7512(5) of such title 5).

(d) ACTIONS INVOLVING DISCRIMINATION.—Notwithstanding any other provision of this section, if, in the case of any matter described in section 7702(a)(1)(B) of title 5, United States Code, there is no judicially reviewable action under the demonstration project within 120 days after the filing of an appeal or other formal request for review (referred to in subsection (c)(2)), an employee shall be entitled to file a civil action to the same extent and in the same manner as provided in section 7702(e)(1) of such title 5 (in the matter following subparagraph (C) thereof).

(e) CERTAIN EMPLOYEES.—Employees shall not be included within any project under this section if such employees are—

(1) neither managers nor supervisors; and

(2) within a unit with respect to which a labor organization is accorded exclusive recognition under chapter 71 of title 5, United States Code.

Notwithstanding the preceding sentence, an aggrieved employee within a unit (referred to in paragraph (2)) may elect to participate in a complaint procedure developed under the demonstration project in lieu of any negotiated grievance procedure and any statutory procedure (as such term is used in section 7121 of such title 5).

(f) REPORTS.—The General Accounting Office shall prepare and submit to the Committees on Government Reform and the Judiciary of the House of Representatives and the Committees on Governmental Affairs and the Judiciary of the Senate periodic reports on any demonstration project conducted under this section, such reports to be submitted after the second and fourth years of its operation. Upon request, the Attorney General or the Secretary shall furnish such information as the General Accounting Office may require to carry out this subsection.

(g) DEFINITION.—In this section, the term "covered entity" has the meaning given such term in section 472(a)(2).

<< 6 USCA § 294 >>

SEC. 474. SENSE OF CONGRESS.

It is the sense of Congress that—

(1) the missions of the Bureau of Border Security and the Bureau of Citizenship and Immigration Services are equally important and, accordingly, they each should be adequately funded; and

(2) the functions transferred under this subtitle should not, after such transfers take effect, operate at levels below those in effect prior to the enactment of this Act.

<< 6 USCA § 295 >>

SEC. 475. DIRECTOR OF SHARED SERVICES.

(a) IN GENERAL.—Within the Office of Deputy Secretary, there shall be a Director of Shared Services.

(b) FUNCTIONS.—The Director of Shared Services shall be responsible for the coordination of resources for the Bureau of Border Security and the Bureau of Citizenship and Immigration Services, including—

(1) information resources management, including computer databases and information technology;

(2) records and file management; and

(3) forms management.

<< 6 USCA § 296 >>

SEC. 476. SEPARATION OF FUNDING.

(a) IN GENERAL.—There shall be established separate accounts in the Treasury of the United States for appropriated funds and other deposits available for the Bureau of Citizenship and Immigration Services and the Bureau of Border Security.

(b) SEPARATE BUDGETS.—To ensure that the Bureau of Citizenship and Immigration Services and the Bureau of Border Security are funded to the extent necessary to fully carry out their respective functions, the Director of the Office of Management and Budget shall separate the budget requests for each such entity.

(c) FEES.—Fees imposed for a particular service, application, or benefit shall be deposited into the account established under subsection (a) that is for the bureau with jurisdiction over the function to which the fee relates.

(d) FEES NOT TRANSFERABLE.—No fee may be transferred between the Bureau of Citizenship and Immigration Services and the Bureau of Border Security for purposes not authorized by section 286 of the Immigration and Nationality Act (8 U.S.C. 1356).

<< 6 USCA § 297 >>

SEC. 477. REPORTS AND IMPLEMENTATION PLANS.

(a) DIVISION OF FUNDS.—The Secretary, not later than 120 days after the effective date of this Act, shall submit to the Committees on Appropriations and the Judiciary of the House of Representatives and of the Senate a report on the proposed division and transfer of funds, including unexpended funds, appropriations, and fees, between the Bureau of Citizenship and Immigration Services and the Bureau of Border Security.

(b) DIVISION OF PERSONNEL.—The Secretary, not later than 120 days after the effective date of this Act, shall submit to the Committees on Appropriations and the Judiciary of the House of Representatives and of the Senate a report on the proposed division of personnel between the Bureau of Citizenship and Immigration Services and the Bureau of Border Security.

(c) IMPLEMENTATION PLAN.—

(1) IN GENERAL.—The Secretary, not later than 120 days after the effective date of this Act, and every 6 months thereafter until the termination of fiscal year 2005, shall submit to the Committees on Appropriations and the Judiciary of the House of Representatives and of the Senate an implementation plan to carry out this Act.

(2) CONTENTS.—The implementation plan should include details concerning the separation of the Bureau of Citizenship and Immigration Services and the Bureau of Border Security, including the following:

(A) Organizational structure, including the field structure.

(B) Chain of command.

(C) Procedures for interaction among such bureaus.

(D) Fraud detection and investigation.

(E) The processing and handling of removal proceedings, including expedited removal and applications for relief from removal.

(F) Recommendations for conforming amendments to the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

(G) Establishment of a transition team.

(H) Methods to phase in the costs of separating the administrative support systems of the Immigration and Naturalization Service in order to provide for separate administrative support systems for the Bureau of Citizenship and Immigration Services and the Bureau of Border Security.

(d) COMPTROLLER GENERAL STUDIES AND REPORTS.—

(1) STATUS REPORTS ON TRANSITION.—Not later than 18 months after the date on which the transfer of functions specified under section 441 takes effect, and every 6 months thereafter, until full implementation of this subtitle has been completed, the Comptroller General of the United States shall submit to the Committees on Appropriations and on the Judiciary of the House of Representatives and the Senate a report containing the following:

(A) A determination of whether the transfers of functions made by subtitles D and E have been completed, and if a transfer of functions has not taken place, identifying the reasons why the transfer has not taken place.

(B) If the transfers of functions made by subtitles D and E have been completed, an identification of any issues that have arisen due to the completed transfers.

(C) An identification of any issues that may arise due to any future transfer of functions.

(2) REPORT ON MANAGEMENT.—Not later than 4 years after the date on which the transfer of functions specified under section 441 takes effect, the Comptroller General of the United States shall submit to the Committees on Appropriations and on the Judiciary of the House of Representatives and the Senate a report, following a study, containing the following:

(A) Determinations of whether the transfer of functions from the Immigration and Naturalization Service to the Bureau of Citizenship and Immigration Services and the Bureau of Border Security have improved, with respect to each function transferred, the following:

(i) Operations.

(ii) Management, including accountability and communication.

(iii) Financial administration.

(iv) Recordkeeping, including information management and technology.

(B) A statement of the reasons for the determinations under subparagraph (A).

(C) Any recommendations for further improvements to the Bureau of Citizenship and Immigration Services and the Bureau of Border Security.

(3) REPORT ON FEES.—Not later than 1 year after the date of the enactment of this Act, the Comptroller General of the United States shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report examining whether the Bureau of Citizenship and Immigration Services is likely to derive sufficient funds from fees to carry out its functions in the absence of appropriated funds.

<< 6 USCA § 298 >>

SEC. 478. IMMIGRATION FUNCTIONS.

(a) ANNUAL REPORT.—

(1) IN GENERAL.—One year after the date of the enactment of this Act, and each year thereafter, the Secretary shall submit a report to the President, to the Committees on the Judiciary and Government Reform of the House of Representatives, and to the Committees on the Judiciary and Government Affairs of the Senate, on the impact the transfers made by this subtitle has had on immigration functions.

(2) MATTER INCLUDED.—The report shall address the following with respect to the period covered by the report:

(A) The aggregate number of all immigration applications and petitions received, and processed, by the Department.

(B) Region-by-region statistics on the aggregate number of immigration applications and petitions filed by an alien (or filed on behalf of an alien) and denied, disaggregated by category of denial and application or petition type.

(C) The quantity of backlogged immigration applications and petitions that have been processed, the aggregate number awaiting processing, and a detailed plan for eliminating the backlog.

(D) The average processing period for immigration applications and petitions, disaggregated by application or petition type.

(E) The number and types of immigration-related grievances filed with any official of the Department of Justice, and if those grievances were resolved.

(F) Plans to address grievances and improve immigration services.

(G) Whether immigration-related fees were used consistent with legal requirements regarding such use.

(H) Whether immigration-related questions conveyed by customers to the Department (whether conveyed in person, by telephone, or by means of the Internet) were answered effectively and efficiently.

(b) SENSE OF CONGRESS REGARDING IMMIGRATION SERVICES.—It is the sense of Congress that—

(1) the quality and efficiency of immigration services rendered by the Federal Government should be improved after the transfers made by this subtitle take effect; and

(2) the Secretary should undertake efforts to guarantee that concerns regarding the quality and efficiency of immigration services are addressed after such effective date.

<< 6 USCA prec. § 311 >>

TITLE V—EMERGENCY PREPAREDNESS AND RESPONSE

<< 6 USCA § 311 >>

SEC. 501. UNDER SECRETARY FOR EMERGENCY PREPAREDNESS AND RESPONSE.

There shall be in the Department a Directorate of Emergency Preparedness and Response headed by an Under Secretary for Emergency Preparedness and Response.

<< 6 USCA § 312 >>

SEC. 502. RESPONSIBILITIES.

The Secretary, acting through the Under Secretary for Emergency Preparedness and Response, shall include—

(1) helping to ensure the effectiveness of emergency response providers to terrorist attacks, major disasters, and other emergencies;

(2) with respect to the Nuclear Incident Response Team (regardless of whether it is operating as an organizational unit of the Department pursuant to this title)—

(A) establishing standards and certifying when those standards have been met;

(B) conducting joint and other exercises and training and evaluating performance; and

(C) providing funds to the Department of Energy and the Environmental Protection Agency, as appropriate, for homeland security planning, exercises and training, and equipment;

(3) providing the Federal Government's response to terrorist attacks and major disasters, including—

(A) managing such response;

(B) directing the Domestic Emergency Support Team, the Strategic National Stockpile, the National Disaster Medical System, and (when operating as an organizational unit of the Department pursuant to this title) the Nuclear Incident Response Team;

(C) overseeing the Metropolitan Medical Response System; and

(D) coordinating other Federal response resources in the event of a terrorist attack or major disaster;

(4) aiding the recovery from terrorist attacks and major disasters;

(5) building a comprehensive national incident management system with Federal, State, and local government personnel, agencies, and authorities, to respond to such attacks and disasters;

(6) consolidating existing Federal Government emergency response plans into a single, coordinated national response plan; and

(7) developing comprehensive programs for developing interoperative communications technology, and helping to ensure that emergency response providers acquire such technology.

<< 6 USCA § 313 >>

SEC. 503. FUNCTIONS TRANSFERRED.

In accordance with title XV, there shall be transferred to the Secretary the functions, personnel, assets, and liabilities of the following entities:

(1) The Federal Emergency Management Agency, including the functions of the Director of the Federal Emergency Management Agency relating thereto.

(2) The Integrated Hazard Information System of the National Oceanic and Atmospheric Administration, which shall be renamed "FIRESAT".

(3) The National Domestic Preparedness Office of the Federal Bureau of Investigation, including the functions of the Attorney General relating thereto.

(4) The Domestic Emergency Support Teams of the Department of Justice, including the functions of the Attorney General relating thereto.

(5) The Office of Emergency Preparedness, the National Disaster Medical System, and the Metropolitan Medical Response System of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and the Assistant Secretary for Public Health Emergency Preparedness relating thereto.

(6) The Strategic National Stockpile of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services relating thereto.

<< 6 USCA § 314 >>

SEC. 504. NUCLEAR INCIDENT RESPONSE.

(a) IN GENERAL.—At the direction of the Secretary (in connection with an actual or threatened terrorist attack, major disaster, or other emergency in the United States), the Nuclear Incident Response Team shall operate as an organizational unit of the Department. While so operating, the Nuclear Incident Response Team shall be subject to the direction, authority, and control of the Secretary.

(b) RULE OF CONSTRUCTION.—Nothing in this title shall be construed to limit the ordinary responsibility of the Secretary of Energy and the Administrator of the Environmental Protection Agency for organizing, training, equipping, and utilizing their respective entities in the Nuclear Incident Response Team, or (subject to the provisions of this title) from exercising direction, authority, and control over them when they are not operating as a unit of the Department.

<< 6 USCA § 315 >>

SEC. 505. CONDUCT OF CERTAIN PUBLIC HEALTH–RELATED ACTIVITIES.

(a) IN GENERAL.—With respect to all public health-related activities to improve State, local, and hospital preparedness and response to chemical, biological, radiological, and nuclear and other emerging terrorist threats carried out by the Department of Health and Human Services (including the Public Health Service), the Secretary of Health and Human Services shall set priorities and preparedness goals and further develop a coordinated strategy for such activities in collaboration with the Secretary.

(b) EVALUATION OF PROGRESS.—In carrying out subsection (a), the Secretary of Health and Human Services shall collaborate with the Secretary in developing specific benchmarks and outcome measurements for evaluating progress toward achieving the priorities and goals described in such subsection.

<< 6 USCA § 316 >>

SEC. 506. DEFINITION.

In this title, the term "Nuclear Incident Response Team" means a resource that includes—

(1) those entities of the Department of Energy that perform nuclear or radiological emergency support functions (including accident response, search response, advisory, and technical operations functions), radiation exposure functions at the medical assistance facility known as the Radiation Emergency Assistance Center/Training Site (REAC/TS), radiological assistance functions, and related functions; and

(2) those entities of the Environmental Protection Agency that perform such support functions (including radiological emergency response functions) and related functions.

SEC. 507. ROLE OF FEDERAL EMERGENCY MANAGEMENT AGENCY.

<< 6 USCA § 317 >>

(a) IN GENERAL.—The functions of the Federal Emergency Management Agency include the following:

(1) All functions and authorities prescribed by the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

(2) Carrying out its mission to reduce the loss of life and property and protect the Nation from all hazards by leading and supporting the Nation in a comprehensive, risk-based emergency management program—

AR.02227

(A) of mitigation, by taking sustained actions to reduce or eliminate long-term risk to people and property from hazards and their effects;

(B) of planning for building the emergency management profession to prepare effectively for, mitigate against, respond to, and recover from any hazard;

(C) of response, by conducting emergency operations to save lives and property through positioning emergency equipment and supplies, through evacuating potential victims, through providing food, water, shelter, and medical care to those in need, and through restoring critical public services;

(D) of recovery, by rebuilding communities so individuals, businesses, and governments can function on their own, return to normal life, and protect against future hazards; and

(E) of increased efficiencies, by coordinating efforts relating to mitigation, planning, response, and recovery.

(b) FEDERAL RESPONSE PLAN.—

(1) ROLE OF FEMA.—Notwithstanding any other provision of this Act, the Federal Emergency Management Agency shall remain the lead agency for the Federal Response Plan established under Executive Order No. 12148 (44 Fed. Reg. 43239) and Executive Order No. 12656 (53 Fed. Reg. 47491).

(2) REVISION OF RESPONSE PLAN.—Not later than 60 days after the date of enactment of this Act, the Director of the Federal Emergency Management Agency shall revise the Federal Response Plan to reflect the establishment of and incorporate the Department.

<< 6 USCA § 318 >>

SEC. 508. USE OF NATIONAL PRIVATE SECTOR NETWORKS IN EMERGENCY RESPONSE.

To the maximum extent practicable, the Secretary shall use national private sector networks and infrastructure for emergency response to chemical, biological, radiological, nuclear, or explosive disasters, and other major disasters.

<< 6 USCA § 319 >>

SEC. 509. USE OF COMMERCIALLY AVAILABLE TECHNOLOGY, GOODS, AND SERVICES.

It is the sense of Congress that—

(1) the Secretary should, to the maximum extent possible, use off-the-shelf commercially developed technologies to ensure that the Department's information technology systems allow the Department to collect, manage, share, analyze, and disseminate information securely over multiple channels of communication; and

(2) in order to further the policy of the United States to avoid competing commercially with the private sector, the Secretary should rely on commercial sources to supply the goods and services needed by the Department.

<< 6 USCA prec. § 331 >>

TITLE VI—TREATMENT OF CHARITABLE TRUSTS FOR MEMBERS OF THE ARMED
FORCES OF THE UNITED STATES AND OTHER GOVERNMENTAL ORGANIZATIONS

<< 6 USCA § 331 >>

SEC. 601. TREATMENT OF CHARITABLE TRUSTS FOR MEMBERS OF THE ARMED FORCES OF THE UNITED
STATES AND OTHER GOVERNMENTAL ORGANIZATIONS.

(a) FINDINGS.—Congress finds the following:

(1) Members of the Armed Forces of the United States defend the freedom and security of our Nation.

(2) Members of the Armed Forces of the United States have lost their lives while battling the evils of terrorism around the world.

(3) Personnel of the Central Intelligence Agency (CIA) charged with the responsibility of covert observation of terrorists around the world are often put in harm's way during their service to the United States.

(4) Personnel of the Central Intelligence Agency have also lost their lives while battling the evils of terrorism around the world.

(5) Employees of the Federal Bureau of Investigation (FBI) and other Federal agencies charged with domestic protection of the United States put their lives at risk on a daily basis for the freedom and security of our Nation.

(6) United States military personnel, CIA personnel, FBI personnel, and other Federal agents in the service of the United States are patriots of the highest order.

(7) CIA officer Johnny Micheal Spann became the first American to give his life for his country in the War on Terrorism declared by President George W. Bush following the terrorist attacks of September 11, 2001.

(8) Johnny Micheal Spann left behind a wife and children who are very proud of the heroic actions of their patriot father.

(9) Surviving dependents of members of the Armed Forces of the United States who lose their lives as a result of terrorist attacks or military operations abroad receive a $6,000 death benefit, plus a small monthly benefit.

(10) The current system of compensating spouses and children of American patriots is inequitable and needs improvement.

(b) DESIGNATION OF JOHNNY MICHEAL SPANN PATRIOT TRUSTS.—Any charitable corporation, fund, foundation, or trust (or separate fund or account thereof) which otherwise meets all applicable requirements under law with respect to charitable entities and meets the requirements described in subsection (c) shall be eligible to characterize itself as a "Johnny Micheal Spann Patriot Trust".

(c) REQUIREMENTS FOR THE DESIGNATION OF JOHNNY MICHEAL SPANN PATRIOT TRUSTS.—The requirements described in this subsection are as follows:

(1) Not taking into account funds or donations reasonably necessary to establish a trust, at least 85 percent of all funds or donations (including any earnings on the investment of such funds or donations) received or collected by any Johnny Micheal Spann Patriot Trust must be distributed to (or, if placed in a private foundation, held in trust for) surviving spouses, children, or dependent parents, grandparents, or siblings of 1 or more of the following:

(A) members of the Armed Forces of the United States;

(B) personnel, including contractors, of elements of the intelligence community, as defined in section 3(4) of the National Security Act of 1947;

(C) employees of the Federal Bureau of Investigation; and

(D) officers, employees, or contract employees of the United States Government,

whose deaths occur in the line of duty and arise out of terrorist attacks, military operations, intelligence operations, or law enforcement operations or accidents connected with activities occurring after September 11, 2001, and related to domestic or foreign efforts to curb international terrorism, including the Authorization for Use of Military Force (Public Law 107–40; 115 Stat. 224).

(2) Other than funds or donations reasonably necessary to establish a trust, not more than 15 percent of all funds or donations (or 15 percent of annual earnings on funds invested in a private foundation) may be used for administrative purposes.

(3) No part of the net earnings of any Johnny Micheal Spann Patriot Trust may inure to the benefit of any individual based solely on the position of such individual as a shareholder, an officer or employee of such Trust.

(4) None of the activities of any Johnny Micheal Spann Patriot Trust shall be conducted in a manner inconsistent with any law that prohibits attempting to influence legislation.

(5) No Johnny Micheal Spann Patriot Trust may participate in or intervene in any political campaign on behalf of (or in opposition to) any candidate for public office, including by publication or distribution of statements.

(6) Each Johnny Micheal Spann Patriot Trust shall comply with the instructions and directions of the Director of Central Intelligence, the Attorney General, or the Secretary of Defense relating to the protection of intelligence sources and methods, sensitive law enforcement information, or other sensitive national security information, including methods for confidentially disbursing funds.

(7) Each Johnny Micheal Spann Patriot Trust that receives annual contributions totaling more than $1,000,000 must be audited annually by an independent certified public accounting firm. Such audits shall be filed with the Internal Revenue Service, and shall be open to public inspection, except that the conduct, filing, and availability of the audit shall be consistent with the protection of intelligence sources and methods, of sensitive law enforcement information, and of other sensitive national security information.

(8) Each Johnny Micheal Spann Patriot Trust shall make distributions to beneficiaries described in paragraph (1) at least once every calendar year, beginning not later than 12 months after the formation of such Trust, and all funds and donations received

and earnings not placed in a private foundation dedicated to such beneficiaries must be distributed within 36 months after the end of the fiscal year in which such funds, donations, and earnings are received.

  (9)(A) When determining the amount of a distribution to any beneficiary described in paragraph (1), a Johnny Micheal Spann Patriot Trust should take into account the amount of any collateral source compensation that the beneficiary has received or is entitled to receive as a result of the death of an individual described in paragraph (1).

  (B) Collateral source compensation includes all compensation from collateral sources, including life insurance, pension funds, death benefit programs, and payments by Federal, State, or local governments related to the death of an individual described in paragraph (1).

  (d) TREATMENT OF JOHNNY MICHEAL SPANN PATRIOT TRUSTS.—Each Johnny Micheal Spann Patriot Trust shall refrain from conducting the activities described in clauses (i) and (ii) of section 301(20)(A) of the Federal Election Campaign Act of 1971 so that a general solicitation of funds by an individual described in paragraph (1) of section 323(e) of such Act will be permissible if such solicitation meets the requirements of paragraph (4)(A) of such section.

  (e) NOTIFICATION OF TRUST BENEFICIARIES.—Notwithstanding any other provision of law, and in a manner consistent with the protection of intelligence sources and methods and sensitive law enforcement information, and other sensitive national security information, the Secretary of Defense, the Director of the Federal Bureau of Investigation, or the Director of Central Intelligence, or their designees, as applicable, may forward information received from an executor, administrator, or other legal representative of the estate of a decedent described in subparagraph (A), (B), (C), or (D) of subsection (c)(1), to a Johnny Micheal Spann Patriot Trust on how to contact individuals eligible for a distribution under subsection (c)(1) for the purpose of providing assistance from such Trust: Provided, That, neither forwarding nor failing to forward any information under this subsection shall create any cause of action against any Federal department, agency, officer, agent, or employee.

  (f) REGULATIONS.—Not later than 90 days after the date of enactment of this Act, the Secretary of Defense, in coordination with the Attorney General, the Director of the Federal Bureau of Investigation, and the Director of Central Intelligence, shall prescribe regulations to carry out this section.

<< 6 USCA prec. § 341 >>

TITLE VII—MANAGEMENT

<< 6 USCA § 341 >>

SEC. 701. UNDER SECRETARY FOR MANAGEMENT.

  (a) IN GENERAL.—The Secretary, acting through the Under Secretary for Management, shall be responsible for the management and administration of the Department, including the following:

  (1) The budget, appropriations, expenditures of funds, accounting, and finance.

  (2) Procurement.

  (3) Human resources and personnel.

  (4) Information technology and communications systems.

  (5) Facilities, property, equipment, and other material resources.

  (6) Security for personnel, information technology and communications systems, facilities, property, equipment, and other material resources.

  (7) Identification and tracking of performance measures relating to the responsibilities of the Department.

  (8) Grants and other assistance management programs.

  (9) The transition and reorganization process, to ensure an efficient and orderly transfer of functions and personnel to the Department, including the development of a transition plan.

  (10) The conduct of internal audits and management analyses of the programs and activities of the Department.

  (11) Any other management duties that the Secretary may designate.

  (b) IMMIGRATION.—

  (1) IN GENERAL.—In addition to the responsibilities described in subsection (a), the Under Secretary for Management shall be responsible for the following:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(A) Maintenance of all immigration statistical information of the Bureau of Border Security and the Bureau of Citizenship and Immigration Services. Such statistical information shall include information and statistics of the type contained in the publication entitled "Statistical Yearbook of the Immigration and Naturalization Service" prepared by the Immigration and Naturalization Service (as in effect immediately before the date on which the transfer of functions specified under section 441 takes effect), including region-by-region statistics on the aggregate number of applications and petitions filed by an alien (or filed on behalf of an alien) and denied by such bureau, and the reasons for such denials, disaggregated by category of denial and application or petition type.

(B) Establishment of standards of reliability and validity for immigration statistics collected by such bureaus.

(2) TRANSFER OF FUNCTIONS.—In accordance with title XV, there shall be transferred to the Under Secretary for Management all functions performed immediately before such transfer occurs by the Statistics Branch of the Office of Policy and Planning of the Immigration and Naturalization Service with respect to the following programs:

(A) The Border Patrol program.

(B) The detention and removal program.

(C) The intelligence program.

(D) The investigations program.

(E) The inspections program.

(F) Adjudication of immigrant visa petitions.

(G) Adjudication of naturalization petitions.

(H) Adjudication of asylum and refugee applications.

(I) Adjudications performed at service centers.

(J) All other adjudications performed by the Immigration and Naturalization Service.

<< 6 USCA § 342 >>

## SEC. 702. CHIEF FINANCIAL OFFICER.

The Chief Financial Officer shall report to the Secretary, or to another official of the Department, as the Secretary may direct.

<< 6 USCA § 343 >>

## SEC. 703. CHIEF INFORMATION OFFICER.

The Chief Information Officer shall report to the Secretary, or to another official of the Department, as the Secretary may direct.

<< 6 USCA § 344 >>

## SEC. 704. CHIEF HUMAN CAPITAL OFFICER.

The Chief Human Capital Officer shall report to the Secretary, or to another official of the Department, as the Secretary may direct and shall ensure that all employees of the Department are informed of their rights and remedies under chapters 12 and 23 of title 5, United States Code, by—

(1) participating in the 2302(c) Certification Program of the Office of Special Counsel;

(2) achieving certification from the Office of Special Counsel of the Department's compliance with section 2302(c) of title 5, United States Code; and

(3) informing Congress of such certification not later than 24 months after the date of enactment of this Act.

<< 6 USCA § 345 >>

## SEC. 705. ESTABLISHMENT OF OFFICER FOR CIVIL RIGHTS AND CIVIL LIBERTIES.

(a) IN GENERAL.—The Secretary shall appoint in the Department an Officer for Civil Rights and Civil Liberties, who shall—

(1) review and assess information alleging abuses of civil rights, civil liberties, and racial and ethnic profiling by employees and officials of the Department; and

(2) make public through the Internet, radio, television, or newspaper advertisements information on the responsibilities and functions of, and how to contact, the Officer.

(b) REPORT.—The Secretary shall submit to the President of the Senate, the Speaker of the House of Representatives, and the appropriate committees and subcommittees of Congress on an annual basis a report on the implementation of this section, including the use of funds appropriated to carry out this section, and detailing any allegations of abuses described under subsection (a)(1) and any actions taken by the Department in response to such allegations.

<< 6 USCA § 346 >>

## SEC. 706. CONSOLIDATION AND CO–LOCATION OF OFFICES.

Not later than 1 year after the date of the enactment of this Act, the Secretary shall develop and submit to Congress a plan for consolidating and co-locating—

(1) any regional offices or field offices of agencies that are transferred to the Department under this Act, if such officers are located in the same municipality; and

(2) portions of regional and field offices of other Federal agencies, to the extent such offices perform functions that are transferred to the Secretary under this Act.

<< 6 USCA prec. § 361 >>

## TITLE VIII—COORDINATION WITH NON–FEDERAL ENTITIES; INSPECTOR GENERAL; UNITED STATES SECRET SERVICE; COAST GUARD; GENERAL PROVISIONS

### Subtitle A—Coordination with Non–Federal Entities

<< 6 USCA § 361 >>

## SEC. 801. OFFICE FOR STATE AND LOCAL GOVERNMENT COORDINATION.

(a) ESTABLISHMENT.—There is established within the Office of the Secretary the Office for State and Local Government Coordination, to oversee and coordinate departmental programs for and relationships with State and local governments.

(b) RESPONSIBILITIES.—The Office established under subsection (a) shall—

(1) coordinate the activities of the Department relating to State and local government;

(2) assess, and advocate for, the resources needed by State and local government to implement the national strategy for combating terrorism;

(3) provide State and local government with regular information, research, and technical support to assist local efforts at securing the homeland; and

(4) develop a process for receiving meaningful input from State and local government to assist the development of the national strategy for combating terrorism and other homeland security activities.

<< 6 USCA prec. § 371 >>

### Subtitle B—Inspector General

<< 6 USCA § 371 >>

## SEC. 811. AUTHORITY OF THE SECRETARY.

(a) IN GENERAL.—Notwithstanding the last two sentences of section 3(a) of the Inspector General Act of 1978, the Inspector General shall be under the authority, direction, and control of the Secretary with respect to audits or investigations, or the issuance of subpoenas, that require access to sensitive information concerning—

(1) intelligence, counterintelligence, or counterterrorism matters;

(2) ongoing criminal investigations or proceedings;

(3) undercover operations;

(4) the identity of confidential sources, including protected witnesses;

(5) other matters the disclosure of which would, in the Secretary's judgment, constitute a serious threat to the protection of any person or property authorized protection by section 3056 of title 18, United States Code, section 202 of title 3 of such Code, or any provision of the Presidential Protection Assistance Act of 1976; or

(6) other matters the disclosure of which would, in the Secretary's judgment, constitute a serious threat to national security.

(b) PROHIBITION OF CERTAIN INVESTIGATIONS.—With respect to the information described in subsection (a), the Secretary may prohibit the Inspector General from carrying out or completing any audit or investigation, or from issuing any subpoena, after such Inspector General has decided to initiate, carry out, or complete such audit or investigation or to issue such subpoena, if the Secretary determines that such prohibition is necessary to prevent the disclosure of any information described in subsection (a), to preserve the national security, or to prevent a significant impairment to the interests of the United States.

(c) NOTIFICATION REQUIRED.—If the Secretary exercises any power under subsection (a) or (b), the Secretary shall notify the Inspector General of the Department in writing stating the reasons for such exercise. Within 30 days after receipt of any such notice, the Inspector General shall transmit a copy of such notice and a written response thereto that includes—

(1) a statement as to whether the Inspector General agrees or disagrees with such exercise; and

(2) the reasons for any disagreement, to the President of the Senate and the Speaker of the House of Representatives and to appropriate committees and subcommittees of Congress.

(d) ACCESS TO INFORMATION BY CONGRESS.—The exercise of authority by the Secretary described in subsection (b) should not be construed as limiting the right of Congress or any committee of Congress to access any information it seeks.

<< 5 USCA App. 3 § 8J >>

(e) OVERSIGHT RESPONSIBILITY.—The Inspector General Act of 1978 (5 U.S.C. App.) is amended by inserting after section 8I the following:

"SPECIAL PROVISIONS CONCERNING THE DEPARTMENT OF HOMELAND SECURITY

"SEC. 8J. Notwithstanding any other provision of law, in carrying out the duties and responsibilities specified in this Act, the Inspector General of the Department of Homeland Security shall have oversight responsibility for the internal investigations performed by the Office of Internal Affairs of the United States Customs Service and the Office of Inspections of the United States Secret Service. The head of each such office shall promptly report to the Inspector General the significant activities being carried out by such office.".

SEC. 812. LAW ENFORCEMENT POWERS OF INSPECTOR GENERAL AGENTS.

<< 5 USCA App. 3 § 6 >>

(a) IN GENERAL.—Section 6 of the Inspector General Act of 1978 (5 U.S.C. App.) is amended by adding at the end the following:

"(e)(1) In addition to the authority otherwise provided by this Act, each Inspector General appointed under section 3, any Assistant Inspector General for Investigations under such an Inspector General, and any special agent supervised by such an Assistant Inspector General may be authorized by the Attorney General to—

"(A) carry a firearm while engaged in official duties as authorized under this Act or other statute, or as expressly authorized by the Attorney General;

"(B) make an arrest without a warrant while engaged in official duties as authorized under this Act or other statute, or as expressly authorized by the Attorney General, for any offense against the United States committed in the presence of such Inspector General, Assistant Inspector General, or agent, or for any felony cognizable under the laws of the United States if such Inspector General, Assistant Inspector General, or agent has reasonable grounds to believe that the person to be arrested has committed or is committing such felony; and

"(C) seek and execute warrants for arrest, search of a premises, or seizure of evidence issued under the authority of the United States upon probable cause to believe that a violation has been committed.

"(2) The Attorney General may authorize exercise of the powers under this subsection only upon an initial determination that—

AR.02233

"(A) the affected Office of Inspector General is significantly hampered in the performance of responsibilities established by this Act as a result of the lack of such powers;

"(B) available assistance from other law enforcement agencies is insufficient to meet the need for such powers; and

"(C) adequate internal safeguards and management procedures exist to ensure proper exercise of such powers.

"(3) The Inspector General offices of the Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Homeland Security, Department of Housing and Urban Development, Department of the Interior, Department of Justice, Department of Labor, Department of State, Department of Transportation, Department of the Treasury, Department of Veterans Affairs, Agency for International Development, Environmental Protection Agency, Federal Deposit Insurance Corporation, Federal Emergency Management Agency, General Services Administration, National Aeronautics and Space Administration, Nuclear Regulatory Commission, Office of Personnel Management, Railroad Retirement Board, Small Business Administration, Social Security Administration, and the Tennessee Valley Authority are exempt from the requirement of paragraph (2) of an initial determination of eligibility by the Attorney General.

"(4) The Attorney General shall promulgate, and revise as appropriate, guidelines which shall govern the exercise of the law enforcement powers established under paragraph (1).

"(5)(A) Powers authorized for an Office of Inspector General under paragraph (1) may be rescinded or suspended upon a determination by the Attorney General that any of the requirements under paragraph (2) is no longer satisfied or that the exercise of authorized powers by that Office of Inspector General has not complied with the guidelines promulgated by the Attorney General under paragraph (4).

"(B) Powers authorized to be exercised by any individual under paragraph (1) may be rescinded or suspended with respect to that individual upon a determination by the Attorney General that such individual has not complied with guidelines promulgated by the Attorney General under paragraph (4).

"(6) A determination by the Attorney General under paragraph (2) or (5) shall not be reviewable in or by any court.

"(7) To ensure the proper exercise of the law enforcement powers authorized by this subsection, the Offices of Inspector General described under paragraph (3) shall, not later than 180 days after the date of enactment of this subsection, collectively enter into a memorandum of understanding to establish an external review process for ensuring that adequate internal safeguards and management procedures continue to exist within each Office and within any Office that later receives an authorization under paragraph (2). The review process shall be established in consultation with the Attorney General, who shall be provided with a copy of the memorandum of understanding that establishes the review process. Under the review process, the exercise of the law enforcement powers by each Office of Inspector General shall be reviewed periodically by another Office of Inspector General or by a committee of Inspectors General. The results of each review shall be communicated in writing to the applicable Inspector General and to the Attorney General.

"(8) No provision of this subsection shall limit the exercise of law enforcement powers established under any other statutory authority, including United States Marshals Service special deputation.".

<< 5 USCA App. 3 § 6 NOTE >>

(b) PROMULGATION OF INITIAL GUIDELINES.—

(1) DEFINITION.—In this subsection, the term "memoranda of understanding" means the agreements between the Department of Justice and the Inspector General offices described under section 6(e)(3) of the Inspector General Act of 1978 (5 U.S.C. App.) (as added by subsection (a) of this section) that—

(A) are in effect on the date of enactment of this Act; and

(B) authorize such offices to exercise authority that is the same or similar to the authority under section 6(e)(1) of such Act.

(2) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, the Attorney General shall promulgate guidelines under section 6(e)(4) of the Inspector General Act of 1978 (5 U.S.C. App.) (as added by subsection (a) of this section) applicable to the Inspector General offices described under section 6(e)(3) of that Act.

(3) MINIMUM REQUIREMENTS.—The guidelines promulgated under this subsection shall include, at a minimum, the operational and training requirements in the memoranda of understanding.

(4) NO LAPSE OF AUTHORITY.—The memoranda of understanding in effect on the date of enactment of this Act shall remain in effect until the guidelines promulgated under this subsection take effect.

AR.02234

<< 5 USCA App. 3 § 6 NOTE >>

(c) EFFECTIVE DATES.—
  (1) IN GENERAL.—Subsection (a) shall take effect 180 days after the date of enactment of this Act.
  (2) INITIAL GUIDELINES.—Subsection (b) shall take effect on the date of enactment of this Act.

<< 6 USCA prec. § 381 >>

Subtitle C—United States Secret Service

<< 6 USCA § 381 >>

SEC. 821. FUNCTIONS TRANSFERRED.

 In accordance with title XV, there shall be transferred to the Secretary the functions, personnel, assets, and obligations of the United States Secret Service, which shall be maintained as a distinct entity within the Department, including the functions of the Secretary of the Treasury relating thereto.

<< 6 USCA prec. § 391 >>

Subtitle D—Acquisitions

<< 6 USCA § 391 >>

SEC. 831. RESEARCH AND DEVELOPMENT PROJECTS.

 (a) AUTHORITY.—During the 5–year period following the effective date of this Act, the Secretary may carry out a pilot program under which the Secretary may exercise the following authorities:
  (1) IN GENERAL.—When the Secretary carries out basic, applied, and advanced research and development projects, including the expenditure of funds for such projects, the Secretary may exercise the same authority (subject to the same limitations and conditions) with respect to such research and projects as the Secretary of Defense may exercise under section 2371 of title 10, United States Code (except for subsections (b) and (f)), after making a determination that the use of a contract, grant, or cooperative agreement for such project is not feasible or appropriate. The annual report required under subsection (b) of this section, as applied to the Secretary by this paragraph, shall be submitted to the President of the Senate and the Speaker of the House of Representatives.
  (2) PROTOTYPE PROJECTS.—The Secretary may, under the authority of paragraph (1), carry out prototype projects in accordance with the requirements and conditions provided for carrying out prototype projects under section 845 of the National Defense Authorization Act for Fiscal Year 1994 (Public Law 103–160). In applying the authorities of that section 845, subsection (c) of that section shall apply with respect to prototype projects under this paragraph, and the Secretary shall perform the functions of the Secretary of Defense under subsection (d) thereof.
(b) REPORT.—Not later than 2 years after the effective date of this Act, and annually thereafter, the Comptroller General shall report to the Committee on Government Reform of the House of Representatives and the Committee on Governmental Affairs of the Senate on—
  (1) whether use of the authorities described in subsection (a) attracts nontraditional Government contractors and results in the acquisition of needed technologies; and
  (2) if such authorities were to be made permanent, whether additional safeguards are needed with respect to the use of such authorities.
(c) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—The Secretary may—
  (1) procure the temporary or intermittent services of experts or consultants (or organizations thereof) in accordance with section 3109(b) of title 5, United States Code; and

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 2259 of 3864

(2) whenever necessary due to an urgent homeland security need, procure temporary (not to exceed 1 year) or intermittent personal services, including the services of experts or consultants (or organizations thereof), without regard to the pay limitations of such section 3109.

(d) DEFINITION OF NONTRADITIONAL GOVERNMENT CONTRACTOR.—In this section, the term "nontraditional Government contractor" has the same meaning as the term "nontraditional defense contractor" as defined in section 845(e) of the National Defense Authorization Act for Fiscal Year 1994 (Public Law 103–160; 10 U.S.C. 2371 note).

<< 6 USCA § 392 >>

## SEC. 832. PERSONAL SERVICES.

The Secretary—

(1) may procure the temporary or intermittent services of experts or consultants (or organizations thereof) in accordance with section 3109 of title 5, United States Code; and

(2) may, whenever necessary due to an urgent homeland security need, procure temporary (not to exceed 1 year) or intermittent personal services, including the services of experts or consultants (or organizations thereof), without regard to the pay limitations of such section 3109.

<< 6 USCA § 393 >>

## SEC. 833. SPECIAL STREAMLINED ACQUISITION AUTHORITY.

(a) AUTHORITY.—

(1) IN GENERAL.—The Secretary may use the authorities set forth in this section with respect to any procurement made during the period beginning on the effective date of this Act and ending September 30, 2007, if the Secretary determines in writing that the mission of the Department (as described in section 101) would be seriously impaired without the use of such authorities.

(2) DELEGATION.—The authority to make the determination described in paragraph (1) may not be delegated by the Secretary to an officer of the Department who is not appointed by the President with the advice and consent of the Senate.

(3) NOTIFICATION.—Not later than the date that is 7 days after the date of any determination under paragraph (1), the Secretary shall submit to the Committee on Government Reform of the House of Representatives and the Committee on Governmental Affairs of the Senate—

(A) notification of such determination; and

(B) the justification for such determination.

(b) INCREASED MICRO–PURCHASE THRESHOLD FOR CERTAIN PROCUREMENTS.—

(1) IN GENERAL.—The Secretary may designate certain employees of the Department to make procurements described in subsection (a) for which in the administration of section 32 of the Office of Federal Procurement Policy Act (41 U.S.C. 428) the amount specified in subsections (c), (d), and (f) of such section 32 shall be deemed to be $7,500.

(2) NUMBER OF EMPLOYEES.—The number of employees designated under paragraph (1) shall be—

(A) fewer than the number of employees of the Department who are authorized to make purchases without obtaining competitive quotations, pursuant to section 32(c) of the Office of Federal Procurement Policy Act (41 U.S.C. 428(c));

(B) sufficient to ensure the geographic dispersal of the availability of the use of the procurement authority under such paragraph at locations reasonably considered to be potential terrorist targets; and

(C) sufficiently limited to allow for the careful monitoring of employees designated under such paragraph.

(3) REVIEW.—Procurements made under the authority of this subsection shall be subject to review by a designated supervisor on not less than a monthly basis. The supervisor responsible for the review shall be responsible for no more than 7 employees making procurements under this subsection.

(c) SIMPLIFIED ACQUISITION PROCEDURES.—

(1) IN GENERAL.—With respect to a procurement described in subsection (a), the Secretary may deem the simplified acquisition threshold referred to in section 4(11) of the Office of Federal Procurement Policy Act (41 U.S.C. 403(11)) to be—

(A) in the case of a contract to be awarded and performed, or purchase to be made, within the United States, $200,000; and

(B) in the case of a contract to be awarded and performed, or purchase to be made, outside of the United States, $300,000.

<< 41 USCA § 416 >>

(2) CONFORMING AMENDMENTS.—Section 18(c)(1) of the Office of Federal Procurement Policy Act is amended—

(A) by striking "or" at the end of subparagraph (F);

(B) by striking the period at the end of subparagraph (G) and inserting "; or"; and

(C) by adding at the end the following:

"(H) the procurement is by the Secretary of Homeland Security pursuant to the special procedures provided in section 833(c) of the Homeland Security Act of 2002.".

(d) APPLICATION OF CERTAIN COMMERCIAL ITEMS AUTHORITIES.—

(1) IN GENERAL.—With respect to a procurement described in subsection (a), the Secretary may deem any item or service to be a commercial item for the purpose of Federal procurement laws.

(2) LIMITATION.—The $5,000,000 limitation provided in section 31(a)(2) of the Office of Federal Procurement Policy Act (41 U.S.C. 427(a)(2)) and section 303(g)(1)(B) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253(g)(1)(B)) shall be deemed to be $7,500,000 for purposes of property or services under the authority of this subsection.

(3) CERTAIN AUTHORITY.—Authority under a provision of law referred to in paragraph (2) that expires under section 4202(e) of the Clinger–Cohen Act of 1996 (divisions D and E of Public Law 104–106; 10 U.S.C. 2304 note) shall, notwithstanding such section, continue to apply for a procurement described in subsection (a).

(e) REPORT.—Not later than 180 days after the end of fiscal year 2005, the Comptroller General shall submit to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform of the House of Representatives a report on the use of the authorities provided in this section. The report shall contain the following:

(1) An assessment of the extent to which property and services acquired using authorities provided under this section contributed to the capacity of the Federal workforce to facilitate the mission of the Department as described in section 101.

(2) An assessment of the extent to which prices for property and services acquired using authorities provided under this section reflected the best value.

(3) The number of employees designated by each executive agency under subsection (b)(1).

(4) An assessment of the extent to which the Department has implemented subsections (b)(2) and (b)(3) to monitor the use of procurement authority by employees designated under subsection (b)(1).

(5) Any recommendations of the Comptroller General for improving the effectiveness of the implementation of the provisions of this section.

<< 6 USCA § 394 >>

SEC. 834. UNSOLICITED PROPOSALS.

(a) REGULATIONS REQUIRED.—Within 1 year of the date of enactment of this Act, the Federal Acquisition Regulation shall be revised to include regulations with regard to unsolicited proposals.

(b) CONTENT OF REGULATIONS.—The regulations prescribed under subsection (a) shall require that before initiating a comprehensive evaluation, an agency contact point shall consider, among other factors, that the proposal—

(1) is not submitted in response to a previously published agency requirement; and

(2) contains technical and cost information for evaluation and overall scientific, technical or socioeconomic merit, or cost-related or price-related factors.

<< 6 USCA § 395 >>

SEC. 835. PROHIBITION ON CONTRACTS WITH CORPORATE EXPATRIATES.

(a) IN GENERAL.—The Secretary may not enter into any contract with a foreign incorporated entity which is treated as an inverted domestic corporation under subsection (b).

(b) INVERTED DOMESTIC CORPORATION.—For purposes of this section, a foreign incorporated entity shall be treated as an inverted domestic corporation if, pursuant to a plan (or a series of related transactions)—

(1) the entity completes after the date of enactment of this Act, the direct or indirect acquisition of substantially all of the properties held directly or indirectly by a domestic corporation or substantially all of the properties constituting a trade or business of a domestic partnership;

(2) after the acquisition at least 80 percent of the stock (by vote or value) of the entity is held—

(A) in the case of an acquisition with respect to a domestic corporation, by former shareholders of the domestic corporation by reason of holding stock in the domestic corporation; or

(B) in the case of an acquisition with respect to a domestic partnership, by former partners of the domestic partnership by reason of holding a capital or profits interest in the domestic partnership; and

(3) the expanded affiliated group which after the acquisition includes the entity does not have substantial business activities in the foreign country in which or under the law of which the entity is created or organized when compared to the total business activities of such expanded affiliated group.

(c) DEFINITIONS AND SPECIAL RULES.—

(1) RULES FOR APPLICATION OF SUBSECTION (b)—In applying subsection (b) for purposes of subsection (a), the following rules shall apply:

(A) CERTAIN STOCK DISREGARDED.—There shall not be taken into account in determining ownership for purposes of subsection (b)(2)—

(i) stock held by members of the expanded affiliated group which includes the foreign incorporated entity; or

(ii) stock of such entity which is sold in a public offering related to the acquisition described in subsection (b)(1).

(B) PLAN DEEMED IN CERTAIN CASES.—If a foreign incorporated entity acquires directly or indirectly substantially all of the properties of a domestic corporation or partnership during the 4–year period beginning on the date which is after the date of enactment of this Act and which is 2 years before the ownership requirements of subsection (b)(2) are met, such actions shall be treated as pursuant to a plan.

(C) CERTAIN TRANSFERS DISREGARDED.—The transfer of properties or liabilities (including by contribution or distribution) shall be disregarded if such transfers are part of a plan a principal purpose of which is to avoid the purposes of this section.

(D) SPECIAL RULE FOR RELATED PARTNERSHIPS.—For purposes of applying subsection (b) to the acquisition of a domestic partnership, except as provided in regulations, all domestic partnerships which are under common control (within the meaning of section 482 of the Internal Revenue Code of 1986) shall be treated as I partnership.

(E) TREATMENT OF CERTAIN RIGHTS.—The Secretary shall prescribe such regulations as may be necessary to—

(i) treat warrants, options, contracts to acquire stock, convertible debt instruments, and other similar interests as stock; and

(ii) treat stock as not stock.

(2) EXPANDED AFFILIATED GROUP.—The term "expanded affiliated group" means an affiliated group as defined in section 1504(a) of the Internal Revenue Code of 1986 (without regard to section 1504(b) of such Code), except that section 1504 of such Code shall be applied by substituting "more than 50 percent" for "at least 80 percent" each place it appears.

(3) FOREIGN INCORPORATED ENTITY.—The term "foreign incorporated entity" means any entity which is, or but for subsection (b) would be, treated as a foreign corporation for purposes of the Internal Revenue Code of 1986.

(4) OTHER DEFINITIONS.—The terms "person", "domestic", and "foreign" have the meanings given such terms by paragraphs (1), (4), and (5) of section 7701(a) of the Internal Revenue Code of 1986, respectively.

(d) WAIVERS.—The Secretary shall waive subsection (a) with respect to any specific contract if the Secretary determines that the waiver is required in the interest of homeland security, or to prevent the loss of any jobs in the United States or prevent the Government from incurring any additional costs that otherwise would not occur.

<< 6 USCA prec. § 411 >>

Subtitle E—Human Resources Management

<< 6 USCA § 411 >>

AR.02238

## SEC. 841. ESTABLISHMENT OF HUMAN RESOURCES MANAGEMENT SYSTEM.

(a) AUTHORITY.—

(1) SENSE OF CONGRESS.—It is the sense of Congress that—

(A) it is extremely important that employees of the Department be allowed to participate in a meaningful way in the creation of any human resources management system affecting them;

(B) such employees have the most direct knowledge of the demands of their jobs and have a direct interest in ensuring that their human resources management system is conducive to achieving optimal operational efficiencies;

(C) the 21st century human resources management system envisioned for the Department should be one that benefits from the input of its employees; and

(D) this collaborative effort will help secure our homeland.

(2) IN GENERAL.—Subpart I of part III of title 5, United States Code, is amended by adding at the end the following:

<< 5 USCA prec. § 9701 >>

"CHAPTER 97—DEPARTMENT OF HOMELAND SECURITY

"Sec.

"9701. Establishment of human resources management system.

<< 5 USCA § 9701 >>

"§ 9701. Establishment of human resources management system

"(a) IN GENERAL.—Notwithstanding any other provision of this part, the Secretary of Homeland Security may, in regulations prescribed jointly with the Director of the Office of Personnel Management, establish, and from time to time adjust, a human resources management system for some or all of the organizational units of the Department of Homeland Security.

"(b) SYSTEM REQUIREMENTS.—Any system established under subsection (a) shall—

"(1) be flexible;

"(2) be contemporary;

"(3) not waive, modify, or otherwise affect—

"(A) the public employment principles of merit and fitness set forth in section 2301, including the principles of hiring based on merit, fair treatment without regard to political affiliation or other nonmerit considerations, equal pay for equal work, and protection of employees against reprisal for whistleblowing;

"(B) any provision of section 2302, relating to prohibited personnel practices;

"(C)(i) any provision of law referred to in section 2302(b)(1), (8), and (9); or

"(ii) any provision of law implementing any provision of law referred to in section 2302(b)(1), (8), and (9) by—

"(I) providing for equal employment opportunity through affirmative action; or

"(II) providing any right or remedy available to any employee or applicant for employment in the civil service;

"(D) any other provision of this part (as described in subsection (c)); or

"(E) any rule or regulation prescribed under any provision of law referred to in any of the preceding subparagraphs of this paragraph;

"(4) ensure that employees may organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them, subject to any exclusion from coverage or limitation on negotiability established by law; and

"(5) permit the use of a category rating system for evaluating applicants for positions in the competitive service.

"(c) OTHER NONWAIVABLE PROVISIONS.—The other provisions of this part as referred to in subsection (b)(3)(D), are (to the extent not otherwise specified in subparagraph (A), (B), (C), or (D) of subsection (b)(3))—

"(1) subparts A, B, E, G, and H of this part; and

"(2) chapters 41, 45, 47, 55, 57, 59, 72, 73, and 79, and this chapter.

"(d) LIMITATIONS RELATING TO PAY.—Nothing in this section shall constitute authority—

"(1) to modify the pay of any employee who serves in—

"(A) an Executive Schedule position under subchapter II of chapter 53 of title 5, United States Code; or

"(B) a position for which the rate of basic pay is fixed in statute by reference to a section or level under subchapter II of chapter 53 of such title 5;

"(2) to fix pay for any employee or position at an annual rate greater than the maximum amount of cash compensation allowable under section 5307 of such title 5 in a year; or

"(3) to exempt any employee from the application of such section 5307.

"(e) PROVISIONS TO ENSURE COLLABORATION WITH EMPLOYEE REPRESENTATIVES.—

"(1) IN GENERAL.—In order to ensure that the authority of this section is exercised in collaboration with, and in a manner that ensures the participation of employee representatives in the planning, development, and implementation of any human resources management system or adjustments to such system under this section, the Secretary of Homeland Security and the Director of the Office of Personnel Management shall provide for the following:

"(A) NOTICE OF PROPOSAL.—The Secretary and the Director shall, with respect to any proposed system or adjustment—

"(i) provide to each employee representative representing any employees who might be affected, a written description of the proposed system or adjustment (including the reasons why it is considered necessary);

"(ii) give each representative 30 calendar days (unless extraordinary circumstances require earlier action) to review and make recommendations with respect to the proposal; and

"(iii) give any recommendations received from any such representatives under clause (ii) full and fair consideration in deciding whether or how to proceed with the proposal.

"(B) PRE–IMPLEMENTATION CONGRESSIONAL NOTIFICATION, CONSULTATION, AND MEDIATION.— Following receipt of recommendations, if any, from employee representatives with respect to a proposal described in subparagraph (A), the Secretary and the Director shall accept such modifications to the proposal in response to the recommendations as they determine advisable and shall, with respect to any parts of the proposal as to which they have not accepted the recommendations—

"(i) notify Congress of those parts of the proposal, together with the recommendations of employee representatives;

"(ii) meet and confer for not less than 30 calendar days with any representatives who have made recommendations, in order to attempt to reach agreement on whether or how to proceed with those parts of the proposal; and

"(iii) at the Secretary's option, or if requested by a majority of the employee representatives who have made recommendations, use the services of the Federal Mediation and Conciliation Service during such meet and confer period to facilitate the process of attempting to reach agreement.

"(C) IMPLEMENTATION.—

"(i) Any part of the proposal as to which the representatives do not make a recommendation, or as to which their recommendations are accepted by the Secretary and the Director, may be implemented immediately.

"(ii) With respect to any parts of the proposal as to which recommendations have been made but not accepted by the Secretary and the Director, at any time after 30 calendar days have elapsed since the initiation of the congressional notification, consultation, and mediation procedures set forth in subparagraph (B), if the Secretary determines, in the Secretary's sole and unreviewable discretion, that further consultation and mediation is unlikely to produce agreement, the Secretary may implement any or all of such parts, including any modifications made in response to the recommendations as the Secretary determines advisable.

"(iii) The Secretary shall promptly notify Congress of the implementation of any part of the proposal and shall furnish with such notice an explanation of the proposal, any changes made to the proposal as a result of recommendations from employee representatives, and of the reasons why implementation is appropriate under this subparagraph.

"(D) CONTINUING COLLABORATION.—If a proposal described in subparagraph (A) is implemented, the Secretary and the Director shall—

"(i) develop a method for each employee representative to participate in any further planning or development which might become necessary; and

"(ii) give each employee representative adequate access to information to make that participation productive.

"(2) PROCEDURES.—Any procedures necessary to carry out this subsection shall be established by the Secretary and the Director jointly as internal rules of departmental procedure which shall not be subject to review. Such procedures shall include measures to ensure—

"(A) in the case of employees within a unit with respect to which a labor organization is accorded exclusive recognition, representation by individuals designated or from among individuals nominated by such organization;

"(B) in the case of any employees who are not within such a unit, representation by any appropriate organization which represents a substantial percentage of those employees or, if none, in such other manner as may be appropriate, consistent with the purposes of the subsection;

"(C) the fair and expeditious handling of the consultation and mediation process described in subparagraph (B) of paragraph (1), including procedures by which, if the number of employee representatives providing recommendations exceeds 5, such representatives select a committee or other unified representative with which the Secretary and Director may meet and confer; and

"(D) the selection of representatives in a manner consistent with the relative number of employees represented by the organizations or other representatives involved.

"(f) PROVISIONS RELATING TO APPELLATE PROCEDURES.—

"(1) SENSE OF CONGRESS.—It is the sense of Congress that—

"(A) employees of the Department are entitled to fair treatment in any appeals that they bring in decisions relating to their employment; and

"(B) in prescribing regulations for any such appeals procedures, the Secretary and the Director of the Office of Personnel Management—

"(i) should ensure that employees of the Department are afforded the protections of due process; and

"(ii) toward that end, should be required to consult with the Merit Systems Protection Board before issuing any such regulations.

"(2) REQUIREMENTS.—Any regulations under this section which relate to any matters within the purview of chapter 77—

"(A) shall be issued only after consultation with the Merit Systems Protection Board;

"(B) shall ensure the availability of procedures which shall—

"(i) be consistent with requirements of due process; and

"(ii) provide, to the maximum extent practicable, for the expeditious handling of any matters involving the Department; and

"(C) shall modify procedures under chapter 77 only insofar as such modifications are designed to further the fair, efficient, and expeditious resolution of matters involving the employees of the Department.

"(g) PROVISIONS RELATING TO LABOR–MANAGEMENT RELATIONS.—Nothing in this section shall be construed as conferring authority on the Secretary of Homeland Security to modify any of the provisions of section 842 of the Homeland Security Act of 2002.

"(h) SUNSET PROVISION.—Effective 5 years after the conclusion of the transition period defined under section 1501 of the Homeland Security Act of 2002, all authority to issue regulations under this section (including regulations which would modify, supersede, or terminate any regulations previously issued under this section) shall cease to be available.".

<< 5 USCA prec. § 2101 >>

(3) TECHNICAL AND CONFORMING AMENDMENT.—The table of chapters for part III of title 5, United States Code, is amended by adding at the end of the following:

**"97. Department of Homeland Security.9701".**

(b) EFFECT ON PERSONNEL.—

(1) NONSEPARATION OR NONREDUCTION IN GRADE OR COMPENSATION OF FULL–TIME PERSONNEL AND PART–TIME PERSONNEL HOLDING PERMANENT POSITIONS.—Except as otherwise provided in this Act, the transfer under this Act of full-time personnel (except special Government employees) and part-time personnel holding permanent positions shall not cause any such employee to be separated or reduced in grade or compensation for 1 year after the date of transfer to the Department.

(2) POSITIONS COMPENSATED IN ACCORDANCE WITH EXECUTIVE SCHEDULE.—Any person who, on the day preceding such person's date of transfer pursuant to this Act, held a position compensated in accordance with the Executive Schedule prescribed in chapter 53 of title 5, United States Code, and who, without a break in service, is appointed in the Department to a position having duties comparable to the duties performed immediately preceding such appointment shall continue to be compensated in such new position at not less than the rate provided for such position, for the duration of the service of such person in such new position.

(3) COORDINATION RULE.—Any exercise of authority under chapter 97 of title 5, United States Code (as amended by subsection (a)), including under any system established under such chapter, shall be in conformance with the requirements of this subsection.

<< 6 USCA § 412 >>

SEC. 842. LABOR–MANAGEMENT RELATIONS.

(a) LIMITATION ON EXCLUSIONARY AUTHORITY.—

  (1) IN GENERAL.—No agency or subdivision of an agency which is transferred to the Department pursuant to this Act shall be excluded from the coverage of chapter 71 of title 5, United States Code, as a result of any order issued under section 7103(b) (1) of such title 5 after June 18, 2002, unless—

    (A) the mission and responsibilities of the agency (or subdivision) materially change; and

    (B) a majority of the employees within such agency (or subdivision) have as their primary duty intelligence, counterintelligence, or investigative work directly related to terrorism investigation.

  (2) EXCLUSIONS ALLOWABLE.—Nothing in paragraph (1) shall affect the effectiveness of any order to the extent that such order excludes any portion of an agency or subdivision of an agency as to which—

    (A) recognition as an appropriate unit has never been conferred for purposes of chapter 71 of such title 5; or

    (B) any such recognition has been revoked or otherwise terminated as a result of a determination under subsection (b)(1).

(b) PROVISIONS RELATING TO BARGAINING UNITS.—

  (1) LIMITATION RELATING TO APPROPRIATE UNITS.—Each unit which is recognized as an appropriate unit for purposes of chapter 71 of title 5, United States Code, as of the day before the effective date of this Act (and any subdivision of any such unit) shall, if such unit (or subdivision) is transferred to the Department pursuant to this Act, continue to be so recognized for such purposes, unless—

    (A) the mission and responsibilities of such unit (or subdivision) materially change; and

    (B) a majority of the employees within such unit (or subdivision) have as their primary duty intelligence, counterintelligence, or investigative work directly related to terrorism investigation.

  (2) LIMITATION RELATING TO POSITIONS OR EMPLOYEES.—No position or employee within a unit (or subdivision of a unit) as to which continued recognition is given in accordance with paragraph (1) shall be excluded from such unit (or subdivision), for purposes of chapter 71 of such title 5, unless the primary job duty of such position or employee—

    (A) materially changes; and

    (B) consists of intelligence, counterintelligence, or investigative work directly related to terrorism investigation.

  In the case of any positions within a unit (or subdivision) which are first established on or after the effective date of this Act and any employees first appointed on or after such date, the preceding sentence shall be applied disregarding subparagraph (A).

(c) WAIVER.—If the President determines that the application of subsections (a), (b), and (d) would have a substantial adverse impact on the ability of the Department to protect homeland security, the President may waive the application of such subsections 10 days after the President has submitted to Congress a written explanation of the reasons for such determination.

(d) COORDINATION RULE.—No other provision of this Act or of any amendment made by this Act may be construed or applied in a manner so as to limit, supersede, or otherwise affect the provisions of this section, except to the extent that it does so by specific reference to this section.

(e) RULE OF CONSTRUCTION.—Nothing in section 9701(e) of title 5, United States Code, shall be considered to apply with respect to any agency or subdivision of any agency, which is excluded from the coverage of chapter 71 of title 5, United States Code, by virtue of an order issued in accordance with section 7103(b) of such title and the preceding provisions of this

section (as applicable), or to any employees of any such agency or subdivision or to any individual or entity representing any such employees or any representatives thereof.

<< 6 USCA prec. § 421 >>

Subtitle F—Federal Emergency Procurement Flexibility

<< 6 USCA § 421 >>

SEC. 851. DEFINITION.

In this subtitle, the term "executive agency" has the meaning given that term under section 4(1) of the Office of Federal Procurement Policy Act (41 U.S.C. 403(1)).

<< 6 USCA § 422 >>

SEC. 852. PROCUREMENTS FOR DEFENSE AGAINST OR RECOVERY FROM TERRORISM OR NUCLEAR, BIOLOGICAL, CHEMICAL, OR RADIOLOGICAL ATTACK.

The authorities provided in this subtitle apply to any procurement of property or services by or for an executive agency that, as determined by the head of the executive agency, are to be used to facilitate defense against or recovery from terrorism or nuclear, biological, chemical, or radiological attack, but only if a solicitation of offers for the procurement is issued during the 1–year period beginning on the date of the enactment of this Act.

<< 6 USCA § 423 >>

SEC. 853. INCREASED SIMPLIFIED ACQUISITION THRESHOLD FOR PROCUREMENTS IN SUPPORT OF HUMANITARIAN OR PEACEKEEPING OPERATIONS OR CONTINGENCY OPERATIONS.

(a) TEMPORARY THRESHOLD AMOUNTS.—For a procurement referred to in section 852 that is carried out in support of a humanitarian or peacekeeping operation or a contingency operation, the simplified acquisition threshold definitions shall be applied as if the amount determined under the exception provided for such an operation in those definitions were—
  (1) in the case of a contract to be awarded and performed, or purchase to be made, inside the United States, $200,000; or
  (2) in the case of a contract to be awarded and performed, or purchase to be made, outside the United States, $300,000.
(b) SIMPLIFIED ACQUISITION THRESHOLD DEFINITIONS.—In this section, the term "simplified acquisition threshold definitions" means the following:
  (1) Section 4(11) of the Office of Federal Procurement Policy Act (41 U.S.C. 403(11)).
  (2) Section 309(d) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 259(d)).
  (3) Section 2302(7) of title 10, United States Code.
(c) SMALL BUSINESS RESERVE.—For a procurement carried out pursuant to subsection (a), section 15(j) of the Small Business Act (15 U.S.C. 644(j)) shall be applied as if the maximum anticipated value identified therein is equal to the amounts referred to in subsection (a).

<< 6 USCA § 424 >>

SEC. 854. INCREASED MICRO–PURCHASE THRESHOLD FOR CERTAIN PROCUREMENTS.

In the administration of section 32 of the Office of Federal Procurement Policy Act (41 U.S.C. 428) with respect to a procurement referred to in section 852, the amount specified in subsections (c), (d), and (f) of such section 32 shall be deemed to be $7,500.

<< 6 USCA § 425 >>

SEC. 855. APPLICATION OF CERTAIN COMMERCIAL ITEMS AUTHORITIES TO CERTAIN PROCUREMENTS.

(a) AUTHORITY.—

(1) IN GENERAL.—The head of an executive agency may apply the provisions of law listed in paragraph (2) to a procurement referred to in section 852 without regard to whether the property or services are commercial items.

(2) COMMERCIAL ITEM LAWS.—The provisions of law referred to in paragraph (1) are as follows:

(A) Sections 31 and 34 of the Office of Federal Procurement Policy Act (41 U.S.C. 427, 430).

(B) Section 2304(g) of title 10, United States Code.

(C) Section 303(g) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253(g)).

(b) INAPPLICABILITY OF LIMITATION ON USE OF SIMPLIFIED ACQUISITION PROCEDURES.—

(1) IN GENERAL.—The $5,000,000 limitation provided in section 31(a)(2) of the Office of Federal Procurement Policy Act (41 U.S.C. 427(a)(2)), section 2304(g)(1)(B) of title 10, United States Code, and section 303(g)(1)(B) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253(g)(1)(B)) shall not apply to purchases of property or services to which any of the provisions of law referred to in subsection (a) are applied under the authority of this section.

(2) OMB GUIDANCE.—The Director of the Office of Management and Budget shall issue guidance and procedures for the use of simplified acquisition procedures for a purchase of property or services in excess of $5,000,000 under the authority of this section.

(c) CONTINUATION OF AUTHORITY FOR SIMPLIFIED PURCHASE PROCEDURES.—Authority under a provision of law referred to in subsection (a)(2) that expires under section 4202(e) of the Clinger–Cohen Act of 1996 (divisions D and E of Public Law 104–106; 10 U.S.C. 2304 note) shall, notwithstanding such section, continue to apply for use by the head of an executive agency as provided in subsections (a) and (b).

<< 6 USCA § 426 >>

SEC. 856. USE OF STREAMLINED PROCEDURES.

(a) REQUIRED USE.—The head of an executive agency shall, when appropriate, use streamlined acquisition authorities and procedures authorized by law for a procurement referred to in section 852, including authorities and procedures that are provided under the following provisions of law:

(1) FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT OF 1949.—In title III of the Federal Property and Administrative Services Act of 1949:

(A) Paragraphs (1), (2), (6), and (7) of subsection (c) of section 303 (41 U.S.C. 253), relating to use of procedures other than competitive procedures under certain circumstances (subject to subsection (e) of such section).

(B) Section 303J (41 U.S.C. 253j), relating to orders under task and delivery order contracts.

(2) TITLE 10, UNITED STATES CODE.—In chapter 137 of title 10, United States Code:

(A) Paragraphs (1), (2), (6), and (7) of subsection (c) of section 2304, relating to use of procedures other than competitive procedures under certain circumstances (subject to subsection (e) of such section).

(B) Section 2304c, relating to orders under task and delivery order contracts.

(3) OFFICE OF FEDERAL PROCUREMENT POLICY ACT.—Paragraphs (1)(B), (1)(D), and (2) of section 18(c) of the Office of Federal Procurement Policy Act (41 U.S.C. 416(c)), relating to inapplicability of a requirement for procurement notice.

(b) WAIVER OF CERTAIN SMALL BUSINESS THRESHOLD REQUIREMENTS.—Subclause (II) of section 8(a)(1)(D)(i) of the Small Business Act (15 U.S.C. 637(a)(1)(D)(i)) and clause (ii) of section 31(b)(2)(A) of such Act (15 U.S.C. 657a(b)(2)(A)) shall not apply in the use of streamlined acquisition authorities and procedures referred to in paragraphs (1)(A) and (2)(A) of subsection (a) for a procurement referred to in section 852.

<< 6 USCA § 427 >>

SEC. 857. REVIEW AND REPORT BY COMPTROLLER GENERAL.

(a) REQUIREMENTS.—Not later than March 31, 2004, the Comptroller General shall—

 (1) complete a review of the extent to which procurements of property and services have been made in accordance with this subtitle; and

 (2) submit a report on the results of the review to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform of the House of Representatives.

(b) CONTENT OF REPORT.—The report under subsection (a)(2) shall include the following matters:

 (1) ASSESSMENT.—The Comptroller General's assessment of—

  (A) the extent to which property and services procured in accordance with this title have contributed to the capacity of the workforce of Federal Government employees within each executive agency to carry out the mission of the executive agency; and

  (B) the extent to which Federal Government employees have been trained on the use of technology.

 (2) RECOMMENDATIONS.—Any recommendations of the Comptroller General resulting from the assessment described in paragraph (1).

(c) CONSULTATION.—In preparing for the review under subsection (a)(1), the Comptroller shall consult with the Committee on Governmental Affairs of the Senate and the Committee on Government Reform of the House of Representatives on the specific issues and topics to be reviewed. The extent of coverage needed in areas such as technology integration, employee training, and human capital management, as well as the data requirements of the study, shall be included as part of the consultation.

<< 6 USCA § 428 >>

## SEC. 858. IDENTIFICATION OF NEW ENTRANTS INTO THE FEDERAL MARKETPLACE.

 The head of each executive agency shall conduct market research on an ongoing basis to identify effectively the capabilities, including the capabilities of small businesses and new entrants into Federal contracting, that are available in the marketplace for meeting the requirements of the executive agency in furtherance of defense against or recovery from terrorism or nuclear, biological, chemical, or radiological attack. The head of the executive agency shall, to the maximum extent practicable, take advantage of commercially available market research methods, including use of commercial databases, to carry out the research.

<< 6 USCA prec. § 441 >>

Subtitle G—Support Anti-terrorism by Fostering Effective Technologies Act of 2002

<< 6 USCA § 101 NOTE >>

## SEC. 861. SHORT TITLE.

 This subtitle may be cited as the "Support Anti-terrorism by Fostering Effective Technologies Act of 2002" or the "SAFETY Act".

<< 6 USCA § 441 >>

## SEC. 862. ADMINISTRATION.

 (a) IN GENERAL.—The Secretary shall be responsible for the administration of this subtitle.

 (b) DESIGNATION OF QUALIFIED ANTI–TERRORISM TECHNOLOGIES.—The Secretary may designate anti-terrorism technologies that qualify for protection under the system of risk management set forth in this subtitle in accordance with criteria that shall include, but not be limited to, the following:

 (1) Prior United States Government use or demonstrated substantial utility and effectiveness.

 (2) Availability of the technology for immediate deployment in public and private settings.

 (3) Existence of extraordinarily large or extraordinarily unquantifiable potential third party liability risk exposure to the Seller or other provider of such anti-terrorism technology.

(4) Substantial likelihood that such anti-terrorism technology will not be deployed unless protections under the system of risk management provided under this subtitle are extended.

(5) Magnitude of risk exposure to the public if such anti-terrorism technology is not deployed.

(6) Evaluation of all scientific studies that can be feasibly conducted in order to assess the capability of the technology to substantially reduce risks of harm.

(7) Anti-terrorism technology that would be effective in facilitating the defense against acts of terrorism, including technologies that prevent, defeat or respond to such acts.

(c) REGULATIONS.—The Secretary may issue such regulations, after notice and comment in accordance with section 553 of title 5, United States Code, as may be necessary to carry out this subtitle.

<< 6 USCA § 442 >>

SEC. 863. LITIGATION MANAGEMENT.

(a) FEDERAL CAUSE OF ACTION.—

(1) IN GENERAL.—There shall exist a Federal cause of action for claims arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller. The substantive law for decision in any such action shall be derived from the law, including choice of law principles, of the State in which such acts of terrorism occurred, unless such law is inconsistent with or preempted by Federal law. Such Federal cause of action shall be brought only for claims for injuries that are proximately caused by sellers that provide qualified anti-terrorism technology to Federal and non-Federal government customers.

(2) JURISDICTION.—Such appropriate district court of the United States shall have original and exclusive jurisdiction over all actions for any claim for loss of property, personal injury, or death arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller.

(b) SPECIAL RULES.—In an action brought under this section for damages the following provisions apply:

(1) PUNITIVE DAMAGES.—No punitive damages intended to punish or deter, exemplary damages, or other damages not intended to compensate a plaintiff for actual losses may be awarded, nor shall any party be liable for interest prior to the judgment.

(2) NONECONOMIC DAMAGES.—

(A) IN GENERAL.—Noneconomic damages may be awarded against a defendant only in an amount directly proportional to the percentage of responsibility of such defendant for the harm to the plaintiff, and no plaintiff may recover noneconomic damages unless the plaintiff suffered physical harm.

(B) DEFINITION.—For purposes of subparagraph (A), the term "noneconomic damages" means damages for losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium, hedonic damages, injury to reputation, and any other nonpecuniary losses.

(c) COLLATERAL SOURCES.—Any recovery by a plaintiff in an action under this section shall be reduced by the amount of collateral source compensation, if any, that the plaintiff has received or is entitled to receive as a result of such acts of terrorism that result or may result in loss to the Seller.

(d) GOVERNMENT CONTRACTOR DEFENSE.—

(1) IN GENERAL.—Should a product liability or other lawsuit be filed for claims arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies approved by the Secretary, as provided in paragraphs (2) and (3) of this subsection, have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller, there shall be a rebuttable presumption that the government contractor defense applies in such lawsuit. This presumption shall only be overcome by evidence showing that the Seller acted fraudulently or with willful misconduct in submitting information to the Secretary during the course of the Secretary's consideration of such technology under this subsection. This presumption of the government contractor defense shall apply regardless of whether the claim against the Seller arises from a sale of the product to Federal Government or non-Federal Government customers.

(2) EXCLUSIVE RESPONSIBILITY.—The Secretary will be exclusively responsible for the review and approval of anti-terrorism technology for purposes of establishing a government contractor defense in any product liability lawsuit for claims arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies approved by the Secretary, as provided in this paragraph and paragraph (3), have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller. Upon the Seller's submission to the Secretary for approval of anti-terrorism technology, the Secretary will conduct a comprehensive review of the design of such technology and determine whether it will perform as intended, conforms to the Seller's specifications, and is safe for use as intended. The Seller will conduct safety and hazard analyses on such technology and will supply the Secretary with all such information.

(3) CERTIFICATE.—For anti-terrorism technology reviewed and approved by the Secretary, the Secretary will issue a certificate of conformance to the Seller and place the anti-terrorism technology on an Approved Product List for Homeland Security.

(e) EXCLUSION.—Nothing in this section shall in any way limit the ability of any person to seek any form of recovery from any person, government, or other entity that—

(1) attempts to commit, knowingly participates in, aids and abets, or commits any act of terrorism, or any criminal act related to or resulting from such act of terrorism; or

(2) participates in a conspiracy to commit any such act of terrorism or any such criminal act.

<< 6 USCA § 443 >>

SEC. 864. RISK MANAGEMENT.

(a) IN GENERAL.—

(1) LIABILITY INSURANCE REQUIRED.—Any person or entity that sells or otherwise provides a qualified anti-terrorism technology to Federal and non-Federal Government customers ("Seller") shall obtain liability insurance of such types and in such amounts as shall be required in accordance with this section and certified by the Secretary to satisfy otherwise compensable third-party claims arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies have been deployed in defense against or response or recovery from such act.

(2) MAXIMUM AMOUNT.—For the total claims related to 1 such act of terrorism, the Seller is not required to obtain liability insurance of more than the maximum amount of liability insurance reasonably available from private sources on the world market at prices and terms that will not unreasonably distort the sales price of Seller's anti-terrorism technologies.

(3) SCOPE OF COVERAGE.—Liability insurance obtained pursuant to this subsection shall, in addition to the Seller, protect the following, to the extent of their potential liability for involvement in the manufacture, qualification, sale, use, or operation of qualified anti-terrorism technologies deployed in defense against or response or recovery from an act of terrorism:

(A) Contractors, subcontractors, suppliers, vendors and customers of the Seller.

(B) Contractors, subcontractors, suppliers, and vendors of the customer.

(4) THIRD PARTY CLAIMS.—Such liability insurance under this section shall provide coverage against third party claims arising out of, relating to, or resulting from the sale or use of anti-terrorism technologies.

(b) RECIPROCAL WAIVER OF CLAIMS.—The Seller shall enter into a reciprocal waiver of claims with its contractors, subcontractors, suppliers, vendors and customers, and contractors and subcontractors of the customers, involved in the manufacture, sale, use or operation of qualified anti-terrorism technologies, under which each party to the waiver agrees to be responsible for losses, including business interruption losses, that it sustains, or for losses sustained by its own employees resulting from an activity resulting from an act of terrorism when qualified anti-terrorism technologies have been deployed in defense against or response or recovery from such act.

(c) EXTENT OF LIABILITY.—Notwithstanding any other provision of law, liability for all claims against a Seller arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller, whether for compensatory or punitive damages or for contribution or indemnity, shall not be in an amount greater than the limits of liability insurance coverage required to be maintained by the Seller under this section.

<< 6 USCA § 444 >>

## SEC. 865. DEFINITIONS.

For purposes of this subtitle, the following definitions apply:

(1) QUALIFIED ANTI–TERRORISM TECHNOLOGY.—For purposes of this subtitle, the term "qualified anti-terrorism technology" means any product, equipment, service (including support services), device, or technology (including information technology) designed, developed, modified, or procured for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause, that is designated as such by the Secretary.

(2) ACT OF TERRORISM.—(A) The term "act of terrorism" means any act that the Secretary determines meets the requirements under subparagraph (B), as such requirements are further defined and specified by the Secretary.

(B) REQUIREMENTS.—An act meets the requirements of this subparagraph if the act—

(i) is unlawful;

(ii) causes harm to a person, property, or entity, in the United States, or in the case of a domestic United States air carrier or a United States-flag vessel (or a vessel based principally in the United States on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), in or outside the United States; and

(iii) uses or attempts to use instrumentalities, weapons or other methods designed or intended to cause mass destruction, injury or other loss to citizens or institutions of the United States.

(3) INSURANCE CARRIER.—The term "insurance carrier" means any corporation, association, society, order, firm, company, mutual, partnership, individual aggregation of individuals, or any other legal entity that provides commercial property and casualty insurance. Such term includes any affiliates of a commercial insurance carrier.

(4) LIABILITY INSURANCE.—

(A) IN GENERAL.—The term "liability insurance" means insurance for legal liabilities incurred by the insured resulting from—

(i) loss of or damage to property of others;

(ii) ensuing loss of income or extra expense incurred because of loss of or damage to property of others;

(iii) bodily injury (including) to persons other than the insured or its employees; or

(iv) loss resulting from debt or default of another.

(5) LOSS.—The term "loss" means death, bodily injury, or loss of or damage to property, including business interruption loss.

(6) NON–FEDERAL GOVERNMENT CUSTOMERS.—The term "non-Federal Government customers" means any customer of a Seller that is not an agency or instrumentality of the United States Government with authority under Public Law 85–804 to provide for indemnification under certain circumstances for third-party claims against its contractors, including but not limited to State and local authorities and commercial entities.

<< 6 USCA prec. § 451 >>

Subtitle H—Miscellaneous Provisions

<< 6 USCA § 451 >>

## SEC. 871. ADVISORY COMMITTEES.

(a) IN GENERAL.—The Secretary may establish, appoint members of, and use the services of, advisory committees, as the Secretary may deem necessary. An advisory committee established under this section may be exempted by the Secretary from Public Law 92–463, but the Secretary shall publish notice in the Federal Register announcing the establishment of such a committee and identifying its purpose and membership. Notwithstanding the preceding sentence, members of an advisory committee that is exempted by the Secretary under the preceding sentence who are special Government employees (as that term is defined in section 202 of title 18, United States Code) shall be eligible for certifications under subsection (b)(3) of section 208 of title 18, United States Code, for official actions taken as a member of such advisory committee.

(b) TERMINATION.—Any advisory committee established by the Secretary shall terminate 2 years after the date of its establishment, unless the Secretary makes a written determination to extend the advisory committee to a specified date, which

shall not be more than 2 years after the date on which such determination is made. The Secretary may make any number of subsequent extensions consistent with this subsection.

<< 6 USCA § 452 >>

SEC. 872. REORGANIZATION.

 (a) REORGANIZATION.—The Secretary may allocate or reallocate functions among the officers of the Department, and may establish, consolidate, alter, or discontinue organizational units within the Department, but only—
  (1) pursuant to section 1502(b); or
  (2) after the expiration of 60 days after providing notice of such action to the appropriate congressional committees, which shall include an explanation of the rationale for the action.
 (b) LIMITATIONS.—
  (1) IN GENERAL.—Authority under subsection (a)(1) does not extend to the abolition of any agency, entity, organizational unit, program, or function established or required to be maintained by this Act.
  (2) ABOLITIONS.—Authority under subsection (a)(2) does not extend to the abolition of any agency, entity, organizational unit, program, or function established or required to be maintained by statute.

<< 6 USCA § 453 >>

SEC. 873. USE OF APPROPRIATED FUNDS.

 (a) DISPOSAL OF PROPERTY.—
  (1) STRICT COMPLIANCE.—If specifically authorized to dispose of real property in this or any other Act, the Secretary shall exercise this authority in strict compliance with section 204 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 485).
  (2) DEPOSIT OF PROCEEDS.—The Secretary shall deposit the proceeds of any exercise of property disposal authority into the miscellaneous receipts of the Treasury in accordance with section 3302(b) of title 31, United States Code.
 (b) GIFTS.—Gifts or donations of services or property of or for the Department may not be accepted, used, or disposed of unless specifically permitted in advance in an appropriations Act and only under the conditions and for the purposes specified in such appropriations Act.
 (c) BUDGET REQUEST.—Under section 1105 of title 31, United States Code, the President shall submit to Congress a detailed budget request for the Department for fiscal year 2004, and for each subsequent fiscal year.

<< 6 USCA § 454 >>

SEC. 874. FUTURE YEAR HOMELAND SECURITY PROGRAM.

 (a) IN GENERAL.—Each budget request submitted to Congress for the Department under section 1105 of title 31, United States Code, shall, at or about the same time, be accompanied by a Future Years Homeland Security Program.
 (b) CONTENTS.—The Future Years Homeland Security Program under subsection (a) shall be structured, and include the same type of information and level of detail, as the Future Years Defense Program submitted to Congress by the Department of Defense under section 221 of title 10, United States Code.
 (c) EFFECTIVE DATE.—This section shall take effect with respect to the preparation and submission of the fiscal year 2005 budget request for the Department and for any subsequent fiscal year, except that the first Future Years Homeland Security Program shall be submitted not later than 90 days after the Department's fiscal year 2005 budget request is submitted to Congress.

<< 6 USCA § 455 >>

SEC. 875. MISCELLANEOUS AUTHORITIES.

 (a) SEAL.—The Department shall have a seal, whose design is subject to the approval of the President.

(b) PARTICIPATION OF MEMBERS OF THE ARMED FORCES.—With respect to the Department, the Secretary shall have the same authorities that the Secretary of Transportation has with respect to the Department of Transportation under section 324 of title 49, United States Code.

(c) REDELEGATION OF FUNCTIONS.—Unless otherwise provided in the delegation or by law, any function delegated under this Act may be redelegated to any subordinate.

<< 6 USCA § 456 >>

SEC. 876. MILITARY ACTIVITIES.

Nothing in this Act shall confer upon the Secretary any authority to engage in warfighting, the military defense of the United States, or other military activities, nor shall anything in this Act limit the existing authority of the Department of Defense or the Armed Forces to engage in warfighting, the military defense of the United States, or other military activities.

<< 6 USCA § 457 >>

SEC. 877. REGULATORY AUTHORITY AND PREEMPTION.

(a) REGULATORY AUTHORITY.—Except as otherwise provided in sections 306(c), 862(c), and 1706(b), this Act vests no new regulatory authority in the Secretary or any other Federal official, and transfers to the Secretary or another Federal official only such regulatory authority as exists on the date of enactment of this Act within any agency, program, or function transferred to the Department pursuant to this Act, or that on such date of enactment is exercised by another official of the executive branch with respect to such agency, program, or function. Any such transferred authority may not be exercised by an official from whom it is transferred upon transfer of such agency, program, or function to the Secretary or another Federal official pursuant to this Act. This Act may not be construed as altering or diminishing the regulatory authority of any other executive agency, except to the extent that this Act transfers such authority from the agency.

(b) PREEMPTION OF STATE OR LOCAL LAW.—Except as otherwise provided in this Act, this Act preempts no State or local law, except that any authority to preempt State or local law vested in any Federal agency or official transferred to the Department pursuant to this Act shall be transferred to the Department effective on the date of the transfer to the Department of that Federal agency or official.

<< 6 USCA § 458 >>

SEC. 878. COUNTERNARCOTICS OFFICER.

The Secretary shall appoint a senior official in the Department to assume primary responsibility for coordinating policy and operations within the Department and between the Department and other Federal departments and agencies with respect to interdicting the entry of illegal drugs into the United States, and tracking and severing connections between illegal drug trafficking and terrorism. Such official shall—

(1) ensure the adequacy of resources within the Department for illicit drug interdiction; and

(2) serve as the United States Interdiction Coordinator for the Director of National Drug Control Policy.

<< 6 USCA § 459 >>

SEC. 879. OFFICE OF INTERNATIONAL AFFAIRS.

(a) ESTABLISHMENT.—There is established within the Office of the Secretary an Office of International Affairs. The Office shall be headed by a Director, who shall be a senior official appointed by the Secretary.

(b) DUTIES OF THE DIRECTOR.—The Director shall have the following duties:

(1) To promote information and education exchange with nations friendly to the United States in order to promote sharing of best practices and technologies relating to homeland security. Such exchange shall include the following:

(A) Exchange of information on research and development on homeland security technologies.

(B) Joint training exercises of first responders.

AR.02250

(C) Exchange of expertise on terrorism prevention, response, and crisis management.

(2) To identify areas for homeland security information and training exchange where the United States has a demonstrated weakness and another friendly nation or nations have a demonstrated expertise.

(3) To plan and undertake international conferences, exchange programs, and training activities.

(4) To manage international activities within the Department in coordination with other Federal officials with responsibility for counter-terrorism matters.

<< 6 USCA § 460 >>

SEC. 880. PROHIBITION OF THE TERRORISM INFORMATION AND PREVENTION SYSTEM.

Any and all activities of the Federal Government to implement the proposed component program of the Citizen Corps known as Operation TIPS (Terrorism Information and Prevention System) are hereby prohibited.

<< 6 USCA § 461 >>

SEC. 881. REVIEW OF PAY AND BENEFIT PLANS.

Notwithstanding any other provision of this Act, the Secretary shall, in consultation with the Director of the Office of Personnel Management, review the pay and benefit plans of each agency whose functions are transferred under this Act to the Department and, within 90 days after the date of enactment, submit a plan to the President of the Senate and the Speaker of the House of Representatives and the appropriate committees and subcommittees of Congress, for ensuring, to the maximum extent practicable, the elimination of disparities in pay and benefits throughout the Department, especially among law enforcement personnel, that are inconsistent with merit system principles set forth in section 2301 of title 5, United States Code.

<< 6 USCA § 462 >>

SEC. 882. OFFICE FOR NATIONAL CAPITAL REGION COORDINATION.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—There is established within the Office of the Secretary the Office of National Capital Region Coordination, to oversee and coordinate Federal programs for and relationships with State, local, and regional authorities in the National Capital Region, as defined under section 2674(f)(2) of title 10, United States Code.

(2) DIRECTOR.—The Office established under paragraph (1) shall be headed by a Director, who shall be appointed by the Secretary.

(3) COOPERATION.—The Secretary shall cooperate with the Mayor of the District of Columbia, the Governors of Maryland and Virginia, and other State, local, and regional officers in the National Capital Region to integrate the District of Columbia, Maryland, and Virginia into the planning, coordination, and execution of the activities of the Federal Government for the enhancement of domestic preparedness against the consequences of terrorist attacks.

(b) RESPONSIBILITIES.—The Office established under subsection (a)(1) shall—

(1) coordinate the activities of the Department relating to the National Capital Region, including cooperation with the Office for State and Local Government Coordination;

(2) assess, and advocate for, the resources needed by State, local, and regional authorities in the National Capital Region to implement efforts to secure the homeland;

(3) provide State, local, and regional authorities in the National Capital Region with regular information, research, and technical support to assist the efforts of State, local, and regional authorities in the National Capital Region in securing the homeland;

(4) develop a process for receiving meaningful input from State, local, and regional authorities and the private sector in the National Capital Region to assist in the development of the homeland security plans and activities of the Federal Government;

(5) coordinate with Federal agencies in the National Capital Region on terrorism preparedness, to ensure adequate planning, information sharing, training, and execution of the Federal role in domestic preparedness activities;

(6) coordinate with Federal, State, local, and regional agencies, and the private sector in the National Capital Region on terrorism preparedness to ensure adequate planning, information sharing, training, and execution of domestic preparedness activities among these agencies and entities; and

(7) serve as a liaison between the Federal Government and State, local, and regional authorities, and private sector entities in the National Capital Region to facilitate access to Federal grants and other programs.

(c) ANNUAL REPORT.—The Office established under subsection (a) shall submit an annual report to Congress that includes —

(1) the identification of the resources required to fully implement homeland security efforts in the National Capital Region;

(2) an assessment of the progress made by the National Capital Region in implementing homeland security efforts; and

(3) recommendations to Congress regarding the additional resources needed to fully implement homeland security efforts in the National Capital Region.

(d) LIMITATION.—Nothing contained in this section shall be construed as limiting the power of State and local governments.

<< 6 USCA § 463 >>

## SEC. 883. REQUIREMENT TO COMPLY WITH LAWS PROTECTING EQUAL EMPLOYMENT OPPORTUNITY AND PROVIDING WHISTLEBLOWER PROTECTIONS.

Nothing in this Act shall be construed as exempting the Department from requirements applicable with respect to executive agencies—

(1) to provide equal employment protection for employees of the Department (including pursuant to the provisions in section 2302(b)(1) of title 5, United States Code, and the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 (Public Law 107–174)); or

(2) to provide whistleblower protections for employees of the Department (including pursuant to the provisions in section 2302(b)(8) and (9) of such title and the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002).

<< 6 USCA § 464 >>

## SEC. 884. FEDERAL LAW ENFORCEMENT TRAINING CENTER.

(a) IN GENERAL.—The transfer of an authority or an agency under this Act to the Department of Homeland Security does not affect training agreements already entered into with the Federal Law Enforcement Training Center with respect to the training of personnel to carry out that authority or the duties of that transferred agency.

(b) CONTINUITY OF OPERATIONS.—All activities of the Federal Law Enforcement Training Center transferred to the Department of Homeland Security under this Act shall continue to be carried out at the locations such activities were carried out before such transfer.

<< 6 USCA § 465 >>

## SEC. 885. JOINT INTERAGENCY TASK FORCE.

(a) ESTABLISHMENT.—The Secretary may establish and operate a permanent Joint Interagency Homeland Security Task Force composed of representatives from military and civilian agencies of the United States Government for the purposes of anticipating terrorist threats against the United States and taking appropriate actions to prevent harm to the United States.

(b) STRUCTURE.—It is the sense of Congress that the Secretary should model the Joint Interagency Homeland Security Task Force on the approach taken by the Joint Interagency Task Forces for drug interdiction at Key West, Florida and Alameda, California, to the maximum extent feasible and appropriate.

<< 6 USCA § 466 >>

## SEC. 886. SENSE OF CONGRESS REAFFIRMING THE CONTINUED IMPORTANCE AND APPLICABILITY OF THE POSSE COMITATUS ACT.

(a) FINDINGS.—Congress finds the following:

(1) Section 1385 of title 18, United States Code (commonly known as the "Posse Comitatus Act"), prohibits the use of the Armed Forces as a posse comitatus to execute the laws except in cases and under circumstances expressly authorized by the Constitution or Act of Congress.

(2) Enacted in 1878, the Posse Comitatus Act was expressly intended to prevent United States Marshals, on their own initiative, from calling on the Army for assistance in enforcing Federal law.

(3) The Posse Comitatus Act has served the Nation well in limiting the use of the Armed Forces to enforce the law.

(4) Nevertheless, by its express terms, the Posse Comitatus Act is not a complete barrier to the use of the Armed Forces for a range of domestic purposes, including law enforcement functions, when the use of the Armed Forces is authorized by Act of Congress or the President determines that the use of the Armed Forces is required to fulfill the President's obligations under the Constitution to respond promptly in time of war, insurrection, or other serious emergency.

(5) Existing laws, including chapter 15 of title 10, United States Code (commonly known as the "Insurrection Act"), and the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), grant the President broad powers that may be invoked in the event of domestic emergencies, including an attack against the Nation using weapons of mass destruction, and these laws specifically authorize the President to use the Armed Forces to help restore public order.

(b) SENSE OF CONGRESS.—Congress reaffirms the continued importance of section 1385 of title 18, United States Code, and it is the sense of Congress that nothing in this Act should be construed to alter the applicability of such section to any use of the Armed Forces as a posse comitatus to execute the laws.

<< 6 USCA § 467 >>

SEC. 887. COORDINATION WITH THE DEPARTMENT OF HEALTH AND HUMAN SERVICES UNDER THE PUBLIC HEALTH SERVICE ACT.

(a) IN GENERAL.—The annual Federal response plan developed by the Department shall be consistent with section 319 of the Public Health Service Act (42 U.S.C. 247d).

(b) DISCLOSURES AMONG RELEVANT AGENCIES.—

(1) IN GENERAL.—Full disclosure among relevant agencies shall be made in accordance with this subsection.

(2) PUBLIC HEALTH EMERGENCY.—During the period in which the Secretary of Health and Human Services has declared the existence of a public health emergency under section 319(a) of the Public Health Service Act (42 U.S.C. 247d(a)), the Secretary of Health and Human Services shall keep relevant agencies, including the Department of Homeland Security, the Department of Justice, and the Federal Bureau of Investigation, fully and currently informed.

(3) POTENTIAL PUBLIC HEALTH EMERGENCY.—In cases involving, or potentially involving, a public health emergency, but in which no determination of an emergency by the Secretary of Health and Human Services under section 319(a) of the Public Health Service Act (42 U.S.C. 247d(a)), has been made, all relevant agencies, including the Department of Homeland Security, the Department of Justice, and the Federal Bureau of Investigation, shall keep the Secretary of Health and Human Services and the Director of the Centers for Disease Control and Prevention fully and currently informed.

<< 6 USCA § 468 >>

SEC. 888. PRESERVING COAST GUARD MISSION PERFORMANCE.

(a) DEFINITIONS.—In this section:

(1) NON–HOMELAND SECURITY MISSIONS.—The term "non-homeland security missions" means the following missions of the Coast Guard:

(A) Marine safety.

(B) Search and rescue.

(C) Aids to navigation.

(D) Living marine resources (fisheries law enforcement).

(E) Marine environmental protection.

(F) Ice operations.

(2) HOMELAND SECURITY MISSIONS.—The term "homeland security missions" means the following missions of the Coast Guard:

(A) Ports, waterways and coastal security.

(B) Drug interdiction.

(C) Migrant interdiction.

(D) Defense readiness.

(E) Other law enforcement.

(b) TRANSFER.—There are transferred to the Department the authorities, functions, personnel, and assets of the Coast Guard, which shall be maintained as a distinct entity within the Department, including the authorities and functions of the Secretary of Transportation relating thereto.

(c) MAINTENANCE OF STATUS OF FUNCTIONS AND ASSETS.—Notwithstanding any other provision of this Act, the authorities, functions, and capabilities of the Coast Guard to perform its missions shall be maintained intact and without significant reduction after the transfer of the Coast Guard to the Department, except as specified in subsequent Acts.

(d) CERTAIN TRANSFERS PROHIBITED.—No mission, function, or asset (including for purposes of this subsection any ship, aircraft, or helicopter) of the Coast Guard may be diverted to the principal and continuing use of any other organization, unit, or entity of the Department, except for details or assignments that do not reduce the Coast Guard's capability to perform its missions.

(e) CHANGES TO MISSIONS.—

(1) PROHIBITION.—The Secretary may not substantially or significantly reduce the missions of the Coast Guard or the Coast Guard's capability to perform those missions, except as specified in subsequent Acts.

(2) WAIVER.—The Secretary may waive the restrictions under paragraph (1) for a period of not to exceed 90 days upon a declaration and certification by the Secretary to Congress that a clear, compelling, and immediate need exists for such a waiver. A certification under this paragraph shall include a detailed justification for the declaration and certification, including the reasons and specific information that demonstrate that the Nation and the Coast Guard cannot respond effectively if the restrictions under paragraph (1) are not waived.

(f) ANNUAL REVIEW.—

(1) IN GENERAL.—The Inspector General of the Department shall conduct an annual review that shall assess thoroughly the performance by the Coast Guard of all missions of the Coast Guard (including non-homeland security missions and homeland security missions) with a particular emphasis on examining the non-homeland security missions.

(2) REPORT.—The report under this paragraph shall be submitted to—

(A) the Committee on Governmental Affairs of the Senate;

(B) the Committee on Government Reform of the House of Representatives;

(C) the Committees on Appropriations of the Senate and the House of Representatives;

(D) the Committee on Commerce, Science, and Transportation of the Senate; and

(E) the Committee on Transportation and Infrastructure of the House of Representatives.

(g) DIRECT REPORTING TO SECRETARY.—Upon the transfer of the Coast Guard to the Department, the Commandant shall report directly to the Secretary without being required to report through any other official of the Department.

(h) OPERATION AS A SERVICE IN THE NAVY.—None of the conditions and restrictions in this section shall apply when the Coast Guard operates as a service in the Navy under section 3 of title 14, United States Code.

(i) REPORT ON ACCELERATING THE INTEGRATED DEEPWATER SYSTEM.—Not later than 90 days after the date of enactment of this Act, the Secretary, in consultation with the Commandant of the Coast Guard, shall submit a report to the Committee on Commerce, Science, and Transportation of the Senate, the Committee on Transportation and Infrastructure of the House of Representatives, and the Committees on Appropriations of the Senate and the House of Representatives that—

(1) analyzes the feasibility of accelerating the rate of procurement in the Coast Guard's Integrated Deepwater System from 20 years to 10 years;

(2) includes an estimate of additional resources required;

(3) describes the resulting increased capabilities;

(4) outlines any increases in the Coast Guard's homeland security readiness;

(5) describes any increases in operational efficiencies; and

(6) provides a revised asset phase-in time line.

SEC. 889. HOMELAND SECURITY FUNDING ANALYSIS IN PRESIDENT'S BUDGET.

<< 31 USCA § 1105 >>

(a) IN GENERAL.—Section 1105(a) of title 31, United States Code, is amended by adding at the end the following:

"(33)(A)(i) a detailed, separate analysis, by budget function, by agency, and by initiative area (as determined by the administration) for the prior fiscal year, the current fiscal year, the fiscal years for which the budget is submitted, and the ensuing fiscal year identifying the amounts of gross and net appropriations or obligational authority and outlays that contribute to homeland security, with separate displays for mandatory and discretionary amounts, including—

"(I) summaries of the total amount of such appropriations or new obligational authority and outlays requested for homeland security;

"(II) an estimate of the current service levels of homeland security spending;

"(III) the most recent risk assessment and summary of homeland security needs in each initiative area (as determined by the administration); and

"(IV) an estimate of user fees collected by the Federal Government on behalf of homeland security activities;

"(ii) with respect to subclauses (I) through (IV) of clause (i), amounts shall be provided by account for each program, project and activity; and

"(iii) an estimate of expenditures for homeland security activities by State and local governments and the private sector for the prior fiscal year and the current fiscal year.

"(B) In this paragraph, consistent with the Office of Management and Budget's June 2002 'Annual Report to Congress on Combatting Terrorism=', the term 'homeland security' refers to those activities that detect, deter, protect against, and respond to terrorist attacks occurring within the United States and its territories.

"(C) In implementing this paragraph, including determining what Federal activities or accounts constitute homeland security for purposes of budgetary classification, the Office of Management and Budget is directed to consult periodically, but at least annually, with the House and Senate Budget Committees, the House and Senate Appropriations Committees, and the Congressional Budget Office.".

(b) REPEAL OF DUPLICATIVE REPORTS.—The following sections are repealed:

<< 31 USCA § 1113 NOTE >>

(1) Section 1051 of Public Law 105–85.

<< 50 USCA § 2301 NOTE >>

(2) Section 1403 of Public Law 105–261.

<< 31 USCA § 1105 NOTE >>

(c) EFFECTIVE DATE.—This section and the amendment made by this section shall apply beginning with respect to the fiscal year 2005 budget submission.

<< 49 USCA § 40101 NOTE >>

SEC. 890. AIR TRANSPORTATION SAFETY AND SYSTEM STABILIZATION ACT.

The Air Transportation Safety and System Stabilization Act (49 U.S.C. 40101 note) is amended—

(1) in section 408 by striking the last sentence of subsection (c); and

(2) in section 402 by striking paragraph (1) and inserting the following:

"(1) AIR CARRIER.—The term 'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation and includes employees and agents (including persons engaged in the business of providing air transportation security and their affiliates) of such citizen. For purposes of the preceding sentence, the term

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

'agent', as applied to persons engaged in the business of providing air transportation security, shall only include persons that have contracted directly with the Federal Aviation Administration on or after and commenced services no later than February 17, 2002, to provide such security, and had not been or are not debarred for any period within 6 months from that date.".

<< 6 USCA prec. § 481 >>

Subtitle I—Information Sharing

<< 6 USCA § 481 >>

SEC. 891. SHORT TITLE; FINDINGS; AND SENSE OF CONGRESS.

(a) SHORT TITLE.—This subtitle may be cited as the "Homeland Security Information Sharing Act".

(b) FINDINGS.—Congress finds the following:

(1) The Federal Government is required by the Constitution to provide for the common defense, which includes terrorist attack.

(2) The Federal Government relies on State and local personnel to protect against terrorist attack.

(3) The Federal Government collects, creates, manages, and protects classified and sensitive but unclassified information to enhance homeland security.

(4) Some homeland security information is needed by the State and local personnel to prevent and prepare for terrorist attack.

(5) The needs of State and local personnel to have access to relevant homeland security information to combat terrorism must be reconciled with the need to preserve the protected status of such information and to protect the sources and methods used to acquire such information.

(6) Granting security clearances to certain State and local personnel is one way to facilitate the sharing of information regarding specific terrorist threats among Federal, State, and local levels of government.

(7) Methods exist to declassify, redact, or otherwise adapt classified information so it may be shared with State and local personnel without the need for granting additional security clearances.

(8) State and local personnel have capabilities and opportunities to gather information on suspicious activities and terrorist threats not possessed by Federal agencies.

(9) The Federal Government and State and local governments and agencies in other jurisdictions may benefit from such information.

(10) Federal, State, and local governments and intelligence, law enforcement, and other emergency preparation and response agencies must act in partnership to maximize the benefits of information gathering and analysis to prevent and respond to terrorist attacks.

(11) Information systems, including the National Law Enforcement Telecommunications System and the Terrorist Threat Warning System, have been established for rapid sharing of classified and sensitive but unclassified information among Federal, State, and local entities.

(12) Increased efforts to share homeland security information should avoid duplicating existing information systems.

(c) SENSE OF CONGRESS.—It is the sense of Congress that Federal, State, and local entities should share homeland security information to the maximum extent practicable, with special emphasis on hard-to-reach urban and rural communities.

<< 6 USCA § 482 >>

SEC. 892. FACILITATING HOMELAND SECURITY INFORMATION SHARING PROCEDURES.

(a) PROCEDURES FOR DETERMINING EXTENT OF SHARING OF HOMELAND SECURITY INFORMATION.—

(1) The President shall prescribe and implement procedures under which relevant Federal agencies—

(A) share relevant and appropriate homeland security information with other Federal agencies, including the Department, and appropriate State and local personnel;

(B) identify and safeguard homeland security information that is sensitive but unclassified; and

(C) to the extent such information is in classified form, determine whether, how, and to what extent to remove classified information, as appropriate, and with which such personnel it may be shared after such information is removed.

(2) The President shall ensure that such procedures apply to all agencies of the Federal Government.

(3) Such procedures shall not change the substantive requirements for the classification and safeguarding of classified information.

(4) Such procedures shall not change the requirements and authorities to protect sources and methods.

(b) PROCEDURES FOR SHARING OF HOMELAND SECURITY INFORMATION.—

(1) Under procedures prescribed by the President, all appropriate agencies, including the intelligence community, shall, through information sharing systems, share homeland security information with Federal agencies and appropriate State and local personnel to the extent such information may be shared, as determined in accordance with subsection (a), together with assessments of the credibility of such information.

(2) Each information sharing system through which information is shared under paragraph (1) shall—

(A) have the capability to transmit unclassified or classified information, though the procedures and recipients for each capability may differ;

(B) have the capability to restrict delivery of information to specified subgroups by geographic location, type of organization, position of a recipient within an organization, or a recipient's need to know such information;

(C) be configured to allow the efficient and effective sharing of information; and

(D) be accessible to appropriate State and local personnel.

(3) The procedures prescribed under paragraph (1) shall establish conditions on the use of information shared under paragraph (1)—

(A) to limit the redissemination of such information to ensure that such information is not used for an unauthorized purpose;

(B) to ensure the security and confidentiality of such information;

(C) to protect the constitutional and statutory rights of any individuals who are subjects of such information; and

(D) to provide data integrity through the timely removal and destruction of obsolete or erroneous names and information.

(4) The procedures prescribed under paragraph (1) shall ensure, to the greatest extent practicable, that the information sharing system through which information is shared under such paragraph include existing information sharing systems, including, but not limited to, the National Law Enforcement Telecommunications System, the Regional Information Sharing System, and the Terrorist Threat Warning System of the Federal Bureau of Investigation.

(5) Each appropriate Federal agency, as determined by the President, shall have access to each information sharing system through which information is shared under paragraph (1), and shall therefore have access to all information, as appropriate, shared under such paragraph.

(6) The procedures prescribed under paragraph (1) shall ensure that appropriate State and local personnel are authorized to use such information sharing systems—

(A) to access information shared with such personnel; and

(B) to share, with others who have access to such information sharing systems, the homeland security information of their own jurisdictions, which shall be marked appropriately as pertaining to potential terrorist activity.

(7) Under procedures prescribed jointly by the Director of Central Intelligence and the Attorney General, each appropriate Federal agency, as determined by the President, shall review and assess the information shared under paragraph (6) and integrate such information with existing intelligence.

(c) SHARING OF CLASSIFIED INFORMATION AND SENSITIVE BUT UNCLASSIFIED INFORMATION WITH STATE AND LOCAL PERSONNEL.—

(1) The President shall prescribe procedures under which Federal agencies may, to the extent the President considers necessary, share with appropriate State and local personnel homeland security information that remains classified or otherwise protected after the determinations prescribed under the procedures set forth in subsection (a).

(2) It is the sense of Congress that such procedures may include 1 or more of the following means:

(A) Carrying out security clearance investigations with respect to appropriate State and local personnel.

(B) With respect to information that is sensitive but unclassified, entering into nondisclosure agreements with appropriate State and local personnel.

(C) Increased use of information-sharing partnerships that include appropriate State and local personnel, such as the Joint Terrorism Task Forces of the Federal Bureau of Investigation, the Anti–Terrorism Task Forces of the Department of Justice, and regional Terrorism Early Warning Groups.

(d) RESPONSIBLE OFFICIALS.—For each affected Federal agency, the head of such agency shall designate an official to administer this Act with respect to such agency.

(e) FEDERAL CONTROL OF INFORMATION.—Under procedures prescribed under this section, information obtained by a State or local government from a Federal agency under this section shall remain under the control of the Federal agency, and a State or local law authorizing or requiring such a government to disclose information shall not apply to such information.

(f) DEFINITIONS.—As used in this section:

(1) The term "homeland security information" means any information possessed by a Federal, State, or local agency that—

(A) relates to the threat of terrorist activity;

(B) relates to the ability to prevent, interdict, or disrupt terrorist activity;

(C) would improve the identification or investigation of a suspected terrorist or terrorist organization; or

(D) would improve the response to a terrorist act.

(2) The term "intelligence community" has the meaning given such term in section 3(4) of the National Security Act of 1947 (50 U.S. C. 401a(4)).

(3) The term "State and local personnel" means any of the following persons involved in prevention, preparation, or response for terrorist attack:

(A) State Governors, mayors, and other locally elected officials.

(B) State and local law enforcement personnel and firefighters.

(C) Public health and medical professionals.

(D) Regional, State, and local emergency management agency personnel, including State adjutant generals.

(E) Other appropriate emergency response agency personnel.

(F) Employees of private-sector entities that affect critical infrastructure, cyber, economic, or public health security, as designated by the Federal Government in procedures developed pursuant to this section.

(4) The term "State" includes the District of Columbia and any commonwealth, territory, or possession of the United States.

(g) CONSTRUCTION.—Nothing in this Act shall be construed as authorizing any department, bureau, agency, officer, or employee of the Federal Government to request, receive, or transmit to any other Government entity or personnel, or transmit to any State or local entity or personnel otherwise authorized by this Act to receive homeland security information, any information collected by the Federal Government solely for statistical purposes in violation of any other provision of law relating to the confidentiality of such information.

<< 6 USCA § 483 >>

SEC. 893. REPORT.

(a) REPORT REQUIRED.—Not later than 12 months after the date of the enactment of this Act, the President shall submit to the congressional committees specified in subsection (b) a report on the implementation of section 892. The report shall include any recommendations for additional measures or appropriation requests, beyond the requirements of section 892, to increase the effectiveness of sharing of information between and among Federal, State, and local entities.

(b) SPECIFIED CONGRESSIONAL COMMITTEES.—The congressional committees referred to in subsection (a) are the following committees:

(1) The Permanent Select Committee on Intelligence and the Committee on the Judiciary of the House of Representatives.

(2) The Select Committee on Intelligence and the Committee on the Judiciary of the Senate.

<< 6 USCA § 484 >>

SEC. 894. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated such sums as may be necessary to carry out section 892.

<< FRCRP Rule 6 >>

SEC. 895. AUTHORITY TO SHARE GRAND JURY INFORMATION.

Rule 6(e) of the Federal Rules of Criminal Procedure is amended—

  (1) in paragraph (2), by inserting ", or of guidelines jointly issued by the Attorney General and Director of Central Intelligence pursuant to Rule 6," after "Rule 6"; and

  (2) in paragraph (3)—

  (A) in subparagraph (A)(ii), by inserting "or of a foreign government" after "(including personnel of a state or subdivision of a state";

  (B) in subparagraph (C)(i)—

  (i) in subclause (I), by inserting before the semicolon the following: "or, upon a request by an attorney for the government, when sought by a foreign court or prosecutor for use in an official criminal investigation";

  (ii) in subclause (IV)—

  (I) by inserting "or foreign" after "may disclose a violation of State";

  (II) by inserting "or of a foreign government" after "to an appropriate official of a State or subdivision of a State"; and

  (III) by striking "or" at the end;

  (iii) by striking the period at the end of subclause (V) and inserting "; or"; and

  (iv) by adding at the end the following:

  "(VI) when matters involve a threat of actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power, domestic or international sabotage, domestic or international terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or by an agent of a foreign power, within the United States or elsewhere, to any appropriate federal, state, local, or foreign government official for the purpose of preventing or responding to such a threat."; and

  (C) in subparagraph (C)(iii)—

  (i) by striking "Federal";

  (ii) by inserting "or clause (i)(VI)" after "clause (i)(V)"; and

  (iii) by adding at the end the following: "Any state, local, or foreign official who receives information pursuant to clause (i)(VI) shall use that information only consistent with such guidelines as the Attorney General and Director of Central Intelligence shall jointly issue.".

<< 18 USCA § 2517 >>

## SEC. 896. AUTHORITY TO SHARE ELECTRONIC, WIRE, AND ORAL INTERCEPTION INFORMATION.

  Section 2517 of title 18, United States Code, is amended by adding at the end the following:

  "(7) Any investigative or law enforcement officer, or other Federal official in carrying out official duties as such Federal official, who by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents or derivative evidence to a foreign investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure, and foreign investigative or law enforcement officers may use or disclose such contents or derivative evidence to the extent such use or disclosure is appropriate to the proper performance of their official duties.

  "(8) Any investigative or law enforcement officer, or other Federal official in carrying out official duties as such Federal official, who by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents or derivative evidence to any appropriate Federal, State, local, or foreign government official to the extent that such contents or derivative evidence reveals a threat of actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power, domestic or international sabotage, domestic or international terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or by an agent of a foreign power, within the United States or elsewhere, for the purpose of preventing or responding to such a threat. Any official who receives information pursuant to this provision may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information, and any State, local, or foreign official who receives information pursuant to this provision may use that information only consistent with such guidelines as the Attorney General and Director of Central Intelligence shall jointly issue.".

SEC. 897. FOREIGN INTELLIGENCE INFORMATION.

<< 50 USCA § 403–5d >>

(a) DISSEMINATION AUTHORIZED.—Section 203(d)(1) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (Public Law 107–56; 50 U.S.C. 403–5d) is amended by adding at the end the following: "Consistent with the responsibility of the Director of Central Intelligence to protect intelligence sources and methods, and the responsibility of the Attorney General to protect sensitive law enforcement information, it shall be lawful for information revealing a threat of actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power, domestic or international sabotage, domestic or international terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or by an agent of a foreign power, within the United States or elsewhere, obtained as part of a criminal investigation to be disclosed to any appropriate Federal, State, local, or foreign government official for the purpose of preventing or responding to such a threat. Any official who receives information pursuant to this provision may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information, and any State, local, or foreign official who receives information pursuant to this provision may use that information only consistent with such guidelines as the Attorney General and Director of Central Intelligence shall jointly issue.".

<< 18 USCA § 2517 NOTE >>

(b) CONFORMING AMENDMENTS.—Section 203(c) of that Act is amended—
  (1) by striking "section 2517(6)" and inserting "paragraphs (6) and (8) of section 2517 of title 18, United States Code,"; and
  (2) by inserting "and (VI)" after "Rule 6(e)(3)(C)(i)(V)".

<< 50 USCA § 1806 >>

SEC. 898. INFORMATION ACQUIRED FROM AN ELECTRONIC SURVEILLANCE.

Section 106(k)(1) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1806) is amended by inserting after "law enforcement officers" the following: "or law enforcement personnel of a State or political subdivision of a State (including the chief executive officer of that State or political subdivision who has the authority to appoint or direct the chief law enforcement officer of that State or political subdivision)".

<< 50 USCA § 1825 >>

SEC. 899. INFORMATION ACQUIRED FROM A PHYSICAL SEARCH.

Section 305(k)(1) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1825) is amended by inserting after "law enforcement officers" the following: "or law enforcement personnel of a State or political subdivision of a State (including the chief executive officer of that State or political subdivision who has the authority to appoint or direct the chief law enforcement officer of that State or political subdivision)".

<< 6 USCA prec. § 491 >>

TITLE IX—NATIONAL HOMELAND SECURITY COUNCIL

<< 6 USCA § 491 >>

SEC. 901. NATIONAL HOMELAND SECURITY COUNCIL.

There is established within the Executive Office of the President a council to be known as the "Homeland Security Council" (in this title referred to as the "Council").

Case 3:20-cv-07721-SI Document 58-3 Filed 11/10/20 Page 2284 of 3864

<< 6 USCA § 492 >>

## SEC. 902. FUNCTION.

The function of the Council shall be to advise the President on homeland security matters.

<< 6 USCA § 493 >>

## SEC. 903. MEMBERSHIP.

The members of the Council shall be the following:
(1) The President.
(2) The Vice President.
(3) The Secretary of Homeland Security.
(4) The Attorney General.
(5) The Secretary of Defense.
(6) Such other individuals as may be designated by the President.

<< 6 USCA § 494 >>

## SEC. 904. OTHER FUNCTIONS AND ACTIVITIES.

For the purpose of more effectively coordinating the policies and functions of the United States Government relating to homeland security, the Council shall—
(1) assess the objectives, commitments, and risks of the United States in the interest of homeland security and to make resulting recommendations to the President;
(2) oversee and review homeland security policies of the Federal Government and to make resulting recommendations to the President; and
(3) perform such other functions as the President may direct.

<< 6 USCA § 495 >>

## SEC. 905. STAFF COMPOSITION.

The Council shall have a staff, the head of which shall be a civilian Executive Secretary, who shall be appointed by the President. The President is authorized to fix the pay of the Executive Secretary at a rate not to exceed the rate of pay payable to the Executive Secretary of the National Security Council.

<< 6 USCA § 496 >>

## SEC. 906. RELATION TO THE NATIONAL SECURITY COUNCIL.

The President may convene joint meetings of the Homeland Security Council and the National Security Council with participation by members of either Council or as the President may otherwise direct.

<< 6 USCA prec. § 511 >>

TITLE X—INFORMATION SECURITY

## SEC. 1001. INFORMATION SECURITY.

<< 6 USCA § 101 NOTE >>

(a) SHORT TITLE.—This title may be cited as the "Federal Information Security Management Act of 2002".

(b) INFORMATION SECURITY.—

  (1) IN GENERAL.—Subchapter II of chapter 35 of title 44, United States Code, is amended to read as follows:

<< 44 USCA prec. § 3531 >>

"SUBCHAPTER II—INFORMATION SECURITY

<< 44 USCA § 3531 >>

"§ 3531. Purposes

"The purposes of this subchapter are to—

  "(1) provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets;

  "(2) recognize the highly networked nature of the current Federal computing environment and provide effective governmentwide management and oversight of the related information security risks, including coordination of information security efforts throughout the civilian, national security, and law enforcement communities;

  "(3) provide for development and maintenance of minimum controls required to protect Federal information and information systems;

  "(4) provide a mechanism for improved oversight of Federal agency information security programs;

  "(5) acknowledge that commercially developed information security products offer advanced, dynamic, robust, and effective information security solutions, reflecting market solutions for the protection of critical information infrastructures important to the national defense and economic security of the nation that are designed, built, and operated by the private sector; and

  "(6) recognize that the selection of specific technical hardware and software information security solutions should be left to individual agencies from among commercially developed products.".

<< 44 USCA § 3532 >>

"§ 3532. Definitions

"(a) IN GENERAL.—Except as provided under subsection (b), the definitions under section 3502 shall apply to this subchapter.

"(b) ADDITIONAL DEFINITIONS.—As used in this subchapter—

  "(1) the term 'information security' means protecting information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide—

  "(A) integrity, which means guarding against improper information modification or destruction, and includes ensuring information nonrepudiation and authenticity;

  "(B) confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information;

  "(C) availability, which means ensuring timely and reliable access to and use of information; and

  "(D) authentication, which means utilizing digital credentials to assure the identity of users and validate their access;

  "(2) the term 'national security system' means any information system (including any telecommunications system) used or operated by an agency or by a contractor of an agency, or other organization on behalf of an agency, the function, operation, or use of which—

  "(A) involves intelligence activities;

  "(B) involves cryptologic activities related to national security;

  "(C) involves command and control of military forces;

  "(D) involves equipment that is an integral part of a weapon or weapons system; or

  "(E) is critical to the direct fulfillment of military or intelligence missions provided that this definition does not apply to a system that is used for routine administrative and business applications (including payroll, finance, logistics, and personnel management applications);

  "(3) the term 'information technology' has the meaning given that term in section 11101 of title 40; and

"(4) the term 'information system' means any equipment or interconnected system or subsystems of equipment that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information, and includes—

"(A) computers and computer networks;

"(B) ancillary equipment;

"(C) software, firmware, and related procedures;

"(D) services, including support services; and

"(E) related resources.

<< 44 USCA § 3533 >>

"§ 3533. Authority and functions of the Director

"(a) The Director shall oversee agency information security policies and practices, by—

"(1) promulgating information security standards under section 11331 of title 40;

"(2) overseeing the implementation of policies, principles, standards, and guidelines on information security;

"(3) requiring agencies, consistent with the standards promulgated under such section 11331 and the requirements of this subchapter, to identify and provide information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of—

"(A) information collected or maintained by or on behalf of an agency; or

"(B) information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency;

"(4) coordinating the development of standards and guidelines under section 20 of the National Institute of Standards and Technology Act (15 U.S. C. 278g–3) with agencies and offices operating or exercising control of national security systems (including the National Security Agency) to assure, to the maximum extent feasible, that such standards and guidelines are complementary with standards and guidelines developed for national security systems;

"(5) overseeing agency compliance with the requirements of this subchapter, including through any authorized action under section 11303(b)(5) of title 40, to enforce accountability for compliance with such requirements;

"(6) reviewing at least annually, and approving or disapproving, agency information security programs required under section 3534(b);

"(7) coordinating information security policies and procedures with related information resources management policies and procedures; and

"(8) reporting to Congress no later than March 1 of each year on agency compliance with the requirements of this subchapter, including—

"(A) a summary of the findings of evaluations required by section 3535;

"(B) significant deficiencies in agency information security practices;

"(C) planned remedial action to address such deficiencies; and

"(D) a summary of, and the views of the Director on, the report prepared by the National Institute of Standards and Technology under section 20(d)(9) of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3).

"(b) Except for the authorities described in paragraphs (4) and (7) of subsection (a), the authorities of the Director under this section shall not apply to national security systems.

<< 44 USCA § 3534 >>

"§ 3534. Federal agency responsibilities

"(a) The head of each agency shall—

"(1) be responsible for—

"(A) providing information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of—

"(i) information collected or maintained by or on behalf of the agency; and

"(ii) information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency;

"(B) complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines, including—

"(i) information security standards promulgated by the Director under section 11331 of title 40; and

"(ii) information security standards and guidelines for national security systems issued in accordance with law and as directed by the President; and

"(C) ensuring that information security management processes are integrated with agency strategic and operational planning processes;

"(2) ensure that senior agency officials provide information security for the information and information systems that support the operations and assets under their control, including through—

"(A) assessing the risk and magnitude of the harm that could result from the unauthorized access, use, disclosure, disruption, modification, or destruction of such information or information systems;

"(B) determining the levels of information security appropriate to protect such information and information systems in accordance with standards promulgated under section 11331 of title 40 for information security classifications and related requirements;

"(C) implementing policies and procedures to cost-effectively reduce risks to an acceptable level; and

"(D) periodically testing and evaluating information security controls and techniques to ensure that they are effectively implemented;

"(3) delegate to the agency Chief Information Officer established under section 3506 (or comparable official in an agency not covered by such section) the authority to ensure compliance with the requirements imposed on the agency under this subchapter, including—

"(A) designating a senior agency information security officer who shall—

"(i) carry out the Chief Information Officer's responsibilities under this section;

"(ii) possess professional qualifications, including training and experience, required to administer the functions described under this section;

"(iii) have information security duties as that official's primary duty; and

"(iv) head an office with the mission and resources to assist in ensuring agency compliance with this section;

"(B) developing and maintaining an agencywide information security program as required by subsection (b);

"(C) developing and maintaining information security policies, procedures, and control techniques to address all applicable requirements, including those issued under section 3533 of this title, and section 11331 of title 40;

"(D) training and overseeing personnel with significant responsibilities for information security with respect to such responsibilities; and

"(E) assisting senior agency officials concerning their responsibilities under paragraph (2);

"(4) ensure that the agency has trained personnel sufficient to assist the agency in complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines; and

"(5) ensure that the agency Chief Information Officer, in coordination with other senior agency officials, reports annually to the agency head on the effectiveness of the agency information security program, including progress of remedial actions.

"(b) Each agency shall develop, document, and implement an agencywide information security program, approved by the Director under section 3533(a)(5), to provide information security for the information and information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other source, that includes—

"(1) periodic assessments of the risk and magnitude of the harm that could result from the unauthorized access, use, disclosure, disruption, modification, or destruction of information and information systems that support the operations and assets of the agency;

"(2) policies and procedures that—

"(A) are based on the risk assessments required by paragraph (1);

"(B) cost-effectively reduce information security risks to an acceptable level;

"(C) ensure that information security is addressed throughout the life cycle of each agency information system; and

"(D) ensure compliance with—

"(i) the requirements of this subchapter;

"(ii) policies and procedures as may be prescribed by the Director, and information security standards promulgated under section 11331 of title 40;

"(iii) minimally acceptable system configuration requirements, as determined by the agency; and

"(iv) any other applicable requirements, including standards and guidelines for national security systems issued in accordance with law and as directed by the President;

"(3) subordinate plans for providing adequate information security for networks, facilities, and systems or groups of information systems, as appropriate;

"(4) security awareness training to inform personnel, including contractors and other users of information systems that support the operations and assets of the agency, of—

"(A) information security risks associated with their activities; and

"(B) their responsibilities in complying with agency policies and procedures designed to reduce these risks;

"(5) periodic testing and evaluation of the effectiveness of information security policies, procedures, and practices, to be performed with a frequency depending on risk, but no less than annually, of which such testing—

"(A) shall include testing of management, operational, and technical controls of every information system identified in the inventory required under section 3505(c); and

"(B) may include testing relied on in a evaluation under section 3535;

"(6) a process for planning, implementing, evaluating, and documenting remedial action to address any deficiencies in the information security policies, procedures, and practices of the agency;

"(7) procedures for detecting, reporting, and responding to security incidents, including—

"(A) mitigating risks associated with such incidents before substantial damage is done; and

"(B) notifying and consulting with, as appropriate—

"(i) law enforcement agencies and relevant Offices of Inspector General;

"(ii) an office designated by the President for any incident involving a national security system; and

"(iii) any other agency or office, in accordance with law or as directed by the President; and

"(8) plans and procedures to ensure continuity of operations for information systems that support the operations and assets of the agency.

"(c) Each agency shall—

"(1) report annually to the Director, the Committees on Government Reform and Science of the House of Representatives, the Committees on Governmental Affairs and Commerce, Science, and Transportation of the Senate, the appropriate authorization and appropriations committees of Congress, and the Comptroller General on the adequacy and effectiveness of information security policies, procedures, and practices, and compliance with the requirements of this subchapter, including compliance with each requirement of subsection (b);

"(2) address the adequacy and effectiveness of information security policies, procedures, and practices in plans and reports relating to—

"(A) annual agency budgets;

"(B) information resources management under subchapter 1 of this chapter;

"(C) information technology management under subtitle III of title 40;

"(D) program performance under sections 1105 and 1115 through 1119 of title 31, and sections 2801 and 2805 of title 39;

"(E) financial management under chapter 9 of title 31, and the Chief Financial Officers Act of 1990 (31 U.S.C. 501 note; Public Law 101–576) (and the amendments made by that Act);

"(F) financial management systems under the Federal Financial Management Improvement Act (31 U.S.C. 3512 note); and

"(G) internal accounting and administrative controls under section 3512 of title 31, United States Code, (known as the 'Federal Managers Financial Integrity Act'); and

"(3) report any significant deficiency in a policy, procedure, or practice identified under paragraph (1) or (2)—

"(A) as a material weakness in reporting under section 3512 of title 31; and

"(B) if relating to financial management systems, as an instance of a lack of substantial compliance under the Federal Financial Management Improvement Act (31 U.S.C. 3512 note).

"(d)(1) In addition to the requirements of subsection (c), each agency, in consultation with the Director, shall include as part of the performance plan required under section 1115 of title 31 a description of—

"(A) the time periods; and

"(B) the resources, including budget, staffing, and training,

"that are necessary to implement the program required under subsection (b).

"(2) The description under paragraph (1) shall be based on the risk assessments required under subsection (b)(2)(1).

"(e) Each agency shall provide the public with timely notice and opportunities for comment on proposed information security policies and procedures to the extent that such policies and procedures affect communication with the public.

<< 44 USCA § 3535 >>

"§ 3535. Annual independent evaluation

"(a)(1) Each year each agency shall have performed an independent evaluation of the information security program and practices of that agency to determine the effectiveness of such program and practices.

"(2) Each evaluation by an agency under this section shall include—

"(A) testing of the effectiveness of information security policies, procedures, and practices of a representative subset of the agency's information systems;

"(B) an assessment (made on the basis of the results of the testing) of compliance with—

"(i) the requirements of this subchapter; and

"(ii) related information security policies, procedures, standards, and guidelines; and

"(C) separate presentations, as appropriate, regarding information security relating to national security systems.

"(b) Subject to subsection (c)—

"(1) for each agency with an Inspector General appointed under the Inspector General Act of 1978, the annual evaluation required by this section shall be performed by the Inspector General or by an independent external auditor, as determined by the Inspector General of the agency; and

"(2) for each agency to which paragraph (1) does not apply, the head of the agency shall engage an independent external auditor to perform the evaluation.

"(c) For each agency operating or exercising control of a national security system, that portion of the evaluation required by this section directly relating to a national security system shall be performed—

"(1) only by an entity designated by the agency head; and

"(2) in such a manner as to ensure appropriate protection for information associated with any information security vulnerability in such system commensurate with the risk and in accordance with all applicable laws.

"(d) The evaluation required by this section—

"(1) shall be performed in accordance with generally accepted government auditing standards; and

"(2) may be based in whole or in part on an audit, evaluation, or report relating to programs or practices of the applicable agency.

"(e) Each year, not later than such date established by the Director, the head of each agency shall submit to the Director the results of the evaluation required under this section.

"(f) Agencies and evaluators shall take appropriate steps to ensure the protection of information which, if disclosed, may adversely affect information security. Such protections shall be commensurate with the risk and comply with all applicable laws and regulations.

"(g)(1) The Director shall summarize the results of the evaluations conducted under this section in the report to Congress required under section 3533(a)(8).

"(2) The Director's report to Congress under this subsection shall summarize information regarding information security relating to national security systems in such a manner as to ensure appropriate protection for information associated with any information security vulnerability in such system commensurate with the risk and in accordance with all applicable laws.

"(3) Evaluations and any other descriptions of information systems under the authority and control of the Director of Central Intelligence or of National Foreign Intelligence Programs systems under the authority and control of the Secretary of Defense

shall be made available to Congress only through the appropriate oversight committees of Congress, in accordance with applicable laws.

"(h) The Comptroller General shall periodically evaluate and report to Congress on—

"(1) the adequacy and effectiveness of agency information security policies and practices; and

"(2) implementation of the requirements of this subchapter.

<< 44 USCA § 3536 >>

"§ 3536. National security systems 'The head of each agency operating or exercising control of a national security system shall be responsible for ensuring that the agency—

"(1) provides information security protections commensurate with the risk and magnitude of the harm resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of the information contained in such system;

"(2) implements information security policies and practices as required by standards and guidelines for national security systems, issued in accordance with law and as directed by the President; and

"(3) complies with the requirements of this subchapter.

<< 44 USCA § 3537 >>

"§ 3537. Authorization of appropriations

"There are authorized to be appropriated to carry out the provisions of this subchapter such sums as may be necessary for each of fiscal years 2003 through 2007.

<< 44 USCA § 3538 >>

"§ 3538. Effect on existing law

"Nothing in this subchapter, section 11331 of title 40, or section 20 of the National Standards and Technology Act (15 U.S.C. 278g–3) may be construed as affecting the authority of the President, the Office of Management and Budget or the Director thereof, the National Institute of Standards and Technology, or the head of any agency, with respect to the authorized use or disclosure of information, including with regard to the protection of personal privacy under section 552a of title 5, the disclosure of information under section 552 of title 5, the management and disposition of records under chapters 29, 31, or 33 of title 44, the management of information resources under subchapter I of chapter 35 of this title, or the disclosure of information to Congress or the Comptroller General of the United States.".

<< 44 USCA prec. § 3501 >>

(2) CLERICAL AMENDMENT.—The items in the table of sections at the beginning of such chapter 35 under the heading "SUBCHAPTER II" are amended to read as follows:

"3531. Purposes.

"3532. Definitions.

"3533. Authority and functions of the Director.

"3534. Federal agency responsibilities.

"3535. Annual independent evaluation.

"3536. National security systems.

"3537. Authorization of appropriations.

"3538. Effect on existing law.".

AR.02267

<< 6 USCA § 511 >>

(c) INFORMATION SECURITY RESPONSIBILITIES OF CERTAIN AGENCIES.—

 (1) NATIONAL SECURITY RESPONSIBILITIES.—(A) Nothing in this Act (including any amendment made by this Act) shall supersede any authority of the Secretary of Defense, the Director of Central Intelligence, or other agency head, as authorized by law and as directed by the President, with regard to the operation, control, or management of national security systems, as defined by section 3532(3) of title 44, United States Code.

 (B) Section 2224 of title 10, United States Code, is amended—

<< 10 USCA § 2224 >>

 (i) in subsection 2224(b), by striking "(b) OBJECTIVES AND MINIMUM REQUIREMENTS.—(1)" and inserting "(b) OBJECTIVES OF THE PROGRAM.—";

<< 10 USCA § 2224 >>

 (ii) in subsection 2224(b), by striking "(2) the program shall at a minimum meet the requirements of section 3534 and 3535 of title 44, United States Code."; and

<< 10 USCA § 2224 >>

 (iii) in subsection 2224(c), by inserting ", including through compliance with subtitle II of chapter 35 of title 44" after "infrastructure".

 (2) ATOMIC ENERGY ACT OF 1954.—Nothing in this Act shall supersede any requirement made by or under the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.). Restricted Data or Formerly Restricted Data shall be handled, protected, classified, downgraded, and declassified in conformity with the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.).

SEC. 1002. MANAGEMENT OF INFORMATION TECHNOLOGY.

<< 40 USCA § 11331 >>

 (a) IN GENERAL.—Section 11331 of title 40, United States Code, is amended to read as follows:

"§ 11331. Responsibilities for Federal information systems standards

 "(a) DEFINITION.—In this section, the term 'information security' has the meaning given that term in section 3532(b)(1) of title 44.

 "(b) REQUIREMENT TO PRESCRIBE STANDARDS.—

 "(1) IN GENERAL.—

 "(A) REQUIREMENT.—Except as provided under paragraph (2), the Director of the Office of Management and Budget shall, on the basis of proposed standards developed by the National Institute of Standards and Technology pursuant to paragraphs (2) and (3) of section 20(a) of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3(a)) and in consultation with the Secretary of Homeland Security, promulgate information security standards pertaining to Federal information systems.

 "(B) REQUIRED STANDARDS.—Standards promulgated under subparagraph (A) shall include—

 "(i) standards that provide minimum information security requirements as determined under section 20(b) of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3(b)); and

 "(ii) such standards that are otherwise necessary to improve the efficiency of operation or security of Federal information systems.

 "(C) REQUIRED STANDARDS BINDING.—Information security standards described under subparagraph (B) shall be compulsory and binding.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) STANDARDS AND GUIDELINES FOR NATIONAL SECURITY SYSTEMS.—Standards and guidelines for national security systems, as defined under section 3532(3) of title 44, shall be developed, promulgated, enforced, and overseen as otherwise authorized by law and as directed by the President.

"(c) APPLICATION OF MORE STRINGENT STANDARDS.—The head of an agency may employ standards for the cost-effective information security for all operations and assets within or under the supervision of that agency that are more stringent than the standards promulgated by the Director under this section, if such standards—

  "(1) contain, at a minimum, the provisions of those applicable standards made compulsory and binding by the Director; and

  "(2) are otherwise consistent with policies and guidelines issued under section 3533 of title 44.

"(d) REQUIREMENTS REGARDING DECISIONS BY DIRECTOR.—

  "(1) DEADLINE.—The decision regarding the promulgation of any standard by the Director under subsection (b) shall occur not later than 6 months after the submission of the proposed standard to the Director by the National Institute of Standards and Technology, as provided under section 20 of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3).

  "(2) NOTICE AND COMMENT.—A decision by the Director to significantly modify, or not promulgate, a proposed standard submitted to the Director by the National Institute of Standards and Technology, as provided under section 20 of the National Institute of Standards and Technology Act (15 U.S. C. 278g–3), shall be made after the public is given an opportunity to comment on the Director's proposed decision.".

<< 40 USCA prec. § 11301 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 113 of title 40, United States Code, is amended by striking the item relating to section 11331 and inserting the following:

"11331. Responsibilities for Federal information systems standards.".

<< 15 USCA § 278g–3 >>

SEC. 1003. NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY.

Section 20 of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3), is amended by striking the text and inserting the following:

"(a) The Institute shall—

  "(1) have the mission of developing standards, guidelines, and associated methods and techniques for information systems;

  "(2) develop standards and guidelines, including minimum requirements, for information systems used or operated by an agency or by a contractor of an agency or other organization on behalf of an agency, other than national security systems (as defined in section 3532(b)(2) of title 44, United States Code);

  "(3) develop standards and guidelines, including minimum requirements, for providing adequate information security for all agency operations and assets, but such standards and guidelines shall not apply to national security systems; and

  "(4) carry out the responsibilities described in paragraph (3) through the Computer Security Division.

"(b) The standards and guidelines required by subsection (a) shall include, at a minimum—

  "(1)(A) standards to be used by all agencies to categorize all information and information systems collected or maintained by or on behalf of each agency based on the objectives of providing appropriate levels of information security according to a range of risk levels;

  "(B) guidelines recommending the types of information and information systems to be included in each such category; and

  "(C) minimum information security requirements for information and information systems in each such category;

  "(2) a definition of and guidelines concerning detection and handling of information security incidents; and

  "(3) guidelines developed in coordination with the National Security Agency for identifying an information system as a national security system consistent with applicable requirements for national security systems, issued in accordance with law and as directed by the President.

"(c) In developing standards and guidelines required by subsections (a) and (b), the Institute shall—

AR.02269
09

"(1) consult with other agencies and offices (including, but not limited to, the Director of the Office of Management and Budget, the Departments of Defense and Energy, the National Security Agency, the General Accounting Office, and the Secretary of Homeland Security) to assure—

"(A) use of appropriate information security policies, procedures, and techniques, in order to improve information security and avoid unnecessary and costly duplication of effort; and

"(B) that such standards and guidelines are complementary with standards and guidelines employed for the protection of national security systems and information contained in such systems;

"(2) provide the public with an opportunity to comment on proposed standards and guidelines;

"(3) submit to the Director of the Office of Management and Budget for promulgation under section 11331 of title 40, United States Code—

"(A) standards, as required under subsection (b)(1)(A), no later than 12 months after the date of the enactment of this section; and

"(B) minimum information security requirements for each category, as required under subsection (b)(1)(C), no later than 36 months after the date of the enactment of this section;

"(4) issue guidelines as required under subsection (b)(1)(B), no later than 18 months after the date of the enactment of this Act;

"(5) ensure that such standards and guidelines do not require specific technological solutions or products, including any specific hardware or software security solutions;

"(6) ensure that such standards and guidelines provide for sufficient flexibility to permit alternative solutions to provide equivalent levels of protection for identified information security risks; and

"(7) use flexible, performance-based standards and guidelines that, to the greatest extent possible, permit the use of off-the-shelf commercially developed information security products.

"(d) The Institute shall—

"(1) submit standards developed pursuant to subsection (a), along with recommendations as to the extent to which these should be made compulsory and binding, to the Director of the Office of Management and Budget for promulgation under section 11331 of title 40, United States Code;

"(2) provide assistance to agencies regarding—

"(A) compliance with the standards and guidelines developed under subsection (a);

"(B) detecting and handling information security incidents; and

"(C) information security policies, procedures, and practices;

"(3) conduct research, as needed, to determine the nature and extent of information security vulnerabilities and techniques for providing cost-effective information security;

"(4) develop and periodically revise performance indicators and measures for agency information security policies and practices;

"(5) evaluate private sector information security policies and practices and commercially available information technologies to assess potential application by agencies to strengthen information security;

"(6) evaluate security policies and practices developed for national security systems to assess potential application by agencies to strengthen information security;

"(7) periodically assess the effectiveness of standards and guidelines developed under this section and undertake revisions as appropriate;

"(8) solicit and consider the recommendations of the Information Security and Privacy Advisory Board, established by section 21, regarding standards and guidelines developed under subsection (a) and submit such recommendations to the Director of the Office of Management and Budget with such standards submitted to the Director; and

"(9) prepare an annual public report on activities undertaken in the previous year, and planned for the coming year, to carry out responsibilities under this section.

"(e) As used in this section—

"(1) the term 'agency' has the same meaning as provided in section 3502(1) of title 44, United States Code;

"(2) the term 'information security' has the same meaning as provided in section 3532(1) of such title;

"(3) the term 'information system' has the same meaning as provided in section 3502(8) of such title;

"(4) the term 'information technology' has the same meaning as provided in section 11101 of title 40, United States Code; and

AR.02270

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2294 of 3864

"(5) the term 'national security system' has the same meaning as provided in section 3532(b)(2) of such title.".

SEC. 1004. INFORMATION SECURITY AND PRIVACY ADVISORY BOARD.

Section 21 of the National Institute of Standards and Technology Act (15 U.S.C. 278g–4), is amended—

<< 15 USCA § 278g–4 >>

(1) in subsection (a), by striking "Computer System Security and Privacy Advisory Board" and inserting "Information Security and Privacy Advisory Board";

<< 15 USCA § 278g–4 >>

(2) in subsection (a)(1), by striking "computer or telecommunications" and inserting "information technology";

<< 15 USCA § 278g–4 >>

(3) in subsection (a)(2)—
  (A) by striking "computer or telecommunications technology" and inserting "information technology"; and
  (B) by striking "computer or telecommunications equipment" and inserting "information technology";

<< 15 USCA § 278g–4 >>

(4) in subsection (a)(3)—
  (A) by striking "computer systems" and inserting "information system"; and
  (B) by striking "computer systems security" and inserting "information security";

<< 15 USCA § 278g–4 >>

(5) in subsection (b)(1) by striking "computer systems security" and inserting "information security";

<< 15 USCA § 278g–4 >>

(6) in subsection (b) by striking paragraph (2) and inserting the following:
  "(2) to advise the Institute and the Director of the Office of Management and Budget on information security and privacy issues pertaining to Federal Government information systems, including through review of proposed standards and guidelines developed under section 20; and";

<< 15 USCA § 278g–4 >>

(7) in subsection (b)(3) by inserting "annually" after "report";

<< 15 USCA § 278g–4 >>

(8) by inserting after subsection (e) the following new subsection:
  "(f) The Board shall hold meetings at such locations and at such time and place as determined by a majority of the Board.";

<< 15 USCA § 278g–4 >>

(9) by redesignating subsections (f) and (g) as subsections (g) and (h), respectively; and

<< 15 USCA § 278g–4 >>

(10) by striking subsection (h), as redesignated by paragraph (9), and inserting the following:

"(h) As used in this section, the terms 'information system' and 'information technology' have the meanings given in section 20.".

SEC. 1005. TECHNICAL AND CONFORMING AMENDMENTS.

(a) FEDERAL COMPUTER SYSTEM SECURITY TRAINING AND PLAN.—

<< 40 USCA § 11332 >>

(1) REPEAL.—Section 11332 of title 40, United States Code, is repealed.

<< 40 USCA prec. § 11301 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 113 of title 40, United States Code, as amended by striking the item relating to section 11332.

<< 44 USCA § 3531 NOTES >>

(b) FLOYD D. SPENCE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2001.—The Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001 (Public Law 106–398) is amended by striking subtitle G of title X (44 U. S. C. 3531 note).

(c) PAPERWORK REDUCTION ACT.—(1) Section 3504(g) of title 44, United States Code, is amended—

<< 44 USCA § 3504 >>

(A) by adding "and" at the end of paragraph (1);

<< 44 USCA § 3504 >>

(B) in paragraph (2)—
  (i) by striking "sections 11331 and 11332(b) and (c) of title 40" and inserting "section 11331 of title 40 and subchapter II of this title"; and
  (ii) by striking the semicolon and inserting a period; and

<< 44 USCA § 3504 >>

(C) by striking paragraph (3).

<< 44 USCA § 3505 >>

(2) Section 3505 of such title is amended by adding at the end the following:
"(c) INVENTORY OF INFORMATION SYSTEMS.—(1) The head of each agency shall develop and maintain an inventory of the information systems (including national security systems) operated by or under the control of such agency;
"(2) The identification of information systems in an inventory under this subsection shall include an identification of the interfaces between each such system and all other systems or networks, including those not operated by or under the control of the agency;
"(3) Such inventory shall be—
  "(A) updated at least annually;
  "(B) made available to the Comptroller General; and
  "(C) used to support information resources management, including—
    "(i) preparation and maintenance of the inventory of information resources under section 3506(b)(4);
    "(ii) information technology planning, budgeting, acquisition, and management under section 3506(h), subtitle III of title 40, and related laws and guidance;
    "(iii) monitoring, testing, and evaluation of information security controls under subchapter II;

"(iv) preparation of the index of major information systems required under section 552(g) of title 5, United States Code; and

"(v) preparation of information system inventories required for records management under chapters 21, 29, 31, and 33.

"(4) The Director shall issue guidance for and oversee the implementation of the requirements of this subsection.".

(3) Section 3506(g) of such title is amended—

<< 44 USCA § 3506 >>

(A) by adding "and" at the end of paragraph (1);

(B) in paragraph (2)—

<< 44 USCA § 3506 >>

(i) by striking "section 11332 of title 40" and inserting "subchapter II of this chapter"; and

(i) by striking "; and" and inserting a period; and

<< 44 USCA § 3506 >>

(C) by striking paragraph (3).

<< 6 USCA § 512 >>

SEC. 1006. CONSTRUCTION.

Nothing in this Act, or the amendments made by this Act, affects the authority of the National Institute of Standards and Technology or the Department of Commerce relating to the development and promulgation of standards or guidelines under paragraphs (1) and (2) of section 20(a) of the National Institute of Standards and Technology Act (15 U.S.C. 278g–3(a)).

<< 6 USCA prec. § 521 >>

TITLE XI—DEPARTMENT OF JUSTICE DIVISIONS

Subtitle A—Executive Office for Immigration Review

<< 6 USCA § 521 >>

SEC. 1101. LEGAL STATUS OF EOIR.

(a) EXISTENCE OF EOIR.—There is in the Department of Justice the Executive Office for Immigration Review, which shall be subject to the direction and regulation of the Attorney General under section 103(g) of the Immigration and Nationality Act, as added by section 1102.

SEC. 1102. AUTHORITIES OF THE ATTORNEY GENERAL.

Section 103 of the Immigration and Nationality Act (8 U.S.C. 1103) as amended by this Act, is further amended by—

(1) amending the heading to read as follows:

<< 8 USCA § 1103 >>

"POWERS AND DUTIES OF THE SECRETARY, THE UNDER SECRETARY, AND THE ATTORNEY GENERAL";

(2) in subsection (a)—

<< 8 USCA § 1103 >>

(A) by inserting "Attorney General," after "President,"; and

<< 8 USCA § 1103 >>

(B) by redesignating paragraphs (8), (9), (8) (as added by section 372 of Public Law 104–208), and (9) (as added by section 372 of Public Law 104–208) as paragraphs (8), (9), (10), and (11), respectively; and

<< 8 USCA § 1103 >>

(3) by adding at the end the following new subsection:

"(g) ATTORNEY GENERAL.—

"(1) IN GENERAL.—The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

"(2) POWERS.—The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.".

<< 6 USCA § 522 >>

SEC. 1103. STATUTORY CONSTRUCTION.

Nothing in this Act, any amendment made by this Act, or in section 103 of the Immigration and Nationality Act, as amended by section 1102, shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General.

<< 6 USCA prec. § 531 >>

Subtitle B—Transfer of the Bureau of Alcohol, Tobacco and Firearms to the Department of Justice

<< 6 USCA § 531 >>

SEC. 1111. BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—There is established within the Department of Justice under the general authority of the Attorney General the Bureau of Alcohol, Tobacco, Firearms, and Explosives (in this section referred to as the "Bureau").

(2) DIRECTOR.—There shall be at the head of the Bureau a Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives (in this subtitle referred to as the "Director"). The Director shall be appointed by the Attorney General and shall perform such functions as the Attorney General shall direct. The Director shall receive compensation at the rate prescribed by law under section 5314 of title V, United States Code, for positions at level III of the Executive Schedule.

(3) COORDINATION.—The Attorney General, acting through the Director and such other officials of the Department of Justice as the Attorney General may designate, shall provide for the coordination of all firearms, explosives, tobacco enforcement, and arson enforcement functions vested in the Attorney General so as to assure maximum cooperation between and among any officer, employee, or agency of the Department of Justice involved in the performance of these and related functions.

(4) PERFORMANCE OF TRANSFERRED FUNCTIONS.—The Attorney General may make such provisions as the Attorney General determines appropriate to authorize the performance by any officer, employee, or agency of the Department of Justice of any function transferred to the Attorney General under this section.

(b) RESPONSIBILITIES.—Subject to the direction of the Attorney General, the Bureau shall be responsible for investigating —

(1) criminal and regulatory violations of the Federal firearms, explosives, arson, alcohol, and tobacco smuggling laws;

(2) the functions transferred by subsection (c); and

(3) any other function related to the investigation of violent crime or domestic terrorism that is delegated to the Bureau by the Attorney General.

(c) TRANSFER OF AUTHORITIES, FUNCTIONS, PERSONNEL, AND ASSETS TO THE DEPARTMENT OF JUSTICE. —

(1) IN GENERAL.—Subject to paragraph (2), but notwithstanding any other provision of law, there are transferred to the Department of Justice the authorities, functions, personnel, and assets of the Bureau of Alcohol, Tobacco and Firearms, which shall be maintained as a distinct entity within the Department of Justice, including the related functions of the Secretary of the Treasury.

(2) ADMINISTRATION AND REVENUE COLLECTION FUNCTIONS.—There shall be retained within the Department of the Treasury the authorities, functions, personnel, and assets of the Bureau of Alcohol, Tobacco and Firearms relating to the administration and enforcement of chapters 51 and 52 of the Internal Revenue Code of 1986, sections 4181 and 4182 of the Internal Revenue Code of 1986, and title 27, United States Code.

(3) BUILDING PROSPECTUS.—Prospectus PDC–98W10, giving the General Services Administration the authority for site acquisition, design, and construction of a new headquarters building for the Bureau of Alcohol, Tobacco and Firearms, is transferred, and deemed to apply, to the Bureau of Alcohol, Tobacco, Firearms, and Explosives established in the Department of Justice under subsection (a).

(d) TAX AND TRADE BUREAU.—

(1) ESTABLISHMENT.—There is established within the Department of the Treasury the Tax and Trade Bureau.

(2) ADMINISTRATOR.—The Tax and Trade Bureau shall be headed by an Administrator, who shall perform such duties as assigned by the Under Secretary for Enforcement of the Department of the Treasury. The Administrator shall occupy a career-reserved position within the Senior Executive Service.

(3) RESPONSIBILITIES.—The authorities, functions, personnel, and assets of the Bureau of Alcohol, Tobacco and Firearms that are not transferred to the Department of Justice under this section shall be retained and administered by the Tax and Trade Bureau.

SEC. 1112. TECHNICAL AND CONFORMING AMENDMENTS.

(a) The Inspector General Act of 1978 (5 U.S.C. App.) is amended—

<< 5 USCA App. 3 § 8D >>

(1) in section 8D(b)(1) by striking "Bureau of Alcohol, Tobacco and Firearms" and inserting "Tax and Trade Bureau"; and

<< 5 USCA App. 3 § 9 >>

(2) in section 9(a)(1)(L)(i), by striking "Bureau of Alcohol, Tobacco, and Firearms" and inserting "Tax and Trade Bureau".

<< 7 USCA § 1445–3 >>

(b) Section 1109(c)(2)(A)(i) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (7 U.S.C. 1445–3(c)(2)(A)(i)) is amended by striking "(on ATF Form 3068) by manufacturers of tobacco products to the Bureau of Alcohol, Tobacco and Firearms" and inserting "by manufacturers of tobacco products to the Tax and Trade Bureau".

<< 8 USCA § 1701 >>

(c) Section 2(4)(J) of the Enhanced Border Security and Visa Entry Reform Act of 2002 (Public Law 107–173; 8 U.S.C.A. 1701(4)(J)) is amended by striking "Bureau of Alcohol, Tobacco, and Firearms" and inserting "Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice".

<< 15 USCA § 2223b >>

(d) Section 3(1)(E) of the Firefighters' Safety Study Act (15 U.S.C. 2223b(1)(E)) is amended by striking "the Bureau of Alcohol, Tobacco, and Firearms," and inserting "the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice,".

(e) Chapter 40 of title 18, United States Code, is amended—

<< 18 USCA § 841 >>

(1) by striking section 841(k) and inserting the following:

"(k) 'Attorney General' means the Attorney General of the United States.";

<< 18 USCA § 846 >>

(2) in section 846(a), by striking "the Attorney General and the Federal Bureau of Investigation, together with the Secretary" and inserting "the Federal Bureau of Investigation, together with the Bureau of Alcohol, Tobacco, Firearms, and Explosives"; and

<< 18 USCA prec. § 841 >>

<< 18 USCA § 841 >>

<< 18 USCA § 842 >>

<< 18 USCA § 843 >>

<< 18 USCA § 844 >>

<< 18 USCA § 845 >>

<< 18 USCA § 846 >>

<< 18 USCA § 846 >>

<< 18 USCA § 847 >>

(3) by striking "Secretary" each place it appears and inserting "Attorney General".

(f) Chapter 44 of title 18, United States Code, is amended—

<< 18 USCA § 921 >>

(1) in section 921(a)(4)(B), by striking "Secretary" and inserting "Attorney General";

<< 18 USCA § 921 >>

(2) in section 921(a)(4), by striking "Secretary of the Treasury" and inserting "Attorney General";

<< 18 USCA § 921 >>

(3) in section 921(a), by striking paragraph (18) and inserting the following:

"(18) The term 'Attorney General' means the Attorney General of the United States";

<< 18 USCA § 922 >>

(4) in section 922(p)(5)(A), by striking "after consultation with the Secretary" and inserting "after consultation with the Attorney General";

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 923 >>

(5) in section 923(l), by striking "Secretary of the Treasury" and inserting "Attorney General"; and

<< 18 USCA § 921 >>

<< 18 USCA § 922 >>

<< 18 USCA § 923 >>

<< 18 USCA § 925 >>

<< 18 USCA § 926 >>

(6) by striking "Secretary" each place it appears, except before "of the Army" in section 921(a)(4) and before "of Defense" in section 922(p)(5)(A), and inserting the term "Attorney General".

<< 18 USCA § 1261 >>

(g) Section 1261(a) of title 18, United States Code, is amended to read as follows:
"(a) The Attorney General—
  "(1) shall enforce the provisions of this chapter; and
  "(2) has the authority to issue regulations to carry out the provisions of this chapter.".

<< 18 USCA § 1952 >>

(h) Section 1952(c) of title 18, United States Code, is amended by striking "Secretary of the Treasury" and inserting "Attorney General".
(i) Chapter 114 of title 18, United States Code, is amended—

<< 18 USCA § 2341 >>

(1) by striking section 2341(5), and inserting the following:
"(5) the term 'Attorney General' means the Attorney General of the United States"; and

<< 18 USCA § 2343 >>

<< 18 USCA § 2346 >>

(2) by striking "Secretary" each place it appears and inserting "Attorney General".

<< 26 USCA § 6103 >>

(j) Section 6103(i)(8)(A)(i) of the Internal Revenue Code of 1986 (relating to confidentiality and disclosure of returns and return information) is amended by striking "or the Bureau of Alcohol, Tobacco and Firearms" and inserting ", the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice, or the Tax and Trade Bureau, Department of the Treasury,".
(k) Section 7801(a) of the Internal Revenue Code of 1986 (relating to the authority of the Department of the Treasury) is amended—

<< 26 USCA § 7801 >>

(1) by striking "SECRETARY.—Except" and inserting "SECRETARY.-
"(1) IN GENERAL.—Except"; and

<< 26 USCA § 7801 >>

(2) by adding at the end the following:

"(2) ADMINISTRATION AND ENFORCEMENT OF CERTAIN PROVISIONS BY ATTORNEY GENERAL.—

"(A) IN GENERAL.—The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General; and the term 'Secretary' or 'Secretary of the Treasury' shall, when applied to those provisions, mean the Attorney General; and the term 'internal revenue officer=' shall, when applied to those provisions, mean any officer of the Bureau of Alcohol, Tobacco, Firearms, and Explosives so designated by the Attorney General:

"(i) Chapter 53.

"(ii) Chapters 61 through 80, to the extent such chapters relate to the enforcement and administration of the provisions referred to in clause (i).

"(B) USE OF EXISTING RULINGS AND INTERPRETATIONS.—Nothing in this Act alters or repeals the rulings and interpretations of the Bureau of Alcohol, Tobacco, and Firearms in effect on the effective date of the Homeland Security Act of 2002, which concern the provisions of this title referred to in subparagraph (A). The Attorney General shall consult with the Secretary to achieve uniformity and consistency in administering provisions under chapter 53 of title 26, United States Code.".

<< 28 USCA § 2006 >>

(l) Section 2006(2) of title 28, United States Code, is amended by inserting ", the Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice," after "the Secretary of the Treasury".

(m) Section 713 of title 31, United States Code, is amended—

(1) by striking the section heading and inserting the following:

<< 31 USCA § 713 >>

"§ 713. Audit of Internal Revenue Service, Tax and Trade Bureau, and Bureau of Alcohol, Tobacco, Firearms, and Explosives";

<< 31 USCA § 713 >>

(2) in subsection (a), by striking "Bureau of Alcohol, Tobacco, and Firearms," and inserting "Tax and Trade Bureau, Department of the Treasury, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice"; and

(3) in subsection (b)—

<< 31 USCA § 713 >>

(A) in paragraph (1)(B), by striking "or the Bureau" and inserting "or either Bureau";

<< 31 USCA § 713 >>

(B) in paragraph (2)—

(i) by striking "or the Bureau" and inserting "or either Bureau"; and

(ii) by striking "and the Director of the Bureau" and inserting "the Tax and Trade Bureau, Department of the Treasury, and the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice"; and

<< 31 USCA § 713 >>

(C) in paragraph (3), by striking "or the Bureau" and inserting "or either Bureau".

(n) Section 9703 of title 31, United States Code, is amended—

(1) in subsection (a)(2)(B)—

<< 31 USCA § 9703 >>

(A) in clause (iii)(III), by inserting "and" after the semicolon;

AR.02278

<< 31 USCA § 9703 >>

(B) in clause (iv), by striking "; and" and inserting a period; and

<< 31 USCA § 9703 >>

(C) by striking clause (v);

<< 31 USCA § 9703 >>

(2) by striking subsection (o);

<< 31 USCA § 9703 >>

(3) by redesignating existing subsection (p) as subsection (o); and

<< 31 USCA § 9703 >>

(4) in subsection (o)(1), as redesignated by paragraph (3), by striking "Bureau of Alcohol, Tobacco and Firearms" and inserting "Tax and Trade Bureau".

<< 42 USCA § 10502 >>

(o) Section 609N(2)(L) of the Justice Assistance Act of 1984 (42 U.S.C. 10502(2)(L)) is amended by striking "Bureau of Alcohol, Tobacco, and Firearms" and inserting "Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice".

(p) Section 32401(a) of the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. 13921(a)) is amended—

<< 42 USCA § 13921 >>

(1) by striking "Secretary of the Treasury" each place it appears and inserting "Attorney General"; and

<< 42 USCA § 13921 >>

(2) in subparagraph (3)(B), by striking "Bureau of Alcohol, Tobacco and Firearms" and inserting "Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice".

<< 49 USCA § 80303 >>

(q) Section 80303 of title 49, United States Code, is amended—

(1) by inserting "or, when the violation of this chapter involves contraband described in paragraph (2) or (5) of section 80302(a), the Attorney General" after "section 80304 of this title."; and

(2) by inserting ", the Attorney General," after "by the Secretary".

(r) Section 80304 of title 49, United States Code, is amended—

<< 49 USCA § 80304 >>

(1) in subsection (a), by striking "(b) and (c)" and inserting "(b), (c), and (d)";

<< 49 USCA § 80304 >>

(2) by redesignating subsection (d) as subsection (e); and

<< 49 USCA § 80304 >>

(3) by inserting after subsection (c), the following:

"(d) ATTORNEY GENERAL.—The Attorney General, or officers, employees, or agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice designated by the Attorney General, shall carry out the laws referred to in section 80306(b) of this title to the extent that the violation of this chapter involves contraband described in section 80302 (a) (2) or (a)(5).".

<< 18 USCA § 921 NOTE >>

(s) Section 103 of the Gun Control Act of 1968 (Public Law 90–618; 82 Stat. 1226) is amended by striking "Secretary of the Treasury" and inserting "Attorney General".

<< 18 USCA § 3051 >>

SEC. 1113. POWERS OF AGENTS OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES.

Chapter 203 of title 18, United States Code, is amended by adding the following:

"§ 3051. Powers of Special Agents of Bureau of Alcohol, Tobacco, Firearms, and Explosives

"(a) Special agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, as well as any other investigator or officer charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States, may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

"(b) Any special agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives may, in respect to the performance of his or her duties, make seizures of property subject to forfeiture to the United States.

"(c)(1) Except as provided in paragraphs (2) and (3), and except to the extent that such provisions conflict with the provisions of section 983 of title 18, United States Code, insofar as section 983 applies, the provisions of the Customs laws relating to—

   "(A) the seizure, summary and judicial forfeiture, and condemnation of property;

   "(B) the disposition of such property;

   "(C) the remission or mitigation of such forfeiture; and

   "(D) the compromise of claims,

"shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under any applicable provision of law enforced or administered by the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

"(2) For purposes of paragraph (1), duties that are imposed upon a customs officer or any other person with respect to the seizure and forfeiture of property under the customs laws of the United States shall be performed with respect to seizures and forfeitures of property under this section by such officers, agents, or any other person as may be authorized or designated for that purpose by the Attorney General.

"(3) Notwithstanding any other provision of law, the disposition of firearms forfeited by reason of a violation of any law of the United States shall be governed by the provisions of section 5872(b) of the Internal Revenue Code of 1986.".

<< 6 USCA § 532 >>

SEC. 1114. EXPLOSIVES TRAINING AND RESEARCH FACILITY.

(a) ESTABLISHMENT.—There is established within the Bureau an Explosives Training and Research Facility at Fort AP Hill, Fredericksburg, Virginia.

(b) PURPOSE.—The facility established under subsection (a) shall be utilized to train Federal, State, and local law enforcement officers to—

   (1) investigate bombings and explosions;

   (2) properly handle, utilize, and dispose of explosive materials and devices;

   (3) train canines on explosive detection; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(4) conduct research on explosives.

(c) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—There are authorized to be appropriated such sums as may be necessary to establish and maintain the facility established under subsection (a).

(2) AVAILABILITY OF FUNDS.—Any amounts appropriated pursuant to paragraph (1) shall remain available until expended.

<< 6 USCA § 533 >>

## SEC. 1115. PERSONNEL MANAGEMENT DEMONSTRATION PROJECT.

Notwithstanding any other provision of law, the Personnel Management Demonstration Project established under section 102 of title I of division C of the Omnibus Consolidated and Emergency Supplemental Appropriations Act for Fiscal Year 1999 (Public Law 105–277; 122 Stat. 2681–585) shall be transferred to the Attorney General of the United States for continued use by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice, and the Secretary of the Treasury for continued use by the Tax and Trade Bureau.

Subtitle C—Explosives

<< 18 USCA § 841 NOTE >>

## SEC. 1121. SHORT TITLE.

This subtitle may be referred to as the "Safe Explosives Act".

## SEC. 1122. PERMITS FOR PURCHASERS OF EXPLOSIVES.

(a) DEFINITIONS.—Section 841 of title 18, United States Code, is amended—

<< 18 USCA § 841 >>

(1) by striking subsection (j) and inserting the following:

"(j) 'Permittee' means any user of explosives for a lawful purpose, who has obtained either a user permit or a limited permit under the provisions of this chapter."; and

<< 18 USCA § 841 >>

(2) by adding at the end the following:

"(r) 'Alien' means any person who is not a citizen or national of the United States.

"(s) 'Responsible person' means an individual who has the power to direct the management and policies of the applicant pertaining to explosive materials.".

(b) PERMITS FOR PURCHASE OF EXPLOSIVES.—Section 842 of title 18, United States Code, is amended—

<< 18 USCA § 842 >>

(1) in subsection (a)(2), by striking "and" at the end;

<< 18 USCA § 842 >>

(2) by striking subsection (a)(3) and inserting the following:

"(3) other than a licensee or permittee knowingly—

"(A) to transport, ship, cause to be transported, or receive any explosive materials; or

"(B) to distribute explosive materials to any person other than a licensee or permittee; or

"(4) who is a holder of a limited permit—

"(A) to transport, ship, cause to be transported, or receive in interstate or foreign commerce any explosive materials; or

"(B) to receive explosive materials from a licensee or permittee, whose premises are located outside the State of residence of the limited permit holder, or on more than 6 separate occasions, during the period of the permit, to receive explosive materials from 1 or more licensees or permittees whose premises are located within the State of residence of the limited permit holder."; and

<< 18 USCA § 842 >>

(3) by striking subsection (b) and inserting the following:

"(b) It shall be unlawful for any licensee or permittee to knowingly distribute any explosive materials to any person other than—

"(1) a licensee;

"(2) a holder of a user permit; or

"(3) a holder of a limited permit who is a resident of the State where distribution is made and in which the premises of the transferor are located.".

<< 18 USCA § 843 >>

(c) LICENSES AND USER PERMITS.—Section 843(a) of title 18, United States Code, is amended—

(1) in the first sentence—

(A) by inserting "or limited permit" after "user permit"; and

(B) by inserting before the period at the end the following: ", including the names of and appropriate identifying information regarding all employees who will be authorized by the applicant to possess explosive materials, as well as fingerprints and a photograph of each responsible person";

(2) in the second sentence, by striking "$200 for each" and inserting "$50 for a limited permit and $200 for any other"; and

(3) by striking the third sentence and inserting "Each license or user permit shall be valid for not longer than 3 years from the date of issuance and each limited permit shall be valid for not longer than 1 year from the date of issuance. Each license or permit shall be renewable upon the same conditions and subject to the same restrictions as the original license or permit, and upon payment of a renewal fee not to exceed one-half of the original fee.".

(d) CRITERIA FOR APPROVING LICENSES AND PERMITS.—Section 843(b) of title 18, United States Code, is amended—

<< 18 USCA § 843 >>

(1) by striking paragraph (1) and inserting the following:

"(1) the applicant (or, if the applicant is a corporation, partnership, or association, each responsible person with respect to the applicant) is not a person described in section 842(i);";

(2) in paragraph (4)—

<< 18 USCA § 843 >>

(A) by inserting "(A) the Secretary verifies by inspection or, if the application is for an original limited permit or the first or second renewal of such a permit, by such other means as the Secretary determines appropriate, that" before "the applicant"; and

<< 18 USCA § 843 >>

(B) by adding at the end the following:

"(B) subparagraph (A) shall not apply to an applicant for the renewal of a limited permit if the Secretary has verified, by inspection within the preceding 3 years, the matters described in subparagraph (A) with respect to the applicant; and";

<< 18 USCA § 843 >>

(3) in paragraph (5), by striking the period at the end and inserting a semicolon; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 843 >>

(4) by adding at the end the following:

"(6) none of the employees of the applicant who will be authorized by the applicant to possess explosive materials is any person described in section 842(i); and

"(7) in the case of a limited permit, the applicant has certified in writing that the applicant will not receive explosive materials on more than 6 separate occasions during the 12–month period for which the limited permit is valid.".

<< 18 USCA § 843 >>

(e) APPLICATION APPROVAL.—Section 843(c) of title 18, United States Code, is amended by striking "forty-five days" and inserting "90 days for licenses and permits,".

<< 18 USCA § 843 >>

(f) INSPECTION AUTHORITY.—Section 843(f) of title 18, United States Code, is amended—

(1) in the first sentence—

(A) by striking "permittees" and inserting "holders of user permits"; and

(B) by inserting "licensees and permittees" before "shall submit";

(2) in the second sentence, by striking "permittee" the first time it appears and inserting "holder of a user permit"; and

(3) by adding at the end the following: "The Secretary may inspect the places of storage for explosive materials of an applicant for a limited permit or, at the time of renewal of such permit, a holder of a limited permit, only as provided in subsection (b)(4).

<< 18 USCA § 843 >>

(g) POSTING OF PERMITS.—Section 843(g) of title 18, United States Code, is amended by inserting "user" before "permits".

<< 18 USCA § 843 >>

(h) BACKGROUND CHECKS; CLEARANCES.—Section 843 of title 18, United States Code, is amended by adding at the end the following:

"(h)(1) If the Secretary receives, from an employer, the name and other identifying information of a responsible person or an employee who will be authorized by the employer to possess explosive materials in the course of employment with the employer, the Secretary shall determine whether the responsible person or employee is one of the persons described in any paragraph of section 842(i). In making the determination, the Secretary may take into account a letter or document issued under paragraph (2).

"(2)(A) If the Secretary determines that the responsible person or the employee is not one of the persons described in any paragraph of section 842(i), the Secretary shall notify the employer in writing or electronically of the determination and issue, to the responsible person or employee, a letter of clearance, which confirms the determination.

"(B) If the Secretary determines that the responsible person or employee is one of the persons described in any paragraph of section 842(i), the Secretary shall notify the employer in writing or electronically of the determination and issue to the responsible person or the employee, as the case may be, a document that—

"(i) confirms the determination;

"(ii) explains the grounds for the determination;

"(iii) provides information on how the disability may be relieved; and

"(iv) explains how the determination may be appealed.".

<< 18 USCA § 843 NOTE >>

(i) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall take effect 180 days after the date of enactment of this Act.

AR.02283

(2) EXCEPTION.—Notwithstanding any provision of this Act, a license or permit issued under section 843 of title 18, United States Code, before the date of enactment of this Act, shall remain valid until that license or permit is revoked under section 843(d) or expires, or until a timely application for renewal is acted upon.

SEC. 1123. PERSONS PROHIBITED FROM RECEIVING OR POSSESSING EXPLOSIVE MATERIALS.

(a) DISTRIBUTION OF EXPLOSIVES.—Section 842(d) of title 18, United States Code, is amended—

<< 18 USCA § 842 >>

(1) in paragraph (5), by striking "or" at the end;

<< 18 USCA § 842 >>

(2) in paragraph (6), by striking the period at the end and inserting "or who has been committed to a mental institution;"; and

<< 18 USCA § 842 >>

(3) by adding at the end the following:
"(7) is an alien, other than an alien who—
  "(A) is lawfully admitted for permanent residence (as defined in section 101 (a)(20) of the Immigration and Nationality Act); or
  "(B) is in lawful nonimmigrant status, is a refugee admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157), or is in asylum status under section 208 of the Immigration and Nationality Act (8 U.S.C. 1158), and—
    "(i) is a foreign law enforcement officer of a friendly foreign government, as determined by the Secretary in consultation with the Secretary of State, entering the United States on official law enforcement business, and the shipping, transporting, possession, or receipt of explosive materials is in furtherance of this official law enforcement business;
    "(ii) is a person having the power to direct or cause the direction of the management and policies of a corporation, partnership, or association licensed pursuant to section 843(a), and the shipping, transporting, possession, or receipt of explosive materials is in furtherance of such power;
    "(iii) is a member of a North Atlantic Treaty Organization (NATO) or other friendly foreign military force, as determined by the Secretary in consultation with the Secretary of Defense, (whether or not admitted in a nonimmigrant status) who is present in the United States under military orders for training or other military purpose authorized by the United States, and the shipping, transporting, possession, or receipt of explosive materials is in furtherance of the military purpose; or
    "(iv) is lawfully present in the United States in cooperation with the Director of Central Intelligence, and the shipment, transportation, receipt, or possession of the explosive materials is in furtherance of such cooperation;
  "(8) has been discharged from the armed forces under dishonorable conditions;
  "(9) having been a citizen of the United States, has renounced the citizenship of that person.".
(b) POSSESSION OF EXPLOSIVE MATERIALS.—Section 842(i) of title 18, United States Code, is amended—

<< 18 USCA § 842 >>

(1) in paragraph (3), by striking "or" at the end; and

<< 18 USCA § 842 >>

(2) by inserting after paragraph (4) the following:
"(5) who is an alien, other than an alien who—
  "(A) is lawfully admitted for permanent residence (as that term is defined in section 101(a)(20) of the Immigration and Nationality Act); or
  "(B) is in lawful nonimmigrant status, is a refugee admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157), or is in asylum status under section 208 of the Immigration and Nationality Act (8 U.S.C. 1158), and—

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(i) is a foreign law enforcement officer of a friendly foreign government, as determined by the Secretary in consultation with the Secretary of State, entering the United States on official law enforcement business, and the shipping, transporting, possession, or receipt of explosive materials is in furtherance of this official law enforcement business;

"(ii) is a person having the power to direct or cause the direction of the management and policies of a corporation, partnership, or association licensed pursuant to section 843(a), and the shipping, transporting, possession, or receipt of explosive materials is in furtherance of such power;

"(iii) is a member of a North Atlantic Treaty Organization (NATO) or other friendly foreign military force, as determined by the Secretary in consultation with the Secretary of Defense, (whether or not admitted in a nonimmigrant status) who is present in the United States under military orders for training or other military purpose authorized by the United States, and the shipping, transporting, possession, or receipt of explosive materials is in furtherance of the military purpose; or

"(iv) is lawfully present in the United States in cooperation with the Director of Central Intelligence, and the shipment, transportation, receipt, or possession of the explosive materials is in furtherance of such cooperation;

"(6) who has been discharged from the armed forces under dishonorable conditions;

"(7) who, having been a citizen of the United States, has renounced the citizenship of that person'; and

<< 18 USCA § 842 >>

(3) by inserting "or affecting" before "interstate" each place that term appears.

<< 18 USCA § 843 >>

## SEC. 1124. REQUIREMENT TO PROVIDE SAMPLES OF EXPLOSIVE MATERIALS AND AMMONIUM NITRATE.

Section 843 of title 18, United States Code, as amended by this Act, is amended by adding at the end the following:

"(i) FURNISHING OF SAMPLES.—

"(1) IN GENERAL.—Licensed manufacturers and licensed importers and persons who manufacture or import explosive materials or ammonium nitrate shall, when required by letter issued by the Secretary, furnish—

"(A) samples of such explosive materials or ammonium nitrate;

"(B) information on chemical composition of those products; and

"(C) any other information that the Secretary determines is relevant to the identification of the explosive materials or to identification of the ammonium nitrate.

"(2) REIMBURSEMENT.—The Secretary shall, by regulation, authorize reimbursement of the fair market value of samples furnished pursuant to this subsection, as well as the reasonable costs of shipment.".

<< 18 USCA § 844 >>

## SEC. 1125. DESTRUCTION OF PROPERTY OF INSTITUTIONS RECEIVING FEDERAL FINANCIAL ASSISTANCE.

Section 844(f)(1) of title 18, United States Code, is amended by inserting before the word "shall" the following: "or any institution or organization receiving Federal financial assistance,".

<< 18 USCA § 845 >>

## SEC. 1126. RELIEF FROM DISABILITIES.

Section 845(b) of title 18, United States Code, is amended to read as follows:

"(b)(1) A person who is prohibited from shipping, transporting, receiving, or possessing any explosive under section 842(i) may apply to the Secretary for relief from such prohibition.

"(2) The Secretary may grant the relief requested under paragraph (1) if the Secretary determines that the circumstances regarding the applicability of section 842(i), and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of such relief is not contrary to the public interest.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.02285

"(3) A licensee or permittee who applies for relief, under this subsection, from the disabilities incurred under this chapter as a result of an indictment for or conviction of a crime punishable by imprisonment for a term exceeding 1 year shall not be barred by such disability from further operations under the license or permit pending final action on an application for relief filed pursuant to this section.".

<< 18 USCA § 844 >>

SEC. 1127. THEFT REPORTING REQUIREMENT.

Section 844 of title 18, United States Code, is amended by adding at the end the following:
"(p) THEFT REPORTING REQUIREMENT.—
  "(1) IN GENERAL.—A holder of a license or permit who knows that explosive materials have been stolen from that licensee or permittee, shall report the theft to the Secretary not later than 24 hours after the discovery of the theft.
  "(2) PENALTY.—A holder of a license or permit who does not report a theft in accordance with paragraph (1), shall be fined not more than $10,000, imprisoned not more than 5 years, or both.".

SEC. 1128. AUTHORIZATION OF APPROPRIATIONS.

There is authorized to be appropriated such sums as necessary to carry out this subtitle and the amendments made by this subtitle.

TITLE XII—AIRLINE WAR RISK INSURANCE LEGISLATION

SEC. 1201. AIR CARRIER LIABILITY FOR THIRD PARTY CLAIMS ARISING OUT OF ACTS OF TERRORISM.

Section 44303 of title 49, United States Code, is amended—

<< 49 USCA § 44303 >>

(1) by inserting "(a) IN GENERAL.—" before "The Secretary of Transportation";

<< 49 USCA § 44303 >>

<< 49 USCA § 40101 NOTE >>

(2) by moving the text of paragraph (2) of section 201(b) of the Air Transportation Safety and System Stabilization Act (115 Stat. 235) to the end and redesignating such paragraph as subsection (b);

<< 49 USCA § 44303 >>

(3) in subsection (b) (as so redesignated)—
  (A) by striking the subsection heading and inserting "AIR CARRIER LIABILITY FOR THIRD PARTY CLAIMS ARISING OUT OF ACTS OF TERRORISM.—";
  (B) in the first sentence by striking "the 180–day period following the date of enactment of this Act, the Secretary of Transportation" and inserting "the period beginning on September 22, 2001, and ending on December 31, 2003, the Secretary"; and
  (C) in the last sentence by striking "this paragraph" and inserting "this subsection".

<< 49 USCA § 44302 >>

SEC. 1202. EXTENSION OF INSURANCE POLICIES.

Section 44302 of title 49, United States Code, is amended by adding at the end the following:
"(f) EXTENSION OF POLICIES.—

"(1) IN GENERAL.—The Secretary shall extend through August 31, 2003, and may extend through December 31, 2003, the termination date of any insurance policy that the Department of Transportation issued to an air carrier under subsection (a) and that is in effect on the date of enactment of this subsection on no less favorable terms to the air carrier than existed on June 19, 2002; except that the Secretary shall amend the insurance policy, subject to such terms and conditions as the Secretary may prescribe, to add coverage for losses or injuries to aircraft hulls, passengers, and crew at the limits carried by air carriers for such losses and injuries as of such date of enactment and at an additional premium comparable to the premium charged for third-party casualty coverage under such policy.

"(2) SPECIAL RULES.—Notwithstanding paragraph (1)—

"(A) in no event shall the total premium paid by the air carrier for the policy, as amended, be more than twice the premium that the air carrier was paying to the Department of Transportation for its third party policy as of June 19, 2002; and

"(B) the coverage in such policy shall begin with the first dollar of any covered loss that is incurred.".

<< 49 USCA § 44306 NOTE >>

<< 49 USCA § 44306 >>

SEC. 1203. CORRECTION OF REFERENCE.

Effective November 19, 2001, section 147 of the Aviation and Transportation Security Act (Public Law 107–71) is amended by striking "(b)" and inserting "(c)".

SEC. 1204. REPORT.

Not later than 90 days after the date of enactment of this Act, the Secretary shall transmit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives a report that—

(A) evaluates the availability and cost of commercial war risk insurance for air carriers and other aviation entities for passengers and third parties;

(B) analyzes the economic effect upon air carriers and other aviation entities of available commercial war risk insurance; and

(C) describes the manner in which the Department could provide an alternative means of providing aviation war risk reinsurance covering passengers, crew, and third parties through use of a risk-retention group or by other means.

TITLE XIII—FEDERAL WORKFORCE IMPROVEMENT

Subtitle A—Chief Human Capital Officers

<< 5 USCA § 101 NOTE >>

SEC. 1301. SHORT TITLE.

This title may be cited as the "Chief Human Capital Officers Act of 2002".

SEC. 1302. AGENCY CHIEF HUMAN CAPITAL OFFICERS.

(a) IN GENERAL.—Part II of title 5, United States Code, is amended by inserting after chapter 13 the following:

<< 5 USCA prec. § 1401 >>

"CHAPTER 14—AGENCY CHIEF HUMAN CAPITAL OFFICERS

"Sec.

"1401. Establishment of agency Chief Human Capital Officers.

"1402. Authority and functions of agency Chief Human Capital Officers.

<< 5 USCA § 1401 >>

"§ 1401. Establishment of agency Chief Human Capital Officers

"The head of each agency referred to under paragraphs (1) and (2) of section 901(b) of title 31 shall appoint or designate a Chief Human Capital Officer, who shall—

"(1) advise and assist the head of the agency and other agency officials in carrying out the agency's responsibilities for selecting, developing, training, and managing a high-quality, productive workforce in accordance with merit system principles;

"(2) implement the rules and regulations of the President and the Office of Personnel Management and the laws governing the civil service within the agency; and

"(3) carry out such functions as the primary duty of the Chief Human Capital Officer.

<< 5 USCA § 1402 >>

"§ 1402. Authority and functions of agency Chief Human Capital Officers

"(a) The functions of each Chief Human Capital Officer shall include—

"(1) setting the workforce development strategy of the agency;

"(2) assessing workforce characteristics and future needs based on the agency's mission and strategic plan;

"(3) aligning the agency's human resources policies and programs with organization mission, strategic goals, and performance outcomes;

"(4) developing and advocating a culture of continuous learning to attract and retain employees with superior abilities;

"(5) identifying best practices and benchmarking studies, and

"(6) applying methods for measuring intellectual capital and identifying links of that capital to organizational performance and growth.

"(b) In addition to the authority otherwise provided by this section, each agency Chief Human Capital Officer—

"(1) shall have access to all records, reports, audits, reviews, documents, papers, recommendations, or other material that—

"(A) are the property of the agency or are available to the agency; and

"(B) relate to programs and operations with respect to which that agency Chief Human Capital Officer has responsibilities under this chapter; and

"(2) may request such information or assistance as may be necessary for carrying out the duties and responsibilities provided by this chapter from any Federal, State, or local governmental entity.".

<< 5 USCA prec. § 1101 >>

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of chapters for chapters for part II of title 5, United States Code, is amended by inserting after the item relating to chapter 13 the following:

**"14. Agency chief Human Capital Officers.1401".**

<< 5 USCA § 1401 NOTE >>

SEC. 1303. CHIEF HUMAN CAPITAL OFFICERS COUNCIL.

(a) ESTABLISHMENT.—There is established a Chief Human Capital Officers Council, consisting of—

(1) the Director of the Office of Personnel Management, who shall act as chairperson of the Council;

(2) the Deputy Director for Management of the Office of Management and Budget, who shall act as vice chairperson of the Council; and

(3) the Chief Human Capital Officers of Executive departments and any other members who are designated by the Director of the Office of Personnel Management.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) FUNCTIONS.—The Chief Human Capital Officers Council shall meet periodically to advise and coordinate the activities of the agencies of its members on such matters as modernization of human resources systems, improved quality of human resources information, and legislation affecting human resources operations and organizations.

(c) EMPLOYEE LABOR ORGANIZATIONS AT MEETINGS.—The Chief Human Capital Officers Council shall ensure that representatives of Federal employee labor organizations are present at a minimum of 1 meeting of the Council each year. Such representatives shall not be members of the Council.

(d) ANNUAL REPORT.—Each year the Chief Human Capital Officers Council shall submit a report to Congress on the activities of the Council.

<< 5 USCA § 1103 >>

SEC. 1304. STRATEGIC HUMAN CAPITAL MANAGEMENT.

Section 1103 of title 5, United States Code, is amended by adding at the end the following:

"(c)(1) The Office of Personnel Management shall design a set of systems, including appropriate metrics, for assessing the management of human capital by Federal agencies.

"(2) The systems referred to under paragraph (1) shall be defined in regulations of the Office of Personnel Management and include standards for—

"(A)(i) aligning human capital strategies of agencies with the missions, goals, and organizational objectives of those agencies; and

"(ii) integrating those strategies into the budget and strategic plans of those agencies;

"(B) closing skill gaps in mission critical occupations;

"(C) ensuring continuity of effective leadership through implementation of recruitment, development, and succession plans;

"(D) sustaining a culture that cultivates and develops a high performing workforce;

"(E) developing and implementing a knowledge management strategy supported by appropriate investment in training and technology; and

"(F) holding managers and human resources officers accountable for efficient and effective human resources management in support of agency missions in accordance with merit system principles.".

<< 5 USCA § 1103 NOTE >>

SEC. 1305. EFFECTIVE DATE.

This subtitle shall take effect 180 days after the date of enactment of this Act.

Subtitle B—Reforms Relating to Federal Human Capital Management

SEC. 1311. INCLUSION OF AGENCY HUMAN CAPITAL STRATEGIC PLANNING IN PERFORMANCE PLANS AND PROGRAMS PERFORMANCE REPORTS.

(a) PERFORMANCE PLANS.—Section 1115 of title 31, United States Code, is amended—

<< 31 USCA § 1115 >>

(1) in subsection (a), by striking paragraph (3) and inserting the following:

"(3) provide a description of how the performance goals and objectives are to be achieved, including the operation processes, training, skills and technology, and the human, capital, information, and other resources and strategies required to meet those performance goals and objectives.";

<< 31 USCA § 1115 >>

(2) by redesignating subsection (f) as subsection (g); and

<< 31 USCA § 1115 >>

(3) by inserting after subsection (e) the following:

"(f) With respect to each agency with a Chief Human Capital Officer, the Chief Human Capital Officer shall prepare that portion of the annual performance plan described under subsection (a)(3).".

(b) PROGRAM PERFORMANCE REPORTS.—Section 1116(d) of title 31, United States Code, is amended—

<< 31 USCA § 1116 >>

(1) in paragraph (4), by striking "and" after the semicolon;

<< 31 USCA § 1116 >>

(2) by redesignating paragraph (5) as paragraph (6); and

<< 31 USCA § 1116 >>

(3) by inserting after paragraph (4) the following:

"(5) include a review of the performance goals and evaluation of the performance plan relative to the agency's strategic human capital management; and".

SEC. 1312. REFORM OF THE COMPETITIVE SERVICE HIRING PROCESS.

(a) IN GENERAL.—Chapter 33 of title 5, United States Code, is amended—

(1) in section 3304(a)—

<< 5 USCA § 3304 >>

(A) in paragraph (1), by striking "and" after the semicolon;

<< 5 USCA § 3304 >>

(B) in paragraph (2), by striking the period and inserting "; and"; and

<< 5 USCA § 3304 >>

(C) by adding at the end of the following:

"(3) authority for agencies to appoint, without regard to the provision of sections 3309 through 3318, candidates directly to positions for which—

"(A) public notice has been given; and

"(B) the Office of Personnel Management has determined that there exists a severe shortage of candidates or there is a critical hiring need.

"The Office shall prescribe, by regulation, criteria for identifying such positions and may delegate authority to make determinations under such criteria."; and

(2) by inserting after section 3318 the following:

<< 5 USCA § 3319 >>

"§ 3319. Alternative ranking and selection procedures

"(a) The Office, in exercising its authority under section 3304, or an agency to which the Office has delegated examining authority under section 1104(a)(2), may establish category rating systems for evaluating applicants for positions in the

AR.02290

30

competitive service, under 2 or more quality categories based on merit consistent with regulations prescribed by the Office of Personnel Management, rather than assigned individual numerical ratings.

"(b) Within each quality category established under subsection (a), preference-eligibles shall be listed ahead of individuals who are not preference eligibles. For other than scientific and professional positions at GS–9 of the General Schedule (equivalent or higher), qualified preference-eligibles who have a compensable service-connected disability of 10 percent or more shall be listed in the highest quality category.

"(c)(1) An appointing official may select any applicant in the highest quality category or, if fewer than 3 candidates have been assigned to the highest quality category, in a merged category consisting of the highest and the second highest quality categories.

"(2) Notwithstanding paragraph (1), the appointing official may not pass over a preference-eligible in the same category from which selection is made, unless the requirements of section 3317(b) or 3318(b), as applicable, are satisfied.

"(d) Each agency that establishes a category rating system under this section shall submit in each of the 3 years following that establishment, a report to Congress on that system including information on—

"(1) the number of employees hired under that system;

"(2) the impact that system has had on the hiring of veterans and minorities, including those who are American Indian or Alaska Natives, Asian, Black or African American, and native Hawaiian or other Pacific Islanders; and

"(3) the way in which managers were trained in the administration of that system.

"(e) The Office of Personnel Management may prescribe such regulations as it considers necessary to carry out the provisions of this section.".

<< 5 USCA prec. § 3301 >>

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 33 of title 5, United States Code, is amended by striking the item relating to section 3319 and inserting the following:

"3319. Alternative ranking and selection procedures.".

SEC. 1313. PERMANENT EXTENSION, REVISION, AND EXPANSION OF AUTHORITIES FOR USE OF VOLUNTARY SEPARATION INCENTIVE PAY AND VOLUNTARY EARLY RETIREMENT.

(a) VOLUNTARY SEPARATION INCENTIVE PAYMENTS.—

(1) IN GENERAL.—

(A) AMENDMENT TO TITLE 5, UNITED STATES CODE.—Chapter 35 of title 5, United States Code, is amended by inserting after subchapter I the following:

<< 5 USCA prec. § 3521 >>

"SUBCHAPTER II—VOLUNTARY SEPARATION INCENTIVE PAYMENTS

<< 5 USCA § 3521 >>

"§ 3521. Definitions

"In this subchapter, the term—

"(1) 'agency' means an Executive agency as defined under section 105; and

"(2) 'employee'—

"(A) means an employee as defined under section 2105 employed by an agency and an individual employed by a county committee established under section 8(b)(5) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h(b)(5)) who—

"(i) is serving under an appointment without time limitation; and

"(ii) has been currently employed for a continuous period of at least 3 years; and

"(B) shall not include—

"(i) a reemployed annuitant under subchapter III of chapter 83 or 84 or another retirement system for employees of the Government;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(ii) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or 84 or another retirement system for employees of the Government;

"(iii) an employee who is in receipt of a decision notice of involuntary separation for misconduct or unacceptable performance;

"(iv) an employee who has previously received any voluntary separation incentive payment from the Federal Government under this subchapter or any other authority;

"(v) an employee covered by statutory reemployment rights who is on transfer employment with another organization; or

"(vi) any employee who—

"(I) during the 36–month period preceding the date of separation of that employee, performed service for which a student loan repayment benefit was or is to be paid under section 5379;

"(II) during the 24–month period preceding the date of separation of that employee, performed service for which a recruitment or relocation bonus was or is to be paid under section 5753; or

"(III) during the 12–month period preceding the date of separation of that employee, performed service for which a retention bonus was or is to be paid under section 5754.

<< 5 USCA § 3522 >>

"§ 3522. Agency plans; approval

"(a) Before obligating any resources for voluntary separation incentive payments, the head of each agency shall submit to the Office of Personnel Management a plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

"(b) The plan of an agency under subsection (a) shall include—

"(1) the specific positions and functions to be reduced or eliminated;

"(2) a description of which categories of employees will be offered incentives;

"(3) the time period during which incentives may be paid;

"(4) the number and amounts of voluntary separation incentive payments to be offered; and

"(5) a description of how the agency will operate without the eliminated positions and functions.

"(c) The Director of the Office of Personnel Management shall review each agency's plan an may make any appropriate modifications in the plan, in consultation with the Director of the Office of Management and Budget. A plan under this section may not be implemented without the approval of the Directive of the Office of Personnel Management.

<< 5 USCA § 3523 >>

"§ 3523. Authority to provide voluntary separation incentive payments

"(a) A voluntary separation incentive payment under this subchapter may be paid to an employee only as provided in the plan of an agency established under section 3522.

"(b) A voluntary incentive payment—

"(1) shall be offered to agency employees on the basis of—

"(A) 1 or more organizational units;

"(B) 1 or more occupational series or levels;

"(C) 1 or more geographical locations;

"(D) skills, knowledge, or other factors related to a position;

"(E) specific periods of time during which eligible employees may elect a voluntary incentive payment; or

"(F) any appropriate combination of such factors;

"(2) shall be paid in a lump sum after the employee's separation;

"(3) shall be equal to the lesser of—

"(A) an amount equal to the amount the employee would be entitled to receive under section 5595(c) if the employee were entitled to payment under such section (without adjustment for any previous payment made); or

"(B) an amount determined by the agency head, not to exceed $25,000;

AR.02292

"(4) may be made only in the case of an employee who voluntarily separates (whether by retirement or resignation) under this subchapter;

"(5) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit;

"(6) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595, based on another other separation; and

"(7) shall be paid from appropriations or funds available for the payment of the basic pay of the employee.

<< 5 USCA § 3524 >>

"§ 3524. Effect of subsequent employment with the Government

"(a) The term 'employment'—

"(1) in subsection (b) includes employment under a personal services contract (or other direct contract) with the United States Government (other than an entity in the legislative branch); and

"(2) in subsection (c) does not include employment under such a contract.

"(b) An individual who has received a voluntary separation incentive payment under this subchapter and accepts any employment for compensation with the Government of the United States with 5 years after the date of the separation on which the payment is based shall be required to pay, before the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

"(c)(1) If the employment under this section is with an agency, other than the General Accounting Office, the United States Postal Service, or the Postal Rate Commission, the Director of the Office of Personnel Management may, at the request of the head of the agency, may waive the repayment if—

"(A) the individual involved possesses unique abilities and is the only qualified applicant available for the position; or

"(B) in case of an emergency involving a direct threat to life or property, the individual—

"(i) has skills directly related to resolving the emergency; and

"(ii) will serve on a temporary basis only so long as that individual's services are made necessary by the emergency.

"(2) If the employment under this section is with an entity in the legislative branch, the head of the entity or the appointing official may waive the repayment if the individual involved possesses unique abilities and is the only qualified applicant available for the position.

"(3) If the employment under this section is with the judicial branch, the Director of the Administrative Office of the United States Courts may waive the repayment if the individual involved possesses unique abilities and is the only qualified applicant available for the position.

<< 5 USCA § 3525 >>

"§ 3525. Regulations

"The Office of Personnel Management may prescribe regulations to carry out this subchapter.".

(B) TECHNICAL AND CONFORMING AMENDMENTS.—Chapter 35 of title 5, United States Code, is amended—

(i) by striking the chapter heading and inserting the following:

<< 5 USCA prec. § 3501 >>

"CHAPTER 35—RETENTION PREFERENCE, VOLUNTARY SEPARATION INCENTIVE PAYMENTS, RESTORATION, AND REEMPLOYMENT";

and

(ii) in the table of sections by inserting after the item relating to section 3504 the following:

<< 5 USCA prec. § 3501 >>

"SUBCHAPTER II—VOLUNTARY SEPARATION INCENTIVE PAYMENTS

"3521. Definitions.

"3522. Agency plans; approval.

"3523. Authority to provide voluntary separation incentive payments.
"3524. Effect of subsequent employment with the Government.
"3525. Regulations.".

<< 5 USCA § 3521 NOTE >>

(2) ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS.—The Director of the Administrative Office of the United States Courts may, by regulation, establish a program substantially similar to the program established under paragraph (1) for individuals serving in the judicial branch.

<< 5 USCA § 3521 NOTE >>

(3) CONTINUATION OF OTHER AUTHORITY.—Any agency exercising any voluntary separation incentive authority in effect on the effective date of this subsection may continue to offer voluntary separation incentives consistent with that authority until that authority expires.

<< 5 USCA § 3521 NOTE >>

(4) EFFECTIVE DATE.—This subsection shall take effect 60 days after the date of enactment of this Act.
(b) FEDERAL EMPLOYEE VOLUNTARY EARLY RETIREMENT.—

<< 5 USCA § 8336 >>

(1) CIVIL SERVICE RETIREMENT SYSTEM.—Section 8336(d)(2) of title 5, United States Code, is amended to read as follows:
"(2)(A) has been employed continuously, by the agency in which the employee is serving, for at least the 31–day period ending on the date on which such agency requests the determination referred to in subparagraph (D);
"(B) is serving under an appointment that is not time limited;
"(C) has not been duly notified that such employee is to be involuntarily separated for misconduct or unacceptable performance;
"(D) is separated from the service voluntarily during a period in which, as determined by the office of Personnel Management (upon request of the agency) under regulations prescribed by the Office—
"(i) such agency (or, if applicable, the component in which the employee is serving) is undergoing substantial delayering, substantial reorganization, substantial reductions in force, substantial transfer of function, or other substantial workforce restructuring (or shaping);
"(ii) a significant percentage of employees servicing in such agency (or component) are likely to be separated or subject to an immediate reduction in the rate of basic pay (without regard to subchapter VI of chapter 53, or comparable provisions); or
"(iii) identified as being in positions which are becoming surplus or excess to the agency's future ability to carry out its mission effectively; and
"(E) as determined by the agency under regulations prescribed by the Office, is within the scope of the offer of voluntary early retirement, which may be made on the basis of—
"(i) 1 or more organizational units;
"(ii) 1 or more occupational series or levels;
"(iii) 1 or more geographical locations;
"(iv) specific periods;
"(v) skills, knowledge, or other factors related to a position; or
"(vi) any appropriate combination of such factors;".

<< 5 USCA § 8414 >>

(2) FEDERAL EMPLOYEES' RETIREMENT SYSTEM.—Section 8414(b)(1) of title 5, United States Code, is amended by striking subparagraph (B) and inserting the following:

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B)(i) has been employed continuously, by the agency in which the employee is serving, for at least the 31–day period ending on the date on which such agency requests the determination referred to in clause (iv);

"(ii) is serving under an appointment that is not time limited;

"(iii) has not been duly notified that such employee is to be involuntarily separated for misconduct or unacceptable performance;

"(iv) is separate from the service voluntarily during a period in which, as determined by the Office of Personnel Management (upon request of the agency) under regulations prescribed by the Office—

"(I) such agency (or, if applicable, the component in which the employee is serving) is undergoing substantial delayering, substantial reorganization, substantial reductions in force, substantial transfer of function, or other substantial workforce restructuring (or shaping);

"(II) a significant percentage of employees serving in such agency (or component) are likely to be separated or subject to an immediate reduction in the rate of basic pay (without regard to subchapter VI of chapter 53, or comparable provisions); or

"(III) identified as being in positions which are becoming surplus or excess to the agency's future ability to carry out its mission effectively; and

"(v) as determined by the agency under regulations prescribed by the Office, is within the scope of the offer of voluntary early retirement, which may be made on the basis of—

"(I) 1 or more organizational units;

"(II) 1 or more occupational series or levels;

"(III) 1 or more geographical locations;

"(IV) specific periods;

"(V) skills, knowledge, or other factors related to a position; or

"(VI) any appropriate combination of such factors.".

<< 5 USCA § 8336 NOTE >>

(3) GENERAL ACCOUNTING OFFICE AUTHORITY.—The amendments made by this subsection shall not be construed to affect the authority under section 1 of Public Law 106–303 (5 U.S.C. 8336 note; 114 State. 1063).

<< 5 USCA § 8336 NOTE >>

<< 5 USCA § 8414 NOTE >>

(4) TECHNICAL AND CONFORMING AMENDMENTS.—Section 7001 of the 1998 Supplemental Appropriations and Rescissions Act (Public Law 105–174; 112 Stat. 91) is repealed.

<< 5 USCA § 8336 NOTE >>

(5) REGULATIONS.—The Office of Personnel Management may prescribe regulations to carry out this subsection.

<< 5 USCA § 3521 NOTE >>

(c) SENSE OF CONGRESS.—It is the sense of Congress that the implementation of this section is intended to reshape the Federal workforce and not downsize the Federal workforce.

SEC. 1314. STUDENT VOLUNTEER TRANSIT SUBSIDY.

<< 5 USCA § 7905 >>

(a) IN GENERAL.—Section 7905(a)(1) of title 5, United States Code, is amended by striking "and a member of a uniformed service" and inserting ", a member of a uniformed service, and a student who provides voluntary services under section 3111".

<< 5 USCA § 3111 >>

AR.02295

(b) TECHNICAL AND CONFORMING AMENDMENT.—Section 3111(c)(1) of title 5, United States Code, is amended by striking "chapter 81 of this title" and inserting "section 7905 (relating to commuting by means other than single-occupancy motor vehicles), chapter 81".

Subtitle C—Reforms Relating to the Senior Executive Service

SEC. 1321. REPEAL OF RECERTIFICATION REQUIREMENTS OF SENIOR EXECUTIVES.

(a) IN GENERAL.—Title 5, United States Code, is amended—
  (1) in chapter 33—

<< 5 USCA § 3393 >>

(A) in section 3393(g) by striking "3393a";

<< 5 USCA § 3393a >>

(B) by repealing section 3393a; and

<< 5 USCA prec. § 3301 >>

(C) in the table of sections by striking the item relating to section 3393a;
  (2) in chapter 35—
  (A) in section 3592(a)—

<< 5 USCA § 3592 >>

(i) in paragraph (1), by inserting "or" at the end;

<< 5 USCA § 3592 >>

(ii) in paragraph (2), by striking "or" at the end;

<< 5 USCA § 3592 >>

(iii) by striking paragraph (3); and

<< 5 USCA § 3592 >>

(iv) by striking the last sentence;

<< 5 USCA § 3593 >>

(B) in section 3593(a), by striking paragraph (2) and inserting the following:
  "(2) the appointee left the Senior Executive Service for reasons other than misconduct, neglect of duty, malfeasance, or less than fully successful executive performance as determined under subchapter II of chapter 43.'; and
  (C) in section 3594(b)—

<< 5 USCA § 3594 >>

(i) in paragraph (1), by inserting "or" at the end;

<< 5 USCA § 3594 >>

(ii) in paragraph (2), by striking "or" at the end; and

<< 5 USCA § 3594 >>

(iii) by striking paragraph (3);

<< 5 USCA § 7701 >>

(3) in section 7701(c)(1)(A), by striking "or removal from the Senior Executive Service for failure to be recertified under section 3393a";
(4) in chapter 83—

<< 5 USCA § 8336 >>

(A) in section 8336(h)(1), by striking "for failure to be recertified as a senior executive under section 3393a or"; and

<< 5 USCA § 8339 >>

(B) in section 8339(h), in the first sentence, by striking ", except that such reduction shall not apply in the case of an employee retiring under section 8336(h) for failure to be recertified as a senior executive"; and
(5) in chapter 84—

<< 5 USCA § 8414 >>

(A) in section 8414(a)(1), by striking "for failure to be recertified as a senior executive under section 3393a or"; and

<< 5 USCA § 8421 >>

(B) in section 8421(a)(2), by striking ", except that an individual entitled to an annuity under section 8414(a) for failure to be recertified as a senior executive shall be entitled to an annuity supplement without regard to such applicable retirement age".

<< 5 USCA § 3592 NOTE >>

(b) SAVINGS PROVISION.—Notwithstanding the amendments made by subsection (a)(2)(A), an appeal under the final sentence of section 3592(a) of title 5, United States Code, that is pending on the day before the effective date of this section—
(1) shall not abate by reason of the enactment of the amendments made by subsection (a)(2)(A); and
(2) shall continue as if such amendments had not been enacted.

<< 5 USCA § 3593 NOTE >>

(c) APPLICATION.—The amendment made by subsection (a)(2)(B) shall not apply with respect to an individual who, before the effective date of this section, leaves the Senior Executive Service for failure to be recertified as a senior executive under section 3393a of title 5, United States Code.

SEC. 1322. ADJUSTMENT OF LIMITATION ON TOTAL ANNUAL COMPENSATION.

<< 5 USCA § 5307 >>

(a) IN GENERAL.—Section 5307 of title 5, United States Code, is amended by adding at the end the following:
"(d)(1) Notwithstanding any other provision of this section, subsection (a)(1) shall be applied by substituting 'the total annual compensation payable to the Vice President under section 104 of title 3' for 'the annual rate of basic pay payable for level I of the Executive Schedule' in the case of any employee who—
"(A) is paid under section 5376 or 5383 of this title or section 332(f), 603, or 604 of title 28; and
"(B) holds a position in or under an agency which is described in paragraph (2).

"(2) An agency described in this paragraph is any agency which, for purposes of the calendar year involved, has been certified under this subsection as having a performance appraisal system which (as designed and applied) makes meaningful distinctions based on relative performance.

"(3)(A) The Office of Personnel Management and the Office of Management and Budget jointly shall promulgate such regulations as may be necessary to carry out this subsection, including the criteria and procedures in accordance with which any determinations under this subsection shall be made.

"(B) An agency's certification under this subsection shall be for a period of 2 calendar years, except that such certification may be terminated at any time, for purposes of either or both of those years, upon a finding that the actions of such agency have not remained in conformance with applicable requirements.

"(C) Any certification or decertification under this subsection shall be made by the Office of Personnel Management, with the concurrence of the Office of Management and Budget.

"(4) Notwithstanding any provision of paragraph (3), any regulations, certifications, or other measures necessary to carry out this subsection with respect to employees within the judicial branch shall be the responsibility of the Director of the Administrative Office of the United States Courts. However, the regulations under this paragraph shall be consistent with those promulgated under paragraph (3).".

<< 5 USCA § 5307 >>

(b) CONFORMING AMENDMENTS.—(1) Section 5307(a) of title 5, United States Code, is amended by inserting "or as otherwise provided under subsection (d)," after "under law,".

<< 5 USCA § 5307 >>

(2) Section 5307(c) of such title is amended by striking "this section," and inserting "this section (subject to subsection (d)),".

Subtitle D—Academic Training

SEC. 1331. ACADEMIC TRAINING.

(a) ACADEMIC DEGREE TRAINING.—Section 4107 of title 5, United States Code, is amended to read as follows:

<< 5 USCA § 4107 >>

"§ 4107. Academic degree training

"(a) Subject to subsection (b), an agency may select and assign an employee to academic degree training and may pay or reimburse the costs of academic degree training from appropriated or other available funds if such training—

"(1) contributes significantly to—

"(A) meeting an identified agency training need;

"(B) resolving an identified agency staffing problem; or

"(C) accomplishing goals in the strategic plan of the agency;

"(2) is part of a planned, systemic, and coordinated agency employee development program linked to accomplishing the strategic goals of the agency; and

"(3) is accredited and is provided by a college or university that is accredited by a nationally recognized body.

"(b) In exercising authority under subsection (a), an agency shall—

"(1) consistent with the merit system principles set forth in paragraphs (2) and (7) of section 2301(b), take into consideration the need to—

"(A) maintain a balanced workforce in which women, members of racial and ethnic minority groups, and persons with disabilities are appropriately represented in Government service; and

"(B) provide employees effective education and training to improve organizational and individual performance;

"(2) assure that the training is not for the sole purpose of providing an employee an opportunity to obtain an academic degree or qualify for appointment to a particular position for which the academic degree is a basic requirement;

"(3) assure that no authority under this subsection is exercised on behalf of any employee occupying or seeking to qualify for—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) a noncareer appointment in the senior Executive Service; or

"(B) appointment to any position that is excepted from the competitive service because of its confidential policy-determining, policy-making or policy-advocating character; and

"(4) to the greatest extent practicable, facilitate the use of online degree training.".

<< 5 USCA prec. § 4101 >>

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 41 of title 5, United States Code, is amended by striking the item relating to section 4107 and inserting the following:

"4107. Academic degree training.".

SEC. 1332. MODIFICATIONS TO NATIONAL SECURITY EDUCATION PROGRAM.

<< 5 USCA § 3301 NOTE >>

(a) FINDINGS AND POLICIES.—

(1) FINDINGS.—Congress finds that—

(A) the United States Government actively encourages and financially supports the training, education, and development of many United States citizens;

(B) as a condition of some of those supports, many of those citizens have an obligation to seek either compensated or uncompensated employment in the Federal sector; and

(C) it is in the United States national interest to maximize the return to the Nation of funds invested in the development of such citizens by seeking to employ them in the Federal sector.

(2) POLICY.—It shall be the policy of the United States Government to—

(A) establish procedures for ensuring that United States citizens who have incurred service obligations as the result of receiving financial support for education and training from the United States Government and have applied for Federal positions are considered in all recruitment and hiring initiatives of Federal departments, bureaus, agencies, and offices; and

(B) advertise and open all Federal positions to United States citizens who have incurred service obligations with the United States Government as the result of receiving financial support for education and training from the United States Government.

(b) FULFILLMENT OF SERVICE REQUIREMENT IF NATIONAL SECURITY POSITIONS ARE UNAVAILABLE.— Section 802(b)(2) of the David L. Boren National Security Education Act of 1991 (50 U.S.C. 1902) is amended—

<< 50 USCA § 1902 >>

(1) in subparagraph (A), by striking clause (ii) and inserting the following:

"(ii) if the recipient demonstrates to the Secretary (in accordance with such regulations) that no national security position in an agency or office of the Federal Government having national security responsibilities is available, work in other offices or agencies of the Federal Government or in the field of higher education in a discipline relating to the foreign country, foreign language, area study, or international field of study for which the scholarship was awarded, for a period specified by the Secretary, which period shall be determined in accordance with clause (i); or'; and

<< 50 USCA § 1902 >>

(2) in subparagraph (B), by striking clause (ii) and inserting the following:

"(ii) if the recipient demonstrates to the Secretary (in accordance with such regulations) that no national security position is available upon the completion of the degree, work in other offices or agencies of the Federal Government or in the field of higher education in a discipline relating to foreign country, foreign language, area study, or international field of study for which the fellowship was awarded, for a period specified by the Secretary, which period shall be determined in accordance with clause (i); and".

TITLE XIV—ARMING PILOTS AGAINST TERRORISM

AR.02299

<< 49 USCA § 40101 NOTE >>

SEC. 1401. SHORT TITLE.

 This title may be cited as the "Arming Pilots Against Terrorism Act".

SEC. 1402. FEDERAL FLIGHT DECK OFFICER PROGRAM.

 (a) IN GENERAL.—Subchapter I of chapter 449 of title 49, United States Code, is amended by adding at the end the following:

<< 49 USCA § 44921 >>

"§ 44921. Federal flight deck officer program
 "(a) ESTABLISHMENT.—The Under Secretary of Transportation for Security shall establish a program to deputize volunteer pilots of air carriers providing passenger air transportation or intrastate passenger air transportation as Federal law enforcement officers to defend the flight decks of aircraft of such air carriers against acts of criminal violence or air piracy. Such officers shall be known as 'Federal flight deck officers'.
 "(b) PROCEDURAL REQUIREMENTS.—
  "(1) IN GENERAL.—Not later than 3 months after the date of enactment of this section, the Under Secretary shall establish procedural requirements to carry out the program under this section.
  "(2) COMMENCEMENT OF PROGRAM.—Beginning 3 months after the date of enactment of this section, the Under Secretary shall begin the process of training and deputizing pilots who are qualified to be Federal flight deck officers as Federal flight deck officers under the program.
  "(3) ISSUES TO BE ADDRESSED.—The procedural requirements established under paragraph (1) shall address the following issues:
   "(A) The type of firearm to be used by a Federal flight deck officer.
   "(B) The type of ammunition to be used by a Federal flight deck officer.
   "(C) The standards and training needed to qualify and requalify as a Federal flight deck officer.
   "(D) The placement of the firearm of a Federal flight deck officer on board the aircraft to ensure both its security and its ease of retrieval in an emergency.
   "(E) An analysis of the risk of catastrophic failure of an aircraft as a result of the discharge (including an accidental discharge) of a firearm into the program in the avionics, electrical systems, or other sensitive areas of the aircraft.
   "(F) The division of responsibility between pilots in the event of an act of criminal violence or air piracy if only 1 pilot is a Federal flight deck officer and if both pilots are Federal flight deck officers.
   "(G) Procedures for ensuring that the firearm of a Federal flight deck officer does not leave the cockpit if there is a disturbance in the passenger cabin of the aircraft or if the pilot leaves the cockpit for personal reasons.
   "(H) Interaction between a Federal flight deck officer and a Federal air marshal on board the aircraft.
   "(I) The process for selection of pilots to participate in the program based on their fitness to participate in the program, including whether an additional background check should be required beyond that required by section 44936(a)(1).
   "(J) Storage and transportation of firearms between flights, including international flights, to ensure the security of the firearms, focusing particularly on whether such security would be enhanced by requiring storage of the firearm at the airport when the pilot leaves the airport to remain overnight away from the pilot's base airport.
   "(K) Methods for ensuring that security personnel will be able to identify whether a pilot is authorized to carry a firearm under the program.
   "(L) Methods for ensuring that pilots (including Federal flight deck officers) will be able to identify whether a passenger is a law enforcement officer who is authorized to carry a firearm aboard the aircraft.
   "(M) Any other issues that the Under Secretary considers necessary.
   "(N) The Under Secretary's decisions regarding the methods for implementing each of the foregoing procedural requirements shall be subject to review only for abuse of discretion.

AR.02300
140

"(4) PREFERENCE.—In selecting pilots to participate in the program, the Under Secretary shall give preference to pilots who are former military or law enforcement personnel.

"(5) CLASSIFIED INFORMATION.—Notwithstanding section 552 of title 5 but subject to section 40119 of this title, information developed under paragraph (3)(E) shall not be disclosed.

"(6) NOTICE TO CONGRESS.—The Under Secretary shall provide notice to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate after completing the analysis required by paragraph (3)(E).

"(7) MINIMIZATION OF RISK.—If the Under Secretary determines as a result of the analysis under paragraph (3)(E) that there is a significant risk of the catastrophic failure of an aircraft as a result of the discharge of a firearm, the Under Secretary shall take such actions as may be necessary to minimize that risk.

"(c) TRAINING, SUPERVISION, AND EQUIPMENT.—

"(1) IN GENERAL.—The Under Secretary shall only be obligated to provide the training, supervision, and equipment necessary for a pilot to be a Federal flight deck officer under this section at no expense to the pilot or the air carrier employing the pilot.

"(2) TRAINING.—

"(A) IN GENERAL.—The Under Secretary shall base the requirements for the training of Federal flight deck officers under subsection (b) on the training standards applicable to Federal air marshals; except that the Under Secretary shall take into account the differing roles and responsibilities of Federal flight deck officers and Federal air marshals.

"(B) ELEMENTS.—The training of a Federal flight deck officer shall include, at a minimum, the following elements:

"(i) Training to ensure that the officer achieves the level of proficiency with a firearm required under subparagraph (C)(i).

"(ii) Training to ensure that the officer maintains exclusive control over the officer's firearm at all times, including training in defensive maneuvers.

"(iii) Training to assist the officer in determining when it is appropriate to use the officer's firearm and when it is appropriate to use less than lethal force.

"(C) TRAINING IN USE OF FIREARMS.—

"(i) STANDARD.—In order to be deputized as a Federal flight deck officer, a pilot must achieve a level of proficiency with a firearm that is required by the Under Secretary. Such level shall be comparable to the level of proficiency required of Federal air marshals.

"(ii) CONDUCT OF TRAINING.—The training of a Federal flight deck officer in the use of a firearm may be conducted by the Under Secretary or by a firearms training facility approved by the Under Secretary.

"(iii) REQUALIFICATION.—The Under Secretary shall require a Federal flight deck officer to requalify to carry a firearm under the program. Such requalification shall occur at an interval required by the Under Secretary.

"(d) DEPUTIZATION.—

"(1) IN GENERAL.—The Under Secretary may deputize, as a Federal flight deck officer under this section, a pilot who submits to the Under Secretary a request to be such an officer and whom the Under Secretary determines is qualified to be such an officer.

"(2) QUALIFICATION.—A pilot is qualified to be a Federal flight deck officer under this section if—

"(A) the pilot is employed by an air carrier;

"(B) the Under Secretary determines (in the Under Secretary's discretion) that the pilot meets the standards established by the Under Secretary for being such an officer; and

"(C) the Under Secretary determines that the pilot has completed the training required by the Under Secretary.

"(3) DEPUTIZATION BY OTHER FEDERAL AGENCIES.—The Under Secretary may request another Federal agency to deputize, as Federal flight deck officers under this section, those pilots that the Under Secretary determines are qualified to be such officers.

"(4) REVOCATION.—The Under Secretary may, (in the Under Secretary's discretion) revoke the deputization of a pilot as a Federal flight deck officer if the Under Secretary finds that the pilot is no longer qualified to be such an officer.

"(e) COMPENSATION.—Pilots participating in the program under this section shall not be eligible for compensation from the Federal Government for services provided as a Federal flight deck officer. The Federal Government and air carriers shall not

be obligated to compensate a pilot for participating in the program or for the pilot's training or qualification and requalification to carry firearms under the program.

"(f) AUTHORITY TO CARRY FIREARMS.—

"(1) IN GENERAL.—The Under Secretary shall authorize a Federal flight deck officer to carry a firearm while engaged in providing air transportation or intrastate air transportation. Notwithstanding subsection (c)(1), the officer may purchase a firearm and carry that firearm aboard an aircraft of which the officer is the pilot in accordance with this section if the firearm is of a type that may be used under the program.

"(2) PREEMPTION.—Notwithstanding any other provision of Federal or State law, a Federal flight deck officer, whenever necessary to participate in the program, may carry a firearm in any State and from 1 State to another State.

"(3) CARRYING FIREARMS OUTSIDE UNITED STATES.—In consultation with the Secretary of State, the Under Secretary may take such action as may be necessary to ensure that a Federal flight deck officer may carry a firearm in a foreign country whenever necessary to participate in the program.

"(g) AUTHORITY TO USE FORCE.—Notwithstanding section 44903(d), the Under Secretary shall prescribe the standards and circumstances under which a Federal flight deck officer may use, while the program under this section is in effect, force (including lethal force) against an individual in the defense of the flight deck of an aircraft in air transportation or intrastate air transportation.

"(h) LIMITATION ON LIABILITY.—

"(1) LIABILITY OF AIR CARRIERS.—An air carrier shall not be liable for damages in any action brought in a Federal or State court arising out of a Federal flight deck officer's use of or failure to use a firearm.

"(2) LIABILITY OF FEDERAL FLIGHT DECK OFFICERS.—A Federal flight deck officer shall not be liable for damages in any action brought in a Federal or State court arising out of the acts or omissions of the officer in defending the flight deck of an aircraft against acts of criminal violence or air piracy unless the officer is guilty of gross negligence or willful misconduct.

"(3) LIABILITY OF FEDERAL GOVERNMENT.—For purposes of an action against the United States with respect to an act or omission of a Federal flight deck officer in defending the flight deck of an aircraft, the officer shall be treated as an employee of the Federal Government under chapter 171 of title 28, relating to tort claims procedure.

"(i) PROCEDURES FOLLOWING ACCIDENTAL DISCHARGES.—If an accidental discharge of a firearm under the pilot program results in the injury or death of a passenger or crew member on an aircraft, the Under Secretary—

"(1) shall revoke the deputization of the Federal flight deck officer responsible for that firearm if the Under Secretary determines that the discharge was attributable to the negligence of the officer; and

"(2) if the Under Secretary determines that a shortcoming in standards, training, or procedures was responsible for the accidental discharge, the Under Secretary may temporarily suspend the program until the shortcoming is corrected.

"(j) LIMITATION ON AUTHORITY OF AIR CARRIERS.—No air carrier shall prohibit or threaten any retaliatory action against a pilot employed by the air carrier from becoming a Federal flight deck officer under this section. No air carrier shall—

"(1) prohibit a Federal flight deck officer from piloting an aircraft operated by the air carrier; or

"(2) terminate the employment of a Federal flight deck officer, solely on the basis of his or her volunteering for or participating in the program under this section.

"(k) APPLICABILITY.—

"(1) EXEMPTION.—This section shall not apply to air carriers operating under part 135 of title 14, Code of Federal Regulations, and to pilots employed by such carriers to the extent that such carriers and pilots are covered by section 135.119 of such title or any successor to such section.

"(2) PILOT DEFINED.—The term 'pilot' means an individual who has final authority and responsibility for the operation and safety of the flight or, if more than 1 pilot is required for the operation of the aircraft or by the regulations under which the flight is being conducted, the individual designated as second in command.".

(b) CONFORMING AMENDMENTS.—

<< 49 USCA prec. § 44901 >>

(1) CHAPTER ANALYSIS.—The analysis for such chapter is amended by inserting after the item relating to section 44920 the following:

"44921. Federal flight deck officer program.".

<< 49 USCA § 44903 NOTE >>

(2) FLIGHT DECK SECURITY.—Section 128 of the Aviation and Transportation Security Act (Public Law 107–71) is repealed.

<< 6 USCA § 513 >>

(c) FEDERAL AIR MARSHAL PROGRAM.—
  (1) SENSE OF CONGRESS.—It is the sense of Congress that the Federal air marshal program is critical to aviation security.
  (2) LIMITATION ON STATUTORY CONSTRUCTION.—Nothing in this Act, including any amendment made by this Act, shall be construed as preventing the Under Secretary of Transportation for Security from implementing and training Federal air marshals.

SEC. 1403. CREW TRAINING.

(a) IN GENERAL.—Section 44918(e) of title 49, United States Code, is amended—

<< 49 USCA § 44918 >>

(1) by striking "The Administrator" and inserting the following:
"(1) IN GENERAL.—The Under Secretary";

<< 49 USCA § 44918 >>

(2) by adding at the end the following:
  "(2) ADDITIONAL REQUIREMENTS.—In updating the training guidance, the Under Secretary, in consultation with the Administrator, shall issue a rule to—
  "(A) require both classroom and effective hands-on situational training in the following elements of self defense:
    "(i) recognizing suspicious activities and determining the seriousness of an occurrence;
    "(ii) deterring a passenger who might present a problem;
    "(iii) crew communication and coordination;
    "(iv) the proper commands to give to passengers and attackers;
    "(v) methods to subdue and restrain an attacker;
    "(vi) use of available items aboard the aircraft for self-defense;
    "(vii) appropriate and effective responses to defend oneself, including the use of force against an attacker;
    "(viii) use of protective devices assigned to crew members (to the extent such devices are approved by the Administrator or Under Secretary);
    "(ix) the psychology of terrorists to cope with their behavior and passenger responses to that behavior; and
    "(x) how to respond to aircraft maneuvers that may be authorized to defend against an act of criminal violence or air piracy;
  "(B) require training in the proper conduct of a cabin search, including the duty time required to conduct the search;
  "(C) establish the required number of hours of training and the qualifications for the training instructors;
  "(D) establish the intervals, number of hours, and elements of recurrent training;
  "(E) ensure that air carriers provide the initial training required by this paragraph within 24 months of the date of enactment of this subparagraph; and
  "(F) ensure that no person is required to participate in any hands-on training activity that that person believes will have an adverse impact on his or her health or safety.
  "(3) RESPONSIBILITY OF UNDER SECRETARY.—(A) CONSULTATION.—In developing the rule under paragraph (2), the Under Secretary shall consult with law enforcement personnel and security experts who have expertise in self-defense training, terrorism experts, and representatives of air carriers, the provider of self-defense training for Federal air marshals,

flight attendants, labor organizations representing flight attendants, and educational institutions offering law enforcement training programs.

"(B) DESIGNATION OF OFFICIAL.—The Under Secretary shall designate an official in the Transportation Security Administration to be responsible for overseeing the implementation of the training program under this subsection.

"(C) NECESSARY RESOURCES AND KNOWLEDGE.—The Under Secretary shall ensure that employees of the Administration responsible for monitoring the training program have the necessary resources and knowledge."; and

<< 49 USCA § 44918 >>

(3) by aligning the remainder of the text of paragraph (1) (as designated by paragraph (1) of this section) with paragraphs (2) and (3) (as added by paragraph (2) of this section).

<< 49 USCA § 114 NOTE >>

(b) ENHANCE SECURITY MEASURES.—Section 109(a) of the Aviation and Transportation Security Act (49 U.S.C. 114 note; 115 Stat. 613–614) is amended by adding at the end the following:

"(9) Require that air carriers provide flight attendants with a discreet, hands-free, wireless method of communicating with the pilots.".

(c) BENEFITS AND RISKS OF PROVIDING FLIGHT ATTENDANTS WITH NONLETHAL WEAPONS.—

(1) STUDY.—The Under Secretary of Transportation for Security shall conduct a study to evaluate the benefits and risks of providing flight attendants with nonlethal weapons to aide in combating air piracy and criminal violence on commercial airlines.

(2) REPORT.—Not later than 6 months after the date of enactment of this Act, the Under Secretary shall transmit to Congress a report on the results of the study.

SEC. 1404. COMMERCIAL AIRLINE SECURITY STUDY.

(a) STUDY.—The Secretary of Transportation shall conduct a study of the following:

(1) The number of armed Federal law enforcement officers (other than Federal air marshals), who travel on commercial airliners annually and the frequency of their travel.

(2) The cost and resources necessary to provide such officers with supplemental training in aircraft anti-terrorism training that is comparable to the training that Federal air marshals are provided.

(3) The cost of establishing a program at a Federal law enforcement training center for the purpose of providing new Federal law enforcement recruits with standardized training comparable to the training that Federal air marshals are provided.

(4) The feasibility of implementing a certification program designed for the purpose of ensuring Federal law enforcement officers have completed the training described in paragraph (2) and track their travel over a 6–month period.

(5) The feasibility of staggering the flights of such officers to ensure the maximum amount of flights have a certified trained Federal officer on board.

(b) REPORT.—Not later than 6 months after the date of enactment of this Act, the Secretary shall transmit to Congress a report on the results of the study. The report may be submitted in classified and redacted form.

SEC. 1405. AUTHORITY TO ARM FLIGHT DECK CREW WITH LESS-THAN-LETHAL WEAPONS.

<< 49 USCA § 44903 >>

(a) IN GENERAL.—Section 44903(i) of title 49, United States Code (as redesignated by section 6 of this Act) is amended by adding at the end the following:

"(3) REQUEST OF AIR CARRIERS TO USE LESS–THAN–LETHAL WEAPONS.—If, after the date of enactment of this paragraph, the Under Secretary receives a request from an air carrier for authorization to allow pilots of the air carrier to carry less-than-lethal weapons, the Under Secretary shall respond to that request within 90 days.".

(b) CONFORMING AMENDMENTS.—Such section is further amended—

<< 49 USCA § 44903 >>

(1) in paragraph (1) by striking "Secretary" the first and third places it appears and inserting "Under Secretary"; and

<< 49 USCA § 44903 >>

(2) in paragraph (2) by striking "Secretary" each place it appears and inserting "Under Secretary".

## SEC. 1406. TECHNICAL AMENDMENTS.

Section 44903 of title 49, United States Code, is amended—

<< 49 USCA § 44903 >>

(1) by redesignating subsection (i) (relating to short-term assessment and deployment of emerging security technologies and procedures) as subsection (j);

<< 49 USCA § 44903 >>

(2) by redesignating the second subsection (h) (relating to authority to arm flight deck crew with less-than-lethal weapons) as subsection (i); and

<< 49 USCA § 44903 >>

(3) by redesignating the third subsection (h) (relating to limitation on liability for acts to thwart criminal violence for aircraft piracy) as subsection (k).

<< 6 USCA prec. § 541 >>

TITLE XV—TRANSITION

Subtitle A—Reorganization Plan

<< 6 USCA § 541 >>

## SEC. 1501. DEFINITIONS.

For purposes of this title:
 (1) The term "agency" includes any entity, organizational unit, program, or function.
 (2) The term "transition period" means the 12–month period beginning on the effective date of this Act.

<< 6 USCA § 542 >>

## SEC. 1502. REORGANIZATION PLAN.

 (a) SUBMISSION OF PLAN.—Not later than 60 days after the date of the enactment of this Act, the President shall transmit to the appropriate congressional committees a reorganization plan regarding the following:
 (1) The transfer of agencies, personnel, assets, and obligations to the Department pursuant to this Act.
 (2) Any consolidation, reorganization, or streamlining of agencies transferred to the Department pursuant to this Act.
 (b) PLAN ELEMENTS.—The plan transmitted under subsection (a) shall contain, consistent with this Act, such elements as the President deems appropriate, including the following:
 (1) Identification of any functions of agencies transferred to the Department pursuant to this Act that will not be transferred to the Department under the plan.

(2) Specification of the steps to be taken by the Secretary to organize the Department, including the delegation or assignment of functions transferred to the Department among officers of the Department in order to permit the Department to carry out the functions transferred under the plan.

(3) Specification of the funds available to each agency that will be transferred to the Department as a result of transfers under the plan.

(4) Specification of the proposed allocations within the Department of unexpended funds transferred in connection with transfers under the plan.

(5) Specification of any proposed disposition of property, facilities, contracts, records, and other assets and obligations of agencies transferred under the plan.

(6) Specification of the proposed allocations within the Department of the functions of the agencies and subdivisions that are not related directly to securing the homeland.

(c) MODIFICATION OF PLAN.—The President may, on the basis of consultations with the appropriate congressional committees, modify or revise any part of the plan until that part of the plan becomes effective in accordance with subsection (d).

(d) EFFECTIVE DATE.—

(1) IN GENERAL.—The reorganization plan described in this section, including any modifications or revisions of the plan under subsection (d), shall become effective for an agency on the earlier of—

(A) the date specified in the plan (or the plan as modified pursuant to subsection (d)), except that such date may not be earlier than 90 days after the date the President has transmitted the reorganization plan to the appropriate congressional committees pursuant to subsection (a); or

(B) the end of the transition period.

(2) STATUTORY CONSTRUCTION.—Nothing in this subsection may be construed to require the transfer of functions, personnel, records, balances of appropriations, or other assets of an agency on a single date.

(3) SUPERSEDES EXISTING LAW.—Paragraph (1) shall apply notwithstanding section 905(b) of title 5, United States Code.

<< 6 USCA § 543 >>

SEC. 1503. REVIEW OF CONGRESSIONAL COMMITTEE STRUCTURES.

It is the sense of Congress that each House of Congress should review its committee structure in light of the reorganization of responsibilities within the executive branch by the establishment of the Department.

<< 6 USCA prec. § 551 >>

Subtitle B—Transitional Provisions

<< 6 USCA § 551 >>

SEC. 1511. TRANSITIONAL AUTHORITIES.

(a) PROVISION OF ASSISTANCE BY OFFICIALS.—Until the transfer of an agency to the Department, any official having authority over or functions relating to the agency immediately before the effective date of this Act shall provide to the Secretary such assistance, including the use of personnel and assets, as the Secretary may request in preparing for the transfer and integration of the agency into the Department.

(b) SERVICES AND PERSONNEL.—During the transition period, upon the request of the Secretary, the head of any executive agency may, on a reimbursable basis, provide services or detail personnel to assist with the transition.

(c) ACTING OFFICIALS.—(1) During the transition period, pending the advice and consent of the Senate to the appointment of an officer required by this Act to be appointed by and with such advice and consent, the President may designate any officer whose appointment was required to be made by and with such advice and consent and who was such an officer immediately before the effective date of this Act (and who continues in office) or immediately before such designation, to act in such office until the same is filled as provided in this Act. While so acting, such officers shall receive compensation at the higher of—

(A) the rates provided by this Act for the respective offices in which they act; or

(B) the rates provided for the offices held at the time of designation.

(2) Nothing in this Act shall be understood to require the advice and consent of the Senate to the appointment by the President to a position in the Department of any officer whose agency is transferred to the Department pursuant to this Act and whose duties following such transfer are germane to those performed before such transfer.

(d) TRANSFER OF PERSONNEL, ASSETS, OBLIGATIONS, AND FUNCTIONS.—Upon the transfer of an agency to the Department—

(1) the personnel, assets, and obligations held by or available in connection with the agency shall be transferred to the Secretary for appropriate allocation, subject to the approval of the Director of the Office of Management and Budget and in accordance with the provisions of section 1531(a)(2) of title 31, United States Code; and

(2) the Secretary shall have all functions relating to the agency that any other official could by law exercise in relation to the agency immediately before such transfer, and shall have in addition all functions vested in the Secretary by this Act or other law.

(e) PROHIBITION ON USE OF TRANSPORTATION TRUST FUNDS.—

(1) IN GENERAL.—Notwithstanding any other provision of this Act, no funds derived from the Highway Trust Fund, Airport and Airway Trust Fund, Inland Waterway Trust Fund, or Harbor Maintenance Trust Fund, may be transferred to, made available to, or obligated by the Secretary or any other official in the Department.

(2) LIMITATION.—This subsection shall not apply to security-related funds provided to the Federal Aviation Administration for fiscal years preceding fiscal year 2003 for (A) operations, (B) facilities and equipment, or (C) research, engineering, and development.

<< 6 USCA § 552 >>

SEC. 1512. SAVINGS PROVISIONS.

(a) COMPLETED ADMINISTRATIVE ACTIONS.—(1) Completed administrative actions of an agency shall not be affected by the enactment of this Act or the transfer of such agency to the Department, but shall continue in effect according to their terms until amended, modified, superseded, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction, or by operation of law.

(2) For purposes of paragraph (1), the term "completed administrative action" includes orders, determinations, rules, regulations, personnel actions, permits, agreements, grants, contracts, certificates, licenses, registrations, and privileges.

(b) PENDING PROCEEDINGS.—Subject to the authority of the Secretary under this Act—

(1) pending proceedings in an agency, including notices of proposed rulemaking, and applications for licenses, permits, certificates, grants, and financial assistance, shall continue notwithstanding the enactment of this Act or the transfer of the agency to the Department, unless discontinued or modified under the same terms and conditions and to the same extent that such discontinuance could have occurred if such enactment or transfer had not occurred; and

(2) orders issued in such proceedings, and appeals therefrom, and payments made pursuant to such orders, shall issue in the same manner and on the same terms as if this Act had not been enacted or the agency had not been transferred, and any such orders shall continue in effect until amended, modified, superseded, terminated, set aside, or revoked by an officer of the United States or a court of competent jurisdiction, or by operation of law.

(c) PENDING CIVIL ACTIONS.—Subject to the authority of the Secretary under this Act, pending civil actions shall continue notwithstanding the enactment of this Act or the transfer of an agency to the Department, and in such civil actions, proceedings shall be had, appeals taken, and judgments rendered and enforced in the same manner and with the same effect as if such enactment or transfer had not occurred.

(d) REFERENCES.—References relating to an agency that is transferred to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this Act shall be deemed to refer, as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions. Statutory reporting requirements that applied in relation to such an agency immediately before the effective date of this Act shall continue to apply following such transfer if they refer to the agency by name.

(e) EMPLOYMENT PROVISIONS.—(1) Notwithstanding the generality of the foregoing (including subsections (a) and (d)), in and for the Department the Secretary may, in regulations prescribed jointly with the Director of the Office of Personnel

Management, adopt the rules, procedures, terms, and conditions, established by statute, rule, or regulation before the effective date of this Act, relating to employment in any agency transferred to the Department pursuant to this Act; and

 (2) except as otherwise provided in this Act, or under authority granted by this Act, the transfer pursuant to this Act of personnel shall not alter the terms and conditions of employment, including compensation, of any employee so transferred.

 (f)  STATUTORY  REPORTING  REQUIREMENTS.—Any  statutory  reporting  requirement  that  applied  to  an  agency, transferred to the Department under this Act, immediately before the effective date of this Act shall continue to apply following that transfer if the statutory requirement refers to the agency by name.

<< 6 USCA § 553 >>

SEC. 1513. TERMINATIONS.

 Except as otherwise provided in this Act, whenever all the functions vested by law in any agency have been transferred pursuant to this Act, each position and office the incumbent of which was authorized to receive compensation at the rates prescribed for an office or position at level II, III, IV, or V, of the Executive Schedule, shall terminate.

<< 6 USCA § 554 >>

SEC. 1514. NATIONAL IDENTIFICATION SYSTEM NOT AUTHORIZED.

 Nothing in this Act shall be construed to authorize the development of a national identification system or card.

<< 6 USCA § 555 >>

SEC. 1515. CONTINUITY OF INSPECTOR GENERAL OVERSIGHT.

 Notwithstanding the transfer of an agency to the Department pursuant to this Act, the Inspector General that exercised oversight of such agency prior to such transfer shall continue to exercise oversight of such agency during the period of time, if any, between the transfer of such agency to the Department pursuant to this Act and the appointment of the Inspector General of the Department of Homeland Security in accordance with section 103(b).

<< 6 USCA § 556 >>

SEC. 1516. INCIDENTAL TRANSFERS.

 The Director of the Office of Management and Budget, in consultation with the Secretary, is authorized and directed to make such additional incidental dispositions of personnel, assets, and liabilities held, used, arising from, available, or to be made available, in connection with the functions transferred by this Act, as the Director may determine necessary to accomplish the purposes of this Act.

<< 6 USCA § 557 >>

SEC. 1517. REFERENCE.

 With respect to any function transferred by or under this Act (including under a reorganization plan that becomes effective under section 1502) and exercised on or after the effective date of this Act, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

   TITLE XVI—CORRECTIONS TO EXISTING LAW RELATING TO AIRLINE TRANSPORTATION SECURITY

SEC.  1601.  RETENTION  OF  SECURITY  SENSITIVE  INFORMATION  AUTHORITY  AT  DEPARTMENT  OF TRANSPORTATION.

(a) Section 40119 of title 49, United States Code, is amended—

<< 49 USCA § 40119 >>

(1) in subsection (a)—
 (A) by inserting "and the Administrator of the Federal Aviation Administration each" after "for Security"; and
 (B) by striking "criminal violence and aircraft piracy" and inserting "criminal violence, aircraft piracy, and terrorism and to ensure security"; and
(2) in subsection (b)(1)—

<< 49 USCA § 40119 >>

 (A) by striking ", the Under Secretary" and inserting "and the establishment of a Department of Homeland Security, the Secretary of Transportation";

<< 49 USCA § 40119 >>

 (B) by striking "carrying out" and all that follows through "if the Under Secretary" and inserting "ensuring security under this title if the Secretary of Transportation"; and

<< 49 USCA § 40119 >>

 (C) in subparagraph (C) by striking "the safety of passengers in transportation" and inserting "transportation safety".

<< 49 USCA § 114 >>

(b) Section 114 of title 49, United States Code, is amended by adding at the end the following:
"(s) NONDISCLOSURE OF SECURITY ACTIVITIES.—
 "(1) IN GENERAL.—Notwithstanding section 552 of title 5, the Under Secretary shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act (Public Law 107–71) or under chapter 449 of this title if the Under Secretary decides that disclosing the information would—
 "(A) be an unwarranted invasion of personal privacy;
 "(B) reveal a trade secret or privileged or confidential commercial or financial information; or
 "(C) be detrimental to the security of transportation.
 "(2) AVAILABILITY OF INFORMATION TO CONGRESS.—Paragraph (1) does not authorize information to be withheld from a committee of Congress authorized to have the information.
 "(3) LIMITATION ON TRANSFERABILITY OF DUTIES.—Except as otherwise provided by law, the Under Secretary may not transfer a duty or power under this subsection to another department, agency, or instrumentality of the United States.".

<< 49 USCA § 46301 >>

SEC. 1602. INCREASE IN CIVIL PENALTIES.

Section 46301(a) of title 49, United States Code, is amended by adding at the end the following:
 "(8) AVIATION SECURITY VIOLATIONS.—Notwithstanding paragraphs (1) and (2) of this subsection, the maximum civil penalty for violating chapter 449 or another requirement under this title administered by the Under Secretary of Transportation for Security shall be $10,000; except that the maximum civil penalty shall be $25,000 in the case of a person operating an aircraft for the transportation of passengers or property for compensation (except an individual serving as an airman).".

<< 49 USCA § 44935 >>

SEC. 1603. ALLOWING UNITED STATES CITIZENS AND UNITED STATES NATIONALS AS SCREENERS.

Section 44935(e)(2)(A)(ii) of title 49, United States Code, is amended by striking "citizen of the United States" and inserting "citizen of the United States or a national of the United States, as defined in section 1101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))".

## TITLE XVII—CONFORMING AND TECHNICAL AMENDMENTS

<< 5 USCA App. 3 § 11 >>

### SEC. 1701. INSPECTOR GENERAL ACT OF 1978.

Section 11 of the Inspector General Act of 1978 (Public Law 95–452) is amended—
  (1) by inserting "Homeland Security," after "Transportation," each place it appears; and
  (2) by striking "; and" each place it appears in paragraph (1) and inserting ";".

### SEC. 1702. EXECUTIVE SCHEDULE.

(a) IN GENERAL.—Title 5, United States Code, is amended—

<< 5 USCA § 5312 >>

(1) in section 5312, by inserting "Secretary of Homeland Security." as a new item after "Affairs.";

<< 5 USCA § 5313 >>

(2) in section 5313, by inserting "Deputy Secretary of Homeland Security." as a new item after "Affairs.";

<< 5 USCA § 5314 >>

(3) in section 5314, by inserting "Under Secretaries, Department of Homeland Security.", "Director of the Bureau of Citizenship and Immigration Services." as new items after "Affairs." the third place it appears;

<< 5 USCA § 5315 >>

(4) in section 5315, by inserting "Assistant Secretaries, Department of Homeland Security.", "General Counsel, Department of Homeland Security.", "Officer for Civil Rights and Civil Liberties, Department of Homeland Security.", "Chief Financial Officer, Department of Homeland Security.", "Chief Information Officer, Department of Homeland Security.", and "Inspector General, Department of Homeland Security." as new items after "Affairs." the first place it appears; and

<< 5 USCA § 5315 >>

(5) in section 5315, by striking "Commissioner of Immigration and Naturalization, Department of Justice.".

<< 5 USCA § 5315 NOTE >>

(b) SPECIAL EFFECTIVE DATE.—Notwithstanding section 4, the amendment made by subsection (a)(5) shall take effect on the date on which the transfer of functions specified under section 441 takes effect.

### SEC. 1703. UNITED STATES SECRET SERVICE.

<< 3 USCA § 202 >>

<< 18 USCA § 3056 >>

(a) IN GENERAL.—(1) The United States Code is amended in section 202 of title 3, and in section 3056 of title 18, by striking "of the Treasury", each place it appears and inserting "of Homeland Security".

<< 3 USCA § 208 >>

(2) Section 208 of title 3, United States Code, is amended by striking "of Treasury" each place it appears and inserting "of Homeland Security".

<< 3 USCA § 202 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of transfer of the United States Secret Service to the Department.

SEC. 1704. COAST GUARD.

<< 14 USCA §§ 1, 3, 669 >>

<< 14 USCA § 673a >>

<< 14 USCA § 53 >>

<< 14 USCA § 95 >>

<< 14 USCA § 145 >>

<< 14 USCA § 516 >>

<< 14 USCA § 666 >>

<< 14 USCA § 673 >>

<< 14 USCA § 674 >>

<< 14 USCA § 687 >>

<< 14 USCA § 688 >>

(a) TITLE 14, UNITED STATES CODE.—Title 14, United States Code, is amended in sections 1, 3, 53, 95, 145, 516, 666, 669, 673, 673a (as redesignated by subsection (e)(1)), 674, 687, and 688 by striking "of Transportation" each place it appears and inserting "of Homeland Security".

<< 10 USCA §§ 379, 717, 888, 1034, 1090, 1124, 1143, 1144, 1148, 1149, 1153, 1175, 1510, 1589, 2578, 2734a, 2775, 2835, 2836, 10150, 12304, 18501 >>

<< 10 USCA § 101 >>

<< 10 USCA § 130b >>

<< 10 USCA § 130b >>

<< 10 USCA § 130c >>

<< 10 USCA § 513 >>

<< 10 USCA § 575 >>

<< 10 USCA § 580 >>

151

<< 10 USCA § 580a >>

<< 10 USCA § 651 >>

<< 10 USCA § 671 >>

<< 10 USCA § 708 >>

<< 10 USCA § 716 >>

<< 10 USCA § 806 >>

<< 10 USCA § 815 >>

<< 10 USCA § 946 >>

<< 10 USCA § 973 >>

<< 10 USCA § 978 >>

<< 10 USCA § 983 >>

<< 10 USCA § 985 >>

<< 10 USCA § 1033 >>

<< 10 USCA § 1033 >>

<< 10 USCA § 1037 >>

<< 10 USCA § 1044d >>

<< 10 USCA § 1058 >>

<< 10 USCA § 1059 >>

<< 10 USCA § 1059 >>

<< 10 USCA § 1073 >>

<< 10 USCA § 1074 >>

<< 10 USCA § 1089 >>

<< 10 USCA § 1091 >>

<< 10 USCA § 1143a >>

<< 10 USCA § 1145 >>

<< 10 USCA § 1150 >>

<< 10 USCA § 1152 >>

<< 10 USCA § 1152 >>

<< 10 USCA § 1212 >>

<< 10 USCA § 1408 >>

<< 10 USCA § 1408 >>

<< 10 USCA § 1463 >>

<< 10 USCA § 1482a >>

<< 10 USCA § 1552 >>

<< 10 USCA § 1565 >>

<< 10 USCA § 1588 >>

<< 10 USCA § 2002 >>

<< 10 USCA § 2302 >>

<< 10 USCA § 2306b >>

<< 10 USCA § 2323 >>

<< 10 USCA § 2376 >>

<< 10 USCA § 2396 >>

<< 10 USCA § 2410a >>

<< 10 USCA § 2572 >>

<< 10 USCA § 2575 >>

<< 10 USCA § 2601 >>

<< 10 USCA § 2634 >>

<< 10 USCA § 2635 >>

<< 10 USCA § 2734 >>

<< 10 USCA § 2830 >>

<< 10 USCA § 4745 >>

<< 10 USCA § 5013a >>

<< 10 USCA § 7361 >>

<< 10 USCA § 10143 >>

<< 10 USCA § 10146 >>

<< 10 USCA § 10147 >>

<< 10 USCA § 10149 >>

<< 10 USCA § 10202 >>

<< 10 USCA § 10203 >>

<< 10 USCA § 10205 >>

<< 10 USCA § 10301 >>

<< 10 USCA § 12103 >>

<< 10 USCA § 12103 >>

<< 10 USCA § 12311 >>

<< 10 USCA § 12522 >>

<< 10 USCA § 12527 >>

<< 10 USCA § 12731 >>

<< 10 USCA § 12731a >>

<< 10 USCA § 16131 >>

<< 10 USCA § 16136 >>

<< 10 USCA § 16301 >>

 (b) TITLE 10, UNITED STATES CODE.—(1) Title 10, United States Code, is amended in sections 101(9), 130b(a), 130b(c)(4), 130c(h)(1), 379, 513(d), 575(b)(2), 580(e)(6), 580a(e), 651(a), 671(c)(2), 708(a), 716(a), 717, 806(d)(2), 815(e), 888, 946(c)(1), 973(d), 978(d), 983(b)(1), 985(a), 1033(d), 1033(b)(1), 1034, 1037(c), 1044d(f), 1058(c), 1059(a), 1059(k)(1), 1073(a), 1074(c)(1), 1089(g)(2), 1090, 1091(a), 1124, 1143, 1143a(h), 1144, 1145(e), 1148, 1149, 1150(c), 1152(a), 1152(d)(1), 1153, 1175, 1212(a), 1408(h)(2), 1408(h)(8), 1463(a)(2), 1482a(b), 1510, 1552(a)(1), 1565(f), 1588(f)(4), 1589, 2002(a), 2302(1), 2306b(b), 2323(j)(2), 2376(2), 2396(b)(1), 2410a(a), 2572(a), 2575(a), 2578, 2601(b)(4), 2634(e), 2635(a), 2734(g), 2734a, 2775, 2830(b)(2), 2835, 2836, 4745(a), 5013a(a), 7361(b), 10143(b)(2), 10146(a), 10147(a), 10149(b), 10150, 10202(b), 10203(d), 10205(b), 10301(b), 12103(b), 12103(d), 12304, 12311(c), 12522(c), 12527(a)(2), 12731(b), 12731a(e), 16131(b), 16136(a), 16301(g), and 18501 by striking "of Transportation" each place it appears and inserting "of Homeland Security".

<< 10 USCA § 801 >>

 (2) Section 801(1) of such title is amended by striking "the General Counsel of the Department of Transportation" and inserting "an official designated to serve as Judge Advocate General of the Coast Guard by the Secretary of Homeland Security".

<< 10 USCA § 983 >>

 (3) Section 983(d)(2)(B) of such title is amended by striking "Department of Transportation" and inserting "Department of Homeland Security".

<< 10 USCA § 2665 >>

 (4) Section 2665(b) of such title is amended by striking "Department of Transportation" and inserting "Department in which the Coast Guard is operating".

(5) Section 7045 of such title is amended—

<< 10 USCA § 7045 >>

  (A) in subsections (a)(1) and (b), by striking "Secretaries of the Army, Air Force, and Transportation" both places it appears and inserting "Secretary of the Army, the Secretary of the Air Force, and the Secretary of Homeland Security"; and

<< 10 USCA § 7045 >>

  (B) in subsection (b), by striking "Department of Transportation" and inserting "Department of Homeland Security".

<< 10 USCA § 7361 >>

  (6) Section 7361(b) of such title is amended in the subsection heading by striking "TRANSPORTATION" and inserting "HOMELAND SECURITY".

<< 10 USCA § 12522 >>

  (7) Section 12522(c) of such title is amended in the subsection heading by striking "TRANSPORTATION" and inserting "HOMELAND SECURITY".

<< 37 USCA § 703 >>

<< 37 USCA § 101 >>

<< 37 USCA § 204 >>

<< 37 USCA § 301a >>

<< 37 USCA § 306 >>

<< 37 USCA § 307 >>

<< 37 USCA § 308 >>

<< 37 USCA § 308 >>

<< 37 USCA § 308 >>

<< 37 USCA § 308b >>

<< 37 USCA § 308c >>

<< 37 USCA § 308d >>

<< 37 USCA § 308e >>

<< 37 USCA § 308g >>

<< 37 USCA § 308h >>

<< 37 USCA § 308i >>

<< 37 USCA § 309 >>

<< 37 USCA § 316 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 37 USCA § 323 >>

<< 37 USCA § 323 >>

<< 37 USCA § 325 >>

<< 37 USCA § 402 >>

<< 37 USCA § 402a >>

<< 37 USCA § 403 >>

<< 37 USCA § 403 >>

<< 37 USCA § 403b >>

<< 37 USCA § 406 >>

<< 37 USCA § 417 >>

<< 37 USCA § 417 >>

<< 37 USCA § 418 >>

<< 37 USCA § 1001 >>

<< 37 USCA § 1006 >>

<< 37 USCA § 1007 >>

<< 37 USCA § 1011 >>

 (c) TITLE 37, UNITED STATES CODE.—Title 37, United States Code, is amended in sections 101(5), 204(i)(4), 301a(a)
(3), 306(d), 307(c), 308(a)(1), 308(d)(2), 308(f), 308b(e), 308c(c), 308d(a), 308e(f), 308g(g), 308h(f), 308i(e), 309(d), 316(d),
323(b), 323(g)(1), 325(i), 402(d), 402a(g)(1), 403(f)(3), 403(l)(1), 403b(i)(5), 406(b)(1), 417(a), 417(b), 418(a), 703, 1001(c),
1006(f), 1007(a), and 1011(d) by striking "of Transportation" each place it appears and inserting "of Homeland Security".

<< 38 USCA § 101 >>

<< 38 USCA § 1560 >>

<< 38 USCA § 3002 >>

<< 38 USCA § 3011 >>

<< 38 USCA § 3011 >>

<< 38 USCA § 3011 >>

<< 38 USCA § 3011 >>

<< 38 USCA § 3012 >>

<< 38 USCA § 3012 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 38 USCA § 3018 >>

<< 38 USCA § 3018A >>

<< 38 USCA § 3018B >>

<< 38 USCA § 3018B >>

<< 38 USCA § 3018C >>

<< 38 USCA § 3020 >>

<< 38 USCA § 3035 >>

<< 38 USCA § 3035 >>

<< 38 USCA § 3035 >>

<< 38 USCA § 3035 >>

<< 38 USCA § 3680A >>

<< 38 USCA § 6105 >>

(d) TITLE 38, UNITED STATES CODE.—Title 38, United States Code, is amended in sections 101(25)(d), 1560(a), 3002(5), 3011(a)(1)(A)(ii)(I), 3011(a)(1)(A)(ii)(II), 3011(a)(1)(B)(ii)(III), 3011(a)(1)(C)(iii)(II)(cc), 3012(b)(1)(A)(v), 3012(b)(1)(B)(ii) (V), 3018(b)(3)(B)(iv), 3018A(a)(3), 3018B(a)(1)(C), 3018B(a)(2)(C), 3018C(a)(5), 3020(m), 3035(b)(2), 3035(c), 3035(d), 3035(e), 3680A(g), and 6105(c) by striking "of Transportation" each place it appears and inserting "of Homeland Security".

(e) OTHER DEFENSE–RELATED LAWS.—(1) Section 363 of Public Law 104–193 (110 Stat. 2247) is amended—

<< 10 USCA § 113 NOTE >>

(A) in subsection (a)(1) (10 U.S.C. 113 note), by striking "of Transportation" and inserting "of Homeland Security"; and

<< 10 USCA § 704 NOTE >>

(B) in subsection (b)(1) (10 U.S.C. 704 note), by striking "of Transportation" and inserting "of Homeland Security".

<< 10 USCA § 1073 NOTE >>

(2) Section 721(1) of Public Law 104–201 (10 U.S.C. 1073 note) is amended by striking "of Transportation" and inserting "of Homeland Security".

<< 10 USCA § 1143a NOTE >>

(3) Section 4463(a) of Public Law 102–484 (10 U.S.C. 1143a note) is amended by striking "after consultation with the Secretary of Transportation".

<< 10 USCA § 1143 NOTE >>

(4) Section 4466(h) of Public Law 102–484 (10 U.S.C. 1143 note) is amended by striking "of Transportation" and inserting "of Homeland Security".

<< 10 USCA § 1293 NOTE >>

(5) Section 542(d) of Public Law 103–337 (10 U.S.C. 1293 note) is amended by striking "of Transportation" and inserting "of Homeland Security".

<< 10 USCA § 2576 NOTE >>

(6) Section 740 of Public Law 106–181 (10 U.S.C. 2576 note) is amended in subsections (b)(2), (c), and (d)(1) by striking "of Transportation" each place it appears and inserting "of Homeland Security".

<< 20 USCA § 926 >>

(7) Section 1407(b)(2) of the Defense Dependents' Education Act of 1978 (20 U.S.C. 926(b)) is amended by striking "of Transportation" both places it appears and inserting "of Homeland Security".

<< 20 USCA § 6671 >>

(8) Section 2301(5)(D) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6671(5)(D)) is amended by striking "of Transportation" and inserting "of Homeland Security".

<< 20 USCA § 6677 >>

(9) Section 2307(a) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6677(a)) is amended by striking "of Transportation" and inserting "of Homeland Security".

<< 21 USCA § 1505a >>

(10) Section 1034(a) of Public Law 105–85 (21 U.S.C. 1505a(a)) is amended by striking "of Transportation" and inserting "of Homeland Security".

(11) The Military Selective Service Act is amended—

<< 50 App. USCA § 454 >>

(A) in section 4(a) (50 U.S.C. App. 454(a)), by striking "of Transportation" in the fourth paragraph and inserting "of Homeland Security";

<< 50 App. USCA § 454 >>

(B) in section 4(b) (50 U.S.C. App. 454(b)), by striking "of Transportation" both places it appears and inserting "of Homeland Security";

<< 50 App. USCA § 456 >>

(C) in section 6(d)(1) (50 U.S.C. App. 456(d)(1)), by striking "of Transportation" both places it appears and inserting "of Homeland Security";

<< 50 App. USCA § 459 >>

(D) in section 9(c) (50 U.S.C. App. 459(c)), by striking "Secretaries of Army, Navy, Air Force, or Transportation" and inserting "Secretary of a military department, and the Secretary of Homeland Security with respect to the Coast Guard,"; and

<< 50 App. USCA § 465 >>

(E) in section 15(e) (50 U.S.C. App. 465(e)), by striking "of Transportation" both places it appears and inserting "of Homeland Security".

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 14 USCA § 673 >>

<< 14 USCA § 673a >>

(f) TECHNICAL CORRECTION.—(1) Title 14, United States Code, is amended by redesignating section 673 (as added by section 309 of Public Law 104–324) as section 673a.

<< 14 USCA prec. § 631 >>

(2) The table of sections at the beginning of chapter 17 of such title is amended by redesignating the item relating to such section as section 673a.

<< 10 USCA § 101 NOTE >>

(g) EFFECTIVE DATE.—The amendments made by this section (other than subsection (f)) shall take effect on the date of transfer of the Coast Guard to the Department.

SEC. 1705. STRATEGIC NATIONAL STOCKPILE AND SMALLPOX VACCINE DEVELOPMENT.

(a) IN GENERAL.—Section 121 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (Public Law 107–188; 42 U.S.C. 300hh–12) is amended—

<< 42 USCA § 300hh–12 >>

(1) in subsection (a)(1)—
  (A) by striking "Secretary of Health and Human Services" and inserting "Secretary of Homeland Security";
  (B) by inserting "the Secretary of Health and Human Services and" between "in coordination with" and "the Secretary of Veterans Affairs"; and
  (C) by inserting "of Health and Human Services" after "as are determined by the Secretary"; and

<< 42 USCA § 300hh–12 >>

(2) in subsections (a)(2) and (b), by inserting "of Health and Human Services" after "Secretary" each place it appears.

<< 42 USCA § 300hh–12 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of transfer of the Strategic National Stockpile of the Department of Health and Human Services to the Department.

SEC. 1706. TRANSFER OF CERTAIN SECURITY AND LAW ENFORCEMENT FUNCTIONS AND AUTHORITIES.

(a) AMENDMENT TO TITLE 40.—Section 581 of title 40, United States Code, is amended—

<< 40 USCA § 581 >>

(1) by striking subsection (a); and
(2) in subsection (b)—

<< 40 USCA § 581 >>

(A) by inserting "and" after the semicolon at the end of paragraph (1);

<< 40 USCA § 581 >>

(B) by striking "; and" at the end of paragraph (2) and inserting a period; and

<< 40 USCA § 581 >>

(C) by striking paragraph (3).

(b) LAW ENFORCEMENT AUTHORITY.—

(1) IN GENERAL.—Section 1315 of title 40, United States Code, is amended to read as follows:

<< 40 USCA § 1315 >>

"§ 1315. Law enforcement authority of Secretary of Homeland Security for protection of public property

"(a) IN GENERAL.—To the extent provided for by transfers made pursuant to the Homeland Security Act of 2002, the Secretary of Homeland Security (in this section referred to as 'Secretary') shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) and the persons on the property.

"(b) OFFICERS AND AGENTS.—

"(1) DESIGNATION.—The Secretary may designate employees of the Department of Homeland Security, including employees transferred to the Department from the Office of the Federal Protective Service of the General Services Administration pursuant to the Homeland Security Act of 2002, as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property.

"(2) POWERS.—While engaged in the performance of official duties, an officer or agent designated under this subsection may—

"(A) enforce Federal laws and regulations for the protection of persons and property;

"(B) carry firearms;

"(C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;

"(D) serve warrants and subpoenas issued under the authority of the United States;

"(E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and

"(F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

"(c) REGULATIONS.—

"(1) IN GENERAL.—The Secretary, in consultation with the Administrator of General Services, may prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property. The regulations may include reasonable penalties, within the limits prescribed in paragraph (2), for violations of the regulations. The regulations shall be posted and remain posted in a conspicuous place on the property.

"(2) PENALTIES.—A person violating a regulation prescribed under this subsection shall be fined under title 18, United States Code, imprisoned for not more than 30 days, or both.

"(d) DETAILS.—

"(1) REQUESTS OF AGENCIES.—On the request of the head of a Federal agency having charge or control of property owned or occupied by the Federal Government, the Secretary may detail officers and agents designated under this section for the protection of the property and persons on the property.

"(2) APPLICABILITY OF REGULATIONS.—The Secretary may—

"(A) extend to property referred to in paragraph (1) the applicability of regulations prescribed under this section and enforce the regulations as provided in this section; or

"(B) utilize the authority and regulations of the requesting agency if agreed to in writing by the agencies.

"(3) FACILITIES AND SERVICES OF OTHER AGENCIES.—When the Secretary determines it to be economical and in the public interest, the Secretary may utilize the facilities and services of Federal, State, and local law enforcement agencies, with the consent of the agencies.

"(e) AUTHORITY OUTSIDE FEDERAL PROPERTY.—For the protection of property owned or occupied by the Federal Government and persons on the property, the Secretary may enter into agreements with Federal agencies and with State and local governments to obtain authority for officers and agents designated under this section to enforce Federal laws and State and local laws concurrently with other Federal law enforcement officers and with State and local law enforcement officers.

"(f) SECRETARY AND ATTORNEY GENERAL APPROVAL.—The powers granted to officers and agents designated under this section shall be exercised in accordance with guidelines approved by the Secretary and the Attorney General.

"(g) LIMITATION ON STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to—

"(1) preclude or limit the authority of any Federal law enforcement agency; or

"(2) restrict the authority of the Administrator of General Services to promulgate regulations affecting property under the Administrator's custody and control.".

<< 40 USCA § 1315 NOTE >>

(2) DELEGATION OF AUTHORITY.—The Secretary may delegate authority for the protection of specific buildings to another Federal agency where, in the Secretary's discretion, the Secretary determines it necessary for the protection of that building.

<< 40 USCA prec. § 1301 >>

(3) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 13 of title 40, United States Code, is amended by striking the item relating to section 1315 and inserting the following:

"1315. Law enforcement authority of Secretary of Homeland Security for protection of public property.".

SEC. 1707. TRANSPORTATION SECURITY REGULATIONS.

Title 49, United States Code, is amended—

<< 49 USCA § 114 >>

(1) in section 114(l)(2)(B), by inserting "for a period not to exceed 90 days" after "effective"; and

<< 49 USCA § 114 >>

(2) in section 114(l)(2)(B), by inserting "ratified or" after "unless".

<< 50 USCA § 1522 NOTE >>

SEC. 1708. NATIONAL BIO–WEAPONS DEFENSE ANALYSIS CENTER.

There is established in the Department of Defense a National Bio–Weapons Defense Analysis Center, whose mission is to develop countermeasures to potential attacks by terrorists using weapons of mass destruction.

SEC. 1709. COLLABORATION WITH THE SECRETARY OF HOMELAND SECURITY.

<< 42 USCA § 262a >>

(a) DEPARTMENT OF HEALTH AND HUMAN SERVICES.—The second sentence of section 351A(e)(1) of the Public Health Service Act (42 U.S.C. 262A(e)(1)) is amended by striking "consultation with" and inserting "collaboration with the Secretary of Homeland Security and".

<< 7 USCA § 8401 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) DEPARTMENT OF AGRICULTURE.—The second sentence of section 212(e)(1) of the Agricultural Bioterrorism Protection Act of 2002 (7 U.S.C. 8401) is amended by striking "consultation with" and inserting "collaboration with the Secretary of Homeland Security and".

SEC. 1710. RAILROAD SAFETY TO INCLUDE RAILROAD SECURITY.

(a) INVESTIGATION AND SURVEILLANCE ACTIVITIES.—Section 20105 of title 49, United States Code, is amended—

<< 49 USCA § 20105 >>

(1) by striking "Secretary of Transportation" in the first sentence of subsection (a) and inserting "Secretary concerned";

<< 49 USCA § 20105 >>

(2) by striking "Secretary" each place it appears (except the first sentence of subsection (a)) and inserting "Secretary concerned";

<< 49 USCA § 20105 >>

(3) by striking "Secretary's duties under chapters 203–213 of this title" in subsection (d) and inserting "duties under chapters 203–213 of this title (in the case of the Secretary of Transportation) and duties under section 114 of this title (in the case of the Secretary of Homeland Security)";

<< 49 USCA § 20105 >>

(4) by striking "chapter." in subsection (f) and inserting "chapter (in the case of the Secretary of Transportation) and duties under section 114 of this title (in the case of the Secretary of Homeland Security)."; and

<< 49 USCA § 20105 >>

(5) by adding at the end the following new subsection:
"(g) DEFINITIONS.—In this section—
"(1) the term 'safety' includes security; and
"(2) the term 'Secretary concerned' means—
"(A) the Secretary of Transportation, with respect to railroad safety matters concerning such Secretary under laws administered by that Secretary; and
"(B) the Secretary of Homeland Security, with respect to railroad safety matters concerning such Secretary under laws administered by that Secretary.".

<< 49 USCA § 20103 >>

(b) REGULATIONS AND ORDERS.—Section 20103(a) of such title is amended by inserting after "1970." the following: "When prescribing a security regulation or issuing a security order that affects the safety of railroad operations, the Secretary of Homeland Security shall consult with the Secretary.".

<< 49 USCA § 20106 >>

(c) NATIONAL UNIFORMITY OF REGULATION.—Section 20106 of such title is amended—
(1) by inserting "and laws, regulations, and orders related to railroad security" after "safety" in the first sentence;
(2) by inserting "or security" after "safety" each place it appears after the first sentence; and
(3) by striking "Transportation" in the second sentence and inserting "Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters),".

SEC. 1711. HAZMAT SAFETY TO INCLUDE HAZMAT SECURITY.

(a) GENERAL REGULATORY AUTHORITY.—Section 5103 of title 49, United States Code, is amended—

<< 49 USCA § 5103 >>

(1) by striking "transportation" the first place it appears in subsection (b)(1) and inserting "transportation, including security,";

<< 49 USCA § 5103 >>

(2) by striking "aspects" in subsection (b)(1)(B) and inserting "aspects, including security,"; and

<< 49 USCA § 5103 >>

(3) by adding at the end the following:
  "(C) CONSULTATION.—When prescribing a security regulation or issuing a security order that affects the safety of the transportation of hazardous material, the Secretary of Homeland Security shall consult with the Secretary.".
(b) PREEMPTION.—Section 5125 of that title is amended—

<< 49 USCA § 5125 >>

(1) by striking "chapter or a regulation prescribed under this chapter" in subsection (a)(1) and inserting "chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security";

<< 49 USCA § 5125 >>

(2) by striking "chapter or a regulation prescribed under this chapter." in subsection (a)(2) and inserting "chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security."; and

<< 49 USCA § 5125 >>

(3) by striking "chapter or a regulation prescribed under this chapter," in subsection (b)(1) and inserting "chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security,".

SEC. 1712. OFFICE OF SCIENCE AND TECHNOLOGY POLICY.

The National Science and Technology Policy, Organization, and Priorities Act of 1976 is amended—

<< 42 USCA § 6613 >>

(1) in section 204(b)(1) (42 U.S.C. 6613(b)(1)), by inserting "homeland security," after "national security,"; and

<< 42 USCA § 6617 >>

(2) in section 208(a)(1) (42 U.S.C. 6617(a)(1)), by inserting "the Office of Homeland Security," after "National Security Council,".

<< 10 USCA § 7902 >>

SEC. 1713. NATIONAL OCEANOGRAPHIC PARTNERSHIP PROGRAM.

Section 7902(b) of title 10, United States Code, is amended by adding at the end the following new paragraphs:

AR.02323

"(13) The Under Secretary for Science and Technology of the Department of Homeland Security.

"(14) Other Federal officials the Council considers appropriate.".

<< 42 USCA § 300aa–33 >>

## SEC. 1714. CLARIFICATION OF DEFINITION OF MANUFACTURER.

Section 2133(3) of the Public Health Service Act (42 U.S.C. 300aa–33(3)) is amended—

  (1) in the first sentence, by striking "under its label any vaccine set forth in the Vaccine Injury Table" and inserting "any vaccine set forth in the Vaccine Injury table, including any component or ingredient of any such vaccine"; and

  (2) in the second sentence, by inserting "including any component or ingredient of any such vaccine" before the period.

<< 42 USCA § 300aa–33 >>

## SEC. 1715. CLARIFICATION OF DEFINITION OF VACCINE-RELATED INJURY OR DEATH.

Section 2133(5) of the Public Health Service Act (42 U.S.C. 300aa–33(5)) is amended by adding at the end the following: "For purposes of the preceding sentence, an adulterant or contaminant shall not include any component or ingredient listed in a vaccine's product license application or product label.".

<< 42 USCA § 300aa–33 >>

## SEC. 1716. CLARIFICATION OF DEFINITION OF VACCINE.

Section 2133 of the Public Health Service Act (42 U.S.C. 300aa–33) is amended by adding at the end the following:

  "(7) The term 'vaccine' means any preparation or suspension, including but not limited to a preparation or suspension containing an attenuated or inactive microorganism or subunit thereof or toxin, developed or administered to produce or enhance the body's immune response to a disease or diseases and includes all components and ingredients listed in the vaccines's product license application and product label.".

<< 42 USCA § 300aa–33 NOTE >>

## SEC. 1717. EFFECTIVE DATE.

The amendments made by sections 1714, 1715, and 1716 shall apply to all actions or proceedings pending on or after the date of enactment of this Act, unless a court of competent jurisdiction has entered judgment (regardless of whether the time for appeal has expired) in such action or proceeding disposing of the entire action or proceeding.

Approved November 25, 2002.

LEGISLATIVE HISTORY—H.R. 5005 (S. 2452):

HOUSE REPORTS: No. 107–609, Pt. 1 (Select Comm. on Homeland Security).

SENATE REPORTS: No. 107–175 accompanying S. 2452 (Comm. on Governmental Affairs).

CONGRESSIONAL RECORD, Vol. 148 (2002):

July 25, 26, considered and passed House.

Sept. 4, 5, 9, 10, 12, 13, 17–19, 23–26, 30, Oct. 1, 13–15, 19, considered and passed Senate, amended.

Nov. 22, House concurred in Senate smendmnet.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 38 (2002):

Nov. 25, Presidential remarks and statement.

PL 107–296, 2002 HR 5005

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 105−277, October 21, 1998, 112 Stat 2681

UNITED STATES PUBLIC LAWS

105th Congress - Second Session

Convening January 27, 1998

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed.

PL 105−277 (HR 4328)

October 21, 1998

OMNIBUS CONSOLIDATED AND EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT, 1999

An Act making omnibus consolidated and emergency appropriations for the fiscal year ending September 30, 1999, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

DIVISION A—OMNIBUS CONSOLIDATED APPROPRIATIONS

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1999, and for other purposes, namely:

SEC. 101(a). For programs, projects or activities in the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

An Act making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies programs for the fiscal year ending September 30, 1999, and for other purposes.

TITLE I

AGRICULTURAL PROGRAMS

PRODUCTION, PROCESSING, AND MARKETING

OFFICE OF THE SECRETARY

(INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of the Office of the Secretary of Agriculture, and not to exceed $75,000 for employment under 5 U.S.C. 3109, $2,836,000: *Provided,* That not to exceed $11,000 of this amount, along with any unobligated balances of representation funds in the Foreign Agricultural Service, shall be available for official reception and representation expenses, not otherwise provided for, as determined by the Secretary: *Provided further,* That none of the funds appropriated or otherwise made available by this Act may be used to pay the salaries and expenses of personnel of the Department of Agriculture to carry out section 793(c)(1)(C) of Public Law 104−127: *Provided further,* That none of the funds made available by this Act may be used to enforce section 793(d) of Public Law 104−127.

EXECUTIVE OPERATIONS

CHIEF ECONOMIST

AR.02326

For necessary expenses of the Chief Economist, including economic analysis, risk assessment, cost-benefit analysis, and the functions of the World Agricultural Outlook Board, as authorized by the Agricultural Marketing Act of 1946 (7 U.S.C. 1622g), and including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $5,000 is for employment under 5 U.S.C. 3109, $5,620,000.

## NATIONAL APPEALS DIVISION

For necessary expenses of the National Appeals Division, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $25,000 is for employment under 5 U.S.C. 3109, $11,718,000.

## OFFICE OF BUDGET AND PROGRAM ANALYSIS

For necessary expenses of the Office of Budget and Program Analysis, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $5,000 is for employment under 5 U.S.C. 3109, $6,120,000.

## OFFICE OF THE CHIEF INFORMATION OFFICER

For necessary expenses of the Office of the Chief Information Officer, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $10,000 is for employment under 5 U.S.C. 3109, $5,551,000.

## OFFICE OF THE CHIEF FINANCIAL OFFICER

For necessary expenses of the Office of the Chief Financial Officer, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $10,000 is for employment under 5 U.S.C. 3109, $4,283,000: *Provided,* That the Chief Financial Officer shall actively market cross-servicing activities of the National Finance Center.

## OFFICE OF THE ASSISTANT SECRETARY FOR ADMINISTRATION

For necessary salaries and expenses of the Office of the Assistant Secretary for Administration to carry out the programs funded by this Act, $613,000.

## AGRICULTURE BUILDINGS AND FACILITIES AND RENTAL PAYMENTS

### (INCLUDING TRANSFERS OF FUNDS)

For payment of space rental and related costs pursuant to Public Law 92–313, including authorities pursuant to the 1984 delegation of authority from the Administrator of General Services to the Department of Agriculture under 40 U.S.C. 486, for programs and activities of the Department which are included in this Act, and for the operation, maintenance, and repair of Agriculture buildings, $132,184,000: *Provided,* That in the event an agency within the Department should require modification of space needs, the Secretary of Agriculture may transfer a share of that agency's appropriation made available by this Act to this appropriation, or may transfer a share of this appropriation to that agency's appropriation, but such transfers shall not exceed 5 percent of the funds made available for space rental and related costs to or from this account. In addition, for construction, repair, improvement, extension, alteration, and purchase of fixed equipment or facilities as necessary to carry out the programs of the Department, where not otherwise provided, $5,000,000, to remain available until expended; making a total appropriation of $137,184,000.

## HAZARDOUS WASTE MANAGEMENT

### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of the Department of Agriculture, to comply with the requirement of section 107(g) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9607(g), and section 6001 of the Resource Conservation and Recovery Act, 42 U.S.C. 6961, $15,700,000, to remain available until expended: *Provided,* That appropriations and funds available herein to the Department for Hazardous Waste Management may be transferred to any agency of the Department for its use in meeting all requirements pursuant to the above Acts on Federal and non-Federal lands.

## DEPARTMENTAL ADMINISTRATION

### (INCLUDING TRANSFERS OF FUNDS)

For Departmental Administration, $32,168,000, to provide for necessary expenses for management support services to offices of the Department and for general administration and disaster management of the Department, repairs and alterations, and other miscellaneous supplies and expenses not otherwise provided for and necessary for the practical and efficient work of the Department, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $10,000 is for employment under 5 U.S.C. 3109: *Provided,* That this appropriation shall be reimbursed from applicable appropriations in this Act for travel expenses incident to the holding of hearings as required by 5 U.S.C. 551–558.

## OUTREACH FOR SOCIALLY DISADVANTAGED FARMERS

For grants and contracts pursuant to section 2501 of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279), $3,000,000, to remain available until expended.

## OFFICE OF THE ASSISTANT SECRETARY FOR CONGRESSIONAL RELATIONS

### (INCLUDING TRANSFERS OF FUNDS)

For necessary salaries and expenses of the Office of the Assistant Secretary for Congressional Relations to carry out the programs funded by this Act, including programs involving intergovernmental affairs and liaison within the executive branch, $3,668,000: *Provided,* That no other funds appropriated to the Department by this Act shall be available to the Department for support of activities of congressional relations: *Provided further,* That not less than $2,241,000 shall be transferred to agencies funded by this Act to maintain personnel at the agency level.

## OFFICE OF COMMUNICATIONS

For necessary expenses to carry on services relating to the coordination of programs involving public affairs, for the dissemination of agricultural information, and the coordination of information, work, and programs authorized by Congress in the Department, $8,138,000, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), of which not to exceed $10,000 shall be available for employment under 5 U.S.C. 3109, and not to exceed $2,000,000 may be used for farmers' bulletins.

## OFFICE OF THE INSPECTOR GENERAL

### (INCLUDING TRANSFERS OF FUNDS)

### << 7 USCA § 2270a >>

For necessary expenses of the Office of the Inspector General, including employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and the Inspector General Act of 1978, $65,128,000, including such sums as may be necessary for contracting and other arrangements with public agencies and private persons pursuant to section 6(a)(9) of the Inspector General Act of 1978, including a sum not to exceed $50,000 for employment under 5 U.S.C. 3109; and including a sum not to exceed $100,000 for certain confidential operational expenses, including the payment of informants, to be expended under the direction of the Inspector General pursuant to Public Law 95–452 and section 1337 of Public Law 97–98: *Provided,* That for fiscal year 1999 and thereafter, funds transferred to the Office of the Inspector General through forfeiture proceedings or from the Department of Justice Assets Forfeiture Fund or the Department of the Treasury Forfeiture Fund, as a participating agency, as an equitable share from the forfeiture of property in investigations in which the Office of the Inspector General participates, or through the granting of a Petition for Remission or Mitigation, shall be deposited to the credit of this account for law enforcement activities authorized under the Inspector General Act of 1978, to remain available until expended.

## OFFICE OF THE GENERAL COUNSEL

For necessary expenses of the Office of the General Counsel, $29,194,000.

## OFFICE OF THE UNDER SECRETARY FOR RESEARCH, EDUCATION AND ECONOMICS

For necessary salaries and expenses of the Office of the Under Secretary for Research, Education and Economics to administer the laws enacted by the Congress for the Economic Research Service, the National Agricultural Statistics Service, the Agricultural Research Service, and the Cooperative State Research, Education, and Extension Service, $540,000.

## ECONOMIC RESEARCH SERVICE

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Economic Research Service in conducting economic research and analysis, as authorized by the Agricultural Marketing Act of 1946 (7 U.S.C. 1621–1627) and other laws, $65,757,000: *Provided,* That $2,000,000 shall be transferred to and merged with the appropriation for "Food and Nutrition Service, Food Program Administration" for studies and evaluations: *Provided further,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225).

## NATIONAL AGRICULTURAL STATISTICS SERVICE

For necessary expenses of the National Agricultural Statistics Service in conducting statistical reporting and service work, including crop and livestock estimates, statistical coordination and improvements, marketing surveys, and the Census of Agriculture, as authorized by the Agricultural Marketing Act of 1946 (7 U.S.C. 1621–1627), the Census of Agriculture Act of 1997 (Public Law 105–113), and other laws, $103,964,000, of which up to $23,599,000 shall be available until expended for the Census of Agriculture: *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $40,000 shall be available for employment under 5 U.S.C. 3109.

## AGRICULTURAL RESEARCH SERVICE

### (INCLUDING TRANSFERS OF FUNDS)

### << 7 USCA § 2254 >>

For necessary expenses to enable the Agricultural Research Service to perform agricultural research and demonstration relating to production, utilization, marketing, and distribution (not otherwise provided for); home economics or nutrition and consumer use including the acquisition, preservation, and dissemination of agricultural information; and for acquisition of lands by donation, exchange, or purchase at a nominal cost not to exceed $100, and for land exchanges where the lands exchanged shall be of equal value or shall be equalized by a payment of money to the grantor which shall not exceed 25 percent of the total value of the land or interests transferred out of Federal ownership, $785,518,000: *Provided,* That appropriations hereunder shall be available for temporary employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $115,000 shall be available for employment under 5 U.S.C. 3109: *Provided further,* That appropriations hereunder shall be available for the operation and maintenance of aircraft and the purchase of not to exceed one for replacement only: *Provided further,* That appropriations hereunder shall be available pursuant to 7 U.S.C. 2250 for the construction, alteration, and repair of buildings and improvements, but unless otherwise provided, the cost of constructing any one building shall not exceed $250,000, except for headhouses or greenhouses which shall each be limited to $1,000,000, and except for ten buildings to be constructed or improved at a cost not to exceed $500,000 each, and the cost of altering any one building during the fiscal year shall not exceed 10 percent of the current replacement value of the building or $250,000, whichever is greater: *Provided further,* That the limitations on alterations contained in this Act shall not apply to modernization or replacement of existing facilities at Beltsville, Maryland: *Provided further,* That appropriations hereunder shall be available for granting easements at the Beltsville Agricultural Research Center, including an easement to the University of Maryland to construct the Transgenic Animal Facility which upon completion shall be accepted by the Secretary as a gift: *Provided further,* That the foregoing limitations shall not apply to replacement of buildings needed to carry out the Act of April 24, 1948 (21 U.S.C. 113a): *Provided further,* That funds may be received from any State, other political subdivision, organization, or

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

individual for the purpose of establishing or operating any research facility or research project of the Agricultural Research Service, as authorized by law.

None of the funds in the foregoing paragraph shall be available to carry out research related to the production, processing or marketing of tobacco or tobacco products.

In fiscal year 1999, the agency is authorized to charge fees, commensurate with the fair market value, for any permit, easement, lease, or other special use authorization for the occupancy or use of land and facilities (including land and facilities at the Beltsville Agricultural Research Center) issued by the agency, as authorized by law, and such fees shall be credited to this account and shall remain available until expended for authorized purposes.

## BUILDINGS AND FACILITIES

For acquisition of land, construction, repair, improvement, extension, alteration, and purchase of fixed equipment or facilities as necessary to carry out the agricultural research programs of the Department of Agriculture, where not otherwise provided, $56,437,000, to remain available until expended (7 U.S.C. 2209b): *Provided,* That funds may be received from any State, other political subdivision, organization, or individual for the purpose of establishing any research facility of the Agricultural Research Service, as authorized by law.

## COOPERATIVE STATE RESEARCH, EDUCATION, AND EXTENSION SERVICE

### RESEARCH AND EDUCATION ACTIVITIES

For payments to agricultural experiment stations, for cooperative forestry and other research, for facilities, and for other expenses, including $180,545,000 to carry into effect the provisions of the Hatch Act (7 U.S.C. 361a–i); $21,932,000 for grants for cooperative forestry research (16 U.S.C. 582a–a7); $29,676,000 for payments to the 1890 land-grant colleges, including Tuskegee University (7 U.S.C. 3222); $63,116,000 for special grants for agricultural research (7 U.S.C. 450i(c)); $15,048,000 for special grants for agricultural research on improved pest control (7 U.S.C. 450i(c)); $119,300,000 for competitive research grants (7 U.S.C. 450i(b)); $5,109,000 for the support of animal health and disease programs (7 U.S.C. 3195); $750,000 for supplemental and alternative crops and products (7 U.S.C. 3319d); $600,000 for grants for research pursuant to the Critical Agricultural Materials Act of 1984 (7 U.S.C. 178) and section 1472 of the Food and Agriculture Act of 1977 (7 U.S.C. 3318), to remain available until expended; $3,000,000 for higher education graduate fellowship grants (7 U.S.C. 3152(b)(6)), to remain available until expended (7 U.S.C. 2209b); $4,350,000 for higher education challenge grants (7 U.S.C. 3152(b)(1)); $1,000,000 for a higher education multicultural scholars program (7 U.S.C. 3152(b)(5)), to remain available until expended (7 U.S.C. 2209b); $2,850,000 for an education grants program for Hispanic-serving Institutions (7 U.S.C. 3241); $500,000 for a secondary agriculture education program and two-year postsecondary education (7 U.S.C. 3152(h)); $4,000,000 for aquaculture grants (7 U.S.C. 3322); $8,000,000 for sustainable agriculture research and education (7 U.S.C. 5811); $9,200,000 for a program of capacity building grants (7 U.S.C. 3152(b)(4)) to colleges eligible to receive funds under the Act of August 30, 1890 (7 U.S.C. 321–326 and 328), including Tuskegee University, to remain available until expended (7 U.S.C. 2209b); $1,552,000 for payments to the 1994 Institutions pursuant to section 534(a)(1) of Public Law 103–382; and $10,688,000 for necessary expenses of Research and Education Activities, of which not to exceed $100,000 shall be for employment under 5 U.S.C. 3109; in all, $481,216,000.

None of the funds in the foregoing paragraph shall be available to carry out research related to the production, processing or marketing of tobacco or tobacco products.

### NATIVE AMERICAN INSTITUTIONS ENDOWMENT FUND

For establishment of a Native American institutions endowment fund, as authorized by Public Law 103–382 (7 U.S.C. 301 note), $4,600,000.

### EXTENSION ACTIVITIES

Payments to States, the District of Columbia, Puerto Rico, Guam, the Virgin Islands, Micronesia, Northern Marianas, and American Samoa: For payments for cooperative extension work under the Smith–Lever Act, to be distributed under sections 3(b) and 3(c) of said Act, and under section 208(c) of Public Law 93–471, for retirement and employees' compensation costs for extension agents and for costs of penalty mail for cooperative extension agents and State extension directors, $276,548,000; payments for extension work at the 1994 Institutions under the Smith–Lever Act (7 U.S.C. 343(b)(3)), $2,060,000; payments

for the nutrition and family education program for low-income areas under section 3(d) of the Act, $58,695,000; payments for the pest management program under section 3(d) of the Act, $10,783,000; payments for the farm safety program under section 3(d) of the Act, $3,000,000; payments for the pesticide impact assessment program under section 3(d) of the Act, $3,214,000; payments to upgrade research, extension, and teaching facilities at the 1890 land-grant colleges, including Tuskegee University, as authorized by section 1447 of Public Law 95–113 (7 U.S.C. 3222b), $8,426,000, to remain available until expended; payments for the rural development centers under section 3(d) of the Act, $908,000; payments for a groundwater quality program under section 3(d) of the Act, $9,561,000; payments for youth-at-risk programs under section 3(d) of the Act, $9,000,000; payments for a food safety program under section 3(d) of the Act, $7,365,000; payments for carrying out the provisions of the Renewable Resources Extension Act of 1978, $3,192,000; payments for Indian reservation agents under section 3(d) of the Act, $1,714,000; payments for sustainable agriculture programs under section 3(d) of the Act, $3,309,000; payments for rural health and safety education as authorized by section 2390 of Public Law 101–624 (7 U.S.C. 2661 note, 2662), $2,628,000; payments for cooperative extension work by the colleges receiving the benefits of the second Morrill Act (7 U.S.C. 321–326 and 328) and Tuskegee University, $25,843,000; and for Federal administration and coordination including administration of the Smith–Lever Act, and the Act of September 29, 1977 (7 U.S.C. 341–349), and section 1361(c) of the Act of October 3, 1980 (7 U.S.C. 301 note), and to coordinate and provide program leadership for the extension work of the Department and the several States and insular possessions, $11,741,000; in all, $437,987,000: *Provided,* That funds hereby appropriated pursuant to section 3(c) of the Act of June 26, 1953, and section 506 of the Act of June 23, 1972, shall not be paid to any State, the District of Columbia, Puerto Rico, Guam, or the Virgin Islands, Micronesia, Northern Marianas, and American Samoa prior to availability of an equal sum from non-Federal sources for expenditure during the current fiscal year.

### OFFICE OF THE ASSISTANT SECRETARY FOR MARKETING AND REGULATORY PROGRAMS

For necessary salaries and expenses of the Office of the Assistant Secretary for Marketing and Regulatory Programs to administer programs under the laws enacted by the Congress for the Animal and Plant Health Inspection Service, the Agricultural Marketing Service, and the Grain Inspection, Packers and Stockyards Administration, $618,000.

### ANIMAL AND PLANT HEALTH INSPECTION SERVICE

### SALARIES AND EXPENSES

### (INCLUDING TRANSFERS OF FUNDS)

### << 21 USCA § 129 >>

For expenses, not otherwise provided for, including those pursuant to the Act of February 28, 1947 (21 U.S.C. 114b–c), necessary to prevent, control, and eradicate pests and plant and animal diseases; to carry out inspection, quarantine, and regulatory activities; to discharge the authorities of the Secretary of Agriculture under the Act of March 2, 1931 (46 Stat. 1468; 7 U.S.C. 426–426b); and to protect the environment, as authorized by law, $425,803,000, of which $4,105,000 shall be available for the control of outbreaks of insects, plant diseases, animal diseases and for control of pest animals and birds to the extent necessary to meet emergency conditions: *Provided,* That no funds shall be used to formulate or administer a brucellosis eradication program for the current fiscal year that does not require minimum matching by the States of at least 40 percent: *Provided further,* That this appropriation shall be available for field employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $40,000 shall be available for employment under 5 U.S.C. 3109: *Provided further,* That this appropriation shall be available for the operation and maintenance of aircraft and the purchase of not to exceed four, of which two shall be for replacement only: *Provided further,* That, in addition, in emergencies which threaten any segment of the agricultural production industry of this country, the Secretary may transfer from other appropriations or funds available to the agencies or corporations of the Department such sums as may be deemed necessary, to be available only in such emergencies for the arrest and eradication of contagious or infectious disease or pests of animals, poultry, or plants, and for expenses in accordance with the Act of February 28, 1947, and section 102 of the Act of September 21, 1944, and any unexpended balances of funds transferred for such emergency purposes in the next preceding fiscal year shall be merged with such transferred amounts: *Provided further,* That appropriations hereunder shall be available pursuant to law (7 U.S.C. 2250)

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2355 of 3864

for the repair and alteration of leased buildings and improvements, but unless otherwise provided the cost of altering any one building during the fiscal year shall not exceed 10 percent of the current replacement value of the building.

In fiscal year 1999, the agency is authorized to collect fees to cover the total costs of providing technical assistance, goods, or services requested by States, other political subdivisions, domestic and international organizations, foreign governments, or individuals, provided that such fees are structured such that any entity's liability for such fees is reasonably based on the technical assistance, goods, or services provided to the entity by the agency, and such fees shall be credited to this account, to remain available until expended, without further appropriation, for providing such assistance, goods, or services.

Of the total amount available under this heading in fiscal year 1999, $88,000,000 shall be derived from user fees deposited in the Agricultural Quarantine Inspection User Fee Account.

## BUILDINGS AND FACILITIES

For plans, construction, repair, preventive maintenance, environmental support, improvement, extension, alteration, and purchase of fixed equipment or facilities, as authorized by 7 U.S.C. 2250, and acquisition of land as authorized by 7 U.S.C. 428a, $7,700,000, to remain available until expended.

## AGRICULTURAL MARKETING SERVICE

### MARKETING SERVICES

For necessary expenses to carry on services related to consumer protection, agricultural marketing and distribution, transportation, and regulatory programs, as authorized by law, and for administration and coordination of payments to States, including field employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225) and not to exceed $90,000 for employment under 5 U.S.C. 3109, $48,831,000, including funds for the wholesale market development program for the design and development of wholesale and farmer market facilities for the major metropolitan areas of the country: *Provided,* That this appropriation shall be available pursuant to law (7 U.S.C. 2250) for the alteration and repair of buildings and improvements, but the cost of altering any one building during the fiscal year shall not exceed 10 percent of the current replacement value of the building.

Fees may be collected for the cost of standardization activities, as established by regulation pursuant to law (31 U.S.C. 9701).

### LIMITATION ON ADMINISTRATIVE EXPENSES

Not to exceed $60,730,000 (from fees collected) shall be obligated during the current fiscal year for administrative expenses: *Provided,* That if crop size is understated and/or other uncontrollable events occur, the agency may exceed this limitation by up to 10 percent with notification to the Appropriations Committees.

### FUNDS FOR STRENGTHENING MARKETS, INCOME, AND SUPPLY (SECTION 32)

#### (INCLUDING TRANSFERS OF FUNDS)

Funds available under section 32 of the Act of August 24, 1935 (7 U.S.C. 612c) shall be used only for commodity program expenses as authorized therein, and other related operating expenses, except for: (1) transfers to the Department of Commerce as authorized by the Fish and Wildlife Act of August 8, 1956; (2) transfers otherwise provided in this Act; and (3) not more than $10,998,000 for formulation and administration of marketing agreements and orders pursuant to the Agricultural Marketing Agreement Act of 1937 and the Agricultural Act of 1961.

### PAYMENTS TO STATES AND POSSESSIONS

For payments to departments of agriculture, bureaus and departments of markets, and similar agencies for marketing activities under section 204(b) of the Agricultural Marketing Act of 1946 (7 U.S.C. 1623(b)), $1,200,000.

### GRAIN INSPECTION, PACKERS AND STOCKYARDS ADMINISTRATION

#### SALARIES AND EXPENSES

For necessary expenses to carry out the provisions of the United States Grain Standards Act, for the administration of the Packers and Stockyards Act, for certifying procedures used to protect purchasers of farm products, and the standardization activities related to grain under the Agricultural Marketing Act of 1946, including field employment pursuant to the second

sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $25,000 for employment under 5 U.S.C. 3109, $26,787,000: *Provided,* That this appropriation shall be available pursuant to law (7 U.S.C. 2250) for the alteration and repair of buildings and improvements, but the cost of altering any one building during the fiscal year shall not exceed 10 percent of the current replacement value of the building.

### LIMITATION ON INSPECTION AND WEIGHING SERVICES EXPENSES

Not to exceed $42,557,000 (from fees collected) shall be obligated during the current fiscal year for inspection and weighing services: *Provided,* That if grain export activities require additional supervision and oversight, or other uncontrollable factors occur, this limitation may be exceeded by up to 10 percent with notification to the Appropriations Committees.

### OFFICE OF THE UNDER SECRETARY FOR FOOD SAFETY

For necessary salaries and expenses of the Office of the Under Secretary for Food Safety to administer the laws enacted by the Congress for the Food Safety and Inspection Service, $446,000.

### FOOD SAFETY AND INSPECTION SERVICE

For necessary expenses to carry out services authorized by the Federal Meat Inspection Act, the Poultry Products Inspection Act, and the Egg Products Inspection Act, $616,986,000, and in addition, $1,000,000 may be credited to this account from fees collected for the cost of laboratory accreditation as authorized by section 1017 of Public Law 102–237: *Provided,* That this appropriation shall not be available for shell egg surveillance under section 5(d) of the Egg Products Inspection Act (21 U.S.C. 1034(d)): *Provided further,* That this appropriation shall be available for field employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $75,000 shall be available for employment under 5 U.S.C. 3109: *Provided further,* That this appropriation shall be available pursuant to law (7 U.S.C. 2250) for the alteration and repair of buildings and improvements, but the cost of altering any one building during the fiscal year shall not exceed 10 percent of the current replacement value of the building.

### OFFICE OF THE UNDER SECRETARY FOR FARM AND FOREIGN AGRICULTURAL SERVICES

For necessary salaries and expenses of the Office of the Under Secretary for Farm and Foreign Agricultural Services to administer the laws enacted by Congress for the Farm Service Agency, the Foreign Agricultural Service, the Risk Management Agency, and the Commodity Credit Corporation, $572,000.

### FARM SERVICE AGENCY

### SALARIES AND EXPENSES

### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses for carrying out the administration and implementation of programs administered by the Farm Service Agency, $714,499,000: *Provided,* That the Secretary is authorized to use the services, facilities, and authorities (but not the funds) of the Commodity Credit Corporation to make program payments for all programs administered by the Agency: *Provided further,* That other funds made available to the Agency for authorized activities may be advanced to and merged with this account: *Provided further,* That these funds shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $1,000,000 shall be available for employment under 5 U.S.C. 3109.

### STATE MEDIATION GRANTS

For grants pursuant to section 502(b) of the Agricultural Credit Act of 1987 (7 U.S.C. 5101–5106), $2,000,000.

### DAIRY INDEMNITY PROGRAM

### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses involved in making indemnity payments to dairy farmers for milk or cows producing such milk and manufacturers of dairy products who have been directed to remove their milk or dairy products from commercial markets because it contained residues of chemicals registered and approved for use by the Federal Government, and in making indemnity

payments for milk, or cows producing such milk, at a fair market value to any dairy farmer who is directed to remove his milk from commercial markets because of: (1) the presence of products of nuclear radiation or fallout if such contamination is not due to the fault of the farmer; or (2) residues of chemicals or toxic substances not included under the first sentence of the Act of August 13, 1968 (7 U.S.C. 450j), if such chemicals or toxic substances were not used in a manner contrary to applicable regulations or labeling instructions provided at the time of use and the contamination is not due to the fault of the farmer, $450,000, to remain available until expended (7 U.S.C. 2209b): *Provided,* That none of the funds contained in this Act shall be used to make indemnity payments to any farmer whose milk was removed from commercial markets as a result of the farmer's willful failure to follow procedures prescribed by the Federal Government: *Provided further,* That this amount shall be transferred to the Commodity Credit Corporation: *Provided further,* That the Secretary is authorized to utilize the services, facilities, and authorities of the Commodity Credit Corporation for the purpose of making dairy indemnity disbursements.

### AGRICULTURAL CREDIT INSURANCE FUND PROGRAM ACCOUNT

#### (INCLUDING TRANSFERS OF FUNDS)

For gross obligations for the principal amount of direct and guaranteed loans as authorized by 7 U.S.C. 1928–1929, to be available from funds in the Agricultural Credit Insurance Fund, as follows: farm ownership loans, $510,682,000, of which $425,031,000 shall be for guaranteed loans; operating loans, $1,648,276,000, of which $948,276,000 shall be for unsubsidized guaranteed loans and $200,000,000 shall be for subsidized guaranteed loans; Indian tribe land acquisition loans as authorized by 25 U.S.C. 488, $1,000,000; for emergency insured loans, $25,000,000 to meet the needs resulting from natural disasters; and for boll weevil eradication program loans as authorized by 7 U.S.C. 1989, $100,000,000.

For the cost of direct and guaranteed loans, including the cost of modifying loans as defined in section 502 of the Congressional Budget Act of 1974, as follows: farm ownership loans, $19,580,000, of which $6,758,000 shall be for guaranteed loans; operating loans, $62,630,000, of which $11,000,000 shall be for unsubsidized guaranteed loans and $17,480,000 shall be for subsidized guaranteed loans; Indian tribe land acquisition loans as authorized by 25 U.S.C. 488, $153,000; for emergency insured loans, $5,900,000 to meet the needs resulting from natural disasters; and for boll weevil eradication program loans as authorized by 7 U.S.C. 1989, $1,440,000. In addition, for administrative expenses necessary to carry out the direct and guaranteed loan programs, $219,861,000, of which $209,861,000 shall be transferred to and merged with the appropriation for "Farm Service Agency, Salaries and Expenses" .

### RISK MANAGEMENT AGENCY

For administrative and operating expenses, as authorized by the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 6933), $64,000,000: *Provided,* That not to exceed $700 shall be available for official reception and representation expenses, as authorized by 7 U.S.C. 1506(i).

### CORPORATIONS

The following corporations and agencies are hereby authorized to make expenditures, within the limits of funds and borrowing authority available to each such corporation or agency and in accord with law, and to make contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act as may be necessary in carrying out the programs set forth in the budget for the current fiscal year for such corporation or agency, except as hereinafter provided.

### FEDERAL CROP INSURANCE CORPORATION FUND

For payments as authorized by section 516 of the Federal Crop Insurance Act, such sums as may be necessary, to remain available until expended (7 U.S.C. 2209b).

### COMMODITY CREDIT CORPORATION FUND

#### REIMBURSEMENT FOR NET REALIZED LOSSES

For fiscal year 1999, such sums as may be necessary to reimburse the Commodity Credit Corporation for net realized losses sustained, but not previously reimbursed (estimated to be $8,439,000,000 in the President's fiscal year 1999 Budget Request (H. Doc. 105–177)), but not to exceed $8,439,000,000, pursuant to section 2 of the Act of August 17, 1961 (15 U.S.C. 713a–11).

### OPERATIONS AND MAINTENANCE FOR HAZARDOUS WASTE MANAGEMENT

For fiscal year 1999, the Commodity Credit Corporation shall not expend more than $5,000,000 for expenses to comply with the requirement of section 107(g) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9607(g), and section 6001 of the Resource Conservation and Recovery Act, 42 U.S.C. 6961: *Provided,* That expenses shall be for operations and maintenance costs only and that other hazardous waste management costs shall be paid for by the USDA Hazardous Waste Management appropriation in this Act.

### TITLE II

### CONSERVATION PROGRAMS

### OFFICE OF THE UNDER SECRETARY FOR NATURAL RESOURCES AND ENVIRONMENT

For necessary salaries and expenses of the Office of the Under Secretary for Natural Resources and Environment to administer the laws enacted by the Congress for the Forest Service and the Natural Resources Conservation Service, $693,000.

### NATURAL RESOURCES CONSERVATION SERVICE

### CONSERVATION OPERATIONS

For necessary expenses for carrying out the provisions of the Act of April 27, 1935 (16 U.S.C. 590a–f), including preparation of conservation plans and establishment of measures to conserve soil and water (including farm irrigation and land drainage and such special measures for soil and water management as may be necessary to prevent floods and the siltation of reservoirs and to control agricultural related pollutants); operation of conservation plant materials centers; classification and mapping of soil; dissemination of information; acquisition of lands, water, and interests therein for use in the plant materials program by donation, exchange, or purchase at a nominal cost not to exceed $100 pursuant to the Act of August 3, 1956 (7 U.S.C. 428a); purchase and erection or alteration or improvement of permanent and temporary buildings; and operation and maintenance of aircraft, $641,243,000, to remain available until expended (7 U.S.C. 2209b), of which not less than $5,990,000 is for snow survey and water forecasting and not less than $9,025,000 is for operation and establishment of the plant materials centers: *Provided,* That appropriations hereunder shall be available pursuant to 7 U.S.C. 2250 for construction and improvement of buildings and public improvements at plant materials centers, except that the cost of alterations and improvements to other buildings and other public improvements shall not exceed $250,000: *Provided further,* That when buildings or other structures are erected on non-Federal land, that the right to use such land is obtained as provided in 7 U.S.C. 2250a: *Provided further,* That this appropriation shall be available for technical assistance and related expenses to carry out programs authorized by section 202(c) of title II of the Colorado River Basin Salinity Control Act of 1974 (43 U.S.C. 1592(c)): *Provided further,* That no part of this appropriation may be expended for soil and water conservation operations under the Act of April 27, 1935 in demonstration projects: *Provided further,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $25,000 shall be available for employment under 5 U.S.C. 3109: *Provided further,* That qualified local engineers may be temporarily employed at per diem rates to perform the technical planning work of the Service (16 U.S.C. 590e–2).

### WATERSHED SURVEYS AND PLANNING

For necessary expenses to conduct research, investigation, and surveys of watersheds of rivers and other waterways, and for small watershed investigations and planning, in accordance with the Watershed Protection and Flood Prevention Act approved August 4, 1954 (16 U.S.C. 1001–1009), $10,368,000: *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $110,000 shall be available for employment under 5 U.S.C. 3109.

### WATERSHED AND FLOOD PREVENTION OPERATIONS

For necessary expenses to carry out preventive measures, including but not limited to research, engineering operations, methods of cultivation, the growing of vegetation, rehabilitation of existing works and changes in use of land, in accordance with the Watershed Protection and Flood Prevention Act approved August 4, 1954 (16 U.S.C. 1001–1005 and 1007–1009), the provisions

of the Act of April 27, 1935 (16 U.S.C. 590a–f), and in accordance with the provisions of laws relating to the activities of the Department, $99,443,000, to remain available until expended (7 U.S.C. 2209b) (of which up to $15,000,000 may be available for the watersheds authorized under the Flood Control Act approved June 22, 1936 (33 U.S.C. 701 and 16 U.S.C. 1006a)): *Provided,* That not to exceed $47,000,000 of this appropriation shall be available for technical assistance: *Provided further,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $200,000 shall be available for employment under 5 U.S.C. 3109: *Provided further,* That not to exceed $1,000,000 of this appropriation is available to carry out the purposes of the Endangered Species Act of 1973 (Public Law 93–205), including cooperative efforts as contemplated by that Act to relocate endangered or threatened species to other suitable habitats as may be necessary to expedite project construction.

## RESOURCE CONSERVATION AND DEVELOPMENT

For necessary expenses in planning and carrying out projects for resource conservation and development and for sound land use pursuant to the provisions of section 32(e) of title III of the Bankhead–Jones Farm Tenant Act (7 U.S.C. 1010–1011; 76 Stat. 607), the Act of April 27, 1935 (16 U.S.C. 590a–f), and the Agriculture and Food Act of 1981 (16 U.S.C. 3451–3461), $35,000,000, to remain available until expended (7 U.S.C. 2209b): *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $50,000 shall be available for employment under 5 U.S.C. 3109.

## FORESTRY INCENTIVES PROGRAM

For necessary expenses, not otherwise provided for, to carry out the program of forestry incentives, as authorized by the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2101), including technical assistance and related expenses, $6,325,000, to remain available until expended, as authorized by that Act.

## TITLE III

## RURAL ECONOMIC AND COMMUNITY DEVELOPMENT PROGRAMS

## OFFICE OF THE UNDER SECRETARY FOR RURAL DEVELOPMENT

For necessary salaries and expenses of the Office of the Under Secretary for Rural Development to administer programs under the laws enacted by the Congress for the Rural Housing Service, the Rural Business–Cooperative Service, and the Rural Utilities Service of the Department of Agriculture, $588,000.

## RURAL COMMUNITY ADVANCEMENT PROGRAM

### (INCLUDING TRANSFERS OF FUNDS)

For the cost of direct loans, loan guarantees, and grants, as authorized by 7 U.S.C. 1926, 1926a, 1926c, and 1932, except for sections 381E–H, 381N, and 381O of the Consolidated Farm and Rural Development Act (7 U.S.C. 2009f), $722,686,000, to remain available until expended, of which $29,786,000 shall be for rural community programs described in section 381E(d)(1) of the Consolidated Farm and Rural Development Act; of which $645,007,000 shall be for the rural utilities programs described in section 381E(d)(2) of such Act, as provided in 7 U.S.C. 1926(a) and 7 U.S.C. 1926C; and of which $47,893,000 shall be for the rural business and cooperative development programs described in section 381E(d)(3) of such Act: *Provided,* That of the amount appropriated for the rural business and cooperative development programs, not to exceed $500,000 shall be made available for a grant to a qualified national organization to provide technical assistance for rural transportation in order to promote economic development: *Provided further,* That not to exceed $16,215,000 shall be for technical assistance grants for rural waste systems pursuant to section 306(a)(14) of such Act; and not to exceed $5,300,000 shall be for contracting with qualified national organizations for a circuit rider program to provide technical assistance for rural water systems: *Provided further,* That of the total amount appropriated, not to exceed $33,926,000 shall be available through June 30, 1999, for empowerment zones and enterprise communities, as authorized by Public Law 103–66, of which $1,844,000 shall be for rural community programs described in section 381E(d)(1) of such Act; of which $23,948,000 shall be for the rural utilities programs described in section 381E(d)(2) of such Act; of which $8,134,000 shall be for the rural business and cooperative development programs described in section 381E(d)(3) of such Act.

AR.02336

## RURAL HOUSING SERVICE

### RURAL HOUSING INSURANCE FUND PROGRAM ACCOUNT

#### (INCLUDING TRANSFERS OF FUNDS)

For gross obligations for the principal amount of direct and guaranteed loans as authorized by title V of the Housing Act of 1949, to be available from funds in the rural housing insurance fund, as follows: $3,965,313,000 for loans to section 502 borrowers, as determined by the Secretary, of which $3,000,000,000 shall be for unsubsidized guaranteed loans; $25,001,000 for section 504 housing repair loans; $100,000,000 for section 538 guaranteed multi-family housing loans; $20,000,000 for section 514 farm labor housing; $114,321,000 for section 515 rental housing; $5,152,000 for section 524 site loans; $16,930,000 for credit sales of acquired property, of which up to $5,001,000 may be for multi-family credit sales; and $5,000,000 for section 523 self-help housing land development loans.

For the cost of direct and guaranteed loans, including the cost of modifying loans, as defined in section 502 of the Congressional Budget Act of 1974, as follows: section 502 loans, $116,800,000, of which $2,700,000 shall be for unsubsidized guaranteed loans; section 504 housing repair loans, $8,808,000; section 538 multi-family housing guaranteed loans, $2,320,000; section 514 farm labor housing, $10,406,000; section 515 rental housing, $55,160,000; section 524 site loans, $17,000; credit sales of acquired property, $3,492,000, of which up to $2,416,000 may be for multi-family credit sales; and section 523 self-help housing land development loans, $282,000: *Provided,* That of the total amount appropriated in this paragraph, $10,380,000 shall be for empowerment zones and enterprise communities, as authorized by Public Law 103–66: *Provided further,* That if such funds are not obligated for empowerment zones and enterprise communities by June 30, 1999, they shall remain available for other authorized purposes under this head.

In addition, for administrative expenses necessary to carry out the direct and guaranteed loan programs, $360,785,000, which shall be transferred to and merged with the appropriation for "Rural Housing Service, Salaries and Expenses".

### RENTAL ASSISTANCE PROGRAM

For rental assistance agreements entered into or renewed pursuant to the authority under section 521(a)(2) or agreements entered into in lieu of debt forgiveness or payments for eligible households as authorized by section 502(c)(5)(D) of the Housing Act of 1949, $583,397,000; and, in addition, such sums as may be necessary, as authorized by section 521(c) of the Act, to liquidate debt incurred prior to fiscal year 1992 to carry out the rental assistance program under section 521(a)(2) of the Act: *Provided,* That of this amount, not more than $5,900,000 shall be available for debt forgiveness or payments for eligible households as authorized by section 502(c)(5)(D) of the Act, and not to exceed $10,000 per project for advances to nonprofit organizations or public agencies to cover direct costs (other than purchase price) incurred in purchasing projects pursuant to section 502(c)(5)(C) of the Act: *Provided further,* That agreements entered into or renewed during fiscal year 1999 shall be funded for a five-year period, although the life of any such agreement may be extended to fully utilize amounts obligated.

### MUTUAL AND SELF–HELP HOUSING GRANTS

For grants and contracts pursuant to section 523(b)(1)(A) of the Housing Act of 1949 (42 U.S.C. 1490c), $26,000,000, to remain available until expended (7 U.S.C. 2209b): *Provided,* That of the total amount appropriated, $1,000,000 shall be for empowerment zones and enterprise communities, as authorized by Public Law 103–66: *Provided further,* That if such funds are not obligated for empowerment zones and enterprise communities by June 30, 1999, they shall remain available for other authorized purposes under this head.

### RURAL HOUSING ASSISTANCE GRANTS

For grants and contracts for housing for domestic farm labor, very low-income housing repair, supervisory and technical assistance, compensation for construction defects, and rural housing preservation made by the Rural Housing Service, as authorized by 42 U.S.C. 1474, 1479(c), 1486, 1490e, and 1490m, $41,000,000, to remain available until expended: *Provided,* That of the total amount appropriated, $1,200,000 shall be for empowerment zones and enterprise communities, as authorized by Public Law 103–66: *Provided further,* That if such funds are not obligated for empowerment zones and enterprise communities by June 30, 1999, they shall remain available for other authorized purposes under this head.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## SALARIES AND EXPENSES

For necessary expenses of the Rural Housing Service, including administering the programs authorized by the Consolidated Farm and Rural Development Act, title V of the Housing Act of 1949, and cooperative agreements, $60,978,000: *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $520,000 may be used for employment under 5 U.S.C. 3109: *Provided further,* That the Administrator may expend not more than $10,000 to provide modest nonmonetary awards to non-USDA employees.

## RURAL BUSINESS–COOPERATIVE SERVICE

### RURAL DEVELOPMENT LOAN FUND PROGRAM ACCOUNT

#### (INCLUDING TRANSFERS OF FUNDS)

For the cost of direct loans, $16,615,000, as authorized by the Rural Development Loan Fund (42 U.S.C. 9812(a)): *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,* That these funds are available to subsidize gross obligations for the principal amount of direct loans of $33,000,000: *Provided further,* That through June 30, 1999, of the total amount appropriated, $3,215,520 shall be available for the cost of direct loans for empowerment zones and enterprise communities, as authorized by title XIII of the Omnibus Budget Reconciliation Act of 1993, to subsidize gross obligations for the principal amount of direct loans, $7,246,000: *Provided further,* That if such funds are not obligated for empowerment zones and enterprise communities by June 30, 1999, they shall remain available for other authorized purposes under this head.

In addition, for administrative expenses to carry out the direct loan programs, $3,482,000 shall be transferred to and merged with the appropriation for "Rural Business Cooperative Service, Salaries and Expenses".

### RURAL ECONOMIC DEVELOPMENT LOANS PROGRAM ACCOUNT

#### (INCLUDING TRANSFERS OF FUNDS)

For the principal amount of direct loans, as authorized under section 313 of the Rural Electrification Act, for the purpose of promoting rural economic development and job creation projects, $15,000,000.

For the cost of direct loans, including the cost of modifying loans as defined in section 502 of the Congressional Budget Act of 1974, $3,783,000.

Of the funds derived from interest on the cushion of credit payments in fiscal year 1999, as authorized by section 313 of the Rural Electrification Act of 1936, $3,783,000 shall not be obligated and $3,783,000 are rescinded.

### RURAL COOPERATIVE DEVELOPMENT GRANTS

For rural cooperative development grants authorized under section 310B(e) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1932), $3,300,000, of which $1,300,000 shall be available for cooperative agreements for the appropriate technology transfer for rural areas program and $250,000 shall be available for an agri-business and cooperative development program.

### SALARIES AND EXPENSES

For necessary expenses of the Rural Business–Cooperative Service, including administering the programs authorized by the Consolidated Farm and Rural Development Act; section 1323 of the Food Security Act of 1985; the Cooperative Marketing Act of 1926; for activities relating to the marketing aspects of cooperatives, including economic research findings, as authorized by the Agricultural Marketing Act of 1946; for activities with institutions concerning the development and operation of agricultural cooperatives; and for cooperative agreements; $25,680,000: *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $260,000 may be used for employment under 5 U.S.C. 3109.

### ALTERNATIVE AGRICULTURAL RESEARCH AND COMMERCIALIZATION CORPORATION REVOLVING FUND

For necessary expenses to carry out the Alternative Agricultural Research and Commercialization Act of 1990 (7 U.S.C. 5901–5908), $3,500,000 is appropriated to the Alternative Agricultural Research and Commercialization Corporation Revolving Fund.

## RURAL UTILITIES SERVICE

## RURAL ELECTRIFICATION AND TELECOMMUNICATIONS LOANS PROGRAM ACCOUNT

### (INCLUDING TRANSFERS OF FUNDS)

Insured loans pursuant to the authority of section 305 of the Rural Electrification Act of 1936 (7 U.S.C. 935) shall be made as follows: 5 percent rural electrification loans, $71,500,000; 5 percent rural telecommunications loans, $75,000,000; cost of money rural telecommunications loans, $300,000,000; municipal rate rural electric loans, $295,000,000; and loans made pursuant to section 306 of that Act, rural electric, $700,000,000 and rural telecommunications, $120,000,000, to remain available until expended.

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, including the cost of modifying loans, of direct and guaranteed loans authorized by the Rural Electrification Act of 1936 (7 U.S.C. 935 and 936), as follows: cost of direct loans, $16,667,000; cost of municipal rate loans, $25,842,000; cost of money rural telecommunications loans, $810,000: *Provided,* That notwithstanding section 305(d)(2) of the Rural Electrification Act of 1936, borrower interest rates may exceed 7 percent per year.

In addition, for administrative expenses necessary to carry out the direct and guaranteed loan programs, $29,982,000, which shall be transferred to and merged with the appropriation for "Rural Utilities Service, Salaries and Expenses".

## RURAL TELEPHONE BANK PROGRAM ACCOUNT

### (INCLUDING TRANSFERS OF FUNDS)

The Rural Telephone Bank is hereby authorized to make such expenditures, within the limits of funds available to such corporation in accord with law, and to make such contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act, as may be necessary in carrying out its authorized programs. During fiscal year 1999 and within the resources and authority available, gross obligations for the principal amount of direct loans shall be $157,509,000.

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, including the cost of modifying loans, of direct loans authorized by the Rural Electrification Act of 1936 (7 U.S.C. 935), $4,174,000.

In addition, for administrative expenses necessary to carry out the loan programs, $3,000,000, which shall be transferred to and merged with the appropriation for "Rural Utilities Service, Salaries and Expenses".

## DISTANCE LEARNING AND TELEMEDICINE PROGRAM

For the cost of direct loans and grants, as authorized by 7 U.S.C. 950aaa et seq., $12,680,000, to remain available until expended, to be available for loans and grants for telemedicine and distance learning services in rural areas: *Provided,* That the costs of direct loans shall be as defined in section 502 of the Congressional Budget Act of 1974.

## SALARIES AND EXPENSES

For necessary expenses of the Rural Utilities Service, including administering the programs authorized by the Rural Electrification Act of 1936, and the Consolidated Farm and Rural Development Act, and for cooperative agreements, $33,000,000: *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $105,000 may be used for employment under 5 U.S.C. 3109.

## TITLE IV

## DOMESTIC FOOD PROGRAMS

## OFFICE OF THE UNDER SECRETARY FOR FOOD, NUTRITION AND CONSUMER SERVICES

For necessary salaries and expenses of the Office of the Under Secretary for Food, Nutrition and Consumer Services to administer the laws enacted by the Congress for the Food and Nutrition Service, $554,000.

## FOOD AND NUTRITION SERVICE

### CHILD NUTRITION PROGRAMS

#### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses to carry out the National School Lunch Act (42 U.S.C. 1751 et seq.), except section 21, and the Child Nutrition Act of 1966 (42 U.S.C. 1771 et seq.), except sections 17 and 21; $9,176,897,000, to remain available through September 30, 2000, of which $4,128,747,000 is hereby appropriated and $5,048,150,000 shall be derived by transfer from funds available under section 32 of the Act of August 24, 1935 (7 U.S.C. 612c): *Provided,* That none of the funds made available under this heading shall be used for studies and evaluations: *Provided further,* That up to $4,300,000 shall be available for independent verification of school food service claims: *Provided further,* That none of the funds under this heading shall be available unless the value of bonus commodities provided under section 32 of the Act of August 24, 1935 (49 Stat. 774, chapter 641; 7 U.S.C. 612c), and section 416 of the Agricultural Act of 1949 (7 U.S.C. 1431) is included in meeting the minimum commodity assistance requirement of section 6(g) of the National School Lunch Act (42 U.S.C. 1755(g)).

### SPECIAL SUPPLEMENTAL NUTRITION PROGRAM FOR WOMEN, INFANTS, AND CHILDREN (WIC)

For necessary expenses to carry out the special supplemental nutrition program as authorized by section 17 of the Child Nutrition Act of 1966 (42 U.S.C. 1786), $3,924,000,000, to remain available through September 30, 2000: *Provided,* That none of the funds made available under this heading shall be used for studies and evaluations: *Provided further,* That of the total amount available, the Secretary shall obligate $10,000,000 for the farmers' market nutrition program within 45 days of the enactment of this Act, and an additional $5,000,000 for the farmers' market nutrition program from any funds not needed to maintain current caseload levels: *Provided further,* That none of the funds in this Act shall be available to pay administrative expenses of WIC clinics except those that have an announced policy of prohibiting smoking within the space used to carry out the program: *Provided further,* That none of the funds provided in this account shall be available for the purchase of infant formula except in accordance with the cost containment and competitive bidding requirements specified in section 17 of the Child Nutrition Act of 1966: *Provided further,* That State agencies required to procure infant formula using a competitive bidding system may use funds appropriated by this Act to purchase infant formula under a cost containment contract entered into after September 30, 1996, only if the contract was awarded to the bidder offering the lowest net price, as defined by section 17(b)(20) of the Child Nutrition Act of 1966, unless the State agency demonstrates to the satisfaction of the Secretary that the weighted average retail price for different brands of infant formula in the State does not vary by more than 5 percent.

### FOOD STAMP PROGRAM

For necessary expenses to carry out the Food Stamp Act (7 U.S.C. 2011 et seq.), $22,585,106,000, of which $100,000,000 shall be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations: *Provided,* That none of the funds made available under this head shall be used for studies and evaluations: *Provided further,* That funds provided herein shall be expended in accordance with section 16 of the Food Stamp Act: *Provided further,* That this appropriation shall be subject to any work registration or workfare requirements as may be required by law: *Provided further,* That funds made available for Employment and Training under this head shall remain available until expended, as authorized by section 16(h)(1) of the Food Stamp Act.

### COMMODITY ASSISTANCE PROGRAM

For necessary expenses to carry out the commodity supplemental food program as authorized by section 4(a) of the Agriculture and Consumer Protection Act of 1973 (7 U.S.C. 612c note) and the Emergency Food Assistance Act of 1983, $131,000,000, to remain available through September 30, 2000: *Provided,* That none of these funds shall be available to reimburse the Commodity Credit Corporation for commodities donated to the program.

### FOOD DONATIONS PROGRAMS FOR SELECTED GROUPS

For necessary expenses to carry out section 4(a) of the Agriculture and Consumer Protection Act of 1973 (7 U.S.C. 612c note), and section 311 of the Older Americans Act of 1965 (42 U.S.C. 3030a), $141,081,000, to remain available through September 30, 2000.

FOOD PROGRAM ADMINISTRATION

For necessary administrative expenses of the domestic food programs funded under this Act, $108,561,000, of which $5,000,000 shall be available only for simplifying procedures, reducing overhead costs, tightening regulations, improving food stamp coupon handling, and assistance in the prevention, identification, and prosecution of fraud and other violations of law and of which $2,000,000 shall be available for obligation only after promulgation of a final rule to curb vendor related fraud: *Provided,* That this appropriation shall be available for employment pursuant to the second sentence of section 706(a) of the Organic Act of 1944 (7 U.S.C. 2225), and not to exceed $150,000 shall be available for employment under 5 U.S.C. 3109.

TITLE V

FOREIGN ASSISTANCE AND RELATED PROGRAMS

FOREIGN AGRICULTURAL SERVICE AND GENERAL SALES MANAGER

(INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of the Foreign Agricultural Service, including carrying out title VI of the Agricultural Act of 1954 (7 U.S.C. 1761–1768), market development activities abroad, and for enabling the Secretary to coordinate and integrate activities of the Department in connection with foreign agricultural work, including not to exceed $128,000 for representation allowances and for expenses pursuant to section 8 of the Act approved August 3, 1956 (7 U.S.C. 1766), $136,203,000: *Provided,* That the Service may utilize advances of funds, or reimburse this appropriation for expenditures made on behalf of Federal agencies, public and private organizations and institutions under agreements executed pursuant to the agricultural food production assistance programs (7 U.S.C. 1736) and the foreign assistance programs of the International Development Cooperation Administration (22 U.S.C. 2392).

None of the funds in the foregoing paragraph shall be available to promote the sale or export of tobacco or tobacco products.

PUBLIC LAW 480 PROGRAM AND GRANT ACCOUNTS

(INCLUDING TRANSFERS OF FUNDS)

For expenses during the current fiscal year, not otherwise recoverable, and unrecovered prior years' costs, including interest thereon, under the Agricultural Trade Development and Assistance Act of 1954 (7 U.S.C. 1691, 1701–1704, 1721–1726a, 1727–1727e, 1731—1736g–3, and 1737), as follows: (1) $203,475,000 for Public Law 480 title I credit, including Food for Progress programs; (2) $16,249,000 is hereby appropriated for ocean freight differential costs for the shipment of agricultural commodities pursuant to title I of said Act and the Food for Progress Act of 1985; (3) $837,000,000 is hereby appropriated for commodities supplied in connection with dispositions abroad pursuant to title II of said Act; and (4) $25,000,000 is hereby appropriated for commodities supplied in connection with dispositions abroad pursuant to title III of said Act: *Provided,* That not to exceed 15 percent of the funds made available to carry out any title of said Act may be used to carry out any other title of said Act: *Provided further,* That such sums shall remain available until expended (7 U.S.C. 2209b).

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of direct credit agreements as authorized by the Agricultural Trade Development and Assistance Act of 1954, and the Food for Progress Act of 1985, including the cost of modifying credit agreements under said Act, $176,596,000.

In addition, for administrative expenses to carry out the Public Law 480 title I credit program, and the Food for Progress Act of 1985, to the extent funds appropriated for Public Law 480 are utilized, $1,850,000, of which $1,035,000 may be transferred to and merged with the appropriation for "Foreign Agricultural Service and General Sales Manager" and $815,000 may be transferred to and merged with the appropriation for "Farm Service Agency, Salaries and Expenses".

COMMODITY CREDIT CORPORATION EXPORT LOANS PROGRAM ACCOUNT

(INCLUDING TRANSFERS OF FUNDS)

For administrative expenses to carry out the Commodity Credit Corporation's export guarantee program, GSM 102 and GSM 103, $3,820,000; to cover common overhead expenses as permitted by section 11 of the Commodity Credit Corporation Charter Act and in conformity with the Federal Credit Reform Act of 1990, of which $3,231,000 may be transferred to and merged

with the appropriation for "Foreign Agricultural Service and General Sales Manager" and $589,000 may be transferred to and merged with the appropriation for "Farm Service Agency, Salaries and Expenses".

## TITLE VI

## RELATED AGENCIES AND FOOD AND DRUG ADMINISTRATION

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## FOOD AND DRUG ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Food and Drug Administration, including hire and purchase of passenger motor vehicles; for payment of space rental and related costs pursuant to Public Law 92–313 for programs and activities of the Food and Drug Administration which are included in this Act; for rental of special purpose space in the District of Columbia or elsewhere; and for miscellaneous and emergency expenses of enforcement activities, authorized and approved by the Secretary and to be accounted for solely on the Secretary's certificate, not to exceed $25,000; $1,103,140,000, of which not to exceed $132,273,000 in fees pursuant to section 736 of the Federal Food, Drug, and Cosmetic Act may be credited to this appropriation and remain available until expended: *Provided,* That fees derived from applications received during fiscal year 1999 shall be subject to the fiscal year 1999 limitation: *Provided further,* That none of these funds shall be used to develop, establish, or operate any program of user fees authorized by 31 U.S.C. 9701: *Provided further,* That of the total amount appropriated: (1) $231,580,000 shall be for the Center for Food Safety and Applied Nutrition and related field activities in the Office of Regulatory Affairs, of which, and notwithstanding section 409(h)(5)(A) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.), an amount of $500,000 shall be made available for the development of systems, regulations, and pilot programs, if any, that would be required to permit full implementation, consistent with section 409(h)(5) of that Act, in fiscal year 2000 of the food contact substance notification program under section 409(h) of such Act; (2) $291,981,000 shall be for the Center for Drug Evaluation and Research and related field activities in the Office of Regulatory Affairs; (3) $125,095,000 shall be for the Center for Biologics Evaluation and Research and for related field activities in the Office of Regulatory Affairs; (4) $41,973,000 shall be for the Center for Veterinary Medicine and for related field activities in the Office of Regulatory Affairs; (5) $145,736,000 shall be for the Center for Devices and Radiological Health and for related field activities in the Office of Regulatory Affairs; (6) $31,579,000 shall be for the National Center for Toxicological Research; (7) $34,000,000 shall be for the Office of Tobacco; (8) $25,855,000 shall be for Rent and Related activities, other than the amounts paid to the General Services Administration; (9) $88,294,000 shall be for payments to the General Services Administration for rent and related costs; and (10) $87,047,000 shall be for other activities, including the Office of the Commissioner, the Office of Policy, the Office of External Affairs, the Office of Operations, the Office of Management and Systems, and central services for these offices: *Provided further,* That funds may be transferred from one specified activity to another with the prior approval of the Committee on Appropriations of both Houses of Congress.

In addition, fees pursuant to section 354 of the Public Health Service Act may be credited to this account, to remain available until expended.

In addition, fees pursuant to section 801 of the Federal Food, Drug, and Cosmetic Act may be credited to this account, to remain available until expended.

## BUILDINGS AND FACILITIES

For plans, construction, repair, improvement, extension, alteration, and purchase of fixed equipment or facilities of or used by the Food and Drug Administration, where not otherwise provided, $11,350,000, to remain available until expended (7 U.S.C. 2209b).

## DEPARTMENT OF THE TREASURY

## FINANCIAL MANAGEMENT SERVICE

## PAYMENTS TO THE FARM CREDIT SYSTEM FINANCIAL ASSISTANCE CORPORATION

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2366 of 3864

For necessary payments to the Farm Credit System Financial Assistance Corporation by the Secretary of the Treasury, as authorized by section 6.28(c) of the Farm Credit Act of 1971, for reimbursement of interest expenses incurred by the Financial Assistance Corporation on obligations issued through 1994, as authorized, $2,565,000.

## INDEPENDENT AGENCIES

## COMMODITY FUTURES TRADING COMMISSION

For necessary expenses to carry out the provisions of the Commodity Exchange Act (7 U.S.C. 1 et seq.), including the purchase and hire of passenger motor vehicles; the rental of space (to include multiple year leases) in the District of Columbia and elsewhere; and not to exceed $25,000 for employment under 5 U.S.C. 3109, $61,000,000, including not to exceed $1,000 for official reception and representation expenses: *Provided,* That the Commission is authorized to charge reasonable fees to attendees of Commission sponsored educational events and symposia to cover the Commission's costs of providing those events and symposia, and notwithstanding 31 U.S.C. 3302, said fees shall be credited to this account, to be available without further appropriation.

## FARM CREDIT ADMINISTRATION

## LIMITATION OF ADMINISTRATIVE EXPENSES

Not to exceed $35,800,000 (from assessments collected from farm credit institutions and from the Federal Agricultural Mortgage Corporation) shall be obligated during the current fiscal year for administrative expenses as authorized under 12 U.S.C. 2249: *Provided,* That this limitation shall not apply to expenses associated with receiverships.

## TITLE VII—GENERAL PROVISIONS

SEC. 701. Within the unit limit of cost fixed by law, appropriations and authorizations made for the Department of Agriculture for the fiscal year 1999 under this Act shall be available for the purchase, in addition to those specifically provided for, of not to exceed 440 passenger motor vehicles, of which 437 shall be for replacement only, and for the hire of such vehicles.

SEC. 702. Funds in this Act available to the Department of Agriculture shall be available for uniforms or allowances therefor as authorized by law (5 U.S.C. 5901–5902).

<< 7 USCA § 1623a >>

SEC. 703. Not less than $1,500,000 of the appropriations of the Department of Agriculture in this Act for research and service work authorized by the Acts of August 14, 1946, and July 28, 1954 (7 U.S.C. 427 and 1621–1629), and by chapter 63 of title 31, United States Code, shall be available for contracting in accordance with said Acts and chapter.

SEC. 704. The cumulative total of transfers to the Working Capital Fund for the purpose of accumulating growth capital for data services and National Finance Center operations shall not exceed $2,000,000: *Provided,* That no funds in this Act appropriated to an agency of the Department shall be transferred to the Working Capital Fund without the approval of the agency administrator.

<< 7 USCA § 2209b >>

SEC. 705. New obligational authority provided for the following appropriation items in this Act shall remain available until expended (7 U.S.C. 2209b): Animal and Plant Health Inspection Service, the contingency fund to meet emergency conditions, fruit fly program, integrated systems acquisition project, and up to $2,000,000 for costs associated with collocating regional offices; Farm Service Agency, salaries and expenses funds made available to county committees; and Foreign Agricultural Service, middle-income country training program.

New obligational authority for the boll weevil program; up to 10 percent of the screwworm program of the Animal and Plant Health Inspection Service; Food Safety and Inspection Service, field automation and information management project; funds appropriated for rental payments; funds for the Native American Institutions Endowment Fund in the Cooperative State Research, Education, and Extension Service; and funds for the competitive research grants (7 U.S.C. 450i(b)), shall remain available until expended.

SEC. 706. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 707. Not to exceed $50,000 of the appropriations available to the Department of Agriculture in this Act shall be available to provide appropriate orientation and language training pursuant to Public Law 94–449.

SEC. 708. No funds appropriated by this Act may be used to pay negotiated indirect cost rates on cooperative agreements or similar arrangements between the United States Department of Agriculture and nonprofit institutions in excess of 10 percent of the total direct cost of the agreement when the purpose of such cooperative arrangements is to carry out programs of mutual interest between the two parties. This does not preclude appropriate payment of indirect costs on grants and contracts with such institutions when such indirect costs are computed on a similar basis for all agencies for which appropriations are provided in this Act.

<< 7 USCA § 612c NOTE >>

SEC. 709. Notwithstanding any other provision of this Act, commodities acquired by the Department in connection with Commodity Credit Corporation and section 32 price support operations may be used, as authorized by law (15 U.S.C. 714c and 7 U.S.C. 612c), to provide commodities to individuals in cases of hardship as determined by the Secretary of Agriculture.

SEC. 710. None of the funds in this Act shall be available to restrict the authority of the Commodity Credit Corporation to lease space for its own use or to lease space on behalf of other agencies of the Department of Agriculture when such space will be jointly occupied.

SEC. 711. None of the funds in this Act shall be available to pay indirect costs on research grants awarded competitively by the Cooperative State Research, Education, and Extension Service that exceed 14 percent of total Federal funds provided under each award: *Provided,* That notwithstanding section 1462 of the National Agricultural Research, Extension, and Teaching Policy Act of 1977 (7 U.S.C. 3310), funds provided by this Act for grants awarded competitively by the Cooperative State Research, Education, and Extension Service shall be available to pay full allowable indirect costs for each grant awarded under the Small Business Innovation Development Act of 1982, Public Law 97–219 (15 U.S.C. 638).

SEC. 712. Notwithstanding any other provisions of this Act, all loan levels provided in this Act shall be considered estimates, not limitations.

SEC. 713. Appropriations to the Department of Agriculture for the cost of direct and guaranteed loans made available in fiscal year 1999 shall remain available until expended to cover obligations made in fiscal year 1999 for the following accounts: the rural development loan fund program account; the Rural Telephone Bank program account; the rural electrification and telecommunications loans program account; and the rural economic development loans program account.

SEC. 714. Such sums as may be necessary for fiscal year 1999 pay raises for programs funded by this Act shall be absorbed within the levels appropriated by this Act.

SEC. 715. Notwithstanding the Federal Grant and Cooperative Agreement Act, marketing services of the Agricultural Marketing Service; Grain Inspection, Packers and Stockyards Administration; and the Animal and Plant Health Inspection Service may use cooperative agreements to reflect a relationship between the Agricultural Marketing Service, the Grain Inspection, Packers and Stockyards Administration or the Animal and Plant Health Inspection Service and a State or Cooperator to carry out agricultural marketing programs or to carry out programs to protect the Nation's animal and plant resources.

SEC. 716. Notwithstanding the Federal Grant and Cooperative Agreement Act, the Natural Resources Conservation Service may enter into contracts, grants, or cooperative agreements with a State agency or subdivision, or a public or private organization, for the acquisition of goods or services, including personal services, to carry out natural resources conservation activities: *Provided,* That Commodity Credit Corporation funds obligated for such purposes shall not exceed the level obligated by the Commodity Credit Corporation for such purposes in fiscal year 1998.

SEC. 717. None of the funds in this Act may be used to retire more than 5 percent of the Class A stock of the Rural Telephone Bank or to maintain any account or subaccount within the accounting records of the Rural Telephone Bank the creation of which has not specifically been authorized by statute: *Provided,* That notwithstanding any other provision of law, none of the funds appropriated or otherwise made available in this Act may be used to transfer to the Treasury or to the Federal Financing Bank any unobligated balance of the Rural Telephone Bank telephone liquidating account which is in excess of current requirements and such balance shall receive interest as set forth for financial accounts in section 505(c) of the Federal Credit Reform Act of 1990.

<< 7 USCA § 5623 NOTE >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 718. Hereafter, none of the funds made available in this Act may be used to provide assistance to, or to pay the salaries of personnel to carry out a market promotion/market access program pursuant to section 203 of the Agricultural Trade Act of 1978 (7 U.S.C. 5623) that provides assistance to the United States Mink Export Development Council or any mink industry trade association.

SEC. 719. Of the funds made available by this Act, not more than $1,800,000 shall be used to cover necessary expenses of activities related to all advisory committees, panels, commissions, and task forces of the Department of Agriculture, except for panels used to comply with negotiated rule makings and panels used to evaluate competitively awarded grants: *Provided,* That interagency funding is authorized to carry out the purposes of the National Drought Policy Commission.

SEC. 720. None of the funds appropriated in this Act may be used to carry out the provisions of section 918 of Public Law 104–127, the Federal Agriculture Improvement and Reform Act.

SEC. 721. No employee of the Department of Agriculture may be detailed or assigned from an agency or office funded by this Act to any other agency or office of the Department for more than 30 days unless the individual's employing agency or office is fully reimbursed by the receiving agency or office for the salary and expenses of the employee for the period of assignment.

SEC. 722. None of the funds appropriated or otherwise made available to the Department of Agriculture shall be used to transmit or otherwise make available to any non-Department of Agriculture employee questions or responses to questions that are a result of information requested for the appropriations hearing process.

SEC. 723. None of the funds made available to the Department of Agriculture by this Act may be used to acquire new information technology systems or significant upgrades, as determined by the Office of the Chief Information Officer, without the approval of the Chief Information Officer and the concurrence of the Executive Information Technology Investment Review Board: *Provided,* That notwithstanding any other provision of law, none of the funds appropriated or otherwise made available by this Act may be transferred to the Office of the Chief Information Officer without the prior approval of the Committee on Appropriations of both Houses of Congress.

SEC. 724. (a) None of the funds provided by this Act, or provided by previous Appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1999, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds which: (1) creates new programs; (2) eliminates a program, project, or activity; (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (4) relocates an office or employees; (5) reorganizes offices, programs, or activities; or (6) contracts out or privatizes any functions or activities presently performed by Federal employees; unless the Committee on Appropriations of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

(b) None of the funds provided by this Act, or provided by previous Appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1999, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for activities, programs, or projects through a reprogramming of funds in excess of $500,000 or 10 percent, whichever is less, that: (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress; or (3) results from any general savings from a reduction in personnel which would result in a change in existing programs, activities, or projects as approved by Congress; unless the Committee on Appropriations of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

SEC. 725. None of the funds appropriated or otherwise made available by this Act or any other Act may be used to pay the salaries and expenses of personnel to carry out section 793 of Public Law 104–127, with the exception of funds made available under that section on January 1, 1997.

SEC. 726. None of the funds appropriated or otherwise made available by this Act shall be used to pay the salaries and expenses of personnel who carry out an environmental quality incentives program authorized by sections 334–341 of Public Law 104–127 in excess of $174,000,000.

SEC. 727. None of the funds appropriated or otherwise available to the Department of Agriculture may be used to administer the provision of contract payments to a producer under the Agricultural Market Transition Act (7 U.S.C. 7201 et seq.) for contract acreage on which wild rice is planted unless the contract payment is reduced by an acre for each contract acre planted to wild rice.

SEC. 728. The Federal facility located in Stuttgart, Arkansas, and known as the "United States National Rice Germplasm Evaluation and Enhancement Center", shall be known and designated as the "Dale Bumpers National Rice Research Center": *Provided,* That any reference in law, map, regulation, document, paper, or other record of the United States to such federal facility shall be deemed to be a reference to the "Dale Bumpers National Rice Research Center".

SEC. 729. Notwithstanding any other provision of law, the Secretary of Agriculture, subject to the reprogramming requirements established by this Act, may transfer up to $26,000,000 in discretionary funds made available by this Act among programs of the Department, not otherwise appropriated for a specific purpose or a specific location, for distribution to or for the benefit of the Lower Mississippi Delta Region, as defined in Public Law 100–460, prior to normal state or regional allocation of funds: *Provided,* That any funds made available through Chapter Four of Subtitle D of Title XII of the Food Security Act of 1985 (16 U.S.C. 3839aa et seq.) may be included in any amount reprogrammed under this section if such funds are used for a purpose authorized by such Chapter: *Provided further,* That any funds made available from ongoing programs of the Department of Agriculture used for the benefit of the Lower Mississippi Delta Region shall be counted toward the level cited in this section.

SEC. 730. None of the funds appropriated or otherwise made available by this Act shall be used to pay the salaries and expenses of personnel to enroll in excess of 120,000 acres in the fiscal year 1999 wetlands reserve program as authorized by 16 U.S.C. 3837.

SEC. 731. None of the funds appropriated or otherwise made available by this Act shall be used to pay the salaries and expenses of personnel to carry out the emergency food assistance program authorized by section 27(a) of the Food Stamp Act if such program exceeds $90,000,000.

SEC. 732. None of the funds appropriated or otherwise made available by this or any other Act shall be used to pay the salaries and expenses of personnel to carry out the provisions of section 401 of Public Law 105–185.

SEC. 733. Notwithstanding any other provision of law, the City of Big Spring, Texas shall be eligible to participate in rural housing programs administered by the Rural Housing Service.

SEC. 734. Notwithstanding any other provision of law, the Municipality of Carolina, Puerto Rico shall be eligible for grants and loans administered by the Rural Utilities Service.

SEC. 735. Notwithstanding section 381A of the Consolidated Farm and Rural Development Act (7 U.S.C. 2009), the definitions of rural areas for certain business programs administered by the Rural Business–Cooperative Service and the community facilities programs administered by the Rural Housing Service shall be those provided for in statute and regulations prior to the enactment of Public Law 104–127.

SEC. 736. None of the funds appropriated or otherwise made available by this Act shall be used to carry out any commodity purchase program that would prohibit eligibility or participation by farmer-owned cooperatives.

<< 21 USCA § 360b >>

SEC. 737. Section 512(d)(4)(D)(iii) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360b(d)(4)(D)(iii)) is amended by inserting before the semicolon the following: ", except that for purposes of this clause, antibacterial ingredient or animal drug does not include the ionophore or arsenical classes of animal drugs".

SEC. 738. (a) None of the funds appropriated or otherwise made available to the Secretary by this Act, any other Act, or any other source may be used to issue the final rule to implement the amendments to Federal milk marketing orders required by subsection (a)(1) of section 143 of the Agricultural Market Transition Act (7 U.S.C. 7253), other than during the period of February 1, 1999, through April 4, 1999, and only if the actual implementation of the amendments as part of Federal milk marketing orders takes effect on October 1, 1999, notwithstanding the penalties that would otherwise be imposed under subsection (c) of such section.

(b) None of such funds may be used to designate the State of California as a separate Federal milk marketing order under subsection (a)(2) of such section, other than during the period beginning on the date of the issuance of the final rule referred to in subsection (a) through September 30, 1999.

(c) For purposes of this section, a final rule shall be considered to be a final rule when the rule is submitted to Congress as required by chapter 8 of title 5, United States Code, to permit congressional review of agency rulemaking and before the Secretary of Agriculture conducts the producer referendum required under section 8c(19) of the Agricultural Adjustment Act (7 U.S.C. 608c(19)), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 739. Whenever the Secretary of Agriculture announces the basic formula price for milk for purposes of Federal milk marketing orders issued under section 8c of the Agricultural Adjustment Act (7 U.S.C. 608c), reenacted with amendments by the Agricultural Marketing Agreement Act of 1937, the Secretary shall include in the announcement an estimate, stated on a per hundredweight basis, of the costs incurred by milk producers, including transportation and marketing costs, to produce milk in the different regions of the United States.

SEC. 740. None of the funds appropriated or otherwise made available by this Act shall be used to pay the salaries and expenses of personnel to carry out a conservation farm option program, as authorized by section 335 of Public Law 104–127.

<< 7 USCA § 2279 NOTE >>

SEC. 741. WAIVER OF STATUTE OF LIMITATIONS. (a) To the extent permitted by the Constitution, any civil action to obtain relief with respect to the discrimination alleged in an eligible complaint, if commenced not later than 2 years after the date of the enactment of this Act, shall not be barred by any statute of limitations.

<< 7 USCA § 2279 NOTE >>

(b) The complainant may, in lieu of filing a civil action, seek a determination on the merits of the eligible complaint by the Department of Agriculture if such complaint was filed not later than 2 years after the date of enactment of this Act. The Department of Agriculture shall—

<< 7 USCA § 2279 NOTE >>

(1) provide the complainant an opportunity for a hearing on the record before making that determination;

<< 7 USCA § 2279 NOTE >>

(2) award the complainant such relief as would be afforded under the applicable statute from which the eligible complaint arose notwithstanding any statute of limitations; and

<< 7 USCA § 2279 NOTE >>

(3) to the maximum extent practicable within 180 days after the date a determination of an eligible complaint is sought under this subsection conduct an investigation, issue a written determination and propose a resolution in accordance with this subsection.

<< 7 USCA § 2279 NOTE >>

(c) Notwithstanding subsections (a) and (b), if an eligible claim is denied administratively, the claimant shall have at least 180 days to commence a cause of action in a Federal court of competent jurisdiction seeking a review of such denial.

<< 7 USCA § 2279 NOTE >>

(d) The United States Court of Federal Claims and the United States District Court shall have exclusive original jurisdiction over—

<< 7 USCA § 2279 NOTE >>

(1) any cause of action arising out of a complaint with respect to which this section waives the statute of limitations; and

<< 7 USCA § 2279 NOTE >>

(2) any civil action for judicial review of a determination in an administrative proceeding in the Department of Agriculture under this section.

<< 7 USCA § 2279 NOTE >>

(e) As used in this section, the term "eligible complaint" means a nonemployment related complaint that was filed with the Department of Agriculture before July 1, 1997 and alleges discrimination at any time during the period beginning on January 1, 1981 and ending December 31, 1996—

<< 7 USCA § 2279 NOTE >>

(1) in violation of the Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) in administering—
  (A) a farm ownership, farm operating, or emergency loan funded from the Agricultural Credit Insurance Program Account; or
  (B) a housing program established under title V of the Housing Act of 1949; or

<< 7 USCA § 2279 NOTE >>

(2) in the administration of a commodity program or a disaster assistance program.

<< 7 USCA § 2279 NOTE >>

(f) This section shall apply in fiscal year 1999 and thereafter.

<< 7 USCA § 2279 NOTE >>

(g) The standard of review for judicial review of an agency action with respect to an eligible complaint is de novo review. Chapter 5 of title 5 of the United States Code shall apply with respect to an agency action under this section with respect to an eligible complaint, without regard to section 554(a)(1) of that title.

<< 7 USCA § 2279d >>

SEC. 742. In any claim brought under the Rehabilitation Act of 1973 and filed with the Secretary of Agriculture after January 1994 resulting in a finding that a farmer was subjected to discrimination under any farm loan program or activity conducted by the United States Department of Agriculture in violation of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), the Secretary of Agriculture shall be liable for compensatory damages. Such liability shall apply to any administrative action brought before the date of enactment of this Act, but only if the action is brought within the applicable statute of limitations and the complainant sought or seeks compensatory damages while the action is pending.

<< 7 USCA § 426 NOTE >>

SEC. 743. Public Law 102–237, Title X, Section 1013(a) and (b) (7 U.S.C. 426 note) is amended by striking ", to the extent practicable," in each instance in which it appears.
SEC. 744. Funds made available for conservation operations by this or any other Act, including prior-year balances, shall be available for financial assistance and technical assistance for the purpose of constructing the Franklin County Lake Project, Mississippi, in the amounts earmarked in appropriations report language.

<< 7 USCA § 1926d >>

SEC. 745. Section 306D of the Consolidated Farm and Rural Development Act (7 U.S.C. 1926d) is amended by inserting "25 percent in" in lieu of "equal" in subsection (b), and by inserting "$20,000,000" in lieu of "$15,000,000" in subsection (d).
SEC. 746. None of the funds made available to the Food and Drug Administration by this Act shall be used to close or relocate, or to plan to close or relocate, the Food and Drug Administration Division of Drug Analysis in St. Louis, Missouri.

<< 7 USCA § 1622 NOTE >>

SEC. 747. None of the funds made available by this Act or any other Act for any fiscal year may be used to carry out section 302(h) of the Agricultural Marketing Act of 1946 (7 U.S.C. 1622(h)) unless the Secretary of Agriculture inspects and certifies agricultural processing equipment, and imposes a fee for the inspection and certification, in a manner that is similar to the inspection and certification of agricultural products under that section, as determined by the Secretary: *Provided,* That this provision shall not affect the authority of the Secretary to carry out the Federal Meat Inspection Act (21 U.S.C. 601 et seq.), the Poultry Products Inspection Act (21 U.S.C. 451 et seq.), or the Egg Products Inspection Act (21 U.S.C. 1031 et seq.).

<< 7 USCA § 1508 NOTE >>

SEC. 748. Notwithstanding the provisions of section 508(b)(5)(A) of the Federal Crop Insurance Act (7 U.S.C. 1508(b)(5) (A)), for the 1999 reinsurance and subsequent reinsurance years, no producer shall pay more than $50 per crop per county as an administrative fee for catastrophic risk protection under section 508(b)(5)(A) of the Act.

SEC. 749. That notwithstanding section 4703(d)(1) of title 5, United States Code, the personnel management demonstration project established in the Department of Agriculture, as described at 55 FR 9062 and amended at 61 FR 9507 and 61 FR 49178, shall be continued indefinitely and become effective upon enactment of this Act.

<< 7 USCA § 1762 NOTE >>

SEC. 750. Strike the last sentence under the heading of Title IV—International Programs, Foreign Agricultural Service of Public Law 100–202 (101 STAT. 1329 et seq.) and insert in lieu thereof the following: "On or after August 1, 1998 such individuals employed by contract to perform such services shall not, by virtue of such employment, be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management. Such individuals may be considered employees within the meaning of the Federal Employee Compensation Act, 5 U.S.C. 8101 et seq.".

<< 16 USCA § 3837d >>

SEC. 751. Section 1237D(c)(1) of subchapter C of the Food Security Act of 1985 is amended by inserting after "perpetual" the following "or 30–year".

<< 16 USCA § 3837 >>

SEC. 752. Section 1237(b)(2) of subchapter C of the Food Security Act of 1985 is amended by adding the following:
"(C) For purposes of subparagraph (A), to the maximum extent practicable should be interpreted to mean that acceptance of wetlands reserve program bids may be in proportion to landowner interest expressed in program options.".

<< 16 USCA § 1642 >>

SEC. 753. (a) Section 3(d)(3) of the Forest and Rangeland Renewable Resources Research Act of 1978 (16 U.S.C. 1642(d) (3)) (as amended by section 253(b) of the Agricultural Research, Extension, and Education Reform Act of 1998) is amended by striking "The Secretary" and inserting "At the request of the Governor of the State of Maine, New Hampshire, New York, or Vermont, the Secretary".

<< 7 USCA § 4606 >>

(b) Section 7(e)(2) of the Honey Research, Promotion, and Consumer Information Act (7 U.S.C. 4606(e)(2)) (as amended by section 605(f)(3) of the Agricultural Research, Extension, and Education Reform Act of 1998) is amended by striking "$0.0075" each place it appears and inserting "$0.01".

<< 7 USCA § 2204f >>

(c)(1) Section 793(c)(2)(B) of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 2204f(c)(2)(B)) is amended—

AR.02349

(A) in clause (iii), by striking "or" at the end;

(B) in clause (iv), by striking the period at the end and inserting "; or"; and

(C) by adding at the end the following:

   "(v) a State agricultural experiment station.".

<< 7 USCA § 7621 >>

(2) Section 401(d) of the Agricultural Research, Extension, and Education Reform Act of 1998 (7 U.S.C. 7621(d)) is amended—

(A) in paragraph (3), by striking "or" at the end;

(B) in paragraph (4), by striking the period at the end and inserting "; or"; and

(C) by adding at the end the following:

   "(5) a State agricultural experiment station.".

<< 7 USCA § 361*o* >>

(d) Section 3(d) of the Hatch Act of 1887 (7 U.S.C. 361c(d)) is amended—

<< 7 USCA § 361*o* >>

(1) in paragraph (1), by striking "No" and inserting "Except as provided in paragraph (4), no"; and

<< 7 USCA § 361*o* >>

(2) by adding at the end the following:

   "(4) TERRITORIES.—In lieu of the matching funds requirement of paragraph (1), the Commonwealth of Puerto Rico, the Virgin Islands, and Guam shall be subject to the same matching funds requirements as those applicable to an eligible institution under section 1449 of the National Agricultural Research, Extension, and Teaching Policy Act of 1977 (7 U.S.C. 3222d).".

<< 7 USCA § 343 >>

(e) Section 3(e) of the Smith–Lever Act (7 U.S.C. 343(e)) is amended—

<< 7 USCA § 343 >>

(1) in paragraph (1), by inserting "paragraph (4) and" after "provided in"; and

<< 7 USCA § 343 >>

(2) by adding at the end the following:

   "(4) TERRITORIES.—In lieu of the matching funds requirement of paragraph (1), the Commonwealth of Puerto Rico, the Virgin Islands, and Guam shall be subject to the same matching funds requirements as those applicable to an eligible institution under section 1449 of the National Agricultural Research, Extension, and Teaching Policy Act of 1977 (7 U.S.C. 3222d).".

<< 7 USCA § 343 NOTE >>

(f) The amendments made by this section shall take effect on the date of enactment of the Agricultural Research, Extension, and Education Reform Act of 1998.

SEC. 754. None of the funds appropriated by this Act or any other Act shall be used to pay the salaries and expenses of personnel who prepare or submit appropriations language as part of the President's Budget submission to the Congress of the United States for programs under the jurisdiction of the Appropriations Subcommittees on Agriculture, Rural Development, and Related Agencies that assumes revenues or reflects a reduction from the previous year due to user fees proposals that have not been enacted into law prior to the submission of the Budget unless such Budget submission identifies which additional

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

spending reductions should occur in the event the users fees proposals are not enacted prior to the date of the convening of a committee of conference for the fiscal year 2000 appropriations Act.

<< 7 USCA § 1622 >>

SEC. 755. (a) Section 203(h) of the Agricultural Marketing Act of 1946 (7 U.S.C. 1622(h)) is amended by adding at the end the following: "Shell eggs packed under the voluntary grading program of the Department of Agriculture shall not have been shipped for sale previous to being packed under the program, as determined under a regulation promulgated by the Secretary.".

(b) Not later than 90 days after the date of enactment of this Act, the Secretary of Agriculture, and the Secretary of Health and Human Services, shall submit a joint status report to the Committees on Appropriations of the House of Representatives and the Senate that describes actions taken by the Secretary of Agriculture and the Secretary of Health and Human Services—

(1) to enhance the safety of shell eggs and egg products;

(2) to prohibit the grading, under the voluntary grading program of the Department of Agriculture, of shell eggs previously shipped for sale; and

(3) to assess the feasibility and desirability of applying to all shell eggs the prohibition on repackaging to enhance food safety, consumer information, and consumer awareness.

<< 15 USCA § 714b >>

SEC. 756. Expenses for computer-related activities of the Department of Agriculture funded through the Commodity Credit Corporation pursuant to section 161(b)(1)(A) of Public Law 104–127 in fiscal year 1999 shall not exceed $65,000,000: *Provided,* That section 4(g) of the Commodity Credit Corporation Charter Act is amended by striking $193,000,000 and inserting $188,000,000.

SEC. 757. (a) The Secretary of Agriculture may use funds for tree assistance made available under Public Law 105–174, to carry out a tree assistance program to owners of trees that were lost or destroyed as a result of a disaster or emergency that was declared by the President or the Secretary of Agriculture during the period beginning May 1, 1998, and ending August 1, 1998, regardless of whether the damage resulted in loss or destruction after August 1, 1998.

(b) Subject to subsection (c), the Secretary shall carry out the program, to the maximum extent practicable, in accordance with the terms and conditions of the tree assistance program established under part 783 of title 7, Code of Federal Regulations.

(c) A person shall be presumed eligible for assistance under the program if the person demonstrates to the Secretary that trees owned by the person were lost or destroyed by May 31, 1999, as a direct result of fire blight infestation that was caused by a disaster or emergency described in subsection (a).

SEC. 758. None of the funds appropriated or otherwise made available by this Act shall be used to establish an Office of Community Food Security or any similar office within the United States Department of Agriculture without the prior approval of the Committee on Appropriations of both Houses of Congress.

SEC. 759. Notwithstanding any other provision of law, the city of Vineland, New Jersey, shall be eligible for programs administered by the Rural Housing Service and the Rural Business–Cooperative Service.

SEC. 760. (a)(1) For purpose of this section, the term "Commission" means the Commodity Futures Trading Commission.

(2) For purposes of this section, the term "qualifying hybrid instrument or swap agreement" means a hybrid instrument or swap agreement that—

(A) was entered into before the start of the restraint period or is entered into during the restraint period; and

(B) is exempt under part 34 or part 35 of title 17, Code of Federal Regulations (as in effect on January 1, 1998), qualifies for the safe harbor contained in the Policy Statement of the Commission regarding swap agreements published in the Federal Register on July 21, 1989 (54 Fed. Reg. 30694), or qualifies for the exclusion set forth in the Statutory Interpretation of the Commission concerning certain hybrid instruments published in the Federal Register on April 11, 1990 (55 Fed. Reg. 13582).

(3) For purposes of this section, the term "restraint period" means the period—

(A) beginning on the date of the enactment of this Act; and

(B) ending on March 30, 1999, or the first date on which legislation is enacted that authorizes appropriations for the Commission for a fiscal year after fiscal year 2000, whichever occurs first.

AR.02351

(b) During the restraint period, the Commission may not propose or issue any rule or regulation, or issue any interpretation or policy statement, that restricts or regulates activity in a qualifying hybrid instrument or swap agreement.

(c) Notwithstanding subsection (b), during the restraint period, the Commission may—

 (1) act on a petition for exemptive relief under section 4(c) of the Commodity Exchange Act (7 U.S.C. 6(c));

 (2) enter such cease and desist orders and take such enforcement action, including the imposition of sanctions, as the Commission considers necessary to enforce any provision of the Commodity Exchange Act (7 U.S.C. 1 et seq.) or title 17, Code of Federal Regulations, in connection with a qualifying hybrid instrument or swap agreement, to the extent such provision is otherwise applicable to that qualifying hybrid instrument or swap agreement or a transaction involving that qualifying hybrid instrument or swap agreement;

 (3) take such action as the Commission considers appropriate with regard to agricultural trade options; and

 (4) take such action as the Commission considers appropriate to respond to a market emergency.

(d)(1) The legal status of contracts involving a qualifying hybrid instrument or swap agreement shall not differ from the legal status afforded such contracts during the period—

 (A) beginning on—

  (i) in the case of swap agreements, July 21, 1989, which was the date on which the Commission adopted a Policy Statement regarding swap agreements (54 Fed. Reg. 30694); and

  (ii) in the case of hybrid instruments, April 11, 1990, which was the date that the Statutory Interpretation of the Commission concerning hybrid instruments was published in the Federal Register; and

 (B) ending on January 1, 1998.

(2) Neither the comment letter of the Commission submitted on February 26, 1998, to the Securities and Exchange Commission regarding the proposal known as "Broker–Dealer Lite", nor the Concept Release of the Commission regarding over-the-counter derivatives published in the Federal Register on May 12, 1998 (63 Fed. Reg. 26114), shall alter or affect the legal status of a qualifying hybrid instrument or swap agreement under the Commodity Exchange Act (7 U.S.C. 1 et seq.).

(e) Nothing in this section shall be construed as reflecting or implying a determination that a qualifying hybrid instrument or swap agreement, or a transaction involving a qualifying hybrid instrument or swap agreement, is subject to the Commodity Exchange Act (7 U.S.C. 1 et seq.).

 SEC. 761. None of the funds appropriated or otherwise made available by this or any other Act may be used to carry out provision of section 612 of Public Law 105–185.

<< 7 USCA § 7236 >>

 SEC. 762. Section 136 of the Agricultural Market Transition Act (7 U.S.C. 7236) is amended by striking "1.25 cents" each place it appears in subsections (a) and (b) and inserting "3 cents".

 SEC. 763. In implementing section 1124 of subtitle C of title XI of this Act, the Secretary of Agriculture shall:

 (a) provide $18,000,000 to the states for distribution of emergency aid to individuals with family incomes below the federal poverty level who have been adversely affected utilizing Federal Emergency Management Agency guidelines;

 (b) transfer to the Secretary of Commerce for obligation and expenditure (1) $15,000,000 for programs pursuant to title IX of Public Law 91–304, as amended, of which six percent may be available for administrative costs; (2) $5,000,000 for the Trade Adjustment Assistance program as provided by the Trade Act of 1974, as amended; and (3) $7,000,000 for disaster research and prevention pursuant to section 402(d) of Public Law 94–265; and

 (c) transfer to the Administrator of the Small Business Administration for obligation and expenditure, $5,000,000 for the cost of direct loans authorized by section 7(b) of the Small Business Act, as amended, for eligible small businesses.

<< 42 USCA § 7671c >>

 SEC. 764. (a) Section 604 of the Clean Air Act is amended by inserting at the end the following:

 "(h) METHYL BROMIDE.—Notwithstanding subsection (d) and section 604(b), the Administrator shall not terminate production of methyl bromide prior to January 1, 2005. The Administrator shall promulgate rules for reductions in, and terminate the production, importation, and consumption of, methyl bromide under a schedule that is in accordance with, but not more stringent than, the phaseout schedule of the Montreal Protocol Treaty as in effect on the date of the enactment of this subsection.".

AR.02352

<< 42 USCA § 7671c >>

(b) Section 604(d) of the Clean Air Act is amended by inserting at the end the following:

  "(5) SANITATION AND FOOD PROTECTION.—To the extent consistent with the Montreal Protocol's quarantine and pre-shipment provisions, the Administrator shall exempt the production, importation, and consumption of methyl bromide to fumigate commodities entering or leaving the United States or any State (or political subdivision thereof) for purposes of compliance with Animal and Plant Health Inspection Service requirements or with any international, Federal, State, or local sanitation or food protection standard.

  "(6) CRITICAL USES.—To the extent consistent with the Montreal Protocol, the Administrator, after notice and the opportunity for public comment, and after consultation with other departments or instrumentalities of the Federal Government having regulatory authority related to methyl bromide, including the Secretary of the Agriculture, may exempt the production, importation, and consumption of methyl bromide for critical uses.".

<< 42 USCA § 7671c >>

(c) Section 604(e) of the Clean Air Act is amended by inserting at the end the following:

  "(3) METHYL BROMIDE.—Notwithstanding the phase-out and termination of production of methyl bromide pursuant to section 604(h), the Administrator may, consistent with the Montreal Protocol, authorize the production of limited quantities of methyl bromide, solely for use in developing countries that are Parties to the Copenhagen Amendments to the Montreal Protocol.".

<< 15 USCA § 590h NOTE >>

  SEC. 765. Notwithstanding any other provision of law, permanent employees of county committees employed on or after October 1, 1998, pursuant to 8(b) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h(b)) shall be considered as having Federal Civil Service status only for the purpose of applying for the United States Department of Agriculture Civil Service vacancies.

  SEC. 766. For grants for the rural empowerment zone and enterprise communities programs, an additional $15,000,000 is hereby appropriated, to remain available until expended, of which $10,000,000 is for grants for entities designated under section 1391(g) of the Internal Revenue Code of 1986 for the Secretary of Agriculture to carry out a second round of the empowerment zone program in rural areas; and of which $5,000,000 is for grants for rural enterprise communities for the Secretary of Agriculture to designate not more than 20 additional rural enterprise communities provided that such communities meet the designation and eligibility requirements of part I of subchapter U of chapter 1 of the Internal Revenue Code of 1986: *Provided,* That the designation of rural enterprise communities pursuant to this section shall be solely for the purpose of this section and not for tax treatment under the Internal Revenue Code: *Provided further,* That these funds are in addition to any other funds made available for empowerment zones and enterprise communities.

TITLE VIII—AGRICULTURAL CREDIT

<< 7 USCA § 2008h >>

  SEC. 801. Section 373 of the Consolidated Farm and Rural Development Act (7 U.S.C. 2008h) is amended by striking subsection (b) and inserting the following:
  "(b) PROHIBITION OF LOANS FOR BORROWERS THAT HAVE RECEIVED DEBT FORGIVENESS.—
  "(1) PROHIBITIONS.—Except as provided in paragraph (2)—
  "(A) the Secretary may not make a loan under this title to a borrower that has received debt forgiveness on a loan made or guaranteed under this title; and
  "(B) the Secretary may not guarantee a loan under this title to a borrower that has received—
  "(i) debt forgiveness after April 4, 1996, on a loan made or guaranteed under this title; or
  "(ii) received debt forgiveness on more than 3 occasions on or before April 4, 1996.
  "(2) EXCEPTIONS.—

"(A) IN GENERAL.—The Secretary may make a direct or guaranteed farm operating loan for paying annual farm or ranch operating expenses of a borrower who—

"(i) was restructured with a write down under section 353; or

"(ii) is current on payments under a confirmed reorganization plan under chapters 11, 12, or 13 of Title 11 of the United States Code.

"(B) EMERGENCY LOANS.—The Secretary may make an emergency loan under section 321 to a borrower that—

"(i) on or before April 4, 1996, received not more than 1 debt forgiveness on a loan made or guaranteed under this title; and

"(ii) after April 4, 1996, has not received debt forgiveness on a loan made or guaranteed under this title.".

<< 7 USCA § 1964 >>

SEC. 802. Section 324(d) of the Consolidated Farm and Rural Development Act (7 U.S.C. 1964(d)) is amended—

<< 7 USCA § 1964 >>

(1) by striking "(d) All loans" and inserting the following:

"(d) REPAYMENT.—

"(1) IN GENERAL.—All loans"; and

<< 7 USCA § 1964 >>

(2) by adding at the end the following:

"(2) NO BASIS FOR DENIAL OF LOAN.—

"(A) IN GENERAL.—Subject to subparagraph (B), the Secretary shall not deny a loan under this subtitle to a borrower by reason of the fact that the borrower lacks a particular amount of collateral for the loan if the Secretary is reasonably certain that the borrower will be able to repay the loan.

"(B) REFUSAL TO PLEDGE AVAILABLE COLLATERAL.—The Secretary may deny or cancel a loan under this subtitle if a borrower refuses to pledge available collateral on request by the Secretary.".

<< 7 USCA § 1508 >>

SEC. 803. (a) Section 508(n) of the Federal Crop Insurance Act (7 U.S.C. 1508(n)) is amended—

<< 7 USCA § 1508 >>

(1) by striking "If" and inserting the following:

"(1) IN GENERAL.—Except as provided in paragraph (2), if"; and

<< 7 USCA § 1508 >>

(2) by adding at the end the following:

"(2) EXCEPTION.—Paragraph (1) shall not apply to emergency loans under subtitle C of the Consolidated Farm and Rural Development Act (7 U.S.C. 1961 et seq.).".

<< 7 USCA § 7333 >>

(b) Section 196(i)(3) of the Agricultural Market Transition Act (7 U.S.C. 7333(i)(3)) is amended—

<< 7 USCA § 7333 >>

(1) by striking "If" and inserting the following:

"(A) IN GENERAL.—Except as provided in subparagraph (B), if"; and

<< 7 USCA § 7333 >>

(2) by adding at the end the following:

"(B) EXCEPTION.—Subparagraph (A) shall not apply to emergency loans under subtitle C of the Consolidated Farm and Rural Development Act (7 U.S.C. 1961 et seq.).".

<< 7 USCA § 1922 >>

SEC. 804. Section 302 of the Consolidated Farm and Rural Development Act (7 U.S.C. 1922) is amended by adding at the end the following:

"(D) NOTICE.—Beginning with fiscal year 2000 not later than 12 months before a borrower will become ineligible for direct loans under this subtitle by reason of this paragraph, the Secretary shall notify the borrower of such impending ineligibility.".

SEC. 805. The Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.) is amended—

<< 7 USCA § 1922 >>

(1) in section 302(a)(2) (7 U.S.C. 1922(a)(2)), by inserting "for direct loans only," before "have either";

<< 7 USCA § 1941 >>

(2) in section 311(a)(2) (7 U.S.C. 1941(a)(2)), by inserting "for direct loans only," before "have either"; and

<< 7 USCA § 2006a >>

(3) in section 359 (7 U.S.C. 2006a)—
 (A) in subsection (a), by striking "and guaranteed"; and
 (B) in subsection (c), by striking "or guaranteed" each place it appears.

<< 7 USCA § 1925 >>

SEC. 806. (a) Section 305 of the Consolidated Farm and Rural Development Act (7 U.S.C. 1925) is amended—

<< 7 USCA § 1925 >>

(1) by striking "Sec. 305. The Secretary" and inserting the following:

"SEC. 305. LIMITATIONS ON AMOUNT OF FARM OWNERSHIP LOANS.
 "(a) IN GENERAL.—The Secretary";

<< 7 USCA § 1925 >>

(2) by striking "$300,000" and inserting "$700,000 (increased, beginning with fiscal year 2000, by the inflation percentage applicable to the fiscal year in which the loan is guaranteed and reduced by the amount of any unpaid indebtedness of the borrower on loans under subtitle B that are guaranteed by the Secretary)";

<< 7 USCA § 1925 >>

(3) by striking "In determining" and inserting the following:
 "(b) DETERMINATION OF VALUE.—In determining"; and

<< 7 USCA § 1925 >>

(4) by adding at the end the following:

"(c) INFLATION PERCENTAGE.—For purposes of this section, the inflation percentage applicable to a fiscal year is the percentage (if any) by which—

"(1) the average of the Prices Paid By Farmers Index (as compiled by the National Agricultural Statistics of the Department of Agriculture) for the 12–month period ending on August 31 of the immediately preceding fiscal year; exceeds

"(2) the average of such index (as so defined) for the 12–month period ending on August 31, 1996.".

<< 7 USCA § 1943 >>

(b) Section 313 of the Consolidated Farm and Rural Development Act (7 U.S.C. 1943) is amended—

<< 7 USCA § 1943 >>

(1) by striking "Sec. 313. The Secretary" and inserting the following:
"SEC. 313. LIMITATIONS ON AMOUNT OF OPERATING LOANS.
"(a) IN GENERAL.—The Secretary";

<< 7 USCA § 1943 >>

(2) by striking "this subtitle (1) that would cause" and inserting "this subtitle—
"(1) that would cause";

<< 7 USCA § 1943 >>

(3) by striking "$400,000; or (2) for the purchasing" and inserting "$700,000 (increased, beginning with fiscal year 2000, by the inflation percentage applicable to the fiscal year in which the loan is guaranteed and reduced by the unpaid indebtedness of the borrower on loans under the sections specified in section 305 that are guaranteed by the Secretary); or
"(2) for the purchasing"; and

<< 7 USCA § 1943 >>

(4) by adding at the end the following:
"(b) INFLATION PERCENTAGE.—For purposes of this section, the inflation percentage applicable to a fiscal year is the percentage (if any) by which—

"(1) the average of the Prices Paid By Farmers Index (as compiled by the National Agricultural Statistics Service of the Department of Agriculture) for the 12–month period ending on August 31 of the immediately preceding fiscal year; exceeds

"(2) the average of such index (as so defined) for the 12–month period ending on August 31, 1996.".

<< 7 USCA § 2001 >>

SEC. 807. Section 353(e) of the Consolidated Farm and Rural Development Act (7 U.S.C. 2001(e)) is amended by adding at the end the following:

"(6) NOTICE OF RECAPTURE.—Beginning with fiscal year 2000 not later than 12 months before the end of the term of a shared appreciation arrangement, the Secretary shall notify the borrower involved of the provisions of the arrangement.".

<< 7 USCA § 2001 >>

SEC. 808. Section 353(c)(3)(C) of the Consolidated Farm and Rural Development Act (7 U.S.C. 2001(c)(3)(C)) is amended by striking "110 percent" and inserting "100 percent".

TITLE IX—INDIA–PAKISTAN RELIEF ACT

<< 22 USCA § 2799aa–1 NOTE >>

SEC. 901. SHORT TITLE. This title may be cited as the "India–Pakistan Relief Act of 1998".

<< 22 USCA § 2799aa–1 NOTE >>

  SEC. 902. WAIVER AUTHORITY. (a) AUTHORITY.—The President may waive for a period not to exceed one year upon enactment of this Act with respect to India or Pakistan the application of any sanction or prohibition (or portion thereof) contained in section 101 or 102 of the Arms Export Control Act, section 620E(e) of the Foreign Assistance Act of 1961, or section 2(b)(4) of the Export Import Bank Act of 1945.

<< 22 USCA § 2799aa–1 NOTE >>

  (b) EXCEPTION.—The authority provided in subsection (a) shall not apply to any restriction in section 102(b)(2)(B), (C), or (G) of the Arms Export Control Act.

<< 22 USCA § 2799aa–1 NOTE >>

  (c) AVAILABILITY OF AMOUNTS.—Amounts made available by this section are designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided,* That such amounts shall be available only to the extent that an official budget request that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

<< 22 USCA § 2799aa–1 NOTE >>

  SEC. 903. CONSULTATION. Prior to each exercise of the authority provided in section 902, the President shall consult with the appropriate congressional committees.

<< 22 USCA § 2799aa–1 NOTE >>

  SEC. 904. REPORTING REQUIREMENT. Not later than 30 days prior to the expiration of a one-year period described in section 902, the Secretary of State shall submit a report to the appropriate congressional committees on economic and national security developments in India and Pakistan.

<< 22 USCA § 2799aa–1 NOTE >>

  SEC. 905. APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED. In this title, the term "appropriate congressional committees" means the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives and the Committees on Appropriations of the House of Representatives and the Senate.

    TITLE X—UNDER SECRETARY OF AGRICULTURE FOR MARKETING AND REGULATORY PROGRAMS
  SEC. 1001. GENERAL. Title II of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994 (7 U.S.C. 6901 et seq.) is amended—

<< 7 USCA § 6918 >>

  (1) in section 218(a)—
  (A) in paragraph (1) by adding "and" at the end;
  (B) in paragraph (2) by striking "; and" and inserting a period; and
  (C) by striking paragraph (3);

<< 7 USCA Ch. 98 >>

  (2) by redesignating subtitle I as subtitle J;

<< 7 USCA Ch. 98 >>

(3) by inserting after subtitle H the following:

"SUBTITLE I—MARKETING AND REGULATORY PROGRAMS

<< 7 USCA § 7005 >>

"SEC. 285. UNDER SECRETARY OF AGRICULTURE FOR MARKETING AND REGULATORY PROGRAMS.

"(a) AUTHORIZATION.—The Secretary is authorized to establish in the Department the position of Under Secretary of Agriculture for Marketing and Regulatory Programs.

"(b) CONFIRMATION REQUIRED.—If the Secretary establishes the position of Under Secretary of Agriculture for Marketing and Regulatory Programs authorized under subsection (a), the Under Secretary shall be appointed by the President, by and with the advice and consent of the Senate.

"(c) FUNCTIONS OF UNDER SECRETARY.—

"(1) PRINCIPAL FUNCTIONS.—Upon establishment, the Secretary shall delegate to the Under Secretary of Agriculture for Marketing and Regulatory Programs those functions and duties under the jurisdiction of the Department that are related to agricultural marketing, animal and plant health inspection, grain inspection, and packers and stockyards.

"(2) ADDITIONAL FUNCTIONS.—The Under Secretary of Agriculture for Marketing and Regulatory Programs shall perform such other functions and duties as may be required by law or prescribed by the Secretary.

"(d) SUCCESSION.—Any official who is serving as Assistant Secretary of Agriculture for Marketing and Regulatory Programs on the date of the enactment of this section and who was appointed by the President, by and with the advice and consent of the Senate, shall not be required to be re-appointed under subsection (b) to the successor position authorized under subsection (a) if the Secretary establishes the position, and the official occupies the new position, within 180 days after the date of enactment of this section (or such later date set by the Secretary if litigation delays rapid succession).

<< 5 USCA § 5314 >>

"(e) EXECUTIVE SCHEDULE.—Section 5314 of title 5, United States Code, is amended by inserting after the item relating to the Under Secretary of Agriculture for Food Safety (as added by section 261(c)) the following:
'Under Secretary of Agriculture for Marketing and Regulatory Programs.'."; and

<< 7 USCA § 7014 >>

(4) in section 296(b)—
(A) in paragraph (2), by striking "or";
(B) in paragraph (3), by striking the period and inserting "; or"; and
(C) by adding at the end the following:
"(4) the authority of the Secretary to establish in the Department the position of Under Secretary of Agriculture for Marketing and Regulatory Programs under section 285.".
SEC. 1002. PAY INCREASE PROHIBITED.
The compensation of any officer or employee of the Department of Agriculture on the date of enactment of this Act shall not be increased as a result of the enactment of this Act.

<< 5 USCA § 5315 >>

SEC. 1003. CONFORMING AMENDMENT.
Section 5315 of title 5, United States Code, is amended by striking "Assistant Secretaries of Agriculture (3)." and inserting "Assistant Secretaries of Agriculture (2).".

TITLE XI—EMERGENCY AND MARKET LOSS ASSISTANCE

Subtitle A—Emergency Assistance for Crop and Livestock Feed Losses Due to Disasters

<< 7 USCA § 1421 NOTE >>

SEC. 1101. GENERAL PROVISIONS.

<< 7 USCA § 1421 NOTE >>

 (a) FAIR AND EQUITABLE DISTRIBUTION.—Assistance made available under this subtitle shall be distributed in a fair and equitable manner to producers who have incurred crop and livestock feed losses in all affected geographic regions of the United States.

<< 7 USCA § 1421 NOTE >>

 (b) PROGRAM ADMINISTRATION.—In carrying out this subtitle, the Secretary of Agriculture (referred to in this title as the "Secretary") may determine—

<< 7 USCA § 1421 NOTE >>

 (1) 1 or more loss thresholds producers on a farm must incur with respect to a crop to be eligible for assistance;

<< 7 USCA § 1421 NOTE >>

 (2) the payment rate for crop and livestock feed losses incurred; and

<< 7 USCA § 1421 NOTE >>

 (3) eligibility and payment limitation criteria (as defined by the Secretary) for persons to receive assistance under this subtitle, which, in the case of assistance received under any section of this subtitle, shall be in addition to—
  (A) assistance made available under any other section of this subtitle and subtitle B;
  (B) payments or loans received by a person under the Agricultural Market Transition Act (7 U.S.C. 7201 et seq.);
  (C) payments received by a person for the 1998 crop under the noninsured crop assistance program established under section 196 of that Act (7 U.S.C. 7333);
  (D) crop insurance indemnities provided for the 1998 crop under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.); and
  (E) emergency loans made available for the 1998 crop under subtitle C of the Consolidated Farm and Rural Development Act (7 U.S.C. 1961 et seq.).

<< 7 USCA § 1421 NOTE >>

SEC. 1102. CROP LOSS ASSISTANCE.

<< 7 USCA § 1421 NOTE >>

 (a) IN GENERAL.—The Secretary shall administer a program under which emergency financial assistance is made available to producers on a farm who have incurred losses associated with crops due to disasters (as determined by the Secretary).

<< 7 USCA § 1421 NOTE >>

 (b) LOSSES INCURRED FOR 1998 CROP.—Subject to section 1132, the Secretary shall use not more than $1,500,000,000 to make available assistance to producers on a farm who have incurred losses in the 1998 crop due to disasters.

<< 7 USCA § 1421 NOTE >>

(c) MULTIYEAR LOSSES.—Subject to section 1132, the Secretary shall use not more than $875,000,000 to make available assistance to producers on a farm who have incurred multiyear losses (as defined by the Secretary) in the 1998 and preceding crops of a commodity due to disasters (including, but not limited to, diseases such as scab).

<< 7 USCA § 1421 NOTE >>

(d) RELATIONSHIP BETWEEN ASSISTANCE.—The Secretary shall make assistance available to producers on a farm under either subsection (b) or (c).

<< 7 USCA § 1421 NOTE >>

(e) QUALIFYING LOSSES.—Assistance under this section may be made for losses associated with crops that are due to, as determined by the Secretary—

<< 7 USCA § 1421 NOTE >>

(1) quantity losses;

<< 7 USCA § 1421 NOTE >>

(2) quality (including, but not limited to, aflatoxin) losses; or

<< 7 USCA § 1421 NOTE >>

(3) severe economic losses due to damaging weather or related condition.

<< 7 USCA § 1421 NOTE >>

(f) CROPS COVERED.—Assistance under this section shall be applicable to losses for all crops (including losses of trees from which a crop is harvested), as determined by the Secretary, due to disasters.

<< 7 USCA § 1421 NOTE >>

(g) CROP INSURANCE.—

<< 7 USCA § 1421 NOTE >>

(1) ADMINISTRATION.—In carrying out this section, the Secretary shall not discriminate against or penalize producers on a farm who have purchased crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

<< 7 USCA § 1421 NOTE >>

(2) ENCOURAGING FUTURE CROP INSURANCE PARTICIPATION.—Subject to section 1132, the Secretary, acting through the Federal Crop Insurance Corporation, may use the funds made available under subsections (b) and (c), and only those funds, to provide premium refunds or other assistance to purchasers of crop insurance for their 1998 insured crops, or their preceding (including 1998) insured crops.

<< 7 USCA § 1421 NOTE >>

(3) PRODUCERS WHO HAVE NOT PURCHASED CROP INSURANCE FOR 1998 CROP.—As a condition of receiving assistance under this section, producers on a farm who have not purchased crop insurance for the 1998 crop under that Act shall agree by contract to purchase crop insurance for the 1999 and 2000 crops produced by the producers.

<< 7 USCA § 1421 NOTE >>

(4) LIQUIDATED DAMAGES.—

(A) IN GENERAL.—The contract under paragraph (3) shall provide for liquidated damages to be paid by the producers due to the failure of the producers to purchase crop insurance as provided in paragraph (3).

(B) NOTICE OF DAMAGES.—The amount of the liquidated damages shall be established by the Secretary and specified in the contract agreed to by the producers.

<< 7 USCA § 1421 NOTE >>

(5) FUNDING FOR CROP INSURANCE PURCHASE REQUIREMENT.—Subject to section 1132, such sums as may be necessary, to remain available until expended, shall be available to the Federal Crop Insurance Corporation to cover costs incurred by the Corporation as a result of the crop insurance purchase requirement of paragraph (3). Funds made available under subsections (b) and (c) may not be used to cover such costs.

<< 7 USCA § 1421 NOTE >>

SEC. 1103. EMERGENCY LIVESTOCK FEED ASSISTANCE.

Subject to section 1132, the Secretary shall use not more than $200,000,000 to make available livestock feed assistance to livestock producers affected by disasters during calendar year 1998.

### SUBTITLE B—MARKET LOSS ASSISTANCE

<< 7 USCA § 1421 NOTE >>

SEC. 1111. MARKET LOSS ASSISTANCE.

<< 7 USCA § 1421 NOTE >>

(a) IN GENERAL.—Subject to section 1132 and except as provided in subsection (d), the Secretary shall use not more than $3,057,000,000 for assistance to owners and producers on a farm who are eligible for final payments for fiscal year 1998 under a production flexibility contract for the farm under the Agricultural Market Transition Act (7 U.S.C. 7201 et seq.) to partially compensate the owners and producers for the loss of markets for the 1998 crop of a commodity.

<< 7 USCA § 1421 NOTE >>

(b) AMOUNT.—Except as provided in subsection (d), the amount of assistance made available to owners and producers on a farm under this section shall be proportional to the amount of the contract payment received by the owners and producers for fiscal year 1998 under a production flexibility contract for the farm under the Agricultural Market Transition Act.

<< 7 USCA § 1421 NOTE >>

(c) TIME FOR PAYMENT.—The assistance made available under this section for an eligible owner or producer shall be made as soon as practicable after the date of enactment of this Act.

<< 7 USCA § 1421 NOTE >>

(d) Of the total amount provided under subsection (a), $200,000,000 shall be available to provide assistance to dairy producers in a manner determined by the Secretary: *Provided,* That no payments made under this section shall affect any decision with respect to rulemaking activities described under section 143 of Public Law 104–127.

### SUBTITLE C—OTHER ASSISTANCE

<< 7 USCA § 1421 NOTE >>

SEC. 1121. INDEMNITY PAYMENTS FOR COTTON PRODUCERS.

<< 7 USCA § 1421 NOTE >>

(a) FEDERAL CONTRIBUTION.—Subject to subsection (b), the Secretary of Agriculture shall pay $5,000,000 to the State of Georgia to help fund an indemnity fund, to be established and managed by that State, to compensate cotton producers in that State for losses incurred in 1998 or 1999 from the loss of properly stored, harvested cotton as the result of the bankruptcy of a warehouseman or other party in possession of warehouse receipts evidencing title to the commodity, an improper conversion or transfer of the cotton, or such other potential hazards as determined appropriate by the State.

<< 7 USCA § 1421 NOTE >>

(b) CONDITIONS ON PAYMENT TO STATE.—The Secretary of Agriculture shall make the payment to the State of Georgia under subsection (a) only if the State also contributes $5,000,000 to the indemnity fund and agrees to expend all amounts in the indemnity fund by not later than January 1, 2000, to provide compensation to cotton producers as provided in such subsection. If the State of Georgia fails to make its contribution of $5,000,000 to the indemnity fund by July 1, 1999, the funds that would otherwise be paid to the State shall be available to the Secretary for the purpose of providing partial compensation to cotton producers as provided in such subsection.

<< 7 USCA § 1421 NOTE >>

(c) REPORTING REQUIREMENTS.—Upon the establishment of the indemnity fund, and not later than October 1, 1999, the State of Georgia shall submit a report to the Secretary of Agriculture and the Congress describing the State's efforts to use the indemnity fund to provide compensation to injured cotton producers.

<< 7 USCA § 1421 NOTE >>

SEC. 1122. HONEY RECOURSE LOANS.

<< 7 USCA § 1421 NOTE >>

(a) IN GENERAL.—Notwithstanding any other provision of law, in order to assist producers of honey to market their honey in an orderly manner during a period of disastrously low prices, the Secretary shall make available recourse loans to producers of the 1998 crop of honey on fair and reasonable terms and conditions, as determined by the Secretary.

<< 7 USCA § 1421 NOTE >>

(b) LOAN RATE.—The loan rate of the loans shall be 85 percent of the average price of honey during the 5–crop year period preceding the 1998 crop year, excluding the crop year in which the average price of honey was the highest and the crop year in which the average price of honey was the lowest in the period.

<< 7 USCA § 1421 NOTE >>

(c) NO NET COST BASIS.—Repayment of a loan under this section shall include repayment for interest and administrative costs as necessary to operate the program established under this section on a no net cost basis.

<< 7 USCA § 1421 NOTE >>

SEC. 1123. NONINSURED CROP ASSISTANCE TO RAISIN PRODUCERS.

Notwithstanding any of the provisions of section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) that would exclude the following producers from benefits thereunder, the Secretary shall make Noninsured Crop Assistance Program payments in fiscal year 1999 to raisin producers who obtained catastrophic risk protection but because of adverse weather conditions were not able to comply with the policy deadlines for laying the raisins in trays.

<< 7 USCA § 1421 NOTE >>

SEC. 1124. EMERGENCY ASSISTANCE.

In addition to amounts appropriated or otherwise made available by this Act, $50,000,000 is appropriated to the Department of Agriculture, to remain available until expended, to provide emergency disaster assistance to persons or entities who have incurred losses from a failure under section 312(a) of Public Law 94–265.

<< 7 USCA § 1421 NOTE >>

SEC. 1125. FOOD FOR PROGRESS.

The Food for Progress Act of 1985 (7 U.S.C. 1736*o*) is amended—

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 1736*o* >>

(1) in subsection (f)(3), by inserting after "$30,000,000" the following: "(or, in the case of fiscal year 1999, $35,000,000)";

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 1736*o* >>

(2) in subsection (l)(1), by inserting after "$10,000,000" the following: "(or, in the case of fiscal year 1999, $12,000,000)";

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 1736*o* >>

(3) by redesignating subsection (n) as subsection (o); and

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 1736*o* >>

(4) by inserting after subsection (m) the following:

"(n) During fiscal year 1999, to the maximum extent practicable, the Secretary shall utilize Private Voluntary Organizations to carry out this section.".

<< 7 USCA § 1421 NOTE >>

SEC. 1126. TEMPORARY EXPANSION OF RECOURSE LOAN AUTHORITY.

Section 137 of the Agricultural Market Transition Act (7 U.S.C. 7237) is amended—

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 7237 >>

(1) in the section heading, by inserting "**AND OTHER FIBERS**" before the period at the end;

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 7237 >>

(2) by redesignating subsection (c) as subsection (d); and

<< 7 USCA § 1421 NOTE >>

<< 7 USCA § 7237 >>

(3) by inserting after subsection (b) the following:

"(c) RECOURSE LOANS AVAILABLE FOR MOHAIR.—

"(1) RECOURSE LOANS AVAILABLE.—Notwithstanding any other provision of law, during fiscal year 1999, the Secretary shall make available recourse loans, as determined by the Secretary, to producers of mohair produced during or before that fiscal year.

"(2) LOAN RATE.—The loan rate for a loan under paragraph (1) shall be equal to $2.00 per pound.

"(3) TERM OF LOAN.—A loan under paragraph (1) shall have a term of 1 year beginning on the first day of the first month after the month in which the loan is made.

"(4) WAIVER OF INTEREST.—Notwithstanding subsection (d), the Secretary shall not charge interest on a loan made under paragraph (1).".

<< 7 USCA § 1421 NOTE >>

SEC. 1127. PILOT PROGRAMS.

<< 7 USCA § 1421 NOTE >>

(a) DOMESTIC MARKET REPORTING PILOT PROGRAM.—Title IV of the Packers and Stockyards Act is amended to include the following new section:

<< 7 USCA § 229a >>

"SEC. 416. MANDATORY DOMESTIC REPORTING PILOT INVESTIGATION.

"(1) IN GENERAL.—The Secretary of Agriculture shall conduct a twelve month pilot investigation, beginning upon the date of implementation of such pilot, under which the Secretary shall require any person or class of persons engaged in the business of buying, selling, or marketing domestic or imported cattle for immediate slaughter and fresh muscle cuts of beef, or domestic or imported sheep and fresh or frozen muscle cuts of lamb, to report to the Secretary, in the least intrusive manner possible, information relating to prices for the procurement of these items.

"(2) APPLICATION.—This section shall only apply to a person that is engaged in the business of buying, selling, or marketing a significant share of the national market, as determined by the Secretary, of the total volume of domestic or imported cattle for immediate slaughter and fresh muscle cuts of beef, or domestic or imported sheep and fresh or frozen muscle cuts of lamb, bought, sold, or marketed in the United States.

"(3) REPORT.—Not later than six months after the conclusion of the mandatory domestic reporting pilot investigation, the Secretary of Agriculture shall submit a report to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate on the effectiveness of the pilot investigation. No information collected under the pilot investigation may be disclosed until the report is submitted.".

<< 7 USCA § 1421 NOTE >>

(b) EXPORT MARKET REPORTING PILOT INVESTIGATION.—

<< 7 USCA § 1421 NOTE >>

(1) IN GENERAL.—The Secretary shall implement a twelve month pilot investigation, beginning on the date of implementation, of a streamlined electronic system for collecting export data, in the least intrusive manner possible, for fresh or frozen muscle cuts of meat food products, and develop a data-reporting program to disseminate summary information in a timely manner, not to exceed two weeks after issuance.

<< 7 USCA § 1421 NOTE >>

(2) REPORT.—Not later than six months after the conclusion of the mandatory export reporting pilot investigation, the Secretary of Agriculture shall submit a report to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate on the effectiveness of the pilot investigation.

<< 7 USCA § 1421 NOTE >>

(c) FUNDING.—An amount of $250,000 is hereby appropriated to carry out this section of the Act.

SUBTITLE D—ADMINISTRATION

<< 7 USCA § 1421 NOTE >>

SEC. 1131. COMMODITY CREDIT CORPORATION.
 Subject to section 1132, the Secretary shall use the funds, facilities, and authorities of the Commodity Credit Corporation to carry out subtitles A, B, and C of this title.

<< 7 USCA § 1421 NOTE >>

SEC. 1132. EMERGENCY REQUIREMENT.
 Notwithstanding the last sentence of section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, amounts made available by subtitles A, B, and C of this title are designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided,* That such amounts shall be available only to the extent that an official budget request that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to Congress.

<< 7 USCA § 1421 NOTE >>

SEC. 1133. REGULATIONS.

<< 7 USCA § 1421 NOTE >>

 (a) ISSUANCE OF REGULATIONS.—As soon as practicable after the date of enactment of this Act, the Secretary and the Commodity Credit Corporation, as appropriate, shall issue such regulations as are necessary to implement subtitles A, B, and C of this title. The issuance of the regulations shall be made without regard to—

<< 7 USCA § 1421 NOTE >>

 (1) the notice and comment provisions of section 553 of title 5, United States Code;

<< 7 USCA § 1421 NOTE >>

 (2) the Statement of Policy of the Secretary of Agriculture effective July 24, 1971 (36 Fed. Reg. 13804), relating to notices of proposed rulemaking and public participation in rulemaking; and

<< 7 USCA § 1421 NOTE >>

 (3) chapter 35 of title 44, United States Code (commonly known as the "Paperwork Reduction Act").

<< 7 USCA § 1421 NOTE >>

(b) CONGRESSIONAL REVIEW OF AGENCY RULEMAKING.—In carrying out this section, the Secretary shall use the authority provided under section 808 of title 5, United States Code.

TITLE XII—BIODIESEL

SEC. 1201. BIODIESEL FUEL USE CREDITS.

<< 42 USCA § 13220 >>

(a) AMENDMENT.—Title III of the Energy Policy Act of 1992 (42 U.S.C. 13211–13219) is amended by adding at the end the following new section:

"SEC. 312. BIODIESEL FUEL USE CREDITS.

"(a) ALLOCATION OF CREDITS.—

"(1) IN GENERAL.—The Secretary shall allocate one credit under this section to a fleet or covered person for each qualifying volume of the biodiesel component of fuel containing at least 20 percent biodiesel by volume purchased after the date of the enactment of this section for use by the fleet or covered person in vehicles owned or operated by the fleet or covered person that weigh more than 8,500 pounds gross vehicle weight rating.

"(2) EXCEPTIONS.—No credits shall be allocated under paragraph (1) for a purchase of biodiesel—

"(A) for use in alternative fueled vehicles; or

"(B) that is required by Federal or State law.

"(3) AUTHORITY TO MODIFY PERCENTAGE.—The Secretary may, by rule, lower the 20 percent biodiesel volume requirement in paragraph (1) for reasons related to cold start, safety, or vehicle function considerations.

"(4) DOCUMENTATION.—A fleet or covered person seeking a credit under this section shall provide written documentation to the Secretary supporting the allocation of a credit to such fleet or covered person under paragraph (1).

"(b) USE OF CREDITS.—

"(1) IN GENERAL.—At the request of a fleet or covered person allocated a credit under subsection (a), the Secretary shall, for the year in which the purchase of a qualifying volume is made, treat that purchase as the acquisition of one alternative fueled vehicle the fleet or covered person is required to acquire under this title, title IV, or title V.

"(2) LIMITATION.—Credits allocated under subsection (a) may not be used to satisfy more than 50 percent of the alternative fueled vehicle requirements of a fleet or covered person under this title, title IV, and title V. This paragraph shall not apply to a fleet or covered person that is a biodiesel alternative fuel provider described in section 501(a)(2)(A).

"(c) CREDIT NOT A SECTION 508 CREDIT.—A credit under this section shall not be considered a credit under section 508.

"(d) ISSUANCE OF RULE.—The Secretary shall, before January 1, 1999, issue a rule establishing procedures for the implementation of this section.

"(e) COLLECTION OF DATA.—The Secretary shall collect such data as are required to make a determination described in subsection (f)(2)(B).

"(f) DEFINITIONS.—For purposes of this section—

"(1) the term 'biodiesel' means a diesel fuel substitute produced from non-petroleum renewable resources that meets the registration requirements for fuels and fuel additives established by the Environmental Protection Agency under section 211 of the Clean Air Act; and

"(2) the term 'qualifying volume' means—

"(A) 450 gallons; or

"(B) if the Secretary determines by rule that the average annual alternative fuel use in light duty vehicles by fleets and covered persons exceeds 450 gallons or gallon equivalents, the amount of such average annual alternative fuel use.".

(b) TABLE OF CONTENTS AMENDMENT.—The table of contents of the Energy Policy Act of 1992 is amended by adding at the end of the items relating to title III the following new item:

"SEC. 312. Biodiesel fuel use credits.".

TITLE XIII—EMERGENCY APPROPRIATIONS DEPARTMENT OF AGRICULTURE

FARM SERVICE AGENCY

AR.02366

## SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $40,000,000, to remain available until expended: *Provided,* That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## AGRICULTURAL CREDIT INSURANCE FUND PROGRAM ACCOUNT

For an additional gross obligation for the principal amount of direct and guaranteed farm operating loans as authorized by 7 U.S.C. 1928–1929, to be available from funds in the Agricultural Credit Insurance Fund, $540,510,000, of which $150,000,000 shall be for unsubsidized guaranteed loans and $156,704,000 shall be for subsidized guaranteed loans.

For the additional cost of direct and guaranteed farm operating loans, including the cost of modifying such loans as defined in section 502 of the Congressional Budget Act of 1974, farm operating loans, $31,405,000, of which $15,969,000 shall be for direct loans, $13,696,000 for guaranteed subsidized loans, and $1,740,000 for unsubsidized guaranteed loans: *Provided,* That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## COMMODITY CREDIT CORPORATION FUND

### DAIRY PRODUCTION DISASTER ASSISTANCE PROGRAM

An additional $3,000,000 is provided for the dairy production indemnity program as established by Public Law 105–174: *Provided,* That the entire amount shall be available only to the extent that an official budget request for $3,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further,* That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of such Act.

## NATURAL RESOURCES CONSERVATION SERVICE

### FORESTRY INCENTIVES PROGRAM

For an additional amount to carry out the program of forestry incentives, as authorized by the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2101), including technical assistance and related expenses, $10,000,000, to remain available until expended, as authorized by that Act: *Provided,* That the entire amount shall be available only to the extent that an official budget request for $10,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further,* That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of such Act.

This Act may be cited as the "Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999".

(b) For programs, projects or activities in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for the Departments of Commerce, Justice, and State, the Judiciary, and related agencies for the fiscal year ending September 30, 1999, and for other purposes.

## TITLE I—DEPARTMENT OF JUSTICE

### GENERAL ADMINISTRATION

### SALARIES AND EXPENSES

For expenses necessary for the administration of the Department of Justice, $79,448,000, of which not to exceed $3,317,000 is for the Facilities Program 2000, to remain available until expended: *Provided,* That not to exceed 43 permanent positions and 44 full-time equivalent workyears and $8,136,000 shall be expended for the Department Leadership Program exclusive of augmentation that occurred in these offices in fiscal year 1998: *Provided further,* That not to exceed 41 permanent positions

and 48 full-time equivalent workyears and $4,811,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: *Provided further,* That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or non-reimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis: *Provided further,* That the Attorney General is authorized to transfer, under such terms and conditions as the Attorney General shall specify, forfeited real or personal property of limited or marginal value, as such value is determined by guidelines established by the Attorney General, to a State or local government agency, or its designated contractor or transferee, for use to support drug abuse treatment, drug and crime prevention and education, housing, job skills, and other community-based public health and safety programs: *Provided further,* That any transfer under the preceding proviso shall not create or confer any private right of action in any person against the United States, and shall be treated as a reprogramming under section 605 of this Act.

## COUNTERTERRORISM FUND

For necessary expenses, as determined by the Attorney General, $10,000,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of any domestic or international terrorist incident; (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities; (3) the costs of conducting a terrorism threat assessment of Federal agencies and their facilities; (4) the costs associated with ensuring the continuance of essential Government functions during a time of emergency; and (5) the costs of activities related to the protection of the Nation's critical infrastructure: *Provided,* That any Federal agency may be reimbursed for the costs of detaining in foreign countries individuals accused of acts of terrorism that violate the laws of the United States: *Provided further,* That funds provided under this paragraph shall be available only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

In addition, for necessary expenses, as determined by the Attorney General, $135,000,000, to remain available until expended, to reimburse or transfer to agencies of the Department of Justice for any costs incurred in connection with: (1) providing bomb training and response capabilities to State and local law enforcement agencies; (2) providing training and related equipment for chemical, biological, nuclear, and cyber attack prevention and response capabilities for States, cities, territories, and local jurisdictions; and (3) providing grants, contracts, cooperative agreements, and other assistance authorized by sections 819, 821, and 822 of the Antiterrorism and Effective Death Penalty Act of 1996: *Provided,* That such funds transferred to the Office of Justice Programs may include amounts for management and administration, which shall be transferred to and merged with the "Justice Assistance" account.

## ADMINISTRATIVE REVIEW AND APPEALS

For expenses necessary for the administration of pardon and clemency petitions and immigration related activities, $75,312,000.

In addition, $59,251,000, for such purposes, to remain available until expended, to be derived from the Violent Crime Reduction Trust Fund.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $35,610,000; including not to exceed $10,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and for the acquisition, lease, maintenance, and operation of motor vehicles, without regard to the general purchase price limitation for the current fiscal year: *Provided,* That up to one-tenth of one percent of the Department of Justice's allocation from the Violent Crime Reduction Trust Fund grant programs may be transferred at the discretion of the Attorney General to this account for the audit or other review of such grant programs, as authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322).

## UNITED STATES PAROLE COMMISSION

## SALARIES AND EXPENSES

For necessary expenses of the United States Parole Commission as authorized by law, $7,400,000.

## LEGAL ACTIVITIES

### SALARIES AND EXPENSES, GENERAL LEGAL ACTIVITIES

For expenses necessary for the legal activities of the Department of Justice, not otherwise provided for, including not to exceed $20,000 for expenses of collecting evidence, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and rent of private or Government-owned space in the District of Columbia, $466,840,000; of which not to exceed $10,000,000 for litigation support contracts shall remain available until expended: *Provided,* That of the funds available in this appropriation, not to exceed $17,834,000 shall remain available until expended for office automation systems for the legal divisions covered by this appropriation, and for the United States Attorneys, the Antitrust Division, and offices funded through "Salaries and Expenses", General Administration: *Provided further,* That of the total amount appropriated, not to exceed $1,000 shall be available to the United States National Central Bureau, INTERPOL, for official reception and representation expenses: *Provided further,* That $813,333 of funds made available to the Department of Justice in this Act shall be transferred by the Attorney General to the Presidential Advisory Commission on Holocaust Assets in the United States: *Provided further,* That any transfer pursuant to the previous proviso shall be treated as a reprogramming under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

In addition, $8,160,000, to be derived from the Violent Crime Reduction Trust Fund, to remain available until expended for such purposes.

In addition, for reimbursement of expenses of the Department of Justice associated with processing cases under the National Childhood Vaccine Injury Act of 1986, as amended, not to exceed $4,028,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

### SALARIES AND EXPENSES, ANTITRUST DIVISION

For expenses necessary for the enforcement of antitrust and kindred laws, $68,275,000: *Provided,* That, notwithstanding any other provision of law, not to exceed $68,275,000 of offsetting collections derived from fees collected in fiscal year 1999 for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: *Provided further,* That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1999, so as to result in a final fiscal year 1999 appropriation from the General Fund estimated at not more than $0.

### SALARIES AND EXPENSES, UNITED STATES ATTORNEYS

For necessary expenses of the Offices of the United States Attorneys, including intergovernmental and cooperative agreements, $1,009,680,000; of which not to exceed $2,500,000 shall be available until September 30, 2000, for (1) training personnel in debt collection, (2) locating debtors and their property, (3) paying the net costs of selling property, and (4) tracking debts owed to the United States Government: *Provided,* That of the total amount appropriated, not to exceed $8,000 shall be available for official reception and representation expenses: *Provided further,* That not to exceed $10,000,000 of those funds available for automated litigation support contracts shall remain available until expended: *Provided further,* That not to exceed $2,500,000 for the operation of the National Advocacy Center shall remain available until expended: *Provided further,* That not to exceed $1,000,000 shall remain available until expended for the expansion of existing Violent Crime Task Forces in United States Attorneys Offices into demonstration projects, including inter-governmental, inter-local, cooperative, and task-force agreements, however denominated, and contracts with State and local prosecutorial and law enforcement agencies engaged in the investigation and prosecution of violent crimes: *Provided further,* That, in addition to reimbursable full-time equivalent workyears available to the Offices of the United States Attorneys, not to exceed 9,044 positions and 9,312 full-time equivalent workyears shall be supported from the funds appropriated in this Act for the United States Attorneys: *Provided further,* That $2,300,000 shall be used to provide for additional assistant United States attorneys and investigators to serve in Philadelphia, Pennsylvania, and Camden County, New Jersey, to enforce Federal laws designed to prevent the possession by criminals of firearms (as that term is defined in section 921(a) of title 18, United States Code), of which $1,500,000 shall be used to provide

AR.02369

for those attorneys and investigators in Philadelphia, Pennsylvania, and $800,000 shall be used to provide for those attorneys and investigators in Camden County, New Jersey.

In addition, $80,698,000, to be derived from the Violent Crime Reduction Trust Fund, to remain available until expended for such purposes.

### UNITED STATES TRUSTEE SYSTEM FUND

For necessary expenses of the United States Trustee Program, as authorized by 28 U.S.C. 589a(a), $114,248,000, to remain available until expended and to be derived from the United States Trustee System Fund: *Provided,* That, notwithstanding any other provision of law, deposits to the Fund shall be available in such amounts as may be necessary to pay refunds due depositors: *Provided further,* That, notwithstanding any other provision of law, $114,248,000 of offsetting collections derived from fees collected pursuant to 28 U.S.C. 589a(b) shall be retained and used for necessary expenses in this appropriation and remain available until expended: *Provided further,* That the sum herein appropriated from the Fund shall be reduced as such offsetting collections are received during fiscal year 1999, so as to result in a final fiscal year 1999 appropriation from the Fund estimated at $0: *Provided further,* That any funds collected in fiscal year 1998 in excess of $114,248,000 are not available for obligation.

### SALARIES AND EXPENSES, FOREIGN CLAIMS SETTLEMENT COMMISSION

For expenses necessary to carry out the activities of the Foreign Claims Settlement Commission, including services as authorized by 5 U.S.C. 3109, $1,227,000.

### SALARIES AND EXPENSES, UNITED STATES MARSHALS SERVICE

For necessary expenses of the United States Marshals Service; including the acquisition, lease, maintenance, and operation of vehicles, and the purchase of passenger motor vehicles for police-type use, without regard to the general purchase price limitation for the current fiscal year, $477,056,000, as authorized by 28 U.S.C. 561(i); of which not to exceed $6,000 shall be available for official reception and representation expenses; and of which not to exceed $4,000,000 for development, implementation, maintenance and support, and training for an automated prisoner information system shall remain available until expended.

In addition, $25,553,000, for such purposes, to remain available until expended, to be derived from the Violent Crime Reduction Trust Fund.

### CONSTRUCTION

For planning, constructing, renovating, equipping, and maintaining United States Marshals Service prisoner-holding space in United States courthouses and federal buildings, including the renovation and expansion of prisoner movement areas, elevators, and sallyports, $4,600,000, to remain available until expended.

### JUSTICE PRISONER AND ALIEN TRANSPORTATION SYSTEM FUND, UNITED STATES MARSHALS SERVICE

<< 18 USCA § 4013 NOTE >>

There is hereby established a Justice Prisoner and Alien Transportation System Fund for the payment of necessary expenses related to the scheduling and transportation of United States prisoners and illegal and criminal aliens in the custody of the United States Marshals Service, as authorized in 18 U.S.C. 4013, including, without limitation, salaries and expenses, operations, and the acquisition, lease, and maintenance of aircraft and support facilities: *Provided,* That the Fund shall be reimbursed or credited with advance payments from amounts available to the Department of Justice, other Federal agencies, and other sources at rates that will recover the expenses of Fund operations, including, without limitation, accrual of annual leave and depreciation of plant and equipment of the Fund: *Provided further,* That proceeds from the disposal of Fund aircraft shall be credited to the Fund: *Provided further,* That amounts in the Fund shall be available without fiscal year limitation, and may be used for operating equipment lease agreements that do not exceed 5 years.

### FEDERAL PRISONER DETENTION

For expenses, related to United States prisoners in the custody of the United States Marshals Service as authorized in 18 U.S.C. 4013, but not including expenses otherwise provided for in appropriations available to the Attorney General, $425,000,000, as authorized by 28 U.S.C. 561(i), to remain available until expended.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## FEES AND EXPENSES OF WITNESSES

For expenses, mileage, compensation, and per diems of witnesses, for expenses of contracts for the procurement and supervision of expert witnesses, for private counsel expenses, and for per diems in lieu of subsistence, as authorized by law, including advances, $95,000,000, to remain available until expended; of which not to exceed $6,000,000 may be made available for planning, construction, renovations, maintenance, remodeling, and repair of buildings, and the purchase of equipment incident thereto, for protected witness safesites; and of which not to exceed $1,000,000 may be made available for the purchase and maintenance of armored vehicles for transportation of protected witnesses.

## SALARIES AND EXPENSES, COMMUNITY RELATIONS SERVICE

For necessary expenses of the Community Relations Service, established by title X of the Civil Rights Act of 1964, $7,199,000 and, in addition, up to $500,000 of funds made available to the Department of Justice in this Act may be transferred by the Attorney General to this account: *Provided,* That notwithstanding any other provision of law, upon a determination by the Attorney General that emergent circumstances require additional funding for conflict prevention and resolution activities of the Community Relations Service, the Attorney General may transfer such amounts to the Community Relations Service, from available appropriations for the current fiscal year for the Department of Justice, as may be necessary to respond to such circumstances: *Provided further,* That any transfer pursuant to the previous proviso shall be treated as a reprogramming under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## ASSETS FORFEITURE FUND

For expenses authorized by 28 U.S.C. 524(c)(1)(A)(ii), (B), (F), and (G), as amended, $23,000,000, to be derived from the Department of Justice Assets Forfeiture Fund.

## RADIATION EXPOSURE COMPENSATION

### ADMINISTRATIVE EXPENSES

For necessary administrative expenses in accordance with the Radiation Exposure Compensation Act, $2,000,000.

### INTERAGENCY LAW ENFORCEMENT

### INTERAGENCY CRIME AND DRUG ENFORCEMENT

For necessary expenses for the detection, investigation, and prosecution of individuals involved in organized crime drug trafficking not otherwise provided for, to include intergovernmental agreements with State and local law enforcement agencies engaged in the investigation and prosecution of individuals involved in organized crime drug trafficking, $304,014,000, of which $50,000,000 shall remain available until expended: *Provided,* That any amounts obligated from appropriations under this heading may be used under authorities available to the organizations reimbursed from this appropriation: *Provided further,* That any unobligated balances remaining available at the end of the fiscal year shall revert to the Attorney General for reallocation among participating organizations in succeeding fiscal years, subject to the reprogramming procedures described in section 605 of this Act.

### FEDERAL BUREAU OF INVESTIGATION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Bureau of Investigation for detection, investigation, and prosecution of crimes against the United States; including purchase for police-type use of not to exceed 2,668 passenger motor vehicles, of which 2,000 will be for replacement only, without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance, and operation of aircraft; and not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General, $2,746,805,000; of which not to exceed $50,000,000 for automated data processing and telecommunications and technical investigative equipment and not to exceed $1,000,000 for undercover operations shall remain available until September 30, 2000; of which not less than $292,473,000 shall be for counterterrorism investigations, foreign counterintelligence, and

other activities related to our national security; of which not to exceed $61,800,000 shall remain available until expended; of which not to exceed $10,000,000 is authorized to be made available for making advances for expenses arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to violent crime, terrorism, organized crime, and drug investigations; and of which $1,500,000 shall be available to maintain an independent program office dedicated solely to the automation of fingerprint identification services: *Provided,* That not to exceed $45,000 shall be available for official reception and representation expenses: *Provided further,* That no funds in this Act may be used to provide ballistics imaging equipment to any State or local authority which has obtained similar equipment through a Federal grant or subsidy unless the State or local authority agrees to return that equipment or to repay that grant or subsidy to the Federal Government.

In addition, $223,356,000 for such purposes, to remain available until expended, to be derived from the Violent Crime Reduction Trust Fund, as authorized by the Violent Crime Control and Law Enforcement Act of 1994, as amended, and the Antiterrorism and Effective Death Penalty Act of 1996.

### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $1,287,000, to remain available until expended.

## DRUG ENFORCEMENT ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Drug Enforcement Administration, including not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; expenses for conducting drug education and training programs, including travel and related expenses for participants in such programs and the distribution of items of token value that promote the goals of such programs; purchase of not to exceed 1,428 passenger motor vehicles, of which 1,080 will be for replacement only, for police-type use without regard to the general purchase price limitation for the current fiscal year; and acquisition, lease, maintenance, and operation of aircraft; $800,780,000, of which not to exceed $1,800,000 for research and $15,000,000 for transfer to the Drug Diversion Control Fee Account for operating expenses shall remain available until expended, and of which not to exceed $4,000,000 for purchase of evidence and payments for information, not to exceed $10,000,000 for contracting for automated data processing and telecommunications equipment, and not to exceed $2,000,000 for laboratory equipment, $4,000,000 for technical equipment, and $2,000,000 for aircraft replacement retrofit and parts, shall remain available until September 30, 2000; and of which not to exceed $50,000 shall be available for official reception and representation expenses.

In addition, $405,000,000, for such purposes, to remain available until expended, to be derived from the Violent Crime Reduction Trust Fund.

### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $8,000,000, to remain available until expended.

## IMMIGRATION AND NATURALIZATION SERVICE

### SALARIES AND EXPENSES

For expenses necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, as follows:

### ENFORCEMENT AND BORDER AFFAIRS

For salaries and expenses for the Border Patrol program, the detention and deportation program, the intelligence program, the investigations program, and the inspections program, including not to exceed $50,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of,

the Attorney General; purchase for police-type use (not to exceed 3,855 passenger motor vehicles, of which 2,535 are for replacement only), without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance and operation of aircraft; research related to immigration enforcement; for protecting and maintaining the integrity of the borders of the United States including, without limitation, equipping, maintaining, and making improvements to the infrastructure; and for the care and housing of Federal detainees held in the joint Immigration and Naturalization Service and United States Marshals Service's Buffalo Detention Facility, $1,069,754,000, of which not to exceed $400,000 for research shall remain available until expended; of which not to exceed $10,000,000 shall be available for costs associated with the training program for basic officer training, and $5,000,000 is for payments or advances arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to immigration; and of which not to exceed $5,000,000 is to fund or reimburse other Federal agencies for the costs associated with the care, maintenance, and repatriation of smuggled illegal aliens: *Provided,* That none of the funds available to the Immigration and Naturalization Service shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 1999: *Provided further,* That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: *Provided further,* That none of the funds provided in this or any other Act shall be used for the continued operation of the San Clemente and Temecula checkpoints unless the checkpoints are open and traffic is being checked on a continuous 24–hour basis.

## CITIZENSHIP AND BENEFITS, IMMIGRATION SUPPORT AND PROGRAM DIRECTION

For all programs of the Immigration and Naturalization Service not included under the heading "Enforcement and Border Affairs", $552,083,000: *Provided,* That not to exceed $5,000 shall be available for official reception and representation expenses: *Provided further,* That the Attorney General may transfer any funds appropriated under this heading and the heading "Enforcement and Border Affairs" between said appropriations notwithstanding any percentage transfer limitations imposed under this appropriation Act and may direct such fees as are collected by the Immigration and Naturalization Service to the activities funded under this heading and the heading "Enforcement and Border Affairs" for performance of the functions for which the fees legally may be expended: *Provided further,* That not to exceed 43 permanent positions and 43 full-time equivalent workyears and $4,284,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: *Provided further,* That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or non-reimbursable basis, or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis: *Provided further,* That the number of positions filled through non-career appointment at the Immigration and Naturalization Service, for which funding is provided in this Act or is otherwise made available to the Immigration and Naturalization Service, shall not exceed 4 permanent positions and 4 full-time equivalent workyears: *Provided further,* That funds may be used, without limitation, for equipping, maintaining, and making improvements to the infrastructure and the purchase of vehicles for police type use within the limits of the Enforcement and Border Affairs appropriation: *Provided further,* That, notwithstanding any other provision of law, during fiscal year 1999, the Attorney General is authorized and directed to impose disciplinary action, including termination of employment, pursuant to policies and procedures applicable to employees of the Federal Bureau of Investigation, for any employee of the Immigration and Naturalization Service who violates policies and procedures set forth by the Department of Justice relative to the granting of citizenship or who willfully deceives the Congress or department leadership on any matter.

## VIOLENT CRIME REDUCTION PROGRAMS

In addition, $842,490,000, for such purposes, to remain available until expended, to be derived from the Violent Crime Reduction Trust Fund: *Provided,* That the Attorney General may use the transfer authority provided under the heading "Citizenship and Benefits, Immigration Support and Program Direction" to provide funds to any program of the Immigration and Naturalization Service that heretofore has been funded by the Violent Crime Reduction Trust Fund.

## CONSTRUCTION

For planning, construction, renovation, equipping, and maintenance of buildings and facilities necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, not otherwise provided for, $90,000,000, to remain available until expended: *Provided,* That no funds shall be available for the site acquisition, design, or construction of any Border Patrol checkpoint in the Tucson sector.

## FEDERAL PRISON SYSTEM

## SALARIES AND EXPENSES

### << 42 USCA § 250a >>

For expenses necessary for the administration, operation, and maintenance of Federal penal and correctional institutions, including purchase (not to exceed 763, of which 599 are for replacement only) and hire of law enforcement and passenger motor vehicles, and for the provision of technical assistance and advice on corrections related issues to foreign governments, $2,862,354,000: *Provided,* That the Attorney General may transfer to the Health Resources and Services Administration such amounts as may be necessary for direct expenditures by that Administration for medical relief for inmates of Federal penal and correctional institutions: *Provided further,* That the Director of the Federal Prison System (FPS), where necessary, may enter into contracts with a fiscal agent/fiscal intermediary claims processor to determine the amounts payable to persons who, on behalf of the FPS, furnish health services to individuals committed to the custody of the FPS: *Provided further,* That not to exceed $6,000 shall be available for official reception and representation expenses: *Provided further,* That not to exceed $90,000,000 for the activation of new facilities shall remain available until September 30, 2000: *Provided further,* That, of the amounts provided for Contract Confinement, not to exceed $20,000,000 shall remain available until expended to make payments in advance for grants, contracts and reimbursable agreements, and other expenses authorized by section 501(c) of the Refugee Education Assistance Act of 1980, as amended, for the care and security in the United States of Cuban and Haitian entrants: *Provided further,* That, notwithstanding section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), FPS may enter into contracts and other agreements with private entities for periods of not to exceed 3 years and 7 additional option years for the confinement of Federal prisoners.

In addition, $26,499,000, for such purposes, to remain available until expended, to be derived from the Violent Crime Reduction Trust Fund.

## BUILDINGS AND FACILITIES

For planning, acquisition of sites and construction of new facilities; leasing the Oklahoma City Airport Trust Facility; purchase and acquisition of facilities and remodeling, and equipping of such facilities for penal and correctional use, including all necessary expenses incident thereto, by contract or force account; and constructing, remodeling, and equipping necessary buildings and facilities at existing penal and correctional institutions, including all necessary expenses incident thereto, by contract or force account, $410,997,000, to remain available until expended, of which not to exceed $14,074,000 shall be available to construct areas for inmate work programs: *Provided,* That labor of United States prisoners may be used for work performed under this appropriation: *Provided further,* That not to exceed 10 percent of the funds appropriated to "Buildings and Facilities" in this Act or any other Act may be transferred to "Salaries and Expenses", Federal Prison System, upon notification by the Attorney General to the Committees on Appropriations of the House of Representatives and the Senate in compliance with provisions set forth in section 605 of this Act.

## FEDERAL PRISON INDUSTRIES, INCORPORATED

The Federal Prison Industries, Incorporated, is hereby authorized to make such expenditures, within the limits of funds and borrowing authority available, and in accord with the law, and to make such contracts and commitments, without regard to fiscal year limitations as provided by section 9104 of title 31, United States Code, as may be necessary in carrying out the program set forth in the budget for the current fiscal year for such corporation, including purchase of (not to exceed five for replacement only) and hire of passenger motor vehicles.

## LIMITATION ON ADMINISTRATIVE EXPENSES, FEDERAL PRISON INDUSTRIES, INCORPORATED

Not to exceed $3,266,000 of the funds of the corporation shall be available for its administrative expenses, and for services as authorized by 5 U.S.C. 3109, to be computed on an accrual basis to be determined in accordance with the corporation's current prescribed accounting system, and such amounts shall be exclusive of depreciation, payment of claims, and expenditures which the said accounting system requires to be capitalized or charged to cost of commodities acquired or produced, including

AR.02374

selling and shipping expenses, and expenses in connection with acquisition, construction, operation, maintenance, improvement, protection, or disposition of facilities and other property belonging to the corporation or in which it has an interest.

OFFICE OF JUSTICE PROGRAMS

JUSTICE ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and the Missing Children's Assistance Act, as amended, including salaries and expenses in connection therewith, and with the Victims of Crime Act of 1984, as amended, $147,151,000, to remain available until expended, as authorized by section 1001 of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by Public Law 102–534 (106 Stat. 3524).

STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, for State and Local Narcotics Control and Justice Assistance Improvements, notwithstanding the provisions of section 511 of said Act, $552,000,000, to remain available until expended, as authorized by section 1001 of title I of said Act, as amended by Public Law 102–534 (106 Stat. 3524), of which $47,000,000 shall be available to carry out the provisions of chapter A of subpart 2 of part E of title I of said Act, for discretionary grants under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs.

VIOLENT CRIME REDUCTION PROGRAMS, STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

For assistance (including amounts for administrative costs for management and administration, which amounts shall be transferred to and merged with the "Justice Assistance" account) authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended ("the 1994 Act"); the Omnibus Crime Control and Safe Streets Act of 1968, as amended ("the 1968 Act"); and the Victims of Child Abuse Act of 1990, as amended ("the 1990 Act"), $2,369,950,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $523,000,000 shall be for Local Law Enforcement Block Grants, pursuant to H.R. 728 as passed by the House of Representatives on February 14, 1995, except that for purposes of this Act, the Commonwealth of Puerto Rico shall be considered a "unit of local government" as well as a "State", for the purposes set forth in paragraphs (A), (B), (D), (F), and (I) of section 101(a)(2) of H.R. 728 and for establishing crime prevention programs involving cooperation between community residents and law enforcement personnel in order to control, detect, or investigate crime or the prosecution of criminals: *Provided,* That no funds provided under this heading may be used as matching funds for any other Federal grant program: *Provided further,* That $40,000,000 of this amount shall be for Boys and Girls Clubs in public housing facilities and other areas in cooperation with State and local law enforcement: *Provided further*, That funds may also be used to defray the costs of indemnification insurance for law enforcement officers: *Provided further*, That, hereafter, for the purpose of eligibility for the Local Law Enforcement Block Grant Program in the State of Louisiana, parish sheriffs are to be considered the unit of local government at the parish level under section 108 of H.R. 728: *Provided further,* That $20,000,000 shall be available to carry out section 102(2) of H.R. 728; of which $45,000,000 shall be for grants to upgrade criminal records, as authorized by section 106(b) of the Brady Handgun Violence Prevention Act of 1993, as amended, and section 4(b) of the National Child Protection Act of 1993; of which $420,000,000 shall be for the State Criminal Alien Assistance Program, as authorized by section 242(j) of the Immigration and Nationality Act, as amended; of which $720,500,000 shall be for Violent Offender Incarceration and Truth in Sentencing Incentive Grants pursuant to subtitle A of title II of the 1994 Act, of which $165,000,000 shall be available for payments to States for incarceration of criminal aliens, of which $25,000,000 shall be available for the Cooperative Agreement Program, and of which $34,000,000 shall be reserved by the Attorney General for fiscal year 1999 under section 20109(a) of subtitle A of title II of the 1994 Act; of which $9,000,000 shall be for the Court Appointed Special Advocate Program, as authorized by section 218 of the 1990 Act; of which $2,000,000 shall be for Child Abuse Training Programs for Judicial Personnel and Practitioners, as authorized by section 224 of the 1990 Act; of which $206,750,000 shall be for Grants to Combat Violence Against Women, to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(18) of the 1968 Act, including $23,000,000 which shall be used exclusively for the purpose of strengthening civil legal assistance programs for victims of domestic violence, and $10,000,000 which shall be used exclusively for violence on college campuses: *Provided further,* That, of these funds, $5,200,000 shall

be provided to the National Institute of Justice for research and evaluation of violence against women, $1,196,000 shall be provided to the Office of the United States Attorney for the District of Columbia for domestic violence programs in D.C. Superior Court, and $10,000,000 shall be available to the Office of Juvenile Justice and Delinquency Prevention for the Safe Start Program, to be administered as authorized by part C of the Juvenile Justice and Delinquency Act of 1974, as amended; of which $34,000,000 shall be for Grants to Encourage Arrest Policies to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(19) of the 1968 Act; of which $25,000,000 shall be for Rural Domestic Violence and Child Abuse Enforcement Assistance Grants, as authorized by section 40295 of the 1994 Act; of which $5,000,000 shall be for training programs to assist probation and parole officers who work with released sex offenders, as authorized by section 40152(c) of the 1994 Act, and for local demonstration projects; of which $1,000,000 shall be for grants for televised testimony, as authorized by section 1001(a)(7) of the 1968 Act; of which $5,000,000 shall be for the Tribal Courts Initiative; of which $63,000,000 shall be for grants for residential substance abuse treatment for State prisoners, as authorized by section 1001(a)(17) of the 1968 Act; of which $15,000,000 shall be for grants to States and units of local government for projects to improve DNA analysis, as authorized by section 1001(a)(22) of the 1968 Act; of which $900,000 shall be for the Missing Alzheimer's Disease Patient Alert Program, as authorized by section 240001(c) of the 1994 Act; of which $1,300,000 shall be for Motor Vehicle Theft Prevention Programs, as authorized by section 220002(h) of the 1994 Act; of which $40,000,000 shall be for Drug Courts, as authorized by title V of the 1994 Act; of which $1,500,000 shall be for Law Enforcement Family Support Programs, as authorized by section 1001(a)(21) of the 1968 Act; of which $2,000,000 shall be for public awareness programs addressing marketing scams aimed at senior citizens, as authorized by section 250005(3) of the 1994 Act; and of which $250,000,000 shall be for Juvenile Accountability Incentive Block Grants, except that such funds shall be subject to the same terms and conditions as set forth in the provisions under this heading for this program in Public Law 105–119, but all references in such provisions to 1998 shall be deemed to refer instead to 1999: *Provided further*, That funds made available in fiscal year 1999 under subpart 1 of part E of title I of the 1968 Act may be obligated for programs to assist States in the litigation processing of death penalty Federal habeas corpus petitions and for drug testing initiatives: *Provided further*, That, if a unit of local government uses any of the funds made available under this title to increase the number of law enforcement officers, the unit of local government will achieve a net gain in the number of law enforcement officers who perform nonadministrative public safety service.

## WEED AND SEED PROGRAM FUND

For necessary expenses, including salaries and related expenses of the Executive Office for Weed and Seed, to implement "Weed and Seed" program activities, $33,500,000 to remain available until expended, for intergovernmental agreements, including grants, cooperative agreements, and contracts, with State and local law enforcement agencies engaged in the investigation and prosecution of violent crimes and drug offenses in "Weed and Seed" designated communities, and for either reimbursements or transfers to appropriation accounts of the Department of Justice and other Federal agencies which shall be specified by the Attorney General to execute the "Weed and Seed" program strategy: *Provided,* That funds designated by Congress through language for other Department of Justice appropriation accounts for "Weed and Seed" program activities shall be managed and executed by the Attorney General through the Executive Office for Weed and Seed: *Provided further,* That the Attorney General may direct the use of other Department of Justice funds and personnel in support of "Weed and Seed" program activities only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

## COMMUNITY ORIENTED POLICING SERVICES

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103–322 ("the 1994 Act") (including administrative costs), $1,400,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, for Public Safety and Community Policing Grants pursuant to title I of the 1994 Act: *Provided,* That not to exceed 266 permanent positions and 266 full-time equivalent workyears and $32,023,000 shall be expended for program management and administration: *Provided further,* That of the funds made available under this heading and the unobligated balances available in this program, $180,000,000 shall be used for innovative community policing programs, of which $80,000,000 shall be used for a law enforcement technology program, $35,000,000 shall be used for policing initiatives to combat methamphetamine production and trafficking and to enhance policing initiatives in drug "hot spots", $17,500,000

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shall be used for programs to combat violence in schools, $25,000,000 shall be used for the Matching Grant Program for Law Enforcement Armor Vests pursuant to section 2501 of part Y of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, $5,000,000 shall be used for additional community law enforcement officers and related program support for the District of Columbia Offender Supervision, Defender, and Court Services Agency, $12,500,000 shall be used for the Community Policing to Combat Domestic Violence Program pursuant to section 1701(d) of part Q of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and $5,000,000 shall be used for Community Prosecutors programs: *Provided further,* That up to $35,000,000 shall be available to improve tribal law enforcement including equipment and training.

In addition, for programs of Police Corps education, training, and service as set forth in sections 200101–200113 of the 1994 Act, $30,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

## JUVENILE JUSTICE PROGRAMS

For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, ("the Act"), including salaries and expenses in connection therewith to be transferred to and merged with the appropriations for Justice Assistance, $267,597,000, to remain available until expended, as authorized by section 299 of part I of title II and section 506 of title V of the Act, as amended by Public Law 102–586, of which (1) notwithstanding any other provision of law, $6,847,000 shall be available for expenses authorized by part A of title II of the Act, $89,000,000 shall be available for expenses authorized by part B of title II of the Act, and $42,750,000 shall be available for expenses authorized by part C of title II of the Act: *Provided,* That $26,500,000 of the amounts provided for part B of title II of the Act, as amended, is for the purpose of providing additional formula grants under part B to States that provide assurances to the Administrator that the State has in effect (or will have in effect no later than one year after date of application) policies and programs, that ensure that juveniles are subject to accountability-based sanctions for every act for which they are adjudicated delinquent; (2) $12,000,000 shall be available for expenses authorized by section 281 and 282 of part D of title II of the Act for prevention and treatment programs relating to juvenile gangs; (3) $10,000,000 shall be available for expenses authorized by section 285 of part E of title II of the Act; (4) $12,000,000 shall be available for expenses authorized by part G of title II of the Act for juvenile mentoring programs; and (5) $95,000,000 shall be available for expenses authorized by title V of the Act for incentive grants for local delinquency prevention programs; of which $10,000,000 shall be for delinquency prevention, control, and system improvement programs for tribal youth; of which $25,000,000 shall be available for grants of $360,000 to each state and $6,640,000 shall be available for discretionary grants to states, for programs and activities to enforce state laws prohibiting the sale of alcoholic beverages to minors or the purchase or consumption of alcoholic beverages by minors, prevention and reduction of consumption of alcoholic beverages by minors, and for technical assistance and training: *Provided further,* That upon the enactment of reauthorization legislation for Juvenile Justice Programs under the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, funding provisions in this Act shall from that date be subject to the provisions of that legislation and any provisions in this Act that are inconsistent with that legislation shall no longer have effect: *Provided further,* That of amounts made available under the Juvenile Justice Programs of the Office of Justice Programs to carry out part B (relating to Federal Assistance for State and Local Programs), subpart II of part C (relating to Special Emphasis Prevention and Treatment Programs), part D (relating to Gang–Free Schools and Communities and Community–Based Gang Intervention), part E (relating to State Challenge Activities), and part G (relating to Mentoring) of title II of the Juvenile Justice and Delinquency Prevention Act of 1974, and to carry out the At–Risk Children's Program under title V of that Act, not more than 10 percent of each such amount may be used for research, evaluation, and statistics activities designed to benefit the programs or activities authorized under the appropriate part or title, and not more than 2 percent of each such amount may be used for training and technical assistance activities designed to benefit the programs or activities authorized under that part or title.

In addition, for grants, contracts, cooperative agreements, and other assistance, $10,000,000 to remain available until expended, for developing, testing, and demonstrating programs designed to reduce drug use among juveniles.

In addition, for grants, contracts, cooperative agreements, and other assistance authorized by the Victims of Child Abuse Act of 1990, as amended, $7,000,000, to remain available until expended, as authorized by section 214B of the Act.

## PUBLIC SAFETY OFFICERS BENEFITS

To remain available until expended, for payments authorized by part L of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796), as amended, such sums as are necessary, as authorized by section 6093 of Public Law 100–690 (102 Stat. 4339–4340).

AR.02377

## GENERAL PROVISIONS—DEPARTMENT OF JUSTICE

SEC. 101. In addition to amounts otherwise made available in this title for official reception and representation expenses, a total of not to exceed $45,000 from funds appropriated to the Department of Justice in this title shall be available to the Attorney General for official reception and representation expenses in accordance with distributions, procedures, and regulations established by the Attorney General.

SEC. 102. Authorities contained in the Department of Justice Appropriation Authorization Act, Fiscal Year 1980 (Public Law 96–132; 93 Stat. 1040 (1979)), as amended, shall remain in effect until the termination date of this Act or until the effective date of a Department of Justice Appropriation Authorization Act, whichever is earlier.

SEC. 103. None of the funds appropriated by this title shall be available to pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape: *Provided,* That should this prohibition be declared unconstitutional by a court of competent jurisdiction, this section shall be null and void.

SEC. 104. None of the funds appropriated under this title shall be used to require any person to perform, or facilitate in any way the performance of, any abortion.

SEC. 105. Nothing in the preceding section shall remove the obligation of the Director of the Bureau of Prisons to provide escort services necessary for a female inmate to receive such service outside the Federal facility: *Provided,* That nothing in this section in any way diminishes the effect of section 104 intended to address the philosophical beliefs of individual employees of the Bureau of Prisons.

<< 18 USCA § 3059 NOTE >>

SEC. 106. Notwithstanding any other provision of law, not to exceed $10,000,000 of the funds made available in this Act may be used to establish and publicize a program under which publicly advertised, extraordinary rewards may be paid, which shall not be subject to spending limitations contained in sections 3059 and 3072 of title 18, United States Code: *Provided,* That any reward of $100,000 or more, up to a maximum of $2,000,000, may not be made without the personal approval of the President or the Attorney General and such approval may not be delegated.

SEC. 107. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Justice in this Act, including those derived from the Violent Crime Reduction Trust Fund, may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: *Provided,* That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation except in compliance with the procedures set forth in that section.

<< 18 USCA § 4043 NOTE >>

SEC. 108. For fiscal year 1999 and thereafter, the Director of the Bureau of Prisons may make expenditures out of the Commissary Fund of the Federal Prison System, regardless of whether any such expenditure is security-related, for programs, goods, and services for the benefit of inmates (to the extent the provision of those programs, goods, or services to inmates is not otherwise prohibited by law), including—

<< 18 USCA § 4043 NOTE >>

(1) the installation, operation, and maintenance of the Inmate Telephone System;

<< 18 USCA § 4043 NOTE >>

(2) the payment of all the equipment purchased or leased in connection with the Inmate Telephone System; and

<< 18 USCA § 4043 NOTE >>

(3) the salaries, benefits, and other expenses of personnel who install, operate, and maintain the Inmate Telephone System.

<< 28 USCA § 509 NOTE >>

SEC. 109. (a) Section 3201 of the Crime Control Act of 1990 (28 U.S.C. 509 note) is amended to read as follows—

"Appropriations in this or any other Act hereafter for the Federal Bureau of Investigation, the Drug Enforcement Administration, or the Immigration and Naturalization Service are available, in an amount of not to exceed $25,000 each per fiscal year, to pay humanitarian expenses incurred by or for any employee thereof (or any member of the employee's immediate family) that results from or is incident to serious illness, serious injury, or death occurring to the employee while on official duty or business.".

<< 28 USCA § 509 NOTE >>

(b) The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is amended by striking section 626 (8 U.S.C. 1363b).

SEC. 110. Any amounts credited to the "Legalization Account" established under section 245(c)(7)(B) of the Immigration and Nationality Act (8 U.S.C. 1255a(c)(7)(B)) are transferred to the "Examinations Fee Account" established under section 286(m) of that Act (8 U.S.C. 1356(m)).

SEC. 111. The Director of the Bureau of Prisons shall conduct a study, not later than 270 days after the date of the enactment of this Act, of private prisons that evaluates the growth and development of the private prison industry during the past 15 years, training qualifications of personnel at private prisons, and the security procedures of such facilities, and compares the general standards and conditions between private prisons and Federal prisons. The results of such study shall be submitted to the Committees on the Judiciary and Appropriations of the House of Representatives and the Senate.

SEC. 112. Notwithstanding any other provision of law, during fiscal year 1999, the Assistant Attorney General for the Office of Justice Programs of the Department of Justice—

(1) may make grants, or enter into cooperative agreements and contracts, for the Office of Justice Programs and the component organizations of that Office; and

(2) shall have final authority over all grants, cooperative agreements, and contracts made, or entered into, for the Office of Justice Programs and the component organizations of that Office.

SEC. 113. Notwithstanding any other provision of law, with respect to any grant program for which amounts are made available under this title, the term "tribal" means of or relating to an Indian tribe (as that term is defined in section 102(2) of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a(2))).

<< 8 USCA § 1356 >>

SEC. 114. Section 286(e)(1)(C) of the Immigration and Nationality Act (8 U.S.C. 1356(e)(1)(C)) is amended by inserting "State" and a comma immediately before "territory".

SEC. 115. (a)(1) Notwithstanding any other provision of law, for fiscal year 1999, the Attorney General may obligate any funds appropriated for or reimbursed to the Counterterrorism programs, projects or activities of the Department of Justice to purchase or lease equipment or any related items, or to acquire interim services, without regard to any otherwise applicable Federal acquisition rule, if the Attorney General determines that—

(A) there is an exigent need for the equipment, related items, or services in order to support an ongoing counterterrorism, national security, or computer-crime investigation or prosecution;

(B) the equipment, related items, or services required are not available within the Department of Justice; and

(C) adherence to that Federal acquisition rule would—

(i) delay the timely acquisition of the equipment, related items, or services; and

(ii) adversely affect an ongoing counterterrorism, national security, or computer-crime investigation or prosecution.

(2) In this subsection, the term "Federal acquisition rule" means any provision of title II or IX of the Federal Property and Administrative Services Act of 1949, the Office of Federal Procurement Policy Act, the Small Business Act, the Federal Acquisition Regulation, or any other provision of law or regulation that establishes policies, procedures, requirements, conditions, or restrictions for procurements by the head of a department or agency or the Federal Government.

(b) The Attorney General shall immediately notify the Committees on Appropriations of the House of Representatives and the Senate in writing of each expenditure under subsection (a), which notification shall include sufficient information to explain the circumstances necessitating the exercise of the authority under that subsection.

AR.02379

<< 8 USCA § 1221 NOTE >>

SEC. 116. Section 110(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1221 note) is amended—

<< 8 USCA § 1221 NOTE >>

(1) in the matter preceding paragraph (1), by striking "later than" and all that follows through "Attorney" and inserting "later than October 15, 1998 (and not later than March 30, 2001, in the case of land border ports of entry and sea ports), the Attorney";

<< 8 USCA § 1221 NOTE >>

(2) in paragraph (1), by striking "and" at the end;

<< 8 USCA § 1221 NOTE >>

(3) in paragraph (2), by striking the period at the end and inserting "; and"; and

<< 8 USCA § 1221 NOTE >>

(4) by adding at the end the following:
"(3) not significantly disrupt trade, tourism, or other legitimate cross-border traffic at land border ports of entry.".

<< 21 USCA § 842 >>

SEC. 117. Section 402 of the Controlled Substances Act (21 U.S.C. 842) is amended—

<< 21 USCA § 842 >>

(1) in subsection (a)(5), by inserting "negligently" before "fail";

<< 21 USCA § 842 >>

(2) in subsection (a)(10), by inserting "negligently" before "to fail"; and

<< 21 USCA § 842 >>

(3) in subsection (c)(1)—
  (A) by inserting "(A)" after "(1)";
  (B) by inserting "subparagraph (B) of this paragraph and" before "paragraph (2)"; and
  (C) by adding at the end the following:
  "(B) In the case of a violation of paragraph (5) or (10) of subsection (a), the civil penalty shall not exceed $10,000.".
SEC. 118. The General Accounting Office shall—
  (1) monitor the compliance of the Department of Justice and all United States Attorneys with the "Guidance on the Use of the False Claims Act in Civil Health Care Matters" issued by the Department of Justice on June 3, 1998, including any revisions to that guidance; and
  (2) not later than February 1, 1999, and again not later than August 2, 1999, submit a report on such compliance to the Committees on the Judiciary and the Committees on Appropriations of the Senate and the House of Representatives.

<< 18 USCA § 921 >>

SEC. 119. FIREARMS SAFETY. (a) SECURE GUN STORAGE DEVICE.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following:
"(34) The term 'secure gun storage or safety device' means—

"(A) a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;

"(B) a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or

"(C) a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.".

<< 18 USCA § 923 >>

(b) CERTIFICATION REQUIRED IN APPLICATION FOR DEALER'S LICENSE.—Section 923(d)(1) of title 18, United States Code, is amended—

<< 18 USCA § 923 >>

(1) in subparagraph (E), by striking "and" at the end;

<< 18 USCA § 923 >>

(2) in subparagraph (F), by striking the period at the end and inserting "; and"; and

<< 18 USCA § 923 >>

(3) by adding at the end the following:

"(G) in the case of an application to be licensed as a dealer, the applicant certifies that secure gun storage or safety devices will be available at any place in which firearms are sold under the license to persons who are not licensees (subject to the exception that in any case in which a secure gun storage or safety device is temporarily unavailable because of theft, casualty loss, consumer sales, backorders from a manufacturer, or any other similar reason beyond the control of the licensee, the dealer shall not be considered to be in violation of the requirement under this subparagraph to make available such a device).".

<< 18 USCA § 923 >>

(c) REVOCATION OF DEALER'S LICENSE FOR FAILURE TO HAVE SECURE GUN STORAGE OR SAFETY DEVICES AVAILABLE.—The first sentence of section 923(e) of title 18, United States Code, is amended by inserting before the period at the end the following: "or fails to have secure gun storage or safety devices available at any place in which firearms are sold under the license to persons who are not licensees (except that in any case in which a secure gun storage or safety device is temporarily unavailable because of theft, casualty loss, consumer sales, backorders from a manufacturer, or any other similar reason beyond the control of the licensee, the dealer shall not be considered to be in violation of the requirement to make available such a device)".

<< 18 USCA § 923 NOTE >>

(d) STATUTORY CONSTRUCTION; EVIDENCE.—

<< 18 USCA § 923 NOTE >>

(1) STATUTORY CONSTRUCTION.—Nothing in the amendments made by this section shall be construed—
  (A) as creating a cause of action against any firearms dealer or any other person for any civil liability; or
  (B) as establishing any standard of care.

<< 18 USCA § 923 NOTE >>

(2) EVIDENCE.—Notwithstanding any other provision of law, evidence regarding compliance or noncompliance with the amendments made by this section shall not be admissible as evidence in any proceeding of any court, agency, board, or other entity.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 921 NOTE >>

(e) EFFECTIVE DATE.—The amendments made by this section shall take effect 180 days after the date of enactment of this Act.

SEC. 120. FIREARM SAFETY EDUCATION GRANTS. (a) IN GENERAL.—Section 510 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3760) is amended—

<< 42 USCA § 3760 >>

(1) in subsection (a), by striking paragraph (1) and inserting the following:

"(1) undertaking educational and training programs for—

"(A) criminal justice personnel; and

"(B) the general public, with respect to the lawful and safe ownership, storage, carriage, or use of firearms, including the provision of secure gun storage or safety devices;";

<< 42 USCA § 3760 >>

(2) in the first sentence of subsection (b), by inserting before the period the following: "and is authorized to make grants to, or enter into contracts with, those persons and entities to carry out the purposes specified in subsection (a)(1)(B) in accordance with subsection (c)"; and

<< 42 USCA § 3760 >>

(3) by adding at the end the following:

"(c)(1) In accordance with this subsection, the Director may make a grant to, or enter into a contract with, any person or entity referred to in subsection (b) to provide for a firearm safety program that, in a manner consistent with subsection (a)(1)(B), provides for general public training and dissemination of information concerning firearm safety, secure gun storage, and the lawful ownership, carriage, or use of firearms, including the provision of secure gun storage or safety devices.

"(2) Funds made available under a grant under paragraph (1) may not be used (either directly or by supplanting non-Federal funds) for advocating or promoting gun control, including making communications that are intended to directly or indirectly affect the passage of Federal, State, or local legislation intended to restrict or control the purchase or use of firearms.

"(3) Except as provided in paragraph (4), each firearm safety program that receives funding under this subsection shall provide for evaluations that shall be developed pursuant to guidelines that the Director of the National Institute of Justice of the Department of Justice, in consultation with the Director of the Bureau of Justice Assistance and recognized private entities that have expertise in firearms safety, education and training, shall establish.

"(4) With respect to a firearm safety program that receives funding under this section, the Director may waive the evaluation requirement described in paragraph (3) if the Director determines that the program—

"(A) is not of a sufficient size to justify an evaluation; or

"(B) is designed primarily to provide material resources and supplies, and that activity would not justify an evaluation.".

<< 42 USCA § 3760 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the earlier of—

<< 42 USCA § 3760 NOTE >>

(1) October 1, 1998; or

<< 42 USCA § 3760 NOTE >>

(2) the date of enactment of this Act.

<< 18 USCA § 922 >>

SEC. 121. FIREARMS. Section 922 of title 18, United States Code, is amended—

<< 18 USCA § 922 >>

(1) in subsection (d), by striking paragraph (5) and inserting the following:

"(5) who, being an alien—

"(A) is illegally or unlawfully in the United States; or

"(B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));";

<< 18 USCA § 922 >>

(2) in subsection (g), by striking paragraph (5) and inserting the following:

"(5) who, being an alien—

"(A) is illegally or unlawfully in the United States; or

"(B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));";

<< 18 USCA § 922 >>

(3) in subsection (s)(3)(B), by striking clause (v) and inserting the following:

"(v) is not an alien who—

"(I) is illegally or unlawfully in the United States; or

"(II) subject to subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));"; and

<< 18 USCA § 922 >>

(4) by inserting after subsection (x) the following:

"(y) PROVISIONS RELATING TO ALIENS ADMITTED UNDER NONIMMIGRANT VISAS.—

"(1) DEFINITIONS.—In this subsection—

"(A) the term 'alien' has the same meaning as in section 101(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(3)); and

"(B) the term 'nonimmigrant visa' has the same meaning as in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)).

"(2) EXCEPTIONS.—Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is—

"(A) admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;

"(B) an official representative of a foreign government who is—

"(i) accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; or

"(ii) en route to or from another country to which that alien is accredited;

"(C) an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; or

"(D) a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business.

"(3) WAIVER.—

"(A) CONDITIONS FOR WAIVER.—Any individual who has been admitted to the United States under a nonimmigrant visa may receive a waiver from the requirements of subsection (g)(5), if—

"(i) the individual submits to the Attorney General a petition that meets the requirements of subparagraph (C); and

"(ii) the Attorney General approves the petition.

"(B) PETITION.—Each petition under subparagraph (B) shall—

"(i) demonstrate that the petitioner has resided in the United States for a continuous period of not less than 180 days before the date on which the petition is submitted under this paragraph; and

"(ii) include a written statement from the embassy or consulate of the petitioner, authorizing the petitioner to acquire a firearm or ammunition and certifying that the alien would not, absent the application of subsection (g)(5)(B), otherwise be prohibited from such acquisition under subsection (g).

"(C) APPROVAL OF PETITION.—The Attorney General shall approve a petition submitted in accordance with this paragraph, if the Attorney General determines that waiving the requirements of subsection (g)(5)(B) with respect to the petitioner—

"(i) would be in the interests of justice; and

"(ii) would not jeopardize the public safety.".

<< 18 USCA § 3486 >>

SEC. 122. Section 3486(a)(1) of title 18, United States Code, is amended by inserting "or any act or activity involving a Federal offense relating to the sexual exploitation or other abuse of children," after "health care offense,".

<< 42 USCA § 14072 >>

SEC. 123. Section 170102 of the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. 14072) is amended—

<< 42 USCA § 14072 >>

(1) in subsection (a)(2), by striking "or";

<< 42 USCA § 14072 >>

(2) in subsection (g)(3), by striking "minimally sufficient" and inserting "State sexual offender"; and

<< 42 USCA § 14072 >>

(3) by amending subsection (i) to read as follows:

"(i) PENALTY.—A person who is—

"(1) required to register under paragraph (1), (2), or (3) of subsection (g) of this section and knowingly fails to comply with this section;

"(2) required to register under a sexual offender registration program in the person's State of residence and knowingly fails to register in any other State in which the person is employed, carries on a vocation, or is a student;

"(3) described in section 4042(c)(4) of title 18, United States Code, and knowingly fails to register in any State in which the person resides, is employed, carries on a vocation, or is a student following release from prison or sentencing to probation; or

"(4) sentenced by a court martial for conduct in a category specified by the Secretary of Defense under section 115(a)(8)(C) of title I of Public Law 105–119, and knowingly fails to register in any State in which the person resides, is employed, carries on a vocation, or is a student following release from prison or sentencing to probation, shall, in the case of a first offense under this subsection, be imprisoned for not more than 1 year and, in the case of a second or subsequent offense under this subsection, be imprisoned for not more than 10 years.".

<< 28 USCA § 534 NOTE >>

SEC. 124. (a)(1) A nursing facility or home health care agency may submit a request to the Attorney General to conduct a search and exchange of records described in subsection (b) regarding an applicant for employment if the employment position is involved in direct patient care.

<< 28 USCA § 534 NOTE >>

(2) A nursing facility or home health care agency requesting a search and exchange of records under this section shall submit to the Attorney General through the appropriate State agency or agency designated by the Attorney General a copy of an employment applicant's fingerprints, a statement signed by the applicant authorizing the nursing facility or home health care agency to request the search and exchange of records, and any other identification information not more than 7 days (excluding Saturdays, Sundays, and legal public holidays under section 6103(a) of title 5, United States Code) after acquiring the fingerprints, signed statement, and information.

<< 28 USCA § 534 NOTE >>

(b) Pursuant to any submission that complies with the requirements of subsection (a), the Attorney General shall search the records of the Criminal Justice Information Services Division of the Federal Bureau of Investigation for any criminal history records corresponding to the fingerprints or other identification information submitted. The Attorney General shall provide any corresponding information resulting from the search to the appropriate State agency or agency designated by the Attorney General to receive such information.

<< 28 USCA § 534 NOTE >>

(c) Information regarding an applicant for employment in a nursing facility or home health care agency obtained pursuant to this section may be used only by the facility or agency requesting the information and only for the purpose of determining the suitability of the applicant for employment by the facility or agency in a position involved in direct patient care.

<< 28 USCA § 534 NOTE >>

(d) The Attorney General may charge a reasonable fee, not to exceed $50 per request, to any nursing facility or home health care agency requesting a search and exchange of records pursuant to this section.

<< 28 USCA § 534 NOTE >>

(e) Not later than 2 years after the date of enactment of this Act, the Attorney General shall submit a report to Congress on the number of requests for searches and exchanges of records made under this section by nursing facilities and home health care agencies and the disposition of such requests.

<< 28 USCA § 534 NOTE >>

(f) Whoever knowingly uses any information obtained pursuant to this section for a purpose other than as authorized under subsection (c) shall be fined in accordance with title 18, United States Code, imprisoned for not more than 2 years, or both.

<< 28 USCA § 534 NOTE >>

(g) A nursing facility or home health care agency that, in denying employment for an applicant, reasonably relies upon information provided by the Attorney General pursuant to this section shall not be liable in any action brought by the applicant based on the employment determination resulting from the incompleteness or inaccuracy of the information.

<< 28 USCA § 534 NOTE >>

(h) The Attorney General may promulgate such regulations as are necessary to carry out this section, including regulations regarding the security, confidentiality, accuracy, use, destruction, and dissemination of information, audits and recordkeeping, the imposition of fees, and any necessary modifications to the definitions contained in subsection (i).

<< 28 USCA § 534 NOTE >>

(i) In this section:

<< 28 USCA § 534 NOTE >>

(1) The term "home health care agency" means an agency that provides home health care or personal care services on a visiting basis in a place of residence.

<< 28 USCA § 534 NOTE >>

(2) The term "nursing facility" means a facility or institution (or a distinct part of an institution) that is primarily engaged in providing to residents of the facility or institution nursing care, including skilled nursing care, and related services for individuals who require medical or nursing care.

<< 28 USCA § 534 NOTE >>

(j) This section shall apply without fiscal year limitation.

<< 5 USCA § 5724a NOTE >>

SEC. 125. Effective with the enactment of this Act, and in any fiscal year hereafter, the Attorney General and the Secretary of the Treasury may, for their respective agencies, extend the payment of relocation expenses listed in section 5724a(b)(1) of Title 5 of the United States Code to include the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and the territories and possessions of the United States.

SEC. 126. Notwithstanding any other provision of this Act, the total of the amounts appropriated under this title of this Act is reduced by $20,038,000, out of which the reductions for each account shall be made in accordance with the chart on Year 2000 funding dated September 17, 1998, provided to Congress by the Department of Justice.

SEC. 127. Notwithstanding any other provision of law, in any action brought by a prisoner under section 1979 of the Revised Statutes (42 U.S.C. 1983) against a Federal, State, or local jail, prison, or correctional facility, or any employee or former employee thereof, arising out of the incarceration of that prisoner—

(1) the financial records of a person employed or formerly employed by the Federal, State, or local jail, prison, or correctional facility, shall not be subject to disclosure without the written consent of that person or pursuant to a court order, unless a verdict of liability has been entered against that person; and

(2) the home address, home phone number, social security number, identity of family members, personal tax returns, and personal banking information of a person described in paragraph (1), and any other records or information of a similar nature relating to that person, shall not be subject to disclosure without the written consent of that person, or pursuant to a court order.

SEC. 128. (a) The numerical limitation set forth in section 209(b) of the Immigration and Nationality Act (8 U.S.C. 1159(b)) shall not apply to any alien described in subsection (b).

(b) An alien described in subsection (a) is an alien who was a United States Government employee, employee of a nongovernmental organization based in the United States, or other Iraqi national who was moved to Guam by the United States Government in 1996 or 1997 pursuant to an arrangement made by the United States Government, and who was granted asylum in the United States under section 208(a) of the Immigration and Nationality Act (8 U.S.C. 1158(a)).

SEC. 129. (a) AMENDMENTS TO JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT OF 1974.—

<< 42 USCA § 5603 >>

(1) IN GENERAL.—Section 103 of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5603) is amended—

(A) by striking paragraph (8) and inserting the following:

"(8) the term 'unit of local government' means—

"(A) any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a State;

"(B) any law enforcement district or judicial enforcement district that—

"(i) is established under applicable State law; and

"(ii) has the authority to, in a manner independent of other State entities, establish a budget and raise revenues;

"(C) an Indian Tribe that performs law enforcement functions, as determined by the Secretary of the Interior; or

"(D) for the purposes of assistance eligibility, any agency of the government of the District of Columbia or the Federal Government that performs law enforcement functions in and for—

"(i) the District of Columbia; or

"(ii) any Trust Territory of the United States;"; and

(B) in paragraph (9), by striking "units of general local government" and inserting "units of local government".

(2) CONFORMING AMENDMENTS.—

<< 42 USCA § 5631 >>

(A) Section 221(a) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5631(a)) is amended by striking "units of general local government" each place that term appears and inserting "units of local government".

<< 42 USCA § 5632 >>

(B) Section 222(c) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5632(c)) is amended by striking "units of general local government" each place that term appears and inserting "units of local government".

<< 42 USCA § 5633 >>

(C) Section 223(a) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5633(a)) is amended—

(i) in paragraph (4)—

(I) by striking "units of general local government" and inserting "units of local government"; and

(II) by striking "local governments" and inserting "units of local government";

(ii) in paragraph (5)—

(I) in subparagraph (A), by striking "units of general local government" and inserting "units of local government"; and

(II) in subparagraph (B), by striking "unit of general local government" and inserting "unit of local government";

(iii) in paragraph (6), by striking "unit of general local government" and inserting "unit of local government"; and

(iv) in paragraph (10), by striking "unit of general local government" and inserting "unit of local government".

<< 42 USCA § 5654 >>

(D) Section 244(5) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5654(5)) is amended by striking "units of general local government" and inserting "units of local government".

<< 42 USCA § 5714b >>

(E) Section 372(a)(3) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5714b(a)(3)) is amended by striking "unit of general local government" and inserting "unit of local government".

<< 42 USCA § 5784 >>

(F) Section 505(a) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5784(a)) is amended by striking "units of general local government" and inserting "units of local government".

<< 42 USCA § 3791 >>

(b) OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968.—Section 901(3) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3791(3)) is amended to read as follows:

"(3) 'unit of local government' means—

"(A) any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a State;

"(B) any law enforcement district or judicial enforcement district that—

"(i) is established under applicable State law; and

"(ii) has the authority to, in a manner independent of other State entities, establish a budget and impose taxes;

"(C) an Indian Tribe (as that term is defined in section 103 of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5603)) that performs law enforcement functions, as determined by the Secretary of the Interior; or

"(D) for the purposes of assistance eligibility, any agency of the government of the District of Columbia or the Federal Government that performs law enforcement functions in and for—

"(i) the District of Columbia; or

"(ii) any Trust Territory of the United States;".

SEC. 130. For payments of judgments against the United States and compromise settlements of claims in suits against the United States arising from the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) and its implementation, such sums as may be necessary, to remain available until expended: *Provided*, That the foregoing authority is available solely for payment of judgments and compromise settlements: *Provided further*, That payment of litigation expenses is available under existing authority as set forth in the Memorandum of Understanding between the Federal Deposit Insurance Corporation and the Department of Justice, dated October 2, 1998, and may not be paid from amounts provided in this Act.

This title may be cited as the "Department of Justice Appropriations Act, 1999".

TITLE II—DEPARTMENT OF COMMERCE AND RELATED AGENCIES

TRADE AND INFRASTRUCTURE DEVELOPMENT

RELATED AGENCIES

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

SALARIES AND EXPENSES

For necessary expenses of the Office of the United States Trade Representative, including the hire of passenger motor vehicles and the employment of experts and consultants as authorized by 5 U.S.C. 3109, $24,200,000, of which $1,000,000 shall remain available until expended: *Provided,* That not to exceed $98,000 shall be available for official reception and representation expenses.

INTERNATIONAL TRADE COMMISSION

SALARIES AND EXPENSES

For necessary expenses of the International Trade Commission, including hire of passenger motor vehicles, and services as authorized by 5 U.S.C. 3109, and not to exceed $2,500 for official reception and representation expenses, $44,495,000, to remain available until expended.

DEPARTMENT OF COMMERCE

INTERNATIONAL TRADE ADMINISTRATION

OPERATIONS AND ADMINISTRATION

For necessary expenses for international trade activities of the Department of Commerce provided for by law, and engaging in trade promotional activities abroad, including expenses of grants and cooperative agreements for the purpose of promoting exports of United States firms, without regard to 44 U.S.C. 3702 and 3703; full medical coverage for dependent members of immediate families of employees stationed overseas and employees temporarily posted overseas; travel and transportation of employees of the United States and Foreign Commercial Service between two points abroad, without regard to 49 U.S.C. 1517; employment of Americans and aliens by contract for services; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; purchase or construction of temporary demountable exhibition structures for use abroad; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2412 of 3864

arise in foreign countries; not to exceed $327,000 for official representation expenses abroad; purchase of passenger motor vehicles for official use abroad, not to exceed $30,000 per vehicle; obtain insurance on official motor vehicles; and rent tie lines and teletype equipment, $286,264,000, to remain available until expended, of which $1,600,000 is to be derived from fees to be retained and used by the International Trade Administration, notwithstanding 31 U.S.C. 3302: *Provided,* That of the $302,757,000 provided for in direct obligations (of which $284,664,000 is appropriated from the General Fund, $1,600,000 is derived from fee collections, and $16,493,000 is derived from unobligated balances and deobligations from prior years), $59,280,000 shall be for Trade Development, $17,779,000 shall be for Market Access and Compliance, $31,047,000 shall be for the Import Administration, $182,736,000 shall be for the United States and Foreign Commercial Service, and $11,915,000 shall be for Executive Direction and Administration: *Provided further,* That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities without regard to section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912); and that for the purpose of this Act, contributions under the provisions of the Mutual Educational and Cultural Exchange Act shall include payment for assessments for services provided as part of these activities.

EXPORT ADMINISTRATION

OPERATIONS AND ADMINISTRATION

For necessary expenses for export administration and national security activities of the Department of Commerce, including costs associated with the performance of export administration field activities both domestically and abroad; full medical coverage for dependent members of immediate families of employees stationed overseas; employment of Americans and aliens by contract for services abroad; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $15,000 for official representation expenses abroad; awards of compensation to informers under the Export Administration Act of 1979, and as authorized by 22 U.S.C. 401(b); purchase of passenger motor vehicles for official use and motor vehicles for law enforcement use with special requirement vehicles eligible for purchase without regard to any price limitation otherwise established by law, $52,331,000 to remain available until expended, of which $1,877,000 shall be for inspections and other activities related to national security: *Provided,* That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities: *Provided further,* That payments and contributions collected and accepted for materials or services provided as part of such activities may be retained for use in covering the cost of such activities, and for providing information to the public with respect to the export administration and national security activities of the Department of Commerce and other export control programs of the United States and other governments: *Provided further,* That no funds may be obligated or expended for processing licenses for the export of satellites of United States origin (including commercial satellites and satellite components) to the People's Republic of China, unless, at least 15 days in advance, the Committees on Appropriations of the House and the Senate and other appropriate Committees of the Congress are notified of such proposed action.

ECONOMIC DEVELOPMENT ADMINISTRATION

ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For grants for economic development assistance as provided by the Public Works and Economic Development Act of 1965, as amended, Public Law 91–304, and such laws that were in effect immediately before September 30, 1982, and for trade adjustment assistance, $368,379,000: *Provided,* That none of the funds appropriated or otherwise made available under this heading may be used directly or indirectly for attorneys' or consultants' fees in connection with securing grants and contracts made by the Economic Development Administration: *Provided further,* That, notwithstanding any other provision of law, the Secretary of Commerce may provide financial assistance for projects to be located on military installations closed or scheduled for closure or realignment to grantees eligible for assistance under the Public Works and Economic Development Act of 1965, as amended, without it being required that the grantee have title or ability to obtain a lease for the property, for the useful life of the project, when in the opinion of the Secretary of Commerce, such financial assistance is necessary for the economic

development of the area: *Provided further,* That the Secretary of Commerce may, as the Secretary considers appropriate, consult with the Secretary of Defense regarding the title to land on military installations closed or scheduled for closure or realignment.

## SALARIES AND EXPENSES

For necessary expenses of administering the economic development assistance programs as provided for by law, $24,000,000: *Provided,* That these funds may be used to monitor projects approved pursuant to title I of the Public Works Employment Act of 1976, as amended, title II of the Trade Act of 1974, as amended, and the Community Emergency Drought Relief Act of 1977.

## MINORITY BUSINESS DEVELOPMENT AGENCY

### MINORITY BUSINESS DEVELOPMENT

For necessary expenses of the Department of Commerce in fostering, promoting, and developing minority business enterprise, including expenses of grants, contracts, and other agreements with public or private organizations, $27,000,000.

## ECONOMIC AND INFORMATION INFRASTRUCTURE

### ECONOMIC AND STATISTICAL ANALYSIS

#### SALARIES AND EXPENSES

For necessary expenses, as authorized by law, of economic and statistical analysis programs of the Department of Commerce, $48,490,000, to remain available until September 30, 2000.

## BUREAU OF THE CENSUS

### SALARIES AND EXPENSES

For expenses necessary for collecting, compiling, analyzing, preparing, and publishing statistics, provided for by law, $136,147,000.

PERIODIC CENSUSES AND PROGRAMS

For expenses necessary to conduct the decennial census, $1,026,936,000 to remain available until expended: *Provided,* That, of this amount, not less than $75,000,000 shall be for the following activities: (1) $23,000,000 for additional staffing requirements for local field offices; (2) $17,000,000 for additional promotion, outreach, and marketing activities; and (3) $35,000,000 for additional costs associated with modifications to decennial census questionnaires.

In addition, for necessary expenses of the Census Monitoring Board as authorized by section 210 of Public Law 105–119, $4,000,000, to remain available until expended.

In addition, for expenses to collect and publish statistics for other periodic censuses and programs provided for by law, $155,966,000, to remain available until expended.

## NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION

### SALARIES AND EXPENSES

#### << 47 USCA § 903 NOTE >>

For necessary expenses, as provided for by law, of the National Telecommunications and Information Administration (NTIA), $10,940,000, to remain available until expended: *Provided,* That, notwithstanding 31 U.S.C. 1535(d), the Secretary of Commerce shall charge Federal agencies for costs incurred in spectrum management, analysis, and operations, and related services and such fees shall be retained and used as offsetting collections for costs of such spectrum services, to remain available until expended: *Provided further,* That hereafter, notwithstanding any other provision of law, NTIA shall not authorize spectrum use or provide any spectrum functions pursuant to the NTIA Organization Act, 47 U.S.C. 902–903, to any Federal entity without reimbursement as required by NTIA for such spectrum management costs, and Federal entities withholding payment of such cost shall not use spectrum: *Provided further,* That the Secretary of Commerce is authorized to retain and use as offsetting collections all funds transferred, or previously transferred, from other Government agencies for all costs incurred in telecommunications research, engineering, and related activities by the Institute for Telecommunication Sciences of the NTIA, in furtherance of

its assigned functions under this paragraph, and such funds received from other Government agencies shall remain available until expended.

## PUBLIC TELECOMMUNICATIONS FACILITIES, PLANNING AND CONSTRUCTION

For grants authorized by section 392 of the Communications Act of 1934, as amended, $21,000,000, to remain available until expended as authorized by section 391 of the Act, as amended: *Provided,* That not to exceed $1,800,000 shall be available for program administration as authorized by section 391 of the Act: *Provided further,* That notwithstanding the provisions of section 391 of the Act, the prior year unobligated balances may be made available for grants for projects for which applications have been submitted and approved during any fiscal year: *Provided further,* That, hereafter, notwithstanding any other provision of law, the Pan–Pacific Education and Communication Experiments by Satellite (PEACESAT) Program is eligible to compete for Public Telecommunications Facilities, Planning and Construction funds.

## INFORMATION INFRASTRUCTURE GRANTS

For grants authorized by section 392 of the Communications Act of 1934, as amended, $18,000,000, to remain available until expended as authorized by section 391 of the Act, as amended: *Provided,* That not to exceed $3,000,000 shall be available for program administration and other support activities as authorized by section 391: *Provided further,* That, of the funds appropriated herein, not to exceed 5 percent may be available for telecommunications research activities for projects related directly to the development of a national information infrastructure: *Provided further,* That, notwithstanding the requirements of section 392(a) and 392(c) of the Act, these funds may be used for the planning and construction of telecommunications networks for the provision of educational, cultural, health care, public information, public safety, or other social services: *Provided further,* That notwithstanding any other provision of law, no entity that receives telecommunications services at preferential rates under section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)) or receives assistance under the regional information sharing systems grant program of the Department of Justice under part M of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796h) may use funds under a grant under this heading to cover any costs of the entity that would otherwise be covered by such preferential rates or such assistance, as the case may be.

## PATENT AND TRADEMARK OFFICE

### SALARIES AND EXPENSES

For necessary expenses of the Patent and Trademark Office provided for by law, including defense of suits instituted against the Commissioner of Patents and Trademarks, $643,026,000, to remain available until expended: *Provided,* That of this amount, $643,026,000 shall be derived from offsetting collections assessed and collected pursuant to 15 U.S.C. 1113 and 35 U.S.C. 41 and 376, and shall be retained and used for necessary expenses in this appropriation: *Provided further,* That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1999, so as to result in a final fiscal year 1999 appropriation from the General Fund estimated at $0: *Provided further,* That, during fiscal year 1999, should the total amount of offsetting fee collections be less than $643,026,000, the total amounts available to the Patent and Trademark Office shall be reduced accordingly: *Provided further,* That any amount received in excess of $643,026,000 in fiscal year 1999 shall remain available until expended, but shall not be available for obligation until October 1, 1999: *Provided further,* That the amounts charged for patent fees under 35 USC 41 (a) and (b) shall be the amounts charged by the Patent and Trademark Office on September 30, 1998, including any applicable surcharges collected pursuant to section 8001 of Public Law 103–66: *Provided further,* That such fees shall be credited as offsetting collections and shall be retained and used for necessary expenses in this appropriation: *Provided further,* That upon enactment of a statute reauthorizing the Patent and Trademark Office or establishing a successor agency or agencies, and upon the subsequent enactment of a new patent fee schedule, the fifth proviso in this paragraph shall no longer have effect: *Provided further,* That, in addition to amounts otherwise made available under this heading, not to exceed $102,000,000 of such amounts collected shall be available for obligation in fiscal year 1999 for purposes as authorized by law: *Provided further,* That any amount received in excess of $102,000,000 in fiscal year 1999 shall remain available until expended, but shall not be available for obligation until October 1, 1999.

## SCIENCE AND TECHNOLOGY

### TECHNOLOGY ADMINISTRATION

## UNDER SECRETARY FOR TECHNOLOGY/OFFICE OF TECHNOLOGY POLICY

### SALARIES AND EXPENSES

For necessary expenses for the Under Secretary for Technology/Office of Technology Policy, $9,495,000, of which not to exceed $1,600,000 shall remain available until September 30, 2000.

### NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

### SCIENTIFIC AND TECHNICAL RESEARCH AND SERVICES

For necessary expenses of the National Institute of Standards and Technology, $280,136,000, to remain available until expended, of which not to exceed $1,625,000 may be transferred to the "Working Capital Fund".

### INDUSTRIAL TECHNOLOGY SERVICES

### << 15 USCA § 278k NOTE >>

For necessary expenses of the Manufacturing Extension Partnership of the National Institute of Standards and Technology, $106,800,000, to remain available until expended: *Provided,* That notwithstanding the time limitations imposed by 15 U.S.C. 278k(c)(1) and (5) on the duration of Federal financial assistance that may be awarded by the Secretary of Commerce to Regional Centers for the transfer of Manufacturing Technology ("Centers"), such Federal financial assistance for a Center may continue beyond six years and may be renewed for additional periods, not to exceed one year, at a rate not to exceed one-third of the Center's total annual costs or the level of funding in the sixth year, whichever is less, subject before any such renewal to a positive evaluation of the Center and to a finding by the Secretary of Commerce that continuation of Federal funding to the Center is in the best interest of the Regional Centers for the transfer of Manufacturing Technology Program: *Provided further,* That the Center's most recent performance evaluation is positive, and the Center has submitted a reapplication which has successfully passed merit review.

In addition, for necessary expenses of the Advanced Technology Program of the National Institute of Standards and Technology, $203,500,000, to remain available until expended, of which not to exceed $66,000,000 shall be available for the award of new grants, and of which not to exceed $500,000 may be transferred to the "Working Capital Fund".

### CONSTRUCTION OF RESEARCH FACILITIES

For construction of new research facilities, including architectural and engineering design, and for renovation of existing facilities, not otherwise provided for the National Institute of Standards and Technology, as authorized by 15 U.S.C. 278c–278e, $56,714,000, to remain available until expended: *Provided,* That of the amounts provided under this heading, $40,000,000 shall be available for obligation and expenditure only after submission of a plan for the expenditure of these funds, in accordance with section 605 of this Act.

### NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

### OPERATIONS, RESEARCH, AND FACILITIES

### (INCLUDING TRANSFERS OF FUNDS)

### << 33 USCA § 851 >>

For necessary expenses of activities authorized by law for the National Oceanic and Atmospheric Administration, including maintenance, operation, and hire of aircraft; not to exceed 250 commissioned officers on the active list as of September 30, 1999; grants, contracts, or other payments to nonprofit organizations for the purposes of conducting activities pursuant to cooperative agreements; and relocation of facilities as authorized by 33 U.S.C. 883i; $1,579,844,000, to remain available until expended: *Provided,* That fees and donations received by the National Ocean Service for the management of the national marine sanctuaries may be retained and used for the salaries and expenses associated with those activities, notwithstanding 31 U.S.C. 3302: *Provided further,* That in addition, $63,381,000 shall be derived by transfer from the fund entitled "Promote and Develop

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Fishery Products and Research Pertaining to American Fisheries": *Provided further,* That grants to States pursuant to sections 306 and 306A of the Coastal Zone Management Act of 1972, as amended, shall not exceed $2,000,000: *Provided further,* That not to exceed $31,439,000 shall be expended for Executive Direction and Administration, which consists of the Offices of the Under Secretary, the Executive Secretariat, Policy and Strategic Planning, International Affairs, Legislative Affairs, Public Affairs, Sustainable Development, the Chief Scientist, and the General Counsel: *Provided further,* That the aforementioned offices, excluding the Office of the General Counsel, shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis above the level of 33 personnel: *Provided further,* That the Secretary of Commerce shall make funds available to implement the mitigation recommendations identified subsequent to the "1995 Secretary's Report to Congress on Adequacy of NEXRAD Coverage and Degradation of Weather Services", and shall ensure continuation of weather service coverage for these communities until mitigation activities are completed: *Provided further,* That no general administrative charge shall be applied against any assigned activity included in this Act and, further, that any direct administrative expenses applied against assigned activities shall be limited to five percent of the funds provided for that assigned activity.

PROCUREMENT, ACQUISITION AND CONSTRUCTION

(INCLUDING TRANSFERS OF FUNDS)

For procurement, acquisition and construction of capital assets, including alteration and modification costs, of the National Oceanic and Atmospheric Administration, $584,677,000, to remain available until expended: *Provided,* That not to exceed $67,667,000 is available for the advanced weather interactive processing system, and may be available for obligation and expenditure only pursuant to a certification by the Secretary of Commerce that the total cost to complete the acquisition and deployment of the advanced weather interactive processing system through Build 4.2 and NOAA Port system, including program management, operations, and maintenance costs through deployment, will not exceed $71,790,000: *Provided further,* That unexpended balances of amounts previously made available in the "Operations, Research, and Facilities" account for activities funded under this heading may be transferred to and merged with this account, to remain available until expended for the purposes for which the funds were originally appropriated.

COASTAL ZONE MANAGEMENT FUND

Of amounts collected pursuant to section 308 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1456a), not to exceed $4,000,000, for purposes set forth in sections 308(b)(2)(A), 308(b)(2)(B)(v), and 315(e) of such Act.

FISHERMEN'S CONTINGENCY FUND

For carrying out the provisions of title IV of Public Law 95–372, not to exceed $953,000, to be derived from receipts collected pursuant to that Act, to remain available until expended.

FOREIGN FISHING OBSERVER FUND

For expenses necessary to carry out the provisions of the Atlantic Tunas Convention Act of 1975, as amended (Public Law 96–339), the Magnuson–Stevens Fishery Conservation and Management Act of 1976, as amended (Public Law 100–627), *and the American Fisheries Promotion Act (Public Law 96–561),* to be derived from the fees imposed under the foreign fishery observer program authorized by these Acts, not to exceed $189,000, to remain available until expended.

FISHERIES FINANCE PROGRAM ACCOUNT

For the cost of direct loans, $338,000, as authorized by the Merchant Marine Act of 1936, as amended: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,* That none of the funds made available under this heading may be used for direct loans for any new fishing vessel that will increase the harvesting capacity in any United States fishery.

GENERAL ADMINISTRATION

SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of Commerce provided for by law, including not to exceed $3,000 for official entertainment, $30,000,000.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $21,000,000.

## PATENT AND TRADEMARK OFFICE

## SALARIES AND EXPENSES

## (RESCISSION)

Of the unobligated balances available under this heading from prior year appropriations, fees collected in this fiscal year, and balances of prior year fees, $71,000,000 are rescinded.

## GENERAL PROVISIONS—DEPARTMENT OF COMMERCE

SEC. 201. During the current fiscal year, applicable appropriations and funds made available to the Department of Commerce by this Act shall be available for the activities specified in the Act of October 26, 1949 (15 U.S.C. 1514), to the extent and in the manner prescribed by the Act, and, notwithstanding 31 U.S.C. 3324, may be used for advanced payments not otherwise authorized only upon the certification of officials designated by the Secretary of Commerce that such payments are in the public interest.

SEC. 202. During the current fiscal year, appropriations made available to the Department of Commerce by this Act for salaries and expenses shall be available for hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; services as authorized by 5 U.S.C. 3109; and uniforms or allowances therefore, as authorized by law (5 U.S.C. 5901–5902).

SEC. 203. None of the funds made available by this Act may be used to support the hurricane reconnaissance aircraft and activities that are under the control of the United States Air Force or the United States Air Force Reserve.

<< 13 USCA § 23 NOTE >>

SEC. 204. None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce, shall be available to reimburse the Unemployment Trust Fund or any other fund or account of the Treasury to pay for any expenses paid before October 1, 1992, as authorized by section 8501 of title 5, United States Code, for services performed after April 20, 1990, by individuals appointed to temporary positions within the Bureau of the Census for purposes relating to the 1990 decennial census of population.

SEC. 205. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Commerce in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: *Provided,* That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 206. (a) Should legislation be enacted to dismantle or reorganize the Department of Commerce, or any portion thereof, the Secretary of Commerce, no later than 90 days thereafter, shall submit to the Committees on Appropriations of the House and the Senate a plan for transferring funds provided in this Act to the appropriate successor organizations: *Provided,* That the plan shall include a proposal for transferring or rescinding funds appropriated herein for agencies or programs terminated under such legislation: *Provided further,* That such plan shall be transmitted in accordance with section 605 of this Act.

(b) The Secretary of Commerce or the appropriate head of any successor organization(s) may use any available funds to carry out legislation dismantling or reorganizing the Department of Commerce, or any portion thereof, to cover the costs of actions relating to the abolishment, reorganization, or transfer of functions and any related personnel action, including voluntary separation incentives if authorized by such legislation: *Provided,* That the authority to transfer funds between appropriations accounts that may be necessary to carry out this section is provided in addition to authorities included under section 205 of this Act: *Provided further,* That use of funds to carry out this section shall be treated as a reprogramming of funds under section

605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 207. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title or from actions taken for the care and protection of loan collateral or grant property shall be absorbed within the total budgetary resources available to such Department or agency: *Provided,* That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: *Provided further,* That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 208. The Secretary of Commerce may award contracts for hydrographic, geodetic, and photogrammetric surveying and mapping services in accordance with title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.).

<< 31 USCA § 501 NOTE >>

SEC. 209. The Secretary of Commerce may use the Commerce franchise fund for expenses and equipment necessary for the maintenance and operation of such administrative services as the Secretary determines may be performed more advantageously as central services, pursuant to section 403 of Public Law 103–356: *Provided,* That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made for the purpose of providing capital shall be used to capitalize such fund: *Provided further,* That such fund shall be paid in advance from funds available to the Department and other Federal agencies for which such centralized services are performed, at rates which will return in full all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of automated data processing (ADP) software and systems (either acquired or donated), and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary: *Provided further,* That such fund shall provide services on a competitive basis: *Provided further,* That an amount not to exceed 4 percent of the total annual income to such fund may be retained in the fund for fiscal year 1999 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment, and for the improvement and implementation of Department financial management, ADP, and other support systems: *Provided further,* That such amounts retained in the fund for fiscal year 1999 and each fiscal year thereafter shall be available for obligation and expenditure only in accordance with section 605 of this Act: *Provided further,* That no later than 30 days after the end of each fiscal year, amounts in excess of this reserve limitation shall be deposited as miscellaneous receipts in the Treasury: *Provided further,* That such franchise fund pilot program shall terminate pursuant to section 403(f) of Public Law 103–356.

SEC. 210. No funds may be used under this Act to process or register any application filed or submitted with the Patent and Trademark Office under the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes", approved July 5, 1946, commonly referred to as the Trademark Act of 1946, as amended, after the date of enactment of this Act for a mark identical to the official tribal insignia of any federally recognized Indian tribe for a period of one year from the date of enactment of this Act.

SEC. 211. (a)(1) Notwithstanding any other provision of law, no transaction or payment shall be authorized or approved pursuant to section 515.527 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, with respect to a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of the mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

(2) No U.S. court shall recognize, enforce or otherwise validate any assertion of rights by a designated national based on common law rights or registration obtained under such section 515.527 of such a confiscated mark, trade name, or commercial name.

(b) No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44 (b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126 (b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

(c) The Secretary of the Treasury shall promulgate such rules and regulations as are necessary to carry out the provisions of this section.

(d) In this section:

(1) The term "designated national" has the meaning given such term in section 515.305 of title 31, Code of Federal Regulations, as in effect on September 9, 1998, and includes a national of any foreign country who is a successor-in-interest to a designated national.

(2) The term "confiscated" has the meaning given such term in section 515.336 of title 31, Code of Federal Regulations, as in effect on September 9, 1998.

SEC. 212. (a) Subject to subsection (b), the Secretary of Commerce shall convey, at fair market value (as determined by the Secretary), to the city of Two Harbors, Minnesota, or its designee, the parcel of land described in subsection (c).

(b) The Secretary may make the conveyance under subsection (a) only if the Secretary receives adequate assurances, as determined by the Secretary, that the conveyance is in accordance with the requirements of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.).

(c) The parcel of land referred to in subsection (a) consists of approximately 21.55 acres known as the J and J Casting site, in Lake County, Minnesota, together with a road easement, all as described in the deed of the United States Marshal, dated March 22, 1988, executed pursuant to the order of sale of the United States District Court for the District of Minnesota, dated May 15, 1987, in case Civil No. 5–86–300.

(d) The Secretary shall carry out this section acting through the Assistant Secretary of Commerce for Economic Development.

SEC. 213. The Secretary of Commerce, through the Under Secretary for Oceans and Atmosphere, is authorized to exchange, under such terms as the Secretary deems appropriate, all right, title, and interest in the 28.16 acre Lena Point property near Juneau, Alaska, to site a National Oceanic and Atmospheric Administration facility: Provided, That the Secretary is authorized to enter into an agreement with the owner of the Lena Point site to modify existing rock quarry operations to minimize future site development costs, and to provide appropriated funds for project mitigation purposes: Provided further, That Section 2(b) of Public Law 104–91 is amended by striking "on Auke Cape near Juneau, Alaska" and inserting in lieu thereof "in Alaska".

SEC. 214. The National Oceanic and Atmospheric Administration (NOAA) is authorized to provide an easement, lease, license or other long-term agreement to allow the State of Alaska to own, operate and maintain a laboratory, classroom, and office facility on the site of the NOAA facility and to accept and expend State funds for development of joint facilities that will be owned and operated by NOAA: Provided, That NOAA is authorized to collect operation and maintenance costs from the State of Alaska and to retain said funds for utility costs, and current and future facility maintenance costs.

This title may be cited as the "Department of Commerce and Related Agencies Appropriations Act, 1999".

## TITLE III—THE JUDICIARY

### SUPREME COURT OF THE UNITED STATES

#### SALARIES AND EXPENSES

For expenses necessary for the operation of the Supreme Court, as required by law, excluding care of the building and grounds, including purchase or hire, driving, maintenance, and operation of an automobile for the Chief Justice, not to exceed $10,000 for the purpose of transporting Associate Justices, and hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; not to exceed $10,000 for official reception and representation expenses; and for miscellaneous expenses, to be expended as the Chief Justice may approve, $31,059,000.

#### CARE OF THE BUILDING AND GROUNDS

For such expenditures as may be necessary to enable the Architect of the Capitol to carry out the duties imposed upon him by the Act approved May 7, 1934 (40 U.S.C. 13a–13b), $5,400,000, of which $2,364,000 shall remain available until expended.

### UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

#### SALARIES AND EXPENSES

For salaries of the chief judge, judges, and other officers and employees, and for necessary expenses of the court, as authorized by law, $16,101,000.

# UNITED STATES COURT OF INTERNATIONAL TRADE

## SALARIES AND EXPENSES

For salaries of the chief judge and 8 judges, salaries of the officers and employees of the court, services as authorized by 5 U.S.C. 3109, and necessary expenses of the court, as authorized by law, $11,804,000.

## COURTS OF APPEALS, DISTRICT COURTS, AND OTHER JUDICIAL SERVICES

## SALARIES AND EXPENSES

For the salaries of circuit and district judges (including judges of the territorial courts of the United States), justices and judges retired from office or from regular active service, judges of the United States Court of Federal Claims, bankruptcy judges, magistrate judges, and all other officers and employees of the Federal Judiciary not otherwise specifically provided for, and necessary expenses of the courts, as authorized by law, $2,821,821,000 (including the purchase of firearms and ammunition); of which not to exceed $13,454,000 shall remain available until expended for space alteration projects; and of which not to exceed $10,000,000 shall remain available until expended for furniture and furnishings related to new space alteration and construction projects.

In addition, for expenses of the United States Court of Federal Claims associated with processing cases under the National Childhood Vaccine Injury Act of 1986, not to exceed $2,515,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

## VIOLENT CRIME REDUCTION PROGRAMS

For activities of the Federal Judiciary as authorized by law, $41,043,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as authorized by section 190001(a) of Public Law 103–322, and sections 818 and 823 of Public Law 104–132.

## DEFENDER SERVICES

For the operation of Federal Public Defender and Community Defender organizations; the compensation and reimbursement of expenses of attorneys appointed to represent persons under the Criminal Justice Act of 1964, as amended; the compensation and reimbursement of expenses of persons furnishing investigative, expert and other services under the Criminal Justice Act (18 U.S.C. 3006A(e)); the compensation (in accordance with Criminal Justice Act maximums) and reimbursement of expenses of attorneys appointed to assist the court in criminal cases where the defendant has waived representation by counsel; the compensation and reimbursement of travel expenses of guardians ad litem acting on behalf of financially eligible minor or incompetent offenders in connection with transfers from the United States to foreign countries with which the United States has a treaty for the execution of penal sentences; and the compensation of attorneys appointed to represent jurors in civil actions for the protection of their employment, as authorized by 28 U.S.C. 1875(d), $360,952,000, to remain available until expended as authorized by 18 U.S.C. 3006A(i).

## FEES OF JURORS AND COMMISSIONERS

For fees and expenses of jurors as authorized by 28 U.S.C. 1871 and 1876; compensation of jury commissioners as authorized by 28 U.S.C. 1863; and compensation of commissioners appointed in condemnation cases pursuant to rule 71A(h) of the Federal Rules of Civil Procedure (28 U.S.C. Appendix Rule 71A(h)), $66,861,000, to remain available until expended: *Provided,* That the compensation of land commissioners shall not exceed the daily equivalent of the highest rate payable under section 5332 of title 5, United States Code.

## COURT SECURITY

For necessary expenses, not otherwise provided for, incident to the procurement, installation, and maintenance of security equipment and protective services for the United States Courts in courtrooms and adjacent areas, including building ingress-egress control, inspection of packages, directed security patrols, and other similar activities as authorized by section 1010 of the Judicial Improvement and Access to Justice Act (Public Law 100–702), $174,569,000, of which not to exceed $10,000,000 shall remain available until expended for security systems, to be expended directly or transferred to the United States Marshals

Service, which shall be responsible for administering elements of the Judicial Security Program consistent with standards or guidelines agreed to by the Director of the Administrative Office of the United States Courts and the Attorney General.

## ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

### SALARIES AND EXPENSES

For necessary expenses of the Administrative Office of the United States Courts as authorized by law, including travel as authorized by 31 U.S.C. 1345, hire of a passenger motor vehicle as authorized by 31 U.S.C. 1343(b), advertising and rent in the District of Columbia and elsewhere, $54,500,000, of which not to exceed $7,500 is authorized for official reception and representation expenses.

## FEDERAL JUDICIAL CENTER

### SALARIES AND EXPENSES

For necessary expenses of the Federal Judicial Center, as authorized by Public Law 90–219, $17,716,000; of which $1,800,000 shall remain available through September 30, 2000, to provide education and training to Federal court personnel; and of which not to exceed $1,000 is authorized for official reception and representation expenses.

## JUDICIAL RETIREMENT FUNDS

### PAYMENT TO JUDICIARY TRUST FUNDS

For payment to the Judicial Officers' Retirement Fund, as authorized by 28 U.S.C. 377(o), $27,500,000; to the Judicial Survivors' Annuities Fund, as authorized by 28 U.S.C. 376(c), $7,800,000; and to the United States Court of Federal Claims Judges' Retirement Fund, as authorized by 28 U.S.C. 178(l), $2,000,000.

## UNITED STATES SENTENCING COMMISSION

### SALARIES AND EXPENSES

For the salaries and expenses necessary to carry out the provisions of chapter 58 of title 28, United States Code, $9,487,000, of which not to exceed $1,000 is authorized for official reception and representation expenses.

### GENERAL PROVISIONS—THE JUDICIARY

SEC. 301. Appropriations and authorizations made in this title which are available for salaries and expenses shall be available for services as authorized by 5 U.S.C. 3109.

SEC. 302. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Judiciary in this Act may be transferred between such appropriations, but no such appropriation, except "Courts of Appeals, District Courts, and Other Judicial Services, Defender Services" and "Courts of Appeals, District Courts, and Other Judicial Services, Fees of Jurors and Commissioners", shall be increased by more than 10 percent by any such transfers: *Provided,* That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 303. Notwithstanding any other provision of law, the salaries and expenses appropriation for district courts, courts of appeals, and other judicial services shall be available for official reception and representation expenses of the Judicial Conference of the United States: *Provided,* That such available funds shall not exceed $10,000 and shall be administered by the Director of the Administrative Office of the United States Courts in the capacity as Secretary of the Judicial Conference.

This title may be cited as "The Judiciary Appropriations Act, 1999".

## TITLE IV—DEPARTMENT OF STATE AND RELATED AGENCIES

### DEPARTMENT OF STATE

### ADMINISTRATION OF FOREIGN AFFAIRS

### DIPLOMATIC AND CONSULAR PROGRAMS

<< 8 USCA § 1351 NOTE >>

For necessary expenses of the Department of State and the Foreign Service not otherwise provided for, including expenses authorized by the State Department Basic Authorities Act of 1956, as amended; representation to certain international organizations in which the United States participates pursuant to treaties, ratified pursuant to the advice and consent of the Senate, or specific Acts of Congress; acquisition by exchange or purchase of passenger motor vehicles as authorized by 31 U.S.C. 1343, 40 U.S.C. 481(c), and 22 U.S.C. 2674; and for expenses of general administration, $1,644,300,000: *Provided,* That, of the amount made available under this heading, not to exceed $4,000,000 may be transferred to, and merged with, funds in the "Emergencies in the Diplomatic and Consular Service" appropriations account, to be available only for emergency evacuations and terrorism rewards: *Provided further,* That of the amount made available under this heading, $500,000 shall be available only for the National Law Center for Inter–American Free Trade: *Provided further,* That notwithstanding section 140(a)(5), and the second sentence of section 140(a)(3), of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236), fees may be collected during fiscal years 1999 and 2000 under the authority of section 140(a)(1) of that Act: *Provided further,* That all fees collected under the preceding proviso shall be deposited in fiscal years 1999 and 2000 as an offsetting collection to appropriations made under this heading to recover costs as set forth under section 140(a)(2) of that Act and shall remain available until expended.

In addition, not to exceed $1,252,000 shall be derived from fees collected from other executive agencies for lease or use of facilities located at the International Center in accordance with section 4 of the International Center Act (Public Law 90–553), as amended; in addition, as authorized by section 5 of such Act, $490,000, to be derived from the reserve authorized by that section, to be used for the purposes set out in that section; and, in addition, not to exceed $15,000, which shall be derived from reimbursements, surcharges, and fees for use of Blair House facilities in accordance with section 46 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2718(a)).

Notwithstanding section 402 of this Act, not to exceed 20 percent of the amounts made available in this Act in the appropriation accounts "Diplomatic and Consular Programs" and "Salaries and Expenses" under the heading "Administration of Foreign Affairs" may be transferred between such appropriation accounts: *Provided,* That any transfer pursuant to this sentence shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of State and the Foreign Service, provided for by law, including expenses authorized by section 9 of the Act of August 31, 1964, as amended (31 U.S.C. 3721), and the State Department Basic Authorities Act of 1956, as amended, $355,000,000: *Provided,* That, of this amount, $813,333 shall be transferred to the Presidential Advisory Commission on Holocaust Assets in the United States.

## CAPITAL INVESTMENT FUND

For necessary expenses of the Capital Investment Fund, $80,000,000, to remain available until expended, as authorized in Public Law 103–236: *Provided,* That section 135(e) of Public Law 103–236 shall not apply to funds available under this heading.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C. App.), $27,495,000, notwithstanding section 209(a)(1) of the Foreign Service Act of 1980, as amended (Public Law 96–465), as it relates to post inspections.

## REPRESENTATION ALLOWANCES

For representation allowances as authorized by section 905 of the Foreign Service Act of 1980, as amended (22 U.S.C. 4085), $4,350,000.

## PROTECTION OF FOREIGN MISSIONS AND OFFICIALS

For expenses, not otherwise provided, to enable the Secretary of State to provide for extraordinary protective services in accordance with the provisions of section 214 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4314) and 3 U.S.C. 208, $8,100,000, to remain available until September 30, 2000.

## SECURITY AND MAINTENANCE OF UNITED STATES MISSIONS

For necessary expenses for carrying out the Foreign Service Buildings Act of 1926, as amended (22 U.S.C. 292–300), preserving, maintaining, repairing, and planning for, buildings that are owned or directly leased by the Department of State, renovating, in addition to funds otherwise available, the Main State Building, and carrying out the Diplomatic Security Construction Program as authorized by title IV of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (22 U.S.C. 4851), $403,561,000, to remain available until expended as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)): *Provided,* That none of the funds appropriated in this paragraph shall be available for acquisition of furniture and furnishings and generators for other departments and agencies.

## EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

For expenses necessary to enable the Secretary of State to meet unforeseen emergencies arising in the Diplomatic and Consular Service pursuant to the requirement of 31 U.S.C. 3526(e), $5,500,000 to remain available until expended as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)), of which not to exceed $1,000,000 may be transferred to and merged with the Repatriation Loans Program Account, subject to the same terms and conditions.

## REPATRIATION LOANS PROGRAM ACCOUNT

For the cost of direct loans, $593,000, as authorized by section 4 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2671): *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974. In addition, for administrative expenses necessary to carry out the direct loan program, $607,000, which may be transferred to and merged with the Salaries and Expenses account under Administration of Foreign Affairs.

## PAYMENT TO THE AMERICAN INSTITUTE IN TAIWAN

For necessary expenses to carry out the Taiwan Relations Act, Public Law 96–8, $14,750,000.

## PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the Foreign Service Retirement and Disability Fund, as authorized by law, $132,500,000.

<< 22 USCA § 269a NOTE >>

## INTERNATIONAL ORGANIZATIONS AND CONFERENCES

## CONTRIBUTIONS TO INTERNATIONAL ORGANIZATIONS

For expenses, not otherwise provided for, necessary to meet annual obligations of membership in international multilateral organizations, pursuant to treaties ratified pursuant to the advice and consent of the Senate, conventions or specific Acts of Congress, $922,000,000: *Provided,* That any payment of arrearages shall be directed toward special activities that are mutually agreed upon by the United States and the respective international organization: *Provided further,* That none of the funds appropriated in this paragraph shall be available for a United States contribution to an international organization for the United States share of interest costs made known to the United States Government by such organization for loans incurred on or after October 1, 1984, through external borrowings: *Provided further,* That, of the funds appropriated in this paragraph, $100,000,000 may be made available only on a semi-annual basis pursuant to a certification by the Secretary of State on a semi-annual basis, that the United Nations has taken no action during the preceding 6 months to increase funding for any United Nations program without identifying an offsetting decrease during that 6–month period elsewhere in the United Nations budget and cause the United Nations to exceed the expected reform budget for the biennium 1998–1999 of $2,533,000,000: *Provided further,* That not to exceed $15,000,000 shall be transferred from funds made available under this heading to the "International Conferences and Contingencies" account for United States contributions to the Comprehensive Nuclear Test Ban Treaty Preparatory Commission, except that such transferred funds may be obligated or expended only for Commission

meetings and sessions, provisional technical secretariat salaries and expenses, other Commission administrative and training activities, including purchase of training equipment, and upgrades to existing internationally based monitoring systems involved in cooperative data sharing agreements with the United States as of the date of enactment of this Act, until the United States Senate ratifies the Comprehensive Nuclear Test Ban Treaty: *Provided further,* That notwithstanding section 402 of this Act, not to exceed $1,223,000 may be transferred from the funds made available under this heading to the "International Conferences and Contingencies" account for assessed contributions to new or provisional international organizations or for travel expenses of official delegates to international conferences: *Provided further,* That any transfer pursuant to the previous proviso shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section: *Provided further,* That not to exceed $2,000,000 shall only be available to establish an international center for response to chemical, biological, and nuclear weapons: *Provided further,* That funds appropriated under this paragraph may be obligated and expended to pay the full U.S. assessment to the civil budget of the North Atlantic Treaty Organization.

## CONTRIBUTIONS FOR INTERNATIONAL PEACEKEEPING ACTIVITIES

For necessary expenses to pay assessed and other expenses of international peacekeeping activities directed to the maintenance or restoration of international peace and security, $231,000,000: *Provided,* That none of the funds made available under this Act shall be obligated or expended for any new or expanded United Nations peace keeping mission unless, at least 15 days in advance of voting for the new or expanded mission in the United Nations Security Council (or in an emergency, as far in advance as is practicable): (1) the Committees on Appropriations of the House of Representatives and the Senate and other appropriate committees of the Congress are notified of the estimated cost and length of the mission, the vital national interest that will be served, and the planned exit strategy; and (2) a reprogramming of funds pursuant to section 605 of this Act is submitted, and the procedures therein followed, setting forth the source of funds that will be used to pay for the cost of the new or expanded mission: *Provided further,* That funds shall be available for peacekeeping expenses only upon a certification by the Secretary of State to the appropriate committees of the Congress that American manufacturers and suppliers are being given opportunities to provide equipment, services, and material for United Nations peacekeeping activities equal to those being given to foreign manufacturers and suppliers: *Provided further,* That none of the funds made available under this heading are available to pay the United States share of the cost of court monitoring that is part of any United Nations peacekeeping mission.

## ARREARAGE PAYMENTS

For an additional amount for payment of arrearages to meet obligations of membership in the United Nations, and to pay assessed expenses of international peacekeeping activities, $475,000,000, to remain available until expended: *Provided,* That none of the funds appropriated or otherwise made available under this heading for payment of arrearages may be obligated or expended unless such obligation or expenditure is expressly authorized by law: *Provided further,* That none of the funds appropriated or otherwise made available under this heading for payment of arrearages may be obligated or expended until such time as the share of the total of all assessed contributions for the regular budget of the United Nations does not exceed 22 percent for any single United Nations member, and the share of the budget for each assessed United Nations peacekeeping operation does not exceed 25 percent for any single United Nations member.

## INTERNATIONAL COMMISSIONS

<< 22 USCA § 269a NOTE >>

For necessary expenses, not otherwise provided for, to meet obligations of the United States arising under treaties, or specific Acts of Congress, as follows:

## INTERNATIONAL BOUNDARY AND WATER COMMISSION, UNITED STATES AND MEXICO

For necessary expenses for the United States Section of the International Boundary and Water Commission, United States and Mexico, and to comply with laws applicable to the United States Section, including not to exceed $6,000 for representation; as follows:

## SALARIES AND EXPENSES

For salaries and expenses, not otherwise provided for, $19,551,000.

## CONSTRUCTION

For detailed plan preparation and construction of authorized projects, $5,939,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

## AMERICAN SECTIONS, INTERNATIONAL COMMISSIONS

For necessary expenses, not otherwise provided for the International Joint Commission and the International Boundary Commission, United States and Canada, as authorized by treaties between the United States and Canada or Great Britain, and for the Border Environment Cooperation Commission as authorized by Public Law 103–182, $5,733,000, of which not to exceed $9,000 shall be available for representation expenses incurred by the International Joint Commission.

## INTERNATIONAL FISHERIES COMMISSIONS

For necessary expenses for international fisheries commissions, not otherwise provided for, as authorized by law, $14,549,000: *Provided,* That the United States' share of such expenses may be advanced to the respective commissions, pursuant to 31 U.S.C. 3324.

## OTHER

### PAYMENT TO THE ASIA FOUNDATION

For a grant to the Asia Foundation, as authorized by section 501 of Public Law 101–246, $8,250,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

## RELATED AGENCIES

### ARMS CONTROL AND DISARMAMENT AGENCY

### ARMS CONTROL AND DISARMAMENT ACTIVITIES

For necessary expenses not otherwise provided, for arms control, nonproliferation, and disarmament activities, $41,500,000, of which not to exceed $50,000 shall be for official reception and representation expenses as authorized by the Act of September 26, 1961, as amended (22 U.S.C. 2551 et seq.).

### UNITED STATES INFORMATION AGENCY

### INTERNATIONAL INFORMATION PROGRAMS

For expenses, not otherwise provided for, necessary to enable the United States Information Agency, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), to carry out international communication, educational and cultural activities; and to carry out related activities authorized by law, including employment, without regard to civil service and classification laws, of persons on a temporary basis (not to exceed $700,000 of this appropriation), as authorized by section 801 of such Act of 1948 (22 U.S.C. 1471), and entertainment, including official receptions, within the United States, not to exceed $25,000 as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)), $455,246,000: *Provided,* That not to exceed $1,400,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085): *Provided further,* That not to exceed $6,000,000, to remain available until expended, may be credited to this appropriation from fees or other payments received from or in connection with English teaching, library, motion pictures, and publication programs as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e) and, notwithstanding any other law, fees from educational advising and counseling, and exchange visitor program services: *Provided further,* That not to exceed $920,000, to remain available until expended, may be used to carry out projects involving security construction and related improvements for agency facilities not physically located together with Department of State facilities abroad.

### EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS

For expenses of educational and cultural exchange programs, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $202,500,000, to remain available until expended as authorized by section 105 of such Act of 1961 (22 U.S.C. 2455): *Provided,* That not to exceed $800,000, to remain available until expended, may be credited to this appropriation from fees or other payments received from or in connection with English teaching and publication programs as authorized by section 810 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1475e) and, notwithstanding any other provision of law, fees from educational advising and counseling: *Provided further,* That notwithstanding section 402 of this Act, not to exceed $2,000,000 may be transferred from the funds made available under this heading to the "Technology Fund" account.

### EISENHOWER EXCHANGE FELLOWSHIP PROGRAM TRUST FUND

For necessary expenses of Eisenhower Exchange Fellowships, Incorporated, as authorized by sections 4 and 5 of the Eisenhower Exchange Fellowship Act of 1990 (20 U.S.C. 5204–5205), all interest and earnings accruing to the Eisenhower Exchange Fellowship Program Trust Fund on or before September 30, 1999, to remain available until expended: *Provided,* That none of the funds appropriated herein shall be used to pay any salary or other compensation, or to enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376; or for purposes which are not in accordance with OMB Circulars A–110 (Uniform Administrative Requirements) and A–122 (Cost Principles for Non-profit Organizations), including the restrictions on compensation for personal services.

### ISRAELI ARAB SCHOLARSHIP PROGRAM

For necessary expenses of the Israeli Arab Scholarship Program as authorized by section 214 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 2452), all interest and earnings accruing to the Israeli Arab Scholarship Fund on or before September 30, 1999, to remain available until expended.

### INTERNATIONAL BROADCASTING OPERATIONS

For expenses necessary to enable the United States Information Agency, as authorized by the United States Information and Educational Exchange Act of 1948, as amended, the United States International Broadcasting Act of 1994, as amended, and Reorganization Plan No. 2 of 1977, to carry out international communication activities, $362,365,000, of which not to exceed $16,000 may be used for official receptions within the United States as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1747(3)), not to exceed $35,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085), and not to exceed $39,000 may be used for official reception and representation expenses of Radio Free Europe/Radio Liberty; and in addition, notwithstanding any other provision of law, not to exceed $2,000,000 in receipts from advertising and revenue from business ventures, not to exceed $500,000 in receipts from cooperating international organizations, and not to exceed $1,000,000 in receipts from privatization efforts of the Voice of America and the International Broadcasting Bureau, to remain available until expended for carrying out authorized purposes.

### BROADCASTING TO CUBA

For expenses necessary to enable the United States Information Agency to carry out the Radio Broadcasting to Cuba Act, as amended, the Television Broadcasting to Cuba Act, and the International Broadcasting Act of 1994, including the purchase, rent, construction, and improvement of facilities for radio and television transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception, $22,095,000, to remain available until expended.

### RADIO CONSTRUCTION

For the purchase, rent, construction, and improvement of facilities for radio transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception as authorized by section 801 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1471), $13,245,000, to remain available until expended, as authorized by section 704(a) of such Act of 1948 (22 U.S.C. 1477b(a)).

### EAST–WEST CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the Center for Cultural and Technical Interchange Between East and West Act of 1960 (22 U.S.C. 2054–2057), by grant to the Center for

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Cultural and Technical Interchange Between East and West in the State of Hawaii, $12,500,000: *Provided,* That none of the funds appropriated herein shall be used to pay any salary, or enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376.

## NORTH/SOUTH CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the North/South Center Act of 1991 (22 U.S.C. 2075), by grant to an educational institution in Florida known as the North/South Center, $1,750,000, to remain available until expended.

## NATIONAL ENDOWMENT FOR DEMOCRACY

For grants made by the United States Information Agency to the National Endowment for Democracy as authorized by the National Endowment for Democracy Act, $31,000,000, to remain available until expended.

## GENERAL PROVISIONS—DEPARTMENT OF STATE AND RELATED AGENCIES

SEC. 401. Funds appropriated under this title shall be available, except as otherwise provided, for allowances and differentials as authorized by subchapter 59 of title 5, United States Code; for services as authorized by 5 U.S.C. 3109; and hire of passenger transportation pursuant to 31 U.S.C. 1343(b).

SEC. 402. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of State in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: *Provided,* That not to exceed 5 percent of any appropriation made available for the current fiscal year for the United States Information Agency in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: *Provided further,* That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 403. (a) An employee who regularly commutes from his or her place of residence in the continental United States to an official duty station in Canada or Mexico shall receive a border equalization adjustment equal to the amount of comparability payments under section 5304 of title 5, United States Code, that he or she would receive if assigned to an official duty station within the United States locality pay area closest to the employee's official duty station.

(b) For purposes of this section, the term "employee" shall mean a person who—

(1) is an "employee" as defined under section 2105 of title 5, United States Code; and

(2) is employed by the United States Department of State, the United States Information Agency, the United States Agency for International Development, or the International Joint Commission, except that the term shall not include members of the Foreign Service as defined by section 103 of the Foreign Service Act of 1980 (Public Law 96–465), section 3903 of title 22, United States Code.

(c) An equalization adjustment payable under this section shall be considered basic pay for the same purposes as are comparability payments under section 5304 of title 5, United States Code, and its implementing regulations.

(d) The agencies referenced in subsection (c)(2) are authorized to promulgate regulations to carry out the purposes of this section.

<< 22 USCA § 2905 >>

SEC. 404. (a) Section 6(4) of the Japan–United States Friendship Act (22 U.S.C. 2905(4)) is amended by striking "needed, except" and all that follows through "United States" and inserting "needed".

<< 22 USCA § 2906 >>

(b) The second sentence of section 7(b) of the Japan–United States Friendship Act (22 U.S.C. 2906(b)) is amended to read as follows: "Such investment may be made only in interest-bearing obligations of the United States, in obligations guaranteed as to both principal and interest by the United States, in interest-bearing obligations of Japan, or in obligations guaranteed as to both principal and interest by Japan.".

SEC. 405. The Director of the United States Information Agency is authorized to administer summer travel and work programs without regard to preplacement requirements.

<< 22 USCA § 288f–2 >>

SEC. 406. Section 12 of the International Organizations Immunities Act (22 U.S.C. 288f–2) is amended by inserting "and the United Nations Industrial Development Organization" after "International Labor Organization".

<< 5 USCA § 5545a >>

SEC. 407. (a) Section 5545a of title 5, United States Code, is amended by adding at the end the following:

"(k)(1) For purposes of this section, the term 'criminal investigator' includes a special agent occupying a position under title II of Public Law 99–399 if such special agent—

"(A) meets the definition of such term under paragraph (2) of subsection (a) (applied disregarding the parenthetical matter before subparagraph (A) thereof); and

"(B) such special agent satisfies the requirements of subsection (d) without taking into account any hours described in paragraph (2)(B) thereof.

"(2) In applying subsection (h) with respect to a special agent under this subsection—

"(A) any reference in such subsection to 'basic pay' shall be considered to include amounts designated as 'salary';

"(B) paragraph (2)(A) of such subsection shall be considered to include (in addition to the provisions of law specified therein) sections 609(b)(1), 805, 806, and 856 of the Foreign Service Act of 1980; and

"(C) paragraph (2)(B) of such subsection shall be applied by substituting for 'Office of Personnel Management' the following: 'Office of Personnel Management or the Secretary of State (to the extent that matters exclusively within the jurisdiction of the Secretary are concerned)'.".

<< 5 USCA § 5545a NOTE >>

(b) Not later than the date on which the amendments made by this section take effect, each special agent of the Diplomatic Security Service who satisfies the requirements of subsection (k)(1) of section 5545a of title 5, United States Code, as amended by this section, and the appropriate supervisory officer, to be designated by the Secretary of State, shall make an initial certification to the Secretary of State that the special agent is expected to meet the requirements of subsection (d) of such section 5545a. The Secretary of State may prescribe procedures necessary to administer this subsection.

<< 5 USCA § 5545a >>

(c)(1) Paragraph (2) of section 5545a(a) of title 5, United States Code, is amended (in the matter before subparagraph (A)) by striking "Public Law 99–399)" and inserting "Public Law 99–399, subject to subsection (k))".

<< 5 USCA § 5545a >>

(2) Section 5542(e) of such title is amended by striking "title 18, United States Code," and inserting "title 18 or section 37(a)(3) of the State Department Basic Authorities Act of 1956,".

<< 5 USCA § 5542 NOTE >>

(d) The amendments made by this section shall take effect on the first day of the first applicable pay period—

<< 5 USCA § 5542 NOTE >>

(1) which begins on or after the 90th day following the date of the enactment of this Act; and

<< 5 USCA § 5542 NOTE >>

AR.02405

(2) on which date all regulations necessary to carry out such amendments are (in the judgment of the Director of the Office of Personnel Management and the Secretary of State) in effect.

SEC. 408. None of the funds made available in this Act may be used by the Department of State or the United States Information Agency to provide equipment, technical support, consulting services, or any other form of assistance to the Palestinian Broadcasting Corporation.

<< 22 USCA § 2669–1 >>

SEC. 409. During the current fiscal year and hereafter, the Secretary of State shall have discretionary authority to pay tort claims in the manner authorized by section 2672 of title 28, United States Code, when such claims arise in foreign countries in connection with the overseas operations of the Department of State.

SEC. 410. (a)(1)(A) Notwithstanding any other provision of law and subject to subparagraph (B), the Secretary of State and the Attorney General shall impose, for the processing of any application for the issuance of a machine readable combined border crossing card and nonimmigrant visa under section 101(a)(15)(B) of the Immigration and Nationality Act, a fee of $13 (for recovery of the costs of manufacturing the combined card and visa) in the case of any alien under 15 years of age where the application for the machine readable combined border crossing card and nonimmigrant visa is made in Mexico by a citizen of Mexico who has at least one parent or guardian who has a visa under such section or is applying for a machine readable combined border crossing card and nonimmigrant visa under such section as well.

(B) The Secretary of State and the Attorney General may not commence implementation of the requirement in subparagraph (A) until the later of—

(i) the date that is 6 months after the date of enactment of this Act; or

(ii) the date on which the Secretary sets the amount of the fee or surcharge in accordance with paragraph (3).

(2)(A) Except as provided in subparagraph (B), if the fee for a machine readable combined border crossing card and nonimmigrant visa issued under section 101(a)(15)(B) of the Immigration and Nationality Act has been reduced under paragraph (1) for a child under 15 years of age, the machine readable combined border crossing card and nonimmigrant visa shall be issued to expire on the earlier of—

(i) the date on which the child attains the age of 15; or

(ii) ten years after its date of issue.

(B) At the request of the parent or guardian of any alien under 15 years of age otherwise covered by subparagraph (A), the Secretary of State and the Attorney General may charge the non-reduced fee for the processing of an application for the issuance of a machine readable combined border crossing card and nonimmigrant visa under section 101(a)(15)(B) of the Immigration and Nationality Act provided that the machine readable combined border crossing card and nonimmigrant visa is issued to expire as of the same date as is usually provided for visas issued under that section.

(3) Notwithstanding any other provision of law, the Secretary of State shall set the amount of the fee or surcharge authorized pursuant to section 140(a) of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236; 8 U.S.C. 1351 note) for the processing of machine readable nonimmigrant visas and machine readable combined border crossing cards and nonimmigrant visas at a level that will ensure the full recovery by the Department of State of the costs of processing such machine readable nonimmigrant visas and machine readable combined border crossing cards and nonimmigrant visas, including the costs of processing the machine readable combined border crossing cards and nonimmigrant visas for which the fee is reduced pursuant to this subsection.

(b) The Secretary of State shall continue, until the date that is 5 years after the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note et seq.), to process applications for visas under section 101(a)(15)(B) of the Immigration and Nationality Act at the following cities in Mexico located near the international border with the United States: Nogales, Nuevo Laredo, Ciudad Acuna, Piedras Negras, Agua Prieta, and Reynosa.

<< 8 USCA § 1101 NOTE >>

(c) Section 104(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note) is amended by striking "3 years" and inserting "5 years".

SEC. 411. Funds appropriated by this Act for the United States Information Agency, the Arms Control and Disarmament Agency, and the Department of State may be obligated and expended notwithstanding section 701 of the United States Information and Educational Exchange Act of 1948 and section 313 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, section 53 of the Arms Control and Disarmament Act, and section 15 of the State Department Basic Authorities Act of 1956.

This title may be cited as the "Department of State and Related Agencies Appropriations Act, 1999".

## TITLE V—RELATED AGENCIES

### DEPARTMENT OF TRANSPORTATION

### MARITIME ADMINISTRATION

### MARITIME SECURITY PROGRAM

For necessary expenses to maintain and preserve a U.S.-flag merchant fleet to serve the national security needs of the United States, $89,650,000, to remain available until expended.

### OPERATIONS AND TRAINING

For necessary expenses of operations and training activities authorized by law, $69,303,000.

### MARITIME GUARANTEED LOAN (TITLE XI) PROGRAM ACCOUNT

For the cost of guaranteed loans, as authorized by the Merchant Marine Act, 1936, $6,000,000, to remain available until expended: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974, as amended: *Provided further,* That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $1,000,000,000.

In addition, for administrative expenses to carry out the guaranteed loan program, not to exceed $3,725,000, which shall be transferred to and merged with the appropriation for Operations and Training.

### ADMINISTRATIVE PROVISIONS—MARITIME ADMINISTRATION

Notwithstanding any other provision of this Act, the Maritime Administration is authorized to furnish utilities and services and make necessary repairs in connection with any lease, contract, or occupancy involving Government property under control of the Maritime Administration, and payments received therefore shall be credited to the appropriation charged with the cost thereof: *Provided,* That rental payments under any such lease, contract, or occupancy for items other than such utilities, services, or repairs shall be covered into the Treasury as miscellaneous receipts.

No obligations shall be incurred during the current fiscal year from the construction fund established by the Merchant Marine Act, 1936, or otherwise, in excess of the appropriations and limitations contained in this Act or in any prior appropriation Act, and all receipts which otherwise would be deposited to the credit of said fund shall be covered into the Treasury as miscellaneous receipts.

### COMMISSION FOR THE PRESERVATION OF AMERICA'S HERITAGE ABROAD

### SALARIES AND EXPENSES

For expenses for the Commission for the Preservation of America's Heritage Abroad, $265,000, as authorized by section 1303 of Public Law 99–83.

### COMMISSION ON CIVIL RIGHTS

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Civil Rights, including hire of passenger motor vehicles, $8,900,000: *Provided,* That not to exceed $50,000 may be used to employ consultants: *Provided further,* That none of the funds appropriated in this paragraph shall be used to employ in excess of 4 full-time individuals under Schedule C of the Excepted Service exclusive of 1 special assistant for each Commissioner: *Provided further,* That none of the funds appropriated in this paragraph shall be

AR.02407

used to reimburse Commissioners for more than 75 billable days, with the exception of the chairperson who is permitted 125 billable days.

## COMMISSION ON SECURITY AND COOPERATION IN EUROPE

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Security and Cooperation in Europe, as authorized by Public Law 94–304, $1,170,000, to remain available until expended as authorized by section 3 of Public Law 99–7.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Equal Employment Opportunity Commission as authorized by title VII of the Civil Rights Act of 1964, as amended (29 U.S.C. 206(d) and 621–634), the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991, including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); non-monetary awards to private citizens; and not to exceed $29,000,000 for payments to State and local enforcement agencies for services to the Commission pursuant to title VII of the Civil Rights Act of 1964, as amended, sections 6 and 14 of the Age Discrimination in Employment Act, the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991, $279,000,000: *Provided,* That the Commission is authorized to make available for official reception and representation expenses not to exceed $2,500 from available funds.

## FEDERAL COMMUNICATIONS COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Communications Commission, as authorized by law, including uniforms and allowances therefor, as authorized by 5 U.S.C. 5901–02; not to exceed $600,000 for land and structure; not to exceed $500,000 for improvement and care of grounds and repair to buildings; not to exceed $4,000 for official reception and representation expenses; purchase (not to exceed 16) and hire of motor vehicles; special counsel fees; and services as authorized by 5 U.S.C. 3109, $192,000,000, of which not to exceed $300,000 shall remain available until September 30, 2000, for research and policy studies: *Provided,* That $172,523,000 of offsetting collections shall be assessed and collected pursuant to section 9 of title I of the Communications Act of 1934, as amended, and shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: *Provided further,* That the sum herein appropriated shall be reduced as such offsetting collections are received during fiscal year 1999 so as to result in a final fiscal year 1999 appropriation estimated at $19,477,000: *Provided further,* That any offsetting collections received in excess of $172,523,000 in fiscal year 1999 shall remain available until expended, but shall not be available for obligation until October 1, 1999.

## FEDERAL MARITIME COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Maritime Commission as authorized by section 201(d) of the Merchant Marine Act, 1936, as amended (46 U.S.C. App. 1111), including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); and uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–02, $14,150,000: *Provided,* That not to exceed $2,000 shall be available for official reception and representation expenses.

## FEDERAL TRADE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Trade Commission, including uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–5902; services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles; and not to exceed $2,000 for official reception and representation expenses, $86,679,000: *Provided,* That not to exceed $300,000 shall be available for use to contract with a person or persons for collection services in accordance with the terms of 31 U.S.C. 3718, as amended: *Provided further,* That, notwithstanding any other provision of law, not to exceed $76,500,000 of offsetting collections derived from fees

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: *Provided further,* That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1999, so as to result in a final fiscal year 1999 appropriation from the General Fund estimated at not more than $10,179,000, to remain available until expended: *Provided further,* That none of the funds made available to the Federal Trade Commission shall be available for obligation for expenses authorized by section 151 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (Public Law 102–242, 105 Stat. 2282–2285).

## LEGAL SERVICES CORPORATION

### PAYMENT TO THE LEGAL SERVICES CORPORATION

For payment to the Legal Services Corporation to carry out the purposes of the Legal Services Corporation Act of 1974, as amended, $300,000,000, of which $289,000,000 is for basic field programs and required independent audits; $2,015,000 is for the Office of Inspector General, of which such amounts as may be necessary may be used to conduct additional audits of recipients; and $8,985,000 is for management and administration.

### ADMINISTRATIVE PROVISION—LEGAL SERVICES CORPORATION

None of the funds appropriated in this Act to the Legal Services Corporation shall be expended for any purpose prohibited or limited by, or contrary to any of the provisions of, sections 501, 502, 503, 504, 505, and 506 of Public Law 105–119, and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions set forth in such sections, except that all references in sections 502 and 503 to 1997 and 1998 shall be deemed to refer instead to 1998 and 1999, respectively.

## MARINE MAMMAL COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Marine Mammal Commission as authorized by title II of Public Law 92–522, as amended, $1,240,000.

## COMMISSION ON OCEAN POLICY

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Ocean Policy, $3,500,000, to remain available until expended: *Provided,* That the funds provided in this Act for the Commission on Ocean Policy shall become available only upon the enactment of authorizing legislation.

## SECURITIES AND EXCHANGE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses for the Securities and Exchange Commission, including services as authorized by 5 U.S.C. 3109, the rental of space (to include multiple year leases) in the District of Columbia and elsewhere, and not to exceed $3,000 for official reception and representation expenses, $23,000,000; and, in addition, to remain available until expended, from fees collected in fiscal year 1998, $87,000,000, and from fees collected in fiscal year 1999, $214,000,000; of which not to exceed $10,000 may be used toward funding a permanent secretariat for the International Organization of Securities Commissions; and of which not to exceed $100,000 shall be available for expenses for consultations and meetings hosted by the Commission with foreign governmental and other regulatory officials, members of their delegations, appropriate representatives and staff to exchange views concerning developments relating to securities matters, development and implementation of cooperation agreements concerning securities matters and provision of technical assistance for the development of foreign securities markets, such expenses to include necessary logistic and administrative expenses and the expenses of Commission staff and foreign invitees in attendance at such consultations and meetings including: (1) such incidental expenses as meals taken in the course of such attendance; (2) any travel and transportation to or from such meetings; and (3) any other related lodging or subsistence:

*Provided,* That fees and charges authorized by sections 6(b)(4) of the Securities Act of 1933 (15 U.S.C. 77f(b)(4)) and 31(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78ee(d)) shall be credited to this account as offsetting collections.

## SMALL BUSINESS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses, not otherwise provided for, of the Small Business Administration as authorized by Public Law 103–403, including hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344, and not to exceed $3,500 for official reception and representation expenses, $288,300,000, of which: $3,500,000 shall be available for a grant to the NTTC at Wheeling Jesuit University to continue the outreach program to assist small business development; $4,000,000 shall be available for a grant for Western Carolina University to develop a facility to assist in small business and rural economic development; $2,000,000 shall be available for a grant for the City of Hazard, Kentucky for a Center for Rural Law Enforcement Technology and Training; $1,500,000 shall be available for a grant to the State University of New York to develop a facility and operate the Institute of Entrepreneurship for small business and workforce development; $1,500,000 shall be available for a grant for Pikeville College for a telemedicine learning and resource center; $1,000,000 shall be available for a grant for the Center for Excellence in Marine Science Education at Southampton College; $1,000,000 shall be for a grant to King's College in Wilkes–Barre, Pennsylvania, for the commercialization of pulverization technologies; $850,000 shall be available for a grant for the Carbondale Technology Transfer Center in Lackawanna County, Pennsylvania; $1,000,000 shall be available for a grant for the Institute for Software Research in Fairmont, West Virginia, for Institute operations and to further develop their capability to perform basic and applied research aimed at software engineering, biometrics, image processing and networks; $500,000 shall be available for a grant for the Altoona Science and Technology Research Academy in Altoona, Pennsylvania; $200,000 shall be available for a grant to the City of Prestonburg, Kentucky for a regional arts and tourism center; $300,000 shall be available for a grant for the City of Parkersburg, West Virginia for infrastructure improvements, facility upgrades, and property acquisition associated with community non-profit service and enrichment projects; $200,000 shall be available for a grant for the Vandalia Heritage Foundation to fulfill its charter purposes; $1,000,000 shall be available for a grant for the Moundsville Economic Development Council to work in conjunction with the Office of Law Enforcement Technology Commercialization for the establishment of the National Corrections and Law Enforcement Training and Technology Center, and for infrastructure improvements associated with this initiative; and $250,000 shall be available for a grant for the Johnstown Area Regional Industries Defense Procurement Center to establish a Year 2000 challenge grant program to assist small businesses that rely heavily on the Federal Government's acquisition system for their livelihood, and help provide a solution to the Year 2000 computer problem: *Provided,* That the Administrator is authorized to charge fees to cover the cost of publications developed by the Small Business Administration, and certain loan servicing activities: *Provided further,* That, notwithstanding 31 U.S.C. 3302, revenues received from all such activities shall be credited to this account, to be available for carrying out these purposes without further appropriations: *Provided further,* That $82,000,000 shall be available to fund grants for performance in fiscal year 1999 or fiscal year 2000 as authorized by section 21 of the Small Business Act, as amended.

### OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C. App.), $10,800,000.

### BUSINESS LOANS PROGRAM ACCOUNT

For the cost of direct loans, $2,200,000, to be available until expended; and for the cost of guaranteed loans, $128,030,000, as authorized by 15 U.S.C. 631 note, of which $45,000,000 shall remain available until September 30, 2000: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974, as amended: *Provided further,* That of the funds previously made available under Public Law 105–135, section 507(g), for the Delta Loan program, up to $20,000,000 may be transferred to and merged with the appropriations for salaries and expenses: *Provided further,* That during fiscal year 1999, commitments to guarantee loans under section 503 of the Small Business Investment Act of 1958, as amended, shall not exceed the amount of financings authorized under section 20(d)(1)(B)(ii) of the Small Business Act, as amended: *Provided further,* That during fiscal year 1999, commitments for general business loans authorized under section

AR.02410

7(a) of the Small Business Act, as amended, shall not exceed $10,000,000,000 without prior notification of the Committees on Appropriations of the House of Representatives and Senate in accordance with section 605 of this Act.

In addition, for administrative expenses to carry out the direct and guaranteed loan programs, $94,000,000, which may be transferred to and merged with the appropriations for Salaries and Expenses.

### DISASTER LOANS PROGRAM ACCOUNT

For the cost of direct loans authorized by section 7(b) of the Small Business Act, as amended, $76,329,000, to remain available until expended: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974, as amended.

In addition, for administrative expenses to carry out the direct loan program, $116,000,000, which may be transferred to and merged with appropriations for Salaries and Expenses, including $500,000 for the Office of Inspector General of the Small Business Administration for audits and reviews of disaster loans and the disaster loan program, and said sums shall be transferred to and merged with appropriations for the Office of Inspector General.

### SURETY BOND GUARANTEES REVOLVING FUND

For additional capital for the "Surety Bond Guarantees Revolving Fund", authorized by the Small Business Investment Act, as amended, $3,300,000, to remain available without fiscal year limitation as authorized by 15 U.S.C. 631 note.

### ADMINISTRATIVE PROVISION—SMALL BUSINESS ADMINISTRATION

Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Small Business Administration in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: *Provided,* That any transfer pursuant to this paragraph shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

### STATE JUSTICE INSTITUTE

### SALARIES AND EXPENSES

For necessary expenses of the State Justice Institute, as authorized by the State Justice Institute Authorization Act of 1992 (Public Law 102–572 (106 Stat. 4515–4516)), $6,850,000, to remain available until expended: *Provided,* That not to exceed $2,500 shall be available for official reception and representation expenses.

### TITLE VI—GENERAL PROVISIONS

SEC. 601. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

SEC. 602. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 603. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

SEC. 604. If any provision of this Act or the application of such provision to any person or circumstances shall be held invalid, the remainder of the Act and the application of each provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

SEC. 605. (a) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1999, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds which: (1) creates new programs; (2) eliminates a program, project, or activity; (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (4) relocates an office or employees; (5) reorganizes offices, programs, or activities; or (6) contracts out or privatizes

any functions, or activities presently performed by Federal employees; unless the Appropriations Committees of both Houses of Congress are notified 15 days in advance of such reprogramming of funds.

(b) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1999, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for activities, programs, or projects through a reprogramming of funds in excess of $500,000 or 10 percent, whichever is less, that: (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress; or (3) results from any general savings from a reduction in personnel which would result in a change in existing programs, activities, or projects as approved by Congress; unless the Appropriations Committees of both Houses of Congress are notified 15 days in advance of such reprogramming of funds.

SEC. 606. None of the funds made available in this Act may be used for the construction, repair (other than emergency repair), overhaul, conversion, or modernization of vessels for the National Oceanic and Atmospheric Administration in shipyards located outside of the United States.

SEC. 607. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 608. None of the funds made available in this Act may be used to implement, administer, or enforce any guidelines of the Equal Employment Opportunity Commission covering harassment based on religion, when it is made known to the Federal entity or official to which such funds are made available that such guidelines do not differ in any respect from the proposed guidelines published by the Commission on October 1, 1993 (58 Fed. Reg. 51266).

SEC. 609. None of the funds appropriated or otherwise made available in this Act may be obligated or expended to pay for any cost incurred for: (1) opening or operating any United States diplomatic or consular post in the Socialist Republic of Vietnam that was not operating on July 11, 1995; (2) expanding any United States diplomatic or consular post in the Socialist Republic of Vietnam that was operating on July 11, 1995; or (3) increasing the total number of personnel assigned to United States diplomatic or consular posts in the Socialist Republic of Vietnam above the levels existing on July 11, 1995; unless the President certifies within 60 days the following:

(A) Based upon all information available to the United States Government, the Government of the Socialist Republic of Vietnam is fully cooperating in good faith with the United States in the following:

(i) Resolving discrepancy cases, live sightings, and field activities.

(ii) Recovering and repatriating American remains.

(iii) Accelerating efforts to provide documents that will help lead to fullest possible accounting of prisoners of war and missing in action.

(iv) Providing further assistance in implementing trilateral investigations with Laos.

(B) The remains, artifacts, eyewitness accounts, archival material, and other evidence associated with prisoners of war and missing in action recovered from crash sites, military actions, and other locations in Southeast Asia are being thoroughly analyzed by the appropriate laboratories with the intent of providing surviving relatives with scientifically defensible, legal determinations of death or other accountability that are fully documented and available in unclassified and unredacted form to immediate family members.

SEC. 610. None of the funds made available by this Act may be used for any United Nations undertaking when it is made known to the Federal official having authority to obligate or expend such funds: (1) that the United Nations undertaking is a peacekeeping mission; (2) that such undertaking will involve United States Armed Forces under the command or operational control of a foreign national; and (3) that the President's military advisors have not submitted to the President a recommendation that such involvement is in the national security interests of the United States and the President has not submitted to the Congress such a recommendation.

SEC. 611. None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system—

(1) in-cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

(2) the viewing of R, X, and NC–17 rated movies, through whatever medium presented;

(3) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(4) possession of in-cell coffee pots, hot plates or heating elements; or

(5) the use or possession of any electric or electronic musical instrument.

SEC. 612. None of the funds made available in title II for the National Oceanic and Atmospheric Administration (NOAA) under the headings "Operations, Research, and Facilities" and "Procurement, Acquisition and Construction" may be used to implement sections 603, 604, and 605 of Public Law 102–567: *Provided,* That NOAA may develop a modernization plan for its fisheries research vessels that takes fully into account opportunities for contracting for fisheries surveys.

SEC. 613. Any costs incurred by a department or agency funded under this Act resulting from personnel actions taken in response to funding reductions included in this Act shall be absorbed within the total budgetary resources available to such department or agency: *Provided,* That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: *Provided further,* That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 614. None of the funds made available in this Act to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity.

SEC. 615. Of the funds appropriated in this Act under the heading "Office of Justice Programs—State and Local Law Enforcement Assistance", not more than 90 percent of the amount to be awarded to an entity under the Local Law Enforcement Block Grant shall be made available to such an entity when it is made known to the Federal official having authority to obligate or expend such funds that the entity that employs a public safety officer (as such term is defined in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968) does not provide such a public safety officer who retires or is separated from service due to injury suffered as the direct and proximate result of a personal injury sustained in the line of duty while responding to an emergency situation or a hot pursuit (as such terms are defined by State law) with the same or better level of health insurance benefits at the time of retirement or separation as they received while on duty.

SEC. 616. (a) None of the funds appropriated or otherwise made available in this Act shall be used to issue visas to any person who—

(1) has been credibly alleged to have ordered, carried out, or materially assisted in the extrajudicial and political killings of Antoine Izmery, Guy Malary, Father Jean–Marie Vincent, Pastor Antoine Leroy, Jacques Fleurival, Mireille Durocher Bertin, Eugene Baillergeau, Michelange Hermann, Max Mayard, Romulus Dumarsais, Claude Yves Marie, Mario Beaubrun, Leslie Grimar, Joseph Chilove, Michel Gonzalez, and Jean–Hubert Feuille;

(2) has been included in the list presented to former President Jean–Bertrand Aristide by former National Security Council Advisor Anthony Lake in December 1995, and acted upon by President Rene Preval;

(3) was sought for an interview by the Federal Bureau of Investigation as part of its inquiry into the March 28, 1995, murder of Mireille Durocher Bertin and Eugene Baillergeau, Jr., and was credibly alleged to have ordered, carried out, or materially assisted in those murders, per a June 28, 1995, letter to the then Minister of Justice of the Government of Haiti, Jean–Joseph Exume;

(4) was a member of the Haitian High Command during the period 1991 through 1994, and has been credibly alleged to have planned, ordered, or participated with members of the Haitian Armed Forces in—

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(A) the September 1991 coup against any person who was a duly elected government official of Haiti (or a member of the family of such official), or

(B) the murders of thousands of Haitians during the period 1991 through 1994; or

(5) has been credibly alleged to have been a member of the paramilitary organization known as FRAPH who planned, ordered, or participated in acts of violence against the Haitian people.

(b) EXEMPTION.—Subsection (a) shall not apply if the Secretary of State finds, on a case-by-case basis, that the entry into the United States of a person who would otherwise be excluded under this section is necessary for medical reasons or such person has cooperated fully with the investigation of these political murders. If the Secretary of State exempts any such person, the Secretary shall notify the appropriate congressional committees in writing.

(c) REPORTING REQUIREMENT.—(1) The United States chief of mission in Haiti shall provide the Secretary of State a list of those who have been credibly alleged to have ordered or carried out the extrajudicial and political killings mentioned in paragraph (1) of subsection (a).

(2) The Secretary of State shall submit the list provided under paragraph (1) to the appropriate congressional committees not later than 3 months after the date of enactment of this Act.

(3) The Secretary of State shall submit to the appropriate congressional committees a list of aliens denied visas, and the Attorney General shall submit to the appropriate congressional committees a list of aliens refused entry to the United States as a result of this provision.

(4) The Secretary of State shall submit a report under this subsection not later than 6 months after the date of enactment of this Act and not later than March 1 of each year thereafter as long as the Government of Haiti has not completed the investigation of the extrajudicial and political killings and has not prosecuted those implicated for the killings specified in paragraph (1) of subsection (a).

(d) DEFINITION.—In this section, the term "appropriate congressional committees" means the Committee on International Relations and the Committee on Appropriations of the House of Representatives and the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

<< 16 USCA § 1851 NOTE >>

SEC. 617. (a) None of the funds made available in this Act may be used to issue or renew a fishing permit or authorization for any fishing vessel of the United States greater than 165 feet in registered length or of more than 750 gross registered tons, and that has an engine or engines capable of producing a total of more than 3,000 shaft horsepower—

(1) as specified in the permit application required under part 648.4(a)(5) of title 50, Code of Federal Regulations, part 648.12 of title 50, Code of Federal Regulations, and the authorization required under part 648.80(d)(2) of title 50, Code of Federal Regulations, to engage in fishing for Atlantic mackerel or herring (or both) under the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.); or

(2) that would allow such a vessel to engage in the catching, taking, or harvesting of fish in any other fishery within the exclusive economic zone of the United States (except territories), unless a certificate of documentation had been issued for the vessel and endorsed with a fishery endorsement that was effective on September 25, 1997, and such fishery endorsement was not surrendered at any time thereafter.

(b) Any fishing permit or authorization issued or renewed prior to the date of the enactment of this Act for a fishing vessel to which the prohibition in subsection (a)(1) applies that would allow such vessel to engage in fishing for Atlantic mackerel or herring (or both) during fiscal year 1999 shall be null and void, and none of the funds made available in this Act may be used to issue a fishing permit or authorization that would allow a vessel whose permit or authorization was made null and void pursuant to this subsection to engage in the catching, taking, or harvesting of fish in any other fishery within the exclusive economic zone of the United States.

SEC. 618. None of the funds provided by this Act shall be available to promote the sale or export of tobacco or tobacco products, or to seek the reduction or removal by any foreign country of restrictions on the marketing of tobacco or tobacco products, except for restrictions which are not applied equally to all tobacco or tobacco products of the same type.

SEC. 619. None of the funds made available in this Act may be used to pay the expenses of an election officer appointed by a court to oversee an election of any officer or trustee for the International Brotherhood of Teamsters.

<< 16 USCA § 469j >>

SEC. 620. Section 1303 of the International Security and Development Corporation Act of 1985 (16 U.S.C. 469j) is amended in subsection (e), by striking "three" and inserting "six".

SEC. 621. None of the funds appropriated pursuant to this Act or any other provision of law may be used for (1) the implementation of any tax or fee in connection with the implementation of 18 U.S.C. 922(t); (2) any system to implement 18 U.S.C. 922(t) that does not require and result in the destruction of any identifying information submitted by or on behalf of any person who has been determined not to be prohibited from owning a firearm.

SEC. 622. Not later than 60 days after the date of enactment of this Act, the United States Trade Representative (in this section referred to as the "Trade Representative") shall report to Congress on the Trade Representative's analysis regarding—

  (1) whether the Korean Government provided subsidies to Hanbo Steel;

  (2) whether such subsidies had an adverse effect on United States companies;

  (3) the status of the Trade Representative's contacts with the Korean Government with respect to industry concerns regarding Hanbo Steel and efforts to eliminate subsidies; and

  (4) the status of the Trade Representative's contacts with other Asian trading partners regarding the adverse effect of Korean steel subsidies on such trading partners.

  (b) The report described in subsection (a) shall also include information on the status of any investigations initiated as a result of press reports that the Korean Government ordered Pohang Iron and Steel Company, in which the Government owns a controlling interest, to sell steel in Korea at a price that is 30 percent lower than the international market prices.

SEC. 623. None of the funds made available in this or any other Act may be used to implement, administer, or enforce Executive Order No. 13083 (titled "Federalism" and dated May 14, 1998).

<< 28 USCA § 118 >>

SEC. 624. (a) Section 118 of title 28, United States Code, is amended—

<< 28 USCA § 118 >>

  (1) in subsection (a) by striking "Philadelphia, and Schuylkill" and inserting "and Philadelphia"; and

<< 28 USCA § 118 >>

  (2) in subsection (b) by inserting "Schuylkill," after "Potter,".

<< 28 USCA § 118 NOTE >>

  (b)(1) This section and the amendments made by this section shall take effect 180 days after the date of the enactment of this Act.

<< 28 USCA § 118 NOTE >>

  (2) This section and the amendments made by this section shall not affect any action commenced before the effective date of this section and pending on such date in the United States District Court for the Eastern District of Pennsylvania.

<< 28 USCA § 118 NOTE >>

  (3) This section and the amendments made by this section shall not affect the composition, or preclude the service, of any grand or petit jury summoned, impaneled, or actually serving on the effective date of this section.

SEC. 625. Beginning 60 days from the date of enactment of this Act, none of the funds appropriated or otherwise made available by this Act may be made available for the participation by delegates of the United States to the Standing Consultative Commission unless the President certifies and so reports to the Committees on Appropriations that the United States Government is not implementing the Memorandum of Understanding Relating to the Treaty Between the United States of America and the

Union of Soviet Socialist Republics on the limitation of Anti–Ballistic Missile Systems of May 26, 1972, entered into in New York on September 26, 1997, by the United States, Russia, Kazakhstan, Belarus, and Ukraine, or until the Senate provides it advice and consent to the Memorandum of Understanding.

SEC. 626. TIME LIMITATION ON FUNDING. (a) Notwithstanding any other provisions of this Act, appropriations and funds made available and authority granted pursuant to this Act (the Departments of Commerce, Justice, and State, and Judiciary, and Related Agencies Appropriations Act, 1999) shall cease to be available after June 15, 1999.

(b) Appropriations and funds made available by or authority granted pursuant to the Act referenced in subsection (a) shall be apportioned under section 1513 of title 31, United States Code, in the manner established for funds provided by a joint resolution making continuing appropriations.

(c) Appropriations made and authority granted pursuant to Act referenced in subsection (a) shall cover all obligations or expenditures incurred for any program, project or activity during the period for which funds or authority for such project or activity are available under such Act.

(d) Expenditures made during the period for which funds or authority are available under such Act shall be charged to the full-year amount provided for the applicable appropriation, fund, or authorization.

## TITLE VII—RESCISSIONS

### DEPARTMENT OF JUSTICE

### GENERAL ADMINISTRATION

### WORKING CAPITAL FUND

#### (RESCISSION)

Of the unobligated balances available under this heading on September 30, 1998, $99,000,000 are rescinded.

### LEGAL ACTIVITIES

### ASSET FORFEITURE FUND

#### (RESCISSION)

Of the unobligated balances available under this heading, $2,000,000 are rescinded.

### FEDERAL BUREAU OF INVESTIGATION

#### (RESCISSIONS)

Of the funds provided in previous Acts, the following funds are hereby rescinded from the following accounts in the specified amounts:

"Construction, 1998", $4,000,000;

"Salaries and Expenses, no year", $6,400,000;

"Violent Crime Reduction Program, 1996", $2,000,000; and

"Violent Crime Reduction Program, 1997", $300,000.

### IMMIGRATION AND NATURALIZATION SERVICE

### IMMIGRATION EMERGENCY FUND

#### (RESCISSION)

Of the unobligated balances available under this heading, $5,000,000 are rescinded.

### DEPARTMENT OF COMMERCE

#### (RESCISSIONS)

Of the funds provided in previous Acts, the following funds are hereby rescinded from the following accounts in the specified amounts:

"United States Travel and Tourism Administration, no year", $915,000; and

"Endowment for Children's Educational TV, no year", $1,175,000.

<div align="center">

NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

INDUSTRIAL TECHNOLOGY SERVICES

(RESCISSION)
</div>

Of the unobligated balances available under this heading for the Advanced Technology Program, $6,000,000 are rescinded.

<div align="center">

DEPARTMENT OF TRANSPORTATION

MARITIME ADMINISTRATION

SHIP CONSTRUCTION

(RESCISSION)
</div>

Of the unobligated balances available under this heading, $17,000,000 are rescinded.

<div align="center">

TITLE VIII
</div>

SEC. 801. ETHICAL STANDARDS FOR FEDERAL PROSECUTORS.

<div align="center">

<< 28 USCA § 530B >>
</div>

(a) IN GENERAL.—Chapter 31 of title 28, United States Code, is amended by adding at the end the following:

**"§ 530B. Ethical standards for attorneys for the Government**

"(a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

"(b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.

"(c) As used in this section, the term 'attorney for the Government' includes any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40.".

<div align="center">

<< 28 USCA Ch. 31 >>
</div>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 31 of title 28, United States Code, is amended by adding at the end the following new item:

"530B. Ethical standards for attorneys for the Government.".

<div align="center">

<< 28 USCA § 530B NOTE >>
</div>

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect 180 days after the date of the enactment of this Act and shall apply during that portion of fiscal year 1999 that follows that taking effect, and in each succeeding fiscal year.

<div align="center">

TITLE IX—NATIONAL WHALE CONSERVATION FUND ACT

<< 16 USCA § 3701 NOTE >>
</div>

SEC. 901. SHORT TITLE. This title may be cited as the "National Whale Conservation Fund Act of 1998".

<< 16 USCA § 3703 NOTE >>

SEC. 902. FINDINGS. Congress finds that—

<< 16 USCA § 3703 NOTE >>

(1) the populations of whales that occur in waters of the United States are resources of substantial ecological, scientific, socioeconomic, and esthetic value;

<< 16 USCA § 3703 NOTE >>

(2) whale populations—
  (A) form a significant component of marine ecosystems;
  (B) are the subject of intense research;
  (C) provide for a multimillion dollar whale watching tourist industry that provides the public an opportunity to enjoy and learn about great whales and the ecosystems of which the whales are a part; and
  (D) are of importance to Native Americans for cultural and subsistence purposes;

<< 16 USCA § 3703 NOTE >>

(3) whale populations are in various stages of recovery, and some whale populations, such as the northern right whale (Eubaleana glacialis) remain perilously close to extinction;

<< 16 USCA § 3703 NOTE >>

(4) the interactions that occur between ship traffic, commercial fishing, whale watching vessels, and other recreational vessels and whale populations may affect whale populations adversely;

<< 16 USCA § 3703 NOTE >>

(5) the exploration and development of oil, gas, and hard mineral resources, marine debris, chemical pollutants, noise, and other anthropogenic sources of change in the habitat of whales may affect whale populations adversely;

<< 16 USCA § 3703 NOTE >>

(6) the conservation of whale populations is subject to difficult challenges related to—
  (A) the migration of whale populations across international boundaries;
  (B) the size of individual whales, as that size precludes certain conservation research procedures that may be used for other animal species, such as captive research and breeding;
  (C) the low reproductive rates of whales that require long-term conservation programs to ensure recovery of whale populations; and
  (D) the occurrence of whale populations in offshore waters where undertaking research, monitoring, and conservation measures is difficult and costly;

<< 16 USCA § 3703 NOTE >>

(7)(A) the Secretary of Commerce, through the Administrator of the National Oceanic and Atmospheric Administration, has research and regulatory responsibility for the conservation of whales under the Marine Mammal Protection Act of 1972 (16 U.S.C. 1361 et seq.); and
  (B) the heads of other Federal agencies and the Marine Mammal Commission established under section 201 of the Marine Mammal Protection Act of 1972 (16 U.S.C. 1401) have related research and management activities under the Marine Mammal Protection Act of 1972 or the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

AR.02418

<< 16 USCA § 3703 NOTE >>

(8) the funding available for the activities described in paragraph (8) is insufficient to support all necessary whale conservation and recovery activities; and

<< 16 USCA § 3703 NOTE >>

(9) there is a need to facilitate the use of funds from non-Federal sources to carry out the conservation of whales.

<< 16 USCA § 3703 >>

SEC. 903. NATIONAL WHALE CONSERVATION FUND. Section 4 of the National Fish and Wildlife Establishment Act (16 U.S.C. 3703) is amended by adding at the end the following:

"(f)(1) In carrying out the purposes under section 2(b), the Foundation may establish a national whale conservation endowment fund, to be used by the Foundation to support research, management activities, or educational programs that contribute to the protection, conservation, or recovery of whale populations in waters of the United States.

"(2)(A) In a manner consistent with subsection (c)(1), the Foundation may—

"(i) accept, receive, solicit, hold, administer, and use any gift, devise, or bequest made to the Foundation for the express purpose of supporting whale conservation; and

"(ii) deposit in the endowment fund under paragraph (1) any funds made available to the Foundation under this subparagraph, including any income or interest earned from a gift, devise, or bequest received by the Foundation under this subparagraph.

"(B) To raise funds to be deposited in the endowment fund under paragraph (1), the Foundation may enter into appropriate arrangements to provide for the design, copyright, production, marketing, or licensing, of logos, seals, decals, stamps, or any other item that the Foundation determines to be appropriate.

"(C)(i) The Secretary of Commerce may transfer to the Foundation for deposit in the endowment fund under paragraph (1) any amount (or portion thereof) received by the Secretary under section 105(a)(1) of the Marine Mammal Protection Act of 1972 (16 U.S.C. 1375(a)(1)) as a civil penalty assessed by the Secretary under that section.

"(ii) The Directors of the Board shall ensure that any amounts transferred to the Foundation under clause (i) for the endowment fund under paragraph (1) are deposited in that fund in accordance with this subparagraph.

"(3) It is the intent of Congress that in making expenditures from the endowment fund under paragraph (1) to carry out activities specified in that paragraph, the Foundation should give priority to funding projects that address the conservation of populations of whales that the Foundation determines—

"(A) are the most endangered (including the northern right whale (Eubalaena glacialis)); or

"(B) most warrant, and are most likely to benefit from, research management, or educational activities that may be funded with amounts made available from the fund.

"(g) In carrying out any action on the part of the Foundation under subsection (f), the Directors of the Board shall consult with the Administrator of the National Oceanic and Atmospheric Administration and the Marine Mammal Commission.".

This Act may be cited as the "Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1999".

(c) For programs, projects or activities in the District of Columbia Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for the government of the District of Columbia and other activities chargeable in whole or in part against revenues of said District for the fiscal year ending September 30, 1999, and for other purposes.

FEDERAL FUNDS

METRORAIL IMPROVEMENTS AND EXPANSION

For a Federal contribution to the Washington Metropolitan Area Transit Authority for improvements and expansion of the Mount Vernon Square Metrorail station located at the site of the proposed Washington Convention Center project, $25,000,000, to remain available until expended.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## FEDERAL PAYMENT FOR MANAGEMENT REFORM

For payment to the District of Columbia, $25,000,000, to remain available until September 30, 1999, which shall be deposited into an escrow account of the District of Columbia Financial Responsibility and Management Assistance Authority and shall be disbursed from such escrow account by the Authority pursuant to the instructions of the Authority only for a program of management reform pursuant to sections 11101–11106 of the District of Columbia Management Reform Act of 1997, Public Law 105–33.

## FEDERAL PAYMENT FOR BOYS TOWN U.S.A. OPERATIONS IN THE DISTRICT OF COLUMBIA

For a Federal contribution of $7,100,000 to be paid to the Board of Trustees of Boys Town U.S.A. for expansion of the operations of Boys Town of Washington, located at 4801 Sargent Road, Northeast, said funds to be allocated as follows: $4,700,000 in capital costs for the construction of one emergency short-term residential center and four long-term residential homes in the District of Columbia; and $2,400,000 in first-year operating expenses for said facilities: *Provided,* That said Board of Trustees shall provide quarterly financial reports during fiscal year 1999 on the expenditure of said funds to the Committees on Appropriations of the Senate and House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives.

## NATION'S CAPITAL INFRASTRUCTURE FUND

For a Federal contribution to the District of Columbia towards the costs of infrastructure needs, which shall be deposited into an escrow account of the District of Columbia Financial Responsibility and Management Assistance Authority and disbursed by the Authority from such account for the repair and maintenance of public safety facilities in the District of Columbia, $18,778,000, to remain available until expended.

## ENVIRONMENTAL STUDY AND RELATED ACTIVITIES AT LORTON CORRECTIONAL COMPLEX

For a Federal contribution for an environmental study and related activities at the property on which the Lorton Correctional Complex is located, to be transferred to the Federal agency with authority over the Complex, $7,000,000, to remain available until expended.

## FEDERAL PAYMENT TO THE DISTRICT OF COLUMBIA CORRECTIONS TRUSTEE OPERATIONS

For payment to the District of Columbia Corrections Trustee, $184,800,000 for the administration and operation of correctional facilities and for the administrative operating costs of the Office of the Corrections Trustee, as authorized by section 11202 of the National Capital Revitalization and Self–Government Improvement Act of 1997, Public Law 105–33; of which $177,385,000 shall be available for expenses incurred in connection with the housing, in both private, District of Columbia and Federal facilities, of the sentenced adult felon population of the District of Columbia; $4,225,000 shall be available for personnel initiatives in the District of Columbia Department of Corrections; $750,000 shall be available for a system of internal controls and audits within the Department of Corrections; and $2,440,000 shall be available for administrative expenses: *Provided,* That, notwithstanding any other provision of law, and consistent with regulations and guidance governing the use of Federal funds by grantees, funds appropriated in this Act for the District of Columbia Corrections Trustee shall be transferred by the Secretary of the Treasury to said Trustee only as funds are needed to pay properly incurred obligations.

## FEDERAL PAYMENT TO THE DISTRICT OF COLUMBIA COURTS

Notwithstanding any other provision of law, $128,000,000 for payment to the Joint Committee on Judicial Administration in the District of Columbia; of which not to exceed $121,000,000 shall be for District of Columbia Courts operation, to be allocated as follows: for the District of Columbia Court of Appeals, $7,839,000 and 96 full-time equivalent (FTE) positions; for the District of Columbia Superior Court, $72,419,000 and 1,017 FTE's; for the District of Columbia court system, $40,742,000 and 120 FTE's; and $7,000,000 shall be for capital improvements for District of Columbia courthouse facilities: *Provided,* That of amounts available for District of Columbia Courts operation, not to exceed $6,900,000 shall be for the Counsel for Child Abuse and Neglect program pursuant to section 1101 of title 11, D.C. Code, and section 2304 of title 16, D.C. Code, and of which not to exceed $25,036,000 shall be to carry out sections 2602 and 2604 of title 11, D.C. Code, relating to representation of indigents in criminal cases under the Criminal Justice Act, in total, $31,936,000: *Provided further,* That subject to normal reprogramming requirements contained in section 116 of this Act, this $31,936,000 may be used for other purposes under this

heading: *Provided further,* That all amounts under this heading shall be paid quarterly by the Treasury of the United States based on quarterly apportionments approved by the Office of Management and Budget, with payroll and financial services to be provided on a contractual basis with the General Services Administration [GSA], said services to include the preparation of monthly financial reports, copies of which shall be submitted directly by GSA to the President and to the Committees on Appropriations of the Senate and House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives.

### FEDERAL PAYMENT TO THE DISTRICT OF COLUMBIA OFFENDER SUPERVISION, DEFENDER, AND COURT SERVICES AGENCY

For payment to the District of Columbia Offender Supervision, Defender, and Court Services Agency, $59,400,000, as authorized by the National Capital Revitalization and Self–Government Improvement Act of 1997, Public Law 105–33; of which $33,802,000 shall be for necessary expenses of Parole Revocation, Adult Probation and Offender Supervision, to include expenses relating to supervision of adults subject to protection orders or provision of services for or related to such persons; $14,486,000 shall be available to the Public Defender Service; and $11,112,000 shall be available to the Pretrial Services Agency: *Provided,* That, notwithstanding any other provision of law, and consistent with regulations and guidance governing the use of Federal funds by grantees, funds appropriated in this Act for the District of Columbia Offender Trustee shall be transferred by the Secretary of the Treasury to said Trustee only as funds are needed to pay properly incurred obligations.

### FEDERAL PAYMENT FOR METROPOLITAN POLICE DEPARTMENT

For payment to the Metropolitan Police Department, $1,200,000, for the administration and operating costs of the Citizen Complaint Review Office.

### FEDERAL PAYMENT FOR FIRE DEPARTMENT

For payment to the Fire Department, $3,240,000, for a 5.5 percent pay increase to be effective and paid to firefighters beginning October 1, 1998.

### FEDERAL PAYMENT TO THE GEORGETOWN WATERFRONT PARK FUND

For payment to the Georgetown Waterfront Park Fund, $1,000,000 for the construction and landscaping of Georgetown Waterfront Park, property described on the District of Columbia Surveyor's Plat Number S.O. 84–230: *Provided,* That the Georgetown Waterfront Park Fund provide an amount equal to one dollar for every dollar expended, in cash or in kind, to carry out the activities supported by the grant.

### FEDERAL PAYMENT TO HISTORICAL SOCIETY FOR CITY MUSEUM

For a Federal payment to the Historical Society of Washington, D.C., for the establishment and operation of a Museum of the City of Washington, D.C. at the Carnegie Library at Mount Vernon Square, $2,000,000, to remain available until expended, to be deposited in a separate account of the Society used exclusively for the establishment and operation of such Museum: *Provided,* That the Secretary of the Treasury shall make such payment in quarterly installments, and the amount of the installment for a quarter shall be equal to the amount of matching funds that the Society has deposited into such account for the quarter (as certified by the Inspector General of the District of Columbia): *Provided further,* That notwithstanding any other provision of law, not later than January 1, 1999, the District of Columbia shall enter into an agreement with the Society under which the District of Columbia shall lease the Carnegie Library at Mount Vernon Square to the Society beginning on such date for 99 years at a rent of $1 per year for use as a city museum.

### FEDERAL PAYMENT FOR A NATIONAL MUSEUM OF AMERICAN MUSIC AND FOR DOWNTOWN REVITALIZATION

For a Federal contribution to the District of Columbia to establish a National Museum of American Music and for downtown revitalization, $700,000 which shall be deposited into an escrow account held by the District of Columbia Financial Responsibility and Management Assistance Authority, to remain available until expended: *Provided,* That $300,000 shall be available from this appropriation for the Federal City Council to conduct a needs and design study for a National Museum of American Music: *Provided further,* That $300,000 shall be available from this appropriation for the Washington Center Alliance to further and promote the objectives of the Interactive Downtown Task Force: *Provided further,* That $100,000 shall be paid

to Save New York Avenue, Inc., for the further improvement of that portion of New York Avenue designated as the Capital Gateway Corridor.

### UNITED STATES PARK POLICE

For a Federal payment to the United States Park Police, $8,500,000, to acquire, modify and operate a helicopter and to make necessary capital expenditures to the Park Police aviation unit base: *Provided,* That the Chief of the United States Park Police shall provide quarterly financial reports during fiscal year 1999 on the expenditure of said funds to the Committees on Appropriations of the Senate and House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives.

### FEDERAL PAYMENT FOR WATERFRONT IMPROVEMENTS

For a Federal payment to the District of Columbia Department of Housing and Community Development for a study in consultation with the United States Army Corps of Engineers of necessary improvements to the Southwest Waterfront in the District of Columbia (including upgrading marina dock pilings and paving and restoring walkways in the marina and fish market areas) for the portions of Federal property in the Southwest quadrant of the District of Columbia within Lots 847 and 848, a portion of Lot 846, and the unassessed Federal real property adjacent to Lot 848 in Square 473, and for carrying out the improvements recommended by the study, $3,000,000: *Provided,* That no portion of such funds shall be available to the District of Columbia unless the District of Columbia executes a 30-year lease with the existing lessees, or with their successors in interest, of such portions of property not later than 30 days after the existing lessees or their successors in interest have submitted to the District of Columbia acceptable plans for improvements and private financing: *Provided further,* That the District of Columbia shall report its progress on this project on a quarterly basis to the Committees on Appropriations of the House of Representatives and the Senate.

### FEDERAL PAYMENT FOR MENTORING SERVICES

For a Federal payment to the International Youth Service and Development Corps, Inc. for a mentoring program for at-risk children in the District of Columbia, $200,000: *Provided,* That the International Youth Service and Development Corps, Inc. shall submit to the Committees on Appropriations of the House of Representatives and the Senate an annual report due November 30, 1999, on the activities carried out with such funds.

### FEDERAL PAYMENT FOR HOTLINE SERVICES

For a Federal payment to the International Youth Service and Development Corps, Inc. for the operation of a resource hotline for low-income individuals in the District of Columbia, $50,000: *Provided,* That the International Youth Service and Development Corps, Inc. shall submit to the Committees on Appropriations of the House of Representatives and the Senate an annual report due November 30, 1999, on the activities carried out with such funds.

### FEDERAL PAYMENT FOR PUBLIC EDUCATION

For a Federal contribution to the public education system for public charter schools, $15,622,000.

### FEDERAL PAYMENT FOR MEDICARE COORDINATED CARE
### DEMONSTRATION PROJECT IN THE DISTRICT OF COLUMBIA

For payment to the District of Columbia Financial Responsibility and Management Assistance Authority, $3,000,000 for the continued funding of a Medicare Coordinated Care Demonstration Project in the District of Columbia as specified in section 4016(b)(2)(C) of the Balanced Budget Act of 1997.

### FEDERAL PAYMENT FOR CHILDREN'S NATIONAL MEDICAL CENTER

For a Federal contribution to the Children's National Medical Center in the District of Columbia, $1,000,000 for construction, renovation, and information technology infrastructure costs associated with establishing community pediatric health clinics for high risk children in medically underserved areas of the District of Columbia.

### DISTRICT OF COLUMBIA FUNDS OPERATING EXPENSES

### DIVISION OF EXPENSES

The following amounts are appropriated for the District of Columbia for the current fiscal year out of the general fund of the District of Columbia, except as otherwise specifically provided.

## GOVERNMENTAL DIRECTION AND SUPPORT

Governmental direction and support, $164,144,000 (including $136,485,000 from local funds, $13,955,000 from Federal funds, and $13,704,000 from other funds): *Provided,* That not to exceed $2,500 for the Mayor, $2,500 for the Chairman of the Council of the District of Columbia, and $2,500 for the Chief Management Officer shall be available from this appropriation for official purposes: *Provided further,* That any program fees collected from the issuance of debt shall be available for the payment of expenses of the debt management program of the District of Columbia: *Provided further,* That no revenues from Federal sources shall be used to support the operations or activities of the Statehood Commission and Statehood Compact Commission: *Provided further,* That the District of Columbia shall identify the sources of funding for Admission to Statehood from its own locally-generated revenues: *Provided further,* That all employees permanently assigned to work in the Office of the Mayor shall be paid from funds allocated to the Office of the Mayor.

## ECONOMIC DEVELOPMENT AND REGULATION

Economic development and regulation, $159,039,000 (including $45,162,000 from local funds, $83,365,000 from Federal funds, and $30,512,000 from other funds), of which $12,000,000 collected by the District of Columbia in the form of BID tax revenue shall be paid to the respective BIDs pursuant to the Business Improvement Districts Act of 1996 (D.C. Law 11–134; D.C. Code, sec. 1–2271 et seq.), and the Business Improvement Districts Temporary Amendment Act of 1997 (D.C. Law 12–23): *Provided,* That such funds are available for acquiring services provided by the General Services Administration: *Provided further,* That Business Improvement Districts shall be exempt from taxes levied by the District of Columbia.

## PUBLIC SAFETY AND JUSTICE

Public safety and justice, including purchase or lease of 135 passenger-carrying vehicles for replacement only, including 130 for police-type use and five for fire-type use, without regard to the general purchase price limitation for the current fiscal year, $755,786,000 (including $530,945,000 from local funds, $30,327,000 from Federal funds, and $194,514,000 from other funds): *Provided,* That the Metropolitan Police Department is authorized to replace not to exceed 25 passenger-carrying vehicles and the Department of Fire and Emergency Medical Services of the District of Columbia is authorized to replace not to exceed five passenger-carrying vehicles annually whenever the cost of repair to any damaged vehicle exceeds three-fourths of the cost of the replacement: *Provided further,* That not to exceed $500,000 shall be available from this appropriation for the Chief of Police for the prevention and detection of crime: *Provided further,* That the Metropolitan Police Department shall provide quarterly reports to the Committees on Appropriations of the House and Senate on efforts to increase efficiency and improve the professionalism in the department: *Provided further,* That notwithstanding any other provision of law, or Mayor's Order 86–45, issued March 18, 1986, the Metropolitan Police Department's delegated small purchase authority shall be $500,000: *Provided further,* That the District of Columbia government may not require the Metropolitan Police Department to submit to any other procurement review process, or to obtain the approval of or be restricted in any manner by any official or employee of the District of Columbia government, for purchases that do not exceed $500,000: *Provided further,* That the Mayor shall reimburse the District of Columbia National Guard for expenses incurred in connection with services that are performed in emergencies by the National Guard in a militia status and are requested by the Mayor, in amounts that shall be jointly determined and certified as due and payable for these services by the Mayor and the Commanding General of the District of Columbia National Guard: *Provided further,* That such sums as may be necessary for reimbursement to the District of Columbia National Guard under the preceding proviso shall be available from this appropriation, and the availability of the sums shall be deemed as constituting payment in advance for emergency services involved: *Provided further,* That the Metropolitan Police Department is authorized to maintain 3,800 sworn officers, with leave for a 50 officer attrition: *Provided further,* That no more than 15 members of the Metropolitan Police Department shall be detailed or assigned to the Executive Protection Unit, until the Chief of Police submits a recommendation to the Council for its review: *Provided further,* That $100,000 shall be available for inmates released on medical and geriatric parole: *Provided further,* That commencing on December 31, 1998, the Metropolitan Police Department shall provide to the Committees on Appropriations of the Senate and House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives, quarterly reports on the status of crime reduction in each of the 83 police service areas established throughout the District of

Columbia: *Provided further,* That funds appropriated for expenses under the District of Columbia Criminal Justice Act, approved September 3, 1974 (88 Stat. 1090; Public Law 93–412; D.C. Code, sec. 11–2601 et seq.), for the fiscal year ending September 30, 1999, shall be available for obligations incurred under the Act in each fiscal year since inception in the fiscal year 1975: *Provided further,* That funds appropriated for expenses under the District of Columbia Neglect Representation Equity Act of 1984, effective March 13, 1985 (D.C. Law 5–129; D.C. Code, sec. 16–2304), for the fiscal year ending September 30, 1999, shall be available for obligations incurred under the Act in each fiscal year since inception in the fiscal year 1985: *Provided further,* That funds appropriated for expenses under the District of Columbia Guardianship, Protective Proceedings, and Durable Power of Attorney Act of 1986, effective February 27, 1987 (D.C. Law 6–204; D.C. Code, sec. 21–2060), for the fiscal year ending September 30, 1999, shall be available for obligations incurred under the Act in each fiscal year since inception in fiscal year 1989.

## PUBLIC EDUCATION SYSTEM

Public education system, including the development of national defense education programs, $788,956,000 (including $640,135,000 from local funds, $125,869,000 from Federal funds, and $22,952,000 from other funds), to be allocated as follows: $644,805,000 (including $545,000,000 from local funds, $95,121,000 from Federal funds, and $4,684,000 from other funds), for the public schools of the District of Columbia; $18,600,000 from local funds for the District of Columbia Teachers' Retirement Fund; $27,857,000 (including $12,235,000 from local funds and $15,622,000 from Federal funds not including funds already made available for District of Columbia public schools) for public charter schools: *Provided,* That if the entirety of this allocation has not been provided as payments to any public charter schools currently in operation through the per pupil funding formula, the funds shall be available for new public charter schools on a per pupil basis: *Provided further,* That $480,000 of this amount shall be available to the District of Columbia Public Charter School Board for administrative costs: *Provided further,* That the Emergency Transitional Education Board of Trustees shall report to Congress not later than February 1, 1999, on the implementation of their policy to give preference to newly created District of Columbia public charter schools for surplus public school property; $72,088,000 (including $40,148,000 from local funds, $14,079,000 from Federal funds, and $17,861,000 from other funds) for the University of the District of Columbia; $23,419,000 (including $22,326,000 from local funds, $686,000 from Federal funds, and $407,000 from other funds) for the Public Library; $2,187,000 (including $1,826,000 from local funds and $361,000 from Federal funds) for the Commission on the Arts and Humanities: *Provided further,* That the public schools of the District of Columbia are authorized to accept not to exceed 31 motor vehicles for exclusive use in the driver education program: *Provided further,* That not to exceed $2,500 for the Superintendent of Schools, $2,500 for the President of the University of the District of Columbia, and $2,000 for the Public Librarian shall be available from this appropriation for official purposes: *Provided further,* That $244,078 shall be used to reimburse the National Capital Area Council of the Boy Scouts of America for services provided on behalf of 12,600 students at 39 public schools in the District of Columbia during fiscal year 1998 (including staff, curriculum, and support materials): *Provided further,* That the Inspector General of the District of Columbia shall certify not later than 30 days after the date of the enactment of this Act whether or not the services were so provided: *Provided further,* That the reimbursement shall be made not later than 15 days after the Inspector General certifies that the services were provided: *Provided further,* That none of the funds contained in this Act may be made available to pay the salaries of any District of Columbia Public School teacher, principal, administrator, official, or employee who knowingly provides false enrollment or attendance information under article II, section 5 of the Act entitled "An Act to provide for compulsory school attendance, for the taking of a school census in the District of Columbia, and for other purposes", approved February 4, 1925 (D.C. Code, sec. 31–401 et seq.): *Provided further,* That this appropriation shall not be available to subsidize the education of any nonresident of the District of Columbia at any District of Columbia public elementary or secondary school during fiscal year 1999 unless the nonresident pays tuition to the District of Columbia at a rate that covers 100 percent of the costs incurred by the District of Columbia which are attributable to the education of the nonresident (as established by the Superintendent of the District of Columbia Public Schools): *Provided further,* That this appropriation shall not be available to subsidize the education of nonresidents of the District of Columbia at the University of the District of Columbia, unless the Board of Trustees of the University of the District of Columbia adopts, for the fiscal year ending September 30, 1999, a tuition rate schedule that will establish the tuition rate for nonresident students at a level no lower than the nonresident tuition rate charged at comparable public institutions of higher education in the metropolitan area.

## HUMAN SUPPORT SERVICES

AR.02424

Human support services, $1,514,751,000 (including $614,679,000 from local funds, $886,682,000 from Federal funds, and $13,390,000 from other funds): *Provided,* That $21,089,000 of this appropriation, to remain available until expended, shall be available solely for District of Columbia employees' disability compensation: *Provided further,* That a peer review committee shall be established to review medical payments and the type of service received by a disability compensation claimant: *Provided further,* That the District of Columbia shall not provide free government services such as water, sewer, solid waste disposal or collection, utilities, maintenance, repairs, or similar services to any legally constituted private nonprofit organization, as defined in section 411(5) of the Stewart B. McKinney Homeless Assistance Act (101 Stat. 485; Public Law 100–77; 42 U.S.C. 11371), providing emergency shelter services in the District, if the District would not be qualified to receive reimbursement pursuant to such Act (101 Stat. 485; Public Law 100–77; 42 U.S.C. 11301 et seq.).

## PUBLIC WORKS

Public works, including rental of one passenger-carrying vehicle for use by the Mayor and three passenger-carrying vehicles for use by the Council of the District of Columbia and leasing of passenger-carrying vehicles, $266,912,000 (including $257,242,000 from local funds, $3,216,000 from Federal funds, and $6,454,000 from other funds): *Provided,* That this appropriation shall not be available for collecting ashes or miscellaneous refuse from hotels and places of business.

## WASHINGTON CONVENTION CENTER FUND TRANSFER PAYMENT

For payment to the Washington Convention Center Enterprise Fund, $5,400,000 from local funds.

## REPAYMENT OF LOANS AND INTEREST

For reimbursement to the United States of funds loaned in compliance with the Act entitled "An Act to provide for the establishment of a modern, adequate, and efficient hospital center in the District of Columbia", approved August 7, 1946 (60 Stat. 896; Public Law 79–648); section 1 of the Act entitled "An Act to authorize the Commissioners of the District of Columbia to borrow funds for capital improvement programs and to amend provisions of law relating to Federal Government participation in meeting costs of maintaining the Nation's Capital City", approved June 6, 1958 (72 Stat. 183; Public Law 85–451; D.C. Code, sec. 9–219); section 4 of the Act entitled "An Act to authorize the Commissioners of the District of Columbia to plan, construct, operate, and maintain a sanitary sewer to connect the Dulles International Airport with the District of Columbia system", approved June 12, 1960 (74 Stat. 211; Public Law 86–515); sections 723 and 743(f) of the District of Columbia Home Rule Act, approved December 24, 1973, as amended (87 Stat. 821; Public Law 93–198; D.C. Code, sec. 47–321, note; 91 Stat. 1156; Public Law 95–131; D.C. Code, sec. 9–219, note), including interest as required thereby, $382,170,000 from local funds.

## REPAYMENT OF GENERAL FUND RECOVERY DEBT

For the purpose of eliminating the $331,589,000 general fund accumulated deficit as of September 30, 1990, $38,453,000 from local funds, as authorized by section 461(a) of the District of Columbia Home Rule Act, approved December 24, 1973, as amended (105 Stat. 540; Public Law 102–106; D.C. Code, sec. 47–321(a)(1)).

## PAYMENT OF INTEREST ON SHORT–TERM BORROWING

For payment of interest on short-term borrowing, $11,000,000 from local funds.

## CERTIFICATES OF PARTICIPATION

For lease payments in accordance with the Certificates of Participation involving the land site underlying the building located at One Judiciary Square, $7,926,000 from local funds.

## HUMAN RESOURCES DEVELOPMENT

For human resources development, including costs of increased employee training, administrative reforms, and an executive compensation system, $6,674,000 from local funds.

## PRODUCTIVITY SAVINGS

The Chief Financial Officer of the District of Columbia shall, under the direction of the District of Columbia Financial Responsibility and Management Assistance Authority, make reductions of $10,000,000 in local funds to one or more of the appropriation headings in this Act for productivity savings.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## RECEIVERSHIP PROGRAMS

For all agencies of the District of Columbia government under court ordered receivership, $318,979,000 (including $189,154,000 from local funds, $96,691,000 from Federal funds, and $33,134,000 from other funds): *Provided,* That, of the sums made available to the Commission on Mental Health Services, $5,000,000 shall be available to a 501(c)(3) nonprofit organization formed in 1991 and located in the District of Columbia to finance capital improvements to community-based housing facilities dedicated for use only by seriously and chronically mentally ill individuals in the District of Columbia.

## DISTRICT OF COLUMBIA FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE AUTHORITY

For the District of Columbia Financial Responsibility and Management Assistance Authority, established by section 101(a) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, approved April 17, 1995 (109 Stat. 97; Public Law 104–8), $7,840,000: *Provided,* That none of the funds contained in this Act may be used to pay any compensation of the Executive Director or General Counsel of the Authority at a rate in excess of the maximum rate of compensation which may be paid to such individual during fiscal year 1999 under section 102 of such Act, as determined by the Comptroller General (as described in GAO letter report B–279095.2).

## ENTERPRISE FUNDS

### WATER AND SEWER AUTHORITY AND THE WASHINGTON AQUEDUCT

For the Water and Sewer Authority and the Washington Aqueduct, $273,314,000 from other funds (including $239,493,000 for the Water and Sewer Authority and $33,821,000 for the Washington Aqueduct) of which $39,933,000 shall be apportioned and payable to the District's debt service fund for repayment of loans and interest incurred for capital improvement projects.

### LOTTERY AND CHARITABLE GAMES ENTERPRISE FUND

For the Lottery and Charitable Games Enterprise Fund, established by the District of Columbia Appropriation Act for the fiscal year ending September 30, 1982, approved December 4, 1981 (95 Stat. 1174, 1175; Public Law 97–91), as amended, for the purpose of implementing the Law to Legalize Lotteries, Daily Numbers Games, and Bingo and Raffles for Charitable Purposes in the District of Columbia, effective March 10, 1981 (D.C. Law 3–172; D.C. Code, secs. 2–2501 et seq. and 22–1516 et seq.), $225,200,000: *Provided,* That the District of Columbia shall identify the source of funding for this appropriation title from the District's own locally-generated revenues: *Provided further,* That no revenues from Federal sources shall be used to support the operations or activities of the Lottery and Charitable Games Control Board.

### CABLE TELEVISION ENTERPRISE FUND

For the Cable Television Enterprise Fund, established by the Cable Television Communications Act of 1981, effective October 22, 1983 (D.C. Law 5–36; D.C. Code, sec. 43–1801 et seq.), $2,108,000 from local funds.

### PUBLIC SERVICE COMMISSION

For the Public Service Commission, $5,026,000 (including $252,000 from Federal funds and $4,774,000 from other funds).

### OFFICE OF THE PEOPLE'S COUNSEL

For the Office of the People's Counsel, $2,501,000 from other funds.

### DEPARTMENT OF INSURANCE AND SECURITIES REGULATION

For the Department of Insurance and Securities Regulation, $7,001,000 from other funds.

### OFFICE OF BANKING AND FINANCIAL INSTITUTIONS

For the Office of Banking and Financial Institutions, $640,000 (including $390,000 from local funds and $250,000 from other funds).

### STARPLEX FUND

For the Starplex Fund, $8,751,000 from other funds for expenses incurred by the Armory Board in the exercise of its powers granted by the Act entitled "An Act To Establish A District of Columbia Armory Board, and for other purposes", approved June

4, 1948 (62 Stat. 339; D.C. Code, sec. 2–301 et seq.) and the District of Columbia Stadium Act of 1957, approved September 7, 1957 (71 Stat. 619; Public Law 85–300; D.C. Code, sec. 2–321 et seq.): *Provided,* That the Mayor shall submit a budget for the Armory Board for the forthcoming fiscal year as required by section 442(b) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 824; Public Law 93–198; D.C. Code, sec. 47–301(b)).

### D.C. GENERAL HOSPITAL

For the District of Columbia General Hospital, established by Reorganization Order No. 57 of the Board of Commissioners, effective August 15, 1953, $113,599,000 of which $46,835,000 shall be derived by transfer from the general fund and $66,764,000 shall be derived from other funds.

### D.C. RETIREMENT BOARD

For the D.C. Retirement Board, established by section 121 of the District of Columbia Retirement Reform Act of 1979, approved November 17, 1979 (93 Stat. 866; D.C. Code, sec. 1–711), $18,202,000 from the earnings of the applicable retirement funds to pay legal, management, investment, and other fees and administrative expenses of the District of Columbia Retirement Board: *Provided,* That the District of Columbia Retirement Board shall provide to the Congress and to the Council of the District of Columbia a quarterly report of the allocations of charges by fund and of expenditures of all funds: *Provided further,* That the District of Columbia Retirement Board shall provide the Mayor, for transmittal to the Council of the District of Columbia, an itemized accounting of the planned use of appropriated funds in time for each annual budget submission and the actual use of such funds in time for each annual audited financial report.

### CORRECTIONAL INDUSTRIES FUND

For the Correctional Industries Fund, established by the District of Columbia Correctional Industries Establishment Act, approved October 3, 1964 (78 Stat. 1000; Public Law 88–622), $3,332,000 from other funds.

### WASHINGTON CONVENTION CENTER ENTERPRISE FUND

For the Washington Convention Center Enterprise Fund, $53,539,000, of which $5,400,000 shall be derived by transfer from the general fund.

### PERSONNEL

The government of the District of Columbia shall employ no more than 32,900 FTE positions, exclusive of intra-District FTE positions, during fiscal year 1999.

### CAPITAL OUTLAY

### (INCLUDING RESCISSIONS)

For construction projects, a net increase of $1,711,160,737 (including a rescission of $114,430,742 of which $24,437,811 is from local funds and $89,992,931 is from highway trust funds appropriated under this heading in prior fiscal years, and an additional $1,825,591,479 of which $718,234,161 is from local funds, $24,452,538 is from the highway trust fund, and $1,082,904,780 is from Federal funds), to remain available until expended: *Provided,* That funds for use of each capital project implementing agency shall be managed and controlled in accordance with all procedures and limitations established under the Financial Management System: *Provided further,* That all funds provided by this appropriation title shall be available only for the specific projects and purposes intended: *Provided further,* That notwithstanding the foregoing, all authorizations for capital outlay projects, except those projects covered by the first sentence of section 23(a) of the Federal–Aid Highway Act of 1968, approved August 23, 1968 (82 Stat. 827; Public Law 90–495; D.C. Code, sec. 7–134, note), for which funds are provided by this appropriation title, shall expire on September 30, 2000, except authorizations for projects for which funds have been obligated in whole or in part prior to September 30, 2000: *Provided further,* That upon expiration of any such project authorization the funds provided herein for the project shall lapse.

### GENERAL PROVISIONS

SEC. 101. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available

AR.02427

for public inspection, except where otherwise provided under existing law, or under existing Executive Order issued pursuant to existing law.

SEC. 102. Except as otherwise provided in this Act, all vouchers covering expenditures of appropriations contained in this Act shall be audited before payment by the designated certifying official, and the vouchers as approved shall be paid by checks issued by the designated disbursing official.

SEC. 103. Whenever in this Act, an amount is specified within an appropriation for particular purposes or objects of expenditure, such amount, unless otherwise specified, shall be considered as the maximum amount that may be expended for said purpose or object rather than an amount set apart exclusively therefor.

SEC. 104. Appropriations in this Act shall be available, when authorized by the Mayor, for allowances for privately owned automobiles and motorcycles used for the performance of official duties at rates established by the Mayor: *Provided,* That such rates shall not exceed the maximum prevailing rates for such vehicles as prescribed in the Federal Property Management Regulations 101–7 (Federal Travel Regulations).

SEC. 105. Appropriations in this Act shall be available for expenses of travel and for the payment of dues of organizations concerned with the work of the District of Columbia government, when authorized by the Mayor: *Provided,* That, in the case of the Council of the District of Columbia, funds may be expended with the authorization of the chair of the Council.

SEC. 106. There are appropriated from the applicable funds of the District of Columbia such sums as may be necessary for making refunds and for the payment of judgments that have been entered against the District of Columbia government: *Provided,* That nothing contained in this section shall be construed as modifying or affecting the provisions of section 11(c)(3) of title XII of the District of Columbia Income and Franchise Tax Act of 1947, approved March 31, 1956 (70 Stat. 78; Public Law 84–460; D.C. Code, sec. 47–1812.11(c)(3)).

SEC. 107. Appropriations in this Act shall be available for the payment of public assistance without reference to the requirement of section 544 of the District of Columbia Public Assistance Act of 1982, effective April 6, 1982 (D.C. Law 4–101; D.C. Code, sec. 3–205.44), and for payment of the non-Federal share of funds necessary to qualify for grants under subtitle A of title II of the Violent Crime Control and Law Enforcement Act of 1994.

SEC. 108. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 109. No funds appropriated in this Act for the District of Columbia government for the operation of educational institutions, the compensation of personnel, or for other educational purposes may be used to permit, encourage, facilitate, or further partisan political activities. Nothing herein is intended to prohibit the availability of school buildings for the use of any community or partisan political group during non-school hours.

SEC. 110. None of the funds appropriated in this Act shall be made available to pay the salary of any employee of the District of Columbia government whose name, title, grade, salary, past work experience, and salary history are not available for inspection by the House and Senate Committees on Appropriations, the Subcommittee on the District of Columbia of the House Committee on Government Reform and Oversight, the Subcommittee on Oversight of Government Management, Restructuring and the District of Columbia of the Senate Committee on Governmental Affairs, and the Council of the District of Columbia, or their duly authorized representative.

SEC. 111. There are appropriated from the applicable funds of the District of Columbia such sums as may be necessary for making payments authorized by the District of Columbia Revenue Recovery Act of 1977, effective September 23, 1977 (D.C. Law 2–20; D.C. Code, sec. 47–421 et seq.).

SEC. 112. No part of this appropriation shall be used for publicity or propaganda purposes or implementation of any policy including boycott designed to support or defeat legislation pending before Congress or any State legislature.

SEC. 113. At the start of the fiscal year, the Mayor shall develop an annual plan, by quarter and by project, for capital outlay borrowings: *Provided,* That within a reasonable time after the close of each quarter, the Mayor shall report to the Council of the District of Columbia and the Congress the actual borrowings and spending progress compared with projections.

SEC. 114. The Mayor shall not borrow any funds for capital projects unless the Mayor has obtained prior approval from the Council of the District of Columbia, by resolution, identifying the projects and amounts to be financed with such borrowings.

SEC. 115. The Mayor shall not expend any moneys borrowed for capital projects for the operating expenses of the District of Columbia government.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 116. None of the funds provided under this Act to the agencies funded by this Act, both Federal and District government agencies, that remain available for obligation or expenditure in fiscal year 1999, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for an agency through a reprogramming of funds which: (1) creates new programs; (2) eliminates a program, project, or activity; (3) establishes or changes allocations specifically denied, limited or increased by Congress in the Act; (4) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (5) reestablishes through reprogramming any program or project previously deferred through reprogramming; (6) augments existing programs, projects, or activities through a reprogramming of funds in excess of $1,000,000 or 10 percent, whichever is less; or (7) increases by 20 percent or more personnel assigned to a specific program, project or activity; unless the Appropriations Committees of both the Senate and House of Representatives are notified in writing thirty days in advance of any reprogramming as set forth in this section.

SEC. 117. None of the Federal funds provided in this Act shall be obligated or expended to provide a personal cook, chauffeur, or other personal servants to any officer or employee of the District of Columbia.

SEC. 118. None of the Federal funds provided in this Act shall be obligated or expended to procure passenger automobiles as defined in the Automobile Fuel Efficiency Act of 1980, approved October 10, 1980 (94 Stat. 1824; Public Law 96–425; 15 U.S.C. 2001(2)), with an Environmental Protection Agency estimated miles per gallon average of less than 22 miles per gallon: *Provided,* That this section shall not apply to security, emergency rescue, or armored vehicles.

SEC. 119. (a) Notwithstanding section 422(7) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 790; Public Law 93–198; D.C. Code, sec. 1–242(7)), the City Administrator shall be paid, during any fiscal year, a salary at a rate established by the Mayor, not to exceed the rate established for Level IV of the Executive Schedule under 5 U.S.C. 5315.

(b) For purposes of applying any provision of law limiting the availability of funds for payment of salary or pay in any fiscal year, the highest rate of pay established by the Mayor under subsection (a) of this section for any position for any period during the last quarter of calendar year 1998 shall be deemed to be the rate of pay payable for that position for September 30, 1998.

(c) Notwithstanding section 4(a) of the District of Columbia Redevelopment Act of 1945, approved August 2, 1946 (60 Stat. 793; Public Law 79–592; D.C. Code, sec. 5–803(a)), the Board of Directors of the District of Columbia Redevelopment Land Agency shall be paid, during any fiscal year, per diem compensation at a rate established by the Mayor.

SEC. 120. Notwithstanding any other provisions of law, the provisions of the District of Columbia Government Comprehensive Merit Personnel Act of 1978, effective March 3, 1979 (D.C. Law 2–139; D.C. Code, sec. 1–601.1 et seq.), enacted pursuant to section 422(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 790; Public Law 93–198; D.C. Code, sec. 1–242(3)), shall apply with respect to the compensation of District of Columbia employees: *Provided,* That for pay purposes, employees of the District of Columbia government shall not be subject to the provisions of title 5, United States Code.

SEC. 121. The Director of the Office of Property Management may pay rentals and repair, alter, and improve rented premises, without regard to the provisions of section 322 of the Economy Act of 1932 (Public Law 72–212; 40 U.S.C. 278a), based upon a determination by the Director, that by reason of circumstances set forth in such determination, the payment of these rents and the execution of this work, without reference to the limitations of section 322, is advantageous to the District in terms of economy, efficiency, and the District's best interest.

SEC. 122. No later than 30 days after the end of the first quarter of the fiscal year ending September 30, 1999, the Mayor of the District of Columbia shall submit to the Council of the District of Columbia the new fiscal year 1999 revenue estimates as of the end of the first quarter of fiscal year 1999. These estimates shall be used in the budget request for the fiscal year ending September 30, 2000. The officially revised estimates at midyear shall be used for the midyear report.

SEC. 123. No sole source contract with the District of Columbia government or any agency thereof may be renewed or extended without opening that contract to the competitive bidding process as set forth in section 303 of the District of Columbia Procurement Practices Act of 1985, effective February 21, 1986 (D.C. Law 6–85; D.C. Code, sec. 1–1183.3), except that the District of Columbia government or any agency thereof may renew or extend sole source contracts for which competition is not feasible or practical: *Provided,* That the determination as to whether to invoke the competitive bidding process has been made in accordance with duly promulgated rules and procedures and said determination has been reviewed and approved by the District of Columbia Financial Responsibility and Management Assistance Authority.

SEC. 124. For purposes of the Balanced Budget and Emergency Deficit Control Act of 1985, approved December 12, 1985 (99 Stat. 1037; Public Law 99–177), as amended, the term "program, project, and activity" shall be synonymous with and refer

specifically to each account appropriating Federal funds in this Act, and any sequestration order shall be applied to each of the accounts rather than to the aggregate total of those accounts: *Provided,* That sequestration orders shall not be applied to any account that is specifically exempted from sequestration by the Balanced Budget and Emergency Deficit Control Act of 1985.

SEC. 125. In the event a sequestration order is issued pursuant to the Balanced Budget and Emergency Deficit Control Act of 1985, approved December 12, 1985 (99 Stat. 1037: Public Law 99–177), as amended, after the amounts appropriated to the District of Columbia for the fiscal year involved have been paid to the District of Columbia, the Mayor of the District of Columbia shall pay to the Secretary of the Treasury, within 15 days after receipt of a request therefor from the Secretary of the Treasury, such amounts as are sequestered by the order: *Provided,* That the sequestration percentage specified in the order shall be applied proportionately to each of the Federal appropriation accounts in this Act that are not specifically exempted from sequestration by the Balanced Budget and Emergency Deficit Control Act of 1985.

SEC. 126. (a) An entity of the District of Columbia government may accept and use a gift or donation during fiscal year 1999 if—

(1) the Mayor approves the acceptance and use of the gift or donation: *Provided,* That the Council of the District of Columbia may accept and use gifts without prior approval by the Mayor; and

(2) the entity uses the gift or donation to carry out its authorized functions or duties.

(b) Each entity of the District of Columbia government shall keep accurate and detailed records of the acceptance and use of any gift or donation under subsection (a) of this section, and shall make such records available for audit and public inspection.

(c) For the purposes of this section, the term "entity of the District of Columbia government" includes an independent agency of the District of Columbia.

(d) This section shall not apply to the District of Columbia Board of Education, which may, pursuant to the laws and regulations of the District of Columbia, accept and use gifts to the public schools without prior approval by the Mayor.

SEC. 127. None of the Federal funds provided in this Act may be used by the District of Columbia to provide for salaries, expenses, or other costs associated with the offices of United States Senator or United States Representative under section 4(d) of the District of Columbia Statehood Constitutional Convention Initiatives of 1979, effective March 10, 1981 (D.C. Law 3–171; D.C. Code, sec. 1–113(d)).

SEC. 128. (a) The University of the District of Columbia shall submit to the Mayor, the District of Columbia Financial Responsibility and Management Assistance Authority (hereafter in this section referred to as "Authority"), and the Council of the District of Columbia (hereafter in this section referred to as "Council") no later than 15 calendar days after the end of each month a report that sets forth—

(1) current month expenditures and obligations, year-to-date expenditures and obligations, and total fiscal year expenditure projections versus budget, broken out on the basis of control center, responsibility center, and object class, and for all funds, non-appropriated funds, and capital financing;

(2) a list of each account for which spending is frozen and the amount of funds frozen, broken out by control center, responsibility center, detailed object, and for all funding sources;

(3) a list of all active contracts in excess of $10,000 annually, which contains the name of each contractor; the budget to which the contract is charged, broken out on the basis of control center and responsibility center, and contract identifying codes used by the University of the District of Columbia; payments made in the last month and year-to-date, the total amount of the contract and total payments made for the contract and any modifications, extensions, renewals; and specific modifications made to each contract in the last month;

(4) all reprogramming requests and reports that have been made by the University of the District of Columbia within the last month in compliance with applicable law; and

(5) changes made in the last month to the organizational structure of the University of the District of Columbia, displaying previous and current control centers and responsibility centers, the names of the organizational entities that have been changed, the name of the staff member supervising each entity affected, and the reasons for the structural change.

(b) The Mayor, the Authority, and the Council shall provide the Congress by February 1, 2000, a summary, analysis, and recommendations on the information provided in the monthly reports.

SEC. 129. Funds authorized or previously appropriated to the government of the District of Columbia by this or any other Act to procure the necessary hardware and installation of new software, conversion, testing, and training to improve or replace its financial management system are also available for the acquisition of accounting and financial management services and

AR.02430

the leasing of necessary hardware, software or any other related goods or services, as determined by the District of Columbia Financial Responsibility and Management Assistance Authority.

SEC. 130. None of the funds contained in this Act may be made available to pay the fees of an attorney who represents a party who prevails in an action, including an administrative proceeding, brought against the District of Columbia Public Schools under the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) if—

(1) the hourly rate of compensation of the attorney exceeds the hourly rate of compensation under section 11–2604(a), District of Columbia Code; or

(2) the maximum amount of compensation of the attorney exceeds the maximum amount of compensation under section 11–2604(b)(1), District of Columbia Code, except that compensation and reimbursement in excess of such maximum may be approved for extended or complex representation in accordance with section 11–2604(c), District of Columbia Code.

SEC. 131. None of the funds appropriated under this Act shall be expended for any abortion except where the life of the mother would be endangered if the fetus were carried to term or where the pregnancy is the result of an act of rape or incest.

SEC. 132. U.S. ARMY CORPS OF ENGINEERS SERVICES TO DISTRICT OF COLUMBIA PUBLIC SCHOOLS. In using funds made available under this Act or any other Act for the repair and improvement of the District of Columbia's public school facilities, any entity of the District of Columbia government, including the District of Columbia Financial Responsibility and Management Assistance Authority, or its designee, may place orders for engineering and construction and related services with the Chief of Engineers of the U.S. Army Corps of Engineers. The Chief of Engineers may accept such orders on a reimbursable basis and may provide any part of such services by contract. In providing such services, the Chief of Engineers shall follow the Federal Acquisition Regulations and the implementing Department of Defense regulations. This section shall apply to fiscal year 1999 and each fiscal year thereafter.

SEC. 133. None of the funds made available in this Act may be used to implement or enforce the Health Care Benefits Expansion Act of 1992 (D.C. Law 9–114; D.C. Code, sec. 36–1401 et seq.) or to otherwise implement or enforce any system of registration of unmarried, cohabiting couples (whether homosexual, heterosexual, or lesbian), including but not limited to registration for the purpose of extending employment, health, or governmental benefits to such couples on the same basis that such benefits are extended to legally married couples.

SEC. 134. The Emergency Transitional Education Board of Trustees shall submit to the Congress, the Mayor, the District of Columbia Financial Responsibility and Management Assistance Authority, and the Council of the District of Columbia no later than 15 calendar days after the end of each month a report that sets forth—

(1) current month expenditures and obligations, year-to-date expenditures and obligations, and total fiscal year expenditure projections versus budget, broken out on the basis of control center, responsibility center, agency reporting code, and object class, and for all funds, including capital financing;

(2) a list of each account for which spending is frozen and the amount of funds frozen, broken out by control center, responsibility center, detailed object, and agency reporting code, and for all funding sources;

(3) a list of all active contracts in excess of $10,000 annually, which contains the name of each contractor; the budget to which the contract is charged, broken out on the basis of control center, responsibility center, and agency reporting code; and contract identifying codes used by the District of Columbia Public Schools; payments made in the last month and year-to-date, the total amount of the contract and total payments made for the contract and any modifications, extensions, renewals; and specific modifications made to each contract in the last month;

(4) all reprogramming requests and reports that are required to be, and have been, submitted to the Board of Education; and

(5) changes made in the last month to the organizational structure of the D.C. Public Schools, displaying previous and current control centers and responsibility centers, the names of the organizational entities that have been changed, the name of the staff member supervising each entity affected, and the reasons for the structural change.

SEC. 135. (a) IN GENERAL.—The Emergency Transitional Education Board of Trustees of the District of Columbia and the University of the District of Columbia shall annually compile an accurate and verifiable report on the positions and employees in the public school system and the university, respectively. The annual report shall set forth—

(1) the number of validated schedule A positions in the District of Columbia public schools and the University of the District of Columbia for fiscal year 1998, fiscal year 1999, and thereafter on full-time equivalent basis, including a compilation of all positions by control center, responsibility center, funding source, position type, position title, pay plan, grade, and annual salary; and

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) a compilation of all employees in the District of Columbia public schools and the University of the District of Columbia as of the preceding December 31, verified as to its accuracy in accordance with the functions that each employee actually performs, by control center, responsibility center, agency reporting code, program (including funding source), activity, location for accounting purposes, job title, grade and classification, annual salary, and position control number.

(b) SUBMISSION.—The annual report required by subsection (a) of this section shall be submitted to the Congress, the Mayor, the District of Columbia Council, the Consensus Commission, and the Authority, not later than February 15 of each year.

SEC. 136. (a) No later than October 1, 1998, or within 30 calendar days after the date of the enactment of this Act, whichever occurs later, and each succeeding year, the Superintendent of the District of Columbia Public Schools and the University of the District of Columbia shall submit to the appropriate congressional committees, the Mayor, the District of Columbia Council, the Consensus Commission, and the District of Columbia Financial Responsibility and Management Assistance Authority, a revised appropriated funds operating budget for the public school system and the University of the District of Columbia for such fiscal year that is in the total amount of the approved appropriation and that realigns budgeted data for personal services and other-than-personal services, respectively, with anticipated actual expenditures.

(b) The revised budget required by subsection (a) of this section shall be submitted in the format of the budget that the Superintendent of the District of Columbia Public Schools and the University of the District of Columbia submit to the Mayor of the District of Columbia for inclusion in the Mayor's budget submission to the Council of the District of Columbia pursuant to section 442 of the District of Columbia Home Rule Act, Public Law 93–198, as amended (D.C. Code, sec. 47–301).

SEC. 137. The Emergency Transitional Education Board of Trustees, the Board of Trustees of the University of the District of Columbia, the Board of Library Trustees, and the Board of Governors of the University of the District of Columbia School of Law shall vote on and approve their respective annual or revised budgets before submission to the Mayor of the District of Columbia for inclusion in the Mayor's budget submission to the Council of the District of Columbia in accordance with section 442 of the District of Columbia Home Rule Act, Public Law 93–198, as amended (D.C. Code, sec. 47–301), or before submitting their respective budgets directly to the Council.

SEC. 138. (a) CEILING ON TOTAL OPERATING EXPENSES.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the total amount appropriated in this Act for operating expenses for the District of Columbia for fiscal year 1999 under the caption "Division of Expenses" shall not exceed the lesser of—

(A) the sum of the total revenues of the District of Columbia for such fiscal year; or

(B) $5,211,920,000 (of which $132,912,000 shall be from intra-District funds and $2,865,763,000 shall be from local funds), which amount may be increased by the following:

(i) proceeds of one-time transactions, which are expended for emergency or unanticipated operating or capital needs approved by the District of Columbia Financial Responsibility and Management Assistance Authority; or

(ii) after notification to the Council, additional expenditures which the Chief Financial Officer of the District of Columbia certifies will produce additional revenues during such fiscal year at least equal to 200 percent of such additional expenditures, and that are approved by the Authority.

(2) ENFORCEMENT.—The Chief Financial Officer of the District of Columbia and the Authority shall take such steps as are necessary to assure that the District of Columbia meets the requirements of this section, including the apportioning by the Chief Financial Officer of the appropriations and funds made available to the District during fiscal year 1999, except that the Chief Financial Officer may not reprogram for operating expenses any funds derived from bonds, notes, or other obligations issued for capital projects.

(b) ACCEPTANCE AND USE OF GRANTS NOT INCLUDED IN CEILING.—

(1) IN GENERAL.—Notwithstanding subsection (a), the Mayor, in consultation with the Chief Financial Officer, during a control year, as defined in section 305(4) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, approved April 17, 1995 (Public Law 104–8; 109 Stat. 152), may accept, obligate, and expend Federal, private, and other grants received by the District government that are not reflected in the amounts appropriated in this Act.

(2) REQUIREMENT OF CHIEF FINANCIAL OFFICER REPORT AND AUTHORITY APPROVAL.—No such Federal, private, or other grant may be accepted, obligated, or expended pursuant to paragraph (1) until—

(A) the Chief Financial Officer of the District of Columbia submits to the Authority a report setting forth detailed information regarding such grant; and

(B) the Authority has reviewed and approved the acceptance, obligation, and expenditure of such grant in accordance with review and approval procedures consistent with the provisions of the District of Columbia Financial Responsibility and Management Assistance Act of 1995.

(3) PROHIBITION ON SPENDING IN ANTICIPATION OF APPROVAL OR RECEIPT.—No amount may be obligated or expended from the general fund or other funds of the District government in anticipation of the approval or receipt of a grant under paragraph (2)(B) of this subsection or in anticipation of the approval or receipt of a Federal, private, or other grant not subject to such paragraph.

(4) MONTHLY REPORTS.—The Chief Financial Officer of the District of Columbia shall prepare a monthly report setting forth detailed information regarding all Federal, private, and other grants subject to this subsection. Each such report shall be submitted to the Council of the District of Columbia, and to the Committees on Appropriations of the House of Representatives and the Senate, not later than 15 days after the end of the month covered by the report.

(c) REPORT ON EXPENDITURES BY FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE AUTHORITY.—Not later than 20 calendar days after the end of each fiscal quarter starting October 1, 1998, the Authority shall submit a report to the Committees on Appropriations of the House of Representatives and the Senate, the Committee on Government Reform and Oversight of the House, and the Committee on Governmental Affairs of the Senate providing an itemized accounting of all non-appropriated funds obligated or expended by the Authority for the quarter. The report shall include information on the date, amount, purpose, and vendor name, and a description of the services or goods provided with respect to the expenditures of such funds.

(d) APPLICATION OF EXCESS REVENUES.—Local revenues collected in excess of amounts required to support appropriations in this Act for operating expenses for the District of Columbia for fiscal year 1999 under the caption "Division of Expenses" shall be applied first to the elimination of the general fund accumulated deficit; second to a reserve account not to exceed $250,000,000 to be used to finance seasonal cash needs (in lieu of short term borrowings); third to accelerate repayment of cash borrowed from the Water and Sewer Fund; and fourth to reduce the outstanding long-term debt.

SEC. 139. UNIVERSITY OF THE DISTRICT OF COLUMBIA INVESTMENT AUTHORITY. Section 108(b) of the District of Columbia Public Education Act (D.C. Code, sec. 31–1408) is amended by striking the period at the end of the sentence and adding the phrase ", except that the funds appropriated in this section also may be invested in equity based securities if approved by the Chief Financial Officer of the District of Columbia.".

SEC. 140. If a department or agency of the government of the District of Columbia is under the administration of a court-appointed receiver or other court-appointed official during fiscal year 1999 or any succeeding fiscal year, the receiver or official shall prepare and submit to the Mayor, for inclusion in the annual budget of the District of Columbia for the year, annual estimates of the expenditures and appropriations necessary for the maintenance and operation of the department or agency. All such estimates shall be forwarded by the Mayor to the Council, for its action pursuant to sections 446 and 603(c) of the District of Columbia Home Rule Act, without revision but subject to the Mayor's recommendations. Notwithstanding any provision of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 790; Public Law 93–198; D.C. Code sec. 1–101 et seq.) the Council may comment or make recommendations concerning such annual estimates but shall have no authority under such Act to revise such estimates.

SEC. 141. The District of Columbia Financial Responsibility and Management Assistance Authority and the Superintendent of the District of Columbia Public Schools are hereby directed to report to the Appropriations Committees of the Senate and the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives not later than April 1, 1999, on all measures necessary and steps to be taken to ensure that the District's Public Schools open on time to begin the 1999–2000 academic year.

SEC. 142. (a) Notwithstanding any other provision of law, rule, or regulation, an employee of the District of Columbia public schools shall be—

(1) classified as an Educational Service employee;

(2) placed under the personnel authority of the Board of Education; and

(3) subject to all Board of Education rules.

(b) School-based personnel shall constitute a separate competitive area from nonschool-based personnel who shall not compete with school-based personnel for retention purposes.

SEC. 143. (a) RESTRICTIONS ON USE OF OFFICIAL VEHICLES.—(1) Except as otherwise provided in this section, none of the funds made available by this Act or by any other Act may be used to provide any officer or employee of the District of Columbia with an official vehicle unless the officer or employee uses the vehicle only in the performance of the officer's or employee's official duties. For purposes of this paragraph, the term "official duties" does not include travel between the officer's or employee's residence and workplace (except in the case of an officer or employee of the Metropolitan Police Department who resides in the District of Columbia or is otherwise designated by the Chief of the Department).

(2) Paragraph (1) shall not apply with respect to any vehicle provided to the officer of the Metropolitan Police Department who was wounded in the line of duty and who is referred to in the letter of July 15, 1998, from the Chief of the Department to the Chair of the Subcommittee on the District of Columbia of the Committee on Appropriations of the House of Representatives. Notwithstanding any other provision of law, the Chief may donate the vehicle to such officer as a gift on behalf of the District of Columbia, and the donation shall not be subject to any Federal, State, or local income or gift tax.

(3) The Chief Financial Officer of the District of Columbia shall submit, by November 15, 1998, an inventory, as of September 30, 1998, of all vehicles owned, leased or operated by the District of Columbia government. The inventory shall include, but not be limited to, the department to which the vehicle is assigned; the year and make of the vehicle; the acquisition date and cost; the general condition of the vehicle; annual operating and maintenance costs; current mileage; and whether the vehicle is allowed to be taken home by a District officer or employee and if so, the officer or employee's title and resident location.

SEC. 144. (a) SOURCE OF PAYMENT FOR EMPLOYEES DETAILED WITHIN GOVERNMENT.—For purposes of determining the amount of funds expended by any entity within the District of Columbia government during fiscal year 1999 and each succeeding fiscal year, any expenditures of the District government attributable to any officer or employee of the District government who provides services which are within the authority and jurisdiction of the entity (including any portion of the compensation paid to the officer or employee attributable to the time spent in providing such services) shall be treated as expenditures made from the entity's budget, without regard to whether the officer or employee is assigned to the entity or otherwise treated as an officer or employee of the entity.

(b) MODIFICATION OF REDUCTION IN FORCE PROCEDURES.—The District of Columbia Government Comprehensive Merit Personnel Act of 1978 (D.C. Code, sec. 1–601.1 et seq.), as amended, is further amended in section 2408(a) by deleting "1998" and inserting, "1999"; in subsection (b), by deleting "1998" and inserting, "1999"; in subsection (i), by deleting "1998" and inserting, "1999"; and in subsection (k), by deleting "1998" and inserting, "1999".

SEC. 145. ASSESSMENT AND PLACEMENT OF SPECIAL EDUCATION STUDENTS. Notwithstanding any other provision of law, not later than 120 days after the date that a District of Columbia Public Schools [DCPS] student is referred for evaluation or assessment—

(1) the District of Columbia Board of Education (referred to in this section as the "Board"), or its successor and DCPS shall assess or evaluate a student who may have a disability and who may require special education services; and

(2) if a student is classified as having a disability, as defined in section 101(a)(1) of the Individuals with Disabilities Education Act (84 Stat. 175; 20 U.S.C. 1401(a)(1)) or in section 7(8) of the Rehabilitation Act of 1973 (87 Stat. 359; 29 U.S.C. 706(8)), the Board and DCPS shall place that student in an appropriate program of special education services.

SEC. 146. (a) COMPLIANCE WITH BUY AMERICAN ACT.—None of the funds made available in this Act may be expended by an entity unless the entity agrees that in expending the funds the entity will comply with the Buy American Act (41 U.S.C. 10a–10c).

(b) SENSE OF THE CONGRESS; REQUIREMENT REGARDING NOTICE.—

(1) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products to the greatest extent practicable.

(2) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance using funds made available in this Act, the head of each agency of the Federal or District of Columbia government shall provide to each recipient of the assistance a notice describing the statement made in paragraph (1) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that

AR.02434

109

is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

<< 36 USCA § 151106 NOTE >>

SEC. 147. Notwithstanding any provision of any Federally-granted charter or any other provision of law, beginning with fiscal year 1999 and for each fiscal year hereafter, the real property of the National Education Association located in the District of Columbia shall be subject to taxation by the District of Columbia in the same manner as any similar organization.

SEC. 148. None of the funds contained in this Act may be used for purposes of the annual independent audit of the District of Columbia government (including the District of Columbia Financial Responsibility and Management Assistance Authority) for fiscal year 1999 unless—

 (1) the audit is conducted by the Inspector General of the District of Columbia pursuant to section 208(a)(4) of the District of Columbia Procurement Practices Act of 1985 (D.C. Code, sec. 1–1182.8(a)(4)); and

 (2) the audit includes a comparison of audited actual year-end results with the revenues submitted in the budget document for such year and the appropriations enacted into law for such year.

SEC. 149. Nothing in this Act shall be construed to authorize any office, agency or entity to expend funds for programs or functions for which a reorganization plan is required but has not been approved by the District of Columbia Financial Responsibility and Management Assistance Authority (hereafter in this section referred to as "Authority"). Appropriations made by this Act for such programs or functions are conditioned only on the approval by the Authority of the required reorganization plans.

SEC. 150. Notwithstanding any other provision of law, rule, or regulation, the evaluation process and instruments for evaluating District of Columbia Public Schools employees shall be a non-negotiable item for collective bargaining purposes.

SEC. 151. None of the funds contained in this Act may be used by the District of Columbia Corporation Counsel or any other officer or entity of the District government to provide assistance for any petition drive or civil action which seeks to require Congress to provide for voting representation in Congress for the District of Columbia.

SEC. 152. The District of Columbia Financial Responsibility and Management Assistance Authority (hereafter in this section referred to as "Authority") shall report to the Appropriations Committees of the Senate and House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committee on Government Reform and Oversight of the House of Representatives, by February 15, 1999, on the status of all partnerships or agreements entered into from January 1, 1994 through September 30, 1998, between the District of Columbia government and any nonprofit organization that provides medical care, substance abuse treatment, low income housing, food and shelter services, abstinance programs, or educational services to children, adults and families residing in the District. For those partnerships or agreements that have been terminated, the Authority shall report to Congress on the plans by the District government for reinitiating the partnerships or agreements with the respective nonprofit organization.

SEC. 153. The Residency Requirement Reinstatement Amendment Act of 1998 (D.C. Act 12–340) is hereby repealed.

SEC. 154. None of the funds contained in this Act may be used after April 1, 1999, to transfer or confine inmates classified above the medium security level, as defined by the Federal Bureau of Prisons classification instrument, to the Northeast Ohio Correctional Center located in Youngstown, Ohio.

SEC. 155. RESERVE.—The District of Columbia Financial Responsibility and Management Assistance Act of 1995, Public Law 104–8, sec. 202 is amended to include the following:

"(i) RESERVE.—Beginning with fiscal year 2000, the plan or budget submitted pursuant to this Act shall contain $150,000,000 for a reserve to be established by the Chief Financial Officer for the District of Columbia and the District of Columbia Financial Responsibility and Management Assistance Authority: *Provided,* That the reserve shall only be expended according to criteria established by the Chief Financial Officer and approved by the District of Columbia Financial Responsibility and Management Assistance Authority.".

SEC. 156. LIBRARY FUNDRAISING AUTHORITY.—D.C. Code Section 37–105 is amended by striking the word "and" after section (11) and striking the period after section (12) and adding the following phrase:

", (13) Notwithstanding any other provision of law, the Board of Trustees of the District of Columbia Public Library is authorized to hire a fund raiser and to raise funds from private sources and expend those funds for the benefit of the District of

Columbia Public Library, with the prior review and approval of the Chief Financial Officer for the District of Columbia and the District of Columbia Financial Responsibility and Management Assistance Authority.".

SEC. 157. DISTRICT OF COLUMBIA ADOPTION IMPROVEMENT ACT OF 1998. (a) SHORT TITLE.—This section may be cited as the "District of Columbia Adoption Improvement Act of 1998".

(b) DATABASE.—The District of Columbia Child and Family Services Agency (referred to as "CFSA") shall maintain an accurate database listing and tracking any child found by the Family Division of the District of Columbia Superior Court to be abused or neglected and who is in the custody of the District of Columbia, including any child with the goal of adoption or legally free for adoption.

(c) CONTRACTING WITH PRIVATE SERVICE PROVIDERS.—

(1) PRIVATE CONTRACTS.—Not later than September 30, 1999, CFSA shall enter into contracts with private service providers to perform some of the adoption recruitment and placement functions of CFSA, which may include recruitment, homestudy, and placement services.

(2) COMPETITIVE BIDDING.—Any contract entered into pursuant to paragraph (1) shall be subject to a competitive bidding process when required by CFSA contracting policies and procedures.

(3) PERFORMANCE–BASED COMPENSATION.—

(A) IN GENERAL.—Any contract entered into pursuant to paragraph (1) shall compensate the winning bidder pursuant to paragraph (2) upon completion of contract deliverables.

(B) CONTRACT DELIVERABLES.—In identifying contract deliverables, CFSA shall consider—

(i) in the case of recruitment, receipt of a list of potential adoptive families;

(ii) in the case of homestudies, receipt of a completed homestudy in a form specified in advance by CFSA; or

(iii) in the case of placements, the child is placed in an adoptive home approved by CFSA or the adoption is finalized.

(4) TYPES OF CONTRACTS.—Nothing in this section shall be construed to prevent CFSA from entering into contracts that provide for multiple deliverables or conditions for partial payment.

(5) REMOVAL OF BARRIERS TO ADOPTION.—CFSA shall meet with contractors to address issues identified during the term of a contract entered into pursuant to this section, including issues related to barriers to timely adoptions.

SEC. 158. CLARIFICATION OF RESPONSIBILITY FOR ADULT OFFENDER SUPERVISION IN THE DISTRICT OF COLUMBIA. (a) Section 11233(b)(2) of the National Capital Revitalization and Self–Government Improvement Act of 1997 (Public Law 105–33) is amended by—

(1) striking "; and" in subparagraph (F) and inserting ";";

(2) striking "Columbia." in subparagraph (G) and inserting "Columbia; and"; and

(3) inserting after subparagraph (G) the following:

"(H) carry out all functions which have heretofore been carried out by the Social Services Division of the Superior Court relating to supervision of adults subject to protection orders or provision of services for or related to such persons.".

(b) Section 11–1722 of the District of Columbia Code is amended—

(1) in subsection (a)—

(A) by inserting "juvenile" after "all" in the first sentence; and

(B) by amending the second sentence to read as follows: "The Director shall have no jurisdiction over any adult under supervision.";

(2) in subsection (b), inserting "including the agency established by section 11233(a) of the National Capital Revitalization and Self-Government Improvement Act of 1997," after "Columbia,"; and

(3) in subsection (c), by inserting "juvenile" after "of".

SEC. 159. Public Law 104–8 is amended by adding new section 109 as follows:

## "SEC. 109. CHIEF MANAGEMENT OFFICER.

"(a) The Authority may employ a Chief Management Officer of the District of Columbia, who shall be appointed by the Chair with the consent of the Authority. The Chief Management Officer shall assist the Authority in the fulfillment of its responsibilities under the District of Columbia Management Reform Act of 1997, subtitle B of the National Capital Revitalization and Self-Government Improvement Act of 1997, title XI of Public Law 105–33, to improve the effectiveness and efficiency of the District of Columbia Government. The Authority may delegate to the Chief Management Officer responsibility for oversight and supervision of departments and functions of the District of Columbia Government, or successor departments

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and functions, consistent with the District of Columbia Management Reform Act of 1997, subtitle B of the National Capital Revitalization and Self-Government Improvement Act of 1997, title XI of Public Law 105–33. The Chief Management Officer shall report directly to the Authority, through the Chair of the Authority, and shall be directed in his or her performance by a majority of the Authority. The Chief Management Officer shall be paid at an annual rate determined by the Authority sufficient in the judgment of the Authority to obtain the services of an individual with the skills and experience required to discharge the duties of the office.

"(b) EMPLOYMENT CONTRACT.—Notwithstanding any other provision of law, the employment agreement entered into as of January 15, 1998, between the Chief Management Officer and the District of Columbia Financial Responsibility and Management Assistance Authority shall be valid in all respects.".

SEC. 160. Section 1–1182.8(a)(4)(A) of the D.C. Code is amended to read as follows—

"(A) Audit the financial statement and report described in paragraph (3)(H) for a fiscal year, except that the financial statement and report may not be audited by the same auditor (or an auditor employed by or affiliated with the same auditor) for more than 5 consecutive fiscal years; and".

SEC. 161. DEFICIT REDUCTION AND REVITALIZATION.—Notwithstanding any other provision of law or this Act, funds allocated to management reform by the District of Columbia Financial Responsibility and Management Assistance Authority under this heading in Public Law 105–100 (111 Stat. 2159), as contained in the Authority's notification of June 24, 1998, shall remain available for management reform until September 30, 1999: *Provided,* That said funds shall not exceed $3,200,000.

<< 31 USCA § 3901 >>

SEC. 162. PROMPT PAYMENTS. (a) Section 3901 of title 31, United States Code is amended by adding at the end the following new subsection (d):

"(d)(1) Notwithstanding subsection (a)(1) of this section, this chapter, except section 3907 of this title, applies to the District of Columbia Courts.

"(2) A claim for an interest penalty not paid under this chapter may be filed in the same manner as claims are filed with respect to contracts to provide property or services for the District of Columbia Courts.

"(3)(A) Except as provided in subparagraph (B), an interest penalty under this chapter does not continue to accrue for more than one year or after a claim for an interest penalty is filed in the manner described in paragraph (2), whichever is earlier.

"(B) If a claim for an interest penalty is filed in the manner described in paragraph (2) and interest is not available for such claims under the laws and regulations governing claims under contracts to provide property or services for the District of Columbia Courts, interest will accrue under this chapter as provided in paragraph (A) and from the date the claim is filed until the date the claim is paid.

"(4) Paragraph (3) of this subsection does not prevent an interest penalty from accruing on a claim if such interest is available for such claim under the laws and regulations governing claims under contracts to provide property or services for the District of Columbia Courts. Such interest may accrue on an unpaid contract payment and on the unpaid penalty under this chapter.

"(5) Except as provided in section 3904 of this title, this chapter does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract. A claim related to the dispute, and any interest payable for the period during which the dispute is being resolved, is subject to the laws and regulations governing claims under contracts to provide property or services for the District of Columbia Courts.".

SEC. 163. Section 147 of the Nation's Capital Bicentennial Designation Act (Public Law 105–100; 111 Stat. 2180) is amended —

(1) in subsection (a)(3)(B) by striking "President's Day" and inserting "Washington's Birthday";

(2) in subsection (b)(1) by striking "President's Day" and inserting "Washington's Birthday".

SEC. 164. Section 101(b) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Public Law 104–8, 109 Stat. 97, is amended by adding at the end of paragraph (5) the following new subparagraph:

"(D) CONTINUATION OF SERVICE UNTIL SUCCESSOR APPOINTED.—Upon the expiration of a term of office, a member of the Authority may continue to serve until a successor has been appointed."

SEC. 165. Section 456(d)(2) of the District of Columbia Home Rule Act (87 Stat. 774; Public Law 93–198, as amended) is amended by adding at the end:

AR.02437

"(H) A statement of the balance of each account held by the District of Columbia Financial Responsibility and Management Assistance Authority as of the end of the quarter, together with a description of the activities within each such account during the quarter based on information supplied by the Authority.".

SEC. 166. No funds made available pursuant to any provision of this Act or any other act now or hereafter enacted shall be used to capitalize the National Capital Revitalization Corporation or for the purpose of implementing the National Capital Revitalization Act of 1998 (D.C. Act 12–355) until at least 30 days after the District of Columbia Financial Responsibility and Management Assistance Authority submits to the appropriate committees of Congress an economic development strategy.

SEC. 167. The District of Columbia government shall maintain for fiscal year 1999 the same funding levels as provided in fiscal year 1997 for homeless services in the District of Columbia: *Provided,* That in addition to such amounts, $1,000,000 shall be paid to The Doe Fund for its Ready, Willing & Able program in Washington, D.C.

SEC. 168. (a) No later than November 1, 1998, or within 30 calendar days after the date of the enactment of this Act, whichever occurs later, the Chief Financial Officer shall submit to the appropriate committees of Congress, the Mayor, and the District of Columbia Financial Responsibility and Management Assistance Authority a revised appropriated funds operating budget for all agencies of the District of Columbia government for such fiscal year that is in the total amount of the approved appropriation and that realigns budgeted data for personal services and other-than-personal-services, respectively, with anticipated actual expenditures.

(b) The revised budget required by subsection (a) of this section shall be submitted in the format of the budget that the District of Columbia government submitted pursuant to section 442 of the District of Columbia Home Rule Act, Public Law 93–198, as amended (D.C. Code, sec. 47–301).

SEC. 169. Notwithstanding section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973, as amended (87 Stat. 813; Public Law 93–198; D.C. Code, sec. 1–233(c)(1), D.C. Act 12–421), "Oyster Elementary School Construction and Revenue Bond Act of 1998", shall take effect upon the date of enactment of this Act.

SEC. 170. None of the funds contained in this Act may be used for any program of distributing sterile needles or syringes for the hypodermic injection of any illegal drug, or for any payment to any individual or entity who carries out any such program.

SEC. 171. None of the funds contained in this Act may be used to conduct any ballot initiative which seeks to legalize or otherwise reduce penalties associated with the possession, use, or distribution of any schedule I substance under the Controlled Substances Act (21 U.S.C. 802) or any tetrahydrocannabinols derivative.

This Act may be cited as the "District of Columbia Appropriations Act, 1999".

(d) For programs, projects or activities in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for foreign operations, export financing, and related programs for the fiscal year ending September 30, 1999, and for other purposes.

## TITLE I—EXPORT AND INVESTMENT ASSISTANCE

### EXPORT–IMPORT BANK OF THE UNITED STATES

The Export–Import Bank of the United States is authorized to make such expenditures within the limits of funds and borrowing authority available to such corporation, and in accordance with law, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 104 of the Government Corporation Control Act, as may be necessary in carrying out the program for the current fiscal year for such corporation: *Provided,* That none of the funds available during the current fiscal year may be used to make expenditures, contracts, or commitments for the export of nuclear equipment, fuel, or technology to any country other than a nuclear-weapon state as defined in Article IX of the Treaty on the Non–Proliferation of Nuclear Weapons eligible to receive economic or military assistance under this Act that has detonated a nuclear explosive after the date of enactment of this Act.

### SUBSIDY APPROPRIATION

For the cost of direct loans, loan guarantees, insurance, and tied-aid grants as authorized by section 10 of the Export–Import Bank Act of 1945, as amended, $765,000,000 to remain available until September 30, 2002: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,*

That such sums shall remain available until 2013 for the disbursement of direct loans, loan guarantees, insurance and tied-aid grants obligated in fiscal years 1999, 2000, 2001, and 2002: *Provided further,* That none of the funds appropriated by this Act or any prior Act appropriating funds for foreign operations, export financing, or related programs for tied-aid credits or grants may be used for any other purpose except through the regular notification procedures of the Committees on Appropriations: *Provided further,* That funds appropriated by this paragraph are made available notwithstanding section 2(b)(2) of the Export Import Bank Act of 1945, in connection with the purchase or lease of any product by any East European country, any Baltic State or any agency or national thereof.

## ADMINISTRATIVE EXPENSES

<< 12 USCA § 635a NOTE >>

  For administrative expenses to carry out the direct and guaranteed loan and insurance programs (to be computed on an accrual basis), including hire of passenger motor vehicles and services as authorized by 5 U.S.C. 3109, and not to exceed $22,500 for official reception and representation expenses for members of the Board of Directors, $50,000,000: *Provided,* That necessary expenses (including special services performed on a contract or fee basis, but not including other personal services) in connection with the collection of moneys owed the Export–Import Bank, repossession or sale of pledged collateral or other assets acquired by the Export–Import Bank in satisfaction of moneys owed the Export–Import Bank, or the investigation or appraisal of any property, or the evaluation of the legal or technical aspects of any transaction for which an application for a loan, guarantee or insurance commitment has been made, shall be considered nonadministrative expenses for the purposes of this heading: *Provided further,* That, notwithstanding subsection (b) of section 117 of the Export Enhancement Act of 1992, subsection (a) thereof shall remain in effect until October 1, 1999.

## OVERSEAS PRIVATE INVESTMENT CORPORATION NONCREDIT ACCOUNT

  The Overseas Private Investment Corporation is authorized to make, without regard to fiscal year limitations, as provided by 31 U.S.C. 9104, such expenditures and commitments within the limits of funds available to it and in accordance with law as may be necessary: *Provided,* That the amount available for administrative expenses to carry out the credit and insurance programs (including an amount for official reception and representation expenses which shall not exceed $35,000) shall not exceed $32,500,000 of which not more than $27,500,000 may be made available until the Corporation reports to the Committees on Appropriations on measures taken to (1) establish sector specific investment funds; and (2) support regional investment initiatives in Georgia, Armenia and Azerbaijan through the Caucasus Fund: *Provided further,* That project-specific transaction costs, including direct and indirect costs incurred in claims settlements, and other direct costs associated with services provided to specific investors or potential investors pursuant to section 234 of the Foreign Assistance Act of 1961, shall not be considered administrative expenses for the purposes of this heading.

## PROGRAM ACCOUNT

  For the cost of direct and guaranteed loans, $50,000,000, as authorized by section 234 of the Foreign Assistance Act of 1961 to be derived by transfer from the Overseas Private Investment Corporation Noncredit Account: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,* That such sums shall be available for direct loan obligations and loan guaranty commitments incurred or made during fiscal years 1999 and 2000: *Provided further,* That such sums shall remain available through fiscal year 2007 for the disbursement of direct and guaranteed loans obligated in fiscal year 1999, and through fiscal year 2008 for the disbursement of direct and guaranteed loans obligated in fiscal year 2000: *Provided further,* That in addition, such sums as may be necessary for administrative expenses to carry out the credit program may be derived from amounts available for administrative expenses to carry out the credit and insurance programs in the Overseas Private Investment Corporation Noncredit Account and merged with said account.

## FUNDS APPROPRIATED TO THE PRESIDENT

## TRADE AND DEVELOPMENT AGENCY

For necessary expenses to carry out the provisions of section 661 of the Foreign Assistance Act of 1961, $44,000,000, to remain available until September 30, 2000: *Provided,* That the Trade and Development Agency may receive reimbursements from corporations and other entities for the costs of grants for feasibility studies and other project planning services, to be deposited as an offsetting collection to this account and to be available for obligation until September 30, 2000, for necessary expenses under this paragraph: *Provided further,* That such reimbursements shall not cover, or be allocated against, direct or indirect administrative costs of the agency.

## TITLE II—BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

For expenses necessary to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes, to remain available until September 30, 1999, unless otherwise specified herein, as follows:

### AGENCY FOR INTERNATIONAL DEVELOPMENT

### CHILD SURVIVAL AND DISEASE PROGRAMS FUND

For necessary expenses to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961, for child survival, basic education, assistance to combat tropical and other diseases, and related activities, in addition to funds otherwise available for such purposes, $650,000,000, to remain available until expended: *Provided,* That this amount shall be made available for such activities as: (1) immunization programs; (2) oral rehydration programs; (3) health and nutrition programs, and related education programs, which address the needs of mothers and children; (4) water and sanitation programs; (5) assistance for displaced and orphaned children; (6) programs for the prevention, treatment, and control of, and research on, tuberculosis, HIV/AIDS, polio, malaria and other diseases; and (7) up to $98,000,000 for basic education programs for children: *Provided further,* That none of the funds appropriated under this heading may be made available for nonproject assistance for health and child survival programs, except that funds may be made available for such assistance for ongoing health programs.

### DEVELOPMENT ASSISTANCE

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses to carry out the provisions of sections 103 through 106, and chapter 10 of part I of the Foreign Assistance Act of 1961, title V of the International Security and Development Cooperation Act of 1980 (Public Law 96–533) and the provisions of section 401 of the Foreign Assistance Act of 1969, $1,225,000,000, to remain available until September 30, 2000: *Provided,* That of the amount appropriated under this heading, up to $20,000,000 may be made available for the Inter–American Foundation and shall be apportioned directly to that Agency: *Provided further,* That of the amount appropriated under this heading, up to $11,000,000 may be made available for the African Development Foundation and shall be apportioned directly to that agency: *Provided further,* That none of the funds made available in this Act nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization: *Provided further,* That none of the funds made available under this heading may be used to pay for the performance of abortion as a method of family planning or to motivate or coerce any person to practice abortions; and that in order to reduce reliance on abortion in developing nations, funds shall be available only to voluntary family planning projects which offer, either directly or through referral to, or information about access to, a broad range of family planning methods and services, and that any such voluntary family planning project shall meet the following requirements: (1) service providers of referral agents in the project shall not implement or be subject to quotas, or other numerical targets, of total number of births, number of family planning acceptors, or acceptors of a particular method of family planning (this provision shall not be construed to include the use of quantitative estimates or indicators for budgeting and planning purposes), (2) the project shall not include payment of incentives, bribes, gratuities, or financial reward to (A) an individual in exchange for becoming a family planning acceptor, or (B) program personnel for achieving a numerical target or quota of total number of births, number of family planning acceptors, or acceptors of a particular method of family planning, (3) the project shall not deny any right or benefit, including the right of access to participate in any program of general welfare or the right of access to health care, as a consequence of any individual's decision not to accept family planning services, (4) the project shall provide family planning acceptors

comprehensible information on the health benefits and risks of the method chosen, including those conditions that might render the use of the method inadvisable and those adverse side effects known to be consequent to the use of the method, (5) the project shall ensure that experimental contraceptive drugs and devices and medical procedures are provided only in the context of a scientific study in which participants are advised of potential risks and benefits; and, not less than 60 days after the date on which the Administrator of the United States Agency for International Development determines that there has been a violation of the requirements contained in paragraphs (1), (2), (3), or (5) of this proviso, or a pattern or practice of violations of the requirements contained in paragraph (4) of this proviso, the Administrator shall submit to the Committee on International Relations and the Committee on Appropriations of the House of Representatives and to the Committee on Foreign Relations and the Committee on Appropriations of the Senate, a report containing a description of such violation and the corrective action taken by the Agency: *Provided further,* That in awarding grants for natural family planning under section 104 of the Foreign Assistance Act of 1961 no applicant shall be discriminated against because of such applicant's religious or conscientious commitment to offer only natural family planning; and, additionally, all such applicants shall comply with the requirements of the previous proviso: *Provided further,* That for purposes of this or any other Act authorizing or appropriating funds for foreign operations, export financing, and related programs, the term "motivate", as it relates to family planning assistance, shall not be construed to prohibit the provision, consistent with local law, of information or counseling about all pregnancy options: *Provided further,* That nothing in this paragraph shall be construed to alter any existing statutory prohibitions against abortion under section 104 of the Foreign Assistance Act of 1961: *Provided further,* That, notwithstanding section 109 of the Foreign Assistance Act of 1961, of the funds appropriated under this heading in this Act, and of the unobligated balances of funds previously appropriated under this heading, $2,500,000 may be transferred to "International Organizations and Programs" for a contribution to the International Fund for Agricultural Development (IFAD): *Provided further,* That none of the funds appropriated under this heading may be made available for any activity which is in contravention of the Convention on International Trade in Endangered Species of Flora and Fauna (CITES): *Provided further,* That none of the funds appropriated under this heading may be made available for assistance for the central Government of the Republic of South Africa, until the Secretary of State reports in writing to the appropriate committees of the Congress on the steps being taken by the United States Government to work with the Government of the Republic of South Africa to negotiate the repeal, suspension, or termination of section 15(c) of South Africa's Medicines and Related Substances Control Amendment Act No. 90 of 1997: *Provided further,* That of the funds appropriated under this heading that are made available for assistance programs for displaced and orphaned children and victims of war, not to exceed $25,000, in addition to funds otherwise available for such purposes, may be used to monitor and provide oversight of such programs: *Provided further,* That of the funds appropriated under this heading, not less than $1,500,000 should be made available for agriculture programs in Laos: *Provided further,* That of the funds appropriated under this heading not less than $500,000 should be made available for support of the United States Telecommunications Training Institute: *Provided further,* That, of the funds made available by this Act for the "Microenterprise Initiative" (including any local currencies made available for the purposes of the Initiative), not less than 50 percent of the funds used for microcredit should be made available for support of programs providing loans of less than $300 to very poor people, particularly women, or for institutional support of organizations primarily engaged in making such loans.

## CYPRUS

  Of the funds appropriated under the headings "Development Assistance" and "Economic Support Fund", not less than $15,000,000 shall be made available for Cyprus to be used only for scholarships, administrative support of the scholarship program, bicommunal projects, and measures aimed at reunification of the island and designed to reduce tensions and promote peace and cooperation between the two communities on Cyprus.

## BURMA

  Of the funds appropriated under the headings "Economic Support Fund" and "Development Assistance", not less than $6,500,000 shall be made available to support democracy activities in Burma, democracy and humanitarian activities along the Burma–Thailand border, and for Burmese student groups and other organizations located outside Burma: *Provided,* That funds made available for Burma-related activities under this heading may be made available notwithstanding any other provision of law: *Provided further,* That the provision of such funds shall be made available subject to the regular notification procedures of the Committees on Appropriations.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## CAMBODIA

None of the funds appropriated by this Act may be made available for activities or programs for Cambodia until the Secretary of State determines and reports to the Committees on Appropriations that the Government of Cambodia has: (1) thoroughly and credibly resolved all election-related disputes and complaints filed by all political parties to the National Election Commission and the Constitutional Council; (2) discontinued all political violence and intimidation of journalists and members of opposition parties; and (3) been formed through credible, democratic elections: *Provided,* That the restrictions under this heading shall not apply to demining or activities administered by nongovernmental organizations: *Provided further,* That such funds shall be subject to the regular notification procedures of the Committees on Appropriations.

## INDONESIA

Of the funds appropriated under the headings "Economic Support Fund" and "Development Assistance", not less than $75,000,000 shall be made available for assistance for Indonesia: *Provided,* That of this amount, not less than $15,000,000 should be made available for activities administered by the Office of Transition Initiatives: *Provided further,* That of the amount made available under this heading up to $25,000,000 may be derived from funds that are available for obligation pursuant to section 511 of this Act or any comparable provision of law.

## PRIVATE AND VOLUNTARY ORGANIZATIONS

<< 22 USCA § 2151u >>

<< 22 USCA § 2151u NOTE >>

None of the funds appropriated or otherwise made available by this Act for development assistance may be made available to any United States private and voluntary organization, except any cooperative development organization, which obtains less than 20 percent of its total annual funding for international activities from sources other than the United States Government: *Provided,* That the Administrator of the Agency for International Development may, on a case-by-case basis, waive the restriction contained in this paragraph, after taking into account the effectiveness of the overseas development activities of the organization, its level of volunteer support, its financial viability and stability, and the degree of its dependence for its financial support on the agency: *Provided further,* That section 123(g) of the Foreign Assistance Act of 1961 and the paragraph entitled "Private and Voluntary Organizations" in title II of the Foreign Assistance and Related Programs Appropriations Act, 1985 (as enacted in Public Law 98–473) are hereby repealed.

Funds appropriated or otherwise made available under title II of this Act should be made available to private and voluntary organizations at a level which is at least equivalent to the level provided in fiscal year 1995. Such private and voluntary organizations shall include those which operate on a not-for-profit basis, receive contributions from private sources, receive voluntary support from the public and are deemed to be among the most cost-effective and successful providers of development assistance.

## INTERNATIONAL DISASTER ASSISTANCE

For necessary expenses for international disaster relief, rehabilitation, and reconstruction assistance pursuant to section 491 of the Foreign Assistance Act of 1961, as amended, $200,000,000, to remain available until expended.

## MICRO AND SMALL ENTERPRISE DEVELOPMENT PROGRAM ACCOUNT

For the cost of direct loans and loan guarantees, $1,500,000, as authorized by section 108 of the Foreign Assistance Act of 1961, as amended: *Provided,* That such costs shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,* That guarantees of loans made under this heading in support of micro-enterprise activities may guarantee up to 70 percent of the principal amount of any such loans notwithstanding section 108 of the Foreign Assistance Act of 1961. In addition, for administrative expenses to carry out programs under this heading, $500,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: *Provided further,* That funds made available under this heading shall remain available until September 30, 2000.

## URBAN AND ENVIRONMENTAL CREDIT PROGRAM ACCOUNT

**<< 22 USCA § 2183 >>**

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of guaranteed loans authorized by sections 221 and 222 of the Foreign Assistance Act of 1961, including the cost of guaranteed loans designed to promote the urban and environmental policies and objectives of part I of such Act, $1,500,000, to remain available until expended: *Provided,* That these funds are available to subsidize loan principal, 100 per centum of which shall be guaranteed, pursuant to the authority of such sections. In addition, for administrative expenses to carry out guaranteed loan programs, $5,000,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: *Provided further,* That commitments to guarantee loans under this heading may be entered into notwithstanding the second and third sentences of section 222(a) of the Foreign Assistance Act of 1961, and the third and fourth sentences of section 223(j) of such Act are repealed.

#### PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the "Foreign Service Retirement and Disability Fund", as authorized by the Foreign Service Act of 1980, $44,552,000.

#### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT

For necessary expenses to carry out the provisions of section 667, $479,950,000: *Provided,* That none of the funds appropriated by this Act for programs administered by the Agency for International Development may be used to finance printing costs of any report or study (except feasibility, design, or evaluation reports or studies) in excess of $25,000 without the approval of the Administrator of the Agency or the Administrator's designee.

#### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL
#### DEVELOPMENT OFFICE OF INSPECTOR GENERAL

For necessary expenses to carry out the provisions of section 667, $30,750,000, to remain available until September 30, 2000, which sum shall be available for the Office of the Inspector General of the Agency for International Development.

#### OTHER BILATERAL ECONOMIC ASSISTANCE

#### ECONOMIC SUPPORT FUND

For necessary expenses to carry out the provisions of chapter 4 of part II, $2,367,000,000, to remain available until September 30, 2000: *Provided,* That of the funds appropriated under this heading, not less than $1,080,000,000 shall be available only for Israel, which sum shall be available on a grant basis as a cash transfer and shall be disbursed within thirty days of enactment of this Act or by October 31, 1998, whichever is later: *Provided further,* That not less than $775,000,000 shall be available only for Egypt, which sum shall be provided on a grant basis, and of which sum cash transfer assistance shall be provided with the understanding that Egypt will undertake significant economic reforms which are additional to those which were undertaken in previous fiscal years: *Provided further,* That in exercising the authority to provide cash transfer assistance for Israel, the President shall ensure that the level of such assistance does not cause an adverse impact on the total level of nonmilitary exports from the United States to such country: *Provided further,* That of the funds appropriated under this heading, not less than $150,000,000 should be made available for assistance for Jordan: *Provided further,* That notwithstanding any other provision of law, not to exceed $10,000,000 may be used to support victims of the Holocaust.

#### INTERNATIONAL FUND FOR IRELAND

For necessary expenses to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, $19,600,000, which shall be available for the United States contribution to the International Fund for Ireland and shall be made available in accordance with the provisions of the Anglo–Irish Agreement Support Act of 1986 (Public Law 99–415): *Provided,* That such amount shall be expended at the minimum rate necessary to make timely payment for projects and activities: *Provided further,* That funds made available under this heading shall remain available until September 30, 2000.

#### ASSISTANCE FOR EASTERN EUROPE AND THE BALTIC STATES

(a) For necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961 and the Support for East European Democracy (SEED) Act of 1989, $430,000,000, to remain available until September 30, 2000, which shall be available, notwithstanding any other provision of law, for economic assistance and for related programs for Eastern Europe and the Baltic States.

(b) Funds appropriated under this heading shall be considered to be economic assistance under the Foreign Assistance Act of 1961 for purposes of making available the administrative authorities contained in that Act for the use of economic assistance.

(c) None of the funds appropriated under this heading may be made available for new housing construction or repair or reconstruction of existing housing in Bosnia and Herzegovina unless directly related to the efforts of United States troops to promote peace in said country.

(d) With regard to funds appropriated under this heading for the economic revitalization program in Bosnia and Herzegovina, and local currencies generated by such funds (including the conversion of funds appropriated under this heading into currency used by Bosnia and Herzegovina as local currency and local currency returned or repaid under such program)—

(1) the Administrator of the Agency for International Development shall provide written approval for grants and loans prior to the obligation and expenditure of funds for such purposes, and prior to the use of funds that have been returned or repaid to any lending facility or grantee; and

(2) the provisions of section 533 of this Act shall apply.

(e) The President is authorized to withhold funds appropriated under this heading made available for economic revitalization programs in Bosnia and Herzegovina, if he determines and certifies to the Committees on Appropriations that the Federation of Bosnia and Herzegovina has not complied with article III of annex 1–A of the General Framework Agreement for Peace in Bosnia and Herzegovina concerning the withdrawal of foreign forces, and that intelligence cooperation on training, investigations, and related activities between Iranian officials and Bosnian officials has not been terminated.

(f) Not to exceed $200,000,000 of the funds appropriated under this heading may be made available for Bosnia and Herzegovina.

(g) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the Fund's disbursement of such funds for program purposes. The Fund may retain for such program purposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

## ASSISTANCE FOR THE NEW INDEPENDENT STATES OF THE FORMER SOVIET UNION

(a) For necessary expenses to carry out the provisions of chapter 11 of part I of the Foreign Assistance Act of 1961 and the FREEDOM Support Act, for assistance for the New Independent States of the former Soviet Union and for related programs, $801,000,000, to remain available until September 30, 2000: *Provided,* That the provisions of such chapter shall apply to funds appropriated by this paragraph: *Provided further,* That such sums as may be necessary may be transferred to the Export–Import Bank of the United States for the cost of any financing under the Export–Import Bank Act of 1945 for activities for the New Independent States.

(b) Funds appropriated under title II of this Act, including funds appropriated under this heading, should be made available for assistance for Mongolia at a level which is at least equivalent to the level provided in fiscal year 1998: *Provided,* That funds made available for assistance for Mongolia may be made available in accordance with the purposes and utilizing the authorities provided in chapter 11 of part I of the Foreign Assistance Act of 1961.

(c)(1) Of the funds appropriated under this heading that are allocated for assistance for the Government of Russia, 50 percent shall be withheld from obligation until the President determines and certifies in writing to the Committees on Appropriations that the Government of Russia has terminated implementation of arrangements to provide Iran with technical expertise, training, technology, or equipment necessary to develop a nuclear reactor, related nuclear research facilities or programs, or ballistic missile capability.

(2) Notwithstanding paragraph (1) assistance may be provided for the Government of Russia if the President determines and certifies to the Committees on Appropriations that making such funds available: (A) is vital to the national security interest of the United States; and (B) that the Government of Russia is taking meaningful steps to limit major supply contracts and to curtail the transfer of technology and technological expertise related to activities referred to in paragraph (1).

AR.02444

(d) Not more than 30 percent of the funds appropriated under this heading may be made available for assistance for any country in the region.

(e) Of the funds appropriated under this heading, not less than $228,000,000 shall be made available for assistance for the Southern Caucasus region: *Provided,* That of the funds made available for the Southern Caucasus region, 17.5 percent should be used for reconstruction and other activities relating to the peaceful resolution of conflicts within the region, especially those in the vicinity of Abkhazia and Nagorno–Karabakh: *Provided further,* That if the Secretary of State after May 30, 1999, determines and reports to the relevant committees of Congress that the full amount of funds that may be made available under the first proviso cannot be effectively utilized, the amount provided may be used for other purposes under this heading: *Provided further,* That of the funds provided under this subsection, 37 percent shall be made available for assistance for Georgia and 35 percent shall be made available for assistance for Armenia: *Provided further,* That of funds made available for Armenia, not less than 12 percent shall be made available for an endowment for the American University in Armenia.

(f) Section 907 of the FREEDOM Support Act shall not apply to—

(1) activities to support democracy or assistance under title V of the FREEDOM Support Act and section 1424 of Public Law 104–201;

(2) any assistance provided by the Trade and Development Agency under section 661 of the Foreign Assistance Act of 1961 (22 U.S.C. 2421);

(3) any activity carried out by a member of the United States and Foreign Commercial Service while acting within his or her official capacity;

(4) any insurance, reinsurance, guarantee, or other assistance provided by the Overseas Private Investment Corporation under title IV of chapter 2 of part I of the Foreign Assistance Act of 1961 (22 U.S.C. 2191 et seq.);

(5) any financing provided under the Export–Import Bank Act of 1945; or

(6) humanitarian assistance.

(g) Of the funds appropriated under this heading, not less than $195,000,000 shall be made available for assistance for Ukraine: *Provided,* That not less than $25,000,000 of such funds should be made available for nuclear reactor safety programs, of which not less than $1,000,000 shall be made available for personnel security initiatives at all nuclear reactor installations: *Provided further,* That 50 percent of the amount made available in this subsection, exclusive of funds made available for nuclear safety and law enforcement reforms, shall be withheld from obligation and expenditure until the Secretary of State reports to the Committees on Appropriations that Ukraine has undertaken significant economic reforms additional to those achieved in fiscal year 1998, and include: (1) reform and effective enforcement of commercial and tax codes; and (2) continued progress on resolution of complaints by United States investors: *Provided further,* That the report in the previous proviso shall be provided 120 days after the date of enactment of this Act: *Provided further,* That for the purposes of the agreement with Ukraine submitted to the Congress under section 123 of the Atomic Energy Act of 1954, as amended, the requirement to submit the agreement and related documents to the Congress and the appropriate congressional committees for the periods described in that Act shall be deemed satisfied upon the enactment of this Act.

(h) The Coordinator for Assistance to the New Independent States of the Former Soviet Union shall inform the Committees on Appropriations prior to the obligation of funds made available under this heading for a United States national lab to administer nuclear safety activities if the management costs exceed 9 percent of the costs associated with the program or activity.

INDEPENDENT AGENCY

PEACE CORPS

For expenses necessary to carry out the provisions of the Peace Corps Act (75 Stat. 612), $240,000,000, including the purchase of not to exceed five passenger motor vehicles for administrative purposes for use outside of the United States: *Provided,* That none of the funds appropriated under this heading shall be used to pay for abortions: *Provided further,* That funds appropriated under this heading shall remain available until September 30, 2000.

DEPARTMENT OF STATE

INTERNATIONAL NARCOTICS CONTROL AND LAW ENFORCEMENT

For necessary expenses to carry out section 481 of the Foreign Assistance Act of 1961, $261,000,000: *Provided,* That none of the funds under this heading may be made available to establish or operate an International Law Enforcement Academy for the Western Hemisphere outside the United States: *Provided further,* That in addition to any funds previously made available for an International Law Enforcement Academy for the Western Hemisphere, not less than $5,000,000 should be made available to establish and operate the International Law Enforcement Academy for the Western Hemisphere at the deBremond Training Center in Roswell, New Mexico: *Provided further,* That during fiscal year 1999, the Department of State may also use the authority of section 608 of the Foreign Assistance Act of 1961, without regard to its restrictions, to receive excess property from an agency of the United States Government for the purpose of providing it to a foreign country under chapter 8 of part I of that Act subject to the regular notification procedures of the Committees on Appropriations.

## MIGRATION AND REFUGEE ASSISTANCE

For expenses, not otherwise provided for, necessary to enable the Secretary of State to provide, as authorized by law, a contribution to the International Committee of the Red Cross, assistance to refugees, including contributions to the International Organization for Migration and the United Nations High Commissioner for Refugees, and other activities to meet refugee and migration needs; salaries and expenses of personnel and dependents as authorized by the Foreign Service Act of 1980; allowances as authorized by sections 5921 through 5925 of title 5, United States Code; purchase and hire of passenger motor vehicles; and services as authorized by section 3109 of title 5, United States Code, $640,000,000: *Provided,* That not more than $13,000,000 shall be available for administrative expenses: *Provided further,* That not less than $70,000,000 shall be made available for refugees from the former Soviet Union and Eastern Europe and other refugees resettling in Israel.

## UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For necessary expenses to carry out the provisions of section 2(c) of the Migration and Refugee Assistance Act of 1962, as amended (22 U.S.C. 260(c)), $30,000,000, to remain available until expended: *Provided,* That the funds made available under this heading are appropriated notwithstanding the provisions contained in section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 which would limit the amount of funds which could be appropriated for this purpose.

## NONPROLIFERATION, ANTI–TERRORISM, DEMINING AND RELATED PROGRAMS

For necessary expenses for nonproliferation, anti-terrorism and related programs and activities, $198,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance, section 504 of the FREEDOM Support Act for the Nonproliferation and Disarmament Fund, section 23 of the Arms Export Control Act or the Foreign Assistance Act of 1961 for demining activities, the clearance of unexploded ordnance, and related activities, notwithstanding any other provision of law, including activities implemented through nongovernmental and international organizations, section 301 of the Foreign Assistance Act of 1961 for a voluntary contribution to the International Atomic Energy Agency (IAEA) and a voluntary contribution to the Korean Peninsula Energy Development Organization (KEDO), and for a United States contribution to the Comprehensive Nuclear Test Ban Treaty Preparatory Commission: Provided, That the Secretary of State shall inform the Committees on Appropriations at least twenty days prior to the obligation of funds for the Comprehensive Nuclear Test Ban Treaty Preparatory Commission: *Provided further,* That of this amount not to exceed $15,000,000, to remain available until expended, may be made available for the Nonproliferation and Disarmament Fund, notwithstanding any other provision of law, to promote bilateral and multilateral activities relating to nonproliferation and disarmament: *Provided further,* That such funds may also be used for such countries other than the New Independent States of the former Soviet Union and international organizations when it is in the national security interest of the United States to do so: *Provided further,* That such funds shall be subject to the regular notification procedures of the Committees on Appropriations: *Provided further,* That of the funds appropriated under this heading not less than $35,000,000 should be made available for demining, clearance of unexploded ordnance, and related activities: *Provided further,* That of the funds made available for demining and related activities, not to exceed $500,000, in addition to funds otherwise available for such purposes, may be used for expenses related to the operation and management of the demining program: *Provided further,* That funds appropriated under this heading may be made available for the International Atomic Energy Agency only if the Secretary of State determines (and so reports to the Congress) that Israel is not being denied its right to participate in the activities of that Agency.

## DEPARTMENT OF THE TREASURY

## DEBT RESTRUCTURING

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of modifying direct loans and loan guarantees, as the President may determine, for which funds have been appropriated or otherwise made available for programs within the International Affairs Budget Function 150, including the cost of selling, reducing, or canceling amounts, through debt buybacks and swaps, owed to the United States as a result of concessional loans made to eligible Latin American and Caribbean countries, pursuant to part IV of the Foreign Assistance Act of 1961; of modifying concessional credit agreements with least developed countries, as authorized under section 411 of the Agricultural Trade Development and Assistance Act of 1954, as amended; and concessional loans, guarantees and credit agreements with any country in sub-Saharan Africa, as authorized under section 572 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 (Public Law 100–461); and of modifying any obligation, or portion of such obligation for Latin American countries to pay for purchases of United States agricultural commodities guaranteed by the Commodity Credit Corporation under export credit guarantee programs authorized pursuant to section 5(f) of the Commodity Credit Corporation Charter Act of June 29, 1948, as amended, section 4(b) of the Food for Peace Act of 1966, as amended (Public Law 89–808), or section 202 of the Agricultural Trade Act of 1978, as amended (Public Law 95–501), $33,000,000, to remain available until expended: *Provided,* That not to exceed $2,900,000 of such funds may be used for implementation of improvements in the foreign credit reporting system of the United States Government: *Provided further,* That the authority provided by section 572 of Public Law 100–461 may be exercised only with respect to countries that are eligible to borrow from the International Development Association, but not from the International Bank for Reconstruction and Development, commonly referred to as "IDA-only" countries: *Provided further,* That the authorities and appropriation under this heading shall also satisfy the requirement of section 808(a)(3) of part V of the Foreign Assistance Act, as amended, for the purpose of debt buybacks and swaps which incur no costs (as defined under section 502(5) of the Federal Credit Reform Act of 1990) in fiscal year 1999.

## INTERNATIONAL AFFAIRS TECHNICAL ASSISTANCE

For necessary expenses to carry out Department of the Treasury international affairs technical assistance activities, $1,500,000, to remain available until expended, which shall be available, pursuant to section 589 of this Act, for economic technical assistance and for related programs.

## UNITED STATES COMMUNITY ADJUSTMENT AND INVESTMENT PROGRAM

For the United States Community Adjustment and Investment Program authorized by section 543 of the North American Free Trade Agreement Implementation Act, $10,000,000 to remain available until September 30, 2000: Provided, That the Secretary may transfer such funds to the North American Development Bank and/or to one or more Federal agencies for the purpose of enabling the Bank or such Federal agencies to assist in carrying out the program by providing technical assistance, grants, loans, loan guarantees, and other financial subsidies endorsed by the inter-agency finance committee established by section 7 of Executive Order 12916: Provided further, That no portion of such funds may be transferred to the Bank unless the Secretary shall have first entered into an agreement with the Bank that provides that any such funds may not be used for the Bank's administrative expenses: Provided further, That any funds transferred to the Bank under this head will be in addition to the 10 percent of the paid-in capital paid to the Bank by the United States referred to in section 543 of the Act: Provided further, That any funds transferred to any Federal agency under this head will be in addition to amounts otherwise provided to such agency: Provided further, That any funds transferred to an agency under this head shall be subject to the same terms and conditions as the account to which transferred.

## TITLE III—MILITARY ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

### INTERNATIONAL MILITARY EDUCATION AND TRAINING

For necessary expenses to carry out the provisions of section 541 of the Foreign Assistance Act of 1961, $50,000,000 of which up to $1,000,000 may remain avail able until expended: *Provided,* That the civilian personnel for whom military education and training may be provided under this heading may include civilians who are not members of a government whose participation would contribute to improved civil-military relations, civilian control of the military, or respect for human rights:

*Provided further,* That funds appropriated under this heading for grant financed military education and training for Indonesia and Guatemala may only be available for expanded international military education and training and funds made available for Guatemala may only be provided through the regular notification procedures of the Committees on Appropriations: *Provided further,* That none of the funds appropriated under this heading may be made available to support grant financed military education and training at the School of the Americas unless the Secretary of Defense certifies that the instruction and training provided by the School of the Americas is fully consistent with training and doctrine, particularly with respect to the observance of human rights, provided by the Department of Defense to United States military students at Department of Defense institutions whose primary purpose is to train United States military personnel.

## FOREIGN MILITARY FINANCING PROGRAM

For expenses necessary for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $3,330,000,000: *Provided,* That of the funds appropriated under this heading, not less than $1,860,000,000 shall be available for grants only for Israel, and not less than $1,300,000,000 shall be made available for grants only for Egypt: *Provided further,* That the funds appropriated by this paragraph for Israel shall be disbursed within thirty days of enactment of this Act or by October 31, 1998, whichever is later: *Provided further,* That to the extent that the Government of Israel requests that funds be used for such purposes, grants made available for Israel by this paragraph shall, as agreed by Israel and the United States, be available for advanced weapons systems, of which not less than $490,000,000 shall be available for the procurement in Israel of defense articles and defense services, including research and development: *Provided further,* That of the funds appropriated by this paragraph, not less than $45,000,000 should be available for assistance for Jordan: *Provided further,* That during fiscal year 1999 the President is authorized to, and shall, direct drawdowns of defense articles from the stocks of the Department of Defense, defense services of the Department of Defense, and military education and training of an aggregate value of not less than $25,000,000 under the authority of this proviso for Jordan for the purposes of part II of the Foreign Assistance Act of 1961: *Provided further,* That section 506(c) of the Foreign Assistance Act of 1961 shall apply, and section 632(d) of the Foreign Assistance Act of 1961 shall not apply, to any such drawdown: *Provided further,* That none of the funds made available under this heading shall be available for any non-NATO country participating in the Partnership for Peace Program except through the regular notification procedures of the Committees on Appropriations: *Provided further,* That of the funds appropriated by this paragraph, not less than $7,000,000 shall be made available for assistance for Tunisia: *Provided further,* That during fiscal year 1999, the President is authorized to, and shall, direct the drawdowns of defense articles from the stocks of the Department of Defense, defense services of the Department of Defense, and military education and training of an aggregate value of not less than $5,000,000 under the authority of this proviso for Tunisia for the purposes of part II of the Foreign Assistance Act of 1961 and any amount so directed shall count toward meeting the earmark in the previous proviso: *Provided further,* That section 506(c) of the Foreign Assistance Act of 1961 shall apply and section 632(d) of the Foreign Assistance Act of 1961 shall not apply to any such drawdown: *Provided further,* That funds appropriated by this paragraph shall be nonrepayable notwithstanding any requirement in section 23 of the Arms Export Control Act: *Provided further,* That funds made available under this heading shall be obligated upon apportionment in accordance with paragraph (5)(C) of title 31, United States Code, section 1501(a).

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of direct loans authorized by section 23 of the Arms Export Control Act as follows: cost of direct loans, $20,000,000: *Provided,* That these funds are available to subsidize gross obligations for the principal amount of direct loans of not to exceed $167,000,000.

None of the funds made available under this heading shall be available to finance the procurement of defense articles, defense services, or design and construction services that are not sold by the United States Government under the Arms Export Control Act unless the foreign country proposing to make such procurements has first signed an agreement with the United States Government specifying the conditions under which such procurements may be financed with such funds: *Provided,* That all country and funding level increases in allocations shall be submitted through the regular notification procedures of section 515 of this Act: *Provided further,* That none of the funds appropriated under this heading shall be available for assistance for Sudan and Liberia: *Provided further,* That funds made available under this heading may be used, notwithstanding any other provision of law, for demining, the clearance of unexploded ordnance, and related activities, and may include activities implemented through nongovernmental and international organizations: *Provided further,* That none of the funds under this heading shall be available for assistance for Guatemala: *Provided further,* That only those countries for which assistance was justified for the "Foreign Military Sales Financing Program" in the fiscal year 1989 congressional presentation for security assistance programs may utilize funds made available under this heading for procurement of defense articles, defense services or design and construction

services that are not sold by the United States Government under the Arms Export Control Act: *Provided further,* That, subject to the regular notification procedures of the Committees on Appropriations, funds made available under this heading for the cost of direct loans may also be used to supplement the funds available under this heading for grants, and funds made available under this heading for grants may also be used to supplement the funds available under this heading for the cost of direct loans: *Provided further,* That funds appropriated under this heading shall be expended at the minimum rate necessary to make timely payment for defense articles and services: *Provided further,* That not more than $29,910,000 of the funds appropriated under this heading may be obligated for necessary expenses, including the purchase of passenger motor vehicles for replacement only for use outside of the United States, for the general costs of administering military assistance and sales: *Provided further,* That not more than $340,000,000 of funds realized pursuant to section 21(e)(1)(A) of the Arms Export Control Act may be obligated for expenses incurred by the Department of Defense during fiscal year 1999 pursuant to section 43(b) of the Arms Export Control Act, except that this limitation may be exceeded only through the regular notification procedures of the Committees on Appropriations.

## PEACEKEEPING OPERATIONS

For necessary expenses to carry out the provisions of section 551 of the Foreign Assistance Act of 1961, $76,500,000: *Provided,* That none of the funds appropriated under this heading shall be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

## TITLE IV—MULTILATERAL ECONOMIC ASSISTANCE

## FUNDS APPROPRIATED TO THE PRESIDENT

## INTERNATIONAL FINANCIAL INSTITUTIONS

## CONTRIBUTION TO THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT

## GLOBAL ENVIRONMENT FACILITY

For payment to the International Bank for Reconstruction and Development by the Secretary of the Treasury, for the United States contribution to the Global Environment Facility (GEF), $192,500,000 to remain available until expended for contributions previously due: Provided, That such funds shall be subject to the regular notification procedures of the Committees on Appropriations.

## CONTRIBUTION TO THE INTERNATIONAL DEVELOPMENT ASSOCIATION

For payment to the International Development Association (IDA) by the Secretary of the Treasury, $800,000,000, to remain available until expended: *Provided,* That none of these funds may be obligated or expended until the Secretary of the Treasury certifies that a procedure has been established for the Comptroller General of the United States to be provided full access to: (1) the financial and related records of the International Bank for Reconstruction and Development and IDA for the purposes of conducting audits of current loans and financial assistance provided by these institutions; and (2) management personnel manuals, procedures, and policy guidelines: *Provided further,* That following the review conducted in the previous proviso, the Comptroller General shall report to the Committees on Appropriations on the results of the audit and recommendations to improve institutional financial and personnel procedures, especially regarding the protection of individuals alleging mismanagement, fraud, or abuses: *Provided further,* That at least ten days prior to the obligation of funds appropriated under this heading the Secretary of Treasury shall report to the Committees on Appropriations of his intent to obligate such funds.

## CONTRIBUTION TO THE INTER–AMERICAN DEVELOPMENT BANK

For payment to the Inter–American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in share portion of the increase in capital stock, $25,610,667.

## CONTRIBUTION TO THE INTER–AMERICAN DEVELOPMENT BANK

## FUND FOR SPECIAL OPERATIONS

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For payment to the Inter–American Bank by the Secretary of the Treasury, for the United States share of the increase in resources for the Fund for Special Operations, $21,152,000, to remain available until expended for contributions previously due.

## LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Inter–American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $1,503,718,910.

## CONTRIBUTION TO THE ENTERPRISE FOR AMERICAS MULTILATERAL INVESTMENT FUND

For payment to the Enterprise for the Americas Multilateral Investment Fund by the Secretary of the Treasury, for the United States contribution to the Fund, $50,000,000 to remain available until expended for contributions previously due.

## CONTRIBUTION TO THE ASIAN DEVELOPMENT BANK

For payment to the Asian Development Bank by the Secretary of the Treasury for the United States share of the paid-in portion of the increase in capital stock, $13,221,596, to remain available until expended.

## LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Asian Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $647,858,204.

## CONTRIBUTION TO THE ASIAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increases in resources of the Asian Development Fund, as authorized by the Asian Development Bank Act, as amended (Public Law 89–369), $210,000,000, to remain available until expended, of which $187,000,000 shall be available for contributions previously due.

## CONTRIBUTION TO THE AFRICAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increase in resources of the African Development Fund, $128,000,000, to remain available until expended, of which $88,300,000 shall be available for contributions previously due.

## CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the European Bank for Reconstruction and Development by the Secretary of the Treasury, $35,778,717, for the United States share of the paid-in portion of the increase in capital stock, to remain available until expended.

## LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the European Bank for Reconstruction and Development may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $123,237,803.

## INTERNATIONAL ORGANIZATIONS AND PROGRAMS

For necessary expenses to carry out the provisions of section 301 of the Foreign Assistance Act of 1961, and of section 2 of the United Nations Environment Program Participation Act of 1973, $187,000,000: *Provided,* That none of the funds appropriated under this heading shall be made available for the United Nations Fund for Science and Technology: *Provided further,* That none of the funds appropriated under this heading may be made available for the United Nations Population Fund (UNFPA): *Provided further,* That not less than $5,000,000 should be made available to the World Food Program: *Provided further,* That none of the funds made available under this heading, may be provided to the Climate Stabilization Fund until fifteen days after the Department of State provides a report to the Committees on Foreign Relations and Appropriations in the Senate and the Committees on International Relations and Appropriations in the House of Representatives detailing the number of Fund employees and associated salaries and the fiscal year 1998 and 1999 Fund activities, programs or projects and associated costs: *Provided further,* That none of the funds appropriated under this heading may be made available to the Korean Peninsula Energy Development Organization (KEDO) or the International Atomic Energy Agency (IAEA).

## TITLE V—GENERAL PROVISIONS

### OBLIGATIONS DURING LAST MONTH OF AVAILABILITY

SEC. 501. Except for the appropriations entitled "International Disaster Assistance", and "United States Emergency Refugee and Migration Assistance Fund", not more than 15 percent of any appropriation item made available by this Act shall be obligated during the last month of availability.

### PROHIBITION OF BILATERAL FUNDING FOR INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 502. Notwithstanding section 614 of the Foreign Assistance Act of 1961, none of the funds contained in title II of this Act may be used to carry out the provisions of section 209(d) of the Foreign Assistance Act of 1961.

### LIMITATION ON RESIDENCE EXPENSES

SEC. 503. Of the funds appropriated or made available pursuant to this Act, not to exceed $126,500 shall be for official residence expenses of the Agency for International Development during the current fiscal year: *Provided,* That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars.

### LIMITATION ON EXPENSES

SEC. 504. Of the funds appropriated or made available pursuant to this Act, not to exceed $5,000 shall be for entertainment expenses of the Agency for International Development during the current fiscal year.

### LIMITATION ON REPRESENTATIONAL ALLOWANCES

SEC. 505. Of the funds appropriated or made available pursuant to this Act, not to exceed $95,000 shall be available for representation allowances for the Agency for International Development during the current fiscal year: *Provided,* That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars: *Provided further,* That of the funds made available by this Act for general costs of administering military assistance and sales under the heading "Foreign Military Financing Program", not to exceed $2,000 shall be available for entertainment expenses and not to exceed $50,000 shall be available for representation allowances: *Provided further,* That of the funds made available by this Act under the heading "International Military Education and Training", not to exceed $50,000 shall be available for entertainment allowances: *Provided further,* That of the funds made available by this Act for the Inter–American Foundation, not to exceed $2,000 shall be available for entertainment and representation allowances: *Provided further,* That of the funds made available by this Act for the Peace Corps, not to exceed a total of $4,000 shall be available for entertainment expenses: *Provided further,* That of the funds made available by this Act under the heading "Trade and Development Agency", not to exceed $2,000 shall be available for representation and entertainment allowances.

### PROHIBITION ON FINANCING NUCLEAR GOODS

SEC. 506. None of the funds appropriated or made available (other than funds for "Nonproliferation, Antiterrorism, Demining and Related Programs") pursuant to this Act, for carrying out the Foreign Assistance Act of 1961, may be used, except for purposes of nuclear safety, to finance the export of nuclear equipment, fuel, or technology.

### PROHIBITION AGAINST DIRECT FUNDING FOR CERTAIN COUNTRIES

SEC. 507. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance or reparations to Cuba, Iraq, Libya, North Korea, Iran, Sudan, or Syria: *Provided,* That for purposes of this section, the prohibition on obligations or expenditures shall include direct loans, credits, insurance and guarantees of the Export–Import Bank or its agents.

### MILITARY COUPS

SEC. 508. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance to any country whose duly elected head of government is deposed by military coup or decree: *Provided,* That assistance may be resumed to such country if the President determines and reports to the Committees on Appropriations that subsequent to the termination of assistance a democratically elected government has taken office.

### TRANSFERS BETWEEN ACCOUNTS

SEC. 509. None of the funds made available by this Act may be obligated under an appropriation account to which they were not appropriated, except for transfers specifically provided for in this Act, unless the President, prior to the exercise of any authority contained in the Foreign Assistance Act of 1961 to transfer funds, consults with and provides a written policy justification to the Committees on Appropriations of the House of Representatives and the Senate: *Provided,* That the exercise of such authority shall be subject to the regular notification procedures of the Committees on Appropriations.

DEOBLIGATION/REOBLIGATION AUTHORITY

SEC. 510. (a) Amounts certified pursuant to section 1311 of the Supplemental Appropriations Act, 1955, as having been obligated against appropriations heretofore made under the authority of the Foreign Assistance Act of 1961 for the same general purpose as any of the headings under title II of this Act are, if deobligated, hereby continued available for the same period as the respective appropriations under such headings or until September 30, 1999, whichever is later, and for the same general purpose, and for countries within the same region as originally obligated: *Provided,* That the Appropriations Committees of both Houses of the Congress are notified 15 days in advance of the reobligation of such funds in accordance with regular notification procedures of the Committees on Appropriations.

(b) Obligated balances of funds appropriated to carry out section 23 of the Arms Export Control Act as of the end of the fiscal year immediately preceding the current fiscal year are, if deobligated, hereby continued available during the current fiscal year for the same purpose under any authority applicable to such appropriations under this Act: *Provided,* That the authority of this subsection may not be used in fiscal year 1999.

AVAILABILITY OF FUNDS

SEC. 511. No part of any appropriation contained in this Act shall remain available for obligation after the expiration of the current fiscal year unless expressly so provided in this Act: *Provided,* That funds appropriated for the purposes of chapters 1, 8, and 11 of part I, section 667, and chapter 4 of part II of the Foreign Assistance Act of 1961, as amended, and funds provided under the heading "Assistance for Eastern Europe and the Baltic States", shall remain available until expended if such funds are initially obligated before the expiration of their respective periods of availability contained in this Act: *Provided further,* That, notwithstanding any other provision of this Act, any funds made available for the purposes of chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated or obligated for cash disbursements in order to address balance of payments or economic policy reform objectives, shall remain available until expended: *Provided further,* That the report required by section 653(a) of the Foreign Assistance Act of 1961 shall designate for each country, to the extent known at the time of submission of such report, those funds allocated for cash disbursement for balance of payment and economic policy reform purposes.

LIMITATION ON ASSISTANCE TO COUNTRIES IN DEFAULT

SEC. 512. No part of any appropriation contained in this Act shall be used to furnish assistance to any country which is in default during a period in excess of one calendar year in payment to the United States of principal or interest on any loan made to such country by the United States pursuant to a program for which funds are appropriated under this Act: *Provided,* That this section and section 620(q) of the Foreign Assistance Act of 1961 shall not apply to funds made available in this Act or during the current fiscal year for Nicaragua, Brazil, Liberia, and for any narcotics-related assistance for Colombia, Bolivia, and Peru authorized by the Foreign Assistance Act of 1961 or the Arms Export Control Act.

COMMERCE AND TRADE

SEC. 513. (a) None of the funds appropriated or made available pursuant to this Act for direct assistance and none of the funds otherwise made available pursuant to this Act to the Export–Import Bank and the Overseas Private Investment Corporation shall be obligated or expended to finance any loan, any assistance or any other financial commitments for establishing or expanding production of any commodity for export by any country other than the United States, if the commodity is likely to be in surplus on world markets at the time the resulting productive capacity is expected to become operative and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity: *Provided,* That such prohibition shall not apply to the Export–Import Bank if in the judgment of its Board of Directors the benefits to industry and employment in the United States are likely to outweigh the injury to United States producers of the same, similar, or competing commodity, and the Chairman of the Board so notifies the Committees on Appropriations.

(b) None of the funds appropriated by this or any other Act to carry out chapter 1 of part I of the Foreign Assistance Act of 1961 shall be available for any testing or breeding feasibility study, variety improvement or introduction, consultancy, publication, conference, or training in connection with the growth or production in a foreign country of an agricultural commodity for export which would compete with a similar commodity grown or produced in the United States: *Provided,* That this subsection shall not prohibit—

   (1) activities designed to increase food security in developing countries where such activities will not have a significant impact in the export of agricultural commodities of the United States; or

   (2) research activities intended primarily to benefit American producers.

## SURPLUS COMMODITIES

<< 22 USCA § 262h NOTE >>

SEC. 514. (a) The Secretary of the Treasury shall instruct the United States Executive Directors of the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Inter–American Development Bank, the International Monetary Fund, the Asian Development Bank, the Inter–American Investment Corporation, the North American Development Bank, the European Bank for Reconstruction and Development, the African Development Bank, and the African Development Fund to use the voice and vote of the United States to oppose any assistance by these institutions, using funds appropriated or made available pursuant to this Act, for the production or extraction of any commodity or mineral for export, if it is in surplus on world markets and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity.

(b) The Secretary of the Treasury should instruct the United States executive directors of international financial institutions listed in subsection (a) of this section to use the voice and vote of the United States to support the purchase of American produced agricultural commodities with funds appropriated or made available pursuant to this Act.

## NOTIFICATION REQUIREMENTS

SEC. 515. (a) For the purposes of providing the executive branch with the necessary administrative flexibility, none of the funds made available under this Act for "Child Survival and Disease Programs Fund", "Development assistance", "International Organizations and Programs", "Trade and Development Agency", "International narcotics control and law enforcement", "Assistance for Eastern Europe and the Baltic States", "Assistance for the New Independent States of the Former Soviet Union", "Economic Support Fund", "Peacekeeping operations", "Operating expenses of the Agency for International Development", "Operating expenses of the Agency for International Development Office of Inspector General", "Non-proliferation, anti-terrorism, demining and related programs", "Foreign Military Financing Program", "International military education and training", "Peace Corps", "Migration and refugee assistance", shall be available for obligation for activities, programs, projects, type of materiel assistance, countries, or other operations not justified or in excess of the amount justified to the Appropriations Committees for obligation under any of these specific headings unless the Appropriations Committees of both Houses of Congress are previously notified 15 days in advance: *Provided,* That the President shall not enter into any commitment of funds appropriated for the purposes of section 23 of the Arms Export Control Act for the provision of major defense equipment, other than conventional ammunition, or other major defense items defined to be aircraft, ships, missiles, or combat vehicles, not previously justified to Congress or 20 percent in excess of the quantities justified to Congress unless the Committees on Appropriations are notified 15 days in advance of such commitment: *Provided further,* That this section shall not apply to any reprogramming for an activity, program, or project under chapter 1 of part I of the Foreign Assistance Act of 1961 of less than 10 percent of the amount previously justified to the Congress for obligation for such activity, program, or project for the current fiscal year: *Provided further,* That the requirements of this section or any similar provision of this Act or any other Act, including any prior Act requiring notification in accordance with the regular notification procedures of the Committees on Appropriations, may be waived if failure to do so would pose a substantial risk to human health or welfare: *Provided further,* That in case of any such waiver, notification to the Congress, or the appropriate congressional committees, shall be provided as early as practicable, but in no event later than three days after taking the action to which such notification requirement was applicable, in the context of the circumstances necessitating such waiver: *Provided further,* That any notification provided pursuant to such a waiver shall contain an explanation of the emergency circumstances.

(b) Drawdowns made pursuant to section 506(a)(2) of the Foreign Assistance Act of 1961 shall be subject to the regular notification procedures of the Committees on Appropriations.

LIMITATION ON AVAILABILITY OF FUNDS FOR INTERNATIONAL ORGANIZATIONS AND PROGRAMS

<< 22 USCA § 2227 >>

SEC. 516. Subject to the regular notification procedures of the Committees on Appropriations, funds appropriated under this Act or any previously enacted Act making appropriations for foreign operations, export financing, and related programs, which are returned or not made available for organizations and programs because of the implementation of section 307(a) of the Foreign Assistance Act of 1961, shall remain available for obligation until September 30, 2000: *Provided,* That section 307(a) of the Foreign Assistance Act of 1961, is amended by inserting before the period at the end thereof ", or at the discretion of the President, Communist countries listed in section 620(f) of this Act".

NEW INDEPENDENT STATES OF THE FORMER SOVIET UNION

SEC. 517. (a) None of the funds appropriated under the heading "Assistance for the New Independent States of the Former Soviet Union" shall be made available for assistance for a Government of the New Independent States of the former Soviet Union—

(1) unless that Government is making progress in implementing comprehensive economic reforms based on market principles, private ownership, respect for commercial contracts, and equitable treatment of foreign private investment; and

(2) if that Government applies or transfers United States assistance to any entity for the purpose of expropriating or seizing ownership or control of assets, investments, or ventures.

Assistance may be furnished without regard to this subsection if the President determines that to do so is in the national interest.

<< 22 USCA § 5814 NOTE >>

(b) None of the funds appropriated under the heading "Assistance for the New Independent States of the Former Soviet Union" shall be made available for assistance for a Government of the New Independent States of the former Soviet Union if that government directs any action in violation of the territorial integrity or national sovereignty of any other new independent state, such as those violations included in the Helsinki Final Act: *Provided,* That such funds may be made available without regard to the restriction in this subsection if the President determines that to do so is in the national security interest of the United States.

(c) None of the funds appropriated under the heading "Assistance for the New Independent States of the Former Soviet Union" shall be made available for any state to enhance its military capability: *Provided,* That this restriction does not apply to demilitarization, demining or nonproliferation programs.

(d) Funds appropriated under the heading "Assistance for the New Independent States of the Former Soviet Union" shall be subject to the regular notification procedures of the Committees on Appropriations.

(e) Funds made available in this Act for assistance to the New Independent States of the former Soviet Union shall be subject to the provisions of section 117 (relating to environment and natural resources) of the Foreign Assistance Act of 1961.

(f) Funds appropriated in this or prior appropriations Acts that are or have been made available for an Enterprise Fund in the New Independent States of the Former Soviet Union may be deposited by such Fund in interest-bearing accounts prior to the disbursement of such funds by the Fund for program purposes. The Fund may retain for such program purposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

(g) In issuing new task orders, entering into contracts, or making grants, with funds appropriated in this Act or prior appropriations Acts under the heading "Assistance for the New Independent States of the Former Soviet Union" for projects or activities that have as one of their primary purposes the fostering of private sector development, the Coordinator for United States Assistance to the New Independent States and the implementing agency shall encourage the participation of and give significant weight to contractors and grantees who propose investing a significant amount of their own resources (including volunteer services and in-kind contributions) in such projects and activities.

(h)(1) WITHHOLDING OF ASSISTANCE.—None of the funds appropriated by this Act may be made available for assistance for the Government of the Russian Federation, after 180 days from the date of enactment of this Act, until agreement has been reached that assistance provided with funds appropriated by this Act will not be subject to customs duties or that legislation has been enacted and is in force that exempts such assistance from being subject to customs duties.

(2) WAIVER.—Notwithstanding paragraph (1), assistance may be provided for the Government of the Russian Federation if the President determines that significant progress has been made on reaching an agreement, or enacting and enforcing legislation, that meets the objectives of this section to provide exemption from customs duties for assistance furnished under this Act.

#### PROHIBITION ON FUNDING FOR ABORTIONS AND INVOLUNTARY STERILIZATION

SEC. 518. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for any biomedical research which relates in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be obligated or expended for any country or organization if the President certifies that the use of these funds by any such country or organization would violate any of the above provisions related to abortions and involuntary sterilizations: *Provided,* That none of the funds made available under this Act may be used to lobby for or against abortion.

#### EXCESS DEFENSE ARTICLES FOR CENTRAL EUROPEAN COUNTRIES

SEC. 519. Section 105 of Public Law 104–164 (110 Stat. 1427) is amended by striking "1996 and 1997" and inserting "1999 and 2000".

#### SPECIAL NOTIFICATION REQUIREMENTS

SEC. 520. None of the funds appropriated by this Act shall be obligated or expended for Colombia, Honduras, Haiti, Liberia, Pakistan, Serbia, Sudan, or the Democratic Republic of Congo except as provided through the regular notification procedures of the Committees on Appropriations.

#### DEFINITION OF PROGRAM, PROJECT, AND ACTIVITY

SEC. 521. For the purpose of this Act, "program, project, and activity" shall be defined at the appropriations Act account level and shall include all appropriations and authorizations Acts earmarks, ceilings, and limitations with the exception that for the following accounts: Economic Support Fund and Foreign Military Financing Program, "program, project, and activity" shall also be considered to include country, regional, and central program level funding within each such account; for the development assistance accounts of the Agency for International Development "program, project, and activity" shall also be considered to include central program level funding, either as: (1) justified to the Congress; or (2) allocated by the executive branch in accordance with a report, to be provided to the Committees on Appropriations within 30 days of enactment of this Act, as required by section 653(a) of the Foreign Assistance Act of 1961.

#### CHILD SURVIVAL, AIDS, AND OTHER ACTIVITIES

SEC. 522. Up to $10,000,000 of the funds made available by this Act for assistance for family planning, health, child survival, basic education, AIDS and other infectious diseases, may be used to reimburse United States Government agencies, agencies of State governments, institutions of higher learning, and private and voluntary organizations for the full cost of individuals (including for the personal services of such individuals) detailed or assigned to, or contracted by, as the case may be, the Agency for International Development for the purpose of carrying out family planning activities, child survival, and basic education activities, and activities relating to research on, and the prevention, treatment and control of acquired immune deficiency syndrome or other diseases in developing countries: *Provided,* That funds appropriated by this Act that are made available for child survival activities or disease programs including activities relating to research on, and the prevention, treatment and control of, acquired immune deficiency syndrome may be made available notwithstanding any provision of law that restricts assistance to foreign countries: *Provided further,* That funds appropriated under title II of this Act may be made available

AR.02455

pursuant to section 301 of the Foreign Assistance Act of 1961 if a primary purpose of the assistance is for child survival and related programs: *Provided further,* That funds appropriated by this Act that are made available for family planning activities may be made available notwithstanding section 512 of this Act and section 620(q) of the Foreign Assistance Act of 1961.

### PROHIBITION AGAINST INDIRECT FUNDING TO CERTAIN COUNTRIES

SEC. 523. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated to finance indirectly any assistance or reparations to Cuba, Iraq, Libya, Iran, Syria, North Korea, or the People's Republic of China, unless the President of the United States certifies that the withholding of these funds is contrary to the national interest of the United States.

### RECIPROCAL LEASING

<< 22 USCA § 2796 >>

SEC. 524. Section 61(a) of the Arms Export Control Act is amended by striking out "1998" and inserting in lieu thereof "the current fiscal year".

### NOTIFICATION ON EXCESS DEFENSE EQUIPMENT

SEC. 525. Prior to providing excess Department of Defense articles in accordance with section 516(a) of the Foreign Assistance Act of 1961, the Department of Defense shall notify the Committees on Appropriations to the same extent and under the same conditions as are other committees pursuant to subsection (c) of that section: *Provided,* That before issuing a letter of offer to sell excess defense articles under the Arms Export Control Act, the Department of Defense shall notify the Committees on Appropriations in accordance with the regular notification procedures of such Committees: *Provided further,* That such Committees shall also be informed of the original acquisition cost of such defense articles.

### AUTHORIZATION REQUIREMENT

SEC. 526. Funds appropriated by this Act may be obligated and expended notwithstanding section 10 of Public Law 91–672 and section 15 of the State Department Basic Authorities Act of 1956.

### DEMOCRACY IN CHINA

SEC. 527. Notwithstanding any other provision of law that restricts assistance to foreign countries, funds appropriated by this Act for "Economic Support Fund" may be made available to provide general support for nongovernmental organizations located outside the People's Republic of China that have as their primary purpose fostering democracy in that country, and for activities of nongovernmental organizations located outside the People's Republic of China to foster democracy in that country: *Provided,* That none of the funds made available for activities to foster democracy in the People's Republic of China may be made available for assistance to the government of that country.

### PROHIBITION ON BILATERAL ASSISTANCE TO TERRORIST COUNTRIES

SEC. 528. (a) Notwithstanding any other provision of law, funds appropriated for bilateral assistance under any heading of this Act and funds appropriated under any such heading in a provision of law enacted prior to enactment of this Act, shall not be made available to any country which the President determines—

(1) grants sanctuary from prosecution to any individual or group which has committed an act of international terrorism, or

(2) otherwise supports international terrorism.

(b) The President may waive the application of subsection (a) to a country if the President determines that national security or humanitarian reasons justify such waiver. The President shall publish each waiver in the Federal Register and, at least fifteen days before the waiver takes effect, shall notify the Committees on Appropriations of the waiver (including the justification for the waiver) in accordance with the regular notification procedures of the Committees on Appropriations.

### COMMERCIAL LEASING OF DEFENSE ARTICLES

<< 22 USCA § 2763 NOTE >>

AR.02456

SEC. 529. Notwithstanding any other provision of law, and subject to the regular notification procedures of the Committees on Appropriations, the authority of section 23(a) of the Arms Export Control Act may be used to provide financing to Israel, Egypt and NATO and major non-NATO allies for the procurement by leasing (including leasing with an option to purchase) of defense articles from United States commercial suppliers, not including Major Defense Equipment (other than helicopters and other types of aircraft having possible civilian application), if the President determines that there are compelling foreign policy or national security reasons for those defense articles being provided by commercial lease rather than by government-to-government sale under such Act.

## COMPETITIVE INSURANCE

SEC. 530. All Agency for International Development contracts and solicitations, and subcontracts entered into under such contracts, shall include a clause requiring that United States insurance companies have a fair opportunity to bid for insurance when such insurance is necessary or appropriate.

## STINGERS IN THE PERSIAN GULF REGION

SEC. 531. Except as provided in section 581 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, the United States may not sell or otherwise make available any Stingers to any country bordering the Persian Gulf under the Arms Export Control Act or chapter 2 of part II of the Foreign Assistance Act of 1961.

## DEBT–FOR–DEVELOPMENT

SEC. 532. In order to enhance the continued participation of nongovernmental organizations in economic assistance activities under the Foreign Assistance Act of 1961, including endowments, debt-for-development and debt-for-nature exchanges, a nongovernmental organization which is a grantee or contractor of the Agency for International Development may place in interest bearing accounts funds made available under this Act or prior Acts or local currencies which accrue to that organization as a result of economic assistance provided under title II of this Act and any interest earned on such investment shall be used for the purpose for which the assistance was provided to that organization.

## SEPARATE ACCOUNTS

<< 22 USCA § 2362 NOTE >>

SEC. 533. (a) SEPARATE ACCOUNTS FOR LOCAL CURRENCIES.—(1) If assistance is furnished to the government of a foreign country under chapters 1 and 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961 under agreements which result in the generation of local currencies of that country, the Administrator of the Agency for International Development shall—

(A) require that local currencies be deposited in a separate account established by that government;

(B) enter into an agreement with that government which sets forth—

(i) the amount of the local currencies to be generated, and

(ii) the terms and conditions under which the currencies so deposited may be utilized, consistent with this section; and

(C) establish by agreement with that government the responsibilities of the Agency for International Development and that government to monitor and account for deposits into and disbursements from the separate account.

<< 22 USCA § 2362 NOTE >>

(2) USES OF LOCAL CURRENCIES.—As may be agreed upon with the foreign government, local currencies deposited in a separate account pursuant to subsection (a), or an equivalent amount of local currencies, shall be used only—

(A) to carry out chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), for such purposes as—

(i) project and sector assistance activities, or

(ii) debt and deficit financing, or

(B) for the administrative requirements of the United States Government.

<< 22 USCA § 2362 NOTE >>

(3) PROGRAMMING ACCOUNTABILITY.—The Agency for International Development shall take all necessary steps to ensure that the equivalent of the local currencies disbursed pursuant to subsection (a)(2)(A) from the separate account established pursuant to subsection (a)(1) are used for the purposes agreed upon pursuant to subsection (a)(2).

<< 22 USCA § 2362 NOTE >>

(4) TERMINATION OF ASSISTANCE PROGRAMS.—Upon termination of assistance to a country under chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), any unencumbered balances of funds which remain in a separate account established pursuant to subsection (a) shall be disposed of for such purposes as may be agreed to by the government of that country and the United States Government.

<< 22 USCA § 2362 NOTE >>

<< 22 USCA § 2346 >>

<< 22 USCA § 2359 >>

(5) CONFORMING AMENDMENTS.—The tenth and eleventh provisos contained under the heading "Sub–Saharan Africa, Development Assistance" as included in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 and sections 531(d) and 609 of the Foreign Assistance Act of 1961 are repealed.

<< 22 USCA § 2362 NOTE >>

(6) REPORTING REQUIREMENT.—The Administrator of the Agency for International Development shall report on an annual basis as part of the justification documents submitted to the Committees on Appropriations on the use of local currencies for the administrative requirements of the United States Government as authorized in subsection (a)(2)(B), and such report shall include the amount of local currency (and United States dollar equivalent) used and/or to be used for such purpose in each applicable country.

<< 22 USCA § 2362 NOTE >>

(b) SEPARATE ACCOUNTS FOR CASH TRANSFERS.—(1) If assistance is made available to the government of a foreign country, under chapters 1 or 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961, as cash transfer assistance or as nonproject sector assistance, that country shall be required to maintain such funds in a separate account and not commingle them with any other funds.

<< 22 USCA § 2362 NOTE >>

(2) APPLICABILITY OF OTHER PROVISIONS OF LAW.—Such funds may be obligated and expended notwithstanding provisions of law which are inconsistent with the nature of this assistance including provisions which are referenced in the Joint Explanatory Statement of the Committee of Conference accompanying House Joint Resolution 648 (H. Report No. 98–1159).

<< 22 USCA § 2362 NOTE >>

(3) NOTIFICATION.—At least fifteen days prior to obligating any such cash transfer or nonproject sector assistance, the President shall submit a notification through the regular notification procedures of the Committees on Appropriations, which shall include a detailed description of how the funds proposed to be made available will be used, with a discussion of the United States interests that will be served by the assistance (including, as appropriate, a description of the economic policy reforms that will be promoted by such assistance).

<< 22 USCA § 2362 NOTE >>

(4) EXEMPTION.—Nonproject sector assistance funds may be exempt from the requirements of subsection (b)(1) only through the notification procedures of the Committees on Appropriations.

## COMPENSATION FOR UNITED STATES EXECUTIVE
## DIRECTORS TO INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 534. (a) No funds appropriated by this Act may be made as payment to any international financial institution while the United States Executive Director to such institution is compensated by the institution at a rate which, together with whatever compensation such Director receives from the United States, is in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while any alternate United States Director to such institution is compensated by the institution at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

(b) For purposes of this section, "international financial institutions" are: the International Bank for Reconstruction and Development, the Inter–American Development Bank, the Asian Development Bank, the Asian Development Fund, the African Development Bank, the African Development Fund, the International Monetary Fund, the North American Development Bank, and the European Bank for Reconstruction and Development.

## COMPLIANCE WITH UNITED NATIONS SANCTIONS AGAINST IRAQ

<< 50 USCA § 1701 NOTE >>

SEC. 535. None of the funds appropriated or otherwise made available pursuant to this Act to carry out the Foreign Assistance Act of 1961 (including title IV of chapter 2 of part I, relating to the Overseas Private Investment Corporation) or the Arms Export Control Act may be used to provide assistance to any country that is not in compliance with the United Nations Security Council sanctions against Iraq unless the President determines and so certifies to the Congress that—

<< 50 USCA § 1701 NOTE >>

(1) such assistance is in the national interest of the United States;

<< 50 USCA § 1701 NOTE >>

(2) such assistance will directly benefit the needy people in that country; or

<< 50 USCA § 1701 NOTE >>

(3) the assistance to be provided will be humanitarian assistance for foreign nationals who have fled Iraq and Kuwait.

## COMPETITIVE PRICING FOR SALES OF DEFENSE ARTICLES

<< 22 USCA § 2762 NOTE >>

SEC. 536. Direct costs associated with meeting a foreign customer's additional or unique requirements will continue to be allowable under contracts under section 22(d) of the Arms Export Control Act. Loadings applicable to such direct costs shall be permitted at the same rates applicable to procurement of like items purchased by the Department of Defense for its own use.

## AUTHORITIES FOR THE PEACE CORPS, THE INTER–AMERICAN FOUNDATION, THE AFRICAN
## DEVELOPMENT FOUNDATION AND THE INTERNATIONAL FUND FOR AGRICULTURAL DEVELOPMENT

SEC. 537. (a) Unless expressly provided to the contrary, provisions of this or any other Act, including provisions contained in prior Acts authorizing or making appropriations for foreign operations, export financing, and related programs, shall not be construed to prohibit activities authorized by or conducted under the Peace Corps Act, the Inter–American Foundation Act, or the African Development Foundation Act. The appropriate agency shall promptly report to the Committees on Appropriations whenever it is conducting activities or is proposing to conduct activities in a country for which assistance is prohibited.

(b) Unless expressly provided to the contrary, limitations on the availability of funds for "International Organizations and Programs" in this or any other Act, including prior appropriations Acts, shall not be construed to be applicable to the International Fund for Agricultural Development.

IMPACT ON JOBS IN THE UNITED STATES

SEC. 538. None of the funds appropriated by this Act may be obligated or expended to provide—

(a) any financial incentive to a business enterprise currently located in the United States for the purpose of inducing such an enterprise to relocate outside the United States if such incentive or inducement is likely to reduce the number of employees of such business enterprise in the United States because United States production is being replaced by such enterprise outside the United States;

(b) assistance for the purpose of establishing or developing in a foreign country any export processing zone or designated area in which the tax, tariff, labor, environment, and safety laws of that country do not apply, in part or in whole, to activities carried out within that zone or area, unless the President determines and certifies that such assistance is not likely to cause a loss of jobs within the United States; or

(c) assistance for any project or activity that contributes to the violation of internationally recognized workers rights, as defined in section 502(a)(4) of the Trade Act of 1974, of workers in the recipient country, including any designated zone or area in that country: *Provided,* That in recognition that the application of this subsection should be commensurate with the level of development of the recipient country and sector, the provisions of this subsection shall not preclude assistance for the informal sector in such country, micro and small-scale enterprise, and smallholder agriculture.

SERBIA–MONTENEGRO AND KOSOVA

<< 50 USCA § 1701 NOTE >>

SEC. 539. (a) RESTRICTIONS.—None of the funds in this or any other Act may be made available to modify or remove any sanction, prohibition or requirement with respect to Serbia–Montenegro unless the President first submits to the Congress a certification described in subsection (c).

<< 50 USCA § 1701 NOTE >>

(b) INTERNATIONAL FINANCIAL INSTITUTIONS.—The Secretary of the Treasury shall instruct the United States executive directors of the international financial institutions to work in opposition to, and vote against, any extension by such institutions of any financial or technical assistance or grants of any kind to the government of Serbia-Montenegro, unless the President first submits to the Congress a certification described in subsection (c).

<< 50 USCA § 1701 NOTE >>

(c) CERTIFICATION.—A certification described in this subsection is a certification that—

<< 50 USCA § 1701 NOTE >>

(1) there is substantial improvement in the human rights situation in Kosova;

<< 50 USCA § 1701 NOTE >>

(2) international human rights observers are allowed to return to Kosova;

<< 50 USCA § 1701 NOTE >>

(3) Serbian, Serbian–Montenegrin federal government officials, and representatives of the ethnic Albanian community in Kosova have agreed on and begun implementation of a negotiated settlement on the future status of Kosova; and

<< 50 USCA § 1701 NOTE >>

(4) the government of Serbia–Montenegro is fully complying with its obligations as a signatory to the General Framework Agreement for Peace in Bosnia–Herzegovina including fully cooperating with the International Criminal Tribunal for the Former Yugoslavia.

<< 50 USCA § 1701 NOTE >>

(d) WAIVER AUTHORITY.—The President may waive the application, in whole or in part, of subsections (a) and (b) if he certifies in writing to the Congress that the waiver is necessary to meet emergency humanitarian needs or to advance negotiations toward a peaceful settlement of the conflict in Kosova that is acceptable to the parties.

<< 50 USCA § 1701 NOTE >>

(e) EXEMPTION FOR MONTENEGRO.—This section shall not apply to Montenegro.

SPECIAL AUTHORITIES

SEC. 540. (a) Funds appropriated in titles I and II of this Act that are made available for Afghanistan, Lebanon, Montenegro, and for victims of war, displaced children, displaced Burmese, humanitarian assistance for Romania, and humanitarian assistance for the peoples of Kosova, may be made available notwithstanding any other provision of law.

(b) Funds appropriated by this Act to carry out the provisions of sections 103 through 106 of the Foreign Assistance Act of 1961 may be used, notwithstanding any other provision of law, for the purpose of supporting tropical forestry and biodiversity conservation activities and, subject to the regular notification procedures of the Committees on Appropriations, energy programs aimed at reducing greenhouse gas emissions: *Provided,* That such assistance shall be subject to sections 116, 502B, and 620A of the Foreign Assistance Act of 1961.

(c) The Agency for International Development may employ personal services contractors, notwithstanding any other provision of law, for the purpose of administering programs for the West Bank and Gaza.

(d)(1) WAIVER.—The President may waive the provisions of section 1003 of Public Law 100–204 if the President determines and certifies in writing to the Speaker of the House of Representatives and the President pro tempore of the Senate that it is important to the national security interests of the United States.

(2) PERIOD OF APPLICATION OF WAIVER.—Any waiver pursuant to paragraph (1) shall be effective for no more than a period of six months at a time and shall not apply beyond twelve months after enactment of this Act.

POLICY ON TERMINATING THE ARAB LEAGUE BOYCOTT OF ISRAEL

SEC. 541. It is the sense of the Congress that—

(1) the Arab League countries should immediately and publicly renounce the primary boycott of Israel and the secondary and tertiary boycott of American firms that have commercial ties with Israel;

(2) the decision by the Arab League in 1997 to reinstate the boycott against Israel was deeply troubling and disappointing;

(3) the Arab League should immediately rescind its decision on the boycott and its members should develop normal relations with their neighbor Israel; and

(4) the President should—

(A) take more concrete steps to encourage vigorously Arab League countries to renounce publicly the primary boycotts of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel as a confidence-building measure;

(B) take into consideration the participation of any recipient country in the primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel when determining whether to sell weapons to said country;

(C) report to Congress on the specific steps being taken by the President to bring about a public renunciation of the Arab primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel and to expand the process of normalizing ties between Arab League countries and Israel; and

(D) encourage the allies and trading partners of the United States to enact laws prohibiting businesses from complying with the boycott and penalizing businesses that do comply.

ANTI–NARCOTICS ACTIVITIES

SEC. 542. (a) Of the funds appropriated by this Act for "Economic Support Fund", assistance may be provided to strengthen the administration of justice in countries in Latin America and the Caribbean and in other regions consistent with the provisions

of section 534(b) of the Foreign Assistance Act of 1961, except that programs to enhance protection of participants in judicial cases may be conducted notwithstanding section 660 of that Act.

(b) Funds made available pursuant to this section may be made available notwithstanding section 534(c) and the second and third sentences of section 534(e) of the Foreign Assistance Act of 1961.

## ELIGIBILITY FOR ASSISTANCE

SEC. 543. (a) ASSISTANCE THROUGH NONGOVERNMENTAL ORGANIZATIONS.—Restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance in support of programs of nongovernmental organizations from funds appropriated by this Act to carry out the provisions of chapters 1, 10, and 11 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, and from funds appropriated under the heading "Assistance for Eastern Europe and the Baltic States": *Provided,* That the President shall take into consideration, in any case in which a restriction on assistance would be applicable but for this subsection, whether assistance in support of programs of nongovernmental organizations is in the national interest of the United States: *Provided further,* That before using the authority of this subsection to furnish assistance in support of programs of nongovernmental organizations, the President shall notify the Committees on Appropriations under the regular notification procedures of those committees, including a description of the program to be assisted, the assistance to be provided, and the reasons for furnishing such assistance: *Provided further,* That nothing in this subsection shall be construed to alter any existing statutory prohibitions against abortion or involuntary sterilizations contained in this or any other Act.

(b) PUBLIC LAW 480.—During fiscal year 1999, restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance under the Agricultural Trade Development and Assistance Act of 1954: *Provided,* That none of the funds appropriated to carry out title I of such Act and made available pursuant to this subsection may be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

(c) EXCEPTION.—This section shall not apply—

(1) with respect to section 620A of the Foreign Assistance Act or any comparable provision of law prohibiting assistance to countries that support international terrorism; or

(2) with respect to section 116 of the Foreign Assistance Act of 1961 or any comparable provision of law prohibiting assistance to countries that violate internationally recognized human rights.

## EARMARKS

SEC. 544. (a) Funds appropriated by this Act which are earmarked may be reprogrammed for other programs within the same account notwithstanding the earmark if compliance with the earmark is made impossible by operation of any provision of this or any other Act or, with respect to a country with which the United States has an agreement providing the United States with base rights or base access in that country, if the President determines that the recipient for which funds are earmarked has significantly reduced its military or economic cooperation with the United States since enactment of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1991; however, before exercising the authority of this subsection with regard to a base rights or base access country which has significantly reduced its military or economic cooperation with the United States, the President shall consult with, and shall provide a written policy justification to the Committees on Appropriations: *Provided,* That any such reprogramming shall be subject to the regular notification procedures of the Committees on Appropriations: *Provided further,* That assistance that is reprogrammed pursuant to this subsection shall be made available under the same terms and conditions as originally provided.

(b) In addition to the authority contained in subsection (a), the original period of availability of funds appropriated by this Act and administered by the Agency for International Development that are earmarked for particular programs or activities by this or any other Act shall be extended for an additional fiscal year if the Administrator of such agency determines and reports promptly to the Committees on Appropriations that the termination of assistance to a country or a significant change in circumstances makes it unlikely that such earmarked funds can be obligated during the original period of availability: *Provided,* That such earmarked funds that are continued available for an additional fiscal year shall be obligated only for the purpose of such earmark.

## CEILINGS AND EARMARKS

SEC. 545. Ceilings and earmarks contained in this Act shall not be applicable to funds or authorities appropriated or otherwise made available by any subsequent Act unless such Act specifically so directs.

Earmarks or minimum funding requirements contained in any other Act shall not be applicable to funds appropriated by this Act.

### PROHIBITION ON PUBLICITY OR PROPAGANDA

SEC. 546. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not authorized before the date of enactment of this Act by the Congress: *Provided,* That not to exceed $750,000 may be made available to carry out the provisions of section 316 of Public Law 96–533.

### PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS

SEC. 547. (a) To the maximum extent possible, assistance provided under this Act should make full use of American resources, including commodities, products, and services.

(b) It is the sense of the Congress that, to the greatest extent practicable, all agriculture commodities, equipment and products purchased with funds made available in this Act should be American-made.

(c) In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (b) by the Congress.

### PROHIBITION OF PAYMENTS TO UNITED NATIONS MEMBERS

SEC. 548. None of the funds appropriated or made available pursuant to this Act for carrying out the Foreign Assistance Act of 1961, may be used to pay in whole or in part any assessments, arrearages, or dues of any member of the United Nations.

### CONSULTING SERVICES

SEC. 549. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to section 3109 of title 5, United States Code, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order pursuant to existing law.

### PRIVATE VOLUNTARY ORGANIZATIONS—DOCUMENTATION

SEC. 550. None of the funds appropriated or made available pursuant to this Act shall be available to a private voluntary organization which fails to provide upon timely request any document, file, or record necessary to the auditing requirements of the Agency for International Development.

### PROHIBITION ON ASSISTANCE TO FOREIGN GOVERNMENTS THAT EXPORT LETHAL MILITARY EQUIPMENT TO COUNTRIES SUPPORTING INTERNATIONAL TERRORISM

SEC. 551. (a) None of the funds appropriated or otherwise made available by this Act may be available to any foreign government which provides lethal military equipment to a country the government of which the Secretary of State has determined is a terrorist government for purposes of section 40(d) of the Arms Export Control Act or any other comparable provision of law. The prohibition under this section with respect to a foreign government shall terminate 12 months after that government ceases to provide such military equipment. This section applies with respect to lethal military equipment provided under a contract entered into after October 1, 1997.

(b) Assistance restricted by subsection (a) or any other similar provision of law, may be furnished if the President determines that furnishing such assistance is important to the national interests of the United States.

(c) Whenever the waiver of subsection (b) is exercised, the President shall submit to the appropriate congressional committees a report with respect to the furnishing of such assistance. Any such report shall include a detailed explanation of the assistance estimated to be provided, including the estimated dollar amount of such assistance, and an explanation of how the assistance furthers United States national interests.

### WITHHOLDING OF ASSISTANCE FOR PARKING FINES OWED BY FOREIGN COUNTRIES

SEC. 552. (a) IN GENERAL.—Of the funds made available for a foreign country under part I of the Foreign Assistance Act of 1961, an amount equivalent to 110 percent of the total unpaid fully adjudicated parking fines and penalties owed to the District of Columbia by such country as of the date of enactment of this Act shall be withheld from obligation for such country until

AR.02463

138

the Secretary of State certifies and reports in writing to the appropriate congressional committees that such fines and penalties are fully paid to the government of the District of Columbia.

(b) DEFINITION.—For purposes of this section, the term "appropriate congressional committees" means the Committee on Foreign Relations and the Committee on Appropriations of the Senate and the Committee on International Relations and the Committee on Appropriations of the House of Representatives.

### LIMITATION ON ASSISTANCE FOR THE PLO FOR THE WEST BANK AND GAZA

SEC. 553. None of the funds appropriated by this Act may be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza unless the President has exercised the authority under section 604(a) of the Middle East Peace Facilitation Act of 1995 (title VI of Public Law 104–107) or any other legislation to suspend or make inapplicable section 307 of the Foreign Assistance Act of 1961 and that suspension is still in effect: *Provided,* That if the President fails to make the certification under section 604(b)(2) of the Middle East Peace Facilitation Act of 1995 or to suspend the prohibition under other legislation, funds appropriated by this Act may not be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza.

### WAR CRIMES TRIBUNALS DRAWDOWN

### << 22 USCA § 2656 NOTE >>

SEC. 554. If the President determines that doing so will contribute to a just resolution of charges regarding genocide or other violations of international humanitarian law, the President may direct a drawdown pursuant to section 552(c) of the Foreign Assistance Act of 1961, as amended, of up to $30,000,000 of commodities and services for the United Nations War Crimes Tribunal established with regard to the former Yugoslavia by the United Nations Security Council or such other tribunals or commissions as the Council may establish to deal with such violations, without regard to the ceiling limitation contained in paragraph (2) thereof: *Provided,* That the determination required under this section shall be in lieu of any determinations otherwise required under section 552(c): *Provided further,* That sixty days after the date of enactment of this Act, and every one hundred eighty days thereafter, the Secretary of State shall submit a report to the Committees on Appropriations describing the steps the United States Government is taking to collect information regarding allegations of genocide or other violations of international law in the former Yugoslavia and to furnish that information to the United Nations War Crimes Tribunal for the former Yugoslavia: *Provided further,* That the drawdown made under this section for any tribunal shall not be construed as an endorsement or precedent for the establishment of any standing or permanent international criminal tribunal or court: *Provided further,* That funds made available for tribunals or commissions other than for Yugoslavia or Rwanda shall be made available subject to the regular notification procedures of the Committees on Appropriations.

### LANDMINES

SEC. 555. Notwithstanding any other provision of law, demining equipment available to the Agency for International Development and the Department of State and used in support of the clearance of landmines and unexploded ordnance for humanitarian purposes may be disposed of on a grant basis in foreign countries, subject to such terms and conditions as the President may prescribe.

### RESTRICTIONS CONCERNING THE PALESTINIAN AUTHORITY

SEC. 556. None of the funds appropriated by this Act may be obligated or expended to create in any part of Jerusalem a new office of any department or agency of the United States Government for the purpose of conducting official United States Government business with the Palestinian Authority over Gaza and Jericho or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles: *Provided,* That this restriction shall not apply to the acquisition of additional space for the existing Consulate General in Jerusalem: *Provided further,* That meetings between officers and employees of the United States and officials of the Palestinian Authority, or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles, for the purpose of conducting official United States Government business with such authority should continue to take place in locations other than Jerusalem. As has been true in the past, officers and employees of the United States Government may continue to meet in Jerusalem on other subjects with Palestinians (including those who now occupy positions in the Palestinian Authority), have social contacts, and have incidental discussions.

PROHIBITION OF PAYMENT OF CERTAIN EXPENSES

SEC. 557. None of the funds appropriated or otherwise made available by this Act under the heading "International Military Education and Training" or "Foreign Military Financing Program" for Informational Program activities may be obligated or expended to pay for—

(1) alcoholic beverages;

(2) food (other than food provided at a military installation) not provided in conjunction with Informational Program trips where students do not stay at a military installation; or

(3) entertainment expenses for activities that are substantially of a recreational character, including entrance fees at sporting events and amusement parks.

EQUITABLE ALLOCATION OF FUNDS

SEC. 558. Not more than 17 percent of the funds appropriated by this Act to carry out the provisions of sections 103 through 106 and chapter 4 of part II of the Foreign Assistance Act of 1961, that are made available for Latin America and the Caribbean region may be made available, through bilateral and Latin America and the Caribbean regional programs, to provide assistance for any country in such region.

SPECIAL DEBT RELIEF FOR THE POOREST

SEC. 559. (a) AUTHORITY TO REDUCE DEBT.—The President may reduce amounts owed to the United States (or any agency of the United States) by an eligible country as a result of—

(1) guarantees issued under sections 221 and 222 of the Foreign Assistance Act of 1961;

(2) credits extended or guarantees issued under the Arms Export Control Act; or

(3) any obligation or portion of such obligation for a Latin American country, to pay for purchases of United States agricultural commodities guaranteed by the Commodity Credit Corporation under export credit guarantee programs authorized pursuant to section 5(f) of the Commodity Credit Corporation Charter Act of June 29, 1948, as amended, section 4(b) of the Food for Peace Act of 1966, as amended (Public Law 89–808), or section 202 of the Agricultural Trade Act of 1978, as amended (Public Law 95–501).

(b) LIMITATIONS.—

(1) The authority provided by subsection (a) may be exercised only to implement multilateral official debt relief ad referendum agreements, commonly referred to as "Paris Club Agreed Minutes".

(2) The authority provided by subsection (a) may be exercised only in such amounts or to such extent as is provided in advance by appropriations Acts.

(3) The authority provided by subsection (a) may be exercised only with respect to countries with heavy debt burdens that are eligible to borrow from the International Development Association, but not from the International Bank for Reconstruction and Development, commonly referred to as "IDA-only" countries.

(c) CONDITIONS.—The authority provided by subsection (a) may be exercised only with respect to a country whose government—

(1) does not have an excessive level of military expenditures;

(2) has not repeatedly provided support for acts of international terrorism;

(3) is not failing to cooperate on international narcotics control matters;

(4) (including its military or other security forces) does not engage in a consistent pattern of gross violations of internationally recognized human rights; and

(5) is not ineligible for assistance because of the application of section 527 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995.

(d) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

(e) CERTAIN PROHIBITIONS INAPPLICABLE.—A reduction of debt pursuant to subsection (a) shall not be considered assistance for purposes of any provision of law limiting assistance to a country. The authority provided by subsection (a) may be exercised notwithstanding section 620(r) of the Foreign Assistance Act of 1961.

## AUTHORITY TO ENGAGE IN DEBT BUYBACKS OR SALES

SEC. 560. (a) LOANS ELIGIBLE FOR SALE, REDUCTION, OR CANCELLATION.—

(1) AUTHORITY TO SELL, REDUCE, OR CANCEL CERTAIN LOANS.—Notwithstanding any other provision of law, the President may, in accordance with this section, sell to any eligible purchaser any concessional loan or portion thereof made before January 1, 1995, pursuant to the Foreign Assistance Act of 1961, to the government of any eligible country as defined in section 702(6) of that Act or on receipt of payment from an eligible purchaser, reduce or cancel such loan or portion thereof, only for the purpose of facilitating—

(A) debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps; or

(B) a debt buyback by an eligible country of its own qualified debt, only if the eligible country uses an additional amount of the local currency of the eligible country, equal to not less than 40 percent of the price paid for such debt by such eligible country, or the difference between the price paid for such debt and the face value of such debt, to support activities that link conservation and sustainable use of natural resources with local community development, and child survival and other child development, in a manner consistent with sections 707 through 710 of the Foreign Assistance Act of 1961, if the sale, reduction, or cancellation would not contravene any term or condition of any prior agreement relating to such loan.

(2) TERMS AND CONDITIONS.—Notwithstanding any other provision of law, the President shall, in accordance with this section, establish the terms and conditions under which loans may be sold, reduced, or canceled pursuant to this section.

(3) ADMINISTRATION.—The Facility, as defined in section 702(8) of the Foreign Assistance Act of 1961, shall notify the administrator of the agency primarily responsible for administering part I of the Foreign Assistance Act of 1961 of purchasers that the President has determined to be eligible, and shall direct such agency to carry out the sale, reduction, or cancellation of a loan pursuant to this section. Such agency shall make an adjustment in its accounts to reflect the sale, reduction, or cancellation.

(4) LIMITATION.—The authorities of this subsection shall be available only to the extent that appropriations for the cost of the modification, as defined in section 502 of the Congressional Budget Act of 1974, are made in advance.

(b) DEPOSIT OF PROCEEDS.—The proceeds from the sale, reduction, or cancellation of any loan sold, reduced, or canceled pursuant to this section shall be deposited in the United States Government account or accounts established for the repayment of such loan.

(c) ELIGIBLE PURCHASERS.—A loan may be sold pursuant to subsection (a)(1)(A) only to a purchaser who presents plans satisfactory to the President for using the loan for the purpose of engaging in debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(d) DEBTOR CONSULTATIONS.—Before the sale to any eligible purchaser, or any reduction or cancellation pursuant to this section, of any loan made to an eligible country, the President should consult with the country concerning the amount of loans to be sold, reduced, or canceled and their uses for debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(e) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

## LIMITATION ON ASSISTANCE FOR HAITI

SEC. 561. (a) LIMITATION.—Funds appropriated by this Act may be made available for assistance for the central Government of Haiti only if the President reports to the Committee on Appropriations and the Committee on International Relations of the House of Representatives and the Committee on Appropriations and the Committee on Foreign Relations of the Senate that the Government of Haiti—

(1) has completed privatization of (or placed under long-term private management or concession) three major public entities including the completion of all required incorporating documents, the transfer of assets, and the eviction of unauthorized occupants of the land or facility;

(2) has re-signed or is implementing the bilateral Repatriation Agreement with the United States and in the preceding six months that the central Government of Haiti is cooperating with the United States in halting illegal emigration from Haiti;

(3) is conducting thorough investigations of extrajudicial and political killings and has made substantial progress in bringing to justice a person or persons responsible for one or more extrajudicial or political killings in Haiti, and is cooperating with United States authorities and with United States-funded technical advisors to the Haitian National Police in such investigations;

(4) has taken action to remove from the Haitian National Police, national palace and residential guard, ministerial guard, and any other public security entity or unit of Haiti those individuals who are credibly alleged to have engaged in or conspired

to conceal gross violations of internationally recognized human rights or credibly alleged to have engaged in or conspired to engage in narcotics trafficking; and

(5) has ratified or is implementing the maritime counter-narcotics agreements signed in October 1997.

(b) AVAILABILITY OF ELECTORAL ASSISTANCE.—The limitation in subsection (a) shall not apply to funds appropriated by this Act that are made available to support elections in Haiti if the President reports to the Congress that the central Government of Haiti:

(1) has achieved a transparent settlement of the contested April 1997 elections; and

(2) has made concrete progress on the constitution of a credible and competent provisional electoral council that is acceptable to a broad spectrum of political parties and civic groups.

(c) EXCEPTIONS.—The limitations in subsections (a) and (b) shall not apply to the provision of—

(1) counter-narcotics assistance, support for the Haitian National Police's Special Investigations Unit and anti-corruption programs, the International Criminal Investigative Assistance Program, and assistance in support of Haitian customs and maritime officials;

(2) food assistance management and support;

(3) assistance for urgent humanitarian needs, such as medical and other supplies and services in support of community health services, schools, and orphanages; and

(4) not more than $3,000,000 for the development and support of political parties and civic groups.

(d) WAIVER.—At any time after 150 days from the date of enactment of this Act, the Secretary of State may waive the requirements contained in subsection (a)(1) if she reports to the Committees specified in subsection (a) that the Government of Haiti has satisfied the requirements of subsection (a)(1) with regard to one major public entity and has satisfied the remaining requirements of subsection (a).

(e) REPORTS.—The Secretary of State shall provide to the Committees specified in subsection (a) on a quarterly basis—

(1) in consultation with the Secretary of Defense and the Administrator of the Drug Enforcement Administration, a report on the status and number of United States personnel deployed in and around Haiti on Department of Defense, Drug Enforcement Administration, and United Nations missions, including displays by functional or operational assignment for such personnel and the cost to the United States of these operations; and

(2) the monthly reports, prepared during the previous quarter, of the Organization of American States/United Nations International Civilian Mission to Haiti (MICIVIH).

(f) ADMINISTRATION OF JUSTICE ASSISTANCE.—(1) The limitation in subsection (a) shall not apply to funds appropriated under this Act that are made available for the Ministry of Justice for the training of judges if the President determines and reports to the Committee on Appropriations and the Committee on Foreign Relations of the Senate, and the Committee on Appropriations and the Committee on International Relations of the House of Representatives, that Haiti's Minister of Justice—

(A) has demonstrated a commitment to the professionalism of judicial personnel by consistently placing students graduated by the Judicial School in appropriate judicial positions and has made a commitment to share program costs associated with the Judicial School; and

(B) is making progress in making the judicial branch in Haiti independent from the executive branch.

(2) The limitation in subsection (a) shall not apply to funds to support the training of prosecutors, judicial mentoring, legal assistance, and case management.

REQUIREMENT FOR DISCLOSURE OF FOREIGN AID IN REPORT OF SECRETARY OF STATE

<< 22 USCA § 2414a NOTE >>

SEC. 562. (a) FOREIGN AID REPORTING REQUIREMENT.—In addition to the voting practices of a foreign country, the report required to be submitted to Congress under section 406(a) of the Foreign Relations Authorization Act, fiscal years 1990 and 1991 (22 U.S.C. 2414a), shall include a side-by-side comparison of individual countries' overall support for the United States at the United Nations and the amount of United States assistance provided to such country in fiscal year 1998.

<< 22 USCA § 2414a NOTE >>

(b) UNITED STATES ASSISTANCE.—For purposes of this section, the term "United States assistance" has the meaning given the term in section 481(e)(4) of the Foreign Assistance Act of 1961 (22 U.S.C. 2291(e)(4)).

### RESTRICTIONS ON VOLUNTARY CONTRIBUTIONS TO UNITED NATIONS AGENCIES

SEC. 563. (a) PROHIBITION ON VOLUNTARY CONTRIBUTIONS FOR THE UNITED NATIONS.—None of the funds appropriated by this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) if the United Nations implements or imposes any taxation on any United States persons.

(b) CERTIFICATION REQUIRED FOR DISBURSEMENT OF FUNDS.—None of the funds appropriated by this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) unless the President certifies to the Congress 15 days in advance of such payment that the United Nations is not engaged in any effort to implement or impose any taxation on United States persons in order to raise revenue for the United Nations or any of its specialized agencies.

(c) DEFINITIONS.—As used in this section the term "United States person" refers to—

　(1) a natural person who is a citizen or national of the United States; or

　(2) a corporation, partnership, or other legal entity organized under the United States or any State, territory, possession, or district of the United States.

### BURMA LABOR REPORT

SEC. 564. Not later than ninety days after enactment of this Act, the Secretary of Labor shall provide to the Committees on Appropriations a report addressing labor practices in Burma: *Provided,* That the report shall provide comprehensive details on child labor practices, worker's rights, forced relocation of laborers, forced labor performed to support the tourism industry, and forced labor performed in conjunction with, and in support of, the Yadonna gas pipeline: *Provided further,* That the report should address whether the government is in compliance with international labor standards: *Provided further,* That the report should provide details regarding the United States government's efforts to address and correct practices of forced labor in Burma.

### HAITI

SEC. 565. The Government of Haiti shall be eligible to purchase defense articles and services under the Arms Export Control Act (22 U.S.C. 2751 et seq.), for the civilian-led Haitian National Police and Coast Guard: *Provided,* That the authority provided by this section shall be subject to the regular notification procedures of the Committees on Appropriations.

### LIMITATION ON ASSISTANCE TO THE PALESTINIAN AUTHORITY

SEC. 566. (a) PROHIBITION OF FUNDS.—None of the funds appropriated by this Act to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961 may be obligated or expended with respect to providing funds to the Palestinian Authority.

(b) WAIVER.—The prohibition included in subsection (a) shall not apply if the President certifies in writing to the Speaker of the House of Representatives and the President pro tempore of the Senate that waiving such prohibition is important to the national security interests of the United States.

(c) PERIOD OF APPLICATION OF WAIVER.—Any waiver pursuant to subsection (b) shall be effective for no more than a period of six months at a time and shall not apply beyond twelve months after enactment of this Act.

### LIMITATION ON ASSISTANCE TO THE GOVERNMENT OF CROATIA

SEC. 567. None of the funds appropriated by title II of this Act may be made available to the Government of Croatia to relocate the remains of Croatian Ustashe soldiers, at the site of the World War II concentration camp at Jasenovac, Croatia.

### LIMITATION ON ASSISTANCE TO SECURITY FORCES

SEC. 568. None of the funds made available by this Act may be provided to any unit of the security forces of a foreign country if the Secretary of State has credible evidence that such unit has committed gross violations of human rights, unless the Secretary determines and reports to the Committees on Appropriations that the government of such country is taking effective measures to bring the responsible members of the security forces unit to justice: *Provided,* That nothing in this section shall be construed to withhold funds made available by this Act from any unit of the security forces of a foreign country not credibly alleged to be

AR.02468

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2492 of 3864

involved in gross violations of human rights: *Provided further,* That in the event that funds are withheld from any unit pursuant to this section, the Secretary of State shall promptly inform the foreign government of the basis for such action and shall, to the maximum extent practicable, assist the foreign government in taking effective measures to bring the responsible members of the security forces to justice.

<div align="center">LIMITATIONS ON TRANSFER OF MILITARY EQUIPMENT TO EAST TIMOR</div>

SEC. 569. In any agreement for the sale, transfer, or licensing of any lethal equipment or helicopter for Indonesia entered into by the United States pursuant to the authority of this Act or any other Act, the agreement shall state that the United States expects that the items will not be used in East Timor: *Provided,* That nothing in this section shall be construed to limit Indonesia's inherent right to legitimate national self-defense as recognized under the United Nations Charter and international law.

<div align="center">RESTRICTIONS ON ASSISTANCE TO COUNTRIES PROVIDING SANCTUARY TO INDICTED WAR CRIMINALS</div>

SEC. 570. (a) BILATERAL ASSISTANCE.—None of the funds made available by this or any prior Act making appropriations for foreign operations, export financing and related programs, may be provided for any country, entity or canton described in subsection (e).

(b) MULTILATERAL ASSISTANCE.—

(1) PROHIBITION.—The Secretary of the Treasury shall instruct the United States executive directors of the international financial institutions to work in opposition to, and vote against, any extension by such institutions of any financial or technical assistance or grants of any kind to any country or entity described in subsection (e).

(2) NOTIFICATION.—Not less than 15 days before any vote in an international financial institution regarding the extension of financial or technical assistance or grants to any country or entity described in subsection (e), the Secretary of the Treasury, in consultation with the Secretary of State, shall provide to the Committee on Appropriations and the Committee on Foreign Relations of the Senate and the Committee on Appropriations and the Committee on Banking and Financial Services of the House of Representatives a written justification for the proposed assistance, including an explanation of the United States position regarding any such vote, as well as a description of the location of the proposed assistance by municipality, its purpose, and its intended beneficiaries.

(3) DEFINITION.—The term "international financial institution" includes the International Monetary Fund, the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Multilateral Investment Guaranty Agency, and the European Bank for Reconstruction and Development.

(c) EXCEPTIONS.—

(1) IN GENERAL.—Subject to paragraph (2), subsections (a) and (b) shall not apply to the provision of—

(A) humanitarian assistance;

(B) democratization assistance;

(C) assistance for cross border physical infrastructure projects involving activities in both a sanctioned country, entity, or canton and a nonsanctioned contiguous country, entity, or canton, if the project is primarily located in and primarily benefits the nonsanctioned country, entity, or canton and if the portion of the project located in the sanctioned country, entity, or canton is necessary only to complete the project;

(D) small-scale assistance projects or activities requested by United States Armed Forces that promote good relations between such forces and the officials and citizens of the areas in the United States SFOR sector of Bosnia;

(E) implementation of the Brcko Arbitral Decision;

(F) lending by the international financial institutions to a country or entity to support common monetary and fiscal policies at the national level as contemplated by the Dayton Agreement; or

(G) direct lending to a non-sanctioned entity, or lending passed on by the national government to a non-sanctioned entity.

(H) assistance to the International Police Task Force for the training of a civilian police force.

(2) NOTIFICATION.—Every 30 days the Secretary of State, in consultation with the Administrator of the Agency for International Development, shall publish in the Federal Register and/or in a comparable publicly accessible document or internet site, a listing and justification of any assistance that is obligated within that period of time for any country, entity, or canton described in subsection (e), including a description of the purpose of the assistance, project and its location, by municipality.

(d) FURTHER LIMITATIONS.—Notwithstanding subsection (c)—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) no assistance may be made available by this Act, or any prior Act making appropriations for foreign operations, export financing and related programs, in any country, entity, or canton described in subsection (e), for a program, project, or activity in which a publicly indicted war criminal is known to have any financial or material interest; and

(2) no assistance (other than emergency foods or medical assistance or demining assistance) may be made available by this Act, or any prior Act making appropriations for foreign operations, export financing and related programs for any program, project, or activity in a community within any country, entity or canton described in subsection (e) if competent authorities within that community are not complying with the provisions of Article IX and Annex 4, Article II, paragraph 8 of the Dayton Agreement relating to war crimes and the Tribunal.

(e) SANCTIONED COUNTRY, ENTITY, OR CANTON.—A sanctioned country, entity, or canton described in this section is one whose competent authorities have failed, as determined by the Secretary of State, to take necessary and significant steps to apprehend and transfer to the Tribunal all persons who have been publicly indicted by the Tribunal.

(f) WAIVER.—

(1) IN GENERAL.—The Secretary of State may waive the application of subsection (a) or subsection (b) with respect to specified bilateral programs or international financial institution projects or programs in a sanctioned country, entity, or canton upon providing a written determination to the Committee on Appropriations and the Committee on Foreign Relations of the Senate and the Committee on Appropriations and the Committee on International Relations of the House of Representatives that such assistance directly supports the implementation of the Dayton Agreement and its Annexes, which include the obligation to apprehend and transfer indicted war criminals to the Tribunal.

(2) REPORT.—Not later than 15 days after the date of any written determination under paragraph (1) the Secretary of State shall submit a report to the Committee on Appropriations and the Committee on Foreign Relations of the Senate and the Committee on Appropriations and the Committee on International Relations of the House of Representatives regarding the status of efforts to secure the voluntary surrender or apprehension and transfer of persons indicted by the Tribunal, in accordance with the Dayton Agreement, and outlining obstacles to achieving this goal; and

(3) ASSISTANCE PROGRAMS AND PROJECTS AFFECTED.—Any waiver made pursuant to this subsection shall be effective only with respect to a specified bilateral program or multilateral assistance project or program identified in the determination of the Secretary of State to Congress.

(g) TERMINATION OF SANCTIONS.—The sanctions imposed pursuant to subsections (a) and (b) with respect to a country or entity shall cease to apply only if the Secretary of State determines and certifies to Congress that the authorities of that country, entity, or canton have apprehended and transferred to the Tribunal all persons who have been publicly indicted by the Tribunal.

(h) DEFINITIONS.—As used in this section—

(1) COUNTRY.—The term "country" means Bosnia–Herzegovina, Croatia, Serbia, and Montenegro.

(2) ENTITY.—The term "entity" refers to the Federation of Bosnia and Herzegovina and the Republika Srpska.

(3) CANTON.—The term "canton" means the administrative units in Bosnia and Herzegovina.

(4) DAYTON AGREEMENT.—The term "Dayton Agreement" means the General Framework Agreement for Peace in Bosnia and Herzegovina, together with annexes relating thereto, done at Dayton, November 10 through 16, 1995.

(5) TRIBUNAL.—The term "Tribunal" means the International Criminal Tribunal for the Former Yugoslavia.

(i) ROLE OF HUMAN RIGHTS ORGANIZATIONS AND GOVERNMENT AGENCIES.—In carrying out this section, the Secretary of State, the Administrator of the Agency for International Development, and the executive directors of the international financial institutions shall consult with representatives of human rights organizations and all government agencies with relevant information to help prevent publicly indicted war criminals from benefitting from any financial or technical assistance or grants provided to any country or entity described in subsection (e).

### ADDITIONAL REQUIREMENTS RELATING TO STOCKPILING OF DEFENSE ARTICLES FOR FOREIGN COUNTRIES

<< 22 USCA § 2321h >>

SEC. 571. (a) VALUE OF ADDITIONS TO STOCKPILES.—Section 514(b)(2)(A) of the Foreign Assistance Act of 1961 (22 U.S.C. 2321h(b)(2)(A)) is amended by striking the word "and" after "1997", and inserting in lieu thereof a comma and inserting before the period at the end the following: "and $340,000,000 for fiscal year 1999".

<< 22 USCA § 2321h >>

(b) REQUIREMENTS RELATING TO THE REPUBLIC OF KOREA AND THAILAND.—Section 514(b)(2)(B) of such Act (22 U.S.C. 2321h(b)(2)(B)) is amended by adding at the end the following: "Of the amount specified in subparagraph (A) for fiscal year 1999, not more than $320,000,000 may be made available for stockpiles in the Republic of Korea and not more than $20,000,000 may be made available for stockpiles in Thailand.".

TO PROHIBIT FOREIGN ASSISTANCE TO THE GOVERNMENT OF RUSSIA SHOULD IT ENACT LAWS WHICH WOULD DISCRIMINATE AGAINST MINORITY RELIGIOUS FAITHS IN THE RUSSIAN FEDERATION

SEC. 572. None of the funds appropriated under this Act may be made available for the Government of Russian Federation, after 180 days from the date of enactment of this Act, unless the President determines and certifies in writing to the Committee on Appropriations and the Committee on Foreign Relations of the Senate that the Government of the Russian Federation has implemented no statute, executive order, regulation or similar government action that would discriminate, or would have as its principal effect discrimination, against religious groups or religious communities in the Russian Federation in violation of accepted international agreements on human rights and religious freedoms to which the Russian Federation is a party.

GREENHOUSE GAS EMISSIONS

SEC. 573. (a) Funds made available in this Act to support programs or activities promoting country participation in the Kyoto Protocol to the Framework Convention on Climate Change (FCCC) shall only be made available subject to the regular notification procedures of the Committees on Appropriations.

(b) The President shall provide a detailed account of all Federal agency obligations and expenditures for climate change programs and activities, domestic and international, for fiscal year 1998, planned obligations for such activities in fiscal year 1999, and any plan for programs thereafter related to the implementation or the furtherance of protocols pursuant to, or related to negotiations to amend the FCCC in conjunction with the President's submission of the Budget of the United States Government for Fiscal Year 2000: *Provided,* That such report shall include an accounting of expenditures by agency with each agency identifying climate change activities and associated costs by line item as presented in the President's Budget Appendix.

WITHHOLDING ASSISTANCE TO COUNTRIES VIOLATING UNITED NATIONS SANCTIONS AGAINST LIBYA

SEC. 574. (a) WITHHOLDING OF ASSISTANCE.—Except as provided in subsection (b), whenever the President determines and certifies to Congress that the government of any country is violating any sanction against Libya imposed pursuant to United Nations Security Council Resolution 731, 748, or 883, then not less than 5 percent of the funds allocated for the country under section 653(a) of the Foreign Assistance Act of 1961 out of appropriations in this Act shall be withheld from obligation or expenditure for that country.

(b) EXCEPTION.—The requirement to withhold funds under subsection (a) shall not apply to funds appropriated in this Act for allocation under section 653(a) of the Foreign Assistance Act of 1961 for development assistance or for humanitarian assistance.

(c) WAIVER.—Funds may be provided for a country without regard to subsection (a) if the President determines that to do so is in the national security interest of the United States.

AID TO THE GOVERNMENT OF THE DEMOCRATIC REPUBLIC OF CONGO

SEC. 575. (a) None of the funds appropriated by this Act may be provided for assistance for the central Government of the Democratic Government of Congo until such time as the President reports in writing to the Congress that the central Government is—

(1) investigating and prosecuting those responsible for human rights violations committed in the Democratic Republic of Congo; and

(2) implementing a credible democratic transition program.

(b) This section shall not apply to assistance to promote democracy and the rule of law as part of a plan to implement a credible democratic transition program.

ASSISTANCE FOR THE MIDDLE EAST

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 576. Of the funds appropriated by this Act under the headings "Economic Support Fund", "Foreign Military Financing", "International Military Education and Training", "Peacekeeping Operations", for refugees resettling in Israel under the heading "Migration and Refugee Assistance", and for assistance for Israel to carry out provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 under the heading "Nonproliferation, Anti–Terrorism, Demining, and Related Programs", not more than a total of $5,402,850,000 may be made available for Israel, Egypt, Jordan, Lebanon, the West Bank and Gaza, the Israel–Lebanon Monitoring Group, the Multinational Force and Observers, the Middle East Regional Democracy Fund, Middle East Regional Cooperation, and Middle East Multilateral Working Groups: *Provided,* That any funds that were appropriated under such headings in prior fiscal years and that were at the time of enactment of this Act obligated or allocated for other recipients may not during fiscal year 1999 be made available for activities that, if funded under this Act, would be required to count against this ceiling: *Provided further,* That funds may be made available notwithstanding the requirements of this section if the President determines and certifies to the Committees on Appropriations that it is important to the national security interest of the United States to do so and any such additional funds shall only be provided through the regular notification procedures of the Committees on Appropriations.

## ENTERPRISE FUND RESTRICTIONS

SEC. 577. Prior to the distribution of any assets resulting from any liquidation, dissolution, or winding up of an Enterprise Fund, in whole or in part, the President shall submit to the Committees on Appropriations, in accordance with the regular notification procedures of the Committees on Appropriations, a plan for the distribution of the assets of the Enterprise Fund.

## CAMBODIA

SEC. 578. The Secretary of the Treasury should instruct the United States executive directors of the international financial institutions to use the voice and vote of the United States to oppose loans to the Government of Cambodia, except loans to support basic human needs.

## EXPORT FINANCING TRANSFER AUTHORITIES

SEC. 579. Not to exceed 5 percent of any appropriation other than for administrative expenses made available for fiscal year 1999 for programs under title I of this Act may be transferred between such appropriations for use for any of the purposes, programs and activities for which the funds in such receiving account may be used, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 25 percent by any such transfer: *Provided,* That the exercise of such authority shall be subject to the regular notification procedures of the Committees on Appropriations.

## AUTHORIZATION FOR POPULATION PLANNING

SEC. 580. (a) Not to exceed $385,000,000 of the funds appropriated in title II of this Act may be available for population planning activities or other population assistance.

(b) Such funds may be apportioned only on a monthly basis, and such monthly apportionments may not exceed 8.34 percent of the total available for such activities.

## REPORT ON ALL UNITED STATES MILITARY TRAINING PROVIDED TO FOREIGN MILITARY PERSONNEL

SEC. 581. (a) The Secretary of Defense and the Secretary of State shall jointly provide to the Congress by January 31, 1999, a report on all military training provided to foreign military personnel under programs administered by the Department of Defense and the Department of State during fiscal years 1998 and 1999, including those proposed for fiscal year 1999. This report shall include, for each such military training activity, the foreign policy justification and purpose for the training activity, the cost of the training activity, the number of foreign students trained and their units of operation, and the location of the training. In addition, this report shall also include, with respect to United States personnel, the operational benefits to United States forces derived from each such training activity and the United States military units involved in each such training activity. This report may include a classified annex if deemed necessary and appropriate.

(b) For purposes of this section a report to Congress shall be deemed to mean a report to the Appropriations and Foreign Relations Committees of the Senate and the Appropriations and International Relations Committees of the House of Representatives.

## KOREAN PENINSULA ENERGY DEVELOPMENT ORGANIZATION

SEC. 582. (a) Of the funds made available under the heading "Nonproliferation, Anti-terrorism, Demining and Related Programs", not to exceed $35,000,000 may be made available for the Korean Peninsula Energy Development Organization (hereafter referred to in this section as "KEDO"), notwithstanding any other provision of law, only for the administrative expenses and heavy fuel oil costs associated with the Agreed Framework: Provided, That none of these funds may be made available until March 1, 1999.

(b) Of the funds made available for KEDO, up to $15,000,000 may be made available prior to June 1, 1999, if, thirty days prior to such obligation of funds, the President certifies and so reports to Congress that:

(1)(A) the parties to the Agreed Framework have taken and continue to take demonstrable steps to assure that progress is made on the implementation of the January 1, 1992, Joint Declaration on the Denuclearization of the Korean Peninsula in which the government of North Korea has committed not to test, manufacture, produce, receive, possess, store, deploy or use nuclear weapons:

(B) the parties to the Agreed Framework have taken and continue to take demonstrable steps to assure that progress is made on the implementation of the North–South dialogue; and

(C) North Korea is complying with all provisions of the Agreed Framework and with the Confidential Minute between North Korea and the United States.

(2) North Korea is cooperating fully in the canning and safe storage of all spent fuel from its graphite-moderated nuclear reactors;

(3) North Korea has not significantly diverted assistance provided by the United States for purposes for which it was not intended; and

(4) The United States is fully engaged in efforts to impede North Korea's development and export of ballistic missiles; and

(c) Of the funds made available for KEDO, up to $20,000,000 may be made available on or after June 1, 1999, if, thirty days prior to such obligation of funds, the President certifies and so reports to Congress that:

(1) the United States has initiated meaningful discussions with North Korea on implementation of the Joint Declaration on the Denuclearization of the Korean Peninsula;

(2) the United States has reached agreement with North Korea on the means for satisfying U.S. concerns regarding suspect underground construction, and;

(3) the United States is making significant progress on reducing and eliminating the North Korean ballistic missile threat, including its ballistic missile exports.

(d) The President may waive the certification requirements of subsections (b) and (c) if the President determines that it is vital to the national security interests of the United States and provides written policy justifications to the appropriate congressional committees prior to his exercise of such waiver. No funds may be obligated for KEDO until 30 days after submission to Congress of such waiver.

(e) Not later than January 1, 1999, the President shall name a "North Korea Policy Coordinator", who shall conduct a full and complete interagency review of United States policy toward North Korea, shall provide policy direction for negotiations with North Korea related to nuclear weapons, ballistic missiles, and other security related issues, and shall also provide leadership for United States participation in KEDO.

(f) The Secretary of State shall submit to the appropriate congressional committees an annual report (to be submitted with the annual presentation for appropriations) providing a full and detailed accounting of the fiscal year request for the United States contribution to KEDO, the expected operating budget of the KEDO, to include unpaid debt, proposed annual costs associated with heavy fuel oil purchases, and the amount of funds pledged by other donor nations and organizations to support KEDO activities on a per country basis, and other related activities.

(g) The Secretary of Defense shall submit to the appropriate congressional committees an annual report on the degree to which KEDO's mission and the Agreed Framework continue to promote important United States national security interests, contribute to delaying North Korean indigenous development of nuclear weapons-related technology, and positively impact the level of tension on the Korean Peninsula.

NATIONAL ADVISORY COUNCIL ON INTERNATIONAL MONETARY AND FINANCIAL POLICIES

<< 22 USCA § 262r NOTE >>

SEC. 583. (a) Notwithstanding any other provision of law, each annual report required by subsection 1701(a) of the International Financial Institutions Act, as amended (Public Law 95–118, 22 U.S.C. 262r), shall comprise—

<< 22 USCA § 262r NOTE >>

(1) an assessment of the effectiveness of the major policies and operations of the international financial institutions;

<< 22 USCA § 262r NOTE >>

(2) the major issues affecting United States participation;

<< 22 USCA § 262r NOTE >>

(3) the major developments in the past year;

<< 22 USCA § 262r NOTE >>

(4) the prospects for the coming year;

<< 22 USCA § 262r NOTE >>

(5) the progress made and steps taken to achieve United States policy goals (including major policy goals embodied in current law) with respect to the international financial institutions; and

<< 22 USCA § 262r NOTE >>

(6) such data and explanations concerning the effectiveness, operations, and policies of the international financial institutions, such recommendations concerning the international financial institutions, and such other data and material as the Chairman may deem appropriate.

<< 22 USCA § 262r NOTE >>

(b) The requirements of Sections 1602(e), 1603(c), 1604(c), and 1701(b) of the International Financial Institutions Act, as amended (Public Law 95–118, 22 U.S.C. 262p–1, 262p–2, 262p–3 and 262(r)), Section 2018(c) of the International Narcotics Control Act of 1986, as amended (Public Law 99–570, 22 U.S.C. 2291 note), Section 407(c) of the Foreign Debt Reserving Act of 1989 (Public Law 101–240, 22 U.S.C. 2291 note), Section 14(c) of the Inter–American Development Bank Act, as amended (Public Law 86–147, 22 U.S.C. 283j–1(c)), and Section 1002 of the Freedom for Russia and Emerging Eurasian Democracies and Open Markets Support Act of 1992 (Public Law 102–511) (22 U.S.C. 286*ll*(b)) shall no longer apply to the contents of such annual reports.

PROHIBITION ON ASSISTANCE TO THE PALESTINIAN BROADCASTING CORPORATION

SEC. 584. None of the funds appropriated or otherwise made available by this Act may be used to provide equipment, technical support, consulting services, or any other form of assistance to the Palestinian Broadcasting Corporation.

REPORT ON IRAQI DEVELOPMENT OF WEAPONS OF MASS DESTRUCTION

SEC. 585. (a) FINDINGS.—Congress finds that—

(1) Iraq is continuing efforts to mask the extent of its weapons of mass destruction and missile programs;

(2) proposals to relax the current international inspection regime would have potentially dangerous consequences for international security; and

(3) Iraq has demonstrated time and again that it cannot be trusted to abide by international norms or by its own agreements, and that the only way the international community can be assured of Iraqi compliance is by ongoing inspection.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the international agencies charged with inspections in Iraq—the International Atomic Energy Agency (IAEA) and the United Nations Special Commission (UNSCOM) should maintain vigorous inspections, including surprise inspections, within Iraq; and

(2) the United States should oppose any efforts to ease the inspections regimes on Iraq until there is clear, credible evidence that the Government of Iraq is in full compliance with all relevant United Nations' resolutions.

(c) REPORT.—Not later than 30 days after the date of enactment of this Act, the President shall submit a report to Congress on the United States Government's assessment of Iraq's nuclear and other weapons of mass destruction programs and its efforts to move toward procurement of nuclear weapons and the means to deliver weapons of mass destruction. The report shall also—

(1) assess the United States view of the International Atomic Energy Agency's action team reports and other IAEA efforts to monitor the extent and nature of Iraq's nuclear program; and

(2) include the United States Government's opinion on the value of maintaining the ongoing inspection regime rather than replacing it with a passive monitoring system.

## SENSE OF CONGRESS REGARDING IRAN

SEC. 586. (a) The Congress finds that—

(1) according to the Department of State, Iran continues to support international terrorism, providing training, financing, and weapons to such terrorist groups as Hizballah, Islamic Jihad and Hamas;

(2) Iran continues to oppose the Arab–Israeli peace process and refuses to recognize Israel's right to exist;

(3) Iran continues aggressively to seek weapons of mass destruction and the missiles to deliver them;

(4) it is long-standing United States policy to offer official government-to-government dialogue with the Iranian regime, such offers having been repeatedly rebuffed by Tehran;

(5) more than a year after the election of President Khatemi, Iranian foreign policy continues to threaten American security and that of our allies in the Middle East; and

(6) despite repeated offers and tentative steps toward rapprochement with Iran by the Clinton Administration, including a decision to waive sanctions under the Iran–Libya Sanctions Act and the President's veto of the Iran Missile Proliferation Sanctions Act, Iran has failed to reciprocate in a meaningful manner.

(b) Therefore it is the sense of the Congress that—

(1) the Administration should make no concessions to the Government of Iran unless and until that government moderates its objectionable policies, including taking steps to end its support of international terrorism, opposition to the Middle East peace process, and the development and proliferation of weapons of mass destruction and their means of delivery; and

(2) there should be no change in United States policy toward Iran until there is credible and sustained evidence of a change in Iranian policies.

## AID OFFICE OF SECURITY

<< 22 USCA § 2381 NOTE >>

SEC. 587. (a) ESTABLISHMENT OF OFFICE.—There shall be established within the Office of the Administrator of the Agency for International Development, an Office of Security. Such Office of Security shall, notwithstanding any other provision of law except section 207 of the Foreign Service Act of 1980 and section 103 of Public Law 199–339, have the responsibility for the supervision, direction, and control of all security activities relating to the programs and operations of that Agency.

<< 22 USCA § 2381 NOTE >>

(b) TRANSFER AND ALLOCATION OF APPROPRIATIONS AND PERSONNEL.—There are transferred to the Office of Security all security functions exercised by the Office of Inspector General of the Agency for International Development exercised before the date of enactment of this Act. The Administrator shall transfer from the Office of the Inspector General of such Agency to the Office of Security established by subsection (a), the personnel (including the Senior Executive Service position designated for the Assistant Inspector General for Security), assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, and other funds held, used, available to, or to be made available in connection with such functions. Unexpended balances of appropriations, and other funds made available or to be made available in connection with

such functions, shall be transferred to and merged with funds appropriated by this Act under the heading "Operating Expenses of the Agency for International Development".

<< 22 USCA § 2381 NOTE >>

(c) TRANSFER OF EMPLOYEES.—Any employee in the career service who is transferred pursuant to this section shall be placed in a position in the Office of Security established by subsection (a) which is comparable to the position the employee held in the Office of the Inspector General of the Agency for International Development.

### SENSE OF CONGRESS REGARDING BALLISTIC MISSILE DEVELOPMENT BY NORTH KOREA

SEC. 588. (a) Congress makes the following findings:

(1) North Korea has been active in developing new generations of medium-range and intermediate-range ballistic missiles, including both the Nodong and Taepo Dong class missiles.

(2) North Korea is not an adherent to the Missile Technology Control Regime, actively cooperates with Iran and Pakistan in ballistic missile programs, and has declared its intention to continue to export ballistic missile technology.

(3) North Korea has shared technology involved in the Taepo Dong I missile program with Iran, which is concurrently developing the Shahab–3 intermediate range ballistic missile.

(4) North Korea is developing the Taepo Dong II intermediate-range ballistic missile, which is expected to have sufficient range to put at risk United States territories, forces, and allies throughout the Asia–Pacific area.

(5) Multistage missiles like the Taepo Dong class missile can ultimately be extended to intercontinental range.

(6) The bipartisan Commission to Assess the Ballistic Missile Threat to the United States emphasized the need for the United States intelligence community and United States policy makers to review the methodology by which they assess foreign missile programs in order to guard against surprise developments with respect to such programs.

(b) It is the sense of Congress that—

(1) North Korea should be forcefully condemned for its August 31, 1998, firing of a Taepo Dong I intermediate-range ballistic missile over the sovereign territory of another country, specifically Japan, an event that demonstrated an advanced capability for employing multistage missiles, which are by nature capable of extended range, including intercontinental range;

(2) the United States should reassess its cooperative space launch programs with countries that continue to assist North Korea and Iran in their ballistic missile and cruise missile programs;

(3) any financial or technical assistance provided to North Korea should take into account the continuing conduct by that county of activities which destabilize the region, including the missile firing referred to in paragraph (1), continued submarine incursions into South Korean territorial waters, and violations of the demilitarized zone separating North Korea and South Korea;

(4) the recommendations of the Commission to Assess the Ballistic Missile Threat to the United States should be incorporated into the analytical processes of the United States intelligence community as soon as possible; and

(5) the United States should accelerate cooperative theater missile defense programs with Japan.

### TECHNICAL ASSISTANCE TO FOREIGN GOVERNMENTS

<< 22 USCA § 2151aa >>

SEC. 589. (a) ESTABLISHMENT OF PROGRAM.—Chapter 1 of part I of the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq.) is amended by adding at the end the following:

"SEC. 129. PROGRAM TO PROVIDE TECHNICAL ASSISTANCE TO FOREIGN GOVERNMENTS AND FOREIGN CENTRAL BANKS OF DEVELOPING OR TRANSITIONAL COUNTRIES.

"(a) ESTABLISHMENT OF PROGRAM.—

"(1) IN GENERAL.—Not later than 150 days after the date of the enactment of this section, the Secretary of the Treasury, after consultation with the Secretary of State and the Administrator of the United States Agency for International Development, is authorized to establish a program to provide technical assistance to foreign governments and foreign central banks of developing or transitional countries.

"(2) ROLE OF SECRETARY OF STATE.—The Secretary of State shall provide foreign policy guidance to the Secretary to ensure that the program established under this subsection is effectively integrated into the foreign policy of the United States.

"(b) CONDUCT OF PROGRAM.—

"(1) IN GENERAL.—In carrying out the program established under subsection (a), the Secretary shall provide economic and financial technical assistance to foreign governments and foreign central banks of developing and transitional countries by providing advisers with appropriate expertise to advance the enactment of laws and establishment of administrative procedures and institutions in such countries to promote macroeconomic and fiscal stability, efficient resource allocation, transparent and market-oriented processes and sustainable private sector growth.

"(2) ADDITIONAL REQUIREMENTS.—To the extent practicable, such technical assistance shall be designed to establish—

"(A) tax systems that are fair, objective, and efficiently gather sufficient revenues for governmental operations;

"(B) debt issuance and management programs that rely on market forces;

"(C) budget planning and implementation that permits responsible fiscal policy management;

"(D) commercial banking sector development that efficiently intermediates between savers and investors; and

"(E) financial law enforcement to protect the integrity of financial systems, financial institutions, and government programs.

"(c) ADMINISTRATIVE REQUIREMENTS.—In carrying out the program established under subsection (a), the Secretary—

"(1) shall establish a methodology for identifying and selecting foreign governments and foreign central banks to receive assistance under the program;

"(2) prior to selecting a foreign government or foreign central bank to receive assistance under the program, shall receive the concurrence of the Secretary of State with respect to the selection of such government or central bank and with respect to the cost of the assistance to such government or central bank;

"(3) shall consult with the heads of appropriate Executive agencies of the United States, including the Secretary of State and the Administrator of the United States Agency for International Development, and appropriate international financial institutions to avoid duplicative efforts with respect to those foreign countries for which such agencies or organizations provide similar assistance;

"(4) shall ensure that the program is consistent with the International Affairs Strategic Plan and Mission Performance Plan of the United States Agency for International Development;

"(5) shall establish and carry out a plan to evaluate the program.

"(d) ADMINISTRATIVE AUTHORITIES.—In carrying out the program established under subsection (a), the Secretary shall have the following administrative authorities:

"(1) The Secretary may provide allowances and benefits under chapter 9 of title I of the Foreign Service Act of 1980 (22 U.S.C. 4081 et seq.) to any officer or employee of any agency of the United States Government performing functions under this section outside the United States.

"(2)(A) The Secretary may allocate or transfer to any agency of the United States Government any part of any funds available for carrying out this section, including any advance to the United States Government by any country or international organization for the procurement of commodities, supplies, or services.

"(B) Such funds shall be available for obligation and expenditure for the purposes for which such funds were authorized, in accordance with authority granted in this section or under authority governing the activities of the agency of the United States Government to which such funds are allocated or transferred.

"(3) Appropriations for the purposes of or pursuant to this section, and allocations to any agency of the United States Government from other appropriations for functions directly related to the purposes of this section, shall be available for—

"(A) contracting with individuals for personal services abroad, except that such individuals shall not be regarded as employees of the United States Government for the purpose of any law administered by the Office of Personnel Management;

"(B) the purchase and hire of passenger motor vehicles, except that passenger motor vehicles may be purchased only—

"(i) for use in foreign countries; and

"(ii) if the Secretary or the Secretary's designee has determined that the vehicle is necessary to accomplish the mission;

"(C) the purchase of insurance for official motor vehicles acquired for use in foreign countries;

"(D)(i) the rent or lease outside the United States, not to exceed 5 years, of offices, buildings, grounds, and quarters, including living quarters to house personnel, consistent with the relevant interagency housing board policy, and payments therefor in advance;

"(ii) maintenance, furnishings, necessary repairs, improvements, and alterations to properties owned or rented by the United States Government or made available for use to the United States Government outside the United States; and

"(iii) costs of insurance, fuel, water, and utilities for such properties;

"(E) expenses of preparing and transporting to their former homes or places of burial the remains of foreign participants or members of the family of foreign participants, who may die while such participants are away from their homes participating in activities carried out with funds covered by this section;

"(F) notwithstanding any other provision of law, transportation and payment of per diem in lieu of subsistence to foreign participants engaged in activities of the program under this section while such participants are away from their homes in countries other than the United States, at rates not in excess of those prescribed by the standardized Government travel regulations;

"(G) expenses in connection with travel of personnel outside the United States, including travel expenses of dependents (including expenses during necessary stop-overs while engaged in such travel), and transportation of personal effects, household goods, and automobiles of such personnel when any part of such travel or transportation begins in one fiscal year pursuant to travel orders issued in that fiscal year, notwithstanding the fact that such travel or transportation may not be completed during the same fiscal year, and cost of transporting automobiles to and from a place of storage, and the cost of storing automobiles of such personnel when it is in the public interest or more economical to authorize storage; and

"(H) grants to, and cooperative agreements and contracts with, any individual, corporation, or other body of persons, nonprofit organization, friendly government or government agency, whether within or without the United States, and international organizations, as the Secretary determines is appropriate to carry out the purposes of this section.

"(4) Whenever the Secretary determines it to be consistent with the purposes of this section, the Secretary is authorized to furnish services and commodities on an advance-of-funds basis to any friendly country or international organization that is not otherwise prohibited from receiving assistance under this Act. Such advances may be credited to the currently applicable appropriation, account, or fund of the Department of the Treasury and shall be available for the purposes for which such appropriation, account, or fund is authorized to be used.

"(e) ISSUANCE OF REGULATIONS.—The Secretary is authorized to issue such regulations with respect to personal service contractors as the Secretary deems necessary to carry out this section.

"(f) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to infringe upon the powers or functions of the Secretary of State (including the powers or functions described in section 103 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (22 U.S.C. 4802)) or of any chief of mission (including the powers or functions described in section 207 of the Foreign Service Act of 1980 (22 U.S.C. 3927)).

"(g) TERMINATION OF ASSISTANCE.—The Secretary shall conclude assistance activities for a recipient foreign government or foreign central bank under the program established under subsection (a) if the Secretary, after consultation with the appropriate officers of the United States, determines that such assistance has resulted in the enactment of laws or the establishment of institutions in that country that promote fiscal stability and administrative procedures, efficient resource allocation, transparent and market-oriented processes and private sector growth in a sustainable manner.

"(h) REPORT.—

"(1) IN GENERAL.—Not later than 3 months after the date of the enactment of this section, and every 6 months thereafter, the Secretary shall prepare and submit to the appropriate congressional committees a report on the conduct of the program established under this section during the preceding 6-month period.

"(2) DEFINITION.—In this subsection, the term 'appropriate congressional committees' means—

"(A) the Committee on International Relations and the Committee on Appropriations of the House of Representatives; and

"(B) the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

"(i) DEFINITIONS.—In this section:

"(1) DEVELOPING OR TRANSITIONAL COUNTRY.—The term 'developing or transitional country' means a country eligible to receive development assistance under this chapter.

"(2) INTERNATIONAL FINANCIAL INSTITUTION.—The term 'international financial institution' means the International Monetary Fund, the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Multilateral Investment Guarantee Agency, the Asian Development Bank, the African Development Bank, the African Development Fund, the Inter–American Development Bank, the Inter–

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

American Investment Corporation, the European Bank for Reconstruction and Development, and the Bank for Economic Cooperation and Development in the Middle East and North Africa.

"(3) SECRETARY.—The term 'Secretary' means the Secretary of the Treasury.

"(4) TECHNICAL ASSISTANCE.—The term 'technical assistance' includes—

  "(A) the use of short-term and long-term expert advisers to assist foreign governments and foreign central banks for the purposes described in subsection (b)(1);

  "(B) training in the recipient country, the United States, or elsewhere for the purposes described in subsection (b)(1);

  "(C) grants of goods, services, or funds to foreign governments and foreign central banks;

  "(D) grants to United States nonprofit organizations to provide services or products which contribute to the provision of advice to foreign governments and foreign central banks; and

  "(D) study tours for foreign officials in the United States or elsewhere for the purpose of providing technical information to such officials.

"(5) FOREIGN PARTICIPANT.—The term 'foreign participant' means the national of a developing or transitional country that is receiving assistance under the program established under subsection (a) who has been designated to participate in activities under such program.

"(j) AUTHORIZATION OF APPROPRIATIONS.—

  "(1) IN GENERAL.—There are authorized to be appropriated to carry out this section $5,000,000 for fiscal year 1999.

  "(2) AVAILABILITY OF AMOUNTS.—Amounts authorized to be appropriated under paragraph (1) are authorized to remain available until expended.".

<< 5 USCA § 5742 >>

(b) TRANSPORTATION OF REMAINS, DEPENDENTS, AND EFFECTS OF UNITED STATES GOVERNMENT EMPLOYEES; DEATH OCCURRING AWAY FROM OFFICIAL STATION ABROAD.—Section 5742(b) of title 5, United States Code, is amended—

<< 5 USCA § 5742 >>

(1) in paragraph (1), by striking the "and" at the end;

<< 5 USCA § 5742 >>

(2) in paragraph (2), by striking the period at the end and inserting "; and"; and

<< 5 USCA § 5742 >>

(3) by adding at the end the following new paragraph:

  "(3) the travel expenses of not more than 2 persons to escort the remains of a deceased employee, if death occurred while the employee was in travel status away from his official station in the United States or while performing official duties outside the United States or in transit thereto or therefrom, from the place of death to the home or official station of such person, or such other place appropriate for interment as is determined by the head of the agency concerned.".

<div align="center">IRAQ OPPOSITION</div>

SEC. 590. Notwithstanding any other provision of law, of the funds made available in this Act and prior Acts making appropriations for foreign operations, export financing and related programs, not less than $8,000,000 shall be made available only for assistance to the Iraqi democratic opposition for such activities as organization, training, communication and dissemination of information, and developing and implementing agreements among opposition groups: *Provided further,* That any agreement reached regarding the obligation of funds under the previous proviso shall include provisions to ensure appropriate monitoring on the use of such funds: *Provided further,* That of this amount not less than $3,000,000 should be made available as a grant to Iraqi National Congress, to be administered by its Executive Committee for the benefit of all constituent groups of the Iraqi National Congress: *Provided further,* That within 30 days of enactment of this Act the Secretary of State shall submit a detailed report to the Appropriations Committees of Congress on implementation of this section.

## NATIONAL COMMISSION ON TERRORISM

SEC. 591. (a) ESTABLISHMENT OF NATIONAL COMMISSION ON TERRORISM.—

(1) ESTABLISHMENT.—There is established a national commission on terrorism to review counter-terrorism policies regarding the prevention and punishment of international acts of terrorism directed at the United States. The commission shall be known as "The National Commission on Terrorism".

(2) COMPOSITION.—The commission shall be composed of 10 members appointed as follows:

(A) Three members shall be appointed by the Majority Leader of the Senate.

(B) Three members shall be appointed by the Speaker of the House of Representatives.

(C) Two members shall be appointed by the Minority Leader of the Senate.

(D) Two members shall be appointed by the Minority Leader of the House of Representatives.

(E) The appointments of the members of the commission should be made no later than 3 months after the date of the enactment of this Act.

(3) QUALIFICATIONS.—The members should have a knowledge and expertise in matters to be studied by the commission.

(4) CHAIR.—The Speaker of the House of Representatives, after consultation with the majority leader of the Senate and the minority leaders of the House of Representatives and the Senate, shall designate one of the members of the Commission to serve as chair of the Commission.

(5) PERIOD OF APPOINTMENT: VACANCIES.—Members shall be appointed for the life of the Commission. Any vacancy in the Commission shall be filled in the same manner as the original appointment.

(6) SECURITY CLEARANCES.—All Members of the Commission should hold appropriate security clearances.

(b) DUTIES.—

(1) IN GENERAL.—The commission shall consider issues relating to international terrorism directed at the United States as follows:

(A) Review the laws, regulations, policies, directives, and practices relating to counterterrorism in the prevention and punishment of international terrorism directed towards the United States.

(B) Assess the extent to which laws, regulations, policies, directives, and practices relating to counterterrorism have been effective in preventing or punishing international terrorism directed towards the United States. At a minimum, the assessment should include a review of the following:

(i) Evidence that terrorist organizations have established an infrastructure in the western hemisphere for the support and conduct of terrorist activities.

(ii) Executive branch efforts to coordinate counterterrorism activities among Federal, State, and local agencies and with other nations to determine the effectiveness of such coordination efforts.

(iii) Executive branch efforts to prevent the use of nuclear, biological, and chemical weapons by terrorists.

(C) Recommend changes to counterterrorism policy in preventing and punishing international terrorism directed toward the United States.

(2) REPORT.—Not later than 6 months after the date on which the Commission first meets, the Commission shall submit to the President and the Congress a final report of the findings and conclusions of the commission, together with any recommendations.

(c) ADMINISTRATIVE MATTERS.—

(1) MEETINGS.—

(A) The commission shall hold its first meeting on a date designated by the Speaker of the House which is not later than 30 days after the date on which all members have been appointed.

(B) After the first meeting, the commission shall meet upon the call of the chair.

(C) A majority of the members of the commission shall constitute a quorum, but a lesser number may hold meetings.

(2) AUTHORITY OF INDIVIDUALS TO ACT FOR COMMISSION.—Any member or agent of the commission may, if authorized by the commission, take any action which the commission is authorized to take under this section.

(3) POWERS.—

(A) The commission may hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the commission considers advisable to carry out its duties.

(B) The commission may secure directly from any agency of the Federal Government such information as the commission considers necessary to carry out its duties. Upon the request of the chair of the commission, the head of a department or agency shall furnish the requested information expeditiously to the commission.

(C) The commission may use the United States mails in the same manner and under the same conditions as other departments and agencies of the Federal Government.

(4) PAY AND EXPENSES OF COMMISSION MEMBERS.—

(A) Subject to appropriations, each member of the commission who is not an employee of the government shall be paid at a rate not to exceed the daily equivalent of the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during which such member is engaged in performing the duties of the commission.

(B) Members and personnel for the commission may travel on aircraft, vehicles, or other conveyances of the Armed Forces of the United States when travel is necessary in the performance of a duty of the commission except when the cost of commercial transportation is less expensive.

(C) The members of the commission may be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the commission.

(D)(i) A member of the commission who is an annuitant otherwise covered by section 8344 of 8468 of title 5, United States Code, by reason of membership on the commission shall not be subject to the provisions of such section with respect to membership on the commission.

(ii) A member of the commission who is a member or former member of a uniformed service shall not be subject to the provisions of subsections (b) and (c) of section 5532 of such title with respect to membership on the commission.

(5) STAFF AND ADMINISTRATIVE SUPPORT.—

(A) The chairman of the commission may, without regard to civil service laws and regulations, appoint and terminate an executive director and up to three additional staff members as necessary to enable the commission to perform its duties. The chairman of the commission may fix the compensation of the executive director and other personnel without regard to the provisions of chapter 51, and subchapter III of chapter 53, of title 5, United States Code, relating to classification of positions and General Schedule pay rates, except that the rate of pay may not exceed the maximum rate of pay for GS–15 under the General Schedule.

(B) Upon the request of the chairman of the commission, the head of any department or agency of the Federal Government may detail, without reimbursement, any personnel of the department or agency to the commission to assist in carrying out its duties. The detail of an employee shall be without interruption or loss of civil service status or privilege.

(d) TERMINATION OF COMMISSION.—The commission shall terminate 30 days after the date on which the commission submits a final report.

(e) FUNDING.—There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section.


## SPECIAL AUTHORITIES AMENDMENT

SEC. 592. The authority of section 614 of the Foreign Assistance Act of 1961, as amended, may not be used during fiscal year 1999 for the Korean Peninsula Energy Development Organization to authorize the use of more than $35,000,000 of funds made available for use under that Act or the Arms Export Control Act.


## ECONOMIC AND POLITICAL TRANSITION IN INDONESIA

SEC. 593. (a) POLITICAL AND ECONOMIC REFORM.—It is the sense of Congress that—

(1) expanding the availability of wheat, wheat products, and rice for distribution to the most needy and vulnerable Indonesians is vital to the well-being of all Indonesians;

(2) the Administration should adopt a more active approach in support of democratic institutions and processes in Indonesia and provide assistance for continued economic and political development in Indonesia, including—

(A) support for humanitarian programs;

(B) leading a multinational effort to expand humanitarian and food aid programs to meet the needs of Indonesia;

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(C) working with international financial institutions to recapitalize and reform the banking system, restructure corporate debt, and introduce economic and legal transparency in Indonesia;

(D) urging the Government of Indonesia to remove, to the maximum extent possible, barriers to trade and investment which impede economic recovery in Indonesia, including tariffs, quotas, export taxes, nontariff barriers, and prohibitions against foreign ownership and investment;

(E) urging the Government of Indonesia to—

(i) recognize and protect the participation of all Indonesians, including ethnic and religious minorities, in the political and economic life of Indonesia; and

(ii) release individuals detained or imprisoned for their political views;

(F) supporting efforts to establish a timetable for elections and building democracy by strengthening political parties and institutions and the rule of law including the repeal of laws and regulations that discriminate on the basis of religion or ethnicity.

(b) REPORT.—Not later than 6 months after the date of enactment of this Act, the Secretary of State shall submit to the Committees on Appropriations a report containing a description and assessment of the actions taken by the Government of the United States and the Government of Indonesia to further the objectives referred to in subsection (a).

(c) ETHNIC VIOLENCE.—It is the sense of Congress that—

(1) the mistreatment of ethnic Chinese in Indonesia and the criminal acts carried out against them during the May 1998 riots in Indonesia are deplorable and condemned;

(2) a full and fair investigation of such criminal acts should be completed by the earliest possible date, and those identified as responsible for perpetrating such criminal acts should be brought to justice;

(3) the investigation by the Government of Indonesia, through its Military Honor Council, of those members of the armed forces of Indonesia suspected of possible involvement in the May 1998 riots, and of any member of the armed forces of Indonesia who may have participated in criminal acts against the people of Indonesia during the riots, is commended and should be supported;

(4) the Government of Indonesia should take action to assure—

(A) the implementation of appropriate measures to prevent ethnic-related violence and rapes in Indonesia and to protect the human rights and physical safety of the ethnic Chinese community in Indonesia; and

(B) the provision of just compensation for victims of the rape and violence that occurred during the May 1998 riots in Indonesia, including medical care;

(5) the Administration and the United Nations should continue to support and assist the Government of Indonesia and nongovernmental organizations, in the investigations into the May 1998 riots in Indonesia in order to expedite such investigations.

(d) REPORT.—(1) Not later than 6 months after the date of enactment of this Act, the Secretary of State shall submit to Congress a report containing the following:

(A) An assessment of—

(i) whether or not there was a systematic and organized campaign of violence, including the use of rape, against the ethnic Chinese community in Indonesia during the May 1998 riots in Indonesia; and

(ii) the level and degree of participation, if any, of members of the Government or armed forces of Indonesia in the riots.

(B) An assessment of the actions taken by the Government of Indonesia to investigate the May 1998 riots in Indonesia, bring the perpetrators of the riots to justice, and ensure that similar riots do not recur.

REPORTING REQUIREMENTS

<< 22 USCA § 2753 NOTE >>

SEC. 594. (a) NOTIFICATION.—No less than 15 days prior to the export to any country identified pursuant to subparagraph (C) of any lethal defense article or service in the amount of $14,000,000 or less, the President shall provide a detailed notification to the Committees on Appropriations and Foreign Relations of the Senate and the Committees on Appropriations and International Relations of the House of Representatives.

<< 22 USCA § 2753 NOTE >>

  (b) CONTENT OF NOTIFICATION.—A detailed notification transmitted pursuant to subparagraph (a) shall include the same type and quantity of information required of a notification submitted pursuant to section 36(b) of the Arms Export Control Act (22 U.S.C. 2776(b)).

<< 22 USCA § 2753 NOTE >>

  (c) COUNTRIES DEFINED.—This section shall apply to any country that is—

<< 22 USCA § 2753 NOTE >>

  (1) identified in section 521 of the annual appropriations Act for Foreign Operations, Export Financing, and Related Programs, or a comparable provision in a subsequent appropriations Act; or

<< 22 USCA § 2753 NOTE >>

  (2) currently ineligible, in whole or in part, under an annual appropriations Act to receive funds for International Military Education and Training or under the Foreign Military Financing Program, excluding high-income countries as defined pursuant to section 546(b) of the Foreign Assistance Act of 1961.

<< 22 USCA § 2753 NOTE >>

  (d) EXCLUSIONS.—Information reportable under title V of the National Security Act of 1947 is excluded from the requirements of this section.

SENSE OF CONGRESS CONCERNING THE MURDER OF FOUR AMERICAN CHURCHWOMEN IN EL SALVADOR
SEC. 595. (a) FINDINGS.—Congress makes the following findings—
  (1) the December 2, 1980 brutal assault and murder of four American churchwomen by members of the Salvadoran National Guard was covered up and never fully investigated;
  (2) on July 22 and July 23, 1998, Salvadoran authorities granted three of the National Guardsmen convicted of the crimes early release from prison;
  (3) the United Nations Truth Commission for El Salvador determined in 1993 that there was sufficient evidence that the Guardsmen were acting on orders from their superiors;
  (4) in March 1998, four of the convicted Guardsmen confessed that they acted after receiving orders from their superiors;
  (5) recently declassified documents from the State Department show that United States Government officials were aware of information suggesting the involvement of superior officers in the murders;
  (6) United States officials granted permanent residence to a former Salvadoran military official involved in the cover-up of the murders, enabling him to remain in Florida; and
  (7) despite the fact that the murders occurred over 17 years ago, the families of the four victims continue to seek the disclosure of information relevant to the murders.
(b) SENSE OF CONGRESS.—It is the sense of Congress that—
  (1) information relevant to the murders should be made public to the fullest extent possible;
  (2) the Secretary of State and the Department of State are to be commended for fully releasing information regarding the murders to the victims' families and to the American public, in prompt response to congressional requests;
  (3) the President should order all other Federal agencies and departments that possess relevant information to make every effort to declassify and release to the victims' families relevant information as expeditiously as possible;
  (4) in making determinations concerning the declassification and release of relevant information, the Federal agencies and departments should presume in favor of releasing, rather than of withholding, such information; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(5) the President should direct the Attorney General to review the circumstances under which individuals involved in either the murders or the cover-up of the murders obtained residence in the United States, and the Attorney General should submit a report to the Congress on the results of such review not later than January 1, 1999.

### SENSE OF CONGRESS REGARDING THE TRIAL IN THE NETHERLANDS OF THE SUSPECTS INDICTED IN THE BOMBING OF PAN AM FLIGHT 103

SEC. 596. (a) FINDINGS.—Congress makes the following findings:

 (1) On December 21, 1988, 270 people, including 189 United States citizens, were killed in a terrorist bombing on Pan Am Flight 103 over Lockerbie, Scotland.

 (2) Britain and the United States indicted 2 Libyan intelligence agents—Abdel Basset Al–Megrahi and Lamen Khalifa Fhimah —in 1991 and sought their extradition from Libya to the United States or the United Kingdom to stand trial for this heinous terrorist act.

 (3) The United Nations Security Council called for the extradition of the suspects in Security Council Resolution 731 and imposed sanctions on Libya in Security Council Resolutions 748 and 883 because Libyan leader, Colonel Muammar Qadaffi, refused to transfer the suspects to either the United States or the United Kingdom to stand trial.

 (4) The sanctions in Security Council Resolutions 748 and 883 include a worldwide ban on Libya's national airline, a ban on flights into and out of Libya by other nations' airlines, a prohibition on supplying arms, airplane parts, and certain oil equipment to Libya, and a freeze on Libyan government funds in other countries.

 (5) Colonel Qaddafi has continually refused to extradite the suspects to either the United States or the United Kingdom and has insisted that he will only transfer the suspects to a third and neutral country to stand trial.

 (6) On August 24, 1998, the United States and the United Kingdom proposed that Colonel Qadaffi transfer the suspects to the Netherlands, where they would stand trial before a Scottish court, under Scottish law, and with a panel of Scottish judges.

 (7) The United States–United Kingdom proposal is consistent with those previously endorsed by the Organization of African Unity, the League of Arab States, the Non–Aligned Movement, and the Islamic Conference.

 (8) The United Nations Security Council endorsed the United States–United Kingdom proposal on August 27, 1998, in United Nations Security Council Resolution 1192.

 (9) The United States Government has stated that this proposal is nonnegotiable and has called on Colonel Qadaffi to respond promptly, positively, and unequivocally to this proposal by ensuring the timely appearance of the two accused individuals in the Netherlands for trial before the Scottish court.

 (10) The United States Government has called on Libya to ensure the production of evidence, including the presence of witnesses before the court, and to comply fully with all the requirements of the United Nations Security Council resolutions.

 (11) Secretary of State Albright has said that the United States will urge a multilateral oil embargo against Libya in the United Nations Security Council if Colonel Muammar Qadaffi does not transfer the suspects to the Netherlands to stand trial.

 (12) The United Nations Security Council will convene on October 30, 1998, to review sanctions imposed on Libya.

 (b) SENSE OF CONGRESS.—It is the sense of Congress that—

 (1) Colonel Qadaffi should promptly transfer the indicted suspects Abdel Basset Al–Megrahi and Lamen Khalifa Fhimah to the Netherlands to stand trial before the Scottish court;

 (2) the United States Government should remain firm in its commitment not to negotiate with Colonel Qadaffi on any of the details of the proposal approved by the United Nations in United Nations Security Council Resolution 1192; and

 (3) if Colonel Qadaffi does not transfer the indicted suspects Abdel Basset Al–Megrahi and Lamen Khalifa Fhimah to the Netherlands by October 29, 1998, the United States Permanent Representative to the United Nations should—

  (A) introduce a resolution in the United Nations Security Council to impose a multilateral oil embargo against Libya;

  (B) actively promote adoption of the resolution by the United Nations Security Council; and

  (C) assure that a vote will occur in the United Nations Security Council on such a resolution.

### SENSE OF THE CONGRESS REGARDING INTERNATIONAL COOPERATION IN RECOVERING CHILDREN ABDUCTED IN THE UNITED STATES AND TAKEN TO OTHER COUNTRIES.

SEC. 597. (a) FINDINGS.—Congress finds that—

 (1) many children in the United States have been abducted by family members who are foreign nationals and living in foreign countries;

(2) children who have been abducted by an estranged father are very rarely returned, through legal remedies, from countries that only recognize the custody rights of the father;

(3) there are at least 140 cases that need to be resolved in which children have been abducted by family members and taken to foreign countries;

(4) although the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, has made progress in aiding the return of abducted children, the Convention does not address the criminal aspects of child abduction, and there is a need to reach agreements regarding child abduction with countries that are not parties to the Convention; and

(5) decisions on awarding custody of children should be made in the children's best interest, and persons who violate laws of the United States by abducting their children should not be rewarded by being granted custody of those children.

(b) SENSE OF THE CONGRESS.—It is the sense of the Congress that the United States Government should promote international cooperation in working to resolve those cases in which children in the United States are abducted by family members who are foreign nationals and taken to foreign countries, and in seeing that justice is served by holding accountable the abductors for violations of criminal law.

## TITLE VI—INTERNATIONAL FINANCIAL PROGRAMS AND REFORM

### FUNDS APPROPRIATED TO THE PRESIDENT

### INTERNATIONAL MONETARY PROGRAMS

### UNITED STATES QUOTA IN THE INTERNATIONAL MONETARY FUND

For an increase in the United States quota in the International Monetary Fund, the dollar equivalent of 10,622,500,000 Special Drawing Rights, to remain available until expended.

### LOANS TO THE INTERNATIONAL MONETARY FUND—NEW ARRANGEMENTS TO BORROW

For loans to the International Monetary Fund under section 17 of the Bretton Woods Agreements Act pursuant to the New Arrangements to Borrow, the dollar equivalent of 2,462,000,000 Special Drawing Rights, to remain available until expended. In addition, the amounts appropriated by title III of the Foreign Aid and Related Agencies Appropriations Act, 1963 (Public Law 87–872) and section 1101(b) of the Supplemental Appropriations Act, 1984 (Public Law 98–181) may also be used under section 17 of the Bretton Woods Agreements Act pursuant to the New Arrangements to Borrow.

### GENERAL PROVISIONS—THIS TITLE

#### CONDITIONS FOR THE USE OF APPROPRIATED FUNDS FOR THE INTERNATIONAL MONETARY FUND

SEC. 601. None of the funds appropriated in this title may be obligated or made available to the International Monetary Fund until 15 days after the Secretary of the Treasury and the Chairman of the Board of Governors of the Federal Reserve System jointly provide written notification to the appropriate committees that the major shareholders of the Fund have publicly agreed to, and will act to implement in the Fund the following policies:

(1) Policies providing that conditions in standby or other arrangements regarding the use of Fund resources include, in addition to appropriate monetary policy conditions, requirements that the recipient country, in accordance with a schedule for action—

(A) liberalize restrictions on trade in goods and services, consistent with the terms of all international trade agreements of which the borrowing country is a signatory;

(B) eliminate the systemic practice or policy of government directed lending on non-commercial terms or provision of market distorting subsidies to favored industries, enterprises, parties, or institutions; and

(C) provide a legal basis for nondiscriminatory treatment in insolvency proceedings between domestic and foreign creditors, and for debtors and other concerned persons.

(2) Policies providing that within 3 months after any meeting of the Executive Board of the Fund at which a Letter of Intent, a Policy Framework Paper, an Article IV economic review consultation with a member country, or a change in a general policy of the Fund is discussed, a full written summary of the meeting should be made available for public inspection, with the following information redacted:

(A) Information which, if released, would adversely affect the national security of a country, and which is of the type that would be classified by the United States Government.

(B) Market-sensitive information.

(C) Proprietary information.

(3) Policies providing that within 3 months after any meeting of the Executive Board of the Fund at which a Letter of Intent, a Memorandum of Understanding, or a Policy Framework Paper is discussed, a copy of the Letter of Intent, Memorandum of Understanding, or Policy Framework Paper should be made available for public inspection with the following information redacted:

(A) Information which, if released, would adversely affect the national security of a country, and which is of the type that would be classified by the United States Government.

(B) Market-sensitive information.

(C) Proprietary information.

(4) Policies providing that, in circumstances where a country is experiencing balance of payments difficulties due to a large short-term financing need resulting from a sudden and disruptive loss of market confidence and in order to provide an incentive for early repayment and encourage private market financing, loans made from the Fund's general resources after the date of the enactment of this section are—

(A) made available at an interest rate that reflects an adjustment for risk that is not less than 300 basis points in excess of the average of the market-based short-term cost of financing of its largest members; and

(B) repaid within 1 to 2½ years from each disbursement.

REPORTS ON FINANCIAL STABILIZATION PROGRAMS IN THE REPUBLIC OF KOREA

SEC. 602. (a) The Secretary of the Treasury shall instruct the United States Executive Director at the International Monetary Fund to exert the influence of the United States to oppose further disbursement of funds to the Republic of Korea under the Republic of Korea's standby arrangement of December 4, 1997 (in this section referred to as the "Arrangement"), unless there is in effect a certification by the Secretary of the Treasury to the appropriate committees that—

(1) no Fund resources made available pursuant to the Arrangement have been used to provide financial assistance to the semiconductor, steel, automobile, shipbuilding, or textile and apparel industries;

(2) the Fund has neither guaranteed nor underwritten the private loans of semiconductor, steel, automobile, shipbuilding, or textile and apparel manufacturers under the Arrangement; and

(3) officials from the Fund and the Department of the Treasury have monitored the implementation of the provisions contained in the Arrangement, and all of the conditions have either been met or the Republic of Korea has committed itself to fulfill all of these conditions according to an explicit timetable for completion; which timetable has been provided to the Fund and the Department of the Treasury and approved by the Fund.

(b) Before each disbursement of Fund resources to the Republic of Korea under the Arrangement, the Secretary of the Treasury shall report to the appropriate committees on whether a certification by the Secretary pursuant to subsection (a) is in effect.

ADVISORY COMMISSION

<< 22 USCA § 262r NOTE >>

SEC. 603. (a) IN GENERAL.—The Secretary of the Treasury shall establish an International Financial Institution Advisory Commission (in this section referred to as the "Commission").

<< 22 USCA § 262r NOTE >>

(b) MEMBERSHIP.—

<< 22 USCA § 262r NOTE >>

(1) IN GENERAL.—The Commission shall be composed of 11 members, as follows:

(A) 3 members appointed by the Speaker of the House of Representatives.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) 3 members appointed by the Majority Leader of the Senate.

(C) 5 members appointed jointly by the Minority Leader of the House of Representatives and the Minority Leader of the Senate.

<< 22 USCA § 262r NOTE >>

(2) TIMING OF APPOINTMENTS.—All appointments to the Commission shall be made not later than 45 days after the date of enactment of this Act.

<< 22 USCA § 262r NOTE >>

(3) CHAIRMAN.—The Majority Leader of the Senate, after consultation with the Speaker of the House of Representatives and the Minority Leaders of the House of Representatives and the Senate, shall designate 1 of the members of the Commission to serve as Chairman of the Commission.

<< 22 USCA § 262r NOTE >>

(c) QUALIFICATIONS.—

<< 22 USCA § 262r NOTE >>

(1) EXPERTISE.—Members of the Commission shall be appointed from among those with knowledge and expertise in the workings of the international financial institutions (as defined in section 1701(c)(2) of the International Financial Institutions Act), the World Trade Organization, and the Bank for International Settlements.

<< 22 USCA § 262r NOTE >>

(2) FORMER AFFILIATION.—At least 4 members of the Commission shall be individuals who were officers or employees of the Executive Branch before January 20, 1992, and not more than half of such 4 members shall have served under Presidents from the same political party.

<< 22 USCA § 262r NOTE >>

(d) PERIOD OF APPOINTMENT; VACANCIES.—Members shall be appointed for the life of the Commission. Any vacancy in the Commission shall be filled in the same manner as the original appointment was made.

<< 22 USCA § 262r NOTE >>

(e) DUTIES OF THE COMMISSION.—The Commission shall advise and report to the Congress on the future role and responsibilities of the international financial institutions (as defined in section 1701(c)(2) of the International Financial Institutions Act), the World Trade Organization, and the Bank for International Settlements. In carrying out such duties, the Commission shall meet with and advise the Secretary of the Treasury or the Deputy Secretary of the Treasury, and shall examine—

<< 22 USCA § 262r NOTE >>

(1) the effect of globalization, increased trade, capital flows, and other relevant factors on such institutions;

<< 22 USCA § 262r NOTE >>

(2) the adequacy, efficacy, and desirability of current policies and programs at such institutions as well as their suitability for respective beneficiaries of such institutions;

<< 22 USCA § 262r NOTE >>

AR.02487

(3) cooperation or duplication of functions and responsibilities of such institutions; and

<< 22 USCA § 262r NOTE >>

(4) other matters the Commission deems necessary to make recommendations pursuant to subsection (g).

<< 22 USCA § 262r NOTE >>

(f) POWERS AND PROCEDURES OF THE COMMISSION.—

<< 22 USCA § 262r NOTE >>

(1) HEARINGS.—The Commission or, at its direction, any panel or member of the Commission may, for the purpose of carrying out the provisions of this section, hold hearings, sit and act at times and places, take testimony, receive evidence, and administer oaths to the extent that the Commission or any panel or member considers advisable.

<< 22 USCA § 262r NOTE >>

(2) INFORMATION.—The Commission may secure directly information that the Commission considers necessary to enable the Commission to carry out its responsibilities under this section.

<< 22 USCA § 262r NOTE >>

(3) MEETINGS.—The Commission shall meet at the call of the Chairman.

<< 22 USCA § 262r NOTE >>

(g) REPORT.—On the termination of the Commission, the Commission shall submit to the Secretary of the Treasury and the appropriate committees a report that contains recommendations regarding the following matters:

<< 22 USCA § 262r NOTE >>

(1) Changes to policy goals set forth in the Bretton Woods Agreements Act and the International Financial Institutions Act.

<< 22 USCA § 262r NOTE >>

(2) Changes to the charters, organizational structures, policies and programs of the international financial institutions (as defined in section 1701(c)(2) of the International Financial Institutions Act).

<< 22 USCA § 262r NOTE >>

(3) Additional monitoring tools, global standards, or regulations for, among other things, global capital flows, bankruptcy standards, accounting standards, payment systems, and safety and soundness principles for financial institutions.

<< 22 USCA § 262r NOTE >>

(4) Possible mergers or abolition of the international financial institutions (as defined in section 1701(c)(2) of the International Financial Institutions Act), including changes to the manner in which such institutions coordinate their policy and program implementation and their roles and responsibilities.

<< 22 USCA § 262r NOTE >>

(5) Any additional changes necessary to stabilize currencies, promote continued trade liberalization and to avoid future financial crises.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 22 USCA § 262r NOTE >>

(h) TERMINATION.—The Commission shall terminate 6 months after the first meeting of the Commission, which shall be not later than 30 days after the appointment of all members of the Commission.

<< 22 USCA § 262r NOTE >>

(i) REPORTS BY THE EXECUTIVE BRANCH.—

<< 22 USCA § 262r NOTE >>

(1) Within three months after receiving the report of the Commission under subsection (g), the President of the United States through the Secretary of the Treasury shall report to the appropriate committees on the desirability and feasibility of implementing the recommendations contained in the report.

<< 22 USCA § 262r NOTE >>

(2) Annually, for three years after the termination of the Commission, the President of the United States through the Secretary of the Treasury shall submit to the appropriate committees a report on the steps taken, if any, through relevant international institutions and international fora to implement such recommendations as are deemed feasible and desirable under paragraph (1).

## INTERNATIONAL ADVISORY COMMITTEE

SEC. 604. The Secretary of the Treasury shall instruct the United States Executive Director at the International Monetary Fund to exert the influence of the United States to seek the establishment of a permanent advisory committee to the Interim Committee of the Board of Governors of the Fund, that is to consist of elected members of the national legislatures of the member countries directly represented by appointed members of the Executive Board of the Fund, and to seek to ensure that the permanent advisory committee has the same access to Fund documents as is afforded to the Executive Board of the Fund.

## STRENGTHENING PROCEDURES FOR MONITORING USE OF IMF FUNDS

SEC. 605. (a) The Secretary of the Treasury shall instruct the United States Executive Director at the International Monetary Fund to exert the influence of the United States to strengthen Fund procedures for ascertaining that funds disbursed by the Fund are used by the central bank (or other fiscal agent) of a borrowing country in a manner that complies with the conditions of the Fund program for the country.

(b) On request of the appropriate committees, the United States Executive Director shall obtain from the Fund and make available to such committees, on a confidential basis if necessary, data concerning such compliance.

(c) Within 6 months after the date of the enactment of this Act, the Secretary of the Treasury shall report to the appropriate committees on the progress made toward achieving the requirements of this section.

(d) On a quarterly basis, the Secretary of the Treasury shall report to the appropriate committees on the standby or other arrangements of the Fund made during the preceding quarter, identifying separately the arrangements to which the policies described in section 601(4) of this title apply and the arrangements to which such policies do not apply.

## PROGRESS REPORTS TO CONGRESS ON UNITED STATES INITIATIVES TO UPDATE THE ARCHITECTURE OF THE INTERNATIONAL MONETARY SYSTEM

<< 22 USCA § 262r NOTE >>

SEC. 606. Not later than July 15, 1999, and July 15, 2000, the Secretary of the Treasury shall report to the Chairmen and Ranking Members of the appropriate committees on the progress of efforts to reform the architecture of the international monetary system. The reports shall include a discussion of the substance of the United States position in consultations with other governments and the degree of progress in achieving international acceptance and implementation of such position with respect to the following issues:

<< 22 USCA § 262r NOTE >>

(1) Adapting the mission and capabilities of the International Monetary Fund to take better account of the increased importance of cross-border capital flows in the world economy and improving the coordination of its responsibilities and activities with those of the International Bank for Reconstruction and Development.

<< 22 USCA § 262r NOTE >>

(2) Advancing measures to prevent, and improve the management of, international financial crises, including by—

(A) integrating aspects of national bankruptcy principles into the management of international financial crises where feasible; and

(B) changing investor expectations about official rescues, thereby reducing moral hazard and systemic risk in international financial markets,

in order to help minimize the adjustment costs that the resolution of financial crises may impose on the real economy, in the form of disrupted patterns of trade, employment, and progress in living standards, and reduce the frequency and magnitude of claims on United States taxpayer resources.

<< 22 USCA § 262r NOTE >>

(3) Improving international economic policy cooperation, including among the Group of Seven countries, to take better account of the importance of cross-border capital flows in the determination of exchange rate relationships.

<< 22 USCA § 262r NOTE >>

(4) Improving international cooperation in the supervision and regulation of financial institutions and markets.

<< 22 USCA § 262r NOTE >>

(5) Strengthening the financial sector in emerging economies, including by improving the coordination of financial sector liberalization with the establishment of strong public and private institutions in the areas of prudential supervision, accounting and disclosure conventions, bankruptcy laws and administrative procedures, and the collection and dissemination of economic and financial statistics, including the maturity structure of foreign indebtedness.

<< 22 USCA § 262r NOTE >>

(6) Advocating that implementation of European Economic and Monetary Union and the advent of the European Currency Unit, or euro, proceed in a manner that is consistent with strong global economic growth and stability in world financial markets.

DEFINITION

<< 22 USCA § 262r NOTE >>

SEC. 607. For purposes of sections 601 through 606 of this title, the term "appropriate committees" means the Committees on Appropriations, Foreign Relations, and Banking, Housing, and Urban Affairs of the Senate and the Committees on Appropriations and Banking and Financial Services of the House of Representatives.

PARTICIPATION IN QUOTA INCREASE

<< 22 USCA § 286e–1m >>

SEC. 608. The Bretton Woods Agreements Act (22 U.S.C. 286–286mm) is amended by adding at the end the following:

**"SEC. 61. QUOTA INCREASE.**

"(a) IN GENERAL.—The United States Governor of the Fund may consent to an increase in the quota of the United States in the Fund equivalent to 10,622,500,000 Special Drawing Rights.

"(b) SUBJECT TO APPROPRIATIONS.—The authority provided by subsection (a) shall be effective only to such extent or in such amounts as are provided in advance in appropriations Acts.".

<div style="text-align:center">NEW ARRANGEMENTS TO BORROW</div>

<div style="text-align:center">&lt;&lt; 22 USCA § 286e–2 &gt;&gt;</div>

SEC. 609. Section 17 of the Bretton Woods Agreements Act (22 U.S.C. 286e–2 et seq.) is amended—

<div style="text-align:center">&lt;&lt; 22 USCA § 286e–2 &gt;&gt;</div>

(1) in subsection (a)—
  (A) by striking "and February 24, 1983" and inserting "February 24, 1983, and January 27, 1997"; and
  (B) by striking "4,250,000,000" and inserting "6,712,000,000";

<div style="text-align:center">&lt;&lt; 22 USCA § 286e–2 &gt;&gt;</div>

(2) in subsection (b), by striking "4,250,000,000" and inserting "6,712,000,000"; and

<div style="text-align:center">&lt;&lt; 22 USCA § 286e–2 &gt;&gt;</div>

(3) in subsection (d)—
  (A) by inserting "or the Decision of January 27, 1997," after "February 24, 1983,"; and
  (B) by inserting "or the New Arrangements to Borrow, as applicable" before the period at the end.

<div style="text-align:center">ADVOCACY OF POLICIES TO ENHANCE THE GENERAL
EFFECTIVENESS OF THE INTERNATIONAL MONETARY FUND</div>

<div style="text-align:center">&lt;&lt; 22 USCA § 262$o$–2 &gt;&gt;</div>

SEC. 610. (a) IN GENERAL.—Title XV of the International Financial Institutions Act (22 U.S.C. 262$o$–262o–1) is amended by adding at the end the following:

**"SEC. 1503. ADVOCACY OF POLICIES TO ENHANCE THE GENERAL EFFECTIVENESS OF THE INTERNATIONAL MONETARY FUND.**

"(a) IN GENERAL.—The Secretary of the Treasury shall instruct the United States Executive Director of the International Monetary Fund to use aggressively the voice and vote of the Executive Director to do the following:

"(1) Vigorously promote policies to increase the effectiveness of the International Monetary Fund in structuring programs and assistance so as to promote policies and actions that will contribute to exchange rate stability and avoid competitive devaluations that will further destabilize the international financial and trading systems.

"(2) Vigorously promote policies to increase the effectiveness of the International Monetary Fund in promoting market-oriented reform, trade liberalization, economic growth, democratic governance, and social stability through—

  "(A) establishing an independent monetary authority, with full power to conduct monetary policy, that provides for a non-inflationary domestic currency that is fully convertible in foreign exchange markets;

  "(B) opening domestic markets to fair and open internal competition among domestic enterprises by eliminating inappropriate favoritism for small or large businesses, eliminating elite monopolies, creating and effectively implementing anti-trust and anti-monopoly laws to protect free competition, and establishing fair and accessible legal procedures for dispute settlement among domestic enterprises;

  "(C) privatizing industry in a fair and equitable manner that provides economic opportunities to a broad spectrum of the population, eliminating government and elite monopolies, closing loss-making enterprises, and reducing government control over the factors of production;

"(D) economic deregulation by eliminating inefficient and overly burdensome regulations and strengthening the legal framework supporting private contract and intellectual property rights;

"(E) establishing or strengthening key elements of a social safety net to cushion the effects on workers of unemployment and dislocation; and

"(F) encouraging the opening of markets for agricultural commodities and products by requiring recipient countries to make efforts to reduce trade barriers.

"(3) Vigorously promote policies to increase the effectiveness of the International Monetary Fund, in concert with appropriate international authorities and other international financial institutions (as defined in section 1701(c)(2)), in strengthening financial systems in developing countries, and encouraging the adoption of sound banking principles and practices, including the development of laws and regulations that will help to ensure that domestic financial institutions meet strong standards regarding capital reserves, regulatory oversight, and transparency.

"(4) Vigorously promote policies to increase the effectiveness of the International Monetary Fund, in concert with appropriate international authorities and other international financial institutions (as defined in section 1701(c)(2)), in facilitating the development and implementation of internationally acceptable domestic bankruptcy laws and regulations in developing countries, including the provision of technical assistance as appropriate.

"(5) Vigorously promote policies that aim at appropriate burden-sharing by the private sector so that investors and creditors bear more fully the consequences of their decisions, and accordingly advocate policies which include—

"(A) strengthening crisis prevention and early warning signals through improved and more effective surveillance of the national economic policies and financial market development of countries (including monitoring of the structure and volume of capital flows to identify problematic imbalances in the inflow of short and medium term investment capital, potentially destabilizing inflows of offshore lending and foreign investment, or problems with the maturity profiles of capital to provide warnings of imminent economic instability), and fuller disclosure of such information to market participants;

"(B) accelerating work on strengthening financial systems in emerging market economies so as to reduce the risk of financial crises;

"(C) consideration of provisions in debt contracts that would foster dialogue and consultation between a sovereign debtor and its private creditors, and among those creditors;

"(D) consideration of extending the scope of the International Monetary Fund's policy on lending to members in arrears and of other policies so as to foster the dialogue and consultation referred to in subparagraph (C);

"(E) intensified consideration of mechanisms to facilitate orderly workout mechanisms for countries experiencing debt or liquidity crises;

"(F) consideration of establishing ad hoc or formal linkages between the provision of official financing to countries experiencing a financial crisis and the willingness of market participants to meaningfully participate in any stabilization effort led by the International Monetary Fund;

"(G) using the International Monetary Fund to facilitate discussions between debtors and private creditors to help ensure that financial difficulties are resolved without inappropriate resort to public resources; and

"(H) the International Monetary Fund accompanying the provision of funding to countries experiencing a financial crisis resulting from imprudent borrowing with efforts to achieve a significant contribution by the private creditors, investors, and banks which had extended such credits.

"(6) Vigorously promote policies that would make the International Monetary Fund a more effective mechanism, in concert with appropriate international authorities and other international financial institutions (as defined in section 1701(c)(2)), for promoting good governance principles within recipient countries by fostering structural reforms, including procurement reform, that reduce opportunities for corruption and bribery, and drug-related money laundering.

"(7) Vigorously promote the design of International Monetary Fund programs and assistance so that governments that draw on the International Monetary Fund channel public funds away from unproductive purposes, including large 'show case' projects and excessive military spending, and toward investment in human and physical capital as well as social programs to protect the neediest and promote social equity.

"(8) Work with the International Monetary Fund to foster economic prescriptions that are appropriate to the individual economic circumstances of each recipient country, recognizing that inappropriate stabilization programs may only serve to further destabilize the economy and create unnecessary economic, social, and political dislocation.

"(9) Structure International Monetary Fund programs and assistance so that the maintenance and improvement of core labor standards are routinely incorporated as an integral goal in the policy dialogue with recipient countries, so that—

"(A) recipient governments commit to affording workers the right to exercise internationally recognized core worker rights, including the right of free association and collective bargaining through unions of their own choosing;

"(B) measures designed to facilitate labor market flexibility are consistent with such core worker rights; and

"(C) the staff of the International Monetary Fund surveys the labor market policies and practices of recipient countries and recommends policy initiatives that will help to ensure the maintenance or improvement of core labor standards.

"(10) Vigorously promote International Monetary Fund programs and assistance that are structured to the maximum extent feasible to discourage practices which may promote ethnic or social strife in a recipient country.

"(11) Vigorously promote recognition by the International Monetary Fund that macroeconomic developments and policies can affect and be affected by environmental conditions and policies, and urge the International Monetary Fund to encourage member countries to pursue macroeconomic stability while promoting environmental protection.

"(12) Facilitate greater International Monetary Fund transparency, including by enhancing accessibility of the International Monetary Fund and its staff, fostering a more open release policy toward working papers, past evaluations, and other International Monetary Fund documents, seeking to publish all Letters of Intent to the International Monetary Fund and Policy Framework Papers, and establishing a more open release policy regarding Article IV consultations.

"(13) Facilitate greater International Monetary Fund accountability and enhance International Monetary Fund self-evaluation by vigorously promoting review of the effectiveness of the Office of Internal Audit and Inspection and the Executive Board's external evaluation pilot program and, if necessary, the establishment of an operations evaluation department modeled on the experience of the International Bank for Reconstruction and Development, guided by such key principles as usefulness, credibility, transparency, and independence.

"(14) Vigorously promote coordination with the International Bank for Reconstruction and Development and other international financial institutions (as defined in section 1701(c)(2)) in promoting structural reforms which facilitate the provision of credit to small businesses, including microenterprise lending, especially in the world's poorest, heavily indebted countries.

"(b) COORDINATION WITH OTHER EXECUTIVE DEPARTMENTS.—To the extent that it would assist in achieving the goals described in subsection (a), the Secretary of the Treasury shall pursue the goals in coordination with the Secretary of State, the Secretary of Labor, the Secretary of Commerce, the Administrator of the Environmental Protection Agency, the Administrator of the Agency for International Development, and the United States Trade Representative.".

<< 22 USCA § 262r >>

(b) ADVISORY COMMITTEE ON IMF POLICY.—Section 1701 of such Act (22 U.S.C. 262p–5) is amended by adding at the end the following:

"(e) ADVISORY COMMITTEE ON IMF POLICY.—

"(1) IN GENERAL.—The Secretary of the Treasury should establish an International Monetary Fund Advisory Committee (in this subsection referred to as the 'Advisory Committee').

"(2) MEMBERSHIP.—The Advisory Committee should consist of members appointed by the Secretary of the Treasury, after appropriate consultations with the relevant organizations. Such members should include representatives from industry, representatives from agriculture, representatives from organized labor, representatives from banking and financial services, and representatives from non-governmental environmental and human rights organizations.".

REDUCTION OF BARRIERS TO AGRICULTURAL TRADE

<< 22 USCA § 262n–3 >>

SEC. 611. Title XIV of the International Financial Institutions Act (22 U.S.C. 262n–262n–2) is amended by adding at the end the following:

**"SEC. 1404. REDUCTION OF BARRIERS TO AGRICULTURAL TRADE.**

"The Secretary of the Treasury shall instruct the United States Executive Director at the International Monetary Fund to use aggressively the voice and vote of the United States to vigorously promote policies to encourage the opening of markets for agricultural commodities and products by requiring recipient countries to make efforts to reduce trade barriers.".

SEMIANNUAL REPORTS ON FINANCIAL STABILIZATION PROGRAMS LED BY THE INTERNATIONAL MONETARY FUND IN CONNECTION WITH FINANCING FROM THE EXCHANGE STABILIZATION FUND

<< 22 USCA § 262r–3 >>

SEC. 612. Title XVII of the International Financial Institutions Act (22 U.S.C. 262r–262r–2) is amended by adding at the end the following:

**"SEC. 1704. REPORTS ON FINANCIAL STABILIZATION PROGRAMS LED BY THE INTERNATIONAL MONETARY FUND IN CONNECTION WITH FINANCING FROM THE EXCHANGE STABILIZATION FUND.**

"(a) IN GENERAL.—The Secretary of the Treasury, in consultation with the Secretary of Commerce and other appropriate Federal agencies, shall prepare reports on the implementation of financial stabilization programs (and any material terms and conditions thereof) led by the International Monetary Fund in countries in connection with which the United States has made a commitment to provide, or has provided financing from the stabilization fund established under section 5302 of title 31, United States Code. The reports shall include the following:

"(1) A description of the condition of the economies of countries requiring the financial stabilization programs, including the monetary, fiscal, and exchange rate policies of the countries.

"(2) A description of the degree to which the countries requiring the financial stabilization programs have fully implemented financial sector restructuring and reform measures required by the International Monetary Fund, including—

"(A) ensuring full respect for the commercial orientation of commercial bank lending;

"(B) ensuring that governments will not intervene in bank management and lending decisions (except in regard to prudential supervision);

"(C) the enactment and implementation of appropriate financial reform legislation;

"(D) strengthening the domestic financial system and improving transparency and supervision; and

"(E) the opening of domestic capital markets.

"(3) A description of the degree to which the countries requiring the financial stabilization programs have fully implemented reforms required by the International Monetary Fund that are directed at corporate governance and corporate structure, including—

"(A) making nontransparent conglomerate practices more transparent through the application of internationally accepted accounting practices, independent external audits, full disclosure, and provision of consolidated statements; and

"(B) ensuring that no government subsidized support or tax privileges will be provided to bail out individual corporations, particularly in the semiconductor, steel, and paper industries.

"(4) A description of the implementation of reform measures required by the International Monetary Fund to deregulate and privatize economic activity by ending domestic monopolies, undertaking trade liberalization, and opening up restricted areas of the economy to foreign investment and competition.

"(5) A detailed description of the trade policies of the countries, including any unfair trade practices or adverse effects of the trade policies on the United States.

"(6) A description of the extent to which the financial stabilization programs have resulted in appropriate burden-sharing among private sector creditors, including rescheduling of outstanding loans by lengthening maturities, agreements on debt reduction, and the extension of new credit.

"(7) A description of the extent to which the economic adjustment policies of the International Monetary Fund and the policies of the government of the country adequately balance the need for financial stabilization, economic growth, environmental protection, social stability, and equity for all elements of the society.

"(8) Whether International Monetary Fund involvement in labor market flexibility measures has had a negative effect on core worker rights, particularly the rights of free association and collective bargaining.

"(9) A description of any pattern of abuses of core worker rights in recipient countries.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(10) The amount, rate of interest, and disbursement and repayment schedules of any funds disbursed from the stabilization fund established under section 5302 of title 31, United States Code, in the form of loans, credits, guarantees, or swaps, in support of the financial stabilization programs.

"(11) The amount, rate of interest, and disbursement and repayment schedules of any funds disbursed by the International Monetary Fund to the countries in support of the financial stabilization programs.

"(b) TIMING.—Not later than March 15, 1999, and semiannually thereafter, the Secretary of the Treasury shall submit to the Committees on Banking and Financial Services and International Relations of the House of Representatives and the Committees on Foreign Relations, and Banking, Housing, and Urban Affairs of the Senate a report on the matters described in subsection (a).".

ANNUAL REPORT AND TESTIMONY ON THE STATE OF THE INTERNATIONAL
FINANCIAL SYSTEM, IMF REFORM, AND COMPLIANCE WITH IMF AGREEMENTS

<< 22 USCA § 262r–4 >>

SEC. 613. Title XVII of the International Financial Institutions Act (22 U.S.C. 262r–262r–2) is further amended by adding at the end the following:

**"SEC. 1705. ANNUAL REPORT AND TESTIMONY ON THE STATE OF THE INTERNATIONAL FINANCIAL SYSTEM, IMF REFORM, AND COMPLIANCE WITH IMF AGREEMENTS.**

"(a) REPORTS.—Not later than October 1 of each year, the Secretary of the Treasury shall submit to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Foreign Relations of the Senate a written report on the progress (if any) made by the United States Executive Director at the International Monetary Fund in influencing the International Monetary Fund to adopt the policies and reform its internal procedures in the manner described in section 1503.

"(b) TESTIMONY.—After submitting the report required by subsection (a) but not later than March 1 of each year, the Secretary of the Treasury shall appear before the Committee on Banking and Financial Services of the House of Representatives and the Committee on Foreign Relations of the Senate and present testimony on—

"(1) any progress made in reforming the International Monetary Fund;

"(2) the status of efforts to reform the international financial system; and

"(3) the compliance of countries which have received assistance from the International Monetary Fund with agreements made as a condition of receiving the assistance.".

AUDITS OF THE INTERNATIONAL MONETARY FUND

<< 22 USCA § 262r–5 >>

SEC. 614. Title XVII of the International Financial Institutions Act (22 U.S.C. 262r—262r–2) is further amended by adding at the end the following:

**"SEC. 1706. AUDITS OF THE INTERNATIONAL MONETARY FUND.**

"(a) ACCESS TO MATERIALS.—Not later than 30 days after the date of the enactment of this section, the Secretary of the Treasury shall certify to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Foreign Relations of the Senate that the Secretary has instructed the United States Executive Director at the International Monetary Fund to facilitate timely access by the General Accounting Office to information and documents of the International Monetary Fund needed by the Office to perform financial reviews of the International Monetary Fund that will facilitate the conduct of United States policy with respect to the Fund.

"(b) REPORTS.—Not later than June 30, 1999, and annually thereafter, the Comptroller General of the United States shall prepare and submit to the committees specified in subsection (a), the Committee on Appropriations of the House of Representatives, and the Committee on Appropriations of the Senate a report on the financial operations of the Fund during the preceding year, which shall include—

"(1) the current financial condition of the International Monetary Fund;

"(2) the amount, rate of interest, disbursement schedule, and repayment schedule for any loans that were initiated or outstanding during the preceding calendar year, and with respect to disbursement schedules, the report shall identify and discuss in detail any conditions required to be fulfilled by a borrower country before a disbursement is made;

"(3) a detailed description of whether the trade policies of borrower countries permit free and open trade by the United States and other foreign countries in the borrower countries;

"(4) a detailed description of the export policies of borrower countries and whether the policies may result in increased export of their products, goods, or services to the United States which may have significant adverse effects on, or result in unfair trade practices against or affecting United States companies, farmers, or communities;

"(5) a detailed description of any conditions of International Monetary Fund loans which have not been met by borrower countries, including a discussion of the reasons why such conditions were not met, and the actions taken by the International Monetary Fund due to the borrower country's noncompliance;

"(6) an identification of any borrower country and loan on which any loan terms or conditions were renegotiated in the preceding calendar year, including a discussion of the reasons for the renegotiation and any new loan terms and conditions; and

"(7) a specification of the total number of loans made by the International Monetary Fund from its inception through the end of the period covered by the report, the number and percentage (by number) of such loans that are in default or arrears, and the identity of the countries in default or arrears, and the number of such loans that are outstanding as of the end of period covered by the report and the aggregate amount of the outstanding loans and the average yield (weighted by loan principal) of the historical and outstanding loan portfolios of the International Monetary Fund.".

This Act may be cited as the "Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1999".

(e) For programs, projects or activities in the Department of the Interior and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for the Department of the Interior and related agencies for the fiscal year ending September 30, 1999, and for other purposes.

## TITLE I—DEPARTMENT OF THE INTERIOR

### BUREAU OF LAND MANAGEMENT

#### MANAGEMENT OF LANDS AND RESOURCES

For expenses necessary for protection, use, improvement, development, disposal, cadastral surveying, classification, acquisition of easements and other interests in lands, and performance of other functions, including maintenance of facilities, as authorized by law, in the management of lands and their resources under the jurisdiction of the Bureau of Land Management, including the general administration of the Bureau, and assessment of mineral potential of public lands pursuant to Public Law 96–487 (16 U.S.C. 3150(a)), $619,311,000, to remain available until expended, of which $2,082,000 shall be available for assessment of the mineral potential of public lands in Alaska pursuant to section 1010 of Public Law 96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived from the special receipt account established by the Land and Water Conservation Act of 1965, as amended (16 U.S.C. 460ℓ–6a(i)); and of which $1,500,000 shall be available in fiscal year 1999 subject to a match by at least an equal amount by the National Fish and Wildlife Foundation, to such Foundation for cost-shared projects supporting conservation of Bureau lands; in addition, $32,650,000 for Mining Law Administration program operations, including the cost of administering the mining claim fee program; to remain available until expended, to be reduced by amounts collected by the Bureau and credited to this appropriation from annual mining claim fees so as to result in a final appropriation estimated at not more than $619,311,000, and $2,000,000, to remain available until expended, from communication site rental fees established by the Bureau for the cost of administering communication site activities: *Provided,* That appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors.

#### WILDLAND FIRE MANAGEMENT

For necessary expenses for fire preparedness, suppression operations, emergency rehabilitation; and hazardous fuels reduction by the Department of the Interior, $286,895,000, to remain available until expended, of which not to exceed $6,950,000 shall be for the renovation or construction of fire facilities: *Provided,* That such funds are also available for repayment of advances to other appropriation accounts from which funds were previously transferred for such purposes: *Provided further,*

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

That unobligated balances of amounts previously appropriated to the "Fire Protection" and "Emergency Department of the Interior Firefighting Fund" may be transferred and merged with this appropriation: *Provided further,* That persons hired pursuant to 43 U.S.C. 1469 may be furnished subsistence and lodging without cost from funds available from this appropriation: *Provided further,* That notwithstanding 42 U.S.C. 1856d, sums received by a Bureau or office of the Department of the Interior for fire protection rendered pursuant to 42 U.S.C. 1856 et seq., Protection of United States Property, may be credited to the appropriation from which funds were expended to provide that protection, and are available without fiscal year limitation.

## CENTRAL HAZARDOUS MATERIALS FUND

For necessary expenses of the Department of the Interior and any of its component offices and bureaus for the remedial action, including associated activities, of hazardous waste substances, pollutants, or contaminants pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. 9601 et seq.), $10,000,000, to remain available until expended: *Provided,* That notwithstanding 31 U.S.C. 3302, sums recovered from or paid by a party in advance of or as reimbursement for remedial action or response activities conducted by the Department pursuant to section 107 or 113(f) of such Act, shall be credited to this account to be available until expended without further appropriation: *Provided further,* That such sums recovered from or paid by any party are not limited to monetary payments and may include stocks, bonds or other personal or real property, which may be retained, liquidated, or otherwise disposed of by the Secretary and which shall be credited to this account.

## CONSTRUCTION

For construction of buildings, recreation facilities, roads, trails, and appurtenant facilities, $10,997,000, to remain available until expended.

## PAYMENTS IN LIEU OF TAXES

For expenses necessary to implement the Act of October 20, 1976, as amended (31 U.S.C. 6901–6907), $125,000,000, of which not to exceed $400,000 shall be available for administrative expenses: *Provided,* That no payment shall be made to otherwise eligible units of local government if the computed amount of the payment is less than $100.

## LAND ACQUISITION

For expenses necessary to carry out sections 205, 206, and 318(d) of Public Law 94–579, including administrative expenses and acquisition of lands or waters, or interests therein, $14,600,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## OREGON AND CALIFORNIA GRANT LANDS

For expenses necessary for management, protection, and development of resources and for construction, operation, and maintenance of access roads, reforestation, and other improvements on the revested Oregon and California Railroad grant lands, on other Federal lands in the Oregon and California land-grant counties of Oregon, and on adjacent rights-of-way; and acquisition of lands or interests therein including existing connecting roads on or adjacent to such grant lands; $97,037,000, to remain available until expended: *Provided,* That 25 percent of the aggregate of all receipts during the current fiscal year from the revested Oregon and California Railroad grant lands is hereby made a charge against the Oregon and California land-grant fund and shall be transferred to the General Fund in the Treasury in accordance with the second paragraph of subsection (b) of title II of the Act of August 28, 1937 (50 Stat. 876).

## FOREST ECOSYSTEMS HEALTH AND RECOVERY FUND

### (REVOLVING FUND, SPECIAL ACCOUNT)

In addition to the purposes authorized in Public Law 102–381, funds made available in the Forest Ecosystem Health and Recovery Fund can be used for the purpose of planning, preparing, and monitoring salvage timber sales and forest ecosystem health and recovery activities such as release from competing vegetation and density control treatments. The Federal share of receipts (defined as the portion of salvage timber receipts not paid to the counties under 43 U.S.C. 1181f and 43 U.S.C. 1181f–1 et seq., and Public Law 103–66) derived from treatments funded by this account shall be deposited into the Forest Ecosystem Health and Recovery Fund.

## RANGE IMPROVEMENTS

For rehabilitation, protection, and acquisition of lands and interests therein, and improvement of Federal rangelands pursuant to section 401 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701), notwithstanding any other Act, sums equal to 50 percent of all moneys received during the prior fiscal year under sections 3 and 15 of the Taylor Grazing Act (43 U.S.C. 315 et seq.) and the amount designated for range improvements from grazing fees and mineral leasing receipts from Bankhead–Jones lands transferred to the Department of the Interior pursuant to law, but not less than $10,000,000, to remain available until expended: *Provided,* That not to exceed $600,000 shall be available for administrative expenses.

## SERVICE CHARGES, DEPOSITS, AND FORFEITURES

### << 43 USCA § 1735 NOTE >>

For administrative expenses and other costs related to processing application documents and other authorizations for use and disposal of public lands and resources, for costs of providing copies of official public land documents, for monitoring construction, operation, and termination of facilities in conjunction with use authorizations, and for rehabilitation of damaged property, such amounts as may be collected under Public Law 94–579, as amended, and Public Law 93–153, to remain available until expended: *Provided,* That notwithstanding any provision to the contrary of section 305(a) of Public Law 94–579 (43 U.S.C. 1735(a)), any moneys that have been or will be received pursuant to that section, whether as a result of forfeiture, compromise, or settlement, if not appropriate for refund pursuant to section 305(c) of that Act (43 U.S.C. 1735(c)), shall be available and may be expended under the authority of this Act by the Secretary to improve, protect, or rehabilitate any public lands administered through the Bureau of Land Management which have been damaged by the action of a resource developer, purchaser, permittee, or any unauthorized person, without regard to whether all moneys collected from each such action are used on the exact lands damaged which led to the action: *Provided further,* That any such moneys that are in excess of amounts needed to repair damage to the exact land for which funds were collected may be used to repair other damaged public lands.

## MISCELLANEOUS TRUST FUNDS

In addition to amounts authorized to be expended under existing laws, there is hereby appropriated such amounts as may be contributed under section 307 of the Act of October 21, 1976 (43 U.S.C. 1701), and such amounts as may be advanced for administrative costs, surveys, appraisals, and costs of making conveyances of omitted lands under section 211(b) of that Act, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Land Management shall be available for purchase, erection, and dismantlement of temporary structures, and alteration and maintenance of necessary buildings and appurtenant facilities to which the United States has title; up to $100,000 for payments, at the discretion of the Secretary, for information or evidence concerning violations of laws administered by the Bureau; miscellaneous and emergency expenses of enforcement activities authorized or approved by the Secretary and to be accounted for solely on his certificate, not to exceed $10,000: *Provided,* That notwithstanding 44 U.S.C. 501, the Bureau may, under cooperative cost-sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly produced publications for which the cooperators share the cost of printing either in cash or in services, and the Bureau determines the cooperator is capable of meeting accepted quality standards.

### << 30 USCA § 28f >>

Section 28f(a) of title 30, United States Code, is amended by striking the first sentence and inserting, "The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before or after the enactment of this Act, shall pay to the Secretary of the Interior, on or before September 1 of each year for years 1999 through 2001, a claim maintenance fee of $100 per claim or site."

### << 30 USCA § 28f >>

Section 28f(d) of title 30, United States Code, is amended by adding the following new subsection at the end:

"(3) If a small miner waiver application is determined to be defective for any reason, the claimant shall have a period of 60 days after receipt of written notification of the defect or defects by the Bureau of Land Management to: (A) cure such defect or defects, or (B) pay the $100 claim maintenance fee due for such period.".

<< 30 USCA § 28g >>

Section 28g of title 30, United States Code, is amended by striking "and before September 30, 1998" and inserting in lieu thereof "and before September 30, 2001".

### UNITED STATES FISH AND WILDLIFE SERVICE

### RESOURCE MANAGEMENT

<< 16 USCA § 718k >>

<< 16 USCA § 746a >>

For necessary expenses of the United States Fish and Wildlife Service, for scientific and economic studies, conservation, management, investigations, protection, and utilization of fishery and wildlife resources, except whales, seals, and sea lions, maintenance of the herd of long-horned cattle on the Wichita Mountains Wildlife Refuge, general administration, and for the performance of other authorized functions related to such resources by direct expenditure, contracts, grants, cooperative agreements and reimbursable agreements with public and private entities, $661,136,000, to remain available until September 30, 2000, except as otherwise provided herein, of which $11,648,000 shall remain available until expended for operation and maintenance of fishery mitigation facilities constructed by the Corps of Engineers under the Lower Snake River Compensation Plan, authorized by the Water Resources Development Act of 1976, to compensate for loss of fishery resources from water development projects on the Lower Snake River, and of which not less than $2,000,000 shall be provided to local governments in southern California for planning associated with the Natural Communities Conservation Planning (NCCP) program and shall remain available until expended: *Provided,* That not less than $1,000,000 for high priority projects which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended: *Provided further,* That not to exceed $5,756,000 shall be used for implementing subsections (a), (b), (c), and (e) of section 4 of the Endangered Species Act, as amended, for species that are indigenous to the United States (except for processing petitions, developing and issuing proposed and final regulations, and taking any other steps to implement actions described in subsections (c)(2)(A), (c)(2)(B)(i), or (c)(2)(B)(ii)): *Provided further,* That of the amount available for law enforcement, up to $400,000 to remain available until expended, may at the discretion of the Secretary, be used for payment for information, rewards, or evidence concerning violations of laws administered by the Service, and miscellaneous and emergency expenses of enforcement activity, authorized or approved by the Secretary and to be accounted for solely on his certificate: *Provided further,* That hereafter, all fees collected for Federal migratory bird permits shall be available to the Secretary, without further appropriation, to be used for the expenses of the U.S. Fish and Wildlife Service in administering such Federal migratory bird permits, and shall remain available until expended: *Provided further,* That hereafter, pursuant to 31 U.S.C. 9701 and notwithstanding 31 U.S.C. 3302, the Secretary shall charge reasonable fees for the full costs of the U.S. Fish and Wildlife Service in operating and maintaining the M/V Tiglax and other vessels, to be credited to this account and to be available until expended: *Provided further,* That of the amount provided for environmental contaminants, up to $1,000,000 may remain available until expended for contaminant sample analyses.

### CONSTRUCTION

For construction and acquisition of buildings and other facilities required in the conservation, management, investigation, protection, and utilization of fishery and wildlife resources, and the acquisition of lands and interests therein; $50,453,000, to remain available until expended: *Provided,* That under this heading in Public Law 105–174, the word "fire," is inserted before the word "floods".

### LAND ACQUISITION

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4 through 11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with

statutory authority applicable to the United States Fish and Wildlife Service, $48,024,000, to be derived from the Land and Water Conservation Fund and to remain available until expended, of which $1,000,000, together with such other sums as may become available, is for a grant to the State of Ohio for acquisition of the Howard Farm near Metzger Marsh in the State of Ohio.

### COOPERATIVE ENDANGERED SPECIES CONSERVATION FUND

For expenses necessary to carry out the provisions of the Endangered Species Act of 1973 (16 U.S.C. 1531–1543), as amended, $14,000,000, to be derived from the Cooperative Endangered Species Conservation Fund, and to remain available until expended.

### NATIONAL WILDLIFE REFUGE FUND

For expenses necessary to implement the Act of October 17, 1978 (16 U.S.C. 715s), $10,779,000.

### NORTH AMERICAN WETLANDS CONSERVATION FUND

For expenses necessary to carry out the provisions of the North American Wetlands Conservation Act, Public Law 101–233, as amended, $15,000,000, to remain available until expended.

### WILDLIFE CONSERVATION AND APPRECIATION FUND

For necessary expenses of the Wildlife Conservation and Appreciation Fund, $800,000, to remain available until expended.

### MULTINATIONAL SPECIES CONSERVATION FUND

<< 16 USCA § 4246 >>

For expenses necessary to carry out the African Elephant Conservation Act (16 U.S.C. 4201–4203, 4211–4213, 4221–4225, 4241–4245, and 1538), the Asian Elephant Conservation Act of 1997 (Public Law 105–96), and the Rhinoceros and Tiger Conservation Act of 1994 (16 U.S.C. 5301–5306), $2,000,000, to remain available until expended: *Provided,* That unexpended balances of amounts previously appropriated to the African Elephant Conservation Fund, Rewards and Operations account, and Rhinoceros and Tiger Conservation Fund may be transferred to and merged with this appropriation: *Provided further,* That in fiscal year 1999 and thereafter, donations to provide assistance under section 5304 of the Rhinoceros and Tiger Conservation Act, subchapter I of the African Elephant Conservation Act, and section 6 of the Asian Elephant Conservation Act of 1997 shall be deposited to this Fund and shall be available without further appropriation: *Provided further,* That in fiscal year 1999 and thereafter, all penalties received by the United States under 16 U.S.C. 4224 which are not used to pay rewards under 16 U.S.C. 4225 shall be deposited to this Fund to provide assistance under 16 U.S.C. 4211 and shall be available without further appropriation: *Provided further,* That in fiscal year 1999 and thereafter, not more than three percent of amounts appropriated to this Fund may be used by the Secretary of the Interior to administer the Fund.

### ADMINISTRATIVE PROVISIONS

<< 16 USCA § 1374 >>

Appropriations and funds available to the United States Fish and Wildlife Service shall be available for purchase of not to exceed 104 passenger motor vehicles, of which 89 are for replacement only (including 38 for police-type use); repair of damage to public roads within and adjacent to reservation areas caused by operations of the Service; options for the purchase of land at not to exceed $1 for each option; facilities incident to such public recreational uses on conservation areas as are consistent with their primary purpose; and the maintenance and improvement of aquaria, buildings, and other facilities under the jurisdiction of the Service and to which the United States has title, and which are used pursuant to law in connection with management and investigation of fish and wildlife resources: *Provided,* That notwithstanding 44 U.S.C. 501, the Service may, under cooperative cost sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly produced publications for which the cooperators share at least one-half the cost of printing either in cash or services and the Service determines the cooperator is capable of meeting accepted quality standards: *Provided further,* That the Service may accept donated aircraft as replacements for existing aircraft: *Provided further,* That notwithstanding any other provision of law, the Secretary of the Interior may not spend any of the funds appropriated in this Act for the purchase of lands or interests in

lands to be used in the establishment of any new unit of the National Wildlife Refuge System unless the purchase is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in Senate Report 105–56: *Provided further,* That hereafter the Secretary may sell land and interests in land, other than surface water rights, acquired in conformance with subsections 206(a) and 207(c) of Public Law 101–618, the receipts of which shall be deposited to the Lahontan Valley and Pyramid Lake Fish and Wildlife Fund and used exclusively for the purposes of such subsections, without regard to the limitation on the distribution of benefits in subsection 206(f)(2) of such law: *Provided further,* That section 104(c)(50)(B) of the Marine Mammal Protection Act (16 U.S.C. 1361–1407) is amended by inserting the words "until expended" after the word "Secretary" in the second sentence.

## TECHNICAL CORRECTIONS

<< 16 USCA § 3503 NOTE >>

Unit SC–03—

<< 16 USCA § 3503 NOTE >>

 (1) The Secretary of the Interior shall, before the end of the 30-day period beginning on the date of the enactment of this Act, make such corrections to the map described in paragraph (2) as are necessary to ensure that depictions of areas on that map are consistent with the depictions of areas appearing on the map entitled "Amendments to the Coastal Barrier Resources System", dated May 15, 1997, and on file with the Committee on Resources of the House of Representatives.

<< 16 USCA § 3503 NOTE >>

 (2) The map described in this paragraph is the map that—
  (A) is included in a set of maps entitled "Coastal Barrier Resources System", dated October 24, 1990; and
  (B) relates to unit SC–03 of the Coastal Barrier Resources System.
Unit FL–35P—

<< 16 USCA § 3503 NOTE >>

 (1) The Secretary of the Interior shall, before the end of the 30-day period beginning on the date of the enactment of this Act, make such corrections to the map described in paragraph (2) as are necessary to ensure that depictions of areas on that map are consistent with the depictions of areas appearing on the map entitled "Amendments to the Coastal Barrier Resources System", dated August 31, 1998, and on file with the Committee on Resources of the House of Representatives.

<< 16 USCA § 3503 NOTE >>

 (2) The map described in this paragraph is the map that—
  (A) is included in a set of maps entitled "Coastal Barrier Resources System", dated October 24, 1990; and
  (B) relates to unit FL–35P of the Coastal Barrier Resources System.
Unit FL–35—
  The Secretary of the Interior shall, before the end of the 30-day period beginning on the date of the enactment of this Act, revise the the map depicting unit FL–35 of the Coastal Barrier Resources System to exclude Pumpkin Key from the System.

## NATIONAL PARK SERVICE

### OPERATION OF THE NATIONAL PARK SYSTEM
 For expenses necessary for the management, operation, and maintenance of areas and facilities administered by the National Park Service (including special road maintenance service to trucking permittees on a reimbursable basis), and for the general administration of the National Park Service, including not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by 16 U.S.C. 1706, $1,285,604,000, of which not less than $600,000 is for salaries and expenses by, at, and exclusively for new hires of mineral examiners on

AR.02501

site at the Mojave National Preserve, none of which may be used for staff or administrative expenses for the geological resources division in Denver, Colorado or any other location, and of which $12,800,000 is for research, planning and interagency coordination in support of land acquisition for Everglades restoration shall remain available until expended, and of which not to exceed $10,000,000, to remain available until expended, is to be derived from the special fee account established pursuant to title V, section 5201 of Public Law 100–203.

## NATIONAL RECREATION AND PRESERVATION

For expenses necessary to carry out recreation programs, natural programs, cultural programs, heritage partnership programs, environmental compliance and review, international park affairs, statutory or contractual aid for other activities, and grant administration, not otherwise provided for, $46,225,000.

## HISTORIC PRESERVATION FUND

For expenses necessary in carrying out the Historic Preservation Act of 1966, as amended (16 U.S.C. 470), and the Omnibus Parks and Public Lands Management Act of 1996 (Public Law 104–333), $72,412,000, to be derived from the Historic Preservation Fund, to remain available until September 30, 2000, of which $7,000,000 pursuant to section 507 of Public Law 104–333 shall remain available until expended: *Provided,* That of the total amount provided, $30,000,000 shall be for Save America's Treasures for priority preservation projects, including preservation of intellectual and cultural artifacts and of historic structures and sites, of the National Archives and Records Administration and of Federal agencies to which funds were appropriated in the Fiscal Year 1998 Interior and Related Agencies Appropriations Act: *Provided further,* That individual Save America's Treasures grants shall be subject to a fifty percent non-Federal match, and shall be available by transfer to appropriate accounts of individual agencies, after approval of projects by the Secretary: *Provided further,* That the agencies shall develop a common list of project selection criteria for Save America's Treasures which shall include national significance, urgency of need, and educational value, and which shall be approved by the House and Senate Committees on Appropriations prior to any commitment of grant funds: *Provided further,* That individual projects shall only be eligible for one grant, and all projects to be funded shall be approved by the House and Senate Committees on Appropriations prior to any commitment of grant funds: *Provided further,* That within the amount provided for Save America's Treasures, $3,000,000 shall be transferred immediately to the Smithsonian Institution for restoration of the Star Spangled Banner, $500,000 shall be available for the Sewall–Belmont House and sufficient funds to complete the restoration of the Declaration of Independence and the U.S. Constitution located in the National Archives: *Provided further,* That none of the funds provided for Save America's Treasures may be used for administrative expenses, and staffing for the program shall be available from the existing staffing levels in the National Park Service.

## CONSTRUCTION

For construction, improvements, repair or replacement of physical facilities, including the modifications authorized by section 104 of the Everglades National Park Protection and Expansion Act of 1989, $226,058,000, to remain available until expended: *Provided,* That $550,000 for the Susan B. Anthony House, $1,000,000 for the Virginia City Historic District, $2,000,000 for the Field Museum, $500,000 for the Hecksher Museum, $600,000 for the Sotterly Plantation House, $1,500,000 for the Kendall County Courthouse, $1,000,000 for the U–505, and $600,000 for the Wheeling National Heritage Area shall be derived from the Historic Preservation Fund pursuant to 16 U.S.C. 470a.

## LAND AND WATER CONSERVATION FUND

## (RESCISSION)

## << 16 USCA § 460*l*–10a NOTE >>

The contract authority provided for fiscal year 1999 by 16 U.S.C. 460*l*–10a is rescinded.

## LAND ACQUISITION AND STATE ASSISTANCE

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4 through 11), including administrative expenses, and for acquisition of lands or waters, or interest therein, in accordance with

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2526 of 3864

statutory authority applicable to the National Park Service, $147,925,000, to be derived from the Land and Water Conservation Fund, to remain available until expended, of which $500,000 is to administer the State assistance program: *Provided,* That any funds made available for the purpose of acquisition of the Elwha and Glines dams shall be used solely for acquisition, and shall not be expended until the full purchase amount has been appropriated by the Congress: *Provided further,* That the Secretary may acquire interests in the property known as George Washington's Boyhood Home, Ferry Farm, from the funds provided under this heading without regard to any restrictions of the Land and Water Conservation Fund Act of 1965: *Provided further,* That from the funds made available for land acquisition at Everglades National Park and Big Cypress National Preserve, the Secretary may provide for Federal assistance to the State of Florida for the acquisition of lands or waters, or interests therein, within the Everglades watershed (consisting of lands and waters within the boundaries of the South Florida Water Management District, Florida Bay and the Florida Keys) under terms and conditions deemed necessary by the Secretary, to improve and restore the hydrological function of the Everglades watershed: *Provided further,* That funds provided under this heading to the State of Florida are contingent upon new matching non-Federal funds by the State and shall be subject to an agreement that the lands to be acquired will be managed in perpetuity for the restoration of the Everglades.

## ADMINISTRATIVE PROVISIONS

Appropriations for the National Park Service shall be available for the purchase of not to exceed 375 passenger motor vehicles, of which 291 shall be for replacement only, including not to exceed 305 for police-type use, 12 buses, and 6 ambulances: *Provided,* That none of the funds appropriated to the National Park Service may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: *Provided further,* That none of the funds appropriated to the National Park Service may be used to implement an agreement for the redevelopment of the southern end of Ellis Island until such agreement has been submitted to the Congress and shall not be implemented prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full and comprehensive report on the development of the southern end of Ellis Island, including the facts and circumstances relied upon in support of the proposed project.

None of the funds in this Act may be spent by the National Park Service for activities taken in direct response to the United Nations Biodiversity Convention.

The National Park Service may distribute to operating units based on the safety record of each unit the costs of programs designed to improve workplace and employee safety, and to encourage employees receiving workers' compensation benefits pursuant to chapter 81 of title 5, United States Code, to return to appropriate positions for which they are medically able.

## UNITED STATES GEOLOGICAL SURVEY

### SURVEYS, INVESTIGATIONS, AND RESEARCH

<< 43 USCA § 50 >>

For expenses necessary for the United States Geological Survey to perform surveys, investigations, and research covering topography, geology, hydrology, and the mineral and water resources of the United States, its territories and possessions, and other areas as authorized by 43 U.S.C. 31, 1332, and 1340; classify lands as to their mineral and water resources; give engineering supervision to power permittees and Federal Energy Regulatory Commission licensees; administer the minerals exploration program (30 U.S.C. 641); and publish and disseminate data relative to the foregoing activities; and to conduct inquiries into the economic conditions affecting mining and materials processing industries (30 U.S.C. 3, 21a, and 1603; 50 U.S.C. 98g(1)) and related purposes as authorized by law and to publish and disseminate data; $797,896,000, of which $69,596,000 shall be available only for cooperation with States or municipalities for water resources investigations; and of which $16,400,000 shall remain available until expended for conducting inquiries into the economic conditions affecting mining and materials processing industries; and of which $2,000,000 shall remain available until expended for ongoing development of a mineral and geologic data base; and of which $161,221,000 shall be available until September 30, 2000 for the biological research activity and the operation of the Cooperative Research Units: Provided, That of the funds available for the biological research activity, $6,600,000 shall be made available by grant to the University of Alaska for conduct of, directly or through subgrants, basic marine research activities in the North Pacific Ocean pursuant to a plan approved by the Department of

Commerce, the Department of the Interior, and the State of Alaska: *Provided further,* That none of these funds provided for the biological research activity shall be used to conduct new surveys on private property, unless specifically authorized in writing by the property owner: *Provided further,* That no part of this appropriation shall be used to pay more than one-half the cost of topographic mapping or water resources data collection and investigations carried on in cooperation with States and municipalities.

## ADMINISTRATIVE PROVISIONS

The amount appropriated for the United States Geological Survey shall be available for the purchase of not to exceed 53 passenger motor vehicles, of which 48 are for replacement only; reimbursement to the General Services Administration for security guard services; contracting for the furnishing of topographic maps and for the making of geophysical or other specialized surveys when it is administratively determined that such procedures are in the public interest; construction and maintenance of necessary buildings and appurtenant facilities; acquisition of lands for gauging stations and observation wells; expenses of the United States National Committee on Geology; and payment of compensation and expenses of persons on the rolls of the Survey duly appointed to represent the United States in the negotiation and administration of interstate compacts: *Provided,* That activities funded by appropriations herein made may be accomplished through the use of contracts, grants, or cooperative agreements as defined in 31 U.S.C. 6302 et seq.: *Provided further,* That the United States Geological Survey may contract directly with individuals or indirectly with institutions or nonprofit organizations, without regard to 41 U.S.C. 5, for the temporary or intermittent services of students or recent graduates, who shall be considered employees for the purposes of chapters 57 and 81 of title 5, United States Code, relating to compensation for travel and work injuries, and chapter 171 of title 28, United States Code, relating to tort claims, but shall not be considered to be Federal employees for any other purposes.

## MINERALS MANAGEMENT SERVICE

### ROYALTY AND OFFSHORE MINERALS MANAGEMENT

For expenses necessary for minerals leasing and environmental studies, regulation of industry operations, and collection of royalties, as authorized by law; for enforcing laws and regulations applicable to oil, gas, and other minerals leases, permits, licenses and operating contracts; and for matching grants or cooperative agreements; including the purchase of not to exceed eight passenger motor vehicles for replacement only; $117,902,000, of which $72,729,000 shall be available for royalty management activities; and an amount not to exceed $100,000,000, to be credited to this appropriation and to remain available until expended, from additions to receipts resulting from increases to rates in effect on August 5, 1993, from rate increases to fee collections for Outer Continental Shelf administrative activities performed by the Minerals Management Service over and above the rates in effect on September 30, 1993, and from additional fees for Outer Continental Shelf administrative activities established after September 30, 1993: *Provided,* That $3,000,000 for computer acquisitions shall remain available until September 30, 2000: *Provided further,* That funds appropriated under this Act shall be available for the payment of interest in accordance with 30 U.S.C. 1721(b) and (d): *Provided further,* That not to exceed $3,000 shall be available for reasonable expenses related to promoting volunteer beach and marine cleanup activities: *Provided further,* That notwithstanding any other provision of law, $15,000 under this heading shall be available for refunds of overpayments in connection with certain Indian leases in which the Director of the Minerals Management Service concurred with the claimed refund due, to pay amounts owed to Indian allottees or Tribes, or to correct prior unrecoverable erroneous payments.

### OIL SPILL RESEARCH

For necessary expenses to carry out title I, section 1016, title IV, sections 4202 and 4303, title VII, and title VIII, section 8201 of the Oil Pollution Act of 1990, $6,118,000, which shall be derived from the Oil Spill Liability Trust Fund, to remain available until expended.

## OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT

### REGULATION AND TECHNOLOGY

<< 30 USCA § 1302 NOTE >>

<< 30 USCA § 1211 NOTE >>

  For necessary expenses to carry out the provisions of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not to exceed 10 passenger motor vehicles, for replacement only; $93,078,000, and notwithstanding 31 U.S.C. 3302, an additional amount shall be credited to this account, to remain available until expended, from performance bond forfeitures in fiscal year 1999 and thereafter: *Provided,* That the Secretary of the Interior, pursuant to regulations, may use directly or through grants to States, moneys collected in fiscal year 1999 for civil penalties assessed under section 518 of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1268), to reclaim lands adversely affected by coal mining practices after August 3, 1977, to remain available until expended: *Provided further,* That appropriations for the Office of Surface Mining Reclamation and Enforcement may provide for the travel and per diem expenses of State and tribal personnel attending Office of Surface Mining Reclamation and Enforcement sponsored training: *Provided further,* That beginning in fiscal year 1999 and thereafter, cost-based fees for the products of the Mine Map Repository shall be established (and revised as needed) in Federal Register Notices, and shall be collected and credited to this account, to be available until expended for the costs of administering this program.

ABANDONED MINE RECLAMATION FUND

<< 30 USCA § 1231 NOTE >>

  For necessary expenses to carry out title IV of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not more than 10 passenger motor vehicles for replacement only, $185,416,000, to be derived from receipts of the Abandoned Mine Reclamation Fund and to remain available until expended; of which up to $7,000,000, to be derived from the cumulative balance of interest earned to date on the Fund, shall be for supplemental grants to States for the reclamation of abandoned sites with acid mine rock drainage from coal mines, and for associated activities, through the Appalachian Clean Streams Initiative: *Provided,* That grants to minimum program States will be $1,500,000 per State in fiscal year 1999: *Provided further,* That of the funds herein provided up to $18,000,000 may be used for the emergency program authorized by section 410 of Public Law 95–87, as amended, of which no more than 25 percent shall be used for emergency reclamation projects in any one State and funds for federally administered emergency reclamation projects under this proviso shall not exceed $11,000,000: *Provided further,* That prior year unobligated funds appropriated for the emergency reclamation program shall not be subject to the 25 percent limitation per State and may be used without fiscal year limitation for emergency projects: *Provided further,* That pursuant to Public Law 97–365, the Department of the Interior is authorized to use up to 20 percent from the recovery of the delinquent debt owed to the United States Government to pay for contracts to collect these debts: *Provided further,* That funds made available to States under title IV of Public Law 95–87 may be used, at their discretion, for any required non-Federal share of the cost of projects funded by the Federal Government for the purpose of environmental restoration related to treatment or abatement of acid mine drainage from abandoned mines: *Provided further,* That such projects must be consistent with the purposes and priorities of the Surface Mining Control and Reclamation Act: *Provided further,* That the State of Maryland may set aside the greater of $1,000,000 or 10 percent of the total of the grants made available to the State under title IV of the Surface Mining Control and Reclamation Act of 1977, as amended (30 U.S.C. 1231 et seq.), if the amount set aside is deposited in an acid mine drainage abatement and treatment fund established under a State law, pursuant to which law the amount (together with all interest earned on the amount) is expended by the State to undertake acid mine drainage abatement and treatment projects, except that before any amounts greater than 10 percent of its title IV grants are deposited in an acid mine drainage abatement and treatment fund, the State of Maryland must first complete all Surface Mining Control and Reclamation Act priority one projects: *Provided further,* That hereafter, donations received to support projects under the Appalachian Clean Streams Initiative and under the Western Mine Lands Restoration Partnerships Initiative, pursuant to 30 U.S.C. 1231, shall be credited to this account and remain available until expended without further appropriation for projects sponsored under these initiatives, directly through agreements with other Federal agencies, or through grants to States, and funding to local governments, or tax exempt private entities.

BUREAU OF INDIAN AFFAIRS

## OPERATION OF INDIAN PROGRAMS

<< 25 USCA § 450j NOTE >>

<< 25 USCA § 13d–3 >>

<< 25 USCA § 2005 NOTE >>

For expenses necessary for the operation of Indian programs, as authorized by law, including the Snyder Act of November 2, 1921 (25 U.S.C. 13), the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450 et seq.), as amended, the Education Amendments of 1978 (25 U.S.C. 2001–2019), and the Tribally Controlled Schools Act of 1988 (25 U.S.C. 2501 et seq.), as amended, $1,584,124,000, to remain available until September 30, 2000 except as otherwise provided herein, of which not to exceed $94,010,000 shall be for welfare assistance payments and notwithstanding any other provision of law, including but not limited to the Indian Self–Determination Act of 1975, as amended, not to exceed $114,871,000 shall be available for payments to tribes and tribal organizations for contract support costs associated with ongoing contracts, grants, compacts, or annual funding agreements entered into with the Bureau prior to or during fiscal year 1999, as authorized by such Act, except that tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants, or compacts, or annual funding agreements and for unmet welfare assistance costs, and of which not to exceed $387,365,000 for school operations costs of Bureau-funded schools and other education programs shall become available on July 1, 1999, and shall remain available until September 30, 2000; and of which not to exceed $52,889,000 shall remain available until expended for housing improvement, road maintenance, attorney fees, litigation support, self-governance grants, the Indian Self–Determination Fund, land records improvement, the Navajo–Hopi Settlement Program: *Provided,* That notwithstanding any other provision of law, including but not limited to the Indian Self–Determination Act of 1975, as amended, and 25 U.S.C. 2008, not to exceed $42,160,000 within and only from such amounts made available for school operations shall be available to tribes and tribal organizations for administrative cost grants associated with the operation of Bureau-funded schools: *Provided further,* That hereafter funds made available to tribes and tribal organizations through contracts, compact agreements, or grants, as authorized by the Indian Self–Determination Act of 1975 or grants authorized by the Indian Education Amendments of 1988 (25 U.S.C. 2001 and 2008A) shall remain available until expended by the contractor or grantee: *Provided further,* That hereafter, to provide funding uniformity within a Self–Governance Compact, any funds provided in this Act with availability for more than two years may be reprogrammed to two year availability but shall remain available within the Compact until expended: *Provided further,* That hereafter notwithstanding any other provision of law, Indian tribal governments may, by appropriate changes in eligibility criteria or by other means, change eligibility for general assistance or change the amount of general assistance payments for individuals within the service area of such tribe who are otherwise deemed eligible for general assistance payments so long as such changes are applied in a consistent manner to individuals similarly situated and, that any savings realized by such changes shall be available for use in meeting other priorities of the tribes and, that any net increase in costs to the Federal Government which result solely from tribally increased payment levels for general assistance shall be met exclusively from funds available to the tribe from within its tribal priority allocation: *Provided further,* That any forestry funds allocated to a tribe which remain unobligated as of September 30, 2000, may be transferred during fiscal year 2001 to an Indian forest land assistance account established for the benefit of such tribe within the tribe's trust fund account: *Provided further,* That any such unobligated balances not so transferred shall expire on September 30, 2001: *Provided further,* That hereafter tribes may use tribal priority allocations funds for the replacement and repair of school facilities in compliance with 25 U.S.C. 2005(a), so long as such replacement or repair is approved by the Secretary and completed with non-Federal tribal and/or tribal priority allocation funds: *Provided further,* That the sixth proviso under Operation of Indian Programs in Public Law 102–154, for the fiscal year ending September 30, 1992 (105 Stat. 1004), is hereby amended to read as follows: "*Provided further,* That until such time as legislation is enacted to the contrary, no funds shall be used to take land into trust within the boundaries of the original Cherokee territory in Oklahoma without consultation with the Cherokee Nation:".

## CONSTRUCTION

For construction, repair, improvement, and maintenance of irrigation and power systems, buildings, utilities, and other facilities, including architectural and engineering services by contract; acquisition of lands, and interests in lands; and

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

preparation of lands for farming, and for construction of the Navajo Indian Irrigation Project pursuant to Public Law 87–483, $123,421,000, to remain available until expended: *Provided,* That such amounts as may be available for the construction of the Navajo Indian Irrigation Project may be transferred to the Bureau of Reclamation: *Provided further,* That not to exceed 6 percent of contract authority available to the Bureau of Indian Affairs from the Federal Highway Trust Fund may be used to cover the road program management costs of the Bureau: *Provided further,* That any funds provided for the Safety of Dams program pursuant to 25 U.S.C. 13 shall be made available on a nonreimbursable basis: *Provided further,* That for fiscal year 1999, in implementing new construction or facilities improvement and repair project grants in excess of $100,000 that are provided to tribally controlled grant schools under Public Law 100–297, as amended, the Secretary of the Interior shall use the Administrative and Audit Requirements and Cost Principles for Assistance Programs contained in 43 CFR part 12 as the regulatory requirements: *Provided further,* That such grants shall not be subject to section 12.61 of 43 CFR; the Secretary and the grantee shall negotiate and determine a schedule of payments for the work to be performed: *Provided further,* That in considering applications, the Secretary shall consider whether the Indian tribe or tribal organization would be deficient in assuring that the construction projects conform to applicable building standards and codes and Federal, tribal, or State health and safety standards as required by 25 U.S.C. 2005(a), with respect to organizational and financial management capabilities: *Provided further,* That if the Secretary declines an application, the Secretary shall follow the requirements contained in 25 U.S.C. 2505(f): *Provided further,* That any disputes between the Secretary and any grantee concerning a grant shall be subject to the disputes provision in 25 U.S.C. 2508(e): *Provided further,* That funds appropriated in Public Law 105–18, making emergency supplemental appropriations for the Bureau of Indian Affairs for the repair of irrigation projects damaged in the severe winter conditions and ensuing flooding, are available on a nonreimbursable basis.

INDIAN LAND AND WATER CLAIM SETTLEMENTS AND MISCELLANEOUS PAYMENTS TO INDIANS

For miscellaneous payments to Indian tribes and individuals and for necessary administrative expenses, $28,882,000, to remain available until expended; of which $27,530,000 shall be available for implementation of enacted Indian land and water claim settlements pursuant to Public Laws 101–618 and 102–575, and for implementation of other enacted water rights settlements; and of which $1,352,000 shall be available pursuant to Public Laws 99–264, 100–383, 103–402, and 100–580: *Provided,* That in fiscal year 1999 and thereafter, the Secretary is directed to sell land and interests in land, other than surface water rights, acquired in conformance with section 2 of the Truckee River Water Quality Settlement Agreement, the receipts of which shall be deposited to the Lahontan Valley and Pyramid Lake Fish and Wildlife Fund, and be available for the purposes of section 2 of such agreement, without regard to the limitation on the distribution of benefits in the second sentence of paragraph 206(f)(2) of Public Law 101–618.

INDIAN GUARANTEED LOAN PROGRAM ACCOUNT

For the cost of guaranteed loans, $4,501,000, as authorized by the Indian Financing Act of 1974, as amended: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,* That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $59,681,698.

In addition, for administrative expenses to carry out the guaranteed loan programs, $500,000.

INDIAN LAND CONSOLIDATION PILOT

For implementation of a pilot program for consolidation of fractional interests in Indian lands by direct expenditure or cooperative agreement, $5,000,000 to remain available until expended, of which not to exceed $250,000 shall be available for administrative expenses: *Provided,* That the Secretary may enter into a cooperative agreement, which shall not be subject to Public Law 93–638, as amended, with a tribe having jurisdiction over the pilot reservation to implement the program to acquire fractional interests on behalf of such tribe: *Provided further,* That the Secretary may develop a reservation-wide system for establishing the fair market value of various types of lands and improvements to govern the amounts offered for acquisition of fractional interests: *Provided further,* That acquisitions shall be limited to one or more pilot reservations as determined by the Secretary: *Provided further,* That funds shall be available for acquisition of fractional interests in trust or restricted lands with the consent of its owners and at fair market value, and the Secretary shall hold in trust for such tribe all interests acquired pursuant to this pilot program: *Provided further,* That all proceeds from any lease, resource sale contract, right-of-way or other transaction derived from the fractional interest shall be credited to this appropriation, and remain available until expended, until

AR.02507

the purchase price paid by the Secretary under this appropriation has been recovered from such proceeds: *Provided further,* That once the purchase price has been recovered, all subsequent proceeds shall be managed by the Secretary for the benefit of the applicable tribe or paid directly to the tribe.

## ADMINISTRATIVE PROVISIONS

The Bureau of Indian Affairs may carry out the operation of Indian programs by direct expenditure, contracts, cooperative agreements, compacts and grants, either directly or in cooperation with States and other organizations.

Appropriations for the Bureau of Indian Affairs (except the revolving fund for loans, the Indian loan guarantee and insurance fund, and the Indian Guaranteed Loan Program account) shall be available for expenses of exhibits, and purchase of not to exceed 229 passenger motor vehicles, of which not to exceed 187 shall be for replacement only.

Notwithstanding any other provision of law, no funds available to the Bureau of Indian Affairs for central office operations or pooled overhead general administration (except facilities operations and maintenance) shall be available for tribal contracts, grants, compacts, or cooperative agreements with the Bureau of Indian Affairs under the provisions of the Indian Self–Determination Act or the Tribal Self–Governance Act of 1994 (Public Law 103–413).

Notwithstanding any other provision of law, no funds available to the Bureau, other than the amounts provided herein for assistance to public schools under 25 U.S.C. 452 et seq., shall be available to support the operation of any elementary or secondary school in the State of Alaska.

Appropriations made available in this or any other Act for schools funded by the Bureau shall be available only to the schools in the Bureau school system as of September 1, 1996. No funds available to the Bureau shall be used to support expanded grades for any school or dormitory beyond the grade structure in place or approved by the Secretary of the Interior at each school in the Bureau school system as of October 1, 1995.

## DEPARTMENTAL OFFICES

## INSULAR AFFAIRS

## ASSISTANCE TO TERRITORIES

<< 48 USCA § 1469b >>

For expenses necessary for assistance to territories under the jurisdiction of the Department of the Interior, $66,175,000, of which: (1) $62,326,000 shall be available until expended for technical assistance, including maintenance assistance, disaster assistance, insular management controls, and brown tree snake control and research; grants to the judiciary in American Samoa for compensation and expenses, as authorized by law (48 U.S.C. 1661(c)); grants to the Government of American Samoa, in addition to current local revenues, for construction and support of governmental functions; grants to the Government of the Virgin Islands as authorized by law; grants to the Government of Guam, as authorized by law; and grants to the Government of the Northern Mariana Islands as authorized by law (Public Law 94–241; 90 Stat. 272); and (2) $3,849,000 shall be available for salaries and expenses of the Office of Insular Affairs: *Provided,* That all financial transactions of the territorial and local governments herein provided for, including such transactions of all agencies or instrumentalities established or used by such governments, may be audited by the General Accounting Office, at its discretion, in accordance with chapter 35 of title 31, United States Code: *Provided further,* That Northern Mariana Islands Covenant grant funding shall be provided according to those terms of the Agreement of the Special Representatives on Future United States Financial Assistance for the Northern Mariana Islands approved by Public Law 99–396, or any subsequent legislation related to Commonwealth of the Northern Mariana Islands grant funding: *Provided further,* That of the Covenant grant funding for the Government of the Northern Mariana Islands $5,000,000 shall be used for the construction of prison facilities and $500,000 shall be used for construction and equipping of a crime laboratory unless the Secretary determines that acceptable alternative financing for these projects is already in place: *Provided further,* That of the amounts provided for technical assistance, sufficient funding shall be made available for a grant to the Close Up Foundation: *Provided further,* That the funds for the program of operations and maintenance improvement are appropriated to institutionalize routine operations and maintenance improvement of capital infrastructure in American Samoa, Guam, the Virgin Islands, the Commonwealth of the Northern Mariana Islands, the Republic of Palau, the Republic of the Marshall Islands, and the Federated States of Micronesia through assessments of long-range operations maintenance needs, improved capability

of local operations and maintenance institutions and agencies (including management and vocational education training), and project-specific maintenance (with territorial participation and cost sharing to be determined by the Secretary based on the individual territory's commitment to timely maintenance of its capital assets): *Provided further,* That any appropriation for disaster assistance under this heading in this Act or previous appropriations Acts may be used as non-Federal matching funds for the purpose of hazard mitigation grants provided pursuant to section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170c).

## COMPACT OF FREE ASSOCIATION

For economic assistance and necessary expenses for the Federated States of Micronesia and the Republic of the Marshall Islands as provided for in sections 122, 221, 223, 232, and 233 of the Compact of Free Association, and for economic assistance and necessary expenses for the Republic of Palau as provided for in sections 122, 221, 223, 232, and 233 of the Compact of Free Association, $20,930,000, to remain available until expended, as authorized by Public Law 99–239 and Public Law 99–658.

## DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

For necessary expenses for management of the Department of the Interior, $64,686,000, of which not to exceed $8,500 may be for official reception and representation expenses, of which not to exceed $5,000,000 shall be available for payments pursuant to section 123 of this Act and up to $1,000,000 shall be available for workers compensation payments and unemployment compensation payments associated with the orderly closure of the United States Bureau of Mines.

## OFFICE OF THE SOLICITOR

### SALARIES AND EXPENSES

For necessary expenses of the Office of the Solicitor, $36,784,000.

## OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General, $25,486,000.

## OFFICE OF SPECIAL TRUSTEE FOR AMERICAN INDIANS

### FEDERAL TRUST PROGRAMS

<< 25 USCA § 4011 NOTE >>

For operation of trust programs for Indians by direct expenditure, contracts, cooperative agreements, compacts, and grants, $39,499,000, to remain available until expended: *Provided,* That funds for trust management improvements may be transferred to the Bureau of Indian Affairs: *Provided further,* That funds made available to Tribes and Tribal organizations through contracts or grants obligated during fiscal year 1999, as authorized by the Indian Self–Determination Act of 1975 (25 U.S.C. 450 et seq.), shall remain available until expended by the contractor or grantee: *Provided further,* That notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss: *Provided further,* That notwithstanding any other provision of law, the Secretary shall not be required to provide a quarterly statement of performance for any Indian trust account that has not had activity for at least eighteen months and has a balance of $1.00 or less: *Provided further,* That the Secretary shall issue an annual account statement and maintain a record of any such accounts and shall permit the balance in each such account to be withdrawn upon the express written request of the accountholder.

## NATURAL RESOURCE DAMAGE ASSESSMENT AND RESTORATION

### NATURAL RESOURCE DAMAGE ASSESSMENT FUND

To conduct natural resource damage assessment activities by the Department of the Interior necessary to carry out the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. 9601 et seq.), Federal Water Pollution Control Act, as amended (33 U.S.C. 1251 et seq.), the Oil Pollution Act of 1990 (Public Law 101–380), and Public Law 101–337; $4,492,000, to remain available until expended: *Provided,* That unobligated and unexpended balances in the United States Fish and Wildlife Service, Natural Resource Damage Assessment Fund account at the end of fiscal year 1998 shall be transferred to and made a part of the Departmental Offices, Natural Resource Damage Assessment and Restoration, Natural Resource Damage Assessment Fund account and shall remain available until expended.

## MANAGEMENT OF FEDERAL LANDS FOR SUBSISTENCE USES

### SUBSISTENCE MANAGEMENT, DEPARTMENT OF THE INTERIOR

For necessary expenses of bureaus and offices of the Department of the Interior to manage federal lands in Alaska for subsistence uses under the provisions of Title VIII of the Alaska National Interest Lands Conservation Act (Public Law 96–487 et seq.) except in areas described in section 339(a)(1)(A) and (B) of this Act, $8,000,000 to become available on September 30, 1999, and remain available until expended: *Provided,* That if prior to October 1, 1999, the Secretary of the Interior determines that the Alaska State Legislature has approved a bill or resolution to amend the Constitution of the State of Alaska that, if approved by the electorate, would enable the implementation of state laws of general applicability which are consistent with, and which provide for the definition, preference and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act, the Secretary of the Interior shall make an $8,000,000 grant to the State of Alaska for the purpose of assisting that State in fulfilling its responsibilities under sections 803, 804, and 805 of that Act: *Provided further,* That if, on June 1, 1999, the Secretary is unable to make a determination that the Alaska State Legislature has approved a bill or resolution to amend the Constitution of the State of Alaska that, if approved by the electorate, would enable the implementation of state laws of general applicability which are consistent with and which provide for the definition, preference and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act, $1,000,000 of these funds shall become available on June 1, 1999, and shall remain available until expended (with expended amounts to be subtracted from the amount that could be granted to the State), for the Secretary to conduct data gathering and research on subsistence uses, and formulate plans for operational aspects and in-season management, but not to implement and enforce subsistence use management beyond those public lands which as of October 1, 1998, were subject to federal management for subsistence uses pursuant to Title VIII of the Alaska National Interest Lands Conservation Act.

### ADMINISTRATIVE PROVISIONS

There is hereby authorized for acquisition from available resources within the Working Capital Fund, 15 aircraft, 10 of which shall be for replacement and which may be obtained by donation, purchase or through available excess surplus property: *Provided,* That notwithstanding any other provision of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft: *Provided further,* That no programs funded with appropriated funds in the "Departmental Management", "Office of the Solicitor", and "Office of Inspector General" may be augmented through the Working Capital Fund or the Consolidated Working Fund.

### GENERAL PROVISIONS, DEPARTMENT OF THE INTERIOR

SEC. 101. Appropriations made in this title shall be available for expenditure or transfer (within each bureau or office), with the approval of the Secretary, for the emergency reconstruction, replacement, or repair of aircraft, buildings, utilities, or other facilities or equipment damaged or destroyed by fire, flood, storm, or other unavoidable causes: *Provided,* That no funds shall be made available under this authority until funds specifically made available to the Department of the Interior for emergencies shall have been exhausted: *Provided further,* That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible.

SEC. 102. The Secretary may authorize the expenditure or transfer of any no year appropriation in this title, in addition to the amounts included in the budget programs of the several agencies, for the suppression or emergency prevention of forest or range fires on or threatening lands under the jurisdiction of the Department of the Interior; for the emergency rehabilitation of burned-over lands under its jurisdiction; for emergency actions related to potential or actual earthquakes, floods, volcanoes,

storms, or other unavoidable causes; for contingency planning subsequent to actual oil spills; for response and natural resource damage assessment activities related to actual oil spills; for the prevention, suppression, and control of actual or potential grasshopper and Mormon cricket outbreaks on lands under the jurisdiction of the Secretary, pursuant to the authority in section 1773(b) of Public Law 99–198 (99 Stat. 1658); for emergency reclamation projects under section 410 of Public Law 95–87; and shall transfer, from any no year funds available to the Office of Surface Mining Reclamation and Enforcement, such funds as may be necessary to permit assumption of regulatory authority in the event a primacy State is not carrying out the regulatory provisions of the Surface Mining Act: *Provided,* That appropriations made in this title for fire suppression purposes shall be available for the payment of obligations incurred during the preceding fiscal year, and for reimbursement to other Federal agencies for destruction of vehicles, aircraft, or other equipment in connection with their use for fire suppression purposes, such reimbursement to be credited to appropriations currently available at the time of receipt thereof: *Provided further,* That for emergency rehabilitation and wildfire suppression activities, no funds shall be made available under this authority until funds appropriated to "Wildland Fire Management" shall have been exhausted: *Provided further,* That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible: *Provided further,* That such replenishment funds shall be used to reimburse, on a pro rata basis, accounts from which emergency funds were transferred.

SEC. 103. Appropriations made in this title shall be available for operation of warehouses, garages, shops, and similar facilities, wherever consolidation of activities will contribute to efficiency or economy, and said appropriations shall be reimbursed for services rendered to any other activity in the same manner as authorized by sections 1535 and 1536 of title 31, United States Code: *Provided,* That reimbursements for costs and supplies, materials, equipment, and for services rendered may be credited to the appropriation current at the time such reimbursements are received.

SEC. 104. Appropriations made to the Department of the Interior in this title shall be available for services as authorized by 5 U.S.C. 3109, when authorized by the Secretary, in total amount not to exceed $500,000; hire, maintenance, and operation of aircraft; hire of passenger motor vehicles; purchase of reprints; payment for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and the payment of dues, when authorized by the Secretary, for library membership in societies or associations which issue publications to members only or at a price to members lower than to subscribers who are not members.

SEC. 105. Appropriations available to the Department of the Interior for salaries and expenses shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902 and D.C. Code 4–204).

SEC. 106. Appropriations made in this title shall be available for obligation in connection with contracts issued for services or rentals for periods not in excess of twelve months beginning at any time during the fiscal year.

SEC. 107. No funds provided in this title may be expended by the Department of the Interior for the conduct of offshore leasing and related activities placed under restriction in the President's moratorium statement of June 26, 1990, in the areas of northern, central, and southern California; the North Atlantic; Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude.

SEC. 108. No funds provided in this title may be expended by the Department of the Interior for the conduct of offshore oil and natural gas preleasing, leasing, and related activities, on lands within the North Aleutian Basin planning area.

SEC. 109. No funds provided in this title may be expended by the Department of the Interior to conduct offshore oil and natural gas preleasing, leasing and related activities in the eastern Gulf of Mexico planning area for any lands located outside Sale 181, as identified in the final Outer Continental Shelf 5–Year Oil and Gas Leasing Program, 1997–2002.

SEC. 110. No funds provided in this title may be expended by the Department of the Interior to conduct oil and natural gas preleasing, leasing and related activities in the Mid–Atlantic and South Atlantic planning areas.

SEC. 111. Advance payments made under this title to Indian tribes, tribal organizations, and tribal consortia pursuant to the Indian Self–Determination and Education Assistance Act (25 U.S.C. 450 et seq.) or the Tribally Controlled Schools Act of 1988 (25 U.S.C. 2501 et seq.) may be invested by the Indian tribe, tribal organization, or consortium before such funds are expended for the purposes of the grant, compact, or annual funding agreement so long as such funds are—

(1) invested by the Indian tribe, tribal organization, or consortium only in obligations of the United States, or in obligations or securities that are guaranteed or insured by the United States, or mutual (or other) funds registered with the Securities and

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Exchange Commission and which only invest in obligations of the United States or securities that are guaranteed or insured by the United States; or

(2) deposited only into accounts that are insured by an agency or instrumentality of the United States, or are fully collateralized to ensure protection of the Funds, even in the event of a bank failure.

<< 50 USCA § 167 NOTE >>

SEC. 112. (a) Employees of Helium Operations, Bureau of Land Management, entitled to severance pay under 5 U.S.C. 5595, may apply for, and the Secretary of the Interior may pay, the total amount of the severance pay to the employee in a lump sum. Employees paid severance pay in a lump sum and subsequently reemployed by the Federal Government shall be subject to the repayment provisions of 5 U.S.C. 5595(i)(2) and (3), except that any repayment shall be made to the Helium Fund.

<< 50 USCA § 167 NOTE >>

(b) Helium Operations employees who elect to continue health benefits after separation shall be liable for not more than the required employee contribution under 5 U.S.C. 8905a(d)(1)(A). The Helium Fund shall pay for 18 months the remaining portion of required contributions.

<< 50 USCA § 167 NOTE >>

(c) The Secretary of the Interior may provide for training to assist Helium Operations employees in the transition to other Federal or private sector jobs during the facility shut-down and disposition process and for up to 12 months following separation from Federal employment, including retraining and relocation incentives on the same terms and conditions as authorized for employees of the Department of Defense in section 348 of the National Defense Authorization Act for Fiscal Year 1995.

<< 50 USCA § 167 NOTE >>

(d) For purposes of the annual leave restoration provisions of 5 U.S.C. 6304(d)(1)(B), the cessation of helium production and sales, and other related Helium Program activities shall be deemed to create an exigency of public business under, and annual leave that is lost during leave years 1997 through 2001 because of, 5 U.S.C. 6304 (regardless of whether such leave was scheduled in advance) shall be restored to the employee and shall be credited and available in accordance with 5 U.S.C. 6304(d)(2). Annual leave so restored and remaining unused upon the transfer of a Helium Program employee to a position of the executive branch outside of the Helium Program shall be liquidated by payment to the employee of a lump sum from the Helium Fund for such leave.

<< 50 USCA § 167 NOTE >>

(e) Benefits under this section shall be paid from the Helium Fund in accordance with section 4(c)(4) of the Helium Privatization Act of 1996. Funds may be made available to Helium Program employees who are or will be separated before October 1, 2002 because of the cessation of helium production and sales and other related activities. Retraining benefits, including retraining and relocation incentives, may be paid for retraining commencing on or before September 30, 2002.

<< 43 USCA § 1473e >>

SEC. 113. In fiscal year 1999 and thereafter, the Secretary may accept donations and bequests of money, services, or other personal property for the management and enhancement of the Department's Natural Resources Library. The Secretary may hold, use, and administer such donations until expended and without further appropriation.

SEC. 114. Notwithstanding any other provision of law, including but not limited to the Indian Self–Determination Act of 1975, as amended, funds available under this title for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self–Determination Act and no funds appropriated in this title shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact or funding agreement entered into between an Indian tribe or tribal organization and any entity other than an agency of the Department of the Interior.

SEC. 115. Notwithstanding any other provisions of law, the National Park Service shall not develop or implement a reduced entrance fee program to accommodate non-local travel through a unit. The Secretary may provide for and regulate local non-recreational passage through units of the National Park System, allowing each unit to develop guidelines and permits for such activity appropriate to that unit.

SEC. 116. (a) Denver Service Center, Presidio, and Golden Gate National Recreation Area employees who voluntarily resign or retire from the National Park Service on or before December 31, 1998, shall receive, from the National Park Service, a lump sum voluntary separation incentive payment that shall be equal to the lesser of an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code, if the employee were entitled to payment under such section; or $25,000.

(1) The voluntary separation incentive payment—

(A) shall not be a basis for payment, and shall not be included in the computation of any other type of Government benefit; and

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employee.

(2) Employees receiving a voluntary separation incentive payment and accepting employment with the Federal Government within five years of the date of separation shall be required to repay the entire amount of the incentive payment to the National Park Service.

(3) The Secretary may, at the request of the head of an Executive branch agency, waive the repayment under paragraph (2) if the individual involved possesses unique abilities and is the only qualified applicant available for the position.

(4) In addition to any other payment which it is required to make under Subchapter III of chapter 83 of title 5, United States Code, the National Park Service shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the National Park Service—

(A) who retires under section 8336(d)(2) of Title 5, United States Code; and,

(B) to whom a voluntary separation incentive payment has been or is to be paid under the provisions of this section.

(b) Employees of Denver Service Center, Presidio, and Golden Gate National Recreation Area entitled to severance pay under 5 U.S.C. 5595, may apply for, and the National Park Service may pay, the total amount of severance pay to the employee in a lump sum. Employees paid severance pay in a lump sum and subsequently reemployed by the Federal Government shall be subject to the repayment provisions of 5 U.S.C. 5595(i)(2) and (3), except that any repayment shall be made to the National Park Service.

(c) Employees of the Denver Service Center, Presidio, and Golden Gate National Recreation Area who voluntarily resign on or before December 31, 1998, or who are separated in a reduction in force, shall be liable for not more than the required employee contribution under 5 U.S.C. 8905a(d)(1)(A) if they elect to continue health benefits after separation. The National Park Service shall pay for 12 months the remaining portion of required contributions.

SEC. 117. Notwithstanding any other provision of law, the Secretary is authorized to permit persons, firms or organizations engaged in commercial, cultural, educational, or recreational activities (as defined in section 612a of title 40, United States Code) not currently occupying such space to use courtyards, auditoriums, meeting rooms, and other space of the main and south Interior building complex, Washington, D.C., the maintenance, operation, and protection of which has been delegated to the Secretary from the Administrator of General Services pursuant to the Federal Property and Administrative Services Act of 1949, and to assess reasonable charges therefore, subject to such procedures as the Secretary deems appropriate for such uses. Charges may be for the space, utilities, maintenance, repair, and other services. Charges for such space and services may be at rates equivalent to the prevailing commercial rate for comparable space and services devoted to a similar purpose in the vicinity of the main and south Interior building complex, Washington, D.C. for which charges are being assessed. The Secretary may without further appropriation hold, administer, and use such proceeds within the Departmental Management Working Capital Fund to offset the operation of the buildings under his jurisdiction, whether delegated or otherwise, and for related purposes, until expended.

<< 16 USCA § 460*o* NOTE >>

SEC. 118. The 37 mile River Valley Trail from the town of Delaware Gap to the edge of the town of Milford, Pennsylvania located within the Delaware Water Gap National Recreation Area shall hereafter be referred to in any law, regulation, document, or record of the United States as the Joseph M. McDade Recreational Trail.

SEC. 119. (a) In this section—

(1) the term "Huron Cemetery" means the lands that form the cemetery that is popularly known as the Huron Cemetery, located in Kansas City, Kansas, as described in subsection (b)(3); and

(2) the term "Secretary" means the Secretary of the Interior.

(b)(1) The Secretary shall take such action as may be necessary to ensure that the lands comprising the Huron Cemetery (as described in paragraph (3)) are used only in accordance with this subsection.

(2) The lands of the Huron Cemetery shall be used only—

(A) for religious and cultural uses that are compatible with the use of the lands as a cemetery; and

(B) as a burial ground.

(3) The description of the lands of the Huron Cemetery is as follows:

The tract of land in the NW quarter of sec. 10, T. 11 S., R. 25 E., of the sixth principal meridian, in Wyandotte County, Kansas (as surveyed and marked on the ground on August 15, 1888, by William Millor, Civil Engineer and Surveyor), described as follows:

"Commencing on the Northwest corner of the Northwest Quarter of the Northwest Quarter of said Section 10;

"Thence South 28 poles to the 'true point of beginning';

"Thence South 71 degrees East 10 poles and 18 links;

"Thence South 18 degrees and 30 minutes West 28 poles;

"Thence West 11 and one-half poles;

"Thence North 19 degrees 15 minutes East 31 poles and 15 feet to the 'true point of beginning', containing 2 acres or more.".

SEC. 120. (a) STUDY.—The Secretary shall enter into an agreement with and provide funding, to the National Academy of Sciences (NAS), the Board on Earth Sciences and Resources, (Board), to conduct a detailed, comprehensive study of the environmental and reclamation requirements relating to mining of locatable minerals on federal lands and the adequacy of those requirements to prevent unnecessary or undue degradation of federal lands in each state in which such mining occurs.

(1) CONTENTS.—The study shall identify and consider—

(A) the operating, reclamation and permitting requirements for locatable minerals mining and exploration operations on federal lands by federal and state air, water, solid waste, reclamation and other environmental statutes, including surface management regulations promulgated by federal land management agencies and state primacy programs under applicable federal statutes and state laws and the time requirements applicable to project environmental review and permitting;

(B) the adequacy of federal and state environmental, reclamation and permitting statutes and regulations applicable in any state or states where mining or exploration of locatable minerals on federal lands is occurring, to prevent unnecessary or undue degradation; and

(C) recommendations and conclusions regarding how federal and state environmental, reclamation and permitting requirements and programs can be coordinated to ensure environmental protection, increase efficiency, avoid duplication and delay, and identify the most cost-effective manner for implementation.

(b) REPORT.—No later than July 31, 1999, the Board shall submit a report addressing areas described under (a)(1) to the appropriate federal agencies, the Congress and the Governors of affected states.

(c) FUNDS.—From the funds collected for mining law administration, the Secretary shall provide to the NAS such funds as it requests, not to exceed $800,000, for the purpose of conducting this analysis.

(d) SURFACE MANAGEMENT REGULATIONS.—The Secretary of the Interior shall not promulgate any final regulations to change the Bureau of Land Management regulations found at 43 CFR Part 3809 prior to September 30, 1999.

SEC. 121. Overhead charges levied by the Fish and Wildlife Service on any and all funds transferred from the Bureau of Reclamation for the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin and for the Recovery Implementation Program for Endangered Fish Species in the San Juan River Basin shall be limited to no more than 50 percent of the biennially determined full indirect cost recovery rate.

SEC. 122. (a) ANCSA DETERMINATION.—

(1) Within 180 days following the enactment of this Act, the Bureau of Land Management shall conduct a determination under section 3(e) of the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.) of the property described as Lot 1, Block 12; the north 50 feet of Lots 43 and 44, Block 12; Lots 50, 51 and 52, Block 12; Lots 28 and 29, Block 33; and a strip of land 25 feet in length running east and west by 24 feet in width running north and south in the southwest corner of Lot 15, Block 33, all within the Nome Townsite, Records of the Cape Nome Recording District, Second Judicial District, State of Alaska.

(2) The ANCSA section 3(e) determination will determine if the lands must be conveyed to the Sitnasuak Native Corporation (the village corporation for Nome).

(3) If and only if the Bureau of Land Management's ANCSA section 3(e) determination concludes that the Sitnasuak Native Corporation is not entitled to the lands, and following the settlement of any and all claims filed appealing the decision, the Secretary shall carry out subsection (b) of this section, and the provisions of subsection (c) shall take effect.

(b) CONVEYANCE.—The Secretary shall convey to Kawerak, Inc., a non-profit tribal organization in Nome, Alaska, without consideration, all right, title, and interest of the United States, subject to all valid existing rights and to the rights-of-way described in subsection (c), in the property described as Lot 1, Block 12; the north 50 feet of Lots 43 and 44, Block 12; Lots 50, 51 and 52, Block 12; Lots 28 and 29, Block 33; and a strip of land 25 feet in length running east and west by 24 feet in width running north and south in the southwest corner of Lot 15, Block 33, all within the Nome Townsite, Records of the Cape Nome Recording District, Second Judicial District, State of Alaska.

(c) RIGHTS–OF–WAY.—The property conveyed under subsection (b) shall be subject to—

(1) title of the State of Alaska, Department of Highways, as to the south three feet of Lots 50, 51, and 52 of Block 12; and

(2) rights of the public or of any governmental agencies in and to any portion of the property lying within any roads, streets, or highways.

<< 16 USCA § 410hh–4 NOTE >>

SEC. 123. COMMERCIAL FISHING IN GLACIER BAY NATIONAL PARK. (a) GENERAL.—

<< 16 USCA § 410hh–4 NOTE >>

(1) The Secretary of the Interior and the State of Alaska shall cooperate in the development of a management plan for the regulation of commercial fisheries in Glacier Bay National Park pursuant to existing State and Federal statutes and any applicable international conservation and management treaties. Such management plan shall provide for commercial fishing in the marine waters within Glacier Bay National Park outside of Glacier Bay Proper, and in the marine waters within Glacier Bay Proper as specified in paragraphs (a)(2) through (a)(5), and shall provide for the protection of park values and purposes, for the prohibition of any new or expanded fisheries, and for the opportunity for the study of marine resources.

<< 16 USCA § 410hh–4 NOTE >>

(2) In the nonwilderness waters within Glacier Bay Proper, commercial fishing shall be limited, by means of non-transferable lifetime access permits, solely to individuals who—

(A) hold a valid commercial fishing permit for a fishery in a geographic area that includes the nonwilderness waters within Glacier Bay Proper;

(B) provide a sworn and notarized affidavit and other available corroborating documentation to the Secretary of the Interior sufficient to establish that such individual engaged in commercial fishing for halibut, tanner crab, or salmon in Glacier Bay Proper during qualifying years which shall be established by the Secretary of the Interior within one year of the date of the enactment of this Act; and

(C) fish only with—

(i) longline gear for halibut;

(ii) pots or ring nets for tanner crab; or

(iii) trolling gear for salmon.

<< 16 USCA § 410hh–4 NOTE >>

(3) With respect to the individuals engaging in commercial fishing in Glacier Bay Proper pursuant to paragraph (2), no fishing shall be allowed in the West Arm of Glacier Bay Proper (West Arm) north of 58 degrees, 50 minutes north latitude, except for trolling for king salmon during the period from October 1 through April 30. The waters of Johns Hopkins Inlet, Tarr Inlet and Reid Inlet shall remain closed to all commercial fishing.

<< 16 USCA § 410hh–4 NOTE >>

(4) With respect to the individuals engaging in commercial fishing in Glacier Bay Proper pursuant to paragraph (2), no fishing shall be allowed in the East Arm of Glacier Bay Proper (East Arm) North of a line drawn from Point Caroline, through the southern end of Garforth Island to the east side of Muir Inlet, except that trolling for king salmon during the period from October 1 through April 30 shall be allowed south of a line drawn across Muir Inlet at the southernmost point of Adams Inlet.

<< 16 USCA § 410hh–4 NOTE >>

(5) With respect to the individuals engaging in commercial fishing in Glacier Bay Proper pursuant to paragraph (2), no fishing shall be allowed in Geikie Inlet.

<< 16 USCA § 410hh–4 NOTE >>

(b) THE BEARDSLEE ISLANDS AND UPPER DUNDAS BAY.—Comerical fishing is prohibited in the designated wilderness waters within Glacier Bay National Park and Preserve, including the waters of the Beardslee Islands and Upper Dundas Bay. Any individual who—

<< 16 USCA § 410hh–4 NOTE >>

(1) on or before February 1, 1999, provides a sworn and notarized affidavit and other available corroborating documentation to the Secretary of the Interior sufficient to establish that he or she has engaged in commercial fishing for Dungeness crab in the designated wilderness waters of the Beardslee Islands or Dundas Bay within Glacier Bay National Park pursuant to a valid commercial fishing permit in at least six of the years during the period 1987 through 1996;

<< 16 USCA § 410hh–4 NOTE >>

(2) at the time of receiving compensation based on the Secretary of the Interior's determination as described below—
  (A) agrees in writing not to engaged in commercial fishing for Dungeness crab within Glacier Bay Proper;
  (B) relinquishes to the State of Alaska for the purposes of its retirement any commercial fishing permit for Dungeness crab for areas within Glacier Bay Proper;
  (C) at the individual's option, relinquishes to the United States the Dungeness crab pots covered by the commercial fishing permit; and
  (D) at the individual's option, relinquishes to the United States the fishing vessel used for Dungeness crab fishing in Glacier Bay Proper; and

<< 16 USCA § 410hh–4 NOTE >>

(3) holds a current valid commercial fishing permit that allows such individual to engage in commercial fishing for Dungeness crab in Glacier Bay National Park,

shall be eligible to receive from the United States compensation that is the greater of (i) $400,000, or (ii) an amount equal to the fair market value (as of the date of relinquishment) of the commercial fishing permit for Dungeness crab, of any Dungeness crab pots or other Dungeness crab gear, and of not more than one Dungeness crab fishing vessel, together with an amount equal to the present value of the foregone net income from commercial fishing for Dungeness crab for the period January 1, 1999, through December 31, 2004, based on the individual's net earnings from the Dungeness crab fishery during the period January 1, 1991, through December 31, 1996. Any individual seeking such compensation shall provide the consent necessary for the Secretary of the Interior to verify such net earnings in the fishery. The Secretary of the Interior's determination of the amount to be paid shall be completed and payment shall be made within six months from the date of application by the individuals described in this subsection and shall constitute final agency action subject to review pursuant to the Administrative Procedures Act in the United States District Court for the District of Alaska.

AR.02516

<< 16 USCA § 410hh–4 NOTE >>

(c) DEFINITION AND SAVINGS CLAUSE.—

<< 16 USCA § 410hh–4 NOTE >>

(1) As used in this section, the term "Glacier Bay Proper" shall mean the marine waters within Glacier Bay, including coves and inlets, north of a line drawn from Point Gustavus to Point Carolus.

<< 16 USCA § 410hh–4 NOTE >>

(2) Noting in this section is intended to enlarge or diminish Federal or State title, jurisdiction, or authority with respect to the waters of the State of Alaska, the waters within the boundaries of Glacier Bay National Park, or the tidal or submerged lands under any provision of State or Federal law.

SEC. 124. Notwithstanding any other provision of law, grazing permits which expire during fiscal year 1999 shall be renewed for the balance of fiscal year 1999 on the same terms and conditions as contained in the expiring permits, or until the Bureau of Land Management completes processing these permits in compliance with all applicable laws, whichever comes first. Upon completion of processing by the Bureau, the terms and conditions of existing grazing permits may be modified, if necessary, and reissued for a term not to exceed ten years. Nothing in this language shall be deemed to affect the Bureau's authority to otherwise modify or terminate grazing permits.

SEC. 125. CONVEYANCE TO THE TOWN OF PAHRUMP, NEVADA. (a) CONVEYANCE.—The Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall convey to the town of Pahrump, Nevada, without consideration, subject to the requirements of 43 U.S.C. 869, all right, title, and interest of the land subject to all valid existing rights in the public lands located south and west of Highway 160 within Sections 32 and 33, T. 20 S., R. 54 E., Mount Diablo Meridian.

(b) USE.—The conveyance of the property under subsection (a) shall be subject to reversion to the United States if the property is used for a purpose other than the purpose of a public fairground or a related public purpose.

SEC. 126. Special Federal Aviation Regulation No. 78, regarding commercial air tour operators in the vicinity of the Rocky Mountain National Park, as published in the Federal Register on January 8, 1997, shall remain in effect until otherwise provided by an Act of Congress.

<< 16 USCA § 3192a >>

SEC. 127. Notwithstanding any other provision of law, none of the funds provided in this Act or any other Act hereafter enacted may be used by the Secretary of the Interior, except with respect to land exchange costs and costs associated with the preparation of land acquisitions, in the acquisition of State, private, or other non-federal lands (or any interest therein) in the State of Alaska, unless, in the acquisition of any State, private, or other non-federal lands (or interest therein) in the State of Alaska, the Secretary seeks to exchange unreserved public lands before purchasing all or any portion of such lands (or interest therein) in the State of Alaska.

<< 16 USCA § 461 NOTE >>

SEC. 128. CHARLESTON, ARKANSAS NATIONAL COMMEMORATIVE SITE. (a) The Congress finds that—

<< 16 USCA § 461 NOTE >>

(1) the 1954 U.S. Supreme Court decision of Brown v. Board of Education, which mandated an end to the segregation of public schools, was one of the most significant Court decisions in the history of the United States;

<< 16 USCA § 461 NOTE >>

(2) the Charleston Public School District in Charleston, Arkansas, in September, 1954, became the first previously-segregated public school district in the former Confederacy to integrate following the Brown decision;

<< 16 USCA § 461 NOTE >>

(3) the orderly and peaceful integration of the public schools in Charleston served as a model and inspiration in the development of the Civil Rights movement in the United States, particularly with respect to public education; and

<< 16 USCA § 461 NOTE >>

(4) notwithstanding the important role of the Charleston School District in the successful implementation of integrated public schools, the role of the district has not been adequately commemorated and interpreted for the benefit and understanding of the nation.

<< 16 USCA § 461 NOTE >>

(b) The Charleston Public School complex in Charleston, Arkansas is hereby designated as the "Charleston National Commemorative Site" in commemoration of the Charleston schools' role as the first public school district in the South to integrate following the 1954 United States Supreme Court decision, Brown v. Board of Education.

<< 16 USCA § 461 NOTE >>

(c) The Secretary, after consultation with the Charleston Public School District, shall establish an appropriate commemorative monument and interpretive exhibit at the Charleston National Commemorative Site to commemorate the 1954 integration of Charleston's public schools.

SEC. 129. (a) In the event any tribe returns appropriations made available by this Act to the Bureau of Indian Affairs for distribution to other tribes, this action shall not diminish the Federal Government's trust responsibility to that tribe, or the government-to-government relationship between the United States and that tribe, or that tribe's ability to access future appropriations.

(b) The Bureau of Indian Affairs (BIA) shall develop alternative methods to fund tribal priority allocations (TPA) base programs in future years. The alternatives shall consider tribal revenues and relative needs of tribes and tribal members. No later than April 1, 1999, the BIA shall submit a report to Congress containing its recommendations and other alternatives. The report shall also identify the methods proposed to be used by BIA to acquire data that is not currently available to BIA and any data gathering mechanisms that may be necessary to encourage tribal compliance. Notwithstanding any other provision of law, for the purposes of developing recommendations, the Bureau of Indian Affairs is hereby authorized access to tribal revenue-related data held by any Federal agency, excluding information held by the Internal Revenue Service.

(c) Except as provided in subsection (d), tribal revenue shall include the sum of tribal net income, however derived, from any business venture owned, held, or operated, in whole or in part, by any tribal entity which is eligible to receive TPA on behalf of the members of any tribe, all amounts distributed as per capita payments which are not otherwise included in net income, and any income from fees, licenses or taxes collected by any tribe.

(d) The calculation of tribal revenues shall exclude payments made by the Federal Government in settlement of claims or judgments and income derived from lands, natural resources, funds, and assets held in trust by the Secretary of the Interior.

(e) In developing alternative TPA distribution methods, the Bureau of Indian Affairs will take into account the financial obligations of a tribe, such as budgeted health, education and public works service costs; its compliance, obligations and spending requirements under the Indian Gaming Regulatory Act; its compliance with the Single Audit Act; and its compact with its State.

SEC. 130. None of the funds in this or any other Act shall be used to issue a notice of final rulemaking with respect to the valuation of crude oil for royalty purposes, including a rulemaking derived from proposed rules published in 63 Federal Register 6113 (1998), 62 Federal Register 36030, and 62 Federal Register 3742 (1997) until June 1, 1999, or until there is a negotiated agreement on the rule.

SEC. 131. Up to $8,000,000 of funds available in fiscal years 1998 and 1999 shall be available for grants, not covering more than 33 percent of the total cost of any acquisition to be made with such funds, to States and local communities for purposes of acquiring lands or interests in lands to preserve and protect Civil War battlefield sites identified in the July 1993 Report on the Nation's Civil War Battlefields prepared by the Civil War Sites Advisory Commission. Lands or interests in lands acquired pursuant to this section shall be subject to the requirements of paragraph 6(f)(3) of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–8(f)(3)).

SEC. 132. LEASING OF CERTAIN RESERVED MINERAL INTERESTS. (a) APPLICATION OF MINERAL LEASING ACT.—Notwithstanding section 4 of Public Law 88–608 (78 Stat. 988), the Federal reserved mineral interests in land conveyed under that Act by United States land patents No. 49–71–0059 and No. 49–71–0065 shall be subject to the Act of February 25, 1920 (commonly known as the "Mineral Leasing Act") (30 U.S.C. 181 et seq.).

(b) ENTRY.—

(1) IN GENERAL.—A person that acquires a lease under the Act of February 25, 1920 (30 U.S.C. 181 et seq.) for the interests referred to in subsection (a) may exercise the right of entry that is reserved to the United States and persons authorized by the United States in the patents conveying the land described in subsection (a) by occupying so much of the surface the land as may be required for purposes reasonably incident to the exploration for, and extraction and removal of, the leased minerals.

(2) CONDITION.—A person that exercises a right of entry under paragraph (1), shall, before commencing occupancy—

(A) secure the written consent or waiver of the patentee; or

(B) post a bond or other financial guarantee with the Secretary of the Interior in an amount sufficient to ensure—

(i) the completion of reclamation pursuant to the requirements of the Secretary under the Act of February 25, 1920 (30 U.S.C. 181 et seq.); and

(ii) the payment to the surface owner for—

(I) any damage to a crop or tangible improvement of the surface owner that results from activity under the mineral lease; and

(II) any permanent loss of income to the surface owner due to loss or impairment of grazing use or of other uses of the land by the surface owner at the time of commencement of activity under the mineral lease.

(c) EFFECTIVE DATE.—In the case of the land conveyed by United States patent No. 49–71–0065, this section takes effect January 1, 1997.

<< 25 USCA § 458ff >>

SEC. 133. Notwithstanding any other provision of law, the Tribal Self–Governance Act (25 U.S.C. § 458aa et seq.) is amended at § 458ff(c) by inserting "450c(d)," following the word "sections".

<< 16 USCA § 3503 NOTE >>

SEC. 134. CORRECTION TO COASTAL BARRIER RESOURCES SYSTEM MAP. (a) IN GENERAL.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior shall make such corrections to the map described in subsection (b) as are necessary to restore on that map the September 30, 1982, boundary for Unit M09 on the portion of Edisto Island located immediately to the south and west of the Jeremy Cay Causeway.

<< 16 USCA § 3503 NOTE >>

(b) MAP DESCRIBED.—The map described in this subsection is the map included in a set of maps entitled "Coastal Barrier Resources System", dated October 24, 1990, that relates to the unit of the Coastal Barrier Resources System entitled "Edisto Complex M09/M09P".

<< 16 USCA § 410hh–1 NOTE >>

SEC. 135. KATMAI NATIONAL PARK LAND EXCHANGE. (a) RATIFICATION OF AGREEMENT.—

<< 16 USCA § 410hh–1 NOTE >>

(1) RATIFICATION.—

(A) IN GENERAL.—The terms, conditions, procedures, covenants, reservations, and other provisions set forth in the document entitled "Agreement for the Sale, Purchase and Conveyance of Lands between the Heirs, Designees and/or Assigns of Palakia Melgenak and the United States of America" (hereinafter referred to in this section as the "Agreement"), executed by its signatories, including the heirs, designees and/or assigns of Palakia Melgenak (hereinafter referred to in this section as the "Heirs") effective on September 1, 1998 are authorized, ratified and confirmed, and set forth the obligations and commitments of the United States and all other signatories, as a matter of Federal law.

(B) NATIVE ALLOTMENT.—Notwithstanding any provision of law to the contrary, all lands described in section 2(c) of the Agreement for conveyance to the Heirs shall be deemed a replacement transaction under "An Act to relieve restricted Indians in the Five Civilized Tribes whose nontaxable lands are required for State, county or municipal improvements or sold to other persons or for other purposes" (25 U.S.C. 409a, 46 Stat. 1471), as amended, and the Secretary shall convey such lands by a patent consistent with the terms of the Agreement and subject to the same restraints on alienation and tax-exempt status as provided for Native allotments pursuant to "An Act authorizing the Secretary of the Interior to allot homesteads to the natives of Alaska" (34 Stat. 197), as amended, repealed by section 18(a) the Alaska Native Claims Settlement Act (85 Stat. 710), with a savings clause for applications pending on December 18, 1971.

(C) LAND ACQUISITION.—Lands and interests in land acquired by the United States pursuant to the Agreement shall be administered by the Secretary of the Interior (hereinafter referred to as the "Secretary") as part of the Katmai National Park, subject to the laws and regulations applicable thereto.

<< 16 USCA § 410hh–1 NOTE >>

(2) MAPS AND DEEDS.—The maps and deeds set forth in the Agreement generally depict the lands subject to the conveyances, the retention of consultation rights, the conservation easement, the access rights, Alaska Native Allotment Act status, and the use and transfer restrictions.

<< 16 USCA § 410hh–1 NOTE >>

<< 16 USCA § 1132 NOTE >>

(b) KATMAI NATIONAL PARK AND PRESERVE WILDERNESS.—Upon the date of closing of the conveyance of the approximately 10 acres of Katmai National Park Wilderness lands to be conveyed to the Heirs under the Agreement, the following lands shall hereby be designated part of the Katmai Wilderness as designated by section 701(4) of the Alaska National Interest Lands Conservation Act (16 U.S.C. 1132 note; 94 Stat. 2417):

A strip of land approximately one half mile long and 165 feet wide lying within Section 1, Township 24 South, Range 33 West, Seward Meridian, Alaska, the center line of which is the center of the unnamed stream from its mouth at Geographic Harbor to the north line of said Section 1. Said unnamed stream flows from the unnamed lake located in Sections 25 and 26, Township 23 South, Range 33 West, Seward Meridian. This strip of land contains approximately 10 acres.

<< 16 USCA § 410hh–1 NOTE >>

(c) AVAILABILITY OF APPROPRIATION.—None of the funds appropriated in this Act or any other Act hereafter enacted for the implementation of the Agreement may be expended until the Secretary determines that the Heirs have signed a valid and full relinquishment and release of any and all claims described in section 2(d) of the Agreement.

<< 16 USCA § 410hh–1 NOTE >>

(d) GENERAL PROVISIONS.—

<< 16 USCA § 410hh–1 NOTE >>

(1) All of the lands designated as Wilderness pursuant to this section shall be subject to any valid existing rights.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 410hh–1 NOTE >>

(2) Subject to the provisions of the Alaska National Interest Lands Conservation Act, the Secretary shall ensure that the lands in the Geographic Harbor area not directly affected by the Agreement remain accessible for the public, including its mooring and mechanized transportation needs.

<< 16 USCA § 410hh–1 NOTE >>

(3) The Agreement shall be placed on file and available for public inspection at the Alaska Regional Office of the National Park Service, at the office of the Katmai National Park and Preserve in King Salmon, Alaska, and at least one public facility managed by the Federal, State or local government located in each of Homer, Alaska, and Kodiak, Alaska and such other public facilities which the Secretary determines are suitable and accessible for such public inspections. In addition, as soon as practicable after enactment of this provision, the Secretary shall make available for public inspection in those same offices, copies of all maps and legal descriptions of lands prepared in implementing either the Agreement or this section. Such legal descriptions shall be published in the Federal Register and filed with the Speaker of the House of Representatives and the President of the Senate.

<< 16 USCA § 1011 >>

SEC. 136. WATERSHED RESTORATION AND ENHANCEMENT AGREEMENTS. Section 124(a) of the Department of the Interior and Related Agencies Appropriations Act, 1997 (16 U.S.C. 1011(a)) is amended by striking "with willing private landowners for restoration and enhancement of fish, wildlife, and other biotic resources on public or private land or both" and inserting "with the heads of other Federal agencies, tribal, State, and local governments, private and nonprofit entities, and landowners for the protection, restoration, and enhancement of fish and wildlife habitat and other resources on public or private land and the reduction of risk from natural disaster where public safety is threatened".

SEC. 137. None of the funds made available in this or any other Act may be expended before March 31, 1999 to publish final regulations based on the regulations proposed at 63 Fed. Reg. 3289 on January 22, 1998.

<< 16 USCA § 424–1 >>

SEC. 138. ACQUISITION OF REAL PROPERTY INTERESTS FOR ADDITION TO CHICKAMAUGA AND CHATTANOOGA NATIONAL MILITARY PARK. The Act of August 19, 1890 (16 U.S.C. 424), is amended by adding at the end the following:

"SEC. 12. ACQUISITION OF LAND.

"(a) IN GENERAL.—The Secretary of the Interior may acquire private land, easements, and buildings within the areas authorized for acquisition for the Chickamauga and Chattanooga National Military Park, by donation, purchase with donated or appropriated funds, or exchange.

"(b) LIMITATION.—Land, easements, and buildings described in subsection (a) may be acquired only from willing sellers.

"(c) ADMINISTRATION.—Land, easements, and buildings acquired by the Secretary under subsection (a) shall be administered by the Secretary as part of the park.".

SEC. 139. Amounts invoiced by the Secretary of the Interior and paid in full before the date of enactment of this Act for the purchase of Federal royalty oil by a refiner pursuant to the preference for small refiners in section 36 of the Mineral Leasing Act (30 U.S.C. 192) or section 27(b)(2) of the Outer Continental Shelf Lands Act (43 U.S.C. 1353(b)(2)) are hereby ratified and deemed to be the refiner's total obligation to the United States for such purchases notwithstanding any other provision of law, including the regulations set forth in 30 C.F.R. 208.13 (1997), subject to adjustment to reconcile billed volumes with delivered volumes: *Provided,* That all delivered royalty oil volumes so invoiced were processed, used, or exchanged for other crude oil on a volume or equivalent basis that was processed or used, in the refiner's refineries located in the United States.

SEC. 140. Remaining funds in the amount of $250,000, appropriated as part of Public Law 105–83 in the National Park Service construction account for fiscal year 1998 for an environmental impact statement of a site for an interpretive center along the

Blue Ridge Parkway near Roanoke, Virginia, may be used for the construction of an interpretive center outside of the boundaries of the Blue Ridge Parkway, near Roanoke, Virginia.

<< 16 USCA § 460u–5 >>

SEC. 141. Section 5(a)(3) of the Act entitled "An Act to provide for the establishment of the Indiana Dunes National Lakeshore, and for other purposes", approved November 5, 1966 (16 U.S.C. 460u–5(a)(3)), is amended—

<< 16 USCA § 460u–5 >>

(1) in subparagraph (A), in the matter preceding clause (i), by—
  (A) striking "as of that date"; and
  (B) inserting ", subject to subparagraph (B)," after "term ending"; and

<< 16 USCA § 460u–5 >>

(2) in subparagraph (B), by striking "Subparagraph (A)" and inserting "Subparagraph (A)(ii)".

SEC. 142. Notwithstanding any other provision of law, any settlement or judgment against the United States for the legislative taking by section 817 of Public Law 104–333 (110 Stat. 4200–4201) of real property on the eastern end of Santa Cruz Island known as the Gherini Ranch shall be paid solely from the permanent judgment appropriation established pursuant to section 1304 of title 31, United States Code.

<< 16 USCA §§ 410vv, 410vv–2, 410vv–3, 410vv–5 >>

<< 16 USCA § 410vv NOTE >>

SEC. 143. Public Law 102–350 (16 U.S.C. 410) is amended to strike "Marsh–Billings" each place it appears and insert "Marsh–Billings–Rockefeller".

SEC. 144. Refunds or rebates received on an on-going basis from a credit card services provider under the Department of the Interior's charge card programs may be deposited to and retained without fiscal year limitation in the Departmental Working Capital Fund established under 43 U.S.C. 1467 and used to fund management initiatives of general benefit to the Department of the Interior's bureaus and offices as determined by the Secretary or his designee.

<< 16 USCA § 460kk NOTE >>

SEC. 145. The principal visitor center for the Santa Monica Mountains National Recreation Area, regardless of location, shall be named for Anthony C. Beilenson and shall be referred to in any law, document or record of the United States as the "Anthony C. Beilenson Visitor Center".

<< 16 USCA § 79a NOTE >>

SEC. 146. The Redwood Information Center located at 119231 Highway 101 in Orick, California is hereby named the "Thomas H. Kuchel Visitor Center" and shall be referred to in any law, document or record of the United States as the "Thomas H. Kuchel Visitor Center".

SEC. 147. Appropriations made in this title under the headings Bureau of Indian Affairs and Office of Special Trustee for American Indians and any available unobligated balances from prior appropriations Acts made under the same headings, shall be available for expenditure or transfer for Indian trust management activities pursuant to the Trust Management Improvement Project High Level Implementation Plan.

SEC. 148. All funds received by the United States as a result of the sale or the exchange and subsequent sale of lands under section 412(a)(1) of the "Treasury and General Government Appropriations Act, 1999" shall be deposited in the "Everglades restoration" account in accordance with section 390(f)(2)(A) of the Federal Agriculture Improvement and Reform Act of 1996, Public Law 104–127, 110 Stat. 1022.

SEC. 149. Notwithstanding any other provision of law, the Secretary of the Interior shall transfer a road easement, no wider than 50 feet, across lot 1 (USS 3811, First Judicial District, Juneau Recording District, State of Alaska), administered by the National Park Service, identified as road alternative 1 on the map entitled "Traffic and Environmental Feasibility Study for Access to Proposed Auke Cape Facility" in the document for the NOAA/NMFS Juneau Consolidated Facility Preliminary Draft Environmental Impact Statement, dated July 1996, to the City and Borough of Juneau, Alaska. The Secretary of the Interior shall also transfer to the City and Borough of Juneau all right, title and interest of the United States in the right of way described by the plat recorded in Book 54, page 371, of the Juneau Recording District. Such transfers shall occur as soon as practical after the Secretary of Commerce has exchanged all, or a portion, of the right, title and interest in the 28.16 acres known as the Auke Cape property for the 22.35 acres known as the Lena Point property, near Juneau, Alaska to the City and Borough of Juneau, Alaska. The Secretary of the Interior shall deliver to the City and Borough of Juneau, Alaska a deed or patent establishing the conveyance to the City and Borough of Juneau, Alaska of said easements. The Secretary of the Interior shall retain the right of access and use of such right of way, easement and road.

SEC. 150. All properties administered by the National Park Service at Fort Baker, Golden Gate National Recreation Area, and leases, concessions, permits and other agreements associated with those properties, shall be exempt from all taxes and special assessments, except sales tax, by the State of California and its political subdivisions, including the County of Marin and the City of Sausalito. Such areas of Fort Baker shall remain under exclusive federal jurisdiction.

SEC. 151. Notwithstanding any provision of law, the Secretary of the Interior is authorized to negotiate and enter into agreements and leases, without regard to section 321 of chapter 314 of the Act of June 30, 1932 (40 U.S.C. 303b), with any person, firm, association, organization, corporation, or governmental entity for all or part of the property within Fort Baker administered by the Secretary as part of Golden Gate National Recreation Area. The proceeds of the agreements or leases shall be retained by the Secretary and such proceeds shall be available, without future appropriation, for the preservation, restoration, operation, maintenance and interpretation and related expenses incurred with respect to Fort Baker properties.

SEC. 152. In implementing section 1307(a) of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3197), the Secretary of the Interior shall deem the holder (on the date of enactment of this Act) of the concession contract KATM001–81 to be a person who, on or before January 1, 1979, was engaged in adequately providing visitor services of the type authorized in said contract with Katmai National Park and Preserve.

TITLE II—RELATED AGENCIES

DEPARTMENT OF AGRICULTURE

FOREST SERVICE

### FOREST AND RANGELAND RESEARCH

For necessary expenses of forest and rangeland research as authorized by law, $197,444,000, to remain available until expended.

### STATE AND PRIVATE FORESTRY

For necessary expenses of cooperating with and providing technical and financial assistance to States, territories, possessions, and others, and for forest health management, cooperative forestry, and education and land conservation activities, $170,722,000, to remain available until expended, as authorized by law.

### NATIONAL FOREST SYSTEM

For necessary expenses of the Forest Service, not otherwise provided for, for management, protection, improvement, and utilization of the National Forest System, and for administrative expenses associated with the management of funds provided under the headings "Forest and Rangeland Research", "State and Private Forestry", "National Forest System", "Wildland Fire Management", "Reconstruction and Construction", and "Land Acquisition", $1,298,570,000, to remain available until expended, which shall include 50 percent of all moneys received during prior fiscal years as fees collected under the Land and Water Conservation Fund Act of 1965, as amended, in accordance with section 4 of the Act (16 U.S.C. 460*l*–6a(i)): *Provided,* That up to $3,000,000 of funds provided herein may be used to construct or reconstruct facilities of the Forest Service: *Provided further,* That no more than $150,000 shall be used on any single project, exclusive of planning and design costs: *Provided*

*further,* That any unobligated balances remaining in this appropriation in the road maintenance extended budget line item at the end of fiscal year 1998 may be transferred to and made a part of the "Reconstruction and Construction" appropriation, road maintenance and decommissioning extended budget line item.

## WILDLAND FIRE MANAGEMENT

For necessary expenses for forest fire presuppression activities on National Forest System lands, for emergency fire suppression on or adjacent to such lands or other lands under fire protection agreement, and for emergency rehabilitation of burned-over National Forest System lands and water, $560,176,000, to remain available until expended: *Provided,* That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes.

For an additional amount to cover necessary expenses for emergency rehabilitation, presuppression due to emergencies, and wildfire suppression activities of the Forest Service, $102,000,000, to remain available until expended: *Provided,* That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further,* That these funds shall be available only to the extent an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## RECONSTRUCTION AND CONSTRUCTION

For necessary expenses of the Forest Service, not otherwise provided for, $297,352,000, to remain available until expended for construction, reconstruction and acquisition of buildings and other facilities, and for construction, reconstruction, repair and maintenance of forest roads and trails by the Forest Service as authorized by 16 U.S.C. 532–538 and 23 U.S.C. 101 and 205: *Provided,* That up to $15,000,000 of the funds provided herein for road maintenance shall be available for the decommissioning of roads, including unauthorized roads not part of the transportation system, which are no longer needed: *Provided further,* That no funds shall be expended to decommission any system road until notice and an opportunity for public comment has been provided: *Provided further,* That the Forest Service may make an advance of up to $200,000 from the funds provided under this heading in this Act and up to $800,000 provided under this heading in Public Law 105–83 to the City of Colorado Springs, Colorado, for the design and reconstruction of the Pikes Peak Summit House in accordance with terms and conditions agreed to.

## LAND ACQUISITION

For expenses necessary to carry out the provisions of the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4 through 11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the Forest Service, $117,918,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## ACQUISITION OF LANDS FOR NATIONAL FORESTS SPECIAL ACTS

For acquisition of lands within the exterior boundaries of the Cache, Uinta, and Wasatch National Forests, Utah; the Toiyabe National Forest, Nevada; and the Angeles, San Bernardino, Sequoia, and Cleveland National Forests, California, as authorized by law, $1,069,000, to be derived from forest receipts.

## ACQUISITION OF LANDS TO COMPLETE LAND EXCHANGES

For acquisition of lands, such sums, to be derived from funds deposited by State, county, or municipal governments, public school districts, or other public school authorities pursuant to the Act of December 4, 1967, as amended (16 U.S.C. 484a), to remain available until expended.

## RANGE BETTERMENT FUND

For necessary expenses of range rehabilitation, protection, and improvement, 50 percent of all moneys received during the prior fiscal year, as fees for grazing domestic livestock on lands in National Forests in the sixteen Western States, pursuant to section 401(b)(1) of Public Law 94–579, as amended, to remain available until expended, of which not to exceed 6 percent shall be available for administrative expenses associated with on-the-ground range rehabilitation, protection, and improvements.

## GIFTS, DONATIONS AND BEQUESTS FOR FOREST AND RANGELAND RESEARCH

For expenses authorized by 16 U.S.C. 1643(b), $92,000, to remain available until expended, to be derived from the fund established pursuant to the above Act.

## MANAGEMENT OF NATIONAL FOREST LANDS FOR SUBSISTENCE USES

### SUBSISTENCE MANAGEMENT, FOREST SERVICE

For necessary expenses of the Forest Service to manage federal lands in Alaska for subsistence uses under the provisions of Title VIII of the Alaska National Interest Lands Conservation Act (Public Law 96–487 et seq.) except in areas described in section 339(a)(1)(A) and (B) of this Act, $3,000,000 to become available on September 30, 1999, and remain available until expended: *Provided,* That if prior to October 1, 1999, the Secretary of the Interior determines that the Alaska State Legislature has approved a bill or resolution to amend the Constitution of the State of Alaska that, if approved by the electorate, would enable the implementation of state laws of general applicability which are consistent with, and which provide for the definition, preference and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act, the Secretary of Agriculture shall make a $3,000,000 grant to the State of Alaska for the purpose of assisting that State in fulfilling its responsibilities under sections 803, 804, and 805 of that Act.

### ADMINISTRATIVE PROVISIONS, FOREST SERVICE

Appropriations to the Forest Service for the current fiscal year shall be available for: (1) purchase of not to exceed 177 passenger motor vehicles of which 22 will be used primarily for law enforcement purposes and of which 176 shall be for replacement; acquisition of 25 passenger motor vehicles from excess sources, and hire of such vehicles; operation and maintenance of aircraft, the purchase of not to exceed two for replacement only, and acquisition of sufficient aircraft from excess sources to maintain the operable fleet at 213 aircraft for use in Forest Service wildland fire programs and other Forest Service programs; notwithstanding other provisions of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft; (2) services pursuant to 7 U.S.C. 2225, and not to exceed $100,000 for employment under 5 U.S.C. 3109; (3) purchase, erection, and alteration of buildings and other public improvements (7 U.S.C. 2250); (4) acquisition of land, waters, and interests therein, pursuant to 7 U.S.C. 428a; (5) for expenses pursuant to the Volunteers in the National Forest Act of 1972 (16 U.S.C. 558a, 558d, and 558a note); (6) the cost of uniforms as authorized by 5 U.S.C. 5901–5902; and (7) for debt collection contracts in accordance with 31 U.S.C. 3718(c).

None of the funds made available under this Act shall be obligated or expended to abolish any region, to move or close any regional office for National Forest System administration of the Forest Service, Department of Agriculture without the consent of the House and Senate Committees on Appropriations.

Any appropriations or funds available to the Forest Service may be transferred to the Wildland Fire Management appropriation for forest firefighting, emergency rehabilitation of burned-over or damaged lands or waters under its jurisdiction, and fire preparedness due to severe burning conditions.

Funds appropriated to the Forest Service shall be available for assistance to or through the Agency for International Development and the Foreign Agricultural Service in connection with forest and rangeland research, technical information, and assistance in foreign countries, and shall be available to support forestry and related natural resource activities outside the United States and its territories and possessions, including technical assistance, education and training, and cooperation with United States and international organizations.

None of the funds made available to the Forest Service under this Act shall be subject to transfer under the provisions of section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or 7 U.S.C. 147b unless the proposed transfer is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 105–163.

None of the funds available to the Forest Service may be reprogrammed without the advance approval of the House and Senate Committees on Appropriations in accordance with the procedures contained in House Report 105–163.

No funds appropriated to the Forest Service shall be transferred to the Working Capital Fund of the Department of Agriculture without the approval of the Chief of the Forest Service.

<< 16 USCA § 556h >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Notwithstanding any other provision of law, hereafter any appropriations or funds available to the Forest Service may be used to disseminate program information to private and public individuals and organizations through the use of nonmonetary items of nominal value and to provide nonmonetary awards of nominal value and to incur necessary expenses for the nonmonetary recognition of private individuals and organizations that make contributions to Forest Service programs.

<< 30 USCA § 185 NOTE >>

Notwithstanding any other provision of law, hereafter money collected, in advance or otherwise, by the Forest Service under authority of section 101 of Public Law 93–153 (30 U.S.C. 185(l)) as reimbursement of administrative and other costs incurred in processing pipeline right-of-way or permit applications and for costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities, may be used to reimburse the applicable appropriation to which such costs were originally charged.

Funds available to the Forest Service shall be available to conduct a program of not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended by Public Law 93–408.

None of the funds available in this Act shall be used for timber sale preparation using clearcutting in hardwood stands in excess of 25 percent of the fiscal year 1989 harvested volume in the Wayne National Forest, Ohio: *Provided,* That this limitation shall not apply to hardwood stands damaged by natural disaster: *Provided further,* That landscape architects shall be used to maintain a visually pleasing forest.

<< 16 USCA § 2106b >>

Any money collected from the States for fire suppression assistance rendered by the Forest Service on non-Federal lands not in the vicinity of National Forest System lands shall hereafter be used to reimburse the applicable appropriation and shall remain available until expended as the Secretary may direct in conducting activities authorized by 16 U.S.C. 2101 note, 2101–2110, 1606, and 2111.

Of the funds available to the Forest Service, $1,500 is available to the Chief of the Forest Service for official reception and representation expenses.

<< 16 USCA § 554e >>

Notwithstanding any other provision of law, hereafter the Forest Service is authorized to employ or otherwise contract with persons at regular rates of pay, as determined by the Service, to perform work occasioned by emergencies such as fires, storms, floods, earthquakes or any other unavoidable cause without regard to Sundays, Federal holidays, and the regular workweek.

To the greatest extent possible, and in accordance with the Final Amendment to the Shawnee National Forest Plan, none of the funds available in this Act shall be used for preparation of timber sales using clearcutting or other forms of even-aged management in hardwood stands in the Shawnee National Forest, Illinois.

<< 16 USCA § 583j–9 >>

Pursuant to sections 405(b) and 410(b) of Public Law 101–593, of the funds available to the Forest Service, up to $2,250,000 may be advanced in a lump sum as Federal financial assistance to the National Forest Foundation, without regard to when the Foundation incurs expenses, for administrative expenses or projects on or benefitting National Forest System lands or related to Forest Service programs: *Provided,* That of the Federal funds made available to the Foundation, no more than $400,000 shall be available for administrative expenses: *Provided further,* That the Foundation shall obtain, by the end of the period of Federal financial assistance, private contributions to match on at least one-for-one basis funds made available by the Forest Service: *Provided further,* That the Foundation may transfer Federal funds to a non-Federal recipient for a project at the same rate that the recipient has obtained the non-Federal matching funds: *Provided further,* That hereafter, the National Forest Foundation may hold Federal funds made available but not immediately disbursed and may use any interest or other investment income earned (before, on, or after the date of enactment of this Act) on Federal funds to carry out the purposes of Public Law 101–593:

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2550 of 3864

*Provided further,* That such investments may be made only in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States.

Pursuant to section 2(b)(2) of Public Law 98–244, up to $2,650,000 of the funds available to the Forest Service shall be available for matching funds to the National Fish and Wildlife Foundation, as authorized by 16 U.S.C. 3701–3709, and may be advanced in a lump sum as Federal financial assistance, without regard to when expenses are incurred, for projects on or benefitting National Forest System lands or related to Forest Service programs: *Provided,* That the Foundation shall obtain, by the end of the period of Federal financial assistance, private contributions to match on at least one-for-one basis funds advanced by the Forest Service: *Provided further,* That the Foundation may transfer Federal funds to a non-Federal recipient for a project at the same rate that the recipient has obtained the non-Federal matching funds.

Funds appropriated to the Forest Service shall be available for interactions with and providing technical assistance to rural communities for sustainable rural development purposes.

Notwithstanding any other provision of law, 80 percent of the funds appropriated to the Forest Service in the "National Forest System" and "Reconstruction and Construction" accounts and planned to be allocated to activities under the "Jobs in the Woods" program for projects on National Forest land in the State of Washington may be granted directly to the Washington State Department of Fish and Wildlife for accomplishment of planned projects. Twenty percent of said funds shall be retained by the Forest Service for planning and administering projects. Project selection and prioritization shall be accomplished by the Forest Service with such consultation with the State of Washington as the Forest Service deems appropriate.

Funds appropriated to the Forest Service shall be available for payments to counties within the Columbia River Gorge National Scenic Area, pursuant to sections 14(c)(1) and (2), and section 16(a)(2) of Public Law 99–663.

The Secretary of Agriculture is authorized to enter into grants, contracts, and cooperative agreements as appropriate with the Pinchot Institute for Conservation, as well as with public and other private agencies, organizations, institutions, and individuals, to provide for the development, administration, maintenance, or restoration of land, facilities, or Forest Service programs, at the Grey Towers National Historic Landmark: *Provided,* That, subject to such terms and conditions as the Secretary of Agriculture may prescribe, any such public or private agency, organization, institution, or individual may solicit, accept, and administer private gifts of money and real or personal property for the benefit of, or in connection with, the activities and services at the Grey Towers National Historic Landmark: *Provided further,* That such gifts may be accepted notwithstanding the fact that a donor conducts business with the Department of Agriculture in any capacity.

Funds appropriated to the Forest Service shall be available, as determined by the Secretary, for payments to Del Norte County, California, pursuant to sections 13(e) and 14 of the Smith River National Recreation Area Act (Public Law 101–612).

For purposes of the Southeast Alaska Economic Disaster Fund as set forth in section 101(c) of Public Law 104–134, the direct grants provided in subsection (c) shall be considered direct payments for purposes of all applicable law except that these direct grants may not be used for lobbying activities.

No employee of the Department of Agriculture may be detailed or assigned from an agency or office funded by this Act to any other agency or office of the Department for more than 30 days unless the individual's employing agency or office is fully reimbursed by the receiving agency or office for the salary and expenses of the employee for the period of assignment.

The Forest Service shall fund overhead, national commitments, indirect expenses, and any other category for use of funds which are expended at any units, that are not directly related to the accomplishment of specific work on-the-ground (referred to as "indirect expenditures"), from funds available to the Forest Service, unless otherwise prohibited by law: *Provided,* That not later than 90 days after the date of the enactment of this Act, the Forest Service shall provide, to the Committees on Appropriations of the House of Representatives and Senate, proposed definitions, which are consistent with Federal Accounting Standards Advisory Board standards, to be used with the fiscal year 2000 budget, for indirect expenditures: *Provided further,* That the Forest Service shall implement and adhere to the definitions on a nationwide basis without flexibility for modification by any organizational level except the Washington Office, and when changed by the Washington Office, such changes in definition shall be reported in budget requests submitted by the Forest Service: *Provided further,* That the Forest Service shall provide in the fiscal year 2000 budget justification, planned indirect expenditures in accordance with the definitions, summarized and displayed to the Regional, Station, Area, and detached unit office level. The justification shall display the estimated source and amount of indirect expenditures, by expanded budget line item, of funds in the agency's annual budget justification. The display shall include appropriated funds and the Knutson–Vandenberg, Brush Disposal, Cooperative Work–Other, and Salvage Sale funds. Changes between estimated and actual indirect expenditures shall be reported in subsequent budget justifications:

*Provided further,* That during fiscal year 2000 the Secretary shall limit total annual indirect obligations from the Brush Disposal, Cooperative Work–Other, Knutson–Vandenberg, Reforestation, Salvage Sale, and Roads and Trails funds to 20 percent of the total obligations from each fund: *Provided further,* That not later than 90 days after the date of the enactment of this Act, the Forest Service shall provide a plan which addresses how the agency will fully integrate all indirect expenditure information into the agency's general ledger system.

## DEPARTMENT OF ENERGY

## CLEAN COAL TECHNOLOGY

### (DEFERRAL)

Of the funds made available under this heading for obligation in prior years, $10,000,000 of such funds shall not be available until October 1, 1999; $15,000,000 shall not be available until October 1, 2000; and $15,000,000 shall not be available until October 1, 2001: *Provided,* That funds made available in previous appropriations Acts shall be available for any ongoing project regardless of the separate request for proposal under which the project was selected.

## FOSSIL ENERGY RESEARCH AND DEVELOPMENT

For necessary expenses in carrying out fossil energy research and development activities, under the authority of the Department of Energy Organization Act (Public Law 95–91), including the acquisition of interest, including defeasible and equitable interests in any real property or any facility or for plant or facility acquisition or expansion, and for conducting inquiries, technological investigations and research concerning the extraction, processing, use, and disposal of mineral substances without objectionable social and environmental costs (30 U.S.C. 3, 1602, and 1603), performed under the minerals and materials science programs at the Albany Research Center in Oregon, $384,056,000, to remain available until expended: *Provided,* That no part of the sum herein made available shall be used for the field testing of nuclear explosives in the recovery of oil and gas.

## ALTERNATIVE FUELS PRODUCTION

### (INCLUDING TRANSFER OF FUNDS)

Moneys received as investment income on the principal amount in the Great Plains Project Trust at the Norwest Bank of North Dakota, in such sums as are earned as of October 1, 1998, shall be deposited in this account and immediately transferred to the general fund of the Treasury. Moneys received as revenue sharing from operation of the Great Plains Gasification Plant shall be immediately transferred to the general fund of the Treasury.

## NAVAL PETROLEUM AND OIL SHALE RESERVES

### << 10 USCA § 7430 NOTE >>

For necessary expenses in carrying out naval petroleum and oil shale reserve activities, $14,000,000, to remain available until expended: *Provided,* That the requirements of 10 U.S.C. 7430(b)(2)(B) shall not apply to fiscal year 1999: *Provided further,* That, notwithstanding any other provision of law, funds available pursuant to the first proviso under this heading in Public Law 101–512 shall be immediately available for all naval petroleum and oil shale reserve activities.

## ELK HILLS SCHOOL LANDS FUND

For necessary expenses in fulfilling the first installment payment under the Settlement Agreement entered into by the United States and the State of California on October 11, 1996, as authorized by section 3415 of Public Law 104–106, $36,000,000 for payment to the State of California for the State Teachers' Retirement Fund from the Elk Hills School Lands Fund.

## ENERGY CONSERVATION

For necessary expenses in carrying out energy conservation activities, $691,701,000, to remain available until expended, including, notwithstanding any other provision of law, $64,000,000, which shall be transferred to this account from amounts held in escrow under section 3002(d) of Public Law 95–509 (15 U.S.C. 4501(d)): *Provided,* That $166,000,000 shall be for use in energy conservation programs as defined in section 3008(3) of Public Law 99–509 (15 U.S.C. 4507): *Provided further,* That

notwithstanding section 3003(d)(2) of Public Law 99–509 such sums shall be allocated to the eligible programs as follows: $133,000,000 for weatherization assistance grants and $33,000,000 for State energy conservation grants.

## ECONOMIC REGULATION

For necessary expenses in carrying out the activities of the Office of Hearings and Appeals, $1,801,000, to remain available until expended.

## STRATEGIC PETROLEUM RESERVE

For necessary expenses for Strategic Petroleum Reserve facility development and operations and program management activities pursuant to the Energy Policy and Conservation Act of 1975, as amended (42 U.S.C. 6201 et seq.), $160,120,000, to remain available until expended.

## ENERGY INFORMATION ADMINISTRATION

For necessary expenses in carrying out the activities of the Energy Information Administration, $70,500,000, to remain available until expended.

## ADMINISTRATIVE PROVISIONS, DEPARTMENT OF ENERGY

Appropriations under this Act for the current fiscal year shall be available for hire of passenger motor vehicles; hire, maintenance, and operation of aircraft; purchase, repair, and cleaning of uniforms; and reimbursement to the General Services Administration for security guard services.

From appropriations under this Act, transfers of sums may be made to other agencies of the Government for the performance of work for which the appropriation is made.

None of the funds made available to the Department of Energy under this Act shall be used to implement or finance authorized price support or loan guarantee programs unless specific provision is made for such programs in an appropriations Act.

The Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, private or foreign: *Provided,* That revenues and other moneys received by or for the account of the Department of Energy or otherwise generated by sale of products in connection with projects of the Department appropriated under this Act may be retained by the Secretary of Energy, to be available until expended, and used only for plant construction, operation, costs, and payments to cost-sharing entities as provided in appropriate cost-sharing contracts or agreements: *Provided further,* That the remainder of revenues after the making of such payments shall be covered into the Treasury as miscellaneous receipts: *Provided further,* That any contract, agreement, or provision thereof entered into by the Secretary pursuant to this authority shall not be executed prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full comprehensive report on such project, including the facts and circumstances relied upon in support of the proposed project.

No funds provided in this Act may be expended by the Department of Energy to prepare, issue, or process procurement documents for programs or projects for which appropriations have not been made.

In addition to other authorities set forth in this Act, the Secretary may accept fees and contributions from public and private sources, to be deposited in a contributed funds account, and prosecute projects using such fees and contributions in cooperation with other Federal, State or private agencies or concerns.

<< 42 USCA § 8287d >>

The Secretary in fiscal year 1999 and thereafter, shall continue the process begun in fiscal year 1998 of accepting funds from other Federal agencies in return for assisting agencies in achieving energy efficiency in Federal facilities and operations by the use of privately financed, energy savings performance contracts and other private financing mechanisms. The funds may be provided after agencies begin to realize energy cost savings; may be retained by the Secretary until expended; and may be used only for the purpose of assisting Federal agencies in achieving greater efficiency, water conservation and use of renewable energy by means of privately financed mechanisms, including energy savings performance contracts and utility incentive programs. These recovered funds will continue to be used to administer even greater energy efficiency, water conservation and use of renewable energy by means of privately financed mechanisms such as utility efficiency service contracts and energy savings

performance contracts. The recoverable funds will be used for all necessary program expenses, including contractor support and resources needed, to achieve overall Federal energy management program objectives for greater energy savings. Any such privately financed contracts shall meet the provisions of the Energy Policy Act of 1992, Public Law 102–486 regarding energy savings performance contracts and utility incentive programs.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### INDIAN HEALTH SERVICE

### INDIAN HEALTH SERVICES

 For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self–Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,950,322,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 238(b) for services furnished by the Indian Health Service: *Provided,* That funds made available to tribes and tribal organizations through contracts, grant agreements, or any other agreements or compacts authorized by the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), shall be deemed to be obligated at the time of the grant or contract award and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: *Provided further,* That $12,000,000 shall remain available until expended, for the Indian Catastrophic Health Emergency Fund: *Provided further,* That $373,801,000 for contract medical care shall remain available for obligation until September 30, 2000: *Provided further,* That of the funds provided, up to $17,000,000 shall be used to carry out the loan repayment program under section 108 of the Indian Health Care Improvement Act: *Provided further,* That funds provided in this Act may be used for one-year contracts and grants which are to be performed in two fiscal years, so long as the total obligation is recorded in the year for which the funds are appropriated: *Provided further,* That the amounts collected by the Secretary of Health and Human Services under the authority of title IV of the Indian Health Care Improvement Act shall remain available until expended for the purpose of achieving compliance with the applicable conditions and requirements of titles XVIII and XIX of the Social Security Act (exclusive of planning, design, or construction of new facilities): *Provided further,* That funding contained herein, and in any earlier appropriations Acts for scholarship programs under the Indian Health Care Improvement Act (25 U.S.C. 1613) shall remain available for obligation until September 30, 2000: *Provided further,* That amounts received by tribes and tribal organizations under title IV of the Indian Health Care Improvement Act shall be reported and accounted for and available to the receiving tribes and tribal organizations until expended: *Provided further,* That, notwithstanding any other provision of law, of the amounts provided herein, not to exceed $203,781,000 shall be for payments to tribes and tribal organizations for contract or grant support costs associated with contracts, grants, self-governance compacts or annual funding agreements between the Indian Health Service and a tribe or tribal organization pursuant to the Indian Self–Determination Act of 1975, as amended, prior to or during fiscal year 1999: *Provided further,* That funds provided to the Ponca Indian Tribe of Nebraska in previous fiscal years that were retained by the tribe to carry out the programs and functions of the Indian Health Service may be used by the tribe to obtain approved clinical space to carry out the program.

### INDIAN HEALTH FACILITIES

 For construction, repair, maintenance, improvement, and equipment of health and related auxiliary facilities, including quarters for personnel; preparation of plans, specifications, and drawings; acquisition of sites, purchase and erection of modular buildings, and purchases of trailers; and for provision of domestic and community sanitation facilities for Indians, as authorized by section 7 of the Act of August 5, 1954 (42 U.S.C. 2004a), the Indian Self–Determination Act, and the Indian Health Care Improvement Act, and for expenses necessary to carry out such Acts and titles II and III of the Public Health Service Act with respect to environmental health and facilities support activities of the Indian Health Service, $289,465,000, to remain available until expended: *Provided,* That notwithstanding any other provision of law, funds appropriated for the planning, design, construction or renovation of health facilities for the benefit of an Indian tribe or tribes may be used to purchase land for sites to construct, improve, or enlarge health or related facilities.

### ADMINISTRATIVE PROVISIONS, INDIAN HEALTH SERVICE

<< 25 USCA § 450j–2 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Appropriations in this Act to the Indian Health Service shall be available for services as authorized by 5 U.S.C. 3109 but at rates not to exceed the per diem rate equivalent to the maximum rate payable for senior-level positions under 5 U.S.C. 5376; hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation and erection of modular buildings and renovation of existing facilities; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and for uniforms or allowances therefore as authorized by 5 U.S.C. 5901–5902; and for expenses of attendance at meetings which are concerned with the functions or activities for which the appropriation is made or which will contribute to improved conduct, supervision, or management of those functions or activities: *Provided,* That in accordance with the provisions of the Indian Health Care Improvement Act, non-Indian patients may be extended health care at all tribally administered or Indian Health Service facilities, subject to charges, and the proceeds along with funds recovered under the Federal Medical Care Recovery Act (42 U.S.C. 2651–2653) shall be credited to the account of the facility providing the service and shall be available without fiscal year limitation: *Provided further,* That notwithstanding any other law or regulation, funds transferred from the Department of Housing and Urban Development to the Indian Health Service shall be administered under Public Law 86–121 (the Indian Sanitation Facilities Act) and Public Law 93–638, as amended: *Provided further,* That funds appropriated to the Indian Health Service in this Act, except those used for administrative and program direction purposes, shall not be subject to limitations directed at curtailing Federal travel and transportation: *Provided further,* That notwithstanding any other provision of law, funds previously or herein made available to a tribe or tribal organization through a contract, grant, or agreement authorized by title I or title III of the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), may be deobligated and reobligated to a self-determination contract under title I, or a self-governance agreement under title III of such Act and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: *Provided further,* That none of the funds made available to the Indian Health Service in this Act shall be used to implement the final rule published in the Federal Register on September 16, 1987, by the Department of Health and Human Services, relating to the eligibility for the health care services of the Indian Health Service until the Indian Health Service has submitted a budget request reflecting the increased costs associated with the proposed final rule, and such request has been included in an appropriations Act and enacted into law: *Provided further,* That funds made available in this Act are to be apportioned to the Indian Health Service as appropriated in this Act, and accounted for in the appropriation structure set forth in this Act: *Provided further,* That with respect to functions transferred by the Indian Health Service to tribes or tribal organizations, the Indian Health Service is authorized to provide goods and services to those entities, on a reimbursable basis, including payment in advance with subsequent adjustment, and the reimbursements received therefrom, along with the funds received from those entities pursuant to the Indian Self–Determination Act, may be credited to the same or subsequent appropriation account which provided the funding, said amounts to remain available until expended: *Provided further,* That, heretofore and hereafter and notwithstanding any other provision of law, funds available to the Indian Health Service in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self–Determination Act and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service: *Provided further,* That reimbursements for training, technical assistance, or services provided by the Indian Health Service will contain total costs, including direct, administrative, and overhead associated with the provision of goods, services, or technical assistance: *Provided further,* That the appropriation structure for the Indian Health Service may not be altered without advance approval of the House and Senate Committees on Appropriations.

OTHER RELATED AGENCIES

OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION

SALARIES AND EXPENSES

For necessary expenses of the Office of Navajo and Hopi Indian Relocation as authorized by Public Law 93–531, $13,000,000, to remain available until expended: *Provided,* That funds provided in this or any other appropriations Act are to be used to relocate eligible individuals and groups including evictees from District 6, Hopi-partitioned lands residents, those in significantly substandard housing, and all others certified as eligible and not included in the preceding categories: *Provided further,* That

none of the funds contained in this or any other Act may be used by the Office of Navajo and Hopi Indian Relocation to evict any single Navajo or Navajo family who, as of November 30, 1985, was physically domiciled on the lands partitioned to the Hopi Tribe unless a new or replacement home is provided for such household: *Provided further,* That no relocatee will be provided with more than one new or replacement home: *Provided further,* That the Office shall relocate any certified eligible relocatees who have selected and received an approved homesite on the Navajo reservation or selected a replacement residence off the Navajo reservation or on the land acquired pursuant to 25 U.S.C. 640d–10.

### INSTITUTE OF AMERICAN INDIAN AND ALASKA NATIVE CULTURE AND ARTS DEVELOPMENT

#### PAYMENT TO THE INSTITUTE

For payment to the Institute of American Indian and Alaska Native Culture and Arts Development, as authorized by title XV of Public Law 99–498, as amended (20 U.S.C. 56 part A), $4,250,000.

### SMITHSONIAN INSTITUTION

#### SALARIES AND EXPENSES

For necessary expenses of the Smithsonian Institution, as authorized by law, including research in the fields of art, science, and history; development, preservation, and documentation of the National Collections; presentation of public exhibits and performances; collection, preparation, dissemination, and exchange of information and publications; conduct of education, training, and museum assistance programs; maintenance, alteration, operation, lease (for terms not to exceed 30 years), and protection of buildings, facilities, and approaches; not to exceed $100,000 for services as authorized by 5 U.S.C. 3109; up to 5 replacement passenger vehicles; purchase, rental, repair, and cleaning of uniforms for employees; $347,154,000, of which not to exceed $38,165,000 for the instrumentation program, collections acquisition, Museum Support Center equipment and move, exhibition reinstallation, the National Museum of the American Indian, the repatriation of skeletal remains program, research equipment, information management, and Latino programming shall remain available until expended, and including such funds as may be necessary to support American overseas research centers and a total of $125,000 for the Council of American Overseas Research Centers: *Provided,* That funds appropriated herein are available for advance payments to independent contractors performing research services or participating in official Smithsonian presentations.

#### CONSTRUCTION AND IMPROVEMENTS, NATIONAL ZOOLOGICAL PARK

For necessary expenses of planning, construction, remodeling, and equipping of buildings and facilities at the National Zoological Park, by contract or otherwise, $4,400,000, to remain available until expended.

#### REPAIR AND RESTORATION OF BUILDINGS

For necessary expenses of repair and restoration of buildings owned or occupied by the Smithsonian Institution, by contract or otherwise, as authorized by section 2 of the Act of August 22, 1949 (63 Stat. 623), including not to exceed $10,000 for services as authorized by 5 U.S.C. 3109, $40,000,000, to remain available until expended: *Provided,* That contracts awarded for environmental systems, protection systems, and exterior repair or restoration of buildings of the Smithsonian Institution may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

#### CONSTRUCTION

For necessary expenses for construction, $16,000,000, to remain available until expended: *Provided,* That notwithstanding any other provision of law, a single procurement for the construction of the National Museum of the American Indian may be issued which includes the full scope of the project: *Provided further,* That the solicitation and the contract shall contain the clause "availability of funds" found at 48 CFR 52.232.18.

#### ADMINISTRATIVE PROVISIONS, SMITHSONIAN INSTITUTION

None of the funds in this or any other Act may be used to initiate the design of any expansion of current space or new facility without consultation with the House and Senate Appropriations Committees.

None of the funds in this or any other Act may be used to prepare a historic structures report, or for any other purpose, involving the Holt House located at the National Zoological Park in Washington, D.C.

AR.02532

The Smithsonian Institution shall not use Federal funds in excess of the amount specified in Public Law 101–185 for the construction of the National Museum of the American Indian.

## NATIONAL GALLERY OF ART

### SALARIES AND EXPENSES

For the upkeep and operations of the National Gallery of Art, the protection and care of the works of art therein, and administrative expenses incident thereto, as authorized by the Act of March 24, 1937 (50 Stat. 51), as amended by the public resolution of April 13, 1939 (Public Resolution 9, Seventy-sixth Congress), including services as authorized by 5 U.S.C. 3109; payment in advance when authorized by the treasurer of the Gallery for membership in library, museum, and art associations or societies whose publications or services are available to members only, or to members at a price lower than to the general public; purchase, repair, and cleaning of uniforms for guards, and uniforms, or allowances therefor, for other employees as authorized by law (5 U.S.C. 5901–5902); purchase or rental of devices and services for protecting buildings and contents thereof, and maintenance, alteration, improvement, and repair of buildings, approaches, and grounds; and purchase of services for restoration and repair of works of art for the National Gallery of Art by contracts made, without advertising, with individuals, firms, or organizations at such rates or prices and under such terms and conditions as the Gallery may deem proper, $57,938,000 of which not to exceed $3,026,000 for the special exhibition program shall remain available until expended.

### REPAIR, RESTORATION AND RENOVATION OF BUILDINGS

For necessary expenses of repair, restoration and renovation of buildings, grounds and facilities owned or occupied by the National Gallery of Art, by contract or otherwise, as authorized, $6,311,000, to remain available until expended: *Provided,* That contracts awarded for environmental systems, protection systems, and exterior repair or renovation of buildings of the National Gallery of Art may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

## JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

### OPERATIONS AND MAINTENANCE

For necessary expenses for the operation, maintenance and security of the John F. Kennedy Center for the Performing Arts, $12,187,000.

### CONSTRUCTION

For necessary expenses for capital repair and rehabilitation of the existing features of the building and site of the John F. Kennedy Center for the Performing Arts, $20,000,000, to remain available until expended.

## WOODROW WILSON INTERNATIONAL CENTER FOR SCHOLARS

### SALARIES AND EXPENSES

For expenses necessary in carrying out the provisions of the Woodrow Wilson Memorial Act of 1968 (82 Stat. 1356) including hire of passenger vehicles and services as authorized by 5 U.S.C. 3109, $5,840,000.

## NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

### NATIONAL ENDOWMENT FOR THE ARTS

#### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $83,500,000 shall be available to the National Endowment for the Arts for the support of projects and productions in the arts through assistance to organizations and individuals pursuant to sections 5(c) and 5(g) of the Act, for program support, and for administering the functions of the Act, to remain available until expended.

#### MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $14,500,000, to remain available until expended, to the National Endowment for the Arts: *Provided,* That this

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the chairman or by grantees of the Endowment under the provisions of section 10(a)(2), subsections 11(a)(2)(A) and 11(a)(3)(A) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

## NATIONAL ENDOWMENT FOR THE HUMANITIES

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $96,800,000, shall be available to the National Endowment for the Humanities for support of activities in the humanities, pursuant to section 7(c) of the Act, and for administering the functions of the Act, to remain available until expended.

### MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $13,900,000, to remain available until expended, of which $9,900,000 shall be available to the National Endowment for the Humanities for the purposes of section 7(h): *Provided,* That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the chairman or by grantees of the Endowment under the provisions of subsections 11(a)(2)(B) and 11(a)(3)(B) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

## INSTITUTE OF MUSEUM AND LIBRARY SERVICES

### OFFICE OF MUSEUM SERVICES

### GRANTS AND ADMINISTRATION

For carrying out subtitle C of the Museum and Library Services Act of 1996, as amended, $23,405,000, to remain available until expended.

### ADMINISTRATIVE PROVISIONS

None of the funds appropriated to the National Foundation on the Arts and the Humanities may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: *Provided,* That none of the funds appropriated to the National Foundation on the Arts and the Humanities may be used for official reception and representation expenses: *Provided further,* That funds from nonappropriated sources may be used as necessary for official reception and representation expenses.

## COMMISSION OF FINE ARTS

### SALARIES AND EXPENSES

For expenses made necessary by the Act establishing a Commission of Fine Arts (40 U.S.C. 104), $898,000.

### NATIONAL CAPITAL ARTS AND CULTURAL AFFAIRS

For necessary expenses as authorized by Public Law 99–190 (20 U.S.C. 956(a)), as amended, $7,000,000.

### ADVISORY COUNCIL ON HISTORIC PRESERVATION

### SALARIES AND EXPENSES

For necessary expenses of the Advisory Council on Historic Preservation (Public Law 89–665, as amended), $2,800,000: *Provided,* That none of these funds shall be available for compensation of level V of the Executive Schedule or higher positions.

## NATIONAL CAPITAL PLANNING COMMISSION

### SALARIES AND EXPENSES

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For necessary expenses, as authorized by the National Capital Planning Act of 1952 (40 U.S.C. 71–71i), including services as authorized by 5 U.S.C. 3109, $5,954,000: *Provided,* That all appointed members will be compensated at a rate not to exceed the rate for level IV of the Executive Schedule.

UNITED STATES HOLOCAUST MEMORIAL COUNCIL

HOLOCAUST MEMORIAL COUNCIL

For expenses of the Holocaust Memorial Council, as authorized by Public Law 96–388 (36 U.S.C. 1401), as amended, $32,107,000, of which $1,575,000 for the museum's repair and rehabilitation program and $1,264,000 for the museum's exhibitions program shall remain available until expended.

PRESIDIO TRUST

PRESIDIO TRUST FUND

For necessary expenses to carry out title I of the Omnibus Parks and Public Lands Management Act of 1996, $14,913,000 shall be available to the Presidio Trust, to remain available until expended. The Trust is authorized to issue obligations to the Secretary of the Treasury pursuant to section 104(d)(3) of the Act, in an amount not to exceed $20,000,000.

TITLE III—GENERAL PROVISIONS

SEC. 301. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive Order issued pursuant to existing law.

SEC. 302. No part of any appropriation under this Act shall be available to the Secretary of the Interior or the Secretary of Agriculture for the leasing of oil and natural gas by noncompetitive bidding on publicly owned lands within the boundaries of the Shawnee National Forest, Illinois: *Provided,* That nothing herein is intended to inhibit or otherwise affect the sale, lease, or right to access to minerals owned by private individuals.

SEC. 303. No part of any appropriation contained in this Act shall be available for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which congressional action is not complete.

SEC. 304. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 305. None of the funds provided in this Act to any department or agency shall be obligated or expended to provide a personal cook, chauffeur, or other personal servants to any officer or employee of such department or agency except as otherwise provided by law.

SEC. 306. No assessments may be levied against any program, budget activity, subactivity, or project funded by this Act unless advance notice of such assessments and the basis therefor are presented to the Committees on Appropriations and are approved by such Committees.

SEC. 307. (a) COMPLIANCE WITH BUY AMERICAN ACT.—None of the funds made available in this Act may be expended by an entity unless the entity agrees that in expending the funds the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c; popularly known as the "Buy American Act").

(b) SENSE OF CONGRESS; REQUIREMENT REGARDING NOTICE.—

(1) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products.

(2) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance using funds made available in this Act, the head of each Federal agency shall provide to each recipient of the assistance a notice describing the statement made in paragraph (1) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made

in America'' inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 308. None of the funds in this Act may be used to plan, prepare, or offer for sale timber from trees classified as giant sequoia (Sequoiadendron giganteum) which are located on National Forest System or Bureau of Land Management lands in a manner different than such sales were conducted in fiscal year 1995.

SEC. 309. None of the funds made available by this Act may be obligated or expended by the National Park Service to enter into or implement a concession contract which permits or requires the removal of the underground lunchroom at the Carlsbad Caverns National Park.

SEC. 310. None of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps program, unless the relevant agencies of the Department of the Interior and/or Agriculture follow appropriate reprogramming guidelines: *Provided,* That if no funds are provided for the AmeriCorps program by the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, then none of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps programs.

SEC. 311. None of the funds made available in this Act may be used: (1) to demolish the bridge between Jersey City, New Jersey, and Ellis Island; or (2) to prevent pedestrian use of such bridge, when it is made known to the Federal official having authority to obligate or expend such funds that such pedestrian use is consistent with generally accepted safety standards.

SEC. 312. (a) LIMITATION OF FUNDS.—None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to accept or process applications for a patent for any mining or mill site claim located under the general mining laws.

(b) EXCEPTIONS.—The provisions of subsection (a) shall not apply if the Secretary of the Interior determines that, for the claim concerned: (1) a patent application was filed with the Secretary on or before September 30, 1994; and (2) all requirements established under sections 2325 and 2326 of the Revised Statutes (30 U.S.C. 29 and 30) for vein or lode claims and sections 2329, 2330, 2331, and 2333 of the Revised Statutes (30 U.S.C. 35, 36, and 37) for placer claims, and section 2337 of the Revised Statutes (30 U.S.C. 42) for mill site claims, as the case may be, were fully complied with by the applicant by that date.

(c) REPORT.—On September 30, 1999, the Secretary of the Interior shall file with the House and Senate Committees on Appropriations and the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate a report on actions taken by the Department under the plan submitted pursuant to section 314(c) of the Department of the Interior and Related Agencies Appropriations Act, 1997 (Public Law 104–208).

(d) MINERAL EXAMINATIONS.—In order to process patent applications in a timely and responsible manner, upon the request of a patent applicant, the Secretary of the Interior shall allow the applicant to fund a qualified third-party contractor to be selected by the Bureau of Land Management to conduct a mineral examination of the mining claims or mill sites contained in a patent application as set forth in subsection (b). The Bureau of Land Management shall have the sole responsibility to choose and pay the third-party contractor in accordance with the standard procedures employed by the Bureau of Land Management in the retention of third-party contractors.

SEC. 313. None of the funds appropriated or otherwise made available by this Act may be used for the purposes of acquiring lands in the counties of Gallia, Lawrence, Monroe, or Washington, Ohio, for the Wayne National Forest.

SEC. 314. Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Laws 103–138, 103–332, 104–134, 104–208 and 105–83 for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes, except that, for the Bureau of Indian Affairs, tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants, self-governance compacts or annual funding agreements.

SEC. 315. Notwithstanding any other provision of law, for fiscal year 1999 the Secretaries of Agriculture and the Interior are authorized to limit competition for watershed restoration project contracts as part of the ''Jobs in the Woods'' component of the President's Forest Plan for the Pacific Northwest to individuals and entities in historically timber-dependent areas in the States of Washington, Oregon, and northern California that have been affected by reduced timber harvesting on Federal lands.

AR.02536

SEC. 316. None of the funds collected under the Recreational Fee Demonstration program may be used to plan, design, or construct a visitor center or any other permanent structure without prior approval of the House and the Senate Committees on Appropriations if the estimated total cost of the facility exceeds $500,000.

SEC. 317. (a) None of the funds made available in this Act or any other Act providing appropriations for the Department of the Interior, the Forest Service or the Smithsonian Institution may be used to submit nominations for the designation of Biosphere Reserves pursuant to the Man and Biosphere program administered by the United Nations Educational, Scientific, and Cultural Organization.

(b) The provisions of this section shall be repealed upon enactment of subsequent legislation specifically authorizing United States participation in the Man and Biosphere program.

<< 16 USCA § 459j–4 NOTE >>

SEC. 318. None of the funds made available in this or any other Act for any fiscal year may be used to designate, or to post any sign designating, any portion of Canaveral National Seashore in Brevard County, Florida, as a clothing-optional area or as an area in which public nudity is permitted, if such designation would be contrary to county ordinance.

SEC. 319. Of the funds provided to the National Endowment for the Arts—

(1) The Chairperson shall only award a grant to an individual if such grant is awarded to such individual for a literature fellowship, National Heritage Fellowship, or American Jazz Masters Fellowship.

(2) The Chairperson shall establish procedures to ensure that no funding provided through a grant, except a grant made to a State or local arts agency, or regional group, may be used to make a grant to any other organization or individual to conduct activity independent of the direct grant recipient. Nothing in this subsection shall prohibit payments made in exchange for goods and services.

(3) No grant shall be used for seasonal support to a group, unless the application is specific to the contents of the season, including identified programs and/or projects.

<< 20 USCA § 956 nt >>

SEC. 320. The National Endowment for the Arts and the National Endowment for the Humanities are authorized to solicit, accept, receive, and invest in the name of the United States, gifts, bequests, or devises of money and other property or services and to use such in furtherance of the functions of the National Endowment for the Arts and the National Endowment for the Humanities. Any proceeds from such gifts, bequests, or devises, after acceptance by the National Endowment for the Arts or the National Endowment for the Humanities, shall be paid by the donor or the representative of the donor to the Chairman. The Chairman shall enter the proceeds in a special interest-bearing account to the credit of the appropriate Endowment for the purposes specified in each case.

SEC. 321. No part of any appropriation contained in this Act shall be expended or obligated to fund new revisions of national forest land management plans until new final or interim final rules for forest land management planning are published in the Federal Register. Those national forests which are currently in a revision process, having formally published a Notice of Intent to revise prior to October 1, 1997; those national forests having been court-ordered to revise; those national forests where plans reach the fifteen year legally mandated date to revise before or during calendar year 2000; national forests within the Interior Columbia Basin Ecosystem study area; and the White Mountain National Forest are exempt from this section and may use funds in this Act and proceed to complete the forest plan revision in accordance with current forest planning regulations.

SEC. 322. No part of any appropriation contained in this Act shall be expended or obligated to complete and issue the five-year program under the Forest and Rangeland Renewable Resources Planning Act.

<< 16 USCA § 1011 NOTE >>

SEC. 323. (a) WATERSHED RESTORATION AND ENHANCEMENT AGREEMENTS.—For fiscal year 1999, 2000 and 2001, to the extent funds are otherwise available, appropriations for the Forest Service may be used by the Secretary of Agriculture for the purpose of entering into cooperative agreements with willing Federal, tribal, State and local governments, private and nonprofit entities and landowners for the protection, restoration and enhancement of fish and wildlife habitat, and

other resources on public or private land, the reduction of risk from natural disaster where public safety is threatened, or a combination thereof or both that benefit these resources within the watershed.

<< 16 USCA § 1011 NOTE >>

(b) DIRECT AND INDIRECT WATERSHED AGREEMENTS.—The Secretary of Agriculture may enter into a watershed restoration and enhancement agreement—

<< 16 USCA § 1011 NOTE >>

(1) directly with a willing private landowner; or

<< 16 USCA § 1011 NOTE >>

(2) indirectly through an agreement with a State, local or tribal government or other public entity, educational institution, or private nonprofit organization.

<< 16 USCA § 1011 NOTE >>

(c) TERMS AND CONDITIONS.—In order for the Secretary to enter into a watershed restoration and enhancement agreement—

<< 16 USCA § 1011 NOTE >>

(1) the agreement shall—
 (A) include such terms and conditions mutually agreed to by the Secretary and the landowner, state or local government, or private or nonprofit entity;
 (B) improve the viability of and otherwise benefit the fish, wildlife, and other resources on national forests lands within the watershed;
 (C) authorize the provision of technical assistance by the Secretary in the planning of management activities that will further the purposes of the agreement;
 (D) provide for the sharing of costs of implementing the agreement among the Federal Government, the landowner(s), and other entities, as mutually agreed on by the affected interests; and
 (E) ensure that any expenditure by the Secretary pursuant to the agreement is determined by the Secretary to be in the public interest; and

<< 16 USCA § 1011 NOTE >>

(2) the Secretary may require such other terms and conditions as are necessary to protect the public investment on non-Federal lands, provided such terms and conditions are mutually agreed to by the Secretary and other landowners, State and local governments or both.

<< 16 USCA § 1011 NOTE >>

(d) REPORTING REQUIREMENTS.—Not later than December 31, 1999, the Secretary shall submit a report to the Committees on Appropriations of the House and Senate, which contains—

<< 16 USCA § 1011 NOTE >>

(1) A concise description of each project, including the project purpose, location on federal and non-federal land, key activities, and all parties to the agreement.

<< 16 USCA § 1011 NOTE >>

(2) the funding and/or other contributions provided by each party for each project agreement.

SEC. 324. (a) In providing services or awarding financial assistance under the National Foundation on the Arts and the Humanities Act of 1965 from funds appropriated under this Act, the Chairperson of the National Endowment for the Arts shall ensure that priority is given to providing services or awarding financial assistance for projects, productions, workshops, or programs that serve underserved populations.

(b) In this section:

(1) The term "underserved population" means a population of individuals who have historically been outside the purview of arts and humanities programs due to factors such as a high incidence of income below the poverty line or to geographic isolation.

(2) The term "poverty line" means the poverty line (as defined by the Office of Management and Budget, and revised annually in accordance with section 673(2) of the Community Services Block Grant Act (42 U.S.C. 9902(2)) applicable to a family of the size involved.

(c) In providing services and awarding financial assistance under the National Foundation on the Arts and Humanities Act of 1965 with funds appropriated by this Act, the Chairperson of the National Endowment for the Arts shall ensure that priority is given to providing services or awarding financial assistance for projects, productions, workshops, or programs that will encourage public knowledge, education, understanding, and appreciation of the arts.

(d) With funds appropriated by this Act to carry out section 5 of the National Foundation on the Arts and Humanities Act of 1965—

(1) the Chairperson shall establish a grant category for projects, productions, workshops, or programs that are of national impact or availability or are able to tour several States;

(2) the Chairperson shall not make grants exceeding 15 percent, in the aggregate, of such funds to any single State, excluding grants made under the authority of paragraph (1);

(3) the Chairperson shall report to the Congress annually and by State, on grants awarded by the Chairperson in each grant category under section 5 of such Act; and

(4) the Chairperson shall encourage the use of grants to improve and support community-based music performance and education.

SEC. 325. None of the funds in this Act may be used for planning, design or construction of improvements to Pennsylvania Avenue in front of the White House without the advance approval of the House and Senate Committees on Appropriations.

<< 40 USCA § 1003 NOTE >>

SEC. 326. Notwithstanding the provisions of section 1010(b) of the Commemorative Works Act (40 U.S.C. 1001 et seq.), the legislative authority for the international memorial to honor the victims of communism, authorized under section 905 of Public Law 103–199 (107 Stat. 2331), shall expire December 17, 2007.

<< 16 USCA § 460*l*–6a NOTE >>

SEC. 327. Section 101(c) of Public Law 104–134, as amended, is further amended as follows: Under the heading "Title III —General Provisions" amend section 315(f) (16 U.S.C. 460*l*–6a note) by striking "September 30, 1999" after the words "and end on" and inserting "September 30, 2001" and striking "September 30, 2002" after the words "remain available through" and inserting "September 30, 2004".

SEC. 328. Notwithstanding any other provision of law, none of the funds in this Act may be used to enter into any new or expanded self-determination contract or grant or self-governance compact pursuant to the Indian Self–Determination Act of 1975, as amended, for any activities not previously covered by such contracts, compacts or grants. Nothing in this section precludes the continuation of those specific activities for which self-determination and self-governance contracts, compacts and grants currently exist or the renewal of contracts, compacts and grants for those activities; implementation of section 325 of Public Law 105–83 (111 Stat. 1597); or compliance with 25 U.S.C. 2005.

<< 16 USCA § 535a >>

SEC. 329. (a) PROHIBITION ON TIMBER PURCHASER ROAD CREDITS.—In financing any forest development road pursuant to section 4 of Public Law 88–657 (16 U.S.C. 535, commonly known as the National Forest Roads and Trails Act), the Secretary of Agriculture may not provide effective credit for road construction to any purchaser of national forest timber or other forest products.

<< 16 USCA § 535a >>

(b)(1) CONSTRUCTION OF ROADS BY TIMBER PURCHASERS.—Whenever the Secretary of Agriculture makes a determination that a forest development road referred to in subsection (a) shall be constructed or paid for, in whole or in part, by a purchaser of national forest timber or other forest products, the Secretary shall include notice of the determination in the notice of sale of the timber or other forest products. The notice of sale shall contain, or announce the availability of, sufficient information related to the road described in the notice to permit a prospective bidder on the sale to calculate the likely cost that would be incurred by the bidder to construct or finance the construction of the road so that the bidder may reflect such cost in the bid.

<< 16 USCA § 535a >>

(2) If there is an increase or decrease in the cost of roads constructed by the timber purchaser, caused by variations in quantities, changes or modifications subsequent to the sale of timber made in accordance with applicable timber sale contract provisions, then an adjustment to the price paid for timber harvested by the purchaser shall be made. The adjustment shall be applied by the Secretary as soon as practicable after any such design change is implemented.

<< 16 USCA § 535a >>

(c) SPECIAL ELECTION BY SMALL BUSINESS CONCERNS.—(1) A notice of sale referred to in subsection (b) containing specified road construction of $50,000 or more, shall give a purchaser of national forest timber or other forest products that qualifies as a "small business concern" under the Small Business Act (15 U.S.C. 631 et seq.), and regulations issued thereunder, the option to elect that the Secretary of Agriculture build the roads described in the notice. The Secretary shall provide the small business concern with an estimate of the cost that would be incurred by the Secretary to construct the roads on behalf of the small business concern. The notice of sale shall also include the date on which the roads described in the notice will be completed by the Secretary if the election is made.

<< 16 USCA § 535a >>

(2) If the election referred to in paragraph (1) is made, the purchaser of the national forest timber or other forest products shall pay to the Secretary of Agriculture, in addition to the price paid for the timber or other forest products, an amount equal to the estimated cost of the roads which otherwise would be paid by the purchaser as provided in the notice of sale. Pending receipt of such amount, the Secretary may use receipts from the sale of national forest timber or other forest products and such additional sums as may be appropriated for the construction of roads, such funds to be available until expended, to accomplish the requested road construction.

<< 16 USCA § 535a >>

(d) POST CONSTRUCTION HARVESTING.—In each sale of national forest timber or other forest products referred to in this section, the Secretary of Agriculture is encouraged to authorize harvest of the timber or other forest products in a unit included in the sale as soon as road work for that unit is completed and the road work is approved by the Secretary.

<< 16 USCA § 535a >>

(e) CONSTRUCTION STANDARD.—For any forest development road that is to be constructed or paid for by a purchaser of national forest timber or other forest products, the Secretary of Agriculture may not require the purchaser to design, construct, or maintain the road (or pay for the design, construction, or maintenance of the road) to a standard higher than the standard,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

consistent with applicable environmental laws and regulations, that is sufficient for the harvesting and removal of the timber or other forest products, unless the Secretary bears that part of the cost necessary to meet the higher standard.

<< 16 USCA § 535a >>

 (f) TREATMENT OF ROAD VALUE.—For any forest development road that is constructed or paid for by a purchaser of national forest timber or other forest products, the estimated cost of the road construction, including subsequent design changes, shall be considered to be money received for purposes of the payments required to be made under the sixth paragraph under the heading "FOREST SERVICE" in the Act of May 23, 1908 (35 Stat. 260, 16 U.S.C. 500), and section 13 of the Act of March 1, 1911 (35 Stat. 963; commonly known as the Weeks Act; 16 U.S.C. 500). To the extent that the appraised value of road construction determined under this subsection reflects funds contributed by the Secretary of Agriculture to build the road to a higher standard pursuant to subsection (e), the Secretary shall modify the appraisal of the road construction to exclude the effect of the Federal funds.

<< 16 USCA § 535a >>

 (g) EFFECTIVE DATE.—(1) This section and the requirements of this section shall take effect (and apply thereafter) upon the earlier of—
 (A) April 1, 1999; or
 (B) the date that is the later of—
 (i) the effective date of regulations issued by the Secretary of Agriculture to implement this section; and
 (ii) the date on which new timber sale contract provisions designed to implement this section, that have been published for public comment, are approved by the Secretary.

<< 16 USCA § 535a >>

 (2) Notwithstanding paragraph (1), any sale of national forest timber or other forest products for which notice of sale is provided before the effective date of this section, and any effective purchaser road credit earned pursuant to a contract resulting from such a notice of sale or otherwise earned before that effective date shall remain in effect, and shall continue to be subject to section 4 of Public Law 88–657 and section 14(i) of the National Forest Management Act of 1976 (16 U.S.C. 472a(i)), and rules issued thereunder, as in effect on the day before the date of the enactment of this Act.

<< 20 USCA § 955 >>

 SEC. 330. Section 6(b)(1)(B)(iii) of the National Foundation on the Arts and Humanities Act of 1965 (20 U.S.C. 955(b)(1) (B)(iii)) is amended by striking "One" and inserting "Two".

<< 43 USCA § 1474d >>

 SEC. 331. Section 401(f) of Public Law 105–83 (111 Stat. 1610) is hereby amended by striking "1998" and inserting in lieu thereof "1999".

 SEC. 332. Amounts deposited during fiscal year 1998 in the roads and trails fund provided for in the fourteenth paragraph under the heading "FOREST SERVICE" of the Act of March 4, 1913 (37 Stat. 843; 16 U.S.C. 501), shall be used by the Secretary of Agriculture, without regard to the State in which the amounts were derived, to repair or reconstruct roads, bridges, and trails on National Forest System lands or to carry out and administer projects to improve forest health conditions, which may include the repair or reconstruction of roads, bridges, and trails on National Forest System lands in the wildland-community interface where there is an abnormally high risk of fire. The projects shall emphasize reducing risks to human safety and public health and property and enhancing ecological functions, long-term forest productivity, and biological integrity. The Secretary shall commence the projects during fiscal year 1999, but the projects may be completed in a subsequent fiscal year. Funds shall not be expended under this section to replace funds which would otherwise appropriately be expended from the timber salvage sale fund. Nothing in this section shall be construed to exempt any project from any environmental law.

<< 20 USCA § 974 >>

SEC. 333. Section 5 of the Arts and Artifacts Indemnity Act (20 U.S.C. 974) is amended—

<< 20 USCA § 974 >>

(1) in subsection (b) by striking "$3,000,000,000" and inserting "$5,000,000,000";

<< 20 USCA § 974 >>

(2) in subsection (c) by striking "$300,000,000" and inserting "$500,000,000";

<< 20 USCA § 974 >>

(3) by striking "or" at the end of subsection (d)(4);

<< 20 USCA § 974 >>

(4) in subsection (d)(5) by striking "$200,000,000 or more" and inserting "not less than $200,000,000 but less than $300,000,000" and by striking the final period and inserting a semicolon; and

<< 20 USCA § 974 >>

(5) by inserting the following two new subsections after subsection (d)(5):

"(6) not less than $300,000,000 but less than $400,000,000, then coverage under this chapter shall extend only to loss or damage in excess of the first $300,000 of loss or damage to items covered; or

"(7) $400,000,000 or more, then coverage under this chapter shall extend only to loss or damage in excess of the first $400,000 of loss or damage to items covered.".

SEC. 334. TULARE CONVEYANCE.

(a) IN GENERAL.—Subject to subsections (c) and (d), all conveyances to the Redevelopment Agency of the City of Tulare, California, of lands described in subsection (b), heretofore or hereafter, made directly by the Southern Pacific Transportation Company, or its successors, are hereby validated to the extent that the conveyances would be legal or valid if all right, title, and interest of the United States, except minerals, were held by the Southern Pacific Transportation Company.

(b) LANDS DESCRIBED.—The lands referred to in subsection (a) are the parcels shown on the map entitled "Tulare Redevelopment Agency Railroad Parcels Proposed 715 to be Acquired", dated May 29, 1997, that formed part of a railroad right-of-way granted to the Southern Pacific Railroad Company, or its successors, agents, or assigns, by the Federal Government (including the right-of-way approved by an Act of Congress on July 27, 1866). The map referred to in this subsection shall be on file and available for public inspection in the offices of the Director of the Bureau of Land Management.

(c) PRESERVATION OF EXISTING RIGHTS OF ACCESS.—Nothing in this section shall impair any existing rights of access in favor of the public or any owner of adjacent lands over, under or across the lands which are referred to in subsection (a).

(d) MINERALS.—The United States disclaims any and all right of surface entry to the mineral estate of lands described in subsection (b).

<< 16 USCA § 3503 NOTE >>

SEC. 335. The final set of maps entitled "Coastal Barrier Resources System", dated "October 24, 1990, revised November 12, 1996", and relating to the following units of the Coastal Barrier Resources System: P04A, P05/P05P; P05A/P05AP, FL–06P; P10/P10P; P11; P11AP; P11A; P18/P18P; P25/P25P; and P32/P32P (which set of maps were created by the Department of the Interior to comply with section 220 of Public Law 104–333, 110 Stat. 4115, and notice of which was published in the Federal Register on May 28, 1997) shall have the force and effect of law and replace and substitute for any other inconsistent Coastal

Barrier Resource System map in the possession of the Department of the Interior. This provision is effective immediately upon enactment of this Act and the Secretary of the Interior or his designee shall immediately make this ministerial substitution.

<< 25 USCA § 1645 >>

SEC. 336. Section 405(c)(2) of the Indian Health Care Improvement Act (42 U.S.C. 1645(c)(2)) is amended by striking "September 30, 1998" and inserting "September 30, 2000".

<< 15 USCA § 4502 >>

SEC. 337. Section 3003 of the Petroleum Overcharge Distribution and Restitution Act of 1986 (15 U.S.C. 4502) is amended by adding after subsection (d) the following new subsection:

"(e) Subsections (b), (c), and (d) of this section are repealed, and any rights that may have arisen are extinguished, on the date of the enactment of the Department of the Interior and Related Agencies Appropriations Act, 1999. After that date, the amount available for direct restitution to current and future refined petroleum product claimants under this Act is reduced by the amounts specified in title II of that Act as being derived from amounts held in escrow under section 3002(d). The Secretary shall assure that the amount remaining in escrow to satisfy refined petroleum product claims for direct restitution is allocated equitably among the claimants.".

<< 25 USCA § 2717 NOTE >>

SEC. 338. Section 123(a)(2)(C) of the Department of the Interior and Related Agencies Appropriations Act, 1998 (111 Stat. 1566), is amended by striking "self-regulated tribes such as".

<< 16 USCA § 3102 NOTE >>

SEC. 339. (a) RESTRICTION ON FEDERAL MANAGEMENT UNDER TITLE VIII OF THE ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—

<< 16 USCA § 3102 NOTE >>

(1) Notwithstanding any other provision of law, hereafter neither the Secretary of the Interior nor the Secretary of Agriculture may, prior to December 1, 2000, implement or enforce any final rule, regulation, or policy pursuant to title VIII of the Alaska National Interest Lands Conservation Act to manage and to assert jurisdiction, authority, or control over land, water, and wild, renewable resources, including fish and wildlife, in Alaska for subsistence uses, except within—

(A) areas listed in 50 C.F.R. 100.3(b) (October 1, 1998) and

(B) areas constituting "public land or public lands" under the definition of such term found at 50 C.F.R. 100.4 (October 1, 1998).

<< 16 USCA § 3102 NOTE >>

(2) The areas in subparagraphs (A) and (B) of paragraph (1) shall only be construed to mean those public land which as of October 1, 1998, were subject to federal management for subsistence uses pursuant to Title VIII of the Alaska National Interest Lands Conservation Act.

<< 16 USCA § 3102 NOTE >>

(b) SUBSECTION (a) REPEALED.—

<< 16 USCA § 3102 NOTE >>

(1) The Secretary of the Interior shall certify before October 1, 1999, if a bill or resolution has been passed by the Alaska State Legislature to amend the Constitution of the State of Alaska that, if approved by the electorate, would enable the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

implementation of state laws of general applicability consistent with, and which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act.

<< 16 USCA § 3102 NOTE >>

 (2) Subsection (a) shall be repealed on October 1, 1999, unless prior to that date the Secretary of the Interior makes such a certification described in paragraph (1).

<< 16 USCA § 3102 NOTE >>

<< 16 USCA § 3115 >>

 (c) TECHNICAL AMENDMENTS TO THE ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—Section 805 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3115) is amended—

<< 16 USCA § 3102 NOTE >>

<< 16 USCA § 3115 >>

 (1) in subsection (a) by striking "one year after the date of enactment of this Act,"

<< 16 USCA § 3102 NOTE >>

<< 16 USCA § 3115 >>

 (2) in subsection (d) by striking "within one year from the date of enactment of this Act,".

<< 16 USCA § 3102 NOTE >>

 (d) EFFECT ON TIDAL AND SUBMERGED LAND.—Nothing in this section invalidates, validates, or in any other way affects any claim of the State of Alaska to title to any tidal or submerged land in Alaska.

 SEC. 340. None of the funds made available in this Act may be used to establish a national wildlife refuge in the Kankakee River watershed in northwestern Indiana and northeastern Illinois.

<< 16 USCA § 544g NOTE >>

 SEC. 341. Upon the condition that Skamania County conveys title acceptable to the Secretary of Agriculture to all right, title and interest in lands identified on a map dated September 29, 1998 entitled "Skamania County Lands to be Transferred", such lands being located on Table Mountain lying within the Columbia River Gorge National Scenic Area, there is hereby conveyed to Skamania County, notwithstanding any other provision of law, the Wind River Nursery Site lands and facilities and all interests therein, except for the corridor of the Pacific Crest National Scenic Trail, as depicted on a map dated September 29, 1998, entitled "Wind River Conveyance", which is on file and available for public inspection in the Office of the Chief, USDA Forest Service, Washington, D.C.

 The conveyance of lands to Skamania County shall become automatically effective upon a determination by the Secretary that Skamania County has conveyed acceptable title to the United States to the Skamania County lands. Lands conveyed to the United States shall become part of the Gifford Pinchot National Forest and shall have the status of lands acquired under the Act of March 1, 1911, (commonly called the Weeks Act) and shall be managed in accordance with the laws and regulations applicable to the National Forest System.

<< 16 USCA § 90a–1 NOTE >>

 SEC. 342. (a) BOUNDARY ADJUSTMENTS.—

<< 16 USCA § 90a–1 NOTE >>

(1) LAKE CHELAN NATIONAL RECREATION AREA.—The boundary of the Lake Chelan National Recreation Area, established by section 202 of Public Law 90–544 (16 U.S.C. 90a–1), is hereby adjusted to exclude a parcel of land and waters consisting of approximately 88 acres, as depicted on the map entitled "Proposed Management Units, North Cascades, Washington", numbered NPBCASB7002A, originally dated October 1967, and revised July 13, 1994.

<< 16 USCA § 90a–1 NOTE >>

(2) WENATCHEE NATIONAL FOREST.—The boundary of the Wenatchee National Forest is hereby adjusted to include the parcel of land and waters described in paragraph (1).

<< 16 USCA § 90a–1 NOTE >>

(3) AVAILABILITY OF MAP.—The map referred to in paragraph (1) shall be on file and available for public inspection in the offices of the superintendent of the Lake Chelan National Recreation Area and the Director of the National Park Service, Department of the Interior, and in the office of the Chief of the Forest Service, Department of Agriculture.

<< 16 USCA § 90a–1 NOTE >>

(b) TRANSFER OF ADMINISTRATIVE JURISDICTION.—Administrative jurisdiction over Federal land and waters in the parcel covered by the boundary adjustments in subsection (a) is transferred from the Secretary of the Interior to the Secretary of Agriculture, and the transferred land and waters shall be managed by the Secretary of Agriculture in accordance with the laws and regulations pertaining to the National Forest System.

<< 16 USCA § 90a–1 NOTE >>

(c) LAND AND WATER CONSERVATION FUND.—For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundaries of the Wenatchee National Forest, as adjusted by subsection (a), shall be considered to be the boundaries of the Wenatchee National Forest as of January 1, 1965.

<< 16 USCA § 1643 NOTE >>

SEC. 343. HARDWOOD TECHNOLOGY TRANSFER AND APPLIED RESEARCH. (a) The Secretary of Agriculture (hereinafter the "Secretary") is hereby authorized to conduct technology transfer and development, training, dissemination of information and applied research in the management, processing and utilization of the hardwood forest resource. This authority is in addition to any other authorities which may be available to the Secretary including, but not limited to, the Cooperative Forestry Assistance Act of 1978, as amended (16 U.S.C. 2101 et. seq.), and the Forest and Rangeland Renewable Resources Act of 1978, as amended (16 U.S.C. 1600–1614).

<< 16 USCA § 1643 NOTE >>

(b) In carrying out this authority, the Secretary may enter into grants, contracts, and cooperative agreements with public and private agencies, organizations, corporations, institutions and individuals. The Secretary may accept gifts and donations pursuant to the Act of October 10, 1978 (7 U.S.C. 2269) including gifts and donations from a donor that conducts business with any agency of the Department of Agriculture or is regulated by the Secretary of Agriculture.

<< 16 USCA § 1643 NOTE >>

(c) The Secretary is authorized, on such terms and conditions as the Secretary may prescribe, to assume all rights, title, and interest, including all outstanding assets, of the Robert C. Byrd Hardwood Technology Center, Inc. (hereinafter the "Center"), a nonprofit corporation existing under the laws of the State of West Virginia: *Provided,* That the Board of Directors of the

Center requests such an action and dissolves the corporation consistent with the Articles of Incorporation and the laws of the State of West Virginia.

<< 16 USCA § 1643 NOTE >>

(d) The Secretary is authorized to operate and utilize the assets of the Center as part of a newly formed "Institute of Hardwood Technology Transfer and Applied Research" (hereinafter the "Institute"). The Institute, in addition to the Center, will consist of a Director, technology transfer specialists from State and Private Forestry, the Forestry Sciences Laboratory in Princeton, West Virginia, and any other organizational unit of the Department of Agriculture as the Secretary deems appropriate. The overall management of the Institute will be the responsibility of the USDA Forest Service, State and Private Forestry.

<< 16 USCA § 1643 NOTE >>

(e) The Secretary is authorized to generate revenue using the authorities provided herein. Any revenue received as part of the operation of the Institute shall be deposited into a special fund in the Treasury of the United States, known as the "Hardwood Technology Transfer and Applied Research Fund", which shall be available to the Secretary until expended, without further appropriation, in furtherance of the purposes of this section, including upkeep, management, and operation of the Institute and the payment of salaries and expenses.

<< 16 USCA § 1643 NOTE >>

(f) There are hereby authorized to be appropriated such sums as necessary to carry out the provisions of this section.

SEC. 344. Notwithstanding the requirements of section 1203(a) of Public Law 99–662 [100 Stat. 4263], the non-Federal share of the cost of correcting the spillway deficiency at Beach City Lake, Muskingum River Basin, Ohio, shall not exceed $141,000.

<< 16 USCA § 497d NOTE >>

SEC. 345. Notwithstanding section 343 of Public Law 105–83, increases in recreation residence fees on the Sawtooth National Forest shall be implemented in fiscal year 1999 only to the extent that such fee increases do not exceed 25 percent.

<< 16 USCA § 580d >>

SEC. 346. Section 7 of the Granger–Thye Act of April 24, 1950 is amended by deleting the words "recondition and maintain," substituting in lieu thereof the words "renovate, recondition, improve, and maintain".

<< 16 USCA § 2104 NOTE >>

SEC. 347. STEWARDSHIP END RESULT CONTRACTING DEMONSTRATION PROJECT. (a) IN GENERAL.—Until September 30, 2002, the Forest Service may enter into no more than twenty-eight (28) contracts with private persons and entities, of which Region One of the Forest Service shall have the authority to enter into nine (9) such contracts, to perform services to achieve land management goals for the national forests that meet local and rural community needs.

<< 16 USCA § 2104 NOTE >>

(b) LAND MANAGEMENT GOALS.—The land management goals of a contract under subsection (a) may include, among other things—

<< 16 USCA § 2104 NOTE >>

(1) road and trail maintenance or obliteration to restore or maintain water quality;

<< 16 USCA § 2104 NOTE >>

(2) soil productivity, habitat for wildlife and fisheries, or other resource values;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 2104 NOTE >>

(3) setting of prescribed fires to improve the composition, structure, condition, and health of stands or to improve wildlife habitat;

<< 16 USCA § 2104 NOTE >>

(4) noncommercial cutting or removing of trees or other activities to promote healthy forest stands, reduce fire hazards, or achieve other non-commercial objectives;

<< 16 USCA § 2104 NOTE >>

(5) watershed restoration and maintenance;

<< 16 USCA § 2104 NOTE >>

(6) restoration and maintenance of wildlife and fish habitat; and

<< 16 USCA § 2104 NOTE >>

(7) control of noxious and exotic weeds and reestablishing native plant species.

<< 16 USCA § 2104 NOTE >>

(c) CONTRACTS.—

<< 16 USCA § 2104 NOTE >>

(1) PROCUREMENT PROCEDURE.—A source for performance of a contract under subsection (a) shall be selected on a best-value basis, including consideration of source under other public and private contracts.

<< 16 USCA § 2104 NOTE >>

(2) TERM.—A multiyear contract may be entered into under subsection (a) in accordance with section 304B of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 254c), except that the period of the contract may exceed 5 years but may not exceed 10 years.

<< 16 USCA § 2104 NOTE >>

(3) OFFSETS.—
  (A) IN GENERAL.—In connection with contracts under subsection (a), the Forest Service may apply the value of timber or other forest products removed as an offset against the cost of services received.
  (B) METHODS OF APPRAISAL.—The value of timber or other forest products used as offsets under subparagraph (A)—
    (i) shall be determined using appropriate methods of appraisal commensurate with the quantity of products to be removed;
    (ii) may be determined using a unit of measure appropriate to the contracts; and
    (iii) may include valuing products on a per acre basis.

<< 16 USCA § 2104 NOTE >>

(4) RELATION TO OTHER LAWS.—The Forest Service may enter into contracts under subsection (a), notwithstanding subsections (d) and (g) of section 14 of the National Forest Management Act of 1976 (16 U.S.C. 472a).

<< 16 USCA § 2104 NOTE >>

(d) RECEIPTS.—

<< 16 USCA § 2104 NOTE >>

 (1) IN GENERAL.—The Forest Service may collect monies from a contract under subsection (a) so long as such collection is a secondary objective of negotiating contracts that will best achieve the purposes of this section.

<< 16 USCA § 2104 NOTE >>

 (2) USE.—Monies from a contract under subsection (a) may be retained by the Forest Service and shall be available for expenditure without further appropriation at the demonstration project site from which the monies are collected or at another demonstration project site.

<< 16 USCA § 2104 NOTE >>

 (3) RELATION TO OTHER LAWS.—The value of services received by the Secretary under a stewardship contract project conducted under this section, and any payments made or resources provided by the contractor or the Secretary under such a project, shall not be considered to be monies received from the National Forest System under any provision of law. The Act of June 9, 1930 (16 U.S.C. 576 et seq.; commonly known as the Knutson–Vandenberg Act), shall not apply to stewardship contracts entered into under this section.

<< 16 USCA § 2104 NOTE >>

 (e) COSTS OF REMOVAL.—The Forest Service may collect deposits from contractors covering the costs of removal of timber or other forest products pursuant to the Act of August 11, 1916 (39 Stat. 462, chapter 313; 16 U.S.C. 490); and the next to the last paragraph under the heading "Forest Service." under the heading "Department of Agriculture" in the Act of June 30, 1914 (38 Stat. 430, chapter 131; 16 U.S.C. 498); notwithstanding the fact that the timber purchasers did not harvest the timber.

<< 16 USCA § 2104 NOTE >>

 (f) PERFORMANCE AND PAYMENT GUARANTEES.—

<< 16 USCA § 2104 NOTE >>

 (1) IN GENERAL.—The Forest Service may require performance and payment bonds, in accordance with sections 103–2 and 103–2 of part 28 of the Federal Acquisition Regulation (48 C.F.R. 28.103–2, 28.103–3), in an amount that the contracting officer considers sufficient to protect the Government's investment in receipts generated by the contractor from the estimated value of the forest products to be removed under contract under subsection (a).

<< 16 USCA § 2104 NOTE >>

 (2) EXCESS OFFSET VALUE.—If the offset value of the forest products exceeds the value of the resource improvement treatments, the Forest Service may—
    (A) collect any residual receipts pursuant to the Act of June 9, 1930 (46 Stat. 527, chapter 416; 16 U.S.C. 576b); and
    (B) apply the excess to other authorized stewardship demonstration projects.

<< 16 USCA § 2104 NOTE >>

 (g) MONITORING, EVALUATION AND REPORTING.—The Forest Service shall establish a multiparty monitoring and evaluation process that accesses each individual stewardship contract conducted under this section. Besides the Forest Service, participants in this process may include any cooperating governmental agencies, including tribal governments, and any interested groups or individuals. The Forest Service shall report annually to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate on—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 2104 NOTE >>

(1) the status of development, execution, and administration of contracts under subsection (a);

<< 16 USCA § 2104 NOTE >>

(2) the specific accomplishments that have resulted; and

<< 16 USCA § 2104 NOTE >>

(3) the role of local communities in development of contract plans.

SEC. 348. The Forest Service and the Federal Highway Administration shall make available to the State of Utah, $15,000,000 for construction of the Trappers Loop connector road. Such funds shall be made available from the Federal Land Highway Program, Public Lands Highways (Forests) funds. Such funds shall be made available prior to computation and aggregation of the state shares of such funds for other projects.

<< 30 USCA § 81 NOTE >>

SEC. 349. PROTECTION OF SANCTITY OF CONTRACTS AND LEASES OF SURFACE PATENT HOLDERS WITH RESPECT TO COALBED METHANE GAS.

<< 30 USCA § 81 NOTE >>

(a) IN GENERAL—Subject to subsection (b), the United States shall recognize as not infringing upon any ownership rights of the United States to coalbed methane any—

<< 30 USCA § 81 NOTE >>

(1) contract or lease covering any land that was conveyed by the United States under the Act entitled "An Act for the protection of surface rights of entrymen", approved March 3, 1909 (30 U.S.C. 81), or the Act entitled "An Act to provide for agricultural entries on coal lands", approved June 22, 1910 (30 U.S.C. 83 et seq.), that was—
   (A) entered into by a person who has title to said land derived under said Acts, and
   (B) that conveys rights to explore for, extract, and sell coalbed methane from said land; or

<< 30 USCA § 81 NOTE >>

(2) coalbed methane production from the lands described in subsection (a)(1) by a person who has title to said land and who, on or before the date of enactment of this Act, has filed an application with the State oil and gas regulating agency for a permit to drill an oil and gas well to a completion target located in a coal formation.

<< 30 USCA § 81 NOTE >>

(b) APPLICATION.—Subsection (a)

<< 30 USCA § 81 NOTE >>

(1) shall apply only to a valid contract or lease described in subsection (a) that is in effect on the date of enactment of this Act;

<< 30 USCA § 81 NOTE >>

(2) shall not otherwise change the terms or conditions of, or affect the rights or obligations of any person under such a contract or lease;

<< 30 USCA § 81 NOTE >>

(3) shall apply only to land with respect to which the United States is the owner of coal reserved to the United States in a patent issued under the Act of March 3, 1909 (30 U.S.C. 81), or the Act of June 22, 1910 (30 U.S.C. 83 et seq.), the position of the United States as the owner of the coal not having passed to a third party by deed, patent or other conveyance by the United States;

<< 30 USCA § 81 NOTE >>

(4) shall not apply to any interest in coal or land conveyed, restored, or transferred by the United States to a federally recognized Indian tribe, including any conveyance, restoration, or transfer made pursuant to the Indian Reorganization Act, June 18, 1934 (c. 576, 48 Stat. 984, as amended); the Act of June 28, 1938, (c. 776, 52 Stat. 1209 as implemented by the order of September 14, 1938, 3 Fed. Reg. 1425); and including the area described in § 3 of P.L. 98–290; or any executive order;

<< 30 USCA § 81 NOTE >>

(5) shall not be construed to constitute a waiver of any rights of the United States with respect to coalbed methane production that is not subject to subsection (a);

<< 30 USCA § 81 NOTE >>

(6) shall not limit the right of any person who entered into a contract or lease before the date of enactment of this Act, or enters into a contract or lease on or after the date of enactment of this Act, for coal owned by the United States, to mine and remove the coal and to release coalbed methane without liability to any person referred to in subsection (a)(1)(A) or (a)(2).

SEC. 350. No timber in Region 10 of the Forest Service shall be advertised for sale which, when using domestic Alaska western red cedar selling values and manufacturing costs, fails to provide at least 60 percent of normal profit and risk of the appraised timber, except at the written request by a prospective bidder. Program accomplishments shall be based on volume sold. Should Region 10 sell, in fiscal year 1999, the annual average portion of the decadal allowable sale quantity called for in the current Tongass Land Management Plan which provides greater than 60 percent of normal profit and risk at the time of the sale advertisement, all of the western red cedar timber from those sales which is surplus to the needs of domestic processors in Alaska, shall be made available to domestic processors in the contiguous 48 United States based on values in the Pacific Northwest as determined by the Forest Service and stated in the timber sale contract. Should Region 10 sell, in fiscal year 1999, less than the annual average portion of the decadal allowable sale quantity called for in the current Tongass Land Management Plan meeting the 60 percent of normal profit and risk standard at the time of sale advertisement, the volume of western red cedar timber available to domestic processors at rates specified in the timber sale contract in the contiguous 48 states shall be that volume: (i) which is surplus to the needs of domestic processors in Alaska; and (ii) is that percent of the surplus western red cedar volume determined by calculating the ratio of the total timber volume which has been sold on the Tongass to the annual average portion of the decadal allowable sale quantity called for in the current Tongass Land Management Plan. The percentage shall be calculated by Region 10 on a rolling basis as each sale is sold. (For purposes of this amendment, a "rolling basis" shall mean that the determination of how much western red cedar is eligible for sale to various markets shall be made at the time each sale is awarded.) Western red cedar shall be deemed "surplus to the needs of domestic processors in Alaska" when the timber sale holder has presented to the Forest Service documentation of the inability to sell western red cedar logs from a given sale to domestic Alaska processors at a price equal to or greater than the log selling value stated in the contract. All additional western red cedar volume not sold to Alaska or contiguous 48 United States domestic processors may be exported to foreign markets at the election of the timber sale holder. All Alaska yellow cedar may be sold at prevailing export prices at the election of the timber sale holder.

SEC. 351. (a) Notwithstanding any other provision of law, prior to September 30, 2001 the Indian Health Service may not disburse funds for the provision of health care services pursuant to Public Law 93–638 (25 U.S.C. 450 et seq.), with any Alaska native village or Alaska Native village corporation that is located within the area served by an Alaska Native regional health entity.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.02550

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2574 of 3864

(b) Nothing in this section shall be construed to prohibit the disbursal of funds to any Alaska Native village or Alaska Native village corporation under any contract or compact entered into prior to August 27, 1997, or to prohibit the renewal of any such agreement.

SEC. 352. None of the funds in this or any other Act shall be expended in Fiscal Year 1999 by the Department of the Interior, the Forest Service, or any other Federal agency for the capture and physical relocation of grizzly bears in the Selway-Bitteroot area of Idaho and adjacent Montana. Nothing in this section shall prohibit the Department of the Interior, the Forest Service, or any other Federal agency from using funds to produce a final environmental impact statement that will include an analysis of the habitat based population viability study completed in 1998, receive public comment on such final environmental impact statement, or issue a Record of Decision.

SEC. 353. KING COVE HEALTH AND SAFETY. (a) ROAD ON KING COVE CORPORATION LANDS.—Of the funds appropriated in this section, not later than 60 days after the date of enactment of this Act, $20,000,000 shall be made available to the Aleutians East Borough for the construction of an unpaved road not more than 20 feet in width, a dock, and marine facilities and equipment. Such road shall be constructed on King Cove Corporation Lands and shall extend from King Cove to such dock. The Aleutians East Borough, in consultation with the State of Alaska, shall determine the appropriate location of such dock and marine facilities. In no instance may any part of such road, dock, marine facilities or equipment enter or pass over any land within the Congressionally-designated wilderness in the Izembek National Wildlife Refuge (for purposes of this section, the lands within the Refuge boundary already conveyed to the King Cove Corporation are not within the wilderness area).

(b) KING COVE AIR STRIP.—Of the funds appropriated in this section, not later than 180 days after the date of enactment of this Act, the Secretary of the Interior shall make available up to $15,000,000 to the State of Alaska for the cost of improvements to the air strip at King Cove, Alaska, including to enable jet aircraft with the capability of flying non-stop between Anchorage, Alaska and King Cove, Alaska to land and take off from such air strip.

(c) KING COVE INDIAN HEALTH SERVICE FACILITY.—Of the funds appropriated in this section, not later than 60 days after the enactment of this Act, the Secretary of Health and Human Services shall make available $2,500,000 to the Indian Health Service for the cost of new construction or improvements to the clinic in King Cove, Alaska, and telemedicine and other medical equipment for such clinic.

(d) APPLICABILITY OF OTHER LAWS.—All actions undertaken pursuant to this section must be in accordance with all other applicable laws.

(e) APPROPRIATION.—In addition to funds in this or any other Act, $37,500,000 is appropriated and shall remain available until expended for the King Cove Health and Safety projects specifically identified within this section.

<< 16 USCA § 544b >>

SEC. 354. (a) IN GENERAL.—To reflect the intent of Congress set forth in Public Law 98–396, section 4(a)(2) of the Columbia River Gorge National Scenic Area Act (16 U.S.C. 544(a)(2)) is amended—

<< 16 USCA § 544b >>

(1) by striking "(2) The boundaries" and inserting the following:
"(2) Boundaries.—
  "(A) IN GENERAL.—Except as provided in subparagraph (B), the boundaries"; and

<< 16 USCA § 544b >>

(2) by adding at the end the following:
  "(B) EXCLUSIONS.—The scenic area shall not include the approximately 29 acres of land owned by the Port of Camas–Washougal in the South ½ of Section 16, Township 1 North, Range 4 East, and the North ½ of Section 21, Township 1 North, Range 4 East, Willamette Meridian, Clark County, Washington, that consists of—
    "(i) the approximately 19 acres of Port land acquired from the Corps of Engineers under the Second Supplemental Appropriations Act, 1984 (Public Law 98–396); and
    "(ii) the approximately 10 acres of adjacent Port land to the west of the land described in clause (i).".

<< 16 USCA § 544b NOTE >>

(b) INTENT.—The amendment made by subsection (a)—

<< 16 USCA § 544b NOTE >>

(1) is intended to achieve the intent of Congress set forth in Public Law 98–396; and

<< 16 USCA § 544b NOTE >>

(2) is not intended to set a precedent regarding adjustment or amendment of any boundaries of the Columbia River Gorge National Scenic Area or any other provisions of the Columbia River Gorge National Scenic Area Act.

<< 20 USCA § 42 >>

SEC. 355. Section 5580 of the Revised Statutes (20 U.S.C. 42) is amended—

<< 20 USCA § 42 >>

(1) by inserting "(a)" before "The business"; and

<< 20 USCA § 42 >>

(2) by adding at the end the following:
"(b) Notwithstanding any other provision of law, the Board of Regents of the Smithsonian Institution may modify the number of members, manner of appointment of members, or tenure of members, of the boards or commissions under the jurisdiction of the Smithsonian Institution, other than—
"(1) the Board of Regents of the Smithsonian Institution; and
"(2) the boards or commissions of the National Gallery of Art, the John F. Kennedy Center for the Performing Arts, and the Woodrow Wilson International Center for Scholars.".

<< 25 USCA § 305f >>

SEC. 356. (a) The Act entitled "An Act to promote the development of Indian arts and crafts and to create a board to assist therein, and for other purposes", approved August 27, 1935 (25 U.S.C. 305 et seq.), is amended by adding at the end the following:
"SEC. 7. (a) Notwithstanding any other provision of law, the Secretary of the Interior is directed to transfer all right, title and interest in that portion of the Indian Arts and Crafts Board art collection maintained permanently by the Indian Arts and Crafts Board in Washington, District of Columbia, to the Secretary of the Smithsonian Institution to be a part of the collection of the National Museum of the American Indian, subject to subsection (b). Transfer of the collection and costs thereof shall be carried out in accordance with terms, conditions, and standards mutually agreed upon by the Secretary of the Interior and the Secretary of the Smithsonian Institution.
"(b) The Indian Arts and Crafts Board shall retain a permanent license to the use of images of the collection for promotional, economic development, educational and related nonprofit purposes. The Indian Arts and Crafts Board shall not be required to pay any royalty or fee for such license.".
(b) The Secretary of the Interior is authorized to use funds appropriated in this Act under the heading •SALARIES AND EXPENSES' under the heading • DEPARTMENTAL MANAGEMENT' for the costs associated with the transfer of the collection.
SEC. 357. None of the funds provided in this or any other Act shall be available for the acquisition of lands or interests in lands within the tract known as the Baca Location No. 1 in New Mexico until such time as—
(1) an appraisal is completed for such tract which conforms with the Uniform Appraisal Standards for Federal Land Acquisitions; and

(2) legislation is enacted authorizing the acquisition of lands or interests in lands within such tract.

SEC. 358. The Federal building located at 15013 Denver West Parkway, Golden, Colorado, and known as the National Renewable Energy Laboratory Visitors Center, shall be known and designated as the "Dan Schaefer Federal Building". Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States court house referred to in this provision shall be deemed to be a reference to the "Dan Schaefer Federal Building". This provision shall take effect on January 3, 1999.

SEC. 359. The new Federal building under construction at 325 Broadway in Boulder, Colorado, shall be known and designated as the "David Skaggs Federal Building". Any reference in a law, map, regulation, document, paper, or other record of the United States to the Federal building referred to in this provision shall be deemed to be a reference to the "David Skaggs Federal Building". This provision shall take effect on January 3, 1999.

SEC. 360. The Federal building located at 201 14th Street, S.W. in Washington, D.C., shall be known and redesignated as the "Sidney R. Yates Federal Building". Any reference in a law, map, regulation, document, paper, or other record of the United States to the Federal building referred to in this provision shall be deemed to be a reference to the "Sidney R. Yates Federal Building". This provision shall take effect on January 3, 1999.

SEC. 361. If all of the funding approved for release by the Committees on September 3, 1998, pursuant to Title V—Priority Land Acquisitions, Land Exchanges, and Maintenance in Public Law 105–83 is not apportioned to and made available for obligation by the relevant land management agencies within five days of the enactment of this Act, those funds are rescinded.

<< 7 USCA § 6919 >>

SEC. 362. Section 219 of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. 103–354, 7 U.S.C. § 6919, is hereby repealed.

TITLE IV

THE HERGER–FEINSTEIN QUINCY LIBRARY GROUP FOREST RECOVERY ACT

<< 16 USCA § 2104 NOTE >>

SEC. 401. PILOT PROJECT FOR PLUMAS, LASSEN, AND TAHOE NATIONAL FORESTS TO IMPLEMENT QUINCY LIBRARY GROUP PROPOSAL. (a) DEFINITION.—For purposes of this section, the term "Quincy Library Group–Community Stability Proposal" means the agreement by a coalition of representatives of fisheries, timber, environmental, county government, citizen groups, and local communities that formed in northern California to develop a resource management program that promotes ecologic and economic health for certain Federal lands and communities in the Sierra Nevada area. Such proposal includes the map entitled "QUINCY LIBRARY GROUP Community Stability Proposal", dated October 12, 1993, and prepared by VESTRA Resources of Redding, California.

<< 16 USCA § 2104 NOTE >>

(b) PILOT PROJECT REQUIRED.—

<< 16 USCA § 2104 NOTE >>

(1) PILOT PROJECT AND PURPOSE.—The Secretary of Agriculture (in this section referred to as the "Secretary"), acting through the Forest Service and after completion of an environmental impact statement (a record of decision for which shall be adopted within 300 days), shall conduct a pilot project on the Federal lands described in paragraph (2) to implement and demonstrate the effectiveness of the resource management activities described in subsection (d) and the other requirements of this section, as recommended in the Quincy Library Group–Community Stability Proposal.

<< 16 USCA § 2104 NOTE >>

(2) PILOT PROJECT AREA.—The Secretary shall conduct the pilot project on the Federal lands within Plumas National Forest, Lassen National Forest, and the Sierraville Ranger District of Tahoe National Forest in the State of California designated

as "Available for Group Selection" on the map entitled "QUINCY LIBRARY GROUP Community Stability Proposal", dated October 12, 1993 (in this section referred to as the "pilot project area"). Such map shall be on file and available for inspection in the appropriate offices of the Forest Service.

<< 16 USCA § 2104 NOTE >>

(c) EXCLUSION OF CERTAIN LANDS, RIPARIAN PROTECTION AND COMPLIANCE.—

<< 16 USCA § 2104 NOTE >>

 (1) EXCLUSION.—All spotted owl habitat areas and protected activity centers located within the pilot project area designated under subsection (b)(2) will be deferred from resource management activities required under subsection (d) and timber harvesting during the term of the pilot project.

<< 16 USCA § 2104 NOTE >>

(2) RIPARIAN PROTECTION.—
 (A) IN GENERAL.—The Scientific Analysis Team guidelines for riparian system protection described in subparagraph (B) shall apply to all resource management activities conducted under subsection (d) and all timber harvesting activities that occur in the pilot project area during the term of the pilot project.
 (B) GUIDELINES DESCRIBED.—The guidelines referred to in subparagraph (A) are those in the document entitled "Viability Assessments and Management Considerations for Species Associated with Late–Successional and Old–Growth Forests of the Pacific Northwest", a Forest Service research document dated March 1993 and co-authored by the Scientific Analysis Team, including Dr. Jack Ward Thomas.
 (C) LIMITATION.—Nothing in this section shall be construed to require the application of the Scientific Analysis Team guidelines to any livestock grazing in the pilot project area during the term of the pilot project, unless the livestock grazing is being conducted in the specific location at which the Scientific Analysis Team guidelines are being applied to an activity under subsection (d).

<< 16 USCA § 2104 NOTE >>

 (3) COMPLIANCE.—All resource management activities required by subsection (d) shall be implemented to the extent consistent with applicable Federal law and the standards and guidelines for the conservation of the California spotted owl as set forth in the California Spotted Owl Sierran Provence Interim Guidelines or the subsequently issued guidelines, whichever are in effect.

<< 16 USCA § 2104 NOTE >>

 (4) ROADLESS AREA PROTECTION.—The Regional Forester for Region 5 shall direct that any resource management activity required by subsection (d)(1) and (2), all road building, all timber harvesting activities, and any riparian management under subsection (d)(4) that utilizes road construction or timber harvesting shall not be conducted on Federal lands within the Plumas National Forest, Lassen National Forest, and the Sierraville Ranger District of the Tahoe National Forest that are designated as either "Off Base" or "Deferred" on the map referred to in subsection (a). Such direction shall be effective during the term of the pilot project.

<< 16 USCA § 2104 NOTE >>

 (d) RESOURCE MANAGEMENT ACTIVITIES.—During the term of the pilot project, the Secretary shall implement and carry out the following resource management activities on an acreage basis on the Federal lands included within the pilot project area designated under subsection (b)(2):

<< 16 USCA § 2104 NOTE >>

(1) FUELBREAK CONSTRUCTION.—Construction of a strategic system of defensible fuel profile zones, including shaded fuelbreaks, utilizing thinning, individual tree selection, and other methods of vegetation management consistent with the Quincy Library Group–Community Stability Proposal, on not less than 40,000, but not more than 60,000, acres per year.

<< 16 USCA § 2104 NOTE >>

(2) GROUP SELECTION AND INDIVIDUAL TREE SELECTION.—Utilization of group selection and individual tree selection uneven-aged forest management prescriptions described in the Quincy Library Group–Community Stability Proposal to achieve a desired future condition of allage, multistory, fire resilient forests as follows:
  (A) GROUP SELECTION.—Group selection on an average acreage of .57 percent of the pilot project area land each year of the pilot project.
  (B) INDIVIDUAL TREE SELECTION.—Individual tree selection may also be utilized within the pilot project area.

<< 16 USCA § 2104 NOTE >>

(3) TOTAL ACREAGE.—The total acreage on which resource management activities are implemented under this subsection shall not exceed 70,000 acres each year.

<< 16 USCA § 2104 NOTE >>

(4) RIPARIAN MANAGEMENT.—A program of riparian management, including wide protection zones and riparian restoration projects, consistent with riparian protection guidelines in subsection (c)(2)(B).

<< 16 USCA § 2104 NOTE >>

(e) COST–EFFECTIVENESS.—In conducting the pilot project, Secretary shall use the most cost-effective means available, as determined by the Secretary, to implement resource management activities described in subsection (d).

<< 16 USCA § 2104 NOTE >>

(f) FUNDING.—

<< 16 USCA § 2104 NOTE >>

(1) SOURCE OF FUNDS.—In conducting the pilot project, the Secretary shall use, subject to the relevant reprogramming guidelines of the House and Senate Committees on Appropriations—
  (A) those funds specifically provided to the Forest Service by the Secretary to implement resource management activities according to the Quincy Library Group–Community Stability Proposal; and
  (B) year-end excess funds that are allocated for the administration and management of Plumas National Forest, Lassen National Forest, and the Sierraville Ranger District of Tahoe National Forest.

<< 16 USCA § 2104 NOTE >>

(2) PROHIBITION ON USE OF CERTAIN FUNDS.—The Secretary may not conduct the pilot project using funds appropriated for any other unit of the National Forest System.

<< 16 USCA § 2104 NOTE >>

(3) FLEXIBILITY.—Subject to normal reprogramming guidelines, during the term of the pilot project, the forest supervisors of Plumas National Forest, Lassen National Forest, and Tahoe National Forest may allocate and use all accounts that contain year-end excess funds and all available excess funds for the administration and management of Plumas National Forest, Lassen National Forest, and the Sierraville Ranger District of Tahoe National Forest to perform the resource management activities described in subsection (d).

<< 16 USCA § 2104 NOTE >>

(4) RESTRICTION.—The Secretary or the forest supervisors, as the case may be, shall not utilize authority provided under paragraphs (1)(B) and (3) if, in their judgment, doing so will limit other nontimber related multiple use activities for which such funds were available.

<< 16 USCA § 2104 NOTE >>

(5) OVERHEAD.—The Secretary shall seek to ensure that of amounts available to carry out this section—
  (A) not more than 12 percent is used or allocated for general administration or other overhead; and
  (B) at least 88 percent is used to implement and carry out activities required by this section.

<< 16 USCA § 2104 NOTE >>

(6) AUTHORIZED SUPPLEMENTAL FUNDS.—There are authorized to be appropriated to implement and carry out the pilot project such sums as are necessary.

<< 16 USCA § 2104 NOTE >>

(7) BASELINE FUNDS.—Amounts available for resource management activities authorized under subsection (d) shall at a minimum include existing baseline funding levels.

<< 16 USCA § 2104 NOTE >>

(g) TERM OF PILOT PROJECT.—The Secretary shall conduct the pilot project until the earlier of: (1) the date on which the Secretary completes amendment or revision of the land and resource management plans directed under and in compliance with subsection (i) for the Plumas National Forest, Lassen National Forest, and Tahoe National Forest; or (2) five years after the date of the commencement of the pilot project.

<< 16 USCA § 2104 NOTE >>

(h) CONSULTATION.—(1) The statement required by subsection (b)(1) shall be prepared in consultation with interested members of the public, including the Quincy Library Group.

<< 16 USCA § 2104 NOTE >>

(2) CONTRACTING.—The Forest Service, subject to the availability of appropriations, may carry out any (or all) of the requirements of this section using private contracts.

<< 16 USCA § 2104 NOTE >>

(i) CORRESPONDING FOREST PLAN AMENDMENTS.—Within 2 years after the date of the enactment of this Act, the Regional Forester for Region 5 shall initiate the process to amend or revise the land and resource management plans for Plumas National Forest, Lassen National Forest, and Tahoe National Forest. The process shall include preparation of at least one alternative that—

<< 16 USCA § 2104 NOTE >>

(1) incorporates the pilot project and area designations made by subsection (b), the resource management activities described in subsection (d), and other aspects of the Quincy Library Group–Community Stability Proposal; and

<< 16 USCA § 2104 NOTE >>

(2) makes other changes warranted by the analyses conducted in compliance with section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)), section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1604), and other applicable laws.

<< 16 USCA § 2104 NOTE >>

(j) STATUS REPORTS.—

<< 16 USCA § 2104 NOTE >>

(1) IN GENERAL.—Not later than February 28 of each year during the term of the pilot project, the Secretary shall submit to Congress a report on the status of the pilot project. The report shall include at least the following:

(A) A complete accounting of the use of funds made available under subsection (f)(1)(A) until such funds are fully expended.

(B) A complete accounting of the use of funds and accounts made available under subsection (f)(1) for the previous fiscal year, including a schedule of the amounts drawn from each account used to perform resource management activities described in subsection (d).

(C) A description of total acres treated for each of the resource management activities required under subsection (d), forest health improvements, fire risk reductions, water yield increases, and other natural resources-related benefits achieved by the implementation of the resource management activities described in subsection (d).

(D) A description of the economic benefits to local communities achieved by the implementation of the pilot project.

(E) A comparison of the revenues generated by, and costs incurred in, the implementation of the resource management activities described in subsection (d) on the Federal lands included in the pilot project area with the revenues and costs during each of the fiscal years 1992 through 1997 for timber management of such lands before their inclusion in the pilot project.

(F) A proposed schedule for the resource management activities to be undertaken in the pilot project area during the 1-year period beginning on the date of submittal of the report.

(G) A description of any adverse environmental impacts from the pilot project.

<< 16 USCA § 2104 NOTE >>

(2) LIMITATION ON EXPENDITURES.—The amount of Federal funds expended on each annual report under this subsection shall not exceed $125,000.

<< 16 USCA § 2104 NOTE >>

(k) FINAL REPORT.—

<< 16 USCA § 2104 NOTE >>

(1) IN GENERAL.—The Secretary shall establish an independent scientific panel to review and report on whether, and to what extent, implementation of the pilot project under this section achieved the goals stated in the Quincy Library Group–Community Stability Proposal, including improved ecological health and community stability. The membership of the panel shall reflect expertise in diverse disciplines in order to adequately address all of those goals.

<< 16 USCA § 2104 NOTE >>

(2) PREPARATION.—The panel shall initiate such review no sooner than 18 months after the first day of the term of the pilot project under subsection (g). The panel shall prepare the report in consultation with interested members of the public, including the Quincy Library Group. The report shall include, but not be limited to, the following:

(A) A description of any adverse environmental impacts resulting from implementation of the pilot project.

(B) An assessment of watershed monitoring data on lands treated pursuant to this section. Such assessment shall address the following issues on a priority basis: timing of water releases; water quality changes; and water yield changes over the short- and long-term in the pilot project area.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 2104 NOTE >>

(3) SUBMISSION TO THE CONGRESS.—The panel shall submit the final report to the Congress as soon as practicable, but in no case later than 18 months after completion of the pilot project.

<< 16 USCA § 2104 NOTE >>

(4) LIMITATION ON EXPENDITURES.—The amount of Federal funds expended for the report under this subsection, other than for watershed monitoring, shall not exceed $350,000. The amount of Federal funds expended for watershed monitoring under this subsection shall not exceed $175,000 for each fiscal year in which the report is prepared.

<< 16 USCA § 2104 NOTE >>

(l) RELATIONSHIP TO OTHER LAWS.—Nothing in this section exempts the pilot project from any Federal environmental law.

<< 16 USCA § 2104 NOTE >>

(m) LOANS FOR DEMONSTRATION PROJECTS FOR WOOD WASTE OR LOW–QUALITY WOOD BYPRODUCTS.—

<< 16 USCA § 2104 NOTE >>

(1) EVALUATION OF LOAN ADVISABILITY.—The Alternative Agricultural Research and Commercialization Corporation established under section 1658 of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 5902) (in this section referred to as the "Corporation") shall evaluate the advisability of making commercialization assistance loans under section 1661 of such Act (7 U.S.C. 5905) to support a minimum of 2 demonstration projects for the development and demonstration of commercial application of technology to convert wood waste or low-quality wood byproducts into usable, higher value products.

<< 16 USCA § 2104 NOTE >>

(2) LOCATION OF DEMONSTRATION PROJECTS.—If the Corporation determines to make loans under this subsection to support the development and demonstration of commercial application of technology to convert wood waste or low-quality wood byproducts into usable, higher value products, the Corporation shall consider making one loan with regard to a demonstration project to be conducted in the pilot project area and one loan with regard to a demonstration project to be conducted in southeast Alaska.

<< 16 USCA § 2104 NOTE >>

(3) ELIGIBILITY REQUIREMENTS.—To be eligible for a loan under this subsection, a demonstration project shall be required to satisfy the eligibility requirements imposed by the Corporation under section 1661 of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 5905).

<< 16 USCA § 2104 NOTE >>

SEC. 402. SHORT TITLE. Section 401 of this title may be cited as the "Herger–Feinstein Quincy Library Group Forest Recovery Act".

<< 16 USCA Ch. 1 >>

TITLE V—LAND BETWEEN THE LAKES PROTECTION ACT

<< 16 USCA § 460*lll* NOTE >>

SEC. 501. SHORT TITLE.

This title may be referred to as "The Land Between the Lakes Protection Act of 1998".

<< 16 USCA § 460*lll* >>

SEC. 502. DEFINITIONS.

In this title:

<< 16 USCA § 460*lll* >>

(1) ADMINISTRATOR.—The term "Administrator" means the Administrator of the Environmental Protection Agency.

<< 16 USCA § 460*lll* >>

(2) ADVISORY BOARD.—The term "Advisory Board" means the Land Between the Lakes Advisory Board established under section 522.

<< 16 USCA § 460*lll* >>

(3) CHAIRMAN.—The term "Chairman" means the Chairman of the Board of Directors of the Tennessee Valley Authority.

<< 16 USCA § 460*lll* >>

(4) ELIGIBLE EMPLOYEE.—The term "eligible employee" means a person that was, on the date of transfer pursuant to section 541, a full-time or part-time annual employee of the Tennessee Valley Authority at the Recreation Area.

<< 16 USCA § 460*lll* >>

(5) ENVIRONMENTAL LAW.—
  (A) IN GENERAL.—The term "environmental law" means all applicable Federal, State, and local laws (including regulations) and requirements related to protection of human health, natural and cultural resources, or the environment.
  (B) INCLUSIONS.—The term "environmental law" includes:
    (i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.);
    (ii) the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.);
    (iii) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.);
    (iv) the Clean Air Act (42 U.S.C. 7401 et seq.);
    (v) the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 136 et seq.);
    (vi) the Toxic Substances Control Act (15 U.S.C. 2601 et seq.);
    (vii) the Safe Drinking Water Act (42 U.S.C. 300f et seq.);
    (viii) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and
    (ix) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).

<< 16 USCA § 460*lll* >>

(6) FOREST HIGHWAY.—The term "forest highway" has the meaning given the term in section 101(a) of title 23, United States Code.

<< 16 USCA § 460*lll* >>

(7) GOVERNMENTAL UNIT.—The term "governmental unit" means an agency of the Federal Government or a State or local government, local governmental unit, public or municipal corporation, or unit of a State university system.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 460*lll* >>

(8) HAZARDOUS SUBSTANCE.—The term "hazardous substance" has the meaning given the term in section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601).

<< 16 USCA § 460*lll* >>

(9) PERSON.—The term "person" has the meaning given the term in section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601).

<< 16 USCA § 460*lll* >>

(10) POLLUTANT OR CONTAMINANT.—The term "pollutant or contaminant" has the meaning given the term in section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601).

<< 16 USCA § 460*lll* >>

(11) RECREATION AREA.—The term "Recreation Area" means the Land Between the Lakes National Recreation Area.

<< 16 USCA § 460*lll* >>

(12) RELEASE.—The term "release" has the meaning given the term in section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601).

<< 16 USCA § 460*lll* >>

(13) RESPONSE ACTION.—The term "response action" has the meaning given the term in section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601).

<< 16 USCA § 460*lll* >>

(14) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

<< 16 USCA § 460*lll* >>

(15) STATE.—The term "State" means the State of Kentucky and the State of Tennessee.

<< 16 USCA § 460*lll*–1 >>

SEC. 503. PURPOSES.

The purposes of this title are:

<< 16 USCA § 460*lll*–1 >>

(1) to transfer without consideration administrative jurisdiction over the Recreation Area from the Tennessee Valley Authority to the Secretary so that the Recreation Area may be managed as a unit of the National Forest System;

<< 16 USCA § 460*lll*–1 >>

(2) to protect and manage the resources of the Recreation Area for optimum yield of outdoor recreation and environmental education through multiple use management by the Forest Service;

<< 16 USCA § 460*lll*–1 >>

(3) to authorize, research, test, and demonstrate innovative programs and cost-effective management of the Recreation Area;

<< 16 USCA § 460*lll*–1 >>

(4) to authorize the Secretary to cooperate between and among the States, Federal agencies, private organizations, and corporations, and individuals, as appropriate, in the management of the Recreation Area and to help stimulate the development of the surrounding region and extend the beneficial results as widely as practicable; and

<< 16 USCA § 460*lll*–1 >>

(5) to provide for the smooth and equitable transfer of jurisdiction from the Tennessee Valley Authority to the Secretary.

<< 16 USCA Ch. 1 >>

Subtitle A—Establishment, Administration, and Jurisdiction

<< 16 USCA § 460*lll*–11 >>

SEC. 511. ESTABLISHMENT.

<< 16 USCA § 460*lll*–11 >>

(a) IN GENERAL.—On the transfer of administrative jurisdiction under section 541, the Land Between the Lakes National Recreation Area in the States of Kentucky and Tennessee is established as a unit of the National Forest System.

<< 16 USCA § 460*lll*–11 >>

(b) MANAGEMENT.—

<< 16 USCA § 460*lll*–11 >>

(1) IN GENERAL.—The Secretary shall manage the Recreation Area for multiple use as a unit of the National Forest System.

<< 16 USCA § 460*lll*–11 >>

(2) EMPHASES.—The emphases in the management of the Recreation Area shall be—
 (A) to provide public recreational opportunities;
 (B) to conserve fish and wildlife and their habitat; and
 (C) to provide for diversity of native and desirable nonnative plants, animals, opportunities for hunting and fishing, and environmental education.

<< 16 USCA § 460*lll*–11 >>

(3) STATUS OF UNIT.—The Secretary may administer the Recreation Area as a separate unit of the National Forest System or in conjunction with an existing national forest.

<< 16 USCA § 460*lll*–11 >>

(c) AREA INCLUDED.—

<< 16 USCA § 460*lll*–11 >>

(1) IN GENERAL.—The Recreation Area shall comprise the federally owned land, water, and interests in the land and water lying between Kentucky Lake and Lake Barkley in the States of Kentucky and Tennessee, as generally depicted on the map entitled "Land Between the Lakes National Recreation Area—January, 1998".

<< 16 USCA § 460*lll*–11 >>

(2) MAP.—The map described in paragraph (1) shall be available for public inspection in the Office of the Chief of the Forest Service, Washington, D.C.

<< 16 USCA § 460*lll*–11 >>

(d) WATERS.—

<< 16 USCA § 460*lll*–11 >>

(1) WATER LEVELS AND NAVIGATION.—Nothing in this title affects the jurisdiction of the Tennessee Valley Authority or the Army Corps of Engineers to manage and regulate water levels and navigation of Kentucky Lake and Lake Barkley and areas subject to flood easements.

<< 16 USCA § 460*lll*–11 >>

(2) OCCUPANCY AND USE.—Subject to the jurisdiction of the Tennessee Valley Authority and the Army Corps of Engineers, the Secretary shall have jurisdiction to regulate the occupancy and use of the surface waters of the lakes for recreational purposes.

<< 16 USCA § 460*lll*–12 >>

SEC. 512. CIVIL AND CRIMINAL JURISDICTION.

<< 16 USCA § 460*lll*–12 >>

(a) ADMINISTRATION.—The Secretary, acting through the Chief of the Forest Service, shall administer the Recreation Area in accordance with this title and the laws, rules, and regulations pertaining to the National Forest System.

<< 16 USCA § 460*lll*–12 >>

(b) STATUS.—Land within the Recreation Area shall have the status of land acquired under the Act of March 1, 1911 (commonly known as the "Weeks Act") (16 U.S.C. 515 et seq.).

<< 16 USCA § 460*lll*–12 >>

(c) LAW ENFORCEMENT.—In order to provide for a cost-effective transfer of the law enforcement responsibilities between the Forest Service and the Tennessee Valley Authority, the law enforcement authorities designated under section 4A of the Tennessee Valley Authority Act 1933 (16 U.S.C. 831c–3) are hereby granted to special agents and law enforcement officers of the Forest Service. The law enforcement authorities designated under the eleventh undesignated paragraph under the heading "Surveying the public lands" of the Act of June 4, 1897 (30 Stat. 35; 16 U.S.C. 551), the first paragraph of that portion designated "General Expenses, Forest Service" of the Act of March 3, 1905 (33 U.S.C. 873; 16 U.S.C. 559), the National Forest System Drug Control Act of 1986 (16 U.S.C. 559b–559g) are hereby granted to law enforcement agents of the Tennessee Valley Authority, within the boundaries of the Recreation Area, for a period of 1 year from the date on which this section takes effect.

<< 16 USCA § 460*lll*–13 >>

SEC. 513. PAYMENTS TO STATES AND COUNTIES.

<< 16 USCA § 460*lll*–13 >>

(a) PAYMENTS IN LIEU OF TAXES.—Land within the Recreation Area shall be subject to the provisions for payments in lieu of taxes under chapter 69 of title 31, United States Code.

<< 16 USCA § 460*lll*–13 >>

(b) DISTRIBUTION.—All amounts received from charges, use fees, and natural resource utilization, including timber and agricultural receipts, shall not be subject to distribution to States under the Act of May 23, 1908 (16 U.S.C. 500).

<< 16 USCA § 460*lll*–13 >>

(c) PAYMENTS BY THE TENNESSEE VALLEY AUTHORITY.—After the transfer of administrative jurisdiction is made under section 541—

<< 16 USCA § 460*lll*–13 >>

(1) the Tennessee Valley Authority shall continue to calculate the amount of payments to be made to States and counties under section 13 of the Tennessee Valley Authority Act of 1933 (16 U.S.C. 831*l*); and

<< 16 USCA § 460*lll*–13 >>

(2) each State (including, for the purposes of this subsection, the State of Kentucky, the State of Tennessee, and any other State) that receives a payment under that section shall continue to calculate the amounts to be distributed to the State and local governments, as though the transfer had not been made.

<< 16 USCA § 460*lll*–14 >>

SEC. 514. FOREST HIGHWAYS.

<< 16 USCA § 460*lll*–14 >>

(a) IN GENERAL.—For purposes of section 204 of title 23, United States Code, the road known as "The Trace" and every other paved road within the Recreation Area (including any road constructed to secondary standards) shall be considered to be a forest highway.

<< 16 USCA § 460*lll*–14 >>

(b) STATE RESPONSIBILITY.—

<< 16 USCA § 460*lll*–14 >>

(1) IN GENERAL.—The States shall be responsible for the maintenance of forest highways within the Recreation Area.

<< 16 USCA § 460*lll*–14 >>

(2) REIMBURSEMENT.—To the maximum extent provided by law, from funds appropriated to the Department of Transportation and available for purposes of highway construction and maintenance, the Secretary of Transportation shall reimburse the States for all or a portion of the costs of maintenance of forest highways in the Recreation Area.

<< 16 USCA Ch. 1 >>

Subtitle B—Management Provisions

<< 16 USCA § 460*lll*–21 >>

SEC. 521. LAND AND RESOURCE MANAGEMENT PLAN.

<< 16 USCA § 460*lll*–21 >>

(a) IN GENERAL.—As soon as practicable after the effective date of the transfer of jurisdiction under section 541, the Secretary shall prepare a land and resource management plan for the Recreation Area in conformity with the National Forest Management Act of 1976 (16 U.S.C. 472a et seq.) and other applicable law.

<< 16 USCA § 460*lll*–21 >>

(b) INTERIM PROVISION.—Until adoption of the land and resource management plan, the Secretary may use, as appropriate, the existing Tennessee Valley Authority Natural Resource Management Plan to provide interim management direction. Use of all or a portion of the management plan by the Secretary shall not be considered to be a major Federal action significantly affecting the quality of the human environment.

<< 16 USCA § 460*lll*–22 >>

SEC. 522. ADVISORY BOARD.

<< 16 USCA § 460*lll*–22 >>

(a) ESTABLISHMENT.—Not later than 90 days after the date of transfer pursuant to section 541, the Secretary shall establish the Land Between the Lakes Advisory Board.

<< 16 USCA § 460*lll*–22 >>

(b) MEMBERSHIP.—The Advisory Board shall be composed of 17 members, of whom—

<< 16 USCA § 460*lll*–22 >>

(1) 4 individuals shall be appointed by the Secretary, including—
  (A) 2 residents of the State of Kentucky; and
  (B) 2 residents of the State of Tennessee;

<< 16 USCA § 460*lll*–22 >>

(2) 2 individuals shall appointed by the Kentucky Fish and Wildlife Commissioner or designee;

<< 16 USCA § 460*lll*–22 >>

(3) 1 individual shall be appointed by the Tennessee Fish and Wildlife Commission or designee;

<< 16 USCA § 460*lll*–22 >>

(4) 2 individuals shall be appointed by the Governor of the State of Tennessee;

<< 16 USCA § 460*lll*–22 >>

(5) 2 individuals shall be appointed by the Governor of the State of Kentucky; and

<< 16 USCA § 460*lll*–22 >>

(6) 2 individuals shall be appointed by appropriate officials of each of the 3 counties containing the Recreation Area.

<< 16 USCA § 460*lll*–22 >>

(c) TERM.—

<< 16 USCA § 460*lll*–22 >>

(1) IN GENERAL.—The term of a member of the Advisory Board shall be 5 years.

<< 16 USCA § 460*lll*–22 >>

(2) SUCCESSION.—Members of the Advisory Board may not succeed themselves.

<< 16 USCA § 460*lll*–22 >>

(d) CHAIRPERSON.—The Regional Forester shall serve as chairperson of the Advisory Board.

<< 16 USCA § 460*lll*–22 >>

(e) RULES OF PROCEDURE.—The Secretary shall prescribe the rules of procedure for the Advisory Board.

<< 16 USCA § 460*lll*–22 >>

(f) FUNCTIONS.—The Advisory Board may advise the Secretary on—

<< 16 USCA § 460*lll*–22 >>

(1) means of promoting public participation for the land and resource management plan for the Recreation Area; and

<< 16 USCA § 460*lll*–22 >>

(2) environmental education.

<< 16 USCA § 460*lll*–22 >>

(g) MEETINGS.—

<< 16 USCA § 460*lll*–22 >>

(1) FREQUENCY.—The Advisory Board shall meet at least biannually.

<< 16 USCA § 460*lll*–22 >>

(2) PUBLIC MEETING.—A meeting of the Advisory Board shall be open to the general public.

<< 16 USCA § 460*lll*–22 >>

(3) NOTICE OF MEETINGS.—The chairperson, through the placement of notices in local news media and by other appropriate means shall give 2 weeks' public notice of each meeting of the Advisory Board.

<< 16 USCA § 460*lll*–22 >>

(h) NO TERMINATION.—Section 14(a)(2) of the Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Advisory Board.

<< 16 USCA § 460*lll*–23 >>

SEC. 523. FEES.

<< 16 USCA § 460*lll*–23 >>

(a) AUTHORITY.—The Secretary may charge reasonable fees for admission to and the use of the designated sites, or for activities, within the Recreation Area.

<< 16 USCA § 460*lll*–23 >>

(b) FACTORS.—In determining whether to charge fees, the Secretary may consider the costs of collection weighed against potential income.

<< 16 USCA § 460*lll*–23 >>

(c) LIMITATION.—No general entrance fees shall be charged within the Recreation Area.

<< 16 USCA § 460*lll*–24 >>

SEC. 524. DISPOSITION OF RECEIPTS.

<< 16 USCA § 460*lll*–24 >>

(a) IN GENERAL.—All amounts received from charges, use fees, and natural resource utilization, including timber and agricultural receipts, shall be deposited in a special fund in the Treasury of the United States to be known as the "Land Between the Lakes Management Fund".

<< 16 USCA § 460*lll*–24 >>

(b) USE.—Amounts in the Fund shall be available to the Secretary until expended, without further Act of appropriation, for the management of the Recreation Area, including payment of salaries and expenses.

<< 16 USCA § 460*lll*–25 >>

SEC. 525. SPECIAL USE AUTHORIZATIONS.

<< 16 USCA § 460*lll*–25 >>

(a) IN GENERAL.—In addition to other authorities for the authorization of special uses within the National Forest System, within the Recreation Area, the Secretary may, on such terms and conditions as the Secretary may prescribe—

<< 16 USCA § 460*lll*–25 >>

(1) convey for no consideration perpetual easements to governmental units for public roads over United States Route 68 and the Trace, and such other rights-of-way as the Secretary and a governmental unit may agree;

<< 16 USCA § 460*lll*–25 >>

(2) transfer or lease to governmental units developed recreation sites or other facilities to be managed for public purposes; and

<< 16 USCA § 460*lll*–25 >>

(3) lease or authorize recreational sites or other facilities, consistent with sections 503(2) and 511(b)(2).

<< 16 USCA § 460*lll*–25 >>

(b) CONSIDERATION.—

<< 16 USCA § 460*lll*–25 >>

(1) IN GENERAL.—Consideration for a lease or other special use authorization within the Recreation Area shall be based on fair market value.

<< 16 USCA § 460lll–25 >>

(2) REDUCTION OR WAIVER.—The Secretary may reduce or waive a fee to a governmental unit or nonprofit organization commensurate with other consideration provided to the United States, as determined by the Secretary.

<< 16 USCA § 460lll–25 >>

(c) PROCEDURE.—The Secretary may use any fair and equitable method for authorizing special uses within the Recreation Area, including public solicitation of proposals.

<< 16 USCA § 460lll–25 >>

(d) EXISTING AUTHORIZATIONS.—

<< 16 USCA § 460lll–25 >>

(1) IN GENERAL.—A permit or other authorization granted by the Tennessee Valley Authority that is in effect on the date of transfer pursuant to section 541 may continue on transfer of administration of the Recreation Area to the Secretary.

<< 16 USCA § 460lll–25 >>

(2) REISSUANCE.—A permit or authorization described in paragraph (1) may be reissued or terminated under terms and conditions prescribed by the Secretary.

<< 16 USCA § 460lll–25 >>

(3) EXERCISE OF RIGHTS.—The Secretary may exercise any of the rights of the Tennessee Valley Authority contained in any permit or other authorization, including any right to amend, modify, and revoke the permit or authorization.

<< 16 USCA § 460lll–26 >>

SEC. 526. COOPERATIVE AUTHORITIES AND GIFTS.

<< 16 USCA § 460lll–26 >>

(a) FISH AND WILDLIFE SERVICE.—

<< 16 USCA § 460lll–26 >>

(1) MANAGEMENT.—
 (A) IN GENERAL.—Subject to such terms and conditions as the Secretary may prescribe, the Secretary may issue a special use authorization to the United States Fish and Wildlife Service for the management by the Service of facilities and land agreed on by the Secretary and the Secretary of the Interior.
 (B) FEES.—
  (i) IN GENERAL.—Reasonable admission and use fees may be charged for all areas administered by the United States Fish and Wildlife Service.
  (ii) DEPOSIT.—The fees shall be deposited in accordance with section 524.

<< 16 USCA § 460lll–26 >>

(2) COOPERATION.—The Secretary and the Secretary of the Interior may cooperate or act jointly on activities such as population monitoring and inventory of fish and wildlife with emphasis on migratory birds and endangered and threatened species, environmental education, visitor services, conservation demonstration projects and scientific research.

<< 16 USCA § 460*lll*–26 >>

(3) SUBORDINATION OF FISH AND WILDLIFE ACTIVITIES TO OVERALL MANAGEMENT. The management and use of areas and facilities under permit to the United States Fish and Wildlife Service as authorized pursuant to this section shall be subordinate to the overall management of the Recreation Area as directed by the Secretary.

<< 16 USCA § 460*lll*–26 >>

(b) AUTHORITIES.—For the management, maintenance, operation, and interpretation of the Recreation Area and its facilities, the Secretary may—

<< 16 USCA § 460*lll*–26 >>

(1) make grants and enter into contracts and cooperative agreements with Federal agencies, governmental units, nonprofit organizations, corporations, and individuals; and

<< 16 USCA § 460*lll*–26 >>

(2) accept gifts under Public Law 95–442 (7 U.S.C. 2269) notwithstanding that the donor conducts business with any agency of the Department of Agriculture or is regulated by the Secretary of Agriculture.

<< 16 USCA § 460*lll*–27 >>

SEC. 527. DESIGNATION OF NATIONAL RECREATION TRAIL.

Effective on the date of transfer pursuant to section 541, the North–South Trail is designated as a national recreation trail under section 4 of the National Trails System Act (16 U.S.C. 1243).

<< 16 USCA § 460*lll*–28 >>

SEC. 528. CEMETERIES.

The Secretary shall maintain an inventory of and ensure access to cemeteries within the Recreation Area for purposes of burial, visitation, and maintenance.

<< 16 USCA § 460*lll*–29 >>

SEC. 529. RESOURCE MANAGEMENT.

<< 16 USCA § 460*lll*–29 >>

(a) MINERALS.—

<< 16 USCA § 460*lll*–29 >>

(1) WITHDRAWAL.—The land within the Recreation Area is withdrawn from the operation of the mining and mineral leasing laws of the United States.

<< 16 USCA § 460*lll*–29 >>

(2) USE OF MINERAL MATERIALS.—The Secretary may permit the use of common varieties of mineral materials for the development and maintenance of the Recreation Area.

<< 16 USCA § 460*lll*–29 >>

(b) HUNTING AND FISHING.—

<< 16 USCA § 460*lll*–29 >>

(1) IN GENERAL.—The Secretary shall permit hunting and fishing on land and water under the jurisdiction of the Secretary within the boundaries of the Recreation Area in accordance with applicable laws of the United States and of each State, respectively.

<< 16 USCA § 460*lll*–29 >>

(2) PROHIBITION.—
(A) IN GENERAL.—The Secretary may designate areas where, and establish periods when, hunting or fishing is prohibited for reasons of public safety, administration, or public use and enjoyment.
(B) CONSULTATION.—Except in emergencies, a prohibition under subparagraph (A) shall become effective only after consultation with the appropriate fish and game departments of the States.

<< 16 USCA § 460*lll*–29 >>

(3) FISH AND WILDLIFE.—Nothing in this title affects the jurisdiction or responsibilities of the States with respect to wildlife and fish on national forests.

<< 16 USCA § 460*lll*–30 >>

SEC. 530. HEMATITE DAM.

Within one year from the date of transfer pursuant to section 541, the Tennessee Valley Authority shall cause any breach in the Hematite Dam to be repaired, or if such repairs have previously been made, the Tennessee Valley Authority shall certify in a letter to the Secretary the sound condition of the dam. Future repair costs and maintenance of the Hematite Dam shall be the responsibility of the Secretary.

<< 16 USCA § 460*lll*–31 >>

SEC. 531. TRUST FUND.

<< 16 USCA § 460*lll*–31 >>

(a) ESTABLISHMENT.—There is established in the Treasury of the United States a special interest-bearing fund known as the "Land Between the Lakes Trust Fund".

<< 16 USCA § 460*lll*–31 >>

(b) AVAILABILITY.—Amounts in the Fund shall be available to the Secretary, until expended, for—

<< 16 USCA § 460*lll*–31 >>

(1) public education, grants, and internships related to recreation, conservation, and multiple use land management in the Recreation Area; and

<< 16 USCA § 460*lll*–31 >>

(2) regional promotion in the Recreation Area, in cooperation with development districts, chambers of commerce, and State and local governments.

<< 16 USCA § 460*lll*–31 >>

(c) DEPOSITS.—The Tennessee Valley Authority shall deposit into the Fund $1,000,000 annually for each of the 5 fiscal years commencing in the first fiscal year of the transfer. Funding to carry out this section shall be derived from funding described in section 549.

<< 16 USCA Ch. 1 >>

Subtitle C—Transfer Provisions

<< 16 USCA § 460*lll*–41 >>

SEC. 541. EFFECTIVE DATE OF TRANSFER.

 Effective on October 1 of the first fiscal year for which Congress does not appropriate to the Tennessee Valley Authority at least $6,000,000 for the Recreation Area, or, if this Act is enacted during a fiscal year for which Congress has not made such an appropriation, effective as of the date of enactment of this Act, administrative jurisdiction over the Recreation Area is transferred from the Tennessee Valley Authority to the Secretary.

<< 16 USCA § 460*lll*–42 >>

SEC. 542. STATEMENT OF POLICY.

 It is the policy of the United States that, to the maximum extent practicable—

<< 16 USCA § 460*lll*–42 >>

 (1) the transfer of jurisdiction over the Recreation Area from the Tennessee Valley Authority to the Secretary should be effected in an efficient and cost-effective manner; and

<< 16 USCA § 460*lll*–42 >>

 (2) due consideration should be given to minimizing—
   (A) disruption of the personal lives of the Tennessee Valley Authority and Forest Service employees; and
   (B) adverse impacts on permittees, contractees, and others owning or operating businesses affected by the transfer.

<< 16 USCA § 460*lll*–43 >>

SEC. 543. MEMORANDUM OF AGREEMENT.

<< 16 USCA § 460*lll*–43 >>

 (a) IN GENERAL.—Not later than 30 days after the date of transfer pursuant to section 541, the Secretary and the Tennessee Valley Authority shall enter into a memorandum of agreement concerning implementation of this title.

<< 16 USCA § 460*lll*–43 >>

 (b) PROVISIONS.—The memorandum of understanding shall provide procedures for—

<< 16 USCA § 460*lll*–43 >>

 (1) the orderly withdrawal of officers and employees of the Tennessee Valley Authority;

<< 16 USCA § 460*lll*–43 >>

 (2) the transfer of property, fixtures, and facilities;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 460*lll*–43 >>

(3) the interagency transfer of officers and employees;

<< 16 USCA § 460*lll*–43 >>

(4) the transfer of records; and

<< 16 USCA § 460*lll*–43 >>

(5) other transfer issues.

<< 16 USCA § 460*lll*–43 >>

(c) TRANSITION TEAM.—

<< 16 USCA § 460*lll*–43 >>

(1) IN GENERAL.—The memorandum of understanding may provide for a transition team consisting of the Tennessee Valley Authority and Forest Service employees.

<< 16 USCA § 460*lll*–43 >>

(2) DURATION.—The team may continue in existence after the date of transfer.

<< 16 USCA § 460*lll*–43 >>

(3) PERSONNEL COSTS.—The Tennessee Valley Authority and the Forest Service shall pay personnel costs of their respective team members.

<< 16 USCA § 460*lll*–44 >>

SEC. 544. RECORDS.

<< 16 USCA § 460*lll*–44 >>

(a) RECREATION AREA RECORDS.—The Secretary shall have access to all records of the Tennessee Valley Authority pertaining to the management of the Recreation Area.

<< 16 USCA § 460*lll*–44 >>

(b) PERSONNEL RECORDS.—The Tennessee Valley Authority personnel records shall be made available to the Secretary, on request, to the extent the records are relevant to Forest Service administration.

<< 16 USCA § 460*lll*–44 >>

(c) CONFIDENTIALITY.—The Tennessee Valley Authority may prescribe terms and conditions on the availability of records to protect the confidentiality of private or proprietary information.

<< 16 USCA § 460*lll*–44 >>

(d) LAND TITLE RECORDS.—The Tennessee Valley Authority shall provide to the Secretary original records pertaining to land titles, surveys, and other records pertaining to transferred personal property and facilities.

<< 16 USCA § 460*lll*–45 >>

SEC. 545. TRANSFER OF PERSONAL PROPERTY.

<< 16 USCA § 460*lll*–45 >>

(a) SUBJECT PROPERTY.—

<< 16 USCA § 460*lll*–45 >>

 (1) INVENTORY.—Not later than 60 days after the date of transfer pursuant to section 541, the Tennessee Valley Authority shall provide the Secretary with an inventory of all property and facilities at the Recreation Area.

<< 16 USCA § 460*lll*–45 >>

 (2) AVAILABILITY FOR TRANSFER.—
 (A) IN GENERAL.—All Tennessee Valley Authority property associated with the administration of the Recreation Area, including any property purchased with Federal funds appropriated for the management of the Tennessee Valley Authority land, shall be available for transfer to the Secretary.
 (B) PROPERTY INCLUDED.—Property under subparagraph (A) includes buildings, office furniture and supplies, computers, office equipment, buildings, vehicles, tools, equipment, maintenance supplies, boats, engines, and publications.

<< 16 USCA § 460*lll*–45 >>

 (3) EXCLUSION OF PROPERTY.—At the request of the authorized representative of the Tennessee Valley Authority, the Secretary may exclude movable property from transfer based on a showing by the Tennessee Valley Authority that the property is vital to the mission of the Tennessee Valley Authority and cannot be replaced in a cost-effective manner, if the Secretary determines that the property is not needed for management of the Recreation Area.

<< 16 USCA § 460*lll*–45 >>

 (b) DESIGNATION.—Pursuant to such procedures as may be prescribed in the memorandum of agreement entered into under section 543, the Secretary shall identify and designate, in writing, all Tennessee Valley Authority property to be transferred to the Secretary.

<< 16 USCA § 460*lll*–45 >>

 (c) FACILITATION OF TRANSFER.—The Tennessee Valley Authority shall, to the maximum extent practicable, use current personnel to facilitate the transfer of necessary property and facilities to the Secretary, including replacement of signs and insignia, repainting of vehicles, printing of public information, and training of new personnel. Funding for these costs shall be derived from funding described in section 549.

<< 16 USCA § 460*lll*–45 >>

 (d) SURPLUS PROPERTY.—

<< 16 USCA § 460*lll*–45 >>

 (1) DISPOSITION.—Any personal property, including structures and facilities, that the Secretary determines cannot be efficiently managed and maintained either by the Forest Service or by lease or permit to other persons may be declared excess by the Secretary and—
 (A) sold by the Secretary on such terms and conditions as the Secretary may prescribe to achieve the maximum benefit to the Federal Government; or

(B) disposed of under the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.).

<< 16 USCA § 460*lll*–45 >>

(2) DEPOSIT OF PROCEEDS.—All net proceeds from the disposal of any property shall be deposited into the Fund established by section 531.

<< 16 USCA § 460*lll*–46 >>

SEC. 546. COMPLIANCE WITH ENVIRONMENTAL LAWS.

<< 16 USCA § 460*lll*–46 >>

(a) DOCUMENTATION OF EXISTING CONDITIONS.—

<< 16 USCA § 460*lll*–46 >>

(1) IN GENERAL.—Not later than 60 days after the date of transfer pursuant to section 541, the Chairman and the Administrator shall provide the Secretary all documentation and information that exists on the environmental condition of the land and waters comprising the Recreation Area property.

<< 16 USCA § 460*lll*–46 >>

(2) ADDITIONAL DOCUMENTATION.—The Chairman and the Administrator shall provide the Secretary with any additional documentation and information regarding the environmental condition of the Recreation Area property as such documentation and information becomes available.

<< 16 USCA § 460*lll*–46 >>

(b) ACTION REQUIRED.—

<< 16 USCA § 460*lll*–46 >>

(1) ASSESSMENT.—Not later than 120 days after the date of transfer pursuant to section 541, the Chairman shall provide to the Secretary an assessment indicating what action, if any, is required under any environmental law on Recreation Area property.

<< 16 USCA § 460*lll*–46 >>

(2) MEMORANDUM OF UNDERSTANDING.—If the assessment concludes action is required under any environmental law with respect to any portion of the Recreation Area property, the Secretary and the Chairman shall enter into a memorandum of understanding that—
  (A) provides for the performance by the Chairman of the required actions identified in the assessment; and
  (B) includes a schedule providing for the prompt completion of the required actions to the satisfaction of the Secretary.

<< 16 USCA § 460*lll*–46 >>

(c) DOCUMENTATION DEMONSTRATING ACTION.—On the transfer of jurisdiction over the Recreation Area from the Tennessee Valley Authority to the Secretary, the Chairman shall provide the Secretary with documentation demonstrating that all actions required under any environmental law have been taken, including all response actions under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) that are necessary to protect human health and the environment with respect to any hazardous substance, pollutant, contaminant, hazardous waste, hazardous material, or petroleum product or derivative of a petroleum product on Recreation Area property.

AR.02573

<< 16 USCA § 460*lll*–46 >>

(d) CONTINUATION OF RESPONSIBILITIES AND LIABILITIES.—

<< 16 USCA § 460*lll*–46 >>

(1) IN GENERAL.—The transfer of the Recreation Area property under this title, and the requirements of this section, shall not in any way affect the responsibilities and liabilities of the Tennessee Valley Authority at the Recreation Area under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) or any other environmental law.

<< 16 USCA § 460*lll*–46 >>

(2) ACCESS.—After transfer of the Recreation Area property, the Chairman shall be accorded any access to the property that may be reasonably required to carry out the responsibility or satisfy the liability referred to in paragraph (1).

<< 16 USCA § 460*lll*–46 >>

(3) NO LIABILITY.—The Secretary shall not be liable under any environmental law for matters that are related directly or indirectly to present or past activities of the Tennessee Valley Authority on the Recreation Area property, including liability for—
  (A) costs or performance of response actions required under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) at or related to the Recreation Area; or
  (B) costs, penalties, fines, or performance of actions related to noncompliance with any environmental law at or related to the Recreation Area or related to the presence, release, or threat of release of any hazardous substance, pollutant, or contaminant, hazardous waste, hazardous material, or petroleum product or derivative of a petroleum product of any kind at or related to the Recreation Area, including contamination resulting from migration.

<< 16 USCA § 460*lll*–46 >>

(4) NO EFFECT ON RESPONSIBILITIES OR LIABILITIES.—Except as provided in paragraph (3), nothing in this title affects, modifies, amends, repeals, alters, limits or otherwise changes, directly or indirectly, the responsibilities or liabilities under any environmental law with respect to the Secretary.

<< 16 USCA § 460*lll*–46 >>

(e) OTHER FEDERAL AGENCIES.—Subject to the other provisions of this section, a Federal agency that carried or carries out operations at the Recreation Area resulting in the release or threatened release of a hazardous substance, pollutant, or contaminant, hazardous waste, hazardous material, or petroleum product or derivative of a petroleum product for which that agency would be liable under any environmental law shall pay the costs of related response actions and shall pay the costs of related actions to remediate petroleum products or their derivatives.

<< 16 USCA § 460*lll*–47 >>

SEC. 547. PERSONNEL.

<< 16 USCA § 460*lll*–47 >>

(a) IN GENERAL.—

<< 16 USCA § 460*lll*–47 >>

(1) HIRING.—Notwithstanding section 3503 of title 5, United States Code, and subject to paragraph (2), the Secretary may—

(A) appoint, hire, and discharge officers and employees to administer the Recreation Area; and

(B) pay the officers and employees at levels that are commensurate with levels at other units of the National Forest System.

<< 16 USCA § 460*lll*–47 >>

(2) INTERIM RETENTION OF ELIGIBLE EMPLOYEES.—

(A) IN GENERAL.—For a period of not less than 5 months after the effective date of transfer to the Forest Service—

(i) all eligible employees shall be retained in the employment of the Tennessee Valley Authority;

(ii) those eligible employees shall be considered to be placed on detail to the Secretary and shall be subject to the direction of the Secretary; and

(iii) the Secretary shall reimburse the Tennessee Valley Authority for the amount of the basic pay and all other compensation of those eligible employees.

(B) NOTICE TO EMPLOYEES.—The Secretary shall provide eligible employees a written notice of not less than 60 days before termination.

(C) TERMINATION FOR CAUSE.—Subparagraph (A) does not preclude a termination for cause during the period described in subparagraph (A).

<< 16 USCA § 460*lll*–47 >>

(b) APPLICATIONS FOR TRANSFER AND APPOINTMENT.—An eligible employee shall have the right to apply for employment by the Secretary under procedures for transfer and appointment of Federal employees outside the Department of Agriculture.

<< 16 USCA § 460*lll*–47 >>

(c) HIRING BY THE SECRETARY.—

<< 16 USCA § 460*lll*–47 >>

(1) IN GENERAL.—Subject to subsection (b), in filling personnel positions within the Recreation Area, the Secretary shall follow all laws (including regulations) and policies applicable to the Department of Agriculture.

<< 16 USCA § 460*lll*–47 >>

(2) NOTIFICATION AND HIRING.—Notwithstanding paragraph (1), the Secretary—

(A) shall notify all eligible employees of all openings for positions with the Forest Service at the Recreation Area before notifying other individuals or considering applications by other individuals for the positions; and

(B) after applications by eligible employees have received consideration, if any positions remain unfilled, shall notify other individuals of the openings.

<< 16 USCA § 460*lll*–47 >>

(3) NONCOMPETITIVE APPOINTMENTS.—Notwithstanding any other placement of career transition programs authorized by the Office of Personnel Management of the United States Department of Agriculture, the Secretary may non-competitively appoint eligible employees to positions in the Recreation Area.

<< 16 USCA § 460*lll*–47 >>

(4) PERIOD OF SERVICE.—Except to the extent that an eligible employee that is appointed by the Secretary may be otherwise compensated for the period of service as an employee of the Tennessee Valley Authority, that period of service shall be treated as a period of service as an employee of the Secretary for the purposes of probation, career tenure, time-in-grade, and leave.

<< 16 USCA § 460*lll*–47 >>

(d) TRANSFER TO POSITIONS IN OTHER UNITS OF THE TENNESSEE VALLEY AUTHORITY.—The Tennessee Valley Authority—

<< 16 USCA § 460*lll*–47 >>

(1) shall notify all eligible employees of all openings for positions in other units of the Tennessee Valley Authority before notifying other individuals or considering applications by other individuals for the positions; and

<< 16 USCA § 460*lll*–47 >>

(2) after applications by eligible employees have received consideration, if any positions remain unfilled, shall notify other individuals of the openings.

<< 16 USCA § 460*lll*–47 >>

(e) EMPLOYEE BENEFIT TRANSITION.—

<< 16 USCA § 460*lll*–47 >>

(1) MEMORANDUM OF UNDERSTANDING.—
  (A) IN GENERAL.—The Secretary and the heads of the Office of Personnel Management, the Tennessee Valley Authority and the Tennessee Valley Authority Retirement System shall enter into a memorandum of understanding providing for the transition for all eligible employees of compensation made available through the Tennessee Valley Authority Retirement System.
  (B) EMPLOYEE PARTICIPATION.—In deciding on the terms of the memorandum of understanding, the Secretary and the heads of the Office of Personnel Management, the Tennessee Valley Authority and the Tennessee Valley Authority Retirement System shall meet and consult with and give full consideration to the views of employees and representatives of the employees of the Tennessee Valley Authority.

<< 16 USCA § 460*lll*–47 >>

(2) ELIGIBLE EMPLOYEES THAT ARE TRANSFERRED TO OTHER UNITS OF TVA.—An eligible employee that is transferred to another unit of the Tennessee Valley Authority shall experience no interruption in coverage for or reduction of any retirement, health, leave, or other employee benefit.

<< 16 USCA § 460*lll*–47 >>

(3) ELIGIBLE EMPLOYEES THAT ARE HIRED BY THE SECRETARY.—
  (A) LEVEL OF BENEFITS.—The Secretary shall provide to an eligible employee that is hired by the Forest Service a level of retirement and health benefits that is equivalent to the level to which the eligible employee would have been entitled if the eligible employee had remained an employee of the Tennessee Valley Authority.
  (B) TRANSFER OF RETIREMENT BENEFITS.—
   (i) IN GENERAL.—Eligible employees hired by the Forest Service shall become members of the Civil Service Retirement System (CSRS) Offset Plan and shall have the option to transfer into the Federal Employees Retirement System (FERS) within six months of their date of transfer. Such employees shall have the option at any time to receive credit in CSRS Offset or FERS for all of their TVA service in accordance with applicable procedures. Any deposits necessary to receive credit for such service shall be considered transfers to a qualified plan for purposes of favorable tax treatment of such amount under the Internal Revenue Code.
   (ii) FUNDING SHORTFALL.—

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(I) IN GENERAL.—For all eligible employees that are not part of the Civil Service Retirement System, the Tennessee Valley Authority shall meet any funding shortfall resulting from the transfer of retirement benefits.

(II) NOTIFICATION.—The Secretary shall notify the Tennessee Valley Authority Board of the cost associated with the transfer of retirement benefits.

(III) PAYMENT.—The Tennessee Valley Authority shall fully compensate the Secretary for the costs associated with the transfer of retirement benefits.

(IV) NO INTERRUPTION.—An eligible employee that is hired by the Forest Service and is eligible for Civil Service Retirement shall not experience any interruption in retirement benefits.

(C) NO INTERRUPTION.—An eligible employee that is hired by the Secretary:

(i) shall experience no interruption in coverage for any health, leave, or other employee benefit; and

(ii) shall be entitled to carry over any leave time accumulated during employment by the Tennessee Valley Authority.

(D) PERIOD OF SERVICE.—Notwithstanding section 8411(b)(3) of title 5, United States Code, except to the extent that an eligible employee may be otherwise compensated (including the provision of retirement benefits in accordance with the memorandum of understanding) for the period of service as an employee of the Tennessee Valley Authority, that period of service shall be treated as a period of service as an employee of the U.S. Department of Agriculture for all purposes relating to the Federal employment of the eligible employee.

<< 16 USCA § 460*lll*–47 >>

(4) ELIGIBLE EMPLOYEES THAT ARE DISCHARGED NOT FOR CAUSE.—

(A) LEVEL OF BENEFITS.—The parties to the memorandum of understanding shall have authority to deem any applicable requirement to be met, to make payments to an employee, or take any other action necessary to provide to an eligible employee that is discharged as being excess to the needs of the Tennessee Valley Authority or the Secretary and not for cause and that does not accept an offer of employment from the Secretary, an optimum level of retirement and health benefits that is equivalent to the level that has been afforded employees discharged in previous reductions in force by the Tennessee Valley Authority.

(B) MINIMUM BENEFITS.—An eligible employee that is discharged as being excess to the needs of the Tennessee Valley Authority or the Secretary and not for cause shall, at a minimum be entitled to—

(i) at the option of the eligible employee—

(I) a lump-sum equal to $1,000, multiplied by the number of years of service of the eligible employee (but not less that $15,000 nor more than $25,000);

(II) a lump-sum payment equal to the amount of pay earned by the eligible employee for the last 26 weeks of the eligible employee's service; or

(III) the deemed addition of 5 years to the age and the years of service of an eligible employee;

(ii) 15 months of health benefits for employees and dependents at the same level provided as of the date of transfer pursuant to section 541;

(iii) 1 week of pay per year of service as provided by the Tennessee Valley Authority Retirement System;

(iv) a lump-sum payment of all accumulated annual leave;

(v) unemployment compensation in accordance with State law;

(vi) eligible pension benefits as provided by the Tennessee Valley Authority Retirement System; and

(vii) retraining assistance provided by the Tennessee Valley Authority.

(C) SHORTFALL.—If the board of directors of the Tennessee Valley Authority Retirement System determines that the cost of providing the benefits described in subparagraphs (A) and (B) would have a negative impact on the overall retirement system, the Tennessee Valley Authority shall be required to meet any funding shortfalls.

SEC. 548. TENNESSEE VALLEY AUTHORITY TRANSFER COSTS.

<< 16 USCA § 460*lll*–48 >>

Any costs incurred by Tennessee Valley Authority associated with the transfer under this subtitle shall be derived from funding described in section 549.

<< 16 USCA § 460*lll*–49 >>

SEC. 549. TENNESSEE VALLEY AUTHORITY TRANSFER FUNDING.

<< 16 USCA § 460*lll*–49 >>

(a) IN GENERAL.—The funding described in this section is funding derived from only 1 or more of the following sources:

<< 16 USCA § 460*lll*–49 >>

(1) Nonpower fund balances and collections.

<< 16 USCA § 460*lll*–49 >>

(2) Investment returns of the nonpower program.

<< 16 USCA § 460*lll*–49 >>

(3) Applied programmatic savings in the power and nonpower programs.

<< 16 USCA § 460*lll*–49 >>

(4) Savings from the suspension of bonuses and awards.

<< 16 USCA § 460*lll*–49 >>

(5) Savings from reductions in memberships and contributions.

<< 16 USCA § 460*lll*–49 >>

(6) Increases in collections resulting from nonpower activities, including user fees.

<< 16 USCA § 460*lll*–49 >>

(7) Increases in charges to private and public utilities both investor and cooperatively owned, as well as to direct load customers.

<< 16 USCA § 460*lll*–49 >>

(b) AVAILABILITY.—Funds from the sources described in subsection (a) shall be available notwithstanding section 11, 14, 15, or 29 or any other provision of the Tennessee Valley Authority Act of 1933 (16 U.S.C. 831 et seq.) or any provisions of the covenants contained in any power bonds issued by the Tennessee Valley Authority.

<< 16 USCA § 460*lll*–49 >>

(c) SUFFICIENCY OF SAVINGS.—The savings from and the revenue adjustment to the budget of the Tennessee Valley Authority for the first fiscal year of the transfer and each fiscal year thereafter shall be sufficient so that the net spending authority and resulting outlays to carry out activities with funding described in subsection (a) shall not exceed $0 for the first fiscal year of the transfer and each fiscal year thereafter.

<< 16 USCA § 460*lll*–49 >>

(d) ITEMIZED LIST OF REDUCTIONS AND INCREASED RECEIPTS.—

<< 16 USCA § 460*lll*–49 >>

(1) PROPOSED CHANGES.—Not later than 30 days after the date of transfer pursuant to section 541, the Chairman of the Tennessee Valley Authority shall submit to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate an itemized list of the amounts of reductions in spending and increases in receipts that are proposed to be made as a result of activities under this subsection during the first fiscal year of the transfer.

<< 16 USCA § 460*lll*–49 >>

(2) ACTUAL CHANGES.—Not later than 24 months after the effective date of the transfer, the Chairman of the Tennessee Valley Authority shall submit to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate an itemized list of the amounts of reductions in spending and increases in receipts as a result of activities under this subsection during the first fiscal year of the transfer.

<< 16 USCA Ch. 1 >>

Subtitle D—Funding

<< 16 USCA § 460*lll*–61 >>

SEC. 551. AUTHORIZATION OF APPROPRIATIONS.

<< 16 USCA § 460*lll*–61 >>

(a) AGRICULTURE.—There are authorized to be appropriated to the Secretary of Agriculture such sums as are necessary to—

<< 16 USCA § 460*lll*–61 >>

(1) permit the Secretary to exercise administrative jurisdiction over the Recreation Area under this title; and

<< 16 USCA § 460*lll*–61 >>

(2) administer the Recreation Area area as a unit of the National Forest System.

<< 16 USCA § 460*lll*–61 >>

(b) INTERIOR.—There are authorized to be appropriated to the Secretary of the Interior such sums as are necessary to carry out activities within the Recreation Area.

TITLE VI—INTERSTATE 90 LAND EXCHANGE ACT

SEC. 601. SHORT TITLE.

This Act may be cited as the "Interstate 90 Land Exchange Act of 1998".

<< 16 USCA § 539k NOTE >>

SEC. 602. FINDINGS AND PURPOSE.

<< 16 USCA § 539k NOTE >>

(a) FINDINGS.—Congress finds that—

<< 16 USCA § 539k NOTE >>

(1) certain parcels of private land located in central and southwest Washington are intermingled with National Forest System land owned by the United States and administered by the Secretary of Agriculture as parts of the Mt. Baker–Snoqualmie National Forest, Wenatchee National Forest, and Gifford Pinchot National Forest;

<< 16 USCA § 539k NOTE >>

(2) the private land surface estate and some subsurface is owned by the Plum Creek Timber Company, L.P. in an intermingled checkerboard pattern, with the United States or Plum Creek owning alternate square mile sections of land or fractions of square mile sections;

<< 16 USCA § 539k NOTE >>

(3) the checkerboard land ownership pattern in the area has frustrated sound and efficient land management on both private and National Forest lands by complicating fish and wildlife habitat management, watershed protection, recreation use, road construction and timber harvest, boundary administration, and protection and management of threatened and endangered species and old growth forest habitat;

<< 16 USCA § 539k NOTE >>

(4) acquisition by the United States of certain parcels of land that have been offered by Plum Creek for addition to the Mt. Baker–Snoqualmie National Forest and Wenatchee National Forest will serve important public objectives, including—
 (A) enhancement of public access, aesthetics and recreation opportunities within or near areas of very heavy public recreational use including—
  (i) the Alpine Lakes Wilderness Area;
  (ii) the Pacific Crest Trail;
  (iii) Snoqualmie Pass;
  (iv) Cle Elum Lake, Kachess Lake and Keechulus Lake; and
  (v) other popular recreation areas along the Interstate 90 corridor east of the Seattle–Tacoma Metropolitan Area;
 (B) protection and enhancement of old growth forests and habitat for threatened, endangered and sensitive species, including a net gain of approximately 28,500 acres of habitat for the northern spotted owl;
 (C) consolidation of National Forest holdings for more efficient administration and to meet a broad array of ecosystem protection and other public land management goals, including net public gains of approximately 283 miles of stream ownership, 14 miles of the route of the Pacific Crest Trail, 20,000 acres of unroaded land, and 7,360 acres of riparian land; and
 (D) a significant reduction in administrative costs to the United States through—
  (i) consolidation of Federal land holdings for more efficient land management and planning;
  (ii) elimination of approximately 300 miles of boundary identification and posting;
  (iii) reduced right-of-way, special use, and other permit processing and issuance for roads and other facilities on National Forest System land; and
  (iv) other administrative cost savings;

<< 16 USCA § 539k NOTE >>

(5) Plum Creek has selected certain parcels of National Forest System land that are logical for consolidation into Plum Creek ownership utilizing a land exchange because the parcels—
 (A) are intermingled with parcels owned by Plum Creek; and
 (B)(i) are generally located in less environmentally sensitive areas than the Plum Creek offered land; and
 (ii) have lower public recreation and other public values than the Plum Creek offered land;

<< 16 USCA § 539k NOTE >>

(6) time is of the essence in consummating a land exchange because delays may force Plum Creek to road or log the offered land and thereby diminish the public values for which the offered land is to be acquired; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 539k NOTE >>

(7) it is in the public interest to complete the land exchange at the earliest practicable date so that the offered land can be acquired and preserved by the United States for permanent public management, use, and enjoyment.

<< 16 USCA § 539k NOTE >>

(b) PURPOSE.—It is the purpose of this Act to further the public interest by authorizing, directing, facilitating, and expediting the consummation of the Interstate 90 land exchange so as to ensure that the offered land is expeditiously acquired for permanent public use and enjoyment.

<< 16 USCA § 539k NOTE >>

SEC. 603. DEFINITIONS.

In this Act:

<< 16 USCA § 539k NOTE >>

(1) OFFERED LAND.—The term "offered land" means all right, title and interest, including the surface and subsurface interests, in land described in section 604(a) to be conveyed into the public ownership of the United States under this Act.

<< 16 USCA § 539k NOTE >>

(2) PLUM CREEK.—The term "Plum Creek" means Plum Creek Timber Company, L.P., a Delaware Limited Partnership, or its successors, heirs, or assigns.

<< 16 USCA § 539k NOTE >>

(3) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

<< 16 USCA § 539k NOTE >>

(4) SELECTED LAND.—The term "selected land" means all right, title and interest, including the surface and subsurface interests, unless Plum Creek agrees otherwise, in land described in section 604(b) to be conveyed into the private ownership of Plum Creek under this Act.

<< 16 USCA § 539k NOTE >>

SEC. 604. LAND EXCHANGE.

<< 16 USCA § 539k NOTE >>

(a) CONDITION AND CONVEYANCE OF OFFERED LAND.—The exchange directed by this Act shall be consummated if Plum Creek conveys title acceptable to the Secretary in and to the lands described in subsection (d), the offered lands described in paragraphs (1) and (2), or, if necessary, the lands and interests in land as provided in subsection (c).

<< 16 USCA § 539k NOTE >>

(1) Certain land comprising approximately 8,808 acres and located within the exterior boundaries of the Mt. Baker–Snoqualmie National Forest, Washington, as generally depicted on a map entitled "Interstate 90 Land Exchange", dated October 1998; and

<< 16 USCA § 539k NOTE >>

(2) Certain land comprising approximately 53,576 acres and located within or adjacent to the exterior boundaries of the Wenatchee National Forest, Washington, as generally depicted on a map entitled "Interstate 90 Land Exchange", dated October 1998.

<< 16 USCA § 539k NOTE >>

(b) CONVEYANCE OF SELECTED LAND BY THE UNITED STATES.—Upon receipt of acceptable title to the offered land, and lands and interests described in subsection (d), the Secretary shall simultaneously convey to Plum Creek all right, title and interest of the United States, subject to valid existing rights, in and to the following selected land:

<< 16 USCA § 539k NOTE >>

(1) Certain land administered, as of the date of enactment of this Act, by the Secretary of Agriculture as part of the Mt. Baker–Snoqualmie National Forest, Washington, and comprising approximately 5,697 acres, as generally depicted on a map entitled "Interstate 90 Land Exchange", dated October 1998.

<< 16 USCA § 539k NOTE >>

(2) Certain land administered, as of the date of enactment of this Act, by the Secretary of Agriculture as part of the Wenatchee National Forest, Washington, and comprising approximately 5,197 acres, as generally depicted on a map entitled "Interstate 90 Land Exchange", dated October 1998.

<< 16 USCA § 539k NOTE >>

(3) Certain land administered, as of the date of enactment of this Act, by the Secretary of Agriculture as part of the Gifford Pinchot National Forest, Washington, and comprising approximately 5,601 acres, as generally depicted on a map entitled "Interstate 90 Land Exchange", dated October 1998.

<< 16 USCA § 539k NOTE >>

(c) OFFERED LAND TITLE.—If Plum Creek conveys title acceptable to the Secretary to less than all rights and interests in the offered lands, but conveys title acceptable to the Secretary to all rights and interests that Plum Creek owns and acquires under previous agreements in the lands described in subsection (d), the offered lands, and lands on the east and west sides of Cle Elum Lake, comprising approximately 252 acres, described as Township 21 North, Range 14 East, Section 5, and Lost Lake lands comprising approximately 272 acres, described as Township 21 North, Range 11 East, W ½ of Section 3, the Secretary shall convey to Plum Creek all rights and interest in the selected land after the values of the offered and selected land are equalized. The values of the offered and selected lands shall be equalized as provided in section 605(c)–(e) without regard to the value of lands described in subsection (d) or the Cle Elum or Lost Lake lands.

<< 16 USCA § 539k NOTE >>

<< 16 USCA § 1132 NOTE >>

(d) LAND DONATION.—Plum Creek agrees that it will convey, in the form of a voluntary donation, title acceptable to the Secretary in and to lands and interests in lands comprising approximately 320 acres, described as Township 22 North, Range 11 East, S½ of Section 13, if Plum Creek conveys title to lands and interests pursuant to subsections (a) or (c). It is the intention of Congress that any portion of such donated land which the Secretary determines qualifies as wilderness be, upon the date of its acquisition by the United States, incorporated in and managed as part of the adjacent Alpine Lakes Wilderness (as designated by Public Law 94–357) in accordance with section 6(a) of the Wilderness Act (16 U.S.C. 1135).

<< 16 USCA § 539k NOTE >>

SEC. 605. EXCHANGE VALUATION, APPRAISALS AND EQUALIZATION.

<< 16 USCA § 539k NOTE >>

(a) EQUAL VALUE EXCHANGE.—

<< 16 USCA § 539k NOTE >>

(1) IN GENERAL.—The values of the offered and selected land—
(A) shall be equal; or
(B) if the values are not equal, shall be equalized as set forth in subsections (c)–(e).

<< 16 USCA § 539k NOTE >>

(2) APPRAISAL ASSUMPTION.—In order to ensure the equitable and uniform appraisal of both the offered and selected land directed for exchange by this Act, all appraisals shall determine the highest and best use of the offered and selected land in accordance with applicable provisions of the Washington State Forest Practices Act and rules and regulations thereunder, including alternative measures for protecting critical habitat pursuant to a habitat conservation plan as provided in Washington Administrative Code 222–16–080–(6).

<< 16 USCA § 539k NOTE >>

(3) APPRAISALS.—The values of the offered land and selected land shall be determined by appraisals utilizing nationally recognized appraisal standards, including applicable provisions of the Uniform Appraisal Standards for Federal Land Acquisitions (1992), the Uniform Standards of Professional Appraisal Practice, and section 206(d) of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1716(d)).

<< 16 USCA § 539k NOTE >>

(4) APPROVAL BY THE SECRETARY.—The appraisals, if not already completed by the date of enactment of this Act, shall be completed and submitted to the Secretary for approval not later than 180 days after the date of enactment of this Act: *Provided,* That all timber harvest cease no later than November 30, 1998, except for any cleanup, reforestation, or other post-harvest work which cannot be completed by November 30, 1998. A comprehensive summary of the appraisal consistent with 7 CFR Part 1.11 shall be made available for public inspection in the Office of the Supervisor, Wenatchee National Forest, not less than 30 days nor more than 45 days prior to the exchange of deeds.

<< 16 USCA § 539k NOTE >>

(b) APPRAISAL PERIOD.—After the final appraised values of the offered and selected lands, or any portion of the land, have been approved by the Secretary or otherwise determined under section 206(d) of the Federal Land Policy and Management Act (43 U.S.C. 1716(d)), the value shall not be reappraised or updated before consummation of the land exchange, except to account for any timber harvest that might occur after completion of the final appraisal, or for any adjustments under section 606(g).

<< 16 USCA § 539k NOTE >>

(c) EQUALIZATION IF SURPLUS OF OFFERED LAND.—

<< 16 USCA § 539k NOTE >>

(1) IN GENERAL.—If the final appraised value of the offered land or lands and interest in lands conveyed by Plum Creek under section 604(c), except for the Cle Elum and Lost Lake lands, exceeds the final appraised value of the selected land, Plum Creek shall delete offered land parcels from the exchange in the exact order each land Section (or offered portion thereof) is listed in paragraph (2) until the values are approximately equal.

<< 16 USCA § 539k NOTE >>

(2) ORDER OF DELETION.—Offered land deletions under paragraph (1) shall be made in the following order:
 (A) Township 22 North, Range 13 East, Section 31, Willamette Meridian;
 (B) Township 21 North, Range 11 East, Section 35;
 (C) Township 19 North, Range 11 East, Section 35;
 (D) Township 19 North, Range 12 East, Section 1;
 (E) Township 20 North, Range 11 East, Sections 1 and 13;
 (F) Township 19 North, Range 12 East, Section 15;
 (G) Township 20 North, Range 11 East, Section 11;
 (H) Township 21 North, Range 11 East, Section 27;
 (I) Township 19 North, Range 13 East, Sections 27 and 15;
 (J) Township 21 North, Range 11 East, Sections 21 and 25;
 (K) Township 19 North, Range 11 East, Section 23;
 (L) Township 19 North, Range 13 East, Sections 21, 9 and 35;
 (M) Township 20 North, Range 12 East, Sections 35 and 27;
 (N) Township 19 North, Range 12 East, Section 11;
 (O) Township 21 North, Range 11 East, Section 17;
 (P) Township 21 North, Range 11 East, Section 5;
 (Q) Township 18 North, Range 15 East, Section 3;
 (R) Township 19 North, Range 14 East, Section 25;
 (S) Township 19 North, Range 15 East, Sections 29 and 31; and
 (T) Township 19 North, Range 13 East, Section 7.

<< 16 USCA § 539k NOTE >>

(d) EQUALIZATION IF SURPLUS OF SELECTED LAND.—

<< 16 USCA § 539k NOTE >>

 (1) IN GENERAL.—If the final appraised value of the selected land exceeds the final appraised value of the offered land or lands and interest in lands conveyed by Plum Creek under section 604(c), except for the Cle Elum and Lost Lake lands, the Secretary shall delete selected land parcels from the exchange in the exact order each land Section (or selected portion thereof) is listed in paragraph (2) until the values are approximately equal.

<< 16 USCA § 539k NOTE >>

(2) ORDER OF DELETION.—Selected land deletions under paragraph 1 shall be made in the following listed order:
(A) the portion of Township 20 North, Range 11 East, Section 30 lying east of the thread of Sawmill Creek;
(B) the portion of Township 19 North, Range 11 East, Section 6 lying east of the thread of Sawmill Creek;
(C) Township 20 North, Range 11 East, Section 32;
(D) Township 21 North, Range 14 East, Sections 28, 22, 36, 26 and 16;
(E) Township 18 North, Range 15 East, Sections 13, 12 and 2;
(F) Township 18 North, Range 15 East, Section 1; and
(G) Township 18 North, Range 15 East, Section 17, Willamette Meridian.

<< 16 USCA § 539k NOTE >>

 (e) Once the values of the offered and selected lands are equalized to the maximum extent practicable under subsections (c) or (d), any cash equalization balance due the Secretary or Plum Creek shall be made through cash equalization payments under subsection 206(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)).

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 16 USCA § 539k NOTE >>

(f) USE OF PROCEEDS BY THE SECRETARY.—The amount of any cash equalization payment received by the Secretary under this section shall be retained by the Secretary and shall be used by the Secretary until fully expended to purchase land from willing sellers in the State of Washington for addition to the National Forest System.

<< 16 USCA § 539k NOTE >>

SEC. 606. MISCELLANEOUS PROVISIONS.

<< 16 USCA § 539k NOTE >>

(a) STATUS OF LANDS AFTER EXCHANGE.—

<< 16 USCA § 539k NOTE >>

(1) LAND ACQUIRED BY THE SECRETARY.—
  (A) IN GENERAL.—Land acquired by the Secretary under this Act shall become part of the Mt. Baker–Snoqualmie, Gifford Pinchot or Wenatchee National Forests, as appropriate.
  (B) MODIFICATION OF BOUNDARIES.—
    (1) If any land acquired by the Secretary lies outside the exterior boundaries of the national forests identified in subparagraph (A), the boundaries of the appropriate national forest are hereby modified to include such land.
    (2) Nothing in this section shall limit the authority of the Secretary to adjust the boundaries of such National Forests pursuant to section 11 of the Act of March 1, 1911 (commonly known as the "Weeks Act").
    (3) For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601–9) the boundaries of Mt. Baker–Snoqualmie, Wenatchee and Gifford Pinchot as modified by this Act shall be considered to be the boundaries of such forests as of January 1, 1965.
  (C) MANAGEMENT.—Land acquired by the Secretary under this Act shall have the status of lands acquired under the Act of March 1, 1911 and shall be managed in accordance with the laws, rules, regulations and guidelines applicable to the National Forest System.

<< 16 USCA § 539k NOTE >>

(2) LAND ACQUIRED BY PLUM CREEK.—Land acquired by Plum Creek under this Act shall become private land for all purposes of law, unless the deed by which conveyance is made to Plum Creek contains a specific reservation.

<< 16 USCA § 539k NOTE >>

(b) POST–EXCHANGE ACCESS TO LAND.—

<< 16 USCA § 539k NOTE >>

(1) FINDING.—Congress finds that Plum Creek and the Secretary should have adequate and timely post-exchange access to lands acquired pursuant to this Act over existing primary, secondary, or other national forest system roads as may be needed.

<< 16 USCA § 539k NOTE >>

(2) INTENTION.—It is the intention of Congress that Plum Creek have access to all lands it acquires under this Act, and when such access requires construction of new roads, it shall be granted in compliance with the National Environmental Policy Act, the Endangered Species Act, the National Historic Preservation Act, and other applicable laws, rules, and regulations.

<< 16 USCA § 539k NOTE >>

(3) ACCESS WITHIN COST SHARE AGREEMENT AREAS.—Within Cost Share Construction and Use Agreement Areas, Plum Creek and the Secretary will convey road access, at no cost, to the lands acquired by each party upon consummation of the exchange pursuant to this Act in accordance with the appropriate terms and procedures of said cost share construction and use agreements.

<< 16 USCA § 539k NOTE >>

(4) ACCESS OUTSIDE COST SHARE AGREEMENT AREAS.—Outside of Cost Share Construction and Use Agreement Areas, the Secretary shall grant Plum Creek road access easements at no cost in a form set out in Forest Service Handbook 2709.12, 35. In the case of new road construction, they shall conform to the Secretary's rules and regulations 36 CFR 251, subpart B, for the roads identified on the map entitled "Plum Creek Access Road Needs", dated September 1998, including mitigation under existing law.

<< 16 USCA § 539k NOTE >>

(c) ACCESS TO CERTAIN LANDS ACQUIRED BY THE UNITED STATES.—Outside of Cost Share Construction and Use Agreement Areas, Plum Creek shall grant the Secretary road access easements at no cost on the locations identified by the Secretary in a format acceptable to the Secretary.

<< 16 USCA § 539k NOTE >>

(d) TIMING.—It is the intent of Congress that the land exchange authorized and directed by this Act be consummated no later than 270 days after the date of enactment of this Act, unless the Secretary and Plum Creek mutually agree to extend the consummation date.

<< 16 USCA § 539k NOTE >>

(e) WITHDRAWAL OF SELECTED LAND.—Effective upon the date of enactment of this Act, all selected land identified for exchange to Plum Creek under section 604(b) is hereby withdrawn from all forms of entry and appropriation under the U.S. mining and mineral leasing laws, including the Geothermal Steam Act of 1970, until such time as the exchange is consummated, or until a particular parcel or parcels are deleted from the exchange under section 605(d).

<< 16 USCA § 539k NOTE >>

(f) WITHDRAWAL OF CLE ELUM RIVER LANDS.—Lands acquired by the Secretary under this Act that are located in Township 23 North, Range 14 East, and Township 22 North, Range 14 East, Willamette Meridian, shall upon the date of their acquisition be permanently withdrawn from all forms of entry and appropriation under the U.S. mining and mineral leasing laws, including the Geothermal Steam Act of 1970.

<< 16 USCA § 539k NOTE >>

(g) PARCELS SUBJECT TO HISTORIC OR CULTURAL RESOURCE RESTRICTIONS.—

<< 16 USCA § 539k NOTE >>

(1) REPORT TO PLUM CREEK.—No later than 180 days after enactment of this Act, the Secretary shall complete determinations and consultation under the National Historic Preservation Act and submit a report to Plum Creek and other consulting parties under the National Historic Preservation Act listing by exact aliquot part description any parcel or parcels of selected land on which cultural properties have been identified and for which protection, use restrictions or mitigation requirements will be imposed. Such report shall include an exact description of each restriction or mitigation action required.

<< 16 USCA § 539k NOTE >>

(2) PLUM CREEK RESPONSE.—Within 30 days of receipt of the Secretary's report under paragraph (1), Plum Creek shall notify the Secretary as to: (i) those parcels it will accept subject to the identified use restrictions or mitigation requirements; and (ii) those parcels it will not accept because the restrictions or mitigation requirements are deemed by Plum Creek to be an unacceptable encumbrance on the land.

<< 16 USCA § 539k NOTE >>

(3) PARCEL DELETION.—The Secretary shall delete from the selected land those parcels identified by Plum Creek as unacceptable for conveyance under paragraph (2).

<< 16 USCA § 539k NOTE >>

(4) APPRAISAL ADJUSTMENT.—The fair market value of any parcels deleted under paragraph (3), or any modification in fair market value caused by the use restrictions or mitigation requirements on land accepted by Plum Creek, shall be based on their contributory value to the final approved appraised value of the selected land and subtracted from such value prior to consummation of the exchange.

<< 16 USCA § 539k NOTE >>

(h) ACCESS LIMITATION.—The Secretary shall not grant any road easements that would access the offered lands listed in section 604(a) prior to consummation of the exchange: *Provided,* That this provision shall not apply should either party withdraw from the exchange.

<< 16 USCA § 539k NOTE >>

SEC. 607. LAND PURCHASE.

<< 16 USCA § 539k NOTE >>

(a) FINDING.—The Congress finds that certain lands owned by Plum Creek in the vicinity of the offered lands (but which are not included in the land exchange under this Act, or are deleted under section 605(c)) are highly desirable for addition to the National Forest System, and that Plum Creek has indicated its willingness to sell certain such lands to the United States. It is the intention of Congress that such lands be acquired by the United States, subject to the availability of funds, by purchase at fair market value consistent with the land acquisition procedures of the Secretary, and with the consent of Plum Creek, in order to preserve their outstanding scenic and natural values for the benefit of future generations.

<< 16 USCA § 539k NOTE >>

(b) PURCHASE CONSULTATION.—In furtherance of subsection (a), the Secretary is authorized and directed to consult with Plum Creek to determine the precise lands Plum Creek is willing to sell.

<< 16 USCA § 539k NOTE >>

(c) OTHER AGREEMENTS.—Nothing in this Act shall be construed to prohibit the Secretary from entering into additional agreements or contracts with Plum Creek to purchase, exchange or otherwise acquire lands from Plum Creek in Washington or any other state under the laws, rules and regulations generally applicable to Federal land acquisitions.

<< 16 USCA § 539k NOTE >>

SEC. 608. TIETON RIVER STUDY.

The Secretary is authorized and directed to consult with Plum Creek concerning opportunities for the United States to acquire by exchange or purchase Plum Creek lands along the Tieton River in Township 14 North, Range 15 East, Willamette Meridian.

<< 16 USCA § 539k NOTE >>

SEC. 609. FUTURE LAND EXCHANGE OPPORTUNITY.

<< 16 USCA § 539k NOTE >>

  (a) FINDING.—The Congress finds that certain lands which were identified for exchange to the United States in the I–90 Land Exchange process have been, or may be, deleted from the final exchange under this Act due to value equalization or other reasons. However, some or all of such deleted lands, or other Plum Creek lands, may possess attributes that merit their conveyance to the United States in a follow-up land exchange, including lands in or around the Carbon River, the Yakima River, the Pacific Crest Trail, Watch Mountain and Goat Mountain on the Gifford Pinchot National Forest, the Green River and the Manastash late successional reserve.

<< 16 USCA § 539k NOTE >>

  (b) FUTURE EXCHANGE.—In furtherance of subsection (a), the Secretary is authorized and directed to consult with Plum Creek in examining opportunities for the United States to acquire such deleted lands, or other Plum Creek lands in the State of Washington, in a future exchange.

<< 16 USCA § 539k NOTE >>

  (c) REPORT TO CONGRESS.—Not later than 18 months after the date of enactment of this Act, the Secretary shall submit a report to the Committee on Energy and Natural Resources of the United States Senate and the Committee on Resources of the United States House of Representatives briefly outlining future land exchange opportunities with Plum Creek, including those for which the Secretary is required to consult under section 608, which the Secretary determines merit detailed analysis and consideration. The Secretary should identify the most urgent acquisitions for purchase or exchange in the report.

<< 16 USCA § 539k NOTE >>

SEC. 610. WILDERNESS STUDY AREA.

  In furtherance of the purposes of the Wilderness Act, if the land exchange directed by this Act is consummated, the area of land comprising approximately 15,000 acres, as generally depicted on a map entitled "Alpine Lakes Wilderness Study Area", dated October 1998, shall be reviewed by the Secretary of Agriculture as to its suitability for preservation as wilderness. The Secretary shall submit a report and findings to the President, and the President shall submit his recommendations to the United States House of Representatives and United States Senate no later than three years after the date of enactment of this Act. Subject to valid existing rights and existing uses, such lands shall, until Congress determines otherwise or until December 31, 2003, be administered by the Secretary to maintain their wilderness character existing as of the date of enactment of this Act and potential for inclusion in the National Wilderness Preservation System, and shall be withdrawn from all forms of entry and appropriation under the U.S. mining and mineral leasing laws, including the Geothermal Steam Act of 1970.

<< 16 USCA § 539k NOTE >>

SEC. 611. KELLY BUTTE SPECIAL MANAGEMENT AREA.

<< 16 USCA § 539k NOTE >>

  (a) ESTABLISHMENT.—Upon conveyance to the United States of the Plum Creek offered lands in the Kelly Butte area, there is hereby established the Kelly Butte Special Management Area in the Mt. Baker–Snoqualmie National Forest, Washington, comprising approximately 5,642 acres, as generally depicted on a map entitled "Kelly Butte Special Management Area", dated October 1998.

<< 16 USCA § 539k NOTE >>

(b) MANAGEMENT.—The Kelly Butte Special Management Area shall be managed by the Secretary in accordance with the laws, rules and regulations generally applicable to National Forest System lands, and subject to the following additional provisions:

<< 16 USCA § 539k NOTE >>

(1) the Area shall be managed with special emphasis on:
  (A) preserving its natural character and protecting and enhancing water quality in the upper Green River watershed;
  (B) permitting hunting and fishing;
  (C) providing opportunities for primitive and semi-primitive recreation and scientific research and study;
  (D) protecting and enhancing populations of fish, wildlife and native plant species; and
  (E) allowing for traditional uses by native American peoples;

<< 16 USCA § 539k NOTE >>

(2) commercial timber harvest and road construction shall be prohibited;

<< 16 USCA § 539k NOTE >>

(3) the Area shall be closed to the use of motor vehicles, except as may be necessary for administrative purposes or in emergencies (including rescue operations) to protect public health and safety; and

<< 16 USCA § 539k NOTE >>

(4) the Area shall, subject to valid existing rights, be permanently withdrawn from all forms of entry and appropriation under the U.S. mining laws and mineral leasing laws, including the Geothermal Steam Act of 1970.

<< 16 USCA § 539k NOTE >>

(c) NO BUFFER ZONES.—Congress does not intend that the designation of the Kelly Butte Special Management Area lead to the creation of protective perimeters or buffer zones around the Area. The fact that non-compatible activities or uses can be seen or heard from within the Kelly Butte Special Management Area shall not, of itself, preclude such activities or uses up to the boundary of the Area.

<< 16 USCA § 539k NOTE >>

SEC. 612. EFFECT ON COUNTY REVENUES.

The Secretary shall consult with the appropriate Committees of Congress, and local elected officials in the counties in the State of Washington in which the offered lands are located, regarding options to minimize the adverse effect on county revenues of the transfer of the offered lands from private to Federal ownership.

<< 25 USCA § 450f NOTE >>

TITLE VII

INDIAN TRIBAL TORT CLAIMS AND RISK MANAGEMENT

<< 25 USCA § 450f NOTE >>

SEC. 701. SHORT TITLE.

This title may be cited as the "Indian Tribal Tort Claims and Risk Management Act of 1998".

<< 25 USCA § 450f NOTE >>

SEC. 702. FINDINGS AND PURPOSE.

<< 25 USCA § 450f NOTE >>

(a) FINDINGS.—Congress finds that—

<< 25 USCA § 450f NOTE >>

(1) Indian tribes have made significant achievements toward developing a foundation for economic self-sufficiency and self-determination, and that economic self-sufficiency and self-determination have increased opportunities for the Indian tribes and other entities and persons to interact more frequently in commerce and intergovernmental relationships;

<< 25 USCA § 450f NOTE >>

(2) although Indian tribes have sought and secured liability insurance coverage to meet their needs, many Indian tribes are faced with significant barriers to obtaining liability insurance because of the high cost or unavailability of such coverage in the private market;

<< 25 USCA § 450f NOTE >>

(3) as a result, Congress has extended liability coverage provided to Indian tribes to organizations to carry out activities under the Indian Self–Determination and Education Assistance Act (25 U.S.C. 450 et seq.); and

<< 25 USCA § 450f NOTE >>

(4) there is an emergent need for comprehensive and cost-efficient insurance that allows the economy of Indian tribes to continue to grow and provides compensation to persons that may suffer personal injury or loss of property.

<< 25 USCA § 450f NOTE >>

(b) PURPOSE.—The purpose of this title is to provide for a study to facilitate relief for a person who is injured as a result of an official action of a tribal government.

<< 25 USCA § 450f NOTE >>

SEC. 703. DEFINITIONS.

In this title:

<< 25 USCA § 450f NOTE >>

(1) INDIAN TRIBE.—The term "Indian tribe" has the meaning given that term in section 4(e) of the Indian Self–Determination and Education Assistance Act (25 U.S.C. 450b(e)).

<< 25 USCA § 450f NOTE >>

(2) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

<< 25 USCA § 450f NOTE >>

(3) TRIBAL ORGANIZATION.—The term "tribal organization" has the meaning given that term in section 4(l) of the Indian Self–Determination and Education Assistance Act (25 U.S.C. 450b(l)).

AR.02590

<< 25 USCA § 450f NOTE >>

SEC. 704. STUDY AND REPORT TO CONGRESS.

<< 25 USCA § 450f NOTE >>

(a) IN GENERAL.—

<< 25 USCA § 450f NOTE >>

(1) STUDY.—In order to minimize and, if possible, eliminate redundant or duplicative liability insurance coverage and to ensure that the provision of insurance to Indian tribes is cost-effective, the Secretary shall conduct a comprehensive survey of the degree, type, and adequacy of liability insurance coverage of Indian tribes at the time of the study.

<< 25 USCA § 450f NOTE >>

(2) CONTENTS OF STUDY.—The study conducted under this subsection shall include—
(A) an analysis of loss data;
(B) risk assessments;
(C) projected exposure to liability, and related matters; and
(D) the category of risk and coverage involved, which may include—
(i) general liability;
(ii) automobile liability;
(iii) the liability of officials of the Indian tribe;
(iv) law enforcement liability;
(v) workers' compensation; and
(vi) other types of liability contingencies.

<< 25 USCA § 450f NOTE >>

(3) ASSESSMENT OF COVERAGE BY CATEGORIES OF RISK.—For each Indian tribe, for each category of risk identified under paragraph (2), the Secretary, in conducting the study, shall determine whether insurance coverage or coverage under chapter 171 of title 28, United States Code, applies to that Indian tribe for that activity.

<< 25 USCA § 450f NOTE >>

(b) REPORT.—Not later than June 1, 1999, and annually thereafter, the Secretary shall submit a report to Congress that contains legislative recommendations that the Secretary determines to—

<< 25 USCA § 450f NOTE >>

(1) be appropriate to improve the provision of insurance coverage to Indian tribes; or

<< 25 USCA § 450f NOTE >>

(2) otherwise achieve the purpose of providing relief to persons who are injured as a result of an official action of a tribal government.

<< 25 USCA § 450f NOTE >>

SEC. 705. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to the Department of the Interior such sums as may be necessary to carry out this title.

This Act may be cited as the "Department of the Interior and Related Agencies Appropriations Act, 1999".

(f) For programs, projects or activities in the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for the Departments of Labor, Health and Human Services, and Education, and Related Agencies for the fiscal year ending September 30, 1999, and for other purposes.

### TITLE I—DEPARTMENT OF LABOR EMPLOYMENT AND TRAINING ADMINISTRATION

### TRAINING AND EMPLOYMENT SERVICES

### (INCLUDING RESCISSION)

For necessary expenses of the Job Training Partnership Act, as amended, including the purchase and hire of passenger motor vehicles, the construction, alteration, and repair of buildings and other facilities, and the purchase of real property for training centers as authorized by the Job Training Partnership Act; the Stewart B. McKinney Homeless Assistance Act; the Women in Apprenticeship and Nontraditional Occupations Act; the National Skill Standards Act of 1994; section 166(j) of the Workforce Investment Act of 1998; and the School-to-Work Opportunities Act; $5,272,324,000 plus reimbursements, of which $3,740,287,000 is available for obligation for the period July 1, 1999 through June 30, 2000; of which $1,250,965,000 is available for obligation for the period April 1, 1999 through June 30, 2000, including $250,000,000 for activities authorized by section 127(b)(1) of the Workforce Investment Act; of which $152,072,000 is available for the period July 1, 1999 through June 30, 2002, including $1,500,000 under authority of part B of title III of the Job Training Partnership Act for use by The Organizing Committee for The 2001 Special Olympics World Winter Games in Alaska to promote employment opportunities for individuals with mental disabilities, and $150,572,000 for necessary expenses of construction, rehabilitation, and acquisition of Job Corps centers; and of which $125,000,000 shall be available from July 1, 1999 through September 30, 2000, for carrying out activities of the School-to-Work Opportunities Act: *Provided,* That funds made available under this heading to carry out the Job Training Partnership Act may be used for transition to, and implementation of, the provisions of the Workforce Investment Act of 1998: *Provided further,* That $57,815,000 shall be for carrying out section 401 of the Job Training Partnership Act, $71,517,000 shall be for carrying out section 402 of such Act, $7,300,000 shall be for carrying out section 441 of such Act, $9,000,000 shall be for all activities conducted by and through the National Occupational Information Coordinating Committee under such Act, $955,000,000 shall be for carrying out title II, part A of such Act, and $129,965,000 shall be for carrying out title II, part C of such Act: *Provided further,* That funding appropriated herein under authority of part B of title III of the Job Training Partnership Act includes $5,000,000 for use by The Organizing Committee for The 1999 Special Olympics World Summer Games to promote employment opportunities for individuals with mental disabilities: *Provided further,* That the National Occupational Information Coordinating Committee is authorized, effective upon enactment, to charge fees for publications, training and technical assistance developed by the National Occupational Information Coordinating Committee: *Provided further,* That revenues received from publications and delivery of technical assistance and training, notwithstanding 31 U.S.C. 3302, shall be credited to the National Occupational Information Coordinating Committee program account and shall be available to the National Occupational Information Coordinating Committee without further appropriations, so long as such revenues are used for authorized activities of the National Occupational Information Coordinating Committee: *Provided further,* That no funds from any other appropriation shall be used to provide meal services at or for Job Corps centers: *Provided further,* That funds provided for title III of the Job Training Partnership Act shall not be subject to the limitation contained in subsection (b) of section 315 of such Act; that the waiver described in section 315(a)(2) may be granted if a substate grantee demonstrates to the Governor that such waiver is appropriate due to the availability of low-cost retraining services, is necessary to facilitate the provision of needs-related payments to accompany long-term training, or is necessary to facilitate the provision of appropriate basic readjustment services; and that funds provided for discretionary grants under part B of such title III may be used to provide needs-related payments to participants who, in lieu of meeting the enrollment requirements under section 314(e) of such Act, are enrolled in training by the end of the sixth week after grant funds have been awarded: *Provided further,* That funds provided to carry out section 324 of such Act may be used for demonstration projects that provide assistance to new entrants in the workforce and incumbent workers: *Provided further,* That service delivery areas may transfer funding provided herein under

authority of title II, parts B and C of the Job Training Partnership Act between the programs authorized by those titles of the Act, if the transfer is approved by the Governor: *Provided further,* That service delivery areas and substate areas may transfer up to 20 percent of the funding provided herein under authority of title II, part A and title III of the Job Training Partnership Act between the programs authorized by those titles of the Act, if such transfer is approved by the Governor: *Provided further,* That, notwithstanding any other provision of law, any proceeds from the sale of Job Corps center facilities shall be retained by the Secretary of Labor to carry out the Job Corps program: *Provided further,* That notwithstanding any other provision of law, the Secretary of Labor may waive any of the statutory or regulatory requirements of titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, worker rights, participation and protection, grievance procedures and judicial review, nondiscrimination, allocation of funds to local areas, eligibility, review and approval of plans, the establishment and functions of service delivery areas and private industry councils, and the basic purposes of the Act), and any of the statutory or regulatory requirements of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), only for funds available for expenditure in program year 1999, pursuant to a request submitted by a State which identifies the statutory or regulatory requirements that are requested to be waived and the goals which the State or local service delivery areas intend to achieve, describes the actions that the State or local service delivery areas have undertaken to remove State or local statutory or regulatory barriers, describes the goals of the waiver and the expected programmatic outcomes if the request is granted, describes the individuals impacted by the waiver, and describes the process used to monitor the progress in implementing a waiver, and for which notice and an opportunity to comment on such request has been provided to the organizations identified in section 105(a)(1) of the Job Training Partnership Act, if and only to the extent that the Secretary determines that such requirements impede the ability of the State to implement a plan to improve the workforce development system and the State has executed a Memorandum of Understanding with the Secretary requiring such State to meet agreed upon outcomes and implement other appropriate measures to ensure accountability.

Of the funds made available beginning on October 1, 1998 under this heading in Public Law 105–78 for Opportunity Areas of Out-of-School Youth, $250,000,000 are rescinded.

## COMMUNITY SERVICE EMPLOYMENT FOR OLDER AMERICANS

To carry out the activities for national grants or contracts with public agencies and public or private nonprofit organizations under paragraph (1)(A) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $343,356,000.

To carry out the activities for grants to States under paragraph (3) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $96,844,000.

## FEDERAL UNEMPLOYMENT BENEFITS AND ALLOWANCES

For payments during the current fiscal year of trade adjustment benefit payments and allowances under part I; and for training, allowances for job search and relocation, and related State administrative expenses under part II, subchapters B and D, chapter 2, title II of the Trade Act of 1974, as amended, $360,700,000, together with such amounts as may be necessary to be charged to the subsequent appropriation for payments for any period subsequent to September 15 of the current year.

## STATE UNEMPLOYMENT INSURANCE AND EMPLOYMENT SERVICE OPERATIONS

For authorized administrative expenses, $162,097,000, together with not to exceed $3,132,076,000 (including not to exceed $1,228,000 which may be used for amortization payments to States which had independent retirement plans in their State employment service agencies prior to 1980), which may be expended from the Employment Security Administration account in the Unemployment Trust Fund including the cost of administering section 1201 of the Small Business Job Protection Act of 1996, section 7(d) of the Wagner–Peyser Act, as amended, section 461 of the Job Training Partnership Act, the Trade Act of 1974, as amended, the Immigration Act of 1990, and the Immigration and Nationality Act, as amended, and of which the sums available in the allocation for activities authorized by title III of the Social Security Act, as amended (42 U.S.C. 502–504), and the sums available in the allocation for necessary administrative expenses for carrying out 5 U.S.C. 8501–8523, shall be available for obligation by the States through December 31, 1999, except that funds used for automation acquisitions shall be available for obligation by the States through September 30, 2001; and of which $162,097,000, together with not to exceed $746,138,000 of the amount which may be expended from said trust fund, shall be available for obligation for the period July 1, 1999 through

June 30, 2000, to fund activities under the Act of June 6, 1933, as amended, including the cost of penalty mail authorized under 39 U.S.C. 3202(a)(1)(E) made available to States in lieu of allotments for such purpose, and of which $180,933,000 shall be available only to the extent necessary for additional State allocations to administer unemployment compensation laws to finance increases in the number of unemployment insurance claims filed and claims paid or changes in a State law: *Provided,* That to the extent that the Average Weekly Insured Unemployment (AWIU) for fiscal year 1999 is projected by the Department of Labor to exceed 2,629,000, an additional $28,600,000 shall be available for obligation for every 100,000 increase in the AWIU level (including a pro rata amount for any increment less than 100,000) from the Employment Security Administration Account of the Unemployment Trust Fund: *Provided further,* That funds appropriated in this Act which are used to establish a national one-stop career center network may be obligated in contracts, grants or agreements with non-State entities: *Provided further,* That funds appropriated under this Act for activities authorized under the Wagner–Peyser Act, as amended, and title III of the Social Security Act, may be used by the States to fund integrated Employment Service and Unemployment Insurance automation efforts, notwithstanding cost allocation principles prescribed under Office of Management and Budget Circular A–87.

### ADVANCES TO THE UNEMPLOYMENT TRUST FUND AND OTHER FUNDS

For repayable advances to the Unemployment Trust Fund as authorized by sections 905(d) and 1203 of the Social Security Act, as amended, and to the Black Lung Disability Trust Fund as authorized by section 9501(c)(1) of the Internal Revenue Code of 1954, as amended; and for non-repayable advances to the Unemployment Trust Fund as authorized by section 8509 of title 5, United States Code, and to the "Federal unemployment benefits and allowances" account, to remain available until September 30, 2000, $357,000,000.

In addition, for making repayable advances to the Black Lung Disability Trust Fund in the current fiscal year after September 15, 1999, for costs incurred by the Black Lung Disability Trust Fund in the current fiscal year, such sums as may be necessary.

### PROGRAM ADMINISTRATION

For expenses of administering employment and training programs, $94,410,000, including $6,360,000 to support up to 75 full-time equivalent staff, the majority of which will be term Federal appointments lasting no more than two years, to administer welfare-to-work grants, together with not to exceed $43,716,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

### PENSION AND WELFARE BENEFITS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for the Pension and Welfare Benefits Administration, $90,000,000.

### PENSION BENEFIT GUARANTY CORPORATION

### PENSION BENEFIT GUARANTY CORPORATION FUND

The Pension Benefit Guaranty Corporation is authorized to make such expenditures, including financial assistance authorized by section 104 of Public Law 96–364, within limits of funds and borrowing authority available to such Corporation, and in accord with law, and to make such contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act, as amended (31 U.S.C. 9104), as may be necessary in carrying out the program through September 30, 1999, for such Corporation: *Provided,* That not to exceed $10,958,000 shall be available for administrative expenses of the Corporation: *Provided further,* That expenses of such Corporation in connection with the termination of pension plans, for the acquisition, protection or management, and investment of trust assets, and for benefits administration services shall be considered as non-administrative expenses for the purposes hereof, and excluded from the above limitation.

### EMPLOYMENT STANDARDS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for the Employment Standards Administration, including reimbursement to State, Federal, and local agencies and their employees for inspection services rendered, $312,076,000, together with $1,924,000 which may be expended from the Special Fund in accordance with sections 39(c), 44(d) and 44(j) of the Longshore and Harbor Workers' Compensation

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Act: *Provided,* That $1,000,000 shall be for the development of an alternative system for the electronic submission of reports as required to be filed under the Labor–Management Reporting and Disclosure Act of 1959, as amended, and for a computer database of the information for each submission by whatever means, that is indexed and easily searchable by the public via the Internet: *Provided further,* That the Secretary of Labor is authorized to accept, retain, and spend, until expended, in the name of the Department of Labor, all sums of money ordered to be paid to the Secretary of Labor, in accordance with the terms of the Consent Judgment in Civil Action No. 91–0027 of the United States District Court for the District of the Northern Mariana Islands (May 21, 1992): *Provided further,* That the Secretary of Labor is authorized to establish and, in accordance with 31 U.S.C. 3302, collect and deposit in the Treasury fees for processing applications and issuing certificates under sections 11(d) and 14 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 211(d) and 214) and for processing applications and issuing registrations under title I of the Migrant and Seasonal Agricultural Worker Protection Act (29 U.S.C. 1801 et seq.).

## SPECIAL BENEFITS

### (INCLUDING TRANSFER OF FUNDS)

For the payment of compensation, benefits, and expenses (except administrative expenses) accruing during the current or any prior fiscal year authorized by title 5, chapter 81 of the United States Code; continuation of benefits as provided for under the head "Civilian War Benefits" in the Federal Security Agency Appropriation Act, 1947; the Employees' Compensation Commission Appropriation Act, 1944; sections 4(c) and 5(f) of the War Claims Act of 1948 (50 U.S.C. App. 2012); and 50 percent of the additional compensation and benefits required by section 10(h) of the Longshore and Harbor Workers' Compensation Act, as amended, $179,000,000 together with such amounts as may be necessary to be charged to the subsequent year appropriation for the payment of compensation and other benefits for any period subsequent to August 15 of the current year: *Provided,* That amounts appropriated may be used under section 8104 of title 5, United States Code, by the Secretary of Labor to reimburse an employer, who is not the employer at the time of injury, for portions of the salary of a reemployed, disabled beneficiary: *Provided further,* That balances of reimbursements unobligated on September 30, 1998, shall remain available until expended for the payment of compensation, benefits, and expenses: *Provided further,* That in addition there shall be transferred to this appropriation from the Postal Service and from any other corporation or instrumentality required under section 8147(c) of title 5, United States Code, to pay an amount for its fair share of the cost of administration, such sums as the Secretary determines to be the cost of administration for employees of such fair share entities through September 30, 1999: *Provided further,* That of those funds transferred to this account from the fair share entities to pay the cost of administration, $20,250,000 shall be made available to the Secretary as follows: for the operation of and enhancement to the automated data processing systems in support of Federal Employees' Compensation Act administration, $11,969,000; for expenditures relating to the expansion of the periodic roll management project, $6,652,000; for the financial management improvement project, $1,629,000; and the remaining funds shall be paid into the Treasury as miscellaneous receipts: *Provided further,* That the Secretary may require that any person filing a notice of injury or a claim for benefits under chapter 81 of title 5, United States Code, or 33 U.S.C. 901 et seq., provide as part of such notice and claim, such identifying information (including Social Security account number) as such regulations may prescribe.

## BLACK LUNG DISABILITY TRUST FUND

### (INCLUDING TRANSFER OF FUNDS)

For payments from the Black Lung Disability Trust Fund, $1,021,000,000, of which $969,725,000 shall be available until September 30, 2000, for payment of all benefits as authorized by section 9501(d) (1), (2), (4), and (7) of the Internal Revenue Code of 1954, as amended, and interest on advances as authorized by section 9501(c)(2) of that Act, and of which $30,191,000 shall be available for transfer to Employment Standards Administration, Salaries and Expenses, $20,422,000 for transfer to Departmental Management, Salaries and Expenses, $306,000 for transfer to Departmental Management, Office of Inspector General, and $356,000 for payment into miscellaneous receipts for the expenses of the Department of Treasury, for expenses of operation and administration of the Black Lung Benefits program as authorized by section 9501(d)(5)(A) of that Act: *Provided,* That, in addition, such amounts as may be necessary may be charged to the subsequent year appropriation for the payment of compensation, interest, or other benefits for any period subsequent to August 15 of the current year.

## OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

AR.02595

## SALARIES AND EXPENSES

<< 29 USCA § 670 NOTE >>

 For necessary expenses for the Occupational Safety and Health Administration, $353,000,000, including not to exceed $80,084,000 which shall be the maximum amount available for grants to States under section 23(g) of the Occupational Safety and Health Act, which grants shall be no less than 50 percent of the costs of State occupational safety and health programs required to be incurred under plans approved by the Secretary under section 18 of the Occupational Safety and Health Act of 1970; and, in addition, notwithstanding 31 U.S.C. 3302, the Occupational Safety and Health Administration may retain up to $750,000 per fiscal year of training institute course tuition fees, otherwise authorized by law to be collected, and may utilize such sums for occupational safety and health training and education grants: *Provided,* That, notwithstanding 31 U.S.C. 3302, the Secretary of Labor is authorized, during the fiscal year ending September 30, 1999, to collect and retain fees for services provided to Nationally Recognized Testing Laboratories, and may utilize such sums, in accordance with the provisions of 29 U.S.C. 9a, to administer national and international laboratory recognition programs that ensure the safety of equipment and products used by workers in the workplace: *Provided further,* That none of the funds appropriated under this paragraph shall be obligated or expended to prescribe, issue, administer, or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 which is applicable to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees: *Provided further,* That no funds appropriated under this paragraph shall be obligated or expended to administer or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 with respect to any employer of ten or fewer employees who is included within a category having an occupational injury lost workday case rate, at the most precise Standard Industrial Classification Code for which such data are published, less than the national average rate as such rates are most recently published by the Secretary, acting through the Bureau of Labor Statistics, in accordance with section 24 of that Act (29 U.S.C. 673), except—

  (1) to provide, as authorized by such Act, consultation, technical assistance, educational and training services, and to conduct surveys and studies;

  (2) to conduct an inspection or investigation in response to an employee complaint, to issue a citation for violations found during such inspection, and to assess a penalty for violations which are not corrected within a reasonable abatement period and for any willful violations found;

  (3) to take any action authorized by such Act with respect to imminent dangers;

  (4) to take any action authorized by such Act with respect to health hazards;

  (5) to take any action authorized by such Act with respect to a report of an employment accident which is fatal to one or more employees or which results in hospitalization of two or more employees, and to take any action pursuant to such investigation authorized by such Act; and

  (6) to take any action authorized by such Act with respect to complaints of discrimination against employees for exercising rights under such Act: *Provided further*, That the foregoing proviso shall not apply to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees.

## MINE SAFETY AND HEALTH ADMINISTRATION

## SALARIES AND EXPENSES

<< 30 USCA § 962 >>

 For necessary expenses for the Mine Safety and Health Administration, $211,165,000, including purchase and bestowal of certificates and trophies in connection with mine rescue and first-aid work, and the hire of passenger motor vehicles; and, in addition, not to exceed $750,000 may be collected by the National Mine Health and Safety Academy for room, board, tuition, and the sale of training materials, otherwise authorized by law to be collected, to be available for mine safety and health education and training activities, notwithstanding 31 U.S.C. 3302; the Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, or private; the Mine Safety and Health Administration is authorized to promote health and safety education and training in the

mining community through cooperative programs with States, industry, and safety associations; and any funds available to the Department may be used, with the approval of the Secretary, to provide for the costs of mine rescue and survival operations in the event of a major disaster: *Provided,* That none of the funds appropriated under this paragraph shall be obligated or expended to carry out section 115 of the Federal Mine Safety and Health Act of 1977 or to carry out that portion of section 104(g)(1) of such Act relating to the enforcement of any training requirements, with respect to shell dredging, or with respect to any sand, gravel, surface stone, surface clay, colloidal phosphate, or surface limestone mine: *Provided further,* That the Mine Safety and Health Administration may obligate or expend funds to promulgate final training regulations that are designed for the above named industries by no later than September 30, 1999.

## BUREAU OF LABOR STATISTICS

### SALARIES AND EXPENSES

  For necessary expenses for the Bureau of Labor Statistics, including advances or reimbursements to State, Federal, and local agencies and their employees for services rendered, $344,724,000, of which $11,159,000 shall be for expenses of revising the Consumer Price Index and shall remain available until September 30, 2000, together with not to exceed $54,146,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

## DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

<< 33 USCA § 921 NOTE >>

  For necessary expenses for Departmental Management, including the hire of three sedans, and including up to $6,750,000 for the President's Committee on Employment of People With Disabilities, and including $500,000 to fund the activities of the Twenty–First Century Workforce Commission authorized by section 334 of the Workforce Investment Act of 1998, $190,832,000; together with not to exceed $299,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund: *Provided,* That no funds made available by this Act may be used by the Solicitor of Labor to participate in a review in any United States court of appeals of any decision made by the Benefits Review Board under section 21 of the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 921) where such participation is precluded by the decision of the United States Supreme Court in Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding, 115 S. Ct. 1278 (1995), notwithstanding any provisions to the contrary contained in Rule 15 of the Federal Rules of Appellate Procedure: *Provided further,* That no funds made available by this Act may be used by the Secretary of Labor to review a decision under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 901 et seq.) that has been appealed and that has been pending before the Benefits Review Board for more than 12 months: *Provided further,* That any such decision pending a review by the Benefits Review Board for more than one year shall be considered affirmed by the Benefits Review Board on the one-year anniversary of the filing of the appeal, and shall be considered the final order of the Board for purposes of obtaining a review in the United States courts of appeals: *Provided further,* That these provisions shall not be applicable to the review or appeal of any decision issued under the Black Lung Benefits Act (30 U.S.C. 901 et seq.).

### ASSISTANT SECRETARY FOR VETERANS EMPLOYMENT AND TRAINING

  Not to exceed $182,719,000 may be derived from the Employment Security Administration account in the Unemployment Trust Fund to carry out the provisions of 38 U.S.C. 4100–4110A, 4212, 4214 and 4321–4327, and Public Law 103–353, and which shall be available for obligation by the States through December 31, 1999.

### OFFICE OF INSPECTOR GENERAL

  For salaries and expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $43,852,000, together with not to exceed $3,648,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

## GENERAL PROVISIONS

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 101. None of the funds appropriated in this title for the Job Corps shall be used to pay the compensation of an individual, either as direct costs or any proration as an indirect cost, at a rate in excess of Executive Level III.

<< 42 USCA § 603 >>

SEC. 102. REVERSION OF UNALLOTTED FORMULA FUNDS UNDER WELFARE–TO–WORK. Section 403(a)(5)(A) of the Social Security Act is amended by adding the following clause:

   "(ix) REVERSION OF UNALLOTTED FORMULA FUNDS.—If at the end of any fiscal year any funds available under this subparagraph have not been allotted due to a determination by the Secretary that any State has not met the requirements of clause (ii), such funds shall be transferred to the General Fund of the Treasury of the United States.".

(TRANSFER OF FUNDS)

SEC. 103. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Labor in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: *Provided,* That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

SEC. 104. Funds shall be available for carrying out title IV–B of the Job Training Partnership Act, notwithstanding section 427(c) of that Act, if a Job Corps center fails to meet national performance standards established by the Secretary.

This title may be cited as the "Department of Labor Appropriations Act, 1999".

TITLE II—DEPARTMENT OF HEALTH AND HUMAN SERVICES

HEALTH RESOURCES AND SERVICES ADMINISTRATION

HEALTH RESOURCES AND SERVICES

   For carrying out titles II, III, VII, VIII, X, XII, XIX, and XXVI of the Public Health Service Act, section 427(a) of the Federal Coal Mine Health and Safety Act, title V and section 1820 of the Social Security Act, the Health Care Quality Improvement Act of 1986, as amended, and the Native Hawaiian Health Care Act of 1988, as amended, $4,108,040,000, of which $150,000 shall remain available until expended for interest subsidies on loan guarantees made prior to fiscal year 1981 under part B of title VII of the Public Health Service Act, and of which $65,345,000 shall be available for the construction and renovation of health care and other facilities, and of which $25,000,000 from general revenues, notwithstanding section 1820(j) of the Social Security Act, shall be available for carrying out the Medicare rural hospital flexibility grants program under section 1820 of such Act: *Provided,* That the Division of Federal Occupational Health may utilize personal services contracting to employ professional management/administrative and occupational health professionals: *Provided further,* That of the funds made available under this heading, $250,000 shall be available until expended for facilities renovations at the Gillis W. Long Hansen's Disease Center: *Provided further,* That in addition to fees authorized by section 427(b) of the Health Care Quality Improvement Act of 1986, fees shall be collected for the full disclosure of information under the Act sufficient to recover the full costs of operating the National Practitioner Data Bank, and shall remain available until expended to carry out that Act: *Provided further,* That no more than $5,000,000 is available for carrying out the provisions of Public Law 104–73: *Provided further,* That of the funds made available under this heading, $215,000,000 shall be for the program under title X of the Public Health Service Act to provide for voluntary family planning projects: *Provided further,* That amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office: *Provided further,* That $461,000,000 shall be for State AIDS Drug Assistance Programs authorized by section 2616 of the Public Health Service Act: *Provided further,* That notwithstanding any other provision of law, funds made available under this heading may be used to continue operating the Council on Graduate Medical Education established by section 301 of Public Law 102–408: *Provided further,* That, notwithstanding section 502(a)(1) of the Social Security Act, not to exceed $107,434,000 is available for carrying out special projects of regional and national significance pursuant to section 501(a)(2) of such Act: *Provided further,* That of the amount provided, $2,000,000 shall be for support of the Center for Sustainable Health Outreach at the University of Southern Mississippi in affiliation with Harrison Institute at Georgetown University for the establishment of demonstration programs that create model health access programs,

health-related jobs and sustainability of community based providers of health services in rural and urban communities; and $1,250,000 shall be for the American Federation for Negro Affairs Education and Research Fund.

## MEDICAL FACILITIES GUARANTEE AND LOAN FUND

### FEDERAL INTEREST SUBSIDIES FOR MEDICAL FACILITIES

For carrying out subsections (d) and (e) of section 1602 of the Public Health Service Act, $1,000,000, together with any amounts received by the Secretary in connection with loans and loan guarantees under title VI of the Public Health Service Act, to be available without fiscal year limitation for the payment of interest subsidies. During the fiscal year, no commitments for direct loans or loan guarantees shall be made.

### HEALTH EDUCATION ASSISTANCE LOANS PROGRAM

Such sums as may be necessary to carry out the purpose of the program, as authorized by Title VII of the Public Health Service Act, as amended. For administrative expenses to carry out the guaranteed loan program, including section 709 of the Public Health Service Act, $3,688,000.

### VACCINE INJURY COMPENSATION PROGRAM TRUST FUND

For payments from the Vaccine Injury Compensation Program Trust Fund, such sums as may be necessary for claims associated with vaccine-related injury or death with respect to vaccines administered after September 30, 1988, pursuant to subtitle 2 of title XXI of the Public Health Service Act, to remain available until expended: *Provided,* That for necessary administrative expenses, not to exceed $3,000,000 shall be available from the Trust Fund to the Secretary of Health and Human Services.

### VACCINE INJURY COMPENSATION

For payment of claims resolved by the United States Court of Federal Claims related to the administration of vaccines before October 1, 1988, $100,000,000, to remain available until expended.

## CENTERS FOR DISEASE CONTROL AND PREVENTION

### DISEASE CONTROL, RESEARCH, AND TRAINING

<< 42 USCA § 238k NOTE >>

To carry out titles II, III, VII, XI, XV, XVII, XIX and XXVI of the Public Health Service Act, sections 101, 102, 103, 201, 202, 203, 301, and 501 of the Federal Mine Safety and Health Act of 1977, sections 20, 21 and 22 of the Occupational Safety and Health Act of 1970, title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980; including insurance of official motor vehicles in foreign countries; and hire, maintenance, and operation of aircraft, $2,558,520,000, of which $17,800,000 shall remain available until expended for equipment and construction and renovation of facilities, and in addition, such sums as may be derived from authorized user fees, which shall be credited to this account: *Provided,* That in addition to amounts provided herein, up to $67,793,000 shall be available from amounts available under section 241 of the Public Health Service Act, to carry out the National Center for Health Statistics surveys: *Provided further,* That none of the funds made available for injury prevention and control at the Centers for Disease Control and Prevention may be used to advocate or promote gun control: *Provided further,* That the Director may redirect the total amount made available under authority of Public Law 101–502, section 3, dated November 3, 1990, to activities the Director may so designate: *Provided further,* That the Congress is to be notified promptly of any such transfer: *Provided further,* That notwithstanding any other provison of law, a single contract or related contracts for the development and construction of the infectious disease laboratory through the General Services Administration may be employed which collectively include the full scope of the project: *Provided further,* That the solicitation and contract shall contain the clause "availability of funds" found at 48 CFR 52.232–18: *Provided further,* That hereinafter obligations may be incurred related to agreement with private entities without receipt of advance payment.

In addition, $51,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40151 and 40261 of Public Law 103–322.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## NATIONAL INSTITUTES OF HEALTH

### NATIONAL CANCER INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cancer, $2,927,187,000.

### NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cardiovascular, lung, and blood diseases, and blood and blood products, $1,793,697,000.

### NATIONAL INSTITUTE OF DENTAL AND CRANIOFACIAL RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to dental disease, $234,338,000.

### NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES

For carrying out section 301 and title IV of the Public Health Service Act with respect to diabetes and digestive and kidney disease, $994,218,000.

### NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE

For carrying out section 301 and title IV of the Public Health Service Act with respect to neurological disorders and stroke, $903,278,000.

### NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

For carrying out section 301 and title IV of the Public Health Service Act with respect to allergy and infectious diseases, $1,570,102,000.

### NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES

For carrying out section 301 and title IV of the Public Health Service Act with respect to general medical sciences, $1,197,825,000.

### NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT

For carrying out section 301 and title IV of the Public Health Service Act with respect to child health and human development, $750,982,000.

### NATIONAL EYE INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to eye diseases and visual disorders, $395,857,000.

### NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES

For carrying out sections 301 and 311 and title IV of the Public Health Service Act with respect to environmental health sciences, $375,743,000.

### NATIONAL INSTITUTE ON AGING

For carrying out section 301 and title IV of the Public Health Service Act with respect to aging, $596,521,000.

### NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES

For carrying out section 301 and title IV of the Public Health Service Act with respect to arthritis and musculoskeletal and skin diseases, $308,164,000.

### NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS

For carrying out section 301 and title IV of the Public Health Service Act with respect to deafness and other communication disorders, $229,887,000.

### NATIONAL INSTITUTE OF NURSING RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to nursing research, $69,834,000.

## NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

For carrying out section 301 and title IV of the Public Health Service Act with respect to alcohol abuse and alcoholism, $259,747,000.

## NATIONAL INSTITUTE ON DRUG ABUSE

For carrying out section 301 and title IV of the Public Health Service Act with respect to drug abuse, $603,274,000.

## NATIONAL INSTITUTE OF MENTAL HEALTH

For carrying out section 301 and title IV of the Public Health Service Act with respect to mental health, $861,208,000.

## NATIONAL HUMAN GENOME RESEARCH INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to human genome research, $264,892,000.

## NATIONAL CENTER FOR RESEARCH RESOURCES

For carrying out section 301 and title IV of the Public Health Service Act with respect to research resources and general research support grants, $554,819,000: *Provided,* That none of these funds shall be used to pay recipients of the general research support grants program any amount for indirect expenses in connection with such grants: *Provided further,* That $30,000,000 shall be for extramural facilities construction grants.

## JOHN E. FOGARTY INTERNATIONAL CENTER

For carrying out the activities at the John E. Fogarty International Center, $35,426,000.

## NATIONAL LIBRARY OF MEDICINE

For carrying out section 301 and title IV of the Public Health Service Act with respect to health information communications, $181,309,000, of which $4,000,000 shall be available until expended for improvement of information systems: *Provided,* That in fiscal year 1999, the Library may enter into personal services contracts for the provision of services in facilities owned, operated, or constructed under the jurisdiction of the National Institutes of Health.

## OFFICE OF THE DIRECTOR

## (INCLUDING TRANSFER OF FUNDS)

For carrying out the responsibilities of the Office of the Director, National Institutes of Health, $306,559,000, of which $43,493,000 shall be for the Office of AIDS Research: *Provided,* That funding shall be available for the purchase of not to exceed twenty-nine passenger motor vehicles for replacement only: *Provided further,* That the Director may direct up to 1 percent of the total amount made available in this or any other Act to all National Institutes of Health appropriations to activities the Director may so designate: *Provided further,* That no such appropriation shall be decreased by more than 1 percent by any such transfers and that the Congress is promptly notified of the transfer: *Provided further,* That NIH is authorized to collect third party payments for the cost of clinical services that are incurred in National Institutes of Health research facilities and that such payments shall be credited to the National Institutes of Health Management Fund: *Provided further,* That all funds credited to the NIH Management Fund shall remain available for one fiscal year after the fiscal year in which they are deposited: *Provided further,* That up to $500,000 shall be available to carry out section 499 of the Public Health Service Act: *Provided further,* That, notwithstanding section 499(k)(10) of the Public Health Service Act, funds from the National Foundation for Biomedical Research may be transferred to the National Institutes of Health: *Provided further,* That $50,000,000 shall be available to carry out section 404E of the Public Health Service Act.

## BUILDINGS AND FACILITIES

For the study of, construction of, and acquisition of equipment for, facilities of or used by the National Institutes of Health, including the acquisition of real property, $237,519,000, to remain available until expended, of which $90,000,000 of the fiscal year 1999 funds shall be for the clinical research center and $40,000,000 shall become available on October 1, 1999

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and $9,143,000 shall be for the Vaccine Facility: *Provided,* That notwithstanding any other provision of law, a single contract or related contracts for the development and construction of the clinical research center may be employed which collectively include the full scope of the project: *Provided further,* That the solicitation and contract shall contain the clause "availability of funds" found at 48 CFR 52.232–18.

### SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION

#### SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES

For carrying out titles V and XIX of the Public Health Service Act with respect to substance abuse and mental health services, the Protection and Advocacy for Mentally Ill Individuals Act of 1986, and section 301 of the Public Health Service Act with respect to program management, $2,488,005,000: *Provided,* That of the amount provided, $300,000 shall be for the Philadelphia City-wide Improvement and Planning Agency.

#### RETIREMENT PAY AND MEDICAL BENEFITS FOR COMMISSIONED OFFICERS

For retirement pay and medical benefits of Public Health Service Commissioned Officers as authorized by law, for payments under the Retired Serviceman's Family Protection Plan and Survivor Benefit Plan, for medical care of dependents and retired personnel under the Dependents' Medical Care Act (10 U.S.C. ch. 55), and for payments pursuant to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), such amounts as may be required during the current fiscal year.

### AGENCY FOR HEALTH CARE POLICY AND RESEARCH

#### HEALTH CARE POLICY AND RESEARCH

For carrying out titles III and IX of the Public Health Service Act, and part A of title XI of the Social Security Act, $100,408,000; in addition, amounts received from Freedom of Information Act fees, reimbursable and interagency agreements, and the sale of data tapes shall be credited to this appropriation and shall remain available until expended: *Provided,* That the amount made available pursuant to section 926(b) of the Public Health Service Act shall not exceed $70,647,000.

### HEALTH CARE FINANCING ADMINISTRATION

#### GRANTS TO STATES FOR MEDICAID

For carrying out, except as otherwise provided, titles XI and XIX of the Social Security Act, $74,593,733,000, to remain available until expended.

For making, after May 31, 1999, payments to States under title XIX of the Social Security Act for the last quarter of fiscal year 1999 for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States under title XIX of the Social Security Act for the first quarter of fiscal year 2000, $28,733,605,000, to remain available until expended.

Payment under title XIX may be made for any quarter with respect to a State plan or plan amendment in effect during such quarter, if submitted in or prior to such quarter and approved in that or any subsequent quarter.

#### PAYMENTS TO HEALTH CARE TRUST FUNDS

For payment to the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as provided under sections 217(g) and 1844 of the Social Security Act, sections 103(c) and 111(d) of the Social Security Amendments of 1965, section 278(d) of Public Law 97–248, and for administrative expenses incurred pursuant to section 201(g) of the Social Security Act, $62,953,000,000.

#### PROGRAM MANAGEMENT

For carrying out, except as otherwise provided, titles XI, XVIII, XIX and XXI of the Social Security Act, titles XIII and XXVII of the Public Health Service Act, and the Clinical Laboratory Improvement Amendments of 1988, not to exceed $1,946,500,000 to be transferred from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the Public Health Service Act and such sums as may be collected from authorized user fees and the sale of data, which shall remain available until expended, and together with administrative fees collected relative to Medicare overpayment recovery

activities, which shall remain available until expended: *Provided,* That all funds derived in accordance with 31 U.S.C. 9701 from organizations established under title XIII of the Public Health Service Act shall be credited to and available for carrying out the purposes of this appropriation: *Provided further,* That $1,000,000 shall be for carrying out section 4021 of Public Law 105–33: *Provided further,* That $45,000,000 appropriated under this heading for the transition to a single Part A and Part B processing system and for Year 2000 century date change conversion requirements of external contractor systems shall remain available until expended: *Provided further,* That $2,000,000 of the amount available for research, demonstration, and evaluation activities shall be available to continue carrying out demonstration projects on Medicaid coverage of community-based attendant care services for people with disabilities which ensures maximum control by the consumer to select and manage their attendant care services: *Provided further,* That funds appropriated under this heading may be obligated to increase Medicare provider audits and implement the Department's corrective action plan to the Chief Financial Officer's audit of the Health Care Financing Administration's oversight of Medicare: *Provided further,* That the Secretary of Health and Human Services is directed to collect, in aggregate, $95,000,000 in fees in fiscal year 1999 from Medicare & Choice organizations pursuant to section 1857(e)(2) of the Social Security Act and from eligible organizations with risk-sharing contracts under section 1876 of that Act pursuant to section 1876(k)(4)(D) of that Act.

### HEALTH MAINTENANCE ORGANIZATION LOAN AND LOAN GUARANTEE FUND

For carrying out subsections (d) and (e) of section 1308 of the Public Health Service Act, any amounts received by the Secretary in connection with loans and loan guarantees under title XIII of the Public Health Service Act, to be available without fiscal year limitation for the payment of outstanding obligations. During fiscal year 1999, no commitments for direct loans or loan guarantees shall be made.

### ADMINISTRATION FOR CHILDREN AND FAMILIES

### FAMILY SUPPORT PAYMENTS TO STATES

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9), to remain available until expended, $1,989,000,000; and for such purposes for the first quarter of fiscal year 2000, $750,000,000.

For making payments to each State for carrying out the program of Aid to Families with Dependent Children under title IV–A of the Social Security Act before the effective date of the program of Temporary Assistance to Needy Families (TANF) with respect to such State, such sums as may be necessary: *Provided,* That the sum of the amounts available to a State with respect to expenditures under such title IV–A in fiscal year 1997 under this appropriation and under such title IV–A as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 shall not exceed the limitations under section 116(b) of such Act.

For making, after May 31 of the current fiscal year, payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9), for the last three months of the current year for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

### LOW INCOME HOME ENERGY ASSISTANCE

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,100,000,000, to be available for obligation in the period October 1, 1999 through September 30, 2000.

For making payments under title XXVI of such Act, $300,000,000: *Provided,* That these funds are hereby designated by Congress to be emergency requirements pursuant to section 251(b)(2)(A) of the Balanced Budget and Deficit Emergency Control Act of 1985: *Provided further,* That these funds shall be made available only after submission to Congress of a formal budget request by the President that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act.

### REFUGEE AND ENTRANT ASSISTANCE

For making payments for refugee and entrant assistance activities authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 (Public Law 96–422), $415,000,000: *Provided,* That funds appropriated pursuant to section 414(a) of the Immigration and Nationality Act under Public Law 104–208 for fiscal

AR.02603

year 1997 shall be available for the costs of assistance provided and other activities conducted in such year and in fiscal years 1998 and 1999.

## CHILD CARE AND DEVELOPMENT BLOCK GRANT

For carrying out sections 658A through 658R of the Omnibus Budget Reconciliation Act of 1981 (The Child Care and Development Block Grant Act of 1990), to become available on October 1, 1999 and remain available through September 30, 2000, $1,182,672,000: *Provided,* That $19,120,000 shall be available for child care resource and referral and school-aged child care activities: *Provided further,* That of the funds provided for fiscal year 1999 under Public Law 105–78, $50,000,000 shall be reserved by the States for activities authorized under section 658G of the Omnibus Budget Reconciliation Act of 1981 (the Child Care and Development Block Grant Act of 1990), such funds to be in addition to the amounts required to be reserved by States under such section 658G: *Provided further,* That of the funds provided for fiscal year 2000 $222,672,000 shall be reserved by the States for activities authorized under section 658G of the Omnibus Budget Reconciliation Act of 1981 (The Child Care and Development Block Grant Act of 1990), such funds to be in addition to the amounts required to be reserved by the States under such section 658G: *Provided further,* That of the funds provided for fiscal year 2000, $10,000,000 shall be for use by the Secretary for child care research, demonstration and evaluation activities (directly or by grants or contracts).

## SOCIAL SERVICES BLOCK GRANT

For making grants to States pursuant to section 2002 of the Social Security Act, $1,909,000,000: *Provided,* That (1) notwithstanding section 2003(c) of such Act, as amended, the amount specified for allocation under such section for fiscal year 1999 shall be $1,909,000,000 and (2) notwithstanding subparagraph (B) of section 404(d)(2) of such Act, the applicable percent specified under such subparagraph for a State to carry out State programs pursuant to title XX of such Act for fiscal years 1999 and 2000 shall be 10 percent.

## CHILDREN AND FAMILIES SERVICES PROGRAMS

### (INCLUDING RESCISSIONS)

For carrying out, except as otherwise provided, the Runaway and Homeless Youth Act, the Developmental Disabilities Assistance and Bill of Rights Act, the Head Start Act, the Child Abuse Prevention and Treatment Act (including section 105(a)(2) of the Child Abuse Prevention and Treatment Act), the Native American Programs Act of 1974, title II of Public Law 95–266 (adoption opportunities), the Adoption and Safe Families Act of 1997 (Public Law 105–89), the Abandoned Infants Assistance Act of 1988, part B(1) of title IV and sections 413, 429A, 1110, and 1115 of the Social Security Act; for making payments under the Community Services Block Grant Act; and for necessary administrative expenses to carry out said Acts and titles I, IV, X, XI, XIV, XVI, and XX of the Social Security Act, the Act of July 5, 1960 (24 U.S.C. ch. 9), the Omnibus Budget Reconciliation Act of 1981, title IV of the Immigration and Nationality Act, section 501 of the Refugee Education Assistance Act of 1980, sections 40155, 40211 and 40241 of Public Law 103–322 and section 126 and titles IV and V of Public Law 100–485, $6,032,087,000, of which $10,000,000 shall be used to establish Individual Development Accounts, for the purpose of encouraging low-income families and individuals to acquire productive assets, contingent upon enactment of authorizing legislation, and of which $20,000,000, to remain available until September 30, 2000, shall be for grants to States for adoption incentive payments, as authorized by section 473A of title IV of the Social Security Act (42 U.S.C. 670–679); of which $563,565,000 shall be for making payments under the Community Services Block Grant Act; and of which $4,660,000,000 shall be for making payments under the Head Start Act: *Provided,* That, notwithstanding section 640(a)(6), of the funds made available for the Head Start Act, $337,500,000 shall be set aside for the Head Start Program for Families with Infants and Toddlers (Early Head Start): *Provided further,* That to the extent Community Services Block Grant funds are distributed as grant funds by a State to an eligible entity as provided under the Act, and have not been expended by such entity, they shall remain with such entity for carryover into the next fiscal year for expenditure by such entity consistent with program purposes.

In addition, $105,000,000, to be derived from the Violent Crime Reduction Trust Fund for carrying out sections 40155, 40211 and 40241 of Public Law 103–322.

Funds appropriated for fiscal year 1999 under section 429A(e), part B of title IV of the Social Security Act shall be reduced by $6,000,000.

Funds appropriated for fiscal year 1999 under section 413(h)(1) of the Social Security Act shall be reduced by $15,000,000.

### FAMILY PRESERVATION AND SUPPORT

For carrying out section 430 of the Social Security Act, $275,000,000.

### PAYMENTS TO STATES FOR FOSTER CARE AND ADOPTION ASSISTANCE

For making payments to States or other non-Federal entities under title IV–E of the Social Security Act, $3,764,000,000.

For making payments to States or other non-Federal entities under title IV–E of the Social Security Act, for the first quarter of fiscal year 2000, $1,355,000,000.

### ADMINISTRATION ON AGING

### AGING SERVICES PROGRAMS

For carrying out, to the extent not otherwise provided, the Older Americans Act of 1965, as amended, and sections 339A, 398, and 399 of the Public Health Service Act, $882,020,000: *Provided,* That notwithstanding section 308(b)(1) of the Older Americans Act of 1965, as amended, the amounts available to each State for administration of the State plan under title III of such Act shall be reduced not more than 5 percent below the amount that was available to such State for such purpose for fiscal year 1995: *Provided further*, That in considering grant applications for nutrition services for elder Indian recipients, the Assistant Secretary shall provide maximum flexibility to applicants who seek to take into account subsistence, local customs, and other characteristics that are appropriate to the unique cultural, regional, and geographic needs of the American Indian, Alaska and Hawaiian Native communities to be served.

### OFFICE OF THE SECRETARY

### GENERAL DEPARTMENTAL MANAGEMENT

For necessary expenses, not otherwise provided, for general departmental management, including hire of six sedans, and for carrying out titles III, XVII, and XX of the Public Health Service Act, and the United States–Mexico Border Health Commission Act, $180,051,000, together with $5,851,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund: *Provided,* That of the funds made available under this heading for carrying out title XVII of the Public Health Service Act, $1,000,000 shall be available until expended for extramural construction: *Provided further,* That $890,000 shall be for a contract with the National Academy of Sciences to conduct a study of all the available scientific literature examining the cause and effect relationship between repetitive tasks in the workplace and musculoskeletal disorders: *Provided further,* That said contract shall be awarded not later than January 1, 1999.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $29,000,000.

### OFFICE FOR CIVIL RIGHTS

For expenses necessary for the Office for Civil Rights, $17,345,000, together with not to exceed $3,314,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund.

### POLICY RESEARCH

For carrying out, to the extent not otherwise provided, research studies under section 1110 of the Social Security Act, $14,000,000.

### PUBLIC HEALTH AND SOCIAL SERVICES EMERGENCY FUND

For expenses necessary to support activities related to countering potential biological, disease and chemical threats to civilian populations, $216,922,000: *Provided,* That the entire amount is hereby designated by Congress to be emergency requirements pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further,* That the entire amount shall be available only to the extent that an official budget request for $216,922,000, that

includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further,* That of the amount provided under this heading, $51,000,000, to remain available until expended, shall be for pharmaceutical and vaccine stockpiling activities at the Centers for Disease Control and Prevention; and $3,000,000 shall be for the renovation and modernization of the Noble Army Hospital facility at Fort McClellan, Alabama; and $322,000 shall be in payment to the health department of Claxon County, Michigan: *Provided further,* That no funds shall be obligated until the Department of Health and Human Services submits an operating plan to the House and Senate Committees on Appropriations.

GENERAL PROVISIONS

SEC. 201. Funds appropriated in this title shall be available for not to exceed $37,000 for official reception and representation expenses when specifically approved by the Secretary.

SEC. 202. The Secretary shall make available through assignment not more than 60 employees of the Public Health Service to assist in child survival activities and to work in AIDS programs through and with funds provided by the Agency for International Development, the United Nations International Children's Emergency Fund or the World Health Organization.

SEC. 203. None of the funds appropriated under this Act may be used to implement section 399L(b) of the Public Health Service Act or section 1503 of the National Institutes of Health Revitalization Act of 1993, Public Law 103–43.

SEC. 204. None of the funds appropriated in this Act for the National Institutes of Health and the Substance Abuse and Mental Health Services Administration shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of Executive Level III.

SEC. 205. None of the funds appropriated in this Act may be expended pursuant to section 241 of the Public Health Service Act, except for funds specifically provided for in this Act, or for other taps and assessments made by any office located in the Department of Health and Human Services, prior to the Secretary's preparation and submission of a report to the Committee on Appropriations of the Senate and of the House detailing the planned uses of such funds.

<< 42 USCA § 3015 NOTE >>

SEC. 206. None of the funds appropriated in this Act or subsequent Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Acts, may be obligated or expended for the Federal Council on Aging under the Older Americans Act or the Advisory Board on Child Abuse and Neglect under the Child Abuse Prevention and Treatment Act.

(TRANSFER OF FUNDS)

SEC. 207. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Health and Human Services in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: *Provided,* That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

SEC. 208. The Director of the National Institutes of Health, jointly with the Director of the Office of AIDS Research, may transfer up to 3 percent among institutes, centers, and divisions from the total amounts identified by these two Directors as funding for research pertaining to the human immunodeficiency virus: *Provided,* That the Congress is promptly notified of the transfer.

SEC. 209. Of the amounts made available in this Act for the National Institutes of Health, the amount for research related to the human immunodeficiency virus, as jointly determined by the Director of NIH and the Director of the Office of AIDS Research, shall be made available to the "Office of AIDS Research" account. The Director of the Office of AIDS Research shall transfer from such account amounts necessary to carry out section 2353(d)(3) of the Public Health Service Act.

<< 5 USCA § 7905 NOTE >>

SEC. 210. Funds appropriated in this Act or subsequent Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Acts, for the National Institutes of Health may be used to provide transit subsidies in amounts consistent with the transportation subsidy programs authorized under section 629 of Public Law 101–509 to non-FTE bearing positions including trainees, visiting fellows and volunteers.

SEC. 211. None of the funds appropriated in this Act may be made available to any entity under title X of the Public Health Service Act unless the applicant for the award certifies to the Secretary that it encourages family participation in the decision of minors to seek family planning services and that it provides counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities.

<< 42 USCA § 281 >>

SEC. 212. Subsection (b)(1)(H) of section 401 of the Public Health Service Act (42 U.S.C. 281(b)(1)(H)) is amended by striking "National Institute of Dental Research" and inserting "National Institute of Dental and Craniofacial Research".

SEC. 213. (a) The final rule entitled "Organ Procurement and Transplantation Network", promulgated by the Secretary of Health and Human Services on April 2, 1998 (63 FR 16295 et seq.) (relating to part 121 of title 42, Code of Federal Regulations), shall not become effective before the expiration of the 1-year period beginning on the date of the enactment of this Act.

(b)(1) The Institute of Medicine under contract with and subject to review by the Comptroller General, in consultation with the Secretary and with the Organ Procurement and Transplantation Network (in this section referred to as the "OPTN"), shall conduct a review of the current polices of the OPTN and the final rule specified in subsection (a) in order to determine the following:

(A) The potential impact on access to transplantation services for low-income populations and for racial and ethnic minority groups. With respect to State policies in carrying out the program under title XIX of the Social Security Act, the determination made under this subparagraph shall include determining the impact of such policies regarding payment for services for patients that are provided to the patients outside of the States in which the patients reside.

(B) With respect to organ procurement organizations (qualified under section 371 of the Public Health Service Act):

(i) The potential impact on the ability of the organizations to facilitate an appropriate rate of organ donation within the service areas of the organizations.

(ii) The reasons underlying the variations in performance among such organizations.

(iii) The potential impact of requiring sharing of organs based on medical criteria instead of geography on the ability of the organizations to facilitate an appropriate rate of organ donation within the service areas of the organizations.

(C) The potential impact on waiting times for organ transplants, including determinations specific to the various geographic regions of the United States, and if practicable, waiting times for each transplant center by organ and medical status category. The determination made under this subparagraph shall include determining the impact of recent changes made by the OPTN in patient listing criteria and in measures of medical status.

(D) The potential impact on patient survival rates and organ failure rates which lead to retransplantation, including any variance by income status, ethnicity, gender, race, or blood type.

(E) The potential impact on the costs of organ transplantation services.

(F) The potential impact on the liability, under State laws and procedures regarding peer review, of members of the OPTN.

(G) The potential impact on the confidential status of information that relates to the transplantation of organs.

(H) Recommendations, if any, to change existing policies and the final rule.

(2)(A) Not later than May 1, 1999, the Comptroller General of the United States shall submit to the congressional committees specified in subparagraph (B) a report describing the results of the review conducted under paragraph (1).

(B) The congressional committees referred to in subparagraph (A) are the Committee on Commerce of the House of Representatives, the Committee on Appropriations of the House, the Committee on Labor and Human Resources of the Senate, and the Committee on Appropriations of the Senate.

(c)(1) Beginning promptly after the date of the enactment of this Act, the Secretary may conduct a series of discussions with the OPTN in order to resolve issues raised by the final rule referred to in subsection (a).

(2) The Secretary and the OPTN may utilize the services of a mediator in conducting the discussions under paragraph (1). An individual may not be selected to serve as the mediator unless the Secretary and the OPTN both approve the selection of the individual to so serve, and the individual agrees that, not later than June 30, 1999, the individual will submit to the congressional committees specified in subsection (b)(2)(B) a report describing the extent of progress that has been made through the discussions under paragraph (1).

(d)(1) Beginning on the date of enactment of this Act, the OPTN shall provide to the Secretary, the Institutes of Medicine, and the Comptroller General, upon request, any data necessary to assess the effectiveness of the Nation's organ donation,

procurement and organ allocation systems, or to assess the quality of care provided to all transplant patients, and analysis of such data in a scientifically and clinically valid manner. If necessary, the OPTN may provide additional data as they deem appropriate.

(2) The OPTN shall make available to the public timely and accurate program-specific information on the performance of transplant programs. These data shall be updated as frequently as possible, and the OPTN shall work to shorten the time period for data collection and analysis in producing its center specific outcomes report, including severity adjusted long term survival rates. Such data shall also include such other cost or performance information including but not limited to transplant program-specific information on waiting time within medical status, organ waitings, and refusal of organ offers.

(e) Data provided under subsection (d) shall be specific (if possible) to individual transplant centers and must be determined in a scientifically and clinically valid manner.

(f) Any disclosure of patient specific medical information under subsection (d) shall be subject to the restrictions contained in the Freedom of Information Act, the Privacy Act, and State laws.

(g) Of the amount appropriated in this title for "OFFICE OF THE SECRETARY–GENERAL DEPARTMENTAL MANAGEMENT", $500,000 shall, not later than 30 days after the date of the enactment of this Act, be transferred to the Comptroller General for purposes of carrying out the studies required and specified in this section.

(h) For purposes of this section:

(1) The term "Comptroller General" means the Comptroller General of the United States.

(2) The term "Organ Procurement and Transplantation Network" means the network operated under section 372 of the Public Health Service Act.

(3) The term "Secretary" means the Secretary of Health and Human Services.

<< 42 USCA § 1397b >>

SEC. 214. (a) Section 2003(c) of the Social Security Act (42 U.S.C. 1397b(c)) is amended by striking paragraph (8) and inserting the following:

"(8) $2,299,000,000 for the fiscal year 1998;".

<< 42 USCA § 1397b NOTE >>

(b) The amendment made by this section takes effect immediately after the amendments made by section 8401 of the Transportation Equity Act for the 21st Century take effect.

SEC. 215. The Consolidated Laboratory Building (Building 50) at the National Institutes of Health is hereby named the Louis Stokes Laboratories.

SEC. 216. None of the funds appropriated by this Act (including funds appropriated to any trust fund) may be used to carry out the Medicare & Choice program if the Secretary denies participation in such program to an otherwise eligible entity (including a Provider Sponsored Organization) because the entity informs the Secretary that it will not provide, pay for, provide coverage of, or provide referrals for abortions: *Provided,* That the Secretary shall make appropriate prospective adjustments to the capitation payment to such an entity (based on an actuarially sound estimate of the expected costs of providing the service to such entity's enrollees): *Provided further,* That nothing in this section shall be construed to change the Medicare program's coverage for such services and a Medicare & Choice organization described in this section shall be responsible for informing enrollees where to obtain information about all Medicare covered services.

SEC. 217. The Vaccine Research Facility (Building 40) at the National Institutes of Health is hereby named the Dale and Betty Bumpers Vaccine Research Facility.

<< 8 USCA § 300x–7 >>

SEC. 218. (a) MENTAL HEALTH.—Section 1918(b) of the Public Health Service Act (42 U.S.C. 300x–7(b)) is amended to read as follows:

"(b) MINIMUM ALLOTMENTS FOR STATES.—

"(1) IN GENERAL.—With respect to fiscal year 1999, the amount of the allotment of a State under section 1911 shall not be less than the amount the State received under section 1911 for fiscal year 1998.

<< 8 USCA § 300x–33 >>

(b) SUBSTANCE ABUSE.—Section 1933(b) of the Public Health Service Act (42 U.S.C. 300x–33(b)) is amended to read as follows:

"(b) MINIMUM ALLOTMENTS FOR STATES.—

"(1) IN GENERAL.—With respect to fiscal year 1999, the amount of the allotment of a State under section 1921 shall not be less than the amount the State received under section 1921 for fiscal year 1998 increased by 30.65 percent of the percentage by which the amount allotted to the States for fiscal year 1999 exceeds the amount allotted to the States for fiscal year 1998.

"(2) LIMITATION.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), a State shall not receive an allotment under section 1921 for fiscal year 1999 in an amount that is less than an amount equal to 0.375 percent of the amount appropriated under section 1935(a) for such fiscal year.

"(B) EXCEPTION.—In applying subparagraph (A), the Secretary shall ensure that no State receives an increase in its allotment under section 1921 for fiscal year 1999 (as compared to the amount allotted to the State in the fiscal year 1998) that is in excess of an amount equal to 300 percent of the percentage by which the amount appropriated under section 1935(a) for fiscal year 1999 exceeds the amount appropriated for the prior fiscal year.

"(3) Only for the purposes of calculating minimum allotments under this subsection, any reference to the amount appropriated under section 1935(a) for fiscal year 1998, allotments to States under section 21 and any references to amounts received by States in fiscal year 1998 shall include amounts appropriated or received under the amendments made by section 105 of the Contract with America Advancement Act of 1996 (Public Law 104–121).".

<< 42 USCA § 300x–7 NOTE >>

(c) EFFECTIVE DATE.—

<< 42 USCA § 300x–7 NOTE >>

(1) IN GENERAL.—The amendments made by subsections (a) and (b) shall become effective as if enacted on October 1, 1998 and shall only apply during fiscal year 1999.

<< 42 USCA § 300x–7 NOTE >>

(2) APPLICATION.—Upon the expiration of the fiscal year described in paragraph (1), the provisions of sections 1918(b) and 1933(b) of the Public Health Service Act (42 U.S.C. 300x–7(b) and 300x–33(b)), as in effect on September 30, 1998, shall be applied as if the amendments made by this section had not been enacted.

SEC. 219. Notwithstanding any other provision of law, no provider of services under title X of the Public Health Service Act shall be exempt from any State law requiring notification or the reporting of child abuse, child molestation, sexual abuse, rape, or incest.

This title may be cited as the "Department of Health and Human Services Appropriations Act, 1999".

## TITLE III—DEPARTMENT OF EDUCATION

### EDUCATION REFORM

For carrying out activities authorized by titles III and IV of the Goals 2000: Educate America Act, the School-to-Work Opportunities Act, and sections 3122, 3132, 3136, and 3141 and parts B, C, and D of title III of the Elementary and Secondary Education Act of 1965, $1,314,000,000, of which $491,000,000 for the Goals 2000: Educate America Act and $125,000,000 for the School-to-Work Opportunities Act shall become available on July 1, 1999 and remain available through September 30, 2000, and of which $87,000,000 shall be for section 3122: *Provided,* That none of the funds appropriated under this heading shall be obligated or expended to carry out section 304(a)(2)(A) of the Goals 2000: Educate America Act, except that no more than $1,500,000 may be used to carry out activities under section 314(a)(2) of that Act: *Provided further,* That section 315(a)(2) of the Goals 2000 Act shall not apply: *Provided further,* That up to one-half of 1 percent of the amount available under

section 3132 shall be set aside for the outlying areas, to be distributed on the basis of their relative need as determined by the Secretary in accordance with the purposes of the program: *Provided further,* That if any State educational agency does not apply for a grant under section 3132, that State's allotment under section 3131 shall be reserved by the Secretary for grants to local educational agencies in that State that apply directly to the Secretary according to the terms and conditions published by the Secretary in the Federal Register: *Provided further,* That $22,000,000 of the funds made available under section 3136 shall be for a competition consistent with the subjects outlined in the House and Senate reports and the statement of the managers, and that such competition should be administered in a manner consistent with the authorizing legislation and current departmental practices and policies: *Provided further,* That $9,850,000 of the funds made available for star schools shall be for a competition consistent with the language outlined in the House and Senate reports and the statement of the managers, and that such competition should be administered in a manner consistent with current departmental practices and policies: *Provided further,* That $8,000,000 shall be awarded to continue and expand the Iowa Communications Network statewide fiber optic demonstration project, and $800,000 shall be awarded to the School of Agriculture and Land Resources Management at the University of Alaska, Fairbanks to enhance distance delivery of natural resources management courses; $350,000 shall be for multi-media classrooms for the rural education technology center at the Western Montana College in Dillon, Montana: *Provided further,* That of the funds made available for section 3136, $2,500,000 shall be to establish the RUNet 2000 project at Rutgers, The State University of New Jersey; $500,000 shall be for state-of-the art information technology systems at Mansfield University, Mansfield, Pennsylvania; $1,000,000 shall be for professional development for technology training at the Krell Institute, Ames, Iowa; $850,000 shall be for Internet-based curriculum at the State of Alaska, Department of Education; $2,000,000 shall be for "Magnet E–School" technology training and curriculum initiative at the Hawaii Department of Education; $600,000 shall be for technology in the classroom pilot program for the Green Bay Public School System, Green Bay, Wisconsin; $250,000 shall be for the "Passport to Chicago Community Network" technology training project; $1,200,000 for LEARN North Carolina and the University of North Carolina at Chapel Hill; and $1,500,000 for the Iowa Department of Education for community college grants to low-income schools for technology.

### EDUCATION FOR THE DISADVANTAGED

  For carrying out title I of the Elementary and Secondary Education Act of 1965, and section 418A of the Higher Education Act, $8,370,520,000, of which $2,198,134,000 shall become available on July 1, 1999, and shall remain available through September 30, 2000, and of which $6,148,386,000 shall become available on October 1, 1999 and shall remain available through September 30, 2000, for academic year 1999–2000: *Provided,* That $6,574,000,000 shall be available for basic grants under section 1124: *Provided further,* That up to $3,500,000 of these funds shall be available to the Secretary on October 1, 1998, to obtain updated local-educational-agency-level census poverty data from the Bureau of the Census: *Provided further,* That $1,102,020,000 shall be available for concentration grants under section 1124A, $7,500,000 shall be available for evaluations under section 1501 and not more than $8,500,000 shall be reserved for section 1308, of which not more than $3,000,000 shall be reserved for section 1308(d): *Provided further,* That grant awards under section 1124 and 1124A of title I of the Elementary and Secondary Education Act shall be made to each State or local educational agency at no less than 100 percent of the amount such State or local educational agency received under this authority for fiscal year 1998: *Provided further,* That $120,000,000 shall be available under section 1002(g)(2) to demonstrate effective approaches to comprehensive school reform to be allocated and expended in accordance with the instructions relating to this activity in the statement of the managers on the conference report accompanying Public Law 108 and in the statement of the managers on the conference report accompanying this Act: *Provided further,* That in carrying out this initiative, the Secretary and the States shall support only approaches that show the most promise of enabling children served by title I to meet challenging State content standards and challenging State student performance standards based on reliable research and effective practices, and include an emphasis on basic academics and parental involvement: *Provided further,* That no funds appropriated under section 1002(g)(2) shall be available for section 1503.

  IMPACT AID

<< 20 USCA § 7702 >>

  For carrying out programs of financial assistance to federally affected schools authorized by title VIII of the Elementary and Secondary Education Act of 1965, $864,000,000, of which $704,000,000 shall be for basic support payments under section 8003(b), $50,000,000 shall be for payments for children with disabilities under section 8003(d), $70,000,000, to remain available

until expended, shall be for payments under section 8003(f), $7,000,000 shall be for construction under section 8007, and $28,000,000 shall be for Federal property payments under section 8002 and $5,000,000 to remain available until expended shall be for facilities maintenance under section 8008: *Provided,* That Section 8002(f) of the Elementary and Secondary Education Act of 1965 is amended—

  (1) by inserting "(1)" after the subsection heading; and

  (2) by adding a new paragraph (2) at the end to read as follows:

  "(2) For each fiscal year beginning with fiscal year 1999, the Secretary shall treat the Webster School District, Day County, South Dakota as meeting the eligibility requirements of subsection (a)(1)(C) of this section.":

*Provided further,* That Section 8002 of the Elementary and Secondary Education Act of 1965 is amended by adding at the end thereof a new subsection (k) to read as follows:

  "(k) SPECIAL RULE.—For purposes of payments under this section for each fiscal year beginning with fiscal year 1998—

  "(1) the Secretary shall, for the Stanley County, South Dakota local educational agency, calculate payments as if subsection (e) had been in effect for fiscal year 1994; and

  "(2) the Secretary shall treat the Delaware Valley, Pennsylvania local educational agency as if it had filed a timely application under section 2 of Public Law 81–874 for fiscal year 1994.":

*Provided further,* That (a) from the funds appropriated for payments to local educational agencies under section 8003(f) of the Elementary and Secondary Education Act of 1965 (ESEA) for fiscal year 1999, the Secretary of Education shall distribute supplemental payments for certain local educational agencies, as follows:

  (1) First, from the amount of $68,000,000, the Secretary shall make supplemental payments to the following agencies under section 8003(b) of the ESEA:

  (A) Local educational agencies that received assistance under section 8003(f) for fiscal year 1998.

  (B) Local educational agencies with Impact Aid applicant numbers 20–0019, 51–0504, 51–2801, 51–1903, 51–0010, 51–4203, 51–2101, 51–0811, and 51–0904.

  (C) Any eligible local educational agency with at least 25,000 children in average daily attendance, at least 55 percent federally connected children described in section 8003(a)(1) in average daily attendance, and at least 6,500 children described in sections 8003(a)(1)(A) and (B) in average daily attendance.

  (2) From the remaining $2,000,000 and any amounts available after making payments under paragraph (1), the Secretary shall then make supplemental payments to local educational agencies that are not described in paragraph (1) of this subsection, but that meet the requirements of paragraphs (2) and (4) of section 8003(f) of the ESEA for fiscal year 1999, except that such agencies may count for purposes of eligibility for these supplemental payments, all students described in section 8003(a)(1).

  (3) After making payments under section 8003(f) to all eligible applicants for fiscal years before fiscal year 1999, the Secretary shall use the combined amount of any funds remaining available under that subsection, and any amounts that may remain for fiscal year 1999 after making payments under paragraphs (1) and (2) of this subsection, to make the following payments:

  (A) First, an amount not to exceed $3,000,000 to Impact Aid applicant number 20–0019.

  (B) Second, from any remaining funds, an amount not to exceed $3,000,000 to Impact Aid applicant number 53–0061.

  (C) Third, from any remaining funds, increased basic support payments under section 8003(b) for all eligible applicants.

  (b) In calculating the amounts of supplemental payments for agencies described in subparagraphs (1)(A) and (B) and paragraph (2) of subsection (a), the Secretary shall use the formula contained in section 8003(b)(1)(C) of the ESEA, except that—

  (1) eligible local educational agencies may count all children described in section 8003(a)(1) in computing the amount of those payments;

  (2) maximum payments for any of those agencies that use local contribution rates identified in section 8003(b)(1)(C)(i) or (ii) shall be computed by using four-fifths instead of one-half of those rates;

  (3) the learning opportunity threshold percentage of all such agencies under section 8003(b)(2)(B) shall be deemed to be 100;

  (4) for an eligible local educational agency with 35 percent or more of its children in average daily attendance described in either subparagraph (D) or (E) of section 8003(a)(1), the weighted student unit figure from its regular basic support payment shall be recomputed by using a factor of 0.55 for such children;

(5) for an eligible local educational agency with fewer than 100 children in average daily attendance, the weighted student unit figure from its regular basic support payment shall be recomputed by multiplying the total number of children described in section 8003(a)(1) by a factor of 1.5; and

(6) for an eligible local educational agency whose total number of children in average daily attendance is at least 100, but fewer than 750, the weighted student unit figure from its regular basic support payment shall be recomputed by multiplying the total number of children described in section 8003(a)(1) by a factor of 1.25.

(c) For a local educational agency described in subsection (a)(1)(C) above, the Secretary shall use the formula contained in section 8003(b)(1)(C) of the ESEA, except that the weighted student unit total from its regular basic support payment shall be increased by 35 percent and its learning opportunity threshold percentage shall be deemed to be 100.

(d) For each eligible local educational agency, the calculated supplemental basic support payment shall be reduced by subtracting the agency's regular fiscal year 1999 section 8003(b) basic support payment.

(e) The actual supplemental basic support payment that local educational agencies receive shall be treated under section 8009 in the same manner as payments under section 8003(f).

(f) If the sums described in subsections (a)(1) and (2) above are insufficient to pay in full the calculated supplemental basic support payments for the local educational agencies identified in those subsections, the Secretary shall ratably reduce the supplemental basic support payment to each local educational agency: *Provided further,* That the Secretary of Education shall treat as timely filed, and shall process for payment, an application for a fiscal year 1998 payment from the local educational agency for Prince Georges County, Maryland, under section 8003 of the Elementary and Secondary Education Act of 1965 if the Secretary has received that application not later than 30 days after the enactment of this Act: *Provided further,* That from the amount appropriated for section 8008 the Secretary shall award $500,000 to the Randolph Field Independent School District, Texas: *Provided further,* That for the purposes of computing the amount of payment for a local educational agency for children identified under section 8003, children residing in housing initially acquired or constructed under section 801 of the Military Construction Authorization Act of 1984, (Public Law 98–115) ("Build to Lease" program) shall be considered as children described under section 8003(a)(1)(B) if the property described is within the fenced security perimeter of the military facility upon which such housing is situated: *Provided further,* That if such property is not owned by the Federal Government, is subject to taxation by a State or political subdivision of a State, and thereby generates revenues for a local educational agency which received a payment from the Secretary under section 8003, the Secretary shall:

(A) require such local educational agency to provide certification from an appropriate official of the Department of Defense that such property is being used to provide military housing; and

(B) reduce the amount of such payment by an amount equal to the amount of revenue from such taxation received in the second preceding fiscal year by such local educational agency, unless the amount of such revenue was taken into account by the State for such second preceding fiscal year and already resulted in a reduction in the amount of State aid paid to such local educational agency: *Provided further,* That of the funds available for payments under section 8002, the Secretary shall pay the San Diego, California, Centennial, Pennsylvania, and Hatboro–Horsham, Pennsylvania, local educational agencies the sum of $500,000 each, in addition to their regularly calculated payments, except that the total funds these agencies receive under this section may not exceed 50 percent of their maximum section 8002 payments.

SCHOOL IMPROVEMENT PROGRAMS

For carrying out school improvement activities authorized by titles II, IV, V–A and B, VI, IX, X, XII and XIII of the Elementary and Secondary Education Act of 1965; the Stewart B. McKinney Homeless Assistance Act; and the Civil Rights Act of 1964 and part B of VIII of the Higher Education Act; $2,811,134,000, of which $2,381,300,000 shall become available on July 1, 1999, and remain available through September 30, 2000: *Provided,* That of the amount appropriated, $335,000,000 shall be for Eisenhower professional development State grants under title II–B of the Elementary and Secondary Education Act of 1965, and $1,575,000,000 shall be for title VI, of which $1,200,000,000 shall be available, notwithstanding any other provision of law, to carry out title VI of the Elementary and Secondary Education Act of 1965 in accordance with section 307 of this Act, in order to reduce class size, particularly in the early grades, using highly qualified teachers to improve educational achievement for regular and special needs children.

READING EXCELLENCE

For necessary expenses to carry out the Reading Excellence Act, $260,000,000, which shall become available on July 1, 1999, and shall remain available through September 30, 2000.

## INDIAN EDUCATION

For expenses necessary to carry out, to the extent not otherwise provided, title IX, part A of the Elementary and Secondary Education Act of 1965, as amended, $66,000,000.

## BILINGUAL AND IMMIGRANT EDUCATION

For carrying out, to the extent not otherwise provided, bilingual, foreign language and immigrant education activities authorized by parts A and C and section 7203 of title VII of the Elementary and Secondary Education Act of 1965, without regard to section 7103(b), $380,000,000: *Provided,* That State educational agencies may use all, or any part of, their part C allocation for competitive grants to local educational agencies.

## SPECIAL EDUCATION

For carrying out the Individuals with Disabilities Education Act, $5,124,146,000, of which $4,879,885,000 shall become available for obligation on July 1, 1999, and shall remain available through September 30, 2000: *Provided,* That $1,500,000 shall be awarded to The Organizing Committee for The 1999 Special Olympics World Summer Games and $1,500,000, to remain available until expended, shall be for preparation and planning and shall be awarded to The Organizing Committee of The 2001 Special Olympics World Winter Games: *Provided further,* That $600,000 shall be for the Early Childhood Development Project of the National Easter Seal Society for the Mississippi Delta Region, which funds shall be used to provide training, technical support, services, and equipment to address personnel and other needs.

## REHABILITATION SERVICES AND DISABILITY RESEARCH

For carrying out, to the extent not otherwise provided, the Rehabilitation Act of 1973, the Technology–Related Assistance for Individuals with Disabilities Act, or successor legislation and the Helen Keller National Center Act, as amended, $2,652,584,000.

## SPECIAL INSTITUTIONS FOR PERSONS WITH DISABILITIES

### AMERICAN PRINTING HOUSE FOR THE BLIND

For carrying out the Act of March 3, 1879, as amended (20 U.S.C. 101 et seq.), $8,661,000.

### NATIONAL TECHNICAL INSTITUTE FOR THE DEAF

For the National Technical Institute for the Deaf under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $45,500,000: *Provided,* That from the amount available, the Institute may at its discretion use funds for the endowment program as authorized under section 207.

### GALLAUDET UNIVERSITY

For the Kendall Demonstration Elementary School, the Model Secondary School for the Deaf, and the partial support of Gallaudet University under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $83,480,000: *Provided,* That from the amount available, the University may at its discretion use funds for the endowment program as authorized under section 207.

## VOCATIONAL AND ADULT EDUCATION

For carrying out, to the extent not otherwise provided, the Carl D. Perkins Vocational and Applied Technology Education Act and the Adult Education and Family Literacy Act, $1,539,247,000, of which $1,535,147,000 shall become available on July 1, 1999 and shall remain available through September 30, 2000: *Provided,* That of the amounts made available for title II of the Carl D. Perkins Vocational and Applied Technology Education Act, $13,497,000 shall be used by the Secretary for national programs under title IV, without regard to section 451: *Provided further,* That, of the amounts made available for the Adult Education and Family Literacy Act, $6,000,000 shall be for national leadership activities under section 243 and $6,000,000 shall be for the National Institute for Literacy under section 242: *Provided further,* That no funds shall be awarded to a State

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Council under section 112(f) of the Carl D. Perkins Vocational and Applied Technology Education Act, and no State shall be required to operate such a Council.

## STUDENT FINANCIAL ASSISTANCE

For carrying out subparts 1, 3 and 4 of part A, part C and part E of title IV of the Higher Education Act of 1965, as amended, $9,348,000,000, which shall remain available through September 30, 2000.

<< 20 USCA § 1070a NOTE >>

The maximum Pell Grant for which a student shall be eligible during award year 1999–2000 shall be $3,125: *Provided,* That notwithstanding section 401(g) of the Act, if the Secretary determines, prior to publication of the payment schedule for such award year, that the amount included within this appropriation for Pell Grant awards in such award year, and any funds available from the fiscal year 1998 appropriation for Pell Grant awards, are insufficient to satisfy fully all such awards for which students are eligible, as calculated under section 401(b) of the Act, the amount paid for each such award shall be reduced by either a fixed or variable percentage, or by a fixed dollar amount, as determined in accordance with a schedule of reductions established by the Secretary for this purpose: *Provided further,* That if the Secretary determines that the funds available to fund Pell Grants for award year 1999–2000 exceed the amount needed to fund Pell Grants at a maximum award of $3,125 for that award year, the Secretary may increase the income protection allowances in sections 475(g)(2)(D), and 476(b)(1)(A)(iv)(I), (II) and (III) up to the amounts at which Pell Grant awards calculated using the increased income protection allowances equal the funds available to make Pell Grants in award year 1999–2000 with a $3,125 maximum award, except that the income protection allowance in section 475(g)(2)(D) may not exceed $2,200, the income protection allowance in sections 476(b)(1)(A)(iv)(I) and (II) may not exceed $4,250, and the income protection allowance in section 476(b)(1)(A)(iv)(III) may not exceed $7,250.

## FEDERAL FAMILY EDUCATION LOAN PROGRAM ACCOUNT

For Federal administrative expenses to carry out guaranteed student loans authorized by title IV, part B, of the Higher Education Act, as amended, $46,482,000.

## HIGHER EDUCATION

For carrying out, to the extent not otherwise provided, section 121 and titles II, III, IV, V, VI, VII, and VIII of the Higher Education Act of 1965, as amended, and the Mutual Educational and Cultural Exchange Act of 1961 and Public Law 102–73; $1,307,846,000, of which $13,000,000 for interest subsidies authorized by section 121 of the Higher Education Act, shall remain available until expended: *Provided,* That $16,723,000 shall be for Youth Offender Grants, of which $4,723,000, which shall become available on July 1, 1999, and remain available until September 30, 2000, shall be used in accordance with section 601 of Public Law 102–73 as that section was in effect prior to enactment of Public Law 105–220: *Provided further,* That $4,800,000, to be available until expended, shall be for Salem State College in Salem, Massachusetts for activities authorized under Title III, part A, section 311(c)(2), of the Higher Education Act of 1965, as amended: *Provided further,* That of the funds made available under title VII, part B, $5,000,000 shall be awarded to the St. Petersburg Junior College for a demonstration of a national method for increasing access to four year degrees and work force training for students attending community college; $2,000,000 shall be for the Technology–Assisted Learning Campus in New Rochelle, New York for high-tech equipment; $250,000 shall be awarded to the Center for Urban Research and Learning, Loyola University, Chicago; $1,150,000 shall be awarded to the Southeast Community College in Letcher County, Kentucky; $3,000,000 shall be for the Oregon State University Distance Education Alliance; $1,000,000 shall be for the Appalachian Center for Economic Networks in Athens, Ohio; $6,000,000 shall be to establish the Robert J. Dole Institute for Public Service and Public Policy on the University of Kansas campus in Lawrence, Kansas; $1,000,000 shall be for the Oregon Institute of Public Service and Constitutional Studies at the Mark O. Hatfield School of Government at Portland State University; $2,150,000 shall be awarded to the College of Natural Resources, University of Wisconsin at Stevens Point for technology-enhanced learning; $1,500,000 shall be for the Touro Law Center in Central Islip, New York for the use of technology to bridge the gap between legal education and the actual practice of law; $1,000,000 shall be for the International Center for Educational Technology and Distance Learning at Empire State College; $500,000 shall be for the University of Northern Iowa National Institute of Technology for Inclusive Education; $1,500,000 shall be for a demonstration project to expand the successful college student preparation at Prairie View A&M, Texas; $750,000 shall be to identify and provide models of alcohol and drug abuse prevention and education in higher education at the college level;

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 2638 of 3864

$500,000 shall be for a teacher training program in experiential learning to be awarded to the Department of Language Teacher Education, School for International Training, Brattleboro, Vermont; and $1,000,000 shall be for the Paul Simon Public Policy Institute at Southern Illinois University at Carbondale, Illinois: *Provided further,* That $9,500,000 of the funds made available for title VII, part B shall be for a competition consistent with the subject areas outlined in the House and Senate reports and the statement of the managers, and that such competition should be administered in a manner consistent with current departmental practices and policies.

### HOWARD UNIVERSITY

For partial support of Howard University (20 U.S.C. 121 et seq.), $214,489,000, of which not less than $3,530,000 shall be for a matching endowment grant pursuant to the Howard University Endowment Act (Public Law 98–480) and shall remain available until expended.

### COLLEGE HOUSING AND ACADEMIC FACILITIES LOANS PROGRAM

For Federal administrative expenses authorized under section 121 of the Higher Education Act, $698,000 to carry out activities related to existing facility loans entered into under the Higher Education Act.

### HISTORICALLY BLACK COLLEGE AND UNIVERSITY CAPITAL FINANCING, PROGRAM ACCOUNT

The total amount of bonds insured pursuant to section 344 of title III, part D of the Higher Education Act shall not exceed $357,000,000, and the cost, as defined in section 502 of the Congressional Budget Act of 1974, of such bonds shall not exceed zero.

For administrative expenses to carry out the Historically Black College and University Capital Financing Program entered into pursuant to title III, part D of the Higher Education Act, as amended, $96,000.

### EDUCATION RESEARCH, STATISTICS, AND IMPROVEMENT

For carrying out activities authorized by the Educational Research, Development, Dissemination, and Improvement Act of 1994, including part E; the National Education Statistics Act of 1994; section 2102 of title II, and parts A, B, I, and K and section 10601 of title X, and part C of title XIII of the Elementary and Secondary Education Act of 1965, as amended, and title VI of Public Law 103–227, $664,867,000: *Provided,* That $25,000,000 shall be available to demonstrate effective approaches to comprehensive school reform to be allocated and expended in accordance with the instructions relating to this activity in the statement of managers on the conference report accompanying Public Law 105–78 and in the statement of the managers on the conference report accompanying this Act: *Provided further,* That the funds made available for comprehensive school reform shall become available on July 1, 1999, and remain available through September 30, 2000, and in carrying out this initiative, the Secretary and the States shall support only approaches that show the most promise of enabling children to meet challenging State content standards and challenging State student performance standards based on reliable research and effective practices, and include an emphasis on basic academics and parental involvement: *Provided further,* That $16,000,000 of the funds made available for title X, part A of the Elementary and Secondary Education Act, shall be carried out consistent with the subject areas outlined in the House and Senate reports and the statement of the managers, and should be administered in a manner consistent with current departmental practices and policies: *Provided further,* That, in addition to the $6,000,000 for Title VI of Public Law 103–227 and notwithstanding the provisions of section 601(c)(1)(C) of that Act, $1,000,000 shall be available to the Center for Civic Education to conduct a civic education program with Northern Ireland and the Republic of Ireland and, consistent with the civics and government activities authorized in section 601(c)(3) of Public Law 103–227, to provide civic education assistance to democracies in developing countries. The term "developing countries" shall have the same meaning as the term "developing country" in the Education for the Deaf Act: *Provided further,* That of the amount provided for part A of title X of the Elementary and Secondary Education Act of 1965, $2,000,000 shall be for a demonstration of full service community school sites in Charles County, Maryland, Westchester County, New York, Cranston, Rhode Island, and Skagit County, Washington; $2,000,000 shall be awarded to First Book for literacy programs; $1,750,000 shall be awarded to the Whitaker Center for Science and the Arts, Harrisburg, Pennsylvania for teaching of science education using the arts; $350,000 shall be awarded to the School of Education at the University of Montana and the Montana Board of Crime Control for community-based initiatives to promote non-violent behavior in schools; $1,000,000 shall be awarded to the NetDay organization to assist schools in connecting K–12 classrooms to the Internet; $1,000,000 shall be awarded to the National Museum of Women in the Arts; $1,000,000 shall be awarded to Youth

Friends of Kansas City to improve attendance and academic performance; $750,000 shall be awarded to the Thornberry Center for Youth and Families, Kansas City, Missouri to assist at-risk children; $400,000 shall be for Bay Shore, New York for Literacy Education and Assessment Partnerships; $1,150,000 shall be awarded to provide technology assistance and for operation of a math/science learning center in Perry County, Kentucky; $100,000 shall be for Presidio School District, Texas for library equipment and materials; $1,200,000 shall be for the Southeastern Pennsylvania Consortium for Higher Education; $1,000,000 shall be for the Dowling College Global Learning Center at the former LaSalle Academy in New York for a master teacher training and education center; $10,000,000 for continuing a demonstration of public school facilities repair and construction to the Iowa Department of Education; and $1,000,000 shall be awarded to the Hechkscher Museum of Art, Long Island, New York for incorporating arts into education curriculum: *Provided further,* That of the amount provided for part I of title X of the Elementary and Secondary Education Act of 1965, $500,000 shall be for after school programs for the Chippewa Falls Area United School System, Wisconsin; $400,000 shall be for after-school programs for the Wausau School System, Wisconsin; $350,000 shall be for the New Rochelle School System, New York, after-school programs; $100,000 shall be for the New York Hall of Science, Queens, New York, after-school program; $25,000 shall be for Louisville Central Community Centers Youth Education Program to support after-school programming; $25,000 shall be for Canaan's Community Development Corporation in Louisville, Kentucky for the Village Learning Center after-school program; $300,000 shall be for the Bay Shore Community Learning Wellness and Fitness Center for Drug Free Lifestyles in Bay Shore, New York; $2,500,000 shall be for an after school anti-drug pilot program in the Chicago Public Schools; and $400,000 shall be for the Green Bay, Wisconsin Public School System after school program: *Provided further,* That $10,000,000 of the funds provided for the national education research institutes shall be allocated notwithstanding section 931(c)(2)(B) of Public Law 103–227.

## DEPARTMENTAL MANAGEMENT

### PROGRAM ADMINISTRATION

For carrying out, to the extent not otherwise provided, the Department of Education Organization Act, including rental of conference rooms in the District of Columbia and hire of two passenger motor vehicles, $362,000,000.

### OFFICE FOR CIVIL RIGHTS

For expenses necessary for the Office for Civil Rights, as authorized by section 203 of the Department of Education Organization Act, $66,000,000.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General, as authorized by section 212 of the Department of Education Organization Act, $31,242,000.

### GENERAL PROVISIONS

SEC. 301. No funds appropriated in this Act may be used for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system, or for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to carry out a plan of racial desegregation of any school or school system.

SEC. 302. None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, to the school offering such special education, in order to comply with title VI of the Civil Rights Act of 1964. For the purpose of this section an in direct requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructuring, pairing or clustering. The prohibition described in this section does not include the establishment of magnet schools.

SEC. 303. No funds appropriated under this Act may be used to prevent the implementation of programs of voluntary prayer and meditation in the public schools.

### (TRANSFER OF FUNDS)

AR.02616

SEC. 304. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the Department of Education in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: *Provided,* That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

SEC. 305. NATIONAL TESTING. (a) IN GENERAL.—Part C of the General Education Provisions Act (20 U.S.C. 1231 et seq.) is amended by adding at the end the following:

<< 20 USCA § 1232j >>

"SEC. 447. PROHIBITION ON FEDERALLY SPONSORED TESTING.

"(a) GENERAL PROHIBITION.—Notwithstanding any other provision of Federal law and except as provided in subsection (b), no funds provided to the Department of Education or to an applicable program, may be used to pilot test, field test, implement, administer or distribute in any way any federally sponsored national test in reading, mathematics, or any other subject that is not specifically and explicitly provided for in authorizing legislation enacted into law.

"(b) EXCEPTIONS.—Subsection (a) shall not apply to the Third International Mathematics and Science Study or other international comparative assessments developed under the authority of section 404(a)(6) of the National Education Statistics Act of 1994 (20 U.S.C. 9003(a)(6) et seq.) and administered to only a representative sample of pupils in the United States and in foreign nations.".

(b) AUTHORITY OF NATIONAL ASSESSMENT GOVERNING BOARD.—Subject to section 447 of the General Education Provisions Act, the exclusive authority over the direction and all policies and guidelines for developing voluntary national tests pursuant to contract RJ97153001 previously entered into between the United States Department of Education and the American Institutes for Research and executed on August 15, 1997, and subsequently modified by the National Assessment Governing Board on February 11, 1998, shall continue to be vested in the National Assessment Governing Board established under section 412 of the National Education Statistics Act of 1994 (20 U.S.C. 9011).

(c) STUDIES.—

(1) PURPOSE, DEFINITION, AND ACHIEVEMENT LEVELS.—The National Assessment Governing Board shall determine and clearly articulate in a report the purpose and intended use of any proposed federally sponsored national test. Such report shall also include—

(A) a definition of the meaning of the term "voluntary" in regards to the administration of any national test; and

(B) a description of the achievement levels and reporting methods to be used in grading any national test.

The report shall be submitted to the White House, the Committees on Education and the Workforce of the House of Representatives, the Committee on Labor and Human Resources of the Senate, and the Committees on Appropriations of the House of Representatives and the Senate not later than September 30, 1999.

(2) RESPONSE TO REPORT.—The National Assessment Governing Board shall develop and submit to the entities identified in paragraph (1) a report, not later than September 30, 1999, that addresses and responds to the findings reported by the National Academy of Sciences in the report entitled "Grading the Nation's Report Card: Evaluating NAEP and Transforming the Assessment of Educational Progress" that assert that the achievement levels of the National Assessment of Educational Progress (NAEP) are fundamentally flawed.

(3) TECHNICAL FEASIBILITY.—The National Academy of Sciences shall conduct a study regarding the technical feasibility, validity, and reliability of including test items from the National Assessment of Educational Progress (NAEP) for 4th grade reading and 8th grade mathematics or from other tests in State and district assessments for the purpose of providing a common measure of individual student performance. The National Academy of Sciences shall submit, to the entities identified under paragraph (1), an interim progress report not later than June 30, 1999 and a final report not later than September 30, 1999.

SEC. 306. Notwithstanding any other provision of law, any institution of higher education which receives funds under title III of the Higher Education Act, except for grants made under section 326, may use up to 20 percent of its award under part A or part B of the Act for endowment building purposes authorized under section 331. Any institution seeking to use part A or part B funds for endowment building purposes shall indicate such intention in its application to the Secretary and shall abide by departmental regulations governing the endowment challenge grant program.

SEC. 307. (a) From the amount appropriated for title VI of the Elementary and Secondary Education Act of 1965 in accordance with this section, the Secretary of Education—

(1) shall make available a total of $6,000,000 to the Secretary of the Interior (on behalf of the Bureau of Indian Affairs) and the outlying areas for activities under this section; and

(2) shall allocate the remainder by providing each State the greater of the amount the State would receive if a total of $1,124,620,000 were allocated under section 1122 of the Elementary and Secondary Education Act of 1965 or under section 2202(b) of the Act for fiscal year 1998, except that such allocations shall be ratably increased or decreased as may be necessary.

(b)(1) Each State that receives funds under this section shall distribute 100 percent of such funds to local educational agencies, of which—

(A) 80 percent of such amount shall be allocated to such local educational agencies in proportion to the number of children, aged 5 to 17, who reside in the school district served by such local educational agency from families with incomes below the poverty line (as defined by the Office of Management and Budget and revised annually in accordance with section 673(2) of the Community Services Block Grant Act (42 U.S.C. 9902(2))) applicable to a family of the size involved for the most recent fiscal year for which satisfactory data is available compared to the number of such individuals who reside in the school districts served by all the local educational agencies in the State for that fiscal year; and

(B) 20 percent of such amount shall be allocated to such local educational agencies in accordance with the relative enrollments of children, aged 5 to 17, in public and private nonprofit elementary and secondary schools within the boundaries of such agencies;

(2) Notwithstanding paragraph (1), if the award to a local educational agency under this section is less than the starting salary for a new teacher in that agency, the State shall not make the award unless the local educational agency agrees to form a consortium with not less than 1 other local educational agency for the purpose of reducing class size.

(c)(1) Each local educational agency that receives funds under this section shall use such funds to carry out effective approaches to reducing class size with highly qualified teachers to improve educational achievement for both regular and special-needs children, with particular consideration given to reducing class size in the early elementary grades for which some research has shown class size reduction is most effective.

(2)(A) Each such local educational agency may pursue the goal of reducing class size through—

(i) recruiting, hiring, and training certified regular and special education teachers and teachers of special-needs children, including teachers certified through State and local alternative routes;

(ii) testing new teachers for academic content knowledge, and to meet State certification requirements that are consistent with title II of the Higher Education Act of 1965; and

(iii) providing professional development to teachers, including special education teachers and teachers of special-needs children, consistent with title II of the Higher Education Act of 1965.

(B) A local educational agency may use not more than a total of 15 percent of the award received under this section for activities described in clauses (ii) and (iii) of subparagraph (A).

(C) A local educational agency that has already reduced class size in the early grades to 18 or less children may use funds received under this section—

(i) to make further class-size reductions in grades 1 through 3;

(ii) to reduce class size in kindergarten or other grades; or

(iii) to carry out activities to improve teacher quality, including professional development.

(3) Each such agency shall use funds under this section only to supplement, and not to supplant, State and local funds that, in the absence of such funds, would otherwise be spent for activities under this section.

(4) No funds made available under this section may be used to increase the salaries or provide benefits, other than participation in professional development and enrichment programs, to teachers who are, or have been, employed by the local educational agency.

(d)(1) Each State receiving funds under this section shall report on activities in the State under this section, consistent with section 6202(a)(2) of the Elementary and Secondary Education Act of 1965.

(2) Each school benefiting from this section, or the local educational agency serving that school, shall produce an annual report to parents, the general public, and the State educational agency in easily understandable language, on student achievement that is a result of hiring additional highly qualified teachers and reducing class size.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(e) If a local educational agency uses funds made available under this section for professional development activities, the agency shall ensure for the equitable participation of private nonprofit elementary and secondary schools in such activities. Section 6402 of the Elementary and Secondary Education Act of 1965 shall not apply to other activities under this section.

(f) ADMINISTRATIVE EXPENSES.—A local educational agency that receives funds under this section may use not more than 3 percent of such funds for local administrative costs.

(g) REQUEST FOR FUNDS.—Each local educational agency that desires to receive funds under this section shall include in the application required under section 6303 of the Elementary and Secondary Education Act of 1965 a description of the agency's program to reduce class size by hiring additional highly qualified teachers.

This title may be cited as the "Department of Education Appropriations Act, 1999".

## TITLE IV—RELATED AGENCIES

### ARMED FORCES RETIREMENT HOME

For expenses necessary for the Armed Forces Retirement Home to operate and maintain the United States Soldiers' and Airmen's Home and the United States Naval Home, to be paid from funds available in the Armed Forces Retirement Home Trust Fund, $70,745,000, of which $15,717,000 shall remain available until expended for construction and renovation of the physical plants at the United States Soldiers' and Airmen's Home and the United States Naval Home: *Provided,* That, notwithstanding any other provision of law, a single contract or related contracts for the development and construction at the United States Soldiers' and Airmen's Home, to include construction of a long-term care facility at the United States Naval Home and conversion of space in the Scott building at the United States Soldiers' and Airmen's Home, may be employed which collectively include the full scope of the project: *Provided further,* That the solicitation and contract shall contain the clause "availability of funds" found in 48 CFR 52.232–18 and 252.232–7007, Limitation of Government Obligations.

### CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

### DOMESTIC VOLUNTEER SERVICE PROGRAMS, OPERATING EXPENSES

For expenses necessary for the Corporation for National and Community Service to carry out the provisions of the Domestic Volunteer Service Act of 1973, as amended, $276,039,000.

### CORPORATION FOR PUBLIC BROADCASTING

For payment to the Corporation for Public Broadcasting, as authorized by the Communications Act of 1934, an amount which shall be available within limitations specified by that Act, for the fiscal year 2001, $340,000,000: *Provided,* That no funds made available to the Corporation for Public Broadcasting by this Act shall be used to pay for receptions, parties, or similar forms of entertainment for Government officials or employees: *Provided further,* That none of the funds contained in this paragraph shall be available or used to aid or support any program or activity from which any person is excluded, or is denied benefits, or is discriminated against, on the basis of race, color, national origin, religion, or sex: *Provided further,* That in addition to the amounts provided above, $15,000,000 shall be for digitalization, only if specifically authorized by subsequent legislation enacted by September 30, 1999.

### FEDERAL MEDIATION AND CONCILIATION SERVICE

### SALARIES AND EXPENSES

For expenses necessary for the Federal Mediation and Conciliation Service to carry out the functions vested in it by the Labor Management Relations Act, 1947 (29 U.S.C. 171–180, 182–183), including hire of passenger motor vehicles; for expenses necessary for the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a); and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, Public Law 95–454 (5 U.S.C. ch. 71), $34,620,000, including $1,500,000, to remain available through September 30, 2000, for activities authorized by the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a): *Provided,* That notwithstanding 31 U.S.C. 3302, fees charged, up to full-cost recovery, for special training activities and for arbitration services shall be credited to and merged with this account, and shall remain available until expended: *Provided further,* That fees for arbitration services shall be available only for education, training, and professional development of the agency workforce: *Provided further,* That the Director of the Service is authorized to accept and use on

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 2643 of 3864

behalf of the United States gifts of services and real, personal, or other property in the aid of any projects or functions within the Director's jurisdiction.

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Federal Mine Safety and Health Review Commission (30 U.S.C. 801 et seq.), $6,060,000.

## INSTITUTE OF MUSEUM AND LIBRARY SERVICES

For carrying out subtitle B of the Museum and Library Services Act, $166,175,000, of which $25,000,000 shall be for national leadership projects, notwithstanding section 221(a)(1)(B): *Provided,* That of the amount provided, $10,000,000, to remain available until expended, shall be awarded to the National Constitution Center, established by Public Law 100–433, for exhibition design, program planning, and operation of the Center to serve as a model between museums and libraries; $750,000 shall be for a Digital Geospatial and Numerical Data Library at the University of Idaho; $1,250,000 shall be awarded to the Franklin Institute, Philadelphia, Pennsylvania; $2,000,000 shall be to enhance digitization at the New York Public Library; $35,000 shall be for the Children's Museum of Manhattan; $300,000 shall be for the State Historical Society of Iowa; and $1,100,000 shall be for the Museum of Science and Industry in Chicago.

## MEDICARE PAYMENT ADVISORY COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1805 of the Social Security Act, $7,015,000, to be transferred to this appropriation from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds.

## NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE

### SALARIES AND EXPENSES

For necessary expenses for the National Commission on Libraries and Information Science, established by the Act of July 20, 1970 (Public Law 91–345, as amended by Public Law 102–95), $1,000,000.

## NATIONAL COUNCIL ON DISABILITY

### SALARIES AND EXPENSES

For expenses necessary for the National Council on Disability as authorized by title IV of the Rehabilitation Act of 1973, as amended, $2,344,000.

## NATIONAL EDUCATION GOALS PANEL

For expenses necessary for the National Education Goals Panel, as authorized by title II, part A of the Goals 2000: Educate America Act, $2,100,000.

## NATIONAL LABOR RELATIONS BOARD

### SALARIES AND EXPENSES

For expenses necessary for the National Labor Relations Board to carry out the functions vested in it by the Labor–Management Relations Act, 1947, as amended (29 U.S.C. 141–167), and other laws, $184,451,000: *Provided,* That no part of this appropriation shall be available to organize or assist in organizing agricultural laborers or used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers as referred to in section 2(3) of the Act of July 5, 1935 (29 U.S.C. 152), and as amended by the Labor–Management Relations Act, 1947, as amended, and as defined in section 3(f) of the Act of June 25, 1938 (29 U.S.C. 203), and including in said definition employees engaged in the maintenance and operation of ditches, canals, reservoirs, and waterways when maintained or operated on a mutual, nonprofit basis and at least 95 percent of the water stored or supplied thereby is used for farming purposes: *Provided further,* That none of the funds made available by this Act shall be used in any way to promulgate a final rule (altering 29 CFR part 103) regarding single location bargaining units in representation cases.

## NATIONAL MEDIATION BOARD

### SALARIES AND EXPENSES

For expenses necessary to carry out the provisions of the Railway Labor Act, as amended (45 U.S.C. 151–188), including emergency boards appointed by the President, $8,400,000: *Provided,* That unobligated balances at the end of fiscal year 1999 not needed for emergency boards shall remain available for other statutory purposes through September 30, 2000.

## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Occupational Safety and Health Review Commission (29 U.S.C. 661), $8,100,000.

## RAILROAD RETIREMENT BOARD

### DUAL BENEFITS PAYMENTS ACCOUNT

For payment to the Dual Benefits Payments Account, authorized under section 15(d) of the Railroad Retirement Act of 1974, $189,000,000, which shall include amounts becoming available in fiscal year 1999 pursuant to section 224(c)(1)(B) of Public Law 98–76; and in addition, an amount, not to exceed 2 percent of the amount provided herein, shall be available proportional to the amount by which the product of recipients and the average benefit received exceeds $189,000,000: *Provided,* That the total amount provided herein shall be credited in 12 approximately equal amounts on the first day of each month in the fiscal year.

### FEDERAL PAYMENTS TO THE RAILROAD RETIREMENT ACCOUNTS

For payment to the accounts established in the Treasury for the payment of benefits under the Railroad Retirement Act for interest earned on unnegotiated checks, $150,000, to remain available through September 30, 2000, which shall be the maximum amount available for payment pursuant to section 417 of Public Law 98–76.

### LIMITATION ON ADMINISTRATION

For necessary expenses for the Railroad Retirement Board for administration of the Railroad Retirement Act and the Railroad Unemployment Insurance Act, $90,000,000, to be derived in such amounts as determined by the Board from the railroad retirement accounts and from moneys credited to the railroad unemployment insurance administration fund.

### LIMITATION ON THE OFFICE OF INSPECTOR GENERAL

#### << 45 USCA § 231f NOTE >>

For expenses necessary for the Office of Inspector General for audit, investigatory and review activities, as authorized by the Inspector General Act of 1978, as amended, not more than $5,600,000, to be derived from the railroad retirement accounts and railroad unemployment insurance account: *Provided,* That none of the funds made available in any other paragraph of this Act may be transferred to the Office; used to carry out any such transfer; used to provide any office space, equipment, office supplies, communications facilities or services, maintenance services, or administrative services for the Office; used to pay any salary, benefit, or award for any personnel of the Office; used to pay any other operating expense of the Office; or used to reimburse the Office for any service provided, or expense incurred, by the Office: *Provided further,* That none of the funds made available under this heading in this Act, or subsequent Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Acts, may be used for any audit, investigation, or review of the Medicare Program.

## SOCIAL SECURITY ADMINISTRATION

### PAYMENTS TO SOCIAL SECURITY TRUST FUNDS

For payment to the Federal Old–Age and Survivors Insurance and the Federal Disability Insurance trust funds, as provided under sections 201(m), 228(g), and 1131(b)(2) of the Social Security Act, $19,689,000.

### SPECIAL BENEFITS FOR DISABLED COAL MINERS

For carrying out title IV of the Federal Mine Safety and Health Act of 1977, $382,803,000, to remain available until expended.

For making, after July 31 of the current fiscal year, benefit payments to individuals under title IV of the Federal Mine Safety and Health Act of 1977, for costs incurred in the current fiscal year, such amounts as may be necessary.

For making benefit payments under title IV of the Federal Mine Safety and Health Act of 1977 for the first quarter of fiscal year 2000, $141,000,000, to remain available until expended.

## SUPPLEMENTAL SECURITY INCOME PROGRAM

For carrying out titles XI and XVI of the Social Security Act, section 401 of Public Law 92–603, section 212 of Public Law 93–66, as amended, and section 405 of Public Law 95–216, including payment to the Social Security trust funds for administrative expenses incurred pursuant to section 201(g)(1) of the Social Security Act, $21,552,000,000, to remain available until expended: *Provided,* That any portion of the funds provided to a State in the current fiscal year and not obligated by the State during that year shall be returned to the Treasury.

From funds provided under the previous paragraph, not less than $100,000,000 shall be available for payment to the Social Security trust funds for administrative expenses for conducting continuing disability reviews.

In addition, $177,000,000, to remain available until September 30, 2000, for payment to the Social Security trust funds for administrative expenses for continuing disability reviews as authorized by section 103 of Public Law 104–121 and section 10203 of Public Law 105–33. The term "continuing disability reviews" means reviews and redeterminations as defined under section 201(g)(1)(A) of the Social Security Act, as amended.

For making, after June 15 of the current fiscal year, benefit payments to individuals under title XVI of the Social Security Act, for unanticipated costs incurred for the current fiscal year, such sums as may be necessary.

For making benefit payments under title XVI of the Social Security Act for the first quarter of fiscal year 2000, $9,550,000,000, to remain available until expended.

## LIMITATION ON ADMINISTRATIVE EXPENSES

For necessary expenses, including the hire of two passenger motor vehicles, and not to exceed $10,000 for official reception and representation expenses, not more than $5,996,000,000 may be expended, as authorized by section 201(g)(1) of the Social Security Act, from any one or all of the trust funds referred to therein: *Provided,* That not less than $1,600,000 shall be for the Social Security Advisory Board: *Provided further,* That unobligated balances at the end of fiscal year 1999 not needed for fiscal year 1999 shall remain available until expended to invest in the Social Security Administration computing network, including related equipment and non-payroll administrative expenses associated solely with this network: *Provided further,* That reimbursement to the trust funds under this heading for expenditures for official time for employees of the Social Security Administration pursuant to section 7131 of title 5, United States Code, and for facilities or support services for labor organizations pursuant to policies, regulations, or procedures referred to in section 7135(b) of such title shall be made by the Secretary of the Treasury, with interest, from amounts in the general fund not otherwise appropriated, as soon as possible after such expenditures are made.

From funds provided under the previous paragraph, notwithstanding the provision under this heading in Public Law 105–78 regarding unobligated balances at the end of fiscal year 1998 not needed for such fiscal year, an amount not to exceed $50,000,000 from such unobligated balances shall, in addition to funding already available under this heading for fiscal year 1999, be available for necessary expenses.

From funds provided under the first paragraph, not less than $200,000,000 shall be available for conducting continuing disability reviews.

From funds provided under the first paragraph, the Commissioner of Social Security shall direct $6,000,000 for Federal–State partnerships which will evaluate means to promote Medicare buy-in programs targeted to elderly and disabled individuals under titles XVIII and XIX of the Social Security Act.

In addition to funding already available under this heading, and subject to the same terms and conditions, $355,000,000, to remain available until September 30, 2000, for continuing disability reviews as authorized by section 103 of Public Law 104–121 and section 10203 of Public Law 105–33. The term "continuing disability reviews" means reviews and redeterminations as defined under section 201(g)(1)(A) of the Social Security Act as amended.

In addition, $75,000,000 to be derived from administration fees in excess of $5.00 per supplementary payment collected pursuant to section 1616(d) of the Social Security Act or section 212(b)(3) of Public Law 93–66, which shall remain available

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.02622

until expended. To the extent that the amounts collected pursuant to such section 1616(d) or 212(b)(3) in fiscal year 1999 exceed $75,000,000, the amounts shall be available in fiscal year 2000 only to the extent provided in advance in appropriations Acts.

## OFFICE OF INSPECTOR GENERAL

### (INCLUDING TRANSFER OF FUNDS)

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $12,000,000, together with not to exceed $44,000,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Federal Old–Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust Fund.

In addition, an amount not to exceed 3 percent of the total provided in this appropriation may be transferred from the "Limitation on Administrative Expenses", Social Security Administration, to be merged with this account, to be available for the time and purposes for which this account is available: *Provided,* That notice of such transfers shall be transmitted promptly to the Committees on Appropriations of the House and Senate.

## UNITED STATES INSTITUTE OF PEACE

### OPERATING EXPENSES

For necessary expenses of the United States Institute of Peace as authorized in the United States Institute of Peace Act, $12,160,000.

## TITLE V—GENERAL PROVISIONS

SEC. 501. The Secretaries of Labor, Health and Human Services, and Education are authorized to transfer unexpended balances of prior appropriations to accounts corresponding to current appropriations provided in this Act: *Provided,* That such transferred balances are used for the same purpose, and for the same periods of time, for which they were originally appropriated.

SEC. 502. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 503. (a) No part of any appropriation contained in this Act shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television, or video presentation designed to support or defeat legislation pending before the Congress or any State legislature, except in presentation to the Congress or any State legislature itself.

(b) No part of any appropriation contained in this Act shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

SEC. 504. The Secretaries of Labor and Education are each authorized to make available not to exceed $15,000 from funds available for salaries and expenses under titles I and III, respectively, for official reception and representation expenses; the Director of the Federal Mediation and Conciliation Service is authorized to make available for official reception and representation expenses not to exceed $2,500 from the funds available for "Salaries and expenses, Federal Mediation and Conciliation Service"; and the Chairman of the National Mediation Board is authorized to make available for official reception and representation expenses not to exceed $2,500 from funds available for "Salaries and expenses, National Mediation Board".

SEC. 505. Notwithstanding any other provision of this Act, no funds appropriated under this Act shall be used to carry out any program of distributing sterile needles or syringes for the hypodermic injection of any illegal drug.

SEC. 506. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that

is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 507. When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds included in this Act, including but not limited to State and local governments and recipients of Federal research grants, shall clearly state: (1) the percentage of the total costs of the program or project which will be financed with Federal money; (2) the dollar amount of Federal funds for the project or program; and (3) percentage and dollar amount of the total costs of the project or program that will be financed by nongovernmental sources.

SEC. 508. (a) None of the funds appropriated under this Act, and none of the funds in any trust fund to which funds are appropriated under this Act, shall be expended for any abortion.

(b) None of the funds appropriated under this Act, and none of the funds in any trust fund to which funds are appropriated under this Act, shall be expended for health benefits coverage that includes coverage of abortion.

(c) The term "health benefits coverage" means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

SEC. 509. (a) The limitations established in the preceding section shall not apply to an abortion—

(1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

<< 31 USCA § 1301 NOTE >>

SEC. 510. Notwithstanding any other provision of law, hereafter—

<< 31 USCA § 1301 NOTE >>

(1) no amount may be transferred from an appropriation account for the Departments of Labor, Health and Human Services, and Education except as authorized in this or any subsequent appropriation Act, or in the Act establishing the program or activity for which funds are contained in this Act;

<< 31 USCA § 1301 NOTE >>

(2) no department, agency, or other entity, other than the one responsible for administering the program or activity for which an appropriation is made in this Act, may exercise authority for the timing of the obligation and expenditure of such appropriation, or for the purpose for which it is obligated and expended, except to the extent and in the manner otherwise provided in sections 1512 and 1513 of title 31, United States Code; and

<< 31 USCA § 1301 NOTE >>

(3) no funds provided under this Act shall be available for the salary (or any part thereof) of an employee who is reassigned on a temporary detail basis to another position in the employing agency or department or in any other agency or department, unless the detail is independently approved by the head of the employing department or agency.

SEC. 511. (a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

AR.02624

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.208(a)(2) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term "human embryo or embryos" includes any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells.

SEC. 512. (a) LIMITATION ON USE OF FUNDS FOR PROMOTION OF LEGALIZATION OF CONTROLLED SUBSTANCES.—None of the funds made available in this Act may be used for any activity that promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act (21 U.S.C. 812).

(b) EXCEPTIONS.—The limitation in subsection (a) shall not apply when there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that federally sponsored clinical trials are being conducted to determine therapeutic advantage.

SEC. 513. None of the funds made available in this Act may be obligated or expended to enter into or renew a contract with an entity if—

(1) such entity is otherwise a contractor with the United States and is subject to the requirement in section 4212(d) of title 38, United States Code, regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans; and

(2) such entity has not submitted a report as required by that section for the most recent year for which such requirement was applicable to such entity.

SEC. 514. None of the funds made available in this Act may be used to pay the expenses of an election officer appointed by a court to oversee an election of any officer or trustee for the International Brotherhood of Teamsters.

SEC. 515. Except as otherwise specifically provided by law, unobligated balances remaining available at the end of fiscal year 1999 from appropriations made available for salaries and expenses for fiscal year 1999 in this Act, shall remain available through December 31, 1999, for each such account for the purposes authorized: *Provided,* That the House and Senate Committees on Appropriations shall be notified at least fifteen days prior to the obligation of such funds.

SEC. 516. None of the funds made available in this Act may be used to promulgate or adopt any final standard under section 1173(b) of the Social Security Act (42 U.S.C. 1320d–2(b)) providing for, or providing for the assignment of, a unique health identifier for an individual (except in an individual's capacity as an employer or a health care provider), until legislation is enacted specifically approving the standard.

### TITLE VI—NATIONAL CENTER FOR COMPLEMENTARY AND ALTERNATIVE MEDICINE

SEC. 601. ESTABLISHMENT OF NATIONAL CENTER FOR COMPLEMENTARY AND ALTERNATIVE MEDICINE.

IN GENERAL.—Title IV of the Public Health Service Act (42 U.S.C. 281 et seq.) is amended—

<< 42 USCA § 283g >>

(1) by striking section 404E; and

<< 42 USCA Ch. 6A >>

(2) in part E, by adding at the end the following:

"Subpart 5—National Center for Complementary and Alternative Medicine

<< 42 USCA § 287c–21 >>

"SEC. 485D. PURPOSE OF CENTER.

<< 42 USCA § 287c–21 >>

"(a) IN GENERAL.—The general purposes of the National Center for Complementary and Alternative Medicine (in this subpart referred to as the 'Center') are the conduct and support of basic and applied research (including both intramural and extramural research), research training, the dissemination of health information, and other programs with respect to identifying, investigating, and validating complementary and alternative treatment, diagnostic and prevention modalities, disciplines and systems. The Center shall be headed by a director, who shall be appointed by the Secretary. The Director of the Center shall report directly to the Director of NIH.

<< 42 USCA § 287c–21 >>

"(b) ADVISORY COUNCIL.—The Secretary shall establish an advisory council for the Center in accordance with section 406, except that at least half of the members of the advisory council who are not ex officio members shall include practitioners licensed in one or more of the major systems with which the Center is concerned, and at least 3 individuals representing the interests of individual consumers of complementary and alternative medicine.

<< 42 USCA § 287c–21 >>

"(c) COMPLEMENT TO CONVENTIONAL MEDICINE.—In carrying out subsection (a), the Director of the Center shall, as appropriate, study the integration of alternative treatment, diagnostic and prevention systems, modalities, and disciplines with the practice of conventional medicine as a complement to such medicine and into health care delivery systems in the United States.

<< 42 USCA § 287c–21 >>

"(d) APPROPRIATE SCIENTIFIC EXPERTISE AND COORDINATION WITH INSTITUTES AND FEDERAL AGENCIES.—The Director of the Center, after consultation with the advisory council for the Center and the division of research grants, shall ensure that scientists with appropriate expertise in research on complementary and alternative medicine are incorporated into the review, oversight, and management processes of all research projects and other activities funded by the Center. In carrying out this subsection, the Director of the Center, as necessary, may establish review groups with appropriate scientific expertise. The Director of the Center shall coordinate efforts with other Institutes and Federal agencies to ensure appropriate scientific input and management.

<< 42 USCA § 287c–21 >>

"(e) EVALUATION OF VARIOUS DISCIPLINES AND SYSTEMS.—In carrying out subsection (a), the Director of the Center shall identify and evaluate alternative and complementary medical treatment, diagnostic and prevention modalities in each of the disciplines and systems with which the Center is concerned, including each discipline and system in which accreditation, national certification, or a State license is available.

<< 42 USCA § 287c–21 >>

"(f) ENSURING HIGH QUALITY, RIGOROUS SCIENTIFIC REVIEW.—In order to ensure high quality, rigorous scientific review of complementary and alternative, diagnostic and prevention modalities, disciplines and systems, the Director of the Center shall conduct or support the following activities:

<< 42 USCA § 287c–21 >>

"(1) Outcomes research and investigations.

<< 42 USCA § 287c–21 >>

"(2) Epidemiological studies.

<< 42 USCA § 287c–21 >>

"(3) Health services research.

<< 42 USCA § 287c–21 >>

"(4) Basic science research.

<< 42 USCA § 287c–21 >>

"(5) Clinical trials.

<< 42 USCA § 287c–21 >>

"(6) Other appropriate research and investigational activities.

<< 42 USCA § 287c–21 >>

The Director of NIH, in coordination with the Director of the Center, shall designate specific personnel in each Institute to serve as full-time liaisons with the Center in facilitating appropriate coordination and scientific input.

<< 42 USCA § 287c–21 >>

"(g) DATA SYSTEM; INFORMATION CLEARINGHOUSE.—

<< 42 USCA § 287c–21 >>

"(1) DATA SYSTEM.—The Director of the Center shall establish a bibliographic system for the collection, storage, and retrieval of worldwide research relating to complementary and alternative treatment, diagnostic and prevention modalities, disciplines and systems. Such a system shall be regularly updated and publicly accessible.

<< 42 USCA § 287c–21 >>

"(2) CLEARINGHOUSE.—The Director of the Center shall establish an information clearinghouse to facilitate and enhance, through the effective dissemination of information, knowledge and understanding of alternative medical treatment, diagnostic and prevention practices by health professionals, patients, industry, and the public.

<< 42 USCA § 287c–21 >>

"(h) RESEARCH CENTERS.—The Director of the Center, after consultation with the advisory council for the Center, shall provide support for the development and operation of multipurpose centers to conduct research and other activities described in subsection (a) with respect to complementary and alternative treatment, diagnostic and prevention modalities, disciplines and systems. The provision of support for the development and operation of such centers shall include accredited complementary and alternative medicine research and education facilities.

<< 42 USCA § 287c–21 >>

"(i) AVAILABILITY OF RESOURCES.—After consultation with the Director of the Center, the Director of NIH shall ensure that resources of the National Institutes of Health, including laboratory and clinical facilities, fellowships (including research training fellowship and junior and senior clinical fellowships), and other resources are sufficiently available to enable the Center to appropriately and effectively carry out its duties as described in subsection (a). The Director of NIH, in coordination with the Director of the Center, shall designate specific personnel in each Institute to serve as full-time liaisons with the Center in facilitating appropriate coordination and scientific input.

<< 42 USCA § 287c–21 >>

 "(j) AVAILABILITY OF APPROPRIATIONS.—Amounts appropriated to carry out this section for fiscal year 1999 are available for obligation through September 30, 2001. Amounts appropriated to carry out this section for fiscal year 2000 are available for obligation through September 30, 2001.".

<< 42 USCA § 281 >>

 (k) TECHNICAL AND CONFORMING AMENDMENT.—Section 401(b)(2) of the Public Health Service Act (42 U.S.C. 281(b)(2) is amended by adding at the end the following:

<< 42 USCA § 281 >>

 "(F) The National Center for Complementary and Alternative Medicine.".

TITLE VII—MISCELLANEOUS PROVISIONS

RATES OF PAY FOR PUBLIC BROADCASTING AND NATIONAL PUBLIC RADIO

<< 47 USCA § 396 >>

 SEC. 701. Section 396(k)(9) of Title 47, United States Code, is amended by striking "at an annual rate of pay which exceeds the rate of basic pay in effect from time to time for level I of the Executive Schedule under 5312 of title 5, United States Code" and inserting "in excess of reasonable compensation as determined pursuant to Section 4958 of the Internal Revenue Code for services that the officer or employee renders to organization" after "compensated."

<< 42 USCA § 1396r–4 NOTE >>

 SEC. 702. The amount of the DSH allotment for the State of Minnesota for fiscal year 1999, specified in the table under section 1923(f)(2) of the Social Security Act (as amended by section 4721(a)(1) of Public Law 105–33) is deemed to be $33,000,000.

<< 42 USCA § 1396r–4 NOTE >>

 SEC. 703. The amount of the DSH allotment for the State of New Mexico for fiscal year 1999, specified in the table under section 1923(f)(2) of the Social Security Act (as amended by section 4721(a)(1) of Public Law 105–33) is deemed to be $9,000,000.

<< 42 USCA § 1396r–4 NOTE >>

 SEC. 704. Notwithstanding section 1923(f)(2) of the Social Security Act (42 U.S.C. 1396r–4(f)(2)) (as amended by section 4721(a)(1) of the Balanced Budget Act of 1997 (Public Law 105–33; 111 Stat. 511), the amount of the DSH allotment for Wyoming for fiscal year 1999 is deemed to be $95,000.
 SEC. 705. EXTENSION OF CERTAIN ADJUDICATION PROVISIONS. The Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990 (Public Law 101–167) is amended—

<< 8 USCA § 1157 NOTE >>

 (1) in section 599D (8 U.S.C. 1157 note)—
 (A) in subsection (b)(3), by striking "1997 and 1998" and inserting "1997, 1998, and 1999"; and
 (B) in subsection (e), by striking "October 1, 1998" each place it appears and inserting "October 1, 1999" and

<< 8 USCA § 1255 NOTE >>

 (2) in section 599E (8 U.S.C. 1255 note) in subsection (b)(2), by striking "September 30, 1998" and inserting "September 30, 1999".

<< 42 USCA § 1397dd >>

SEC. 706. (a) Section 2104(c) of the Social Security Act (42 U.S.C. 1397dd(c)) is amended by adding at the end the following new paragraph:

<< 42 USCA § 1397dd >>

"(4) ADDITIONAL ALLOTMENT.—

"(A) IN GENERAL.—In addition to the allotment under paragraph (1), the Secretary shall allot each commonwealth and territory described in paragraph (3) the applicable percentage specified in paragraph (2) of the amount appropriated under subparagraph (B).

"(B) APPROPRIATIONS.—For purposes of providing allotments pursuant to subparagraph (A), there is appropriated, out of any money in the Treasury not otherwise appropriated $32,000,000 for fiscal year 1999.".

<< 42 USCA § 1397dd >>

(b) Section 2104(b)(1) of such Act (42 U.S.C. 1397dd(b)(1)) is amended by inserting "(determined without regard to paragraph (4) thereof)" after "subsection (c)".

<< 42 USCA § 1397dd NOTE >>

SEC. 707. DETERMINATION OF NUMBER OF CHILDREN AND STATE COST FACTORS FOR FISCAL YEARS 1998 AND 1999 FOR PURPOSES OF STATE CHILDREN'S HEALTH INSURANCE PROGRAM (SCHIP). Notwithstanding any other provision of law, for purposes of determining the product under section 2104(b)(1)(A) of the Social Security Act (42 U.S.C. 1397dd(b)(1)(A)) for a State for each of fiscal years 1998 and 1999—

<< 42 USCA § 1397dd NOTE >>

(1) the number of children under clause (i) of such section shall be the number of low-income children specified for the State in Column B of the table on pages 48101–48102 of the Federal Register published on September 12, 1997, adjusted by the Census Bureau as necessary to treat children as being without health insurance if they have access to health care funded by the Indian Health Service but do not have health insurance; and

<< 42 USCA § 1397dd NOTE >>

(2) the State cost factor under clause (ii) of such section shall be the State cost factor specified for the State in Column C of such table.

<< 50 USCA App. § 2351 NOTE >>

SEC. 708. (a) EXTENSION OF DEADLINE FOR SUBMISSION OF REPORT BY COMMISSION TO ASSESS THE ORGANIZATION OF THE FEDERAL GOVERNMENT TO COMBAT THE PROLIFERATION OF WEAPONS OF MASS DESTRUCTION.—Section 712(c)(1) of the Combating Proliferation of Weapons of Mass Destruction Act of 1996 (subtitle A of title VII of Public Law 104–293; 110 Stat. 3470; 50 U.S.C. 2351 note) is amended by striking out "the date of the enactment of this Act" and inserting in lieu thereof "January 18, 1998".

<< 50 USCA App. § 2351 NOTE >>

(b) MEMBERSHIP OF COMMISSION.—Section 711 of that Act is amended—

<< 50 USCA App. § 2351 NOTE >>

AR.02629

(1) in the matter preceding subsection (b)(1), by striking out "eight members" and inserting in lieu thereof "twelve members, none of whom may, during the period of their service on the Commission, be an officer or employee of any department, agency, or other establishment of the Executive Branch (other than the Commission), and";

<< 50 USCA App. § 2351 NOTE >>

(2) in subsection (b)(2), by striking out "one" and inserting in lieu thereof "three";

<< 50 USCA App. § 2351 NOTE >>

(3) in subsection (b)(4), by striking out "one" and inserting in lieu thereof "three"; and

<< 50 USCA App. § 2351 NOTE >>

(4) in subsection (e), by striking out "the date on which all members of the Commission have been appointed" and inserting in lieu thereof "the date of enactment of an Act making appropriations for the Departments of Labor, Health and Human Services, and Education, and related agencies, for the fiscal year ending September 30, 1999, regardless of whether all the members of the Commission have been appointed as of that date,".

<< 50 USCA App. § 2351 NOTE >>

(c) RESTRICTIONS ON ACTIVITIES OF COMMISSION.—Section 712(a) of that Act is amended by adding at the end the following:

<< 50 USCA App. § 2351 NOTE >>

(4) RESTRICTIONS.—In carrying out the study under paragraph (1), making the assessments under paragraph (2), and addressing the matters identified in paragraph (3), the Commission shall not review, evaluate, or report on—
  "(A) United States domestic response capabilities with respect to weapons of mass destruction; or
  "(B) the adequacy or usefulness of United States laws that provide for the imposition of sanctions on countries or entities that engage in the proliferation of weapons of mass destruction.".

<< 50 USCA App. § 2351 NOTE >>

(d) LIMITATION ON COMMISSION EXPENDITURES.—Section 717 of that Act is amended by striking out "shall be paid" and inserting in lieu thereof "shall not exceed $1,000,000, and shall be paid".

<< 45 USCA § 231e >>

SEC. 709. PROTECTION OF DIVORCED SPOUSES. (a) IN GENERAL.—Section 6(c) of the Railroad Retirement Act of 1974 (45 U.S.C. 231e(c)) is amended—

<< 45 USCA § 231e >>

(1) in the last sentence of paragraph (1), by inserting "(other than to a survivor in the circumstances described in paragraph (3))" after "no further benefits shall be paid"; and

<< 45 USCA § 231e >>

(2) by adding at the end the following:

<< 45 USCA § 231e >>

"(3) Notwithstanding the last sentence of paragraph (1), benefits shall be paid to a survivor who—
  "(A) is a divorced wife; and

"(B) through administrative error received benefits otherwise precluded by the making of a lump sum payment under this section to a widow;

if that divorced wife makes an election to repay to the Board the lump sum payment. The Board may withhold up to 10 percent of each benefit amount paid after the date of the enactment of this paragraph toward such reimbursement. The Board may waive such repayment to the extent the Board determines it would cause an unjust financial hardship for the beneficiary.".

<< 45 USCA § 231e NOTE >>

(b) APPLICATION OF AMENDMENT.—The amendment made by this section shall apply with respect to any benefits paid before the date of enactment of this Act as well as to benefits payable on or after the date of the enactment of this Act.

<< 42 USCA § 1396a NOTE >>

SEC. 710. For purposes of payments to States for medical assistance under title XIX of the Social Security Act from amounts appropriated to carry out such title for fiscal year 1999 and for any subsequent fiscal year, individuals who are PACE program eligible individuals under section 1934 of that Act and who meet the income and resource eligibility requirements of individuals who are eligible for medical assistance under section 1902(a)(10)(A)(ii)(VI) of that Act shall be treated as individuals described in such section 1902(a)(10)(A)(ii)(VI) during the period of their enrollment in the PACE program.

TITLE VIII—READING EXCELLENCE ACT

SUBTITLE I—READING AND LITERACY GRANTS

SEC. 101. AMENDMENT TO ESEA FOR READING AND LITERACY GRANTS.

(a) IN GENERAL.—Title II of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6601 et seq.) is amended—

<< 20 USCA Ch. 70 >>

(1) by redesignating parts C and D as parts D and E, respectively; and

<< 20 USCA Ch. 70 >>

(2) by inserting after part B the following:

<< 20 USCA § 6661 >>

"PART C—READING AND LITERACY GRANTS

"SEC. 2251. PURPOSES.
"The purposes of this part are as follows:
"(1) To provide children with the readiness skills they need to learn to read once they enter school.
"(2) To teach every child to read in the child's early childhood years:
  "(A) as soon as the child is ready to read; or
  "(B) as soon as possible once the child enters school, but not later than 3d grade.
"(3) To improve the reading skills of students, and the instructional practices for current teachers (and, as appropriate, other instructional staff) who teach reading, through the use of findings from scientifically based reading research, including findings relating to phonemic awareness, systematic phonics, fluency, and reading comprehension.
"(4) To expand the number of high-quality family literacy programs.
"(5) To provide early literacy intervention to children who are experiencing reading difficulties in order to reduce the number of children who are incorrectly identified as a child with a disability and inappropriately referred to special education.

<< 20 USCA § 6661a >>

"SEC. 2252. DEFINITIONS.

"For purposes of this part:

"(1) ELIGIBLE PROFESSIONAL DEVELOPMENT PROVIDER.—The term 'eligible professional development provider' means a provider of professional development in reading instruction to teachers that is based on scientifically based reading research.

"(2) FAMILY LITERACY SERVICES.—The term •family literacy services' means services provided to participants on a voluntary basis that are of sufficient intensity in terms of hours, and of sufficient duration, to make sustainable changes in a family, and that integrate all of the following activities:

"(A) Interactive literacy activities between parents and their children.

"(B) Training for parents regarding how to be the primary teacher for their children and full partners in the education of their children.

"(C) Parent literacy training that leads to economic self-sufficiency.

"(D) An age-appropriate education to prepare children for success in school and life experiences.

"(3) INSTRUCTIONAL STAFF.—The term 'instructional staff'—

"(A) means individuals who have responsibility for teaching children to read; and

"(B) includes principals, teachers, supervisors of instruction, librarians, library school media specialists, teachers of academic subjects other than reading, and other individuals who have responsibility for assisting children to learn to read.

"(4) READING.—The term 'reading' means a complex system of deriving meaning from print that requires all of the following:

"(A) The skills and knowledge to understand how phonemes, or speech sounds, are connected to print.

"(B) The ability to decode unfamiliar words.

"(C) The ability to read fluently.

"(D) Sufficient background information and vocabulary to foster reading comprehension.

"(E) The development of appropriate active strategies to construct meaning from print.

"(F) The development and maintenance of a motivation to read.

"(5) SCIENTIFICALLY BASED READING RESEARCH.—The term 'scientifically based reading research'—

"(A) means the application of rigorous, systematic, and objective procedures to obtain valid knowledge relevant to reading development, reading instruction, and reading difficulties; and

"(B) shall include research that—

"(i) employs systematic, empirical methods that draw on observation or experiment;

"(ii) involves rigorous data analyses that are adequate to test the stated hypotheses and justify the general conclusions drawn;

"(iii) relies on measurements or observational methods that provide valid data across evaluators and observers and across multiple measurements and observations; and

"(iv) has been accepted by a peer-reviewed journal or approved by a panel of independent experts through a comparably rigorous, objective, and scientific review.

<< 20 USCA § 6661b >>

"SEC. 2253. READING AND LITERACY GRANTS TO STATE EDUCATIONAL AGENCIES.

"(a) PROGRAM AUTHORIZED.—

"(1) IN GENERAL.—Subject to the provisions of this part, the Secretary shall award grants to State educational agencies to carry out the reading and literacy activities authorized under this section and sections 2254 through 2256.

"(2) LIMITATIONS.—

"(A) SINGLE GRANT PER STATE.—A State educational agency may not receive more than one grant under paragraph (1).

"(B) 3–YEAR TERM.—A State educational agency that receives a grant under paragraph (1) may expend the funds provided under the grant only during the 3–year period beginning on the date on which the grant is made.

"(b) APPLICATION.—

"(1) IN GENERAL.—A State educational agency that desires to receive a grant under this part shall submit an application to the Secretary at such time and in such form as the Secretary may require. The application shall contain the information described in paragraph (2).

"(2) CONTENTS.—An application under this subsection shall contain the following:

"(A) An assurance that the Governor of the State, in consultation with the State educational agency, has established a reading and literacy partnership described in subsection (d), and a description of how such partnership—

"(i) assisted in the development of the State plan;

"(ii) will be involved in advising on the selection of subgrantees under sections 2255 and 2256; and

"(iii) will assist in the oversight and evaluation of such subgrantees.

"(B) A description of the following:

"(i) How the State educational agency will ensure that professional development activities related to reading instruction and provided under this part are—

"(I) coordinated with other State and local level funds and used effectively to improve instructional practices for reading; and

"(II) based on scientifically based reading research.

"(ii) How the activities assisted under this part will address the needs of teachers and other instructional staff, and will effectively teach students to read, in schools receiving assistance under section 2255 and 2256.

"(iii) The extent to which the activities will prepare teachers in all the major components of reading instruction (including phonemic awareness, systematic phonics, fluency, and reading comprehension).

"(iv) How the State educational agency will use technology to enhance reading and literacy professional development activities for teachers, as appropriate.

"(v) How parents can participate in literacy-related activities assisted under this part to enhance their children's reading.

"(vi) How subgrants made by the State educational agency under sections 2255 and 2256 will meet the requirements of this part, including how the State educational agency will ensure that subgrantees will use practices based on scientifically based reading research.

"(vii) How the State educational agency will, to the extent practicable, make grants to subgrantees in both rural and urban areas.

"(viii) The process that the State used to establish the reading and literacy partnership described in subsection (d).

"(C) An assurance that each local educational agency to which the State educational agency makes a subgrant—

"(i) will provide professional development for the classroom teacher and other appropriate instructional staff on the teaching of reading based on scientifically based reading research;

"(ii) will provide family literacy services based on programs such as the Even Start family literacy model authorized under part B of title I, to enable parents to be their child's first and most important teacher;

"(iii) will carry out programs to assist those kindergarten students who are not ready for the transition to first grade, particularly students experiencing difficulty with reading skills; and

"(iv) will use supervised individuals (including tutors), who have been appropriately trained using scientifically based reading research, to provide additional support, before school, after school, on weekends, during noninstructional periods of the school day, or during the summer, for children preparing to enter kindergarten and students in kindergarten through grade 3 who are experiencing difficulty reading.

"(D) An assurance that instruction in reading will be provided to children with reading difficulties who—

"(i) are at risk of being referred to special education based on these difficulties; or

"(ii) have been evaluated under section 614 of the Individuals with Disabilities Education Act but, in accordance with section 614(b)(5) of such Act, have not been identified as being a child with a disability (as defined in section 602 of the such Act).

"(E) A description of how the State educational agency—

"(i) will build on, and promote coordination among, literacy programs in the State (including federally funded programs such as the Adult Education and Family Literacy Act and the Individuals with Disabilities Education Act), in order to increase the effectiveness of the programs in improving reading for adults and children and to avoid duplication of the efforts of the programs;

"(ii) will promote reading and library programs that provide access to engaging reading material;

"(iii) will make local educational agencies described in sections 2255(a)(1) and 2256(a)(1) aware of the availability of subgrants under sections 2255 and 2256; and

"(iv) will assess and evaluate, on a regular basis, local educational agency activities assisted under this part, with respect to whether they have been effective in achieving the purposes of this part.

"(F) A description of the evaluation instrument the State educational agency will use for purposes of the assessments and evaluations under subparagraph (E)(iv).

"(c) APPROVAL OF APPLICATIONS.—

"(1) IN GENERAL.—The Secretary shall approve an application of a State educational agency under this section only—

"(A) if such application meets the requirement of this section; and

"(B) after taking into account the extent to which the application furthers the purposes of this part and the overall quality of the application.

"(2) PEER REVIEW.—

"(A) IN GENERAL.—The Secretary, in consultation with the National Institute for Literacy, shall convene a panel to evaluate applications under this section. At a minimum, the panel shall include—

"(i) representatives of the National Institute for Literacy, the National Research Council of the National Academy of Sciences, and the National Institute of Child Health and Human Development;

"(ii) 3 individuals selected by the Secretary;

"(iii) 3 individuals selected by the National Institute for Literacy;

"(iv) 3 individuals selected by the National Research Council of the National Academy of Sciences; and

"(v) 3 individuals selected by the National Institute of Child Health and Human Development.

"(B) EXPERTS.—The panel shall include experts who are competent, by virtue of their training, expertise, or experience, to evaluate applications under this section, and experts who provide professional development to teachers of reading to children and adults, and experts who provide professional development to other instructional staff, based on scientifically based reading research.

"(C) PRIORITY.—The panel shall recommend grant applications from State educational agencies under this section to the Secretary for funding or for disapproval. In making such recommendations, the panel shall give priority to applications from State educational agencies whose States have modified, are modifying, or provide an assurance that not later than 18 months after receiving a grant under this section the State educational agencies will increase the training and the methods of teaching reading required for certification as an elementary school teacher to reflect scientifically based reading research, except that nothing in this Act shall be construed to establish a national system of teacher certification.

"(D) MINIMUM GRANT AMOUNTS.—

"(i) STATES.—Each State educational agency selected to receive a grant under this section shall receive an amount for the grant period that is not less than $500,000.

"(ii) OUTLYING AREAS.—The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands selected to receive a grant under this section shall receive an amount for the grant period that is not less than $100,000.

"(E) LIMITATION.—The Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall not be eligible to receive a grant under this part.

"(d) READING AND LITERACY PARTNERSHIPS.—

"(1) REQUIRED PARTICIPANTS.—In order for a State educational agency to receive a grant under this section, the Governor of the State, in consultation with the State educational agency, shall establish a reading and literacy partnership consisting of at least the following participants:

"(A) The Governor of the State.

"(B) The chief State school officer.

"(C) The chairman and the ranking member of each committee of the State legislature that is responsible for education policy.

"(D) A representative, selected jointly by the Governor and the chief State school officer, of at least one local educational agency that is eligible to receive a subgrant under section 2255.

"(E) A representative, selected jointly by the Governor and the chief State school officer, of a community-based organization working with children to improve their reading skills, particularly a community-based organization using tutors and scientifically based reading research.

"(F) State directors of appropriate Federal or State programs with a strong reading component.

"(G) A parent of a public or private school student or a parent who educates their child or children in their home, selected jointly by the Governor and the chief State school officer.

"(H) A teacher who successfully teaches reading and an instructional staff member, selected jointly by the Governor and the chief State school officer.

"(I) A family literacy service provider selected jointly by the Governor and the chief State school officer.

"(2) OPTIONAL PARTICIPANTS.—A reading and literacy partnership may include additional participants, who shall be selected jointly by the Governor and the chief State school officer, and who may include a representative of—

"(A) an institution of higher education operating a program of teacher preparation based on scientifically based reading research in the State;

"(B) a local educational agency;

"(C) a private nonprofit or for-profit eligible professional development provider providing instruction based on scientifically based reading research;

"(D) an adult education provider;

"(E) a volunteer organization that is involved in reading programs; or

"(F) a school library or a public library that offers reading or literacy programs for children or families.

"(3) PREEXISTING PARTNERSHIP.—If, before the date of the enactment of the Reading Excellence Act, a State established a consortium, partnership, or any other similar body, that includes the Governor and the chief State school officer and has, as a central part of its mission, the promotion of literacy for children in their early childhood years through the 3d grade and family literacy services, but that does not satisfy the requirements of paragraph (1), the State may elect to treat that consortium, partnership, or body as the reading and literacy partnership for the State notwithstanding such paragraph, and it shall be considered a reading and literacy partnership for purposes of the other provisions of this part.

<< 20 USCA § 6661c >>

"SEC. 2254. USE OF AMOUNTS BY STATE EDUCATIONAL AGENCIES.

"A State educational agency that receives a grant under section 2253—

"(1) shall use not more than 5 percent of the funds made available under the grant for the administrative costs of carrying out this part (excluding section 2256), of which not more than 2 percent may be used to carry out section 2259; and

"(2) shall use not more than 15 percent of the funds made available under the grant to solicit applications for, award, and oversee the performance of, not less than one subgrant pursuant to section 2256.

<< 20 USCA § 6661d >>

"SEC. 2255. LOCAL READING IMPROVEMENT SUBGRANTS.

"(a) IN GENERAL.—

"(1) SUBGRANTS.—A State educational agency that receives a grant under section 2253 shall make subgrants, on a competitive basis, to local educational agencies that either—

"(A) have at least one school that is identified for school improvement under section 1116(c) in the geographic area served by the agency;

"(B) have the largest, or second largest, number of children who are counted under section 1124(c), in comparison to all other local educational agencies in the State; or

"(C) have the highest, or second highest, school-age child poverty rate, in comparison to all other local educational agencies in the State.

For purposes of subparagraph (C), the term 'school-age child poverty rate' means the number of children counted under section 1124(c) who are living within the geographic boundaries of the local educational agency, expressed as a percentage of the total number of children aged 5–17 years living within the geographic boundaries of the local educational agency.

"(2) SUBGRANT AMOUNT.—A subgrant under this section shall consist of an amount sufficient to enable the subgrant recipient to operate a program for a 2–year period and may not be revoked or terminated on the grounds that a school ceases, during the grant period, to meet the requirements of subparagraph (A), (B), or (C) of paragraph (1).

"(b) APPLICATIONS.—A local educational agency that desires to receive a subgrant under this section shall submit an application to the State educational agency at such time, in such manner, and including such information as the agency may require. The application—

"(1) shall describe how the local educational agency will work with schools selected by the agency to receive assistance under subsection (d)(1)—

"(A) to select one or more programs of reading instruction, developed using scientifically based reading research, to improve reading instruction by all academic teachers for all children in each of the schools selected by the agency under such subsection and, where appropriate, for their parents; and

"(B) to enter into an agreement with a person or entity responsible for the development of each program selected under subparagraph (A), or a person with experience or expertise about the program and its implementation, under which the person or entity agrees to work with the local educational agency and the schools in connection with such implementation and improvement efforts;

"(2) shall include an assurance that the local educational agency—

"(A) will carry out professional development for the classroom teacher and other instructional staff on the teaching of reading based on scientifically based reading research;

"(B) will provide family literacy services based on programs such as the Even Start family literacy model authorized under part B of title I, to enable parents to be their child's first and most important teacher;

"(C) will carry out programs to assist those kindergarten students who are not ready for the transition to first grade, particularly students experiencing difficulty with reading skills; and

"(D) will use supervised individuals (including tutors), who have been appropriately trained using scientifically based reading research, to provide additional support, before school, after school, on weekends, during noninstructional periods of the school day, or during the summer, for children preparing to enter kindergarten and students in kindergarten through grade 3 who are experiencing difficulty reading;

"(3) shall describe how the applicant will ensure that funds available under this part, and funds available for reading instruction for kindergarten through grade 6 from other appropriate sources, are effectively coordinated, and, where appropriate, integrated with funds under this Act in order to improve existing activities in the areas of reading instruction, professional development, program improvement, parental involvement, technical assistance, and other activities that can help meet the purposes of this part;

"(4) shall describe, if appropriate, how parents, tutors, and early childhood education providers will be assisted by, and participate in, literacy-related activities receiving financial assistance under this part to enhance children's reading fluency;

"(5) shall describe how the local educational agency—

"(A) provides instruction in reading to children with reading difficulties who—

"(i) are at risk of being referred to special education based on these difficulties; or

"(ii) have been evaluated under section 614 of the Individuals with Disabilities Education Act but, in accordance with section 614(b)(5) of such Act, have not been identified as being a child with a disability (as defined in section 602 of the such Act); and

"(B) will promote reading and library programs that provide access to engaging reading material; and

"(6) shall include an assurance that the local educational agency will make available, upon request and in an understandable and uniform format, to any parent of a student attending any school selected to receive assistance under subsection (d)(1) in the geographic area served by the local educational agency, information regarding the professional qualifications of the student's classroom teacher to provide instruction in reading.

"(c) SPECIAL RULE.—To the extent feasible, a local educational agency that desires to receive a grant under this section shall form a partnership with one or more community-based organizations of demonstrated effectiveness in early childhood literacy, and reading readiness, reading instruction, and reading achievement for both adults and children, such as a Head Start program, family literacy program, public library, or adult education program, to carry out the functions described in paragraphs (1) through (6) of subsection (b). In evaluating subgrant applications under this section, a State educational agency shall consider

AR.02636

whether the applicant has satisfied the requirement in the preceding sentence. If not, the applicant must provide information on why it would not have been feasible for the applicant to have done so.

"(d) USE OF FUNDS.—

"(1) IN GENERAL.—Subject to paragraph (2), a local educational agency that receives a subgrant under this section shall use amounts from the subgrant to carry out activities to advance reform of reading instruction in any school that (A) is described in subsection (a)(1)(A), (B) has the largest, or second largest, number of children who are counted under section 1124(c), in comparison to all other schools in the local educational agency, or (C) has the highest, or second highest, school-age child poverty rate (as defined in the second sentence of subsection (a)(1)), in comparison to all other schools in the local educational agency. Such activities shall include the following:

"(A) Securing technical and other assistance from—

"(i) a program of reading instruction based on scientifically based reading research;

"(ii) a person or entity with experience or expertise about such program and its implementation, who has agreed to work with the recipient in connection with its implementation; or

"(iii) a program providing family literacy services.

"(B) Providing professional development activities to teachers and other instructional staff (including training of tutors), using scientifically based reading research and purchasing of curricular and other supporting materials.

"(C) Promoting reading and library programs that provide access to engaging reading material.

"(D) Providing, on a voluntary basis, training to parents of children enrolled in a school selected to receive assistance under subsection (d)(1) on how to help their children with school work, particularly in the development of reading skills. Such training may be provided directly by the subgrant recipient, or through a grant or contract with another person. Such training shall be consistent with reading reforms taking place in the school setting. No parent shall be required to participate in such training.

"(E) Carrying out family literacy services based on programs such as the Even Start family literacy model authorized under part B of title I, to enable parents to be their child's first and most important teacher.

"(F) Providing instruction for parents of children enrolled in a school selected to receive assistance under subsection (d)(1), and others who volunteer to be reading tutors for such children, in the instructional practices based on scientifically based reading research used by the applicant.

"(G) Programs to assist those kindergarten students enrolled in a school selected to receive assistance under subsection (d)(1) who are not ready for the transition to first grade, particularly students experiencing difficulty with reading skills.

"(H) Providing additional support for children preparing to enter kindergarten and students in kindergarten through grade 3 who are enrolled in a school selected to receive assistance under subsection (d)(1), who are experiencing difficulty reading, before school, after school, on weekends, during noninstructional periods of the school day, or during the summer, using supervised individuals (including tutors), who have been appropriately trained using scientifically based reading research.

"(I) Providing instruction in reading to children with reading difficulties who—

"(i) are at risk of being referred for special education based on these difficulties; or

"(ii) have been evaluated under section 614 of the Individuals with Disabilities Education Act but, in accordance with section 614(b)(5) of such Act, have not been identified as being a child with a disability (as defined in section 602 of the such Act).

"(J) Providing coordination of reading, library, and literacy programs within the local educational agency to avoid duplication and in- crease the effectiveness of reading, library, and literacy activities.

"(2) LIMITATION ON ADMINISTRATIVE EXPENSES.—A recipient of a subgrant under this section may use not more than 5 percent of the subgrant funds for administrative costs.

"(e) TRAINING NONRECIPIENTS.—A recipient of a subgrant under this section may train, on a fee-for-service basis, personnel from schools, or local educational agencies, that are not a beneficiary of, or receiving, such a subgrant, in the instructional practices based on scientifically based reading research used by the recipient. Such a nonrecipient school or agency may use funds received under title I of this Act, and other appropriate Federal funds used for reading instruction, to pay for such training, to the extent consistent with the law under which such funds were received.

<< 20 USCA § 6661e >>

"SEC. 2256. TUTORIAL ASSISTANCE SUBGRANTS.

"(a) IN GENERAL.—

"(1) SUBGRANTS.—Except as provided in paragraph (4), a State educational agency that receives a grant under section 2253 shall make at least one subgrant on a competitive basis to—

"(A) local educational agencies that have at least one school in the geographic area served by the agency that—

"(i) is located in an area designated as an empowerment zone under part I of subchapter U of chapter 1 of the Internal Revenue Code of 1986; or

"(ii) is located in an area designated as an enterprise community under part I of subchapter U of chapter 1 of the Internal Revenue Code of 1986;

"(B) local educational agencies that have at least one school that is identified for school improvement under section 1116(c) in the geographic area served by the agency;

"(C) local educational agencies with the largest, or second largest, number of children who are counted under section 1124(c), in comparison to all other local educational agencies in the State; or

"(D) local educational agencies with the highest, or second highest, school-age child poverty rate, in comparison to all other local educational agencies in the State.

For purposes of subparagraph (D), the term 'school-age child poverty rate' means the number of children counted under section 1124(c) who are living within the geographic boundaries of the local educational agency, expressed as a percentage of the total number of children aged 5–17 years living within the geographic boundaries of the local educational agency.

"(2) NOTIFICATION.—

"(A) TO LOCAL EDUCATIONAL AGENCIES.—A State educational agency shall provide notice to all local educational agencies within the State regarding the availability of the subgrants under this section.

"(B) TO PROVIDERS AND PARENTS.—Not later than 30 days after the date on which the State educational agency provides notice under subparagraph (A), each local educational agency described in paragraph (1) shall, as a condition on the agency's receipt of funds made available under title I of this Act, provide public notice to potential providers of tutorial assistance operating in the jurisdiction of the agency, and parents residing in such jurisdiction, regarding the availability of the subgrants under this section.

"(3) APPLICATION.—A local educational agency that desires to receive a subgrant under this section shall submit an application to the State educational agency at such time, in such manner, and including such information as the agency may require. The application shall include an assurance that the local educational agency will use the subgrant funds to carry out the duties described in subsection (b) for children enrolled in any school selected by the agency that (A) is described in paragraph (1)(A), (B) is described in paragraph (1)(B), (C) has the largest, or second largest, number of children who are counted under section 1124(c), in comparison to all other schools in the local educational agency, or (D) has the highest, or second highest, school-age child poverty rate (as defined in the second sentence of paragraph (1)), in comparison to all other schools in the local educational agency.

"(4) EXCEPTION.—If no local educational agency within the State submits an application to receive a subgrant under this section within the 6-month period beginning on the date on which the State educational agency provided notice to the local educational agencies regarding the availability of the subgrants, the State educational agency may use funds otherwise reserved under 2254(2) for the purpose of providing local reading improvement subgrants under section 2255 if the State educational agency certifies to the Secretary that the requirements of paragraph (2) have been met and each local educational agency in the State described in subparagraph (B) of such paragraph has demonstrated to the State educational agency that no provider of tutorial assistance described in such subparagraph requested the local educational agency to submit under paragraph (3) an application for a tutorial assistance subgrant.

"(b) USE OF FUNDS.—

"(1) IN GENERAL.—A local educational agency that receives a subgrant under this section shall carry out, using the funds provided under the subgrant, each of the duties described in paragraph (2).

"(2) DUTIES.—The duties described in this paragraph are the provision of tutorial assistance in reading, before school, after school, on weekends, or during the summer, to children who have difficulty reading, using instructional practices based on scientifically based reading research, through the following:

"(A) The creation and implementation of objective criteria to determine in a uniform manner the eligibility of tutorial assistance providers and tutorial assistance programs desiring to provide tutorial assistance under the subgrant. Such criteria shall include the following:

"(i) A record of effectiveness with respect to reading readiness, reading instruction for children in kindergarten through 3d grade, and early childhood literacy, as appropriate.

"(ii) Location in a geographic area convenient to the school or schools attended by the children who will be receiving tutorial assistance.

"(iii) The ability to provide tutoring in reading to children who have difficulty reading, using instructional practices based on scientifically based reading research and consistent with the reading instructional methods and content used by the school the child attends.

"(B) The provision, to parents of a child eligible to receive tutorial assistance pursuant to this section, of multiple choices among tutorial assistance providers and tutorial assistance programs determined to be eligible under the criteria described in subparagraph (A). Such choices shall include a school-based program and at least one tutorial assistance program operated by a provider pursuant to a contract with the local educational agency.

"(C) The development of procedures—

"(i) for the provision of information to parents of an eligible child regarding such parents' choices for tutorial assistance for the child;

"(ii) for considering children for tutorial assistance who are identified under subparagraph (D) and for whom no parent has selected a tutorial assistance provider or tutorial assistance program that give such parents additional opportunities to select a tutorial assistance provider or tutorial assistance program referred to in subparagraph (B); and

"(iii) that permit a local educational agency to recommend a tutorial assistance provider or tutorial assistance program in a case where a parent asks for assistance in the making of such selection.

"(D) The development of a selection process for providing tutorial assistance in accordance with this paragraph that limits the provision of assistance to children identified, by the school the child attends, as having difficulty reading, including difficulty mastering phonemic awareness, systematic phonics, fluency, and reading comprehension.

"(E) The development of procedures for selecting children to receive tutorial assistance, to be used in cases where insufficient funds are available to provide assistance with respect to all children identified by a school under subparagraph (D), that—

"(i) give priority to children who are determined, through State or local reading assessments, to be most in need of tutorial assistance; and

"(ii) give priority, in cases where children are determined, through State or local reading assessments, to be equally in need of tutorial assistance, based on a random selection principle.

"(F) The development of a methodology by which payments are made directly to tutorial assistance providers who are identified and selected pursuant to this section and selected for funding. Such methodology shall include the making of a contract, consistent with State and local law, between the provider and the local educational agency. Such contract shall satisfy the following requirements:

"(i) It shall contain specific goals and timetables with respect to the performance of the tutorial assistance provider.

"(ii) It shall require the tutorial assistance provider to report to the local educational agency on the provider's performance in meeting such goals and timetables.

"(iii) It shall specify the measurement techniques that will be used to evaluate the performance of the provider.

"(iv) It shall require the provider to meet all applicable Federal, State, and local health, safety, and civil rights laws.

"(v) It shall ensure that the tutorial assistance provided under the contract is consistent with reading instruction and content used by the local educational agency.

"(vi) It shall contain an agreement by the provider that information regarding the identity of any child eligible for, or enrolled in the program, will not be publicly disclosed without the permission of a parent of the child.

"(vii) It shall include the terms of an agreement between the provider and the local educational agency with respect to the provider's purchase and maintenance of adequate general liability insurance.

"(viii) It shall contain provisions with respect to the making of payments to the provider by the local educational agency.

"(G) The development of procedures under which the local educational agency carrying out this paragraph—

AR.02639

"(i) will ensure oversight of the quality and effectiveness of the tutorial assistance provided by each tutorial assistance provider that is selected for funding;

"(ii) will provide for the termination of contracts with ineffective and unsuccessful tutorial assistance providers (as determined by the local educational agency based upon the performance of the provider with respect to the goals and timetables contained in the contract between the agency and the provider under subparagraph (F));

"(iii) will provide to each parent of a child identified under subparagraph (D) who requests such information for the purpose of selecting a tutorial assistance provider for the child, in a comprehensible format, information with respect to the quality and effectiveness of the tutorial assistance referred to in clause (i);

"(iv) will ensure that each school identifying a child under subparagraph (D) will provide upon request, to a parent of the child, assistance in selecting, from among the tutorial assistance providers who are identified pursuant to subparagraph (B) the provider who is best able to meet the needs of the child;

"(v) will ensure that parents of a child receiving tutorial assistance pursuant to this section are informed of their child's progress in the tutorial program; and

"(vi) will ensure that it does not disclose the name of any child who may be eligible for tutorial assistance pursuant to this section, the name of any parent of such a child, or any other personally identifiable information about such a parent or child, to any tutorial assistance provider (excluding the agency itself), without the prior written consent of such parent.

<< 20 USCA § 6661f >>

"SEC. 2257. NATIONAL EVALUATION.

"From funds reserved under section 2260(b)(1), the Secretary, through grants or contracts, shall conduct a national assessment of the programs under this part. In developing the criteria for the assessment, the Secretary shall receive recommendations from the peer review panel convened under section 2253(c)(2).

<< 20 USCA § 6661g >>

"SEC. 2258. INFORMATION DISSEMINATION.

"(a) IN GENERAL.—From funds reserved under section 2260(b)(2), the National Institute for Literacy shall disseminate information on scientifically based reading research and information on subgrantee projects under section 2255 or 2256 that have proven effective. At a minimum, the institute shall disseminate such information to all recipients of Federal financial assistance under titles I and VII of this Act, the Head Start Act, the Individuals with Disabilities Education Act, and the Adult Education and Family Literacy Act.

"(b) COORDINATION.—In carrying out this section, the National Institute for Literacy—

"(1) shall use, to the extent practicable, information networks developed and maintained through other public and private persons, including the Secretary, the National Center for Family Literacy, and the Readline Program;

"(2) shall work in conjunction with any panel convened by the National Institute of Child Health and Human Development and the Secretary and any panel convened by the Office of Educational Research and Improvement to assess the current status of research-based knowledge on reading development, including the effectiveness of various approaches to teaching children to read, with respect to determining the criteria by which the National Institute for Literacy judges scientifically based reading research and the design of strategies to disseminate such information; and

"(3) may assist any State educational agency selected to receive a grant under section 2253, and that requests such assistance—

"(A) in determining whether applications submitted under section 2253 meet the requirements of this title relating to scientifically based reading research; and

"(B) in the development of subgrant application forms.

<< 20 USCA § 6661h >>

"SEC. 2259. STATE EVALUATIONS; PERFORMANCE REPORTS.

"(a) STATE EVALUATIONS.—

"(1) IN GENERAL.—Each State educational agency that receives a grant under section 2253 shall evaluate the success of the agency's subgrantees in meeting the purposes of this part. At a minimum, the evaluation shall measure the extent to which students who are the intended beneficiaries of the subgrants made by the agency have improved their reading skills.

"(2) CONTRACT.—A State educational agency shall carry out the evaluation under this subsection by entering into a contract with an entity that conducts scientifically based reading research, under which contract the entity will perform the evaluation.

"(3) SUBMISSION.—A State educational agency shall submit the findings from the evaluation under this subsection to the Secretary. The Secretary shall submit a summary of the findings from the evaluations under this subsection and the national assessment conducted under section 2257 to the appropriate committees of the Congress, including the Committee on Education and the Workforce of the House of Representatives and the Committee on Labor and Human Resources of the Senate.

"(b) PERFORMANCE REPORTS.—A State educational agency that receives a grant under section 2253 shall submit performance reports to the Secretary pursuant to a schedule to be determined by the Secretary, but not more frequently than annually. Such reports shall include—

"(1) with respect to subgrants under section 2255, the program or programs of reading instruction, based on scientifically based reading research, selected by subgrantees;

"(2) the results of use of the evaluation referred to in section 2253(b)(2)(E)(iv); and

"(3) a description of the subgrantees receiving funds under this part.

<< 20 USCA § 6661i >>

"SEC. 2260. AUTHORIZATIONS OF APPROPRIATIONS; RESERVATIONS FROM APPROPRIATIONS; SUNSET.

"(a) AUTHORIZATIONS.—

"(1) FY 1999.—There are authorized to be appropriated to carry out this part and section 1202(c) $260,000,000 for fiscal year 1999.

"(2) FY 2000.—There are authorized to be appropriated to carry out this part and section 1202(c) $260,000,000 for fiscal year 2000.

"(b) RESERVATIONS.—From each of the amounts appropriated under subsection (a) for a fiscal year, the Secretary—

"(1) shall reserve 1.5 percent to carry out section 2257(a);

"(2) shall reserve $5,000,000 to carry out section 2258; and

"(3) shall reserve $10,000,000 to carry out section 1202(c).

"(c) SUNSET.—Notwithstanding section 422(a) of the General Education Provisions Act, this part is not subject to extension under such section." .

(b) CONFORMING AMENDMENTS.—

<< 20 USCA § 6603 >>

(1) AUTHORIZATION OF APPROPRIATIONS.—Section 2003 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6603) is amended—

(A) in subsection (a), by striking "title," and inserting "title (other than part C),"; and

(B) in subsection (b)(3), by striking "part C" and inserting "part D".

<< 20 USCA § 6646 >>

(2) PRIORITY FOR PROFESSIONAL DEVELOPMENT IN MATHEMATICS AND SCIENCE.—Section 2206 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6646) is amended by inserting "(other than part C)" after "for this title" each place such term appears.

<< 20 USCA § 6701 >>

(3) REPORTING AND ACCOUNTABILITY.—Section 2401 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6701) is amended by striking "under this part" each place such term appears and inserting "under this title (other than part C)".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 20 USCA § 6702 >>

(4) DEFINITIONS.—Section 2402 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6701) is amended by striking "this part–"and inserting "this title (other than part C)–".

<< 20 USCA § 8801 >>

(5) GENERAL DEFINITIONS.—Section 14101(10)(C) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 8801(10)(C)) is amended by striking "part C" and inserting "part D".

<< 20 USCA § 8893 >>

(6) PARTICIPATION BY PRIVATE SCHOOL CHILDREN AND TEACHERS.—Section 14503(b)(1)(B) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 8893(b)(1)(B)) is amended by striking "part C" and inserting "part D".

SUBTITLE II—AMENDMENTS TO EVEN START FAMILY LITERACY PROGRAMS

<< 20 USCA § 6362 >>

SEC. 201. RESERVATION FOR GRANTS.

Section 1202(c) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6362(c)) is amended to read as follows:

"(c) RESERVATION FOR GRANTS.—

"(1) GRANTS AUTHORIZED.—From funds reserved under section 2260(b)(3), the Secretary shall award grants, on a competitive basis, to States to enable such States to plan and implement statewide family literacy initiatives to coordinate and, where appropriate, integrate existing Federal, State, and local literacy resources consistent with the purposes of this part. Such coordination and integration shall include funds available under the Adult Education and Family Literacy Act, the Head Start Act, this part, part A of this title, and part A of title IV of the Social Security Act.

"(2) CONSORTIA.—

"(A) ESTABLISHMENT.—To receive a grant under this subsection, a State shall establish a consortium of State-level programs under the following laws:

"(i) This title (other than part D).

"(ii) The Head Start Act.

"(iii) The Adult Education and Family Literacy Act.

"(iv) All other State-funded preschool programs and programs providing literacy services to adults.

"(B) PLAN.—To receive a grant under this subsection, the consortium established by a State shall create a plan to use a portion of the State's resources, derived from the programs referred to in subparagraph (A), to strengthen and expand family literacy services in such State.

"(C) COORDINATION WITH PART C OF TITLE II.—The consortium shall coordinate its activities with the activities of the reading and literacy partnership for the State established under section 2253(d), if the State educational agency receives a grant under section 2253.

"(3) READING INSTRUCTION.—Statewide family literacy initiatives implemented under this subsection shall base reading instruction on scientifically based reading research (as such term is defined in section 2252).

"(4) TECHNICAL ASSISTANCE.—The Secretary shall provide, directly or through a grant or contract with an organization with experience in the development and operation of successful family literacy services, technical assistance to States receiving a grant under this subsection.

"(5) MATCHING REQUIREMENT.—The Secretary shall not make a grant to a State under this subsection unless the State agrees that, with respect to the costs to be incurred by the eligible consortium in carrying out the activities for which the grant was awarded, the State will make available non-Federal contributions in an amount equal to not less than the Federal funds provided under the grant.".

<< 20 USCA § 6362 >>

SEC. 202. DEFINITIONS.

Section 1202(e) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6362(e)) is amended—

  (1) by redesignating paragraphs (3) and (4) as paragraphs (4) and (5), respectively; and

  (2) by inserting after paragraph (2) the following:

  "(3) the term 'family literacy services' means services provided to participants on a voluntary basis that are of sufficient intensity in terms of hours, and of sufficient duration, to make sustainable changes in a family, and that integrate all of the following activities:

    "(A) Interactive literacy activities between parents and their children.

    "(B) Training for parents regarding how to be the primary teacher for their children and full partners in the education of their children.

    "(C) Parent literacy training that leads to economic self-sufficiency.

    "(D) An age-appropriate education to prepare children for success in school and life experiences.

<< 20 USCA § 6369 >>

SEC. 203. EVALUATION.

Section 1209 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6369) is amended—

  (1) in paragraph (1), by striking "and" at the end;

  (2) in paragraph (2), by striking the period at the end and inserting "; and"; and

  (3) by adding at the end the following:

  "(3) to provide States and eligible entities receiving a subgrant under this part, directly or through a grant or contract with an organization with experience in the development and operation of successful family literacy services, technical assistance to ensure local evaluations undertaken under section 1205(10) provide accurate information on the effectiveness of programs assisted under this part.".

SEC. 204. INDICATORS OF PROGRAM QUALITY.

<< 20 USCA § 6370 >>

(a) IN GENERAL.—The Elementary and Secondary Education Act of 1965 is amended—

<< 20 USCA § 6370 >>

(1) by redesignating section 1210 as section 1212; and

<< 20 USCA § 6370 >>

(2) by inserting after section 1209 the following:

<< 20 USCA § 6369a >>

"SEC. 1210. INDICATORS OF PROGRAM QUALITY.

  "Each State receiving funds under this part shall develop, based on the best available research and evaluation data, indicators of program quality for programs assisted under this part. Such indicators shall be used to monitor, evaluate, and improve such programs within the State. Such indicators shall include the following:

  "(1) With respect to eligible participants in a program who are adults—

    "(A) achievement in the areas of reading, writing, English language acquisition, problem solving, and numeracy;

    "(B) receipt of a high school diploma or a general equivalency diploma;

    "(C) entry into a post-secondary school, job retraining program, or employment or career advancement, including the military; and

"(D) such other indicators as the State may develop.

"(2) With respect to eligible participants in a program who are children—

"(A) improvement in ability to read on grade level or reading readiness;

"(B) school attendance;

"(C) grade retention and promotion; and

"(D) such other indicators as the State may develop.".

<< 20 USCA § 6363 >>

(b) STATE LEVEL ACTIVITIES.—Section 1203(a) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6363(a)) is amended—

<< 20 USCA § 6363 >>

(1) in paragraph (1), by striking "and" at the end;

<< 20 USCA § 6363 >>

(2) in paragraph (2), by striking the period at the end and inserting "; and"; and

<< 20 USCA § 6363 >>

(3) by adding at the end the following:

"(3) carrying out section 1210.".

<< 20 USCA § 6368 >>

(c) AWARD OF SUBGRANTS.—Paragraphs (3) and (4) of section 1208(b) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6368) are amended to read as follows:

"(3) CONTINUING ELIGIBILITY.—In awarding subgrant funds to continue a program under this part for the second, third, or fourth year, the State educational agency shall evaluate the program based on the indicators of program quality developed by the State under section 1210. Such evaluation shall take place after the conclusion of the startup period, if any.

"(4) INSUFFICIENT PROGRESS.—The State educational agency may refuse to award subgrant funds if such agency finds that the eligible entity has not sufficiently improved the performance of the program, as evaluated based on the indicators of program quality developed by the State under section 1210, after—

"(A) providing technical assistance to the eligible entity; and

"(B) affording the eligible entity notice and an opportunity for a hearing.".

SEC. 205. RESEARCH.

The Elementary and Secondary Education Act of 1965, as amended by section 204 of this Act, is further amended by inserting after section 1210 the following:

<< 20 USCA § 6369b >>

"SEC. 1211. RESEARCH.

"(a) IN GENERAL.—The Secretary shall carry out, through grant or contract, research into the components of successful family literacy services, to use—

"(1) to improve the quality of existing programs assisted under this part or other family literacy programs carried out under this Act or the Adult Education and Family Literacy Act; and

"(2) to develop models for new programs to be carried out under this Act or the Adult Education and Family Literacy Act.

"(b) DISSEMINATION.—The National Institute for Literacy shall disseminate, pursuant to section 2258, the results of the research described in subsection (a) to States and recipients of subgrants under this part.".

SUBTITLE III—REPEALS

SEC. 301. REPEAL OF CERTAIN UNFUNDED EDUCATION PROGRAMS.

<< 20 USCA § 1070 NOTE >>

(a) COMMUNITY SCHOOL PARTNERSHIPS.—The Community School Partnership Act (contained in part B of title V of the Improving America's Schools Act of 1994 (20 U.S.C. 1070 note) is repealed.

<< 20 USCA § 6041 >>

(b) EDUCATIONAL RESEARCH, DEVELOPMENT, DISSEMINATION, AND IMPROVEMENT ACT OF 1994.—Section 941(j) of the Educational Research, Development, Dissemination, and Improvement Act of 1994 (20 U.S.C. 6041(j)) is repealed.

(c) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—The following provisions are repealed:

<< 20 USCA § 6493 >>

(1) INNOVATIVE ELEMENTARY SCHOOL TRANSITION PROJECTS.—Section 1503 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6493).

<< 20 USCA § 8221 to 8224 >>

(2) DE LUGO TERRITORIAL EDUCATION IMPROVEMENT PROGRAM.—Part H of title X of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 8221 et seq.).

<< 20 USCA § 8351 >>

(3) EXTENDED TIME FOR LEARNING AND LONGER SCHOOL YEAR.—Part L of title X of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 8351).

<< 20 USCA § 8371 >>

(4) TERRITORIAL ASSISTANCE.—Part M of title X of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 8371).

<< 20 USCA § 13792 >>

(d) FAMILY AND COMMUNITY ENDEAVOR SCHOOLS.—The Family and Community Endeavor Schools Act (42 U.S.C. 13792) is repealed.

<< 20 USCA § 5951 >>

(e) GOALS 2000: EDUCATE AMERICA ACT.—Subsections (b) and (d)(1) of section 601 of the Goals 2000: Educate America Act (20 U.S.C. 5951) are repealed.

SUBTITLE IV—TECHNICAL AND CONFORMING AMENDMENTS

SEC. 401. TECHNICAL AMENDMENTS TO THE WORKFORCE INVESTMENT ACT OF 1998.

<< 29 USCA § 2821 >>

(1) Section 111(c) of the Workforce Investment Act of 1998 is amended by striking "CHAIRMAN" and inserting "CHAIRPERSON".

<< 29 USCA § 2822 >>

(2) Section 112(c)(1) of such Act is amended by striking "; and" and inserting "; or".

<< 29 USCA § 2831 >>

(3) Section 116(a)(3)(D)(ii)(I)(aa) of such Act is amended by striking "; or" and inserting "; and".

<< 29 USCA § 2832 >>

(4) Section 117 of such Act is amended—
  (A) in subsection (f)(1)(D), by striking "State" and inserting "Governor"; and
  (B) in subsection (i)(1)(D)(ii), by striking subclause (II), and inserting the following:
   "(II) other representatives of employees in the local area (for a local area in which no employees are represented by such organizations).".
(5) Section 134(d)(4)(F) of such Act is amended by adding at the end the following:

<< 29 USCA § 2864 >>

  "(iii) INDIVIDUAL TRAINING ACCOUNTS.—An individual who seeks training services and who is eligible pursuant to subparagraph (A), may, in consultation with a case manager, select an eligible provider of training services from the list or identifying information for providers described in clause (ii)(I). Upon such selection, the one-stop operator involved shall, to the extent practicable, refer such individual to the eligible provider of training services, and arrange for payment for such services through an individual training account.".

<< 29 USCA § 2899 >>

(6) Section 159 of such Act is amended—
  (A) in subsections (c)(1)(G) and (d)(4), by striking "post-secondary" and inserting "post-secondary"; and
  (B) in subsection (c)(3), by striking "containing" and inserting "containing,".

<< 29 USCA § 2911 >>

(7) Section 166(h)(3)(A) of such Act is amended by striking "paragraph (2)" and inserting "subparagraph (B)".

<< 29 USCA § 2912 >>

(8) Section 167(d) of such Act is amended by inserting "and section 127(b)(1)(A)(iii)" after "this section".

<< 29 USCA § 2915 >>

(9) Section 170(a)(1) of such Act is amended by striking "carry out" and inserting "carrying out".

<< 29 USCA § 2915 >>

(10) Section 170(b)(2) of such Act is amended by striking "174(b)" and inserting "173(b)".

<< 29 USCA § 2916 >>

(11) Section 171(b)(2) of such Act is amended by striking "only on a competitive" and all that follows through the period and inserting "in accordance with generally applicable Federal requirements.".

<< 29 USCA § 2918 >>

(12) Section 173(a)(2) of such Act is amended by striking "the Robert" and inserting "The Robert".

<< 29 USCA § 2939 >>

(13) Section 189(i)(1) of such Act is amended by striking "1997 (Public Law 104–208; 110 Stat. 3009–234)" and inserting "1998 (Public Law 105–78; 111 Stat. 1467).

<< 29 USCA § 2942 >>

(14) Paragraphs (2) and (3) of section 192(a) of such Act are amended by striking "), to" and inserting ") to".

<< 29 USCA § 2701 NOTE >>

(15) Section 334(b) of such Act is amended by striking paragraph (2) and inserting the following:
"(2) DATE.—The appointments of the members of the Commission shall be made by February 1, 1999.".

<< 29 USCA § 760 to 765 >>

(16) Section 405 of such Act is amended by striking "et seq.)," and inserting "et seq.)".

<< 20 USCA § 9271 >>

(17) Section 501(b)(1) of such Act is amended by adding at the end the following: "For purposes of this paragraph, the activities and programs described in subparagraphs (A) and (B) of paragraph (2) shall not be considered to be 2 or more activities or programs for purposes of the unified plan. Such activities or programs shall be considered to be 1 activity or program.".

<< 20 USCA § 9275 >>

(18) Section 505 of such Act is amended—
  (A) in subsection (a), by striking "in this Act" and inserting "under title I, II, or III or this title"; and
  (B) in subsection (b), by striking "under this Act" each place it appears and inserting "under title I, II, or III or this title".

<< 20 USCA § 9276 >>

(19) Section 506(d) of such Act is amended—
  (A) in paragraph (1), by striking "subsection (b)" and inserting "subsection (c)"; and
  (B) in paragraph (2)—
    (i) by inserting "planning authorized under" after "carry out" each place that such appears; and
    (ii) by striking "the purposes" and inserting "the planning purposes".

SEC. 402. TECHNICAL AMENDMENTS TO THE REHABILITATION ACT OF 1973.

<< 29 USCA § 705 to 718 >>

(a) REDESIGNATION.—

<< 29 USCA § 705 to 718 >>

(1) The Rehabilitation Act of 1973 (as amended by title IV of the Workforce Investment Act of 1998) is further amended by redesignating sections 6 through 19 as sections 7, 8, and 10 through 21, respectively.

<< 29 USCA § 705 to 718 >>

(2) The table of contents for the Rehabilitation Act of 1973 (as amended by section 403 of the Workforce Investment Act of 1998) is further amended by striking the items relating to sections 6 through 19 and inserting the following:

"Sec. 7. Definitions.

"Sec. 8. Allotment percentage.

"Sec. 10. Nonduplication.

"Sec. 11. Application of other laws.

"Sec. 12. Administration of the Act.

"Sec. 13. Reports.

"Sec. 14. Evaluation.

"Sec. 15. Information clearinghouse.

"Sec. 16. Transfer of funds.

"Sec. 17. State administration.

"Sec. 18. Review of applications.

"Sec. 19. Carryover.

"Sec. 20. Client assistance information.

"Sec. 21. Traditionally underserved populations.".
 (b) SECTION HEADINGS.—

<< 29 USCA § 701 NOTE >>

 (1) Section 1 of such Act (as so amended) is further amended by striking the section heading and all that follows through "SHORT TITLE.—"and inserting the following:

"SECTION 1. SHORT TITLE; TABLE OF CONTENTS.
 "(a) SHORT TITLE.—".
 (2) Section 2 of such Act (as so amended) is further amended by striking the section heading and all that follows through "FINDINGS.—"and inserting the following:

"SEC. 2. FINDINGS; PURPOSE; POLICY.
 "(a) FINDINGS.—".

<< 29 USCA § 705 >>

 (3) Section 7 of such Act (as so amended and redesignated in subsection (a)) is further amended by striking the section heading and all that follows through "(1) The term" and inserting the following:

"SEC. 7. DEFINITIONS.
 "For the purposes of this Act:
 "(1) ADMINISTRATIVE COSTS.—The term".

<< 29 USCA § 716 >>

(4) Section 19 of such Act (as so amended and redesignated in subsection (a)) is further amended by striking the section heading and all that follows through "IN GENERAL.—"and inserting the following:

"SEC. 19. CARRYOVER.
 "(a) IN GENERAL.—".

<< 29 USCA § 717 >>

(5) Section 20 of such Act (as so amended and redesignated in subsection (a)) is further amended by striking the section heading and all that follows through "All" and inserting the following:

"SEC. 20. CLIENT ASSISTANCE INFORMATION.
 "All".

<< 29 USCA § 718 >>

(6) Section 21 of such Act (as so amended and redesignated in subsection (a)) is further amended by striking the section heading and all that follows through "FINDINGS.—"and inserting the following:

"SEC. 21. TRADITIONALLY UNDERSERVED POPULATIONS.
 "(a) FINDINGS.—".

<< 29 USCA § 730 >>

(7) Section 110 of such Act (as so amended) is further amended by striking the section heading and all that follows through "(a)(1) Subject" and inserting the following:

"STATE ALLOTMENTS
"SEC. 110. (a)(1) Subject".

<< 29 USCA § 731 >>

(8) Section 111 of such Act (as so amended) is further amended by striking the section heading and all that follows through "(a)(1) Except" and inserting the following:

"PAYMENTS TO STATES
"SEC. 111. (a)(1) Except".

<< 29 USCA § 732 >>

(9) Section 112 of such Act (as so amended) is further amended by striking the section heading and all that follows through "(a) From" and inserting the following:

"CLIENT ASSISTANCE PROGRAM
"SEC. 112. (a) From".

<< 29 USCA § 741 >>

(10) Section 121 of such Act (as so amended) is further amended by striking the section heading and all that follows through "(a) The" and inserting the following:

"VOCATIONAL REHABILITATION SERVICES GRANTS
"SEC. 121. (a) The".

<< 29 USCA § 765 >>

(11) Section 205 of such Act (as so amended) is further amended by striking the section heading and all that follows through "ESTABLISHMENT.—"and inserting the following:

"SEC. 205. REHABILITATION RESEARCH ADVISORY COUNCIL.
  "(a) ESTABLISHMENT.—".

<< 29 USCA § 795g >>

(12) Section 621 of such Act (as so amended) is further amended by striking the section heading and all that follows through "It" and inserting the following:

"SEC. 621. PURPOSE.
  "It".

<< 29 USCA § 795h >>

(13) Section 622 of such Act (as so amended) is further amended by striking the section heading and all that follows through "IN GENERAL.—"and inserting the following:

"SEC. 622. ALLOTMENTS.
  "(a) IN GENERAL.—".

<< 29 USCA § 795i >>

(14) Section 623 of such Act (as so amended) is further amended by striking the section heading and all that follows through "Funds provided under this part may" and inserting the following:

"SEC. 623. AVAILABILITY OF SERVICES.
  "Funds provided under this part may".

<< 29 USCA § 795j >>

(15) Section 624 of such Act (as so amended) is further amended by striking the section heading and all that follows through "An" and inserting the following:

"SEC. 624. ELIGIBILITY.
  "An".

<< 29 USCA § 795k >>

(16) Section 625 of such Act (as so amended) is further amended by striking the section heading and all that follows through "STATE PLAN SUPPLEMENTS.—" and inserting the following:

"SEC. 625. STATE PLAN.
  "(a) STATE PLAN SUPPLEMENTS.—".

<< 29 USCA § 795*l* >>

(17) Section 626 of such Act (as so amended) is further amended by striking the section heading and all that follows through "Each" and inserting the following:

"SEC. 626. RESTRICTION.

"Each".

<< 29 USCA § 795m >>

 (18) Section 627 of such Act (as so amended) is further amended by striking the section heading and all that follows through "SUPPORTED EMPLOYMENT SERVICES.—"and inserting the following:

"SEC. 627. SAVINGS PROVISION.
 "(a) SUPPORTED EMPLOYMENT SERVICES.—".

<< 29 USCA § 795n >>

 (19) Section 628 of such Act (as so amended) is further amended by striking the section heading and all that follows through "There" and inserting the following:

"SEC. 628. AUTHORIZATION OF APPROPRIATIONS.
 "There".
 (c) OTHER AMENDMENTS.—
 (1) Section 7 of such Act (as so amended and redesignated in subsection (a)) is further amended—
  (A) in paragraph (2)(B), by striking "objectives, nature," and inserting "nature";
  (B) by striking paragraph (7);
  (C) in paragraph (16)(A)(iii), by striking "client" and inserting "eligible individual"; and
  (D) in paragraph (36)(C), by striking "rehabilitation objectives" and inserting "employment outcome".

<< 29 USCA § 707 >>

 (2) Section 10 of such Act (as so amended and redesignated in subsection (a)) is further amended—
  (A) by striking "disregarded: (1)" and inserting the following: "disregarded—
 "(1)";
  (B) by striking "(2)" and inserting the following:
 "(2)"; and
  (C) by striking "No payment" and inserting the following:

"No payment".

<< 29 USCA § 718 >>

 (3) The second and third sentences of section 21(a)(3) of such Act (as so amended and redesignated in subsection (a)) are further amended by striking "are" and inserting "is".

<< 29 USCA § 721 >>

 (4) Section 101(a) of such Act (as so amended) is further amended—
  (A) in paragraph (18)(C), by striking "will be utilized" and inserting "were utilized during the preceding year"; and
  (B) in paragraph (21)(A)(i)(II)(bb), by striking "Commission" and inserting "commission".

<< 29 USCA § 722 >>

 (5) Section 102(c)(5)(F) (as so amended) is further amended—
  (A) in clause (ii), by striking "and" at the end thereof;
  (B) in clause (iii), by striking the period and inserting "; and"; and
  (C) by adding at the end the following:
   "(iv) not delegate the responsibility for making the final decision to any officer or employee of the designated State unit.".

AR.02651

<< 29 USCA § 725 >>

(6) Section 105(b) of such Act (as so amended) is further amended—

 (A) in paragraph (3)—

  (i) by striking "Governor" the first place it appears and inserting "Governor or, in the case of a State that, under State law, vests authority for the administration of the activities carried out under this Act in an entity other than the Governor (such as one or more houses of the State legislature or an independent board), the chief officer of that entity"; and

  (ii) in the second and third sentences, by striking "Governor" and inserting "appointing authority";

 (B) in paragraph (4)(A)(i), by striking "section 7(20)(A)" and inserting "section 7(20)(B)";

 (C) in paragraph (5)(B)—

  (i) in the subparagraph heading, by striking "GOVERNOR" and inserting "CHIEF EXECUTIVE OFFICER"; and

  (ii) by striking "Governor shall" and inserting "appointing authority described in paragraph (3) shall"; and

 (D) in paragraphs (6)(A)(ii) and (7)(B), by striking "Governor" and inserting "appointing authority described in paragraph (3)".

<< 29 USCA § 796d >>

(7) Section 705(b) of such Act (as so amended) is further amended—

 (A) in paragraph (1)—

  (i) by striking "Governor" the first place it appears and inserting "Governor or, in the case of a State that, under State law, vests authority for the administration of the activities carried out under this Act in an entity other than the Governor (such as one or more houses of the State legislature or an independent board), the chief officer of that entity"; and

  (ii) in the second sentence, by striking "Governor" and inserting "appointing authority";

 (B) in paragraph (5)(B)—

  (i) in the subparagraph heading, by striking "GOVERNOR" and inserting "CHIEF EXECUTIVE OFFICER"; and

  (ii) by striking "Governor shall" and inserting "appointing authority described in paragraph (3) shall"; and

 (C) in paragraphs (6)(A)(ii) and (7)(B), by striking "Governor" and inserting "appointing authority described in paragraph (3)".

## SEC. 403. TECHNICAL AMENDMENTS TO OTHER ACTS.

 (a) WAGNER–PEYSER ACT.—

<< 29 USCA § 49*l*–2 >>

 (1) IN GENERAL.—Section 15 of the Wagner–Peyser Act (as added by section 309 of the Workforce Investment Act of 1998) is amended—

  (A) in subsection (a)(2)(A)(i), by striking "of this section" the second place it appears; and

  (B) in subsection (e)(2)(G), by striking "complementary" and inserting "complementarity".

<< 29 USCA § 49*l*–2 NOTE >>

 (2) EFFECTIVE DATE.—The amendments made by paragraph (1) take effect on July 2, 1999.

<< 42 USCA § 3056 >>

 (b) OLDER AMERICANS ACT OF 1965.—Subparagraph (Q) of section 502(b)(1) of the Older Americans Act of 1965 (42 U.S.C. 3056(b)(1)) (as added by section 323 of the Workforce Investment Act of 1998) is amended by aligning the margins of the subparagraph with the margins of subparagraph (P) of such section.

## SEC. 404. TECHNICAL AMENDMENTS REGARDING ADULT EDUCATION.

<< 20 USCA § 9202 to 9204 >>

(a) REFERENCES TO TITLE.—The matter preceding paragraph (1) of section 203, and sections 204 and 205, of the Adult Education and Family Literacy Act (20 U.S.C. 9202, 9203, and 9204) are each amended by striking "this subtitle" and inserting "this title".

<< 20 USCA § 9211 >>

(b) QUALIFYING ADULT.—Section 211(d)(1) of the Adult Education and Family Literacy Act (20 U.S.C. 9211(d)(1)) is amended by striking ", but less than 61 years of age".

<< 20 USCA § 9212 >>

(c) LEVELS OF PERFORMANCE.—Section 212(b)(3)(A)(vi) of the Adult Education and Family Literacy Act (20 U.S.C. 9212(b)(3)(A)(vi)) is amended by striking "136(j)" and inserting "136(i)(1)".

<< 20 USCA § 9225 >>

(d) CORRECTIONS EDUCATION.—Section 225(a) of the Adult Education and Family Literacy Act (20 U.S.C. 9225) is amended—

<< 20 USCA § 9225 >>

(1) in subsection (a), by striking "or education" and inserting "and education"; and

<< 20 USCA § 9225 >>

(2) in subsection (c), by striking "with" and inserting "within".

<< 20 USCA § 9255 >>

(e) NATIONAL LEADERSHIP ACTIVITIES.—Section 243(2)(B) of the Adult Education and Family Literacy Act (20 U.S.C. 9253(2)(B)) is amended by striking "qualify" and inserting "quality".

<< 20 USCA § 9273 >>

(f) INCENTIVE GRANTS.—Section 503(a) of the Workforce Investment Act of 1998 (20 U.S.C. 9273(a)) is amended by striking "expected" and inserting "adjusted".

SEC. 405. CONFORMING AMENDMENTS.

(a) REFERENCES TO SECTION 204 OF THE IMMIGRATION REFORM AND CONTROL ACT OF 1986.—The table of contents for the Immigration Reform and Control Act of 1986 is amended by striking the item relating to section 204 of such Act.

(b) REFERENCES TO TITLE II OF PUBLIC LAW 95–250.—Section 103 of Public Law 95–250 (16 U.S.C. 79*l*) is amended—

<< 16 USCA § 79*l* >>

(1) by striking the second sentence of subsection (a); and

<< 16 USCA § 79*l* >>

(2) by striking the second sentence of subsection (b).

(c) REFERENCES TO SUBTITLE C OF TITLE VII OF THE STEWART B. MCKINNEY HOMELESS ASSISTANCE ACT.—

(1) TABLE OF CONTENTS RELATING TO SUBTITLE C OF TITLE VII.—The table of contents of the Stewart B. McKinney Homeless Assistance Act (42 U.S.C. 11421 et seq.) is amended by striking the items relating to sections 731 through 737, and sections 739 through 741, of such Act.

<< 42 USCA Ch. 119 >>

(2) TITLE VII.—Title VII of such Act is amended by inserting before section 738 the following:

"Subtitle C—Job Training for the Homeless".

(3) TITLE 31, UNITED STATES CODE.—Section 6703(a) of title 31, United States Code, is amended—

<< 31 USCA § 6703 >>

(A) by striking paragraph (15); and

<< 31 USCA § 6703 >>

(B) by redesignating paragraphs (16) through (19) as paragraphs (15) through (18), respectively.

(d) REFERENCES TO JOB TRAINING PARTNERSHIP ACT PRIOR TO REPEAL.—

(1) TITLE 5, UNITED STATES CODE.—Section 3502(d) of title 5, United States Code, is amended—

<< 5 USCA § 3502 >>

(A) in paragraph (3)—

(i) in subparagraph (A), by striking clause (i) and inserting the following:

"(i) the appropriate State dislocated worker unit or office (referred to in section 311(b)(2) of the Job Training Partnership Act), or the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998; and"; and

(ii) in subparagraph (B)(iii), by striking "other services under the Job Training Partnership Act" and inserting "other services under the Job Training Partnership Act or under title I of the Workforce Investment Act of 1998"; and

(B) in paragraph (4), in the second sentence, by striking "Secretary of Labor on matters relating to the Job Training Partnership Act" and inserting "Secretary of Labor on matters relating to the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 7 USCA § 2014 >>

(2) FOOD STAMP ACT OF 1977.—

(A) SECTION 5.—Section 5(l) of the Food Stamp Act of 1977 (7 U.S.C. 2014(l)) is amended by striking "Notwithstanding section 142(b) of the Job Training Partnership Act (29 U.S.C. 1552(b)), earnings to individuals participating in on-the-job training programs under section 204(b)(1)(C) or section 264(c)(1)(A) of the Job Training Partnership Act" and inserting "Notwithstanding section 142(b) of the Job Training Partnership Act or section 181(a)(2) of the Workforce Investment Act of 1998, earnings to individuals participating in on-the-job training programs under section 204(b)(1)(C) or 264(c)(1)(A) of the Job Training Partnership Act or in on-the-job training under title I of the Workforce Investment Act of 1998".

<< 7 USCA § 2015 >>

(B) SECTION 6.—Section 6 of the Food Stamp Act of 1977 (7 U.S.C. 2015) is amended—

(i) in subsection (d)(4)(M), by striking "the State public employment offices and agencies operating programs under the Job Training Partnership Act" and inserting "the State public employment offices and agencies operating programs under the Job Training Partnership Act or of the State public employment offices and other State agencies and providers carrying out activities under title I of the Workforce Investment Act of 1998";

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(ii) in subsection (e)(3), by striking subparagraph (A) and inserting the following:

"(A) a program under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998;"; and

(iii) in subsection (o)(1)(A), by striking "Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 7 USCA § 2026 >>

(C) SECTION 17.—The second sentence of section 17(b)(2) of the Food Stamp Act of 1977 (7 U.S.C. 2026(b)(2)) is amended—

(i) by striking "to accept an offer of employment from a political subdivision or a prime sponsor pursuant to the Comprehensive Employment and Training Act of 1973, as amended (29 U.S.C. 812)," and inserting "to accept an offer of employment from a political subdivision or provider pursuant to a program carried out under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998,"; and

(ii) by striking ": *Provided*, That all of the political subdivision's" and all that follows and inserting ", if all of the jobs supported under the program have been made available to participants in the program before the political subdivision or provider providing the jobs extends an offer of employment under this paragraph, and if the political subdivision or provider, in employing the person, complies with the requirements of Federal law that relate to the program.".

(3) PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996.—

<< 8 USCA § 1613 >>

(A) Section 403(c)(2)(K) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1613(c)(2)(K)) is amended by striking "Job Training Partnership Act" and inserting "Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 8 USCA § 1183a NOTE >>

(B) Section 423(d)(11) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1183a note) is amended by striking "Job Training Partnership Act" and inserting "Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 8 USCA § 1255a >>

(4) IMMIGRATION AND NATIONALITY ACT.—Section 245A(h)(4)(F) of the Immigration and Nationality Act (8 U.S.C. 1255a(h)(4)(F)) is amended by striking "The Job Training Partnership Act." and inserting "The Job Training Partnership Act or title I of the Workforce Investment Act of 1998.".

<< 8 USCA § 1522 NOTE >>

(5) REFUGEE EDUCATION ASSISTANCE ACT OF 1980.—Section 402(a)(4) of the Refugee Education Assistance Act of 1980 (8 U.S.C. 1522 note) is amended by striking "the Comprehensive Employment and Training Act of 1973" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 10 USCA § 2391 NOTE >>

(6) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1991.—Section 4003(5)(C) of the National Defense Authorization Act for Fiscal Year 1991 (10 U.S.C. 2391 note) is amended by inserting before the period the following: ", as in effect on the day before the date of enactment of the Workforce Investment Act of 1998".

(7) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1993.—

<< 42 USCA § 7274h >>

(A) SECTION 3161.—Section 3161(c)(6) of the National Defense Authorization Act for Fiscal Year 1993 (42 U.S.C. 7274h(c)(6)) is amended by striking subparagraph (A) and inserting the following:

"(A) programs carried out by the Secretary of Labor under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998;".

<< 10 USCA § 1143 NOTE >>

(B) SECTION 4461.—Section 4461(1) of the National Defense Authorization Act for Fiscal Year 1993 (10 U.S.C. 1143 note) is amended by striking "The Job Training Partnership Act (29 U.S.C. 1501 et seq.)." and inserting "The Job Training Partnership Act or title I of the Workforce Investment Act of 1998.".

<< 10 USCA § 2501 NOTE >>

(C) SECTION 4471.—Section 4471 of the National Defense Authorization Act for Fiscal Year 1993 (10 U.S.C. 2501 note) is amended—

(i) in subsection (c)(2), by striking "the State dislocated" and all that follows through "and the chief" and inserting "the State dislocated worker unit or office referred to in section 311(b)(2) of the Job Training Partnership Act, or the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998, and the chief";

(ii) in subsection (d)—

(I) in the first sentence, by striking "for training, adjustment assistance, and employment services" and all that follows through "except where" and inserting "for training, adjustment assistance, and employment services under section 325 or 325A of the Job Training Partnership Act or to participate in employment and training activities carried out under title I of the Workforce Investment Act of 1998, except in a case in which"; and

(II) by striking the second sentence; and

(iii) in subsection (e), by striking "for training," and all that follows through "beginning" and inserting ", on the basis of any related reduction in funding under the contract, for training, adjustment assistance, and employment services under section 325 or 325A of the Job Training Partnership Act or to participate in employment and training activities under title I of the Workforce Investment Act of 1998, beginning".

<< 10 USCA § 1143 NOTE >>

(D) SECTION 4492.—Section 4492(b) of the National Defense Authorization Act for Fiscal Year 1993 (10 U.S.C. 1143 note) is amended by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 10 USCA § 2701 NOTE >>

(8) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1994.—Section 1333(c)(2)(B) of the National Defense Authorization Act for Fiscal Year 1994 (10 U.S.C. 2701 note) is amended by striking "Private industry councils (as described in section 102 of the Job Training Partnership Act (29 U.S.C. 1512))." and inserting "Private industry councils as described in section 102 of the Job Training Partnership Act or local workforce investment boards established under section 117 of the Workforce Investment Act of 1998.".

<< 10 USCA § 2687 NOTE >>

(9) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1998.—Section 2824(c)(5) of the National Defense Authorization Act for Fiscal Year 1998 (10 U.S.C. 2687 note) is amended by striking "Job Training Partnership Act" and inserting "Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 15 USCA § 636 >>

(10) SMALL BUSINESS ACT.—The fourth sentence of section 7(j)(13)(E) of the Small Business Act (15 U.S.C. 636(j)(13)(E)) is amended by striking "the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 15 USCA § 1022a >>

(11) EMPLOYMENT ACT OF 1946.—Section 4(f)(2)(B) of the Employment Act of 1946 (15 U.S.C. 1022a(f)(2)(B)) is amended by striking "and include these in the annual Employment and Training Report of the President required under section 705(a) of the Comprehensive Employment and Training Act of 1973 (hereinafter in this Act referred to as 'CETA')" and inserting "and prepare and submit to the President an annual report containing the recommendations".

<< 15 USCA § 3116 >>

(12) FULL EMPLOYMENT AND BALANCED GROWTH ACT OF 1978.—
  (A) SECTION 206.—Section 206 of the Full Employment and Balanced Growth Act of 1978 (15 U.S.C. 3116) is amended—
   (i) in subsection (b)—
    (I) in the matter preceding paragraph (1), by striking "CETA" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998"; and
    (II) in paragraph (1), by striking "(including use of section 110 of CETA when necessary)"; and
   (ii) in subsection (c)(1), by striking "CETA" and inserting "activities carried out under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 15 USCA § 3151 >>

  (B) SECTION 401.—Section 401(d) of the Full Employment and Balanced Growth Act of 1978 (15 U.S.C. 3151(d)) is amended by striking "include, in the annual Employment and Training Report of the President provided under section 705(a) of CETA," and inserting "include, in the annual report referred to in section 4(f)(2)(B) of the Employment Act of 1946 (15 U.S.C. 1022a(f)(2)(B)),".

<< 18 USCA § 665 >>

(13) TITLE 18, UNITED STATES CODE.—Subsections (a), (b), and (c) of section 665 of title 18, United States Code are amended by striking "the Comprehensive Employment and Training Act or the Job Training Partnership Act" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".
(14) TRADE ACT OF 1974.—

<< 19 USCA § 2296 >>

  (A) SECTION 236.—Section 236(a)(5)(B) of the Trade Act of 1974 (19 U.S.C. 2296(a)(5)(B)) is amended by striking "section 303 of the Job Training Partnership Act" and inserting "section 303 of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 19 USCA § 2311 >>

  (B) SECTION 239.—Section 239(e) of the Trade Act of 1974 (19 U.S.C. 2311(e)) is amended by striking "under title III of the Job Training Partnership Act" and inserting "under title III of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 20 USCA § 1070d–2 >>

(15) HIGHER EDUCATION ACT OF 1965.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(A) SECTION 418A.—Subsections (b)(1)(B)(ii) and (c)(1)(A) of section 418A of the Higher Education Act of 1965 (20 U.S.C. 1070d–2) are amended by striking "section 402 of the Job Training Partnership Act" and inserting "section 402 of the Job Training Partnership Act or section 167 of the Workforce Investment Act of 1998".

<< 20 USCA § 1087vv >>

(B) SECTION 480.—Section 480(b)(14) of the Higher Education Act of 1965 (20 U.S.C. 1087vv(b)(14)) is amended by striking "Job Training Partnership Act noneducational benefits" and inserting "Job Training Partnership Act noneducational benefits or benefits received through participation in employment and training activities under title I of the Workforce Investment Act of 1998".

<< 20 USCA § 3443 >>

(16) DEPARTMENT OF EDUCATION ORGANIZATION ACT.—Subsection (a) of section 302 of the Department of Education Organization Act (20 U.S.C. 3443(a)) is amended by striking "under section 303(c)(2) of the Comprehensive Employment and Training Act" and inserting "relating to such education".

(17) NATIONAL SKILL STANDARDS ACT OF 1994.—

<< 20 USCA § 5934 >>

(A) SECTION 504.—Section 504(c)(3) of the National Skill Standards Act of 1994 (20 U.S.C. 5934(c)(3)) is amended by striking "the Capacity Building and Information and Dissemination Network established under section 453(b) of the Job Training Partnership Act (29 U.S.C. 1733(b)) and".

<< 20 USCA § 5938 >>

(B) SECTION 508.—Section 508(1) of the National Skill Standards Act of 1994 (20 U.S.C. 5938(1)) is amended to read as follows:

"(1) COMMUNITY–BASED ORGANIZATION.—The term 'community-based organization' means a private nonprofit organization that is representative of a community or a significant segment of a community and that has demonstrated expertise and effectiveness in the field of workforce investment.".

(18) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—

<< 20 USCA § 6365 >>

(A) SECTION 1205.—Section 1205(8)(B) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6365(8)(B)) is amended by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998".

<< 20 USCA § 6434 >>

(B) SECTION 1414.—Section 1414(c)(8) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6434(c)(8)) is amended by striking "programs under the Job Training Partnership Act," and inserting "programs under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998,".

<< 20 USCA § 6453 >>

(C) SECTION 1423.—Section 1423(9) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6453(9)) is amended by striking "programs under the Job Training and Partnership Act" and inserting "programs under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 20 USCA § 6455 >>

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(D) SECTION 1425.—Section 1425(9) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6455(9)) is amended by striking ", such as funds under the Job Training Partnership Act," and inserting ", such as funds made available under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998,".

<< DC ST § 31–2853.64 >>

(19) DISTRICT OF COLUMBIA SCHOOL REFORM ACT OF 1995.—Section 2604(c)(2)(B)(ii) of the District of Columbia School Reform Act of 1995 (Public Law 104–134; 110 Stat. 1321–145) is amended by striking "Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 22 USCA § 5855 >>

(20) FREEDOM SUPPORT ACT.—The last sentence of section 505 of the FREEDOM Support Act (22 U.S.C. 5855) is amended by striking ", through the Defense Conversion" and all that follows through "or through" and inserting "or through".

(21) EMERGENCY JOBS AND UNEMPLOYMENT ASSISTANCE ACT OF 1974.—

<< 26 USCA § 3304 NOTE >>

(A) SECTION 204.—Section 204(b) of the Emergency Jobs and Unemployment Assistance Act of 1974 (26 U.S.C. 3304 note) is amended by striking "designate as an area" and all that follows and inserting "designate as an area under this section an area that is a service delivery area established under section 101 of the Job Training Partnership Act (except that after local workforce investment areas are designated under section 116 of the Workforce Investment Act of 1998 for the State involved, the corresponding local workforce investment area shall be considered to be the area designated under this section) or a local workforce investment area designated under section 116 of the Workforce Investment Act of 1998.".

<< 26 USCA § 3304 NOTE >>

(B) SECTION 223.—Section 223 of the Emergency Jobs and Unemployment Assistance Act of 1974 (26 U.S.C. 3304 note) is amended—

(i) in paragraph (3), by striking "assistance provided" and all that follows and inserting "assistance provided under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998;"; and

(ii) in paragraph (4), by striking "funds provided" and all that follows and inserting "funds provided under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998;".

<< 29 USCA § 1501 NOTE >>

(22) JOB TRAINING REFORM AMENDMENTS OF 1992.—Section 701 of the Job Training Reform Amendments of 1992 (29 U.S.C. 1501 note) is repealed.

<< 29 USCA § 1551 NOTE >>

(23) PUBLIC LAW 98–524.—Section 7 of Public Law 98–524 (29 U.S.C. 1551 note) is repealed.

<< 29 USCA § 1721 NOTE >>

(24) VETERANS' BENEFITS AND PROGRAMS IMPROVEMENT ACT OF 1988.—Section 402 of the Veterans' Benefits and Programs Improvement Act of 1988 (29 U.S.C. 1721 note) is amended—

(A) in subsection (a), by striking "title III of the Job Training Partnership Act (29 U.S.C. 1651 et seq.)" and inserting "title III of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998";

(B) in subsection (c), by striking "Training, in consultation with the office designated or created under section 322(b) of the Job Training Partnership Act," and inserting "Training, in consultation with the unit or office designated or created under section 322(b) of the Job Training Partnership Act or any successor to such unit or office under title I of the Workforce Investment Act of 1998,"; and

AR.02659

(C) in subsection (d)—

  (i) in paragraph (1)(A), by striking "part C" and all that follows through "; and" and inserting "part C of title IV of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998; and"; and

  (ii) in paragraph (2), by striking "Employment and training" and all that follows and inserting "Employment and training activities for dislocated workers under title III of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998.".

<< 29 USCA § 1721 NOTE >>

(25) VETERANS' JOB TRAINING ACT.—

  (A) SECTION 13.—Section 13(b) of the Veterans' Job Training Act (29 U.S.C. 1721 note) is amended by striking "assistance under the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "assistance under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

  (B) SECTION 14.—Section 14(b)(3)(B)(i)(II) of the Veterans' Job Training Act (29 U.S.C. 1721 note) is amended by striking "under part C of title IV of the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "under part C of title IV the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

  (C) SECTION 15.—Section 15(c)(2) of the Veterans' Job Training Act (29 U.S.C. 1721 note) is amended—

  (i) in the second sentence, by striking "part C of title IV of the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "part C of title IV of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998"; and

  (ii) in the third sentence, by striking "title III of that Act" and inserting "title III of the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 29 USCA § 2102 >>

  (26) WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT.—Section 3(a)(2) of the Worker Adjustment and Retraining Notification Act (29 U.S.C. 2102(a)(2)) is amended by striking "to the State" and all that follows through "and the chief" and inserting "to the State dislocated worker unit or office (referred to in section 311(b)(2) of the Job Training and Partnership Act), or the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998, and the chief".

<< 31 USCA § 6703 >>

  (27) TITLE 31, UNITED STATES CODE.—Section 6703(a) of title 31, United States Code, is amended by striking paragraph (4) and inserting the following:

  "(4) Programs under title II or IV of the Job Training Partnership Act or under title I of the Workforce Investment Act of 1998.".

<< 38 USCA § 4101 NOTE >>

  (28) VETERANS' REHABILITATION AND EDUCATION AMENDMENTS OF 1980.—Section 512 of the Veterans' Rehabilitation and Education Amendments of 1980 (38 U.S.C. 4101 note) is amended by striking "the Comprehensive Employment and Training Act (29 U.S.C. et seq.)," and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998,".

  (29) TITLE 38, UNITED STATES CODE.—

<< 38 USCA § 4102A >>

  (A) SECTION 4102A.—Section 4102A(d) of title 38, United States Code, is amended by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998".

<< 38 USCA § 4103A >>

(B) SECTION 4103A.—Section 4103A(c)(4) of title 38, United States Code, is amended by striking "(including part C of title IV of the Job Training Partnership Act (29 U.S.C. 1501 et seq.))" and inserting "including part C of title IV of the Job Training Partnership Act and title I of the Workforce Investment Act of 1998".

<< 38 USCA § 4213 >>

(C) SECTION 4213.—Section 4213 of title 38, United States Code, is amended by striking "program assisted under the Job Training Partnership Act (29 U.S.C. 1501 et seq.)," and inserting "program carried out under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998,".

(30) SOCIAL SECURITY ACT.—Section 403(a)(5) of Social Security Act (42 U.S.C. 603(a)(5)) is amended—

<< 42 USCA § 603 >>

(A) in subparagraph (A)(vii)(I), by striking "(as described in section 103(c) of the Job Training Partnership Act)" and inserting "(as described in section 103(c) of the Job Training Partnership Act or defined in section 101 of the Workforce Investment Act of 1998)"; and

<< 42 USCA § 603 >>

(B) in subparagraph (D)—
  (i) in clause (ii), by striking "means, with respect to a service delivery area, the private industry council (or successor entity) established for the service delivery area pursuant to the Job Training Partnership Act" and inserting "means, with respect to a service delivery area, the private industry council or local workforce investment board established for the service delivery area pursuant to the Job Training Partnership Act or title I of the Workforce Investment Area of 1998, as appropriate"; and
  (ii) in clause (iii), by striking "shall have the meaning given such term (or the successor to such term) for purposes of the Job Training Partnership Act" and inserting "shall have the meaning given such term for purposes of the Job Training Partnership Act or shall mean a local area as defined in section 101 of the Workforce Investment Act of 1998, as appropriate".

<< 42 USCA § 1437u >>

(31) UNITED STATES HOUSING ACT.—Section 23 of the United States Housing Act of 1937 (42 U.S.C. 1437u) is amended—

(A) in subsection (b)(2)(A), by striking "the Job Training" and all that follows through "or the" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998 or the";
(B) in the first sentence of subsection (f)(2), by striking "programs under the" and all that follows through "and the" and inserting "programs under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998 or the"; and
(C) in subsection (g)—
  (i) in paragraph (2), by striking "programs under the" and all that follows through "and the" and inserting "programs under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998 or the"; and
  (ii) in paragraph (3)(H), by striking "program under" and all that follows through "and any other" and inserting "programs under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998 and any other".

<< 42 USCA § 1474 >>

(32) HOUSING ACT OF 1949.—Section 504(c)(3) of the Housing Act of 1949 (42 U.S.C. 1474(c)(3)) is amended by striking "pursuant to" and all that follows through "or the" and inserting "pursuant to the Job Training Partnership Act or title I of the Workforce Investment Act of 1998 or the".

(33) OLDER AMERICANS ACT OF 1965.—
  (A) SECTION 203.—Section 203 of the Older Americans Act of 1965 (42 U.S.C. 3013) is amended—

<< 42 USCA § 3013 >>

(i) in subsection (a)(2), by striking the last sentence and inserting the following: "In particular, the Secretary of Labor shall consult and cooperate with the Assistant Secretary in carrying out the Job Training Partnership Act and title I of the Workforce Investment Act of 1998."; and

<< 42 USCA § 3013 >>

(ii) in subsection (b), by striking paragraph (1) and inserting the following:
"(1) the Job Training Partnership Act or title I of the Workforce Investment Act of 1998,".
(B) SECTION 502.—Section 502 of the Older Americans Act of 1965 (42 U.S.C. 3056) is amended—

<< 42 USCA § 3056 >>

(i) in subsection (b)(1)(N)(i), by striking "the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998"; and

<< 42 USCA § 3056 >>

(ii) in subsection (e)(2)(C), by striking "programs carried out under section 124 of the Job Training Partnership Act (29 U.S.C. 1534)" and inserting "programs carried out under the Job Training Partnership Act and title I of the Workforce Investment Act of 1998".
(C) SECTION 503.—Section 503(b)(1) of the Older Americans Act of 1965 (42 U.S.C. 3056a(b)(1)) is amended—

<< 42 USCA § 3056a >>

(i) in the first sentence, by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998"; and
(ii) in the first sentence, by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 42 USCA § 3056h >>

(D) SECTION 510.—Section 510 of the Older Americans Act of 1965 (42 U.S.C. 3056h) is amended by striking the matter following the section heading and inserting the following:
"In the case of projects under this title carried out jointly with programs carried out under the Job Training Partnership Act, eligible individuals shall be deemed to satisfy the requirements of sections 203 and 204(d)(5)(A) of such Act (29 U.S.C. 1603, 1604(d)(5)(A)) that are applicable to adults. In the case of projects under this title carried out jointly with programs carried out under subtitle B of title I of the Workforce Investment Act of 1998, eligible individuals shall be deemed to satisfy the requirements of section 134 of such Act.".

<< 42 USCA § 3796ee >>

(34) OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968.—Section 1801(b)(3) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796ee(b)(3)) is amended by striking "activities carried out under part B of title IV of the Job Training Partnership Act (relating to Job Corps) (29 U.S.C. 1691 et seq.)" and inserting "activities carried out under part B of title IV of the Job Training Partnership Act or subtitle C of title I of the Workforce Investment Act of 1998 (relating to Job Corps)".

<< 42 USCA § 4368a >>

(35) ENVIRONMENTAL PROGRAMS ASSISTANCE ACT OF 1984.—The second sentence of section 2(a) of the Environmental Programs Assistance Act of 1984 (42 U.S.C. 4368a(a)) is amended by striking "and title IV of the Job Training Partnership Act" and inserting "and title IV of the Job Training Partnership Act or subtitle D of title I of the Workforce Investment Act of 1998".

(36) DOMESTIC VOLUNTEER SERVICE ACT OF 1973.—

<< 42 USCA § 4953 >>

(A) SECTION 103.—The second sentence of section 103(d) of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4953(d)) is amended to read as follows: "Whenever feasible, such efforts shall be coordinated with an appropriate private industry council established under the Job Training Partnership Act or local workforce investment board established under section 117 of the Workforce Investment Act of 1998.".

<< 42 USCA § 4959 >>

(B) SECTION 109.—Subsections (c)(2) and (d)(2) of section 109 of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4959) is amended by striking "administrative entities designated to administer job training plans under the Job Training Partnership Act" and inserting "administrative entities designated to administer job training plans under the Job Training Partnership Act and eligible providers of employment and training activities under subtitle B of title I of the Workforce Investment Act of 1998".

<< 42 USCA § 6103 >>

(37) AGE DISCRIMINATION ACT OF 1975.—Section 304(c)(1) of the Age Discrimination Act of 1975 (42 U.S.C. 6103(c)(1)) is amended by striking "Except with" and all that follows through "nothing" and inserting "Nothing".

<< 42 USCA § 6864 >>

(38) ENERGY CONSERVATION AND PRODUCTION ACT.—Section 414(b)(3) of the Energy Conservation and Production Act (42 U.S.C. 6864(b)(3)) is amended by striking "the Comprehensive Employment and Training Act of 1973" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 42 USCA § 6873 >>

(39) NATIONAL ENERGY CONSERVATION POLICY ACT.—Section 233 of the National Energy Conservation Policy Act (42 U.S.C. 6873) is amended, in the matter preceding paragraph (1), by striking "the Comprehensive Employment and Training Act of 1973" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 42 USCA § 9806 >>

(40) COMMUNITY ECONOMIC DEVELOPMENT ACT OF 1981.—Section 617(a)(3) of the Community Economic Development Act of 1981 (42 U.S.C. 9806(a)(3)) is amended by striking "activities such as those described in the Comprehensive Employment and Training Act" and inserting "activities such as the activities described in the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

<< 42 USCA § 11302 >>

(41) STEWART B. MCKINNEY HOMELESS ASSISTANCE ACT.—Section 103(b)(2) of the Stewart B. McKinney Homeless Assistance Act (42 U.S.C. 11302(b)(2)) is amended by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

(42) NATIONAL AND COMMUNITY SERVICE ACT OF 1990.—

<< 42 USCA § 12637 >>

(A) SECTION 177.—Section 177(d) of the National and Community Service Act of 1990 (42 U.S.C. 12637(d)) is amended to read as follows:

"(d) TREATMENT OF BENEFITS.—Allowances, earnings, and payments to individuals participating in programs that receive assistance under this title shall not be considered to be income for the purposes of determining eligibility for and the

AR.02663

338

amount of income transfer and in-kind aid furnished under any Federal or federally assisted program based on need, other than as provided under the Social Security Act (42 U.S.C. 301 et seq.).".

(B) SECTION 198C.—Section 198C of the National and Community Service Act of 1990 (42 U.S.C. 12653c) is amended—

<< 42 USCA § 12653c >>

(i) in subsection (b)(1), by striking "a military installation described in section 325(e)(1) of the Job Training Partnership Act (29 U.S.C. 1662d(e)(1))." and inserting "a military installation being closed or realigned under—

"(A) the Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of division B of Public Law 101–510; 10 U.S.C. 2687 note); and

"(B) title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).", and

<< 42 USCA § 12653c >>

(ii) in subsection (e)(1)(B), by striking clause (iii) and inserting the following:

<< 42 USCA § 12653c >>

"(iii) an eligible youth described in section 423 of the Job Training Partnership Act or an individual described in section 144 of the Workforce Investment Act of 1998.".

<< 42 USCA § 12655m >>

(C) SECTION 199L.—Section 199L(a) of the National and Community Service Act of 1990 (42 U.S.C. 12655m(a)) is amended by striking "the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998".

(43) CRANSTON–GONZALEZ NATIONAL AFFORDABLE HOUSING ACT.—

<< 42 USCA § 12899c >>

(A) SECTION 454.—Subparagraphs (H) and (M) of subsection (c)(2), and subsection (d)(7), of section 454 of the Cranston–Gonzalez National Affordable Housing Act (42 U.S.C. 12899c) are amended by striking "the Job Training Partnership Act" and inserting "the Job Training Partnership Act and title I of the Workforce Investment Act of 1998".

<< 42 USCA § 12899e >>

(B) SECTION 456.—The first sentence of section 456(e) of the Cranston–Gonzalez National Affordable Housing Act (42 U.S.C. 12899e(e)) is amended by inserting "(as in effect on the day before the date of enactment of the Workforce Investment Act of 1998)" after "the Job Training Partnership Act" each place it appears.

<< 42 USCA § 13823 >>

(44) VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994.—Section 31113(a)(4)(C) of the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. 13823(a)(4)(C)) is amended by striking "authorized under the Job Training Partnership Act (29 U.S.C. 1501 et seq.)" and inserting "authorized under the Job Training Partnership Act or title I of the Workforce Investment Act of 1998".

(e) OTHER REFERENCES TO TITLE VII OF THE STEWART B. MCKINNEY HOMELESS ASSISTANCE ACT.—

(1) TABLE OF CONTENTS.—The table of contents of the Stewart B. McKinney Homeless Assistance Act (42 U.S.C. 11421 et seq.) is amended by striking the items relating to title VII of such Act, except the items relating to the title heading, and subtitles B and C, of such title.

<< 42 USCA Ch. 119 >>

(2) TITLE VII.—The Stewart B. McKinney Homeless Assistance Act (as amended by section 199(b)(1) of the Workforce Investment Act of 1998) is further amended by inserting before subtitle B (relating to education for homeless children and families) the following:

"SUBTITLE VII—EDUCATION AND TRAINING".

(f) REFERENCES TO JOB TRAINING PARTNERSHIP ACT SUBSEQUENT TO REPEAL.—

<< 5 USCA § 3502 >>

(1) TITLE 5, UNITED STATES CODE.—Section 3502(d) of title 5, United States Code, is amended—
  (A) in paragraph (3)—
  (i) in subparagraph (A), by striking clause (i) and inserting the following:
  "(i) the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998; and"; and
  (ii) in subparagraph (B)(iii), by striking "under the Job Training Partnership Act or"; and
  (B) in paragraph (4), in the second sentence, by striking "the Job Training Partnership Act or".
(2) FOOD STAMP ACT OF 1977.—

<< 7 USCA § 2014 >>

  (A) SECTION 5.—Section 5(l) of the Food Stamp Act of 1977 (7 U.S.C. 2014(l)) is amended by striking "Notwithstanding section 142(b) of the Job Training Partnership Act or section 181(a)(2) of the Workforce Investment Act of 1998, earnings to individuals participating in on-the-job training programs under section 204(b)(1)(C) or 264(c)(1)(A) of the Job Training Partnership Act or in on-the-job training under title I of the Workforce Investment Act of 1998" and inserting "Notwithstanding section 181(a)(2) of the Workforce Investment Act of 1998, earnings to individuals participating in on-the-job training under title I of the Workforce Investment Act of 1998"

<< 7 USCA § 2015 >>

  (B) SECTION 6.—Section 6 of the Food Stamp Act of 1977 (7 U.S.C. 2015) is amended—
  (i) in subsection (d)(4)(M), by striking "the State public employment offices and agencies operating programs under the Job Training Partnership Act or of";
  (ii) in subsection (e)(3), by striking subparagraph (A) and inserting the following:
  "(A) a program under title I of the Workforce Investment Act of 1998;"; and
  (iii) in subsection (o)(1)(A), by striking "Job Training Partnership Act or".

<< 7 USCA § 2026 >>

  (C) SECTION 17.—The second sentence of section 17(b)(2) of the Food Stamp Act of 1977 (7 U.S.C. 2026(b)(2)) is amended by striking "the Job Training Partnership Act or".
(3) PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996.—

<< 8 USCA § 1613 >>

  (A) Section 403(c)(2)(K) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1613(c)(2)(K)) is amended by striking "Job Training Partnership Act or".

<< 8 USCA § 1183a NOTE >>

  (B) Section 423(d)(11) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1183a note) is amended by striking "Job Training Partnership Act or".

<< 8 USCA § 1255a >>

(4) IMMIGRATION AND NATIONALITY ACT.—Section 245A(h)(4)(F) of the Immigration and Nationality Act (8 U.S.C. 1255a(h)(4)(F)) is amended by striking "The Job Training Partnership Act or title" and inserting "Title".

<< 8 USCA § 1522 NOTE >>

(5) REFUGEE EDUCATION ASSISTANCE ACT OF 1980.—Section 402(a)(4) of the Refugee Education Assistance Act of 1980 (8 U.S.C. 1522 note) is amended by striking "the Comprehensive Employment and Training Act of 1973" and inserting "the Job Training Partnership Act or".

(6) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1993.—

<< 42 USCA § 7274h >>

(A) SECTION 3161.—Section 3161(c)(6) of the National Defense Authorization Act for Fiscal Year 1993 (42 U.S.C. 7274h(c)(6)) is amended by striking subparagraph (A) and inserting the following:

"(A) programs carried out by the Secretary of Labor under title I of the Workforce Investment Act of 1998;".

<< 10 USCA § 1143 NOTE >>

(B) SECTION 4461.—Section 4461(1) of the National Defense Authorization Act for Fiscal Year 1993 (10 U.S.C. 1143 note) is amended by striking "The Job Training Partnership Act of title" and inserting "Title".

<< 10 USCA § 2501 NOTE >>

(C) SECTION 4471.—Section 4471 of the National Defense Authorization Act for Fiscal Year 1993 (10 U.S.C. 2501 note) is amended—

(i) in subsection (c)(2), by striking "the State dislocated worker unit or office referred to in section 311(b)(2) of the Job Training Partnership Act, or";

(ii) in subsection (d), in the first sentence, by striking "for training, adjustment assistance, and employment services under section 325 or 325A of the Job Training Partnership Act or"; and

(iii) in subsection (e), by striking "for training, adjustment assistance, and employment services under section 325 or 325A of the Job Training Partnership Act or".

<< 10 USCA § 1143 NOTE >>

(D) SECTION 4492.—Section 4492(b) of the National Defense Authorization Act for Fiscal Year 1993 (10 U.S.C. 1143 note) is amended by striking "the Job Training Partnership Act or".

<< 10 USCA § 2701 NOTE >>

(7) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1994.—Section 1333(c)(2)(B) of the National Defense Authorization Act for Fiscal Year 1994 (10 U.S.C. 2701 note) is amended by striking "Private industry councils as described in section 102 of the Job Training Partnership Act or local" and inserting "local".

<< 10 USCA § 2687 NOTE >>

(8) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1998.—Section 2824(c)(5) of the National Defense Authorization Act for Fiscal Year 1998 (10 U.S.C. 2687 note) is amended by striking "Job Training Partnership Act or".

<< 15 USCA § 636 >>

(9) SMALL BUSINESS ACT.—The fourth sentence of section 7(j)(13)(E) of the Small Business Act (15 U.S.C. 636(j)(13)(E)) is amended by striking "the Job Training Partnership Act or".

<< 15 USCA § 3116 >>

(10) FULL EMPLOYMENT AND BALANCED GROWTH ACT OF 1978.—Section 206 of the Full Employment and Balanced Growth Act of 1978 (15 U.S.C. 3116) is amended—

(A) in subsection (b), in the matter preceding paragraph (1), by striking "CETA" and inserting "the Job Training Partnership Act and"; and

(B) in subsection (c)(1), by striking "activities carried out under the Job Training Partnership Act or".

(11) TRADE ACT OF 1974.—

<< 19 USCA § 2296 >>

(A) SECTION 236.—Section 236(a)(5)(B) of the Trade Act of 1974 (19 U.S.C. 2296(a)(5)(B)) is amended by striking "section 303 of the Job Training Partnership Act or".

<< 19 USCA § 2311 >>

(B) SECTION 239.—Section 239(e) of the Trade Act of 1974 (19 U.S.C. 2311(e)) is amended by striking "title III of the Job Training Partnership Act or".

(12) HIGHER EDUCATION ACT OF 1965.—

<< 20 USCA § 1070d–2 >>

(A) SECTION 418A.—Subsections (b)(1)(B)(ii) and (c)(1)(A) of section 418A of the Higher Education Act of 1965 (20 U.S.C. 1070d–2) are amended by striking "section 402 of the Job Training Partnership Act or".

<< 20 USCA § 1087vv >>

(B) SECTION 480.—Section 480(b)(14) of the Higher Education Act of 1965 (20 U.S.C. 1087vv(b)(14)) is amended by striking "Job Training Partnership Act noneducational benefits or".

(13) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—

<< 20 USCA § 6365 >>

(A) SECTION 1205.—Section 1205(8)(B) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6365(8)(B)) is amended by striking "the Job Training Partnership Act and".

<< 20 USCA § 6434 >>

(B) SECTION 1414.—Section 1414(c)(8) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6434(c)(8)) is amended by striking "the Job Training Partnership Act or".

<< 20 USCA § 6453 >>

(C) SECTION 1423.—Section 1423(9) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6453(9)) is amended by striking "the Job Training Partnership Act or".

<< 20 USCA § 6455 >>

(D) SECTION 1425.—Section 1425(9) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6455(9)) is amended by striking "the Job Training Partnership Act or".

<< DC ST § 31–2853.64 >>

(14) DISTRICT OF COLUMBIA SCHOOL REFORM ACT OF 1995.—Section 2604(c)(2)(B)(ii) of the District of Columbia School Reform Act of 1995 (Public Law 104–134; 110 Stat. 1321–145) is amended by striking "Job Training Partnership Act or".

<< 26 USCA § 3304 NOTE >>

(15) EMERGENCY JOBS AND UNEMPLOYMENT ASSISTANCE ACT OF 1974.—
  (A) SECTION 204.—Section 204(b) of the Emergency Jobs and Unemployment Assistance Act of 1974 (26 U.S.C. 3304 note) is amended by striking "service delivery area established" and all that follows through "this section) or a".
  (B) SECTION 223.—Section 223 of the Emergency Jobs and Unemployment Assistance Act of 1974 (26 U.S.C. 3304 note) is amended—
    (i) in paragraph (3), by striking "the Job Training Partnership Act or"; and
    (ii) in paragraph (4), by striking "the Job Training Partnership Act or".

<< 29 USCA § 1721 NOTE >>

(16) VETERANS' BENEFITS AND PROGRAMS IMPROVEMENT ACT OF 1988.—Section 402 of the Veterans' Benefits and Programs Improvement Act of 1988 (29 U.S.C. 1721 note) is amended—
  (A) in subsection (a), by striking "title III of the Job Training Partnership Act or"; and
  (B) in subsection (d)—
  (i) in paragraph (1)(A), by striking "part C of title IV of the Job Training Partnership Act or"; and
  (ii) in paragraph (2), by striking "title III of the Job Training Partnership Act or".

<< 29 USCA § 1721 NOTE >>

(17) VETERANS' JOB TRAINING ACT.—
  (A) SECTION 13.—Section 13(b) of the Veterans' Job Training Act (29 U.S.C. 1721 note) is amended by striking "the Job Training Partnership Act or".
  (B) SECTION 14.—Section 14(b)(3)(B)(i)(II) of the Veterans' Job Training Act (29 U.S.C. 1721 note) is amended by striking "part C of title IV the Job Training Partnership Act or".
  (C) SECTION 15.—Section 15(c)(2) of the Veterans' Job Training Act (29 U.S.C. 1721 note) is amended—
    (i) in the second sentence, by striking "part C of title IV of the Job Training Partnership Act or"; and
    (ii) in the third sentence, by striking "title III of the Job Training Partnership Act or".

<< 29 USCA § 2102 >>

(18) WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT.—Section 3(a)(2) of the Worker Adjustment and Retraining Notification Act (29 U.S.C. 2102(a)(2)) is amended by striking "the State dislocated worker unit or office (referred to in section 311(b)(2) of the Job Training and Partnership Act), or".

<< 31 USCA § 6703 >>

(19) TITLE 31, UNITED STATES CODE.—Section 6703(a) of title 31, United States Code, is amended by striking paragraph (4) and inserting the following:
  "(4) Programs under title I of the Workforce Investment Act of 1998.".

<< 38 USCA § 4101 NOTE >>

AR.02668

(20) VETERANS' REHABILITATION AND EDUCATION AMENDMENTS OF 1980.—Section 512 of the Veterans' Rehabilitation and Education Amendments of 1980 (38 U.S.C. 4101 note) is amended by striking "the Job Training Partnership Act or".

(21) TITLE 38, UNITED STATES CODE.—

<< 38 USCA § 4102A >>

(A) SECTION 4102A.—Section 4102A(d) of title 38, United States Code, is amended by striking "the Job Training Partnership Act and".

<< 38 USCA § 4103A >>

(B) SECTION 4103A.—Section 4103A(c)(4) of title 38, United States Code, is amended by striking "part C of title IV of the Job Training Partnership Act and".

<< 38 USCA § 4213 >>

(C) SECTION 4213.—Section 4213 of title 38, United States Code, is amended by striking "the Job Training Partnership Act or".

<< 42 USCA § 603 >>

(22) SOCIAL SECURITY ACT.—Section 403(a)(5) of Social Security Act (42 U.S.C. 603(a)(5)) is amended—
(A) in subparagraph (A)(vii)(I), by striking "described in section 103(c) of the Job Training Partnership Act or"; and
(B) in subparagraph (D)—
(i) in clause (ii), by striking "the Job Training Partnership Act or"; and
(ii) in clause (iii), by striking "shall mean a local area as defined in section 101 of the Workforce Investment Act of 1998, as appropriate".

<< 42 USCA § 1437u >>

(23) UNITED STATES HOUSING ACT.—Section 23 of the United States Housing Act of 1937 (42 U.S.C. 1437u) is amended—
(A) in subsection (b)(2)(A), by striking "the Job Training Partnership Act or";
(B) in the first sentence of subsection (f)(2), by striking "the Job Training Partnership Act or"; and
(C) in subsection (g)—
(i) in paragraph (2), by striking "the Job Training Partnership Act or"; and
(ii) in paragraph (3)(H), by striking "the Job Training Partnership Act or".

<< 42 USCA § 1474 >>

(24) HOUSING ACT OF 1949.—Section 504(c)(3) of the Housing Act of 1949 (42 U.S.C. 1474(c)(3)) is amended by striking "the Job Training Partnership Act or".

(25) OLDER AMERICANS ACT OF 1965.—

<< 42 USCA § 3013 >>

(A) SECTION 203.—Section 203 of the Older Americans Act of 1965 (42 U.S.C. 3013) is amended—
(i) in subsection (a)(2), by striking "the Job Training Partnership Act and"; and
(ii) in subsection (b), by striking paragraph (1) and inserting the following:
"(1) title I of the Workforce Investment Act of 1998,".

<< 42 USCA § 3056 >>

(B) SECTION 502.—Section 502 of the Older Americans Act of 1965 (42 U.S.C. 3056) is amended—
  (i) in subsection (b)(1)(N)(i), by striking "the Job Training Partnership Act and"; and
  (ii) in subsection (e)(2)(C), by striking "the Job Training Partnership Act and".

<< 42 USCA § 3056a >>

(C) SECTION 503.—Section 503(b)(1) of the Older Americans Act of 1965 (42 U.S.C. 3056a(b)(1)) is amended—
  (i) in the first sentence, by striking "the Job Training Partnership Act and"; and
  (ii) in the first sentence, by striking "the Job Training Partnership Act or".

<< 42 USCA § 3056h >>

(D) SECTION 510.—Section 510 of the Older Americans Act of 1965 (42 U.S.C. 3056h) is amended by striking the matter following the section heading and inserting the following:
"In the case of projects under this title carried out jointly with programs carried out under subtitle B of title I of the Workforce Investment Act of 1998, eligible individuals shall be deemed to satisfy the requirements of section 134 of such Act.".

<< 42 USCA § 3796ee >>

(26) OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968.—Section 1801(b)(3) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796ee(b)(3)) is amended by striking "part B of title IV of the Job Training Partnership Act or".

<< 42 USCA § 4368a >>

(27) ENVIRONMENTAL PROGRAMS ASSISTANCE ACT OF 1984.—The second sentence of section 2(a) of the Environmental Programs Assistance Act of 1984 (42 U.S.C. 4368a(a)) is amended by striking "title IV of the Job Training Partnership Act or".

<< 42 USCA § 4953 >>

(28) DOMESTIC VOLUNTEER SERVICE ACT OF 1973.—

<< 42 USCA § 4953 >>

(A) SECTION 103.—The second sentence of section 103(d) of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4953(d)) is amended to read as follows: "private industry council established under the Job Training Partnership Act or".

<< 42 USCA § 4959 >>

(B) SECTION 109.—Subsections (c)(2) and (d)(2) of section 109 of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4959) is amended by striking "administrative entities designated to administer job training plans under the Job Training Partnership Act and".

<< 42 USCA § 6864 >>

(29) ENERGY CONSERVATION AND PRODUCTION ACT.—Section 414(b)(3) of the Energy Conservation and Production Act (42 U.S.C. 6864(b)(3)) is amended by striking "the Job Training Partnership Act or".

<< 42 USCA § 6873 >>

(30) NATIONAL ENERGY CONSERVATION POLICY ACT.—Section 233 of the National Energy Conservation Policy Act (42 U.S.C. 6873) is amended, in the matter preceding paragraph (1), by striking "the Job Training Partnership Act or".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 42 USCA § 9806 >>

(31) COMMUNITY ECONOMIC DEVELOPMENT ACT OF 1981.—Section 617(a)(3) of the Community Economic Development Act of 1981 (42 U.S.C. 9806(a)(3)) is amended by striking "the Job Training Partnership Act or".

<< 42 USCA § 11302 >>

(32) STEWART B. MCKINNEY HOMELESS ASSISTANCE ACT.—Section 103(b)(2) of the Stewart B. McKinney Homeless Assistance Act (42 U.S.C. 11302(b)(2)) is amended by striking "the Job Training Partnership Act or".
(33) NATIONAL AND COMMUNITY SERVICE ACT OF 1990.—

<< 42 USCA § 12653c >>

(A) SECTION 198C.—Section 198C(e)(1)(B) of the National and Community Service Act of 1990 (42 U.S.C. 12653c(e)(1)(C)) is amended by striking clause (iii) and inserting the following:
"(iii) an individual described in section 144 of the Workforce Investment Act of 1998.".

<< 42 USCA § 12655m >>

(B) SECTION 199L.—Section 199L(a) of the National and Community Service Act of 1990 (42 U.S.C. 12655m(a)) is amended by striking "the Job Training Partnership Act and".

<< 42 USCA § 12899c >>

(34) CRANSTON–GONZALEZ NATIONAL AFFORDABLE HOUSING ACT.—Subparagraphs (H) and (M) of subsection (c)(2), and subsection (d)(7), of section 454 of the Cranston–Gonzalez National Affordable Housing Act (42 U.S.C. 12899c) are amended by striking "the Job Training Partnership Act and".

<< 42 USCA § 13823 >>

(35) VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994.—Section 31113(a)(4)(C) of the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. 13823(a)(4)(C)) is amended by striking "the Job Training Partnership Act or".

<< 5 USCA § 3502 NOTE >>

(g) EFFECTIVE DATES.—

<< 5 USCA § 3502 NOTE >>

(1) IMMEDIATELY EFFECTIVE AMENDMENTS.—The amendments made by subsections (a) through (d) shall take effect on the date of the enactment of this Act.

<< 5 USCA § 3502 NOTE >>

(2) SUBSEQUENTLY EFFECTIVE AMENDMENTS.—
(A) STEWART B. MCKINNEY HOMELESS ASSISTANCE ACT.—The amendments made by subsection (e) shall take effect on July 1, 1999.
(B) JOB TRAINING PARTNERSHIP ACT.—The amendments made by subsection (f) shall take effect on July 1, 2000.
(h) REFERENCES.—

<< 29 USCA § 2940 >>

(1) IN GENERAL.—Section 190 of the Workforce Investment Act of 1998 is amended to read as follows:

"SEC. 190. REFERENCES.

"(a) REFERENCES TO COMPREHENSIVE EMPLOYMENT AND TRAINING ACT.—Except as otherwise specified, a reference in a Federal law (other than a reference in a provision amended by the Reading Excellence Act) to a provision of the Comprehensive Employment and Training Act—

"(1) effective on the date of enactment of this Act, shall be deemed to refer to the corresponding provision of the Job Training Partnership Act or of the Workforce Investment Act of 1998; and

"(2) effective on July 1, 2000, shall be deemed to refer to the corresponding provision of the Workforce Investment Act of 1998.".

"(b) REFERENCES TO JOB TRAINING PARTNERSHIP ACT.—Except as otherwise specified, a reference in a Federal law (other than a reference in this Act or a reference in a provision amended by the Reading Excellence Act) to a provision of the Job Training Partnership Act—

"(1) effective on the date of enactment of this Act, shall be deemed to refer to that provision or the corresponding provision of the Workforce Investment Act of 1998; and

"(2) effective on July 1, 2000, shall be deemed to refer to the corresponding provision of the Workforce Investment Act of 1998.".

<< 29 USCA § 2940 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall take effect as if included in the Workforce Investment Act of 1998.

<< 29 USCA § 2918 >>

<< 29 USCA § 2940 NOTE >>

(3) CONFORMING AMENDMENT.—Section 199A of such Act is amended by striking subsection (c).

"SUBTITLE VIII—AMENDMENT TO WORKFORCE INVESTMENT ACT OF 1998".

Section 173 of the Workforce Investment Act of 1998 (29 U.S.C. 2918) is amended by adding at the end the following new subsection:

"(e) ADDITIONAL ASSISTANCE.—

"(1) IN GENERAL.—From the amount appropriated and made available to carry out this section for any program year, the Secretary shall use not more than $15,000,000 to make grants to not more than 8 States to provide employment and training activities under section 134, in accordance with subtitle B.

"(2) ELIGIBLE STATES.—The Secretary shall make a grant under paragraph (1) to a State for a program year if—

"(A)(i) the amount of the allotment that would be made to the State for the program year under the formula specified in section 202(a) of the Job Training Partnership Act, as in effect on July 1, 1998; is greater than

"(ii) the amount of the allotment that would be made to the State for the program year under the formula specified in section 132(b)(1)(B); and

"(B) the State is 1 of the 8 States with the greatest quotient obtained by dividing—

"(i) the amount described in subparagraph (A)(i); by

"(ii) the amount described in subparagraph (A)(ii).

"(3) AMOUNT OF GRANTS.—Subject to paragraph (1), the amount of the grant made under paragraph (1) to a State for a program year shall be based on the difference between—

"(A) the amount of the allotment that would be made to the State for the program year under the formula specified in section 202(a) of the Job Training Partnership Act, as in effect on July 1, 1998; and

"(B) the amount of the allotment that would be made to the State for the program year under the formula specified in section 132(b)(1)(B).

"(4) ALLOCATION OF FUNDS.—A State that receives a grant under paragraph (1) for a program year—

"(A) shall allocate funds made available through the grant on the basis of the formula used by the State to allocate funds within the State for that program year under—

"(i) paragraph (2)(A) or (3) of section 133(b); or

"(ii) paragraph (2)(B) of section 133(b); and

"(B) shall use the funds in the same manner as the State uses other funds allocated under the appropriate paragraph of section 133(b).".

## TITLE IX—WOMEN'S HEALTH AND CANCER RIGHTS

<< 42 USCA § 201 NOTE >>

SEC. 901. SHORT TITLE.

This title may be cited as the "Women's Health and Cancer Rights Act of 1998".

SEC. 902. AMENDMENTS TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.

<< 29 USCA § 1185b >>

(a) IN GENERAL.—Subpart B of part 7 of subtitle B of title I of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1185 et seq.) is amended by adding at the end the following new section:

"SEC. 713. REQUIRED COVERAGE FOR RECONSTRUCTIVE SURGERY FOLLOWING MASTECTOMIES.

"(a) IN GENERAL.—A group health plan, and a health insurance issuer providing health insurance coverage in connection with a group health plan, that provides medical and surgical benefits with respect to a mastectomy shall provide, in a case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for—

"(1) all stages of reconstruction of the breast on which the mastectomy has been performed;

"(2) surgery and reconstruction of the other breast to produce a symmetrical appearance; and

"(3) prostheses and physical complications of mastectomy, including lymphedemas;

in a manner determined in consultation with the attending physician and the patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage. Written notice of the availability of such coverage shall be delivered to the participant upon enrollment and annually thereafter.

"(b) NOTICE.—A group health plan, and a health insurance issuer providing health insurance coverage in connection with a group health plan shall provide notice to each participant and beneficiary under such plan regarding the coverage required by this section in accordance with regulations promulgated by the Secretary. Such notice shall be in writing and prominently positioned in any literature or correspondence made available or distributed by the plan or issuer and shall be transmitted—

"(1) in the next mailing made by the plan or issuer to the participant or beneficiary;

"(2) as part of any yearly informational packet sent to the participant or beneficiary; or

"(3) not later than January 1, 1999; whichever is earlier.

"(c) PROHIBITIONS.—A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not—

"(1) deny to a patient eligibility, or continued eligibility, to enroll or to renew coverage under the terms of the plan, solely for the purpose of avoiding the requirements of this section; and

"(2) penalize or otherwise reduce or limit the reimbursement of an attending provider, or provide incentives (monetary or otherwise) to an attending provider, to induce such provider to provide care to an individual participant or beneficiary in a manner inconsistent with this section.

"(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section.

AR.02673

"(e) PREEMPTION, RELATION TO STATE LAWS.—

  "(1) IN GENERAL.—Nothing in this section shall be construed to preempt any State law in effect on the date of enactment of this section with respect to health insurance coverage that requires coverage of at least the coverage of reconstructive breast surgery otherwise required under this section.

  "(2) ERISA.—Nothing in this section shall be construed to affect or modify the provisions of section 514 with respect to group health plans.".

  (b) CLERICAL AMENDMENT.—The table of contents in section 1 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 note) is amended by inserting after the item relating to section 712 the following new item:

"Sec. 713. Required coverage reconstructive surgery following mastectomies.".

<< 29 USCA § 1185b NOTE >>

(c) EFFECTIVE DATES.—

<< 29 USCA § 1185b NOTE >>

  (1) IN GENERAL.—The amendments made by this section shall apply with respect to plan years beginning on or after the date of enactment of this Act.

<< 29 USCA § 1185b NOTE >>

  (2) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—In the case of a group health plan maintained pursuant to 1 or more collective bargaining agreements between employee representatives and 1 or more employers, any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section shall not be treated as a termination of such collective bargaining agreement.

SEC. 903. AMENDMENTS TO THE PUBLIC HEALTH SERVICE ACT.

<< 42 USCA § 300gg–6 >>

  (a) GROUP MARKET.—Subpart 2 of part A of title XXVII of the Public Health Service Act (42 U.S.C. 300gg–4 et seq.) is amended by adding at the end the following new section:

"SEC. 2706. REQUIRED COVERAGE FOR RECONSTRUCTIVE SURGERY FOLLOWING MASTECTOMIES.

  "The provisions of section 713 of the Employee Retirement Income Security Act of 1974 shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart.".

<< 42 USCA § 300gg–52 >>

  (b) INDIVIDUAL MARKET.—Subpart 3 of part B of title XXVII of the Public Health Service Act (42 U.S.C. 300gg–51 et seq.) is amended by adding at the end the following new section:

"SEC. 2752. REQUIRED COVERAGE FOR RECONSTRUCTIVE SURGERY FOLLOWING MASTECTOMIES.

  "The provisions of section 2706 shall apply to health insurance coverage offered by a health insurance issuer in the individual market in the same manner as they apply to health insurance coverage offered by a health insurance issuer in connection with a group health plan in the small or large group market.".

  (c) EFFECTIVE DATES.—

<< 42 USCA § 300gg–6 >>

  (1) GROUP PLANS.—

(A) IN GENERAL.—The amendment made by subsection (a) shall apply to group health plans for plan years beginning on or after the date of enactment of this Act.

(B) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—In the case of a group health plan maintained pursuant to 1 or more collective bargaining agreements between employee representatives and 1 or more employers, any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by the amendment made by subsection (a) shall not be treated as a termination of such collective bargaining agreement.

<< 42 USCA § 300gg–52 >>

(2) INDIVIDUAL PLANS.—The amendment made by subsection (b) shall apply with respect to health insurance coverage offered, sold, issued, renewed, in effect, or operated in the individual market on or after the date of enactment of this Act.

This Act may be cited as the "Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1999".

This Act may be cited as the "Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1999".

(g) For programs, projects or activities in the Department of Transportation and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for the Department of Transportation and related agencies for the fiscal year ending September 30, 1999, and for other purposes.

## TITLE I

## DEPARTMENT OF TRANSPORTATION

### OFFICE OF THE SECRETARY

#### IMMEDIATE OFFICE OF THE SECRETARY

For necessary expenses of the Immediate Office of the Secretary, $1,624,000.

#### IMMEDIATE OFFICE OF THE DEPUTY SECRETARY

For necessary expenses of the Immediate Office of the Deputy Secretary, $585,000.

#### OFFICE OF THE GENERAL COUNSEL

For necessary expenses of the Office of the General Counsel, $8,750,000.

#### OFFICE OF THE ASSISTANT SECRETARY FOR POLICY

For necessary expenses of the Office of the Assistant Secretary for Policy, $2,808,000.

#### OFFICE OF THE ASSISTANT SECRETARY FOR AVIATION AND INTERNATIONAL AFFAIRS

For necessary expenses of the Office of the Assistant Secretary for Aviation and International Affairs, $7,650,300: *Provided*, That notwithstanding any other provision of law, there may be credited to this appropriation up to $1,000,000 in funds received in user fees.

#### OFFICE OF THE ASSISTANT SECRETARY FOR BUDGET AND PROGRAMS

For necessary expenses of the Office of the Assistant Secretary for Budget and Programs, $6,349,000, including not to exceed $40,000 for allocation within the Department for official reception and representation expenses as the Secretary may determine.

#### OFFICE OF THE ASSISTANT SECRETARY FOR GOVERNMENTAL AFFAIRS

For necessary expenses of the Office of the Assistant Secretary for Governmental Affairs, $1,940,600.

#### OFFICE OF THE ASSISTANT SECRETARY FOR ADMINISTRATION

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For necessary expenses of the Office of the Assistant Secretary for Administration, $19,721,600.

## OFFICE OF PUBLIC AFFAIRS

For necessary expenses of the Office of Public Affairs, $1,565,500.

## EXECUTIVE SECRETARIAT

For necessary expenses of the Executive Secretariat, $1,046,900.

## BOARD OF CONTRACT APPEALS

For necessary expenses of the Board of Contract Appeals, $561,100.

## OFFICE OF SMALL AND DISADVANTAGED BUSINESS UTILIZATION

For necessary expenses of the Office of Small and Disadvantaged Business Utilization, $1,020,400.

## OFFICE OF INTELLIGENCE AND SECURITY

For necessary expenses of the Office of Intelligence and Security, $1,036,100.

## OFFICE OF THE CHIEF INFORMATION OFFICER

For necessary expenses of the Office of the Chief Information Officer, $4,874,600.

## OFFICE OF INTERMODALISM

For necessary expenses of the Office of Intermodalism, $956,900.

## OFFICE OF CIVIL RIGHTS

For necessary expenses of the Office of Civil Rights, $6,966,000.

## TRANSPORTATION PLANNING, RESEARCH, AND DEVELOPMENT

For necessary expenses for conducting transportation planning, research, systems development, development activities, and making grants, to remain available until expended, $9,000,000.

## TRANSPORTATION ADMINISTRATIVE SERVICE CENTER

Necessary expenses for operating costs and capital outlays of the Transportation Administrative Service Center, not to exceed $124,124,000, shall be paid from appropriations made available to the Department of Transportation: *Provided,* That the preceding limitation shall not apply to activities associated with departmental Year 2000 conversion activities: *Provided further,* That such services shall be provided on a competitive basis to entities within the Department of Transportation: *Provided further,* That the above limitation on operating expenses shall not apply to non-DOT entities: *Provided further,* That no funds appropriated in this Act to an agency of the Department shall be transferred to the Transportation Administrative Service Center without the approval of the agency modal administrator: *Provided further,* That no assessments may be levied against any program, budget activity, subactivity or project funded by this Act unless notice of such assessments and the basis therefor are presented to the House and Senate Committees on Appropriations and are approved by such Committees.

## MINORITY BUSINESS RESOURCE CENTER

For the cost of direct loans, $1,500,000, as authorized by 49 U.S.C. 332: *Provided,* That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further,* That these funds are available to subsidize gross obligations for the principal amount of direct loans not to exceed $13,775,000. In addition, for administrative expenses to carry out the direct loan program, $400,000.

## MINORITY BUSINESS OUTREACH

For necessary expenses of Minority Business Resource Center outreach activities, $2,900,000, of which $2,635,000 shall remain available until September 30, 2000: *Provided,* That notwithstanding 49 U.S.C. 332, these funds may be used for business opportunities related to any mode of transportation.

## COAST GUARD

## OPERATING EXPENSES

### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses for the operation and maintenance of the Coast Guard, not otherwise provided for; purchase of not to exceed five passenger motor vehicles for replacement only; payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), and section 229(b) of the Social Security Act (42 U.S.C. 429(b)); and recreation and welfare; $2,700,000,000, of which $300,000,000 shall be available for defense-related activities; and of which $25,000,000 shall be derived from the Oil Spill Liability Trust Fund: *Provided*, That none of the funds appropriated in this or any other Act shall be available for pay or administrative expenses in connection with shipping commissioners in the United States: *Provided further*, That none of the funds provided in this Act shall be available for expenses incurred for yacht documentation under 46 U.S.C. 12109, except to the extent fees are collected from yacht owners and credited to this appropriation: *Provided further*, That the Commandant shall reduce both military and civilian employment levels for the purpose of complying with Executive Order No. 12839: *Provided further*, That up to $615,000 in user fees collected pursuant to section 1111 of Public Law 104–324 shall be credited to this appropriation as offsetting collections in fiscal year 1999: *Provided further*, That the Secretary may transfer funds to this account, from Federal Aviation Administration "Operations", not to exceed $71,705,000 in total for the fiscal year, fifteen days after written notification to the House and Senate Committees on Appropriations, solely for the purpose of providing additional funds for drug interdiction activities: *Provided further*, That none of the funds in this Act shall be available for the Coast Guard to plan, finalize, or implement any regulation that would promulgate new maritime user fees not specifically authorized by law after the date of enactment of this Act.

## ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of acquisition, construction, renovation, and improvement of aids to navigation, shore facilities, vessels, and aircraft, including equipment related thereto, $395,465,000, of which $20,000,000 shall be derived from the Oil Spill Liability Trust Fund; of which $219,923,000 shall be available to acquire, repair, renovate or improve vessels, small boats and related equipment, to remain available until September 30, 2003; $35,700,000 shall be available to acquire new aircraft and increase aviation capability, to remain available until September 30, 2001; $36,569,000 shall be available for other equipment, to remain available until September 30, 2001; $54,823,000 shall be available for shore facilities and aids to navigation facilities, to remain available until September 30, 2001; and $48,450,000 shall be available for personnel compensation and benefits and related costs, to remain available until September 30, 2000: *Provided*, That funds received from the sale of HU–25 aircraft shall be credited to this appropriation for the purpose of acquiring new aircraft and increasing aviation capacity: *Provided further*, That the Commandant may dispose of surplus real property by sale or lease and the proceeds shall be credited to this appropriation, of which not more than $1,000,000 shall be credited as offsetting collections to this account, to be available for the purposes of this account: *Provided further*, That the amount herein appropriated from the General Fund shall be reduced by such amount: *Provided further*, That any proceeds from the sale or lease of Coast Guard surplus real property in excess of $1,000,000 shall be retained and remain available until expended, but shall not be available for obligation until October 1, 1999: *Provided further*, That the Secretary, with funds made available under this heading, acting through the Commandant, may enter into a long-term Use Agreement with the City of Homer for dedicated pier space on the Homer dock necessary to support Coast Guard vessels when such vessels call on Homer, Alaska.

## ENVIRONMENTAL COMPLIANCE AND RESTORATION

For necessary expenses to carry out the Coast Guard's environmental compliance and restoration functions under chapter 19 of title 14, United States Code, $21,000,000, to remain available until expended.

## ALTERATION OF BRIDGES

For necessary expenses for alteration or removal of obstructive bridges, $14,000,000, to remain available until expended.

## RETIRED PAY

For retired pay, including the payment of obligations therefor otherwise chargeable to lapsed appropriations for this purpose, and payments under the Retired Serviceman's Family Protection and Survivor Benefits Plans, and for payments for medical care of retired personnel and their dependents under the Dependents Medical Care Act (10 U.S.C. ch. 55), $684,000,000.

## RESERVE TRAINING

### (INCLUDING TRANSFER OF FUNDS)

For all necessary expenses of the Coast Guard Reserve, as authorized by law; maintenance and operation of facilities; and supplies, equipment, and services; $69,000,000: *Provided*, That no more than $20,000,000 of funds made available under this heading may be transferred to Coast Guard "Operating expenses" or otherwise made available to reimburse the Coast Guard for financial support of the Coast Guard Reserve: *Provided further*, That none of the funds in this Act may be used by the Coast Guard to assess direct charges on the Coast Guard Reserves for items or activities which were not so charged during fiscal year 1997.

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

For necessary expenses, not otherwise provided for, for applied scientific research, development, test, and evaluation; maintenance, rehabilitation, lease and operation of facilities and equipment, as authorized by law, $12,000,000, to remain available until expended, of which $3,500,000 shall be derived from the Oil Spill Liability Trust Fund: *Provided*, That there may be credited to and used for the purposes of this appropriation funds received from State and local governments, other public authorities, private sources, and foreign countries, for expenses incurred for research, development, testing, and evaluation.

## FEDERAL AVIATION ADMINISTRATION

### OPERATIONS

Notwithstanding any other provision of law, for necessary expenses of the Federal Aviation Administration, not otherwise provided for, including operations and research activities related to commercial space transportation, administrative expenses for research and development, establishment of air navigation facilities, the operation (including leasing) and maintenance of aircraft, subsidizing the cost of aeronautical charts and maps sold to the public, and carrying out the provisions of subchapter I of chapter 471 of title 49, United States Code, or other provisions of law authorizing the obligation of funds for similar programs of airport and airway development or improvement, lease or purchase of passenger motor vehicles for replacement only, in addition to amounts made available by Public Law 104–264, $5,562,558,000 of which $4,112,174,000 shall be derived from the Airport and Airway Trust Fund: *Provided*, That none of the funds in this Act shall be available for the Federal Aviation Administration to plan, finalize, or implement any regulation that would promulgate new aviation user fees not specifically authorized by law after the date of enactment of this Act: *Provided further*, That there may be credited to this appropriation funds received from States, counties, municipalities, foreign authorities, other public authorities, and private sources, for expenses incurred in the provision of agency services, including receipts for the maintenance and operation of air navigation facilities, and for issuance, renewal or modification of certificates, including airman, aircraft, and repair station certificates, or for tests related thereto, or for processing major repair or alteration forms: *Provided further*, That of the funds appropriated under this heading, $6,000,000 shall be for the contract tower cost-sharing program: *Provided further*, That funds may be used to enter into a grant agreement with a nonprofit standard-setting organization to assist in the development of aviation safety standards: *Provided further*, That none of the funds in this Act shall be available for new applicants for the second career training program: *Provided further*, That none of the funds in this Act shall be available for paying premium pay under 5 U.S.C. 5546(a) to any Federal Aviation Administration employee unless such employee actually performed work during the time corresponding to such premium pay: *Provided further*, That none of the funds in this Act may be obligated or expended to operate a manned auxiliary flight service station in the contiguous United States: *Provided further*, That no more than $28,600,000 of funds appropriated to the Federal Aviation Administration in this Act may be used for activities conducted by, or coordinated through, the Transportation Administrative Service Center (TASC): *Provided further*, That none of the funds in this Act may be used for the Federal Aviation Administration to enter into a multiyear lease greater than five years in length or greater than $100,000,000 in value unless such lease is specifically authorized by the Congress and appropriations have been provided to fully cover the Federal Government's contingent liabilities: *Provided further*, That none of the funds in this Act may be used for the Federal Aviation Administration (FAA) to sign a lease for satellite services related to the global positioning system (GPS) wide area augmentation system until the administrator of the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

FAA certifies in writing to the House and Senate Committees on Appropriations that FAA has conducted a lease versus buy analysis which indicates that such lease will result in the lowest overall cost to the agency.

## FACILITIES AND EQUIPMENT

### (AIRPORT AND AIRWAY TRUST FUND)

Notwithstanding any other provision of law, for necessary expenses, not otherwise provided for, for acquisition, establishment, and improvement by contract or purchase, and hire of air navigation and experimental facilities and equipment as authorized under part A of subtitle VII of title 49, United States Code, including initial acquisition of necessary sites by lease or grant; engineering and service testing, including construction of test facilities and acquisition of necessary sites by lease or grant; and construction and furnishing of quarters and related accommodations for officers and employees of the Federal Aviation Administration stationed at remote localities where such accommodations are not available; and the purchase, lease, or transfer of aircraft from funds available under this head; to be derived from the Airport and Airway Trust Fund, $1,900,000,000, of which $1,652,000,000 shall remain available until September 30, 2001, and of which $248,000,000 shall remain available until September 30, 1999: *Provided*, That there may be credited to this appropriation funds received from States, counties, municipalities, other public authorities, and private sources, for expenses incurred in the establishment and modernization of air navigation facilities: *Provided further*, That none of the funds in this Act or any other Act making appropriations for fiscal year 1999 may be obligated for bulk explosive detection systems until 30 days after the FAA Administrator certifies to the House and Senate Committees on Appropriations, in writing, that the major air carriers responsible for providing aircraft security at Category X airports have agreed to: (1) begin assuming the operation and maintenance costs of such machines beginning in fiscal year 1999; and (2) substantially increase the usage of such machines above the level experienced as of April 1, 1998: *Provided further*, That none of the funds provided under this heading for "Next Generation Navigation Systems" may be obligated or expended for activities related to phase two or phase three of the wide area augmentation system.

## RESEARCH, ENGINEERING, AND DEVELOPMENT

### (AIRPORT AND AIRWAY TRUST FUND)

Notwithstanding any other provision of law, for necessary expenses, not otherwise provided for, for research, engineering, and development, as authorized under part A of subtitle VII of title 49, United States Code, including construction of experimental facilities and acquisition of necessary sites by lease or grant, $150,000,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 2001: *Provided*, That there may be credited to this appropriation funds received from States, counties, municipalities, other public authorities, and private sources, for expenses incurred for research, engineering, and development.

## GRANTS–IN–AID FOR AIRPORTS

### (LIQUIDATION OF CONTRACT AUTHORIZATION)

### (AIRPORT AND AIRWAY TRUST FUND)

Notwithstanding any other provision of law, for liquidation of obligations incurred for grants-in-aid for airport planning and development, and for noise compatibility planning and programs as authorized under subchapter I of chapter 471 and subchapter I of chapter 475 of title 49, United States Code, and under other law authorizing such obligations, $1,600,000,000, to be derived from the Airport and Airway Trust Fund and to remain available until expended: *Provided*, That none of the funds in this Act shall be available for the planning or execution of programs the obligations for which are in excess of $1,950,000,000 in fiscal year 1999 for grants-in-aid for airport planning and development, and noise compatibility planning and programs, notwithstanding section 47117(h) of title 49, United States Code: *Provided further*, That no more than $975,000,000 of funds limited under this heading may be obligated prior to the enactment of a bill extending contract authorization for the Grants-in-Aid for Airports program to the third and fourth quarters of fiscal year 1999.

## AVIATION INSURANCE REVOLVING FUND

AR.02679

The Secretary of Transportation is hereby authorized to make such expenditures and investments, within the limits of funds available pursuant to 49 U.S.C. 44307, and in accordance with section 104 of the Government Corporation Control Act, as amended (31 U.S.C. 9104), as may be necessary in carrying out the program for aviation insurance activities under chapter 443 of title 49, United States Code.

AIRCRAFT PURCHASE LOAN GUARANTEE PROGRAM

<< 49 USCA § 40113 NOTE >>

None of the funds in this Act shall be available for activities under this heading during fiscal year 1999.

FEDERAL HIGHWAY ADMINISTRATION

LIMITATION ON GENERAL OPERATING EXPENSES

Necessary expenses for administration and operation of the Federal Highway Administration not to exceed $327,413,000 shall be paid in accordance with law from appropriations made available by this Act to the Federal Highway Administration together with advances and reimbursements received by the Federal Highway Administration: *Provided further*, That $53,375,000 shall be available to carry out the functions and operations of the office of motor carriers.

FEDERAL–AID HIGHWAYS

(LIMITATION ON OBLIGATIONS)

(HIGHWAY TRUST FUND)

<< 23 USCA § 104 NOTE >>

None of the funds in this Act shall be available for the implementation or execution of programs, the obligations for which are in excess of $25,511,000,000 for Federal-aid highways and highway safety construction programs for fiscal year 1999: *Provided*, That, notwithstanding any other provision of law, within the $25,511,000,000 obligation limitation on Federal-aid highways and highway safety construction programs, not more than $200,000,000 shall be available for the implementation or execution of programs for Intelligent Transportation Systems (Sections 5204, 5205, 5206, 5207, 5208, and 5209 of Public Law 105–178) for fiscal year 1999; not more than $178,150,000 shall be available for the implementation or execution of programs for transportation research (Sections 502, 503, 504, 506, 507, and 508 of title 23, United States Code, as amended; section 5505 of title 49, United States Code, as amended; and section 5112 of Public Law 105–178) for fiscal year 1999; not more than $38,000,000 shall be available for the implementation or execution of programs for Ferry Boat and Ferry Terminal Facility Program (Section 1064 of the Intermodal Surface Transportation Efficiency Act of 1991 (23 U.S.C. 129 note; 105 Stat. 2005) as amended)) for fiscal year 1999; not more than $15,000,000 shall be available for the implementation or execution of programs for the Magnetic Levitation Transportation Technology Deployment Program (Section 1218 of Public Law 105–178) for fiscal year 1999, of which not to exceed $500,000 shall be available to the Federal Railroad Administration for administrative expenses and technical assistance in connection with such program; not more than $31,000,000 shall be available for the implementation or execution of programs for the Bureau of Transportation Statistics (Section 111 of title 49, United States Code) for fiscal year 1999: *Provided further*, That notwithstanding any other provision of law, within the $25,511,000,000 obligation limitation, $4,000,000 of the amounts made available as contract authority under section 1221(e) of the Transportation Equity Act for the 21st Century (Public Law 105–178) shall be made available to carry out section 5113 of that Act: *Provided further*, That within the $200,000,000 obligation limitation on Intelligent Transportation Systems, not less than the following sums shall be made available for Intelligent Transportation system projects in the following specified areas:

Amherst, Massachusetts, $1,000,000;

Arlington County, Virginia, $750,000;

Atlanta, Georgia, $2,000,000;

Brandon, Vermont, $375,000;

Buffalo, New York, $500,000;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Centre Valley, Pennsylvania, $500,000;

Cleveland, Ohio, $1,000,000;

Columbus, Ohio, $1,000,000;

Corpus Christi, Texas, $900,000;

Dade County, Florida, $1,000,000;

Del Rio, Texas, $1,000,000;

Delaware River, Pennsylvania, $1,000,000;

Fairfield, California, $1,000,000;

Fitchburg, Massachusetts, $500,000;

Greater metropolitan capital region, DC, $5,000,000;

Hammond, Louisiana, $4,000,000;

Houston, Texas, $2,000,000;

Huntington Beach, California, $1,000,000;

Huntsville, Alabama, $1,000,000;

Inglewood, California, $1,500,000;

Jackson, Mississippi, $1,000,000;

Kansas City, Missouri, $500,000;

Laredo, Texas, $1,000,000;

Middlesboro, Kentucky, $3,000,000;

Mission Viejo, California, $1,000,000;

Mobile, Alabama, $2,500,000;

Monroe County, New York, $400,000;

Montgomery, Alabama, $1,250,000;

Nashville, Tennessee, $500,000;

New Orleans, Louisiana, $1,500,000;

New York City, New York, $2,500,000;

New York/Long Island, New York, $2,300,000;

Oakland County, Michigan, $1,000,000;

Onandaga County, New York, $400,000;

Port Angeles, Washington, $500,000;

Raleigh–Wake County, North Carolina, $2,000,000;

Riverside, California, $1,000,000;

San Francisco, California, $1,500,000;

Scranton, Pennsylvania, $1,000,000;

Silicon Valley, California, $1,500,000;

Spokane, Washington, $450,000;

Springfield, Virginia, $500,000;

St. Louis, Missouri, $750,000;

State of Alaska, $1,500,000;

State of Idaho, $1,000,000;

State of Maryland, $2,500,000;

State of Minnesota, $7,100,000;

State of Mississippi, $1,000,000;

State of Missouri, $500,000;

State of Montana, $700,000;

State of Nevada, $575,000;

State of New Jersey, $3,000,000;

State of New Mexico, $1,000,000;

State of New York, $2,500,000;

AR.02681

State of North Dakota, $1,450,000;

Commonwealth of Pennsylvania, $14,000,000;

State of Texas, $1,000,000;

State of Utah, $3,600,000;

State of Washington, $2,000,000;

State of Wisconsin, $1,500,000;

Temucula, California, $250,000;

Tucson, Arizona, $1,000,000;

Volusia County, Florida, $1,000,000;

Warren County, Virginia, $250,000;

Wausau–Stevens Point–Wisconsin Rapids, Wisconsin, $1,000,000;

Westchester and Putnam Counties, New York, $500,000; and

White Plains, New York, $1,000,000.

## FEDERAL–AID HIGHWAYS

### (LIQUIDATION OF CONTRACT AUTHORIZATION)

### (HIGHWAY TRUST FUND)

Notwithstanding any other provision of law, for carrying out the provisions of title 23, U.S.C., that are attributable to Federal-aid highways, including the National Scenic and Recreational Highway as authorized by 23 U.S.C. 148, not otherwise provided, including reimbursement for sums expended pursuant to the provisions of 23 U.S.C. 308, $24,000,000,000 or so much thereof as may be available in and derived from the Highway Trust Fund, to remain available until expended.

## MOTOR CARRIER SAFETY GRANTS

### (LIQUIDATION OF CONTRACT AUTHORIZATION)

### (HIGHWAY TRUST FUND)

Notwithstanding any other provision of law, for payment of obligations incurred in carrying out 49 U.S.C. 31102, $100,000,000, to be derived from the Highway Trust Fund and to remain available until expended: *Provided*, That none of the funds in this Act shall be available for the implementation or execution of programs the obligations for which are in excess of $100,000,000 for "Motor Carrier Safety Grants".

## NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

### OPERATIONS AND RESEARCH

### (HIGHWAY TRUST FUND)

For expenses necessary to discharge the functions of the Secretary, to be derived from the Highway Trust Fund, $87,400,000 for traffic and highway safety under chapter 301 of title 49, U.S.C., and part C of subtitle VI of title 49, U.S.C., of which $58,558,000 shall remain available until September 30, 2001: *Provided*, That none of the funds appropriated by this Act may be obligated or expended to plan, finalize, or implement any rulemaking to add to section 575.104 of title 49 of the Code of Federal Regulations any requirement pertaining to a grading standard that is different from the three grading standards (treadwear, traction, and temperature resistance) already in effect.

### OPERATIONS AND RESEARCH

### (LIQUIDATION OF CONTRACT AUTHORIZATION)

### (LIMITATION ON OBLIGATIONS)

### (HIGHWAY TRUST FUND)

AR.02682

Notwithstanding any other provision of law, for payment of obligations incurred in carrying out the provisions of 23 U.S.C. 403, to remain available until expended, $72,000,000, to be derived from the Highway Trust Fund: *Provided*, That none of the funds in this Act shall be available for the planning or execution of programs the total obligations for which, in fiscal year 1999, are in excess of $72,000,000 for programs authorized under 23 U.S.C. 403.

## NATIONAL DRIVER REGISTER

### (HIGHWAY TRUST FUND)

For expenses necessary to discharge the functions of the Secretary with respect to the National Driver Register under chapter 303 of title 49, United States Code, $2,000,000 to be derived from the Highway Trust Fund, and to remain available until expended.

## HIGHWAY TRAFFIC SAFETY GRANTS

### (LIQUIDATION OF CONTRACT AUTHORIZATION)

### (LIMITATION ON OBLIGATIONS)

### (HIGHWAY TRUST FUND)

Notwithstanding any other provision of law, for payment of obligations incurred in carrying out the provisions of 23 U.S.C. 402, 405, 410, and 411 to remain available until expended, $200,000,000, to be derived from the Highway Trust Fund: *Provided*, That none of the funds in this Act shall be available for the planning or execution of programs the total obligations for which, in fiscal year 1999, are in excess of $200,000,000 for programs authorized under 23 U.S.C. 402, 405, 410, and 411 of which $150,000,000 shall be for "Highway Safety Programs" under 23 U.S.C. 402, $10,000,000 shall be for "Occupant Protection Incentive Grants" under 23 U.S.C. 405, $35,000,000 shall be for "Alcohol–Impaired Driving Countermeasures Grants" under 23 U.S.C. 410, $5,000,000 shall be for the "State Highway Safety Data Grants" under 23 U.S.C. 411: *Provided further*, That none of these funds shall be used for construction, rehabilitation, or remodeling costs, or for office furnishings and fixtures for State, local, or private buildings or structures: *Provided further*, That not to exceed $7,500,000 of the funds made available for section 402, not to exceed $500,000 of the funds made available for section 405, not to exceed $1,750,000 of the funds made available for section 410, and not to exceed $193,000 of the funds made available for section 411 shall be available to NHTSA for administering highway safety grants under Chapter 4 of title 23, U.S.C.: *Provided further*, That not to exceed $500,000 of the funds made available for section 410 "Alcohol–Impaired Driving Countermeasures Grants" shall be available for technical assistance to the States.

## FEDERAL RAILROAD ADMINISTRATION

### OFFICE OF THE ADMINISTRATOR

#### << 40 USCA § 817 NOTE >>

For necessary expenses of the Federal Railroad Administration, not otherwise provided for, $21,215,000, of which $1,784,000 shall remain available until expended: *Provided*, That, as part of the Washington Union Station transaction in which the Secretary assumed the first deed of trust on the property and, where the Union Station Redevelopment Corporation or any successor is obligated to make payments on such deed of trust on the Secretary's behalf, including payments on and after September 30, 1988, the Secretary is authorized to receive such payments directly from the Union Station Redevelopment Corporation, credit them to the appropriation charged for the first deed of trust, and make payments on the first deed of trust with those funds: *Provided further*, That such additional sums as may be necessary for payment on the first deed of trust may be advanced by the Administrator from unobligated balances available to the Federal Railroad Administration, to be reimbursed from payments received from the Union Station Redevelopment Corporation.

## RAILROAD SAFETY

For necessary expenses in connection with railroad safety, not otherwise provided for, $61,488,000, of which $3,825,000 shall remain available until expended: *Provided*, That notwithstanding any other provision of law, funds appropriated under this heading are available for the reimbursement of out-of-state travel and per diem costs incurred by employees of State governments directly supporting the Federal railroad safety program, including regulatory development and compliance-related activities.

### RAILROAD RESEARCH AND DEVELOPMENT

For necessary expenses for railroad research and development, $22,364,000, to remain available until expended: *Provided*, That the Secretary is authorized to sell aluminum reaction rail, power rail base, and other related materials located at the Transportation Technology Center, near Pueblo, Colorado, and shall credit the receipts from such sale to this account, notwithstanding 31 U.S.C. 3302, to remain available until expended.

### RAILROAD REHABILITATION AND IMPROVEMENT PROGRAM

The Secretary of Transportation is authorized to issue to the Secretary of the Treasury notes or other obligations pursuant to section 512 of the Railroad Revitalization and Regulatory Reform Act of 1976 (Public Law 94–210), as amended, in such amounts and at such times as may be necessary to pay any amounts required pursuant to the guarantee of the principal amount of obligations under sections 511 through 513 of such Act, such authority to exist as long as any such guaranteed obligation is outstanding: *Provided*, That pursuant to section 502 of such Act, as amended, no new direct loans or loan guarantee commitments shall be made using Federal funds for the credit risk premium during fiscal year 1999.

### NEXT GENERATION HIGH–SPEED RAIL

For necessary expenses for the Next Generation High–Speed Rail program as authorized under 49 United States Code sections 26101 and 26102, $20,494,000, to remain available until expended.

### ALASKA RAILROAD REHABILITATION

To enable the Secretary of Transportation to make grants to the Alaska Railroad, $10,000,000 shall be for capital rehabilitation and improvements benefiting its passenger operations.

### RHODE ISLAND RAIL DEVELOPMENT

For the costs associated with construction of a third track on the Northeast Corridor between Davisville and Central Falls, Rhode Island, with sufficient clearance to accommodate double stack freight cars, $5,000,000 to be matched by the State of Rhode Island or its designee on a dollar-for-dollar basis and to remain available until expended.

### CAPITAL GRANTS TO THE NATIONAL RAILROAD

### PASSENGER CORPORATION

For necessary expenses of capital improvements of the National Railroad Passenger Corporation as authorized by U.S.C. 24104(a), $609,230,000, to remain available until expended.

### FEDERAL TRANSIT ADMINISTRATION

### ADMINISTRATIVE EXPENSES

For necessary administrative expenses of the Federal Transit Administration's programs authorized by chapter 53 of title 49, United States Code, $10,800,000, to remain available until expended: *Provided*, That no more than $54,000,000 of budget authority shall be available for these purposes: *Provided further*, That of the funds in this Act available for the execution of contracts under section 5327(c) of title 49, United States Code, $800,000 shall be transferred to the Department of Transportation Inspector General for costs associated with the audit and review of new fixed guideway systems.

### FORMULA GRANTS

For necessary expenses to carry out 49 U.S.C. 5307, 5308, 5310, 5311, 5327, and section 3038 of Public Law 105–178, $570,000,000, to remain available until expended: *Provided*, That no more than $2,850,000,000 of budget authority shall be available for these purposes: *Provided further*, That notwithstanding section 3008 of Public Law 105–178, the $50,000,000 to carry out 49 U.S.C. 5308 shall be transferred to and merged with funding provided for the replacement, rehabilitation, and

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

purchase of buses and related equipment and the construction of bus-related facilities under "Federal Transit Administration, Capital investment grants".

## UNIVERSITY TRANSPORTATION RESEARCH

For necessary expenses to carry out 49 U.S.C. 5505, $1,200,000, to remain available until expended: *Provided*, That no more than $6,000,000 of budget authority shall be available for these purposes.

## TRANSIT PLANNING AND RESEARCH

For necessary expenses to carry out 49 U.S.C. 5303, 5304, 5305, 5311(b)(2), 5312, 5313(a), 5314, 5315, and 5322, $19,800,000, to remain available until expended: *Provided*, That no more than $98,000,000 of budget authority shall be available for these purposes: *Provided further*, That $5,250,000 is available to provide rural transportation assistance (49 U.S.C. 5311(b)(2)); $4,000,000 is available to carry out programs under the National Transit Institute (49 U.S.C. 5315); $8,250,000 is available to carry out transit cooperative research programs (49 U.S.C. 5313(a)); $43,841,600 is available for metropolitan planning (49 U.S.C. 5303, 5304, and 5305); $9,158,400 is available for state planning (49 U.S.C. 5313(b)); and $27,500,000 is available for the national planning and research program (49 U.S.C. 5314): *Provided further*, That of the total budget authority made available for the national planning and research program, the Federal Transit Administration shall provide the following amounts for the projects and activities listed below:

City of Branson, MO congestion study, $450,000;

Skagit County, WA North Sound connecting communities project, Skagit County Council of Governments, $50,000;

Desert air quality comprehensive analysis, Las Vegas, NV, $1,000,000;

Vegetation control on rail rights-of-way survey, $250,000;

Zinc-air battery bus technology demonstration, $1,500,000;

North Orange–South Seminole County, FL fixed guideway technology, $750,000;

Galveston, TX fixed guideway activities, $750,000;

Washoe County, NV transit technology, $1,250,000;

Massachusetts Bay Transit Authority advanced electric transit buses and related infrastructure, $1,500,000;

Palm Springs, CA fuel cell buses, $1,000,000;

Gloucester, MA intermodal technology center, $1,500,000;

Southeastern Pennsylvania Transit Authority advanced propulsion control system, $2,000,000;

Project ACTION, $3,000,000;

Advanced transportation and alternative fuel vehicle technology consortium (CALSTART), $2,000,000;

Rural transportation assistance program, $750,000;

JOBLINKS, $1,000,000;

Fleet operations, including bus rapid transit, $1,500,000;

Northern tier community transportation, Massachusetts, $500,000;

Hennepin County community transportation, Minnesota, $1,000,000; and

Seattle, Washington livable city, $200,000.

## TRUST FUND SHARE OF EXPENSES

## (LIQUIDATION OF CONTRACT AUTHORIZATION)

## (HIGHWAY TRUST FUND)

Notwithstanding any other provision of law, for payment of obligations incurred in carrying out 49 U.S.C. 5303–5308, 5310–5315, 5317(b), 5322, 5327, 5334, 5505, and sections 3037 and 3038 of Public Law 105–178, $4,251,800,000, to remain available until expended and to be derived from the Mass Transit Account of the Highway Trust Fund: *Provided*, That $2,280,000,000 shall be paid to the Federal Transit Administration's formula grants account: *Provided further*, That $78,200,000 shall be paid to the Federal Transit Administration's transit planning and research account: *Provided further*, That $43,200,000 shall be paid to the Federal Transit Administration's administrative expenses account: *Provided further*, That $4,800,000 shall be paid to the Federal Transit Administration's university transportation research account: *Provided further*, That $40,000,000 shall be paid

to the Federal Transit Administration's job access and reverse commute grants program: *Provided further*, That $1,805,600,000 shall be paid to the Federal Transit Administration's Capital Investment Grants account.

## CAPITAL INVESTMENT GRANTS

### (INCLUDING TRANSFER OF FUNDS)

  For necessary expenses to carry out 49 U.S.C. 5308, 5309, 5318, and 5327, $451,400,000, to remain available until expended: *Provided*, That no more than $2,257,000,000 of budget authority shall be available for these purposes: *Provided further*, That notwithstanding any other provision of law, there shall be available for fixed guideway modernization, $902,800,000; there shall be available for the replacement, rehabilitation, and purchase of buses and related equipment and the construction of bus-related facilities, $451,400,000, together with $50,000,000 transferred from "Federal Transit Administration, Formula grants", to be available for the following projects in amounts specified below:

| No. | State | Project | Conference |
|-----|-------|---------|-----------|
| 1 | Alaska | Anchorage Ship Creek intermodal facility | $4,300,000 |
| 2 | Alaska | Fairbanks intermodal rail/bus transfer facility | 2,000,000 |
| 3 | Alaska | North Slope Borough buses | 500,000 |
| 4 | Alaska | Whittier intermodal facility and pedestrian overpass | 700,000 |
| 5 | Alabama | Birmingham intermodal facility | 2,000,000 |
| 6 | Alabama | Birmingham–Jefferson County, buses | 1,250,000 |
| 7 | Alabama | Dothan Wiregrass Transit Authority demand response shuttle vehicles and transit facility | 500,000 |
| 8 | Alabama | Huntsville, intermodal space centers | 5,000,000 |
| 9 | Alabama | Huntsville, transit facility | 1,000,000 |
| 10 | Alabama | Jasper buses | 50,000 |
| 11 | Alabama | Lee–Russell Council buses | 790,000 |
| 12 | Alabama | Mobile, GM&O building | 5,000,000 |
| 13 | Alabama | Montgomery Union Station intermodal center and buses | 5,000,000 |
| 14 | Alabama | Pritchard, bus transfer facility | 500,000 |
| 15 | Alabama | Tuscaloosa, intermodal center | 1,950,000 |
| 16 | Alabama | University of North Alabama pedestrian walkways | 800,000 |
| 17 | Arkansas | Arkansas Highway and Transit Department buses | 200,000 |
| 18 | Arkansas | Fayetteville, University of Arkansas Transit System buses | 500,000 |
| 19 | Arkansas | Hot Springs, transportation depot and plaza | 560,000 |
| 20 | Arkansas | Little Rock, Central Arkansas Transit buses | 300,000 |

| 21 | Arkansas | Statewide bus needs | 1,500,000 |
|----|----------|---------------------|-----------|
| 22 | Arizona | Phoenix bus and bus facilities | 4,000,000 |
| 23 | Arizona | Tucson alternatively fueled buses | 2,000,000 |
| 24 | Arizona | Tucson intermodal facility | 1,000,000 |
| 25 | California | Central Contra Costa County transit vans | 200,000 |
| 26 | California | Culver City, CityBus buses | 1,250,000 |
| 27 | California | Davis, Unitrans transit maintenance facility | 625,000 |
| 28 | California | Davis/Sacramento area hydrogen bus technology program | 950,000 |
| 29 | California | Folsom multimodal facility | 1,000,000 |
| 30 | California | Healdsburg, intermodal facility | 1,000,000 |
| 31 | California | Humboldt, intermodal facility | 1,000,000 |
| 32 | California | Huntington Beach buses | 200,000 |
| 33 | California | I–5 corridor intermodal transit centers | 2,500,000 |
| 34 | California | Lake Tahoe intermodal transit center | 500,000 |
| 35 | California | Livermore automatic vehicle locator program | 1,000,000 |
| 36 | California | Los Angeles County Metropolitan transportation authority buses | 3,000,000 |
| 37 | California | Los Angeles Foothills Transit maintenance facility | 1,000,000 |
| 38 | California | Los Angeles municipal transit operators consortium | 2,500,000 |
| 39 | California | Los Angeles, Union Station Gateway Intermodal Transit Center | 1,250,000 |
| 40 | California | Modesto, bus maintenance facility | 1,355,000 |
| 41 | California | Monterey, Monterey–Salinas buses | 625,000 |
| 42 | California | Morongo Basin, Transit Authority bus facility | 650,000 |
| 43 | California | North San Diego County transit district buses | 1,750,000 |
| 44 | California | Perris, bus maintenance facility | 1,250,000 |
| 45 | California | Riverside Transit Agency buses and facilities and ITS applications | 1,000,000 |
| 46 | California | Sacramento, CNG buses | 1,250,000 |
| 47 | California | San Bernardino buses | 1,000,000 |
| 48 | California | San Diego City College multimodal center (12th Avenue/College Station) | 1,000,000 |

| 49 | California | San Fernando Valley smart shuttle buses | 300,000 |
| 50 | California | San Francisco, Islais Creek maintenance facility | 1,250,000 |
| 51 | California | San Joaquin (Stockton) buses and bus facilities | 1,000,000 |
| 52 | California | Santa Clara Valley Transportation Authority buses and bus facilities | 1,000,000 |
| 53 | California | Santa Clarita transit maintenance facility | 2,250,000 |
| 54 | California | Santa Cruz metropolitan bus facilities | 625,000 |
| 55 | California | Santa Cruz transit facility | 1,000,000 |
| 56 | California | Santa Rosa/Cotati, and Rohnert Park facilities | 750,000 |
| 57 | California | Santa Rosa/Cotati, intermodal transportation facilities | 750,000 |
| 58 | California | Solano Links intercity transit consortium | 1,000,000 |
| 59 | California | Ukiah Transit Center | 500,000 |
| 60 | California | Windsor, Intermodal Facility | 750,000 |
| 61 | California | Woodland Hills, Warner Center Transportation Hub | 325,000 |
| 62 | California | Yolo County, bus facility | 1,200,000 |
| 63 | Colorado | Boulder/Denver, RTD buses | 625,000 |
| 64 | Colorado | Colorado buses and bus facilities | 6,800,000 |
| 65 | Colorado | Denver, Stapleton Intermodal Center | 1,250,000 |
| 66 | Connecticut | Hartford, Transportation Access Project | 800,000 |
| 67 | Connecticut | New Haven, bus facility | 2,250,000 |
| 68 | Connecticut | Norwich, buses | 2,250,000 |
| 69 | Connecticut | Waterbury, bus facility | 2,250,000 |
| 70 | District/Columbia | Fuel cell bus and bus facilities program (section 3015(b)) | 4,850,000 |
| 71 | District/Columbia | Washington, D.C. Intermodal Transportation Center | 2,500,000 |
| 72 | Delaware | Delaware statewide buses | 1,000,000 |
| 73 | Florida | Broward County, buses | 1,000,000 |
| 74 | Florida | Clearwater multimodal facility | 2,500,000 |
| 75 | Florida | Daytona Beach, Intermodal Center | 2,500,000 |
| 76 | Florida | Gainesville buses and equipment | 1,500,000 |

| 77 | Florida | Jacksonville buses and bus facilities | 1,000,000 |
| 78 | Florida | Lakeland, Citrus Connection transit vehicles and related equipment... | 1,250,000 |
| 79 | Florida | Lynx buses and bus facilities | 1,000,000 |
| 80 | Florida | Miami, bus security and surveillance | 1,000,000 |
| 81 | Florida | Miami Beach multimodal transit center | 1,000,000 |
| 82 | Florida | Miami Beach, Electric Shuttle Service | 750,000 |
| 83 | Florida | Miami–Dade, buses | 2,250,000 |
| 84 | Florida | Orlando, Intermodal Facility | 2,500,000 |
| 85 | Florida | Tampa Hartline buses | 1,250,000 |
| 86 | Georgia | Atlanta, MARTA buses | 12,000,000 |
| 87 | Georgia | Savannah/Chatham Area transit bus transfer centers and buses | 3,500,000 |
| 88 | Hawaii | Honolulu, bus facility and buses | 3,250,000 |
| 89 | Illinois | Illinois statewide buses and bus-related equipment | 6,800,000 |
| 90 | Illinois | Rock Island, buses | 2,500,000 |
| 91 | Indiana | City of East Chicago buses | 200,000 |
| 92 | Indiana | Gary, Transit Consortium buses | 1,250,000 |
| 93 | Indiana | Indianapolis, buses | 5,000,000 |
| 94 | Indiana | South Bend, Urban Intermodal Transportation Facility | 1,250,000 |
| 95 | Iowa | Fort Dodge, Intermodal Facility (Phase II) | 885,000 |
| 96 | Iowa | Iowa statewide buses and bus facilities | 3,000,000 |
| 97 | Iowa | Iowa/Illinois Transit Consortium bus safety and security | 1,000,000 |
| 98 | Iowa | Sioux City park and ride bus facility | 1,800,000 |
| 99 | Kansas | Johnson County bus maintenance/operations facility | 2,000,000 |
| 100 | Kentucky | Louisville, Kentucky University of Louisville and River City buses... | 3,000,000 |
| 101 | Kentucky | Northern Kentucky Area Development District senior citizen buses... | 100,000 |
| 102 | Kentucky | Owensboro buses | 200,000 |
| 103 | Kentucky | Southern and eastern Kentucky buses and bus facilities | 2,000,000 |
| 104 | Louisiana | Statewide buses and bus-related facilities | 11,000,000 |
| 105 | Massachusetts | Essex and Middlesex buses | 3,128,000 |

| 106 | Massachusetts | New Bedford/Fall River Mobile Access to health care | 250,000 |
| 107 | Massachusetts | Pittsfield intermodal center | 4,600,000 |
| 108 | Massachusetts | Springfield, Union Station | 1,250,000 |
| 109 | Massachusetts | Westfield intermodal center | 2,000,000 |
| 110 | Massachusetts | Worcester, Union Station Intermodal Transportation Center | 2,500,000 |
| 111 | Maryland | Maryland statewide bus facilities and buses | 10,000,000 |
| 112 | Michigan | Lansing, CATA bus technology improvements | 600,000 |
| 113 | Michigan | Michigan statewide buses | 10,000,000 |
| 114 | Minnesota | Duluth, Transit Authority community circulation vehicles | 1,000,000 |
| 115 | Minnesota | Duluth, Transit Authority intelligent transportation systems | 500,000 |
| 116 | Minnesota | Duluth, Transit Authority Transit Hub | 500,000 |
| 117 | Minnesota | Northstar Corridor, Intermodal Facilities and buses | 6,000,000 |
| 118 | Minnesota | Twin Cities area metro transit buses and bus facilities | 9,500,000 |
| 119 | Missouri | Kansas City Union Station redevelopment | 2,500,000 |
| 120 | Missouri | OATS Transit | 2,500,000 |
| 121 | Missouri | Southwest Missouri State University park and ride facility | 1,000,000 |
| 122 | Missouri | St. Louis, Bi-state Intermodal Center | 1,250,000 |
| 123 | Missouri | Statewide bus and bus facilities | 4,500,000 |
| 124 | Mississippi | Harrison County multimodal center/hybrid electric shuttle buses | 1,900,000 |
| 125 | Mississippi | High Street, Jackson intermodal center | 2,000,000 |
| 126 | Mississippi | Jackson buses and facilities | 1,600,000 |
| 127 | Montana | Butte bus replacements | 1,500,000 |
| 128 | Nevada | Clark County Regional Transportation Commission buses and bus facilities | 2,615,000 |
| 129 | Nevada | Reno, RTC transit passenger and facility security improvements | 1,250,000 |
| 130 | Nevada | Washoe County, transit improvements | 2,250,000 |
| 131 | New Hampshire | Berlin Tri–County Community Action transit garage | 120,000 |
| 132 | New Hampshire | Carroll County transportation alliance buses | 200,000 |
| 133 | New Hampshire | Concord Area Transit buses | 750,000 |

| 134 | New Hampshire | Greater Laconia Transit Agency buses | 450,000 |
|---|---|---|---|
| 135 | New Hampshire | Keene HCS community care buses and equipment | 100,000 |
| 136 | New Hampshire | Lebanon advance transit buses | 150,000 |
| 137 | New Hampshire | Statewide transit systems | 1,000,000 |
| 138 | New Jersey | New Jersey Transit jitney shuttle buses | 1,750,000 |
| 139 | New Jersey | Newark, Morris & Essex Station access and buses | 1,250,000 |
| 140 | New Jersey | South Amboy, Regional Intermodal Transportation Initiative | 1,250,000 |
| 141 | New Jersey | Statewide alternatively fueled vehicles | 7,500,000 |
| 142 | New Mexico | Albuquerque, buses, paratransit vehicles, and bus facility | 3,750,000 |
| 143 | New Mexico | Northern New Mexico park and ride facilities | 2,000,000 |
| 144 | New York | Babylon, Intermodal Center | 1,250,000 |
| 145 | New York | Brookhaven Town, elderly and disabled buses and vans | 225,000 |
| 146 | New York | Brooklyn–Staten Island, Mobility Enhancement buses | 800,000 |
| 147 | New York | Broome County buses and fare collection equipment | 900,000 |
| 148 | New York | Buffalo, Auditorium Intermodal Center | 3,000,000 |
| 149 | New York | Dutchess County, Loop System buses | 521,000 |
| 150 | New York | East Hampton, elderly and disabled buses and vans | 100,000 |
| 151 | New York | Ithaca, TCAT bus technology improvements | 1,250,000 |
| 152 | New York | Long Beach central bus facility | 750,000 |
| 153 | New York | Long Island, CNG transit vehicles and facilities and bus replacement | 1,250,000 |
| 154 | New York | Mineola/Hicksville, LIRR Intermodal Centers | 1,250,000 |
| 155 | New York | Nassau County CNG buses | 1,000,000 |
| 156 | New York | New York City Midtown West Ferry Terminal | 1,500,000 |
| 157 | New York | New York, West 72nd St. Intermodal Station | 1,750,000 |
| 158 | New York | Niagara Frontier Transportation Authority Hublink | 500,000 |
| 159 | New York | Rensselaer intermodal bus facility | 1,000,000 |
| 160 | New York | Riverhead, elderly and disabled buses and vans | 125,000 |
| 161 | New York | Rochester central bus facility | 1,000,000 |
| 162 | New York | Rome, Intermodal Center | 400,000 |

| 163 | New York | Shelter Island, elderly and disabled buses and vans | 100,000 |
| 164 | New York | Smithtown, elderly and disabled buses and vans | 125,000 |
| 165 | New York | Southampton, elderly and disabled buses and vans | 125,000 |
| 166 | New York | Southold, elderly and disabled buses and vans | 100,000 |
| 167 | New York | Suffolk County, elderly and disabled buses and vans | 100,000 |
| 168 | New York | Syracuse CNG buses and facilities | 2,000,000 |
| 169 | New York | Ulster County bus facilities and equipment | 1,000,000 |
| 170 | New York | Utica and Rome, bus facilities and buses | 500,000 |
| 171 | New York | Utica, Union Station | 2,100,000 |
| 172 | New York | Westchester County, Bee–Line transit system fareboxes | 979,000 |
| 173 | New York | Westchester County, Bee–Line transit system shuttle buses | 1,000,000 |
| 174 | New York | Westchester County, DOT articulated buses | 1,250,000 |
| 175 | North Carolina | Greensboro, Multimodal Center | 3,340,000 |
| 176 | North Carolina | Greensboro, Transit Authority buses | 1,500,000 |
| 177 | North Carolina | Greensboro, Transit Authority small buses and vans | 321,000 |
| 178 | North Carolina | Statewide buses and bus facilities | 5,000,000 |
| 179 | North Dakota | Statewide buses and bus-related facilities | 2,000,000 |
| 180 | Ohio | Cleveland, Triskett Garage bus maintenance facility | 625,000 |
| 181 | Ohio | Dayton, Multimodal Transportation Center | 625,000 |
| 182 | Ohio | Statewide buses and bus facilities | 12,000,000 |
| 183 | Ohio | Toledo Mud Hens transit center study | 200,000 |
| 184 | Oklahoma | Oklahoma statewide bus facilities and buses | 5,000,000 |
| 185 | Oregon | Lane County, Bus Rapid Transit | 4,400,000 |
| 186 | Oregon | Portland, Tri–Met buses | 1,750,000 |
| 187 | Oregon | Rogue Valley transit district bus purchase | 1,000,000 |
| 188 | Oregon | Salem area mass transit system buses | 1,000,000 |
| 189 | Oregon | Wilsonville, buses and shelters | 400,000 |
| 190 | Pennsylvania | Altoona bus testing facility (section 3009) | 3,000,000 |

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

| 191 | Pennsylvania | Altoona, Metro Transit Authority buses and transit system improvements | 842,000 |
|---|---|---|---|
| 192 | Pennsylvania | Altoona, Metro Transit Authority Logan Valley Mall Suburban Transfer Center | 80,000 |
| 193 | Pennsylvania | Altoona, Metro Transit Authority Transit Center improvements | 424,000 |
| 194 | Pennsylvania | Altoona, pedestrian crossover | 800,000 |
| 195 | Pennsylvania | Armstrong County Mid–County, PA bus facilities and buses | 150,000 |
| 196 | Pennsylvania | Beaver County bus facility | 1,000,000 |
| 197 | Pennsylvania | Bradford County, Endless Mountain Transportation Authority buses | 1,000,000 |
| 198 | Pennsylvania | Cambria County, bus facilities and buses | 575,000 |
| 199 | Pennsylvania | Centre Area, Transportation Authority buses | 1,250,000 |
| 200 | Pennsylvania | Chambersburg, Transit Authority buses | 300,000 |
| 201 | Pennsylvania | Chambersburg, Transit Authority Intermodal Center | 1,000,000 |
| 202 | Pennsylvania | Chester County, Paoli Transportation Center | 1,000,000 |
| 203 | Pennsylvania | Crawford Area, Transportation buses | 500,000 |
| 204 | Pennsylvania | Erie, Metropolitan Transit Authority buses | 1,000,000 |
| 205 | Pennsylvania | Fayette County, Intermodal Facilities and buses | 1,270,000 |
| 206 | Pennsylvania | Lackawanna County, Transit System buses | 600,000 |
| 207 | Pennsylvania | Mercer County, buses | 750,000 |
| 208 | Pennsylvania | Monroe County, Transportation Authority buses | 1,000,000 |
| 209 | Pennsylvania | Philadelphia, Frankford Transportation Center | 5,000,000 |
| 210 | Pennsylvania | Philadelphia, Intermodal 30th Street Station | 1,250,000 |
| 211 | Pennsylvania | Philadelphia, Regional Transportation System for Elderly and Disabled | 750,000 |
| 212 | Pennsylvania | Reading, BARTA Intermodal Transportation Facility | 1,750,000 |
| 213 | Pennsylvania | Red Rose, Transit Bus Terminal | 1,000,000 |
| 214 | Pennsylvania | Robinson, Towne Center Intermodal Facility | 1,500,000 |
| 215 | Pennsylvania | Schuylkill County buses | 220,000 |
| 216 | Pennsylvania | Somerset County, bus facilities and buses | 175,000 |
| 217 | Pennsylvania | Towamencin Township, Intermodal Bus Transportation Center | 1,500,000 |

| | | | |
|---|---|---|---|
| 218 | Pennsylvania | Washington County, Intermodal Facilities | 630,000 |
| 219 | Pennsylvania | Westmoreland County, Intermodal Facility | 200,000 |
| 220 | Pennsylvania | Wilkes–Barre, Intermodal Facility | 1,250,000 |
| 221 | Pennsylvania | Williamsport, Bus Facility | 1,200,000 |
| 222 | Puerto Rico | San Juan Intermodal access | 950,000 |
| 223 | Rhode Island | Providence, buses and bus maintenance facility | 2,250,000 |
| 224 | Rhode Island | Rhode Island Public Transit Authority buses | 3,200,000 |
| 225 | South Carolina | Columbia Bus replacement | 1,100,000 |
| 226 | South Carolina | Pee Dee buses and facilities | 1,250,000 |
| 227 | South Carolina | South Carolina statewide Virtual Transit Enterprise | 1,220,000 |
| 228 | South Carolina | Spartanburg buses and facilities | 1,000,000 |
| 229 | South Dakota | Computerized bus dispatch system, radios, money boxes, and lift replacements | 800,000 |
| 230 | South Dakota | Sioux Falls buses | 1,000,000 |
| 231 | South Dakota | South Dakota statewide bus facilities and buses | 3,500,000 |
| 232 | Tennessee | Statewide buses and bus facilities | 2,000,000 |
| 233 | Texas | Austin, buses | 2,250,000 |
| 234 | Texas | Brazos Transit Authority buses and facilities | 1,500,000 |
| 235 | Texas | Corpus Christi transit authority buses and facilities | 1,000,000 |
| 236 | Texas | Dallas Area Rapid transit buses | 2,750,000 |
| 237 | Texas | Fort Worth bus and paratransit vehicle project | 2,500,000 |
| 238 | Texas | Galveston buses and bus facilities | 1,000,000 |
| 239 | Texas | Texas statewide small urban and rural buses | 6,000,000 |
| 240 | Utah | Ogden, Intermodal Center | 800,000 |
| 241 | Utah | Utah Hybrid electric vehicle bus purchase | 1,500,000 |
| 242 | Utah | Utah Transit Authority, Intermodal Facilities | 1,500,000 |
| 243 | Utah | Utah Transit Authority/Park City Transit, buses | 6,500,000 |
| 244 | Vermont | Brattleboro Union Station multimodal center | 2,500,000 |
| 245 | Vermont | Burlington intermodal center | 1,000,000 |

| 246 | Vermont | Deerfield Valley Transit authority | 500,000 |
| 247 | Virginia | Alexandria, bus maintenance facility and Crystal City canopy project | 1,000,000 |
| 248 | Virginia | Alexandria, King Street Station access | 1,100,000 |
| 249 | Virginia | Harrisonburg, buses | 200,000 |
| 250 | Virginia | Lynchburg, buses | 200,000 |
| 251 | Virginia | Richmond, GRTC bus maintenance facility | 1,250,000 |
| 252 | Virginia | Roanoke, buses | 200,000 |
| 253 | Virginia | Statewide buses and bus facilities | 10,000,000 |
| 254 | Washington | Anacortes ferry terminal information system | 500,000 |
| 255 | Washington | Ben Franklin transit operating facility | 1,000,000 |
| 256 | Washington | Bremerton transportation center | 1,000,000 |
| 257 | Washington | Central Puget Sound Seattle bus program | 8,000,000 |
| 258 | Washington | Chelan–Douglas multimodal center | 900,000 |
| 259 | Washington | Everett, Multimodal Transportation Center | 1,950,000 |
| 260 | Washington | Grant County, buses and vans | 600,000 |
| 261 | Washington | Mount Vernon, Multimodal Center | 1,750,000 |
| 262 | Washington | Port Angeles center | 1,000,000 |
| 263 | Washington | Seattle, Intermodal Transportation Terminal | 1,250,000 |
| 264 | Washington | Snohomish County, Community transit buses | 1,000,000 |
| 265 | Washington | Tacoma Dome, buses and bus facilities | 1,750,000 |
| 266 | Washington | Thurston County intercity buses | 1,000,000 |
| 267 | Washington | Vancouver, Clark County (C–Tran) bus facilities | 1,000,000 |
| 268 | Wisconsin | Milwaukee County, buses | 4,000,000 |
| 269 | Wisconsin | Wisconsin statewide bus facilities and buses | 12,875,000 |
| 270 | West Virginia | Huntington, Intermodal Facility | 8,000,000 |
| 271 | West Virginia | West Virginia statewide Intermodal Facility and buses | 6,500,000 |

; and there shall be available for new fixed guideway systems, $902,800,000, to be available as follows:

$10,400,000 for the Alaska or Hawaii ferry projects;

$5,000,000 for the Albuquerque light rail project;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

$52,110,000 for the Atlanta–North Springs project;

$1,000,000 for the Austin Capital metro project;

$500,000 for the Baltimore central downtown transit alternatives major investment study;

$1,000,000 for the Baltimore light rail double track project;

$1,000,000 for the Birmingham, Alabama alternatives analysis study and preliminary engineering;

$500,000 for the Boston North–South rail link project;

$750,000 for the Boston urban ring project;

$2,000,000 for the Burlington–Essex, Vermont commuter rail project;

$2,200,000 for the Canton–Akron–Cleveland commuter rail project;

$2,200,000 for the Charleston, South Carolina monobeam rail project;

$3,000,000 for the Charlotte, North Carolina South–North corridor transitway project;

$6,000,000 for the Chicago Metra commuter rail extensions and upgrades project;

$3,000,000 for the Chicago Transit Authority Ravenswood and Douglas branch lines projects: *Provided*, That recognizing the nature of these projects, of the requirements of 49 U.S.C. section 5309(e), only sections 5309(e)(1)(C) and 5309(e)(4) shall apply;

$1,800,000 for the Cincinnati Northeast/Northern Kentucky rail line project;

$4,000,000 for the Clark County, Nevada fixed guideway project;

$1,000,000 for the Cleveland Berea Red Line extension to the Hopkins International Airport project;

$2,000,000 for the Cleveland Euclid corridor improvement project;

$500,000 for the Colorado–North Front Range corridor feasibility study;

$12,000,000 for the Dallas–Fort Worth RAILTRAN project;

$16,000,000 for the DART North Central light rail extension project;

$1,000,000 for the Dayton, Ohio light rail study;

$40,000,000 for the Denver Southwest Corridor project;

$500,000 for the Denver Southeast Corridor multimodal corridor project;

$17,000,000 for the Dulles corridor project;

$4,000,000 for the Fort Lauderdale, Florida Tri–County commuter rail project;

$1,000,000 for the Harrisburg, Pennsylvania capital area transit/corridor one project;

$1,500,000 for the Hartford, Connecticut light rail project;

$3,000,000 for the Honolulu, Hawaii major investment analysis of transit alternatives;

$2,000,000 for the Houston advanced regional transit program;

$59,670,000 for the Houston Regional Bus project;

$1,000,000 for the Johnson County, Kansas I–35 commuter rail project;

$500,000 for the Kansas City, Missouri commuter rail study;

$500,000 for the Kenosha–Racine–Milwaukee, Wisconsin commuter rail project;

$250,000 for the King County, Washington Elliot Bay water taxi;

$1,500,000 for the Knoxville, Tennessee electric transit project;

$1,000,000 for the Largo, Maryland Metro Blue Line extension project;

$1,000,000 for the Little Rock, Arkansas River rail project;

$24,000,000 for the Long Island Railroad East Side access project, New York;

$38,000,000 for the Los Angeles MOS–3 project;

$1,000,000 for the Massachusetts North Shore corridor project;

$17,041,000 for the MARC commuter rail project;

$1,000,000 for the Maryland Route 5 corridor;

$2,200,000 for the Memphis, Tennessee Medical Center rail extension project;

$3,000,000 for the Miami Metro–Dade Transit east-west corridor project;

$3,000,000 for the Miami Metro–Dade North 27th Avenue corridor project;

$8,000,000 for the Mid–City and East Side projects, Los Angeles;

$4,000,000 for the Morgantown, West Virginia fixed guideway modernization project;

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

$1,000,000 for the Nashville, Tennessee regional commuter rail project;

$70,000,000 for the New Jersey urban core Hudson–Bergen LRT project;

$6,000,000 for the New Jersey urban core Newark–Elizabeth rail link project;

$500,000 for the New London, Connecticut waterfront access project;

$22,000,000 for the New Orleans Canal Street corridor project;

$2,000,000 for the New Orleans Desire Streetcar project;

$8,000,000 for the Norfolk–Virginia Beach regional rail project;

$500,000 for the Northeast Ohio commuter rail study, Phase 2;

$3,000,000 for the Northern Indiana South Shore commuter rail project;

$3,000,000 for the Oceanside–Escondido passenger rail project;

$500,000 for the Old Saybrook–Hartford, Connecticut rail extension project;

$1,000,000 for the Omaha, Nebraska trolley system;

$2,500,000 for the Orange County, California transitway project;

$17,500,000 for the Orlando Lynx light rail project;

$3,000,000 for the Philadelphia–Reading SEPTA Schuykill Valley Metro project;

$1,000,000 for the Philadelphia SEPTA Cross County Metro project;

$5,000,000 for the Phoenix metropolitan area transit project;

$4,000,000 for the Pittsburgh Allegheny County Stage II light rail project;

$1,000,000 for the Pittsburgh North Shore central business district transit options MIS;

$25,718,000 for the Portland–Westside/Hillsboro project;

$5,000,000 for the Puget Sound RTA Link light rail project;

$41,000,000 for the Puget Sound RTA Sounder commuter rail project;

$10,000,000 for the Raleigh–Durham–Chapel Hill Triangle Transit project;

$23,480,000 for the Sacramento south corridor LRT project;

$70,000,000 for the Salt Lake City South LRT project;

$5,000,000 for the Salt Lake City/Airport to University (West–East) light rail project: *Provided further*, That the non-governmental share for these funds shall be determined in accordance with Section 3030(c)(2)(B)(ii) of the Transportation Equity Act for the 21st Century, as amended (Public Law 105–178);

$1,000,000 for the San Bernardino Metrolink extension project;

$2,000,000 for the San Diego Mid–Coast corridor project;

$1,500,000 for the San Diego Mission Valley East light rail transit project;

$40,000,000 for the San Francisco BART extension to the airport project;

$500,000 for the San Jacinto–Branch Line (Riverside County) project;

$27,000,000 for the San Jose Tasman LRT project;

$20,000,000 for the San Juan Tren Urbano;

$500,000 for the Savannah, Georgia water taxi;

$250,000 for the Sioux City micro rail trolley system;

$53,983,000 for the South Boston Piers MOS–2 project;

$1,000,000 for the South Dekalb–Lindburgh corridor LRT project;

$200,000 for the Southeast Michigan commuter rail viability project;

$1,000,000 for the Spokane, Washington light rail project;

$500,000 for the St. Louis–Jefferson City–Kansas City, Missouri commuter rail project;

$35,000,000 for the St. Louis–St.Clair LRT extension project;

$1,000,000 for the Stamford, Connecticut fixed guideway connector;

$1,000,000 for the Tampa Bay regional rail project;

$17,000,000 for the Twin Cities Transitways project;

$2,000,000 for the Virginia Railway Express Woodbridge station improvements project; and

$1,000,000 for the West Trenton, New Jersey rail project:

AR.02697

*Provided further*, That funds provided in Public Law 105–66 for the Pennsylvania Strawberry Hill/Diamond Branch rail project shall be available for the Laurel Rail line project in Lackawanna County, Pennsylvania.

## MASS TRANSIT CAPITAL FUND

### (LIQUIDATION OF CONTRACT AUTHORIZATION)

### (HIGHWAY TRUST FUND)

Notwithstanding any other provision of law, for payment of previous obligations incurred in carrying out 49 U.S.C. 5338(b), $2,000,000,000, to remain available until expended and to be derived from the Mass Transit Account of the Highway Trust Fund.

### JOB ACCESS AND REVERSE COMMUTE GRANTS

For necessary expenses to carry out section 3037 of the Federal Transit Act of 1998, $35,000,000, to remain available until expended: *Provided*, That no more than $75,000,000 of budget authority shall be available for these purposes: *Provided further*, That of the amounts appropriated under this head, not more than $10,000,000 shall be used for grants for reverse commute projects.

### WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

For necessary expenses to carry out the provisions of section 14 of Public Law 96–184 and Public Law 101–551, $50,000,000, to remain available until expended.

## SAINT LAWRENCE SEAWAY DEVELOPMENT CORPORATION

### SAINT LAWRENCE SEAWAY DEVELOPMENT CORPORATION

The Saint Lawrence Seaway Development Corporation is hereby authorized to make such expenditures, within the limits of funds and borrowing authority available to the Corporation, and in accord with law, and to make such contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act, as amended, as may be necessary in carrying out the programs set forth in the Corporation's budget for the current fiscal year.

### OPERATIONS AND MAINTENANCE

### (HARBOR MAINTENANCE TRUST FUND)

For necessary expenses for operations and maintenance of those portions of the Saint Lawrence Seaway operated and maintained by the Saint Lawrence Seaway Development Corporation, $11,496,000, to be derived from the Harbor Maintenance Trust Fund, pursuant to Public Law 99–662.

## RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION

### RESEARCH AND SPECIAL PROGRAMS

For expenses necessary to discharge the functions of the Research and Special Programs Administration, $29,280,000, of which $574,000 shall be derived from the Pipeline Safety Fund, and of which $3,460,000 shall remain available until September 30, 2001: *Provided*, That up to $1,200,000 in fees collected under 49 U.S.C. 5108(g) shall be deposited in the general fund of the Treasury as offsetting receipts: *Provided further*, That there may be credited to this appropriation, to be available until expended, funds received from States, counties, municipalities, other public authorities, and private sources for expenses incurred for training, for reports publication and dissemination, and for travel expenses incurred in performance of hazardous materials exemptions and approvals functions.

### PIPELINE SAFETY

### (PIPELINE SAFETY FUND)

### (OIL SPILL LIABILITY TRUST FUND)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For expenses necessary to conduct the functions of the pipeline safety program, for grants-in-aid to carry out a pipeline safety program, as authorized by 49 U.S.C. 60107, and to discharge the pipeline program responsibilities of the Oil Pollution Act of 1990, $33,248,000, of which $4,248,000 shall be derived from the Oil Spill Liability Trust Fund and shall remain available until September 30, 2001; and of which $29,000,000 shall be derived from the Pipeline Safety Fund, of which $16,219,000 shall remain available until September 30, 2001: *Provided*, That in addition to amounts made available for the Pipeline Safety Fund, $1,400,000 shall be available for grants to States for the development and establishment of one-call notification systems and public education activities, and shall be derived from amounts previously collected under 49 U.S.C. 60301.

## EMERGENCY PREPAREDNESS GRANTS

### (EMERGENCY PREPAREDNESS FUND)

For necessary expenses to carry out 49 U.S.C. 5127(c), $200,000, to be derived from the Emergency Preparedness Fund, to remain available until September 30, 2001: *Provided*, That not more than $11,000,000 shall be made available for obligation in fiscal year 1999 from amounts made available by 49 U.S.C. 5116(i) and 5127(d): *Provided further*, That none of the funds made available by 49 U.S.C. 5116(i) and 5127(d) shall be made available for obligation by individuals other than the Secretary of Transportation, or his designee.

## OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General to carry out the provisions of the Inspector General Act of 1978, as amended, $43,495,000.

## SURFACE TRANSPORTATION BOARD

### SALARIES AND EXPENSES

For necessary expenses of the Surface Transportation Board, including services authorized by 5 U.S.C. 3109, $16,000,000: *Provided*, That notwithstanding any other provision of law, not to exceed $2,600,000 from fees established by the Chairman of the Surface Transportation Board shall be credited to this appropriation as offsetting collections and used for necessary and authorized expenses under this heading: *Provided further*, That the sum herein appropriated from the general fund shall be reduced on a dollar-for-dollar basis as such offsetting collections are received during fiscal year 1999, to result in a final appropriation from the general fund estimated at no more than $16,000,000: *Provided further*, That any fees received in excess of $2,600,000 in fiscal year 1999 shall remain available until expended, but shall not be available for obligation until October 1, 1999.

## TITLE II

### RELATED AGENCIES ARCHITECTURAL AND TRANSPORTATION BARRIERS COMPLIANCE BOARD

### SALARIES AND EXPENSES

For expenses necessary for the Architectural and Transportation Barriers Compliance Board, as authorized by section 502 of the Rehabilitation Act of 1973, as amended, $3,847,000: *Provided*, That, notwithstanding any other provision of law, there may be credited to this appropriation funds received for publications and training expenses.

## NATIONAL TRANSPORTATION SAFETY BOARD

### SALARIES AND EXPENSES

For necessary expenses of the National Transportation Safety Board, including hire of passenger motor vehicles and aircraft; services as authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for a GS–15; uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902), $53,473,000, of which not to exceed $2,000 may be used for official reception and representation expenses.

### EMERGENCY FUND

For necessary expenses of the National Transportation Safety Board for accident investigations, including hire of passenger motor vehicles and aircraft; services as authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for a GS–15; uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902), $1,000,000, to remain available until expended.

TITLE III

GENERAL PROVISIONS

(INCLUDING TRANSFERS OF FUNDS)

SEC. 301. During the current fiscal year applicable appropriations to the Department of Transportation shall be available for maintenance and operation of aircraft; hire of passenger motor vehicles and aircraft; purchase of liability insurance for motor vehicles operating in foreign countries on official department business; and uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902).

SEC. 302. Such sums as may be necessary for fiscal year 1999 pay raises for programs funded in this Act shall be absorbed within the levels appropriated in this Act or previous appropriations Acts.

<< 49 USCA § 106 NOTE >>

SEC. 303. Funds appropriated under this Act for expenditures by the Federal Aviation Administration shall be available: (1) except as otherwise authorized by title VIII of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7701 et seq.), for expenses of primary and secondary schooling for dependents of Federal Aviation Administration personnel stationed outside the continental United States at costs for any given area not in excess of those of the Department of Defense for the same area, when it is determined by the Secretary that the schools, if any, available in the locality are unable to provide adequately for the education of such dependents; and (2) for transportation of said dependents between schools serving the area that they attend and their places of residence when the Secretary, under such regulations as may be prescribed, determines that such schools are not accessible by public means of transportation on a regular basis.

SEC. 304. Appropriations contained in this Act for the Department of Transportation shall be available for services as authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for an Executive Level IV.

SEC. 305. None of the funds in this Act shall be available for salaries and expenses of more than 100 political and Presidential appointees in the Department of Transportation: *Provided*, That none of the personnel covered by this provision may be assigned on temporary detail outside the Department of Transportation.

SEC. 306. None of the funds in this Act shall be used for the planning or execution of any program to pay the expenses of, or otherwise compensate, non-Federal parties intervening in regulatory or adjudicatory proceedings funded in this Act.

SEC. 307. None of the funds appropriated in this Act shall remain available for obligation beyond the current fiscal year, nor may any be transferred to other appropriations, unless expressly so provided herein.

SEC. 308. The Secretary of Transportation may enter into grants, cooperative agreements, and other transactions with any person, agency, or instrumentality of the United States, any unit of State or local government, any educational institution, and any other entity in execution of the Technology Reinvestment Project authorized under the Defense Conversion, Reinvestment and Transition Assistance Act of 1992 and related legislation: *Provided*, That the authority provided in this section may be exercised without regard to section 3324 of title 31, United States Code.

SEC. 309. The expenditure of any appropriation under this Act for any consulting service through procurement contract pursuant to section 3109 of title 5, United States Code, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

<< 23 USCA § 104 NOTE >>

SEC. 310. (a) For fiscal year 1999, the Secretary of Transportation shall—

<< 23 USCA § 104 NOTE >>

(1) not distribute from the obligation limitation for Federal-aid Highways amounts authorized for administrative expenses and programs funded from the administrative takedown authorized by section 104(a) of title 23, United States Code, and amounts authorized for the highway use tax evasion program and the Bureau of Transportation Statistics.

<< 23 USCA § 104 NOTE >>

(2) not distribute an amount from the obligation limitation for Federal-aid Highways that is equal to the unobligated balance of amounts made available from the Highway Trust Fund (other than the Mass Transit Account) for Federal-aid highways and highway safety programs for the previous fiscal year the funds for which are allocated by the Secretary;

<< 23 USCA § 104 NOTE >>

(3) determine the ratio that—
(A) the obligation limitation for Federal-aid Highways less the aggregate of amounts not distributed under paragraphs (1) and (2), bears to
(B) the total of the sums authorized to be appropriated for Federal-aid highways and highway safety construction programs (other than sums authorized to be appropriated for sections set forth in paragraphs (1) through (7) of subsection (b) and sums authorized to be appropriated for section 105 of title 23, United States Code, equal to the amount referred to in subsection (b)(8)) for such fiscal year less the aggregate of the amounts not distributed under paragraph (1) of this subsection;

<< 23 USCA § 104 NOTE >>

(4) distribute the obligation limitation for Federal-aid Highways less the aggregate amounts not distributed under paragraphs (1) and (2) for section 117 of title 23, United States Code (relating to high priority projects program), section 201 of the Appalachian Regional Development Act of 1965, the Woodrow Wilson Memorial Bridge Authority Act of 1995, and $2,000,000,000 for such fiscal year under section 105 of the Transportation Equity Act for the 21st Century (relating to minimum guarantee) so that the amount of obligation authority available for each of such sections is equal to the amount determined by multiplying the ratio determined under paragraph (3) by the sums authorized to be appropriated for such section (except in the case of section 105, $2,000,000,000) for such fiscal year;

<< 23 USCA § 104 NOTE >>

(5) distribute the obligation limitation provided for Federal-aid Highways less the aggregate amounts not distributed under paragraphs (1) and (2) and amounts distributed under paragraph (4) for each of the programs that are allocated by the Secretary under title 23, United State Code (other than activities to which paragraph (1) applies and programs to which paragraph (4) applies) by multiplying the ratio determined under paragraph (3) by the sums authorized to be appropriated for such program for such fiscal year; and

<< 23 USCA § 104 NOTE >>

(6) distribute the obligation limitation provided for Federal-aid Highways less the aggregate amounts not distributed under paragraphs (1) and (2) and amounts distributed under paragraphs (4) and (5) for Federal-aid highways and highway safety construction programs (other than the minimum guarantee program, but only to the extent that amounts apportioned for the minimum guarantee program for such fiscal year exceed $2,639,000,000, and the Appalachian development highway system program) that are apportioned by the Secretary under title 23, United States Code, in the ratio that—
(A) sums authorized to be appropriated for such programs that are apportioned to each State for such fiscal year, bear to
(B) the total of the sums authorized to be appropriated for such programs that are apportioned to all States for such fiscal year.

<< 23 USCA § 104 NOTE >>

(b) EXCEPTIONS FROM OBLIGATION LIMITATION.—The obligation limitation for Federal-aid Highways shall not apply to obligations (1) under section 125 of title 23, United States Code; (2) under section 147 of the Surface Transportation Assistance Act of 1978; (3) under section 9 of the Federal-Aid Highway Act of 1981; (4) under sections 131(b) and 131(j) of the Surface Transportation Assistance Act of 1982; (5) under sections 149(b) and 149(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987; (6) under section 1103 through 1108 of the Intermodal Surface Transportation Efficiency Act of 1991; (7) under section 157 of title 23, United States Code, as in effect on the day before the date of enactment of the Transportation Equity Act for the 21st Century; and (8) under section 105 of title 23, United States Code (but, only in an amount equal to $639,000,000 for such fiscal year).

<< 23 USCA § 104 NOTE >>

(c) REDISTRIBUTION OF UNUSED OBLIGATION AUTHORITY.—Notwithstanding subsection (a), the Secretary shall after August 1 for such fiscal year revise a distribution of the obligation limitation made available under subsection (a) if a State will not obligate the amount distributed during that fiscal year and redistribute sufficient amounts to those States able to obligate amounts in addition to those previously distributed during that fiscal year giving priority to those States having large unobligated balances of funds apportioned under sections 104 and 144 of title 23, United States Code, section 160 (as in effect on the day before the enactment of the Transportation Equity Act for the 21st Century) of title 23, United States Code, and under section 1015 of the Intermodal Surface Transportation Act of 1991 (105 Stat. 1943–1945).

<< 23 USCA § 104 NOTE >>

(d) APPLICABILITY OF OBLIGATION LIMITATIONS TO TRANSPORTATION RESEARCH PROGRAMS.—The obligation limitation shall apply to transportation research programs carried out under chapters 3 and 5 of title 23, United States Code, except that obligation authority made available for such programs under such limitation shall remain available for a period of 3 fiscal years.

<< 23 USCA § 104 NOTE >>

(e) REDISTRIBUTION OF CERTAIN AUTHORIZED FUNDS.—Not later than 30 days after the date of the distribution of obligation limitation under subsection (a), the Secretary shall distribute to the States any funds (1) that are authorized to be appropriated for such fiscal year for Federal-aid highways programs (other than the program under section 160 of title 23, United States Code) and for carrying out subchapter I of chapter 311 of title 49, United States Code, and chapter 4 of title 23, United States Code, and (2) that the Secretary determines will not be allocated to the States, and will not be available for obligation, in such fiscal year due to the imposition of any obligation limitation for such fiscal year. Such distribution to the States shall be made in the same ratio as the distribution of obligation authority under subsection (a)(6). The funds so distributed shall be available for any purposes described in section 133(b) of title 23, United States Code.

<< 23 USCA § 104 NOTE >>

(f) SPECIAL RULE.—Obligation limitation distributed for a fiscal year under subsection (a)(4) for a section set forth in subsection (a)(4) shall remain available until used for obligation of funds for such section and shall be in addition to the amount of any limitation imposed on obligations for Federal-aid highway and highway safety construction programs for future fiscal years.

<< 49 USCA § 5338 NOTE >>

SEC. 311. The limitations on obligations for the programs of the Federal Transit Administration shall not apply to any authority under 49 U.S.C. 5338, previously made available for obligation, or to any other authority previously made available for obligation.

SEC. 312. None of the funds in this Act shall be used to implement section 404 of title 23, United States Code.

SEC. 313. None of the funds in this Act shall be available to plan, finalize, or implement regulations that would establish a vessel traffic safety fairway less than five miles wide between the Santa Barbara Traffic Separation Scheme and the San Francisco Traffic Separation Scheme.

<< 49 USCA § 44502 NOTE >>

SEC. 314. Notwithstanding any other provision of law, airports may transfer, without consideration, to the Federal Aviation Administration (FAA) instrument landing systems (along with associated approach lighting equipment and runway visual range equipment) which conform to FAA design and performance specifications, the purchase of which was assisted by a Federal airport-aid program, airport development aid program or airport improvement program grant. The FAA shall accept such equipment, which shall thereafter be operated and maintained by the FAA in accordance with agency criteria.

SEC. 315. None of the funds in this Act shall be available to award a multiyear contract for production end items that: (1) includes economic order quantity or long lead time material procurement in excess of $10,000,000 in any one year of the contract; (2) includes a cancellation charge greater than $10,000,000 which at the time of obligation has not been appropriated to the limits of the Government's liability; or (3) includes a requirement that permits performance under the contract during the second and subsequent years of the contract without conditioning such performance upon the appropriation of funds: *Provided*, That this limitation does not apply to a contract in which the Federal Government incurs no financial liability from not buying additional systems, subsystems, or components beyond the basic contract requirements.

<< 23 USCA § 218 >>

SEC. 316. Section 218 of title 23, United States Code, is amended—

<< 23 USCA § 218 >>

(1) in subsection (a)—

(A) in the first sentence by striking "the south Alaskan border" and inserting "Haines" in lieu thereof;

(B) in the third sentence by striking "highway" and inserting "highway or the Alaska Marine Highway System" in lieu thereof;

(C) in the fourth sentence by striking "any other fiscal year thereafter" and inserting "any other fiscal year thereafter, including any portion of any other fiscal year thereafter, prior to the date of the enactment of the Transportation Equity Act for the 21st Century" in lieu thereof;

(D) in the fifth sentence by striking "construction of such highways until an agreement" and inserting "construction of the portion of such highways that are in Canada until an agreement" in lieu thereof; and

<< 23 USCA § 218 >>

(2) in subsection (b) by inserting "in Canada" after "undertaken".

SEC. 317. Notwithstanding any other provision of law, and except for fixed guideway modernization projects, funds made available by this Act under "Federal Transit Administration, Capital investment grants" for projects specified in this Act or identified in reports accompanying this Act not obligated by September 30, 2001, and other recoveries, shall be made available for other projects under 49 U.S.C. 5309.

SEC. 318. Notwithstanding any other provision of law, any funds appropriated before October 1, 1998, under any section of chapter 53 of title 49, United States Code, that remain available for expenditure may be transferred to and administered under the most recent appropriation heading for any such section.

SEC. 319. None of the funds in this Act may be used to compensate in excess of 350 technical staff-years under the federally funded research and development center contract between the Federal Aviation Administration and the Center for Advanced Aviation Systems Development during fiscal year 1999.

SEC. 320. Funds provided in this Act for the Transportation Administrative Service Center (TASC) shall be reduced by $15,000,000, which limits fiscal year 1999 TASC obligational authority for elements of the Department of Transportation funded in this Act to no more than $109,124,000: *Provided*, That such reductions from the budget request shall be allocated

by the Department of Transportation to each appropriations account in proportion to the amount included in each account for the Transportation Administrative Service Center.

SEC. 321. Funds received by the Federal Highway Administration, Federal Transit Administration, and Federal Railroad Administration from States, counties, municipalities, other public authorities, and private sources for expenses incurred for training may be credited respectively to the Federal Highway Administration's "Limitation on General Operating Expenses" account, the Federal Transit Administration's "Transit Planning and Research" account, and to the Federal Railroad Administration's "Railroad Safety" account, except for State rail safety inspectors participating in training pursuant to 49 U.S.C. 20105.

SEC. 322. None of the funds in this Act shall be available to prepare, propose, or promulgate any regulations pursuant to title V of the Motor Vehicle Information and Cost Savings Act (49 U.S.C. 32901 et seq.) prescribing corporate average fuel economy standards for automobiles, as defined in such title, in any model year that differs from standards promulgated for such automobiles prior to enactment of this section.

SEC. 323. Notwithstanding any other provision of law, the Secretary of Transportation shall convey, without consideration, all right, title, and interest of the United States in and to the parcels of real property described in this section, together with any improvements thereon, as the Secretary considers appropriate for purposes of the conveyance, to the entities described in this section, namely: (1) United States Coast Guard Pass Manchac Light in Tangipahoa Parish, Louisiana, to the State of Louisiana; and (2) Tchefuncte River Range Rear Light in Madisonville, Louisiana, to the Town of Madisonville, Louisiana.

SEC. 324. None of the funds made available in this Act may be used for the purpose of promulgating or enforcing any regulation that has the practical effect of (a) requiring more than one attendant during unloading of liquefied compressed gases, or (b) preventing the attendant from monitoring the customer's liquefied compressed gas storage tank during unloading.

SEC. 325. Notwithstanding 31 U.S.C. 3302, funds received by the Bureau of Transportation Statistics from the sale of data products, for necessary expenses incurred pursuant to 49 U.S.C. 111 may be credited to the Federal-aid highways account for the purpose of reimbursing the Bureau for such expenses: *Provided*, That such funds shall be subject to the obligation limitation for Federal-aid highways and highway safety construction.

SEC. 326. None of the funds in this Act may be obligated or expended for employee training which: (1) does not meet identified needs for knowledge, skills and abilities bearing directly upon the performance of official duties; (2) contains elements likely to induce high levels of emotional response or psychological stress in some participants; (3) does not require prior employee notification of the content and methods to be used in the training and written end of course evaluations; (4) contains any methods or content associated with religious or quasi-religious belief systems or "new age" belief systems as defined in Equal Employment Opportunity Commission Notice N–915.022, dated September 2, 1988; (5) is offensive to, or designed to change, participants' personal values or lifestyle outside the workplace; or (6) includes content related to human immunodeficiency virus/acquired immune deficiency syndrome (HIV/AIDS) other than that necessary to make employees more aware of the medical ramifications of HIV/AIDS and the workplace rights of HIV-positive employees.

SEC. 327. None of the funds in this Act shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation: *Provided*, That this shall not prevent officers or employees of the Department of Transportation or related agencies funded in this Act from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

SEC. 328. Not to exceed $1,000,000 of the funds provided in this Act for the Department of Transportation shall be available for the necessary expenses of advisory committees: *Provided*, That this limitation shall not apply to advisory committees established for the purpose of conducting negotiated rulemaking in accordance with the Negotiated Rulemaking Act, 5 U.S.C. 561–570a, or the Coast Guard's advisory council on roles and missions.

<< 43 USCA § 1653 NOTE >>

SEC. 329. BULK FUEL STORAGE TANKS. (a) TRANSFER OF FUNDS.—Notwithstanding any other provision of law, the remainder of the balance in the Trans–Alaska Pipeline Liability Fund that is transferred and deposited into the Oil Spill

Liability Trust Fund under section 8102(a)(2)(B)(ii) of the Oil Pollution Act of 1990 (43 U.S.C. 1653 note) after June 16, 1998 shall be used in accordance with this section.

<< 43 USCA § 1653 NOTE >>

 (b) USE OF INTEREST ONLY.—The interest produced from the investment of the Trans–Alaska Pipeline Liability Fund balance that is transferred and deposited into the Oil Spill Liability Trust Fund under section 8102(a)(2)(B)(ii) of the Oil Pollution Act of 1990 (43 U.S.C. 1653 note) after June 16, 1998 shall be transferred annually by the National Pollution Funds Center to the Denali Commission for a program, to be developed in consultation with the Coast Guard, to repair or replace bulk fuel storage tanks in Alaska which are not in compliance with federal law, including the Oil Pollution Act of 1990, or State law.

<< 43 USCA § 1653 NOTE >>

 (c) TAPS PAYMENT TO ALASKA DEDICATED TO BULK FUEL STORAGE TANK REPAIR AND REPLACEMENT. —Section 8102(a)(2)(B)(i) of Public Law 101–380 (43 U.S.C. 1653 note) is amended by inserting immediately before the semicolon, ", which, except as otherwise provided under article IX, section 15, of the Alaska Constitution, shall be used for the remediation of aboveground storage tanks".

 SEC. 330. No funds other than those appropriated to the Surface Transportation Board or fees collected by the Board shall be used for conducting the activities of the Board.

 SEC. 331. (a) None of the funds made available in this Act may be expended by an entity unless the entity agrees that in expending the funds the entity will comply with the Buy American Act (41 U.S.C. 10a–10c).

 (b) SENSE OF THE CONGRESS; REQUIREMENT REGARDING NOTICE.—

 (1) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products to the greatest extent practicable.

 (2) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance using funds made available in this Act, the head of each Federal agency shall provide to each recipient of the assistance a notice describing the statement made in paragraph (1) by the Congress.

 (c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

 SEC. 332. Notwithstanding any other provision of law, receipts, in amounts determined by the Secretary, collected from users of fitness centers operated by or for the Department of Transportation shall be available to support the operation and maintenance of those facilities.

 SEC. 333. None of the funds in this Act shall be available to implement or enforce regulations that would result in the withdrawal of a slot from an air carrier at O'Hare International Airport under section 93.223 of title 14 of the Code of Federal Regulations in excess of the total slots withdrawn from that air carrier as of October 31, 1993 if such additional slot is to be allocated to an air carrier or foreign air carrier under section 93.217 of title 14 of the Code of Federal Regulations.

 SEC. 334. Notwithstanding 49 U.S.C. 41742, no essential air service shall be provided to communities in the 48 contiguous States that are located fewer than 70 highway miles from the nearest large or medium hub airport, or that require a rate of subsidy per passenger in excess of $200 unless such point is greater than 210 miles from the nearest large or medium hub airport.

 SEC. 335. Rebates, refunds, incentive payments, minor fees and other funds received by the Department from travel management centers, charge card programs, the subleasing of building space, and miscellaneous sources are to be credited to appropriations of the Department and allocated to elements of the Department using fair and equitable criteria and such funds shall be available until December 31, 1999.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 336. Notwithstanding any other provision of law, rule or regulation, the Secretary of Transportation is authorized to allow the issuer of any preferred stock heretofore sold to the Department to redeem or repurchase such stock upon the payment to the Department of an amount determined by the Secretary.

SEC. 337. The unobligated balances of the funds made available in previous appropriations Acts for the National Civil Aviation Review Commission and for Urban Discretionary Grants are rescinded.

SEC. 338. (a) Notwithstanding any other provision of law—

(1) the land and improvements thereto comprising the Coast Guard Reserve Training Facility in Jacksonville, Florida, is deemed to be surplus property; and

(2) the Commandant of the Coast Guard shall dispose of all right, title, and interest of the United States in and to that property, by sale, at fair market value.

(b) RIGHT OF FIRST REFUSAL.—Before a sale is made under subsection (a) to any other person, the Commandant of the Coast Guard shall give to the City of Jacksonville, Florida, the right of first refusal to purchase all or any part of the property required to be sold under that subsection.

SEC. 339. Of the funds provided under Federal Aviation Administration "Operations", $250,000 is only for activities and operations of the Centennial of Flight Commission.

SEC. 340. Notwithstanding any other provision of law, the Secretary of Transportation shall waive repayment of any Federal-aid highway funds expended on the construction of those high occupancy lanes or auxiliary lanes constructed on I–287 in the State of New Jersey, pursuant to section 338 of the fiscal year 1993 Department of Transportation and Related Agencies Appropriations Act (Public Law 102–388), if the State of New Jersey presents the Secretary with its determination that such high occupancy vehicle lanes or auxiliary lanes are not in the public interest.

SEC. 341. (a) AUTHORITY TO CONVEY.—The Secretary of Transportation may convey, without consideration, to the State of North Carolina (in this section referred to as the "State"), all right, title, and interest of the United States in and to a parcel of real property, together with any improvements thereon, in Ocracoke, North Carolina, consisting of such portion of the Coast Guard Station Ocracoke, North Carolina, as the Secretary considers appropriate for purposes of the conveyance.

(b) CONDITIONS.—The conveyance under subsection (a) shall be subject to the following conditions:

(1) That the State accept the property to be conveyed under that subsection subject to such easements or rights of way in favor of the United States as the Secretary considers to be appropriate for—

(A) utilities;

(B) access to and from the property;

(C) the use of the boat launching ramp on the property; and

(D) the use of pier space on the property by search and rescue assets.

(2) That the State maintain the property in a manner so as to preserve the usefulness of the easements or rights of way referred to in paragraph (1).

(3) That the State utilize the property for transportation, education, environmental, or other public purposes.

(c) REVERSION.—(1) If the Secretary determines at any time that the property conveyed under subsection (a) is not to be used in accordance with subsection (b), all right, title, and interest in and to the property, including any improvements thereon, shall revert to the United States, and the United States shall have the right of immediate entry thereon.

(2) Upon reversion under paragraph (1), the property shall be under the administrative jurisdiction of the Administrator of General Services.

(d) DESCRIPTION OF PROPERTY.—The exact acreage and legal description of the property conveyed under subsection (a), and any easements or rights of way granted under subsection (b)(1), shall be determined by a survey satisfactory to the Secretary. The cost of the survey shall be borne by the State.

(e) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions with respect to the conveyance under subsection (a), and any easements or rights of way granted under subsection (b)(1), as the Secretary considers appropriate to protect the interests of the United States.

SEC. 342. Notwithstanding any other provision of law, funds appropriated in this or any other Act intended for highway demonstration projects, railroad-highway crossings demonstration projects or railroad relocation projects in Augusta, Georgia are available for implementation of a project consisting of modifications and additions to streets, railroads, and related improvements in the vicinity of the grade crossing of the CSX railroad and 15th Street in Augusta, Georgia.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 33 USCA § 2720 NOTE >>

SEC. 343. (a) None of the funds made available by this Act or subsequent Acts may be used by the Coast Guard to issue, implement, or enforce a regulation or to establish an interpretation or guideline under the Edible Oil Regulatory Reform Act (Public Law 104–55), or the amendments made by that Act, that does not recognize and provide for, with respect to fats, oils, and greases (as described in that Act, or the amendments made by that Act) differences in—

<< 33 USCA § 2720 NOTE >>

(1) physical, chemical, biological and other relevant properties; and

<< 33 USCA § 2720 NOTE >>

(2) environmental effects.

<< 33 USCA § 2720 NOTE >>

(b) Not later than March 31, 1999, the Secretary of Transportation shall issue regulations amending 33 CFR 154 to comply with the requirements of Public Law 104–55.

SEC. 344. Funding made available in Public Law 105–174 for emergency railroad rehabilitation and repair shall be available for repairs resulting from natural disasters occurring from September 1996 through July 10, 1998.

SEC. 345. For purposes of evaluating environmental impacts of the toll road in Orange and San Diego counties, California, the Administrator of the Federal Highway Administration and other participating Federal agencies shall consider only those transportation alternatives previously identified by regional planning processes and shall restrict agency comments to those matters over which the agency has direct jurisdiction: *Provided*, That notwithstanding any inter-agency memoranda of understanding, the Administrator of the Federal Highway Administration shall retain and exercise all authority regarding the form, content and timing of any environmental impact statement and record of decision regarding the toll road, including the evaluation and selection of alternatives and distribution of draft and final environmental impact statements.

SEC. 346. (a) Notwithstanding any other law, the Commandant, United States Coast Guard, shall convey to the University of South Alabama (in this section referred to as "the recipient"), the right, title, and interest of the United States Government in and to a decommissioned vessel of the Coast Guard, as determined appropriate by the Commandant and the recipient, if—

(1) the recipient agrees to use the vessel for the purposes of supporting archaeological and historical research in the Mobile Bay Delta;

(2) the recipient agrees not to use the vessel for commercial transportation purposes, except as incident to the provision of logistics services in connection with the Old Mobile Archaeological Project;

(3) The recipient agrees to make the vessel available to the Government if the Commandant requires use of the vessel by the Government in times of war or national emergency;

(4) the recipient agrees to hold the Government harmless for any claims arising from exposure to hazardous materials including, but not limited to, asbestos and polychlorinated biphenyls (PCBs), after conveyance of the vessel, except for claims arising from use by the Government under paragraph (3);

(5) the recipient has funds available to be committed for use to restore the vessel to operation and thereafter maintain it in good working condition, in the amount of at least $400,000; and

(6) the recipient agrees to any other conditions that the Secretary considers appropriate.

(b) DELIVERY OF VESSEL.—If a conveyance is made under this section, the Commandant shall deliver the vessel at the place where the vessel is located, in its present condition, without cost to the Government. The conveyance of this vessel shall not be considered a distribution in commerce for purposes of section 2605(e) of title 15, United States Code.

(c) OTHER UNNEEDED EQUIPMENT.—The Commandant may convey to the recipient any unneeded equipment or parts from other decommissioned vessels pending disposition for use to restore the vessel to operability. The Commandant may require compensation from the recipient for such items.

(d) APPLICABLE LAWS AND REGULATIONS.—The vessel shall at all times remain subject to applicable vessel safety laws and regulations.

SEC. 347. Item 1132 in section 1602 of the Transportation Equity Act for the 21st Century (112 Stat. 298), relating to Mississippi, is amended by striking "Pirate Cove" and inserting "Pirates' Cove and 4-lane connector to Mississippi Highway 468".

SEC. 348. (a) AUTHORITY TO CONVEY COAST GUARD PROPERTY TO JACKSONVILLE UNIVERSITY IN JACKSONVILLE, FLORIDA.—

(1) IN GENERAL.—The Secretary of Transportation may convey to Jacksonville University, located in Jacksonville, Florida, without consideration, all right, title, and interest of the United States in and to the property comprising the Long Branch Rear Range Light, Jacksonville, Florida.

(2) IDENTIFICATION OF PROPERTY.—The Secretary may identify, describe, and determine the property to be conveyed under this section.

(b) TERMS AND CONDITIONS.—Any conveyance of any property under this section shall be made—

(1) subject to such terms and conditions as the Commandant may consider appropriate; and

(2) subject to the condition that all right, title, and interest in and to the property conveyed shall immediately revert to the United States if the property, or any part thereof, ceases to be used by Jacksonville University.

SEC. 349. For necessary expenses of the Amtrak Reform Council authorized under section 203 of Public Law 105–134, $450,000, to remain available until September 30, 2000: *Provided*, That none of the funds provided under this heading shall be for payments to outside consultants: *Provided further*, That the duties of the Amtrak Reform Council described in section 203(g)(1) of Public Law 105–134 shall include the identification of Amtrak routes which are candidates for closure or realignment, based on performance rankings developed by Amtrak which incorporate information on each route's fully allocated costs and ridership on core intercity passenger service, and which assume, for purposes of closure or realignment candidate identification, that federal subsidies for Amtrak will decline over the 4-year period from fiscal year 1999 to fiscal year 2002: *Provided further*, That these closure or realignment recommendations shall be included in the Amtrak Reform Council's annual report to the Congress required by section 203(h) of Public Law 105–134.

SEC. 350. Notwithstanding any other provision of law, the Secretary shall approve and the State of New York is authorized to proceed with engineering, final design and construction of additional entrances and exits between exits 57 and 58 on Interstate 495 in Suffolk County, New York. The Secretary may review final design of such project.

<< 49 USCA § 30113 >>

SEC. 351. (a) Section 30113 of title 49, United States Code, is amended—

<< 49 USCA § 30113 >>

(1) in subsection (b)—

(A) in paragraph (1), by inserting "or passenger motor vehicles from a bumper standard prescribed under chapter 325 of this title," after "a motor vehicle safety standard prescribed under this chapter"; and

(B) in paragraph (3)(A), by inserting "or chapter 325 of this title (as applicable)" after "this chapter";

<< 49 USCA § 30113 >>

(2) in subsection (c)(1), by inserting ", or a bumper standard prescribed under chapter 325 of this title," after "motor vehicle safety standard prescribed under this chapter";

<< 49 USCA § 30113 >>

(3) in subsection (d), by inserting "(including an exemption under subsection (b)(3)(B)(i) relating to a bumper standard referred to in subsection (b)(1))" after "subsection (b)(3)(B)(i) of this section"; and

<< 49 USCA § 30113 >>

(4) in subsection (h), by inserting "or bumper standard prescribed under chapter 325 of this title" after "each motor vehicle safety standard prescribed under this chapter".

(b) CONFORMING AMENDMENTS.—

<< 49 USCA § 32502 >>

(1) Section 32502(c) of title 49, United States Code, is amended—

(A) in the matter preceding paragraph (1), by striking "any part of a standard" and inserting "all or any part of a standard";

(B) in paragraph (1), by striking "or" at the end;

(C) in paragraph (2), by striking the period and inserting "; or"; and

(D) by adding at the end the following:

"(3) a passenger motor vehicle for which an application for an exemption under section 30013(b) of this title has been filed in accordance with the requirements of that section.".

<< 49 USCA § 32506 >>

(2) Section 32506(a) of title 49, United States Code, is amended by inserting "and section 32502 of this title" after "Except as provided in this section".

SEC. 352. Notwithstanding any other provision of law, $10,000,000 of funds available under section 104(a) of title 23 U.S.C., shall be made available to the University of Alabama in Tuscaloosa, Alabama, for research activities at the Transportation Research Institute and to construct a building to house the Institute, and shall remain available until expended.

SEC. 353. Discretionary grants funds for bus and bus-related facilities made available in this Act and in Public Law 105–66 and its accompanying conference report for the Virtual Transit Enterprise project shall be used to fund any aspect of the Virtual Transit Enterprise integration of information project in South Carolina.

<< 49 USCA § 5307 NOTE >>

SEC. 354. Section 3021 of the Transportation Equity Act for the 21st Century (Public Law 105–178) is amended—

<< 49 USCA § 5307 NOTE >>

(1) in subsection (a), by inserting "or the State of Vermont" after "the State of Oklahoma"; and

<< 49 USCA § 5307 NOTE >>

(2) in subsection (b)(2)(A), by inserting "and the State of Vermont" after "within the State of Oklahoma".

SEC. 355. Section 3 of the Act of July 17, 1952 (66 Stat. 746, chapter 921), and section 3 of the Act of July 17, 1952 (66 Stat. 571, chapter 922), are each amended in the proviso—

(1) by striking "That" and all that follows through "the collection of" and inserting "That the commission may collect"; and

(2) by striking ", shall cease" and all that follows through the period at the end and inserting a period.

SEC. 356. Section 1212(m) of Public Law 105–178 is amended— (1) in the subsection heading, by inserting ", Idaho, Alaska and West Virginia" after "Minnesota"; and (2) by inserting "or the States of Idaho, Alaska or West Virginia" after "Minnesota".

SEC. 357. Notwithstanding any other provision of law, funds obligated and awarded in fiscal year 1994 by the Economic Development Administration in the amount of $912,000 to the City of Pittsburg, Kansas, as Project Number 05–19–61200 for water, sewer and street improvements shall be disbursed to the City upon determination by the EDA that the improvements have been completed in accordance with the project description in the award documents.

SEC. 358. Section 3030(d)(3) of the Transportation Equity Act for the 21st Century (Public Law 105–178) is amended by adding at the end the following:

"(C) Saint Barnard Parish, Louisiana intermodal facility.".

SEC. 359. The Secretary of Transportation is authorized to transfer funds appropriated for any office of the Office of the Secretary to any other office of the Office of the Secretary: *Provided*, That no appropriation shall be increased or decreased by

more than 12 per centum by all such transfers: *Provided further*, That any such transfer shall be submitted for approval to the House and Senate Committees on Appropriations.

<< 49 USCA § 5307 NOTE >>

SEC. 360. Section 3027 of the Transportation Equity Act for the 21st Century (49 U.S.C. 5307 note; 112 Stat. 366) is amended by adding at the end the following:

"(3) SERVICES FOR ELDERLY AND PERSONS WITH DISABILITIES.—In addition to assistance made available under paragraph (1), the Secretary may provide assistance under section 5307 of title 49, United States Code, to a transit provider that operates 20 or fewer vehicles in an urbanized area with a population of at least 200,000 to finance the operating costs of equipment and facilities used by the transit provider in providing mass transportation services to elderly and persons with disabilities, provided that such assistance to all entities shall not exceed $1,000,000 annually.".

SEC. 361. Hereafter, the Commonwealth of Virginia shall have the exclusive authority to determine the high-occupancy vehicle restrictions applicable to Interstate Highway 66 in Virginia.

SEC. 362. None of the funds appropriated by this Act may be used to issue a final standard under docket number NHTSA 98–3945 (relating to section 656(b) of the Illegal Immigration Reform and Responsibility Act of 1996).

SEC. 363. Items 178 and 1547 in section 1602 of the Transportation Equity Act for the 21st Century (Public Law 105–178), relating to Georgia, are amended by adding at the end the following: "and construct improvements to said corridor".

SEC. 364. Notwithstanding any other provision of law, the Secretary shall approve the construction of Type II noise barriers from funds apportioned under sections 104(b)(1) and 104(b)(3) of title 23, United States Code, at the following locations:

(a) beginning on the north and south sides of Interstate Route 20 extending from H.E. Holmes Road to Fulton Industrial Boulevard in Fulton County, Georgia;

(b) beginning on the north and south sides of Interstate Route 20 extending from Flat Shoals Road to Columbia Drive in DeKalb County, Georgia; and

(c) beginning on the west side of Interstate Route 75 extending from Howell Mill Road to West Paces Ferry Road in Fulton County, Georgia.

SEC. 365. Notwithstanding any other provision of law, except as otherwise provided in this section, the Secretary shall approve and the State of Alabama is authorized to proceed with construction of the East Foley corridor project from Baldwin County Highway 20 to State Highway 59, identified in items 857 and 1501 in the table contained in Section 1602 of the Transportation Equity Act for the 21st Century (Public Law 105–178). Environmental reviews performed by the Alabama Department of Environmental Management and the Mobile District of the U.S. Army Corps of Engineers and all other non-environmental federal laws shall remain in effect.

SEC. 366. Item 1083 contained in section 1602 of the Transportation Equity Act for the 21st Century (112 Stat. 297) is amended by striking "between Southwest Drive and U.S. 277".

SEC. 367. Notwithstanding any other provision of Federal law, the State of Minnesota may obligate funds apportioned in fiscal years 1998 through 2003 pursuant to section 117 of title 23, United States Code, for high priority project numbers 1628 and 1195 authorized in section 1602 of the Transportation Equity Act for the 21st Century (Public Law 105–178): *Provided*, That such obligation shall be subject to the allocation percentages of section 1602(b) as modified by section 1212(m) of the Transportation Equity Act for the 21st Century (Public Law 105–178).

SEC. 368. Item number 577 in the table contained in Section 1602 of the Transportation Equity Act for the 21st Century (Public Law 105–178) is amended by striking "Construct" and all that follows through "Ketchikan" and insert "For the purposes set forth in item number 1496".

<< 23 USCA § 502 NOTE >>

SEC. 369. Section 5117(b)(6) of the Transportation Equity Act for the 21st Century (23 U.S.C. 502 note; 112 Stat. 450) is amended by striking "Pennsylvania Transportation Institute" and inserting "Commonwealth of Pennsylvania".

<< 23 USCA § 502 NOTE >>

SEC. 370. Section 5204 of the Transportation Equity Act for the 21st Century (23 U.S.C. 502 note; 112 Stat. 453–455) is amended by adding at the end the following:

"(k) USE OF RIGHTS–OF–WAY.—Intelligent transportation system projects specified in section 5117(b)(3) and 5117(b)(6) and involving privately owned intelligent transportation system components that is carried out using funds made available from the Highway Trust Fund shall not be subject to any law or regulation of a State or political subdivision of a State prohibiting or regulating commercial activities in the rights-of-way of a highway for which Federal-aid highway funds have been utilized for planning, design, construction, or maintenance, if the Secretary of Transportation determines that such use is in the public interest. Nothing in this subsection shall affect the authority of a State or political subdivision of a State to regulate highway safety.".

SEC. 371. (a) The Commandant of the Coast Guard shall convey, without consideration, to the Town of New Castle, New Hampshire (in this section referred to as the "Town"), all right, title, and interest of the United States in and to a parcel of real property comprising approximately 2 acres and having approximately 100 feet of ocean front that is located in New Castle, New Hampshire. The property is bordered to the west by property owned by the Town and to the east by Coast Guard Station Portsmouth Harbor, New Hampshire.

(b)(1) The Commandant shall, in connection with the conveyance required by subsection (a), grant to the Town such easements and rights-of-way as the Commandant considers necessary to permit access to the property conveyed under that subsection.

(2) The Commandant may, in connection with the conveyance required by subsection (a), reserve in favor of the United States such easements and rights-of-way as the Commandant considers necessary to protect the interests of the United States.

(c)(1) The conveyance of property under subsection (a) shall be subject to the following conditions:

(A) That the property, or any portion thereof, shall revert to the United States if the Commandant determines that such property is required by the United States for purposes of the national security of the United States.

(B) That the property, or any portion thereof, shall revert to the United States if the Commandant determines that such property is required by the United States for purposes of a site for an aid to navigation.

(2)(A) At least 30 days before the date of the reversion of property under paragraph (1)(A), the Commandant shall provide the Town written notice that the property is required for purposes of the national security of the United States.

(B) At least 30 days before the date of the reversion of property under paragraph (1)(B), the Commandant shall provide the Town written notice that the property is required for purposes of a site for an aid to navigation.

(d)(1) Notwithstanding any other provision of the Land and Water Conservation Fund Act of 1965, Public Law 88–578, as amended, or other law, the Coast Guard property conveyed to New Castle, New Hampshire pursuant to subsection (a) may be used to replace a portion of Land and Water Conservation Fund-assisted land in New Castle, New Hampshire under project number 33–00077: *Provided*, That the replacement property satisfactorily meets the conversion criteria regarding reasonably equivalent recreation usefulness and location.

(2) The Town may not use the property referred to in paragraph (1) for the purpose specified in that paragraph unless the property conveyed under subsection (a) provides opportunities for recreational activities that are reasonably similar to the opportunities for recreational activities provided by the property referred to in paragraph (1).

(e) The Commandant may require such additional terms and conditions in connection with the conveyance under subsection (a), and the grants of any easements or rights-of-way under subsection (b), as the Commandant considers appropriate to protect the interests of the United States.

SEC. 372. None of the Funds made available under this Act or any other Act, may be used to implement, carry out, or enforce any regulation issued under section 41705 of title 49, United States Code, including any regulation contained in part 382 of title 14, Code of Federal Regulations, or any other provision of law (including any Act of Congress, regulation, or Executive order or any official guidance or correspondence thereto), that requires or encourages an air carrier (as that term is defined in section 40102 of title 49, United States Code) to, on intrastate or interstate air transportation (as those terms are defined in section 40102 of title 49, United States Code)—

(1) provide a peanut-free buffer zone or any other related peanut-restricted area; or

(2) restrict the distribution of peanuts,

until 90 days after submission to the Congress and the Secretary of a peer-reviewed scientific study that determines that there are severe reactions by passengers to peanuts as a result of contact with very small airborne peanut particles of the kind that passengers might encounter in an aircraft.

SEC. 373. MODIFICATION OF SUBSTITUTE PROJECT IN WISCONSIN.—

Section 1045 of the Intermodal Surface Transportation Efficiency Act of 1991 (105 Stat. 1994) is amended in subsection (a) by striking paragraph (a)(2) and inserting the following:

"(2)(A) For six months after the date of enactment of this paragraph, the provisions set forth in paragraph (2)(B) shall apply to all of the funds identified in this section after such time, the provisions set forth in paragraph (2)(B) shall apply to fifty percent of the funds identified in this section, and the provisions of paragraph (2)(C) shall apply to fifty percent of the funds identified in this section."

"(B) Notwithstanding paragraph (1) and subsection (c) of this section, upon the request of the Governor of the State of Wisconsin, after consultation with appropriate local government officials, submitted by October 1, 2000, the Secretary may approve one or more substitute projects in lieu of the substitute project approved by the Secretary under paragraph (1) and subsection (c) of this section."

"(C) Notwithstanding paragraph (1) and subsection (c) of this section, upon the request of the Governor of the State of Wisconsin, submitted by October 1, 2000, the Secretary shall approve one or more substitute projects in lieu of the substitute project approved by the Secretary under paragraph (1) and subsection (c) of this section.".

This Act may be cited as the "Department of Transportation and Related Agencies Appropriations Act, 1999".

(h) For programs, projects or activities in the Treasury and General Government Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for the Treasury Department, the United States Postal Service, the Executive Office of the President, and certain Independent Agencies, for the fiscal year ending September 30, 1999, and for other purposes.

TITLE I—DEPARTMENT OF THE TREASURY

DEPARTMENTAL OFFICES

SALARIES AND EXPENSES

For necessary expenses of the Departmental Offices including operation and maintenance of the Treasury Building and Annex; hire of passenger motor vehicles; maintenance, repairs, and improvements of, and purchase of commercial insurance policies for, real properties leased or owned overseas, when necessary for the performance of official business; not to exceed $2,900,000 for official travel expenses; not to exceed $150,000 for official reception and representation expenses; not to exceed $258,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Secretary of the Treasury and to be accounted for solely on his certificate, $123,151,000: *Provided*, That the Office of Foreign Assets Control shall be funded at no less than $6,560,800: *Provided further*, That the Department is authorized to charge both direct and indirect costs to the Office of Foreign Assets Control in the implementation of this floor: *Provided further*, That the methodology for applying such charges will be the same method used in developing the Departmental Offices Fiscal Year 1999 President's Budget Justification to the Congress.

AUTOMATION ENHANCEMENT

(INCLUDING TRANSFER OF FUNDS)

For development and acquisition of automatic data processing equipment, software, and services for the Department of the Treasury, $28,690,000: *Provided*, That these funds shall remain available until September 30, 2000: *Provided further*, That these funds shall be transferred to accounts and in amounts as necessary to satisfy the requirements of the Department's offices, bureaus, and other organizations: *Provided further*, That this transfer authority shall be in addition to any other transfer authority provided in this Act: *Provided further*, That none of the funds appropriated shall be used to support or supplement the Internal Revenue Service appropriations for Information Systems: *Provided further*, That $6,000,000 of the funds appropriated for the Customs Modernization project may not be transferred to the United States Customs Service or obligated until the Treasury's Chief Information Officer, through the Treasury Investment Review Board, concurs on the plan and milestone schedule for the

deployment of the system: *Provided further*, That $6,000,000 of the funds made available for the Customs Modernization project may not be obligated for any major system investments prior to the development of an architecture which is compliant with the Treasury Information Systems Architecture Framework (TISAF) and the establishment of measures to enforce compliance with the architecture.

## OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, not to exceed $2,000,000 for official travel expenses; including hire of passenger motor vehicles; and not to exceed $100,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Inspector General of the Treasury, $30,678,000.

### TREASURY BUILDING AND ANNEX REPAIR AND RESTORATION

For the repair, alteration, and improvement of the Treasury Building and Annex, $27,000,000, to remain available until expended: *Provided*, That none of the funds provided shall be available for obligation until September 30, 1999.

## FINANCIAL CRIMES ENFORCEMENT NETWORK

### SALARIES AND EXPENSES

For necessary expenses of the Financial Crimes Enforcement Network, including hire of passenger motor vehicles; travel expenses of non-Federal law enforcement personnel to attend meetings concerned with financial intelligence activities, law enforcement, and financial regulation; not to exceed $14,000 for official reception and representation expenses; and for assistance to Federal law enforcement agencies, with or without reimbursement, $24,000,000: *Provided*, That funds appropriated in this account may be used to procure personal services contracts.

## VIOLENT CRIME REDUCTION PROGRAMS

### (INCLUDING TRANSFER OF FUNDS)

For activities authorized by Public Law 103–322, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as follows:

(1) As authorized by section 190001(e), $119,000,000; of which $3,000,000 shall be available to the Bureau of Alcohol, Tobacco and Firearms for administering the Gang Resistance Education and Training program; of which $1,400,000 shall be available to the Financial Crimes Enforcement Network; of which $22,628,000 shall be available to the United States Secret Service, including $6,700,000 for vehicle replacement, $5,000,000 for investigations of counterfeiting, $7,732,000 for the 2000 candidate/nominee protection program, and $3,196,000 for forensic and related support of investigations of missing and exploited children, of which $1,196,000 shall be available as a grant for activities related to the investigations of exploited children and shall remain available until expended; of which $65,472,000 shall be available for the United States Customs Service, including $54,000,000 for narcotics detection technology, $9,500,000 for the passenger processing initiative, $972,000 for construction of canopies for inspection of outbound vehicles along the Southwest border, and $1,000,000 for technology investments related to the Cyber–Smuggling Center; of which $2,500,000 shall be available to the Office of National Drug Control Policy, including $1,000,000 for Model State Drug Law Conferences, and $1,500,000 to expand the Milwaukee, Wisconsin High Intensity Drug Trafficking Area; and of which $24,000,000 shall be available for Interagency Crime and Drug Enforcement;

(2) As authorized by section 32401, $13,000,000 to the Bureau of Alcohol, Tobacco and Firearms for disbursement through grants, cooperative agreements, or contracts to local governments for Gang Resistance Education and Training: *Provided*, That notwithstanding sections 32401 and 310001, such funds shall be allocated to State and local law enforcement and prevention organizations.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

<< 42 USCA § 3771 NOTE >>

For necessary expenses of the Federal Law Enforcement Training Center, as a bureau of the Department of the Treasury, including materials and support costs of Federal law enforcement basic training; purchase (not to exceed 52 for police-type use, without regard to the general purchase price limitation) and hire of passenger motor vehicles; for expenses for student athletic and related activities; uniforms without regard to the general purchase price limitation for the current fiscal year; the conducting of and participating in firearms matches and presentation of awards; for public awareness and enhancing community support of law enforcement training; not to exceed $9,500 for official reception and representation expenses; room and board for student interns; and services as authorized by 5 U.S.C. 3109; $71,923,000, of which up to $13,843,000 for materials and support costs of Federal law enforcement basic training shall remain available until September 30, 2001: *Provided*, That the Center is authorized to accept and use gifts of property, both real and personal, and to accept services, for authorized purposes, including funding of a gift of intrinsic value which shall be awarded annually by the Director of the Center to the outstanding student who graduated from a basic training program at the Center during the previous fiscal year, which shall be funded only by gifts received through the Center's gift authority: *Provided further,* That notwithstanding any other provision of law, students attending training at any Federal Law Enforcement Training Center site shall reside in on-Center or Center-provided housing, insofar as available and in accordance with Center policy: *Provided further,* That funds appropriated in this account shall be available, at the discretion of the Director, for the following: training United States Postal Service law enforcement personnel and Postal police officers; State and local government law enforcement training on a space-available basis; training of foreign law enforcement officials on a space-available basis with reimbursement of actual costs to this appropriation, except that reimbursement may be waived by the Secretary for law enforcement training activities in foreign countries undertaken pursuant to section 801 of the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–32; training of private sector security officials on a space-available basis with reimbursement of actual costs to this appropriation; and travel expenses of non-Federal personnel to attend course development meetings and training sponsored by the Center: *Provided further,* That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training sponsored by the Federal Law Enforcement Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available at the end of the fiscal year: *Provided further,* That the Federal Law Enforcement Training Center is authorized to provide training for the Gang Resistance Education and Training program to Federal and non-Federal personnel at any facility in partnership with the Bureau of Alcohol, Tobacco and Firearms: *Provided further,* That the Federal Law Enforcement Training Center is authorized to provide short-term medical services for students undergoing training at the Center.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For expansion of the Federal Law Enforcement Training Center, for acquisition of necessary additional real property and facilities, and for ongoing maintenance, facility improvements, and related expenses, $34,760,000, to remain available until expended.

### INTERAGENCY LAW ENFORCEMENT

### INTERAGENCY CRIME AND DRUG ENFORCEMENT

For expenses necessary for the detection and investigation of individuals involved in organized crime drug trafficking, including cooperative efforts with State and local law enforcement, $51,900,000, of which $7,827,000 shall remain available until expended.

### FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the Financial Management Service, $196,490,000, of which not to exceed $13,235,000 shall remain available until September 30, 2001, for information systems modernization initiatives.

### FEDERAL FINANCING BANK

For liquidation of certain debts to the United States Treasury incurred by the Federal Financing Bank pursuant to section 9(b) of the Federal Financing Bank Act of 1973, $3,317,960,000.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, including purchase of not to exceed 812 vehicles for police-type use, of which 650 shall be for replacement only, and hire of passenger motor vehicles; hire of aircraft; services of expert witnesses at such rates as may be determined by the Director; for payment of per diem and/or subsistence allowances to employees where an assignment to the National Response Team during the investigation of a bombing or arson incident requires an employee to work 16 hours or more per day or to remain overnight at his or her post of duty; not to exceed $15,000 for official reception and representation expenses; for training of State and local law enforcement agencies with or without reimbursement, including training in connection with the training and acquisition of canines for explosives and fire accelerants detection; and provision of laboratory assistance to State and local agencies, with or without reimbursement; $541,574,000, of which $2,206,000 shall not be available for obligation until September 30, 1999; of which $27,000,000 may be used for the Youth Crime Gun Interdiction Initiative; of which not to exceed $1,000,000 shall be available for the payment of attorneys' fees as provided by 18 U.S.C. 924(d)(2); and of which $1,000,000 shall be available for the equipping of any vessel, vehicle, equipment, or aircraft available for official use by a State or local law enforcement agency if the conveyance will be used in joint law enforcement operations with the Bureau of Alcohol, Tobacco and Firearms and for the payment of overtime salaries, travel, fuel, training, equipment, and other similar costs of State and local law enforcement personnel, including sworn officers and support personnel, that are incurred in joint operations with the Bureau of Alcohol, Tobacco and Firearms: *Provided,* That no funds made available by this or any other Act may be used to transfer the functions, missions, or activities of the Bureau of Alcohol, Tobacco and Firearms to other agencies or Departments in fiscal year 1999: *Provided further,* That of the funds made available, $4,500,000 shall be made available for the expansion of the National Tracing Center: *Provided further,* That no funds appropriated herein shall be available for salaries or administrative expenses in connection with consolidating or centralizing, within the Department of the Treasury, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees: *Provided further,* That no funds appropriated herein shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to implement an amendment or amendments to 27 CFR 178.118 or to change the definition of "Curios or relics" in 27 CFR 178.11 or remove any item from ATF Publication 5300.11 as it existed on January 1, 1994: *Provided further,* That none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c): *Provided further,* That such funds shall be available to investigate and act upon applications filed by corporations for relief from Federal firearms disabilities under 18 U.S.C. 925(c): *Provided further,* That no funds in this Act may be used to provide ballistics imaging equipment to any State or local authority who has obtained similar equipment through a Federal grant or subsidy unless the State or local authority agrees to return that equipment or to repay that grant or subsidy to the Federal Government: *Provided further,* That no funds under this Act may be used to electronically retrieve information gathered pursuant to 18 U.S.C. 923(g)(4) by name or any personal identification code.

## UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the United States Customs Service, including purchase and lease of up to 1,050 motor vehicles of which 550 are for replacement only and of which 1,030 are for police-type use and commercial operations; hire of motor vehicles; contracting with individuals for personal services abroad; not to exceed $40,000 for official reception and representation expenses; and awards of compensation to informers, as authorized by any Act enforced by the United States Customs Service, $1,642,565,000, of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (19 U.S.C. 58c(f) (3)), shall be derived from that Account; of the total, not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations, not to exceed $4,000,000 shall be available until expended for research, not to exceed $5,000,000 shall be available until expended for conducting special operations pursuant to 19 U.S.C. 2081, and up to $8,000,000

shall be available until expended for the procurement of automation infrastructure items, including hardware, software, and installation: *Provided*, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: *Provided further*, That of the amount provided, an additional $2,400,000 shall be made available for staffing and resources for the child pornography cyber-smuggling initiative: *Provided further*, That $500,000 shall be available to fund the expansion of services at the Vermont World Trade Office: *Provided further*, That not to exceed $2,500,000 shall be available until expended for relocation of the Customs Air Branch from Belle Chase to Hammond, Louisiana: *Provided further*, That notwithstanding any other provision of law, the fiscal year aggregate overtime limitation prescribed in subsection 5(c)(1) of the Act of February 13, 1911 (19 U.S.C. 261 and 267) shall be $30,000: *Provided further*, That of the amount provided, $9,500,000 shall not be available for obligation until September 30, 1999.

OPERATION, MAINTENANCE AND PROCUREMENT, AIR AND MARINE INTERDICTION PROGRAMS

For expenses, not otherwise provided for, necessary for the operation and maintenance of marine vessels, aircraft, and other related equipment of the Air and Marine Programs, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include the following: the interdiction of narcotics and other goods; the provision of support to Customs and other Federal, State, and local agencies in the enforcement or administration of laws enforced by the Customs Service; and, at the discretion of the Commissioner of Customs, the provision of assistance to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts, $113,688,000, which shall remain available until expended: *Provided*, That no aircraft or other related equipment, with the exception of aircraft which is one of a kind and has been identified as excess to Customs requirements and aircraft which has been damaged beyond repair, shall be transferred to any other Federal agency, department, or office outside of the Department of the Treasury, during fiscal year 1999 without the prior approval of the Committees on Appropriations.

HARBOR MAINTENANCE FEE COLLECTION

(INCLUDING TRANSFER OF FUNDS)

For administrative expenses related to the collection of the Harbor Maintenance Fee, pursuant to Public Law 103–182, $3,000,000, to be derived from the Harbor Maintenance Trust Fund and to be transferred to and merged with the Customs "Salaries and Expenses" account for such purposes.

BUREAU OF THE PUBLIC DEBT

ADMINISTERING THE PUBLIC DEBT

<< 31 USCA § 306 NOTE >>

For necessary expenses connected with any public-debt issues of the United States, $176,500,000, of which not to exceed $2,500 shall be available for official reception and representation expenses, and of which not to exceed $2,000,000 shall remain available until September 30, 2001, for information systems modernization initiatives: *Provided*, That the sum appropriated herein from the General Fund for fiscal year 1999 shall be reduced by not more than $4,400,000 as definitive security issue fees and Treasury Direct Investor Account Maintenance fees are collected, so as to result in a final fiscal year 1999 appropriation from the General Fund estimated at $172,100,000, and in addition, $20,000, to be derived from the Oil Spill Liability Trust Fund to reimburse the Bureau for administrative and personnel expenses for financial management of the Fund, as authorized by section 102 of Public Law 101–380: *Provided further*, That notwithstanding any other provisions of law, effective upon enactment and thereafter, the Bureau of the Public Debt shall be fully and directly reimbursed by the funds described in section 104 of Public Law 101–136 (103 Stat. 789) for costs and services performed by the Bureau in the administration of such funds.

INTERNAL REVENUE SERVICE

PROCESSING, ASSISTANCE, AND MANAGEMENT

For necessary expenses of the Internal Revenue Service for tax returns processing; revenue accounting; tax law and account assistance to taxpayers by telephone and correspondence; programs to match information returns and tax returns; management

services; rent and utilities; and inspection; including purchase (not to exceed 150 for replacement only for police-type use) and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner; $3,086,208,000, of which up to $3,700,000 shall be for the Tax Counseling for the Elderly Program, and of which not to exceed $25,000 shall be for official reception and representation expenses: *Provided*, That of the amount provided, $105,000,000 shall remain available until expended for postage and shall not be obligated before September 30, 1999: *Provided further*, That, pursuant to 39 U.S.C. 3206(a), funds shall continue to be provided to the United States Postal Service for postage due: *Provided further*, That of the amount provided, $25,000,000 shall not be available for obligation until September 30, 1999.

## TAX LAW ENFORCEMENT

For necessary expenses of the Internal Revenue Service for determining and establishing tax liabilities; providing litigation support; issuing technical rulings; examining employee plans and exempt organizations; conducting criminal investigation and enforcement activities; securing unfiled tax returns; collecting unpaid accounts; compiling statistics of income and conducting compliance research; purchase (for police-type use, not to exceed 850) and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner, $3,164,189,000.

## EARNED INCOME TAX CREDIT COMPLIANCE INITIATIVE

For funding essential earned income tax credit compliance and error reduction initiatives pursuant to section 5702 of the Balanced Budget Act of 1997 (Public Law 105–33), $143,000,000, of which not to exceed $10,000,000 may be used to reimburse the Social Security Administration for the costs of implementing section 1090 of the Taxpayer Relief Act of 1997.

## INFORMATION SYSTEMS

For necessary expenses of the Internal Revenue Service for information systems and telecommunications support, including developmental information systems and operational information systems; the hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner, $1,265,456,000, which shall remain available until September 30, 2000, and of which $103,000,000 shall be available only for improvements to customer service.

## INFORMATION TECHNOLOGY INVESTMENTS

For necessary expenses of the Internal Revenue Service, $211,000,000, to remain available until September 30, 2002, for the capital asset acquisition of information technology systems, including management and related contractual costs of such acquisition, and including contractual costs associated with operations authorized by 5 U.S.C. 3109: *Provided*, That none of these funds is available for obligation until September 30, 1999: *Provided further*, That none of these funds shall be obligated until the Internal Revenue Service and the Department of the Treasury submit to Congress for approval, a plan for expenditure that: (1) implements the Internal Revenue Service's Modernization Blueprint submitted to Congress on May 15, 1997; (2) meets the information systems investment guidelines established by the Office of Management and Budget and in the fiscal year 1998 budget; (3) is reviewed and approved by the Office of Management and Budget, the Department of the Treasury's IRS Management Board, and is reviewed by the General Accounting Office; (4) meets the requirements of the May 15, 1997 Internal Revenue Service's Systems Life Cycle program; and (5) is in compliance with acquisition rules, requirements, guidelines, and systems acquisition management practices of the Federal Government.

## ADMINISTRATIVE PROVISIONS—INTERNAL REVENUE SERVICE

SECTION 101. Not to exceed 5 percent of any appropriation made available in this Act to the Internal Revenue Service may be transferred to any other Internal Revenue Service appropriation upon the advance approval of the House and Senate Committees on Appropriations.

<< 26 USCA § 7803 NOTE >>

SEC. 102. The Internal Revenue Service shall maintain a training program to ensure that Internal Revenue Service employees are trained in taxpayers' rights, in dealing courteously with the taxpayers, and in cross-cultural relations.

SEC. 103. The funds provided in this Act for the Internal Revenue Service shall be used to provide, as a minimum, the fiscal year 1995 level of service, staffing, and funding for Taxpayer Services.

SEC. 104. None of the funds appropriated by this title shall be used in connection with the collection of any underpayment of any tax imposed by the Internal Revenue Code of 1986 unless the conduct of officers and employees of the Internal Revenue Service in connection with such collection, including any private sector employees under contract to the Internal Revenue Service, complies with subsection (a) of section 805 (relating to communications in connection with debt collection), and section 806 (relating to harassment or abuse), of the Fair Debt Collection Practices Act (15 U.S.C. 1692).

<< 26 USCA § 6103 NOTE >>

SEC. 105. The Internal Revenue Service shall institute and enforce policies and procedures which will safeguard the confidentiality of taxpayer information.

SEC. 106. Funds made available by this or any other Act to the Internal Revenue Service shall be available for improved facilities and increased manpower to provide sufficient and effective 1–800 help line for taxpayers. The Commissioner shall continue to make the improvement of the Internal Revenue Service 1–800 help line service a priority and allocate resources necessary to increase phone lines and staff to improve the Internal Revenue Service 1–800 help line service.

SEC. 107. Notwithstanding any other provision of law, no reorganization of the field office structure of the Internal Revenue Service Criminal Investigation Division will result in a reduction of criminal investigators in Wisconsin and South Dakota from the 1996 level.

## UNITED STATES SECRET SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the United States Secret Service, including purchase of not to exceed 739 vehicles for police-type use, of which 675 shall be for replacement only, and hire of passenger motor vehicles; hire of aircraft; training and assistance requested by State and local governments, which may be provided without reimbursement; services of expert witnesses at such rates as may be determined by the Director; rental of buildings in the District of Columbia, and fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; for payment of per diem and/or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee require an employee to work 16 hours per day or to remain overnight at his or her post of duty; the conducting of and participating in firearms matches; presentation of awards; for travel of Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act if approval is obtained in advance from the Committees on Appropriations; for research and development; for making grants to conduct behavioral research in support of protective research and operations; not to exceed $20,000 for official reception and representation expenses; not to exceed $50,000 to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; for payment in advance for commercial accommodations as may be necessary to perform protective functions; and for uniforms without regard to the general purchase price limitation for the current fiscal year, $600,302,000: *Provided*, That $18,000,000 provided for protective travel shall remain available until September 30, 2000; *Provided further*, That of the amount provided, $5,000,000 shall not be available for obligation until September 30, 1999.

### ACQUISITION, CONSTRUCTION, IMPROVEMENT, AND RELATED EXPENSES

For necessary expenses of construction, repair, alteration, and improvement of facilities, $8,068,000, to remain available until expended.

### GENERAL PROVISIONS—DEPARTMENT OF THE TREASURY

SEC. 110. Any obligation or expenditure by the Secretary of the Treasury in connection with law enforcement activities of a Federal agency or a Department of the Treasury law enforcement organization in accordance with 31 U.S.C. 9703(g)(4)(B) from unobligated balances remaining in the Fund on September 30, 1999, shall be made in compliance with reprogramming guidelines.

SEC. 111. Appropriations to the Department of the Treasury in this Act shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901), including maintenance, repairs, and cleaning; purchase of insurance for official motor

vehicles operated in foreign countries; purchase of motor vehicles without regard to the general purchase price limitations for vehicles purchased and used overseas for the current fiscal year; entering into contracts with the Department of State for the furnishing of health and medical services to employees and their dependents serving in foreign countries; and services authorized by 5 U.S.C. 3109.

SEC. 112. The funds provided to the Bureau of Alcohol, Tobacco and Firearms for fiscal year 1999 in this Act for the enforcement of the Federal Alcohol Administration Act shall be expended in a manner so as not to diminish enforcement efforts with respect to section 105 of the Federal Alcohol Administration Act.

SEC. 113. Not to exceed 2 percent of any appropriations in this Act made available to the Federal Law Enforcement Training Center, Financial Crimes Enforcement Network, Bureau of Alcohol, Tobacco and Firearms, United States Customs Service, and United States Secret Service may be transferred between such appropriations upon the advance approval of the Committees on Appropriations. No transfer may increase or decrease any such appropriation by more than 2 percent.

SEC. 114. Not to exceed 2 percent of any appropriations in this Act made available to the Departmental Offices, Office of Inspector General, Financial Management Service, and Bureau of the Public Debt, may be transferred between such appropriations upon the advance approval of the Committees on Appropriations. No transfer may increase or decrease any such appropriation by more than 2 percent.

<< 18 USCA § 921 >>

SEC. 115. Section 921(a) of title 18, United States Code, is amended—

<< 18 USCA § 921 >>

(1) in paragraph (5), by striking "the explosive in a fixed shotgun shell" and inserting "an explosive";

<< 18 USCA § 921 >>

(2) in paragraph (7), by striking "the explosive in a fixed metallic cartridge" and inserting "an explosive"; and

<< 18 USCA § 921 >>

(3) by striking paragraph (16) and inserting the following:

"(16) The term 'antique firearm' means—

"(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or

"(B) any replica of any firearm described in subparagraph (A) if such replica—

"(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

"(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

"(C) any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term 'antique firearm' shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.".

SEC. 116. Of the funds available for the purchase of law enforcement vehicles, no funds may be obligated until the Secretary of the Treasury certifies that the purchase by the respective Treasury bureau is consistent with the vehicle management principles: *Provided*, That the Secretary may delegate this authority to the Assistant Secretary for Management.

<< 28 USCA § 1610 >>

SEC. 117. EXCEPTION TO IMMUNITY FROM ATTACHMENT OR EXECUTION. (a) Section 1610 of title 28, United States Code, is amended by adding at the end the following new subsection:

"(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7).

"(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

"(2)(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7), the Secretary of the Treasury and the Secretary of State shall fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

"(B) In providing such assistance, the Secretaries—

"(i) may provide such information to the court under seal; and

"(ii) shall provide the information in a manner sufficient to allow the court to direct the United States Marshal's office to promptly and effectively execute against that property.".

<< 28 USCA § 1606 >>

(b) CONFORMING AMENDMENT.—Section 1606 of title 28, United States Code, is amended by inserting after "punitive damages" the following: ", except any action under section 1605(a)(7) or 1610(f)".

<< 28 USCA § 1610 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall apply to any claim for which a foreign state is not immune under section 1605(a)(7) of title 28, United States Code, arising before, on, or after the date of enactment of this Act.

<< 28 USCA § 1610 NOTE >>

(d) WAIVER.—The President may waive the requirements of this section in the interest of national security.

This title may be cited as the "Treasury Department Appropriations Act, 1999".

TITLE II—POSTAL SERVICE

PAYMENTS TO THE POSTAL SERVICE FUND

<< 39 USCA § 403 NOTE >>

For payment to the Postal Service Fund for revenue forgone on free and reduced rate mail, pursuant to subsections (c) and (d) of section 2401 of title 39, United States Code, $71,195,000, which shall remain available until September 30, 2000: *Provided*, That none of the funds provided shall be available for obligation until October 1, 1999: *Provided further*, That mail for overseas voting and mail for the blind shall continue to be free: *Provided further*, That 6-day delivery and rural delivery of mail shall continue at not less than the 1983 level: *Provided further*, That none of the funds made available to the Postal Service by this Act shall be used to implement any rule, regulation, or policy of charging any officer or employee of any State or local child support enforcement agency, or any individual participating in a State or local program of child support enforcement, a fee for information requested or provided concerning an address of a postal customer: *Provided further*, That none of the funds provided in this Act shall be used to consolidate or close small rural and other small post offices in the fiscal year ending on September 30, 1999.

This title may be cited as the "Postal Service Appropriations Act, 1999".

TITLE III—EXECUTIVE OFFICE OF THE PRESIDENT AND FUNDS APPROPRIATED TO THE PRESIDENT

AR.02720

COMPENSATION OF THE PRESIDENT AND THE WHITE HOUSE OFFICE

COMPENSATION OF THE PRESIDENT

<< 3 USCA § 102 NOTE >>

For compensation of the President, including an expense allowance at the rate of $50,000 per annum as authorized by 3 U.S.C. 102, $250,000: *Provided*, That none of the funds made available for official expenses shall be expended for any other purpose and any unused amount shall revert to the Treasury pursuant to section 1552 of title 31, United States Code: *Provided further*, That none of the funds made available for official expenses shall be considered as taxable to the President.

SALARIES AND EXPENSES

For necessary expenses for the White House as authorized by law, including not to exceed $3,850,000 for services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 105; subsistence expenses as authorized by 3 U.S.C. 105, which shall be expended and accounted for as provided in that section; hire of passenger motor vehicles, newspapers, periodicals, teletype news service, and travel (not to exceed $100,000 to be expended and accounted for as provided by 3 U.S.C. 103); and not to exceed $19,000 for official entertainment expenses, to be available for allocation within the Executive Office of the President, $52,344,000: *Provided*, That $10,100,000 of the funds appropriated shall be available for reimbursements to the White House Communications Agency.

EXECUTIVE RESIDENCE AT THE WHITE HOUSE

OPERATING EXPENSES

For the care, maintenance, repair and alteration, refurnishing, improvement, heating, and lighting, including electric power and fixtures, of the Executive Residence at the White House and official entertainment expenses of the President, $8,061,000, to be expended and accounted for as provided by 3 U.S.C. 105, 109, 110, and 112–114: *Provided*, That such amount shall not be available for expenses for domestic staff overtime.

In addition, for necessary expenses for domestic staff overtime, $630,000: *Provided*, That such amount shall not become available for obligation until the Comptroller General of the United States notifies the Committees on Appropriations that (1) the Executive Office of the President has received, reviewed, and commented on the draft report of the General Accounting Office with respect to its audit of the Executive Residence at the White House; and (2) the General Accounting Office has received the comments of the Executive Office of the President.

REIMBURSABLE EXPENSES

For the reimbursable expenses of the Executive Residence at the White House, such sums as may be necessary: *Provided*, That all reimbursable operating expenses of the Executive Residence shall be made in accordance with the provisions of this paragraph: *Provided further*, That, notwithstanding any other provision of law, such amount for reimbursable operating expenses shall be the exclusive authority of the Executive Residence to incur obligations and to receive offsetting collections, for such expenses: *Provided further*, That the Executive Residence shall require each person sponsoring a reimbursable political event to pay in advance an amount equal to the estimated cost of the event, and all such advance payments shall be credited to this account and remain available until expended: *Provided further*, That the Executive Residence shall require the national committee of the political party of the President to maintain on deposit $25,000, to be separately accounted for and available for expenses relating to reimbursable political events sponsored by such committee during such fiscal year: *Provided further*, That the Executive Residence shall ensure that a written notice of any amount owed for a reimbursable operating expense under this paragraph is submitted to the person owing such amount within 60 days after such expense is incurred, and that such amount is collected within 30 days after the submission of such notice: *Provided further*, That the Executive Residence shall charge interest and assess penalties and other charges on any such amount that is not reimbursed within such 30 days, in accordance with the interest and penalty provisions applicable to an outstanding debt on a United States Government claim under section 3717 of title 31, United States Code: *Provided further*, That each such amount that is reimbursed, and any accompanying interest and charges, shall be deposited in the Treasury as miscellaneous receipts: *Provided further*, That the Executive Residence shall prepare and submit to the Committees on Appropriations, by not later than 90 days after the end of the fiscal year covered by this Act, a

report setting forth the reimbursable operating expenses of the Executive Residence during the preceding fiscal year, including the total amount of such expenses, the amount of such total that consists of reimbursable official and ceremonial events, the amount of such total that consists of reimbursable political events, and the portion of each such amount that has been reimbursed as of the date of the report: *Provided further*, That the Executive Residence shall maintain a system for the tracking of expenses related to reimbursable events within the Executive Residence that includes a standard for the classification of any such expense as political or nonpolitical: *Provided further*, That no provision of this paragraph may be construed to exempt the Executive Residence from any other applicable requirement of subchapter I or II of chapter 37 of title 31, United States Code.

## SPECIAL ASSISTANCE TO THE PRESIDENT AND THE OFFICIAL RESIDENCE OF THE VICE PRESIDENT

### SALARIES AND EXPENSES

For necessary expenses to enable the Vice President to provide assistance to the President in connection with specially assigned functions; services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 106, including subsistence expenses as authorized by 3 U.S.C. 106, which shall be expended and accounted for as provided in that section; and hire of passenger motor vehicles, $3,512,000.

### OPERATING EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For the care, operation, refurnishing, improvement, heating, and lighting, including electric power and fixtures, of the official residence of the Vice President; the hire of passenger motor vehicles; and not to exceed $90,000 for official entertainment expenses of the Vice President, to be accounted for solely on his certificate, $334,000: *Provided*, That advances or repayments or transfers from this appropriation may be made to any department or agency for expenses of carrying out such activities.

## COUNCIL OF ECONOMIC ADVISERS

### SALARIES AND EXPENSES

For necessary expenses of the Council in carrying out its functions under the Employment Act of 1946 (15 U.S.C. 1021), $3,666,000.

## OFFICE OF POLICY DEVELOPMENT

### SALARIES AND EXPENSES

For necessary expenses of the Office of Policy Development, including services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 107, $4,032,000.

## NATIONAL SECURITY COUNCIL

### SALARIES AND EXPENSES

For necessary expenses of the National Security Council, including services as authorized by 5 U.S.C. 3109, $6,806,000.

## OFFICE OF ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Office of Administration, including services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 107, and hire of passenger motor vehicles, $28,350,000.

## OFFICE OF MANAGEMENT AND BUDGET

### SALARIES AND EXPENSES

For necessary expenses of the Office of Management and Budget (OMB), including hire of passenger motor vehicles and services as authorized by 5 U.S.C. 3109, $60,617,000, of which not to exceed $5,000,000 shall be available to carry out the provisions of chapter 35 of title 44, United States Code: *Provided*, That, as provided in 31 U.S.C. 1301(a), appropriations shall be applied only to the objects for which appropriations were made except as otherwise provided by law: *Provided further*,

That none of the funds appropriated in this Act for the Office of Management and Budget may be used for the purpose of reviewing any agricultural marketing orders or any activities or regulations under the provisions of the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. 601 et seq.): *Provided further*, That none of the funds made available for the Office of Management and Budget by this Act may be expended for the altering of the transcript of actual testimony of witnesses, except for testimony of officials of the Office of Management and Budget, before the Committees on Appropriations or the Committees on Veterans' Affairs or their subcommittees: *Provided further*, That the preceding shall not apply to printed hearings released by the Committees on Appropriations or the Committees on Veterans' Affairs: *Provided further*, That the Director of OMB amends Section —.36 of OMB Circular A–110 to require Federal awarding agencies to ensure that all data produced under an award will be made available to the public through the procedures established under the Freedom of Information Act: *Provided further*, That if the agency obtaining the data does so solely at the request of a private party, the agency may authorize a reasonable user fee equaling the incremental cost of obtaining the data: *Provided further*, That OMB is directed to submit a report by March 31, 1999, to the Committees on Appropriations, the Senate Committee on Governmental Affairs, and the House Committee on Government Reform and Oversight that: (1) identifies specific paperwork reduction accomplishments expected, constituting annual five percent reductions in paperwork expected in fiscal year 1999 and fiscal year 2000; and (2) issues guidance on the requirements of 5 U.S.C. Sec. 801(a)(1) and (3); sections 804(3), and 808(2), including a standard new rule reporting form for use under section 801(a)(1)(A)–(B).

## OFFICE OF NATIONAL DRUG CONTROL POLICY

### SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

### << 21 USCA § 1702 NOTE >>

For necessary expenses of the Office of National Drug Control Policy; for research activities pursuant to title I of Public Law 100–690; not to exceed $8,000 for official reception and representation expenses; and for participation in joint projects or in the provision of services on matters of mutual interest with nonprofit, research, or public organizations or agencies, with or without reimbursement; $48,042,000, of which $30,100,000 shall remain available until expended, consisting of $1,100,000 for policy research and evaluation, and $16,000,000 for the Counterdrug Technology Assessment Center for counternarcotics research and development projects, and $13,000,000 for the continued operation of the technology transfer program: *Provided*, That the $16,000,000 for the Counterdrug Technology Assessment Center shall be available for transfer to other Federal departments or agencies: *Provided further*, That the Office is authorized to accept, hold, administer, and utilize gifts, both real and personal, public and private, without fiscal year limitation, for the purpose of aiding or facilitating the work of the Office.

### FEDERAL DRUG CONTROL PROGRAMS

### HIGH INTENSITY DRUG TRAFFICKING AREAS PROGRAM

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy's High Intensity Drug Trafficking Areas Program, $182,477,000 for drug control activities consistent with the approved strategy for each of the designated High Intensity Drug Trafficking Areas, of which no less than 51 percent shall be transferred to State and local entities for drug control activities, which shall be obligated within 120 days of the date of enactment of this Act: *Provided*, That funding shall be provided for existing High Intensity Drug Trafficking Areas at no less than the total fiscal year 1998 level consisting of funding from this account as well as the Violent Crime Reduction Trust Fund.

### SPECIAL FORFEITURE FUND

### (INCLUDING TRANSFER OF FUNDS)

For activities to support a national anti-drug campaign for youth, and other purposes, authorized by Public Law 100–690, as amended, $214,500,000, to remain available until expended: *Provided*, That such funds may be transferred to other Federal

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

departments and agencies to carry out such activities: *Provided further*, That of the funds provided, $185,000,000 shall be to support a national media campaign to reduce and prevent drug use among young Americans: *Provided further*, That none of the funds provided for the support of a national media campaign may be obligated for the following purposes: to supplant current anti-drug community based coalitions; to supplant current pro bono public service time donated by national and local broadcasting networks; for partisan political purposes; or to fund media campaigns that feature any elected officials, persons seeking elected office, cabinet-level officials, or other Federal officials employed pursuant to Schedule C of title 5, Code of Federal Regulations, section 213, absent advance notice to the Committees on Appropriations and the Senate Judiciary Committee: *Provided further*, That (1) ONDCP will require a pro bono match commitment up-front as part of its media buy from each and every seller of ad time and space, (2) ONDCP, or any agent acting on its behalf, may not obligate any funds for the creative development of advertisements from for-profit organizations, not including out-of-pocket production costs and talent re-use payments, unless (A) the advertisements are intended to reach a minority, ethnic or other special audience that cannot be obtained on a pro bono basis within the time frames required by ONDCP's advertising and buying agencies, and (B) ONDCP receives prior approval from the Committees on Appropriations, (3) ONDCP will submit within three months of enactment of this Act an implementation plan to the Committees on Appropriations to secure corporate sponsorship equaling 40 percent of the appropriated amount in fiscal year 1999, the definition of which is a contribution that is not received as a result of leveraging funds to receive said sponsorship, corporate sponsorship equaling 60 percent of the appropriated amount in fiscal year 2000, corporate sponsorship equaling 80 percent of the appropriated amount in fiscal year 2001, corporate sponsorship equaling 100 percent of the appropriated amount in fiscal year 2002, (4) the funds provided for the support of a national media campaign may be used to fund the purchase of media time and space, talent re-use payments, out-of-pocket advertising production costs, testing and evaluation of advertising, evaluation of the effectiveness of the media campaign, the negotiated fees for the winning bidder on the request for proposal recently issued by ONDCP, partnership with community, civic, and professional groups, and government organizations related to the media campaign, entertainment industry collaborations to fashion anti-drug messages in movies, television programming, and popular music, interactive (Internet and new) media projects/activities, public information (News Media Outreach), and corporate sponsorship/participation, (5) ONDCP shall not obligate funds provided for the national media campaign for fiscal year 1999 until ONDCP has submitted the evaluation and results of Phase I of the campaign to the Committees on Appropriations, and may obligate not more than 75 percent of these funds until ONDCP has submitted the evaluation and results of Phase II of the campaign to the Committees on Appropriations, and (6) ONDCP is required to report to the Committees on Appropriations not only quarterly, but also to provide monthly itemized reports of all expenditures and obligations relating to the media campaign as well as the specific parameters of the national media campaign, and shall report to Congress within one year on the effectiveness of the national media campaign based upon the measurable outcomes provided to Congress previously: *Provided further*, That of the funds provided, $4,500,000 shall be available for transfer to the Agricultural Research Service for anti-drug research and related matters: *Provided further*, That of the funds provided, $20,000,000 shall be to continue a program of matching grants to drug-free communities, as authorized in the Drug–Free Communities Act of 1997: *Provided further*, That of the funds provided, $5,000,000 shall be available for the chronic users study.

### UNANTICIPATED NEEDS

For expenses necessary to enable the President to meet unanticipated needs, in furtherance of the national interest, security, or defense which may arise at home or abroad during the current fiscal year, $1,000,000.

This title may be cited as the "Executive Office Appropriations Act, 1999".

### TITLE IV—INDEPENDENT AGENCIES

### COMMITTEE FOR PURCHASE FROM PEOPLE WHO ARE BLIND OR SEVERELY DISABLED

### SALARIES AND EXPENSES

For necessary expenses of the Committee for Purchase From People Who Are Blind or Severely Disabled established by the Act of June 23, 1971, Public Law 92–28, $2,464,000.

### FEDERAL ELECTION COMMISSION

### SALARIES AND EXPENSES

For necessary expenses to carry out the provisions of the Federal Election Campaign Act of 1971, as amended, $36,500,000, of which no less than $4,402,500 shall be available for internal automated data processing systems, and of which not to exceed $5,000 shall be available for reception and representation expenses: *Provided*, That of the amounts appropriated for salaries and expenses, $1,120,000 may not be obligated until the Federal Election Commission submits a plan for approval to the House Committee on Appropriations for the expenditure of such funds.

## FEDERAL LABOR RELATIONS AUTHORITY

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Federal Labor Relations Authority, pursuant to Reorganization Plan Numbered 2 of 1978, and the Civil Service Reform Act of 1978, including services authorized by 5 U.S.C. 3109, including hire of experts and consultants, hire of passenger motor vehicles, and rental of conference rooms in the District of Columbia and elsewhere, $22,586,000: *Provided*, That public members of the Federal Service Impasses Panel may be paid travel expenses and per diem in lieu of subsistence as authorized by law (5 U.S.C. 5703) for persons employed intermittently in the Government service, and compensation as authorized by 5 U.S.C. 3109: *Provided further*, That notwithstanding 31 U.S.C. 3302, funds received from fees charged to non-Federal participants at labor-management relations conferences shall be credited to and merged with this account, to be available without further appropriation for the costs of carrying out these conferences.

## GENERAL SERVICES ADMINISTRATION

### FEDERAL BUILDINGS FUND

### LIMITATIONS ON AVAILABILITY OF REVENUE

### (INCLUDING TRANSFER OF FUNDS)

For additional expenses necessary to carry out the purpose of the Fund established pursuant to section 210(f) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)), $450,018,000 to be deposited into the Fund. The revenues and collections deposited into the Fund shall be available for necessary expenses of real property management and related activities not otherwise provided for, including operation, maintenance, and protection of federally owned and leased buildings; rental of buildings in the District of Columbia; restoration of leased premises; moving governmental agencies (including space adjustments and telecommunications relocation expenses) in connection with the assignment, allocation and transfer of space; contractual services incident to cleaning or servicing buildings, and moving; repair and alteration of federally owned buildings including grounds, approaches and appurtenances; care and safeguarding of sites; maintenance, preservation, demolition, and equipment; acquisition of buildings and sites by purchase, condemnation, or as otherwise authorized by law; acquisition of options to purchase buildings and sites; conversion and extension of federally owned buildings; preliminary planning and design of projects by contract or otherwise; construction of new buildings (including equipment for such buildings); and payment of principal, interest, and any other obligations for public buildings acquired by installment purchase and purchase contract; in the aggregate amount of $5,605,018,000, of which: (1) $492,190,000 shall remain available until expended for construction of additional projects at locations and at maximum construction improvement costs (including funds for sites and expenses and associated design and construction services) as follows:

  New construction:
  Arkansas:
    Little Rock, U.S. courthouse, $3,436,000
  California:
    San Diego, U.S. courthouse, $15,400,000
    San Jose, U.S. courthouse, $10,800,000
  Colorado:
    Denver, U.S. courthouse, $83,959,000
  District of Columbia:
    Southeast Federal Center remediation, $10,000,000
  Florida:

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Jacksonville, U.S. courthouse, $86,010,000
Orlando, U.S. courthouse, $1,930,000
Massachusetts:
Springfield, U.S. courthouse, $5,563,000
Michigan:
Sault Sainte Marie, border station, $572,000
Mississippi:
Biloxi–Gulfport, U.S. courthouse, $7,543,000
Missouri:
Cape Girardeau, U.S. courthouse, $2,196,000
Montana:
Babb, Piegan border station, $6,165,000
New York:
Brooklyn, U.S. courthouse, $152,626,000
New York, U.S. Mission to the United Nations, $3,163,000
Oregon:
Eugene, U.S. courthouse, $7,190,000
Tennessee:
Greenville, U.S. courthouse, $28,229,000
Texas:
Laredo, U.S. courthouse, $28,105,000
West Virginia:
Wheeling, U.S. courthouse, $29,303,000
Nationwide:
Non-prospectus, $10,000,000:

*Provided*, That each of the immediately foregoing limits of costs on new construction projects may be exceeded to the extent that savings are effected in other such projects, but not to exceed 10 percent unless advance approval is obtained from the Committees on Appropriations of a greater amount: *Provided further*, That notwithstanding any other provision of law in order to rescind a General Services Administration property sale, the General Services Administration is authorized to re-acquire that parcel of land on Block 111, East Denver, Denver, Colorado, which was sold at public auction by the Federal government to its present owner pursuant to paragraphs (6) and (7) of section 12 of Public Law 94–204 (43 U.S.C. 1611 note) at a price equivalent to the 1988 auction sale price plus the amount of cumulative consumer price index, pursuant to the methodology as used in Public Law 104–42, Sec. 107(a), from the closing date of the sale until the date of re-acquisition by the Federal government, offset by any net income received from the property by the present owner since the 1988 sale: *Provided further*, That the funds provided in Public Law 102–393 for Hilo, Hawaii, shall be expended for the planning and design of the Mauna Kea Astronomy Educational Center, notwithstanding Public Law 103–123, and of the funds provided not more than $475,000 is to be disbursed in this fiscal year: *Provided further*, That all funds for direct construction projects shall expire on September 30, 2000, and remain in the Federal Buildings Fund except for funds for projects as to which funds for design or other funds have been obligated in whole or in part prior to such date: *Provided further*, That of the funds provided for non-prospectus construction projects, $2,100,000 shall be available until expended for acquisition, lease, construction, and equipping of flexiplace telecommuting centers: *Provided further*, That from the funds made available under this heading in this or prior Acts of Congress, the Administrator of General Services may purchase at a price he determines appropriate, notwithstanding any other provision of law, property adjacent to the new courthouse currently under construction in Scranton, Pennsylvania; (2) $668,031,000 shall remain available until expended, for repairs and alterations which includes associated design and construction services: *Provided further*, That of the amount provided, $161,500,000 shall not be available for obligation until September 30, 1999: *Provided further*, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the amount by project as follows, except each project may be increased by an amount not to exceed 10 percent unless advance approval is obtained from the Committees on Appropriations of a greater amount:
Repairs and alterations:

AR.02726

California:

  San Francisco, Appraisers Building, $29,778,000

Colorado:

  Lakewood, Denver Federal Center, Building 25, $29,351,000

District of Columbia:

  Federal Office Building, 10B, $13,844,000

  Interstate Commerce Commission, Connecting Wing Complex, Customs Building, Phase 3/3, $83,959,000

  Old Executive Office Building, $25,210,000

  Department of State, Phase 1, $29,779,000

New York:

  Brookhaven, Internal Revenue Service, Service Center, $20,019,000

  New York, U.S. Courthouse, 40 Foley Square, $4,782,000

Pennsylvania:

  Philadelphia, Byrne–Green, Federal Building—U.S. Courthouse, $11,212,000

Virginia:

  Reston, J.W. Powell Building, $9,151,000

Nationwide:

  Chlorofluorocarbons Program, $25,000,000

  Energy Program, $25,000,000

  Design Program, $16,710,000

  Basic Repairs and Alteration, $344,236,000:

<< 40 USCA § 490i >>

<< 40 USCA § 872 NOTE >>

*Provided further*, That additional projects for which prospectuses have been fully approved may be funded under this category only if advance approval is obtained from the Committees on Appropriations: *Provided further*, That the amounts provided in this or any prior Act for "Repairs and Alterations" may be used to fund costs associated with implementing security improvements to buildings necessary to meet the minimum standards for security in accordance with current law and in compliance with the reprogramming guidelines of the appropriate Committees of the House and Senate: *Provided further*, That the difference between the funds appropriated and expended on any projects in this or any prior Act, under the heading "Repairs and Alterations", may be transferred to Basic Repairs and Alterations or used to fund authorized increases in prospectus projects: *Provided further*, That all funds for repairs and alterations prospectus projects shall expire on September 30, 2000, and remain in the Federal Buildings Fund except funds for projects as to which funds for design or other funds have been obligated in whole or in part prior to such date: *Provided further*, That of the amount provided, $100,000 shall be used to address the lighting issues at the Byrne–Green Federal Courthouse in Philadelphia, Pennsylvania: *Provided further*, That of the amount provided in this or any prior Act for Basic Repairs and Alterations, $1,600,000 shall be provided to complete the alterations required at the Milwaukee, Wisconsin Courthouse: *Provided further*, That of the amount provided in this or any prior Act for Basic Repairs and Alterations, $1,100,000 may be used to provide a new fence surrounding the Suitland Federal Complex in Suitland, Maryland: *Provided further*, That $5,700,000 of the funds provided under this heading in Public Law 103–329 for the Holtsville, New York, IRS Service Center shall remain available until September 30, 1999: *Provided further*, That the amount provided in this or any prior Act for Basic Repairs and Alterations may be used to pay claims against the Government arising from any projects under the heading "Repairs and Alterations" or used to fund authorized increases in prospectus projects; (3) $215,764,000 for installment acquisition payments including payments on purchase contracts which shall remain available until expended; (4) $2,583,261,000 for rental of space which shall remain available until expended: *Provided further*, That of the amount provided, $15,000,000 shall not be available for obligation until September 30, 1999; and (5) $1,554,772,000 for building operations which shall remain available until expended: *Provided further*, That of the amount provided $68,000,000 shall not be available for obligation until September 30, 1999: *Provided further*, That funds available to the General Services Administration shall not be available for expenses of any construction, repair, alteration and acquisition project for which a prospectus, if required

by the Public Buildings Act of 1959, as amended, has not been approved, except that necessary funds may be expended for each project for required expenses for the development of a proposed prospectus: *Provided further*, That for the purposes of this authorization, and hereafter, buildings constructed pursuant to the purchase contract authority of the Public Buildings Amendments of 1972 (40 U.S.C. 602a), buildings occupied pursuant to installment purchase contracts, and buildings under the control of another department or agency where alterations of such buildings are required in connection with the moving of such other department or agency from buildings then, or thereafter to be, under the control of the General Services Administration shall be considered to be federally owned buildings: *Provided further*, That funds available in the Federal Buildings Fund may be expended for emergency repairs when advance approval is obtained from the Committees on Appropriations: *Provided further*, That amounts necessary to provide reimbursable special services to other agencies under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)(6)) and amounts to provide such reimbursable fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control as may be appropriate to enable the United States Secret Service to perform its protective functions pursuant to 18 U.S.C. 3056, shall be available from such revenues and collections: *Provided further*, That the remaining balances and associated assets and liabilities of the Pennsylvania Avenue Activities account are hereby transferred to the Federal Buildings Fund to be effective October 1, 1998, and that all income earned after that effective date that would otherwise have been deposited to the Pennsylvania Avenue Activities account shall thereafter be deposited to the Federal Buildings Fund, to be available for the purposes authorized by Public Laws 104–134 and 104–208, notwithstanding subsection 210(f)(2) of the Federal Property and Administrative Services Act, as amended: *Provided further*, That of the amount provided, $475,000 shall be made available for the 1999 Women's World Cup Soccer event: *Provided further*, That of the amount provided, $600,000 shall be made available for the 1999 World Alpine Ski Championships: *Provided further*, That revenues and collections and any other sums accruing to this Fund during fiscal year 1999, excluding reimbursements under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490(f)(6)) in excess of $5,605,018,000 shall remain in the Fund and shall not be available for expenditure except as authorized in appropriations Acts.

## POLICY AND OPERATIONS

For expenses authorized by law, not otherwise provided for, for Government-wide policy and oversight activities associated with asset management activities; utilization and donation of surplus personal property; transportation; procurement and supply; Government-wide and internal responsibilities relating to automated data management, telecommunications, information resources management, and related technology activities; utilization survey, deed compliance inspection, appraisal, environmental and cultural analysis, and land use planning functions pertaining to excess and surplus real property; agency-wide policy direction; Board of Contract Appeals; accounting, records management, and other support services incident to adjudication of Indian Tribal Claims by the United States Court of Federal Claims; services as authorized by 5 U.S.C. 3109; and not to exceed $5,000 for official reception and representation expenses; $109,594,000: *Provided*, That none of the funds appropriated from this Act shall be available to convert the Old Post Office at 1100 Pennsylvania Avenue in Northwest Washington, D.C., from office use to any other use until a comprehensive plan, which shall include street-level retail use, has been approved by the Senate Committee on Appropriations, the House Committee on Transportation and Infrastructure, and the Senate Committee on Environment and Public Works: *Provided further*, That no funds from this Act shall be available to acquire by purchase, condemnation, or otherwise the leasehold rights of the existing lease with private parties at the Old Post Office prior to the approval of the comprehensive plan by the Senate Committee on Appropriations, the House Committee on Transportation and Infrastructure, and the Senate Committee on Environment and Public Works: *Provided further*, That $100,000 is provided to the property disposal activity for the Racine, Wisconsin, property transfer identified in General Services Administration General Provision section 409.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General and services authorized by 5 U.S.C. 3109, $32,000,000: *Provided*, That not to exceed $10,000 shall be available for payment for information and detection of fraud against the Government, including payment for recovery of stolen Government property: *Provided further*, That not to exceed $2,500 shall be available for awards to employees of other Federal agencies and private citizens in recognition of efforts and initiatives resulting in enhanced Office of Inspector General effectiveness.

AR.02728

## ALLOWANCES AND OFFICE STAFF FOR FORMER PRESIDENTS

### (INCLUDING TRANSFER OF FUNDS)

For carrying out the provisions of the Act of August 25, 1958, as amended (3 U.S.C. 102 note), and Public Law 95–138, $2,241,000: *Provided*, That the Administrator of General Services shall transfer to the Secretary of the Treasury such sums as may be necessary to carry out the provisions of such Acts.

### GENERAL PROVISIONS—GENERAL SERVICES ADMINISTRATION

SEC. 401. The appropriate appropriation or fund available to the General Services Administration shall be credited with the cost of operation, protection, maintenance, upkeep, repair, and improvement, included as part of rentals received from Government corporations pursuant to law (40 U.S.C. 129).

SEC. 402. Funds available to the General Services Administration shall be available for the hire of passenger motor vehicles.

SEC. 403. Funds in the Federal Buildings Fund made available for fiscal year 1999 for Federal Buildings Fund activities may be transferred between such activities only to the extent necessary to meet program requirements: *Provided*, That any proposed transfers shall be approved in advance by the Committees on Appropriations.

SEC. 404. No funds made available by this Act shall be used to transmit a fiscal year 2000 request for United States Courthouse construction that: (1) does not meet the design guide standards for construction as established and approved by the General Services Administration, the Judicial Conference of the United States, and the Office of Management and Budget; and (2) does not reflect the priorities of the Judicial Conference of the United States as set out in its approved 5-year construction plan: *Provided*, That the fiscal year 2000 request must be accompanied by a standardized courtroom utilization study of each facility to be constructed, replaced, or expanded.

SEC. 405. None of the funds provided in this Act may be used to increase the amount of occupiable square feet, provide cleaning services, security enhancements, or any other service usually provided through the Federal Buildings Fund, to any agency which does not pay the rate per square foot assessment for space and services as determined by the General Services Administration in compliance with the Public Buildings Amendments Act of 1972 (Public Law 92–313).

SEC. 406. Funds provided to other Government agencies by the Information Technology Fund, General Services Administration, under 40 U.S.C. 757 and sections 5124(b) and 5128 of Public Law 104–106, Information Technology Management Reform Act of 1996, for performance of pilot information technology projects which have potential for Government-wide benefits and savings, may be repaid to this Fund from any savings actually incurred by these projects or other funding, to the extent feasible.

SEC. 407. From funds made available under the heading "Federal Buildings Fund Limitations on Revenue", claims against the Government of less than $250,000 arising from direct construction projects and acquisition of buildings may be liquidated from savings effected in other construction projects with prior notification to the Committees on Appropriations.

SEC. 408. From the funds made available under the heading "Federal Buildings Fund Limitations on Revenue", in addition to amounts provided in budget activities above, up to $5,000,000 shall be available for the demolition, cleanup and conveyance of the property at block 35 and lot 2 of block 36 in Anchorage, Alaska: *Provided*, That notwithstanding any other provision of law, the Administrator of General Services shall, not later than 18 months after the date of enactment of this Act, demolish and remove all buildings, structures and other fixtures on the property at block 35 and lot 2 of block 36, Anchorage Original Townsite East Addition, Anchorage, Alaska, excluding any portion dedicated for use by the Centers for Disease Control and Prevention: *Provided further*, That the remediation of said parcel shall include the removal of all asbestos, lead and any other contamination, and restoration of the property, to the extent practicable, to an undeveloped condition: *Provided further*, That upon completion of the activities required for the demolition and removal of buildings, and notwithstanding any other provision of law, the Administrator of General Services shall convey to the municipality of Anchorage, without reimbursement, all right, title, and interest of the United States to the property.

SEC. 409. The Administrator of General Services may convey to the City of Racine, Wisconsin, all right, title, and interest of the United States in and to a parcel of excess real property, including improvements thereon, that is located on 2310 Center Street, commencing at the intersection of the North line of 24th Street and the center line of Center Street, being the point of the beginning; thence Northerly along the center line of Center Street, 426 feet to the South line of 23rd Street extended East; thence Westerly along the South line of 23rd Street extended East; 325 feet to the West line of Franklin Street extended

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

South; thence southerly along the West line of Franklin Street extended South to a point on the North line of 24th Street; thence Easterly along the North line of 24th Street to the point of beginning located in Racine, Wisconsin, and which contains the U.S. Army Reserve Center.

SEC. 410. DEPARTMENT OF TRANSPORTATION HEADQUARTERS. (a) IN GENERAL.—The Administrator of General Services shall—

(1) enter into an operating lease to acquire space for the Department of Transportation headquarters; and

(2) commence procurement of the lease not later than November 1, 1998:

*Provided,* That the annual rent payment does not exceed $55,000,000.

(b) TERMS.—The authority granted in subsection (a) is effective only to the extent that the lease acquisition meets the guidelines for operating leases set forth in the joint statement of the managers for the conference report to the Balanced Budget Agreement of 1997, as determined by the Director of the Office of Management and Budget.

SEC. 411. Notwithstanding any other provision of law, the requirement under section 407 of Public Law 104–208 (110 Stat. 3009–337–38), that the Administrator of General Services charge user fees for flexiplace telecommuting centers that approximate commercial charges for comparable space and services but in no instance less than the amount necessary to pay the cost of establishing and operating such centers, shall not apply to the user fees charged for the period beginning October 1, 1996, and ending September 30, 1998, for the telecommuting centers established as part of a pilot telecommuting demonstration program in the Washington, D.C. metropolitan area by Public Laws 102–393, 103–123, 103–329, 104–52, and 104–208: *Provided*, That for these centers in the pilot demonstration program for the period beginning October 1, 1998, and ending September 30, 2000, the Administrator shall charge fees for Federal agency use of a telecenter based on 50 percent of the Administrator's annual costs of operating the center, including the reasonable cost of replacement for furniture, fixtures, and equipment: *Provided further*, That effective October 1, 2000, the Administrator shall charge fees for Federal agency use of the demonstration telecommuting centers based on 100 percent of the annual operating costs, including the reasonable cost of replacement for furniture, fixtures, and equipment: *Provided further*, That, to the extent such user charges do not cover the Administrator's costs in operating these centers, appropriations to the General Services Administration are authorized to reimburse the Federal Buildings Fund for any loss of revenue.

SEC. 412. (a) AUTHORITY TO CONVEY.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the Administrator of General Services shall convey to the University of Miami, by negotiated sale or by negotiated land exchange and by not later than September 30, 1999, all right, title, and interest of the United States in and to the property described in paragraph (2).

(2) PROPERTY DESCRIBED.—The property referred to in paragraph (1) is real property in Miami–Dade County, Florida, including improvements thereon, comprising the Federal facility known as the United States Naval Observatory/Alternate Time Service Laboratory, consisting of approximately 76 acres. The exact acreage and legal description of the property shall be determined by a survey that is satisfactory to the Administrator.

(b) CONDITION REGARDING USE.—Any conveyance under subsection (a) shall be subject to the condition that during the 10-year period beginning on the date of the conveyance, the University shall use the property, or provide for use of the property, only for—

(1) a research, education, and training facility complementary to longstanding national research missions, subject to such incidental exceptions as may be approved by the Administrator;

(2) research-related purposes other than the use specified in paragraph (1), under an agreement entered into by the Administrator and the University; or

(3) a combination of uses described in paragraph (1) and paragraph (2), respectively.

(c) ADDITIONAL TERMS AND CONDITIONS.—The Administrator may require such additional terms and conditions with respect to the conveyance under subsection (a) as the Administrator considers appropriate to protect the interests of the United States.

(d) REVERSION.—If the Administrator determines at any time that the property conveyed under subsection (a) is not being used in accordance with this section, all right, title, and interest in and to the property, including any improvements thereon, shall revert to the United States, and the United States shall have the right of immediate entry thereon.

SEC. 413. The Administrator of General Services is directed to reincorporate the elements of the original proposed design for the facade of the United States Courthouse, London, Kentucky, project into the revised design of the building in order to

AR.02730

ensure compatibility of this new facility with the historic U.S. Courthouse in London, Kentucky, to maintain the stateliness of the building. Construction or design of the London, Kentucky, project should not be diminished in anyway to achieve this goal.

### ENVIRONMENTAL DISPUTE RESOLUTION FUND

For payment to the Environmental Dispute Resolution Fund to carry out activities authorized in the Environmental Policy and Conflict Resolution Act of 1997, $4,250,000, to remain available until expended, of which $3,000,000 will be for capitalization of the Fund, and $1,250,000 will be for annual operating expenses.

### MERIT SYSTEMS PROTECTION BOARD

### SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses to carry out functions of the Merit Systems Protection Board pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and direct procurement of survey printing, $25,805,000, together with not to exceed $2,430,000 for administrative expenses to adjudicate retirement appeals to be transferred from the Civil Service Retirement and Disability Fund in amounts determined by the Merit Systems Protection Board.

### NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### OPERATING EXPENSES

For necessary expenses in connection with the administration of the National Archives (including the Information Security Oversight Office) and records and related activities, as provided by law, and for expenses necessary for the review and declassification of documents, and for the hire of passenger motor vehicles, $224,614,000: *Provided*, That of the amount provided, $7,861,000 shall not be available for obligation until September 30, 1999: *Provided further*, That the Archivist of the United States is authorized to use any excess funds available from the amount borrowed for construction of the National Archives facility, for expenses necessary to provide adequate storage for holdings.

### REPAIRS AND RESTORATION

For the repair, alteration, and improvement of archives facilities, and to provide adequate storage for holdings, $11,325,000, to remain available until expended, of which $2,000,000 is for an architectural and engineering study for the renovation of the Archives I facility, of which $4,000,000 is for encasement of the Charters of Freedom, and of which $875,000 is for a requirements study and design of the National Archives Anchorage, Alaska, facility.

### NATIONAL HISTORICAL PUBLICATIONS AND RECORDS COMMISSION

### GRANTS PROGRAM

For necessary expenses for allocations and grants for historical publications and records as authorized by 44 U.S.C. 2504, as amended, $10,000,000, to remain available until expended: *Provided*, That of the amount provided, $4,000,000 shall not be available for obligation until September 30, 1999.

### OFFICE OF GOVERNMENT ETHICS

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Government Ethics pursuant to the Ethics in Government Act of 1978, as amended and the Ethics Reform Act of 1989, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and not to exceed $1,500 for official reception and representation expenses, $8,492,000.

### OFFICE OF PERSONNEL MANAGEMENT

## SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses to carry out functions of the Office of Personnel Management pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109; medical examinations performed for veterans by private physicians on a fee basis; rental of conference rooms in the District of Columbia and elsewhere; hire of passenger motor vehicles; not to exceed $2,500 for official reception and representation expenses; advances for reimbursements to applicable funds of the Office of Personnel Management and the Federal Bureau of Investigation for expenses incurred under Executive Order No. 10422 of January 9, 1953, as amended; and payment of per diem and/or subsistence allowances to employees where Voting Rights Act activities require an employee to remain overnight at his or her post of duty, $85,350,000; and in addition $91,236,000 for administrative expenses, to be transferred from the appropriate trust funds of the Office of Personnel Management without regard to other statutes, including direct procurement of printed materials, for the retirement and insurance programs: *Provided*, That the provisions of this appropriation shall not affect the authority to use applicable trust funds as provided by section 8348(a)(1)(B) of title 5, United States Code: *Provided further*, That, except as may be consistent with 5 U.S.C. 8902a(f)(1) and (i), no payment may be made from the Employees Health Benefits Fund to any physician, hospital, or other provider of health care services or supplies who is, at the time such services or supplies are provided to an individual covered under chapter 89 of title 5, United States Code, excluded, pursuant to section 1128 or 1128A of the Social Security Act (42 U.S.C. 1320a–7 through 1320a–7a), from participation in any program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.): *Provided further*, That no part of this appropriation shall be available for salaries and expenses of the Legal Examining Unit of the Office of Personnel Management established pursuant to Executive Order No. 9358 of July 1, 1943, or any successor unit of like purpose: *Provided further*, That the President's Commission on White House Fellows, established by Executive Order No. 11183 of October 3, 1964, may, during fiscal year 1999, accept donations of money, property, and personal services in connection with the development of a publicity brochure to provide information about the White House Fellows, except that no such donations shall be accepted for travel or reimbursement of travel expenses, or for the salaries of employees of such Commission.

## OFFICE OF INSPECTOR GENERAL

## SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act, as amended, including services as authorized by 5 U.S.C. 3109, hire of passenger motor vehicles, $960,000; and in addition, not to exceed $9,145,000 for administrative expenses to audit the Office of Personnel Management's retirement and insurance programs, to be transferred from the appropriate trust funds of the Office of Personnel Management, as determined by the Inspector General: *Provided*, That the Inspector General is authorized to rent conference rooms in the District of Columbia and elsewhere.

## GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEES HEALTH BENEFITS

For payment of Government contributions with respect to retired employees, as authorized by chapter 89 of title 5, United States Code, and the Retired Federal Employees Health Benefits Act (74 Stat. 849), as amended, such sums as may be necessary.

## GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEE LIFE INSURANCE

For payment of Government contributions with respect to employees retiring after December 31, 1989, as required by chapter 87 of title 5, United States Code, such sums as may be necessary.

## PAYMENT TO CIVIL SERVICE RETIREMENT AND DISABILITY FUND

<< 33 USCA § 776 >>

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For financing the unfunded liability of new and increased annuity benefits becoming effective on or after October 20, 1969, as authorized by 5 U.S.C. 8348, and annuities under special Acts to be credited to the Civil Service Retirement and Disability Fund, such sums as may be necessary: *Provided*, That annuities authorized by the Act of May 29, 1944, as amended, and the Act of August 19, 1950, as amended (33 U.S.C. 771–775), may hereafter be paid out of the Civil Service Retirement and Disability Fund.

## OFFICE OF SPECIAL COUNSEL

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Special Counsel pursuant to Reorganization Plan Numbered 2 of 1978, the Civil Service Reform Act of 1978 (Public Law 95–454), the Whistleblower Protection Act of 1989 (Public Law 101–12), Public Law 103–424, and the Uniformed Services Employment and Reemployment Act of 1994 (Public Law 103–353), including services as authorized by 5 U.S.C. 3109, payment of fees and expenses for witnesses, rental of conference rooms in the District of Columbia and elsewhere, and hire of passenger motor vehicles, $8,720,000.

## UNITED STATES TAX COURT

### SALARIES AND EXPENSES

<< 26 USCA § 7443 NOTE >>

For necessary expenses, including contract reporting and other services as authorized by 5 U.S.C. 3109, $32,765,000: *Provided*, That travel expenses of the judges shall be paid upon the written certificate of the judge.

This title may be cited as the "Independent Agencies Appropriations Act, 1999".

## TITLE V—GENERAL PROVISIONS

### THIS ACT

SEC. 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

SEC. 503. None of the funds made available by this Act shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would prohibit the enforcement of section 307 of the Tariff Act of 1930.

SEC. 504. None of the funds made available by this Act shall be available in fiscal year 1999 for the purpose of transferring control over the Federal Law Enforcement Training Center located at Glynco, Georgia, and Artesia, New Mexico, out of the Department of the Treasury.

SEC. 505. No part of any appropriation contained in this Act shall be available to pay the salary for any person filling a position, other than a temporary position, formerly held by an employee who has left to enter the Armed Forces of the United States and has satisfactorily completed his period of active military or naval service, and has within 90 days after his release from such service or from hospitalization continuing after discharge for a period of not more than 1 year, made application for restoration to his former position and has been certified by the Office of Personnel Management as still qualified to perform the duties of his former position and has not been restored thereto.

SEC. 506. No funds appropriated pursuant to this Act may be expended by an entity unless the entity agrees that in expending the assistance the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c, popularly known as the "Buy American Act").

SEC. 507. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or products that may be authorized to be purchased with financial assistance provided under this Act, it is the sense of the

Congress that entities receiving such assistance should, in expending the assistance, purchase only American-made equipment and products.

(b) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance under this Act, the Secretary of the Treasury shall provide to each recipient of the assistance a notice describing the statement made in subsection (a) by the Congress.

SEC. 508. If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, such person shall be ineligible to receive any contract or subcontract made with funds provided pursuant to this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 509. No funds appropriated by this Act shall be available to pay for an abortion, or the administrative expenses in connection with any health plan under the Federal employees health benefit program which provides any benefits or coverage for abortions.

SEC. 510. The provision of section 509 shall not apply where the life of the mother would be endangered if the fetus were carried to term, or the pregnancy is the result of an act of rape or incest.

SEC. 511. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 1999 from appropriations made available for salaries and expenses for fiscal year 1999 in this Act, shall remain available through September 30, 2000, for each such account for the purposes authorized: *Provided*, That a request shall be submitted to the Committees on Appropriations for approval prior to the expenditure of such funds: *Provided further*, That these requests shall be made in compliance with reprogramming guidelines.

SEC. 512. None of the funds made available in this Act may be used by the Executive Office of the President to request from the Federal Bureau of Investigation any official background investigation report on any individual, except when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such individual has given his or her express written consent for such request not more than 6 months prior to the date of such request and during the same presidential administration; or

(2) such request is required due to extraordinary circumstances involving national security.

SEC. 513. Funds provided in this Act may be used to initiate or continue projects or activities to the extent necessary, consistent with existing agency plans, to achieve Year 2000 (Y2K) computer conversion until such time as supplemental appropriations are made available for that purpose: *Provided*, That the program, project, or activity from which funds are obligated for Y2K conversion activities shall be reimbursed when such supplemental appropriations are made available.

SEC. 515. Hereafter, any payment of attorneys fees, costs, and sanctions required to be made by the Federal Government pursuant to the order of the district court in the case *Association of American Physicians and Surgeons, Inc. v. Clinton,* 989 F.Supp. 8 (1997), or any appeal of such case, shall be derived by transfer from amounts made available in this or any other Act for any fiscal year for "Compensation of the President and the White House Office—Salaries and Expenses".

SEC. 516. Notwithstanding Section 515 of Public Law 104–208, fifty percent of the unobligated balances available to the White House Office, Salaries and Expenses appropriations in fiscal year 1997, shall remain available through September 30, 1999, for the purposes of satisfying the conditions of Section 515 of this Act.

SEC. 517. The Morris K. Udall Scholarship and Excellence in National Environmental and Native American Public Policy Act of 1992, as amended (20 U.S.C. 5601 et seq.), is amended as follows:

<< 20 USCA § 5607b >>

(a) in section 11, by—

<< 20 USCA § 5607b >>

(1) deleting the heading and inserting "Use of the Institute by a Federal Agency or Other Entity."; and

<< 20 USCA § 5607b >>

(2) adding the following new subsection at the end:

"(e) NON–FEDERAL ENTITIES.—

"(1) Non–Federal entities, including state and local governments, Native American tribal governments, nongovernmental organizations and persons, as defined in 1 U.S.C. 1, may use the Foundation and the Institute to provide assessment, mediation, or other related services in connection with a dispute or conflict involving the Federal government related to the environment, public lands, or natural resources.

"(2) PAYMENT INTO THE ENVIRONMENTAL DISPUTE RESOLUTION FUND.—Entities utilizing services pursuant to this subsection shall reimburse the Institute for the costs of services provided. Such amounts shall be deposited into the Environmental Dispute Resolution Fund established under section 10."; and

<< 20 USCA § 5608 >>

(b) in section 12, by:

<< 20 USCA § 5608 >>

(1) deleting "IN GENERAL—" and inserting "(a) IN GENERAL—"; and

<< 20 USCA § 5608 >>

(2) adding the following new subsection:

"(b) THE INSTITUTE.—The authorities set forth above shall, with the exception of paragraph (4), apply to the Institute established pursuant to section 10."; and

<< 20 USCA § 5607a >>

(c) in section 10(b), by adding before the period as follows: ", including not to exceed $1,000 annually for official reception and representation expenses".

SEC. 518. The cost accounting standards promulgated under section 26 of the Office of Federal Procurement Policy Act (Public Law 93–400; 41 U.S.C. 422) shall not apply with respect to a contract under the Federal Employees Health Benefits Program established under chapter 89 of title 5, United States Code.

## TITLE VI—GENERAL PROVISIONS

### DEPARTMENTS, AGENCIES, AND CORPORATIONS

SEC. 601. Funds appropriated in this or any other Act may be used to pay travel to the United States for the immediate family of employees serving abroad in cases of death or life threatening illness of said employee.

SEC. 602. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1999 shall obligate or expend any such funds, unless such department, agency, or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from the illegal use, possession, or distribution of controlled substances (as defined in the Controlled Substances Act) by the officers and employees of such department, agency, or instrumentality.

<< 40 USCA § 490b NOTE >>

SEC. 603. Notwithstanding 31 U.S.C. 1345, any agency, department, or instrumentality of the United States which provides or proposes to provide child care services for Federal employees may, in fiscal year 1999 and thereafter, reimburse any Federal employee or any person employed to provide such services for travel, transportation, and subsistence expenses incurred for training classes, conferences, or other meetings in connection with the provision of such services: *Provided*, That any per diem allowance made pursuant to this section shall not exceed the rate specified in regulations prescribed pursuant to section 5707 of title 5, United States Code.

<< 31 USCA § 1343 NOTE >>

SEC. 604. Unless otherwise specifically provided, the maximum amount allowable during the current fiscal year in accordance with section 16 of the Act of August 2, 1946 (60 Stat. 810), for the purchase of any passenger motor vehicle (exclusive of buses, ambulances, law enforcement, and undercover surveillance vehicles), is hereby fixed at $8,100 except station wagons for which the maximum shall be $9,100: *Provided*, That these limits may be exceeded by not to exceed $3,700 for police-type vehicles, and by not to exceed $4,000 for special heavy-duty vehicles: *Provided further*, That the limits set forth in this section may not be exceeded by more than 5 percent for electric or hybrid vehicles purchased for demonstration under the provisions of the Electric and Hybrid Vehicle Research, Development, and Demonstration Act of 1976: *Provided further*, That the limits set forth in this section may be exceeded by the incremental cost of clean alternative fuels vehicles acquired pursuant to Public Law 101–549 over the cost of comparable conventionally fueled vehicles.

SEC. 605. Appropriations of the executive departments and independent establishments for the current fiscal year available for expenses of travel, or for the expenses of the activity concerned, are hereby made available for quarters allowances and cost-of-living allowances, in accordance with 5 U.S.C. 5922–5924.

<< 5 USCA § 3101 NOTE >>

SEC. 606. Unless otherwise specified during the current fiscal year, no part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States (including any agency the majority of the stock of which is owned by the Government of the United States) whose post of duty is in the continental United States unless such person: (1) is a citizen of the United States; (2) is a person in the service of the United States on the date of enactment of this Act who, being eligible for citizenship, has filed a declaration of intention to become a citizen of the United States prior to such date and is actually residing in the United States; (3) is a person who owes allegiance to the United States; (4) is an alien from Cuba, Poland, South Vietnam, the countries of the former Soviet Union, or the Baltic countries lawfully admitted to the United States for permanent residence; (5) is a South Vietnamese, Cambodian, or Laotian refugee paroled in the United States after January 1, 1975; or (6) is a national of the People's Republic of China who qualifies for adjustment of status pursuant to the Chinese Student Protection Act of 1992: *Provided*, That for the purpose of this section, an affidavit signed by any such person shall be considered prima facie evidence that the requirements of this section with respect to his or her status have been complied with: *Provided further*, That any person making a false affidavit shall be guilty of a felony, and, upon conviction, shall be fined no more than $4,000 or imprisoned for not more than 1 year, or both: *Provided further*, That the above penal clause shall be in addition to, and not in substitution for, any other provisions of existing law: *Provided further*, That any payment made to any officer or employee contrary to the provisions of this section shall be recoverable in action by the Federal Government. This section shall not apply to citizens of Ireland, Israel, or the Republic of the Philippines, or to nationals of those countries allied with the United States in a current defense effort, or to international broadcasters employed by the United States Information Agency, or to temporary employment of translators, or to temporary employment in the field service (not to exceed 60 days) as a result of emergencies.

SEC. 607. Appropriations available to any department or agency during the current fiscal year for necessary expenses, including maintenance or operating expenses, shall also be available for payment to the General Services Administration for charges for space and services and those expenses of renovation and alteration of buildings and facilities which constitute public improvements performed in accordance with the Public Buildings Act of 1959 (73 Stat. 749), the Public Buildings Amendments of 1972 (87 Stat. 216), or other applicable law.

SEC. 608. In addition to funds provided in this or any other Act, all Federal agencies are authorized to receive and use funds resulting from the sale of materials, including Federal records disposed of pursuant to a records schedule recovered through recycling or waste prevention programs. Such funds shall be available until expended for the following purposes:

(1) Acquisition, waste reduction and prevention, and recycling programs as described in Executive Order No. 12873 (October 20, 1993), including any such programs adopted prior to the effective date of the Executive order.

(2) Other Federal agency environmental management programs, including, but not limited to, the development and implementation of hazardous waste management and pollution prevention programs.

(3) Other employee programs as authorized by law or as deemed appropriate by the head of the Federal agency.

SEC. 609. Funds made available by this or any other Act for administrative expenses in the current fiscal year of the corporations and agencies subject to chapter 91 of title 31, United States Code, shall be available, in addition to objects for which such funds are otherwise available, for rent in the District of Columbia; services in accordance with 5 U.S.C. 3109;

and the objects specified under this head, all the provisions of which shall be applicable to the expenditure of such funds unless otherwise specified in the Act by which they are made available: *Provided*, That in the event any functions budgeted as administrative expenses are subsequently transferred to or paid from other funds, the limitations on administrative expenses shall be correspondingly reduced.

SEC. 610. No part of any appropriation for the current fiscal year contained in this or any other Act shall be paid to any person for the filling of any position for which he or she has been nominated after the Senate has voted not to approve the nomination of said person.

SEC. 611. No part of any appropriation contained in this or any other Act shall be available for interagency financing of boards (except Federal Executive Boards), commissions, councils, committees, or similar groups (whether or not they are interagency entities) which do not have a prior and specific statutory approval to receive financial support from more than one agency or instrumentality.

SEC. 612. Funds made available by this or any other Act to the Postal Service Fund (39 U.S.C. 2003) shall be available for employment of guards for all buildings and areas owned or occupied by the Postal Service and under the charge and control of the Postal Service, and such guards shall have, with respect to such property, the powers of special policemen provided by the first section of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318), and, as to property owned or occupied by the Postal Service, the Postmaster General may take the same actions as the Administrator of General Services may take under the provisions of sections 2 and 3 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318a and 318b), attaching thereto penal consequences under the authority and within the limits provided in section 4 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318c).

SEC. 613. None of the funds made available pursuant to the provisions of this Act shall be used to implement, administer, or enforce any regulation which has been disapproved pursuant to a resolution of disapproval duly adopted in accordance with the applicable law of the United States.

<< 5 USCA § 5343 NOTE >>

SEC. 614. (a) Notwithstanding any other provision of law, and except as otherwise provided in this section, no part of any of the funds appropriated for fiscal year 1999, by this or any other Act, may be used to pay any prevailing rate employee described in section 5342(a)(2)(A) of title 5, United States Code—

<< 5 USCA § 5343 NOTE >>

(1) during the period from the date of expiration of the limitation imposed by section 614 of the Treasury and General Government Appropriations Act, 1998, until the normal effective date of the applicable wage survey adjustment that is to take effect in fiscal year 1999, in an amount that exceeds the rate payable for the applicable grade and step of the applicable wage schedule in accordance with such section 614; and

<< 5 USCA § 5343 NOTE >>

(2) during the period consisting of the remainder of fiscal year 1999, in an amount that exceeds, as a result of a wage survey adjustment, the rate payable under paragraph (1) by more than the sum of—
  (A) the percentage adjustment taking effect in fiscal year 1999 under section 5303 of title 5, United States Code, in the rates of pay under the General Schedule; and
  (B) the difference between the overall average percentage of the locality-based comparability payments taking effect in fiscal year 1999 under section 5304 of such title (whether by adjustment or otherwise), and the overall average percentage of such payments which was effective in fiscal year 1998 under such section.

<< 5 USCA § 5343 NOTE >>

(b) Notwithstanding any other provision of law, no prevailing rate employee described in subparagraph (B) or (C) of section 5342(a)(2) of title 5, United States Code, and no employee covered by section 5348 of such title, may be paid during the periods

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

for which subsection (a) is in effect at a rate that exceeds the rates that would be payable under subsection (a) were subsection (a) applicable to such employee.

<< 5 USCA § 5343 NOTE >>

(c) For the purposes of this section, the rates payable to an employee who is covered by this section and who is paid from a schedule not in existence on September 30, 1998, shall be determined under regulations prescribed by the Office of Personnel Management.

<< 5 USCA § 5343 NOTE >>

(d) Notwithstanding any other provision of law, rates of premium pay for employees subject to this section may not be changed from the rates in effect on September 30, 1998, except to the extent determined by the Office of Personnel Management to be consistent with the purpose of this section.

<< 5 USCA § 5343 NOTE >>

(e) This section shall apply with respect to pay for service performed after September 30, 1998.

<< 5 USCA § 5343 NOTE >>

(f) For the purpose of administering any provision of law (including any rule or regulation that provides premium pay, retirement, life insurance, or any other employee benefit) that requires any deduction or contribution, or that imposes any requirement or limitation on the basis of a rate of salary or basic pay, the rate of salary or basic pay payable after the application of this section shall be treated as the rate of salary or basic pay.

<< 5 USCA § 5343 NOTE >>

(g) Nothing in this section shall be considered to permit or require the payment to any employee covered by this section at a rate in excess of the rate that would be payable were this section not in effect.

<< 5 USCA § 5343 NOTE >>

(h) The Office of Personnel Management may provide for exceptions to the limitations imposed by this section if the Office determines that such exceptions are necessary to ensure the recruitment or retention of qualified employees.

SEC. 615. During the period in which the head of any department or agency, or any other officer or civilian employee of the Government appointed by the President of the United States, holds office, no funds may be obligated or expended in excess of $5,000 to furnish or redecorate the office of such department head, agency head, officer, or employee, or to purchase furniture or make improvements for any such office, unless advance notice of such furnishing or redecoration is expressly approved by the Committees on Appropriations. For the purposes of this section, the word "office" shall include the entire suite of offices assigned to the individual, as well as any other space used primarily by the individual or the use of which is directly controlled by the individual.

SEC. 616. Notwithstanding any other provision of law, no executive branch agency shall purchase, construct, and/or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the Committees on Appropriations, except that the Federal Law Enforcement Training Center is authorized to obtain the temporary use of additional facilities by lease, contract, or other agreement for training which cannot be accommodated in existing Center facilities.

SEC. 617. Notwithstanding section 1346 of title 31, United States Code, or section 611 of this Act, funds made available for fiscal year 1999 by this or any other Act shall be available for the interagency funding of national security and emergency preparedness telecommunications initiatives which benefit multiple Federal departments, agencies, or entities, as provided by Executive Order No. 12472 (April 3, 1984).

SEC. 618. (a) None of the funds appropriated by this or any other Act may be obligated or expended by any Federal department, agency, or other instrumentality for the salaries or expenses of any employee appointed to a position of a confidential or policy-

determining character excepted from the competitive service pursuant to section 3302 of title 5, United States Code, without a certification to the Office of Personnel Management from the head of the Federal department, agency, or other instrumentality employing the Schedule C appointee that the Schedule C position was not created solely or primarily in order to detail the employee to the White House.

(b) The provisions of this section shall not apply to Federal employees or members of the armed services detailed to or from—

(1) the Central Intelligence Agency;

(2) the National Security Agency;

(3) the Defense Intelligence Agency;

(4) the offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs;

(5) the Bureau of Intelligence and Research of the Department of State;

(6) any agency, office, or unit of the Army, Navy, Air Force, and Marine Corps, the Federal Bureau of Investigation and the Drug Enforcement Administration of the Department of Justice, the Department of Transportation, the Department of the Treasury, and the Department of Energy performing intelligence functions; and

(7) the Director of Central Intelligence.

SEC. 619. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1999 shall obligate or expend any such funds, unless such department, agency, or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from discrimination and sexual harassment and that all of its workplaces are not in violation of title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the Rehabilitation Act of 1973.

SEC. 620. No part of any appropriation contained in this Act may be used to pay for the expenses of travel of employees, including employees of the Executive Office of the President, not directly responsible for the discharge of official governmental tasks and duties: *Provided,* That this restriction shall not apply to the family of the President, Members of Congress or their spouses, Heads of State of a foreign country or their designees, persons providing assistance to the President for official purposes, or other individuals so designated by the President.

<< 5 USCA § 5303 NOTE >>

SEC. 621. For purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989 (5 U.S.C. 5318 note), no adjustment under section 5303 of title 5, United States Code, shall be considered to have taken effect in fiscal year 1999 in the rates of basic pay for the statutory pay systems.

SEC. 622. None of the funds appropriated in this or any other Act shall be used to acquire information technologies which do not comply with part 39.106 (Year 2000 compliance) of the Federal Acquisition Regulation, unless an agency's Chief Information Officer determines that noncompliance with part 39.106 is necessary to the function and operation of the requesting agency or the acquisition is required by a signed contract with the agency in effect before the date of enactment of this Act. Any waiver granted by the Chief Information Officer shall be reported to the Office of Management and Budget, and copies shall be provided to Congress.

SEC. 623. None of the funds made available in this Act for the United States Customs Service may be used to allow the importation into the United States of any good, ware, article, or merchandise mined, produced, or manufactured by forced or indentured child labor, as determined pursuant to section 307 of the Tariff Act of 1930 (19 U.S.C. 1307).

<< 5 USCA § 5546 NOTE >>

SEC. 624. Notwithstanding any other provision of law, no part of any funds provided by this Act or any other Act beginning in fiscal year 1999 and thereafter shall be available for paying Sunday premium pay to any employee unless such employee actually performed work during the time corresponding to such premium pay.

SEC. 625. No part of any appropriation contained in this or any other Act shall be available for the payment of the salary of any officer or employee of the Federal Government, who—

(1) prohibits or prevents, or attempts or threatens to prohibit or prevent, any other officer or employee of the Federal Government from having any direct oral or written communication or contact with any Member, committee, or subcommittee

of the Congress in connection with any matter pertaining to the employment of such other officer or employee or pertaining to the department or agency of such other officer or employee in any way, irrespective of whether such communication or contact is at the initiative of such other officer or employee or in response to the request or inquiry of such Member, committee, or subcommittee; or

  (2) removes, suspends from duty without pay, demotes, reduces in rank, seniority, status, pay, or performance of efficiency rating, denies promotion to, relocates, reassigns, transfers, disciplines, or discriminates in regard to any employment right, entitlement, or benefit, or any term or condition of employment of, any other officer or employee of the Federal Government, or attempts or threatens to commit any of the foregoing actions with respect to such other officer or employee, by reason of any communication or contact of such other officer or employee with any Member, committee, or subcommittee of the Congress as described in paragraph (1).

SEC. 626. Section 626(b) of the Treasury, Postal Service, and General Government Appropriations Act, 1997, as contained in section 101(f) of Public Law 104–208 (110 Stat. 3009–360), the Omnibus Consolidated Appropriations Act, 1997, is amended to read as follows: "(b) Until September 30, 1999, or until the end of the current FTS 2000 contracts, whichever is earlier, subsection (a) shall continue to apply to the use of the funds appropriated by this or any other Act.".

<< 28 USCA § 2671 NOTE >>

SEC. 627. (a) DEFINITIONS.—In this section—

  (1) the term "crime of violence" has the meaning given that term in section 16 of title 18, United States Code; and

  (2) the term "law enforcement officer" means any employee described in subparagraph (A), (B), or (C) of section 8401(17) of title 5, United States Code; and any special agent in the Diplomatic Security Service of the Department of State.

  (b) RULE OF CONSTRUCTION.—Notwithstanding any other provision of law, for purposes of chapter 171 of title 28, United States Code, or any other provision of law relating to tort liability, a law enforcement officer shall be construed to be acting within the scope of his or her office or employment, if the officer takes reasonable action, including the use of force, to—

  (1) protect an individual in the presence of the officer from a crime of violence;

  (2) provide immediate assistance to an individual who has suffered or who is threatened with bodily harm; or

  (3) prevent the escape of any individual who the officer reasonably believes to have committed in the presence of the officer a crime of violence.

SEC. 628. FEDERAL FIREFIGHTERS OVERTIME PAY REFORM ACT OF 1998. (a) IN GENERAL.—Subchapter V of chapter 55 of title 5, United States Code, is amended—

<< 5 USCA § 5542 >>

  (1) in section 5542 by adding at the end the following new subsection:

"(f) In applying subsection (a) of this section with respect to a firefighter who is subject to section 5545b—

  "(1) such subsection shall be deemed to apply to hours of work officially ordered or approved in excess of 106 hours in a biweekly pay period, or, if the agency establishes a weekly basis for overtime pay computation, in excess of 53 hours in an administrative workweek; and

  "(2) the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of basic pay under section 5545b (b)(1)(A) or (c)(1)(B), as applicable, and such overtime hourly rate of pay may not be less than such hourly rate of basic pay in applying the limitation on the overtime rate provided in paragraph (2) of such subsection (a).": and

<< 5 USCA § 5545b >>

  (2) by inserting after section 5545a the following new section:

## "§ 5545b. Pay for firefighters

  "(a) This section applies to an employee whose position is classified in the firefighter occupation in conformance with the GS–081 standard published by the Office of Personnel Management, and whose normal work schedule, as in effect throughout the year, consists of regular tours of duty which average at least 106 hours per biweekly pay period.

"(b)(1) If the regular tour of duty of a firefighter subject to this section generally consists of 24–hour shifts, rather than a basic 40–hour workweek (as determined under regulations prescribed by the Office of Personnel Management), section 5504(b) shall be applied as follows in computing pay—

  "(A) paragraph (1) of such section shall be deemed to require that the annual rate be divided by 2756 to derive the hourly rate; and

  "(B) the computation of such firefighter's daily, weekly, or biweekly rate shall be based on the hourly rate under subparagraph (A);

  "(2) For the purpose of sections 5595(c), 5941, 8331(3), and 8704(c), and for such other purposes as may be expressly provided for by law or as the Office of Personnel Management may by regulation prescribe, the basic pay of a firefighter subject to this subsection shall include an amount equal to the firefighter's basic hourly rate (as computed under paragraph (1)(A)) for all hours in such firefighter's regular tour of duty (including overtime hours).

  "(c)(1) If the regular tour of duty of a firefighter subject to this section includes a basic 40–hour workweek (as determined under regulations prescribed by the Office of Personnel Management), section 5504(b) shall be applied as follows in computing pay—

  "(A) the provisions of such section shall apply to the hours within the basic 40–hour workweek;

  "(B) for hours outside the basic 40–hour workweek, such section shall be deemed to require that the hourly rate be derived by dividing the annual rate by 2756; and

  "(C) the computation of such firefighter's daily, weekly, or biweekly rate shall be based on subparagraphs (A) and (B), as each applies to the hours involved.

  "(2) For purposes of sections 5595(c), 5941, 8331(3), and 8704(c), and for such other purposes as may be expressly provided for by law or as the Office of Personnel Management may by regulation prescribe, the basic pay of a firefighter subject to this subsection shall include—

  "(A) an amount computed under paragraph (1)(A) for the hours within the basic 40–hour workweek; and

  "(B) an amount equal to the firefighter's basic hourly rate (as computed under paragraph (1)(B)) for all hours outside the basic 40–hour workweek that are within such firefighter's regular tour of duty (including overtime hours).

  "(d)(1) A firefighter who is subject to this section shall receive overtime pay in accordance with section 5542, but shall not receive premium pay provided by other provisions of this subchapter.

  "(2) For the purpose of applying section 7(k) of the Fair Labor Standards Act of 1938 to a firefighter who is subject to this section, no violation referred to in such section 7(k) shall be deemed to have occurred if the requirements of section 5542(a) are met, applying section 5542(a) as provided in subsection (f) of that section: *Provided*, That the overtime hourly rate of pay for such firefighter shall in all cases be an amount equal to one and one-half times the firefighter's hourly rate of basic pay under subsection (b)(1)(A) or (c)(1)(B) of this section, as applicable.

  "(3) The Office of Personnel Management may prescribe regulations, with respect to firefighters subject to this section, that would permit an agency to reduce or eliminate the variation in the amount of firefighters' biweekly pay caused by work scheduling cycles that result in varying hours in the regular tours of duty from pay period to pay period. Under such regulations, the pay that a firefighter would otherwise receive for regular tours of duty over the work scheduling cycle shall, to the extent practicable, remain unaffected.".

<< 5 USCA Ch. 55 >>

  (b) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 55 of title 5, United States Code, is amended by inserting after the item relating to section 5545a the following:

"5545b. Pay for firefighters.".

<< 5 USCA § 4109 >>

  (c) TRAINING.—Section 4109 of title 5, United States Code, is amended by adding at the end the following new subsection:

  "(d) Notwithstanding subsection (a)(1), a firefighter who is subject to section 5545b of this title shall be paid basic pay and overtime pay for the firefighter's regular tour of duty while attending agency sanctioned training.".

<< 5 USCA § 8331 >>

(d) INCLUSION IN BASIC PAY FOR FEDERAL RETIREMENT.—Section 8331(3) of title 5, United States Code, is amended—

<< 5 USCA § 8331 >>

(1) by striking "and" after subparagraph (D);

<< 5 USCA § 8331 >>

(2) by redesignating subparagraph (E) as subparagraph (G);

<< 5 USCA § 8331 >>

(3) by inserting the following:
  "(E) with respect to a criminal investigator, availability pay under section 5545a of this title;
  "(F) pay as provided in section 5545b(b)(2) and (c)(2); and"; and

<< 5 USCA § 8331 >>

(4) by striking "subparagraphs (B), (C), (D), and (E)" and inserting "subparagraphs (B) through (G)".

<< 5 USCA § 4109 NOTE >>

(e) EFFECTIVE DATE.—The amendments made by this section shall take effect on the first day of the first applicable pay period which begins on or after October 1, 1998.

<< 5 USCA § 5545b NOTE >>

(f) REGULATIONS.—Under regulations prescribed by the Office of Personnel Management, a firefighter subject to section 5545 of title 5, United States Code, as added by this section, whose regular tours of duty average 60 hours or less per workweek and do not include a basic 40–hour workweek, shall, upon implementation of this section, be granted an increase in basic pay equal to 2 step-increases of the applicable General Schedule grade, and such increase shall not be an equivalent increase in pay. If such increase results in a change to a longer waiting period for the firefighter's next step increase, the firefighter shall be credited with an additional year of service for the purpose of such waiting period. If such increase results in a rate of basic pay which is above the maximum rate of the applicable grade, such resulting pay rate shall be treated as a retained rate of basic pay in accordance with section 5363 of title 5, United States Code.

<< 5 USCA § 5545b NOTE >>

(g) NO REDUCTION IN REGULAR PAY.—Under regulations prescribed by the Office of Personnel Management, the regular pay (over the established work scheduling cycle) of a firefighter subject to section 5545b of title 5, United States Code, as added by this section, shall not be reduced as a result of the implementation of this section.

SEC. 629. (1) Not later than 180 days after the date of enactment of this Act, the Director of the Office of National Drug Control Policy, the Secretary of the Treasury, and the Attorney General shall conduct a joint review of Federal efforts and submit to the appropriate congressional committees, including the Committees on Appropriations, a plan to improve coordination among the Federal agencies with responsibility to protect the borders against drug trafficking. The review shall also include consideration of Federal agencies' coordination with State and local law enforcement agencies. The plan shall include an assessment and action plan, including the activities of the following departments and agencies:
  (A) Department of the Treasury;
  (B) Department of Justice;
  (C) United States Coast Guard;

(D) Department of Defense;

(E) Department of Transportation;

(F) Department of State; and

(G) Department of Interior.

(2) The purpose of the plan under paragraph (1) is to maximize the effectiveness of the border control efforts in achieving the objectives of the national drug control strategy in a manner that is also consistent with the goal of facilitating trade. In order to maximize the effectiveness, the plan shall:

(A) specify the methods used to enhance cooperation, planning and accountability among the Federal, State, and local agencies with responsibilities along the Southwest border;

(B) specify mechanisms to ensure cooperation among the agencies, including State and local agencies, with responsibilities along the Southwest border;

(C) identify new technologies that will be used in protecting the borders including conclusions regarding appropriate deployment of technology;

(D) identify new initiatives for infrastructure improvements;

(E) recommend reinforcements in terms of resources, technology and personnel necessary to ensure capacity to maintain appropriate inspections;

(F) integrate findings of the White House Intelligence Architecture Review into the plan; and

(G) make recommendations for strengthening the HIDTA program along the Southwest border.

<< 40 USCA § 490 NOTE >>

SEC. 630. (a) FLEXIPLACE WORK TELECOMMUTING PROGRAMS.—For fiscal year 1999 and each fiscal year thereafter, of the funds made available to each Executive agency for salaries and expenses, at a minimum $50,000 shall be available only for the necessary expenses of the Executive agency to carry out a flexiplace work telecommuting program.

<< 40 USCA § 490 NOTE >>

(b) DEFINITIONS.—For purposes of this section:

<< 40 USCA § 490 NOTE >>

(1) EXECUTIVE AGENCY.—The term "Executive agency" means the following list of departments and agencies: Department of State, Treasury, Defense, Justice, Interior, Labor, Health and Human Services, Agriculture, Commerce, Housing and Urban Development, Transportation, Energy, Education, Veterans' Affairs, General Services Administration, Office of Personnel Management, Small Business Administration, Social Security Administration, Environmental Protection Agency, U.S. Postal Service.

<< 40 USCA § 490 NOTE >>

(2) FLEXIPLACE WORK TELECOMMUTING PROGRAM.—The term "flexiplace work telecommuting program" means a program under which employees of an Executive agency are permitted to perform all or a portion of their duties at a flexiplace work telecommuting center established under section 210(l) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490(l)) or other Federal law.

<< 5 USCA § 4507 >>

SEC. 631. (a) MERITORIOUS EXECUTIVE.—Section 4507(e)(1) of title 5, United States Code, is amended by striking "$10,000" and inserting "an amount equal to 20 percent of annual basic pay".

<< 5 USCA § 4507 >>

(b) DISTINGUISHED EXECUTIVE.—Section 4507(e)(2) of title 5, United States Code, is amended by striking "$20,000" and inserting "an amount equal to 35 percent of annual basic pay".

<< 5 USCA § 4507 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on October 1, 1998, or the date of enactment of this Act, whichever is later.

<< 5 USCA § 5384 >>

SEC. 632. (a) CAREER SES PERFORMANCE AWARDS.—Section 5384(b)(3) of title 5, United States Code, is amended—

<< 5 USCA § 5384 >>

(1) by striking "3 percent" and inserting "10 percent"; and

<< 5 USCA § 5384 >>

(2) by striking "15 percent" and inserting "20 percent".

<< 5 USCA § 5384 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on October 1, 1998, or the date of enactment of this Act, whichever is later.

<< 39 USCA § 407 >>

SEC. 633. (a) INTERNATIONAL POSTAL ARRANGEMENTS.—Section 407 of title 39, United States Code, is amended to read as follows:

**"§ 407. International Postal Arrangements.**

"(a)(1) The Secretary of State shall have primary responsibility for formulation, coordination and oversight of policy with respect to United States participation in the Universal Postal Union, including the Universal Postal Convention and other Acts of the Universal Postal Union, amendments thereto, and all postal treaties and conventions concluded within the framework of the Convention and such Acts.

"(2) Subject to subsection (d), the Secretary may, with the consent of the President, negotiate and conclude treaties, conventions and amendments referred to in paragraph (1).

"(b)(1) Subject to subsections (a), (c), and (d), the Postal Service may, with the consent of the President, negotiate and conclude postal treaties and conventions.

"(2) The Postal Service may, with the consent of the President, establish rates of postage or other charges on mail matter conveyed between the United States and other countries.

"(3) The Postal Service shall transmit a copy of each postal treaty or convention concluded with other governments under the authority of this subsection to the Secretary of State, who shall furnish a copy to the Public Printer for publication.

"(c) The Postal Service shall not conclude any treaty or convention under the authority of this section or any other arrangement related to the delivery of international postal services that is inconsistent with any policy developed pursuant to subsection (a).

"(d) In carrying out their responsibilities under this section, the Secretary and the Postal Service shall consult with such federal agencies as the Secretary or the Postal Service considers appropriate, private providers of international postal services, users of international postal services, the general public, and such other persons as the Secretary or the Postal Service considers appropriate.".

(b) SENSE OF CONGRESS.—It is the sense of Congress that any treaty, convention or amendment entered into under the authority of section 407 of title 39 of the United States Code, as amended by this section, should not grant any undue or unreasonable preference to the Postal Service, a private provider of postal services, or any other person.

<< 19 USCA § 2114b >>

(c) TRADE–IN–SERVICE PROGRAMS.—The second sentence of paragraph (5) of section 306(a) of the Trade and Tariff Act of 1984 (19 U.S.C. 2114b(5)) is amended by inserting "postal and delivery services," after "transportation."

<< 39 USCA § 407 NOTE >>

(d) TRANSFER OF FUNDS.—In fiscal year 1999 and each fiscal year hereafter, the Postal Service shall allocate to the Department of State from any funds available to the Postal Service such sums as may be reasonable, documented and auditable for the Department of State to carry out the activities of Section 407 of title 39 of the United States Code.

<< 5 USCA § 7301 NOTE >>

SEC. 634. Notwithstanding any provision of law, the President, or his designee, must certify to Congress, annually, that no person or persons with direct or indirect responsibility for administering the Executive Office of the President's Drug–Free Workplace Plan are themselves subject to a program of individual random drug testing.

SEC. 635. (a) None of the funds made available in this or any other Act may be obligated or expended for any employee training that—

(1) does not meet identified needs for knowledge, skills, and abilities bearing directly upon the performance of official duties;

(2) contains elements likely to induce high levels of emotional response or psychological stress in some participants;

(3) does not require prior employee notification of the content and methods to be used in the training and written end of course evaluation;

(4) contains any methods or content associated with religious or quasi-religious belief systems or "new age" belief systems as defined in Equal Employment Opportunity Commission Notice N–915.022, dated September 2, 1988; or

(5) is offensive to, or designed to change, participants' personal values or lifestyle outside the workplace.

(b) Nothing in this section shall prohibit, restrict, or otherwise preclude an agency from conducting training bearing directly upon the performance of official duties.

SEC. 636. No funds appropriated in this or any other Act for fiscal year 1999 may be used to implement or enforce the agreements in Standard Forms 312 and 4355 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These restrictions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by Executive Order No. 12958; section 7211 of title 5, United States Code (governing disclosures to Congress); section 1034 of title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that could expose confidential Government agents); and the statutes which protect against disclosure that may compromise the national security, including sections 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. 783(b)). The definitions, requirements, obligations, rights, sanctions, and liabilities created by said Executive order and listed statutes are incorporated into this agreement and are controlling.": *Provided*, That notwithstanding the preceding paragraph, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress or to an authorized official of an executive agency or the Department of Justice that are essential to reporting a substantial violation of law.

SEC. 637. No part of any funds appropriated in this or any other Act shall be used by an agency of the executive branch, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, and for the preparation, distribution or use of any kit, pamphlet, booklet, publication, radio, television or film presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 638. (a) IN GENERAL.—For calendar year 2000, the Director of the Office of Management and Budget shall prepare and submit to Congress, with the budget submitted under section 1105 of title 31, United States Code, an accounting statement and associated report containing—

  (1) an estimate of the total annual costs and benefits (including quantifiable and nonquantifiable effects) of Federal rules and paperwork, to the extent feasible—

    (A) in the aggregate;

    (B) by agency and agency program; and

    (C) by major rule;

  (2) an analysis of impacts of Federal regulation on State, local, and tribal government, small business, wages, and economic growth; and

  (3) recommendations for reform.

 (b) NOTICE.—The Director of the Office of Management and Budget shall provide public notice and an opportunity to comment on the statement and report under subsection (a) before the statement and report are submitted to Congress.

 (c) GUIDELINES.—To implement this section, the Director of the Office of Management and Budget shall issue guidelines to agencies to standardize—

  (1) measures of costs and benefits; and

  (2) the format of accounting statements.

 (d) PEER REVIEW.—The Director of the Office of Management and Budget shall provide for independent and external peer review of the guidelines and each accounting statement and associated report under this section. Such peer review shall not be subject to the Federal Advisory Committee Act (5 U.S.C. App.).

 SEC. 639. None of the funds appropriated by this Act or any other Act, may be used by an agency to provide a Federal employee's home address to any labor organization except when it is made known to the Federal official having authority to obligate or expend such funds that the employee has authorized such disclosure or that such disclosure has been ordered by a court of competent jurisdiction.

<< 18 USCA § 846 NOTE >>

 SEC. 640. The Secretary of the Treasury is authorized to establish scientific certification standards for explosives detection canines, and shall provide, on a reimbursable basis, for the certification of explosives detection canines employed by Federal agencies, or other agencies providing explosives detection services at airports in the United States.

 SEC. 641. None of the funds made available in this Act or any other Act may be used to provide any nonpublic information such as mailing or telephone lists to any person or any organization outside of the Federal Government without the approval of the Committees on Appropriations.

 SEC. 642. No part of any appropriation contained in this or any other Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

 SEC. 643. The Director of the United States Marshals Service is directed to conduct a quarterly threat assessment on the Director of the Office of National Drug Control Policy.

<< 5 USCA Ch. 59 >>

SEC. 644. Section 636(c) of Public Law 104–208 is amended as follows:

<< 5 USCA Ch. 59 >>

 (1) In subparagraph (1) by inserting after "United States Code" the following: "any agency or court in the Judicial Branch,";

<< 5 USCA Ch. 59 >>

 (2) In subparagraph (2) by amending "prosecution, or detention" to read: "prosecution, detention, or supervision"; and

<< 5 USCA Ch. 59 >>

(3) In subparagraph (3) by inserting after "title 5," the following: "and, with regard to the Judicial Branch, mean a justice or judge of the United States as defined in 28 U.S.C. 451 in regular active service or retired from regular active service, other judicial officers as authorized by the Judicial Conference of the United States, and supervisors and managers within the Judicial Branch as authorized by the Judicial Conference of the United States,".

SEC. 645. (a) In this section the term "agency"—

(1) means an Executive agency as defined under section 105 of title 5, United States Code;

(2) includes a military department as defined under section 102 of such title, the Postal Service, and the Postal Rate Commission; and

(3) shall not include the General Accounting Office.

(b) Unless authorized in accordance with law or regulations to use such time for other purposes, an employee of an agency shall use official time in an honest effort to perform official duties. An employee not under a leave system, including a Presidential appointee exempted under section 6301(2) of title 5, United States Code, has an obligation to expend an honest effort and a reasonable proportion of such employee's time in the performance of official duties.

SEC. 646. Notwithstanding any other provision of law, the Secretary of the Treasury is authorized to, upon submission of proper documentation (as determined by the Secretary), reimburse importers of large capacity military magazine rifles as defined in the Treasury Department's April 6, 1998 "Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles", for which authority had been granted to import such firearms into the United States on or before November 14, 1997, and released under bond to the importer by the U.S. Customs Service on or before February 10, 1998: *Provided*, That the importer abandons title to the firearms to the United States: *Provided further*, That reimbursements are submitted to the Secretary for his approval within 120 days of enactment of this provision. In no event shall reimbursements under this provision exceed the importers cost for the weapons, plus any shipping, transportation, duty, and storage costs related to the importation of such weapons. Money made available for expenditure under 31 U.S.C. section 1304(a) in an amount not to exceed $1,000,000 shall be available for reimbursements under this provision: *Provided*, That accepting the compensation provided under this provision is final and conclusive and constitutes a complete release of any and all claims, demands, rights, and causes of action whatsoever against the United States, its agencies, officers, or employees arising from the denial by the Department of the Treasury of the entry of such firearms into the United States. Such compensation is not otherwise required by law and is not intended to create or recognize any legally enforceable right to any person.

<< 5 USCA § 5305 NOTE >>

SEC. 647. (a) The adjustment in rates of basic pay for the statutory pay systems that takes effect in fiscal year 1999 under section 5303 and 5304 of title 5, United States Code, shall be an increase of 3.6 percent.

<< 5 USCA § 5305 NOTE >>

(b) Funds used to carry out this section shall be paid from appropriations which are made to each applicable department or agency for salaries and expenses for fiscal year 1999.

<< 39 USCA § 3663 >>

SEC. 648. INTERNATIONAL MAIL REPORTING REQUIREMENT. (a) IN GENERAL.—Chapter 36 of title 39, United States Code, is amended by adding after section 3662 the following:

**"§ 3663. Annual report on international services**

"(a) Not later than July 1 of each year, the Postal Rate Commission shall transmit to each House of Congress a comprehensive report of the costs, revenues, and volumes accrued by the Postal Service in connection with mail matter conveyed between the United States and other countries for the previous fiscal year.

"(b) Not later than March 15 of each year, the Postal Service shall provide to the Postal Rate Commission such data as the Commission may require to prepare the report required under subsection (a) of this section. Data shall be provided in sufficient detail to enable the Commission to analyze the costs, revenues, and volumes for each international mail product or service, under the methods determined appropriate by the Commission for the analysis of rates for domestic mail.".

<< 39 USCA Ch. 36 >>

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 63 of title 39, United States Code, is amended by adding after the item relating to section 3662 the following:

"3663. Annual report on international services.".

<< 18 USCA § 922 NOTE >>

SEC. 649. EXTENSION OF SUNSET PROVISION. Section 2(f)(2) of the Undetectable Firearms Act of 1988 (18 U.S.C. 922 note) is amended by striking "(2)" and all that follows through "10 years" and inserting the following:

"(2) SUNSET.—Effective 15 years".

SEC. 650. IMPORTATION OF CERTAIN GRAINS. (a) FINDINGS.—The Congress finds that—

(1) importation of grains into the United States at less than the cost to produce those grains is causing injury to the United States producers of those grains;

(2) importation of grains into the United States at less than the fair value of those grains is causing injury to the United States producers of those grains;

(3) the Canadian Government and the Canadian Wheat Board have refused to disclose pricing and cost information necessary to determine whether grains are being exported to the United States at prices in violation of United States trade laws or agreements.

(b) REQUIREMENTS.—

(1) The Customs Service, consulting with the United States Trade Representative and the Department of Commerce, shall conduct a study of the efficiency and effectiveness of requiring that all spring wheat, durum or barley imported into the United States be imported into the United States through a single port of entry.

(2) The Customs Service shall report to the Committees on Appropriations and the Senate Committee on Finance and the House Committee on Ways and Means not later than ninety days after the effective date of this Act on the results of the study required by paragraph (1).

SEC. 651. DESIGNATION OF EUGENE J. MCCARTHY POST OFFICE BUILDING. (a) IN GENERAL.—The building of the United States Postal Service located at 180 East Kellogg Boulevard in Saint Paul, Minnesota, shall be known and designated as the "Eugene J. McCarthy Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Eugene J. McCarthy Post Office Building".

SEC. 652. The Administrator of General Services may provide, from government-wide credit card rebates, up to $3,000,000 in support of the Joint Financial Management Improvement Program as approved by the Chief Financial Officer's Council.

<< 5 USCA § 6302 >>

SEC. 653. Section 6302(g) of title 5, United States Code, is amended by inserting after "chapter 35" the following: "or section 3595".

<< 5 USCA § 601 NOTE >>

SEC. 654. ASSESSMENT OF FEDERAL REGULATIONS AND POLICIES ON FAMILIES. (a) PURPOSES.—The purposes of this section are to—

<< 5 USCA § 601 NOTE >>

(1) require agencies to assess the impact of proposed agency actions on family well-being; and

<< 5 USCA § 601 NOTE >>

(2) improve the management of executive branch agencies.

<< 5 USCA § 601 NOTE >>

(b) DEFINITIONS.—In this section—

<< 5 USCA § 601 NOTE >>

(1) the term "agency" has the meaning given the term "Executive agency" by section 105 of title 5, United States Code, except such term does not include the General Accounting Office; and

<< 5 USCA § 601 NOTE >>

(2) the term "family" means—
(A) a group of individuals related by blood, marriage, adoption, or other legal custody who live together as a single household; and
(B) any individual who is not a member of such group, but who is related by blood, marriage, or adoption to a member of such group, and over half of whose support in a calendar year is received from such group.

<< 5 USCA § 601 NOTE >>

(c) FAMILY POLICYMAKING ASSESSMENT.—Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether—

<< 5 USCA § 601 NOTE >>

(1) the action strengthens or erodes the stability or safety of the family and, particularly, the marital commitment;

<< 5 USCA § 601 NOTE >>

(2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children;

<< 5 USCA § 601 NOTE >>

(3) the action helps the family perform its functions, or substitutes governmental activity for the function;

<< 5 USCA § 601 NOTE >>

(4) the action increases or decreases disposable income or poverty of families and children;

<< 5 USCA § 601 NOTE >>

(5) the proposed benefits of the action justify the financial impact on the family;

<< 5 USCA § 601 NOTE >>

(6) the action may be carried out by State or local government or by the family; and

<< 5 USCA § 601 NOTE >>

(7) the action establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth, and the norms of society.

<< 5 USCA § 601 NOTE >>

(d) GOVERNMENTWIDE FAMILY POLICY COORDINATION AND REVIEW.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 5 USCA § 601 NOTE >>

(1) CERTIFICATION AND RATIONALE.—With respect to each proposed policy or regulation that may affect family well-being, the head of each agency shall—

(A) submit a written certification to the Director of the Office of Management and Budget and to Congress that such policy or regulation has been assessed in accordance with this section; and

(B) provide an adequate rationale for implementation of each policy or regulation that may negatively affect family well-being.

<< 5 USCA § 601 NOTE >>

(2) OFFICE OF MANAGEMENT AND BUDGET.—The Director of the Office of Management and Budget shall—

(A) ensure that policies and regulations proposed by agencies are implemented consistent with this section; and

(B) compile, index, and submit annually to the Congress the written certifications received pursuant to paragraph (1)(A).

<< 5 USCA § 601 NOTE >>

(3) OFFICE OF POLICY DEVELOPMENT.—The Office of Policy Development shall—

(A) assess proposed policies and regulations in accordance with this section;

(B) provide evaluations of policies and regulations that may affect family well-being to the Director of the Office of Management and Budget; and

(C) advise the President on policy and regulatory actions that may be taken to strengthen the institutions of marriage and family in the United States.

<< 5 USCA § 601 NOTE >>

(e) ASSESSMENTS UPON REQUEST BY MEMBERS OF CONGRESS.—Upon request by a Member of Congress relating to a proposed policy or regulation, an agency shall conduct an assessment in accordance with subsection (c), and shall provide a certification and rationale in accordance with subsection (d).

<< 5 USCA § 601 NOTE >>

(f) JUDICIAL REVIEW.—This section is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

<< 18 USCA § 922 NOTE >>

SEC. 655. None of the funds appropriated pursuant to this Act or any other provision of law may be used for any system to implement section 922(t) of title 18, United States Code, unless the system allows, in connection with a person's delivery of a firearm to a Federal firearms licensee as collateral for a loan, the background check to be performed at the time the collateral is offered for delivery to such licensee: *Provided*, That the licensee notifies local law enforcement within 48 hours of the licensee receiving a denial on the person offering the collateral: *Provided further*, That the provisions of section 922(t) shall apply at the time of the redemption of the firearm.

SEC. 656. (a) None of the funds appropriated by this Act may be used to enter into or renew a contract which includes a provision providing prescription drug coverage, except where the contract also includes a provision for contraceptive coverage.

(b) Nothing in this section shall apply to a contract with:

(1) any of the following religious plans:

(a) SelectCare

(b) Personal CaresHMO

(c) Care Choices

(d) OSF Health Plans, Inc.

(e) Yellowstone Community Health Plan

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) any existing or future plan, if the plan objects to such coverage on the basis of religious beliefs.

(c) In implementing this section, any plan that enters into or renews a contract under this section may not subject any individual to discrimination on the basis that the individual refuses to prescribe contraceptives because such activities would be contrary to the individual's religious beliefs or moral convictions.

(d) Nothing in this section shall be construed to require coverage of abortion or abortion-related services.

TITLE VIII—TECHNICAL AND CLARIFYING AMENDMENTS

SEC. 801. TECHNICAL AND CLARIFYING AMENDMENTS RELATING TO DISTRICT OF COLUMBIA RETIREMENT FUNDS.

<< DC ST § 1–761.2 >>

(a) PERMITTING OTHER FEDERAL ENTITIES TO ADMINISTER PROGRAM.—Section 11003 of the Balanced Budget Act of 1997 (DC Code, sec. 1–761.2) is amended—

(1) in paragraph (1), by inserting ", and includes any agreement with a department, agency, or instrumentality of the United States entered into under that section" after "the Trustee"; and

(2) in paragraph (10), by striking ", partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization" and inserting "; partnership; joint venture; corporation; mutual company; joint-stock company; trust; estate; unincorporated organization; association; employee organization; or department, agency, or instrumentality of the United States".

<< DC ST § 1–763.1 >>

(b) PERMITTING WAIVER OF RECOVERY OF AMOUNTS PAID IN ERROR.—Section 11021(3) of such Act (DC Code, sec. 1–763.1(3)) is amended by inserting ", or waive recoupment or recovery of," after "recover".

<< DC ST § 1–764.2 >>

(c) PERMITTING USE OF TRUST FUND TO COVER ADMINISTRATIVE EXPENSES.—Section 11032 of such Act (DC Code, sec. 1–764.2) is amended—

(1) by amending subsection (a) to read as follows:

"(a) IN GENERAL.—Amounts in the Trust Fund shall be used—

"(1) to make Federal benefit payments under this subtitle;

"(2) subject to subsection (b)(1), to cover the reasonable and necessary expenses of administering the Trust Fund under the contract entered into pursuant to section 11035(b);

"(3) to cover the reasonable and necessary administrative expenses incurred by the Secretary in carrying out the Secretary s responsibilities under this subtitle; and

"(4) for such other purposes as are specified in this subtitle."; and

(2) in subsection (b)(2), by inserting "(including expenses described in section 11041(b))" after "to administer the Trust Fund".

<< DC ST § 1–764.5 >>

(d) PROMOTING FLEXIBILITY IN ADMINISTRATION OF PROGRAM.—Section 11035 of such Act (DC Code, sec. 1–764.5) is amended—

(1) by redesignating subsection (c) as subsection (e); and

(2) by inserting after subsection (b) the following new subsections:

"(c) SUBCONTRACTS.—Notwithstanding any provision of a District Retirement Program or any other law, rule, or regulation, the Trustee may, with the approval of the Secretary, enter into one or more subcontracts with the District Government or any person to provide services to the Trustee in connection with its performance of the contract. The Trustee shall monitor the performance of any such subcontract and enforce its provisions.

"(d) DETERMINATION BY THE SECRETARY.—Notwithstanding subsection (b) or any other provision of this subtitle, the Secretary may determine, with respect to any function otherwise to be performed by the Trustee, that in the interest of economy and efficiency such function shall be performed by the Secretary rather than the Trustee.".

<< DC ST § 1–765.1 >>

(e) PROCESS FOR REIMBURSEMENT OF DISTRICT GOVERNMENT FOR EXPENSES OF INTERIM ADMINISTRATION.—Section 11041 of such Act (DC Code, sec. 1–765.1) is amended—

(1) in subsection (b), by striking "The Trustee shall" and inserting "The Secretary or the Trustee shall, at such times during or after the period of interim administration described in subsection (a) as are deemed appropriate by the Secretary or the Trustee";

(2) in subsection (b)(1), by inserting "the Secretary or" after "if"; and

(3) in subsection (c), by striking "the replacement plan adoption date" and inserting "such time as the Secretary notifies the District Government that the Secretary has directed the Trustee to carry out the duties and responsibilities required under the contract".

<< DC ST § 1–766.3 >>

(f) ANNUAL FEDERAL PAYMENT INTO FEDERAL SUPPLEMENTAL FUND.—Section 11053 of such Act (DC Code, sec. 1–766.3) is amended—

(1) by amending subsection (a) to read as follows:

"(a) ANNUAL AMORTIZATION AMOUNT.—At the end of each applicable fiscal year the Secretary shall promptly pay into the Federal Supplemental Fund from the General Fund of the Treasury an amount equal to the annual amortization amount for the year (which may not be less than zero).";

(2) in subsection (b), by striking "freeze date" and inserting "effective date of this Act";

(3) by redesignating subsections (b) and (c) as subsections (c) and (d); and

(4) by inserting after subsection (a) the following new subsection:

"(b) ADMINISTRATIVE EXPENSES.—During each applicable fiscal year, the Secretary shall pay into the Federal Supplemental Fund from the General Fund of the Treasury amounts not to exceed the covered administrative expenses for the year.".

<< DC ST § 1–762.2 >>

(g) TECHNICAL CORRECTIONS.—(1) Section 11012(c) of such Act (DC Code, sec. 1–752.2(c)) [1] is amended by striking "District of Columbia Retirement Board" and inserting "District Government".

[1] So in original. Probably should read "1–762.2(c)".

<< DC ST § 1–764.3 >>

(2) Section 11033(c)(1) of such Act (DC Code, sec. 1–764.3(c)(1)) is amended by striking "consisting" in the first place that it appears.

<< DC ST § 1–766.2 >>

(3) Section 11052 of such Act (DC Code, sec. 1–766.2) is amended by inserting "to" after "may be made only".

SEC. 802. CLARIFYING TREATMENT OF DISTRICT OF COLUMBIA EMPLOYEES TRANSFERRED TO FEDERAL RETIREMENT SYSTEMS.

(a) ELIGIBILITY OF NONJUDICIAL EMPLOYEES OF DISTRICT OF COLUMBIA COURTS FOR MEDICARE AND SOCIAL SECURITY BENEFITS.—Section 11246(b) of the Balanced Budget Act of 1997 (Public Law 105–33; 111 Stat. 755) is amended—

<< 26 USCA § 3121 NOTE >>

(1) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4); and

<< 26 USCA § 3121 >>

(2) by inserting after paragraph (1) the following new paragraph:

"(2) CONFORMING AMENDMENTS TO INTERNAL REVENUE CODE AND SOCIAL SECURITY.—(A) Section 3121(b)(7)(C) of the Internal Revenue Code of 1986 (relating to the definition of employment for service performed in the employ of the District of Columbia) is amended by inserting '(other than the Federal Employees Retirement System provided in chapter 84 of title 5, United States Code)' after 'law of the United States'.

<< 42 USCA § 410 >>

"(B) Section 210(a)(7)(D) of the Social Security Act (42 U.S.C. 410(a)(7)(D)) (relating to the definition of employment for service performed in the employ of the District of Columbia), is amended by inserting '(other than the Federal Employees Retirement System provided in chapter 84 of title 5, United States Code)' after 'law of the United States.".

<< DC ST § 1–627.10 >>

(b) VESTING UNDER PREVIOUS DISTRICT OF COLUMBIA RETIREMENT PROGRAM.—For purposes of vesting pursuant to section 2610(b) of the District of Columbia Government Comprehensive Merit Personnel Act of 1978 (DC Code, sec. 1–627.10(b)), creditable service with the District for employees whose participation in the District Defined Contribution Plan ceases as a result of the implementation of the Balanced Budget Act of 1997 shall include—

(1) continuous service performed by nonjudicial employees of the District of Columbia courts after September 30, 1997; and

(2) service performed for a successor employer, including the Department of Justice or the District of Columbia Offender Supervision, Defender, and Courts Services Agency established under section 11233 of the Balanced Budget Act of 1997, that provides services previously performed by the District government.

SEC. 803. METHODOLOGY FOR DESIGNATING ASSETS OF RETIREMENT FUND.

<< DC ST § 1–764.3 >>

Section 11033 of the Balanced Budget Act of 1997 (DC Code, sec. 1–764.3) is amended by adding at the end the following new subsection:

"(e) METHODOLOGY FOR DESIGNATING ASSETS.—

"(1) IN GENERAL.—In carrying out subsection (b), the Secretary may develop and implement a methodology for designating assets after the replacement plan adoption date that takes into account the value of the District Retirement Fund as of the replacement plan adoption date and the proportion of such value represented by $1.275 billion, together with the income (including returns on investments) earned on the assets of and withdrawals from and deposits to the Fund during the period between such date and the date on which the Secretary designates assets under subsection (b). In implementing a methodology under the previous sentence, the Secretary shall not be required to determine the value of designated assets as of the replacement plan adoption date. Nothing in this paragraph may be deemed to effect the entitlement of the District Retirement Fund to income (including returns on investments) earned after the replacement plan adoption date on assets designated for retention by the Fund.

"(2) EMPLOYEE CONTRIBUTIONS; JUDICIAL RETIREMENT AND SURVIVORS ANNUITY FUND.—The Secretary may develop and implement a methodology comparable to the methodology described in paragraph (1) in carrying out the requirements of subsection (c) and in designating assets to be transferred to the District of Columbia Judicial Retirement and Survivors Annuity Fund pursuant to section 124(c)(1) of the District of Columbia Retirement Reform Act (as amended by section 11252).

"(3) DISCRETION OF THE SECRETARY.—The Secretary's development and implementation of methodologies for designating assets under this subsection shall be final and binding.".

## SEC. 804. TECHNICAL AND CLARIFYING AMENDMENTS RELATING TO JUDICIAL RETIREMENT PROGRAM.

<< DC ST § 11–1570 >>

(a) ADMINISTRATION OF JUDICIAL RETIREMENT AND SURVIVORS ANNUITY FUND.—Section 11–1570, District of Columbia Code, as amended by section 11251 of the Balanced Budget Act of 1997, is amended as follows:

(1) In subsection (b)(1)—

(A) by striking "title I of the National Capital Revitalization and Self–Government Improvement Act of 1997" and inserting "subtitle A of title XI of the Balanced Budget Act of 1997"; and

(B) by inserting after the second sentence the following new sentences: "Notwithstanding any other provision of District law or any other law, rule, or regulation, any Trustee, contractor, or enrolled actuary selected by the Secretary under this subsection may, with the approval of the Secretary, enter into one or more subcontracts with the District of Columbia government or any person to provide services to such Trustee, contractor, or enrolled actuary in connection with its performance of its agreement with the Secretary. Such Trustee, contractor, or enrolled actuary shall monitor the performance of any subcontract to which it is a party and enforce its provisions.".

(2) In subsection (b)(2)—

(A) by striking "chief judges of the District of Columbia Court of Appeals and Superior Court of the District of Columbia" and inserting "Secretary";

(B) by striking "and the Secretary";

(C) by striking "and appropriations"; and

(D) by striking "and deficiency".

(3) By amending subsection (c) to read as follows:

"(c)(1) Amounts in the Fund are available—

"(A) for the payment of judges retirement pay, annuities, refunds, and allowances under this subchapter;

"(B) to cover the reasonable and necessary expenses of administering the Fund under any agreement entered into with a Trustee, contractor, or enrolled actuary under subsection (b)(1), including any agreement with a department, agency or instrumentality of the United States; and

"(C) to cover the reasonable and necessary administrative expenses incurred by the Secretary in carrying out the Secretary s responsibilities under this subchapter.

"(2) Notwithstanding any other provision of District law or any other law, rule, or regulation—

"(A) the Secretary may review benefit determinations under this subchapter made prior to the date of the enactment of the Balanced Budget Act of 1997, and shall make initial benefit determinations after such date; and

"(B) the Secretary may recoup or recover, or waive recoupment or recovery of, any amounts paid under this subchapter as a result of errors or omissions by any person.".

(4) In subsection (d)(1)—

(A) by striking "Subject to the availability of appropriations, there shall be deposited into the Fund" and inserting "The Secretary shall pay into the Fund from the General Fund of the Treasury"; and

(B) by striking "(beginning with the first fiscal year which ends more than 6 months after the replacement plan adoption date described in section 103(13) of the National Capital Revitalization and Self–Government Improvement Act of 1997)".

(5) In subsection (d)(2)(A)—

(A) by striking "June 30, 1997" and inserting "September 30, 1997"; and

(B) by striking "net the sum of future normal cost" and inserting "net of the sum of the present value of future normal costs".

(6) In subsection (d)(3), by striking "shall be taken from sums available for that fiscal year for the payment of the expenses of the Court, and".

(7) By adding at the end the following new subsections:

"(h) For purposes of the Internal Revenue Code of 1986—

"(1) the Fund shall be treated as a trust described in section 401(a) of the Code that is exempt from taxation under section 501(a) of the Code;

"(2) any transfer to or distribution from the Fund shall be treated in the same manner as a transfer to or distribution from a trust described in section 401(a) of the Code; and

"(3) the benefits provided by the Fund shall be treated as benefits provided under a governmental plan maintained by the District of Columbia.

"(i) For purposes of the Employee Retirement Income Security Act of 1974, the benefits provided by the Fund shall be treated as benefits provided under a governmental plan maintained by the District of Columbia.

"(j) To the extent that any provision of subpart A of part I of subchapter D of the chapter 1 of the Internal Revenue Code of 1986 (26 U.S.C. 401 et seq.) is amended after the date of the enactment of this subsection, such provision as amended shall apply to the Fund only to the extent the Secretary determines that application of the provision as amended is consistent with the administration of this subchapter.

"(k) Federal obligations for benefits under this subchapter are backed by the full faith and credit of the United States.".

<< DC ST § 11–1570 >>

(b) REGULATORY AUTHORITY OF SECRETARY.—Section 11251 of the Balanced Budget Act of 1997 (Public Law 105–33; 111 Stat. 756) is amended—

(1) by redesignating subsection (b) as subsection (c);

(2) by inserting after subsection (a) the following new subsection:

<< DC ST § 11–1572 >>

"(b) REGULATIONS; EFFECT ON REFORM ACT.—Title 11, District of Columbia Code, is amended by adding the following new section:

**'§ 11–1572. Regulations; effect on Reform Act.**

'(a) The Secretary is authorized to issue regulations to implement, interpret, administer and carry out the purposes of this subchapter, and, in the Secretary's discretion, those regulations may have retroactive effect, except that nothing in this subsection may be construed to permit the Secretary to issue any regulation to retroactively reduce or eliminate the benefits to which any individual is entitled under this subchapter.

'(b) This subchapter supersedes any provision of the District of Columbia Retirement Reform Act (Public Law 96–122) inconsistent with this subchapter and the regulations thereunder.'.''; and

<< DC ST § >>

(3) by amending subsection (c) (as so redesignated) to read as follows:

"(c) CLERICAL AMENDMENTS.—

"(1) The table of sections for subchapter III of chapter 15 of title 11, District of Columbia Code, is amended by amending the item relating to section 11–1570 to read as follows:

'11–1570. The District of Columbia Judicial Retirement and Survivors Annuity Fund.'.

"(2) The table of sections for subchapter III of chapter 15 of title 11, District of Columbia Code, is amended by adding at the end the following new item:

'11–1572. Regulations; effect on Reform Act.'.''

<< DC ST § 1–714 >>

(c) TERMINATION OF PREVIOUS FUND AND PROGRAM.—Section 124 of the District of Columbia Retirement Reform Act (DC Code, sec. 1–714), as amended by section 11252(a) of the Balanced Budget Act of 1997, is amended—

(1) in subsection (a), by inserting "(except as provided in section 11–1570, District of Columbia Code)" after "the following";

(2) in subsection (c)(1), by striking "title I of the National Capital Revitalization and Self–Government Improvement Act of 1997" and inserting "subtitle A of title XI of the Balanced Budget Act of 1997"; and

(3) in subsection (c)(2)—

(A) by striking "(2) The" and inserting "(2) In accordance with the direction of the Secretary, the";

AR.02755

(B) by striking "in the Treasury" and inserting "at the Board"; and

(C) by striking "appropriated" and inserting "used".

<< DC ST §§ 1–711, 1–763.3, 1–764.2, 1–764.3, 1–765.1 >>

(d) ADMINISTRATION OF RETIREMENT FUNDS.—Section 11252 of the Balanced Budget Act of 1997 is amended—

(1) by redesignating subsection (b) as subsection (c);

(2) by inserting after subsection (a) the following new subsection:

"(b) TRANSITION FROM DISTRICT OF COLUMBIA ADMINISTRATION.—Sections 11023, 11032(b)(2), 11033(d), and 11041 shall apply to the administration of the District of Columbia Judges Retirement Fund established under section 124 of the District of Columbia Retirement Reform Act (DC Code, sec. 1–714), the District of Columbia Judicial Retirement and Survivors Annuity Fund established under section 11–1570, District of Columbia Code, and the retirement program for judges under subchapter III of chapter 15 of title 11, District of Columbia Code, except as follows:

"(1) In applying each such section—

"(A) any reference to this subtitle shall instead refer to subchapter III of chapter 15 of title 11, District of Columbia Code;

"(B) any reference to the District Retirement Program shall be deemed to include the retirement program for judges under subchapter III of chapter 15 of title 11, District of Columbia Code;

"(C) any reference to the District Retirement Fund shall be deemed to include the District of Columbia Judges Retirement Fund established under section 124 of the District of Columbia Retirement Reform Act;

"(D) any reference to Federal benefit payments shall be deemed to include judges retirement pay, annuities, refunds and allowances under subchapter III of chapter 15 of title 11, District of Columbia Code;

"(E) any reference to the Trust Fund shall instead refer to the District of Columbia Judicial Retirement and Survivors Annuity Fund established under section 11–1570, District of Columbia Code;

"(F) any reference to section 11033 shall instead refer to section 124 of the District of Columbia Retirement Reform Act, as amended by section 11252; and

"(G) any reference to chapter 2 shall instead refer to section 11–1570, District of Columbia Code.

"(2) In applying section 11023—

"(A) any reference to the contract shall instead refer to the agreement referred to in section 11–1570(b), District of Columbia Code; and

"(B) any reference to the Trustee shall instead refer to the Trustee or contractor referred to in section 11–1570(b), District of Columbia Code.

"(3) In applying section 11033(d)—

"(A) any reference to this section shall instead refer to section 124 of the District of Columbia Retirement Reform Act, as amended by section 11252; and

"(B) any reference to the Trustee shall instead refer to the Secretary or the Trustee or contractor referred to in section 11–1570(b), District of Columbia Code.

"(4) In applying section 11041(b), any reference to the Trustee shall instead refer to the Trustee or contractor referred to in section 11–1570(b), District of Columbia Code."; and

(3) by adding at the end the following new subsection:

<< DC ST § 1–711 >>

"(d) EFFECTIVE DATE.—The provisions of subsection (c) shall take effect on the date on which the assets of the District of Columbia Judges Retirement Fund are transferred to the District of Columbia Judicial Retirement and Survivors Annuity Fund.".

<< DC ST §§ 11–1568, 11–1569 >>

(e) MISCELLANEOUS TECHNICAL AND CLERICAL AMENDMENTS.—(1) Sections 11–1568(d) and 11–1569, District of Columbia Code, are each amended by striking "Mayor" each place it appears and inserting "Secretary of the Treasury".

<< DC ST § 11–1568.2 >>

(2) Section 11–1568.2, District of Columbia Code, is amended by striking "Mayor of the District of Columbia" each place it appears and inserting "Secretary of the Treasury".

<< DC ST § 1–711 >>

(3) Section 121(b)(1)(A) of the District of Columbia Retirement Reform Act (DC Code, sec. 1–711(b)(1)(A)), as amended by section 11252(c)(1) of the Balanced Budget Act of 1997 (as redesignated by subsection (d)(1)), is amended in the matter preceding clause (i), by striking "11" and inserting "12".

<< DC ST § 11–1561 >>

(4) Section 11–1561(4), District of Columbia Code, as amended by section 11253(b) of the Balanced Budget Act of 1997, is amended by striking "sections" and inserting "section".

(5) Section 11253(c) of the Balanced Budget Act of 1997 (Public Law 105–33; 111 Stat. 759) is amended to read as follows:

<< DC ST § 11–1564 >>

"(c) TREATMENT OF FEDERAL SERVICE OF JUDGES.—Section 11–1564, District of Columbia Code, is amended—

"(1) in subsection (d)(2)(A), by striking 'section 1–1814' and inserting 'section 1–714' or the District of Columbia Judicial Retirement and Survivors Annuity Fund (established by section 11–1570)'; and

"(2) in subsection (d)(4), by striking 'Judges Retirement Fund established by section 124(a) of the District of Columbia Retirement Reform Act' and inserting 'Judicial Retirement and Survivors Annuity Fund under section 11–1570'.".

(6) Section 11253 of the Balanced Budget Act of 1997 (Public Law 105–33; 111 Stat. 759) is amended by adding at the end the following new subsection:

<< DC ST § 11–1568.1 >>

"(d) REDEPOSITS TO FUND.—Section 11–1568.1(4)(A), District of Columbia Code, is amended by striking 'Judges Retirement Fund' and inserting 'Judicial Retirement and Survivors Annuity Fund'.".

<< DC ST § 11–1570 >>

(f) EFFECTIVE DATE.—The amendments made by subsections (a)(2), (a)(4), and (a)(6) shall take effect October 1, 1998.

<< DC ST §§ 1–627.10, 1–711, 1–714, 1–761.2, 1–762.2, 1–763.1, 1–763.3, 1–764.2, 1–764.3, 1–764.5, 1–765.1, 1–766.2, 1–766.3, 11–1561, 11–1564, 11–1568, 11–1568.1, 11–1568.2, 11–1569, 11–1570 >>

<< DC ST § 11–1572 >>

<< 26 USCA § 3121 NOTE >>

<< 42 USCA § 410 nt >>

SEC. 805. EFFECTIVE DATE.

Except as otherwise specifically provided, this title and the amendments made by this title shall take effect as if included in the enactment of title XI of the Balanced Budget Act of 1997.

TITLE IX—HAITIAN REFUGEE IMMIGRATION FAIRNESS ACT OF 1998

<< 8 USCA § 1101 NOTE >>

SEC. 901. SHORT TITLE. This title may be cited as the "Haitian Refugee Immigration Fairness Act of 1998".

<< 8 USCA § 1255 NOTE >>

SEC. 902. ADJUSTMENT OF STATUS OF CERTAIN HAITIAN NATIONALS. (a) ADJUSTMENT OF STATUS.—

<< 8 USCA § 1255 NOTE >>

 (1) IN GENERAL.—The status of any alien described in subsection (b) shall be adjusted by the Attorney General to that of an alien lawfully admitted for permanent residence, if the alien—

  (A) applies for such adjustment before April 1, 2000; and

  (B) is otherwise admissible to the United States for permanent residence, except that, in determining such admissibility, the grounds for inadmissibility specified in paragraphs (4), (5), (6)(A), (7)(A), and (9)(B) of section 212(a) of the Immigration and Nationality Act shall not apply.

<< 8 USCA § 1255 NOTE >>

 (2) RELATIONSHIP OF APPLICATION TO CERTAIN ORDERS.—An alien present in the United States who has been ordered excluded, deported, removed, or ordered to depart voluntarily from the United States under any provision of the Immigration and Nationality Act may, notwithstanding such order, apply for adjustment of status under paragraph (1). Such an alien may not be required, as a condition on submitting or granting such application, to file a separate motion to reopen, reconsider, or vacate such order. If the Attorney General grants the application, the Attorney General shall cancel the order. If the Attorney General makes a final decision to deny the application, the order shall be effective and enforceable to the same extent as if the application had not been made.

<< 8 USCA § 1255 NOTE >>

 (b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided by subsection (a) shall apply to any alien who is a national of Haiti who—

<< 8 USCA § 1255 NOTE >>

 (1) was present in the United States on December 31, 1995, who—

  (A) filed for asylum before December 31, 1995,

  (B) was paroled into the United States prior to December 31, 1995, after having been identified as having a credible fear of persecution, or paroled for emergent reasons or reasons deemed strictly in the public interest, or

  (C) was a child (as defined in the text above subparagraph (A) of section 101(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1101(b)(1)) at the time of arrival in the United States and on December 31, 1995, and who—

   (i) arrived in the United States without parents in the United States and has remained without parents in the United States since such arrival,

   (ii) became orphaned subsequent to arrival in the United States, or

   (iii) was abandoned by parents or guardians prior to April 1, 1998 and has remained abandoned since such abandonment; and

<< 8 USCA § 1255 NOTE >>

 (2) has been physically present in the United States for a continuous period beginning not later than December 31, 1995, and ending not earlier than the date the application for such adjustment is filed, except that an alien shall not be considered to have failed to maintain continuous physical presence by reason of an absence, or absences, from the United States for any period or periods amounting in the aggregate to not more than 180 days.

<< 8 USCA § 1255 NOTE >>

(c) STAY OF REMOVAL.—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1255 NOTE >>

(1) IN GENERAL.—The Attorney General shall provide by regulation for an alien who is subject to a final order of deportation or removal or exclusion to seek a stay of such order based on the filing of an application under subsection (a).

<< 8 USCA § 1255 NOTE >>

(2) DURING CERTAIN PROCEEDINGS.—Notwithstanding any provision of the Immigration and Nationality Act, the Attorney General shall not order any alien to be removed from the United States, if the alien is in exclusion, deportation, or removal proceedings under any provision of such Act and has applied for adjustment of status under subsection (a), except where the Attorney General has made a final determination to deny the application.

<< 8 USCA § 1255 NOTE >>

(3) WORK AUTHORIZATION.—The Attorney General may authorize an alien who has applied for adjustment of status under subsection (a) to engage in employment in the United States during the pendency of such application and may provide the alien with an "employment authorized" endorsement or other appropriate document signifying authorization of employment, except that if such application is pending for a period exceeding 180 days, and has not been denied, the Attorney General shall authorize such employment.

<< 8 USCA § 1255 NOTE >>

(d) ADJUSTMENT OF STATUS FOR SPOUSES AND CHILDREN.—

<< 8 USCA § 1255 NOTE >>

(1) IN GENERAL.—The status of an alien shall be adjusted by the Attorney General to that of an alien lawfully admitted for permanent residence, if—
   (A) the alien is a national of Haiti;
   (B) the alien is the spouse, child, or unmarried son or daughter, of an alien whose status is adjusted to that of an alien lawfully admitted for permanent residence under subsection (a), except that, in the case of such an unmarried son or daughter, the son or daughter shall be required to establish that he or she has been physically present in the United States for a continuous period beginning not later than December 31, 1995, and ending not earlier than the date the application for such adjustment is filed;
   (C) the alien applies for such adjustment and is physically present in the United States on the date the application is filed; and
   (D) the alien is otherwise admissible to the United States for permanent residence, except that, in determining such admissibility, the grounds for inadmissibility specified in paragraphs (4), (5), (6)(A), (7)(A), and (9)(B) of section 212(a) of the Immigration and Nationality Act shall not apply.

<< 8 USCA § 1255 NOTE >>

(2) PROOF OF CONTINUOUS PRESENCE.—For purposes of establishing the period of continuous physical presence referred to in paragraph (1)(B), an alien shall not be considered to have failed to maintain continuous physical presence by reason of an absence, or absences, from the United States for any period or periods amounting in the aggregate to not more than 180 days.

<< 8 USCA § 1255 NOTE >>

(e) AVAILABILITY OF ADMINISTRATIVE REVIEW.—The Attorney General shall provide to applicants for adjustment of status under subsection (a) the same right to, and procedures for, administrative review as are provided to—

<< 8 USCA § 1255 NOTE >>

(1) applicants for adjustment of status under section 245 of the Immigration and Nationality Act; or

AR.02759

<< 8 USCA § 1255 NOTE >>

(2) aliens subject to removal proceedings under section 240 of such Act.

<< 8 USCA § 1255 NOTE >>

(f) LIMITATION ON JUDICIAL REVIEW.—A determination by the Attorney General as to whether the status of any alien should be adjusted under this section is final and shall not be subject to review by any court.

<< 8 USCA § 1255 NOTE >>

(g) NO OFFSET IN NUMBER OF VISAS AVAILABLE.—When an alien is granted the status of having been lawfully admitted for permanent resident pursuant to this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under any provision of the Immigration and Nationality Act.

<< 8 USCA § 1255 NOTE >>

(h) APPLICATION OF IMMIGRATION AND NATIONALITY ACT PROVISIONS.—Except as otherwise specifically provided in this title, the definitions contained in the Immigration and Nationality Act shall apply in the administration of this section. Nothing contained in this title shall be held to repeal, amend, alter, modify, effect, or restrict the powers, duties, functions, or authority of the Attorney General in the administration and enforcement of such Act or any other law relating to immigration, nationality, or naturalization. The fact that an alien may be eligible to be granted the status of having been lawfully admitted for permanent residence under this section shall not preclude the alien from seeking such status under any other provision of law for which the alien may be eligible.

<< 8 USCA § 1255 NOTE >>

(i) ADJUSTMENT OF STATUS HAS NO EFFECT ON ELIGIBILITY FOR WELFARE AND PUBLIC BENEFITS.—No alien whose status has been adjusted in accordance with this section and who was not a qualified alien on the date of enactment of this Act may, solely on the basis of such adjusted status, be considered to be a qualified alien under section 431(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641(b)), as amended by section 5302 of the Balanced Budget Act of 1997 (Public Law 105–33; 111 Stat. 598), for purposes of determining the alien's eligibility for supplemental security income benefits under title XVI of the Social Security Act (42 U.S.C. 1381 et seq.) or medical assistance under title XIX of such Act (42 U.S.C. 1396 et seq.).

<< 8 USCA § 1255 NOTE >>

(j) PERIOD OF APPLICABILITY.—Subsection (i) shall not apply after October 1, 2003.

<< 8 USCA § 1255 NOTE >>

(k) Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter (until all applications for adjustment of status under this section have been finally adjudicated), the Comptroller General of the United States shall submit to the Committees on the Judiciary and the Committees on Appropriations of the United States House of Representatives and the United States Senate a report containing the following:

<< 8 USCA § 1255 NOTE >>

(1)(A) The number of aliens who applied for adjustment of status under subsection (a), including a breakdown specifying the number of such applicants who are described in subparagraph (A), (B), or (C) of subsection (b)(1), respectively.

(B) the number of aliens described in subparagraph (A) whose status was ajusted under this section, including a breakdown described in the subparagraph.

<< 8 USCA § 1255 NOTE >>

(2)(A) The number of aliens who applied for adjustment of status under subsection (d), including a breakdown specifying the number of such applicants who are sponsors, children, or unmarried sons or daughters described in such subsection, respectively.

(B) The number of aliens described in subparagraph (A) whose status was adjusted under this section, including a breakdown described in the subparagraph.

<< 8 USCA § 1255 NOTE >>

SEC. 903. COLLECTION OF DATA ON DETAINED ASYLUM SEEKERS. (a) IN GENERAL.—The Attorney General shall regularly collect data on a nation-wide basis with respect to asylum seekers in detention in the United States, including the following information:

<< 8 USCA § 1255 NOTE >>

(1) The number of detainees.

<< 8 USCA § 1255 NOTE >>

(2) An identification of the countries of origin of the detainees.

<< 8 USCA § 1255 NOTE >>

(3) The percentage of each gender within the total number of detainees.

<< 8 USCA § 1255 NOTE >>

(4) The number of detainees listed by each year of age of the detainees.

<< 8 USCA § 1255 NOTE >>

(5) The location of each detainee by detention facility.

<< 8 USCA § 1255 NOTE >>

(6) With respect to each facility where detainees are held, whether the facility is also used to detain criminals and whether any of the detainees are held in the same cells as criminals.

<< 8 USCA § 1255 NOTE >>

(7) The number and frequency of the transfers of detainees between detention facilities.

<< 8 USCA § 1255 NOTE >>

(8) The average length of detention and the number of detainees by category of the length of detention.

<< 8 USCA § 1255 NOTE >>

(9) The rate of release from detention of detainees for each district of the Immigration and Naturalization Service.

<< 8 USCA § 1255 NOTE >>

(10) A description of the disposition of cases.

<< 8 USCA § 1377 >>

(b) ANNUAL REPORTS.—Beginning October 1, 1999, and not later than October 1 of each year thereafter, the Attorney General shall submit to the Committee on the Judiciary of each House of Congress a report setting forth the data collected under subsection (a) for the fiscal year ending September 30 of that year.

<< 8 USCA § 1377 >>

(c) AVAILABILITY TO PUBLIC.—Copies of the data collected under subsection (a) shall be made available to members of the public upon request pursuant to such regulations as the Attorney General shall prescribe.

<< 8 USCA § 1378 >>

SEC. 904. COLLECTION OF DATA ON OTHER DETAINED ALIENS. (a) IN GENERAL.—The Attorney General shall regularly collect data on a nationwide basis on aliens being detained in the United States by the Immigration and Naturalization Service other than the aliens described in section 903, including the following information:

<< 8 USCA § 1378 >>

(1) The number of detainees who are criminal aliens and the number of detainees who are noncriminal aliens who are not seeking asylum.

<< 8 USCA § 1378 >>

(2) An identification of the ages, gender, and countries of origin of detainees within each category described in paragraph (1).

<< 8 USCA § 1378 >>

(3) The types of facilities, whether facilities of the Immigration and Naturalization Service or other Federal, State, or local facilities, in which each of the categories of detainees described in paragraph (1) are held.

<< 8 USCA § 1378 >>

(b) LENGTH OF DETENTION, TRANSFERS, AND DISPOSITIONS.—With respect to detainees who are criminal aliens and detainees who are noncriminal aliens who are not seeking asylum, the Attorney General shall also collect data concerning—

<< 8 USCA § 1378 >>

(1) the number and frequency of transfers between detention facilities for each category of detainee;

<< 8 USCA § 1378 >>

(2) the average length of detention of each category of detainee;

<< 8 USCA § 1378 >>

(3) for each category of detainee, the number of detainees who have been detained for the same length of time, in 3–month increments;

<< 8 USCA § 1378 >>

(4) for each category of detainee, the rate of release from detention for each district of the Immigration and Naturalization Service; and

AR.02762

<< 8 USCA § 1378 >>

(5) for each category of detainee, the disposition of detention, including whether detention ended due to deportation, release on parole, or any other release.

<< 8 USCA § 1378 >>

(c) CRIMINAL ALIENS.—With respect to criminal aliens, the Attorney General shall also collect data concerning—

<< 8 USCA § 1378 >>

(1) the number of criminal aliens apprehended under the immigration laws and not detained by the Attorney General; and

<< 8 USCA § 1378 >>

(2) a list of crimes committed by criminal aliens after the decision was made not to detain them, to the extent this information can be derived by cross-checking the list of criminal aliens not detained with other databases accessible to the Attorney General.

<< 8 USCA § 1378 >>

(d) ANNUAL REPORTS.—Beginning on October 1, 1999, and not later than October 1 of each year thereafter, the Attorney General shall submit to the Committee on the Judiciary of each House of Congress a report setting forth the data collected under subsections (a), (b), and (c) for the fiscal year ending September 30 of that year.

<< 8 USCA § 1378 >>

(e) AVAILABILITY TO PUBLIC.—Copies of the data collected under subsections (a), (b), and (c) shall be made available to members of the public upon request pursuant to such regulations as the Attorney General shall prescribe.

This Act may be cited as the "Treasury and General Government Appropriations Act, 1999".

SEC. 102. For the purpose of carrying out the provisions of the Tennessee Valley Authority Act of 1933, as amended (16 U.S.C. ch. 12A), including hire, maintenance, and operation of aircraft, and purchase and hire of passenger motor vehicles, $50,000,000 is hereby appropriated: *Provided*, That use of the funds provided herein is limited to the purposes for which funds were provided under this heading in Public Law 105–62: *Provided further*, That of the amounts appropriated under this section, $7,000,000 shall be available for operation, maintenance, surveillance, and improvement of Land Between the Lakes.

SEC. 103. REPURCHASE OF BONDS BY THE TENNESSEE VALLEY AUTHORITY. (a) REPURCHASE.— Notwithstanding any other provision of law or any term contained in any bond issued by the Tennessee Valley Authority to the Federal Financing Bank—

(1) subject to subsection (b), the Tennessee Valley Authority shall have the right to repurchase all such bonds by payment of the principal amount of the bonds plus interest to the date of repurchase;

(2) the Federal Financing Bank shall not require payment from the Tennessee Valley Authority of any additional amount in connection with the repurchase; and

(3) there is hereby appropriated to the Federal Financing Bank such amounts as may be necessary to pay the difference between (1) the amount that the Tennessee Valley Authority paid to the Federal Financing Bank to prepay its outstanding loans from the Federal Financing Bank under this section and (2) the amount that the Federal Financing Bank would have received otherwise.

(b) NO FURTHER FINANCING.—Notwithstanding any other law, after the date of repurchase of bonds under subsection (a), the Tennessee Valley Authority shall not be entitled or permitted to obtain financing from the Federal Financing Bank.

(c) USE OF SAVINGS.—

(1) IN GENERAL.—From non-appropriated funds, beginning on the date of repurchase of bonds and ending on the date on which the bonds would have matured but for this section, amounts that, as determined under paragraph (2), are equivalent to amounts that the Tennessee Valley Authority saves as a result of the repurchase of bonds shall be used to reduce debt of the Tennessee Valley Authority.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) DETERMINATION OF AMOUNT OF SAVINGS.—On each date on which a payment of interest would have been made on a repurchased bond if the bond had not been repurchased, the Tennessee Valley Authority shall be considered to realize a saving in the amount of the difference between—

(A) the amount of interest that would have been due at the rate of interest specified in the bond; and

(B) the amount of interest that would have been due if the rate of interest specified in the bond had been the yield to maturity of a marketable public obligation of the United States with a maturity of 10 years as of September 30, 1997.

SEC. 104. Section 312 of Public Law 105–245, the Energy and Water Development Appropriations Act, 1999, is repealed.

SEC. 105. An additional amount of $35,000,000, to remain available until expended, for Department of Defense—Civil, Department of the Army, Corps of Engineers—Civil, "Construction, General", is hereby appropriated for the Columbia River Fish Mitigation, Washington, Oregon, and Idaho, project.

SEC. 106. The Secretary of the Army, acting through the Chief of Engineers, is directed to use $1,500,000 of the funds previously appropriated in "Construction, General", for the Lackawanna River, Scranton, Pennsylvania, project to initiate construction of the Delaware River Mainstem and Channel Deepening, Delaware, New Jersey, and Pennsylvania, project. The Secretary of the Army, acting through the Chief of Engineers, is directed to use $400,000 of the funds previously appropriated in "Construction, General", for the Lackawanna River, Scranton, Pennsylvania, project to initiate a comprehensive review of aquatic ecosystem restoration initiatives in the Upper Susquehanna–Lackawanna Watershed under the Aquatic Ecosystem Restoration (Section 206) program. Subject to enactment of authorizing legislation, the Secretary of the Army, acting through the Chief of Engineers, is directed to use $340,000 of available "Construction, General" funds to initiate construction of the Pierre, South Dakota, flood mitigation project. The Secretary of the Army, acting through the Chief of Engineers, is directed to use $1,500,000 of the funds appropriated in "Construction, General", in Public Law 105–245 for the South Central Pennsylvania Environment Improvement Program only for water-related environmental infrastructure and resource protection and development projects in Allegheny County, Pennsylvania, in accordance with the purposes of subsection (a) and requirements of subsections (b) through (e) of section 313 of the Water Resources Development Act of 1992, as amended.

SEC. 107. The Secretary of the Army, acting through the Chief of Engineers, is authorized and directed to use $750,000 of available "Construction, General" funds for engineering and design, and repair of the Archusa Dam and appurtenant structures located in Quitman, Mississippi.

SEC. 108. An additional amount of $60,000,000 for Department of Energy—Energy Programs, "Energy Supply", is hereby appropriated to remain available until September 30, 2000.

SEC. 109. An additional amount of $15,000,000, to remain available until expended, for Department of Energy—Energy Programs, "Science", is hereby appropriated.

SEC. 110. LAKE POWELL. No funds appropriated by this Act or any other Act for fiscal year 1999 shall be used to study or implement any plan to drain Lake Powell or decommission the Glen Canyon Dam.

SEC. 111. Notwithstanding any other provision of law, for necessary expenses relating to construction of, and improvements to, surface transportation projects located in the Commonwealth of Massachusetts, $100,000,000, to remain available until expended.

SEC. 112. Notwithstanding any other provision of law, for necessary expenses relating to construction of, and improvements to, Corridor X of the Appalachian development highway system located in the State of Alabama, $100,000,000, to remain available until expended.

SEC. 113. Notwithstanding any other provision of law, for necessary expenses relating to construction of, and improvements to, the Appalachian development highway system in the State of West Virginia, $32,000,000, to remain available until expended.

SEC. 114. Notwithstanding any other provision of law, for necessary expenses relating to construction of, and improvements to, highway projects in the corridor designated by section 1105(c)(18)(C)(ii) of the Intermodal Surface Transportation Efficiency Act of 1991 (105 Stat. 2032–2033), as amended by section 1211(i) of the Transportation Equity Act for the 21st Century, $100,000,000, to remain available until expended.

SEC. 115. Notwithstanding any other provision of law, to enable the Secretary of Transportation to make grants to the Alaska Railroad, $28,000,000, to remain available until expended, which shall be for capital improvements benefiting its passenger rail operations.

SEC. 116. Of the unobligated balances authorized in Public Law 102–240 under 49 U.S.C. 5338(b)(1), $392,000,000 is rescinded.

SEC. 117. Notwithstanding any other provision of law, within the funding made available in the Department of Transportation and Related Agencies Appropriations Act, 1999 for discretionary grants under the obligation limitation for Federal Aviation Administration, "Grants-in-Aid for Airports" in fiscal year 1999, not less than $11,250,000 shall be made available for capital improvement projects at the Wilkes–Barre/Scranton International Airport.

SEC. 118. Notwithstanding any other provision of law, within the funding made available in the Department of Transportation and Related Agencies Appropriations Act, 1999 for discretionary grants under the obligation limitation for Federal Aviation Administration, "Grants-in-Aid for Airports" in fiscal year 1999, not less than $7,000,000 shall be made available for capital improvement projects at the Minneapolis–St. Paul International Airport.

SEC. 119. The Legislative Branch Appropriations Act, 1999, is amended by amending the item relating to "JOINT ITEMS—Joint Committee on Printing" to read as follows:

"JOINT COMMITTEE ON PRINTING

"For salaries and expenses of the Joint Committee on Printing, $202,000, to be disbursed by the Secretary of the Senate, together with an additional amount of $150,000 if there is enacted into law legislation which transfers the legislative and oversight responsibilities of the Joint Committee on Printing to the Committee on House Oversight of the House of Representatives: *Provided*, That such additional amount shall be transferred to the Committee on House Oversight of the House of Representatives and made available beginning January 1, 1999: *Provided further*, That such additional amount shall be disbursed by the Chief Administrative Officer of the House of Representatives."

SEC. 120. For carrying out the provisions of division C, title II of this Act, $30,000,000, including $750,000 for the cost of the direct loan under section 207(a), $20,000,000 for the payments in section 207(d), $250,000 for the cost of direct loans under section 211(e), $1,000,000 for the cost of a direct loan in the Bering Sea and Aleutian Islands crab fisheries under the authority of section 312(b) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1861a(b)), and $6,000,000 and $2,000,000 for the Secretary of Commerce and Secretary of Transportation, respectively, to implement division C, title II.

SEC. 121. In addition to amounts provided in the conference report accompanying H.R. 4194 (H. Rept. 105–769), the following funds are hereby appropriated: $10,000,000 for "Housing opportunities for persons with AIDS", to remain available until expended; $45,000,000 to the Secretary of Housing and Urban Development for "Urban Empowerment Zones" for grants in connection with a second round of the empowerment zones program in urban areas, designated by the Secretary of Housing and Urban Development in fiscal year 1999 pursuant to the Taxpayer Relief Act of 1997, including $3,000,000 for each empowerment zone for use in conjunction with economic development activities consistent with the strategic plan of each empowerment zone, to remain available until expended; $20,000,000 for "State and tribal assistance grants" for a grant for construction and related activities for wastewater treatment for Boston, Massachusetts, to remain available until expended; $10,000,000 for "National and community service programs operating expenses" for grants under the National Service Trust program authorized under subtitle C of title I of the National and Community Service Act of 1990 (42 U.S.C. 12571 et seq.) (relating to activities including the AmeriCorps program), to remain available until September 30, 2000: *Provided*, That none of the funds provided herein for "National and community service programs operating expenses" may be used to administer, reimburse, or support any national service program authorized under section 121(d)(2) of the aforementioned Act; $10,000,000 for "Science and technology", for research associated with the Climate Change Technology Initiative, to remain available until September 30, 2000: *Provided further*, That the obligated balance of such $10,000,000 shall remain available through September 30, 2007 for liquidating obligations made in fiscal years 1999 and 2000; and $15,000,000 for "Community development financial institutions fund program account", to remain available until September 30, 2000.

Of the amount appropriated in H.R. 4194, the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, under the heading "Community development block grants", $4,750,000 shall be available as a grant to Cayuga County, New York, to repair and rehabilitate the seawalls at the Owasco Lake outlet, and $250,000 shall be available as a grant to Jackson, Michigan, to remove a portion of the Grand River culvert in Jackson, Michigan.

<< 12 USCA § 1454 NOTE >>

<< 12 USCA § 1454 >>

<< 12 USCA § 4513 >>

SEC. 122. Upon enactment of H.R. 4194, the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, section 202 of that Act is hereby repealed.

<< 42 USCA § 1437n NOTE >>

<< 42 USCA § 1437n >>

SEC. 123. Section 513(a) of the "Quality Housing and Work Responsibility Act of 1998" is amended, upon enactment, by inserting after "40 percent" at the end of proposed section 16(c)(3) of the United States Housing Act of 1937, as set forth in section 513(a), the following: "shall be available for leasing only by families whose incomes at the time of commencement of occupancy do not exceed 30 percent of the area median income, as determined by the Secretary with adjustments for smaller and larger families.".

SEC. 124. Notwithstanding the third undesignated paragraph under the heading "Community development block grants" under title II of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999, of the amount made available under such heading for the city of Oklahoma City, Oklahoma, up to 50 percent of such amount shall be available to such city for payment of claims for bomb damage and repairs for infrastructure located in the area described in clause (1) of such undesignated paragraph. Any amounts available for use under such undesignated paragraph that are not expended to pay such claims or for such repairs shall be utilized for the revolving loan pool described in such undesignated paragraph.

SEC. 125. Of the amounts earmarked in the Joint Explanatory Statement of the Committee of Conference accompanying H.R. 4194 for grants targeted for economic investments, $2,000,000 made available to the Hawaii Housing Authority for work associated with the construction of the Community Resource Center at Kuhio Homes/Kuhio Park Terrace in Honolulu, Hawaii shall instead be made available to the Housing and Community Development Corporation of Hawaii for the same purpose.

SEC. 126. If the President makes the appointment to the position of Under Secretary for Health of the Department of Veterans Affairs authorized by section 907 of the Veterans Programs Enhancement Act of 1998, the individual appointed shall receive the pay and allowances authorized for that position as if the appointment had been made on September 29, 1998, except that the amount of such pay and allowances that is attributable to the period beginning on September 29, 1998, and ending on the day before the date of that appointment shall be reduced by any amount paid that individual by the United States for personal services performed during that period.

<< 19 USCA § 2213 >>

SEC. 127. TRADE DEFICIT REVIEW COMMISSION. (a) SHORT TITLE.—This section may be cited as the "Trade Deficit Review Commission Act".

<< 19 USCA § 2213 >>

(b) FINDINGS.—Congress makes the following findings:

<< 19 USCA § 2213 >>

(1) The United States continues to run substantial merchandise trade and current account deficits.

<< 19 USCA § 2213 >>

(2) Economic forecasts anticipate continued growth in such deficits in the next few years.

<< 19 USCA § 2213 >>

(3) The positive net international asset position that the United States built up over many years was eliminated in the 1980s. The United States today has become the world's largest debtor nation.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 19 USCA § 2213 >>

(4) The United States merchandise trade deficit is characterized by large bilateral trade imbalances with a handful of countries.

<< 19 USCA § 2213 >>

(5) The United States has one of the most open borders and economies in the world. The United States faces significant tariff and nontariff trade barriers with its trading partners. The United States does not benefit from fully reciprocal market access.

<< 19 USCA § 2213 >>

(6) The United States is once again at a critical juncture in trade policy development. The nature of the United States trade deficit and its causes and consequences must be analyzed and documented.

<< 19 USCA § 2213 >>

(c) ESTABLISHMENT OF COMMISSION.—

<< 19 USCA § 2213 >>

(1) ESTABLISHMENT.—There is established a commission to be known as the Trade Deficit Review Commission (hereafter in this section referred to as the "Commission").

<< 19 USCA § 2213 >>

(2) PURPOSE.—The purpose of the Commission is to study the nature, causes, and consequences of the United States merchandise trade and current account deficits.

<< 19 USCA § 2213 >>

(3) MEMBERSHIP OF COMMISSION.—
(A) COMPOSITION.—The Commission shall be composed of 12 members as follows:
(i) Three persons shall be appointed by the President pro tempore of the Senate upon the recommendation of the Majority Leader of the Senate, after consultation with the Chairman of the Committee on Finance.
(ii) Three persons shall be appointed by the President pro tempore of the Senate upon the recommendation of the Minority Leader of the Senate, after consultation with the ranking minority member of the Committee on Finance.
(iii) Three persons shall be appointed by the Speaker of the House of Representatives, after consultation with the Chairman of the Committee on Ways and Means.
(iv) Three persons shall be appointed by the Minority Leader of the House of Representatives, after consultation with the ranking minority member of the Committee on Ways and Mean.
(B) QUALIFICATIONS OF MEMBERS.—
(i) APPOINTMENTS.—Persons who are appointed under subparagraph (A) shall be persons who—
(I) have expertise in economics, international trade, manufacturing, labor, environment, business, or have other pertinent qualifications or experience; and
(II) are not officers or employees of the United States.
(ii) OTHER CONSIDERATIONS.—In appointing Commission members, every effort shall be made to ensure that the members—
(I) are representative of a broad cross-section of economic and trade perspectives within the United States; and
(II) provide fresh insights to analyzing the causes and consequences of United States merchandise trade and current account deficits.

<< 19 USCA § 2213 >>

(4) PERIOD OF APPOINTMENT; VACANCIES.—

 (A) IN GENERAL.—Members shall be appointed not later than 60 days after the date of enactment of this Act and the appointment shall be for the life of the Commission.

 (B) VACANCIES.—Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner as the original appointment.

<< 19 USCA § 2213 >>

 (5) INITIAL MEETING.—Not later than 30 days after the date on which all members of the Commission have been appointed, the Commission shall hold its first meeting.

<< 19 USCA § 2213 >>

(6) MEETINGS.—The Commission shall meet at the call of the Chairperson.

<< 19 USCA § 2213 >>

 (7) CHAIRPERSON AND VICE CHAIRPERSON.—The members of the Commission shall elect a chairperson and vice chairperson from among the members of the Commission.

<< 19 USCA § 2213 >>

(8) QUORUM.—A majority of the members of the Commission shall constitute a quorum for the transaction of business.

<< 19 USCA § 2213 >>

 (9) VOTING.—Each member of the Commission shall be entitled to 1 vote, which shall be equal to the vote of every other member of the Commission.

<< 19 USCA § 2213 >>

(d) DUTIES OF THE COMMISSION.—

<< 19 USCA § 2213 >>

 (1) IN GENERAL.—The Commission shall be responsible for examining the nature, causes, and consequences of, and the accuracy of available data on, the United States merchandise trade and current account deficits.

<< 19 USCA § 2213 >>

 (2) ISSUES TO BE ADDRESSED.—The Commission shall examine and report to the President, the Committee on Ways and Means of the House of Representatives, the Committee on Finance of the Senate, and other appropriate committees of Congress on the following:

 (A) The relationship of the merchandise trade and current account balances to the overall well-being of the United States economy, and to wages and employment in various sectors of the United States economy.

 (B) The impact that United States monetary and fiscal policies may have on United States merchandise trade and current account deficits.

 (C) The extent to which the coordination, allocation, and accountability of trade responsibilities among Federal agencies may contribute to the trade and current account deficits.

 (D) The causes and consequences of the merchandise trade and current account deficits and specific bilateral trade deficits, including—

  (i) identification and quantification of—

   (I) the macroeconomic factors and bilateral trade barriers that may contribute to the United States merchandise trade and current account deficits;

(II) any impact of the merchandise trade and current account deficits on the domestic economy, industrial base, manufacturing capacity, technology, number and quality of jobs, productivity, wages, and the United States standard of living;

(III) any impact of the merchandise trade and current account deficits on the defense production and innovation capabilities of the United States; and

(IV) trade deficits within individual industrial, manufacturing, and production sectors, and any relationship between such deficits and the increasing volume of intra-industry and intra-company transactions;

(ii) a review of the adequacy and accuracy of the current collection and reporting of import and export data, and the identification and development of additional data bases and economic measurements that may be needed to properly quantify the merchandise trade and current account balances, and any impact the merchandise trade and current account balances may have on the United States economy; and

(iii) the extent to which there is reciprocal market access substantially equivalent to that afforded by the United States in each country with which the United States has a persistent and substantial bilateral trade deficit, and the extent to which such deficits have become structural.

(E) Any relationship of United States merchandise trade and current account deficits to both comparative and competitive trade advantages within the global economy, including—

(i) a systematic analysis of the United States trade patterns with different trading partners and to what extent the trade patterns are based on comparative and competitive trade advantages;

(ii) the extent to which the increased mobility of capital and technology has changed both comparative and competitive trade advantages;

(iii) any impact that labor, environmental, or health and safety standards may have on comparative and competitive trade advantages;

(iv) the effect that offset and technology transfer agreements have on the long-term competitiveness of the United States manufacturing sectors; and

(v) any effect that international trade, labor, environmental, or other agreements may have on United States competitiveness.

(F) The extent to which differences in the growth rates of the United States and its trading partners may impact on United States merchandise trade and current account deficits.

(G) The impact that currency exchange rate fluctuations and any manipulation of exchange rates may have on United States merchandise trade and current account deficits.

(H) The flow of investments both into and out of the United States, including—

(i) any consequences for the United States economy of the current status of the United States as a debtor nation;

(ii) any relationship between such investment flows and the United States merchandise trade and current account deficits and living standards of United States workers;

(iii) any impact such investment flows may have on United States labor, community, environmental, and health and safety standards, and how such investment flows influence the location of manufacturing facilities; and

(iv) the effect of barriers to United States foreign direct investment in developed and developing nations, particularly nations with which the United States has a merchandise trade and current account deficit.

<< 19 USCA § 2213 >>

(e) FINAL REPORT.—

<< 19 USCA § 2213 >>

(1) IN GENERAL.—Not later than 12 months after the date of the initial meeting of the Commission, the Commission shall submit to the President and Congress a final report which contains—

(A) the findings and conclusions of the Commission described in subsection (d); and

(B) recommendations for addressing the problems identified as part of the Commission's analysis.

<< 19 USCA § 2213 >>

(2) SEPARATE VIEWS.—Any member of the Commission may submit additional findings and recommendations as part of the final report.

<< 19 USCA § 2213 >>

(f) POWERS OF COMMISSION.—

<< 19 USCA § 2213 >>

(1) HEARINGS.—The Commission may hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the Commission may find advisable to fulfill the requirements of this section. The Commission shall hold at least 1 or more hearings in Washington, D.C., and 4 in different regions of the United States.

<< 19 USCA § 2213 >>

(2) INFORMATION FROM FEDERAL AGENCIES.—The Commission may secure directly from any Federal department or agency such information as the Commission considers necessary to carry out the provisions of this section. Upon request of the Chairperson of the Commission, the head of such department or agency shall furnish such information to the Commission.

<< 19 USCA § 2213 >>

(3) POSTAL SERVICES.—The Commission may use the United States mails in the same manner and under the same conditions as other departments and agencies of the Federal Government.

<< 19 USCA § 2213 >>

(g) COMMISSION PERSONNEL MATTERS.—

<< 19 USCA § 2213 >>

(1) COMPENSATION OF MEMBERS.—Each member of the Commission shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during which such member is engaged in the performance of the duties of the Commission.

<< 19 USCA § 2213 >>

(2) TRAVEL EXPENSES.—The members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Commission.

<< 19 USCA § 2213 >>

(3) STAFF.—
  (A) IN GENERAL.—The Chairperson of the Commission may, without regard to the civil service laws and regulations, appoint and terminate an executive director and such other additional personnel as may be necessary to enable the Commission to perform its duties. The employment of an executive director shall be subject to confirmation by the Commission.
  (B) COMPENSATION.—The Chairperson of the Commission may fix the compensation of the executive director and other personnel without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification of positions and General Schedule pay rates, except that the rate of pay for the executive director and other personnel may not exceed the rate payable for level V of the Executive Schedule under section 5316 of such title.

<< 19 USCA § 2213 >>

 (4) DETAIL OF GOVERNMENT EMPLOYEES.—Any Federal Government employee may be detailed to the Commission without reimbursement, and such detail shall be without interruption or loss of civil service status or privilege.

<< 19 USCA § 2213 >>

 (5) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—The Chairperson of the Commission may procure temporary and intermittent services under section 3109(b) of title 5, United States Code, at rates for individuals which do not exceed the daily equivalent of the annual rate of basic pay prescribed for level V of the Executive Schedule under section 5316 of such title.

<< 19 USCA § 2213 >>

 (h) SUPPORT SERVICES.—The Administrator of the General Services Administration shall provide to the Commission on a reimbursable basis such administrative support services as the Commission may request.

<< 19 USCA § 2213 >>

 (i) APPROPRIATIONS.—There are appropriated $2,000,000 to the Commission to carry out the provisions of this section.

 SEC. 128. None of the funds provided or otherwise made available in this Division of this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

 SEC. 130. Notwithstanding section 11031 of the National Capital Revitalization and Self–Government Improvement Act of 1997 or any other provision of law and not later than September 30, 1999, the Secretary of the Treasury shall invest, or direct the Trustee to invest, the assets of the Trust Fund in public debt securities with maturities suitable to the needs of the Trust Fund, as determined by the Secretary, and bearing interest at rates determined by the Secretary, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities.

 SEC. 131. To capitalize the District of Columbia National Capital Revitalization Corporation, as authorized by the District Council, $25,000,000 to remain available until expended for economic development planning, project development, capital investments, loans, grants, administrative expenses and other purposes included in the District Council's authorizing legislation: *Provided*, That no funds shall be available unless the Secretary of the Treasury, in consultation with the Director of the Office of Management and Budget, determines that the Corporation advances the purposes of the National Capital Revitalization and Self–Government Improvement Act of 1997: *Provided further*, That the Secretary, after apportionment pursuant to 31 U.S.C. 1512, may provide for the disbursement of funds in the manner provided for Federal grant programs.

 SEC. 132. For a Federal payment to the District of Columbia Public Schools, $30,000,000, for special education costs.

 SEC. 133. For payment to the District of Columbia, $20,000,000 which shall be deposited into an escrow account of the District of Columbia Financial Responsibility and Management Assistance Authority, and shall be disbursed from such escrow account by the Authority for Year 2000 information technology and related chip replacement projects approved by the Authority: *Provided*, That, for purposes of any appropriations made by this or any other Act, for emergency expenses related to Year 2000 conversion of Federal information technology systems, and related expenses, the Government of the District of Columbia shall be considered an agency of the United States Government: *Provided further*, That, any funds provided pursuant to the preceding proviso shall be in addition to funds appropriated directly under this paragraph.

 SEC. 134. For a Federal contribution to the District of Columbia for the costs of infrastructure needs, which shall be deposited into an escrow account of the District of Columbia Financial Responsibility and Management Assistance Authority and disbursed by the Authority from such account for the repair and maintenance of roads, highways, bridges and transit in the District of Columbia and other economic development projects and planning in the District of Columbia, $50,000,000, to remain available until expended.

DIVISION B—EMERGENCY SUPPLEMENTAL APPROPRIATIONS

TITLE I—MILITARY READINESS AND OVERSEAS CONTINGENCY OPERATIONS

CHAPTER 1

## DEPARTMENT OF DEFENSE—MILITARY

## MILITARY PERSONNEL

### MILITARY PERSONNEL, ARMY

For an additional amount for "Military Personnel, Army", $10,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $10,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### MILITARY PERSONNEL, NAVY

For an additional amount for "Military Personnel, Navy", $33,300,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $33,300,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### MILITARY PERSONNEL, MARINE CORPS

For an additional amount for "Military Personnel, Marine Corps", $8,900,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $8,900,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### RESERVE PERSONNEL, NAVY

For an additional amount for "Reserve Personnel, Navy", $10,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $10,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE

### OPERATION AND MAINTENANCE, ARMY

For an additional amount for "Operation and Maintenance, Army", $314,500,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $314,500,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### OPERATION AND MAINTENANCE, NAVY

For an additional amount for "Operation and Maintenance, Navy", $232,600,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $232,600,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE, MARINE CORPS

For an additional amount for "Operation and Maintenance, Marine Corps", $52,400,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $52,400,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE, AIR FORCE

For an additional amount for "Operation and Maintenance, Air Force", $303,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $303,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Operation and Maintenance, Defense–Wide", $1,496,600,000, to remain available for obligation until expended: *Provided*, That the Secretary of Defense may transfer these funds to appropriations accounts for operation and maintenance; procurement; and research, development, test and evaluation: *Provided further*, That the funds transferred shall be merged with and be available for the same purposes and for the same time period as the appropriation to which transferred: *Provided further*, That the transfer authority provided under this heading is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the entire amount made available under this heading is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE, ARMY RESERVE

For an additional amount for "Operation and Maintenance, Army Reserve", $3,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $3,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE, MARINE CORPS RESERVE

For an additional amount for "Operation and Maintenance, Marine Corps Reserve", $3,300,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $3,300,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OPERATION AND MAINTENANCE, AIR FORCE RESERVE

For an additional amount for "Operation and Maintenance, Air Force Reserve", $9,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and

Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $9,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### OPERATION AND MAINTENANCE, ARMY NATIONAL GUARD

For an additional amount for "Operation and Maintenance, Army National Guard", $50,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $50,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### OPERATION AND MAINTENANCE, AIR NATIONAL GUARD

For an additional amount for "Operation and Maintenance, Air National Guard", $21,000,000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $21,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### OVERSEAS CONTINGENCY OPERATIONS TRANSFER FUND

### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Overseas Contingency Operations Transfer Fund", $1,858,600,000, to remain available for obligation until expended: *Provided*, That of the amounts provided under this heading, the following amounts shall be transferred to the specified accounts:

"Military Personnel, Army", $310,600,000;

"Military Personnel, Navy", $9,275,000;

"Military Personnel, Marine Corps", $2,748,000;

"Military Personnel, Air Force", $17,000,000; and

"Reserve Personnel, Navy", $2,295,000:

*Provided further*, That of the remaining funds made available under this heading, the Secretary of Defense may transfer these funds only to operation and maintenance accounts, procurement accounts, the defense health program appropriation, and working capital funds accounts: *Provided further*, That the funds transferred shall be merged with and shall be available for the same purposes and for the same time period, as the appropriation to which transferred: *Provided further*, That the transfer authority provided under this heading is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the entire amount made available under this heading is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### MORALE, WELFARE AND RECREATION AND PERSONNEL SUPPORT FOR CONTINGENCY DEPLOYMENTS

### (INCLUDING TRANSFER OF FUNDS)

In addition to amounts appropriated or otherwise made available in the Department of Defense Appropriations Act, 1999, $50,000,000, to remain available for obligation until expended, is hereby made available only for expenses, not otherwise provided for, to provide necessary morale, welfare and recreation support, family support, and to sustain necessary retention and re-enlistment of military personnel in critical military occupational specialties, resulting from the deployment of military personnel to Bosnia and Southwest Asia: *Provided*, That the Secretary of Defense may transfer these funds only to operation and maintenance accounts of the military services: *Provided further*, That the funds transferred shall be available only for the purposes described under this heading: *Provided further*, That the transfer authority provided under this heading is in addition

AR.02774
149

to any other transfer authority available to the Department of Defense: *Provided further*, That the entire amount made available under this heading is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $50,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OTHER DEPARTMENT OF DEFENSE PROGRAMS

### DEFENSE HEALTH PROGRAM

For an additional amount for "Defense Health Program", $200,000,000: *Provided*, That these funds shall be for Operation and maintenance, of which not to exceed two per centum shall remain available until September 30, 2000: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $200,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### DRUG INTERDICTION AND COUNTER–DRUG ACTIVITIES, DEFENSE

#### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Drug Interdiction and Counter–Drug Activities, Defense", $42,000,000: *Provided*, That funds appropriated under this heading may be transferred to appropriations available to the Department of Defense for military personnel of the reserve components serving under the provisions of title 10 and title 32, United States Code; for Operation and maintenance; for Procurement; and for Research, development, test and evaluation: *Provided further*, That funds appropriated under this heading shall be available for obligation for the same time period and for the same purposes as the appropriation to which transferred: *Provided further*, That the transfer authority provided under this heading is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $42,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### GENERAL PROVISIONS, THIS CHAPTER

SEC. 101. Funds appropriated by this Act, or made available by the transfer of funds in this Act, for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

SEC. 102. In addition to the amounts appropriated or otherwise made available in the Department of Defense Appropriations Act, 1999, $1,000,000,000, to remain available for obligation until expended, is hereby appropriated under the heading "Research, Development, Test and Evaluation, Defense–Wide": *Provided*, That these funds shall be made available only for the enhanced testing, accelerated development, construction, and integration and infrastructure efforts in support of ballistic missile defense systems: *Provided further*, That the entire amount made available in this section is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

SEC. 103. In addition to amounts appropriated or otherwise made available in the Department of Defense Appropriations Act, 1999, $259,853,000 is hereby appropriated to the Department of Defense, only for emergency expenses incurred at United States military facilities or installations in the United States or overseas directly resulting from storm damage or other natural disasters, as follows:

"Military Personnel, Marine Corps", $232,000;

"Reserve Personnel, Army", $343,000;

"Reserve Personnel, Navy", $100,000;

"Operation and Maintenance, Army", $139,056,000;

"Operation and Maintenance, Navy", $57,179,000;

"Operation and Maintenance, Marine Corps", $8,470,000;

"Operation and Maintenance, Air Force", $34,254,000;

"Operation and Maintenance, Army Reserve", $853,000;

"Operation and Maintenance, Navy Reserve", $5,058,000;

"Operation and Maintenance, Army National Guard", $5,750,000;

"Operation and Maintenance, Air National Guard", $4,355,000;

"Defense Health Program", $2,120,000; and

"Navy Working Capital Fund", $2,083,000:

*Provided*, That these funds may be used to execute projects or programs that were deferred in order to carry out emergency repairs resulting from such storm damage or natural disasters: *Provided further*, That the entire amount made available in this section is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That of the amounts provided in this section, $153,551,000 shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That of the amount referred to in the third proviso in this section, up to $29,454,000 may be transferred from "Operation and Maintenance, Army", to "Military Construction, Army".

  SEC. 104. In addition to amounts provided in this Act, $2,000,000 is hereby appropriated for "Defense Health Program", to remain available for obligation until expended: *Provided*, That notwithstanding any other provision of law, these funds shall be available only for a grant to the Fisher House Foundation, Inc., only for the construction and furnishing of additional Fisher Houses to meet the needs of military family members when confronted with the illness or hospitalization of an eligible military beneficiary.

  SEC. 105. Section 8136 of the Department of Defense Appropriations Act, 1999, is amended by striking out "$502,000,000" and inserting in lieu thereof "$569,000,000", and further amended by striking out "$176,000,000" and inserting in lieu thereof "$243,000,000".

CHAPTER 2

DEPARTMENT OF ENERGY

ATOMIC ENERGY DEFENSE ACTIVITIES

OTHER DEFENSE ACTIVITIES

  For an additional amount for "Other Defense Activities", for expenditures in the Russian Federation to implement a United States/Russian accord for the disposition of excess weapons plutonium, $200,000,000, to remain available until expended: *Provided*, That none of the funds may be obligated until the Department of Energy submits to Congress a detailed budget justification for use of these funds, and the proposal has been approved by the House and Senate Committees on Appropriations: *Provided further*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined by the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

  For an additional amount to purchase natural uranium associated with the 1997 and 1998 deliveries under the United States–Russia HEU Purchase Agreement (hereinafter, "the Agreement"), $325,000,000, to remain available until expended, which shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act

of 1985, as amended, is transmitted to the Congress: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That such uranium is located in the United States at the time of purchase, and shall become part of the inventory of the Department of Energy: *Provided further*, That such funds shall be available only upon conclusion of a long-term agreement by the Government of the Russian Federation and commercial partners for the sale of uranium to be derived from deliveries scheduled for 1999 and thereafter under the Agreement.

## CHAPTER 3

### DEPARTMENT OF DEFENSE—MILITARY CONSTRUCTION

#### MILITARY CONSTRUCTION, ARMY

For an additional amount for "Military Construction, Army" to replace facilities destroyed by monsoons in the Republic of Korea during August of 1998, $118,000,000, as authorized by 10 U.S.C. 2854, to remain available until September 30, 1999: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That from amounts made available in this or any other Act for military construction, the Secretary of the Army may acquire real property and carry out a military construction project at Camp Casey in Korea, in the amount of $12,016,000.

#### MILITARY CONSTRUCTION, NAVY

For an additional amount for "Military Construction, Navy" to cover the incremental costs arising from the consequences of Hurricanes Georges and Bonnie, $5,860,000, as authorized by 10 U.S.C. 2854, to remain available until September 30, 1999: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### MILITARY CONSTRUCTION, AIR FORCE

For an additional amount for "Military Construction, Air Force", $29,200,000, to remain available until September 30, 1999: *Provided*, That of this amount, $2,200,000 shall be available to cover the incremental costs arising from force protection, as authorized by 10 U.S.C. 2803: *Provided further*, That of this amount $27,000,000 shall be available to cover the incremental costs arising from the consequences of Hurricane Georges, as authorized by 10 U.S.C. 2854: *Provided further*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### MILITARY CONSTRUCTION, ARMY NATIONAL GUARD

For an additional amount for "Military Construction, Army National Guard" to cover the incremental costs arising from the consequences of Hurricane Georges, $2,500,000, as authorized by 10 U.S.C. 2854, to remain available until September 30, 1999: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### MILITARY CONSTRUCTION, AIR NATIONAL GUARD

For an additional amount for "Military Construction, Air National Guard" to cover the incremental costs arising from the consequences of Hurricane Georges, $15,900,000, as authorized by 10 U.S.C. 2854, to remain available until September 30,

1999: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### FAMILY HOUSING, ARMY

 For an additional amount for "Family Housing, Army" to cover the incremental costs arising from the consequences of Hurricane Georges and for the rehabilitation of family housing, $5,200,000, to remain available until September 30, 1999: *Provided*, That notwithstanding any other provision of law, of this amount $4,000,000 shall be available only for the rehabilitation of family housing referred to in Section 8142 of the Department of Defense Appropriations Act of 1999: *Provided further*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### FAMILY HOUSING, NAVY AND MARINE CORPS

 For an additional amount for "Family Housing, Navy and Marine Corps" to cover the incremental costs arising from the consequences of Hurricane Bonnie, $10,599,000, as authorized by 10 U.S.C. 2854, to remain available until September 30, 1999: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### FAMILY HOUSING, AIR FORCE

 For an additional amount for "Family Housing, Air Force" to cover the incremental costs arising from the consequences of Hurricane Georges, $22,233,000, as authorized by 10 U.S.C. 2854, to remain available until September 30, 1999: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISION, THIS CHAPTER

 Section 2304(c)(2) of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 is amended by striking "$2,000,000,000" and inserting "$2,000,000".

### CHAPTER 4

### DEPARTMENT OF TRANSPORTATION

### COAST GUARD

### OPERATING EXPENSES

 For an additional amount for necessary expenses for the operation and maintenance of the Coast Guard, not otherwise provided for, $100,000,000, of which $28,000,000 is only available for expenses related to expansion of drug interdiction activities around Puerto Rico, the United States Virgin Islands, and other transit zone areas of operation, including costs to operate and maintain PC–170 patrol craft offered by the Department of Defense: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985,

as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

For an additional amount for acquisition, construction, renovation, and improvement of facilities and equipment, to be available for expansion of Coast Guard drug interdiction activities, $100,000,000, to remain available until expended and to be distributed as follows:

Acquisition and construction of Barracuda class coastal patrol boats, $33,000,000;

Reactivation costs for up to 3 HU–25 aircraft for maritime patrol, $7,500,000;

Acquisition of installed or deployable electronic sensors and communication systems for Coast Guard cutters or boats, $13,000,000;

Operational test and evaluation of the use of force from aircraft, $2,500,000; and

Acquisition of installed or deployable electronic sensors for maritime patrol aircraft and not to exceed $5,800,000 for C–130 engine upgrade, $44,000,000:

*Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## RESERVE TRAINING

For an additional amount for operating, maintenance, and training expenses of the Coast Guard Reserve, including supplies, equipment and services, $5,000,000: *Provided*, That none of these funds may be transferred to Coast Guard "Operating expenses" or otherwise made available to reimburse the Coast Guard for financial support of the Coast Guard Reserves: *Provided further*, That the highest priority for use of these funds shall be for enhancing drug interdiction activities conducted by the Coast Guard Reserves: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

For an additional amount for necessary expenses for applied scientific research, development, test, and evaluation, maintenance, rehabilitation, lease and operation of facilities and equipment, $5,000,000, to remain available until expended: *Provided*, That the highest priority for use of these funds shall be the development of new technologies or operational procedures which enhance drug interdiction activities of the Coast Guard: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

TITLE II—ANTITERRORISM

CHAPTER 1

DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF INVESTIGATION

## SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $21,680,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## DEPARTMENT OF STATE

### ADMINISTRATION OF FOREIGN AFFAIRS

#### DIPLOMATIC AND CONSULAR PROGRAMS

Notwithstanding section 15 of the State Department Basic Authorities Act of 1956, an additional amount for "Diplomatic and Consular Programs", $773,700,000, to remain available until expended, of which $25,700,000 shall be available only to the extent that an official budget request that includes the designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided*, That as determined by the Secretary of State, such funds may be used to procure services and equipment overseas necessary to improve worldwide security and reconstitute embassy operations in Kenya and Tanzania on behalf of any other agency: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### SALARIES AND EXPENSES

Notwithstanding section 15 of the State Department Basic Authorities Act of 1956, an additional amount for "Salaries and Expenses", $12,000,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### OFFICE OF INSPECTOR GENERAL

Notwithstanding section 15 of the State Department Basic Authorities Act of 1956, an additional amount for "Office of Inspector General", $1,000,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### SECURITY AND MAINTENANCE OF UNITED STATES MISSIONS

Notwithstanding section 15 of the State Department Basic Authorities Act of 1956, an additional amount for "Security and Maintenance of United States Missions", $627,000,000, to remain available until expended; of which $56,000,000 is for security projects, relocations, and security equipment on behalf of missions of other U.S. Government agencies, which amount may be transferred to any appropriation for this purpose, to be merged with and available for the same time period as the appropriation to which transferred; and of which $185,000,000 is for capital improvements or relocation of office and residential facilities to improve security, which amount shall become available fifteen days after notice thereof has been transmitted to the Appropriations Committees of both Houses of Congress: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

Notwithstanding section 15 of the State Department Basic Authorities Act of 1956, an additional amount for "Emergencies in the Diplomatic and Consular Service", $10,000,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### CHAPTER 2

### DEPARTMENT OF DEFENSE—MILITARY OPERATION AND MAINTENANCE

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## OPERATION AND MAINTENANCE, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Operation and Maintenance, Defense–Wide", $358,427,000, to remain available for obligation until expended: *Provided*, That the Secretary of Defense may transfer these funds to fiscal year 1999 appropriations for operation and maintenance; procurement; research, development, test and evaluation; and family housing: *Provided further*, That the funds transferred shall be merged with and be available for the same purposes and for the same time period as the appropriation to which transferred: *Provided further*, That the transfer authority provided under this heading is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the entire amount made available under this heading is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $358,427,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### GENERAL PROVISIONS, THIS CHAPTER

<< 10 USCA § 374 >>

SEC. 201. MAINTENANCE AND OPERATION OF EQUIPMENT.—Section 374 of title 10, United States Code, is amended —

<< 10 USCA § 374 >>

(1) in subsection (b)(1)(A), by striking "or";

<< 10 USCA § 374 >>

(2) in subsection (b)(1)(B), by striking the period at the end, inserting in lieu thereof a semicolon and the following new subparagraphs:

"(C) a foreign or domestic counter-terrorism operation; or

"(D) a rendition of a suspected terrorist from a foreign country to the United States to stand trial.";

<< 10 USCA § 374 >>

(3) in subsection (b)(2)(F)(i)—

(A) by inserting "along with any other civilian or military personnel who are supporting, or conducting, a joint operation with civilian law enforcement personnel;" after "the transportation of civilian law enforcement personnel"; and

(B) by striking "and";

<< 10 USCA § 374 >>

(4) in subsection (b)(2)(F)(ii)—

(A) by inserting "and supporting" after "the operation of a base of operations for civilian law enforcement";

(B) by striking the period at the end and inserting in lieu thereof "; and"; and

(C) by inserting at the end the following new clause:

"(iii) the transportation of suspected terrorists from foreign countries to the United States for trial (so long as the requesting Federal law enforcement agency provides all security for such transportation and maintains custody over the suspect through the duration of the transportation).";

<< 10 USCA § 374 >>

(5) in subsection (b)(4)(A), by striking "an" and inserting in lieu thereof "a Federal"; and

<< 10 USCA § 374 >>

(6) in subsection (b)(4)(A), by inserting a new clause "(v) Any law, foreign or domestic, prohibiting terrorist activities." after "(iv) The Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.).".

### (INCLUDING TRANSFER OF FUNDS)

SEC. 202. In addition to amounts appropriated or otherwise made available in the Department of Defense Appropriations Act, 1999, $50,000,000 is hereby appropriated, only to initiate and expand activities of the Department of Defense to prevent, prepare for, and respond to a terrorist attack in the United States involving weapons of mass destruction: *Provided*, That $35,000,000 of the funds made available in this section shall be transferred to the following accounts in the specified amounts:

"National Guard Personnel, Army", $4,000,000;

"National Guard Personnel, Air Force", $1,000,000;

"Operation and Maintenance, Army", $2,000,000;

"Operation and Maintenance, Army National Guard", $20,000,000; and

"Procurement, Defense–Wide", $8,000,000:

*Provided further*, That of the funds made available in this section, $15,000,000 shall be transferred to "Research, Development, Test and Evaluation, Army", only to develop and support a long term, sustainable Weapons of Mass Destruction emergency preparedness training program: *Provided further*, That funds transferred pursuant to this section shall be merged with and be available for the same purposes and for the same time period as the appropriation to which transferred: *Provided further*, That the transfer authority provided in this section is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That the entire amount provided in this section is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $50,000,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

SEC. 203. In addition to amounts appropriated or otherwise made available in the Department of Defense Appropriations Act, 1999, $120,500,000, to remain available for obligation until expended, is appropriated to the proper accounts within the Department of the Air Force: *Provided*, That the additional amount shall be made available only for the provision of crisis response aviation support for critical national security, law enforcement and emergency response agencies: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for $120,500,000, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the President of the United States shall submit to the Congress by March 15, 1999, an interagency agreement for the utilization of Department of Defense assets to support the crisis response requirements of the Federal Bureau of Investigation and the Federal Emergency Management Agency.

### CHAPTER 3

### FUNDS APPROPRIATED TO THE PRESIDENT

### INTERNATIONAL SECURITY ASSISTANCE

### ECONOMIC SUPPORT FUND

### (INCLUDING TRANSFERS OF FUNDS)

Notwithstanding section 10 of Public Law 91–672, for an additional amount for "Economic Support Fund" for assistance for Kenya and Tanzania, $50,000,000, to remain available until September 30, 2000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit

Control Act of 1985, as amended: *Provided further*, That funds appropriated under this paragraph may be made available for administrative costs associated with assistance provided under this paragraph: *Provided further*, That $2,500,000 shall be transferred to and merged with "Operating Expenses of the Agency for International Development" for security and related expenses: *Provided further*, That $1,269,000 shall be transferred to and merged with "Peace Corps" for security and related expenses: *Provided further*, That the transfers authorized in the preceding provisos shall be in addition to sums otherwise available for such purposes: *Provided further*, That funds appropriated under this paragraph shall only be available through the regular notification procedures of the Committees on Appropriations.

### NONPROLIFERATION, ANTI–TERRORISM, DEMINING AND RELATED PROGRAMS

Notwithstanding section 15 of the State Department Basic Authorities Act of 1956 and section 10 of Public Law 91–672, for an additional amount for "Nonproliferation, Anti–Terrorism, Demining and Related Programs" for anti-terrorism assistance, $20,000,000, to remain available until September 30, 2000: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 4

## DEPARTMENT OF THE INTERIOR

### NATIONAL PARK SERVICE

#### OPERATION OF THE NATIONAL PARK SYSTEM

For an additional amount for "Operation of the National Park System" for emergency security related expenses, $2,320,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### CONSTRUCTION

For an additional amount for "Construction" for emergency security related expenses, $3,680,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 5

## ARCHITECT OF THE CAPITOL

### CAPITOL VISITOR CENTER

For necessary expenses for the planning, engineering, design, and construction, as each such milestone is approved by the Committee on Rules and Administration of the Senate, the Committee on House Oversight of the House of Representatives, the Committees on Appropriations of the House of Representatives and of the Senate, and other appropriate committees of the House of Representatives and of the Senate, of a new facility to provide greater security for all persons working in or visiting the United States Capitol and to enhance the educational experience of those who have come to learn about the Capitol building and Congress, $100,000,000, to be supplemented by private funds, which shall remain available until expended: *Provided*, That Section 3709 of the Revised Statutes of the United States (41 U.S.C. 5) shall not apply to the funds made available under this heading: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### CAPITOL POLICE BOARD

#### SECURITY ENHANCEMENTS

For the Capitol Police Board for security enhancements to the Capitol complex, including the buildings and grounds of the Library of Congress, $106,782,000, to remain available until expended: *Provided*, That such security enhancements shall be carried out in accordance with a plan or plans approved by the Committee on House Oversight of the House of Representatives,

AR.02783

the Committee on Rules and Administration of the Senate, the Committee on Appropriations of the House of Representatives, and the Committee on Appropriations of the Senate: *Provided further*, That the Capitol Police Board shall transfer to the Architect of the Capitol such portion of the funds made available under this heading as the Architect may require for expenses necessary to provide support for the security enhancements, subject to the approval of the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate: *Provided further*, That the Capitol Police Board shall transfer to the Librarian of Congress such portion of the funds made available under this heading as the Librarian may require for expenses necessary to provide support for the security enhancements, subject to the approval of the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

GENERAL PROVISION, THIS CHAPTER

<< 2 USCA § 141a >>

The responsibility for design, installation, and maintenance of security systems to protect the physical security of the buildings and grounds of the Library of Congress is transferred from the Architect of the Capitol to the Capitol Police Board. Such design, installation, and maintenance shall be carried out under the direction of the Committee on House Oversight of the House of Representatives and the Committee on Rules and Administration of the Senate, and without regard to section 3709 of the Revised Statutes of the United States (41 U.S.C. 5). Any alteration to a structural, mechanical, or architectural feature of the buildings and grounds of the Library of Congress that is required for a security system under the preceding sentence may be carried out only with the approval of the Architect of the Capitol.

CHAPTER 6

DEPARTMENT OF TRANSPORTATION

FEDERAL AVIATION ADMINISTRATION

FACILITIES AND EQUIPMENT

(AIRPORT AND AIRWAY TRUST FUND)

For an additional amount for "Facilities and Equipment", $100,000,000, for necessary expenses for acquisition, installation and related activities supporting the deployment of bulk and trace explosives detection systems and other advanced security equipment at airports in the United States, to remain available until September 30, 2001: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985.

CHAPTER 7

DEPARTMENT OF THE TREASURY

FEDERAL LAW ENFORCEMENT TRAINING CENTER

SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $3,548,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

UNITED STATES SECRET SERVICE

## SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $80,808,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## TITLE III—YEAR 2000 CONVERSION OF FEDERAL INFORMATION TECHNOLOGY SYSTEMS

### FISCAL YEAR 1999 EMERGENCY SUPPLEMENTAL
### APPROPRIATIONS FUNDS APPROPRIATED TO THE PRESIDENT

### INFORMATION TECHNOLOGY SYSTEMS AND RELATED EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for emergency expenses related to Year 2000 conversion of Federal information technology systems, and related expenses, $2,250,000,000, to remain available until September 30, 2001, of which $5,500,000 shall be transferred to the Legislative Branch for "SENATE", "Contingent Expenses of the Senate", "Sergeant at Arms and Doorkeeper of the Senate" for salaries and expenses related to Year 2000 conversion of Senate information technology systems: *Provided*, That the funds may be obligated with the prior approval of the Senate Committee on Appropriations; and of which, $6,373,000 shall be transferred to the Legislative Branch for "HOUSE OF REPRESENTATIVES", "Salaries and Expenses", "Salaries, Officers and Employees" for salaries and expenses related to Year 2000 conversion of House of Representatives information technology systems; and of which $5,000,000 shall be transferred to the Legislative Branch for "GENERAL ACCOUNTING OFFICE", "Information Technology Systems and Related Expenses" for expenses related to Year 2000 conversion of information technology systems and related expenses of all entities in the Legislative Branch other than the "Senate" and "House of Representatives" covered by the Legislative Branch Appropriations Act, 1998 (Public Law 105–55), which the Comptroller General shall transfer to the affected entities in the Legislative Branch, upon the approval of the House and Senate Committees on Appropriations; and of which $13,044,000 shall be transferred to the Judiciary to the Judiciary Information Technology Fund for expenses related to Year 2000 conversion of Judicial Branch information technology and security systems: *Provided further*, That the remaining funds made available shall be transferred, as necessary, by the Director of the Office of Management and Budget to all affected Federal Departments and Agencies, except the Department of Defense, for expenses necessary to ensure the information technology that is used or acquired by the Federal government meets the definition of Year 2000 compliant under Federal Acquisition Regulations (concerning accurate processing of date/time data, including calculating, comparing, and sequencing from, into, and between the twentieth and twenty-first centuries, and the years 1999 and 2000 and leap year calculations) and to meet other criteria for Year 2000 compliance as the head of each Department or Agency considers appropriate: *Provided further*, That none of the funds provided under this heading, except those transferred to the Legislative Branch and the Judiciary, may be transferred to any Department or Agency until fifteen days after the Director of the Office of Management and Budget has submitted to the House and Senate Committees on Appropriations, the Senate Special Committee on the Year 2000 Technology Problem, the House Committee on Science, and the House Committee on Government Reform and Oversight, a proposed allocation and plan for that Department or Agency to achieve Year 2000 compliance for technology information systems: *Provided further*, That the transfer authority provided in this paragraph is in addition to any other transfer authority contained elsewhere in this or any other Act: *Provided further*, That funds provided under this heading shall be in addition to funds available in this or any other Act for Year 2000 compliance by any Federal Department or Agency: *Provided further*, That the entire amount, except those amounts transferred to the Legislative Branch and the Judiciary, shall be available only to the extent that an official budget request that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### DEPARTMENT OF DEFENSE—MILITARY OPERATION AND MAINTENANCE

### INFORMATION TECHNOLOGY SYSTEMS AND SECURITY TRANSFER ACCOUNT

(INCLUDING TRANSFER OF FUNDS)

For emergency expenses relating to Year 2000 conversion of information technology and national security systems, for information technology, and infrastructure protection to include computer security/information assurance programs, and for related expenses, $1,100,000,000, to remain available until September 30, 2001: *Provided*, That the funds made available shall be transferred, as necessary, by the Secretary of Defense to any account in any previously enacted Department of Defense Appropriations Act for expenses necessary to ensure the information technology that is used or acquired by the Federal government meets the definition of Year 2000 compliant under Federal Acquisition Regulations (concerning accurate processing of date/time data, including calculating, comparing, and sequencing from, into, and between the twentieth and twenty-first centuries, and the years 1999 and 2000 and leap year calculations) and to meet other criteria for Year 2000 compliance as the Secretary considers appropriate: *Provided further*, That none of the funds provided under this heading may be transferred to any other account until fifteen days after the Secretary of Defense has submitted to the House and Senate Committees on Appropriations, the Senate Special Committee on the Year 2000 Technology Problem, the House Committee on Science, and the House Committee on Government Reform and Oversight, a proposed allocation and plan for the Department of Defense to achieve Year 2000 compliance for technology information systems: *Provided further*, That the funds transferred shall be merged with and shall be available for the same purposes and for the same time period as the appropriation to which transferred: *Provided further*, That the transfer authority provided under this heading is in addition to any other transfer authority available to the Department of Defense: *Provided further*, That funds provided under this heading shall be in addition to funds available in this or any other Act making appropriations for the Department of Defense for Year 2000 compliance and related activities: *Provided further*, That the entire amount made available under this heading is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount made available under this heading shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

TITLE IV—OTHER EMERGENCIES

CHAPTER 1

DEPARTMENT OF COMMERCE

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

OPERATIONS, RESEARCH, AND FACILITIES

In addition to the amounts appropriated or otherwise made available for this purpose, $5,000,000 is appropriated to the Department of Commerce to remain available until expended to provide emergency disaster assistance to persons or entities in the Northeast multispecies fishery who have incurred losses from a commercial fishery failure under section 308(b) of the Interjurisdictional Fisheries Act of 1986, as amended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent an official budget request, for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to the Congress.

RELATED AGENCY

SMALL BUSINESS ADMINISTRATION

DISASTER LOANS PROGRAM ACCOUNT

For an additional amount for the cost of direct loans, $71,000,000, to remain available until expended to subsidize additional gross obligations for the principal amount of direct loans: *Provided*, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974; and for administrative expenses to carry out the

disaster loan program, an additional $30,000,000 to remain available until expended, which may be transferred to and merged with appropriations for "Salaries and Expenses": *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## CHAPTER 2

## DEPARTMENT OF DEFENSE—CIVIL

## DEPARTMENT OF THE ARMY CORPS OF ENGINEERS—CIVIL

### FLOOD CONTROL, MISSISSIPPI RIVER AND TRIBUTARIES, ARKANSAS, ILLINOIS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, AND TENNESSEE

For an additional amount for emergency repairs and dredging due to flooding, $2,500,000, to remain available until expended, which shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### OPERATION AND MAINTENANCE, GENERAL

For an additional amount for emergency repairs and dredging due to flooding, $99,700,000, to remain available until expended, of which such amounts for eligible navigation projects which may be derived from the Harbor Maintenance Trust Fund pursuant to Public Law 99–662, shall be derived from that Fund: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 3

## FUNDS APPROPRIATED TO THE PRESIDENT

## AGENCY FOR INTERNATIONAL DEVELOPMENT

### CHILD SURVIVAL AND DISEASE PROGRAMS FUND

Notwithstanding section 10 of Public Law 91–672, for an additional amount for "Child Survival and Disease Programs Fund", $50,000,000, to remain available until expended: *Provided*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## OTHER BILATERAL ECONOMIC ASSISTANCE

### ASSISTANCE FOR THE NEW INDEPENDENT STATES OF THE FORMER SOVIET UNION

Notwithstanding section 10 of Public Law 91–672, for an additional amount for "Assistance for the New Independent States of the former Soviet Union," $46,000,000, to remain available until September 30, 2000: *Provided*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of

1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNANTICIPATED NEEDS

For an additional amount for "Unanticipated Needs", $30,000,000, to remain available until expended, only for a grant to the American Red Cross for reimbursement of disaster relief, recovery expenditures, and emergency services: *Provided*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 4

## DEPARTMENT OF THE INTERIOR

## UNITED STATES FISH AND WILDLIFE SERVICE

## CONSTRUCTION

For an additional amount for "Construction", $25,000,000, to remain available until expended, to repair damage due to hurricanes, floods and other acts of nature: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the amount provided shall be available only to the extent that an official budget request that includes designation of the entire amount as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## NATIONAL PARK SERVICE

## CONSTRUCTION

For an additional amount for "Construction", $10,000,000, to remain available until expended, to repair damage due to hurricanes, floods and other acts of nature: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the amount provided shall be available only to the extent that an official budget request that includes designation of the entire amount as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## UNITED STATES GEOLOGICAL SURVEY

## SURVEYS, INVESTIGATIONS, AND RESEARCH

For an additional amount for "Surveys, Investigations, and Research", $1,000,000, to remain available until expended, to repair damage due to hurricanes, floods and other acts of nature: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the amount provided shall be available only to the extent that an official budget request that includes designation of the entire amount as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## CHAPTER 5

## DEPARTMENT OF LABOR

## EMPLOYMENT AND TRAINING ADMINISTRATION

TRAINING AND EMPLOYMENT SERVICES

For an additional amount for "Training and Employment Services" to carry out section 402 of the Job Training Partnership Act, $7,000,000, to be available upon enactment and remain available through June 30, 1999: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 6

## DEPARTMENT OF TRANSPORTATION

### COAST GUARD

#### ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

For an additional amount for "Acquisition, Construction, and Improvements", for facility replacement or repairs arising from the consequences of Hurricane Georges, $12,600,000, to remain available until expended: *Provided*, That the entire amount shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 7

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### COMMUNITY PLANNING AND DEVELOPMENT

#### COMMUNITY DEVELOPMENT BLOCK GRANTS

For an additional amount for "Community development block grants", as authorized under title I of the Housing and Community Development Act of 1974, $250,000,000, which shall remain available until September 30, 2002, for use only for disaster relief, long-term recovery, and mitigation in communities affected by Presidentially-declared natural disasters designated during fiscal years 1998 and 1999, except for those activities reimbursable by or for which funds are made available by the Federal Emergency Management Agency, the Small Business Administration, or the Army Corps of Engineers: *Provided*, That in administering these amounts and except as provided in the next proviso, the Secretary of Housing and Urban Development (the Secretary) may waive or specify alternative requirements for any provision of any statute or regulation that the Secretary administers in connection with the obligation by the Secretary or the use by the recipient of these funds, except for statutory requirements related to civil rights, fair housing and nondiscrimination, the environment, and labor standards, upon a finding that such waiver is required to facilitate the use of such funds and would not be inconsistent with the overall purpose of the statute: *Provided further*, That the Secretary may waive the requirements that activities benefit persons of low and moderate income, except that at least 50 percent of the funds under this heading must benefit primarily persons of low and moderate income unless the Secretary makes a finding of compelling need: *Provided further*, That, upon a finding of compelling need, the Secretary must provide an explanation of the finding to the Committees on Appropriations: *Provided further*, That all funds under this heading shall be allocated by the Secretary to states (including Indian tribes for all purposes under this heading) to be administered by each state in conjunction with its Federal Emergency Management Agency program or its community development block grants program or by the entity designated by its Chief Executive Officer to administer the HOME Investment Partnerships Program: *Provided further*, That each state shall provide not less than 25 percent in non-Federal public matching funds or its equivalent value (other than administrative costs) for any funds allocated to the state under this heading: *Provided further*, That, in conjunction with the Director of the Federal Emergency Management Agency (the Director), the Secretary shall allocate funds based on the unmet needs identified by the Director as those which have not or will not be addressed by other federal disaster assistance programs: *Provided further*, That, in conjunction with the Director, the Secretary shall utilize annual disaster cost estimates in order that the funds under this heading shall be available, to the maximum extent

feasible, to assist states with all Presidentially declared disasters designated during these fiscal years: *Provided further*, That the Secretary shall publish a notice in the Federal Register governing the allocation and use of the community development block grants funds made available under this heading for disaster areas: *Provided further*, That any project or activity underway prior to a Presidentially declared disaster may not receive funds under this heading unless the disaster directly impacted the project: *Provided further*, That 10 days prior to distribution of funds, the Secretary and the Director shall submit a list to the Committees on Appropriations, setting forth the proposed uses of funds, including an explanation of why other Federal disaster assistance programs do not cover the costs of unmet needs identified by the Director, the most recent estimates of unmet needs (including all uses of waivers and the reasons therefore), and an explanation of how the disaster impacted the proposed project: *Provided further*, That the Secretary and the Director shall submit quarterly reports to the Committees on Appropriations regarding the actual projects, localities and needs for which funds have been provided: *Provided further*, That these reports shall be based upon quarterly reports submitted to the Secretary and the Director by each state receiving funds under this heading: *Provided further*, That the entire amount shall be available only to the extent an official budget request, that includes designation of the entire amount of the request as an emergency requirement as defined by the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

INDEPENDENT AGENCY

FEDERAL EMERGENCY MANAGEMENT AGENCY

DISASTER RELIEF

For an additional amount for "Disaster relief", $906,000,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

TITLE V—COUNTER–DRUG ACTIVITIES AND INTERDICTION

CHAPTER 1

DEPARTMENT OF AGRICULTURE

AGRICULTURE RESEARCH SERVICE

"Agriculture Research Service", Department of Agriculture, $23,000,000, for additional counterdrug research and development activities: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That such amounts shall be available only to the extent an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in such Act is transmitted by the President to the Congress.

CHAPTER 2

DEPARTMENT OF JUSTICE

DRUG ENFORCEMENT ADMINISTRATION

SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $10,200,000, to remain available until expended, of which the entire amount shall be available only to the extent that an official budget request that includes the designation of the entire amount

of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## IMMIGRATION AND NATURALIZATION SERVICE

## SALARIES AND EXPENSES

### ENFORCEMENT AND BORDER AFFAIRS

For an additional amount for "Salaries and Expenses, Enforcement and Border Affairs", $10,000,000, to remain available until expended, of which the entire amount shall be available only to the extent that an official budget request that includes the designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 3

## DEPARTMENT OF STATE

### INTERNATIONAL NARCOTICS CONTROL AND LAW ENFORCEMENT

For an additional amount for "International Narcotics Control and Law Enforcement", $232,600,000, to remain available until expended: *Provided*, That such funds shall be made available subject to the regular notification procedures of the Committees on Appropriations: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## CHAPTER 4

## DEPARTMENT OF TRANSPORTATION

## COAST GUARD

### OPERATING EXPENSES

For an additional amount for necessary expenses for the operation and maintenance of the Coast Guard, not otherwise provided for, $16,300,000, available solely for expenses related to the expansion of drug interdiction activities around Puerto Rico, the United States Virgin Islands, and other transit zone areas of operation, including costs to operate and maintain PC–170 patrol craft offered by the Department of Defense: *Provided*, That $4,000,000 of these funds shall be used only for the establishment and operating costs of a Caribbean International Support Tender, to train and support foreign coast guards in the Caribbean region: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

For an additional amount for acquisition, construction, renovation, and improvement of facilities and equipment, to be available for expansion of Coast Guard drug interdiction activities, $117,400,000, to remain available until expended: *Provided*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Budget and Emergency Deficit Control Act of 1985, as amended: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

CHAPTER 5

DEPARTMENT OF THE TREASURY

DEPARTMENTAL OFFICES

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Salaries and Expenses", $1,500,000, to remain available until expended for necessary expenses for an interagency money laundering initiative: *Provided*, That funds shall be available for transfer to the National Foreign Intelligence Program: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That none of the funds provided under this heading may be obligated until fifteen days after notice thereof has been transmitted to the Committees on Appropriations.

UNITED STATES CUSTOMS SERVICE

SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $106,300,000, to remain available until expended for counterdrug initiatives: *Provided*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That none of the funds provided under this heading may be obligated until fifteen days after notice thereof has been transmitted to the Committees on Appropriations.

OPERATION, MAINTENANCE AND PROCUREMENT, AIR AND MARINE INTERDICTION PROGRAMS

For an additional amount for "Operation, Maintenance and Procurement, Air and Marine Interdiction Programs", $162,700,000, to remain available until expended: *Provided*, That of the amount provided, $153,000,000 shall be available for the procurement and conversion of two P–3B AEW aircraft and four P–3B Slick aircraft to be transferred from the Department of Defense to the Customs Service: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That none of the funds provided under this heading may be obligated until fifteen days after notice thereof has been transmitted to the Committees on Appropriations.

CUSTOMS FACILITIES, CONSTRUCTION, IMPROVEMENTS AND RELATED EXPENSES

For an additional amount for "Customs Facilities, Construction, Improvements and Related Expenses", $7,000,000, to remain available until expended: *Provided*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as

defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That none of the funds provided under this heading may be obligated until fifteen days after notice thereof has been transmitted to the Committees on Appropriations.

### EXECUTIVE OFFICE OF THE PRESIDENT AND FUNDS APPROPRIATED TO THE PRESIDENT

### OFFICE OF NATIONAL DRUG CONTROL POLICY

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $1,200,000: *Provided*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That none of the funds provided under this heading may be obligated until fifteen days after notice thereof has been transmitted to the Committees on Appropriations.

### SPECIAL FORFEITURE FUND

### (INCLUDING TRANSFER OF FUNDS)

For an additional amount to support the National Drug Court Institute, $2,000,000, to remain available until expended: *Provided*, That the entire amount shall be available for transfer to the National Drug Court Institute: *Provided further*, That the entire amount shall be available only to the extent that an official budget request for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress: *Provided further*, That the entire amount is designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That none of the funds provided under this heading may be obligated until fifteen days after notice thereof has been transmitted to the Committees on Appropriations.

### TITLE VI—GENERAL PROVISION

No part of any appropriation contained in this Division of this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

### DIVISION C—OTHER MATTERS

### TITLE I—OTHER MATTERS

### << 5 USCA APP § 3 NOTE >>

SEC. 101. ACTING TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION. (a) IN GENERAL.— Notwithstanding any other provision of law, the President may appoint an acting Treasury Inspector General for Tax Administration to serve during the period—

### << 5 USCA APP § 3 NOTE >>

(1) beginning on the date of the enactment of this section (or, if later, the date of the appointment), and

### << 5 USCA APP § 3 NOTE >>

(2) ending on the earlier of—
(A) April 30, 1999, or

(B) the date on which the first Treasury Inspector General for Tax Administration takes office (other than pursuant to this section).

<< 5 USCA APP § 3 NOTE >>

(b) DUTIES BEFORE JANUARY 18, 1999.—The acting Treasury Inspector General for Tax Administration appointed under subsection (a) shall, before January 18, 1999, take only such actions as are necessary to begin operation of the Office of Treasury Inspector General for Tax Administration, including—

<< 5 USCA APP § 3 NOTE >>

(1) making interim arrangements for administrative support for the Office,

<< 5 USCA APP § 3 NOTE >>

(2) establishing interim positions in the Office into which personnel will be transferred upon the transfer of functions and duties to the Office on January 18, 1999,

<< 5 USCA APP § 3 NOTE >>

(3) appointing such acting personnel on an interim basis as may be necessary upon the transfer of functions and duties to the Office on January 18, 1999, and

<< 5 USCA APP § 3 NOTE >>

(4) providing guidance and input for the fiscal year 2000 budget process for the Office.

<< 5 USCA APP § 3 NOTE >>

(c) ACTIONS NOT TO LIMIT AUTHORITY OF IG.—None of the actions taken by an individual appointed under subsection (a) shall affect the future authority of any Treasury Inspector General for Tax Administration not appointed under subsection (a).

<< 5 USCA APP § 3 NOTE >>

(d) LIMITATIONS.—

<< 5 USCA APP § 3 NOTE >>

(1) NOMINATION.—No individual appointed under subsection (a) may serve on or after January 19, 1999, unless on or before such date the President has submitted to the Senate his nomination of an individual to serve as the first Treasury Inspector General for Tax Administration.

<< 5 USCA APP § 3 NOTE >>

(2) TREASURY INSPECTOR GENERAL MAY NOT SERVE.—No individual appointed under subsection (a) may serve during any period such individual is serving as the Inspector General of the Treasury of the United States or the acting Inspector General of the Treasury of the United States.

<< 5 USCA APP § 3 NOTE >>

(3) EMPLOYMENT RESTRICTIONS.—The provisions of section 8D(j) of the Inspector General Act of 1978 (5 U.S.C. App.) shall apply to any individual appointed under subsection (a).

<< 5 USCA § 3104 NOTE >>

SEC. 102. Section 122 of Public Law 105–119 (5 U.S.C. 3104 note) is amended—

<< 5 USCA § 3104 NOTE >>

(1) by amending subsection (g) to read as follows:

"(g)(1) Notwithstanding any other provision of law and subject to paragraph (2), the Secretary of the Treasury is authorized to establish, for a period of three years from date of enactment of this provision, a personnel management demonstration project providing for the compensation and performance management of not more than a combined total of 950 employees who fill critical scientific, technical, engineering, intelligence analyst, language translator, and medical positions in the Bureau of Alcohol, Tobacco and Firearms, the United States Customs Service, and the United States Secret Service.

"(2) The provisions of subsections (b) through (f) and subsection (h) shall apply to the demonstration project authorized by paragraph (1) except that—

"(A) any reference in such subsections to the Director of the Federal Bureau of Investigation shall include a reference to the Secretary of the Treasury;

"(B) the operating plan required by subsection (d) shall be submitted not later than February 1, 1999 to the House and Senate Committees on Appropriations, the House Committee on Government Reform and Oversight, the Senate Committee on Governmental Affairs, the House Committee on Ways and Means, and the Senate Committee on Finance; and

"(C) the report required by subsection (f) shall be submitted not later than March 31, 2001."; and

(2) by amending subsection (h) to read as follows—

"(h) The authority to establish a demonstration project under this section shall terminate on November 26, 2000.".

<< 22 USCA § 4064 >>

SEC. 103. Section 824 of the Foreign Service Act is amended—

<< 22 USCA § 4064 >>

(1) in subsection (a)(1)(A) by inserting "or in the case of a waiver under subsection (g)" after "subsection (b)"; and

<< 22 USCA § 4064 >>

(2) by adding the following new subsections (g) and (h) at the end:

"(g) The Secretary of State may waive the application of the paragraphs (a) through (d) of this section, on a case-by-case basis, for an annuitant reemployed on a temporary basis, but only if, and for so long as, the authority is necessary due to an emergency involving a direct threat to life or property or other unusual circumstances.

"(h) A reemployed annuitant as to whom a waiver under subsection (g) is in effect shall not be considered a participant for purposes of subchapter I or subchapter II, or an employee for purposes of chapter 83 or 84 of title 5, United States Code.".

<< 22 USCA § 4824 >>

SEC. 104. Title II of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99–399) is amended by adding the following new section at the end:

**"SEC. 206. CONTRACTING AUTHORITY.**

"The Secretary of State is authorized to employ individuals or organizations by contract to carry out the purposes of this Act, and individuals employed by contract to perform such services shall not by virtue of such employment be considered to be employees of the United States Government for purposes of any law administered by the Office of Personnel Management (except that the Secretary may determine the applicability to such individuals of any law administered by the Secretary concerning the employment of such individuals); and such contracts are authorized to be negotiated, the terms of the contracts to be prescribed, and the work to be performed, where necessary, without regard to such statutory provisions as relate to the negotiation, making and performance of contracts and performance of work in the United States.".

<< 49 USCA § 14501 >>

SEC. 106. INTRASTATE BUS TRANSPORTATION IN HAWAII. Section 14501(a)(1) of Title 49, United States Code, is amended by striking "operations" and inserting "operations, or to intrastate bus transportation of any nature in the State of Hawaii".

SEC. 107. Provisions of 23 U.S.C. 125(b)(1) shall not apply to emergency relief projects resulting from the flooding in the State of California in January and March 1995.

SEC. 108. For the purpose of any Rule of the House of Representatives, notwithstanding any other provision of law, any obligation limitation relating to surface transportation projects under section 1602 of P.L. 105–178 shall be assumed to be administered on the basis of sound program management practices that are consistent with past practices of the administering agency permitting States to decide High Priority Project funding priorities within state program allocations.

<< 49 USCA § 31701 NOTE >>

SEC. 109. OPERATION OF TRAILERS. (a) REGISTRATION OF TRAILERS.—A State that requires annual registration of container chassis and the apportionment of fees for such registrations in accordance with the International Registration Plan (as defined under section 31701 of title 49, United States Code) shall not limit the operation, or require the registration, in the State of a container chassis (or impose fines or penalties on the operation of a container chassis for being operated in the State without a registration issued by the State) if such chassis—

<< 49 USCA § 31701 NOTE >>

(1) is registered under the laws of another State; and

<< 49 USCA § 31701 NOTE >>

(2) is operating under a trip permit issued by the State.

<< 49 USCA § 31701 NOTE >>

(b) LIMITATION ON REGISTRATION OF TRAILERS.—A State described in subsection (a) may not deny the use of trip permits for the operation in the State of a container chassis that is registered under the laws of another State.

<< 49 USCA § 31701 NOTE >>

(c) SAFETY REGULATION.—This section shall apply to registration requirements only and shall not affect the ability of the State to regulate for safety.

<< 49 USCA § 31701 NOTE >>

(d) PENALTIES.—No State described in subsection (a), political subdivision of such a State, or person may impose or collect any fee, penalty, fine, or other form of damages which is based in whole or in part upon the nonpayment of a State registration fee (including related weight and licensing fees assessed as part of registration) attributable to a container chassis operated in the State (and registered in another State) before the date of enactment of this Act, unless it is shown by the State, political subdivision, or person that such container chassis was not operated in the State under a trip permit issued by the State.

<< 49 USCA § 31701 NOTE >>

(e) CONTAINER CHASSIS DEFINED.—In this section, the term "container chassis" means a trailer, semi-trailer, or auxiliary axle used exclusively for the transportation of ocean shipping containers.

<< 49 USCA § 47114 NOTE >>

SEC. 110. REAUTHORIZATION OF THE FEDERAL AVIATION ADMINISTRATION. (a) PERIOD OF APPLICABILITY OF CERTAIN AMENDMENTS.—Effective September 29, 1998, section 125 of the Federal Aviation Reauthorization Act of 1996 (49 U.S.C. 47114 note; 110 Stat. 3220) is repealed.

(b) AIRPORT IMPROVEMENT PROGRAM.—

<< 49 USCA § 48103 >>

(1) AUTHORIZATION OF APPROPRIATIONS.—Section 48103 of title 49, United States Code, is amended—

(A) by striking "September 30, 1996" and inserting "September 30, 1998"; and

(B) by striking "$2,280,000,000" and all that follows through the period at the end and inserting the following: "$1,205,000,000 for the six-month period beginning October 1, 1998".

<< 49 USCA § 47104 >>

(2) OBLIGATIONAL AUTHORITY.—Section 47104(c) of title 49, United States Code, is amended by striking "September 30, 1998" and inserting "March 31, 1999".

(c) AVIATION INSURANCE PROGRAM AMENDMENTS.—

<< 49 USCA § 44309 >>

(1) REIMBURSEMENT OF INSURED PARTY'S SUBROGEE.—Section 44309(a) of title 49, United States Code, is amended to read as follows:

"(a) LOSSES.—

"(1) ACTIONS AGAINST UNITED STATES.—A person may bring a civil action in a district court of the United States or in the United States Court of Federal Claims against the United States Government when—

"(A) a loss insured under this chapter is in dispute; or

"(B)(i) the person is subrogated under a contract between the person and a party insured under this chapter (other than section 44305(b)) to the rights of the insured party against the United States Government; and

"(ii) the person has paid to the insured party, with the approval of the Secretary of Transportation, an amount for a physical damage loss that the Secretary has determined is a loss covered by insurance issued under this chapter (other than section 44305(b)).

"(2) LIMITATION.—A civil action involving the same matter (except the action authorized by this subsection) may not be brought against an agent, officer, or employee of the Government carrying out this chapter.

"(3) PROCEDURE.—To the extent applicable, the procedure in an action brought under section 1346(a)(2) of title 28, United States Code, applies to an action under this subsection.".

<< 49 USCA § 44310 >>

(2) EXTENSION OF AVIATION INSURANCE PROGRAM.—Section 44310 of such title is amended by striking "December 31, 1998." and inserting "March 31, 1999.".

(d) ELIGIBILITY OF AIP FUNDS TO ASSESS Y2K COMPLIANCE.—

(1) ELIGIBILITY.—For fiscal year 1999 the term "airport development" under section 47102(3) of title 49, United States Code, may include activities of an airport sponsor of a commercial service airport (as defined by section 47102(7) of such title) to assess the Year 2000 processing capabilities of any airport facilities, technology systems, or equipment owned by the airport sponsor and directly related to airport activities, regardless of whether such facilities, systems, or equipment are otherwise eligible for assistance under chapter 471 of such title. Such activities may include testing associated with such assessment.

(2) LIMITATIONS.—

(A) Only funds apportioned to sponsors under section 47114(c) of title 49, United States Code, or to States under subsections (d) and (e) of section 47114 of such title, may be used for activities described in paragraph (1).

(B) The expanded eligibility under paragraph (1) applies only to the assessment (and associated testing) with respect to the Year 2000 processing capabilities of airport facilities, systems, and equipment owned by the airport sponsor.

(3) DEFINITION.—In this subsection, the term "Year 2000 processing" means the processing (including, without limitation, calculating, comparing, sequencing, displaying, or storing), transmitting, or receiving of date or date/time data from, into, and between the twentieth and twenty-first centuries, and the years 1999 and 2000, and leap year calculations.

(e) SCOREKEEPING ADJUSTMENT.—Notwithstanding Rule 3 of the Budget Scorekeeping Guidelines set forth in the Joint Explanatory Statement of the Committee of Conference accompanying Conference Report No. 105–217, legislation in this section that would have been estimated by the Office of Management and Budget as changing direct spending or receipts under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 were it included in an Act other than an appropriation Act shall be treated as direct spending or receipts legislation, as appropriate, under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985.

(f) JOINT VENTURE AGREEMENTS.

<< 49 USCA § 41716 >>

(1) IN GENERAL.—Subchapter I of chapter 417 is amended by adding at the end the following:

**"§ 41716. Joint venture agreements**

"(a) DEFINITIONS.—In this section, the following definitions apply:

"(1) JOINT VENTURE AGREEMENT.—The term 'joint venture agreement' means an agreement entered into by a major air carrier on or after January 1, 1998, with regard to (A) code-sharing, blocked-space arrangements, long-term wet leases (as defined in section 207.1 of title 14, Code of Federal Regulations) of a substantial number (as defined by the Secretary by regulation) of aircraft, or frequent flyer programs, or (B) any other cooperative working arrangement (as defined by the Secretary by regulation) between 2 or more major air carriers that affects more than 15 percent of the total number of available seat miles offered by the major air carriers.

"(2) MAJOR AIR CARRIER.—The term 'major air carrier' means a passenger air carrier that is certificated under chapter 411 of this title and included in Carrier Group III under criteria contained in section 04 of part 241 of title 14, Code of Federal Regulations.

"(b) SUBMISSION OF JOINT VENTURE AGREEMENT.—At least 30 days before a joint venture agreement may take effect, each of the major air carriers that entered into the agreement shall submit to the Secretary—

"(1) a complete copy of the joint venture agreement and all related agreements; and

"(2) other information and documentary material that the Secretary may require by regulation.

"(c) EXTENSION OF WAITING PERIOD.—

"(1) IN GENERAL.—The Secretary may extend the 30–day period referred to in subsection (b) until—

"(A) in the case of a joint venture agreement with regard to code-sharing, the 150th day following the last day of such period; and

"(B) in the case of any other joint venture agreement, the 60th day following the last day of such period.

"(2) PUBLICATION OF REASONS FOR EXTENSION.—If the Secretary extends the 30–day period referred to in subsection (b), the Secretary shall publish in the Federal Register the Secretary's reasons for making the extension.

"(d) TERMINATION OF WAITING PERIOD.—At any time after the date of submission of a joint venture agreement under subsection (b), the Secretary may terminate the waiting periods referred to in subsections (b) and (c) with respect to the agreement.

"(e) REGULATIONS.—The effectiveness of a joint venture agreement may not be delayed due to any failure of the Secretary to issue regulations to carry out this section.

"(f) MEMORANDUM TO PREVENT DUPLICATIVE REVIEWS.—Promptly after the date of enactment of this section, the Secretary shall consult with the Assistant Attorney General of the Antitrust Division of the Department of Justice in order to establish, through a written memorandum of understanding, preclearance procedures to prevent unnecessary duplication of effort by the Secretary and the Assistant Attorney General under this section and the antitrust laws of the United States, respectively.

"(g) PRIOR AGREEMENTS.—With respect to a joint venture agreement entered into before the date of enactment of this section as to which the Secretary finds that—

"(1) the parties submitted the agreement to the Secretary before such date of enactment; and

"(2) the parties submitted all information on the agreement requested by the Secretary,

the waiting period described in paragraphs (2) and (3) shall begin on the date, as determined by the Secretary, on which all such information was submitted and end on the last day to which the period could be extended under this section.

"(h) LIMITATION ON STATUTORY CONSTRUCTION.—The authority granted to the Secretary under this section shall not in any way limit the authority of the Attorney General to enforce the antitrust laws as defined in the first section of the Clayton Act (15 U.S.C. 12).".

<< 49 USCA Ch. 417 >>

(2) CONFORMING AMENDMENT.—The analysis for subchapter I of chapter 417 is amended by adding at the end the following:

"41716. Joint venture agreements.".

(g) COMPETITIVE PRACTICES IN THE AIRLINE INDUSTRY.

(1) NATIONAL RESEARCH COUNCIL.—

(a) STUDY.—The National Research Council of the National Academy of Sciences shall complete a comprehensive update of the 1991 study of airline deregulation prepared by the Transportation Research Board of the Council. The update shall include updated versions of the chapters contained in the study pertaining to competitive issues in the airline industry as well as recommendations for changes in the statutory framework under which the airline industry operates.

(b) REPORT BY NATIONAL RESEARCH COUNCIL.—Not later than 6 months after the date of enactment of this Act, the National Research Council shall transmit to Congress and the Secretary of Transportation a report containing the results of the study conducted under paragraph (a).

(c) REPORT BY THE SECRETARY.—Not later than 2 months after the date on which the Secretary receives the report of the National Research Council under paragraph (b), the Secretary shall transmit to Congress a report containing the response of the Secretary to the findings and recommendations of the National Research Council.

(2) REPORT TO CONGRESS.—The Secretary shall conduct a study and transmit to Congress a report that includes—

(a) a description of any complaints received by the Secretary concerning acts of unfair competition or predatory pricing in the airline industry (including the number of such complaints) and of specific examples of such acts;

(b) a description of the options of the Secretary for addressing any acts of unfair competition or predatory pricing identified under paragraph (a);

(c) an analysis of the guidelines proposed in Docket OST–98–3713, including information documenting and quantifying the impact of the guidelines on the items listed in subsection (3)(c); and

(d) a description of the manner in which the Secretary plans to coordinate the handling of predatory pricing and unfair competition complaints against air carriers filed with the Secretary and similar complaints filed with the Attorney General, including methods to ensure efficient use of limited government resources and to ensure that all parties avoid duplicate requests by government agencies for information unless each of the agencies needs the information to carry out its statutory responsibilities.

(3) GUIDELINES.—

(a) ISSUANCE.—The Secretary shall not issue final guidelines in Docket OST–98–3713 before the date of transmittal to Congress of a report under subsection (2).

(b) TRANSMITTAL TO CONGRESS.—If the Secretary issues final guidelines in Docket OST–98–3713, the Secretary shall transmit the guidelines to Congress.

(c) IMPACT OF GUIDELINES.—If, as a result of the study conducted under subsection (2), the Secretary decides to issue final guidelines in Docket OST–98–3713 that are different from the guidelines originally proposed, the Secretary shall, as part of the transmittal under paragraph (b), include information that documents and quantifies the impact of the guidelines on the following:

(i) Scheduled service to small- and medium-sized communities.

(ii) Airfares, including the availability of senior citizen, Internet, and standby discounts on routes covered by the guidelines.

(iii) The incentive and ability of major air carriers to offer low airfares.

(iv) The incentive of new entrant air carriers to offer low airfares.

(v) The ability of air carriers to offer inclusive leisure travel for which airfares are not separately advertised.

(vi) Members of frequent flyer programs.

(vii) The ability of air carriers to carry nonorigination and destination traffic on the portion of routes that are served by new entrant air carriers covered by the guidelines.

(viii) Airline employees.

(4) CONSULTATION.—In conducting the study under section (2), the Secretary shall consult with the Attorney General, major air carriers, new entrant air carriers, airport and community leaders, academic and economic experts, and airline employees and passengers.

(5) EFFECTIVE DATE.—The guidelines adopted in Docket OST–98–3713, or any similar guidelines, shall not become effective before the last day of the 12–week period beginning on the date of transmittal to Congress of final guidelines in Docket OST–98–3713, except that a week shall not count toward such 12–week period unless the House of Representatives is in session for legislative business at least 1 day during the week.

SEC. 111. STEEL IMPORTS INTO THE UNITED STATES. (a) FINDINGS.—Congress makes the following findings:

(1) The current financial crises in Asia, the independent States of the former Soviet Union (as defined in section 3 of the FREEDOM Support Act), Russia, and other areas of the world, involve significant depreciation in the currencies of several key steel-producing and steel-consuming countries, along with a collapse in the domestic demand for steel in the countries.

(2) The crises have generated and will continue to generate increases in United States imports of steel, both from the countries whose currencies have been depreciated and from other Asian steel-producing countries that are no longer able to export steel to the countries that are experiencing an economic crisis.

(3) United States imports of finished steel mill products from Asian steel-producing countries, such as the People's Republic of China, Japan, Korea, India, Taiwan, Indonesia, Thailand, and Malaysia, increased by 79 percent in the first 5 months of 1998.

(4) Year-to-date imports of steel from Russia now exceed the record import levels of 1997, and steel imports from Russia and the Ukraine now approach 2,500,000 net tons.

(5) Foreign government trade restrictions and private restraints of trade distort international trade and investment patterns and result in burdens on United States commerce, including absorption of a disproportionate share of steel diverted from other countries.

(6) The European Union, for example, despite also being a major economy, in 1997 imported only one-tenth as much finished steel products from Asian steel-producing countries as the United States did and has restricted imports of steel from the independent states of the former Soviet Union and Russia.

(7) The United States is simultaneously facing a substantial increase in steel imports from the independent states of the former Soviet Union and Russia, caused in part by the closure of Asian markets to steel imports.

(8) There is a well recognized need for improvement in the enforcement of the United States trade laws to provide an effective response to situations of such increased imports.

(b) SENSE OF CONGRESS.—Congress calls upon the President to—

(1) pursue enhanced enforcement of the United States trade laws with respect to the increase in steel imports into the United States, using all remedies available under United States laws including imposition of offsetting duties, quantitative restrictions, and other appropriate remedial measures;

(2) pursue with all methods at the President's disposal to achieve a more equitable sharing of the burden of accepting imports of finished steel products from Asia and the independent states of the former Soviet Union;

(3) establish a task force within the executive branch that has responsibility for closely monitoring imports of steel into the United States; and

(4) report to Congress not later than January 5, 1999, with a comprehensive plan for responding to the increase in steel imports, including ways of limiting the deleterious effects on employment, prices, and investment in the United States steel industry.

SEC. 112. INCLUSION OF SPIRIT MOUND, SOUTH DAKOTA, ON THE LEWIS AND CLARK TRAIL. (a) ACQUISITION.—The Secretary of the Interior is authorized to acquire on a willing seller basis, at a cost of not to exceed $600,000, the tract of land known as "Spirit Mound", located on South Dakota Highway 19 near Vermilion, South Dakota.

(b) INCLUSION ON THE LEWIS AND CLARK TRAIL.—The tract described in subsection (a) shall be administered as part of the Lewis and Clark National Historic Trail.

(c) COOPERATIVE AGREEMENT.—The Secretary of the Interior shall enter into a cooperative agreement with Lewis and Clark/Spirit Mound Trust Inc., providing for the restoration, interpretation, and long-term preservation of, and public access to, Spirit Mound.

SEC. 113. (a) DESIGNATION OF DICK CHENEY FEDERAL BUILDING.—The Federal Building and Post Office located at 100 East B Street, Casper, Wyoming, shall be known and designated as the "Dick Cheney Federal Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the Federal Building and Post Office referred to in subsection (a) shall be deemed to be a reference to the "Dick Cheney Federal Building".

SEC. 114. (a) DESIGNATION.—The United States Post Office located at 297 Larkfield Road in East Northport, New York, shall be known and designated as the "Jerome Anthony Ambro, Jr. Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office referred to in subsection (a) shall be deemed to be a reference to the "Jerome Anthony Ambro, Jr. Post Office Building".

SEC. 115. DESIGNATION OF LIEUTENANT HENRY O. FLIPPER STATION. (a) IN GENERAL.—The facility of the United States Postal Service located at Tall Timbers Village Square, United States Highway 19 South, in Thomasville, Georgia, shall be known and designated as the "Lieutenant Henry O. Flipper Station".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the facility of the United States Postal Service referred to in subsection (a) shall be deemed to be a reference to the "Lieutenant Henry O. Flipper Station".

SEC. 116. WILLIAM R. "BILLY" ROLLE POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 3191 Grand Avenue in Coconut Grove, Florida, shall be known and designated as the "William R. 'Billy' Rolle Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "William R. 'Billy' Rolle Post Office Building".

SEC. 117. HELEN MILLER POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 550 Fisherman Street in Opa Locka, Florida, shall be known and designated as the "Helen Miller Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Helen Miller Post Office Building".

SEC. 118. ESSIE SILVA POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 18690 N.W. 37th Avenue in Carol City, Florida, shall be known and designated as the "Essie Silva Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Essie Silva Post Office Building".

SEC. 119. ATHALIE RANGE POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 500 North West 2d Avenue in Miami, Florida, shall be known and designated as the "Athalie Range Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Athalie Range Post Office Building".

SEC. 120. GARTH REEVES, SR. POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 995 North West 119th Street in Miami, Florida, shall be known and designated as the "Garth Reeves, Sr. Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Garth Reeves, Sr. Post Office Building".

SEC. 121. (a) DESIGNATION.—The United States Post Office located at 16250 Highway 603 in Kiln, Mississippi, shall be known and designated as the "Ray J. Favre Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office referred to in subsection (a) shall be deemed to be a reference to the "Ray J. Favre Post Office Building".

AR.02801

SEC. 122. (a) REDESIGNATION.—The building of the United States Postal Service located at 2419 West Monroe Street, in Chicago, Illinois, and known as the Midwest Post Office Building, shall be known and designated as the "Nancy B. Jefferson Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Nancy B. Jefferson Post Office Building".

SEC. 123. (a) REDESIGNATION.—The facility of the United States Postal Service located at 9719 Candelaria Road NE in Albuquerque, New Mexico, and known as the Eldorado Station Post Office, shall be known and designated as the "Steve Schiff Post Office".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the facility referred to in subsection (a) shall be deemed to be a reference to the "Steve Schiff Post Office".

SEC. 124. (a) DESIGNATION.—The United States Post Office located at 860 Penniman Avenue in Plymouth, Michigan, shall be known and designated as the "Carl D. Pursell Post Office".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office referred to in subsection (a) shall be deemed to be a reference to the "Carl D. Pursell Post Office".

SEC. 125. (a) DESIGNATION.—The United States Post Office located at 202 Center Street in Garwood, New Jersey, shall be known and designated as the "James T. Leonard, Sr. Post Office".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office referred to in subsection (a) shall be deemed to be a reference to the "James T. Leonard, Sr. Post Office".

SEC. 126. EDGAR C. CAMPBELL, SR., POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 658 63rd Street, in Philadelphia, Pennsylvania, shall be known and designated as the "Edgar C. Campbell, Sr., Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Edgar C. Campbell, Sr., Post Office Building".

SEC. 127. DAVID P. RICHARDSON, JR., POST OFFICE BUILDING. (a) DESIGNATION.—The United States Postal Service building located at 5209 Greene Street, in Philadelphia, Pennsylvania, shall be known and designated as the "David P. Richardson, Jr., Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "David P. Richardson, Jr., Post Office Building".

SEC. 128. (a) REDESIGNATION.—The building of the United States Postal Service located at 324 South Laramie Street, in Chicago, Illinois, and known as the Austin Post Office Building, shall be known and designated as the "Reverend Milton R. Brunson Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Reverend Milton R. Brunson Post Office Building".

SEC. 129. DESIGNATION. (a) IN GENERAL.—The facility of the United States Postal Service located at 3750 North Kedzie Avenue in Chicago, Illinois, shall be known and designated as the "Daniel J. Doffyn Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office building referred to in subsection (a) shall be deemed to be a reference to the "Daniel J. Doffyn Post Office Building".

SEC. 130. (a) DESIGNATION.—The United States Post Office located at 215 East Jackson Street in Painesville, Ohio, as the "Karl Bernal Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office referred to in subsection (a) shall be deemed to be a reference to the "Karl Bernal Post Office Building".

SEC. 131. (a) DESIGNATION.—The United States Post Office located at 95 West #100 South in Provo, Utah, shall be known and designated as the "Howard C. Nielson Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States Post Office referred to in subsection (a) shall be deemed to be a reference to the "Howard C. Nielson Post Office Building".

SEC. 132. (a) DESIGNATION.—The United States Postal Service building located at 11550 Livingston Road, in Fort Washington, Maryland, shall be known and designated as the "Jacob Joseph Chestnut Post Office Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the building referred to in subsection (a) shall be deemed to be a reference to the "Jacob Joseph Chestnut Post Office Building".

SEC. 133. (a) DESIGNATION.—The Federal building located at 309 North Church Street in Dyersburg, Tennessee, shall be known and designated as the "Jere Cooper Federal Building".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the Federal building referred to in subsection (a) shall be deemed to be a reference to the "Jere Cooper Federal Building".

SEC. 134. Notwithstanding any other law, sections 101 (d), (k), (p), (s) and (x) of the Omnibus Personnel Reform Amendment Act of 1998, D.C. Law 12–124, effective June 11, 1998, are enacted into law.

SEC. 135. (a) Any right, title, or interest of the United States in the property described in subsection (b) is hereby waived.

(b) The property described in this subsection is certain real property comprised of approximately 106.94 acres of land located in Anne Arundel County in the State of Maryland, said property being originally approximately 144.5 acres of land granted to the United States to be held in trust by the "Commissioners of the District of Columbia on behalf of the United States of America", in fee simple, by a Judgment of Taking in U.S. District Court, Civil Action Number 2391, saving and excepting therefrom approximately 37.57 acres of land by deed dated June 17, 1947, and recorded at Liber 584, Folio 591.

SEC. 136. FLOOD MITIGATION NEAR PIERRE, SOUTH DAKOTA. (a) IN GENERAL.—

(1) LAND ACQUISITION.—To provide full operational capability to carry out the authorized purposes of the Missouri River Main Stem dams that are part of the Pick–Sloan Missouri River Basin Program authorized by section 9 of the Act entitled "An Act authorizing the construction of certain public works on rivers and harbors for flood control, and other purposes", approved December 22, 1944, the Secretary may acquire from willing sellers such land and property in the vicinity of Pierre, South Dakota, or floodproof or relocate such property within the project area, as the Secretary determines is adversely affected by the full wintertime Oahe Powerplant releases.

(2) OWNERSHIP AND USE.—Any land that is acquired under this authority shall be kept in public ownership and will be dedicated and maintained in perpetuity for a use that is compatible with any remaining flood threat.

(3) REPORT.—

(A) IN GENERAL.—The Secretary shall not obligate funds to implement this paragraph until the Secretary has completed a report addressing the criteria for selecting which properties are to be acquired, relocated or floodproofed, and a plan for implementing such measures and has made a determination that the measures are economically justified.

(B) DEADLINE.—The report shall be completed not later than 180 days after funding is made available.

(4) COORDINATION AND COOPERATION.—The report and implementation plan—

(A) shall be coordinated with the Federal Emergency Management Agency; and

(B) shall be prepared in consultation with other Federal agencies, and State and local officials, and residents.

(5) CONSIDERATIONS.—Such report should take into account information from prior and ongoing studies.

(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to carry out this section $35,000,000.

SEC. 137. GRAND FORKS, NORTH DAKOTA, AND EAST GRAND FORKS, MINNESOTA.—The following project for water resources development and conservation and other purposes is authorized to be carried out by the Secretary of the Army, acting through the Chief of Engineers, substantially in accordance with the plans, and subject to the conditions recommended in a final report of the Chief of Engineers as approved by the Secretary, if the report of the Chief is completed not later than December 31, 1998: The project for flood damage reduction and recreation, Grand Forks, North Dakota, and East Grand Forks, Minnesota, at a total cost of $307,750,000, with an estimated Federal cost of $154,360,000 and an estimated non-Federal cost of $153,390,000.

Sec. 138. POLICE CORPS ACT. (a) TRAINING PERIOD.—

<< 42 USCA § 14097 >>

(1) IN GENERAL.—Section 200108 of the Police Corps Act (42 U.S.C. 14097) is amended by striking subsection (b) and inserting the following:

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(b) TRAINING SESSIONS.—A participant in a State Police Corps program shall attend up to 24 weeks, but no less than 16 weeks, of training at a training center. The Director may approve training conducted in not more than 3 separate sessions.".

<< 42 USCA § 14097 >>

(2) CONFORMING AMENDMENT.—Section 200108(c) of the Police Corps Act (42 U.S.C. 14097(c)) is amended by striking "16 weeks of".

<< 42 USCA § 14101 >>

(b) REAUTHORIZATION.—Section 200112 of the Police Corps Act (42 U.S.C. 14101) is amended by striking "$20,000" and all that follows before the period and inserting "$50,000,000 for fiscal year 1999, $70,000,000 for fiscal year 2000, $90,000,000 for fiscal year 2001, and $90,000,000 for fiscal year 2002".

<< 31 USCA § 5111 NOTE >>

SEC. 139. CONGRESSIONAL GOLD MEDALS AND COMMEMORATIVE COINS. (a) LITTLE ROCK NINE.—

<< 31 USCA § 5111 NOTE >>

(1) The Congress hereby finds the following:
  (A) Jean Brown Trickey, Carlotta Walls LaNier, Melba Patillo Beals, Terrence Roberts, Gloria Ray Karlmark, Thelma Mothershed Wair, Ernest Green, Elizabeth Eckford, and Jefferson Thomas, hereafter in this section referred to as the "Little Rock Nine", voluntarily subjected themselves to the bitter stinging pains of racial bigotry.
  (B) The Little Rock Nine are civil rights pioneers whose selfless acts considerably advanced the civil rights debate in this country.
  (C) The Little Rock Nine risked their lives to integrate Central High School in Little Rock, Arkansas, and subsequently the Nation.
  (D) The Little Rock Nine sacrificed their innocence to protect the American principle that we are all "one Nation, under God, indivisible".
  (E) The Little Rock Nine have indelibly left their mark on the history of the Nation.
  (F) The Little Rock Nine have continued to work toward equality for all Americans.

<< 31 USCA § 5111 NOTE >>

  (2)(A) The President is authorized to present, on behalf of Congress, to Jean Brown Trickey, Carlotta Walls LaNier, Melba Patillo Beals, Terrence Roberts, Gloria Ray Karlmark, Thelma Mothershed Wair, Ernest Green, Elizabeth Eckford, and Jefferson Thomas, commonly referred to as the "Little Rock Nine", gold medals of appropriate design, in recognition of the selfless heroism such individuals exhibited and the pain they suffered in the cause of civil rights by integrating Central High School in Little Rock, Arkansas.
  (B) For purposes of the presentation referred to in subsection (A) the Secretary of the Treasury shall strike a gold medal with suitable emblems, devices, and inscriptions to be determined by the Secretary for each recipient.
  (C) Effective October 1, 1998, there be authorized to be appropriated such sums as may be necessary to carry out this subsection.

<< 31 USCA § 5111 NOTE >>

  (3)(A) The Secretary of the Treasury may strike and sell duplicates in bronze of the gold medals struck pursuant to subsection (a)(2)(B) under such regulations as the Secretary may prescribe, at a price sufficient to cover the cost thereof, including labor, materials, dies, use of machinery, and overhead expenses, and the cost of the gold medal.
  (B) The appropriation used to carry out this subsection shall be reimbursed out of the proceeds of sales under subsection (a)(3)(A).

<< 31 USCA § 5111 NOTE >>

(4) The medals struck pursuant to this subsection are national medals for purposes of chapter 51 of title 31, United States Code.

<< 31 USCA § 5111 NOTE >>

(b) GERALD R. AND BETTY FORD.—

<< 31 USCA § 5111 NOTE >>

(1) The President is authorized to present, on behalf of the Congress, to Gerald R. and Betty Ford a gold medal of appropriated design—

(A) in recognition of their dedicated public service and outstanding humanitarian contributions to the people of the United States; and

(B) in commemoration of the following occasions in 1998:

(i) The 85th anniversary of the birth of President Ford.

(ii) The 80th anniversary of the birth of Mrs. Ford.

(iii) The 50th wedding anniversary of President and Mrs. Ford.

(iv) The 50th anniversary of the 1st election of Gerald R. Ford to the United States to the United States House of Representatives.

(v) The 25th anniversary of the approval of Gerald R. Ford by the Congress to become Vice President of the United States.

<< 31 USCA § 5111 NOTE >>

(2) For purposes of the presentation referred to in subsection (b)(1), the Secretary of the Treasury shall strike a gold medal with suitable emblems, devices, and inscriptions to be determined by the Secretary.

<< 31 USCA § 5111 NOTE >>

(3) There are authorized to be appropriated not to exceed $20,000 to carry out this subsection.

<< 31 USCA § 5111 NOTE >>

(4) The Secretary of the Treasury may strike and sell duplicates in bronze of the gold medal struck pursuant to subsection (b)(2) under such regulations as the Secretary may prescribe, at a price sufficient to cover the cost thereof, including labor, materials, dies, use of machinery, and overhead expenses, and the cost of the gold medal.

<< 31 USCA § 5111 NOTE >>

(5) The appropriation used to carry out this subsection shall be reimbursed out of the proceeds of sales under subsection (b)(4).

<< 31 USCA § 5111 NOTE >>

(6) The medals struck pursuant to this subsection are national medals for purposes of chapter 51 of title 31, United States Code.

<< 31 USCA § 5112 NOTE >>

(c) 6–MONTH EXTENSION FOR CERTAIN SALES.—Notwithstanding section 101(7)(D) of the United States Commemorative Coin Act of 1996, the Secretary of the Treasury may, at any time before January 1, 1999, make bulk sales at a reasonable discount to the Jackie Robinson Foundation of not less than 20 percent of any denomination of proof and uncirculated coins minted under section 101(7) of such Act which remained unissued as of July 1, 1998, except that the total number of coins of any such denomination which were issued under such section or this section may not exceed the amount of such denomination of coins which were authorized to be minted and issued under section 101(7)(A) of such Act.

SEC. 140. (a) LAND CONVEYANCE, SAN JOAQUIN COUNTY, CALIFORNIA.—Notwithstanding any other provision of law (including the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.)), the Attorney General shall convey, by quit claim deed and by negotiated sale, to the City of Tracy, California (in this section referred to as the "City"), the interest of the United States in a parcel of real property consisting of approximately 200 acres located in San Joaquin County, California, and currently administered by the Federal Bureau of Prisons of the Department of Justice. The Attorney General shall complete the conveyance to the City not later than 120 days after the date of the enactment of this Act.

(b) DESCRIPTION OF PROPERTY.—The exact acreage and legal description of the real property to be conveyed under subsection (a) shall be determined by a survey satisfactory to the Attorney General. The cost of the survey shall be borne by the City.

(c) PURPOSE OF CONVEYANCE.—The purpose of the real property conveyance under subsection (a) is to permit the City to use approximately 150 acres of the conveyed property as the location of a joint secondary and post secondary educational facility and for other educational purposes and to use approximately 50 acres of the conveyed property for economic development. In the event that the City determines that a joint secondary and post secondary educational facility is unfeasible for the 150-acre portion of the conveyed property, the City shall use up to 50 acres of that portion for at least 30 years as the location for a secondary school and for other educational purposes and use up to 100 acres of that portion as a public park and for other recreational purposes.

(d) CONDITIONS ON USE.—(1) The use of the real property conveyed under subsection (a) for educational purposes, as provided in subsection (c), shall be subject to the approval of the Secretary of Education.

(2) The use of the conveyed real property for economic development, as provided in subsection (c), shall be subject to the approval of the Attorney General.

(3) If a portion of the conveyed real property is used as a public park or for other recreational purposes, as provided in subsection (c), the use of such portion shall be subject to the approval of the Secretary of the Interior.

(e) REVERSIONARY INTERESTS.—(1) If the Secretary of Education determines at any time that the portion of the real property conveyed under subsection (a) that is to be used for educational purposes is not being used for such purposes, all right, title, and interest in and to that portion of the property, including any improvements thereon, shall revert to the United States.

(2) If the Attorney General determines at any time that the portion of the real property conveyed under subsection (a) that is to be used for economic development is not being used for such purposes, all right, title, and interest in and to that portion of the property, including any improvements thereon, shall revert to the United States.

(3) If a portion of the real property conveyed under subsection (a) is used as a public park or for other recreational purposes, as provided in subsection (c), and the Secretary of the Interior determines that such portion is no longer being used for such purposes, all right, title, and interest in and to that portion of the property, including any improvements thereon, shall revert to the United States.

(f) ADDITIONAL TERMS AND CONDITIONS.—The Attorney General may require such additional terms and conditions in connection with the conveyance under subsection (a) as the Attorney General considers appropriate to protect the interests of the United States.

SEC. 141. (a) SHORT TITLE. This section may be cited as the "Lorton Technical Corrections Act of 1998".

(b) TRANSFER OF LAND TO GENERAL SERVICES ADMINISTRATION. Section 11201 of the National Capital Revitalization and Self–Government Improvement Act of 1997 (Public Law 105–33; D.C. Code 24–1201) is amended—

(1) by redesignating the second subsection (g) and subsection (h) as subsections (h) and (i);

(2) in subsection (g)(1)—

(A) by inserting "(A)" before "Notwithstanding";

(B) by striking "Except as provided in paragraph (2)" and all that follows through "Department of the Interior."; and

(C) by adding at the end the following new subparagraphs:

"(B) Contingent on the General Services Administration (GSA) receiving the necessary appropriations to carry out the requirements of this paragraph and subsection (g), and notwithstanding the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.), not later than 60 days after the date of the enactment of the Lorton Technical Corrections Act of 1998, any property on which the Lorton Correctional Complex is located shall be transferred to the GSA.

"(C) Not later than 1 year after the date of the enactment of the Lorton Technical Corrections Act of 1998, Fairfax County shall submit a reuse plan that complies with all requisite approvals to the Administrator of General Services, that aims to

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

maximize use of the land for open space, park land, or recreation, while delineating permissible or required uses, potential development densities, and any time limits on such development factors of the property on which the Lorton Correctional Complex is located.

 "(D) Not later than 180 days after the date of the enactment of the Lorton Technical Corrections Act of 1998, the Secretary of the Interior shall notify GSA of any property it requests to be transferred to the Department of the Interior for the purpose of a land exchange by the United States Fish and Wildlife Service within the Commonwealth of Virginia or such other purposes consistent with the reuse plan developed by Fairfax County as the Secretary may request. The Administrator of General Services shall approve the Secretary's request to the extent that the request is consistent with the reuse plan developed by Fairfax County and does not result in a significant reduction in the marketability or value of any remaining property. The Administrator of General Services shall coordinate with the Secretary of the Interior to resolve any conflicts presented by the Department of the Interior's request and shall transfer the property to the Department of the Interior at no cost.

 "(E) Any property not transferred to the Department of the Interior under subparagraph (D) shall be disposed of according to paragraphs (2) and (4).";

 (3) in subsection (g)(2)(A)(ii) by striking "Department of Parks and Recreation" each place it appears and inserting "Park Authority";

 (4) in subsection (g) by adding at the end the following new paragraphs:

 "(4) CONDITIONS ON TRANSFER OF LORTON PROPERTY EAST OF OX ROAD (STATE ROUTE 123).—

 "(A) IN GENERAL.—With respect to property east of Ox Road (State Route 123) on which the Lorton Correctional Complex is located, the Administrator of General Services shall—

 "(i) cooperate with the District of Columbia Corrections Trustee to determine property necessary for the Trustee to maintain the security of the Lorton Correctional Complex until its closure;

 "(ii) prepare a report of title, complete a property description, provide protection and maintenance, conduct an environmental assessment of the property to determine the extent of contamination, complete National Environmental Policy Act of 1969 (42 U.S.C. 4331 et seq.) and National Historic Preservation Act (16 U.S.C. 470 et seq.) processes for closure and disposal of the property, and provide an estimate of the cost for remediation and contingent on receiving the necessary appropriations complete the remediation in compliance with applicable Federal and State environmental laws;

 "(iii) develop a disposition strategy incorporating the Fairfax County reuse plan and the Department of the Interior's land transfer request, and resolve conflicts between the plan and the transfer request, or between the reuse plan, the transfer request and the results of the environmental studies;

 "(iv) negotiate with any entity that has a lease, agreement, memorandum of understanding, right-of-way, or easement with the District of Columbia to occupy or utilize any parcels of such property on the date of the enactment of this title, to perfect or extend such lease, agreement, memorandum of understanding, right-of-way, or easement;

 "(v) transfer any property identified for use for open space, park land, or recreation in the Fairfax County reuse plan to the Northern Virginia Regional Park Authority, the Fairfax County Park Authority, or another public entity, subject to the condition that the recipient use the conveyed property only for open space, park land, or recreation and that the transfer be at fair market value considering the highest and best use of the property to be open space, park land, and recreation;

 "(vi) not later than 60 days after the property is transferred to the General Services Administration, transfer at fair market value the six-acre parcel east of Shirley Highway on Interstate 95 to Amtrak, subject to such terms and conditions as the Administrator determines to be in the best interest of the United States;

 "(vii) dispose of any parcels not reserved by the Department of the Interior and not otherwise addressed under this subparagraph at fair market value, subject to such terms and conditions as the Administrator determines to be in the best interest of the United States;

 "(viii) deposit any proceeds from the sale of property on which the Lorton Correctional Complex is located into a special fund established in the treasury for purposes of covering real property utilization and disposal related expenses, including environmental compliance and remediation for the Lorton Correctional Complex until all property has been conveyed; and

 "(ix) deposit any remaining funds in the Policy and Operations appropriation account of the General Services Administration to be used for real property utilization and disposal activities until expended.

 "(B) REPORT.—Not later than 90 days after the date of the receipt of the Fairfax County reuse plan and the Department of the Interior property transfer request by the Administrator of General Services, the Administrator shall report to the

AR.02807

Committees on Appropriations and Government Reform and Oversight of the House of Representatives, and the Committees on Appropriations and Governmental Affairs of the Senate on plans to comply with the terms of this paragraph and any estimated costs associated with such compliance.

"(C) AUTHORIZATION.—There is authorized to be appropriated such sums as are necessary from the general funds of the Treasury, to remain available until expended, to the Policy and Operations appropriation account of the General Services Administration for the real property utilization and disposal activities in carrying out the provisions of this title.

"(5) JURISDICTION.—Any property disposed of according to paragraphs (2) and (4) shall be under the jurisdiction of the Commonwealth of Virginia. Any development of such property and any property transferred to the Department of the Interior for exchange purposes shall comply with any applicable planning and zoning requirements of Fairfax County and the Fairfax County reuse plan.".

<< 36 USCA § 101 NOTE >>

SEC. 142. OLYMPIC AND AMATEUR SPORTS. (a) SHORT TITLE.—This section may be cited as the "Olympic and Amateur Sports Act Amendments of 1998".

(b) AMENDMENT OF TITLE 36, UNITED STATES CODE; TITLE OF CHAPTER.—

(1) Except as otherwise expressly provided, whenever in this section an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of title 36, United States Code.

<< 36 USCA § 220501 >>

(2) Section 220501 is amended—
(A) by striking "Definitions" in the heading and inserting "Title and Definitions";
(B) by inserting after the heading the following:
"(a) TITLE.—This chapter may be cited as the 'Ted Stevens Olympic and Amateur Sports Act'."; and
(C) by inserting "(b) DEFINITIONS.—" immediately before "For the purposes of".

<< 36 USCA § 220501 >>

(c) DEFINITIONS.—Section 220501 is amended by—

<< 36 USCA § 220501 >>

(1) inserting "or paralympic sports organization" after "national governing body" in paragraph (1);

<< 36 USCA § 220501 >>

(2) redesignating paragraph (7) as paragraph (8); and

<< 36 USCA § 220501 >>

(3) inserting after paragraph (6) the following:
"(7) 'paralympic sports organization' means an amateur sports organization which is recognized by the corporation under section 220521 of this title.".

<< 36 USCA § 220503 >>

(d) PURPOSES.—Section 220503 is amended by—

<< 36 USCA § 220503 >>

(1) striking "Olympic Games" each place it appears in paragraphs (3) and (4) and inserting "Olympic Games, the Paralympic Games,"; and

<< 36 USCA § 220503 >>

(2) striking paragraph (13) and inserting the following:

"(13) to encourage and provide assistance to amateur athletic programs and competition for amateur athletes with disabilities, including, where feasible, the expansion of opportunities for meaningful participation by such amateur athletes in programs of athletic competition for able-bodied amateur athletes; and".

<< 36 USCA § 220504 >>

(e) MEMBERSHIP.—Section 220504(b) is amended by—

<< 36 USCA § 220504 >>

(1) striking paragraphs (1) and (2) and inserting the following:

"(1) amateur sports organizations recognized as national governing bodies and paralympic sports organizations in accordance with section 220521 of this title, including through provisions which establish and maintain a National Governing Bodies' Council composed of representatives of the national governing bodies and any paralympic sports organizations and selected by their boards of directors or such other governing boards to ensure effective communication between the corporation and such national governing bodies and paralympic sports organizations;

"(2) amateur athletes who are actively engaged in amateur athletic competition or who have represented the United States in international amateur athletic competition within the preceding 10 years, including through provisions which—

"(A) establish and maintain an Athletes' Advisory Council composed of, and elected by, such amateur athletes to ensure communication between the corporation and such amateur athletes; and

"(B) ensure that the membership and voting power held by such amateur athletes is not less than 20 percent of the membership and voting power held in the board of directors of the corporation and in the committees and entities of the corporation;"; and

<< 36 USCA § 220504 >>

(2) inserting a comma and "the Paralympic Games," after "Olympic Games" in paragraph (3).

<< 36 USCA § 220505 >>

(f) POWERS.—

<< 36 USCA § 220505 >>

(1) GENERAL CORPORATE POWERS.—Section 220505(b)(9) is amended by striking "sued; and" and inserting "sued, except that any civil action brought in a State court against the corporation and solely relating to the corporation's responsibilities under this Act shall be removed, at the request of the corporation, to the district court of the United States in the district in which the action was brought, and such district court shall have original jurisdiction over the action without regard to the amount in controversy or citizenship of the parties involved, and except that neither this paragraph nor any other provision of this chapter shall create a private right of action under this chapter; and".

<< 36 USCA § 220505 >>

(2) POWERS RELATED TO AMATEUR ATHLETICS AND THE OLYMPIC GAMES.—Section 220505(c) is amended by—

(A) striking "Organization;"in paragraph (2) and inserting "Organization and as its national Paralympic committee in relations with the International Paralympic Committee;";

(B) striking "Games and of" in paragraph (3) and inserting "Games, the Paralympic Games, and";

(C) striking "Games;" in paragraph (4) and inserting "Games, or as paralympic sports organizations for any sport that is included on the program of the Paralympic Games;"; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(D) striking "Games," in paragraph (5) and inserting "Games, the Paralympic Games, the Pan–American Games, world championship competition,".

<< 36 USCA § 220506 >>

(g) USE OF OLYMPIC, PARALYMPIC, AND PAN–AMERICAN SYMBOLS.—Section 220506 is amended by—

<< 36 USCA § 220506 >>

(1) striking "rings;" in subsection (a)(2) and inserting "rings, the symbol of the International Paralympic Committee, consisting of 3 TaiGeuks, or the symbol of the Pan–American Sports Organization, consisting of a torch surrounded by concentric rings;";

<< 36 USCA § 220506 >>

(2) inserting " 'Paralympic', 'Paralympiad', 'Pan–American', 'America Espirito Sport Fraternite'," before "or any combination" in subsection (a)(4);

<< 36 USCA § 220506 >>

(3) inserting a comma and "International Paralympic Committee, the Pan–American Sports Organization," after "International Olympic Committee" in subsection (b);

<< 36 USCA § 220506 >>

(4) inserting "the Paralympic team," before "the Pan–American team" in subsection (b);

<< 36 USCA § 220506 >>

(5) inserting a comma and "Paralympic, or Pan–American Games" after "any Olympic" in subsection (c)(3);

<< 36 USCA § 220506 >>

(6) inserting a comma and "the International Paralympic Committee, the Pan–American Sports Organization," after "International Olympic Committee" in subsection (c)(4);

<< 36 USCA § 220506 >>

(7) inserting "AND GEOGRAPHIC REFERENCE" after "PRE–EXISTING" in subsection (d); and

<< 36 USCA § 220506 >>

(8) adding at the end of subsection (d) the following:
"(3) Use of the word 'Olympic' to identify a business or goods or services is permitted by this section where—
"(A) such use is not combined with any of the intellectual properties referenced in subsections (a) or (c) of this section;
"(B) it is evident from the circumstances that such use of the word 'Olympic' refers to the naturally occurring mountains or geographical region of the same name that were named prior to February 6, 1998, and not to the corporation or any Olympic activity; and
"(C) such business, goods, or services are operated, sold, and marketed in the State of Washington west of the Cascade Mountain range and operations, sales, and marketing outside of this area are not substantial.".

<< 36 USCA § 220509 >>

(h) RESOLUTION OF DISPUTES.—Section 220509 is amended by—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 36 USCA § 220509 >>

(1) inserting "(a) GENERAL.—" before "The corporation";

<< 36 USCA § 220509 >>

(2) inserting "the Paralympic Games," before "the Pan–American Games";

<< 36 USCA § 220509 >>

(3) inserting after "the corporation." the following: "In any lawsuit relating to the resolution of a dispute involving the opportunity of an amateur athlete to participate in the Olympic Games, the Paralympic Games, or the Pan–American Games, a court shall not grant injunctive relief against the corporation within 21 days before the beginning of such games if the corporation, after consultation with the chair of the Athletes' Advisory Council, has provided a sworn statement in writing executed by an officer of the corporation to such court that its constitution and bylaws cannot provide for the resolution of such dispute prior to the beginning of such games."; and

<< 36 USCA § 220509 >>

(4) adding at the end thereof the following:
"(b) OMBUDSMAN.—
 "(1) The corporation shall hire and provide salary, benefits, and administrative expenses for an ombudsman for athletes, who shall—
  "(A) provide independent advice to athletes at no cost about the applicable provisions of this chapter and the constitution and bylaws of the corporation, national governing bodies, a paralympic sports organizations, international sports federations, the International Olympic Committee, the International Paralympic Committee, and the Pan–American Sports Organization, and with respect to the resolution of any dispute involving the opportunity of an amateur athlete to participate in the Olympic Games, the Paralympic Games, the Pan–American Games, world championship competition or other protected competition as defined in the constitution and bylaws of the corporation;
  "(B) assist in mediating any such disputes; and
  "(C) report to the Athletes' Advisory Council on a regular basis.
 "(2)(A) The procedure for hiring the ombudsman for athletes shall be as follows:
  "(i) The Athletes' Advisory Council shall provide the corporation's executive director with the name of one qualified person to serve as ombudsman for athletes.
  "(ii) The corporation's executive director shall immediately transmit the name of such person to the corporation's executive committee.
  "(iii) The corporation's executive committee shall hire or not hire such person after fully considering the advice and counsel of the Athletes' Advisory Council.

"If there is a vacancy in the position of the ombudsman for athletes, the nomination and hiring procedure set forth in this paragraph shall be followed in a timely manner.
"(B) The corporation may terminate the employment of an individual serving as ombudsman for athletes only if—
 "(i) the termination is carried out in accordance with the applicable policies and procedures of the corporation;
 "(ii) the termination is initially recommended to the corporation's executive committee by either the corporation's executive director or by the Athletes' Advisory Council; and
 "(iii) the corporation's executive committee fully considers the advice and counsel of the Athletes' Advisory Council prior to deciding whether or not to terminate the employment of such individual."

<< 36 USCA § 220510 >>

(i) AGENT FOR SERVICE OF PROCESS.—The text of section 220510 is amended to read as follows; "As a condition to the exercise of any power or privilege granted by this chapter, the corporation shall have a designated agent in the State of Colorado to receive service of process for the corporation. Notice to or service on the agent, or mailed to the business address of the agent, is notice to or service on the corporation.".

<< 36 USCA § 220511 >>

(j) REPORT.—

<< 36 USCA § 220511 >>

(1) Section 220511(a) is amended to read as follows:

"(a) SUBMISSION TO PRESIDENT AND CONGRESS.—The corporation shall, on or before the first day of June, 2001, and every fourth year thereafter, transmit simultaneously to the President and to each House of Congress a detailed report of its operations for the preceding 4 years, including—

"(1) a complete statement of its receipts and expenditures;

"(2) a comprehensive description of the activities and accomplishments of the corporation during such 4 year period;

"(3) data concerning the participation of women, disabled individuals, and racial and ethnic minorities in the amateur athletic activities and administration of the corporation and national governing bodies; and

"(4) a description of the steps taken to encourage the participation of women, disabled individuals, and racial minorities in amateur athletic activities.".

<< 36 USCA Ch. 2205 >>

(2) The chapter analysis for chapter 2205 is amended by striking the item relating to section 220511 and inserting the following:

"220511. Report.".

(k) COMPLETE TEAMS.—

<< 36 USCA § 220512 >>

(1) GENERAL.—Subchapter I of chapter 2205 is amended by adding at the end thereof the following:

"§ 220512. Complete teams

"In obtaining representation for the United States in each competition and event of the Olympic Games, Paralympic Games, and Pan–American Games, the corporation, either directly or by delegation to the appropriate national governing body or paralympic sports organization, may select, but is not obligated to select (even if not selecting will result in an incomplete team for an event), athletes who have not met the eligibility standard of the national governing body and the Corporation, when the number of athletes who have met the eligibility standards of such entities is insufficient to fill the roster for an event.".

<< 36 USCA Ch. 2205 >>

(2) The chapter analysis for chapter 2205 is amended by inserting after the item relating to section 220511 the following:

"220512. Complete teams.".

<< 36 USCA § 220521 >>

(l) RECOGNITION OF AMATEUR SPORTS ORGANIZATIONS.—Section 220521 is amended by—

<< 36 USCA § 220521 >>

AR.02812

(1) striking the first sentence of subsection (a) and inserting the following: "For any sport which is included on the program of the Olympic Games, the Paralympic Games, or the Pan–American Games, the corporation is authorized to recognize as a national governing body (in the case of a sport on the program of the Olympic Games or Pan–American Games) or as a paralympic sports organization (in the case of a sport on the program of the Paralympic Games for which a national governing body has not been designated under section 220522(b)) an amateur sports organization which files an application and is eligible for such recognition in accordance with the provisions of subsections (a) or (b) of section 220522.";

<< 36 USCA § 220521 >>

(2) striking "approved." in subsection (a) and inserting "approved, except as provided in section 220522(b) with respect to a paralympic sports organization.";

<< 36 USCA § 220521 >>

(3) striking "hold a public hearing" in subsection (b) and inserting "hold at least 2 public hearings";

<< 36 USCA § 220521 >>

(4) striking "hearing." each place it appears in subsection (b) and inserting "hearings."; and

<< 36 USCA § 220521 >>

(5) adding at the end of subsection (b) the following: "The corporation shall send written notice, which shall include a copy of the application, at least 30 days prior to the date of any such public hearing to all amateur sports organizations known to the corporation in that sport.".

<< 36 USCA § 220522 >>

(m) ELIGIBILITY REQUIREMENTS.—Section 220522 is amended by—

<< 36 USCA § 220522 >>

(1) inserting "(a) GENERAL.—" before "An amateur";

<< 36 USCA § 220522 >>

(2) striking paragraph (4) and inserting the following:
"(4) agrees to submit to binding arbitration in any controversy involving—
  "(A) its recognition as a national governing body, as provided for in section 220529 of this title, upon demand of the corporation; and
  "(B) the opportunity of any amateur athlete, coach, trainer, manager, administrator or official to participate in amateur athletic competition, upon demand of the corporation or any aggrieved amateur athlete, coach, trainer, manager, administrator or official, conducted in accordance with the Commercial Rules of the American Arbitration Association, as modified and provided for in the corporation's constitution and bylaws, except that if the Athletes' Advisory Council and National Governing Bodies' Council do not concur on any modifications to such Rules, and if the corporation's executive committee is not able to facilitate such concurrence, the Commercial Rules of Arbitration shall apply unless at least two-thirds of the corporation's board of directors approves modifications to such Rules;";

<< 36 USCA § 220522 >>

(3) striking paragraph (10) and inserting the following:
"(10) demonstrates, based on guidelines approved by the corporation, the Athletes' Advisory Council, and the National Governing Bodies' Council, that its board of directors and other such governing boards have established criteria and election procedures for and maintain among their voting members individuals who are actively engaged in amateur athletic competition

in the sport for which recognition is sought or who have represented the United States in international amateur athletic competition within the preceding 10 years, that any exceptions to such guidelines by such organization have been approved by the corporation, and that the voting power held by such individuals is not less than 20 percent of the voting power held in its board of directors and other such governing boards;";

<< 36 USCA § 220522 >>

(4) inserting "or to participation in the Olympic Games, the Paralympic Games, or the Pan–American Games" after "amateur status" in paragraph (14); and

<< 36 USCA § 220522 >>

(5) adding at the end thereof the following:
"(b) RECOGNITION OF PARALYMPIC SPORTS ORGANIZATIONS.—For any sport which is included on the program of the Paralympic Games, the corporation is authorized to designate, where feasible and when such designation would serve the best interest of the sport, and with the approval of the affected national governing body, a national governing body recognized under subsection (a) to govern such sport. Where such designation is not feasible or would not serve the best interest of the sport, the corporation is authorized to recognize another amateur sports organization as a paralympic sports organization to govern such sport, except that, notwithstanding the other requirements of this chapter, any such paralympic sports organization—
"(1) shall comply only with those requirements, perform those duties, and have those powers that the corporation, in its sole discretion, determines are appropriate to meet the objects and purposes of this chapter; and
"(2) may, with the approval of the corporation, govern more than one sport included on the program of the Paralympic Games.".

<< 36 USCA § 220523 >>

(n) AUTHORITY OF NATIONAL GOVERNING BODIES.—Section 220523 is amended by—

<< 36 USCA § 220523 >>

(1) striking "Games and" in paragraph (6) and inserting "Games, the Paralympic Games, and"; and

<< 36 USCA § 220523 >>

(2) striking "Games and" in paragraph (7) and inserting "Games, the Paralympic Games, and".

<< 36 USCA § 220524 >>

(o) DUTIES OF NATIONAL GOVERNING BODIES.—Section 220524 is amended by—

<< 36 USCA § 220524 >>

(1) redesignating paragraphs (4) through (8) as paragraphs (5) through (9); and

<< 36 USCA § 220524 >>

(2) inserting after paragraph (3) the following:
"(4) disseminate and distribute to amateur athletes, coaches, trainers, managers, administrators, and officials in a timely manner the applicable rules and any changes to such rules of the national governing body, the corporation, the appropriate international sports federation, the International Olympic Committee, the International Paralympic Committee, and the Pan–American Sports Organization;".

<< 36 USCA § 220528 >>

(p) REPLACEMENT OF NATIONAL GOVERNING BODY.—Section 220528 is amended by—

<< 36 USCA § 220528 >>

 (1) striking "Olympic Games or both" in subsection (c)(1)(A) and inserting "Olympic Games or the Paralympic Games, or in both";

<< 36 USCA § 220528 >>

 (2) striking "registered" in subsection (c)(2) and inserting "certified";

<< 36 USCA § 220528 >>

 (3) striking "body." in subsection (c)(2) and inserting "body and with any other organization that has filed an application.";

<< 36 USCA § 220528 >>

 (4) inserting "open to the public" in subsection (d) after "formal hearing" in the first sentence;

<< 36 USCA § 220528 >>

 (5) inserting after the second sentence in subsection (d) the following: "The corporation also shall send written notice, including a copy of the application, at least 30 days prior to the date of the hearing to all amateur sports organizations known to the corporation in that sport."; and

<< 36 USCA § 220528 >>

 (6) striking "title." in subsection (f)(4) and inserting "title and notify such national governing body of such probation and of the actions needed to comply with such requirements.".

<< 36 USCA § 220501 NOTE >>

 (q) SPECIAL REPORT TO CONGRESS.—Five years from the date of the enactment of this Act, the United States Olympic Committee shall submit a special report to the Congress on the effectiveness of the provisions of chapter 2205 of title 36, United States Code, as amended by this Act, together with any additional proposed changes to that chapter the United States Olympic Committee determines are appropriate.

<< 10 USCA § 113 NOTE >>

 SEC. 143. Section 8106(a) of the Department of Defense Appropriations Act, 1997 (titles I through VIII of the matter under section 101(b) of Public Law 104–208; 110 Stat. 3009–111; 10 U.S.C. 113 note), is amended by striking "$3,000,000" and inserting "$1,000,000".

 SEC. 144. Section 8120 of the Department of Defense Appropriations Act, 1999, is amended by striking out "owned, or partially owned by" and inserting in lieu thereof "if the Secretary of Defense determines that", and is further amended by inserting before the period "owns more than a fifty per centum interest in the company".

 SEC. 145. MODIFICATION OF LAND CONVEYANCE AUTHORITY, ARMED FORCES RETIREMENT HOME. (a) POSTPONEMENT OF SALE.—Subsection (a) of section 1053 of the National Defense Authorization Act for Fiscal Year 1997 (Public Law 104–201), as amended by section 1043 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, is further amended—

 (1) by inserting "(1)" before "Notwithstanding"; and

 (2) by adding at the end the following:

 "(2) The sale under paragraph (1) may not occur before April 30, 1999.".

 (b) DEPOSIT OF PROCEEDS OF SALE.—Subsection (b) of such section 1053, as so amended, is further amended by adding at the end the following:

"(3) The payment received under paragraph (2) shall be deposited in the Armed Forces Retirement Home Trust Fund in accordance with section 1519(a)(2) of the National Defense Authorization Act for Fiscal Year 1991 (104 Stat. 1730; 24 U.S.C. 419(a)(2)).".

<< 22 USCA § 2778 NOTE >>

SEC. 146. CERTIFICATION OF EXPORTS OF MISSILE EQUIPMENT OR TECHNOLOGY TO CHINA. (a) CERTIFICATION.—Section 1512 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 is amended —

<< 22 USCA § 2778 NOTE >>

(1) by striking "The" and inserting "(a) CERTIFICATION.—The"; and

<< 22 USCA § 2778 NOTE >>

(2) by adding at the end the following:
"(b) EXCEPTION.—The certification requirement contained in subsection (a) shall not apply to the export of inertial reference units and components in manned civilian aircraft or supplied as spare or replacement parts for such aircraft.".

<< 22 USCA § 2778 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the later of—

<< 22 USCA § 2778 NOTE >>

(1) the enactment of this Act; or

<< 22 USCA § 2778 NOTE >>

(2) the enactment of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999.

SEC. 147. The Secretary of the Navy, in consultation with the Commandant of the Marine Corps, shall assess the requirement for Marine Corps warfighting and attrition reserve F/A–18 aircraft and monitor the viability of the existing F/A–18 production line to meet these requirements: *Provided*, That, pursuant to section 8005 of the Department of Defense Appropriations Act, 1999, the Secretary of the Navy may transfer funds sufficient to ensure that the F/A–18 production capability remains available to meet Marine Corps F/A–18 warfighting and attrition reserve aircraft requirements through additional aircraft production.

<< 37 USCA § 301b NOTE >>

SEC. 148. Section 8135 of the Department of Defense Appropriations Act, 1992 (Public Law 102–172; 105 Stat. 1212; 37 U.S.C. 301b note), is amended—

<< 37 USCA § 301b NOTE >>

(1) in subsection (a), by inserting before the period at the end the following: "or as a supplemental payment if the officer's final military pay account is already settled"; and

<< 37 USCA § 301b NOTE >>

(2) in subsection (b)—
  (A) by inserting "applies" after "subsection (a)";
  (B) by striking "January 17, 1991" and inserting "August 2, 1990";
  (C) by inserting "(regardless of the date of the commencement of combatant activities in such zone as specified in that Executive Order)" after "as a combat zone"; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(D) by striking "section 302b" and inserting "section 301b".

<< 11 USCA § 1201 NOTE >>

<< 11 USCA § 1201 >>

<< 11 USCA § 1202 >>

<< 11 USCA § 1203 >>

<< 11 USCA § 1204 >>

<< 11 USCA § 1205 >>

<< 11 USCA § 1206 >>

<< 11 USCA § 1207 >>

<< 11 USCA § 1208 >>

 SEC. 149. (a) Chapter 12 of title 11 of the United States Code, as in effect on September 30, 1998, is hereby reenacted for the period beginning on October 1, 1998, and ending on April 1, 1999.

<< 11 USCA § 1201 NOTE >>

 (b) All cases commenced or pending under chapter 12 of title 11, United States Code, as reenacted under subsection (a), and all matters and proceedings in or relating to such cases, shall be conducted and determined under such chapter as if such chapter were continued in effect after April 1, 1999. The substantive rights of parties in connection with such cases, matters, and proceedings shall continue to be governed under the law applicable to such cases, matters, and proceedings as if such chapter were continued in effect after April 1, 1999.

<< 11 USCA § 1201 NOTE >>

 (c) This section shall take effect on October 1, 1998.
 Sec. 150.
 (a) EXTENSION OF AGREEMENT FOR STATE OF MISSISSIPPI.—The Secretary of the Interior shall offer to reinstate the Memorandum of Agreement between the Mississippi Department of Wildlife Conservation and the United States Fish and Wildlife Service concerning the framework closing dates for the 1979–1980 through 1981–1982 duck hunting seasons, executed in November 1979, for the 1998–1999 duck hunting season in the State of Mississippi, except that—
  (1) the duck hunting season shall end on January 31, 1999; and
  (2) the total number of days for the duck hunting season in the State of Mississippi shall not exceed 51 days.
 (b) EXTENSION OF AGREEMENT TO OTHER STATES.—At the request of any other State represented on the Lower–Region Regulations Committee of the Mississippi Flyway Council, the Secretary of the Interior shall extend the agreement described in subsection (a) to that State for the 1998–1999 duck hunting season if the State agrees to reduce the total number of days of the duck hunting season in the State to the extent necessary to result in no net increase in the duck harvest in the State for that season.

SEC. 151. FEDERAL VACANCIES AND APPOINTMENTS.

<< 5 USCA § 330 NOTE >>

 (a) SHORT TITLE.—This section may be cited as the "Federal Vacancies Reform Act of 1998".
 (b) IN GENERAL.—Chapter 33 of title 5, United States Code, is amended by striking sections 3345 through 3349 and inserting the following:

<< 5 USCA § 3345 >>

"§ 3345. Acting officer

"(a) If an officer of an Executive agency (including the Executive Office of the President, and other than the General Accounting Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—

"(1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;

"(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or

"(3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if—

"(A) during the 365–day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and

"(B) the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS–15 of the General Schedule.

"(b)(1) Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if—

"(A) during the 365–day period preceding the date of the death, resignation, or beginning of inability to serve, such person—

"(i) did not serve in the position of first assistant to the office of such officer; or

"(ii) served in the position of first assistant to the office of such officer for less than 90 days; and

"(B) the President submits a nomination of such person to the Senate for appointment to such office.

"(2) Paragraph (1) shall not apply to any person if—

"(A) such person is serving as the first assistant to the office of an officer described under subsection (a);

"(B) the office of such first assistant is an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate; and

"(C) the Senate has approved the appointment of such person to such office.

"(c)(1) Notwithstanding subsection (a)(1), the President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department without a break in service, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

"(2) For purposes of this section and sections 3346, 3347, 3348, 3349, 3349a, and 3349d, the expiration of a term of office is an inability to perform the functions and duties of such office.

<< 5 USCA § 3346 >>

"§ 3346. Time limitation

"(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

"(1) for no longer than 210 days beginning on the date the vacancy occurs; or

"(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

"(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

"(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—

"(A) until the second nomination is confirmed; or

"(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

"(c) If a vacancy occurs during an adjournment of the Congress sine die, the 210–day period under subsection (a) shall begin on the date that the Senate first reconvenes.

<< 5 USCA § 3347 >>

"§ 3347. Exclusivity

"(a) Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency (including the Executive Office of the President, and other than the General Accounting Office) for which appointment is required to be made by the President, by and with the advice and consent of the Senate, unless—

"(1) a statutory provision expressly—

"(A) authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or

"(B) designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or

"(2) the President makes an appointment to fill a vacancy in such office during the recess of the Senate pursuant to clause 3 of section 2 of article II of the United States Constitution.

"(b) Any statutory provision providing general authority to the head of an Executive agency (including the Executive Office of the President, and other than the General Accounting Office) to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(2) applies.

<< 5 USCA § 3348 >>

"§ 3348. Vacant office

"(a) In this section—

"(1) the term 'action' includes any agency action as defined under section 551(13); and

"(2) the term 'function or duty' means any function or duty of the applicable office that—

"(A)(i) is established by statute; and

"(ii) is required by statute to be performed by the applicable officer (and only that officer); or

"(B)(i)(I) is established by regulation; and

"(II) is required by such regulation to be performed by the applicable officer (and only that officer); and

"(ii) includes a function or duty to which clause (i)(I) and (II) applies, and the applicable regulation is in effect at any time during the 180–day period preceding the date on which the vacancy occurs.

"(b) Unless an officer or employee is performing the functions and duties in accordance with sections 3345, 3346, and 3347, if an officer of an Executive agency (including the Executive Office of the President, and other than the General Accounting Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—

"(1) the office shall remain vacant; and

"(2) in the case of an office other than the office of the head of an Executive agency (including the Executive Office of the President, and other than the General Accounting Office), only the head of such Executive agency may perform any function or duty of such office.

"(c) If the last day of any 210–day period under section 3346 is a day on which the Senate is not in session, the second day the Senate is next in session and receiving nominations shall be deemed to be the last day of such period.

"(d)(1) An action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect.

"(2) An action that has no force or effect under paragraph (1) may not be ratified.

"(e) This section shall not apply to—

AR.02819

"(1) the General Counsel of the National Labor Relations Board;

"(2) the General Counsel of the Federal Labor Relations Authority;

"(3) any Inspector General appointed by the President, by and with the advice and consent of the Senate;

"(4) any Chief Financial Officer appointed by the President, by and with the advice and consent of the Senate; or

"(5) an office of an Executive agency (including the Executive Office of the President, and other than the General Accounting Office) if a statutory provision expressly prohibits the head of the Executive agency from performing the functions and duties of such office.

<< 5 USCA § 3349 >>

"§ 3349. Reporting of vacancies

"(a) The head of each Executive agency (including the Executive Office of the President, and other than the General Accounting Office) shall submit to the Comptroller General of the United States and to each House of Congress—

"(1) notification of a vacancy in an office to which this section and sections 3345, 3346, 3347, 3348, 3349a, 3349b, 3349c, and 3349d apply and the date such vacancy occurred immediately upon the occurrence of the vacancy;

"(2) the name of any person serving in an acting capacity and the date such service began immediately upon the designation;

"(3) the name of any person nominated to the Senate to fill the vacancy and the date such nomination is submitted immediately upon the submission of the nomination; and

"(4) the date of a rejection, withdrawal, or return of any nomination immediately upon such rejection, withdrawal, or return.

"(b) If the Comptroller General of the United States makes a determination that an officer is serving longer than the 210–day period including the applicable exceptions to such period under section 3346 or section 3349a, the Comptroller General shall report such determination immediately to—

"(1) the Committee on Governmental Affairs of the Senate;

"(2) the Committee on Government Reform and Oversight of the House of Representatives;

"(3) the Committees on Appropriations of the Senate and House of Representatives;

"(4) the appropriate committees of jurisdiction of the Senate and House of Representatives;

"(5) the President; and

"(6) the Office of Personnel Management.

<< 5 USCA § 3349a >>

"§ 3349a. Presidential inaugural transitions

"(a) In this section, the term 'transitional inauguration day' means the date on which any person swears or affirms the oath of office as President, if such person is not the President on the date preceding the date of swearing or affirming such oath of office.

"(b) With respect to any vacancy that exists during the 60–day period beginning on a transitional inauguration day, the 210–day period under section 3346 or 3348 shall be deemed to begin on the later of the date occurring—

"(1) 90 days after such transitional inauguration day; or

"(2) 90 days after the date on which the vacancy occurs.

<< 5 USCA § 3349b >>

"§ 3349b. Holdover provisions

"Sections 3345 through 3349a shall not be construed to affect any statute that authorizes a person to continue to serve in any office—

"(1) after the expiration of the term for which such person is appointed; and

"(2) until a successor is appointed or a specified period of time has expired.

<< 5 USCA § 3349c >>

"§ 3349c. Exclusion of certain officers

"Sections 3345 through 3349b shall not apply to—

"(1) any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that—

"(A) is composed of multiple members; and

"(B) governs an independent establishment or Government corporation;

"(2) any commissioner of the Federal Energy Regulatory Commission;

"(3) any member of the Surface Transportation Board; or

"(4) any judge appointed by the President, by and with the advice and consent of the Senate, to a court constituted under article I of the United States Constitution.

<< 5 USCA § 3349d >>

"§ 3349d. Notification of intent to nominate during certain recesses or adjournments

"(a) The submission to the Senate, during a recess or adjournment of the Senate in excess of 15 days, of a written notification by the President of the President's intention to submit a nomination after the recess or adjournment shall be considered a nomination for purposes of sections 3345 through 3349c if such notification contains the name of the proposed nominee and the office for which the person is nominated.

"(b) If the President does not submit a nomination of the person named under subsection (a) within 2 days after the end of such recess or adjournment, effective after such second day the notification considered a nomination under subsection (a) shall be treated as a withdrawn nomination for purposes of sections 3345 through 3349c.".

<< 5 USCA Ch. 33 >>

(c) TECHNICAL AND CONFORMING AMENDMENT.—

<< 5 USCA Ch. 33 >>

(1) TABLE OF SECTIONS.—The table of sections for chapter 33 of title 5, United States Code, is amended by striking the matter relating to subchapter III and inserting the following:

"SUBCHAPTER III—DETAILS, VACANCIES, AND APPOINTMENTS

"3341. Details; within Executive or military departments.

"[3342. Repealed.]

"3343. Details; to international organizations.

"3344. Details; administrative law judges.

"3345. Acting officer.

"3346. Time limitation.

"3347. Exclusivity.

"3348. Vacant office.

"3349. Reporting of vacancies.

"3349a. Presidential inaugural transitions.

"3349b. Holdover provisions relating to certain independent establishments.

"3349c. Exclusion of certain officers.

"3349d. Notification of intent to nominate during certain recesses or adjournments.".

<< 5 USCA Ch. 33 >>

(2) SUBCHAPTER HEADING.—The subchapter heading for subchapter III of chapter 33 of title 5, United States Code, is amended to read as follows:

"SUBCHAPTER III—DETAILS, VACANCIES, AND APPOINTMENTS".

<< 5 USCA § 3345 NOTE >>

(d) EFFECTIVE DATE AND APPLICATION.—

<< 5 USCA § 3345 NOTE >>

(1) EFFECTIVE DATE.—Subject to paragraph (2), this section and the amendments made by this section shall take effect 30 days after the date of enactment of this section.

<< 5 USCA § 3345 NOTE >>

(2) APPLICATION.—
(A) IN GENERAL.—This section shall apply to any office that becomes vacant after the effective date of this section.
(B) IMMEDIATE APPLICATION OF TIME LIMITATION.—Notwithstanding subparagraph (A), for any office vacant on the effective date of this section, the time limitations under section 3346 of title 5, United States Code (as amended by this section) shall apply to such office. Such time limitations shall apply as though such office first became vacant on the effective date of this section.
(C) CERTAIN NOMINATIONS.—If the President submits to the Senate the nomination of any person after the effective date of this section for an office for which such person had been nominated before such date, the next nomination of such person after such date shall be considered a first nomination of such person to that office for purposes of sections 3345 through 3349 and section 3349d of title 5, United States Code (as amended by this section).

TITLE II—FISHERIES

Subtitle I—Fishery Endorsements

<< 46 USCA § 2101 NOTE >>

SEC. 201. SHORT TITLE.

This title may be cited as the "American Fisheries Act".

SEC. 202. STANDARD FOR FISHERY ENDORSEMENTS.

<< 46 USCA § 12102 >>

(a) STANDARD.—Section 12102(c) of title 46, United States Code, is amended to read as follows—
"(c)(1) A vessel owned by a corporation, partnership, association, trust, joint venture, limited liability company, limited liability partnership, or any other entity is not eligible for a fishery endorsement under section 12108 of this title unless at least 75 per centum of the interest in such entity, at each tier of ownership of such entity and in the aggregate, is owned and controlled by citizens of the United States.
"(2) The Secretary shall apply section 2(c) of the Shipping Act, 1916 (46 App. U.S.C. 802(c)) in determining under this subsection whether at least 75 per centum of the interest in a corporation, partnership, association, trust, joint venture, limited liability company, limited liability partnership, or any other entity is owned and controlled by citizens of the United States. For

the purposes of this subsection and of applying the restrictions on controlling interest in section 2(c) of such Act, the terms 'control' or 'controlled'—

"(A) shall include—

"(i) the right to direct the business of the entity which owns the vessel;

"(ii) the right to limit the actions of or replace the chief executive officer, a majority of the board of directors, any general partner, or any person serving in a management capacity of the entity which owns the vessel; or

"(iii) the right to direct the transfer, operation or manning of a vessel with a fishery endorsement; and

"(B) shall not include the right to simply participate in the activities under subparagraph (A), or the use by a mortgagee under paragraph (4) of loan covenants approved by the Secretary.

"(3) A fishery endorsement for a vessel that is chartered or leased to an individual who is not a citizen of the United States or to an entity that is not eligible to own a vessel with a fishery endorsement and used as a fishing vessel shall be invalid immediately upon such use.

"(4)(A) An individual or entity that is otherwise eligible to own a vessel with a fishery endorsement shall be ineligible by reason of an instrument or evidence of indebtedness, secured by a mortgage of the vessel to a trustee eligible to own a vessel with a fishery endorsement that is issued, assigned, transferred or held in trust for a person not eligible to own a vessel with a fishery endorsement, unless the Secretary determines that the issuance, assignment, transfer, or trust arrangement does not result in an impermissible transfer of control of the vessel and that the trustee—

"(i) is organized as a corporation, and is doing business, under the laws of the United States or of a State;

"(ii) is authorized under those laws to exercise corporate trust powers;

"(iii) is subject to supervision or examination by an official of the United States Government or a State;

"(iv) has a combined capital and surplus (as stated in its most recent published report of condition) of at least $3,000,000; and

"(v) meets any other requirements prescribed by the Secretary.

"(B) A vessel with a fishery endorsement may be operated by a trustee only with the approval of the Secretary.

"(C) A right under a mortgage of a vessel with a fishery endorsement may be issued, assigned, or transferred to a person not eligible to be a mortgagee of that vessel under section 31322(a)(4) of this title only with the approval of the Secretary.

"(D) The issuance, assignment, or transfer of an instrument or evidence of indebtedness contrary to this paragraph is voidable by the Secretary.

"(5) The requirements of this subsection shall not apply to a vessel when it is engaged in fisheries in the exclusive economic zone under the authority of the Western Pacific Fishery Management Council established under section 302(a)(1)(H) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1852(a)(1)(H)) or to a purse seine vessel when it is engaged in tuna fishing in the Pacific Ocean outside the exclusive economic zone of the United States or pursuant to the South Pacific Regional Fisheries Treaty, provided that the owner of the vessel continues to comply with the eligibility requirements for a fishery endorsement under the federal law that was in effect on October 1, 1998. A fishery endorsement issued by the Secretary pursuant to this paragraph shall be valid for engaging only in fisheries in the exclusive economic zone under the authority of such Council, in such tuna fishing in the Pacific Ocean, or pursuant to such Treaty.

"(6) A vessel greater than 165 feet in registered length, of more than 750 gross registered tons, or that has an engine or engines capable of producing a total of more than 3,000 shaft horsepower is not eligible for a fishery endorsement under section 12108 of this title unless—

"(A)(i) a certificate of documentation was issued for the vessel and endorsed with a fishery endorsement that was effective on September 25, 1997;

"(ii) the vessel is not placed under foreign registry after the date of the enactment of the American Fisheries Act; and

"(iii) in the event of the invalidation of the fishery endorsement after the date of the enactment of the American Fisheries Act, application is made for a new fishery endorsement within fifteen (15) business days of such invalidation; or

"(B) the owner of such vessel demonstrates to the Secretary that the regional fishery management council of jurisdiction established under section 302(a)(1) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1852(a)(1)) has recommended after the date of the enactment of the American Fisheries Act, and the Secretary of Commerce has approved, conservation and management measures in accordance with such Act to allow such vessel to be used in fisheries under such council's authority.".

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 46 USCA § 31322 >>

(b) PREFERRED MORTGAGE.—Section 31322(a) of title 46, United States Code is amended—

<< 46 USCA § 31322 >>

(1) by striking "and" at the end of paragraph (2);

<< 46 USCA § 31322 >>

(2) by striking the period at the end of paragraph (3)(B) and inserting in lieu thereof a semicolon and "and"; and

<< 46 USCA § 31322 >>

(3) by inserting at the end the following new paragraph:
"(4) with respect to a vessel with a fishery endorsement that is 100 feet or greater in registered length, has as the mortgagee—
 "(A) a person eligible to own a vessel with a fishery endorsement under section 12102(c) of this title;
 "(B) a state or federally chartered financial institution that satisfies the controlling interest criteria of section 2(b) of the Shipping Act, 1916 (46 U.S.C. 802(b)); or
 "(C) a person that complies with the provisions of section 12102(c)(4) of this title.".

<< 46 USCA § 12102 NOTE >>

SEC. 203. ENFORCEMENT OF STANDARD.

<< 46 USCA § 12102 NOTE >>

(a) EFFECTIVE DATE.—The amendments made by section 202 shall take effect on October 1, 2001.

<< 46 USCA § 12102 NOTE >>

(b) REGULATIONS.—Final regulations to implement this subtitle shall be published in the Federal Register by April 1, 2000. Letter rulings and other interim interpretations about the effect of this subtitle and amendments made by this subtitle on specific vessels may not be issued prior to the publication of such final regulations. The regulations to implement this subtitle shall prohibit impermissible transfers of ownership or control, specify any transactions which require prior approval of an implementing agency, identify transactions which do not require prior agency approval, and to the extent practicable, minimize disruptions to the commercial fishing industry, to the traditional financing arrangements of such industry, and to the opportunity to form fishery cooperatives.

<< 46 USCA § 12102 NOTE >>

(c) VESSELS MEASURING 100 FEET AND GREATER.—(1) The Administrator of the Maritime Administration shall administer section 12102(c) of title 46, United States Code, as amended by this subtitle, with respect to vessels 100 feet or greater in registered length. The owner of each such vessel shall file a statement of citizenship setting forth all relevant facts regarding vessel ownership and control with the Administrator of the Maritime Administration on an annual basis to demonstrate compliance with such section. Regulations to implement this subsection shall conform to the extent practicable with the regulations establishing the form of citizenship affidavit set forth in part 355 of title 46, Code of Federal Regulations, as in effect on September 25, 1997, except that the form of the statement under this paragraph shall be written in a manner to allow the owner of each such vessel to satisfy any annual renewal requirements for a certificate of documentation for such vessel and to comply with this subsection and section 12102(c) of title 46, United States Code, as amended by this Act, and shall not be required to be notarized.

<< 46 USCA § 12102 NOTE >>

(2) After October 1, 2001, transfers of ownership and control of vessels subject to section 12102(c) of title 46, United States Code, as amended by this Act, which are 100 feet or greater in registered length, shall be rigorously scrutinized for violations of such section, with particular attention given to leases, charters, mortgages, financing, and similar arrangements, to the control of persons not eligible to own a vessel with a fishery endorsement under section 12102(c) of title 46, United States Code, as amended by this Act, over the management, sales, financing, or other operations of an entity, and to contracts involving the purchase over extended periods of time of all, or substantially all, of the living marine resources harvested by a fishing vessel.

<< 46 USCA § 12102 NOTE >>

(d) VESSELS MEASURING LESS THAN 100 FEET.—The Secretary of Transportation shall establish such requirements as are reasonable and necessary to demonstrate compliance with section 12102(c) of title 46, United States Code, as amended by this Act, with respect to vessels measuring less than 100 feet in registered length, and shall seek to minimize the administrative burden on individuals who own and operate such vessels.

<< 46 USCA § 12102 NOTE >>

(e) ENDORSEMENTS REVOKED.—The Secretary of Transportation shall revoke the fishery endorsement of any vessel subject to section 12102(c) of title 46, United States Code, as amended by this Act, whose owner does not comply with such section.

<< 46 USCA § 12122 >>

(f) PENALTY.—Section 12122 of title 46, United States Code, is amended by inserting at the end the following new subsection:
"(c) In addition to penalties under subsections (a) and (b), the owner of a documented vessel for which a fishery endorsement has been issued is liable to the United States Government for a civil penalty of up to $100,000 for each day in which such vessel has engaged in fishing (as such term is defined in section 3 of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1802)) within the exclusive economic zone of the United States, if the owner or the representative or agent of the owner knowingly falsified or concealed a material fact, or knowingly made a false statement or representation with respect to the eligibility of the vessel under section 12102(c) of this title in applying for or applying to renew such fishery endorsement.".

<< 16 USCA § 6001 NOTE >>

(g) CERTAIN VESSELS.—The vessels EXCELLENCE (United States official number 967502), GOLDEN ALASKA (United States official number 651041), OCEAN PHOENIX (United States official number 296779), NORTHERN TRAVELER (United States official number 635986), and NORTHERN VOYAGER (United States official number 637398) (or a replacement vessel for the NORTHERN VOYAGER that complies with paragraphs (2), (5), and (6) of section 208(g) of this Act) shall be exempt from section 12102(c), as amended by this Act, until such time after October 1, 2001 as more than 50 percent of the interest owned and controlled in the vessel changes, provided that the vessel maintains eligibility for a fishery endorsement under the federal law that was in effect the day before the date of the enactment of this Act, and unless, in the case of the NORTHERN TRAVELER or the NORTHERN VOYAGER (or such replacement), the vessel is used in any fishery under the authority of a regional fishery management council other than the New England Fishery Management Council or Mid–Atlantic Fishery Management Council established, respectively, under subparagraphs (A) and (B) of section 302(a)(1) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1852(a)(1)(A) and (B)), or in the case of the EXCELLENCE, GOLDEN ALASKA, or OCEAN PHOENIX, the vessel is used to harvest any fish.

<< 46 USCA § 12102 NOTE >>

SEC. 204. REPEAL OF OWNERSHIP SAVINGS CLAUSE.

AR.02825
500

<< 46 USCA § 12102 NOTE >>

(a) REPEAL.—Section 7(b) of the Commercial Fishing Industry Vessel Anti–Reflagging Act of 1987 (Public Law 100–239; 46 U.S.C. 12102 note) is hereby repealed.

<< 46 USCA § 12102 NOTE >>

(b) EFFECTIVE DATE.—Subsection (a) shall take effect on October 1, 2001.

Subtitle II—Bering Sea Pollock Fishery

<< 16 USCA § 1851 NOTE >>

SEC. 205. DEFINITIONS.

As used in this subtitle—

<< 16 USCA § 1851 NOTE >>

(1) the term "Bering Sea and Aleutian Islands Management Area" has the same meaning as the meaning given for such term in part 679.2 of title 50, Code of Federal Regulations, as in effect on October 1, 1998;

<< 16 USCA § 1851 NOTE >>

(2) the term "catcher/processor" means a vessel that is used for harvesting fish and processing that fish;

<< 16 USCA § 1851 NOTE >>

(3) the term "catcher vessel" means a vessel that is used for harvesting fish and that does not process pollock onboard;

<< 16 USCA § 1851 NOTE >>

(4) the term "directed pollock fishery" means the fishery for the directed fishing allowances allocated under paragraphs (1), (2), and (3) of section 206(b);

<< 16 USCA § 1851 NOTE >>

(5) the term "harvest" means to commercially engage in the catching, taking, or harvesting of fish or any activity that can reasonably be expected to result in the catching, taking, or harvesting of fish;

<< 16 USCA § 1851 NOTE >>

(6) the term "inshore component" means the following categories that process groundfish harvested in the Bering Sea and Aleutian Islands Management Area:
  (A) shoreside processors, including those eligible under section 208(f); and
  (B) vessels less than 125 feet in length overall that process less than 126 metric tons per week in round-weight equivalents of an aggregate amount of pollock and Pacific cod;

<< 16 USCA § 1851 NOTE >>

(7) the term "Magnuson–Stevens Act" means the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.);

<< 16 USCA § 1851 NOTE >>

(8) the term "mothership" means a vessel that receives and processes fish from other vessels in the exclusive economic zone of the United States and is not used for, or equipped to be used for, harvesting fish;

<< 16 USCA § 1851 NOTE >>

(9) the term "North Pacific Council" means the North Pacific Fishery Management Council established under section 302(a)(1)(G) of the Magnuson–Stevens Act (16 U.S.C. 1852(a)(1)(G));

<< 16 USCA § 1851 NOTE >>

(10) the term "offshore component" means all vessels not included in the definition of "inshore component" that process groundfish harvested in the Bering Sea and Aleutian Islands Management Area;

<< 16 USCA § 1851 NOTE >>

(11) the term "Secretary" means the Secretary of Commerce; and

<< 16 USCA § 1851 NOTE >>

(12) the term "shoreside processor" means any person or vessel that receives unprocessed fish, except catcher/processors, motherships, buying stations, restaurants, or persons receiving fish for personal consumption or bait.

<< 16 USCA § 1851 NOTE >>

SEC. 206. ALLOCATIONS.

<< 16 USCA § 1851 NOTE >>

(a) POLLOCK COMMUNITY DEVELOPMENT QUOTA.—Effective January 1, 1999, 10 percent of the total allowable catch of pollock in the Bering Sea and Aleutian Islands Management Area shall be allocated as a directed fishing allowance to the western Alaska community development quota program established under section 305(i) of the Magnuson–Stevens Act (16 U.S.C. 1855(i)).

<< 16 USCA § 1851 NOTE >>

(b) INSHORE/OFFSHORE.—Effective January 1, 1999, the remainder of the pollock total allowable catch in the Bering Sea and Aleutian Islands Management Area, after the subtraction of the allocation under subsection (a) and the subtraction of allowances for the incidental catch of pollock by vessels harvesting other groundfish species (including under the western Alaska community development quota program) shall be allocated as directed fishing allowances as follows—

<< 16 USCA § 1851 NOTE >>

(1) 50 percent to catcher vessels harvesting pollock for processing by the inshore component;

<< 16 USCA § 1851 NOTE >>

(2) 40 percent to catcher/processors and catcher vessels harvesting pollock for processing by catcher/processors in the offshore component; and

<< 16 USCA § 1851 NOTE >>

(3) 10 percent to catcher vessels harvesting pollock for processing by motherships in the offshore component.

<< 16 USCA § 1851 NOTE >>

SEC. 207. BUYOUT.

<< 16 USCA § 1851 NOTE >>

(a) FEDERAL LOAN.—Under the authority of sections 1111 and 1112 of title XI of the Merchant Marine Act, 1936 (46 U.S.C. App. 1279f and 1279g) and notwithstanding the requirements of section 312 of the Magnuson–Stevens Act (16 U.S.C. 1861a), the Secretary shall, subject to the availability of appropriations for the cost of the direct loan, provide up to $75,000,000 through a direct loan obligation for the payments required under subsection (d).

<< 16 USCA § 1851 NOTE >>

(b) INSHORE FEE SYSTEM.—Notwithstanding the requirements of section 304(d) or 312 of the Magnuson–Stevens Act (16 U.S.C. 1854(d) and 1861a), the Secretary shall establish a fee for the repayment of such loan obligation which—

<< 16 USCA § 1851 NOTE >>

(1) shall be six-tenths (0.6) of one cent for each pound round-weight of all pollock harvested from the directed fishing allowance under section 206(b)(1); and

<< 16 USCA § 1851 NOTE >>

(2) shall begin with such pollock harvested on or after January 1, 2000, and continue without interruption until such loan obligation is fully repaid; and

<< 16 USCA § 1851 NOTE >>

(3) shall be collected in accordance with section 312(d)(2)(C) of the Magnuson–Stevens Act (16 U.S.C. 1861a(d)(2)(C)) and in accordance with such other conditions as the Secretary establishes.

<< 16 USCA § 1851 NOTE >>

(c) FEDERAL APPROPRIATION.—Under the authority of section 312(c)(1)(B) of the Magnuson–Stevens Act (16 U.S.C. 1861a(c)(1)(B)), there are authorized to be appropriated $20,000,000 for the payments required under subsection (d).

<< 16 USCA § 1851 NOTE >>

(d) PAYMENTS.—Subject to the availability of appropriations for the cost of the direct loan under subsection (a) and funds under subsection (c), the Secretary shall pay by not later than December 31, 1998—

<< 16 USCA § 1851 NOTE >>

(1) up to $90,000,000 to the owner or owners of the catcher/processors listed in paragraphs (1) through (9) of section 209, in such manner as the owner or owners, with the concurrence of the Secretary, agree, except that—

(A) the portion of such payment with respect to the catcher/processor listed in paragraph (1) of section 209 shall be made only after the owner submits a written certification acceptable to the Secretary that neither the owner nor a purchaser from the owner intends to use such catcher/processor outside of the exclusive economic zone of the United States to harvest any stock of fish (as such term is defined in section 3 of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1802)) that occurs within the exclusive economic zone of the United States; and

(B) the portion of such payment with respect to the catcher/processors listed in paragraphs (2) through (9) of section 209 shall be made only after the owner or owners of such catcher/processors submit a written certification acceptable to the Secretary that such catcher/processors will be scrapped by December 31, 2000 and will not, before that date, be used to harvest or process any fish; and

<< 16 USCA § 1851 NOTE >>

(2)(A) if a contract has been filed under section 210(a) by the catcher/processors listed in section 208(e), $5,000,000 to the owner or owners of the catcher/processors listed in paragraphs (10) through (14) of such section in such manner as the owner or owners, with the concurrence of the Secretary, agree; or

(B) if such a contract has not been filed by such date, $5,000,000 to the owners of the catcher vessels eligible under section 208(b) and the catcher/processors eligible under paragraphs (1) through (20) of section 208(e), divided based on the amount of the harvest of pollock in the directed pollock fishery by each such vessel in 1997 in such manner as the Secretary deems appropriate,

except that any such payments shall be reduced by any obligation to the federal government that has not been satisfied by such owner or owners of any such vessels.

<< 16 USCA § 1851 NOTE >>

(e) PENALTY.—If the catcher/processor under paragraph (1) of section 209 is used outside of the exclusive economic zone of the United States to harvest any stock of fish that occurs within the exclusive economic zone of the United States while the owner who received the payment under subsection (d)(1)(A) has an ownership interest in such vessel, or if the catcher/processors listed in paragraphs (2) through (9) of section 209 are determined by the Secretary not to have been scrapped by December 31, 2000 or to have been used in a manner inconsistent with subsection (d)(1)(B), the Secretary may suspend any or all of the federal permits which allow any vessels owned in whole or in part by the owner or owners who received payments under subsection (d)(1) to harvest or process fish within the exclusive economic zone of the United States until such time as the obligations of such owner or owners under subsection (d)(1) have been fulfilled to the satisfaction of the Secretary.

<< 16 USCA § 1851 NOTE >>

(f) PROGRAM DEFINED; MATURITY.—For the purposes of section 1111 of the Merchant Marine Act, 1936 (46 U.S.C. App. 1279f), the fishing capacity reduction program in this subtitle shall be within the meaning of the term "program" as defined and used in such section. Notwithstanding section 1111(b)(4) of such Act (46 U.S.C. App. 1279f(b)(4)), the debt obligation under subsection (a) of this section may have a maturity not to exceed 30 years.

<< 16 USCA § 1851 NOTE >>

(g) FISHERY CAPACITY REDUCTION REGULATIONS.—The Secretary of Commerce shall by not later than October 15, 1998 publish proposed regulations to implement subsections (b), (c), (d), and (e) of section 312 of the Magnuson–Stevens Act (16 U.S.C. 1861a) and sections 1111 and 1112 of title XI of the Merchant Marine Act, 1936 (46 U.S.C. App. 1279f and 1279g).

<< 16 USCA § 1851 NOTE >>

SEC. 208. ELIGIBLE VESSELS AND PROCESSORS.

<< 16 USCA § 1851 NOTE >>

(a) CATCHER VESSELS ONSHORE.—Effective January 1, 2000, only catcher vessels which are—

<< 16 USCA § 1851 NOTE >>

(1) determined by the Secretary—
(A) to have delivered at least 250 metric tons of pollock; or
(B) to be less than 60 feet in length overall and to have delivered at least 40 metric tons of pollock,

for processing by the inshore component in the directed pollock fishery in any one of the years 1996 or 1997, or between January 1, 1998 and September 1, 1998;

<< 16 USCA § 1851 NOTE >>

(2) eligible to harvest pollock in the directed pollock fishery under the license limitation program recommended by the North Pacific Council and approved by the Secretary; and

<< 16 USCA § 1851 NOTE >>

(3) not listed in subsection (b),

shall be eligible to harvest the directed fishing allowance under section 206(b)(1) pursuant to a federal fishing permit.

<< 16 USCA § 1851 NOTE >>

(b) CATCHER VESSELS TO CATCHER/PROCESSORS.—Effective January 1, 1999, only the following catcher vessels shall be eligible to harvest the directed fishing allowance under section 206(b)(2) pursuant to a federal fishing permit:

<< 16 USCA § 1851 NOTE >>

(1) AMERICAN CHALLENGER (United States official number 615085);

<< 16 USCA § 1851 NOTE >>

(2) FORUM STAR (United States official number 925863);

<< 16 USCA § 1851 NOTE >>

(3) MUIR MILACH (United States official number 611524);

<< 16 USCA § 1851 NOTE >>

(4) NEAHKAHNIE (United States official number 599534);

<< 16 USCA § 1851 NOTE >>

(5) OCEAN HARVESTER (United States official number 549892);

<< 16 USCA § 1851 NOTE >>

(6) SEA STORM (United States official number 628959);

<< 16 USCA § 1851 NOTE >>

(7) TRACY ANNE (United States official number 904859); and

<< 16 USCA § 1851 NOTE >>

(8) any catcher vessel—
(A) determined by the Secretary to have delivered at least 250 metric tons and at least 75 percent of the pollock it harvested in the directed pollock fishery in 1997 to catcher/processors for processing by the offshore component; and
(B) eligible to harvest pollock in the directed pollock fishery under the license limitation program recommended by the North Pacific Council and approved by the Secretary.

<< 16 USCA § 1851 NOTE >>

(c) CATCHER VESSELS TO MOTHERSHIPS.—Effective January 1, 2000, only the following catcher vessels shall be eligible to harvest the directed fishing allowance under section 206(b)(3) pursuant to a federal fishing permit:

<< 16 USCA § 1851 NOTE >>

(1) ALEUTIAN CHALLENGER (United States official number 603820);

<< 16 USCA § 1851 NOTE >>

(2) ALYESKA (United States official number 560237);

<< 16 USCA § 1851 NOTE >>

(3) AMBER DAWN (United States official number 529425);

<< 16 USCA § 1851 NOTE >>

(4) AMERICAN BEAUTY (United States official number 613847);

<< 16 USCA § 1851 NOTE >>

(5) CALIFORNIA HORIZON (United States official number 590758);

<< 16 USCA § 1851 NOTE >>

(6) MAR–GUN (United States official number 525608);

<< 16 USCA § 1851 NOTE >>

(7) MARGARET LYN (United States official number 615563);

<< 16 USCA § 1851 NOTE >>

(8) MARK I (United States official number 509552);

<< 16 USCA § 1851 NOTE >>

(9) MISTY DAWN (United States official number 926647);

<< 16 USCA § 1851 NOTE >>

(10) NORDIC FURY (United States official number 542651);

<< 16 USCA § 1851 NOTE >>

(11) OCEAN LEADER (United States official number 561518);

<< 16 USCA § 1851 NOTE >>

(12) OCEANIC (United States official number 602279);

<< 16 USCA § 1851 NOTE >>

(13) PACIFIC ALLIANCE (United States official number 612084);

<< 16 USCA § 1851 NOTE >>

(14) PACIFIC CHALLENGER (United States official number 518937);

<< 16 USCA § 1851 NOTE >>

(15) PACIFIC FURY (United States official number 561934);

<< 16 USCA § 1851 NOTE >>

(16) PAPADO II (United States official number 536161);

<< 16 USCA § 1851 NOTE >>

(17) TRAVELER (United States official number 929356);

<< 16 USCA § 1851 NOTE >>

(18) VESTERAALEN (United States official number 611642);

<< 16 USCA § 1851 NOTE >>

(19) WESTERN DAWN (United States official number 524423); and

<< 16 USCA § 1851 NOTE >>

(20) any vessel—
  (A) determined by the Secretary to have delivered at least 250 metric tons of pollock for processing by motherships in the offshore component of the directed pollock fishery in any one of the years 1996 or 1997, or between January 1, 1998 and September 1, 1998;
  (B) eligible to harvest pollock in the directed pollock fishery under the license limitation program recommended by the North Pacific Council and approved by the Secretary; and
  (C) not listed in subsection (b).

<< 16 USCA § 1851 NOTE >>

 (d) MOTHERSHIPS.—Effective January 1, 2000, only the following motherships shall be eligible to process the directed fishing allowance under section 206(b)(3) pursuant to a federal fishing permit:

<< 16 USCA § 1851 NOTE >>

(1) EXCELLENCE (United States official number 967502);

<< 16 USCA § 1851 NOTE >>

(2) GOLDEN ALASKA (United States official number 651041); and

<< 16 USCA § 1851 NOTE >>

(3) OCEAN PHOENIX (United States official number 296779).

<< 16 USCA § 1851 NOTE >>

 (e) CATCHER/PROCESSORS.—Effective January 1, 1999, only the following catcher/processors shall be eligible to harvest the directed fishing allowance under section 206(b)(2) pursuant to a federal fishing permit:

<< 16 USCA § 1851 NOTE >>

(1) AMERICAN DYNASTY (United States official number 951307);

<< 16 USCA § 1851 NOTE >>

(2) KATIE ANN (United States official number 518441);

<< 16 USCA § 1851 NOTE >>

(3) AMERICAN TRIUMPH (United States official number 646737);

<< 16 USCA § 1851 NOTE >>

(4) NORTHERN EAGLE (United States official number 506694);

<< 16 USCA § 1851 NOTE >>

(5) NORTHERN HAWK (United States official number 643771);

<< 16 USCA § 1851 NOTE >>

(6) NORTHERN JAEGER (United States official number 521069);

<< 16 USCA § 1851 NOTE >>

(7) OCEAN ROVER (United States official number 552100);

<< 16 USCA § 1851 NOTE >>

(8) ALASKA OCEAN (United States official number 637856);

<< 16 USCA § 1851 NOTE >>

(9) ENDURANCE (United States official number 592206);

<< 16 USCA § 1851 NOTE >>

(10) AMERICAN ENTERPRISE (United States official number 594803);

<< 16 USCA § 1851 NOTE >>

(11) ISLAND ENTERPRISE (United States official number 610290);

<< 16 USCA § 1851 NOTE >>

(12) KODIAK ENTERPRISE (United States official number 579450);

<< 16 USCA § 1851 NOTE >>

(13) SEATTLE ENTERPRISE (United States official number 904767);

<< 16 USCA § 1851 NOTE >>

(14) US ENTERPRISE (United States official number 921112);

<< 16 USCA § 1851 NOTE >>

(15) ARCTIC STORM (United States official number 903511);

<< 16 USCA § 1851 NOTE >>

(16) ARCTIC FJORD (United States official number 940866);

<< 16 USCA § 1851 NOTE >>

(17) NORTHERN GLACIER (United States official number 663457);

<< 16 USCA § 1851 NOTE >>

(18) PACIFIC GLACIER (United States official number 933627);

<< 16 USCA § 1851 NOTE >>

(19) HIGHLAND LIGHT (United States official number 577044);

<< 16 USCA § 1851 NOTE >>

(20) STARBOUND (United States official number 944658); and

<< 16 USCA § 1851 NOTE >>

(21) any catcher/processor not listed in this subsection and determined by the Secretary to have harvested more than 2,000 metric tons of the pollock in the 1997 directed pollock fishery and determined to be eligible to harvest pollock in the directed pollock fishery under the license limitation program recommended by the North Pacific Council and approved by the Secretary, except that catcher/processors eligible under this paragraph shall be prohibited from harvesting in the aggregate a total of more than one-half (0.5) of a percent of the pollock apportioned for the directed pollock fishery under section 206(b)(2).

Notwithstanding section 213(a), failure to satisfy the requirements of section 4(a) of the Commercial Fishing Industry Vessel Anti–Reflagging Act of 1987 (Public Law 100–239; 46 U.S.C. 12108 note) shall not make a catcher/processor listed under this subsection ineligible for a fishery endorsement.

<< 16 USCA § 1851 NOTE >>

(f) SHORESIDE PROCESSORS.—(1) Effective January 1, 2000 and except as provided in paragraph (2), the catcher vessels eligible under subsection (a) may deliver pollock harvested from the directed fishing allowance under section 206(b)(1) only to—

(A) shoreside processors (including vessels in a single geographic location in Alaska State waters) determined by the Secretary to have processed more than 2,000 metric tons round-weight of pollock in the inshore component of the directed pollock fishery during each of 1996 and 1997; and

(B) shoreside processors determined by the Secretary to have processed pollock in the inshore component of the directed pollock fishery in 1996 or 1997, but to have processed less than 2,000 metric tons round-weight of such pollock in each year, except that effective January 1, 2000, each such shoreside processor may not process more than 2,000 metric tons round-weight from such directed fishing allowance in any year.

<< 16 USCA § 1851 NOTE >>

(2) Upon recommendation by the North Pacific Council, the Secretary may approve measures to allow catcher vessels eligible under subsection (a) to deliver pollock harvested from the directed fishing allowance under section 206(b)(1) to shoreside processors not eligible under paragraph (1) if the total allowable catch for pollock in the Bering Sea and Aleutian Islands Management Area increases by more than 10 percent above the total allowable catch in such fishery in 1997, or in the event of the actual total loss or constructive total loss of a shoreside processor eligible under paragraph (1)(A).

<< 16 USCA § 1851 NOTE >>

(g) REPLACEMENT VESSELS.—In the event of the actual total loss or constructive total loss of a vessel eligible under subsections (a), (b), (c), (d), or (e), the owner of such vessel may replace such vessel with a vessel which shall be eligible in the same manner under that subsection as the eligible vessel, provided that—

<< 16 USCA § 1851 NOTE >>

(1) such loss was caused by an act of God, an act of war, a collision, an act or omission of a party other than the owner or agent of the vessel, or any other event not caused by the willful misconduct of the owner or agent;

<< 16 USCA § 1851 NOTE >>

(2) the replacement vessel was built in the United States and if ever rebuilt, was rebuilt in the United States;

<< 16 USCA § 1851 NOTE >>

(3) the fishery endorsement for the replacement vessel is issued within 36 months of the end of the last year in which the eligible vessel harvested or processed pollock in the directed pollock fishery;

<< 16 USCA § 1851 NOTE >>

(4) if the eligible vessel is greater than 165 feet in registered length, of more than 750 gross registered tons, or has engines capable of producing more than 3,000 shaft horsepower, the replacement vessel is of the same or lesser registered length, gross registered tons, and shaft horsepower;

<< 16 USCA § 1851 NOTE >>

(5) if the eligible vessel is less than 165 feet in registered length, of fewer than 750 gross registered tons, and has engines incapable of producing less than 3,000 shaft horsepower, the replacement vessel is less than each of such thresholds and does not exceed by more than 10 percent the registered length, gross registered tons or shaft horsepower of the eligible vessel; and

<< 16 USCA § 1851 NOTE >>

(6) the replacement vessel otherwise qualifies under federal law for a fishery endorsement, including under section 12102(c) of title 46, United States Code, as amended by this Act.

<< 16 USCA § 1851 NOTE >>

(h) ELIGIBILITY DURING IMPLEMENTATION.—In the event the Secretary is unable to make a final determination about the eligibility of a vessel under subsection (b)(8) or subsection (e)(21) before January 1, 1999, or a vessel or shoreside processor under subsection (a), subsection (c)(21), or subsection (f) before January 1, 2000, such vessel or shoreside processor, upon the filing of an application for eligibility, shall be eligible to participate in the directed pollock fishery pending final determination by the Secretary with respect to such vessel or shoreside processor.

<< 16 USCA § 1851 NOTE >>

(i) ELIGIBILITY NOT A RIGHT.—Eligibility under this section shall not be construed—

<< 16 USCA § 1851 NOTE >>

(1) to confer any right of compensation, monetary or otherwise, to the owner of any catcher vessel, catcher/processor, mothership, or shoreside processor if such eligibility is revoked or limited in any way, including through the revocation or limitation of a fishery endorsement or any federal permit or license;

<< 16 USCA § 1851 NOTE >>

(2) to create any right, title, or interest in or to any fish in any fishery; or

<< 16 USCA § 1851 NOTE >>

(3) to waive any provision of law otherwise applicable to such catcher vessel, catcher/processor, mothership, or shoreside processor.

<< 16 USCA § 1851 NOTE >>

SEC. 209. LIST OF INELIGIBLE VESSELS.

Effective December 31, 1998, the following vessels shall be permanently ineligible for fishery endorsements, and any claims (including relating to catch history) associated with such vessels that could qualify any owners of such vessels for any present or future limited access system permit in any fishery within the exclusive economic zone of the United States (including a vessel moratorium permit or license limitation program permit in fisheries under the authority of the North Pacific Council) are hereby extinguished:

<< 16 USCA § 1851 NOTE >>

(1) AMERICAN EMPRESS (United States official number 942347);

<< 16 USCA § 1851 NOTE >>

(2) PACIFIC SCOUT (United States official number 934772);

<< 16 USCA § 1851 NOTE >>

(3) PACIFIC EXPLORER (United States official number 942592);

<< 16 USCA § 1851 NOTE >>

(4) PACIFIC NAVIGATOR (United States official number 592204);

<< 16 USCA § 1851 NOTE >>

(5) VICTORIA ANN (United States official number 592207);

<< 16 USCA § 1851 NOTE >>

(6) ELIZABETH ANN (United States official number 534721);

<< 16 USCA § 1851 NOTE >>

(7) CHRISTINA ANN (United States official number 653045);

<< 16 USCA § 1851 NOTE >>

(8) REBECCA ANN (United States official number 592205); and

<< 16 USCA § 1851 NOTE >>

(9) BROWNS POINT (United States official number 587440).

<< 16 USCA § 1851 NOTE >>

SEC. 210. FISHERY COOPERATIVE LIMITATIONS.

<< 16 USCA § 1851 NOTE >>

(a) PUBLIC NOTICE.—(1) Any contract implementing a fishery cooperative under section 1 of the Act of June 25, 1934 (15 U.S.C. 521) in the directed pollock fishery and any material modifications to any such contract shall be filed not less than 30 days prior to the start of fishing under the contract with the North Pacific Council and with the Secretary, together with a copy of a letter from a party to the contract requesting a business review letter on the fishery cooperative from the Department of Justice and any response to such request. Notwithstanding section 402 of the Magnuson–Stevens Act (16 U.S.C. 1881a) or any other provision of law, but taking into account the interest of parties to any such contract in protecting the confidentiality of proprietary information, the North Pacific Council and Secretary shall—

(A) make available to the public such information about the contract, contract modifications, or fishery cooperative the North Pacific Council and Secretary deem appropriate, which at a minimum shall include a list of the parties to the contract, a list of the vessels involved, and the amount of pollock and other fish to be harvested by each party to such contract; and

(B) make available to the public in such manner as the North Pacific Council and Secretary deem appropriate information about the harvest by vessels under a fishery cooperative of all species (including bycatch) in the directed pollock fishery on a vessel-by-vessel basis.

<< 16 USCA § 1851 NOTE >>

(b) CATCHER VESSELS ONSHORE.—

(1) CATCHER VESSEL COOPERATIVES.—Effective January 1, 2000, upon the filing of a contract implementing a fishery cooperative under subsection (a) which—

(A) is signed by the owners of 80 percent or more of the qualified catcher vessels that delivered pollock for processing by a shoreside processor in the directed pollock fishery in the year prior to the year in which the fishery cooperative will be in effect; and

(B) specifies, except as provided in paragraph (6), that such catcher vessels will deliver pollock in the directed pollock fishery only to such shoreside processor during the year in which the fishery cooperative will be in effect and that such shoreside processor has agreed to process such pollock,

the Secretary shall allow only such catcher vessels (and catcher vessels whose owners voluntarily participate pursuant to paragraph (2)) to harvest the aggregate percentage of the directed fishing allowance under section 206(b)(1) in the year in which the fishery cooperative will be in effect that is equivalent to the aggregate total amount of pollock harvested by such catcher vessels (and by such catcher vessels whose owners voluntarily participate pursuant to paragraph (2)) in the directed pollock fishery for processing by the inshore component during 1995, 1996, and 1997 relative to the aggregate total amount of pollock harvested in the directed pollock fishery for processing by the inshore component during such years and shall prevent such catcher vessels (and catcher vessels whose owners voluntarily participate pursuant to paragraph (2)) from harvesting in aggregate in excess of such percentage of such directed fishing allowance.

<< 16 USCA § 1851 NOTE >>

(2) VOLUNTARY PARTICIPATION.—Any contract implementing a fishery cooperative under paragraph (1) must allow the owners of other qualified catcher vessels to enter into such contract after it is filed and before the calendar year in which fishing will begin under the same terms and conditions as the owners of the qualified catcher vessels who entered into such contract upon filing.

<< 16 USCA § 1851 NOTE >>

(3) QUALIFIED CATCHER VESSEL.—For the purposes of this subsection, a catcher vessel shall be considered a "qualified catcher vessel" if, during the year prior to the year in which the fishery cooperative will be in effect, it delivered more pollock to the shoreside processor to which it will deliver pollock under the fishery cooperative in paragraph (1) than to any other shoreside processor.

<< 16 USCA § 1851 NOTE >>

(4) CONSIDERATION OF CERTAIN VESSELS.—Any contract implementing a fishery cooperative under paragraph (1) which has been entered into by the owner of a qualified catcher vessel eligible under section 208(a) that harvested pollock for processing by catcher/processors or motherships in the directed pollock fishery during 1995, 1996, and 1997 shall, to the extent practicable, provide fair and equitable terms and conditions for the owner of such qualified catcher vessel.

<< 16 USCA § 1851 NOTE >>

(5) OPEN ACCESS.—A catcher vessel eligible under section 208(a) the catch history of which has not been attributed to a fishery cooperative under paragraph (1) may be used to deliver pollock harvested by such vessel from the directed fishing allowance under section 206(b)(1) (other than pollock reserved under paragraph (1) for a fishery cooperative) to any of the shoreside processors eligible under section 208(f). A catcher vessel eligible under section 208(a) the catch history of which has been attributed to a fishery cooperative under paragraph (1) during any calendar year may not harvest any pollock apportioned under section 206(b)(1) in such calendar year other than the pollock reserved under paragraph (1) for such fishery cooperative.

<< 16 USCA § 1851 NOTE >>

(6) TRANSFER OF COOPERATIVE HARVEST.—A contract implementing a fishery cooperative under paragraph (1) may, notwithstanding the other provisions of this subsection, provide for up to 10 percent of the pollock harvested under such cooperative to be processed by a shoreside processor eligible under section 208(f) other than the shoreside processor to which pollock will be delivered under paragraph (1).

<< 16 USCA § 1851 NOTE >>

(c) CATCHER VESSELS TO CATCHER/PROCESSORS.—Effective January 1, 1999, not less than 8.5 percent of the directed fishing allowance under section 206(b)(2) shall be available for harvest only by the catcher vessels eligible under section 208(b). The owners of such catcher vessels may participate in a fishery cooperative with the owners of the catcher/processors eligible under paragraphs (1) through (20) of the section 208(e). The owners of such catcher vessels may participate in a fishery cooperative that will be in effect during 1999 only if the contract implementing such cooperative establishes penalties to prevent such vessels from exceeding in 1999 the traditional levels harvested by such vessels in all other fisheries in the exclusive economic zone of the United States.

<< 16 USCA § 1851 NOTE >>

(d) CATCHER VESSELS TO MOTHERSHIPS.—

<< 16 USCA § 1851 NOTE >>

(1) PROCESSING.—Effective January 1, 2000, the authority in section 1 of the Act of June 25, 1934 (48 Stat. 1213 and 1214; 15 U.S.C. 521 et seq.) shall extend to processing by motherships eligible under section 208(d) solely for the purposes of forming or participating in a fishery cooperative in the directed pollock fishery upon the filing of a contract to implement a fishery cooperative under subsection (a) which has been entered into by the owners of 80 percent or more of the catcher vessels eligible under section 208(c) for the duration of such contract, provided that such owners agree to the terms of the fishery cooperative involving processing by the motherships.

<< 16 USCA § 1851 NOTE >>

(2) VOLUNTARY PARTICIPATION.—Any contract implementing a fishery cooperative described in paragraph (1) must allow the owners of any other catcher vessels eligible under section 208(c) to enter such contract after it is filed and before the calendar year in which fishing will begin under the same terms and conditions as the owners of the catcher vessels who entered into such contract upon filing.

<< 16 USCA § 1851 NOTE >>

(e) EXCESSIVE SHARES.—

<< 16 USCA § 1851 NOTE >>

(1) HARVESTING.—No particular individual, corporation, or other entity may harvest, through a fishery cooperative or otherwise, a total of more than 17.5 percent of the pollock available to be harvested in the directed pollock fishery.

<< 16 USCA § 1851 NOTE >>

(2) PROCESSING.—Under the authority of section 301(a)(4) of the Magnuson–Stevens Act (16 U.S.C. 1851(a)(4)), the North Pacific Council is directed to recommend for approval by the Secretary conservation and management measures to prevent any particular individual or entity from processing an excessive share of the pollock available to be harvested in the directed pollock fishery. In the event the North Pacific Council recommends and the Secretary approves an excessive processing share that is lower than 17.5 percent, any individual or entity that previously processed a percentage greater than such share shall be allowed to continue to process such percentage, except that their percentage may not exceed 17.5 percent (excluding pollock processed by catcher/processors that was harvested in the directed pollock fishery by catcher vessels eligible under 208(b)) and shall be reduced if their percentage decreases, until their percentage is below such share. In recommending the excessive processing share, the North Pacific Council shall consider the need of catcher vessels in the directed pollock fishery to have competitive buyers for the pollock harvested by such vessels.

<< 16 USCA § 1851 NOTE >>

(3) REVIEW BY MARITIME ADMINISTRATION.—At the request of the North Pacific Council or the Secretary, any individual or entity believed by such Council or the Secretary to have exceeded the percentage in either paragraph (1) or (2) shall submit such information to the Administrator of the Maritime Administration as the Administrator deems appropriate to allow the Administrator to determine whether such individual or entity has exceeded either such percentage. The Administrator shall make a finding as soon as practicable upon such request and shall submit such finding to the North Pacific Council and the Secretary. For the purposes of this subsection, any entity in which 10 percent or more of the interest is owned or controlled by another individual or entity shall be considered to be the same entity as the other individual or entity.

<< 16 USCA § 1851 NOTE >>

(f) LANDING TAX JURISDICTION.—Any contract filed under subsection (a) shall include a contract clause under which the parties to the contract agree to make payments to the State of Alaska for any pollock harvested in the directed pollock fishery which is not landed in the State of Alaska, in amounts which would otherwise accrue had the pollock been landed in the State of Alaska subject to any landing taxes established under Alaska law. Failure to include such a contract clause or for such amounts to be paid shall result in a revocation of the authority to form fishery cooperatives under section 1 of the Act of June 25, 1934 (15 U.S.C. 521 et seq.).

<< 16 USCA § 1851 NOTE >>

(g) PENALTIES.—The violation of any of the requirements of this section or section 211 shall be considered the commission of an act prohibited by section 307 of the Magnuson–Stevens Act (16 U.S.C. 1857). In addition to the civil penalties and permit sanctions applicable to prohibited acts under section 308 of such Act (16 U.S.C. 1858), any person who is found by the Secretary, after notice and an opportunity for a hearing in accordance with section 554 of title 5, United States Code, to have violated a

requirement of this section shall be subject to the forfeiture to the Secretary of Commerce of any fish harvested or processed during the commission of such act.

<< 16 USCA § 1851 NOTE >>

SEC. 211. PROTECTIONS FOR OTHER FISHERIES; CONSERVATION MEASURES.

<< 16 USCA § 1851 NOTE >>

(a) GENERAL.—The North Pacific Council shall recommend for approval by the Secretary such conservation and management measures as it determines necessary to protect other fisheries under its jurisdiction and the participants in those fisheries, including processors, from adverse impacts caused by this Act or fishery cooperatives in the directed pollock fishery.

<< 16 USCA § 1851 NOTE >>

(b) CATCHER/PROCESSOR RESTRICTIONS.—

<< 16 USCA § 1851 NOTE >>

(1) GENERAL.—The restrictions in this subsection shall take effect on January 1, 1999 and shall remain in effect thereafter except that they may be superceded (with the exception of paragraph (4)) by conservation and management measures recommended after the date of the enactment of this Act by the North Pacific Council and approved by the Secretary in accordance with the Magnuson–Stevens Act.

<< 16 USCA § 1851 NOTE >>

(2) BERING SEA FISHING.—The catcher/processors eligible under paragraphs (1) through (20) of section 208(e) are hereby prohibited from, in the aggregate—
(A) exceeding the percentage of the harvest available in the offshore component of any Bering Sea and Aleutian Islands groundfish fishery (other than the pollock fishery) that is equivalent to the total harvest by such catcher/processors and the catcher/processors listed in section 209 in the fishery in 1995, 1996, and 1997 relative to the total amount available to be harvested by the offshore component in the fishery in 1995, 1996, and 1997;
(B) exceeding the percentage of the prohibited species available in the offshore component of any Bering Sea and Aleutian Islands groundfish fishery (other than the pollock fishery) that is equivalent to the total of the prohibited species harvested by such catcher/processors and the catcher/processors listed in section 209 in the fishery in 1995, 1996, and 1997 relative to the total amount of prohibited species available to be harvested by the offshore component in the fishery in 1995, 1996, and 1997; and
(C) fishing for Atka mackerel in the eastern area of the Bering Sea and Aleutian Islands and from exceeding the following percentages of the directed harvest available in the Bering Sea and Aleutian Islands Atka mackerel fishery—
(i) 11.5 percent in the central area; and
(ii) 20 percent in the western area.

<< 16 USCA § 1851 NOTE >>

(3) BERING SEA PROCESSING.—The catcher/processors eligible under paragraphs (1) through (20) of section 208(e) are hereby prohibited from—
(A) processing any of the directed fishing allowances under paragraphs (1) or (3) of section 206(b); and
(B) processing any species of crab harvested in the Bering Sea and Aleutian Islands Management Area.

<< 16 USCA § 1851 NOTE >>

(4) GULF OF ALASKA.—The catcher/processors eligible under paragraphs (1) through (20) of section 208(e) are hereby prohibited from—

(A) harvesting any fish in the Gulf of Alaska;

(B) processing any groundfish harvested from the portion of the exclusive economic zone off Alaska known as area 630 under the fishery management plan for Gulf of Alaska groundfish; or

(C) processing any pollock in the Gulf of Alaska (other than as bycatch in non-pollock groundfish fisheries) or processing, in the aggregate, a total of more than 10 percent of the cod harvested from areas 610, 620, and 640 of the Gulf of Alaska under the fishery management plan for Gulf of Alaska groundfish.

<< 16 USCA § 1851 NOTE >>

(5) FISHERIES OTHER THAN NORTH PACIFIC.—The catcher/processors eligible under paragraphs (1) through (20) of section 208(e) and motherships eligible under section 208(d) are hereby prohibited from harvesting fish in any fishery under the authority of any regional fishery management council established under section 302(a) of the Magnuson–Stevens Act (16 U.S.C. 1852(a)) other than the North Pacific Council, except for the Pacific whiting fishery, and from processing fish in any fishery under the authority of any such regional fishery management council other than the North Pacific Council, except in the Pacific whiting fishery, unless the catcher/processor or mothership is authorized to harvest or process fish under a fishery management plan recommended by the regional fishery management council of jurisdiction and approved by the Secretary.

<< 16 USCA § 1851 NOTE >>

(6) OBSERVERS AND SCALES.—The catcher/processors eligible under paragraphs (1) through (20) of section 208(e) shall —

(A) have two observers onboard at all times while groundfish is being harvested, processed, or received from another vessel in any fishery under the authority of the North Pacific Council; and

(B) weigh its catch on a scale onboard approved by the National Marine Fisheries Service while harvesting groundfish in fisheries under the authority of the North Pacific Council.

This paragraph shall take effect on January 1, 1999 for catcher/processors eligible under paragraphs (1) through (20) of section 208(e) that will harvest pollock allocated under section 206(a) in 1999, and shall take effect on January 1, 2000 for all other catcher/processors eligible under such paragraphs of section 208(e).

<< 16 USCA § 1851 NOTE >>

(c) CATCHER VESSEL AND SHORESIDE PROCESSOR RESTRICTIONS.—

<< 16 USCA § 1851 NOTE >>

(1) REQUIRED COUNCIL RECOMMENDATIONS.—By not later than July 1, 1999, the North Pacific Council shall recommend for approval by the Secretary conservation and management measures to—

(A) prevent the catcher vessels eligible under subsections (a), (b), and (c) of section 208 from exceeding in the aggregate the traditional harvest levels of such vessels in other fisheries under the authority of the North Pacific Council as a result of fishery cooperatives in the directed pollock fishery; and

(B) protect processors not eligible to participate in the directed pollock fishery from adverse effects as a result of this Act or fishery cooperatives in the directed pollock fishery.

If the North Pacific Council does not recommend such conservation and management measures by such date, or if the Secretary determines that such conservation and management measures recommended by the North Pacific Council are not adequate to fulfill the purposes of this paragraph, the Secretary may by regulation restrict or change the authority in section 210(b) to the extent the Secretary deems appropriate, including by preventing fishery cooperatives from being formed pursuant to such section and by providing greater flexibility with respect to the shoreside processor or shoreside processors to which catcher vessels in a fishery cooperative under section 210(b) may deliver pollock.

<< 16 USCA § 1851 NOTE >>

(2) BERING SEA CRAB AND GROUNDFISH.—

 (A) Effective January 1, 2000, the owners of the motherships eligible under section 208(d) and the shoreside processors eligible under section 208(f) that receive pollock from the directed pollock fishery under a fishery cooperative are hereby prohibited from processing, in the aggregate for each calendar year, more than the percentage of the total catch of each species of crab in directed fisheries under the jurisdiction of the North Pacific Council than facilities operated by such owners processed of each such species in the aggregate, on average, in 1995, 1996, 1997. For the purposes of this subparagraph, the term "facilities" means any processing plant, catcher/processor, mothership, floating processor, or any other operation that processes fish. Any entity in which 10 percent or more of the interest is owned or controlled by another individual or entity shall be considered to be the same entity as the other individual or entity for the purposes of this subparagraph.

 (B) Under the authority of section 301(a)(4) of the Magnuson–Stevens Act (16 U.S.C. 1851(a)(4)), the North Pacific Council is directed to recommend for approval by the Secretary conservation and management measures to prevent any particular individual or entity from harvesting or processing an excessive share of crab or of groundfish in fisheries in the Bering Sea and Aleutian Islands Management Area.

 (C) The catcher vessels eligible under section 208(b) are hereby prohibited from participating in a directed fishery for any species of crab in the Bering Sea and Aleutian Islands Management Area unless the catcher vessel harvested crab in the directed fishery for that species of crab in such Area during 1997 and is eligible to harvest such crab in such directed fishery under the license limitation program recommended by the North Pacific Council and approved by the Secretary. The North Pacific Council is directed to recommend measures for approval by the Secretary to eliminate latent licenses under such program, and nothing in this subparagraph shall preclude the Council from recommending measures more restrictive than under this paragraph.

<< 16 USCA § 1851 NOTE >>

(3) FISHERIES OTHER THAN NORTH PACIFIC.—

 (A) By not later than July 1, 2000, the Pacific Fishery Management Council established under section 302(a)(1)(F) of the Magnuson–Stevens Act (16 U.S.C. 1852(a)(1)(F)) shall recommend for approval by the Secretary conservation and management measures to protect fisheries under its jurisdiction and the participants in those fisheries from adverse impacts caused by this Act or by any fishery cooperatives in the directed pollock fishery.

 (B) If the Pacific Council does not recommend such conservation and management measures by such date, or if the Secretary determines that such conservation and management measures recommended by the Pacific Council are not adequate to fulfill the purposes of this paragraph, the Secretary may by regulation implement adequate measures including, but not limited to, restrictions on vessels which harvest pollock under a fishery cooperative which will prevent such vessels from harvesting Pacific groundfish, and restrictions on the number of processors eligible to process Pacific groundfish.

<< 16 USCA § 1851 NOTE >>

 (d) BYCATCH INFORMATION.—Notwithstanding section 402 of the Magnuson–Stevens Act (16 U.S.C. 1881a), the North Pacific Council may recommend and the Secretary may approve, under such terms and conditions as the North Pacific Council and Secretary deem appropriate, the public disclosure of any information from the groundfish fisheries under the authority of such Council that would be beneficial in the implementation of section 301(a)(9) or section 303(a)(11) of the Magnuson–Stevens Act (16 U.S.C. 1851(a)(9) and 1853(a)(11)).

<< 16 USCA § 1851 NOTE >>

 (e) COMMUNITY DEVELOPMENT LOAN PROGRAM.—Under the authority of title XI of the Merchant Marine Act, 1936 (46 U.S.C. App. 1271 et seq.), and subject to the availability of appropriations, the Secretary is authorized to provide direct loan obligations to communities eligible to participate in the western Alaska community development quota program established under 304(i) of the Magnuson Stevens Act (16 U.S.C. 1855(i)) for the purposes of purchasing all or part of an ownership interest in vessels and shoreside processors eligible under subsections (a), (b), (c), (d), (e), or (f) of section 208. Notwithstanding the eligibility criteria in section 208(a) and section 208(c), the LISA MARIE (United States official number 1038717) shall be eligible under such sections in the same manner as other vessels eligible under such sections.

<< 16 USCA § 1851 NOTE >>

<< 46 USCA App. § 1274 NOTE >>

SEC. 212. RESTRICTION ON FEDERAL LOANS.

 Section 302(b) of the Fisheries Financing Act (46 U.S.C. 1274 note) is amended—

<< 16 USCA § 1851 NOTE >>

<< 46 USCA App. § 1274 NOTE >>

 (1) by inserting "(1)" before "Until October 1, 2001"; and

<< 16 USCA § 1851 NOTE >>

<< 46 USCA App. § 1274 NOTE >>

 (2) by inserting at the end the following new paragraph:
 "(2) No loans may be provided or guaranteed by the Federal Government for the construction or rebuilding of a vessel intended for use as a fishing vessel (as defined in section 2101 of title 46, United States Code), if such vessel will be greater than 165 feet in registered length, of more than 750 gross registered tons, or have an engine or engines capable of producing a total of more than 3,000 shaft horsepower, after such construction or rebuilding is completed. This prohibition shall not apply to vessels to be used in the menhaden fishery or in tuna purse seine fisheries outside the exclusive economic zone of the United States or the area of the South Pacific Regional Fisheries Treaty.".

<< 16 USCA § 1851 NOTE >>

SEC. 213. DURATION.

<< 16 USCA § 1851 NOTE >>

 (a) GENERAL.—Except as otherwise provided in this title, the provisions of this title shall take effect upon the date of the enactment of this Act. Sections 206, 208, and 210 shall remain in effect until December 31, 2004, and shall be repealed on such date, except that the North Pacific Council may recommend and the Secretary may approve conservation and management measures as part of a fishery management plan under the Magnuson–Stevens Act to give effect to the measures in such sections thereafter.

<< 16 USCA § 1851 NOTE >>

 (b) EXISTING AUTHORITY.—Except for the measures required by this subtitle, nothing in this subtitle shall be construed to limit the authority of the North Pacific Council or the Secretary under the Magnuson–Stevens Act.

<< 16 USCA § 1851 NOTE >>

 (c) CHANGES TO FISHERY COOPERATIVE LIMITATIONS AND POLLOCK CDQ ALLOCATION.—The North Pacific Council may recommend and the Secretary may approve conservation and management measures in accordance with the Magnuson–Stevens Act—

<< 16 USCA § 1851 NOTE >>

 (1) that supersede the provisions of this title, except for sections 206 and 208, for conservation purposes or to mitigate adverse effects in fisheries or on owners of fewer than three vessels in the directed pollock fishery caused by this title or fishery

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

cooperatives in the directed pollock fishery, provided such measures take into account all factors affecting the fisheries and are imposed fairly and equitably to the extent practicable among and within the sectors in the directed pollock fishery;

<< 16 USCA § 1851 NOTE >>

(2) that supersede the allocation in section 206(a) for any of the years 2002, 2003, and 2004, upon the finding by such Council that the western Alaska community development quota program for pollock has been adversely affected by the amendments in this title; or

<< 16 USCA § 1851 NOTE >>

(3) that supersede the criteria required in paragraph (1) of section 210(b) to be used by the Secretary to set the percentage allowed to be harvested by catcher vessels pursuant to a fishery cooperative under such paragraph.

<< 16 USCA § 1851 NOTE >>

(d) REPORT TO CONGRESS.—Not later than October 1, 2000, the North Pacific Council shall submit a report to the Secretary and to Congress on the implementation and effects of this Act, including the effects on fishery conservation and management, on bycatch levels, on fishing communities, on business and employment practices of participants in any fishery cooperatives, on the western Alaska community development quota program, on any fisheries outside of the authority of the North Pacific Council, and such other matters as the North Pacific Council deems appropriate.

<< 16 USCA § 1851 NOTE >>

(e) REPORT ON FILLET PRODUCTION.—Not later than June 1, 2000, the General Accounting Office shall submit a report to the North Pacific Council, the Secretary, and the Congress on the whether this Act has negatively affected the market for fillets and fillet blocks, including through the reduction in the supply of such fillets and fillet blocks. If the report determines that such market has been negatively affected, the North Pacific Council shall recommend measures for the Secretary's approval to mitigate any negative effects.

<< 16 USCA § 1851 NOTE >>

(f) SEVERABILITY.—If any provision of this title, an amendment made by this title, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this title, the amendments made by this title, and the application of the provisions of such to any person or circumstance shall not be affected thereby.

<< 16 USCA § 1851 NOTE >>

(g) INTERNATIONAL AGREEMENTS.—In the event that any provision of section 12102(c) or section 31322(a) of title 46, United States Code, as amended by this Act, is determined to be inconsistent with an existing international agreement relating to foreign investment to which the United States is a party with respect to the owner or mortgagee on October 1, 2001 of a vessel with a fishery endorsement, such provision shall not apply to that owner or mortgagee with respect to such vessel to the extent of any such inconsistency. The provisions of section 12102(c) and section 31322(a) of title 46, United States Code, as amended by this Act, shall apply to all subsequent owners and mortgagees of such vessel, and shall apply, notwithstanding the preceding sentence, to the owner on October 1, 2001 of such vessel if any ownership interest in that owner is transferred to or otherwise acquired by a foreign individual or entity after such date.

TITLE III—DENALI COMMISSION

<< 42 USCA § 3121 NOTE >>

SEC. 301. SHORT TITLE.

This title may be cited as the "Denali Commission Act of 1998".

<< 42 USCA § 3121 NOTE >>

SEC. 302. PURPOSES.

 The purposes of this title are as follows:

<< 42 USCA § 3121 NOTE >>

  (1) To deliver the services of the Federal Government in the most cost-effective manner practicable by reducing administrative and overhead costs.

<< 42 USCA § 3121 NOTE >>

  (2) To provide job training and other economic development services in rural communities particularly distressed communities (many of which have a rate of unemployment that exceeds 50 percent).

<< 42 USCA § 3121 NOTE >>

  (3) To promote rural development, provide power generation and transmission facilities, modern communication systems, water and sewer systems and other infrastructure needs.

<< 42 USCA § 3121 NOTE >>

SEC. 303. ESTABLISHMENT OF COMMISSION.

<< 42 USCA § 3121 NOTE >>

 (a) ESTABLISHMENT.—There is established a commission to be known as the Denali Commission (referred to in this title as the "Commission").

<< 42 USCA § 3121 NOTE >>

 (b) MEMBERSHIP.—

<< 42 USCA § 3121 NOTE >>

 (1) COMPOSITION.—The Commission shall be composed of 7 members, who shall be appointed by the Secretary of Commerce (referred to in this title as the "Secretary"), of whom—
  (A) one shall be the Governor of the State of Alaska, or an individual selected from nominations submitted by the Governor, who shall serve as the State Cochairperson;
  (B) one shall be the President of the University of Alaska, or an individual selected from nominations submitted by the President of the University of Alaska;
  (C) one shall be the President of the Alaska Municipal League or an individual selected from nominations submitted by the President of the Alaska Municipal League;
  (D) one shall be the President of the Alaska Federation or Natives or an individual selected from nominations submitted by the President of the Alaska Federation or Natives;
  (E) one shall be the Executive President of the Alaska State AFL–CIO or an individual selected from nominations submitted by the Executive President;
  (F) one shall be the President of the Associated General Contractors of Alaska or an individual selected from nominations submitted by the President of the Associated General Contractors of Alaska; and
  (G) one shall be the Federal Cochairperson, who shall be selected in accordance with the requirements of paragraph (2).

<< 42 USCA § 3121 NOTE >>

(2) FEDERAL COCHAIRPERSON.—

 (A) IN GENERAL.—The President pro temporare of the Senate and the Speaker of the House of Representatives shall each submit a list of nominations for the position of the Federal Cochairperson under paragraph (1)(G), including pertinent biographical information, to the Secretary.

 (B) APPOINTMENT.—The Secretary shall appoint the Federal Cochairperson from among the list of nominations submitted under subparagraph (A). The Federal Cochairperson shall serve as an employee of the Department of Commerce, and may be removed by the Secretary for cause.

 (C) FEDERAL COCHAIRPERSON VOTE.—The Federal Cochairperson appointed under this paragraph shall break any tie in the voting of the Commission.

<< 42 USCA § 3121 NOTE >>

 (4) DATE.—The appointments of the members of the Commission shall be made no later than January 1, 1999.

<< 42 USCA § 3121 NOTE >>

 (c) PERIOD OF APPOINTMENT; VACANCIES.—Members shall be appointed for the life of the Commission. Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner as the original appointment.

<< 42 USCA § 3121 NOTE >>

 (d) MEETINGS.—

<< 42 USCA § 3121 NOTE >>

 (1) IN GENERAL.—The Commission shall meet at the call of the Federal Cochairperson not less frequently than 2 times each year, and may, as appropriate, conduct business by telephone or other electronic means.

<< 42 USCA § 3121 NOTE >>

 (2) NOTIFICATION.—Not later than 2 weeks before calling a meeting under this subsection, the Federal Cochairperson shall—

 (A) notify each member of the Commission of the time, date and location of that meeting; and

 (B) provide each member of the Commission with a written agenda for the meeting, including any proposals for discussion and consideration, and any appropriate background materials.

<< 42 USCA § 3121 NOTE >>

 (e) QUORUM.—A majority of the members of the Commission shall constitute a quorum, but a lesser number of members may hold hearings.

<< 42 USCA § 3121 NOTE >>

SEC. 304. DUTIES OF THE COMMISSION.

<< 42 USCA § 3121 NOTE >>

 (a) WORK PLAN.—

<< 42 USCA § 3121 NOTE >>

(1) IN GENERAL.—Not later than 1 year after the date of enactment of this Act and annually thereafter, the Commission shall develop a proposed work plan for Alaska that meets the requirements of paragraph (2) and submit that plan to the Federal Cochairperson for review in accordance with the requirements of subsection (b).

<< 42 USCA § 3121 NOTE >>

(2) WORK PLAN.—In developing the work plan, the Commission shall—
 (A) solicit project proposals from local governments and other entities and organizations; and
 (B) provide for a comprehensive work plan for rural and infrastructure development and necessary job training in the area covered under the work plan.

<< 42 USCA § 3121 NOTE >>

(3) REPORT.—Upon completion of a work plan under this subsection, the Commission shall prepare, and submit to the Secretary, the Federal Cochairperson, and the Director of the Office of Management and Budget, a report that outlines the work plan and contains recommendations for funding priorities.

<< 42 USCA § 3121 NOTE >>

(b) REVIEW BY FEDERAL COCHAIRPERSON.—

<< 42 USCA § 3121 NOTE >>

(1) IN GENERAL.—Upon receiving a work plan under this section, the Secretary, acting through the Federal Cochairperson, shall publish the work plan in the Federal Register, with notice and an opportunity for public comment. The period for public review and comment shall be the 30–day period beginning on the date of publication of that notice.

<< 42 USCA § 3121 NOTE >>

(2) CRITERIA FOR REVIEW.—In conducting a review under paragraph (1), the Secretary, acting through the Federal Cochairperson, shall—
 (A) take into consideration the information, views, and comments received from interested parties through the public review and comment process specified in paragraph (1); and
 (B) consult with appropriate Federal officials in Alaska including but not limited to Bureau of Indian Affairs, Economic Development Administration, and Rural Development Administration.

<< 42 USCA § 3121 NOTE >>

(3) APPROVAL.—Not later than 30 days after the end of the period specified in paragraph (1), the Secretary acting through the Federal Cochairperson, shall—
 (A) approve, disapprove, or partially approve the work plan that is the subject of the review; and
 (B) issue to the Commission a notice of the approval, disapproval, or partial approval that—
 (i) specifies the reasons for disapproving any portion of the work plan; and
 (ii) if applicable, includes recommendations for revisions to the work plan to make the plan subject to approval.

<< 42 USCA § 3121 NOTE >>

(4) REVIEW OF DISAPPROVAL OR PARTIAL APPROVAL.—If the Secretary, acting through the Federal Cochairperson, disapproves or partially approves a work plan, the Federal Cochairperson shall submit that work plan to the Commission for review and revision.

<< 42 USCA § 3121 NOTE >>

## SEC. 305. POWERS OF THE COMMISSION.

<< 42 USCA § 3121 NOTE >>

(a) INFORMATION FROM FEDERAL AGENCIES.—The Commission may secure directly from any Federal department or agency such information as it considers necessary to carry out the provisions of this Act. Upon request of the Federal Cochairperson of the Commission, the head of such department or agency shall furnish such information to the Commission. Agencies must provide the Commission with the requested information in a timely manner. Agencies are not required to provide the Commission any information that is exempt from disclosure by the Freedom of Information Act. Agenices may, upon request by the Commission, make services and personnel available to the Commission to carry out the duties of the Commission. To the maximum extent practicable, the Commission shall contract for completion of necesssary work utilizing local firms and labor to minimize costs.

<< 42 USCA § 3121 NOTE >>

(b) POSTAL SERVICES.—The Commission may use the United States mails in the same manner and under the same conditions as other departments and agencies of the Federal Government.

<< 42 USCA § 3121 NOTE >>

(c) GIFTS.—The Commission may accept, use, and dispose of gifts or donations of services or property.

<< 42 USCA § 3121 NOTE >>

## SEC. 306. COMMISSION PERSONNEL MATTERS.

<< 42 USCA § 3121 NOTE >>

(a) COMPENSATION OF MEMBERS.—Each member of the Commission who is not an officer or employee of the Federal Government shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during the time such member is engaged in the performance of the duties of the Commission. All members of the Commission who are officers or employees of the United States shall serve without compensation that is in addition to that received for their services as officers or employees of the United States.

<< 42 USCA § 3121 NOTE >>

(b) TRAVEL EXPENSES.—The members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Commission.

<< 42 USCA § 3121 NOTE >>

(c) STAFF.—

<< 42 USCA § 3121 NOTE >>

(1) IN GENERAL.—The Federal Cochairperson of the Commission may, without regard to the civil service laws and regulations, appoint such personnel as may be necessary to enable the Commission to perform its duties.

<< 42 USCA § 3121 NOTE >>

(2) COMPENSATION.—The Chairman of the Commission may fix the compensation of personnel without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification of positions and General Schedule pay rates.

<< 42 USCA § 3121 NOTE >>

(d) DETAIL OF GOVERNMENT EMPLOYEES.—Any Federal Government employee may be detailed to the Commission without reimbursement, and such detail shall be without interruption or loss of civil service status or privilege.

<< 42 USCA § 3121 NOTE >>

(e) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—The Federal Cochairperson of the Commission may procure temporary and intermittent services under section 3109(b) of title 5, United States Code, at rates for individuals which do not exceed the daily equivalent of the annual rate of basic pay prescribed for level V of the Executive Schedule under section 5316 of such title.

<< 42 USCA § 3121 NOTE >>

(f) OFFICES.—The principal office of the Commission shall be located in Alaska, at a location that the Commission shall select.

<< 42 USCA § 3121 NOTE >>

SEC. 307. SPECIAL FUNCTIONS.

<< 42 USCA § 3121 NOTE >>

(a) RURAL UTILITIES.—In carrying out its functions under this title, the Commission shall as appropriate, provide assistance, seek to avoid duplicating services and assistance, and complement the water and sewer wastewater programs under section 306D of the Consolidated Farm and Rural Development Act (7 U.S.C. 1926d) and section 303 of the Safe Drinking Water Act Amendments of 1996 (33 U.S.C. 1263a).

<< 42 USCA § 3121 NOTE >>

(b) BULK FUELS.—The Commission, in consultation with the Commandant of the Coast Guard, shall develop a plan to provide for the repair or replacement of bulk fuel storage tanks in Alaska that are not in compliance with applicable—

<< 42 USCA § 3121 NOTE >>

(1) Federal law, including the Oil Pollution Act of 1990 (104 Stat. 484); or

<< 42 USCA § 3121 NOTE >>

(2) State law.

<< 42 USCA § 3121 NOTE >>

SEC. 308. EXEMPTION FROM FEDERAL ADVISORY COMMITTEE ACT.

The Federal Advisory Committee Act shall not apply to the Commission.

<< 42 USCA § 3121 NOTE >>

SEC. 309. AUTHORIZATION OF APPROPRIATIONS.

<< 42 USCA § 3121 NOTE >>

 (a) IN GENERAL.—There are authorized to be appropriated to the Commission to carry out the duties of the Commission consistent with the purposes of this title and pursuant to the work plan approved under section 4 under this Act, $20,000,000 for fiscal year 1999, and such sums as may be necessary for fiscal years 2000, 2001, 2002, and 2003

<< 42 USCA § 3121 NOTE >>

 (b) AVAILABILITY.—Any sums appropriated under the authorization contained in this section shall remain available until expended.

TITLE IV—AMERICAN COMPETITIVENESS AND WORKFORCE IMPROVEMENT ACT

SEC. 401. SHORT TITLE; TABLE OF CONTENTS; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.

<< 8 USCA § 1101 NOTE >>

 (a) SHORT TITLE.—This title may be cited as the "American Competitiveness and Workforce Improvement Act of 1998".
 (b) TABLE OF CONTENTS.—The table of contents of this title is as follows:

Sec. 401. Short title; table of contents; amendments to Immigration and Nationality Act.

Subtitle A—Provisions Relating to H–1B Nonimmigrants

Sec. 411. Temporary increase in access to temporary skilled personnel under H–1B program.

Sec. 412. Protection against displacement of United States workers in case of H–1B dependent employers.

Sec. 413. Changes in enforcement and penalties.

Sec. 414. Collection and use of H–1B nonimmigrant fees for scholarships for low-income math, engineering, and computer science students and job training of United States workers.

Sec. 415. Computation of prevailing wage level.

Sec. 416. Improving count of H–1B and H–2B nonimmigrants.

Sec. 417. Report on older workers in the information technology field.

Sec. 418. Report on high technology labor market needs; reports on economic impact of increase in H–1B nonimmigrants.

Subtitle B—Special Immigrant Status for Certain NATO Civilian Employees

Sec. 421. Special immigrant status for certain NATO civilian employees.

Subtitle C—Miscellaneous Provision

Sec. 431. Academic honoraria.
 (c) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided in this title, whenever in this title an amendment is expressed in terms of an amendment to a section or other provision, the reference shall be considered to be made to that section or other provision of the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

SUBTITLE A—PROVISIONS RELATING TO H–1B NONIMMIGRANTS

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 411. TEMPORARY INCREASE IN ACCESS TO TEMPORARY SKILLED PERSONNEL UNDER H–1B PROGRAM.

<< 8 USCA § 1184 >>

(a) TEMPORARY INCREASE IN SKILLED NONIMMIGRANT WORKERS.—Paragraph (1)(A) of section 214(g) (8 U.S.C. 1184(g)) is amended to read as follows:

"(A) under section 101(a)(15)(H)(i)(b), may not exceed—

"(i) 65,000 in each fiscal year before fiscal year 1999;

"(ii) 115,000 in fiscal year 1999;

"(iii) 115,000 in fiscal year 2000;

"(iv) 107,500 in fiscal year 2001; and

"(v) 65,000 in each succeeding fiscal year; or".

<< 8 USCA § 1184 NOTE >>

(b) EFFECTIVE DATES.—The amendment made by subsection (a) applies beginning with fiscal year 1999.

SEC. 412. PROTECTION AGAINST DISPLACEMENT OF UNITED STATES WORKERS IN CASE OF H–1B–DEPENDENT EMPLOYERS.

<< 8 USCA § 1182 >>

(a) PROTECTION AGAINST LAYOFF AND REQUIREMENT FOR PRIOR RECRUITMENT OF UNITED STATES WORKERS.—

<< 8 USCA § 1182 >>

(1) ADDITIONAL STATEMENTS ON APPLICATION.—Section 212(n)(1) (8 U.S.C. 1182(n)(1)) is amended by inserting after subparagraph (D) the following:

"(E)(i) In the case of an application described in clause (ii), the employer did not displace and will not displace a United States worker (as defined in paragraph (4)) employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application.

"(ii) An application described in this clause is an application filed on or after the date final regulations are first promulgated to carry out this subparagraph, and before October 1, 2001, by an H–1B–dependent employer (as defined in paragraph (3)) or by an employer that has been found, on or after the date of the enactment of the American Competitiveness and Workforce Improvement Act of 1998, under paragraph (2)(C) or (5) to have committed a willful failure or misrepresentation during the 5–year period preceding the filing of the application. An application is not described in this clause if the only H–1B nonimmigrants sought in the application are exempt H–1B nonimmigrants.

"(F) In the case of an application described in subparagraph (E)(ii), the employer will not place the nonimmigrant with another employer (regardless of whether or not such other employer is an H–1B–dependent employer) where—

"(i) the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and

"(ii) there are indicia of an employment relationship between the nonimmigrant and such other employer;

unless the employer has inquired of the other employer as to whether, and has no knowledge that, within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, the other employer has displaced or intends to displace a United States worker employed by the other employer.

"(G)(i) In the case of an application described in subparagraph (E)(ii), subject to clause (ii), the employer, prior to filing the application—

AR.02851

"(I) has taken good faith steps to recruit, in the United States using procedures that meet industry wide standards and offering compensation that is at least as great as that required to be offered to H–1B nonimmigrants under subparagraph (A), United States workers for the job for which the nonimmigrant or nonimmigrants is or are sought; and

"(II) has offered the job to any United States worker who applies and is equally or better qualified for the job for which the nonimmigrant or nonimmigrants is or are sought.

"(ii) The conditions described in clause (i) shall not apply to an application filed with respect to the employment of an H–1B nonimmigrant who is described in subparagraph (A), (B), or (C) of section 203(b)(1).".

<< 8 USCA § 1182 >>

(2) NOTICE ON APPLICATION OF POTENTIAL LIABILITY OF PLACING EMPLOYERS.—Section 212(n)(1) (8 U.S.C. 1182(n)(1)) is amended by adding at the end the following: "The application form shall include a clear statement explaining the liability under subparagraph (F) of a placing employer if the other employer described in such subparagraph displaces a United States worker as described in such subparagraph.".

<< 8 USCA § 1182 >>

(3) CONSTRUCTION.—Section 212(n)(1) (8 U.S.C. 1182(n)(1)) is further amended by adding at the end the following: "Nothing in subparagraph (G) shall be construed to prohibit an employer from using legitimate selection criteria relevant to the job that are normal or customary to the type of job involved, so long as such criteria are not applied in a discriminatory manner.".

<< 8 USCA § 1182 >>

(b) H–1B–DEPENDENT EMPLOYER AND OTHER DEFINITIONS.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(n) (8 U.S.C. 1182(n)) is amended by adding at the end the following:

"(3)(A) For purposes of this subsection, the term 'H–1B–dependent employer' means an employer that—

"(i)(I) has 25 or fewer full-time equivalent employees who are employed in the United States; and (II) employs more than 7 H–1B nonimmigrants;

"(ii)(I) has at least 26 but not more than 50 full-time equivalent employees who are employed in the United States; and (II) employs more than 12 H–1B nonimmigrants; or

"(iii)(I) has at least 51 full-time equivalent employees who are employed in the United States; and (II) employs H–1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

"(B) For purposes of this subsection—

"(i) the term 'exempt H–1B nonimmigrant' means an H–1B nonimmigrant who—

"(I) receives wages (including cash bonuses and similar compensation) at an annual rate equal to at least $60,000; or

"(II) has attained a master's or higher degree (or its equivalent) in a specialty related to the intended employment; and

"(ii) the term 'nonexempt H–1B nonimmigrant' means an H–1B nonimmigrant who is not an exempt H–1B nonimmigrant.

"(C) For purposes of subparagraph (A)—

"(i) in computing the number of full-time equivalent employees and the number of H–1B nonimmigrants, exempt H–1B nonimmigrants shall not be taken into account during the longer of—

"(I) the 6–month period beginning on the date of the enactment of the American Competitiveness and Workforce Improvement Act of 1998; or

"(II) the period beginning on the date of the enactment of the American Competitiveness and Workforce Improvement Act of 1998 and ending on the date final regulations are issued to carry out this paragraph; and

"(ii) any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 shall be treated as a single employer.

"(4) For purposes of this subsection:

"(A) The term 'area of employment' means the area within normal commuting distance of the worksite or physical location where the work of the H–1B nonimmigrant is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

"(B) In the case of an application with respect to one or more H–1B nonimmigrants by an employer, the employer is considered to 'displace' a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

"(C) The term 'H–1B nonimmigrant' means an alien admitted or provided status as a nonimmigrant described in section 101(a)(15)(H)(i)(b).

"(D)(i) The term 'lays off', with respect to a worker—

"(I) means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract (other than a temporary employment contract entered into in order to evade a condition described in subparagraph (E) or (F) of paragraph (1)); but

"(II) does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer (or, in the case of a placement of a worker with another employer under paragraph (1)(F), with either employer described in such paragraph) at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

"(ii) Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

"(E) The term 'United States worker' means an employee who—

"(i) is a citizen or national of the United States; or

"(ii) is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 207, is granted asylum under section 208, or is an immigrant otherwise authorized, by this Act or by the Attorney General, to be employed.".

(2) CONFORMING AMENDMENTS.—Section 212(n)(1) (8 U.S.C. 1182(n)(1)) is amended by striking "a nonimmigrant described in section 101(a)(15)(H)(i)(b)" each place it appears and inserting "an H–1B nonimmigrant".

<< 8 USCA § 1182 >>

(c) IMPROVED POSTING OF NOTICE OF APPLICATION.—Section 212(n)(1)(C)(ii) (8 U.S.C. 1182(n)(1)(C)(ii)) is amended to read as follows:

"(ii) if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which H–1B nonimmigrants are sought.".

<< 8 USCA § 1182 NOTE >>

(d) EFFECTIVE DATES.—The amendments made by subsection (a) apply to applications filed under section 212(n)(1) of the Immigration and Nationality Act on or after the date final regulations are issued to carry out such amendments, and the amendments made by subsections (b) and (c) take effect on the date of the enactment of this Act.

<< 8 USCA § 1182 NOTE >>

(e) REDUCTION OF PERIOD FOR PUBLIC COMMENT.—In first promulgating regulations to implement the amendments made by this section in a timely manner, the Secretary of Labor and the Attorney General may reduce to not less than 30 days the period of public comment on proposed regulations.

SEC. 413. CHANGES IN ENFORCEMENT AND PENALTIES.

<< 8 USCA § 1182 >>

(a) INCREASED ENFORCEMENT AND PENALTIES.—Section 212(n)(2)(C) (8 U.S.C. 1182(n)(2)(C)) is amended to read as follows:

"(C)(i) If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), (1) (E), or (1)(F), a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application—

"(I) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and

"(II) the Attorney General shall not approve petitions filed with respect to that employer under section 204 or 214(c) during a period of at least 1 year for aliens to be employed by the employer.

"(ii) If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an application, or a violation of clause (iv)—

"(I) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary determines to be appropriate; and

"(II) the Attorney General shall not approve petitions filed with respect to that employer under section 204 or 214(c) during a period of at least 2 years for aliens to be employed by the employer.

"(iii) If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an application, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application—

"(I) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary determines to be appropriate; and

"(II) the Attorney General shall not approve petitions filed with respect to that employer under section 204 or 214(c) during a period of at least 3 years for aliens to be employed by the employer.

"(iv) It is a violation of this clause for an employer who has filed an application under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

"(v) The Secretary of Labor and the Attorney General shall devise a process under which an H–1B nonimmigrant who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

"(vi)(I) It is a violation of this clause for an employer who has filed an application under this subsection to require an H–1B nonimmigrant to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

"(II) It is a violation of this clause for an employer who has filed an application under this subsection to require an alien who is the subject of a petition filed under section 214(c)(1), for which a fee is imposed under section 214(c)(9), to reimburse, or otherwise compensate, the employer for part or all of the cost of such fee. It is a violation of this clause for such an employer otherwise to accept such reimbursement or compensation from such an alien.

"(III) If the Secretary finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

"(vii)(I) It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H–1B nonimmigrant designated as a full-time employee on the petition filed under section 214(c)(1) by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

"(II) It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H–1B nonimmigrant designated as a part-time employee on the petition filed under section 214(c)(1) by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on such petition consistent with the rate of pay identified on such petition.

"(III) In the case of an H–1B nonimmigrant who has not yet entered into employment with an employer who has had approved an application under this subsection, and a petition under section 214(c)(1), with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States pursuant to the petition, or 60 days after the date the nonimmigrant becomes eligible to work for the employer (in the case of a nonimmigrant who is present in the United States on the date of the approval of the petition).

"(IV) This clause does not apply to a failure to pay wages to an H–1B nonimmigrant for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

"(V) This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to an H–1B nonimmigrant an established salary practice of the employer, under which the employer pays to H–1B nonimmigrants and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if—

"(aa) the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

"(bb) the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this Act to remain in the United States.

"(VI) This clause shall not be construed as superseding clause (viii).

"(viii) It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an application under this subsection to fail to offer to an H–1B nonimmigrant, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and non-cash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.".

<< 8 USCA § 1182 >>

(b) USE OF ARBITRATION PROCESS FOR DISPUTES INVOLVING QUALIFICATIONS OF UNITED STATES WORKERS NOT HIRED.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(n) (8 U.S.C. 1182(n)), as amended by section 412(b), is further amended by adding at the end the following:

"(5)(A) This paragraph shall apply instead of subparagraphs (A) through (E) of paragraph (2) in the case of a violation described in subparagraph (B), but shall not be construed to limit or affect the authority of the Secretary or the Attorney General with respect to any other violation.

"(B) The Attorney General shall establish a process for the receipt, initial review, and disposition in accordance with this paragraph of complaints respecting an employer's failure to meet the condition of paragraph (1)(G)(i)(II) or a petitioner's misrepresentation of material facts with respect to such condition. Complaints may be filed by an aggrieved individual who has submitted a resume or otherwise applied in a reasonable manner for the job that is the subject of the condition. No proceeding

shall be conducted under this paragraph on a complaint concerning such a failure or misrepresentation unless the Attorney General determines that the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.

"(C) If the Attorney General finds that a complaint has been filed in accordance with subparagraph (B) and there is reasonable cause to believe that such a failure or misrepresentation described in such complaint has occurred, the Attorney General shall initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of such Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings. The Attorney General shall pay the fee and expenses of the arbitrator.

"(D)(i) The arbitrator shall make findings respecting whether a failure or misrepresentation described in subparagraph (B) occurred. If the arbitrator concludes that failure or misrepresentation was willful, the arbitrator shall make a finding to that effect. The arbitrator may not find such a failure or misrepresentation (or that such a failure or misrepresentation was willful) unless the complainant demonstrates such a failure or misrepresentation (or its willful character) by clear and convincing evidence. The arbitrator shall transmit the findings in the form of a written opinion to the parties to the arbitration and the Attorney General. Such findings shall be final and conclusive, and, except as provided in this subparagraph, no official or court of the United States shall have power or jurisdiction to review any such findings.

"(ii) The Attorney General may review and reverse or modify the findings of an arbitrator only on the same bases as an award of an arbitrator may be vacated or modified under section 10 or 11 of title 9, United States Code.

"(iii) With respect to the findings of an arbitrator, a court may review only the actions of the Attorney General under clause (ii) and may set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of title 5, United States Code. Notwithstanding any other provision of law, such judicial review may only be brought in an appropriate United States court of appeals.

"(E) If the Attorney General receives a finding of an arbitrator under this paragraph that an employer has failed to meet the condition of paragraph (1)(G)(i)(II) or has misrepresented a material fact with respect to such condition, unless the Attorney General reverses or modifies the finding under subparagraph (D)(ii)—

"(i) the Attorney General may impose administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation or $5,000 per violation in the case of a willful failure or misrepresentation) as the Attorney General determines to be appropriate; and

"(ii) the Attorney General is authorized to not approve petitions filed, with respect to that employer and for aliens to be employed by the employer, under section 204 or 214(c)—

"(I) during a period of not more than 1 year; or

"(II) in the case of a willful failure or willful misrepresentation, during a period of not more than 2 years.

"(F) The Attorney General shall not delegate, to any other employee or official of the Department of Justice, any function of the Attorney General under this paragraph, until 60 days after the Attorney General has submitted a plan for such delegation to the Committees on the Judiciary of the United States House of Representatives and the Senate.".

<< 8 USCA § 1182 >>

(2) CONFORMING AMENDMENT.—The first sentence of section 212(n)(2)(A) (8 U.S.C. 1182(n)(2)(A)) is amended by striking "The Secretary" and inserting "Subject to paragraph (5)(A), the Secretary".

<< 8 USCA § 1182 >>

(c) LIABILITY OF PETITIONING EMPLOYER IN CASE OF PLACEMENT OF H–1B NONIMMIGRANT WITH ANOTHER EMPLOYER.—Section 212(n)(2) (8 U.S.C. 1182(n)(2)) is amended by adding at the end the following:

"(E) If an H–1B–dependent employer places a nonexempt H–1B nonimmigrant with another employer as provided under paragraph (1)(F) and the other employer has displaced or displaces a United States worker employed by such other employer during the period described in such paragraph, such displacement shall be considered for purposes of this paragraph a failure, by the placing employer, to meet a condition specified in an application submitted under paragraph (1); except that the Attorney

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

General may impose a sanction described in subclause (II) of subparagraph (C)(i), (C)(ii), or (C)(iii) only if the Secretary of Labor found that such placing employer—

   "(i) knew or had reason to know of such displacement at the time of the placement of the nonimmigrant with the other employer; or

   "(ii) has been subject to a sanction under this subparagraph based upon a previous placement of an H–1B nonimmigrant with the same other employer.".

<< 8 USCA § 1182 >>

   (d) SPOT INVESTIGATIONS DURING PROBATIONARY PERIOD.—Section 212(n)(2) (8 U.S.C. 1182(n)(2)), as amended by subsection (c), is further amended by adding at the end the following:

   "(F) The Secretary may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date (on or after the date of the enactment of the American Competitiveness and Workforce Improvement Act of 1998) on which the employer is found by the Secretary to have committed a willful failure to meet a condition of paragraph (1) (or has been found under paragraph (5) to have committed a willful failure to meet the condition of paragraph (1)(G)(i) (II)) or to have made a willful misrepresentation of material fact in an application. The preceding sentence shall apply to an employer regardless of whether or not the employer is an H–1B–dependent employer. The authority of the Secretary under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).".

   (e) ADDITIONAL INVESTIGATIVE AUTHORITY.—

<< 8 USCA § 1182 >>

   (1) IN GENERAL.—Section 212(n)(2) (8 U.S.C. 1182(n)(2)), as amended by subsection (d), is further amended by adding at the end the following:

   "(G)(i) If the Secretary receives specific credible information from a source, who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's labor condition application under paragraph (1), and whose identity is known to the Secretary, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary may conduct a 30–day investigation into the alleged failure or failures. The Secretary (or the Acting Secretary in the case of the Secretary's absence or disability) shall personally certify that the requirements for conducting such an investigation have been met and shall approve commencement of the investigation. The Secretary may withhold the identity of the source from the employer, and the source's identity shall not be subject to disclosure under section 552 of title 5, United States Code.

   "(ii) The Secretary shall establish a procedure for any person, desiring to provide to the Secretary information described in clause (i) that may be used, in whole or in part, as the basis for commencement of an investigation described in such clause, to provide the information in writing on a form developed and provided by the Secretary and completed by or on behalf of the person. The person may not be an officer or employee of the Department of Labor, unless the information satisfies the requirement of clause (iii)(II) (although an officer or employee of the Department of Labor may complete the form on behalf of the person).

   "(iii) Any investigation initiated or approved by the Secretary under clause (i) shall be based on information that satisfies the requirements of such clause and that (I) originates from a source other than an officer or employee of the Department of Labor, or (II) was lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation under this Act or any other Act.

   "(iv) The receipt by the Secretary of information submitted by an employer to the Attorney General or the Secretary for purposes of securing the employment of an H–1B nonimmigrant shall not be considered a receipt of information for purposes of clause (i).

   "(v) No investigation described in clause (i) (or hearing described in clause (vii)) may be conducted with respect to information about a failure to meet a condition described in clause (i), unless the Secretary receives the information not later than 12 months after the date of the alleged failure.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(vi) The Secretary shall provide notice to an employer with respect to whom the Secretary has received information described in clause (i), prior to the commencement of an investigation under such clause, of the receipt of the information and of the potential for an investigation. The notice shall be provided in such a manner, and shall contain sufficient detail, to permit the employer to respond to the allegations before an investigation is commenced. The Secretary is not required to comply with this clause if the Secretary determines that to do so would interfere with an effort by the Secretary to secure compliance by the employer with the requirements of this subsection. There shall be no judicial review of a determination by the Secretary under this clause.

"(vii) If the Secretary determines under this subparagraph that a reasonable basis exists to make a finding that a failure described in clause (i) has occurred, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing, in accordance with section 556 of title 5, United States Code, within 60 days after the date of the determination. If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing.".

<< 8 USCA § 1182 NOTE >>

(2) SUNSET.—The amendment made by paragraph (1) shall cease to be effective on September 30, 2001.

<< 8 USCA § 1182 >>

(f) CONSTRUCTION.—Section 212(n)(2) (8 U.S.C. 1182(n)(2)), as amended by subsection (e), is further amended by adding at the end the following:

"(H) Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this Act (such as the authorities under section 274B), or any other Act.".

SEC. 414. COLLECTION AND USE OF H–1B NONIMMIGRANT FEES FOR SCHOLARSHIPS FOR LOW–INCOME MATH, ENGINEERING, AND COMPUTER SCIENCE STUDENTS AND JOB TRAINING OF UNITED STATES WORKERS.

<< 8 USCA § 1184 >>

(a) IMPOSITION OF FEE.—Section 214(c) (8 U.S.C. 1184(c)) is amended by adding at the end the following:

"(9)(A) The Attorney General shall impose a fee on an employer (excluding an employer described in subparagraph (A) or (B) of section 212(p)(1)) filing (on or after December 1, 1998, and before October 1, 2001) a petition under paragraph (1)—

"(i) initially to grant an alien nonimmigrant status described in section 101(a)(15)(H)(i)(b);

"(ii) to extend the stay of an alien having such status (unless the employer previously has obtained an extension for such alien); or

"(iii) to obtain authorization for an alien having such status to change employers.

"(B) The amount of the fee shall be $500 for each such petition.

"(C) Fees collected under this paragraph shall be deposited in the Treasury in accordance with section 286(s).".

<< 8 USCA § 1356 >>

(b) ESTABLISHMENT OF ACCOUNT; USE OF FEES.—Section 286 (8 U.S.C. 1356) is amended by adding at the end the following:

"(s) H–1B NONIMMIGRANT PETITIONER ACCOUNT.—

"(1) IN GENERAL.—There is established in the general fund of the Treasury a separate account, which shall be known as the 'H–1B Nonimmigrant Petitioner Account'. Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the account all fees collected under section 214(c)(9).

"(2) USE OF FEES FOR JOB TRAINING.—56.3 percent of amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Secretary of Labor until expended for demonstration programs and projects described in section 414(c) of the American Competitiveness and Workforce Improvement Act of 1998.

"(3) USE OF FEES FOR LOW–INCOME SCHOLARSHIP PROGRAM.—28.2 percent of the amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Director of the National Science Foundation until expended for scholarships described in section 414(d) of the American Competitiveness and Workforce Improvement Act of 1998 for low-income students enrolled in a program of study leading to a degree in mathematics, engineering, or computer science.

"(4) ADDITIONAL NSF USES.—

"(A) GRANTS FOR MATHEMATICS, ENGINEERING, OR SCIENCE ENRICHMENT COURSES.—4 percent of the amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Director of the National Science Foundation until expended to make merit-reviewed grants, under section 3(a)(1) of the National Science Foundation Act of 1950 (42 U.S.C. 1862(a)(1)), for programs that provide opportunities for enrollment in year-round academic enrichment courses in mathematics, engineering, or science.

"(B) SYSTEMIC REFORM ACTIVITIES.—4 percent of the amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Director of the National Science Foundation until expended to carry out systemic reform activities administered by the National Science Foundation under section 3(a)(1) of the National Science Foundation Act of 1950 (42 U.S.C. 1862(a)(1)).

"(5) USE OF FEES FOR DUTIES RELATING TO PETITIONS.—1.5 percent of the amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Attorney General until expended to carry out duties under paragraphs (1) and (9) of section 214(c) related to petitions made for nonimmigrants described in section 101(a)(15)(H)(i)(b), to decrease the processing time for such petitions, and to carry out duties under section 416 of the American Competitiveness and Workforce Improvement Act of 1998. Such amounts shall be available in addition to any other fees authorized to be collected by the Attorney General with respect to such petitions.

"(6) USE OF FEES FOR APPLICATION PROCESSING AND ENFORCEMENT.—For fiscal year 1999, 6 percent of the amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Secretary of Labor until expended for decreasing the processing time for applications under section 212(n)(1) and for carrying out section 212(n)(2). Beginning with fiscal year 2000, 3 percent of the amounts deposited into the H–1B Nonimmigrant Petitioner Account shall remain available to the Secretary of Labor until expended for decreasing the processing time for applications under section 212(n)(1), and 3 percent of such amounts shall remain available to such Secretary until expended for carrying out section 212(n)(2). Notwithstanding the preceding sentence, both of the amounts made available for any fiscal year (beginning with fiscal year 2000) pursuant to the preceding sentence shall be available to such Secretary, and shall remain available until expended, only for decreasing the processing time for applications under section 212(n)(1) until the Secretary submits to the Congress a report containing a certification that, during the most recently concluded calendar year, the Secretary substantially complied with the requirement in section 212(n)(1) relating to the provision of the certification described in section 101(a)(15)(H)(i)(b) within a 7–day period.".

<< 29 USCA § 2916 NOTE >>

(c) DEMONSTRATION PROGRAMS AND PROJECTS TO PROVIDE TECHNICAL SKILLS TRAINING FOR WORKERS.—

<< 29 USCA § 2916 NOTE >>

(1) IN GENERAL.—In establishing demonstration programs under section 452(c) of the Job Training Partnership Act (29 U.S.C. 1732(c)), as in effect on the date of the enactment of this Act, or demonstration programs or projects under section 171(b) of the Workforce Investment Act of 1998, the Secretary of Labor shall use funds available under section 286(s)(2) to establish demonstration programs or projects to provide technical skills training for workers, including both employed and unemployed workers.

<< 29 USCA § 2916 NOTE >>

(2) GRANTS.—The Secretary of Labor shall award grants to carry out the programs and projects described in paragraph (1) to—

(A)(i) private industry councils established under section 102 of the Job Training Partnership Act (29 U.S.C. 1512), as in effect on the date of the enactment of this Act; or

(ii) local boards that will carry out such programs or projects through one-stop delivery systems established under section 121 of the Workforce Investment Act of 1998; or

(B) regional consortia of councils or local boards described in subparagraph (A).

<< 29 USCA § 2916 NOTE >>

(d) LOW–INCOME SCHOLARSHIP PROGRAM.—

<< 42 USCA § 1869c >>

(1) ESTABLISHMENT.—The Director of the National Science Foundation (referred to in this subsection as the "Director") shall award scholarships to low-income individuals to enable such individuals to pursue associate, undergraduate, or graduate level degrees in mathematics, engineering, or computer science.

<< 42 USCA § 1869c >>

(2) ELIGIBILITY.—

(A) IN GENERAL.—To be eligible to receive a scholarship under this subsection, an individual—

(i) must be a citizen of the United States, a national of the United States (as defined in section 101(a) of the Immigration and Nationality Act), an alien admitted as a refugee under section 207 of the Immigration and Nationality, or an alien lawfully admitted to the United States for permanent residence;

(ii) shall prepare and submit to the Director an application at such time, in such manner, and containing such information as the Director may require; and

(iii) shall certify to the Director that the individual intends to use amounts received under the scholarship to enroll or continue enrollment at an institution of higher education (as defined in section 101(a) of the Higher Education Act of 1965) in order to pursue an associate, undergraduate, or graduate level degree in mathematics, engineering, or computer science.

(B) ABILITY.—Awards of scholarships under this subsection shall be made by the Director solely on the basis of the ability of the applicant, except that in any case in which 2 or more applicants for scholarships are deemed by the Director to be possessed of substantially equal ability, and there are not sufficient scholarships available to grant one to each of such applicants, the available scholarship or scholarships shall be awarded to the applicants in a manner that will tend to result in a geographically wide distribution throughout the United States of recipients' places of permanent residence.

<< 42 USCA § 1869c >>

(3) LIMITATION.—The amount of a scholarship awarded under this subsection shall be determined by the Director, except that the Director shall not award a scholarship in an amount exceeding $2,500 per year.

<< 42 USCA § 1869c >>

(4) FUNDING.—The Director shall carry out this subsection only with funds made available under section 286(s)(3) of the Immigration and Nationality Act.

SEC. 415. COMPUTATION OF PREVAILING WAGE LEVEL.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212 (8 U.S.C. 1182) is amended by adding at the end the following:

"(p)(1) In computing the prevailing wage level for an occupational classification in an area of employment for purposes of subsections (n)(1)(A)(i)(II) and (a)(5)(A) in the case of an employee of—

"(A) an institution of higher education (as defined in section 101(a) of the Higher Education Act of 1965), or a related or affiliated nonprofit entity; or

"(B) a nonprofit research organization or a Governmental research organization,

the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment.

"(2) With respect to a professional athlete (as defined in subsection (a)(5)(A)(iii)(II)) when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations shall be considered as not adversely affecting the wages of United States workers similarly employed and be considered the prevailing wage.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) applies to prevailing wage computations made—

<< 8 USCA § 1182 NOTE >>

(1) for applications filed on or after the date of the enactment of this Act; and

<< 8 USCA § 1182 NOTE >>

(2) for applications filed before such date, but only to the extent that the computation is subject to an administrative or judicial determination that is not final as of such date.

<< 8 USCA § 1184 NOTE >>

SEC. 416. IMPROVING COUNT OF H–1B AND H–2B NONIMMIGRANTS.

<< 8 USCA § 1184 NOTE >>

(a) ENSURING ACCURATE COUNT.—The Attorney General shall take such steps as are necessary to maintain an accurate count of the number of aliens subject to the numerical limitations of section 214(g)(1) of the Immigration and Nationality Act (8 U.S.C. 1184(g)(1)) who are issued visas or otherwise provided nonimmigrant status.

<< 8 USCA § 1184 NOTE >>

(b) REVISION OF PETITION FORMS.—The Attorney General shall take such steps as are necessary to revise the forms used for petitions for visas or nonimmigrant status under clause (i)(b) or (ii)(b) of section 101(a)(15)(H) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)(H)) so as to ensure that the forms provide the Attorney General with sufficient information to permit the Attorney General accurately to count the number of aliens subject to the numerical limitations of section 214(g)(1) of such Act (8 U.S.C. 1184(g)(1)) who are issued visas or otherwise provided nonimmigrant status.

<< 8 USCA § 1184 NOTE >>

(c) PROVISION OF INFORMATION.—

<< 8 USCA § 1184 NOTE >>

(1) QUARTERLY NOTIFICATION.—Beginning not later than 60 days after the first day of fiscal year 1999, the Attorney General shall notify, on a quarterly basis, the Committees on the Judiciary of the United States House of Representatives and the Senate of the numbers of aliens who were issued visas or otherwise provided nonimmigrant status under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act during the preceding 3–month period.

<< 8 USCA § 1184 NOTE >>

(2) ANNUAL SUBMISSION.—Beginning with fiscal year 2000, the Attorney General shall submit on an annual basis, to the Committees on the Judiciary of the United States House of Representatives and the Senate, information on the countries of origin and occupations of, educational levels attained by, and compensation paid to, aliens who were issued visas or otherwise

provided nonimmigrant status under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act during the previous fiscal year. With respect to the first submission under this paragraph, the information shall relate solely to aliens provided nonimmigrant status after the date that is 60 days after the date on which final regulations are issued to carry out section 412(a).

<< 8 USCA § 1184 NOTE >>

 (3) SPECIFICATION OF NUMBER OF PETITIONS FILED BY CERTAIN EMPLOYERS.—Each notification under paragraph (1), and each submission under paragraph (2), shall include the number of aliens who were issued visas or otherwise provided nonimmigrant status pursuant to petitions filed by institutions or organizations described in section 212(p)(1) of the Immigration and Nationality Act (as added by section 415 of this title).

<< 29 USCA § 2901 NOTE >>

SEC. 417. REPORT ON OLDER WORKERS IN THE INFORMATION TECHNOLOGY FIELD.

<< 29 USCA § 2901 NOTE >>

 (a) STUDY.—The Director of the National Science Foundation shall enter into a contract with the President of the National Academy of Sciences to conduct a study, using the best available data, assessing the status of older workers in the information technology field. The study shall consider the following:

<< 29 USCA § 2901 NOTE >>

 (1) The existence and extent of age discrimination in the information technology workplace.

<< 29 USCA § 2901 NOTE >>

 (2) The extent to which there is a difference, based on age, in—
  (A) promotion and advancement;
  (B) working hours;
  (C) telecommuting;
  (D) salary; and
  (E) stock options, bonuses, and other benefits.

<< 29 USCA § 2901 NOTE >>

 (3) The relationship between rates of advancement, promotion, and compensation to experience, skill level, education, and age.

<< 29 USCA § 2901 NOTE >>

 (4) Differences in skill level on the basis of age.

<< 29 USCA § 2901 NOTE >>

 (b) REPORT.—Not later than October 1, 2000, the Director of the National Science Foundation shall submit to the Committees on the Judiciary of the United States House of Representatives and the Senate a report containing the results of the study described in subsection (a).

SEC. 418. REPORT ON HIGH TECHNOLOGY LABOR MARKET NEEDS; REPORTS ON ECONOMIC IMPACT OF INCREASE IN H–1B NONIMMIGRANTS.

<< 29 USCA § 2901 NOTE >>

(a) NATIONAL SCIENCE FOUNDATION STUDY AND REPORT.—

<< 29 USCA § 2901 NOTE >>

(1) IN GENERAL.—The Director of the National Science Foundation shall conduct a study to assess labor market needs for workers with high technology skills during the next 10 years. The study shall investigate and analyze the following:

(A) Future training and education needs of companies in the high technology and information technology sectors and future training and education needs of United States students to ensure that students' skills at various levels are matched to the needs in such sectors.

(B) An analysis of progress made by educators, employers, and government entities to improve the teaching and educational level of American students in the fields of math, science, computer science, and engineering since 1998.

(C) An analysis of the number of United States workers currently or projected to work overseas in professional, technical, and managerial capacities.

(D) The relative achievement rates of United States and foreign students in secondary schools in a variety of subjects, including math, science, computer science, English, and history.

(E) The relative performance, by subject area, of United States and foreign students in postsecondary and graduate schools as compared to secondary schools.

(F) The needs of the high technology sector for foreign workers with specific skills and the potential benefits and costs to United States employers, workers, consumers, postsecondary educational institutions, and the United States economy, from the entry of skilled foreign professionals in the fields of science and engineering.

(G) The needs of the high technology sector to adapt products and services for export to particular local markets in foreign countries.

(H) An examination of the amount and trend of moving the production or performance of products and services now occurring in the United States abroad.

<< 29 USCA § 2901 NOTE >>

(2) REPORT.—Not later than October 1, 2000, the Director of the National Science Foundation shall submit to the Committees on the Judiciary of the United States House of Representatives and the Senate a report containing the results of the study described in paragraph (1).

<< 29 USCA § 2901 NOTE >>

(3) INVOLVEMENT.—The study under paragraph (1) shall be conducted in a manner that ensures the participation of individuals representing a variety of points of view.

<< 8 USCA § 1184 NOTE >>

(b) REPORTING ON STUDIES SHOWING ECONOMIC IMPACT OF H–1B NONIMMIGRANT INCREASE.—The Chairman of the Board of Governors of the Federal Reserve System, the Director of the Office of Management and Budget, the Chair of the Council of Economic Advisers, the Secretary of the Treasury, the Secretary of Commerce, the Secretary of Labor, and any other member of the Cabinet, shall promptly report to the Congress the results of any reliable study that suggests, based on legitimate economic analysis, that the increase effected by section 411(a) of this title in the number of aliens who may be issued visas or otherwise provided nonimmigrant status under section 101(a)(15)(H)(i)(b) of the Immigration and Nationality Act has had an impact on any national economic indicator, such as the level of inflation or unemployment, that warrants action by the Congress.

SUBTITLE B—SPECIAL IMMIGRANT STATUS FOR CERTAIN NATO CIVILIAN EMPLOYEES

<< 8 USCA § 1101 >>

SEC. 421. SPECIAL IMMIGRANT STATUS FOR CERTAIN NATO CIVILIAN EMPLOYEES.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  AR.02863  538

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(27) (8 U.S.C. 1101(a)(27)) is amended—

<< 8 USCA § 1101 >>

(1) by striking "or" at the end of subparagraph (J);

<< 8 USCA § 1101 >>

(2) by striking the period at the end of subparagraph (K) and inserting "; or"; and

<< 8 USCA § 1101 >>

(3) by adding at the end the following new subparagraph:

"(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause—

   "(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North Atlantic Treaty Organization (NATO);

   "(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO–6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the 'Protocol on the Status of International Military Headquarters' set up pursuant to the North Atlantic Treaty, or as a dependent); and

   "(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the American Competitiveness and Workforce Improvement Act of 1998.".

<< 8 USCA § 1101 >>

(b) CONFORMING NONIMMIGRANT STATUS FOR CERTAIN PARENTS OF SPECIAL IMMIGRANT CHILDREN.—Section 101(a)(15)(N) (8 U.S.C. 1101(a)(15)(N)) is amended—

<< 8 USCA § 1101 >>

(1) by inserting "(or under analogous authority under paragraph (27)(L))" after "(27)(I)(i)"; and

<< 8 USCA § 1101 >>

(2) by inserting "(or under analogous authority under paragraph (27)(L))" after "(27)(I)".

SUBTITLE C—MISCELLANEOUS PROVISION

SEC. 431. ACADEMIC HONORARIA.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212 (8 U.S.C. 1182), as amended by section 415, is further amended by adding at the end the following:

"(q) Any alien admitted under section 101(a)(15)(B) may accept an honorarium payment and associated incidental expenses for a usual academic activity or activities (lasting not longer than 9 days at any single institution), as defined by the Attorney General in consultation with the Secretary of Education, if such payment is offered by an institution or organization described in subsection (p)(1) and is made for services conducted for the benefit of that institution or entity and if the alien has not accepted such payment or expenses from more than 5 institutions or organizations in the previous 6–month period.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to activities occurring on or after the date of the enactment of this Act.

### TITLE V—SALTON SEA FEASIBILITY STUDY

(a) IN GENERAL.—No later than January 1, 2000, the Secretary of the Interior, in accordance with this section, shall complete all feasibility studies and cost analyses for the options set forth in subsection (b)(2)(A) necessary for Congress to fully evaluate such options.

(b) FEASIBILITY STUDY.—

(1) IN GENERAL.—

(A) The Secretary shall complete all studies, including, but not limited to environmental and other reviews, of the feasibility and benefit-cost of various options that permit the continued use of the Salton Sea as a reservoir for irrigation drainage and (1) reduce and stabilize the overall salinity of the Salton Sea, (2) stabilize the surface elevation of the Salton Sea, (3) reclaim, in the long term, healthy fish and wildlife resources and their habitats, and (4) enhance the potential for recreational uses and economic development of the Salton Sea.

(B) Based solely on whatever information is available at the time of submission of the report, the Secretary shall (1) identify any options he deems economically feasible and cost effective, (2) identify any additional information necessary to develop construction specifications, and (3) submit any recommendations, along with the results of the study to the Committees no later than January 1, 2000.

(i) The Secretary shall carry out the feasibility study in accordance with a memorandum of understanding entered into by the Secretary, the Salton Sea Authority, and the Governor of California.

(ii) The memorandum of understanding shall, at a minimum, establish criteria for evaluation and selection of options under subparagraph (2)(A), including criteria for determining benefits and the magnitude and practicability of costs of construction, operation, and maintenance of each option evaluated.

(2) OPTIONS TO BE CONSIDERED.—Options considered in the feasibility study—

(A) shall consist of, but need not be limited to—

(i) use of impoundments to segregate a portion of the waters of the Salton Sea in one or more evaporation ponds located in the Salton Sea basin;

(ii) pumping water out of the Salton Sea;

(iii) augmented flows of water into the Salton Sea;

(iv) a combination of the options referred to in clauses (i), (ii), and (iii); and

(v) any other economically feasible remediation option the Secretary considers appropriate and for which feasibility analyses and cost estimates can be completed by January 1, 2000;

(B) shall be limited to proven technologies; and

(C) shall not include any option that—

(i) relies on the importation of any new or additional water from the Colorado River; or

(ii) is inconsistent with the provisions of subsection (c).

(3) ASSUMPTIONS.—In evaluating options, the Secretary shall apply assumptions regarding water inflows into the Salton Sea Basin that encourage water conservation, account for transfers of water out of the Salton Sea Basin, and are based on a maximum likely reduction in inflows into the Salton Sea Basin which could be 800,000 acre-feet or less per year.

(4) CONSIDERATION OF COSTS.—In evaluating the feasibility of options, the Secretary shall consider the ability of Federal, tribal, State and local government sources and private sources to fund capital construction costs and annual operation, maintenance, energy, and replacement costs and shall set forth the basis for any cost sharing allocations as well as anticipated repayment, if any, of federal contributions.

(c) RELATIONSHIP TO OTHER LAW.—

(1) RECLAMATION LAWS.—Activities authorized by this title shall not be subject to the Act of June 17, 1902 (32 Stat. 388; 43 U.S.C. 391 et seq.), and Acts amendatory thereof and supplemental thereto. Amounts expended for those activities

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shall be considered nonreimbursable for purposes of those laws and shall not be considered to be a supplemental or additional benefit for purposes of the Reclamation Reform Act of 1982 (96 Stat. 1263; 43 U.S.C. 390aa et seq.).

(2) PRESERVATION OF RIGHTS AND OBLIGATIONS WITH RESPECT TO THE COLORADO RIVER.—This Act shall not be considered to supersede or otherwise affect any treaty, law, decree, contract, or agreement governing use of water from the Colorado River. All activities taken under this Act must be carried out in a manner consistent with rights and obligations of persons under those treaties, laws, decrees, contracts, and agreements.

### TITLE VI—CHEYENNE RIVER SIOUX TRIBE, LOWER BRULE SIOUX TRIBE, AND STATE OF SOUTH DAKOTA TERRESTRIAL WILDLIFE HABITAT RESTORATION

SEC. 601. DEFINITIONS.

In this title, the following definitions apply:

(1) RESTORATION.—The term "restoration" means mitigation of the habitat of wildlife.

(2) TERRESTRIAL WILDLIFE HABITAT.—The term "terrestrial wildlife habitat" means a habitat for a wildlife species (including game and nongame species) that existed or exists on an upland habitat (including a prairie grassland, woodland, bottom land forest, scrub, or shrub) or an emergent wetland habitat.

(3) WILDLIFE.—The term "wildlife" has the meaning given the term in section 8 of the Fish and Wildlife Coordination Act (16 U.S.C. 666b).

SEC. 602. TERRESTRIAL WILDLIFE HABITAT RESTORATION.

(a) TERRESTRIAL WILDLIFE HABITAT RESTORATION PLANS.—

(1) IN GENERAL.—In accordance with this subsection and in consultation with the Secretary and the Secretary of the Interior, the State of South Dakota, the Cheyenne River Sioux Tribe, and the Lower Brule Sioux Tribe shall, as a condition of the receipt of funds under this title, each develop a plan for the restoration of terrestrial wildlife habitat loss that occurred as a result of flooding related to the Big Bend and Oahe projects carried out as part of the Pick–Sloan Missouri River Basin program.

(2) SUBMISSION OF PLAN TO SECRETARY.—On completion of a plan for terrestrial wildlife habitat restoration, the State of South Dakota, the Cheyenne River Sioux Tribe, and the Lower Brule Sioux Tribe shall submit the plan to the Secretary.

(3) REVIEW BY SECRETARY AND SUBMISSION TO COMMITTEES.—The Secretary shall review the plan and submit the plan, with any comments, to the appropriate committees of the Senate and the House of Representatives.

(4) FUNDING FOR CARRYING OUT PLANS.—

(A) STATE OF SOUTH DAKOTA.—

(i) NOTIFICATION.—On receipt of the plan for terrestrial wildlife habitat restoration submitted by the State of South Dakota, each of the Committees referred to in paragraph (3) shall notify the Secretary of the Treasury of the receipt of the plan.

(ii) AVAILABILITY OF FUNDS.—On notification in accordance with clause (i), the Secretary of the Treasury shall make available to the State of South Dakota funds from the South Dakota Terrestrial Wildlife Habitat Restoration Trust Fund established under section 803, to be used to carry out the plan for terrestrial wildlife habitat restoration submitted by the State and only after the Trust Fund is fully capitalized.

(B) CHEYENNE RIVER SIOUX TRIBE AND LOWER BRULE SIOUX TRIBE.—

(i) NOTIFICATION.—On receipt of the plan for terrestrial wildlife habitat restoration submitted by the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe, each of the Committees referred to in paragraph (3) shall notify the Secretary of the Treasury of the receipt of each of the plans.

(ii) AVAILABILITY OF FUNDS.—On notification in accordance with clause (i), the Secretary of the Treasury shall make available to the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe funds from the Cheyenne River Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund and the Lower Brule Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund, respectively, established under section 804, to be used to carry out the plan for terrestrial wildlife habitat restoration submitted by the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe, respectively, and only after the Trust Fund is fully capitalized.

(C) TRANSITION PERIOD.—

(i) IN GENERAL.—During the period described in clause (ii), the Secretary shall—

(I) fund the terrestrial wildlife habitat restoration programs being carried out on the date of enactment of this Act on Oahe and Big Bend project land and the plans established under this section at a level that does not exceed the highest amount of funding that was provided for the programs during a previous fiscal year; and

(II) fund the activities described in sections 803(d)(3) and 804(d)(3).

(ii) PERIOD.—Clause (i) shall apply during the period—

(I) beginning on the date of enactment of this Act; and

(II) ending on the date on which funds are made available for use from the South Dakota Terrestrial Wildlife Habitat Restoration Trust Fund under section 803(d)(3)(A)(i) and the Cheyenne River Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund and the Lower Brule Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund under section 804(d)(3)(A)(i).

(b) PROGRAMS FOR THE PURCHASE OF WILDLIFE HABITAT LEASES.—

(1) IN GENERAL.—The State of South Dakota may use funds made available under section 803(d)(3)(A)(iii) to develop a program for the purchase of wildlife habitat leases that meets the requirements of this subsection.

(2) DEVELOPMENT OF A PLAN.—

(A) IN GENERAL.—If the State of South Dakota, the Cheyenne River Sioux Tribe, or the Lower Brule Sioux Tribe elects to conduct a program under this subsection, the State of South Dakota, the Cheyenne River Sioux Tribe, or the Lower Brule Sioux Tribe (in consultation with the United States Fish and Wildlife Service and the Secretary and with an opportunity for public comment) shall develop a plan to lease land for the protection and development of wildlife habitat, including habitat for threatened and endangered species, associated with the Missouri River ecosystem.

(B) USE FOR PROGRAM.—The plan shall be used by the State of South Dakota, the Cheyenne River Sioux Tribe, or the Lower Brule Sioux Tribe in carrying out the program carried out under paragraph (1).

(3) CONDITIONS OF LEASES.—Each lease covered under a program carried out under paragraph (1) shall specify that the owner of the property that is subject to the lease shall provide—

(A) public access for sportsmen during hunting season; and

(B) public access for other outdoor uses covered under the lease, as negotiated by the landowner and the State of South Dakota, the Cheyenne River Sioux Tribe, or the Lower Brule Sioux Tribe.

(4) USE OF ASSISTANCE.—

(A) STATE OF SOUTH DAKOTA.—If the State of South Dakota conducts a program under this subsection, the State may use funds made available under section 803(d)(3)(A)(iii) to—

(i) acquire easements, rights-of-way, or leases for management and protection of wildlife habitat, including habitat for threatened and endangered species, and public access to wildlife on private property in the State of South Dakota;

(ii) create public access to Federal or State land through the purchase of easements or rights-of-way that traverse such private property; or

(iii) lease land for the creation or restoration of a wetland on such private property.

(B) CHEYENNE RIVER SIOUX TRIBE AND LOWER BRULE SIOUX TRIBE.—If the Cheyenne River Sioux Tribe or the Lower Brule Sioux Tribe conducts a program under this subsection, the Tribe may use funds made available under section 804(d)(3)(A)(iii) for the purposes described in subparagraph (A).

(c) FEDERAL OBLIGATION FOR TERRESTRIAL WILDLIFE HABITAT MITIGATION FOR THE BIG BEND AND OAHE PROJECTS IN SOUTH DAKOTA.—The establishment of the trust funds under sections 803 and 804 and the development and implementation of plans for terrestrial wildlife habitat restoration developed by the State of South Dakota, the Cheyenne River Sioux Tribe, and the Lower Brule Sioux Tribe in accordance with this section shall be considered to satisfy the Federal obligation under the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.) for terrestrial wildlife habitat mitigation for the State of South Dakota, the Cheyenne River Sioux Tribe, and the Lower Brule Sioux Tribe for the Big Bend and Oahe projects carried out as part of the Pick–Sloan Missouri River Basin program.

SEC. 603. SOUTH DAKOTA TERRESTRIAL WILDLIFE HABITAT RESTORATION TRUST FUND.

(a) ESTABLISHMENT.—There is established in the Treasury of the United States a fund to be known as the "South Dakota Terrestrial Wildlife Habitat Restoration Trust Fund" (referred to in this section as the "Fund").

(b) FUNDING.—For the fiscal year during which this Act is enacted and each fiscal year thereafter until the aggregate amount deposited in the Fund under this subsection is equal to at least $108,000,000, the Secretary of the Treasury shall deposit $10,000,000 in the Fund.

(c) INVESTMENTS.—The Secretary of the Treasury shall invest the amounts deposited under subsection (b) only in interest-bearing obligations of the United States or in obligations guaranteed by the United States as to both principal and interest.

(d) PAYMENTS.—

(1) IN GENERAL.—All amounts credited as interest under subsection (c) shall be available, without fiscal year limitation, to the State of South Dakota for use in accordance with paragraph (3) after the Fund has been fully capitalized.

(2) WITHDRAWAL AND TRANSFER OF FUNDS.—Subject to section 802(a)(4)(A), the Secretary of the Treasury shall withdraw amounts credited as interest under paragraph (1) and transfer the amounts to the State of South Dakota for use as State funds in accordance with paragraph (3) after the Fund has been fully capitalized.

(3) USE OF TRANSFERRED FUNDS.—

(A) IN GENERAL.—Subject to subparagraph (B), the State of South Dakota shall use the amounts transferred under paragraph (2) only to—

(i) fully fund the annually scheduled work described in the terrestrial wildlife habitat restoration plan of the State developed under section 802(a); and

(ii) with any remaining funds—

(I) protect archaeological, historical, and cultural sites located along the Missouri River on land transferred to the State;

(II) fund all costs associated with the ownership, management, operation, administration, maintenance, and development of recreation areas and other lands that are transferred to the State of South Dakota by the Secretary;

(III) purchase and administer wildlife habitat leases under section 802(b);

(IV) carry out other activities described in section 802; and

(V) develop and maintain public access to, and protect, wildlife habitat and recreation areas along the Missouri River.

(B) PROHIBITION.—The amounts transferred under paragraph (2) shall not be used for the purchase of land in fee title.

(e) TRANSFERS AND WITHDRAWALS.—Except as provided in subsection (d), the Secretary of the Treasury may not transfer or withdraw any amount deposited under subsection (b).

(f) ADMINISTRATIVE EXPENSES.—There are authorized to be appropriated to the Secretary of the Treasury such sums as are necessary to pay the administrative expenses of the Fund.

SEC. 604. CHEYENNE RIVER SIOUX TRIBE AND LOWER BRULE SIOUX TRIBE TERRESTRIAL WILDLIFE HABITAT RESTORATION TRUST FUNDS.

(a) ESTABLISHMENT.—There are established in the Treasury of the United States 2 funds to be known as the "Cheyenne River Sioux Tribe Terrestrial Wildlife Restoration Trust Fund" and the "Lower Brule Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund" (each of which is referred to in this section as a "Fund").

(b) FUNDING.—

(1) IN GENERAL.—Subject to paragraph (2), for the fiscal year during which this Act is enacted and each fiscal year thereafter until the aggregate amount deposited in the Funds under this subsection is equal to at least $57,400,000, the Secretary of the Treasury shall deposit $5,000,000 in the Funds.

(2) ALLOCATION.—Of the total amount of funds deposited into the Funds for a fiscal year, the Secretary of the Treasury shall deposit—

(A) 74 percent of the funds into the Cheyenne River Sioux Tribe Terrestrial Wildlife Restoration Trust Fund; and

(B) 26 percent of the funds into the Lower Brule Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund.

(c) INVESTMENTS.—The Secretary of the Treasury shall invest the amounts deposited under subsection (b) only in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States.

(d) PAYMENTS.—

(1) IN GENERAL.—All amounts credited as interest under subsection (c) shall be available after the Trust Funds are fully capitalized, without fiscal year limitation, to the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe for their use in accordance with paragraph (3).

AR.02868

(2) WITHDRAWAL AND TRANSFER OF FUNDS.—Subject to section 802(a)(4)(B), the Secretary of the Treasury shall withdraw amounts credited as interest under paragraph (1) and transfer the amounts to the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe for use in accordance with paragraph (3).

(3) USE OF TRANSFERRED FUNDS.—

(A) IN GENERAL.—Subject to subparagraph (B), the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe shall use the amounts transferred under paragraph (2) only to—

(i) fully fund the annually scheduled work described in the terrestrial wildlife habitat restoration plan of the respective Tribe developed under section 802(a); and

(ii) with any remaining funds—

(I) protect archaeological, historical, and cultural sites located along the Missouri River on land transferred to the respective Tribe;

(II) fund all costs associated with the ownership, management, operation, administration, maintenance, and development of recreation areas and other lands that are transferred to the respective Tribe by the Secretary;

(III) purchase and administer wildlife habitat leases under section 802(b);

(IV) carry out other activities described in section 802; and

(V) develop and maintain public access to, and protect, wildlife habitat and recreation areas along the Missouri River.

(B) PROHIBITION.—The amounts transferred under paragraph (2) shall not be used for the purchase of land in fee title.

(e) TRANSFERS AND WITHDRAWALS.—Except as provided in subsection (d), the Secretary of the Treasury may not transfer or withdraw any amount deposited under subsection (b).

(f) ADMINISTRATIVE EXPENSES.—There are authorized to be appropriated to the Secretary of the Treasury such sums as are necessary to pay the administrative expenses of the Fund.

SEC. 605. TRANSFER OF FEDERAL LAND TO STATE OF SOUTH DAKOTA.

(a) IN GENERAL.—

(1) TRANSFER.—

(A) IN GENERAL.—The Secretary shall transfer to the Department of Game, Fish and Parks of the State of South Dakota (referred to in this section as the "Department") the land and recreation areas described in subsections (b) and (c) for fish and wildlife purposes, or public recreation uses, in perpetuity.

(B) PERMITS, RIGHTS–OF–WAY, AND EASEMENTS.—All permits, rights-of-way, and easements granted by the Secretary to the Oglala Sioux Tribe for land on the west side of the Missouri River between the Oahe Dam and Highway 14, and all permits, rights-of-way, and easements on any other land administered by the Secretary and used by the Oglala Sioux Rural Water Supply System, are granted to the Oglala Sioux Tribe in perpetuity to be held in trust under section 3(e) of the Mni Wiconi Project Act of 1988 (102 Stat. 2568).

(2) USES.—The Department shall maintain and develop the land outside the recreation areas for fish and wildlife purposes in accordance with—

(A) fish and wildlife purposes in effect on the date of enactment of this Act; or

(B) a plan developed under section 802.

(3) CORPS OF ENGINEERS.—The transfer shall not interfere with the Corps of Engineers operation of a project under this section for an authorized purpose of the project under the Act of December 22, 1944 (58 Stat. 887, chapter 665; 33 U.S.C. 701–1 et seq.), or other applicable law.

(4) SECRETARY.—The Secretary shall retain the right to inundate with water the land transferred to the Department under this section or draw down a project reservoir, as necessary to carry out an authorized purpose of a project.

(b) LAND TRANSFERRED.—The land described in this subsection is land that—

(1) is located above the top of the exclusive flood pool of the Oahe, Big Bend, Fort Randall, and Gavin's Point projects of the Pick–Sloan Missouri River Basin program;

(2) was acquired by the Secretary for the implementation of the Pick–Sloan Missouri River Basin program;

(3) is located outside the external boundaries of a reservation of an Indian Tribe; and

(4) is located within the State of South Dakota.

(c) RECREATION AREAS TRANSFERRED.—A recreation area described in this section includes the land and waters within a recreation area that—

(1) the Secretary determines, at the time of the transfer, is a recreation area classified for recreation use by the Corps of Engineers on the date of enactment of this Act;

(2) is located outside the external boundaries of a reservation of an Indian Tribe;

(3) is located within the State of South Dakota;

(4) is not the recreation area known as "Cottonwood", "Training Dike", or "Tailwaters"; and

(5) is located below Gavin's Point Dam in the State of South Dakota in accordance with boundary agreements and reciprocal fishing agreements between the State of South Dakota and the State of Nebraska in effect on the date of enactment of this Act, which agreements shall continue to be honored by the State of South Dakota as the agreements apply to any land or recreation areas transferred under this title to the State of South Dakota below Gavin's Point Dam and on the waters of the Missouri River.

(d) MAP.—

(1) IN GENERAL.—The Secretary, in consultation with the Department, shall prepare a map of the land and recreation areas transferred under this section.

(2) LAND.—The map shall identify—

(A) land reasonably expected to be required for project purposes during the 20-year period beginning on the date of enactment of this Act; and

(B) dams and related structures; which shall be retained by the Secretary.

(3) AVAILABILITY.—The map shall be on file in the appropriate offices of the Secretary.

(e) SCHEDULE FOR TRANSFER.—

(1) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary of the Army and the Secretary of the Department shall jointly develop a schedule for transferring the land and recreation areas under this section.

(2) TRANSFER DEADLINE.—All land and recreation areas shall be transferred not later than 1 year after the full capitalization of the Trust Fund described in section 803.

(f) TRANSFER CONDITIONS.—The land and recreation areas described in subsections (b) and (c) shall be transferred in fee title to the Department on the following conditions:

(1) RESPONSIBILITY FOR DAMAGE.—The Secretary shall not be responsible for any damage to the land caused by flooding, sloughing, erosion, or other changes to the land caused by the operation of any project of the Pick–Sloan Missouri River Basin program (except as otherwise provided by Federal law).

(2) EASEMENTS, RIGHTS–OF–WAY, LEASES, AND COST–SHARING AGREEMENTS.—The Department shall maintain all easements, rights-of-way, leases, and cost-sharing agreements that are in effect as of the date of the transfer.

(g) HUNTING AND FISHING.—

(1) IN GENERAL.—Nothing in this title affects jurisdiction over the land and water below the exclusive flood pool of the Missouri River within the State of South Dakota, including affected Indian reservations. The State of South Dakota, the Lower Brule Sioux Tribe, and the Cheyenne River Sioux Tribe shall continue in perpetuity to exercise the jurisdiction the State and Tribes possess on the date of enactment of this Act.

(2) NO EFFECT ON RESPECTIVE JURISDICTIONS.—The Secretary may not adopt any regulation or otherwise affect the respective jurisdictions of the State of South Dakota, the Lower Brule River Sioux Tribe, or the Cheyenne River Sioux Tribe described in paragraph (1).

(h) APPLICABILITY OF LAW.—Notwithstanding any other provision of this Act, the following provisions of law shall apply to land transferred under this section—

(1) The National Historic Preservation Act (16 U.S.C. 470 et seq.), including sections 106 and 304 of that Act (16 U.S.C. 470f, 470w–3).

(2) The Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa et seq.), including sections 4, 6, 7, and 9 of that Act (16 U.S.C. 470cc, 470ee, 470ff, 470hh).

(3) The Native American Graves Protection Act and Repatriation Act (25 U.S.C. 3001 et seq.), including subsections (a) and (d) of section 3 of that Act (25 U.S.C. 3003).

SEC. 606. TRANSFER OF CORPS OF ENGINEERS LAND FOR INDIAN TRIBES.

AR.02870

(a) IN GENERAL.—

(1) TRANSFER.—The Secretary of the Army shall transfer to the Secretary of the Interior the land and recreation areas described in subsections (b) and (c).

(2) CORPS OF ENGINEERS.—The transfer shall not interfere with the Corps of Engineers operation of a project under this section for an authorized purpose of the project under the Act of December 22, 1944 (58 Stat. 887, chapter 665; 33 U.S.C. 701–1 et seq.), or other applicable law.

(3) SECRETARY OF THE ARMY.—The Secretary of the Army shall retain the right to inundate with water the land transferred to the Secretary of the Interior under this section or draw down a project reservoir, as necessary to carry out an authorized purpose of a project.

(4) TRUST.—The Secretary of the Interior shall hold in trust for the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe the land transferred under this section that is located within the external boundaries of the reservation of the Indian Tribes.

(b) LAND TRANSFERRED.—The land described in this subsection is land that—

(1) is located above the top of the exclusive flood pool of the Big Bend and Oahe projects of the Pick–Sloan Missouri River Basin program;

(2) was acquired by the Secretary of the Army for the implementation of the Pick–Sloan Missouri River Basin program; and

(3) is located within the external boundaries of the reservation of the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe.

(c) RECREATION AREAS TRANSFERRED.—A recreation area described in this section includes the land and waters within a recreation area that—

(1) the Secretary determines, at the time of the transfer, is a recreation area classified for recreation use by the Corps of Engineers on the date of enactment of this Act;

(2) is located within the external boundaries of a reservation of an Indian Tribe; and

(3) is located within the State of South Dakota.

(d) MAP.—

(1) IN GENERAL.—The Secretary, in consultation with the governing bodies of the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe, shall prepare a map of the land transferred under this section.

(2) LAND.—The map shall identify—

(A) land reasonably expected to be required for project purposes during the 20–year period beginning on the date of enactment of this Act; and

(B) dams and related structures;

which shall be retained by the Secretary.

(3) AVAILABILITY.—The map shall be on file in the appropriate offices of the Secretary.

(e) SCHEDULE FOR TRANSFER.—

(1) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary and the Chairmen of the Cheyenne River Sioux Tribe and the Lower Brule Sioux Tribe shall jointly develop a schedule for transferring the land and recreation areas under this section.

(2) TRANSFER DEADLINE.—All land and recreation areas shall be transferred not later than 1 year after the full capitalization of the State and tribal Trust Fund described in section 804.

(f) TRANSFER CONDITIONS.—The land and recreation areas described in subsections (b) and (c) shall be transferred to, and held in trust by, the Secretary of the Interior on the following conditions:

(1) RESPONSIBILITY FOR DAMAGE.—The Secretary shall not be responsible for any damage to the land caused by flooding, sloughing, erosion, or other changes to the land caused by the operation of any project of the Pick–Sloan Missouri River Basin program (except as otherwise provided by Federal law).

(2) HUNTING AND FISHING.—Nothing in this title affects jurisdiction over the land and waters below the exclusive flood pool and within the external boundaries of the Cheyenne River Sioux Tribe and Lower Brule Sioux Tribe reservations. The State of South Dakota, the Lower Brule Sioux Tribe, and the Cheyenne River Sioux Tribe shall continue to exercise, in perpetuity, the jurisdiction they possess on the date of enactment of this Act with regard to those lands and waters. The Secretary may not adopt any regulation or otherwise affect the respective jurisdictions of the State of South Dakota, the Lower Brule River Sioux Tribe, or the Cheyenne River Sioux Tribe described in the preceding sentence. Jurisdiction over the land transferred

under this section shall be the same as that over other land held in trust by the Secretary of the Interior on the Cheyenne River Sioux Tribe reservation and the Lower Brule Sioux Tribe reservation.

(3) EASEMENTS, RIGHTS–OF–WAY, LEASES, AND COST–SHARING AGREEMENTS.—

(A) MAINTENANCE.—The Secretary of the Interior shall maintain all easements, rights-of-way, leases, and cost-sharing agreements that are in effect as of the date of the transfer.

(B) PAYMENTS TO COUNTY.—The Secretary of the Interior shall pay any affected county 100 percent of the receipts from the easements, rights-of-way, leases, and cost-sharing agreements described in subparagraph (A).

SEC. 607. ADMINISTRATION.

(a) IN GENERAL.—Nothing in this title diminishes or affects—

(1) any water right of an Indian Tribe;

(2) any other right of an Indian Tribe, except as specifically provided in another provision of this title;

(3) any treaty right that is in effect on the date of enactment of this Act;

(4) any external boundary of an Indian reservation of an Indian Tribe;

(5) any authority of the State of South Dakota that relates to the protection, regulation, or management of fish, terrestrial wildlife, and cultural and archaeological resources, except as specifically provided in this title; or

(6) any authority of the Secretary, the Secretary of the Interior, or the head of any other Federal agency under a law in effect on the date of enactment of this Act, including—

(A) the National Historic Preservation Act (16 U.S.C. 470 et seq.);

(B) the Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa et seq.);

(C) the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.);

(D) the Act entitled "An Act for the protection of the bald eagle", approved June 8, 1940 (16 U.S.C. 668 et seq.);

(E) the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.);

(F) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

(G) the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.);

(H) the Federal Water Pollution Control Act (commonly known as the "Clean Water Act") (33 U.S.C. 1251 et seq.);

(I) the Safe Drinking Water Act (42 U.S.C. 300f et seq.); and

(J) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(b) FEDERAL LIABILITY FOR DAMAGE.—Nothing in this title relieves the Federal Government of liability for damage to private land caused by the operation of the Pick–Sloan Missouri River Basin program.

(c) FLOOD CONTROL.—Notwithstanding any other provision of this title, the Secretary shall retain the authority to operate the Pick–Sloan Missouri River Basin program for purposes of meeting the requirements of the Act of December 22, 1944 (58 Stat. 887, chapter 665; 33 U.S.C. 701–1 et seq.).

SEC. 608. STUDY.

(a) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary shall arrange for the United States Geological Survey, in consultation with the Bureau of Indian Affairs and other appropriate Federal agencies, to conduct a comprehensive study of the potential impacts of the transfer of land under sections 805(b) and 806(b), including potential impacts on South Dakota Sioux Tribes having water claims within the Missouri River Basin, on water flows in the Missouri River.

(b) NO TRANSFER PENDING DETERMINATION.—No transfer of land under section 805(b) or 806(b) shall occur until the Secretary determines, based on the study, that the transfer of land under either section will not significantly reduce the amount of water flow to the downstream States of the Missouri River.

SEC. 609. AUTHORIZATION OF APPROPRIATIONS.

(a) SECRETARY.—There are authorized to be appropriated to the Secretary such sums as are necessary—

(1) to pay the administrative expenses incurred by the Secretary in carrying out this title; and

(2) to fund the implementation of terrestrial wildlife habitat restoration plans under section 802(a) and other activities under sections 803(d)(3) and 804(d)(3).

(b) SECRETARY OF THE INTERIOR.—There are authorized to be appropriated to the Secretary of the Interior such sums as are necessary to pay the administrative expenses incurred by the Secretary of the Interior in carrying out this title.

<< 21 USCA Ch. 22 >>

TITLE VII—OFFICE OF NATIONAL DRUG CONTROL POLICY REAUTHORIZATION

<< 21 USCA § 1701 NOTE >>

SEC. 701. SHORT TITLE.

This title may be cited as the "Office of National Drug Control Policy Reauthorization Act of 1998".

<< 21 USCA § 1701 >>

SEC. 702. DEFINITIONS.

In this title:

<< 21 USCA § 1701 >>

(1) DEMAND REDUCTION.—The term "demand reduction" means any activity conducted by a National Drug Control Program agency, other than an enforcement activity, that is intended to reduce the use of drugs, including—
  (A) drug abuse education;
  (B) drug abuse prevention;
  (C) drug abuse treatment;
  (D) drug abuse research;
  (E) drug abuse rehabilitation;
  (F) drug-free workplace programs; and
  (G) drug testing.

<< 21 USCA § 1701 >>

(2) DIRECTOR.—The term "Director" means the Director of National Drug Control Policy.

<< 21 USCA § 1701 >>

(3) DRUG.—The term "drug" has the meaning given the term "controlled substance" in section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)).

<< 21 USCA § 1701 >>

(4) DRUG CONTROL.—The term "drug control" means any activity conducted by a National Drug Control Program agency involving supply reduction or demand reduction.

<< 21 USCA § 1701 >>

(5) FUND.—The term "Fund" means the fund established under section 703(d).

<< 21 USCA § 1701 >>

(6) NATIONAL DRUG CONTROL PROGRAM.—The term "National Drug Control Program" means programs, policies, and activities undertaken by National Drug Control Program agencies pursuant to the responsibilities of such agencies under the National Drug Control Strategy.

<< 21 USCA § 1701 >>

(7) NATIONAL DRUG CONTROL PROGRAM AGENCY.—The term "National Drug Control Program agency" means any agency that is responsible for implementing any aspect of the National Drug Control Strategy, including any agency that receives Federal funds to implement any aspect of the National Drug Control Strategy, but does not include any agency that receives funds for drug control activity solely under the National Foreign Intelligence Program, the Joint Military Intelligence Program or Tactical Intelligence and Related Activities, unless such agency has been designated—

   (A) by the President; or

   (B) jointly by the Director and the head of the agency.

<< 21 USCA § 1701 >>

(8) NATIONAL DRUG CONTROL STRATEGY.—The term "National Drug Control Strategy" means the strategy developed and submitted to Congress under section 706.

<< 21 USCA § 1701 >>

(9) OFFICE.—Unless the context clearly implicates otherwise, the term "Office" means the Office of National Drug Control Policy established under section 703(a).

<< 21 USCA § 1701 >>

(10) STATE AND LOCAL AFFAIRS.—The term "State and local affairs" means domestic activities conducted by a National Drug Control Program agency that are intended to reduce the availability and use of drugs, including—

   (A) coordination and facilitation of Federal, State, and local law enforcement drug control efforts;

   (B) promotion of coordination and cooperation among the drug supply reduction and demand reduction agencies of the various States, territories, and units of local government; and

   (C) such other cooperative governmental activities which promote a comprehensive approach to drug control at the national, State, territory, and local levels.

<< 21 USCA § 1701 >>

(11) SUPPLY REDUCTION.—The term "supply reduction" means any activity of a program conducted by a National Drug Control Program agency that is intended to reduce the availability or use of drugs in the United States and abroad, including—

   (A) international drug control;

   (B) foreign and domestic drug intelligence;

   (C) interdiction; and

   (D) domestic drug law enforcement, including law enforcement directed at drug users.

<< 21 USCA § 1702 >>

SEC. 703. OFFICE OF NATIONAL DRUG CONTROL POLICY.

<< 21 USCA § 1702 >>

(a) ESTABLISHMENT OF OFFICE.—There is established in the Executive Office of the President an Office of National Drug Control Policy, which shall—

<< 21 USCA § 1702 >>

(1) develop national drug control policy;

<< 21 USCA § 1702 >>

(2) coordinate and oversee the implementation of that national drug control policy;

<< 21 USCA § 1702 >>

(3) assess and certify the adequacy of national drug control programs and the budget for those programs; and

<< 21 USCA § 1702 >>

(4) evaluate the effectiveness of the national drug control programs.

<< 21 USCA § 1702 >>

(b) DIRECTOR AND DEPUTY DIRECTORS.—

<< 21 USCA § 1702 >>

(1) DIRECTOR.—There shall be at the head of the Office a Director of National Drug Control Policy.

<< 21 USCA § 1702 >>

(2) DEPUTY DIRECTOR OF NATIONAL DRUG CONTROL POLICY.—There shall be in the Office a Deputy Director of National Drug Control Policy, who shall assist the Director in carrying out the responsibilities of the Director under this title.

<< 21 USCA § 1702 >>

(3) OTHER DEPUTY DIRECTORS.—There shall be in the Office—
  (A) a Deputy Director for Demand Reduction, who shall be responsible for the activities described in subparagraphs (A) through (G) of section 702(1);
  (B) a Deputy Director for Supply Reduction, who shall be responsible for the activities described in subparagraphs (A) through (C) of section 702(11); and
  (C) a Deputy Director for State and Local Affairs, who shall be responsible for the activities described in subparagraphs (A) through (C) of section 702(10) and subparagraph (D) of section 702(11).

<< 21 USCA § 1702 >>

(c) ACCESS BY CONGRESS.—The location of the Office in the Executive Office of the President shall not be construed as affecting access by Congress, or any committee of the House of Representatives or the Senate, to any—

<< 21 USCA § 1702 >>

(1) information, document, or study in the possession of, or conducted by or at the direction of the Director; or

<< 21 USCA § 1702 >>

(2) personnel of the Office.

<< 21 USCA § 1702 >>

(d) OFFICE OF NATIONAL DRUG CONTROL POLICY GIFT FUND.—

<< 21 USCA § 1702 >>

(1) ESTABLISHMENT.—There is established in the Treasury of the United States a fund for the receipt of gifts, both real and personal, for the purpose of aiding or facilitating the work of the Office under section 704(c).

<< 21 USCA § 1702 >>

(2) CONTRIBUTIONS.—The Office may accept, hold, and administer contributions to the Fund.

<< 21 USCA § 1702 >>

(3) USE OF AMOUNTS DEPOSITED.—Amounts deposited in the Fund are authorized to be appropriated, to remain available until expended for authorized purposes at the discretion of the Director.

<< 21 USCA § 1703 >>

SEC. 704. APPOINTMENT AND DUTIES OF DIRECTOR AND DEPUTY DIRECTORS.

<< 21 USCA § 1703 >>

(a) APPOINTMENT.—

<< 21 USCA § 1703 >>

(1) IN GENERAL.—The Director, the Deputy Director of National Drug Control Policy, the Deputy Director for Demand Reduction, the Deputy Director for Supply Reduction, and the Deputy Director for State and Local Affairs, shall each be appointed by the President, by and with the advice and consent of the Senate, and shall serve at the pleasure of the President. In appointing the Deputy Director for Demand Reduction under this paragraph, the President shall take into consideration the scientific, educational or professional background of the individual, and whether the individual has experience in the fields of substance abuse prevention, education, or treatment.

<< 21 USCA § 1703 >>

(2) DUTIES OF DEPUTY DIRECTOR OF NATIONAL DRUG CONTROL POLICY.—The Deputy Director of National Drug Control Policy shall—
  (A) carry out the duties and powers prescribed by the Director; and
  (B) serve as the Director in the absence of the Director or during any period in which the office of the Director is vacant.

<< 21 USCA § 1703 >>

(3) DESIGNATION OF OTHER OFFICERS.—In the absence of the Deputy Director, or if the office of the Deputy Director is vacant, the Director shall designate such other permanent employee of the Office to serve as the Director, if the Director is absent or unable to serve.

<< 21 USCA § 1703 >>

(4) PROHIBITION.—No person shall serve as Director or a Deputy Director while serving in any other position in the Federal Government.

<< 21 USCA § 1703 >>

(5) PROHIBITION ON POLITICAL CAMPAIGNING.—Any officer or employee of the Office who is appointed to that position by the President, by and with the advice and consent of the Senate, may not participate in Federal election campaign activities, except that such official is not prohibited by this paragraph from making contributions to individual candidates.

<< 21 USCA § 1703 >>

(b) RESPONSIBILITIES.—The Director—

<< 21 USCA § 1703 >>

(1) shall assist the President in the establishment of policies, goals, objectives, and priorities for the National Drug Control Program;

<< 21 USCA § 1703 >>

(2) shall promulgate the National Drug Control Strategy under section 706(a) and each report under section 706(b) in accordance with section 706;

<< 21 USCA § 1703 >>

(3) shall coordinate and oversee the implementation by the National Drug Control Program agencies of the policies, goals, objectives, and priorities established under paragraph (1) and the fulfillment of the responsibilities of such agencies under the National Drug Control Strategy and make recommendations to National Drug Control Program agency heads with respect to implementation of Federal counter-drug programs;

<< 21 USCA § 1703 >>

(4) shall make such recommendations to the President as the Director determines are appropriate regarding changes in the organization, management, and budgets of Federal departments and agencies engaged in drug enforcement, and changes in the allocation of personnel to and within those departments and agencies, to implement the policies, goals, priorities, and objectives established under paragraph (1) and the National Drug Control Strategy;

<< 21 USCA § 1703 >>

(5) shall consult with and assist State and local governments with respect to the formulation and implementation of National Drug Control Policy and their relations with the National Drug Control Program agencies;

<< 21 USCA § 1703 >>

(6) shall appear before duly constituted committees and subcommittees of the House of Representatives and of the Senate to represent the drug policies of the executive branch;

<< 21 USCA § 1703 >>

(7) shall notify any National Drug Control Program agency if its policies are not in compliance with the responsibilities of the agency under the National Drug Control Strategy, transmit a copy of each such notification to the President, and maintain a copy of each such notification;

<< 21 USCA § 1703 >>

(8) shall provide, by July 1 of each year, budget recommendations, including requests for specific initiatives that are consistent with the priorities of the President under the National Drug Control Strategy, to the heads of departments and agencies with responsibilities under the National Drug Control Program, which recommendations shall—
   (A) apply to the next budget year scheduled for formulation under the Budget and Accounting Act of 1921, and each of the 4 subsequent fiscal years; and
   (B) address funding priorities developed in the National Drug Control Strategy;

<< 21 USCA § 1703 >>

(9) may serve as representative of the President in appearing before Congress on all issues relating to the National Drug Control Program;

<< 21 USCA § 1703 >>

(10) shall, in any matter affecting national security interests, work in conjunction with the Assistant to the President for National Security Affairs;

<< 21 USCA § 1703 >>

(11) may serve as spokesperson of the Administration on drug issues;

<< 21 USCA § 1703 >>

(12) shall ensure that no Federal funds appropriated to the Office of National Drug Control Policy shall be expended for any study or contract relating to the legalization (for a medical use or any other use) of a substance listed in schedule I of section 202 of the Controlled Substances Act (21 U.S.C. 812) and take such actions as necessary to oppose any attempt to legalize the use of a substance (in any form) that—
    (A) is listed in schedule I of section 202 of the Controlled Substances Act (21 U.S.C. 812); and
    (B) has not been approved for use for medical purposes by the Food and Drug Administration;

<< 21 USCA § 1703 >>

(13) shall require each National Drug Control Program agency to submit to the Director on an annual basis (beginning in 1999) an evaluation of progress by the agency with respect to drug control program goals using the performance measures for the agency developed under section 706(c), including progress with respect to—
    (A) success in reducing domestic and foreign sources of illegal drugs;
    (B) success in protecting the borders of the United States (and in particular the Southwestern border of the United States) from penetration by illegal narcotics;
    (C) success in reducing violent crime associated with drug use in the United States;
    (D) success in reducing the negative health and social consequences of drug use in the United States; and
    (E) implementation of drug treatment and prevention programs in the United States and improvements in the adequacy and effectiveness of such programs;

<< 21 USCA § 1703 >>

(14) shall submit to the Appropriations committees and the authorizing committees of jurisdiction of the House of Representatives and the Senate on an annual basis, not later than 60 days after the date of the last day of the applicable period, a summary of—
    (A) each of the evaluations received by the Director under paragraph (13); and
    (B) the progress of each National Drug Control Program agency toward the drug control program goals of the agency using the performance measures for the agency developed under section 706(c); and

<< 21 USCA § 1703 >>

(15) shall ensure that drug prevention and drug treatment research and information is effectively disseminated by National Drug Control Program agencies to State and local governments and nongovernmental entities involved in demand reduction by—
    (A) encouraging formal consultation between any such agency that conducts or sponsors research, and any such agency that disseminates information in developing research and information product development agendas;
    (B) encouraging such agencies (as appropriate) to develop and implement dissemination plans that specifically target State and local governments and nongovernmental entities involved in demand reduction; and

(C) developing a single interagency clearinghouse for the dissemination of research and information by such agencies to State and local governments and nongovernmental agencies involved in demand reduction.

<< 21 USCA § 1703 >>

(c) NATIONAL DRUG CONTROL PROGRAM BUDGET.—

<< 21 USCA § 1703 >>

(1) RESPONSIBILITIES OF NATIONAL DRUG CONTROL PROGRAM AGENCIES.—

(A) IN GENERAL.—For each fiscal year, the head of each department, agency, or program of the Federal Government with responsibilities under the National Drug Control Program Strategy shall transmit to the Director a copy of the proposed drug control budget request of the department, agency, or program at the same time as that budget request is submitted to their superiors (and before submission to the Office of Management and Budget) in the preparation of the budget of the President submitted to Congress under section 1105(a) of title 31, United States Code.

(B) SUBMISSION OF DRUG CONTROL BUDGET REQUESTS.—The head of each National Drug Control Program agency shall ensure timely development and submission to the Director of each proposed drug control budget request transmitted pursuant to this paragraph, in such format as may be designated by the Director with the concurrence of the Director of the Office of Management and Budget.

<< 21 USCA § 1703 >>

(2) NATIONAL DRUG CONTROL PROGRAM BUDGET PROPOSAL.—For each fiscal year, following the transmission of proposed drug control budget requests to the Director under paragraph (1), the Director shall, in consultation with the head of each National Drug Control Program agency—

(A) develop a consolidated National Drug Control Program budget proposal designed to implement the National Drug Control Strategy;

(B) submit the consolidated budget proposal to the President; and

(C) after submission under subparagraph (B), submit the consolidated budget proposal to Congress.

<< 21 USCA § 1703 >>

(3) REVIEW AND CERTIFICATION OF BUDGET REQUESTS AND BUDGET SUBMISSIONS OF NATIONAL DRUG CONTROL PROGRAM AGENCIES.—

(A) IN GENERAL.—The Director shall review each drug control budget request submitted to the Director under paragraph (1).

(B) REVIEW OF BUDGET REQUESTS.—

(i) INADEQUATE REQUESTS.—If the Director concludes that a budget request submitted under paragraph (1) is inadequate, in whole or in part, to implement the objectives of the National Drug Control Strategy with respect to the department, agency, or program at issue for the year for which the request is submitted, the Director shall submit to the head of the applicable National Drug Control Program agency a written description of funding levels and specific initiatives that would, in the determination of the Director, make the request adequate to implement those objectives.

(ii) ADEQUATE REQUESTS.—If the Director concludes that a budget request submitted under paragraph (1) is adequate to implement the objectives of the National Drug Control Strategy with respect to the department, agency, or program at issue for the year for which the request is submitted, the Director shall submit to the head of the applicable National Drug Control Program agency a written statement confirming the adequacy of the request.

(iii) RECORD.—The Director shall maintain a record of each description submitted under clause (i) and each statement submitted under clause (ii).

(C) AGENCY RESPONSE.—

AR.02879

(i) IN GENERAL.—The head of a National Drug Control Program agency that receives a description under subparagraph (B)(i) shall include the funding levels and initiatives described by the Director in the budget submission for that agency to the Office of Management and Budget.

(ii) IMPACT STATEMENT.—The head of a National Drug Control Program agency that has altered its budget submission under this subparagraph shall include as an appendix to the budget submission for that agency to the Office of Management and Budget an impact statement that summarizes—

(I) the changes made to the budget under this subparagraph; and

(II) the impact of those changes on the ability of that agency to perform its other responsibilities, including any impact on specific missions or programs of the agency.

(iii) CONGRESSIONAL NOTIFICATION.—The head of a National Drug Control Program agency shall submit a copy of any impact statement under clause (ii) to the Senate and the House of Representatives at the time the budget for that agency is submitted to Congress under section 1105(a) of title 31, United States Code.

(D) CERTIFICATION OF BUDGET SUBMISSIONS.—

(i) IN GENERAL.—At the time a National Drug Control Program agency submits its budget request to the Office of Management and Budget, the head of the National Drug Control Program agency shall submit a copy of the budget request to the Director.

(ii) CERTIFICATION.—The Director—

(I) shall review each budget submission submitted under clause (i); and

(II) based on the review under subclause (I), if the Director concludes that the budget submission of a National Drug Control Program agency does not include the funding levels and initiatives described under subparagraph (B)—

(aa) may issue a written decertification of that agency's budget; and

(bb) in the case of a decertification issued under item (aa), shall submit to the Senate and the House of Representatives a copy of—

(aaa) the decertification issued under item (aa);

(bbb) the description made under subparagraph (B); and

(ccc) the budget recommendations made under subsection (b)(8).

<< 21 USCA § 1703 >>

(4) REPROGRAMMING AND TRANSFER REQUESTS.—

(A) IN GENERAL.—No National Drug Control Program agency shall submit to Congress a reprogramming or transfer request with respect to any amount of appropriated funds in an amount exceeding $5,000,000 that is included in the National Drug Control Program budget unless the request has been approved by the Director.

(B) APPEAL.—The head of any National Drug Control Program agency may appeal to the President any disapproval by the Director of a reprogramming or transfer request under this paragraph.

<< 21 USCA § 1703 >>

(d) POWERS OF THE DIRECTOR.—In carrying out subsection (b), the Director may—

<< 21 USCA § 1703 >>

(1) select, appoint, employ, and fix compensation of such officers and employees of the Office as may be necessary to carry out the functions of the Office under this title;

<< 21 USCA § 1703 >>

(2) subject to subsection (e)(3), request the head of a department or agency, or program of the Federal Government to place department, agency, or program personnel who are engaged in drug control activities on temporary detail to another department, agency, or program in order to implement the National Drug Control Strategy, and the head of the department or agency shall comply with such a request;

<< 21 USCA § 1703 >>

(3) use for administrative purposes, on a reimbursable basis, the available services, equipment, personnel, and facilities of Federal, State, and local agencies;

<< 21 USCA § 1703 >>

(4) procure the services of experts and consultants in accordance with section 3109 of title 5, United States Code, relating to appointments in the Federal Service, at rates of compensation for individuals not to exceed the daily equivalent of the rate of pay payable under level IV of the Executive Schedule under section 5311 of title 5, United States Code;

<< 21 USCA § 1703 >>

(5) accept and use gifts and donations of property from Federal, State, and local government agencies, and from the private sector, as authorized in section 703(d);

<< 21 USCA § 1703 >>

(6) use the mails in the same manner as any other department or agency of the executive branch;

<< 21 USCA § 1703 >>

(7) monitor implementation of the National Drug Control Program, including—
 (A) conducting program and performance audits and evaluations; and
 (B) requesting assistance from the Inspector General of the relevant agency in such audits and evaluations;

<< 21 USCA § 1703 >>

(8) transfer funds made available to a National Drug Control Program agency for National Drug Control Strategy programs and activities to another account within such agency or to another National Drug Control Program agency for National Drug Control Strategy programs and activities, except that—
 (A) the authority under this paragraph may be limited in an annual appropriations Act or other provision of Federal law;
 (B) the Director may exercise the authority under this paragraph only with the concurrence of the head of each affected agency;
 (C) in the case of an interagency transfer, the total amount of transfers under this paragraph may not exceed 3 percent of the total amount of funds made available for National Drug Control Strategy programs and activities to the agency from which those funds are to be transferred;
 (D) funds transferred to an agency under this paragraph may only be used to increase the funding for programs or activities have been authorized by Congress; and
 (E) the Director shall—
  (i) submit to Congress, including to the Committees on Appropriations of the Senate and the House of Representatives, the authorizing committees for the Office, and any other applicable committees of jurisdiction, a reprogramming or transfer request in advance of any transfer under this paragraph in accordance with the regulations of the affected agency or agencies; and
  (ii) annually submit to Congress a report describing the effect of all transfers of funds made pursuant to this paragraph or subsection (c)(4) during the 12–month period preceding the date on which the report is submitted;

<< 21 USCA § 1703 >>

(9) issue to the head of a National Drug Control Program agency a fund control notice described in subsection (f) to ensure compliance with the National Drug Control Program Strategy; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 21 USCA § 1703 >>

(10) participate in the drug certification process pursuant to section 490 of the Foreign Assistance Act of 1961 (22 U.S.C. 2291j).

<< 21 USCA § 1703 >>

(e) PERSONNEL DETAILED TO OFFICE.—

<< 21 USCA § 1703 >>

(1) EVALUATIONS.—Notwithstanding any provision of chapter 43 of title 5, United States Code, the Director shall perform the evaluation of the performance of any employee detailed to the Office for purposes of the applicable performance appraisal system established under such chapter for any rating period, or part thereof, that such employee is detailed to such office.

<< 21 USCA § 1703 >>

(2) COMPENSATION.—
  (A) BONUS PAYMENTS.—Notwithstanding any other provision of law, the Director may provide periodic bonus payments to any employee detailed to the Office.
  (B) RESTRICTIONS.—An amount paid under this paragraph to an employee for any period—
    (i) shall not be greater than 20 percent of the basic pay paid or payable to such employee for such period; and
    (ii) shall be in addition to the basic pay of such employee.
  (C) AGGREGATE AMOUNT.—The aggregate amount paid during any fiscal year to an employee detailed to the Office as basic pay, awards, bonuses, and other compensation shall not exceed the annual rate payable at the end of such fiscal year for positions at level III of the Executive Schedule.

<< 21 USCA § 1703 >>

(3) MAXIMUM NUMBER OF DETAILEES.—The maximum number of personnel who may be detailed to another department or agency (including the Office) under subsection (d)(2) during any fiscal year is—
  (A) for the Department of Defense, 50; and
  (B) for any other department or agency, 10.

<< 21 USCA § 1703 >>

(f) FUND CONTROL NOTICES.—

<< 21 USCA § 1703 >>

(1) IN GENERAL.—A fund control notice may direct that all or part of an amount appropriated to the National Drug Control Program agency account be obligated by—
  (A) months, fiscal year quarters, or other time periods; and
  (B) activities, functions, projects, or object classes.

<< 21 USCA § 1703 >>

(2) UNAUTHORIZED OBLIGATION OR EXPENDITURE PROHIBITED.—An officer or employee of a National Drug Control Program agency shall not make or authorize an expenditure or obligation contrary to a fund control notice issued by the Director.
  (3) DISCIPLINARY ACTION FOR VIOLATION.—In the case of a violation of paragraph (2) by an officer or employee of a National Drug Control Program agency, the head of the agency, upon the request of and in consultation with the Director, may

subject the officer or employee to appropriate administrative discipline, including, when circumstances warrant, suspension from duty without pay or removal from office.

<< 21 USCA § 1703 >>

(g) INAPPLICABILITY TO CERTAIN PROGRAMS.—The provisions of this section shall not apply to the National Foreign Intelligence Program, the Joint Military Intelligence Program and Tactical Intelligence and Related Activities unless the agency that carries out such program is designated as a National Drug Control Program agency by the President or jointly by the Director and the head of the agency.

<< 21 USCA § 1703 >>

(h) CONSTRUCTION.—Nothing in this Act shall be construed as derogating the authorities and responsibilities of the Director of Central Intelligence contained in sections 104 and 504 of the National Security Act of 1947 or any other law.

<< 21 USCA § 1704 >>

SEC. 705. COORDINATION WITH NATIONAL DRUG CONTROL PROGRAM AGENCIES IN DEMAND REDUCTION, SUPPLY REDUCTION, AND STATE AND LOCAL AFFAIRS.

<< 21 USCA § 1704 >>

(a) ACCESS TO INFORMATION.—

<< 21 USCA § 1704 >>

(1) IN GENERAL.—Upon the request of the Director, the head of any National Drug Control Program agency shall cooperate with and provide to the Director any statistics, studies, reports, and other information prepared or collected by the agency concerning the responsibilities of the agency under the National Drug Control Strategy that relate to—
  (A) drug abuse control; or
  (B) the manner in which amounts made available to that agency for drug control are being used by that agency.

<< 21 USCA § 1704 >>

(2) PROTECTION OF INTELLIGENCE INFORMATION.—
  (A) IN GENERAL.—The authorities conferred on the Office and the Director by this title shall be exercised in a manner consistent with provisions of the National Security Act of 1947 (50 U.S.C. 401 et seq.). The Director of Central Intelligence shall prescribe such regulations as may be necessary to protect information provided pursuant to this title regarding intelligence sources and methods.
  (B) DUTIES OF DIRECTOR.—The Director of Central Intelligence shall, to the maximum extent practicable in accordance with subparagraph (A), render full assistance and support to the Office and the Director.

<< 21 USCA § 1704 >>

(3) ILLEGAL DRUG CULTIVATION.—The Secretary of Agriculture shall annually submit to the Director an assessment of the acreage of illegal drug cultivation in the United States.

<< 21 USCA § 1704 >>

(b) CERTIFICATION OF POLICY CHANGES TO DIRECTOR.—

<< 21 USCA § 1704 >>

(1) IN GENERAL.—Subject to paragraph (2), the head of a National Drug Control Program agency shall, unless exigent circumstances require otherwise, notify the Director in writing regarding any proposed change in policies relating to the activities of that agency under the National Drug Control Program prior to implementation of such change. The Director shall promptly review such proposed change and certify to the head of that agency in writing whether such change is consistent with the National Drug Control Strategy.

<< 21 USCA § 1704 >>

(2) EXCEPTION.—If prior notice of a proposed change under paragraph (1) is not practicable—

 (A) the head of the National Drug Control Program agency shall notify the Director of the proposed change as soon as practicable; and

 (B) upon such notification, the Director shall review the change and certify to the head of that agency in writing whether the change is consistent with the National Drug Control Program.

<< 21 USCA § 1704 >>

 (c) GENERAL SERVICES ADMINISTRATION.—The Administrator of General Services shall provide to the Director, in a reimbursable basis, such administrative support services as the Director may request.

<< 21 USCA § 1704 >>

 (d) ACCOUNTING OF FUNDS EXPENDED.—The Director shall—

 (A) require the National Drug Control Program agencies to submit to the Director not later than February 1 of each year a detailed accounting of all funds expended by the agencies for National Drug Control Program activities during the previous fiscal year, and require such accounting to be authenticated by the Inspector General for each agency prior to submission to the Director; and

 (B) submit to Congress not later than April 1 of each year the information submitted to the Director under subparagraph (A).

<< 21 USCA § 1705 >>

SEC. 706. DEVELOPMENT, SUBMISSION, IMPLEMENTATION, AND ASSESSMENT OF NATIONAL DRUG CONTROL STRATEGY.

<< 21 USCA § 1705 >>

 (a) TIMING, CONTENTS, AND PROCESS FOR DEVELOPMENT AND SUBMISSION OF NATIONAL DRUG CONTROL STRATEGY.—

<< 21 USCA § 1705 >>

 (1) TIMING.—Not later than February 1, 1999, the President shall submit to Congress a National Drug Control Strategy, which shall set forth a comprehensive plan, covering a period of not more than 5 years, for reducing drug abuse and the consequences of drug abuse in the United States, by limiting the availability of and reducing the demand for illegal drugs.

<< 21 USCA § 1705 >>

(2) CONTENTS.—

 (A) IN GENERAL.—The National Drug Control Strategy submitted under paragraph (1) shall include—

 (i) comprehensive, research-based, long-range, quantifiable, goals for reducing drug abuse and the consequences of drug abuse in the United States;

 (ii) annual, quantifiable, and measurable objectives and specific targets to accomplish long-term quantifiable goals that the Director determines may be achieved during each year of the period beginning on the date on which the National Drug Control Strategy is submitted;

(iii) 5–year projections for program and budget priorities; and

(iv) a review of international, State, local, and private sector drug control activities to ensure that the United States pursues well-coordinated and effective drug control at all levels of government.

(B) CLASSIFIED INFORMATION.—Any contents of the National Drug Control Strategy that involves information properly classified under criteria established by an Executive order shall be presented to Congress separately from the rest of the National Drug Control Strategy.

<< 21 USCA § 1705 >>

(3) PROCESS FOR DEVELOPMENT AND SUBMISSION.—

(A) CONSULTATION.—In developing and effectively implementing the National Drug Control Strategy, the Director—

(i) shall consult with—

(I) the heads of the National Drug Control Program agencies;

(II) Congress;

(III) State and local officials;

(IV) private citizens and organizations with experience and expertise in demand reduction;

(V) private citizens and organizations with experience and expertise in supply reduction; and

(VI) appropriate representatives of foreign governments;

(ii) with the concurrence of the Attorney General, may require the El Paso Intelligence Center to undertake specific tasks or projects to implement the National Drug Control Strategy; and

(iii) with the concurrence of the Director of Central Intelligence and the Attorney General, may request that the National Drug Intelligence Center undertake specific tasks or projects to implement the National Drug Control Strategy.

(B) INCLUSION IN STRATEGY.—The National Drug Control Strategy under this subsection, and each report submitted under subsection (b), shall include a list of each entity consulted under subparagraph (A)(i).

<< 21 USCA § 1705 >>

(4) SPECIFIC TARGETS.—The targets in the National Drug Control Strategy shall include the following:

(A) Reduction of unlawful drug use to 3 percent of the population of the United States or less by December 31, 2003 (as measured in terms of overall illicit drug use during the past 30 days by the National Household Survey), and achievement of at least 20 percent of such reduction during each of 1999, 2000, 2001, 2002, and 2003.

(B) Reduction of adolescent unlawful drug use (as measured in terms of illicit drug use during the past 30 days by the Monitoring the Future Survey of the University of Michigan or the National PRIDE Survey conducted by the National Parents' Resource Institute for Drug Education) to 3 percent of the adolescent population of the United States or less by December 31, 2003, and achievement of at least 20 percent of such reduction during each of 1999, 2000, 2001, 2002, and 2003.

(C) Reduction of the availability of cocaine, heroin, marijuana, and methamphetamine in the United States by 80 percent by December 31, 2003.

(D) Reduction of the respective nationwide average street purity levels for cocaine, heroin, marijuana, and methamphetamine (as estimated by the interagency drug flows assessment led by the Office of National Drug Control Policy, and based on statistics collected by the Drug Enforcement Administration and other National Drug Control Program agencies identified as relevant by the Director) by 60 percent by December 31, 2003, and achievement of at least 20 percent of each such reduction during each of 1999, 2000, 2001, 2002, and 2003.

(E) Reduction of drug-related crime in the United States by 50 percent by December 31, 2003, and achievement of at least 20 percent of such reduction during each of 1999, 2000, 2001, 2002, and 2003, including—

(i) reduction of State and Federal unlawful drug trafficking and distribution;

(ii) reduction of State and Federal crimes committed by persons under the influence of unlawful drugs;

(iii) reduction of State and Federal crimes committed for the purpose of obtaining unlawful drugs or obtaining property that is intended to be used for the purchase of unlawful drugs; and

(iv) reduction of drug-related emergency room incidents in the United States (as measured by data of the Drug Abuse Warning Network on illicit drug abuse), including incidents involving gunshot wounds and automobile accidents in which illicit drugs are identified in the bloodstream of the victim, by 50 percent by December 31, 2003.

<< 21 USCA § 1705 >>

(5) FURTHER REDUCTIONS IN DRUG USE, AVAILABILITY, AND CRIME.—Following the submission of a National Drug Control Strategy under this section to achieve the specific targets described in paragraph (4), the Director may formulate a strategy for additional reductions in drug use and availability and drug-related crime beyond the 5–year period covered by the National Drug Control Strategy that has been submitted.

<< 21 USCA § 1705 >>

(b) ANNUAL STRATEGY REPORT.—

<< 21 USCA § 1705 >>

(1) IN GENERAL.—Not later than February 1, 1999, and on February 1 of each year thereafter, the President shall submit to Congress a report on the progress in implementing the Strategy under subsection (a), which shall include—

(A) an assessment of the Federal effectiveness in achieving the National Drug Control Strategy goals and objectives using the performance measurement system described in subsection (c), including—

(i) an assessment of drug use and availability in the United States; and

(ii) an estimate of the effectiveness of interdiction, treatment, prevention, law enforcement, and international programs under the National Drug Control Strategy in effect during the preceding year, or in effect as of the date on which the report is submitted;

(B) any modifications of the National Drug Control Strategy or the performance measurement system described in subsection (c);

(C) an assessment of the manner in which the budget proposal submitted under section 704(c) is intended to implement the National Drug Control Strategy and whether the funding levels contained in such proposal are sufficient to implement such Strategy;

(D) measurable data evaluating the success or failure in achieving the annual measurable objectives described in subsection (a)(2)(A)(ii);

(E) an assessment of current drug use (including inhalants) and availability, impact of drug use, and treatment availability, which assessment shall include—

(i) estimates of drug prevalence and frequency of use as measured by national, State, and local surveys of illicit drug use and by other special studies of—

(I) casual and chronic drug use;

(II) high-risk populations, including school dropouts, the homeless and transient, arrestees, parolees, probationers, and juvenile delinquents; and

(III) drug use in the workplace and the productivity lost by such use;

(ii) an assessment of the reduction of drug availability against an ascertained baseline, as measured by—

(I) the quantities of cocaine, heroin, marijuana, methamphetamine, and other drugs available for consumption in the United States;

(II) the amount of marijuana, cocaine, heroin, and precursor chemicals entering the United States;

(III) the number of hectares of marijuana, poppy, and coca cultivated and destroyed domestically and in other countries;

(IV) the number of metric tons of marijuana, heroin, cocaine, and methamphetamine seized;

(V) the number of cocaine and methamphetamine processing laboratories destroyed domestically and in other countries;

(VI) changes in the price and purity of heroin and cocaine, changes in the price of methamphetamine, and changes in tetrahydrocannabinol level of marijuana;

(VII) the amount and type of controlled substances diverted from legitimate retail and wholesale sources; and

(VIII) the effectiveness of Federal technology programs at improving drug detection capabilities in interdiction, and at United States ports of entry;

(iii) an assessment of the reduction of the consequences of drug use and availability, which shall include estimation of—

(I) the burden drug users placed on hospital emergency departments in the United States, such as the quantity of drug-related services provided;

(II) the annual national health care costs of drug use, including costs associated with people becoming infected with the human immuno-deficiency virus and other infectious diseases as a result of drug use;

(III) the extent of drug-related crime and criminal activity; and

(IV) the contribution of drugs to the underground economy, as measured by the retail value of drugs sold in the United States;

(iv) a determination of the status of drug treatment in the United States, by assessing—

(I) public and private treatment capacity within each State, including information on the treatment capacity available in relation to the capacity actually used;

(II) the extent, within each State, to which treatment is available;

(III) the number of drug users the Director estimates could benefit from treatment; and

(IV) the specific factors that restrict the availability of treatment services to those seeking it and proposed administrative or legislative remedies to make treatment available to those individuals; and

(v) a review of the research agenda of the Counter–Drug Technology Assessment Center to reduce the availability and abuse of drugs; and

(F) an assessment of private sector initiatives and cooperative efforts between the Federal Government and State and local governments for drug control.

<< 21 USCA § 1705 >>

(2) SUBMISSION OF REVISED STRATEGY.—The President may submit to Congress a revised National Drug Control Strategy that meets the requirements of this section—

(A) at any time, upon a determination by the President, in consultation with the Director, that the National Drug Control Strategy in effect is not sufficiently effective; and

(B) if a new President or Director takes office.

<< 21 USCA § 1705 >>

(3) 1999 STRATEGY REPORT.—With respect to the Strategy report required to be submitted by this subsection on February 1, 1999, the President shall prepare the report using such information as is available for the period covered by the report.

<< 21 USCA § 1705 >>

(c) PERFORMANCE MEASUREMENT SYSTEM.—

<< 21 USCA § 1705 >>

(1) SENSE OF CONGRESS.—It is the sense of Congress that—

(A) the targets described in subsection (a) are important to the reduction of overall drug use in the United States;

(B) the President should seek to achieve those targets during the 5 years covered by the National Drug Control Strategy required to be submitted under subsection (a);

(C) the purpose of such targets and the annual reports to Congress on the progress towards achieving the targets is to allow for the annual restructuring of appropriations by the Appropriations Committees and authorizing committees of jurisdiction of Congress to meet the goals described in this Act;

(D) the performance measurement system developed by the Director described in this subsection is central to the National Drug Control Program targets, programs, and budget;

(E) the Congress strongly endorses the performance measurement system for establishing clear outcomes for reducing drug use nationwide during the next five years, and the linkage of this system to all agency drug control programs and budgets receiving funds scored as drug control agency funding.

<< 21 USCA § 1705 >>

(2) SUBMISSION TO CONGRESS.—Not later than February 1, 1999, the Director shall submit to Congress a description of the national drug control performance measurement system, designed in consultation with affected National Drug Control Program agencies, that—

(A) develops performance objectives, measures, and targets for each National Drug Control Strategy goal and objective;

(B) revises performance objectives, measures, and targets, to conform with National Drug Control Program Agency budgets;

(C) identifies major programs and activities of the National Drug Control Program agencies that support the goals and objectives of the National Drug Control Strategy;

(D) evaluates in detail the implementation by each National Drug Control Program agency of program activities supporting the National Drug Control Strategy;

(E) monitors consistency between the drug-related goals and objectives of the National Drug Control Program agencies and ensures that drug control agency goals and budgets support and are fully consistent with the National Drug Control Strategy; and

(F) coordinates the development and implementation of national drug control data collection and reporting systems to support policy formulation and performance measurement, including an assessment of—

(i) the quality of current drug use measurement instruments and techniques to measure supply reduction and demand reduction activities;

(ii) the adequacy of the coverage of existing national drug use measurement instruments and techniques to measure the casual drug user population and groups that are at risk for drug use; and

(iii) the actions the Director shall take to correct any deficiencies and limitations identified pursuant to subparagraphs (A) and (B) of subsection (b)(4).

<< 21 USCA § 1705 >>

(3) MODIFICATIONS.—A description of any modifications made during the preceding year to the national drug control performance measurement system described in paragraph (2) shall be included in each report submitted under subsection (b).

<< 21 USCA § 1706 >>

SEC. 707. HIGH INTENSITY DRUG TRAFFICKING AREAS PROGRAM.

<< 21 USCA § 1706 >>

(a) ESTABLISHMENT.—There is established in the Office a program to be known as the High Intensity Drug Trafficking Areas Program.

<< 21 USCA § 1706 >>

(b) DESIGNATION.—The Director, upon consultation with the Attorney General, the Secretary of the Treasury, heads of the National Drug Control Program agencies, and the Governor of each applicable State, may designate any specified area of the United States as a high intensity drug trafficking area. After making such a designation and in order to provide Federal assistance to the area so designated, the Director may—

<< 21 USCA § 1706 >>

(1) obligate such sums as appropriated for the High Intensity Drug Trafficking Areas Program;

<< 21 USCA § 1706 >>

(2) direct the temporary reassignment of Federal personnel to such area, subject to the approval of the head of the department or agency that employs such personnel;

<< 21 USCA § 1706 >>

(3) take any other action authorized under section 704 to provide increased Federal assistance to those areas;

<< 21 USCA § 1706 >>

(4) coordinate activities under this subsection (specifically administrative, recordkeeping, and funds management activities) with State and local officials.

<< 21 USCA § 1706 >>

(c) FACTORS FOR CONSIDERATION.—In considering whether to designate an area under this section as a high intensity drug trafficking area, the Director shall consider, in addition to such other criteria as the Director considers to be appropriate, the extent to which—

<< 21 USCA § 1706 >>

(1) the area is a center of illegal drug production, manufacturing, importation, or distribution;

<< 21 USCA § 1706 >>

(2) State and local law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem;

<< 21 USCA § 1706 >>

(3) drug-related activities in the area are having a harmful impact in other areas of the country; and

<< 21 USCA § 1706 >>

(4) a significant increase in allocation of Federal resources is necessary to respond adequately to drug-related activities in the area.

<< 21 USCA § 1706 >>

(d) USE OF FUNDS.—The Director shall ensure that no Federal funds appropriated for the High Intensity Drug Trafficking Program are expended for the establishment or expansion of drug treatment programs.

<< 21 USCA § 1707 >>

SEC. 708. COUNTER–DRUG TECHNOLOGY ASSESSMENT CENTER.

<< 21 USCA § 1707 >>

(a) ESTABLISHMENT.—There is established within the Office the Counter–Drug Technology Assessment Center (referred to in this section as the "Center"). The Center shall operate under the authority of the Director of National Drug Control Policy and shall serve as the central counter-drug technology research and development organization of the United States Government.

<< 21 USCA § 1707 >>

(b) DIRECTOR OF TECHNOLOGY.—There shall be at the head of the Center the Director of Technology, who shall be appointed by the Director of National Drug Control Policy from among individuals qualified and distinguished in the area of science, medicine, engineering, or technology.

<< 21 USCA § 1707 >>

(c) ADDITIONAL RESPONSIBILITIES OF THE DIRECTOR OF NATIONAL DRUG CONTROL POLICY.—

<< 21 USCA § 1707 >>

(1) IN GENERAL.—The Director, acting through the Director of Technology shall—

  (A) identify and define the short-, medium-, and long-term scientific and technological needs of Federal, State, and local drug supply reduction agencies, including—

   (i) advanced surveillance, tracking, and radar imaging;

   (ii) electronic support measures;

   (iii) communications;

   (iv) data fusion, advanced computer systems, and artificial intelligence; and

   (v) chemical, biological, radiological (including neutron, electron, and graviton), and other means of detection;

  (B) identify demand reduction basic and applied research needs and initiatives, in consultation with affected National Drug Control Program agencies, including—

   (i) improving treatment through neuroscientific advances;

   (ii) improving the transfer of biomedical research to the clinical setting; and

   (iii) in consultation with the National Institute on Drug Abuse, and through interagency agreements or grants, examining addiction and rehabilitation research and the application of technology to expanding the effectiveness or availability of drug treatment;

  (C) make a priority ranking of such needs identified in subparagraphs (A) and (B) according to fiscal and technological feasibility, as part of a National Counter–Drug Enforcement Research and Development Program;

  (D) oversee and coordinate counter-drug technology initiatives with related activities of other Federal civilian and military departments;

  (E) provide support to the development and implementation of the national drug control performance measurement system; and

  (F) pursuant to the authority of the Director of National Drug Control Policy under section 704, submit requests to Congress for the reprogramming or transfer of funds appropriated for counter-drug technology research and development.

<< 21 USCA § 1707 >>

(2) LIMITATION ON AUTHORITY.—The authority granted to the Director under this subsection shall not extend to the award of contracts, management of individual projects, or other operational activities.

<< 21 USCA § 1707 >>

(d) ASSISTANCE AND SUPPORT TO OFFICE OF NATIONAL DRUG CONTROL POLICY.—The Secretary of Defense and the Secretary of Health and Human Services shall, to the maximum extent practicable, render assistance and support to the Office and to the Director in the conduct of counter-drug technology assessment.

<< 21 USCA § 1708 >>

SEC. 709. PRESIDENT'S COUNCIL ON COUNTER–NARCOTICS.

<< 21 USCA § 1708 >>

(a) ESTABLISHMENT.—There is established a council to be known as the President's Council on Counter–Narcotics (referred to in this section as the "Council").

<< 21 USCA § 1708 >>

(b) MEMBERSHIP.—

<< 21 USCA § 1708 >>

(1) IN GENERAL.—Subject to paragraph (2), the Council shall be composed of 18 members, of whom—
(A) 1 shall be the President, who shall serve as Chairman of the Council;
(B) 1 shall be the Vice President;
(C) 1 shall be the Secretary of State;
(D) 1 shall be the Secretary of the Treasury;
(E) 1 shall be the Secretary of Defense;
(F) 1 shall be the Attorney General;
(G) 1 shall be the Secretary of Transportation;
(H) 1 shall be the Secretary of Health and Human Services;
(I) 1 shall be the Secretary of Education;
(J) 1 shall be the Representative of the United States of America to the United Nations;
(K) 1 shall be the Director of the Office of Management and Budget;
(L) 1 shall be the Chief of Staff to the President;
(M) 1 shall be the Director of the Office, who shall serve as the Executive Director of the Council;
(N) 1 shall be the Director of Central Intelligence;
(O) 1 shall be the Assistant to the President for National Security Affairs;
(P) 1 shall be the Counsel to the President;
(Q) 1 shall be the Chairman of the Joint Chiefs of Staff; and
(R) 1 shall be the National Security Adviser to the Vice President.

<< 21 USCA § 1708 >>

(2) ADDITIONAL MEMBERS.—The President may, in the discretion of the President, appoint additional members to the Council.

<< 21 USCA § 1708 >>

(c) FUNCTIONS.—The Council shall advise and assist the President in—

<< 21 USCA § 1708 >>

(1) providing direction and oversight for the national drug control strategy, including relating drug control policy to other national security interests and establishing priorities; and

<< 21 USCA § 1708 >>

(2) ensuring coordination among departments and agencies of the Federal Government concerning implementation of the National Drug Control Strategy.

<< 21 USCA § 1708 >>

(d) ADMINISTRATION.—

<< 21 USCA § 1708 >>

(1) IN GENERAL.—The Council may utilize established or ad hoc committees, task forces, or interagency groups chaired by the Director (or a representative of the Director) in carrying out the functions of the Council under this section.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 21 USCA § 1708 >>

(2) STAFF.—The staff of the Office, in coordination with the staffs of the Vice President and the Assistant to the President for National Security Affairs, shall act as staff for the Council.

<< 21 USCA § 1708 >>

(3) COOPERATION FROM OTHER AGENCIES.—Each department and agency of the executive branch shall—
  (A) cooperate with the Council in carrying out the functions of the Council under this section; and
  (B) provide such assistance, information, and advice as the Council may request, to the extent permitted by law.

<< 21 USCA § 1709 >>

SEC. 710. PARENTS ADVISORY COUNCIL ON YOUTH DRUG ABUSE.

<< 21 USCA § 1709 >>

(a) IN GENERAL.—

<< 21 USCA § 1709 >>

(1) ESTABLISHMENT.—There is established a Council to be known as the Parents Advisory Council on Youth Drug Abuse (referred to in this section as the "Council").

<< 21 USCA § 1709 >>

(2) MEMBERSHIP.—
  (A) COMPOSITION.—The Council shall be composed of 16 members, of whom—
  (i) 4 shall be appointed by the President, each of whom shall be a parent or guardian of a child who is not less than 6 and not more than 18 years of age as of the date on which the appointment is made;
  (ii) 4 shall be appointed by the Majority Leader of the Senate, 3 of whom shall be a parent or guardian of a child who is not less than 6 and not more than 18 years of age as of the date on which the appointment is made;
  (iii) 2 shall be appointed by the Minority Leader of the Senate, each of whom shall be a parent or guardian of a child who is not less than 6 and not more than 18 years of age as of the date on which the appointment is made;
  (iv) 4 shall be appointed by the Speaker of the House of Representatives, 3 of whom shall be a parent or guardian of a child who is not less than 6 and not more than 18 years of age as of the date on which the appointment is made; and
  (v) 2 shall be appointed by the Minority Leader of the House of Representatives, each of whom shall be a parent or guardian of a child who is not less than 6 and not more than 18 years of age as of the date on which the appointment is made.
  (B) REQUIREMENTS.—
  (i) IN GENERAL.—Each member of the Council shall be an individual from the private sector with a demonstrated interest and expertise in research, education, treatment, or prevention activities related to youth drug abuse.
  (ii) REPRESENTATIVES OF NONPROFIT ORGANIZATIONS.—Not less than 1 member appointed under each of clauses (i) through (v) of paragraph (2)(A) shall be a representative of a nonprofit organization focused on involving parents in anti-drug education and prevention.
  (C) DATE.—The appointments of the initial members of the Council shall be made not later than 60 days after the date of enactment of this section.
  (D) EXECUTIVE DIRECTOR.—The Director shall appoint the Executive Director of the Council, who shall be an employee of the Office of National Drug Control Policy.

<< 21 USCA § 1709 >>

(3) PERIOD OF APPOINTMENT; VACANCIES.—

(A) PERIOD OF APPOINTMENT.—Each member of the Council shall be appointed for a term of 3 years, except that, of the initial members of the Council—

(i) 1 member appointed under each of clauses (i) through (v) of paragraph (2)(A) shall be appointed for a term of 1 year; and

(ii) 1 member appointed under each of clauses (i) through (v) of paragraph (2)(A) shall be appointed for a term of 2 years.

(B) VACANCIES.—Any vacancy in the Council shall not affect its powers, provided that a quorum is present, but shall be filled in the same manner as the original appointment. Any member appointed to fill a vacancy occurring before the expiration of the term for which the member's predecessor was appointed shall be appointed only for the remainder of that term.

(C) APPOINTMENT OF SUCCESSOR.—To the extent necessary to prevent a vacancy in the membership of the Council, a member of the Council may serve for not more than 6 months after the expiration of the term of that member, if the successor of that member has not been appointed.

<< 21 USCA § 1709 >>

(4) INITIAL MEETING.—Not later than 120 days after the date on which all initial members of the Council have been appointed, the Council shall hold its first meeting.

<< 21 USCA § 1709 >>

(5) MEETINGS.—The Council shall meet at the call of the Chairperson.

<< 21 USCA § 1709 >>

(6) QUORUM.—Nine members of the Council shall constitute a quorum, but a lesser number of members may hold hearings.

<< 21 USCA § 1709 >>

(7) CHAIRPERSON AND VICE CHAIRPERSON.—

(A) IN GENERAL.—The members of the Council shall select a Chairperson and Vice Chairperson from among the members of the Council.

(B) DUTIES OF CHAIRPERSON.—The Chairperson of the Council shall assign committee duties relating to the Council and direct the Executive Director to convene hearings and conduct other necessary business of the Council.

(C) DUTIES OF VICE CHAIRPERSON.—If the Chairperson of the Council is unable to serve, the Vice Chairperson shall serve as the Chairperson.

<< 21 USCA § 1709 >>

(b) DUTIES OF THE COUNCIL.—

<< 21 USCA § 1709 >>

(1) IN GENERAL.—The Council—

(A) shall advise the Director on drug prevention, education, and treatment and assist the Deputy Director of Demand Reduction in the responsibilities for the coordination of the demand reduction programs of the Federal Government and the analysis and consideration of prevention and treatment alternatives; and

(B) may issue reports and recommendations on drug prevention, education, and treatment, in addition to the reports detailed in paragraph (2), as the Council considers appropriate.

<< 21 USCA § 1709 >>

(2) SUBMISSION OF REPORTS.—Any report or recommendation issued by the Council shall be submitted to the Director and subsequently to Congress.

<< 21 USCA § 1709 >>

AR.02893

(3) ADVICE ON THE NATIONAL DRUG CONTROL STRATEGY.—Not later than December 1, 1999, and on December 1 of each year thereafter, the Council shall submit to the Director an annual report containing drug control strategy recommendations on drug prevention, education, and treatment. The Director may include any recommendations submitted under this paragraph in the report submitted by the Director under section 706(b).

<< 21 USCA § 1709 >>

(c) EXPENSES.—The members of the Council shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Council.

<< 21 USCA § 1709 >>

(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Council such sums as may be necessary carry out this section.

<< 21 USCA § 1710 >>

SEC. 711. DRUG INTERDICTION.

<< 21 USCA § 1710 >>

(a) DEFINITION.—In this section, the term "Federal drug control agency" means—

<< 21 USCA § 1710 >>

(1) the Office of National Drug Control Policy;

<< 21 USCA § 1710 >>

(2) the Department of Defense;

<< 21 USCA § 1710 >>

(3) the Drug Enforcement Administration;

<< 21 USCA § 1710 >>

(4) the Federal Bureau of Investigation;

<< 21 USCA § 1710 >>

(5) the Immigration and Naturalization Service;

<< 21 USCA § 1710 >>

(6) the United States Coast Guard;

<< 21 USCA § 1710 >>

(7) the United States Customs Service; and

<< 21 USCA § 1710 >>

(8) any other department or agency of the Federal Government that the Director determines to be relevant.

<< 21 USCA § 1710 >>

 (b) REPORT.—In order to assist Congress in determining the personnel, equipment, funding, and other resources that would be required by Federal drug control agencies in order to achieve a level of interdiction success at or above the highest level achieved before the date of enactment of this title, not later than 90 days after the date of enactment of this Act, the Director shall submit to Congress and to each Federal drug control program agency a report, which shall include—

<< 21 USCA § 1710 >>

 (1) with respect to the southern and western border regions of the United States (including the Pacific coast, the border with Mexico, the Gulf of Mexico coast, and other ports of entry) and in overall totals, data relating to—
 (A) the amount of marijuana, heroin, methamphetamine, and cocaine—
 (i) seized during the year of highest recorded seizures for each drug in each region and during the year of highest recorded overall seizures; and
 (ii) disrupted during the year of highest recorded disruptions for each drug in each region and during the year of highest recorded overall seizures; and
 (B) the number of persons arrested for violations of section 1010(a) of the Controlled Substances Import and Export Act (21 U.S.C. 960(a)) and related offenses during the year of the highest number of arrests on record for each region and during the year of highest recorded overall arrests;

<< 21 USCA § 1710 >>

 (2) the price of cocaine, heroin, methamphetamine, and marijuana during the year of highest price on record during the preceding 10–year period, adjusted for purity where possible; and

<< 21 USCA § 1710 >>

 (3) a description of the personnel, equipment, funding, and other resources of the Federal drug control agency devoted to drug interdiction and securing the borders of the United States against drug trafficking for each of the years identified in paragraphs (1) and (2) for each Federal drug control agency.

<< 21 USCA § 1710 >>

(c) BUDGET PROCESS.—

<< 21 USCA § 1710 >>

 (1) INFORMATION TO DIRECTOR.—Based on the report submitted under subsection (b), each Federal drug control agency shall submit to the Director, at the same time as each annual drug control budget request is submitted by the Federal drug control agency to the Director under section 704(c)(1), a description of the specific personnel, equipment, funding, and other resources that would be required for the Federal drug control agency to meet or exceed the highest level of interdiction success for that agency identified in the report submitted under subsection (b).

<< 21 USCA § 1710 >>

 (2) INFORMATION TO CONGRESS.—The Director shall include each submission under paragraph (1) in each annual consolidated National Drug Control Program budget proposal submitted by the Director to Congress under section 704(c)(2), which submission shall be accompanied by a description of any additional resources that would be required by the Federal drug control agencies to meet the highest level of interdiction success identified in the report submitted under subsection (b).

<< 21 USCA § 1509 >>

SEC. 712. ESTABLISHMENT OF SPECIAL FORFEITURE FUND.

  Section 6073 of the Asset Forfeiture Amendments Act of 1988 (21 U.S.C. 1509) is amended—

<< 21 USCA § 1509 >>

  (1) in subsection (b)—
    (A) by striking "section 524(c)(9)" and inserting "section 524(c)(8)"; and
    (B) by striking "section 9307(g)" and inserting "section 9703(g)"; and

<< 21 USCA § 1509 >>

  (2) in subsection (e), by striking "strategy" and inserting "Strategy".

SEC. 713. TECHNICAL AND CONFORMING AMENDMENTS.

  (a) TITLE 5, UNITED STATES CODE.—Chapter 53 of title 5, United States Code, is amended—

<< 5 USCA § 5312 >>

  (1) in section 5312, by adding at the end the following:
  "Director of National Drug Control Policy.";

<< 5 USCA § 5313 >>

  (2) in section 5313, by adding at the end the following:
  "Deputy Director of National Drug Control Policy."; and

<< 5 USCA § 5314 >>

  (3) in section 5314, by adding at the end the following:
  "Deputy Director for Demand Reduction, Office of National Drug Control Policy.
  "Deputy Director for Supply Reduction, Office of National Drug Control Policy.
  "Deputy Director for State and Local Affairs, Office of National Drug Control Policy.".

<< 50 USCA § 402 >>

  (b) NATIONAL SECURITY ACT OF 1947.—Section 101 of the National Security Act of 1947 (50 U.S.C. 402) is amended by redesignating subsection (f) as subsection (g) and inserting after subsection (e) the following:
  "(f) The Director of National Drug Control Policy may, in the role of the Director as principal adviser to the National Security Council on national drug control policy, and subject to the direction of the President, attend and participate in meetings of the National Security Council.".

<< 31 USCA § 1105 >>

  (c) SUBMISSION OF NATIONAL DRUG CONTROL PROGRAM BUDGET WITH ANNUAL BUDGET REQUEST OF PRESIDENT.—Section 1105(a) of title 31, United States Code, is amended by inserting after paragraph (25) the following:
  "(26) a separate statement of the amount of appropriations requested for the Office of National Drug Control Policy and each program of the National Drug Control Program.".

<< 21 USCA § 1711 >>

SEC. 714. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated to carry out this title, to remain available until expended, such sums as may be necessary for each of fiscal years 1999 through 2003.

<< 21 USCA § 1712 >>

SEC. 715. TERMINATION OF OFFICE OF NATIONAL DRUG CONTROL POLICY.

<< 21 USCA § 1712 >>

(a) IN GENERAL.—Except as provided in subsection (b), effective on September 30, 2003, this title and the amendments made by this title are repealed.

<< 21 USCA § 1712 >>

(b) EXCEPTION.—Subsection (a) does not apply to section 713 or the amendments made by that section.

TITLE VIII—WESTERN HEMISPHERE DRUG ELIMINATION

<< 21 USCA § 501 NOTE >>

SEC. 801. SHORT TITLE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This title may be cited as the "Western Hemisphere Drug Elimination Act".
(b) TABLE OF CONTENTS.—The table of contents for this title is as follows:

Sec. 801. Short title; table of contents.

Sec. 802. Findings and statement of policy.

SUBTITLE A—ENHANCED SOURCE AND TRANSIT COUNTRY COVERAGE

Sec. 811. Expansion of radar coverage and operation in source and transit countries.

Sec. 812. Expansion of Coast Guard drug interdiction.

Sec. 813. Expansion of aircraft coverage and operation in source and transit countries.

SUBTITLE B—ENHANCED ERADICATION AND INTERDICTION STRATEGY IN SOURCE COUNTRIES

Sec. 821. Additional eradication resources for Colombia.

Sec. 822. Additional eradication resources for Peru.

Sec. 823. Additional eradication resources for Bolivia.

Sec. 824. Miscellaneous additional eradication resources.

Sec. 825. Bureau of International Narcotics and Law Enforcement Affairs.

SUBTITLE C—ENHANCED ALTERNATIVE CROP DEVELOPMENT SUPPORT IN SOURCE ZONE

Sec. 831. Alternative crop development support.

Sec. 832. Authorization of appropriations for Agricultural Research Service counterdrug research and development activities.

Sec. 833. Master plan for herbicides to control narcotic crops.

Sec. 834. Authorization of use of environmentally-approved herbicides to eliminate illicit narcotics crops.

SUBTITLE D—ENHANCED INTERNATIONAL LAW ENFORCEMENT TRAINING

Sec. 841. Enhanced international law enforcement academy training.

Sec. 842. Enhanced United States drug enforcement international training.

Sec. 843. Provision of nonlethal equipment to foreign law enforcement organizations for cooperative illicit narcotics control activities.

SUBTITLE E—ENHANCED DRUG TRANSIT AND SOURCE
ZONE LAW ENFORCEMENT OPERATIONS AND EQUIPMENT

Sec. 851. Increased funding for operations and equipment; report.

Sec. 852. Funding for computer software and hardware to facilitate direct communication between drug enforcement agencies.

Sec. 853. Sense of Congress regarding priority of drug interdiction and counterdrug activities.

SUBTITLE F—RELATIONSHIP TO OTHER LAWS

Sec. 861. Authorizations of appropriations.

SUBTITLE G—TRAFFICKING IN CONTROLLED SUBSTANCES

Sec. 871. Short title.

Sec. 872. Limitation.

SEC. 802. FINDINGS AND STATEMENT OF POLICY.

(a) FINDINGS.—Congress makes the following findings:

(1) Teenage drug use in the United States has doubled since 1993.

(2) The drug crisis facing the United States is a top national security threat.

(3) The spread of illicit drugs through United States borders cannot be halted without an effective drug interdiction strategy.

(4) Effective drug interdiction efforts have been shown to limit the availability of illicit narcotics, drive up the street price, support demand reduction efforts, and decrease overall drug trafficking and use.

(5) A prerequisite for reducing youth drug use is increasing the price of drugs. To increase price substantially, at least 60 percent of drugs must be interdicted.

(6) In 1987, the national drug control budget maintained a significant balance between demand and supply reduction efforts, illustrated as follows:

(A) 29 percent of the total drug control budget expenditures for demand reduction programs.

(B) 38 percent of the total drug control budget expenditures for domestic law enforcement.

(C) 33 percent of the total drug control budget expenditures for international drug interdiction efforts.

(7) In the late 1980's and early 1990's, counternarcotic efforts were successful, specifically in protecting the borders of the United States from penetration by illegal narcotics through increased seizures by the United States Coast Guard and other agencies, including a 302 percent increase in pounds of cocaine seized between 1987 and 1991.

(8) Limiting the availability of narcotics to drug traffickers in the United States had a promising effect as illustrated by the decline of illicit drug use between 1988 and 1991, through a—

(A) 13 percent reduction in total drug use;

(B) 35 percent drop in cocaine use; and

(C) 16 percent decrease in marijuana use.

(9) In 1993, drug interdiction efforts in the transit zones were reduced due to an imbalance in the national drug control strategy. This trend has continued through 1995 as shown by the following figures:

(A) 35 percent for demand reduction programs.

(B) 53 percent for domestic law enforcement.

(C) 12 percent for international drug interdiction efforts.

(10) Supply reduction efforts became a lower priority for the Administration and the seizures by the United States Coast Guard and other agencies decreased as shown by a 68 percent decrease in the pounds of cocaine seized between 1991 and 1996.

(11) Reductions in funding for comprehensive interdiction operations like OPERATION GATEWAY and OPERATION STEELWEB, initiatives that encompassed all areas of interdiction and attempted to disrupt the operating methods of drug smugglers along the entire United States border, have created unprotected United States border areas which smugglers exploit to move their product into the United States.

(12) The result of this new imbalance in the national drug control strategy caused the drug situation in the United States to become a crisis with serious consequences including—

(A) doubling of drug-abuse-related arrests for minors between 1992 and 1996;

(B) 70 percent increase in overall drug use among children aged 12 to 17;

(C) 80 percent increase in drug use for graduating seniors since 1992;

(D) a sharp drop in the price of 1 pure gram of heroin from \$1,647 in 1992 to \$966 in February 1996; and

(E) a reduction in the street price of 1 gram of cocaine from \$123 to \$104 between 1993 and 1994.

(13) The percentage change in drug use since 1992, among graduating high school students who used drugs in the past 12 months, has substantially increased—marijuana use is up 80 percent, cocaine use is up 80 percent, and heroin use is up 100 percent.

(14) The Department of Defense has been called upon to support counter-drug efforts of Federal law enforcement agencies that are carried out in source countries and through transit zone interdiction, but in recent years Department of Defense assets critical to those counter-drug activities have been consistently diverted to missions that the Secretary of Defense and the Chairman of the Joint Chiefs of Staff consider a higher priority.

(15) The Secretary of Defense and the Chairman of the Joint Chiefs of Staff, through the Department of Defense policy referred to as the Global Military Force Policy, has established the priorities for the allocation of military assets in the following order: (1) war; (2) military operations other than war that might involve contact with hostile forces (such as peacekeeping operations and noncombatant evacuations); (3) exercises and training; and (4) operational tasking other than those involving hostilities (including counter-drug activities and humanitarian assistance).

(16) Use of Department of Defense assets is critical to the success of efforts to stem the flow of illegal drugs from source countries and through transit zones to the United States.

(17) The placement of counter-drug activities in the fourth and last priority of the Global Military Force Policy list of priorities for the allocation of military assets has resulted in a serious deficiency in assets vital to the success of source country and transit zone efforts to stop the flow of illegal drugs into the United States.

(18) At present the United States faces few, if any, threats from abroad greater than the threat posed to the Nation's youth by illegal and dangerous drugs.

(19) The conduct of counter-drug activities has the potential for contact with hostile forces.

(20) The Department of Defense counter-drug activities mission should be near the top, not among the last, of the priorities for the allocation of Department of Defense assets after the first priority for those assets for the war-fighting mission of the Department of Defense.

(b) STATEMENT OF POLICY.—It is the policy of the United States to—

(1) reduce the supply of drugs and drug use through an enhanced drug interdiction effort in the major drug transit countries, as well support a comprehensive supply country eradication and crop substitution program, because a commitment of increased resources in international drug interdiction efforts will create a balanced national drug control strategy among demand reduction, law enforcement, and international drug interdiction efforts; and

(2) develop and establish comprehensive drug interdiction and drug eradication strategies, and dedicate the required resources, to achieve the goal of reducing the flow of illegal drugs into the United States by 80 percent by as early as January 1, 2003.

Subtitle A–Enhanced Source and Transit Country Coverage

SEC. 811. EXPANSION OF RADAR COVERAGE AND OPERATION IN SOURCE AND TRANSIT COUNTRIES.

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are authorized to be appropriated for the Department of the Treasury for fiscal years 1999, 2000, and 2001 for the enhancement of radar coverage in drug source and transit countries in the total amount of $14,300,000 which shall be available for the following purposes:

(1) For restoration of radar, and operation and maintenance of radar, in the Bahamas.

(2) For operation and maintenance of ground-based radar at Guantanamo Bay Naval Base, Cuba.

(b) REPORT.—Not later than January 31, 1999, the Secretary of Defense, in conjunction with the Director of Central Intelligence, shall submit to the Committee on National Security, the Committee on International Relations, and the Permanent Select Committee on Intelligence of the House of Representatives and the Committee on Armed Services, the Committee on Foreign Relations, and the Select Committee on Intelligence of the Senate a report examining the options available to the United States for improving Relocatable Over the Horizon (ROTHR) capability to provide enhanced radar coverage of narcotics source zone countries in South America and transit zones in the Eastern Pacific. The report shall include—

(1) a discussion of the need and costs associated with the establishment of a proposed fourth ROTHR site located in the source or transit zones; and

(2) an assessment of the intelligence specific issues raised if such a ROTHR facility were to be established in conjunction with a foreign government.

SEC. 812. EXPANSION OF COAST GUARD DRUG INTERDICTION.

(a) OPERATING EXPENSES.—For operating expenses of the Coast Guard associated with expansion of drug interdiction activities around Puerto Rico, the United States Virgin Islands, and other transit zone areas of operation, there is authorized to be appropriated to the Secretary of Transportation $151,500,000 for each of fiscal years 1999, 2000, and 2001. Such amounts shall include (but are not limited to) amounts for the following:

(1) For deployment of intelligent acoustic detection buoys in the Florida Straits and Bahamas.

(2) For a nonlethal technology program to enhance countermeasures against the threat of transportation of drugs by so-called Go–Fast boats.

(b) ACQUISITION, CONSTRUCTION, AND IMPROVEMENT.—

(1) IN GENERAL.—For acquisition, construction, and improvement of facilities and equipment to be used for expansion of Coast Guard drug interdiction activities, there is authorized to be appropriated to the Secretary of Transportation for fiscal year 1999 the total amount of $630,300,000 which shall be available for the following purposes:

(A) For maritime patrol aircraft sensors.

(B) For acquisition of deployable pursuit boats.

(C) For the acquisition and construction of up to 15 United States Coast Guard Coastal Patrol Boats.

(D) For—

(i) the reactivation of up to 3 United States Coast Guard HU–25 Falcon jets;

(ii) the procurement of up to 3 C–37A aircraft; or

(iii) the procurement of up to 3 C–20H aircraft.

(E) For acquisition of installed or deployable electronic sensors and communications systems for Coast Guard Cutters.

(F) For acquisition and construction of facilities and equipment to support regional and international law enforcement training and support in Puerto Rico, the United States Virgin Islands, and the Caribbean Basin.

(G) For acquisition or conversion of maritime patrol aircraft.

(H) For acquisition or conversion of up to 2 vessels to be used as Coast Guard Medium or High Endurance Cutters.

(I) For acquisition or conversion of up to 2 vessels to be used as Coast Guard Cutters as support, command, and control platforms for drug interdiction operations.

(J) For acquisition of up to 6 Coast Guard Medium Endurance Cutters.

(2) CONTINUED AVAILABILITY.—Amounts appropriated under this subsection may remain available until expended.

(c) REQUIREMENT TO ACCEPT PATROL CRAFT FROM DEPARTMENT OF DEFENSE.—The Secretary of Transportation shall accept, for use by the Coast Guard for expanded drug interdiction activities, 7 PC–170 patrol craft if offered by the Department of Defense.

SEC. 813. EXPANSION OF AIRCRAFT COVERAGE AND OPERATION IN SOURCE AND TRANSIT COUNTRIES.

 (a) DEPARTMENT OF THE TREASURY.—Funds are authorized to be appropriated for the Department of the Treasury for fiscal years 1999, 2000, and 2001 for the enhancement of air coverage and operation for drug source and transit countries in the total amount of $886,500,000 which shall be available for the following purposes:

  (1) For procurement of 10 P–3B Early Warning aircraft for the United States Customs Service to enhance overhead air coverage of drug source zone countries.

  (2) For the procurement and deployment of 10 P–3B Slick airplanes for the United States Customs Service to enhance overhead air coverage of the drug source zone.

  (3) In fiscal years 2000 and 2001, for operation and maintenance of 10 P–3B Early Warning aircraft for the United States Customs Service to enhance overhead air coverage of drug source zone countries.

  (4) For personnel for the 10 P–3B Early Warning aircraft for the United States Customs Service to enhance overhead air coverage of drug source zone countries.

  (5) In fiscal years 2000 and 2001, for operation and maintenance of 10 P–3B Slick airplanes for the United States Customs Service to enhance overhead coverage of the drug source zone.

  (6) For personnel for the 10 P–3B Slick airplanes for the United States Customs Service to enhance overhead air coverage of drug source zone countries.

  (7) For construction and furnishing of an additional facility for the P–3B aircraft.

  (8) For operation and maintenance for overhead air coverage for source countries.

  (9) For operation and maintenance for overhead coverage for the Caribbean and Eastern Pacific regions.

  (10) For purchase and for operation and maintenance of 3 RU–38A observation aircraft (to be piloted by pilots under contract with the United States).

 (b) REPORT.—Not later than January 31, 1999, the Secretary of Defense, in consultation with the Secretary of State and the Director of Central Intelligence, shall submit to the Committee on National Security, the Committee on International Relations, and the Permanent Select Committee on Intelligence of the House of Representatives and to the Committee on Armed Services, the Committee on Foreign Relations, and the Select Committee on Intelligence of the Senate a report examining the options available in the source and transit zones to replace Howard Air Force Base in Panama and specifying the requirements of the United States to establish an airbase or airbases for use in support of counternarcotics operations to optimize operational effectiveness in the source and transit zones. The report shall identify the following:

  (1) The specific requirements necessary to support the national drug control policy of the United States.

  (2) The estimated construction, operation, and maintenance costs for a replacement counterdrug airbase or airbases in the source and transit zones.

  (3) Possible interagency cost sharing arrangements for a replacement airbase or airbases.

  (4) Any legal or treaty-related issues regarding the replacement airbase or airbases.

  (5) A summary of completed alternative site surveys for the airbase or airbases.

 (c) TRANSFER OF AIRCRAFT.—The Secretary of the Navy shall transfer to the United States Customs Service—

  (1) ten currently retired and previously identified heavyweight P–3B aircraft for modification into P–3 AEW&C aircraft; and

  (2) ten currently retired and previously identified heavyweight P–3B aircraft for modification into P–3 Slick aircraft.

Subtitle B—Enhanced Eradication and Interdiction Strategy in Source Countries

SEC. 821. ADDITIONAL ERADICATION RESOURCES FOR COLOMBIA.

 (a) DEPARTMENT OF STATE.—Funds are authorized to be appropriated for the Department of State for fiscal years 1999, 2000, and 2001 for the enhancement of drug-related eradication efforts in Colombia in the total amount of $201,250,000 which shall be available for the following purposes:

  (1) For each such fiscal year for sustaining support of the helicopters and fixed wing fleet of the national police of Colombia.

(2) For the purchase of DC–3 transport aircraft for the national police of Colombia.

(3) For acquisition of resources needed for prison security in Colombia.

(4) For the purchase of minigun systems for the national police of Colombia.

(5) For the purchase of 6 UH–60L Black Hawk utility helicopters for the national police of Colombia and for operation, maintenance, and training relating to such helicopters.

(6) For procurement, for upgrade of 50 UH–1H helicopters to the Huey II configuration equipped with miniguns for the use of the national police of Colombia.

(7) For the repair and rebuilding of the antinarcotics base in southern Colombia.

(8) For providing sufficient and adequate base and force security for any rebuilt facility in southern Colombia, and the other forward operating antinarcotics bases of the Colombian National Police antinarcotics unit.

<< 22 USCA § 2291 NOTE >>

(b) COUNTERNARCOTICS ASSISTANCE.—

<< 22 USCA § 2291 NOTE >>

(1) LIMITATION ON PROVISION OF ASSISTANCE.—Except as provided in paragraph (2), United States counternarcotics assistance may not be provided for the Government of Colombia under this title or under any other provision of law on or after the date of enactment of this Act if the Government of Colombia negotiates or permits the establishment of any demilitarized zone in which the eradication of drug production by the security forces of Colombia, including the Colombian National Police antinarcotics unit, is prohibited.

<< 22 USCA § 2291 NOTE >>

(2) EXCEPTION.—If the Government of Colombia negotiates or permits the establishment of a demilitarized zone described in paragraph (1), United States counternarcotics assistance may be provided for the Government of Colombia for a period of up to 90 consecutive days upon a finding by the President that providing such assistance is in the national interest of the United States.

<< 22 USCA § 2291 NOTE >>

(3) NOTIFICATION.—In each case in which counternarcotics assistance is provided for the Government of Colombia as a result of a finding by the President described in paragraph (2), the President shall notify the Committees on Appropriations and the authorizing committees of jurisdiction of the House of Representatives and the Senate not later than 5 days after such assistance is provided.

SEC. 822. ADDITIONAL ERADICATION RESOURCES FOR PERU.

(a) DEPARTMENT OF STATE.—Funds are authorized to be appropriated for the Department of State for fiscal years 1999, 2000, and 2001 for the establishment of a third drug interdiction site in Peru to support air bridge and riverine missions for enhancement of drug-related eradication efforts in Peru, in the total amount of $3,000,000, and an additional amount of $1,000,000 for each of fiscal years 2000 and 2001 for operation and maintenance.

(b) DEPARTMENT OF DEFENSE STUDY.—The Secretary of Defense shall conduct a study of Peruvian counternarcotics air interdiction requirements and, not later than 90 days after the date of enactment of this Act, submit to Congress a report on the results of the study. The study shall include a review of the Peruvian Air Force's current and future requirements for counternarcotics air interdiction to complement the Peruvian Air Force's A–37 capability.

SEC. 823. ADDITIONAL ERADICATION RESOURCES FOR BOLIVIA.

Funds are authorized to be appropriated for the Department of State for fiscal years 1999, 2000, and 2001 for enhancement of drug-related eradication efforts in Bolivia in the total amount of $17,000,000 which shall be available for the following purposes:

(1) For support of air operations in Bolivia.

(2) For support of riverine operations in Bolivia.

(3) For support of coca eradication programs.

(4) For procurement of 2 mobile x-ray machines, with operation and maintenance support.

## SEC. 824. MISCELLANEOUS ADDITIONAL ERADICATION RESOURCES.

Funds are authorized to be appropriated for the Department of State for fiscal years 1999, 2000, and 2001 for enhanced precursor chemical control projects, in the total amount of $500,000.

## SEC. 825. BUREAU OF INTERNATIONAL NARCOTICS AND LAW ENFORCEMENT AFFAIRS.

(a) SENSE OF CONGRESS RELATING TO PROFESSIONAL QUALIFICATIONS OF OFFICIALS RESPONSIBLE FOR INTERNATIONAL NARCOTICS CONTROL.—It is the sense of Congress that any individual serving in the position of assistant secretary in any department or agency of the Federal Government who has primary responsibility for international narcotics control and law enforcement, and the principal deputy of any such assistant secretary, shall have substantial professional qualifications in the fields of—

(1) management;

(2) Federal law enforcement or intelligence; and

(3) foreign policy.

(b) SENSE OF CONGRESS RELATING TO DEFICIENCIES IN INTERNATIONAL NARCOTICS ASSISTANCE ACTIVITIES.—It is the sense of Congress that the responsiveness and effectiveness of international narcotics assistance activities under the Department of State have been severely hampered due, in part, to the lack of law enforcement expertise by responsible personnel in the Department of State.

Subtitle C—Enhanced Alternative Crop Development Support in Source Zone

## SEC. 831. ALTERNATIVE CROP DEVELOPMENT SUPPORT.

Funds are authorized to be appropriated for the United States Agency for International Development for fiscal years 1999, 2000, and 2001 for alternative development programs in the total amount of $180,000,000 which shall be available as follows:

(1) In the Guaviare, Putumayo, and Caqueta regions in Colombia.

(2) In the Ucayali, Apurimac, and Huallaga Valley regions in Peru.

(3) In the Chapare and Yungas regions in Bolivia.

## SEC. 832. AUTHORIZATION OF APPROPRIATIONS FOR AGRICULTURAL RESEARCH SERVICE COUNTERDRUG RESEARCH AND DEVELOPMENT ACTIVITIES.

(a) IN GENERAL.—There is authorized to be appropriated to the Secretary of Agriculture for each of fiscal years 1999, 2000, and 2001, $23,000,000 to support the counternarcotics research efforts of the Agricultural Research Service of the Department of Agriculture. Of that amount, funds are authorized as follows:

(1) $5,000,000 shall be used for crop eradication technologies.

(2) $2,000,000 shall be used for narcotics plant identification, chemistry, and biotechnology.

(3) $1,000,000 shall be used for worldwide crop identification, detection tagging, and production estimation technology.

(4) $5,000,000 shall be used for improving the disease resistance, yield, and economic competitiveness of commercial crops that can be promoted as alternatives to the production of narcotics plants.

(5) $10,000,000 to contract with entities meeting the criteria described in subsection (b) for the product development, environmental testing, registration, production, aerial distribution system development, product effectiveness monitoring, and modification of multiple herbicides to control narcotic crops (including coca, poppy, and cannabis) in the United States and internationally.

(b) CRITERIA FOR ELIGIBLE ENTITIES.—An entity under this subsection is an entity which possesses—

(1) experience in diseases of narcotic crops;

(2) intellectual property involving seed-borne dispersal formulations;

(3) the availability of state-of-the-art containment or quarantine facilities;

(4) country-specific herbicide formulations;

(5) specialized fungicide resistant formulations; or

(6) special security arrangements.

## SEC. 833. MASTER PLAN FOR HERBICIDES TO CONTROL NARCOTIC CROPS.

(a) IN GENERAL.—The Director of the Office of National Drug Control Policy shall develop a 10–year master plan for the use of herbicides to control narcotic crops (including coca, poppy, and cannabis) in the United States and internationally.

(b) COORDINATION.—The Director shall develop the plan in coordination with—

(1) the Department of Agriculture;

(2) the Drug Enforcement Administration of the Department of Justice;

(3) the Department of Defense;

(4) the Environmental Protection Agency;

(5) the Bureau for International Narcotics and Law Enforcement Activities of the Department of State;

(6) the United States Information Agency; and

(7) other appropriate agencies.

(c) REPORT.—Not later than March 1, 1999, the Director of the Office of National Drug Control Policy shall submit to Congress a report describing the activities undertaken to carry out this section.

<< 21 USCA § 1713 >>

## SEC. 834. AUTHORIZATION OF USE OF ENVIRONMENTALLY–APPROVED HERBICIDES TO ELIMINATE ILLICIT NARCOTICS CROPS.

The Secretary of State, the Attorney General, the Secretary of Agriculture, the Secretary of Defense, the Director of the Office of National Drug Control Policy, and the Administrator of the Environmental Protection Agency are authorized to support the development and use of environmentally-approved herbicides to eliminate illicit narcotics crops, including coca, cannabis, and opium poppy, both in the United States and in foreign countries.

Subtitle D—Enhanced International Law Enforcement Training

## SEC. 841. ENHANCED INTERNATIONAL LAW ENFORCEMENT ACADEMY TRAINING.

(a) MARITIME LAW ENFORCEMENT TRAINING CENTER.—Funds are authorized to be appropriated for the Department of Transportation and the Department of the Treasury for fiscal years 1999, 2000, and 2001 for the joint establishment, operation, and maintenance in San Juan, Puerto Rico, of a center for training law enforcement personnel of countries located in the Latin American and Caribbean regions in matters relating to maritime law enforcement, including customs-related ports management matters, as follows:

(1) For each such fiscal year for funding by the Department of Transportation, $1,500,000.

(2) For each such fiscal year for funding by the Department of the Treasury, $1,500,000.

(b) UNITED STATES COAST GUARD INTERNATIONAL MARITIME TRAINING VESSEL.—Funds are authorized to be appropriated for the Department of Transportation for fiscal years 1999, 2000, and 2001 for the establishment, operation, and maintenance of maritime training vessels in the total amount of $15,000,000 which shall be available for the following purposes:

(1) For a vessel for international maritime training, which shall visit participating Latin American and Caribbean nations on a rotating schedule in order to provide law enforcement training and to perform maintenance on participating national assets.

(2) For support of the United States Coast Guard Balsam Class Buoy Tender training vessel.

## SEC. 842. ENHANCED UNITED STATES DRUG ENFORCEMENT INTERNATIONAL TRAINING.

(a) MEXICO.—Funds are authorized to be appropriated for the Department of Justice for fiscal years 1999, 2000, and 2001 for substantial exchanges for Mexican judges, prosecutors, and police, in the total amount of $2,000,000 for each such fiscal year. The Attorney General shall consult with the Secretary of State regarding such exchanges.

(b) BRAZIL.—Funds are authorized to be appropriated for the Department of Justice for fiscal years 1999, 2000, and 2001 for enhanced support for the Brazilian Federal Police Training Center, in the total amount of $1,000,000 for each such fiscal year. The Attorney General shall consult with the Secretary of State regarding such enhanced support.

(c) PANAMA.—

(1) IN GENERAL.—Funds are authorized to be appropriated for the Department of Transportation for fiscal years 1999, 2000, and 2001 for operation and maintenance, for locating and operating Coast Guard assets so as to strengthen the capability of the Coast Guard of Panama to patrol the Atlantic and Pacific coasts of Panama for drug enforcement and interdiction activities, in the total amount of $1,000,000 for each such fiscal year. The Secretary of Transportation shall consult with the Secretary of State regarding the location and operation of such assets for such purposes.

(2) ELIGIBILITY TO RECEIVE TRAINING.—Notwithstanding any other provision of law, members of the national police of Panama shall be eligible to receive training through the International Military Education Training program.

(d) VENEZUELA.—There are authorized to be appropriated for the Department of Justice for each of fiscal years 1999, 2000, and 2001, $1,000,000 for operation and maintenance, for support for the Venezuelan Judicial Technical Police Counterdrug Intelligence Center. The Attorney General shall consult with the Secretary of State regarding such support.

(e) ECUADOR.—

(1) IN GENERAL.—Funds are authorized to be appropriated for the Department of Transportation and the Department of the Treasury for each of fiscal years 1999, 2000, and 2001 for the buildup of local coast guard and port control in Guayaquil and Esmeraldas, Ecuador, as follows:

(A) For each such fiscal year for the Department of Transportation, $500,000.

(B) For each such fiscal year for the Department of the Treasury, $500,000.

(2) CONSULTATION.—The Secretary of Transportation and the Secretary of the Treasury shall consult with the Secretary of State regarding the buildup described in paragraph (1).

(f) HAITI AND THE DOMINICAN REPUBLIC.—Funds are authorized to be appropriated for the Department of the Treasury for each of fiscal years 1999, 2000, and 2001, $500,000 for the buildup of local coast guard and port control in Haiti and the Dominican Republic. The Secretary of the Treasury shall consult with the Secretary of State regarding such buildup of local coast guard and port patrol.

(g) CENTRAL AMERICA.—There are authorized to be appropriated for the Department of the Treasury for each of fiscal years 1999, 2000, and 2001, $12,000,000 for the buildup of local coast guard and port control in Belize, Costa Rica, El Salvador, Guatemala, Honduras, and Nicaragua. The Secretary of the Treasury shall consult with the Secretary of State regarding such buildup of local coast guard and port patrol.

<< 22 USCA § 2291–5 >>

SEC. 843. PROVISION OF NONLETHAL EQUIPMENT TO FOREIGN LAW ENFORCEMENT ORGANIZATIONS FOR COOPERATIVE ILLICIT NARCOTICS CONTROL ACTIVITIES.

<< 22 USCA § 2291–5 >>

(a) IN GENERAL.—(1) Subject to paragraph (2), the Administrator of the Drug Enforcement Administration, in consultation with the Secretary of State, may transfer or lease each year nonlethal equipment to foreign law enforcement organizations for the purpose of establishing and carrying out cooperative illicit narcotics control activities.

<< 22 USCA § 2291–5 >>

(2)(A) The Administrator may transfer or lease equipment under paragraph (1) only if the equipment is not designated as a munitions item or controlled on the United States Munitions List pursuant to section 38 of the Arms Export Control Act.

(B) The value of each piece of equipment transferred or leased under paragraph (1) may not exceed $100,000.

<< 22 USCA § 2291–5 >>

(b) ADDITIONAL REQUIREMENT.—The Administrator shall provide for the maintenance and repair of any equipment transferred or leased under subsection (a).

<< 22 USCA § 2291–5 >>

(c) NOTIFICATION REQUIREMENT.—Before the export of any item authorized for transfer under subsection (a), the Administrator shall provide written notice to the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives in accordance with the procedures applicable to reprogramming notifications under section 634A of the Foreign Assistance Act of 1961 (22 U.S.C. 2394–1).

<< 22 USCA § 2291–5 >>

(d) SENSE OF CONGRESS.—It is the sense of Congress that—

<< 22 USCA § 2291–5 >>

(1) all United States law enforcement personnel serving in Mexico should be accredited the same status under the Vienna Convention on Diplomatic Immunity as other diplomatic personnel serving at United States posts in Mexico; and

<< 22 USCA § 2291–5 >>

(2) all Mexican narcotics law enforcement personnel serving in the United States should be accorded the same diplomatic status as Drug Enforcement Administration personnel serving in Mexico.

Subtitle E—Enhanced Drug Transit and Source Zone Law Enforcement Operations and Equipment

SEC. 851. INCREASED FUNDING FOR OPERATIONS AND EQUIPMENT; REPORT.

(a) DRUG ENFORCEMENT ADMINISTRATION.—Funds are authorized to be appropriated for the Drug Enforcement Administration for fiscal years 1999, 2000, and 2001 for enhancement of counternarcotic operations in drug transit and source countries in the total amount of $58,900,000 which shall be available for the following purposes:

(1) For support of the Merlin program.

(2) For support of the intercept program.

(3) For support of the development and implementation of automation systems to support investigative and intelligence requirements.

(4) For support of the Caribbean Initiative.

(5) For the hire of special agents, administrative and investigative support personnel, and intelligence analysts for the support of overseas investigations.

(b) DEPARTMENT OF STATE.—Funds are authorized to be appropriated for the Department of State for fiscal year 1999, 2000, and 2001 for the deployment of commercial unclassified intelligence and imaging data and a Passive Coherent Location System for counternarcotics and interdiction purposes in the Western Hemisphere, the total amount of $20,000,000.

(c) DEPARTMENT OF THE TREASURY.—Funds are authorized to be appropriated for the United States Customs Service for fiscal years 1999, 2000, and 2001 for enhancement of counternarcotic operations in drug transit and source countries in the total amount of $71,500,000 which shall be available for the following purposes:

(1) For refurbishment of up to 30 interceptor and Blue Water Platform vessels in the Caribbean maritime fleet.

(2) For purchase of up to 9 new interceptor vessels in the Caribbean maritime fleet.

(3) For the hire and training of up to 25 special agents for maritime operations in the Caribbean.

(4) For purchase of up to 60 automotive vehicles for ground use in South Florida.

(5) For each such fiscal year for operation and maintenance support for up to 10 United States Customs Service Citations Aircraft to be dedicated for the source and transit zone.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(6) For purchase of non-intrusive inspection systems consistent with the United States Customs Service 5–year technology plan, including truck x-rays and gamma-imaging for drug interdiction purposes at high-threat seaports and land border ports of entry.

(d) DEPARTMENT OF DEFENSE REPORT.—Not later than January 31, 1999, the Secretary of Defense, in consultation with the Director of the Office of National Drug Control Policy, shall submit to Congress a report examining and proposing recommendations regarding any organizational changes to optimize counterdrug activities, including alternative cost-sharing arrangements regarding the following facilities:

(1) The Joint Inter–Agency Task Force, East, Key West, Florida.

(2) The Joint Inter–Agency Task Force, West, Alameda, California.

(3) The Joint Inter–Agency Task Force, South, Panama City, Panama.

(4) The Joint Task Force 6, El Paso, Texas.

## SEC. 852. FUNDING FOR COMPUTER SOFTWARE AND HARDWARE TO FACILITATE DIRECT COMMUNICATION BETWEEN DRUG ENFORCEMENT AGENCIES.

(a) AUTHORIZATION.—Funds are authorized to be appropriated for the development and purchase of computer software and hardware to facilitate direct communication between agencies that perform work relating to the interdiction of drugs at United States borders, including the United States Customs Service, the Border Patrol, the Federal Bureau of Investigation, the Drug Enforcement Agency, and the Immigration and Naturalization Service, in the total amount of $50,000,000.

(b) AVAILABILITY.—Funds authorized pursuant to the authorization of appropriations in subsection (a) shall remain available until expended.

## SEC. 853. SENSE OF CONGRESS REGARDING PRIORITY OF DRUG INTERDICTION AND COUNTERDRUG ACTIVITIES.

It is the sense of Congress that the Secretary of Defense should revise the Global Military Force Policy of the Department of Defense in order—

(1) to treat the international drug interdiction and counter-drug activities of the Department as a military operation other than war, thereby elevating the priority given such activities under the Policy to the next priority below the priority given to war under the Policy and to the same priority as is given to peacekeeping operations under the Policy; and

(2) to allocate the assets of the Department to drug interdiction and counter-drug activities in accordance with the priority given those activities.

Subtitle F—Relationship to Other Laws

## SEC. 861. AUTHORIZATIONS OF APPROPRIATIONS.

The funds authorized to be appropriated for any department or agency of the Federal Government for fiscal years 1999, 2000, or 2001 by this title are in addition to funds authorized to be appropriated for that department or agency for fiscal year 1999, 2000, or 2001 by any other provision of law.

Subtitle G—Trafficking in Controlled Substances

<< 21 USCA § 801 NOTE >>

## SEC. 871. SHORT TITLE.

This subtitle may be cited as the "Controlled Substances Trafficking Prohibition Act".

## SEC. 872. LIMITATION.

<< 21 USCA § 956 >>

(a) AMENDMENT.—Section 1006(a) of the Controlled Substances Import and Export Act (21 U.S.C. 956(a)) is amended—

<< 21 USCA § 956 >>

(1) by striking "The Attorney General" and inserting "(1) Subject to paragraph (2), the Attorney General"; and

<< 21 USCA § 956 >>

(2) by adding at the end the following:

"(2) Notwithstanding any exemption under paragraph (1), a United States resident who enters the United States through an international land border with a controlled substance (except a substance in schedule I) for which the individual does not possess a valid prescription issued by a practitioner (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) in accordance with applicable Federal and State law (or documentation that verifies the issuance of such a prescription to that individual) may not import the controlled substance into the United States in an amount that exceeds 50 dosage units of the controlled substance.".

<< 21 USCA § 956 NOTE >>

(b) FEDERAL MINIMUM REQUIREMENT.—Section 1006(a)(2) of the Controlled Substances Import and Export Act, as added by subsection (a), is a minimum Federal requirement and shall not be construed to limit a State from imposing any additional requirement.

<< 21 USCA § 956 NOTE >>

(c) EXTENT.—The amendment made by subsection (a) shall not be construed to affect the jurisdiction of the Secretary of Health and Human Services under the Federal Food, Drug and Cosmetic Act (21 U.S.C. 301 et seq.).

TITLE IX—DRUG–FREE WORKPLACE ACT

<< 15 USCA § 631 >>

SEC. 901. SHORT TITLE.

This title may be cited as the "Drug–Free Workplace Act of 1998".

<< 15 USCA § 654 NOTE >>

SEC. 902. FINDINGS; PURPOSES.

<< 15 USCA § 654 NOTE >>

(a) FINDINGS.—Congress finds that—

<< 15 USCA § 654 NOTE >>

(1) 74 percent of adults who use illegal drugs are employed;

<< 15 USCA § 654 NOTE >>

(2) small business concerns employ over 50 percent of the Nation's workforce;

<< 15 USCA § 654 NOTE >>

(3) in more than 88 percent of families with children under the age of 18, at least 1 parent is employed; and

<< 15 USCA § 654 NOTE >>

(4) employees who use and abuse addictive illegal drugs and alcohol increase costs for businesses and risk the health and safety of all employees because—

(A) absenteeism is 66 percent higher among drug users than individuals who do not use drugs;

(B) health benefit utilization is 300 percent higher among drug users than individuals who do not use drugs;

(C) 47 percent of workplace accidents are drug-related;

(D) disciplinary actions are 90 percent higher among drug users than among individuals who do not use drugs; and

(E) employee turnover is significantly higher among drug users than among individuals who do not use drugs.

<< 15 USCA § 654 NOTE >>

(b) PURPOSES.—The purposes of this title are to—

<< 15 USCA § 654 NOTE >>

(1) educate small business concerns about the advantages of a drug-free workplace;

<< 15 USCA § 654 NOTE >>

(2) provide grants and technical assistance in addition to financial incentives to enable small business concerns to create a drug-free workplace;

<< 15 USCA § 654 NOTE >>

(3) assist working parents in keeping their children drug-free; and

<< 15 USCA § 654 NOTE >>

(4) encourage small business employers and employees alike to participate in drug-free workplace programs.

<< 15 USCA § 654 NOTE >>

SEC. 903. SENSE OF CONGRESS.

It is the sense of Congress that—

<< 15 USCA § 654 NOTE >>

(1) businesses should adopt drug-free workplace programs;

<< 15 USCA § 654 NOTE >>

(2) States should consider incentives to encourage businesses to adopt drug-free workplace programs; and

<< 15 USCA § 654 NOTE >>

(3) such incentives may include—

(A) financial incentives, including—

(i) a reduction in workers' compensation premiums;

(ii) a reduction in unemployment insurance premiums; and

(iii) tax deductions in an amount equal to the amount of expenditures for employee assistance programs, treatment, or illegal drug testing; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) other incentives, such as the adoption of liability limitations, as recommended by the President's Commission on Model State Drug Laws.

<< 15 USCA § 654 >>

SEC. 904. DRUG–FREE WORKPLACE DEMONSTRATION PROGRAM.

Section 27 of the Small Business Act (15 U.S.C. 654) is amended to read as follows:

**"SEC. 27. DRUG–FREE WORKPLACE DEMONSTRATION PROGRAM.**

"(a) DEFINITIONS.—In this section:

"(1) DRUG–FREE WORKPLACE PROGRAM.—The term 'drug-free workplace program' means a program that includes—

"(A) a written policy, including a clear statement of expectations for workplace behavior, prohibitions against reporting to work or working under the influence of illegal drugs or alcohol, prohibitions against the use or possession of illegal drugs in the workplace, and the consequences of violating those expectations and prohibitions;

"(B) drug and alcohol abuse prevention training for a total of not less than 2 hours for each employee, and additional voluntary drug and alcohol abuse prevention training for employees who are parents;

"(C) employee illegal drug testing, with analysis conducted by a drug testing laboratory certified by the Substance Abuse and Mental Health Services Administration, or approved by the College of American Pathologists for forensic drug testing, and a review of each positive test result by a medical review officer;

"(D) employee access to an employee assistance program, including confidential assessment, referral, and short-term problem resolution; and

"(E) continuing alcohol and drug abuse prevention education.

"(2) ELIGIBLE INTERMEDIARY.—The term 'eligible intermediary' means an organization—

"(A) that has not less than 2 years of experience in carrying out drug-free workplace programs;

"(B) that has a drug-free workplace policy in effect;

"(C) that is located in a State, the District of Columbia, or a territory of the United States; and

"(D) the purpose of which is—

"(i) to develop comprehensive drug-free workplace programs or to supply drug-free workplace services; or

"(ii) to provide other forms of assistance and services to small business concerns.

"(3) EMPLOYEE.—The term 'employee' includes any—

"(A) applicant for employment;

"(B) employee;

"(C) supervisor;

"(D) manager;

"(E) officer of a small business concern who is active in management of the concern; and

"(F) owner of a small business concern who is active in management of the concern.

"(4) MEDICAL REVIEW OFFICER.—The term 'medical review officer'—

"(A) means a licensed physician with knowledge of substance abuse disorders; and

"(B) does not include any—

"(i) employee of the small business concern; or

"(ii) employee or agent of, or any person having a financial interest in, the laboratory for which the illegal drug test results are being reviewed.

"(b) ESTABLISHMENT.—There is established a drug-free workplace demonstration program, under which the Administrator may make grants to, or enter into cooperative agreements or contracts with, eligible intermediaries for the purpose of providing financial and technical assistance to small business concerns seeking to establish a drug-free workplace program.

"(c) PRIVACY PROTECTION FOR EMPLOYEES PARTICIPATING IN A DRUG–FREE WORKPLACE PROGRAM.— Each drug-free workplace program established with assistance made available under this section shall—

"(1) include, as reasonably necessary and appropriate, practices and procedures to ensure the confidentiality of illegal drug test results and of any participation by an employee in a rehabilitation program;

"(2) prohibit the mandatory disclosure of medical information by an employee prior to a confirmed positive illegal drug test; and

"(3) require that a medical review officer reviewing illegal drug test results shall report only the final results, limited to those drugs for which the employee tests positive, in writing and in a manner designed to ensure the confidentiality of the results.

"(d) EVALUATION AND COORDINATION.—Not later than 18 months after the date of enactment of the Drug–Free Workplace Act of 1998, the Administrator, in coordination with the Secretary of Labor, the Secretary of Health and Human Services, and the Director of National Drug Control Policy, shall—

"(1) evaluate the drug-free workplace programs established with assistance made available under this section; and

"(2) submit to Congress a report describing the results of the evaluation under paragraph (1).

"(e) CONTRACT AUTHORITY.—In carrying out this section, the Administrator may—

"(1) contract with public and private entities to provide assistance related to carrying out the program under this section; and

"(2) compensate those entities for provision of that assistance.

"(f) CONSTRUCTION.—Nothing in this section may be construed to require an employer who attends a program offered by an intermediary to contract for any service offered by the intermediary.

"(g) AUTHORIZATION.—

"(1) IN GENERAL.—There is authorized to be appropriated to carry out this section, $10,000,000 for fiscal years 1999 and 2000. Amounts made available under this subsection shall remain available until expended.

"(2) SMALL BUSINESS DEVELOPMENT CENTERS.—Of the total amount made available under this subsection, not more than the greater of 10 percent or $1,000,000 may be used to carry out section 21(c)(3)(T).".

<< 15 USCA § 648 >>

SEC. 905. SMALL BUSINESS DEVELOPMENT CENTERS.

Section 21(c)(3) of the Small Business Act (15 U.S.C. 648(c)(3)) is amended—

<< 15 USCA § 648 >>

(1) in subparagraph (R), by striking "and" at the end;

<< 15 USCA § 648 >>

(2) in subparagraph (S), by striking the period at the end and inserting "; and"; and

<< 15 USCA § 648 >>

(3) by adding at the end the following:

"(T) providing information and assistance to small business concerns with respect to establishing drug-free workplace programs on or before October 1, 2000.".

TITLE X—CANYON FERRY RESERVOIR, MONTANA, ACT

SECTION 1001. FINDINGS.

Congress finds that the conveyance of the properties described in section 4(b) to the lessees of those properties for fair market value would have the beneficial results of—

(1) reducing Pick–Sloan project debt for the Canyon Ferry Unit;

(2) providing a permanent source of funding to acquire publicly accessible land and interests in land, including easements and conservation easements, in the State from willing sellers at fair market value to—

(A) restore and conserve fisheries habitat, including riparian habitat;

(B) restore and conserve wildlife habitat;

(C) enhance public hunting, fishing, and recreational opportunities; and

(D) improve public access to public land;

AR.02911

(3) eliminating Federal payments in lieu of taxes and associated management expenditures in connection with the Federal Government's ownership of the properties while increasing local tax revenues from the new owners; and

(4) eliminating expensive and contentious disputes between the Secretary and leaseholders while ensuring that the Federal Government receives full and fair value for the properties.

SEC. 1002. PURPOSES.

The purposes of this Act are to—

(1) establish terms and conditions under which the Secretary of the Interior shall, for fair market value, convey certain properties around Canyon Ferry Reservoir, Montana, to private parties; and

(2) acquire certain land for fish and wildlife conservation purposes.

SEC. 1003. DEFINITIONS.

In this Act:

(1) CANYON FERRY–BROADWATER COUNTY TRUST.—The term "Canyon Ferry-Broadwater County Trust" means the Canyon Ferry-Broadwater County Trust established under section 8.

(2) CFRA.—The term "CFRA" means the Canyon Ferry Recreation Association, Incorporated, a Montana corporation.

(3) COMMISSIONERS.—The term "Commissioners" means the Board of Commissioners for Broadwater County, Montana.

(4) LEASE.—The term "lease" means a lease or permit in effect on the date of enactment of this Act that gives a leaseholder the right to occupy a property.

(5) LESSEE.—The term "lessee" means—

(A) the leaseholder of 1 of the properties on the date of enactment of this Act; and

(B) the leaseholder's heirs, executors, and assigns of the leasehold interest in the property.

(6) MONTANA FISH AND WILDLIFE CONSERVATION TRUST.—The term "Montana Fish and Wildlife Conservation Trust" means the Montana Fish and Wildlife Conservation Trust established under section 7.

(7) PROJECT.—The term "project" means the Canyon Ferry Unit of the Pick–Sloan Missouri River Basin Project.

(8) PROPERTY.—

(A) IN GENERAL.—The term "property" means 1 of the cabin sites described in section 4(b).

(B) USE IN THE PLURAL.—The term "properties" means all 265 of the properties and any contiguous parcels referred to in section 4(b)(1)(B).

(9) PURCHASER.—The term "purchaser" means a person or entity, excluding CFRA or a lessee, that purchases the properties under section 4.

(10) RESERVOIR.—The term "Reservoir" means the Canyon Ferry Reservoir, Montana.

(11) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(12) STATE.—The term "State" means the State of Montana.

SEC. 1004. SALE OF PROPERTIES.

(a) IN GENERAL.—Consistent with the Act of June 17, 1902 (32 Stat. 388, chapter 1093) and Acts supplemental to and amendatory of that Act (43 U.S.C. 371 et seq.), the Secretary shall convey to CFRA or a purchaser—

(1) all right, title, and interest (except the mineral estate) of the United States in and to the properties, subject to valid existing rights and the operational requirements of the Pick–Sloan Missouri River Basin Program; and

(2) perpetual easements for—

(A) vehicular access to each property;

(B) access to and use of 1 dock per property; and

(C) access to and use of all boathouses, ramps, retaining walls, and other improvements for which access is provided in the leases as of the date of enactment of this Act.

(b) DESCRIPTION OF PROPERTIES.—

(1) IN GENERAL.—The properties to be conveyed are—

(A) the 265 cabin sites of the Bureau of Reclamation located along the northern end of the Reservoir in portions of sections 2, 11, 12, 13, 15, 22, 23, and 26, Township 10 North, Range 1 West; and

(B) any small parcel contiguous to any property (not including shoreline or land needed to provide public access to the shoreline of the Reservoir) that the Secretary determines should be conveyed in order to eliminate an inholding and facilitate administration of surrounding land remaining in Federal ownership.

(2) ACREAGE; LEGAL DESCRIPTION.—The acreage and legal description of each property and of each parcel shall be determined by the Secretary in consultation with CFRA.

(3) RESTRICTIVE USE COVENANT.—

(A) IN GENERAL.—In order to maintain the unique character of the Reservoir area, the Secretary, the purchaser, CFRA, and each subsequent owner of each property shall covenant that the use restrictions to carry out subparagraphs (B) and (C) shall—

(i) be appurtenant to, and run, with each property; and

(ii) be binding on each subsequent owner of each property.

(B) ACCESS TO RESERVOIR.—

(i) IN GENERAL.—The Secretary, the purchaser, CFRA, and the subsequent owners of each property shall ensure that—

(I) public access to and along the shoreline of the Reservoir in existence on the date of enactment of this Act is not obstructed; and

(II) adequate public access to and along the shoreline of the Reservoir is maintained.

(ii) FEDERAL RECLAMATION LAW.—

(I) IN GENERAL.—No conveyance of property under this Act shall restrict or limit the authority or ability of the Secretary to fulfill the duties of the Secretary under the Act of June 17, 1902 (32 Stat. 388, chapter 1093), and Acts supplemental to and amendatory of that Act (43 U.S.C. 371 et seq.).

(II) NO LIABILITY.—The operation of the Reservoir by the Secretary in fulfillment of the duties described in subclause (I) shall not result in liability for damages, direct or indirect, to the owner of any property conveyed under section 4(a) or damages from any loss of use or enjoyment of the property.

(C) HISTORICAL USE.—The Secretary, the purchaser, CFRA, and each subsequent owner of each property shall covenant that future uses of the property shall be limited to the type and intensity of uses in existence on the date of enactment of this Act, as limited by the prohibitions contained in the annual operating plan of the Bureau of Reclamation for the Reservoir in effect on October 1, 1998.

(c) PURCHASE PROCESS.—

(1) IN GENERAL.—The Secretary shall—

(A) solicit sealed bids for the properties;

(B) subject to paragraph (2), sell the properties to the bidder that submits the highest bid above the minimum bid determined under paragraph (2); and

(C) not accept any bid for less than all of the properties in 1 transaction.

(2) MINIMUM BID.—

(A) IN GENERAL.—Before accepting bids, the Secretary shall establish a minimum bid, which shall be equal to the fair market value of the properties determined by an appraisal of each property, exclusive of the value of private improvements made by the leaseholders before the date of the conveyance, in conformance with the Uniform Appraisal Standards for Federal Land Acquisition.

(B) FAIR MARKET VALUE.—Any dispute over the fair market value of a property under subparagraph (A) shall be resolved in accordance with section 2201.4 of title 43, Code of Federal Regulations.

(3) RIGHT OF FIRST REFUSAL.—If the highest bidder is other than CFRA, CFRA shall have the right to match the highest bid and purchase the properties at a price equal to the amount of the highest bid.

(d) TERMS OF CONVEYANCE.—

(1) PURCHASER.—If the highest bidder is other than CFRA, and CFRA does not match the highest bid, the following shall apply:

(A) PAYMENT.—The purchaser shall pay the amount bid to the Secretary for distribution in accordance with section 6.

(B) CONVEYANCE.—The Secretary shall convey the properties to the purchaser.

(C) OPTION TO PURCHASE.—The purchaser shall give each lessee of a property conveyed under this section an option to purchase the property at fair market value, as determined under subsection (c)(2).

(D) NONPURCHASING LESSEES.—

(i) RIGHT TO CONTINUE LEASE.—A lessee that is unable or unwilling to purchase a property shall be provided the opportunity to lease the property for fair market value rent under the same terms and conditions as apply under the existing lease for the property, and shall have the right to renew the term of the existing lease for 2 consecutive 5–year terms.

(ii) COMPENSATION FOR IMPROVEMENTS.—If a lessee declines to purchase a property, the purchaser shall compensate the lessee for the fair market value, as determined pursuant to customary appraisal procedures, of all improvements made to the property by the lessee. The lessee may sell the improvements to the purchaser at any time, but the sale shall be completed by the final termination of the lease, after all renewals under clause (i).

(2) CFRA.—If CFRA is the highest bidder, or matches the highest bid, the following shall apply:

(A) CLOSING.—On receipt of a purchase request from a lessee or CFRA, the Secretary shall close on the property and prepare all other properties for closing within 45 days.

(B) PAYMENT.—At the closing for a property—

(i) the lessee or CFRA shall deliver to the Secretary payment for the property, which the Secretary shall distribute in accordance with section 6; and

(ii) the Secretary shall convey the property to the lessee or CFRA.

(C) APPRAISAL.—The Secretary shall determine the purchase amount of each property based on the appraisal conducted under subsection (c)(2), the amount of the bid under subsection (c)(1), and the proportionate share of administrative costs pursuant to subsection (e). The total purchase amount for all properties shall equal the total bid amount plus administrative costs under subsection (e).

(D) TIMING.—CFRA and the lessees shall purchase at least 75 percent of the properties not later than August 1 of the year that begins at least 12 months after title to the first property is conveyed by the Secretary to a lessee.

(E) RIGHT TO RENEW.—The Secretary shall afford the lessees who have not purchased properties under this section the right to renew the term of the existing lease for 2 (but not more than 2) consecutive 5–year terms.

(F) REIMBURSEMENT.—A lessee shall reimburse CFRA for a proportionate share of the costs to CFRA of completing the transactions contemplated by this Act, including any interest charges.

(G) RENTAL PAYMENTS.—All rent received from the leases shall be distributed by the Secretary in accordance with section 6.

(e) ADMINISTRATIVE COSTS.—Any reasonable administrative costs incurred by the Secretary, including the costs of survey and appraisals, incident to the conveyance under subsection (a) shall be reimbursed by the purchaser or CFRA.

(f) TIMING.—The Secretary shall make every effort to complete the conveyance under subsection (a) not later than 1 year after the satisfaction of the condition established by section 8(b).

(g) CLOSINGS.—Real estate closings to complete the conveyance under subsection (a) may be staggered to facilitate the conveyance as agreed to by the Secretary and the purchaser or CFRA.

(h) CONVEYANCE TO LESSEE.—If a lessee purchases a property from the purchaser or CFRA, the Secretary, at the request of the lessee, shall have the conveyance documents prepared in the name or names of the lessee so as to minimize the amount of time and number of documents required to complete the closing for the property.

SEC. 1005. AGREEMENT.

(a) MANAGEMENT OF SILO'S CAMPGROUND.—Not later than 180 days after the date of enactment of this Act, the Secretary, acting through the Commissioner of Reclamation, shall—

(1) offer to contract with the Commissioners to manage the Silo's campground;

(2) enter into such a contract if agreed to by the Secretary and the Commissioners; and

(3) grant necessary easements for access roads within and adjacent to the Silo's campground.

(b) CONCESSION INCOME.—Any income generated by any concession that may be granted by the Commissioners at the Silo's recreation area—

(1) shall be deposited in the Canyon Ferry–Broadwater County Trust; and

(2) may be disbursed by the Canyon Ferry–Broadwater County Trust manager as part of the income of the Trust.

SEC. 1006. USE OF PROCEEDS.

 Notwithstanding any other provision of law, proceeds of conveyances under this Act shall be available, without further Act of appropriation, as follows:

   (1) 10 percent of the proceeds shall be applied by the Secretary of the Treasury to reduce the outstanding debt for the Pick–Sloan project at the Reservoir.

   (2) 90 percent of the proceeds shall be deposited in the Montana Fish and Wildlife Conservation Trust.

SEC. 1007. MONTANA FISH AND WILDLIFE CONSERVATION TRUST.

 (a) ESTABLISHMENT.—The Secretary, in consultation with the State congressional delegation and the Governor of the State, shall establish a nonprofit charitable permanent perpetual public trust in the State, to be known as the ''Montana Fish and Wildlife Conservation Trust'' (referred to in this section as the "Trust").

 (b) PURPOSE.—The purpose of the Trust shall be to provide a permanent source of funding to acquire publicly accessible land and interests in land, including easements and conservation easements, in the State from willing sellers at fair market value to—

   (1) restore and conserve fisheries habitat, including riparian habitat;

   (2) restore and conserve wildlife habitat;

   (3) enhance public hunting, fishing, and recreational opportunities; and

   (4) improve public access to public land.

 (c) ADMINISTRATION.—

   (1) TRUST MANAGER.—The Trust shall be managed by a trust manager, who—

   (A) shall be responsible for investing the corpus of the Trust; and

   (B) shall disburse funds from the Trust on receiving a request for disbursement from a majority of the members of the Joint State–Federal Agency Board established under paragraph (2) and after determining, in consultation with the Citizen Advisory Board established under paragraph (3) and after consideration of any comments submitted by members of the public, that the request meets the purpose of the Trust under subsection (b) and the requirements of subsections (d) and (e).

   (2) JOINT STATE–FEDERAL AGENCY BOARD.—

   (A) ESTABLISHMENT.—There is established a Joint State–Federal agency Board, which shall consist of—

   (i) 1 Forest Service employee employed in the State designated by the Forest Service;

   (ii) 1 Bureau of Land Management employee employed in the State designated by the Bureau of Land Management;

   (iii) 1 Bureau of Reclamation employee employed in the State designated by the Bureau of Reclamation;

   (iv) 1 United States Fish and Wildlife Service employee employed in the State designated by the United States Fish and Wildlife Service; and

   (v) 1 Montana Department of Fish, Wildlife and Parks employee designated by the Department.

   (B) REQUESTS FOR DISBURSEMENT.—After consulting with the Citizen Advisory Board established under paragraph (3) and after consideration of the Trust plan prepared under paragraph (3)(C) and of any comments or requests submitted by members of the public, the Joint State–Federal Agency Board, by a vote of a majority of its members, may submit to the Trust Manager a request for disbursement if the Board determines that the request meets the purpose of the Trust.

   (3) CITIZEN ADVISORY BOARD.—

   (A) IN GENERAL.—The Secretary shall nominate, and the Joint State–Federal Agency Board shall approve by a majority vote, a Citizen Advisory Board.

   (B) MEMBERSHIP.—The Citizen Advisory Board shall consist of 4 members, including 1 with a demonstrated commitment to improving public access to public land and to fish and wildlife conservation, from each of—

   (i) a Montana organization representing agricultural landowners;

   (ii) a Montana organization representing hunters;

   (iii) a Montana organization representing fishermen; and

   (iv) a Montana nonprofit land trust or environmental organization.

(C) DUTIES.—The Citizen Advisory Board, in consultation with the Joint State–Federal Agency Board and the Montana Association of Counties, shall prepare and periodically update a Trust plan including recommendations for requests for disbursement by the Joint State–Federal Agency Board.

(D) OBJECTIVES OF PLAN.—The Trust plan shall be designed to maximize the effectiveness of Montana Fish and Wildlife Conservation Trust expenditures considering—

(i) public needs and requests;

(ii) availability of property;

(iii) alternative sources of funding; and

(iv) availability of matching funds.

(4) PUBLIC NOTICE AND COMMENT.—Before requesting any disbursements under paragraph (2), the Joint State–Federal Agency Board shall—

(A) notify members of the public, including local governments; and

(B) provide opportunity for public comment.

(d) USE.—

(1) PRINCIPAL.—The principal of the Trust shall be inviolate.

(2) EARNINGS.—Earnings on amounts in the Trust shall be used to carry out subsection (b) and to administer the Trust and Citizen Advisory Board.

(3) LOCAL PURPOSES.—Not more than 50 percent of the income from the Trust in any year shall be used outside the watershed of the Missouri River in the State, from Holter Dam upstream to the confluence of the Jefferson River, Gallatin River, and Madison River.

(e) MANAGEMENT.—Land and interests in land acquired under this section shall be managed for the purpose described in subsection (b).

## SEC. 1008. CANYON FERRY–BROADWATER COUNTY TRUST.

(a) ESTABLISHMENT.—The Commissioners shall establish a nonprofit charitable permanent perpetual public trust to be known as the "Canyon Ferry–Broadwater County Trust" (referred to in this section as the "Trust").

(b) PRIORITY OF TRUST ESTABLISHMENT.—

(1) CONDITION TO SALE.—No sale of property under section 4 shall be made until at least $3,000,000, or a lesser amount as offset by in-kind contributions made before full funding of the trust, is deposited as the initial corpus of the Trust.

(2) IN–KIND CONTRIBUTIONS.—

(A) IN GENERAL.—In-kind contributions—

(i) shall be approved in advance by the Commissioners;

(ii) shall be made in Broadwater County;

(iii) shall be related to the improvement of access to the portions of the Reservoir lying within Broadwater County or to the creation and improvement of new and existing recreational areas within Broadwater County; and

(iv) shall not include any contribution made by Broadwater County.

(B) APPROVAL.—Approval by the Commissioners of an in-kind contribution under subparagraph (A) shall include approval of the value, nature, and type of the contribution and of the entity that makes the contribution.

(3) INTEREST.—Notwithstanding any other provision of this Act, all interest earned on the principal of the Trust shall be reinvested and considered part of its corpus until the condition stated in paragraph (1) is met.

(c) TRUST MANAGEMENT.—

(1) TRUST MANAGER.—The Trust shall be managed by a nonprofit foundation or other independent trustee to be selected by the Commissioners.

(2) USE.—The Trust manager shall invest the corpus of the Trust and disburse funds as follows:

(A) PRINCIPAL.—A sum not to exceed $500,000 may be expended from the corpus to pay for the planning and construction of a harbor at the Silo's recreation area.

(B) INTEREST.—The balance of the Trust shall be held and the income shall be expended annually for the improvement of access to the portions of the Reservoir lying within Broadwater County, Montana, and for the creation and improvement of new and existing recreational areas within Broadwater County.

(3) DISBURSEMENT.—The Trust manager—

 (A) shall approve or reject any request for disbursement; and

 (B) shall not make any expenditure except on the recommendation of the advisory committee established under subsection (d).

 (d) ADVISORY COMMITTEE.—

 (1) ESTABLISHMENT.—The Commissioners shall appoint an advisory committee consisting of not fewer than 3 nor more than 5 persons.

 (2) DUTIES.—The advisory committee shall meet on a regular basis to establish priorities and make requests for the disbursement of funds to the Trust manager.

 (3) APPROVAL BY THE COMMISSIONERS.—The advisory committee shall recommend only such expenditures as are approved by the Commissioners.

 (e) NO OFFSET.—Neither the corpus nor the income of the Trust shall be used to reduce or replace the regular operating expenses of the Secretary at the Reservoir, unless approved by the Commissioners.

## SEC. 1009. AUTHORIZATION.

 (a) IN GENERAL.—The Secretary is authorized to—

 (1) investigate, plan, construct, operate, and maintain public recreational facilities on land withdrawn or acquired for the development of the project;

 (2) conserve the scenery, the natural historic, paleontologic, and archaeologic objects, and the wildlife on the land;

 (3) provide for public use and enjoyment of the land and of the water areas created by the project by such means as are consistent with but subordinate to the purposes of the project; and

 (4) investigate, plan, construct, operate, and maintain facilities for the conservation of fish and wildlife resources.

 (b) COSTS.—The costs (including operation and maintenance costs) of carrying out subsection (a) shall be nonreimbursable and nonreturnable under Federal reclamation law.

## TITLE XI—MORATORIUM ON CERTAIN TAXES

<< 47 USCA § 151 NOTE >>

## SEC. 1100. SHORT TITLE.

 This title may be cited as the "Internet Tax Freedom Act".

<< 47 USCA § 151 NOTE >>

## SEC. 1101. MORATORIUM.

<< 47 USCA § 151 NOTE >>

 (a) MORATORIUM.—No State or political subdivision thereof shall impose any of the following taxes during the period beginning on October 1, 1998, and ending 3 years after the date of the enactment of this Act—

<< 47 USCA § 151 NOTE >>

 (1) taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and

<< 47 USCA § 151 NOTE >>

 (2) multiple or discriminatory taxes on electronic commerce.

<< 47 USCA § 151 NOTE >>

(b) PRESERVATION OF STATE AND LOCAL TAXING AUTHORITY.—Except as provided in this section, nothing in this title shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or superseding of, any State or local law pertaining to taxation that is otherwise permissible by or under the Constitution of the United States or other Federal law and in effect on the date of enactment of this Act.

<< 47 USCA § 151 NOTE >>

(c) LIABILITIES AND PENDING CASES.—Nothing in this title affects liability for taxes accrued and enforced before the date of enactment of this Act, nor does this title affect ongoing litigation relating to such taxes.

<< 47 USCA § 151 NOTE >>

(d) DEFINITION OF GENERALLY IMPOSED AND ACTUALLY ENFORCED.—For purposes of this section, a tax has been generally imposed and actually enforced prior to October 1, 1998, if, before that date, the tax was authorized by statute and either—

<< 47 USCA § 151 NOTE >>

(1) a provider of Internet access services had a reasonable opportunity to know by virtue of a rule or other public proclamation made by the appropriate administrative agency of the State or political subdivision thereof, that such agency has interpreted and applied such tax to Internet access services; or

<< 47 USCA § 151 NOTE >>

(2) a State or political subdivision thereof generally collected such tax on charges for Internet access.

<< 47 USCA § 151 NOTE >>

(e) EXCEPTION TO MORATORIUM.—

<< 47 USCA § 151 NOTE >>

(1) IN GENERAL.—Subsection (a) shall also not apply in the case of any person or entity who knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, makes any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors unless such person or entity has restricted access by minors to material that is harmful to minors—
  (A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number;
  (B) by accepting a digital certificate that verifies age; or
  (C) by any other reasonable measures that are feasible under available technology.

<< 47 USCA § 151 NOTE >>

(2) SCOPE OF EXCEPTION.—For purposes of paragraph (1), a person shall not be considered to making a communication for commercial purposes of material to the extent that the person is—
  (A) a telecommunications carrier engaged in the provision of a telecommunications service;
  (B) a person engaged in the business of providing an Internet access service;
  (C) a person engaged in the business of providing an Internet information location tool; or
  (D) similarly engaged in the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication made by another person, without selection or alteration of the communication.

<< 47 USCA § 151 NOTE >>

(3) DEFINITIONS.—In this subsection:

(A) BY MEANS OF THE WORLD WIDE WEB.—The term "by means of the World Wide Web" means by placement of material in a computer server-based file archive so that it is publicly accessible, over the Internet, using hypertext transfer protocol, file transfer protocol, or other similar protocols.

(B) COMMERCIAL PURPOSES; ENGAGED IN THE BUSINESS.—

(i) COMMERCIAL PURPOSES.—A person shall be considered to make a communication for commercial purposes only if such person is engaged in the business of making such communications.

(ii) ENGAGED IN THE BUSINESS.—The term "engaged in the business" means that the person who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income). A person may be considered to be engaged in the business of making, by means of the World Wide Web, communications for commercial purposes that include material that is harmful to minors, only if the person knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web.

(C) INTERNET.—The term "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

(D) INTERNET ACCESS SERVICE.—The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services.

(E) INTERNET INFORMATION LOCATION TOOL.—The term "Internet information location tool" means a service that refers or links users to an online location on the World Wide Web. Such term includes directories, indices, references, pointers, and hypertext links.

(F) MATERIAL THAT IS HARMFUL TO MINORS.—The term "material that is harmful to minors" means any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—

(i) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

(ii) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

(G) MINOR.—The term "minor" means any person under 17 years of age.

(H) TELECOMMUNICATIONS CARRIER; TELECOMMUNICATIONS SERVICE.—The terms "telecommunications carrier" and "telecommunications service" have the meanings given such terms in section 3 of the Communications Act of 1934 (47 U.S.C. 153).

<< 47 USCA § 151 NOTE >>

(f) ADDITIONAL EXCEPTION TO MORATORIUM.—

<< 47 USCA § 151 NOTE >>

(1) IN GENERAL.—Subsection (a) shall also not apply with respect to an Internet access provider, unless, at the time of entering into an agreement with a customer for the provision of Internet access services, such provider offers such customer (either for a fee or at no charge) screening software that is designed to permit the customer to limit access to material on the Internet that is harmful to minors.

<< 47 USCA § 151 NOTE >>

(2) DEFINITIONS.—In this subsection:

 (A) INTERNET ACCESS PROVIDER.—The term 'Internet access provider' means a person engaged in the business of providing a computer and communications facility through which a customer may obtain access to the Internet, but does not include a common carrier to the extent that it provides only telecommunications services.

 (B) INTERNET ACCESS SERVICES.—The term 'Internet access services' means the provision of computer and communications services through which a customer using a computer and a modem or other communications device may obtain access to the Internet, but does not include telecommunications services provided by a common carrier.

 (C) SCREENING SOFTWARE.—The term "screening software" means software that is designed to permit a person to limit access to material on the Internet that is harmful to minors.

<< 47 USCA § 151 NOTE >>

 (3) APPLICABILITY.—Paragraph (1) shall apply to agreements for the provision of Internet access services entered into on or after the date that is 6 months after the date of enactment of this Act.

<< 47 USCA § 151 NOTE >>

SEC. 1102. ADVISORY COMMISSION ON ELECTRONIC COMMERCE.

<< 47 USCA § 151 NOTE >>

 (a) ESTABLISHMENT OF COMMISSION.—There is established a commission to be known as the Advisory Commission on Electronic Commerce (in this title referred to as the "Commission"). The Commission shall—

<< 47 USCA § 151 NOTE >>

 (1) be composed of 19 members appointed in accordance with subsection (b), including the chairperson who shall be selected by the members of the Commission from among themselves; and

<< 47 USCA § 151 NOTE >>

 (2) conduct its business in accordance with the provisions of this title.

<< 47 USCA § 151 NOTE >>

 (b) MEMBERSHIP.—

<< 47 USCA § 151 NOTE >>

 (1) IN GENERAL.—The Commissioners shall serve for the life of the Commission. The membership of the Commission shall be as follows:

 (A) 3 representatives from the Federal Government, comprised of the Secretary of Commerce, the Secretary of the Treasury, and the United States Trade Representative (or their respective delegates).

 (B) 8 representatives from State and local governments (one such representative shall be from a State or local government that does not impose a sales tax and one representative shall be from a State that does not impose an income tax).

 (C) 8 representatives of the electronic commerce industry (including small business), telecommunications carriers, local retail businesses, and consumer groups, comprised of—

 (i) 5 individuals appointed by the Majority Leader of the Senate;

 (ii) 3 individuals appointed by the Minority Leader of the Senate;

 (iii) 5 individuals appointed by the Speaker of the House of Representatives; and

 (iv) 3 individuals appointed by the Minority Leader of the House of Representatives.

<< 47 USCA § 151 NOTE >>

(2) APPOINTMENTS.—Appointments to the Commission shall be made not later than 45 days after the date of the enactment of this Act. The chairperson shall be selected not later than 60 days after the date of the enactment of this Act.

<< 47 USCA § 151 NOTE >>

(3) VACANCIES.—Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner as the original appointment.

<< 47 USCA § 151 NOTE >>

(c) ACCEPTANCE OF GIFTS AND GRANTS.—The Commission may accept, use, and dispose of gifts or grants of services or property, both real and personal, for purposes of aiding or facilitating the work of the Commission. Gifts or grants not used at the expiration of the Commission shall be returned to the donor or grantor.

<< 47 USCA § 151 NOTE >>

(d) OTHER RESOURCES.—The Commission shall have reasonable access to materials, resources, data, and other information from the Department of Justice, the Department of Commerce, the Department of State, the Department of the Treasury, and the Office of the United States Trade Representative. The Commission shall also have reasonable access to use the facilities of any such Department or Office for purposes of conducting meetings.

<< 47 USCA § 151 NOTE >>

(e) SUNSET.—The Commission shall terminate 18 months after the date of the enactment of this Act.

<< 47 USCA § 151 NOTE >>

(f) RULES OF THE COMMISSION.—

<< 47 USCA § 151 NOTE >>

(1) QUORUM.—Nine members of the Commission shall constitute a quorum for conducting the business of the Commission.

<< 47 USCA § 151 NOTE >>

(2) MEETINGS.—Any meetings held by the Commission shall be duly noticed at least 14 days in advance and shall be open to the public.

<< 47 USCA § 151 NOTE >>

(3) OPPORTUNITIES TO TESTIFY.—The Commission shall provide opportunities for representatives of the general public, taxpayer groups, consumer groups, and State and local government officials to testify.

<< 47 USCA § 151 NOTE >>

(4) ADDITIONAL RULES.—The Commission may adopt other rules as needed.

<< 47 USCA § 151 NOTE >>

(g) DUTIES OF THE COMMISSION.—

<< 47 USCA § 151 NOTE >>

(1) IN GENERAL.—The Commission shall conduct a thorough study of Federal, State and local, and international taxation and tariff treatment of transactions using the Internet and Internet access and other comparable intrastate, interstate or international sales activities.

<< 47 USCA § 151 NOTE >>

(2) ISSUES TO BE STUDIED.—The Commission may include in the study under subsection (a)—
 (A) an examination of—
  (i) barriers imposed in foreign markets on United States providers of property, goods, services, or information engaged in electronic commerce and on United States providers of telecommunications services; and
  (ii) how the imposition of such barriers will affect United States consumers, the competitiveness of United States citizens providing property, goods, services, or information in foreign markets, and the growth and maturing of the Internet;
 (B) an examination of the collection and administration of consumption taxes on electronic commerce in other countries and the United States, and the impact of such collection on the global economy, including an examination of the relationship between the collection and administration of such taxes when the transaction uses the Internet and when it does not;
 (C) an examination of the impact of the Internet and Internet access (particularly voice transmission) on the revenue base for taxes imposed under section 4251 of the Internal Revenue Code of 1986;
 (D) an examination of model State legislation that—
  (i) would provide uniform definitions of categories of property, goods, service, or information subject to or exempt from sales and use taxes; and
  (ii) would ensure that Internet access services, online services, and communications and transactions using the Internet, Internet access service, or online services would be treated in a tax and technologically neutral manner relative to other forms of remote sales;
 (E) an examination of the effects of taxation, including the absence of taxation, on all interstate sales transactions, including transactions using the Internet, on retail businesses and on State and local governments, which examination may include a review of the efforts of State and local governments to collect sales and use taxes owed on in-State purchases from out-of-State sellers; and
 (F) the examination of ways to simplify Federal and State and local taxes imposed on the provision of telecommunications services.

<< 47 USCA § 151 NOTE >>

(3) EFFECT ON THE COMMUNICATIONS ACT OF 1934.—Nothing in this section shall include an examination of any fees or charges imposed by the Federal Communications Commission or States related to:
 (A) obligations under the Communications Act of 1934 (47 U.S.C. 151 et seq.); or
 (B) the implementation of the Telecommunications Act of 1996 (or of amendments made by that Act).

<< 47 USCA § 151 NOTE >>

(h) NATIONAL TAX ASSOCIATION COMMUNICATIONS AND ELECTRONIC COMMERCE TAX PROJECT.—The Commission shall, to the extent possible, ensure that its work does not undermine the efforts of the National Tax Association Communications and Electronic Commerce Tax Project.

<< 47 USCA § 151 NOTE >>

SEC. 1103. REPORT.

 Not later than 18 months after the date of the enactment of this Act, the Commission shall transmit to Congress for its consideration a report reflecting the results, including such legislative recommendations as required to address the findings of the Commission's study under this title. Any recommendation agreed to by the Commission shall be tax and technologically neutral and apply to all forms of remote commerce. No finding or recommendation shall be included in the report unless agreed to by at least two-thirds of the members of the Commission serving at the time the finding or recommendation is made.

<< 47 USCA § 151 NOTE >>

SEC. 1104. DEFINITIONS.

For the purposes of this title:

<< 47 USCA § 151 NOTE >>

(1) BIT TAX.—The term "bit tax" means any tax on electronic commerce expressly imposed on or measured by the volume of digital information transmitted electronically, or the volume of digital information per unit of time transmitted electronically, but does not include taxes imposed on the provision of telecommunications services.

<< 47 USCA § 151 NOTE >>

(2) DISCRIMINATORY TAX.—The term "discriminatory tax" means—
(A) any tax imposed by a State or political subdivision thereof on electronic commerce that—
(i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;
(ii) is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as part of a phase-out of the tax over not more than a 5–year period;
(iii) imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means;
(iv) establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means; or
(B) any tax imposed by a State or political subdivision thereof, if—
(i) except with respect to a tax (on Internet access) that was generally imposed and actually enforced prior to October 1, 1998, the sole ability to access a site on a remote seller's out-of-State computer server is considered a factor in determining a remote seller's tax collection obligation; or
(ii) a provider of Internet access service or online services is deemed to be the agent of a remote seller for determining tax collection obligations solely as a result of—
(I) the display of a remote seller's information or content on the out-of-State computer server of a provider of Internet access service or online services; or
(II) the processing of orders through the out-of-State computer server of a provider of Internet access service or online services.

<< 47 USCA § 151 NOTE >>

(3) ELECTRONIC COMMERCE.—The term "electronic commerce" means any transaction conducted over the Internet or through Internet access, comprising the sale, lease, license, offer, or delivery of property, goods, services, or information, whether or not for consideration, and includes the provision of Internet access.

<< 47 USCA § 151 NOTE >>

(4) INTERNET.—The term "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

<< 47 USCA § 151 NOTE >>

(5) INTERNET ACCESS.—The term "Internet access" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to users. Such term does not include telecommunications services.

<< 47 USCA § 151 NOTE >>

(6) MULTIPLE TAX.—
   (A) IN GENERAL.—The term "multiple tax" means any tax that is imposed by one State or political subdivision thereof on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State or political subdivision thereof (whether or not at the same rate or on the same basis), without a credit (for example, a resale exemption certificate) for taxes paid in other jurisdictions.
   (B) EXCEPTION.—Such term shall not include a sales or use tax imposed by a State and 1 or more political subdivisions thereof on the same electronic commerce or a tax on persons engaged in electronic commerce which also may have been subject to a sales or use tax thereon.
   (C) SALES OR USE TAX.—For purposes of subparagraph (B), the term "sales or use tax" means a tax that is imposed on or incident to the sale, purchase, storage, consumption, distribution, or other use of tangible personal property or services as may be defined by laws imposing such tax and which is measured by the amount of the sales price or other charge for such property or service.

<< 47 USCA § 151 NOTE >>

(7) STATE.—The term "State" means any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States.

<< 47 USCA § 151 NOTE >>

(8) TAX.—
   (A) IN GENERAL.—The term "tax" means—
      (i) any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is not a fee imposed for a specific privilege, service, or benefit conferred; or
      (ii) the imposition on a seller of an obligation to collect and to remit to a governmental entity any sales or use tax imposed on a buyer by a governmental entity.
   (B) EXCEPTION.—Such term does not include any franchise fee or similar fee imposed by a State or local franchising authority, pursuant to section 622 or 653 of the Communications Act of 1934 (47 U.S.C. 542, 573), or any other fee related to obligations or telecommunications carriers under the Communications Act of 1934 (47 U.S.C. 151 et seq.).

<< 47 USCA § 151 NOTE >>

(9) TELECOMMUNICATIONS SERVICE.—The term "telecommunications service" has the meaning given such term in section 3(46) of the Communications Act of 1934 (47 U.S.C. 153(46)) and includes communications services (as defined in section 4251 of the Internal Revenue Code of 1986).

<< 47 USCA § 151 NOTE >>

(10) TAX ON INTERNET ACCESS.—The term "tax on Internet access" means a tax on Internet access, including the enforcement or application of any new or preexisting tax on the sale or use of Internet services unless such tax was generally imposed and actually enforced prior to October 1, 1998.

TITLE XII—OTHER PROVISIONS

<< 47 USCA § 281 NOTE >>

## SEC. 1201. DECLARATION THAT INTERNET SHOULD BE FREE OF NEW FEDERAL TAXES.

It is the sense of Congress that no new Federal taxes similar to the taxes described in section 1101(a) should be enacted with respect to the Internet and Internet access during the moratorium provided in such section.

<< 19 USCA § 2241 >>

## SEC. 1202. NATIONAL TRADE ESTIMATE.

Section 181 of the Trade Act of 1974 (19 U.S.C. 2241) is amended—

<< 19 USCA § 2241 >>

(1) in subsection (a)(1)—
  (A) in subparagraph (A)—
    (i) by striking "and" at the end of clause (i);
    (ii) by inserting "and" at the end of clause (ii); and
    (iii) by inserting after clause (ii) the following new clause:
    "(iii) United States electronic commerce,"; and
  (B) in subparagraph (C)—
    (i) by striking "and" at the end of clause (i);
    (ii) by inserting "and" at the end of clause (ii);
    (iii) by inserting after clause (ii) the following new clause:
    "(iii) the value of additional United States electronic commerce,"; and
    (iv) by inserting "or transacted with," after "or invested in";

<< 19 USCA § 2241 >>

(2) in subsection (a)(2)(E)—
  (A) by striking "and" at the end of clause (i);
  (B) by inserting "and" at the end of clause (ii); and
  (C) by inserting after clause (ii) the following new clause:
    "(iii) the value of electronic commerce transacted with,"; and

<< 19 USCA § 2241 >>

(3) by adding at the end the following new subsection:
"(d) ELECTRONIC COMMERCE.—For purposes of this section, the term 'electronic commerce' has the meaning given that term in section 1104(3) of the Internet Tax Freedom Act.".

<< 19 USCA § 2241 NOTE >>

## SEC. 1203. DECLARATION THAT THE INTERNET SHOULD BE FREE OF FOREIGN TARIFFS, TRADE BARRIERS, AND OTHER RESTRICTIONS.

<< 19 USCA § 2241 NOTE >>

(a) IN GENERAL.—It is the sense of Congress that the President should seek bilateral, regional, and multilateral agreements to remove barriers to global electronic commerce through the World Trade Organization, the Organization for Economic Cooperation and Development, the Trans–Atlantic Economic Partnership, the Asia Pacific Economic Cooperation forum, the Free Trade Area of the America, the North American Free Trade Agreement, and other appropriate venues.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 19 USCA § 2241 NOTE >>

(b) NEGOTIATING OBJECTIVES.—The negotiating objectives of the United States shall be—

<< 19 USCA § 2241 NOTE >>

 (1) to assure that electronic commerce is free from—
   (A) tariff and nontariff barriers;
   (B) burdensome and discriminatory regulation and standards; and
   (C) discriminatory taxation; and

<< 19 USCA § 2241 NOTE >>

 (2) to accelerate the growth of electronic commerce by expanding market access opportunities for—
   (A) the development of telecommunications infrastructure;
   (B) the procurement of telecommunications equipment;
   (C) the provision of Internet access and telecommunications services; and
   (D) the exchange of goods, services, and digitalized information.

<< 19 USCA § 2241 NOTE >>

 (c) ELECTRONIC COMMERCE.—For purposes of this section, the term "electronic commerce" has the meaning given that term in section 1104(3).

<< 19 USCA § 2241 NOTE >>

## SEC. 1204. NO EXPANSION OF TAX AUTHORITY.

 Nothing in this title shall be construed to expand the duty of any person to collect or pay taxes beyond that which existed immediately before the date of the enactment of this Act.

<< 19 USCA § 2241 NOTE >>

## SEC. 1205. PRESERVATION OF AUTHORITY.

 Nothing in this title shall limit or otherwise affect the implementation of the Telecommunications Act of 1996 (Public Law 104–104) or the amendments made by such Act.

<< 19 USCA § 2241 NOTE >>

## SEC. 1206. SEVERABILITY.

 If any provision of this title, or any amendment made by this title, or the application of that provision to any person or circumstance, is held by a court of competent jurisdiction to violate any provision of the Constitution of the United States, then the other provisions of that title, and the application of that provision to other persons and circumstances, shall not be affected.

<< 15 USCA Ch. 91 >>

## TITLE XIII—CHILDREN'S ONLINE PRIVACY PROTECTION

<< 15 USCA § 6501 NOTE >>

## SEC. 1301. SHORT TITLE.

This title may be cited as the "Children's Online Privacy Protection Act of 1998".

<< 15 USCA § 6501 >>

SEC. 1302. DEFINITIONS.

In this title:

<< 15 USCA § 6501 >>

(1) CHILD.—The term "child" means an individual under the age of 13.

<< 15 USCA § 6501 >>

(2) OPERATOR.—The term "operator"—
  (A) means any person who operates a website located on the Internet or an online service and who collects or maintains personal information from or about the users of or visitors to such website or online service, or on whose behalf such information is collected or maintained, where such website or online service is operated for commercial purposes, including any person offering products or services for sale through that website or online service, involving commerce—
    (i) among the several States or with 1 or more foreign nations;
    (ii) in any territory of the United States or in the District of Columbia, or between any such territory and—
     (I) another such territory; or
     (II) any State or foreign nation; or
    (iii) between the District of Columbia and any State, territory, or foreign nation; but
  (B) does not include any nonprofit entity that would otherwise be exempt from coverage under section 5 of the Federal Trade Commission Act (15 U.S.C. 45).

<< 15 USCA § 6501 >>

(3) COMMISSION.—The term "Commission" means the Federal Trade Commission.

<< 15 USCA § 6501 >>

(4) DISCLOSURE.—The term "disclosure" means, with respect to personal information—
  (A) the release of personal information collected from a child in identifiable form by an operator for any purpose, except where such information is provided to a person other than the operator who provides support for the internal operations of the website and does not disclose or use that information for any other purpose; and
  (B) making personal information collected from a child by a website or online service directed to children or with actual knowledge that such information was collected from a child, publicly available in identifiable form, by any means including by a public posting, through the Internet, or through—
    (i) a home page of a website;
    (ii) a pen pal service;
    (iii) an electronic mail service;
    (iv) a message board; or
    (v) a chat room.

<< 15 USCA § 6501 >>

(5) FEDERAL AGENCY.—The term "Federal agency" means an agency, as that term is defined in section 551(1) of title 5, United States Code.

<< 15 USCA § 6501 >>

(6) INTERNET.—The term "Internet" means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

<< 15 USCA § 6501 >>

(7) PARENT.—The term "parent" includes a legal guardian.

<< 15 USCA § 6501 >>

(8) PERSONAL INFORMATION.—The term "personal information" means individually identifiable information about an individual collected online, including—

(A) a first and last name;

(B) a home or other physical address including street name and name of a city or town;

(C) an e-mail address;

(D) a telephone number;

(E) a Social Security number;

(F) any other identifier that the Commission determines permits the physical or online contacting of a specific individual; or

(G) information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph.

<< 15 USCA § 6501 >>

(9) VERIFIABLE PARENTAL CONSENT.—The term "verifiable parental consent" means any reasonable effort (taking into consideration available technology), including a request for authorization for future collection, use, and disclosure described in the notice, to ensure that a parent of a child receives notice of the operator's personal information collection, use, and disclosure practices, and authorizes the collection, use, and disclosure, as applicable, of personal information and the subsequent use of that information before that information is collected from that child.

<< 15 USCA § 6501 >>

(10) WEBSITE OR ONLINE SERVICE DIRECTED TO CHILDREN.—

(A) IN GENERAL.—The term "website or online service directed to children" means—

(i) a commercial website or online service that is targeted to children; or

(ii) that portion of a commercial website or online service that is targeted to children.

(B) LIMITATION.—A commercial website or online service, or a portion of a commercial website or online service, shall not be deemed directed to children solely for referring or linking to a commercial website or online service directed to children by using information location tools, including a directory, index, reference, pointer, or hypertext link.

<< 15 USCA § 6501 >>

(11) PERSON.—The term "person" means any individual, partnership, corporation, trust, estate, cooperative, association, or other entity.

<< 15 USCA § 6501 >>

(12) ONLINE CONTACT INFORMATION.—The term "online contact information" means an e-mail address or another substantially similar identifier that permits direct contact with a person online.

<< 15 USCA § 6502 >>

SEC. 1303. REGULATION OF UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN CONNECTION WITH THE COLLECTION AND USE OF PERSONAL INFORMATION FROM AND ABOUT CHILDREN ON THE INTERNET.

<< 15 USCA § 6502 >>

(a) ACTS PROHIBITED.—

<< 15 USCA § 6502 >>

(1) IN GENERAL.—It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed under subsection (b).

<< 15 USCA § 6502 >>

(2) DISCLOSURE TO PARENT PROTECTED.—Notwithstanding paragraph (1), neither an operator of such a website or online service nor the operator's agent shall be held to be liable under any Federal or State law for any disclosure made in good faith and following reasonable procedures in responding to a request for disclosure of personal information under subsection (b)(1)(B)(iii) to the parent of a child.

<< 15 USCA § 6502 >>

(b) REGULATIONS.—

<< 15 USCA § 6502 >>

(1) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Commission shall promulgate under section 553 of title 5, United States Code, regulations that—
(A) require the operator of any website or online service directed to children that collects personal information from children or the operator of a website or online service that has actual knowledge that it is collecting personal information from a child—
(i) to provide notice on the website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information; and
(ii) to obtain verifiable parental consent for the collection, use, or disclosure of personal information from children;
(B) require the operator to provide, upon request of a parent under this subparagraph whose child has provided personal information to that website or online service, upon proper identification of that parent, to such parent—
(i) a description of the specific types of personal information collected from the child by that operator;
(ii) the opportunity at any time to refuse to permit the operator's further use or maintenance in retrievable form, or future online collection, of personal information from that child; and
(iii) notwithstanding any other provision of law, a means that is reasonable under the circumstances for the parent to obtain any personal information collected from that child;
(C) prohibit conditioning a child's participation in a game, the offering of a prize, or another activity on the child disclosing more personal information than is reasonably necessary to participate in such activity; and
(D) require the operator of such a website or online service to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children.

<< 15 USCA § 6502 >>

(2) WHEN CONSENT NOT REQUIRED.—The regulations shall provide that verifiable parental consent under paragraph (1)(A)(ii) is not required in the case of—
(A) online contact information collected from a child that is used only to respond directly on a one-time basis to a specific request from the child and is not used to recontact the child and is not maintained in retrievable form by the operator;

(B) a request for the name or online contact information of a parent or child that is used for the sole purpose of obtaining parental consent or providing notice under this section and where such information is not maintained in retrievable form by the operator if parental consent is not obtained after a reasonable time;

(C) online contact information collected from a child that is used only to respond more than once directly to a specific request from the child and is not used to recontact the child beyond the scope of that request—

(i) if, before any additional response after the initial response to the child, the operator uses reasonable efforts to provide a parent notice of the online contact information collected from the child, the purposes for which it is to be used, and an opportunity for the parent to request that the operator make no further use of the information and that it not be maintained in retrievable form; or

(ii) without notice to the parent in such circumstances as the Commission may determine are appropriate, taking into consideration the benefits to the child of access to information and services, and risks to the security and privacy of the child, in regulations promulgated under this subsection;

(D) the name of the child and online contact information (to the extent reasonably necessary to protect the safety of a child participant on the site)—

(i) used only for the purpose of protecting such safety;

(ii) not used to recontact the child or for any other purpose; and

(iii) not disclosed on the site,

if the operator uses reasonable efforts to provide a parent notice of the name and online contact information collected from the child, the purposes for which it is to be used, and an opportunity for the parent to request that the operator make no further use of the information and that it not be maintained in retrievable form; or

(E) the collection, use, or dissemination of such information by the operator of such a website or online service necessary—

(i) to protect the security or integrity of its website;

(ii) to take precautions against liability;

(iii) to respond to judicial process; or

(iv) to the extent permitted under other provisions of law, to provide information to law enforcement agencies or for an investigation on a matter related to public safety.

<< 15 USCA § 6502 >>

(3) TERMINATION OF SERVICE.—The regulations shall permit the operator of a website or an online service to terminate service provided to a child whose parent has refused, under the regulations prescribed under paragraph (1)(B)(ii), to permit the operator's further use or maintenance in retrievable form, or future online collection, of personal information from that child.

<< 15 USCA § 6502 >>

(c) ENFORCEMENT.—Subject to sections 1304 and 1306, a violation of a regulation prescribed under subsection (a) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

<< 15 USCA § 6502 >>

(d) INCONSISTENT STATE LAW.—No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this title that is inconsistent with the treatment of those activities or actions under this section.

<< 15 USCA § 6503 >>

SEC. 1304. SAFE HARBORS.

<< 15 USCA § 6503 >>

(a) GUIDELINES.—An operator may satisfy the requirements of regulations issued under section 1303(b) by following a set of self-regulatory guidelines, issued by representatives of the marketing or online industries, or by other persons, approved under subsection (b).

<< 15 USCA § 6503 >>

(b) INCENTIVES.—

<< 15 USCA § 6503 >>

(1) SELF–REGULATORY INCENTIVES.—In prescribing regulations under section 1303, the Commission shall provide incentives for self-regulation by operators to implement the protections afforded children under the regulatory requirements described in subsection (b) of that section.

<< 15 USCA § 6503 >>

(2) DEEMED COMPLIANCE.—Such incentives shall include provisions for ensuring that a person will be deemed to be in compliance with the requirements of the regulations under section 1303 if that person complies with guidelines that, after notice and comment, are approved by the Commission upon making a determination that the guidelines meet the requirements of the regulations issued under section 1303.

<< 15 USCA § 6503 >>

(3) EXPEDITED RESPONSE TO REQUESTS.—The Commission shall act upon requests for safe harbor treatment within 180 days of the filing of the request, and shall set forth in writing its conclusions with regard to such requests.

<< 15 USCA § 6503 >>

(c) APPEALS.—Final action by the Commission on a request for approval of guidelines, or the failure to act within 180 days on a request for approval of guidelines, submitted under subsection (b) may be appealed to a district court of the United States of appropriate jurisdiction as provided for in section 706 of title 5, United States Code.

<< 15 USCA § 6504 >>

SEC. 1305. ACTIONS BY STATES.

<< 15 USCA § 6504 >>

(a) IN GENERAL.—

<< 15 USCA § 6504 >>

(1) CIVIL ACTIONS.—In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by the engagement of any person in a practice that violates any regulation of the Commission prescribed under section 1303(b), the State, as parens patriae, may bring a civil action on behalf of the residents of the State in a district court of the United States of appropriate jurisdiction to—
(A) enjoin that practice;
(B) enforce compliance with the regulation;
(C) obtain damage, restitution, or other compensation on behalf of residents of the State; or
(D) obtain such other relief as the court may consider to be appropriate.

<< 15 USCA § 6504 >>

(2) NOTICE.—

(A) IN GENERAL.—Before filing an action under paragraph (1), the attorney general of the State involved shall provide to the Commission—

  (i) written notice of that action; and

  (ii) a copy of the complaint for that action.

(B) EXEMPTION.—

  (i) IN GENERAL.—Subparagraph (A) shall not apply with respect to the filing of an action by an attorney general of a State under this subsection, if the attorney general determines that it is not feasible to provide the notice described in that subparagraph before the filing of the action.

  (ii) NOTIFICATION.—In an action described in clause (i), the attorney general of a State shall provide notice and a copy of the complaint to the Commission at the same time as the attorney general files the action.

<< 15 USCA § 6504 >>

(b) INTERVENTION.—

<< 15 USCA § 6504 >>

  (1) IN GENERAL.—On receiving notice under subsection (a)(2), the Commission shall have the right to intervene in the action that is the subject of the notice.

<< 15 USCA § 6504 >>

  (2) EFFECT OF INTERVENTION.—If the Commission intervenes in an action under subsection (a), it shall have the right—

  (A) to be heard with respect to any matter that arises in that action; and

  (B) to file a petition for appeal.

<< 15 USCA § 6504 >>

  (3) AMICUS CURIAE.—Upon application to the court, a person whose self-regulatory guidelines have been approved by the Commission and are relied upon as a defense by any defendant to a proceeding under this section may file amicus curiae in that proceeding.

<< 15 USCA § 6504 >>

(c) CONSTRUCTION.—For purposes of bringing any civil action under subsection (a), nothing in this title shall be construed to prevent an attorney general of a State from exercising the powers conferred on the attorney general by the laws of that State to—

<< 15 USCA § 6504 >>

(1) conduct investigations;

<< 15 USCA § 6504 >>

(2) administer oaths or affirmations; or

<< 15 USCA § 6504 >>

(3) compel the attendance of witnesses or the production of documentary and other evidence.

<< 15 USCA § 6504 >>

AR.02932

(d) ACTIONS BY THE COMMISSION.—In any case in which an action is instituted by or on behalf of the Commission for violation of any regulation prescribed under section 1303, no State may, during the pendency of that action, institute an action under subsection (a) against any defendant named in the complaint in that action for violation of that regulation.

<< 15 USCA § 6504 >>

(e) VENUE; SERVICE OF PROCESS.—

<< 15 USCA § 6504 >>

(1) VENUE.—Any action brought under subsection (a) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28, United States Code.

<< 15 USCA § 6504 >>

(2) SERVICE OF PROCESS.—In an action brought under subsection (a), process may be served in any district in which the defendant—
   (A) is an inhabitant; or
   (B) may be found.

<< 15 USCA § 6505 >>

SEC. 1306. ADMINISTRATION AND APPLICABILITY OF ACT.

<< 15 USCA § 6505 >>

(a) IN GENERAL.—Except as otherwise provided, this title shall be enforced by the Commission under the Federal Trade Commission Act (15 U.S.C. 41 et seq.).

<< 15 USCA § 6505 >>

(b) PROVISIONS.—Compliance with the requirements imposed under this title shall be enforced under—

<< 15 USCA § 6505 >>

(1) section 8 of the Federal Deposit Insurance Act (12 U.S.C. 1818), in the case of—
   (A) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;
   (B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25(a) of the Federal Reserve Act (12 U.S.C. 601 et seq. and 611 et. seq.), by the Board; and
   (C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation;

<< 15 USCA § 6505 >>

(2) section 8 of the Federal Deposit Insurance Act (12 U.S.C. 1818), by the Director of the Office of Thrift Supervision, in the case of a savings association the deposits of which are insured by the Federal Deposit Insurance Corporation;

<< 15 USCA § 6505 >>

(3) the Federal Credit Union Act (12 U.S.C. 1751 et seq.) by the National Credit Union Administration Board with respect to any Federal credit union;

<< 15 USCA § 6505 >>

(4) part A of subtitle VII of title 49, United States Code, by the Secretary of Transportation with respect to any air carrier or foreign air carrier subject to that part;

<< 15 USCA § 6505 >>

(5) the Packers and Stockyards Act, 1921 (7 U.S.C. 181 et seq.) (except as provided in section 406 of that Act (7 U.S.C. 226, 227)), by the Secretary of Agriculture with respect to any activities subject to that Act; and

<< 15 USCA § 6505 >>

(6) the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.) by the Farm Credit Administration with respect to any Federal land bank, Federal land bank association, Federal intermediate credit bank, or production credit association.

<< 15 USCA § 6505 >>

(c) EXERCISE OF CERTAIN POWERS.—For the purpose of the exercise by any agency referred to in subsection (a) of its powers under any Act referred to in that subsection, a violation of any requirement imposed under this title shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in subsection (a), each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this title, any other authority conferred on it by law.

<< 15 USCA § 6505 >>

(d) ACTIONS BY THE COMMISSION.—The Commission shall prevent any person from violating a rule of the Commission under section 1303 in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this title. Any entity that violates such rule shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act in the same manner, by the same means, and with the same jurisdiction, power, and duties as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made a part of this title.

<< 15 USCA § 6505 >>

(e) EFFECT ON OTHER LAWS.—Nothing contained in the Act shall be construed to limit the authority of the Commission under any other provisions of law.

<< 15 USCA § 6506 >>

SEC. 1307. REVIEW.

Not later than 5 years after the effective date of the regulations initially issued under section 1303, the Commission shall—

<< 15 USCA § 6506 >>

(1) review the implementation of this title, including the effect of the implementation of this title on practices relating to the collection and disclosure of information relating to children, children's ability to obtain access to information of their choice online, and on the availability of websites directed to children; and

<< 15 USCA § 6506 >>

(2) prepare and submit to Congress a report on the results of the review under paragraph (1).

<< 15 USCA § 6501 NOTE >>

<< 15 USCA §§ 6502 nt, 6504 nt, 6505 nt >>

SEC. 1308. EFFECTIVE DATE.

Sections 1303(a), 1305, and 1306 of this title take effect on the later of—

<< 15 USCA § 6501 NOTE >>

<< 15 USCA §§ 6502 nt, 6504 nt, 6505 nt >>

(1) the date that is 18 months after the date of enactment of this Act; or

<< 15 USCA § 6501 NOTE >>

<< 15 USCA §§ 6502 nt, 6504 nt, 6505 nt >>

(2) the date on which the Commission rules on the first application filed for safe harbor treatment under section 1304 if the Commission does not rule on the first such application within one year after the date of enactment of this Act, but in no case later than the date that is 30 months after the date of enactment of this Act.

TITLE XIV—CHILD ONLINE PROTECTION

<< 47 USCA § 609 NOTE >>

SEC. 1401. SHORT TITLE.

This title may be cited as the "Child Online Protection Act".

<< 47 USCA § 231 NOTE >>

SEC. 1402. CONGRESSIONAL FINDINGS.

The Congress finds that—

<< 47 USCA § 231 NOTE >>

(1) while custody, care, and nurture of the child resides first with the parent, the widespread availability of the Internet presents opportunities for minors to access materials through the World Wide Web in a manner that can frustrate parental supervision or control;

<< 47 USCA § 231 NOTE >>

(2) the protection of the physical and psychological well-being of minors by shielding them from materials that are harmful to them is a compelling governmental interest;

<< 47 USCA § 231 NOTE >>

(3) to date, while the industry has developed innovative ways to help parents and educators restrict material that is harmful to minors through parental control protections and self-regulation, such efforts have not provided a national solution to the problem of minors accessing harmful material on the World Wide Web;

<< 47 USCA § 231 NOTE >>

(4) a prohibition on the distribution of material harmful to minors, combined with legitimate defenses, is currently the most effective and least restrictive means by which to satisfy the compelling government interest; and

<< 47 USCA § 231 NOTE >>

(5) notwithstanding the existence of protections that limit the distribution over the World Wide Web of material that is harmful to minors, parents, educators, and industry must continue efforts to find ways to protect children from being exposed to harmful material found on the Internet.

<< 47 USCA § 231 >>

SEC. 1403. REQUIREMENT TO RESTRICT ACCESS BY MINORS TO MATERIALS COMMERCIALLY DISTRIBUTED BY MEANS OF THE WORLD WIDE WEB THAT ARE HARMFUL TO MINORS.

Part I of title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:

"SEC. 231. RESTRICTION OF ACCESS BY MINORS TO MATERIALS COMMERCIALLY DISTRIBUTED BY MEANS OF WORLD WIDE WEB THAT ARE HARMFUL TO MINORS.

"(a) REQUIREMENT TO RESTRICT ACCESS.—

"(1) PROHIBITED CONDUCT.—Whoever knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, makes any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors shall be fined not more than $50,000, imprisoned not more than 6 months, or both.

"(2) INTENTIONAL VIOLATIONS.—In addition to the penalties under paragraph (1), whoever intentionally violates such paragraph shall be subject to a fine of not more than $50,000 for each violation. For purposes of this paragraph, each day of violation shall constitute a separate violation.

"(3) CIVIL PENALTY.—In addition to the penalties under paragraphs (1) and (2), whoever violates paragraph (1) shall be subject to a civil penalty of not more than $50,000 for each violation. For purposes of this paragraph, each day of violation shall constitute a separate violation.

"(b) INAPPLICABILITY OF CARRIERS AND OTHER SERVICE PROVIDERS.—For purposes of subsection (a), a person shall not be considered to make any communication for commercial purposes to the extent that such person is—

"(1) a telecommunications carrier engaged in the provision of a telecommunications service;

"(2) a person engaged in the business of providing an Internet access service;

"(3) a person engaged in the business of providing an Internet information location tool; or

"(4) similarly engaged in the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication made by another person, without selection or alteration of the content of the communication, except that such person's deletion of a particular communication or material made by another person in a manner consistent with subsection (c) or section 230 shall not constitute such selection or alteration of the content of the communication.

"(c) AFFIRMATIVE DEFENSE.—

"(1) DEFENSE.—It is an affirmative defense to prosecution under this section that the defendant, in good faith, has restricted access by minors to material that is harmful to minors—

"(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number;

"(B) by accepting a digital certificate that verifies age; or

"(C) by any other reasonable measures that are feasible under available technology.

"(2) PROTECTION FOR USE OF DEFENSES.—No cause of action may be brought in any court or administrative agency against any person on account of any activity that is not in violation of any law punishable by criminal or civil penalty, and that the person has taken in good faith to implement a defense authorized under this subsection or otherwise to restrict or prevent the transmission of, or access to, a communication specified in this section.

"(d) PRIVACY PROTECTION REQUIREMENTS.—

"(1) DISCLOSURE OF INFORMATION LIMITED.—A person making a communication described in subsection (a)—

"(A) shall not disclose any information collected for the purposes of restricting access to such communications to individuals 17 years of age or older without the prior written or electronic consent of—

"(i) the individual concerned, if the individual is an adult; or

"(ii) the individual's parent or guardian, if the individual is under 17 years of age; and

"(B) shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the person making such communication and the recipient of such communication.

"(2) EXCEPTIONS.—A person making a communication described in subsection (a) may disclose such information if the disclosure is—

"(A) necessary to make the communication or conduct a legitimate business activity related to making the communication; or

"(B) made pursuant to a court order authorizing such disclosure.

"(e) DEFINITIONS.—For purposes of this subsection, the following definitions shall apply:

"(1) BY MEANS OF THE WORLD WIDE WEB.—The term 'by means of the World Wide Web' means by placement of material in a computer server-based file archive so that it is publicly accessible, over the Internet, using hypertext transfer protocol or any successor protocol.

"(2) COMMERCIAL PURPOSES; ENGAGED IN THE BUSINESS.—

"(A) COMMERCIAL PURPOSES.—A person shall be considered to make a communication for commercial purposes only if such person is engaged in the business of making such communications.

"(B) ENGAGED IN THE BUSINESS.—The term 'engaged in the business' means that the person who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income). A person may be considered to be engaged in the business of making, by means of the World Wide Web, communications for commercial purposes that include material that is harmful to minors, only if the person knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web.

"(3) INTERNET.—The term 'Internet' means the combination of computer facilities and electromagnetic transmission media, and related equipment and software, comprising the interconnected world-wide network of computer networks that employ the Transmission Control Protocol/Internet Protocol or any successor protocol to transmit information.

"(4) INTERNET ACCESS SERVICE.—The term 'Internet access service' means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services.

"(5) INTERNET INFORMATION LOCATION TOOL.—The term 'Internet information location tool' means a service that refers or links users to an online location on the World Wide Web. Such term includes directories, indices, references, pointers, and hypertext links.

"(6) MATERIAL THAT IS HARMFUL TO MINORS.—The term 'material that is harmful to minors' means any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—

"(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

"(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

"(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

"(7) MINOR.—The term 'minor' means any person under 17 years of age.".

SEC. 1404. NOTICE REQUIREMENT.

<< 47 USCA § 230 >>

(a) NOTICE.—Section 230 of the Communications Act of 1934 (47 U.S.C. 230) is amended—

<< 47 USCA § 230 >>

(1) in subsection (d)(1), by inserting "or 231" after "section 223";

<< 47 USCA § 230 >>

(2) by redesignating subsections (d) and (e) as subsections (e) and (f), respectively; and

<< 47 USCA § 230 >>

(3) by inserting after subsection (c) the following new subsection:

"(d) OBLIGATIONS OF INTERACTIVE COMPUTER SERVICE.—A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.".

<< 47 USCA § 223 >>

(b) CONFORMING AMENDMENT.—Section 223(h)(2) of the Communications Act of 1934 (47 U.S.C. 223(h)(2)) is amended by striking "230(e)(2)" and inserting "230(f)(2)".

<< 47 USCA § 231 NOTE >>

SEC. 1405. STUDY BY COMMISSION ON ONLINE CHILD PROTECTION.

<< 47 USCA § 231 NOTE >>

(a) ESTABLISHMENT.—There is hereby established a temporary Commission to be known as the Commission on Online Child Protection (in this section referred to as the "Commission") for the purpose of conducting a study under this section regarding methods to help reduce access by minors to material that is harmful to minors on the Internet.

<< 47 USCA § 231 NOTE >>

(b) MEMBERSHIP.—The Commission shall be composed of 19 members, as follows:

<< 47 USCA § 231 NOTE >>

(1) INDUSTRY MEMBERS.—The Commission shall include—

(A) 2 members who are engaged in the business of providing Internet filtering or blocking services or software;

(B) 2 members who are engaged in the business of providing Internet access services;

(C) 2 members who are engaged in the business of providing labeling or ratings services;

(D) 2 members who are engaged in the business of providing Internet portal or search services;

(E) 2 members who are engaged in the business of providing domain name registration services;

(F) 2 members who are academic experts in the field of technology; and

(G) 4 members who are engaged in the business of making content available over the Internet.

Of the members of the Commission by reason of each subparagraph of this paragraph, an equal number shall be appointed by the Speaker of the House of Representatives and by the Majority Leader of the Senate.

<< 47 USCA § 231 NOTE >>

(2) EX OFFICIO MEMBERS.—The Commission shall include the following officials:
  (A) The Assistant Secretary (or the Assistant Secretary's designee).
  (B) The Attorney General (or the Attorney General's designee).
  (C) The Chairman of the Federal Trade Commission (or the Chairman's designee).

<< 47 USCA § 231 NOTE >>

(c) STUDY.—

<< 47 USCA § 231 NOTE >>

(1) IN GENERAL.—The Commission shall conduct a study to identify technological or other methods that—
  (A) will help reduce access by minors to material that is harmful to minors on the Internet; and
  (B) may meet the requirements for use as affirmative defenses for purposes of section 231(c) of the Communications Act of 1934 (as added by this title).

Any methods so identified shall be used as the basis for making legislative recommendations to the Congress under subsection (d)(3).

<< 47 USCA § 231 NOTE >>

(2) SPECIFIC METHODS.—In carrying out the study, the Commission shall identify and analyze various technological tools and methods for protecting minors from material that is harmful to minors, which shall include (without limitation)—
  (A) a common resource for parents to use to help protect minors (such as a "one-click-away" resource);
  (B) filtering or blocking software or services;
  (C) labeling or rating systems;
  (D) age verification systems;
  (E) the establishment of a domain name for posting of any material that is harmful to minors; and
  (F) any other existing or proposed technologies or methods for reducing access by minors to such material.

<< 47 USCA § 231 NOTE >>

(3) ANALYSIS.—In analyzing technologies and other methods identified pursuant to paragraph (2), the Commission shall examine—
  (A) the cost of such technologies and methods;
  (B) the effects of such technologies and methods on law enforcement entities;
  (C) the effects of such technologies and methods on privacy;
  (D) the extent to which material that is harmful to minors is globally distributed and the effect of such technologies and methods on such distribution;
  (E) the accessibility of such technologies and methods to parents; and
  (F) such other factors and issues as the Commission considers relevant and appropriate.

<< 47 USCA § 231 NOTE >>

(d) REPORT.—Not later than 1 year after the enactment of this Act, the Commission shall submit a report to the Congress containing the results of the study under this section, which shall include—

<< 47 USCA § 231 NOTE >>

(1) a description of the technologies and methods identified by the study and the results of the analysis of each such technology and method;

<< 47 USCA § 231 NOTE >>

(2) the conclusions and recommendations of the Commission regarding each such technology or method;

<< 47 USCA § 231 NOTE >>

(3) recommendations for legislative or administrative actions to implement the conclusions of the committee; and

<< 47 USCA § 231 NOTE >>

(4) a description of the technologies or methods identified by the study that may meet the requirements for use as affirmative defenses for purposes of section 231(c) of the Communications Act of 1934 (as added by this title).

<< 47 USCA § 231 NOTE >>

(e) STAFF AND RESOURCES.—The Assistant Secretary for Communication and Information of the Department of Commerce shall provide to the Commission such staff and resources as the Assistant Secretary determines necessary for the Commission to perform its duty efficiently and in accordance with this section.

<< 47 USCA § 231 NOTE >>

(f) TERMINATION.—The Commission shall terminate 30 days after the submission of the report under subsection (d).

<< 47 USCA § 231 NOTE >>

(g) INAPPLICABILITY OF FEDERAL ADVISORY COMMITTEE ACT.—The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Commission.

<< 47 USCA § 223 NOTE >>

<< 47 USCA § 230 nt >>

<< 47 USCA § 231 nt >>

SEC. 1406. EFFECTIVE DATE.

This title and the amendments made by this title shall take effect 30 days after the date of enactment of this Act.

TITLE XV—VACCINE INJURY COMPENSATION PROGRAM MODIFICATION ACT

<< 26 USCA § 1 NOTE >>

SECTION 1501. SHORT TITLE.

This title may be cited as the "Vaccine Injury Compensation Program Modification Act".

<< 42 USCA § 300aa–11 >>

SEC. 1502. ELIMINATION OF THRESHOLD REQUIREMENT OF UNREIMBURSABLE EXPENSES.

Section 2111(c)(1)(D)(i) of the Public Health Service Act (42 U.S.C. 300aa–11(c)(1)(D)(i)) is amended by striking "and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1,000".

SEC. 1503. INCLUSION OF ROTAVIRUS GASTROENTERITIS AS A TAXABLE VACCINE.

<< 26 USCA § 4132 >>

(a) IN GENERAL.—Section 4132(1) of the Internal Revenue Code of 1986 (defining taxable vaccine) is amended by adding at the end the following new subparagraph:

"(K) Any vaccine against rotavirus gastroenteritis.".

<< 26 USCA § 4132 NOTE >>

(b) EFFECTIVE DATE.—

<< 26 USCA § 4132 NOTE >>

(1) SALES.—The amendment made by this section shall apply to sales after the date of the enactment of this Act.

<< 26 USCA § 4132 NOTE >>

(2) DELIVERIES.—For purposes of paragraph (1), in the case of sales on or before the date of the enactment of this Act for which delivery is made after such date, the delivery date shall be considered the sale date.

SEC. 1504. VACCINE INJURY COMPENSATION TRUST FUND.

(a) AMENDMENTS RELATED TO SECTION 904 OF 1997 ACT.—

<< 26 USCA § 9510 >>

(1) Paragraph (1) of section 9510(c) of the 1986 Code is amended to read as follows:

"(1) IN GENERAL.—Amounts in the Vaccine Injury Compensation Trust Fund shall be available, as provided in appropriation Acts, only for—

"(A) the payment of compensation under subtitle 2 of title XXI of the Public Health Service Act (as in effect on August 6, 1997) for vaccine-related injury or death with respect to any vaccine—

"(i) which is administered after September 30, 1988, and

"(ii) which is a taxable vaccine (as defined in section 4132(a)(1)) at the time the vaccine was administered, or

"(B) the payment of all expenses of administration incurred by the Federal Government in administering such subtitle.".

<< 26 USCA § 9510 >>

(2) Section 9510(b) of the 1986 Code is amended by adding at the end the following new paragraph:

"(3) LIMITATION ON TRANSFERS TO VACCINE INJURY COMPENSATION TRUST FUND.—No amount may be appropriated to the Vaccine Injury Compensation Trust Fund on and after the date of any expenditure from the Trust Fund which is not permitted by this section. The determination of whether an expenditure is so permitted shall be made without regard to—

"(A) any provision of law which is not contained or referenced in this title or in a revenue Act, and

"(B) whether such provision of law is a subsequently enacted provision or directly or indirectly seeks to waive the application of this paragraph.".

<< 26 USCA § 9510 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the provisions of the Taxpayer Relief Act of 1997 to which they relate.

TITLE XVI—SERVICE CONNECTION FOR PERSIAN GULF WAR ILLNESSES

<< 38 USCA § 101 NOTE >>

SEC. 1601. SHORT TITLE.

This title may be cited as the "Persian Gulf War Veterans Act of 1998".

<< 38 USCA § 1118 >>

SEC. 1602. PRESUMPTION OF SERVICE CONNECTION FOR ILLNESSES ASSOCIATED WITH SERVICE IN THE PERSIAN GULF DURING THE PERSIAN GULF WAR.

<< 38 USCA § 1118 >>

(a) IN GENERAL.—(1) Subchapter II of chapter 11 of title 38, United States Code, is amended by adding at the end the following:

**"§ 1118. Presumptions of service connection for illnesses associated with service in the Persian Gulf during the Persian Gulf War**

"(a)(1) For purposes of section 1110 of this title, and subject to section 1113 of this title, each illness, if any, described in paragraph (2) shall be considered to have been incurred in or aggravated by service referred to in that paragraph, notwithstanding that there is no record of evidence of such illness during the period of such service.

"(2) An illness referred to in paragraph (1) is any diagnosed or undiagnosed illness that—

"(A) the Secretary determines in regulations prescribed under this section to warrant a presumption of service connection by reason of having a positive association with exposure to a biological, chemical, or other toxic agent, environmental or wartime hazard, or preventive medicine or vaccine known or presumed to be associated with service in the Armed Forces in the Southwest Asia theater of operations during the Persian Gulf War; and

"(B) becomes manifest within the period, if any, prescribed in such regulations in a veteran who served on active duty in that theater of operations during that war and by reason of such service was exposed to such agent, hazard, or medicine or vaccine.

"(3) For purposes of this subsection, a veteran who served on active duty in the Southwest Asia theater of operations during the Persian Gulf War and has an illness described in paragraph (2) shall be presumed to have been exposed by reason of such service to the agent, hazard, or medicine or vaccine associated with the illness in the regulations prescribed under this section unless there is conclusive evidence to establish that the veteran was not exposed to the agent, hazard, or medicine or vaccine by reason of such service.

"(b)(1)(A) Whenever the Secretary makes a determination described in subparagraph (B), the Secretary shall prescribe regulations providing that a presumption of service connection is warranted for the illness covered by that determination for purposes of this section.

"(B) A determination referred to in subparagraph (A) is a determination based on sound medical and scientific evidence that a positive association exists between—

"(i) the exposure of humans or animals to a biological, chemical, or other toxic agent, environmental or wartime hazard, or preventive medicine or vaccine known or presumed to be associated with service in the Southwest Asia theater of operations during the Persian Gulf War; and

"(ii) the occurrence of a diagnosed or undiagnosed illness in humans or animals.

"(2)(A) In making determinations for purposes of paragraph (1), the Secretary shall take into account—

"(i) the reports submitted to the Secretary by the National Academy of Sciences under section 1603 of the Persian Gulf War Veterans Act of 1998; and

"(ii) all other sound medical and scientific information and analyses available to the Secretary.

"(B) In evaluating any report, information, or analysis for purposes of making such determinations, the Secretary shall take into consideration whether the results are statistically significant, are capable of replication, and withstand peer review.

AR.02942

"(3) An association between the occurrence of an illness in humans or animals and exposure to an agent, hazard, or medicine or vaccine shall be considered to be positive for purposes of this subsection if the credible evidence for the association is equal to or outweighs the credible evidence against the association.

"(c)(1) Not later than 60 days after the date on which the Secretary receives a report from the National Academy of Sciences under section 1603 of the Persian Gulf War Veterans Act of 1998, the Secretary shall determine whether or not a presumption of service connection is warranted for each illness, if any, covered by the report.

"(2) If the Secretary determines under this subsection that a presumption of service connection is warranted, the Secretary shall, not later than 60 days after making the determination, issue proposed regulations setting forth the Secretary's determination.

"(3)(A) If the Secretary determines under this subsection that a presumption of service connection is not warranted, the Secretary shall, not later than 60 days after making the determination, publish in the Federal Register a notice of the determination. The notice shall include an explanation of the scientific basis for the determination.

"(B) If an illness already presumed to be service connected under this section is subject to a determination under subparagraph (A), the Secretary shall, not later than 60 days after publication of the notice under that subparagraph, issue proposed regulations removing the presumption of service connection for the illness.

"(4) Not later than 90 days after the date on which the Secretary issues any proposed regulations under this subsection, the Secretary shall issue final regulations. Such regulations shall be effective on the date of issuance.

"(d) Whenever the presumption of service connection for an illness under this section is removed under subsection (c)—

"(1) a veteran who was awarded compensation for the illness on the basis of the presumption before the effective date of the removal of the presumption shall continue to be entitled to receive compensation on that basis; and

"(2) a survivor of a veteran who was awarded dependency and indemnity compensation for the death of a veteran resulting from the illness on the basis of the presumption before that date shall continue to be entitled to receive dependency and indemnity compensation on that basis.

"(e) Subsections (b) through (d) shall cease to be effective 10 years after the first day of the fiscal year in which the National Academy of Sciences submits to the Secretary the first report under section 1603 of the Persian Gulf War Veterans Act of 1998.".

<< 38 USCA Ch. 11 >>

(2) The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 1117 the following new item:

"1118. Presumptions of service connection for illnesses associated with service in the Persian Gulf during the Persian Gulf War.".

<< 38 USCA § 1113 >>

(b) CONFORMING AMENDMENTS.—Section 1113 of title 38, United States Code, is amended—

<< 38 USCA § 1113 >>

(1) by striking out "or 1117" each place it appears and inserting in lieu thereof "1117, or 1118"; and

<< 38 USCA § 1113 >>

(2) in subsection (a), by striking out "or 1116" and inserting in lieu thereof ", 1116, or 1118".

<< 38 USCA § 1117 >>

(c) COMPENSATION FOR UNDIAGNOSED GULF WAR ILLNESSES.—Section 1117 of title 38, United States Code, is amended—

<< 38 USCA § 1117 >>

(1) by redesignating subsections (c), (d), and (e) as subsections (d), (e), and (f), respectively; and

<< 38 USCA § 1117 >>

(2) by inserting after subsection (b) the following new subsection (c):

"(c)(1) Whenever the Secretary determines under section 1118(c) of this title that a presumption of service connection for an undiagnosed illness (or combination of undiagnosed illnesses) previously established under this section is no longer warranted—

"(A) a veteran who was awarded compensation under this section for such illness (or combination of illnesses) on the basis of the presumption shall continue to be entitled to receive compensation under this section on that basis; and

"(B) a survivor of a veteran who was awarded dependency and indemnity compensation for the death of a veteran resulting from the disease on the basis of the presumption before that date shall continue to be entitled to receive dependency and indemnity compensation on that basis.

"(2) This subsection shall cease to be effective 10 years after the first day of the fiscal year in which the National Academy of Sciences submits to the Secretary the first report under section 1603 of the Persian Gulf War Veterans Act of 1998.".

<< 38 USCA § 1117 NOTE >>

SEC. 1603. AGREEMENT WITH NATIONAL ACADEMY OF SCIENCES.

<< 38 USCA § 1117 NOTE >>

(a) PURPOSE.—The purpose of this section is to provide for the National Academy of Sciences, an independent nonprofit scientific organization with appropriate expertise, to review and evaluate the available scientific evidence regarding associations between illnesses and exposure to toxic agents, environmental or wartime hazards, or preventive medicines or vaccines associated with Gulf War service.

<< 38 USCA § 1117 NOTE >>

(b) AGREEMENT.—The Secretary of Veterans Affairs shall seek to enter into an agreement with the National Academy of Sciences for the Academy to perform the activities covered by this section. The Secretary shall seek to enter into the agreement not later than two months after the date of enactment of this Act.

<< 38 USCA § 1117 NOTE >>

(c) IDENTIFICATION OF AGENTS AND ILLNESSES.—(1) Under the agreement under subsection (b), the National Academy of Sciences shall—

(A) identify the biological, chemical, or other toxic agents, environmental or wartime hazards, or preventive medicines or vaccines to which members of the Armed Forces who served in the Southwest Asia theater of operations during the Persian Gulf War may have been exposed by reason of such service; and

(B) identify the illnesses (including diagnosed illnesses and undiagnosed illnesses) that are manifest in such members.

<< 38 USCA § 1117 NOTE >>

(2) In identifying illnesses under paragraph (1)(B), the Academy shall review and summarize the relevant scientific evidence regarding illnesses among the members described in paragraph (1)(A) and among other appropriate populations of individuals, including mortality, symptoms, and adverse reproductive health outcomes among such members and individuals.

<< 38 USCA § 1117 NOTE >>

(d) INITIAL CONSIDERATION OF SPECIFIC AGENTS.—(1) In identifying under subsection (c) the agents, hazards, or preventive medicines or vaccines to which members of the Armed Forces may have been exposed for purposes of the first report under subsection (i), the National Academy of Sciences shall consider, within the first six months after the date of enactment of this Act, the following:

(A) The following organophosphorous pesticides:

   (i) Chlorpyrifos.

   (ii) Diazinon.

   (iii) Dichlorvos.

   (iv) Malathion.

  (B) The following carbamate pesticides:

   (i) Proxpur.

   (ii) Carbaryl.

   (iii) Methomyl.

  (C) The carbamate pyridostigmine bromide used as nerve agent prophylaxis.

  (D) The following chlorinated hydrocarbon and other pesticides and repellents:

   (i) Lindane.

   (ii) Pyrethrins.

   (iii) Permethrins.

   (iv) Rodenticides (bait).

   (v) Repellent (DEET).

  (E) The following low-level nerve agents and precursor compounds at exposure levels below those which produce immediately apparent incapacitating symptoms:

   (i) Sarin.

   (ii) Tabun.

  (F) The following synthetic chemical compounds:

   (i) Mustard agents at levels below those which cause immediate blistering.

   (ii) Volatile organic compounds.

   (iii) Hydrazine.

   (iv) Red fuming nitric acid.

   (v) Solvents.

   (vi) Uranium.

  (G) The following ionizing radiation:

   (i) Depleted uranium.

   (ii) Microwave radiation.

   (iii) Radio frequency radiation.

  (H) The following environmental particulates and pollutants:

   (i) Hydrogen sulfide.

   (ii) Oil fire byproducts.

   (iii) Diesel heater fumes.

   (iv) Sand microparticles.

  (I) Diseases endemic to the region (including the following):

   (i) Leishmaniasis.

   (ii) Sandfly fever.

   (iii) Pathogenic escherechia coli.

   (iv) Shigellosis.

  (J) Time compressed administration of multiple live, 'attenuated', and toxoid vaccines.

<< 38 USCA § 1117 NOTE >>

  (2) The consideration of agents, hazards, and medicines and vaccines under paragraph (1) shall not preclude the Academy from identifying other agents, hazards, or medicines or vaccines to which members of the Armed Forces may have been exposed for purposes of any report under subsection (i).

<< 38 USCA § 1117 NOTE >>

(3) Not later than six months after the date of enactment of this Act, the Academy shall submit to the designated congressional committees a report specifying the agents, hazards, and medicines and vaccines considered under paragraph (1).

<< 38 USCA § 1117 NOTE >>

(e) DETERMINATIONS OF ASSOCIATIONS BETWEEN AGENTS AND ILLNESSES.—(1) For each agent, hazard, or medicine or vaccine and illness identified under subsection (c), the National Academy of Sciences shall determine, to the extent that available scientific data permit meaningful determinations—

(A) whether a statistical association exists between exposure to the agent, hazard, or medicine or vaccine and the illness, taking into account the strength of the scientific evidence and the appropriateness of the scientific methodology used to detect the association;

(B) the increased risk of the illness among human or animal populations exposed to the agent, hazard, or medicine or vaccine; and

(C) whether a plausible biological mechanism or other evidence of a causal relationship exists between exposure to the agent, hazard, or medicine or vaccine and the illness.

<< 38 USCA § 1117 NOTE >>

(2) The Academy shall include in its reports under subsection (i) a full discussion of the scientific evidence and reasoning that led to its conclusions under this subsection.

<< 38 USCA § 1117 NOTE >>

(f) REVIEW OF POTENTIAL TREATMENT MODELS FOR CERTAIN ILLNESSES.—Under the agreement under subsection (b), the National Academy of Sciences shall separately review, for each chronic undiagnosed illness identified under subsection (c)(1)(B) and for any other chronic illness that the Academy determines to warrant such review, the available scientific data in order to identify empirically valid models of treatment for such illnesses which employ successful treatment modalities for populations with similar symptoms.

<< 38 USCA § 1117 NOTE >>

(g) RECOMMENDATIONS FOR ADDITIONAL SCIENTIFIC STUDIES.—(1) Under the agreement under subsection (b), the National Academy of Sciences shall make any recommendations that it considers appropriate for additional scientific studies (including studies relating to treatment models) to resolve areas of continuing scientific uncertainty relating to the health consequences of exposure to toxic agents, environmental or wartime hazards, or preventive medicines or vaccines associated with Gulf War service.

<< 38 USCA § 1117 NOTE >>

(2) In making recommendations for additional studies, the Academy shall consider the available scientific data, the value and relevance of the information that could result from such studies, and the cost and feasibility of carrying out such studies.

<< 38 USCA § 1117 NOTE >>

(h) SUBSEQUENT REVIEWS.—(1) Under the agreement under subsection (b), the National Academy of Sciences shall conduct on a periodic and ongoing basis additional reviews of the evidence and data relating to its activities under this section.

<< 38 USCA § 1117 NOTE >>

(2) As part of each review under this subsection, the Academy shall—

(A) conduct as comprehensive a review as is practicable of the evidence referred to in subsection (c) and the data referred to in subsections (e), (f), and (g) that became available since the last review of such evidence and data under this section; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) make determinations under the subsections referred to in subparagraph (A) on the basis of the results of such review and all other reviews previously conducted for purposes of this section.

<< 38 USCA § 1117 NOTE >>

(i) REPORTS.—(1) Under the agreement under subsection (b), the National Academy of Sciences shall submit to the committees and officials referred to in paragraph (5) periodic written reports regarding the Academy's activities under the agreement.

<< 38 USCA § 1117 NOTE >>

(2) The first report under paragraph (1) shall be submitted not later than 18 months after the date of enactment of this Act. That report shall include—
  (A) the determinations and discussion referred to in subsection (e);
  (B) the results of the review of models of treatment under subsection (f); and
  (C) any recommendations of the Academy under subsection (g).

<< 38 USCA § 1117 NOTE >>

(3) Reports shall be submitted under this subsection at least once every two years, as measured from the date of the report under paragraph (2).

<< 38 USCA § 1117 NOTE >>

(4) In any report under this subsection (other than the report under paragraph (2)), the Academy may specify an absence of meaningful developments in the scientific or medical community with respect to the activities of the Academy under this section during the 2-year period ending on the date of such report.

<< 38 USCA § 1117 NOTE >>

(5) Reports under this subsection shall be submitted to the following:
  (A) The designated congressional committees.
  (B) The Secretary of Veterans Affairs.
  (C) The Secretary of Defense.

<< 38 USCA § 1117 NOTE >>

(j) SUNSET.—This section shall cease to be effective 10 years after the last day of the fiscal year in which the National Academy of Sciences submits the first report under subsection (i).

<< 38 USCA § 1117 NOTE >>

(k) ALTERNATIVE CONTRACT SCIENTIFIC ORGANIZATION.—(1) If the Secretary is unable within the time period set forth in subsection (b) to enter into an agreement with the National Academy of Sciences for the purposes of this section on terms acceptable to the Secretary, the Secretary shall seek to enter into an agreement for purposes of this section with another appropriate scientific organization that is not part of the Government, operates as a not-for-profit entity, and has expertise and objectivity comparable to that of the National Academy of Sciences.

<< 38 USCA § 1117 NOTE >>

(2) If the Secretary enters into an agreement with another organization under this subsection, any reference in this section and section 1118 of title 38, United States Code (as added by section 1602(a)), to the National Academy of Sciences shall be treated as a reference to such other organization.

<< 38 USCA § 1117 NOTE >>

SEC. 1604. REPEAL OF INCONSISTENT PROVISIONS OF LAW.

  In the event of the enactment, before, on, or after the date of the enactment of this Act, of section 101 of the Veterans Programs Enhancement Act of 1998, or any similar provision of law enacted during the second session of the 105th Congress requiring an agreement with the National Academy of Sciences regarding an evaluation of health consequences of service in Southwest Asia during the Persian Gulf War, such section 101 (or other provision of law) shall be treated as if never enacted, and shall have no force or effect.

<< 38 USCA § 1117 NOTE >>

SEC. 1605. DEFINITIONS.

  In this title:

<< 38 USCA § 1117 NOTE >>

  (1) The term "toxic agent, environmental or wartime hazard, or preventive medicine or vaccine associated with Gulf War service" means a biological, chemical, or other toxic agent, environmental or wartime hazard, or preventive medicine or vaccine that is known or presumed to be associated with service in the Armed Forces in the Southwest Asia theater of operations during the Persian Gulf War, whether such association arises as a result of single, repeated, or sustained exposure and whether such association arises through exposure singularly or in combination.

<< 38 USCA § 1117 NOTE >>

  (2) The term "designated congressional committees" means the following:
  (A) The Committees on Veterans' Affairs and Armed Services of the Senate.
  (B) The Committees on Veterans' Affairs and National Security of the House of Representatives.

<< 38 USCA § 1117 NOTE >>

  (3) The term "Persian Gulf War" has the meaning given that term in section 101(33) of title 38, United States Code.

TITLE XVII—GOVERNMENT PAPERWORK ELIMINATION ACT

SEC. 1701. SHORT TITLE.

  This title may be cited as the "Government Paperwork Elimination Act".

<< 44 USCA § 101 NOTE >>

<< 44 USCA § 3504 >>

SEC. 1702. AUTHORITY OF OMB TO PROVIDE FOR ACQUISITION AND USE OF ALTERNATIVE INFORMATION TECHNOLOGIES BY EXECUTIVE AGENCIES.

  Section 3504(a)(1)(B)(vi) of title 44, United States Code, is amended to read as follows:
  "(vi) the acquisition and use of information technology, including alternative information technologies that provide for electronic submission, maintenance, or disclosure of information as a substitute for paper and for the use and acceptance of electronic signatures.".

<< 44 USCA § 3504 NOTE >>

SEC. 1703. PROCEDURES FOR USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES BY EXECUTIVE AGENCIES.

<< 44 USCA § 3504 NOTE >>

(a) IN GENERAL.—In order to fulfill the responsibility to administer the functions assigned under chapter 35 of title 44, United States Code, the provisions of the Clinger–Cohen Act of 1996 (divisions D and E of Public Law 104–106) and the amendments made by that Act, and the provisions of this title, the Director of the Office of Management and Budget shall, in consultation with the National Telecommunications and Information Administration and not later than 18 months after the date of enactment of this Act, develop procedures for the use and acceptance of electronic signatures by Executive agencies.

<< 44 USCA § 3504 NOTE >>

(b) REQUIREMENTS FOR PROCEDURES.—(1) The procedures developed under subsection (a)—
  (A) shall be compatible with standards and technology for electronic signatures that are generally used in commerce and industry and by State governments;
  (B) may not inappropriately favor one industry or technology;
  (C) shall ensure that electronic signatures are as reliable as is appropriate for the purpose in question and keep intact the information submitted;
  (D) shall provide for the electronic acknowledgment of electronic forms that are successfully submitted; and
  (E) shall, to the extent feasible and appropriate, require an Executive agency that anticipates receipt by electronic means of 50,000 or more submittals of a particular form to take all steps necessary to ensure that multiple methods of electronic signatures are available for the submittal of such form.

<< 44 USCA § 3504 NOTE >>

(2) The Director shall ensure the compatibility of the procedures under paragraph (1)(A) in consultation with appropriate private bodies and State government entities that set standards for the use and acceptance of electronic signatures.

<< 44 USCA § 3504 NOTE >>

SEC. 1704. DEADLINE FOR IMPLEMENTATION BY EXECUTIVE AGENCIES OF PROCEDURES FOR USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES.

In order to fulfill the responsibility to administer the functions assigned under chapter 35 of title 44, United States Code, the provisions of the Clinger–Cohen Act of 1996 (divisions D and E of Public Law 104–106) and the amendments made by that Act, and the provisions of this title, the Director of the Office of Management and Budget shall ensure that, commencing not later than five years after the date of enactment of this Act, Executive agencies provide—

<< 44 USCA § 3504 NOTE >>

(1) for the option of the electronic maintenance, submission, or disclosure of information, when practicable as a substitute for paper; and

<< 44 USCA § 3504 NOTE >>

(2) for the use and acceptance of electronic signatures, when practicable.

<< 44 USCA § 3504 NOTE >>

SEC. 1705. ELECTRONIC STORAGE AND FILING OF EMPLOYMENT FORMS.

In order to fulfill the responsibility to administer the functions assigned under chapter 35 of title 44, United States Code, the provisions of the Clinger–Cohen Act of 1996 (divisions D and E of Public Law 104–106) and the amendments made by that Act, and the provisions of this title, the Director of the Office of Management and Budget shall, not later than 18 months after the date of enactment of this Act, develop procedures to permit private employers to store and file electronically with Executive agencies forms containing information pertaining to the employees of such employers.

<< 44 USCA § 3504 NOTE >>

SEC. 1706. STUDY ON USE OF ELECTRONIC SIGNATURES.

<< 44 USCA § 3504 NOTE >>

(a) ONGOING STUDY REQUIRED.—In order to fulfill the responsibility to administer the functions assigned under chapter 35 of title 44, United States Code, the provisions of the Clinger–Cohen Act of 1996 (divisions D and E of Public Law 104–106) and the amendments made by that Act, and the provisions of this title, the Director of the Office of Management and Budget shall, in cooperation with the National Telecommunications and Information Administration, conduct an ongoing study of the use of electronic signatures under this title on—

<< 44 USCA § 3504 NOTE >>

(1) paperwork reduction and electronic commerce;

<< 44 USCA § 3504 NOTE >>

(2) individual privacy; and

<< 44 USCA § 3504 NOTE >>

(3) the security and authenticity of transactions.

<< 44 USCA § 3504 NOTE >>

(b) REPORTS.—The Director shall submit to Congress on a periodic basis a report describing the results of the study carried out under subsection (a).

<< 44 USCA § 3504 NOTE >>

SEC. 1707. ENFORCEABILITY AND LEGAL EFFECT OF ELECTRONIC RECORDS.

Electronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form.

<< 44 USCA § 3504 NOTE >>

SEC. 1708. DISCLOSURE OF INFORMATION.

Except as provided by law, information collected in the provision of electronic signature services for communications with an executive agency, as provided by this title, shall only be used or disclosed by persons who obtain, collect, or maintain such information as a business or government practice, for the purpose of facilitating such communications, or with the prior affirmative consent of the person about whom the information pertains.

<< 44 USCA § 3504 NOTE >>

AR.02950

## SEC. 1709. APPLICATION WITH INTERNAL REVENUE LAWS.

No provision of this title shall apply to the Department of the Treasury or the Internal Revenue Service to the extent that such provision—

<< 44 USCA § 3504 NOTE >>

(1) involves the administration of the internal revenue laws; or

<< 44 USCA § 3504 NOTE >>

(2) conflicts with any provision of the Internal Revenue Service Restructuring and Reform Act of 1998 or the Internal Revenue Code of 1986.

<< 44 USCA § 3504 NOTE >>

## SEC. 1710. DEFINITIONS.

For purposes of this title:

<< 44 USCA § 3504 NOTE >>

(1) ELECTRONIC SIGNATURE.—The term "electronic signature" means a method of signing an electronic message that—
  (A) identifies and authenticates a particular person as the source of the electronic message; and
  (B) indicates such person's approval of the information contained in the electronic message.

<< 44 USCA § 3504 NOTE >>

(2) EXECUTIVE AGENCY.—The term "Executive agency" has the meaning given that term in section 105 of title 5, United States Code.

### DIVISION D—DRUG DEMAND REDUCTION ACT

## SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

<< 21 USCA § 1801 NOTE >>

(a) SHORT TITLE.—This division may be cited as the "Drug Demand Reduction Act".
(b) TABLE OF CONTENTS.—The table of contents for this division is as follows:

Sec. 1. Short title; table of contents.

### TITLE I—TARGETED SUBSTANCE ABUSE PREVENTION AND TREATMENT PROGRAMS

#### Subtitle A—National Youth Anti–Drug Media Campaign

Sec. 101. Short title.

Sec. 102. Requirement to conduct national media campaign.

Sec. 103. Use of funds.

Sec. 104. Reports to Congress.

Sec. 105. Authorization of appropriations.

Subtitle B—Drug–Free Prisons and Jails

Sec. 111. Short title.

Sec. 112. Purpose.

Sec. 113. Program authorization.

Sec. 114. Grant application.

Sec. 115. Uses of funds.

Sec. 116. Evaluation and recommendation report to Congress.

Sec. 117. Definitions.

Sec. 118. Authorization of appropriations.

Subtitle C—Drug–Free Schools Quality Assurance

Sec. 121. Short title.

Sec. 122. Amendment to Safe and Drug–Free Schools and Communities Act.

TITLE II—STATEMENT OF NATIONAL ANTI–DRUG POLICY

Subtitle A—Congressional Leadership in Community Coalitions

Sec. 201. Sense of Congress.

Subtitle B—Rejection of Legalization of Drugs

Sec. 211. Sense of Congress.

Subtitle C—Report on Streamlining Federal Prevention and Treatment Efforts

Sec. 221. Report on streamlining Federal prevention and treatment efforts.

TITLE I—TARGETED SUBSTANCE ABUSE PREVENTION AND TREATMENT PROGRAMS

<< 21 USCA Ch. 22 >>

Subtitle A—National Youth Anti–Drug Media Campaign

<< 21 USCA § 1801 NOTE >>

SEC. 101. SHORT TITLE.

 This subtitle may be cited as the "Drug–Free Media Campaign Act of 1998".

<< 21 USCA § 1801 >>

SEC. 102. REQUIREMENT TO CONDUCT NATIONAL MEDIA CAMPAIGN.

<< 21 USCA § 1801 >>

(a) IN GENERAL.—The Director of the Office of National Drug Control Policy (in this subtitle referred to as the "Director") shall conduct a national media campaign in accordance with this subtitle for the purpose of reducing and preventing drug abuse among young people in the United States.

<< 21 USCA § 1801 >>

(b) LOCAL TARGET REQUIREMENT.—The Director shall, to the maximum extent feasible, use amounts made available to carry out this subtitle under section 105 for media that focuses on, or includes specific information on, prevention or treatment resources for consumers within specific local areas.

<< 21 USCA § 1802 >>

SEC. 103. USE OF FUNDS.

<< 21 USCA § 1802 >>

(a) AUTHORIZED USES.—

<< 21 USCA § 1802 >>

(1) IN GENERAL.—Amounts made available to carry out this subtitle for the support of the national media campaign may only be used for—
  (A) the purchase of media time and space;
  (B) talent reuse payments;
  (C) out-of-pocket advertising production costs;
  (D) testing and evaluation of advertising;
  (E) evaluation of the effectiveness of the media campaign;
  (F) the negotiated fees for the winning bidder on request for proposals issued by the Office of National Drug Control Policy;
  (G) partnerships with community, civic, and professional groups, and government organizations related to the media campaign; and
  (H) entertainment industry collaborations to fashion antidrug messages in motion pictures, television programing, popular music, interactive (Internet and new) media projects and activities, public information, news media outreach, and corporate sponsorship and participation.

<< 21 USCA § 1802 >>

(2) ADVERTISING.—In carrying out this subtitle, the Director shall devote sufficient funds to the advertising portion of the national media campaign to meet the stated reach and frequency goals of the campaign.

<< 21 USCA § 1802 >>

(b) PROHIBITIONS.—None of the amounts made available under section 105 may be obligated or expended—

<< 21 USCA § 1802 >>

(1) to supplant current antidrug community based coalitions;

<< 21 USCA § 1802 >>

(2) to supplant current pro bono public service time donated by national and local broadcasting networks;

<< 21 USCA § 1802 >>

(3) for partisan political purposes; or

AR.02953

<< 21 USCA § 1802 >>

(4) to fund media campaigns that feature any elected officials, persons seeking elected office, cabinet level officials, or other Federal officials employed pursuant to section 213 of Schedule C of title 5, Code of Federal Regulations, unless the Director provides advance notice to the Committees on Appropriations of the House of Representatives and the Senate, the Committee on Government Reform and Oversight of the House of Representatives and the Committee on the Judiciary of the Senate.

<< 21 USCA § 1802 >>

(c) MATCHING REQUIREMENT.—Amounts made available under section 105 should be matched by an equal amount of non-Federal funds for the national media campaign, or be matched with in-kind contributions to the campaign of the same value.

<< 21 USCA § 1803 >>

SEC. 104. REPORTS TO CONGRESS.

The Director shall—

<< 21 USCA § 1803 >>

(1) submit to Congress on an annual basis a report on the activities for which amounts made available under section 105 have been obligated during the preceding year, including information for each quarter of such year, and on the specific parameters of the national media campaign; and

<< 21 USCA § 1803 >>

(2) not later than 1 year after the date of enactment of this Act, submit to Congress a report on the effectiveness of the national media campaign based on measurable outcomes provided to Congress previously.

<< 21 USCA § 1804 >>

SEC. 105. AUTHORIZATION OF APPROPRIATIONS.

There is authorized to be appropriated to the Office of National Drug Control Policy to carry out this subtitle $195,000,000 for each of fiscal years 1999 through 2002.

Subtitle B—Drug–Free Prisons and Jails

<< 42 USCA § 3751 NOTE >>

SEC. 111. SHORT TITLE.

This subtitle may be cited as the "Drug–Free Prisons and Jails Act of 1998".

<< 42 USCA § 3751 NOTE >>

SEC. 112. PURPOSE.

The purpose of this subtitle is to provide for the establishment of model programs for comprehensive treatment of substance involved offenders in the criminal justice system to reduce drug abuse and drug-related crime, and reduce the costs of the criminal justice system, that can be successfully replicated by States and local units of government through a comprehensive evaluation.

<< 42 USCA § 3751 NOTE >>

SEC. 113. PROGRAM AUTHORIZATION.

<< 42 USCA § 3751 NOTE >>

 (a) ESTABLISHMENT.—The Director of the Bureau of Justice Assistance shall establish a model substance abuse treatment program for substance offenders by—

<< 42 USCA § 3751 NOTE >>

 (1) providing financial assistance to grant recipients selected in accordance with section 114(b); and

<< 42 USCA § 3751 NOTE >>

 (2) evaluating the success of programs conducted pursuant to this subtitle.

<< 42 USCA § 3751 NOTE >>

 (b) GRANT AWARDS.—The Director may award not more than 5 grants to units of local government and not more than 5 grants to States.

<< 42 USCA § 3751 NOTE >>

 (c) ADMINISTRATIVE COSTS.—Not more than 5 percent of a grant award made pursuant to this subtitle may be used for administrative costs.

<< 42 USCA § 3751 NOTE >>

SEC. 114. GRANT APPLICATION.

<< 42 USCA § 3751 NOTE >>

 (a) CONTENTS.—An application submitted by a unit of local government or a State for a grant award under this subtitle shall include each of the following:

<< 42 USCA § 3751 NOTE >>

 (1) STRATEGY.—A strategy to coordinate programs and services for substance offenders provided by the unit of local government or the State, as the case may be, developed in consultation with representatives from all components of the criminal justice system within the jurisdiction, including judges, law enforcement personnel, prosecutors, corrections personnel, probation personnel, parole personnel, substance abuse treatment personnel, and substance abuse prevention personnel.

<< 42 USCA § 3751 NOTE >>

 (2) CERTIFICATION.—A certification that—
  (A) Federal funds made available under this subtitle will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities; and
  (B) the programs developed pursuant to this subtitle meet all requirements of this subtitle.

<< 42 USCA § 3751 NOTE >>

 (b) REVIEW AND APPROVAL.—Subject to section 113(b), the Director shall approve applications and make grant awards to units of local governments and States that show the most promise for accomplishing the purposes of this subtitle consistent with the provisions of section 115.

<< 42 USCA § 3751 NOTE >>

SEC. 115. USES OF FUNDS.

A unit of local government or State that receives a grant award under this subtitle shall use such funds to provide comprehensive treatment programs to inmates in prisons or jails, including not less than 3 of the following:

<< 42 USCA § 3751 NOTE >>

(1) Tailored treatment programs to meet the special needs of different types of substance offenders.

<< 42 USCA § 3751 NOTE >>

(2) Random and frequent drug testing, including a system of sanctions.

<< 42 USCA § 3751 NOTE >>

(3) Training and assistance for corrections officers and personnel to assist substance offenders in correctional facilities.

<< 42 USCA § 3751 NOTE >>

(4) Clinical assessment of incoming substance-involved offenders.

<< 42 USCA § 3751 NOTE >>

(5) Availability of religious and spiritual activity and counseling to provide an environment that encourages recovery from substance involvement in correctional facilities.

<< 42 USCA § 3751 NOTE >>

(6) Education and vocational training.

<< 42 USCA § 3751 NOTE >>

(7) A substance-free correctional facility policy.

<< 42 USCA § 3751 NOTE >>

SEC. 116. EVALUATION AND RECOMMENDATION REPORT TO CONGRESS.

<< 42 USCA § 3751 NOTE >>

(a) EVALUATION.—

<< 42 USCA § 3751 NOTE >>

(1) IN GENERAL.—The Director shall enter into a contract, with an evaluating agency that has demonstrated experience in the evaluation of substance abuse treatment, to conduct an evaluation that incorporates the criteria described in paragraph (2).

<< 42 USCA § 3751 NOTE >>

(2) EVALUATION CRITERIA.—The Director, in consultation with the Directors of the appropriate National Institutes of Health, shall establish minimum criteria for evaluating each program. Such criteria shall include—
(A) reducing substance abuse among participants;
(B) reducing recidivism among participants;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(C) cost effectiveness of providing services to participants; and

(D) a data collection system that will produce data comparable to that used by the Office of Applied Studies of the Substance Abuse and Mental Health Services Administration and the Bureau of Justice Statistics of the Office of Justice Programs.

<< 42 USCA § 3751 NOTE >>

(b) REPORT.—The Director shall submit to the appropriate committees, at the same time as the President's budget for fiscal year 2001 is submitted, a report that—

<< 42 USCA § 3751 NOTE >>

(1) describes the activities funded by grant awards under this subtitle;

<< 42 USCA § 3751 NOTE >>

(2) includes the evaluation submitted pursuant to subsection (a); and

<< 42 USCA § 3751 NOTE >>

(3) makes recommendations regarding revisions to the authorization of the program, including extension, expansion, application requirements, reduction, and termination.

<< 42 USCA § 3751 NOTE >>

SEC. 117. DEFINITIONS.

In this subtitle:

<< 42 USCA § 3751 NOTE >>

(1) APPROPRIATE COMMITTEES.—The term "appropriate committees" means the Committees on the Judiciary and the Committees on Appropriations of the House of Representatives and the Senate.

<< 42 USCA § 3751 NOTE >>

(2) DIRECTOR.—The term "Director" means the Director of the Bureau of Justice Assistance.

<< 42 USCA § 3751 NOTE >>

(3) SUBSTANCE OFFENDER.—The term "substance offender" means an individual under the supervision of a State or local criminal justice system, awaiting trial or serving a sentence imposed by the criminal justice system, who—

(A) violated or has been arrested for violating a drug or alcohol law;

(B) was under the influence of alcohol or an illegal drug at the time the crime was committed;

(C) stole property to buy illegal drugs; or

(D) has a history of substance abuse and addiction.

<< 42 USCA § 3751 NOTE >>

(4) UNIT OF LOCAL GOVERNMENT.—The term "unit of local government" means any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a State, an Indian tribe which performs law enforcement functions as determined by the Secretary of the Interior and any agency of the District of Columbia government or the United States Government performing law enforcement functions in and for the District of Columbia, and the Trust Territory of the Pacific Islands.

<< 42 USCA § 3751 NOTE >>

SEC. 118. AUTHORIZATION OF APPROPRIATIONS.

<< 42 USCA § 3751 NOTE >>

 (a) IN GENERAL.—There are authorized to be appropriated to carry out this subtitle from the Violent Crime Reduction Trust Fund as authorized by title 31 of the Violent Crime and Control and Law Enforcement Act of 1994 (42 U.S.C. 14211)—

<< 42 USCA § 3751 NOTE >>

 (1) for fiscal year 1999, $30,000,000; and

<< 42 USCA § 3751 NOTE >>

 (2) for fiscal year 2000, $20,000,000.

<< 42 USCA § 3751 NOTE >>

 (b) RESERVATION.—The Director may reserve each fiscal year not more than 20 percent of the funds appropriated pursuant to subsection (a) for activities required under section 116.

Subtitle C—Drug–Free Schools Quality Assurance

<< 20 USCA § 6301 NOTE >>

SEC. 121. SHORT TITLE.

 This subtitle may be cited as the "Drug–Free Schools Quality Assurance Act".

<< 20 USCA § 7144 >>

SEC. 122. AMENDMENT TO SAFE AND DRUG–FREE SCHOOLS AND COMMUNITIES ACT.

 Subpart 3 of title IV of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7141 et seq.) is amended by adding at the end the following:

"SEC. 4134. QUALITY RATING.
 "(a) IN GENERAL.—The chief executive officer of each State, or in the case of a State in which the constitution or law of such State designates another individual, entity, or agency in the State to be responsible for education activities, such individual, entity, or agency, is authorized and encouraged—
 "(1) to establish a standard of quality for drug, alcohol, and tobacco prevention programs implemented in public elementary schools and secondary schools in the State in accordance with subsection (b); and
 "(2) to identify and designate, upon application by a public elementary school or secondary school, any such school that achieves such standard as a quality program school.
 "(b) CRITERIA.—The standard referred to in subsection (a) shall address, at a minimum—
 "(1) a comparison of the rate of illegal use of drugs, alcohol, and tobacco by students enrolled in the school for a period of time to be determined by the chief executive officer of the State;
 "(2) the rate of suspensions or expulsions of students enrolled in the school for drug, alcohol, or tobacco-related offenses;
 "(3) the effectiveness of the drug, alcohol, or tobacco prevention program as proven by research;
 "(4) the involvement of parents and community members in the design of the drug, alcohol, and tobacco prevention program; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(5) the extent of review of existing community drug, alcohol, and tobacco prevention programs before implementation of the public school program.

"(c) REQUEST FOR QUALITY PROGRAM SCHOOL DESIGNATION.—A school that wishes to receive a quality program school designation shall submit a request and documentation of compliance with this section to the chief executive officer of the State or the individual, entity, or agency described in subsection (a), as the case may be.

"(d) PUBLIC NOTIFICATION.—Not less than once a year, the chief executive officer of each State or the individual, entity, or agency described in subsection (a), as the case may be, shall make available to the public a list of the names of each public school in the State that has received a quality program school designation in accordance with this section.".

TITLE II—STATEMENT OF NATIONAL ANTIDRUG POLICY

Subtitle A—Congressional Leadership in Community Coalitions

## SEC. 201. SENSE OF CONGRESS.

(a) FINDINGS.—Congress finds the following:

(1) Illegal drug use is dangerous to the physical well-being of the Nation's youth.

(2) Illegal drug use can destroy the lives of the Nation's youth by diminishing their sense of morality and with it everything in life that is important and worthwhile.

(3) According to recently released national surveys, drug use among the Nation's youth remains at alarmingly high levels.

(4) National leadership is critical to conveying to the Nation's youth the message that drug use is dangerous and wrong.

(5) National leadership can help mobilize every sector of the community to support the implementation of comprehensive, sustainable, and effective programs to reduce drug abuse.

(6) As of September 1, 1998, 76 Members of the House of Representatives were establishing community-based antidrug coalitions in their congressional districts or were actively supporting such coalitions that already existed.

(7) The individual Members of the House of Representatives can best help their constituents prevent drug use among the Nation's youth by establishing community-based antidrug coalitions in their congressional districts or by actively supporting such coalitions that already exist.

(b) SENSE OF CONGRESS.—It is the sense of Congress that the individual Members of the House of Representatives, including the Delegates and the Resident Commissioner, should establish community-based antidrug coalitions in their congressional districts or should actively support any such coalitions that have been established.

Subtitle B—Rejection of Legalization of Drugs

## SEC. 211. SENSE OF CONGRESS.

(a) FINDINGS.—Congress finds the following:

(1) Illegal drug use is harmful and wrong.

(2) Illegal drug use can kill the individuals involved or cause the individuals to hurt or kill others, and such use strips the individuals of their moral sense.

(3) The greatest threat presented by such use is to the youth of the United States, who are illegally using drugs in increasingly greater numbers.

(4) The people of the United States are more concerned about illegal drug use and crimes associated with such use than with any other current social problem.

(5) Efforts to legalize or otherwise legitimize drug use present a message to the youth of the United States that drug use is acceptable.

(6) Article VI, clause 2 of the Constitution of the United States states that "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.".

(7) The courts of the United States have repeatedly found that any State law that conflicts with a Federal law or treaty is preempted by such law or treaty.

(8) The Controlled Substances Act (21 U.S.C. 801 et seq.) strictly regulates the use and possession of drugs.

(9) The United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotrophic Substances Treaty similarly regulates the use and possession of drugs.

(10) Any attempt to authorize under State law an activity prohibited under such Treaty or the Controlled Substances Act would conflict with that Treaty or Act.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the several States, and the citizens of such States, should reject the legalization of drugs through legislation, ballot proposition, constitutional amendment, or any other means; and

(2) each State should make efforts to be a drug-free State.

Subtitle C—Report on Streamlining Federal Prevention and Treatment Efforts

<< 21 USCA § 1703 NOTE >>

SEC. 221. REPORT ON STREAMLINING FEDERAL PREVENTION AND TREATMENT EFFORTS.

<< 21 USCA § 1703 NOTE >>

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

<< 21 USCA § 1703 NOTE >>

(1) the efforts of the Federal Government to reduce the demand for illegal drugs in the United States are frustrated by the fragmentation of those efforts across multiple departments and agencies; and

<< 21 USCA § 1703 NOTE >>

(2) improvement of those efforts can best be achieved through consolidation and coordination.

<< 21 USCA § 1703 NOTE >>

(b) REPORT REQUIREMENT.—

<< 21 USCA § 1703 NOTE >>

(1) IN GENERAL.—Not later than 18 months after the date of enactment of this Act, the Director of the Office of National Drug Control Policy shall prepare and submit to the appropriate committees a report evaluating options for increasing the efficacy of drug prevention and treatment programs and activities by the Federal Government. Such option shall include the merits of a consolidation of programs into a single agency, transferring programs from 1 agency to another, and improving coordinating mechanisms and authorities. The report shall also include a thorough review of the activities and potential consolidation of existing Federal drug information clearinghouses.

<< 21 USCA § 1703 NOTE >>

(2) RECOMMENDATION AND EXPLANATORY STATEMENT.—The study submitted under paragraph (1) shall identify options that are determined by the Director to have merit, and an explanation which options should be implemented.

<< 21 USCA § 1703 NOTE >>

(3) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Office of National Drug Control Policy to carry out this subsection $1,000,000 for contracting, policy research, and related costs.

<< 21 USCA § 1703 NOTE >>

 (c) APPROPRIATE COMMITTEES DEFINED.—In this section, the term "appropriate committees" means the Committee on Appropriations, the Committee on Commerce, and the Committee on Education and the Workforce of the House of Representatives, and the Committee on Appropriations, and Committee on Labor and Human Resources of the Senate.

DIVISION E—METHAMPHETAMINE TRAFFICKING PENALTY ENHANCEMENT ACT OF 1998

<< 21 USCA § 801 NOTE >>

SECTION 1. SHORT TITLE.

 This division may be cited as the "Methamphetamine Trafficking Penalty Enhancement Act of 1998".

SEC. 2. METHAMPHETAMINE PENALTY INCREASES.

<< 21 USCA § 841 >>

 (a) CONTROLLED SUBSTANCES ACT.—Section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) is amended—

<< 21 USCA § 841 >>

 (1) in subparagraph (A)(viii)—
   (A) by striking "100 grams" and inserting "50 grams"; and
   (B) by striking "1 kilogram" and inserting "500 grams"; and

<< 21 USCA § 841 >>

 (2) in subparagraph (B)(viii)—
   (A) by striking "10 grams" and inserting "5 grams"; and
   (B) by striking "100 grams" and inserting "50 grams".

<< 21 USCA § 960 >>

 (b) CONTROLLED SUBSTANCES IMPORT AND EXPORT ACT.—Section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)) is amended—

<< 21 USCA § 960 >>

 (1) in paragraph (1)(H)—
   (A) by striking "100 grams" and inserting "50 grams"; and
   (B) by striking "1 kilogram" and inserting "500 grams"; and

<< 21 USCA § 960 >>

 (2) in paragraph (2)(H)—
   (A) by striking "10 grams" and inserting "5 grams"; and
   (B) by striking "100 grams" and inserting "50 grams".

<< 42 USCA § 13705 >>

SEC. 3. ADDITIONAL REQUIREMENTS FOR THE USE OF FUNDS UNDER THE VIOLENT OFFENDER INCARCERATION AND TRUTH–IN–SENTENCING GRANTS PROGRAM.

Section 20105(b) of the Violent Crime Control and Law Enforcement Act of 1994 is amended to read as follows:

"(b) ADDITIONAL REQUIREMENTS.—

"(1) ELIGIBILITY FOR GRANT.—To be eligible to receive a grant under section 20103 or section 20104, a State shall—

"(A) provide assurances to the Attorney General that the State has implemented or will implement not later than 18 months after the date of the enactment of this subtitle, policies that provide for the recognition of the rights of crime victims; and

"(B) subject to the limitation of paragraph (2), no later than September 1, 2000, consider a program of drug testing and intervention for appropriate categories of convicted offenders during periods of incarceration and post-incarceration and criminal justice supervision, with sanctions including denial or revocation of release for positive drug tests, consistent with guidelines issued by the Attorney General.

"(2) USE OF FUNDS.—Beginning in fiscal year 1999, not more than 10 percent of the funds provided under section 20103 or section 20104 of this subtitle may be applied to the cost of offender drug testing and intervention programs during periods of incarceration and post-incarceration criminal justice supervision, consistent with guidelines issued by the Attorney General. Further, such funds may be used by the States to pay the costs of providing to the Attorney General a baseline study on their prison drug abuse problem. Such studies shall be consistent with guidelines issued by the Attorney General.".

## DIVISION F—NOT LEGALIZING MARIJUANA FOR MEDICINAL USE

It is the sense of the Congress that—

(1) certain drugs are listed on Schedule I of the Controlled Substances Act if they have a high potential for abuse, lack any currently accepted medical use in treatment, and are unsafe, even under medical supervision;

(2) the consequences of illegal use of Schedule I drugs are well documented, particularly with regard to physical health, highway safety, and criminal activity;

(3) pursuant to section 401 of the Controlled Substances Act, it is illegal to manufacture, distribute, or dispense marijuana, heroin, LSD, and more than 100 other Schedule I drugs;

(4) pursuant to section 505 of the Federal Food, Drug and Cosmetic Act, before any drug can be approved as a medication in the United States, it must meet extensive scientific and medical standards established by the Food and Drug Administration to ensure it is safe and effective;

(5) marijuana and other Schedule I drugs have not been approved by the Food and Drug Administration to treat any disease or condition;

(6) the Federal Food, Drug and Cosmetic Act already prohibits the sale of any unapproved drug, including marijuana, that has not been proven safe and effective for medical purposes and grants the Food and Drug Administration the authority to enforce this prohibition through seizure and other civil action, as well as through criminal penalties;

(7) marijuana use by children in grades 8 through 12 declined steadily from 1980 to 1992, but, from 1992 to 1996, has dramatically increased by 253 percent among 8th graders, 151 percent among 10th graders, and 84 percent among 12th graders, and the average age of firsttime use of marijuana is now younger than it has ever been;

(8) according to the 1997 survey by the Center on Addiction and Substance Abuse at Columbia University, 500,000 8th graders began using marijuana in the 6th and 7th grades;

(9) according to that same 1997 survey, youths between the ages of 12 and 17 who use marijuana are 85 times more likely to use cocaine than those who abstain from marijuana, and 60 percent of adolescents who use marijuana before the age of 15 will later use cocaine;

(10) the rate of illegal drug use among youth is linked to their perceptions of the health and safety risks of those drugs, and the ambiguous cultural messages about marijuana use are contributing to a growing acceptance of marijuana use among children and teenagers;

(11) Congress continues to support the existing Federal legal process for determining the safety and efficacy of drugs and opposes efforts to circumvent this process by legalizing marijuana, and other Schedule I drugs, for medicinal use without valid scientific evidence and the approval of the Food and Drug Administration; and

(12) not later than 90 days after the date of the enactment of this Act—

(A) the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and the Senate a report on—

(i) the total quantity of marijuana eradicated in the United States during the period from 1992 through 1997; and

(ii) the annual number of arrests and prosecutions for Federal marijuana offenses during the period described in clause (i); and

(B) the Commissioner of Foods and Drugs shall submit to the Committee on Commerce of the House of Representatives and the Committee on Labor and Human Resources of the Senate a report on the specific efforts underway to enforce sections 304 and 505 of the Federal Food, Drug and Cosmetic Act with respect to marijuana and other Schedule I drugs.

## DIVISION G—FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT OF 1998

<< 22 USCA § 6501 NOTE >>

SEC. 1001. SHORT TITLE.

This division may be cited as the "Foreign Affairs Reform and Restructuring Act of 1998".

SEC. 1002. ORGANIZATION OF DIVISION INTO SUBDIVISIONS; TABLE OF CONTENTS.

(a) DIVISIONS.—This division is organized into three subdivisions as follows:

(1) SUBDIVISION A.—Foreign Affairs Agencies Consolidation Act of 1998.

(2) SUBDIVISION B.—Foreign Relations Authorization Act, Fiscal Years 1998 and 1999.

(3) SUBDIVISION C.—United Nations Reform Act of 1998.

(b) TABLE OF CONTENTS.—The table of contents for this division is as follows:

### DIVISION ____—FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT OF 1998

Sec. 1001. Short title.

Sec. 1002. Organization of division into subdivisions; table of contents.

### SUBDIVISION A—CONSOLIDATION OF FOREIGN AFFAIRS AGENCIES

### TITLE XI—GENERAL PROVISIONS

Sec. 1101. Short title.

Sec. 1102. Purposes.

Sec. 1103. Definitions.

Sec. 1104. Report on budgetary cost savings resulting from reorganization.

### TITLE XII—UNITED STATES ARMS CONTROL AND DISARMAMENT AGENCY

### CHAPTER 1—GENERAL PROVISIONS

Sec. 1201. Effective date.

### CHAPTER 2—ABOLITION AND TRANSFER OF FUNCTIONS

Sec. 1211. Abolition of United States Arms Control and Disarmament Agency.

Sec. 1212. Transfer of functions to Secretary of State.

Sec. 1213. Under Secretary for Arms Control and International Security.

### CHAPTER 3—CONFORMING AMENDMENTS

Sec. 1221. References.

Sec. 1222. Repeals.

Sec. 1223. Amendments to the Arms Control and Disarmament Act.

Sec. 1224. Compensation of officers.

Sec. 1225. Additional conforming amendments.

## TITLE XIII—UNITED STATES INFORMATION AGENCY

### CHAPTER 1—GENERAL PROVISIONS

Sec. 1301. Effective date.

### CHAPTER 2—ABOLITION AND TRANSFER OF FUNCTIONS

Sec. 1311. Abolition of United States Information Agency.
Sec. 1312. Transfer of functions.
Sec. 1313. Under Secretary of State for Public Diplomacy.
Sec. 1314. Abolition of Office of Inspector General of United States Information Agency and transfer of functions.

### CHAPTER 3—INTERNATIONAL BROADCASTING

Sec. 1321. Congressional findings and declaration of purpose.
Sec. 1322. Continued existence of Broadcasting Board of Governors.
Sec. 1323. Conforming amendments to the United States International Broadcasting Act of 1994.
Sec. 1324. Amendments to the Radio Broadcasting to Cuba Act.
Sec. 1325. Amendments to the Television Broadcasting to Cuba Act.
Sec. 1326. Transfer of broadcasting related funds, property, and personnel.
Sec. 1327. Savings provisions.
Sec. 1328. Report on the privatization of RFE/RL, Incorporated.

### CHAPTER 4—CONFORMING AMENDMENTS

Sec. 1331. References.
Sec. 1332. Amendments to title 5, United States Code.
Sec. 1333. Application of certain laws.
Sec. 1334. Abolition of United States Advisory Commission on Public Diplomacy.
Sec. 1335. Conforming amendments.
Sec. 1336. Repeals.

## TITLE XIV—UNITED STATES INTERNATIONAL DEVELOPMENT COOPERATION AGENCY

### CHAPTER 1—GENERAL PROVISIONS

Sec. 1401. Effective date.

### CHAPTER 2—ABOLITION AND TRANSFER OF FUNCTIONS

Sec. 1411. Abolition of United States International Development Cooperation Agency.
Sec. 1412. Transfer of functions and authorities.
Sec. 1413. Status of AID.

### CHAPTER 3—CONFORMING AMENDMENTS

Sec. 1421. References.
Sec. 1422. Conforming amendments.

## TITLE XV—AGENCY FOR INTERNATIONAL DEVELOPMENT

### CHAPTER 1—GENERAL PROVISIONS

Sec. 1501. Effective date.

### CHAPTER 2—REORGANIZATION AND TRANSFER OF FUNCTIONS

Sec. 1511. Reorganization of Agency for International Development.

### CHAPTER 3—AUTHORITIES OF THE SECRETARY OF STATE

Sec. 1521. Definition of United States assistance.
Sec. 1522. Administrator of AID reporting to the Secretary of State.
Sec. 1523. Assistance programs coordination and oversight.

TITLE XVI—TRANSITION

CHAPTER 1—REORGANIZATION PLAN
Sec. 1601. Reorganization plan and report.

CHAPTER 2—REORGANIZATION AUTHORITY
Sec. 1611. Reorganization authority.
Sec. 1612. Transfer and allocation of appropriations.
Sec. 1613. Transfer, appointment, and assignment of personnel.
Sec. 1614. Incidental transfers.
Sec. 1615. Savings provisions.
Sec. 1616. Authority of Secretary of State to facilitate transition.
Sec. 1617. Final report.

SUBDIVISION B—FOREIGN RELATIONS AUTHORIZATION

TITLE XX—GENERAL PROVISIONS
Sec. 2001. Short title.
Sec. 2002. Definition of appropriate congressional committees.

TITLE XXI—AUTHORIZATION OF APPROPRIATIONS FOR DEPARTMENT OF STATE
Sec. 2101. Administration of foreign affairs.
Sec. 2102. International commissions.
Sec. 2103. Grants to The Asia Foundation.
Sec. 2104. Voluntary contributions to international organizations.
Sec. 2105. Voluntary contributions to peacekeeping operations.
Sec. 2106. Limitation on United States voluntary contributions to United Nations Development Program.

TITLE XXII—DEPARTMENT OF STATE AUTHORITIES AND ACTIVITIES

CHAPTER 1—AUTHORITIES AND ACTIVITIES.
Sec. 2201. Reimbursement of Department of State for assistance to overseas educational facilities.
Sec. 2202. Revision of Department of State rewards program.
Sec. 2203. Retention of additional defense trade controls registration fees.
Sec. 2204. Fees for commercial services.
Sec. 2205. Pilot program for foreign affairs reimbursement.
Sec. 2206. Fee for use of diplomatic reception rooms.
Sec. 2207. Budget presentation documents.
Sec. 2208. Office of the Inspector General.
Sec. 2209. Capital Investment Fund.
Sec. 2210. Contracting for local guards services overseas.
Sec. 2211. Authority of the Foreign Claims Settlement Commission.
Sec. 2212. Expenses relating to certain international claims and proceedings.
Sec. 2213. Grants to remedy international abductions of children.
Sec. 2214. Counterdrug and anticrime activities of the Department of State.
Sec. 2215. Annual report on overseas surplus properties.
Sec. 2216. Human rights reports.

Sec. 2217. Reports and policy concerning diplomatic immunity.
Sec. 2218. Reaffirming United States international telecommunications policy.
Sec. 2219. Reduction of reporting.

### CHAPTER 2 CONSULAR AUTHORITIES OF THE DEPARTMENT OF STATE

Sec. 2221. Use of certain passport processing fees for enhanced passport services.
Sec. 2222. Consular officers.
Sec. 2223. Repeal of outdated consular receipt requirements.
Sec. 2224. Elimination of duplicate Federal Register publication for travel advisories.
Sec. 2225. Denial of visas to confiscators of American property.
Sec. 2226. Inadmissibility of any alien supporting an international child abductor.

### CHAPTER 3—REFUGEES AND MIGRATION

#### SUBCHAPTER A—AUTHORIZATION OF APPROPRIATIONS

Sec. 2231. Migration and refugee assistance.

#### SUBCHAPTER B—AUTHORITIES

Sec. 2241. United States policy regarding the involuntary return of refugees.
Sec. 2242. United States policy with respect to the involuntary return of persons in danger of subjection to torture.
Sec. 2243. Reprogramming of migration and refugee assistance funds.
Sec. 2244. Eligibility for refugee status.
Sec. 2245. Reports to Congress concerning Cuban emigration policies.

### TITLE XXIII—ORGANIZATION OF THE DEPARTMENT OF STATE; DEPARTMENT OF STATE PERSONNEL; THE FOREIGN SERVICE

#### CHAPTER 1—ORGANIZATION OF THE DEPARTMENT OF STATE

Sec. 2301. Coordinator for Counterterrorism.
Sec. 2302. Elimination of Deputy Assistant Secretary of State for Burdensharing.
Sec. 2303. Personnel management.
Sec. 2304. Diplomatic security.
Sec. 2305. Number of senior official positions authorized for the Department of State.
Sec. 2306. Nomination of Under Secretaries and Assistant Secretaries of State.

#### CHAPTER 2—PERSONNEL OF THE DEPARTMENT OF STATE; THE FOREIGN SERVICE

Sec. 2311. Foreign Service reform.
Sec. 2312. Retirement benefits for involuntary separation.
Sec. 2313. Authority of Secretary to separate convicted felons from the Foreign Service.
Sec. 2314. Career counseling.
Sec. 2315. Limitations on management assignments.
Sec. 2316. Availability pay for certain criminal investigators within the Diplomatic Security Service.
Sec. 2317. Nonovertime differential pay.
Sec. 2318. Report concerning minorities and the Foreign Service.

### TITLE XXIV—UNITED STATES INFORMATIONAL, EDUCATIONAL, AND CULTURAL PROGRAMS

#### CHAPTER 1—AUTHORIZATION OF APPROPRIATIONS

Sec. 2401. International information activities and educational and cultural exchange programs.

#### CHAPTER 2—AUTHORITIES AND ACTIVITIES

Sec. 2411. Retention of interest.

AR.02966

Sec. 2412. Use of selected program fees.
Sec. 2413. Muskie Fellowship Program.
Sec. 2414. Working Group on United States Government–Sponsored International Exchanges and Training.
Sec. 2415. Educational and cultural exchanges and scholarships for Tibetans and Burmese.
Sec. 2416. Surrogate broadcasting study.
Sec. 2417. Radio broadcasting to Iran in the Farsi language.
Sec. 2418. Authority to administer summer travel and work programs.
Sec. 2419. Permanent administrative authorities regarding appropriations.
Sec. 2420. Voice of America broadcasts.

TITLE XXV—INTERNATIONAL ORGANIZATIONS OTHER THAN UNITED NATIONS
Sec. 2501. International conferences and contingencies.
Sec. 2502. Restriction relating to United States accession to any new international criminal tribunal.
Sec. 2503. United States membership in the Bureau of the Interparliamentary Union.
Sec. 2504. Service in international organizations.
Sec. 2505. Reports regarding foreign travel.

TITLE XXVI—UNITED STATES ARMS CONTROL AND DISARMAMENT AGENCY
Sec. 2601. Authorization of appropriations.
Sec. 2602. Statutory construction.

TITLE XXVII—EUROPEAN SECURITY ACT OF 1998
Sec. 2701. Short title.
Sec. 2702. Statement of policy.
Sec. 2703. Authorities relating to NATO enlargement.
Sec. 2704. Sense of Congress with respect to the Treaty on Conventional Armed Forces in Europe.
Sec. 2705. Restrictions and requirements relating to ballistic missile defense.

TITLE XXVIII—OTHER FOREIGN POLICY PROVISIONS
Sec. 2801. Reports on claims by United States firms against the Government of Saudi Arabia.
Sec. 2802. Reports on determinations under title IV of the Libertad Act.
Sec. 2803. Report on compliance with the Hague Convention on International Child Abduction.
Sec. 2804. Sense of Congress relating to recognition of the Ecumenical Patriarchate by the Government of Turkey.
Sec. 2805. Report on relations with Vietnam.
Sec. 2806. Reports and policy concerning human rights violations in Laos.
Sec. 2807. Report on an alliance against narcotics trafficking in the Western Hemisphere.
Sec. 2808. Congressional statement regarding the accession of Taiwan to the World Trade Organization.
Sec. 2809. Programs or projects of the International Atomic Energy Agency in Cuba.
Sec. 2810. Limitation on assistance to countries aiding Cuba nuclear development.
Sec. 2811. International Fund for Ireland.
Sec. 2812. Support for democratic opposition in Iraq.
Sec. 2813. Development of democracy in the Republic of Serbia.

<< 22 USCA Ch. 74 >>

SUBDIVISION A—CONSOLIDATION OF FOREIGN AFFAIRS AGENCIES

TITLE XI—GENERAL PROVISIONS

<< 22 USCA § 6501 NOTE >>

SEC. 1101. SHORT TITLE.

This subdivision may be cited as the "Foreign Affairs Agencies Consolidation Act of 1998".

<< 22 USCA § 6501 >>

SEC. 1102. PURPOSES.

The purposes of this subdivision are—

<< 22 USCA § 6501 >>

(1) to strengthen—
 (A) the coordination of United States foreign policy; and
 (B) the leading role of the Secretary of State in the formulation and articulation of United States foreign policy;

<< 22 USCA § 6501 >>

(2) to consolidate and reinvigorate the foreign affairs functions of the United States within the Department of State by—
 (A) abolishing the United States Arms Control and Disarmament Agency, the United States Information Agency, and the United States International Development Cooperation Agency, and transferring the functions of these agencies to the Department of State while preserving the special missions and skills of these agencies;
 (B) transferring certain functions of the Agency for International Development to the Department of State; and
 (C) providing for the reorganization of the Department of State to maximize the efficient use of resources, which may lead to budget savings, eliminate redundancy in functions, and improvement in the management of the Department of State;

<< 22 USCA § 6501 >>

(3) to ensure that programs critical to the promotion of United States national interests be maintained;

<< 22 USCA § 6501 >>

(4) to assist congressional efforts to balance the Federal budget and reduce the Federal debt;

<< 22 USCA § 6501 >>

(5) to ensure that the United States maintains effective representation abroad within budgetary restraints; and

<< 22 USCA § 6501 >>

(6) to encourage United States foreign affairs agencies to maintain a high percentage of the best qualified, most competent United States citizens serving in the United States Government.

<< 22 USCA § 6502 >>

SEC. 1103. DEFINITIONS.

In this subdivision:

<< 22 USCA § 6502 >>

(1) ACDA.—The term "ACDA" means the United States Arms Control and Disarmament Agency.

<< 22 USCA § 6502 >>

(2) AID.—The term "AID" means the United States Agency for International Development.

<< 22 USCA § 6502 >>

(3) AGENCY; FEDERAL AGENCY.—The term "agency" or "Federal agency" means an Executive agency as defined in section 105 of title 5, United States Code.

<< 22 USCA § 6502 >>

(4) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the Committee on International Relations and the Committee on Appropriations of the House of Representatives and the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

<< 22 USCA § 6502 >>

(5) COVERED AGENCY.—The term "covered agency" means any of the following agencies: ACDA, USIA, IDCA, and AID.

<< 22 USCA § 6502 >>

(6) DEPARTMENT.—The term "Department" means the Department of State.

<< 22 USCA § 6502 >>

(7) FUNCTION.—The term "function" means any duty, obligation, power, authority, responsibility, right, privilege, activity, or program.

<< 22 USCA § 6502 >>

(8) IDCA.—The term "IDCA" means the United States International Development Cooperation Agency.

<< 22 USCA § 6502 >>

(9) OFFICE.—The term "office" includes any office, administration, agency, institute, unit, organizational entity, or component thereof.

<< 22 USCA § 6502 >>

(10) SECRETARY.—The term "Secretary" means the Secretary of State.

<< 22 USCA § 6502 >>

(11) USIA.—The term "USIA" means the United States Information Agency.

<< 22 USCA § 6503 >>

SEC. 1104. REPORT ON BUDGETARY COST SAVINGS RESULTING FROM REORGANIZATION.

 The Secretary of State shall submit a report, together with the congressional presentation document for the budget of the Department of State for each of the fiscal years 2000 and 2001, to the appropriate congressional committees describing the total anticipated and achieved cost savings in budget outlays and budget authority related to the reorganization implemented under this subdivision, including cost savings by each of the following categories:

<< 22 USCA § 6503 >>

(1) Reductions in personnel.

<< 22 USCA § 6503 >>

(2) Administrative consolidation, including procurement.

<< 22 USCA § 6503 >>

(3) Program consolidation.

<< 22 USCA § 6503 >>

(4) Consolidation of real properties and leases.

<< 22 USCA Ch. 74 >>

TITLE XII—UNITED STATES ARMS CONTROL AND DISARMAMENT AGENCY

CHAPTER 1—GENERAL PROVISIONS

<< 22 USCA § 6511 NOTE >>

SEC. 1201. EFFECTIVE DATE.

This title, and the amendments made by this title, shall take effect on the earlier of—

<< 22 USCA § 6511 NOTE >>

(1) April 1, 1999; or

<< 22 USCA § 6511 NOTE >>

(2) the date of abolition of the United States Arms Control and Disarmament Agency pursuant to the reorganization plan described in section 1601.

CHAPTER 2—ABOLITION AND TRANSFER OF FUNCTIONS

<< 22 USCA § 6511 >>

SEC. 1211. ABOLITION OF UNITED STATES ARMS CONTROL AND DISARMAMENT AGENCY.

The United States Arms Control and Disarmament Agency is abolished.

<< 22 USCA § 6512 >>

SEC. 1212. TRANSFER OF FUNCTIONS TO SECRETARY OF STATE.

There are transferred to the Secretary of State all functions of the Director of the United States Arms Control and Disarmament Agency, and all functions of the United States Arms Control and Disarmament Agency and any office or component of such agency, under any statute, reorganization plan, Executive order, or other provision of law, as of the day before the effective date of this title.

<< 22 USCA § 2651a >>

SEC. 1213. UNDER SECRETARY FOR ARMS CONTROL AND INTERNATIONAL SECURITY.

Section 1(b) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651(b)) is amended—

<< 22 USCA § 2651a >>

(1) by striking "There" and inserting the following:
"(1) IN GENERAL.—There"; and

<< 22 USCA § 2651a >>

(2) by adding at the end the following:
"(2) UNDER SECRETARY FOR ARMS CONTROL AND INTERNATIONAL SECURITY.—There shall be in the Department of State, among the Under Secretaries authorized by paragraph (1), an Under Secretary for Arms Control and International Security, who shall assist the Secretary and the Deputy Secretary in matters related to international security policy, arms control, and nonproliferation. Subject to the direction of the President, the Under Secretary may attend and participate in meetings of the National Security Council in his role as Senior Advisor to the President and the Secretary of State on Arms Control and Nonproliferation Matters.".

CHAPTER 3—CONFORMING AMENDMENTS

<< 22 USCA § 6521 >>

SEC. 1221. REFERENCES.

Except as otherwise provided in section 1223 or 1225, any reference in any statute, reorganization plan, Executive order, regulation, agreement, determination, or other official document or proceeding to—

<< 22 USCA § 6521 >>

(1) the Director of the United States Arms Control and Disarmament Agency, the Director of the Arms Control and Disarmament Agency, or any other officer or employee of the United States Arms Control and Disarmament Agency or the Arms Control and Disarmament Agency shall be deemed to refer to the Secretary of State; or

<< 22 USCA § 6521 >>

(2) the United States Arms Control and Disarmament Agency or the Arms Control and Disarmament Agency shall be deemed to refer to the Department of State.

<< 22 USCA § 2561 >>

<< 22 USCA § 2562 >>

<< 22 USCA § 2563 >>

<< 22 USCA § 2564 >>

<< 22 USCA § 2565 >>

<< 22 USCA § 2566 >>

<< 22 USCA § 2575 >>

<< 22 USCA § 2582 >>

<< 22 USCA § 2583 >>

<< 22 USCA § 2585 >>

<< 22 USCA § 2586 >>

<< 22 USCA § 2587 >>

<< 22 USCA § 2588 >>

<< 22 USCA § 2591 >>

<< 22 USCA § 2593 >>

<< 22 USCA § 2593c >>

<< 22 USCA § 2593d >>

<< 22 USCA § 2595b >>

SEC. 1222. REPEALS.

  The following sections of the Arms Control and Disarmament Act (22 U.S.C. 2551 et seq.) are repealed: Sections 21 through 26 (22 U.S.C. 2561–2566), section 35 (22 U.S.C. 2575), section 42 (22 U.S.C. 2582), section 43 (22 U.S.C. 2583), sections 45 through 50 (22 U.S.C. 2585–2593), section 53 (22 U.S.C. 2593c), section 54 (22 U.S.C. 2593d), and section 63 (22 U.S.C. 2595b).

SEC. 1223. AMENDMENTS TO THE ARMS CONTROL AND DISARMAMENT ACT.

  The Arms Control and Disarmament Act (22 U.S.C. 2551 et seq.) is amended—

<< 22 USCA § 2551 >>

  (1) in section 2 (22 U.S.C. 2551)—
  (A) in the first undesignated paragraph, by striking "creating a new agency of peace to deal with" and inserting "addressing";
  (B) by striking the second undesignated paragraph; and
  (C) in the third undesignated paragraph—
    (i) by striking "This organization" and inserting "The Secretary of State";
    (ii) by striking "It shall have" and inserting "The Secretary shall have";
    (iii) by striking "and the Secretary of State";
    (iv) by inserting ", nonproliferation," after "arms control" in paragraph (1);
    (v) by striking paragraph (2);
    (vi) by redesignating paragraphs (3) through (5) as paragraphs (2) through (4), respectively; and
    (vii) by striking ", as appropriate," in paragraph (3) (as redesignated);

<< 22 USCA § 2552 >>

  (2) in section 3 (22 U.S.C. 2552), by striking subsection (c);

<< 22 USCA Ch. 35 >>

  (3) in the heading for title II, by striking "ORGANIZATION" and inserting "SPECIAL REPRESENTATIVES AND VISITING SCHOLARS";

<< 22 USCA § 2567 >>

  (4) in section 27 (22 U.S.C. 2567)—
  (A) by striking the third sentence;

(B) in the fourth sentence, by striking ", acting through the Director"; and

(C) in the fifth sentence, by striking "Agency" and inserting "Department of State";

<< 22 USCA § 2568 >>

(5) in section 28 (22 U.S.C. 2568)—

  (A) by striking "Director" each place it appears and inserting "Secretary of State";

  (B) in the second sentence—

   (i) by striking "Agency" each place it appears and inserting "Department of State"; and

   (ii) by striking "Agency's" and inserting "Department of State's"; and

  (C) by striking the fourth sentence;

<< 22 USCA § 2571 >>

(6) in section 31 (22 U.S.C. 2571)—

  (A) by inserting "this title in" after "powers in";

  (B) by striking "Director" each place it appears and inserting "Secretary of State";

  (C) by striking "insure" each place it appears and inserting "ensure";

  (D) in the second sentence, by striking "in accordance with procedures established under section 35 of this Act";

  (E) in the fourth sentence by striking "The authority" and all that follows through "disarmament:" and inserting the following: "The authority of the Secretary under this Act with respect to research, development, and other studies concerning arms control, nonproliferation, and disarmament shall be limited to participation in the following:"; and

  (F) in subsection (l), by inserting "and" at the end;

<< 22 USCA § 2572 >>

(7) in section 32 (22 U.S.C. 2572)—

  (A) by striking "Director" and inserting "Secretary of State"; and

  (B) by striking "subsection" and inserting "section";

<< 22 USCA § 2573 >>

(8) in section 33(a) (22 U.S.C. 2573(a))—

  (A) by striking "the Secretary of State,"; and

  (B) by striking "Director" and inserting "Secretary of State";

<< 22 USCA § 2574 >>

(9) in section 34 (22 U.S.C. 2574)—

  (A) in subsection (a)—

   (i) in the first sentence, by striking "Director" and inserting "Secretary of State";

   (ii) in the first sentence, by striking "and the Secretary of State";

   (iii) in the first sentence, by inserting ", nonproliferation," after "in the fields of arms control";

   (iv) in the first sentence, by striking "and shall have primary responsibility, whenever directed by the President, for the preparation, conduct, and management of the United States participation in international negotiations and implementation fora in the field of nonproliferation";

   (v) in the second sentence, by striking "section 27" and inserting "section 201"; and

   (vi) in the second sentence, by striking "the" after "serve as";

  (B) by striking subsection (b);

  (C) by redesignating subsection (c) as subsection (b); and

  (D) in subsection (b) (as redesignated)—

   (i) in the text above paragraph (1), by striking "Director" and inserting "Secretary of State";

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   (ii) by striking paragraph (1); and
   (iii) by redesignating paragraphs (2) and (3) as paragraphs (1) and (2), respectively;

<< 22 USCA § 2576 >>

(10) in section 36 (22 U.S.C. 2576)—
   (A) by striking "Director" each place it appears and inserting "Secretary of State"; and
   (B) by striking ", in accordance with the procedures established pursuant to section 35 of this Act,";

<< 22 USCA § 2577 >>

(11) in section 37 (22 U.S.C. 2577)—
   (A) by striking "Director" and "Agency" each place it appears and inserting "Secretary of State" or "Department of State", respectively; and
   (B) by striking subsection (d);

<< 22 USCA § 2578 >>

(12) in section 38 (22 U.S.C. 2578)—
   (A) by striking "Director" each place it appears and inserting "Secretary of State"; and
   (B) by striking subsection (c);

<< 22 USCA § 2581 >>

(13) in section 41 (22 U.S.C. 2581)—
   (A) by striking "In the performance of his functions, the Director" and inserting "In addition to any authorities otherwise available, the Secretary of State in the performance of functions under this Act";
   (B) by striking "Agency", "Agency's", "Director", and "Director's" each place they appear and inserting "Department of State", "Department of State's", "Secretary of State", or "Secretary of State's", as appropriate;
   (C) in subsection (a), by striking the sentence that begins "It is the intent";
   (D) in subsection (b)—
    (i) by striking "appoint officers and employees, including attorneys, for the Agency in accordance with the provisions of title 5, United States Code, governing appointment in the competitive service, and fix their compensation in accordance with chapter 51 and with subchapter III of chapter 53 of such title, relating to classification and General Schedule pay rates, except that the Director may, to the extent the Director determines necessary to the discharge of his responsibilities,";
    (ii) in paragraph (1), by striking "exception" and inserting "subsection"; and
    (iii) in paragraph (2)—
     (I) by striking "exception" and inserting "subsection"; and
     (II) by striking "ceiling" and inserting "positions allocated to carry out the purpose of this Act";
   (E) by striking subsection (g);
   (F) by redesignating subsections (h), (i), and (j) as subsections (g), (h), and (i), respectively;
   (G) by amending subsection (f) to read as follows:
 "(f) establish a scientific and policy advisory board to advise with and make recommendations to the Secretary of State on United States arms control, nonproliferation, and disarmament policy and activities. A majority of the board shall be composed of individuals who have a demonstrated knowledge and technical expertise with respect to arms control, nonproliferation, and disarmament matters and who have distinguished themselves in any of the fields of physics, chemistry, mathematics, biology, or engineering, including weapons engineering. The members of the board may receive the compensation and reimbursement for expenses specified for consultants by subsection (d) of this section;"; and
   (H) in subsection (h) (as redesignated), by striking "Deputy Director" and inserting "Under Secretary for Arms Control and International Security";

<< 22 USCA § 2584 >>

(14) in section 44 (22 U.S.C. 2584)—

 (A) by striking "CONFLICT–OF–INTEREST AND";

 (B) by striking "The members" and all that follows through "(5 U.S.C. 2263), or any other" and inserting "Members of advisory boards and consultants may serve as such without regard to any"; and

 (C) by inserting at the end the following new sentence: "This section shall apply only to individuals carrying out activities related to arms control, nonproliferation, and disarmament.";

<< 22 USCA § 2593a >>

(15) in section 51 (22 U.S.C. 2593a)—

 (A) in subsection (a)—

  (i) in paragraphs (1) and (3), by inserting ", nonproliferation," after "arms control" each place it appears;

  (ii) by striking "Director, in consultation with the Secretary of State," and inserting "Secretary of State with the concurrence of the Director of Central Intelligence and in consultation with";

  (iii) by striking "the Chairman of the Joint Chiefs of Staff, and the Director of Central Intelligence" and inserting "and the Chairman of the Joint Chiefs of Staff";

  (iv) by striking paragraphs (2) and (4); and

  (v) by redesignating paragraphs (3), (5), (6), and (7) as paragraphs (2) through (5), respectively; and

 (B) by adding at the end of subsection (b) the following: "The portions of this report described in paragraphs (4) and (5) of subsection (a) shall summarize in detail, at least in classified annexes, the information, analysis, and conclusions relevant to possible noncompliance by other nations that are provided by United States intelligence agencies.";

<< 22 USCA § 2593b >>

(16) in section 52 (22 U.S.C. 2593b), by striking "Director" and inserting "Secretary of State";

<< 22 USCA § 2595 >>

(17) in section 61 (22 U.S.C. 2593a)—

 (A) in paragraph (1), by striking "United States Arms Control and Disarmament Agency" and inserting "Department of State";

 (B) by striking paragraph (2);

 (C) by redesignating paragraphs (3) through (7) as paragraphs (2) through (6), respectively;

 (D) in paragraph (4) (as redesignated), by striking "paragraph (4)" and inserting "paragraph (3)"; and

 (E) in paragraph (6) (as redesignated), by striking "United States Arms Control and Disarmament Agency and the";

<< 22 USCA § 2595a >>

(18) in section 62 (22 U.S.C. 2595a)—

 (A) in subsection (c)—

  (i) in the subsection heading, by striking "DIRECTOR" and inserting "SECRETARY OF STATE"; and

  (ii) by striking "2(d), 22, and 34(c)" and inserting "102(3) and 304(b)"; and

 (B) by striking "Director" and inserting "Secretary of State";

<< 22 USCA § 2595b–1 >>

(19) in section 64 (22 U.S.C. 2595b–1)—

 (A) by striking the section title and inserting "SEC. 503. REVIEW OF CERTAIN REPROGRAMMING NOTIFICATIONS.";

 (B) by striking subsection (a); and

(C) in subsection (b)—

 (i) by striking "(b) REVIEW OF CERTAIN REPROGRAMMING NOTIFICATIONS.—"; and

 (ii) by striking "Foreign Affairs" and inserting "International Relations";

<< 22 USCA § 2595c >>

(20) in section 65(1) (22 U.S.C. 2595c(1)) by inserting "of America" after "United States"; and

<< 22 USCA § 2551 NOTE >>

<< 22 USCA § 2551 >>

<< 22 USCA § 2552 >>

<< 22 USCA § 2553 >>

<< 22 USCA § 2567 >>

<< 22 USCA § 2568 >>

<< 22 USCA § 2571 >>

<< 22 USCA § 2572 >>

<< 22 USCA § 2573 >>

<< 22 USCA § 2574 >>

<< 22 USCA § 2576 >>

<< 22 USCA § 2577 >>

<< 22 USCA § 2578 >>

<< 22 USCA § 2579 >>

<< 22 USCA § 2581 >>

<< 22 USCA § 2584 >>

<< 22 USCA § 2593a >>

<< 22 USCA § 2593b >>

<< 22 USCA § 2595 >>

<< 22 USCA § 2595a >>

<< 22 USCA § 2595b–1 >>

<< 22 USCA § 2595c >>

 (21) by redesignating sections 1, 2, 3, 27, 28, 31, 32, 33, 34, 36, 37, 38, 39, 41, 44, 51, 52, 61, 62, 64, and 65, as amended by this section, as sections 101, 102, 103, 201, 202, 301, 302, 303, 304, 305, 306, 307, 308, 401, 402, 403, 404, 501, 502, 503, and 504, respectively.

SEC. 1224. COMPENSATION OF OFFICERS.

Title 5, United States Code, is amended—

<< 5 USCA § 5313 >>

(1) in section 5313, by striking "Director of the United States Arms Control and Disarmament Agency.";

<< 5 USCA § 5314 >>

(2) in section 5314, by striking "Deputy Director of the United States Arms Control and Disarmament Agency.";

<< 5 USCA § 5315 >>

(3) in section 5315—
  (A) by striking "Assistant Directors, United States Arms Control and Disarmament Agency (4)."; and
  (B) by striking "Special Representatives of the President for arms control, nonproliferation, and disarmament matters, United States Arms Control and Disarmament Agency", and inserting "Special Representatives of the President for arms control, nonproliferation, and disarmament matters, Department of State"; and

<< 5 USCA § 5316 >>

(4) in section 5316, by striking "General Counsel of the United States Arms Control and Disarmament Agency.".

SEC. 1225. ADDITIONAL CONFORMING AMENDMENTS.

(a) ARMS EXPORT CONTROL ACT.—The Arms Export Control Act is amended—

<< 22 USCA § 2776 >>

(1) in section 36(b)(1)(D) (22 U.S.C. 2776(b)(1)(D)), by striking "Director of the Arms Control and Disarmament Agency in consultation with the Secretary of State and the Secretary of Defense" and inserting "Secretary of State in consultation with the Secretary of Defense and the Director of Central Intelligence";

<< 22 USCA § 2778 >>

(2) in section 38(a)(2) (22 U.S.C. 2778(a)(2))—
  (A) in the first sentence, by striking "be made in coordination with the Director of the United States Arms Control and Disarmament Agency, taking into account the Director's assessment as to" and inserting "take into account"; and
  (B) by striking the second sentence;

<< 22 USCA § 2791 >>

(3) in section 42(a) (22 U.S.C. 2791(a))—
  (A) in paragraph (1)(C), by striking "the assessment of the Director of the United States Arms Control and Disarmament Agency as to";
  (B) by striking "(1)" after "(a)"; and
  (C) by striking paragraph (2);

<< 22 USCA § 2797 >>

(4) in section 71(a) (22 U.S.C. 2797(a)), by striking ", the Director of the Arms Control and Disarmament Agency,";

<< 22 USCA § 2797 >>

(5) in section 71(b)(1) (22 U.S.C. 2797(b)(1)), by striking "and the Director of the United States Arms Control and Disarmament Agency";

<< 22 USCA § 2797 >>

(6) in section 71(b)(2) (22 U.S.C. 2797(b)(2))—
   (A) by striking ", the Secretary of Commerce, and the Director of the United States Arms Control and Disarmament Agency" and inserting "and the Secretary of Commerce"; and
   (B) by striking "or the Director";

<< 22 USCA § 2797 >>

(7) in section 71(c) (22 U.S.C. 2797(c)), by striking "with the Director of the United States Arms Control and Disarmament Agency,"; and

<< 22 USCA § 2797 >>

(8) in section 73(d) (22 U.S.C. 2797b(d)), by striking ", the Secretary of Commerce, and the Director of the United States Arms Control and Disarmament Agency" and inserting "and the Secretary of Commerce".

<< 22 USCA § 2321d >>

(b) FOREIGN ASSISTANCE ACT.—Section 511 of the Foreign Assistance Act of 1961 (22 U.S.C. 2321d) is amended by striking "be made in coordination with the Director of the United States Arms Control and Disarmament Agency and shall take into account his opinion as to" and inserting "take into account".
(c) UNITED STATES INSTITUTE OF PEACE ACT.—

<< 22 USCA § 4605 >>

(1) Section 1706(b) of the United States Institute of Peace Act (22 U.S.C. 4605(b)) is amended—
   (A) by striking paragraph (3);
   (B) by redesignating paragraphs (4) and (5) as paragraphs (3) and (4), respectively; and
   (C) in paragraph (4) (as redesignated), by striking "Eleven" and inserting "Twelve".

<< 22 USCA § 4606 >>

(2) Section 1707(d)(2) of that Act (22 U.S.C. 4606(d)(2)) is amended by striking ", Director of the Arms Control and Disarmament Agency".
(d) ATOMIC ENERGY ACT OF 1954.—The Atomic Energy Act of 1954 is amended—

<< 42 USCA § 2077 >>

(1) in section 57b. (42 U.S.C. 2077(b))—
   (A) in the first sentence, by striking "the Arms Control and Disarmament Agency,"; and
   (B) in the second sentence, by striking "the Director of the Arms Control and Disarmament Agency,";

<< 42 USCA § 2139 >>

(2) in section 109b. (42 U.S.C. 2129(b)), by striking "and the Director";

<< 42 USCA § 2141 >>

(3) in section 111b. (42 U.S.C. 2131(b)) by striking "the Arms Control and Disarmament Agency, the Nuclear Regulatory Commission," and inserting "the Nuclear Regulatory Commission";

<< 42 USCA § 2153 >>

(4) in section 123 (42 U.S.C. 2153)—
  (A) in subsection a., in the third sentence—
    (i) by striking "and in consultation with the Director of the Arms Control and Disarmament Agency ('the Director')";
    (ii) by inserting "and" after "Energy,";
    (iii) by striking "Commission, and the Director, who" and inserting "Commission. The Secretary of State"; and
    (iv) after "nuclear explosive purpose.", by inserting the following new sentence: "Each Nuclear Proliferation Assessment Statement prepared pursuant to this Act shall be accompanied by a classified annex, prepared in consultation with the Director of Central Intelligence, summarizing relevant classified information.";
  (B) in subsection d., in the first proviso—
    (i) by striking "Nuclear Proliferation Assessment Statement prepared by the Director of the Arms Control and Disarmament Agency," and inserting "Nuclear Proliferation Assessment Statement prepared by the Secretary of State, and any annexes thereto,"; and
    (ii) by striking "has been" and inserting "have been"; and
  (C) in the first undesignated paragraph following subsection d., by striking "the Arms Control and Disarmament Agency,";

<< 42 USCA § 2155 >>

(5) in section 126a.(1), by striking "the Director of the Arms Control and Disarmament Agency, and the Nuclear Regulatory Commission" and inserting "and the Nuclear Regulatory Commission,";

<< 42 USCA § 2160 >>

(6) in section 131a. (42 U.S.C. 2160(a))—
  (A) in paragraph (1)—
    (i) in the first sentence, by striking "the Director,";
    (ii) in the third sentence, by striking "the Director declares that he intends" and inserting "the Secretary of State is required"; and
    (iii) in the third sentence, by striking "the Director's declaration" and inserting "the requirement to prepare a Nuclear Proliferation Assessment Statement";
  (B) in paragraph (2)—
    (i) by striking "Director's view" and inserting "view of the Secretary of State, Secretary of Energy, Secretary of Defense, or the Commission"; and
    (ii) by striking "he may prepare" and inserting "the Secretary of State, in consultation with such Secretary or the Commission, shall prepare"; and

<< 42 USCA § 2160 >>

(7) in section 131c. (42 U.S.C. 2160(c))—
  (A) in the first sentence, by striking ", the Director of the Arms Control and Disarmament Agency,";
  (B) in the sixth and seventh sentences, by striking "Director" each place it appears and inserting "Secretary of State"; and
  (C) in the seventh sentence, by striking "Director's" and inserting "Secretary of State's".
(e) NUCLEAR NON–PROLIFERATION ACT OF 1978.—The Nuclear Non–Proliferation Act of 1978 is amended—

<< 22 USCA § 3203 >>

(1) in section 4 (22 U.S.C. 3203)—
  (A) by striking paragraph (2); and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) by redesignating paragraphs (3) through (8) as paragraphs (2) through (7), respectively;

<< 22 USCA § 3222 >>

(2) in section 102 (22 U.S.C. 3222), by striking ", the Secretary of State, and the Director of the Arms Control and Disarmament Agency" and inserting "and the Secretary of State";

<< 42 USCA § 2156a >>

(3) in section 304(d) (42 U.S.C. 2156a), by striking "the Secretary of Defense, and the Director," and inserting "and the Secretary of Defense,";

<< 42 USCA § 2139a >>

(4) in section 309 (42 U.S.C. 2139a)—
(A) in subsection (b), by striking "the Department of Commerce, and the Arms Control and Disarmament Agency" and inserting "and the Department of Commerce"; and
(B) in subsection (c), by striking "the Arms Control and Disarmament Agency,";

<< 42 USCA § 2160a >>

(5) in section 406 (42 U.S.C. 2160a), by inserting ", or any annexes thereto," after "Statement"; and

<< 22 USCA § 3282 >>

(6) in section 602 (22 U.S.C. 3282)—
(A) in subsection (c), by striking "the Arms Control and Disarmament Agency,"; and
(B) in subsection (e), by striking "and the Director".

<< 22 USCA § 2695 >>

(f) STATE DEPARTMENT BASIC AUTHORITIES ACT OF 1956.—Section 23(a) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2695(a)) is amended by striking "the Agency for International Development, and the Arms Control and Disarmament Agency" and inserting "and the Agency for International Development".

<< 2 USCA § 194a >>

(g) FOREIGN RELATIONS AUTHORIZATION ACT OF 1972.—Section 502 of the Foreign Relations Authorization Act of 1972 (2 U.S.C. 194a) is amended by striking "the United States Arms Control and Disarmament Agency,".

<< 49 USCA § 40118 >>

(h) TITLE 49.—Section 40118(d) of title 49, United States Code, is amended by striking ", or the Director of the Arms Control and Disarmament Agency".

<< 22 USCA Ch. 74 >>

TITLE XIII—UNITED STATES INFORMATION AGENCY

CHAPTER 1—GENERAL PROVISIONS

<< 22 USCA § 6531 NOTE >>

SEC. 1301. EFFECTIVE DATE.

This title, and the amendments made by this title, shall take effect on the earlier of—

<< 22 USCA § 6531 NOTE >>

(1) October 1, 1999; or

<< 22 USCA § 6531 NOTE >>

(2) the date of abolition of the United States Information Agency pursuant to the reorganization plan described in section 1601.

<< 22 USCA Ch. 74 >>

CHAPTER 2—ABOLITION AND TRANSFER OF FUNCTIONS

<< 22 USCA § 6531 >>

SEC. 1311. ABOLITION OF UNITED STATES INFORMATION AGENCY.

 The United States Information Agency (other than the Broadcasting Board of Governors and the International Broadcasting Bureau) is abolished.

<< 22 USCA § 6532 >>

SEC. 1312. TRANSFER OF FUNCTIONS.

<< 22 USCA § 6532 >>

 (a) IN GENERAL.—There are transferred to the Secretary of State all functions of the Director of the United States Information Agency and all functions of the United States Information Agency and any office or component of such agency, under any statute, reorganization plan, Executive order, or other provision of law, as of the day before the effective date of this title.

<< 22 USCA § 6532 >>

 (b) EXCEPTION.—Subsection (a) does not apply to the Broadcasting Board of Governors, the International Broadcasting Bureau, or any function performed by the Board or the Bureau.

<< 22 USCA § 2651a >>

SEC. 1313. UNDER SECRETARY OF STATE FOR PUBLIC DIPLOMACY.

 Section 1(b) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(b)), as amended by this division, is further amended by adding at the end the following new paragraph:
 "(3) UNDER SECRETARY FOR PUBLIC DIPLOMACY.—There shall be in the Department of State, among the Under Secretaries authorized by paragraph (1), an Under Secretary for Public Diplomacy, who shall have primary responsibility to assist the Secretary and the Deputy Secretary in the formation and implementation of United States public diplomacy policies and activities, including international educational and cultural exchange programs, information, and international broadcasting.".

SEC. 1314. ABOLITION OF OFFICE OF INSPECTOR GENERAL OF UNITED STATES INFORMATION AGENCY AND
  TRANSFER OF FUNCTIONS.

<< 22 USCA § 6533 >>

 (a) ABOLITION OF OFFICE.—The Office of Inspector General of the United States Information Agency is abolished.

<< 22 USCA § 6533 >>

<< 5 USCA App. 3 § 11 >>

(b) AMENDMENTS TO INSPECTOR GENERAL ACT OF 1978.—Section 11 of the Inspector General Act of 1978 (5 U.S.C. App.) is amended—

<< 22 USCA § 6533 >>

<< 5 USCA App. 3 § 11 >>

(1) in paragraph (1), by striking "the Office of Personnel Management, the United States Information Agency" and inserting "or the Office of Personnel Management"; and

<< 22 USCA § 6533 >>

<< 5 USCA App. 3 § 11 >>

(2) in paragraph (2), by striking "the United States Information Agency,".

<< 22 USCA § 6533 >>

<< 5 USCA § 5315 >>

(c) EXECUTIVE SCHEDULE.—Section 5315 of title 5, United States Code, is amended by striking the following: "Inspector General, United States Information Agency.".

<< 22 USCA § 6533 >>

<< 22 USCA § 6207 >>

(d) AMENDMENTS TO PUBLIC LAW 103–236.—Subsections (i) and (j) of section 308 of the United States International Broadcasting Act of 1994 (22 U.S.C. 6207 (i) and (j)) are amended—

<< 22 USCA § 6533 >>

<< 22 USCA § 6207 >>

(1) by striking "Inspector General of the United States Information Agency" each place it appears and inserting "Inspector General of the Department of State and the Foreign Service"; and

<< 22 USCA § 6533 >>

<< 22 USCA § 6207 >>

(2) by striking ", the Director of the United States Information Agency,".

<< 22 USCA § 6533 >>

(e) TRANSFER OF FUNCTIONS.—There are transferred to the Office of the Inspector General of the Department of State and the Foreign Service the functions that the Office of Inspector General of the United States Information Agency exercised before the effective date of this title (including all related functions of the Inspector General of the United States Information Agency).

<< 22 USCA Ch. 74 >>

CHAPTER 3—INTERNATIONAL BROADCASTING

<< 22 USCA § 6541 >>

SEC. 1321. CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSE.

Congress finds that—

<< 22 USCA § 6541 >>

(1) it is the policy of the United States to promote the right of freedom of opinion and expression, including the freedom "to seek, receive, and impart information and ideas through any media and regardless of frontiers", in accordance with Article 19 of the Universal Declaration of Human Rights;

<< 22 USCA § 6541 >>

(2) open communication of information and ideas among the peoples of the world contributes to international peace and stability, and the promotion of such communication is in the interests of the United States;

<< 22 USCA § 6541 >>

(3) it is in the interest of the United States to support broadcasting to other nations consistent with the requirements of this chapter and the United States International Broadcasting Act of 1994; and

<< 22 USCA § 6541 >>

(4) international broadcasting is, and should remain, an essential instrument of United States foreign policy.

<< 22 USCA § 6203 >>

SEC. 1322. CONTINUED EXISTENCE OF BROADCASTING BOARD OF GOVERNORS.

Section 304(a) of the United States International Broadcasting Act of 1994 (22 U.S.C. 6203(a)) is amended to read as follows:
"(a) CONTINUED EXISTENCE WITHIN EXECUTIVE BRANCH.—
"(1) IN GENERAL.—The Broadcasting Board of Governors shall continue to exist within the Executive branch of Government as an entity described in section 104 of title 5, United States Code.
"(2) RETENTION OF EXISTING BOARD MEMBERS.—The members of the Broadcasting Board of Governors appointed by the President pursuant to subsection (b)(1)(A) before the effective date of title XIII of the Foreign Affairs Agencies Consolidation Act of 1998 and holding office as of that date may serve the remainder of their terms of office without reappointment.
"(3) INSPECTOR GENERAL AUTHORITIES.—
"(A) IN GENERAL.—The Inspector General of the Department of State and the Foreign Service shall exercise the same authorities with respect to the Broadcasting Board of Governors and the International Broadcasting Bureau as the Inspector General exercises under the Inspector General Act of 1978 and section 209 of the Foreign Service Act of 1980 with respect to the Department of State.
"(B) RESPECT FOR JOURNALISTIC INTEGRITY OF BROADCASTERS.—The Inspector General shall respect the journalistic integrity of all the broadcasters covered by this title and may not evaluate the philosophical or political perspectives reflected in the content of broadcasts.".

SEC. 1323. CONFORMING AMENDMENTS TO THE UNITED STATES INTERNATIONAL BROADCASTING ACT OF 1994.

(a) REFERENCES IN SECTION.—Whenever in this section an amendment or repeal is expressed as an amendment or repeal of a provision, the reference shall be deemed to be made to the United States International Broadcasting Act of 1994 (22 U.S.C. 6201 et seq.).

<< 22 USCA § 6203 >>

(b) SUBSTITUTION OF SECRETARY OF STATE.—Sections 304(b)(1)(B), 304(b) (2) and (3), 304(c), and 304(e) (22 U.S.C. 6203(b)(1)(B), 6203(b) (2) and (3), 6203(c), and 6203(e)) are amended by striking "Director of the United States Information Agency" each place it appears and inserting "Secretary of State".

<< 22 USCA § 6203 >>

(c) SUBSTITUTION OF ACTING SECRETARY OF STATE.—Section 304(c) (22 U.S.C. 6203(c)) is amended by striking "acting Director of the agency" and inserting "Acting Secretary of State".

<< 22 USCA § 6202 >>

(d) STANDARDS AND PRINCIPLES OF INTERNATIONAL BROADCASTING.—Section 303(b) (22 U.S.C. 6202(b)) is amended—

<< 22 USCA § 6202 >>

(1) in paragraph (3), by inserting ", including editorials, broadcast by the Voice of America, which present the views of the United States Government" after "policies";

<< 22 USCA § 6202 >>

(2) by redesignating paragraphs (4) through (9) as paragraphs (5) through (10), respectively; and

<< 22 USCA § 6202 >>

(3) by inserting after paragraph (3) the following:
"(4) the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;";

<< 22 USCA § 6204 >>

(e) AUTHORITIES OF THE BOARD.—Section 305(a) (22 U.S.C. 6204(a)) is amended—

<< 22 USCA § 6204 >>

(1) in paragraph (1)—
(A) by striking "direct and"; and
(B) by striking "and the Television Broadcasting to Cuba Act" and inserting ", the Television Broadcasting to Cuba Act, and Worldnet Television, except as provided in section 306(b)";

<< 22 USCA § 6204 >>

(2) in paragraph (4), by inserting ", after consultation with the Secretary of State," after "annually,";

<< 22 USCA § 6204 >>

(3) in paragraph (9)—
(A) by striking ", through the Director of the United States Information Agency,"; and
(B) by adding at the end the following new sentence: "Each annual report shall place special emphasis on the assessment described in paragraph (2).";

<< 22 USCA § 6204 >>

(4) in paragraph (12)—

 (A) by striking "1994 and 1995" and inserting "1998 and 1999"; and

 (B) by striking "to the Board for International Broadcasting for such purposes for fiscal year 1993" and inserting "to the Board and the International Broadcasting Bureau for such purposes for fiscal year 1997"; and

<< 22 USCA § 6204 >>

 (5) by adding at the end the following new paragraphs:

 "(15)(A) To procure temporary and intermittent personal services to the same extent as is authorized by section 3109 of title 5, United States Code, at rates not to exceed the daily equivalent of the rate provided for positions classified above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code.

 "(B) To allow those providing such services, while away from their homes or their regular places of business, travel expenses (including per diem in lieu of subsistence) as authorized by section 5703 of title 5, United States Code, for persons in the Government service employed intermittently, while so employed.

 "(16) To procure, pursuant to section 1535 of title 31, United States Code (commonly known as the 'Economy Act'), such goods and services from other departments or agencies for the Board and the International Broadcasting Bureau as the Board determines are appropriate.

 "(17) To utilize the provisions of titles III, IV, V, VII, VIII, IX, and X of the United States Information and Educational Exchange Act of 1948, and section 6 of Reorganization Plan Number 2 of 1977, as in effect on the day before the effective date of title XIII of the Foreign Affairs Agencies Consolidation Act of 1998, to the extent the Board considers necessary in carrying out the provisions and purposes of this title.

 "(18) To utilize the authorities of any other statute, reorganization plan, Executive order, regulation, agreement, determination, or other official document or proceeding that had been available to the Director of the United States Information Agency, the Bureau, or the Board before the effective date of title XIII of the Foreign Affairs Consolidation Act of 1998 for carrying out the broadcasting activities covered by this title.".

<< 22 USCA § 6204 >>

(f) DELEGATION OF AUTHORITY.—Section 305 (22 U.S.C. 6204) is amended—

<< 22 USCA § 6204 >>

 (1) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively; and

<< 22 USCA § 6204 >>

 (2) by inserting after subsection (a) the following new subsection:

 "(b) DELEGATION OF AUTHORITY.—The Board may delegate to the Director of the International Broadcasting Bureau, or any other officer or employee of the United States, to the extent the Board determines to be appropriate, the authorities provided in this section, except those authorities provided in paragraph (1), (2), (3), (4), (5), (6), (9), or (11) of subsection (a).".

<< 22 USCA § 6204 >>

(g) BROADCASTING BUDGETS.—Section 305(c)(1) (as redesignated) is amended—

<< 22 USCA § 6204 >>

 (1) by striking "(1)" before "The Director"; and

<< 22 USCA § 6204 >>

(2) by striking "the Director of the United States Information Agency for the consideration of the Director as a part of the Agency's budget submission to".

<< 22 USCA § 6204 >>

(h) REPEAL.—Section 305(c)(2) (as redesignated) is repealed.

<< 22 USCA § 6204 >>

(i) IMPLEMENTATION.—Section 305(d) (as redesignated) is amended to read as follows:

"(d) PROFESSIONAL INDEPENDENCE OF BROADCASTERS.—The Secretary of State and the Board, in carrying out their functions, shall respect the professional independence and integrity of the International Broadcasting Bureau, its broadcasting services, and the grantees of the Board.".

<< 22 USCA § 6205 >>

(j) FOREIGN POLICY GUIDANCE.—Section 306 (22 U.S.C. 6205) is amended—

<< 22 USCA § 6205 >>

(1) in the section heading, by striking "FOREIGN POLICY GUIDANCE" and inserting "ROLE OF THE SECRETARY OF STATE";

<< 22 USCA § 6205 >>

(2) by inserting "(a) FOREIGN POLICY GUIDANCE.—" immediately before "To";

<< 22 USCA § 6205 >>

(3) by striking "State, acting through the Director of the United States Information Agency," and inserting "State";

<< 22 USCA § 6205 >>

(4) by inserting before the period at the end the following: ", as the Secretary may deem appropriate"; and

<< 22 USCA § 6205 >>

(5) by adding at the end the following:

"(b) CERTAIN WORLDNET PROGRAMMING.—The Secretary of State is authorized to use Worldnet broadcasts for the purposes of continuing interactive dialogues with foreign media and other similar overseas public diplomacy programs sponsored by the Department of State. The Chairman of the Broadcasting Board of Governors shall provide access to Worldnet for this purpose on a nonreimbursable basis.".

<< 22 USCA § 6206 >>

(k) INTERNATIONAL BROADCASTING BUREAU.—Section 307 (22 U.S.C. 6206) is amended—

<< 22 USCA § 6206 >>

(1) in subsection (a), by striking "within the United States Information Agency" and inserting "under the Board";

<< 22 USCA § 6206 >>

(2) in subsection (b)(1), by striking "Chairman of the Board, in consultation with the Director of the United States Information Agency and with the concurrence of a majority of the Board" and inserting "President, by and with the advice and consent of the Senate";

<< 22 USCA § 6206 >>

(3) by redesignating subsection (b)(1) as subsection (b);

<< 22 USCA § 6206 >>

(4) by striking subsection (b)(2); and

<< 22 USCA § 6206 >>

(5) by adding at the end the following new subsection:

"(c) RESPONSIBILITIES OF THE DIRECTOR.—The Director shall organize and chair a coordinating committee to examine and make recommendations to the Board on long-term strategies for the future of international broadcasting, including the use of new technologies, further consolidation of broadcast services, and consolidation of currently existing public affairs and legislative relations functions in the various international broadcasting entities. The coordinating committee shall include representatives of Radio Free Asia, RFE/RL, Incorporated, the Broadcasting Board of Governors, and, as appropriate, the Office of Cuba Broadcasting, the Voice of America, and Worldnet.".

(l) REPEALS.—The following provisions of law are repealed:

<< 22 USCA § 6207 >>

(1) Subsections (k) and (l) of section 308 (22 U.S.C. 6207 (k), (l)).

<< 22 USCA § 6209 >>

(2) Section 310 (22 U.S.C. 6209).

SEC. 1324. AMENDMENTS TO THE RADIO BROADCASTING TO CUBA ACT.

The Radio Broadcasting to Cuba Act (22 U.S.C. 1465 et seq.) is amended—

<< 22 USCA § 1465a >>

<< 22 USCA § 1465d >>

<< 22 USCA § 1465f >>

(1) by striking "United States Information Agency" each place it appears and inserting "Broadcasting Board of Governors";

<< 22 USCA § 1465a >>

<< 22 USCA § 1465d >>

<< 22 USCA § 1465e >>

<< 22 USCA § 1465f >>

(2) by striking "Agency" each place it appears and inserting "Board";

<< 22 USCA § 1465a >>

<< 22 USCA § 1465b >>

(3) by striking "the Director of the United States Information Agency" each place it appears and inserting "the Broadcasting Board of Governors";

<< 22 USCA § 1465b >>

(4) in section 4 (22 U.S.C. 1465b), by striking "the Voice of America" and inserting "the International Broadcasting Bureau";

<< 22 USCA § 1465c >>

(5) in section 5 (22 U.S.C. 1465c)—
 (A) by striking "Board" each place it appears and inserting "Advisory Board"; and
 (B) in subsection (a), by striking the first sentence and inserting "There is established within the Office of the President the Advisory Board for Cuba Broadcasting (in this division referred to as the 'Advisory Board').": and

<< 22 USCA § 1465b >>

(6) by striking any other reference to "Director" not amended by paragraph (3) each place it appears and inserting "Board".

SEC. 1325. AMENDMENTS TO THE TELEVISION BROADCASTING TO CUBA ACT.

The Television Broadcasting to Cuba Act (22 U.S.C. 1465aa et seq.) is amended—

<< 22 USCA § 1465bb >>

<< 22 USCA § 1465dd >>

(1) in section 243(a) (22 U.S.C. 1465bb(a)) and section 246 (22 U.S.C. 1465dd), by striking "United States Information Agency" each place it appears and inserting "Broadcasting Board of Governors";

<< 22 USCA § 1465bb >>

(2) in section 243(c) (22 U.S.C. 1465bb(c))—
 (A) in the subsection heading, by striking "USIA"; and
 (B) by striking " 'USIA Television" and inserting "the 'Television";

<< 22 USCA § 1465cc >>

<< 22 USCA § 1465dd >>

(3) in section 244(c) (22 U.S.C. 1465cc(c)) and section 246 (22 U.S.C. 1465dd), by striking "Agency" each place it appears and inserting "Board";

<< 22 USCA § 1465cc >>

(4) in section 244 (22 U.S.C. 1465cc)—
 (A) in the section heading, by striking "OF THE UNITED STATES INFORMATION AGENCY";
 (B) in subsection (a)—
  (i) in the first sentence, by striking "The Director of the United States Information Agency shall establish" and inserting "There is"; and
  (ii) in the second sentence—
   (I) by striking "Director of the United States Information Agency" and inserting "Broadcasting Board of Governors"; and
   (II) by striking "the Director of the Voice of America" and inserting "the International Broadcasting Bureau";

(C) in subsection (b)—

  (i) by striking "Agency facilities" and inserting "Board facilities"; and

  (ii) by striking "Information Agency" and inserting "International"; and

(D) in the heading of subsection (c), by striking "USIA"; and

<< 22 USCA § 1465c NOTE >>

(5) in section 245(d) (22 U.S.C. 1465c note), by striking "Board" and inserting "Advisory Board".

<< 22 USCA § 6542 >>

SEC. 1326. TRANSFER OF BROADCASTING RELATED FUNDS, PROPERTY, AND PERSONNEL.

<< 22 USCA § 6542 >>

(a) TRANSFER AND ALLOCATION OF PROPERTY AND APPROPRIATIONS.—

<< 22 USCA § 6542 >>

 (1) IN GENERAL.—The assets, liabilities (including contingent liabilities arising from suits continued with a substitution or addition of parties under section 1327(d)), contracts, property, records, and unexpended balance of appropriations, authorizations, allocations, and other funds employed, held, used, arising from, available to, or to be made available in connection with the functions and offices of USIA transferred to the Broadcasting Board of Governors by this chapter shall be transferred to the Broadcasting Board of Governors for appropriate allocation.

<< 22 USCA § 6542 >>

 (2) ADDITIONAL TRANSFERS.—In addition to the transfers made under paragraph (1), there shall be transferred to the Chairman of the Broadcasting Board of Governors the assets, contracts, property, records, and unexpended balance of appropriations, authorizations, allocations, and other funds, as determined by the Secretary, in concurrence with the Broadcasting Board of Governors, to support the functions transferred by this chapter.

<< 22 USCA § 6542 >>

(b) TRANSFER OF PERSONNEL.—Notwithstanding any other provision of law—

<< 22 USCA § 6542 >>

 (1) except as provided in subsection (c), all personnel and positions of USIA employed or maintained to carry out the functions transferred by this chapter to the Broadcasting Board of Governors shall be transferred to the Broadcasting Board of Governors at the same grade or class and the same rate of basic pay or basic salary rate and with the same tenure held immediately preceding transfer; and

<< 22 USCA § 6542 >>

 (2) the personnel and positions of USIA, as determined by the Secretary of State, with the concurrence of the Broadcasting Board of Governors and the Director of USIA, to support the functions transferred by this chapter shall be transferred to the Broadcasting Board of Governors, including the International Broadcasting Bureau, at the same grade or class and the same rate of basic pay or basic salary rate and with the same tenure held immediately preceding transfer.

<< 22 USCA § 6542 >>

(c) TRANSFER AND ALLOCATION OF PROPERTY, APPROPRIATIONS, AND PERSONNEL ASSOCIATED WITH WORLDNET.—USIA personnel responsible for carrying out interactive dialogs with foreign media and other similar overseas

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

public diplomacy programs using the Worldnet television broadcasting system, and funds associated with such personnel, shall be transferred to the Department of State in accordance with the provisions of title XVI of this subdivision.

<< 22 USCA § 6542 >>

 (d) INCIDENTAL TRANSFERS.—The Director of the Office of Management and Budget, when requested by the Broadcasting Board of Governors, is authorized to make such incidental dispositions of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds held, used, arising from, available to, or to be made available in connection with functions and offices transferred from USIA, as may be necessary to carry out the provisions of this section.

<< 22 USCA § 6543 >>

SEC. 1327. SAVINGS PROVISIONS.

<< 22 USCA § 6543 >>

 (a) CONTINUING LEGAL FORCE AND EFFECT.—All orders, determinations, rules, regulations, permits, agreements, grants, contracts, certificates, licenses, registrations, privileges, and other administrative actions—

<< 22 USCA § 6543 >>

 (1) that have been issued, made, granted, or allowed to become effective by the President, any Federal agency or official thereof, or by a court of competent jurisdiction, in the performance of functions exercised by the Broadcasting Board of Governors of the United States Information Agency on the day before the effective date of this title, and

<< 22 USCA § 6543 >>

 (2) that are in effect at the time this title takes effect, or were final before the effective date of this title and are to become effective on or after the effective date of this title,

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the President, the Broadcasting Board of Governors, or other authorized official, a court of competent jurisdiction, or by operation of law.

<< 22 USCA § 6543 >>

 (b) PENDING PROCEEDINGS.—

<< 22 USCA § 6543 >>

 (1) IN GENERAL.—The provisions of this chapter, or amendments made by this chapter, shall not affect any proceedings, including notices of proposed rulemaking, or any application for any license, permit, certificate, or financial assistance pending before the Broadcasting Board of Governors of the United States Information Agency at the time this title takes effect, with respect to functions exercised by the Board as of the effective date of this title but such proceedings and applications shall be continued.

<< 22 USCA § 6543 >>

 (2) ORDERS, APPEALS, AND PAYMENTS.—Orders shall be issued in such proceedings, appeals shall be taken therefrom, and payments shall be made pursuant to such orders, as if this chapter had not been enacted, and orders issued in any such proceedings shall continue in effect until modified, terminated, superseded, or revoked by a duly authorized official, by a court of competent jurisdiction, or by operation of law.

<< 22 USCA § 6543 >>

(3) STATUTORY CONSTRUCTION.—Nothing in this subsection shall be deemed to prohibit the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that such proceeding could have been discontinued or modified if this chapter had not been enacted.

<< 22 USCA § 6543 >>

(c) NONABATEMENT OF PROCEEDINGS.—No suit, action, or other proceeding commenced by or against any officer in the official capacity of such individual as an officer of the Broadcasting Board of Governors, or any commission or component thereof, shall abate by reason of the enactment of this chapter. No cause of action by or against the Broadcasting Board of Governors, or any commission or component thereof, or by or against any officer thereof in the official capacity of such officer, shall abate by reason of the enactment of this chapter.

<< 22 USCA § 6543 >>

(d) CONTINUATION OF PROCEEDINGS WITH SUBSTITUTION OF PARTIES.—

<< 22 USCA § 6543 >>

(1) SUBSTITUTION OF PARTIES.—If, before the effective date of this title, USIA or the Broadcasting Board of Governors, or any officer thereof in the official capacity of such officer, is a party to a suit which is related to the functions transferred by this chapter, then effective on such date such suit shall be continued with the Broadcasting Board of Governors or other appropriate official of the Board substituted or added as a party.

<< 22 USCA § 6543 >>

(2) LIABILITY OF THE BOARD.—The Board shall participate in suits continued under paragraph (1) where the Broadcasting Board of Governors or other appropriate official of the Board is added as a party and shall be liable for any judgments or remedies in those suits or proceedings arising from the exercise of the functions transferred by this chapter to the same extent that USIA would have been liable if such judgment or remedy had been rendered on the day before the abolition of USIA.

<< 22 USCA § 6543 >>

(e) ADMINISTRATIVE ACTIONS RELATING TO PROMULGATION OF REGULATIONS.—Any administrative action relating to the preparation or promulgation of a regulation by the Broadcasting Board of Governors relating to a function exercised by the Board before the effective date of this title may be continued by the Board with the same effect as if this chapter had not been enacted.

<< 22 USCA § 6543 >>

(f) REFERENCES.—Reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or relating to the Broadcasting Board of Governors of the United States Information Agency with regard to functions exercised before the effective date of this title, shall be deemed to refer to the Board.

<< 22 USCA § 6544 >>

SEC. 1328. REPORT ON THE PRIVATIZATION OF RFE/RL, INCORPORATED.

Not later than March 1 of each year, the Broadcasting Board of Governors shall submit to the appropriate congressional committees a report on the progress of the Board and of RFE/RL, Incorporated, on any steps taken to further the policy declared

in section 312(a) of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995. The report under this subsection shall include the following:

<< 22 USCA § 6544 >>

 (1) Efforts by RFE/RL, Incorporated, to terminate individual language services.

<< 22 USCA § 6544 >>

 (2) A detailed description of steps taken with regard to section 312(a) of that Act.

<< 22 USCA § 6544 >>

 (3) An analysis of prospects for privatization over the coming year.

<< 22 USCA § 6544 >>

 (4) An assessment of the extent to which United States Government funding may be appropriate in the year 2000 and subsequent years for surrogate broadcasting to the countries to which RFE/RL, Incorporated, broadcast during the year. This assessment shall include an analysis of the environment for independent media in those countries, noting the extent of government control of the media, the ability of independent journalists and news organizations to operate, relevant domestic legislation, level of government harassment and efforts to censor, and other indications of whether the people of such countries enjoy freedom of expression.

CHAPTER 4—CONFORMING AMENDMENTS

<< 22 USCA § 6551 >>

SEC. 1331. REFERENCES.

<< 22 USCA § 6551 >>

 (a) IN GENERAL.—Except as otherwise provided in this subdivision, any reference in any statute, reorganization plan, Executive order, regulation, agreement, determination, or other official document or proceeding to—

<< 22 USCA § 6551 >>

 (1) the Director of the United States Information Agency or the Director of the International Communication Agency shall be deemed to refer to the Secretary of State; and

<< 22 USCA § 6551 >>

 (2) the United States Information Agency, USIA, or the International Communication Agency shall be deemed to refer to the Department of State.

<< 22 USCA § 6551 >>

 (b) CONTINUING REFERENCES TO USIA OR DIRECTOR.—Subsection (a) shall not apply to section 146 (a), (b), or (c) of the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991 (22 U.S.C. 4069a(f), 4069b(g), or 4069c(f)).

SEC. 1332. AMENDMENTS TO TITLE 5, UNITED STATES CODE.

 Title 5, United States Code, is amended—

<< 5 USCA § 5313 >>

(1) in section 5313, by striking "Director of the United States Information Agency.";

<< 5 USCA § 5315 >>

(2) in section 5315—
  (A) by striking "Deputy Director of the United States Information Agency."; and
  (B) by striking "Director of the International Broadcasting Bureau, the United States Information Agency." and inserting "Director of the International Broadcasting Bureau."; and

<< 5 USCA § 5316 >>

(3) in section 5316—
  (A) by striking "Deputy Director, Policy and Plans, United States Information Agency."; and
  (B) by striking "Associate Director (Policy and Plans), United States Information Agency.".

<< 22 USCA § 6552 >>

SEC. 1333. APPLICATION OF CERTAIN LAWS.

<< 22 USCA § 6552 >>

  (a) APPLICATION TO FUNCTIONS OF DEPARTMENT OF STATE.—Section 501 of Public Law 80–402 (22 U.S.C. 1461), section 202 of Public Law 95–426 (22 U.S.C. 1461–1), and section 208 of Public Law 99–93 (22 U.S.C. 1461–1a) shall not apply to public affairs and other information dissemination functions of the Secretary of State as carried out prior to any transfer of functions pursuant to this subdivision.

<< 22 USCA § 6552 >>

  (b) APPLICATION TO FUNCTIONS TRANSFERRED TO DEPARTMENT OF STATE.—Section 501 of Public Law 80–402 (22 U.S.C. 1461), section 202 of Public Law 95–426 (22 U.S.C. 1461–1), and section 208 of Public Law 99–93 (22 U.S.C. 1461–1a) shall apply only to public diplomacy programs of the Director of the United States Information Agency as carried out prior to any transfer of functions pursuant to this subdivision to the same extent that such programs were covered by these provisions prior to such transfer.

<< 22 USCA § 6552 >>

  (c) LIMITATION ON USE OF FUNDS.—Except as provided in section 501 of Public Law 80–402 and section 208 of Public Law 99–93, funds specifically authorized to be appropriated for such public diplomacy programs shall not be used to influence public opinion in the United States, and no program material prepared using such funds shall be distributed or disseminated in the United States.

<< 22 USCA § 6552 >>

  (d) REPORTING REQUIREMENTS.—The report submitted pursuant to section 1601(f) of this subdivision shall include a detailed statement of the manner in which the special mission of public diplomacy carried out by USIA prior to the transfer of functions under this subdivision shall be preserved within the Department of State, including the planned duties and responsibilities of any new bureaus that will perform such public diplomacy functions. Such report shall also include the best available estimates of—

<< 22 USCA § 6552 >>

  (1) the amounts expended by the Department of State for public affairs programs during fiscal year 1998, and on the personnel and support costs for such programs;

AR.02993

<< 22 USCA § 6552 >>

(2) the amounts expended by USIA for its public diplomacy programs during fiscal year 1998, and on the personnel and support costs for such programs; and

<< 22 USCA § 6552 >>

(3) the amounts, including funds to be transferred from USIA and funds appropriated to the Department, that will be allocated for the programs described in paragraphs (1) and (2), respectively, during the fiscal year in which the transfer of functions from USIA to the Department occurs.

<< 22 USCA § 6552 >>

(e) CONGRESSIONAL PRESENTATION DOCUMENT.—The Department of State's Congressional Presentation Document for fiscal year 2000 and each fiscal year thereafter shall include—

<< 22 USCA § 6552 >>

(1) the aggregated amounts that the Department will spend on such public diplomacy programs and on costs of personnel for such programs, and a detailed description of the goals and purposes for which such funds shall be expended; and

<< 22 USCA § 6552 >>

(2) the amount of funds allocated to and the positions authorized for such public diplomacy programs, including bureaus to be created upon the transfer of functions from USIA to the Department.

SEC. 1334. ABOLITION OF UNITED STATES ADVISORY COMMISSION ON PUBLIC DIPLOMACY.

<< 22 USCA § 6553 >>

(a) ABOLITION.—The United States Advisory Commission on Public Diplomacy is abolished.

<< 22 USCA § 1461 NOTE >>

<< 22 USCA § 1469 >>

<< 5 USCA App. 2 § 8 >>

(b) REPEALS.—Section 604 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1469) and section 8 of Reorganization Plan Numbered 2 of 1977 are repealed.

SEC. 1335. CONFORMING AMENDMENTS.

(a) The United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1431 et seq.) is amended—

<< 22 USCA § 1464a >>

(1) in section 505 (22 U.S.C. 1464a)—
(A) by striking "Director of the United States Information Agency" each place it appears and inserting "Broadcasting Board of Governors";
(B) by striking "United States Information Agency" each place it appears and inserting "Broadcasting Board of Governors";
(C) in subsection (b)—
(i) by striking "Agency's" and all that follows through " 'USIA–TV')" and inserting "television broadcasts of the United States International Television Service"; and

(ii) in paragraphs (1), (2), and (3), by striking "USIA–TV" each place it appears and inserting "The United States International Television Service"; and

(D) in subsections (d) and (e), by striking "USIA–TV" each place it appears and inserting "the United States International Television Service";

<< 22 USCA § 1464b >>

(2) in section 506(c) (22 U.S.C. 1464b(c))—
 (A) by striking "Director of the United States Information Agency" and inserting "Broadcasting Board of Governors";
 (B) by striking "Agency" and inserting "Board"; and
 (C) by striking "Director" and inserting "Board";

<< 22 USCA § 1477c >>

(3) in section 705 (22 U.S.C. 1477c)—
 (A) by striking subsections (a) and (c); and
 (B) in subsection (b)—
  (i) by striking "(b) In addition, the United States Information Agency" and inserting "The Department of State"; and
  (ii) by striking "program grants" and inserting "grants for overseas public diplomacy programs";

<< 22 USCA § 1471 >>

(4) in section 801(7) (22 U.S.C. 1471(7))—
 (A) by striking "Agency" and inserting "overseas public diplomacy"; and
 (B) by inserting "other" after "together with"; and

<< 22 USCA § 1475g >>

(5) in section 812 (22 U.S.C. 1475g)—
 (A) by striking "United States Information Agency post" each place it appears and inserting "overseas public diplomacy post";
 (B) in subsection (a), by striking "United States Information Agency" the first place it appears and inserting "Department of State";
 (C) in subsection (b), by striking "Director of the United States Information Agency" and inserting "Secretary of State"; and
 (D) in the section heading, by striking "USIA" and inserting "OVERSEAS PUBLIC DIPLOMACY".

<< 22 USCA § 1475h >>

(b) Section 212 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 1475h) is amended—

<< 22 USCA § 1475h >>

(1) by striking "United States Information Agency" each place it appears and inserting "Department of State";

<< 22 USCA § 1475h >>

(2) in subsection (a), by inserting "for carrying out its overseas public diplomacy functions" after "grants";

<< 22 USCA § 1475h >>

(3) in subsection (b)—
 (A) by striking "a grant" the first time it appears and inserting "an overseas public diplomacy grant"; and
 (B) in paragraph (1), by inserting "such" before "a grant" the first place it appears;

AR.02995

<< 22 USCA § 1475h >>

(4) in subsection (c)(1), by inserting "overseas public diplomacy" before "grants";

<< 22 USCA § 1475h >>

(5) in subsection (c)(3), by inserting "such" before "grant"; and

<< 22 USCA § 1475h >>

(6) by striking subsection (d).

<< 22 USCA § 2452a >>

(c) Section 602 of the National and Community Service Act of 1990 (22 U.S.C. 2452a) is amended—

<< 22 USCA § 2452a >>

(1) in the second sentence of subsection (a), by striking "United States Information Agency" and inserting "Department of State"; and

<< 22 USCA § 2452a >>

(2) in subsection (b)—
  (A) by striking "appropriations account of the United States Information Agency" and inserting "appropriate appropriations account of the Department of State"; and
  (B) by striking "and the United States Information Agency".

<< 19 USCA § 2604 >>

(d) Section 305 of Public Law 97–446 (19 U.S.C. 2604) is amended in the first sentence, by striking ", after consultation with the Director of the United States Information Agency,".

<< 20 USCA § 5951 >>

(e) Section 601 of Public Law 103–227 (20 U.S.C. 5951(a)) is amended by striking "of the Director of the United States Information Agency and with" and inserting "and".

<< 22 USCA § 4902 >>

(f) Section 1003(b) of the Fascell Fellowship Act (22 U.S.C. 4902(b)) is amended—

<< 22 USCA § 4902 >>

(1) in the text above paragraph (1), by striking "9 members" and inserting "7 members";

<< 22 USCA § 4902 >>

(2) in paragraph (4), by striking "Six" and inserting "Five";

<< 22 USCA § 4902 >>

(3) by striking paragraph (3); and

<< 22 USCA § 4902 >>

(4) by redesignating paragraph (4) as paragraph (3).

<< 50 USCA § 1903 >>

(g) Section 803 of the Intelligence Authorization Act, Fiscal Year 1992 (50 U.S.C. 1903) is amended—

<< 50 USCA § 1903 >>

(1) in subsection (b)—
  (A) by striking paragraph (6); and
  (B) by redesignating paragraphs (7) and (8) as paragraphs (6) and (7), respectively; and

<< 50 USCA § 1903 >>

(2) in subsection (c), by striking "subsection (b)(7)" and inserting "subsection (b)(6)".

<< 40 USCA § 1106 >>

(h) Section 7 of the Federal Triangle Development Act (40 U.S.C. 1106) is amended—

<< 40 USCA § 1106 >>

(1) in subsection (c)(1)—
  (A) in the text above subparagraph (A), by striking "15 members" and inserting "14 members";
  (B) by striking subparagraph (F); and
  (C) by redesignating subparagraphs (G) through (J) as subparagraphs (F) through (I), respectively;

<< 40 USCA § 1106 >>

(2) in paragraphs (3) and (5) of subsection (c), by striking "paragraph (1)(J)" each place it appears and inserting "paragraph (1)(I)"; and

<< 40 USCA § 1106 >>

(3) in subsection (d)(3) and subsection (e), by striking "the Administrator and the Director of the United States Information Agency" each place it appears and inserting "and the Administrator".

<< 20 USCA § 80f >>

(i) Section 3 of the Woodrow Wilson Memorial Act of 1968 (Public Law 90–637; 20 U.S.C. 80f) is amended—

<< 20 USCA § 80f >>

(1) in subsection (b)—
  (A) in the text preceding paragraph (1), by striking "19 members" and inserting "17 members";
  (B) by striking paragraph (7);
  (C) by striking "10" in paragraph (10) and inserting "9"; and
  (D) by redesignating paragraphs (8) through (10) as paragraphs (7) through (9), respectively; and

<< 20 USCA § 80f >>

(2) in subsection (c), by striking "(9)" and inserting "(8)".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 20 USCA § 1131c >>

(j) Section 624 of Public Law 89–329 (20 U.S.C. 1131c) is amended by striking "the United States Information Agency,".

(k) The Foreign Service Act of 1980 (22 U.S.C. 3901 et seq.) is amended—

<< 22 USCA § 3922 >>

(1) in section 202(a)(1) (22 U.S.C. 3922(a)(1)), by striking "Director of the United States Information Agency" and inserting "Broadcasting Board of Governors";

<< 22 USCA § 3930 >>

(2) in section 210 (22 U.S.C. 3930), by striking "United States Information Agency" and inserting "Broadcasting Board of Governors";

<< 22 USCA § 4103 >>

(3) in section 1003(a) (22 U.S.C. 4103(a)), by striking "United States Information Agency" and inserting "Broadcasting Board of Governors"; and

<< 22 USCA § 4131 >>

(4) in section 1101(c) (22 U.S.C. 4131(c)), by striking "the United States Information Agency," and inserting "Broadcasting Board of Governors,".

(l) The State Department Authorities Act of 1956, as amended by this division, is further amended—

<< 22 USCA § 2695 >>

(1) in section 23(a) (22 U.S.C. 2695(a)), by striking "United States Information Agency" and inserting "Broadcasting Board of Governors";

<< 22 USCA § 2697 >>

(2) in section 25(f) (22 U.S.C. 2697(f))—
  (A) by striking "Director of the United States Information Agency" and inserting "Broadcasting Board of Governors"; and
  (B) by striking "with respect to their respective agencies" and inserting "with respect to the Board and the Agency";

<< 22 USCA § 2698 >>

(3) in section 26(b) (22 U.S.C. 2698(b)), as amended by this division—
  (A) by striking "Director of the United States Information Agency, the chairman of the Board for International Broadcasting," and inserting "Broadcasting Board of Governors,"; and
  (B) by striking "with respect to their respective agencies" and inserting "with respect to the Board and the Agency"; and

<< 22 USCA § 2704 >>

(4) in section 32 (22 U.S.C. 2704), as amended by this division, by striking "the Director of the United States Information Agency" and inserting "the Broadcasting Board of Governors".

<< 22 USCA § 2669a >>

(m) Section 507(b)(3) of Public Law 103–317 (22 U.S.C. 2669a(b)(3)) is amended by striking ", the United States Information Agency,".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 2 USCA § 194a >>

(n) Section 502 of Public Law 92–352 (2 U.S.C. 194a) is amended by striking "the United States Information Agency,".

<< 22 USCA § 2141d >>

(o) Section 6 of Public Law 104–288 (22 U.S.C. 2141d) is amended—

<< 22 USCA § 2141d >>

 (1) in subsection (a), by striking "Director of the United States Information Agency,"; and

<< 22 USCA § 2141d >>

 (2) in subsection (b), by striking "the Director of the United States Information Agency" and inserting "the Under Secretary of State for Public Diplomacy".

<< 49 USCA § 40118 >>

 (p) Section 40118(d) of title 49, United States Code, is amended by striking ", the Director of the United States Information Agency,".

<< 22 USCA § 4001 NOTE >>

 (q) Section 155 of Public Law 102–138 is amended—

<< 22 USCA § 4001 NOTE >>

 (1) by striking the comma before "Department of Commerce" and inserting "and"; and

<< 22 USCA § 4001 NOTE >>

 (2) by striking ", and the United States Information Agency".

<< 22 USCA § 6037 >>

 (r) Section 107 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (22 U.S.C. 6037) is amended by striking "Director of the United States Information Agency" each place it appears and inserting "Director of the International Broadcasting Bureau".

SEC. 1336. REPEALS.

 The following provisions are repealed:

<< 22 USCA § 1476 >>

<< 22 USCA § 1477b >>

<< 22 USCA § 1475b >>

<< 22 USCA § 1475c >>

<< 22 USCA § 1475f >>

<< 22 USCA § 1440 >>

(1) Sections 701 (22 U.S.C. 1476), 704 (22 U.S.C. 1477b), 807 (22 U.S.C 1475b), 808 (22 U.S.C 1475c), 811 (22 U.S.C 1475f), and 1009 (22 U.S.C. 1440) of the United States Information and Educational Exchange Act of 1948.

<< 22 USCA § 2456 >>

(2) Section 106(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2456(c)).

<< 22 USCA § 2679c >>

(3) Section 565(e) of the Anti–Economic Discrimination Act of 1994 (22 U.S.C. 2679c(e)).

<< 22 USCA § 1475q NOTE >>

(4) Section 206(b) of Public Law 102–138.

<< 22 USCA § 4001 NOTE >>

(5) Section 2241 of Public Law 104–66.

<< 5 USCA App. 1 § 1 >>

<< 5 USCA App. 1 § 2 >>

<< 5 USCA App. 1 § 3 >>

<< 5 USCA App. 1 § 4 >>

<< 5 USCA App. 1 § 5 >>

<< 5 USCA App. 1 § 6 >>

<< 22 USCA § 1461 NOTE >>

(6) Sections 1 through 6 of Reorganization Plan Numbered 2 of 1977 (91 Stat. 636).

<< 22 USCA § 1464a NOTE >>

(7) Section 207 of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (Public Law 100–204; 22 U.S.C. 1463 note).

<< 22 USCA Ch. 74 >>

TITLE XIV—UNITED STATES INTERNATIONAL DEVELOPMENT COOPERATION AGENCY

CHAPTER 1—GENERAL PROVISIONS

<< 22 USCA § 6561 NOTE >>

SEC. 1401. EFFECTIVE DATE.

This title, and the amendments made by this title, shall take effect on the earlier of—

<< 22 USCA § 6561 NOTE >>

(1) April 1, 1999; or

<< 22 USCA § 6561 NOTE >>

(2) the date of abolition of the United States International Development Cooperation Agency pursuant to the reorganization plan described in section 1601.

<< 22 USCA Ch. 74 >>

CHAPTER 2—ABOLITION AND TRANSFER OF FUNCTIONS

<< 22 USCA § 6561 >>

SEC. 1411. ABOLITION OF UNITED STATES INTERNATIONAL DEVELOPMENT COOPERATION AGENCY.

<< 22 USCA § 6561 NOTE >>

(a) IN GENERAL.—Except for the components specified in subsection (b), the United States International Development Cooperation Agency (including the Institute for Scientific and Technological Cooperation) is abolished.

<< 22 USCA § 6561 NOTE >>

(b) AID AND OPIC EXEMPTED.—Subsection (a) does not apply to the Agency for International Development or the Overseas Private Investment Corporation.

<< 22 USCA § 6562 >>

SEC. 1412. TRANSFER OF FUNCTIONS AND AUTHORITIES.

<< 22 USCA § 6562 >>

(a) ALLOCATION OF FUNDS.—

<< 22 USCA § 6562 >>

(1) ALLOCATION TO THE SECRETARY OF STATE.—Funds made available under the categories of assistance deemed allocated to the Director of the International Development Cooperation Agency under section 1–801 of Executive Order No. 12163 (22 U.S.C. 2381 note) as of October 1, 1997, shall be allocated to the Secretary of State on and after the effective date of this title without further action by the President.

<< 22 USCA § 6562 >>

(2) PROCEDURES FOR REALLOCATIONS OR TRANSFERS.—The Secretary of State may allocate or transfer as appropriate any funds received under paragraph (1) in the same manner as previously provided for the Director of the International Development Cooperation Agency under section 1–802 of that Executive Order, as in effect on October 1, 1997.

<< 22 USCA § 6562 >>

(b) WITH RESPECT TO THE OVERSEAS PRIVATE INVESTMENT CORPORATION.—There are transferred to the Administrator of the Agency for International Development all functions of the Director of the United States International Development Cooperation Agency as of the day before the effective date of this title with respect to the Overseas Private Investment Corporation.

<< 22 USCA § 6562 >>

(c) OTHER ACTIVITIES.—The authorities and functions transferred to the United States International Development Cooperation Agency or the Director of that Agency by section 6 of Reorganization Plan Numbered 2 of 1979 shall, to the extent such authorities and functions have not been repealed, be transferred to those agencies or heads of agencies, as the case may be, in which those authorities and functions were vested by statute as of the day before the effective date of such reorganization plan.

<< 22 USCA § 6563 >>

SEC. 1413. STATUS OF AID.

<< 22 USCA § 6563 >>

(a) IN GENERAL.—Unless abolished pursuant to the reorganization plan submitted under section 1601, and except as provided in section 1412, there is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5, United States Code.

<< 22 USCA § 6563 >>

(b) RETENTION OF OFFICERS.—Nothing in this section shall require the reappointment of any officer of the United States serving in the Agency for International Development of the United States International Development Cooperation Agency as of the day before the effective date of this title.

<< 22 USCA Ch. 74 >>

CHAPTER 3—CONFORMING AMENDMENTS

<< 22 USCA § 6571 >>

SEC. 1421. REFERENCES.
Except as otherwise provided in this subdivision, any reference in any statute, reorganization plan, Executive order, regulation, agreement, determination, or other official document or proceeding to the United States International Development Cooperation Agency (IDCA) or to the Director or any other officer or employee of IDCA—

<< 22 USCA § 6571 >>

(1) insofar as such reference relates to any function or authority transferred under section 1412(a), shall be deemed to refer to the Secretary of State;

<< 22 USCA § 6571 >>

(2) insofar as such reference relates to any function or authority transferred under section 1412(b), shall be deemed to refer to the Administrator of the Agency for International Development;

<< 22 USCA § 6571 >>

(3) insofar as such reference relates to any function or authority transferred under section 1412(c), shall be deemed to refer to the head of the agency to which such function or authority is transferred under such section; and

<< 22 USCA § 6571 >>

(4) insofar as such reference relates to any function or authority not transferred by this title, shall be deemed to refer to the President or such agency or agencies as may be specified by Executive order.

SEC. 1422. CONFORMING AMENDMENTS.

(a) TERMINATION OF REORGANIZATION PLANS AND DELEGATIONS.—The following shall cease to be effective:

<< 5 USCA App. § 2 NOTE >>

<< 22 USCA § 2381 NOTE >>

(1) Reorganization Plan Numbered 2 of 1979 (5 U.S.C. App.).

<< 22 USCA § 2381 NOTE >>

(2) Section 1–101 through 1–103, sections 1–401 through 1–403, section 1–801(a), and such other provisions that relate to the United States International Development Cooperation Agency or the Director of IDCA, of Executive Order No. 12163 (22 U.S.C. 2381 note; relating to administration of foreign assistance and related functions).

(3) The International Development Cooperation Agency Delegation of Authority Numbered 1 (44 Fed. Reg. 57521), except for section 1–6 of such Delegation of Authority.

<< 22 USCA § 5812 NOTE >>

(4) Section 3 of Executive Order No. 12884 (58 Fed. Reg. 64099; relating to the delegation of functions under the Freedom for Russia and Emerging Eurasian Democracies and Open Markets Support Act of 1992, the Foreign Assistance Act of 1961, the Foreign Operations, Export Financing and Related Programs Appropriations Act, 1993, and section 301 of title 3, United States Code).

(b) OTHER STATUTORY AMENDMENTS AND REPEAL.—

<< 5 USCA § 7103 >>

(1) TITLE 5.—Section 7103(a)(2)(B)(iv) of title 5, United States Code, is amended by striking "United States International Development Cooperation Agency" and inserting "Agency for International Development".

<< 5 USCA App. 3 § 8A >>

(2) INSPECTOR GENERAL ACT OF 1978.—Section 8A of the Inspector General Act of 1978 (5 U.S.C. App. 3) is amended—

(A) in subsection (a)—
(i) by striking "Development" through "(1) shall" and inserting "Development shall";
(ii) by striking "; and" at the end of subsection (a)(1) and inserting a period; and
(iii) by striking paragraph (2);
(B) by striking subsections (c) and (f); and
(C) by redesignating subsections (d), (e), (g), and (h) as subsections (c), (d), (e), and (f), respectively.

(3) STATE DEPARTMENT BASIC AUTHORITIES ACT OF 1956.—The State Department Basic Authorities Act of 1956 is amended—

<< 22 USCA § 2697 >>

(A) in section 25(f) (22 U.S.C. 2697(f)), as amended by this division, by striking "Director of the United States International Development Cooperation Agency" and inserting "Administrator of the Agency for International Development";

<< 22 USCA § 2698 >>

(B) in section 26(b) (22 U.S.C. 2698(b)), as amended by this divisionAct, by striking "Director of the United States International Development Cooperation Agency" and inserting "Administrator of the Agency for International Development"; and

<< 22 USCA § 2704 >>

(C) in section 32 (22 U.S.C. 2704), by striking "Director of the United States International Development Cooperation Agency" and inserting "Administrator of the Agency for International Development".

(4) FOREIGN SERVICE ACT OF 1980.—The Foreign Service Act of 1980 is amended—

<< 22 USCA § 3922 >>

(A) in section 202(a)(1) (22 U.S.C. 3922(a)(1)), by striking "Director of the United States International Development Cooperation Agency" and inserting "Administrator of the Agency for International Development";

<< 22 USCA § 3930 >>

(B) in section 210 (22 U.S.C. 3930), by striking "United States International Development Cooperation Agency" and inserting "Agency for International Development";

<< 22 USCA § 4103 >>

(C) in section 1003(a) (22 U.S.C. 4103(a)), by striking "United States International Development Cooperation Agency" and inserting "Agency for International Development"; and

<< 22 USCA § 4131 >>

(D) in section 1101(c) (22 U.S.C. 4131(c)), by striking "United States International Development Cooperation Agency" and inserting "Agency for International Development".

<< 22 USCA § 3512 >>

(5) REPEAL.—Section 413 of Public Law 96–53 (22 U.S.C. 3512) is repealed.

<< 49 USCA § 40118 >>

(6) TITLE 49.—Section 40118(d) of title 49, United States Code, is amended by striking "the Director of the United States International Development Cooperation Agency" and inserting "or the Administrator of the Agency for International Development".

<< 50 APP. USCA § 2405 >>

(7) EXPORT ADMINISTRATION ACT OF 1979.—Section 2405(g) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(g)) is amended—
    (A) by striking "Director of the United States International Development Cooperation Agency" each place it appears and inserting "Administrator of the Agency for International Development"; and
    (B) in the fourth sentence, by striking "Director" and inserting "Administrator".

<< 22 USCA Ch. 74 >>

TITLE XV—AGENCY FOR INTERNATIONAL DEVELOPMENT

CHAPTER 1—GENERAL PROVISIONS

<< 22 USCA § 6581 NOTE >>

<< 22 USCA § 2384 nt >>

SEC. 1501. EFFECTIVE DATE.

This title, and the amendments made by this title, shall take effect on the earlier of—

<< 22 USCA § 6581 NOTE >>

<< 22 USCA § 2384 nt >>

(1) April 1, 1999; or

<< 22 USCA § 6581 NOTE >>

<< 22 USCA § 2384 nt >>

(2) the date of reorganization of the Agency for International Development pursuant to the reorganization plan described in section 1601.

<< 22 USCA Ch. 74 >>

CHAPTER 2—REORGANIZATION AND TRANSFER OF FUNCTIONS

<< 22 USCA § 6581 >>

SEC. 1511. REORGANIZATION OF AGENCY FOR INTERNATIONAL DEVELOPMENT.

<< 22 USCA § 6581 >>

(a) IN GENERAL.—The Agency for International Development shall be reorganized in accordance with this subdivision and the reorganization plan transmitted pursuant to section 1601.

<< 22 USCA § 6581 >>

(b) FUNCTIONS TO BE TRANSFERRED.—The reorganization of the Agency for International Development shall provide, at a minimum, for the transfer to and consolidation with the Department of State of the following functions of AID:

<< 22 USCA § 6581 >>

(1) The Press office.

<< 22 USCA § 6581 >>

(2) Certain administrative functions.

<< 22 USCA Ch. 74 >>

CHAPTER 3—AUTHORITIES OF THE SECRETARY OF STATE

<< 22 USCA § 6591 >>

SEC. 1521. DEFINITION OF UNITED STATES ASSISTANCE.

In this chapter, the term "United States assistance" means development and other economic assistance, including assistance made available under the following provisions of law:

<< 22 USCA § 6591 >>

(1) Chapter 1 of part I of the Foreign Assistance Act of 1961 (relating to development assistance).

<< 22 USCA § 6591 >>

(2) Chapter 4 of part II of the Foreign Assistance Act of 1961 (relating to the economic support fund).

<< 22 USCA § 6591 >>

(3) Chapter 10 of part I of the Foreign Assistance Act of 1961 (relating to the Development Fund for Africa).

<< 22 USCA § 6591 >>

(4) Chapter 11 of part I of the Foreign Assistance Act of 1961 (relating to assistance for the independent states of the former Soviet Union).

<< 22 USCA § 6591 >>

(5) The Support for East European Democracy Act (22 U.S.C. 5401 et seq.).

<< 22 USCA § 6592 >>

SEC. 1522. ADMINISTRATOR OF AID REPORTING TO THE SECRETARY OF STATE.

The Administrator of the Agency for International Development, appointed pursuant to section 624(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2384(a)), shall report to and be under the direct authority and foreign policy guidance of the Secretary of State.

<< 22 USCA § 6593 >>

SEC. 1523. ASSISTANCE PROGRAMS COORDINATION AND OVERSIGHT.

<< 22 USCA § 6593 >>

(a) AUTHORITY OF THE SECRETARY OF STATE.—

<< 22 USCA § 6593 >>

(1) IN GENERAL.—Under the direction of the President, the Secretary of State shall coordinate all United States assistance in accordance with this section, except as provided in paragraphs (2) and (3).

<< 22 USCA § 6593 >>

(2) EXPORT PROMOTION ACTIVITIES.—Coordination of activities relating to promotion of exports of United States goods and services shall continue to be primarily the responsibility of the Secretary of Commerce.

<< 22 USCA § 6593 >>

(3) INTERNATIONAL ECONOMIC ACTIVITIES.—Coordination of activities relating to United States participation in international financial institutions and relating to organization of multilateral efforts aimed at currency stabilization, currency convertibility, debt reduction, and comprehensive economic reform programs shall continue to be primarily the responsibility of the Secretary of the Treasury.

<< 22 USCA § 6593 >>

(4) AUTHORITIES AND POWERS OF THE SECRETARY OF STATE.—The powers and authorities of the Secretary provided in this chapter are in addition to the powers and authorities provided to the Secretary under any other Act, including section 101(b) and section 622(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151(b), 2382(c)).

<< 22 USCA § 6593 >>

(b) COORDINATION ACTIVITIES.—Coordination activities of the Secretary of State under subsection (a) shall include—

<< 22 USCA § 6593 >>

(1) approving an overall assistance and economic cooperation strategy;

<< 22 USCA § 6593 >>

(2) ensuring program and policy coordination among agencies of the United States Government in carrying out the policies set forth in the Foreign Assistance Act of 1961, the Arms Export Control Act, and other relevant assistance Acts;

<< 22 USCA § 6593 >>

(3) pursuing coordination with other countries and international organizations; and

<< 22 USCA § 6593 >>

(4) resolving policy, program, and funding disputes among United States Government agencies.

<< 22 USCA § 6593 >>

(c) STATUTORY CONSTRUCTION.—Nothing in this section may be construed to lessen the accountability of any Federal agency administering any program, project, or activity of United States assistance for any funds made available to the Federal agency for that purpose.

<< 22 USCA § 6593 >>

(d) AUTHORITY TO PROVIDE PERSONNEL OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT.—The Administrator of the Agency for International Development is authorized to detail to the Department of State on a nonreimbursable basis such personnel employed by the Agency as the Secretary of State may require to carry out this section.

<< 22 USCA Ch. 74 >>

TITLE XVI—TRANSITION

CHAPTER 1—REORGANIZATION PLAN

<< 22 USCA § 6601 >>

SEC. 1601. REORGANIZATION PLAN AND REPORT.

<< 22 USCA § 6601 >>

(a) SUBMISSION OF PLAN AND REPORT.—Not later than 60 days after the date of the enactment of this Act, the President shall transmit to the appropriate congressional committees a reorganization plan and report regarding—

<< 22 USCA § 6601 >>

(1) the abolition of the United States Arms Control and Disarmament Agency, the United States Information Agency, and the United States International Development Cooperation Agency in accordance with this subdivision;

<< 22 USCA § 6601 >>

(2) with respect to the Agency for International Development, the consolidation and streamlining of the Agency and the transfer of certain functions of the Agency to the Department in accordance with section 1511;

<< 22 USCA § 6601 >>

(3) the termination of functions of each covered agency as may be necessary to effectuate the reorganization under this subdivision, and the termination of the affairs of each agency abolished under this subdivision;

<< 22 USCA § 6601 >>

(4) the transfer to the Department of the functions and personnel of each covered agency consistent with the provisions of this subdivision; and

<< 22 USCA § 6601 >>

(5) the consolidation, reorganization, and streamlining of the Department in connection with the transfer of such functions and personnel in order to carry out such functions.

<< 22 USCA § 6601 >>

(b) COVERED AGENCIES.—The agencies covered by this section are the following:

<< 22 USCA § 6601 >>

(1) The United States Arms Control and Disarmament Agency.

<< 22 USCA § 6601 >>

(2) The United States Information Agency.

<< 22 USCA § 6601 >>

(3) The United States International Development Cooperation Agency.

<< 22 USCA § 6601 >>

(4) The Agency for International Development.

<< 22 USCA § 6601 >>

(c) PLAN ELEMENTS.—The plan transmitted under subsection (a) shall contain, consistent with this subdivision, such elements as the President deems appropriate, including elements that—

<< 22 USCA § 6601 >>

(1) identify the functions of each covered agency that will be transferred to the Department under the plan;

<< 22 USCA § 6601 >>

(2) specify the steps to be taken by the Secretary of State to reorganize internally the functions of the Department, including the consolidation of offices and functions, that will be required under the plan in order to permit the Department to carry out the functions transferred to it under the plan;

<< 22 USCA § 6601 >>

(3) specify the funds available to each covered agency that will be transferred to the Department as a result of the transfer of functions of such agency to the Department;

<< 22 USCA § 6601 >>

(4) specify the proposed allocations within the Department of unexpended funds transferred in connection with the transfer of functions under the plan; and

<< 22 USCA § 6601 >>

(5) specify the proposed disposition of the property, facilities, contracts, records, and other assets and liabilities of each covered agency in connection with the transfer of the functions of such agency to the Department.

<< 22 USCA § 6601 >>

(d) REORGANIZATION PLAN OF AGENCY FOR INTERNATIONAL DEVELOPMENT.—In addition to applicable provisions of subsection (c), the reorganization plan transmitted under this section for the Agency for International Development—

<< 22 USCA § 6601 >>

(1) may provide for the abolition of the Agency for International Development and the transfer of all its functions to the Department of State; or

<< 22 USCA § 6601 >>

(2) in lieu of the abolition and transfer of functions under paragraph (1)—
  (A) shall provide for the transfer to and consolidation within the Department of the functions set forth in section 1511; and
  (B) may provide for additional consolidation, reorganization, and streamlining of AID, including—
  (i) the termination of functions and reductions in personnel of AID;
  (ii) the transfer of functions of AID, and the personnel associated with such functions, to the Department; and
  (iii) the consolidation, reorganization, and streamlining of the Department upon the transfer of such functions and personnel in order to carry out the functions transferred.

<< 22 USCA § 6601 >>

(e) MODIFICATION OF PLAN.—The President may, on the basis of consultations with the appropriate congressional committees, modify or revise any part of the plan transmitted under subsection (a) until that part of the plan becomes effective in accordance with subsection (g).

<< 22 USCA § 6601 >>

(f) REPORT.—The report accompanying the reorganization plan for the Department and the covered agencies submitted pursuant to this section shall describe the implementation of the plan and shall include—

<< 22 USCA § 6601 >>

(1) a detailed description of—
  (A) the actions necessary or planned to complete the reorganization,
  (B) the anticipated nature and substance of any orders, directives, and other administrative and operational actions which are expected to be required for completing or implementing the reorganization, and
  (C) any preliminary actions which have been taken in the implementation process;

<< 22 USCA § 6601 >>

(2) the number of personnel and positions of each covered agency (including civil service personnel, Foreign Service personnel, and detailees) that are expected to be transferred to the Department, separated from service with such agency, or eliminated under the plan, and a projected schedule for such transfers, separations, and terminations;

<< 22 USCA § 6601 >>

(3) the number of personnel and positions of the Department (including civil service personnel, Foreign Service personnel, and detailees) that are expected to be transferred within the Department, separated from service with the Department, or eliminated under the plan, and a projected schedule for such transfers, separations, and terminations;

<< 22 USCA § 6601 >>

(4) a projected schedule for completion of the implementation process; and

<< 22 USCA § 6601 >>

(5) recommendations, if any, for legislation necessary to carry out changes made by this subdivision relating to personnel and to incidental transfers.

<< 22 USCA § 6601 >>

(g) EFFECTIVE DATE.—

<< 22 USCA § 6601 >>

(1) IN GENERAL.—The reorganization plan described in this section, including any modifications or revisions of the plan under subsection (e), shall become effective on the earlier of the date for the respective covered agency specified in paragraph (2) or the date announced by the President under paragraph (3).

<< 22 USCA § 6601 >>

(2) STATUTORY EFFECTIVE DATES.—The effective dates under this paragraph for the reorganization plan described in this section are the following:
  (A) April 1, 1999, with respect to functions of the Agency for International Development described in section 1511.
  (B) April 1, 1999, with respect to the abolition of the United States Arms Control and Disarmament Agency and the United States International Development Cooperation Agency.
  (C) October 1, 1999, with respect to the abolition of the United States Information Agency.

<< 22 USCA § 6601 >>

(3) EFFECTIVE DATE BY PRESIDENTIAL DETERMINATION.—An effective date under this paragraph for a reorganization plan described in this section is such date as the President shall determine to be appropriate and announce by notice published in the Federal Register, which date may be not earlier than 90 calendar days after the President has transmitted the reorganization plan to the appropriate congressional committees pursuant to subsection (a).

<< 22 USCA § 6601 >>

(4) STATUTORY CONSTRUCTION.—Nothing in this subsection may be construed to require the transfer of functions, personnel, records, balance of appropriations, or other assets of a covered agency on a single date.

<< 22 USCA § 6601 >>

(5) SUPERSEDES EXISTING LAW.—Paragraph (1) shall apply notwithstanding section 905(b) of title 5, United States Code.

<< 22 USCA § 6601 >>

(h) PUBLICATION.—The reorganization plan described in this section shall be printed in the Federal Register after the date upon which it first becomes effective.

<< 22 USCA Ch. 6611 >>

CHAPTER 2—REORGANIZATION AUTHORITY

<< 22 USCA § 6611 >>

SEC. 1611. REORGANIZATION AUTHORITY.

<< 22 USCA § 6611 >>

(a) IN GENERAL.—The Secretary is authorized, subject to the requirements of this subdivision, to allocate or reallocate any function transferred to the Department under any title of this subdivision, and to establish, consolidate, alter, or discontinue such organizational entities within the Department as may be necessary or appropriate to carry out any reorganization under this subdivision, but this subsection does not authorize the Secretary to modify the terms of any statute that establishes or defines the functions of any bureau, office, or officer of the Department.

<< 22 USCA § 6611 >>

(b) REQUIREMENTS AND LIMITATIONS ON REORGANIZATION PLAN.—The reorganization plan transmitted under section 1601 may not have the effect of—

<< 22 USCA § 6611 >>

(1) creating a new executive department;

<< 22 USCA § 6611 >>

(2) continuing a function beyond the period authorized by law for its exercise or beyond the time when it would have terminated if the reorganization had not been made;

<< 22 USCA § 6611 >>

(3) authorizing a Federal agency to exercise a function which is not authorized by law at the time the plan is transmitted to Congress;

<< 22 USCA § 6611 >>

(4) creating a new Federal agency which is not a component or part of an existing executive department or independent agency; or

<< 22 USCA § 6611 >>

(5) increasing the term of an office beyond that provided by law for the office.

<< 22 USCA § 6612 >>

SEC. 1612. TRANSFER AND ALLOCATION OF APPROPRIATIONS.

<< 22 USCA § 6612 >>

(a) IN GENERAL.—Except as otherwise provided in this subdivision, the assets, liabilities (including contingent liabilities arising from suits continued with a substitution or addition of parties under section 1615(e)), contracts, property, records, and unexpended balance of appropriations, authorizations, allocations, and other funds employed, held, used, arising from, available to, or to be made available in connection with the functions and offices, or portions thereof, transferred by any title of this subdivision shall be transferred to the Secretary for appropriate allocation.

<< 22 USCA § 6612 >>

(b) LIMITATION ON USE OF TRANSFERRED FUNDS.—Except as provided in subsection (c), unexpended and unobligated funds transferred pursuant to any title of this subdivision shall be used only for the purposes for which the funds were originally authorized and appropriated.

<< 22 USCA § 6612 >>

(c) FUNDS TO FACILITATE TRANSITION.—

<< 22 USCA § 6612 >>

(1) CONGRESSIONAL NOTIFICATION.—Funds transferred pursuant to subsection (a) may be available for the purposes of reorganization subject to notification of the appropriate congressional committees in accordance with the procedures applicable to a reprogramming of funds under section 34 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706).

<< 22 USCA § 6612 >>

(2) TRANSFER AUTHORITY.—Funds in any account appropriated to the Department of State may be transferred to another such account for the purposes of reorganization, subject to notification of the appropriate congressional committees in accordance with the procedures applicable to a reprogramming of funds under section 34 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706). The authority in this paragraph is in addition to any other transfer authority available to the Secretary of State and shall expire September 30, 2000.

<< 22 USCA § 6613 >>

SEC. 1613. TRANSFER, APPOINTMENT, AND ASSIGNMENT OF PERSONNEL.

<< 22 USCA § 6613 >>

(a) TRANSFER OF PERSONNEL FROM ACDA AND USIA.—Except as otherwise provided in title XIII—

<< 22 USCA § 6613 >>

(1) not later than the date of abolition of ACDA, all personnel and positions of ACDA, and

<< 22 USCA § 6613 >>

(2) not later than the date of abolition of USIA, all personnel and positions of USIA, shall be transferred to the Department of State at the same grade or class and the same rate of basic pay or basic salary rate and with the same tenure held immediately preceding transfer.

<< 22 USCA § 6613 >>

(b) TRANSFER OF PERSONNEL FROM AID.—Except as otherwise provided in title XIII, not later than the date of transfer of any function of AID to the Department of State under this subdivision, all AID personnel performing such functions and all positions associated with such functions shall be transferred to the Department of State at the same grade or class and the same rate of basic pay or basic salary rate and with the same tenure held immediately preceding transfer.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 22 USCA § 6613 >>

(c) ASSIGNMENT AUTHORITY.—The Secretary, for a period of not more than 6 months commencing on the effective date of the transfer to the Department of State of personnel under subsections (a) and (b), is authorized to assign such personnel to any position or set of duties in the Department of State regardless of the position held or duties performed by such personnel prior to transfer, except that, by virtue of such assignment, such personnel shall not have their grade or class or their rate of basic pay or basic salary rate reduced, nor their tenure changed. The Secretary shall consult with the relevant exclusive representatives (as defined in section 1002 of the Foreign Service Act and in section 7103 of title 5, United States Code) with regard to the exercise of this authority. This subsection does not authorize the Secretary to assign any individual to any position that by law requires appointment by the President, by and with the advice and consent of the Senate.

<< 22 USCA § 6613 >>

(d) SUPERSEDING OTHER PROVISIONS OF LAW.—Subsections (a) through (c) shall be exercised notwithstanding any other provision of law.

<< 22 USCA § 6614 >>

SEC. 1614. INCIDENTAL TRANSFERS.

The Director of the Office of Management and Budget, when requested by the Secretary, is authorized to make such incidental dispositions of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds held, used, arising from, available to, or to be made available in connection with such functions, as may be necessary to carry out the provisions of any title of this subdivision. The Director of the Office of Management and Budget, in consultation with the Secretary, shall provide for the termination of the affairs of all entities terminated by this subdivision and for such further measures and dispositions as may be necessary to effectuate the purposes of any title of this subdivision.

<< 22 USCA § 6615 >>

SEC. 1615. SAVINGS PROVISIONS.

<< 22 USCA § 6615 >>

(a) CONTINUING LEGAL FORCE AND EFFECT.—All orders, determinations, rules, regulations, permits, agreements, grants, contracts, certificates, licenses, registrations, privileges, and other administrative actions—

<< 22 USCA § 6615 >>

(1) that have been issued, made, granted, or allowed to become effective by the President, any Federal agency or official thereof, or by a court of competent jurisdiction, in the performance of functions that are transferred under any title of this subdivision; and

<< 22 USCA § 6615 >>

(2) that are in effect as of the effective date of such title, or were final before the effective date of such title and are to become effective on or after the effective date of such title,

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the President, the Secretary, or other authorized official, a court of competent jurisdiction, or by operation of law.

<< 22 USCA § 6615 >>

(b) PENDING PROCEEDINGS.—

<< 22 USCA § 6615 >>

 (1) IN GENERAL.—The provisions of any title of this subdivision shall not affect any proceedings, including notices of proposed rulemaking, or any application for any license, permit, certificate, or financial assistance pending on the effective date of any title of this subdivision before any Federal agency, commission, or component thereof, functions of which are transferred by any title of this subdivision. Such proceedings and applications, to the extent that they relate to functions so transferred, shall be continued.

<< 22 USCA § 6615 >>

 (2) ORDERS, APPEALS, PAYMENTS.—Orders shall be issued in such proceedings, appeals shall be taken therefrom, and payments shall be made pursuant to such orders, as if this subdivision had not been enacted. Orders issued in any such proceedings shall continue in effect until modified, terminated, superseded, or revoked by the Secretary, by a court of competent jurisdiction, or by operation of law.

<< 22 USCA § 6615 >>

 (3) STATUTORY CONSTRUCTION.—Nothing in this subdivision shall be deemed to prohibit the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that such proceeding could have been discontinued or modified if this subdivision had not been enacted.

<< 22 USCA § 6615 >>

 (4) REGULATIONS.—The Secretary is authorized to promulgate regulations providing for the orderly transfer of proceedings continued under this subsection to the Department.

<< 22 USCA § 6615 >>

 (c) NO EFFECT ON JUDICIAL OR ADMINISTRATIVE PROCEEDINGS.—Except as provided in subsection (e) and section 1327(d)—

<< 22 USCA § 6615 >>

 (1) the provisions of this subdivision shall not affect suits commenced prior to the effective dates of the respective titles of this subdivision; and

<< 22 USCA § 6615 >>

 (2) in all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and effect as if this subdivision had not been enacted.

<< 22 USCA § 6615 >>

 (d) NONABATEMENT OF PROCEEDINGS.—No suit, action, or other proceeding commenced by or against any officer in the official capacity of such individual as an officer of any Federal agency, or any commission or component thereof, functions of which are transferred by any title of this subdivision, shall abate by reason of the enactment of this subdivision. No cause of action by or against any Federal agency, or any commission or component thereof, functions of which are transferred by any title of this subdivision, or by or against any officer thereof in the official capacity of such officer shall abate by reason of the enactment of this subdivision.

<< 22 USCA § 6615 >>

(e) CONTINUATION OF PROCEEDING WITH SUBSTITUTION OF PARTIES.—If, before the effective date of any title of this subdivision, any Federal agency, or officer thereof in the official capacity of such officer, is a party to a suit, and under this subdivision any function of such department, agency, or officer is transferred to the Secretary or any other official of the Department, then effective on such date such suit shall be continued with the Secretary or other appropriate official of the Department substituted or added as a party.

<< 22 USCA § 6615 >>

(f) REVIEWABILITY OF ORDERS AND ACTIONS UNDER TRANSFERRED FUNCTIONS.—Orders and actions of the Secretary in the exercise of functions transferred under any title of this subdivision shall be subject to judicial review to the same extent and in the same manner as if such orders and actions had been by the Federal agency or office, or part thereof, exercising such functions immediately preceding their transfer. Any statutory requirements relating to notice, hearings, action upon the record, or administrative review that apply to any function transferred by any title of this subdivision shall apply to the exercise of such function by the Secretary.

<< 22 USCA § 6616 >>

SEC. 1616. AUTHORITY OF SECRETARY OF STATE TO FACILITATE TRANSITION.

Notwithstanding any provision of this subdivision, the Secretary of State, with the concurrence of the head of the appropriate Federal agency exercising functions transferred under this subdivision, may transfer the whole or part of such functions prior to the effective dates established in this subdivision, including the transfer of personnel and funds associated with such functions.

<< 22 USCA § 6617 >>

SEC. 1617. FINAL REPORT.

Not later than January 1, 2001, the President, in consultation with the Secretary of the Treasury and the Director of the Office of Management and Budget, shall submit to the appropriate congressional committees a report which provides a final accounting of the finances and operations of the agencies abolished under this subdivision.

SUBDIVISION B—FOREIGN RELATIONS AUTHORIZATION

TITLE XX—GENERAL PROVISIONS

<< 22 USCA § 2651 NOTE >>

SEC. 2001. SHORT TITLE.

This subdivision may be cited as the "Foreign Relations Authorization Act, Fiscal Years 1998 and 1999".

SEC. 2002. DEFINITION OF APPROPRIATE CONGRESSIONAL COMMITTEES.

In this subdivision, the term "appropriate congressional committees" means the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate.

TITLE XXI—AUTHORIZATION OF APPROPRIATIONS FOR DEPARTMENT OF STATE

SEC. 2101. ADMINISTRATION OF FOREIGN AFFAIRS.

The following amounts are authorized to be appropriated for the Department of State under "Administration of Foreign Affairs" to carry out the authorities, functions, duties, and responsibilities in the conduct of the foreign affairs of the United States and for other purposes authorized by law, including the diplomatic security program:

(1) DIPLOMATIC AND CONSULAR PROGRAMS.—For "Diplomatic and Consular Programs", of the Department of State $1,730,000,000 for the fiscal year 1998 and $1,644,300,000 for the fiscal year 1999.

(2) SALARIES AND EXPENSES.—

(A) AUTHORIZATION OF APPROPRIATIONS.—For "Salaries and Expenses", of the Department of State $363,513,000 for the fiscal year 1998 and $355,000,000 for the fiscal year 1999.

(B) LIMITATIONS.—Of the amounts authorized to be appropriated by subparagraph (A), $2,000,000 for fiscal year 1998 and $2,000,000 for the fiscal year 1999 are authorized to be appropriated only for the recruitment of minorities for careers in the Foreign Service and international affairs.

(3) CAPITAL INVESTMENT FUND.—For "Capital Investment Fund", of the Department of State $86,000,000 for the fiscal year 1998 and $80,000,000 for the fiscal year 1999.

(4) SECURITY AND MAINTENANCE OF UNITED STATES MISSIONS.—For "Security and Maintenance of United States Missions", $404,000,000 for the fiscal year 1998 and $403,561,000 for the fiscal year 1999.

(5) REPRESENTATION ALLOWANCES.—For "Representation Allowances", $4,200,000 for the fiscal year 1998 and $4,350,000 for the fiscal year 1999.

(6) EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE.—For "Emergencies in the Diplomatic and Consular Service", $5,500,000 for the fiscal year 1998 and $5,500,000 for the fiscal year 1999.

(7) OFFICE OF THE INSPECTOR GENERAL.—For "Office of the Inspector General", $27,495,000 for the fiscal year 1998 and $27,495,000 for the fiscal year 1999.

(8) PAYMENT TO THE AMERICAN INSTITUTE IN TAIWAN.—For "Payment to the American Institute in Taiwan", $14,000,000 for the fiscal year 1998 and $14,750,000 for the fiscal year 1999.

(9) PROTECTION OF FOREIGN MISSIONS AND OFFICIALS.—(A) For "Protection of Foreign Missions and Officials", $7,900,000 for the fiscal year 1998 and $8,100,000 for the fiscal year 1999.

(B) Each amount appropriated pursuant to this paragraph is authorized to remain available through September 30 of the fiscal year following the fiscal year for which the amount appropriated was made.

(10) REPATRIATION LOANS.—For "Repatriation Loans", $1,200,000 for the fiscal year 1998 and $1,200,000 for the fiscal year 1999, for administrative expenses.

## SEC. 2102. INTERNATIONAL COMMISSIONS.

The following amounts are authorized to be appropriated under "International Commissions" for the Department of State to carry out the authorities, functions, duties, and responsibilities in the conduct of the foreign affairs of the United States and for other purposes authorized by law:

(1) INTERNATIONAL BOUNDARY AND WATER COMMISSION, UNITED STATES AND MEXICO.—For "International Boundary and Water Commission, United States and Mexico"—

(A) for "Salaries and Expenses" $17,490,000 for the fiscal year 1998 and $19,551,000 for the fiscal year 1999; and

(B) for "Construction" $6,463,000 for the fiscal year 1998 and $6,463,000 for the fiscal year 1999.

(2) INTERNATIONAL BOUNDARY COMMISSION, UNITED STATES AND CANADA.—For "International Boundary Commission, United States and Canada", $761,000 for the fiscal year 1998 and $761,000 for the fiscal year 1999.

(3) INTERNATIONAL JOINT COMMISSION.—For "International Joint Commission", $3,189,000 for the fiscal year 1998 and $3,432,000 for the fiscal year 1999.

(4) INTERNATIONAL FISHERIES COMMISSIONS.—For "International Fisheries Commissions", $14,549,000 for the fiscal year 1998 and $14,549,000 for the fiscal year 1999.

<< 22 USCA § 4403 >>

## SEC. 2103. GRANTS TO THE ASIA FOUNDATION.

Section 404 of The Asia Foundation Act (title IV of Public Law 98–164) is amended to read as follows:

"SEC. 404. There are authorized to be appropriated to the Secretary of State $10,000,000 for each of the fiscal years 1998 and 1999 for grants to The Asia Foundation pursuant to this title.".

## SEC. 2104. VOLUNTARY CONTRIBUTIONS TO INTERNATIONAL ORGANIZATIONS.

(a) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for "Voluntary Contributions to International Organizations", $194,500,000 for the fiscal year 1998 and $214,000,000 for the fiscal year 1999.

(b) LIMITATIONS.—

(1) WORLD FOOD PROGRAM.—Of the amounts authorized to be appropriated under subsection (a), $4,000,000 for the fiscal year 1998 and $2,000,000 for the fiscal year 1999 are authorized to be appropriated only for a United States contribution to the World Food Program.

(2) UNITED NATIONS VOLUNTARY FUND FOR VICTIMS OF TORTURE.—Of the amount authorized to be appropriated under subsection (a), $3,000,000 for the fiscal year 1998 and $3,000,000 for the fiscal year 1999 are authorized to be appropriated only for a United States contribution to the United Nations Voluntary Fund for Victims of Torture.

(3) INTERNATIONAL PROGRAM ON THE ELIMINATION OF CHILD LABOR.—Of the amounts authorized to be appropriated under subsection (a), $5,000,000 for the fiscal year 1998 and $5,000,000 for the fiscal year 1999 are authorized to be appropriated only for a United States contribution to the International Labor Organization for the activities of the International Program on the Elimination of Child Labor.

(c) AVAILABILITY OF FUNDS.—Amounts authorized to be appropriated under subsection (a) are authorized to remain available until expended.

## SEC. 2105. VOLUNTARY CONTRIBUTIONS TO PEACEKEEPING OPERATIONS.

There are authorized to be appropriated for "Peacekeeping Operations", $77,500,000 for the fiscal year 1998 and $83,000,000 for the fiscal year 1999 for the Department of State to carry out section 551 of Public Law 87–195.

## SEC. 2106. LIMITATION ON UNITED STATES VOLUNTARY CONTRIBUTIONS TO UNITED NATIONS DEVELOPMENT PROGRAM.

(a) LIMITATION.—Of the amounts made available for fiscal years 1998 and 1999 for United States voluntary contributions to the United Nations Development Program an amount equal to the amount the United Nations Development Program will spend in Burma during each fiscal year shall be withheld unless during such fiscal year the President submits to the appropriate congressional committees the certification described in subsection (b).

(b) CERTIFICATION.—The certification referred to in subsection (a) is a certification by the President that all programs and activities of the United Nations Development Program (including United Nations Development Program—Administered Funds) in Burma—

(1) are focused on eliminating human suffering and addressing the needs of the poor;

(2) are undertaken only through international or private voluntary organizations that have been deemed independent of the State Law and Order Restoration Council (SLORC), after consultation with the leadership of the National League for Democracy and the leadership of the National Coalition Government of the Union of Burma;

(3) provide no financial, political, or military benefit to the SLORC; and

(4) are carried out only after consultation with the leadership of the National League for Democracy and the leadership of the National Coalition Government of the Union of Burma.

## TITLE XXII—DEPARTMENT OF STATE AUTHORITIES AND ACTIVITIES

### CHAPTER 1—AUTHORITIES AND ACTIVITIES

<< 22 USCA § 2701 >>

## SEC. 2201. REIMBURSEMENT OF DEPARTMENT OF STATE FOR ASSISTANCE TO OVERSEAS EDUCATIONAL FACILITIES.

Section 29 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2701) is amended by adding at the end the following: "Notwithstanding any other provision of law, where the child of a United States citizen employee of an agency of the United States Government who is stationed outside the United States attends an educational facility assisted by the Secretary of State under this section, the head of that agency is authorized to reimburse, or credit with advance payment, the Department of State for funds used in providing assistance to such educational facilities, by grant or otherwise, under this section.".

<< 22 USCA § 2708 >>

SEC. 2202. REVISION OF DEPARTMENT OF STATE REWARDS PROGRAM.

Section 36 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2708) is amended to read as follows:

"SEC. 36. DEPARTMENT OF STATE REWARDS PROGRAM.

"(a) ESTABLISHMENT.—

"(1) IN GENERAL.—There is established a program for the payment of rewards to carry out the purposes of this section.

"(2) PURPOSE.—The rewards program shall be designed to assist in the prevention of acts of international terrorism, international narcotics trafficking, and other related criminal acts.

"(3) IMPLEMENTATION.—The rewards program shall be administered by the Secretary of State, in consultation, as appropriate, with the Attorney General.

"(b) REWARDS AUTHORIZED.—In the sole discretion of the Secretary (except as provided in subsection (c)(2)) and in consultation, as appropriate, with the Attorney General, the Secretary may pay a reward to any individual who furnishes information leading to—

"(1) the arrest or conviction in any country of any individual for the commission of an act of international terrorism against a United States person or United States property;

"(2) the arrest or conviction in any country of any individual conspiring or attempting to commit an act of international terrorism against a United States person or United States property;

"(3) the arrest or conviction in any country of any individual for committing, primarily outside the territorial jurisdiction of the United States, any narcotics-related offense if that offense involves or is a significant part of conduct that involves—

"(A) a violation of United States narcotics laws such that the individual would be a major violator of such laws;

"(B) the killing or kidnapping of—

"(i) any officer, employee, or contract employee of the United States Government while such individual is engaged in official duties, or on account of that individual's official duties, in connection with the enforcement of United States narcotics laws or the implementing of United States narcotics control objectives; or

"(ii) a member of the immediate family of any such individual on account of that individual's official duties, in connection with the enforcement of United States narcotics laws or the implementing of United States narcotics control objectives; or

"(C) an attempt or conspiracy to commit any act described in subparagraph (A) or (B);

"(4) the arrest or conviction in any country of any individual aiding or abetting in the commission of an act described in paragraph (1), (2), or (3); or

"(5) the prevention, frustration, or favorable resolution of an act described in paragraph (1), (2), or (3).

"(c) COORDINATION.—

"(1) PROCEDURES.—To ensure that the payment of rewards pursuant to this section does not duplicate or interfere with the payment of informants or the obtaining of evidence or information, as authorized to the Department of Justice, the offering, administration, and payment of rewards under this section, including procedures for—

"(A) identifying individuals, organizations, and offenses with respect to which rewards will be offered;

"(B) the publication of rewards;

"(C) the offering of joint rewards with foreign governments;

"(D) the receipt and analysis of data; and

"(E) the payment and approval of payment,

shall be governed by procedures developed by the Secretary of State, in consultation with the Attorney General.

"(2) PRIOR APPROVAL OF ATTORNEY GENERAL REQUIRED.—Before making a reward under this section in a matter over which there is Federal criminal jurisdiction, the Secretary of State shall obtain the concurrence of the Attorney General.

"(d) FUNDING.—

"(1) AUTHORIZATION OF APPROPRIATIONS.—Notwithstanding section 102 of the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987 (Public Law 99–93; 99 Stat. 408), but subject to paragraph (2), there are authorized to be appropriated to the Department of State from time to time such amounts as may be necessary to carry out this section.

"(2) LIMITATION.—No amount of funds may be appropriated under paragraph (1) which, when added to the unobligated balance of amounts previously appropriated to carry out this section, would cause such amounts to exceed $15,000,000.

"(3) ALLOCATION OF FUNDS.—To the maximum extent practicable, funds made available to carry out this section should be distributed equally for the purpose of preventing acts of international terrorism and for the purpose of preventing international narcotics trafficking.

"(4) PERIOD OF AVAILABILITY.—Amounts appropriated under paragraph (1) shall remain available until expended.

"(e) LIMITATIONS AND CERTIFICATION.—

"(1) MAXIMUM AMOUNT.—No reward paid under this section may exceed $2,000,000.

"(2) APPROVAL.—A reward under this section of more than $100,000 may not be made without the approval of the Secretary.

"(3) CERTIFICATION FOR PAYMENT.—Any reward granted under this section shall be approved and certified for payment by the Secretary.

"(4) NONDELEGATION OF AUTHORITY.—The authority to approve rewards of more than $100,000 set forth in paragraph (2) may not be delegated.

"(5) PROTECTION MEASURES.—If the Secretary determines that the identity of the recipient of a reward or of the members of the recipient's immediate family must be protected, the Secretary may take such measures in connection with the payment of the reward as he considers necessary to effect such protection.

"(f) INELIGIBILITY.—An officer or employee of any entity of Federal, State, or local government or of a foreign government who, while in the performance of his or her official duties, furnishes information described in subsection (b) shall not be eligible for a reward under this section.

"(g) REPORTS.—

"(1) REPORTS ON PAYMENT OF REWARDS.—Not later than 30 days after the payment of any reward under this section, the Secretary shall submit a report to the appropriate congressional committees with respect to such reward. The report, which may be submitted in classified form if necessary, shall specify the amount of the reward paid, to whom the reward was paid, and the acts with respect to which the reward was paid. The report shall also discuss the significance of the information for which the reward was paid in dealing with those acts.

"(2) ANNUAL REPORTS.—Not later than 60 days after the end of each fiscal year, the Secretary shall submit a report to the appropriate congressional committees with respect to the operation of the rewards program. The report shall provide information on the total amounts expended during the fiscal year ending in that year to carry out this section, including amounts expended to publicize the availability of rewards.

"(h) PUBLICATION REGARDING REWARDS OFFERED BY FOREIGN GOVERNMENTS. Notwithstanding any other provision of this section, in the sole discretion of the Secretary, the resources of the rewards program shall be available for the publication of rewards offered by foreign governments regarding acts of international terrorism which do not involve United States persons or property or a violation of the narcotics laws of the United States.

"(i) DETERMINATIONS OF THE SECRETARY.—A determination made by the Secretary under this section shall be final and conclusive and shall not be subject to judicial review.

"(j) DEFINITIONS.—As used in this section:

"(1) ACT OF INTERNATIONAL TERRORISM.—The term 'act of international terrorism' includes—

"(A) any act substantially contributing to the acquisition of unsafeguarded special nuclear material (as defined in paragraph (8) of section 830 of the Nuclear Proliferation Prevention Act of 1994 (22 U.S.C. 3201 note)) or any nuclear explosive device (as defined in paragraph (4) of that section) by an individual, group, or nonnuclear-weapon state (as defined in paragraph (5) of that section); and

"(B) any act, as determined by the Secretary, which materially supports the conduct of international terrorism, including the counterfeiting of United States currency or the illegal use of other monetary instruments by an individual, group, or country

supporting international terrorism as determined for purposes of section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(1)(A)).

"(2) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term 'appropriate congressional committees' means the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate.

"(3) MEMBER OF THE IMMEDIATE FAMILY.—The term 'member of the immediate family', with respect to an individual, includes—

"(A) a spouse, parent, brother, sister, or child of the individual;

"(B) a person with respect to whom the individual stands in loco parentis; and

"(C) any person not covered by subparagraph (A) or (B) who is living in the individual's household and is related to the individual by blood or marriage.

"(4) REWARDS PROGRAM.—The term 'rewards program' means the program established in subsection (a)(1).

"(5) UNITED STATES NARCOTICS LAWS.—The term 'United States narcotics laws' means the laws of the United States for the prevention and control of illicit trafficking in controlled substances (as such term is defined in section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6))).

"(6) UNITED STATES PERSON.—The term 'United States person' means—

"(A) a citizen or national of the United States; and

"(B) an alien lawfully present in the United States.".

<< 22 USCA § 2717 >>

SEC. 2203. RETENTION OF ADDITIONAL DEFENSE TRADE CONTROLS REGISTRATION FEES.

Section 45(a) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2717(a)) is amended—

<< 22 USCA § 2717 >>

(1) at the end of paragraph (1), by striking "and";

<< 22 USCA § 2717 >>

(2) in paragraph (2)—

(A) by striking "functions" and inserting "functions, including compliance and enforcement activities,"; and

(B) by striking the period at the end and inserting "; and"; and

<< 22 USCA § 2717 >>

(3) by adding at the end the following new paragraph:

"(3) the enhancement of defense trade export compliance and enforcement activities, including compliance audits of United States and foreign parties, the conduct of administrative proceedings, monitoring of end-uses in cases of direct commercial arms sales or other transfers, and cooperation in proceedings for enforcement of criminal laws related to defense trade export controls.".

SEC. 2204. FEES FOR COMMERCIAL SERVICES.

<< 22 USCA § 2724 >>

Section 52(b) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2724(b)) is amended by adding at the end the following: "Funds deposited under this subsection shall remain available for obligation through September 30 of the fiscal year following the fiscal year in which the funds were deposited.".

SEC. 2205. PILOT PROGRAM FOR FOREIGN AFFAIRS REIMBURSEMENT.

<< 22 USCA § 4021 >>

(a) FOREIGN AFFAIRS REIMBURSEMENT.—

<< 22 USCA § 4021 >>

(1) IN GENERAL.—Section 701 of the Foreign Service Act of 1980 (22 U.S.C. 4021) is amended—

(A) by redesignating subsection (d)(4) as subsection (g); and

(B) by inserting after subsection (d) the following new subsections:

"(e)(1) The Secretary may provide appropriate training or related services, except foreign language training, through the institution to any United States person (or any employee or family member thereof) that is engaged in business abroad.

"(2) The Secretary may provide job-related training or related services, including foreign language training, through the institution to a United States person under contract to provide services to the United States Government or to any employee thereof that is performing such services.

"(3) Training under this subsection may be provided only to the extent that space is available and only on a reimbursable or advance-of-funds basis. Reimbursements and advances shall be credited to the currently available applicable appropriation account.

"(4) Training and related services under this subsection is authorized only to the extent that it will not interfere with the institution's primary mission of training employees of the Department and of other agencies in the field of foreign relations.

"(5) In this subsection, the term 'United States person' means—

"(A) any individual who is a citizen or national of the United States; or

"(B) any corporation, company, partnership, association, or other legal entity that is 50 percent or more beneficially owned by citizens or nationals of the United States.

"(f)(1) The Secretary is authorized to provide, on a reimbursable basis, training programs to Members of Congress or the Judiciary.

"(2) Employees of the legislative branch and employees of the judicial branch may participate, on a reimbursable basis, in training programs offered by the institution.

"(3) Reimbursements collected under this subsection shall be credited to the currently available applicable appropriation account.

"(4) Training under this subsection is authorized only to the extent that it will not interfere with the institution's primary mission of training employees of the Department and of other agencies in the field of foreign relations.".

<< 22 USCA § 4021 NOTE >>

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall take effect on October 1, 1998.

<< 22 USCA § 4021 >>

(3) TERMINATION OF PILOT PROGRAM.—Effective October 1, 2002, section 701 of the Foreign Service Act of 1980 (22 U.S.C. 4021), as amended by this subsection, is further amended—

(A) by striking subsections (e) and (f); and

(B) by redesignating subsection (g) as paragraph (4) of subsection (d).

<< 22 USCA § 2725 >>

(b) FEES FOR USE OF NATIONAL FOREIGN AFFAIRS TRAINING CENTER.—Title I of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a et seq.) is amended by adding at the end the following new section:

"SEC. 53. FEES FOR USE OF THE NATIONAL FOREIGN AFFAIRS TRAINING CENTER.

"The Secretary is authorized to charge a fee for use of the National Foreign Affairs Training Center of the Department of State. Amounts collected under this section (including reimbursements and surcharges) shall be deposited as an offsetting collection to any Department of State appropriation to recover the costs of such use and shall remain available for obligation until expended.".

<< 22 USCA § 2725 NOTE >>

(c) REPORTING ON PILOT PROGRAM.—Two years after the date of enactment of this Act, the Secretary of State shall submit a report to the appropriate congressional committees containing—

<< 22 USCA § 2725 NOTE >>

(1) the number of persons who have taken advantage of the pilot program established under subsections (e) and (f) of section 701 of the Foreign Service Act of 1980 and section 53 of the State Department Basic Authorities Act of 1956, as added by this section;

<< 22 USCA § 2725 NOTE >>

(2) the business or government affiliation of such persons;

<< 22 USCA § 2725 NOTE >>

(3) the amount of fees collected; and

<< 22 USCA § 2725 NOTE >>

(4) the impact of the program on the primary mission of the National Foreign Affairs Training Center.

<< 22 USCA § 2726 >>

SEC. 2206. FEE FOR USE OF DIPLOMATIC RECEPTION ROOMS.

Title I of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a et seq.), as amended by this division, is further amended by adding at the end the following new section:

"SEC. 54. FEE FOR USE OF DIPLOMATIC RECEPTION ROOMS.
"The Secretary is authorized to charge a fee for use of the diplomatic reception rooms of the Department of State. Amounts collected under this section (including reimbursements and surcharges) shall be deposited as an offsetting collection to any Department of State appropriation to recover the costs of such use and shall remain available for obligation until expended.".

<< 22 USCA § 2727 >>

SEC. 2207. ACCOUNTING OF COLLECTIONS IN BUDGET PRESENTATION DOCUMENTS.

Title I of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a et seq.), as amended by this division, is further amended by adding at the end the following new section:

"SEC. 55. ACCOUNTING OF COLLECTIONS IN BUDGET PRESENTATION DOCUMENTS.
"The Secretary shall include in the annual Congressional Presentation Document and the Budget in Brief a detailed accounting of the total collections received by the Department of State from all sources, including fee collections. Reporting on total collections shall also cover collections from the preceding fiscal year and the projected expenditures from all collections accounts.".

SEC. 2208. OFFICE OF THE INSPECTOR GENERAL.

<< 22 USCA § 3929 >>

(a) PROCEDURES.—Section 209(c) of the Foreign Service Act of 1980 (22 U.S.C. 3929(c)) is amended by adding at the end the following:

"(4) The Inspector General shall develop and provide to employees—

"(A) information detailing their rights to counsel; and

"(B) guidelines describing in general terms the policies and procedures of the Office of Inspector General with respect to individuals under investigation other than matters exempt from disclosure under other provisions of law.".

<< 22 USCA § 3929 >>

(b) NOTICE.—Section 209(e) of the Foreign Service Act of 1980 (22 U.S.C. 3929(e)) is amended by adding at the end the following new paragraph:

"(3) The Inspector General shall ensure that only officials from the Office of the Inspector General may participate in formal interviews or other formal meetings with the individual who is the subject of an investigation, other than an intelligence-related or sensitive undercover investigation, or except in those situations when the Inspector General has a reasonable basis to believe that such notice would cause tampering with witnesses, destroying evidence, or endangering the lives of individuals, unless that individual receives prior adequate notice regarding participation by officials of any other agency, including the Department of Justice, in such interviews or meetings.".

(c) REPORT.—

(1) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, the Inspector General of the Department of State and the Foreign Service shall submit a report to the appropriate congressional committees which includes the following:

(A) Detailed descriptions of the internal guidance developed or used by the Office of the Inspector General with respect to public disclosure of any information related to an ongoing investigation of any officer or employee of the Department of State, the United States Information Agency, or the United States Arms Control and Disarmament Agency.

(B) Detailed descriptions of those instances for the year ending December 31, 1997, in which any disclosure of information to the public by an employee of the Office of Inspector General about an ongoing investigation occurred, including details on the recipient of the information, the date of the disclosure, and the internal clearance process for the disclosure.

(2) STATUTORY CONSTRUCTION.—Disclosure of information to the public under this section shall not be construed to include information shared with Congress by an employee of the Office of the Inspector General.

<< 22 USCA § 2684a >>

SEC. 2209. CAPITAL INVESTMENT FUND.

Section 135 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (22 U.S.C. 2684a) is amended—

<< 22 USCA § 2684a >>

(1) in subsection (a), by inserting "and enhancement" after "procurement";

<< 22 USCA § 2684a >>

(2) in subsection (c), by striking "are authorized to" and inserting "shall";

<< 22 USCA § 2684a >>

(3) in subsection (d), by striking "for expenditure to procure capital equipment and information technology" and inserting "for purposes of subsection (a)"; and

<< 22 USCA § 2684a >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(4) by amending subsection (e) to read as follows:

"(e) REPROGRAMMING PROCEDURES.—Funds credited to the Capital Investment Fund shall not be available for obligation or expenditure except in compliance with the procedures applicable to reprogramming notifications under section 34 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706).".

<< 22 USCA § 4864 >>

SEC. 2210. CONTRACTING FOR LOCAL GUARDS SERVICES OVERSEAS.

Section 136(c) of the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991 (22 U.S.C. 4864(c)) is amended—

<< 22 USCA § 4864 >>

(1) by amending paragraph (3) to read as follows:

"(3) in evaluating proposals for such contracts, award contracts to the technically acceptable firm offering the lowest evaluated price, except that proposals of United States persons and qualified United States joint venture persons (as defined in subsection (d)) shall be evaluated by reducing the bid price by 10 percent;";

<< 22 USCA § 4864 >>

(2) by inserting "and" at the end of paragraph (5);

<< 22 USCA § 4864 >>

(3) by striking "; and" at the end of paragraph (6) and inserting a period; and

<< 22 USCA § 4864 >>

(4) by striking paragraph (7).

<< 22 USCA § 1623 >>

SEC. 2211. AUTHORITY OF THE FOREIGN CLAIMS SETTLEMENT COMMISSION.

Section 4(a) of the International Claims Settlement Act of 1949 (22 U.S.C. 1623(a)) is amended—

<< 22 USCA § 1623 >>

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively;

<< 22 USCA § 1623 >>

(2) in the first sentence, by striking "(a) The" and all that follows through the period and inserting the following:

"(a)(1) The Commission shall have jurisdiction to receive, examine, adjudicate, and render a final decision with respect to any claim of the Government of the United States or of any national of the United States—

"(A) included within the terms of the Yugoslav Claims Agreement of 1948;

"(B) included within the terms of any claims agreement concluded on or after March 10, 1954, between the Government of the United States and a foreign government (exclusive of governments against which the United States declared the existence of a state of war during World War II) similarly providing for the settlement and discharge of claims of the Government of the United States and of nationals of the United States against a foreign government, arising out of the nationalization or other taking of property, by the agreement of the Government of the United States to accept from that government a sum in en bloc settlement thereof; or

"(C) included in a category of claims against a foreign government which is referred to the Commission by the Secretary of State."; and

<< 22 USCA § 1623 >>

(3) by redesignating the second sentence as paragraph (2).

SEC. 2212. EXPENSES RELATING TO CERTAIN INTERNATIONAL CLAIMS AND PROCEEDINGS.

<< 22 USCA § 2661 >>

 (a) RECOVERY OF CERTAIN EXPENSES.—The Department of State Appropriation Act of 1937 (22 U.S.C. 2661) is amended in the fifth undesignated paragraph under the heading entitled "INTERNATIONAL FISHERIES COMMISSION" by inserting "(including such expenses as salaries and other personnel expenses)" after "extraordinary expenses".

<< 22 USCA § 2710 >>

 (b) PROCUREMENT OF SERVICES.—Section 38(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2710(c)) is amended in the first sentence by inserting "personal and" before "other support services".

<< 42 USCA § 11606 >>

SEC. 2213. GRANTS TO REMEDY INTERNATIONAL ABDUCTIONS OF CHILDREN.

 Section 7 of the International Child Abduction Remedies Act (42 U.S.C. 11606; Public Law 100–300) is amended by adding at the end the following new subsection:

 "(e) GRANT AUTHORITY.—The United States Central Authority is authorized to make grants to, or enter into contracts or agreements with, any individual, corporation, other Federal, State, or local agency, or private entity or organization in the United States for purposes of accomplishing its responsibilities under the Convention and this Act.".

<< 22 USCA § 2656i >>

SEC. 2214. COUNTERDRUG AND ANTICRIME ACTIVITIES OF THE DEPARTMENT OF STATE.

<< 22 USCA § 2656i >>

(a) COUNTERDRUG AND LAW ENFORCEMENT STRATEGY.—

<< 22 USCA § 2656i >>

 (1) REQUIREMENT.—Not later than 180 days after the date of enactment of this Act, the Secretary of State shall establish, implement, and submit to Congress a comprehensive, long-term strategy to carry out the counterdrug responsibilities of the Department of State in a manner consistent with the National Drug Control Strategy. The strategy shall involve all elements of the Department in the United States and abroad.

<< 22 USCA § 2656i >>

(2) OBJECTIVES.—In establishing the strategy, the Secretary shall—
 (A) coordinate with the Office of National Drug Control Policy in the development of clear, specific, and measurable counterdrug objectives for the Department that support the goals and objectives of the National Drug Control Strategy;
 (B) develop specific and, to the maximum extent practicable, quantifiable measures of performance relating to the objectives, including annual and long-term measures of performance, for purposes of assessing the success of the Department in meeting the objectives;
 (C) assign responsibilities for meeting the objectives to appropriate elements of the Department;
 (D) develop an operational structure within the Department that minimizes impediments to meeting the objectives;

(E) ensure that every United States ambassador or chief of mission is fully briefed on the strategy, and works to achieve the objectives; and

(F) ensure that—

 (i) all budgetary requests and transfers of equipment (including the financing of foreign military sales and the transfer of excess defense articles) relating to international counterdrug efforts conforms with the objectives; and

 (ii) the recommendations of the Department regarding certification determinations made by the President on March 1 as to the counterdrug cooperation, or adequate steps on its own, of each major illicit drug producing and drug trafficking country to achieve full compliance with the goals and objectives established by the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances also conform to meet such objectives.

<< 22 USCA § 2656i >>

 (3) REPORTS.—Not later than February 15 of each year subsequent to the submission of the strategy described in paragraph (1), the Secretary shall submit to Congress an update of the strategy. The update shall include—

 (A) an outline of the proposed activities with respect to the strategy during the succeeding year, including the manner in which such activities will meet the objectives set forth in paragraph (2); and

 (B) detailed information on how certification determinations described in paragraph (2)(F) made the previous year affected achievement of the objectives set forth in paragraph (2) for the previous calendar year.

<< 22 USCA § 2656i >>

 (4) LIMITATION ON DELEGATION.—The Secretary shall designate an official in the Department who reports directly to the Secretary to oversee the implementation of the strategy throughout the Department.

<< 22 USCA § 2656i >>

(b) INFORMATION ON INTERNATIONAL CRIMINALS.—

<< 22 USCA § 2656i >>

 (1) INFORMATION SYSTEM.—The Secretary shall, in consultation with the heads of appropriate United States law enforcement agencies, including the Attorney General and the Secretary of the Treasury, take appropriate actions to establish an information system or improve existing information systems containing comprehensive information on serious crimes committed by foreign nationals. The information system shall be available to United States embassies and missions abroad for use in consideration of applications for visas for entry into the United States.

<< 22 USCA § 2656i >>

 (2) REPORT.—Not later than 180 days after the date of enactment of this Act, the Secretary shall submit to the appropriate congressional committees a report on the actions taken under paragraph (1).

<< 22 USCA § 2656i >>

(c) OVERSEAS COORDINATION OF COUNTERDRUG AND ANTICRIME PROGRAMS, POLICY, AND ASSISTANCE.—

<< 22 USCA § 2656i >>

 (1) STRENGTHENING COORDINATION.—The responsibilities of every diplomatic mission of the United States shall include the strengthening of cooperation between and among the United States and foreign governmental entities and multilateral entities with respect to activities relating to international narcotics and crime.

<< 22 USCA § 2656i >>

(2) DESIGNATION OF OFFICERS.—

(A) IN GENERAL.—Consistent with existing memoranda of understanding between the Department of State and other departments and agencies of the United States, including the Department of Justice, the chief of mission of every diplomatic mission of the United States shall designate an officer or officers within the mission to carry out the responsibility of the mission under paragraph (1), including the coordination of counterdrug, law enforcement, rule of law, and administration of justice programs, policy, and assistance. Such officer or officers shall report to the chief of mission, or the designee of the chief of mission, on a regular basis regarding activities undertaken in carrying out such responsibility.

(B) REPORTS.—The chief of mission of every diplomatic mission of the United States shall submit to the Secretary on a regular basis a report on the actions undertaken by the mission to carry out such responsibility.

<< 22 USCA § 2656i >>

(3) REPORT TO CONGRESS.—Not later than 180 days after the date of enactment of this Act, the Secretary shall submit to the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives a report on the status of any proposals for action or on action undertaken to improve staffing and personnel management at diplomatic missions of the United States in order to carry out the responsibility set forth in paragraph (1).

<< 22 USCA § 303 >>

SEC. 2215. ANNUAL REPORT ON OVERSEAS SURPLUS PROPERTIES.

The Foreign Service Buildings Act, 1926 (22 U.S.C. 292 et seq.) is amended by adding at the end the following new section: "SEC. 12. Not later than March 1 of each year, the Secretary of State shall submit to Congress a report listing overseas United States surplus properties that are administered under this Act and that have been identified for sale.".

<< 22 USCA § 2151n >>

SEC. 2216. HUMAN RIGHTS REPORTS.

Section 116(d) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151n(d)) is amended—

<< 22 USCA § 2151n >>

(1) by striking "January 31" and inserting "February 25";

<< 22 USCA § 2151n >>

(2) by redesignating paragraphs (3), (4), (5), and (6) as paragraphs (4), (5), (6), and (7), respectively; and

<< 22 USCA § 2151n >>

(3) by inserting after paragraph (2) the following new paragraph:
"(3) the status of child labor practices in each country, including:
"(A) whether such country has adopted policies to protect children from exploitation in the workplace, including a prohibition of forced and bonded labor and policies regarding acceptable working conditions; and
"(B) the extent to which each country enforces such policies, including the adequacy of the resources and oversight dedicated to such policies;".

<< 22 USCA § 2728 >>

SEC. 2217. REPORTS AND POLICY CONCERNING DIPLOMATIC IMMUNITY.

Title I of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a et seq.), as amended by this division, is further amended by adding at the end the following new section:

"SEC. 56. CRIMES COMMITTED BY DIPLOMATS.

"(a) ANNUAL REPORT CONCERNING DIPLOMATIC IMMUNITY.—

"(1) REPORT TO CONGRESS.—180 days after the date of enactment, and annually thereafter, the Secretary of State shall prepare and submit to the Congress, a report concerning diplomatic immunity entitled "Report on Cases Involving Diplomatic Immunity".

"(2) CONTENT OF REPORT.—In addition to such other information as the Secretary of State may consider appropriate, the report under paragraph (1) shall include the following:

"(A) The number of persons residing in the United States who enjoy full immunity from the criminal jurisdiction of the United States under laws extending diplomatic privileges and immunities.

"(B) Each case involving an alien described in subparagraph (A) in which an appropriate authority of a State, a political subdivision of a State, or the United States reported to the Department of State that the authority had reasonable cause to believe the alien committed a serious criminal offense within the United States, and any additional information provided to the Secretary relating to other serious criminal offenses that any such authority had reasonable cause to believe the alien committed before the period covered by the report. The Secretary may omit from such report any matter the provision of which the Secretary reasonably believes would compromise a criminal investigation or prosecution or which would directly compromise law enforcement or intelligence sources or methods.

"(C) Each case described in subparagraph (B) in which the Secretary of State has certified that a person enjoys full immunity from the criminal jurisdiction of the United States under laws extending diplomatic privileges and immunities.

"(D) The number of United States citizens who are residing in a receiving state and who enjoy full immunity from the criminal jurisdiction of such state under laws extending diplomatic privileges and immunities.

"(E) Each case involving a United States citizen under subparagraph (D) in which the United States has been requested by the government of a receiving state to waive the immunity from criminal jurisdiction of the United States citizen.

"(F) Whether the Secretary has made the notifications referred to in subsection (c) during the period covered by the report.

"(3) SERIOUS CRIMINAL OFFENSE DEFINED.—For the purposes of this section, the term 'serious criminal offense' means—

"(A) any felony under Federal, State, or local law;

"(B) any Federal, State, or local offense punishable by a term of imprisonment of more than 1 year;

"(C) any crime of violence as defined for purposes of section 16 of title 18, United States Code; or

"(D)(i) driving under the influence of alcohol or drugs;

"(ii) reckless driving; or

"(iii) driving while intoxicated.

"(b) UNITED STATES POLICY CONCERNING REFORM OF DIPLOMATIC IMMUNITY.—It is the sense of the Congress that the Secretary of State should explore, in appropriate fora, whether states should enter into agreements and adopt legislation—

"(1) to provide jurisdiction in the sending state to prosecute crimes committed in the receiving state by persons entitled to immunity from criminal jurisdiction under laws extending diplomatic privileges and immunities; and

"(2) to provide that where there is probable cause to believe that an individual who is entitled to immunity from the criminal jurisdiction of the receiving state under laws extending diplomatic privileges and immunities committed a serious crime, the sending state will waive such immunity or the sending state will prosecute such individual.

"(c) NOTIFICATION OF DIPLOMATIC CORPS.—The Secretary should periodically notify each foreign mission of United States policies relating to criminal offenses committed by individuals with immunity from the criminal jurisdiction of the United States under laws extending diplomatic privileges and immunities.".

<< 22 USCA § 2669b >>

SEC. 2218. REAFFIRMING UNITED STATES INTERNATIONAL TELECOMMUNICATIONS POLICY.

<< 22 USCA § 2669b >>

(a) PROCUREMENT POLICY.—It is the policy of the United States to foster and support procurement of goods and services from private, commercial companies.

<< 22 USCA § 2669b >>

(b) IMPLEMENTATION.—In order to achieve the policy set forth in subsection (a), the Diplomatic Telecommunications Service Program Office (DTS–PO) shall—

<< 22 USCA § 2669b >>

(1) utilize full and open competition, to the maximum extent practicable, in the procurement of telecommunications services, including satellite space segment, for the Department of State and each other Federal entity represented at United States diplomatic missions and consular posts overseas;

<< 22 USCA § 2669b >>

(2) make every effort to ensure and promote the participation in the competition for such procurement of commercial private sector providers of satellite space segment who have no ownership or other connection with an intergovernmental satellite organization; and

<< 22 USCA § 2669b >>

(3) implement the competitive procedures required by paragraphs (1) and (2) at the prime contracting level and, to the maximum extent practicable, the subcontracting level.

<< 22 USCA § 4171 NOTE >>

SEC. 2219. REDUCTION OF REPORTING.

<< 22 USCA § 4171 NOTE >>

(a) REPEALS.—The following provisions of law are repealed:

<< 22 USCA § 4171 NOTE >>

(1) MODEL FOREIGN LANGUAGE COMPETENCE POSTS.—The second sentence of section 161(c) of the Foreign Relations Authorization Act, Fiscal Year 1990 and 1991 (22 U.S.C. 4171 note).
(2) ACTIONS OF THE GOVERNMENT OF HAITI.—Section 705(c) of the International Security and Development Cooperation Act of 1985 (Public Law 99–83).

<< 22 USCA § 4021 NOTE >>

(3) TRAINING FACILITY FOR THE FOREIGN SERVICE INSTITUTE.—Section 123(e)(2) of the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987 (Public Law 99–93).
(4) MILITARY ASSISTANCE FOR HAITI.—Section 203(c) of the Special Foreign Assistance Act of 1986 (Public Law 99–529).

<< 7 USCA § 3605 >>

(5) INTERNATIONAL SUGAR AGREEMENT, 1977.—Section 5 of the Act entitled "An Act providing for the implementation of the International Sugar Agreement, 1977, and for other purposes" (Public Law 96–236; 7 U.S.C. 3605 and 3606).
(6) AUDIENCE SURVEY OF WORLDNET PROGRAM.—Section 209 (c) and (d) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (Public Law 100–204).

<< 22 USCA § 2452 NOTE >>

(7) RESEARCH ON THE NEAR AND MIDDLE EAST.—Section 228(b) of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138; 22 U.S.C. 2452 note).

<< 22 USCA § 2376 >>

(b) PROGRESS TOWARD REGIONAL NONPROLIFERATION.—Section 620F(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2376(c); relating to periodic reports on progress toward regional nonproliferation) is amended by striking "Not later than April 1, 1993 and every six months thereafter," and inserting "Not later than April 1 of each year,".

<< 42 USCA § 1973ff >>

(c) REPORT ON PARTICIPATION BY UNITED STATES MILITARY PERSONNEL ABROAD IN UNITED STATES ELECTIONS.—Section 101(b)(6) of the Uniformed and Overseas Citizens Absentee Voting Act of 1986 (42 U.S.C. 1973ff(b)(6)) is amended by striking "of voter participation" and inserting "of uniformed services voter participation, a general assessment of overseas nonmilitary participation,".

CHAPTER 2—CONSULAR AUTHORITIES OF THE DEPARTMENT OF STATE

SEC. 2221. USE OF CERTAIN PASSPORT PROCESSING FEES FOR ENHANCED PASSPORT SERVICES.

For each of the fiscal years 1998 and 1999, of the fees collected for expedited passport processing and deposited to an offsetting collection pursuant to title V of the Department of State and Related Agencies Appropriations Act for Fiscal Year 1995 (Public Law 103–317; 22 U.S.C. 214 note), 30 percent shall be available only for enhancing passport services for United States citizens, improving the integrity and efficiency of the passport issuance process, improving the secure nature of the United States passport, investigating passport fraud, and deterring entry into the United States by terrorists, drug traffickers, or other criminals.

SEC. 2222. CONSULAR OFFICERS.

<< 22 USCA § 2705 >>

(a) PERSONS AUTHORIZED TO ISSUE REPORTS OF BIRTHS ABROAD.—Section 33 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2705) is amended in paragraph (2) by adding at the end the following: "For purposes of this paragraph, the term 'consular officer' includes any United States citizen employee of the Department of State who is designated by the Secretary of State to adjudicate nationality abroad pursuant to such regulations as the Secretary may prescribe.".

<< 22 USCA § 4191 >>

(b) PROVISIONS APPLICABLE TO CONSULAR OFFICERS.—Section 1689 of the Revised Statutes (22 U.S.C. 4191) is amended by inserting "and to such other United States citizen employees of the Department of State as may be designated by the Secretary of State pursuant to such regulations as the Secretary may prescribe" after "such officers".

(c) PERSONS AUTHORIZED TO AUTHENTICATE FOREIGN DOCUMENTS.—

<< 22 USCA § 4221 >>

(1) DESIGNATED UNITED STATES CITIZENS PERFORMING NOTARIAL ACTS.—Section 1750 of the Revised Statutes, as amended (22 U.S.C. 4221) is further amended by inserting after the first sentence: "At any post, port, or place where there is no consular officer, the Secretary of State may authorize any other officer or employee of the United States Government who is a United States citizen serving overseas, including any contract employee of the United States Government, to perform such acts, and any such contractor so authorized shall not be considered to be a consular officer.".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 18 USCA § 3492 >>

(2) DEFINITION OF CONSULAR OFFICERS.—Section 3492(c) of title 18, United States Code, is amended by adding at the end the following: "For purposes of this section and sections 3493 through 3496 of this title, the term 'consular officers' includes any United States citizen who is designated to perform notarial functions pursuant to section 1750 of the Revised Statutes, as amended (22 U.S.C. 4221).".

<< 35 USCA § 115 >>

(d) PERSONS AUTHORIZED TO ADMINISTER OATHS.—Section 115 of title 35, United States Code, is amended by adding at the end the following: "For purposes of this section, a consular officer shall include any United States citizen serving overseas, authorized to perform notarial functions pursuant to section 1750 of the Revised Statutes, as amended (22 U.S.C. 4221).".

<< 8 USCA § 1101 >>

(e) DEFINITION OF CONSULAR OFFICER.—Section 101(a)(9) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(9)) is amended by—

<< 8 USCA § 1101 >>

(1) inserting "or employee" after "officer" the second place it appears; and

<< 8 USCA § 1101 >>

(2) inserting before the period at the end of the sentence "or, when used in title III, for the purpose of adjudicating nationality".

<< 22 USCA § 4024 >>

(f) TRAINING FOR EMPLOYEES PERFORMING CONSULAR FUNCTIONS.—Section 704 of the Foreign Service Act of 1980 (22 U.S.C. 4024) is amended by adding at the end the following new subsection:

"(d)(1) Before a United States citizen employee (other than a diplomatic or consular officer of the United States) may be designated by the Secretary of State, pursuant to regulation, to perform a consular function abroad, the United States citizen employee shall—

"(A) be required to complete successfully a program of training essentially equivalent to the training that a consular officer who is a member of the Foreign Service would receive for purposes of performing such function; and

"(B) be certified by an appropriate official of the Department of State to be qualified by knowledge and experience to perform such function.

"(2) As used in this subsection, the term 'consular function' includes the issuance of visas, the performance of notarial and other legalization functions, the adjudication of passport applications, the adjudication of nationality, and the issuance of citizenship documentation.".

<< 22 USCA §§ 4212, 4213, 4214 >>

SEC. 2223. REPEAL OF OUTDATED CONSULAR RECEIPT REQUIREMENTS.

Sections 1726, 1727, and 1728 of the Revised Statutes of the United States (22 U.S.C. 4212, 4213, and 4214), as amended (relating to accounting for consular fees) are repealed.

SEC. 2224. ELIMINATION OF DUPLICATE FEDERAL REGISTER PUBLICATION FOR TRAVEL ADVISORIES.

<< 49 USCA § 44908 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(a) FOREIGN AIRPORTS.—Section 44908(a) of title 49, United States Code, is amended—

<< 49 USCA § 44908 >>

(1) by inserting "and" at the end of paragraph (1);

<< 49 USCA § 44908 >>

(2) by striking paragraph (2); and

<< 49 USCA § 44908 >>

(3) by redesignating paragraph (3) as paragraph (2).

<< 46 USCA App. § 1804 >>

(b) FOREIGN PORTS.—Section 908(a) of the International Maritime and Port Security Act of 1986 (46 U.S.C. App. 1804(a)) is amended by striking the second sentence, relating to Federal Register publication by the Secretary of State.

<< 8 USCA § 1182d >>

SEC. 2225. DENIAL OF VISAS TO CONFISCATORS OF AMERICAN PROPERTY.

<< 8 USCA § 1182d >>

(a) DENIAL OF VISAS.—Except as otherwise provided in section 401 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (Public Law 104–114), and subject to subsection (b), the Secretary of State may deny the issuance of a visa to any alien who—

<< 8 USCA § 1182d >>

(1) through the abuse of position, including a governmental or political party position, converts or has converted for personal gain real property that has been confiscated or expropriated, a claim to which is owned by a national of the United States, or who is complicit in such a conversion; or

<< 8 USCA § 1182d >>

(2) induces any of the actions or omissions described in paragraph (1) by any person.

<< 8 USCA § 1182d >>

(b) EXCEPTIONS.—Subsection (a) shall not apply to—

<< 8 USCA § 1182d >>

(1) any country established by international mandate through the United Nations; or

<< 8 USCA § 1182d >>

(2) any territory recognized by the United States Government to be in dispute.

<< 8 USCA § 1182d >>

(c) REPORTING REQUIREMENT.—Not later than 6 months after the date of enactment of this Act, and every 12 months thereafter, the Secretary of State shall submit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate a report, including—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1182d >>

(1) a list of aliens who have been denied a visa under this subsection; and

<< 8 USCA § 1182d >>

(2) a list of aliens who could have been denied a visa under subsection (a) but were issued a visa and an explanation as to why each such visa was issued.

SEC. 2226. INADMISSIBILITY OF ANY ALIEN SUPPORTING AN INTERNATIONAL CHILD ABDUCTOR.

<< 8 USCA § 1182 >>

(a) AMENDMENT OF IMMIGRATION AND NATIONALITY ACT.—Section 212(a)(10)(C) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(10)(C)) is amended by striking clause (ii) and inserting the following:

"(ii) ALIENS SUPPORTING ABDUCTORS AND RELATIVES OF ABDUCTORS.—Any alien who—

"(I) is known by the Secretary of State to have intentionally assisted an alien in the conduct described in clause (i),

"(II) is known by the Secretary of State to be intentionally providing material support or safe haven to an alien described in clause (i), or

"(III) is a spouse (other than the spouse who is the parent of the abducted child), child (other than the abducted child), parent, sibling, or agent of an alien described in clause (i), if such person has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion, is inadmissible until the child described in clause (i) is surrendered to the person granted custody by the order described in that clause, and such person and child are permitted to return to the United States or such person's place of residence.

"(iii) EXCEPTIONS.—Clauses (i) and (ii) shall not apply—

"(I) to a government official of the United States who is acting within the scope of his or her official duties;

"(II) to a government official of any foreign government if the official has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion; or

"(III) so long as the child is located in a foreign state that is a party to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to aliens seeking admission to the United States on or after the date of enactment of this Act.

CHAPTER 3—REFUGEES AND MIGRATION

Subchapter A—Authorization of Appropriations

SEC. 2231. MIGRATION AND REFUGEE ASSISTANCE.

(a) MIGRATION AND REFUGEE ASSISTANCE.—

(1) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for "Migration and Refugee Assistance" for authorized activities, $650,000,000 for the fiscal year 1998 and $704,500,000 for the fiscal year 1999.

(2) LIMITATIONS.—

(A) LIMITATION REGARDING TIBETAN REFUGEES IN INDIA AND NEPAL.—Of the amounts authorized to be appropriated in paragraph (1), not more than $2,000,000 for the fiscal year 1998 and $2,000,000 for the fiscal year 1999 are authorized to be available only for humanitarian assistance, including food, medicine, clothing, and medical and vocational training, to Tibetan refugees in India and Nepal who have fled Chinese-occupied Tibet.

(B) REFUGEES RESETTLING IN ISRAEL.—Of the amounts authorized to be appropriated in paragraph (1), $80,000,000 for the fiscal year 1998 and $80,000,000 for the fiscal year 1999 are authorized to be available for assistance for refugees resettling in Israel from other countries.

(C) HUMANITARIAN ASSISTANCE FOR DISPLACED BURMESE.—Of the amounts authorized to be appropriated in paragraph (1), $1,500,000 for the fiscal year 1998 and $1,500,000 for the fiscal year 1999 for humanitarian assistance are authorized to be available, including food, medicine, clothing, and medical and vocational training, to persons displaced as a result of civil conflict in Burma, including persons still within Burma.

(b) AVAILABILITY OF FUNDS.—Funds appropriated pursuant to this section are authorized to remain available until expended.

Subchapter B—Authorities

<< 22 USCA § 2601 NOTE >>

SEC. 2241. UNITED STATES POLICY REGARDING THE INVOLUNTARY RETURN OF REFUGEES.

<< 22 USCA § 2601 NOTE >>

(a) IN GENERAL.—None of the funds made available by this subdivision shall be available to effect the involuntary return by the United States of any person to a country in which the person has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, except on grounds recognized as precluding protection as a refugee under the United Nations Convention Relating to the Status of Refugees of July 28, 1951, and the Protocol Relating to the Status of Refugees of January 31, 1967, subject to the reservations contained in the United States Senate Resolution of Ratification.

<< 22 USCA § 2601 NOTE >>

(b) MIGRATION AND REFUGEE ASSISTANCE.—None of the funds made available by section 2231 of this division or by section 2(c) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601(c)) shall be available to effect the involuntary return of any person to any country unless the Secretary of State first notifies the appropriate congressional committees, except that in the case of an emergency involving a threat to human life the Secretary of State shall notify the appropriate congressional committees as soon as practicable.

<< 22 USCA § 2601 NOTE >>

(c) INVOLUNTARY RETURN DEFINED.—As used in this section, the term "to effect the involuntary return" means to require, by means of physical force or circumstances amounting to a threat thereof, a person to return to a country against the person's will, regardless of whether the person is physically present in the United States and regardless of whether the United States acts directly or through an agent.

<< 8 USCA § 1231 NOTE >>

SEC. 2242. UNITED STATES POLICY WITH RESPECT TO THE INVOLUNTARY RETURN OF PERSONS IN DANGER OF SUBJECTION TO TORTURE.

<< 8 USCA § 1231 NOTE >>

(a) POLICY.—It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

<< 8 USCA § 1231 NOTE >>

(b) REGULATIONS.—Not later than 120 days after the date of enactment of this Act, the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

<< 8 USCA § 1231 NOTE >>

(c) EXCLUSION OF CERTAIN ALIENS.—To the maximum extent consistent with the obligations of the United States under the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention, the regulations described in subsection (b) shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)(B)).

<< 8 USCA § 1231 NOTE >>

(d) REVIEW AND CONSTRUCTION.—Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

<< 8 USCA § 1231 NOTE >>

(e) AUTHORITY TO DETAIN.—Nothing in this section shall be construed as limiting the authority of the Attorney General to detain any person under any provision of law, including, but not limited to, any provision of the Immigration and Nationality Act.

<< 8 USCA § 1231 NOTE >>

(f) DEFINITIONS.—

<< 8 USCA § 1231 NOTE >>

(1) CONVENTION DEFINED.—In this section, the term "Convention" means the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, done at New York on December 10, 1984.

<< 8 USCA § 1231 NOTE >>

(2) SAME TERMS AS IN THE CONVENTION.—Except as otherwise provided, the terms used in this section have the meanings given those terms in the Convention, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

<< 22 USCA § 2706 >>

SEC. 2243. REPROGRAMMING OF MIGRATION AND REFUGEE ASSISTANCE FUNDS.

Section 34 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706) is amended—

<< 22 USCA § 2706 >>

(1) in subsection (a)—
    (A) by striking "Foreign Affairs" and inserting "International Relations and the Committee on Appropriations"; and
    (B) by inserting "and the Committee on Appropriations" after "Foreign Relations"; and

<< 22 USCA § 2706 >>

(2) by adding at the end the following new subsection:

"(c) The Secretary of State may waive the notification requirement of subsection (a), if the Secretary determines that failure to do so would pose a substantial risk to human health or welfare. In the case of any waiver under this subsection, notification to the Committee on Foreign Relations and the Committee on Appropriations of the Senate and the Committee on International Relations and the Committee on Appropriations of the House of Representatives shall be provided as soon as practicable, but not later than 3 days after taking the action to which the notification requirement was applicable, and shall contain an explanation of the emergency circumstances.".

SEC. 2244. ELIGIBILITY FOR REFUGEE STATUS.

Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (Public Law 104–208; 110 Stat. 3009–171) is amended—

(1) in subsection (a)—

(A) by striking "For purposes" and inserting "Notwithstanding any other provision of law, for purposes"; and

(B) by striking "fiscal year 1997" and inserting "fiscal years 1997, 1998, and 1999"; and

(2) by amending subsection (b) to read as follows:

"(b) ALIENS COVERED.—

"(1) IN GENERAL.—An alien described in this subsection is an alien who—

"(A) is the son or daughter of a qualified national;

"(B) is 21 years of age or older; and

"(C) was unmarried as of the date of acceptance of the alien's parent for resettlement under the Orderly Departure Program.

"(2) QUALIFIED NATIONAL.—For purposes of paragraph (1), the term 'qualified national' means a national of Vietnam who—

"(A)(i) was formerly interned in a reeducation camp in Vietnam by the Government of the Socialist Republic of Vietnam; or

"(ii) is the widow or widower of an individual described in clause (i); and

"(B)(i) qualified for refugee processing under the reeducation camp internees subprogram of the Orderly Departure Program; and

"(ii) on or after April 1, 1995, is or has been accepted:

"(I) for resettlement as a refugee; or

"(II) for admission as an immigrant under the Orderly Departure Program.".

SEC. 2245. REPORTS TO CONGRESS CONCERNING CUBAN EMIGRATION POLICIES.

Beginning not later than 6 months after the date of enactment of this Act, and every 6 months thereafter, the Secretary of State shall supplement the monthly report to Congress entitled "Update on Monitoring of Cuban Migrant Returnees" with additional information concerning the methods employed by the Government of Cuba to enforce the United States–Cuba agreement of September 1994 and the treatment by the Government of Cuba of persons who have returned to Cuba pursuant to the United States–Cuba agreement of May 1995.

TITLE XXIII—ORGANIZATION OF THE DEPARTMENT OF STATE;
DEPARTMENT OF STATE PERSONNEL; THE FOREIGN SERVICE

CHAPTER 1—ORGANIZATION OF THE DEPARTMENT OF STATE

SEC. 2301. COORDINATOR FOR COUNTERTERRORISM.

<< 22 USCA § 2651a >>

(a) ESTABLISHMENT.—Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a) is amended by adding at the end the following new subsection:

"(f) COORDINATOR FOR COUNTERTERRORISM.—

"(1) IN GENERAL.—There is within the office of the Secretary of State a Coordinator for Counterterrorism (in this paragraph referred to as the 'Coordinator') who shall be appointed by the President, by and with the advice and consent of the Senate.

"(2) DUTIES.—

"(A) IN GENERAL.—The Coordinator shall perform such duties and exercise such powers as the Secretary of State shall prescribe.

"(B) DUTIES DESCRIBED.—The principal duty of the Coordinator shall be the overall supervision (including policy oversight of resources) of international counterterrorism activities. The Coordinator shall be the principal adviser to the Secretary of State on international counterterrorism matters. The Coordinator shall be the principal counterterrorism official within the senior management of the Department of State and shall report directly to the Secretary of State.

"(3) RANK AND STATUS OF AMBASSADOR.—The Coordinator shall have the rank and status of Ambassador at Large.".

<< 22 USCA § 2651a >>

(b) TECHNICAL AND CONFORMING AMENDMENTS.—Section 161 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236) is amended by striking subsection (e).

<< 22 USCA § 2651a NOTE >>

SEC. 2302. ELIMINATION OF DEPUTY ASSISTANT SECRETARY OF STATE FOR BURDENSHARING.

Section 161 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (22 U.S.C. 2651a note) is amended by striking subsection (f).

<< 22 USCA § 2651a >>

SEC. 2303. PERSONNEL MANAGEMENT.

Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a), as amended by this division, is further amended by adding at the end the following new subsection:

"(g) QUALIFICATIONS OF OFFICER HAVING PRIMARY RESPONSIBILITY FOR PERSONNEL MANAGEMENT. —The officer of the Department of State with primary responsibility for assisting the Secretary of State with respect to matters relating to personnel in the Department of State, or that officer's principal deputy, shall have substantial professional qualifications in the field of human resource policy and management.".

SEC. 2304. DIPLOMATIC SECURITY.

<< 22 USCA § 2651a >>

Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a), as amended by this division, is further amended by adding at the end the following new subsection:

"(h) QUALIFICATIONS OF OFFICER HAVING PRIMARY RESPONSIBILITY FOR DIPLOMATIC SECURITY.—The officer of the Department of State with primary responsibility for assisting the Secretary of State with respect to diplomatic security, or that officer's principal deputy, shall have substantial professional qualifications in the fields of (1) management, and (2) Federal law enforcement, intelligence, or security.".

<< 22 USCA § 2651a >>

SEC. 2305. NUMBER OF SENIOR OFFICIAL POSITIONS AUTHORIZED FOR THE DEPARTMENT OF STATE.

<< 22 USCA § 2651a >>

(a) UNDER SECRETARIES.—

<< 22 USCA § 2651a >>

 (1) IN GENERAL.—Section 1(b) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(b)) is amended by striking "5" and inserting "6".

<< 22 USCA § 2651a >>

 (2) CONFORMING AMENDMENT TO TITLE 5.—Section 5314 of title 5, United States Code, is amended by striking "Under Secretaries of State (5)" and inserting "Under Secretaries of State (6)".
(b) ASSISTANT SECRETARIES.—

<< 22 USCA § 2651a >>

 (1) IN GENERAL.—Section 1(c)(1) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(c)(1)) is amended by striking "20" and inserting "24".

<< 5 USCA § 5315 >>

 (2) CONFORMING AMENDMENT TO TITLE 5.—Section 5315 of title 5, United States Code, is amended by striking "Assistant Secretaries of State (20)" and inserting "Assistant Secretaries of State (24)".

<< 22 USCA § 2651a >>

 (c) DEPUTY ASSISTANT SECRETARIES.—Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a), as amended by this division, is further amended—

<< 22 USCA § 2651a >>

 (1) by striking subsection (d); and

<< 22 USCA § 2651a >>

 (2) by redesignating subsections (e), (f), (g), and (h) as subsections (d), (e), (f), and (g), respectively.

<< 22 USCA § 2651a >>

SEC. 2306. NOMINATION OF UNDER SECRETARIES AND ASSISTANT SECRETARIES OF STATE.

<< 22 USCA § 2651a >>

 (a) UNDER SECRETARIES OF STATE.—Section 1(b) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(c)), as amended by this division, is further amended by adding at the end the following new paragraph:
 "(4) NOMINATION OF UNDER SECRETARIES.—Whenever the President submits to the Senate a nomination of an individual for appointment to a position in the Department of State that is described in paragraph (1), the President shall designate the particular Under Secretary position in the Department of State that the individual shall have.".

<< 22 USCA § 2651a >>

 (b) ASSISTANT SECRETARIES OF STATE.—Section 1(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(c)), as amended by this division, is further amended by adding at the end the following new paragraph:

"(3) NOMINATION OF ASSISTANT SECRETARIES.—Whenever the President submits to the Senate a nomination of an individual for appointment to a position in the Department of State that is described in paragraph (1), the President shall designate the regional or functional bureau or bureaus of the Department of State with respect to which the individual shall have responsibility.".

## CHAPTER 2—PERSONNEL OF THE DEPARTMENT OF STATE; THE FOREIGN SERVICE

SEC. 2311. FOREIGN SERVICE REFORM.

<< 22 USCA § 3965 >>

(a) PERFORMANCE PAY.—Section 405 of the Foreign Service Act of 1980 (22 U.S.C. 3965) is amended—

<< 22 USCA § 3965 >>

(1) in subsection (a), by striking "Members" and inserting "Subject to subsection (e), members"; and

<< 22 USCA § 3965 >>

(2) by adding at the end the following new subsection:

"(e) Notwithstanding any other provision of law, the Secretary of State may provide for recognition of the meritorious or distinguished service of any member of the Foreign Service described in subsection (a) (including any member of the Senior Foreign Service) by means other than an award of performance pay in lieu of making such an award under this section.".

<< 22 USCA § 4010 NOTE >>

(b) EXPEDITED SEPARATION OUT.—

<< 22 USCA § 4010 NOTE >>

(1) SEPARATION OF LOWEST RANKED FOREIGN SERVICE MEMBERS.—Not later than 90 days after the date of enactment of this Act, the Secretary of State shall develop and implement procedures to identify, and recommend for separation, any member of the Foreign Service ranked by promotion boards of the Department of State in the bottom 5 percent of his or her class for 2 or more of the 5 years preceding the date of enactment of this Act (in this subsection referred to as the "years of lowest ranking") if the rating official for such member was not the same individual for any two of the years of lowest ranking.

<< 22 USCA § 4010 NOTE >>

(2) SPECIAL INTERNAL REVIEWS.—In any case where the member was evaluated by the same rating official in any 2 of the years of lowest ranking, an internal review of the member's file shall be conducted to determine whether the member should be considered for action leading to separation.

<< 22 USCA § 4010 NOTE >>

(3) PROCEDURES.—The Secretary of State shall develop procedures for the internal reviews required under paragraph (2).

SEC. 2312. RETIREMENT BENEFITS FOR INVOLUNTARY SEPARATION.

<< 22 USCA § 4009 >>

(a) BENEFITS.—Section 609 of the Foreign Service Act of 1980 (22 U.S.C. 4009) is amended—

<< 22 USCA § 4009 >>

(1) in subsection (a)(2)(A), by inserting "or any other applicable provision of chapter 84 of title 5, United States Code," after "section 811";

<< 22 USCA § 4009 >>

(2) in subsection (a), by inserting "or section 855, as appropriate" after "section 806"; and

<< 22 USCA § 4009 >>

(3) in subsection (b)(2)—
  (A) by striking "(2)" and inserting "(2)(A) for those participants in the Foreign Service Retirement and Disability System,"; and
  (B) by inserting before the period at the end "; and (B) for those participants in the Foreign Service Pension System, benefits as provided in section 851"; and

<< 22 USCA § 4009 >>

(4) in subsection (b) in the matter following paragraph (2), by inserting "(for participants in the Foreign Service Retirement and Disability System) or age 62 (for participants in the Foreign Service Pension System)" after "age 60".

<< 22 USCA § 4071 >>

(b) ENTITLEMENT TO ANNUITY.—Section 855(b) of the Foreign Service Act of 1980 (22 U.S.C. 4071d(b)) is amended—

<< 22 USCA § 4071 >>

(1) in paragraph (1)—
  (A) by inserting "611," after "608,";
  (B) by inserting "or for participants in the Foreign Service Pension System," after "for participants in the Foreign Service Retirement and Disability System"; and
  (C) by striking "Service shall" and inserting "Service, shall"; and

<< 22 USCA § 4071 >>

(2) in paragraph (3), by striking "or 610" and inserting "610, or 611".

<< 22 USCA § 4009 NOTE >>

<< 22 USCA § 4071d nt >>

(c) EFFECTIVE DATES.—

<< 22 USCA § 4009 NOTE >>

<< 22 USCA § 4071d nt >>

(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section shall take effect on the date of the enactment of this Act.

<< 22 USCA § 4009 NOTE >>

<< 22 USCA § 4071d nt >>

(2) EXCEPTIONS.—The amendments made by paragraphs (2) and (3) of subsection (a) and paragraphs (1)(A) and (2) of subsection (b) shall apply with respect to any actions taken under section 611 of the Foreign Service Act of 1980 on or after January 1, 1996.

<< 22 USCA § 4010 >>

SEC. 2313. AUTHORITY OF SECRETARY TO SEPARATE CONVICTED FELONS FROM THE FOREIGN SERVICE.

Section 610(a)(2) of the Foreign Service Act of 1980 (22 U.S.C. 4010(a)(2)) is amended in the first sentence by striking "A member" and inserting "Except in the case of an individual who has been convicted of a crime for which a sentence of imprisonment of more than 1 year may be imposed, a member".

SEC. 2314. CAREER COUNSELING.

<< 22 USCA § 4026 >>

(a) IN GENERAL.—Section 706(a) of the Foreign Service Act of 1980 (22 U.S.C. 4026(a)) is amended by adding at the end the following new sentence: "Career counseling and related services provided pursuant to this Act shall not be construed to permit an assignment that consists primarily of paid time to conduct a job search and without other substantive duties for more than one month.".

<< 22 USCA § 4026 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective 180 days after the date of the enactment of this Act.

<< 22 USCA § 4117 >>

SEC. 2315. LIMITATIONS ON MANAGEMENT ASSIGNMENTS.

Section 1017(e)(2) of the Foreign Service Act of 1980 (22 U.S.C. 4117(e)(2)) is amended to read as follows:
"(2) For the purposes of paragraph (1)(A)(ii) and paragraph (1)(B), the term 'management official' does not include—
"(A) any chief of mission;
"(B) any principal officer or deputy principal officer;
"(C) any administrative or personnel officer abroad; or
"(D) any individual described in section 1002(12)(B), (C), or (D) who is not involved in the administration of this chapter or in the formulation of the personnel policies and programs of the Department.".

SEC. 2316. AVAILABILITY PAY FOR CERTAIN CRIMINAL INVESTIGATORS WITHIN THE DIPLOMATIC SECURITY SERVICE.

<< 5 USCA § 5545a >>

(a) IN GENERAL.—Section 5545a of title 5, United States Code, is amended by adding at the end the following:
"(k)(1) For purposes of this section, the term 'criminal investigator' includes a special agent occupying a position under title II of Public Law 99–399 if such special agent—
"(A) meets the definition of such term under paragraph (2) of subsection (a) (applied disregarding the parenthetical matter before subparagraph (A) thereof); and
"(B) such special agent satisfies the requirements of subsection (d) without taking into account any hours described in paragraph (2)(B) thereof.
"(2) In applying subsection (h) with respect to a special agent under this subsection:
"(A) any reference in such subsection to 'basic pay' shall be considered to include amounts designated as 'salary';

AR.03041

"(B) paragraph (2)(A) of such subsection shall be considered to include (in addition to the provisions of law specified therein) sections 609(b)(1), 805, 806, and 856 of the Foreign Service Act of 1980; and

"(C) paragraph (2)(B) of such subsection shall be applied by substituting for 'Office of Personnel Management' the following: 'Office of Personnel Management or the Secretary of State (to the extent that matters exclusively within the jurisdiction of the Secretary are concerned)'.".

<< 5 USCA § 5545a NOTE >>

(b) IMPLEMENTATION.—Not later than the date on which the amendments made by this section take effect, each special agent of the Diplomatic Security Service who satisfies the requirements of subsection (k)(1) of section 5545a of title 5, United States Code, as amended by this section, and the appropriate supervisory officer, to be designated by the Secretary of State, shall make an initial certification to the Secretary of State that the special agent is expected to meet the requirements of subsection (d) of such section 5545a. The Secretary of State may prescribe procedures necessary to administer this subsection.

<< 5 USCA § 5545a >>

(c) TECHNICAL AND CONFORMING AMENDMENTS.—(1) Paragraph (2) of section 5545a(a) of title 5, United States Code, is amended (in the matter before subparagraph (A)) by striking "Public Law 99–399)" and inserting "Public Law 99–399, subject to subsection (k))".

<< 5 USCA § 5542 >>

(2) Section 5542(e) of such title is amended by striking "title 18, United States Code," and inserting "title 18 or section 37(a)(3) of the State Department Basic Authorities Act of 1956,".

<< 5 USCA § 5542 NOTE >>

<< 5 USCA § 5545a nt >>

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the first day of the first applicable pay period—

<< 5 USCA § 5542 NOTE >>

<< 5 USCA § 5545a nt >>

(1) which begins on or after the 90th day following the date of the enactment of this Act; and

<< 5 USCA § 5542 NOTE >>

<< 5 USCA § 5545a nt >>

(2) on which date all regulations necessary to carry out such amendments are (in the judgment of the Director of the Office of Personnel Management and the Secretary of State) in effect.

SEC. 2317. NONOVERTIME DIFFERENTIAL PAY.

Title 5 of the United States Code is amended—

<< 5 USCA § 5544 >>

(1) in section 5544(a), by inserting after the fourth sentence the following new sentence: "For employees serving outside the United States in areas where Sunday is a routine workday and another day of the week is officially recognized as the day of

rest and worship, the Secretary of State may designate the officially recognized day of rest and worship as the day with respect to which the preceding sentence shall apply instead of Sunday."; and

<< 5 USCA § 5546 >>

(2) at the end of section 5546(a), by adding the following new sentence: "For employees serving outside the United States in areas where Sunday is a routine workday and another day of the week is officially recognized as the day of rest and worship, the Secretary of State may designate the officially recognized day of rest and worship as the day with respect to which the preceding sentence shall apply instead of Sunday.".

<< 22 USCA § 3922a NOTE >>

SEC. 2318. REPORT CONCERNING MINORITIES AND THE FOREIGN SERVICE.

The Secretary of State shall during each of calendar years 1998 and 1999 submit a report to the Congress concerning minorities and the Foreign Service officer corps. In addition to such other information as is relevant to this issue, the report shall include the following data for the last preceding examination and promotion cycles for which such information is available (reported in terms of real numbers and percentages and not as ratios):

<< 22 USCA § 3922a NOTE >>

(1) The numbers and percentages of all minorities taking the written Foreign Service examination.

<< 22 USCA § 3922a NOTE >>

(2) The numbers and percentages of all minorities successfully completing and passing the written Foreign Service examination.

<< 22 USCA § 3922a NOTE >>

(3) The numbers and percentages of all minorities successfully completing and passing the oral Foreign Service examination.

<< 22 USCA § 3922a NOTE >>

(4) The numbers and percentages of all minorities entering the junior officers class of the Foreign Service.

<< 22 USCA § 3922a NOTE >>

(5) The numbers and percentages of all minority Foreign Service officers at each grade.

<< 22 USCA § 3922a NOTE >>

(6) The numbers of and percentages of minorities promoted at each grade of the Foreign Service officer corps.

TITLE XXIV—UNITED STATES INFORMATIONAL, EDUCATIONAL, AND CULTURAL PROGRAMS

CHAPTER 1—AUTHORIZATION OF APPROPRIATIONS

SEC. 2401. INTERNATIONAL INFORMATION ACTIVITIES AND EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS.

The following amounts are authorized to be appropriated to carry out international information activities and educational and cultural exchange programs under the United States Information and Educational Exchange Act of 1948, the Mutual Educational and Cultural Exchange Act of 1961, Reorganization Plan Number 2 of 1977, the United States International Broadcasting Act of 1994, the Radio Broadcasting to Cuba Act, the Television Broadcasting to Cuba Act, the Board for International Broadcasting

Act, the North/South Center Act of 1991, and the National Endowment for Democracy Act, and to carry out other authorities in law consistent with such purposes:

(1) INTERNATIONAL INFORMATION PROGRAMS.—For "International Information Programs", $427,097,000 for the fiscal year 1998 and $455,246,000 for the fiscal year 1999.

(2) TECHNOLOGY FUND.—For the "Technology Fund" for the United States Information Agency, $5,050,000 for the fiscal year 1998 and $5,050,000 for the fiscal year 1999.

(3) EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS.—

(A) FULBRIGHT ACADEMIC EXCHANGE PROGRAMS.—

(i) FULBRIGHT ACADEMIC EXCHANGE PROGRAMS.—There are authorized to be appropriated for the "Fulbright Academic Exchange Programs" (other than programs described in subparagraph (B)), $99,236,000 for the fiscal year 1998 and $100,000,000 for the fiscal year 1999.

(ii) VIETNAM FULBRIGHT ACADEMIC EXCHANGE PROGRAMS.—Of the amounts authorized to be appropriated under clause (i), $5,000,000 for the fiscal year 1998 and $5,000,000 for the fiscal year 1999 are authorized to be available for the Vietnam scholarship program established by section 229 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138).

(B) OTHER EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS.—

(i) IN GENERAL.—There are authorized to be appropriated for other educational and cultural exchange programs authorized by law, $100,764,000 for the fiscal year 1998 and $102,500,000 for the fiscal year 1999.

(ii) SOUTH PACIFIC EXCHANGES.—Of the amounts authorized to be appropriated under clause (i), $500,000 for the fiscal year 1998 and $500,000 for the fiscal year 1999 are authorized to be available for "South Pacific Exchanges".

(iii) EAST TIMORESE SCHOLARSHIPS.—Of the amounts authorized to be appropriated under clause (i), $500,000 for the fiscal year 1998 and $500,000 for the fiscal year 1999 are authorized to be available for "East Timorese Scholarships".

(iv) TIBETAN EXCHANGES.—Of the amounts authorized to be appropriated under clause (i), $500,000 for the fiscal year 1998 and $500,000 for the fiscal year 1999 are authorized to be available for "Educational and Cultural Exchanges with Tibet" under section 236 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236).

(4) INTERNATIONAL BROADCASTING ACTIVITIES.—

(A) AUTHORIZATION OF APPROPRIATIONS.—For "International Broadcasting Activities", $340,315,000 for the fiscal year 1998, and $340,365,000 for the fiscal year 1999.

(B) ALLOCATION.—Of the amounts authorized to be appropriated under subparagraph (A), the Director of the United States Information Agency and the Broadcasting Board of Governors shall seek to ensure that the amounts made available for broadcasting to nations whose people do not fully enjoy freedom of expression do not decline in proportion to the amounts made available for broadcasting to other nations.

(5) RADIO CONSTRUCTION.—For "Radio Construction", $40,000,000 for the fiscal year 1998, and $13,245,000 for the fiscal year 1999.

(6) RADIO FREE ASIA.—For "Radio Free Asia", $24,100,000 for the fiscal year 1998 and $22,000,000 for the fiscal year 1999, and an additional $8,000,000 in fiscal year 1998 for one-time capital costs.

(7) BROADCASTING TO CUBA.—For "Broadcasting to Cuba", $22,095,000 for the fiscal year 1998 and $22,095,000 for the fiscal year 1999.

(8) CENTER FOR CULTURAL AND TECHNICAL INTERCHANGE BETWEEN EAST AND WEST. For the "Center for Cultural and Technical Interchange between East and West", not more than $12,000,000 for the fiscal year 1998 and not more than $12,500,000 for the fiscal year 1999.

(9) NATIONAL ENDOWMENT FOR DEMOCRACY.—For the "National Endowment for Democracy", $31,000,000 for the fiscal year 1998 and $31,000,000 for the fiscal year 1999.

(10) CENTER FOR CULTURAL AND TECHNICAL INTERCHANGE BETWEEN NORTH AND SOUTH.—For "Center for Cultural and Technical Interchange between North and South" not more than $1,500,000 for the fiscal year 1998 and not more than $1,750,000 for the fiscal year 1999.

CHAPTER 2—AUTHORITIES AND ACTIVITIES

<< 22 USCA § 4416 >>

SEC. 2411. RETENTION OF INTEREST.

Notwithstanding any other provision of law, with the approval of the National Endowment for Democracy, grant funds made available by the National Endowment for Democracy may be deposited in interest-bearing accounts pending disbursement, and any interest which accrues may be retained by the grantee without returning such interest to the Treasury of the United States and interest earned may be obligated and expended for the purposes for which the grant was made without further appropriation.

<< 22 USCA § 1475e >>

SEC. 2412. USE OF SELECTED PROGRAM FEES.

Section 810 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1475e) is amended to read as follows:

"USE OF ENGLISH–TEACHING PROGRAM FEES

"SEC. 810. (a) IN GENERAL.—Notwithstanding section 3302 of title 31, United States Code, or any other law or limitation of authority, fees and receipts described in subsection (b) are authorized to be credited each fiscal year for authorized purposes to the appropriate appropriations of the United States Information Agency to such extent as may be provided in advance in appropriations acts.

"(b) FEES AND RECEIPTS DESCRIBED.—The fees and receipts described in this subsection are fees and payments received by or for the use of the United States Information Agency from or in connection with—

"(1) English-teaching and library services,

"(2) educational advising and counseling,

"(3) Exchange Visitor Program Services,

"(4) advertising and business ventures of the Voice of America and the International Broadcasting Bureau,

"(5) cooperating international organizations, and

"(6) Agency-produced publications,

"(7) an amount not to exceed $100,000 of the payments from motion picture and television programs produced or conducted by or on behalf of the Agency under the authority of this Act or the Mutual Education and Cultural Exchange Act of 1961.".

<< 22 USCA § 2452 NOTE >>

SEC. 2413. MUSKIE FELLOWSHIP PROGRAM.

<< 22 USCA § 2452 NOTE >>

(a) GUIDELINES.—Section 227(c)(5) of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 2452 note) is amended by inserting "journalism and communications, education administration, public policy, library and information science," after "business administration," each of the two places it appears.

<< 22 USCA § 2452 NOTE >>

(b) REDESIGNATION OF SOVIET UNION.—Section 227 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 2452 note) is amended—

<< 22 USCA § 2452 NOTE >>

(1) in subsections (a), (b), and (c)(5), by striking "Soviet Union" each place it appears and inserting "independent states of the former Soviet Union";

<< 22 USCA § 2452 NOTE >>

(2) in subsection (c)(11), by striking "Soviet republics" and inserting "independent states of the former Soviet Union"; and

<< 22 USCA § 2452 NOTE >>

(3) in the section heading, by inserting "INDEPENDENT STATES OF THE FORMER" after "FROM THE".

<< 22 USCA § 2460 >>

## SEC. 2414. WORKING GROUP ON UNITED STATES GOVERNMENT–SPONSORED INTERNATIONAL EXCHANGES AND TRAINING.

Section 112 of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2460) is amended by adding at the end the following new subsection:

"(g) WORKING GROUP ON UNITED STATES GOVERNMENT SPONSORED INTERNATIONAL EXCHANGES AND TRAINING.—(1) In order to carry out the purposes of subsection (f) and to improve the coordination, efficiency, and effectiveness of United States Government-sponsored international exchanges and training, there is established within the United States Information Agency a senior-level interagency working group to be known as the Working Group on United States Government–Sponsored International Exchanges and Training (in this section referred to as the 'Working Group').

"(2) For purposes of this subsection, the term 'Government-sponsored international exchanges and training' means the movement of people between countries to promote the sharing of ideas, to develop skills, and to foster mutual understanding and cooperation, financed wholly or in part, directly or indirectly, with United States Government funds.

"(3) The Working Group shall be composed as follows:

"(A) The Associate Director for Educational and Cultural Affairs of the United States Information Agency, who shall act as Chair.

"(B) A senior representative of the Department of State, who shall be designated by the Secretary of State.

"(C) A senior representative of the Department of Defense, who shall be designated by the Secretary of Defense.

"(D) A senior representative of the Department of Education, who shall be designated by the Secretary of Education.

"(E) A senior representative of the Department of Justice, who shall be designated by the Attorney General.

"(F) A senior representative of the Agency for International Development, who shall be designated by the Administrator of the Agency.

"(G) Senior representatives of such other departments and agencies as the Chair determines to be appropriate.

"(4) Representatives of the National Security Adviser and the Director of the Office of Management and Budget may participate in the Working Group at the discretion of the Adviser and the Director, respectively.

"(5) The Working Group shall be supported by an interagency staff office established in the Bureau of Educational and Cultural Affairs of the United States Information Agency.

"(6) The Working Group shall have the following purposes and responsibilities:

"(A) To collect, analyze, and report data provided by all United States Government departments and agencies conducting international exchanges and training programs.

"(B) To promote greater understanding and cooperation among concerned United States Government departments and agencies of common issues and challenges in conducting international exchanges and training programs, including through the establishment of a clearinghouse for information on international exchange and training activities in the governmental and nongovernmental sectors.

"(C) In order to achieve the most efficient and cost-effective use of Federal resources, to identify administrative and programmatic duplication and overlap of activities by the various United States Government departments and agencies involved in Government sponsored international exchange and training programs, to identify how each Government-sponsored international exchange and training program promotes United States foreign policy, and to report thereon.

"(D)(i) Not later than 1 year after the date of the enactment of the Foreign Relations Authorization Act, Fiscal Years 1998 and 1999, the Working Group shall develop a coordinated and cost-effective strategy for all United States Government-sponsored

international exchange and training programs, including an action plan with the objective of achieving a minimum of 10 percent cost savings through greater efficiency, the consolidation of programs, or the elimination of duplication, or any combination thereof.

"(ii) Not later than 1 year after the date of enactment of the Foreign Relations Authorization Act, Fiscal Years 1998 and 1999, the Working Group shall submit a report to the appropriate congressional committees setting forth the strategy and action plan required by clause (i).

"(iii) Each year thereafter the Working Group shall assess the strategy and plan required by clause (i).

"(E) Not later than 2 years after the date of the enactment of the Foreign Relations Authorization Act, Fiscal Years 1998 and 1999, to develop recommendations on common performance measures for all United States Government-sponsored international exchange and training programs, and to issue a report.

"(F) To conduct a survey of private sector international exchange activities and develop strategies for expanding public and private partnerships in, and leveraging private sector support for, United States Government-sponsored international exchange and training activities.

"(G) Not later than 6 months after the date of the enactment of the Foreign Relations Authorization Act, Fiscal Years 1998 and 1999, to report on the feasibility and advisability of transferring funds and program management for the ATLAS or the Mandela Fellows programs, or both, in South Africa from the Agency for International Development to the United States Information Agency. The report shall include an assessment of the capabilities of the South African Fulbright Commission to manage such programs and the cost effects of consolidating such programs under one entity.

"(7) All reports prepared by the Working Group shall be submitted to the President, through the Director of the United States Information Agency.

"(8) The Working Group shall meet at least on a quarterly basis.

"(9) All decisions of the Working Group shall be by majority vote of the members present and voting.

"(10) The members of the Working Group shall serve without additional compensation for their service on the Working Group. Any expenses incurred by a member of the Working Group in connection with service on the Working Group shall be compensated by that member's department or agency.

"(11) With respect to any report issued under paragraph (6), a member may submit dissenting views to be submitted as part of the report of the Working Group.".

<< 22 USCA § 2452 NOTE >>

SEC. 2415. EDUCATIONAL AND CULTURAL EXCHANGES AND SCHOLARSHIPS FOR TIBETANS AND BURMESE.

<< 22 USCA § 2452 NOTE >>

 (a) IN GENERAL.—Section 103(b)(1) of the Human Rights, Refugee, and Other Foreign Relations Provisions Act of 1996 (Public Law 104–319; 22 U.S.C. 2151 note) is amended—

<< 22 USCA § 2452 NOTE >>

 (1) by striking "for fiscal year 1997" and inserting "for the fiscal year 1999"; and

<< 22 USCA § 2452 NOTE >>

 (2) by inserting after "who are outside Tibet" the following: "(if practicable, including individuals active in the preservation of Tibet's unique culture, religion, and language)".

<< 22 USCA § 2452 NOTE >>

 (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on October 1, 1998.

SEC. 2416. SURROGATE BROADCASTING STUDY.

Not later than 6 months after the date of enactment of this Act, the Broadcasting Board of Governors, acting through the International Broadcasting Bureau, should conduct and complete a study of the appropriateness, feasibility, and projected costs of providing surrogate broadcasting service to Africa and transmit the results of the study to the appropriate congressional committees.

SEC. 2417. RADIO BROADCASTING TO IRAN IN THE FARSI LANGUAGE.

(a) RADIO FREE IRAN.—Not more than $2,000,000 of the funds made available under section 2401(a)(4) of this division for each of the fiscal years 1998 and 1999 for grants to RFE/RL, Incorporated, shall be available only for surrogate radio broadcasting by RFE/RL, Incorporated, to the Iranian people in the Farsi language, such broadcasts to be designated as "Radio Free Iran".

(b) REPORT TO CONGRESS.—Not later than 60 days after the date of enactment of this Act, the Broadcasting Board of Governors of the United States Information Agency shall submit a detailed report to Congress describing the costs, implementation, and plans for creation of the surrogate broadcasting service described in subsection (a).

(c) AVAILABILITY OF FUNDS.—None of the funds made available under subsection (a) may be made available report required under subsection (b).

<< 22 USCA § 1474 NOTE >>

SEC. 2418. AUTHORITY TO ADMINISTER SUMMER TRAVEL AND WORK PROGRAMS.

The Director of the United States Information Agency is authorized to administer summer travel and work programs without regard to preplacement requirements.

<< 22 USCA § 1476 >>

SEC. 2419. PERMANENT ADMINISTRATIVE AUTHORITIES REGARDING APPROPRIATIONS.

Section 701(f) of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1476(f)) is amended by striking paragraph (4).

<< 22 USCA § 6202 NOTE >>

SEC. 2420. VOICE OF AMERICA BROADCASTS.

<< 22 USCA § 6202 NOTE >>

(a) IN GENERAL.—The Voice of America shall devote programming each day to broadcasting information on the individual States of the United States. The broadcasts shall include—

<< 22 USCA § 6202 NOTE >>

(1) information on the products, tourism, and cultural and educational facilities of each State;

<< 22 USCA § 6202 NOTE >>

(2) information on the potential for trade with each State; and

<< 22 USCA § 6202 NOTE >>

(3) discussions with State officials with respect to the matters described in paragraphs (1) and (2).

<< 22 USCA § 6202 NOTE >>

(b) REPORT.—Not later than one year after the date of enactment of this Act, the Broadcasting Board of Governors of the United States Information Agency shall submit a report to Congress detailing the actions that have been taken to carry out subsection (a).

<< 22 USCA § 6202 NOTE >>

(c) STATE DEFINED.—In this section, the term "State" means any of the several States of the United States, the District of Columbia, or any commonwealth or territory of the United States.

TITLE XXV—INTERNATIONAL ORGANIZATIONS OTHER THAN UNITED NATIONS

SEC. 2501. INTERNATIONAL CONFERENCES AND CONTINGENCIES.

There are authorized to be appropriated for "International Conferences and Contingencies", $6,537,000 for the fiscal year 1998 and $16,223,000 for the fiscal year 1999 for the Department of State to carry out the authorities, functions, duties, and responsibilities in the conduct of the foreign affairs of the United States with respect to international conferences and contingencies and to carry out other authorities in law consistent with such purposes.

<< 22 USCA § 262–1 >>

SEC. 2502. RESTRICTION RELATING TO UNITED STATES ACCESSION TO ANY NEW INTERNATIONAL CRIMINAL TRIBUNAL.

<< 22 USCA § 262–1 >>

(a) PROHIBITION.—The United States shall not become a party to any new international criminal tribunal, nor give legal effect to the jurisdiction of such a tribunal over any matter described in subsection (b), except pursuant to—

<< 22 USCA § 262–1 >>

(1) a treaty made under Article II, section 2, clause 2 of the Constitution of the United States on or after the date of enactment of this Act; or

<< 22 USCA § 262–1 >>

(2) any statute enacted by Congress on or after the date of enactment of this Act.

<< 22 USCA § 262–1 >>

(b) JURISDICTION DESCRIBED.—The jurisdiction described in this section is jurisdiction over—

<< 22 USCA § 262–1 >>

(1) persons found, property located, or acts or omissions committed, within the territory of the United States; or

<< 22 USCA § 262–1 >>

(2) nationals of the United States, wherever found.

<< 22 USCA § 262–1 >>

(c) STATUTORY CONSTRUCTION.—Nothing in this section precludes sharing information, expertise, or other forms of assistance with such tribunal.

<< 22 USCA § 262–1 >>

(d) DEFINITION.—The term "new international criminal tribunal" means any permanent international criminal tribunal established on or after the date of enactment of this Act and does not include—

<< 22 USCA § 262–1 >>

(1) the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law in the Territory of the Former Yugoslavia, as established by United Nations Security Council Resolution 827 of May 25, 1993; or

<< 22 USCA § 262–1 >>

(2) the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, as established by United Nations Security Council Resolution 955 of November 8, 1994.

SEC. 2503. UNITED STATES MEMBERSHIP IN THE BUREAU OF THE INTERPARLIAMENTARY UNION.

<< 22 USCA § 276 NOTE >>

(a) INTERPARLIAMENTARY UNION LIMITATION.—Unless the Secretary of State certifies to Congress that the United States will be assessed not more than $500,000 for its annual contribution to the Bureau of the Interparliamentary Union during fiscal year 1999, then effective October 1, 1999, the authority for further participation by the United States in the Bureau shall terminate in accordance with subsection (d).

<< 22 USCA § 276 >>

(b) ELIMINATION OF AUTHORITY TO PAY EXPENSES OF THE AMERICAN GROUP.—Section 1 of the Act entitled "An Act to authorize participation by the United States in the Interparliamentary Union", approved June 28, 1935 (22 U.S.C. 276) is amended—

<< 22 USCA § 276 >>

(1) in the first sentence—
  (A) by striking "fiscal year" and all that follows through "(1) for" and inserting "fiscal year for";
  (B) by striking "; and"; and
  (C) by striking paragraph (2); and

<< 22 USCA § 276 >>

(2) by striking the second sentence.

<< 22 USCA § 276 NOTE >>

(c) ELIMINATION OF PERMANENT APPROPRIATION.—Section 303 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1988 (as contained in section 101(a) of the Continuing Appropriations Act, 1988 (Public Law 100–202; 22 U.S.C. 276 note)) is amended—

<< 22 USCA § 276 NOTE >>

(1) by striking "$440,000" and inserting "$350,000"; and

<< 22 USCA § 276 NOTE >>

(2) by striking "paragraph (2) of the first section of Public Law 74–170,".

<< 22 USCA § 276 NOTE >>

<< 22 USCA § 276 >>

<< 22 USCA § 276a >>

<< 22 USCA § 276a–1 >>

<< 22 USCA § 276a–2 >>

<< 22 USCA § 276a–3 >>

<< 22 USCA § 276a–4 >>

(d) CONDITIONAL TERMINATION OF AUTHORITY.—Unless Congress receives the certification described in subsection (a) before October 1, 1999, effective on that date the Act entitled "An Act to authorize participation by the United States in the Interparliamentary Union", approved June 28, 1935 (22 U.S.C. 276–276a–4) is repealed.

<< 22 USCA § 276 NOTE >>

(e) TRANSFER OF FUNDS TO THE TREASURY.—Unobligated balances of appropriations made under section 303 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act 1988 (as contained in section 101(a) of the Continuing Appropriations Act, 1988; Public Law 100–202) that are available as of the day before the date of enactment of this Act shall be transferred on such date to the general fund of the Treasury of the United States.

SEC. 2504. SERVICE IN INTERNATIONAL ORGANIZATIONS.

<< 5 USCA § 3582 >>

(a) IN GENERAL.—Section 3582(b) of title 5, United States Code, is amended by striking all after the first sentence and inserting the following: "On reemployment, an employee entitled to the benefits of subsection (a) is entitled to the rate of basic pay to which the employee would have been entitled had the employee remained in the civil service. On reemployment, the agency shall restore the sick leave account of the employee, by credit or charge, to its status at the time of transfer. The period of separation caused by the employment of the employee with the international organization and the period necessary to effect reemployment are deemed creditable service for all appropriate civil service employment purposes. This subsection does not apply to a congressional employee.".

<< 5 USCA § 3582 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to transfers that take effect on or after the date of enactment of this Act.

<< 5 USCA § 5707 NOTE >>

SEC. 2505. REPORTS REGARDING FOREIGN TRAVEL.

<< 5 USCA § 5707 NOTE >>

(a) PROHIBITION.—Except as provided in subsection (e), none of the funds authorized to be appropriated by this division for fiscal year 1999 may be used to pay for the expenses of foreign travel by an officer or employee of an Executive branch agency to attend an international conference, or for the routine services that a United States diplomatic mission or consular post provides in support of foreign travel by such an officer or employee to attend an international conference, unless that officer or employee

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

has submitted a preliminary report with respect to that foreign travel in accordance with subsection (b), and has not previously failed to submit a final report with respect to foreign travel to attend an international conference required by subsection (c).

<< 5 USCA § 5707 NOTE >>

 (b) PRELIMINARY REPORTS.—A preliminary report referred to in subsection (a) is a report by an officer or employee of an Executive branch agency with respect to proposed foreign travel to attend an international conference, submitted to the Director prior to commencement of the travel, setting forth—

<< 5 USCA § 5707 NOTE >>

 (1) the name and employing agency of the officer or employee;

<< 5 USCA § 5707 NOTE >>

 (2) the name of the official who authorized the travel; and

<< 5 USCA § 5707 NOTE >>

 (3) the purpose and duration of the travel.

<< 5 USCA § 5707 NOTE >>

 (c) FINAL REPORTS.—A final report referred to in subsection (a) is a report by an officer or employee of an Executive branch agency with respect to foreign travel to attend an international conference, submitted to the Director not later than 30 days after the conclusion of the travel—

<< 5 USCA § 5707 NOTE >>

 (1) setting forth the actual duration and cost of the travel; and

<< 5 USCA § 5707 NOTE >>

 (2) updating any other information included in the preliminary report.

<< 5 USCA § 5707 NOTE >>

 (d) REPORT TO CONGRESS.—The Director shall submit a report not later than April 1, 1999, to the Committees on Foreign Relations and Appropriations of the Senate and the Committees on International Relations and Appropriations of the House of Representatives, setting forth with respect to each international conference for which reports described in subsection (c) were required to be submitted to the Director during the preceding six months—

<< 5 USCA § 5707 NOTE >>

 (1) the names and employing agencies of all officers and employees of Executive branch agencies who attended the international conference;

<< 5 USCA § 5707 NOTE >>

 (2) the names of all officials who authorized travel to the international conference, and the total number of officers and employees who were authorized to travel to the conference by each such official; and

<< 5 USCA § 5707 NOTE >>

 (3) the total cost of travel by officers and employees of Executive branch agencies to the international conference.

<< 5 USCA § 5707 NOTE >>

(e) EXCEPTIONS.—This section shall not apply to travel by—

<< 5 USCA § 5707 NOTE >>

  (1) the President or the Vice President;

<< 5 USCA § 5707 NOTE >>

  (2) any officer or employee who is carrying out an intelligence or intelligence-related activity, who is performing a protective function, or who is engaged in a sensitive diplomatic mission; or

<< 5 USCA § 5707 NOTE >>

  (3) any officer or employee who travels prior to January 1, 1999.

<< 5 USCA § 5707 NOTE >>

(f) DEFINITIONS.—In this section:

<< 5 USCA § 5707 NOTE >>

  (1) DIRECTOR.—The term "Director" means the Director of the Office of International Conferences of the Department of State.

<< 5 USCA § 5707 NOTE >>

  (2) EXECUTIVE BRANCH AGENCY.—The terms "Executive branch agency" and "Executive branch agencies" mean—
    (A) an entity or entities, other than the General Accounting Office, defined in section 105 of title 5, United States Code; and
    (B) the Executive Office of the President (except as provided in subsection (e)).

<< 5 USCA § 5707 NOTE >>

  (3) INTERNATIONAL CONFERENCE.—The term "international conference" means any meeting held under the auspices of an international organization or foreign government, at which representatives of more than two foreign governments are expected to be in attendance, and to which United States Executive branch agencies will send a total of ten or more representatives.

<< 5 USCA § 5707 NOTE >>

(g) REPORT.—Not later than 180 days after the date of enactment of this Act, and annually thereafter, the President shall submit to the appropriate congressional committees a report describing—

<< 5 USCA § 5707 NOTE >>

  (1) the total Federal expenditure of all official international travel in each Executive branch agency during the previous fiscal year; and

<< 5 USCA § 5707 NOTE >>

  (2) the total number of individuals in each agency who engaged in such travel.

TITLE XXVI—UNITED STATES ARMS CONTROL AND DISARMAMENT AGENCY

SEC. 2601. AUTHORIZATION OF APPROPRIATIONS.

  There are authorized to be appropriated to carry out the purposes of the Arms Control and Disarmament Act $41,500,000 for the fiscal year 1999.

<< 22 USCA § 2573 >>

SEC. 2602. STATUTORY CONSTRUCTION.

  Section 303 of the Arms Control and Disarmament Act (22 U.S.C. 2573), as redesignated by section 2223 of this division, is amended by adding at the end the following new subsection:

  "(c) STATUTORY CONSTRUCTION.—Nothing contained in this chapter shall be construed to authorize any policy or action by any Government agency which would interfere with, restrict, or prohibit the acquisition, possession, or use of firearms by an individual for the lawful purpose of personal defense, sport, recreation, education, or training.".

<< 22 USCA § 1928 NOTE >>

TITLE XXVII—EUROPEAN SECURITY ACT OF 1998

<< 22 USCA § 1928 NOTE >>

SEC. 2701. SHORT TITLE.

  This title may be cited as the "European Security Act of 1998".

<< 22 USCA § 1928 NOTE >>

SEC. 2702. STATEMENT OF POLICY.

<< 22 USCA § 1928 NOTE >>

  (a) POLICY WITH RESPECT TO NATO ENLARGEMENT.—Congress urges the President to outline a clear and complete strategic rationale for the enlargement of the North Atlantic Treaty Organization (NATO), and declares that—

<< 22 USCA § 1928 NOTE >>

  (1) Poland, Hungary, and the Czech Republic should not be the last emerging democracies in Central and Eastern Europe invited to join NATO;

<< 22 USCA § 1928 NOTE >>

  (2) the United States should ensure that NATO continues a process whereby all other emerging democracies in Central and Eastern Europe that wish to join NATO will be considered for membership in NATO as soon as they meet the criteria for such membership;

<< 22 USCA § 1928 NOTE >>

  (3) the United States should ensure that no limitations are placed on the numbers of NATO troops or types of equipment, including tactical nuclear weapons, to be deployed on the territory of new member states;

<< 22 USCA § 1928 NOTE >>

  (4) the United States should reject all efforts to condition NATO decisions on review or approval by the United Nations Security Council;

<< 22 USCA § 1928 NOTE >>

(5) the United States should clearly delineate those NATO deliberations, including but not limited to discussions on arms control, further Alliance enlargement, procurement matters, and strategic doctrine, that are not subject to review or discussion in the NATO–Russia Permanent Joint Council;

<< 22 USCA § 1928 NOTE >>

(6) the United States should work to ensure that countries invited to join the Alliance are provided an immediate seat in NATO discussions; and

<< 22 USCA § 1928 NOTE >>

(7) the United States already pays more than a proportionate share of the costs of the common defense of Europe and should obtain, in advance, agreement on an equitable distribution of the cost of NATO enlargement to ensure that the United States does not continue to bear a disproportionate burden.

<< 22 USCA § 1928 NOTE >>

(b) POLICY WITH RESPECT TO NEGOTIATIONS WITH RUSSIA.—

<< 22 USCA § 1928 NOTE >>

(1) IMPLEMENTATION.—NATO enlargement should be carried out in such a manner as to underscore the Alliance's defensive nature and demonstrate to Russia that NATO enlargement will enhance the security of all countries in Europe, including Russia. Accordingly, the United States and its NATO allies should make this intention clear in negotiations with Russia, including negotiations regarding adaptation of the Conventional Armed Forces in Europe (CFE) Treaty of November 19, 1990.

<< 22 USCA § 1928 NOTE >>

(2) LIMITATIONS ON COMMITMENTS TO RUSSIA.—In seeking to demonstrate to Russia NATO's defensive and security-enhancing intentions, it is essential that neither fundamental United States security interests in Europe nor the effectiveness and flexibility of NATO as a defensive alliance be jeopardized. In particular, no commitments should be made to Russia that would have the effect of—

(A) extending rights or imposing responsibilities on new NATO members different from those applicable to current NATO members, including rights or responsibilities with respect to the deployment of nuclear weapons and the stationing of troops and equipment from other NATO members;

(B) limiting the ability of NATO to defend the territory of new NATO members by, for example, restricting the construction of defense infrastructure or limiting the ability of NATO to deploy necessary reinforcements;

(C) providing any international organization, or any country that is not a member of NATO, with authority to delay, veto, or otherwise impede deliberations and decisions of the North Atlantic Council or the implementation of such decisions, including deliberations and decisions with respect to the deployment of NATO forces or the admission of additional members to NATO;

(D) impeding the development of enhanced relations between NATO and other European countries that do not belong to the Alliance;

(E) establishing a nuclear weapons-free zone in Central or Eastern Europe;

(F) requiring NATO to subsidize Russian arms sales, service, or support to the militaries of those former Warsaw Pact countries invited to join the Alliance; or

(G) legitimizing Russian efforts to link concessions in arms control negotiations to NATO enlargement.

<< 22 USCA § 1928 NOTE >>

(3) COMMITMENTS FROM RUSSIA.—In order to enhance security and stability in Europe, the United States should seek commitments from Russia—

 (A) to demarcate and respect all its borders with neighboring states;

 (B) to achieve the immediate and complete withdrawal of any armed forces and military equipment under the control of Russia that are deployed on the territories of the independent states of the former Soviet Union without the full and complete agreement of those states;

 (C) to station its armed forces on the territory of other states only with the full and complete agreement of that state and in strict accordance with international law; and

 (D) to take steps to reduce further its nuclear and conventional forces in Kaliningrad.

<< 22 USCA § 1928 NOTE >>

 (4) CONSULTATIONS.—As negotiations on adaptation of the Treaty on Conventional Armed Forces in Europe proceed, the United States should engage in close and continuous consultations not only with its NATO allies, but also with the emerging democracies of Central and Eastern Europe, Ukraine, and the South Caucasus.

<< 22 USCA § 1928 NOTE >>

(c) POLICY WITH RESPECT TO BALLISTIC MISSILE DEFENSE COOPERATION.—

<< 22 USCA § 1928 NOTE >>

 (1) IN GENERAL.—As the United States proceeds with efforts to develop defenses against ballistic missile attack, it should seek to foster a climate of cooperation with Russia on matters related to missile defense. In particular, the United States and its NATO allies should seek to cooperate with Russia in such areas as early warning.

<< 22 USCA § 1928 NOTE >>

 (2) DISCUSSIONS WITH NATO ALLIES.—The United States should initiate discussions with its NATO allies for the purpose of examining the feasibility of deploying a ballistic missile defense capable of protecting NATO's southern and eastern flanks from a limited ballistic missile attack.

<< 22 USCA § 1928 NOTE >>

 (3) CONSTITUTIONAL PREROGATIVES.—Even as the Congress seeks to promote ballistic missile defense cooperation with Russia, it must insist on its constitutional prerogatives regarding consideration of arms control agreements with Russia that bear on ballistic missile defense.

<< 22 USCA § 1928 NOTE >>

SEC. 2703. AUTHORITIES RELATING TO NATO ENLARGEMENT.

<< 22 USCA § 1928 NOTE >>

(a) POLICY OF SECTION.—This section is enacted in order to implement the policy set forth in section 2702(a).

<< 22 USCA § 1928 NOTE >>

(b) DESIGNATION OF ADDITIONAL COUNTRIES ELIGIBLE FOR NATO ENLARGEMENT ASSISTANCE.—

<< 22 USCA § 1928 NOTE >>

(1) DESIGNATION OF ADDITIONAL COUNTRIES.—Romania, Estonia, Latvia, Lithuania, and Bulgaria are each designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994 (22 U.S.C. 1928 note) and shall be deemed to have been so designated pursuant to section 203(d)(1) of such Act.

<< 22 USCA § 1928 NOTE >>

(2) RULE OF CONSTRUCTION.—The designation of countries pursuant to paragraph (1) as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994—

(A) is in addition to the designation of other countries by law or pursuant to section 203(d)(2) of such Act as eligible to receive assistance under the program established under section 203(a) of such Act; and

(B) shall not preclude the designation by the President of other emerging democracies in Central and Eastern Europe pursuant to section 203(d)(2) of such Act as eligible to receive assistance under the program established under section 203(a) of such Act.

<< 22 USCA § 1928 NOTE >>

(3) SENSE OF CONGRESS.—It is the sense of Congress that Romania, Estonia, Latvia, Lithuania, and Bulgaria—

(A) are to be commended for their progress toward political and economic reform and meeting the guidelines for prospective NATO members;

(B) would make an outstanding contribution to furthering the goals of NATO and enhancing stability, freedom, and peace in Europe should they become NATO members; and

(C) upon complete satisfaction of all relevant criteria should be invited to become full NATO members at the earliest possible date.

<< 22 USCA § 1928 NOTE >>

(c) REGIONAL AIRSPACE INITIATIVE AND PARTNERSHIP FOR PEACE INFORMATION MANAGEMENT SYSTEM.—

<< 22 USCA § 1928 NOTE >>

(1) IN GENERAL.—Funds described in paragraph (2) are authorized to be made available to support the implementation of the Regional Airspace Initiative and the Partnership for Peace Information Management System, including—

(A) the procurement of items in support of these programs; and

(B) the transfer of such items to countries participating in these programs.

<< 22 USCA § 1928 NOTE >>

(2) FUNDS DESCRIBED.—Funds described in this paragraph are funds that are available—

(A) during any fiscal year under the NATO Participation Act of 1994 with respect to countries eligible for assistance under that Act; or

(B) during fiscal year 1998 under any Act to carry out the Warsaw Initiative.

<< 22 USCA § 1928 NOTE >>

(d) EXTENSION OF AUTHORITY REGARDING EXCESS DEFENSE ARTICLES.—Section 105 of Public Law 104–164 (110 Stat. 1427) is amended by striking "1996 and 1997" and inserting "1997, 1998, and 1999".

<< 22 USCA § 1928 NOTE >>

(e) CONFORMING AMENDMENTS TO THE NATO PARTICIPATION ACT OF 1994.—Section 203(c) of the NATO Participation Act of 1994 (22 U.S.C. 1928 note) is amended—

<< 22 USCA § 1928 NOTE >>

(1) in paragraph (1), by striking ", without regard to the restrictions" and all that follows through "section)";

<< 22 USCA § 1928 NOTE >>

(2) by striking paragraph (2);

<< 22 USCA § 1928 NOTE >>

(3) in paragraph (6), by striking "appropriated under the 'Nonproliferation and Disarmament Fund' account" and inserting "made available for the 'Nonproliferation and Disarmament Fund' "; and

<< 22 USCA § 1928 NOTE >>

(4) in paragraph (8)—
(A) by striking "any restrictions in sections 516 and 519" and inserting "section 516(e)";
(B) by striking "as amended,"; and
(C) by striking "paragraphs (1) and (2)" and inserting "paragraph (1)"; and

<< 22 USCA § 1928 NOTE >>

(5) by redesignating paragraphs (3) through (8) as paragraphs (2) through (7), respectively.

<< 22 USCA § 1928 NOTE >>

SEC. 2704. SENSE OF CONGRESS WITH RESPECT TO THE TREATY ON CONVENTIONAL ARMED FORCES IN EUROPE.

It is the sense of Congress that no revisions to the Treaty on Conventional Armed Forces in Europe will be approved for entry into force with respect to the United States that jeopardize fundamental United States security interests in Europe or the effectiveness and flexibility of NATO as a defensive alliance by—

<< 22 USCA § 1928 NOTE >>

(1) extending rights or imposing responsibilities on new NATO members different from those applicable to current NATO members, including rights or responsibilities with respect to the deployment of nuclear weapons and the stationing of troops and equipment from other NATO members;

<< 22 USCA § 1928 NOTE >>

(2) limiting the ability of NATO to defend the territory of new NATO members by, for example, restricting the construction of defense infrastructure or limiting the ability of NATO to deploy necessary reinforcements;

<< 22 USCA § 1928 NOTE >>

(3) providing any international organization, or any country that is not a member of NATO, with the authority to delay, veto, or otherwise impede deliberations and decisions of the North Atlantic Council or the implementation of such decisions, including deliberations and decisions with respect to the deployment of NATO forces or the admission of additional members to NATO; or

<< 22 USCA § 1928 NOTE >>

(4) impeding the development of enhanced relations between NATO and other European countries that do not belong to the Alliance.

<< 22 USCA § 1928 NOTE >>

SEC. 2705. RESTRICTIONS AND REQUIREMENTS RELATING TO BALLISTIC MISSILE DEFENSE.

<< 22 USCA § 1928 NOTE >>

(a) POLICY OF SECTION.—This section is enacted in order to implement the policy set forth in section 2702(c).

<< 22 USCA § 1928 NOTE >>

(b) RESTRICTION ON ENTRY INTO FORCE OF ABM/TMD DEMARCATION AGREEMENTS. An ABM/TMD demarcation agreement shall not be binding on the United States, and shall not enter into force with respect to the United States, unless, after the date of enactment of this Act, that agreement is specifically approved with the advice and consent of the United States Senate pursuant to Article II, section 2, clause 2 of the Constitution.

<< 22 USCA § 1928 NOTE >>

(c) SENSE OF CONGRESS WITH RESPECT TO DEMARCATION AGREEMENTS.—

<< 22 USCA § 1928 NOTE >>

(1) RELATIONSHIP TO MULTILATERALIZATION OF ABM TREATY.—It is the sense of Congress that no ABM/TMD demarcation agreement will be considered for advice and consent to ratification unless, consistent with the certification of the President pursuant to condition (9) of the resolution of ratification of the CFE Flank Document, the President submits for Senate advice and consent to ratification any agreement, arrangement, or understanding that would—

(A) add one or more countries as State Parties to the ABM Treaty, or otherwise convert the ABM Treaty from a bilateral treaty to a multilateral treaty; or

(B) change the geographic scope or coverage of the ABM Treaty, or otherwise modify the meaning of the term "national territory" as used in Article VI and Article IX of the ABM Treaty.

<< 22 USCA § 1928 NOTE >>

(2) PRESERVATION OF UNITED STATES THEATER BALLISTIC MISSILE DEFENSE POTENTIAL.—It is the sense of Congress that no ABM/TMD demarcation agreement that would reduce the capabilities of United States theater missile defense systems, or the numbers or deployment patterns of such systems, will be approved for entry into force with respect to the United States.

<< 22 USCA § 1928 NOTE >>

(d) REPORT ON COOPERATIVE PROJECTS WITH RUSSIA.—Not later than January 1, 1999, and January 1, 2000, the President shall submit to the Committees on International Relations, National Security, and Appropriations of the House of Representatives and the Committees on Foreign Relations, Armed Services, and Appropriations of the Senate a report on cooperative projects with Russia in the area of ballistic missile defense, including in the area of early warning. Each such report shall include the following:

<< 22 USCA § 1928 NOTE >>

(1) COOPERATIVE PROJECTS.—A description of all cooperative projects conducted in the area of early warning and ballistic missile defense during the preceding fiscal year and the fiscal year during which the report is submitted.

<< 22 USCA § 1928 NOTE >>

(2) FUNDING.—A description of the funding for such projects during the preceding fiscal year and the year during which the report is submitted and the proposed funding for such projects for the next fiscal year.

<< 22 USCA § 1928 NOTE >>

(3) STATUS OF DIALOGUE OR DISCUSSIONS.—A description of the status of any dialogue or discussions conducted during the preceding fiscal year between the United States and Russia aimed at exploring the potential for mutual accommodation of outstanding issues between the two nations on matters relating to ballistic missile defense and the ABM Treaty, including the possibility of developing a strategic relationship not based on mutual nuclear threats.

<< 22 USCA § 1928 NOTE >>

(e) DEFINITIONS.—In this section:

<< 22 USCA § 1928 NOTE >>

(1) ABM/TMD DEMARCATION AGREEMENT.—The term "ABM/TMD demarcation agreement" means any agreement that establishes a demarcation between theater ballistic missile defense systems and strategic antiballistic missile defense systems for purposes of the ABM Treaty.

<< 22 USCA § 1928 NOTE >>

(2) ABM TREATY.—The term "ABM Treaty" means the Treaty Between the United States of America and the Union of Soviet Socialist Republics on the Limitation of Anti–Ballistic Missile Systems, signed at Moscow on May 26, 1972 (23 UST 3435), and includes the Protocols to that Treaty, signed at Moscow on July 3, 1974 (27 UST 1645).

TITLE XXVIII—OTHER FOREIGN POLICY PROVISIONS

SEC. 2801. REPORTS ON CLAIMS BY UNITED STATES FIRMS AGAINST THE GOVERNMENT OF SAUDI ARABIA.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act and every 180 days thereafter, the Secretary of State, after consultation with the Secretary of Defense and the Secretary of Commerce, shall submit a report to the appropriate congressional committees on specific actions taken by the Department of State, the Department of Defense, and the Department of Commerce toward progress in resolving the commercial disputes between United States firms and the Government of Saudi Arabia that are described in the June 30, 1993, report by the Secretary of Defense pursuant to section 9140(c) of the Department of Defense Appropriations Act, 1993 (Public Law 102–396), including the additional claims noticed by the Department of Commerce on page 2 of that report.

(b) TERMINATION.—Subsection (a) shall cease to have effect on the earlier of—

(1) the date of submission of the third report under that subsection; or

(2) the date that the Secretary of State, after consultation with the Secretary of Defense and the Secretary of Commerce, certifies in writing to the appropriate congressional committees that the commercial disputes referred to in subsection (a) have been resolved satisfactorily.

SEC. 2802. REPORTS ON DETERMINATIONS UNDER TITLE IV OF THE LIBERTAD ACT.

(a) REPORTS REQUIRED.—Not later than 30 days after the date of the enactment of this Act and every 3 months thereafter during the period ending September 30, 1999, the Secretary of State shall submit to the appropriate congressional committees a report on the implementation of section 401 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (22 U.S.C. 6091). Each report shall include:

(1) an unclassified list, by economic sector, of the number of entities then under review pursuant to that section;

(2) an unclassified list of all entities and a classified list of all individuals that the Secretary of State has determined to be subject to that section;

(3) an unclassified list of all entities and a classified list of all individuals that the Secretary of State has determined are no longer subject to that section;

(4) an explanation of the status of the review underway for the cases referred to in paragraph (1); and

(5) an unclassified explanation of each determination of the Secretary of State under section 401(a) of that Act and each finding of the Secretary under section 401(c) of that Act—

(A) since the date of the enactment of this Act, in the case of the first report under this subsection; and

(B) in the preceding 3–month period, in the case of each subsequent report.

(b) PROTECTION OF IDENTITY OF CONCERNED ENTITIES.—In preparing the report under subsection (a), the names of entities shall not be identified under paragraph (1) or (4).

## SEC. 2803. REPORT ON COMPLIANCE WITH THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION.

(a) IN GENERAL.—Beginning 6 months after the date of the enactment of this Act and every 12 months thereafter during the period ending September 30, 1999, the Secretary of State shall submit a report to the appropriate congressional committees on the compliance with the provisions of the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, by the signatory countries of the Convention. Each such report shall include the following information:

(1) The number of applications for the return of children submitted by United States citizens to the Central Authority for the United States that remain unresolved more than 18 months after the date of filing.

(2) A list of the countries to which children in unresolved applications described in paragraph (1) are alleged to have been abducted.

(3) A list of the countries that have demonstrated a pattern of noncompliance with the obligations of the Convention with respect to applications for the return of children submitted by United States citizens to the Central Authority for the United States.

(4) Detailed information on each unresolved case described in paragraph (1) and on actions taken by the Department of State to resolve each such case.

(5) Information on efforts by the Department of State to encourage other countries to become signatories of the Convention.

(b) DEFINITION.—In this section, the term "Central Authority for the United States" has the meaning given the term in Article 6 of the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.

## SEC. 2804. SENSE OF CONGRESS RELATING TO RECOGNITION OF THE ECUMENICAL PATRIARCHATE BY THE GOVERNMENT OF TURKEY.

It is the sense of Congress that the United States should use its influence with the Government of Turkey to suggest that the Government of Turkey—

(1) recognize the Ecumenical Patriarchate and its nonpolitical, religious mission;

(2) ensure the continued maintenance of the institution's physical security needs, as provided for under Turkish and international law, including the Treaty of Lausanne, the 1968 Protocol, the Helsinki Final Act (1975), and the Charter of Paris;

(3) provide for the proper protection and safety of the Ecumenical Patriarch and Patriarchate personnel; and

(4) reopen the Ecumenical Patriarchate's Halki Patriarchal School of Theology.

## SEC. 2805. REPORT ON RELATIONS WITH VIETNAM.

In order to provide Congress with the necessary information by which to evaluate the relationship between the United States and Vietnam, the Secretary of State shall submit a report to the appropriate congressional committees, not later than 90 days after the date of enactment of this Act and every 180 days thereafter during the period ending September 30, 1999, on the extent to which—

(1) the Government of the Socialist Republic of Vietnam is cooperating with the United States in providing the fullest possible accounting of all unresolved cases of prisoners of war (POWs) or persons missing-in-action (MIAs) through the provision of records and the unilateral and joint recovery and repatriation of American remains;

(2) the Government of the Socialist Republic of Vietnam has made progress toward the release of all political and religious prisoners, including Catholic, Protestant, and Buddhist clergy;

(3) the Government of the Socialist Republic of Vietnam is cooperating with requests by the United States to obtain full and free access to persons of humanitarian interest to the United States for interviews under the Orderly Departure (ODP) and Resettlement Opportunities for Vietnamese Refugees (ROVR) programs, and in providing exit visas for such persons;

(4) the Government of the Socialist Republic of Vietnam has taken vigorous action to end extortion, bribery, and other corrupt practices in connection with such exit visas; and

(5) the Government of the United States is making vigorous efforts to interview and resettle former reeducation camp victims, their immediate families including unmarried sons and daughters, former United States Government employees, and other persons eligible for the ODP program, and to give such persons the full benefit of all applicable United States laws including sections 599D and 599E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990 (Public Law 101–167).

## SEC. 2806. REPORTS AND POLICY CONCERNING HUMAN RIGHTS VIOLATIONS IN LAOS.

Not later than 180 days after the date of enactment of this Act, the Secretary of State shall submit a report to the appropriate congressional committees on the allegations of persecution and abuse of the Hmong and Laotian refugees who have returned to Laos. The report shall include the following:

(1) A full investigation, including full documentation of individual cases of persecution, of the Lao Government's treatment of Hmong and Laotian refugees who have returned to Laos.

(2) The steps the Department of State will take to continue to monitor any systematic human rights violations by the Government of Laos.

(3) The actions which the Department of State will take to seek to ensure the cessation of human rights violations.

## SEC. 2807. REPORT ON AN ALLIANCE AGAINST NARCOTICS TRAFFICKING IN THE WESTERN HEMISPHERE.

(a) SENSE OF CONGRESS ON DISCUSSIONS FOR ALLIANCE.—

(1) SENSE OF CONGRESS.—It is the sense of Congress that the President should discuss with the democratically-elected governments of the Western Hemisphere, the prospect of forming a multilateral alliance to address problems relating to international drug trafficking in the Western Hemisphere.

(2) CONSULTATIONS.—In the consultations on the prospect of forming an alliance described in paragraph (1), the President should seek the input of such governments on the possibility of forming one or more structures within the alliance—

(A) to develop a regional, multilateral strategy to address the threat posed to nations in the Western Hemisphere by drug trafficking; and

(B) to establish a new mechanism for improving multilateral coordination of drug interdiction and drug-related law enforcement activities in the Western Hemisphere.

(b) REPORT.—

(1) REQUIREMENT.—Not later than 60 days after the date of enactment of this Act, the President shall submit to Congress a report on the proposal discussed under subsection (a). The report shall include the following:

(A) An analysis of the reactions of the governments concerned to the proposal.

(B) An assessment of the proposal, including an evaluation of the feasibility and advisability of forming the alliance.

(C) A determination in light of the analysis and assessment whether or not the formation of the alliance is in the national interests of the United States.

(D) If the President determines that the formation of the alliance is in the national interests of the United States, a plan for encouraging and facilitating the formation of the alliance.

(E) If the President determines that the formation of the alliance is not in the national interests of the United States, an alternative proposal to improve significantly efforts against the threats posed by narcotics trafficking in the Western Hemisphere, including an explanation of how the alternative proposal will—

(i) improve upon current cooperation and coordination of counter-drug efforts among nations in the Western Hemisphere;

(ii) provide for the allocation of the resources required to make significant progress in disrupting and disbanding the criminal organizations responsible for the trafficking of illegal drugs in the Western Hemisphere; and

(iii) differ from and improve upon past strategies adopted by the United States Government which have failed to make sufficient progress against the trafficking of illegal drugs in the Western Hemisphere.

(2) UNCLASSIFIED FORM.—The report under paragraph (1) shall be submitted in unclassified form, but may contain a classified annex.

## SEC. 2808. CONGRESSIONAL STATEMENT REGARDING THE ACCESSION OF TAIWAN TO THE WORLD TRADE ORGANIZATION.

(a) FINDINGS.—The Congress makes the following findings:

(1) The people of the United States and the people of the Republic of China on Taiwan have long enjoyed extensive ties.

(2) Taiwan is currently the 8th largest trading partner of the United States.

(3) The executive branch of Government has committed publicly to support Taiwan's bid to join the World Trade Organization and has declared that the United States will not oppose this bid solely on the grounds that the People's Republic of China, which also seeks membership in the World Trade Organization, is not yet eligible because of its unacceptable trade practices.

(4) The United States and Taiwan have concluded discussions on a variety of outstanding trade issues that remain unresolved with the People's Republic of China and that are necessary for the United States to support Taiwan's membership in the World Trade Organization.

(5) The reversion of control over Hong Kong—a member of the World Trade Organization—to the People's Republic of China in many respects affords to the People's Republic of China the practical benefit of membership in the World Trade Organization for a substantial portion of its trade in goods despite the fact that the trade practices of the People's Republic of China currently fall far short of what the United States expects for membership in the World Trade Organization.

(6) The executive branch of Government has announced its interest in the admission of the People's Republic of China to the World Trade Organization; the fundamental sense of fairness of the people of the United States warrants the United States Government's support for Taiwan's relatively more meritorious application for membership in the World Trade Organization.

(7) Despite having made significant progress in negotiations for its accession to the World Trade Organization, Taiwan has yet to offer acceptable terms of accession in agricultural and certain other market sectors.

(8) It is in the economic interest of United States consumers and exporters for Taiwan to complete those requirements for accession to the World Trade Organization at the earliest possible moment.

(b) CONGRESSIONAL STATEMENT.—The Congress favors public support by officials of the Department of State for the accession of Taiwan to the World Trade Organization.

<< 22 USCA § 2227 >>

## SEC. 2809. PROGRAMS OR PROJECTS OF THE INTERNATIONAL ATOMIC ENERGY AGENCY IN CUBA.

(a) WITHHOLDING OF UNITED STATES PROPORTIONAL SHARE OF ASSISTANCE.—Section 307(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2227(c)) is amended—

<< 22 USCA § 2227 >>

(1) by striking "The limitations" and inserting "(1) Subject to paragraph (2), the limitations"; and

<< 22 USCA § 2227 >>

(2) by adding at the end the following:

"(2)(A) Except as provided in subparagraph (B), with respect to funds authorized to be appropriated by this chapter and available for the International Atomic Energy Agency, the limitations of subsection (a) shall apply to programs or projects of such Agency in Cuba.

"(B)(i) Subparagraph (A) shall not apply with respect to programs or projects of the International Atomic Energy Agency that provide for the discontinuation, dismantling, or safety inspection of nuclear facilities or related materials, or for inspections and similar activities designed to prevent the development of nuclear weapons by a country described in subsection (a).

"(ii) Clause (i) shall not apply with respect to the Juragua Nuclear Power Plant near Cienfuegos, Cuba, or the Pedro Pi Nuclear Research Center unless Cuba—

"(I) ratifies the Treaty on the Non–Proliferation of Nuclear Weapons (21 UST 483) or the Treaty for the Prohibition of Nuclear Weapons in Latin America (commonly known as the Treaty of Tlatelolco);

"(II) negotiates full-scope safeguards of the International Atomic Energy Agency not later than two years after ratification by Cuba of such Treaty; and

"(III) incorporates internationally accepted nuclear safety standards.".

<< 22 USCA § 2021 NOTE >>

(b) OPPOSITION TO CERTAIN PROGRAMS OR PROJECTS.—The Secretary of State shall direct the United States representative to the International Atomic Energy Agency to oppose the following:

<< 22 USCA § 2021 NOTE >>

(1) Technical assistance programs or projects of the Agency at the Juragua Nuclear Power Plant near Cienfuegos, Cuba, and at the Pedro Pi Nuclear Research Center.

<< 22 USCA § 2021 NOTE >>

(2) Any other program or project of the Agency in Cuba that is, or could become, a threat to the security of the United States.

<< 22 USCA § 2021 NOTE >>

(c) REPORTING REQUIREMENTS.—

<< 22 USCA § 2021 NOTE >>

(1) REQUEST FOR IAEA REPORTS.—The Secretary of State shall direct the United States representative to the International Atomic Energy Agency to request the Director–General of the Agency to submit to the United States all reports prepared with respect to all programs or projects of the Agency that are of concern to the United States, including the programs or projects described in subsection (b).

<< 22 USCA § 2021 NOTE >>

(2) ANNUAL REPORTS TO THE CONGRESS.—Not later than 180 days after the date of the enactment of this Act, and on an annual basis thereafter, the Secretary of State, in consultation with the United States representative to the International Atomic Energy Agency, shall prepare and submit to the Congress a report containing a description of all programs or projects of the Agency in each country described in section 307(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2227(a)).

SEC. 2810. LIMITATION ON ASSISTANCE TO COUNTRIES AIDING CUBA NUCLEAR DEVELOPMENT.

<< 22 USCA § 2370 >>

(a) IN GENERAL.—Section 620 of the Foreign Assistance Act of 1961 (22 U.S.C. 2370), as amended by this division, is further amended by adding at the end the following:

"(y)(1) Except as provided in paragraph (2), the President shall withhold from amounts made available under this Act or any other Act and allocated for a country for a fiscal year an amount equal to the aggregate value of nuclear fuel and related assistance and credits provided by that country, or any entity of that country, to Cuba during the preceding fiscal year.

"(2) The requirement to withhold assistance for a country for a fiscal year under paragraph (1) shall not apply if Cuba—

"(A) has ratified the Treaty on the Non-Proliferation of Nuclear Weapons (21 UST 483) or the Treaty of Tlatelelco, and Cuba is in compliance with the requirements of either such Treaty;

"(B) has negotiated and is in compliance with full-scope safeguards of the International Atomic Energy Agency not later than two years after ratification by Cuba of such Treaty; and

"(C) incorporates and is in compliance with internationally accepted nuclear safety standards.

"(3) The Secretary of State shall prepare and submit to the Congress each year a report containing a description of the amount of nuclear fuel and related assistance and credits provided by any country, or any entity of a country, to Cuba during the preceding year, including the terms of each transfer of such fuel, assistance, or credits.".

<< 22 USCA § 2370 NOTE >>

(b) EFFECTIVE DATE.—Section 620(y) of the Foreign Assistance Act of 1961, as added by subsection (a), shall apply with respect to assistance provided in fiscal years beginning on or after the date of the enactment of this Act.

SEC. 2811. INTERNATIONAL FUND FOR IRELAND.

(a) PURPOSES.—Section 2(b) of the Anglo–Irish Agreement Support Act of 1986 (Public Law 99–415; 100 Stat. 947) is amended by adding at the end the following new sentences: "United States contributions should be used in a manner that effectively increases employment opportunities in communities with rates of unemployment higher than the local or urban average of unemployment in Northern Ireland. In addition, such contributions should be used to benefit individuals residing in such communities.".

(b) CONDITIONS AND UNDERSTANDINGS.—Section 5(a) of such Act is amended—

(1) in the first sentence—

(A) by striking "The United States" and inserting the following:

"(1) IN GENERAL.—The United States";

(B) by striking "in this Act may be used" and inserting the following: "in this Act—

"(A) may be used";

(C) by striking the period and inserting "; and"; and

(D) by adding at the end the following:

"(B) should be provided to individuals or entities in Northern Ireland which employ practices consistent with the principles of economic justice."; and

(2) in the second sentence, by striking "The restrictions" and inserting the following:

"(2) ADDITIONAL REQUIREMENTS.—The restrictions".

(c) PRIOR CERTIFICATIONS.—Section 5(c)(2) of such Act is amended—

(1) in subparagraph (A), by striking "in accordance with the principle of equality" and all that follows and inserting "to individuals and entities whose practices are consistent with principles of economic justice; and"; and

(2) in subparagraph (B), by inserting before the period at the end the following: "and will create employment opportunities in regions and communities of Northern Ireland suffering from high rates of unemployment".

(d) ANNUAL REPORTS.—Section 6 of such Act is amended—

(1) in paragraph (2), by striking "and" at the end;

(2) in paragraph (3), by striking the period and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(4) the extent to which the practices of each individual or entity receiving assistance from United States contributions to the International Fund has been consistent with the principles of economic justice.".

(e) REQUIREMENTS RELATING TO FUNDS.—Section 7 of such Act is amended by adding at the end the following:

"(c) PROHIBITION.—Nothing included herein shall require quotas or reverse discrimination or mandate their use.".

(f) DEFINITIONS.—Section 8 of such Act is amended—

(1) in paragraph (1), by striking "and" at the end;

(2) in paragraph (2), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new paragraph:

AR.03065

"(3) the term 'principles of economic justice' means the following principles:

"(A) Increasing the representation of individuals from underrepresented religious groups in the workforce, including managerial, supervisory, administrative, clerical, and technical jobs.

"(B) Providing adequate security for the protection of minority employees at the workplace.

"(C) Banning provocative sectarian or political emblems from the workplace.

"(D) Providing that all job openings be advertised publicly and providing that special recruitment efforts be made to attract applicants from underrepresented religious groups.

"(E) Providing that layoff, recall, and termination procedures do not favor a particular religious group.

"(F) Abolishing job reservations, apprenticeship restrictions, and differential employment criteria which discriminate on the basis of religion.

"(G) Providing for the development of training programs that will prepare substantial numbers of minority employees for skilled jobs, including the expansion of existing programs and the creation of new programs to train, upgrade, and improve the skills of minority employees.

"(H) Establishing procedures to assess, identify, and actively recruit minority employees with the potential for further advancement.

"(I) Providing for the appointment of a senior management staff member to be responsible for the employment efforts of the entity and, within a reasonable period of time, the implementation of the principles described in subparagraphs (A) through (H).".

## SEC. 2812. SUPPORT FOR DEMOCRATIC OPPOSITION IN IRAQ.

(a) ASSISTANCE FOR JUSTICE IN IRAQ.—There are authorized to be appropriated for fiscal year 1998 $3,000,000 for assistance to an international commission to establish an international record for the criminal culpability of Saddam Hussein and other Iraqi officials and for an international criminal tribunal established for the purpose of indicting, prosecuting, and punishing Saddam Hussein and other Iraqi officials responsible for crimes against humanity, genocide, and other violations of international law.

(b) ASSISTANCE TO THE DEMOCRATIC OPPOSITION IN IRAQ.—There are authorized to be appropriated for fiscal year 1998 $15,000,000 to provide support for democratic opposition forces in Iraq, of which—

(1) not more than $10,000,000 shall be for assistance to the democratic opposition, including leadership organization, training political cadre, maintaining offices, disseminating information, and developing and implementing agreements among opposition elements; and

(2) not more than $5,000,000 of the funds made available under this subsection shall be available only for grants to RFE/RL, Incorporated, for surrogate radio broadcasting by RFE/RL, Incorporated, to the Iraqi people in the Arabic language, such broadcasts to be designated as "Radio Free Iraq".

(c) ASSISTANCE FOR HUMANITARIAN RELIEF AND RECONSTRUCTION.—There are authorized to be appropriated for fiscal year 1998 $20,000,000 for the relief, rehabilitation, and reconstruction of people living in Iraq, and communities located in Iraq, who are not under the control of the Saddam Hussein regime.

(d) AVAILABILITY.—Amounts authorized to be appropriated by this section shall be provided in addition to amounts otherwise made available and shall remain available until expended.

(e) NOTIFICATION.—All assistance provided pursuant to this section shall be notified to Congress in accordance with the procedures applicable to reprogramming notifications under section 634A of the Foreign Assistance Act of 1961.

(f) RELATION TO OTHER LAWS.—Funds made available to carry out the provisions of this section may be made available notwithstanding any other provision of law.

(g) REPORT.—Not later than 45 days after the date of enactment of this Act, the Secretary of State and the Broadcasting Board of Governors of the United States Information Agency shall submit a detailed report to Congress describing—

(1) the costs, implementation, and plans for the establishment of an international war crimes tribunal described in subsection (a);

(2) the establishment of a political assistance program, and the surrogate broadcasting service, as described in subsection (b); and

(3) the humanitarian assistance program described in subsection (c).

AR.03066

SEC. 2813. DEVELOPMENT OF DEMOCRACY IN THE REPUBLIC OF SERBIA.

(a) FINDINGS.—Congress makes the following findings:

(1) The United States stands as the beacon of democracy and freedom in the world.

(2) A stable and democratic Republic of Serbia is important to the interests of the United States, the international community, and to peace in the Balkans.

(3) Democratic forces in the Republic of Serbia are beginning to emerge, notwithstanding the efforts of Europe's longest-standing communist dictator, Slobodan Milosevic.

(4) The Serbian authorities have sought to continue to hinder the growth of free and independent news media in the Republic of Serbia, in particular the broadcast news media, and have harassed journalists performing their professional duties.

(5) Under Slobodan Milosevic, the political opposition in Serbia has been denied free, fair, and equal opportunity to participate in the democratic process.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the United States, the international community, nongovernmental organizations, and the private sector should continue to promote the building of democratic institutions and civic society in the Republic of Serbia, help strengthen the independent news media, and press for the Government of the Republic of Serbia to respect the rule of law; and

(2) the normalization of relations between the "Federal Republic of Yugoslavia" (Serbia and Montenegro) and the United States requires, among other things, that President Milosevic and the leadership of Serbia—

(A) promote the building of democratic institutions, including strengthening the independent news media and respecting the rule of law;

(B) promote the respect for human rights throughout the "Federal Republic of Yugoslavia" (Serbia and Montenegro); and

(C) promote and encourage free, fair, and equal conditions for the democratic opposition in Serbia.

DIVISION—H

<< 12 USCA § 1811 NOTE >>

SECTION 1. SHORT TITLE.

This Division may be cited as the "Depository Institution–GSE Affiliation Act of 1998".

<< 12 USCA § 1828 >>

SEC. 2. CERTAIN AFFILIATION PERMITTED.

Section 18(s) of the Federal Deposit Insurance Act (12 U.S.C. 1828(s)) is amended—

<< 12 USCA § 1828 >>

(1) by redesignating paragraph (4) as paragraph (5); and

<< 12 USCA § 1828 >>

(2) by inserting after paragraph (3) the following new paragraph:

"(4) STUDENT LOANS.—

"(A) IN GENERAL.—This subsection shall not apply to any arrangement between the Holding Company (or any subsidiary of the Holding Company other than the Student Loan Marketing Association) and a depository institution, if the Secretary approves the affiliation and determines that—

"(i) the reorganization of such Association in accordance with section 440 of the Higher Education Act of 1965, as amended, will not be adversely affected by the arrangement;

"(ii) the dissolution of the Association pursuant to such reorganization will occur before the end of the 2–year period beginning on the date on which such arrangement is consummated or on such earlier date as the Secretary deems appropriate: *Provided*, That the Secretary may extend this period for not more than 1 year at a time if the Secretary determines that such

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

extension is in the public interest and is appropriate to achieve an orderly reorganization of the Association or to prevent market disruptions in connection with such reorganization, but no such extensions shall in the aggregate exceed 2 years;

"(iii) the Association will not purchase or extend credit to, or guarantee or provide credit enhancement to, any obligation of the depository institution;

"(iv) the operations of the Association will be separate from the operations of the depository institution; and

"(v) until the 'dissolution date' (as that term is defined in section 440 of the Higher Education Act of 1965, as amended) has occurred, such depository institution will not use the trade name or service mark 'Sallie Mae' in connection with any product or service it offers if the appropriate Federal banking agency for such depository institution determines that—

"(I) the depository institution is the only institution offering such product or service using the 'Sallie Mae' name; and

"(II) such use would result in the depository institution having an unfair competitive advantage over other depository institutions.

"(B) TERMS AND CONDITIONS.—In approving any arrangement referred to in subparagraph (A) the Secretary may impose any terms and conditions on such an arrangement that the Secretary considers appropriate, including—

"(i) imposing additional restrictions on the issuance of debt obligations by the Association; or

"(ii) restricting the use of proceeds from the issuance of such debt.

"(C) ADDITIONAL LIMITATIONS.—In the event that the Holding Company (or any subsidiary of the Holding Company) enters into such an arrangement, the value of the Association's 'investment portfolio' shall not at any time exceed the lesser of—

"(i) the value of such portfolio on the date of the enactment of this subsection; or

"(ii) the value of such portfolio on the date such an arrangement is consummated. The term 'investment portfolio' shall mean all investments shown on the consolidated balance sheet of the Association other than—

"(I) any instrument or assets described in section 439(d) of the Higher Education Act of 1965, as amended;

"(II) any direct noncallable obligations of the United States or any agency thereof for which the full faith and credit of the United States is pledged; or

"(III) cash or cash equivalents.

"(D) ENFORCEMENT.—The terms and conditions imposed under subparagraph (B) may be enforced by the Secretary in accordance with section 440 of the Higher Education Act of 1965.

"(E) DEFINITIONS.—For purposes of this paragraph, the following definition shall apply—

"(i) ASSOCIATION; HOLDING COMPANY.—Notwithstanding any provision in section 3, the terms 'Association' and 'Holding Company' have the same meanings as in section 440(i) of the Higher Education Act of 1965.

"(ii) SECRETARY.—The term 'Secretary' means the Secretary of the Treasury.".

<< 22 USCA Ch. 75 >>

DIVISION I—CHEMICAL WEAPONS CONVENTION

<< 22 USCA § 6701 NOTE >>

SECTION 1. SHORT TITLE.

 This Division may be cited as the "Chemical Weapons Convention Implementation Act of 1998".

SEC. 2. TABLE OF CONTENTS.

 The table of contents for this Act is as follows:
Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. Definitions.

TITLE I—GENERAL PROVISIONS
Sec. 101. Designation of United States National Authority.

Sec. 102. No abridgement of constitutional rights.
Sec. 103. Civil liability of the United States.

TITLE II—PENALTIES FOR UNLAWFUL ACTIVITIES SUBJECT TO THE JURISDICTION OF THE UNITED STATES

### Subtitle A—Criminal and Civil Penalties

Sec. 201. Criminal and civil provisions.

### Subtitle B—Revocations of Export Privileges

Sec. 211. Revocations of export privileges.

### TITLE III—INSPECTIONS

Sec. 301. Definitions in the title.
Sec. 302. Facility agreements.
Sec. 303. Authority to conduct inspections.
Sec. 304. Procedures for inspections.
Sec. 305. Warrants.
Sec. 306. Prohibited acts relating to inspections.
Sec. 307. National security exception.
Sec. 308. Protection of constitutional rights of contractors.
Sec. 309. Annual report on inspections.
Sec. 310. United States assistance in inspections at private facilities.

### TITLE IV—REPORTS

Sec. 401. Reports required by the United States National Authority.
Sec. 402. Prohibition relating to low concentrations of schedule 2 and 3 chemicals.
Sec. 403. Prohibition relating to unscheduled discrete organic chemicals and coincidental byproducts in waste streams.
Sec. 404. Confidentiality of information.
Sec. 405. Recordkeeping violations.

### TITLE V—ENFORCEMENT

Sec. 501. Penalties.
Sec. 502. Specific enforcement.
Sec. 503. Expedited judicial review.

### TITLE VI—MISCELLANEOUS PROVISIONS

Sec. 601. Repeal.
Sec. 602. Prohibition.
Sec. 603. Bankruptcy actions.

<< 22 USCA § 6701 >>

SEC. 3. DEFINITIONS.

In this Act:

<< 22 USCA § 6701 >>

(1) CHEMICAL WEAPON.—The term "chemical weapon" means the following, together or separately:
  (A) A toxic chemical and its precursors, except where intended for a purpose not prohibited under this Act as long as the type and quantity is consistent with such a purpose.
  (B) A munition or device, specifically designed to cause death or other harm through toxic properties of those toxic chemicals specified in subparagraph (A), which would be released as a result of the employment of such munition or device.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(C) Any equipment specifically designed for use directly in connection with the employment of munitions or devices specified in subparagraph (B).

<< 22 USCA § 6701 >>

(2) CHEMICAL WEAPONS CONVENTION; CONVENTION.—The terms "Chemical Weapons Convention" and "Convention" mean the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993.

<< 22 USCA § 6701 >>

(3) KEY COMPONENT OF A BINARY OR MULTICOMPONENT CHEMICAL SYSTEM.—The term "key component of a binary or multicomponent chemical system" means the precursor which plays the most important role in determining the toxic properties of the final product and reacts rapidly with other chemicals in the binary or multicomponent system.

<< 22 USCA § 6701 >>

(4) NATIONAL OF THE UNITED STATES.—The term "national of the United States" has the same meaning given such term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

<< 22 USCA § 6701 >>

(5) ORGANIZATION.—The term "Organization" means the Organization for the Prohibition of Chemical Weapons.

<< 22 USCA § 6701 >>

(6) PERSON.—The term "person", except as otherwise provided, means any individual, corporation, partnership, firm, association, trust, estate, public or private institution, any State or any political subdivision thereof, or any political entity within a State, any foreign government or nation or any agency, instrumentality or political subdivision of any such government or nation, or other entity located in the United States.

<< 22 USCA § 6701 >>

(7) PRECURSOR.—
  (A) IN GENERAL.—The term "precursor" means any chemical reactant which takes part at any stage in the production by whatever method of a toxic chemical. The term includes any key component of a binary or multicomponent chemical system.
  (B) LIST OF PRECURSORS.—Precursors which have been identified for the application of verification measures under Article VI of the Convention are listed in schedules contained in the Annex on Chemicals of the Chemical Weapons Convention.

<< 22 USCA § 6701 >>

(8) PURPOSES NOT PROHIBITED BY THIS ACT.—The term "purposes not prohibited by this Act" means the following:
  (A) PEACEFUL PURPOSES.—Any peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity.
  (B) PROTECTIVE PURPOSES.—Any purpose directly related to protection against toxic chemicals and to protection against chemical weapons.
  (C) UNRELATED MILITARY PURPOSES.—Any military purpose of the United States that is not connected with the use of a chemical weapon and that is not dependent on the use of the toxic or poisonous properties of the chemical weapon to cause death or other harm.
  (D) LAW ENFORCEMENT PURPOSES.—Any law enforcement purpose, including any domestic riot control purpose and including imposition of capital punishment.

<< 22 USCA § 6701 >>

(9) TECHNICAL SECRETARIAT.—The term "Technical Secretariat" means the Technical Secretariat of the Organization for the Prohibition of Chemical Weapons established by the Chemical Weapons Convention.

<< 22 USCA § 6701 >>

(10) SCHEDULE 1 CHEMICAL AGENT.—The term 'Schedule 1 chemical agent' means any of the following, together or separately:

(A) OAlkyl (≤C10, incl. cycloalkyl) alkyl

  (Me, Et, n-Pr or i-Pr)-phosphonofluoridates

  (e.g. Sarin: O–Isopropyl methylphosphonofluoridate Soman: O–Pinacolyl methylphosphonofluoridate).

(B) O–Alkyl (≤C10, incl. cycloalkyl) N,N-dialkyl

  (Me, Et, n-Pr or i-Pr)-phosphoramidocyanidates

  (e.g. Tabun: O–Ethyl N,N-dimethyl phosphoramidocyanidate).

(C) O–Alkyl (H or ≤C10, incl. cycloalkyl) S–2–dialkyl

  (Me, Et, n-Pr or i-Pr)aminoethyl alkyl

  (Me, Et, n-Pr or i-Pr) phosphonothiolates and corresponding alkylated or protonated salts

  (e.g. VX: O–Ethyl S–2–diisopropylaminoethyl methyl phosphonothiolate).

(D) Sulfur mustards:

  2–Chloroethylchloromethylsulfide

  Mustard gas: (Bis(2–chloroethyl)sulfide

  Bis(2–chloroethylthio)methane

  Sesquimustard: 1,2Bis(2–chloroethylthio)ethane

  1,3Bis(2–chloroethylthio)npropane

  1,4Bis(2–chloroethylthio)nbutane

  1,5Bis(2–chloroethylthio)npentane

  Bis(2–chloroethylthiomethyl)ether

  O–Mustard: Bis(2–chloroethylthioethyl)ether.

(E) Lewisites:

  Lewisite 1: 2–Chlorovinyldichloroarsine

  Lewisite 2: Bis(2–chlorovinyl)chloroarsine

  Lewisite 3: Tris (2–clorovinyl)arsine.

(F) Nitrogen mustards:

  HN1: Bis(2–chloroethyl)ethylamine

  HN2: Bis(2–chloroethyl)methylamine

  HN3: Tris(2–chloroethyl)amine.

(G) Saxitoxin.

(H) Ricin.

(I) Alkyl (Me, Et, n-Pr or i-Pr) phosphonyldifluorides

  e.g. DF: Methylphosphonyldifluoride.

(J) OAlkyl (H or ≤C10, incl. cycloalkyl)O–2–dialkyl

  (Me, Et, n-Pr or i-Pr)-aminoethyl alkyl

  (Me, Et, n-Pr or i-Pr) phosphonites and corresponding alkylated or protonated salts

e.g. QL: O–Ethyl O–2–diisopropylaminoethyl methylphosphonite.

(K) Chlorosarin: OIsopropyl methylphosphonochloridate.

  (L) Chlorosoman: OPinacolyl methylphosphonochloridate.

<< 22 USCA § 6701 >>

(11) SCHEDULE 2 CHEMICAL AGENT.—The term 'Schedule 2 chemical agent' means the following, together or separately:

(A) Amiton: O,O–Diethyl S-[2–(diethylamino)ethyl]

phosphorothiolate and corresponding alkylated or protonated salts.

(B) PFIB: 1,1,3,3,3–Pentafluoro–2–(trifluoromethyl)–1–propene.

(C) BZ: 3–Quinuclidinyl benzilate

(D) Chemicals, except for those listed in Schedule 1, containing a phosphorus atom to which is bonded one methyl, ethyl or propyl (normal or iso) group but not further carbon atoms,

e.g. Methylphosphonyl dichloride Dimethyl methylphosphonate

Exemption: Fonofos: O–Ethyl Sphenyl ethylphosphonothiolothionate.

(E) N,N–Dialkyl (Me, Et, n-Pr or i-Pr) phosphoramidic dihalides.

(F) Dialkyl (Me, Et, n-Pr or i-Pr) N,N-dialkyl (Me, Et, n-Pr or i-Pr)phosphoramidates.

(G) arsenic trichloride.

(H) 2,2–Diphenyl–2–hydroxyacetic acid.

(I) Quinuclidine–3–ol.

(J) N,N–Dialkyl (Me, Et, n-Pr or i-Pr) aminoethyl–2–chlorides and corresponding protonated salts.

(K) N,N–Dialkyl (Me, Et, n-Pr or i-Pr) aminoethane–2–ols and corresponding protonated salts

Exemptions: N,N–Dimethylaminoethanol and corresponding protonated salts N, N–Diethylaminoethanol and corresponding protonated salts.

(L) N,N–Dialkyl (Me, Et, n-Pr or i-Pr) aminoethane–2–thiols and corresponding protonated salts.

(M) Thiodiglycol: Bis(2–hydroxyethyl)sulfide.

(N) Pinacolyl alcohol: 3,3–Dimethylbutane–2–ol.

<< 22 USCA § 6701 >>

(12) SCHEDULE 3 CHEMICAL AGENT.—The term 'Schedule 3 chemical agent' means any the following, together or separately:

(A) Phosgene: carbonyl dichloride.

(B) Cyanogen chloride.

(C) Hydrogen cyanide.

(D) Chloropicrin: trichloronitromethane.

(E) Phosphorous oxychloride.

(F) Phosphorous trichloride.

(G) Phosphorous pentachloride.

(H) Trimethyl phosphite.

(I) Triethyl phosphite.

(J) Dimethyl phosphite.

(K) Diethyl phosphite.

(L) Sulfur monochloride.

(M) Sulfur dichloride.

(N) Thionyl chloride.

(O) Ethyldiethanolamine.

(P) Methyldiethanolamine.

(Q) Triethanolamine.

<< 22 USCA § 6701 >>

(13) TOXIC CHEMICAL.—

(A) IN GENERAL.—The term "toxic chemical" means any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals,

regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere.

(B) LIST OF TOXIC CHEMICALS.—Toxic chemicals which have been identified for the application of verification measures under Article VI of the Convention are listed in schedules contained in the Annex on Chemicals of the Chemical Weapons Convention.

<< 22 USCA § 6701 >>

(14) UNITED STATES.—The term "United States" means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States and includes all places under the jurisdiction or control of the United States, including—

(A) any of the places within the provisions of paragraph (41) of section 40102 of title 49, United States Code;

(B) any civil aircraft of the United States or public aircraft, as such terms are defined in paragraphs (17) and (37), respectively, of section 40102 of title 49, United States Code; and

(C) any vessel of the United States, as such term is defined in section 3(b) of the Maritime Drug Enforcement Act, as amended (46 U.S.C., App. sec. 1903(b)).

<< 22 USCA § 6701 >>

(15) UNSCHEDULED DISCRETE ORGANIC CHEMICAL.—The term "unscheduled discrete organic chemical" means any chemical not listed on any schedule contained in the Annex on Chemicals of the Convention that belongs to the class of chemical compounds consisting of all compounds of carbon, except for its oxides, sulfides, and metal carbonates.

<< 22 USCA Ch. 75 >>

TITLE I—GENERAL PROVISIONS

<< 22 USCA § 6711 >>

SEC. 101. DESIGNATION OF UNITED STATES NATIONAL AUTHORITY.

<< 22 USCA § 6711 >>

(a) DESIGNATION.—Pursuant to paragraph 4 of Article VII of the Chemical Weapons Convention, the President shall designate the Department of State to be the United States National Authority.

<< 22 USCA § 6711 >>

(b) PURPOSES.—The United States National Authority shall—

<< 22 USCA § 6711 >>

(1) serve as the national focal point for effective liaison with the Organization for the Prohibition of Chemical Weapons and other States Parties to the Convention; and

<< 22 USCA § 6711 >>

(2) implement the provisions of this Act in coordination with an interagency group designated by the President consisting of the Secretary of Commerce, Secretary of Defense, Secretary of Energy, the Attorney General, and the heads of agencies considered necessary or advisable by the President.

<< 22 USCA § 6711 >>

(c) DIRECTOR.—The Secretary of State shall serve as the Director of the United States National Authority.

<< 22 USCA § 6711 >>

(d) POWERS.—The Director may utilize the administrative authorities otherwise available to the Secretary of State in carrying out the responsibilities of the Director set forth in this Act.

<< 22 USCA § 6711 >>

(e) IMPLEMENTATION.—The President is authorized to implement and carry out the provisions of this Act and the Convention and shall designate through Executive order which agencies of the United States shall issue, amend, or revise the regulations in order to implement this Act and the provisions of the Convention. The Director of the United States National Authority shall report to the Congress on the regulations that have been issued, implemented, or revised pursuant to this section.

<< 22 USCA § 6712 >>

SEC. 102. NO ABRIDGEMENT OF CONSTITUTIONAL RIGHTS.

No person may be required, as a condition for entering into a contract with the United States or as a condition for receiving any benefit from the United States, to waive any right under the Constitution for any purpose related to this Act or the Convention.

<< 22 USCA § 6713 >>

SEC. 103. CIVIL LIABILITY OF THE UNITED STATES.

<< 22 USCA § 6713 >>

(a) CLAIMS FOR TAKING OF PROPERTY.—

<< 22 USCA § 6713 >>

(1) JURISDICTION OF COURTS OF THE UNITED STATES.—
(A) UNITED STATES COURT OF FEDERAL CLAIMS.—The United States Court of Federal Claims shall, subject to subparagraph (B), have jurisdiction of any civil action or claim against the United States for any taking of property without just compensation that occurs by reason of the action of any officer or employee of the Organization for the Prohibition of Chemical Weapons, including any member of an inspection team of the Technical Secretariat, or by reason of the action of any officer or employee of the United States pursuant to this Act or the Convention. For purposes of this subsection, action taken pursuant to or under the color of this Act or the Convention shall be deemed to be action taken by the United States for a public purpose.
(B) DISTRICT COURTS.—The district courts of the United States shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of any civil action or claim described in subparagraph (A) that does not exceed $10,000.

<< 22 USCA § 6713 >>

(2) NOTIFICATION.—Any person intending to bring a civil action pursuant to paragraph (1) shall notify the United States National Authority of that intent at least one year before filing the claim in the United States Court of Federal Claims. Action on any claim filed during that one-year period shall be stayed. The one-year period following the notification shall not be counted for purposes of any law limiting the period within which the civil action may be commenced.

<< 22 USCA § 6713 >>

(3) INITIAL STEPS BY UNITED STATES GOVERNMENT TO SEEK REMEDIES.—During the period between a notification pursuant to paragraph (2) and the filing of a claim covered by the notification in the United States Court of Federal Claims, the United States National Authority shall pursue all diplomatic and other remedies that the United States National

Authority considers necessary and appropriate to seek redress for the claim including, but not limited to, the remedies provided for in the Convention and under this Act.

<< 22 USCA § 6713 >>

  (4) BURDEN OF PROOF.—In any civil action under paragraph (1), the plaintiff shall have the burden to establish a prima facie case that, due to acts or omissions of any official of the Organization or any member of an inspection team of the Technical Secretariat taken under the color of the Convention, proprietary information of the plaintiff has been divulged or taken without authorization. If the United States Court of Federal Claims finds that the plaintiff has demonstrated such a prima facie case, the burden shall shift to the United States to disprove the plaintiff's claim. In deciding whether the plaintiff has carried its burden, the United States Court of Federal Claims shall consider, among other things—
    (A) the value of proprietary information;
    (B) the availability of the proprietary information;
    (C) the extent to which the proprietary information is based on patents, trade secrets, or other protected intellectual property;
    (D) the significance of proprietary information; and
    (E) the emergence of technology elsewhere a reasonable time after the inspection.

<< 22 USCA § 6713 >>

  (b) TORT LIABILITY.—The district courts of the United States shall have exclusive jurisdiction of civil actions for money damages for any tort under the Constitution or any Federal or State law arising from the acts or omissions of any officer or employee of the United States or the Organization, including any member of an inspection team of the Technical Secretariat, taken pursuant to or under color of the Convention or this Act.

<< 22 USCA § 6713 >>

  (c) WAIVER OF SOVEREIGN IMMUNITY OF THE UNITED STATES.—In any action under subsection (a) or (b), the United States may not raise sovereign immunity as a defense.

<< 22 USCA § 6713 >>

  (d) AUTHORITY FOR CAUSE OF ACTION.—

<< 22 USCA § 6713 >>

  (1) UNITED STATES ACTIONS IN UNITED STATES DISTRICT COURT.—Notwithstanding any other law, the Attorney General of the United States is authorized to bring an action in the United States District Court for the District of Columbia against any foreign nation for money damages resulting from that nation's refusal to provide indemnification to the United States for any liability imposed on the United States by virtue of the actions of an inspector of the Technical Secretariat who is a national of that foreign nation acting at the direction or the behest of that foreign nation.

<< 22 USCA § 6713 >>

  (2) UNITED STATES ACTIONS IN COURTS OUTSIDE THE UNITED STATES.—The Attorney General is authorized to seek any and all available redress in any international tribunal for indemnification to the United States for any liability imposed on the United States by virtue of the actions of an inspector of the Technical Secretariat, and to seek such redress in the courts of the foreign nation from which the inspector is a national.

<< 22 USCA § 6713 >>

  (3) ACTIONS BROUGHT BY INDIVIDUALS AND BUSINESSES.—Notwithstanding any other law, any national of the United States, or any business entity organized and operating under the laws of the United States, may bring a civil action in a United States District Court for money damages against any foreign national or any business entity organized and operating

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

under the laws of a foreign nation for an unauthorized or unlawful acquisition, receipt, transmission, or use of property by or on behalf of such foreign national or business entity as a result of any tort under the Constitution or any Federal or State law arising from acts or omissions by any officer or employee of the United States or any member of an inspection team of the Technical Secretariat taken pursuant to or under the color of the Convention or this Act.

<< 22 USCA § 6713 >>

(e) RECOUPMENT.—

<< 22 USCA § 6713 >>

(1) POLICY.—It is the policy of the United States to recoup all funds withdrawn from the Treasury of the United States in payment for any tort under Federal or State law or taking under the Constitution arising from the acts or omissions of any foreign person, officer, or employee of the Organization, including any member of an inspection team of the Technical Secretariat, taken under color of the Chemical Weapons Convention or this Act.

<< 22 USCA § 6713 >>

(2) SANCTIONS ON FOREIGN COMPANIES.—

(A) IMPOSITION OF SANCTIONS.—The sanctions provided in subparagraph (B) shall be imposed for a period of not less than ten years upon—

(i) any foreign person, officer, or employee of the Organization, including any member of an inspection team of the Technical Secretariat, for whose actions or omissions the United States has been held liable for a tort or taking pursuant to this Act; and

(ii) any foreign person or business entity organized and operating under the laws of a foreign nation which knowingly assisted, encouraged or induced, in any way, a foreign person described in clause (i) to publish, divulge, disclose, or make known in any manner or to any extent not authorized by the Convention any United States confidential business information.

(B) SANCTIONS.—

(i) ARMS EXPORT TRANSACTIONS.—The United States Government shall not sell to a person described in subparagraph (A) any item on the United States Munitions List and shall terminate sales of any defense articles, defense services, or design and construction services to a person described in subparagraph (A) under the Arms Export Control Act.

(ii) SANCTIONS UNDER EXPORT ADMINISTRATION ACT OF 1979.—The authorities under section 6 of the Export Administration Act of 1979 shall be used to prohibit the export of any goods or technology on the control list established pursuant to section 5(c)(1) of that Act to a person described in subparagraph (A).

(iii) INTERNATIONAL FINANCIAL ASSISTANCE.—The United States shall oppose any loan or financial or technical assistance by international financial institutions in accordance with section 701 of the International Financial Institutions Act to a person described in subparagraph (A).

(iv) EXPORT–IMPORT BANK TRANSACTIONS.—The United States shall not give approval to guarantee, insure, or extend credit, or to participate in the extension of credit to a person described in subparagraph (A) through the Export–Import Bank of the United States.

(v) PRIVATE BANK TRANSACTIONS.—Regulations shall be issued to prohibit any United States bank from making any loan or providing any credit to a person described in subparagraph (A).

(vi) BLOCKING OF ASSETS.—The President shall take all steps necessary to block any transactions in any property subject to the jurisdiction of the United States in which a person described in subparagraph (A) has any interest whatsoever, for the purpose of recouping funds in accordance with the policy in paragraph (1).

(vii) DENIAL OF LANDING RIGHTS.—Landing rights in the United States shall be denied to any private aircraft or air carrier owned by a person described in subparagraph (A) except as necessary to provide for emergencies in which the safety of the aircraft or its crew or passengers is threatened.

<< 22 USCA § 6713 >>

(3) SANCTIONS ON FOREIGN GOVERNMENTS.—

(A) IMPOSITION OF SANCTIONS.—Whenever the President determines that persuasive information is available indicating that a foreign country has knowingly assisted, encouraged or induced, in any way, a person described in paragraph (2)(A) to publish, divulge, disclose, or make known in any manner or to any extent not authorized by the Convention any United States confidential business information, the President shall, within 30 days after the receipt of such information by the executive branch of Government, notify the Congress in writing of such determination and, subject to the requirements of paragraphs (4) and (5), impose the sanctions provided under subparagraph (B) for a period of not less than five years.

(B) SANCTIONS.—

(i) ARMS EXPORT TRANSACTIONS.—The United States Government shall not sell a country described in subparagraph (A) any item on the United States Munitions List, shall terminate sales of any defense articles, defense services, or design and construction services to that country under the Arms Export Control Act, and shall terminate all foreign military financing for that country under the Arms Export Control Act.

(ii) DENIAL OF CERTAIN LICENSES.—Licenses shall not be issued for the export to the sanctioned country of any item on the United States Munitions List or commercial satellites.

(iii) DENIAL OF ASSISTANCE.—No appropriated funds may be used for the purpose of providing economic assistance, providing military assistance or grant military education and training, or extending military credits or making guarantees to a country described in subparagraph (A).

(iv) SANCTIONS UNDER EXPORT ADMINISTRATION ACT OF 1979.—The authorities of section 6 of the Export Administration Act of 1979 shall be used to prohibit the export of any goods or technology on the control list established pursuant to section 5(c)(1) of that Act to a country described in subparagraph (A).

(v) INTERNATIONAL FINANCIAL ASSISTANCE.—The United States shall oppose any loan or financial or technical assistance by international financial institutions in accordance with section 701 of the International Financial Institutions Act to a country described in subparagraph (A).

(vi) TERMINATION OF ASSISTANCE UNDER FOREIGN ASSISTANCE ACT OF 1961.—The United States shall terminate all assistance to a country described in subparagraph (A) under the Foreign Assistance Act of 1961, except for urgent humanitarian assistance.

(vii) PRIVATE BANK TRANSACTIONS.—The United States shall not give approval to guarantee, insure, or extend credit, or participate in the extension of credit through the Export–Import Bank of the United States to a country described in subparagraph (A).

(viii) PRIVATE BANK TRANSACTIONS.—Regulations shall be issued to prohibit any United States bank from making any loan or providing any credit to a country described in subparagraph (A).

(ix) DENIAL OF LANDING RIGHTS.—Landing rights in the United States shall be denied to any air carrier owned by a country described in subparagraph (A), except as necessary to provide for emergencies in which the safety of the aircraft or its crew or passengers is threatened.

<< 22 USCA § 6713 >>

(4) SUSPENSION OF SANCTIONS UPON RECOUPMENT BY PAYMENT.—Sanctions imposed under paragraph (2) or (3) may be suspended if the sanctioned person, business entity, or country, within the period specified in that paragraph, provides full and complete compensation to the United States Government, in convertible foreign exchange or other mutually acceptable compensation equivalent to the full value thereof, in satisfaction of a tort or taking for which the United States has been held liable pursuant to this Act.

<< 22 USCA § 6713 >>

(5) WAIVER OF SANCTIONS ON FOREIGN COUNTRIES.—The President may waive some or all of the sanctions provided under paragraph (3) in a particular case if he determines and certifies in writing to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that such waiver is necessary to protect the national security interests of the United States. The certification shall set forth the reasons supporting the determination and shall take effect on the date on which the certification is received by the Congress.

<< 22 USCA § 6713 >>

(6) NOTIFICATION TO CONGRESS.—Not later than five days after sanctions become effective against a foreign person pursuant to this Act, the President shall transmit written notification of the imposition of sanctions against that foreign person to the chairmen and ranking members of the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate.

<< 22 USCA § 6713 >>

(f) SANCTIONS FOR UNAUTHORIZED DISCLOSURE OF UNITED STATES CONFIDENTIAL BUSINESS INFORMATION.—The Secretary of State shall deny a visa to, and the Attorney General shall exclude from the United States any alien who, after the date of enactment of this Act—

<< 22 USCA § 6713 >>

(1) is, or previously served as, an officer or employee of the Organization and who has willfully published, divulged, disclosed, or made known in any manner or to any extent not authorized by the Convention any United States confidential business information coming to him in the course of his employment or official duties, or by reason of any examination or investigation of any return, report, or record made to or filed with the Organization, or any officer or employee thereof, such practice or disclosure having resulted in financial loses or damages to a United States person and for which actions or omissions the United States has been found liable of a tort or taking pursuant to this Act;

<< 22 USCA § 6713 >>

(2) traffics in United States confidential business information, a proven claim to which is owned by a United States national;

<< 22 USCA § 6713 >>

(3) is a corporate officer, principal, shareholder with a controlling interest of an entity which has been involved in the unauthorized disclosure of United States confidential business information, a proven claim to which is owned by a United States national; or

<< 22 USCA § 6713 >>

(4) is a spouse, minor child, or agent of a person excludable under paragraph (1), (2), or (3).

<< 22 USCA § 6713 >>

(g) UNITED STATES CONFIDENTIAL BUSINESS INFORMATION DEFINED.—In this section, the term "United States confidential business information" means any trade secrets or commercial or financial information that is privileged and confidential—

<< 22 USCA § 6713 >>

(1) including—
(A) data described in section 304(e)(2) of this Act,
(B) any chemical structure,
(C) any plant design process, technology, or operating method,
(D) any operating requirement, input, or result that identifies any type or quantity of chemicals used, processed, or produced, or
(E) any commercial sale, shipment, or use of a chemical, or

<< 22 USCA § 6713 >>

(2) as described in section 552(b)(4) of title 5, United States Code,

and that is obtained—

(i) from a United States person; or

(ii) through the United States Government or the conduct of an inspection on United States territory under the Convention.

TITLE II—PENALTIES FOR UNLAWFUL ACTIVITIES SUBJECT TO THE JURISDICTION OF THE UNITED STATES

Subtitle A—Criminal and Civil Penalties

SEC. 201. CRIMINAL AND CIVIL PROVISIONS.

<< 18 USCA Ch. 11B >>

(a) IN GENERAL.—Part I of title 18, United States Code, is amended by inserting after chapter 11A the following new chapter:

"CHAPTER 11B—CHEMICAL WEAPONS

"Sec.

"229. Prohibited activities.

"229A. Penalties.

"229B. Criminal forfeitures; destruction of weapons.

"229C. Individual self-defense devices.

"229D. Injunctions.

"229E. Requests for military assistance to enforce prohibition in certain emergencies.

"229F. Definitions.

<< 18 USCA § 229 >>

"§ 229. Prohibited activities

"(a) UNLAWFUL CONDUCT.—Except as provided in subsection (b), it shall be unlawful for any person knowingly—

"(1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon; or

"(2) to assist or induce, in any way, any person to violate paragraph (1), or to attempt or conspire to violate paragraph (1).

"(b) EXEMPTED AGENCIES AND PERSONS.—

"(1) IN GENERAL.—Subsection (a) does not apply to the retention, ownership, possession, transfer, or receipt of a chemical weapon by a department, agency, or other entity of the United States, or by a person described in paragraph (2), pending destruction of the weapon.

"(2) EXEMPTED PERSONS.—A person referred to in paragraph (1) is—

"(A) any person, including a member of the Armed Forces of the United States, who is authorized by law or by an appropriate officer of the United States to retain, own, possess, transfer, or receive the chemical weapon; or

"(B) in an emergency situation, any otherwise nonculpable person if the person is attempting to destroy or seize the weapon.

"(c) JURISDICTION.—Conduct prohibited by subsection (a) is within the jurisdiction of the United States if the prohibited conduct—

"(1) takes place in the United States;

"(2) takes place outside of the United States and is committed by a national of the United States;

"(3) is committed against a national of the United States while the national is outside the United States; or

"(4) is committed against any property that is owned, leased, or used by the United States or by any department or agency of the United States, whether the property is within or outside the United States.

<< 18 USCA § 229A >>

"§ 229A. Penalties

"(a) CRIMINAL PENALTIES.—

"(1) IN GENERAL.—Any person who violates section 229 of this title shall be fined under this title, or imprisoned for any term of years, or both.

"(2) DEATH PENALTY.—Any person who violates section 229 of this title and by whose action the death of another person is the result shall be punished by death or imprisoned for life.

"(b) CIVIL PENALTIES.—

"(1) IN GENERAL.—The Attorney General may bring a civil action in the appropriate United States district court against any person who violates section 229 of this title and, upon proof of such violation by a preponderance of the evidence, such person shall be subject to pay a civil penalty in an amount not to exceed $100,000 for each such violation.

"(2) RELATION TO OTHER PROCEEDINGS.—The imposition of a civil penalty under this subsection does not preclude any other criminal or civil statutory, common law, or administrative remedy, which is available by law to the United States or any other person.

"(c) REIMBURSEMENT OF COSTS.—The court shall order any person convicted of an offense under subsection (a) to reimburse the United States for any expenses incurred by the United States incident to the seizure, storage, handling, transportation, and destruction or other disposition of any property that was seized in connection with an investigation of the commission of the offense by that person. A person ordered to reimburse the United States for expenses under this subsection shall be jointly and severally liable for such expenses with each other person, if any, who is ordered under this subsection to reimburse the United States for the same expenses.

<< 18 USCA § 229B >>

"§ 229B. Criminal forfeitures; destruction of weapons

"(a) PROPERTY SUBJECT TO CRIMINAL FORFEITURE.—Any person convicted under section 229A(a) shall forfeit to the United States irrespective of any provision of State law—

"(1) any property, real or personal, owned, possessed, or used by a person involved in the offense;

"(2) any property constituting, or derived from, and proceeds the person obtained, directly or indirectly, as the result of such violation; and

"(3) any of the property used in any manner or part, to commit, or to facilitate the commission of, such violation.

The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to section 229A(a), that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by section 229A(a), a defendant who derived profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

"(b) PROCEDURES.—

"(1) GENERAL.—Property subject to forfeiture under this section, any seizure and disposition thereof, and any administrative or judicial proceeding in relation thereto, shall be governed by subsections (b) through (p) of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except that any reference under those subsections to—

"(A) 'this subchapter or subchapter II' shall be deemed to be a reference to section 229A(a); and

"(B) 'subsection (a)' shall be deemed to be a reference to subsection (a) of this section.

"(2) TEMPORARY RESTRAINING ORDERS.—

"(A) IN GENERAL.—For the purposes of forfeiture proceedings under this section, a temporary restraining order may be entered upon application of the United States without notice or opportunity for a hearing when an information or indictment

has not yet been filed with respect to the property, if, in addition to the circumstances described in section 413(e)(2) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853(e)(2)), the United States demonstrates that there is probable cause to believe that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section and exigent circumstances exist that place the life or health of any person in danger.

  "(B) WARRANT OF SEIZURE.—If the court enters a temporary restraining order under this paragraph, it shall also issue a warrant authorizing the seizure of such property.

  "(C) APPLICABLE PROCEDURES.—The procedures and time limits applicable to temporary restraining orders under section 413(e)(2) and (3) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853(e)(2) and (3)) shall apply to temporary restraining orders under this paragraph.

  "(c) AFFIRMATIVE DEFENSE.—It is an affirmative defense against a forfeiture under subsection (b) that the property—

  "(1) is for a purpose not prohibited under the Chemical Weapons Convention; and

  "(2) is of a type and quantity that under the circumstances is consistent with that purpose.

  "(d) DESTRUCTION OR OTHER DISPOSITION.—The Attorney General shall provide for the destruction or other appropriate disposition of any chemical weapon seized and forfeited pursuant to this section.

  "(e) ASSISTANCE.—The Attorney General may request the head of any agency of the United States to assist in the handling, storage, transportation, or destruction of property seized under this section.

  "(f) OWNER LIABILITY.—The owner or possessor of any property seized under this section shall be liable to the United States for any expenses incurred incident to the seizure, including any expenses relating to the handling, storage, transportation, and destruction or other disposition of the seized property.

<< 18 USCA § 229C >>

"§ 229C. Individual self-defense devices

  "Nothing in this chapter shall be construed to prohibit any individual self-defense device, including those using a pepper spray or chemical mace.

<< 18 USCA § 229D >>

"§ 229D. Injunctions

  "The United States may obtain in a civil action an injunction against—

  "(1) the conduct prohibited under section 229 or 229C of this title; or

  "(2) the preparation or solicitation to engage in conduct prohibited under section 229 or 229D of this title.

<< 18 USCA § 229E >>

"§ 229E. Requests for military assistance to enforce prohibition in certain emergencies

  "The Attorney General may request the Secretary of Defense to provide assistance under section 382 of title 10 in support of Department of Justice activities relating to the enforcement of section 229 of this title in an emergency situation involving a chemical weapon. The authority to make such a request may be exercised by another official of the Department of Justice in accordance with section 382(f)(2) of title 10.

<< 18 USCA § 229F >>

"§ 229F. Definitions

  "In this chapter:

  "(1) CHEMICAL WEAPON.—The term 'chemical weapon' means the following, together or separately:

  "(A) A toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose.

  "(B) A munition or device, specifically designed to cause death or other harm through toxic properties of those toxic chemicals specified in subparagraph (A), which would be released as a result of the employment of such munition or device.

"(C) Any equipment specifically designed for use directly in connection with the employment of munitions or devices specified in subparagraph (B).

"(2) CHEMICAL WEAPONS CONVENTION; CONVENTION.—The terms 'Chemical Weapons Convention' and 'Convention' mean the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993.

"(3) KEY COMPONENT OF A BINARY OR MULTICOMPONENT CHEMICAL SYSTEM.—The term 'key component of a binary or multicomponent chemical system' means the precursor which plays the most important role in determining the toxic properties of the final product and reacts rapidly with other chemicals in the binary or multicomponent system.

"(4) NATIONAL OF THE UNITED STATES.—The term 'national of the United States' has the same meaning given such term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

"(5) PERSON.—The term 'person', except as otherwise provided, means any individual, corporation, partnership, firm, association, trust, estate, public or private institution, any State or any political subdivision thereof, or any political entity within a State, any foreign government or nation or any agency, instrumentality or political subdivision of any such government or nation, or other entity located in the United States.

"(6) PRECURSOR.—

"(A) IN GENERAL.—The term 'precursor' means any chemical reactant which takes part at any stage in the production by whatever method of a toxic chemical. The term includes any key component of a binary or multicomponent chemical system.

"(B) LIST OF PRECURSORS.—Precursors which have been identified for the application of verification measures under Article VI of the Convention are listed in schedules contained in the Annex on Chemicals of the Chemical Weapons Convention.

"(7) PURPOSES NOT PROHIBITED BY THIS CHAPTER.—The term 'purposes not prohibited by this chapter' means the following:

"(A) PEACEFUL PURPOSES.—Any peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity.

"(B) PROTECTIVE PURPOSES.—Any purpose directly related to protection against toxic chemicals and to protection against chemical weapons.

"(C) UNRELATED MILITARY PURPOSES.—Any military purpose of the United States that is not connected with the use of a chemical weapon or that is not dependent on the use of the toxic or poisonous properties of the chemical weapon to cause death or other harm.

"(D) LAW ENFORCEMENT PURPOSES.—Any law enforcement purpose, including any domestic riot control purpose and including imposition of capital punishment.

"(8) TOXIC CHEMICAL.—

"(A) IN GENERAL.—The term 'toxic chemical' means any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals. The term includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere.

"(B) LIST OF TOXIC CHEMICALS.—Toxic chemicals which have been identified for the application of verification measures under Article VI of the Convention are listed in schedules contained in the Annex on Chemicals of the Chemical Weapons Convention.

"(9) UNITED STATES.—The term 'United States' means the several States of the United States, the District of Columbia, and the commonwealths, territories, and possessions of the United States and includes all places under the jurisdiction or control of the United States, including—

"(A) any of the places within the provisions of paragraph (41) of section 40102 of title 49, United States Code;

"(B) any civil aircraft of the United States or public aircraft, as such terms are defined in paragraphs (17) and (37), respectively, of section 40102 of title 49, United States Code; and

"(C) any vessel of the United States, as such term is defined in section 3(b) of the Maritime Drug Enforcement Act, as amended (46 U.S.C., App. sec. 1903(b)).".

<< 18 USCA § 2332a >>

(b) CONFORMING AMENDMENTS.—

<< 18 USCA § 2332a >>

(1) WEAPONS OF MASS DESTRUCTION.—Section 2332a of title 18, United States Code, is amended—
  (A) by striking "§ 2332a. Use of weapons of mass destruction" and inserting "§ 2332a. Use of certain weapons of mass destruction";
  (B) in subsection (a), by inserting "(other than a chemical weapon as that term is defined in section 229F)" after "weapon of mass destruction"; and
  (C) in subsection (b), by inserting "(other than a chemical weapon (as that term is defined in section 229F))" after "weapon of mass destruction".

<< 18 USCA Ch. 1 >>

(2) TABLE OF CHAPTERS.—The table of chapters for part I of title 18, United States Code, is amended by inserting after the item for chapter 11A the following new item:

"11B. Chemical Weapons .......... 229".
  (c) REPEALS.—The following provisions of law are repealed:

<< 18 USCA § 2332c >>

(1) Section 2332c of title 18, United States Code, relating to chemical weapons.

<< 18 USCA Ch. 113B >>

(2) In the table of sections for chapter 113B of title 18, United States Code, the item relating to section 2332c.

Subtitle B—Revocations of Export Privileges

<< 18 USCA § 229 NOTE >>

SEC. 211. REVOCATIONS OF EXPORT PRIVILEGES.

  If the President determines, after notice and an opportunity for a hearing in accordance with section 554 of title 5, United States Code, that any person within the United States, or any national of the United States located outside the United States, has committed any violation of section 229 of title 18, United States Code, the President may issue an order for the suspension or revocation of the authority of the person to export from the United States any goods or technology (as such terms are defined in section 16 of the Export Administration Act of 1979 (50 U.S.C. App. 2415)).

<< 22 USCA Ch. 75 >>

TITLE III—INSPECTIONS

<< 22 USCA § 6721 >>

SEC. 301. DEFINITIONS IN THE TITLE.

<< 22 USCA § 6721 >>

  (a) IN GENERAL.—In this title, the terms "challenge inspection", "plant site", "plant", "facility agreement", "inspection team", and "requesting state party" have the meanings given those terms in Part I of the Annex on Implementation and Verification of the Chemical Weapons Convention. The term "routine inspection" means an inspection, other than an "initial inspection", undertaken pursuant to Article VI of the Convention.

<< 22 USCA § 6721 >>

(b) DEFINITION OF JUDGE OF THE UNITED STATES.—In this title, the term "judge of the United States" means a judge or magistrate judge of a district court of the United States.

<< 22 USCA § 6722 >>

SEC. 302. FACILITY AGREEMENTS.

<< 22 USCA § 6722 >>

(a) AUTHORIZATION OF INSPECTIONS.—Inspections by the Technical Secretariat of plants, plant sites, or other facilities or locations for which the United States has a facility agreement with the Organization shall be conducted in accordance with the facility agreement. Any such facility agreement may not in any way limit the right of the owner or operator of the facility to withhold consent to an inspection request.

<< 22 USCA § 6722 >>

(b) TYPES OF FACILITY AGREEMENTS.—

<< 22 USCA § 6722 >>

(1) SCHEDULE TWO FACILITIES.—The United States National Authority shall ensure that facility agreements for plants, plant sites, or other facilities or locations that are subject to inspection pursuant to paragraph 4 of Article VI of the Convention are concluded unless the owner, operator, occupant, or agent in charge of the facility and the Technical Secretariat agree that such an agreement is not necessary.

<< 22 USCA § 6722 >>

(2) SCHEDULE THREE FACILITIES.—The United States National Authority shall ensure that facility agreements are concluded for plants, plant sites, or other facilities or locations that are subject to inspection pursuant to paragraph 5 or 6 of Article VI of the Convention if so requested by the owner, operator, occupant, or agent in charge of the facility.

<< 22 USCA § 6722 >>

(c) NOTIFICATION REQUIREMENTS.—The United States National Authority shall ensure that the owner, operator, occupant, or agent in charge of a facility prior to the development of the agreement relating to that facility is notified and, if the person notified so requests, the person may participate in the preparations for the negotiation of such an agreement. To the maximum extent practicable consistent with the Convention, the owner and the operator, occupant or agent in charge of a facility may observe negotiations of the agreement between the United States and the Organization concerning that facility.

<< 22 USCA § 6722 >>

(d) CONTENT OF FACILITY AGREEMENTS.—Facility agreements shall—

<< 22 USCA § 6722 >>

(1) identify the areas, equipment, computers, records, data, and samples subject to inspection;

<< 22 USCA § 6722 >>

(2) describe the procedures for providing notice of an inspection to the owner, occupant, operator, or agent in charge of a facility;

<< 22 USCA § 6722 >>

(3) describe the timeframes for inspections; and

<< 22 USCA § 6722 >>

(4) detail the areas, equipment, computers, records, data, and samples that are not subject to inspection.

<< 22 USCA § 6723 >>

SEC. 303. AUTHORITY TO CONDUCT INSPECTIONS.

<< 22 USCA § 6723 >>

(a) PROHIBITION.—No inspection of a plant, plant site, or other facility or location in the United States shall take place under the Convention without the authorization of the United States National Authority in accordance with the requirements of this title.

<< 22 USCA § 6723 >>

(b) AUTHORITY.—

<< 22 USCA § 6723 >>

(1) TECHNICAL SECRETARIAT INSPECTION TEAMS.—Any duly designated member of an inspection team of the Technical Secretariat may inspect any plant, plant site, or other facility or location in the United States subject to inspection pursuant to the Convention.

<< 22 USCA § 6723 >>

(2) UNITED STATES GOVERNMENT REPRESENTATIVES.—The United States National Authority shall coordinate the designation of employees of the Federal Government to accompany members of an inspection team of the Technical Secretariat and, in doing so, shall ensure that—

  (A) a special agent of the Federal Bureau of Investigation, as designated by the Federal Bureau of Investigation, accompanies each inspection team visit pursuant to paragraph (1);

  (B) no employee of the Environmental Protection Agency or the Occupational Safety and Health Administration accompanies any inspection team visit conducted pursuant to paragraph (1); and

  (C) the number of duly designated representatives shall be kept to the minimum necessary.

<< 22 USCA § 6723 >>

(3) OBJECTIONS TO INDIVIDUALS SERVING AS INSPECTORS.—

  (A) IN GENERAL.—In deciding whether to exercise the right of the United States under the Convention to object to an individual serving as an inspector, the President shall give great weight to his reasonable belief that—

   (i) such individual is or has been a member of, or a participant in, any group or organization that has engaged in, or attempted or conspired to engage in, or aided or abetted in the commission of, any terrorist act or activity;

   (ii) such individual has committed any act or activity which would be a felony under the laws of the United States; or

   (iii) the participation of such individual as a member of an inspection team would pose a risk to the national security or economic well-being of the United States.

  (B) NOT SUBJECT TO JUDICIAL REVIEW.—Any objection by the President to an individual serving as an inspector, whether made pursuant to this section or otherwise, shall not be reviewable in any court.

<< 22 USCA § 6724 >>

SEC. 304. PROCEDURES FOR INSPECTIONS.

<< 22 USCA § 6724 >>

(a) TYPES OF INSPECTIONS.—Each inspection of a plant, plant site, or other facility or location in the United States under the Convention shall be conducted in accordance with this section and section 305, except where other procedures are provided in a facility agreement entered into under section 302.

<< 22 USCA § 6724 >>

(b) NOTICE.—

<< 22 USCA § 6724 >>

(1) IN GENERAL.—An inspection referred to in subsection (a) may be made only upon issuance of an actual written notice by the United States National Authority to the owner and to the operator, occupant, or agent in charge of the premises to be inspected.

<< 22 USCA § 6724 >>

(2) TIME OF NOTIFICATION.—The notice for a routine inspection shall be submitted to the owner and to the operator, occupant, or agent in charge within six hours of receiving the notification of the inspection from the Technical Secretariat or as soon as possible thereafter. Notice for a challenge inspection shall be provided at any appropriate time determined by the United States National Authority. Notices may be posted prominently at the plant, plant site, or other facility or location if the United States is unable to provide actual written notice to the owner, operator, or agent in charge of the premises.

<< 22 USCA § 6724 >>

(3) CONTENT OF NOTICE.—
(A) IN GENERAL.—The notice under paragraph (1) shall include all appropriate information supplied by the Technical Secretariat to the United States National Authority concerning—
(i) the type of inspection;
(ii) the basis for the selection of the plant, plant site, or other facility or location for the type of inspection sought;
(iii) the time and date that the inspection will begin and the period covered by the inspection; and
(iv) the names and titles of the inspectors.
(B) SPECIAL RULE FOR CHALLENGE INSPECTIONS.—In the case of a challenge inspection pursuant to Article IX of the Convention, the notice shall also include all appropriate evidence or reasons provided by the requesting state party to the Convention for seeking the inspection.

<< 22 USCA § 6724 >>

(4) SEPARATE NOTICES REQUIRED.—A separate notice shall be provided for each inspection, except that a notice shall not be required for each entry made during the period covered by the inspection.

<< 22 USCA § 6724 >>

(c) CREDENTIALS.—The head of the inspection team of the Technical Secretariat and the accompanying employees of the Federal government shall display appropriate identifying credentials to the owner, operator, occupant, or agent in charge of the premises before the inspection is commenced.

<< 22 USCA § 6724 >>

(d) TIMEFRAME FOR INSPECTIONS.—Consistent with the provisions of the Convention, each inspection shall be commenced and completed with reasonable promptness and shall be conducted at reasonable times, within reasonable limits, and in a reasonable manner.

<< 22 USCA § 6724 >>

(e) SCOPE.—

<< 22 USCA § 6724 >>

(1) IN GENERAL.—Except as provided in a warrant issued under section 305 or a facility agreement entered into under section 302, an inspection conducted under this title may extend to all things within the premises inspected (including records, files, papers, processes, controls, structures and vehicles) related to whether the requirements of the Convention applicable to such premises have been complied with.

<< 22 USCA § 6724 >>

(2) EXCEPTION.—Unless required by the Convention, no inspection under this title shall extend to—
 (A) financial data;
 (B) sales and marketing data (other than shipment data);
 (C) pricing data;
 (D) personnel data;
 (E) research data;
 (F) patent data;
 (G) data maintained for compliance with environmental or occupational health and safety regulations; or
 (H) personnel and vehicles entering and personnel and personal passenger vehicles exiting the facility.

<< 22 USCA § 6724 >>

(f) SAMPLING AND SAFETY.—

<< 22 USCA § 6724 >>

(1) IN GENERAL.—The Director of the United States National Authority is authorized to require the provision of samples to a member of the inspection team of the Technical Secretariat in accordance with the provisions of the Convention. The owner or the operator, occupant or agent in charge of the premises to be inspected shall determine whether the sample shall be taken by representatives of the premises or the inspection team or other individuals present. No sample collected in the United States pursuant to an inspection permitted by this Act may be transferred for analysis to any laboratory outside the territory of the United States.

<< 22 USCA § 6724 >>

(2) COMPLIANCE WITH REGULATIONS.—In carrying out their activities, members of the inspection team of the Technical Secretariat and representatives of agencies or departments accompanying the inspection team shall observe safety regulations established at the premises to be inspected, including those for protection of controlled environments within a facility and for personal safety.

<< 22 USCA § 6724 >>

(g) COORDINATION.—The appropriate representatives of the United States, as designated, if present, shall assist the owner and the operator, occupant or agent in charge of the premises to be inspected in interacting with the members of the inspection team of the Technical Secretariat.

<< 22 USCA § 6725 >>

SEC. 305. WARRANTS.

<< 22 USCA § 6725 >>

(a) IN GENERAL.—The United States Government shall seek the consent of the owner or the operator, occupant, or agent in charge of the premises to be inspected prior to any inspection referred to in section 304(a). If consent is obtained, a warrant is not required for the inspection. The owner or the operator, occupant, or agent in charge of the premises to be inspected may withhold consent for any reason or no reason. After providing notification pursuant to subsection (b), the United States Government may seek a search warrant from a United States magistrate judge. Proceedings regarding the issuance of a search warrant shall be conducted ex parte, unless otherwise requested by the United States Government.

<< 22 USCA § 6725 >>

(b) ROUTINE INSPECTIONS.—

<< 22 USCA § 6725 >>

(1) OBTAINING ADMINISTRATIVE SEARCH WARRANTS.—For any routine inspection conducted on the territory of the United States pursuant to Article VI of the Convention, where consent has been withheld, the United States Government shall first obtain an administrative search warrant from a judge of the United States. The United States Government shall provide to the judge of the United States all appropriate information supplied by the Technical Secretariat to the United States National Authority regarding the basis for the selection of the plant site, plant, or other facility or location for the type of inspection sought. The United States Government shall also provide any other appropriate information available to it relating to the reasonableness of the selection of the plant, plant site, or other facility or location for the inspection.

<< 22 USCA § 6725 >>

(2) CONTENT OF AFFIDAVITS FOR ADMINISTRATIVE SEARCH WARRANTS.—The judge of the United States shall promptly issue a warrant authorizing the requested inspection upon an affidavit submitted by the United States Government showing that—

(A) the Chemical Weapons Convention is in force for the United States;

(B) the plant site, plant, or other facility or location sought to be inspected is required to report data under title IV of this Act and is subject to routine inspection under the Convention;

(C) the purpose of the inspection is—

(i) in the case of any facility owned or operated by a non-Government entity related to Schedule 1 chemical agents, to verify that the facility is not used to produce any Schedule 1 chemical agent except for declared chemicals; quantities of Schedule 1 chemicals produced, processed, or consumed are correctly declared and consistent with needs for the declared purpose; and Schedule 1 chemicals are not diverted or used for other purposes;

(ii) in the case of any facility related to Schedule 2 chemical agents, to verify that activities are in accordance with obligations under the Convention and consistent with the information provided in data declarations; and

(iii) in the case of any facility related to Schedule 3 chemical agents and any other chemical production facility, to verify that the activities of the facility are consistent with the information provided in data declarations;

(D) the items, documents, and areas to be searched and seized;

(E) in the case of a facility related to Schedule 2 or Schedule 3 chemical agents or unscheduled discrete organic chemicals, the plant site has not been subject to more than 1 routine inspection in the current calendar year, and, in the case of facilities

related to Schedule 3 chemical agents or unscheduled discrete organic chemicals, the inspection will not cause the number of routine inspections in the United States to exceed 20 in a calendar year;

(F) the selection of the site was made in accordance with procedures established under the Convention and, in particular—

(i) in the case of any facility owned or operated by a non-Government entity related to Schedule 1 chemical agents, the intensity, duration, timing, and mode of the requested inspection is based on the risk to the object and purpose of the Convention by the quantities of chemical produced, the characteristics of the facility and the nature of activities carried out at the facility, and the requested inspection, when considered with previous such inspections of the facility undertaken in the current calendar year, shall not exceed the number reasonably required based on the risk to the object and purpose of the Convention as described above;

(ii) in the case of any facility related to Schedule 2 chemical agents, the Technical Secretariat gave due consideration to the risk to the object and purpose of the Convention posed by the relevant chemical, the characteristics of the plant site and the nature of activities carried out there, taking into account the respective facility agreement as well as the results of the initial inspections and subsequent inspections; and

(iii) in the case of any facility related to Schedule 3 chemical agents or unscheduled discrete organic chemicals, the facility was selected randomly by the Technical Secretariat using appropriate mechanisms, such as specifically designed computer software, on the basis of two weighting factors: (I) equitable geographical distribution of inspections; and (II) the information on the declared sites available to the Technical Secretariat, related to the relevant chemical, the characteristics of the plant site, and the nature of activities carried out there;

(G) the earliest commencement and latest closing dates and times of the inspection; and

(H) the duration of inspection will not exceed time limits specified in the Convention unless agreed by the owner, operator, or agent in charge of the plant.


<< 22 USCA § 6725 >>


(3) CONTENT OF WARRANTS.—A warrant issued under paragraph (2) shall specify the same matters required of an affidavit under that paragraph. In addition to the requirements for a warrant issued under this paragraph, each warrant shall contain, if known, the identities of the representatives of the Technical Secretariat conducting the inspection and the observers of the inspection and, if applicable, the identities of the representatives of agencies or departments of the United States accompanying those representatives.


<< 22 USCA § 6725 >>


(4) CHALLENGE INSPECTIONS.—

(A) CRIMINAL SEARCH WARRANT.—For any challenge inspection conducted on the territory of the United States pursuant to Article IX of the Chemical Weapons Convention, where consent has been withheld, the United States Government shall first obtain from a judge of the United States a criminal search warrant based upon probable cause, supported by oath or affirmation, and describing with particularity the place to be searched and the person or things to be seized.

(B) INFORMATION PROVIDED.—The United States Government shall provide to the judge of the United States—

(i) all appropriate information supplied by the Technical Secretariat to the United States National Authority regarding the basis for the selection of the plant site, plant, or other facility or location for the type of inspection sought;

(ii) any other appropriate information relating to the reasonableness of the selection of the plant, plant site, or other facility or location for the inspection;

(iii) information concerning—

(I) the duration and scope of the inspection;

(II) areas to be inspected;

(III) records and data to be reviewed; and

(IV) samples to be taken;

(iv) appropriate evidence or reasons provided by the requesting state party for the inspection;

(v) any other evidence showing probable cause to believe that a violation of this Act has occurred or is occurring; and

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

(vi) the identities of the representatives of the Technical Secretariat on the inspection team and the Federal Government employees accompanying the inspection team.

(C) CONTENT OF WARRANT.—The warrant shall specify—

(i) the type of inspection authorized;

(ii) the purpose of the inspection;

(iii) the type of plant site, plant, or other facility or location to be inspected;

(iv) the areas of the plant site, plant, or other facility or location to be inspected;

(v) the items, documents, data, equipment, and computers that may be inspected or seized;

(vi) samples that may be taken;

(vii) the earliest commencement and latest concluding dates and times of the inspection; and

(viii) the identities of the representatives of the Technical Secretariat on the inspection teams and the Federal Government employees accompanying the inspection team.

<< 22 USCA § 6726 >>

SEC. 306. PROHIBITED ACTS RELATING TO INSPECTIONS.

It shall be unlawful for any person willfully to fail or refuse to permit entry or inspection, or to disrupt, delay, or otherwise impede an inspection, authorized by this Act.

<< 22 USCA § 6727 >>

SEC. 307. NATIONAL SECURITY EXCEPTION.

Consistent with the objective of eliminating chemical weapons, the President may deny a request to inspect any facility in the United States in cases where the President determines that the inspection may pose a threat to the national security interests of the United States.

SEC. 308. PROTECTION OF CONSTITUTIONAL RIGHTS OF CONTRACTORS.

<< 41 USCA § 436 >>

(a) The Office of Federal Procurement Policy Act (41 U.S.C. 403 et seq.) is amended by adding at the end the following:

"SEC. 39. PROTECTION OF CONSTITUTIONAL RIGHTS OF CONTRACTORS.

"(a) PROHIBITION.—A contractor may not be required, as a condition for entering into a contract with the Federal Government, to waive any right under the Constitution for any purpose related to Chemical Weapons Convention Implementation Act of 1997 or the Chemical Weapons Convention (as defined in section 3 of such Act.)

"(b) CONSTRUCTION.—Nothing in subsection (a) shall be construed to prohibit an executive agency from including in a contract a clause that requires the contractor to permit inspections for the purpose of ensuring that the contractor is performing the contract in accordance with the provisions of the contract.".

(b) The table of contents in section 1(b) of such Act is amended by adding at the end the following:

"Sec. 39. Protection of constitutional rights of contractors.".

<< 22 USCA § 6728 >>

SEC. 309. ANNUAL REPORT ON INSPECTIONS.

<< 22 USCA § 6728 >>

(a) IN GENERAL.—Not later than one year after the date of enactment of this Act, and annually thereafter, the President shall submit a report in classified and unclassified form to the appropriate congressional committees on inspections made under the Convention during the preceding year.

<< 22 USCA § 6728 >>

(b) CONTENT OF REPORTS.—Each report shall contain the following information for the reporting period:

<< 22 USCA § 6728 >>

(1) The name of each company or entity subject to the jurisdiction of the United States reporting data pursuant to title IV of this Act.

<< 22 USCA § 6728 >>

(2) The number of inspections under the Convention conducted on the territory of the United States.

<< 22 USCA § 6728 >>

(3) The number and identity of inspectors conducting any inspection described in paragraph (2) and the number of inspectors barred from inspection by the United States.

<< 22 USCA § 6728 >>

(4) The cost to the United States for each inspection described in paragraph (2).

<< 22 USCA § 6728 >>

(5) The total costs borne by United States business firms in the course of inspections described in paragraph (2).

<< 22 USCA § 6728 >>

(6) A description of the circumstances surrounding inspections described in paragraph (2), including instances of possible industrial espionage and misconduct of inspectors.

<< 22 USCA § 6728 >>

(7) The identity of parties claiming loss of trade secrets, the circumstances surrounding those losses, and the efforts taken by the United States Government to redress those losses.

<< 22 USCA § 6728 >>

(8) A description of instances where inspections under the Convention outside the United States have been disrupted or delayed.

<< 22 USCA § 6728 >>

(c) DEFINITION.—The term "appropriate congressional committees" means the Committee on the Judiciary, the Committee on Foreign Relations, and the Select Committee on Intelligence of the Senate and the Committee on the Judiciary, the Committee on International Relations, and the Permanent Select Committee on Intelligence of the House of Representatives.

<< 22 USCA § 6729 >>

SEC. 310. UNITED STATES ASSISTANCE IN INSPECTIONS AT PRIVATE FACILITIES.

<< 22 USCA § 6729 >>

(a) ASSISTANCE IN PREPARATION FOR INSPECTIONS.—At the request of an owner of a facility not owned or operated by the United States Government, or contracted for use by or for the United States Government, the Secretary of Defense may assist the facility to prepare the facility for possible inspections pursuant to the Convention.

<< 22 USCA § 6729 >>

(b) REIMBURSEMENT REQUIREMENT.—

<< 22 USCA § 6729 >>

(1) IN GENERAL.—Except as provided in paragraph (2), the owner of a facility provided assistance under subsection (a) shall reimburse the Secretary for the costs incurred by the Secretary in providing the assistance.

<< 22 USCA § 6729 >>

(2) EXCEPTION.—In the case of assistance provided under subsection (a) to a facility owned by a person described in subsection (c), the United States National Authority shall reimburse the Secretary for the costs incurred by the Secretary in providing the assistance.

<< 22 USCA § 6729 >>

(c) OWNERS COVERED BY UNITED STATES NATIONAL AUTHORITY REIMBURSEMENTS.—Subsection (b)(2) applies in the case of assistance provided to the following:

<< 22 USCA § 6729 >>

(1) SMALL BUSINESS CONCERNS.—A small business concern as defined in section 3 of the Small Business Act.

<< 22 USCA § 6729 >>

(2) DOMESTIC PRODUCERS OF SCHEDULE 3 OR UNSCHEDULED DISCRETE ORGANIC CHEMICALS.—Any person located in the United States that—
  (A) does not possess, produce, process, consume, import, or export any Schedule 1 or Schedule 2 chemical; and
  (B) in the calendar year preceding the year in which the assistance is to be provided, produced—
  (i) more than 30 metric tons of Schedule 3 or unscheduled discrete organic chemicals that contain phosphorous, sulfur, or fluorine; or
  (ii) more than 200 metric tons of unscheduled discrete organic chemicals.

<< 22 USCA Ch. 75 >>

TITLE IV—REPORTS

<< 22 USCA § 6741 >>

SEC. 401. REPORTS REQUIRED BY THE UNITED STATES NATIONAL AUTHORITY.

<< 22 USCA § 6741 >>

(a) REGULATIONS ON RECORDKEEPING.—

<< 22 USCA § 6741 >>

(1) REQUIREMENTS.—The United States National Authority shall ensure that regulations are prescribed that require each person located in the United States who produces, processes, consumes, exports, or imports, or proposes to produce, process, consume, export, or import, a chemical substance that is subject to the Convention to—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(A) maintain and permit access to records related to that production, processing, consumption, export, or import of such substance; and

(B) submit to the Director of the United States National Authority such reports as the United States National Authority may reasonably require to provide to the Organization, pursuant to subparagraph 1(a) of the Annex on Confidentiality of the Convention, the minimum amount of information and data necessary for the timely and efficient conduct by the Organization of its responsibilities under the Convention.

<< 22 USCA § 6741 >>

(2) RULEMAKING.—The Director of the United States National Authority shall ensure that regulations pursuant to this section are prescribed expeditiously.

<< 22 USCA § 6741 >>

(b) COORDINATION.—

<< 22 USCA § 6741 >>

(1) AVOIDANCE OF DUPLICATION.—To the extent feasible, the United States Government shall not require the submission of any report that is unnecessary or duplicative of any report required by or under any other law. The head of each Federal agency shall coordinate the actions of that agency with the heads of the other Federal agencies in order to avoid the imposition of duplicative reporting requirements under this Act or any other law.

<< 22 USCA § 6741 >>

(2) DEFINITION.—As used in paragraph (1), the term "Federal agency" has the meaning given the term "agency" in section 551(1) of title 5, United States Code.

<< 22 USCA § 6742 >>

SEC. 402. PROHIBITION RELATING TO LOW CONCENTRATIONS OF SCHEDULE 2 AND 3 CHEMICALS.

<< 22 USCA § 6742 >>

(a) PROHIBITION.—Notwithstanding any other provision of this Act, no person located in the United States shall be required to report on, or to submit to, any routine inspection conducted for the purpose of verifying the production, possession, consumption, exportation, importation, or proposed production, possession, consumption, exportation, or importation of any substance that contains less than—

<< 22 USCA § 6742 >>

(1) 10 percent concentration of a Schedule 2 chemical; or

<< 22 USCA § 6742 >>

(2) 80 percent concentration of a Schedule 3 chemical.

<< 22 USCA § 6742 >>

(b) STANDARD FOR MEASUREMENT OF CONCENTRATION.—The percent concentration of a chemical in a substance shall be measured on the basis of volume or total weight, which measurement yields the lesser percent.

<< 22 USCA § 6743 >>

SEC. 403. PROHIBITION RELATING TO UNSCHEDULED DISCRETE ORGANIC CHEMICALS AND COINCIDENTAL BYPRODUCTS IN WASTE STREAMS.

<< 22 USCA § 6743 >>

(a) PROHIBITION.—Notwithstanding any other provision of this Act, no person located in the United States shall be required to report on, or to submit to, any routine inspection conducted for the purpose of verifying the production, possession, consumption, exportation, importation, or proposed production, possession, consumption, exportation, or importation of any substance that is—

<< 22 USCA § 6743 >>

(1) an unscheduled discrete organic chemical; and

<< 22 USCA § 6743 >>

(2) a coincidental byproduct of a manufacturing or production process that is not isolated or captured for use or sale during the process and is routed to, or escapes, from the waste stream of a stack, incinerator, or wastewater treatment system or any other waste stream.

<< 22 USCA § 6744 >>

SEC. 404. CONFIDENTIALITY OF INFORMATION.

<< 22 USCA § 6744 >>

(a) FREEDOM OF INFORMATION ACT EXEMPTION FOR CERTAIN CONVENTION INFORMATION.—Except as provided in subsection (b) or (c), any confidential business information, as defined in section 103(g), reported to, or otherwise acquired by, the United States Government under this Act or under the Convention shall not be disclosed under section 552(a) of title 5, United States Code.

<< 22 USCA § 6744 >>

(b) EXCEPTIONS.—

<< 22 USCA § 6744 >>

(1) INFORMATION FOR THE TECHNICAL SECRETARIAT.—Information shall be disclosed or otherwise provided to the Technical Secretariat or other states parties to the Chemical Weapons Convention in accordance with the Convention, in particular, the provisions of the Annex on the Protection of Confidential Information.

<< 22 USCA § 6744 >>

(2) INFORMATION FOR CONGRESS.—Information shall be made available to any committee or subcommittee of Congress with appropriate jurisdiction upon the written request of the chairman or ranking minority member of such committee or subcommittee, except that no such committee or subcommittee, and no member and no staff member of such committee or subcommittee, shall disclose such information or material except as otherwise required or authorized by law.

<< 22 USCA § 6744 >>

(3) INFORMATION FOR ENFORCEMENT ACTIONS.—Information shall be disclosed to other Federal agencies for enforcement of this Act or any other law, and shall be disclosed or otherwise provided when relevant in any proceeding under this Act or any other law, except that disclosure or provision in such a proceeding shall be made in such manner as to preserve confidentiality to the extent practicable without impairing the proceeding.

<< 22 USCA § 6744 >>

(c) INFORMATION DISCLOSED IN THE NATIONAL INTEREST.—

<< 22 USCA § 6744 >>

 (1) AUTHORITY.—The United States Government shall disclose any information reported to, or otherwise required by the United States Government under this Act or the Convention, including categories of such information, that it determines is in the national interest to disclose and may specify the form in which such information is to be disclosed.

<< 22 USCA § 6744 >>

(2) NOTICE OF DISCLOSURE.—
 (A) REQUIREMENT.—If any Department or agency of the United States Government proposes pursuant to paragraph (1) to publish or disclose or otherwise provide information exempt from disclosure under subsection (a), the United States National Authority shall, unless contrary to national security or law enforcement needs, provide notice of intent to disclose the information—
  (i) to the person that submitted such information; and
  (ii) in the case of information about a person received from another source, to the person to whom that information pertains.

 The information may not be disclosed until the expiration of 30 days after notice under this paragraph has been provided.
 (B) PROCEEDINGS ON OBJECTIONS.—In the event that the person to which the information pertains objects to the disclosure, the agency shall promptly review the grounds for each objection of the person and shall afford the objecting person a hearing for the purpose of presenting the objections to the disclosure. Not later than 10 days before the scheduled or rescheduled date for the disclosure, the United States National Authority shall notify such person regarding whether such disclosure will occur notwithstanding the objections.

<< 22 USCA § 6744 >>

 (d) CRIMINAL PENALTY FOR WRONGFUL DISCLOSURE.—Any officer or employee of the United States, and any former officer or employee of the United States, who by reason of such employment or official position has obtained possession of, or has access to, information the disclosure or other provision of which is prohibited by subsection (a), and who, knowing that disclosure or provision of such information is prohibited by such subsection, willfully discloses or otherwise provides the information in any manner to any person (including any person located outside the territory of the United States) not authorized to receive it, shall be fined under title 18, United States Code, or imprisoned for not more than five years, or both.

<< 22 USCA § 6744 >>

 (e) CRIMINAL FORFEITURE.—The property of any person who violates subsection (d) shall be subject to forfeiture to the United States in the same manner and to the same extent as is provided in section 229C of title 18, United States Code, as added by this Act.

<< 22 USCA § 6744 >>

 (f) INTERNATIONAL INSPECTORS.—The provisions of this section shall also apply to employees of the Technical Secretariat.

<< 22 USCA § 6745 >>

SEC. 405. RECORDKEEPING VIOLATIONS.

 It shall be unlawful for any person willfully to fail or refuse—

<< 22 USCA § 6745 >>

(1) to establish or maintain any record required by this Act or any regulation prescribed under this Act;

<< 22 USCA § 6745 >>

(2) to submit any report, notice, or other information to the United States Government in accordance with this Act or any regulation prescribed under this Act; or

<< 22 USCA § 6745 >>

(3) to permit access to or copying of any record that is exempt from disclosure under this Act or any regulation prescribed under this Act.

<< 22 USCA Ch. 75 >>

TITLE V—ENFORCEMENT

<< 22 USCA § 6761 >>

SEC. 501. PENALTIES.

<< 22 USCA § 6761 >>

(a) CIVIL.—

<< 22 USCA § 6761 >>

(1) PENALTY AMOUNTS.—
  (A) PROHIBITED ACTS RELATING TO INSPECTIONS.—Any person that is determined, in accordance with paragraph (2), to have violated section 306 of this Act shall be required by order to pay a civil penalty in an amount not to exceed $25,000 for each such violation. For purposes of this paragraph, each day such a violation of section 306 continues shall constitute a separate violation of that section.
  (B) RECORDKEEPING VIOLATIONS.—Any person that is determined, in accordance with paragraph (2), to have violated section 405 of this Act shall be required by order to pay a civil penalty in an amount not to exceed $5,000 for each such violation.

<< 22 USCA § 6761 >>

(2) HEARING.—
  (A) IN GENERAL.—Before imposing an order described in paragraph (1) against a person under this subsection for a violation of section 306 or 405, the Secretary of State shall provide the person or entity with notice and, upon request made within 15 days of the date of the notice, a hearing respecting the violation.
  (B) CONDUCT OF HEARING.—Any hearing so requested shall be conducted before an administrative law judge. The hearing shall be conducted in accordance with the requirements of section 554 of title 5, United States Code. If no hearing is so requested, the Secretary of State's imposition of the order shall constitute a final and unappealable order.
  (C) ISSUANCE OF ORDERS.—If the administrative law judge determines, upon the preponderance of the evidence received, that a person or entity named in the complaint has violated section 306 or 405, the administrative law judge shall state his findings of fact and issue and cause to be served on such person or entity an order described in paragraph (1).
  (D) FACTORS FOR DETERMINATION OF PENALTY AMOUNTS.—In determining the amount of any civil penalty, the administrative law judge shall take into account the nature, circumstances, extent, and gravity of the violation or violations and, with respect to the violator, the ability to pay, effect on ability to continue to do business, any history of prior such

violations, the degree of culpability, the existence of an internal compliance program, and such other matters as justice may require.

<< 22 USCA § 6761 >>

(3) ADMINISTRATIVE APPELLATE REVIEW.—The decision and order of an administrative law judge shall become the final agency decision and order of the head of the United States National Authority unless, within 30 days, the head of the United States National Authority modifies or vacates the decision and order, with or without conditions, in which case the decision and order of the head of the United States National Authority shall become a final order under this subsection.

<< 22 USCA § 6761 >>

(4) OFFSETS.—The amount of the civil penalty under a final order of the United States National Authority may be deducted from any sums owed by the United States to the person.

<< 22 USCA § 6761 >>

(5) JUDICIAL REVIEW.—A person adversely affected by a final order respecting an assessment may, within 30 days after the date the final order is issued, file a petition in the Court of Appeals for the District of Columbia Circuit or for any other circuit in which the person resides or transacts business.

<< 22 USCA § 6761 >>

(6) ENFORCEMENT OF ORDERS.—If a person fails to comply with a final order issued under this subsection against the person or entity—
  (A) after the order making the assessment has become a final order and if such person does not file a petition for judicial review of the order in accordance with paragraph (5), or
  (B) after a court in an action brought under paragraph (5) has entered a final judgment in favor of the United States National Authority,

the Secretary of State shall file a suit to seek compliance with the order in any appropriate district court of the United States, plus interest at currently prevailing rates calculated from the date of expiration of the 30day period referred to in paragraph (5) or the date of such final judgment, as the case may be. In any such suit, the validity and appropriateness of the final order shall not be subject to review.

<< 22 USCA § 6761 >>

(b) CRIMINAL.—Any person who knowingly violates any provision of section 306 or 405 of this Act, shall, in addition to or in lieu of any civil penalty which may be imposed under subsection (a) for such violation, be fined under title 18, United States Code, imprisoned for not more than one year, or both.

<< 22 USCA § 6762 >>

SEC. 502. SPECIFIC ENFORCEMENT.

<< 22 USCA § 6762 >>

(a) JURISDICTION.—The district courts of the United States shall have jurisdiction over civil actions to—

<< 22 USCA § 6762 >>

(1) restrain any violation of section 306 or 405 of this Act; and

<< 22 USCA § 6762 >>

(2) compel the taking of any action required by or under this Act or the Convention.

<< 22 USCA § 6762 >>

(b) CIVIL ACTIONS.—

<< 22 USCA § 6762 >>

(1) IN GENERAL.—A civil action described in subsection (a) may be brought—

 (A) in the case of a civil action described in subsection (a)(1), in the United States district court for the judicial district in which any act, omission, or transaction constituting a violation of section 306 or 405 occurred or in which the defendant is found or transacts business; or

 (B) in the case of a civil action described in subsection (a)(2), in the United States district court for the judicial district in which the defendant is found or transacts business.

<< 22 USCA § 6762 >>

(2) SERVICE OF PROCESS.—In any such civil action process may be served on a defendant wherever the defendant may reside or may be found, whether the defendant resides or may be found within the United States or elsewhere.

<< 22 USCA § 6763 >>

SEC. 503. EXPEDITED JUDICIAL REVIEW.

<< 22 USCA § 6763 >>

 (a) CIVIL ACTION.—Any person or entity subject to a search under this Act may file a civil action challenging the constitutionality of any provision of this Act. Notwithstanding any other provision of law, during the full calendar year of, and the two full calendar years following, the enactment of this Act, the district court shall accord such a case a priority in its disposition ahead of all other civil actions except for actions challenging the legality and conditions of confinement.

<< 22 USCA § 6763 >>

 (b) EN BANC REVIEW.—Notwithstanding any other provision of law, during the full calendar year of, and the two full calendar years following, the enactment of this Act, any appeal from a final order entered by a district court in an action brought under subsection (a) shall be heard promptly by the full Court of Appeals sitting en banc.

<< 22 USCA Ch. 75 >>

TITLE VI—MISCELLANEOUS PROVISIONS

<< 50 USCA § 1520 >>

SEC. 601. REPEAL.

 Section 808 of the Department of Defense Appropriation Authorization Act, 1978 (50 U.S.C. 1520; relating to the use of human subjects for the testing of chemical or biological agents) is repealed.

<< 22 USCA § 6771 >>

SEC. 602. PROHIBITION.

<< 22 USCA § 6771 >>

(a) IN GENERAL.—Neither the Secretary of Defense nor any other officer or employee of the United States may, directly or by contract—

<< 22 USCA § 6771 >>

(1) conduct any test or experiment involving the use of any chemical or biological agent on a civilian population; or

<< 22 USCA § 6771 >>

(2) use human subjects for the testing of chemical or biological agents.

<< 22 USCA § 6771 >>

(b) CONSTRUCTION.—Nothing in subsection (a) may be construed to prohibit actions carried out for purposes not prohibited by this Act (as defined in section 3(8)).

<< 22 USCA § 6771 >>

(c) BIOLOGICAL AGENT DEFINED.—In this section, the term "biological agent" means any micro-organism (including bacteria, viruses, fungi, rickettsiae or protozoa), pathogen, or infectious substance, or any naturally occurring, bio-engineered or synthesized component of any such micro-organism, pathogen, or infectious substance, whatever its origin or method of production, capable of causing—

<< 22 USCA § 6771 >>

(1) death, disease, or other biological malfunction in a human, an animal, a plant, or another living organism;

<< 22 USCA § 6771 >>

(2) deterioration of food, water, equipment, supplies, or materials of any kind; or

<< 22 USCA § 6771 >>

(3) deleterious alteration of the environment.

<< 11 USCA § 362 >>

SEC. 603. BANKRUPTCY ACTIONS.

Section 362(b) of title 11, United States Code, is amended—

<< 11 USCA § 362 >>

(1) by striking paragraphs (4) and (5); and

<< 11 USCA § 362 >>

(2) by inserting after paragraph (3) the following:

"(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement

of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;''.

## DIVISION J—REVENUES AND MEDICARE

SEC. 1000. SHORT TITLE; AMENDMENT OF 1986 CODE; TABLE OF CONTENTS.

### << 26 USCA § 1 NOTE >>

(a) SHORT TITLE.—This division may be cited as the ''Tax and Trade Relief Extension Act of 1998''.
(b) AMENDMENT OF 1986 CODE.—Except as otherwise expressly provided, whenever in this division an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1986.
(c) TABLE OF CONTENTS.—

## DIVISION J—REVENUES AND MEDICARE

Sec. 1000. Short title; amendment of 1986 Code; table of contents.

### TITLE I—EXTENSION AND MODIFICATION OF CERTAIN EXPIRING PROVISIONS

#### Subtitle A—Tax Provisions

Sec. 1001. Research credit.

Sec. 1002. Work opportunity credit.

Sec. 1003. Welfare-to-work credit.

Sec. 1004. Contributions of stock to private foundations; expanded public inspection of private foundations' annual returns.

Sec. 1005. Subpart F exemption for active financing income.

Sec. 1006. Disclosure of return information on income contingent student loans.

#### Subtitle B—Trade Provisions

Sec. 1011. Extension of duty-free treatment under Generalized System of Preferences.

Sec. 1012. Trade adjustment assistance.

### TITLE II—OTHER TAX PROVISIONS

#### Subtitle A—Provisions Relating to Individuals

Sec. 2001. Nonrefundable personal credits fully allowed against regular tax liability during 1998.

Sec. 2002. 100 percent deduction for health insurance costs of self-employed individuals.

Sec. 2003. Modification of estimated tax safe harbors.

#### Subtitle B—Provisions Relating to Farmers

Sec. 2011. Income averaging for farmers made permanent.

Sec. 2012. Production flexibility contract payments.

Sec. 2013. 5–year net operating loss carryback for farming losses.

Subtitle C—Miscellaneous Provisions

Sec. 2021. Increase in volume cap on private activity bonds.

Sec. 2022. Depreciation study.

Sec. 2023. Exemption for students employed by State schools, colleges, or universities.

TITLE III—REVENUE OFFSETS

Sec. 3001. Treatment of certain deductible liquidating distributions of regulated investment companies and real estate investment trusts.

Sec. 3002. Inclusion of rotavirus gastroenteritis as a taxable vaccine.

Sec. 3003. Clarification and expansion of mathematical error assessment procedures.

Sec. 3004. Clarification of definition of specified liability loss.

TITLE IV—TECHNICAL CORRECTIONS

Sec. 4001. Definitions; coordination with other subtitles.

Sec. 4002. Amendments related to Internal Revenue Service Restructuring and Reform Act of 1998.

Sec. 4003. Amendments related to Taxpayer Relief Act of 1997.

Sec. 4004. Amendments related to Tax Reform Act of 1984.

Sec. 4005. Amendments related to Uruguay Round Agreements Act.

Sec. 4006. Other amendments.

TITLE V—MEDICARE–RELATED PROVISIONS

Subtitle A—Home Health

Sec. 5101. Increase in per beneficiary limits and per visit payment limits for payment for home health services.

Subtitle B—Other Medicare–Related Provisions

Sec. 5201. Authorization of additional exceptions to imposition of penalties for providing inducements to beneficiaries.

Sec. 5202. Expansion of membership of MedPAC to 17.

Subtitle C—Revenue Offsets

Sec. 5301. Tax treatment of cash option for qualified prizes.

TITLE I—EXTENSION AND MODIFICATION OF CERTAIN EXPIRING PROVISIONS

Subtitle A—Tax Provisions

SEC. 1001. RESEARCH CREDIT.

<< 26 USCA § 41 >>

(a) TEMPORARY EXTENSION.—Paragraph (1) of section 41(h) (relating to termination) is amended—

<< 26 USCA § 41 >>

(1) by striking "June 30, 1998" and inserting "June 30, 1999";

<< 26 USCA § 41 >>

(2) by striking "24–month" and inserting "36–month"; and

<< 26 USCA § 41 >>

(3) by striking "24 months" and inserting "36 months".

<< 26 USCA § 45C >>

(b) TECHNICAL AMENDMENT.—Subparagraph (D) of section 45C(b)(1) is amended by striking "June 30, 1998" and inserting "June 30, 1999".

<< 26 USCA § 41 NOTE >>

<< 26 USCA § 45C nt >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to amounts paid or incurred after June 30, 1998.

SEC. 1002. WORK OPPORTUNITY CREDIT.

<< 26 USCA § 51 >>

(a) TEMPORARY EXTENSION.—Subparagraph (B) of section 51(c)(4) (relating to termination) is amended by striking "June 30, 1998" and inserting "June 30, 1999".

<< 26 USCA § 51 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to individuals who begin work for the employer after June 30, 1998.

<< 26 USCA § 51A >>

SEC. 1003. WELFARE–TO–WORK CREDIT.

Subsection (f) of section 51A (relating to termination) is amended by striking "April 30, 1999" and inserting "June 30, 1999".

SEC. 1004. CONTRIBUTIONS OF STOCK TO PRIVATE FOUNDATIONS; EXPANDED PUBLIC INSPECTION OF PRIVATE FOUNDATIONS' ANNUAL RETURNS.

(a) SPECIAL RULE FOR CONTRIBUTIONS OF STOCK MADE PERMANENT.—

<< 26 USCA § 170 >>

(1) IN GENERAL.—Paragraph (5) of section 170(e) is amended by striking subparagraph (D) (relating to termination).

<< 26 USCA § 170 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply to contributions made after June 30, 1998.

<< 26 USCA § 6104 >>

(b) EXPANDED PUBLIC INSPECTION OF PRIVATE FOUNDATIONS' ANNUAL RETURNS, ETC.—

<< 26 USCA § 6104 >>

(1) IN GENERAL.—Section 6104 (relating to publicity of information required from certain exempt organizations and certain trusts) is amended by striking subsections (d) and (e) and inserting after subsection (c) the following new subsection:
"(d) PUBLIC INSPECTION OF CERTAIN ANNUAL RETURNS AND APPLICATIONS FOR EXEMPTION.—
"(1) IN GENERAL.—In the case of an organization described in subsection (c) or (d) of section 501 and exempt from taxation under section 501(a)—
"(A) a copy of—
"(i) the annual return filed under section 6033 (relating to returns by exempt organizations) by such organization, and
"(ii) if the organization filed an application for recognition of exemption under section 501, the exempt status application materials of such organization,

shall be made available by such organization for inspection during regular business hours by any individual at the principal office of such organization and, if such organization regularly maintains 1 or more regional or district offices having 3 or more employees, at each such regional or district office, and
"(B) upon request of an individual made at such principal office or such a regional or district office, a copy of such annual return and exempt status application materials shall be provided to such individual without charge other than a reasonable fee for any reproduction and mailing costs.

The request described in subparagraph (B) must be made in person or in writing. If such request is made in person, such copy shall be provided immediately and, if made in writing, shall be provided within 30 days.
"(2) 3–YEAR LIMITATION ON INSPECTION OF RETURNS.—Paragraph (1) shall apply to an annual return filed under section 6033 only during the 3–year period beginning on the last day prescribed for filing such return (determined with regard to any extension of time for filing).
"(3) EXCEPTIONS FROM DISCLOSURE REQUIREMENT.—
"(A) NONDISCLOSURE OF CONTRIBUTORS, ETC.—In the case of an organization which is not a private foundation (within the meaning of section 509(a)), paragraph (1) shall not require the disclosure of the name or address of any contributor to the organization. In the case of an organization described in section 501(d), paragraph (1) shall not require the disclosure of the copies referred to in section 6031(b) with respect to such organization.
"(B) NONDISCLOSURE OF CERTAIN OTHER INFORMATION.—Paragraph (1) shall not require the disclosure of any information if the Secretary withheld such information from public inspection under subsection (a)(1)(D).
"(4) LIMITATION ON PROVIDING COPIES.—Paragraph (1)(B) shall not apply to any request if, in accordance with regulations promulgated by the Secretary, the organization has made the requested documents widely available, or the Secretary determines, upon application by an organization, that such request is part of a harassment campaign and that compliance with such request is not in the public interest.
"(5) EXEMPT STATUS APPLICATION MATERIALS.—For purposes of paragraph (1), the term 'exempt status application materials' means the application for recognition of exemption under section 501 and any papers submitted in support of such application and any letter or other document issued by the Internal Revenue Service with respect to such application.".
(2) CONFORMING AMENDMENTS.—

<< 26 USCA § 6033 >>

(A) Subsection (c) of section 6033 is amended by adding "and" at the end of paragraph (1), by striking paragraph (2), and by redesignating paragraph (3) as paragraph (2).

<< 26 USCA § 6652 >>

(B) Subparagraph (C) of section 6652(c)(1) is amended by striking "subsection (d) or (e)(1) of section 6104 (relating to public inspection of annual returns)" and inserting "section 6104(d) with respect to any annual return".

<< 26 USCA § 6652 >>

(C) Subparagraph (D) of section 6652(c)(1) is amended by striking "section 6104(e)(2) (relating to public inspection of applications for exemption)" and inserting "section 6104(d) with respect to any exempt status application materials (as defined in such section)".

<< 26 USCA § 6685 >>

(D) Section 6685 is amended by striking "or (e)".

<< 26 USCA § 7207 >>

(E) Section 7207 is amended by striking "or (e)".

<< 26 USCA § 6104 NOTE >>

<< 26 USCA §§ 170 nt, 6033 nt, 6652 nt, 6685 nt, 7207 nt >>

(3) EFFECTIVE DATE.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the amendments made by this subsection shall apply to requests made after the later of December 31, 1998, or the 60th day after the Secretary of the Treasury first issues the regulations referred to in section 6104(d)(4) of the Internal Revenue Code of 1986, as amended by this section.

(B) PUBLICATION OF ANNUAL RETURNS.—Section 6104(d) of such Code, as in effect before the amendments made by this subsection, shall not apply to any return the due date for which is after the date such amendments take effect under subparagraph (A).

SEC. 1005. SUBPART F EXEMPTION FOR ACTIVE FINANCING INCOME.

<< 26 USCA § 954 >>

(a) INCOME DERIVED FROM BANKING, FINANCING, OR SIMILAR BUSINESSES.—Section 954(h) (relating to income derived in the active conduct of banking, financing, or similar businesses) is amended to read as follows:

"(h) SPECIAL RULE FOR INCOME DERIVED IN THE ACTIVE CONDUCT OF BANKING, FINANCING, OR SIMILAR BUSINESSES.—

"(1) IN GENERAL.—For purposes of subsection (c)(1), foreign personal holding company income shall not include qualified banking or financing income of an eligible controlled foreign corporation.

"(2) ELIGIBLE CONTROLLED FOREIGN CORPORATION.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'eligible controlled foreign corporation' means a controlled foreign corporation which—

"(i) is predominantly engaged in the active conduct of a banking, financing, or similar business, and

"(ii) conducts substantial activity with respect to such business.

"(B) PREDOMINANTLY ENGAGED.—A controlled foreign corporation shall be treated as predominantly engaged in the active conduct of a banking, financing, or similar business if—

"(i) more than 70 percent of the gross income of the controlled foreign corporation is derived directly from the active and regular conduct of a lending or finance business from transactions with customers which are not related persons,

"(ii) it is engaged in the active conduct of a banking business and is an institution licensed to do business as a bank in the United States (or is any other corporation not so licensed which is specified by the Secretary in regulations), or

"(iii) it is engaged in the active conduct of a securities business and is registered as a securities broker or dealer under section 15(a) of the Securities Exchange Act of 1934 or is registered as a Government securities broker or dealer under section 15C(a) of such Act (or is any other corporation not so registered which is specified by the Secretary in regulations).

"(3) QUALIFIED BANKING OR FINANCING INCOME.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'qualified banking or financing income' means income of an eligible controlled foreign corporation which—

"(i) is derived in the active conduct of a banking, financing, or similar business by—

"(I) such eligible controlled foreign corporation, or

"(II) a qualified business unit of such eligible controlled foreign corporation,

"(ii) is derived from one or more transactions—

"(I) with customers located in a country other than the United States, and

"(II) substantially all of the activities in connection with which are conducted directly by the corporation or unit in its home country, and

"(iii) is treated as earned by such corporation or unit in its home country for purposes of such country's tax laws.

"(B) LIMITATION ON NONBANKING AND NONSECURITIES BUSINESSES.—No income of an eligible controlled foreign corporation not described in clause (ii) or (iii) of paragraph (2)(B) (or of a qualified business unit of such corporation) shall be treated as qualified banking or financing income unless more than 30 percent of such corporation's or unit's gross income is derived directly from the active and regular conduct of a lending or finance business from transactions with customers which are not related persons and which are located within such corporation's or unit's home country.

"(C) SUBSTANTIAL ACTIVITY REQUIREMENT FOR CROSS BORDER INCOME.—The term 'qualified banking or financing income' shall not include income derived from 1 or more transactions with customers located in a country other than the home country of the eligible controlled foreign corporation or a qualified business unit of such corporation unless such corporation or unit conducts substantial activity with respect to a banking, financing, or similar business in its home country.

"(D) DETERMINATIONS MADE SEPARATELY.—For purposes of this paragraph, the qualified banking or financing income of an eligible controlled foreign corporation and each qualified business unit of such corporation shall be determined separately for such corporation and each such unit by taking into account—

"(i) in the case of the eligible controlled foreign corporation, only items of income, deduction, gain, or loss and activities of such corporation not properly allocable or attributable to any qualified business unit of such corporation, and

"(ii) in the case of a qualified business unit, only items of income, deduction, gain, or loss and activities properly allocable or attributable to such unit.

"(4) LENDING OR FINANCE BUSINESS.—For purposes of this subsection, the term 'lending or finance business' means the business of—

"(A) making loans,

"(B) purchasing or discounting accounts receivable, notes, or installment obligations,

"(C) engaging in leasing (including entering into leases and purchasing, servicing, and disposing of leases and leased assets),

"(D) issuing letters of credit or providing guarantees,

"(E) providing charge and credit card services, or

"(F) rendering services or making facilities available in connection with activities described in subparagraphs (A) through (E) carried on by—

"(i) the corporation (or qualified business unit) rendering services or making facilities available, or

"(ii) another corporation (or qualified business unit of a corporation) which is a member of the same affiliated group (as defined in section 1504, but determined without regard to section 1504(b)(3)).

"(5) OTHER DEFINITIONS.—For purposes of this subsection—

"(A) CUSTOMER.—The term 'customer' means, with respect to any controlled foreign corporation or qualified business unit, any person which has a customer relationship with such corporation or unit and which is acting in its capacity as such.

"(B) HOME COUNTRY.—Except as provided in regulations—

"(i) CONTROLLED FOREIGN CORPORATION.—The term 'home country' means, with respect to any controlled foreign corporation, the country under the laws of which the corporation was created or organized.

"(ii) QUALIFIED BUSINESS UNIT.—The term 'home country' means, with respect to any qualified business unit, the country in which such unit maintains its principal office.

"(C) LOCATED.—The determination of where a customer is located shall be made under rules prescribed by the Secretary.

"(D) QUALIFIED BUSINESS UNIT.—The term 'qualified business unit' has the meaning given such term by section 989(a).

"(E) RELATED PERSON.—The term 'related person' has the meaning given such term by subsection (d)(3).

"(6) COORDINATION WITH EXCEPTION FOR DEALERS.—Paragraph (1) shall not apply to income described in subsection (c)(2)(C)(ii) of a dealer in securities (within the meaning of section 475) which is an eligible controlled foreign corporation described in paragraph (2)(B)(iii).

"(7) ANTI–ABUSE RULES.—For purposes of applying this subsection and subsection (c)(2)(C)(ii)—

"(A) there shall be disregarded any item of income, gain, loss, or deduction with respect to any transaction or series of transactions one of the principal purposes of which is qualifying income or gain for the exclusion under this section, including any transaction or series of transactions a principal purpose of which is the acceleration or deferral of any item in order to claim the benefits of such exclusion through the application of this subsection,

"(B) there shall be disregarded any item of income, gain, loss, or deduction of an entity which is not engaged in regular and continuous transactions with customers which are not related persons,

"(C) there shall be disregarded any item of income, gain, loss, or deduction with respect to any transaction or series of transactions utilizing, or doing business with—

"(i) one or more entities in order to satisfy any home country requirement under this subsection, or

"(ii) a special purpose entity or arrangement, including a securitization, financing, or similar entity or arrangement,

if one of the principal purposes of such transaction or series of transactions is qualifying income or gain for the exclusion under this subsection, and

"(D) a related person, an officer, a director, or an employee with respect to any controlled foreign corporation (or qualified business unit) which would otherwise be treated as a customer of such corporation or unit with respect to any transaction shall not be so treated if a principal purpose of such transaction is to satisfy any requirement of this subsection.

"(8) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection, subsection (c)(1)(B)(i), subsection (c)(2)(C)(ii), and the last sentence of subsection (e)(2).

"(9) APPLICATION.—This subsection, subsection (c)(2)(C)(ii), and the last sentence of subsection (e)(2) shall apply only to the first taxable year of a foreign corporation beginning after December 31, 1998, and before January 1, 2000, and to taxable years of United States shareholders with or within which such taxable year of such foreign corporation ends.".

<< 26 USCA § 953 >>

(b) INCOME DERIVED FROM INSURANCE BUSINESS.—

<< 26 USCA § 953 >>

(1) INCOME ATTRIBUTABLE TO ISSUANCE OR REINSURANCE.—

(A) IN GENERAL.—Section 953(a) (defining insurance income) is amended to read as follows:

"(a) INSURANCE INCOME.—

"(1) IN GENERAL.—For purposes of section 952(a)(1), the term 'insurance income' means any income which—

"(A) is attributable to the issuing (or reinsuring) of an insurance or annuity contract, and

"(B) would (subject to the modifications provided by subsection (b)) be taxed under subchapter L of this chapter if such income were the income of a domestic insurance company.

"(2) EXCEPTION.—Such term shall not include any exempt insurance income (as defined in subsection (e)).".

(B) EXEMPT INSURANCE INCOME.—Section 953 (relating to insurance income) is amended by adding at the end the following new subsection:

"(e) EXEMPT INSURANCE INCOME.—For purposes of this section—

AR.03106

"(1) EXEMPT INSURANCE INCOME DEFINED.—

"(A) IN GENERAL.—The term 'exempt insurance income' means income derived by a qualifying insurance company which—

"(i) is attributable to the issuing (or reinsuring) of an exempt contract by such company or a qualifying insurance company branch of such company, and

"(ii) is treated as earned by such company or branch in its home country for purposes of such country's tax laws.

"(B) EXCEPTION FOR CERTAIN ARRANGEMENTS.—Such term shall not include income attributable to the issuing (or reinsuring) of an exempt contract as the result of any arrangement whereby another corporation receives a substantially equal amount of premiums or other consideration in respect of issuing (or reinsuring) a contract which is not an exempt contract.

"(C) DETERMINATIONS MADE SEPARATELY.—For purposes of this subsection and section 954(i), the exempt insurance income and exempt contracts of a qualifying insurance company or any qualifying insurance company branch of such company shall be determined separately for such company and each such branch by taking into account—

"(i) in the case of the qualifying insurance company, only items of income, deduction, gain, or loss, and activities of such company not properly allocable or attributable to any qualifying insurance company branch of such company, and

"(ii) in the case of a qualifying insurance company branch, only items of income, deduction, gain, or loss and activities properly allocable or attributable to such branch.

"(2) EXEMPT CONTRACT.—

"(A) IN GENERAL.—The term 'exempt contract' means an insurance or annuity contract issued or reinsured by a qualifying insurance company or qualifying insurance company branch in connection with property in, liability arising out of activity in, or the lives or health of residents of, a country other than the United States.

"(B) MINIMUM HOME COUNTRY INCOME REQUIRED.—

"(i) IN GENERAL.—No contract of a qualifying insurance company or of a qualifying insurance company branch shall be treated as an exempt contract unless such company or branch derives more than 30 percent of its net written premiums from exempt contracts (determined without regard to this subparagraph)—

"(I) which cover applicable home country risks, and

"(II) with respect to which no policyholder, insured, annuitant, or beneficiary is a related person (as defined in section 954(d)(3)).

"(ii) APPLICABLE HOME COUNTRY RISKS.—The term 'applicable home country risks' means risks in connection with property in, liability arising out of activity in, or the lives or health of residents of, the home country of the qualifying insurance company or qualifying insurance company branch, as the case may be, issuing or reinsuring the contract covering the risks.

"(C) SUBSTANTIAL ACTIVITY REQUIREMENTS FOR CROSS BORDER RISKS.—A contract issued by a qualifying insurance company or qualifying insurance company branch which covers risks other than applicable home country risks (as defined in subparagraph (B)(ii)) shall not be treated as an exempt contract unless such company or branch, as the case may be—

"(i) conducts substantial activity with respect to an insurance business in its home country, and

"(ii) performs in its home country substantially all of the activities necessary to give rise to the income generated by such contract.

"(3) QUALIFYING INSURANCE COMPANY.—The term 'qualifying insurance company' means any controlled foreign corporation which—

"(A) is subject to regulation as an insurance (or reinsurance) company by its home country, and is licensed, authorized, or regulated by the applicable insurance regulatory body for its home country to sell insurance, reinsurance, or annuity contracts to persons other than related persons (within the meaning of section 954(d)(3)) in such home country,

"(B) derives more than 50 percent of its aggregate net written premiums from the issuance or reinsurance by such controlled foreign corporation and each of its qualifying insurance company branches of contracts—

"(i) covering applicable home country risks (as defined in paragraph (2)) of such corporation or branch, as the case may be, and

"(ii) with respect to which no policyholder, insured, annuitant, or beneficiary is a related person (as defined in section 954(d)(3)), except that in the case of a branch, such premiums shall only be taken into account to the extent such premiums are treated as earned by such branch in its home country for purposes of such country's tax laws, and

"(C) is engaged in the insurance business and would be subject to tax under subchapter L if it were a domestic corporation.

"(4) QUALIFYING INSURANCE COMPANY BRANCH.—The term 'qualifying insurance company branch' means a qualified business unit (within the meaning of section 989(a)) of a controlled foreign corporation if—

"(A) such unit is licensed, authorized, or regulated by the applicable insurance regulatory body for its home country to sell insurance, reinsurance, or annuity contracts to persons other than related persons (within the meaning of section 954(d)(3)) in such home country, and

"(B) such controlled foreign corporation is a qualifying insurance company, determined under paragraph (3) as if such unit were a qualifying insurance company branch.

"(5) LIFE INSURANCE OR ANNUITY CONTRACT.—For purposes of this section and section 954, the determination of whether a contract issued by a controlled foreign corporation or a qualified business unit (within the meaning of section 989(a)) is a life insurance contract or an annuity contract shall be made without regard to sections 72(s), 101(f), 817(h), and 7702 if—

"(A) such contract is regulated as a life insurance or annuity contract by the corporation's or unit's home country, and

"(B) no policyholder, insured, annuitant, or beneficiary with respect to the contract is a United States person.

"(6) HOME COUNTRY.—For purposes of this subsection, except as provided in regulations—

"(A) CONTROLLED FOREIGN CORPORATION.—The term 'home country' means, with respect to a controlled foreign corporation, the country in which such corporation is created or organized.

"(B) QUALIFIED BUSINESS UNIT.—The term 'home country' means, with respect to a qualified business unit (as defined in section 989(a)), the country in which the principal office of such unit is located and in which such unit is licensed, authorized, or regulated by the applicable insurance regulatory body to sell insurance, reinsurance, or annuity contracts to persons other than related persons (as defined in section 954(d)(3)) in such country.

"(7) ANTI–ABUSE RULES.—For purposes of applying this subsection and section 954(i)—

"(A) the rules of section 954(h)(7) (other than subparagraph (B) thereof) shall apply,

"(B) there shall be disregarded any item of income, gain, loss, or deduction of, or derived from, an entity which is not engaged in regular and continuous transactions with persons which are not related persons,

"(C) there shall be disregarded any change in the method of computing reserves a principal purpose of which is the acceleration or deferral of any item in order to claim the benefits of this subsection or section 954(i),

"(D) a contract of insurance or reinsurance shall not be treated as an exempt contract (and premiums from such contract shall not be taken into account for purposes of paragraph (2)(B) or (3)) if—

"(i) any policyholder, insured, annuitant, or beneficiary is a resident of the United States and such contract was marketed to such resident and was written to cover a risk outside the United States, or

"(ii) the contract covers risks located within and without the United States and the qualifying insurance company or qualifying insurance company branch does not maintain such contemporaneous records, and file such reports, with respect to such contract as the Secretary may require,

"(E) the Secretary may prescribe rules for the allocation of contracts (and income from contracts) among 2 or more qualifying insurance company branches of a qualifying insurance company in order to clearly reflect the income of such branches, and

"(F) premiums from a contract shall not be taken into account for purposes of paragraph (2)(B) or (3) if such contract reinsures a contract issued or reinsured by a related person (as defined in section 954(d)(3)).

For purposes of subparagraph (D), the determination of where risks are located shall be made under the principles of section 953.

"(8) COORDINATION WITH SUBSECTION (c).—In determining insurance income for purposes of subsection (c), exempt insurance income shall not include income derived from exempt contracts which cover risks other than applicable home country risks.

"(9) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection and section 954(i).

"(10) APPLICATION.—This subsection and section 954(i) shall apply only to the first taxable year of a foreign corporation beginning after December 31, 1998, and before January 1, 2000, and to taxable years of United States shareholders with or within which such taxable year of such foreign corporation ends.

"(11) CROSS REFERENCE.—

"For income exempt from foreign personal holding company income, see section 954(i).".

<< 26 USCA § 954 >>

(2) EXEMPTION FROM FOREIGN PERSONAL HOLDING COMPANY INCOME.—Section 954 (defining foreign base company income) is amended by adding at the end the following new subsection:

"(i) SPECIAL RULE FOR INCOME DERIVED IN THE ACTIVE CONDUCT OF INSURANCE BUSINESS.—

"(1) IN GENERAL.—For purposes of subsection (c)(1), foreign personal holding company income shall not include qualified insurance income of a qualifying insurance company.

"(2) QUALIFIED INSURANCE INCOME.—The term 'qualified insurance income' means income of a qualifying insurance company which is—

"(A) received from a person other than a related person (within the meaning of subsection (d)(3)) and derived from the investments made by a qualifying insurance company or a qualifying insurance company branch of its reserves allocable to exempt contracts or of 80 percent of its unearned premiums from exempt contracts (as both are determined in the manner prescribed under paragraph (4)), or

"(B) received from a person other than a related person (within the meaning of subsection (d)(3)) and derived from investments made by a qualifying insurance company or a qualifying insurance company branch of an amount of its assets allocable to exempt contracts equal to—

"(i) in the case of property, casualty, or health insurance contracts, one-third of its premiums earned on such insurance contracts during the taxable year (as defined in section 832(b)(4)), and

"(ii) in the case of life insurance or annuity contracts, 10 percent of the reserves described in subparagraph (A) for such contracts.

"(3) PRINCIPLES FOR DETERMINING INSURANCE INCOME.—Except as provided by the Secretary, for purposes of subparagraphs (A) and (B) of paragraph (2)—

"(A) in the case of any contract which is a separate account-type contract (including any variable contract not meeting the requirements of section 817), income credited under such contract shall be allocable only to such contract, and

"(B) income not allocable under subparagraph (A) shall be allocated ratably among contracts not described in subparagraph (A).

"(4) METHODS FOR DETERMINING UNEARNED PREMIUMS AND RESERVES.—For purposes of paragraph (2)(A)—

"(A) PROPERTY AND CASUALTY CONTRACTS.—The unearned premiums and reserves of a qualifying insurance company or a qualifying insurance company branch with respect to property, casualty, or health insurance contracts shall be determined using the same methods and interest rates which would be used if such company or branch were subject to tax under subchapter L, except that—

"(i) the interest rate determined for the functional currency of the company or branch, and which, except as provided by the Secretary, is calculated in the same manner as the Federal mid-term rate under section 1274(d), shall be substituted for the applicable Federal interest rate, and

"(ii) such company or branch shall use the appropriate foreign loss payment pattern.

"(B) LIFE INSURANCE AND ANNUITY CONTRACTS.—The amount of the reserve of a qualifying insurance company or qualifying insurance company branch for any life insurance or annuity contract shall be equal to the greater of—

"(i) the net surrender value of such contract (as defined in section 807(e)(1)(A)), or

"(ii) the reserve determined under paragraph (5).

"(C) LIMITATION ON RESERVES.—In no event shall the reserve determined under this paragraph for any contract as of any time exceed the amount which would be taken into account with respect to such contract as of such time in determining foreign statement reserves (less any catastrophe, deficiency, equalization, or similar reserves).

"(5) AMOUNT OF RESERVE.—The amount of the reserve determined under this paragraph with respect to any contract shall be determined in the same manner as it would be determined if the qualifying insurance company or qualifying insurance company branch were subject to tax under subchapter L, except that in applying such subchapter—

"(A) the interest rate determined for the functional currency of the company or branch, and which, except as provided by the Secretary, is calculated in the same manner as the Federal mid-term rate under section 1274(d), shall be substituted for the applicable Federal interest rate,

"(B) the highest assumed interest rate permitted to be used in determining foreign statement reserves shall be substituted for the prevailing State assumed interest rate, and

"(C) tables for mortality and morbidity which reasonably reflect the current mortality and morbidity risks in the company's or branch's home country shall be substituted for the mortality and morbidity tables otherwise used for such subchapter.

The Secretary may provide that the interest rate and mortality and morbidity tables of a qualifying insurance company may be used for 1 or more of its qualifying insurance company branches when appropriate.

"(6) DEFINITIONS.—For purposes of this subsection, any term used in this subsection which is also used in section 953(e) shall have the meaning given such term by section 953.".

<< 26 USCA § 953 >>

(3) RESERVES.—Section 953(b) is amended by redesignating paragraph (3) as paragraph (4) and by inserting after paragraph (2) the following new paragraph:

"(3) Reserves for any insurance or annuity contract shall be determined in the same manner as under section 954(i).".

<< 26 USCA § 954 >>

(c) SPECIAL RULES FOR DEALERS.—Section 954(c)(2)(C) is amended to read as follows:

"(C) EXCEPTION FOR DEALERS.—Except as provided by regulations, in the case of a regular dealer in property which is property described in paragraph (1)(B), forward contracts, option contracts, or similar financial instruments (including notional principal contracts and all instruments referenced to commodities), there shall not be taken into account in computing foreign personal holding company income—

"(i) any item of income, gain, deduction, or loss (other than any item described in subparagraph (A), (E), or (G) of paragraph (1)) from any transaction (including hedging transactions) entered into in the ordinary course of such dealer's trade or business as such a dealer, and

"(ii) if such dealer is a dealer in securities (within the meaning of section 475), any interest or dividend or equivalent amount described in subparagraph (E) or (G) of paragraph (1) from any transaction (including any hedging transaction or transaction described in section 956(c)(2)(J)) entered into in the ordinary course of such dealer's trade or business as such a dealer in securities, but only if the income from the transaction is attributable to activities of the dealer in the country under the laws of which the dealer is created or organized (or in the case of a qualified business unit described in section 989(a), is attributable to activities of the unit in the country in which the unit both maintains its principal office and conducts substantial business activity).".

<< 26 USCA § 954 >>

(d) EXEMPTION FROM FOREIGN BASE COMPANY SERVICES INCOME.—Paragraph (2) of section 954(e) is amended by inserting "or" at the end of subparagraph (A), by striking ", or" at the end of subparagraph (B) and inserting a period, by striking subparagraph (C), and by adding at the end the following new flush sentence:

"Paragraph (1) shall also not apply to income which is exempt insurance income (as defined in section 953(e)) or which is not treated as foreign personal holding income by reason of subsection (c)(2)(C)(ii), (h), or (i).".

<< 26 USCA § 954 >>

(e) EXEMPTION FOR GAIN.—Section 954(c)(1)(B)(i) (relating to net gains from certain property transactions) is amended by inserting "other than property which gives rise to income not treated as foreign personal holding company income by reason of subsection (h) or (i) for the taxable year" before the comma at the end.

<< 26 USCA § 6103 >>

## SEC. 1006. DISCLOSURE OF RETURN INFORMATION ON INCOME CONTINGENT STUDENT LOANS.

Subparagraph (D) of section 6103(l)(13) (relating to disclosure of return information to carry out income contingent repayment of student loans) is amended by striking "September 30, 1998" and inserting "September 30, 2003".

Subtitle B—Trade Provisions

## SEC. 1011. EXTENSION OF DUTY–FREE TREATMENT UNDER GENERALIZED SYSTEM OF PREFERENCES.

<< 19 USCA § 2465 >>

(a) IN GENERAL.—Section 505 of the Trade Act of 1974 (19 U.S.C. 2465) is amended by striking "June 30, 1998" and inserting "June 30, 1999".

<< 19 USCA § 2465 NOTE >>

(b) EFFECTIVE DATE.—

<< 19 USCA § 2465 NOTE >>

(1) IN GENERAL.—The amendments made by this section apply to articles entered on or after the date of the enactment of this Act.

<< 19 USCA § 2465 NOTE >>

(2) RETROACTIVE APPLICATION FOR CERTAIN LIQUIDATIONS AND RELIQUIDATIONS.—
(A) GENERAL RULE.—Notwithstanding section 514 of the Tariff Act of 1930 or any other provision of law, and subject to paragraph (3), any entry—
(i) of an article to which duty-free treatment under title V of the Trade Act of 1974 would have applied if such entry had been made on July 1, 1998, and such title had been in effect on July 1, 1998, and
(ii) that was made—
(I) after June 30, 1998, and
(II) before the date of enactment of this Act,

shall be liquidated or reliquidated as free of duty, and the Secretary of the Treasury shall refund any duty paid with respect to such entry.
(B) ENTRY.—As used in this paragraph, the term "entry" includes a withdrawal from warehouse for consumption.

<< 19 USCA § 2465 NOTE >>

(3) REQUESTS.—Liquidation or reliquidation may be made under paragraph (2) with respect to an entry only if a request therefor is filed with the Customs Service, within 180 days after the date of enactment of this Act, that contains sufficient information to enable the Customs Service—
(A) to locate the entry; or
(B) to reconstruct the entry if it cannot be located.

## SEC. 1012. TRADE ADJUSTMENT ASSISTANCE.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 19 USCA § 2317 >>

(a) ASSISTANCE FOR WORKERS.—Section 245 of the Trade Act of 1974 (19 U.S.C. 2317) is amended—

<< 19 USCA § 2317 >>

(1) in subsection (a), by striking "for each of" and all that follows through "1998," and inserting "for the period beginning October 1, 1998, and ending June 30, 1999,"; and

<< 19 USCA § 2317 >>

(2) in subsection (b), by striking "for each of" and all that follows through "1998," and inserting "for the period beginning October 1, 1998, and ending June 30, 1999,".

<< 19 USCA § 2331 >>

(b) NAFTA TRANSITIONAL PROGRAM.—Section 250(d)(2) of the Trade Act of 1974 (19 U.S.C. 2331(d)(2)) is amended by striking "for any fiscal year shall not exceed $30,000,000" and inserting "for the period beginning October 1, 1998, and ending June 30, 1999, shall not exceed $15,000,000".

<< 19 USCA § 2346 >>

(c) ADJUSTMENT ASSISTANCE FOR FIRMS.—Section 256(b) of the Trade Act of 1974 (19 U.S.C. 2346(b)) is amended by striking "for fiscal years" and all that follows through "1998" and inserting "for the period beginning October 1, 1998, and ending June 30, 1999".

<< 19 USCA Ch. 12 >>

(d) TERMINATION.—Section 285(c) of the Trade Act of 1974 (19 U.S.C. 2271 note preceding) is amended—

<< 19 USCA Ch. 12 >>

(1) in paragraph (1), by striking "September 30, 1998" and inserting "June 30, 1999"; and

<< 19 USCA Ch. 12 >>

(2) in paragraph (2)(A), by striking "the day that is" and all that follows through "effective" and inserting "June 30, 1999".

TITLE II—OTHER TAX PROVISIONS

Subtitle A—Provisions Relating to Individuals

SEC. 2001. NONREFUNDABLE PERSONAL CREDITS FULLY ALLOWED AGAINST REGULAR TAX LIABILITY DURING 1998.

<< 26 USCA § 26 >>

(a) IN GENERAL.—Subsection (a) of section 26 is amended by adding at the end the following flush sentence:

"For purposes of paragraph (2), the taxpayer's tentative minimum tax for any taxable year beginning during 1998 shall be treated as being zero."

<< 26 USCA § 24 >>

 (b) CONFORMING AMENDMENT.—Section 24(d)(2) is amended by striking "The credit" and inserting "For taxable years beginning after December 31, 1998, the credit".

<< 26 USCA § 24 NOTE >>

<< 26 USCA § 26 nt >>

 (c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1997.

SEC. 2002. 100 PERCENT DEDUCTION FOR HEALTH INSURANCE COSTS OF SELF–EMPLOYED INDIVIDUALS.

<< 26 USCA § 162 >>

 (a) IN GENERAL.—The table contained in subparagraph (B) of section 162(l)(1) (relating to special rules for health insurance costs of self-employed individuals) is amended to read as follows:

| "For taxable years beginning in calendar year— | The applicable percentage is— |
| --- | --- |
| 1999 through 2001 | 60 |
| 2002 | 70 |
| 2003 and thereafter | 100   ." |

<< 26 USCA § 162 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 1998.

SEC. 2003. MODIFICATION OF ESTIMATED TAX SAFE HARBORS.

<< 26 USCA § 6654 >>

 (a) IN GENERAL.—The table contained in clause (i) of section 6654(d)(1)(C) (relating to limitation on use of preceding year's tax) is amended by striking the item relating to 1998, 1999, or 2000 and inserting the following new items:

| "1998 | 105 |
| --- | --- |
| 1999 or 2000 | 106". |

<< 26 USCA § 6654 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by this section shall apply with respect to any installment payment for taxable years beginning after December 31, 1999.

Subtitle B—Provisions Relating to Farmers

<< 26 USCA § 1301 NOTE >>

SEC. 2011. INCOME AVERAGING FOR FARMERS MADE PERMANENT.

 Subsection (c) of section 933 of the Taxpayer Relief Act of 1997 is amended by striking ", and before January 1, 2001".

<< 7 USCA § 7212 NOTE >>

SEC. 2012. PRODUCTION FLEXIBILITY CONTRACT PAYMENTS.

<< 7 USCA § 7212 NOTE >>

(a) IN GENERAL.—The options under paragraphs (2) and (3) of section 112(d) of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7212(d)(2) and (3)), as in effect on the date of the enactment of this Act, shall be disregarded in determining the taxable year for which any payment under a production flexibility contract under subtitle B of title I of such Act (as so in effect) is properly includible in gross income for purposes of the Internal Revenue Code of 1986.

<< 7 USCA § 7212 NOTE >>

(b) EFFECTIVE DATE.—Subsection (a) shall apply to taxable years ending after December 31, 1995.

SEC. 2013. 5–YEAR NET OPERATING LOSS CARRYBACK FOR FARMING LOSSES.

<< 26 USCA § 172 >>

(a) IN GENERAL.—Paragraph (1) of section 172(b) (relating to net operating loss deduction) is amended by adding at the end the following new subparagraph:

"(G) FARMING LOSSES.—In the case of a taxpayer which has a farming loss (as defined in subsection (i)) for a taxable year, such farming loss shall be a net operating loss carryback to each of the 5 taxable years preceding the taxable year of such loss.".

<< 26 USCA § 172 >>

(b) FARMING LOSS.—Section 172 is amended by redesignating subsection (i) as subsection (j) and by inserting after subsection (h) the following new subsection:

"(i) RULES RELATING TO FARMING LOSSES.—For purposes of this section—

"(1) IN GENERAL.—The term 'farming loss' means the lesser of—

"(A) the amount which would be the net operating loss for the taxable year if only income and deductions attributable to farming businesses (as defined in section 263A(e)(4)) are taken into account, or

"(B) the amount of the net operating loss for such taxable year.

"(2) COORDINATION WITH SUBSECTION (b)(2).—For purposes of applying subsection (b)(2), a farming loss for any taxable year shall be treated in a manner similar to the manner in which a specified liability loss is treated.

"(3) ELECTION.—Any taxpayer entitled to a 5–year carryback under subsection (b)(1)(G) from any loss year may elect to have the carryback period with respect to such loss year determined without regard to subsection (b)(1)(G). Such election shall be made in such manner as may be prescribed by the Secretary and shall be made by the due date (including extensions of time) for filing the taxpayer's return for the taxable year of the net operating loss. Such election, once made for any taxable year, shall be irrevocable for such taxable year.".

<< 26 USCA § 172 >>

(c) COORDINATION WITH FARM DISASTER LOSSES.—Clause (ii) of section 172(b)(1)(F) is amended by adding at the end the following flush sentence:

"Such term shall not include any farming loss (as defined in subsection (i)).".

<< 26 USCA § 172 NOTE >>

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to net operating losses for taxable years beginning after December 31, 1997.

Subtitle C—Miscellaneous Provisions

SEC. 2021. INCREASE IN VOLUME CAP ON PRIVATE ACTIVITY BONDS.

<< 26 USCA § 146 >>

(a) IN GENERAL.—Subsection (d) of section 146 (relating to volume cap) is amended by striking paragraphs (1) and (2) and inserting the following new paragraphs:

  "(1) IN GENERAL.—The State ceiling applicable to any State for any calendar year shall be the greater of—

    "(A) an amount equal to the per capita limit for such year multiplied by the State population, or

    "(B) the aggregate limit for such year.

  Subparagraph (B) shall not apply to any possession of the United States.

  "(2) PER CAPITA LIMIT; AGGREGATE LIMIT.—For purposes of paragraph (1), the per capita limit, and the aggregate limit, for any calendar year shall be determined in accordance with the following table:

| Calendar Year | Per Capita Limit | Aggregate Limit |
|---|---|---|
| 1999 through 2002................................................................ | $50 | $150,000,000 |
| 2003................................................................................... | 55 | 165,000,000 |
| 2004................................................................................... | 60 | 180,000,000 |
| 2005................................................................................... | 65 | 195,000,000 |
| 2006................................................................................... | 70 | 210,000,000 |
| 2007 and thereafter............................................................ | 75 | 225,000,000 ." |

<< 26 USCA § 146 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to calendar years after 1998.

<< 26 USCA § 168 NOTE >>

SEC. 2022. DEPRECIATION STUDY.

  The Secretary of the Treasury (or the Secretary's delegate)—

<< 26 USCA § 168 NOTE >>

  (1) shall conduct a comprehensive study of the recovery periods and depreciation methods under section 168 of the Internal Revenue Code of 1986, and

<< 26 USCA § 168 NOTE >>

  (2) not later than March 31, 2000, shall submit the results of such study, together with recommendations for determining such periods and methods in a more rational manner, to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate.

<< 42 USCA § 418 NOTE >>

SEC. 2023. EXEMPTION FOR STUDENTS EMPLOYED BY STATE SCHOOLS, COLLEGES, OR UNIVERSITIES.

<< 42 USCA § 418 NOTE >>

 (a) IN GENERAL.—Notwithstanding section 218 of the Social Security Act, any agreement with a State (or any modification thereof) entered into pursuant to such section may, at the option of such State, be modified at any time on or after January 1, 1999, and on or before March 31, 1999, so as to exclude service performed in the employ of a school, college, or university if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university.

<< 42 USCA § 418 NOTE >>

 (b) EFFECTIVE DATE OF MODIFICATION.—Any modification of an agreement pursuant to subsection (a) shall be effective with respect to services performed after June 30, 2000.

<< 42 USCA § 418 NOTE >>

 (c) IRREVOCABILITY OF MODIFICATION.—If any modification of an agreement pursuant to subsection (a) terminates coverage with respect to service performed in the employ of a school, college, or university, by a student who is enrolled and regularly attending classes at such school, college, or university, the Commissioner of Social Security and the State may not thereafter modify such agreement so as to again make the agreement applicable to such service performed in the employ of such school, college, or university.

TITLE III—REVENUE OFFSETS

SEC. 3001. TREATMENT OF CERTAIN DEDUCTIBLE LIQUIDATING DISTRIBUTIONS OF REGULATED INVESTMENT COMPANIES AND REAL ESTATE INVESTMENT TRUSTS.

<< 26 USCA § 332 >>

 (a) IN GENERAL.—Section 332 (relating to complete liquidations of subsidiaries) is amended by adding at the end the following new subsection:
 "(c) DEDUCTIBLE LIQUIDATING DISTRIBUTIONS OF REGULATED INVESTMENT COMPANIES AND REAL ESTATE INVESTMENT TRUSTS.—If a corporation receives a distribution from a regulated investment company or a real estate investment trust which is considered under subsection (b) as being in complete liquidation of such company or trust, then, notwithstanding any other provision of this chapter, such corporation shall recognize and treat as a dividend from such company or trust an amount equal to the deduction for dividends paid allowable to such company or trust by reason of such distribution.".
 (b) CONFORMING AMENDMENTS.—

<< 26 USCA § 332 >>

 (1) The material preceding paragraph (1) of section 332(b) is amended by striking "subsection (a)" and inserting "this section".

<< 26 USCA § 334 >>

 (2) Paragraph (1) of section 334(b) is amended by striking "section 332(a)" and inserting "section 332".

<< 26 USCA § 332 NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by this section shall apply to distributions after May 21, 1998.
 (d) ASSUMPTIONS.—In making the estimate required for this Act by section 252(d)(2) of the Balanced Budget and Emergency Deficit Control Act of 1985, that part of the estimate that measures the change in receipts resulting from the amendments made by this section shall be based on the economic and technical assumptions underlying the supplemental summary of the budget for fiscal year 1999, submitted on May 26, 1998, pursuant to section 1106 of title 31, United States

Code, notwithstanding section 252(d)(2)(B). All other parts of such estimate required by such section 252(d)(2) shall be made pursuant to the requirements of such section 252(d)(2)(B).

SEC. 3002. INCLUSION OF ROTAVIRUS GASTROENTERITIS AS A TAXABLE VACCINE.

<< 26 USCA § 4132 >>

  (a) IN GENERAL.—Paragraph (1) of section 4132(a) (defining taxable vaccine) is amended by adding at the end the following new subparagraph:
    "(K) Any vaccine against rotavirus gastroenteritis.".

<< 26 USCA § 4132 NOTE >>

  (b) EFFECTIVE DATE.—

<< 26 USCA § 4132 NOTE >>

  (1) SALES.—The amendment made by this section shall apply to sales after the date of the enactment of this Act.

<< 26 USCA § 4132 NOTE >>

  (2) DELIVERIES.—For purposes of paragraph (1), in the case of sales on or before the date of the enactment of this Act for which delivery is made after such date, the delivery date shall be considered the sale date.

SEC. 3003. CLARIFICATION AND EXPANSION OF MATHEMATICAL ERROR ASSESSMENT PROCEDURES.

<< 26 USCA § 6213 >>

  (a) TIN DEEMED INCORRECT IF INFORMATION ON RETURN DIFFERS WITH AGENCY RECORDS.—Paragraph (2) of section 6213(g) (defining mathematical or clerical error) is amended by adding at the end the following flush sentence:

  "A taxpayer shall be treated as having omitted a correct TIN for purposes of the preceding sentence if information provided by the taxpayer on the return with respect to the individual whose TIN was provided differs from the information the Secretary obtains from the person issuing the TIN.".

<< 26 USCA § 6213 >>

  (b) EXPANSION OF MATHEMATICAL ERROR PROCEDURES TO CASES WHERE TIN ESTABLISHES INDIVIDUAL NOT ELIGIBLE FOR TAX CREDIT. Paragraph (2) of section 6213(g) is amended by striking "and" at the end of subparagraph (J), by striking the period at the end of the subparagraph (K) and inserting ", and", and by inserting after subparagraph (K) the following new subparagraph:
    "(L) the inclusion on a return of a TIN required to be included on the return under section 21, 24, or 32 if—
    "(i) such TIN is of an individual whose age affects the amount of the credit under such section, and
    "(ii) the computation of the credit on the return reflects the treatment of such individual as being of an age different from the individual's age based on such TIN.".

<< 26 USCA § 6213 NOTE >>

  (c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years ending after the date of the enactment of this Act.

SEC. 3004. CLARIFICATION OF DEFINITION OF SPECIFIED LIABILITY LOSS.

<< 26 USCA § 172 >>

(a) IN GENERAL.—Subparagraph (B) of section 172(f)(1) (defining specified liability loss) is amended to read as follows:

"(B)(i) Any amount allowable as a deduction under this chapter (other than section 468(a)(1) or 468A(a)) which is in satisfaction of a liability under a Federal or State law requiring—

"(I) the reclamation of land,

"(II) the decommissioning of a nuclear power plant (or any unit thereof),

"(III) the dismantlement of a drilling platform,

"(IV) the remediation of environmental contamination, or

"(V) a payment under any workers compensation act (within the meaning of section 461(h)(2)(C)(i)).

"(ii) A liability shall be taken into account under this subparagraph only if—

"(I) the act (or failure to act) giving rise to such liability occurs at least 3 years before the beginning of the taxable year, and

"(II) the taxpayer used an accrual method of accounting throughout the period or periods during which such act (or failure to act) occurred.".

<< 26 USCA § 172 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to net operating losses arising in taxable years ending after the date of the enactment of this Act.

TITLE IV—TECHNICAL CORRECTIONS

<< 26 USCA § 1 NOTE >>

SEC. 4001. DEFINITIONS; COORDINATION WITH OTHER TITLES.

<< 26 USCA § 1 NOTE >>

(a) DEFINITIONS.—For purposes of this title—

<< 26 USCA § 1 NOTE >>

(1) 1986 CODE.—The term "1986 Code" means the Internal Revenue Code of 1986.

<< 26 USCA § 1 NOTE >>

(2) 1998 ACT.—The term "1998 Act" means the Internal Revenue Service Restructuring and Reform Act of 1998 (Public Law 105–206).

<< 26 USCA § 1 NOTE >>

(3) 1997 ACT.—The term "1997 Act" means the Taxpayer Relief Act of 1997 (Public Law 105–34).

<< 26 USCA § 1 NOTE >>

(b) COORDINATION WITH OTHER TITLES.—For purposes of applying the amendments made by any title of this division other than this title, the provisions of this title shall be treated as having been enacted immediately before the provisions of such other titles.

SEC. 4002. AMENDMENTS RELATED TO INTERNAL REVENUE SERVICE RESTRUCTURING AND REFORM ACT OF 1998.

<< 26 USCA § 6103 >>

(a) AMENDMENT RELATED TO SECTION 1101 OF 1998 ACT.—Paragraph (5) of section 6103(h) of the 1986 Code, as added by section 1101(b) of the 1998 Act, is redesignated as paragraph (6).

<< 26 USCA § 7491 >>

(b) AMENDMENT RELATED TO SECTION 3001 OF 1998 ACT.—Paragraph (2) of section 7491(a) of the 1986 Code is amended by adding at the end the following flush sentence:

"Subparagraph (C) shall not apply to any qualified revocable trust (as defined in section 645(b)(1)) with respect to liability for tax for any taxable year ending after the date of the decedent's death and before the applicable date (as defined in section 645(b)(2)).".

(c) AMENDMENTS RELATED TO SECTION 3201 OF 1998 ACT.—

<< 26 USCA § 7421 >>

(1) Section 7421(a) of the 1986 Code is amended by striking "6015(d)" and inserting "6015(e)".

<< 26 USCA § 6015 >>

(2) Subparagraph (A) of section 6015(e)(3) is amended by striking "of this section" and inserting "of subsection (b) or (f)".

<< 26 USCA § 6601 NOTE >>

(d) AMENDMENT RELATED TO SECTION 3301 OF 1998 ACT.—Paragraph (2) of section 3301(c) of the 1998 Act is amended by striking "The amendments" and inserting "Subject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment, the amendments".

<< 26 USCA § 7443A >>

(e) AMENDMENT RELATED TO SECTION 3401 OF 1998 ACT.—Section 3401(c) of the 1998 Act is amended—

<< 26 USCA § 7443A >>

(1) in paragraph (1), by striking "7443(b)" and inserting "7443A(b)"; and

<< 26 USCA § 7443A >>

(2) in paragraph (2), by striking "7443(c)" and inserting "7443A(c)".

<< 26 USCA § 7421 >>

(f) AMENDMENT RELATED TO SECTION 3433 OF 1998 ACT.—Section 7421(a) of the 1986 Code is amended by inserting "6331(i)," after "6246(b),".

<< 26 USCA § 6159 >>

(g) AMENDMENT RELATED TO SECTION 3467 OF 1998 ACT.—The subsection (d) of section 6159 of the 1986 Code relating to cross reference is redesignated as subsection (e).

<< 26 USCA § 6103 >>

(h) AMENDMENT RELATED TO SECTION 3708 OF 1998 ACT.—Subparagraph (A) of section 6103(p)(3) of the 1986 Code is amended by inserting "(f)(5)," after "(c), (e),".

(i) AMENDMENTS RELATED TO SECTION 5001 OF 1998 ACT.—

<< 26 USCA § 1 >>

(1) Subparagraph (B) of section 1(h)(13) of the 1986 Code is amended by striking "paragraph (7)(A)" and inserting "paragraph (7)(A)(i)".

<center>&lt;&lt; 26 USCA § 1 NOTE &gt;&gt;</center>

(2)(A) Subparagraphs (A)(i)(II), (A)(ii)(II), and (B)(ii) of section 1(h)(13) of the 1986 Code shall not apply to any distribution after December 31, 1997, by a regulated investment company or a real estate investment trust with respect to—

  (i) gains and losses recognized directly by such company or trust, and

  (ii) amounts properly taken into account by such company or trust by reason of holding (directly or indirectly) an interest in another such company or trust to the extent that such subparagraphs did not apply to such other company or trust with respect to such amounts.

(B) Subparagraph (A) shall not apply to any distribution which is treated under section 852(b)(7) or 857(b)(8) of the 1986 Code as received on December 31, 1997.

(C) For purposes of subparagraph (A), any amount which is includible in gross income of its shareholders under section 852(b)(3)(D) or 857(b)(3)(D) of the 1986 Code after December 31, 1997, shall be treated as distributed after such date.

(D)(i) For purposes of subparagraph (A), in the case of a qualified partnership with respect to which a regulated investment company meets the holding requirement of clause (iii)—

  (I) the subparagraphs referred to in subparagraph (A) shall not apply to gains and losses recognized directly by such partnership for purposes of determining such company's distributive share of such gains and losses, and

  (II) such company's distributive share of such gains and losses (as so determined) shall be treated as recognized directly by such company.

The preceding sentence shall apply only if the qualified partnership provides the company with written documentation of such distributive share as so determined.

(ii) For purposes of clause (i), the term "qualified partnership" means, with respect to a regulated investment company, any partnership if—

  (I) the partnership is an investment company registered under the Investment Company Act of 1940,

  (II) the regulated investment company is permitted to invest in such partnership by reason of section 12(d)(1)(E) of such Act or an exemptive order of the Securities and Exchange Commission under such section, and

  (III) the regulated investment company and the partnership have the same taxable year.

(iii) A regulated investment company meets the holding requirement of this clause with respect to a qualified partnership if (as of January 1, 1998)—

  (I) the value of the interests of the regulated investment company in such partnership is 35 percent or more of the value of such company's total assets, or

  (II) the value of the interests of the regulated investment company in such partnership and all other qualified partnerships is 90 percent or more of the value of such company's total assets.

<center>&lt;&lt; 26 USCA § 1 &gt;&gt;</center>

(3) Paragraph (13) of section 1(h) of the 1986 Code is amended by adding at the end the following new subparagraph:

  "(D) CHARITABLE REMAINDER TRUSTS.—Subparagraphs (A) and (B)(ii) shall not apply to any capital gain distribution made by a trust described in section 664."

<center>&lt;&lt; 26 USCA § 408A &gt;&gt;</center>

(j) AMENDMENT RELATED TO SECTION 7004 OF 1998 ACT.—Clause (i) of section 408A(c)(3)(C) of the 1986 Code, as amended by section 7004 of the 1998 Act, is amended by striking the period at the end of subclause (II) and inserting ", and".

<center>&lt;&lt; 26 USCA § 1 NOTE &gt;&gt;</center>

<center>&lt;&lt; 26 USCA §§ 6103 nt, 7491 nt, 7421 nt, 6015 nt, 6601 nt, 7443A nt, 7421 nt, 6159 nt, 408A nt &gt;&gt;</center>

(k) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the provisions of the 1998 Act to which they relate.

SEC. 4003. AMENDMENTS RELATED TO TAXPAYER RELIEF ACT OF 1997.

<< 26 USCA § 163 >>

(a) AMENDMENTS RELATED TO SECTION 202 OF 1997 ACT.—

<< 26 USCA § 163 >>

(1) Paragraph (2) of section 163(h) of the 1986 Code is amended by striking "and" at the end of subparagraph (D), by striking the period at the end of subparagraph (E) and inserting ", and", and by adding at the end the following new subparagraph:
  "(F) any interest allowable as a deduction under section 221 (relating to interest on educational loans)."

<< 26 USCA § 221 >>

(2)(A) Subparagraph (C) of section 221(b)(2) of the 1986 Code is amended—
  (i) by striking "135, 137," in clause (i),
  (ii) by inserting "135, 137," after "sections 86," in clause (ii), and
  (iii) by striking the last sentence.

<< 26 USCA § 86 >>

<< 26 USCA § 135 >>

<< 26 USCA § 219 >>

(B) Sections 86(b)(2)(A), 135(c)(4)(A), and 219(g)(3)(A)(ii) of the 1986 Code are each amended by inserting "221," after "137,".

<< 26 USCA § 137 >>

(C) Subparagraph (A) of section 137(b)(3) of the 1986 Code is amended by inserting "221," before "911,".

<< 26 USCA § 469 >>

(D) Clause (iii) of section 469(i)(3)(E) of the 1986 Code is amended to read as follows:
  "(iii) the amounts allowable as a deduction under sections 219 and 221, and".

<< 26 USCA § 221 >>

(3) The last sentence of section 221(e)(1) of the 1986 Code is amended by inserting before the period "or to any person by reason of a loan under any qualified employer plan (as defined in section 72(p)(4)) or under any contract referred to in section 72(p)(5)".

<< 26 USCA § 1 NOTE >>

(b) PROVISION RELATED TO SECTION 311 OF 1997 ACT.—In the case of any capital gain distribution made after 1997 by a trust to which section 664 of the 1986 Code applies with respect to amounts properly taken into account by such trust during 1997, paragraphs (5)(A)(i)(I), (5)(A)(ii)(I), and (13)(A) of section 1(h) of the 1986 Code (as in effect for taxable years ending on December 31, 1997) shall not apply.

<< 26 USCA § 2001 >>

(c) AMENDMENT RELATED TO SECTION 506 OF 1997 ACT.—Section 2001(f)(2) of the 1986 Code is amended by adding at the end the following:

"For purposes of subparagraph (A), the value of an item shall be treated as shown on a return if the item is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature of such item.".

<< 26 USCA § 9510 >>

(d) AMENDMENTS RELATED TO SECTION 904 OF 1997 ACT.—

<< 26 USCA § 9510 >>

(1) Paragraph (1) of section 9510(c) of the 1986 Code is amended to read as follows:

"(1) IN GENERAL.—Amounts in the Vaccine Injury Compensation Trust Fund shall be available, as provided in appropriation Acts, only for—

"(A) the payment of compensation under subtitle 2 of title XXI of the Public Health Service Act (as in effect on August 5, 1997) for vaccine related injury or death with respect to any vaccine—

"(i) which is administered after September 30, 1988, and

"(ii) which is a taxable vaccine (as defined in section 4132(a)(1)) at the time compensation is paid under such subtitle 2, or

"(B) the payment of all expenses of administration (but not in excess of $9,500,000 for any fiscal year) incurred by the Federal Government in administering such subtitle.".

<< 26 USCA § 9510 >>

(2) Section 9510(b) of the 1986 Code is amended by adding at the end the following new paragraph:

"(3) LIMITATION ON TRANSFERS TO VACCINE INJURY COMPENSATION TRUST FUND.—No amount may be appropriated to the Vaccine Injury Compensation Trust Fund on and after the date of any expenditure from the Trust Fund which is not permitted by this section. The determination of whether an expenditure is so permitted shall be made without regard to—

"(A) any provision of law which is not contained or referenced in this title or in a revenue Act, and

"(B) whether such provision of law is a subsequently enacted provision or directly or indirectly seeks to waive the application of this paragraph.".

(e) AMENDMENTS RELATED TO SECTION 915 OF 1997 ACT.—

<< 26 USCA § 7508A NOTE >>

(1) Section 915(b) of the 1997 Act is amended by inserting "or 1998" after "1997".

<< 26 USCA § 6404 >>

(2) Paragraph (2) of section 6404(h) of the 1986 Code is amended by inserting "Robert T. Stafford" before "Disaster".

(f) AMENDMENTS RELATED TO SECTION 1012 OF 1997 ACT.—

<< 26 USCA § 351 >>

(1) Paragraph (2) of section 351(c) of the 1986 Code, as amended by section 6010(c) of the 1998 Act, is amended by inserting ", or the fact that the corporation whose stock was distributed issues additional stock," after "dispose of part or all of the distributed stock".

<< 26 USCA § 368 >>

(2) Clause (ii) of section 368(a)(2)(H) of the 1986 Code, as amended by section 6010(c) of the 1998 Act, is amended by inserting ", or the fact that the corporation whose stock was distributed issues additional stock," after "dispose of part or all of the distributed stock".

<< 26 USCA § 833 NOTE >>

(g) PROVISION RELATED TO SECTION 1042 OF 1997 ACT.—Rules similar to the rules of section 1.1502–75(d)(5) of the Treasury Regulations shall apply with respect to any organization described in section 1042(b) of the 1997 Act.

<< 26 USCA § 172 >>

(h) AMENDMENT RELATED TO SECTION 1082 OF 1997 ACT.—Subparagraph (F) of section 172(b)(1) of the 1986 Code is amended by adding at the end the following new clause:

"(iv) COORDINATION WITH PARAGRAPH (2).—For purposes of applying paragraph (2), an eligible loss for any taxable year shall be treated in a manner similar to the manner in which a specified liability loss is treated."

<< 26 USCA § 264 >>

(i) AMENDMENT RELATED TO SECTION 1084 OF 1997 ACT.—Paragraph (3) of section 264(f) of the 1986 Code is amended by adding at the end the following flush sentence:

"If the amount described in subparagraph (A) with respect to any policy or contract does not reasonably approximate its actual value, the amount taken into account under subparagraph (A) shall be the greater of the amount of the insurance company liability or the insurance company reserve with respect to such policy or contract (as determined for purposes of the annual statement approved by the National Association of Insurance Commissioners) or shall be such other amount as is determined by the Secretary."

<< 26 USCA § 954 >>

(j) AMENDMENT RELATED TO SECTION 1175 OF 1997 ACT.—Subparagraph (C) of section 954(e)(2) of the 1986 Code is amended by striking "subsection (h)(8)" and inserting "subsection (h)(9)".

<< 26 USCA § 6311 >>

(k) AMENDMENT RELATED TO SECTION 1205 OF 1997 ACT.—Paragraph (2) of section 6311(d) of the 1986 Code is amended by striking "under such contracts" in the last sentence and inserting "under any such contract for the use of credit, debit, or charge cards for the payment of taxes imposed by subtitle A".

<< 26 USCA § 86 NOTE >>

(l) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the provisions of the 1997 Act to which they relate.

SEC. 4004. AMENDMENTS RELATED TO TAX REFORM ACT OF 1984.

<< 26 USCA § 172 >>

(a) IN GENERAL.—Subparagraph (C) of section 172(d)(4) of the 1986 Code is amended to read as follows:

"(C) any deduction for casualty or theft losses allowable under paragraph (2) or (3) of section 165(c) shall be treated as attributable to the trade or business; and".
(b) CONFORMING AMENDMENTS.—

<< 26 USCA § 67 >>

(1) Paragraph (3) of section 67(b) of the 1986 Code is amended by striking "for losses described in subsection (c)(3) or (d) of section 165" and inserting "for casualty or theft losses described in paragraph (2) or (3) of section 165(c) or for losses described in section 165(d)".

<< 26 USCA § 68 >>

(2) Paragraph (3) of section 68(c) of the 1986 Code is amended by striking "for losses described in subsection (c)(3) or (d) of section 165" and inserting "for casualty or theft losses described in paragraph (2) or (3) of section 165(c) or for losses described in section 165(d)".

<< 26 USCA § 873 >>

(3) Paragraph (1) of section 873(b) is amended to read as follows:

"(1) LOSSES.—The deduction allowed by section 165 for casualty or theft losses described in paragraph (2) or (3) of section 165(c), but only if the loss is of property located within the United States."

(c) EFFECTIVE DATES.—

<< 26 USCA § 172 NOTE >>

<< 26 USCA § 873 nt >>

(1) The amendments made by subsections (a) and (b)(3) shall apply to taxable years beginning after December 31, 1983.

<< 26 USCA § 67 NOTE >>

(2) The amendment made by subsection (b)(1) shall apply to taxable years beginning after December 31, 1986.

<< 26 USCA § 68 NOTE >>

(3) The amendment made by subsection (b)(2) shall apply to taxable years beginning after December 31, 1990.

SEC. 4005. AMENDMENTS RELATED TO URUGUAY ROUND AGREEMENTS ACT.

<< 42 USCA § 407 >>

(a) INAPPLICABILITY OF ASSIGNMENT PROHIBITION.—Section 207 of the Social Security Act (42 U.S.C. 407) is amended by adding at the end the following new subsection:

"(c) Nothing in this section shall be construed to prohibit withholding taxes from any benefit under this title, if such withholding is done pursuant to a request made in accordance with section 3402(p)(1) of the Internal Revenue Code of 1986 by the person entitled to such benefit or such person's representative payee.".

<< 42 USCA § 401 >>

(b) PROPER ALLOCATION OF COSTS OF WITHHOLDING BETWEEN THE TRUST FUNDS AND THE GENERAL FUND.—Section 201(g) of such Act (42 U.S.C. 401(g)) is amended—

<< 42 USCA § 401 >>

(1) by inserting before the period in paragraph (1)(A)(ii) the following: "and the functions of the Social Security Administration in connection with the withholding of taxes from benefits, as described in section 207(c), pursuant to requests by persons entitled to such benefits or such persons' representative payee";

<< 42 USCA § 401 >>

(2) by inserting before the period at the end of paragraph (1)(A) the following: "and the functions of the Social Security Administration in connection with the withholding of taxes from benefits, as described in section 207(c), pursuant to requests by persons entitled to such benefits or such persons' representative payee";

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 42 USCA § 401 >>

(3) in paragraph (1)(B)(i)(I), by striking "subparagraph (A))," and inserting "subparagraph (A)) and the functions of the Social Security Administration in connection with the withholding of taxes from benefits, as described in section 207(c), pursuant to requests by persons entitled to such benefits or such persons' representative payee,";

<< 42 USCA § 401 >>

(4) in paragraph (1)(C)(iii), by inserting before the period the following: "and the functions of the Social Security Administration in connection with the withholding of taxes from benefits, as described in section 207(c), pursuant to requests by persons entitled to such benefits or such persons' representative payee";

<< 42 USCA § 401 >>

(5) in paragraph (1)(D), by inserting after "section 232" the following: "and the functions of the Social Security Administration in connection with the withholding of taxes from benefits as described in section 207(c)"; and

<< 42 USCA § 401 >>

(6) in paragraph (4), by inserting after the first sentence the following: "The Board of Trustees of such Trust Funds shall prescribe the method of determining the costs which should be borne by the general fund in the Treasury of carrying out the functions of the Social Security Administration in connection with the withholding of taxes from benefits, as described in section 207(c), pursuant to requests by persons entitled to such benefits or such persons' representative payee.".

<< 42 USCA § 401 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (b) shall apply to benefits paid on or after the first day of the second month beginning after the month in which this Act is enacted.

SEC. 4006. OTHER AMENDMENTS.

(a) AMENDMENTS RELATED TO SECTION 6103 OF 1986 CODE.—

<< 26 USCA § 6103 >>

(1) Subsection (j) of section 6103 of the 1986 Code is amended by adding at the end the following new paragraph:
"(5) DEPARTMENT OF AGRICULTURE.—Upon request in writing by the Secretary of Agriculture, the Secretary shall furnish such returns, or return information reflected thereon, as the Secretary may prescribe by regulation to officers and employees of the Department of Agriculture whose official duties require access to such returns or information for the purpose of, but only to the extent necessary in, structuring, preparing, and conducting the census of agriculture pursuant to the Census of Agriculture Act of 1997 (Public Law 105–113).".

<< 26 USCA § 6103 >>

(2) Paragraph (4) of section 6103(p) of the 1986 Code is amended by striking "(j)(1) or (2)" in the material preceding subparagraph (A) and in subparagraph (F) and inserting "(j)(1), (2), or (5)".

<< 26 USCA § 6103 NOTE >>

(3) The amendments made by this subsection shall apply to requests made on or after the date of the enactment of this Act.
(b) AMENDMENT RELATED TO SECTION 9004 OF TRANSPORTATION EQUITY ACT FOR THE 21ST CENTURY.—

<< 26 USCA § 9503 >>

AR.03125

(1) Paragraph (2) of section 9503(f) of the 1986 Code is amended to read as follows:

"(2) notwithstanding section 9602(b), obligations held by such Fund after September 30, 1998, shall be obligations of the United States which are not interest-bearing."

<< 26 USCA § 9503 NOTE >>

(2) The amendment made by paragraph (1) shall take effect on October 1, 1998.

(c) CLERICAL AMENDMENTS.—

<< 26 USCA § 51 >>

<< 26 USCA § 51 NOTE >>

(1) Clause (i) of section 51(d)(6)(B) of the 1986 Code is amended by striking "rehabilitation plan" and inserting "plan for employment". The reference to "plan for employment" in such clause shall be treated as including a reference to the rehabilitation plan referred to in such clause as in effect before the amendment made by the preceding sentence.

<< 26 USCA § 56 >>

(2) Paragraph (3) of section 56(a) of the 1986 Code is amended by striking "section 460(b)(2)" and inserting "section 460(b)(1)" and by striking "section 460(b)(4)" and inserting "section 460(b)(3)".

<< 26 USCA § 2031 >>

(3) Paragraph (10) of section 2031(c) of the 1986 Code is amended by striking "section 2033A(e)(3)" and inserting "section 2057(e)(3)".

<< 26 USCA § 6693 >>

(4) Subparagraphs (C) and (D) of section 6693(a)(2) of the 1986 Code are each amended by striking "Section" and inserting "section".

TITLE V—MEDICARE–RELATED PROVISIONS

SUBTITLE A—HOME HEALTH

SEC. 5101. INCREASE IN PER BENEFICIARY LIMITS AND PER VISIT PAYMENT LIMITS FOR PAYMENT FOR HOME HEALTH SERVICES.

<< 42 USCA § 1395x >>

(a) INCREASE IN PER BENEFICIARY LIMITS.—Section 1861(v)(1)(L) of the Social Security Act (42 U.S.C. 1395x(v)(1)(L)) is amended—

<< 42 USCA § 1395x >>

(1) in the first sentence of clause (v), by inserting "subject to clause (viii)(I)," before "the Secretary";

<< 42 USCA § 1395x >>

(2) in clause (vi)(I), by inserting "subject to clauses (viii)(II) and (viii)(III)" after "fiscal year 1994"; and

<< 42 USCA § 1395x >>

(3) by adding at the end the following new clause:

"(viii)(I) In the case of a provider with a 12–month cost reporting period ending in fiscal year 1994, if the limit imposed under clause (v) (determined without regard to this subclause) for a cost reporting period beginning during or after fiscal year 1999 is less than the median described in clause (vi)(I) (but determined as if any reference in clause (v) to '98 percent' were a reference to '100 percent'), the limit otherwise imposed under clause (v) for such provider and period shall be increased by ⅓ of such difference.

"(II) Subject to subclause (IV), for new providers and those providers without a 12–month cost reporting period ending in fiscal year 1994, but for which the first cost reporting period begins before fiscal year 1999, for cost reporting periods beginning during or after fiscal year 1999, the per beneficiary limitation described in clause (vi)(I) shall be equal to the median described in such clause (determined as if any reference in clause (v) to '98 percent' were a reference to '100 percent').

"(III) Subject to subclause (IV), in the case of a new provider for which the first cost reporting period begins during or after fiscal year 1999, the limitation applied under clause (vi)(I) (but only with respect to such provider) shall be equal to 75 percent of the median described in clause (vi)(I).

"(IV) In the case of a new provider or a provider without a 12–month cost reporting period ending in fiscal year 1994, subclause (II) shall apply, instead of subclause (III), to a home health agency which filed an application for home health agency provider status under this title before September 15, 1998, or which was approved as a branch of its parent agency before such date and becomes a subunit of the parent agency or a separate agency on or after such date.

"(V) Each of the amounts specified in subclauses (I) through (III) are such amounts as adjusted under clause (iii) to reflect variations in wages among different areas.".

<< 42 USCA § 1395x >>

(b) REVISION OF PER VISIT LIMITS.—Section 1861(v)(1)(L)(i) of such Act (42 U.S.C. 1395x(v)(1)(L)(i)) is amended—

<< 42 USCA § 1395x >>

(1) in subclause (III), by striking "or";

<< 42 USCA § 1395x >>

(2) in subclause (IV)—
  (A) by inserting "and before October 1, 1998," after "October 1, 1997,"; and
  (B) by striking the period at the end and inserting ", or"; and

<< 42 USCA § 1395x >>

(3) by adding at the end the following new subclause:
"(V) October 1, 1998, 106 percent of such median.".
(c) ONE–YEAR DELAY IN 15 PERCENT REDUCTION IN PAYMENT LIMITS; CHANGE IN TIMING OF IMPLEMENTATION OF PROSPECTIVE PAYMENT SYSTEM.—

<< 42 USCA § 1395fff >>

(1) PROSPECTIVE PAYMENT SYSTEM.—Section 1895 of such Act (42 U.S.C. 1395fff) is amended—
  (A) in subsection (a), by striking "for cost reporting periods beginning on or after October 1, 1999" and inserting "for portions of cost reporting periods occurring on or after October 1, 2000"; and
  (B) in subsection (b)(3)—
  (i) in subparagraph (A)(i), by striking "fiscal year 2000" and inserting "fiscal year 2001";
  (ii) in subparagraph (A)(ii), by striking "September 30, 1999" and inserting "September 30, 2000"; and
  (iii) in subparagraph (B)(i), by striking "fiscal year 2001" and inserting "fiscal year 2002".

<< 42 USCA § 1395fff NOTE >>

(2) CHANGE IN EFFECTIVE DATE.—Section 4603(d) of the Balanced Budget Act of 1997 (42 U.S.C. 1395fff note) is amended by striking "cost reporting periods beginning on or after October 1, 1999" and inserting "portions of cost reporting periods occurring on or after October 1, 2000".

<< 42 USCA § 1395fff NOTE >>

(3) CONTINGENCY REDUCTION.—Section 4603(e) of the Balanced Budget Act of 1997 (42 U.S.C. 1395fff note) is amended—

(A) by striking "cost reporting periods described in subsection (d), for such cost reporting periods" and inserting "portions of cost reporting periods described in subsection (d), for such portions"; and

(B) by striking "September 30, 1999" and inserting "September 30, 2000".

<< 42 USCA § 1395x >>

(d) CHANGE IN HOME HEALTH MARKET BASKET INCREASE.—

<< 42 USCA § 1395x >>

(1) INTERIM PAYMENT SYSTEM.—Section 1861(v)(1)(L) of the Social Security Act (42 U.S.C. 1395x(v)(1)(L)), as amended by subsection (a)(3), is amended by adding at the end the following:

"(ix) Notwithstanding any other provision of this subparagraph, in updating any limit under this subparagraph by a home health market basket index for cost reporting periods beginning during each of fiscal years 2000, 2001, 2002, and 2003, the update otherwise provided shall be reduced by 1.1 percentage points.".

<< 42 USCA § 1395x >>

(2) PROSPECTIVE PAYMENT SYSTEM.—Section 1895(b)(3)(B) of such Act (42 U.S.C. 1395fff(b)(3)(B)) is amended—

(A) in clause (i), by striking "home health market basket percentage increase" and inserting "home health applicable increase percentage (as defined in clause (ii))";

(B) by redesignating clause (ii) as clause (iii); and

(C) by inserting after clause (i) the following:

"(ii) HOME HEALTH APPLICABLE INCREASE PERCENTAGE.—For purposes of this subparagraph, the term 'home health applicable increase percentage' means, with respect to—

"(I) fiscal year 2002 or 2003, the home health market basket percentage increase (as defined in clause (iii)) minus 1.1 percentage points; or

"(II) any subsequent fiscal year, the home health market basket percentage increase.".

<< 42 USCA § 1395r >>

(e) EXCLUSION OF ADDITIONAL PART B COSTS FROM DETERMINATION OF PART B MONTHLY PREMIUM.—Section 1839 of such Act (42 U.S.C. 1395r) is amended—

<< 42 USCA § 1395r >>

(1) in subsection (a)(3), by inserting "(except as provided in subsection (g))" after "year that"; and

<< 42 USCA § 1395r >>

(2) by adding at the end the following new subsection:

"(g) In estimating the benefits and administrative costs which will be payable from the Federal Supplementary Medical Insurance Trust Fund for a year for purposes of determining the monthly premium rate under subsection (a)(3), the Secretary shall exclude an estimate of any benefits and administrative costs attributable to the application of section 1861(v)(1)(L)(viii) or to the establishment under section 1861(v)(1)(L)(i)(V) of a per visit limit at 106 percent of the median (instead of 105 percent

AR.03128

of the median), but only to the extent payment for home health services under this title is not being made under section 1895 (relating to prospective payment for home health services).".

(f) REPORTS ON SUMMARY OF RESEARCH CONDUCTED BY THE SECRETARY ON THE PROSPECTIVE PAYMENT SYSTEM.—By not later than January 1, 1999, the Secretary of Health and Human Services shall submit to Congress a report on the following matters:

(1) RESEARCH.—A description of any research paid for by the Secretary on the development of a prospective payment system for home health services furnished under the medicare program under title XVIII of the Social Security Act, and a summary of the results of such research.

(2) SCHEDULE FOR IMPLEMENTATION OF SYSTEM.—The Secretary's schedule for the implementation of the prospective payment system for home health services under section 1895 of the Social Security Act (42 U.S.C. 1395fff).

(g) MEDPAC REPORTS.—

(1) REVIEW OF SECRETARY'S REPORT.—Not later than 60 days after the date the Secretary of Health and Human Services submits to Congress the report under subsection (f), the Medicare Payment Advisory Commission (established under section 1805 of the Social Security Act (42 U.S.C. 1395b–6)) shall submit to Congress a report describing the Commission's analysis of the Secretary's report, and shall include the Commission's recommendations with respect to the matters contained in such report.

(2) ANNUAL REPORT.—The Commission shall include in its annual report to Congress for June 1999 an analysis of whether changes in law made by the Balanced Budget Act of 1997, as modified by the amendments made by this section, with respect to payments for home health services furnished under the medicare program under title XVIII of the Social Security Act, impede access to such services by individuals entitled to benefits under such program.

(h) GAO AUDIT OF RESEARCH EXPENDITURES.—The Comptroller General of the United States shall conduct an audit of sums obligated or expended by the Health Care Financing Administration for the research described in subsection (f)(1), and of the data, reports, proposals, or other information provided by such research.

<< 42 USCA § 1395x NOTE >>

(i) PROMPT IMPLEMENTATION.—

<< 42 USCA § 1395x NOTE >>

(1) IN GENERAL.—The Secretary of Health and Human Services shall promptly issue (without regard to chapter 8 of title 5, United States Code) such regulations or program memoranda as may be necessary to effect the amendments made by this section for cost reporting periods beginning during fiscal year 1999.

<< 42 USCA § 1395x NOTE >>

(2) USE OF PAYMENT AMOUNTS AND LIMITS FROM PUBLISHED TABLES.—

(A) PER BENEFICIARY LIMITS.—In effecting the amendments made by subsection (a) for cost reporting periods beginning in fiscal year 1999, the "median" referred to in section 1861(v)(1)(L)(vi)(I) of the Social Security Act for such periods shall be the national standardized per beneficiary limitation specified in Table 3C published in the Federal Register on August 11, 1998 (63 FR 42926) and the "standardized regional average of such costs" referred to in section 1861(v)(1)(L)(v) (I) of such Act for a census division shall be the sum of the labor and nonlabor components of the standardized per beneficiary limitation for that census division specified in Table 3B published in the Federal Register on that date (63 FR 42926) (or in Table 3D as so published with respect to Puerto Rico and Guam), and adjusted to reflect variations in wages among different geographic areas as specified in Tables 4a and 4b published in the Federal Register on that date (63 FR 42926–42933).

(B) PER VISIT LIMITS.—In effecting the amendments made by subsection (b) for cost reporting periods beginning in fiscal year 1999, the limits determined under section 1861(v)(1)(L)(i)(V) of such Act for cost reporting periods beginning during such fiscal year shall be equal to the per visit limits as specified in Table 3A published in the Federal Register on August 11, 1998 (63 FR 42925) and as subsequently corrected, multiplied by $^{106}/_{105}$, and adjusted to reflect variations in wages among different geographic areas as specified in Tables 4a and 4b published in the Federal Register on August 11, 1998 (63 FR 42926–42933).

AR.03129

804

SUBTITLE B–OTHER MEDICARE–RELATED PROVISIONS

SEC. 5201. AUTHORIZATION OF ADDITIONAL EXCEPTIONS TO IMPOSITION OF PENALTIES FOR PROVIDING INDUCEMENTS TO BENEFICIARIES.

<< 42 USCA § 1320a–7a >>

(a) IN GENERAL.—Subparagraph (B) of section 1128A(i)(6) of the Social Security Act (42 U.S.C. 1320a–7a(i)(6)) is amended to read as follows:

"(B) subject to subsection (n), any permissible practice described in any subparagraph of section 1128B(b)(3) or in regulations issued by the Secretary;".

(b) SPECIAL PROVISIONS CONCERNING A SAFE HARBOR FOR PAYMENT OF MEDIGAP PREMIUMS OF ESRD BENEFICIARIES.—

<< 42 USCA § 1320a–7a >>

(1) 2–YEAR LIMITATION.—Section 1128A of such Act (42 U.S.C. 1320a–7a) is amended by adding at the end the following:

"(n)(1) Subparagraph (B) of subsection (i)(6) shall not apply to a practice described in paragraph (2) unless—

"(A) the Secretary, through the Inspector General of the Department of Health and Human Services, promulgates a rule authorizing such a practice as an exception to remuneration; and

"(B) the remuneration is offered or transferred by a person under such rule during the 2–year period beginning on the date the rule is first promulgated.

"(2) A practice described in this paragraph is a practice under which a health care provider or facility pays, in whole or in part, premiums for medicare supplemental policies for individuals entitled to benefits under part A of title XVIII pursuant to section 226A.".

<< 42 USCA § 1320a–7a NOTE >>

(2) GAO STUDY AND REPORT ON IMPACT OF SAFE HARBOR ON MEDIGAP POLICIES.—If a permissible practice is promulgated under section 1128A(n)(1)(A) of the Social Security Act (as added by paragraph (1)), the Comptroller General of the United States shall conduct a study that compares any disproportionate impact on specific issuers of medicare supplemental policies (including the impact on premiums for non-ESRD medicare beneficiaries enrolled in such policies) due to adverse selection in enrolling medicare ESRD beneficiaries before the enactment of the Health Insurance Portability and Accountability Act of 1996 and 1 year after the date of promulgation of such permissible practice under section 1128A(n)(1)(A) of the Social Security Act. Not later than 18 months after the date of promulgation of such practice, the Comptroller General shall submit a report to Congress on such study and shall include in the report recommendations concerning whether the time limitation imposed under section 1128A(n)(1)(B) of such Act should be extended.

<< 42 USCA § 1320a–7d >>

(c) EXTENSION OF ADVISORY OPINION AUTHORITY.—Section 1128D(b)(2)(A) of such Act (42 U.S.C. 1320a–7d(b)(2)(A)) is amended by inserting "or section 1128A(i)(6)" after "1128B(b)".

<< 42 USCA § 1320a–7a NOTE >>

<< 42 USCA § 1320a–7d nt >>

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act.

<< 42 USCA § 1320a–7a NOTE >>

<< 42 USCA § 1320a–7d nt >>

(e) INTERIM FINAL RULEMAKING AUTHORITY.—The Secretary of Health and Human Services may promulgate regulations that take effect on an interim basis, after notice and pending opportunity for public comment, in order to implement the amendments made by this section in a timely manner.

SEC. 5202. EXPANSION OF MEMBERSHIP OF MEDPAC TO 17.

<< 42 USCA § 1395b–6 >>

(a) IN GENERAL.—Section 1805(c)(1) of the Social Security Act (42 U.S.C. 1395b–6(c)(1)), as added by section 4022 of the Balanced Budget Act of 1997, is amended by striking "15" and inserting "17".

<< 42 USCA § 1395b–6 NOTE >>

(b) INITIAL TERMS OF ADDITIONAL MEMBERS.—

<< 42 USCA § 1395b–6 NOTE >>

(1) IN GENERAL.—For purposes of staggering the initial terms of members of the Medicare Payment Advisory Commission (under section 1805(c)(3) of such Act (42 U.S.C. 1395b–6(c)(3)), the initial terms of the two additional members of the Commission provided for by the amendment under subsection (a) are as follows:

(A) One member shall be appointed for one year.
(B) One member shall be appointed for two years.

<< 42 USCA § 1395b–6 NOTE >>

(2) COMMENCEMENT OF TERMS.—Such terms shall begin on May 1, 1999.

SUBTITLE C—REVENUE OFFSETS

SEC. 5301. TAX TREATMENT OF CASH OPTION FOR QUALIFIED PRIZES.

<< 26 USCA § 451 >>

(a) IN GENERAL.—Section 451 (relating to taxable year for which items of gross income included) is amended by adding at the end the following new subsection:

"(h) SPECIAL RULE FOR CASH OPTIONS FOR RECEIPT OF QUALIFIED PRIZES.—

"(1) IN GENERAL.—For purposes of this title, in the case of an individual on the cash receipts and disbursements method of accounting, a qualified prize option shall be disregarded in determining the taxable year for which any portion of the qualified prize is properly includible in gross income of the taxpayer.

"(2) QUALIFIED PRIZE OPTION; QUALIFIED PRIZE.—For purposes of this subsection—

"(A) IN GENERAL.—The term 'qualified prize option' means an option which—

"(i) entitles an individual to receive a single cash payment in lieu of receiving a qualified prize (or remaining portion thereof), and

"(ii) is exercisable not later than 60 days after such individual becomes entitled to the qualified prize.

"(B) QUALIFIED PRIZE.—The term 'qualified prize' means any prize or award which—

"(i) is awarded as a part of a contest, lottery, jackpot, game, or other similar arrangement,

"(ii) does not relate to any past services performed by the recipient and does not require the recipient to perform any substantial future service, and

"(iii) is payable over a period of at least 10 years.

"(3) PARTNERSHIP, ETC.—The Secretary shall provide for the application of this subsection in the case of a partnership or other pass-through entity consisting entirely of individuals described in paragraph (1)."

<< 26 USCA § 451 NOTE >>

(b) EFFECTIVE DATE.—

<< 26 USCA § 451 NOTE >>

(1) IN GENERAL.—The amendment made by this section shall apply to any prize to which a person first becomes entitled after the date of enactment of this Act.

<< 26 USCA § 451 NOTE >>

(2) TRANSITION RULE.—The amendment made by this section shall apply to any prize to which a person first becomes entitled on or before the date of enactment of this Act, except that in determining whether an option is a qualified prize option as defined in section 451(h)(2)(A) of the Internal Revenue Code of 1986 (as added by such amendment)—

(A) clause (ii) of such section 451(h)(2)(A) shall not apply, and

(B) such option shall be treated as a qualified prize option if it is exercisable only during all or part of the 18–month period beginning on July 1, 1999.

### DIVISION K—PAY–AS–YOU–GO PROVISION

Notwithstanding Rule 3 of the Budget Scorekeeping Guidelines set forth in the Joint Explanatory Statement of the Committee of Conference accompanying Conference Report No. 105–217, legislation in section 103 of Division A and in divisions C through J of this Act that would have been estimated by the Office of Management and Budget as changing direct spending or receipts under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 were it included in an Act other than an appropriation Act shall be treated as direct spending or receipts legislation, as appropriate, under section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985.

This Act may be cited as the "Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999".

Approved October 21, 1998.

PL 105–277, 1998 HR 4328

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 104–208, September 30, 1996, 110 Stat 3009

UNITED STATES PUBLIC LAWS

104th Congress - Second Session

Convening January 3, 1996

Additions and Deletions are not identified in this document.

PL 104–208 (HR 3610)

September 30, 1996

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997

An Act making omnibus consolidated appropriations for the fiscal year ending September 30, 1997, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

[THIS ACT IS FROM THE HAND ENROLLED BILL.]

## DIVISION A

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1997, and for other purposes, namely:

## TITLE I—OMNIBUS APPROPRIATIONS

SEC. 101. (a) For programs, projects or activities in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Departments of Commerce, Justice, and State, the Judiciary, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—DEPARTMENT OF JUSTICE

## GENERAL ADMINISTRATION

## SALARIES AND EXPENSES

For expenses necessary for the administration of the Department of Justice, $75,773,000 of which not to exceed $3,317,000 is for the Facilities Program 2000, to remain available until expended: Provided, That not to exceed 43 permanent positions and 44 full-time equivalent workyears and $7,477,000 shall be expended for the Department Leadership Program exclusive of augmentation that occurred in these offices in fiscal year 1996: Provided further, That not to exceed 41 permanent positions and 48 full-time equivalent workyears and $4,660,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or non-reimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount, for enhancements for the Office of Intelligence Policy and Review and security measures, $3,600,000; of which $2,170,000 is for security enhancements: Provided, That the entire amount is designated by Congress

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### COUNTERTERRORISM FUND

For necessary expenses, as determined by the Attorney General, $9,450,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City or any domestic or international terrorist incident, (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities, and (3) the costs of conducting a terrorism threat assessment of Federal agencies and their facilities: Provided, That funds provided under this heading shall be available only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

For an additional amount for necessary expenses, as determined by the Attorney General, $20,000,000, to remain available until expended, to reimburse any Department of Justice organization for (1) the costs incurred in reestablishing the operational capability of an office or facility which has been damaged or destroyed as a result of any domestic or international terrorist incident, or (2) the costs of providing support to counter, investigate or prosecute domestic or international terrorism, including payment of rewards in connection with these activities: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### ADMINISTRATIVE REVIEW AND APPEALS

For expenses necessary for the administration of pardon and clemency petitions and immigration related activities, $62,000,000.

For an additional amount for security measures for the Executive Office of Immigration Review, $1,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, ADMINISTRATIVE REVIEW AND APPEALS

For activities authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $48,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $31,960,000; including not to exceed $10,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and for the acquisition, lease, maintenance, and operation of motor vehicles, without regard to the general purchase price limitation for the current fiscal year.

### UNITED STATES PAROLE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the United States Parole Commission as authorized by law, $4,845,000.

### LEGAL ACTIVITIES

### SALARIES AND EXPENSES, GENERAL LEGAL ACTIVITIES

For expenses, necessary for the legal activities of the Department of Justice, not otherwise provided for, including not to exceed $20,000 for expenses of collecting evidence, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; and rent of private or Government-owned space in the District of Columbia; 420,793,000; of which not to exceed $10,000,000 for litigation support contracts shall remain available until expended: Provided, That of

AR.03134

the funds available in this appropriation, not to exceed $17,525,000 shall remain available until expended for office automation systems for the legal divisions covered by this appropriation, and for the United States Attorneys, the Antitrust Division, and offices funded through "Salaries and Expenses", General Administration: Provided further, That of the total amount appropriated, not to exceed $1,000 shall be available to the United States National Central Bureau, INTERPOL, for official reception and representation expenses: Provided further, That notwithstanding 31 U.S.C. 1342, the Attorney General may accept on behalf of the United States, and credit to this appropriation, gifts of money, personal property and services, for the purposes of hosting the International Criminal Police Organization's (INTERPOL) American Regional Conference in the United States during fiscal year 1997: Provided further, That not to exceed 8 permanent positions and 10 full-time equivalent workyears and $987,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

  In addition, for reimbursement of expenses of the Department of Justice associated with processing cases under the National Childhood Vaccine Injury Act of 1986 as amended, not to exceed $4,028,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

  For an additional amount for expenses of the Criminal Division relating to terrorism, $1,719,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, GENERAL LEGAL ACTIVITIES

  For the expeditious deportation of denied asylum applicants, as authorized by section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $7,750,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### SALARIES AND EXPENSES, ANTITRUST DIVISION

  For expenses necessary for the enforcement of antitrust and kindred laws, $76,447,000: Provided, That notwithstanding any other provision of law, not to exceed $58,905,000 of offsetting collections derived from fees collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at not more than $17,542,000: Provided further, That any fees received in excess of $58,905,000 in fiscal year 1997, shall remain available until expended, but shall not be available for obligation until October 1, 1997.

### SALARIES AND EXPENSES, UNITED STATES ATTORNEYS

  For necessary expenses of the Office of the United States Attorneys, including intergovernmental agreements, $923,340,000 of which not to exceed $2,500,000 shall be available until September 30, 1998, for the purposes of (1) providing training of personnel of the Department of Justice in debt collection, (2) providing services to the Department of Justice related to locating debtors and their property, such as title searches, debtor skiptracing, asset searches, credit reports and other investigations, (3) paying the costs of the Department of Justice for the sale of property not covered by the sale proceeds, such as auctioneers' fees and expenses, maintenance and protection of property and businesses, advertising and title search and surveying costs, and (4) paying the costs of processing and tracking debts owed to the United States Government: Provided, That of the total amount appropriated, not to exceed $8,000 shall be available for official reception and representation expenses: Provided further, That not to exceed $10,000,000 of those funds available for automated litigation support contracts shall remain available until expended: Provided further, That $1,900,000 for supervision of the International Brotherhood of Teamsters national election, shall remain available until expended: Provided further, That in addition to reimbursable full-time equivalent workyears available to the Office of the United States Attorneys, not to exceed 8,652 positions and 8,936 full-time equivalent workyears shall be supported from the funds appropriated in this Act for the United States Attorneys.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For an additional amount for expenses relating to terrorism and security needs, $10,900,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS, UNITED STATES ATTORNEYS

For activities authorized by sections 40114, 130005, 190001(b), 190001(d) and 250005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 815 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), $43,876,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, of which $28,602,000 shall be available to help meet the increased demands for litigation and related activities, $4,641,000 for Southwest Border Control, $1,000,000 for Federal victim counselors, and $9,633,000 for expeditious deportation of denied asylum applicants.

### UNITED STATES TRUSTEE SYSTEM FUND

For necessary expenses of the United States Trustee Program, as authorized by 28 U.S.C. 589a(a), $107,950,000, to remain available until expended and to be derived from the United States Trustee System Fund: Provided, That notwithstanding any other provision of law, deposits to the Fund shall be available in such amounts as may be necessary to pay refunds due depositors: Provided further, That notwithstanding any other provision of law, $107,950,000 of offsetting collections derived from fees collected pursuant to 28 U.S.C. 589a(b) shall be retained and used for necessary expenses in this appropriation and remain available until expended: Provided further, That the sum herein appropriated from the Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the Fund estimated at $0: Provided further, That any such fees collected in excess of $107,950,000 in fiscal year 1997 shall remain available until expended but shall not be available for obligation until October 1, 1997.

### SALARIES AND EXPENSES, FOREIGN CLAIMS SETTLEMENT COMMISSION

For expenses necessary to carry out the activities of the Foreign Claims Settlement Commission, including services as authorized by 5 U.S.C. 3109, $953,000.

### SALARIES AND EXPENSES, UNITED STATES MARSHALS SERVICE

For necessary expenses of the United States Marshals Service; including the acquisition, lease, maintenance, and operation of vehicles and aircraft, and the purchase of passenger motor vehicles for police-type use, without regard to the general purchase price limitation for the current fiscal year, $457,495,000, as authorized by 28 U.S.C. 561(i); of which not to exceed $6,000 shall be available for official reception and representation expenses; and of which not to exceed $4,000,000 for development, implementation, maintenance and support, and training for an automated prisoner information system, and $2,200,000 to support the Justice Prisoner and Alien Transportation System, shall remain available until expended: Provided, That, with respect to the amounts appropriated above, the service of maintaining and transporting State, local, or territorial prisoners shall be considered a specialized or technical service for purposes of 31 U.S.C. 6505, and any prisoners so transported shall be considered persons (transported for other than commercial purposes) whose presence is associated with the performance of a governmental function for purposes of 49 U.S.C. 40102: Provided further, That not to exceed 12 permanent positions and 12 full-time equivalent workyears and $700,000 shall be expended for the Offices of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

### VIOLENT CRIME REDUCTION PROGRAMS, UNITED STATES MARSHALS SERVICE

For activities authorized by section 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $25,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### FEDERAL PRISONER DETENTION

For expenses, related to United States prisoners in the custody of the United States Marshals Service as authorized in 18 U.S.C. 4013, but not including expenses otherwise provided for in appropriations available to the Attorney General, $405,262,000,

as authorized by 28 U.S.C. 561(i), to remain available until expended: Provided, That this appropriation hereafter shall not be available for expenses authorized under 18 U.S.C. 4013(a)(4).

## FEES AND EXPENSES OF WITNESSES

For expenses, mileage, compensation, and per diems of witnesses, for expenses of contracts for the procurement and supervision of expert witnesses, for private counsel expenses, and for per diems in lieu of subsistence, as authorized by law, including advances, $100,702,000, to remain available until expended; of which not to exceed $4,750,000 may be made available for planning, construction, renovations, maintenance, remodeling, and repair of buildings, and the purchase of equipment incident thereto, for protected witness safesites; of which not to exceed $1,000,000 may be made available for the purchase and maintenance of armored vehicles for transportation of protected witnesses; and of which not to exceed $4,000,000 may be made available for the purchase, installation and maintenance of a secure, automated information network to store and retrieve the identities and locations of protected witnesses.

## SALARIES AND EXPENSES, COMMUNITY RELATIONS SERVICE

For necessary expenses of the Community Relations Service, established by title X of the Civil Rights Act of 1964, $5,319,000: Provided, That notwithstanding any other provision of law, upon a determination by the Attorney General that emergent circumstances require additional funding for conflict prevention and resolution activities of the Community Relations Service, the Attorney General may transfer such amounts to the Community Relations Service, from available appropriations for the current fiscal year for the Department of Justice, as may be necessary to respond to such circumstances: Provided further, That any transfer pursuant to this paragraph shall be treated as a reprogramming under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## ASSETS FORFEITURE FUND

For expenses authorized by 28 U.S.C. 524(c)(1)(A)(ii), (B), (C), (F), and (G), as amended, $23,000,000, to be derived from the Department of Justice Assets Forfeiture Fund.

## RADIATION EXPOSURE COMPENSATION

### ADMINISTRATIVE EXPENSES

For necessary administrative expenses in accordance with the Radiation Exposure Compensation Act, $2,000,000.

### PAYMENT TO RADIATION EXPOSURE COMPENSATION TRUST FUND

For payments to the Radiation Exposure Compensation Trust Fund, $13,736,000, not to be available for obligation until September 30, 1997.

## INTERAGENCY LAW ENFORCEMENT

### INTERAGENCY CRIME AND DRUG ENFORCEMENT

For necessary expenses for the detection, investigation, and prosecution of individuals involved in organized crime drug trafficking not otherwise provided for, to include intergovernmental agreements with State and local law enforcement agencies engaged in the investigation and prosecution of individuals involved in organized crime drug trafficking, $359,430,000, of which $50,000,000 shall remain available until expended: Provided, That any amounts obligated from appropriations under this heading may be used under authorities available to the organizations reimbursed from this appropriation: Provided further, That any unobligated balances remaining available at the end of the fiscal year shall revert to the Attorney General for reallocation among participating organizations in succeeding fiscal years, subject to the reprogramming procedures described in section 605 of this Act.

## FEDERAL BUREAU OF INVESTIGATION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Bureau of Investigation for detection, investigation, and prosecution of crimes against the United States; including purchase for police-type use of not to exceed 2,706 passenger motor vehicles, of which 1,945 will be for

replacement only, without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance, and operation of aircraft; and not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; $2,451,361,000, of which not to exceed $50,000,000 for automated data processing and telecommunications and technical investigative equipment and $1,000,000 for undercover operations shall remain available until September 30, 1998; of which not less than $147,081,000 shall be for counterterrorism investigations, foreign counterintelligence, and other activities related to our national security; of which not to exceed $98,400,000 shall remain available until expended; and of which not to exceed $10,000,000 is authorized to be made available for making payments or advances for expenses arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to violent crime, terrorism, organized crime, and drug investigations; and of which $1,500,000 shall be available to maintain an independent program office dedicated solely to the relocation of the Criminal Justice Information Services Division and the automation of fingerprint identification services: Provided, That not to exceed $45,000 shall be available for official reception and representation expenses: Provided further, That not to exceed 81 permanent positions and 85 full-time equivalent workyears and $5,959,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount for necessary expenses of the Federal Bureau of Investigation to prevent and investigate terrorism activities and incidents; provide for additional agents and support staff; protect key physical assets; establish a capability for chemical, biological and nuclear research; improve domestic intelligence; and improve security at Federal Bureau of Investigation offices, $115,610,000, as authorized by the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132): Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) as amended ("the 1994 Act"), and the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"), $169,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $76,356,000 shall be for activities authorized by section 190001(c) of the 1994 Act and section 811 of the Antiterrorism Act; $53,404,000 shall be for activities authorized by section 190001(b) of the 1994 Act, of which $20,240,000 shall be for activities authorized by section 103 of the Brady Handgun Violence Prevention Act (Public Law 103–159), as amended; $4,000,000 shall be for training and investigative assistance authorized by section 210501 of the 1994 Act; $9,500,000 shall be for grants to States, as authorized by section 811(b) of the Antiterrorism Act; and $5,500,000 shall be for establishing DNA quality-assurance and proficiency-testing standards, establishing an index to facilitate law enforcement exchange of DNA identification information, and related activities authorized by section 210501 of the 1994 Act.

### TELECOMMUNICATIONS CARRIER COMPLIANCE FUND

For necessary expenses, as determined by the Attorney General, $60,000,000, to remain available until expended, to be deposited in the Telecommunications Carrier Compliance Fund for making payments to telecommunications carriers, equipment manufacturers, and providers of telecommunications support services pursuant to section 110 of this Act: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the entire amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $41,639,000, to remain available until expended.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### DRUG ENFORCEMENT ADMINISTRATION

#### SALARIES AND EXPENSES

For necessary expenses of the Drug Enforcement Administration, including not to exceed $70,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; expenses for conducting drug education and training programs, including travel and related expenses for participants in such programs and the distribution of items of token value that promote the goals of such programs; purchase of not to exceed 1,158 passenger motor vehicles, of which 1,032 will be for replacement only, for policetype use without regard to the general purchase price limitation for the current fiscal year; and acquisition, lease, maintenance, and operation of aircraft; $745,388,000, of which not to exceed $1,800,000 for research and $15,000,000 for transfer to the Drug Diversion Control Fee Account for operating expenses shall remain available until expended, and of which not to exceed $4,000,000 for purchase of evidence and payments for information, not to exceed $4,000,000 for contracting for automated data processing and telecommunications equipment, and not to exceed $2,000,000 for laboratory equipment, $4,000,000 for technical equipment, and $2,000,000 for aircraft replacement retrofit and parts, shall remain available until September 30, 1998; and of which not to exceed $50,000 shall be available for official reception and representation expenses: Provided, That not to exceed 25 permanent positions and 25 full-time equivalent workyears and $1,828,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount for security measures for domestic and foreign Drug Enforcement Administration offices, $5,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

#### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by sections 180104 and 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 814 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), and for the purchase of passenger motor vehicles for police-type use, as otherwise authorized in this title, $220,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

#### CONSTRUCTION

For necessary expenses to construct or acquire buildings and sites by purchase, or as otherwise authorized by law (including equipment for such buildings); conversion and extension of federally-owned buildings; and preliminary planning and design of projects; $30,806,000, to remain available until expended.

### IMMIGRATION AND NATURALIZATION SERVICE

#### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, including not to exceed $50,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; purchase for police-type use (not to exceed 2,691, of which 1,711 are for replacement only), without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance and operation of aircraft; and research related to immigration enforcement; $1,590,159,000 of which not to exceed $400,000 for research shall remain available until expended; and of which not to exceed $10,000,000 shall be available for costs associated with the training program for basic officer training, and $5,000,000 is for payments or advances arising out of contractual or reimbursable agreements with State and local law enforcement agencies while engaged in cooperative activities related to immigration: Provided, That none of the funds available to the Immigration and Naturalization Service shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 1997: Provided

further, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That not to exceed $5,000 shall be available for official reception and representation expenses: Provided further, That none of the funds provided in this or any other Act shall be used for the continued operation of the San Clemente and Temecula checkpoints unless the checkpoints are open and traffic is being checked on a continuous 24–hour basis: Provided further, That the Land Border Fee Pilot Project scheduled to end September 30, 1996, is extended to September 30, 1999, for projects on both the northern and southern borders of the United States, except that no pilot program may implement a universal land border crossing toll: Provided further, That obligated and unobligated balances available to "Salaries and Expenses, Community Relations Service" under section 501(c) of the Refugee Education Assistance Act of 1980 are transferred to this account and shall remain available until expended: Provided further, That not to exceed 48 permanent positions and 48 full-time equivalent workyears and $4,628,000 shall be expended for the Office of Legislative Affairs and Public Affairs: Provided further, That the latter two aforementioned offices shall not be augmented by personnel details, temporary transfers of personnel on either a reimbursable or nonreimbursable basis or any other type of formal or informal transfer or reimbursement of personnel or funds on either a temporary or long-term basis.

For an additional amount to support the detention and removal of aliens with ties to terrorist organizations and expand the detention and removal of illegal aliens and enhance the intelligence of the Immigration and Naturalization Service, $15,000,000, of which $10,000,000 shall be for detention and removal of aliens: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by sections 130002, 130005, 130006, 130007, and 190001(b) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, and section 813 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), $500,000,000, to remain available until expended, which will be derived from the Violent Crime Reduction Trust Fund, of which $66,217,000 shall be for expeditious deportation of denied asylum applicants, $317,256,000 shall be for improving border controls, and $116,527,000 shall be for detention and deportation proceedings: Provided, That amounts not required for asylum processing provided under the expeditious deportation of denied asylum applicants shall also be available for other deportation program activities.

## CONSTRUCTION

For planning, construction, renovation, equipping, and maintenance of buildings and facilities necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, not otherwise provided for, $9,841,000, to remain available until expended.

## FEDERAL PRISON SYSTEM

## SALARIES AND EXPENSES

<< 42 USCA § 250a >>

<< 18 USCA § 4352 NOTE >>

For expenses necessary for the administration, operation, and maintenance of Federal penal and correctional institutions, including purchase (not to exceed 836, of which 572 are for replacement only) and hire of law enforcement and passenger motor vehicles, and for the provision of technical assistance and advice on corrections related issues to foreign governments; $2,768,316,000: Provided, That the Attorney General may transfer to the Health Resources and Services Administration such amounts as may be necessary for direct expenditures by that Administration for medical relief for inmates of Federal penal and correctional institutions: Provided further, That the Director of the Federal Prison System (FPS), where necessary, may enter into contracts with a fiscal agent/fiscal intermediary claims processor to determine the amounts payable to persons who, on behalf of the FPS, furnish health services to individuals committed to the custody of the FPS: Provided further, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That not to exceed $6,000 shall be available for official reception and representation expenses: Provided further, That not to exceed

$90,000,000 for the activation of new facilities shall remain available until September 30, 1998: Provided further, That of the amounts provided for Contract Confinement, not to exceed $20,000,000 shall remain available until expended to make payments in advance for grants, contracts and reimbursable agreements, and other expenses authorized by section 501(c) of the Refugee Education Assistance Act of 1980, as amended, for the care and security in the United States of Cuban and Haitian entrants: Provided further, That notwithstanding section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), FPS may enter into contracts and other agreements with private entities for periods of not to exceed 3 years and 7 additional option years for the confinement of Federal prisoners: Provided further, That the National Institute of Corrections hereafter shall be included in the FPS Salaries and Expenses budget, in the Contract Confinement program and shall continue to perform its current functions under 18 U.S.C. 4351, et seq., with the exception of its grant program and shall collect reimbursement for services whenever possible: Provided further, That any unexpended balances available to the "National Institute of Corrections" account shall be credited to and merged with this appropriation, to remain available until expended.

### VIOLENT CRIME REDUCTION PROGRAMS

For substance abuse treatment in Federal prisons as authorized by section 32001(e) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended, $25,224,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

### BUILDINGS AND FACILITIES

For planning, acquisition of sites and construction of new facilities; leasing the Oklahoma City Airport Trust Facility; purchase and acquisition of facilities and remodeling, and equipping of such facilities for penal and correctional use, including all necessary expenses incident thereto, by contract or force account; and constructing, remodeling, and equipping necessary buildings and facilities at existing penal and correctional institutions, including all necessary expenses incident thereto, by contract or force account; $395,700,000, to remain available until expended, of which not to exceed $14,074,000 shall be available to construct areas for inmate work programs: Provided, That labor of United States prisoners may be used for work performed under this appropriation: Provided further, That not to exceed 10 percent of the funds appropriated to "Buildings and Facilities" in this Act or any other Act may be transferred to "Salaries and Expenses", Federal Prison System, upon notification by the Attorney General to the Committees on Appropriations of the House of Representatives and the Senate in compliance with provisions set forth in section 605 of this Act: Provided further, That of the total amount appropriated, not to exceed $36,570,000 shall be available for the renovation and construction of United States Marshals Service prisoner-holding facilities.

### FEDERAL PRISON INDUSTRIES, INCORPORATED

The Federal Prison Industries, Incorporated, is hereby authorized to make such expenditures, within the limits of funds and borrowing authority available, and in accord with the law, and to make such contracts and commitments, without regard to fiscal year limitations as provided by section 9104 of title 31, United States Code, as may be necessary in carrying out the program set forth in the budget for the current fiscal year for such corporation, including purchase of (not to exceed five for replacement only) and hire of passenger motor vehicles.

### LIMITATION ON ADMINISTRATIVE EXPENSES, FEDERAL PRISON INDUSTRIES, INCORPORATED

Not to exceed $3,042,000 of the funds of the corporation shall be available for its administrative expenses, and for services as authorized by 5 U.S.C. 3109, to be computed on an accrual basis to be determined in accordance with the corporation's current prescribed accounting system, and such amounts shall be exclusive of depreciation, payment of claims, and expenditures which the said accounting system requires to be capitalized or charged to cost of commodities acquired or produced, including selling and shipping expenses, and expenses in connection with acquisition, construction, operation, maintenance, improvement, protection, or disposition of facilities and other property belonging to the corporation or in which it has an interest.

### OFFICE OF JUSTICE PROGRAMS

### JUSTICE ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and the Missing Children's Assistance Act, as amended, including salaries and expenses in connection therewith, and with the Victims of Crime Act of 1984, as amended, $101,429,000, to remain available until

expended, as authorized by section 1001 of title I of the Omnibus Crime Control and Safe Streets Act, as amended by Public Law 102–534 (106 Stat. 3524).

For an additional amount, $17,000,000, to remain available until expended; of which $5,000,000 shall be for Local Firefighter and Emergency Services Training Grants as authorized by section 819 of the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"); of which $10,000,000 shall be for development of counterterrorism technologies to help State and local law enforcement combat terrorism, as authorized by section 821 of the Antiterrorism Act; of which $2,000,000 shall be for specialized multi-agency response training: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the entire amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

## STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

For grants, contracts, cooperative agreements, and other assistance authorized by part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, for State and Local Narcotics Control and Justice Assistance Improvements, notwithstanding the provisions of section 511 of said Act, $361,000,000, to remain available until expended, as authorized by section 1001 of title I of said Act, as amended by Public Law 102–534 (106 Stat. 3524), of which $60,000,000 shall be available to carry out the provisions of chapter A of subpart 2 of part E of title I of said Act, for discretionary grants under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs.

## VIOLENT CRIME REDUCTION PROGRAMS, STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE

### << 42 USCA § 13703 NOTE >>

For assistance (including amounts for administrative costs for management and administration, which amounts shall be transferred to and merged with the "Justice Assistance" account) authorized by the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended ("the 1994 Act"); the Omnibus Crime Control and Safe Streets Act of 1968, as amended ("the 1968 Act"); and the Victims of Child Abuse Act of 1990, as amended ("the 1990 Act"); $2,036,150,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund; of which $523,000,000 shall be for Local Law Enforcement Block Grants, pursuant to H.R. 728 as passed by the House of Representatives on February 14, 1995, except that for purposes of this Act, the Commonwealth of Puerto Rico shall be considered a "unit of local government" as well as a "State", for the purposes set forth in paragraphs (A), (B), (D), (F), and (I) of section 101(a)(2) of H.R. 728 and for establishing crime prevention programs involving cooperation between community residents and law enforcement personnel in order to control, detect, or investigate crime or the prosecution of criminals: Provided, That no funds provided under this heading may be used as matching funds for any other Federal grant program: Provided further, That $20,000,000 of this amount shall be for Boys and Girls Clubs in public housing facilities and other areas in cooperation with State and local law enforcement: Provided further, That funds may also be used to defray the costs of indemnification insurance for law enforcement officers; of which $50,000,000 shall be for grants to upgrade criminal records, as authorized by section 106(b) of the Brady Handgun Violence Prevention Act of 1993, as amended, and section 4(b) of the National Child Protection Act of 1993; of which $199,000,000 shall be available as authorized by section 1001 of title I of the 1968 Act, to carry out the provisions of subpart 1, part E of title I of the 1968 Act, notwithstanding section 511 of said Act, for the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs; of which $330,000,000 shall be for the State Criminal Alien Assistance Program, as authorized by section 242(j) of the Immigration and Nationality Act, as amended; of which $670,000,000 shall be for Violent Offender Incarceration and Truth in Sentencing Incentive Grants pursuant to subtitle A of title II of the 1994 Act, of which $170,000,000 shall be available for payments to States for incarceration of criminal aliens, and of which $12,500,000 shall be available for the Cooperative Agreement Program: Provided further, That funds made available for Violent Offender Incarceration and Truth in Sentencing Incentive Grants to the State of California may, at the discretion of the recipient, be used for payments for the incarceration of criminal aliens: Provided further, That beginning in fiscal year 1999, and thereafter, no funds shall be available to make grants to a State pursuant to section 20103 or section 20104 of the Violent Crime Control and Law Enforcement Act of 1994 unless

no later than September 1, 1998, such State has implemented a program of controlled substance testing and intervention for appropriate categories of convicted offenders during periods of incarceration and criminal justice supervision, with sanctions including denial or revocation of release for positive controlled substance tests, consistent with guidelines issued by the Attorney General; of which $6,000,000 shall be for the Court Appointed Special Advocate Program, as authorized by section 218 of the 1990 Act; of which $1,000,000 shall be for Child Abuse Training Programs for Judicial Personnel and Practitioners, as authorized by section 224 of the 1990 Act; of which $145,000,000 shall be for Grants to Combat Violence Against Women, to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(18) of the 1968 Act; of which $33,000,000 shall be for Grants to Encourage Arrest Policies to States, units of local government, and Indian tribal governments, as authorized by section 1001(a)(19) of the 1968 Act; of which $8,000,000 shall be for Rural Domestic Violence and Child Abuse Enforcement Assistance Grants, as authorized by section 40295 of the 1994 Act; of which $1,000,000 shall be for training programs to assist probation and parole officers who work with released sex offenders, as authorized by section 40152(c) of the 1994 Act; of which $550,000 shall be for grants for televised testimony, as authorized by section 1001(a)(7) of the 1968 Act; of which $1,750,000 shall be for national stalker and domestic violence reduction, as authorized by section 40603 of the 1994 Act; of which $30,000,000 shall be for grants for residential substance abuse treatment for State prisoners as authorized by section 1001(a)(17) of the 1968 Act; of which $3,000,000 shall be for grants to States and units of local government for projects to improve DNA analysis, as authorized by section 1001(a)(22) of the 1968 Act; of which $900,000 shall be for the Missing Alzheimer's Disease Patient Alert Program, as authorized by section 240001(c) of the 1994 Act; of which $750,000 shall be for Motor Vehicle Theft Prevention Programs, as authorized by section 220002(h) of the 1994 Act; of which $200,000 shall be for a National Baseline Study on Campus Sexual Assault, as authorized by section 40506(e) of the 1994 Act; of which $30,000,000 shall be for Drug Courts, as authorized by title V of the 1994 Act; of which $1,000,000 shall be for Law Enforcement Family Support Programs, as authorized by section 1001(a)(21) of the 1968 Act; and of which $2,000,000 shall be for public awareness programs addressing marketing scams aimed at senior citizens, as authorized by section 250005(3) of the 1994 Act: Provided further, That funds made available in fiscal year 1997 under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, may be obligated for programs to assist States in the litigation processing of death penalty Federal habeas corpus petitions and for drug testing initiatives: Provided further, That any 1996 balances for these programs shall be transferred to and merged with this appropriation: Provided further, That if a unit of local government uses any of the funds made available under this title to increase the number of law enforcement officers, the unit of local government will achieve a net gain in the number of law enforcement officers who perform nonadministrative public safety service.

## WEED AND SEED PROGRAM FUND

For necessary expenses, including salaries and related expenses of the Executive Office for Weed and Seed, to implement "Weed and Seed" program activities, $28,500,000, which shall be derived from discretionary grants provided under the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs, to remain available until expended for intergovernmental agreements, including grants, cooperative agreements, and contracts, with State and local law enforcement agencies engaged in the investigation and prosecution of violent crimes and drug offenses in "Weed and Seed" designated communities, and for either reimbursements or transfers to appropriation accounts of the Department of Justice and other Federal agencies which shall be specified by the Attorney General to execute the "Weed and Seed" program strategy: Provided, That funds designated by Congress through language for other Department of Justice appropriation accounts for "Weed and Seed" program activities shall be managed and executed by the Attorney General through the Executive Office for Weed and Seed: Provided further, That the Attorney General may direct the use of other Department of Justice funds and personnel in support of "Weed and Seed" program activities only after the Attorney General notifies the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of this Act.

## COMMUNITY ORIENTED POLICING SERVICES

### VIOLENT CRIME REDUCTION PROGRAMS

For activities authorized by the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103–322 ("the 1994 Act") (including administrative costs), $1,400,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, for Public Safety and Community Policing Grants pursuant to title I of the 1994 Act:

Provided, That not to exceed 186 permanent positions and 174 full-time equivalent workyears and $19,800,000 shall be expended for program management and administration.

In addition, for programs of Police Corps education, training and service as set forth in sections 200101–200113 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), $20,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund.

## JUVENILE JUSTICE PROGRAMS

For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, including salaries and expenses in connection therewith to be transferred to and merged with the appropriations for Justice Assistance, $170,000,000, to remain available until expended, as authorized by section 299 of part I of title II and section 506 of title V of the Act, as amended by Public Law 102–586, of which (1) notwithstanding any other provision of law, $5,000,000 shall be available for expenses authorized by part A of title II of the Act, $86,500,000 shall be available for expenses authorized by part B of title II of the Act, and $29,500,000 shall be available for expenses authorized by part C of title II of the Act: Provided, That $16,500,000 of the amounts provided for part B of title II of the Act, as amended, is for the purpose of providing additional formula grants under part B, for innovative local law enforcement and community policing programs, to States that provide assurances to the Administrator that the State has in effect (or will have in effect no later than 1 year after date of application) policies and programs, that ensure that juveniles are subject to accountability-based sanctions for every act for which they are adjudicated delinquent; (2) $12,000,000 shall be available for expenses authorized by sections 281 and 282 of part D of title II of the Act for prevention and treatment programs relating to juvenile gangs; (3) $10,000,000 shall be available for expenses authorized by section 285 of part E of title II of the Act; (4) $7,000,000 shall be available for expenses authorized by part G of title II of the Act for juvenile mentoring programs; and (5) $20,000,000 shall be available for expenses authorized by title V of the Act for incentive grants for local delinquency prevention programs: Provided, That upon the enactment of reauthorization legislation for Juvenile Justice Programs under the Juvenile Justice and Delinquency Prevention Act of 1974, as amended, funding provided in this Act shall from that date be subject to the provisions of that legislation and any provisions in this Act that are inconsistent with that legislation shall no longer have effect.

In addition, for grants, contracts, cooperative agreements, and other assistance authorized by the Victims of Child Abuse Act of 1990, as amended, $4,500,000, to remain available until expended, as authorized by sections 214B of the Act.

## PUBLIC SAFETY OFFICERS BENEFITS

For payments authorized by part L of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796), as amended, such sums as are necessary, to remain available until expended, as authorized by section 6093 of Public Law 100–690 (102 Stat. 4339–4340), and, in addition, $2,200,000, to remain available until expended, for payments as authorized by section 1201(b) of said Act.

## GENERAL PROVISIONS—DEPARTMENT OF JUSTICE

SEC. 101. In addition to amounts otherwise made available in this title for official reception and representation expenses, a total of not to exceed $45,000 from funds appropriated to the Department of Justice in this title shall be available to the Attorney General for official reception and representation expenses in accordance with distributions, procedures, and regulations established by the Attorney General.

SEC. 102. Authorities contained in the Department of Justice Appropriation Authorization Act, Fiscal Year 1980 (Pub.L. 96–132, 93 Stat. 1040 (1979)), as amended, shall remain in effect until the termination date of this Act or until the effective date of a Department of Justice Appropriation Authorization Act, whichever is earlier.

SEC. 103. None of the funds appropriated by this title shall be available to pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape: Provided, That should this prohibition be declared unconstitutional by a court of competent jurisdiction, this section shall be null and void.

SEC. 104. None of the funds appropriated under this title shall be used to require any person to perform, or facilitate in any way the performance of, any abortion.

SEC. 105. Nothing in the preceding section shall remove the obligation of the Director of the Bureau of Prisons to provide escort services necessary for a female inmate to receive such service outside the Federal facility: Provided, That nothing in this

section in any way diminishes the effect of section 104 intended to address the philosophical beliefs of individual employees of the Bureau of Prisons.

<< 18 USCA § 3059 NOTE >>

  SEC. 106. Notwithstanding any other provision of law, not to exceed $10,000,000 of the funds made available in this Act may be used to establish and publicize a program under which publicly-advertised, extraordinary rewards may be paid, which shall not be subject to spending limitations contained in sections 3059 and 3072 of title 18, United States Code: Provided, That any reward of $100,000 or more, up to a maximum of $2,000,000, may not be made without the personal approval of the President or the Attorney General and such approval may not be delegated.

  SEC. 107. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Justice in this Act, including those derived from the Violent Crime Reduction Trust Fund, may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation except in compliance with the procedures set forth in that section.

<< 28 USCA § 524 >>

  SEC. 108. Section 524(c)(8)(E) of title 28, United States Code, is amended by striking the year in the date therein contained and replacing the same with "1996".

<< 28 USCA § 1930 >>

  SEC. 109. (a) Section 1930(a) of title 28, United States Code, is amended in paragraph (3), by inserting "$" before "800", and in paragraph (6), by striking everything after "total less than $15,000;" and inserting in lieu thereof: "$500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $5,000 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.".

<< 28 USCA § 589a >>

  (b) Section 589a of title 28, United States Code, is amended to read as follows:

"§ 589a. United States Trustee System Fund

  "(a) There is hereby established in the Treasury of the United States a special fund to be known as the 'United States Trustee System Fund' (hereinafter in this section referred to as the 'Fund'). Monies in the Fund shall be available to the Attorney General without fiscal year limitation in such amounts as may be specified in appropriations Acts for the following purposes in connection with the operations of United States trustees—
    "(1) salaries and related employee benefits;
    "(2) travel and transportation;
    "(3) rental of space;
    "(4) communication, utilities, and miscellaneous computer charges;
    "(5) security investigations and audits;
    "(6) supplies, books, and other materials for legal research;
    "(7) furniture and equipment;
    "(8) miscellaneous services, including those obtained by contract; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(9) printing.

"(b) For the purpose of recovering the cost of services of the United States Trustee System, there shall be deposited as offsetting collections to the appropriation 'United States Trustee System Fund', to remain available until expended, the following—

"(1) 23.08 percent of the fees collected under section 1930(a)(1) of this title;

"(2) one-half of the fees collected under section 1930(a)(3) of this title;

"(3) one-half of the fees collected under section 1930(a)(4) of this title;

"(4) one-half of the fees collected under section 1930(a)(5) of this title;

"(5) 100 percent of the fees collected under section 1930(a)(6) of this title;

"(6) three-fourths of the fees collected under the last sentence of section 1930(a) of this title;

"(7) the compensation of trustees received under section 330(d) of title 11 by the clerks of the bankruptcy courts; and

"(8) excess fees collected under section 586(e)(2) of this title.

"(c) Amounts in the Fund which are not currently needed for the purposes specified in subsection (a) shall be kept on deposit or invested in obligations of, or guaranteed by, the United States.

"(d) The Attorney General shall transmit to the Congress, not later than 120 days after the end of each fiscal year, a detailed report on the amounts deposited in the Fund and a description of expenditures made under this section.

"(e) There are authorized to be appropriated to the Fund for any fiscal year such sums as may be necessary to supplement amounts deposited under subsection (b) for the purposes specified in subsection (a).".

<< 28 USCA § 589a NOTE >>

(c) Notwithstanding any other provision of law or of this Act, the amendments to 28 U.S.C. 589a made by subsection (b) of this section shall take effect upon enactment of this Act.

<< 28 USCA § 1930 NOTE >>

(d) Section 101(a) of Public Law 104–91, as amended by section 211 of Public Law 104–99, is further amended by inserting ": Provided further, That, notwithstanding any other provision of law, the fees under 28 U.S.C. 1930(a)(6) shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans" after "enacted into law".

SEC. 110. Public Law 103–414 (108 Stat. 4279) is amended by inserting at its conclusion a new title IV, as follows:

<< 47 USCA Ch. 9 >>

"TITLE IV—TELECOMMUNICATIONS CARRIER COMPLIANCE PAYMENTS

<< 47 USCA § 1021 >>

"SEC. 401. DEPARTMENT OF JUSTICE TELECOMMUNICATIONS CARRIER COMPLIANCE FUND.

"(a) ESTABLISHMENT OF FUND.—There is hereby established in the United States Treasury a fund to be known as the Department of Justice Telecommunications Carrier Compliance Fund (hereafter referred to as 'the Fund'), which shall be available without fiscal year limitation to the Attorney General for making payments to telecommunications carriers, equipment manufacturers, and providers of telecommunications support services pursuant to section 109 of this Act.

"(b) DEPOSITS TO THE FUND.—Notwithstanding any other provision of law, any agency of the United States with law enforcement or intelligence responsibilities may deposit as offsetting collections to the Fund any unobligated balances that are available until expended, upon compliance with any Congressional notification requirements for reprogrammings of funds applicable to the appropriation from which the deposit is to be made.

"(c) TERMINATION.—

"(1) The Attorney General may terminate the Fund at such time as the Attorney General determines that the Fund is no longer necessary.

"(2) Any balance in the Fund at the time of its termination shall be deposited in the General Fund of the Treasury.

"(3) A decision of the Attorney General to terminate the Fund shall not be subject to judicial review.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(d) AVAILABILITY OF FUNDS FOR EXPENDITURE.—Funds shall not be available for obligation unless an implementation plan as set forth in subsection (e) is submitted to each member of the Committees on the Judiciary and Appropriations of both the House of Representatives and the Senate and the Congress does not by law block or prevent the obligation of such funds. Such funds shall be treated as a reprogramming of funds under section 605 of the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section and this section.

"(e) IMPLEMENTATION PLAN.—The implementation plan shall include:

"(1) the law enforcement assistance capability requirements and an explanation of law enforcement's recommended interface;

"(2) the proposed actual and maximum capacity requirements for the number of simultaneous law enforcement communications intercepts, pen registers, and trap and trace devices that authorized law enforcement agencies may seek to conduct, set forth on a county-by-county basis for wireline services and on a market service area basis for wireless services, and the historical baseline of electronic surveillance activity upon which such capacity requirements are based;

"(3) a prioritized list of carrier equipment, facilities, and services deployed on or before January 1, 1995, to be modified by carriers at the request of law enforcement based on its investigative needs;

"(4) a projected reimbursement plan that estimates the cost for the coming fiscal year and for each fiscal year thereafter, based on the prioritization of law enforcement needs as outlined in (3), of modification by carriers of equipment, facilities and services, installed on or before January 1, 1995.

"(f) ANNUAL REPORT TO THE CONGRESS.—The Attorney General shall submit to the Congress each year a report specifically detailing all deposits and expenditures made pursuant to this Act in each fiscal year. This report shall be submitted to each member of the Committees on the Judiciary and Appropriations of both the House of Representatives and the Senate, and to the Speaker and minority leader of the House of Representatives and to the majority and minority leaders of the Senate, no later than 60 days after the end of each fiscal year.".

SEC. 111. It is the sense of the Congress that the Drug Enforcement Administration, together with other appropriate Federal agencies, should take such actions as may be necessary to end the illegal importation into the United States of Rohypnol (flunitrazepam), a drug frequently distributed with the intent to facilitate sexual assault and rape.

<< 42 USCA § 10601 >>

SEC. 112. Section 1402 of the Victims of Crime Act of 1984, as amended (42 U.S.C. 10601), is amended at subsection (e) by deleting "2" and inserting "3", and at subsection (d) by adding a new paragraph (5) as follows:

"(5) The Director may set aside up to $500,000 of the reserve fund described in paragraph (4) to make supplemental grants to United States Attorneys Offices to provide necessary assistance to victims of the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, to facilitate observation of and/or participation by such victims in trial proceedings arising therefrom, including, without limitation, provision of lodging and travel assistance, and to pay such other, related expenses determined to be necessary by the Director.".

<< 18 USCA § 841 NOTE >>

SEC. 113. Section 732 of Public Law 104–132 (110 Stat. 1303; 18 U.S.C. 841 note) is amended—

(1) in subsection (a), by adding at the end the following new paragraph:

"(3) NEW PREVENTION TECHNOLOGIES.—In addition to the study of taggants as provided herein, the Secretary, in consultation with the Attorney General, shall concurrently report to the Congress on the possible use, and exploitation of technologies such as vapor detection devices, computed tomography, nuclear quadropole resonance, thermal neutron analysis, pulsed fast-neutron analysis, and other technologies upon which recommendations to the Congress may be made for further study, funding, and use of the same in preventing and solving acts of terrorism involving explosive devices."; and

(2) by adding at the end the following new subsection:

"(f) SPECIAL STUDY.—

"(1) IN GENERAL.—Notwithstanding subsection (a), the Secretary of the Treasury shall enter into a contract with the National Academy of Sciences (referred to in this section as the 'Academy') to conduct a study of the tagging of smokeless

and black powder by any viable technology for purposes of detection and identification. The study shall be conducted by an independent panel of 5 experts appointed by the Academy.

"(2) STUDY ELEMENTS.—The study conducted under this subsection shall—

"(A) indicate whether the tracer elements, when added to smokeless and black powder—

"(i) will pose a risk to human life or safety;

"(ii) will substantially assist law enforcement officers in their investigative efforts;

"(iii) will impair the quality and performance of the powders (which shall include a broad and comprehensive sampling of all available powders) for their intended lawful use, including, but not limited to the sporting, defense, and handloading uses of the powders, as well as their use in display and lawful consumer pyrotechnics;

"(iv) will have a substantially adverse effect on the environment;

"(v) will incur costs which outweigh the benefits of their inclusion, including an evaluation of the probable production and regulatory cost of compliance to the industry, and the costs and effects on consumers, including the effect on the demand for ammunition; and

"(vi) can be evaded, and with what degree of difficulty, by terrorists or terrorist organizations, including evading tracer elements by the use of precursor chemicals to make black or other powders; and

"(B) provide for consultation on the study with Federal, State, and local officials, non-governmental organizations, including all national police organizations, national sporting organizations, and national industry associations with expertise in this area and such other individuals as shall be deemed necessary.

"(3) REPORT AND COSTS.—The study conducted under this subsection shall be presented to Congress 12 months after the enactment of this subsection and be made available to the public, including any data tapes or data used to form such recommendations. There are authorized to be appropriated such sums as may be necessary to carry out the study.".

<< 28 USCA § 524 >>

Sec. 114. (a) Section 524(c)(1) of title 28, United States Code, is amended in the first sentence following the second subparagraph (I) by deleting "(C),".

(b) Section 524(c)(8)(A) is amended by deleting "(C),".

<< 28 USCA § 509 NOTE >>

Sec. 115. Effective with the enactment of this Act and in any fiscal year hereafter, under policies established by the Attorney General, the Department of Justice may reimburse employees who are paid by an appropriation account within the Department of Justice and are traveling on behalf of the United States in temporary duty status to investigate, prosecute, or litigate (including the provision of support therefor) a criminal or civil matter, or for other similar special circumstances, for Federal, State, and local taxes heretofore and hereafter resulting from any reimbursement of travel expenses from an appropriation account within the Department of Justice: Provided, That such reimbursement may include an amount equal to all income taxes for which the employee would be liable due to such reimbursement.

<< 28 USCA § 524 >>

Sec. 116. Section 524 of title 28, United States Code, is amended by adding a new subsection (d) as follows:

"(d)(1) The Attorney General may accept, hold, administer, and use gifts, devises, and bequests of any property for the purpose of aiding or facilitating the work of the Department of Justice.

"(2) Gifts, devises, and bequests of money, the proceeds of sale or liquidation of any other property accepted hereunder, and any income accruing from any property accepted hereunder—

"(A) shall be deposited in the Treasury in a separate fund and held in trust by the Secretary of the Treasury for the benefit of the Department of Justice; and

"(B) are hereby appropriated, without fiscal year limitation, and shall be disbursed on order of the Attorney General.

"(3) Upon request of the Attorney General, the Secretary of the Treasury may invest and reinvest the fund described herein in public debt securities with maturities suitable for the needs of the fund and bearing interest at rates determined by the Secretary

of the Treasury, taking into consideration the current average market yield on outstanding marketable obligations of the United States or comparable maturities.

"(4) Evidences of any intangible personal property (other than money) accepted hereunder shall be deposited with the Secretary of the Treasury, who may hold or liquidate them, except that they shall be liquidated upon the request of the Attorney General.

"(5) For purposes of federal income, estate, and gift taxes, property accepted hereunder shall be considered a gift, devise, or bequest to, or for the use of, the United States.".

<< 28 USCA § 524 >>

Sec. 117. Section 524(c)(9), of title 28, United States Code, is amended to read as follows:

"(9)(A) Following the completion of procedures for the forfeiture of property pursuant to any law enforced or administered by the Department, the Attorney General is authorized, in her discretion, to warrant clear title to any subsequent purchaser or transferee of such property.

"(B) For fiscal year 1997, the Attorney General is authorized to transfer, under such terms and conditions as the Attorney General shall specify, real or personal property of limited or marginal value, to a State or local government agency, or its designated contractor or transferee, for use to support drug abuse treatment, drug and crime prevention and education, housing, job skills, and other community-based public health and safety programs. Such transfer shall not create or confer any private right of action in any person against the United States.".

<< 28 USCA § 594 >>

Sec. 118. Section 594(b)(3)(A) of title 28, United States Code, is amended in the second sentence by—

(a) striking "by 6 months" and inserting "for successive 6–month periods"; and

(b) striking the phrase "employee assigned duties under subsection (l)(1)(A)(iii) certifies" and inserting "independent counsel and the division of the court certify";

(c) striking "such employee" and inserting "the independent counsel" and "the division of the court".

<< 29 USCA § 621 NOTE >>

Sec. 119. This section may be cited as the "Age Discrimination in Employment Amendments of 1996".

Subsection 1. AGE DISCRIMINATION AMENDMENT.

<< 29 USCA § 623 NOTE >>

(a) REPEAL OF REPEALER.—Section 3(b) of the Age Discrimination in Employment Amendments of 1986 (29 U.S.C. 623 note) is repealed.

<< 29 USCA § 623 >>

(b) EXEMPTION.—Section 4(j) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 623(j)), as in effect immediately before December 31, 1993—

(1) is reenacted as such section; and

(2) as so reenacted, is amended in paragraph (1) by striking "and the individual has attained the age" and all that follows through "1983, and" and inserting the following: ", the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained—

"(A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or

"(B)(i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996; or

"(ii) if applicable State or local law was enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996 and the individual was discharged, the higher of—

"(I) the age of retirement in effect on the date of such discharge under such law; and

"(II) age 55; and".

<< 29 USCA § 623 NOTE >>

(c) CONSTRUCTION.—Nothing in the repeal, reenactment, and amendment made by subsections (a) and (b) shall be construed to make lawful the failure or refusal to hire, or the discharge of, an individual pursuant to a law that—

(1) was enacted after March 3, 1983 and before the date of enactment of the Age Discrimination in Employment Amendments of 1996; and

(2) lowered the age of hiring or retirement, respectively, for firefighters or law enforcement officers that was in effect under applicable State or local law on March 3, 1983.

<< 29 USCA § 623 NOTE >>

Subsection 2. STUDY AND GUIDELINES FOR PERFORMANCE TESTS.

(a) STUDY.—Not later than 3 years after the date of enactment of this Act, the Secretary of Health and Human Services, acting through the Director of the National Institute for Occupational Safety and Health (referred to in this section as the "Secretary"), shall conduct, directly or by contract, a study, and shall submit to the appropriate committees of Congress a report based on the results of the study that shall include—

(1) a list and description of all tests available for the assessment of abilities important for the completion of public safety tasks performed by law enforcement officers and firefighters;

(2) a list of the public safety tasks for which adequate tests described in paragraph (1) do not exist;

(3) a description of the technical characteristics that the tests shall meet to be in compliance with applicable Federal civil rights law and policies;

(4) a description of the alternative methods that are available for determining minimally acceptable performance standards on the tests;

(5) a description of the administrative standards that should be met in the administration, scoring, and score interpretation of the tests; and

(6) an examination of the extent to which the tests are cost-effective, are safe, and comply with the Federal civil rights law and policies.

(b) CONSULTATION REQUIREMENT; OPPORTUNITY FOR PUBLIC COMMENT.—

(1) CONSULTATION.—The Secretary shall, during the conduct of the study required by subsection (a), consult with—

(A) the Deputy Administrator of the United States Fire Administration;

(B) the Director of the Federal Emergency Management Agency;

(C) organizations that represent law enforcement officers, firefighters, and employers of the officers and firefighters; and

(D) organizations that represent older individuals.

(2) PUBLIC COMMENT.—Prior to issuing the advisory guidelines required in subsection (c), the Secretary shall provide an opportunity for public comment on the proposed advisory guidelines.

(c) ADVISORY GUIDELINES.—Not later than 4 years after the date of enactment of this Act, the Secretary shall develop and issue, based on the results of the study required by subsection (a), advisory guidelines for the administration and use of physical and mental fitness tests to measure the ability and competency of law enforcement officers and firefighters to perform the requirements of the jobs of the officers and firefighters.

(d) JOB PERFORMANCE TESTS.—

(1) IDENTIFICATION OF TESTS.—After issuance of the advisory guidelines described in subsection (c), the Secretary shall issue regulations identifying valid, nondiscriminatory job performance tests that shall be used by employers seeking the exemption described in section 4(j) of the Age Discrimination in Employment Act of 1967 with respect to firefighters or law enforcement officers who have attained an age of retirement described in such section 4(j).

(2) USE OF TESTS.—Effective on the date of issuance of the regulations described in paragraph (1), any employer seeking such exemption with respect to a firefighter or law enforcement officer who has attained such age shall provide to each

firefighter or law enforcement officer who has attained such age an annual opportunity to demonstrate physical and mental fitness by passing a test described in paragraph (1), in order to continue employment.

(e) DEVELOPMENT OF STANDARDS FOR WELLNESS PROGRAMS.—Not later than 2 years after the date of enactment of this Act, the Secretary shall propose advisory standards for wellness programs for law enforcement officers and firefighters.

(f) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $5,000,000 to carry out this section.

<< 29 USCA § 623 NOTE >>

SUBSECTION 3. EFFECTIVE DATES.

(a) GENERAL EFFECTIVE DATE.—Except as provided in subsection (b), this title and the amendments made by this title shall take effect on the date of enactment of this Act.

(b) SPECIAL EFFECTIVE DATE.—The repeal made by section 2(a) and the reenactment made by section 2(b)(1) shall take effect on December 31, 1993.

<< 28 USCA RULES FRE Rule 413 NOTE >>

Sec. 120. Section 320935(e) of the Violent Crime Control and Law Enforcement Act of 1994 is amended by inserting ", including all trials commenced on or after the effective date of such amendments" after "such amendments".

<< 18 USCA § 2251 NOTE >>

Sec. 121. This section may be cited as the "Child Pornography Prevention Act of 1996".

<< 18 USCA § 2251 NOTE >>

SUBSECTION 1. FINDINGS.

Congress finds that—

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer;

(5) new photographic and computer imaging technologies make it possible to produce by electronic, mechanical, or other means, visual depictions of what appear to be children engaging in sexually explicit conduct that are virtually indistinguishable to the unsuspecting viewer from unretouched photographic images of actual children engaging in sexually explicit conduct;

(6) computers and computer imaging technology can be used to—

(A) alter sexually explicit photographs, films, and videos in such a way as to make it virtually impossible for unsuspecting viewers to identify individuals, or to determine if the offending material was produced using children;

(B) produce visual depictions of child sexual activity designed to satisfy the preferences of individual child molesters, pedophiles, and pornography collectors; and

(C) alter innocent pictures of children to create visual depictions of those children engaging in sexual conduct;

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(8) the effect of visual depictions of child sexual activity on a child molester or pedophile using that material to stimulate or whet his own sexual appetites, or on a child where the material is being used as a means of seducing or breaking down the child's inhibitions to sexual abuse or exploitation, is the same whether the child pornography consists of photographic depictions of actual children or visual depictions produced wholly or in part by electronic, mechanical, or other means, including by computer, which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children;

(9) the danger to children who are seduced and molested with the aid of child sex pictures is just as great when the child pornographer or child molester uses visual depictions of child sexual activity produced wholly or in part by electronic, mechanical, or other means, including by computer, as when the material consists of unretouched photographic images of actual children engaging in sexually explicit conduct;

(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

<< 18 USCA § 2256 >>

SUBSECTION 2. DEFINITIONS.

Section 2256 of title 18, United States Code, is amended—

(1) in paragraph (5), by inserting before the semicolon the following: ", and data stored on computer disk or by electronic means which is capable of conversion into a visual image";

(2) in paragraph (6), by striking "and";

(3) in paragraph (7), by striking the period and inserting a semicolon; and

(4) by adding at the end the following new paragraphs:

"(8) 'child pornography' means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—

"(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

"(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;

"(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

"(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct; and

"(9) 'identifiable minor'—

"(A) means a person—

"(i)(I) who was a minor at the time the visual depiction was created, adapted, or modified; or

"(II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and

"(ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and

"(B) shall not be construed to require proof of the actual identity of the identifiable minor.".

SUBSECTION 3. PROHIBITED ACTIVITIES RELATING TO MATERIAL CONSTITUTING OR CONTAINING CHILD PORNOGRAPHY.

<< 18 USCA § 2252A >>

(a) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by adding after section 2252 the following:

"§ 2252A. Certain activities relating to material constituting or containing child pornography

"(a) Any person who—

"(1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;

"(2) knowingly receives or distributes—

"(A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

"(B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

"(3) knowingly reproduces any child pornography for distribution through the mails, or in interstate or foreign commerce by any means, including by computer;

"(4) either—

"(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly sells or possesses with the intent to sell any child pornography; or

"(B) knowingly sells or possesses with the intent to sell any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or

"(5) either—

"(A) in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151), knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography; or

"(B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer,

shall be punished as provided in subsection (b).

"(b)(1) Whoever violates, or attempts or conspires to violate, paragraphs (1), (2), (3), or (4) of subsection (a) shall be fined under this title or imprisoned not more than 15 years, or both, but, if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 5 years nor more than 30 years.

"(2) Whoever violates, or attempts or conspires to violate, subsection (a)(5) shall be fined under this title or imprisoned not more than 5 years, or both, but, if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the possession of child pornography, such person shall be fined under this title and imprisoned for not less than 2 years nor more than 10 years.

"(c) It shall be an affirmative defense to a charge of violating paragraphs (1), (2), (3), or (4) of subsection (a) that—

"(1) the alleged child pornography was produced using an actual person or persons engaging in sexually explicit conduct;

"(2) each such person was an adult at the time the material was produced; and

"(3) the defendant did not advertise, promote, present, describe, or distribute the material in such a manner as to convey the impression that it is or contains a visual depiction of a minor engaging in sexually explicit conduct.".

<< 18 USCA Ch. 110 >>

(b) TECHNICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by adding after the item relating to section 2252 the following:

"2252A. Certain activities relating to material constituting or containing child pornography.".

<< 18 USCA § 2251 >>

SUBSECTION 4. PENALTIES FOR SEXUAL EXPLOITATION OF CHILDREN.

Section 2251(d) of title 18, United States Code, is amended to read as follows:

"(d) Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title or imprisoned not less than 10 years nor more than 20 years, and both, but if such person has one prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned for not less than 15 years nor more than 30 years, but if such person has 2 or more prior convictions under this chapter or chapter 109A, or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 30 years nor more than life. Any organization that violates, or attempts or conspires to violate, this section shall be fined under this title. Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for any term of years or for life.".

<< 18 USCA § 2252 >>

SUBSECTION 5. MATERIAL INVOLVING SEXUAL EXPLOITATION OF MINORS.

Section 2252 of title 18, United States Code, is amended—by striking subsection (b) and inserting the following:

"(b)(1) Whoever violates, or attempts or conspires to violate, paragraphs (1), (2), or (3) of subsection (a) shall be fined under this title or imprisoned not more than 15 years, or both, but if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 5 years nor more than 30 years.

"(2) Whoever violates, or attempts or conspires to violate, paragraph (4) of subsection (a) shall be fined under this title or imprisoned not more than 5 years, or both, but if such person has a prior conviction under this chapter or chapter 109A, or under the laws of any State relating to the possession of child pornography, such person shall be fined under this title and imprisoned for not less than 2 years nor more than 10 years.".

<< 42 USCA § 2000aa >>

SUBSECTION 6. PRIVACY PROTECTION ACT AMENDMENTS.

Section 101 of the Privacy Protection Act of 1980 (42 U.S.C. 2000aa) is amended—

(1) in subsection (a)(1), by inserting before the parenthesis at the end the following: ", or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code"; and

(2) in subsection (b)(1), by inserting before the parenthesis at the end the following: ", or if the offense involves the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, the sexual exploitation of children, or the sale or purchase of children under section 2251, 2251A, 2252, or 2252A of title 18, United States Code".

SUBSECTION 7. AMBER HAGERMAN CHILD PROTECTION ACT OF 1996.

<< 18 USCA § 2241 NOTE >>

AR.03154

(a) SHORT TITLE.—This section may be cited as the "Amber Hagerman Child Protection Act of 1996".

<< 18 USCA § 2241 >>

(b) AGGRAVATED SEXUAL ABUSE OF A MINOR.—Section 2241(c) of title 18, United States Code, is amended to read as follows:

"(c) WITH CHILDREN.—Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than that person), or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both. If the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison.".

<< 18 USCA § 2243 >>

(c) SEXUAL ABUSE OF A MINOR.—Section 2243(a) of title 18, United States Code, is amended by inserting "crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, or" after "Whoever".

<< 18 USCA § 2251 NOTE >>

SUBSECTION 8. SEVERABILITY.

If any provision of this Act, including any provision or section of the definition of the term child pornography, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this Act, including any other provision or section of the definition of the term child pornography, the amendments made by this Act, and the application of such to any other person or circumstance shall not be affected thereby.

This title may be cited as the "Department of Justice Appropriations Act, 1997".

TITLE II—DEPARTMENT OF COMMERCE AND RELATED AGENCIES

TRADE AND INFRASTRUCTURE DEVELOPMENT

RELATED AGENCIES

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

SALARIES AND EXPENSES

For necessary expenses of the Office of the United States Trade Representative, including the hire of passenger motor vehicles and the employment of experts and consultants as authorized by 5 U.S.C. 3109, $21,449,000, of which $2,500,000 shall remain available until expended: Provided, That not to exceed $98,000 shall be available for official reception and representation expenses.

INTERNATIONAL TRADE COMMISSION

SALARIES AND EXPENSES

For necessary expenses of the International Trade Commission, including hire of passenger motor vehicles, and services as authorized by 5 U.S.C. 3109, and not to exceed $2,500 for official reception and representation expenses, $40,850,000, to remain available until expended.

DEPARTMENT OF COMMERCE

INTERNATIONAL TRADE ADMINISTRATION

## OPERATIONS AND ADMINISTRATION

For necessary expenses for international trade activities of the Department of Commerce provided for by law, and engaging in trade promotional activities abroad, including expenses of grants and cooperative agreements for the purpose of promoting exports of United States firms, without regard to 44 U.S.C. 3702 and 3703; full medical coverage for dependent members of immediate families of employees stationed overseas and employees temporarily posted overseas; travel and transportation of employees of the United States and Foreign Commercial Service between two points abroad, without regard to 49 U.S.C. 1517; employment of Americans and aliens by contract for services; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; purchase or construction of temporary demountable exhibition structures for use abroad; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $327,000 for official representation expenses abroad; purchase of passenger motor vehicles for official use abroad, not to exceed $30,000 per vehicle; obtain insurance on official motor vehicles; and rent tie lines and teletype equipment; $270,000,000, to remain available until expended: Provided, That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities without regard to section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912); and that for the purpose of this Act, contributions under the provisions of the Mutual Educational and Cultural Exchange Act shall include payment for assessments for services provided as part of these activities.

## EXPORT ADMINISTRATION

## OPERATIONS AND ADMINISTRATION

For necessary expenses for export administration and national security activities of the Department of Commerce, including costs associated with the performance of export administration field activities both domestically and abroad; full medical coverage for dependent members of immediate families of employees stationed overseas; employment of Americans and aliens by contract for services abroad; rental of space abroad for periods not exceeding ten years, and expenses of alteration, repair, or improvement; payment of tort claims, in the manner authorized in the first paragraph of 28 U.S.C. 2672 when such claims arise in foreign countries; not to exceed $15,000 for official representation expenses abroad; awards of compensation to informers under the Export Administration Act of 1979, and as authorized by 22 U.S.C. 401(b); purchase of passenger motor vehicles for official use and motor vehicles for law enforcement use with special requirement vehicles eligible for purchase without regard to any price limitation otherwise established by law; $36,000,000, to remain available until expended: Provided, That the provisions of the first sentence of section 105(f) and all of section 108(c) of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2455(f) and 2458(c)) shall apply in carrying out these activities: Provided further, That payments and contributions collected and accepted for materials or services provided as part of such activities may be retained for use in covering the cost of such activities, and for providing information to the public with respect to the export administration and national security activities of the Department of Commerce and other export control programs of the United States and other governments.

For an additional amount for nonproliferation efforts to prevent illegal exports of chemical weapon precursors, biological agents, nuclear weapons and missile development equipment, $3,900,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## ECONOMIC DEVELOPMENT ADMINISTRATION

## ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For grants for economic development assistance as provided by the Public Works and Economic Development Act of 1965, as amended, Public Law 91–304, and such laws that were in effect immediately before September 30, 1982, and for trade adjustment assistance, $328,500,000: Provided, That none of the funds appropriated or otherwise made available under this heading may be used directly or indirectly for attorneys' or consultants' fees in connection with securing grants and contracts made by the Economic Development Administration: Provided further, That, notwithstanding any other provision of law, the Secretary of Commerce may provide financial assistance for projects to be located on military installations closed or scheduled for closure or realignment to grantees eligible for assistance under the Public Works and Economic Development Act of 1965,

as amended, without it being required that the grantee have title or ability to obtain a lease for the property, for the useful life of the project, when in the opinion of the Secretary of Commerce, such financial assistance is necessary for the economic development of the area: Provided further, That the Secretary of Commerce may, as the Secretary considers appropriate, consult with the Secretary of Defense regarding the title to land on military installations closed or scheduled for closure or realignment.

## SALARIES AND EXPENSES

For necessary expenses of administering the economic development assistance programs as provided for by law, $20,036,000: Provided, That these funds may be used to monitor projects approved pursuant to title I of the Public Works Employment Act of 1976, as amended, title II of the Trade Act of 1974, as amended, and the Community Emergency Drought Relief Act of 1977.

## MINORITY BUSINESS DEVELOPMENT AGENCY

## MINORITY BUSINESS DEVELOPMENT

For necessary expenses of the Department of Commerce in fostering, promoting, and developing minority business enterprise, including expenses of grants, contracts, and other agreements with public or private organizations, $28,000,000: Provided, That of the total amount provided, $2,000,000 shall be available for obligation and expenditure only for projects jointly developed, implemented and administered with the Small Business Administration.

## ECONOMIC AND INFORMATION INFRASTRUCTURE

## ECONOMIC AND STATISTICAL ANALYSIS

## SALARIES AND EXPENSES

For necessary expenses, as authorized by law, of economic and statistical analysis programs of the Department of Commerce, $45,900,000, to remain available until September 30, 1998.

## ECONOMICS AND STATISTICS ADMINISTRATION

## REVOLVING FUND

<< 15 USCA § 1527a NOTE >>

The Secretary of Commerce is authorized to disseminate economic and statistical data products as authorized by sections 1, 2, and 4 of Public Law 91–412 (15 U.S.C. 1525–1527) and, notwithstanding section 5412 of the Omnibus Trade and Competitiveness Act of 1988 (15 U.S.C. 4912), charge fees necessary to recover the full costs incurred in their production. Notwithstanding 31 U.S.C. 3302, receipts received from these data dissemination activities shall be credited to this account, to be available for carrying out these purposes without further appropriation.

## BUREAU OF THE CENSUS

## SALARIES AND EXPENSES

For expenses necessary for collecting, compiling, analyzing, preparing, and publishing statistics, provided for by law, $135,000,000.

## PERIODIC CENSUSES AND PROGRAMS

For expenses necessary to collect and publish statistics for periodic censuses and programs provided for by law, $210,500,000, to remain available until expended.

## NATIONAL TELECOMMUNICATIONS AND INFORMATION

## ADMINISTRATION

## SALARIES AND EXPENSES

<< 47 USCA § 903 NOTE >>

For necessary expenses, as provided for by law, of the National Telecommunications and Information Administration (NTIA), $15,000,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 1535(d), the Secretary of Commerce shall charge Federal agencies for costs incurred in spectrum management, analysis, and operations, and related services and such fees shall be retained and used as offsetting collections for costs of such spectrum services, to remain available until expended: Provided further, That hereafter, notwithstanding any other provision of law, NTIA shall not authorize spectrum use or provide any spectrum functions pursuant to the NTIA Organization Act, 47 U.S.C. §§ 902–903, to any Federal entity without reimbursement as required by NTIA for such spectrum management costs, and Federal entities withholding payment of such cost shall not use spectrum: Provided further, That the Secretary of Commerce is authorized to retain and use as offsetting collections all funds transferred, or previously transferred, from other Government agencies for all costs incurred in telecommunications research, engineering, and related activities by the Institute for Telecommunication Sciences of the NTIA, in furtherance of its assigned functions under this paragraph, and such funds received from other Government agencies shall remain available until expended.

### PUBLIC BROADCASTING FACILITIES, PLANNING AND CONSTRUCTION

For grants authorized by section 392 of the Communications Act of 1934, as amended, $15,250,000, to remain available until expended as authorized by section 391 of the Act, as amended: Provided, That not to exceed $1,500,000 shall be available for program administration as authorized by section 391 of the Act: Provided further, That notwithstanding the provisions of section 391 of the Act, the prior year unobligated balances may be made available for grants for projects for which applications have been submitted and approved during any fiscal year.

### INFORMATION INFRASTRUCTURE GRANTS

For grants authorized by section 392 of the Communications Act of 1934, as amended, $21,490,000, to remain available until expended as authorized by section 391 of the Act, as amended: Provided, That not to exceed $3,000,000 shall be available for program administration and other support activities as authorized by section 391: Provided further, That of the funds appropriated herein, not to exceed 5 percent may be available for telecommunications research activities for projects related directly to the development of a national information infrastructure: Provided further, That notwithstanding the requirements of section 392(a) and 392(c) of the Act, these funds may be used for the planning and construction of telecommunications networks for the provision of educational, cultural, health care, public information, public safety, or other social services.

### PATENT AND TRADEMARK OFFICE

### SALARIES AND EXPENSES

For necessary expenses of the Patent and Trademark Office provided for by law, including defense of suits instituted against the Commissioner of Patents and Trademarks, $61,252,000, to remain available until expended: Provided, That the funds made available under this heading are to be derived from deposits in the Patent and Trademark Office Fee Surcharge Fund as authorized by law: Provided further, That the amounts made available under the Fund shall not exceed amounts deposited; and such fees as shall be collected pursuant to 15 U.S.C. 1113 and 35 U.S.C. 41 and 376, shall remain available until expended.

### TECHNOLOGY ADMINISTRATION

### UNDER SECRETARY FOR TECHNOLOGY/OFFICE OF TECHNOLOGY POLICY

### SALARIES AND EXPENSES

For necessary expenses for the Under Secretary for Technology/Office of Technology Policy, $9,500,000: Provided, That $2,500,000 of the total amount provided under this heading shall be available to support the United States–Israel Science and Technology Commission.

### SCIENCE AND TECHNOLOGY

AR.03158

## NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

### SCIENTIFIC AND TECHNICAL RESEARCH AND SERVICES

For necessary expenses of the National Institute of Standards and Technology, $268,000,000, to remain available until expended, of which not to exceed $1,625,000 may be transferred to the "Working Capital Fund".

### INDUSTRIAL TECHNOLOGY SERVICES

<< 15 USCA § 278k NOTE >>

For necessary expenses of the Manufacturing Extension Partnership of the National Institute of Standards and Technology, $95,000,000, to remain available until expended, of which not to exceed $300,000 may be transferred to the "Working Capital Fund": Provided, That notwithstanding the time limitations imposed by 15 U.S.C. 278k(c)(1) and (5) on the duration of Federal financial assistance that may be awarded by the Secretary of Commerce to Regional Centers for the transfer of Manufacturing Technology ("Centers"), such Federal financial assistance for a Center may continue beyond six years and may be renewed for additional periods, not to exceed one year, at a rate not to exceed one-third of the Center's total annual costs, subject before any such renewal to a positive evaluation of the Center and to a finding by the Secretary of Commerce that continuation of Federal funding to the Center is in the best interest of the Regional Centers for the transfer of Manufacturing Technology Program.

In addition, for necessary expenses of the Advanced Technology Program of the National Institute of Standards and Technology, $225,000,000, to remain available until expended, of which not to exceed $500,000 may be transferred to the "Working Capital Fund."

## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

### OPERATIONS, RESEARCH, AND FACILITIES (INCLUDING TRANSFER OF FUNDS)

<< 33 USCA § 851 NOTE >>

For necessary expenses of activities authorized by law for the National Oceanic and Atmospheric Administration, including acquisition, maintenance, operation, and hire of aircraft; not to exceed 299 commissioned officers on the active list as of September 30, 1997; grants, contracts, or other payments to nonprofit organizations for the purposes of conducting activities pursuant to cooperative agreements; and alteration, modernization, and relocation of facilities as authorized by 33 U.S.C. 883i; $1,854,067,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 3302 but consistent with other existing law, fees shall be assessed, collected, and credited to this appropriation as offsetting collections to be available until expended, to recover the costs of administering aeronautical charting programs: Provided further, That the sum herein appropriated from the general fund shall be reduced as such additional fees are received during fiscal year 1997, so as to result in a final general fund appropriation estimated at not more than $1,851,067,000: Provided further, That any such additional fees received in excess of $3,000,000 in fiscal year 1997 shall not be available for obligation until October 1, 1997: Provided further, That fees and donations received by the National Ocean Service for the management of the national marine sanctuaries may be retained and used for the salaries and expenses associated with those activities, notwithstanding 31 U.S.C. 3302: Provided further, That in addition, $66,000,000 shall be derived by transfer from the fund entitled "Promote and Develop Fishery Products and Research Pertaining to American Fisheries": Provided further, That grants to States pursuant to sections 306 and 306A of the Coastal Zone Management Act of 1972, as amended, shall not exceed $2,000,000: Provided further, That not later than November 15, 1996, the Department of Commerce, in conjunction with the National Oceanic and Atmospheric Administration, shall submit to the appropriate committees of the Congress, a long-term plan and a legislative proposal necessary to implement such plan regarding the continuation of a National Oceanic and Atmospheric Administration commissioned corps.

### COASTAL ZONE MANAGEMENT FUND

Of amounts collected pursuant to section 308 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1456a), not to exceed $7,800,000, for purposes set forth in sections 308(b)(2)(A), 308(b)(2)(B)(v), and 315(e) of such Act.

### CONSTRUCTION

For repair and modification of, and additions to, existing facilities and construction of new facilities, and for facility planning and design and land acquisition not otherwise provided for the National Oceanic and Atmospheric Administration, $58,250,000, to remain available until expended, of which $8,500,000 shall be available only for a grant to the University of New Hampshire for construction and related expenses for an environmental technology facility.

### FLEET MODERNIZATION, SHIPBUILDING AND CONVERSION

For expenses necessary for the repair, acquisition, leasing, or conversion of vessels, including related equipment to maintain and modernize the existing fleet and to continue planning the modernization of the fleet, for the National Oceanic and Atmospheric Administration, $8,000,000, to remain available until expended.

### FISHING VESSEL AND GEAR DAMAGE COMPENSATION FUND

For carrying out the provisions of section 3 of Public Law 95–376, not to exceed $200,000, to be derived from receipts collected pursuant to subsections (b) and (f) of section 10 of the Fishermen's Protective Act of 1967 (22 U.S.C. 1980), to remain available until expended.

### FISHERMEN'S CONTINGENCY FUND

For carrying out the provisions of title IV of Public Law 95–372, not to exceed $1,000,000, to be derived from receipts collected pursuant to that Act, to remain available until expended.

### FOREIGN FISHING OBSERVER FUND

For expenses necessary to carry out the provisions of the Atlantic Tunas Convention Act of 1975, as amended (Public Law 96–339), the Magnuson Fishery Conservation and Management Act of 1976, as amended (Public Law 100–627), and the American Fisheries Promotion Act (Public Law 96–561), to be derived from the fees imposed under the foreign fishery observer program authorized by these Acts, not to exceed $196,000, to remain available until expended.

### FISHING VESSEL OBLIGATIONS GUARANTEES

For the cost of guaranteed loans, $250,000, as authorized by the Merchant Marine Act of 1936, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That none of the funds made available under this heading may be used to guarantee loans for any new fishing vessel that will increase the harvesting capacity in any United States fishery.

### GENERAL ADMINISTRATION

### SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of Commerce provided for by law, including not to exceed $3,000 for official entertainment, $28,490,000.

### OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App. 1–11 as amended by Public Law 100–504), $20,140,000.

### NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

### CONSTRUCTION OF RESEARCH FACILITIES

### (RESCISSION)

Of the obligated and unobligated balances available under this heading, $16,000,000 are rescinded.

### NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

### OPERATIONS, RESEARCH, AND FACILITIES

(RESCISSION)

Of the unobligated balances available under this heading, $20,000,000 are rescinded.

GENERAL PROVISIONS—DEPARTMENT OF COMMERCE

SEC. 201. During the current fiscal year, applicable appropriations and funds made available to the Department of Commerce by this Act shall be available for the activities specified in the Act of October 26, 1949 (15 U.S.C. 1514), to the extent and in the manner prescribed by the Act, and, notwithstanding 31 U.S.C. 3324, may be used for advanced payments not otherwise authorized only upon the certification of officials designated by the Secretary that such payments are in the public interest.

SEC. 202. During the current fiscal year, appropriations made available to the Department of Commerce by this Act for salaries and expenses shall be available for hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; services as authorized by 5 U.S.C. 3109; and uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902).

SEC. 203. None of the funds made available by this Act may be used to support the hurricane reconnaissance aircraft and activities that are under the control of the United States Air Force or the United States Air Force Reserve.

<< 13 USCA § 23 NOTE >>

SEC. 204. None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce, shall be available to reimburse the Unemployment Trust Fund or any other fund or account of the Treasury to pay for any expenses paid before October 1, 1992, as authorized by section 8501 of title 5, United States Code, for services performed after April 20, 1990, by individuals appointed to temporary positions within the Bureau of the Census for purposes relating to the 1990 decennial census of population.

SEC. 205. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Commerce in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 206. (a) Should legislation be enacted to dismantle or reorganize the Department of Commerce, the Secretary of Commerce, no later than 90 days thereafter, shall submit to the Committees on Appropriations of the House and the Senate a plan for transferring funds provided in this Act to the appropriate successor organizations: Provided, That the plan shall include a proposal for transferring or rescinding funds appropriated herein for agencies or programs terminated under such legislation: Provided further, That such plan shall be transmitted in accordance with section 605 of this Act.

(b) The Secretary of Commerce or the appropriate head of any successor organization(s) may use any available funds to carry out legislation dismantling or reorganizing the Department of Commerce to cover the costs of actions relating to the abolishment, reorganization, or transfer of functions and any related personnel action, including voluntary separation incentives if authorized by such legislation: Provided, That the authority to transfer funds between appropriations accounts that may be necessary to carry out this section is provided in addition to authorities included under section 205 of this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 207. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

<< 16 USCA § 1851 NOTE >>

SEC. 208. None of the funds appropriated under this Act or any other Act henceforth may be used to develop new fishery management plans, amendments, or regulations which create new individual fishing quota programs (whether such quotas are transferable or not) or to implement any such plans, amendments or regulations approved by a Regional Fishery Management

Council or the Secretary after January 4, 1995, until offsetting fees to pay for the cost of administering such plans, amendments, or regulations are expressly authorized under the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.). This restriction shall also apply to any program relating to the Gulf of Mexico commercial red snapper fishery that authorizes the consolidation of licenses permits or endorsements that result in different trip limits for vessels in the same class. This restriction shall not apply in any way to the North Pacific halibut and sablefish, South Atlantic wreckfish, or the Mid–Atlantic surfclam and ocean (including mahogany) quohog individual fishing quota programs. The term "individual fishing quota" does not include a community development quota.

SEC. 209. The Secretary may award contracts for hydrographic, geodetic, and photogrammetric surveying and mapping services in accordance with title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.).

<< 13 USCA § 11 NOTE >>

SEC. 210. There is hereby established the Bureau of the Census Working Capital Fund, which shall be available without fiscal year limitation, for expenses and equipment necessary for the maintenance and operation of such services and projects as the Director of the Census Bureau determines may be performed more advantageously when centralized: Provided, That such central services shall, to the fullest extent practicable, be used to make unnecessary the maintenance of separate like services in the divisions and offices of the Bureau: Provided further, That a separate schedule of expenditures and reimbursements, and a statement of the current assets and liabilities of the Working Capital Fund as of the close of the last completed fiscal year, shall be prepared each year: Provided further, That notwithstanding 31 U.S.C. 3302, the Working Capital Fund may be credited with advances and reimbursements from applicable appropriations of the Bureau and from funds of other agencies or entities for services furnished pursuant to law: Provided further, That any inventories, equipment, and other assets pertaining to the services to be provided by such funds, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made hereafter for the purpose of providing capital, shall be used to capitalize the Working Capital Fund: Provided further, That the Working Capital Fund shall provide for centralized services at rates which will return in full all expenses of operation, including depreciation of fund plant and equipment, amortization of automated data processing software and hardware systems, and an amount necessary to maintain a reasonable operating reserve as determined by the Director.

<< 16 USCA § 1801 NOTE >>

SEC. 211. (a) Effective 15 days after the enactment of the Sustainable Fisheries Act, section 1 of the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801) shall be amended to read as follows: "That this Act may be cited as the 'Magnuson–Stevens Fishery Conservation and Management Act'."

(b) Effective 15 days after the enactment of the Sustainable Fisheries Act, all references to the Magnuson Fishery Conservation and Management Act shall be redesignated as references to the Magnuson–Stevens Fishery Conservation and Management Act.

This title may be cited as the "Department of Commerce and Related Agencies Appropriations Act, 1997".

## TITLE III—THE JUDICIARY

### SUPREME COURT OF THE UNITED STATES

#### SALARIES AND EXPENSES

For expenses necessary for the operation of the Supreme Court, as required by law, excluding care of the building and grounds, including purchase or hire, driving, maintenance, and operation of an automobile for the Chief Justice, not to exceed $10,000 for the purpose of transporting Associate Justices, and hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344; not to exceed $10,000 for official reception and representation expenses; and for miscellaneous expenses, to be expended as the Chief Justice may approve; $27,157,000.

#### CARE OF THE BUILDING AND GROUNDS

For such expenditures as may be necessary to enable the Architect of the Capitol to carry out the duties imposed upon him by the Act approved May 7, 1934 (40 U.S.C. 13a–13b), $2,800,000, of which $260,000 shall remain available until expended.

### UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## SALARIES AND EXPENSES

For salaries of the chief judge, judges, and other officers and employees, and for necessary expenses of the court, as authorized by law, $15,013,000.

## UNITED STATES COURT OF INTERNATIONAL TRADE

## SALARIES AND EXPENSES

For salaries of the chief judge and eight judges, salaries of the officers and employees of the court, services as authorized by 5 U.S.C. 3109, and necessary expenses of the court, as authorized by law, $11,114,000.

## COURTS OF APPEALS, DISTRICT COURTS, AND OTHER JUDICIAL SERVICES

## SALARIES AND EXPENSES

### (INCLUDING TRANSFER OF FUNDS)

For the salaries of circuit and district judges (including judges of the territorial courts of the United States), justices and judges retired from office or from regular active service, judges of the United States Court of Federal Claims, bankruptcy judges, magistrate judges, and all other officers and employees of the Federal Judiciary not otherwise specifically provided for, and necessary expenses of the courts, as authorized by law, $2,556,000,000 (including the purchase of firearms and ammunition); of which not to exceed $13,454,000 shall remain available until expended for space alteration projects; of which $500,000 shall be transferred to the Commission on Structural Alternatives for the Federal Courts of Appeals only after legislation is enacted to establish the Commission; of which not to exceed $10,000,000 shall remain available until expended for furniture and furnishings related to new space alteration and construction projects; and of which $500,000 is to remain available until expended for acquisition of books, periodicals, and newspapers, and all other legal reference materials, including subscriptions. In addition, for expenses of the United States Court of Federal Claims associated with processing cases under the National Childhood Vaccine Injury Act of 1986, not to exceed $2,390,000, to be appropriated from the Vaccine Injury Compensation Trust Fund.

For an additional amount for expenses relating to additional workload from the Antiterrorism and Effective Death Penalty Act of 1996, and for Court Security needs, $10,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

## VIOLENT CRIME REDUCTION PROGRAMS

For activities of the Federal Judiciary as authorized by law, $30,000,000, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as authorized by section 190001(a) of Public Law 103–322.

## DEFENDER SERVICES

For the operation of Federal Public Defender and Community Defender organizations; the compensation and reimbursement of expenses of attorneys appointed to represent persons under the Criminal Justice Act of 1964, as amended; the compensation and reimbursement of expenses of persons furnishing investigative, expert and other services under the Criminal Justice Act (18 U.S.C. 3006A(e)); the compensation (in accordance with Criminal Justice Act maximums) and reimbursement of expenses of attorneys appointed to assist the court in criminal cases where the defendant has waived representation by counsel; the compensation and reimbursement of travel expenses of guardians ad litem acting on behalf of financially eligible minor or incompetent offenders in connection with transfers from the United States to foreign countries with which the United States has a treaty for the execution of penal sentences; and the compensation of attorneys ap-[sic]

## FEES OF JURORS AND COMMISSIONERS

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For fees and expenses of jurors as authorized by 28 U.S.C. 1871 and 1876; compensation of jury commissioners as authorized by 28 U.S.C. 1863; and compensation of commissioners appointed in condemnation cases pursuant to rule 71A(h) of the Federal Rules of Civil Procedure (28 U.S.C. Appendix Rule 71A(h)); $67,000,000, to remain available until expended: Provided, That the compensation of land commissioners shall not exceed the daily equivalent of the highest rate payable under section 5332 of title 5, United States Code.

## COURT SECURITY

For necessary expenses, not otherwise provided for, incident to the procurement, installation, and maintenance of security equipment and protective services for the United States Courts in courtrooms and adjacent areas, including building ingress-egress control, inspection of packages, directed security patrols, and other similar activities as authorized by section 1010 of the Judicial Improvement and Access to Justice Act (Public Law 100–702); $127,000,000, to be expended directly or transferred to the United States Marshals Service which shall be responsible for administering elements of the Judicial Security Program consistent with standards or guidelines agreed to by the Director of the Administrative Office of the United States Courts and the Attorney General.

## ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

### SALARIES AND EXPENSES

For necessary expenses of the Administrative Office of the United States Courts as authorized by law, including travel as authorized by 31 U.S.C. 1345, hire of a passenger motor vehicle as authorized by 31 U.S.C. 1343(b), advertising and rent in the District of Columbia and elsewhere, $49,450,000, of which not to exceed $7,500 is authorized for official reception and representation expenses.

## FEDERAL JUDICIAL CENTER

### SALARIES AND EXPENSES

For necessary expenses of the Federal Judicial Center, as authorized by Public Law 90–219, $17,495,000; of which $1,800,000 shall remain available through September 30, 1998, to provide education and training to Federal court personnel; and of which not to exceed $1,000 is authorized for official reception and representation expenses.

## JUDICIAL RETIREMENT FUNDS

### PAYMENT TO JUDICIARY TRUST FUNDS

For payment to the Judicial Officers' Retirement Fund, as authorized by 28 U.S.C. 377(o), $21,000,000, to the Judicial Survivors' Annuities Fund, as authorized by 28 U.S.C. 376(c), $7,300,000, and to the United States Court of Federal Claims Judges' Retirement Fund, as authorized by 28 U.S.C. 178(l), $1,900,000.

## UNITED STATES SENTENCING COMMISSION

### SALARIES AND EXPENSES

For the salaries and expenses necessary to carry out the provisions of chapter 58 of title 28, United States Code, $8,490,000, of which not to exceed $1,000 is authorized for official reception and representation expenses.

## GENERAL PROVISIONS—THE JUDICIARY

SEC. 301. Appropriations and authorizations made in this title which are available for salaries and expenses shall be available for services as authorized by 5 U.S.C. 3109.

SEC. 302. Appropriations made in this title shall be available for salaries and expenses of the Special Court established under the Regional Rail Reorganization Act of 1973, Public Law 93–236.

SEC. 303. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Judiciary in this Act may be transferred between such appropriations, but no such appropriation, except "Courts of Appeals, District Courts, and other Judicial Services, Defender Services" and "Courts of Appeals, District Courts, and other Judicial Services, Fees of Jurors and Commissioners", shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to

this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 304. Notwithstanding any other provision of law, the salaries and expenses appropriation for district courts, courts of appeals, and other judicial services shall be available for official reception and representation expenses of the Judicial Conference of the United States: Provided, That such available funds shall not exceed $10,000 and shall be administered by the Director of the Administrative Office of the United States Courts in his capacity as Secretary of the Judicial Conference.

<< 28 USCA § 612 >>

SEC. 305. Section 612(l) of title 28, United States Code, shall be amended as follows: strike "1997", and insert in lieu thereof "1998".

<< 18 USCA § 3626 NOTE >>

SEC. 306. None of the funds available to the Judiciary in fiscal years 1996 and 1997 and hereafter shall be available for expenses authorized pursuant to section 802(a) of title VIII of section 101(a) of title I of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Public Law 104–134, for costs related to the appointment of Special Masters prior to April 26, 1996.

Sec. 307. The United States courthouse at 310 West Sixth Street in Medford, Oregon, shall be known and designated as the "James A. Redden Federal Courthouse".

Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States courthouse at 310 West Sixth Street in Medford, Oregon, shall be deemed to be a reference to the "James A. Redden Federal Courthouse".

This title may be cited as "The Judiciary Appropriations Act, 1997".

TITLE IV—DEPARTMENT OF STATE AND RELATED AGENCIES

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

DIPLOMATIC AND CONSULAR PROGRAMS

<< 8 USCA § 1351 NOTE >>

<< 22 USCA § 2695b >>

For necessary expenses of the Department of State and the Foreign Service not otherwise provided for, including expenses authorized by the State Department Basic Authorities Act of 1956, as amended; representation to certain international organizations in which the United States participates pursuant to treaties, ratified pursuant to the advice and consent of the Senate, or specific Acts of Congress; acquisition by exchange or purchase of passenger motor vehicles as authorized by 31 U.S.C. 1343, 40 U.S.C. 481(c) and 22 U.S.C. 2674; and for expenses of general administration; $1,700,450,000: Provided, That notwithstanding section 140(a)(5), and the second sentence of section 140(a)(3), of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Public Law 103–236), not to exceed $150,000,000 of fees may be collected during fiscal year 1997 under the authority of section 140(a)(1) of that Act: Provided further, That all fees collected under the preceding proviso shall be deposited in fiscal year 1997 as an offsetting collection to appropriations made under this heading to recover the costs of providing consular services and shall remain available until expended: Provided further, That in fiscal year 1998, a system shall be in place that allocates to each department and agency the full cost of its presence outside of the United States.

Of the funds provided under this heading, $24,856,000 shall be available only for the Diplomatic Telecommunications Service for operation of existing base services and not to exceed $17,230,000 shall be available only for the enhancement of the Diplomatic Telecommunications Service and shall remain available until expended. Of the latter amount, $2,500,000 shall not be made available until expiration of the 15 day period beginning on the date when the Secretary of State and the Director of the Diplomatic Telecommunications Service submit the pilot program report required by section 507 of Public Law 103–317.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In addition, not to exceed $700,000 in registration fees collected pursuant to section 38 of the Arms Export Control Act, as amended, may be used in accordance with section 45 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2717); and in addition not to exceed $1,223,000 shall be derived from fees collected from other executive agencies for lease or use of facilities located at the International Center in accordance with section 4 of the International Center Act (Public Law 90–553), as amended; and in addition, as authorized by section 5 of such Act, $450,000, to be derived from the reserve authorized by that section, to be used for the purposes set out in that section; and in addition not to exceed $15,000 which shall be derived from reimbursements, surcharges, and fees for use of Blair House facilities in accordance with section 46 of the State of Department Basic Authorities Act of 1956 (22 U.S.C. 2718(a)).

Notwithstanding section 402 of this Act, not to exceed 20 percent of the amounts made available in this Act in the appropriation accounts "Diplomatic and Consular Programs" and "Salaries and Expenses" under the heading "Administration of Foreign Affairs" may be transferred between such appropriation accounts: Provided, That any transfer pursuant to this sentence shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

For an additional amount for counterterrorism requirements overseas, including security guards and equipment, $23,700,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## SALARIES AND EXPENSES

For expenses necessary for the general administration of the Department of State and the Foreign Service, provided for by law, including expenses authorized by section 9 of the Act of August 31, 1964, as amended (31 U.S.C. 3721), and the State Department Basic Authorities Act of 1956, as amended, $352,300,000.

## CAPITAL INVESTMENT FUND

For necessary expenses of the Capital Investment Fund, $24,600,000, to remain available until expended, as authorized in Public Law 103–236: Provided, That section 135(e) of Public Law 103–236 shall not apply to funds appropriated under this heading.

## OFFICE OF INSPECTOR GENERAL

<< 5 USCA App. 3 § 11 NOTE >>

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App.), $27,495,000, notwithstanding section 209(a)(1) of the Foreign Service Act of 1980, as amended (Public Law 96–465), as it relates to post inspections: Provided, That notwithstanding any other provision of law, the merger of the Office of Inspector General of the United States Information Agency with the Office of Inspector General of the Department of State provided for in the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1996, contained in Public Law 104–134, is effective hereafter.

## REPRESENTATION ALLOWANCES

For representation allowances as authorized by section 905 of the Foreign Service Act of 1980, as amended (22 U.S.C. 4085), $4,490,000.

## PROTECTION OF FOREIGN MISSIONS AND OFFICIALS

For expenses, not otherwise provided, to enable the Secretary of State to provide for extraordinary protective services in accordance with the provisions of section 214 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4314) and 3 U.S.C. 208, $8,332,000, to remain available until September 30, 1998.

## SECURITY AND MAINTENANCE OF UNITED STATES MISSIONS

For necessary expenses for carrying out the Foreign Service Buildings Act of 1926, as amended (22 U.S.C. 292–300), and the Diplomatic Security Construction Program as authorized by title IV of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (22 U.S.C. 4851), $364,495,000, to remain available until expended as authorized by section 24(c) of the State

Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)): Provided, That none of the funds appropriated in this paragraph shall be available for acquisition of furniture and furnishings and generators for other departments and agencies.

For an additional amount for security improvements, necessary relocation expenses, and security equipment for United States diplomatic facilities and missions overseas, $24,825,000, to remain available until expended: Provided, That of this amount $9,400,000 is for security projects on behalf of United States and Foreign Commercial Service missions and $1,125,000 is for security projects on behalf of United States Information Agency missions: Provided further, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That the amount not previously designated by the President as an emergency requirement shall be available only to the extent an official budget request, for a specific dollar amount that includes designation of the entire amount of the request as an emergency requirement, as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted to Congress.

## EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

For expenses necessary to enable the Secretary of State to meet unforeseen emergencies arising in the Diplomatic and Consular Service pursuant to the requirement of 31 U.S.C. 3526(e), $5,800,000, to remain available until expended as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)), of which not to exceed $1,000,000 may be transferred to and merged with the Repatriation Loans Program Account, subject to the same terms and conditions.

## REPATRIATION LOANS PROGRAM ACCOUNT

For the cost of direct loans, $593,000, as authorized by section 4 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2671): Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974. In addition, for administrative expenses necessary to carry out the direct loan program, $663,000 which may be transferred to and merged with the Salaries and Expenses account under Administration of Foreign Affairs.

## PAYMENT TO THE AMERICAN INSTITUTE IN TAIWAN

For necessary expenses to carry out the Taiwan Relations Act, Public Law 96–8 (93 Stat. 14), $14,490,000.

## PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the Foreign Service Retirement and Disability Fund, as authorized by law, $126,491,000.

## INTERNATIONAL ORGANIZATIONS AND CONFERENCES

## CONTRIBUTIONS TO INTERNATIONAL ORGANIZATIONS

<< 22 USCA § 269a NOTE >>

For expenses, not otherwise provided for, necessary to meet annual obligations of membership in international multilateral organizations, pursuant to treaties ratified pursuant to the advice and consent of the Senate, conventions or specific Acts of Congress, $892,000,000: Provided, That any payment of arrearages shall be directed toward special activities that are mutually agreed upon by the United States and the respective international organization: Provided further, That 20 percent of the funds appropriated in this paragraph for the assessed contribution of the United States to the United Nations shall be withheld from obligation and expenditure until a certification is made under section 401(b) of Public Law 103–236 for fiscal year 1997: Provided further, That certification under section 401(b) of Public Law 103–236 for fiscal year 1997 may only be made if the Committees on Appropriations and Foreign Relations of the Senate and the Committees on Appropriations and International Relations of the House of Representatives are notified of the steps taken, and anticipated, to meet the requirements of section 401(b) of Public Law 103–236 at least 15 days in advance of the proposed certification: Provided further, That none of the funds appropriated in this paragraph shall be available for a United States contribution to an international organization for the United States share of interest costs made known to the United States Government by such organization for loans incurred on or after October 1, 1984, through external borrowings: Provided further, That of the funds appropriated in this paragraph, $100,000,000 may be made available only pursuant to a certification by the Secretary of State by no later than January 30, 1997,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

that the United Nations has taken no action during calendar year 1996 to increase funding for any United Nations program without identifying an offsetting decrease elsewhere in the United Nations budget and cause the United Nations to exceed its no growth budget for the biennium 1996–1997 adopted in December, 1995: Provided further, That if the Secretary of State is unable to make the aforementioned certification, the $100,000,000 is to be applied to paying the current year assessment for other international organizations for which the assessment has not been paid in full or to paying the assessment due in the next fiscal year for such organizations, subject to the reprogramming procedures contained in Section 605 of this Act: Provided further, That notwithstanding section 402 of this Act, not to exceed $10,000,000 may be transferred from the funds made available under this heading to the "International Conferences and Contingencies" account for assessed contributions to new or provisional international organizations or for travel expenses of official delegates to international conferences: Provided further, That any transfer pursuant to this paragraph shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## CONTRIBUTIONS FOR INTERNATIONAL PEACEKEEPING ACTIVITIES

For necessary expenses to pay assessed and other expenses of international peacekeeping activities directed to the maintenance or restoration of international peace and security, $352,400,000, of which $50,000,000 is for payment of arrearages accumulated in 1995, and which shall be available only upon certification by the Secretary of State that at least two of the following have been achieved: (1) savings of at least $100,000,000 will be achieved in the biennial expenses of the following United Nations divisions and activities—the United Nations Conference on Trade and Development, the Regional Economic Commissions, the Department of Public Information, and the Department of Conference Services, travel and overtime; (2) the number of professional and general service staff employed by the United Nations Secretariat at the conclusion of the 1996–1997 biennium will be at least ten percent below the number of such positions on January 1, 1996; and (3) the United Nations has adopted a budget outline for the 1998–1999 biennium that is below $2,608,000,000; as part of a five-year program to achieve major cost-saving reforms in the United Nations and specialized agencies: Provided, That none of the funds made available under this Act shall be obligated or expended for any new or expanded United Nations peacekeeping mission unless, at least fifteen days in advance of voting for the new or expanded mission in the United Nations Security Council (or in an emergency, as far in advance as is practicable), (1) the Committees on Appropriations of the House of Representatives and the Senate and other appropriate Committees of the Congress are notified of the estimated cost and length of the mission, the vital national interest that will be served, and the planned exit strategy; and (2) a reprogramming of funds pursuant to section 605 of this Act is submitted, and the procedures therein followed, setting forth the source of funds that will be used to pay for the cost of the new or expanded mission: Provided further, That funds shall be available for peacekeeping expenses only upon a certification by the Secretary of State to the appropriate committees of the Congress that American manufacturers and suppliers are being given opportunities to provide equipment, services, and material for United Nations peacekeeping activities equal to those being given to foreign manufacturers and suppliers.

## INTERNATIONAL COMMISSIONS

<< 22 USCA § 269a NOTE >>

For necessary expenses, not otherwise provided for, to meet obligations of the United States arising under treaties, or specific Acts of Congress, as follows:

## INTERNATIONAL BOUNDARY AND WATER COMMISSION, UNITED STATES AND MEXICO

For necessary expenses for the United States Section of the International Boundary and Water Commission, United States and Mexico, and to comply with laws applicable to the United States Section, including not to exceed $6,000 for representation; as follows:

## SALARIES AND EXPENSES

For salaries and expenses, not otherwise provided for, $15,490,000.

## CONSTRUCTION

For detailed plan preparation and construction of authorized projects, $6,463,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

## AMERICAN SECTIONS, INTERNATIONAL COMMISSIONS

For necessary expenses, not otherwise provided for the International Joint Commission and the International Boundary Commission, United States and Canada, as authorized by treaties between the United States and Canada or Great Britain, and for the Border Environment Cooperation Commission as authorized by Public Law 103–182; $5,490,000, of which not to exceed $9,000 shall be available for representation expenses incurred by the International Joint Commission.

## INTERNATIONAL FISHERIES COMMISSIONS

For necessary expenses for international fisheries commissions, not otherwise provided for, as authorized by law, $14,549,000: Provided, That the United States' share of such expenses may be advanced to the respective commissions, pursuant to 31 U.S.C. 3324.

## OTHER

### PAYMENT TO THE ASIA FOUNDATION

For a grant to the Asia Foundation, as authorized by section 501 of Public Law 101–246, $8,000,000, to remain available until expended, as authorized by section 24(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2696(c)).

## RELATED AGENCIES

## ARMS CONTROL AND DISARMAMENT AGENCY

### ARMS CONTROL AND DISARMAMENT ACTIVITIES

For necessary expenses not otherwise provided, for arms control, nonproliferation, and disarmament activities, $41,500,000, of which not to exceed $50,000 shall be for official reception and representation expenses as authorized by the Act of September 26, 1961, as amended (22 U.S.C. 2551 et seq.).

## UNITED STATES INFORMATION AGENCY

### SALARIES AND EXPENSES

For expenses, not otherwise provided for, necessary to enable the United States Information Agency, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), to carry out international communication, educational and cultural activities; and to carry out related activities authorized by law, including employment, without regard to civil service and classification laws, of persons on a temporary basis (not to exceed $700,000 of this appropriation), as authorized by section 801 of such Act of 1948 (22 U.S.C. 1471), and entertainment, including official receptions, within the United States, not to exceed $25,000 as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)); $440,000,000: Provided, That not to exceed $1,400,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085): Provided further, That not to exceed $7,615,000, to remain available until expended, may be credited to this appropriation from fees or other payments received from or in connection with English teaching, library, motion pictures, and publication programs as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e) and, notwithstanding any other law, fees from student advising and counseling: Provided further That not to exceed $1,100,000 to remain available until expended may be used to carry out projects involving security construction and related improvements for agency facilities not physically located together with Department of State facilities abroad.

For an additional amount for necessary expenses relating to security, $1,375,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## TECHNOLOGY FUND

For expenses necessary to enable the United States Information Agency to provide for the procurement of information technology improvements, as authorized by the United States Information and Educational Exchange Act of 1948, as amended (22 U.S.C. 1431 et seq.), the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $5,050,000, to remain available until expended.

## EDUCATIONAL AND CULTURAL EXCHANGE PROGRAMS

For expenses of educational and cultural exchange programs, as authorized by the Mutual Educational and Cultural Exchange Act of 1961, as amended (22 U.S.C. 2451 et seq.), and Reorganization Plan No. 2 of 1977 (91 Stat. 1636), $185,000,000, to remain available until expended as authorized by section 105 of such Act of 1961 (22 U.S.C. 2455).

## EISENHOWER EXCHANGE FELLOWSHIP PROGRAM TRUST FUND

For necessary expenses of Eisenhower Exchange Fellowships, Incorporated, as authorized by sections 4 and 5 of the Eisenhower Exchange Fellowship Act of 1990 (20 U.S.C. 5204–5205), all interest and earnings accruing to the Eisenhower Exchange Fellowship Program Trust Fund on or before September 30, 1997, to remain available until expended: Provided, That none of the funds appropriated herein shall be used to pay any salary or other compensation, or to enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376; or for purposes which are not in accordance with OMB Circulars A–110 (Uniform Administrative Requirements) and A–122 (Cost Principles for Non-profit Organizations), including the restrictions on compensation for personal services.

## ISRAELI ARAB SCHOLARSHIP PROGRAM

For necessary expenses of the Israeli Arab Scholarship Program as authorized by section 214 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (22 U.S.C. 2452), all interest and earnings accruing to the Israeli Arab Scholarship Fund on or before September 30, 1997, to remain available until expended.

## INTERNATIONAL BROADCASTING OPERATIONS

For expenses necessary to enable the United States Information Agency, as authorized by the United States Information and Educational Exchange Act of 1948, as amended, the United States International Broadcasting Act of 1994, as amended, and Reorganization Plan No. 2 of 1977, to carry out international communication activities; $325,000,000, of which not to exceed $16,000 may be used for official receptions within the United States as authorized by section 804(3) of such Act of 1948 (22 U.S.C. 1474(3)), not to exceed $35,000 may be used for representation abroad as authorized by section 302 of such Act of 1948 (22 U.S.C. 1452) and section 905 of the Foreign Service Act of 1980 (22 U.S.C. 4085), and not to exceed $39,000 may be used for official reception and representation expenses of Radio Free Europe/Radio Liberty; and in addition, not to exceed $250,000 from fees as authorized by section 810 of such Act of 1948 (22 U.S.C. 1475e), to remain available until expended for carrying out authorized purposes; and in addition, notwithstanding any other provision of law, not to exceed $1,000,000 in monies received (including receipts from advertising, if any) by or for the use of the United States Information Agency from or in connection with broadcasting resources owned by or on behalf of the Agency, to be available until expended for carrying out authorized purposes.

## BROADCASTING TO CUBA

For expenses necessary to enable the United States Information Agency to carry out the Radio Broadcasting to Cuba Act, as amended, the Television Broadcasting to Cuba Act, and the International Broadcasting Act of 1994, including the purchase, rent, construction, and improvement of facilities for radio and television transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception, $25,000,000, to remain available until expended.

## RADIO CONSTRUCTION

For the purchase, rent, construction, and improvement of facilities for radio transmission and reception, and purchase and installation of necessary equipment for radio and television transmission and reception as authorized by section 801 of the United States Information and Educational Exchange Act of 1948 (22 U.S.C. 1471), $35,490,000, to remain available until expended, as authorized by section 704(a) of such Act of 1948 (22 U.S.C. 1477b(a)).

## EAST–WEST CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the Center for Cultural and Technical Interchange Between East and West Act of 1960 (22 U.S.C. 2054–2057), by grant to the Center for Cultural and Technical Interchange Between East and West in the State of Hawaii, $10,000,000: Provided, That none of the funds appropriated herein shall be used to pay any salary, or enter into any contract providing for the payment thereof, in excess of the rate authorized by 5 U.S.C. 5376.

## NORTH/SOUTH CENTER

To enable the Director of the United States Information Agency to provide for carrying out the provisions of the North/South Center Act of 1991 (22 U.S.C. 2075), by grant to an educational institution in Florida known as the North/South Center, $1,495,000, to remain available until expended.

## NATIONAL ENDOWMENT FOR DEMOCRACY

For grants made by the United States Information Agency to the National Endowment for Democracy as authorized by the National Endowment for Democracy Act, $30,000,000, to remain available until expended.

## GENERAL PROVISIONS—DEPARTMENT OF STATE AND RELATED AGENCIES

SEC. 401. Funds appropriated under this title shall be available, except as otherwise provided, for allowances and differentials as authorized by subchapter 59 of 5 U.S.C.; for services as authorized by 5 U.S.C. 3109; and hire of passenger transportation pursuant to 31 U.S.C. 1343(b).

SEC. 402. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of State in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided, That not to exceed 5 percent of any appropriation made available for the current fiscal year for the United States Information Agency in this Act may be transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by any such transfers: Provided further, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

<< 22 USCA § 268c >>

SEC. 403. Funds hereafter appropriated or otherwise made available under this Act or any other Act may be expended for compensation of the United States Commissioner of the International Boundary Commission, United States and Canada, only for actual hours worked by such Commissioner.

SEC. 404. Funds appropriated by this Act for the United States Information Agency, the Arms Control and Disarmament Agency, and the Department of State may be obligated and expended notwithstanding section 701 of the United States Information and Educational Exchange Act of 1948 and section 313 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, section 53 of the Arms Control and Disarmament Act, and section 15 of the State Department Basic Authorities Act of 1956.

SEC. 405. Any costs incurred by a Department or agency funded under this title resulting from personnel actions taken in response to funding reductions included in this title shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 406. Starting sixty days after enactment of this Act, none of the funds made available by this Act may be made available to support the activities of the Standing Consultative Commission (SCC) unless the President provides to the Congress a report containing a detailed analysis of whether the Memorandum of Understanding on Succession and the Agreed Statement regarding Demarcation agreed to by the Standing Consultative Commission on June 24, 1996, which was reaffirmed by Secretary of State Warren Christopher and Minister of Foreign Affairs Evgeny Primakov on September 23, 1996, represent substantive changes to the Anti–Ballistic Missile Treaty of 1972 and whether these agreements will require the advice and consent of the Senate of the United States.

<< 22 USCA § 214 >>

SEC. 407. Section 1 of the Act of June 4, 1920 (41 Stat. 750; 22 U.S.C. 214) is amended by—

 (1) inserting before the period at the end of the first sentence the following: "; except that the Secretary of State may by regulation authorize State officials or the United States Postal Service to collect and retain the execution fee for each application for a passport accepted by such officials or by that Service"; and

 (2) striking the second sentence.

This title may be cited as the "Department of State and Related Agencies Appropriations Act, 1997".

## TITLE V—RELATED AGENCIES

## DEPARTMENT OF TRANSPORTATION

## MARITIME ADMINISTRATION

## OPERATING–DIFFERENTIAL SUBSIDIES

### (LIQUIDATION OF CONTRACT AUTHORITY)

 For the payment of obligations incurred for operating-differential subsidies, as authorized by the Merchant Marine Act, 1936, as amended, $148,430,000, to remain available until expended.

## MARITIME SECURITY PROGRAM

 For necessary expenses to maintain and preserve a U.S.-flag merchant fleet to serve the national security needs of the United States, $54,000,000, to remain available until expended: Provided, That these funds will be available only upon enactment of an authorization for this program.

## OPERATIONS AND TRAINING

 For necessary expenses of operations and training activities authorized by law, $65,000,000: Provided, That reimbursements may be made to this appropriation from receipts to the "Federal Ship Financing Fund" for administrative expenses in support of that program in addition to any amount heretofore appropriated.

## MARITIME GUARANTEED LOAN (TITLE XI) PROGRAM ACCOUNT

 For the cost of guaranteed loans, as authorized by the Merchant Marine Act, 1936, $37,450,000, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974, as amended: Provided further, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $1,000,000,000.

 In addition, for administrative expenses to carry out the guaranteed loan program, not to exceed $3,450,000, which shall be transferred to and merged with the appropriation for Operations and Training.

## ADMINISTRATIVE PROVISIONS—MARITIME ADMINISTRATION

 Notwithstanding any other provision of this Act, the Maritime Administration is authorized to furnish utilities and services and make necessary repairs in connection with any lease, contract, or occupancy involving Government property under control of the Maritime Administration, and payments received therefor shall be credited to the appropriation charged with the cost thereof: Provided, That rental payments under any such lease, contract, or occupancy for items other than such utilities, services, or repairs shall be covered into the Treasury as miscellaneous receipts.

 No obligations shall be incurred during the current fiscal year from the construction fund established by the Merchant Marine Act, 1936, or otherwise, in excess of the appropriations and limitations contained in this Act or in any prior appropriation Act, and all receipts which otherwise would be deposited to the credit of said fund shall be covered into the Treasury as miscellaneous receipts.

## COMMISSION FOR THE PRESERVATION OF AMERICA'S HERITAGE ABROAD

## SALARIES AND EXPENSES

For expenses for the Commission for the Preservation of America's Heritage Abroad, $206,000, as authorized by Public Law 99–83, section 1303.

## COMMISSION ON CIVIL RIGHTS

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Civil Rights, including hire of passenger motor vehicles, $8,740,000: Provided, That not to exceed $50,000 may be used to employ consultants: Provided further, That none of the funds appropriated in this paragraph shall be used to employ in excess of four full-time individuals under Schedule C of the Excepted Service exclusive of one special assistant for each Commissioner: Provided further, That none of the funds appropriated in this paragraph shall be used to reimburse Commissioners for more than 75 billable days, with the exception of the Chairperson who is permitted 125 billable days.

## COMMISSION ON IMMIGRATION REFORM

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Immigration Reform pursuant to section 141(f) of the Immigration Act of 1990, $2,196,000, to remain available until expended.

## COMMISSION ON SECURITY AND COOPERATION IN EUROPE

### SALARIES AND EXPENSES

For necessary expenses of the Commission on Security and Cooperation in Europe, as authorized by Public Law 94–304, $1,090,000, to remain available until expended as authorized by section 3 of Public Law 99–7.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Equal Employment Opportunity Commission as authorized by title VII of the Civil Rights Act of 1964, as amended (29 U.S.C. 206(d) and 621–634), the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991, including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); non-monetary awards to private citizens; not to exceed $27,500,000, for payments to State and local enforcement agencies for services to the Commission pursuant to title VII of the Civil Rights Act of 1964, as amended, sections 6 and 14 of the Age Discrimination in Employment Act, the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991; $239,740,000; Provided, That the Commission is authorized to make available for official reception and representation expenses not to exceed $2,500 from available funds.

## FEDERAL COMMUNICATIONS COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Communications Commission, as authorized by law, including uniforms and allowances therefor, as authorized by 5 U.S.C. 5901–02; not to exceed $600,000 for land and structure; not to exceed $500,000 for improvement and care of grounds and repair to buildings; not to exceed $4,000 for official reception and representation expenses; purchase (not to exceed sixteen) and hire of motor vehicles; special counsel fees; and services as authorized by 5 U.S.C. 3109; $189,079,000, of which not to exceed $300,000 shall remain available until September 30, 1998, for research and policy studies: Provided, That $152,523,000 of offsetting collections shall be assessed and collected pursuant to section 9 of title I of the Communications Act of 1934, as amended, and shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated shall be reduced as such offsetting collections are received during fiscal year 1997 so as to result in a final fiscal year 1997 appropriation estimated at $36,556,000:

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Provided further, That any offsetting collections received in excess of $152,523,000 in fiscal year 1997 shall remain available until expended, but shall not be available for obligation until October 1, 1997.

## FEDERAL MARITIME COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Maritime Commission as authorized by section 201(d) of the Merchant Marine Act of 1936, as amended (46 App. U.S.C. 1111), including services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles as authorized by 31 U.S.C. 1343(b); and uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–02; $14,000,000: Provided, That not to exceed $2,000 shall be available for official reception and representation expenses.

## FEDERAL TRADE COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Federal Trade Commission, including uniforms or allowances therefor, as authorized by 5 U.S.C. 5901–5902; services as authorized by 5 U.S.C. 3109; hire of passenger motor vehicles; and not to exceed $2,000 for official reception and representation expenses; $85,930,000: Provided, That not to exceed $300,000 shall be available for use to contract with a person or persons for collection services in accordance with the terms of 31 U.S.C. 3718, as amended: Provided further, That notwithstanding any other provision of law, not to exceed $58,905,000 of offsetting collections derived from fees collected for premerger notification filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 (15 U.S.C. 18(a)) shall be retained and used for necessary expenses in this appropriation, and shall remain available until expended: Provided further, That the sum herein appropriated from the General Fund shall be reduced as such offsetting collections are received during fiscal year 1997, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at not more than $27,025,000, to remain available until expended: Provided further, That any fees received in excess of $58,905,000 in fiscal year 1997 shall remain available until expended, but shall not be available for obligation until October 1, 1997: Provided further, That none of the funds made available to the Federal Trade Commission shall be available for obligation for expenses authorized by section 151 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (Public Law 102–242, 105 Stat. 2282–2285).

## GAMBLING IMPACT STUDY COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the National Gambling Impact Study Commission, $4,000,000 to remain available until expended: Provided, That these funds will be available only upon enactment of an authorization for this Commission.

## LEGAL SERVICES CORPORATION

### PAYMENT TO THE LEGAL SERVICES CORPORATION

For payment to the Legal Services Corporation to carry out the purposes of the Legal Services Corporation Act of 1974, as amended, $283,000,000, of which $274,400,000 is for basic field programs and required independent audits; $1,500,000 is for the Office of Inspector General, of which such amounts as may be necessary may be used to conduct additional audits of recipients; and $7,100,000 is for management and administration.

### ADMINISTRATIVE PROVISIONS—LEGAL SERVICES CORPORATION

SEC. 501. (a) CONTINUATION OF COMPETITIVE SELECTION PROCESS.—None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any person or entity except through a competitive selection process conducted in accordance with regulations promulgated by the Corporation in accordance with the criteria set forth in subsections (c), (d), and (e) of section 503 of Public Law 104–134 (110 Stat. 1321–52 et seq.).

(b) INAPPLICABILITY OF NONCOMPETITIVE PROCEDURES.—For purposes of the funding provided in this Act, rights under sections 1007(a)(9) and 1011 of the Legal Services Corporation Act (42 U.S.C. 2996f(a)(9) and 42 U.S.C. 2996j) shall not apply.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 502. (a) CONTINUATION OF REQUIREMENTS AND RESTRICTIONS.—None of the funds appropriated in this Act to the Legal Services Corporation shall be expended for any purpose prohibited or limited by, or contrary to any of the provisions of—

  (1) sections 501, 502, 505, 506, and 507 of Public Law 104–134 (110 Stat. 1321–51 et seq.), and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions as set forth in such sections, except that all references in such sections to 1995 and 1996 shall be deemed to refer instead to 1996 and 1997, respectively; and

  (2) section 504 of Public Law 104–134 (110 Stat. 1321–53 et seq.), and all funds appropriated in this Act to the Legal Services Corporation shall be subject to the same terms and conditions set forth in such section, except that—

  (A) subsection (c) of such section 504 shall not apply;

  (B) paragraph (3) of section 508(b) of Public Law 104–134 (110 Stat. 1321–58) shall apply with respect to the requirements of subsection (a)(13) of such section 504, except that all references in such section 508(b) to the date of enactment shall be deemed to refer to April 26, 1996; and

  (C) subsection (a)(11) of such section 504 shall not be construed to prohibit a recipient from using funds derived from a source other than the Corporation to provide related legal assistance to—

   (i) an alien who has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty; or

   (ii) an alien whose child has been battered or subjected to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, and the alien did not actively participate in such battery or cruelty.

(b) DEFINITIONS.—For purposes of subsection (a)(2)(C):

  (1) The term "battered or subjected to extreme cruelty" has the meaning given such term under regulations issued pursuant to subtitle G of the Violence Against Women Act of 1994 (Pub.L. 103–322; 108 Stat. 1953).

  (2) The term "related legal assistance" means legal assistance directly related to the prevention of, or obtaining of relief from, the battery or cruelty described in such subsection.

SEC. 503. (a) CONTINUATION OF AUDIT REQUIREMENTS.—The requirements of section 509 of Public Law 104–134 (110 Stat. 1321–58 et seq.), other than subsection (l) of such section, shall apply during fiscal year 1997.

  (b) REQUIREMENT OF ANNUAL AUDIT.—An annual audit of each person or entity receiving financial assistance from the Legal Services Corporation under this Act shall be conducted during fiscal year 1997 in accordance with the requirements referred to in subsection (a).


MARINE MAMMAL COMMISSION


SALARIES AND EXPENSES

 For necessary expenses of the Marine Mammal Commission as authorized by title II of Public Law 92–522, as amended, $1,189,000.


NATIONAL BANKRUPTCY REVIEW COMMISSION


SALARIES AND EXPENSES

 For necessary expenses of the National Bankruptcy Review Commission, as authorized by the Bankruptcy Reform Act of 1994, $494,000.


OUNCE OF PREVENTION COUNCIL

 For activities authorized by sections 30101 and 30102 of Public Law 103–322 (including administrative costs), $1,500,000, to remain available until expended, for the Ounce of Prevention Grant Program: Provided, That the Council may accept and use gifts and donations, both real and personal, for the purpose of aiding or facilitating the authorized activities of the Council, of which not to exceed $5,000 may be used for official reception and representation expenses.


SECURITIES AND EXCHANGE COMMISSION

## SALARIES AND EXPENSES

<< 15 USCA § 77f NOTE, 78ee NOTE >>

 For necessary expenses for the Securities and Exchange Commission, including services as authorized by 5 U.S.C. 3109, the rental of space (to include multiple year leases) in the District of Columbia and elsewhere, and not to exceed $3,000 for official reception and representation expenses, $260,400,000, of which not to exceed $10,000 may be used toward funding a permanent secretariat for the International Organization of Securities Commissions, and of which not to exceed $100,000 shall be available for expenses for consultations and meetings hosted by the Commission with foreign governmental and other regulatory officials, members of their delegations, appropriate representatives and staff to exchange views concerning developments relating to securities matters, development and implementation of cooperation agreements concerning securities matters and provision of technical assistance for the development of foreign securities markets, such expenses to include necessary logistic and administrative expenses and the expenses of Commission staff and foreign invitees in attendance at such consultations and meetings including (1) such incidental expenses as meals taken in the course of such attendance, (2) any travel and transportation to or from such meetings, and (3) any other related lodging or subsistence: Provided, That immediately upon enactment of this Act, the rate of fees under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)) shall increase from one-fiftieth of one percentum to one-thirty-third of one percentum, and such increase shall be deposited as an offsetting collection to this appropriation, to remain available until expended, to recover costs of services of the securities registration process: Provided further, That effective January 1, 1997, every national securities association shall pay to the Commission a fee at a rate of one-three-hundredth of one percentum of the aggregate dollar amount of sales transacted by or through any member of such association otherwise than on a national securities exchange (other than bonds, debentures, and other evidences of indebtedness) subject to prompt last sale reporting pursuant to the rules of the Commission or a registered national securities association, excluding any sales for which a fee is paid under section 31 of the Securities Exchange Act of 1934 (15 U.S.C. 78ee), and such increase shall be deposited as an offsetting collection to this appropriation, to remain available until expended, to recover the costs to the Government of the supervision and regulation of securities markets and securities professionals: Provided further, That the fee due from every national securities association shall be paid on or before September 30, 1997, with respect to transactions and sales occurring during the period beginning on January 1, 1997, and ending at the close of August 31, 1997: Provided further, That the total amount appropriated for fiscal year 1997 under this heading shall be reduced as all such offsetting fees are deposited to this appropriation so as to result in a final total fiscal year 1997 appropriation from the General Fund estimated at not more than $37,778,000: Provided further, That any such fees collected in excess of $222,622,000 shall remain available until expended but shall not be available for obligation until October 1, 1997.

## SMALL BUSINESS ADMINISTRATION

## SALARIES AND EXPENSES

 For necessary expenses, not otherwise provided for, of the Small Business Administration as authorized by Public Law 103–403, including hire of passenger motor vehicles as authorized by 31 U.S.C. 1343 and 1344, and not to exceed $3,500 for official reception and representation expenses, $223,547,000, of which $1,000,000 shall only be available for obligation and expenditure for projects jointly developed, implemented and administered with the Minority Business Development Agency of the Department of Commerce: Provided, That the Administrator is authorized to charge fees to cover the cost of publications developed by the Small Business Administration, and certain loan servicing activities: Provided further, That notwithstanding 31 U.S.C. 3302, revenues received from all such activities shall be credited to this account, to be available for carrying out these purposes without further appropriations: Provided further, That $75,500,000 shall be available to fund grants for performance in fiscal year 1997 or fiscal year 1998 as authorized by section 21 of the Small Business Act, as amended. In addition, for expenses not otherwise provided for, of the Small Business Administration, $11,500,000, of which: $3,000,000 shall be available for a grant to continue the WVHTC Foundation outreach program to assist small business development; $7,000,000 shall be available for a grant to the Center for Rural Development in Somerset, Kentucky, for small business and rural technology development assistance; $1,000,000 shall be available for a grant to Indiana State University for the renovation and equipping of a training facility, to assist in creating small business and economic development opportunities; and $500,000 shall be available for a

continuation grant to the Center for Entrepreneurial Opportunity in Greensburg, Pennsylvania, to provide for small business consulting and assistance.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended (5 U.S.C.App. 1–11, as amended by Public Law 100–504), $9,000,000.

## BUSINESS LOANS PROGRAM ACCOUNT

For the cost of direct loans, $1,691,000, and for the cost of guaranteed loans, $182,017,000, as authorized by 15 U.S.C. 631 note, of which $2,317,000, to be available until expended, shall be for the Microloan Guarantee Program, and of which $40,510,000 shall remain available until September 30, 1998: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That during fiscal year 1997, commitments to guarantee loans under section 503 of the Small Business Investment Act of 1958, as amended, shall not exceed the amount of financings authorized under section 20(n)(2)(B) of the Small Business Act, as amended.

In addition, for administrative expenses to carry out the direct and guaranteed loan programs, $94,000,000, which may be transferred to and merged with the appropriations for Salaries and Expenses.

## DISASTER LOANS PROGRAM ACCOUNT

For the cost of direct loans authorized by section 7(b) of the Small Business Act, as amended, $105,432,000, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974.

In addition, for administrative expenses to carry out the direct loan program, $86,500,000, including not to exceed $500,000 for the Office of Inspector General of the Small Business Administration for audits and reviews of disaster loans and the disaster loan program, and said sums may be transferred to and merged with appropriations for Salaries and Expenses and Office of Inspector General.

## SURETY BOND GUARANTEES REVOLVING FUND

For additional capital for the "Surety Bond Guarantees Revolving Fund", authorized by the Small Business Investment Act, as amended, $3,730,000, to remain available without fiscal year limitation as authorized by 15 U.S.C. 631 note.

## ADMINISTRATIVE PROVISION—SMALL BUSINESS ADMINISTRATION

SEC. 504. Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Small Business Administration in this Act may be transferred between such appropriations, but no such appropriation shall be increased by more than 10 percent by any such transfers: Provided, That any transfer pursuant to this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

## STATE JUSTICE INSTITUTE

## SALARIES AND EXPENSES

For necessary expenses of the State Justice Institute, as authorized by the State Justice Institute Authorization Act of 1992 (Public Law 102–572 (106 Stat. 4515–4516)), $6,000,000, to remain available until expended: Provided, That not to exceed $2,500 shall be available for official reception and representation expenses.

## TITLE VI—GENERAL PROVISIONS

SEC. 601. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

SEC. 602. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 603. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available

for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

SEC. 604. If any provision of this Act or the application of such provision to any person or circumstances shall be held invalid, the remainder of the Act and the application of each provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

SEC. 605. (a) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds which (1) creates new programs; (2) eliminates a program, project, or activity; (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (4) relocates an office or employees; (5) reorganizes offices, programs, or activities; or (6) contracts out or privatizes any functions, or activities presently performed by Federal employees; unless the Appropriations Committees of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

(b) None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 1997, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure for activities, programs, or projects through a reprogramming of funds in excess of $500,000 or 10 percent, whichever is less, that (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress; or (3) results from any general savings from a reduction in personnel which would result in a change in existing programs, activities, or projects as approved by Congress; unless the Appropriations Committees of both Houses of Congress are notified fifteen days in advance of such reprogramming of funds.

SEC. 606. None of the funds made available in this Act may be used for the construction, repair (other than emergency repair), overhaul, conversion, or modernization of vessels for the National Oceanic and Atmospheric Administration in shipyards located outside of the United States.

SEC. 607. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 608. None of the funds made available in this Act may be used to implement, administer, or enforce any guidelines of the Equal Employment Opportunity Commission covering harassment based on religion, when it is made known to the Federal entity or official to whom such funds are made available that such guidelines do not differ in any respect from the proposed guidelines published by the Commission on October 1, 1993 (58 Fed.Reg. 51266).

SEC. 609. None of the funds appropriated or otherwise made available by this Act may be obligated or expended to pay for any cost incurred for (1) opening or operating any United States diplomatic or consular post in the Socialist Republic of Vietnam that was not operating on July 11, 1995; (2) expanding any United States diplomatic or consular post in the Socialist Republic of Vietnam that was operating on July 11, 1995; or (3) increasing the total number of personnel assigned to United States diplomatic or consular posts in the Socialist Republic of Vietnam above the levels existing on July 11, 1995, unless the President certifies within 60 days, based upon all information available to the United States Government that the Government of the Socialist Republic of Vietnam is cooperating in full faith with the United States in the following four areas:

(1) Resolving discrepancy cases, live sightings and field activities,

(2) Recovering and repatriating American remains,

(3) Accelerating efforts to provide documents that will help lead to fullest possible accounting of POW/MIA's.

(4) Providing further assistance in implementing trilateral investigations with Laos.

SEC. 610. None of the funds made available by this Act may be used for any United Nations undertaking when it is made known to the Federal official having authority to obligate or expend such funds (1) that the United Nations undertaking is a peacekeeping mission, (2) that such undertaking will involve United States Armed Forces under the command or operational control of a foreign national, and (3) that the President's military advisors have not submitted to the President a recommendation that such involvement is in the national security interests of the United States and the President has not submitted to the Congress such a recommendation.

SEC. 611. None of the funds made available in this Act shall be used to provide the following amenities or personal comforts in the Federal prison system—

(1) in-cell television viewing except for prisoners who are segregated from the general prison population for their own safety;

(2) the viewing of R, X, and NC–17 rated movies, through whatever medium presented;

(3) any instruction (live or through broadcasts) or training equipment for boxing, wrestling, judo, karate, or other martial art, or any bodybuilding or weightlifting equipment of any sort;

(4) possession of in-cell coffee pots, hot plates, or heating elements; or

(5) the use or possession of any electric or electronic musical instrument.

Sec. 612. None of the funds made available in title II for the National Oceanic and Atmospheric Administration (NOAA) under the heading "Fleet Modernization, Shipbuilding and Conversion" may be used to implement sections 603, 604, and 605 of Public Law 102–567: Provided, That NOAA may develop a modernization plan for its fisheries research vessels that takes fully into account opportunities for contracting for fisheries surveys.

SEC. 613. Any costs incurred by a Department or agency funded under this Act resulting from personnel actions taken in response to funding reductions included in this Act shall be absorbed within the total budgetary resources available to such Department or agency: Provided, That the authority to transfer funds between appropriations accounts as may be necessary to carry out this section is provided in addition to authorities included elsewhere in this Act: Provided further, That use of funds to carry out this section shall be treated as a reprogramming of funds under section 605 of this Act and shall not be available for obligation or expenditure except in compliance with the procedures set forth in that section.

SEC. 614. None of the funds made available in this Act to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity.

SEC. 615. Of the funds appropriated in this Act under the heading "OFFICE OF JUSTICE PROGRAMS—STATE AND LOCAL LAW ENFORCEMENT ASSISTANCE" and "Community Oriented Policing Services Program", not more than ninety percent of the amount to be awarded to an entity under the Local Law Enforcement Block Grant and part Q of title I of the Omnibus Crime Control and Safe Streets Act of 1968 shall be made available to such an entity when it is made known to the Federal official having authority to obligate or expend such funds that the entity that employs a public safety officer (as such term is defined in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968) does not provide such a public safety officer who retires or is separated from service due to injury suffered as the direct and proximate result of a personal injury sustained in the line of duty while responding to an emergency situation or a hot pursuit (as such terms are defined by State law) with the same or better level of health insurance benefits that are paid by the entity at the time of retirement or separation.

<< 35 USCA § 287 >>

SEC. 616. LIMITATION ON PATENT INFRINGEMENTS RELATING TO A MEDICAL PRACTITIONER'S PERFORMANCE OF A MEDICAL ACTIVITY.

Section 287 of title 35, United States Code, is amended by adding at the end the following new subsection:

(c)(1) With respect to a medical practitioner's performance of a medical activity that constitutes an infringement under section 271(a) or (b) of this title, the provisions of sections 281, 283, 284, and 285 of this title shall not apply against the medical practitioner or against a related health care entity with respect to such medical activity.

(2) For the purposes of this subsection:

(A) the term "medical activity" means the performance of a medical or surgical procedure on a body, but shall not include (i) the use of a patented machine, manufacture, or composition of matter in violation of such patent, (ii) the practice of a patented use of a composition of matter in violation of such patent, or (iii) the practice of a process in violation of a biotechnology patent.

(B) the term "medical practitioner" means any natural person who is licensed by a State to provide the medical activity described in subsection (c)(1) or who is acting under the direction of such person in the performance of the medical activity.

(C) the term "related health care entity" shall mean an entity with which a medical practitioner has a professional affiliation under which the medical practitioner performs the medical activity, including but not limited to a nursing home, hospital, university, medical school, health maintenance organization, group medical practice, or a medical clinic.

(D) the term "professional affiliation" shall mean staff privileges, medical staff membership, employment or contractual relationship, partnership or ownership interest, academic appointment, or other affiliation under which a medical practitioner provides the medical activity on behalf of, or in association with, the health care entity.

(E) the term "body" shall mean a human body, organ or cadaver, or a nonhuman animal used in medical research or instruction directly relating to the treatment of humans.

(F) the term "patented use of a composition of matter" does not include a claim for a method of performing a medical or surgical procedure on a body that recites the use of a composition of matter where the use of that composition of matter does not directly contribute to achievement of the objective of the claimed method.

(G) the term "State" shall mean any state or territory of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

(3) This subsection does not apply to the activities of any person, or employee or agent of such person (regardless of whether such person is a tax exempt organization under section 501(c) of the Internal Revenue Code), who is engaged in the commercial development, manufacture, sale, importation, or distribution of a machine, manufacture, or composition of matter or the provision of pharmacy or clinical laboratory services (other than clinical laboratory services provided in a physician's office), where such activities are:

(A) directly related to the commercial development, manufacture, sale, importation, or distribution of a machine, manufacture, or composition of matter or the provision of pharmacy or clinical laboratory services (other than clinical laboratory services provided in a physician's office), and

(B) regulated under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, or the Clinical Laboratories Improvement Act.

(4) This subsection shall not apply to any patent issued before the date of enactment of this subsection.

SEC. 617. Effective with the enactment of this Act and in any fiscal year hereafter, section 8 of Public Law 96–132 is hereby repealed.

<< 46 App. USCA § 1273a NOTE >>

SEC. 618. (a) IN GENERAL.—The Secretary may issue a guarantee or a commitment to guarantee obligations under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.), upon such terms as the Secretary may prescribe, to assist in the reactivation and modernization of any shipyard in the United States that is closed on the date of the enactment of this Act, if the Secretary finds that—

(1) the closed shipyard historically built military vessels and responsible entities now seek to reopen it as an internationally competitive commercial shipyard;

(2)(A) the closed shipyard has been designated by the President as a public-private partnership project; or

(B) has a reuse plan approved by the Navy in which commercial shipbuilding and repair are primary activities and has a revolving economic conversion fund approved by the Department of Defense; and

(3) the State in which the shipyard is located, and each other involved State, or a State-chartered agency, is making a significant financial investment in the overall cost of reactivation and modernization as its contribution to the reactivation and modernization project, in addition to the funds required by subsection (d)(2) of this section.

(b) WAIVERS.—Notwithstanding any other provision of title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.), the Secretary shall not apply the requirements of section 1104A(d) of that Act when issuing a guarantee or a commitment to guarantee an obligation under this section.

(c) CONDITIONS.—The Secretary shall impose such conditions on the issuance of a guarantee or a commitment to guarantee under this section as are necessary to protect the interests of the United States from the risk of a default. The Secretary shall consider the interdependency of such shipyard modernization and reactivation projects and related vessel loan guarantee requests pending under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.) before issuing a guarantee or a commitment to guarantee under this section.

(d) FUNDING PROVISIONS.—

  (1) The Secretary may not guarantee or commit to guarantee obligations under this section that exceed $50,000,000 in the aggregate.

  (2) The amount of appropriated funds required by the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.) in advance of the Secretary's issuance of a guarantee or a commitment to guarantee under this section shall be provided by the State in which the shipyard is located, and other involved States, or by a State-chartered agency, and deposited by the Secretary in the financing account established under the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.) for loan guarantees issued by the Secretary under title XI of the Merchant Marine Act of 1936 (46 App.U.S.C. 1271 et seq.). No federally appropriated funds shall be available for this purpose. The funds deposited into that financing account shall be held and applied by the Secretary in accordance with the provisions of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.), except that, unless the Secretary shall have earlier paid an obligee or been required to pay an obligee pursuant to the terms of a loan guarantee, the funds deposited in that financing account shall be returned, upon the expiration of the Secretary's loan guarantee, to the State, States, or State-chartered agency which originally provided the funds to the Secretary.

  (3) Notwithstanding the provisions of any other law or regulation, the cost (as that term is defined by the Federal Credit Reform Act of 1990 (2 U.S.C. 661a et seq.)) of a guarantee or commitment to guarantee issued under this section—

    (A) may only be determined with reference to the merits of the specific closed shipyard reactivation project which is the subject of that guarantee or commitment to guarantee, without reference to any other project, type of project, or averaged risk; and

    (B) may not be used in determining the cost of any other project, type of project, or averaged risk applicable to guarantees or commitments to guarantee issued under title XI of the Merchant Marine Act, 1936 (46 App.U.S.C. 1271 et seq.).

(e) SUNSET.—No commitment to guarantee obligations under this section shall be issued by the Secretary after one year after the date of enactment of this section.

(f) DEFINITION.—As used in this section, the term "Secretary" means the Secretary of Transportation.

## TITLE VII—RESCISSIONS

## DEPARTMENT OF JUSTICE

## GENERAL ADMINISTRATION

## WORKING CAPITAL FUND

### (RESCISSION)

Of the unobligated balances available under this heading on October 31, 1996, $30,000,000 are rescinded.

## IMMIGRATION AND NATURALIZATION SERVICE

## IMMIGRATION EMERGENCY FUND

### (RESCISSION)

Of the unobligated balances available under this heading $34,779,000 are rescinded.

## TITLE VIII—FISCAL YEAR 1996 SUPPLEMENTAL AND RESCISSION

## DEPARTMENT OF JUSTICE

## FEDERAL PRISON SYSTEM

### SALARIES AND EXPENSES

In addition to funds made available under this heading, $40,000,000, which shall remain available until September 30, 1997: Provided, That these funds shall be available upon enactment of this Act: Provided further, That these funds shall only be available if enacted by September 30, 1996.

### (RESCISSION)

Of the unobligated balances made available under this heading until September 30, 1996, $40,000,000 are rescinded: Provided, That these funds shall only be available for rescission if enacted by September 30, 1996.

### TITLE IX—SUPPLEMENTAL APPROPRIATIONS

### DEPARTMENT OF COMMERCE

### ECONOMIC DEVELOPMENT ADMINISTRATION

### ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

For an additional amount for "Economic Development Assistance Programs" for emergency infrastructure expenses resulting from Hurricane Fran and Hurricane Hortense and other natural disasters, $25,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### RELATED AGENCY

### SMALL BUSINESS ADMINISTRATION

### DISASTER LOANS PROGRAM ACCOUNT

For an additional amount for "Disaster Loans Program Account" for emergency expenses resulting from Hurricanes Fran and Hortense and other disasters, $113,000,000 for the cost of direct loans, to remain available until expended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974; and for administrative expenses to carry out the disaster loan program, $22,000,000, to remain available until expended, which may be transferred to and merged with "Salaries and Expenses": Provided further, That both amounts are hereby designated by Congress as emergency requirements pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

This Act may be cited as the "Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997".

(b) For programs, projects or activities in the Department of Defense Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

### AN ACT

Making appropriations for the Department of Defense for the fiscal year ending September 30, 1997, and for other purposes

### TITLE I

### MILITARY PERSONNEL

### MILITARY PERSONNEL, ARMY

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Army on active duty (except members of reserve components provided for elsewhere), cadets, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $20,633,998,000.

## MILITARY PERSONNEL, NAVY

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Navy on active duty (except members of the Reserve provided for elsewhere), midshipmen, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $16,986,976,000.

## MILITARY PERSONNEL, MARINE CORPS

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Marine Corps on active duty (except members of the Reserve provided for elsewhere); and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $6,111,728,000.

## MILITARY PERSONNEL, AIR FORCE

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Air Force on active duty (except members of reserve components provided for elsewhere), cadets, and aviation cadets; and for payments pursuant to section 156 of Public Law 97–377, as amended (42 U.S.C. 402 note), to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), and to the Department of Defense Military Retirement Fund; $17,069,490,000.

## RESERVE PERSONNEL, ARMY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Army Reserve on active duty under sections 10211, 10302, and 3038 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty or other duty, and for members of the Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $2,073,479,000.

## RESERVE PERSONNEL, NAVY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Navy Reserve on active duty under section 10211 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty, and for members of the Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $1,405,606,000.

## RESERVE PERSONNEL, MARINE CORPS

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Marine Corps Reserve on active duty under section 10211 of title 10, United States Code, or while serving on active duty under section 12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty, and for members of the Marine Corps platoon leaders class, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $388,643,000.

## RESERVE PERSONNEL, AIR FORCE

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Air Force Reserve on active duty under sections 10211, 10305, and 8038 of title 10, United States Code, or while serving on active duty under section

12301(d) of title 10, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing reserve training, or while performing drills or equivalent duty or other duty, and for members of the Air Reserve Officers' Training Corps, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $783,697,000.

### NATIONAL GUARD PERSONNEL, ARMY

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Army National Guard while on duty under section 10211, 10302, or 12402 of title 10 or section 708 of title 32, United States Code, or while serving on duty under section 12301(d) of title 10 or section 502(f) of title 32, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing training, or while performing drills or equivalent duty or other duty, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $3,266,393,000.

### NATIONAL GUARD PERSONNEL, AIR FORCE

For pay, allowances, clothing, subsistence, gratuities, travel, and related expenses for personnel of the Air National Guard on duty under section 10211, 10305, or 12402 of title 10 or section 708 of title 32, United States Code, or while serving on duty under section 12301(d) of title 10 or section 502(f) of title 32, United States Code, in connection with performing duty specified in section 12310(a) of title 10, United States Code, or while undergoing training, or while performing drills or equivalent duty or other duty, and expenses authorized by section 16131 of title 10, United States Code; and for payments to the Department of Defense Military Retirement Fund; $1,296,490,000.

### TITLE II

### OPERATION AND MAINTENANCE

### OPERATION AND MAINTENANCE, ARMY

### (INCLUDING TRANSFER OF FUNDS)

### << 43 USCA § 1471g >>

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Army, as authorized by law; and not to exceed $11,437,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Army, and payments may be made on his certificate of necessity for confidential military purposes; $17,519,340,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund: Provided, That during the current fiscal year and hereafter, funds appropriated under this paragraph may be made available to the Department of the Interior to support the Memorial Day and Fourth of July ceremonies and activities in the National Capital Region: Provided further, That of the funds appropriated in this paragraph, not less than $300,000,000 shall be made available only for conventional ammunition care and maintenance.

### OPERATION AND MAINTENANCE, NAVY

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Navy and the Marine Corps, as authorized by law; and not to exceed $3,995,000, can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Navy, and payments may be made on his certificate of necessity for confidential military purposes; $20,061,961,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund.

### OPERATION AND MAINTENANCE, MARINE CORPS

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Marine Corps, as authorized by law; $2,254,119,000.

## OPERATION AND MAINTENANCE, AIR FORCE

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of the Air Force, as authorized by law; and not to exceed $8,362,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of the Air Force, and payments may be made on his certificate of necessity for confidential military purposes; $17,263,193,000 and, in addition, $50,000,000 shall be derived by transfer from the National Defense Stockpile Transaction Fund.

## OPERATION AND MAINTENANCE, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For expenses, not otherwise provided for, necessary for the operation and maintenance of activities and agencies of the Department of Defense (other than the military departments), as authorized by law; $10,044,200,000, of which not to exceed $25,000,000 may be available for the CINC initiative fund account; and of which not to exceed $28,500,000 can be used for emergencies and extraordinary expenses, to be expended on the approval or authority of the Secretary of Defense, and payments may be made on his certificate of necessity for confidential military purposes: Provided, That of the funds appropriated under this heading, $20,000,000 shall be made available only for use in federally owned education facilities located on military installations for the purpose of transferring title of such facilities to the local education agency: Provided further, That of the funds appropriated under this heading, $1,000,000 is available, by grant or other transfer, to the Harnett County School Board, Lillington, North Carolina, for use by the school board for the education of dependents of members of the Armed Forces and employees of the Department of Defense located at Fort Bragg and Pope Air Force Base, North Carolina.

## OPERATION AND MAINTENANCE, ARMY RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Army Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $1,119,436,000.

## OPERATION AND MAINTENANCE, NAVY RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Navy Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $886,027,000.

## OPERATION AND MAINTENANCE, MARINE CORPS RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Marine Corps Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $109,667,000.

## OPERATION AND MAINTENANCE, AIR FORCE RESERVE

For expenses, not otherwise provided for, necessary for the operation and maintenance, including training, organization, and administration, of the Air Force Reserve; repair of facilities and equipment; hire of passenger motor vehicles; travel and transportation; care of the dead; recruiting; procurement of services, supplies, and equipment; and communications; $1,496,553,000.

## OPERATION AND MAINTENANCE, ARMY NATIONAL GUARD

For expenses of training, organizing, and administering the Army National Guard, including medical and hospital treatment and related expenses in non-Federal hospitals; maintenance, operation, and repairs to structures and facilities; hire of passenger motor vehicles; personnel services in the National Guard Bureau; travel expenses (other than mileage), as authorized by law

for Army personnel on active duty, for Army National Guard division, regimental, and battalion commanders while inspecting units in compliance with National Guard Bureau regulations when specifically authorized by the Chief, National Guard Bureau; supplying and equipping the Army National Guard as authorized by law; and expenses of repair, modification, maintenance, and issue of supplies and equipment (including aircraft); $2,254,477,000.

## OPERATION AND MAINTENANCE, AIR NATIONAL GUARD

For operation and maintenance of the Air National Guard, including medical and hospital treatment and related expenses in non-Federal hospitals; maintenance, operation, repair, and other necessary expenses of facilities for the training and administration of the Air National Guard, including repair of facilities, maintenance, operation, and modification of aircraft; transportation of things, hire of passenger motor vehicles; supplies, materials, and equipment, as authorized by law for the Air National Guard; and expenses incident to the maintenance and use of supplies, materials, and equipment, including such as may be furnished from stocks under the control of agencies of the Department of Defense; travel expenses (other than mileage) on the same basis as authorized by law for Air National Guard personnel on active Federal duty, for Air National Guard commanders while inspecting units in compliance with National Guard Bureau regulations when specifically authorized by the Chief, National Guard Bureau; $2,716,379,000.

## OVERSEAS CONTINGENCY OPERATIONS TRANSFER FUND

### (INCLUDING TRANSFER OF FUNDS)

For expenses directly relating to Overseas Contingency Operations by United States military forces; $1,140,157,000: Provided, That the Secretary of Defense may transfer these funds only to operation and maintenance accounts within this title: Provided further, That the funds transferred shall be merged with and shall be available for the same purposes and for the same time period, as the appropriation to which transferred: Provided further, That the transfer authority provided in this paragraph is in addition to any other transfer authority contained elsewhere in this Act.

## UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

For salaries and expenses necessary for the United States Court of Appeals for the Armed Forces; $6,797,000, of which not to exceed $2,500 can be used for official representation purposes.

## ENVIRONMENTAL RESTORATION, ARMY

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Army, $339,109,000, to remain available until transferred: Provided, That the Secretary of the Army shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Army, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Army, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: Provided further, That not more than twenty-five percent of funds provided under this heading may be obligated for environmental remediation by the Corps of Engineers under total environmental remediation contracts.

## ENVIRONMENTAL RESTORATION, NAVY

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Navy, $287,788,000, to remain available until transferred: Provided, That the Secretary of the Navy shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Navy, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Navy, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## ENVIRONMENTAL RESTORATION, AIR FORCE

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Air Force, $394,010,000, to remain available until transferred: Provided, That the Secretary of the Air Force shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of the Air Force, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Air Force, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## ENVIRONMENTAL RESTORATION, DEFENSE–WIDE

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Defense, $36,722,000, to remain available until transferred: Provided, That the Secretary of Defense shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris of the Department of Defense, or for similar purposes, transfer the funds made available by this appropriation to other appropriations made available to the Department of Defense, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## ENVIRONMENTAL RESTORATION, FORMERLY USED DEFENSE SITES

### (INCLUDING TRANSFER OF FUNDS)

For the Department of the Army, $256,387,000, to remain available until transferred: Provided, That the Secretary of the Army shall, upon determining that such funds are required for environmental restoration, reduction and recycling of hazardous waste, removal of unsafe buildings and debris at sites formerly used by the Department of Defense, transfer the funds made available by this appropriation to other appropriations made available to the Department of the Army, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred: Provided further, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation.

## OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID

For expenses relating to the Overseas Humanitarian, Disaster, and Civic Aid programs of the Department of Defense (consisting of the programs provided under sections 401, 402, 404, 2547, and 2551 of title 10, United States Code); $49,000,000, to remain available until September 30, 1998.

## FORMER SOVIET UNION THREAT REDUCTION

For assistance to the republics of the former Soviet Union, including assistance provided by contract or by grants, for facilitating the elimination and the safe and secure transportation and storage of nuclear, chemical and other weapons; for establishing programs to prevent the proliferation of weapons, weapons components, and weapon-related technology and expertise; for programs relating to the training and support of defense and military personnel for demilitarization and protection of weapons, weapons components and weapons technology and expertise; $327,900,000, to remain available until expended.

## QUALITY OF LIFE ENHANCEMENTS, DEFENSE

For expenses, not otherwise provided for, resulting from unfunded shortfalls in the repair and maintenance of real property of the Department of Defense (including military housing and barracks); $600,000,000, for the maintenance of real property

of the Department of Defense (including minor construction and major maintenance and repair), which shall remain available for obligation until September 30, 1998, as follows:

Army, $149,000,000;

Navy, $108,000,000;

Marine Corps, $45,000,000;

Air Force, $108,000,000;

Army Reserve, $18,000,000;

Navy Reserve, $18,000,000;

Marine Corps Reserve, $9,000,000;

Air Force Reserve, $15,000,000;

Army National Guard, $86,000,000; and

Air National Guard, $44,000,000.

## TITLE III

## PROCUREMENT

### AIRCRAFT PROCUREMENT, ARMY

For construction, procurement, production, modification, and modernization of aircraft, equipment, including ordnance, ground handling equipment, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,348,434,000, to remain available for obligation until September 30, 1999.

### MISSILE PROCUREMENT, ARMY

For construction, procurement, production, modification, and modernization of missiles, equipment, including ordnance, ground handling equipment, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,041,867,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY

For construction, procurement, production, and modification of weapons and tracked combat vehicles, equipment, including ordnance, spare parts, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,470,286,000, to remain available for obligation until September 30, 1999: Provided, That of the funds appropriated in this paragraph and notwithstanding the provisions of title 31, United States Code, Section 1502(a), not to exceed $33,100,000 may be obligated for future year V903 diesel engine requirements to maintain the industrial base.

### PROCUREMENT OF AMMUNITION, ARMY

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment,

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $1,127,149,000, to remain available for obligation until September 30, 1999.

### OTHER PROCUREMENT, ARMY

For construction, procurement, production, and modification of vehicles, including tactical, support, and non-tracked combat vehicles; the purchase of not to exceed 14 passenger motor vehicles for replacement only; communications and electronic equipment; other support equipment; spare parts, ordnance, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $3,172,485,000, to remain available for obligation until September 30, 1999: Provided, That of the funds appropriated in this paragraph and notwithstanding the provisions of title 31, United States Code, Section 1502(a), not to exceed $2,400,000 may be obligated for future year V903 diesel engine requirements to maintain the industrial base.

### AIRCRAFT PROCUREMENT, NAVY

For construction, procurement, production, modification, and modernization of aircraft, equipment, including ordnance, spare parts, and accessories therefor; specialized equipment; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $7,027,010,000, to remain available for obligation until September 30, 1999.

### WEAPONS PROCUREMENT, NAVY

For construction, procurement, production, modification, and modernization of missiles, torpedoes, other weapons, and related support equipment including spare parts, and accessories therefor; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $1,389,913,000, to remain available for obligation until September 30, 1999: Provided, That in addition to the foregoing purposes, the funds appropriated above under this heading shall be available to liquidate reported deficiencies in appropriations provided under this heading in prior Department of Defense appropriations acts, to the extent such deficiencies cannot otherwise be liquidated pursuant to 31 U.S.C. 1553(b).

### PROCUREMENT OF AMMUNITION, NAVY AND MARINE CORPS

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $289,695,000, to remain available for obligation until September 30, 1999.

### SHIPBUILDING AND CONVERSION, NAVY

For expenses necessary for the construction, acquisition, or conversion of vessels as authorized by law, including armor and armament thereof, plant equipment, appliances, and machine tools and installation thereof in public and private plants; reserve plant and Government and contractor-owned equipment layaway; procurement of critical, long leadtime components and designs for vessels to be constructed or converted in the future; and expansion of public and private plants, including land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title, as follows:

For continuation of the SSN–21 attack submarine program, $649,071,000;

NSSN–1 (AP), $296,186,000;

NSSN–2 (AP), $501,000,000;

CVN Refuelings, $237,029,000;

DDG–51 destroyer program, $3,609,072,000;

Oceanographic ship program, $54,400,000;

Oceanographic ship SWATH, $45,000,000;

LCAC landing craft air cushion program (AP–CY), $3,000,000; and

For craft, outfitting, post delivery, conversions, and first destination transportation, $218,907,000;

In all: $5,613,665,000, to remain available for obligation until September 30, 2001: Provided, That additional obligations may be incurred after September 30, 2001, for engineering services, tests, evaluations, and other such budgeted work that must be performed in the final stage of ship construction: Provided further, That none of the funds herein provided for the construction or conversion of any naval vessel to be constructed in shipyards in the United States shall be expended in foreign facilities for the construction of major components of such vessel: Provided further, That none of the funds herein provided shall be used for the construction of any naval vessel in foreign shipyards.

## OTHER PROCUREMENT, NAVY

For procurement, production, and modernization of support equipment and materials not otherwise provided for, Navy ordnance (except ordnance for new aircraft, new ships, and ships authorized for conversion); expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $3,067,944,000, to remain available for obligation until September 30, 1999.

## PROCUREMENT, MARINE CORPS

For expenses necessary for the procurement, manufacture, and modification of missiles, armament, military equipment, spare parts, and accessories therefor; plant equipment, appliances, and machine tools, and installation thereof in public and private plants; reserve plant and Government and contractor-owned equipment layaway; vehicles for the Marine Corps, including the purchase of not to exceed 88 passenger motor vehicles for replacement only; and expansion of public and private plants, including land necessary therefor, and such lands and interests therein, may be acquired and construction prosecuted thereon prior to approval of title; $569,073,000, to remain available for obligation until September 30, 1999.

## AIRCRAFT PROCUREMENT, AIR FORCE

For construction, procurement, and modification of aircraft and equipment, including armor and armament, specialized ground handling equipment, and training devices, spare parts, and accessories therefor; specialized equipment; expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes including rents and transportation of things; $6,404,980,000, to remain available for obligation until September 30, 1999.

## MISSILE PROCUREMENT, AIR FORCE

For construction, procurement, and modification of missiles, spacecraft, rockets, and related equipment, including spare parts and accessories therefor, ground handling equipment, and training devices; expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes including rents and transportation of things; $2,297,145,000, to remain available for obligation until September 30, 1999.

## PROCUREMENT OF AMMUNITION, AIR FORCE

For construction, procurement, production, and modification of ammunition, and accessories therefor; specialized equipment and training devices; expansion of public and private plants, including ammunition facilities authorized by section 2854, title 10, United States Code, and the land necessary therefor, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; and other expenses necessary for the foregoing purposes; $293,153,000, to remain available for obligation until September 30, 1999.

### OTHER PROCUREMENT, AIR FORCE

For procurement and modification of equipment (including ground guidance and electronic control equipment, and ground electronic and communication equipment), and supplies, materials, and spare parts therefor, not otherwise provided for; the purchase of not to exceed 506 passenger motor vehicles for replacement only; the purchase of 1 vehicle required for physical security of personnel, notwithstanding price limitations applicable to passenger vehicles but not to exceed $287,000 per vehicle; and expansion of public and private plants, Government-owned equipment and installation thereof in such plants, erection of structures, and acquisition of land, for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon, prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; $5,944,680,000, to remain available for obligation until September 30, 1999.

### PROCUREMENT, DEFENSE–WIDE

For expenses of activities and agencies of the Department of Defense (other than the military departments) necessary for procurement, production, and modification of equipment, supplies, materials, and spare parts therefor, not otherwise provided for; the purchase of not to exceed 389 passenger motor vehicles for replacement only; expansion of public and private plants, equipment, and installation thereof in such plants, erection of structures, and acquisition of land for the foregoing purposes, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; reserve plant and Government and contractor-owned equipment layaway; $1,978,005,000, to remain available for obligation until September 30, 1999.

### NATIONAL GUARD AND RESERVE EQUIPMENT

For procurement of aircraft, missiles, tracked combat vehicles, ammunition, other weapons, and other procurement for the reserve components of the Armed Forces; $780,000,000, to remain available for obligation until September 30, 1999: Provided, That the Chiefs of the Reserve and National Guard components shall, not later than 30 days after the enactment of this Act, individually submit to the congressional defense committees the modernization priority assessment for their respective Reserve or National Guard component.

### TITLE IV

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, ARMY

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $5,062,763,000, to remain available for obligation until September 30, 1998.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, NAVY

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $8,208,946,000, to remain available for obligation until September 30, 1998: Provided, That funds appropriated in this paragraph which are available for the V–22 may be used to meet unique requirements of the Special Operations Forces.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, AIR FORCE

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For expenses necessary for basic and applied scientific research, development, test and evaluation, including maintenance, rehabilitation, lease, and operation of facilities and equipment; $14,499,606,000, to remain available for obligation until September 30, 1998: Provided, That not less than $1,000,000 of the funds appropriated in this paragraph shall be made available only to assess the budgetary, cost, technical, operational, training, and safety issues associated with a decision to eliminate development of the F–22B two-seat training variant of the F–22 advanced tactical fighter: Provided further, That the assessment required by the preceding proviso shall be submitted, in classified and unclassified versions, by the Secretary of the Air Force to the congressional defense committees not later than February 15, 1997: Provided further, That of the funds made available in this paragraph, $10,000,000 shall be only for development of reusable launch vehicle technologies.

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, DEFENSE–WIDE

For expenses of activities and agencies of the Department of Defense (other than the military departments), necessary for basic and applied scientific research, development, test and evaluation; advanced research projects as may be designated and determined by the Secretary of Defense, pursuant to law; maintenance, rehabilitation, lease, and operation of facilities and equipment; $9,362,800,000, to remain available for obligation until September 30, 1998: Provided, That not less than $304,171,000 of the funds appropriated in this paragraph shall be made available only for the Sea–Based Wide Area Defense (Navy Upper–Tier) program.

### DEVELOPMENTAL TEST AND EVALUATION, DEFENSE

For expenses, not otherwise provided for, of independent activities of the Director, Test and Evaluation in the direction and supervision of developmental test and evaluation, including performance and joint developmental testing and evaluation; and administrative expenses in connection therewith; $282,038,000, to remain available for obligation until September 30, 1998.

### OPERATIONAL TEST AND EVALUATION, DEFENSE

For expenses, not otherwise provided for, necessary for the independent activities of the Director, Operational Test and Evaluation in the direction and supervision of operational test and evaluation, including initial operational test and evaluation which is conducted prior to, and in support of, production decisions; joint operational testing and evaluation; and administrative expenses in connection therewith; $24,968,000, to remain available for obligation until September 30, 1998.

### TITLE V—REVOLVING AND MANAGEMENT FUNDS

### DEFENSE BUSINESS OPERATIONS FUND

For the Defense Business Operations Fund; $947,900,000.

### NATIONAL DEFENSE SEALIFT FUND

For National Defense Sealift Fund programs, projects, and activities, and for expenses of the National Defense Reserve Fleet, as established by section 11 of the Merchant Ship Sales Act of 1946 (50 U.S.C.App. 1744); $1,428,002,000, to remain available until expended: Provided, That none of the funds provided in this paragraph shall be used to award a new contract that provides for the acquisition of any of the following major components unless such components are manufactured in the United States: auxiliary equipment, including pumps, for all ship-board services; propulsion system components (that is; engines, reduction gears, and propellers); shipboard cranes; and spreaders for shipboard cranes: Provided further, That the exercise of an option in a contract awarded through the obligation of previously appropriated funds shall not be considered to be the award of a new contract: Provided further, That the Secretary of the military department responsible for such procurement may waive these restrictions on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate, that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes.

### TITLE VI—OTHER DEPARTMENT OF DEFENSE PROGRAMS

### DEFENSE HEALTH PROGRAM

For expenses, not otherwise provided for, for medical and health care programs of the Department of Defense, as authorized by law; $10,207,308,000, of which $9,937,838,000 shall be for Operation and maintenance, of which not to exceed three percent

shall remain available until September 30, 1998; and of which $269,470,000, to remain available for obligation until September 30, 1999, shall be for Procurement: Provided, That of the funds appropriated under this heading, $14,500,000 shall be made available for obtaining emergency communications services for members of the Armed Forces and their families from the American National Red Cross: Provided further, That notwithstanding any other provision of law, of the funds provided under this heading, the Secretary of Defense is directed to use and obligate, within thirty days of enactment of this Act, not less than $3,400,000 only to permit private sector or non-Federal physicians who have used and will use the antibacterial treatment method based upon the excretion of dead and decaying spherical bacteria to work in conjunction with the Walter Reed Army Medical Center on a treatment protocol and related studies for Desert Storm Syndrome affected veterans.

### CHEMICAL AGENTS AND MUNITIONS DESTRUCTION, DEFENSE

 For expenses, not otherwise provided for, necessary for the destruction of the United States stockpile of lethal chemical agents and munitions in accordance with the provisions of section 1412 of the Department of Defense Authorization Act, 1986 (50 U.S.C. 1521), and for the destruction of other chemical warfare materials that are not in the chemical weapon stockpile, $758,447,000, of which $478,947,000 shall be for Operation and maintenance, $191,200,000 shall be for Procurement to remain available until September 30, 1999, and $88,300,000 shall be for Research, development, test and evaluation to remain available until September 30, 1998: Provided, That of the funds made available under this heading, $1,000,000 shall be available until expended only for a Johnston Atoll off-island leave program: Provided further, That notwithstanding any other provision of law, the Secretaries concerned may, pursuant to uniform regulations prescribe travel and transportation allowances for travel by participants in the off-island leave program.

### DRUG INTERDICTION AND COUNTER–DRUG ACTIVITIES, DEFENSE

### (INCLUDING TRANSFER OF FUNDS)

 For drug interdiction and counter-drug activities of the Department of Defense, for transfer to appropriations available to the Department of Defense for military personnel of the reserve components serving under the provisions of title 10 and title 32, United States Code; for Operation and maintenance; for Procurement; and for Research, development, test and evaluation; $807,800,000: Provided, That the funds appropriated by this paragraph shall be available for obligation for the same time period and for the same purpose as the appropriation to which transferred: Provided further, That the transfer authority provided in this paragraph is in addition to any transfer authority contained elsewhere in this Act.

### OFFICE OF THE INSPECTOR GENERAL

 For expenses and activities of the Office of the Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended; $139,157,000, of which $137,157,000 shall be for Operation and maintenance, of which not to exceed $500,000 is available for emergencies and extraordinary expenses to be expended on the approval or authority of the Inspector General, and payments may be made on his certificate of necessity for confidential military purposes; and of which $2,000,000, to remain available until September 30, 1999, shall be for Procurement.

### TITLE VII

### RELATED AGENCIES

### CENTRAL INTELLIGENCE AGENCY RETIREMENT AND DISABILITY SYSTEM FUND

 For payment to the Central Intelligence Agency Retirement and Disability System Fund, to maintain proper funding level for continuing the operation of the Central Intelligence Agency Retirement and Disability System; $196,400,000.

### INTELLIGENCE COMMUNITY MANAGEMENT ACCOUNT

 For necessary expenses of the Intelligence Community Management Account; $129,164,000: Provided, That of the funds appropriated under this heading, $27,000,000 shall be transferred to the Department of Justice for the National Drug Intelligence Center to support the Department of Defense's counterdrug monitoring and detection responsibilities.

### PAYMENT TO KAHO'OLAWE ISLAND CONVEYANCE,
### REMEDIATION, AND ENVIRONMENTAL RESTORATION FUND

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For payment to Kaho'olawe Island Conveyance, Remediation, and Environmental Restoration Fund, as authorized by law; $10,000,000, to remain available until expended.

## NATIONAL SECURITY EDUCATION TRUST FUND

For the purposes of title VIII of Public Law 102–183, $5,100,000, to be derived from the National Security Education Trust Fund, to remain available until expended.

## TITLE VIII

### GENERAL PROVISIONS

SEC. 8001. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not authorized by the Congress.

<< 10 USCA § 1584 NOTE >>

SEC. 8002. During the current fiscal year, provisions of law prohibiting the payment of compensation to, or employment of, any person not a citizen of the United States shall not apply to personnel of the Department of Defense: Provided, That salary increases granted to direct and indirect hire foreign national employees of the Department of Defense funded by this Act shall not be at a rate in excess of the percentage increase authorized by law for civilian employees of the Department of Defense whose pay is computed under the provisions of section 5332 of title 5, United States Code, or at a rate in excess of the percentage increase provided by the appropriate host nation to its own employees, whichever is higher: Provided further, That this section shall not apply to Department of Defense foreign service national employees serving at United States diplomatic missions whose pay is set by the Department of State under the Foreign Service Act of 1980: Provided further, That the limitations of this provision shall not apply to foreign national employees of the Department of Defense in the Republic of Turkey.

SEC. 8003. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year, unless expressly so provided herein.

SEC. 8004. No more than 20 per centum of the appropriations in this Act which are limited for obligation during the current fiscal year shall be obligated during the last two months of the fiscal year: Provided, That this section shall not apply to obligations for support of active duty training of reserve components or summer camp training of the Reserve Officers' Training Corps.

### (TRANSFER OF FUNDS)

SEC. 8005. Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $2,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: Provided, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by Congress: Provided further, That the Secretary of Defense shall notify the Congress promptly of all transfers made pursuant to this authority or any other authority in this Act: Provided further, That no part of the funds in this Act shall be available to prepare or present a request to the Committees on Appropriations for reprogramming of funds, unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which reprogramming is requested has been denied by the Congress.

### (TRANSFER OF FUNDS)

SEC. 8006. During the current fiscal year, cash balances in working capital funds of the Department of Defense established pursuant to section 2208 of title 10, United States Code, may be maintained in only such amounts as are necessary at any time for cash disbursements to be made from such funds: Provided, That transfers may be made between such funds and the "Foreign Currency Fluctuations, Defense" and "Operation and Maintenance" appropriation accounts in such amounts as may be determined by the Secretary of Defense, with the approval of the Office of Management and Budget, except that such transfers

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

may not be made unless the Secretary of Defense has notified the Congress of the proposed transfer. Except in amounts equal to the amounts appropriated to working capital funds in this Act, no obligations may be made against a working capital fund to procure or increase the value of war reserve material inventory, unless the Secretary of Defense has notified the Congress prior to any such obligation.

SEC. 8007. Funds appropriated by this Act may not be used to initiate a special access program without prior notification 30 calendar days in session in advance to the congressional defense committees.

SEC. 8008. None of the funds contained in this Act available for the Civilian Health and Medical Program of the Uniformed Services shall be available for payments to physicians and other non-institutional health care providers in excess of the amounts allowed in fiscal year 1996 for similar services, except that: (a) for services for which the Secretary of Defense determines an increase is justified by economic circumstances, the allowable amounts may be increased in accordance with appropriate economic index data similar to that used pursuant to title XVIII of the Social Security Act; and (b) for services the Secretary determines are overpriced based on allowable payments under title XVIII of the Social Security Act, the allowable amounts shall be reduced by not more than 15 percent (except that the reduction may be waived if the Secretary determines that it would impair adequate access to health care services for beneficiaries). The Secretary shall solicit public comment prior to promulgating regulations to implement this section. Such regulations shall include a limitation, similar to that used under title XVIII of the Social Security Act, on the extent to which a provider may bill a beneficiary an actual charge in excess of the allowable amount.

SEC. 8009. None of the funds provided in this Act shall be available to initiate (1) a multiyear contract that employs economic order quantity procurement in excess of $20,000,000 in any one year of the contract or that includes an unfunded contingent liability in excess of $20,000,000, or (2) a contract for advance procurement leading to a multiyear contract that employs economic order quantity procurement in excess of $20,000,000 in any one year, unless the congressional defense committees have been notified at least thirty days in advance of the proposed contract award: Provided, That no part of any appropriation contained in this Act shall be available to initiate a multiyear contract for which the economic order quantity advance procurement is not funded at least to the limits of the Government's liability: Provided further, That no part of any appropriation contained in this Act shall be available to initiate multiyear procurement contracts for any systems or component thereof if the value of the multiyear contract would exceed $500,000,000 unless specifically provided in this Act: Provided further, That no multiyear procurement contract can be terminated without 10–day prior notification to the congressional defense committees: Provided further, That the execution of multiyear authority shall require the use of a present value analysis to determine lowest cost compared to an annual procurement: Provided further, That notwithstanding Section 8010 of Public Law 104–61, funds appropriated for the DDG–51 destroyer program in Public Law 104–61 may be used to initiate a multiyear contract for the Arleigh Burke class destroyer program.

Funds appropriated in title III of this Act may be used for multiyear procurement contracts as follows:

Javelin missiles;

Army Tactical Missile System (ATACMS);

MK19–3 grenade machine guns;

M16A2 rifles;

M249 Squad Automatic Weapons;

M4 carbine rifles;

M240B machine guns; and

Arleigh Burke (DDG–51) class destroyers.

<< 10 USCA § 401 NOTE >>

SEC. 8010. Within the funds appropriated for the operation and maintenance of the Armed Forces, funds are hereby appropriated pursuant to section 401 of title 10, United States Code, for humanitarian and civic assistance costs under chapter 20 of title 10, United States Code. Such funds may also be obligated for humanitarian and civic assistance costs incidental to authorized operations and pursuant to authority granted in section 401 of chapter 20 of title 10, United States Code, and these obligations shall be reported to Congress on September 30 of each year: Provided, That funds available for operation and maintenance shall be available for providing humanitarian and similar assistance by using Civic Action Teams in the Trust Territories of the Pacific Islands and freely associated states of Micronesia, pursuant to the Compact of Free Association as authorized by Public Law 99–239: Provided further, That upon a determination by the Secretary of the Army that such

action is beneficial for graduate medical education programs conducted at Army medical facilities located in Hawaii, the Secretary of the Army may authorize the provision of medical services at such facilities and transportation to such facilities, on a nonreimbursable basis, for civilian patients from American Samoa, the Commonwealth of the Northern Mariana Islands, the Marshall Islands, the Federated States of Micronesia, Palau, and Guam.

SEC. 8011. (a) During fiscal year 1997, the civilian personnel of the Department of Defense may not be managed on the basis of any end-strength, and the management of such personnel during that fiscal year shall not be subject to any constraint or limitation (known as an end-strength) on the number of such personnel who may be employed on the last day of such fiscal year.

(b) The fiscal year 1998 budget request for the Department of Defense as well as all justification material and other documentation supporting the fiscal year 1998 Department of Defense budget request shall be prepared and submitted to the Congress as if subsections (a) and (b) of this provision were effective with regard to fiscal year 1998.

(c) Nothing in this section shall be construed to apply to military (civilian) technicians.

SEC. 8012. Notwithstanding any other provision of law, none of the funds made available by this Act shall be used by the Department of Defense to exceed, outside the fifty United States, its territories, and the District of Columbia, 125,000 civilian workyears: Provided, That workyears shall be applied as defined in the Federal Personnel Manual: Provided further, That workyears expended in dependent student hiring programs for disadvantaged youths shall not be included in this workyear limitation.

SEC. 8013. None of the funds made available by this Act shall be used in any way, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before the Congress.

SEC. 8014. (a) None of the funds appropriated by this Act shall be used to make contributions to the Department of Defense Education Benefits Fund pursuant to section 2006(g) of title 10, United States Code, representing the normal cost for future benefits under section 3015(c) of title 38, United States Code, for any member of the armed services who, on or after the date of enactment of this Act—

(1) enlists in the armed services for a period of active duty of less than three years; or

(2) receives an enlistment bonus under section 308a or 308f of title 37, United States Code,

nor shall any amounts representing the normal cost of such future benefits be transferred from the Fund by the Secretary of the Treasury to the Secretary of Veterans Affairs pursuant to section 2006(d) of title 10, United States Code; nor shall the Secretary of Veterans Affairs pay such benefits to any such member: Provided, That in the case of a member covered by clause (1), these limitations shall not apply to members in combat arms skills or to members who enlist in the armed services on or after July 1, 1989, under a program continued or established by the Secretary of Defense in fiscal year 1991 to test the cost-effective use of special recruiting incentives involving not more than nineteen noncombat arms skills approved in advance by the Secretary of Defense: Provided further, That this subsection applies only to active components of the Army.

(b) None of the funds appropriated by this Act shall be available for the basic pay and allowances of any member of the Army participating as a full-time student and receiving benefits paid by the Secretary of Veterans Affairs from the Department of Defense Education Benefits Fund when time spent as a full-time student is credited toward completion of a service commitment: Provided, That this subsection shall not apply to those members who have reenlisted with this option prior to October 1, 1987: Provided further, That this subsection applies only to active components of the Army.

SEC. 8015. None of the funds appropriated by this Act shall be available to convert to contractor performance an activity or function of the Department of Defense that, on or after the date of enactment of this Act, is performed by more than ten Department of Defense civilian employees until a most efficient and cost-effective organization analysis is completed on such activity or function and certification of the analysis is made to the Committees on Appropriations of the House of Representatives and the Senate: Provided, That this section shall not apply to a commercial or industrial type function of the Department of Defense that: (1) is included on the procurement list established pursuant to section 2 of the Act of June 25, 1938 (41 U.S.C. 47), popularly referred to as the Javits–Wagner–O'Day Act; (2) is planned to be converted to performance by a qualified nonprofit agency for the blind or by a qualified nonprofit agency for other severely handicapped individuals in accordance with that Act; or (3) is planned to be converted to performance by a qualified firm under 51 percent Native American ownership.

(TRANSFER OF FUNDS)

SEC. 8016. Funds appropriated in title III of this Act for the Department of Defense Pilot Mentor–Protege Program may be transferred to any other appropriation contained in this Act solely for the purpose of implementing a Mentor–Protege Program

developmental assistance agreement pursuant to section 831 of the National Defense Authorization Act for Fiscal Year 1991 (Public Law 101–510; 10 U.S.C. 2301 note), as amended, under the authority of this provision or any other transfer authority contained in this Act.

  SEC. 8017. None of the funds in this Act may be available for the purchase by the Department of Defense (and its departments and agencies) of welded shipboard anchor and mooring chain 4 inches in diameter and under unless the anchor and mooring chain are manufactured in the United States from components which are substantially manufactured in the United States: Provided, That for the purpose of this section manufactured will include cutting, heat treating, quality control, testing of chain and welding (including the forging and shot blasting process): Provided further, That for the purpose of this section substantially all of the components of anchor and mooring chain shall be considered to be produced or manufactured in the United States if the aggregate cost of the components produced or manufactured in the United States exceeds the aggregate cost of the components produced or manufactured outside the United States: Provided further, That when adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis, the Secretary of the service responsible for the procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations that such an acquisition must be made in order to acquire capability for national security purposes.

  SEC. 8018. None of the funds appropriated by this Act available for the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) shall be available for the reimbursement of any health care provider for inpatient mental health service for care received when a patient is referred to a provider of inpatient mental health care or residential treatment care by a medical or health care professional having an economic interest in the facility to which the patient is referred: Provided, That this limitation does not apply in the case of inpatient mental health services provided under the program for the handicapped under subsection (d) of section 1079 of title 10, United States Code, provided as partial hospital care, or provided pursuant to a waiver authorized by the Secretary of Defense because of medical or psychological circumstances of the patient that are confirmed by a health professional who is not a Federal employee after a review, pursuant to rules prescribed by the Secretary, which takes into account the appropriate level of care for the patient, the intensity of services required by the patient, and the availability of that care.

  SEC. 8019. Funds available in this Act may be used to provide transportation for the next-of-kin of individuals who have been prisoners of war or missing in action from the Vietnam era to an annual meeting in the United States, under such regulations as the Secretary of Defense may prescribe.

<< 10 USCA § 2687 NOTE >>

  SEC. 8020. Notwithstanding any other provision of law, during the current fiscal year, the Secretary of Defense may, by Executive Agreement, establish with host nation governments in NATO member states a separate account into which such residual value amounts negotiated in the return of United States military installations in NATO member states may be deposited, in the currency of the host nation, in lieu of direct monetary transfers to the United States Treasury: Provided, That such credits may be utilized only for the construction of facilities to support United States military forces in that host nation, or such real property maintenance and base operating costs that are currently executed through monetary transfers to such host nations: Provided further, That the Department of Defense's budget submission for fiscal year 1998 shall identify such sums anticipated in residual value settlements, and identify such construction, real property maintenance or base operating costs that shall be funded by the host nation through such credits: Provided further, That all military construction projects to be executed from such accounts must be previously approved in a prior Act of Congress: Provided further, That each such Executive Agreement with a NATO member host nation shall be reported to the congressional defense committees, the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate thirty days prior to the conclusion and endorsement of any such agreement established under this provision.

  SEC. 8021. None of the funds available to the Department of Defense may be used to demilitarize or dispose of M–1 Carbines, M–1 Garand rifles, M–14 rifles, .22 caliber rifles, .30 caliber rifles, or M–1911 pistols.

  SEC. 8022. Notwithstanding any other provision of law, none of the funds appropriated by this Act shall be available to pay more than 50 percent of an amount paid to any person under section 308 of title 37, United States Code, in a lump sum.

  SEC. 8023. None of the funds appropriated by this Act shall be available for payments under the Department of Defense contract with the Louisiana State University Medical Center involving the use of cats for Brain Missile Wound Research, and the Department of Defense shall not make payments under such contract from funds obligated prior to the date of the enactment

of this Act, except as necessary for costs incurred by the contractor prior to the enactment of this Act: Provided, That funds necessary for the care of animals covered by this contract are allowed.

SEC. 8024. Of the funds made available by this Act in title III, Procurement, $8,000,000, drawn pro rata from each appropriations account in title III, shall be available for incentive payments authorized by section 504 of the Indian Financing Act of 1974, 25 U.S.C. 1544. These payments shall be available only to contractors which have submitted subcontracting plans pursuant to 15 U.S.C. 637(d), and according to regulations which shall be promulgated by the Secretary of Defense within 90 days of the passage of this Act.

SEC. 8025. None of the funds provided in this Act or any other Act shall be available to conduct bone trauma research at any Army Research Laboratory until the Secretary of the Army certifies that the synthetic compound to be used in the experiments is of such a type that its use will result in a significant medical finding, the research has military application, the research will be conducted in accordance with the standards set by an animal care and use committee, and the research does not duplicate research already conducted by a manufacturer or any other research organization.

SEC. 8026. During the current fiscal year, none of the funds available to the Department of Defense may be used to procure or acquire (1) defensive handguns unless such handguns are the M9 or M11 9 mm Department of Defense standard handguns, or (2) offensive handguns except for the Special Operations Forces: Provided, That the foregoing shall not apply to handguns and ammunition for marksmanship competitions.

SEC. 8027. No more than $500,000 of the funds appropriated or made available in this Act shall be used for any single relocation of an organization, unit, activity or function of the Department of Defense into or within the National Capital Region: Provided, That the Secretary of Defense may waive this restriction on a case-by-case basis by certifying in writing to the Congressional defense committees that such a relocation is required in the best interest of the Government.

SEC. 8028. During the current fiscal year, funds appropriated or otherwise available for any Federal agency, the Congress, the judicial branch, or the District of Columbia may be used for the pay, allowances, and benefits of an employee as defined by section 2105 of title 5 or an individual employed by the government of the District of Columbia, permanent or temporary indefinite, who—

(1) is a member of a Reserve component of the Armed Forces, as described in section 261 of title 10, or the National Guard, as described in section 101 of title 32;

(2) performs, for the purpose of providing military aid to enforce the law or providing assistance to civil authorities in the protection or saving of life or property or prevention of injury—

(A) Federal service under sections 331, 332, 333, or 12406 of title 10, or other provision of law, as applicable, or

(B) full-time military service for his or her State, the District of Columbia, the Commonwealth of Puerto Rico, or a territory of the United States; and

(3) requests and is granted—

(A) leave under the authority of this section; or

(B) annual leave, which may be granted without regard to the provisions of sections 5519 and 6323(b) of title 5, if such employee is otherwise entitled to such annual leave:

Provided, That any employee who requests leave under subsection (3)(A) for service described in subsection (2) of this section is entitled to such leave, subject to the provisions of this section and of the last sentence of section 6323(b) of title 5, and such leave shall be considered leave under section 6323(b) of title 5.

SEC. 8029. None of the funds appropriated by this Act shall be available to perform any cost study pursuant to the provisions of OMB Circular A–76 if the study being performed exceeds a period of twenty-four months after initiation of such study with respect to a single function activity or forty-eight months after initiation of such study for a multi-function activity.

SEC. 8030. Funds appropriated by this Act for the American Forces Information Service shall not be used for any national or international political or psychological activities.

SEC. 8031. Notwithstanding any other provision of law or regulation, the Secretary of Defense may adjust wage rates for civilian employees hired for certain health care occupations as authorized for the Secretary of Veterans Affairs by section 7455 of title 38, United States Code.

SEC. 8032. None of the funds appropriated or made available in this Act shall be used to reduce or disestablish the operation of the 53rd Weather Reconnaissance Squadron of the Air Force Reserve, if such action would reduce the WC–130 Weather Reconnaissance mission below the levels funded in this Act.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 8033. (a) Of the funds for the procurement of supplies or services appropriated by this Act, qualified nonprofit agencies for the blind or other severely handicapped shall be afforded the maximum practicable opportunity to participate as subcontractors and suppliers in the performance of contracts let by the Department of Defense.

(b) During the current fiscal year, a business concern which has negotiated with a military service or defense agency a subcontracting plan for the participation by small business concerns pursuant to section 8(d) of the Small Business Act (15 U.S.C. 637(d)) shall be given credit toward meeting that subcontracting goal for any purchases made from qualified nonprofit agencies for the blind or other severely handicapped.

(c) For the purpose of this section, the phrase "qualified nonprofit agency for the blind or other severely handicapped" means a nonprofit agency for the blind or other severely handicapped that has been approved by the Committee for the Purchase from the Blind and Other Severely Handicapped under the Javits–Wagner–O'Day Act (41 U.S.C. 46–48).

SEC. 8034. During the current fiscal year, net receipts pursuant to collections from third party payers pursuant to section 1095 of title 10, United States Code, shall be made available to the local facility of the uniformed services responsible for the collections and shall be over and above the facility's direct budget amount.

SEC. 8035. During the current fiscal year, the Department of Defense is authorized to incur obligations of not to exceed $350,000,000 for purposes specified in section 2350j(c) of title 10, United States Code, in anticipation of receipt of contributions, only from the Government of Kuwait, under that section: Provided, That, upon receipt, such contributions from the Government of Kuwait shall be credited to the appropriation or fund which incurred such obligations.

SEC. 8036. Of the funds made available in this Act, not less than $23,626,000 shall be available for the Civil Air Patrol, of which $19,926,000 shall be available for Operation and maintenance.

SEC. 8037. (a) None of the funds appropriated in this Act are available to establish a new Department of Defense (department) federally funded research and development center (FFRDC), either as a new entity, or as a separate entity administered by an organization managing another FFRDC, or as a nonprofit membership corporation consisting of a consortium of other FFRDCs and other non-profit entities.

(b) LIMITATION ON COMPENSATION.—No member of a Board of Directors, Trustees, Overseers, Advisory Group, Special Issues Panel, Visiting Committee, or any similar entity of a defense FFRDC, and no paid consultant to any defense FFRDC, may be compensated for his or her services as a member of such entity, or as a paid consultant, except under the same conditions, and to the same extent, as members of the Defense Science Board: Provided, That a member of any such entity referred to previously in this subsection shall be allowed travel expenses and per diem as authorized under the Federal Joint Travel Regulations, when engaged in the performance of membership duties.

(c) Notwithstanding any other provision of law, none of the funds available to the department from any source during fiscal year 1997 may be used by a defense FFRDC, through a fee or other payment mechanism, for charitable contributions, for construction of new buildings, for payment of cost sharing for projects funded by government grants, or for absorption of contract overruns.

(d) Notwithstanding any other provision of law, of the funds available to the department during fiscal year 1997, not more than 5,975 staff years of technical effort (staff years) may be funded for defense FFRDCs: Provided, That of the specific amount referred to previously in this subsection, not more than 1,088 staff years may be funded for the defense studies and analysis FFRDCs.

(e) Notwithstanding any other provision of law, the Secretary of Defense shall control the total number of staff years to be performed by defense FFRDCs during fiscal year 1997 so as to reduce the total amounts appropriated in titles II, III, and IV of this Act by $52,286,000: Provided, That the total amounts appropriated in titles II, III, and IV of this Act are hereby reduced by $52,286,000 to reflect savings from the use of defense FFRDCs by the department.

(f) Within 60 days after enactment of this Act, the Secretary of Defense shall submit to the Congressional defense committees a report presenting the specific amounts of staff years of technical effort to be allocated by the department for each defense FFRDC during fiscal year 1997: Provided, That, after the submission of the report required by this subsection, the department may not reallocate more than five percent of an FFRDC's staff years among other defense FFRDCs until 30 days after a detailed justification for any such reallocation is submitted to the Congressional defense committees.

(g) The Secretary of Defense shall, with the submission of the department's fiscal year 1998 budget request, submit a report presenting the specific amounts of staff years of technical effort to be allocated for each defense FFRDC during that fiscal year.

(h) The total amounts appropriated to or for the use of the department in titles II, III, and IV of this Act are hereby further reduced by $102,286,000 to reflect savings from the decreased use of non-FFRDC consulting services by the department.

(i) No part of the reductions contained in subsections (e) and (h) of this section may be applied against any budget activity, activity group, subactivity group, line item, program element, program, project, subproject or activity which does not fund defense FFRDC activities or non-FFRDC consulting services within each appropriation account.

(j) Not later than 90 days after enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report listing the specific funding reductions allocated to each category listed in subsection (i) above pursuant to this section.

SEC. 8038. None of the funds in this or any other Act shall be available for the preparation of studies on—

  (a) the feasibility of removal and transportation of unitary chemical weapons or agents from the eight chemical storage sites within the continental United States to Johnston Atoll: Provided, That this prohibition shall not apply to General Accounting Office studies requested by a Member of Congress or a Congressional Committee; and

  (b) the potential future uses of the nine chemical disposal facilities other than for the destruction of stockpile chemical munitions and as limited by section 1412(c)(2), Public Law 99–145: Provided, That this prohibition does not apply to future use studies for the CAMDS facility at Tooele, Utah.

SEC. 8039. None of the funds appropriated or made available in this Act shall be used to procure carbon, alloy or armor steel plate for use in any Government-owned facility or property under the control of the Department of Defense which were not melted and rolled in the United States or Canada: Provided, That these procurement restrictions shall apply to any and all Federal Supply Class 9515, American Society of Testing and Materials (ASTM) or American Iron and Steel Institute (AISI) specifications of carbon, alloy or armor steel plate: Provided further, That the Secretary of the military department responsible for the procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes: Provided further, That these restrictions shall not apply to contracts which are in being as of the date of enactment of this Act.

SEC. 8040. For the purposes of this Act, the term "congressional defense committees" means the National Security Committee of the House of Representatives, the Armed Services Committee of the Senate, the subcommittee on Defense of the Committee on Appropriations of the Senate, and the subcommittee on National Security of the Committee on Appropriations of the House of Representatives.

SEC. 8041. During the current fiscal year, the Department of Defense may acquire the modification, depot maintenance and repair of aircraft, vehicles and vessels as well as the production of components and other Defense-related articles, through competition between Department of Defense depot maintenance activities and private firms: Provided, That the Senior Acquisition Executive of the military department or defense agency concerned, with power of delegation, shall certify that successful bids include comparable estimates of all direct and indirect costs for both public and private bids: Provided further, That Office of Management and Budget Circular A–76 shall not apply to competitions conducted under this section.

<< 41 USCA § 10b–2 >>

SEC. 8042. (a)(1) If the Secretary of Defense, after consultation with the United States Trade Representative, determines that a foreign country which is party to an agreement described in paragraph (2) has violated the terms of the agreement by discriminating against certain types of products produced in the United States that are covered by the agreement, the Secretary of Defense shall rescind the Secretary's blanket waiver of the Buy American Act with respect to such types of products produced in that foreign country.

(2) An agreement referred to in paragraph (1) is any reciprocal defense procurement memorandum of understanding, between the United States and a foreign country pursuant to which the Secretary of Defense has prospectively waived the Buy American Act for certain products in that country.

(b) The Secretary of Defense shall submit to Congress a report on the amount of Department of Defense purchases from foreign entities in fiscal year 1997. Such report shall separately indicate the dollar value of items for which the Buy American Act was waived pursuant to any agreement described in subsection (a)(2), the Trade Agreement Act of 1979 (19 U.S.C. 2501 et seq.), or any international agreement to which the United States is a party.

AR.03200

(c) For purposes of this section, the term "Buy American Act" means title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved March 3, 1933 (41 U.S.C. 10a et seq.).

SEC. 8043. Appropriations contained in this Act that remain available at the end of the current fiscal year as a result of energy cost savings realized by the Department of Defense shall remain available for obligation for the next fiscal year to the extent, and for the purposes, provided in section 2865 of title 10, United States Code.

<< 10 USCA § 1175 NOTE >>

SEC. 8044. During the current fiscal year and hereafter, voluntary separation incentives payable under 10 U.S.C. 1175 may be paid in such amounts as are necessary from the assets of the Voluntary Separation Incentive Fund established by section 1175(h)(1).

(INCLUDING TRANSFER OF FUNDS)

SEC. 8045. Amounts deposited during the current fiscal year to the special account established under 40 U.S.C. 485(h)(2) and to the special account established under 10 U.S.C. 2667(d)(1) are appropriated and shall be available until transferred by the Secretary of Defense to current applicable appropriations or funds of the Department of Defense under the terms and conditions specified by 40 U.S.C. 485(h)(2) (A) and (B) and 10 U.S.C. 2667(d)(1)(B), to be merged with and to be available for the same time period and the same purposes as the appropriation to which transferred.

SEC. 8046. During the current fiscal year, appropriations available to the Department of Defense may be used to reimburse a member of a reserve component of the Armed Forces who is not otherwise entitled to travel and transportation allowances and who occupies transient government housing while performing active duty for training or inactive duty training: Provided, That such members may be provided lodging in kind if transient government quarters are unavailable as if the member was entitled to such allowances under subsection (a) of section 404 of title 37, United States Code: Provided further, That if lodging in kind is provided, any authorized service charge or cost of such lodging may be paid directly from funds appropriated for operation and maintenance of the reserve component of the member concerned.

<< 10 USCA § 221 NOTE >>

SEC. 8047. The President shall include with each budget for a fiscal year submitted to the Congress under section 1105 of title 31, United States Code, materials that shall identify clearly and separately the amounts requested in the budget for appropriation for that fiscal year for salaries and expenses related to administrative activities of the Department of Defense, the military departments, and the Defense Agencies.

SEC. 8048. Notwithstanding any other provision of law, funds available for "Drug Interdiction and Counter–Drug Activities, Defense" may be obligated for the Young Marines program.

SEC. 8049. During the current fiscal year, amounts contained in the Department of Defense Overseas Military Facility Investment Recovery Account established by section 2921(c)(1) of the National Defense Authorization Act of 1991 (Public Law 101–510; 10 U.S.C. 2687 note) shall be available until expended for the payments specified by section 2921(c)(2) of that Act.

<< 10 USCA § 12681 NOTE >>

SEC. 8050. During the current fiscal year and hereafter, annual payments granted under the provisions of section 4416 of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 106 Stat. 2714) shall be made from appropriations in this Act which are available for the pay of reserve component personnel.

SEC. 8051. Of the funds appropriated or otherwise made available by this Act, not more than $119,200,000 shall be available for payment of the operating costs of NATO Headquarters: Provided, That the Secretary of Defense may waive this section for Department of Defense support provided to NATO forces in and around the former Yugoslavia.

SEC. 8052. During the current fiscal year, appropriations which are available to the Department of Defense for operation and maintenance may be used to purchase items having an investment item unit cost of not more than $100,000.

<< 10 USCA § 1293 NOTE >>

SEC. 8053. During the current fiscal year and hereafter, appropriations available for the pay and allowances of active duty members of the Armed Forces shall be available to pay the retired pay which is payable pursuant to section 4403 of Public Law 102–484 (10 U.S.C. 1293 note) under the terms and conditions provided in section 4403.

SEC. 8054. (a) During the current fiscal year, none of the appropriations or funds available to the Defense Business Operations Fund shall be used for the purchase of an investment item for the purpose of acquiring a new inventory item for sale or anticipated sale during the current fiscal year or a subsequent fiscal year to customers of the Defense Business Operations Fund if such an item would not have been chargeable to the Defense Business Operations Fund during fiscal year 1994 and if the purchase of such an investment item would be chargeable during the current fiscal year to appropriations made to the Department of Defense for procurement.

(b) The fiscal year 1998 budget request for the Department of Defense as well as all justification material and other documentation supporting the fiscal year 1998 Department of Defense budget shall be prepared and submitted to the Congress on the basis that any equipment which was classified as an end item and funded in a procurement appropriation contained in this Act shall be budgeted for in a proposed fiscal year 1998 procurement appropriation and not in the supply management business area or any other area or category of the Defense Business Operations Fund.

SEC. 8055. None of the funds provided in this Act shall be available for use by a Military Department to modify an aircraft, weapon, ship or other item of equipment, that the Military Department concerned plans to retire or otherwise dispose of within five years after completion of the modification: Provided, That this prohibition shall not apply to safety modifications: Provided further, That this prohibition may be waived by the Secretary of a Military Department if the Secretary determines it is in the best national security interest of the United States to provide such waiver and so notifies the congressional defense committees in writing.

SEC. 8056. None of the funds appropriated by this Act for programs of the Central Intelligence Agency shall remain available for obligation beyond the current fiscal year, except for funds appropriated for the Reserve for Contingencies, which shall remain available until September 30, 1998.

SEC. 8057. Notwithstanding any other provision of law, funds made available in this Act for the Defense Intelligence Agency may be used for the design, development, and deployment of General Defense Intelligence Program intelligence communications and intelligence information systems for the Services, the Unified and Specified Commands, and the component commands.

SEC. 8058. (a) Notwithstanding any other provision of law, funds appropriated in this Act for the High Performance Computing Modernization Program shall be made available only for the acquisition, modernization and sustainment of supercomputing capability and capacity at Department of Defense (DoD) science and technology sites under the cognizance of the Director of Defense Research and Engineering and DoD test and evaluation facilities under the Director of Test and Evaluation, OUSD (A&T): Provided, That these funds shall be awarded based on user-defined requirements.

(b) Of the funds appropriated in this Act under the heading "Procurement, Defense–Wide", $124,735,000 shall be made available for the High Performance Computing Modernization Program. Of the total funds made available for the program pursuant to this subsection, $20,000,000 shall be for the Army High Performance Computing Research Center.

SEC. 8059. Of the funds appropriated by the Department of Defense under the heading "Operation and Maintenance, Defense–Wide", not less than $8,000,000 shall be made available only for the mitigation of environmental impacts, including training and technical assistance to tribes, related administrative support, the gathering of information, documenting of environmental damage, and developing a system for prioritization of mitigation, on Indian lands resulting from Department of Defense activities.

SEC. 8060. Amounts collected for the use of the facilities of the National Science Center for Communications and Electronics during the current fiscal year pursuant to section 1459(g) of the Department of Defense Authorization Act, 1986 and deposited to the special account established under subsection 1459(g)(2) of that Act are appropriated and shall be available until expended for the operation and maintenance of the Center as provided for in subsection 1459(g)(2).

SEC. 8061. None of the funds appropriated in this Act may be used to fill the commander's position at any military medical facility with a health care professional unless the prospective candidate can demonstrate professional administrative skills.

SEC. 8062. (a) None of the funds appropriated in this Act may be expended by an entity of the Department of Defense unless the entity, in expending the funds, complies with Buy American Act. For purposes of this subsection, the term "Buy American

Act" means title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved March 3, 1933 (41 U.S.C. 10a et seq.).

(b) If the Secretary of Defense determines that a person has been convicted of intentionally affixing a label bearing a "Made in America" inscription to any product sold in or shipped to the United States that is not made in America, the Secretary shall determine, in accordance with section 2410f of title 10, United States Code, whether the person should be debarred from contracting with the Department of Defense.

(c) In the case of any equipment or products purchased with appropriations provided under this Act, it is the sense of the Congress that any entity of the Department of Defense, in expending the appropriation, purchase only American-made equipment and products, provided that American-made equipment and products are cost-competitive, quality-competitive, and available in a timely fashion.

SEC. 8063. None of the funds appropriated by this Act shall be available for a contract for studies, analyses, or consulting services entered into without competition on the basis of an unsolicited proposal unless the head of the activity responsible for the procurement determines—

(1) as a result of thorough technical evaluation, only one source is found fully qualified to perform the proposed work, or

(2) the purpose of the contract is to explore an unsolicited proposal which offers significant scientific or technological promise, represents the product of original thinking, and was submitted in confidence by one source, or

(3) the purpose of the contract is to take advantage of unique and significant industrial accomplishment by a specific concern, or to insure that a new product or idea of a specific concern is given financial support:

Provided, That this limitation shall not apply to contracts in an amount of less than $25,000, contracts related to improvements of equipment that is in development or production, or contracts as to which a civilian official of the Department of Defense, who has been confirmed by the Senate, determines that the award of such contract is in the interest of the national defense.

SEC. 8064. Funds appropriated by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

<< 50 USCA § 1521 NOTE >>

SEC. 8065. Notwithstanding section 142 of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, of the funds provided in title VI of this Act, under the heading "Chemical Agents and Munitions Destruction, Defense", $40,000,000 shall only be available for the conduct of a pilot program to identify and demonstrate not less than two alternatives to the baseline incineration process for the demilitarization of assembled chemical munitions: Provided, That the Under Secretary of Defense for Acquisition and Technology shall, not later than December 1, 1996, designate a program manager who is not, nor has been, in direct or immediate control of the baseline reverse assembly incineration demilitarization program to carry out the pilot program: Provided further, That the Under Secretary of Defense for Acquisition and Technology shall evaluate the effectiveness of each alternative chemical munitions demilitarization technology identified and demonstrated under the pilot program to demilitarize munitions and assembled chemical munitions while meeting all applicable Federal and State environmental and safety requirements: Provided further, That the Under Secretary of Defense for Acquisition and Technology shall transmit, by December 15 of each year, a report to the congressional defense committees on the activities carried out under the pilot program during the preceding fiscal year in which the report is to be made: Provided further, That section 142(f)(3) of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, is repealed: Provided further, That no funds may be obligated for the construction of a baseline incineration facility at the Lexington Blue Grass Army Depot or the Pueblo Depot activity until 180 days after the Secretary of Defense has submitted to the congressional defense committees a report detailing the effectiveness of each alternative chemical munitions demilitarization technology identified and demonstrated under the pilot program and its ability to meet the applicable safety and environmental requirements: Provided further, That none of the funds in this or any other Act may be obligated for the preparation of studies, assessments, or planning of the removal and transportation of stockpile assembled unitary chemical weapons or neutralized chemical agent to any of the eight chemical weapons storage sites within the continental United States.

SEC. 8066. (a) None of the funds made available by this Act may be obligated for design, development, acquisition, or operation of more than 47 Titan IV expendable launch vehicles, or for satellite mission-model planning for a Titan IV requirement beyond 47 vehicles.

(b) $59,600,000 made available in this Act for Research, Development, Test and Evaluation, Air Force, may only be obligated for development of a new family of medium-lift and heavy-lift expendable launch vehicles evolved from existing technologies.

SEC. 8067. None of the funds available to the Department of Defense in this Act may be used to establish additional field operating agencies of any element of the Department during fiscal year 1997, except for field operating agencies funded within the National Foreign Intelligence Program: Provided, That the Secretary of Defense may waive this section by certifying to the House and Senate Committees on Appropriations that the creation of such field operating agencies will reduce either the personnel and/or financial requirements of the Department of Defense.

SEC. 8068. Notwithstanding section 303 of Public Law 96–487 or any other provision of law, the Secretary of the Navy is authorized to lease real and personal property at Naval Air Facility, Adak, Alaska, pursuant to 10 U.S.C. 2667(f), for commercial, industrial or other purposes.

<< 10 USCA Ch. 108 >>

SEC. 8069. Notwithstanding any other provision of law, for resident classes entering the war colleges after September 30, 1997, the Department of Defense shall require that not less than 20 percent of the total of United States military students at each war college shall be from military departments other than the hosting military department: Provided, That each military department will recognize the attendance at a sister military department war college as the equivalent of attendance at its own war college for promotion and advancement of personnel.

(RESCISSIONS)

SEC. 8070. Of the funds provided in Department of Defense Appropriations Acts, the following funds are hereby rescinded from the following accounts in the specified amounts:

"Procurement of Ammunition, Army, 1995/1997", $4,500,000;

"Aircraft Procurement, Navy, 1995/1997", $8,000,000;

"Procurement of Ammunition, Navy and Marine Corps, 1995/1997", $2,000,000;

"Other Procurement, Navy, 1995/1997", $10,000,000;

"Aircraft Procurement, Air Force, 1995/1997", $3,100,000;

"Missile Procurement, Air Force, 1995/1997", $31,900,000;

"Aircraft Procurement, Navy, 1996/1998", $5,400,000;

"Procurement of Ammunition, Navy and Marine Corps, 1996/1998", $12,708,000;

"Aircraft Procurement, Air Force, 1996/1998", $9,000,000;

"Missile Procurement, Air Force, 1996/1998", $20,000,000;

"Other Procurement, Air Force, 1996/1998", $26,000,000;

"Research, Development, Test and Evaluation, Navy 1996/1997", $4,500,000.

SEC. 8071. None of the funds provided in this Act may be obligated for payment on new contracts on which allowable costs charged to the government include payments for individual compensation at a rate in excess of $250,000 per year.

SEC. 8072. Of the funds appropriated in the Department of Defense Appropriations Act, 1996 (Public Law 104–61), under the heading "Other Procurement, Army", the Department of the Army shall grant $477,000 to the Kansas Unified School District 207 for the purpose of integrating schools at Fort Leavenworth into the existing fiber optic network on post.

SEC. 8073. None of the funds available in this Act may be used to reduce the authorized positions for military (civilian) technicians of the Army National Guard, the Air National Guard, Army Reserve and Air Force Reserve for the purpose of applying any administratively imposed civilian personnel ceiling, freeze, or reduction on military (civilian) technicians, unless such reductions are a direct result of a reduction in military force structure.

SEC. 8074. None of the funds appropriated or otherwise made available in this Act may be obligated or expended for assistance to the Democratic People's Republic of North Korea unless specifically appropriated for that purpose.

SEC. 8075. During the current fiscal year, funds appropriated in this Act are available to compensate members of the National Guard for duty performed pursuant to a plan submitted by a Governor of a State and approved by the Secretary of Defense under section 112 of title 32, United States Code: Provided, That during the performance of such duty, the members of the National Guard shall be under State command and control: Provided further, That such duty shall be treated as full-time National Guard duty for purposes of sections 12602(a)(2) and (b)(2) of title 10, United States Code.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 8076. Funds appropriated in this Act for operation and maintenance of the Military Departments, Unified and Specified Commands and Defense Agencies shall be available for reimbursement of pay, allowances and other expenses which would otherwise be incurred against appropriations for the National Guard and Reserve when members of the National Guard and Reserve provide intelligence support to Unified Commands, Defense Agencies and Joint Intelligence Activities, including the activities and programs included within the General Defense Intelligence Program and the Consolidated Cryptologic Program: Provided, That nothing in this section authorizes deviation from established Reserve and National Guard personnel and training procedures.

SEC. 8077. During the current fiscal year, none of the funds appropriated in this Act may be used to reduce the civilian medical and medical support personnel assigned to military treatment facilities below the September 30, 1996 level: Provided, That the Service Surgeons General may waive this section by certifying to the congressional defense committees that the beneficiary population is declining in some catchment areas and civilian strength reductions may be consistent with responsible resource stewardship and capitation-based budgeting.

SEC. 8078. All refunds or other amounts collected in the administration of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) shall be credited to current year appropriations.

(INCLUDING TRANSFER OF FUNDS)

SEC. 8079. None of the funds appropriated in this Act may be transferred to or obligated from the Pentagon Reservation Maintenance Revolving Fund, unless the Secretary of Defense certifies that the total cost for the planning, design, construction and installation of equipment for the renovation of the Pentagon Reservation will not exceed $1,118,000,000.

<< 10 USCA § 374 NOTE >>

SEC. 8080. (a) None of the funds available to the Department of Defense for any fiscal year for drug interdiction or counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law.

<< 50 USCA § 403f NOTE >>

(b) None of the funds available to the Central Intelligence Agency for any fiscal year for drug interdiction and counter-drug activities may be transferred to any other department or agency of the United States except as specifically provided in an appropriations law.

(TRANSFER OF FUNDS)

SEC. 8081. Appropriations available in this Act under the heading "Operation and Maintenance, Defense–Wide" for increasing energy and water efficiency in Federal buildings may, during their period of availability, be transferred to other appropriations or funds of the Department of Defense for projects related to increasing energy and water efficiency, to be merged with and to be available for the same general purposes, and for the same time period, as the appropriation or fund to which transferred.

SEC. 8082. None of the funds appropriated by this Act may be used for the procurement of ball and roller bearings other than those produced by a domestic source and of domestic origin: Provided, That the Secretary of the military department responsible for such procurement may waive this restriction on a case-by-case basis by certifying in writing to the Committees on Appropriations of the House of Representatives and the Senate, that adequate domestic supplies are not available to meet Department of Defense requirements on a timely basis and that such an acquisition must be made in order to acquire capability for national security purposes.

SEC. 8083. Notwithstanding any other provision of law, funds available to the Department of Defense shall be made available to provide transportation of medical supplies and equipment, on a nonreimbursable basis, to American Samoa: Provided, That notwithstanding any other provision of law, funds available to the Department of Defense shall be made available to provide transportation of medical supplies and equipment, on a nonreimbursable basis, to the Indian Health Service when it is in conjunction with a civil-military project.

SEC. 8084. None of the funds in this Act may be used to purchase any supercomputer which is not manufactured in the United States, unless the Secretary of Defense certifies to the congressional defense committees that such an acquisition must be made in order to acquire capability for national security purposes that is not available from United States manufacturers.

SEC. 8085. Notwithstanding any other provision of law, the Naval shipyards of the United States shall be eligible to participate in any manufacturing extension program financed by funds appropriated in this or any other Act.

SEC. 8086. None of the funds appropriated by this Act shall be available to lease or charter a vessel in excess of seventeen months (inclusive of any option periods) to transport fuel or oil for the Department of Defense if the vessel was constructed after October 1, 1995 unless the Secretary of Defense requires that the vessel be constructed in the United States with a double hull under the long-term lease or charter authority provided in section 2401 note of title 10, United States Code: *Provided*, That this limitation shall not apply to contracts in force on the date of enactment of this Act: *Provided further*, That by 1997 at least 20 percent of annual leases and charters must be for ships of double hull design constructed after October 1, 1995 if available in numbers sufficient to satisfy this requirement: *Provided further*, That the Military Sealift Command shall plan to achieve the goal of eliminating single hull ship leases by the year 2015.

(TRANSFER OF FUNDS)

SEC. 8087. In addition to amounts appropriated or otherwise made available by this Act, $300,000,000 is hereby appropriated to the Department of Defense and shall be available only for transfer to the United States Coast Guard.

SEC. 8088. Notwithstanding any other provision in this Act, the total amount appropriated in this Act is hereby reduced by $150,000,000 to reflect savings from reduced carryover of activities funded through the Defense Business Operations Fund, to be distributed as follows: "Operation and Maintenance, Army", $60,000,000; and "Operation and Maintenance, Navy", $90,000,000.

SEC. 8089. Notwithstanding any other provision of law, each contract awarded by the Department of Defense during the current fiscal year for construction or service performed in whole or in part in a State which is not contiguous with another State and has an unemployment rate in excess of the national average rate of unemployment as determined by the Secretary of Labor, shall include a provision requiring the contractor to employ, for the purpose of performing that portion of the contract in such State that is not contiguous with another State, individuals who are residents of such State and who, in the case of any craft or trade, possess or would be able to acquire promptly the necessary skills: *Provided*, That the Secretary of Defense may waive the requirements of this section, on a case-by-case basis, in the interest of national security.

SEC. 8090. During the current fiscal year, the Army shall use the former George Air Force Base as the airhead for the National Training Center at Fort Irwin: *Provided*, That none of the funds in this Act shall be obligated or expended to transport Army personnel into Edwards Air Force Base for training rotations at the National Training Center.

SEC. 8091. (a) The Secretary of Defense shall submit, on a quarterly basis, a report to the congressional defense committees, the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate setting forth all costs (including incremental costs) incurred by the Department of Defense during the preceding quarter in implementing or supporting resolutions of the United Nations Security Council, including any such resolution calling for international sanctions, international peacekeeping operations, and humanitarian missions undertaken by the Department of Defense. The quarterly report shall include an aggregate of all such Department of Defense costs by operation or mission.

(b) The Secretary of Defense shall detail in the quarterly reports all efforts made to seek credit against past United Nations expenditures and all efforts made to seek compensation from the United Nations for costs incurred by the Department of Defense in implementing and supporting United Nations activities.

SEC. 8092. (a) LIMITATION ON TRANSFER OF DEFENSE ARTICLES AND SERVICES.—Notwithstanding any other provision of law, none of the funds available to the Department of Defense for the current fiscal year may be obligated or expended to transfer to another nation or an international organization any defense articles or services (other than intelligence services) for use in the activities described in subsection (b) unless the congressional defense committees, the Committee on International Relations of the House of Representatives, and the Committee on Foreign Relations of the Senate are notified 15 days in advance of such transfer.

(b) COVERED ACTIVITIES.—(1) This section applies to—

(A) any international peacekeeping or peace-enforcement operation under the authority of chapter VI or chapter VII of the United Nations Charter under the authority of a United Nations Security Council resolution; and

(B) any other international peacekeeping, peace-enforcement, or humanitarian assistance operation.

(c) REQUIRED NOTICE.—A notice under subsection (a) shall include the following:

(1) A description of the equipment, supplies, or services to be transferred.

(2) A statement of the value of the equipment, supplies, or services to be transferred.

AR.03206

(3) In the case of a proposed transfer of equipment or supplies—

(A) a statement of whether the inventory requirements of all elements of the Armed Forces (including the reserve components) for the type of equipment or supplies to be transferred have been met; and

(B) a statement of whether the items proposed to be transferred will have to be replaced and, if so, how the President proposes to provide funds for such replacement.

SEC. 8093. To the extent authorized by subchapter VI of Chapter 148 of title 10, United States Code, the Secretary of Defense shall issue loan guarantees in support of U.S. defense exports not otherwise provided for: Provided, That the total contingent liability of the United States for guarantees issued under the authority of this section may not exceed $15,000,000,000: Provided further, That the exposure fees charged and collected by the Secretary for each guarantee, shall be paid by the country involved and shall not be financed as part of a loan guaranteed by the United States: Provided further, That the Secretary shall provide quarterly reports to the Committees on Appropriations, Armed Services and Foreign Relations of the Senate and the Committees on Appropriations, National Security and International Relations in the House of Representatives on the implementation of this program: Provided further, That amounts charged for administrative fees and deposited to the special account provided for under section 2540c(d) of title 10, shall be available for paying the costs of administrative expenses of the Department of Defense that are attributable to the loan guarantee program under subchapter VI of Chapter 148 of title 10.

SEC. 8094. None of the funds available to the Department of Defense shall be obligated or expended to make a financial contribution to the United Nations for the cost of an United Nations peacekeeping activity (whether pursuant to assessment or a voluntary contribution) or for payment of any United States arrearage to the United Nations.

SEC. 8095. None of the funds available to the Department of Defense under this Act shall be obligated or expended to pay a contractor under a contract with the Department of Defense for costs of any amount paid by the contractor to an employee when—

(1) such costs are for a bonus or otherwise in excess of the normal salary paid by the contractor to the employee; and

(2) such bonus is part of restructuring costs associated with a business combination.

SEC. 8096. The amount otherwise provided by this Act for "Operation and Maintenance, Air Force" is hereby reduced by $194,500,000, to reflect a reduction in the pass-through to the Air Force business areas of the Defense Business Operations Fund.

SEC. 8097. (a) None of the funds appropriated or otherwise made available in this Act may be used to transport or provide for the transportation of chemical munitions or agents to the Johnston Atoll for the purpose of storing or demilitarizing such munitions or agents.

(b) The prohibition in subsection (a) shall not apply to any obsolete World War II chemical munition or agent of the United States found in the World War II Pacific Theater of Operations.

(c) The President may suspend the application of subsection (a) during a period of war in which the United States is a party.

SEC. 8098. None of the funds provided in title II of this Act for "Former Soviet Union Threat Reduction" may be obligated or expended to finance housing for any individual who was a member of the military forces of the Soviet Union or for any individual who is or was a member of the military forces of the Russian Federation.

SEC. 8099. During the current fiscal year, no more than $15,000,000 of appropriations made in this Act under the heading "Operation and Maintenance, Defense–Wide" may be transferred to appropriations available for the pay of military personnel, to be merged with, and to be available for the same time period as the appropriations to which transferred, to be used in support of such personnel in connection with support and services for eligible organizations and activities outside the Department of Defense pursuant to section 2012 of title 10, United States Code.

<< 18 USCA § 3056 NOTE >>

SEC. 8100. Beginning in fiscal year 1997 and thereafter, and notwithstanding any other provision of law, fixed and mobile telecommunications support shall be provided by the White House Communications Agency (WHCA) to the United States Secret Service (USSS), without reimbursement, in connection with the Secret Service's duties directly related to the protection of the President or the Vice President or other officer immediately next in order of succession to the office of the President at the White House Security Complex in the Washington, D.C. Metropolitan Area and Camp David, Maryland. For these purposes, the White House Security Complex includes the White House, the White House grounds, the Old Executive Office Building, the New Executive Office Building, the Blair House, the Treasury Building, and the Vice President's Residence at the Naval Observatory.

SEC. 8101. None of the funds provided in this Act may be obligated or expended for the sale of zinc in the National Defense Stockpile if zinc commodity prices decline more than five percent below the London Metals Exchange market price reported on the date of enactment of this Act.

SEC. 8102. For purposes of section 1553(b) of title 31, United States Code, any subdivision of appropriations made in this Act under the heading "Shipbuilding and Conversion, Navy" shall be considered to be for the same purpose as any subdivision under the heading "Shipbuilding and Conversion, Navy" appropriations in any prior year, and the one percent limitation shall apply to the total amount of the appropriation.

SEC. 8103. During the current fiscal year, and notwithstanding 31 U.S.C. 1552(a), not more than $107,000,000 appropriated under the heading "Aircraft Procurement, Air Force" in Public Law 101–511 and not more than $15,000,000 appropriated under the heading "Aircraft Procurement, Air Force" in Public Law 102–172 which were available and obligated for the B–2 Aircraft Program shall remain available for expenditure and for adjusting obligations for such Program until September 30, 2002.

SEC. 8104. During the current fiscal year, in the case of an appropriation account of the Department of Defense for which the period of availability for obligation has expired or which has closed under the provisions of section 1552 of title 31, United States Code, and which has a negative unliquidated or unexpended balance, an obligation or an adjustment of an obligation may be charged to any current appropriation account for the same purpose as the expired or closed account if—

   (1) the obligation would have been properly chargeable (except as to amount) to the expired or closed account before the end of the period of availability or closing of that account;

   (2) the obligation is not otherwise properly chargeable to any current appropriation account of the Department of Defense; and

   (3) in the case of an expired account, the obligation is not chargeable to a current appropriation of the Department of Defense under the provisions of section 1405(b)(8) of the National Defense Authorization Act for Fiscal Year 1991, Public Law 101–510, as amended (31 U.S.C. 1551 note): Provided, That in the case of an expired account, if subsequent review or investigation discloses that there was not in fact a negative unliquidated or unexpended balance in the account, any charge to a current account under the authority of this section shall be reversed and recorded against the expired account: Provided further, That the total amount charged to a current appropriation under this section may not exceed an amount equal to one percent of the total appropriation for that account.

(TRANSFER OF FUNDS)

SEC. 8105. Upon enactment of this Act, the Secretary of Defense shall make the following transfers of funds: Provided, That the amounts transferred shall be available for the same purposes as the appropriations to which transferred, and for the same time period as the appropriation from which transferred: Provided further, That the amounts shall be transferred between the following appropriations in the amount specified:

From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1985/1995":
    CG–47 cruiser program, $4,300,000;
    For craft, outfitting, and post delivery, $2,000,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1985/1995":
    DDG–51 destroyer program, $6,300,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1986/1996":
    LHD–1 amphibious assault ship program, $2,154,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1986/1996":
    For craft, outfitting and post delivery, $2,154,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1987/1996":
    T–AO fleet oiler program, $1,095,000;
    Oceanographic ship program, $735,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1987/1996":

For craft, outfitting, and post delivery, $1,830,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1989/2000":
    T–AO fleet oiler program, $6,571,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1989/2000":
    SSN–21 attack submarine program, $6,571,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1991/2001":
    DDG–51 destroyer program, $12,687,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1991/2001":
    LHD–1 amphibious assault ship program, $9,387,000;
    MHC coastal mine hunter program, $3,300,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1992/1996":
    For escalation, $1,600,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1992/1996":
    MHC coastal mine hunter program, $1,600,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":
    DDG–51 destroyer program, $5,000,000;
    LSD–41 cargo variant ship program, $2,700,000;
    For craft, outfitting, post delivery, and first destination transportation, and inflation adjustments, $1,577,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":
    AOE combat support ship program, $9,277,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":
    Carrier replacement program, $18,023,000;
To:
  Under the heading, "Shipbuilding and Conversion, Navy, 1993/1997":
    MHC coastal mine hunter program, $6,700,000;
    AOE combat support ship program, $11,323,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1994/1998":
    LHD–1 amphibious assault ship program, $4,100,000;
    Mine warfare command and control ship, $1,000,000;
    For craft, outfitting, post delivery, and first destination transportation, $2,000,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":
    Carrier replacement program, $9,477,000;
From:
  Under the heading, "Shipbuilding and Conversion, Navy, 1996/2000":
    NSSN–1 (AP), $3,791,000;
    DDG–51 destroyer program, $4,075,000;
    CVN Refuelings, $5,212,000;
    LHD–1 amphibious ship program, $16,800,000;

T–AGS–64 multi-purpose oceanographic survey ship, $375,000;

For craft, outfitting, post delivery, conversions and first destination transportation, $11,770,000;

To:

Under the heading, "Shipbuilding and Conversion, Navy, 1994/1998":

DDG–51 destroyer program, $41,800,000; and

Under the heading, "Shipbuilding and Conversion, Navy, 1995/1999":

For craft, outfitting, post delivery, conversions and first destination transportation, $16,800,000.

<< 10 USCA § 113 NOTE >>

SEC. 8106. (a) The Secretary of Defense shall require not later than June 30, 1997, each disbursement by the Department of Defense in an amount in excess of $3,000,000 be matched to a particular obligation before the disbursement is made.

(b) The Secretary shall ensure that a disbursement in excess of the threshold amount applicable under section (a) is not divided into multiple disbursements of less than that amount for the purpose of avoiding the applicability of such section to that disbursement.

SEC. 8107. Notwithstanding any other provision of law, the Air Force shall not introduce any new supplier for the remaining production units for the AN/ALE–47 Countermeasures Dispenser System without conducting a full and open competition that will include, but not be limited to, small businesses.

SEC. 8108. The Under Secretary of Defense (Comptroller) shall submit to the congressional defense committees a detailed report identifying, by amount and by separate budget activity, activity group, subactivity group, line item, program element, program, project, subproject, and activity, any activity for which the fiscal year 1998 budget request was reduced because Congress appropriated funds above the President's budget request for that specific activity for fiscal year 1997.

<< 10 USCA § 2241 NOTE >>

SEC. 8109. In applying section 9005 of the Department of Defense Appropriations Act, 1993, Public Law 102–396 (10 U.S.C. 2241 note), during the current fiscal year and thereafter—

(1) the term "synthetic fabric and coated synthetic fabric" shall be deemed to include all textile fibers and yarns that are for use in such fabrics; and

(2) such section shall be treated, notwithstanding section 34 of Public Law 93–400 (41 U.S.C. 430), as being applicable to contracts and subcontracts for the procurement of commercial items that are articles or items, specialty metals, or tools covered by that section 9005.

SEC. 8110. Notwithstanding any other provision of law, including Section 2304(j) of title 10, United States Code, of the funds appropriated under the heading "Aircraft Procurement, Navy" in Public Law 104–61, $45,000,000 shall be made available only for acquisition of T–39N aircraft, associated ground-based training system (GBTS), service life extension related components and parts, associated equipment, and data that meet the Undergraduate Flight Officer (UNFO) training requirements by procurement of the T–39N aircraft currently being used by the Navy for UNFO training under a services contract.

SEC. 8111. TRADEOFF STUDY OF CURRENT AND FUTURE DEEP–STRIKE CAPABILITIES.—

(1) The Secretary of Defense shall carry out the deep-strike tradeoff study announced by the President to study tradeoffs between bombers, land and sea-based tactical aircraft, and missiles capable of striking targets in an enemy's rear area.

(2) The Secretary of Defense shall establish an ad hoc review committee under the auspices of the Defense Science Board to establish the methodological approach to the tradeoff study, to establish a broad range of stressing scenarios of interest, and to review assumptions regarding the analyses to be conducted.

(3) The ad hoc review committee to be established under paragraph (2) shall include among its members analysts who have performed or participated in bomber tradeoff analysis, retired military personnel with broad experience in recent conventional warfare operations, and experts on the logistics of both initial deployment and sustaining support. These members shall be selected without regard for current service on the Defense Science Board.

(4) After submitting its recommendations for the conduct of the deep-strike tradeoff study to the Secretary of Defense, the ad hoc review committee shall continue to meet regularly to review preliminary results of the analysis and to recommend additional variations in assumptions that may be required to illuminate particular force tradeoff issues.

SEC. 8112. Notwithstanding 31 U.S.C. 1552(a), of the funds provided in Department of Defense Appropriations Acts, not more than the specified amounts of funds from the following accounts shall remain available for the payment of satellite on-orbit incentive fees until the fees are paid:

"Missile Procurement, Air Force, 1990/1992", $17,800,000;

"Missile Procurement, Air Force, 1991/1993", $19,330,000;

"Missile Procurement, Air Force, 1992/1994", $23,570,000;

"Missile Procurement, Air Force, 1993/1995", $16,780,000;

"Missile Procurement, Air Force, 1994/1996", $16,780,000.

SEC. 8113. TACTICAL AIRCRAFT REQUIREMENT STUDY.—The Secretary of Defense and the Chairman of the Joint Chiefs of Staff shall carry out a joint study under the direct supervision of the Joint Requirements Oversight Council (JROC) assessing future tactical aircraft requirements across service jurisdictions. This study shall determine the best and most affordable mix of weapon systems to carry out different mission areas and shall include recommendations for changes to the planned numbers and types of tactical aircraft to be developed and procured over the next ten years if appropriate. Such report shall be submitted to the congressional defense committees no later than March 30, 1997.

SEC. 8114. None of the funds available to the Department of the Navy may be used to enter into any contract for the overhaul, repair, or maintenance of any naval vessel homeported on the West Coast of the United States which includes charges for interport differential as an evaluation factor for award.

SEC. 8115. (a) None of the funds available to the Department of Defense under this Act may be obligated or expended to reimburse a defense contractor for restructuring costs associated with a business combination of the defense contractor that occurs after the date of enactment of this Act unless:

(1) the auditable savings for the Department of Defense resulting from the restructuring will exceed the costs allowed by a factor of at least two to one, or

(2) the savings for the Department of Defense resulting from the restructuring will exceed the costs allowed and the Secretary of Defense determines that the business combination will result in the preservation of a critical capability that might otherwise be lost to the Department, and

(3) the report required by Section 818(e) of Public Law 103–337 to be submitted to Congress in 1996 is submitted.

(b) Not later than April 1, 1997, the Comptroller General shall, in consultation with the Inspector General of the Department of Defense, the Secretary of Defense, and the Secretary of Labor, submit to Congress a report which shall include the following:

(1) an analysis and breakdown of the restructuring costs paid by or submitted to the Department of Defense to companies involved in business combinations since 1993;

(2) an analysis of the specific costs associated with workforce reductions;

(3) an analysis of the services provided to the workers affected by business combinations;

(4) an analysis of the effectiveness of the restructuring costs used to assist laid off workers in gaining employment;

(5) in accordance with section 818 of Public Law 103–337, an analysis of the savings reached from the business combination relative to the restructuring costs paid by the Department of Defense.

(c) The report should set forth recommendations to make this program more effective for workers affected by business combinations and more efficient in terms of the use of Federal dollars.

SEC. 8116. Notwithstanding any other provision of law, none of the funds appropriated in this Act may be used to purchase, install, replace, or otherwise repair any lock on a safe or security container which protects information critical to national security or any other classified materials and which has not been certified as passing the security lock specifications contained in regulation FF–L–2740 dated October 12, 1989, and has not passed all testing criteria and procedures established through February 28, 1992: Provided, That the Director of Central Intelligence may waive this provision, on a case-by-case basis only, upon certification that the above cited locks are not adequate for the protection of sensitive intelligence information.

SEC. 8117. Section 8110 of Public Law 104–61 (109 Stat. 674) is hereby repealed.

SEC. 8118. The Secretary of Defense, in conjunction with the Secretary of Labor, shall take such steps as required to ensure that those Department of Defense contractors and other entities subject to section 4212(d) of title 38, United States Code are

aware of, and in compliance with, the requirements of that section regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans: Provided, That the Secretary of Defense shall ensure that those Department of Defense contractors and other entities subject to section 4212(d) of title 38, United States Code which have contracts with the Department of Defense are notified of the potential penalties associated with failure to comply with these annual reporting requirements (including potential suspension or debarment from federal contracting): Provided further, That within 180 days of enactment of this Act the Secretary of Labor and the Secretary of Defense shall submit a report to Congress which—

(1) using the most recent reporting data, details the number of reports received from Department of Defense contractors and the estimated number of Department of Defense contractors which are not in compliance with these annual reporting requirements;

(2) describes the steps taken by the Departments of Labor and Defense in order to ensure compliance with section 4212(d) of title 38, United States Code;

(3) describes any additional measures taken or planned to be taken by the Departments of Labor and Defense to improve compliance with section 4212(d) of title 38, United States Code pursuant to this section; and

(4) any further recommendations regarding additional action (including changes in existing law) which may be necessary to improve compliance with section 4212(d) of title 38, United States Code.

SEC. 8119. Funds appropriated in title II of this Act for supervision and administration costs for facilities maintenance and repair, minor construction, or design projects may be obligated at the time the reimbursable order is accepted by the performing activity: Provided, That for the purpose of this section, supervision and administration costs includes all in-house Government cost.

SEC. 8120. (a) LIMITATION ON ADVANCE BILLING.—During fiscal year 1997, advance billing for services provided or work performed by the Defense Business Operations Fund activities of the Department of the Navy in excess of $1,000,000,000 is prohibited.

(b) REVISED RATES; ADDITIONAL SURCHARGES.—In conjunction with the Under Secretary of Defense (Comptroller), the Secretary of the Navy shall develop a plan to revise fiscal year 1997 customer rates or establish additional surcharges so as to increase revenues to the Defense Business Operations Fund by at least an additional $500,000,000 in executing orders accepted during fiscal year 1997.

(c) TRANSFER AUTHORITY.—To the extent necessary to comply with any rate increase or new surcharge on rates in fiscal year 1997 established under subsection (b), the Secretary of the Navy shall transfer at least $500,000,000, from funds made available under subsection (d), into customer accounts of the Navy used to reimburse the Defense Business Operations Fund so as to provide customers with sufficient resources to pay the increased customer rates and additional surcharges. The transfer authority provided by this subsection is in addition to other transfer authority provided in this Act. The funds transferred shall be merged with and available for the same purposes, and for the same time period, as the appropriation to which transferred.

(d) SOURCE OF FUNDS.—To provide funds for transfer under subsection (c), the amounts appropriated elsewhere in this Act for the following appropriation accounts are reduced by 2.0 percent: Aircraft Procurement, Navy; Weapons Procurement, Navy; Procurement of Ammunition, Navy and Marine Corps; Shipbuilding and Conversion, Navy; Other Procurement, Navy; and Research, Development, Test and Evaluation, Navy. These reductions shall be applied on a pro-rata basis to each line item, program element, program, project, subproject, and activity within each appropriation account.

SEC. 8121. The Secretary of Defense may waive reimbursement of the cost of conferences, seminars, courses of instruction, or similar educational activities of the Asia–Pacific Center for Security Studies for military officers and civilian officials of foreign nations if the Secretary determines that attendance by such personnel, without reimbursement, is in the national security interest of the United States: Provided, That costs for which reimbursement is waived pursuant to this subsection shall be paid from appropriations available for the Asia–Pacific Center.

SEC. 8122. (a) Of the amounts appropriated or otherwise made available by this Act for the Department of the Air Force, $2,000,000 shall be available only for a facility at Lackland Air Force Base, Texas to provide comprehensive care and rehabilitation services to children with disabilities who are dependents of members of the Armed Forces.

(b) Subject to subsection (c), the Secretary of the Air Force shall grant the funds made available under subsection (a) to the Children's Association for Maximum Potential (CAMP) for use by the association to defray the costs of designing and constructing the facility referred to in subsection (a).

(c)(1) The Secretary may not make a grant of funds under subsection (b) until the Secretary and the association enter into an agreement under which the Secretary leases to the association the facility to be constructed using the funds.

AR.03212

(2) The term of the lease under subsection (c)(1) may not be less than 25 years.

(3) The Secretary may require such additional terms and conditions in connection with the lease as the Secretary considers appropriate to protect the interests of the United States.

SEC. 8123. None of the funds appropriated by this Act may be obligated or expended—

(1) to reduce the number of units of special operations forces of the Army National Guard during fiscal year 1997;

(2) to reduce the authorized strength of any such unit below the strength authorized for the unit as of September 30, 1996; or

(3) to apply any administratively imposed limitation on the assigned strength of any such unit at less than the strength authorized for that unit as of September 30, 1996.

SEC. 8124. (a) The Secretary of the Army shall ensure that solicitations for contracts for unrestricted procurement to be entered into using funds appropriated for the Army by this Act include, where appropriate, specific goals for subcontracts with small businesses, small disadvantaged businesses, and women owned small businesses.

(b) The Secretary shall ensure that any subcontract entered into pursuant to a solicitation referred to in subsection (a) that meets a specific goal referred to in that subsection is credited toward the overall goal of the Army for subcontracts with the businesses referred to in that subsection.

SEC. 8125. (a) The Secretary of the Air Force and the Director of the Office of Personnel Management shall submit a joint report describing in detail the benefits, allowances, services, and any other forms of assistance which may or shall be provided to any civilian employee of the Federal Government or to any private citizen, or to the family of such an individual, who is injured or killed while traveling on an aircraft owned, leased, chartered, or operated by the Government of the United States.

(b) The report required by subsection (a) above shall be submitted to the congressional defense committees and to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives not later than December 15, 1996.

SEC. 8126. (a) Not later than March 1, 1997, the Deputy Secretary of Defense shall submit to the congressional defense committees a report on Department of Defense procurements of propellant raw materials.

(b) The report shall include the following:

(1) The projected future requirements of the Department of Defense for propellant raw materials, such as nitrocellulose.

(2) The capacity, ability, and production cost rates of the national technology and industrial base, including Government-owned, contractor-operated facilities, contractor-owned and operated facilities, and Government-owned, Government-operated facilities, for meeting such requirements.

(3) The national security benefits of preserving in the national technology and industrial base contractor-owned and operated facilities for producing propellant raw materials, including nitrocellulose.

(4) The extent to which the cost rates for production of nitrocellulose in Government-owned, contractor-operated facilities is lower because of the relationship of those facilities with the Department of Defense than such rates would be without that relationship.

(5) The advantages and disadvantages of permitting commercial facilities to compete for award of Department of Defense contracts for procurement of propellant raw materials, such as nitrocellulose.

SEC. 8127. Not later than six months after the date of the enactment of this Act, the Secretary of the Air Force shall submit to Congress a cost-benefit analysis of consolidating the ground station infrastructure of the Air Force that supports polar orbiting satellites.

(INCLUDING TRANSFER OF FUNDS)

SEC. 8128. In addition to the amounts appropriated elsewhere in this Act, $100,000,000 is appropriated for defense against weapons of mass destruction: Provided, That the funds appropriated under this section may be transferred to and merged with funds appropriated elsewhere in this Act and that this transfer authority shall be in addition to any other transfer authority provided under this Act: Provided further, That of the funds made available by this section, $10,000,000 shall be transferred to and merged with funds appropriated in this Act for "Procurement, Marine Corps" and shall be available only for the procurement of equipment that enhances the capability of the Chemical–Biological Incident Response Force to respond to incidents of terrorism.

SEC. 8129. The Secretary of Defense, in consultation with the Secretary of Health and Human Services and the Director of the Office of Personnel Management, shall submit a report to the congressional defense committees by February 1, 1997 containing recommendations regarding the establishment of a demonstration program under which covered beneficiaries under chapter 55

of title 10, United States Code, who are entitled to benefits under part A of the medicare program and who do not have access to TRICARE, would be permitted to enroll in a health benefits program offered through the Federal Employee Health Benefits Program under chapter 89 of title 5, United States Code.

SEC. 8130. (a) Section 203 of H.R. 3230, the National Defense Authorization Act for Fiscal Year 1997, as passed by the Senate on September 10, 1996, is hereby amended by repealing section 203(a), section 203(c), and section 203(e).

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 as if section 203 of such Act had been enacted as so amended.

<< 10 USCA § 1073 NOTE >>

SEC. 8131. (a) Section 722(c) of the National Defense Authorization Act for Fiscal Year 1997 is amended—

(1) by striking out paragraph (2);

(2) by striking out "(1)"; and

(3) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively.

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 as if section 722 of such Act had been enacted as so amended.

SEC. 8132. The Secretary of Defense shall complete a cost/benefit analysis on the establishment of a National Missile Defense Joint Program Office: Provided, That the Secretary of Defense shall submit a report on this analysis to the congressional defense committees no later than March 31, 1997: Provided further, That the Department of Defense shall take no action to establish any National Missile Defense Joint Program Office, to reassign service National Missile Defense roles and missions under any National Missile Defense Joint Program Office strategy or to relocate people under such a strategy prior to March 31, 1997.

SEC. 8133. (a) Notwithstanding any other provision of law, the Chief of the National Guard Bureau may permit the use of equipment of the National Guard Distance Learning Project by any person or entity on a space-available, reimbursable basis. The Chief of the National Guard Bureau shall establish the amount of reimbursement for such use on a case-by-case basis.

(b) Amounts collected under subsection (a) shall be credited to funds available for the National Guard Distance Learning Project and be available to defray the costs associated with the use of equipment of the project under that subsection. Such funds shall be available for such purposes without fiscal year limitation.

SEC. 8134. Using funds available by this Act or any other Act, the Secretary of the Air Force, pursuant to a determination under section 2690 of title 10, United States Code, may implement cost-effective agreements for required heating facility modernization in the Kaiserslautern Military Community in the Federal Republic of Germany: Provided, That in the City of Kaiserslautern such agreements will include the use of United States anthracite as the base load energy for municipal district heat to the United States Defense installations: Provided further, That at Landstuhl Army Regional Medical Center and Ramstein Air Base, furnished heat may be obtained from private, regional or municipal services, if provisions are included for the consideration of United States coal as an energy source.

SEC. 8135. (a) Section 2867 of the National Defense Authorization Act for Fiscal Year 1997 is amended—

(1) by striking out "Michael O'Callaghan Military Hospital" both places it appears in the text of such section and inserting in lieu thereof "Mike O'Callaghan Federal Hospital"; and

(2) in the section heading, by striking out "MICHAEL O'CALLAGHAN MILITARY HOSPITAL" and inserting in lieu thereof "MIKE O'CALLAGHAN FEDERAL HOSPITAL".

(b) The amendments made by subsection (a) shall take effect as of the date of the enactment of the National Defense Authorization Act for Fiscal Year 1997 and shall apply as if such amendments had been included in section 2867 of such Act when enacted.

SEC. 8136. (a) In addition to any other reductions required by this Act, the following funds are hereby reduced from the following accounts in title IV of this Act in the specified amounts:

"Research, Development, Test and Evaluation, Army", $101,257,000;

"Research, Development, Test and Evaluation, Navy", $164,179,000;

"Research, Development, Test and Evaluation, Air Force", $289,992,000;

"Research, Development, Test and Evaluation, Defense–Wide", $119,483,000; and

"Developmental Test and Evaluation, Defense", $5,641,000.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) The reductions taken pursuant to subsection (a) shall be applied on a pro-rata basis by subproject within each R–1 program element as modified by this Act, except that no reduction may be taken against the funds made available to the Department of Defense for Ballistic Missile Defense.

(c) Unless expressly exempted by subsection (b), each program element, program, project, subproject, and activity funded by title IV of this Act shall be allocated a pro-rata share of any of the reductions made by this section.

(d) Not later than 60 days after enactment of this Act, the Secretary of Defense shall submit to the Congressional defense committees a report listing the specific funding reductions allocated to each category listed in subsection (c) above pursuant to this section.

Sec. 8137. In addition to amounts appropriated or otherwise made available in this Act, $230,680,000 is hereby appropriated to the Department of Defense for anti-terrorism, counter-terrorism, and security enhancement programs and activities, as follows:

"Operation and Maintenance, Army", $15,249,000;

"Operation and Maintenance, Navy", $23,956,000;

"Operation and Maintenance, Marine Corps", $600,000;

"Operation and Maintenance, Air Force", $10,750,000;

"Operation and Maintenance, Defense–Wide", $29,534,000;

"Operation and Maintenance, Navy Reserve", $517,000;

"Other Procurement, Army", $5,252,000;

"Other Procurement, Air Force", $101,472,000;

"Procurement, Defense–Wide", $35,350,000;

"Research, Development, Test and Evaluation, Defense–Wide", $8,000,000:

Provided, That such amounts in their entirety are designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended; Provided further, That funds appropriated in this section, or made available by transfer of such funds, for programs and activities of the Central Intelligence Agency shall remain available until September 30, 1997; Provided further, That funds appropriated in this section or made available by transfer of such funds, to any intelligence agency or activity of the United States Government shall be deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

Sec. 8138. Of the amounts provided in Titles I through VIII of this Act, $230,680,000 are permanently canceled: Provided, That the Secretary of Defense shall allocate the amount of budgetary resources canceled by this section on a pro-rata basis among each budget activity, activity group and subactivity group and each program, project or activity within each appropriations account.

Titles I through VIII of this Act may be cited as the "Department of Defense Appropriations Act, 1997".

TITLE IX—FISCAL YEAR 1996 SUPPLEMENTAL APPROPRIATIONS AND RESCISSIONS FOR ANTI–TERRORISM, COUNTER–TERRORISM, AND SECURITY ENHANCEMENT ACTIVITIES

The following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to provide emergency supplemental appropriations for the Department of Defense for the fiscal year ending September 30, 1996, namely:

DEPARTMENT OF DEFENSE—MILITARY

MILITARY PERSONNEL

Military Personnel, Army

For an additional amount for "Military Personnel, Army", $4,800,000: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

Military Personnel, Air Force

For an additional amount for "Military Personnel, Air Force", $4,000,000: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## OPERATION AND MAINTENANCE

### Operation and Maintenance, Army

For an additional amount for "Operation and Maintenance, Army", $21,200,000, to remain available until September 30, 1997: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Operation and Maintenance, Air Force

For an additional amount for "Operation and Maintenance, Air Force", $67,400,000, to remain available until September 30, 1997: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That these funds may be used to liquidate obligations incurred by the Air Force during fiscal year 1996 for costs incurred under the authority of the Feed and Forage Act (41 U.S.C. 11).

## PROCUREMENT

### Other Procurement, Army

For an additional amount for "Other Procurement, Army", $11,600,000, to remain available until September 30, 1998: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Other Procurement, Air Force

For an additional amount for "Other Procurement, Air Force", $13,600,000, to remain available until September 30, 1998: Provided, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## GENERAL PROVISIONS

### (Rescissions)

Sec. 9001. Of the funds provided in Department of Defense Appropriations Acts, the following funds are hereby rescinded, as of the date of enactment of this Act, from the following accounts in the specified amounts:

"Procurement of Ammunition, Army, 1994/1996", $1,000,000;

"Other Procurement, Army, 1994/1996", $6,000,000;

"Research, Development, Test and Evaluation, Army, 1995/1996", $2,055,000;

"Aircraft Procurement, Navy, 1994/1996", $10,157,000;

"Weapons Procurement, Navy, 1994/1996", $10,688,000;

"Other Procurement, Navy, 1994/1996", $4,000,000;

"Research, Development, Test and Evaluation, Navy, 1995/1996", $6,909,000;

"Aircraft Procurement, Air Force, 1994/1996", $18,771,000;

"Missile Procurement, Air Force, 1994/1996", $10,156,000;

"Other Procurement, Air Force, 1994/1996", $14,395,000;

"Research, Development, Test and Evaluation, Air Force, 1995/1996", $4,918,000;

"Procurement, Defense–Wide, 1994/1996", $9,954,000;

"Research, Development, Test and Evaluation, Defense–Wide, 1995/1996", $23,597,000.

Sec. 9002. Funds appropriated by this title, or made available by transfer of such funds, for programs and activities of the Central Intelligence Agency shall remain available until September 30, 1997: Provided, That funds appropriated by this title, or made available by transfer of such funds, to any intelligence agency or intelligence activity of the United States Government shall be deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414).

(c) For programs, projects or activities in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the foreign operations, export financing, and related programs for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—EXPORT AND INVESTMENT ASSISTANCE

### EXPORT–IMPORT BANK OF THE UNITED STATES

The Export–Import Bank of the United States is authorized to make such expenditures within the limits of funds and borrowing authority available to such corporation, and in accordance with law, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 104 of the Government Corporation Control Act, as may be necessary in carrying out the program for the current fiscal year for such corporation: Provided, That none of the funds available during the current fiscal year may be used to make expenditures, contracts, or commitments for the export of nuclear equipment, fuel, or technology to any country other than a nuclear-weapon State as defined in Article IX of the Treaty on the Non–Proliferation of Nuclear Weapons eligible to receive economic or military assistance under this Act that has detonated a nuclear explosive after the date of enactment of this Act.

### SUBSIDY APPROPRIATION

For the cost of direct loans, loan guarantees, insurance, and tied-aid grants as authorized by section 10 of the Export–Import Bank Act of 1945, as amended, $726,000,000 to remain available until September 30, 1998: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That such sums shall remain available until 2012 for the disbursement of direct loans, loan guarantees, insurance and tied-aid grants obligated in fiscal years 1997 and 1998: Provided further, That up to $50,000,000 of funds appropriated by this paragraph shall remain available until expended and may be used for tied-aid grant purposes: Provided further, That none of the funds appropriated by this paragraph may be used for tied-aid credits or grants except through the regular notification procedures of the Committees on Appropriations: Provided further, That funds appropriated by this paragraph are made available notwithstanding section 2(b)(2) of the Export–Import Bank Act of 1945, in connection with the purchase or lease of any product by any East European country, any Baltic State, or any agency or national thereof.

### ADMINISTRATIVE EXPENSES

<< 12 USCA § 635a NOTE >>

For administrative expenses to carry out the direct and guaranteed loan and insurance programs (to be computed on an accrual basis), including hire of passenger motor vehicles and services as authorized by 5 U.S.C. 3109, and not to exceed $20,000 for official reception and representation expenses for members of the Board of Directors, $46,614,000: Provided, That necessary expenses (including special services performed on a contract or fee basis, but not including other personal services) in connection with the collection of moneys owed the Export–Import Bank, repossession or sale of pledged collateral or other assets acquired by the Export–Import Bank in satisfaction of moneys owed the Export–Import Bank, or the investigation or appraisal of any property, or the evaluation of the legal or technical aspects of any transaction for which an application for a loan, guarantee or insurance commitment has been made, shall be considered nonadministrative expenses for the purposes of this heading: Provided further, That, effective July 21, 1997, notwithstanding any other provision of law, none of the funds made available by this or any other Act may be made available to compensate the incumbent Chairman and President of the Export–Import

AR.03217

Bank Provided further, That, notwithstanding subsection (b) of section 117 of the Export Enhancement Act of 1992, subsection (a) thereof shall remain in effect until October 1, 1997.

## OVERSEAS PRIVATE INVESTMENT CORPORATION

### NONCREDIT ACCOUNT

The Overseas Private Investment Corporation is authorized to make, without regard to fiscal year limitations, as provided by 31 U.S.C. 9104, such expenditures and commitments within the limits of funds available to it and in accordance with law as may be necessary: Provided, That the amount available for administrative expenses to carry out the credit and insurance programs (including an amount for official reception and representation expenses which shall not exceed $35,000) shall not exceed $32,000,000: Provided further, That project-specific transaction costs, including direct and indirect costs incurred in claims settlements, and other direct costs associated with services provided to specific investors or potential investors pursuant to section 234 of the Foreign Assistance Act of 1961, shall not be considered administrative expenses for the purposes of this heading.

### PROGRAM ACCOUNT

<< 22 USCA § 2195 >>

For the cost of direct and guaranteed loans, $72,000,000, as authorized by section 234 of the Foreign Assistance Act of 1961: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That such sums shall be available for direct loan obligations and loan guaranty commitments incurred or made during fiscal years 1997 and 1998: Provided further, That such sums shall remain available through fiscal year 2005 for the disbursement of direct and guaranteed loans obligated in fiscal year 1997, and through fiscal year 2006 for the disbursement of direct and guaranteed loans obligated in fiscal year 1998: Provided further, That section 235(a)(3) of the Foreign Assistance Act of 1961 (22 U.S.C. 2195(a)(3)) is amended by striking out "1996" and inserting in lieu thereof "1997" and, notwithstanding section 235(a)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2195(a)(1)), the maximum contingent liability of issuing authority for insurance and financing shall not in the aggregate exceed the amounts provided in section 235(a)(1) and (2) of that Act. In addition, such sums as may be necessary for administrative expenses to carry out the credit program may be derived from amounts available for administrative expenses to carry out the credit and insurance programs in the Overseas Private Investment Corporation Noncredit Account and merged with said account.

## FUNDS APPROPRIATED TO THE PRESIDENT

### TRADE AND DEVELOPMENT AGENCY

For necessary expenses to carry out the provisions of section 661 of the Foreign Assistance Act of 1961, $40,000,000: Provided, That the Trade and Development Agency may receive reimbursements from corporations and other entities for the costs of grants for feasibility studies and other project planning services, to be deposited as an offsetting collection to this account and to be available for obligation until September 30, 1998, for necessary expenses under this paragraph: Provided further, That such reimbursements shall not cover, or be allocated against, direct or indirect administrative costs of the agency.

## TITLE II—BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

For expenses necessary to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes, to remain available until September 30, 1997, unless otherwise specified herein, as follows:

### AGENCY FOR INTERNATIONAL DEVELOPMENT

### CHILD SURVIVAL AND DISEASE PROGRAMS FUND

For necessary expenses to carry out the provisions of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, for child survival, basic education, assistance to combat tropical and other diseases, and related activities, in addition to funds

otherwise available for such purposes, $600,000,000, to remain available until expended: Provided, That this amount shall be made available for such activities as (1) immunization programs, (2) oral rehydration programs, (3) health and nutrition programs, and related education programs, which address the needs of mothers and children, (4) water and sanitation programs, (5) assistance for displaced and orphaned children, (6) programs for the prevention, treatment, and control of, and research on, tuberculosis, HIV/AIDS, polio, malaria and other diseases, (7) not to exceed $98,000,000 for basic education programs for children, and (8) a contribution on a grant basis to the United Nations Children's Fund (UNICEF) pursuant to section 301 of the Foreign Assistance Act of 1961.

## DEVELOPMENT ASSISTANCE

### (INCLUDING TRANSFER OF FUNDS)

   For necessary expenses to carry out the provisions of sections 103 through 106 and chapter 10 of part I of the Foreign Assistance Act of 1961, title V of the International Security and Development Cooperation Act of 1980 (Public Law 96–533) and the provisions of section 401 of the Foreign Assistance Act of 1969, $1,181,500,000, to remain available until September 30, 1998: Provided, That of the amount appropriated under this heading, up to $20,000,000 may be made available for the Inter–American Foundation and shall be apportioned directly to that agency: Provided further, That of the amount appropriated under this heading, up to $11,500,000 may be made available for the African Development Foundation and shall be apportioned directly to that agency: Provided further, That of the funds appropriated under title II of this Act that are administered by the Agency for International Development and made available for family planning assistance, not less than 65 percent shall be made available directly to the agency's central Office of Population and shall be programmed by that office for family planning activities: Provided further, That of the funds appropriated under this heading and under the heading "Child Survival and Disease Programs Fund" that are made available by the Agency for International Development for development assistance activities, the amount made available to carry out chapter 10 of part I of the Foreign Assistance Act of 1961 (relating to the Development Fund for Africa) and the amount made available for activities in the Latin America and Caribbean region should be in at least the same proportion as the amount identified in the fiscal year 1997 draft congressional presentation document for development assistance for each such region is to the total amount requested for development assistance for such fiscal year: Provided further, That funds appropriated under this heading may be made available, notwithstanding any other provision of law except section 515 of this Act, to assist Vietnam to reform its trade regime (such as through reform of its commercial and investment legal codes): Provided further, That none of the funds made available in this Act nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization: Provided further, That none of the funds made available under this heading may be used to pay for the performance of abortion as a method of family planning or to motivate or coerce any person to practice abortions; and that in order to reduce reliance on abortion in developing nations, funds shall be available only to voluntary family planning projects which offer, either directly or through referral to, or information about access to, a broad range of family planning methods and services: Provided further, That in awarding grants for natural family planning under section 104 of the Foreign Assistance Act of 1961 no applicant shall be discriminated against because of such applicant's religious or conscientious commitment to offer only natural family planning; and, additionally, all such applicants shall comply with the requirements of the previous proviso: Provided further, That for purposes of this or any other Act authorizing or appropriating funds for foreign operations, export financing, and related programs, the term "motivate", as it relates to family planning assistance, shall not be construed to prohibit the provision, consistent with local law, of information or counseling about all pregnancy options: Provided further, That nothing in this paragraph shall be construed to alter any existing statutory prohibitions against abortion under section 104 of the Foreign Assistance Act of 1961: Provided further, That, notwithstanding section 109 of the Foreign Assistance Act of 1961, of the funds appropriated under this heading in this Act, and of the unobligated balances of funds previously appropriated under this heading, up to $17,500,000 may be transferred to "International Organizations and Programs" for a contribution to the International Fund for Agricultural Development (IFAD), and that any such transfer of funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That of the funds appropriated under this heading that are made available for assistance programs for displaced and orphaned children and victims of war, not to exceed $25,000, in addition to funds otherwise available for such purposes, may be used to monitor and provide oversight of such programs: Provided further, That not less than $500,000 of the funds made available under this heading shall be available only for support of the United States Telecommunications Training Institute.

## CYPRUS

Of the funds appropriated under the headings "Development Assistance" and "Economic Support Fund", not less than $15,000,000 shall be made available for Cyprus to be used only for scholarships, administrative support of the scholarship program, bicommunal projects, and measures aimed at reunification of the island and designed to reduce tensions and promote peace and cooperation between the two communities on Cyprus.

## BURMA

Of the funds appropriated by this Act to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, not less than $2,500,000 shall be made available to support activities in Burma, along the Burma–Thailand border, and for activities of Burmese student groups and other organizations located outside Burma, for the purposes of fostering democracy in Burma, supporting the provision of medical supplies and other humanitarian assistance to Burmese located in Burma or displaced Burmese along the borders, and for other purposes: Provided, That of this amount, not less than $200,000 shall be made available to support newspapers, publications, and other media activities promoting democracy inside Burma: Provided further, That funds made available under this heading may be made available notwithstanding any other provision of law: Provided further, That provision of such funds shall be made available subject to the regular notification procedures of the Committees on Appropriations.

## PRIVATE AND VOLUNTARY ORGANIZATIONS

<< 22 USCA § 2151u NOTE >>

None of the funds appropriated or otherwise made available by this Act for development assistance may be made available to any United States private and voluntary organization, except any cooperative development organization, which obtains less than 20 per centum of its total annual funding for international activities from sources other than the United States Government: Provided, That the requirements of the provisions of section 123(g) of the Foreign Assistance Act of 1961 and the provisions on private and voluntary organizations in title II of the "Foreign Assistance and Related Programs Appropriations Act, 1985" (as enacted in Public Law 98–473) shall be superseded by the provisions of this section, except that the authority contained in the last sentence of section 123(g) may be exercised by the Administrator with regard to the requirements of this paragraph.

Funds appropriated or otherwise made available under title II of this Act should be made available to private and voluntary organizations at a level which is equivalent to the level provided in fiscal year 1995. Such private and voluntary organizations shall include those which operate on a not-for-profit basis, receive contributions from private sources, receive voluntary support from the public and are deemed to be among the most cost-effective and successful providers of development assistance.

## INTERNATIONAL DISASTER ASSISTANCE

For necessary expenses for international disaster relief, rehabilitation, and reconstruction assistance pursuant to section 491 of the Foreign Assistance Act of 1961, as amended, $190,000,000, to remain available until expended.

## DEBT RESTRUCTURING

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of modifying direct loans and loan guarantees, as the President may determine, for which funds have been appropriated or otherwise made available for programs within the International Affairs Budget Function 150, including the cost of selling, reducing, or canceling amounts, through debt buybacks and swaps, owed to the United States as a result of concessional loans made to eligible Latin American and Caribbean countries, pursuant to part IV of the Foreign Assistance Act of 1961, and of modifying concessional loans authorized under title I of the Agricultural Trade Development and Assistance Act of 1954, as amended, as authorized under subsection (a) under the heading "Debt Reduction for Jordan" in title VI of Public Law 103–306; $27,000,000, to remain available until expended: Provided, That none of the funds appropriated under this heading shall be obligated except as provided through the regular notification procedures of the Committees on Appropriations.

## MICRO AND SMALL ENTERPRISE DEVELOPMENT PROGRAM ACCOUNT

For the cost of direct loans and loan guarantees, $1,500,000, as authorized by section 108 of the Foreign Assistance Act of 1961, as amended: Provided, That such costs shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That guarantees of loans made under this heading in support of microenterprise activities may guarantee up to 70 percent of the principal amount of any such loans notwithstanding section 108 of the Foreign Assistance Act of 1961. In addition, for administrative expenses to carry out programs under this heading, $500,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: Provided further, That funds made available under this heading shall remain available until September 30, 1998.

### HOUSING GUARANTY PROGRAM ACCOUNT

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of guaranteed loans authorized by sections 221 and 222 of the Foreign Assistance Act of 1961, $3,500,000, to remain available until September 30, 1998: Provided, That these funds are available to subsidize loan principal, 100 percent of which shall be guaranteed, pursuant to the authority of such sections. In addition, for administrative expenses to carry out guaranteed loan programs, $6,000,000, all of which may be transferred to and merged with the appropriation for Operating Expenses of the Agency for International Development: Provided further, That commitments to guarantee loans under this heading may be entered into notwithstanding the second and third sentences of section 222(a) and, with regard to programs for Central and Eastern Europe and programs for the benefit of South Africans disadvantaged by apartheid, section 223(j) of the Foreign Assistance Act of 1961.

### PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the "Foreign Service Retirement and Disability Fund", as authorized by the Foreign Service Act of 1980, $43,826,000.

### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT

For necessary expenses to carry out the provisions of section 667, $470,750,000: Provided, That none of the funds appropriated by this Act for programs administered by the Agency for International Development may be used to finance printing costs of any report or study (except feasibility, design, or evaluation reports or studies) in excess of $25,000 without the approval of the Administrator of the Agency or the Administrator's designee

### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT OFFICE OF INSPECTOR GENERAL

For necessary expenses to carry out the provisions of section 667, $30,000,000, to remain available until September 30, 1998, which sum shall be available for the Office of the Inspector General of the Agency for International Development.

### OTHER BILATERAL ECONOMIC ASSISTANCE

### ECONOMIC SUPPORT FUND

For necessary expenses to carry out the provisions of chapter 4 of part II, $2,343,000,000, to remain available until September 30, 1998: Provided, That of the funds appropriated under this heading, not less than $1,200,000,000 shall be available only for Israel, which sum shall be available on a grant basis as a cash transfer and shall be disbursed within thirty days of enactment of this Act or by October 31, 1996, whichever is later: Provided further, That not less than $815,000,000 shall be available only for Egypt, which sum shall be provided on a grant basis, and of which sum cash transfer assistance may be provided, with the understanding that Egypt will undertake significant economic reforms which are additional to those which were undertaken in previous fiscal years, and of which not less than $200,000,000 shall be provided as Commodity Import Program assistance: Provided further, That in exercising the authority to provide cash transfer assistance for Israel and Egypt, the President shall ensure that the level of such assistance does not cause an adverse impact on the total level of nonmilitary exports from the United States to each such country: Provided further, That it is the sense of the Congress that the recommended levels of assistance for Egypt and Israel are based in great measure upon their continued participation in the Camp David Accords and upon the Egyptian–Israeli peace treaty: Provided further, That none of the funds appropriated under this heading shall be made available for Zaire.

### INTERNATIONAL FUND FOR IRELAND

For necessary expenses to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961, $19,600,000, which shall be available for the United States contribution to the International Fund for Ireland and shall be made available in accordance with the provisions of the Anglo–Irish Agreement Support Act of 1986 (Public Law 99–415): Provided, That such amount shall be expended at the minimum rate necessary to make timely payment for projects and activities: Provided further, That funds made available under this heading shall remain available until September 30, 1998.

### ASSISTANCE FOR EASTERN EUROPE AND THE BALTIC STATES

(a) For necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961 and the Support for East European Democracy (SEED) Act of 1989, $475,000,000, to remain available until September 30, 1998, which shall be available, notwithstanding any other provision of law, for economic assistance and for related programs for Eastern Europe and the Baltic States.

(b) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the Fund's disbursement of such funds for program purposes. The Fund may retain for such program purposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

(c) Funds appropriated under this heading shall be considered to be economic assistance under the Foreign Assistance Act of 1961 for purposes of making available the administrative authorities contained in that Act for the use of economic assistance.

(d) None of the funds appropriated under this heading may be made available for new housing construction or repair or reconstruction of existing housing in Bosnia and Herzegovina unless directly related to the efforts of United States troops to promote peace in said country.

(e) With regard to funds appropriated or otherwise made available under this heading for the economic revitalization program in Bosnia and Herzegovina, and local currencies generated by such funds (including the conversion of funds appropriated under this heading into currency used by Bosnia and Herzegovina as local currency and local currency returned or repaid under such program)—

(1) the Administrator of the Agency for International Development shall provide written approval for grants and loans prior to the obligation and expenditure of funds for such purposes, and prior to the use of funds that have been returned or repaid to any lending facility or grantee; and

(2) the provisions of section 531 of this Act shall apply.

(f) With regard to funds appropriated under this heading that are made available for economic revitalization programs in Bosnia and Herzegovina, 50 percent of such funds shall not be available for obligation unless the President determines and certifies to the Committees on Appropriations that the Federation of Bosnia and Herzegovina has complied with article III of annex 1–A of the General Framework Agreement for Peace in Bosnia and Herzegovina concerning the withdrawal of foreign forces, and that intelligence cooperation on training, investigations, and related activities between Iranian officials and Bosnian officials has been terminated.

### ASSISTANCE FOR THE NEW INDEPENDENT STATES OF THE FORMER SOVIET UNION

(a) For necessary expenses to carry out the provisions of chapter 11 of part I of the Foreign Assistance Act of 1961 and the FREEDOM Support Act, for assistance for the new independent states of the former Soviet Union and for related programs, $625,000,000, to remain available until September 30, 1998: Provided, That the provisions of such chapter shall apply to funds appropriated by this paragraph.

(b) None of the funds appropriated under this heading shall be transferred to the Government of Russia—

(1) unless that Government is making progress in implementing comprehensive economic reforms based on market principles, private ownership, negotiating repayment of commercial debt, respect for commercial contracts, and equitable treatment of foreign private investment; and

(2) if that Government applies or transfers United States assistance to any entity for the purpose of expropriating or seizing ownership or control of assets, investments, or ventures.

(c) Funds may be furnished without regard to subsection (b) if the President determines that to do so is in the national interest.

<< 22 USCA § 5814 NOTE >>

(d) None of the funds appropriated under this heading shall be made available to any government of the new independent states of the former Soviet Union if that government directs any action in violation of the territorial integrity or national sovereignty of any other new independent state, such as those violations included in the Helsinki Final Act: Provided, That such funds may be made available without regard to the restriction in this subsection if the President determines that to do so is in the national security interest of the United States: Provided further, That the restriction of this subsection shall not apply to the use of such funds for the provision of assistance for purposes of humanitarian, disaster and refugee relief.

(e) None of the funds appropriated under this heading for the new independent states of the former Soviet Union shall be made available for any state to enhance its military capability: Provided, That this restriction does not apply to demilitarization or nonproliferation programs.

(f) Funds appropriated under this heading shall be subject to the regular notification procedures of the Committees on Appropriations.

(g) Funds made available in this Act for assistance to the new independent states of the former Soviet Union shall be subject to the provisions of section 117 (relating to environment and natural resources) of the Foreign Assistance Act of 1961.

(h)(1) Of the funds appropriated under title II of this Act, including funds appropriated under this heading, not less than $10,000,000 shall be available only for assistance for Mongolia, of which amount not less than $6,000,000 shall be available only for the Mongolian energy sector.

(2) Funds made available for assistance for Mongolia may be made available in accordance with the purposes and utilizing the authorities provided in chapter 11 of part I of the Foreign Assistance Act of 1961.

(i) Funds made available in this Act for assistance to the New Independent States of the former Soviet Union shall be provided to the maximum extent feasible through the private sector, including small- and medium-size businesses, entrepreneurs, and others with indigenous private enterprises in the region, intermediary development organizations committed to private enterprise, and private voluntary organizations: Provided, That grantees and contractors should, to the maximum extent possible, place in key staff positions specialists with prior on the ground expertise in the region of activity and fluency in one of the local languages.

(j) In issuing new task orders, entering into contracts, or making grants, with funds appropriated under this heading or in prior appropriations Acts, for projects or activities that have as one of their primary purposes the fostering of private sector development, the Coordinator for United States Assistance to the New Independent States and the implementing agency shall encourage the participation of and give significant weight to contractors and grantees who propose investing a significant amount of their own resources (including volunteer services and in-kind contributions) in such projects and activities.

(k) Of the funds made available under this heading, not less than $225,000,000 shall be made available for Ukraine, of which funds not less than $25,000,000 shall be made available to carry out United States decommissioning obligations regarding the Chornobyl plant made in the Memorandum of Understanding between the Government of Ukraine and the G–7 Group: Provided, That not less than $35,000,000 shall be made available for agricultural projects, including those undertaken through the Food Systems Restructuring Program, which leverage private sector resources with United States Government assistance: Provided further, That $5,000,000 shall be available for a small business incubator project: Provided further, That $5,000,000 shall be made available for screening and treatment of childhood mental and physical illnesses related to Chornobyl radiation: Provided further, That $5,000,000 shall be available only for a land and resource management institute to identify nuclear contamination at Chornobyl: Provided further, That $15,000,000 shall be available for the legal restructuring necessary to support a decentralized market-oriented economic system, including enactment of necessary substantive commercial law, implementation of reforms necessary to establish an independent judiciary and bar, legal education for judges, attorneys, and law students, and education of the public designed to promote understanding of a law-based economy.

(l) Of the funds made available for Ukraine, under this Act and Public Law 104–107, not less than $50,000,000 shall be made available to improve safety at nuclear reactors: Provided, That of this amount $20,000,000 shall be provided for the purchase and installation of, and training for, safety parameter display or control systems at all operational nuclear reactors: Provided further, That of this amount, $20,000,000 shall be made available for the purchase, construction, installation and training for Full Scope and Analytical/Engineering simulators: Provided further, That of this amount funds shall be made available to conduct Safety Analysis Reports at all operational nuclear reactors.

(m) Of the funds made available by this Act, not less than $95,000,000 shall be made available for Armenia.

(n) Funds appropriated under this heading or in prior appropriations Acts that are or have been made available for an Enterprise Fund may be deposited by such Fund in interest-bearing accounts prior to the disbursement of such funds by the Fund for program purposes. The Fund may retain for such program proposes any interest earned on such deposits without returning such interest to the Treasury of the United States and without further appropriation by the Congress. Funds made available for Enterprise Funds shall be expended at the minimum rate necessary to make timely payment for projects and activities.

(o)(1) None of the funds appropriated under this heading may be made available for Russia unless the President determines and certifies in writing to the Committees on Appropriations that the Government of Russia has terminated implementation of arrangements to provide Iran with technical expertise, training, technology, or equipment necessary to develop a nuclear reactor or related nuclear research facilities or programs.

(2) Paragraph (1) shall not apply if the President determines that making such funds available is important to the national security interest of the United States. Any such determination shall cease to be effective six months after being made unless the President determines that its continuation is important to the national security interest of the United States.

(p) Of the funds made available under this heading, not less than $10,000,000 shall be made available for a United States contribution to the Trans–Caucasus Enterprise Fund: Provided, That to further the development of the private sector in the Trans–Caucasus, such amount and amounts appropriated for purposes of subsection (t) under the heading "Assistance for the New Independent States of the Former Soviet Union" in Public Law 104–107 may be invested in a Trans–Caucasus Enterprise Fund or, notwithstanding the provisions of such subsection, invested in other funds established by public or private organizations, or transferred to the Overseas Private Investment Corporation to be available, subject to the requirements of the Federal Credit Reform Act, to subsidize the costs of direct and guaranteed loans.

(q)(1) Funds appropriated under this heading may not be made available for the Government of Ukraine if the President determines and reports to the Committees on Appropriations that the Government of Ukraine is engaged in military cooperation with the Government of Libya.

(2) Paragraph (1) shall not apply if the President determines that making such funds available is important to the national security interest of the United States. Any such determination shall cease to be effective six months after being made unless the President determines that its continuation is important to the national security interest of the United States.

(r) Of the funds appropriated under this heading, not less than $15,000,000 should be available only for a family planning program for the New Independent States of the former Soviet Union comparable to the family planning program currently administered by the Agency for International Development in the Central Asian Republics and focusing on population assistance which provides an alternative to abortion.

(s) Funds made available under this Act or any other Act (other than assistance under title V of the FREEDOM Support Act and section 1424 of the "National Defense Authorization Act for Fiscal Year 1997") may not be provided for assistance to the Government of Azerbaijan until the President determines, and so reports to the Congress, that the Government of Azerbaijan is taking demonstrable steps to cease all blockades and other offensive uses of force against Armenia and Nagorno–Karabakh.

(t) Of the funds appropriated under this heading, not less than $2,500,000 shall be made available for the American–Russian Center.

INDEPENDENT AGENCY

PEACE CORPS

For expenses necessary to carry out the provisions of the Peace Corps Act (75 Stat. 612), $208,000,000, including the purchase of not to exceed five passenger motor vehicles for administrative purposes for use outside of the United States: Provided, That none of the funds appropriated under this heading shall be used to pay for abortions: Provided further, That funds appropriated under this heading shall remain available until September 30, 1998.

DEPARTMENT OF STATE

INTERNATIONAL NARCOTICS CONTROL

For necessary expenses to carry out section 481 of the Foreign Assistance Act of 1961, $213,000,000: Provided, That during fiscal year 1997, the Department of State may also use the authority of section 608 of the Foreign Assistance Act of 1961, without regard to its restrictions, to receive non-lethal excess property from an agency of the United States Government for the

purpose of providing it to a foreign country under chapter 8 of part I of that Act subject to the regular notification procedures of the Committees on Appropriations: Provided further, That none of the funds made available under this heading may be provided to any unit of the security forces of a foreign country if the Secretary of State has credible evidence to believe such unit has committed gross violations of human rights unless the Secretary determines and reports to the Committees on Appropriations that the government of such country is taking steps to bring the responsible members of the security forces unit to justice.

## MIGRATION AND REFUGEE ASSISTANCE

For expenses, not otherwise provided for, necessary to enable the Secretary of State to provide, as authorized by law, a contribution to the International Committee of the Red Cross, assistance to refugees, including contributions to the International Organization for Migration and the United Nations High Commissioner for Refugees, and other activities to meet refugee and migration needs; salaries and expenses of personnel and dependents as authorized by the Foreign Service Act of 1980; allowances as authorized by sections 5921 through 5925 of title 5, United States Code; purchase and hire of passenger motor vehicles; and services as authorized by section 3109 of title 5, United States Code, $650,000,000: Provided, That not more than $12,000,000 shall be available for administrative expenses: Provided further, That not less than $80,000,000 shall be made available for refugees from the former Soviet Union and Eastern Europe and other refugees resettling in Israel.

## REFUGEE RESETTLEMENT ASSISTANCE

For necessary expenses for the targeted assistance program authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 and administered by the Office of Refugee Resettlement of the Department of Health and Human Services, in addition to amounts otherwise available for such purposes, $5,000,000.

## UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For necessary expenses to carry out the provisions of section 2(c) of the Migration and Refugee Assistance Act of 1962, as amended (22 U.S.C. 260(c)), $50,000,000, to remain available until expended: Provided, That the funds made available under this heading are appropriated notwithstanding the provisions contained in section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 which would limit the amount of funds which could be appropriated for this purpose.

## NONPROLIFERATION, ANTI–TERRORISM, DEMINING AND RELATED PROGRAMS

For necessary expenses for nonproliferation, anti-terrorism and related programs and activities, $133,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance, section 504 of the FREEDOM Support Act for the Nonproliferation and Disarmament Fund, section 23 of the Arms Export Control Act for demining activities, notwithstanding any other provision of law, including activities implemented through non-governmental and international organizations, section 301 of the Foreign Assistance Act of 1961 for a voluntary contribution to the International Atomic Energy Agency (IAEA) and a voluntary contribution to the Korean Peninsula Energy Development Organization (KEDO), and for the acquisition and provision of goods and services, or for grants to Israel necessary to support the eradication of terrorism in and around Israel: Provided, That of this amount not to exceed $15,000,000, to remain available until expended, may be made available for the Nonproliferation and Disarmament Fund, notwithstanding any other provision of law, to promote bilateral and multilateral activities relating to nonproliferation and disarmament: Provided further, That such funds may also be used for such countries other than the new independent states of the former Soviet Union and international organizations when it is in the national security interest of the United States to do so: Provided further, That such funds shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That funds appropriated under this heading may be made available for the International Atomic Energy Agency only if the Secretary of State determines (and so reports to the Congress) that Israel is not being denied its right to participate in the activities of that Agency: Provided further, That not to exceed $25,000,000 may be made available to the Korean Peninsula Energy Development Organization (KEDO) only for the administrative expenses and heavy fuel oil costs associated with the Agreed Framework: Provided further, That such funds may be obligated to KEDO only if, prior to such obligation of funds, the President certifies and so reports to Congress that (1)(A) the United States is taking steps to assure that progress is made on the implementation of the January 1, 1992, Joint Declaration on the Denuclearization of the Korean Peninsula and the implementation of the North–South dialogue, and (B) North Korea is complying with the other provisions of the Agreed Framework between North Korea and the United States and with the Confidential Minute; (2) North Korea is cooperating fully in the canning and safe storage of all spent fuel

from its graphite-moderated nuclear reactors and that such canning and safe storage is scheduled to be completed by the end of fiscal year 1997; and (3) North Korea has not significantly diverted assistance provided by the United States for purposes for which it was not intended: *Provided further*, That the President may waive the certification requirements of the preceding proviso if the President determines that it is vital to the national security interests of the United States: *Provided further*, That no funds may be obligated for KEDO until 30 calendar days after submission to Congress of the waiver permitted under the preceding proviso: *Provided further*, That before obligating any funds for KEDO, the President shall report to Congress on (1) the cooperation of North Korea in the process of returning to the United States the remains of United States military personnel who are listed as missing in action as a result of the Korean conflict (including conducting joint field activities with the United States); (2) violations of the military armistice agreement of 1953; (3) the actions which the United States is taking to assure that North Korea is consistently taking steps to implement the Joint Declaration on Denuclearization of the Korean Peninsula and engage in North–South dialogue; and (4) all instances of non-compliance with the Agreed Framework between North Korea and the United States and the Confidential Minute, including diversion of heavy fuel oil: *Provided further*, That the obligation of such funds shall be subject to the regular notification procedures of the Committees on Appropriations: *Provided further*, That the Secretary of State shall submit to the appropriate congressional committees an annual report (to be submitted with the annual presentation for appropriations) providing a full and detailed accounting of the fiscal year request for the United States contribution to KEDO, the expected operating budget of the Korean Peninsula Energy Development Organization, to include proposed annual costs associated with heavy fuel oil purchases and other related activities, and the amount of funds pledged by other donor nations and organizations to support KEDO activities on a per country basis.

## TITLE III—MILITARY ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT INTERNATIONAL MILITARY EDUCATION AND TRAINING

For necessary expenses to carry out the provisions of section 541 of the Foreign Assistance Act of 1961, $43,475,000: *Provided*, That none of the funds appropriated under this heading shall be available for Zaire and Guatemala: *Provided further*, That funds appropriated under this heading for grant financed military education and training for Indonesia may only be available for expanded international military education and training.

### FOREIGN MILITARY FINANCING PROGRAM

For expenses necessary for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $3,164,000,000: *Provided*, That of the funds appropriated by this paragraph not less than $1,800,000,000 shall be available for grants only for Israel, and not less than $1,300,000,000 shall be available for grants only for Egypt: *Provided further*, That the funds appropriated by this paragraph for Israel shall be disbursed within thirty days of enactment of this Act or by October 31, 1996, whichever is later: *Provided further*, That to the extent that the Government of Israel requests that funds be used for such purposes, grants made available for Israel by this paragraph shall, as agreed by Israel and the United States, be available for advanced weapons systems, of which not less than $475,000,000 shall be available for the procurement in Israel of defense articles and defense services, including research and development: *Provided further*, That of the funds made available under this paragraph, $30,000,000 shall be available for assistance on a grant basis for Poland, Hungary, and the Czech Republic to carry out title II of Public Law 103–477 and section 585 of Public Law 104–107: *Provided further*, That funds made available under this paragraph shall be nonrepayable notwithstanding any requirement in section 23 of the Arms Export Control Act: *Provided further*, That, for the purpose only of providing support for NATO expansion and the Warsaw Initiative Program, of the funds appropriated by this Act under the headings "Assistance for Eastern Europe and the Baltic States" and "Assistance for the New Independent States of the Former Soviet Union", up to a total of $7,000,000 may be transferred, notwithstanding any other provision of law, to the funds appropriated under this paragraph: *Provided further*, That none of the funds made available under this heading shall be available for any non-NATO country participating in the Partnership for Peace Program except through the regular notification procedures of the Committees on Appropriations.

For the cost, as defined in section 502 of the Congressional Budget Act of 1974, of direct loans authorized by section 23 of the Arms Export Control Act as follows: cost of direct loans, $60,000,000: *Provided*, That these funds are available to subsidize gross obligations for the principal amount of direct loans of not to exceed $540,000,000: *Provided further*, That the rate of interest charged on such loans shall be not less than the current average market yield on outstanding marketable obligations of the United States of comparable maturities: *Provided further*, That of the funds appropriated under this paragraph $20,000,000

shall be made available to Poland, Hungary, and the Czech Republic: Provided further, That funds appropriated under this heading shall be made available for Greece and Turkey only on a loan basis, and the principal amount of direct loans for each country shall not exceed the following: $122,500,000 only for Greece and $175,000,000 only for Turkey.

None of the funds made available under this heading shall be available to finance the procurement of defense articles, defense services, or design and construction services that are not sold by the United States Government under the Arms Export Control Act unless the foreign country proposing to make such procurements has first signed an agreement with the United States Government specifying the conditions under which such procurements may be financed with such funds: Provided, That all country and funding level increases in allocations shall be submitted through the regular notification procedures of section 515 of this Act: Provided further, That funds made available under this heading shall be obligated upon apportionment in accordance with paragraph (5)(C) of title 31, United States Code, section 1501(a): Provided further, That none of the funds appropriated under this heading shall be available for Zaire, Sudan, Liberia, and Guatemala: Provided further, That funds made available under this heading may be used, notwithstanding any other provision of law, for activities related to the clearance of landmines and unexploded ordnance, and may include activities implemented through nongovernmental and international organizations: Provided further, That only those countries for which assistance was justified for the "Foreign Military Sales Financing Program" in the fiscal year 1989 congressional presentation for security assistance programs may utilize funds made available under this heading for procurement of defense articles, defense services or design and construction services that are not sold by the United States Government under the Arms Export Control Act: Provided further, That, subject to the regular notification procedures of the Committees on Appropriations, funds made available under this heading for the cost of direct loans may also be used to supplement the funds available under this heading for grants, and funds made available under this heading for grants may also be used to supplement the funds available under this heading for the cost of direct loans: Provided further, That funds appropriated under this heading shall be expended at the minimum rate necessary to make timely payment for defense articles and services: Provided further, That not more than $23,250,000 of the funds appropriated under this heading may be obligated for necessary expenses, including the purchase of passenger motor vehicles for replacement only for use outside of the United States, for the general costs of administering military assistance and sales: Provided further, That not more than $355,000,000 of funds realized pursuant to section 21(e)(1)(A) of the Arms Export Control Act may be obligated for expenses incurred by the Department of Defense during fiscal year 1997 pursuant to section 43(b) of the Arms Export Control Act, except that this limitation may be exceeded only through the regular notification procedures of the Committees on Appropriations.

TITLE IV—MULTILATERAL ECONOMIC ASSISTANCE

FUNDS APPROPRIATED TO THE PRESIDENT INTERNATIONAL FINANCIAL INSTITUTIONS
CONTRIBUTION TO THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the International Bank for Reconstruction and Development by the Secretary of the Treasury, for the United States contribution to the Global Environment Facility (GEF), $35,000,000, to remain available until September 30, 1998.

CONTRIBUTION TO THE INTERNATIONAL DEVELOPMENT ASSOCIATION

For payment to the International Development Association by the Secretary of the Treasury, $700,000,000, for the United States contribution to the tenth replenishment, to remain available until expended: Provided, That none of the funds may be obligated before March 1, 1997: Provided further, That not less than twenty days before such funds are obligated, the Secretary of the Treasury shall submit a report to the Committees on Appropriations on his efforts to reach agreement with the other IDA–11 donors, including at the February 1997 IDA–11 donors review meeting, that the procurement restrictions in the Interim Trust Fund will be lifted.

CONTRIBUTION TO THE INTERNATIONAL FINANCE CORPORATION

For payment to the International Finance Corporation by the Secretary of the Treasury, $6,656,000, for the United States share of the increase in subscriptions to capital stock, to remain available until expended.

CONTRIBUTION TO THE INTER–AMERICAN DEVELOPMENT BANK

For payment to the Inter–American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in share portion of the increase in capital stock, $25,610,667, and for the United States share of the increase in the resources of the Fund for Special Operations, $10,000,000, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Inter–American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $1,503,718,910.

### CONTRIBUTION TO THE ENTERPRISE FOR THE AMERICAS MULTILATERAL INVESTMENT FUND

For payment to the Enterprise for the Americas Multilateral Investment Fund by the Secretary of the Treasury, for the United States contribution to the Fund to be administered by the Inter–American Development Bank, $27,500,000 to remain available until expended.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT BANK

For payment to the Asian Development Bank by the Secretary of the Treasury for the United States share of the paid-in portion of the increase in capital stock, $13,221,596, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the Asian Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $647,858,204.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increases in resources of the Asian Development Fund, as authorized by the Asian Development Bank Act, as amended (Public Law 89–369), $100,000,000, to remain available until expended.

### CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the European Bank for Reconstruction and Development by the Secretary of the Treasury, $11,916,447, for the United States share of the paid-in share portion of the initial capital subscription, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the European Bank for Reconstruction and Development may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $27,805,043.

### NORTH AMERICAN DEVELOPMENT BANK

For payment to the North American Development Bank by the Secretary of the Treasury, for the United States share of the paid-in portion of the capital stock, $56,000,000, to remain available until expended.

### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the North American Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of the capital stock of the North American Development Bank in an amount not to exceed $318,750,000.

### INTERNATIONAL ORGANIZATIONS AND PROGRAMS

For necessary expenses to carry out the provisions of section 301 of the Foreign Assistance Act of 1961, and of section 2 of the United Nations Environment Program Participation Act of 1973, $169,950,000: Provided, That none of the funds appropriated under this heading shall be made available for the United Nations Fund for Science and Technology: Provided further, That none of the funds appropriated under this heading that are made available to the United Nations Population Fund (UNFPA) shall be made available for activities in the People's Republic of China: Provided further, That not more than $25,000,000 of the funds appropriated under this heading may be made available to the UNFPA: Provided further, That not more than one-half of this amount may be provided to UNFPA before March 1, 1997, and that no later than February 15, 1997, the Secretary of State shall submit a report to the Committees on Appropriations indicating the amount UNFPA is budgeting for the People's Republic of China in 1997: Provided further, That any amount UNFPA plans to spend in the People's Republic of China in 1997 shall be deducted from the amount of funds provided to UNFPA after March 1, 1997, pursuant to the previous provisos: Provided further, That with respect to any funds appropriated under this heading that are made available to UNFPA, UNFPA

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

shall be required to maintain such funds in a separate account and not commingle them with any other funds: *Provided further,* That none of the funds appropriated under this heading may be made available to the Korean Peninsula Energy Development Organization (KEDO) or the International Atomic Energy Agency (IAEA).

## TITLE V—GENERAL PROVISIONS

### OBLIGATIONS DURING LAST MONTH OF AVAILABILITY

SEC. 501. Except for the appropriations entitled "International Disaster Assistance", and "United States Emergency Refugee and Migration Assistance Fund", not more than 15 per centum of any appropriation item made available by this Act shall be obligated during the last month of availability.

### PROHIBITION OF BILATERAL FUNDING FOR INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 502. None of the funds contained in title II of this Act may be used to carry out the provisions of section 209(d) of the Foreign Assistance Act of 1961.

### LIMITATION ON RESIDENCE EXPENSES

SEC. 503. Of the funds appropriated or made available pursuant to this Act, not to exceed $126,500 shall be for official residence expenses of the Agency for International Development during the current fiscal year: *Provided,* That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars.

### LIMITATION ON EXPENSES

SEC. 504. Of the funds appropriated or made available pursuant to this Act, not to exceed $5,000 shall be for entertainment expenses of the Agency for International Development during the current fiscal year.

### LIMITATION ON REPRESENTATIONAL ALLOWANCES

SEC. 505. Of the funds appropriated or made available pursuant to this Act, not to exceed $95,000 shall be available for representation allowances for the Agency for International Development during the current fiscal year: *Provided,* That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars: *Provided further,* That of the funds made available by this Act for general costs of administering military assistance and sales under the heading "Foreign Military Financing Program", not to exceed $2,000 shall be available for entertainment expenses and not to exceed $50,000 shall be available for representation allowances: *Provided further,* That of the funds made available by this Act under the heading "International Military Education and Training", not to exceed $50,000 shall be available for entertainment allowances: *Provided further,* That of the funds made available by this Act for the Inter–American Foundation, not to exceed $2,000 shall be available for entertainment and representation allowances: *Provided further,* That of the funds made available by this Act for the Peace Corps, not to exceed a total of $4,000 shall be available for entertainment expenses: *Provided further,* That of the funds made available by this Act under the heading "Trade and Development Agency", not to exceed $2,000 shall be available for representation and entertainment allowances.

### PROHIBITION ON FINANCING NUCLEAR GOODS

SEC. 506. None of the funds appropriated or made available (other than funds for "Nonproliferation, Anti-terrorism, Demining and Related Programs") pursuant to this Act, for carrying out the Foreign Assistance Act of 1961, may be used, except for purposes of nuclear safety, to finance the export of nuclear equipment, fuel, or technology.

### PROHIBITION AGAINST DIRECT FUNDING FOR CERTAIN COUNTRIES

SEC. 507. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance or reparations to Cuba, Iraq, Libya, North Korea, Iran, Sudan, or Syria: *Provided,* That for purposes of this section, the prohibition on obligations or expenditures shall include direct loans, credits, insurance and guarantees of the Export–Import Bank or its agents.

### MILITARY COUPS

SEC. 508. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance to any country whose duly elected Head of Government is deposed by military coup or decree: Provided, That assistance may be resumed to such country if the President determines and reports to the Committees on Appropriations that subsequent to the termination of assistance a democratically elected government has taken office.

## TRANSFERS BETWEEN ACCOUNTS

SEC. 509. None of the funds made available by this Act may be obligated under an appropriation account to which they were not appropriated, except for transfers specifically provided for in this Act, unless the President, prior to the exercise of any authority contained in the Foreign Assistance Act of 1961 to transfer funds, consults with and provides a written policy justification to the Committees on Appropriations of the House of Representatives and the Senate.

## DEOBLIGATION/REOBLIGATION AUTHORITY

SEC. 510. (a) Amounts certified pursuant to section 1311 of the Supplemental Appropriations Act, 1955, as having been obligated against appropriations heretofore made under the authority of the Foreign Assistance Act of 1961 for the same general purpose as any of the headings under title II of this Act are, if deobligated, hereby continued available for the same period as the respective appropriations under such headings or until September 30, 1997, whichever is later, and for the same general purpose, and for countries within the same region as originally obligated: Provided, That the Appropriations Committees of both Houses of the Congress are notified fifteen days in advance of the reobligation of such funds in accordance with regular notification procedures of the Committees on Appropriations.

(b) Obligated balances of funds appropriated to carry out section 23 of the Arms Export Control Act as of the end of the fiscal year immediately preceding the current fiscal year are, if deobligated, hereby continued available during the current fiscal year for the same purpose under any authority applicable to such appropriations under this Act: Provided, That the authority of this subsection may not be used in fiscal year 1997.

## AVAILABILITY OF FUNDS

SEC. 511. No part of any appropriation contained in this Act shall remain available for obligation after the expiration of the current fiscal year unless expressly so provided in this Act: Provided, That funds appropriated for the purposes of chapters 1, 8, and 11 of part I, section 667, and chapter 4 of part II of the Foreign Assistance Act of 1961, as amended, and funds provided under the heading "Assistance for Eastern Europe and the Baltic States", shall remain available until expended if such funds are initially obligated before the expiration of their respective periods of availability contained in this Act: Provided further, That, notwithstanding any other provision of this Act, any funds made available for the purposes of chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated or obligated for cash disbursements in order to address balance of payments or economic policy reform objectives, shall remain available until expended: Provided further, That the report required by section 653(a) of the Foreign Assistance Act of 1961 shall designate for each country, to the extent known at the time of submission of such report, those funds allocated for cash disbursement for balance of payment and economic policy reform purposes.

## LIMITATION ON ASSISTANCE TO COUNTRIES IN DEFAULT

SEC. 512. No part of any appropriation contained in this Act shall be used to furnish assistance to any country which is in default during a period in excess of one calendar year in payment to the United States of principal or interest on any loan made to such country by the United States pursuant to a program for which funds are appropriated under this Act: Provided, That this section and section 620(q) of the Foreign Assistance Act of 1961 shall not apply to funds made available in this Act or during the current fiscal year for Nicaragua, and for any narcotics-related assistance for Columbia, Bolivia, and Peru authorized by the Foreign Assistance Act of 1961 or the Arms Export Control Act.

## COMMERCE AND TRADE

SEC. 513. (a) None of the funds appropriated or made available pursuant to this Act for direct assistance and none of the funds otherwise made available pursuant to this Act to the Export–Import Bank and the Overseas Private Investment Corporation shall be obligated or expended to finance any loan, any assistance or any other financial commitments for establishing or expanding production of any commodity for export by any country other than the United States, if the commodity is likely to be in surplus on world markets at the time the resulting productive capacity is expected to become operative and if the assistance will cause

AR.03230

substantial injury to United States producers of the same, similar, or competing commodity: Provided, That such prohibition shall not apply to the Export–Import Bank if in the judgment of its Board of Directors the benefits to industry and employment in the United States are likely to outweigh the injury to United States producers of the same, similar, or competing commodity, and the Chairman of the Board so notifies the Committees on Appropriations.

(b) None of the funds appropriated by this or any other Act to carry out chapter 1 of part I of the Foreign Assistance Act of 1961 shall be available for any testing or breeding feasibility study, variety improvement or introduction, consultancy, publication, conference, or training in connection with the growth or production in a foreign country of an agricultural commodity for export which would compete with a similar commodity grown or produced in the United States: Provided, That this subsection shall not prohibit—

(1) activities designed to increase food security in developing countries where such activities will not have a significant impact in the export of agricultural commodities of the United States; or

(2) research activities intended primarily to benefit American producers.

## SURPLUS COMMODITIES

<< 22 USCA § 262h NOTE >>

SEC. 514. The Secretary of the Treasury shall instruct the United States Executive Directors of the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Inter–American Development Bank, the International Monetary Fund, the Asian Development Bank, the Inter–American Investment Corporation, the North American Development Bank, the European Bank for Reconstruction and Development, the African Development Bank, and the African Development Fund to use the voice and vote of the United States to oppose any assistance by these institutions, using funds appropriated or made available pursuant to this Act, for the production or extraction of any commodity or mineral for export, if it is in surplus on world markets and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity.

## NOTIFICATION REQUIREMENTS

SEC. 515. For the purposes of providing the Executive Branch with the necessary administrative flexibility, none of the funds made available under this Act for "Child Survival and Disease Programs Fund", "Development Assistance", "Debt restructuring", "International organizations and programs", "Trade and Development Agency", "International narcotics control", "Assistance for Eastern Europe and the Baltic States", "Assistance for the New Independent States of the Former Soviet Union", "Economic Support Fund", "Peacekeeping operations", "Operating expenses of the Agency for International Development", "Operating expenses of the Agency for International Development Office of Inspector General", "Nonproliferation, anti-terrorism, demining and related programs", "Foreign Military Financing Program", "International military education and training", "Inter–American Foundation", "African Development Foundation", "Peace Corps", "Migration and refugee assistance", shall be available for obligation for activities, programs, projects, type of materiel assistance, countries, or other operations not justified or in excess of the amount justified to the Appropriations Committees for obligation under any of these specific headings unless the Appropriations Committees of both Houses of Congress are previously notified fifteen days in advance: Provided, That the President shall not enter into any commitment of funds appropriated for the purposes of section 23 of the Arms Export Control Act for the provision of major defense equipment, other than conventional ammunition, or other major defense items defined to be aircraft, ships, missiles, or combat vehicles, not previously justified to Congress or 20 per centum in excess of the quantities justified to Congress unless the Committees on Appropriations are notified fifteen days in advance of such commitment: Provided further, That this section shall not apply to any reprogramming for an activity, program, or project under chapter 1 of part I of the Foreign Assistance Act of 1961 of less than 10 per centum of the amount previously justified to the Congress for obligation for such activity, program, or project for the current fiscal year: Provided further, That the requirements of this section or any similar provision of this Act or any other Act, including any prior Act requiring notification in accordance with the regular notification procedures of the Committees on Appropriations, may be waived if failure to do so would pose a substantial risk to human health or welfare: Provided further, That in case of any such waiver, notification to the Congress, or the appropriate congressional committees, shall be provided as early as practicable, but in no event later than three days after taking the action to which such notification requirement was applicable, in the context of

the circumstances necessitating such waiver: Provided further, That any notification provided pursuant to such a waiver shall contain an explanation of the emergency circumstances.

Drawdowns made pursuant to section 506(a)(2) of the Foreign Assistance Act of 1961 shall be subject to the regular notification procedures of the Committees on Appropriations.

### LIMITATION ON AVAILABILITY OF FUNDS FOR INTERNATIONAL ORGANIZATIONS AND PROGRAMS

SEC. 516. Notwithstanding any other provision of law or of this Act, none of the funds provided for "International Organizations and Programs" shall be available for the United States proportionate share, in accordance with section 307(c) of the Foreign Assistance Act of 1961, for any programs identified in section 307, or for Libya, Iran, or, at the discretion of the President, Communist countries listed in section 620(f) of the Foreign Assistance Act of 1961, as amended: Provided, That, subject to the regular notification procedures of the Committees on Appropriations, funds appropriated under this Act or any previously enacted Act making appropriations for foreign operations, export financing, and related programs, which are returned or not made available for organizations and programs because of the implementation of this section or any similar provision of law, shall remain available for obligation through September 30, 1998.

### ECONOMIC SUPPORT FUND ASSISTANCE FOR ISRAEL

SEC. 517. The Congress finds that progress on the peace process in the Middle East is vitally important to United States security interests in the region. The Congress recognizes that, in fulfilling its obligations under the Treaty of Peace Between the Arab Republic of Egypt and the State of Israel, done at Washington on March 26, 1979, Israel incurred severe economic burdens. Furthermore, the Congress recognizes that an economically and militarily secure Israel serves the security interests of the United States, for a secure Israel is an Israel which has the incentive and confidence to continue pursuing the peace process. Therefore, the Congress declares that, subject to the availability of appropriations, it is the policy and the intention of the United States that the funds provided in annual appropriations for the Economic Support Fund which are allocated to Israel shall not be less than the annual debt repayment (interest and principal) from Israel to the United States Government in recognition that such a principle serves United States interests in the region.

### PROHIBITION ON FUNDING FOR ABORTIONS AND INVOLUNTARY STERILIZATION

SEC. 518. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for any biomedical research which relates in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be obligated or expended for any country or organization if the President certifies that the use of these funds by any such country or organization would violate any of the above provisions related to abortions and involuntary sterilizations: Provided, That none of the funds made available under this Act may be used to lobby for or against abortion.

### AUTHORIZATION FOR POPULATION PLANNING

SEC. 518A. (a) None of the funds made available in title II of this Act for population planning activities or other population assistance pursuant to section 104(b) of the Foreign Assistance Act or any other provision of law may be obligated or expended prior to July 1, 1997.

(b) Not to exceed $385,000,000 of the funds appropriated in title II of this Act may be made available for population planning activities or other population assistance.

(c) Such funds may be apportioned only on a monthly basis, and such monthly apportionments may not exceed 8 percent of the total available for such activities.

(d) Not later than February 1, 1997, the President shall submit a finding to the Congress regarding the impact of the limitation on obligations imposed by subsection (a) of this section on the proper functioning of the population planning program. If such Presidential finding indicates that the limitation is having a negative impact on the proper functioning of the population

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

planning program, funds for population planning activities and other population assistance referred to in subsection (a) may be made available beginning March 1, 1997, notwithstanding the July 1, 1997, limitation set forth in subsection (a), if the Congress approves such finding by adoption of a joint resolution of approval not later than February 28, 1997, in accordance with subsection (e).

(e) CONGRESSIONAL REVIEW PROCEDURE.—

(1) This subsection is enacted by Congress—

(A) as an exercise of the rulemaking power of the House of Representatives and the Senate, respectively, and as such it is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraph (2) of this subsection; and it supersedes other rules only to the extent that it is inconsistent therewith; and

(B) with full recognition of the constitutional right of either House to change the rules (so far as those rules relate to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of such House.

(2) For purposes of this section, the term "resolution" means a joint resolution, the text of which is as follows: "That the House of Representatives and Senate approve the Presidential finding, submitted to the Congress on XXXXX, that the limitation on obligations imposed by section 518A(a) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, is having a negative impact on the proper functioning of the population planning program.". The blank space therein shall be filled with the date on which the President submits his finding to the House of Representatives and the Senate.

(3) On the day on which the President submits a finding under this section to the Congress, a joint resolution described in paragraph (2) shall be introduced (by request) in the House by the majority leader of the House, for himself and the minority leader of the House, or by Members of the House designated by the majority leader and minority leader of the House; and shall be introduced (by request) in the Senate by the majority leader of the Senate, for himself and the minority leader of the Senate, or by Members of the Senate designated by the majority leader and minority leader of the Senate. If either House is not in session on the day on which the President submits such finding, the resolution shall be introduced in that House, as provided in the preceding sentence, on the first day thereafter on which that House is in session. A resolution once introduced in the House with respect to a Presidential finding under this section shall be referred to 1 or more committees (and all resolutions with respect to the same Presidential finding shall be referred to the same committee or committees) by the Speaker of the House of Representatives. A resolution once introduced in the Senate with respect to a Presidential finding under this section shall be referred to the appropriate committee (and all resolutions with respect to the same Presidential finding shall be referred to the same committee) by the President of the Senate.

(4) No amendment to a resolution introduced under this section shall be in order in either the House of Representatives or the Senate; and no motion to suspend the application of this subsection shall be in order in either House, nor shall it be in order in either House for the presiding officer to entertain a request to suspend the application of this subsection by unanimous consent.

(5)(A) If any committee to which a resolution with respect to a Presidential finding under this section has been referred has not reported it at the end of 5 calendar days after its introduction, such committee shall be automatically discharged from further consideration of the resolution and it shall be placed on the appropriate calendar. A vote on final passage of the resolution, shall be taken in each House on or before February 28, 1997. If prior to the passage by 1 House of a resolution of that House under this section, that House receives the same resolution from the other House, then—

(i) the procedure in that House shall be the same as if no resolution had been received from the other House, but

(ii) the vote on final passage shall be on the resolution of the other House.

(6)(A) A motion in the House of Representatives to proceed to the consideration of a resolution under this section shall be highly privileged and not debatable. An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the House of Representatives on the resolution described in paragraph (2) of this subsection shall be limited to not more than 2 hours, which shall be divided equally between those favoring and those opposing such resolution. A motion to further limit debate shall not be debatable. It shall not be in order to move to recommit a resolution or to move to reconsider the vote by which such resolution was agreed to or disagreed to.

(C) Appeals from the decision of the Chair relating to the application of the rules of the House of Representatives to the procedures relating to a resolution under this section shall be decided without debate.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(D) Except to the extent specifically provided in preceding provisions of this subsection, consideration in the House of Representatives of a resolution under this subsection shall be governed by the rules of the House of Representatives applicable to other resolutions in similar circumstances.

(7)(A) A motion in the Senate to proceed to the consideration of a resolution under this section shall not be debatable. It shall not be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(B) Debate in the Senate on the resolution described in paragraph (2) of this subsection, and all debatable motions and appeals in connection therewith, shall be limited to not more than 2 hours. The time shall be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(C) A motion in the Senate to further limit debate is not debatable. A motion to recommit a resolution is not in order.

## REPORTING REQUIREMENT

SEC. 519. The President shall submit to the Committees on Appropriations the reports required by section 25(a)(1) of the Arms Export Control Act.

## SPECIAL NOTIFICATION REQUIREMENTS

SEC. 520. None of the funds appropriated in this Act shall be obligated or expended for Colombia, Guatemala (except that this provision shall not apply to development assistance for Guatemala), Dominican Republic, Haiti, Liberia, Pakistan, Peru, Serbia, Sudan, or Zaire except as provided through the regular notification procedures of the Committees on Appropriations.

## DEFINITION OF PROGRAM, PROJECT, AND ACTIVITY

SEC. 521. For the purpose of this Act, "program, project, and activity" shall be defined at the Appropriations Act account level and shall include all Appropriations and Authorizations Acts earmarks, ceilings, and limitations with the exception that for the following accounts: Economic Support Fund and Foreign Military Financing Program, "program, project, and activity" shall also be considered to include country, regional, and central program level funding within each such account; for the development assistance accounts of the Agency for International Development "program, project, and activity" shall also be considered to include central program level funding, either as (1) justified to the Congress, or (2) allocated by the executive branch in accordance with a report, to be provided to the Committees on Appropriations within thirty days of enactment of this Act, as required by section 653(a) of the Foreign Assistance Act of 1961.

## CHILD SURVIVAL AND AIDS ACTIVITIES

SEC. 522. Up to $8,000,000 of the funds made available by this Act for assistance for family planning, health, child survival, and AIDS, may be used to reimburse United States Government agencies, agencies of State governments, institutions of higher learning, and private and voluntary organizations for the full cost of individuals (including for the personal services of such individuals) detailed or assigned to, or contracted by, as the case may be, the Agency for International Development for the purpose of carrying out family planning activities, child survival activities and activities relating to research on, and the treatment and control of acquired immune deficiency syndrome in developing countries: Provided, That funds appropriated by this Act that are made available for child survival activities or activities relating to research on, and the treatment and control of, acquired immune deficiency syndrome may be made available notwithstanding any provision of law that restricts assistance to foreign countries: Provided further, That funds appropriated by this Act that are made available for family planning activities may be made available notwithstanding section 512 of this Act and section 620(q) of the Foreign Assistance Act of 1961.

## PROHIBITION AGAINST INDIRECT FUNDING TO CERTAIN COUNTRIES

SEC. 523. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated to finance indirectly any assistance or reparations to Cuba, Iraq, Libya, Iran, Syria, North Korea, or the People's Republic of China, unless the President of the United States certifies that the withholding of these funds is contrary to the national interest of the United States.

## RECIPROCAL LEASING

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 22 USCA § 2796 >>

SEC. 524. Section 61(a) of the Arms Export Control Act is amended by striking out "1996" and inserting in lieu thereof "1997".

### NOTIFICATION ON EXCESS DEFENSE EQUIPMENT

SEC. 525. Prior to providing excess Department of Defense articles in accordance with section 516(a) of the Foreign Assistance Act of 1961, the Department of Defense shall notify the Committees on Appropriations to the same extent and under the same conditions as are other committees pursuant to subsection (c) of that section: Provided, That before issuing a letter of offer to sell excess defense articles under the Arms Export Control Act, the Department of Defense shall notify the Committees on Appropriations in accordance with the regular notification procedures of such Committees: Provided further, That such Committees shall also be informed of the original acquisition cost of such defense articles.

### AUTHORIZATION REQUIREMENT

SEC. 526. Funds appropriated by this Act may be obligated and expended notwithstanding section 10 of Public Law 91–672 and section 15 of the State Department Basic Authorities Act of 1956.

### PROHIBITION ON BILATERAL ASSISTANCE TO TERRORIST COUNTRIES

SEC. 527. (a) Notwithstanding any other provision of law, funds appropriated for bilateral assistance under any heading of this Act and funds appropriated under any such heading in a provision of law enacted prior to enactment of this Act, shall not be made available to any country which the President determines—

(1) grants sanctuary from prosecution to any individual or group which has committed an act of international terrorism, or

(2) otherwise supports international terrorism.

(b) The President may waive the application of subsection (a) to a country if the President determines that national security or humanitarian reasons justify such waiver. The President shall publish each waiver in the Federal Register and, at least fifteen days before the waiver takes effect, shall notify the Committees on Appropriations of the waiver (including the justification for the waiver) in accordance with the regular notification procedures of the Committees on Appropriations.

### COMMERCIAL LEASING OF DEFENSE ARTICLES

<< 22 USCA § 2763 NOTE >>

SEC. 528. Notwithstanding any other provision of law, and subject to the regular notification procedures of the Committees on Appropriations, the authority of section 23(a) of the Arms Export Control Act may be used to provide financing to Israel, Egypt and NATO and major non-NATO allies for the procurement by leasing (including leasing with an option to purchase) of defense articles from United States commercial suppliers, not including Major Defense Equipment (other than helicopters and other types of aircraft having possible civilian application), if the President determines that there are compelling foreign policy or national security reasons for those defense articles being provided by commercial lease rather than by government-to-government sale under such Act.

### COMPETITIVE INSURANCE

SEC. 528A. All Agency for International Development contracts and solicitations, and subcontracts entered into under such contracts, shall include a clause requiring that United States insurance companies have a fair opportunity to bid for insurance when such insurance is necessary or appropriate.

### STINGERS IN THE PERSIAN GULF REGION

SEC. 529. Except as provided in section 581 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, the United States may not sell or otherwise make available any Stingers to any country bordering the Persian Gulf under the Arms Export Control Act or chapter 2 of part II of the Foreign Assistance Act of 1961.

### DEBT–FOR–DEVELOPMENT

SEC. 530. In order to enhance the continued participation of nongovernmental organizations in economic assistance activities under the Foreign Assistance Act of 1961, including endowments, debt-for-development and debt-for-nature exchanges, a nongovernmental organization which is a grantee or contractor of the Agency for International Development may place in interest bearing accounts funds made available under this Act or prior Acts or local currencies which accrue to that organization as a result of economic assistance provided under title II of this Act and any interest earned on such investment shall be used for the purpose for which the assistance was provided to that organization.

SEPARATE ACCOUNTS

<< 22 USCA § 2359 NOTE >>

SEC. 531. (a) SEPARATE ACCOUNTS FOR LOCAL CURRENCIES.—(1) If assistance is furnished to the government of a foreign country under chapters 1 and 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961 under agreements which result in the generation of local currencies of that country, the Administrator of the Agency for International Development shall—

  (A) require that local currencies be deposited in a separate account established by that government;

  (B) enter into an agreement with that government which sets forth—

  (i) the amount of the local currencies to be generated, and

  (ii) the terms and conditions under which the currencies so deposited may be utilized, consistent with this section; and

  (C) establish by agreement with that government the responsibilities of the Agency for International Development and that government to monitor and account for deposits into and disbursements from the separate account.

(2) USES OF LOCAL CURRENCIES.—As may be agreed upon with the foreign government, local currencies deposited in a separate account pursuant to subsection (a), or an equivalent amount of local currencies, shall be used only—

  (A) to carry out chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), for such purposes as—

  (i) project and sector assistance activities, or

  (ii) debt and deficit financing; or

  (B) for the administrative requirements of the United States Government.

(3) PROGRAMMING ACCOUNTABILITY.—The Agency for International Development shall take all necessary steps to ensure that the equivalent of the local currencies disbursed pursuant to subsection (a)(2)(A) from the separate account established pursuant to subsection (a)(1) are used for the purposes agreed upon pursuant to subsection (a)(2).

(4) TERMINATION OF ASSISTANCE PROGRAMS.—Upon termination of assistance to a country under chapters 1 or 10 of part I or chapter 4 of part II (as the case may be), any unencumbered balances of funds which remain in a separate account established pursuant to subsection (a) shall be disposed of for such purposes as may be agreed to by the government of that country and the United States Government.

(5) CONFORMING AMENDMENTS.—The provisions of this subsection shall supersede the tenth and eleventh provisos contained under the heading "Sub–Saharan Africa, Development Assistance" as included in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 and sections 531(d) and 609 of the Foreign Assistance Act of 1961.

(6) REPORTING REQUIREMENT.—The Administrator of the Agency for International Development shall report on an annual basis as part of the justification documents submitted to the Committees on Appropriations on the use of local currencies for the administrative requirements of the United States Government as authorized in subsection (a)(2)(B), and such report shall include the amount of local currency (and United States dollar equivalent) used and/or to be used for such purpose in each applicable country.

(b) SEPARATE ACCOUNTS FOR CASH TRANSFERS.—(1) If assistance is made available to the government of a foreign country, under chapters 1 or 10 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961, as cash transfer assistance or as nonproject sector assistance, that country shall be required to maintain such funds in a separate account and not commingle them with any other funds.

(2) APPLICABILITY OF OTHER PROVISIONS OF LAW.—Such funds may be obligated and expended notwithstanding provisions of law which are inconsistent with the nature of this assistance including provisions which are referenced in the Joint Explanatory Statement of the Committee of Conference accompanying House Joint Resolution 648 (H. Report No. 98–1159).

AR.03236

(3) NOTIFICATION.—At least fifteen days prior to obligating any such cash transfer or nonproject sector assistance, the President shall submit a notification through the regular notification procedures of the Committees on Appropriations, which shall include a detailed description of how the funds proposed to be made available will be used, with a discussion of the United States interests that will be served by the assistance (including, as appropriate, a description of the economic policy reforms that will be promoted by such assistance).

(4) EXEMPTION.—Nonproject sector assistance funds may be exempt from the requirements of subsection (b)(1) only through the notification procedures of the Committees on Appropriations.

## COMPENSATION FOR UNITED STATES EXECUTIVE
## DIRECTORS TO INTERNATIONAL FINANCING INSTITUTIONS

SEC. 532. (a) No funds appropriated by this Act may be made as payment to any international financial institution while the United States Executive Director to such institution is compensated by the institution at a rate which, together with whatever compensation such Director receives from the United States, is in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while any alternate United States Director to such institution is compensated by the institution at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

(b) For purposes of this section, "international financial institutions" are: the International Bank for Reconstruction and Development, the Inter–American Development Bank, the Asian Development Bank, the Asian Development Fund, the African Development Bank, the African Development Fund, the International Monetary Fund, the North American Development Bank, and the European Bank for Reconstruction and Development.

## COMPLIANCE WITH UNITED NATIONS SANCTIONS AGAINST IRAQ

<< 50 USCA § 1701 NOTE >>

SEC. 533. (a) DENIAL OF ASSISTANCE.—None of the funds appropriated or otherwise made available pursuant to this Act to carry out the Foreign Assistance Act of 1961 (including title IV of chapter 2 of part I, relating to the Overseas Private Investment Corporation) or the Arms Export Control Act may be used to provide assistance to any country that is not in compliance with the United Nations Security Council sanctions against Iraq, Serbia or Montenegro unless the President determines and so certifies to the Congress that—

(1) such assistance is in the national interest of the United States;

(2) such assistance will directly benefit the needy people in that country; or

(3) the assistance to be provided will be humanitarian assistance for foreign nationals who have fled Iraq and Kuwait.

(b) IMPORT SANCTIONS.—If the President considers that the taking of such action would promote the effectiveness of the economic sanctions of the United Nations and the United States imposed with respect to Iraq, Serbia, or Montenegro, as the case may be, and is consistent with the national interest, the President may prohibit, for such a period of time as he considers appropriate, the importation into the United States of any or all products of any foreign country that has not prohibited—

(1) the importation of products of Iraq, Serbia, or Montenegro into its customs territory, and

(2) the export of its products to Iraq, Serbia, or Montenegro, as the case may be.

## COMPETITIVE PRICING FOR SALES OF DEFENSE ARTICLES

<< 22 USCA § 2762 NOTE >>

SEC. 533A. Direct costs associated with meeting a foreign customer's additional or unique requirements will continue to be allowable under contracts under section 22(d) of the Arms Export Control Act. Loadings applicable to such direct costs shall be permitted at the same rates applicable to procurement of like items purchased by the Department of Defense for its own use.

## POW/MIA MILITARY DRAWDOWN

SEC. 534. (a) Notwithstanding any other provision of law, the President may direct the drawdown, without reimbursement by the recipient, of defense articles from the stocks of the Department of Defense, defense services of the Department of Defense,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and military education and training, of an aggregate value not to exceed $15,000,000 in fiscal year 1997, as may be necessary to carry out subsection (b).

(b) Such defense articles, services and training may be provided to Vietnam, Cambodia and Laos, under subsection (a) as the President determines are necessary to support efforts to locate and repatriate members of the United States Armed Forces and civilians employed directly or indirectly by the United States Government who remain unaccounted for from the Vietnam War, and to ensure the safety of United States Government personnel engaged in such cooperative efforts and to support United States Department of Defense-sponsored humanitarian projects associated with the POW/MIA efforts. Any aircraft shall be provided under this section only to Laos and only on a lease or loan basis, but may be provided at no cost notwithstanding section 61 of the Arms Export Control Act and may be maintained with defense articles, services and training provided under this section.

(c) The President shall, within sixty days of the end of any fiscal year in which the authority of subsection (a) is exercised, submit a report to the Congress which identifies the articles, services, and training drawn down under this section.

## MEDITERRANEAN EXCESS DEFENSE ARTICLES

<< 22 USCA § 2321j NOTE >>

SEC. 535. For the four-year period beginning on October 1, 1996, the President shall ensure that excess defense articles will be made available under section 516 and 519 of the Foreign Assistance Act of 1961 consistent with the manner in which the President made available excess defense articles under those sections during the four-year period that began on October 1, 1992, pursuant to section 573(e) of the Foreign Operations, Export Financing, Related Programs Appropriations Act, 1990.

## CASH FLOW FINANCING

SEC. 536. For each country that has been approved for cash flow financing (as defined in section 25(d) of the Arms Export Control Act, as added by section 112(b) of Public Law 99–83) under the Foreign Military Financing Program, any Letter of Offer and Acceptance or other purchase agreement, or any amendment thereto, for a procurement in excess of $100,000,000 that is to be financed in whole or in part with funds made available under this Act shall be submitted through the regular notification procedures to the Committees on Appropriations.

## AUTHORITIES FOR THE PEACE CORPS, THE INTER–AMERICAN FOUNDATION AND THE AFRICAN DEVELOPMENT FOUNDATION

SEC. 537. Unless expressly provided to the contrary, provisions of this or any other Act, including provisions contained in prior Acts authorizing or making appropriations for foreign operations, export financing, and related programs, shall not be construed to prohibit activities authorized by or conducted under the Peace Corps Act, the Inter–American Foundation Act, or the African Development Foundation Act. The appropriate agency shall promptly report to the Committees on Appropriations whenever it is conducting activities or is proposing to conduct activities in a country for which assistance is prohibited.

## IMPACT ON JOBS IN THE UNITED STATES

SEC. 538. None of the funds appropriated by this Act may be obligated or expended to provide—

(a) any financial incentive to a business enterprise currently located in the United States for the purpose of inducing such an enterprise to relocate outside the United States if such incentive or inducement is likely to reduce the number of employees of such business enterprise in the United States because United States production is being replaced by such enterprise outside the United States;

(b) assistance for the purpose of establishing or developing in a foreign country any export processing zone or designated area in which the tax, tariff, labor, environment, and safety laws of that country do not apply, in part or in whole, to activities carried out within that zone or area, unless the President determines and certifies that such assistance is not likely to cause a loss of jobs within the United States; or

(c) assistance for any project or activity that contributes to the violation of internationally recognized workers rights, as defined in section 502(a)(4) of the Trade Act of 1974, of workers in the recipient country, including any designated zone or area in that country: Provided, That in recognition that the application of this subsection should be commensurate with the level of development of the recipient country and sector, the provisions of this subsection shall not preclude assistance for the informal sector in such country, micro and small-scale enterprise, and smallholder agriculture.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## AUTHORITY TO ASSIST BOSNIA AND HERZEGOVINA

SEC. 539. (a) The President is authorized to direct the transfer, subject to prior notification of the Committees on Appropriations, to the Government of Bosnia and Herzegovina, without reimbursement, of defense articles from the stocks of the Department of Defense and defense services of the Department of Defense of an aggregate value of not to exceed $100,000,000 in fiscal years 1996 and 1997: Provided, That the President certifies in a timely fashion to the Congress that the transfer of such articles would assist that nation in self-defense and thereby promote the security and stability of the region.

(b) Within 60 days of any transfer under the authority provided in subsection (a), and every 60 days thereafter, the President shall report in writing to the Speaker of the House of Representatives and the President pro tempore of the Senate concerning the articles transferred and the disposition thereof.

(c) There are authorized to be appropriated to the President such sums as may be necessary to reimburse the applicable appropriation, fund, or account for defense articles provided under this section.

## RESTRICTIONS ON THE TERMINATION OF SANCTIONS AGAINST SERBIA AND MONTENEGRO

### << 50 USCA § 1701 NOTE >>

SEC. 540. (a) RESTRICTIONS.—Notwithstanding any other provision of law, no sanction, prohibition, or requirement described in section 1511 of the National Defense Authorization Act for Fiscal Year 1994 (Public Law 103–160), with respect to Serbia or Montenegro, may cease to be effective, unless—

(1) the President first submits to the Congress a certification described in subsection (b); and

(2) the requirements of section 1511 of that Act are met.

(b) CERTIFICATION.—A certification described in this subsection is a certification that—

(1) there is substantial progress toward—

(A) the realization of a separate identity for Kosova and the right of the people of Kosova to govern themselves; or

(B) the creation of an international protectorate for Kosova;

(2) there is substantial improvement in the human rights situation in Kosova;

(3) international human rights observers are allowed to return to Kosova; and

(4) the elected government of Kosova is permitted to meet and carry out its legitimate mandate as elected representatives of the people of Kosova.

(c) WAIVER AUTHORITY.—The President may waive the application in whole or in part, of subsection (a) if the President certifies to the Congress that the President has determined that the waiver is necessary to meet emergency humanitarian needs or to achieve a negotiated settlement of the conflict in Bosnia and Herzegovina that is acceptable to the parties.

## SPECIAL AUTHORITIES

SEC. 541. (a) Funds appropriated in title II of this Act that are made available for Afghanistan, Lebanon, and Cambodia, and for victims of war, displaced children, displaced Burmese, humanitarian assistance for Romania, and humanitarian assistance for the peoples of Bosnia and Herzegovina, Croatia, and Kosova, may be made available notwithstanding any other provision of law: Provided, That any such funds that are made available for Cambodia shall be subject to the provisions of section 531(e) of the Foreign Assistance Act of 1961 and section 906 of the International Security and Development Cooperation Act of 1985: Provided further, That none of the funds appropriated by this Act may be made available for assistance for any country or organization that the Secretary of State determines is cooperating, tactically or strategically, with the Khmer Rouge in their military operations, or to the military of any country that is not acting vigorously to prevent its members from facilitating the export of timber from Cambodia by the Khmer Rouge: Provided further, That the Secretary of State shall submit a report to the Committees on Appropriations by February 1, 1997, on whether there are any countries, organizations, or militaries for which assistance is prohibited under the previous proviso, the basis for such conclusions and, if appropriate, the steps being taken to terminate assistance: Provided further, That the prohibition on assistance to the military of any country that is not acting vigorously to prevent its members from facilitating the export of timber from Cambodia by the Khmer Rouge may be waived by the President if he determines and reports to the Committees on Appropriations that it is important to the national security interest of the United States to do so.

AR.03239

(b) Funds appropriated by this Act to carry out the provisions of sections 103 through 106 of the Foreign Assistance Act of 1961 may be used, notwithstanding any other provision of law, for the purpose of supporting tropical forestry and energy programs aimed at reducing emissions of greenhouse gases, and for the purpose of supporting biodiversity conservation activities: Provided, That such assistance shall be subject to sections 116, 502B, and 620A of the Foreign Assistance Act of 1961.

(c) During fiscal year 1997, the President may use up to $40,000,000 under the authority of section 451 of the Foreign Assistance Act of 1961, notwithstanding the funding ceiling contained in subsection (a) of that section.

(d) The Agency for International Development may employ personal services contractors, notwithstanding any other provision of law, for the purpose of administering programs for the West Bank and Gaza.

### POLICY ON TERMINATING THE ARAB LEAGUE BOYCOTT OF ISRAEL

SEC. 542. It is the sense of the Congress that—

(1) the Arab League countries should immediately and publicly renounce the primary boycott of Israel and the secondary and tertiary boycott of American firms that have commercial ties with Israel; and

(2) the President should—

(A) take more concrete steps to encourage vigorously Arab League countries to renounce publicly the primary boycotts of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel as a confidence-building measure;

(B) take into consideration the participation of any recipient country in the primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel when determining whether to sell weapons to said county;

(C) report to Congress on the specific steps being taken by the President to bring about a public renunciation of the Arab primary boycott of Israel and the secondary and tertiary boycotts of American firms that have commercial relations with Israel; and

(D) encourage the allies and trading partners of the United States to enact laws prohibiting businesses from complying with the boycott and penalizing businesses that do comply.

### ANTI–NARCOTICS ACTIVITIES

SEC. 543. (a) Of the funds appropriated or otherwise made available by this Act for "Economic Support Fund", assistance may be provided to strengthen the administration of justice in countries in Latin America and the Caribbean and in other regions consistent with the provisions of section 534(b) of the Foreign Assistance Act of 1961, except that programs to enhance protection of participants in judicial cases may be conducted notwithstanding section 660 of that Act.

(b) Funds made available pursuant to this section may be made available notwithstanding section 534(c) and the second and third sentences of section 534(e) of the Foreign Assistance Act of 1961. Funds made available pursuant to subsection (a) for Bolivia, Colombia and Peru may be made available notwithstanding section 534(c) and the second sentence of section 534(e) of the Foreign Assistance Act of 1961.

### ELIGIBILITY FOR ASSISTANCE

SEC. 544. (a) ASSISTANCE THROUGH NONGOVERNMENTAL ORGANIZATIONS.—Restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance in support of programs of nongovernmental organizations from funds appropriated by this Act to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961: Provided, That the President shall take into consideration, in any case in which a restriction on assistance would be applicable but for this subsection, whether assistance in support of programs of nongovernmental organizations is in the national interest of the United States: Provided further, That before using the authority of this subsection to furnish assistance in support of programs of nongovernmental organizations, the President shall notify the Committees on Appropriations under the regular notification procedures of those committees, including a description of the program to be assisted, the assistance to be provided, and the reasons for furnishing such assistance: Provided further, That nothing in this subsection shall be construed to alter any existing statutory prohibitions against abortion or involuntary sterilizations contained in this or any other Act.

(b) PUBLIC LAW 480.—During fiscal year 1997, restrictions contained in this or any other Act with respect to assistance for a country shall not be construed to restrict assistance under the Agricultural Trade Development and Assistance Act of 1954:

Provided, That none of the funds appropriated to carry out title I of such Act and made available pursuant to this subsection may be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

(c) EXCEPTION.—This section shall not apply—

(1) with respect to section 620A of the Foreign Assistance Act or any comparable provision of law prohibiting assistance to countries that support international terrorism; or

(2) with respect to section 116 of the Foreign Assistance Act of 1961 or any comparable provision of law prohibiting assistance to countries that violate internationally recognized human rights.

## EARMARKS

SEC. 544A. (a) Funds appropriated by this Act which are earmarked may be reprogrammed for other programs within the same account notwithstanding the earmark if compliance with the earmark is made impossible by operation of any provision of this or any other Act or, with respect to a country with which the United States has an agreement providing the United States with base rights or base access in that country, if the President determines that the recipient for which funds are earmarked has significantly reduced its military or economic cooperation with the United States since enactment of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1991; however, before exercising the authority of this subsection with regard to a base rights or base access country which has significantly reduced its military or economic cooperation with the United States, the President shall consult with, and shall provide a written policy justification to the Committees on Appropriations: Provided, That any such reprogramming shall be subject to the regular notification procedures of the Committees on Appropriations: Provided further, That assistance that is reprogrammed pursuant to this subsection shall be made available under the same terms and conditions as originally provided.

(b) In addition to the authority contained in subsection (a), the original period of availability of funds appropriated by this Act and administered by the Agency for International Development that are earmarked for particular programs or activities by this or any other Act shall be extended for an additional fiscal year if the Administrator of such agency determines and reports promptly to the Committees on Appropriations that the termination of assistance to a country or a significant change in circumstances makes it unlikely that such earmarked funds can be obligated during the original period of availability: Provided, That such earmarked funds that are continued available for an additional fiscal year shall be obligated only for the purpose of such earmark.

## CEILINGS AND EARMARKS

SEC. 545. Ceilings and earmarks contained in this Act shall not be applicable to funds or authorities appropriated or otherwise made available by any subsequent Act unless such Act specifically so directs.

## PROHIBITION ON PUBLICITY OR PROPAGANDA

SEC. 546. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not authorized before the date of enactment of this Act by the Congress: Provided, That not to exceed $750,000 may be made available to carry out the provisions of section 316 of Public Law 96–533.

## USE OF AMERICAN RESOURCES

SEC. 547. To the maximum extent possible, assistance provided under this Act should make full use of American resources, including commodities, products, and services.

## PROHIBITION OF PAYMENTS TO UNITED NATIONS MEMBERS

SEC. 548. None of the funds appropriated or made available pursuant to this Act for carrying out the Foreign Assistance Act of 1961, may be used to pay in whole or in part any assessments, arrearages, or dues of any member of the United Nations.

## CONSULTING SERVICES

SEC. 549. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to section 3109 of title 5, United States Code, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order pursuant to existing law.

## PRIVATE VOLUNTARY ORGANIZATIONS—DOCUMENTATION

SEC. 550. None of the funds appropriated or made available pursuant to this Act shall be available to a private voluntary organization which fails to provide upon timely request any document, file, or record necessary to the auditing requirements of the Agency for International Development.

### PROHIBITION ON ASSISTANCE TO FOREIGN GOVERNMENTS THAT EXPORT LETHAL MILITARY EQUIPMENT TO COUNTRIES SUPPORTING INTERNATIONAL TERRORISM

SEC. 551. (a) None of the funds appropriated or otherwise made available by this Act may be available to any foreign government which provides lethal military equipment to a country the government of which the Secretary of State has determined is a terrorist government for purposes of section 40(d) of the Arms Export Control Act. The prohibition under this section with respect to a foreign government shall terminate 12 months after that government ceases to provide such military equipment. This section applies with respect to lethal military equipment provided under a contract entered into after the date of enactment of this Act.

(b) Assistance restricted by subsection (a) or any other similar provision of law, may be furnished if the President determines that furnishing such assistance is important to the national interests of the United States.

(c) Whenever the waiver of subsection (b) is exercised, the President shall submit to the appropriate congressional committees a report with respect to the furnishing of such assistance. Any such report shall include a detailed explanation of the assistance to be provided, including the estimated dollar amount of such assistance, and an explanation of how the assistance furthers United States national interests.

### WITHHOLDING OF ASSISTANCE FOR PARKING FINES OWED BY FOREIGN COUNTRIES

SEC. 552. (a) IN GENERAL.—Of the funds made available for a foreign country under part I of the Foreign Assistance Act of 1961, an amount equivalent to 110 percent of the total unpaid fully adjudicated parking fines and penalties owed to the District of Columbia by such country as of the date of enactment of this Act shall be withheld from obligation for such country until the Secretary of State certifies and reports in writing to the appropriate congressional committees that such fines and penalties are fully paid to the government of the District of Columbia.

(b) DEFINITION.—For purposes of this section, the term "appropriate congressional committees" means the Committee on Foreign Relations and the Committee on Appropriations of the Senate and the Committee on International Relations and the Committee on Appropriations of the House of Representatives.

### LIMITATION ON ASSISTANCE FOR THE PLO FOR THE WEST BANK AND GAZA

SEC. 553. None of the funds appropriated by this Act may be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza unless the President has exercised the authority under section 604(a) of the Middle East Peace Facilitation Act of 1995 (title VI of Public Law 104–107) or any other legislation to suspend or make inapplicable section 307 of the Foreign Assistance Act of 1961 and that suspension is still in effect: Provided, That if the President fails to make the certification under section 604(b)(2) of the Middle East Peace Facilitation Act of 1995 or to suspend the prohibition under other legislation, funds appropriated by this Act may not be obligated for assistance for the Palestine Liberation Organization for the West Bank and Gaza.

### EXPORT FINANCING TRANSFER AUTHORITIES

SEC. 554. Not to exceed 5 percent of any appropriation other than for administrative expenses made available for fiscal year 1997 for programs under title I of this Act may be transferred between such appropriations for use for any of the purposes, programs and activities for which the funds in such receiving account may be used, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 25 percent by any such transfer: Provided, That the exercise of such authority shall be subject to the regular notification procedures of the Committees on Appropriations.

### WAR CRIMES TRIBUNALS

<< 22 USCA § 2656 NOTE >>

SEC. 555. If the President determines that doing so will contribute to a just resolution of charges regarding genocide or other violations of international humanitarian law, the President may direct a drawdown pursuant to section 552(c) of the Foreign

Assistance Act of 1961, as amended, of up to $25,000,000 of commodities and services for the United Nations War Crimes Tribunal established with regard to the former Yugoslavia by the United Nations Security Council or such other tribunals or commissions as the Council may establish to deal with such violations, without regard to the ceiling limitation contained in paragraph (2) thereof: Provided, That the determination required under this section shall be in lieu of any determinations otherwise required under section 552(c): Provided further, That 60 days after the date of enactment of this Act, and every 180 days thereafter, the Secretary of State shall submit a report to the Committees on Appropriations describing the steps the United States Government is taking to collect information regarding allegations of genocide or other violations of international law in the former Yugoslavia and to furnish that information to the United Nations War Crimes Tribunal for the former Yugoslavia.

## LANDMINES

<< 22 USCA § 2778 NOTE >>

 SEC. 556. Notwithstanding any other provision of law, demining equipment available to the Agency for International Development and the Department of State and used in support of the clearing of landmines and unexploded ordnance for humanitarian purposes may be disposed of on a grant basis in foreign countries, subject to such terms and conditions as the President may prescribe: Provided, That section 1365(c) of the National Defense Authorization Act for Fiscal Year 1993 (Public Law 102–484; 22 U.S.C., 2778 note) is amended by striking out "During the five-year period beginning on October 23, 1992" and inserting in lieu thereof "During the eight-year period beginning on October 23, 1992".

## RESTRICTIONS CONCERNING THE PALESTINIAN AUTHORITY

 SEC. 557. None of the funds appropriated by this Act may be obligated or expended to create in any part of Jerusalem a new office of any department or agency of the United States Government for the purpose of conducting official United States Government business with the Palestinian Authority over Gaza and Jericho or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles: Provided, That this restriction shall not apply to the acquisition of additional space for the existing Consulate General in Jerusalem: Provided further, That meetings between officers and employees of the United States and officials of the Palestinian Authority, or any successor Palestinian governing entity provided for in the Israel–PLO Declaration of Principles, for the purpose of conducting official United States Government business with such authority should continue to take place in locations other than Jerusalem. As has been true in the past, officers and employees of the United States Government may continue to meet in Jerusalem on other subjects with Palestinians (including those who now occupy positions in the Palestinian Authority), have social contacts, and have incidental discussions.

## PROHIBITION OF PAYMENT OF CERTAIN EXPENSES

 SEC. 558. None of the funds appropriated or otherwise made available by this Act under the heading "INTERNATIONAL MILITARY EDUCATION AND TRAINING" or "FOREIGN MILITARY FINANCING PROGRAM" for Informational Program activities may be obligated or expended to pay for—

 (1) alcoholic beverages;

 (2) food (other than food provided at a military installation) not provided in conjunction with Informational Program trips where students do not stay at a military installation; or

 (3) entertainment expenses for activities that are substantially of a recreational character, including entrance fees at sporting events and amusement parks.

## HUMANITARIAN CORRIDORS

<< 22 USCA § 2378–1 >>

 SEC. 559. The Foreign Assistance Act of 1961 is amended by adding immediately after section 620H the following new section:

"SEC. 620I. PROHIBITION ON ASSISTANCE TO COUNTRIES THAT RESTRICT UNITED STATES HUMANITARIAN ASSISTANCE.—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(a) IN GENERAL.—No assistance shall be furnished under this Act or the Arms Export Control Act to any country when it is made known to the President that the government of such country prohibits or otherwise restricts, directly or indirectly, the transport or delivery of United States humanitarian assistance.

"(b) EXCEPTION.—Assistance may be furnished without regard to the restriction in subsection (a) if the President determines that to do so is in the national security interest of the United States.

"(c) NOTICE.—Prior to making any determination under subsection (b), the President shall notify the Committee on International Relations, the Committee on Foreign Relations, and the Committees on Appropriations of the Senate and House of Representatives of his intention to make such a determination, the effective date of the determination, and the reasons for making the determination.".

## EQUITABLE ALLOCATION OF FUNDS

SEC. 560. Not more than 20 percent of the funds appropriated by this Act to carry out the provisions of sections 103 through 106 and chapter 4 of part II of the Foreign Assistance Act of 1961, that are made available for Latin America and the Caribbean region may be made available, through bilateral and Latin America and the Caribbean regional programs, to provide assistance for any country in such region.

## PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS

SEC. 561. (a) SENSE OF CONGRESS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

## LIMITATION OF FUNDS FOR NORTH AMERICAN DEVELOPMENT BANK

SEC. 562. None of the Funds appropriated in this Act under the heading "North American Development Bank" and made available for the Community Adjustment and Investment Program shall be used for purposes other than those set out in the binational agreement establishing the Bank.

## INTERNATIONAL DEVELOPMENT ASSOCIATION

SEC. 563. In order to pay for the United States contribution to the tenth replenishment of the resources of the International Development Association authorized in section 526 of Public Law 103–87, there is authorized to be appropriated, without fiscal year limitation, $700,000,000 for payment by the Secretary of the Treasury.

## SPECIAL DEBT RELIEF FOR THE POOREST

SEC. 564. (a) AUTHORITY TO REDUCE DEBT.—The President may reduce amounts owed to the United States (or any agency of the United States) by an eligible country as a result of—

(1) guarantees issued under sections 221 and 222 of the Foreign Assistance Act of 1961; or

(2) credits extended or guarantees issued under the Arms Export Control Act.

(b) LIMITATIONS.—

(1) The authority provided by subsection (a) may be exercised only to implement multilateral official debt relief and referendum agreements, commonly referred to as "Paris Club Agreed Minutes".

(2) The authority provided by subsection (a) may be exercised only in such amounts or to such extent as is provided in advance by appropriations Acts.

(3) The authority provided by subsection (a) may be exercised only with respect to countries with heavy debt burdens that are eligible to borrow from the International Development Association, but not from the International Bank for Reconstruction and Development, commonly referred to as "IDA-only" countries.

(c) CONDITIONS—The authority provided by subsection (a) may be exercised only with respect to a country whose government—

(1) does not have an excessive level of military expenditures;

(2) has not repeatedly provided support for acts of international terrorism;

(3) is not failing to cooperate on international narcotics control matters;

(4) (including its military or other security forces) does not engage in a consistent pattern of gross violations of internationally recognized human rights; and

(5) is not ineligible for assistance because of the application of section 527 of the Foreign Relations Authorization Act, fiscal years 1994 and 1995.

(d) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

(e) CERTAIN PROHIBITIONS INAPPLICABLE.—A reduction of debt pursuant to subsection (a) shall not be considered assistance for purposes of any provision of law limiting assistance to a country. The authority provided by subsection (a) may be exercised notwithstanding section 620(r) of the Foreign Assistance Act of 1961.

### AUTHORITY TO ENGAGE IN DEBT BUYBACKS OR SALES

SEC. 565. (a) LOANS ELIGIBLE FOR SALE, REDUCTION, OR CANCELLATION.—

(1) AUTHORITY TO SELL, REDUCE, OR CANCEL CERTAIN LOANS.—Notwithstanding any other provision of law, the President may, in accordance with this section, sell to any eligible purchaser any concessional loan or portion thereof made before January 1, 1995, pursuant to the Foreign Assistance Act of 1961, to the government of any eligible country as defined in section 702(6) of that Act or on receipt of payment from an eligible purchaser, reduce or cancel such loan or portion thereof, only for the purpose of facilitating—

(A) debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps; or

(B) a debt buyback by an eligible country of its own qualified debt, only if the eligible country uses an additional amount of the local currency of the eligible country, equal to not less than 40 percent of the price paid for such debt by such eligible country, or the difference between the price paid for such debt and the face value of such debt, to support activities that link conservation and sustainable use of natural resources with local community development, and child survival and other child development, in a manner consistent with sections 707 through 710 of the Foreign Assistance Act of 1961, if the sale, reduction, or cancellation would not contravene any term or condition of any prior agreement relating to such loan.

(2) TERMS AND CONDITIONS.—Notwithstanding any other provision of law, the President shall, in accordance with this section, establish the terms and conditions under which loans may be sold, reduced, or canceled pursuant to this section.

(3) ADMINISTRATION.—The Facility, as defined in section 702(8) of the Foreign Assistance Act of 1961, shall notify the administrator of the agency primarily responsible for administering part I of the Foreign Assistance Act of 1961 of purchasers that the President has determined to be eligible, and shall direct such agency to carry out the sale, reduction, or cancellation of a loan pursuant to this section. Such agency shall make an adjustment in its accounts to reflect the sale, reduction, or cancellation.

(4) LIMITATION.—The authorities of this subsection shall be available only to the extent that appropriations for the cost of the modification, as defined in section 502 of the Congressional Budget Act of 1974, are made in advance.

(b) DEPOSIT OF PROCEEDS.—The proceeds from the sale, reduction, or cancellation of any loan sold, reduced, or canceled pursuant to this section shall be deposited in the United States Government account or accounts established for the repayment of such loan.

(c) ELIGIBLE PURCHASERS.—A loan may be sold pursuant to subsection (a)(1)(A) only to a purchaser who presents plans satisfactory to the President for using the loan for the purpose of engaging in debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(d) DEBTOR CONSULTATIONS.—Before the sale to any eligible purchaser, or any reduction or cancellation pursuant to this section, of any loan made to an eligible country, the President should consult with the country concerning the amount of loans to be sold, reduced, or canceled and their uses for debt-for-equity swaps, debt-for-development swaps, or debt-for-nature swaps.

(e) AVAILABILITY OF FUNDS.—The authority provided by subsection (a) may be used only with regard to funds appropriated by this Act under the heading "Debt restructuring".

### LIBERIA

SEC. 566. Funds appropriated by this Act may be made available for assistance for Liberia notwithstanding section 620(q) of the Foreign Assistance Act of 1961 and section 512 of this Act.

### GUATEMALA

SEC. 567. (a) Funds provided in this Act may be made available for the Guatemalan military forces, and the restrictions on Guatemala under the headings "International Military Education and Training" and "Foreign Military Financing Program" shall not apply, only if the President determines and certifies to the Congress that the Guatemalan military is cooperating fully with efforts to resolve human rights abuses which elements of the Guatemalan military forces are alleged to have committed, ordered or attempted to thwart the investigation of, and with efforts to negotiate a peace settlement.

(b) The prohibition contained in subsection (a) shall not apply to funds made available to implement a ceasefire or peace agreement.

(c) Any funds made available pursuant to subsections (a) or (b) shall be subject to the regular notification procedures of the Committees on Appropriations.

(d) Any funds made available pursuant to subsections (a) and (b) for international military education and training may only be for expanded international military education and training.

### SANCTIONS AGAINST COUNTRIES HARBORING WAR CRIMINALS

SEC. 568. (a) BILATERAL ASSISTANCE.—The President is authorized to withhold funds appropriated by this Act under the Foreign Assistance Act of 1961 or the Arms Export Control Act for any country described in subsection (c).

(b) MULTILATERAL ASSISTANCE.—The Secretary of the Treasury should instruct the United States executive directors of the international financial institutions to work in opposition to, and vote against, any extension by such institutions of financing or financial or technical assistance to any country described in subsection (c).

(c) SANCTIONED COUNTRIES.—A country described in this subsection is a country the government of which knowingly grants sanctuary to persons in its territory for the purpose of evading prosecution, where such persons—

(1) have been indicted by the International Criminal Tribunal for the former Yugoslavia, the International Criminal Tribunal for Rwanda, or any other international tribunal with similar standing under international law, or

(2) have been indicted for war crimes or crimes against humanity committed during the period beginning March 23, 1933 and ending on May 8, 1945 under the direction of, or in association with—

(A) the Nazi government of Germany;

(B) any government in any area occupied by the military forces of the Nazi government of Germany;

(C) any government which was established with the assistance or cooperation of the Nazi government; or

(D) any government which was an ally of the Nazi government of Germany.

### LIMITATION ON ASSISTANCE FOR HAITI

SEC. 569. (a) LIMITATION.—None of the funds appropriated or otherwise made available by this Act, may be provided to the Government of Haiti until the President reports to Congress that—

(1) the Government is conducting thorough investigations of extrajudicial and political killings; and

(2) the Government is cooperating with United States authorities in the investigations of political and extrajudicial killings.

(b) Nothing in this section shall be construed to restrict the provision of humanitarian, development, or electoral assistance.

(c) The President may waive the requirements of this section on a semiannual basis if he determines and certifies to the appropriate committees of Congress that it is in the national interest of the United States.

### POLICY TOWARD BURMA

SEC. 570. (a) Until such time as the President determines and certifies to Congress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government, the following sanctions shall be imposed on Burma:

(1) BILATERAL ASSISTANCE.—There shall be no United States assistance to the Government of Burma, other than—

(A) humanitarian assistance,

(B) subject to the regular notification procedures of the Committees on Appropriations, counter-narcotics assistance under chapter 8 of part I of the Foreign Assistance Act of 1961, or crop substitution assistance, if the Secretary of State certifies to the appropriate congressional committees that—

(i) the Government of Burma is fully cooperating with United States counter-narcotics efforts, and

(ii) the programs are fully consistent with United States human rights concerns in Burma and serve the United States national interest, and

(C) assistance promoting human rights and democratic values.

(2) MULTILATERAL ASSISTANCE.—The Secretary of the Treasury shall instruct the United States executive director of each international financial institution to vote against any loan or other utilization of funds of the respective bank to or for Burma.

(3) VISAS.—Except as required by treaty obligations or to staff the Burmese mission to the United States, the United States should not grant entry visas to any Burmese government official.

(b) CONDITIONAL SANCTIONS.—The President is hereby authorized to prohibit, and shall prohibit United States persons from new investment in Burma, if the President determines and certifies to Congress that, after the date of enactment of this Act, the Government of Burma has physically harmed, rearrested for political acts, or exiled Daw Aung San Suu Kyi or has committed large-scale repression of or violence against the Democratic opposition.

(c) MULTILATERAL STRATEGY.—The President shall seek to develop, in coordination with members of ASEAN and other countries having major trading and investment interests in Burma, a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma, including the development of a dialogue between the State Law and Order Restoration Council (SLORC) and democratic opposition groups within Burma.

(d) PRESIDENTIAL REPORTS.—Every six months following the enactment of this Act, the President shall report to the Chairmen of the Committee on Foreign Relations, the Committee on International Relations and the House and Senate Appropriations Committees on the following:

(1) progress toward democratization in Burma;

(2) progress on improving the quality of life of the Burmese people, including progress on market reforms, living standards, labor standards, use of forced labor in the tourism industry, and environmental quality; and

(3) progress made in developing the strategy referred to in subsection (c).

(e) WAIVER AUTHORITY.—The President shall have the authority to waive, temporarily or permanently, any sanction referred to in subsection (a) or subsection (b) if he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States.

(f) DEFINITIONS.—

(1) The term "international financial institutions" shall include the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Multilateral Investment Guarantee Agency, the Asian Development Bank, and the International Monetary Fund.

(2) The term "new investment" shall mean any of the following activities if such an activity is undertaken pursuant to an agreement, or pursuant to the exercise of rights under such an agreement, that is entered into with the Government of Burma or a nongovernmental entity in Burma, on or after the date of the certification under subsection (b):

(A) the entry into a contract that includes the economical development of resources located in Burma, or the entry into a contract providing for the general supervision and guarantee of another person's performance of such a contract;

(B) the purchase of a share of ownership, including an equity interest, in that development;

(C) the entry into a contract providing for the participation in royalties, earnings, or profits in that development, without regard to the form of the participation:

Provided, That the term "new investment" does not include the entry into, performance of, or financing of a contract to sell or purchase goods, services, or technology.

REPORT REGARDING HONG KONG

<< 22 USCA § 5731 NOTE >>

SEC. 571. In light of the deficiencies in reports submitted to the Congress pursuant to section 301 of the United States–Hong Kong Policy Act (22 U.S.C. 5731), the Congress directs that the additional report required to be submitted during 1997 under such section include detailed information on the status of, and other developments affecting, implementation of the Sino–British Joint Declaration on the Question of Hong Kong, including—

(1) the Basic Law and its consistency with the Joint Declaration;

(2) Beijing's plans to replace the elected legislature with an appointed body;

(3) the openness and fairness of the election of the chief executive and the executive's accountability to the legislature;

(4) the treatment of political parties;

(5) the independence of the Judiciary and its ability to exercise the power of final judgment over Hong Kong law; and

(6) the Bill of Rights.

### USE OF FUNDS FOR PURCHASE OF PRODUCTS NOT MADE IN AMERICA

SEC. 572. The Administrator of the Agency for International Development shall provide a report to the appropriate committees of the Congress on the ability of the United States Government to implement a provision of law (and on the foreign policy implications of such a provision of law) which would require that United States funds could be made available to the government of a foreign country for the purchase of any equipment or products only if such purchases were to occur in such foreign country or the United States, and substantially similar equipment and products were made in the United States and available for purchase at a price that is not more than 10 percent higher than that in other countries.

### CONFLICT IN CHECHNYA

SEC. 573. The Secretary of State shall provide to the Committees on Appropriations no later than 30 days from the date of enactment of this Act a detailed report on actions undertaken by the United States Government to resolve the conflict in Chechnya.

### EXTENSION OF CERTAIN ADJUDICATION PROVISIONS

SEC. 575. The Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990 (Public Law 101–167) is amended—

<< 8 USCA § 1157 NOTE >>

(1) in section 599D (8 U.S.C. 1157 note)—

(A) in subsection (b)(3), by striking "and 1996" and inserting "1996, and 1997"; and

(B) in subsection (e), by striking out "October 1, 1996" each place it appears and inserting "October 1, 1997"; and

<< 8 USCA § 1255 NOTE >>

(2) in section 599E (8 U.S.C. 1255 note) in subsection (b)(2), by striking out "September 30, 1996" and inserting "September 30, 1997".

### TRANSPARENCY OF BUDGETS

<< 22 USCA § 262k–1 >>

SEC. 576. (a) LIMITATION.—Beginning three years after the date of the enactment of this Act, the Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to use the voice and vote of the United States to oppose any loan or other utilization of the funds of their respective institution, other than to address basic human needs, for the government of any country which the Secretary of the Treasury determines—

(1) does not have in place a functioning system for a civilian audit of all receipts and expenditures that fund activities of the armed forces and security forces;

(2) has not provided a summary of a current audit to the institution.

(b) DEFINITION.—For purposes of this section, the term "international financial institution" shall include the institutions identified in section 532(b) of this Act.

### GUARANTEES

<< 2 USCA § 901 >>

SEC. 577. Section 251(b)(2)(G) of the Balanced Budget and Emergency Deficit Control Act of 1985 is amended by striking "fiscal year 1994 and 1995" and inserting in lieu thereof "fiscal years 1994, 1995, and 1997" in both places that this appears.

AR.03248

INFORMATION ON COOPERATION WITH UNITED STATES ANTI–
TERRORISM EFFORTS IN ANNUAL COUNTRY REPORTS ON TERRORISM

<< 22 USCA § 2656f >>

SEC. 578. Section 140 of the Foreign Relations Authorization Act, fiscal years 1988 and 1989 (22 U.S.C. 2656f) is amended—

(1) in subsection (a)—

  (A) by striking "and" at the end of paragraph (1);

  (B) by striking the period at the end of paragraph (2) and inserting a semicolon; and

  (C) by adding at the end the following:

"(3) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the investigation or prosecution of an act of international terrorism against United States citizens or interests, information on—

  "(A) the extent to which the government of the foreign country is cooperating with the United States Government in apprehending, convicting, and punishing the individual or individuals responsible for the act; and

  "(B) the extent to which the government of the foreign country is cooperating in preventing further acts of terrorism against United States citizens in the foreign country; and

"(4) with respect to each foreign country from which the United States Government has sought cooperation during the previous five years in the prevention of an act of international terrorism against such citizens or interests, the information described in paragraph (3)(B)."; and

(2) in subsection (c)—

  (A) by striking "The report" and inserting "(1) Except as provided in paragraph (2), the report";

  (B) by indenting the margin of paragraph (1) as so designated, 2 ems; and

  (C) by adding at the end the following:

"(2) If the Secretary of State determines that the transmittal of the information with respect to a foreign country under paragraph (3) or (4) of subsection (a) in classified form would make more likely the cooperation of the government of the foreign country as specified in such paragraph, the Secretary may transmit the information under such paragraph in classified form.".

FEMALE GENITAL MUTILATION

<< 22 USCA § 262k–2 >>

SEC. 579. (a) LIMITATION.—Beginning 1 year after the date of the enactment of this Act, the Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to use the voice and vote of the United States to oppose any loan or other utilization of the funds of their respective institution, other than to address basic human needs, for the government of any country which the Secretary of the Treasury determines—

  (1) has, as a cultural custom, a known history of the practice of female genital mutilation; and

  (2) has not taken steps to implement educational programs designed to prevent the practice of female genital mutilation.

(b) DEFINITION.—For purposes of this section, the term "international financial institution" shall include the institutions identified in section 532(b) of this Act.

REQUIREMENT FOR DISCLOSURE OF FOREIGN AID IN REPORT OF SECRETARY OF STATE

<< 22 USCA § 2414a NOTE >>

SEC. 580. (a) FOREIGN AID REPORTING REQUIREMENT.—In addition to the voting practices of a foreign country, the report required to be submitted to Congress under section 406(a) of the Foreign Relations Authorization Act, fiscal years 1990 and 1991 (22 U.S.C. 2414a), shall include a side-by-side comparison of individual countries' overall support for the United States at the United Nations and the amount of United States assistance provided to such country in fiscal year 1996.

(b) UNITED STATES ASSISTANCE.—For purposes of this section, the term "United States assistance" has the meaning given the term in section 481(e)(4) of the Foreign Assistance Act of 1961 (22 U.S.C. 2291(e)(4)).

## RESTRICTIONS ON VOLUNTARY CONTRIBUTIONS TO UNITED NATIONS AGENCIES

SEC. 581. (a) PROHIBITION ON VOLUNTARY CONTRIBUTIONS FOR THE UNITED NATIONS.—None of the funds appropriated or otherwise made available by this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) if the United Nations implements or imposes any taxation on any United States persons.

(b) CERTIFICATION REQUIRED FOR DISBURSEMENT OF FUNDS.—None of the funds appropriated or otherwise made available under this Act may be made available to pay any voluntary contribution of the United States to the United Nations (including the United Nations Development Program) unless the President certifies to the Congress 15 days in advance of such payment that the United Nations is not engaged in any effort to implement or impose any taxation on United States persons in order to raise revenue for the United Nations or any of its specialized agencies.

(c) DEFINITIONS.—As used in this section the term "United States person" refers to—

(1) a natural person who is a citizen or national of the United States; or

(2) a corporation, partnership, or other legal entity organized under the United States or any State, territory, possession, or district of the United States.

## HAITI

SEC. 582. The Government of Haiti shall be eligible to purchase defense articles and services under the Arms Export Control Act (22 U.S.C. 2751 et seq.), for the civilian-led Haitian National Police and Coast Guard: Provided, That the authority provided by this section shall be subject to the regular notification procedures of the Committees on Appropriations.

## REFUGEE STATUS FOR ADULT CHILDREN OF FORMER VIETNAMESE REEDUCATION CAMP INTERNEES RESETTLED UNDER THE ORDERLY DEPARTURE PROGRAM

SEC. 584. (a) ELIGIBILITY FOR ORDERLY DEPARTURE PROGRAM.—For purposes of eligibility for the Orderly Departure Program for nationals of Vietnam, during fiscal year 1997, an alien described in subsection (b) shall be considered to be a refugee of special humanitarian concern to the United States within the meaning of section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) and shall be admitted to the United States for resettlement if the alien would be admissible as an immigrant under the Immigration and Nationality Act (except as provided in section 207(c)(3) of that Act).

(b) ALIENS COVERED.—An alien described in this subsection is an alien who—

(1) is the son or daughter of a national of Vietnam who—

(A) was formerly interned in a reeducation camp in Vietnam by the Government of the Socialist Republic of Vietnam; and

(B) has been accepted for resettlement as a refugee under the Orderly Departure Program on or after April 1, 1995;

(2) is 21 years of age or older; and

(3) was unmarried as of the date of acceptance of the alien's parent for resettlement under the Orderly Departure Program.

(c) SUPERSEDES EXISTING LAW.—This section supersedes any other provision of law.

## NORTH KOREA

### << 22 USCA § 2656 NOTE >>

SEC. 585. Ninety days after the date of enactment of this Act, and every 180 days thereafter, the Secretary of State, in consultation with the Secretary of Defense, shall provide a report in a classified or unclassified form to the Committee on Appropriations including the following information:

(a) a best estimate on fuel used by the military forces of the Democratic People's Republic of Korea (DPRK);

(b) the deployment position and military training and activities of the DPRK forces and best estimate of the associated costs of these activities;

(c) steps taken to reduce the DPRK level of forces; and

(d) cooperation, training, or exchanges of information, technology or personnel between the DPRK and any other nation supporting the development or deployment of a ballistic missile capability.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

LIMITATION ON ASSISTANCE TO MEXICO

SEC. 587. Not less than $2,500,000 of the funds appropriated or otherwise made available by this Act for the Government of Mexico shall be withheld from obligation until the President has determined and reported to Congress that—

(1) the Government of Mexico is taking actions to reduce the amount of illegal drugs entering the United States from Mexico; and

(2) the Government of Mexico—

(A) is taking effective actions to apply vigorously all law enforcement resources to investigate, track, capture, incarcerate, and prosecute individuals controlling, supervising, or managing international narcotics cartels or other similar entities and the accomplices of such individuals, individuals responsible for, or otherwise involved in, corruption, and individuals involved in money-laundering;

(B) is pursuing international anti-drug trafficking initiatives;

(C) is cooperating fully with international efforts at narcotics interdiction; and

(D) is cooperating fully with requests by the United States for assistance in investigations of money-laundering violations and is making progress toward implementation of effective laws to prohibit money-laundering.

LIMITATION OF ASSISTANCE TO TURKEY

SEC. 588. Not more than $22,000,000 of the funds appropriated in this Act under the heading "Economic Support Fund" may be made available to the Government of Turkey.

<< 28 USCA § 1605 NOTE >>

CIVIL LIABILITY FOR ACTS OF STATE SPONSORED TERRORISM

SEC. 589. (a) an official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).

(b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. 1605(f) and (g) shall also apply to actions brought under this section.

No action shall be maintained under this action if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.

Titles I through V of this Act may be cited as the "Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997".

<< 22 USCA § 1928 NOTE >>

TITLE VI—NATO ENLARGEMENT FACILITATION ACT OF 1996

SEC. 601. SHORT TITLE.

This title may be cited as the "NATO Enlargement Facilitation Act of 1996".

SEC. 602. FINDINGS.

The Congress makes the following findings:

(1) Since 1949, the North Atlantic Treaty Organization (NATO) has played an essential role in guaranteeing the security, freedom, and prosperity of the United States and its partners in the Alliance.

(2) The NATO Alliance is, and has been since its inception, purely defensive in character, and it poses no threat to any nation. The enlargement of the NATO Alliance to include as full and equal members emerging democracies in Central and Eastern Europe will serve to reinforce stability and security in Europe by fostering their integration into the structures which have

created and sustained peace in Europe since 1945. Their admission into NATO will not threaten any nation. America's security, freedom, and prosperity remain linked to the security of the countries of Europe.

(3) The sustained commitment of the member countries of NATO to a mutual defense has made possible the democratic transformation of Central and Eastern Europe. Members of the Alliance can and should play a critical role in addressing the security challenges of the post-Cold War era and in creating the stable environment needed for those emerging democracies in Central and Eastern Europe to successfully complete political and economic transformation.

(4) The United States continues to regard the political independence and territorial integrity of all emerging democracies in Central and Eastern Europe as vital to European peace and security.

(5) The active involvement by the countries of Central and Eastern Europe has made the Partnership for Peace program an important forum to foster cooperation between NATO and those countries seeking NATO membership.

(6) NATO has enlarged its membership on 3 different occasions since 1949.

(7) Congress supports the admission of qualified new members to NATO and the European Union at an early date and has sought to facilitate the admission of qualified new members into NATO.

(8) Lasting security and stability in Europe requires not only the military integration of emerging democracies in Central and Eastern Europe into existing European structures, but also the eventual economic and political integration of these countries into existing European structures.

(9) As new members of NATO assume the responsibilities of Alliance membership, the costs of maintaining stability in Europe should be shared more widely. Facilitation of the enlargement process will require current members of NATO, and the United States in particular, to demonstrate the political will needed to build on successful ongoing programs such as the Warsaw Initiative and the Partnership for Peace by making available the resources necessary to supplement efforts prospective new members are themselves undertaking.

(10) New members will be full members of the Alliance, enjoying all rights and assuming all the obligations under the North Atlantic Treaty, signed at Washington on April 4, 1949 (hereafter in this Act referred to as the "Washington Treaty").

(11) In order to assist emerging democracies in Central and Eastern Europe that have expressed interest in joining NATO to be prepared to assume the responsibilities of NATO membership, the United States should encourage and support efforts by such countries to develop force structures and force modernization priorities that will enable such countries to contribute to the full range of NATO missions, including, most importantly, territorial defense of the Alliance.

(12) Cooperative regional peacekeeping initiatives involving emerging democracies in Central and Eastern Europe that have expressed interest in joining NATO, such as the Baltic Peacekeeping Battalion, the Polish–Lithuanian Joint Peacekeeping Force, and the Polish–Ukrainian Peacekeeping Force, can make an important contribution to European peace and security and international peacekeeping efforts, can assist those countries preparing to assume the responsibilities of possible NATO membership, and accordingly should receive appropriate support from the United States.

(13) NATO remains the only multilateral security organization capable of conducting effective military operations and preserving security and stability of the Euro–Atlantic region.

(14) NATO is an important diplomatic forum and has played a positive role in defusing tensions between members of the Alliance and, as a result, no military action has occurred between two Alliance member states since the inception of NATO in 1949.

(15) The admission to NATO of emerging democracies in Central and Eastern Europe which are found to be in a position to further the principles of the Washington Treaty would contribute to international peace and enhance the security of the region. Countries which have become democracies and established market economies, which practice good neighborly relations, and which have established effective democratic civilian control over their defense establishments and attained a degree of interoperability with NATO, should be evaluated for their potential to further the principles of the Washington Treaty.

(16) Democratic civilian control of defense forces is an essential element in the process of preparation for those states interested in possible NATO membership.

(17) Protection and promotion of fundamental freedoms and human rights is an integral aspect of genuine security, and in evaluating requests for membership in NATO, the human rights records of the emerging democracies in Central and Eastern Europe should be evaluated according to their commitments to fulfill in good faith the human rights obligations of the Charter of the United Nations, the principles of the Universal Declaration on Human Rights, and the Helsinki Final Act.

(18) A number of Central and Eastern European countries have expressed interest in NATO membership, and have taken concrete steps to demonstrate this commitment, including their participation in Partnership for Peace activities.

(19) The Caucasus region remains important geographically and politically to the future security of Central Europe. As NATO proceeds with the process of enlargement, the United States and NATO should continue to examine means to strengthen the sovereignty and enhance the security of United Nations recognized countries in that region.

(20) In recognition that not all countries which have requested membership in NATO will necessarily qualify at the same pace, the accession date for each new member will vary.

(21) The provision of additional NATO transition assistance should include those emerging democracies most ready for closer ties with NATO and should be designed to assist other countries meeting specified criteria of eligibility to move forward toward eventual NATO membership.

(22) The Congress of the United States finds in particular that Poland, Hungary, and the Czech Republic have made significant progress toward achieving the criteria set forth in section 203(d)(3) of the NATO Participation Act of 1994 and should be eligible for the additional assistance described in this Act.

(23) The evaluation of future membership in NATO for emerging democracies in Central and Eastern Europe should be based on the progress of those nations in meeting criteria for NATO membership, which require enhancement of NATO's security and the approval of all NATO members.

(24) The process of NATO enlargement entails the consensus agreement of the governments of all 16 NATO members and ratification in accordance with their constitutional procedures.

(25) Some NATO members, such as Spain and Norway, do not allow the deployment of nuclear weapons on their territory although they are accorded the full collective security guarantees provided by Article 5 of the Washington Treaty. There is no a priori requirement for the stationing of nuclear weapons on the territory of new NATO members, particularly in the current security climate. However, NATO retains the right to alter its security posture at any time as circumstances warrant.

## SEC. 603. UNITED STATES POLICY.

It is the policy of the United States—

(1) to join with the NATO allies of the United States to adapt the role of the NATO Alliance in the post-Cold War world;

(2) to actively assist the emerging democracies in Central and Eastern Europe in their transition so that such countries may eventually qualify for NATO membership;

(3) to support the enlargement of NATO in recognition that enlargement will benefit the interests of the United States and the Alliance and to consider these benefits in any analysis of the costs of NATO enlargement;

(4) to ensure that all countries in Central and Eastern Europe are fully aware of and capable of assuming the costs and responsibilities of NATO membership, including the obligation set forth in Article 10 of the Washington Treaty that new members be able to contribute to the security of the North Atlantic area; and

(5) to work to define a constructive and cooperative political and security relationship between an enlarged NATO and the Russian Federation.

## SEC. 604. SENSE OF THE CONGRESS REGARDING FURTHER ENLARGEMENT OF NATO.

It is the sense of the Congress that in order to promote economic stability and security in Slovakia, Estonia, Latvia, Lithuania, Romania, Bulgaria, Albania, Moldova, and Ukraine—

(1) the United States should continue and expand its support for the full and active participation of these countries in activities appropriate for qualifying for NATO membership;

(2) the United States Government should use all diplomatic means available to press the European Union to admit as soon as possible any country which qualifies for membership;

(3) the United States Government and the North Atlantic Treaty Organization should continue and expand their support for military exercises and peacekeeping initiatives between and among these nations, nations of the North Atlantic Treaty Organization, and Russia; and

(4) the process of enlarging NATO to include emerging democracies in Central and Eastern Europe should not be limited to consideration of admitting Poland, Hungary, the Czech Republic, and Slovenia as full members of the NATO Alliance.

SEC. 605. SENSE OF THE CONGRESS REGARDING ESTONIA, LATVIA AND LITHUANIA.

In view of the forcible incorporation of Estonia, Latvia, Lithuania into the Soviet Union in 1940 under the Molotov–Ribbentrop Pact and the refusal of the United States and other countries to recognize that incorporation for over 50 years, it is the sense of the Congress that—

(1) Estonia, Latvia, and Lithuania have valid historical security concerns that must be taken into account by the United States; and

(2) Estonia, Latvia, and Lithuania should not be disadvantaged in seeking to join NATO by virtue of their forcible incorporation into the Soviet Union.

SEC. 606. DESIGNATION OF COUNTRIES ELIGIBLE FOR NATO ENLARGEMENT ASSISTANCE.

(a) IN GENERAL.—The following countries are designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994 and shall be deemed to have been so designated pursuant to section 203(d)(1) of such Act: Poland, Hungary, and the Czech Republic.

(b) DESIGNATION OF SLOVENIA.—Effective 90 days after the date of enactment of this Act, Slovenia is designated as eligible to receive assistance under the program established under section 203(a) of the NATO Participation Act of 1994, and shall be deemed to have been so designated pursuant to section 203(d) of such Act, unless the President certifies to Congress prior to such effective date that Slovenia fails to meet the criteria under section 203(d)(3) of such Act.

(c) DESIGNATION OF OTHER COUNTRIES.—The President shall designate other emerging democracies in Central and Eastern Europe as eligible to receive assistance under the program established under section 203(a) of such Act if such countries—

(1) have expressed a clear desire to join NATO;

(2) have begun an individualized dialogue with NATO in preparation for accession;

(3) are strategically significant to an effective NATO defense; and

(4) meet the other criteria outlined in section 203(d)(3) of the NATO Participation Act of 1994 (title II of Public Law 103–447; 22 U.S.C. 1928 note).

(d) RULE OF CONSTRUCTION.—Nothing in this section precludes the designation by the President of Estonia, Latvia, Lithuania, Romania, Slovakia, Bulgaria, Albania, Moldova, Ukraine, or any other emerging democracy in Central and Eastern Europe pursuant to section 203(d) of the NATO Participation Act of 1994 as eligible to receive assistance under the program established under section 203(a) of such Act.

SEC. 607. AUTHORIZATION OF APPROPRIATIONS FOR NATO ENLARGEMENT ASSISTANCE.

(a) IN GENERAL.—There are authorized to be appropriated $60,000,000 for fiscal year 1997 for the program established under section 203(a) of the NATO Participation Act of 1994.

(b) AVAILABILITY.—Of the funds authorized to be appropriated by subsection (a)—

(1) not less than $20,000,000 shall be available for the cost, as defined in section 502(5) of the Credit Reform Act of 1990, of direct loans pursuant to the authority of section 203(c)(4) of the NATO Participation Act of 1994 (relating to the "Foreign Military Financing Program");

(2) not less than $30,000,000 shall be available for assistance on a grant basis pursuant to the authority of section 203(c)(4) of the NATO Participation Act of 1994 (relating to the "Foreign Military Financing Program"); and

(3) not more than $10,000,000 shall be available for assistance pursuant to the authority of section 203(c)(3) of the NATO Participation Act of 1994 (relating to international military education and training).

(c) RULE OF CONSTRUCTION.—Amounts authorized to be appropriated under this section are authorized to be appropriated in addition to such amounts as otherwise may be available for such purposes.

SEC. 608. REGIONAL AIRSPACE INITIATIVE AND PARTNERSHIP FOR PEACE INFORMATION MANAGEMENT SYSTEM.

(a) IN GENERAL.—To the extent provided in advance in appropriations acts for such purposes, funds described in subsection (b) are authorized to be made available to support the implementation of the Regional Airspace Initiative and the Partnership for Peace Information Management System, including—

   (1) the procurement of items in support of these programs; and

   (2) the transfer of such items to countries participating in these programs.

   (b) FUNDS DESCRIBED.—Funds described in this subsection are funds that are available—

   (1) during any fiscal year under the NATO Participation Act of 1994 with respect to countries eligible for assistance under that Act; or

   (2) during fiscal year 1997 under any Act to carry out the Warsaw Initiative.

SEC. 609. EXCESS DEFENSE ARTICLES.

  (a) PRIORITY DELIVERY.—Notwithstanding any other provision of law, the delivery of excess defense articles under the authority of section 203(c)(1) and (2) of the NATO Participation Act of 1994 and section 516 of the Foreign Assistance Act of 1961 shall be given priority to the maximum extent feasible over the delivery of such excess defense articles to all other countries except those countries referred to in section 541 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1995 (Public Law 103–306; 108 Stat. 1640).

  (b) COOPERATIVE REGIONAL PEACEKEEPING INITIATIVES.—The Congress encourages the President to provide excess defense articles and other appropriate assistance to cooperative regional peacekeeping initiatives involving emerging democracies in Central and Eastern Europe that have expressed an interest in joining NATO in order to enhance their ability to contribute to European peace and security and international peacekeeping efforts.

SEC. 610. MODERNIZATION OF DEFENSE CAPABILITY.

  The Congress endorses efforts by the United States to modernize the defense capability of Poland, Hungary, the Czech Republic, Slovenia, and any other countries designated by the President pursuant to section 203(d) of the NATO Participation Act of 1994, by exploring with such countries options for the sale or lease to such countries of weapons systems compatible with those used by NATO members, including air defense systems, advanced fighter aircraft, and telecommunications infrastructure.

SEC. 611. TERMINATION OF ELIGIBILITY.

  (a) TERMINATION OF ELIGIBILITY.—The eligibility of a country designated pursuant to subsection (a) or (b) of section 606 or pursuant to section 203(d) of the NATO Participation Act of 1994 may be terminated upon a determination by the President that such country does not meet the criteria set forth in section 203(d)(3) of the NATO Participation Act of 1994.

  (b) NOTIFICATION.—At least 15 days before terminating the eligibility of any country pursuant to subsection (a), the President shall notify the congressional committees specified in section 634A of the Foreign Assistance Act of 1961 in accordance with the procedures applicable to reprogramming notifications under that section.

SEC. 612. CONFORMING AMENDMENTS TO THE NATO PARTICIPATION ACT.

  The NATO Participation Act of 1994 (title II of Public Law 103–447; 22 U.S.C. 1928 note) is amended in sections 203(a), 203(d)(1), and 203(d)(2) by striking "countries emerging from communist domination" each place it appears and inserting "emerging democracies in Central and Eastern Europe".

<< 22 USCA Ch. 7 >>

TITLE VII—MIDDLE EAST DEVELOPMENT BANK

<< 22 USCA § 290*o* NOTE >>

SEC. 701. SHORT TITLE.

  This title may be cited as the "Bank for Economic Cooperation and Development in the Middle East and North Africa Act".

<< 22 USCA § 290*o* >>

SEC. 702. ACCEPTANCE OF MEMBERSHIP.

  The President is hereby authorized to accept membership for the United States in the Bank for Economic Cooperation and Development in the Middle East and North Africa (in this title referred to as the "Bank") provided for by the agreement establishing the Bank (in this title referred to as the "Agreement"), signed on May 31, 1996.

<< 22 USCA § 290*o*–1 >>

SEC. 703. GOVERNOR AND ALTERNATE GOVERNOR.

  (a) APPOINTMENT.—At the inaugural meeting of the Board of Governors of the Bank, the Governor and the alternate for the Governor of the International Bank for Reconstruction and Development, appointed pursuant to section 3 of the Bretton Woods Agreements Act, shall serve ex-officio as a Governor and the alternate for the Governor, respectively, of the Bank. The President, by and with the advice and consent of the Senate, shall appoint a Governor of the Bank and an alternate for the Governor.
  (b) COMPENSATION.—Any person who serves as a governor of the Bank or as an alternate for the Governor may not receive any salary or other compensation from the United States by reason of such service.

<< 22 USCA § 290*o*–2 >>

SEC. 704. APPLICABILITY OF CERTAIN PROVISIONS OF THE BRETTON WOODS AGREEMENTS ACT.

  Section 4 of the Bretton Woods Agreements Act shall apply to the Bank in the same manner in which such section applies to the International Bank for Reconstruction and Development and the International Monetary Fund.

<< 22 USCA § 290*o*–3 >>

SEC. 705. FEDERAL RESERVE BANKS AS DEPOSITORIES.

  Any Federal Reserve Bank which is requested to do so by the Bank may act as its depository, or as its fiscal agent, and the Board of Governors of the Federal Reserve System shall exercise general supervision over the carrying out of these functions.

<< 22 USCA § 290*o*–4 >>

SEC. 706. SUBSCRIPTION OF STOCK.

  (a) SUBSCRIPTION AUTHORITY.—
  (1) IN GENERAL.—The Secretary of the Treasury may subscribe on behalf of the United States to not more than 7,011,270 shares of the capital stock of the Bank.
  (2) EFFECTIVENESS OF SUBSCRIPTION COMMITMENT.—Any commitment to make such subscription shall be effective only to such extent or in such amounts as are provided for in advance by appropriations Acts.
  (b) LIMITATIONS ON AUTHORIZATION OF APPROPRIATIONS.—For payment by the Secretary of the Treasury of the subscription of the United States for shares described in subsection (a), there are authorized to be appropriated $1,050,007,800 without fiscal year limitation.
  (c) LIMITATIONS ON OBLIGATION OF APPROPRIATED AMOUNTS FOR SHARES OF CAPITAL STOCK.—
  (1) PAID–IN CAPITAL STOCK.—
  (A) IN GENERAL.—Not more than $105,000,000 of the amounts appropriated pursuant to subsection (b) may be obligated for subscription to shares of paid-in capital stock.
  (B) FISCAL YEAR 1997.—Not more than $52,500,000 of the amounts appropriated pursuant to subsection (b) for fiscal year 1997 may be obligated for subscription to shares of paid-in capital stock.

(2) CALLABLE CAPITAL STOCK.—Not more than $787,505,852 of the amounts appropriated pursuant to subsection (b) may be obligated for subscription to shares of callable capital stock.

(d) DISPOSITION OF NET INCOME DISTRIBUTIONS BY THE BANK.—Any payment made to the United States by the Bank as a distribution of net income shall be covered into the Treasury as a miscellaneous receipt.

<< 22 USCA § 290*o*–5 >>

SEC. 707. JURISDICTION AND VENUE OF CIVIL ACTIONS BY OR AGAINST THE BANK.

(a) JURISDICTION.—The United States district courts shall have original and exclusive jurisdiction of any civil action brought in the United States by or against the Bank.

(b) VENUE.—For purposes of section 1391(b) of title 28, United States Code, the Bank shall be deemed to be a resident of the judicial district in which the principal office of the Bank in the United States, or its agent appointed for the purpose of accepting service or notice of service, is located.

<< 22 USCA § 290*o*–6 >>

SEC. 708. EFFECTIVENESS OF AGREEMENT.

The Agreement shall have full force and effect in the United States, its territories and possessions, and the Commonwealth of Puerto Rico, upon acceptance of membership by the United States in the Bank and the entry into force of the Agreement.

<< 22 USCA § 290*o*–7 >>

SEC. 709. EXEMPTION FROM SECURITIES LAWS FOR CERTAIN SECURITIES ISSUED BY THE BANK; REPORTS REQUIRED.

(a) EXEMPTION FROM SECURITIES LAWS; REPORTS TO SECURITIES AND EXCHANGE COMMISSION.—Any securities issued by the Bank (including any guaranty by the Bank, whether or not limited in scope) in connection with borrowing of funds, or the guarantee of securities as to both principal and interest, shall be deemed to be exempted securities within the meaning of section 3(a)(2) of the Securities Act of 1933 and section 3(a)(12) of the Securities Exchange Act of 1934. The Bank shall file with the Securities and Exchange Commission such annual and other reports with regard to such securities as the Commission shall determine to be appropriate in view of the special character of the Bank and its operations and necessary in the public interest or for the protection of investors.

(b) AUTHORITY OF SECURITIES AND EXCHANGE COMMISSION TO SUSPEND EXEMPTION; REPORTS TO THE CONGRESS.—The Securities and Exchange Commission, acting in consultation with such agency or officer as the President shall designate, may suspend the provisions of subsection (a) at any time as to any or all securities issued or guaranteed by the Bank during the period of such suspension. The Commission shall include in its annual reports to the Congress such information as it shall deem advisable with regard to the operations and effect of this section.

SEC. 710. TECHNICAL AMENDMENTS.

<< 22 USCA § 262r >>

(a) ANNUAL REPORT REQUIRED ON PARTICIPATION OF THE UNITED STATES IN THE BANK.—Section 1701(c)(2) of the International Financial Institutions Act (22 U.S.C. 262r(c)(2)) is amended by inserting "Bank for Economic Cooperation and Development in the Middle East and North Africa," after "Inter–American Development Bank".

<< 12 USCA § 24 >>

(b) EXEMPTION FROM LIMITATIONS AND RESTRICTIONS ON POWER OF NATIONAL, BANKING ASSOCIATIONS TO DEAL IN AND UNDERWRITE INVESTMENT SECURITIES OF THE BANK.—The seventh sentence

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of paragraph 7 of section 5136 of the Revised Statutes of the United States (12 U.S.C. 24) is amended by inserting "Bank for Economic Cooperation and Development in the Middle East and North Africa," after "the Inter–American Development Bank".

<< 22 USCA § 276c–2 >>

(c) BENEFITS FOR UNITED STATES CITIZEN–REPRESENTATIVES TO THE BANK.—Section 51 of Public Law 91–599 (22 U.S.C. 276c–2) is amended by inserting "the Bank for Economic Cooperation and Development in the Middle East and North Africa," after "the Inter–American Development Bank,".

(d) For programs, projects or activities in the Department of the Interior and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

Making appropriations for the Department of the Interior, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

TITLE I—DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

<< 43 USCA § 1734a >>

For expenses necessary for protection, use, improvement, development, disposal, cadastral surveying, classification, acquisition of easements and other interests in lands, and performance of other functions, including maintenance of facilities, as authorized by law, in the management of lands and their resources under the jurisdiction of the Bureau of Land Management, including the general administration of the Bureau, and assessment of mineral potential of public lands pursuant to Public Law 96–487 (16 U.S.C. 3150(a)), $572,164,000, to remain available until expended, of which $2,010,000 shall be available for assessment of the mineral potential of public lands in Alaska pursuant to section 1010 of Public Law 96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived from the special receipt account established by the Land and Water Conservation Act of 1965, as amended (16 U.S.C. 460*l*–6a(i)); and of which $1,000,000 shall be available in fiscal year 1997 subject to a match by at least an equal amount by the National Fish and Wildlife Foundation, to such Foundation for challenge cost share projects supporting fish and wildlife conservation affecting Bureau lands; in addition, $27,300,000 for Mining Law Administration program operations, to remain available until expended, to be reduced by amounts collected by the Bureau and credited to this appropriation from annual mining claim fees so as to result in a final appropriation estimated at not more than $572,164,000; and in addition, not to exceed $5,000,000, to remain available until expended, from annual mining claim fees; which shall be credited to this account for the costs of administering the mining claim fee program, and $2,000,000 from communication site rental fees established by the Bureau for the cost of administering communication site activities: Provided, That appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors: Provided further, That in fiscal year 1997 and thereafter, all fees, excluding mining claim fees, in excess of the fiscal year 1996 collections established by the Secretary of the Interior under the authority of 43 U.S.C. 1734 for processing, recording, or documenting authorizations to use public lands or public land natural resources (including cultural, historical, and mineral) and for providing specific services to public land users, and which are not presently being covered into any Bureau of Land Management appropriation accounts, and not otherwise dedicated by law for a specific distribution, shall be made immediately available for program operations in this account and remain available until expended.

WILDLAND FIRE MANAGEMENT

For necessary expenses for fire use and management, fire preparedness, suppression operations, and emergency rehabilitation by the Department of the Interior, $252,042,000, to remain available until expended, of which not to exceed $5,025,000 shall be for the renovation or construction of fire facilities: Provided, That such funds are also available for repayment of advances to other appropriation accounts from which funds were previously transferred for such purposes: Provided further, That persons hired pursuant to 43 U.S.C. 1469 may be furnished subsistence and lodging without costs from funds available from this

appropriation: Provided further, That unobligated balances of amounts previously appropriated to the "Fire Protection" and "Emergency Department of the Interior Firefighting Fund" may be transferred to this appropriation.

## CENTRAL HAZARDOUS MATERIALS FUND

For necessary expenses of the Department of the Interior and any of its component offices and bureaus for the remedial action, including associated activities, of hazardous waste substances, pollutants, or contaminants pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended (42 U.S.C. 9601 et seq.), $12,000,000, to remain available until expended: Provided, That notwithstanding 31 U.S.C. 3302, sums recovered from or paid by a party in advance of or as reimbursement for remedial action or response activities conducted by the Department pursuant to sections 107 or 113(f) of such Act, shall be credited to this account to be available until expended without further appropriation: Provided further, That such sums recovered from or paid by any party are not limited to monetary payments and may include stocks, bonds or other personal or real property, which may be retained, liquidated, or otherwise disposed of by the Secretary and which shall be credited to this account.

## CONSTRUCTION

For construction of buildings, recreation facilities, roads, trails, and appurtenant facilities, $4,333,000, to remain available until expended.

## PAYMENTS IN LIEU OF TAXES

For expenses necessary to implement the Act of October 20, 1976, as amended (31 U.S.C. 6901–07), $113,500,000, of which not to exceed $400,000 shall be available for administrative expenses.

## LAND ACQUISITION

For expenses necessary to carry out sections 205, 206, and 318(d) of Public Law 94–579 including administrative expenses and acquisition of lands or waters, or interests therein, $10,410,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## OREGON AND CALIFORNIA GRANT LANDS

For expenses necessary for management, protection, and development of resources and for construction, operation, and maintenance of access roads, reforestation, and other improvements on the revested Oregon and California Railroad grant lands, on other Federal lands in the Oregon and California land-grant counties of Oregon, and on adjacent rights-of-way; and acquisition of lands or interests therein including existing connecting roads on or adjacent to such grant lands; $100,515,000, to remain available until expended: Provided, That 25 per centum of the aggregate of all receipts during the current fiscal year from the revested Oregon and California Railroad grant lands is hereby made a charge against the Oregon and California land-grant fund and shall be transferred to the General Fund in the Treasury in accordance with the second paragraph of subsection (b) of title II of the Act of August 28, 1937 (50 Stat. 876).

## RANGE IMPROVEMENTS

For rehabilitation, protection, and acquisition of lands and interests therein, and improvement of Federal rangelands pursuant to section 401 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701), notwithstanding any other Act, sums equal to 50 per centum of all moneys received during the prior fiscal year under sections 3 and 15 of the Taylor Grazing Act (43 U.S.C. 315 et seq.) and the amount designated for range improvements from grazing fees and mineral leasing receipts from Bankhead–Jones lands transferred to the Department of the Interior pursuant to law, but not less than $9,113,000, to remain available until expended: Provided, That not to exceed $600,000 shall be available for administrative expenses.

## SERVICE CHARGES, DEPOSITS, AND FORFEITURES

<< 43 USCA § 1735 NOTE >>

For administrative expenses and other costs related to processing application documents and other authorizations for use and disposal of public lands and resources, for costs of providing copies of official public land documents, for monitoring construction, operation, and termination of facilities in conjunction with use authorizations, and for rehabilitation of damaged

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

property, such amounts as may be collected under Public Law 94–579, as amended, and Public Law 93–153, to remain available until expended: Provided, That notwithstanding any provision to the contrary of section 305(a) of Public Law 94–579 (43 U.S.C. 1735(a)), any moneys that have been or will be received pursuant to that section, whether as a result of forfeiture, compromise, or settlement, if not appropriate for refund pursuant to section 305(c) of that Act (43 U.S.C. 1735(c)), shall be available and may be expended under the authority of this Act by the Secretary to improve, protect, or rehabilitate any public lands administered through the Bureau of Land Management which have been damaged by the action of a resource developer, purchaser, permittee, or any unauthorized person, without regard to whether all moneys collected from each such action are used on the exact lands damaged which led to the action: Provided further, That any such moneys that are in excess of amounts needed to repair damage to the exact land for which funds were collected may be used to repair other damaged public lands.

### MISCELLANEOUS TRUST FUNDS

In addition to amounts authorized to be expended under existing laws, there is hereby appropriated such amounts as may be contributed under section 307 of the Act of October 21, 1976 (43 U.S.C. 1701), and such amounts as may be advanced for administrative costs, surveys, appraisals, and costs of making conveyances of omitted lands under section 211(b) of that Act, to remain available until expended.

### ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Land Management shall be available for purchase, erection, and dismantlement of temporary structures, and alteration and maintenance of necessary buildings and appurtenant facilities to which the United States has title; up to $100,000 for payments, at the discretion of the Secretary, for information or evidence concerning violations of laws administered by the Bureau; miscellaneous and emergency expenses of enforcement activities authorized or approved by the Secretary and to be accounted for solely on his certificate, not to exceed $10,000: Provided, That notwithstanding 44 U.S.C. 501, the Bureau may, under cooperative cost-sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly-produced publications for which the cooperators share the cost of printing either in cash or in services, and the Bureau determines the cooperator is capable of meeting accepted quality standards.

The Bureau of Land Management's Visitor Center in Rand, Oregon is hereby named the "William B. Smullin Visitor Center".

### UNITED STATES FISH AND WILDLIFE SERVICE

### RESOURCE MANAGEMENT

<< 16 USCA § 742b NOTE >>

For expenses necessary for scientific and economic studies, conservation, management, investigations, protection, and utilization of fishery and wildlife resources, except whales, seals, and sea lions, and for the performance of other authorized functions related to such resources; for the general administration of the United States Fish and Wildlife Service; for maintenance of the herd of long-horned cattle on the Wichita Mountains Wildlife Refuge; and not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended, $523,947,000, to remain available until September 30, 1998, of which $11,557,000 shall remain available until expended for operation and maintenance of fishery mitigation facilities constructed by the Corps of Engineers under the Lower Snake River Compensation Plan, authorized by the Water Resources Development Act of 1976, to compensate for loss of fishery resources from water development projects on the Lower Snake River, and of which $2,000,000 shall be provided to local governments in southern California for planning associated with the Natural Communities Conservation Planning (NCCP) program and shall remain available until expended: Provided, That hereafter, pursuant to 31 U.S.C. 9701, the Secretary shall charge reasonable fees for the full costs of providing training by the National Education and Training Center, to be credited to this account, notwithstanding 31 U.S.C. 3302, for the direct costs of providing such training.

### CONSTRUCTION

For construction and acquisition of buildings and other facilities required in the conservation, management, investigation, protection, and utilization of fishery and wildlife resources, and the acquisition of lands and interests therein; $43,365,000, to remain available until expended.

## NATURAL RESOURCE DAMAGE ASSESSMENT FUND

To conduct natural resource damage assessment activities by the Department of the Interior necessary to carry out the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. 9601, et seq.), Federal Water Pollution Control Act, as amended (33 U.S.C. 1251, et seq.), the Oil Pollution Act of 1990 (Public Law 101–380), and Public Law 101–337; $4,000,000, to remain available until expended.

## LAND ACQUISITION

<< 16 USCA § 668dd NOTE >>

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the United States Fish and Wildlife Service, $44,479,000, of which $3,000,000 is authorized to be appropriated and shall be used to establish the Clarks River National Wildlife Refuge in Kentucky, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## COOPERATIVE ENDANGERED SPECIES CONSERVATION FUND

For expenses necessary to carry out the provisions of the Endangered Species Act of 1973 (16 U.S.C. 1531–1543), as amended, $14,085,000, for grants to States, to be derived from the Cooperative Endangered Species Conservation Fund, and to remain available until expended.

## NATIONAL WILDLIFE REFUGE FUND

For expenses necessary to implement the Act of October 17, 1978 (16 U.S.C. 715s), $10,779,000.

## REWARDS AND OPERATIONS

For expenses necessary to carry out the provisions of the African Elephant Conservation Act (16 U.S.C. 4201–4203, 4211–4213, 4221–4225, 4241–4245, and 1538), $1,000,000, to remain available until expended.

## NORTH AMERICAN WETLANDS CONSERVATION FUND

For expenses necessary to carry out the provisions of the North American Wetlands Conservation Act, Public Law 101–233, as amended, $9,750,000, to remain available until expended.

## RHINOCEROS AND TIGER CONSERVATION FUND

For deposit to the Rhinoceros and Tiger Conservation Fund, $400,000, to remain available until expended, to carry out the Rhinoceros and Tiger Conservation Act of 1994 (Public Law 103–391).

## WILDLIFE CONSERVATION AND APPRECIATION FUND

For deposit to the Wildlife Conservation and Appreciation Fund, $800,000, to remain available until expended.

## ADMINISTRATIVE PROVISIONS

<< 16 USCA § 460*l*–6a NOTE >>

Appropriations and funds available to the United States Fish and Wildlife Service shall be available for purchase of not to exceed 83 passenger motor vehicles of which 73 are for replacement only (including 43 for police-type use); not to exceed $400,000 for payment, at the discretion of the Secretary, for information, rewards, or evidence concerning violations of laws administered by the Service, and miscellaneous and emergency expenses of enforcement activities, authorized or approved by the Secretary and to be accounted for solely on his certificate; repair of damage to public roads within and adjacent to reservation areas caused by operations of the Service; options for the purchase of land at not to exceed $1 for each option; facilities incident to such public recreational uses on conservation areas as are consistent with their primary purpose; and the maintenance and improvement of aquaria, buildings, and other facilities under the jurisdiction of the Service and to which the United States has title, and which are utilized pursuant to law in connection with management and investigation of fish

and wildlife resources: Provided, That notwithstanding 44 U.S.C. 501, the Service may, under cooperative cost sharing and partnership arrangements authorized by law, procure printing services from cooperators in connection with jointly-produced publications for which the cooperators share at least one-half the cost of printing either in cash or services and the Service determines the cooperator is capable of meeting accepted quality standards: Provided further, That the Service may accept donated aircraft as replacements for existing aircraft: Provided further, That notwithstanding any other provision of law, the Secretary of the Interior may not spend any of the funds appropriated in this Act for the purchase of lands or interests in lands to be used in the establishment of any new unit of the National Wildlife Refuge System unless the purchase is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 103–551: Provided further, That section 101(c) of the Omnibus Consolidated Rescissions and Appropriations Act of 1996 is amended in section 315(c)(1)(E) (110 Stat. 1321–201; 16 U.S.C. 460l–6a note) by striking "distributed in accordance with section 201(c) of the Emergency Wetlands Resources Act" and inserting "available to the Secretary of the Interior until expended to be used in accordance with clauses (i), (ii), and (iii) of section 201(c)(A) of the Emergency Wetlands Resources Act of 1986 (16 U.S.C. 3911(c)(A))".

## NATIONAL PARK SERVICE

### OPERATION OF THE NATIONAL PARK SYSTEM

 For expenses necessary for the management, operation, and maintenance of areas and facilities administered by the National Park Service (including special road maintenance service to trucking permittees on a reimbursable basis), and for the general administration of the National Park Service, including not to exceed $1,593,000 for the Volunteers-in-Parks program, and not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by 16 U.S.C. 1706, $1,152,311,000, without regard to 16 U.S.C. 451, of which $8,000,000 for research, planning and interagency coordination in support of land acquisition for Everglades restoration shall remain available until expended, and of which not to exceed $72,000,000, to remain available until expended, is to be derived from the special fee account established pursuant to title V, section 5201, of Public Law 100–203.

### NATIONAL RECREATION AND PRESERVATION

 For expenses necessary to carry out recreation programs, natural programs, cultural programs, environmental compliance and review, international park affairs, statutory or contractual aid for other activities, and grant administration, not otherwise provided for, $37,976,000.

### HISTORIC PRESERVATION FUND

 For expenses necessary in carrying out the Historic Preservation Act of 1966, as amended (16 U.S.C. 470), $36,612,000, to be derived from the Historic Preservation Fund, to remain available until September 30, 1998.

### CONSTRUCTION

 For construction, improvements, repair or replacement of physical facilities including the modifications authorized by section 104 of the Everglades National Park Protection and Expansion Act of 1989, $163,444,000, to remain available until expended, of which $270,000 shall be used for appropriate fish restoration projects not related to dam removal including reimbursement to the State of Washington for emergency actions taken to protect the 1996 run of fall chinook salmon on the Elwha River: Provided, That funds previously provided under this heading that had been made available to the City of Hot Springs, Arkansas, to be used for a flood protection feasibility study, are now made available to the City of Hot Springs for the rehabilitation of the Federally-constructed Hot Springs Creek Arch, including the portion within Hot Springs National Park.

### LAND AND WATER CONSERVATION FUND (RESCISSION)

<< 16 USCA § 460l–10a NOTE >>

The contract authority provided for fiscal year 1997 by 16 U.S.C. 460l–10a is rescinded.

### LAND ACQUISITION AND STATE ASSISTANCE

For expenses necessary to carry out the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of lands or waters, or interest therein, in accordance with statutory authority applicable to the National Park Service, $53,915,000, to be derived from the Land and Water Conservation Fund, to remain available until expended, of which $1,500,000 is to administer the State assistance program: Provided, That any funds made available for the purpose of acquisition of the Elwha and Glines dams shall be used solely for acquisition, and shall not be expended until the full purchase amount has been appropriated by the Congress: Provided further, That of the funds provided herein, $9,000,000 is available for acquisition of the Sterling Forest, subject to authorization.

## ADMINISTRATIVE PROVISIONS

Appropriations for the National Park Service shall be available for the purchase of not to exceed 404 passenger motor vehicles, of which 287 shall be for replacement only, including not to exceed 320 for police-type use, 13 buses, and 6 ambulances: Provided, That none of the funds appropriated to the National Park Service may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: Provided further, That none of the funds appropriated to the National Park Service may be used to implement an agreement for the redevelopment of the southern end of Ellis Island until such agreement has been submitted to the Congress and shall not be implemented prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full and comprehensive report on the development of the southern end of Ellis Island, including the facts and circumstances relied upon in support of the proposed project.

None of the funds in this Act may be spent by the National Park Service for activities taken in direct response to the United Nations Biodiversity Convention.

<< 16 USCA § 1g >>

The National Park Service may in fiscal year 1997 and thereafter enter into cooperative agreements that involve the transfer of National Park Service appropriated funds to State, local and tribal governments, other public entities, educational institutions, and private nonprofit organizations for the public purpose of carrying out National Park Service programs pursuant to 31 U.S.C. 6305 to carry out public purposes of National Park Service programs.

Notwithstanding any other provision of law, remaining balances, including interest, from funds granted to the National Park Foundation pursuant to the National Park System Visitor Facilities Fund Act of 1983 (Public Law 97–433, 96 Stat. 2277) shall be available to the National Park Foundation for expenditure in units of the National Park System for the purpose of improving visitor facilities.

## UNITED STATES GEOLOGICAL SURVEY

### SURVEYS, INVESTIGATIONS, AND RESEARCH

<< 43 USCA § 31j >>

<< 43 USCA § 50 >>

For expenses necessary for the United States Geological Survey to perform surveys, investigations, and research covering topography, geology, hydrology, and the mineral and water resources of the United States, its Territories and possessions, and other areas as authorized by 43 U.S.C. 31, 1332 and 1340; classify lands as to their mineral and water resources; give engineering supervision to power permittees and Federal Energy Regulatory Commission licensees; administer the minerals exploration program (30 U.S.C. 641); and publish and disseminate data relative to the foregoing activities; and to conduct inquiries into the economic conditions affecting mining and materials processing industries (30 U.S.C. 3, 21a, and 1603; 50 U.S.C. 98g(1)) and related purposes as authorized by law and to publish and disseminate data; $738,913,000, of which $64,559,000 shall be available only for cooperation with States or municipalities for water resources investigations; and of which $16,000,000 shall remain available until expended for conducting inquiries into the economic conditions affecting mining and materials processing industries; and of which $137,500,000 shall be available until September 30, 1998 for the biological research activity and the

operation of the Cooperative Research Units: Provided, That none of these funds provided for the biological research activity shall be used to conduct new surveys on private property, unless specifically authorized in writing by the property owner: Provided further, That beginning in fiscal year 1998 and once every five years thereafter, the National Academy of Sciences shall review and report on the biological research activity of the Survey: Provided further, That no part of this appropriation shall be used to pay more than one-half the cost of topographic mapping or water resources data collection and investigations carried on in cooperation with States and municipalities.

## ADMINISTRATIVE PROVISIONS

The amount appropriated for the United States Geological Survey shall be available for the purchase of not to exceed 53 passenger motor vehicles, of which 48 are for replacement only; reimbursement to the General Services Administration for security guard services; contracting for the furnishing of topographic maps and for the making of geophysical or other specialized surveys when it is administratively determined that such procedures are in the public interest; construction and maintenance of necessary buildings and appurtenant facilities; acquisition of lands for gauging stations and observation wells; expenses of the United States National Committee on Geology; and payment of compensation and expenses of persons on the rolls of the Survey duly appointed to represent the United States in the negotiation and administration of interstate compacts: Provided, That activities funded by appropriations herein made may be accomplished through the use of contracts, grants, or cooperative agreements as defined in 31 U.S.C. 6302, et seq.

## MINERALS MANAGEMENT SERVICE

### ROYALTY AND OFFSHORE MINERALS MANAGEMENT

For expenses necessary for minerals leasing and environmental studies, regulation of industry operations, and collection of royalties, as authorized by law; for enforcing laws and regulations applicable to oil, gas, and other minerals leases, permits, licenses and operating contracts; and for matching grants or cooperative agreements; including the purchase of not to exceed eight passenger motor vehicles for replacement only; $156,955,000, of which not less than $70,063,000 shall be available for royalty management activities; and an amount not to exceed $41,000,000 for the Technical Information Management System and activities of the Outer Continental Shelf (OCS) Lands Activity, to be credited to this appropriation and to remain available until expended, from additions to receipts resulting from increases to rates in effect on August 5, 1993, from rate increases to fee collections for OCS administrative activities performed by the Minerals Management Service over and above the rates in effect on September 30, 1993, and from additional fees for OCS administrative activities established after September 30, 1993: Provided, That $1,500,000 for computer acquisitions shall remain available until September 30, 1998: Provided further, That funds appropriated under this Act shall be available for the payment of interest in accordance with 30 U.S.C. 1721(b) and (d): Provided further, That not to exceed $3,000 shall be available for reasonable expenses related to promoting volunteer beach and marine cleanup activities: Provided further, That notwithstanding any other provision of law, $15,000 under this head shall be available for refunds of overpayments in connection with certain Indian leases in which the Director of the Minerals Management Service concurred with the claimed refund due, to pay amounts owed to Indian allottees or Tribes, or to correct prior unrecoverable erroneous payments.

### OIL SPILL RESEARCH

For necessary expenses to carry out title I, section 1016, title IV, sections 4202 and 4303, title VII, and title VIII, section 8201 of the Oil Pollution Act of 1990, $6,440,000, which shall be derived from the Oil Spill Liability Trust Fund, to remain available until expended.

## OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT

### REGULATION AND TECHNOLOGY

#### << 30 USCA § 1211 NOTE >>

For necessary expenses to carry out the provisions of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not to exceed 10 passenger motor vehicles, for replacement only; $94,172,000,

and notwithstanding 31 U.S.C. 3302, an additional amount shall be credited to this account, to remain available until expended, from performance bond forfeitures in fiscal year 1997: Provided, That the Secretary of the Interior, pursuant to regulations, may utilize directly or through grants to States, moneys collected in fiscal year 1997 for civil penalties assessed under section 518 of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1268), to reclaim lands adversely affected by coal mining practices after August 3, 1977, to remain available until expended: Provided further, That appropriations for the Office of Surface Mining Reclamation and Enforcement may provide for the travel and per diem expenses of State and tribal personnel attending Office of Surface Mining Reclamation and Enforcement sponsored training.

## ABANDONED MINE RECLAMATION FUND

For necessary expenses to carry out title IV of the Surface Mining Control and Reclamation Act of 1977, Public Law 95–87, as amended, including the purchase of not more than 10 passenger motor vehicles for replacement only, $177,085,000, to be derived from receipts of the Abandoned Mine Reclamation Fund and to remain available until expended; of which up to $4,000,000 shall be for supplemental grants to States for the reclamation of abandoned sites with acid mine rock drainage from coal mines through the Appalachian Clean Streams Initiative: Provided, That grants to minimum program States will be $1,500,000 per State in fiscal year 1997: Provided further, That of the funds herein provided up to $18,000,000 may be used for the emergency program authorized by section 410 of Public Law 95–87, as amended, of which no more than 25 per centum shall be used for emergency reclamation projects in any one State and funds for federally-administered emergency reclamation projects under this proviso shall not exceed $11,000,000: Provided further, That prior year unobligated funds appropriated for the emergency reclamation program shall not be subject to the 25 per centum limitation per State and may be used without fiscal year limitation for emergency projects: Provided further, That pursuant to Public Law 97–365, the Department of the Interior is authorized to use up to 20 per centum from the recovery of the delinquent debt owed to the United States Government to pay for contracts to collect these debts: Provided further, That funds made available to States under title IV of Public Law 95–87 may be used, at their discretion, for any required non-Federal share of the cost of projects funded by the Federal Government for the purpose of environmental restoration related to treatment or abatement of acid mine drainage from abandoned mines: Provided further, That such projects must be consistent with the purposes and priorities of the Surface Mining Control and Reclamation Act: Provided further, That the State of Maryland may set aside the greater of $1,000,000 or 10 percent of the total of the grants made available to the State under title IV of the Surface Mining Control and Reclamation Act of 1977, as amended (30 U.S.C. 1231 et. seq.), if the amount set aside is deposited in an acid mine drainage abatement and treatment fund established under a State law, pursuant to which law the amount (together with all interest earned on the amount) is expended by the State to undertake acid mine drainage abatement and treatment projects, except that before any amounts greater than 10 percent of its title IV grants are deposited in an acid mine drainage abatement and treatment fund, the State of Maryland must first complete all Surface Mining Control and Reclamation Act priority one projects.

## BUREAU OF INDIAN AFFAIRS

## OPERATION OF INDIAN PROGRAMS

### << 25 USCA § 2012 NOTE >>

For operation of Indian programs by direct expenditure, contracts, cooperative agreements, compacts, and grants including expenses necessary to provide education and welfare services for Indians, either directly or in cooperation with States and other organizations, including payment of care, tuition, assistance, and other expenses of Indians in boarding homes, or institutions, or schools; grants and other assistance to needy Indians; maintenance of law and order; management, development, improvement, and protection of resources and appurtenant facilities under the jurisdiction of the Bureau, including payment of irrigation assessments and charges; acquisition of water rights; advances for Indian industrial and business enterprises; operation of Indian arts and crafts shops and museums; development of Indian arts and crafts, as authorized by law; for the general administration of the Bureau, including such expenses in field offices; maintaining of Indian reservation roads as defined in 23 U.S.C. 101; and construction, repair, and improvement of Indian housing, $1,436,902,000, of which not to exceed $86,520,000 shall be for welfare assistance payments and not to exceed $90,829,000 shall be for payments to tribes and tribal organizations for contract support costs associated with ongoing contracts or grants or compacts entered into with the Bureau prior to fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975, as amended, and up to $5,000,000 shall be for the Indian Self–

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Determination Fund, which shall be available for the transitional cost of initial or expanded tribal contracts, grants, compacts, or cooperative agreements with the Bureau under such Act; and of which not to exceed $365,124,000 for school operations costs of Bureau-funded schools and other education programs shall become available on July 1, 1997, and shall remain available until September 30, 1998; and of which not to exceed $53,805,000 for higher education scholarships, adult vocational training, and assistance to public schools under 25 U.S.C. 452 et seq., shall remain available until September 30, 1998; and of which not to exceed $54,973,000 shall remain available until expended for housing improvement, road maintenance, attorney fees, litigation support, self-governance grants, the Indian Self–Determination Fund, and the Navajo–Hopi Settlement Program: Provided, That tribes and tribal contractors may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants or compact agreements and for unmet welfare assistance costs: Provided further, That funds made available to tribes and tribal organizations through contracts or grants obligated during fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975, or grants authorized by the Indian Education Amendments of 1988 (25 U.S.C. 2001 and 2008A) shall remain available until expended by the contractor or grantee: Provided further, That to provide funding uniformity within a Self–Governance Compact, any funds provided in this Act with availability for more than one year may be reprogrammed to one year availability but shall remain available within the Compact until expended: Provided further, That notwithstanding any other provision of law, Indian tribal governments may, by appropriate changes in eligibility criteria or by other means, change eligibility for general assistance or change the amount of general assistance payments for individuals within the service area of such tribe who are otherwise deemed eligible for general assistance payments so long as such changes are applied in a consistent manner to individuals similarly situated: Provided further, That any savings realized by such changes shall be available for use in meeting other priorities of the tribes: Provided further, That any net increase in costs to the Federal Government which result solely from tribally increased payment levels for general assistance shall be met exclusively from funds available to the tribe from within its tribal priority allocation: Provided further, That any forestry funds allocated to a tribe which remain unobligated as of September 30, 1997, may be transferred during fiscal year 1998 to an Indian forest land assistance account established for the benefit of such tribe within the tribe's trust fund account: Provided further, That any such unobligated balances not so transferred shall expire on September 30, 1998: Provided further, That notwithstanding any other provision of law, no funds available to the Bureau, other than the amounts provided herein for assistance to public schools under 25 U.S.C. 452 et seq., shall be available to support the operation of any elementary or secondary school in the State of Alaska in fiscal year 1997: Provided further, That funds made available in this or any other Act for expenditure through September 30, 1998 for schools funded by the Bureau shall be available only to the schools in the Bureau school system as of September 1, 1995: Provided further, That no funds available to the Bureau shall be used to support expanded grades for any school or dormitory beyond the grade structure in place or approved by the Secretary of the Interior at each school in the Bureau school system as of October 1, 1995: Provided further, That in fiscal year 1997 and thereafter, notwithstanding the provisions of 25 U.S.C. 2012(h)(1)(A) and (B), upon the recommendation of either (i) a local school board and school supervisor for an education position in a Bureau of Indian Affairs operated school, or (ii) an Agency school board and education line officer for an Agency education position, the Secretary shall establish adjustments to the rates of basic compensation or annual salary rates established under 25 U.S.C. 2012(h)(1)(A) and (B) for education positions at the school or the Agency, at a level not less than that for comparable positions in the nearest public school district, and the adjustment shall be deemed to be a change to basic pay and shall not be subject to collective bargaining: Provided further, That any reduction to rates of basic compensation or annual salary rates below the rates established under 25 U.S.C. 2012(h)(1)(A) and (B) shall apply only to educators appointed after June 30, 1997, and shall not affect the right of an individual employed on June 30, 1997, in an education position, to receive the compensation attached to such position under 25 U.S.C. 2012(h)(1)(A) and (B) so long as the individual remains in the same position at the same school: Provided further, That notwithstanding 25 U.S.C. 2012(h)(1)(B), when the rates of basic compensation for teachers and counselors at Bureau-operated schools are established at the rates of basic compensation applicable to comparable positions in overseas schools under the Defense Department Overseas Teachers Pay and Personnel Practices Act, such rates shall become effective with the start of the next academic year following the issuance of the Department of Defense salary schedule and shall not be effected retroactively.

## CONSTRUCTION

For construction, major repair, and improvement of irrigation and power systems, buildings, utilities, and other facilities, including architectural and engineering services by contract; acquisition of lands, and interests in lands; and preparation of lands for farming, and for construction of the Navajo Indian Irrigation Project pursuant to Public Law 87–483, $94,531,000, to remain available until expended: Provided, That such amounts as may be available for the construction of the Navajo Indian

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Irrigation Project may be transferred to the Bureau of Reclamation: Provided further, That not to exceed 6 per centum of contract authority available to the Bureau of Indian Affairs from the Federal Highway Trust Fund may be used to cover the road program management costs of the Bureau: Provided further, That any funds provided for the Safety of Dams program pursuant to 25 U.S.C. 13 shall be made available on a non-reimbursable basis: Provided further, That for fiscal year 1997, in implementing new construction or facilities improvement and repair project grants in excess of $100,000 that are provided to tribally controlled grant schools under Public Law 100–297, as amended, the Secretary of the Interior shall use the Administrative and Audit Requirements and Cost Principles for Assistance Programs contained in 43 CFR part 12 of the regulatory requirements: Provided further, That such grants shall not be subject to section 12.61 of 43 CFR; the Secretary and the grantee shall negotiate and determine a schedule of payments for the work to be performed: Provided further, That in considering applications, the Secretary shall consider whether the Indian tribe or tribal organization would be deficient in assuring that the construction projects conform to applicable building standards and codes and Federal, tribal, or State health and safety standards as required by 25 U.S.C. 2005(a), with respect to organizational and financial management capabilities: Provided further, That if the Secretary declines an application, the Secretary shall follow the requirements contained in 25 U.S.C. 2505(f): Provided further, That any disputes between the Secretary and any grantee concerning a grant shall be subject to the disputes provision in 25 U.S.C. 2508(e).

### INDIAN LAND AND WATER CLAIM SETTLEMENTS AND MISCELLANEOUS PAYMENTS TO INDIANS

For miscellaneous payments to Indian tribes and individuals and for necessary administrative expenses, $69,241,000, to remain available until expended; of which $68,400,000 shall be available for implementation of enacted Indian land and water claim settlements pursuant to Public Laws 101–618, 102–374, 102–575, and for implementation of other enacted water rights settlements, including not to exceed $8,000,000, which shall be for the Federal share of the Catawba Indian Tribe of South Carolina Claims Settlement, as authorized by section 5(a) of Public Law 103–116; and of which $841,000 shall be available pursuant to Public Laws 98–500, 99–264, and 100–580.

### INDIAN GUARANTEED LOAN PROGRAM ACCOUNT

For the cost of guaranteed loans, $4,500,000, as authorized by the Indian Financing Act of 1974, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $34,615,000.

In addition, for administrative expenses to carry out the guaranteed loan programs, $500,000.

### ADMINISTRATIVE PROVISIONS

Appropriations for the Bureau of Indian Affairs (except the revolving fund for loans, the Indian loan guarantee and insurance fund, the Technical Assistance of Indian Enterprises account, the Indian Direct Loan Program account, and the Indian Guaranteed Loan Program account) shall be available for expenses of exhibits, and purchase of not to exceed 229 passenger motor vehicles, of which not to exceed 187 shall be for replacement only.

Notwithstanding any other provision of law, no funds available to the Bureau of Indian Affairs for central office operations or pooled overhead general administration shall be available for tribal contracts, grants, compacts, or cooperative agreements with the Bureau of Indian Affairs under the provisions of the Indian Self–Determination Act or the Tribal Self–Governance Act of 1994 (Public Law 103–413).

### DEPARTMENTAL OFFICES

### INSULAR AFFAIRS

### ASSISTANCE TO TERRITORIES

<< 48 USCA § 1469b >>

<< 48 USCA § 1801 NOTE >>

For expenses necessary for assistance to territories under the jurisdiction of the Department of the Interior, $65,188,000, of which (1) $61,339,000 shall be available until expended for technical assistance, including maintenance assistance, disaster

assistance, insular management controls, and brown tree snake control and research; grants to the judiciary in American Samoa for compensation and expenses, as authorized by law (48 U.S.C. 1661(c)); grants to the Government of American Samoa, in addition to current local revenues, for construction and support of governmental functions; grants to the Government of the Virgin Islands as authorized by law; grants to the Government of Guam, as authorized by law; and grants to the Government of the Northern Mariana Islands as authorized by law (Public Law 94–241; 90 Stat. 272); and (2) $3,849,000 shall be available for salaries and expenses of the Office of Insular Affairs: Provided, That all financial transactions of the territorial and local governments herein provided for, including such transactions of all agencies or instrumentalities established or utilized by such governments, may be audited by the General Accounting Office, at its discretion, in accordance with chapter 35 of title 31, United States Code: Provided further, That Northern Mariana Islands Covenant grant funding shall be provided according to those terms of the Agreement of the Special Representatives on Future United States Financial Assistance for the Northern Mariana Islands approved by Public Law 99–396, or any subsequent legislation related to Commonwealth of the Northern Mariana Islands grant funding: Provided further, That section 703(a) of Public Law 94–241, as amended, is hereby amended by striking "of the Government of the Northern Mariana Islands": Provided further, That of the amounts provided for technical assistance, sufficient funding shall be made available for a grant to the Close Up Foundation: Provided further, That the funds for the program of operations and maintenance improvement are appropriated to institutionalize routine operations and maintenance improvement of capital infrastructure in American Samoa, Guam, the Virgin Islands, the Commonwealth of the Northern Mariana Islands, the Republic of Palau, the Republic of the Marshall Islands, and the Federated States of Micronesia through assessments of long-range operations maintenance needs, improved capability of local operations and maintenance institutions and agencies (including management and vocational education training), and project-specific maintenance (with territorial participation and cost sharing to be determined by the Secretary based on the individual territory's commitment to timely maintenance of its capital assets): Provided further, That any appropriation for disaster assistance under this head in this Act or previous appropriations Acts may be used as non-Federal matching funds for the purpose of hazard mitigation grants provided pursuant to section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170c).

## COMPACT OF FREE ASSOCIATION

For economic assistance and necessary expenses for the Federated States of Micronesia and the Republic of the Marshall Islands as provided for in sections 122, 221, 223, 232, and 233 of the Compacts of Free Association, and for economic assistance and necessary expenses for the Republic of Palau as provided for in sections 122, 221, 223, 232, and 233 of the Compact of Free Association, $23,538,000, to remain available until expended, as authorized by Public Law 99–239 and Public Law 99–658.

## DEPARTMENTAL MANAGEMENT

### SALARIES AND EXPENSES

For necessary expenses for management of the Department of the Interior, $58,286,00,[1] of which not to exceed $7,500 may be for official reception and representation expenses, and of which up to $2,000,000 shall be available for workers compensation payments and unemployment compensation payments associated with the orderly closure of the United States Bureau of Mines

[1] Remainder of figure missing, complete figure probably should read '$58,286,000".

## OFFICE OF THE SOLICITOR

### SALARIES AND EXPENSES

For necessary expenses of the Office of the Solicitor, $35,443,000.

## OFFICE OF INSPECTOR GENERAL

### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General, $24,439,000, together with any funds or property transferred to the Office of Inspector General through forfeiture proceedings or from the Department of Justice Assets Forfeiture Fund or the Department of the Treasury Assets Forfeiture Fund, that represent an equitable share from the forfeiture of property

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

in investigations in which the Office of Inspector General participated, with such transferred funds to remain available until expended.

## NATIONAL INDIAN GAMING COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the National Indian Gaming Commission, pursuant to Public Law 100–497, $1,000,000.

## OFFICE OF SPECIAL TRUSTEE FOR AMERICAN INDIANS

### FEDERAL TRUST PROGRAMS

For operation of trust programs for Indians by direct expenditure, contracts, cooperative agreements, compacts, and grants, $32,126,000, to remain available until expended for trust funds management: Provided, That funds made available to tribes and tribal organizations through contracts or grants obligated during fiscal year 1997, as authorized by the Indian Self–Determination Act of 1975 (25 U.S.C. 450 et seq.), shall remain available until expended by the contractor or grantee: Provided further, That notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss: Provided further, That unobligated balances previously made available (1) to liquidate obligations owed tribal and individual Indian payees of any checks canceled pursuant to section 1003 of the Competitive Equality Banking Act of 1987 (Public Law 100–86; 31 U.S.C. 3334(b)), (2) to restore Individual Indian Monies trust funds, Indian Irrigation Systems, and Indian Power Systems accounts amounts invested in credit unions or defaulted savings and loan associations and which where not Federally insured, including any interest on these amounts that may have been earned, but was not because of the default, and (3) to reimburse Indian trust fund account holders for losses to their respective accounts where the claim for said loss has been reduced to a judgement or settlement agreement approved by the Department of Justice, under the heading "Indian Land and Water Claim Settlements and Miscellaneous Payments to Indians", Bureau of Indian Affairs in fiscal years 1995 and 1996, are hereby transferred to and merged with this appropriation and may only be used for the operation of trust programs, in accordance with this appropriation.

### ADMINISTRATIVE PROVISIONS

There is hereby authorized for acquisition from available resources within the Working Capital Fund, 15 aircraft, 10 of which shall be for replacement and which may be obtained by donation, purchase or through available excess surplus property: Provided, That notwithstanding any other provision of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft: Provided further, That no programs funded with appropriated funds in "Departmental Management", "Office of the Solicitor", and "Office of Inspector General" may be augmented through the Working Capital Fund or the Consolidated Working Fund.

### GENERAL PROVISIONS, DEPARTMENT OF THE INTERIOR

SEC. 101. Appropriations made in this title shall be available for expenditure or transfer (within each bureau or office), with the approval of the Secretary, for the emergency reconstruction, replacement, or repair of aircraft, buildings, utilities, or other facilities or equipment damaged or destroyed by fire, flood, storm, or other unavoidable causes: Provided, That no funds shall be made available under this authority until funds specifically made available to the Department of the Interior for emergencies shall have been exhausted: Provided further, That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible.

SEC. 102. The Secretary may authorize the expenditure or transfer of any no year appropriation in this title, in addition to the amounts included in the budget programs of the several agencies, for the suppression or emergency prevention of forest or range fires on or threatening lands under the jurisdiction of the Department of the Interior; for the emergency rehabilitation of burned-over lands under its jurisdiction; for emergency actions related to potential or actual earthquakes, floods, volcanoes, storms, or other unavoidable causes; for contingency planning subsequent to actual oilspills; response and natural resource damage assessment activities related to actual oilspills; for the prevention, suppression, and control of actual or potential grasshopper

AR.03269

and Mormon cricket outbreaks on lands under the jurisdiction of the Secretary, pursuant to the authority in section 1773(b) of Public Law 99–198 (99 Stat. 1658); for emergency reclamation projects under section 410 of Public Law 95–87; and shall transfer, from any no year funds available to the Office of Surface Mining Reclamation and Enforcement, such funds as may be necessary to permit assumption of regulatory authority in the event a primacy State is not carrying out the regulatory provisions of the Surface Mining Act: Provided, That appropriations made in this title for fire suppression purposes shall be available for the payment of obligations incurred during the preceding fiscal year, and for reimbursement to other Federal agencies for destruction of vehicles, aircraft, or other equipment in connection with their use for fire suppression purposes, such reimbursement to be credited to appropriations currently available at the time of receipt thereof: Provided further, That for emergency rehabilitation and wildfire suppression activities, no funds shall be made available under this authority until funds appropriated to "Wildland Fire Management" shall have been exhausted: Provided further, That all funds used pursuant to this section are hereby designated by Congress to be "emergency requirements" pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985, and must be replenished by a supplemental appropriation which must be requested as promptly as possible: Provided further, That such replenishment funds shall be used to reimburse, on a pro rata basis, accounts from which emergency funds were transferred.

SEC. 103. Appropriations made in this title shall be available for operation of warehouses, garages, shops, and similar facilities, wherever consolidation of activities will contribute to efficiency or economy, and said appropriations shall be reimbursed for services rendered to any other activity in the same manner as authorized by sections 1535 and 1536 of title 31, United States Code: Provided, That reimbursements for costs and supplies, materials, equipment, and for services rendered may be credited to the appropriation current at the time such reimbursements are received.

SEC. 104. Appropriations made to the Department of the Interior in this title shall be available for services as authorized by 5 U.S.C. 3109, when authorized by the Secretary, in total amount not to exceed $500,000; hire, maintenance, and operation of aircraft; hire of passenger motor vehicles; purchase of reprints; payment for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and the payment of dues, when authorized by the Secretary, for library membership in societies or associations which issue publications to members only or at a price to members lower than to subscribers who are not members.

SEC. 105. Appropriations available to the Department of the Interior for salaries and expenses shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901–5902 and D.C. Code 4–204).

SEC. 106. Appropriations made in this title shall be available for obligation in connection with contracts issued for services or rentals for periods not in excess of twelve months beginning at any time during the fiscal year.

SEC. 107. Prior to the transfer of Presidio properties to the Presidio Trust, when authorized, the Secretary may not obligate in any calendar month more than $1/12$ of the fiscal year 1997 appropriation for operation of the Presidio: Provided, That prior to the transfer of any Presidio property to the Presidio Trust, the Secretary shall transfer such funds as the Trust deems necessary to initiate leasing and other authorized activities of the Trust: Provided further, That this section shall expire on December 31, 1996.

SEC. 108. No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act.

SEC. 109. No funds provided in this title may be expended by the Department of the Interior for the conduct of offshore leasing and related activities placed under restriction in the President's moratorium statement of June 26, 1990, in the areas of Northern, Central, and Southern California; the North Atlantic; Washington and Oregon; and the Eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude.

SEC. 110. No funds provided in this title may be expended by the Department of the Interior for the conduct of leasing, or the approval or permitting of any drilling or other exploration activity, on lands within the North Aleutian Basin planning area.

SEC. 111. No funds provided in this title may be expended by the Department of the Interior for the conduct of preleasing and leasing activities in the Eastern Gulf of Mexico for Outer Continental Shelf Lease Sale 151 in the Outer Continental Shelf Natural Gas and Oil Resource Management Comprehensive Program, 1992–1997.

SEC. 112. No funds provided in this title may be expended by the Department of the Interior for the conduct of preleasing and leasing activities in the Atlantic for Outer Continental Shelf Lease Sale 164 in the Outer Continental Shelf Natural Gas and Oil Resource Management Comprehensive Program, 1992–1997.

<< 31 USCA § 501 NOTE >>

SEC. 113. There is hereby established in the Treasury a franchise fund pilot, as authorized by section 403 of Public Law 103–356, to be available as provided in such section for costs of capitalizing and operating administrative services as the Secretary determines may be performed more advantageously as central services: Provided, That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made prior to the current year for the purpose of providing capital shall be used to capitalize such fund: Provided further, That such fund shall be paid in advance from funds available to the Department and other Federal agencies for which such centralized services are performed, at rates which will return in full all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of automatic data processing (ADP) software and systems (either acquired or donated) and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary: Provided further, That such fund shall provide services on a competitive basis: Provided further, That an amount not to exceed four percent of the total annual income to such fund may be retained in the fund for fiscal year 1997 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment, and for the improvement and implementation of Department financial management, ADP, and other support systems: Provided further, That no later than thirty days after the end of each fiscal year amounts in excess of this reserve limitation shall be transferred to the Treasury: Provided further, That such franchise fund pilot shall terminate pursuant to section 403(f) of Public Law 103–356.

Sec. 114. Public Law 102–495 is amended by adding the following new section:

"Sec. 10. Washington State Removal Option.

"(a) Upon appropriation of $29,500,000 for the Federal government to acquire the projects in the State of Washington pursuant to this Act, the State of Washington may, upon the submission to Congress of a binding agreement to remove the projects within a reasonable period of time, purchase the projects from the Federal government for $2. Such a binding agreement shall provide for the full restoration of the Elwha River ecosystem and native anadromous fisheries, for protection of the existing quality and availability of water from the Elwha River for municipal and industrial uses from possible adverse impacts of dam removal, and for fulfillment by the State of each of the other obligations of the Secretary under this Act.

"(b) Upon receipt of the payment pursuant to subsection (a), the Federal government shall relinquish ownership and title of the projects to the State of Washington.

"(c) Upon the purchase of the projects by the State of Washington, section 3(a), (c), and (d), and Sections 4, 7, and 9 of this Act are hereby repealed, and the remaining sections renumbered accordingly.".

<< 16 USCA § 461 NOTE >>

SEC. 115. Section 7 of Public Law 99–647 (16 U.S.C. 461 note) is amended to read as follows:

"SEC. 7. TERMINATION OF COMMISSION.

"The Commission shall terminate on November 10, 1997.".

SEC. 116. The Congress of the United States hereby designates and ratifies the assignment to the University of Utah as successor to, and beneficiary of, all the existing assets, revenues, funds and rights granted to the State of Utah under the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and the School of Mines Grant (July 26, 1894, 28 Stat. 110). Further, the Secretary of the Interior is authorized and directed to accept such relinquishment of all remaining and unconveyed entitlement for quantity grants owed the State of Utah for the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and any unconveyed entitlement that may remain for the University of Utah School of Mines Grant (July 26, 1894, 28 Stat. 110).

<< 25 USCA § 458bb >>

SEC. 117. Section 402(b)(1) of The Indian Self–Determination and Education Assistance Act (25 U.S.C. 458bb) is amended to read as follows: "(1) In addition to those Indian tribes participating in self-governance under subsection (a) of this section,

the Secretary, acting through the Director of the Office of Self–Governance, may select up to 50 new tribes per year from the applicant pool described in subsection (c) of this section to participate in self-governance.".

<< 25 USCA § 305a–1 >>

  SEC. 118. In fiscal year 1997 and thereafter, the Indian Arts and Crafts Board may charge admission fees at its museums; charge rent and/or franchise fees for shops located in its museums; publish and sell publications; sell or rent or license use of photographs or other images in hard copy or other forms; license the use of designs, in whole or in part, by others; charge for consulting services provided to others; and may accept the services of volunteers to carry out its mission: Provided, That all revenue derived from such activities is covered into the special fund established by section 4 of Public Law 74–355 (25 U.S.C. 305c).

SEC. 119. TRANSFER OF CERTAIN BUREAU OF LAND MANAGEMENT FACILITIES.—

  (a) BATTLE MOUNTAIN, NEVADA.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall transfer to Lander County, Nevada, without consideration, title to the former Bureau of Land Management administrative site and associated buildings in Battle Mountain, Nevada.
  (b) WINNEMUCCA, NEVADA.—
  (1) TRANSFER.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, acting through the Director of the Bureau of Land Management, shall transfer to the State of Nevada, without consideration, title to the surplus Bureau of Land Management District Office building in Winnemucca, Nevada.
  (2) USE.—The transfer under paragraph (1) is made with the intent that the building shall be available to meet the needs of the Department of Conservation and Natural Resources of the State of Nevada.

SEC. 120. ALASKA AVIATION HERITAGE.—

  (a) FINDINGS.—The Congress finds that—
  (1) the Department of the Interior's Grumman Goose G21–A aircraft number N789 is to be retired from several decades of active service in the State of Alaska in 1996; and
  (2) the aircraft is of significant historic value to the people of the State of Alaska.
  (b) DONATION OF AIRCRAFT.—The Secretary of the Interior shall transfer the Grumman Goose G21–A aircraft number N789 to the Alaska Aviation Heritage Museum in Anchorage, Alaska, at no cost to the museum, for permanent display.
  SEC. 121. The Mesquite Lands Act of 1988 is amended by adding the following at the end of section 3:
  "(d) FOURTH AREA.—(1) No later than ten years after the date of enactment of this Act, the City of Mesquite shall notify the Secretary as to which if any of the public lands identified in paragraph (2) of this subsection the city wishes to purchase.
  "(2) For a period of twelve years after the date of enactment of this Act, the city shall have exclusive right to purchase the following parcels of public lands:
  "Parcel A—East ½ Sec. 6, T. 13 S., R. 71 E., Mount Diablo Meridian; Sec. 5, T. 13 S., R. 71 E., Mount Diablo Meridian; West ½ Sec. 4, T. 13 S., R. 71 E, Mount Diablo Meridian; East ½, West ½ Sec. 4, T. 13 S., R. 71 E., Mount Diablo Meridian.
  "Parcel B—North ½ Sec. 7, T. 13 S., R. 71 E., Mount Diablo Meridian; South East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, West ½ North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian.
  "Parcel C—West ½ Sec. 6, T. 13 S., R. 71 E., Mount Diablo Meridian; Sec. 1, T. 13 S., R. 70 E., Mount Diablo Meridian; West ½, West ½, North East ¼ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; North West ¼ Sec. 13, S., R. 70 E., Mount Diablo Meridian; West ½ Sec. 12, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½, South East ¼, Sec. 11, T. 13 S., R. 70 E., Mount Diablo Meridian; East ½ North East ¼, Sec. 14, T. 13 S., R. 70 E., Mount Diablo Meridian.
  "Parcel D—South ½ Sec. 14, T. 13 S., R. 70 E., Mount Diablo Meridian; South West ¼, Sec. 13, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 23, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 24, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian; Portion of section 26, North of Interstate 15, T. 13 S., R. 70 E., Mount Diablo Meridian."

SEC. 122. FATHER AULL SITE TRANSFER.—

(a) This section may be cited as the "Father Aull Site Transfer Act of 1996".

(b) FINDINGS.—Congress finds that—

(1) the buildings and grounds developed by Father Roger Aull located on public domain land near Silver City, New Mexico, are historically significant to the citizens of the community;

(2) vandalism at the site has become increasingly destructive and frequent in recent years;

(3) because of the isolated location and the distance from other significant resources and agency facilities, the Bureau of Land Management has been unable to devote sufficient resources to restore and protect the site from further damage; and

(4) St. Vincent DePaul Parish in Silver City, New Mexico, has indicated an interest in, and developed a sound proposal for the restoration of, the site, such that the site could be permanently occupied and used by the community.

(c) CONVEYANCE OF PROPERTY.—Subject to valid existing rights, all right, title and interest of the United States in and to the land (including improvements on the land), consisting of approximately 43.06 acres, located approximately 10 miles east of Silver City, New Mexico, and described as follows: T. 17 S., R. 12 W., Section 30: Lot 13, and Section 31: Lot 27 (as generally depicted on the map dated July 1995) is hereby conveyed by operation of law to St. Vincent DePaul Parish in Silver City, New Mexico, without consideration.

(d) RELEASE.—Upon the conveyance of any land or interest in land identified in this section of St. Vincent DePaul Parish, St. Vincent DePaul Parish shall assume any liability for any claim relating to the land or interest in the land arising after the date of the conveyance.

(e) MAP.—The map referred to in this section shall be on file and available for public inspection in—

(1) the State of New Mexico Office of the Bureau of Land Management, Santa Fe, New Mexico; and

(2) the Las Cruces District Office of the Bureau of Land Management, Las Cruces, New Mexico.

SEC. 123. The second proviso under the heading "Bureau of Mines, Administrative Provisions" of Public Law 104–134 is amended by inserting after the word "authorized" the word "hereafter".

<< 16 USCA § 1011 >>

SEC. 124. Watershed Restoration and Enhancement Agreements.

(a) IN GENERAL.—For fiscal year 1997 and each fiscal year thereafter, appropriations made for the Bureau of Land Management may be used by the Secretary of the Interior for the purpose of entering into cooperative agreements with willing private landowners for restoration and enhancement of fish, wildlife, and other biotic resources on public or private land or both that benefit these resources on public lands within the watershed.

(b) DIRECT AND INDIRECT WATERSHED AGREEMENTS.—The Secretary of the Interior may enter into a watershed restoration and enhancement agreement—

(1) directly with a willing private landowner; or

(2) indirectly through an agreement with a state, local, or tribal government or other public entity, educational institution, or private nonprofit organization.

(c) TERMS AND CONDITIONS.—In order for the Secretary to enter into a watershed restoration and enhancement agreement—

(1) the agreement shall—

(A) include such terms and conditions mutually agreed to by the Secretary and the landowner;

(B) improve the viability of and otherwise benefit the fish, wildlife, and other biotic resources on public land in the watershed;

(C) authorize the provision of technical assistance by the Secretary in the planning of management activities that will further the purposes of the agreement;

(D) provide for the sharing of costs of implementing the agreement among the Federal government, the landowner, and other entities, as mutually agreed on by the affected interests; and

(E) ensure that any expenditure by the Secretary pursuant to the agreement is determined by the Secretary to be in the public interest; and

(2) the Secretary may require such other terms and conditions as are necessary to protect the public investment on private lands, provided such terms and conditions are mutually agreed to by the Secretary and the landowner.

<< 16 USCA § 410ff NOTE >>

SEC. 125. Visitor Center Designation at Channel Islands National Park.

(a) The visitor center at Channel Islands National Park, California, is hereby designated as the "Robert J. Lagomarsino Visitor Center".

(b) Any reference in law, regulation, paper, record, map, or any other document in the United States to the visitor center referred to in subsection (a) shall be deemed to be a reference to the "Robert J. Lagomarsino Visitor Center".

TITLE II—RELATED AGENCIES

DEPARTMENT OF AGRICULTURE

FOREST SERVICE

### FOREST AND RANGELAND RESEARCH

For necessary expenses of forest and rangeland research as authorized by law, $179,786,000, to remain available until expended.

### STATE AND PRIVATE FORESTRY

For necessary expenses of cooperating with, and providing technical and financial assistance to States, Territories, possessions, and others and for forest pest management activities, cooperative forestry and education and land conservation activities, $155,461,000, to remain available until expended, as authorized by law: Provided That of funds available under this heading for Pacific Northwest Assistance in this or prior appropriations Acts. $750,000 shall be provided to the World Forestry Center for purposes of continuing scientific research and other authorized efforts regarding the land exchange efforts in the Umpqua River Basin region.

### NATIONAL FOREST SYSTEM

For necessary expenses of the Forest Service, not otherwise provided for, for management, protection, improvement, and utilization of the National Forest System, for ecosystem planning, inventory, and monitoring, and for administrative expenses associated with the management of funds provided under the heads "Forest and Rangeland Research," "State and Private Forestry," "National Forest System," "Wildland Fire Management," "Reconstruction and Construction," and "Land Acquisition," $1,274,781,000, to remain available until expended, and including 50 per centum of all monies received during the prior fiscal year as fees collected under the Land and Water Conservation Fund Act of 1965, as amended, in accordance with section 4 of the Act (16 U.S.C. 460*l*–6a(i)): Provided, That up to $5,000,000 of the funds provided herein for road maintenance shall be available for the planned obliteration of roads which are no longer needed.

### WILDLAND FIRE MANAGEMENT

For necessary expenses for forest fire presuppression activities on National Forest System lands, for emergency fire suppression on or adjacent to such lands or other lands under fire protection agreement, and for emergency rehabilitation of burned over National Forest System lands, $530,016,000, to remain available until expended: Provided, That unexpended balances of amounts previously appropriated under any other headings for Forest Service fire activities are transferred to and merged with this appropriation and subject to the same terms and conditions: Provided, further, That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes.

### RECONSTRUCTION AND CONSTRUCTION

For necessary expenses of the Forest Service, not otherwise provided for, $174,974,000, to remain available until expended for construction, reconstruction and acquisition of buildings and other facilities, and for construction, reconstruction and repair of forest roads and trails by the Forest Service as authorized by 16 U.S.C. 532–538 and 23 U.S.C. 101 and 205: Provided, That not to exceed $50,000,000, to remain available until expended, may be obligated for the construction of forest roads by

timber purchasers: Provided further, That funds appropriated under this head for the construction of the Wayne National Forest Supervisor's Office may be granted to the Ohio State Highway Patrol as the federal share of the cost of construction of a new facility to be occupied jointly by the Forest Service and the Ohio State Highway Patrol: Provided further, That an agreed upon lease of space in the new facility shall be provided to the Forest Service without charge for the life of the building.

## LAND ACQUISITION

For expenses necessary to carry out the provisions of the Land and Water Conservation Fund Act of 1965, as amended (16 U.S.C. 460*l*–4–11), including administrative expenses, and for acquisition of land or waters, or interest therein, in accordance with statutory authority applicable to the Forest Service, $40,575,000, to be derived from the Land and Water Conservation Fund, to remain available until expended.

## ACQUISITION OF LANDS FOR NATIONAL FORESTS SPECIAL ACTS

For acquisition of lands within the exterior boundaries of the Cache, Uinta, and Wasatch National Forests, Utah; the Toiyabe National Forest, Nevada; and the Angeles, San Bernardino, Sequoia, and Cleveland National Forests, California, as authorized by law, $1,069,000, to be derived from forest receipts.

## ACQUISITION OF LANDS TO COMPLETE LAND EXCHANGES

For acquisition of lands, such sums, to be derived from funds deposited by State, county, or municipal governments, public school districts, or other public school authorities pursuant to the Act of December 4, 1967, as amended (16 U.S.C. 484a), to remain available until expended.

## RANGE BETTERMENT FUND

For necessary expenses of range rehabilitation, protection, and improvement, 50 per centum of all moneys received during the prior fiscal year, as fees for grazing domestic livestock on lands in National Forests in the sixteen Western States, pursuant to section 401(b)(1) of Public Law 94–579, as amended, to remain available until expended, of which not to exceed 6 per centum shall be available for administrative expenses associated with on-the-ground range rehabilitation, protection, and improvements.

## GIFTS, DONATIONS AND BEQUESTS FOR FOREST AND RANGELAND RESEARCH

For expenses authorized by 16 U.S.C. 1643(b), $92,000, to remain available until expended, to be derived from the fund established pursuant to the above Act.

## ADMINISTRATIVE PROVISIONS, FOREST SERVICE

Appropriations to the Forest Service for the current fiscal year shall be available for: (a) purchase of not to exceed 159 passenger motor vehicles of which 14 will be used primarily for law enforcement purposes and of which 149 shall be for replacement; acquisition of 10 passenger motor vehicles from excess sources, and hire of such vehicles; operation and maintenance of aircraft, the purchase of not to exceed two for replacement only, and acquisition of 20 aircraft from excess sources; notwithstanding other provisions of law, existing aircraft being replaced may be sold, with proceeds derived or trade-in value used to offset the purchase price for the replacement aircraft; (b) services pursuant to 7 U.S.C. 2225, and not to exceed $100,000 for employment under 5 U.S.C. 3109; (c) purchase, erection, and alteration of buildings and other public improvements (7 U.S.C. 2250); (d) acquisition of land, waters, and interests therein, pursuant to 7 U.S.C. 428a; (e) for expenses pursuant to the Volunteers in the National Forest Act of 1972 (16 U.S.C. 558a, 558d, 558a note); and (f) for debt collection contracts in accordance with 31 U.S.C. 3718(c).

None of the funds made available under this Act shall be obligated or expended to change the boundaries of any region, to abolish any region, to move or close any regional office for research, State and private forestry, or National Forest System administration of the Forest Service, Department of Agriculture, or to implement any reorganization, "reinvention" or other type of organizational restructuring of the Forest Service, other than the relocation of the Regional Office for Region 5 of the Forest Service from San Francisco to excess military property at Mare Island, Vallejo, California, without the consent of the House and Senate Committees on Appropriations.

Any funds available to the Forest Service may be used for retrofitting Mare Island facilities to accommodate the relocation: Provided, That funds for the move must come from funds otherwise available to Region 5: Provided further, That any funds to be provided for such purposes shall only be available upon approval of the House and Senate Committees on Appropriations.

Any appropriations or funds available to the Forest Service may be advanced to the Wildland Fire Management appropriation and may be used for forest firefighting and the emergency rehabilitation of burned-over lands under its jurisdiction.

Funds appropriated to the Forest Service shall be available for assistance to or through the Agency for International Development and the Foreign Agricultural Service in connection with forest and rangeland research, technical information, and assistance in foreign countries, and shall be available to support forestry and related natural resource activities outside the United States and its territories and possessions, including technical assistance, education and training, and cooperation with United States and international organizations.

None of the funds made available to the Forest Service under this Act shall be subject to transfer under the provisions of section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or 7 U.S.C. 147b unless the proposed transfer is approved in advance by the House and Senate Committees on Appropriations in compliance with the reprogramming procedures contained in House Report 103–551.

None of the funds available to the Forest Service may be reprogrammed without the advance approval of the House and Senate Committees on Appropriations in accordance with the procedures contained in House Report 103–551.

No funds appropriated to the Forest Service shall be transferred to the Working Capital Fund of the Department of Agriculture without the approval of the Chief of the Forest Service.

Notwithstanding any other provision of the law, any appropriations or funds available to the Forest Service may be used to disseminate program information to private and public individuals and organizations through the use of nonmonetary items of nominal value and to provide nonmonetary awards of nominal value and to incur necessary expenses for the nonmonetary recognition of private individuals and organizations that make contributions to Forest Service programs.

Notwithstanding any other provision of law, money collected, in advance or otherwise, by the Forest Service under authority of section 101 of Public Law 93–153 (30 U.S.C. 185(l)) as reimbursement of administrative and other costs incurred in processing pipeline right-of-way or permit applications and for costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities, may be used to reimburse the applicable appropriation to which such costs were originally charged.

Funds available to the Forest Service shall be available to conduct a program of not less than $1,000,000 for high priority projects within the scope of the approved budget which shall be carried out by the Youth Conservation Corps as authorized by the Act of August 13, 1970, as amended by Public Law 93–408.

None of the funds available in this Act shall be used for timber sale preparation using clearcutting in hardwood stands in excess of 25 percent of the fiscal year 1989 harvested volume in the Wayne National Forest, Ohio: Provided, That this limitation shall not apply to hardwood stands damaged by natural disaster: Provided further, That landscape architects shall be used to maintain a visually pleasing forest.

Any money collected from the States for fire suppression assistance rendered by the Forest Service on non-Federal lands not in the vicinity of National Forest System lands shall be used to reimburse the applicable appropriation and shall remain available until expended as the Secretary may direct in conducting activities authorized by 16 U.S.C. 2101 (note), 2101–2110, 1606, and 2111.

Of the funds available to the Forest Service, $1,500 is available to the Chief of the Forest Service for official reception and representation expenses.

Notwithstanding any other provision of law, the Forest Service is authorized to employ or otherwise contract with persons at regular rates of pay, as determined by the Service, to perform work occasioned by emergencies such as fires, storms, floods, earthquakes or any other unavoidable cause without regard to Sundays, Federal holidays, and the regular workweek.

To the greatest extent possible, and in accordance with the Final Amendment to the Shawnee National Forest Plan, none of the funds available in this Act shall be used for preparation of timber sales using clearcutting or other forms of even aged management in hardwood stands in the Shawnee National Forest, Illinois.

Pursuant to sections 405(b) and 410(b) of Public Law 101–593, funds up to $1,000,000 for matching funds shall be available for the National Forest Foundation on a one-for-one basis to match private contributions for projects on or benefitting National Forest System lands or related to Forest Service programs.

Pursuant to section 2(b)(2) of Public Law 98–244, up to $1,000,000 of the funds available to the Forest Service shall be available for matching funds, as authorized in 16 U.S.C. 3701–3709, on a one-for-one basis to match private contributions for projects on or benefitting National Forest System lands or related to Forest Service programs.

Funds appropriated to the Forest Service shall be available for interactions with and providing technical assistance to rural communities for sustainable rural development purposes.

Notwithstanding any other provision of law, 80 percent of the funds appropriated to the Forest Service in the National Forest System and Construction accounts and planned to be allocated to activities under the "Jobs in the Woods" program for projects on National Forest land in the State of Washington may be granted directly to the Washington State Department of Fish and Wildlife for accomplishment of planned projects. Twenty percent of said funds shall be retained by the Forest Service for planning and administering projects. Project selection and prioritization shall be accomplished by the Forest Service with such consultation with the State of Washington as the Forest Service deems appropriate.

Funds appropriated to the Forest Service shall be available for payments to counties within the Columbia River Gorge National Scenic Area, pursuant to sections 14(c)(1) and (2), and section 16(a)(2) of Public Law 99–663.

The Secretary of Agriculture shall by March 31, 1997 report to the Committees on Appropriations of the House of Representatives and the Senate on the status and disposition of all salvage timber sales started under the authority of Section 2001 of Public Law 104–19 and subsequently withdrawn or delayed and completed under different authorities as a consequence of the July 2, 1996 directive on the implementation of Section 2001 issued by the Secretary.

The Pacific Northwest Research Station Silviculture Laboratory in Bend, Oregon is hereby named the "Robert W. Chandler Building".

For purposes of the Southeast Alaska Economic Disaster Fund as set forth in section 101(c) of Public Law 104–134, the direct grants provided in subsection (c) shall be considered direct payments for purposes of all applicable law except that these direct grants may not be used for lobbying activities.

No employee of the Department of Agriculture may be detailed or assigned from an agency or office funded by this Act to any other agency or office of the Department for more than 30 days unless the individual's employing agency or office is fully reimbursed by the receiving agency or office for the salary and expenses of the employee for the period of assignment.

## DEPARTMENT OF ENERGY

### CLEAN COAL TECHNOLOGY

#### (RESCISSION)

Of the funds made available under this heading for obligation in fiscal year 1997 or prior years, $123,000,000 are rescinded: Provided, That funds made available in previous appropriations Acts shall be available for any ongoing project regardless of the separate request for proposal under which the project was selected.

### FOSSIL ENERGY RESEARCH AND DEVELOPMENT

For necessary expenses in carrying out fossil energy research and development activities, under the authority of the Department of Energy Organization Act (Public Law 95–91), including the acquisition of interest, including defeasible and equitable interests in any real property or any facility or for plant or facility acquisition or expansion, and for conducting inquiries, technological investigations and research concerning the extraction, processing, use, and disposal of mineral substances without objectionable social and environmental costs (30 U.S.C. 3, 1602, and 1603), performed under the minerals and materials science programs at the Albany Research Center in Oregon, $364,704,000 to remain available until expended: Provided, That no part of the sum herein made available shall be used for the field testing of nuclear explosives in the recovery of oil and gas.

### ALTERNATIVE FUELS PRODUCTION

#### (INCLUDING TRANSFER AND RESCISSION OF FUNDS)

Monies received as investment income on the principal amount in the Great Plains Project Trust at the Norwest Bank of North Dakota, in such sums as are earned as of October 1, 1996, shall be deposited in this account and immediately transferred to the General Fund of the Treasury. Monies received as revenue sharing from the operation of the Great Plains Gasification Plant shall be immediately transferred to the General Fund of the Treasury. Funds are hereby rescinded in the amount of $2,500,000 from unobligated balances under this head.

### NAVAL PETROLEUM AND OIL SHALE RESERVES

<< 10 USCA § 7430 NOTE >>

For necessary expenses in carrying out naval petroleum and oil shale reserve activities, $143,786,000, to remain available until expended: Provided, That the requirements of 10 U.S.C. 7430(b)(2)(B) shall not apply to fiscal year 1997.

## ENERGY CONSERVATION

For necessary expenses in carrying out energy conservation activities, $569,762,000, to remain available until expended, including, notwithstanding any other provision of law, the excess amount for fiscal year 1997 determined under the provisions of section 3003(d) of Public Law 99–509 (15 U.S.C. 4502): Provided, That $149,845,000 shall be for use in energy conservation programs as defined in section 3008(3) of Public Law 99–509 (15 U.S.C. 4507) and shall not be available until excess amounts are determined under the provisions of section 3003(d) of Public Law 99–509 (15 U.S.C. 4502): Provided further, That notwithstanding section 3003(d)(2) of Public Law 99–509 such sums shall be allocated to the eligible programs as follows: $120,845,000 for weatherization assistance grants and $29,000,000 for State energy conservation grants.

## ECONOMIC REGULATION

For necessary expenses in carrying out the activities of the Office of Hearing and Appeals, $2,725,000, to remain available until expended.

## STRATEGIC PETROLEUM RESERVE

### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses for Strategic Petroleum Reserve facility development and operations and program management activities pursuant to the Energy Policy and Conservation Act of 1975, as amended (42 U.S.C. 6201 et seq.), $220,000,000, to remain available until expended, of which $220,000,000 shall be repaid from the "SPR Operating Fund" from amounts made available from the sale of oil from the Reserve: Provided, That notwithstanding section 161 of the Energy Policy and Conservation Act, the Secretary shall draw down and sell in fiscal year 1997 $220,000,000 worth of oil from the Strategic Petroleum Reserve: Provided further, That the proceeds from the sale shall be deposited into a special account in the Treasury, to be established and known as the "SPR Operating Fund", and shall, upon receipt, be transferred to the Strategic Petroleum Reserve account for operations of the Strategic Petroleum Reserve.

## SPR PETROLEUM ACCOUNT

Notwithstanding 42 U.S.C. 6240(d) the United States share of crude oil in Naval Petroleum Reserve Numbered 1 (Elk Hills) may be sold or otherwise disposed of to other than the Strategic Petroleum Reserve: Provided, That outlays in fiscal year 1997 resulting from the use of funds in this account shall not exceed $5,000,000.

## ENERGY INFORMATION ADMINISTRATION

For necessary expenses in carrying out the activities of the Energy Information Administration, $66,120,000 to remain available until expended.

## ADMINISTRATIVE PROVISIONS, DEPARTMENT OF ENERGY

Appropriations under this Act for the current fiscal year shall be available for hire of passenger motor vehicles; hire, maintenance, and operation of aircraft; purchase, repair, and cleaning of uniforms; and reimbursement to the General Services Administration for security guard services.

From appropriations under this Act, transfers of sums may be made to other agencies of the Government for the performance of work for which the appropriation is made.

None of the funds made available to the Department of Energy under this Act shall be used to implement or finance authorized price support or loan guarantee programs unless specific provision is made for such programs in an appropriations Act.

The Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, private or foreign: Provided, That revenues and other moneys received by or for the account of the Department of Energy or otherwise generated by sale of products in connection with projects of the Department appropriated under this Act may be retained by the Secretary of Energy, to be available until

expended, and used only for plant construction, operation, costs, and payments to cost-sharing entities as provided in appropriate cost-sharing contracts or agreements: Provided further, That the remainder of revenues after the making of such payments shall be covered into the Treasury as miscellaneous receipts: Provided further, That any contract, agreement, or provision thereof entered into by the Secretary pursuant to this authority shall not be executed prior to the expiration of 30 calendar days (not including any day in which either House of Congress is not in session because of adjournment of more than three calendar days to a day certain) from the receipt by the Speaker of the House of Representatives and the President of the Senate of a full comprehensive report on such project, including the facts and circumstances relied upon in support of the proposed project.

No funds provided in this Act may be expended by the Department of Energy to prepare, issue, or process procurement documents for programs or projects for which appropriations have not been made.

In addition to other authorities set forth in this Act, the Secretary may accept fees and contributions from public and private sources, to be deposited in a contributed funds account, and prosecute projects using such fees and contributions in cooperation with other Federal, State or private agencies or concerns.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### INDIAN HEALTH SERVICE

### INDIAN HEALTH SERVICES

For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self–Determination Act, the Indian Health Care Improvement Act, and titles II and III of the Public Health Service Act with respect to the Indian Health Service, $1,806,269,000, together with payments received during the fiscal year pursuant to 42 U.S.C. 238(b) for services furnished by the Indian Health Service: Provided, That funds made available to tribes and tribal organizations through contracts, grant agreements, or any other agreements or compacts authorized by the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), shall be deemed to be obligated at the time of the grant or contract award and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: Provided further, That $12,000,000 shall remain available until expended, for the Indian Catastrophic Health Emergency Fund: Provided further, That $356,325,000 for contract medical care shall remain available for obligation until September 30, 1998: Provided further, That of the funds provided, not less than $11,706,000 shall be used to carry out the loan repayment program under section 108 of the Indian Health Care Improvement Act: Provided further, That funds provided in this Act may be used for one-year contracts and grants which are to be performed in two fiscal years, so long as the total obligation is recorded in the year for which the funds are appropriated: Provided further, That the amounts collected by the Secretary of Health and Human Services under the authority of title IV of the Indian Health Care Improvement Act shall remain available until expended for the purpose of achieving compliance with the applicable conditions and requirements of titles XVIII and XIX of the Social Security Act (exclusive of planning, design, or construction of new facilities): Provided further, That of the funds provided, $7,500,000 shall remain available until expended, for the Indian Self–Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts, compacts, grants or cooperative agreements with the Indian Health Service under the provisions of the Indian Self–Determination Act: Provided further, That funding contained herein, and in any earlier appropriations Acts for scholarship programs under the Indian Health Care Improvement Act (25 U.S.C. 1613) shall remain available for obligation until September 30, 1998: Provided further, That amounts received by tribes and tribal organizations under title IV of the Indian Health Care Improvement Act shall be reported and accounted for and available to the receiving tribes and tribal organizations until expended.

### INDIAN HEALTH FACILITIES

For construction, repair, maintenance, improvement, and equipment of health and related auxiliary facilities, including quarters for personnel; preparation of plans, specifications, and drawings; acquisition of sites, purchase and erection of modular buildings, and purchases of trailers; and for provision of domestic and community sanitation facilities for Indians, as authorized by section 7 of the Act of August 5, 1954 (42 U.S.C. 2004a), the Indian Self–Determination Act, and the Indian Health Care Improvement Act, and for expenses necessary to carry out such Acts and titles II and III of the Public Health Service Act with respect to environmental health and facilities support activities of the Indian Health Service, $247,731,000, to remain available until expended: Provided, That notwithstanding any other provision of law, funds appropriated for the planning, design,

construction or renovation of health facilities for the benefit of an Indian tribe or tribes may be used to purchase land for sites to construct, improve, or enlarge health or related facilities.

## ADMINISTRATIVE PROVISIONS, INDIAN HEALTH SERVICE

Appropriations in this Act to the Indian Health Service shall be available for services as authorized by 5 U.S.C. 3109 but at rates not to exceed the per diem rate equivalent to the maximum rate payable for senior-level positions under 5 U.S.C. 5376; hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation and erection of modular buildings and renovation of existing facilities; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; and for uniforms or allowances therefore as authorized by 5 U.S.C. 5901–5902; and for expenses of attendance at meetings which are concerned with the functions or activities for which the appropriation is made or which will contribute to improved conduct, supervision, or management of those functions or activities: Provided, That in accordance with the provisions of the Indian Health Care Improvement Act, non-Indian patients may be extended health care at all tribally administered or Indian Health Service facilities, subject to charges, and the proceeds along with funds recovered under the Federal Medical Care Recovery Act (42 U.S.C. 2651–53) shall be credited to the account of the facility providing the service and shall be available without fiscal year limitation: Provided further, That notwithstanding any other law or regulation, funds transferred from the Department of Housing and Urban Development to the Indian Health Service shall be administered under Public Law 86–121 (the Indian Sanitation Facilities Act) and Public Law 93–638, as amended: Provided further, That funds appropriated to the Indian Health Service in this Act, except those used for administrative and program direction purposes, shall not be subject to limitations directed at curtailing Federal travel and transportation: Provided further, That notwithstanding any other provision of law, funds previously or herein made available to a tribe or tribal organization through a contract, grant, or agreement authorized by title I or title III of the Indian Self–Determination and Education Assistance Act of 1975 (25 U.S.C. 450), may be deobligated and reobligated to a self-determination contract under title I, or a self-governance agreement under title III of such Act and thereafter shall remain available to the tribe or tribal organization without fiscal year limitation: Provided further, That none of the funds made available to the Indian Health Service in this Act shall be used to implement the final rule published in the Federal Register on September 16, 1987, by the Department of Health and Human Services, relating to the eligibility for the health care services of the Indian Health Service until the Indian Health Service has submitted a budget request reflecting the increased costs associated with the proposed final rule, and such request has been included in an appropriations Act and enacted into law: Provided further, That funds made available in this Act are to be apportioned to the Indian Health Service as appropriated in this Act, and accounted for in the appropriation structure set forth in this Act: Provided further, That funds received from any source, including tribal contractors and compactors for previously transferred functions which tribal contractors and compactors no longer wish to retain, for services, goods, or training and technical assistance, shall be retained by the Indian Health Service and shall remain available until expended by the Indian Health Service: Provided further, That reimbursements for training, technical assistance, or services provided by the Indian Health Service will contain total costs, including direct, administrative, and overhead associated with the provision of goods, services, or technical assistance: Provided further, That the appropriation structure for the Indian Health Service may not be altered without advance approval of the House and Senate Committees on Appropriations.

## DEPARTMENT OF EDUCATION

## OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

## INDIAN EDUCATION

For necessary expenses to carry out, to the extent not otherwise provided, title IX, part A of the Elementary and Secondary Education Act of 1965, as amended, and section 215 of the Department of Education Organization Act, $61,000,000.

## OTHER RELATED AGENCIES

## OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION

## SALARIES AND EXPENSES

For necessary expenses of the Office of Navajo and Hopi Indian Relocation as authorized by Public Law 93–531, $19,345,000, to remain available until expended: Provided, That funds provided in this or any other appropriations Act are to be used to relocate eligible individuals and groups including evictees from District 6, Hopi-partitioned lands residents, those in significantly substandard housing, and all others certified as eligible and not included in the preceding categories: Provided further, That none of the funds contained in this or any other Act may be used by the Office of Navajo and Hopi Indian Relocation to evict any single Navajo or Navajo family who, as of November 30, 1985, was physically domiciled on the lands partitioned to the Hopi Tribe unless a new or replacement home is provided for such household: Provided further, That no relocatee will be provided with more than one new or replacement home: Provided further, That the Office shall relocate any certified eligible relocatees who have selected and received an approved homesite on the Navajo reservation or selected a replacement residence off the Navajo reservation or on the land acquired pursuant to 25 U.S.C. 640d–10.

### INSTITUTE OF AMERICAN INDIAN AND ALASKA NATIVE CULTURE AND ARTS DEVELOPMENT

#### PAYMENT TO THE INSTITUTE

For payment to the Institute of American Indian and Alaska Native Culture and Arts Development, as authorized by title XV of Public Law 99–498, as amended (20 U.S.C. 56, part A), $5,500,000.

### SMITHSONIAN INSTITUTION

#### SALARIES AND EXPENSES

For necessary expenses of the Smithsonian Institution, as authorized by law, including research in the fields of art, science, and history; development, preservation, and documentation of the National Collections; presentation of public exhibits and performances; collection, preparation, dissemination, and exchange of information and publications; conduct of education, training, and museum assistance programs; maintenance, alteration, operation, lease (for terms not to exceed thirty years), and protection of buildings, facilities, and approaches; not to exceed $100,000 for services as authorized by 5 U.S.C. 3109; up to 5 replacement passenger vehicles; purchase, rental, repair, and cleaning of uniforms for employees; $317,557,000, of which not to exceed $30,665,000 for the instrumentation program, collections acquisition, Museum Support Center equipment and move, exhibition reinstallation, the National Museum of the American Indian, the repatriation of skeletal remains program, research equipment, information management, and Latino programming shall remain available until expended, and including such funds as may be necessary to support American overseas research centers and a total of $125,000 for the Council of American Overseas Research Centers: Provided, That funds appropriated herein are available for advance payments to independent contractors performing research services or participating in official Smithsonian presentations.

#### CONSTRUCTION AND IMPROVEMENTS, NATIONAL ZOOLOGICAL PARK

For necessary expenses of planning, construction, remodeling, and equipping of buildings and facilities at the National Zoological Park, by contract or otherwise, $3,850,000, to remain available until expended.

#### REPAIR AND RESTORATION OF BUILDINGS

For necessary expenses of repair and restoration of buildings owned or occupied by the Smithsonian Institution, by contract or otherwise, as authorized by section 2 of the Act of August 22, 1949 (63 Stat. 623), including not to exceed $10,000 for services as authorized by 5 U.S.C. 3109, $39,000,000, to remain available until expended: Provided, That contracts awarded for environmental systems, protection systems, and exterior repair or restoration of buildings of the Smithsonian Institution may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

#### CONSTRUCTION

For necessary expenses for construction, $10,000,000, to remain available until expended.

### NATIONAL GALLERY OF ART

#### SALARIES AND EXPENSES

For the upkeep and operations of the National Gallery of Art, the protection and care of the works of art therein, and administrative expenses incident thereto, as authorized by the Act of March 24, 1937 (50 Stat. 51), as amended by the public

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

resolution of April 13, 1939 (Public Resolution 9, Seventy-sixth Congress), including services as authorized by 5 U.S.C. 3109; payment in advance when authorized by the treasurer of the Gallery for membership in library, museum, and art associations or societies whose publications or services are available to members only, or to members at a price lower than to the general public; purchase, repair, and cleaning of uniforms for guards, and uniforms, or allowances therefor, for other employees as authorized by law (5 U.S.C. 5901–5902); purchase or rental of devices and services for protecting buildings and contents thereof, and maintenance, alteration, improvement, and repair of buildings, approaches, and grounds; and purchase of services for restoration and repair of works of art for the National Gallery of Art by contracts made, without advertising, with individuals, firms, or organizations at such rates or prices and under such terms and conditions as the Gallery may deem proper, $53,899,000, of which not to exceed $3,026,000 for the special exhibition program shall remain available until expended.

### REPAIR, RESTORATION AND RENOVATION OF BUILDINGS

For necessary expenses of repair, restoration and renovation of buildings, grounds and facilities owned or occupied by the National Gallery of Art, by contract or otherwise, as authorized, $5,942,000, to remain available until expended: Provided, That contracts awarded for environmental systems, protection systems, and exterior repair or renovation of buildings of the National Gallery of Art may be negotiated with selected contractors and awarded on the basis of contractor qualifications as well as price.

### JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

### OPERATIONS AND MAINTENANCE

For necessary expenses for the operation, maintenance and security of the John F. Kennedy Center for the Performing Arts, $10,875,000.

### CONSTRUCTION

For necessary expenses of capital repair and rehabilitation of the existing features of the building and site of the John F. Kennedy Center for the Performing Arts, $9,000,000, to remain available until expended.

### WOODROW WILSON INTERNATIONAL CENTER FOR SCHOLARS

### SALARIES AND EXPENSES

For expenses necessary in carrying out the provisions of the Woodrow Wilson Memorial Act of 1968 (82 Stat. 1356) including hire of passenger vehicles and services as authorized by 5 U.S.C. 3109, $5,840,000.

### NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

### NATIONAL ENDOWMENT FOR THE ARTS

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $82,734,000, shall be available to the National Endowment for the Arts for the support of projects and productions in the arts through assistance to organizations and individuals pursuant to section 5(c) of the Act, and for administering the functions of the Act, to remain available until expended.

### MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $16,760,000, to remain available until expended, to the National Endowment for the Arts: Provided, That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the Chairman or by grantees of the Endowment under the provisions of section 10(a)(2), subsections 11(a)(2)(A) and 11(a)(3)(A) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

### NATIONAL ENDOWMENT FOR THE HUMANITIES

### GRANTS AND ADMINISTRATION

For necessary expenses to carry out the National Foundation on the Arts and the Humanities Act of 1965, as amended, $96,100,000 shall be available to the National Endowment for the Humanities for support of activities in the humanities, pursuant to section 7(c) of the Act, and for administering the functions of the Act, to remain available until expended.

## MATCHING GRANTS

To carry out the provisions of section 10(a)(2) of the National Foundation on the Arts and the Humanities Act of 1965, as amended, $13,900,000, to remain available until expended, of which $8,000,000 shall be available to the National Endowment for the Humanities for the purposes of section 7(h): Provided, That this appropriation shall be available for obligation only in such amounts as may be equal to the total amounts of gifts, bequests, and devises of money, and other property accepted by the Chairman or by grantees of the Endowment under the provisions of subsections 11(a)(2)(B) and 11(a)(3)(B) during the current and preceding fiscal years for which equal amounts have not previously been appropriated.

## INSTITUTE OF MUSEUM SERVICES

### GRANTS AND ADMINISTRATION

For carrying out title II of the Arts, Humanities, and Cultural Affairs Act of 1976, as amended, $22,000,000, to remain available until expended.

### ADMINISTRATIVE PROVISIONS

None of the funds appropriated to the National Foundation on the Arts and the Humanities may be used to process any grant or contract documents which do not include the text of 18 U.S.C. 1913: Provided, That none of the funds appropriated to the National Foundation on the Arts and the Humanities may be used for official reception and representation expenses.

## COMMISSION OF FINE ARTS

### SALARIES AND EXPENSES

For expenses made necessary by the Act establishing a Commission of Fine Arts (40 U.S.C. 104), $867,000.

### NATIONAL CAPITAL ARTS AND CULTURAL AFFAIRS

For necessary expenses as authorized by Public Law 99–190 (20 U.S.C. 956(a)), as amended, $6,000,000.

## ADVISORY COUNCIL ON HISTORIC PRESERVATION

### SALARIES AND EXPENSES

For necessary expenses of the Advisory Council on Historic Preservation (Public Law 89–665, as amended), $2,500,000: Provided, That none of these funds shall be available for the compensation of Executive Level V or higher position.

## NATIONAL CAPITAL PLANNING COMMISSION

### SALARIES AND EXPENSES

For necessary expenses, as authorized by the National Capital Planning Act of 1952 (40 U.S.C. 71–71i), including services as authorized by 5 U.S.C. 3109, $5,390,000: Provided, That all appointed members will be compensated at a rate not to exceed the rate for Executive Schedule Level IV.

## FRANKLIN DELANO ROOSEVELT MEMORIAL COMMISSION

### SALARIES AND EXPENSES

For necessary expenses of the Franklin Delano Roosevelt Memorial Commission, established by the Act of August 11, 1955 (69 Stat. 694), as amended by Public Law 92–332 (86 Stat. 401), $500,000 to remain available until expended.

## UNITED STATES HOLOCAUST MEMORIAL COUNCIL

### HOLOCAUST MEMORIAL COUNCIL

For expenses of the Holocaust Memorial Council, as authorized by Public Law 96–388 (36 U.S.C. 1401), as amended, $30,707,000, of which $1,575,000 for the Museum's repair and rehabilitation program and $1,264,000 for the Museum's exhibitions program shall remain available until expended.

## TITLE III—GENERAL PROVISIONS

SEC. 301. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive Order issued pursuant to existing law.

SEC. 302. No part of any appropriation under this Act shall be available to the Secretary of the Interior or the Secretary of Agriculture for the leasing of oil and natural gas by noncompetitive bidding on publicly owned lands within the boundaries of the Shawnee National Forest, Illinois: Provided, That nothing herein is intended to inhibit or otherwise affect the sale, lease, or right to access to minerals owned by private individuals.

SEC. 303. No part of any appropriation contained in this Act shall be available for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which congressional action is not complete.

SEC. 304. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 305. None of the funds provided in this Act to any department or agency shall be obligated or expended to provide a personal cook, chauffeur, or other personal servants to any officer or employee of such department or agency except as otherwise provided by law.

SEC. 306. No assessments may be levied against any program, budget activity, subactivity, or project funded by this Act unless advance notice of such assessments and the basis therefor are presented to the Committees on Appropriations and are approved by such Committees.

SEC. 307. (a) COMPLIANCE WITH BUY AMERICAN ACT.—None of the funds made available in this Act may be expended by an entity unless the entity agrees that in expending the funds the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c; popularly known as the "Buy American Act").

(b) SENSE OF CONGRESS; REQUIREMENT REGARDING NOTICE.—

(1) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or product that may be authorized to be purchased with financial assistance provided using funds made available in this Act, it is the sense of the Congress that entities receiving the assistance should, in expending the assistance, purchase only American-made equipment and products.

(2) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance using funds made available in this Act, the head of each Federal agency shall provide to each recipient of the assistance a notice describing the statement made in paragraph (1) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA. —If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 308. None of the funds in this Act may be used to plan, prepare, or offer for sale timber from trees classified as giant sequoia (Sequoiadendron giganteum) which are located on National Forest System or Bureau of Land Management lands in a manner different than such sales were conducted in fiscal year 1995.

SEC. 309. None of the funds made available by this Act may be obligated or expended by the National Park Service to enter into or implement a concession contract which permits or requires the removal of the underground lunchroom at the Carlsbad Caverns National Park.

SEC. 310. Where the actual costs of construction projects under self-determination contracts, compacts, or grants, pursuant to Public Laws 93–638, 103–413, or 100–297, are less than the estimated costs thereof, use of the resulting excess funds shall be determined by the appropriate Secretary after consultation with the tribes.

SEC. 311. Notwithstanding Public Law 103–413, quarterly payments of funds to tribes and tribal organizations under annual funding agreements pursuant to section 108 of Public Law 93–638, as amended, may be made on the first business day following the first day of a fiscal quarter.

SEC. 312. None of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps program, unless the relevant agencies of the Department of the Interior and/or Agriculture follow appropriate reprogramming guidelines: Provided, That if no funds are provided for the AmeriCorps program by the VA–HUD and Independent Agencies fiscal year 1997 appropriations bill, then none of the funds appropriated or otherwise made available by this Act may be used for the AmeriCorps programs.

SEC. 313. None of the funds made available in this Act may be used (1) to demolish the bridge between Jersey City, New Jersey, and Ellis Island; or (2) to prevent pedestrian use of such bridge, when it is made known to the Federal official having authority to obligate or expend such funds that such pedestrian use is consistent with generally accepted safety standards.

SEC. 314. (a) None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to accept or process applications for a patent for any mining or mill site claim located under the general mining laws.

(b) The provisions of subsection (a) shall not apply if the Secretary of the Interior determines that, for the claim concerned: (1) a patent application was filed with the Secretary on or before September 30, 1994, and (2) all requirements established under sections 2325 and 2326 of the Revised Statutes (30 U.S.C. 29 and 30) for vein or lode claims and sections 2329, 2330, 2331, and 2333 of the Revised Statutes (30 U.S.C. 35, 36, and 37) for placer claims, and section 2337 of the Revised Statutes (30 U.S.C. 42) for mill site claims, as the case may be, were fully complied with by the applicant by that date.

(c) PROCESSING SCHEDULE.—For those applications for patents pursuant to subsection (b) which were filed with the Secretary of the Interior, prior to September 30, 1994, the Secretary of the Interior shall—

(1) Within three months of the enactment of this Act, file with the House and Senate Committees on Appropriations and the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the United States Senate a plan which details how the Department of the Interior will make a final determination as to whether or not an applicant is entitled to a patent under the general mining laws on at least 90 percent of such applications within five years of the enactment of this Act and file reports annually thereafter with the same committees detailing actions taken by the Department of the Interior to carry out such plan; and

(2) Take such actions as may be necessary to carry out such plan.

(d) MINERAL EXAMINATIONS.—In order to process patent applications in a timely and responsible manner, upon the request of a patent applicant, the Secretary of the Interior shall allow the applicant to fund a qualified third-party contractor to be selected by the Bureau of Land Management to conduct a mineral examination of the mining claims or mill sites contained in a patent application as set forth in subsection (b). The Bureau of Land Management shall have the sole responsibility to choose and pay the third-party contractor in accordance with the standard procedures employed by the Bureau of Land Management in the retention of third-party contractors.

SEC. 315. None of the funds appropriated or otherwise made available by this Act may be used for the purposes of acquiring lands in the counties of Gallia, Lawrence, Monroe, or Washington, Ohio, for the Wayne National Forest.

SEC. 316. Of the funds provided to the National Endowment for the Arts:

(a) The Chairperson shall only award a grant to an individual if such grant is awarded to such individual for a literature fellowship, National Heritage Fellowship, or American Jazz Masters Fellowship.

(b) The Chairperson shall establish procedures to ensure that no funding provided through a grant, except a grant made to a State or local arts agency, or regional group, may be used to make a grant to any other organization or individual to conduct activity independent of the direct grant recipient. Nothing in this subsection shall prohibit payments made in exchange for goods and services.

(c) No grant shall be used for seasonal support to a group, unless the application is specific to the contents of the season, including identified programs and/or projects.

Sec. 317. None of the funds available to the Department of the Interior or the Department of Agriculture by this or any other Act may be used to prepare, promulgate, implement, or enforce any interim or final rule or regulation pursuant to Title VIII of the Alaska National Interest Lands Conservation Act to assert jurisdiction, management, or control over any waters (other than non-navigable waters on Federal lands), non-Federal lands, or lands selected by, but not conveyed to, the State of Alaska

pursuant to the Submerged Lands Act of 1953 or the Alaska Statehood Act, or an Alaska Native Corporation pursuant to the Alaska Native Claims Settlement Act.

<< 16 USCA § 620c NOTE >>

SEC. 318. No funds appropriated under this or any other Act shall be used to review or modify sourcing areas previously approved under section 490(c)(3) of the Forest Resources Conservation and Shortage Relief Act of 1990 (Public Law 101–382) or to enforce or implement Federal regulations 36 CFR part 223 promulgated on September 8, 1995. The regulations and interim rules in effect prior to September 8, 1995 (36 CFR 223.48, 36 CFR 223.87, 36 CFR 223 subpart D, 36 CFR 223 subpart F, and 36 CFR 261.6) shall remain in effect. The Secretary of Agriculture or the Secretary of the Interior shall not adopt any policies concerning Public Law 101–382 or existing regulations that would restrain domestic transportation or processing of timber from private lands or impose additional accountability requirements on any timber. The Secretary of Commerce shall extend until September 30, 1997, the order issued under section 491(b)(2)(A) of Public Law 101–382 and shall issue an order under section 491(b)(2)(B) of such law that will be effective October 1, 1997.

<< 16 USCA § 460*l*–6a NOTE >>

SEC. 319. Section 101(c) of Public Law 104–134 is amended as follows: Under the heading "Title III—General Provisions" amend section 315(b) by striking "50, areas," and inserting in lieu thereof "100, areas," and amend section 315(f) by striking "September 30, 1998" and inserting in lieu thereof "September 30, 1999" and by striking "September 30, 2001" and inserting in lieu thereof "September 30, 2002".

SEC. 320. None of the amounts made available by this Act may be used for design, planning, implementation, engineering, construction, or any other activity in connection with a scenic shoreline drive in Pictured Rocks National Lakeshore.

SEC. 321. LAND TRANSFER, BEND SILVICULTURE LAB, DESCHUTES NATIONAL FOREST, OREGON.—

(a) TRANSFER OF REAL PROPERTY AND ALL IMPROVEMENTS LOCATED THEREON.—Notwithstanding any other provisions of law, there is hereby transferred, without consideration and subject to existing valid rights, all right, title and interest of the United States in and to approximately 5.73 acres of land as described by plat dated July 7, 1977, (which is on file and available for public inspection in the Office of the Chief, USDA Forest Service, Washington, D.C.), as well as all improvements, including the Bend Silviculture Lab located thereon, to the Central Oregon Community College, Bend, Oregon; this being a portion of the same tract acquired by donation from the City of Bend on August 10, 1960, through a Bargain and Sale deed to the USDA Forest Service for use as a research lab, and recorded in volume 125, page 508 of the Deschutes County, Oregon, Deed Records.

(b) CONDITIONS OF TRANSFER.—The transfer effected by subsection (a) is made subject to no special terms or conditions.

SEC. 322. No part of any appropriation contained in this Act or any other Act shall be expended or obligated to fund the activities of the Office of Forestry and Economic Assistance, or any successor office after December 31, 1996.

SEC. 323. (a) The Secretary of the Interior is authorized to accept title to approximately 84 acres of land located in Prince Georges County, Maryland, adjacent to Oxon Cove Park, and bordered generally by the Potomac River, Interstate 295 and the Woodrow Wilson Bridge, or any interest therein, and in exchange therefor may convey to the Corrections Corporation of America approximately 50 acres of land located in Oxon Cove Park in the District of Columbia and bordered generally by Oxon Cove, Interstate 295 and the District of Columbia Impound Lot, or any interest therein.

(b) Before proceeding with an exchange, the Secretary shall determine if the federal property is suitable for exchange under the criteria normally used by the National Park Service. The exchange shall comply with applicable regulations and National Park Service policies for land exchanges.

(c)(1) The Secretary shall not acquire any lands under this section if the Secretary determines that the lands or any portion thereof have become contaminated with hazardous substances (as defined in the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 960*l*)).

(2) Notwithstanding any other provision of law, the United States shall have no responsibility or liability with respect to any hazardous wastes or other substances placed on any of the lands covered by this section after their transfer to the ownership of any party, but nothing in this section shall be construed as either diminishing or increasing any responsibility or liability of

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the United States based on the condition of such lands on the date of their transfer to the ownership of another party: Provided, That the Corrections Corporation of America shall indemnify the United States for liabilities arising under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 960*l*) and the Resource Conservation Recovery Act (42 U.S.C. 690l, et seq.).

  (d) The properties so exchanged either shall be approximately equal in fair market value or if they are not approximately equal, shall be equalized by the payment of cash to the Corporation or to the Secretary as required or in the event the value of the Corporation's lands is greater, the acreage may be reduced so that the fair market value is approximately equal: Provided, That the Secretary shall order appraisals made of the fair market value for improvements thereon: Provided further, That any such cash payment received by the Secretary shall be deposited to "Miscellaneous Trust Funds, National Park Service" and shall be available without further appropriation until expended for the acquisition of land within the National Park System.

  (e) Costs of conducting necessary land surveys, preparing the legal descriptions of the lands to be conveyed, performing the appraisals, and administrative costs incurred in completing the exchange shall be borne by the Corporation.

  (f) Following any exchange authorized by this provision, the boundaries of Oxon Cove Park shall be expanded to include the land acquired by the United States.

SEC. 324. SECTION 1. LAND EXCHANGE.—

  (a) EXCHANGE.—Subject to subsection (c), the Secretary of Agriculture (referred to in this section as the "Secretary") shall convey all right, title, and interest of the United States in and to the National Forest System lands described in subsection (b)(1) to Public Utility District No. 1 of Chelan County, Washington (referred to in this section as the "Public Utility District"), in exchange for the conveyance to the Department of Agriculture by the Public Utility District of all right, title, and interest of the Public Utility District in and to the lands described in subsection (b)(2).

  (b) DESCRIPTION OF LANDS.—

  (1) NATIONAL FOREST SYSTEM LANDS.—The National Forest System lands referred to in subsection (a) are 122 acres, more or less, that are partially occupied by a wastewater treatment facility referred to in subsection (c)(4)(A) with the following legal description:

  (A) The NE¼ of SW¼ of section 27 of township 27 north, range 17 east, Willamette Meridian, Chelan County, Washington.

  (B) The N½ of SE¼ of SW¼ of such section 27.

  (C) The W½ of NW¼ of SE¼ of such section 27.

  (D) The NW¼ of SW¼ of SE¼ of such section 27.

  (E) The E½ of NW¼ of the SE¼ of such section 27.

  (F) That portion of the S½ of SE¼ of SW¼ lying north of the northerly edge of Highway 209 right-of-way of such section 27.

  (2) PUBLIC UTILITY DISTRICT LANDS.—The lands owned by the Public Utility District are 109.15 acres, more or less, with the following legal description:

  (A) S½ of SW¼ of section 35 of township 26 north, range 17 east, Willamette Meridian, Chelan County, Washington.

  (B) The area specified by Public Utility District No. 1 as Government Lot 5 in such section 35.

  (c) REQUIREMENTS FOR EXCHANGE.—

  (1) TITLE ACCEPTANCE AND CONVEYANCE.—Upon offer by the Public Utility District of all right, title and interest in and to the lands described in subsection (b)(2), if the title is found acceptable by the Secretary, the Secretary shall accept title to such lands and interests therein and shall convey to the Public Utility District all right, title, and interest of the United States in and to the lands described in subsection (b)(1).

  (2) APPRAISALS REQUIRED.—Before making an exchange pursuant to subsection (a), the Secretary shall conduct appraisals of the lands that are subject to the exchange to determine the fair market value of the lands. Such appraisals shall not include the value of the wastewater treatment facility referred to in paragraph (4)(A).

  (3) ADDITIONAL CONSIDERATION.—If, on the basis of the appraisals made under paragraph (1), the Secretary determines that the fair market value of the lands to be conveyed by one party under subsection (a) is less than the fair market value of the lands to be conveyed by the other party under subsection (a), then, as a condition of making the exchange under subsection (a), the party conveying the lands with the lesser value shall pay the other party the amount by which the fair market value of the lands of greater value exceeds the fair market value of the lands of lesser value.

AR.03287

(4) CONVEYANCE OF WASTEWATER TREATMENT FACILITY.—(A) As part of an exchange made under subsection (a), the Secretary shall convey to the Public Utility District of Chelan County, Washington, all right, title and interest of the United States in and to the wastewater treatment facility (including the wastewater treatment plant and associated lagoons) located on the lands described in subsection (b)(1) that is in existence on the date of the exchange.

(B) As a condition for the exchange under subsection (a), the Public Utility District shall provide for a credit equal to the fair market value of the wastewater treatment facility conveyed pursuant to subparagraph (A) (determined as of November 4, 1991), that shall be applied to the United States' share of any new wastewater treatment facility constructed by the Public Utility District after such date.

(d) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions in connection with the exchange under this section as the Secretary determines appropriate to protect the interests of the United States.

SEC. 325. "Snoqualmie National Forest Boundary Adjustment Act of 1996."

(a) IN GENERAL.—The Secretary of Agriculture is hereby directed to modify the boundary of the Snoqualmie National Forest to include and encompass 10,589.47 acres, more or less, as generally depicted on a map entitled "Snoqualmie National Forest Proposed 1996 Boundary Modification" dated July, 1996. Such map, together with a legal description of all lands included in the boundary adjustment, shall be on file and available for public inspection in the Office of the Chief of the Forest Service in Washington, District of Columbia.

(b) RULE FOR LAND AND WATER CONSERVATION FUND.—For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundary of the Snoqualmie National Forest, as modified pursuant to subsection (a), shall be considered to be the boundary of that National Forest as of January 1, 1965.

SEC. 326. Sugarbush Land Exchange Act of 1996.

(a) EXCHANGE OR SALE OF LAND.—

(1) If Sugarbush Resort Holdings, Inc. conveys to the United States land acceptable to the Secretary of Agriculture that is at least equal in value to the value of the land described in subsection (a)(2), makes a payment of cash at least equal to that value, or conveys land and makes a payment of cash that in combination are at least equal to that value, the Secretary, subject to valid existing rights, shall, under such terms and conditions as the Secretary may prescribe, convey all right, title, and interest of the United States in and to the land described in subsection (a)(2).

(2) FEDERAL LAND TO BE EXCHANGED.—The Federal land to be exchanged is approximately 57 acres of federally owned land in the Green Mountain National Forest depicted on the map entitled "Green Mountain National Forest, Sugarbush Exchange," dated December 1995.

(3) Lands acquired from Sugarbush Resort Holdings, Inc.—Any land conveyed to the United States in an exchange under subsection (a)(1) shall be subject to such valid existing rights of record as may be acceptable to the Secretary, and the title to the parcel shall conform with the title approval standards applicable to federal land acquisitions.

(b) ADMINISTRATION OF LAND.—

(1) ADDITION TO GREEN MOUNTAIN NATIONAL FOREST.—On approval and acceptance of title by the Secretary, the land acquired by the United States through an exchange or with proceeds from a sale under subsection (a) shall become part of the Green Mountain National Forest, and the boundaries of the National Forest shall be adjusted to include the land.

(2) ADMINISTRATION.—Land acquired under this Act shall be administered by the Secretary in accordance with the laws (including regulations) pertaining to the National Forest System.

(3) AUTHORITY OF THE SECRETARY.—This section does not limit the authority of the Secretary to adjust the boundaries of the Green Mountain National Forest pursuant to section 11 of the Act of March 1, 1911 (36 Stat. 963, chapter 186; 16 U.S.C. 521) (commonly known as the "Weeks Law").

(4) For the purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 460*l*–9), the boundaries of the Green Mountain National Forest, as adjusted under this Act, shall be considered to be the boundaries of the Green Mountain National Forest as of January 1, 1965.

SEC. 327. Snowbird Wilderness Study Area.

 (a) In General.—Section 6(a)(4) of the North Carolina Wilderness Act of 1984 (Public Law 98–324) is amended—
  (1) by striking "eight thousand four hundred and ninety acres" and inserting "8,390 acres"; and
  (2) by striking "July 1983" and inserting "July 1996".
 (b) Management.—The Secretary of Agriculture shall manage the area removed from wilderness study status by the amendments made by subsection (a) in accordance with the provisions of law applicable to adjacent areas outside the wilderness study area.

<< 16 USCA § 1132 NOTE >>

SEC. 328. Renaming of Wilderness Area.

 (a) The Columbia Wilderness, created by the Oregon Wilderness Act of 1984, Public Law 98–328, located in the Mt. Hood National Forest, Oregon, shall be known and designated as the "Mark O. Hatfield Wilderness".
 (b) Any references in a law, map, regulation, document, paper, or other record of the United States to the Columbia Wilderness shall be deemed to be a reference to the "Mark O. Hatfield Wilderness".
 SEC. 329. Notwithstanding any other provision of law, for fiscal year 1997 the Secretaries of Agriculture and Interior are authorized to limit competition for watershed restoration project contracts as part of the "Jobs in the Woods" component of the President's Forest Plan for the Pacific Northwest to individuals and entities in historically timber-dependent areas in the States of Washington, Oregon, and northern California that have been affected by reduced timber harvesting on Federal lands.

<< 25 USCA § 1708 >>

SEC. 330. Section 9 of the Rhode Island Indian Claims Settlement Act (25 U.S.C. 1708) is amended—
  (1) by striking "Sec. 9. Except as"; and inserting the following:
 "(a) In General.—Except as";
  (2) by striking the section heading and inserting the following:
 "Sec. 9. Applicability of State Law; Treatment of Settlement Lands Under the Indian Gaming Regulatory Act."; and
  (3) by adding at the end the following new subsection:
 "(b) Treatment of Settlement Lands Under the Indian Gaming Regulatory Act.—For purposes of the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.), settlement lands shall not be treated as Indian lands.".

TITLE IV—EMERGENCY APPROPRIATIONS

DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANAGEMENT OF LANDS AND RESOURCES

 For an additional amount for management of lands and resources, $3,500,000, to remain available until expended, to restore public lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

WILDLAND FIRE MANAGEMENT

 For an additional amount for wildland fire management, $100,000,000, to remain available until expended, for emergency rehabilitation and wildfire suppression activities of the Department of the Interior: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget

request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## OREGON AND CALIFORNIA GRANT LANDS

For an additional amount for Oregon and California grant lands, $2,500,000, to remain available until expended, to restore public lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### United States Fish and Wildlife Service

## RESOURCE MANAGEMENT

For an additional amount for resource management, $2,100,000, to remain available until expended, of which $600,000 is to restore public lands damaged by fire and $1,500,000 is address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## CONSTRUCTION

For an additional amount for construction, $15,891,000, to remain available until expended, to repair damage caused by hurricanes, floods and other acts of nature: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### NATIONAL PARK SERVICE

## OPERATION OF THE NATIONAL PARK SYSTEM

For an additional amount for operation of the National park system, $2,300,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## CONSTRUCTION

For an additional amount for construction, $9,300,000, to remain available until expended, of which $3,000,000 is to repair damage caused by hurricanes and $6,300,000 is to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### UNITED STATES GEOLOGICAL SURVEY

### SURVEYS, INVESTIGATIONS, AND RESEARCH

For an additional amount for surveys, investigations, and research, $1,138,000, to remain available until expended, to address damage caused by hurricanes and floods: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## BUREAU OF INDIAN AFFAIRS

### OPERATION OF INDIAN PROGRAMS

For an additional amount for operation of Indian programs, $6,600,000, to remain available until expended, to repair damage caused by floods and to restore Indian lands damaged by fire: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### CONSTRUCTION

For an additional amount for construction, $6,000,000, to remain available until expended, to repair damage caused by floods: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

## DEPARTMENT OF AGRICULTURE

### FOREST SERVICE

### NATIONAL FOREST SYSTEM

For an additional amount for the National Forest System, $3,395,000, to remain available until expended, to repair damage caused by hurricanes: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### WILDLAND FIRE MANAGEMENT

For an additional amount for wildland fire management, $550,000,000, to remain available until expended, for presuppression due to emergencies for emergency fire suppression on or adjacent to National Forest System lands or other lands under fire protection agreement and for emergency rehabilitation of burned over National Forest System lands: Provided, That such funds are available for repayment of advances from other appropriations accounts previously transferred for such purposes: Provided further, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### RECONSTRUCTION AND CONSTRUCTION

For an additional amount for reconstruction and construction, $5,210,000, to remain available until expended, to repair damage caused by hurricanes: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section

251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### OTHER RELATED AGENCIES

### SMITHSONIAN INSTITUTION

#### SALARIES AND EXPENSES

For an additional amount for salaries and expenses, $935,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS

#### OPERATIONS AND MAINTENANCE

For an additional amount for operations and maintenance, $1,600,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

#### CONSTRUCTION

For an additional amount for construction, $3,400,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### NATIONAL GALLERY OF ART

#### SALARIES AND EXPENSES

For an additional amount for salaries and expenses, $382,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

### UNITED STATES HOLOCAUST MEMORIAL COUNCIL

#### HOLOCAUST MEMORIAL COUNCIL

For an additional amount for the Holocaust Memorial Council, $1,000,000, to remain available until expended, to address anti-terrorism requirements: Provided, That Congress hereby designates this amount as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended: Provided further, That this amount shall be available only to the extent that an official budget request for a specific dollar amount, that includes

designation of the entire amount as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, is transmitted by the President to the Congress.

This Act may be cited as the "Department of the Interior and Related Agencies Appropriations Act, 1997".

(e) For programs, projects or activities in the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

Making appropriations for the Departments of Labor, Health and Human Services, and Education, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

TITLE I—DEPARTMENT OF LABOR

EMPLOYMENT AND TRAINING ADMINISTRATION

TRAINING AND EMPLOYMENT SERVICES

<< 29 USCA § 1732 NOTE >>

For expenses necessary to carry into effect the Job Training Partnership Act, as amended, including the purchase and hire of passenger motor vehicles, the construction, alteration, and repair of buildings and other facilities, and the purchase of real property for training centers as authorized by the Job Training Partnership Act; the Women in Apprenticeship and Nontraditional Occupations Act; the National Skill Standards Act of 1994; and the School-to-Work Opportunities Act; $4,719,703,000 plus reimbursements, of which $3,559,408,000 is available for obligation for the period July 1, 1997 through June 30, 1998; of which $88,685,000 is available for the period July 1, 1997 through June 30, 2000 for necessary expenses of construction, rehabilitation, and acquisition of Job Corps centers; and of which $200,000,000 shall be available from July 1, 1997 through September 30, 1998, for carrying out activities of the School-to-Work Opportunities Act: Provided, That $52,502,000 shall be for carrying out section 401 of the Job Training Partnership Act, $69,285,000 shall be for carrying out section 402 of such Act, $7,300,000 shall be for carrying out section 441 of such Act, $8,000,000 shall be for all activities conducted by and through the National Occupational Information Coordinating Committee under such Act, $895,000,000 shall be for carrying out title II, part A of such Act, and $126,672,000 shall be for carrying out title II, part C of such Act: Provided further, That no funds from any other appropriation shall be used to provide meal services at or for Job Corps centers: Provided further, That funds provided to carry out title III of the Job Training Partnership Act shall not be subject to the limitation contained in subsection (b) of section 315 of such Act; that the waiver allowing a reduction in the cost limitation relating to retraining services described in subsection (a)(2) of such section 315 may be granted with respect to funds from this Act if a substate grantee demonstrates to the Governor that such waiver is appropriate due to the availability of low-cost retraining services, is necessary to facilitate the provision of needs-related payments to accompany long-term training, or is necessary to facilitate the provision of appropriate basic readjustment services; and that funds provided to carry out the Secretary's discretionary grants under part B of such title III may be used to provide needs-related payments to participants who, in lieu of meeting the requirements relating to enrollment in training under section 314(e) of such Act, are enrolled in training by the end of the sixth week after grant funds have been awarded: Provided further, That service delivery areas may transfer funding provided herein under authority of titles II–B and II–C of the Job Training Partnership Act between the programs authorized by those titles of that Act, if such transfer is approved by the Governor: Provided further, That service delivery areas and substate areas may transfer up to 20 percent of the funding provided herein under authority of title II–A and title III of the Job Training Partnership Act between the programs authorized by those titles of the Act, if such transfer is approved by the Governor: Provided further, That, notwithstanding any other provision of law, any proceeds from the sale of Job Corps center facilities shall be retained by the Secretary of Labor to carry out the Job Corps program: Provided further, That notwithstanding any other provision of law, the Secretary of Labor may waive any of the statutory or regulatory requirements of titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, worker rights, participation and protection, grievance procedures and judicial review, nondiscrimination, allocation of funds to local areas, eligibility, review and approval of plans, the establishment and functions of service delivery areas and private industry councils, and the basic purposes of the Act), and any of the statutory or regulatory requirements

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), only for funds available for expenditure in program year 1997, pursuant to a request submitted by a State which identifies the statutory or regulatory requirements that are requested to be waived and the goals which the State or local service delivery areas intend to achieve, describes the actions that the State or local service delivery areas have undertaken to remove State or local statutory or regulatory barriers, describes the goals of the waiver and the expected programmatic outcomes if the request is granted, describes the individuals impacted by the waiver, and describes the process used to monitor the progress in implementing a waiver, and for which notice and an opportunity to comment on such request has been provided to the organizations identified in section 105(a)(1) of the Job Training Partnership Act, if and only to the extent that the Secretary determines that such requirements impede the ability of the State to implement a plan to improve the workforce development system and the State has executed a Memorandum of Understanding with the Secretary requiring such State to meet agreed upon outcomes and implement other appropriate measures to ensure accountability: Provided further, That the Secretary of Labor shall establish a workforce flexibility (work-flex) partnership demonstration program under which the Secretary shall authorize not more than six States, of which at least three States shall each have populations not in excess of 3,500,000, with a preference given to those States that have been designated Ed–Flex Partnership States under section 311(e) of Public Law 103–227, to waive any statutory or regulatory requirement applicable to service delivery areas or substate areas within the State under titles I–III of the Job Training Partnership Act (except for requirements relating to wage and labor standards, grievance procedures and judicial review, nondiscrimination, allotment of funds, and eligibility), and any of the statutory or regulatory requirements of sections 8–10 of the Wagner–Peyser Act (except for requirements relating to the provision of services to unemployment insurance claimants and veterans, and to universal access to basic labor exchange services without cost to job seekers), for a duration not to exceed the waiver period authorized under section 311(e) of Public Law 103–227, pursuant to a plan submitted by such States and approved by the Secretary for the provision of workforce employment and training activities in the States, which includes a description of the process by which service delivery areas and substate areas may apply for and have waivers approved by the State, the requirements of the Wagner–Peyser Act to be waived, the outcomes to be achieved and other measures to be taken to ensure appropriate accountability for federal funds.

## COMMUNITY SERVICE EMPLOYMENT FOR OLDER AMERICANS

### (TRANSFER OF FUNDS)

To carry out the activities for national grants or contracts with public agencies and public or private nonprofit organizations under paragraph (1)(A) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $361,140,000, including $21,840,000 which shall be available for the period ending June 30, 1997.

To carry out the activities for grants to States under paragraph (3) of section 506(a) of title V of the Older Americans Act of 1965, as amended, or to carry out older worker activities as subsequently authorized, $101,860,000, including $6,160,000 which shall be available for the period ending June 30, 1997.

The funds appropriated under this heading shall be transferred to the Department of Health and Human Services, "Aging Services Programs" following the enactment of legislation authorizing the administration of the program by that Department.

## FEDERAL UNEMPLOYMENT BENEFITS AND ALLOWANCES

For payments during the current fiscal year of trade adjustment benefit payments and allowances under part I, and for training, for allowances for job search and relocation, and for related State administrative expenses under part II, subchapters B and D, chapter 2, title II of the Trade Act of 1974, as amended, $324,500,000, together with such amounts as may be necessary to be charged to the subsequent appropriation for payments for any period subsequent to September 15 of the current year.

## STATE UNEMPLOYMENT INSURANCE AND EMPLOYMENT

### SERVICE OPERATIONS

For authorized administrative expenses, $173,452,000, together with not to exceed $3,146,826,000 (including not to exceed $1,653,000 which may be used for amortization payments to States which had independent retirement plans in their State employment service agencies prior to 1980, and including not to exceed $2,000,000 which may be obligated in contracts with

non-State entities for activities such as occupational and test research activities which benefit the Federal–State Employment Service System), which may be expended from the Employment Security Administration account in the Unemployment Trust Fund including the cost of administering section 1201 of the Small Business Job Protection Act of 1996, section 7(d) of the Wagner–Peyser Act, as amended, the Trade Act of 1974, as amended, the Immigration Act of 1990, and the Immigration and Nationality Act, as amended, and of which the sums available in the allocation for activities authorized by title III of the Social Security Act, as amended (42 U.S.C. 502–504), and the sums available in the allocation for necessary administrative expenses for carrying out 5 U.S.C. 8501–8523, shall be available for obligation by the States through December 31, 1997, except that funds used for automation acquisitions shall be available for obligation by States through September 30, 1999; and of which $23,452,000, together with not to exceed $738,283,000 of the amount which may be expended from said trust fund, shall be available for obligation for the period July 1, 1997 through June 30, 1998, to fund activities under the Act of June 6, 1933, as amended, including the cost of penalty mail authorized under 39 U.S.C. 3202(a)(1)(E) made available to States in lieu of allotments for such purpose, and of which $216,333,000 shall be available only to the extent necessary for additional State allocations to administer unemployment compensation laws to finance increases in the number of unemployment insurance claims filed and claims paid or changes in a State law: Provided, That to the extent that the Average Weekly Insured Unemployment (AWIU) for fiscal year 1997 is projected by the Department of Labor to exceed 2,828,000 an additional $28,600,000 shall be available for obligation for every 100,000 increase in the AWIU level (including a pro rata amount for any increment less than 100,000) from the Employment Security Administration Account of the Unemployment Trust Fund: Provided further, That funds appropriated in this Act which are used to establish a national one-stop career center network may be obligated in contracts, grants or agreements with non-State entities: Provided further, That funds appropriated under this Act for activities authorized under the Wagner–Peyser Act, as amended, and title III of the Social Security Act, may be used by the States to fund integrated Employment Service and Unemployment Insurance automation efforts, notwithstanding cost allocation principles prescribed under Office of Management and Budget Circular A–87.

### ADVANCES TO THE UNEMPLOYMENT TRUST FUND AND OTHER FUNDS

For repayable advances to the Unemployment Trust Fund as authorized by sections 905(d) and 1203 of the Social Security Act, as amended, and to the Black Lung Disability Trust Fund as authorized by section 9501(c)(1) of the Internal Revenue Code of 1954, as amended; and for nonrepayable advances to the Unemployment Trust Fund as authorized by section 8509 of title 5, United States Code, section 104(d) of Public Law 102–164, and section 5 of Public Law 103–6, and to the "Federal unemployment benefits and allowances" account, to remain available until September 30, 1998, $373,000,000.

In addition, for making repayable advances to the Black Lung Disability Trust Fund in the current fiscal year after September 15, 1997, for costs incurred by the Black Lung Disability Trust Fund in the current fiscal year, such sums as may be necessary.

### PROGRAM ADMINISTRATION

For expenses of administering employment and training programs and for carrying out section 908 of the Social Security Act, $81,393,000, together with not to exceed $39,977,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

### PENSION AND WELFARE BENEFITS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for Pension and Welfare Benefits Administration, $77,083,000, of which $6,000,000 shall remain available through September 30, 1998 for expenses of revising the processing of employee benefit plan returns.

### PENSION BENEFIT GUARANTY CORPORATION

### PENSION BENEFIT GUARANTY CORPORATION FUND

The Pension Benefit Guaranty Corporation is authorized to make such expenditures, including financial assistance authorized by section 104 of Public Law 96–364, within limits of funds and borrowing authority available to such Corporation, and in accord with law, and to make such contracts and commitments without regard to fiscal year limitations as provided by section 104 of the Government Corporation Control Act, as amended (31 U.S.C. 9104), as may be necessary in carrying out the program through September 30, 1997, for such Corporation: Provided, That not to exceed $10,345,000 shall be available for administrative

expenses of the Corporation: Provided further, That expenses of such Corporation in connection with the termination of pension plans, for the acquisition, protection or management, and investment of trust assets, and for benefits administration services shall be considered as non-administrative expenses for the purposes hereof, and excluded from the above limitation.

## EMPLOYMENT STANDARDS ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses for the Employment Standards Administration, including reimbursement to State, Federal, and local agencies and their employees for inspection services rendered, $290,422,000, together with $983,000 which may be expended from the Special Fund in accordance with sections 39(c) and 44(j) of the Longshore and Harbor Workers' Compensation Act: Provided, That the Secretary of Labor is authorized to accept, retain, and spend, until expended, in the name of the Department of Labor, all sums of money ordered to be paid to the Secretary of Labor, in accordance with the terms of the Consent Judgment in Civil Action No. 91–0027 of the United States District Court for the District of the Northern Mariana Islands (May 21, 1992): Provided further, That the Secretary of Labor is authorized to establish and, in accordance with 31 U.S.C. 3302, collect and deposit in the Treasury fees for processing applications and issuing certificates under sections 11(d) and 14 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 211(d) and 214) and for processing applications and issuing registrations under Title I of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. 1801 et seq.

### SPECIAL BENEFITS

### (INCLUDING TRANSFER OF FUNDS)

For the payment of compensation, benefits, and expenses (except administrative expenses) accruing during the current or any prior fiscal year authorized by title 5, chapter 81 of the United States Code; continuation of benefits as provided for under the head "Civilian War Benefits" in the Federal Security Agency Appropriation Act, 1947; the Employees' Compensation Commission Appropriation Act, 1944; and sections 4(c) and 5(f) of the War Claims Act of 1948 (50 U.S.C.App. 2012); and 50 per centum of the additional compensation and benefits required by section 10(h) of the Longshore and Harbor Workers' Compensation Act, as amended, $213,000,000 together with such amounts as may be necessary to be charged to the subsequent year appropriation for the payment of compensation and other benefits for any period subsequent to August 15 of the current year: Provided, That such sums as are necessary may be used under section 8104 of title 5, United States Code, by the Secretary to reimburse an employer, who is not the employer at the time of injury, for portions of the salary of a reemployed, disabled beneficiary: Provided further, That balances of reimbursements unobligated on September 30, 1996, shall remain available until expended for the payment of compensation, benefits, and expenses: Provided further, That in addition there shall be transferred to this appropriation from the Postal Service and from any other corporation or instrumentality required under section 8147(c) of title 5, United States Code, to pay an amount for its fair share of the cost of administration, such sums as the Secretary of Labor determines to be the cost of administration for employees of such fair share entities through September 30, 1997: Provided further, That of those funds transferred to this account from the fair share entities to pay the cost of administration, $11,390,000 shall be made available to the Secretary of Labor for expenditures relating to capital improvements in support of Federal Employees' Compensation Act administration, and the balance of such funds shall be paid into the Treasury as miscellaneous receipts: Provided further, That the Secretary may require that any person filing a notice of injury or a claim for benefits under Subchapter 5, U.S.C., chapter 81, or under subchapter 33, U.S.C. 901, et seq. (the Longshore and Harbor Workers' Compensation Act, as amended), provide as part of such notice and claim, such identifying information (including Social Security account number) as such regulations may prescribe.

### BLACK LUNG DISABILITY TRUST FUND

### (INCLUDING TRANSFER OF FUNDS)

For payments from the Black Lung Disability Trust Fund, $1,007,644,000, of which $961,665,000 shall be available until September 30, 1998, for payment of all benefits as authorized by section 9501(d)(1), (2), (4), and (7) of the Internal Revenue Code of 1954, as amended, and interest on advances as authorized by section 9501(c)(2) of that Act, and of which $26,071,000 shall be available for transfer to Employment Standards Administration, Salaries and Expenses, $19,621,000 for transfer to Departmental Management, Salaries and Expenses, and $287,000 for transfer to Departmental Management, Office of Inspector

General, for expenses of operation and administration of the Black Lung Benefits program as authorized by section 9501(d) (5)(A) of that Act: Provided, That, in addition, such amounts as may be necessary may be charged to the subsequent year appropriation for the payment of compensation, interest, or other benefits for any period subsequent to August 15 of the current year: Provided further, That in addition such amounts shall be paid from this fund into miscellaneous receipts as the Secretary of the Treasury determines to be the administrative expenses of the Department of the Treasury for administering the fund during the current fiscal year, as authorized by section 9501(d)(5)(B) of that Act.

## OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

### SALARIES AND EXPENSES

<< 29 USCA § 670 NOTE >>

 For necessary expenses for the Occupational Safety and Health Administration, $325,734,000, including not to exceed $77,354,000 which shall be the maximum amount available for grants to States under section 23(g) of the Occupational Safety and Health Act, which grants shall be no less than fifty percent of the costs of State occupational safety and health programs required to be incurred under plans approved by the Secretary under section 18 of the Occupational Safety and Health Act of 1970; and, in addition, notwithstanding 31 U.S.C. 3302, the Occupational Safety and Health Administration may retain up to $750,000 per fiscal year of training institute course tuition fees, otherwise authorized by law to be collected, and may utilize such sums for occupational safety and health training and education grants: Provided, That, notwithstanding 31 U.S.C. 3302, the Secretary of Labor is authorized, during the fiscal year ending September 30, 1997, to collect and retain fees for services provided to Nationally Recognized Testing Laboratories, and may utilize such sums, in accordance with the provisions of 29 U.S.C. 9a, to administer national and international laboratory recognition programs that ensure the safety of equipment and products used by workers in the workplace: Provided further, That none of the funds appropriated under this paragraph shall be obligated or expended to prescribe, issue, administer, or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 which is applicable to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees: Provided further, That no funds appropriated under this paragraph shall be obligated or expended to administer or enforce any standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 with respect to any employer of ten or fewer employees who is included within a category having an occupational injury lost workday case rate, at the most precise Standard Industrial Classification Code for which such data are published, less than the national average rate as such rates are most recently published by the Secretary, acting through the Bureau of Labor Statistics, in accordance with section 24 of that Act (29 U.S.C. 673), except—

  (1) to provide, as authorized by such Act, consultation, technical assistance, educational and training services, and to conduct surveys and studies;

  (2) to conduct an inspection or investigation in response to an employee complaint, to issue a citation for violations found during such inspection, and to assess a penalty for violations which are not corrected within a reasonable abatement period and for any willful violations found;

  (3) to take any action authorized by such Act with respect to imminent dangers;

  (4) to take any action authorized by such Act with respect to health hazards;

  (5) to take any action authorized by such Act with respect to a report of an employment accident which is fatal to one or more employees or which results in hospitalization of two or more employees, and to take any action pursuant to such investigation authorized by such Act; and

  (6) to take any action authorized by such Act with respect to complaints of discrimination against employees for exercising rights under such Act: Provided further, That the foregoing proviso shall not apply to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer employees.

## MINE SAFETY AND HEALTH ADMINISTRATION

### SALARIES AND EXPENSES

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 30 USCA § 962 >>

For necessary expenses for the Mine Safety and Health Administration, $197,810,000, including purchase and bestowal of certificates and trophies in connection with mine rescue and first-aid work, and the hire of passenger motor vehicles; the Secretary is authorized to accept lands, buildings, equipment, and other contributions from public and private sources and to prosecute projects in cooperation with other agencies, Federal, State, or private; the Mine Safety and Health Administration is authorized to promote health and safety education and training in the mining community through cooperative programs with States, industry, and safety associations; and any funds available to the Department may be used, with the approval of the Secretary, to provide for the costs of mine rescue and survival operations in the event of a major disaster: Provided, That none of the funds appropriated under this paragraph shall be obligated or expended to carry out section 115 of the Federal Mine Safety and Health Act of 1977 or to carry out that portion of section 104(g)(1) of such Act relating to the enforcement of any training requirements, with respect to shell dredging, or with respect to any sand, gravel, surface stone, surface clay, colloidal phosphate, or surface limestone mine.

BUREAU OF LABOR STATISTICS

SALARIES AND EXPENSES

For necessary expenses for the Bureau of Labor Statistics, including advances or reimbursements to State, Federal, and local agencies and their employees for services rendered, $309,647,000, of which $16,145,000 shall be for expenses of revising the Consumer Price Index and shall remain available until September 30, 1998, together with not to exceed $52,053,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

DEPARTMENTAL MANAGEMENT

SALARIES AND EXPENSES

<< 33 USCA § 921 NOTE >>

For necessary expenses for Departmental Management, including the hire of three sedans, and including up to $4,358,000 for the President's Committee on Employment of People With Disabilities, $144,211,000; together with not to exceed $297,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund: Provided, That no funds made available by this Act may be used by the Solicitor of Labor to participate in a review in any United States court of appeals of any decision made by the Benefits Review Board under section 21 of the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 921) where such participation is precluded by the decision of the United States Supreme Court in Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding, 115 S.Ct. 1278 (1995): Provided further, That no funds made available by this Act may be used by the Secretary of Labor to review a decision under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. 901 et seq.) that has been appealed and that has been pending before the Benefits Review Board for more than 12 months: Provided further, That any such decision pending a review by the Benefits Review Board for more than one year shall be considered affirmed by the Benefits Review Board on that date, and shall be considered the final order of the Board for purposes of obtaining a review in the United States courts of appeals: Provided further, That these provisions shall not be applicable to the review of any decision issued under the Black Lung Benefits Act (30 U.S.C. 901 et seq.).

ASSISTANT SECRETARY FOR VETERANS EMPLOYMENT AND TRAINING

Not to exceed $181,949,000 may be derived from the Employment Security Administration account in the Unemployment Trust Fund to carry out the provisions of 38 U.S.C. 4100–4110A and 4321–4327, and Public Law 103–353, and which shall be available for obligation by the States through December 31, 1997.

OFFICE OF INSPECTOR GENERAL

For salaries and expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $42,938,000, together with not to exceed $3,543,000, which may be expended from the Employment Security Administration account in the Unemployment Trust Fund.

## GENERAL PROVISIONS

Sec. 101. None of the funds appropriated in this title for the Job Corps shall be used to pay the compensation of an individual, either as direct costs or any proration as an indirect cost, at a rate in excess of $125,000.

## (TRANSFER OF FUNDS)

Sec. 102. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Labor in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

Sec. 103. Funds shall be available for carrying out title IV–B of the Job Training Partnership Act, notwithstanding section 427(c) of that Act, if a Job Corps center fails to meet national performance standards established by the Secretary.

Sec. 104. Effective January 1, 1997, no funds appropriated or otherwise made available to the Department of Labor in this title shall be disbursed without the approval of the Department's Chief Financial Officer or his delegatee.

Sec. 105. Notwithstanding any other provision of law, the Secretary of Labor may waive any of the requirements contained in sections 4, 104, 105, 107, 108, 121, 164, 204, 253, 254, 264, 301, 311, 313, 314, and 315 of the Job Training Partnership Act in order to assist States in improving State workforce development systems, pursuant to a request submitted by a State that has prior to the date of enactment of this Act executed a Memorandum of Understanding with the United States requiring such State to meet agreed upon outcomes.

This title may be cited as the "Department of Labor Appropriations Act, 1997".

## TITLE II—DEPARTMENT OF HEALTH AND HUMAN SERVICES

## HEALTH RESOURCES AND SERVICES ADMINISTRATION

## HEALTH RESOURCES AND SERVICES

For carrying out titles II, III, VII, VIII, X, XII, XVI, XIX, and XXVI of the Public Health Service Act, section 427(a) of the Federal Coal Mine Health and Safety Act, title V of the Social Security Act, the Health Care Quality Improvement Act of 1986, as amended, and the Native Hawaiian Health Care Act of 1988, as amended, $3,405,019,000, of which $297,000 shall remain available until expended for interest subsidies on loan guarantees made prior to fiscal year 1981 under part B of title VII of the Public Health Service Act: Provided, That the Division of Federal Occupational Health may utilize personal services contracting to employ professional management/administrative and occupational health professionals: Provided further, That of the funds made available under this heading, $828,000 shall be available until expended for facilities renovations at the Gillis W. Long Hansen's Disease Center: Provided further, That in addition to fees authorized by section 427(b) of the Health Care Quality Improvement Act of 1986, fees shall be collected for the full disclosure of information under the Act sufficient to recover the full costs of operating the National Practitioner Data Bank, and shall remain available until expended to carry out that Act: Provided further, That no more than $5,000,000 is available for carrying out the provisions of Public Law 104–73: Provided further, That of the funds made available under this heading, $198,452,000 shall be for the program under title X of the Public Health Service Act to provide for voluntary family planning projects: Provided further, That amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office: Provided further, That $167,000,000 shall be for State AIDS Drug Assistance Programs authorized by section 2616 of the Public Health Service Act and shall be distributed to States as authorized by section 2618(b)(2) of such Act: Provided further, That notwithstanding any other provision of law, funds made available under this heading may be used to continue operating the Council on Graduate Medical Education established by section 301 of Public Law 102–408: Provided further, That, of the funds made available under this heading, not more than $8,000,000 shall be made available and shall remain available until expended for loan guarantees for loans made by non-Federal lenders for the construction, renovation, and modernization of medical facilities that are owned

and operated by health centers funded under part A of title XVI of the Public Health Service Act as amended, and, subject to authorization, for loans made to health centers for the costs of developing and operating managed care networks or plans, and that such funds be available to subsidize guarantees of total loan principal in an amount not to exceed $80,000,000: Provided further, That notwithstanding section 502(a)(1) of the Social Security Act, not to exceed $103,609,000 is available for carrying out special projects of regional and national significance pursuant to section 501(a)(2) of such Act.

## MEDICAL FACILITIES GUARANTEE AND LOAN FUND

### FEDERAL INTEREST SUBSIDIES FOR MEDICAL FACILITIES

For carrying out subsections (d) and (e) of section 1602 of the Public Health Service Act, $7,000,000, together with any amounts received by the Secretary in connection with loans and loan guarantees under title VI of the Public Health Service Act, to be available without fiscal year limitation for the payment of interest subsidies. During the fiscal year, no commitments for direct loans or loan guarantees shall be made.

### HEALTH EDUCATION ASSISTANCE LOANS PROGRAM

For the cost of guaranteed loans, such sums as may be necessary to carry out the purpose of the program, as authorized by title VII of the Public Health Service Act, as amended: Provided, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: Provided further, That these funds are available to subsidize gross obligations for the total loan principal any part of which is to be guaranteed at not to exceed $140,000,000. In addition, for administrative expenses to carry out the guaranteed loan program, $2,688,000.

### VACCINE INJURY COMPENSATION PROGRAM TRUST FUND

For payments from the Vaccine Injury Compensation Program Trust Fund, such sums as may be necessary for claims associated with vaccine-related injury or death with respect to vaccines administered after September 30, 1988, pursuant to subtitle 2 of title XXI of the Public Health Service Act, to remain available until expended: Provided, That for necessary administrative expenses, not to exceed $3,000,000 shall be available from the Trust Fund to the Secretary of Health and Human Services.

### VACCINE INJURY COMPENSATION

For payment of claims resolved by the United States Court of Federal Claims related to the administration of vaccines before October 1, 1988, $110,000,000, to remain available until expended.

## CENTERS FOR DISEASE CONTROL AND PREVENTION

### DISEASE CONTROL, RESEARCH, AND TRAINING

<< 30 USCA § 1 NOTE >>

To carry out titles II, III, VII, XI, XV, XVII, and XIX of the Public Health Service Act, sections 101, 102, 103, 201, 202, 203, 301, and 501 of the Federal Mine Safety and Health Act of 1977, and sections 20, 21 and 22 of the Occupational Safety and Health Act of 1970, title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980; including insurance of official motor vehicles in foreign countries; and hire, maintenance, and operation of aircraft, $2,262,698,000, of which $30,553,000 shall remain available until expended for equipment and construction and renovation of facilities, and of which $32,000,000 shall remain available until September 30, 1998 for mine safety and health activities, and in addition, such sums as may be derived from authorized user fees, which shall be credited to this account: Provided, That in addition to amounts provided herein, up to $48,400,000 shall be available from amounts available under section 241 of the Public Health Service Act, to carry out the National Center for Health Statistics surveys: Provided further, That none of the funds made available for injury prevention and control at the Centers for Disease Control and Prevention may be used to advocate or promote gun control: Provided further, That the Director may redirect the total amount made available under authority of Public Law 101–502, section 3, dated November 3, 1990, to activities the Director may so designate: Provided further, That the Congress is to be notified promptly of any such transfer: Provided further, That the functions described in clause (1) of the first proviso under the subheading "mines and minerals" under the heading "Bureau of Mines" in the text of title I of the Department of the Interior and Related Agencies Appropriations Act, 1996, as enacted by section 101(c) of

the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134), are hereby transferred to, and vested in, the Secretary of Health and Human Services, subject to section 1531 of title 31, United States Code: Provided further, That of the amount provided, $23,000,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

 In addition, $41,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40151 and 40261 of Public Law 103–322.

### NATIONAL INSTITUTES OF HEALTH

#### NATIONAL CANCER INSTITUTE

For carrying out section 301 and title IV of the Public Health Service Act with respect to cancer, $2,382,532,000.

#### NATIONAL HEART, LUNG, AND BLOOD INSTITUTE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to cardiovascular, lung, and blood diseases, and blood and blood products, $1,433,001,000.

#### NATIONAL INSTITUTE OF DENTAL RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to dental disease, $195,997,000.

#### NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to diabetes and digestive and kidney disease, $815,982,000.

#### NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to neurological disorders and stroke, $726,746,000.

#### NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to allergy and infectious diseases, $1,257,234,000.

#### NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to general medical sciences, $998,470,000.

#### NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT

 For carrying out section 301 and title IV of the Public Health Service Act with respect to child health and human development, $631,703,000.

#### NATIONAL EYE INSTITUTE

 For carrying out section 301 and title IV of the Public Health Service Act with respect to eye diseases and visual disorders, $332,735,000.

#### NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES

 For carrying out sections 301 and 311 and title IV of the Public Health Service Act with respect to environmental health sciences, $308,819,000.

#### NATIONAL INSTITUTE ON AGING

For carrying out section 301 and title IV of the Public Health Service Act with respect to aging, $486,047,000.

#### NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES

 For carrying out section 301 and title IV of the Public Health Service Act with respect to arthritis and musculoskeletal and skin diseases, $257,111,000.

### NATIONAL INSTITUTE ON DEAFNESS AND OTHER COMMUNICATION DISORDERS

For carrying out section 301 and title IV of the Public Health Service Act with respect to deafness and other communication disorders, $188,422,000.

### NATIONAL INSTITUTE OF NURSING RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to nursing research, $59,743,000.

### NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM

For carrying out section 301 and title IV of the Public Health Service Act with respect to alcohol abuse and alcoholism, $212,004,000.

### NATIONAL INSTITUTE ON DRUG ABUSE

For carrying out section 301 and title IV of the Public Health Service Act with respect to drug abuse, $489,375,000.

### NATIONAL INSTITUTE OF MENTAL HEALTH

For carrying out section 301 and title IV of the Public Health Service Act with respect to mental health, $701,585,000.

### NATIONAL CENTER FOR RESEARCH RESOURCES

For carrying out section 301 and title IV of the Public Health Service Act with respect to research resources and general research support grants, $415,145,000: Provided, That none of these funds shall be used to pay recipients of the general research support grants program any amount for indirect expenses in connection with such grants: Provided further, That $20,000,000 shall be for extramural facilities construction grants.

### NATIONAL CENTER FOR HUMAN GENOME RESEARCH

For carrying out section 301 and title IV of the Public Health Service Act with respect to human genome research, $189,657,000.

### JOHN E. FOGARTY INTERNATIONAL CENTER

For carrying out the activities at the John E. Fogarty International Center, $26,586,000.

### NATIONAL LIBRARY OF MEDICINE

For carrying out section 301 and title IV of the Public Health Service Act with respect to health information communications, $151,103,000, of which $4,000,000 shall be available until expended for improvement of information systems: Provided, That in fiscal year 1997, the Library may enter into personal services contracts for the provision of services in facilities owned, operated, or constructed under the jurisdiction of the National Institutes of Health.

### OFFICE OF THE DIRECTOR

### (INCLUDING TRANSFER OF FUNDS)

For carrying out the responsibilities of the Office of the Director, National Institutes of Health, $287,206,000, of which $35,589,000 shall be for the Office of AIDS Research: Provided, That funding shall be available for the purchase of not to exceed five passenger motor vehicles for replacement only: Provided further, That the Director may direct up to 1 percent of the total amount made available in this Act to all National Institutes of Health appropriations to activities the Director may so designate: Provided further, That no such appropriation shall be increased or decreased by more than 1 percent by any such transfers and that the Congress is promptly notified of the transfer: Provided further, That NIH is authorized to collect third party payments for the cost of clinical services that are incurred in National Institutes of Health research facilities and that such payments shall be credited to the National Institutes of Health Management Fund: Provided further, That all funds credited to the NIH Management Fund shall remain available for one fiscal year after the fiscal year in which they are deposited: Provided further, That up to $200,000 shall be available to carry out section 499 of the Public Health Service Act.

### BUILDINGS AND FACILITIES

For the study of, construction of, and acquisition of equipment for, facilities of or used by the National Institutes of Health, including the acquisition of real property, $200,000,000, to remain available until expended, of which $90,000,000 shall be for the clinical research center: Provided, That, notwithstanding any other provision of law, a single contract or related contracts for the development and construction of the clinical research center may be employed which collectively include the full scope of the project: Provided further, That the solicitation and contract shall contain the clause "availability of funds" found at 48 CFR 52.232–18.

## SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION

### SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES

For carrying out titles V and XIX of the Public Health Service Act with respect to substance abuse and mental health services, the Protection and Advocacy for Mentally Ill Individuals Act of 1986, section 30401 of Public Law 103–322 and section 301 of the Public Health Service Act with respect to program management, $2,134,743,000, of which $5,000,000 shall be for grants to rural and Native American projects and $12,800,000 shall be for activities authorized by section 30401 of Public Law 103–322.

### RETIREMENT PAY AND MEDICAL BENEFITS FOR COMMISSIONED OFFICERS

For retirement pay and medical benefits of Public Health Service Commissioned Officers as authorized by law, and for payments under the Retired Serviceman's Family Protection Plan and Survivor Benefit Plan and for medical care of dependents and retired personnel under the Dependents' Medical Care Act (10 U.S.C. ch. 55), and for payments pursuant to section 229(b) of the Social Security Act (42 U.S.C. 429(b)), such amounts as may be required during the current fiscal year.

## AGENCY FOR HEALTH CARE POLICY AND RESEARCH

### HEALTH CARE POLICY AND RESEARCH

For carrying out titles III and IX of the Public Health Service Act, and part A of title XI of the Social Security Act, $96,175,000; in addition, amounts received from Freedom of Information Act fees, reimbursable and interagency agreements, and the sale of data tapes shall be credited to this appropriation and shall remain available until expended: Provided, That the amount made available pursuant to section 926(b) of the Public Health Service Act shall not exceed $47,412,000.

## HEALTH CARE FINANCING ADMINISTRATION

### GRANTS TO STATES FOR MEDICAID

For carrying out, except as otherwise provided, titles XI and XIX of the Social Security Act, $75,056,618,000, to remain available until expended.

For making, after May 31, 1997, payments to States under title XIX of the Social Security Act for the last quarter of fiscal year 1997 for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States under title XIX of the Social Security Act for the first quarter of fiscal year 1998, $27,988,993,000, to remain available until expended.

Payment under title XIX may be made for any quarter with respect to a State plan or plan amendment in effect during such quarter, if submitted in or prior to such quarter and approved in that or any subsequent quarter.

### PAYMENTS TO HEALTH CARE TRUST FUNDS

For payment to the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as provided under sections 217(g) and 1844 of the Social Security Act, sections 103(c) and 111(d) of the Social Security Amendments of 1965, section 278(d) of Public Law 97–248, and for administrative expenses incurred pursuant to section 201(g) of the Social Security Act, $60,079,000,000.

### PROGRAM MANAGEMENT

For carrying out, except as otherwise provided, titles XI, XVIII, and XIX of the Social Security Act, title XIII of the Public Health Service Act, and the Clinical Laboratory Improvement Amendments of 1988, not to exceed $1,735,125,000 to be transferred from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the Public Health

Service Act, the latter funds to remain available until expended, together with such sums as may be collected from authorized user fees and the sale of data, which shall remain available until expended: Provided, That all funds derived in accordance with 31 U.S.C. 9701 from organizations established under title XIII of the Public Health Service Act are to be credited to and available for carrying out the purposes of this appropriation.

### HEALTH MAINTENANCE ORGANIZATION LOAN AND LOAN GUARANTEE FUND

For carrying out subsections (d) and (e) of section 1308 of the Public Health Service Act, any amounts received by the Secretary in connection with loans and loan guarantees under title XIII of the Public Health Service Act, to be available without fiscal year limitation for the payment of outstanding obligations. During fiscal year 1997, no commitments for direct loans or loan guarantees shall be made.

### ADMINISTRATION FOR CHILDREN AND FAMILIES

### FAMILY SUPPORT PAYMENTS TO STATES

For making payments of such sums as necessary to each State for carrying out the program of Aid to Families with Dependent Children under title IV–A of the Social Security Act in fiscal year 1997 before the effective date of the program of Temporary Assistance to Needy Families (TANF) with respect to such State: Provided, That the sum of the amounts available to a State with respect to expenditures under such title IV–A in fiscal year 1997 under this appropriation and under such title IV–A as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 shall not exceed the limitations under section 116(b) of such Act.

For making payments to States for carrying out title IV–A (other than section 402(g)(6)) of the Social Security Act in calendar quarters prior to October 1, 1996, such sums as may be necessary.

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9), $2,158,000,000 to remain available until expended.

For making, after May 31 of the current fiscal year, payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act, for the last three months of the current year for unanticipated costs, incurred for the current fiscal year, such sums as may be necessary.

For making payments to States or other non-Federal entities under titles I, IV–D, X, XI, XIV, and XVI of the Social Security Act and the Act of July 5, 1960 (24 U.S.C. ch. 9) for the first quarter of fiscal year 1998, $607,000,000, to remain available until expended.

### JOB OPPORTUNITIES AND BASIC SKILLS

For carrying out aid to families with dependent children work programs, as authorized by part F of title IV of the Social Security Act, $1,000,000,000.

### LOW INCOME HOME ENERGY ASSISTANCE

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,000,000,000.

For making payments under title XXVI of the Omnibus Budget Reconciliation Act of 1981, $1,000,000,000, to be available for obligation in the period October 1, 1997 through September 30, 1998.

### REFUGEE AND ENTRANT ASSISTANCE

For making payments for refugee and entrant assistance activities authorized by title IV of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 (Public Law 96–422), $412,076,000: Provided, That funds appropriated pursuant to section 414(a) of the Immigration and Nationality Act under Public Law 103–333 for fiscal year 1995 shall be available for the costs of assistance provided and other activities conducted in such year and in fiscal years 1996 and 1997.

### CHILD CARE AND DEVELOPMENT BLOCK GRANT

### (INCLUDING TRANSFER OF FUNDS)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For carrying out sections 658A through 658R of the Omnibus Budget Reconciliation Act of 1981 (The Child Care and Development Block Grant Act of 1990), $956,120,000, of which $937,000,000 shall become available on October 1, 1997 and shall remain available through September 30, 1998: Provided, That $19,120,000 shall become available for obligation on October 1, 1996 for child care resource and referral and school-age child care activities, of which $6,120,000 shall be derived from an amount that shall be transferred from the amount appropriated under section 452(j) of the Social Security Act (42 U.S.C. 652(j)) for fiscal year 1996 and remaining available for expenditure.

## SOCIAL SERVICES BLOCK GRANT

For making grants to States pursuant to section 2002 of the Social Security Act, $2,500,000,000: Provided, That notwithstanding section 2003(c) of such Act, as amended, the amount specified for allocation under such section for fiscal year 1997 shall be $2,500,000,000.

## CHILDREN AND FAMILIES SERVICES PROGRAMS

### (INCLUDING RESCISSIONS)

For carrying out, except as otherwise provided, the Runaway and Homeless Youth Act, the Developmental Disabilities Assistance and Bill of Rights Act, the Head Start Act, the Child Abuse Prevention and Treatment Act, the Temporary Child Care for Children with Disabilities and Crisis Nurseries Act of 1986, section 429A, part B of title IV of the Social Security Act, section 413 of the Social Security Act, the Family Violence Prevention and Services Act, the Native American Programs Act of 1974, title II of Public Law 95–266 (adoption opportunities), the Abandoned Infants Assistance Act of 1988, and part B(1) of title IV of the Social Security Act; for making payments under the Community Services Block Grant Act; and for necessary administrative expenses to carry out said Acts and titles I, IV, X, XI, XIV, XVI, and XX of the Social Security Act, the Act of July 5, 1960 (24 U.S.C. ch. 9), the Omnibus Budget Reconciliation Act of 1981, title IV of the Immigration and Nationality Act, section 501 of the Refugee Education Assistance Act of 1980, and section 126 and titles IV and V of Public Law 100–485, $5,363,569,000, of which $536,432,000 shall be for making payments under the Community Services Block Grant Act: Provided, That to the extent Community Services Block Grant funds are distributed as grant funds by a State to an eligible entity as provided under the Act, and have not been expended by such entity, they shall remain with such entity for carryover into the next fiscal year for expenditure by such entity consistent with program purposes: Provided further, That of the amount appropriated for fiscal year 1997 under section 672(a) of the Community Services Block Grant Act, the Secretary shall use up to one percent of the funds available to correct allocation errors that occurred in fiscal year 1995 and fiscal year 1996 to ensure that the minimum allotment to each State for each of fiscal years 1995 and 1996 would be $2,222,460: Provided further, That no more than one-half of one percent of the funds available under section 672(a) shall be used for the purposes of section 674(a) of the Community Services Block Grant Act.

In addition, $20,000,000, to be derived from the Violent Crime Reduction Trust Fund, for carrying out sections 40155, 40211 and 40241 of Public Law 103–322.

Funds appropriated for fiscal year 1996 and fiscal year 1997 under section 429A(e), part B of title IV of the Social Security Act shall be reduced by $6,000,000 in each such year.

Funds appropriated for fiscal year 1997 under section 413(h)(1) of the Social Security Act shall be reduced by $15,000,000.

## FAMILY PRESERVATION AND SUPPORT

For carrying out section 430 of the Social Security Act, $240,000,000.

## PAYMENTS TO STATES FOR FOSTER CARE AND ADOPTION ASSISTANCE

For making payments to States or other non-Federal entities, under title IV–E of the Social Security Act, $4,445,031,000.

For making payments to States or other non-Federal entities, under title IV–E of the Social Security Act, for the first quarter of fiscal year 1998, $1,111,000,000.

## ADMINISTRATION ON AGING

## AGING SERVICES PROGRAMS

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For carrying out, to the extent not otherwise provided, the Older Americans Act of 1965, as amended, $830,168,000: Provided, That notwithstanding section 308(b)(1) of such Act, the amounts available to each State for administration of the State plan under title III of such Act shall be reduced not more than 5 percent below the amount that was available to such State for such purpose for fiscal year 1995: Provided further, That in considering grant applications for nutrition services for elder Indian recipients, the Assistant Secretary shall provide maximum flexibility to applicants who seek to take into account subsistence, local customs and other characteristics that are appropriate to the unique cultural, regional and geographic needs of the American Indian, Alaskan and Hawaiian native communities to be served.

## OFFICE OF THE SECRETARY

### GENERAL DEPARTMENTAL MANAGEMENT

For necessary expenses, not otherwise provided, for general departmental management, including hire of six sedans, and for carrying out titles III, XVII, and XX of the Public Health Service Act, $174,523,000, together with $5,851,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund: Provided, That of the funds made available under this heading for carrying out title XVII of the Public Health Service Act, $11,500,000 shall be available until expended for extramural construction: Provided further, That notwithstanding section 2010(b) and (c) under title XX of the Public Health Service Act, as amended, of the funds made available under this heading, $10,879,000 shall be for activities specified under section 2003(b)(2) of title XX of the Public Health Service Act, as amended, and of which $9,011,000 shall be for prevention grants under section 510(b)(2) of title V of the Social Security Act, as amended: Provided further, That of the amount provided, $5,775,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $32,999,000, together with any funds, to remain available until expended, that represent the equitable share from the forfeiture of property in investigations in which the Office of Inspector General participated, and which are transferred to the Office of Inspector General by the Department of Justice, the Department of the Treasury, or the United States Postal Service.

### OFFICE FOR CIVIL RIGHTS

For expenses necessary for the Office for Civil Rights, $16,216,000, together with not to exceed $3,314,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Hospital Insurance Trust Fund and the Supplemental Medical Insurance Trust Fund.

### POLICY RESEARCH

For carrying out, to the extent not otherwise provided, research studies under section 1110 of the Social Security Act and section 301(l) of Public Law 104–191, $18,500,000: Provided, That $9,500,000, to remain available until September 30, 1998, shall be for carrying out section 301(l) of Public Law 104–191.

### GENERAL PROVISIONS

Sec. 201. Funds appropriated in this title shall be available for not to exceed $37,000 for official reception and representation expenses when specifically approved by the Secretary.

Sec. 202. The Secretary shall make available through assignment not more than 60 employees of the Public Health Service to assist in child survival activities and to work in AIDS programs through and with funds provided by the Agency for International Development, the United Nations International Children's Emergency Fund or the World Health Organization.

Sec. 203. None of the funds appropriated under this Act may be used to implement section 399L(b) of the Public Health Service Act or section 1503 of the National Institutes of Health Revitalization Act of 1993, Public Law 103–43.

Sec. 204. None of the funds made available by this Act may be used to withhold payment to any State under the Child Abuse Prevention and Treatment Act by reason of a determination that the State is not in compliance with section 1340.2(d)(2)(ii) of title 45 of the Code of Federal Regulations. This provision expires upon the date of enactment of the reauthorization of the Child Abuse Prevention and Treatment Act.

Sec. 205. None of the funds appropriated in this Act for the National Institutes of Health and the Substance Abuse and Mental Health Services Administration shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of $125,000 per year.

Sec. 206. None of the funds appropriated in this Act may be expended pursuant to section 241 of the Public Health Service Act, except for funds specifically provided for in this Act, or for other taps and assessments made by any office located in the Department of Health and Human Services, prior to the Secretary's preparation and submission of a report to the Committee on Appropriations of the Senate and of the House detailing the planned uses of such funds.

(TRANSFER OF FUNDS)

Sec. 207. Of the funds appropriated or otherwise made available for the Department of Health and Human Services, General Departmental Management, for fiscal year 1997, the Secretary of Health and Human Services shall transfer to the Office of the Inspector General such sums as may be necessary for any expenses with respect to the provision of security protection for the Secretary of Health and Human Services.

Sec. 208. None of the funds appropriated in this Act may be obligated or expended for the Federal Council on Aging under the Older Americans Act or the Advisory Board on Child Abuse and Neglect under the Child Abuse Prevention and Treatment Act.

(TRANSFER OF FUNDS)

Sec. 209. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Health and Human Services in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

(TRANSFER OF FUNDS)

Sec. 210. The Director of the National Institutes of Health, jointly with the Director of the Office of AIDS Research, may transfer up to 3 percent among institutes, centers, and divisions from the total amounts identified by these two Directors as funding for research pertaining to the human immunodeficiency virus: Provided, That the Congress is promptly notified of the transfer.

(TRANSFER OF FUNDS)

Sec. 211. Of the amounts made available in this Act for the National Institutes of Health, the amount for research related to the human immunodeficiency virus, as jointly determined by the Director of NIH and the Director of the Office of AIDS Research, shall be made available to the "Office of AIDS Research" account. The Director of the Office of AIDS Research shall transfer from such account amounts necessary to carry out section 2353(d)(3) of the Public Health Service Act.

Sec. 212. Not later than January 1, 1997, the Administrator of the Health Care Financing Administration, with the advice and technical assistance of the Agency for Health Care Policy and Research, shall transmit to the appropriate committees of the Congress a report including—

(1) a review of all available studies and research data on the treatment of end-stage emphysema and chronic obstructive pulmonary disease by both unilateral and bilateral lung volume reduction surgery, involving both invasive and noninvasive surgery and supplemental surgical methods, including laser applications; and

(2) a recommendation, based on such review, as to the appropriateness of Medicare coverage of such procedures and the conditions, if necessary, that facilities and physicians should be required to meet, to ensure the efficacy of such procedures, as more detailed clinical studies are conducted.

<< 42 USCA § 10403 >>

Sec. 213. Section 304(a)(1) of the Family Violence Prevention and Services Act (42 U.S.C. 10403(a)(1)) is amended by striking "$200,000" and inserting "$400,000".

Sec. 214. The new clinical research center at the National Institutes of Health is hereby named the Mark O. Hatfield Clinical Research Center.

<< 42 USCA §§ 652, 653 >>

<< 42 USCA §§ 652 NOTE,653 nt >>

Sec. 215. Section 345 of Public Law 104–193 is amended by replacing "section 457(a)" wherever it appears with "a plan approved under this part". Amounts available under such section shall be calculated as though such section were effective October 1, 1995.

This title may be cited as the "Department of Health and Human Services Appropriations Act, 1997".

## TITLE III—DEPARTMENT OF EDUCATION

### EDUCATION REFORM

For carrying out activities authorized by titles III and IV of the Goals 2000: Educate America Act and the School-to-Work Opportunities Act, $691,000,000, of which $476,000,000 for the Goals 2000: Educate America Act and $200,000,000 for the School-to-Work Opportunities Act shall become available on July 1, 1997, and remain available through September 30, 1998: Provided, That none of the funds appropriated under this heading shall be obligated or expended to carry out section 304(a) (2)(A) of the Goals 2000: Educate America Act.

### EDUCATION FOR THE DISADVANTAGED

For carrying out title I of the Elementary and Secondary Education Act of 1965, and section 418A of the Higher Education Act, $7,698,469,000, of which $6,380,114,000 shall become available on July 1, 1997, and shall remain available through September 30, 1998, and of which $1,298,386,000 shall become available on October 1, 1997 and shall remain available through September 30, 1998, for academic year 1997–1998: Provided, That $6,194,850,000 shall be available for basic grants under section 1124: Provided further, That up to $3,500,000 of these funds shall be available to the Secretary on October 1, 1996, to obtain updated local-educational-agency-level census poverty data from the Bureau of the Census: Provided further, That $999,249,000 shall be available for concentration grants under section 1124(A) and $7,000,000 shall be available for evaluations under section 1501.

### IMPACT AID

For carrying out programs of financial assistance to federally affected schools authorized by title VIII of the Elementary and Secondary Education Act of 1965, $730,000,000, of which $615,500,000 shall be for basic support payments under section 8003(b), $40,000,000 shall be for payments for children with disabilities under section 8003(d), $52,000,000, to remain available until expended, shall be for payments under section 8003(f), $5,000,000 shall be for construction under section 8007, and $17,500,000 shall be for Federal property payments under section 8002.

### SCHOOL IMPROVEMENT PROGRAMS

For carrying out school improvement activities authorized by titles II, IV–A–1, V–A and B, VI, IX, X and XIII of the Elementary and Secondary Education Act of 1965; the Stewart B. McKinney Homeless Assistance Act; and the Civil Rights Act of 1964; $1,425,631,000, of which $1,202,478,000 shall become available on July 1, 1997, and remain available through September 30, 1998: Provided, That of the amount appropriated, $310,000,000 shall be for Eisenhower professional development State grants under title II–B and $310,000,000 shall be for innovative education program strategies State grants under title VI–A.

### BILINGUAL AND IMMIGRANT EDUCATION

For carrying out, to the extent not otherwise provided, bilingual, foreign language and immigrant education activities authorized by parts A and C and section 7203 of title VII of the Elementary and Secondary Education Act, without regard to section 7103(b), $261,700,000, of which $100,000,000 shall be for immigrant education programs authorized by part C: Provided, That State educational agencies may use all, or any part of, their part C allocation for competitive grants to local educational agencies: Provided further, That the Department of Education should only support instructional programs which ensure that students completely master English in a timely fashion (a period of three to five years) while meeting rigorous achievement standards in the academic content areas.

### SPECIAL EDUCATION

For carrying out parts B, C, D, E, F, G, and H and section 610(j)(2)(C) of the Individuals with Disabilities Education Act, $4,036,000,000, of which $3,783,685,000 shall become available for obligation on July 1, 1997, and shall remain available through September 30, 1998: Provided, That the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall continue to be eligible to receive funds under the Individuals with Disabilities Education Act consistent with the provisions of Public Law 104–134: Provided further, That the entities that received competitive awards for direct services to children under section 611 of the Individuals with Disabilities Education Act in accordance with the competition required in Public Law 104–134 shall continue to be funded, without competition, in the same amounts as under Public Law 104–134.

### REHABILITATION SERVICES AND DISABILITY RESEARCH

For carrying out, to the extent not otherwise provided, the Rehabilitation Act of 1973, the Technology–Related Assistance for Individuals with Disabilities Act, and the Helen Keller National Center Act, as amended, $2,509,447,000.

### SPECIAL INSTITUTIONS FOR PERSONS WITH DISABILITIES

### AMERICAN PRINTING HOUSE FOR THE BLIND

For carrying out the Act of March 3, 1879, as amended (20 U.S.C. 101 et seq.), $6,680,000.

### NATIONAL TECHNICAL INSTITUTE FOR THE DEAF

For the National Technical Institute for the Deaf under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $43,041,000: Provided, That from the amount available, the Institute may at its discretion use funds for the endowment program as authorized under section 207.

### GALLAUDET UNIVERSITY

For the Kendall Demonstration Elementary School, the Model Secondary School for the Deaf, and the partial support of Gallaudet University under titles I and II of the Education of the Deaf Act of 1986 (20 U.S.C. 4301 et seq.), $79,182,000: Provided, That from the amount available, the University may at its discretion use funds for the endowment program as authorized under section 207.

### VOCATIONAL AND ADULT EDUCATION

For carrying out, to the extent not otherwise provided, the Carl D. Perkins Vocational and Applied Technology Education Act, the Adult Education Act, and the National Literacy Act of 1991, $1,486,531,000, of which $4,500,000 shall be for the National Institute for Literacy; and of which $1,483,612,000 shall become available on July 1, 1997 and shall remain available through September 30, 1998: Provided, That, of the amounts made available for title II of the Carl D. Perkins Vocational and Applied Technology Education Act, $4,500,000 shall be used by the Secretary for national programs under title IV, without regard to section 451: Provided further, That, in addition, the Secretary may reserve up to $9,000,000 under section 101(a)(1)(A) of the Carl D. Perkins Vocational and Applied Technology Education Act, without regard to section 451: Provided further, That the Secretary may reserve up to $5,000,000 under section 313(d) of the Adult Education Act for activities carried out under section 383 of that Act: Provided further, That no funds shall be awarded to a State Council under section 112(f) of the Carl D. Perkins Vocational and Applied Technology Education Act, and no State shall be required to operate such a Council.

### STUDENT FINANCIAL ASSISTANCE

For carrying out subparts 1, 3, and 4 of part A, part C and part E of title IV of the Higher Education Act of 1965, as amended, $7,560,407,000, which shall remain available through September 30, 1998.

<< 20 USCA § 1070a NOTE >>

The maximum Pell Grant for which a student shall be eligible during award year 1997–1998 shall be $2,700: Provided, That notwithstanding section 401(g) of the Act, if the Secretary determines, prior to publication of the payment schedule for such award year, that the amount included within this appropriation for Pell Grant awards in such award year, and any funds available

from the fiscal year 1996 appropriation for Pell Grant awards, are insufficient to satisfy fully all such awards for which students are eligible, as calculated under section 401(b) of the Act, the amount paid for each such award shall be reduced by either a fixed or variable percentage, or by a fixed dollar amount, as determined in accordance with a schedule of reductions established by the Secretary for this purpose.

### FEDERAL FAMILY EDUCATION LOAN PROGRAM ACCOUNT

For Federal administrative expenses to carry out guaranteed student loans authorized by title IV, part B, of the Higher Education Act, as amended, $46,572,000.

### HIGHER EDUCATION

For carrying out, to the extent not otherwise provided, parts A and B of title III, without regard to section 360(a)(1)(B)(ii), titles IV, V, VI, VII, and IX, part A and subpart 1 of part B of title X, and title XI of the Higher Education Act of 1965, as amended, Public Law 102–423 and the Mutual Educational and Cultural Exchange Act of 1961; $879,054,000, of which $15,673,000 for interest subsidies under title VII of the Higher Education Act, as amended, shall remain available until expended: Provided, That funds available for part D of title IX of the Higher Education Act shall be available to fund noncompeting continuation awards for academic year 1997–1998 for fellowships awarded originally under part B of title IX of said Act, under the terms and conditions of part B: Provided further, That $5,931,000 of the funds available for part D of title IX of the Higher Education Act shall be available to fund new and noncompeting continuation awards for academic year 1997–1998 for fellowships awarded under part C of title IX of said Act, under the terms and conditions of part C: Provided further, That notwithstanding sections 419D, 419E, and 419H of the Higher Education Act, as amended, scholarships made under title IV, part A, subpart 6 shall be prorated to maintain the same number of new scholarships in fiscal year 1997 as in fiscal year 1996: Provided further, That $3,000,000, to remain available until expended, shall be for the George H.W. Bush fellowship program, if authorized by April 1, 1997: Provided further, That $3,000,000, to remain available until expended, shall be for the Edmund S. Muskie Foundation to establish an endowment fund to provide income to support such foundation on a continuing basis, if authorized by April 1, 1997: Provided further, That $3,000,000, to remain available until expended, shall be for the Claiborne Pell Institute for International Relations and Public Policy at Salve Regina University in Newport, Rhode Island, if authorized by April 1, 1997: Provided further, That $1,000,000, to remain available until expended, shall be for the Calvin Coolidge Memorial Foundation, if authorized by April 1, 1997: Provided further, That, of the amounts made available under title X, part A of the Higher Education Act, $2,000,000 shall be awarded to the Pennsylvania Educational Telecommunications Exchange Network.

### HOWARD UNIVERSITY

For partial support of Howard University (20 U.S.C. 121 et seq.), $196,000,000: Provided, That from the amount available, the University may at its discretion use funds for the endowment program as authorized under the Howard University Endowment Act (Public Law 98–480).

### HIGHER EDUCATION FACILITIES LOANS

The Secretary is hereby authorized to make such expenditures, within the limits of funds available under this heading and in accord with law, and to make such contracts and commitments without regard to fiscal year limitation, as provided by section 104 of the Government Corporation Control Act (31 U.S.C. 9104), as may be necessary in carrying out the program for the current fiscal year.

### COLLEGE HOUSING AND ACADEMIC FACILITIES LOANS PROGRAM

For administrative expenses to carry out the existing direct loan program of college housing and academic facilities loans entered into pursuant to title VII, part C, of the Higher Education Act, as amended, $698,000.

### COLLEGE HOUSING LOANS

Pursuant to title VII, part C of the Higher Education Act, as amended, for necessary expenses of the college housing loans program, the Secretary shall make expenditures and enter into contracts without regard to fiscal year limitation using loan repayments and other resources available to this account. Any unobligated balances becoming available from fixed fees paid into this account pursuant to 12 U.S.C. 1749d, relating to payment of costs for inspections and site visits, shall be available for the operating expenses of this account.

## HISTORICALLY BLACK COLLEGE AND UNIVERSITY

### CAPITAL FINANCING, PROGRAM ACCOUNT

The total amount of bonds insured pursuant to section 724 of title VII, part B of the Higher Education Act shall not exceed $357,000,000, and the cost, as defined in section 502 of the Congressional Budget Act of 1974, of such bonds shall not exceed zero.

For administrative expenses to carry out the Historically Black College and University Capital Financing Program entered into pursuant to title VII, part B of the Higher Education Act, as amended, $104,000.

### EDUCATION RESEARCH, STATISTICS, AND IMPROVEMENT

For carrying out activities authorized by the Educational Research, Development, Dissemination, and Improvement Act of 1994, including part E; the National Education Statistics Act of 1994; section 2102, sections 3132, 3136 and 3141, parts B, C, and D of title III and parts A, B, I, and K and section 10601 of title X, and part C of title XIII of the Elementary and Secondary Education Act of 1965, as amended, and title VI of Public Law 103–227, $598,350,000: Provided, That $200,000,000 shall be for section 3132, $56,965,000 shall be for section 3136 and $10,000,000 shall be for section 3141 of the Elementary and Secondary Education Act: Provided further, That notwithstanding any other provision of law, one-half of one percent of the amount available for section 3132 of the Elementary and Secondary Education Act of 1965, as amended, shall be set aside for the outlying areas to be distributed among the outlying areas on the basis of their relative need as determined by the Secretary in accordance with the purposes of the program: Provided further, That, notwithstanding section 3131(b) of said Act, if any State educational agency does not apply for a grant under section 3132, that State's allotment under section 3131 shall be reserved by the Secretary for grants to local educational agencies in the State that apply directly to the Secretary according to the terms and conditions announced by the Secretary in the Federal Register: Provided further, That, of the amount available for title III, part B of the Elementary and Secondary Education Act of 1965, as amended, funds shall be awarded to continue the Iowa Communication Network statewide fiber optic demonstration and $2,000,000 shall be awarded to the Southeastern Pennsylvania Consortium for Higher Education for the establishment of local and wide area computer networks to provide instructional resources to students and faculty: Provided further, That none of the funds appropriated in this paragraph may be obligated or expended for the Goals 2000 Community Partnerships Program.

### LIBRARIES

Notwithstanding title VII of this Act, for carrying out titles I, II, III, and IV of the Library Services and Construction Act, and title II–B of the Higher Education Act, $136,369,000, of which $16,369,000 shall be used to carry out the provisions of title II of the Library Services and Construction Act and shall remain available until expended; and $2,500,000 shall be for section 222 and $5,000,000 shall be for section 223 of the Higher Education Act: Provided, That $1,000,000 shall be competitively awarded to a nonprofit regional social tolerance resource center, operating tolerance tools and prejudice reduction programs and multimedia tolerance and genocide exhibits: Provided further, That $1,500,000 shall be for the continuation of a demonstration project making information available for public use by connecting Internet to a multistate consortium and a historical society: Provided further, That $1,000,000 shall be for continuation of catalog conversion of research and doctoral institutions and networking of local libraries under the fiber optics demonstration initiated in Public Law 102–394 under section 223 of the Higher Education Act: Provided further, That each State or local recipient of funds under titles I, II, III, and IV of the Library Services and Construction Act may use any such funds to plan for any library program or activity authorized under title VII of this Act and conduct any other activity reasonably necessary to provide for an orderly and effective transition to the operation of library programs or activities under title VII of this Act.

### DEPARTMENTAL MANAGEMENT

### PROGRAM ADMINISTRATION

For carrying out, to the extent not otherwise provided, the Department of Education Organization Act, including rental of conference rooms in the District of Columbia and hire of two passenger motor vehicles, $327,000,000.

### OFFICE FOR CIVIL RIGHTS

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For expenses necessary for the Office for Civil Rights, as authorized by section 203 of the Department of Education Organization Act, $55,000,000.

## OFFICE OF THE INSPECTOR GENERAL

For expenses necessary for the Office of the Inspector General, as authorized by section 212 of the Department of Education Organization Act, $30,000,000.

## GENERAL PROVISIONS

Sec. 301. No funds appropriated in this Act may be used for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system, or for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to carry out a plan of racial desegregation of any school or school system.

Sec. 302. None of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home, except for a student requiring special education, to the school offering such special education, in order to comply with title VI of the Civil Rights Act of 1964. For the purpose of this section an indirect requirement of transportation of students includes the transportation of students to carry out a plan involving the reorganization of the grade structure of schools, the pairing of schools, or the clustering of schools, or any combination of grade restructuring, pairing or clustering. The prohibition described in this section does not include the establishment of magnet schools.

Sec. 303. No funds appropriated under this Act may be used to prevent the implementation of programs of voluntary prayer and meditation in the public schools.

Sec. 304. Notwithstanding any other provision of law, funds available under section 458 of the Higher Education Act shall not exceed $491,000,000 for fiscal year 1997. The Department of Education shall use $80,000,000 of the amounts provided for payment of administrative cost allowances to guaranty agencies for fiscal year 1996. For fiscal year 1997, the Department of Education shall pay administrative costs to guaranty agencies, calculated on the basis of 0.85 percent of the total principal amount of loans upon which insurance was issued on or after October 1, 1996: Provided, That such administrative costs shall be paid only on the first $8,200,000,000 of the principal amount of loans upon which insurance was issued on or after October 1, 1996 by such guaranty agencies, and shall not exceed a total of $70,000,000. Such payments are to be paid quarterly, and receipt of such funds and uses of such funds shall be in accordance with section 428(f) of the Higher Education Act.

## << 20 USCA § 1087h NOTE >>

Notwithstanding section 458 of the Higher Education Act, the Secretary may not use funds available under that section or any other section for subsequent fiscal years for administrative expenses of the William D. Ford Direct Loan Program. The Secretary may not require the return of guaranty agency reserve funds during fiscal year 1997, except after consultation with both the Chairmen and ranking members of the House Economic and Educational Opportunities Committee and the Senate Labor and Human Resources Committee. Any reserve funds recovered by the Secretary shall be returned to the Treasury of the United States for purposes of reducing the Federal deficit.

No funds available to the Secretary may be used for (1) the hiring of advertising agencies or other third parties to provide advertising services for student loan programs prior to January 1, 1997, or (2) payment of administrative fees relating to the William D. Ford Direct Loan Program to institutions of higher education.

Sec. 305. None of the funds appropriated in this Act may be obligated or expended to carry out section 621(b) of Public Law 101–589.

## (TRANSFER OF FUNDS)

Sec. 306. Not to exceed 1 percent of any discretionary funds (pursuant to the Balanced Budget and Emergency Deficit Control Act, as amended) which are appropriated for the current fiscal year for the Department of Education in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such transfer: Provided, That the Appropriations Committees of both Houses of Congress are notified at least fifteen days in advance of any transfer.

Sec. 307. (a) Section 8003(f)(3)(A)(i) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7703(f)(3)(A)(i)) is amended—

<center>&lt;&lt; 20 USCA § 7703 &gt;&gt;</center>

(1) in the matter preceding subclause (I), by striking "The Secretary" and all that follows through "greater of—" and inserting the following: "The Secretary, in conjunction with the local educational agency, shall first determine each of the following:";
(2) in each of subclauses (I) through (III), by striking "the average" each place it appears the first time in each such subclause and inserting "The average";
(3) in subclause (I), by striking the semicolon and inserting a period;
(4) in subclause (II), by striking ": or" and inserting a period; and
(5) by adding at the end the following:
"The local educational agency shall select one of the amounts determined under subclause (I), (II), or (III) for purposes of the remaining computations under this subparagraph.".

<center>&lt;&lt; 20 USCA § 7703 NOTE &gt;&gt;</center>

(b) The amendments made by subsection (a) shall apply with respect to fiscal years beginning with fiscal year 1995.

<center>&lt;&lt; 20 USCA § 1092 &gt;&gt;</center>

Sec. 308. Section 485(e)(9) of the Higher Education Act of 1965 is amended by striking out "June 30" in the second sentence of such section and inserting "August 30".
This title may be cited as the "Department of Education Appropriations Act, 1997".

<center>TITLE IV–RELATED AGENCIES</center>

<center>ARMED FORCES RETIREMENT HOME</center>

For expenses necessary for the Armed Forces Retirement Home to operate and maintain the United States Soldiers' and Airmen's Home and the United States Naval Home, to be paid from funds available in the Armed Forces Retirement Home Trust Fund, $56,204,000, of which $432,000 shall remain available until expended for construction and renovation of the physical plants at the United States Soldiers' and Airmen's Home and the United States Naval Home: Provided, That this appropriation shall not be available for the payment of hospitalization of members of the Soldiers' and Airmen's Home in United States Army hospitals at rates in excess of those prescribed by the Secretary of the Army upon recommendation of the Board of Commissioners and the Surgeon General of the Army.

<center>CORPORATION FOR NATIONAL AND COMMUNITY SERVICE</center>

<center>DOMESTIC VOLUNTEER SERVICE PROGRAMS, OPERATING EXPENSES</center>

For expenses necessary for the Corporation for National and Community Service to carry out the provisions of the Domestic Volunteer Service Act of 1973, as amended, $213,969,000.

<center>CORPORATION FOR PUBLIC BROADCASTING</center>

For payment to the Corporation for Public Broadcasting, as authorized by the Communications Act of 1934, an amount which shall be available within limitations specified by that Act, for the fiscal year 1999, $250,000,000: Provided, That no funds made available to the Corporation for Public Broadcasting by this Act shall be used to pay for receptions, parties, or similar forms of entertainment for Government officials or employees: Provided further, That none of the funds contained in this paragraph shall be available or used to aid or support any program or activity from which any person is excluded, or is denied benefits, or is discriminated against, on the basis of race, color, national origin, religion, or sex.

<center>FEDERAL MEDIATION AND CONCILIATION SERVICE</center>

<center>SALARIES AND EXPENSES</center>

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For expenses necessary for the Federal Mediation and Conciliation Service to carry out the functions vested in it by the Labor Management Relations Act, 1947 (29 U.S.C. 171–180, 182–183), including hire of passenger motor vehicles; and for expenses necessary for the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a); and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, Public Law 95–454 (5 U.S.C. chapter 71), $32,579,000 including $1,500,000, to remain available through September 30, 1998, for activities authorized by the Labor–Management Cooperation Act of 1978 (29 U.S.C. 175a): Provided, That notwithstanding 31 U.S.C. 3302, fees charged, up to full-cost recovery, for special training activities and for arbitration services shall be credited to and merged with this account, and shall remain available until expended: Provided further, That fees for arbitration services shall be available only for education, training, and professional development of the agency workforce: Provided further, That the Director of the Service is authorized to accept on behalf of the United States gifts of services and real, personal, or other property in the aid of any projects or functions within the Director's jurisdiction.

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Federal Mine Safety and Health Review Commission (30 U.S.C. 801 et seq.), $6,060,000.

## NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE

### SALARIES AND EXPENSES

For necessary expenses for the National Commission on Libraries and Information Science, established by the Act of July 20, 1970 (Public Law 91–345, as amended by Public Law 102–95), $897,000.

## NATIONAL COUNCIL ON DISABILITY

### SALARIES AND EXPENSES

For expenses necessary for the National Council on Disability as authorized by title IV of the Rehabilitation Act of 1973, as amended, $1,793,000.

## NATIONAL EDUCATION GOALS PANEL

For expenses necessary for the National Education Goals Panel, as authorized by title II, part A of the Goals 2000: Educate America Act, $1,500,000.

## NATIONAL LABOR RELATIONS BOARD

### SALARIES AND EXPENSES

For expenses necessary for the National Labor Relations Board to carry out the functions vested in it by the Labor–Management Relations Act, 1947, as amended (29 U.S.C. 141–167), and other laws, $175,000,000: Provided, That no part of this appropriation shall be available to organize or assist in organizing agricultural laborers or used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers as referred to in section 2(3) of the Act of July 5, 1935 (29 U.S.C. 152), and as amended by the Labor–Management Relations Act, 1947, as amended, and as defined in section 3(f) of the Act of June 25, 1938 (29 U.S.C. 203), and including in said definition employees engaged in the maintenance and operation of ditches, canals, reservoirs, and waterways when maintained or operated on a mutual, nonprofit basis and at least 95 per centum of the water stored or supplied thereby is used for farming purposes: Provided further, That none of the funds made available by this Act shall be used in any way to promulgate a final rule (altering 29 CFR part 103) regarding single location bargaining units in representation cases.

## NATIONAL MEDIATION BOARD

### SALARIES AND EXPENSES

AR.03314

For expenses necessary to carry out the provisions of the Railway Labor Act, as amended (45 U.S.C. 151–188), including emergency boards appointed by the President, $8,300,000: Provided, That unobligated balances at the end of fiscal year 1997 not needed for emergency boards shall remain available for other statutory purposes through September 30, 1998.

## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary for the Occupational Safety and Health Review Commission (29 U.S.C. 661), $7,753,000.

## PHYSICIAN PAYMENT REVIEW COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1845(a) of the Social Security Act, $3,263,000, to be transferred to this appropriation from the Federal Supplementary Medical Insurance Trust Fund.

## PROSPECTIVE PAYMENT ASSESSMENT COMMISSION

### SALARIES AND EXPENSES

For expenses necessary to carry out section 1886(e) of the Social Security Act, $3,263,000, to be transferred to this appropriation from the Federal Hospital Insurance and the Federal Supplementary Medical Insurance Trust Funds.

## SOCIAL SECURITY ADMINISTRATION

### PAYMENTS TO SOCIAL SECURITY TRUST FUNDS

For payment to the Federal Old–Age and Survivors Insurance and the Federal Disability Insurance trust funds, as provided under sections 201(m), 228(g), and 1131(b)(2) of the Social Security Act, $20,923,000.

In addition, to reimburse these trust funds for administrative expenses to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986, $10,000,000, to remain available until expended.

### SPECIAL BENEFITS FOR DISABLED COAL MINERS

For carrying out title IV of the Federal Mine Safety and Health Act of 1977, $460,070,000, to remain available until expended.

For making, after July 31 of the current fiscal year, benefit payments to individuals under title IV of the Federal Mine Safety and Health Act of 1977, for costs incurred in the current fiscal year, such amounts as may be necessary.

For making benefit payments under title IV of the Federal Mine Safety and Health Act 1977 for the first quarter of fiscal year 1998, $160,000,000, to remain available until expended.

### SUPPLEMENTAL SECURITY INCOME PROGRAM

For carrying out titles XI and XVI of the Social Security Act, section 401 of Public Law 92–603, section 212 of Public Law 93–66, as amended, and section 405 of Public Law 95–216, including payment to the Social Security trust funds for administrative expenses incurred pursuant to section 201(g)(1) of the Social Security Act, $19,372,010,000, to remain available until expended: Provided, That any portion of the funds provided to a State in the current fiscal year and not obligated by the State during that year shall be returned to the Treasury.

From funds provided under the previous paragraph, not less than $100,000,000 shall be available for payment to the Social Security trust funds for administrative expenses for conducting continuing disability reviews.

In addition, $175,000,000, to remain available until September 30, 1998, for payment to the Social Security trust funds for administrative expenses for continuing disability reviews as authorized by section 103 of Public Law 104–121 and Supplemental Security Income administrative work as authorized by Public Law 104–193. The term "continuing disability reviews" means reviews and redetermination as defined under section 201(g)(1)(A) of the Social Security Act as amended, and reviews and redeterminations authorized under section 211 of Public Law 104–193.

For making, after June 15 of the current fiscal year, benefit payments to individuals under title XVI of the Social Security Act, for unanticipated costs incurred for the current fiscal year, such sums as may be necessary.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For carrying out title XVI of the Social Security Act for the first quarter of fiscal year 1998, $9,690,000,000, to remain available until expended.

### LIMITATION ON ADMINISTRATIVE EXPENSES

For necessary expenses, including the hire of two passenger motor vehicles, and not to exceed $10,000 for official reception and representation expenses, not more than $5,873,382,000 may be expended, as authorized by section 201(g)(1) of the Social Security Act or as necessary to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986 from any one or all of the trust funds referred to therein: Provided, That reimbursement to the trust funds under this heading for administrative expenses to carry out sections 9704 and 9706 of the Internal Revenue Code of 1986 shall be made, with interest, not later than September 30, 1998: Provided further, That not less than $1,268,000 shall be for the Social Security Advisory Board: Provided further, That unobligated balances at the end of fiscal year 1997 not needed for fiscal year 1997 shall remain available until expended for a state-of-the-art computing network, including related equipment and administrative expenses associated solely with this network.

From funds provided under the previous paragraph, not less than $200,000,000 shall be available for conducting continuing disability reviews.

In addition to funding already available under this heading, and subject to the same terms and conditions, $310,000,000, to remain available until September 30, 1998, for continuing disability reviews as authorized by section 103 of Public Law 104–121 and Supplemental Security Income administrative work as authorized by Public Law 104–193. The term "continuing disability reviews" means reviews and redeterminations as defined under section 201(g)(1)(A) of the Social Security Act as amended, and reviews and redeterminations authorized under section 211 of Public Law 104–193.

In addition to funding already available under this heading, and subject to the same terms and conditions, $234,895,000, which shall remain available until expended, to invest in a state-of-the-art computing network, including related equipment and administrative expenses associated solely with this network, for the Social Security Administration and the State Disability Determination Services, may be expended from any or all of the trust funds as authorized by section 201(g)(1) of the Social Security Act.

### OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, $6,335,000, together with not to exceed $31,089,000, to be transferred and expended as authorized by section 201(g)(1) of the Social Security Act from the Federal Old–Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust Fund.

### RAILROAD RETIREMENT BOARD

### DUAL BENEFITS PAYMENTS ACCOUNT

For payment to the Dual Benefits Payments Account, authorized under section 15(d) of the Railroad Retirement Act of 1974, $223,000,000, which shall include amounts becoming available in fiscal year 1997 pursuant to section 224(c)(1)(B) of Public Law 98–76; and in addition, an amount, not to exceed 2 percent of the amount provided herein, shall be available proportional to the amount by which the product of recipients and the average benefit received exceeds $223,000,000: Provided, That the total amount provided herein shall be credited in 12 approximately equal amounts on the first day of each month in the fiscal year.

### FEDERAL PAYMENTS TO THE RAILROAD RETIREMENT ACCOUNTS

For payment to the accounts established in the Treasury for the payment of benefits under the Railroad Retirement Act for interest earned on unnegotiated checks, $300,000, to remain available through September 30, 1998, which shall be the maximum amount available for payment pursuant to section 417 of Public Law 98–76.

### LIMITATION ON ADMINISTRATION

For necessary expenses for the Railroad Retirement Board for administration of the Railroad Retirement Act and the Railroad Unemployment Insurance Act, $87,898,000, to be derived in such amounts as determined by the Board from the railroad retirement accounts and from moneys credited to the railroad unemployment insurance administration fund.

### LIMITATION ON THE OFFICE OF INSPECTOR GENERAL

For expenses necessary for the Office of Inspector General for audit, investigatory and review activities, as authorized by the Inspector General Act of 1978, as amended, not more than $5,404,000, to be derived from the railroad retirement accounts and railroad unemployment insurance account: Provided, That none of the funds made available in this Act may be transferred to the Office from the Department of Health and Human Services, or used to carry out any such transfer: Provided further, That none of the funds made available in this paragraph may be used for any audit, investigation, or review of the Medicare program.

### UNITED STATES INSTITUTE OF PEACE

### OPERATING EXPENSES

For necessary expenses of the United States Institute of Peace as authorized in the United States Institute of Peace Act, $11,160,000.

### TITLE V—GENERAL PROVISIONS

SEC. 501. The Secretaries of Labor, Health and Human Services, and Education are authorized to transfer unexpended balances of prior appropriations to accounts corresponding to current appropriations provided in this Act: Provided, That such transferred balances are used for the same purpose, and for the same periods of time, for which they were originally appropriated.

SEC. 502. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 503. (a) No part of any appropriation contained in this Act shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television, or video presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself or any State legislature, except in presentation to the Congress or any State legislative body itself.

(b) No part of any appropriation contained in this Act shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence legislation or appropriations pending before the Congress or any State legislature.

SEC. 504. The Secretaries of Labor and Education are each authorized to make available not to exceed $15,000 from funds available for salaries and expenses under titles I and III, respectively, for official reception and representation expenses; the Director of the Federal Mediation and Conciliation Service is authorized to make available for official reception and representation expenses not to exceed $2,500 from the funds available for "Salaries and expenses, Federal Mediation and Conciliation Service"; and the Chairman of the National Mediation Board is authorized to make available for official reception and representation expenses not to exceed $2,500 from funds available for "Salaries and expenses, National Mediation Board".

Sec. 505. Notwithstanding any other provision of this Act, no funds appropriated under this Act shall be used to carry out any program of distributing sterile needles for the hypodermic injection of any illegal drug unless the Secretary of Health and Human Services determines that such programs are effective in preventing the spread of HIV and do not encourage the use of illegal drugs.

Sec. 506. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.

(b) NOTICE REQUIREMENT.—In providing financial assistance to, or entering into any contract with, any entity using funds made available in this Act, the head of each Federal agency, to the greatest extent practicable, shall provide to such entity a notice describing the statement made in subsection (a) by the Congress.

(c) PROHIBITION OF CONTRACTS WITH PERSONS FALSELY LABELING PRODUCTS AS MADE IN AMERICA.—If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, the person shall be ineligible to receive any contract or subcontract made with funds made available in this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 507. When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds included in this Act, including but not limited to State and local governments and recipients of Federal research grants, shall clearly state (1) the percentage of the total costs of the program or project which will be financed with Federal money, (2) the dollar amount of Federal funds for the project or program, and (3) percentage and dollar amount of the total costs of the project or program that will be financed by nongovernmental sources.

SEC. 508. None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.

<< 5 USCA § 3341 nt >>

<< 31 USCA § 1301 NOTE >>

SEC. 509. Notwithstanding any other provision of law—

(1) no amount may be transferred from an appropriation account for the Departments of Labor, Health and Human Services, and Education except as authorized in this or any subsequent appropriation Act, or in the Act establishing the program or activity for which funds are contained in this Act;

(2) no department, agency, or other entity, other than the one responsible for administering the program or activity for which an appropriation is made in this Act, may exercise authority for the timing of the obligation and expenditure of such appropriation, or for the purpose for which it is obligated and expended, except to the extent and in the manner otherwise provided in sections 1512 and 1513 of title 31, United States Code; and

(3) no funds provided under this Act shall be available for the salary (or any part thereof) of an employee who is reassigned on a temporary detail basis to another position in the employing agency or department or in any other agency or department, unless the detail is independently approved by the head of the employing department or agency.

SEC. 510. None of the funds made available in this Act may be used for the expenses of an electronic benefit transfer (EBT) task force.

SEC. 511. None of the funds made available in this Act may be used to enforce the requirements of section 428(b)(1)(U)(iii) of the Higher Education Act of 1965 with respect to any lender when it is made known to the Federal official having authority to obligate or expend such funds that the lender has a loan portfolio under part B of title IV of such Act that is equal to or less than $5,000,000.

SEC. 512. (a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.208(a)(2) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term "human embryo or embryos" include any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes.

SEC. 513. (a) Limitation on Use of Funds for Promotion of Legalization of Controlled Substances.—None of the funds made available in this Act may be used for any activity when it is made known to the Federal official having authority to obligate or expend such funds that the activity promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act (21 U.S.C. 812).

(b) Exceptions.—The limitation in subsection (a) shall not apply when it is made known to the Federal official having authority to obligate or expend such funds that there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that Federally-sponsored clinical trials are being conducted to determine therapeutic advantage.

<< 10 USCA § 503 NOTE >>

SEC. 514. (a) Denial of Funds for Preventing ROTC Access to Campus.—None of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any

fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid) to a covered educational entity if the Secretary of Defense determines that the covered educational entity has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) the maintaining, establishing, or operation of a unit of the Senior Reserve Officer Training Corps (in accordance with section 654 of title 10, United States Code, and other applicable Federal laws) at the covered educational entity; or

(2) a student at the covered educational entity from enrolling in a unit of the Senior Reserve Officer Training Corps at another institution of higher education.

(b) Denial of Funds for Preventing Federal Military Recruiting on Campus.—None of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid) to a covered educational entity if the Secretary of Defense determines that the covered educational entity has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of Federal military recruiting; or

(2) access by military recruiters for purposes of Federal military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at the covered educational entity:

(A) student names, addresses, and telephone listings; and

(B) if known, student ages, levels of education, and majors.

(c) Exceptions.—The limitation established in subsection (a) or (b) shall not apply to a covered educational entity if the Secretary of Defense determines that—

(1) the covered educational entity has ceased the policy or practice described in such subsection;

(2) the institution of higher education involved has a longstanding policy of pacifism based on historical religious affiliation; or

(3) the institution of higher education involved is prohibited by the law of any State, or by the order of any State court, from allowing Senior Reserve Officer Training Corps activities or Federal military recruiting on campus, except that this paragraph shall apply only during the one-year period beginning on the effective date of this section.

(d) Notice of Determinations.—Whenever the Secretary of Defense makes a determination under subsection (a), (b), or (c), the Secretary—

(1) shall transmit a notice of the determination to the Secretary of Education and to the Congress; and

(2) shall publish in the Federal Register a notice of the determination and the effect of the determination on the eligibility of the covered educational entity for contracts and grants.

(e) Semiannual Notice in Federal Register.—The Secretary of Defense shall publish in the Federal Register once every 6 months a list of each covered educational entity that is currently ineligible for contracts and grants by reason of a determination of the Secretary under subsection (a) or (b).

(f) Covered Educational Entity.—For purposes of this section, the term "covered educational entity" means an institution of higher education, or a subelement of an institution of higher education.

(g) Effective Date.—This section shall take effect upon the expiration of the 180–day period beginning on the date of the enactment of this Act, by which date the Secretary of Defense shall have published final regulations in consultation with the Secretary of Education to carry out this section.

Sec. 515. (a) Technical Amendment to Other ROTC and Military Recruiting Provisions.—Sections 508 and 509 of the Energy and Water Development Appropriations Act, 1997, are amended by striking "when it is made known to the Federal official having authority to obligate or expend such funds" each place it appears and inserting "if the Secretary of Defense determines".

(b) Effective Date.—Sections 508 and 509 of the Energy and Water Development Appropriations Act, 1997, shall not take effect until the expiration of the 180–day period beginning on the date of the enactment of this Act, by which date the Secretary of Defense shall have published final regulations to carry out such sections (as amended by subsection (a)).

SEC. 516. None of the funds made available in this Act may be obligated or expended to enter into or renew a contract with an entity when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such entity is otherwise a contractor with the United States and is subject to the requirement in section 4212(d) of title 38, United States Code, regarding submission of an annual report to the Secretary of Labor concerning employment of certain veterans; and

(2) such entity has not submitted a report as required by that section for the most recent year for which such requirement was applicable to such entity.

SEC. 517. (a) Notwithstanding any provision of the Carl D. Perkins Vocational and Applied Technology Act (as such Act was in effect on September 24, 1990), a State shall be deemed to have met the requirements of section 503 of such Act with respect to decisions appealed by applications filed on April 30, 1993 and October 29, 1993 under section 452(b) of the General Education Provisions Act.

(b) Subsection (a) shall take effect on October 1, 1996.

SEC. 518. None of the funds appropriated in this Act may be made available to any entity under title X of the Public Health Service Act unless it is made known to the Federal official having authority to obligate or expend such funds that the applicant for the award certifies to the Secretary that it encourages family participation in the decision of the minor to seek family planning services.

Sec. 519. Of the budgetary resources available to agencies in this Act for salaries and expenses during fiscal year 1997, $30,500,000, to be allocated by the Office of Management and Budget, are permanently canceled: Provided, That the foregoing provision shall not apply to the Food and Drug Administration and the Indian Health Service: Provided further, That amounts available in this Act for congressional and legislative affairs, public affairs, and intergovernmental affairs activities are hereby reduced by $2,000,000.

<< 5 USCA § 5597 NOTE >>

SEC. 520. Voluntary Separation Incentives for Employees of Certain Federal Agencies.—(a) Definitions.—For the purposes of this section—

(1) the term "agency" means the Railroad Retirement Board and the Office of Inspector General of the Railroad Retirement Board;

(2) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who is employed by an agency, is serving under an appointment without time limitation, and has been currently employed for a continuous period of at least 3 years, but does not include—

(A) a reemployed annuitant under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(B) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(C) an employee who is in receipt of a specific notice of involuntary separation for misconduct or unacceptable performance;

(D) an employee who, upon completing an additional period of service as referred to in section 3(b)(2)(B)(ii) of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 5597 note), would qualify for a voluntary separation incentive payment under section 3 of such Act;

(E) an employee who has previously received any voluntary separation incentive payment by the Federal Government under this section or any other authority and has not repaid such payment;

(F) an employee covered by statutory reemployment rights who is on transfer to another organization; or

(G) any employee who, during the twenty-four-month period preceding the date of separation, has received a recruitment or relocation bonus under section 5753 of title 5, United States Code, or who, within the twelve-month period preceding the date of separation, received a retention allowance under section 5754 of title 5, United States Code.

(b) Agency Strategic Plan.—

(1) In general.—The three-member Railroad Retirement Board, prior to obligating any resources for voluntary separation incentive payments, shall submit to the House and Senate Committees on Appropriations and the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives a strategic plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

(2) Contents.—The agency's plan shall include—

(A) the positions and functions to be reduced or eliminated, identified by organizational unit, geographic location, occupational category and grade level;

(B) the number and amounts of voluntary separation incentive payments to be offered; and

(C) a description of how the agency will operate without the eliminated positions and functions.

(c) Authority to Provide Voluntary Separation Incentive Payments.—

(1) In general.—A voluntary separation incentive payment under this section may be paid by an agency to any employee only to the extent necessary to eliminate the positions and functions identified by the strategic plan.

(2) Amount and treatment of payments.—A voluntary separation incentive payment—

(A) shall be paid in a lump sum after the employee's separation;

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employees;

(C) shall be equal to the lesser of—

(i) an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(ii) an amount determined by the agency head not to exceed $25,000;

(D) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before September 30, 1997;

(E) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(F) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) Additional Agency Contributions to the Retirement Fund.—

(1) In general.—In addition to any other payments which it is required to make under subchapter III of chapter 83 of title 5, United States Code, an agency shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the agency who is covered under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, to whom a voluntary separation incentive has been paid under this section.

2) Definition.—For the purpose of paragraph (1), the term "final basic pay", with respect to an employee, means the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

e) Effect of Subsequent Employment With the Government.—An individual who has received a voluntary separation incentive payment under this section and accepts any employment for compensation with the Government of the United States, or who works for any agency of the United States Government through a personal services contract, within 5 years after the date of the separation on which the payment is based shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

(f) Reduction of Agency Employment Levels.—

(1) In general.—The total number of funded employee positions in the agency shall be reduced by one position for each vacancy created by the separation of any employee who has received, or is due to receive, a voluntary separation incentive payment under this section. For the purposes of this subsection, positions shall be counted on a full-time-equivalent basis.

(2) Enforcement.—The President, through the Office of Management and Budget, shall monitor the agency and take any action necessary to ensure that the requirements of this subsection are met.

(g) Effective Date.—This section shall take effect October 1, 1996.

<< 42 USCA § 233 NOTE >>

SEC. 521. Correction of Effective Date.—Effective on the day after the date of enactment of the Health Centers Consolidation Act of 1996, section 5 of that Act is amended by striking "October 1, 1997" and inserting "October 1, 1996".

TITLE VI—REORGANIZATION AND PRIVATIZATION OF SALLIE MAE AND CONNIE LEE

<< 20 USCA § 1001 NOTE >>

SEC. 601. SHORT TITLE.

AR.03321

This title may be cited as the "Student Loan Marketing Association Reorganization Act of 1996".

## SEC. 602. REORGANIZATION OF THE STUDENT LOAN MARKETING ASSOCIATION THROUGH THE FORMATION OF A HOLDING COMPANY.

<< 20 USCA § 1087–3 >>

(a) AMENDMENT.—Part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) is amended by inserting after section 439 (20 U.S.C. 1087–2) the following new section:

"SEC. 440. REORGANIZATION OF THE STUDENT LOAN MARKETING ASSOCIATION THROUGH THE FORMATION OF A HOLDING COMPANY.

"(a) ACTIONS BY THE ASSOCIATION'S BOARD OF DIRECTORS.—The Board of Directors of the Association shall take or cause to be taken all such action as the Board of Directors deems necessary or appropriate to effect, upon the shareholder approval described in subsection (b), a restructuring of the common stock ownership of the Association, as set forth in a plan of reorganization adopted by the Board of Directors (the terms of which shall be consistent with this section) so that all of the outstanding common shares of the Association shall be directly owned by a Holding Company. Such actions may include, in the Board of Director's discretion, a merger of a wholly owned subsidiary of the Holding Company with and into the Association, which would have the effect provided in the plan of reorganization and the law of the jurisdiction in which such subsidiary is incorporated. As part of the restructuring, the Board of Directors may cause—

"(1) the common shares of the Association to be converted, on the reorganization effective date, to common shares of the Holding Company on a one for one basis, consistent with applicable State or District of Columbia law; and

"(2) Holding Company common shares to be registered with the Securities and Exchange Commission.

"(b) SHAREHOLDER APPROVAL.—The plan of reorganization adopted by the Board of Directors pursuant to subsection (a) shall be submitted to common shareholders of the Association for their approval. The reorganization shall occur on the reorganization effective date, provided that the plan of reorganization has been approved by the affirmative votes, cast in person or by proxy, of the holders of a majority of the issued and outstanding shares of the Association common stock.

"(c) TRANSITION.—In the event the shareholders of the Association approve the plan of reorganization under subsection (b), the following provisions shall apply beginning on the reorganization effective date:

"(1) IN GENERAL.—Except as specifically provided in this section, until the dissolution date the Association shall continue to have all of the rights, privileges and obligations set forth in, and shall be subject to all of the limitations and restrictions of, section 439, and the Association shall continue to carry out the purposes of such section. The Holding Company and any subsidiary of the Holding Company (other than the Association) shall not be entitled to any of the rights, privileges, and obligations, and shall not be subject to the limitations and restrictions, applicable to the Association under section 439, except as specifically provided in this section. The Holding Company and any subsidiary of the Holding Company (other than the Association or a subsidiary of the Association) shall not purchase loans insured under this Act until such time as the Association ceases acquiring such loans, except that the Holding Company may purchase such loans if the Association is merely continuing to acquire loans as a lender of last resort pursuant to section 439(q) or under an agreement with the Secretary described in paragraph (6).

"(2) TRANSFER OF CERTAIN PROPERTY.—

"(A) IN GENERAL.—Except as provided in this section, on the reorganization effective date or as soon as practicable thereafter, the Association shall use the Association's best efforts to transfer to the Holding Company or any subsidiary of the Holding Company (or both), as directed by the Holding Company, all real and personal property of the Association (both tangible and intangible) other than the remaining property. Subject to the preceding sentence, such transferred property shall include all right, title, and interest in—

"(i) direct or indirect subsidiaries of the Association (excluding special purpose funding companies in existence on the date of enactment of this section and any interest in any government-sponsored enterprise);

"(ii) contracts, leases, and other agreements of the Association;

"(iii) licenses and other intellectual property of the Association; and

"(iv) any other property of the Association.

"(B) CONSTRUCTION.—Nothing in this paragraph shall be construed to prohibit the Association from transferring remaining property from time to time to the Holding Company or any subsidiary of the Holding Company, subject to the provisions of paragraph (4).

"(3) TRANSFER OF PERSONNEL.—On the reorganization effective date, employees of the Association shall become employees of the Holding Company (or any subsidiary of the Holding Company), and the Holding Company (or any subsidiary of the Holding Company) shall provide all necessary and appropriate management and operational support (including loan servicing) to the Association, as requested by the Association. The Association, however, may obtain such management and operational support from persons or entities not associated with the Holding Company.

"(4) DIVIDENDS.—The Association may pay dividends in the form of cash or noncash distributions so long as at the time of the declaration of such dividends, after giving effect to the payment of such dividends as of the date of such declaration by the Board of Directors of the Association, the Association's capital would be in compliance with the capital standards and requirements set forth in section 439(r). If, at any time after the reorganization effective date, the Association fails to comply with such capital standards, the Holding Company shall transfer with due diligence to the Association additional capital in such amounts as are necessary to ensure that the Association again complies with the capital standards.

"(5) CERTIFICATION PRIOR TO DIVIDEND.—Prior to the payment of any dividend under paragraph (4), the Association shall certify to the Secretary of the Treasury that the payment of the dividend will be made in compliance with paragraph (4) and shall provide copies of all calculations needed to make such certification.

"(6) RESTRICTIONS ON NEW BUSINESS ACTIVITY OR ACQUISITION OF ASSETS BY ASSOCIATION.—

"(A) IN GENERAL.—After the reorganization effective date, the Association shall not engage in any new business activities or acquire any additional program assets described in section 439(d) other than in connection with—

"(i) student loan purchases through September 30, 2007;

"(ii) contractual commitments for future warehousing advances, or pursuant to letters of credit or standby bond purchase agreements, which are outstanding as of the reorganization effective date;

"(iii) the Association serving as a lender-of-last-resort pursuant to section 439(q); and

"(iv) the Association's purchase of loans insured under this part, if the Secretary, with the approval of the Secretary of the Treasury, enters into an agreement with the Association for the continuation or resumption of the Association's secondary market purchase program because the Secretary determines there is inadequate liquidity for loans made under this part.

"(B) AGREEMENT.—The Secretary is authorized to enter into an agreement described in clause (iv) of subparagraph (A) with the Association covering such secondary market activities. Any agreement entered into under such clause shall cover a period of 12 months, but may be renewed if the Secretary determines that liquidity remains inadequate. The fee provided under section 439(h)(7) shall not apply to loans acquired under any such agreement with the Secretary.

"(7) ISSUANCE OF DEBT OBLIGATIONS DURING THE TRANSITION PERIOD; ATTRIBUTES OF DEBT OBLIGATIONS.—After the reorganization effective date, the Association shall not issue debt obligations which mature later than September 30, 2008, except in connection with serving as a lender-of-last-resort pursuant to section 439(q) or with purchasing loans under an agreement with the Secretary as described in paragraph (6). Nothing in this section shall modify the attributes accorded the debt obligations of the Association by section 439, regardless of whether such debt obligations are incurred prior to, or at any time following, the reorganization effective date or are transferred to a trust in accordance with subsection (d).

"(8) MONITORING OF SAFETY AND SOUNDNESS.—

"(A) OBLIGATION TO OBTAIN, MAINTAIN, AND REPORT INFORMATION.—The Association shall obtain such information and make and keep such records as the Secretary of the Treasury may from time to time prescribe concerning—

"(i) the financial risk to the Association resulting from the activities of any associated person, to the extent such activities are reasonably likely to have a material impact on the financial condition of the Association, including the Association's capital ratio, the Association's liquidity, or the Association's ability to conduct and finance the Association's operations; and

"(ii) the Association's policies, procedures, and systems for monitoring and controlling any such financial risk.

"(B) SUMMARY REPORTS.—The Secretary of the Treasury may require summary reports of the information described in subparagraph (A) to be filed no more frequently than quarterly. If, as a result of adverse market conditions or based on reports provided pursuant to this subparagraph or other available information, the Secretary of the Treasury has concerns regarding the financial or operational condition of the Association, the Secretary of the Treasury may, notwithstanding the

preceding sentence and subparagraph (A), require the Association to make reports concerning the activities of any associated person whose business activities are reasonably likely to have a material impact on the financial or operational condition of the Association.

"(C) SEPARATE OPERATION OF CORPORATIONS.—

"(i) IN GENERAL.—The funds and assets of the Association shall at all times be maintained separately from the funds and assets of the Holding Company or any subsidiary of the Holding Company and may be used by the Association solely to carry out the Association's purposes and to fulfill the Association's obligations.

"(ii) BOOKS AND RECORDS.—The Association shall maintain books and records that clearly reflect the assets and liabilities of the Association, separate from the assets and liabilities of the Holding Company or any subsidiary of the Holding Company.

"(iii) CORPORATE OFFICE.—The Association shall maintain a corporate office that is physically separate from any office of the Holding Company or any subsidiary of the Holding Company.

"(iv) DIRECTOR.—No director of the Association who is appointed by the President pursuant to section 439(c)(1)(A) may serve as a director of the Holding Company.

"(v) ONE OFFICER REQUIREMENT.—At least one officer of the Association shall be an officer solely of the Association.

"(vi) TRANSACTIONS.—Transactions between the Association and the Holding Company or any subsidiary of the Holding Company, including any loan servicing arrangements, shall be on terms no less favorable to the Association than the Association could obtain from an unrelated third party offering comparable services.

"(vii) CREDIT PROHIBITION.—The Association shall not extend credit to the Holding Company or any subsidiary of the Holding Company nor guarantee or provide any credit enhancement to any debt obligations of the Holding Company or any subsidiary of the Holding Company.

"(viii) AMOUNTS COLLECTED.—Any amounts collected on behalf of the Association by the Holding Company or any subsidiary of the Holding Company with respect to the assets of the Association, pursuant to a servicing contract or other arrangement between the Association and the Holding Company or any subsidiary of the Holding Company, shall be collected solely for the benefit of the Association and shall be immediately deposited by the Holding Company or such subsidiary to an account under the sole control of the Association.

"(D) ENCUMBRANCE OF ASSETS.—Notwithstanding any Federal or State law, rule, or regulation, or legal or equitable principle, doctrine, or theory to the contrary, under no circumstances shall the assets of the Association be available or used to pay claims or debts of or incurred by the Holding Company. Nothing in this subparagraph shall be construed to limit the right of the Association to pay dividends not otherwise prohibited under this subparagraph or to limit any liability of the Holding Company explicitly provided for in this section.

"(E) HOLDING COMPANY ACTIVITIES.—After the reorganization effective date and prior to the dissolution date, all business activities of the Holding Company shall be conducted through subsidiaries of the Holding Company.

"(F) CONFIDENTIALITY.—Any information provided by the Association pursuant to this section shall be subject to the same confidentiality obligations contained in section 439(r)(12).

"(G) DEFINITION.—For purposes of this paragraph, the term 'associated person' means any person, other than a natural person, who is directly or indirectly controlling, controlled by, or under common control with, the Association.

"(9) ISSUANCE OF STOCK WARRANTS.—

"(A) IN GENERAL.—On the reorganization effective date, the Holding Company shall issue to the District of Columbia Financial Responsibility and Management Assistance Authority a number of stock warrants that is equal to one percent of the outstanding shares of the Association, determined as of the last day of the fiscal quarter preceding the date of enactment of this section, with each stock warrant entitling the holder of the stock warrant to purchase from the Holding Company one share of the registered common stock of the Holding Company or the Holding Company's successors or assigns, at any time on or before September 30, 2008. The exercise price for such warrants shall be an amount equal to the average closing price of the common stock of the Association for the 20 business days prior to the date of enactment of this section on the exchange or market which is then the primary exchange or market for the common stock of the Association. The number of shares of Holding Company common stock subject to each stock warrant and the exercise price of each stock warrant shall be adjusted as necessary to reflect—

AR.03324

"(i) the conversion of Association common stock into Holding Company common stock as part of the plan of reorganization approved by the Association's shareholders; and

"(ii) any issuance or sale of stock (including issuance or sale of treasury stock), stock split, recapitalization, reorganization, or other corporate event, if agreed to by the Secretary of the Treasury and the Association.

"(B) AUTHORITY TO SELL OR EXERCISE STOCK WARRANTS; DEPOSIT OF PROCEEDS.—The District of Columbia Financial Responsibility and Management Assistance Authority is authorized to sell or exercise the stock warrants described in subparagraph (A). The District of Columbia Financial Responsibility and Management Assistance Authority shall deposit into the account established under section 3(e) of the Student Loan Marketing Association Reorganization Act of 1996 amounts collected from the sale and proceeds resulting from the exercise of the stock warrants pursuant to this subparagraph.

"(10) RESTRICTIONS ON TRANSFER OF ASSOCIATION SHARES AND BANKRUPTCY OF ASSOCIATION.—After the reorganization effective date, the Holding Company shall not sell, pledge, or otherwise transfer the outstanding shares of the Association, or agree to or cause the liquidation of the Association or cause the Association to file a petition for bankruptcy under title 11, United States Code, without prior approval of the Secretary of the Treasury and the Secretary of Education.

"(d) TERMINATION OF THE ASSOCIATION.—In the event the shareholders of the Association approve a plan of reorganization under subsection (b), the Association shall dissolve, and the Association's separate existence shall terminate on September 30, 2008, after discharge of all outstanding debt obligations and liquidation pursuant to this subsection. The Association may dissolve pursuant to this subsection prior to such date by notifying the Secretary of Education and the Secretary of the Treasury of the Association's intention to dissolve, unless within 60 days after receipt of such notice the Secretary of Education notifies the Association that the Association continues to be needed to serve as a lender of last resort pursuant to section 439(q) or continues to be needed to purchase loans under an agreement with the Secretary described in subsection (c) (6). On the dissolution date, the Association shall take the following actions:

"(1) ESTABLISHMENT OF A TRUST.—The Association shall, under the terms of an irrevocable trust agreement that is in form and substance satisfactory to the Secretary of the Treasury, the Association and the appointed trustee, irrevocably transfer all remaining obligations of the Association to the trust and irrevocably deposit or cause to be deposited into such trust, to be held as trust funds solely for the benefit of holders of the remaining obligations, money or direct noncallable obligations of the United States or any agency thereof for which payment the full faith and credit of the United States is pledged, maturing as to principal and interest in such amounts and at such times as are determined by the Secretary of the Treasury to be sufficient, without consideration of any significant reinvestment of such interest, to pay the principal of, and interest on, the remaining obligations in accordance with their terms. To the extent the Association cannot provide money or qualifying obligations in the amount required, the Holding Company shall be required to transfer money or qualifying obligations to the trust in the amount necessary to prevent any deficiency.

"(2) USE OF TRUST ASSETS.—All money, obligations, or financial assets deposited into the trust pursuant to this subsection shall be applied by the trustee to the payment of the remaining obligations assumed by the trust.

"(3) OBLIGATIONS NOT TRANSFERRED TO THE TRUST.—The Association shall make proper provision for all other obligations of the Association not transferred to the trust, including the repurchase or redemption, or the making of proper provision for the repurchase or redemption, of any preferred stock of the Association outstanding. Any obligations of the Association which cannot be fully satisfied shall become liabilities of the Holding Company as of the date of dissolution.

"(4) TRANSFER OF REMAINING ASSETS.—After compliance with paragraphs (1) and (3), any remaining assets of the trust shall be transferred to the Holding Company or any subsidiary of the Holding Company, as directed by the Holding Company.

"(e) OPERATION OF THE HOLDING COMPANY.—In the event the shareholders of the Association approve the plan of reorganization under subsection (b), the following provisions shall apply beginning on the reorganization effective date:

"(1) HOLDING COMPANY BOARD OF DIRECTORS.—The number of members and composition of the Board of Directors of the Holding Company shall be determined as set forth in the Holding Company's charter or like instrument (as amended from time to time) or bylaws (as amended from time to time) and as permitted under the laws of the jurisdiction of the Holding Company's incorporation.

"(2) HOLDING COMPANY NAME.—The names of the Holding Company and any subsidiary of the Holding Company (other than the Association)—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) may not contain the name 'Student Loan Marketing Association'; and

"(B) may contain, to the extent permitted by applicable State or District of Columbia law, 'Sallie Mae' or variations thereof, or such other names as the Board of Directors of the Association or the Holding Company deems appropriate.

"(3) USE OF SALLIE MAE NAME.—Subject to paragraph (2), the Association may assign to the Holding Company, or any subsidiary of the Holding Company, the 'Sallie Mae' name as a trademark or service mark, except that neither the Holding Company nor any subsidiary of the Holding Company (other than the Association or any subsidiary of the Association) may use the 'Sallie Mae' name on, or to identify the issuer of, any debt obligation or other security offered or sold by the Holding Company or any subsidiary of the Holding Company (other than a debt obligation or other security issued to and held by the Holding Company or any subsidiary of the Holding Company). The Association shall remit to the account established under section 3(e) of the Student Loan Marketing Association Reorganization Act of 1996, $5,000,000, within 60 days of the reorganization effective date as compensation for the right to assign the 'Sallie Mae' name as a trademark or service mark.

"(4) DISCLOSURE REQUIRED.—Until 3 years after the dissolution date, the Holding Company, and any subsidiary of the Holding Company (other than the Association), shall prominently display—

"(A) in any document offering the Holding Company's securities, a statement that the obligations of the Holding Company and any subsidiary of the Holding Company are not guaranteed by the full faith and credit of the United States; and

"(B) in any advertisement or promotional materials which use the 'Sallie Mae' name or mark, a statement that neither the Holding Company nor any subsidiary of the Holding Company is a government-sponsored enterprise or instrumentality of the United States.

"(f) STRICT CONSTRUCTION.—Except as specifically set forth in this section, nothing in this section shall be construed to limit the authority of the Association as a federally chartered corporation, or of the Holding Company as a State or District of Columbia chartered corporation.

"(g) RIGHT TO ENFORCE.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of this section, or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with this section.

"(h) DEADLINE FOR REORGANIZATION EFFECTIVE DATE.—This section shall be of no further force and effect in the event that the reorganization effective date does not occur on or before 18 months after the date of enactment of this section.

"(i) DEFINITIONS.—For purposes of this section:

"(1) ASSOCIATION.—The term 'Association' means the Student Loan Marketing Association.

"(2) DISSOLUTION DATE.—The term 'dissolution date' means September 30, 2008, or such earlier date as the Secretary of Education permits the transfer of remaining obligations in accordance with subsection (d).

"(3) HOLDING COMPANY.—The term 'Holding Company' means the new business corporation established pursuant to this section by the Association under the laws of any State of the United States or the District of Columbia for the purposes of the reorganization and restructuring described in subsection (a).

"(4) REMAINING OBLIGATIONS.—The term 'remaining obligations' means the debt obligations of the Association outstanding as of the dissolution date.

"(5) REMAINING PROPERTY.—The term 'remaining property' means the following assets and liabilities of the Association which are outstanding as of the reorganization effective date:

"(A) Debt obligations issued by the Association.

"(B) Contracts relating to interest rate, currency, or commodity positions or protections.

"(C) Investment securities owned by the Association.

"(D) Any instruments, assets, or agreements described in section 439(d) (including, without limitation, all student loans and agreements relating to the purchase and sale of student loans, forward purchase and lending commitments, warehousing advances, academic facilities obligations, letters of credit, standby bond purchase agreements, liquidity agreements, and student loan revenue bonds or other loans).

"(E) Except as specifically prohibited by this section or section 439, any other nonmaterial assets or liabilities of the Association which the Association's Board of Directors determines to be necessary or appropriate to the Association's operations.

"(6) REORGANIZATION.—The term 'reorganization' means the restructuring event or events (including any merger event) giving effect to the Holding Company structure described in subsection (a).

"(7) REORGANIZATION EFFECTIVE DATE.—The term 'reorganization effective date' means the effective date of the reorganization as determined by the Board of Directors of the Association, which shall not be earlier than the date that shareholder approval is obtained pursuant to subsection (b) and shall not be later than the date that is 18 months after the date of enactment of this section.

"(8) SUBSIDIARY.—The term 'subsidiary' means one or more direct or indirect subsidiaries.".

(b) TECHNICAL AMENDMENTS.—

(1) ELIGIBLE LENDER.—

(A) AMENDMENTS TO THE HIGHER EDUCATION ACT.—

<< 20 USCA § 1085 >>

(i) DEFINITION OF ELIGIBLE LENDER.—Section 435(d)(1)(F) of the Higher Education Act of 1965 (20 U.S.C. 1085(d)(1)(F)) is amended by inserting after "Student Loan Marketing Association" the following: "or the Holding Company of the Student Loan Marketing Association, including any subsidiary of the Holding Company, created pursuant to section 440,".

<< 20 USCA §§ 1078–3, 1085 >>

(ii) DEFINITION OF ELIGIBLE LENDER AND FEDERAL CONSOLIDATION LOANS.—Sections 435(d)(1)(G) and 428C(a)(1)(A) of such Act (20 U.S.C. 1085(d)(1)(G) and 1078–3(a)(1)(A)) are each amended by inserting after "Student Loan Marketing Association" the following: "or the Holding Company of the Student Loan Marketing Association, including any subsidiary of the Holding Company, created pursuant to section 440".

<< 20 USCA § 1078–3 NOTE >>

(B) EFFECTIVE DATE.—The amendments made by this paragraph shall take effect on the reorganization effective date as defined in section 440(h) of the Higher Education Act of 1965 (as added by subsection (a)).

<< 20 USCA § 1087–2 >>

(2) ENFORCEMENT OF SAFETY AND SOUNDNESS REQUIREMENTS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is amended—

(A) in the first sentence of paragraph (12), by inserting "or the Association's associated persons" after "by the Association";

(B) by redesignating paragraph (13) as paragraph (15); and

(C) by inserting after paragraph (12) the following new paragraph:

"(13) ENFORCEMENT OF SAFETY AND SOUNDNESS REQUIREMENTS.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of this section, or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with this section.".

(3) FINANCIAL SAFETY AND SOUNDNESS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is further amended—

(A) in paragraph (1)—

(i) by striking "and" at the end of subparagraph (A);

(ii) by striking the period at the end of subparagraph (B) and inserting "; and"; and

(iii) by adding at the end the following new subparagraph:

"(C)(i) financial statements of the Association within 45 days of the end of each fiscal quarter; and

"(ii) reports setting forth the calculation of the capital ratio of the Association within 45 days of the end of each fiscal quarter.";

(B) in paragraph (2)—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(i) by striking clauses (i) and (ii) of subparagraph (A) and inserting the following:

"(i) appoint auditors or examiners to conduct audits of the Association from time to time to determine the condition of the Association for the purpose of assessing the Association's financial safety and soundness and to determine whether the requirements of this section and section 440 are being met; and

"(ii) obtain the services of such experts as the Secretary of the Treasury determines necessary and appropriate, as authorized by section 3109 of title 5, United States Code, to assist in determining the condition of the Association for the purpose of assessing the Association's financial safety and soundness, and to determine whether the requirements of this section and section 440 are being met."; and

(ii) by adding at the end the following new subparagraph:

"(D) ANNUAL ASSESSMENT.—

"(i) IN GENERAL.—For each fiscal year beginning on or after October 1, 1996, the Secretary of the Treasury may establish and collect from the Association an assessment (or assessments) in amounts sufficient to provide for reasonable costs and expenses of carrying out the duties of the Secretary of the Treasury under this section and section 440 during such fiscal year. In no event may the total amount so assessed exceed, for any fiscal year, $800,000, adjusted for each fiscal year ending after September 30, 1997, by the ratio of the Consumer Price Index for All Urban Consumers (issued by the Bureau of Labor Statistics) for the final month of the fiscal year preceding the fiscal year for which the assessment is made to the Consumer Price Index for All Urban Consumers for September 1997.

"(ii) DEPOSIT.—Amounts collected from assessments under this subparagraph shall be deposited in an account within the Treasury of the United States as designated by the Secretary of the Treasury for that purpose. The Secretary of the Treasury is authorized and directed to pay out of any funds available in such account the reasonable costs and expenses of carrying out the duties of the Secretary of the Treasury under this section and section 440. None of the funds deposited into such account shall be available for any purpose other than making payments for such costs and expenses."; and

(C) by inserting after paragraph (13) (as added by paragraph (2)(C)) the following new paragraph:

"(14) ACTIONS BY SECRETARY.—

"(A) IN GENERAL.—For any fiscal quarter ending after January 1, 2000, the Association shall have a capital ratio of at least 2.25 percent. The Secretary of the Treasury may, whenever such capital ratio is not met, take any one or more of the actions described in paragraph (7), except that—

"(i) the capital ratio to be restored pursuant to paragraph (7)(D) shall be 2.25 percent; and

"(ii) if the relevant capital ratio is in excess of or equal to 2 percent for such quarter, the Secretary of the Treasury shall defer taking any of the actions set forth in paragraph (7) until the next succeeding quarter and may then proceed with any such action only if the capital ratio of the Association remains below 2.25 percent.

"(B) APPLICABILITY.—The provisions of paragraphs (4), (5), (6), (8), (9), (10), and (11) shall be of no further application to the Association for any period after January 1, 2000.".

(4) INFORMATION REQUIRED; DIVIDENDS.—Section 439(r) of the Higher Education Act of 1965 (20 U.S.C. 1087–2(r)) is further amended—

(A) by adding at the end of paragraph (2) (as amended in paragraph (3)(B)(ii)) the following new subparagraph:

"(E) OBLIGATION TO OBTAIN, MAINTAIN, AND REPORT INFORMATION.—

"(i) IN GENERAL.—The Association shall obtain such information and make and keep such records as the Secretary of the Treasury may from time to time prescribe concerning—

"(I) the financial risk to the Association resulting from the activities of any associated person, to the extent such activities are reasonably likely to have a material impact on the financial condition of the Association, including the Association's capital ratio, the Association's liquidity, or the Association's ability to conduct and finance the Association's operations; and

"(II) the Association's policies, procedures, and systems for monitoring and controlling any such financial risk.

"(ii) SUMMARY REPORTS.—The Secretary of the Treasury may require summary reports of such information to be filed no more frequently than quarterly. If, as a result of adverse market conditions or based on reports provided pursuant to this subparagraph or other available information, the Secretary of the Treasury has concerns regarding the financial or operational condition of the Association, the Secretary of the Treasury may, notwithstanding the preceding sentence and clause (i), require the Association to make reports concerning the activities of any associated person, whose business activities are reasonably likely to have a material impact on the financial or operational condition of the Association.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(iii) DEFINITION.—For purposes of this subparagraph, the term 'associated person' means any person, other than a natural person, directly or indirectly controlling, controlled by, or under common control with the Association."; and

(B) by adding at the end the following new paragraphs:

"(16) DIVIDENDS.—The Association may pay dividends in the form of cash or noncash distributions so long as at the time of the declaration of such dividends, after giving effect to the payment of such dividends as of the date of such declaration by the Board of Directors of the Association, the Association's capital would be in compliance with the capital standards set forth in this section.

"(17) CERTIFICATION PRIOR TO PAYMENT OF DIVIDEND.—Prior to the payment of any dividend under paragraph (16), the Association shall certify to the Secretary of the Treasury that the payment of the dividend will be made in compliance with paragraph (16) and shall provide copies of all calculations needed to make such certification.".

(c) SUNSET OF THE ASSOCIATION'S CHARTER IF NO REORGANIZATION PLAN OCCURS.—Section 439 of the Higher Education Act of 1965 (20 U.S.C. 1087–2) is amended by adding at the end the following new subsection:

"(s) CHARTER SUNSET.—

"(1) APPLICATION OF PROVISIONS.—This subsection applies beginning 18 months and one day after the date of enactment of this subsection if no reorganization of the Association occurs in accordance with the provisions of section 440.

"(2) SUNSET PLAN.—

"(A) PLAN SUBMISSION BY THE ASSOCIATION.—Not later than July 1, 2007, the Association shall submit to the Secretary of the Treasury and to the Chairman and Ranking Member of the Committee on Labor and Human Resources of the Senate and the Chairman and Ranking Member of the Committee on Economic and Educational Opportunities of the House of Representatives, a detailed plan for the orderly winding up, by July 1, 2013, of business activities conducted pursuant to the charter set forth in this section. Such plan shall—

"(i) ensure that the Association will have adequate assets to transfer to a trust, as provided in this subsection, to ensure full payment of remaining obligations of the Association in accordance with the terms of such obligations;

"(ii) provide that all assets not used to pay liabilities shall be distributed to shareholders as provided in this subsection; and

"(iii) provide that the operations of the Association shall remain separate and distinct from that of any entity to which the assets of the Association are transferred.

"(B) AMENDMENT OF THE PLAN BY THE ASSOCIATION.—The Association shall from time to time amend such plan to reflect changed circumstances, and submit such amendments to the Secretary of the Treasury and to the Chairman and Ranking Minority Member of the Committee on Labor and Human Resources of the Senate and Chairman and Ranking Minority Member of the Committee on Economic and Educational Opportunities of the House of Representatives. In no case may any amendment extend the date for full implementation of the plan beyond the dissolution date provided in paragraph (3).

"(C) PLAN MONITORING.—The Secretary of the Treasury shall monitor the Association's compliance with the plan and shall continue to review the plan (including any amendments thereto).

"(D) AMENDMENT OF THE PLAN BY THE SECRETARY OF THE TREASURY.—The Secretary of the Treasury may require the Association to amend the plan (including any amendments to the plan), if the Secretary of the Treasury deems such amendments necessary to ensure full payment of all obligations of the Association.

"(E) IMPLEMENTATION BY THE ASSOCIATION.—The Association shall promptly implement the plan (including any amendments to the plan, whether such amendments are made by the Association or are required to be made by the Secretary of the Treasury).

"(3) DISSOLUTION OF THE ASSOCIATION.—The Association shall dissolve and the Association's separate existence shall terminate on July 1, 2013, after discharge of all outstanding debt obligations and liquidation pursuant to this subsection. The Association may dissolve pursuant to this subsection prior to such date by notifying the Secretary of Education and the Secretary of the Treasury of the Association's intention to dissolve, unless within 60 days of receipt of such notice the Secretary of Education notifies the Association that the Association continues to be needed to serve as a lender of last resort pursuant to subsection (q) or continues to be needed to purchase loans under an agreement with the Secretary described in paragraph (4) (A). On the dissolution date, the Association shall take the following actions:

"(A) ESTABLISHMENT OF A TRUST.—The Association shall, under the terms of an irrevocable trust agreement in form and substance satisfactory to the Secretary of the Treasury, the Association, and the appointed trustee, irrevocably transfer all remaining obligations of the Association to a trust and irrevocably deposit or cause to be deposited into such trust, to be held

as trust funds solely for the benefit of holders of the remaining obligations, money or direct noncallable obligations of the United States or any agency thereof for which payment the full faith and credit of the United States is pledged, maturing as to principal and interest in such amounts and at such times as are determined by the Secretary of the Treasury to be sufficient, without consideration of any significant reinvestment of such interest, to pay the principal of, and interest on, the remaining obligations in accordance with their terms.

"(B) USE OF TRUST ASSETS.—All money, obligations, or financial assets deposited into the trust pursuant to this subsection shall be applied by the trustee to the payment of the remaining obligations assumed by the trust. Upon the fulfillment of the trustee's duties under the trust, any remaining assets of the trust shall be transferred to the persons who, at the time of the dissolution, were the shareholders of the Association, or to the legal successors or assigns of such persons.

"(C) OBLIGATIONS NOT TRANSFERRED TO THE TRUST.—The Association shall make proper provision for all other obligations of the Association, including the repurchase or redemption, or the making of proper provision for the repurchase or redemption, of any preferred stock of the Association outstanding.

"(D) TRANSFER OF REMAINING ASSETS.—After compliance with subparagraphs (A) and (C), the Association shall transfer to the shareholders of the Association any remaining assets of the Association.

"(4) RESTRICTIONS RELATING TO WINDING UP.—

"(A) RESTRICTIONS ON NEW BUSINESS ACTIVITY OR ACQUISITION OF ASSETS BY THE ASSOCIATION.—

"(i) IN GENERAL.—Beginning on July 1, 2009, the Association shall not engage in any new business activities or acquire any additional program assets (including acquiring assets pursuant to contractual commitments) described in subsection (d) other than in connection with the Association—

"(I) serving as a lender of last resort pursuant to subsection (q); and

"(II) purchasing loans insured under this part, if the Secretary, with the approval of the Secretary of the Treasury, enters into an agreement with the Association for the continuation or resumption of the Association's secondary market purchase program because the Secretary determines there is inadequate liquidity for loans made under this part.

"(ii) AGREEMENT.—The Secretary is authorized to enter into an agreement described in subclause (II) of clause (i) with the Association covering such secondary market activities. Any agreement entered into under such subclause shall cover a period of 12 months, but may be renewed if the Secretary determines that liquidity remains inadequate. The fee provided under subsection (h)(7) shall not apply to loans acquired under any such agreement with the Secretary.

"(B) ISSUANCE OF DEBT OBLIGATIONS DURING THE WIND UP PERIOD; ATTRIBUTES OF DEBT OBLIGATIONS.—The Association shall not issue debt obligations which mature later than July 1, 2013, except in connection with serving as a lender of last resort pursuant to subsection (q) or with purchasing loans under an agreement with the Secretary as described in subparagraph (A). Nothing in this subsection shall modify the attributes accorded the debt obligations of the Association by this section, regardless of whether such debt obligations are transferred to a trust in accordance with paragraph (3).

"(C) USE OF ASSOCIATION NAME.—The Association may not transfer or permit the use of the name 'Student Loan Marketing Association', 'Sallie Mae', or any variation thereof, to or by any entity other than a subsidiary of the Association.".

(d) REPEALS.—

<< 20 USCA §§ 1087–2, 1087–3 >>

(1) IN GENERAL.—Sections 439 of the Higher Education Act of 1965 (20 U.S.C. 1087–2) and 440 of such Act (as added by subsection (a) of this section) are repealed.

<< 20 USCA § 1087–2 NOTE >>

(2) EFFECTIVE DATE.—The repeals made by paragraph (1) shall be effective one year after—

(A) the date on which all of the obligations of the trust established under section 440(d)(1) of the Higher Education Act of 1965 (as added by subsection (a)) have been extinguished, if a reorganization occurs in accordance with section 440 of such Act; or

(B) the date on which all of the obligations of the trust established under subsection 439(s)(3)(A) of such Act (as added by subsection (c)) have been extinguished, if a reorganization does not occur in accordance with section 440 of such Act.

(e) ASSOCIATION NAMES.—Upon dissolution in accordance with section 439(s) of the Higher Education Act of 1965 (20 U.S.C. 1087–2), the names "Student Loan Marketing Association", "Sallie Mae", and any variations thereof may not be used by any entity engaged in any business similar to the business conducted pursuant to section 439 of such Act (as such section was in effect on the date of enactment of this Act) without the approval of the Secretary of the Treasury.

(f) RIGHT TO ENFORCE.—The Secretary of Education or the Secretary of the Treasury, as appropriate, may request that the Attorney General bring an action in the United States District Court for the District of Columbia for the enforcement of any provision of subsection (e), or may, under the direction or control of the Attorney General, bring such an action. Such court shall have jurisdiction and power to order and require compliance with subsection (e).

<< 20 USCA § 1132f–10 >>

SEC. 603. CONNIE LEE PRIVATIZATION.

(a) STATUS OF THE CORPORATION AND CORPORATE POWERS; OBLIGATIONS NOT FEDERALLY GUARANTEED.—

(1) STATUS OF THE CORPORATION.—The Corporation shall not be an agency, instrumentality, or establishment of the United States Government, nor a Government corporation, nor a Government controlled corporation, as such terms are defined in section 103 of title 5, United States Code. No action under section 1491 of title 28, United States Code (commonly known as the Tucker Act) shall be allowable against the United States based on the actions of the Corporation.

(2) CORPORATE POWERS.—The Corporation shall be subject to the provisions of this section, and, to the extent not inconsistent with this section, to the District of Columbia Business Corporation Act (or the comparable law of another State, if applicable). The Corporation shall have the powers conferred upon a corporation by the District of Columbia Business Corporation Act (or such other applicable State law) as from time to time in effect in order to conduct the Corporation's affairs as a private, for-profit corporation and to carry out the Corporation's purposes and activities incidental thereto. The Corporation shall have the power to enter into contracts, to execute instruments, to incur liabilities, to provide products and services, and to do all things as are necessary or incidental to the proper management of the Corporation's affairs and the efficient operation of a private, for-profit business.

(3) LIMITATION ON OWNERSHIP OF STOCK.—

(A) STUDENT LOAN MARKETING ASSOCIATION.—The Student Loan Marketing Association shall not increase its share of the ownership of the Corporation in excess of 42 percent of the shares of stock of the Corporation outstanding on the date of enactment of this Act. The Student Loan Marketing Association shall not control the operation of the Corporation, except that the Student Loan Marketing Association may participate in the election of directors as a shareholder, and may continue to exercise the Student Loan Marketing Association's right to appoint directors under section 754 of the Higher Education Act of 1965 (20 U.S.C. 1132f–3) as long as that section is in effect.

(B) PROHIBITION.—Until such time as the Secretary of the Treasury sells the stock of the Corporation owned by the Secretary of Education pursuant to subsection (c), the Student Loan Marketing Association shall not provide financial support or guarantees to the Corporation.

(C) FINANCIAL SUPPORT OR GUARANTEES.—After the Secretary of the Treasury sells the stock of the Corporation owned by the Secretary of Education pursuant to subsection (c), the Student Loan Marketing Association may provide financial support or guarantees to the Corporation, if such support or guarantees are subject to terms and conditions that are no more advantageous to the Corporation than the terms and conditions the Student Loan Marketing Association provides to other entities, including, where applicable, other monoline financial guaranty corporations in which the Student Loan Marketing Association has no ownership interest.

(4) NO FEDERAL GUARANTEE.—

(A) OBLIGATIONS INSURED BY THE CORPORATION.—

(i) FULL FAITH AND CREDIT OF THE UNITED STATES.—No obligation that is insured, guaranteed, or otherwise backed by the Corporation shall be deemed to be an obligation that is guaranteed by the full faith and credit of the United States.

(ii) STUDENT LOAN MARKETING ASSOCIATION.—No obligation that is insured, guaranteed, or otherwise backed by the Corporation shall be deemed to be an obligation that is guaranteed by the Student Loan Marketing Association.

(iii) SPECIAL RULE.—This paragraph shall not affect the determination of whether such obligation is guaranteed for purposes of Federal income taxes.

(B) SECURITIES OFFERED BY THE CORPORATION.—No debt or equity securities of the Corporation shall be deemed to be guaranteed by the full faith and credit of the United States.

(5) DEFINITION.—The term "Corporation" as used in this section means the College Construction Loan Insurance Association as in existence on the day before the date of enactment of this Act, and any successor corporation.

(b) RELATED PRIVATIZATION REQUIREMENTS.—

(1) NOTICE REQUIREMENTS.—

(A) IN GENERAL.—During the six-year period following the date of enactment of this Act, the Corporation shall include, in each of the Corporation's contracts for the insurance, guarantee, or reinsurance of obligations, and in each document offering debt or equity securities of the Corporation, a prominent statement providing notice that—

(i) such obligations or such securities, as the case may be, are not obligations of the United States, nor are such obligations or such securities, as the case may be, guaranteed in any way by the full faith and credit of the United States; and

(ii) the Corporation is not an instrumentality of the United States.

(B) ADDITIONAL NOTICE.—During the five-year period following the sale of stock pursuant to subsection (c)(1), in addition to the notice requirements in subparagraph (A), the Corporation shall include, in each of the contracts and documents referred to in such subparagraph, a prominent statement providing notice that the United States is not an investor in the Corporation.

(2) CORPORATE CHARTER.—The Corporation's charter shall be amended as necessary and without delay to conform to the requirements of this section.

(3) CORPORATE NAME.—The name of the Corporation, or of any direct or indirect subsidiary thereof, may not contain the term "College Construction Loan Insurance Association", or any substantially similar variation thereof.

(4) ARTICLES OF INCORPORATION.—The Corporation shall amend the Corporation's articles of incorporation without delay to reflect that one of the purposes of the Corporation shall be to guarantee, insure, and reinsure bonds, leases, and other evidences of debt of educational institutions, including Historically Black Colleges and Universities and other academic institutions which are ranked in the lower investment grade category using a nationally recognized credit rating system.

(5) REQUIREMENTS UNTIL STOCK SALE.—Notwithstanding subsection (d), the requirements of sections 754 and 760 of the Higher Education Act of 1965 (20 U.S.C. 1132f–3 and 1132f–9), as such sections were in effect on the day before the date of enactment of this Act, shall continue to be effective until the day immediately following the date of closing of the purchase of the Secretary of Education's stock (or the date of closing of the final purchase, in the case of multiple transactions) pursuant to subsection (c)(1) of this Act.

(c) SALE OF FEDERALLY OWNED STOCK.—

(1) PURCHASE BY THE CORPORATION.—The Secretary of the Treasury shall sell and the Corporation shall purchase, within 90 days after the date of enactment of this Act, the stock of the Corporation held by the Secretary of Education at a price determined by the binding, independent appraisal of a nationally recognized financial firm, except that the 90–day period may be extended by mutual agreement of the Secretary of the Treasury and the Corporation to not more than 150 days after the date of enactment of this Act. The appraiser shall be jointly selected by the Secretary of the Treasury and the Corporation. In the event that the Secretary of the Treasury and the Corporation cannot agree on the appraiser, then the Secretary of the Treasury and the Corporation shall name an independent third party to select the appraiser.

(2) REIMBURSEMENT OF COSTS AND EXPENSES OF SALE.—The Secretary of the Treasury shall be reimbursed from the proceeds of the sale of the stock under this subsection for all reasonable costs and expenses related to such sale, except that one-half of all reasonable costs and expenses relating to the independent appraisal under paragraph (1) shall be borne by the Corporation.

(3) DEPOSIT INTO ACCOUNT.—Amounts collected from the sale of stock pursuant to this subsection that are not used to reimburse the Secretary of the Treasury pursuant to paragraph (2) shall be deposited into the account established under subsection (e).

(4) ASSISTANCE BY THE CORPORATION.—The Corporation shall provide such assistance as the Secretary of the Treasury and the Secretary of Education may require to facilitate the sale of the stock under this subsection.

(5) REPORT TO CONGRESS.—Not later than 6 months after the date of enactment of this Act, the Secretary of the Treasury shall report to the appropriate committees of Congress on the completion and terms of the sale of stock of the Corporation pursuant to this subsection.

<< 20 USCA §§ 1132f, 1132f–1, 1132f–2, 1132f–3, 1132f–4, 1132f–5, 1132f–6, 1132f–7, 1132f–8, 1132f–9 >>

<< 20 USCA § 1132f–10 >>

(d) REPEAL OF STATUTORY RESTRICTIONS AND RELATED PROVISIONS.—Part D of title VII of the Higher Education Act of 1965 (20 U.S.C. 1132f et seq.) is repealed.

<< 20 USCA § 1132f–10 >>

(e) ESTABLISHMENT OF ACCOUNT.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the District of Columbia Financial Responsibility and Management Assistance Authority shall establish an account to receive—

(A) amounts collected from the sale and proceeds resulting from the exercise of stock warrants pursuant to section 440(c)(9) of the Higher Education Act of 1965;

(B) amounts and proceeds remitted as compensation for the right to assign the "Sallie Mae" name as a trademark or service mark pursuant to section 440(e)(3) of the Higher Education Act of 1965; and

(C) amounts and proceeds collected from the sale of the stock of the Corporation and deposited pursuant to subsection (c)(3).

(2) AMOUNTS AND PROCEEDS.—

(A) AMOUNTS AND PROCEEDS RELATING TO SALLIE MAE.—The amounts and proceeds described in subparagraphs (A) and (B) of paragraph (1) shall be used to finance public elementary and secondary school facility construction and repair within the District of Columbia or to carry out the District of Columbia School Reform Act of 1995.

(B) AMOUNTS AND PROCEEDS RELATING TO CONNIE LEE.—The amounts and proceeds described in subparagraph (C) of paragraph (1) shall be used to finance public elementary and secondary school facility construction and repair within the District of Columbia.

<< 20 USCA § 1087–4 >>

SEC. 604. DISCRIMINATION IN SECONDARY MARKETS PROHIBITED.

Part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) is amended by adding after section 440 (as added by section 602) the following new section:

"SEC. 440A. DISCRIMINATION IN SECONDARY MARKETS PROHIBITED.

"The Student Loan Marketing Association (and, if the Association is privatized under section 440, any successor entity functioning as a secondary market for loans under this part, including the Holding Company described in such section) shall not engage directly or indirectly in any pattern or practice that results in a denial of a borrower's access to loans under this part because of the borrower's race, sex, color, religion, national origin, age, disability status, income, attendance at a particular eligible institution, length of the borrower's educational program, or the borrower's academic year at an eligible institution.".

TITLE VII—MUSEUM AND LIBRARY SERVICES ACT OF 1996

<< 20 USCA § 9101 NOTE >>

SECTION 701. SHORT TITLE.

This title may be cited as the "Museum and Library Services Act of 1996".

<< 20 USCA §§ 961, 962, 963, 964, 965, 966, 967, 968, 969 >>

<< 20 USCA § 961 NOTE >>

SEC. 702. MUSEUM AND LIBRARY SERVICES.

 The Museum Services Act (20 U.S.C. 961 et seq.) is amended to read as follows:

"TITLE II—MUSEUM AND LIBRARY SERVICES

<< 20 USCA Ch. 72 >>

"Subtitle A—General Provisions

<< 20 USCA § 9101 NOTE >>

"SEC. 201. SHORT TITLE.

 "This title may be cited as the 'Museum and Library Services Act'.

<< 20 USCA § 9101 >>

"SEC. 202. GENERAL DEFINITIONS.

 "As used in this title:
  "(1) COMMISSION.—The term 'Commission' means the National Commission on Libraries and Information Science established under section 3 of the National Commission on Libraries and Information Sciences Act (20 U.S.C. 1502).
  "(2) DIRECTOR.—The term 'Director' means the Director of the Institute appointed under section 204.
  "(3) INSTITUTE.—The term 'Institute' means the Institute of Museum and Library Services established under section 203.
  "(4) MUSEUM BOARD.—The term 'Museum Board' means the National Museum Services Board established under section 275.

<< 20 USCA § 9102 >>

"SEC. 203. INSTITUTE OF MUSEUM AND LIBRARY SERVICES.

  "(a) ESTABLISHMENT.—There is established, within the National Foundation on the Arts and the Humanities, an Institute of Museum and Library Services.
  "(b) OFFICES.—The Institute shall consist of an Office of Museum Services and an Office of Library Services. There shall be a National Museum Services Board in the Office of Museum Services.

<< 20 USCA § 9103 >>

"SEC. 204. DIRECTOR OF THE INSTITUTE.

 "(a) APPOINTMENT.—
  "(1) IN GENERAL.—The Institute shall be headed by a Director, appointed by the President, by and with the advice and consent of the Senate.
  "(2) TERM.—The Director shall serve for a term of 4 years.
  "(3) QUALIFICATIONS.—Beginning with the first individual appointed to the position of Director after the date of enactment of the Museum and Library Services Act of 1996, every second individual so appointed shall be appointed from among individuals who have special competence with regard to library and information services. Beginning with the second individual appointed to the position of Director after the date of enactment of the Museum and Library Services Act of 1996, every second individual so appointed shall be appointed from among individuals who have special competence with regard to museum services.

"(b) COMPENSATION.—The Director may be compensated at the rate provided for level III of the Executive Schedule under section 5314 of title 5, United States Code.

"(c) DUTIES AND POWERS.—The Director shall perform such duties and exercise such powers as may be prescribed by law, including awarding financial assistance for activities described in this title.

"(d) NONDELEGATION.—The Director shall not delegate any of the functions of the Director to any person who is not an officer or employee of the Institute.

"(e) COORDINATION.—The Director shall ensure coordination of the policies and activities of the Institute with the policies and activities of other agencies and offices of the Federal Government having interest in and responsibilities for the improvement of museums and libraries and information services.

<< 20 USCA § 9104 >>

"SEC. 205. DEPUTY DIRECTORS.

"The Office of Library Services shall be headed by a Deputy Director, who shall be appointed by the Director from among individuals who have a graduate degree in library science and expertise in library and information services. The Office of Museum Services shall be headed by a Deputy Director, who shall be appointed by the Director from among individuals who have expertise in museum services.

<< 20 USCA § 9105 >>

"SEC. 206. PERSONNEL.

"(a) IN GENERAL.—The Director may, in accordance with applicable provisions of title 5, United States Code, appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute.

"(b) VOLUNTARY SERVICES.—The Director may accept and utilize the voluntary services of individuals and reimburse the individuals for travel expenses, including per diem in lieu of subsistence, in the same amounts and to the same extent as authorized under section 5703 of title 5, United States Code, for persons employed intermittently in Federal Government service.

<< 20 USCA § 9106 >>

"SEC. 207. CONTRIBUTIONS.

"The Institute is authorized to solicit, accept, receive, and invest in the name of the United States, gifts, bequests, or devises of money and other property or services and to use such property or services in furtherance of the functions of the Institute. Any proceeds from such gifts, bequests, or devises, after acceptance by the Institute, shall be paid by the donor or the representative of the donor to the Director. The Director shall enter the proceeds in a special-interest bearing account to the credit of the Institute for the purposes specified in each case.

<< 20 USCA Ch. 72 >>

"Subtitle B—Library Services and Technology

<< 20 USCA § 9101 NOTE >>

"SEC. 211. SHORT TITLE.

"This subtitle may be cited as the 'Library Services and Technology Act'.

<< 20 USCA § 9121 >>

"SEC. 212. PURPOSE.

"It is the purpose of this subtitle—

"(1) to consolidate Federal library service programs;

"(2) to stimulate excellence and promote access to learning and information resources in all types of libraries for individuals of all ages;

"(3) to promote library services that provide all users access to information through State, regional, national and international electronic networks;

"(4) to provide linkages among and between libraries; and

"(5) to promote targeted library services to people of diverse geographic, cultural, and socioeconomic backgrounds, to individuals with disabilities, and to people with limited functional literacy or information skills.

<< 20 USCA § 9122 >>

"SEC. 213. DEFINITIONS.

"As used in this subtitle:

"(1) INDIAN TRIBE.—The term 'Indian tribe' means any tribe, band, nation, or other organized group or community, including any Alaska native village, regional corporation, or village corporation, as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), which is recognized by the Secretary of the Interior as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

"(2) LIBRARY.—The term 'library' includes—

"(A) a public library;

"(B) a public elementary school or secondary school library;

"(C) an academic library;

"(D) a research library, which for the purposes of this subtitle means a library that—

"(i) makes publicly available library services and materials suitable for scholarly research and not otherwise available to the public; and

"(ii) is not an integral part of an institution of higher education; and

"(E) a private library, but only if the State in which such private library is located determines that the library should be considered a library for purposes of this subtitle.

"(3) LIBRARY CONSORTIUM.—The term 'library consortium' means any local, statewide, regional, interstate, or international cooperative association of library entities which provides for the systematic and effective coordination of the resources of school, public, academic, and special libraries and information centers, for improved services for the clientele of such library entities.

"(4) STATE.—The term 'State', unless otherwise specified, includes each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

"(5) STATE LIBRARY ADMINISTRATIVE AGENCY.—The term 'State library administrative agency' means the official agency of a State charged by the law of the State with the extension and development of public library services throughout the State.

"(6) STATE PLAN.—The term 'State plan' means the document which gives assurances that the officially designated State library administrative agency has the fiscal and legal authority and capability to administer all aspects of this subtitle, provides assurances for establishing the State's policies, priorities, criteria, and procedures necessary to the implementation of all programs under this subtitle, submits copies for approval as required by regulations promulgated by the Director, identifies a State's library needs, and sets forth the activities to be taken toward meeting the identified needs supported with the assistance of Federal funds made available under this subtitle.

<< 20 USCA § 9123 >>

"SEC. 214. AUTHORIZATION OF APPROPRIATIONS.

"(a) AUTHORIZATION OF APPROPRIATIONS.—

"(1) IN GENERAL.—There are authorized to be appropriated $150,000,000 for fiscal year 1997 and such sums as may be necessary for each of the fiscal years 1998 through 2002 to carry out this subtitle.

"(2) TRANSFER.—The Secretary of Education shall—

"(A) transfer promptly to the Director any funds appropriated under the authority of paragraph (1), to enable the Director to carry out this subtitle; and

"(B) not exercise any authority concerning the administration of this title other than the transfer described in subparagraph (A).

"(b) FORWARD FUNDING.—

"(1) IN GENERAL.—To the end of affording the responsible Federal, State, and local officers adequate notice of available Federal financial assistance for carrying out ongoing library activities and projects, appropriations for grants, contracts, or other payments under any program under this subtitle are authorized to be included in the appropriations Act for the fiscal year preceding the fiscal year during which such activities and projects shall be carried out.

"(2) ADDITIONAL AUTHORIZATION OF APPROPRIATIONS.—In order to effect a transition to the timing of appropriation action authorized by subsection (a), the application of this section may result in the enactment, in a fiscal year, of separate appropriations for a program under this subtitle (whether in the same appropriations Act or otherwise) for two consecutive fiscal years.

"(c) ADMINISTRATION.—Not more than 3 percent of the funds appropriated under this section for a fiscal year may be used to pay for the Federal administrative costs of carrying out this subtitle.

<< 20 USCA Ch. 72 >>

"CHAPTER 1—BASIC PROGRAM REQUIREMENTS

<< 20 USCA § 9131 >>

"SEC. 221. RESERVATIONS AND ALLOTMENTS.

"(a) RESERVATIONS.—

"(1) IN GENERAL.—From the amount appropriated under the authority of section 214 for any fiscal year, the Director—

"(A) shall reserve 1½ percent to award grants in accordance with section 261; and

"(B) shall reserve 4 percent to award national leadership grants or contracts in accordance with section 262.

"(2) SPECIAL RULE.—If the funds reserved pursuant to paragraph (1)(B) for a fiscal year have not been obligated by the end of such fiscal year, then such funds shall be allotted in accordance with subsection (b) for the fiscal year succeeding the fiscal year for which the funds were so reserved.

"(b) ALLOTMENTS.—

"(1) IN GENERAL.—From the sums appropriated under the authority of section 214 and not reserved under subsection (a) for any fiscal year, the Director shall award grants from minimum allotments, as determined under paragraph (3), to each State. Any sums remaining after minimum allotments are made for such year shall be allotted in the manner set forth in paragraph (2).

"(2) REMAINDER.—From the remainder of any sums appropriated under the authority of section 214 that are not reserved under subsection (a) and not allotted under paragraph (1) for any fiscal year, the Director shall award grants to each State in an amount that bears the same relation to such remainder as the population of the State bears to the population of all States.

"(3) MINIMUM ALLOTMENT.—

"(A) IN GENERAL.—For the purposes of this subsection, the minimum allotment for each State shall be $340,000, except that the minimum allotment shall be $40,000 in the case of the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

"(B) RATABLE REDUCTIONS.—If the sum appropriated under the authority of section 214 and not reserved under subsection (a) for any fiscal year is insufficient to fully satisfy the aggregate of the minimum allotments for all States for that purpose for such year, each of such minimum allotments shall be reduced ratably.

"(C) SPECIAL RULE.—

"(i) IN GENERAL.—Notwithstanding any other provision of this subsection and using funds allotted for the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau under this subsection, the Director shall award grants to Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, or the Republic of Palau to carry out activities described in this subtitle in accordance with the provisions of this subtitle that the Director determines are not inconsistent with this subparagraph.

"(ii) AWARD BASIS.—The Director shall award grants pursuant to clause (i) on a competitive basis and pursuant to recommendations from the Pacific Region Educational Laboratory in Honolulu, Hawaii.

"(iii) TERMINATION OF ELIGIBILITY.—Notwithstanding any other provision of law, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau shall not receive any funds under this subtitle for any fiscal year that begins after September 30, 2001.

"(iv) ADMINISTRATIVE COSTS.—The Director may provide not more than 5 percent of the funds made available for grants under this subparagraph to pay the administrative costs of the Pacific Region Educational Laboratory regarding activities assisted under this subparagraph.

"(4) DATA.—The population of each State and of all the States shall be determined by the Director on the basis of the most recent data available from the Bureau of the Census.

<< 20 USCA § 9132 >>

"SEC. 222. ADMINISTRATION.

"(a) IN GENERAL.—Not more than 4 percent of the total amount of funds received under this subtitle for any fiscal year by a State may be used for administrative costs.

"(b) CONSTRUCTION.—Nothing in this section shall be construed to limit spending for evaluation costs under section 224(c) from sources other than this subtitle.

<< 20 USCA § 9133 >>

"SEC. 223. PAYMENTS; FEDERAL SHARE; AND MAINTENANCE OF EFFORT REQUIREMENTS.

"(a) PAYMENTS.—Subject to appropriations provided pursuant to section 214, the Director shall pay to each State library administrative agency having a State plan approved under section 224 the Federal share of the cost of the activities described in the State plan.

"(b) FEDERAL SHARE.—

"(1) IN GENERAL.—The Federal share shall be 66 percent.

"(2) NON–FEDERAL SHARE.—The non-Federal share of payments shall be provided from non-Federal, State, or local sources.

"(c) MAINTENANCE OF EFFORT.—

"(1) STATE EXPENDITURES.—

"(A) REQUIREMENT.—

"(i) IN GENERAL.—The amount otherwise payable to a State for a fiscal year pursuant to an allotment under this chapter shall be reduced if the level of State expenditures, as described in paragraph (2), for the previous fiscal year is less than the average of the total of such expenditures for the 3 fiscal years preceding that previous fiscal year. The amount of the reduction in allotment for any fiscal year shall be equal to the amount by which the level of such State expenditures for the fiscal year for which the determination is made is less than the average of the total of such expenditures for the 3 fiscal years preceding the fiscal year for which the determination is made.

"(ii) CALCULATION.—Any decrease in State expenditures resulting from the application of subparagraph (B) shall be excluded from the calculation of the average level of State expenditures for any 3–year period described in clause (i).

"(B) DECREASE IN FEDERAL SUPPORT.—If the amount made available under this subtitle for a fiscal year is less than the amount made available under this subtitle for the preceding fiscal year, then the expenditures required by subparagraph (A) for such preceding fiscal year shall be decreased by the same percentage as the percentage decrease in the amount so made available.

"(2) LEVEL OF STATE EXPENDITURES.—The level of State expenditures for the purposes of paragraph (1) shall include all State dollars expended by the State library administrative agency for library programs that are consistent with the purposes of this subtitle. All funds included in the maintenance of effort calculation under this subsection shall be expended during the fiscal year for which the determination is made, and shall not include capital expenditures, special one-time project costs, or similar windfalls.

"(3) WAIVER.—The Director may waive the requirements of paragraph (1) if the Director determines that such a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State.

<< 20 USCA § 9134 >>

"SEC. 224. STATE PLANS.

"(a) STATE PLAN REQUIRED.—

"(1) IN GENERAL.—In order to be eligible to receive a grant under this subtitle, a State library administrative agency shall submit a State plan to the Director not later than April 1, 1997.

"(2) DURATION.—The State plan shall cover a period of 5 fiscal years.

"(3) REVISIONS.—If a State library administrative agency makes a substantive revision to its State plan, then the State library administrative agency shall submit to the Director an amendment to the State plan containing such revision not later than April 1 of the fiscal year preceding the fiscal year for which the amendment will be effective.

"(b) CONTENTS.—The State plan shall—

"(1) establish goals, and specify priorities, for the State consistent with the purposes of this subtitle;

"(2) describe activities that are consistent with the goals and priorities established under paragraph (1), the purposes of this subtitle, and section 231, that the State library administrative agency will carry out during such year using such grant;

"(3) describe the procedures that such agency will use to carry out the activities described in paragraph (2);

"(4) describe the methodology that such agency will use to evaluate the success of the activities established under paragraph (2) in achieving the goals and meeting the priorities described in paragraph (1);

"(5) describe the procedures that such agency will use to involve libraries and library users throughout the State in policy decisions regarding implementation of this subtitle; and

"(6) provide assurances satisfactory to the Director that such agency will make such reports, in such form and containing such information, as the Director may reasonably require to carry out this subtitle and to determine the extent to which funds provided under this subtitle have been effective in carrying out the purposes of this subtitle.

"(c) EVALUATION AND REPORT.—Each State library administrative agency receiving a grant under this subtitle shall independently evaluate, and report to the Director regarding, the activities assisted under this subtitle, prior to the end of the 5–year plan.

"(d) INFORMATION.—Each library receiving assistance under this subtitle shall submit to the State library administrative agency such information as such agency may require to meet the requirements of subsection (c).

"(e) APPROVAL.—

"(1) IN GENERAL.—The Director shall approve any State plan under this subtitle that meets the requirements of this subtitle and provides satisfactory assurances that the provisions of such plan will be carried out.

"(2) PUBLIC AVAILABILITY.—Each State library administrative agency receiving a grant under this subtitle shall make the State plan available to the public.

"(3) ADMINISTRATION.—If the Director determines that the State plan does not meet the requirements of this section, the Director shall—

"(A) immediately notify the State library administrative agency of such determination and the reasons for such determination;

"(B) offer the State library administrative agency the opportunity to revise its State plan;

"(C) provide technical assistance in order to assist the State library administrative agency in meeting the requirements of this section; and

"(D) provide the State library administrative agency the opportunity for a hearing.

<< 20 USCA Ch. 72 >>

"CHAPTER 2—LIBRARY PROGRAMS

<< 20 USCA § 9141 >>

"SEC. 231. GRANTS TO STATES.

  "(a) IN GENERAL.—Of the funds provided to a State library administrative agency under section 214, such agency shall expend, either directly or through subgrants or cooperative agreements, at least 96 percent of such funds for—
  "(1)(A) establishing or enhancing electronic linkages among or between libraries;
  "(B) electronically linking libraries with educational, social, or information services;
  "(C) assisting libraries in accessing information through electronic networks;
  "(D) encouraging libraries in different areas, and encouraging different types of libraries, to establish consortia and share resources; or
  "(E) paying costs for libraries to acquire or share computer systems and telecommunications technologies; and
  "(2) targeting library and information services to persons having difficulty using a library and to underserved urban and rural communities, including children (from birth through age 17) from families with incomes below the poverty line (as defined by the Office of Management and Budget and revised annually in accordance with section 673(2) of the Community Services Block Grant Act (42 U.S.C. 9902(2)) applicable to a family of the size involved.
  "(b) SPECIAL RULE.—Each State library administrative agency receiving funds under this chapter may apportion the funds available for the purposes described in subsection (a) between the two purposes described in paragraphs (1) and (2) of such subsection, as appropriate, to meet the needs of the individual State.

<< 20 USCA Ch. 72 >>

"CHAPTER 3—ADMINISTRATIVE PROVISIONS

"Subchapter A—State Requirements

<< 20 USCA § 9151 >>

"SEC. 251. STATE ADVISORY COUNCILS.

  "Each State desiring assistance under this subtitle may establish a State advisory council which is broadly representative of the library entities in the State, including public, school, academic, special, and institutional libraries, and libraries serving individuals with disabilities.

<< 20 USCA Ch. 72 >>

"Subchapter B—Federal Requirements

<< 20 USCA § 9161 >>

"SEC. 261. SERVICES FOR INDIAN TRIBES.

  "From amounts reserved under section 221(a)(1)(A) for any fiscal year the Director shall award grants to organizations primarily serving and representing Indian tribes to enable such organizations to carry out the activities described in section 231.

<< 20 USCA § 9162 >>

"SEC. 262. NATIONAL LEADERSHIP GRANTS OR CONTRACTS.

"(a) IN GENERAL.—From the amounts reserved under section 221(a)(1)(B) for any fiscal year the Director shall establish and carry out a program awarding national leadership grants or contracts to enhance the quality of library services nationwide and to provide coordination between libraries and museums. Such grants or contracts shall be used for activities that may include—

  "(1) education and training of persons in library and information science, particularly in areas of new technology and other critical needs, including graduate fellowships, traineeships, institutes, or other programs;

  "(2) research and demonstration projects related to the improvement of libraries, education in library and information science, enhancement of library services through effective and efficient use of new technologies, and dissemination of information derived from such projects;

  "(3) preservation or digitization of library materials and resources, giving priority to projects emphasizing coordination, avoidance of duplication, and access by researchers beyond the institution or library entity undertaking the project; and

  "(4) model programs demonstrating cooperative efforts between libraries and museums.

"(b) GRANTS OR CONTRACTS.—

  "(1) IN GENERAL.—The Director may carry out the activities described in subsection (a) by awarding grants to, or entering into contracts with, libraries, agencies, institutions of higher education, or museums, where appropriate.

  "(2) COMPETITIVE BASIS.—Grants and contracts under this section shall be awarded on a competitive basis.

"(c) SPECIAL RULE.—The Director shall make every effort to ensure that activities assisted under this section are administered by appropriate library and museum professionals or experts.

<< 20 USCA § 9163 >>

"SEC. 263. STATE AND LOCAL INITIATIVES.

  "Nothing in this subtitle shall be construed to interfere with State and local initiatives and responsibility in the conduct of library services. The administration of libraries, the selection of personnel and library books and materials, and insofar as consistent with the purposes of this subtitle, the determination of the best uses of the funds provided under this subtitle, shall be reserved for the States and their local subdivisions.

<< 20 USCA Ch. 72 >>

"Subtitle C—Museum Services

<< 20 USCA § 9171 >>

"SEC. 271. PURPOSE.

  "It is the purpose of this subtitle—

  "(1) to encourage and assist museums in their educational role, in conjunction with formal systems of elementary, secondary, and postsecondary education and with programs of nonformal education for all age groups;

  "(2) to assist museums in modernizing their methods and facilities so that the museums are better able to conserve the cultural, historic, and scientific heritage of the United States; and

  "(3) to ease the financial burden borne by museums as a result of their increasing use by the public.

<< 20 USCA § 9172 >>

"SEC. 272. DEFINITIONS.

  "As used in this subtitle:

  "(1) MUSEUM.—The term 'museum' means a public or private nonprofit agency or institution organized on a permanent basis for essentially educational or aesthetic purposes, that utilizes a professional staff, owns or utilizes tangible objects, cares for the tangible objects, and exhibits the tangible objects to the public on a regular basis.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) STATE.—The term 'State' means each of the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

<< 20 USCA § 9173 >>

"SEC. 273. MUSEUM SERVICES ACTIVITIES.

"(a) GRANTS.—The Director, subject to the policy direction of the Museum Board, may make grants to museums to pay for the Federal share of the cost of increasing and improving museum services, through such activities as—

"(1) programs that enable museums to construct or install displays, interpretations, and exhibitions in order to improve museum services provided to the public;

"(2) assisting museums in developing and maintaining professionally trained or otherwise experienced staff to meet the needs of the museums;

"(3) assisting museums in meeting the administrative costs of preserving and maintaining the collections of the museums, exhibiting the collections to the public, and providing educational programs to the public through the use of the collections;

"(4) assisting museums in cooperating with each other in developing traveling exhibitions, meeting transportation costs, and identifying and locating collections available for loan;

"(5) assisting museums in the conservation of their collections;

"(6) developing and carrying out specialized programs for specific segments of the public, such as programs for urban neighborhoods, rural areas, Indian reservations, and penal and other State institutions; and

"(7) model programs demonstrating cooperative efforts between libraries and museums.

"(b) CONTRACTS AND COOPERATIVE AGREEMENTS.—

"(1) PROJECTS TO STRENGTHEN MUSEUM SERVICES.—The Director, subject to the policy direction of the Museum Board, is authorized to enter into contracts and cooperative agreements with appropriate entities, as determined by the Director, to pay for the Federal share of enabling the entities to undertake projects designed to strengthen museum services, except that any contracts or cooperative agreements entered into pursuant to this subsection shall be effective only to such extent or in such amounts as are provided in appropriations Acts.

"(2) LIMITATION ON AMOUNT.—The aggregate amount of financial assistance made available under this subsection for a fiscal year shall not exceed 15 percent of the amount appropriated under this subtitle for such fiscal year.

"(3) OPERATIONAL EXPENSES.—No financial assistance may be provided under this subsection to pay for operational expenses.

"(c) FEDERAL SHARE.—

"(1) 50 PERCENT.—Except as provided in paragraph (2), the Federal share described in subsections (a) and (b) shall be not more than 50 percent.

"(2) GREATER THAN 50 PERCENT.—The Director may use not more than 20 percent of the funds made available under this subtitle for a fiscal year to make grants under subsection (a), or enter into contracts or agreements under subsection (b), for which the Federal share may be greater than 50 percent.

"(d) REVIEW AND EVALUATION.—The Director shall establish procedures for reviewing and evaluating grants, contracts, and cooperative agreements made or entered into under this subtitle. Procedures for reviewing grant applications or contracts and cooperative agreements for financial assistance under this subtitle shall not be subject to any review outside of the Institute.

<< 20 USCA § 9174 >>

"SEC. 274. AWARD.

"The Director, with the advice of the Museum Board, may annually award a National Award for Museum Service to outstanding museums that have made significant contributions in service to their communities.

<< 20 USCA § 9175 >>

"SEC. 275. NATIONAL MUSEUM SERVICES BOARD.

"(a) ESTABLISHMENT.—There is established in the Institute a National Museum Services Board.

"(b) COMPOSITION AND QUALIFICATIONS.—

"(1) COMPOSITION.—The Museum Board shall consist of the Director and 14 members appointed by the President, by and with the advice and consent of the Senate.

"(2) QUALIFICATIONS.—The appointive members of the Museum Board shall be selected from among citizens of the United States—

"(A) who are members of the general public;

"(B) who are or have been affiliated with—

"(i) resources that, collectively, are broadly representative of the curatorial, conservation, educational, and cultural resources of the United States; or

"(ii) museums that, collectively, are broadly representative of various types of museums, including museums relating to science, history, technology, art, zoos, and botanical gardens; and

"(C) who are recognized for their broad knowledge, expertise, or experience in museums or commitment to museums.

"(3) GEOGRAPHIC AND OTHER REPRESENTATION.—Members of the Museum Board shall be appointed to reflect persons from various geographic regions of the United States. The Museum Board may not include, at any time, more than 3 members from a single State. In making such appointments, the President shall give due regard to equitable representation of women, minorities, and persons with disabilities who are involved with museums.

"(c) TERMS.—

"(1) IN GENERAL.—Each appointive member of the Museum Board shall serve for a term of 5 years, except that—

"(A) of the members first appointed, 3 shall serve for terms of 5 years, 3 shall serve for terms of 4 years, 3 shall serve for terms of 3 years, 3 shall serve for terms of 2 years, and 2 shall serve for terms of 1 year, as designated by the President at the time of nomination for appointment; and

"(B) any member appointed to fill a vacancy shall serve for the remainder of the term for which the predecessor of the member was appointed.

"(2) REAPPOINTMENT.—No member of the Museum Board who has been a member for more than 7 consecutive years shall be eligible for reappointment.

"(3) SERVICE UNTIL SUCCESSOR TAKES OFFICE.—Notwithstanding any other provision of this subsection, a member of the Museum Board shall serve after the expiration of the term of the member until the successor to the member takes office.

"(d) DUTIES AND POWERS.—The Museum Board shall have the responsibility to advise the Director on general policies with respect to the duties, powers, and authority of the Institute relating to museum services, including general policies with respect to—

"(1) financial assistance awarded under this subtitle for museum services; and

"(2) projects described in section 262(a)(4).

"(e) CHAIRPERSON.—The President shall designate 1 of the appointive members of the Museum Board as Chairperson of the Museum Board.

"(f) MEETINGS.—

"(1) IN GENERAL.—The Museum Board shall meet—

"(A) not less than 3 times each year, including—

"(i) not less than 2 times each year separately; and

"(ii) not less than 1 time each year in a joint meeting with the Commission, convened for purposes of making general policies with respect to financial assistance for projects described in section 262(a)(4); and

"(B) at the call of the Director.

"(2) VOTE.—All decisions by the Museum Board with respect to the exercise of the duties and powers of the Museum Board shall be made by a majority vote of the members of the Museum Board who are present. All decisions by the Commission and the Museum Board with respect to the policies described in paragraph (1)(A)(ii) shall be made by a $^2/_3$ majority vote of the total number of the members of the Commission and the Museum Board who are present.

"(g) QUORUM.—A majority of the members of the Museum Board shall constitute a quorum for the conduct of business at official meetings of the Museum Board, but a lesser number of members may hold hearings. A majority of the members of the Commission and a majority of the members of the Museum Board shall constitute a quorum for the conduct of business at official joint meetings of the Commission and the Museum Board.

"(h) COMPENSATION AND TRAVEL EXPENSES.—

"(1) COMPENSATION.—Each member of the Museum Board who is not an officer or employee of the Federal Government may be compensated at a rate to be fixed by the President, but not to exceed the daily equivalent of the maximum rate authorized for a position above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code, for each day (including travel time) during which such member is engaged in the performance of the duties of the Museum Board. All members of the Museum Board who are officers or employees of the Federal Government shall serve without compensation in addition to compensation received for their services as officers or employees of the Federal Government.

"(2) TRAVEL EXPENSES.—The members of the Museum Board may be allowed travel expenses, including per diem in lieu of subsistence, in the same amounts and to the same extent, as authorized under section 5703 of title 5, United States Code, for persons employed intermittently in Federal Government service.

"(i) COORDINATION.—The Museum Board, with the advice of the Director, shall take steps to ensure that the policies and activities of the Institute are coordinated with other activities of the Federal Government.

<< 20 USCA § 9176 >>

"SEC. 276. AUTHORIZATION OF APPROPRIATIONS.

"(a) GRANTS.—For the purpose of carrying out this subtitle, there are authorized to be appropriated to the Director $28,700,000 for the fiscal year 1997, and such sums as may be necessary for each of the fiscal years 1998 through 2002.

"(b) ADMINISTRATION.—Not more than 10 percent of the funds appropriated under this section for a fiscal year may be used to pay for the administrative costs of carrying out this subtitle.

"(c) SUMS REMAINING AVAILABLE.—Sums appropriated pursuant to subsection (a) for any fiscal year shall remain available for obligation until expended.".

SEC. 703. NATIONAL COMMISSION ON LIBRARIES AND INFORMATION SCIENCE.

<< 20 USCA § 1504 >>

(a) FUNCTIONS.—Section 5 of the National Commission on Libraries and Information Science Act (20 U.S.C. 1504) is amended—

(1) by redesignating subsections (b) through (d) as subsections (d) through (f), respectively; and

(2) by inserting after subsection (a) the following:

"(b) The Commission shall have the responsibility to advise the Director of the Institute of Museum and Library Services on general policies with respect to the duties, powers, and authority of the Institute of Museum and Library Services relating to library services, including—

"(1) general policies with respect to—

"(A) financial assistance awarded under the Museum and Library Services Act for library services; and

"(B) projects described in section 262(a)(4) of such Act; and

"(2) measures to ensure that the policies and activities of the Institute of Museum and Library Services are coordinated with other activities of the Federal Government.

"(c)(1) The Commission shall meet not less than 1 time each year in a joint meeting with the National Museum Services Board, convened for purposes of providing advice on general policy with respect to financial assistance for projects described in section 262(a)(4) of such Act.

"(2) All decisions by the Commission and the National Museum Services Board with respect to the advice on general policy described in paragraph (1) shall be made by a $2/3$ majority vote of the total number of the members of the Commission and the National Museum Services Board who are present.

"(3) A majority of the members of the Commission and a majority of the members of the National Museum Services Board shall constitute a quorum for the conduct of business at official joint meetings of the Commission and the National Museum Services Board.".

<< 20 USCA § 1505 >>

(b) MEMBERSHIP.—Section 6 of the National Commission on Libraries and Information Science Act (20 U.S.C. 1505) is amended—

(1) in subsection (a)—

(A) in the first sentence, by striking "Librarian of Congress" and inserting "Librarian of Congress, the Director of the Institute of Museum and Library Services (who shall serve as an ex officio, nonvoting member),";

(B) in the second sentence—

(i) by striking "special competence or interest in" and inserting "special competence in or knowledge of; and

(ii) by inserting before the period the following: "and at least one other of whom shall be knowledgeable with respect to the library and information service and science needs of the elderly";

(C) in the third sentence, by inserting "appointive" before "members"; and

(D) in the last sentence, by striking "term and at least" and all that follows and inserting "term."; and

(2) in subsection (b), by striking "the rate specified" and all that follows through "and while" and inserting "the daily equivalent of the maximum rate authorized for a position above grade GS–15 of the General Schedule under section 5108 of title 5, United States Code, for each day (including travel-time) during which the members are engaged in the business of the Commission. While".

<< 20 USCA § 9102 NOTE >>

SEC. 704. TRANSFER OF FUNCTIONS FROM INSTITUTE OF MUSEUM SERVICES.

(a) DEFINITIONS.—For purposes of this section, unless otherwise provided or indicated by the context—

(1) the term "Federal agency" has the meaning given to the term "agency" by section 551(1) of title 5, United States Code;

(2) the term "function" means any duty, obligation, power, authority, responsibility, right, privilege, activity, or program; and

(3) the term "office" includes any office, administration, agency, institute, unit, organizational entity, or component thereof.

(b) TRANSFER OF FUNCTIONS FROM THE INSTITUTE OF MUSEUM SERVICES AND THE LIBRARY PROGRAM OFFICE.—There are transferred to the Director of the Institute of Museum and Library Services established under section 203 of the Museum and Library Services Act—

(1) all functions that the Director of the Institute of Museum Services exercised before the date of enactment of this section (including all related functions of any officer or employee of the Institute of Museum Services); and

(2) all functions that the Director of Library Programs in the Office of Educational Research and Improvement in the Department of Education exercised before the date of enactment of this section and any related function of any officer or employee of the Department of Education.

(c) DETERMINATIONS OF CERTAIN FUNCTIONS BY THE OFFICE OF MANAGEMENT AND BUDGET.—If necessary, the Office of Management and Budget shall make any determination of the functions that are transferred under subsection (b).

(d) DELEGATION AND ASSIGNMENT.—Except where otherwise expressly prohibited by law or otherwise provided by this section, the Director of the Institute of Museum and Library Services may delegate any of the functions transferred to the Director of the Institute of Museum and Library Services by this section and any function transferred or granted to such Director of the Institute of Museum and Library Services after the effective date of this section to such officers and employees of the Institute of Museum and Library Services as the Director of the Institute of Museum and Library Services may designate, and may authorize successive redelegations of such functions as may be necessary or appropriate, except that any delegation of any such functions with respect to libraries shall be made to the Deputy Director of the Office of Library Services and with respect to museums shall be made to the Deputy Director of the Office of Museum Services. No delegation of functions by the Director of the Institute of Museum and Library Services under this section or under any other provision of this section shall relieve such Director of the Institute of Museum and Library Services of responsibility for the administration of such functions.

(e) REORGANIZATION.—The Director of the Institute of Museum and Library Services may allocate or reallocate any function transferred under subsection (b) among the officers of the Institute of Museum and Library Services, and may establish, consolidate, alter, or discontinue such organizational entities in the Institute of Museum and Library Services as may be necessary or appropriate.

(f) RULES.—The Director of the Institute of Museum and Library Services may prescribe, in accordance with chapters 5 and 6 of title 5, United States Code, such rules and regulations as the Director of the Institute of Museum and Library Services determines to be necessary or appropriate to administer and manage the functions of the Institute of Museum and Library Services.

(g) TRANSFER AND ALLOCATIONS OF APPROPRIATIONS AND PERSONNEL.—Except as otherwise provided in this section, the personnel employed in connection with, and the assets, liabilities, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds employed, used, held, arising from, available to, or to be made available in connection with the functions transferred by this section, subject to section 1531 of title 31, United States Code, shall be transferred to the Institute of Museum and Library Services. Unexpended funds transferred pursuant to this subsection shall be used only for the purposes for which the funds were originally authorized and appropriated.

(h) INCIDENTAL TRANSFERS.—The Director of the Office of Management and Budget, at such time or times as the Director shall provide, may make such determinations as may be necessary with regard to the functions transferred by this section, and make such additional incidental dispositions of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds held, used, arising from, available to, or to be made available in connection with such functions, as may be necessary to carry out this section. The Director of the Office of Management and Budget shall provide for the termination of the affairs of all entities terminated by this section and for such further measures and dispositions as may be necessary to effectuate the purposes of this section.

(i) EFFECT ON PERSONNEL.—

(1) IN GENERAL.—Except as otherwise provided by this section, the transfer pursuant to this section of full-time personnel (except special Government employees) and part-time personnel holding permanent positions shall not cause any such employee to be separated or reduced in grade or compensation for 1 year after the date of transfer of such employee under this section.

(2) EXECUTIVE SCHEDULE POSITIONS.—Except as otherwise provided in this section, any person who, on the day preceding the effective date of this section, held a position compensated in accordance with the Executive Schedule prescribed in chapter 53 of title 5, United States Code, and who, without a break in service, is appointed in the Institute of Museum and Library Services to a position having duties comparable to the duties performed immediately preceding such appointment shall continue to be compensated in such new position at not less than the rate provided for such previous position, for the duration of the service of such person in such new position.

(j) SAVINGS PROVISIONS.—

(1) CONTINUING EFFECT OF LEGAL DOCUMENTS.—All orders, determinations, rules, regulations, permits, agreements, grants, contracts, certificates, licenses, registrations, privileges, and other administrative actions—

(A) that have been issued, made, granted, or allowed to become effective by the President, any Federal agency or official of a Federal agency, or by a court of competent jurisdiction, in the performance of functions that are transferred under this section; and

(B) that were in effect before the effective date of this section, or were final before the effective date of this section and are to become effective on or after the effective date of this section;

shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law by the President, the Director of the Institute of Museum and Library Services or other authorized official, a court of competent jurisdiction, or by operation of law.

(2) PROCEEDINGS NOT AFFECTED.—This section shall not affect any proceedings, including notices of proposed rulemaking, or any application for any license, permit, certificate, or financial assistance pending before the Institute of Museum Services on the effective date of this section, with respect to functions transferred by this section. Such proceedings and applications shall be continued. Orders shall be issued in such proceedings, appeals shall be taken from the orders, and payments shall be made pursuant to the orders, as if this section had not been enacted, and orders issued in any such proceedings shall continue in effect until modified, terminated, superseded, or revoked by a duly authorized official, by a court of competent

AR.03346

jurisdiction, or by operation of law. Nothing in this paragraph shall be construed to prohibit the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that such proceeding could have been discontinued or modified if this section had not been enacted.

  (3) SUITS NOT AFFECTED.—This section shall not affect suits commenced before the effective date of this section, and in all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this section had not been enacted.

  (4) NONABATEMENT OF ACTIONS.—No suit, action, or other proceeding commenced by or against the Institute of Museum Services, or by or against any individual in the official capacity of such individual as an officer of the Institute of Museum Services, shall abate by reason of the enactment of this section.

  (5) ADMINISTRATIVE ACTIONS RELATING TO PROMULGATION OF REGULATIONS.—Any administrative action relating to the preparation or promulgation of a regulation by the Institute of Museum Services relating to a function transferred under this section may be continued by the Institute of Museum and Library Services with the same effect as if this section had not been enacted.

(k) TRANSITION.—The Director of the Institute of Museum and Library Services may utilize—

  (1) the services of such officers, employees, and other personnel of the Institute of Museum Services with respect to functions transferred to the Institute of Museum and Library Services by this section; and

  (2) funds appropriated to such functions for such period of time as may reasonably be needed to facilitate the orderly implementation of this section.

(l) REFERENCES.—A reference in any other Federal law, Executive order, rule, regulation, or delegation of authority, or any document of or relating to—

  (1) the Director of the Institute of Museum Services with regard to functions transferred under subsection (b), shall be deemed to refer to the Director of the Institute of Museum and Library Services; and

  (2) the Institute of Museum Services with regard to functions transferred under subsection (b), shall be deemed to refer to the Institute of Museum and Library Services.

(m) ADDITIONAL CONFORMING AMENDMENTS.—

  (1) RECOMMENDED LEGISLATION.—After consultation with the appropriate committees of Congress and the Director of the Office of Management and Budget, the Director of the Institute of Museum and Library Services shall prepare and submit to the appropriate committees of Congress recommended legislation containing technical and conforming amendments to reflect the changes made by this section.

  (2) SUBMISSION TO CONGRESS.—Not later than 6 months after the effective date of this section, the Director of the Institute of Museum and Library Services shall submit to the appropriate committees of Congress the recommended legislation referred to under paragraph (1).

<< 20 USCA § 9103 NOTE >>

## SEC. 705. SERVICE OF INDIVIDUALS SERVING ON DATE OF ENACTMENT.

  Notwithstanding section 204 of the Museum and Library Services Act, the individual who was appointed to the position of Director of the Institute of Museum Services under section 205 of the Museum Services Act (as such section was in effect on the day before the date of enactment of this Act) and who is serving in such position on the day before the date of enactment of this Act shall serve as the first Director of the Institute of Museum and Library Services under section 204 of the Museum and Library Services Act (as added by section 2 of this Act), and shall serve at the pleasure of the President.

<< 20 USCA § 9105 NOTE >>

## SEC. 706. CONSIDERATION.

  Consistent with title 5, United States Code, in appointing employees of the Office of Library Services, the Director of the Institute of Museum and Library Services shall give strong consideration to individuals with experience in administering State-based and national library and information services programs.

<< 20 USCA § 9102 NOTE >>

SEC. 707. TRANSITION AND TRANSFER OF FUNDS.

 (a) TRANSITION.—The Director of the Office of Management and Budget shall take appropriate measures to ensure an orderly transition from the activities previously administered by the Director of Library Programs in the Office of Educational Research and Improvement in the Department of Education to the activities administered by the Institute for Museum and Library Services under this Act. Such measures may include the transfer of appropriated funds.

 (b) TRANSFER.—From any amounts available to the Secretary of Education for salaries and expenses at the Department of Education, the Secretary of Education shall transfer to the Director the amount of funds necessary to ensure the orderly transition from activities previously administered by the Director of the Office of Library Programs in the Office of Educational Research and Improvement in the Department of Education to the activities administered by the Institute for Museum and Library Services. In no event shall the amount of funds transferred pursuant to the preceding sentence be less than $200,000.

SEC. 708. REPEALS.

<< 20 USCA §§ 351, 351a, 351b, 351c, 351d, 351e, 351f, 351g, 352, 353, 354, 355, 355a, 355b, 355c, 355d, 355e, 355e–1, 355e–2, 355e–3, 355e–4, 361, 362, 363, 364, 365, 366, 371, 375, 381, 385, 385a, 385b, 385c, 385d, 385e, 386, 386a, 386b, 386c, 386d, 386e, 386f, 386g >>

<< 20 USCA § 351 NOTE >>

 (a) LIBRARY SERVICES AND CONSTRUCTION ACT.—The Library Services and Construction Act (20 U.S.C. 351 et seq.) is repealed.

<< 20 USCA §§ 1021, 1022, 1023, 1029, 1031, 1032, 1033, 1034, 1041, 1042, 1047 >>

 (b) TITLE II OF THE HIGHER EDUCATION ACT OF 1965.—Title II of the Higher Education Act of 1965 (20 U.S.C. 1021 et seq.), relating to academic libraries and information services, is repealed.

<< 20 USCA § 1029 NOTE >>

 (c) PART D OF TITLE XIII OF THE HIGHER EDUCATION AMENDMENTS OF 1986.—Part D of title XIII of the Higher Education Amendments of 1986 (20 U.S.C. 1029 note), relating to library resources, is repealed.

<< 20 USCA § 1221i >>

 (d) SECTION 519 OF THE EDUCATION AMENDMENTS OF 1974.—Section 519 of the Education Amendments of 1974 (20 U.S.C. 1221i) is repealed.

<< 20 USCA §§ 7001, 7002, 7003, 7004, 7005 >>

 (e) PART F OF THE TECHNOLOGY FOR EDUCATION ACT OF 1994.—Part F of the Technology for Education Act of 1994 (20 U.S.C. 7001 et seq.), contained in title III of the Elementary and Secondary Education Act of 1965, is repealed.

SEC. 709. CONFORMING AMENDMENTS.

 (a) REFERENCES TO LIBRARY SERVICES AND CONSTRUCTION ACT.—

<< 20 USCA § 6813 >>

(1) TECHNOLOGY FOR EDUCATION ACT OF 1994.—Section 3113(10) of the Technology for Education Act of 1994 (20 U.S.C. 6813(10)) is amended by striking "section 3 of the Library Services and Construction Act;" and inserting "section 213 of the Library Services and Technology Act;".

<< 20 USCA § 3489 >>

(2) OMNIBUS EDUCATION RECONCILIATION ACT OF 1981.—Section 528 of the Omnibus Education Reconciliation Act of 1981 (20 U.S.C. 3489) is amended—
(A) by striking paragraph (12); and
(B) by redesignating paragraphs (13) through (15) as paragraphs (12) through (14), respectively.

<< 20 USCA § 6813 >>

(3) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—Section 3113(10) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6813(10)) is amended by striking "section 3 of the Library Services and Construction Act" and inserting "section 213 of the Library Services and Technology Act".

<< 40 USCA § 276d–3 >>

(4) COMMUNITY IMPROVEMENT VOLUNTEER ACT OF 1994.—Section 7305 of the Community Improvement Volunteer Act of 1994 (40 U.S.C. 276d–3) is amended—
(A) by striking paragraph (1); and
(B) by redesignating paragraphs (2) through (6) as paragraphs (1) through (5), respectively.

<< 40 App. USCA § 214 >>

(5) APPALACHIAN REGIONAL DEVELOPMENT ACT OF 1965.—Section 214(c) of the Appalachian Regional Development Act of 1965 (40 U.S.C. App. 214(c)) is amended by striking "Library Services and Construction Act;".

<< 42 USCA § 3338 >>

(6) DEMONSTRATION CITIES AND METROPOLITAN DEVELOPMENT ACT OF 1966.—Section 208(2) of the Demonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. 3338(2)) is amended by striking "title II of the Library Services and Construction Act;".

<< 48 USCA § 1666 >>

(7) PUBLIC LAW 87–688.—Subsection (c) of the first section of the Act entitled "An Act to extend the application of certain laws to American Samoa", approved September 25, 1962 (48 U.S.C. 1666(c)) is amended by striking "the Library Services Act (70 Stat. 293; 20 U.S.C. 351 et seq.),".

<< 47 USCA § 254 >>

(8) COMMUNICATIONS ACT OF 1934.—Paragraph (4) of section 254(h) of the Communications Act of 1934 (47 U.S.C. 254(h)(4)) is amended by striking "library not eligible for participation in State-based plans for funds under title III of the Library Services and Construction Act (20 U.S.C. 335c et seq.)" and inserting "library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act".
(b) REFERENCES TO INSTITUTE OF MUSEUM SERVICES.—

<< 5 USCA § 5315 >>

(1) TITLE 5, UNITED STATES CODE.—Section 5315 of title 5, United States Code, is amended by striking the following:
"Director of the Institute of Museum Services." and inserting the following:
"Director of the Institute of Museum and Library Services.".

<< 20 USCA § 3441 >>

(2) DEPARTMENT OF EDUCATION ORGANIZATION ACT.—Section 301 of the Department of Education Organization Act (20 U.S.C. 3441) is amended—

(A) in subsection (a)—
(i) by striking paragraph (5); and
(ii) by redesignating paragraphs (6) and (7) as paragraphs (5) and (6), respectively; and
(B) in subsection (b)—
(i) by striking paragraph (4); and
(ii) by redesignating paragraphs (5) through (7) as paragraphs (4) through (6), respectively.
(3) ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965.—

<< 20 USCA §§ 6621, 6645, 6648, 6649, 8091 >>

(A) Sections 2101(b), 2205(c)(1)(D), 2208(d)(1)(H)(v), and 2209(b)(1)(C)(iv), and subsection (d)(6) and (e)(2) of section 10401 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6621(b), 6645(c)(1)(D), 6648(d)(1)(H)(v), 6649(b)(1)(C)(vi), and 8091(d)(6) and (e)(2)) are amended by striking "the Institute of Museum Services" and inserting "the Institute of Museum and Library Services".

<< 20 USCA § 8102 >>

(B) Section 10412(b) of such Act (20 U.S.C. 8102(b)) is amended—
(i) in paragraph (2), by striking "the Director of the Institute of Museum Services," and inserting "the Director of the Institute of Museum and Library Services,"; and
(ii) in paragraph (7), by striking "the Director of the Institute of Museum Services," and inserting "the director of the Institute of Museum and Library Services,".

<< 20 USCA § 8104 >>

(C) Section 10414(a)(2)(B) of such Act (20 U.S.C. 8104(a)(2)(B)) is amended by striking clause (iii) and inserting the following new clause:
"(iii) the Institute of Museum and Library Services.".

<< 20 USCA § 3473 >>

(c) REFERENCE TO OFFICE OF LIBRARIES AND LEARNING RESOURCES.—Section 413(b)(1) of the Department of Education Organization Act (20 U.S.C. 3473(b)(1)) is amended—
(1) by striking subparagraph (H); and
(2) by redesignating subparagraphs (I) through (M) as subparagraphs (H) through (L), respectively.

<< 20 USCA § 1069b >>

(d) REFERENCES TO STATE POSTSECONDARY REVIEW ENTITY PROGRAMS.—Section 356(b)(2) of the Higher Education Act of 1965 (20 U.S.C. 10696(b)) is amended by striking "II,".
This Act may be cited as the "Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1997".
(f) For programs, projects or activities in the Treasury, Postal Service, and General Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT

Making appropriations for the Treasury Department, the United States Postal Service, the Executive Office of the President, and certain Independent Agencies, for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—DEPARTMENT OF THE TREASURY

### DEPARTMENTAL OFFICES

#### SALARIES AND EXPENSES

For necessary expenses of the Departmental Offices including operation and maintenance of the Treasury Building and Annex; hire of passenger motor vehicles; maintenance, repairs, and improvements of, and purchase of commercial insurance policies for, real properties leased or owned overseas, when necessary for the performance of official business; not to exceed $2,900,000 for official travel expenses; not to exceed $150,000 for official reception and representation expenses; not to exceed $258,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Secretary of the Treasury and to be accounted for solely on his certificate; $111,760,000.

### AUTOMATION ENHANCEMENT

#### INCLUDING TRANSFER OF FUNDS

For the development and acquisition of automatic data processing equipment, software, and services for the Department of the Treasury, $27,100,000, of which $15,000,000 shall be available to the United States Customs Service for the Automated Commercial Environment project, and of which $5,600,000 shall be available to the United States Customs Service for the International Trade Data System: Provided, That these funds shall remain available until September 30, 1999: Provided further, That these funds shall be transferred to accounts and in amounts as necessary to satisfy the requirements of the Department's offices, bureaus, and other organizations: Provided further, That this transfer authority shall be in addition to any other transfer authority provided in this Act: Provided further, That none of the funds shall be used to support or supplement Internal Revenue Service appropriations for Information Systems and Tax Systems Modernization: Provided further, That of the funds appropriated for the Automated Commercial Environment, $3,475,000 may not be obligated until the Commissioner of Customs consults with the Committees on Appropriations regarding deficiencies identified by the General Accounting Office.

### OFFICE OF INSPECTOR GENERAL

#### SALARIES AND EXPENSES

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978, as amended, not to exceed $2,000,000 for official travel expenses; including hire of passenger motor vehicles; and not to exceed $100,000 for unforeseen emergencies of a confidential nature, to be allocated and expended under the direction of the Inspector General of the Treasury; $29,736,000.

### OFFICE OF PROFESSIONAL RESPONSIBILITY

#### SALARIES AND EXPENSES

For necessary expenses of the Office of Professional Responsibility, including purchase and hire of passenger motor vehicles, $1,500,000.

### TREASURY BUILDINGS AND ANNEX REPAIR AND RESTORATION

#### INCLUDING TRANSFER OF FUNDS

For the repair, alteration, and improvement of the Treasury Building and Annex, $28,213,000, to remain available until expended: Provided, That funds previously made available under this title for the Secret Service Headquarter's building shall be transferred to the Secret Service Acquisition, Construction, Improvement and Related Expenses appropriation.

### FINANCIAL CRIMES ENFORCEMENT NETWORK

#### SALARIES AND EXPENSES

For necessary expenses of the Financial Crimes Enforcement Network, including hire of passenger motor vehicles; travel expenses of non-Federal law enforcement personnel to attend meetings concerned with financial intelligence activities, law

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

enforcement, and financial regulation; not to exceed $14,000 for official reception and representation expenses; and for assistance to Federal law enforcement agencies, with or without reimbursement; $22,387,000: Provided, That notwithstanding any other provision of law, the Director of the Financial Crimes Enforcement Network may procure up to $500,000 in specialized, unique, or novel automatic data processing equipment, ancillary equipment, software, services, and related resources from commercial vendors without regard to otherwise applicable procurement laws and regulations and without full and open competition, utilizing procedures best suited under the circumstances of the procurement to efficiently fulfill the agency's requirements: Provided further, That funds appropriated in this account may be used to procure personal services contracts.

## DEPARTMENT OF THE TREASURY FORFEITURE FUND

For necessary expenses of the Treasury Forfeiture Fund, as authorized by Public Law 102–393, not to exceed $10,000,000, to be derived from deposits in the fund: Provided, That notwithstanding any other provision of law, not to exceed $7,500,000 shall be made available for the development of a Federal wireless communication system: Provided further, That the Secretary of the Treasury is authorized to receive all unavailable collections transferred from the Special Forfeiture Fund established by section 6073 of the Anti–Drug Abuse Act of 1988 (21 U.S.C. 1509) by the Director of the Office of Drug Control Policy as a deposit into the Treasury Forfeiture Fund (31 U.S.C. 9703(a)).

## VIOLENT CRIME REDUCTION PROGRAMS

### INCLUDING TRANSFER OF FUNDS

For activities authorized by Public Law 103–322, to remain available until expended, which shall be derived from the Violent Crime Reduction Trust Fund, as follows:

(a) As authorized by section 190001(e), $89,000,000, of which $36,595,000 shall be available to the Bureau of Alcohol, Tobacco and Firearms, of which $3,000,000 shall be available for administering the Gang Resistance Education and Training program, of which $3,662,000 shall be available for ballistics technologies, including the purchase, maintenance and upgrading of equipment and of which $29,133,000 shall be available to enhance training and purchase equipment and services, and of which $800,000 shall be available for project LEAD; of which $18,300,000 shall be available to the Secretary as authorized by section 732 of Public Law 104–132 as amended by Section 113 of the Fiscal Year 1997 Department of Commerce, Justice and State, and the Judiciary, and Related Agencies Appropriations Act; of which $1,000,000 shall be available to the Financial Crimes Enforcement Network; of which $20,000,000 shall be available to the United States Secret Service, of which no less than $1,400,000 shall be available for a grant for activities related to the investigations of missing and exploited children; and of which $13,105,000 shall be available to the Federal Drug Control Programs, High Intensity Drug Trafficking Areas program.

(b) As authorized by section 32401, $8,000,000, for disbursement through grants, cooperative agreements or contracts, to local governments for Gang Resistance Education and Training: Provided, That notwithstanding sections 32401 and 310001, such funds shall be allocated only to the affected State and local law enforcement and prevention organizations participating in such projects.

## TREASURY FRANCHISE FUND

### << 31 USCA § 501 NOTE >>

There is hereby established in the Treasury a franchise fund pilot, as authorized by section 403 of Public Law 103–356, to be available as provided in such section for expenses and equipment necessary for the maintenance and operation of such financial and administrative support services as the Secretary determines may be performed more advantageously as central services: Provided, That any inventories, equipment, and other assets pertaining to the services to be provided by such fund, either on hand or on order, less the related liabilities or unpaid obligations, and any appropriations made for the purpose of providing capital, shall be used to capitalize such fund: Provided further, That such fund shall be reimbursed or credited with the payments, including advanced payments, from applicable appropriations and funds available to the Department and other Federal agencies for which such administrative and financial services are performed, at rates which will recover all expenses of operation, including accrued leave, depreciation of fund plant and equipment, amortization of Automatic Data Processing (ADP) software and systems, and an amount necessary to maintain a reasonable operating reserve, as determined by the Secretary:

Provided further, That such fund shall provide services on a competitive basis: Provided further, That an amount not to exceed 4 percent of the total annual income to such fund may be retained in the fund for fiscal year 1997 and each fiscal year thereafter, to remain available until expended, to be used for the acquisition of capital equipment and for the improvement and implementation of Treasury financial management, ADP, and other support systems: Provided further, That no later than 30 days after the end of each fiscal year, amounts in excess of this reserve limitation shall be deposited as miscellaneous receipts in the Treasury: Provided further, That such franchise fund pilot shall terminate pursuant to section 403(f) of Public Law 103–356.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

<< 42 USCA § 3771 NOTE >>

For necessary expenses of the Federal Law Enforcement Training Center, as a bureau of the Department of the Treasury, including materials and support costs of Federal law enforcement basic training; purchase (not to exceed 52 for police-type use, without regard to the general purchase price limitation) and hire of passenger motor vehicles; for expenses for student athletic and related activities; uniforms without regard to the general purchase price limitation for the current fiscal year; the conducting of and participating in firearms matches and presentation of awards; for public awareness and enhancing community support of law enforcement training; not to exceed $9,500 for official reception and representation expenses; room and board for student interns; and services as authorized by 5 U.S.C. 3109; $54,831,000, of which up to $13,034,000 for materials and support costs of Federal law enforcement basic training shall remain available until September 30, 1999: Provided, That the Center is authorized to accept and use gifts of property, both real and personal, and to accept services, for authorized purposes, including funding of a gift of intrinsic value which shall be awarded annually by the Director of the Center to the outstanding student who graduated from a basic training program at the Center during the previous fiscal year, which shall be funded only by gifts received through the Center's gift authority: Provided further, That notwithstanding any other provision of law, students attending training at any Federal Law Enforcement Training Center site shall reside in on-Center or Center-provided housing, insofar as available and in accordance with Center policy: Provided further, That funds appropriated in this account shall be available, at the discretion of the Director, for: training United States Postal Service law enforcement personnel and Postal police officers; State and local government law enforcement training on a space-available basis; training of foreign law enforcement officials on a space-available basis with reimbursement of actual costs to this appropriation; training of private sector security officials on a space-available basis with reimbursement of actual costs to this appropriation; and travel expenses of non-Federal personnel to attend course development meetings and training at the Center: Provided further, That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training at the Federal Law Enforcement Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available at the end of the fiscal year: Provided further, That the Federal Law Enforcement Training Center is authorized to provide short term medical services for students undergoing training at the Center.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For expansion of the Federal Law Enforcement Training Center, for acquisition of necessary additional real property and facilities, and for ongoing maintenance, facility improvements, and related expenses, $18,884,000, to remain available until expended.

## FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the Financial Management Service, $196,069,000, of which not to exceed $14,277,000 shall remain available until expended for systems modernization initiatives. In addition, $90,000, to be derived from the Oil Spill Liability Trust Fund, to reimburse the Service for administrative and personnel expenses for financial management of the Fund, as authorized by section 1012 of Public Law 101–380: Provided, That none of the funds made available for systems modernization initiatives may not be obligated until the Commissioner of the Financial Management Service has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems

investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, including purchase of not to exceed 650 vehicles for police-type use for replacement only and hire of passenger motor vehicles; hire of aircraft; and services of expert witnesses at such rates as may be determined by the Director; for payment of per diem and/or subsistence allowances to employees where an assignment to the National Response Team during the investigation of a bombing or arson incident requires an employee to work 16 hours or more per day or to remain overnight at his or her post of duty; not to exceed $12,500 for official reception and representation expenses; for training of State and local law enforcement agencies with or without reimbursement, including training in connection with the training and acquisition of canines for explosives and fire accelerants detection; provision of laboratory assistance to State and local agencies, with or without reimbursement; $393,971,000, of which $12,011,000, to remain available until expended, shall be available for arson investigations, with priority assigned to any arson, explosion or violence against religious institutions; which not to exceed $1,000,000 shall be available for the payment of attorneys' fees as provided by 18 U.S.C. 924(d)(2); and of which $1,000,000 shall be available for the equipping of any vessel, vehicle, equipment, or aircraft available for official use by a State or local law enforcement agency if the conveyance will be used in drug-related joint law enforcement operations with the Bureau of Alcohol, Tobacco and Firearms and for the payment of overtime salaries, travel, fuel, training, equipment, and other similar costs of State and local law enforcement officers that are incurred in joint operations with the Bureau of Alcohol, Tobacco and Firearms: Provided, That no funds made available by this or any other Act may be used to transfer the functions, missions, or activities of the Bureau of Alcohol, Tobacco and Firearms to other agencies or Departments in the fiscal year ending on September 30, 1997: Provided further, That no funds appropriated herein shall be available for salaries or administrative expenses in connection with consolidating or centralizing, within the Department of the Treasury, the records, or any portion thereof, of acquisition and disposition of firearms maintained by Federal firearms licensees: Provided further, That no funds appropriated herein shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to implement an amendment or amendments to 27 CFR 178.118 or to change the definition of "Curios or relics" in 27 CFR 178.11 or remove any item from ATF Publication 5300.11 as it existed on January 1, 1994: Provided further, That none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c): Provided further, That such funds shall be available to investigate and act upon applications filed by corporations for relief from Federal firearms disabilities under 18 U.S.C. 925(c): Provided further, That no funds in this Act may be used to provide ballistics imaging equipment to any State or local authority who has obtained similar equipment through a Federal grant or subsidy unless the State or local authority agrees to return that equipment or to repay that grant or subsidy to the Federal Government: Provided further, That no funds available for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations: Provided further, That no funds under this Act may be used to electronically retrieve information gathered pursuant to 18 U.S.C. 923(g)(4) by name or any personal identification code.

### LABORATORY FACILITIES

For necessary expenses for design of a new facility or facilities, to house the Bureau of Alcohol, Tobacco and Firearms National Laboratory Center and the Fire Investigation Research and Development Center, not to exceed 185,000 occupiable square feet, $6,978,000, to remain available until expended: Provided, That these funds shall not be available until a prospectus of authorization for the Laboratory Facilities is approved by the House Committee on Transportation and Infrastructure and the Senate Committee on Environment and Public Works.

## UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For necessary expenses of the United States Customs Service, including purchase of up to 1,000 motor vehicles of which 960 are for replacement only, including 990 for police-type use and commercial operations; hire of motor vehicles; contracting with individuals for personal services abroad; not to exceed $30,000 for official reception and representation expenses; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

awards of compensation to informers, as authorized by any Act enforced by the United States Customs Service; $1,487,250,000; of which $65,000,000 shall be available until expended for Operation Hardline; of which $28,000,000 shall remain available until expended for acquisition of aircraft and related operations and maintenance associated with Operation Gateway; and of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Reconciliation Act of 1985, as amended (19 U.S.C. 58c(f)(3)), shall be derived from that Account; of the total, not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations, and not to exceed $4,000,000 shall be available until expended for research and not to exceed $1,000,000 shall be available until expended for conducting special operations pursuant to 19 U.S.C. 2081 and up to $6,000,000 shall be available until expended for the procurement of automation infrastructure items, including hardware, software, and installation: Provided, That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: Provided further, That the United States Custom Service shall implement the General Aviation Telephonic Entry program within 30 days of enactment of this Act: Provided further, That no funds available for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations: Provided further, That the Spirit of St. Louis Airport in St. Louis County, Missouri, shall be designated a port of entry: Provided further, That no funds under this Act may be used to provide less than 30 days public notice for any change in apparel regulations: Provided further, That $750,000 shall be available for additional part-time and temporary positions in the Honolulu Customs District: Provided further, That of the funds appropriated $2,500,000 may be made available for the Western Hemisphere Trade Center authorized by Public Law 103–182.

### OPERATION AND MAINTENANCE, AIR AND MARINE INTERDICTION PROGRAMS

For expenses, not otherwise provided for, necessary for the operation and maintenance of marine vessels, aircraft, and other related equipment of the Air and Marine Programs, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include: the interdiction of narcotics and other goods; the provision of support to Customs and other Federal, State, and local agencies in the enforcement or administration of laws enforced by the Customs Service; and, at the discretion of the Commissioner of Customs, the provision of assistance to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts; $83,363,000, which shall remain available until expended: Provided, That no aircraft or other related equipment, with the exception of aircraft which is one of a kind and has been identified as excess to Customs requirements and aircraft which has been damaged beyond repair, shall be transferred to any other Federal agency, Department, or office outside of the Department of the Treasury, during fiscal year 1997 without the prior approval of the House and Senate Committees on Appropriations.

### CUSTOMS SERVICES AT SMALL AIRPORTS

### (TO BE DERIVED FROM FEES COLLECTED)

Such sums as may be necessary for expenses for the provision of Customs services at certain small airports or other facilities when authorized by law and designated by the Secretary of the Treasury, including expenditures for the salary and expenses of individuals employed to provide such services, to be derived from fees collected by the Secretary pursuant to section 236 of Public Law 98–573 for each of these airports or other facilities when authorized by law and designated by the Secretary, and to remain available until expended.

### HARBOR MAINTENANCE FEE COLLECTION

For administrative expenses related to the collection of the Harbor Maintenance Fee, pursuant to Public Law 103–182, $3,000,000, to be derived from the Harbor Maintenance Trust Fund and to be transferred to and merged with the Customs "Salaries and Expenses" account for such purposes.

### BUREAU OF THE PUBLIC DEBT

### ADMINISTERING THE PUBLIC DEBT

For necessary expenses connected with any public-debt issues of the United States; $169,735,000: Provided, That the sum appropriated herein from the General Fund for fiscal year 1997 shall be reduced by not more than $4,400,000 as definitive

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

security issue fees and Treasury Direct Investor Account Maintenance fees are collected, so as to result in a final fiscal year 1997 appropriation from the General Fund estimated at $165,335,000.

## INTERNAL REVENUE SERVICE

### PROCESSING, ASSISTANCE, AND MANAGEMENT

For necessary expenses of the Internal Revenue Service, not otherwise provided for; including processing tax returns; revenue accounting; providing assistance to taxpayers, management services, and inspection; including purchase (not to exceed 150 for replacement only for police-type use) and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner; $1,779,840,000, of which up to $3,700,000 shall be for the Tax Counseling for the Elderly Program, and of which not to exceed $25,000 shall be for official reception and representation expenses.

### TAX LAW ENFORCEMENT

For necessary expenses of the Internal Revenue Service for determining and establishing tax liabilities; tax and enforcement litigation; technical rulings; examining employee plans and exempt organizations; investigation and enforcement activities; securing unfiled tax returns; collecting unpaid accounts; statistics of income and compliance research; the purchase (for police-type use, not to exceed 850), and hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner $4,104,211,000, of which not to exceed $1,000,000 shall remain available until September 30, 1999, for research.

### INFORMATION SYSTEMS

For necessary expenses for data processing and telecommunications support for Internal Revenue Service activities, including tax systems modernization and operational information systems; the hire of passenger motor vehicles (31 U.S.C. 1343(b)); and services as authorized by 5 U.S.C. 3109, at such rates as may be determined by the Commissioner, $1,323,075,000, of which no less than $130,075,000 shall be available for Tax Systems Modernization (TSM) development and deployment which shall be available until September 30, 1999, and of which no less than $206,200,000 shall be available for TSM Operational Systems: Provided, That none of the funds made available for TSM Operational Systems shall be available after July 31, 1997, unless the Department of the Treasury has prepared a Request for Proposal which could be used as a base for a solicitation of a contract with an alternative or new Prime Contractor to manage, integrate, test and implement the TSM program: Provided further, That all activities associated with the development of a request for proposal, contract solicitation, and contract award for private sector assistance on TSM (both operational systems and development and deployment systems), beyond private sector assistance which is currently under contract, shall be conducted by the Department of the Treasury's Modernization Management Board: Provided further, That if the Internal Revenue Service determines that it is unable to meet deadlines established herein, the Secretary of the Treasury shall notify the Committees on Appropriations of the House and the Senate of the delay Provided further, That the Internal Revenue Service shall submit, by February 1, 1997, a timetable for implementing, by October 1, 1997, recommendations made by the General Accounting Office in its July 1995 report, entitled: "Tax Systems Modernization: Management and Technical Weaknesses Must Be Corrected If Modernization Is To Succeed": Provided further, That the Internal Revenue Service shall submit, by December 1, 1996, a schedule to transfer, not later than July 31, 1997, a majority of Tax Systems Modernization development, deployment, management, integration, and testing, from the Internal Revenue Service to the private sector.

### INFORMATION SYSTEMS

#### (RESCISSION)

Of the funds made available under this heading for Information Systems in Public Law 104–52, $115,000,000 are rescinded, in Public Law 103–123, $17,447,000 are rescinded, in Public Law 102–393, $15,000,000 are rescinded, and in Public Law 102–141, $27,000,000 are rescinded.

### ADMINISTRATIVE PROVISIONS—INTERNAL REVENUE SERVICE

SECTION 101. Not to exceed 5 percent of any appropriation made available in this Act to the Internal Revenue Service may be transferred to any other Internal Revenue Service appropriation upon the advance approval of the House and Senate Committees on Appropriations.

<< 26 USCA § 7803 NOTE >>

SEC. 102. The Internal Revenue Service shall maintain a training program to insure that Internal Revenue Service employees are trained in taxpayers' rights, in dealing courteously with the taxpayers, and in cross-cultural relations.

SEC. 103. The funds provided in this Act for the Internal Revenue Service shall be used to provide as a minimum, the fiscal year 1995 level of service, staffing, and funding for Taxpayer Services.

SEC. 104. No funds available in this Act to the Internal Revenue Service for separation incentive payments as authorized by section 663 of this Act may be obligated without the advance approval of the House and Senate Committees on Appropriations.

Sec. 105. The Internal Revenue Service (IRS) may proceed with its field support reorganization in fiscal year 1997 after it submits its report, no earlier than March 1, 1997, to the Committees on Appropriations of the House and Senate only if the IRS maintains, in fiscal year 1997, the current level of taxpayer service employees that work on cases generated through walk in visits and telephone calls to IRS offices.

SEC. 106. Funds made available by this or any other Act to the Internal Revenue Service shall be available for improved facilities and increased manpower to provide sufficient and effective 1–800 help line for taxpayers. The Commissioner shall make the improvement of the IRS 1–800 help line service a priority and allocate resources necessary to increase phone lines and staff to improve the IRS 1–800 help line service.

SEC. 107. No funds made available by this Act, or any other Act, to the Internal Revenue Service may be used to pay for the design and printing of more than two ink colors on the covers of income tax packages, and such ink colors must be the same colors as used to print the balance of the material in each package.

SEC. 108. Notwithstanding any other provision of law, no field support reorganization of the Internal Revenue Service shall be undertaken in Aberdeen, South Dakota until the Internal Revenue Service toll-free help phone line assistance program reaches at least an 80 percent service level. The Commissioner shall submit to Congress a report and the GAO shall certify to Congress that the 80 percent service level has been met.

UNITED STATES SECRET SERVICE

SALARIES AND EXPENSES

<< 3 USCA § 203 >>

For necessary expenses of the United States Secret Service, including purchase (not to exceed 702 vehicles for police-type use, of which 665 shall be for replacement only), and hire of passenger motor vehicles; hire of aircraft; training and assistance requested by State and local governments, which may be provided without reimbursement; services of expert witnesses at such rates as may be determined by the Director; rental of buildings in the District of Columbia, and fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; for payment of per diem and/or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee require an employee to work 16 hours per day or to remain overnight at his or her post of duty; the conducting of and participating in firearms matches; presentation of awards; and for travel of Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act: Provided, That approval is obtained in advance from the House and Senate Committees on Appropriations; for repairs, alterations, and minor construction at the James J. Rowley Secret Service Training Center; for research and development; for making grants to conduct behavioral research in support of protective research and operations; not to exceed $20,000 for official reception and representation expenses; not to exceed $50,000 to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; for payment in advance for commercial accommodations as may be necessary to perform protective functions; and for uniforms without regard to the general purchase price limitation for the current fiscal year: Provided further, That 3 U.S.C. 203(a) is amended by deleting "but not exceeding twelve hundred in number"; $528,262,000,

of which $1,200,000 shall be available as a grant for activities related to the investigations of missing and exploited children and shall remain available until expended.

### SALARIES AND EXPENSES

#### (RESCISSION)

Of the funds made available under this heading in Public Law 104–52, $7,600,000 are rescinded.

### ACQUISITION, CONSTRUCTION, IMPROVEMENT, AND RELATED EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of construction, repair, alteration, and improvement of facilities, $37,365,000, of which $8,200,000 shall be available for the Rowley Secret Service Training Center, to remain available until expended: Provided, That funds previously provided under the title, "Treasury Buildings and Annex Repair and Restoration," for the Secret Service's Headquarters Building, shall be transferred to this account: Provided further, That funds for the Rowley Secret Service Training Center shall not be available until a prospectus authorizing such facilities is approved in accordance with the Public Buildings Act of 1959, as amended, except that funds may be expended for required expenses in connection with the development of a proposed prospectus.

### GENERAL PROVISIONS—DEPARTMENT OF THE TREASURY

SECTION 111. Any obligation or expenditure by the Secretary in connection with law enforcement activities of a Federal agency or a Department of the Treasury law enforcement organization in accordance with 31 U.S.C. 9703(g)(4)(B) from unobligated balances remaining in the Fund on September 30, 1997, shall be made in compliance with the reprogramming guidelines contained in the House and Senate reports accompanying this Act.

SEC. 112. Appropriations to the Treasury Department in this Act shall be available for uniforms or allowances therefor, as authorized by law (5 U.S.C. 5901), including maintenance, repairs, and cleaning; purchase of insurance for official motor vehicles operated in foreign countries; purchase of motor vehicles without regard to the general purchase price limitations for vehicles purchased and used overseas for the current fiscal year; entering into contracts with the Department of State for the furnishing of health and medical services to employees and their dependents serving in foreign countries; and services authorized by 5 U.S.C. 3109.

SEC. 113. None of the funds appropriated by this title shall be used in connection with the collection of any underpayment of any tax imposed by the Internal Revenue Code of 1986 unless the conduct of officers and employees of the Internal Revenue Service in connection with such collection, including any private sector employees under contract to the Internal Revenue Service, complies with subsection (a) of section 805 (relating to communications in connection with debt collection), and section 806 (relating to harassment or abuse), of the Fair Debt Collection Practices Act (15 U.S.C. 1692).

<< 26 USCA § 6103 NOTE >>

SEC. 114. The Internal Revenue Service shall institute policies and procedures which will safeguard the confidentiality of taxpayer information.

SEC. 115. The funds provided to the Bureau of Alcohol Tobacco and Firearms for fiscal year 1997 in this Act for the enforcement of the Federal Alcohol Administration Act shall be expended in a manner so as not to diminish enforcement efforts with respect to section 105 of the Federal Alcohol Administration Act.

<< 31 USCA § 9703 >>

SEC. 116. Paragraph (3)(C) of section 9703(g) of title 31, United States Code, is amended—

(1) by striking in the third sentence "and at the end of each fiscal year thereafter";

(2) by inserting in lieu thereof "1994, 1995, and 1996"; and

(3) by adding at the end the following new sentence: "At the end of fiscal year 1997, and at the end of each fiscal year thereafter, the Secretary shall reserve any amounts that are required to be retained in the Fund to ensure the availability of amounts in the subsequent fiscal year for purposes authorized under subsection (a)."

SEC. 117. Of the funds available to the Internal Revenue Service, $13,000,000 shall be made available to continue the private sector debt collection program which was initiated in fiscal year 1996 and $13,000,000 shall be transferred to the Departmental Offices appropriation to initiate a new private sector debt collection program: Provided, That the transfer provided herein shall be in addition to any other transfer authority contained in this Act.

<< 18 USCA § 923 >>

SEC. 118. Section 923(j) of title 18, United States Code, is amended by striking the period after the last sentence, and inserting the following: ", including the right of a licensee to conduct 'curios or relics' firearms transfers and business away from their business premises with another licensee without regard as to whether the location of where the business is conducted is located in the State specified on the license of either licensee.".

This title may be cited as the "Treasury Department Appropriations Act, 1997".

TITLE II—POSTAL SERVICE

PAYMENTS TO THE POSTAL SERVICE

PAYMENT TO THE POSTAL SERVICE FUND

<< 39 USCA § 403 NOTE >>

For payment to the Postal Service Fund for revenue forgone on free and reduced rate mail, pursuant to subsections (c) and (d) of section 2401 of title 39, United States Code, $85,080,000: Provided, That mail for overseas voting and mail for the blind shall continue to be free: Provided further, That 6–day delivery and rural delivery of mail shall continue at not less than the 1983 level: Provided further, That none of the funds made available to the Postal Service by this Act shall be used to implement any rule, regulation, or policy of charging any officer or employee of any State or local child support enforcement agency, or any individual participating in a State or local program of child support enforcement, a fee for information requested or provided concerning an address of a postal customer: Provided further, That none of the funds provided in this Act shall be used to consolidate or close small rural and other small post offices in the fiscal year ending on September 30, 1997.

PAYMENT TO THE POSTAL SERVICE FUND FOR NONFUNDED LIABILITIES

For payment to the Postal Service Fund for meeting the liabilities of the former Post Office Department to the Employees' Compensation Fund pursuant to 39 United States Code 2004, $35,536,000.

TITLE III—EXECUTIVE OFFICE OF THE PRESIDENT AND FUNDS APPROPRIATED TO THE PRESIDENT

COMPENSATION OF THE PRESIDENT AND THE WHITE HOUSE OFFICE

COMPENSATION OF THE PRESIDENT

<< 3 USCA § 102 NOTE >>

For compensation of the President, including an expense allowance at the rate of $50,000 per annum as authorized by 3 U.S.C. 102, $250,000: Provided, That none of the funds made available for official expenses shall be expended for any other purpose and any unused amount shall revert to the Treasury pursuant to section 1552 of title 31, United States Code: Provided further, That none of the funds made available for official expenses shall be considered as taxable to the President.

SALARIES AND EXPENSES

For necessary expenses for the White House as authorized by law, including not to exceed $3,850,000 for services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 105; including subsistence expenses as authorized by 3 U.S.C. 105, which shall be expended and accounted for as provided in that section; hire of passenger motor vehicles, newspapers, periodicals, teletype news service, and travel (not to exceed $100,000 to be expended and accounted for as provided by 3 U.S.C. 103); not to exceed $19,000 for official entertainment expenses, to be available for allocation within the Executive Office of the President; $40,193,000:

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SL    Document 58-3    Filed 11/10/20    Page 3383 of 3864

Provided, That $420,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

### EXECUTIVE RESIDENCE AT THE WHITE HOUSE

#### OPERATING EXPENSES

For the care, maintenance, repair and alteration, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the Executive Residence at the White House and official entertainment expenses of the President, $7,827,000, to be expended and accounted for as provided by 3 U.S.C. 105, 109–110, 112–114.

### SPECIAL ASSISTANCE TO THE PRESIDENT AND THE OFFICIAL RESIDENCE OF THE VICE PRESIDENT

#### SALARIES AND EXPENSES

For necessary expenses to enable the Vice President to provide assistance to the President in connection with specially assigned functions, services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 106, including subsistence expenses as authorized by 3 U.S.C. 106, which shall be expended and accounted for as provided in that section; and hire of passenger motor vehicles; $3,280,000: Provided, That $150,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

#### OPERATING EXPENSES

For the care, operation, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the official residence of the Vice President, the hire of passenger motor vehicles, and not to exceed $90,000 for official entertainment expenses of the Vice President, to be accounted for solely on his certificate; $324,000: Provided, That advances or repayments or transfers from this appropriation may be made to any department or agency for expenses of carrying out such activities: Provided further, That $8,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted for approval to the Committees on Appropriations of the House and Senate a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

### COUNCIL OF ECONOMIC ADVISERS

#### SALARIES AND EXPENSES

For necessary expenses of the Council in carrying out its functions under the Employment Act of 1946 (15 U.S.C. 1021), $3,439,000.

### OFFICE OF POLICY DEVELOPMENT

#### SALARIES AND EXPENSES

For necessary expenses of the Office of Policy Development, including services as authorized by 5 U.S.C. 3109, and 3 U.S.C. 107; $3,867,000: Provided, That $45,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

### NATIONAL SECURITY COUNCIL

#### SALARIES AND EXPENSES

For necessary expenses of the National Security Council, including services as authorized by 5 U.S.C. 3109, $6,648,000: Provided, That $3,000 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## OFFICE OF ADMINISTRATION

### SALARIES AND EXPENSES

For necessary expenses of the Office of Administration, $26,100,000, including services as authorized by 5 U.S.C. 3109 and 3 U.S.C. 107, and hire of passenger motor vehicles: Provided, That $340,700 of the funds appropriated may not be obligated until the Director of the Office of Administration has submitted, and the Committees on Appropriations of the House and Senate have approved, a report that identifies, evaluates, and prioritizes all computer systems investments planned for fiscal year 1997, a milestone schedule for the development and implementation of all projects included in the systems investment plan, and a systems architecture plan.

## OFFICE OF MANAGEMENT AND BUDGET

### SALARIES AND EXPENSES

For necessary expenses of the Office of Management and Budget, including hire of passenger motor vehicles, services as authorized by 5 U.S.C. 3109, $55,573,000, of which not to exceed $5,000,000 shall be available to carry out the provisions of 44 U.S.C. chapter 35: Provided, That, as provided in 31 U.S.C. 1301(a), appropriations shall be applied only to the objects for which appropriations were made except as otherwise provided by law: Provided further, That none of the funds appropriated in this Act for the Office of Management and Budget may be used for the purpose of reviewing any agricultural marketing orders or any activities or regulations under the provisions of the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. 601 et seq.): Provided further, That none of the funds made available for the Office of Management and Budget by this Act may be expended for the altering of the transcript of actual testimony of witnesses, except for testimony of officials of the Office of Management and Budget, before the House and Senate Committees on Appropriations or the House and Senate Committees on Veterans' Affairs or their subcommittees: Provided further, That this proviso shall not apply to printed hearings released by the House and Senate Committees on Appropriations or the House and Senate Committees on Veterans' Affairs.

## OFFICE OF NATIONAL DRUG CONTROL POLICY

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy; for research activities pursuant to title I of Public Law 100–690; not to exceed $8,000 for official reception and representation expenses; and for participation in joint projects or in the provision of services on matters of mutual interest with nonprofit, research, or public organizations or agencies, with or without reimbursement; $35,838,000, of which $19,000,000 shall remain available until expended, consisting of $1,000,000 for policy research and evaluation and $18,000,000 for the Counter–Drug Technology Assessment Center for counternarcotics research and development projects of which $1,000,000 shall be obligated for state conferences on model state drug laws: Provided, That the $17,000,000 for the Counter–Drug Technology Assessment Center shall be available for transfer to other Federal departments or agencies: Provided further, That the Office is authorized to accept, hold, administer, and utilize gifts, both real and personal, for the purpose of aiding or facilitating the work of the Office: Provided further, That not before January 31, 1997, the Director of the Office of National Drug Control Policy shall transfer all balances in the Special Forfeiture Fund established by section 6073 of the Anti–Drug Abuse Act of 1988 (21 U.S.C. § 1509) to the Treasury Forfeiture Fund (31 U.S.C. 9703(a)).

## FEDERAL DRUG CONTROL PROGRAMS

### HIGH INTENSITY DRUG TRAFFICKING AREAS PROGRAM

AR.03361

(INCLUDING TRANSFER OF FUNDS)

For necessary expenses of the Office of National Drug Control Policy's High Intensity Drug Trafficking Areas Program, $127,102,000 for drug control activities consistent with the approved strategy for each of the designated High Intensity Drug Trafficking Areas, of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in Lake County, Indiana; of which $6,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area for the Gulf Coast States of Louisiana, Alabama, and Mississippi; of which $8,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area dedicated to combating methamphetamine use, production and trafficking in a five State area including Iowa, Missouri, Nebraska, South Dakota, and Kansas; of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in the State of Colorado; of which $3,000,000 shall be used for a newly designated High Intensity Drug Trafficking Area in the Pacific Northwest; of the total amount appropriated, including transferred funds, no less than $71,000,000 shall be transferred to State and local entities for drug control activities, and up to $69,207,000 may be transferred to Federal agencies and departments at a rate to be determined by the Director: Provided, That the funds made available under this head shall be obligated within 90 days of the date of enactment of this Act.

This title may be cited as the "Executive Office Appropriations Act, 1997".

TITLE IV—INDEPENDENT AGENCIES

COMMITTEE FOR PURCHASE FROM PEOPLE WHO ARE BLIND OR SEVERELY DISABLED

SALARIES AND EXPENSES

For necessary expenses of the Committee for Purchase From People Who Are Blind or Severely Disabled established by the Act of June 23, 1971, Public Law 92–28; $1,800,000.

FEDERAL ELECTION COMMISSION

SALARIES AND EXPENSES

For necessary expenses to carry out the provisions of the Federal Election Campaign Act of 1971, as amended, $28,165,000, of which no less than $2,500,000 shall be available for internal automated data processing systems, and of which not to exceed $5,000 shall be available for reception and representation expenses.

FEDERAL LABOR RELATIONS AUTHORITY

SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Federal Labor Relations Authority, pursuant to Reorganization Plan Numbered 2 of 1978, and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, including hire of experts and consultants, hire of passenger motor vehicles, rental of conference rooms in the District of Columbia and elsewhere; $21,588,000: Provided, That public members of the Federal Service Impasses Panel may be paid travel expenses and per diem in lieu of subsistence as authorized by law (5 U.S.C. 5703) for persons employed intermittently in the Government service, and compensation as authorized by 5 U.S.C. 3109: Provided further, That notwithstanding 31 U.S.C. 3302, funds received from fees charged to non-Federal participants at labor-management relations conferences shall be credited to and merged with this account, to be available without further appropriation for the costs of carrying out these conferences.

GENERAL SERVICES ADMINISTRATION

FEDERAL BUILDINGS FUND

LIMITATIONS ON AVAILABILITY OF REVENUE

(INCLUDING TRANSFER OF FUNDS)

For additional expenses necessary to carry out the purpose of the Fund established pursuant to section 210(f) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)), $400,544,000, to be deposited into said Fund. The revenues and collections deposited into the Fund shall be available for necessary expenses of real property management

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

and related activities not otherwise provided for, including operation, maintenance, and protection of federally owned and leased buildings; rental of buildings in the District of Columbia; restoration of leased premises; moving governmental agencies (including space adjustments and telecommunications relocation expenses) in connection with the assignment, allocation and transfer of space; contractual services incident to cleaning or servicing buildings, and moving; repair and alteration of federally owned buildings including grounds, approaches and appurtenances; care and safeguarding of sites; maintenance, preservation, demolition, and equipment; acquisition of buildings and sites by purchase, condemnation, or as otherwise authorized by law; acquisition of options to purchase buildings and sites; conversion and extension of federally owned buildings; preliminary planning and design of projects by contract or otherwise; construction of new buildings (including equipment for such buildings); and payment of principal, interest, taxes, and any other obligations for public buildings acquired by installment purchase and purchase contract, in the aggregate amount of $5,555,544,000 of which (1) not to exceed $657,711,000 shall remain available until expended for construction of additional projects and at maximum construction improvement costs (including funds for sites and expenses and associated design and construction services) as follows:

New Construction:
California:
  Fresno, Federal Building and U.S. Courthouse, $6,595,000
Colorado:
  Denver, Rogers Federal Building–U.S. Courthouse, $9,545,000
District of Columbia:
  U.S. Courthouse Annex, $5,703,000
Florida:
  Miami, U.S. Courthouse, $24,990,000
  Orlando, U.S. Courthouse, $9,514,000
Kentucky:
  Covington, U.S. Courthouse, $17,134,000
  London, U.S. Courthouse, $13,732,000
Montana:
  Babb, Piegan Border Station, $333,000
  Sweetgrass, Border Station, $1,059,000
Nevada:
  Las Vegas, U.S. Courthouse, $83,719,000
New York:
  Brooklyn, U.S. Courthouse, $169,000,000
Ohio:
  Cleveland, U.S. Courthouse, $128,559,000
  Youngstown, U.S. Courthouse, $15,813,000
Oregon:
  Portland, Consolidated Law Federal Office Building, $4,750,000
Pennsylvania:
  Erie, U.S. Courthouse Annex, $3,300,000
  Philadelphia, DVA–Federal Complex, Phase II, $13,765,000
South Carolina:
  Columbia, U.S. Courthouse Annex, $43,848,000
Texas:
  Corpus Christi, U.S. Courthouse, $24,161,000
Utah:
  Salt Lake City, Moss U.S. Courthouse Annex and Alteration, $11,474,000
Washington:
  Blaine, U.S. Border Station, $13,978,000
  Oroville, U.S. Border Station, $1,452,000

AR.03363

   Seattle, U.S. Courthouse, $16,853,000

   Sumas, U.S. Border Station (Claim), $1,177,000

Nationwide:

   Non-prospectus construction projects, $10,000,000

   Security Enhancements, $27,256,000:

Provided, That each of the immediately foregoing limits of costs on new construction projects may be exceeded to the extent that savings are affected in other such projects, but not to exceed 10 percent unless advance approval is obtained from the House and Senate Committees on Appropriations of a greater amount: Provided further, That the cost of future U.S. Courthouse annex projects shall reflect savings through improving design efficiencies, curtailing planned interior finishes, requiring more efficient use of courtroom and library space, and by otherwise limiting space requirements: Providing further, That from funds available in the Federal Buildings Fund, $20,000,000 shall be available until expended for environmental clean up activities at the Southeast Federal Center in the District of Columbia and $81,000,000 shall be available until expended for design and construction activities at the Consolidated Law Federal Office Building in Portland, Oregon: Provided further, That from funds available for non-prospectus construction projects, $250,000 may be available until expended for the acquisition, lease, construction, and equipping of flexiplace work telecommuting centers in West Virginia: Provided further, That all funds for direct construction projects shall expire on September 30, 1999: (2) not to exceed $639,000,000 shall remain available until expended, for repairs and alterations which includes associated design and construction services: Provided further, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the amount by project as follows, except each project may be increased by an amount not to exceed 10 per centum unless advance approval is obtained from the Committees on Appropriations of the House and Senate of a greater amount:

  Repairs and alterations:

  District of Columbia:

   Ariel Rios Building, $62,740,000

   Justice Department, Phase 1 of 3, $50,000,000

   Lafayette Building, $5,166,000

  Hawaii:

   Honolulu, Prince Jonah Kuhio Kalanianaole Federal Building and U.S. Courthouse, $4,140,000

  Illinois:

   Chicago, Everett M. Dirksen Federal Building, $18,844,000

   Chicago, John C. Kluczynski, Jr. Federal Building (IRS), $13,414,000

  Louisiana:

   New Orleans, Customhouse, $3,500,000

  Maryland:

   Montgomery County, White Oak environmental clean up activities, $10,000,000

  Massachusetts:

   Andover, IRS Regional Service Center, $812,000

  New Hampshire:

   Concord, J.C. Cleveland Federal Building, $8,251,000

  New Jersey:

   Camden, U.S. Post Office–Courthouse $11,096,000

  New York:

   Albany, James T. Foley Post Office–Courthouse, $3,880,000

   Brookhaven, IRS Service Center, $2,272,000

   New York, Jacob K. Javits Federal Building, $13,651,000

  Pennsylvania:

   Scranton, Federal Building–U.S. Courthouse, $10,610,000

  Rhode Island:

   Providence, Federal Building–U.S. Courthouse, $8,209,000

  Texas:

AR.03364

Fort Worth, Federal Center, $11,259,000

Nationwide:

Chlorofluorocarbons Program, $23,456,000

Elevator Program, $10,000,000

Energy Program, $20,000,000

Security Enhancements, various buildings, $2,700,000

Basic Repairs and Alterations, $345,000,000:

<< 40 USCA § 872 NOTE >>

Provided further, That additional projects for which prospectuses have been fully approved may be funded under this category only if advance approval is obtained from the Committees on Appropriations of the House and Senate: Provided further, That the amounts provided in this or any prior Act for Repairs and Alterations may be used to fund costs associated with implementing security improvements to buildings necessary to meet the minimum standards for security in accordance with current law and in compliance with the reprogramming guidelines of the appropriate Committees of the House and Senate: Provided further, That funds in the Federal Buildings Fund for Repairs and Alterations shall, for prospectus projects, be limited to the originally authorized amount, except each project may be increased by an amount not to exceed 10 percent when advance approval is obtained from the Committees on Appropriations of the House and Senate of a greater amount: Provided further, That the difference between the funds appropriated and expended on any projects in this or any prior Act, under the heading "Repairs and Alterations", may be transferred to Basic Repairs and Alterations or used to fund authorized increases in prospectus projects: Provided further, That from funds made available for Basic Repairs and Alterations, $8,000,000 shall be made available for renovation of the Agricultural Research Service Laboratory in Ames, Iowa, which is currently occupied by the Animal and Plant Health Inspection Service: Provided further, That from funds made available for Basic Repairs Alterations, $1,450,000 may be available for the renovation of the Pioneer Courthouse located at 520 SW Morrison, in Portland, Oregon: Provided further, That from funds made available for Basic Repairs and Alterations, $6,000,000 shall be used for necessary expenses associated with ongoing construction of the U.S. Courthouse in Montgomery, Alabama: Provided further, That from funds made available for Basic Repairs and Alterations, $100,000 shall be transferred to the National Park Service "Construction" appropriation for restoration and maintenance of the multi-purpose field at Wallenberg Place in Washington, DC: Provided further, That all funds for repairs and alterations prospectus projects shall expire on September 30, 1999, and remain in the Federal Buildings Fund except funds for projects as to which funds for design or other funds have been obligated in whole or in part prior to such date: Provided further, That the amount provided in this or any prior Act for Basic Repairs and Alterations may be used to pay claims against the Government arising from any projects under the heading "Repairs and Alterations" or used to fund authorized increases in prospectus projects: Provided further, That $5,700,000 of the funds provided under this heading in Public Law 103–329, for the IRS Service Center, Holtsville, New York, shall be available until September 30, 1998; (3) not to exceed $173,075,000 for installment acquisition payments including payments on purchase contracts which shall remain available until expended: Provided further, That up to $1,500,000 shall be available for a design prospectus of the Federal Building and U.S. Courthouse located at 811 Grand Avenue in Kansas City, Missouri; (4) not to exceed $2,343,795,000 for rental of space which shall remain available until expended; and (5) not to exceed $1,552,651,000 for building operations which shall remain available until expended and of which $8,000,000 shall be transferred to the "Policy and Operations" appropriation: Provided further, That funds available to the General Services Administration shall not be available for expenses in connection with any construction, repair, alteration, and acquisition project for which a prospectus, if required by the Public Buildings Act of 1959, as amended, has not been approved, except that necessary funds may be expended for each project for required expenses in connection with the development of a proposed prospectus: Provided further, That the Administrator of General Services shall, at the earliest practicable date, initiate discussions with the Smithsonian Institution on the feasibility of transferring Federal Building 10B located at 600 Independence Avenue SW., Washington, DC to the Smithsonian Institution at such price and under such terms and conditions as determined appropriate by the Administrator and subject to the prior approval of the appropriate authorizing and appropriations committees of the Congress: Provided further, That funds provided in this Act under the heading "Security Enhancements, various buildings" may be used, by project in accordance with an approved prospectus: Provided further, That the Administrator is authorized in fiscal year 1997 and thereafter, to enter into and perform such leases, contracts, or other transactions with any agency or instrumentality of the United States, the several States, or the District of Columbia, or with any

person, firm, association, or corporation, as may be necessary to implement the trade center plan at the Federal Triangle Project and is hereby granted all the rights and authorities of the former Pennsylvania Avenue Development Corporation (PADC) with regard to property transferred from the PADC to the General Services Administration in fiscal year 1996: *Provided further,* That notwithstanding any other provision of law, the Administrator of General Services is hereby authorized to use all funds transferred from the PADC or income earned on PADC properties for activities associated with carrying out the responsibilities of the PADC transferred to the Administrator of General Services and that any such income earned on or after April 1, 1996, shall be deposited to the Pennsylvania Avenue Activities account and shall remain available until expended: *Provided further,* That any funds or income as may be deemed by the Administrator as excess to the amount needed to fulfill the PADC responsibilities transferred to the Administrator of General Services, shall be applied to any outstanding debt, with the exception of debt associated with the Ronald Reagan Building and International Trade Center, incurred by the PADC in the course of acquiring real estate: *Provided further,* That with respect to real property transferred from the PADC to the General Services Administration pursuant to section 313 of Public Law 104–134, Title III, General Provisions, the Administrator of General Services is hereafter authorized and directed to make payments required by section 10(b) of the PADC Act of 1972, Public Law 92–578 in the same manner as previously paid by the PADC: *Provided further,* That for the purposes of this authorization, buildings constructed pursuant to the purchase contract authority of the Public Buildings Amendments of 1972 (40 U.S.C. 602a), buildings occupied pursuant to installment purchase contracts, and buildings under the control of another department or agency where alterations of such buildings are required in connection with the moving of such other department or agency from buildings then, or thereafter to be, under the control of the General Services Administration shall be considered to be federally owned buildings: *Provided further,* That funds available in the Federal Buildings Fund may be expended for emergency repairs when advance approval is obtained from the Committees on Appropriations of the House and Senate: *Provided further,* That amounts necessary to provide reimbursable special services to other agencies under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 490(f)(6)) and amounts to provide such reimbursable fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control as may be appropriate to enable the United States Secret Service to perform its protective functions pursuant to 18 U.S.C. 3056, as amended, shall be available from such revenues and collections: *Provided further,* That revenues and collections and any other sums accruing to this Fund during fiscal year 1997, excluding reimbursements under section 210(f)(6) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490(f)(6)) in excess of $5,555,544,000 shall remain in the Fund and shall not be available for expenditure except as authorized in appropriations Acts.

## POLICY AND OPERATIONS

For expenses authorized by law, not otherwise provided for, for Government-wide policy and oversight activities associated with asset management activities; utilization and donation of surplus personal property; transportation management activities; procurement and supply management activities; Government-wide and internal responsibilities relating to automated data management, telecommunications, information resources management, and related technology activities; utilization survey, deed compliance inspection, appraisal, environmental and cultural analysis, and land use planning functions pertaining to excess and surplus real property; agency-wide policy direction; Board of Contract Appeals; accounting, records management, and other support services incident to adjudication of Indian Tribal Claims by the United States Court of Federal Claims; services as authorized by 5 U.S.C. 3109; and not to exceed $5,000 for official reception and representation expenses; $110,173,000.

## OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General and services authorized by 5 U.S.C. 3109, $33,863,000: *Provided,* That not to exceed $5,000 shall be available for payment for information and detection of fraud against the Government, including payment for recovery of stolen Government property: *Provided further,* That not to exceed $2,500 shall be available for awards to employees of other Federal agencies and private citizens in recognition of efforts and initiatives resulting in enhanced Office of Inspector General effectiveness.

## ALLOWANCES AND OFFICE STAFF FOR FORMER PRESIDENTS

For carrying out the provisions of the Act of August 25, 1958, as amended (3 U.S.C. 102 note), and Public Law 95–138, $2,180,000: *Provided,* That the Administrator of General Services shall transfer to the Secretary of the Treasury such sums as may be necessary to carry out the provisions of such Acts.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXPENSES, PRESIDENTIAL TRANSITION

For expenses necessary to carry out the Presidential Transition Act of 1963, as amended (3 U.S.C. 102 note), $5,600,000.

GENERAL PROVISIONS—GENERAL SERVICES

ADMINISTRATION

SECTION 401. The appropriate appropriation or fund available to the General Services Administration shall be credited with the cost of operation, protection, maintenance, upkeep, repair, and improvement, included as part of rentals received from Government corporations pursuant to law (40 U.S.C. 129).

SEC. 402. Funds available to the General Services Administration shall be available for the hire of passenger motor vehicles.

SEC. 403. Funds in the Federal Buildings Fund made available for fiscal year 1997 for Federal Buildings Fund activities may be transferred between such activities only to the extent necessary to meet program requirements: Provided, That any proposed transfers shall be approved in advance by the Committees on Appropriations of the House and Senate.

SEC. 404. No funds made available by this Act shall be used to transmit a fiscal year 1998 request for United States Courthouse construction that does not meet the design guide standards for construction as established by the General Services Administration, the Judicial Conference of the United States, and the Office of Management and Budget and does not reflect the priorities of the Judicial Conference of the United States as set out in its approved 5–year construction plan: Provided, That the request must be accompanied by a standardized courtroom utilization study of each facility to be replaced or expanded.

SEC. 405. None of the funds provided in this Act may be used to increase the amount of occupiable square feet, provide cleaning services, security enhancements, or any other service usually provided through the Federal Buildings Fund, to any agency which does not pay the requested rate per square foot assessment for space and services as determined by the General Services Administration in compliance with the Public Buildings Amendments Act of 1972 (Public Law 92–313).

SEC. 406. The Administrator of the General Services is directed to ensure that the materials used for the fascade on the United States Courthouse Annex, Savannah, Georgia project are compatible with the existing Savannah Federal Building–U.S. Courthouse fascade, in order to ensure compatibility of this new facility with the Savannah historic district and to ensure that the Annex will not endanger the National Landmark status of the Savannah historic district.

SEC. 407. (a) Section 210 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 490) is amended by adding at the end the following new subsection:

<< 40 USCA § 490 >>

"(l)(1) The Administrator may establish, acquire space for, and equip flexiplace work telecommuting centers (in this subsection referred to as 'telecommuting centers') for use by employees of Federal agencies, State and local governments, and the private sector in accordance with this subsection.

"(2) The Administrator may make any telecommuting center available for use by individuals who are not Federal employees to the extent the center is not being fully utilized by Federal employees. The Administrator shall give Federal employees priority in using the telecommuting centers.

"(3)(A) The Administrator shall charge user fees for the use of any telecommuting center. The amount of the user fee shall approximate commercial charges for comparable space and services except that in no instance shall such fee be less than that necessary to pay the cost of establishing and operating the center, including the reasonable cost of renovation and replacement of furniture, fixtures, and equipment.

"(B) Amounts received by the Administrator after September 30, 1993, as user fees for use of any telecommuting center may be deposited into the Fund established under subsection (f) of this section and may be used by the Administrator to pay costs incurred in the establishment and operation of the center.

"(4) The Administrator may provide guidance, assistance, and oversight to any person regarding establishment and operation of alternative workplace arrangements, such as telecommuting, hoteling, virtual offices, and other distributive work arrangements.

"(5) In considering whether to acquire any space, quarters, buildings, or other facilities for use by employees of any executive agency, the head of that agency shall consider whether the need for the facilities can be met using alternative workplace arrangements referred to in paragraph (4).".

(b) Section 13 of the Public Building Act of 1959, as amended, (107 Stat. 438; 40 U.S.C. 612) is amended—

<< 40 USCA § 612 >>

(1) by striking "(xi)" and inserting in lieu thereof "(xii)"; and

(2) by striking "and (x)" and inserting in lieu thereof "(x) telecommuting centers and (xi)".

SEC. 408. Notwithstanding any other provision of law, the Administrator of General Services is authorized and directed to acquire the land bounded by S.W. First Avenue, S.W. Second Avenue, S.W. Main Street, and S.W. Madison Street, Portland, Oregon, for the purposes of constructing the proposed Law Enforcement Center on the site.

SEC. 409. Section 2815 of Public Law 103–160, relating to the conveyance of real property at the Iowa Army Ammunition Plant, is amended—

(1) in subsection (a), by striking "may convey to" and inserting "shall convey, without reimbursement and if requested by,"; and

(2) by striking subsection (b) and inserting the following new subsection:

"(b) USE OF WATER AND SEWER LINES.—As part of the conveyance under subsection (a), the Secretary shall permit the City to use existing water and sewer lines and sewage system at the Iowa Army Ammunition Plant for a three-year period beginning on the date of the conveyance.".

SEC. 410. (a) CONVEYANCE OF LAND.—

(1) ADMINISTRATOR OF GENERAL SERVICES.—Subject to subsections (b) and (c), the Administrator of General Services (hereinafter in this section referred to as the "Administrator") shall convey, without compensation, to a nonprofit organization known as the "Beaver County Corporation for Economic Development" all right, title, and interest of the United States in and to those pieces or parcels of land in Hopewell Township, Pennsylvania, described in subsection (b), together with all improvements thereon and appurtenances thereto. The purpose of the conveyance is to provide a site for economic development in Hopewell Township.

(2) PROPERTY DESCRIPTION.—The land referred to in paragraph (1) is the parcel of land in the township of Hopewell, county of Beaver, Pennsylvania, bounded and described as follows:

(A) Beginning at the southwest corner at a point common to Lot No. 1, same plan, lands now or formerly of Frank and Catherine Wutter, and the easterly right-of-way line of Pennsylvania Legislative Route No. 60 (Beaver Valley Expressway); thence proceeding by the easterly right-of-way of Pennsylvania Legislative Route No. 60 by the following three courses and distances:

(i) North 17 degrees, 14 minutes, 20 seconds West, 213.10 feet to a point.

(ii) North 72 degrees, 45 minutes, 40 seconds East, 30.00 feet to a point.

(iii) North 17 degrees, 14 minutes, 20 seconds West, 252.91 feet to a point; on a line dividing Lot No. 1 from the other part of Lot No. 1, said part now called Lot No. 5, same plan; thence by last mentioned dividing line, North 78 degrees, 00 minutes, 00 seconds East; 135.58 feet to a point, a cul-de-sac on Industrial Drive; thence by said cul-de-sac and the southerly side of Industrial Drive by the following courses and distances:

(I) By a curve to the right having a radius of 100.00 feet for an arc distance of 243.401 feet to a point.

(II) Thence by a curve to the right having a radius of 100.00 feet for an arc distance of 86.321 feet to a point.

(III) Thence by 78 degrees, 00 minutes, 00 seconds East, 777.78 feet to a point.

(IV) Thence, North 12 degrees, 00 minutes, 00 seconds West, 74.71 feet to a point.

(V) Thence by a curve to the right, having a radius of 50.00 feet for an arc distance of 78.54 feet to a point.

(VI) Thence North 78 degrees, 00 minutes, 00 seconds East, 81.24 feet to a point.

(VII) Thence by a curve to the right, having a radius of 415.00 feet for an arc distance of 140.64 feet to a point.

(VIII) Thence, South 82 degrees, 35 minutes, 01 second East, 125.00 feet to a point.

(IX) Thence, South 7 degrees, 24 minutes, 59 seconds West, 5.00 feet to a point.

(X) Thence by a curve to the right, having a radius of 320.00 feet for an arc distance of 256.85 feet to a point.

(XI) Thence by a curve to the right having a radius of 50.00 feet for an arc distance of 44.18 feet to a point on the northerly side of Airport Road.

(B) Thence by the northerly side thereof by the following:

(i) South 14 degrees, 01 minutes, 54 seconds, West, 56.94 feet to a point.

(ii) Thence by a curve to the right having a radius of 225.00 feet for an arc distance of 207.989 feet to a point.

(iii) Thence South 66 degrees, 59 minutes, 45 seconds West, 192.08 feet to a point on the southern boundary of Lot No. 1, which line is also the line dividing Lot No. 1 from lands now or formerly, of Frank and Catherine Wutter.

(C) Thence by the same, South 75 degrees, 01 minutes, 00 seconds West, 1,351.23 feet to a point at the place of beginning.

(3) DATE OF CONVEYANCE.—The date of the conveyance of property required under paragraph (1) shall be not later than the 90th day following the date of the enactment of this Act.

(4) CONVEYANCE TERMS.—

(A) TERMS AND CONDITIONS.—The conveyance of property required under paragraph (1) shall be subject to such terms and conditions as may be determined by the Administrator to be necessary to safeguard the interests of the United States. Such terms and conditions shall be consistent with the terms and conditions set forth in this section.

(B) QUITCLAIM DEED.—The conveyance of property required under paragraph (1) shall be by quitclaim deed.

(b) LIMITATION ON CONVEYANCE.—No part of any land conveyed under subsection (a) may be used, during the 30–year period beginning on the date of conveyance for any purpose other than economic development.

(c) REVERSIONARY INTEREST.—

(1) IN GENERAL.—The property conveyed under subsection (a) shall revert to the United States on any date in the 30–year period beginning on the date of such conveyance on which the property is used for a purpose other than economic development.

(2) ENFORCING REVERSION.—The Administrator shall perform all acts necessary to enforce any reversion of property to the United States under this subsection.

(3) INVENTORY OF PUBLIC BUILDINGS SERVICE.—Property that reverts to the United States under this subsection shall be under the control of the General Services Administration.

SEC. 411. Notwithstanding any other provision of law, the land contained in block 111 in the Federal District, Denver, Colorado, obtained pursuant to paragraphs (6) and (7) of section 12 of Public Law 94–204 (43 U.S.C. 1611 note) shall not be subject to condemnation by any agency or instrumentality of the Federal Government, without the consent of the owner of that land.

## JOHN F. KENNEDY ASSASSINATION RECORDS REVIEW BOARD

For necessary expenses to carry out the John F. Kennedy Assassination Records Collection Act of 1992, $2,150,000.

## MERIT SYSTEMS PROTECTION BOARD

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF FUNDS)

For necessary expenses to carry out functions of the Merit Systems Protection Board pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and direct procurement of survey printing, $23,923,000, together with not to exceed $2,430,000 for administrative expenses to adjudicate retirement appeals to be transferred from the Civil Service Retirement and Disability Fund in amounts determined by the Merit Systems Protection Board.

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### OPERATING EXPENSES

For necessary expenses in connection with the administration of the National Archives (including the Information Security Oversight Office) and records and related activities, as provided by law, and for expenses necessary for the review and declassification of documents, and for the hire of passenger motor vehicles, $196,963,000: Provided, That the Archivist of the United States is authorized to use any excess funds available from the amount borrowed for construction of the National Archives facility, for expenses necessary to move into the facility.

## ARCHIVES FACILITIES AND PRESIDENTIAL LIBRARIES

### REPAIRS AND RESTORATION

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

For the repair, alteration, and improvement of archives facilities and presidential libraries, and to provide adequate storage for holdings, $16,229,000 to remain available until expended.

## NATIONAL HISTORICAL PUBLICATIONS AND RECORDS COMMISSION

### GRANTS PROGRAM

For necessary expenses for allocations and grants for historical publications and records as authorized by 44 U.S.C. 2504, as amended, $5,000,000 to remain available until expended.

## OFFICE OF GOVERNMENT ETHICS

### SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Government Ethics pursuant to the Ethics in Government Act of 1978, as amended by Public Law 100–598, and the Ethics Reform Act of 1989, Public Law 101–194, including services as authorized by 5 U.S.C. 3109, rental of conference rooms in the District of Columbia and elsewhere, hire of passenger motor vehicles, and not to exceed $1,500 for official reception and representation expenses; $8,078,000.

## OFFICE OF PERSONNEL MANAGEMENT

### SALARIES AND EXPENSES

#### (INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses to carry out functions of the Office of Personnel Management pursuant to Reorganization Plan Numbered 2 of 1978 and the Civil Service Reform Act of 1978, including services as authorized by 5 U.S.C. 3109; medical examinations performed for veterans by private physicians on a fee basis; rental of conference rooms in the District of Columbia and elsewhere; hire of passenger motor vehicles; not to exceed $2,500 for official reception and representation expenses; advances for reimbursements to applicable funds of the Office of Personnel Management and the Federal Bureau of Investigation for expenses incurred under Executive Order 10422 of January 9, 1953, as amended; and payment of per diem and/or subsistence allowances to employees where Voting Rights Act activities require an employee to remain overnight at his or her post of duty; $87,076,000, of which not to exceed $1,000,000 shall be available for the establishment of health promotion and disease prevention programs for Federal employees; and in addition $94,736,000 for administrative expenses, to be transferred from the appropriate trust funds of the Office of Personnel Management without regard to other statutes, including direct procurement of printing materials for annuitants, for the retirement and insurance programs, of which $3,500,000 shall be transferred at such times as the Office of Personnel Management deems appropriate, and shall remain available until expended for the costs of automating the retirement recordkeeping systems, together with remaining amounts authorized in previous Acts for the recordkeeping systems: Provided, That the provisions of this appropriation shall not affect the authority to use applicable trust funds as provided by section 8348(a)(1)(B) of title 5, United States Code: Provided further, That, except as may be consistent with 5 U.S.C. 8902a(f)(1) and (i), no payment may be made from the Employees Health Benefits Fund to any physician, hospital, or other provider of health care services or supplies who is, at the time such services or supplies are provided to an individual covered under chapter 89 of title 5, United States Code, excluded, pursuant to section 1128 or 1128A of the Social Security Act (42 U.S.C. 1320a–7–1320a–7a), from participation in any program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.): Provided further, That no part of this appropriation shall be available for salaries and expenses of the Legal Examining Unit of the Office of Personnel Management established pursuant to Executive Order 9358 of July 1, 1943, or any successor unit of like purpose: Provided further, That the President's Commission on White House Fellows, established by Executive Order 11183 of October 3, 1964, may, during the fiscal year ending September 30, 1997, accept donations of money, property, and personal services in connection with the development of a publicity brochure to provide information about the White House Fellows, except that no such donations shall be accepted for travel or reimbursement of travel expenses, or for the salaries of employees of such Commission.

## GENERAL PROVISIONS—OFFICE OF PERSONNEL

### MANAGEMENT

<< 5 USCA § 1304 >>

SEC. 421. The first sentence of section 1304(e)(1) of title 5, United States Code, is amended by inserting after "basis" the following ", including personnel management services performed at the request of individual agencies (which would otherwise be the responsibility of such agencies), or at the request of nonappropriated fund instrumentalities".

<< 5 USCA § 8906 >>

SEC. 422. Paragraph (1) of section 8906(e) of title 5, United States Code, is amended—
(1) by striking the last sentence of that paragraph and redesignating the remainder of that paragraph as (1)(A);
(2) by adding at the end of paragraph (1)(A) (as so designated) the following:
"(B) During each pay period in which an enrollment continues under subparagraph (A)—
"(i) employee and Government contributions required by this section shall be paid on a current basis; and
"(ii) if necessary, the head of the employing agency shall approve advance payment, recoverable in the same manner as under section 5524a(c), of a portion of basic pay sufficient to pay current employee contributions.
"(C) Each agency shall establish procedures for accepting direct payments of employee contributions for the purposes of this paragraph.".

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF TRUST FUNDS)

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act, as amended, including services as authorized by 5 U.S.C. 3109, hire of passenger motor vehicles, $960,000; and in addition, not to exceed $8,645,000 for administrative expenses to audit the Office of Personnel Management's retirement and insurance programs, to be transferred from the appropriate trust funds of the Office of Personnel Management, as determined by the Inspector General: Provided, That the Inspector General is authorized to rent conference rooms in the District of Columbia and elsewhere.

GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEES HEALTH BENEFITS

For payment of Government contributions with respect to retired employees, as authorized by chapter 89 of title 5, United States Code, and the Retired Federal Employees Health Benefits Act (74 Stat. 849), as amended, such sums as may be necessary.

GOVERNMENT PAYMENT FOR ANNUITANTS, EMPLOYEE LIFE INSURANCE

For payment of Government contributions with respect to employees retiring after December 31, 1989, as required by chapter 87 of title 5, United States Code, such sums as may be necessary.

PAYMENT TO CIVIL SERVICE RETIREMENT AND DISABILITY FUND

<< 33 USCA § 776 >>

For financing the unfunded liability of new and increased annuity benefits becoming effective on or after October 20, 1969, as authorized by 5 U.S.C. 8348, and annuities under special Acts to be credited to the Civil Service Retirement and Disability Fund, such sums as may be necessary: Provided, That annuities authorized by the Act of May 29, 1944, as amended, and the Act of August 19, 1950, as amended (33 U.S.C. 771–75), may hereafter be paid out of the Civil Service Retirement and Disability Fund.

OFFICE OF SPECIAL COUNSEL

SALARIES AND EXPENSES

For necessary expenses to carry out functions of the Office of Special Counsel pursuant to Reorganization Plan Numbered 2 of 1978, the Civil Service Reform Act of 1978 (Public Law 95–454), the Whistleblower Protection Act of 1989 (Public Law 101–

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

12), Public Law 103–424, and the Uniformed Services Employment and Reemployment Act of 1994 (Public Law 103–353), including services as authorized by 5 U.S.C. 3109, payment of fees and expenses for witnesses, rental of conference rooms in the District of Columbia and elsewhere, and hire of passenger motor vehicles; $8,116,000.

### UNITED STATES TAX COURT

### SALARIES AND EXPENSES

<< 26 USCA § 7443 NOTE >>

  For necessary expenses, including contract reporting and other services as authorized by 5 U.S.C. 3109, $33,781,000: Provided, That travel expenses of the judges shall be paid upon the written certificate of the judge.
  This title may be cited as the "Independent Agencies Appropriations Act, 1997".

### TITLE V—GENERAL PROVISIONS

### THIS ACT

  SECTION 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.
  SEC. 502. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to 5 U.S.C. 3109, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order issued pursuant to existing law.

<< 31 USCA § 5131 >>

  SEC. 503. Section 5131 of title 31, United States Code, is amended—
  (1) by striking subsection (c); and
  (2) by redesignating subsection (d) as subsection (c).
  SEC. 504. None of the funds made available by this Act shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would prohibit the enforcement of section 307 of the Tariff Act of 1930.
  SEC. 505. None of the funds made available by this Act shall be available for the purpose of transferring control over the Federal Law Enforcement Training Center located at Glynco, Georgia, and Artesia, New Mexico, out of the Treasury Department.
  SEC. 506. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.
  SEC. 507. No part of any appropriation contained in this Act shall be available for the payment of the salary of any officer or employee of the United States Postal Service, who—
  (1) prohibits or prevents, or attempts or threatens to prohibit or prevent, any officer or employee of the United States Postal Service from having any direct oral or written communication or contact with any Member or committee of Congress in connection with any matter pertaining to the employment of such officer or employee or pertaining to the United States Postal Service in any way, irrespective of whether such communication or contact is at the initiative of such officer or employee or in response to the request or inquiry of such Member or committee; or
  (2) removes, suspends from duty without pay, demotes, reduces in rank, seniority, status, pay, or performance of efficiency rating, denies promotion to, relocates, reassigns, transfers, disciplines, or discriminates in regard to any employment right, entitlement, or benefit, or any term or condition of employment of, any officer or employee of the United States Postal Service, or attempts or threatens to commit any of the foregoing actions with respect to such officer or employee, by reason of any communication or contact of such officer or employee with any Member or committee of Congress as described in paragraph (1).

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 508. The Office of Personnel Management may, during the fiscal year ending September 30, 1997, accept donations of supplies, services, land, and equipment for the Federal Executive Institute and Management Development Centers to assist in enhancing the quality of Federal management.

<< 18 USCA § 3056 NOTE >>

SEC. 509. The United States Secret Service may, during the fiscal year ending September 30, 1997, and hereafter, accept donations of money to off-set costs incurred while protecting former Presidents and spouses of former Presidents when the former President or spouse travels for the purpose of making an appearance or speech for a payment of money or any thing of value.

SEC. 510. No part of any appropriation contained in this Act shall be available to pay the salary for any person filling a position, other than a temporary position, formerly held by an employee who has left to enter the Armed Forces of the United States and has satisfactorily completed his period of active military or naval service and has within 90 days after his release from such service or from hospitalization continuing after discharge for a period of not more than 1 year made application for restoration to his former position and has been certified by the Office of Personnel Management as still qualified to perform the duties of his former position and has not been restored thereto.

SEC. 511. None of the funds made available in this Act may be used to provide any non-public information such as mailing or telephone lists to any person or any organization outside of the Federal Government without the approval of the House and Senate Committees on Appropriations.

SEC. 512. No funds appropriated pursuant to this Act may be expended by an entity unless the entity agrees that in expending the assistance the entity will comply with sections 2 through 4 of the Act of March 3, 1933 (41 U.S.C. 10a–10c, popularly known as the "Buy American Act").

SEC. 513. (a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—In the case of any equipment or products that may be authorized to be purchased with financial assistance provided under this Act, it is the sense of the Congress that entities receiving such assistance should, in expending the assistance, purchase only American-made equipment and products.

(b) NOTICE TO RECIPIENTS OF ASSISTANCE.—In providing financial assistance under this Act, the Secretary of the Treasury shall provide to each recipient of the assistance a notice describing the statement made in subsection (a) by the Congress.

SEC. 514. If it has been finally determined by a court or Federal agency that any person intentionally affixed a label bearing a "Made in America" inscription, or any inscription with the same meaning, to any product sold in or shipped to the United States that is not made in the United States, such person shall be ineligible to receive any contract or subcontract made with funds provided pursuant to this Act, pursuant to the debarment, suspension, and ineligibility procedures described in sections 9.400 through 9.409 of title 48, Code of Federal Regulations.

SEC. 515. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 1997 from appropriations made available for salaries and expenses for fiscal year 1997 in this Act, shall remain available through September 30, 1998, for each such account for the purposes authorized: Provided, That a request shall be submitted to the House and Senate Committees on Appropriations for approval prior to the expenditure of such funds.

SEC. 516. Where appropriations in this Act are expendable for travel expenses of employees and no specific limitation has been placed thereon, the expenditures for such travel expenses may not exceed the amount set forth in the budget estimates submitted for appropriations without the advance approval of the House and Senate Committees on Appropriations: Provided, That this section shall not apply to travel performed by uncompensated officials of local boards and appeal boards in the Selective Service System; to travel performed directly in connection with care and treatment of medical beneficiaries of the Department of Veterans Affairs; to travel of the Office of Personnel Management in carrying out its observation responsibilities of the Voting Rights Act; or to payments to interagency motor pools separately set forth in the budget schedules: Provided further, That this provision does not apply to accounts that do not contain an object identification for travel.

<< 31 USCA § 5141 NOTE >>

SEC. 517. Notwithstanding any other provision of law or regulation during the fiscal year ending September 30, 1997, and thereafter:

(1) The authority of the special police officers of the Bureau of Engraving and Printing, in the Washington, DC Metropolitan area, extends to buildings and land under the custody and control of the Bureau; to buildings and land acquired by or for the Bureau through lease, unless otherwise provided by the acquisition agency; to the streets, sidewalks and open areas immediately adjacent to the Bureau along Wallenberg Place (15th Street) and 14th Street between Independence and Maine Avenues and C and D Streets between 12th and 14th Streets; to areas which include surrounding parking facilities used by Bureau employees, including the lots at 12th and C Streets, SW, Maine Avenue and Water Streets, SW, Maiden Lane, the Tidal Basin and East Potomac Park; to the protection in transit of United States securities, plates and dies used in the production of United States securities, or other products or implements of the Bureau of Engraving and Printing which the Director of that agency so designates.

<< 31 USCA §§ 5131 nt, 5141 NOTE >>

(2) The authority of the special police officers of the United States Mint extends to the buildings and land under the custody and control of the Mint; to the streets, sidewalks and open areas in the vicinity to such facilities; to surrounding parking facilities used by Mint employees; and to the protection in transit of bullion, coins, dies, and other property and assets of, or in the custody of, the Mint.

(3) The exercise of police authority by Bureau or Mint officers, with the exception of the exercise of authority upon property under the custody and control of the Bureau or the Mint, respectively, shall be deemed supplementary to the Federal police force with primary jurisdictional responsibility. This authority shall be in addition to any other law enforcement authority which has been provided to these officers under other provisions of law or regulations.

SEC. 518. No funds appropriated by this Act shall be available to pay for an abortion, or the administrative expenses in connection with any health plan under the Federal employees health benefit program which provides any benefits or coverage for abortions.

SEC. 519. The provision of section 518 shall not apply where the life of the mother would be endangered if the fetus were carried to term, or the pregnancy is the result of an act of rape or incest.

SEC. 520. No part of any appropriation made available in this Act shall be used to implement Bureau of Alcohol, Tobacco and Firearms Ruling TD ATF–360; Re: Notice Nos. 782, 780, 91F009P.

SEC. 521. Notwithstanding title 5, United States Code, Personal Service Contractors (PSC) employed by the Department of the Treasury shall be considered as Federal Government employees for purposes of making available Federal employee health and life insurance.

<< 31 USCA § 5131 >>

SEC. 522. Section 5131 of title 31, United States Code, is amended by striking subsection (c); and by redesignating subsection (d) as subsection (c).

<< 31 USCA § 5112 >>

<< 31 USCA 5112 NOTE >>

SEC. 523. Section 5112(i)(4) of title 31, United States Code, is amended by adding at the end the following new subparagraph:
"(C) The Secretary may continue to mint and issue coins in accordance with the specifications contained in paragraphs (7), (8), (9), and (10) of subsection (a) and paragraph (1)(A) of this subsection at the same time the Secretary in minting and issuing other bullion and proof gold coins under this subsection in accordance with such program procedures and coin specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, in the Secretary's discretion, may prescribe from time to time.": Provided, That profits generated from the sale of gold to the United States Mint for this program shall be considered as a receipt to be deposited into the General Fund of the Treasury.

<< 31 USCA § 5112 >>

<< 31 USCA § 5112 NOTE >>

SEC. 524. Section 5112 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(k) The Secretary may mint and issue bullion and proof platinum coins in accordance with such specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, in the Secretary's discretion, may prescribe from time to time.": Provided, That the Secretary is authorized to use Government platinum reserves stockpiled at the United States Mint as working material and shall ensure that reserves utilized are replaced by the Mint.

SEC. 526. (a) REIMBURSEMENT OF CERTAIN ATTORNEY FEES AND COSTS.—

(1) IN GENERAL.—The Secretary of the Treasury shall pay from amounts appropriated in title I of this Act under the heading, "Departmental Offices, Salaries and Expenses", up to $500,000 to reimburse former employees of the White House Travel Office whose employment in that Office was terminated on May 19, 1993, for any attorney fees and costs they incurred with respect to that termination.

(2) VERIFICATION REQUIRED.—The Secretary shall pay an individual in full under paragraph (1) upon submission by the individual of documentation verifying the attorney fees and costs.

(3) NO INFERENCE OF LIABILITY.—Liability of the United States shall not be inferred from enactment of or payment under this subsection.

(b) LIMITATION ON FILING OF CLAIMS.—The Secretary of the Treasury shall not pay any claim filed under this section that is filed later than 120 days after the date of the enactment of this Act.

(c) LIMITATION.—Payments under subsection (a) shall not include attorney fees or costs incurred with respect to any Congressional hearing or investigation into the termination of employment of the former employees of the White House Travel Office.

(d) REDUCTION.—The amount paid pursuant to this section to an individual for attorney fees and costs described in subsection (a) shall be reduced by any amount received before the date of the enactment of this Act, without obligation for repayment by the individual, for payment of such attorney fees and costs (including any amount received from the funds appropriated for the individual in the matter relating to the "Office of the General Counsel" under the heading "Office of the Secretary" in title I of the Department of Transportation and Related Agencies Appropriations Act, 1994).

(e) PAYMENT IN FULL SETTLEMENT OF CLAIMS AGAINST THE UNITED STATES.—Payment under this section, when accepted by an individual described in subsection (a), shall be in full satisfaction of all claims of, or on behalf of, the individual against the United States that arose out of the termination of the White House Travel Office employment of that individual on May 19, 1993.

SEC. 527. None of the funds made available in this Act may be used by the Executive Office of the President to request from the Federal Bureau of Investigation any official background investigation report on any individual, except when it is made known to the Federal official having authority to obligate or expend such funds that—

(1) such individual has given his or her express written consent for such request not more than 6 months prior to the date of such request and during the same presidential administration; or

(2) such request is required due to extraordinary circumstances involving national security.

SEC. 528. (a) CLOSING OF ALLEY.—The alley bisecting the property on which a facility is being constructed for use by the United States Government at 930 H Street, N.W., Washington, District of Columbia, is closed to the public, without regard to any contingencies.

(b) JURISDICTION.—The Administrator of General Services shall have administrative jurisdiction over, and shall hold title on behalf of the United States in, the alley, property, and facility referred to in subsection (a).

SEC. 529. (a) COMMEMORATIVE COIN PROGRAM RESTRICTIONS.—Section 5112 of title 31, United States Code, as amended by sections 524 and 530 of this Act, is amended by adding at the end the following new subsection:

<< 31 USCA § 5112 >>

"(m) COMMEMORATIVE COIN PROGRAM RESTRICTIONS.—

"(1) MAXIMUM NUMBER.—Beginning January 1, 1999, the Secretary may mint and issue commemorative coins under this section during any calendar year with respect to not more than 2 commemorative coin programs.

"(2) MINTAGE LEVELS.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), in carrying out any commemorative coin program, the Secretary shall mint—

"(i) not more than 750,000 clad half-dollar coins;

"(ii) not more than 500,000 silver one-dollar coins; and

"(iii) not more than 100,000 gold five-dollar or ten-dollar coins.

"(B) EXCEPTION.—If the Secretary determines, based on independent, market-based research conducted by a designated recipient organization of a commemorative coin program, that the mintage levels described in subparagraph (A) are not adequate to meet public demand for that commemorative coin, the Secretary may waive one or more of the requirements of subparagraph (A) with respect to that commemorative coin program.

"(C) DESIGNATED RECIPIENT ORGANIZATION DEFINED.—For purposes of this paragraph, the term 'designated recipient organization' means any organization designated, under any provision of law, as the recipient of any surcharge imposed on the sale of any numismatic item.".

(b) RECOVERY OF MINT EXPENSES REQUIRED BEFORE PAYMENT OF SURCHARGES TO ANY RECIPIENT ORGANIZATION.—

<< 31 USCA § 5134 >>

(1) CLARIFICATION OF LAW RELATING TO DEPOSIT OF SURCHARGES IN THE NUMISMATIC PUBLIC ENTERPRISE FUND.—Section 5134(c)(2) of title 31, United States Code, is amended by inserting ", including amounts attributable to any surcharge imposed with respect to the sale of any numismatic item" before the period.

(2) CONDITIONS ON PAYMENT OF SURCHARGES TO RECIPIENT ORGANIZATIONS.—Section 5134 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(f) CONDITIONS ON PAYMENT OF SURCHARGES TO RECIPIENT ORGANIZATIONS.—

"(1) PAYMENT OF SURCHARGES.—Notwithstanding any other provision of law, no amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall be paid from the fund to any designated recipient organization unless—

"(A) all numismatic operation and program costs allocable to the program under which such numismatic item is produced and sold have been recovered; and

"(B) the designated recipient organization submits an audited financial statement that demonstrates to the satisfaction of the Secretary of the Treasury that, with respect to all projects or purposes for which the proceeds of such surcharge may be used, the organization has raised funds from private sources for such projects and purposes in an amount that is equal to or greater than the maximum amount the organization may receive from the proceeds of such surcharge.

"(2) ANNUAL AUDITS.—

"(A) ANNUAL AUDITS OF RECIPIENTS REQUIRED.—Each designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall provide, as a condition for receiving any such amount, for an annual audit, in accordance with generally accepted government auditing standards by an independent public accountant selected by the organization, of all such payments to the organization beginning in the first fiscal year of the organization in which any such amount is received and continuing until all amounts received by such organization from the fund with respect to such surcharges are fully expended or placed in trust.

"(B) MINIMUM REQUIREMENTS FOR ANNUAL AUDITS.—At a minimum, each audit of a designated recipient organization pursuant to subparagraph (A) shall report—

"(i) the amount of payments received by the designated recipient organization from the fund during the fiscal year of the organization for which the audit is conducted that are derived from the proceeds of any surcharge imposed on the sale of any numismatic item;

"(ii) the amount expended by the designated recipient organization from the proceeds of such surcharges during the fiscal year of the organization for which the audit is conducted; and

"(iii) whether all expenditures by the designated recipient organization during the fiscal year of the organization for which the audit is conducted from the proceeds of such surcharges were for authorized purposes.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(C) RESPONSIBILITY OF ORGANIZATION TO ACCOUNT FOR EXPENDITURES OF SURCHARGES.—Each designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall take appropriate steps, as a condition for receiving any such payment, to ensure that the receipt of the payment and the expenditure of the proceeds of such surcharge by the organization in each fiscal year of the organization can be accounted for separately from all other revenues and expenditures of the organization.

"(D) SUBMISSION OF AUDIT REPORT.—Not later than 90 days after the end of any fiscal year of a designated recipient organization for which an audit is required under subparagraph (A), the organization shall—

"(i) submit a copy of the report to the Secretary of the Treasury; and

"(ii) make a copy of the report available to the public.

"(E) USE OF SURCHARGES FOR AUDITS.—Any designated recipient organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item may use the amount received to pay the cost of an audit required under subparagraph (A).

"(F) WAIVER OF PARAGRAPH.—The Secretary of the Treasury may waive the application of any subparagraph of this paragraph to any designated recipient organization for any fiscal year after taking into account the amount of surcharges that such organization received or expended during such year.

"(G) NONAPPLICABILITY TO FEDERAL ENTITIES.—This paragraph shall not apply to any Federal agency or department or any independent establishment in the executive branch that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item.

"(H) AVAILABILITY OF BOOKS AND RECORDS.—An organization that receives any payment from the fund of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item shall provide, as a condition for receiving any such payment, to the Inspector General of the Department of the Treasury or the Comptroller General of the United States, upon the request of such Inspector General or the Comptroller General, all books, records, and work papers belonging to or used by the organization, or by any independent public accountant who audited the organization in accordance with subparagraph (A), which may relate to the receipt or expenditure of any such amount by the organization.

"(3) USE OF AGENTS OR ATTORNEYS TO INFLUENCE COMMEMORATIVE COIN LEGISLATION.—No portion of any payment from the fund to any designated recipient organization of any amount derived from the proceeds of any surcharge imposed on the sale of any numismatic item may be used, directly or indirectly, by the organization to compensate any agent or attorney for services rendered to support or influence in any way legislative action of the Congress relating to such numismatic item.

"(4) DESIGNATED RECIPIENT ORGANIZATION DEFINED.—For purposes of this subsection, the term 'designated recipient organization' means any organization designated, under any provision of law, as the recipient of any surcharge imposed on the sale of any numismatic item.".

<< 31 USCA § 5134 NOTE >>

(3) SCOPE OF APPLICATION.—The amendments made by this section shall apply with respect to the proceeds of any surcharge imposed on the sale of any numismatic item that are deposited in the Numismatic Public Enterprise Fund after the date of the enactment of this Act.

<< 31 USCA § 5112 NOTE >>

(4) REPEAL OF EXISTING RECIPIENT REPORT REQUIREMENT.—Section 303 of Public Law 103–186 (31 U.S.C. 5112 note) is repealed.

<< 31 USCA § 5134 >>

(c) QUARTERLY FINANCIAL REPORTS.—Section 5134 of title 31, United States Code, is amended by adding at the end the following new subsection:

"(g) QUARTERLY FINANCIAL REPORTS.—

"(1) IN GENERAL.—Not later than the 30th day of each month following each calendar quarter through and including the final period of sales with respect to any commemorative coin program authorized on or after the date of enactment of the Treasury, Postal Service, and General Government Appropriations Act, 1997, the Mint shall submit to the Congress a quarterly financial report in accordance with this subsection.

"(2) REQUIREMENTS.—Each report submitted under paragraph (1) shall include, with respect to the calendar quarter at issue—

"(A) a detailed financial statement, prepared in accordance with generally accepted accounting principles, that includes financial information specific to that quarter, as well as cumulative financial information relating to the entire program;

"(B) a detailed accounting of—

"(i) all costs relating to marketing efforts;

"(ii) all funds projected for marketing use;

"(iii) all costs for employee travel relating to the promotion of commemorative coin programs;

"(iv) all numismatic items minted, sold, not sold, and rejected during the production process; and

"(v) the costs of melting down all rejected and unsold products;

"(C) adequate market-based research for all commemorative coin programs; and

"(D) a description of the efforts of the Mint in keeping the sale price of numismatic items as low as practicable.".

<< 31 USCA § 5135 >>

(d) CITIZENS COMMEMORATIVE COIN ADVISORY COMMITTEE.—

(1) FIXED TERMS FOR MEMBERS.—Section 5135(a)(4) of title 31, United States Code, is amended to read as follows:

"(4) TERMS.—Each member appointed under clause (i) or (iii) of paragraph (3)(A) shall be appointed for a term of 4 years.".

(2) CHAIRPERSON.—Section 5135(a) of title 31, United States Code, is amended by adding at the end the following new paragraph:

"(7) CHAIRPERSON.—

"(A) IN GENERAL.—Subject to subparagraph (B), the Chairperson of the Advisory Committee shall be elected by the members of the Advisory Committee from among such members.

"(B) EXCEPTION.—The member appointed pursuant to paragraph (3)(A)(ii) (or the alternate to that member) may not serve as the Chairperson of the Advisory Committee, beginning on June 1, 1999.".

<< 31 USCA §§ 5112 NOTE, 5134 nt, 5135 nt >>

(e) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date of enactment of this Act.

## TITLE VI—GENERAL PROVISIONS

### DEPARTMENTS, AGENCIES, AND CORPORATIONS

SECTION 601. Funds appropriated in this or any other Act may be used to pay travel to the United States for the immediate family of employees serving abroad in cases of death or life threatening illness of said employee.

SEC. 602. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1997 shall obligate or expend any such funds, unless such department, agency, or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from the illegal use, possession, or distribution of controlled substances (as defined in the Controlled Substances Act) by the officers and employees of such department, agency, or instrumentality.

SEC. 603. Notwithstanding 31 U.S.C. 1345, any agency, department or instrumentality of the United States which provides or proposes to provide child care services for Federal employees may reimburse any Federal employee or any person employed to provide such services for travel, transportation, and subsistence expenses incurred for training classes, conferences or other meetings in connection with the provision of such services: Provided, That any per diem allowance made pursuant to this section shall not exceed the rate specified in regulations prescribed pursuant to section 5707 of title 5, United States Code.

<< 31 USCA § 1343 NOTE >>

SEC. 604. Unless otherwise specifically provided, the maximum amount allowable during the current fiscal year in accordance with section 16 of the Act of August 2, 1946 (60 Stat. 810), for the purchase of any passenger motor vehicle (exclusive of buses, ambulances, law enforcement, and undercover surveillance vehicles), is hereby fixed at $8,100 except station wagons for which the maximum shall be $9,100: Provided, That these limits may be exceeded by not to exceed $3,700 for police-type vehicles, and by not to exceed $4,000 for special heavy-duty vehicles: Provided further, That the limits set forth in this section may not be exceeded by more than 5 percent for electric or hybrid vehicles purchased for demonstration under the provisions of the Electric and Hybrid Vehicle Research, Development, and Demonstration Act of 1976: Provided further, That the limits set forth in this section may be exceeded by the incremental cost of clean alternative fuels vehicles acquired pursuant to Public Law 101–549 over the cost of comparable conventionally fueled vehicles.

SEC. 605. Appropriations of the executive departments and independent establishments for the current fiscal year available for expenses of travel or for the expenses of the activity concerned, are hereby made available for quarters allowances and cost-of-living allowances, in accordance with 5 U.S.C. 5922–24.

<< 5 USCA § 3101 NOTE >>

SEC. 606. Unless otherwise specified during the current fiscal year, no part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States (including any agency the majority of the stock of which is owned by the Government of the United States) whose post of duty is in the continental United States unless such person (1) is a citizen of the United States, (2) is a person in the service of the United States on the date of enactment of this Act who, being eligible for citizenship, has filed a declaration of intention to become a citizen of the United States prior to such date and is actually residing in the United States, (3) is a person who owes allegiance to the United States, (4) is an alien from Cuba, Poland, South Vietnam, the countries of the former Soviet Union, or the Baltic countries lawfully admitted to the United States for permanent residence, (5) is a South Vietnamese, Cambodian, or Laotian refugee paroled in the United States after January 1, 1975, or (6) is a national of the People's Republic of China who qualifies for adjustment of status pursuant to the Chinese Student Protection Act of 1992: Provided, That for the purpose of this section, an affidavit signed by any such person shall be considered prima facie evidence that the requirements of this section with respect to his or her status have been complied with: Provided further, That any person making a false affidavit shall be guilty of a felony, and, upon conviction, shall be fined no more than $4,000 or imprisoned for not more than 1 year, or both: Provided further, That the above penal clause shall be in addition to, and not in substitution for, any other provisions of existing law: Provided further, That any payment made to any officer or employee contrary to the provisions of this section shall be recoverable in action by the Federal Government. This section shall not apply to citizens of Ireland, Israel, or the Republic of the Philippines, or to nationals of those countries allied with the United States in the current defense effort, or to international broadcasters employed by the United States Information Agency, or to temporary employment of translators, or to temporary employment in the field service (not to exceed 60 days) as a result of emergencies.

SEC. 607. Appropriations available to any department or agency during the current fiscal year for necessary expenses, including maintenance or operating expenses, shall also be available for payment to the General Services Administration for charges for space and services and those expenses of renovation and alteration of buildings and facilities which constitute public improvements performed in accordance with the Public Buildings Act of 1959 (73 Stat. 749), the Public Buildings Amendments of 1972 (87 Stat. 216), or other applicable law.

SEC. 608. In addition to funds provided in this or any other Act, all Federal agencies are authorized to receive and use funds resulting from the sale of materials, including Federal records disposed of pursuant to a records schedule recovered through recycling or waste prevention programs. Such funds shall be available until expended for the following purposes:

(1) Acquisition, waste reduction and prevention, and recycling programs as described in Executive Order 12873 (October 20, 1993), including any such programs adopted prior to the effective date of the Executive Order.

(2) Other Federal agency environmental management programs, including, but not limited to, the development and implementation of hazardous waste management and pollution prevention programs.

(3) Other employee programs as authorized by law or as deemed appropriate by the head of the Federal agency.

SEC. 609. Funds made available by this or any other Act for administrative expenses in the current fiscal year of the corporations and agencies subject to chapter 91 of title 31, United States Code, shall be available, in addition to objects for which such funds are otherwise available, for rent in the District of Columbia; services in accordance with 5 U.S.C. 3109; and the objects specified under this head, all the provisions of which shall be applicable to the expenditure of such funds unless otherwise specified in the Act by which they are made available: Provided, That in the event any functions budgeted as administrative expenses are subsequently transferred to or paid from other funds, the limitations on administrative expenses shall be correspondingly reduced.

SEC. 610. No part of any appropriation for the current fiscal year contained in this or any other Act shall be paid to any person for the filling of any position for which he or she has been nominated after the Senate has voted not to approve the nomination of said person.

<< 40 USCA § 486a >>

SEC. 611. For the fiscal year ending September 30, 1997, and thereafter, any department or agency to which the Administrator of General Services has delegated the authority to operate, maintain or repair any building or facility pursuant to section 205(d) of the Federal Property and Administrative Services Act of 1949, as amended, shall retain that portion of the GSA rental payment available for operation, maintenance or repair of the building or facility, as determined by the Administrator, and expend such funds directly for the operation, maintenance or repair of the building or facility. Any funds retained under this section shall remain available until expended for such purposes.

SEC. 612. (a) IN GENERAL.—Section 1306 of title 31, United States Code, is amended to read as follows:

<< 31 USCA § 1306 >>

"§ 1306. Use of foreign credits

"(a) IN GENERAL.—Foreign credits (including currencies) owed to or owned by the United States may be used by any agency for any purpose for which appropriations are made for the agency for the current fiscal year (including the carrying out of Acts requiring or authorizing the use of such credits), but only when reimbursement therefor is made to the Treasury from applicable appropriations of the agency.

"(b) EXCEPTION TO REIMBURSEMENT REQUIREMENT.—Credits described in subsection (a) that are received as exchanged allowances, or as the proceeds of the sale of personal property, may be used in whole or partial payment for the acquisition of similar items, to the extent and in the manner authorized by law, without reimbursement to the Treasury.".

<< 31 USCA § 1306 NOTE >>

(b) APPLICABILITY.—The amendment made by this section shall take effect on the date of the enactment of this Act and shall apply thereafter.

SEC. 613. No part of any appropriation contained in this or any other Act shall be available for interagency financing of boards (except Federal Executive Boards), commissions, councils, committees, or similar groups (whether or not they are interagency entities) which do not have a prior and specific statutory approval to receive financial support from more than one agency or instrumentality.

SEC. 614. Funds made available by this or any other Act to the "Postal Service Fund" (39 U.S.C. 2003) shall be available for employment of guards for all buildings and areas owned or occupied by the Postal Service and under the charge and control of the Postal Service, and such guards shall have, with respect to such property, the powers of special policemen provided by the first section of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318), and, as to property owned or occupied by the Postal Service, the Postmaster General may take the same actions as the Administrator of General Services may take under the provisions of sections 2 and 3 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318a, 318b), attaching thereto penal consequences under the authority and within the limits provided in section 4 of the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318c).

SEC. 615. None of the funds made available pursuant to the provisions of this Act shall be used to implement, administer, or enforce any regulation which has been disapproved pursuant to a resolution of disapproval duly adopted in accordance with the applicable law of the United States.

<< 5 USCA § 5343 NOTE >>

SEC. 616. (a) Notwithstanding any other provision of law, and except as otherwise provided in this section, no part of any of the funds appropriated for the fiscal year ending on September 30, 1997, by this or any other Act, may be used to pay any prevailing rate employee described in section 5342(a)(2)(A) of title 5, United States Code—

 (1) during the period from the date of expiration of the limitation imposed by section 616 of the Treasury, Postal Service and General Government Appropriations Act, 1996, until the normal effective date of the applicable wage survey adjustment that is to take effect in fiscal year 1997, in an amount that exceeds the rate payable for the applicable grade and step of the applicable wage schedule in accordance with such section 616; and

 (2) during the period consisting of the remainder of fiscal year 1997, in an amount that exceeds, as a result of a wage survey adjustment, the rate payable under paragraph (1) by more than the sum of—

  (A) the percentage adjustment taking effect in fiscal year 1997 under section 5303 of title 5, United States Code, in the rates of pay under the General Schedule; and

  (B) the difference between the overall average percentage of the locality-based comparability payments taking effect in fiscal year 1997 under section 5304 of such title (whether by adjustment or otherwise), and the overall average percentage of such payments which was effective in fiscal year 1996 under such section.

 (b) Notwithstanding any other provision of law, no prevailing rate employee described in subparagraph (B) or (C) of section 5342(a)(2) of title 5, United States Code, and no employee covered by section 5348 of such title, may be paid during the periods for which subsection (a) is in effect at a rate that exceeds the rates that would be payable under subsection (a) were subsection (a) applicable to such employee.

 (c) For the purposes of this section, the rates payable to an employee who is covered by this section and who is paid from a schedule not in existence on September 30, 1996, shall be determined under regulations prescribed by the Office of Personnel Management.

 (d) Notwithstanding any other provision of law, rates of premium pay for employees subject to this section may not be changed from the rates in effect on September 30, 1996, except to the extent determined by the Office of Personnel Management to be consistent with the purpose of this section.

 (e) This section shall apply with respect to pay for service performed after September 30, 1996.

 (f) For the purpose of administering any provision of law (including section 8431 of title 5, United States Code, and any rule or regulation that provides premium pay, retirement, life insurance, or any other employee benefit) that requires any deduction or contribution, or that imposes any requirement or limitation on the basis of a rate of salary or basic pay, the rate of salary or basic pay payable after the application of this section shall be treated as the rate of salary or basic pay.

 (g) Nothing in this section shall be considered to permit or require the payment to any employee covered by this section at a rate in excess of the rate that would be payable were this section not in effect.

 (h) The Office of Personnel Management may provide for exceptions to the limitations imposed by this section if the Office determines that such exceptions are necessary to ensure the recruitment or retention of qualified employees.

SEC. 617. During the period in which the head of any department or agency, or any other officer or civilian employee of the Government appointed by the President of the United States, holds office, no funds may be obligated or expended in excess of $5,000 to furnish or redecorate the office of such department head, agency head, officer or employee, or to purchase furniture or make improvements for any such office, unless advance notice of such furnishing or redecoration is expressly approved by the Committees on Appropriations of the House and Senate. For the purposes of this section, the word "office" shall include the entire suite of offices assigned to the individual, as well as any other space used primarily by the individual or the use of which is directly controlled by the individual.

SEC. 618. Notwithstanding any other provision of law, no executive branch agency shall purchase, construct, and/or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the House and Senate Committees on Appropriations.

SEC. 619. Notwithstanding section 1346 of title 31, United States Code, or section 613 of this Act, funds made available for fiscal year 1997 by this or any other Act shall be available for the interagency funding of national security and emergency preparedness telecommunications initiatives which benefit multiple Federal departments, agencies, or entities, as provided by Executive Order Numbered 12472 (April 3, 1984).

SEC. 620. (a) None of the funds appropriated by this or any other Act may be obligated or expended by any Federal department, agency, or other instrumentality for the salaries or expenses of any employee appointed to a position of a confidential or policy-determining character excepted from the competitive service pursuant to section 3302 of title 5, United States Code, without a certification to the Office of Personnel Management from the head of the Federal department, agency, or other instrumentality employing the Schedule C appointee that the Schedule C position was not created solely or primarily in order to detail the employee to the White House.

(b) The provisions of this section shall not apply to Federal employees or members of the armed services detailed to or from—

(1) the Central Intelligence Agency;

(2) the National Security Agency;

(3) the Defense Intelligence Agency;

(4) the offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs;

(5) the Bureau of Intelligence and Research of the Department of State;

(6) any agency, office, or unit of the Army, Navy, Air Force, and Marine Corps, the Federal Bureau of Investigation and the Drug Enforcement Administration of the Department of Justice, the Department of Transportation, the Department of the Treasury, and the Department of Energy performing intelligence functions; and

(7) the Director of Central Intelligence.

SEC. 621. No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year 1997 shall obligate or expend any such funds, unless such department, agency or instrumentality has in place, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from discrimination and sexual harassment and that all of its workplaces are not in violation of title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the Rehabilitation Act of 1973.

SEC. 622. No part of any appropriation contained in this Act may be used to pay for the expenses of travel of employees, including employees of the Executive Office of the President, not directly responsible for the discharge of official governmental tasks and duties: *Provided,* That this restriction shall not apply to the family of the President, Members of Congress or their spouses, Heads of State of a foreign country or their designees, persons providing assistance to the President for official purposes, or other individuals so designated by the President.

<< 5 USCA § 7301 NOTE >>

SEC. 623. Notwithstanding any provision of law, the President, or his designee, must certify to Congress, annually, that no person or persons with direct or indirect responsibility for administering the Executive Office of the President's Drug–Free Workplace Plan are themselves subject to a program of individual random drug testing.

SEC. 624. (a) None of the funds made available in this Act or any other Act may be obligated or expended for any employee training when it is made known to the Federal official having authority to obligate or expend such funds that such employee training—

(1) does not meet identified needs for knowledge, skills, and abilities bearing directly upon the performance of official duties;

(2) contains elements likely to induce high levels of emotional response or psychological stress in some participants;

(3) does not require prior employee notification of the content and methods to be used in the training and written end of course evaluation;

(4) contains any methods or content associated with religious or quasi-religious belief systems or "new age" belief systems as defined in Equal Employment Opportunity Commission Notice N–915.022, dated September 2, 1988;

(5) is offensive to, or designed to change, participants' personal values or lifestyle outside the workplace; or

(6) includes content related to human immunodeficiency virus/acquired immune deficiency syndrome (HIV/AIDS) other than that necessary to make employees more aware of the medical ramifications of HIV/AIDS and the workplace rights of HIV-positive employees.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(b) Nothing in this section shall prohibit, restrict, or otherwise preclude an agency from conducting training bearing directly upon the performance of official duties.

SEC. 625. No funds appropriated in this or any other Act for fiscal year 1997 may be used to implement or enforce the agreements in Standard Forms 312 and 4355 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These restrictions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by Executive Order 12356; section 7211 of title 5, United States Code (governing disclosures to Congress); section 1034 of title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); section 2302(b)(8) of title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that could expose confidential Government agents); and the statutes which protect against disclosure that may compromise the national security, including sections 641, 793, 794, 798, and 952 of title 18, United States Code, and section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. section 783(b)). The definitions, requirements, obligations, rights, sanctions, and liabilities created by said Executive Order and listed statutes are incorporated into this agreement and are controlling.": *Provided,* That notwithstanding the preceding paragraph, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress or to an authorized official of an executive agency or the Department of Justice that are essential to reporting a substantial violation of law.

SEC. 626. (a) None of the funds appropriated by this or any other Act may be expended by any Federal Agency to procure any product or service subject to section 5124 of Public Law 104–106 and that will be available under the procurement by the Administrator of General Services known as "FTS2000" unless—

(1) such product or service is procured by the Administrator of General Services as part of the procurement known as "FTS2000"; or

(2) that agency establishes to the satisfaction of the Administrator of General Services that—

(A) that agency's requirements for such procurement are unique and cannot be satisfied by property and service procured by the Administrator of General Services as part of the procurement known as "FTS2000"; and

(B) the agency procurement, pursuant to such delegation, would be cost-effective and would not adversely affect the cost-effectiveness of the FTS2000 procurement.

(b) After December 31, 1998, subsection (a) shall apply only if the Administrator of General Services has reported that the FTS2000 procurement is producing prices that allow the Government to satisfy its requirements for such procurement in the most cost-effective manner.

<< 31 USCA § 501 NOTE >>

SEC. 627. Subsection (f) of section 403 of Public Law 103–356 is amended by deleting "October 1, 1999" and inserting "October 1, 2001".

SEC. 628. (a) IN GENERAL.—Notwithstanding any other provision of law, none of the funds made available by this Act for the Department of the Treasury shall be available for any activity or for paying the salary of any Government employee where funding an activity or paying a salary to a Government employee would result in a decision, determination, rule, regulation, or policy that would permit the Secretary of the Treasury to make any loan or extension of credit under section 5302 of title 31, United States Code, with respect to a single foreign entity or government of a foreign country (including agencies or other entities of that government)—

(1) with respect to a loan or extension of credit for more than 60 days, unless the President certifies to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Banking and Financial Services of the House of Representatives that—

(A) there is no projected cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the United States from the proposed loan or extension of credit; and

(B) any proposed obligation or expenditure of United States funds to or on behalf of the foreign government is adequately backed by an assured source of repayment to ensure that all United States funds will be repaid; and

(2) other than as provided by an Act of Congress, if that loan or extension of credit would result in expenditures and obligations, including contingent obligations, aggregating more than $1,000,000,000 with respect to that foreign country for more than 180 days during the 12–month period beginning on the date on which the first such action is taken.

(b) WAIVER OF LIMITATIONS.—The President may exceed the dollar and time limitations in subsection (a)(2) if he certifies in writing to the Congress that a financial crisis in that foreign country poses a threat to vital United States economic interests or to the stability of the international financial system.

(c) EXPEDITED PROCEDURES FOR A RESOLUTION OF DISAPPROVAL.—A presidential certification pursuant to subsection (b) shall not take effect, if the Congress, within 30 calendar days after receiving such certification, enacts a joint resolution of disapproval, as described in paragraph (5) of this subsection.

(1) REFERENCE TO COMMITTEES.—All joint resolutions introduced in the Senate to disapprove the certification shall be referred to the Committee on Banking, Housing, and Urban Affairs, and in the House of Representatives, to the appropriate committees.

(2) DISCHARGE OF COMMITTEES.—(A) If the committee of either House to which a resolution has been referred has not reported it at the end of 15 days after its introduction, it is in order to move either to discharge the committee from further consideration of the joint resolution or to discharge the committee from further consideration of any other resolution introduced with respect to the same matter, except no motion to discharge shall be in order after the committee has reported a joint resolution with respect to the same matter.

(B) A motion to discharge may be made only by an individual favoring the resolution, and is privileged in the Senate; and debate thereon shall be limited to not more than 1 hour, the time to be divided in the Senate equally between, and controlled by, the majority leader and the minority leader or their designees.

(3) FLOOR CONSIDERATION IN THE SENATE.—(A) A motion in the Senate to proceed to the consideration of a resolution shall be privileged.

(B) Debate in the Senate on a resolution, and all debatable motions and appeals in connection therewith, shall be limited to not more than 4 hours, to be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

(C) Debate in the Senate on any debatable motion or appeal in connection with a resolution shall be limited to not more than 20 minutes, to be equally divided between, and controlled by, the mover and the manager of the resolution, except that in the event the manager of the resolution is in favor of any such motion or appeal, the time in opposition thereto, shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

(D) A motion in the Senate to further limit debate on a resolution, debatable motion, or appeal is not debatable. No amendment to, or motion to recommit, a resolution is in order in the Senate.

(4) In the case of a resolution, if prior to the passage by one House of a resolution of that House, that House receives a resolution with respect to the same matter from the other House, then—

(A) the procedure in that House shall be the same as if no resolution had been received from the other House; but

(B) the vote on final passage shall be on the resolution of the other House.

(5) For purposes of this subsection, the term "joint resolution" means only a joint resolution of the 2 Houses of Congress, the matter after the resolving clause of which is as follows: "That the Congress disapproves the action of the President under section 628(c) of the Treasury, Postal Service, and General Government Appropriations Act, 1997, notice of which was submitted to the Congress on _____.", with the blank space being filled with the appropriate date.

(d) APPLICABILITY.—This section—

(1) shall not apply to any action taken as part of the program of assistance to Mexico announced by the President on January 31, 1995; and

(2) shall remain in effect through fiscal year 1997.

<< 5 USCA § 8401 NOTE >>

SEC. 629. (a) TECHNICAL AMENDMENT.—Section 640 of Public Law 104–52 (109 Stat. 513) is amended by striking "Service performed" and inserting "Hereafter, service performed".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in Public Law 104–52 on the date of its enactment.

SEC. 630. Notwithstanding any other provision of law, no part of any appropriation contained in this Act for any fiscal year shall be available for paying Sunday premium or differential pay to any employee unless such employee actually performed work during the time corresponding to such premium or differential pay.

SEC. 631. No part of any funds appropriated in this or any other Act shall be used by an agency of the executive branch, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, and for the preparation, distribution or use of any kit, pamphlet, booklet, publication, radio, television or film presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself.

SEC. 632. (a) The United States Courthouse under construction at 1030 Southwest 3d Avenue in Portland, Oregon, shall be known and designated as the "Mark O. Hatfield United States Courthouse".

(b) Any reference in a law, map, regulation, document, paper, or other record of the United States to the courthouse referred to in section 901 shall be deemed to be a reference to the "Mark O. Hatfield United States Courthouse".

(c) This section shall take effect on January 2, 1997.

SEC. 633. SURVIVOR ANNUITY RESUMPTION UPON TERMINATION OF MARRIAGE.—(a) AMENDMENTS.—

<< 5 USCA § 8341 >>

(1) CIVIL SERVICE RETIREMENT SYSTEM.—Section 8341(e) of title 5, United States Code, is amended by adding at the end the following:

"(4) If the annuity of a child under this subchapter terminates under paragraph (3)(E) because of marriage, then, if such marriage ends, such annuity shall resume on the first day of the month in which it ends, but only if—

"(A) any lump sum paid is returned to the Fund; and

"(B) that individual is not otherwise ineligible for such annuity.".

<< 5 USCA § 8443 >>

(2) FEDERAL EMPLOYEES' RETIREMENT SYSTEM.—Section 8443(b) of such title is amended by adding at the end the following: "If the annuity of a child under this subchapter terminates under subparagraph (E) because of marriage, then, if such marriage ends, such annuity shall resume on the first day of the month in which it ends, but only if any lump sum paid is returned to the Fund, and that individual is not otherwise ineligible for such annuity.".

<< 5 USCA § 8908 >>

(3) FEDERAL EMPLOYEES HEALTH BENEFITS.—Section 8908 of title 5, United States Code, is amended by adding at the end of the following new subsection:

"(d) A surviving child whose survivor annuity under section 8341(e) or 8443(b) was terminated and is later restored under paragraph (4) of section 8341(e) or the last sentence of section 8443(b) may, under regulations prescribed by the Office, enroll in a health benefits plan described by section 8903 or 8903a if such surviving child was covered by any such plan immediately before such annuity was terminated.".

<< 5 USCA § 8341 NOTE >>

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to any termination of marriage taking effect before, on, or after the date of enactment of this Act, except that benefits shall be payable only with respect to amounts accruing for periods beginning on the first day of the month beginning after the later of such termination of marriage or such date of enactment.

<< 5 USCA § 6302 >>

SEC. 634. AVAILABILITY OF ANNUAL LEAVE FOR EMPLOYEES AFFECTED BY REDUCTION IN FORCE.—Section 6302 of title 5, United States Code, is amended by adding at the end of the following new subsection:

"(g) An employee who is being involuntarily separated from an agency due to a reduction in force or transfer of function under subchapter I of chapter 35 may elect to use annual leave to the employee's credit to remain on the agency's rolls after the date the employee would otherwise have been separated if, and only to the extent that, such additional time in a pay status will enable the employee to qualify for an immediate annuity under section 8336, 8412, 8414, or to qualify to carry health benefits coverage into retirement under section 8905(b).".

<< 18 USCA § 207 >>

SEC. 635. Section 207(e)(6)(B) of title 18, United States Code, is amended by striking "level V of the Executive Schedule" and inserting "level 5 of the Senior Executive Service".

<< 5 USCA Ch. 59 NOTE >>

SEC. 636. REIMBURSEMENTS RELATING TO PROFESSIONAL LIABILITY INSURANCE.—(a) AUTHORITY.—Notwithstanding any other provision of law, amounts appropriated by this Act (or any other Act for fiscal year 1997 or any fiscal year thereafter) for salaries and expenses may be used to reimburse any qualified employee for not to exceed one-half the costs incurred by such employee for professional liability insurance. A payment under this section shall be contingent upon the submission of such information or documentation as the employing agency may require.

(b) QUALIFIED EMPLOYEE.—For purposes of this section, the term "qualified employee" means an agency employee whose position is that of—

  (1) a law enforcement officer; or

  (2) a supervisor or management official.

(c) DEFINITIONS.—For purposes of this section—

  (1) the term "agency" means an Executive agency, as defined by section 105 of title 5, United States Code, and any agency of the Legislative Branch of Government including any office or committee of the Senate or the House of Representatives;

  (2) the term "law enforcement officer" means an employee, the duties of whose position are primarily the investigation, apprehension, prosecution, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, including any law enforcement officer under section 8331(20) or 8401(17) of such title 5, or under section 4823 of title 22, United States Code;

  (3) the terms "supervisor" and "management official" have the respective meanings given them by section 7103(a) of such title 5, and

  (4) the term "professional liability insurance" means insurance which provides coverage for—

  (A) legal liability for damages due to injuries to other persons, damage to their property, or other damage or loss to such other persons (including the expenses of litigation and settlement) resulting from or arising out of any tortious act, error, or omission of the covered individual (whether common law, statutory, or constitutional) while in the performance of such individual's official duties as a qualified employee; and

  (B) the cost of legal representation for the covered individual in connection with any administrative or judicial proceeding (including any investigation or disciplinary proceeding) relating to any act, error, or omission of the covered individual while in the performance of such individual's official duties as a qualified employee, and other legal costs and fees relating to any such administrative or judicial proceeding.

(d) APPLICABILITY.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply thereafter.

<< 5 USCA § 5303 NOTE >>

SEC. 637. For purposes of each provision of law amended by section 704(a)(2) of the Ethics Reform Act of 1989 (5 U.S.C. 5318 note), no adjustment under section 5303 of title 5, United States Code, shall be considered to have taken effect in fiscal year 1997 in the rates of basic pay for the statutory pay systems.

SEC. 638. For FY 1997, the Secretary of the Treasury is authorized to use funds made available to the FSLIC Resolution Fund under P.L. 103–327, not to exceed $26.1 million, to reimburse the Department of Justice for the reasonable expenses of litigation that are incurred in the defense of claims against the U.S. arising from FIRREA and its implementation.

SEC. 639. Section 608 of Public Law 104–52 is amended in the first sentence by inserting before the period, ", including Federal records disposed of pursuant to a records schedule".

<< 40 USCA § 1411 NOTE >>

SEC. 640. In reviewing and analyzing the contracting out, outsourcing or privatization of business and administrative functions, and in implementing 40 U.S.C. sections 1413 and 1423, and other provisions, in title LI of the National Defense Authorization Act for fiscal year 1996 (the Information Technology Management Reform Act)—

(1) the Director of the Office of Management and Budget and the heads of the executive agencies may have studies, analyses, reviews and other management assistance performed by the private sector;

(2) the reviews, analyses, and studies called for by 40 U.S.C. section 1413(b)(2)(B) and (C) shall be completed and reported to the Agency Head within 180 days, or less measured from when a study analysis or review is initiated unless the Agency Head determines additional time is needed;

(3) in accordance with principles and rules governing organizational conflicts of interest, persons involved in a particular study may not compete for any work that is to be or is outsourced as a result of that study; and

(4) this section will apply with respect to studies occurring on or after the date of enactment of this subsection and completed before September 1, 1999 and the Comptroller General of the United States shall review and provide an assessment of this program by January 1, 1999.

<< 5 USCA § 5509 NOTE >>

SEC. 641. (a) SECTION 1—AUTHORIZATION OF APPROPRIATIONS.—Section 8(a)(1) of the Whistleblower Protection Act of 1989 (5 U.S.C. 5509 note, Public Law 101–12, April 10, 1989, 103 Stat. 34, as amended Public Law 103–424, Section 1, October 29, 1994, 108 Stat. 4361), is amended by striking the words: "1993, 1994, 1995, 1996, and 1997," and inserting in lieu thereof "1998, 1999, 2000, 2001, and 2002".

(b) SECTION 2—EFFECTIVE DATE.—This Act shall take effect on October 1, 1998.

<< 5 USCA § 5509 NOTE >>

SEC. 642. (a) SECTION 1.—AUTHORIZATION OF APPROPRIATIONS.—Section 8(a)(1) of the Whistleblower Protection Act of 1989 (5 U.S.C. 5509 note; Public Law 103–424; 103 Stat. 34) is amended by striking out: "1993, 1994, 1995, 1996, and 1997," and inserting in lieu thereof "1998, 1999, 2000, 2001, and 2002".

(b) SECTION 2—EFFECTIVE DATE.—This Act shall take effect on October 1, 1998.

<< 26 USCA § 7801 NOTE >>

SEC. 643. MODIFICATIONS OF NATIONAL COMMISSION ON RESTRUCTURING THE INTERNAL REVENUE SERVICE.—(a) QUORUM.—Paragraph (4) of section 637(b) of the Treasury, Postal Service, and General Government Appropriations Act, 1996 (Public Law 104–52, 109 Stat. 510) is amended by striking "Seven" and inserting "Nine".

(b) CO–CHAIRS.—

(1) IN GENERAL.—Paragraph (3) of section 637(b) of such Act is amended—

(A) by striking "a Chairman" and inserting "Co–Chairs", and

(B) by striking "Chairman" in the heading and inserting "Co–Chairs".

(2) CONFORMING AMENDMENTS.—(A) Paragraph (5)(B) of section 637(b) of such Act is amended by striking "a Chairman" and inserting "Co–Chairs".

(B) Subsections (b)(4), (d)(1)(B), (d)(3), and (e)(1) of section 637 of such Act are each amended by striking "Chairman" each place it appears and inserting "Co–Chairs".

(c) GIFTS.—Section 637(d) of such Act is amended by adding at the end the following new paragraph:

"(6) GIFTS.—The Commission may accept, use, and dispose of gifts or donations of services or property in carrying out its duties under this section."

(d) TRAVEL EXPENSES.—Section 637(f)(2) of such Act is amended by striking "shall" and inserting "may".

(e) TIME FOR FILING REPORT.—

  (1) IN GENERAL.—Paragraph (1) of section 637(g) of such Act is amended by striking "one year" and inserting "15 months".

  (2) CONFORMING AMENDMENT.—Subparagraph (A) of section 637(c)(1) of such Act is amended by striking "one year" and inserting "15 months".

(f) EFFECTIVE DATE.—The amendments made by this section shall take effect as if included in the provisions of the Treasury, Postal Service, and General Government Appropriations Act, 1996.

<< 39 USCA § 202 >>

SEC. 644. (a) IN GENERAL.—Section 202(a) of title 39, United States Code, is amended by striking "$10,000 a year" and inserting "$30,000 a year".

<< 39 USCA § 202 NOTE >>

(b) EFFECTIVE DATE.—Subsection (a) shall take effect at the beginning of the next applicable pay period beginning after the date of the enactment of this Act.

SEC. 645. (a) IN GENERAL.—No later than September 30, 1997, the Director of the Office of Management and Budget shall submit to the Congress a report that provides—

  (1) estimates of the total annual costs and benefits of Federal regulatory programs, including quantitative and nonquantitative measures of regulatory costs and benefits;

  (2) estimates of the costs and benefits (including quantitative and nonquantitative measures) of each rule that is likely to have a gross annual effect on the economy of $100,000,000 or more in increased costs;

  (3) an assessment of the direct and indirect impacts of Federal rules on the private sector, State and local government, and the Federal Government; and

  (4) recommendations from the Director and a description of significant public comments to reform or eliminate any Federal regulatory program or program element that is inefficient, ineffective, or is not a sound use of the Nation's resources.

(b) NOTICE.—The Director shall provide public notice and an opportunity to comment on the report under subsection (a) before the report is issued in final form.

<< 31 USCA § 501 NOTE >>

SEC. 646. Subsection (b) of section 404 of Public Law 103–356 is amended by deleting "September 30, 1997" and inserting "December 31, 1999".

SEC. 647. (a) Notwithstanding any other provision of law, the Secretary shall, on behalf of the United States, transfer to the University of Miami, without charge, title to the real property and improvements that as of the date of the enactment of this Act constitute the Federal facility known as the Perrine Primate Center, subject to the condition that, during the 10–year period beginning on the date of the transfer—

  (1) the University will provide for the continued use of the real property and improvements as an animal research facility, including primates, and such use will be the exclusive use of the property (with such incidental exceptions as the Secretary may approve); or

  (2) the real property and improvements will be used for research-related purposes other than the purpose specified in paragraph (1) (or for both of such purposes), if the Secretary and the University enter into an agreement accordingly.

(b) The conveyance under subsection (a) shall not become effective unless the conveyance specifies that, if the University of Miami engages in a material breach of the conditions specified in such subsection, title to the real property and improvements involved reverts to the United States at the election of the Secretary.

(c) The real property referred to in subsections (a) and (b) is located in the county of Dade in the State of Florida, and is a parcel consisting of the northernmost 30 acre-parcel of the area. The exact acreage and legal description used for purposes of the transfer under subsection (a) shall be in accordance with a survey that is satisfactory to the Secretary.

(d) For the purposes of this section—
  (1) the term "Secretary" means the Secretary of Health and Human Services; and
  (2) the term "University of Miami" means the University of Miami located in the State of Florida.

<< 18 USCA §§ 474, 474A >>

SEC. 648. (a) INCREASED PENALTIES FOR COUNTERFEITING VIOLATIONS.—Sections 474 and 474A of title 18, United States Code, are amended by striking "class C felony" each place that term appears and inserting "class B felony".
 (b) CRIMINAL PENALTY FOR PRODUCTION, SALE, TRANSPORTATION, POSSESSION OF FICTITIOUS FINANCIAL INSTRUMENTS PURPORTING TO BE THOSE OF THE STATES, OF POLITICAL SUBDIVISIONS, AND OF PRIVATE ORGANIZATIONS.—

<< 18 USCA § 514 >>

 (1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by inserting after section 513, the following new section:

"§ 514. Fictitious obligations

 "(a) Whoever, with the intent to defraud—
  "(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;
  "(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or
  "(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.
 "(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c).
 "(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section."

<< 18 USCA Ch. 25 >>

 (2) TECHNICAL AMENDMENT.—The analysis for chapter 25 of title 18, United States Code, is amended by inserting after the item relating to section 513 the following:
 "514. Fictitious obligations.".

<< 18 USCA § 474 NOTE >>

 (c) PERIOD OF EFFECT.—This section and the amendments made by this section shall become effective on the date of enactment of this Act and shall remain in effect during each fiscal year following that date of enactment.
 SEC. 649. None of the funds appropriated by this Act may be used by an agency to provide a Federal employee's home address to any labor organization except when it is made known to the Federal official having authority to obligate or expend such funds that the employee has authorized such disclosure or that such disclosure has been ordered by a court of competent jurisdiction.
 SEC. 650. (a) No later than 45 days after the date of the enactment of this Act, the Inspector General of each Federal department or agency that uses administratively uncontrollable overtime in the pay of any employee shall—
  (1) conduct an audit on the use of administratively uncontrollable overtime by employees of such department or agency, which shall include—

(A) an examination of the policies, extent, costs, and other relevant aspects of the use of administratively uncontrollable overtime at the department or agency; and

(B) a determination of whether the eligibility criteria of the department or agency and payment of administratively uncontrollable overtime comply with Federal statutory and regulatory requirements; and

(2) submit a report of the findings and conclusions of such audit to—

(A) the Office of Personnel Management;

(B) the Governmental Affairs Committee of the Senate; and

(C) the Government Reform and Oversight Committee of the House of Representatives.

(b) No later than 30 days after the submission of the report under subsection (a), the Office of Personnel Management shall issue revised guidelines to all Federal departments and agencies that—

(1) limit the use of administratively uncontrollable overtime to employees meeting the statutory intent of section 5545(c)(2) of title 5, United States Code; and

(2) expressly prohibit the use of administratively uncontrollable overtime for—

(A) customary or routine work duties; and

(B) work duties that are primarily administrative in nature, or occur in noncompelling circumstances.

<< 5 USCA § 8133 NOTE >>

SEC. 651. Notwithstanding section 8116 of title 5, United States Code, and in addition to any payment made under 5 U.S.C. 8101 et seq., beginning in fiscal year 1997 and thereafter, the head of any department or agency is authorized to pay from appropriations made available to the department or agency a death gratuity to the personal representative (as that term is defined by applicable law) of a civilian employee of that department or agency whose death resulted from an injury sustained in the line of duty on or after August 2, 1990: Provided, That payments made pursuant to this section, in combination with the payments made pursuant to sections 8133(f) and 8134(a) of such title 5 and section 312 of Public Law 103–332 (108 Stat. 2537), may not exceed a total of $10,000 per employee.

<< 18 USCA § 846 NOTE >>

SEC. 653. (a) AUTHORIZATION.—

The Secretary of the Treasury is authorized to establish scientific certification standards for explosives detection canines, and shall provide, on a reimbursable basis, for the certification of explosives detection canines employed by Federal agencies, or other agencies providing explosives detection services at airports in the United States.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out the purposes of this section.

SEC. 654. NATIONAL REPOSITORY FOR INFORMATION ON EXPLOSIVES INCIDENTS AND ARSON.

<< 18 USCA § 846 >>

(a) Section 846 of title 18, United States Code, is amended by—

(1) designating the existing section as subsection (a); and

(2) by adding the following new subsection (b) to read as follows:

"(b) The Secretary is authorized to establish a national repository of information on incidents involving arson and the suspected criminal misuse of explosives. All Federal agencies having information concerning such incidents shall report the information to the Secretary pursuant to such regulations as deemed necessary to carry out the provisions of this subsection. The repository shall also contain information on incidents voluntarily reported to the Secretary by State and local authorities."

<< 18 USCA § 846 NOTE >>

(b) There is authorized to be appropriated such sums as may be necessary to carry out the provisions of this subsection.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 20 USCA § 5603 >>

SEC. 655. Section 5(c)(1) of Public Law 102–259 (20 U.S.C. 5603(c)(1)) is amended—

(1) in subparagraph (A)(iii), by striking "and" after the semicolon;

(2) in subparagraph (B), by striking the period and inserting "; and"; and

(3) by adding after subparagraph (B) the following:

"(C) a Trustee may serve after the expiration of the Trustee's term until a successor has been chosen.".

SEC. 656. Notwithstanding any other provision of law, the Secretary of the Interior, through the Bureau of Indian Affairs, may directly transfer to Indian tribes in North and South Dakota portable housing units at the Grand Forks Air Force base in North Dakota which have been declared excess by the Department of Defense and requested for transfer by the Department of the Interior.

<< 18 USCA § 922 >>

SEC. 657. Section 922(q) of title 18, United States Code, is amended to read as follows:

"(q)(1) The Congress finds and declares that—

"(A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

"(B) crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

"(C) firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the House of Representatives and the Committee on the Judiciary of the Senate;

"(D) in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

"(E) while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

"(F) the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

"(G) this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

"(H) States, localities, and school systems find it almost impossible to handle gun-related crime by themselves—even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

"(I) the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

"(2)(A) It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

"(B) Subparagraph (A) does not apply to the possession of a firearm—

"(i) on private property not part of school grounds;

"(ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

"(iii) that is—

"(I) not loaded; and

"(II) in a locked container, or a locked firearms rack that is on a motor vehicle;

"(iv) by an individual for use in a program approved by a school in the school zone;

"(v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

"(vi) by a law enforcement officer acting in his or her official capacity; or

"(vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

"(3)(A) Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

"(B) Subparagraph (A) does not apply to the discharge of a firearm—

  "(i) on private property not part of school grounds;

  "(ii) as part of a program approved by a school in the school zone, by an individual who is participating in the program;

  "(iii) by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

  "(iv) by a law enforcement officer acting in his or her official capacity.

  "(4) Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.".

SEC. 658. GUN BAN FOR INDIVIDUALS CONVICTED OF A MISDEMEANOR CRIME OF DOMESTIC VIOLENCE.

<< 18 USCA § 921 >>

(a) DEFINITION.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following:

"(33)(A) Except as provided in subparagraph (C), the term 'misdemeanor crime of domestic violence' means an offense that—

  "(i) is a misdemeanor under Federal or State law; and

  "(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim

"(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless—

  "(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

  (II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

    (aa) the case was tried by a jury, or

    (bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

  "(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.".

<< 18 USCA § 922 >>

(b) PROHIBITIONS.—

  (1) Section 922(d) of such title is amended—

  (A) by striking "or" at the end of paragraph (7);

  (B) by striking the period at the end of paragraph (8) and inserting "; or"; and

  (C) by inserting after paragraph (8) the following:

  "(9) has been convicted in any court of a misdemeanor crime of domestic violence.".

  (2) Section 922(g) of such title is amended—

  (A) by striking "or" at the end of paragraph (7);

  (B) by striking the comma at the end of paragraph (8) and inserting "; or"; and

  (C) by inserting after paragraph (8) the following:

  "(9) who has been convicted in any court of a misdemeanor crime of domestic violence,".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) Section 922(s)(3)(B)(i) of such title is amended by inserting ", and has not been convicted in any court of a misdemeanor crime of domestic violence" before this semicolon.

<< 18 USCA § 925 >>

(c) GOVERNMENT ENTITIES NOT EXCEPTED.—Section 925(a)(1) of such title is amended by inserting "sections 922(d)(9) and 922(g)(9) and" after "except for".

SEC. 659. THRIFT SAVINGS PLAN.

TITLE I—ADDITIONAL INVESTMENT FUNDS FOR THE THRIFT SAVINGS PLAN

<< 5 USCA § 8401 NOTE >>

SEC. 101. SHORT TITLE

This title may be cited as the "Thrift Savings Investment Funds Act of 1996".

<< 5 USCA § 8438 >>

SEC. 102. ADDITIONAL INVESTMENT FUNDS FOR THE THRIFT SAVINGS PLAN

Section 8438 of title 5, United States Code, is amended—
(1) in subsection (a)—
(A) by redesignating paragraphs (5) through (8) as paragraphs (6) through (9), respectively;
(B) by inserting after paragraph (4) the following new paragraph:
"(5) the term 'International Stock Index Investment Fund' means the International Stock Index Investment Fund established under subsection (b)(1)(E);";
(C) in paragraph (8) (as redesignated by subparagraph (A) of this paragraph) by striking out "and" at the end thereof;
(D) in paragraph (9) (as redesignated by subparagraph (A) of this paragraph)—
(i) by striking out "paragraph (7)(D)" in each place it appears and inserting in each such place "paragraph (8)(D)"; and
(ii) by striking out the period and inserting in lieu thereof a semicolon and "and"; and
(E) by adding at the end thereof the following new paragraph:
"(10) the term 'Small Capitalization Stock Index Investment Fund' means the Small Capitalization Stock Index Investment Fund established under subsection (b)(1)(D)."; and
(2) in subsection (b)—
(A) in paragraph (1)—
(i) in subparagraph (B) by striking out "and" at the end thereof;
(ii) in subparagraph (C) by striking out the period and inserting in lieu thereof a semicolon; and
(iii) by adding at the end thereof the following new subparagraphs:
"(D) a Small Capitalization Stock Index Investment Fund as provided in paragraph (3); and
"(E) an International Stock Index Investment Fund as provided in paragraph (4)."; and
(B) by adding at the end thereof the following new paragraphs:
"(3)(A) The Board shall select an index which is a commonly recognized index comprised of common stock the aggregate market value of which represents the United States equity markets excluding the common stocks included in the Common Stock Index Investment Fund.
"(B) The Small Capitalization Stock Index Investment Fund shall be invested in a portfolio designed to replicate the performance of the index in subparagraph (A). The portfolio shall be designed such that, to the extent practicable, the percentage of the Small Capitalization Stock Index Investment Fund that is invested in each stock is the same as the percentage determined by dividing the aggregate market value of all shares of that stock by the aggregate market value of all shares of all stocks included in such index.

"(4)(A) The Board shall select an index which is a commonly recognized index comprised of stock the aggregate market value of which is a reasonably complete representation of the international equity markets excluding the United States equity markets.

"(B) The International Stock Index Investment Fund shall be invested in a portfolio designed to replicate the performance of the index in subparagraph (A). The portfolio shall be designed such that, to the extent practicable, the percentage of the International Stock Index Investment Fund that is invested in each stock is the same as the percentage determined by dividing the aggregate market value of all shares of that stock by the aggregate market value of all shares of all stocks included in such index.".

<< 5 USCA § 8439 >>

SEC. 103. ACKNOWLEDGEMENT OF INVESTMENT RISK

Section 8439(d) of title 5, United States Code, is amended by striking out "Each employee, Member, former employee, or former Member who elects to invest in the Common Stock Index Investment Fund or the Fixed Income Investment Fund described in paragraphs (1) and (3)," and inserting in lieu thereof "Each employee, Member, former employee, or former Member who elects to invest in the Common Stock Index Investment Fund, the Fixed Income Investment Fund, the International Stock Index Investment Fund, or the Small Capitalization Stock Index Investment Fund, defined in paragraphs (1), (3), (5), and (10),".

<< 5 USCA § 8438 NOTE >>

SEC. 104. EFFECTIVE DATE

This title shall take effect on the date of enactment of this Act, and the Funds established under this title shall be offered for investment at the earliest practicable election period (described in section 8432(b) of title 5, United States Code) as determined by the Executive Director in regulations.

TITLE II—THRIFT SAVINGS ACCOUNTS LIQUIDITY

<< 5 USCA § 8401 NOTE >>

SEC. 201. SHORT TITLE

This title may be cited as the "Thrift Savings Plan Act of 1996".

<< 5 USCA § 8351 >>

SEC. 202. NOTICE TO SPOUSES FOR IN–SERVICE WITHDRAWALS; DE MINIMUS ACCOUNTS; CIVIL SERVICE RETIREMENT SYSTEM PARTICIPANTS

Section 8351(b) of title 5, United States Code, is amended—

(1) in paragraph (5)—

(A) in subparagraph (B)—

(i) by striking out "An election, change of election, or modification (relating to the commencement date of a deferred annuity)" and inserting in lieu thereof "An election or change of election";

(ii) by inserting "or withdrawal" after "and a loan";

(iii) by inserting "and (h)" after "8433(g)";

(iv) by striking out "the election, change of election, or modification" and inserting in lieu thereof "the election or change of election"; and

(v) by inserting "or withdrawal" after "for such loan"; and

(B) in subparagraph (D)—

(i) by inserting "or withdrawals" after "of loans"; and

(ii) by inserting "or (h)" after "8433(g)"; and

(2) in paragraph (6)—

 (A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

 (B) by striking out "unless the employee or Member elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b)".

SEC. 203. IN–SERVICE WITHDRAWALS; WITHDRAWAL ELECTIONS, FEDERAL EMPLOYEES RETIREMENT SYSTEM PARTICIPANTS

<< 5 USCA § 8433 >>

 (a) IN GENERAL.—Section 8433 of title 5, United States Code, is amended—

 (1) by striking out subsections (b) and (c) and inserting in lieu thereof the following:

 "(b) Subject to section 8435 of this title, any employee or Member who separates from Government employment is entitled and may elect to withdraw from the Thrift Savings Fund the balance of the employee's or Member's account as—

 "(1) an annuity;

 "(2) a single payment;

 "(3) 2 or more substantially equal payments to be made not less frequently than annually; or

 "(4) any combination of payments as provided under paragraphs (1) through (3) as the Executive Director may prescribe by regulation.

 "(c)(1) In addition to the right provided under subsection (b) to withdraw the balance of the account, an employee or Member who separates from Government service and who has not made a withdrawal under subsection (h)(1)(A) may make one withdrawal of any amount as a single payment in accordance with subsection (b)(2) from the employee's or Member's account.

 "(2) An employee or Member may request that the amount withdrawn from the Thrift Savings Fund in accordance with subsection (b)(2) be transferred to an eligible retirement plan.

 "(3) The Executive Director shall make each transfer elected under paragraph (2) directly to an eligible retirement plan or plans (as defined in section 402(c)(8) of the Internal Revenue Code of 1986) identified by the employee, Member, former employee, or former Member for whom the transfer is made.

 "(4) A transfer may not be made for an employee, Member, former employee, or former Member under paragraph (2) until the Executive Director receives from that individual the information required by the Executive Director specifically to identify the eligible retirement plan or plans to which the transfer is to be made.";

 (2) in subsection (d)—

 (A) in paragraph (1) by striking out "Subject to paragraph (3)(A)" and inserting in lieu thereof "Subject to paragraph (3)";

 (B) by striking out paragraph (2) and redesignating paragraph (3) as paragraph (2); and

 (C) in paragraph (2) (as redesignated under subparagraph (B) of this paragraph)—

 (i) in subparagraph (A) by striking out "(A)"; and

 (ii) by striking out subparagraph (B);

 (3) in subsection (f)(1)—

 (A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation; and

 (B) by striking out "unless the employee or Member elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b), or" and inserting a comma;

 (4) in subsection (f)(2)—

 (A) by striking out "February 1" and inserting in lieu thereof "April 1";

 (B) in subparagraph (A)—

 (i) by striking out "65" and inserting in lieu thereof "70½"; and

 (ii) by inserting "or" after the semi-colon;

 (C) by striking out subparagraph (B); and

 (D) by redesignating subparagraph (C) as subparagraph (B);

 (5) in subsection (g)—

(A) in paragraph (1) by striking out "after December 31, 1987, and", and by adding at the end of the paragraph the following sentence: "Before a loan is issued, the Executive Director shall provide in writing the employee or Member with appropriate information concerning the cost of the loan relative to other sources of financing, as well as the lifetime cost of the loan, including the difference in interest rates between the funds offered by the Thrift Savings Fund, and any other effect of such loan on the employee's or Member's final account balance."; and

(B) by striking out paragraph (2) and redesignating paragraphs (3) through (5) as paragraphs (2) through (4), respectively; and

(6) by adding after subsection (g) the following new subsection:

"(h)(1) An employee or Member may apply, before separation, to the Board for permission to withdraw an amount from the employee's or Member's account based upon—

"(A) the employee or Member having attained age 59½; or

"(B) financial hardship.

"(2) A withdrawal under paragraph (1)(A) shall be available to each eligible participant one time only.

"(3) A withdrawal under paragraph (1)(B) shall be available only for an amount not exceeding the value of that portion of such account which is attributable to contributions made by the employee or Member under section 8432(a) of this title.

"(4) Withdrawals under paragraph (1) shall be subject to such other conditions as the Executive Director may prescribe by regulation.

"(5) A withdrawal may not be made under this subsection unless the requirements of section 8435(e) of this title are satisfied.".

<< 5 USCA § 8433 NOTE >>

(b) INVALIDITY OF CERTAIN PRIOR ELECTIONS.—Any election made under section 8433(b)(2) of title 5, United States Code (as in effect before the effective date of this title), with respect to an annuity which has not commenced before the implementation date of this title as provided by regulation by the Executive Director in accordance with section 207 of this title, shall be invalid.

<< 5 USCA § 8435 >>

SEC. 204. SURVIVOR ANNUITIES FOR FORMER SPOUSES; NOTICE TO FEDERAL EMPLOYEES RETIREMENT SYSTEM SPOUSES FOR IN–SERVICE WITHDRAWALS

Section 8435 of title 5, United States Code, is amended—

(1) in subsection (a)(1)(A)—

(A) by striking out "may make an election under subsection (b)(3) or (b)(4) of section 8433 of this title or change an election previously made under subsection (b)(1) or (b)(2) of such section" and inserting in lieu thereof "may withdraw all or part of a Thrift Savings Fund account under subsection (b)(2), (3), or (4) of section 8433 of this title or change a withdrawal election"; and

(B) by adding at the end thereof "A married employee or Member (or former employee or Member) may make a withdrawal from a Thrift Savings Fund account under subsection (c)(1) of section 8433 of this title only if the employee or Member (or former employee or Member) satisfies the requirements of subparagraph (B).";

(2) in subsection (c)—

(A) in paragraph (1)—

(i) by striking out "An election, change of election, or modification of the commencement date of a deferred annuity" and inserting in lieu thereof "An election or change of election"; and

(ii) by striking out "modification, or transfer" and inserting in lien thereof "or transfer"; and

(B) in paragraph (2) in the matter following subparagraph (B)(ii) by striking out "modification,";

(3) in subsection (e)—

(A) in paragraph (1)—

(i) in subparagraph (A)—

(I) by inserting "or withdrawal" after "A loan";

(II) by inserting "and (h)" after "8433(g)"; and

(III) by inserting "or withdrawal" after "such loan";

(ii) in subparagraph (B) by inserting "or withdrawal" after "loan"; and

(iii) in subparagraph (C)—

(I) by inserting "or withdrawal" after "to a loan"; and

(II) by inserting "or withdrawal" after "for such loan"; and

(B) in paragraph (2)—

(i) by inserting "or withdrawal" after "loan"; and

(ii) by inserting "and (h)" after "8344(g)"; and

(4) in subsection (g)—

(A) by inserting "or withdrawals" after "loans"; and

(B) by inserting "and (h)" after "8344(g)".

## SEC. 205. DE MINIMUS ACCOUNTS RELATING TO THE JUDICIARY

<< 5 USCA § 8440a >>

(a) JUSTICES AND JUDGES.—Section 8440a(b)(7) of title 5, United States Code, is amended—

(1) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(2) by striking out "unless the justice or judge elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under section 8433(b)".

<< 5 USCA § 8440b >>

(b) BANKRUPTCY JUDGES AND MAGISTRATES.—Section 8440b(b) of title 5, United States Code, is amended—

(1) in paragraph (7) in the first sentence by inserting "of the distribution" after "equal to the amount"; and

(2) in paragraph (8)—

(A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(B) by striking out "unless the bankruptcy judge or magistrate elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under subsection (b)".

<< 5 USCA § 8440c >>

(c) FEDERAL CLAIMS JUDGES.—Section 8440c(b) of title 5, United States Code, is amended—

(1) in paragraph (7) in the first sentence by inserting "of the distribution" after "equal to the amount"; and

(2) in paragraph (8)—

(A) by striking out "$3,500 or less" and inserting in lieu thereof "less than an amount that the Executive Director prescribes by regulation"; and

(B) by striking out "unless the judge elects, at such time and otherwise in such manner as the Executive Director prescribes, one of the options available under section 8433(b)".

## SEC. 206. DEFINITION OF BASIC PAY

<< 5 USCA § 8401 >>

(a) IN GENERAL.—(1) Section 8401(4) of title 5, United States Code, is amended by striking out "except as provided in subchapter III of this chapter,".

<< 5 USCA § 8431 >>

(2) Section 8431 of title 5, United States Code, is repealed.

<< 5 USCA Ch. 84 >>

(b) TECHNICAL AND CONFORMING AMENDMENTS.—(1) The table of sections for chapter 84 of title 5, United States Code, is amended by striking out the item relating to section 8431.

<< 5 USCA § 5545a >>

(2) Section 5545a(h)(2)(A) of title 5, United States Code, is amended by striking out "8431,".

<< 5 USCA § 5343 NOTE >>

(3) Section 615(f) of the Treasury, Postal Service, and General Government Appropriations Act, 1996 (Public Law 104–52; 109 Stat. 500; 5 U.S.C. 5343 note) is amended by striking out "section 8431 of title 5, United States Code,".

<< 5 USCA § 5545a NOTE >>

SEC. 207. EFFECTIVE DATE

This title shall take effect on the date of the enactment of this Act and withdrawals and elections as provided under the amendments made by this title shall be made at the earliest practicable date as determined by the Executive Director in regulations.

Sec. 660. Notwithstanding Section 613, interagency financing is authorized to carry out the purposes of the National Bioethics Advisory Commission.

SEC. 661. (a) DESIGNATION.—The United States courthouse to be constructed at 111 South 18th Plaza, Omaha, Nebraska, shall be known and designated as the "Roman L. Hruska United States Courthouse".

(b) REFERENCES.—Any reference in a law, map, regulation, document, paper, or other record of the United States to the United States courthouse referred to in section 1 shall be deemed to be a reference to the "Roman L. Hruska United States Courthouse".

SEC. 662. (a) PROVISIONS RELATING TO TITLE 39, UNITED STATES CODE.—

<< 39 USCA § 202 >>

"(1) APPOINTMENT AND REMOVAL OF INSPECTOR GENERAL.—Section 202 of title 39, United States Code, is amended by adding at the end the following:

"(e)(1) The Governors shall appoint and shall have the power to remove the Inspector General.

"(2) The Inspector General shall be appointed—

"(A) for a term of 7 years;

"(B) without regard to political affiliation; and

"(C) solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations.

"(3) The Inspector General may at any time be removed upon the written concurrence of at least 7 Governors, but only for cause. Nothing in this subsection shall be considered to exempt the Governors from the requirements of section 8G(e) of the Inspector General Act of 1978.".

<< 39 USCA § 102 >>

(2) DEFINITION.—Section 102 of title 39, United States Code, is amended—

(A) by striking "and" at the end of paragraph (2);

(B) by striking the period at the end of paragraph (3) and inserting "; and"; and

(C) by adding at the end the following:

"(4) 'Inspector General' means the Inspector General appointed under section 202(e) of this title.".

<< 39 USCA § 2009 NOTE >>

(3) SEPARATE ITEM IN ANNUAL BUDGET.—For purposes of the fifth sentence of section 2009 of title 39, United States Code, the operations of the Office of Inspector General of the United States Postal Service shall be considered a major type of activity.

(b) AMENDMENTS TO THE INSPECTOR GENERAL ACT OF 1978.—

<< 5 USCA App. 3 § 8G >>

(1) GOVERNORS AS HEAD OF THE POSTAL SERVICE.—Section 8G(a)(4) of the Inspector General Act of 1978 (5 U.S.C.App.) is amended by striking "except that" and all that follows through the semicolon and inserting "except that—

"(A) with respect to the National Science Foundation, such term means the National Science Board; and

"(B) with respect to the United States Postal Service, such term means the Governors (within the meaning of section 102(3) of title 39, United States Code);".

(2) SPECIAL RULES RELATING TO THE UNITED STATES POSTAL SERVICE.—Subsection (f) of section 8G of such Act is amended to read as follows:

"(f)(1) For purposes of carrying out subsection (c) with respect to the United States Postal Service, the appointment provisions of section 202(e) of title 39, United States Code, shall be applied.

"(2) In carrying out the duties and responsibilities specified in this Act, the Inspector General of the United States Postal Service (hereinafter in this subsection referred to as the 'Inspector General') shall have oversight responsibility for all activities of the Postal Inspection Service, including any internal investigation performed by the Postal Inspection Service. The Chief Postal Inspector shall promptly report the significant activities being carried out by the Postal Inspection Service to such Inspector General.

"(3)(A)(i) Notwithstanding subsection (d), the Inspector General shall be under the authority, direction, and control of the Governors with respect to audits or investigations, or the issuance of subpoenas, which require access to sensitive information concerning—

"(I) ongoing civil or criminal investigations or proceedings;

"(II) undercover operations;

"(III) the identity of confidential sources, including protected witnesses;

"(IV) intelligence or counterintelligence matters; or

"(V) other matters the disclosure of which would constitute a serious threat to national security.

"(ii) With respect to the information described under clause (i), the Governors may prohibit the Inspector General from carrying out or completing any audit or investigation, or from issuing any subpoena, after such Inspector General has decided to initiate, carry out, or complete such audit or investigation or to issue such subpoena, if the Governors determine that such prohibition is necessary to prevent the disclosure of any information described under clause (i) or to prevent the significant impairment to the national interests of the United States.

"(iii) If the Governors exercise any power under clause (i) or (ii), the Governors shall notify the Inspector General in writing stating the reasons for such exercise. Within 30 days after receipt of any such notice, the Inspector General shall transmit a copy of such notice to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives, and to other appropriate committees or subcommittees of the Congress.

"(B) In carrying out the duties and responsibilities specified in this Act, the Inspector General—

"(i) may initiate, conduct and supervise such audits and investigations in the United States Postal Service as the Inspector General considers appropriate; and

"(ii) shall give particular regard to the activities of the Postal Inspection Service with a view toward avoiding duplication and insuring effective coordination and cooperation.

"(C) Any report required to be transmitted by the Governors to the appropriate committees or subcommittees of the Congress under section 5(d) shall also be transmitted, within the seven-day period specified under such section, to the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives.

"(3) Nothing in this Act shall restrict, eliminate, or otherwise adversely affect any of the rights, privileges, or benefits of either employees of the United States Postal Service, or labor organizations representing employees of the United States Postal Service, under chapter 12 of title 39, United States Code, the National Labor Relations Act, any handbook or manual affecting employee labor relations with the United States Postal Service, or any collective bargaining agreement.

"(4) As used in this subsection, the term 'Governors' has the meaning given such term by section 102(3) of title 39, United States Code.".

<< 5 USCA App. 3 § 8H >>

(3) TECHNICAL CORRECTION.—The Inspector General Act of 1978 is amended by redesignating the second section which is designated as section 8G as section 8H.

(c) PROVISIONS RELATING TO COMPENSATION.—

(1) INSPECTOR GENERAL.—Section 5315 of title 5, United States Code, is amended by adding at the end the following:

<< 5 USCA § 5315 >>

"Inspector General, United States Postal Service.".

<< 5 USCA § 5315 NOTE >>

The amendment made by the preceding sentence shall apply notwithstanding section 410 or any other provision of title 39, United States Code.

<< 39 USCA § 1003 >>

(2) OFFICERS AND EMPLOYEES OF THE OFFICE OF INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE; POSTAL INSPECTORS.—

(A) IN GENERAL.—Section 1003 of title 39, United States Code, is amended—

(i) by redesignating subsection (b) as subsection (d); and

(ii) by inserting after subsection (a) the following:

"(b) Compensation and benefits for all officers and employees serving in or under the Office of Inspector General of the United States Postal Service shall be maintained on a standard of comparability to the compensation and benefits paid for comparable levels of work in the respective Offices of Inspector General of the various establishments named in section 11(2) of the Inspector General Act of 1978.

"(c) Compensation and benefits for all Postal Inspectors shall be maintained on a standard of comparability to the compensation and benefits paid for comparable levels of work in the executive branch of the Government outside of the Postal Service. As used in this subsection, the term 'Postal Inspector' included any agent to whom any investigative powers are granted under section 3061 of title 18.".

(B) CONFORMING AMENDMENT.—The first sentence of section 1003(a) of title 39, United States Code, is amended by striking "chapters 2 and 12 of this title" and inserting "chapters 2 and 12 of this title, section 8G of the Inspector General Act of 1978,".

<< 39 USCA § 2802 NOTE >>

(d) STRATEGIC PLANS.—

(1) OFFICE OF INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE.—

(A) IN GENERAL.—Strategic plans shall be prepared under this paragraph addressing staffing requirements, general goals and objectives for major functions and operations of the Office of Inspector General of the United States Postal Service, and how goals and objectives of the Office are to be achieved, including a description of operational processes, skills and technology, and the human, capital, information, and other resources required to meet those goals and objectives.

(B) SPECIFIC REQUIREMENTS.—Plans under this paragraph—

(i) shall be prepared by the Inspector General of the United States Postal Service;

(ii) shall each cover a 5–year period (the beginning and ending dates of which shall be specified in each such plan); and

(iii) shall be included, as part of the annual budget required under section 2009 of title 39, United States Code, at least every 3 years.

(C) FIRST SUBMISSION.—The first plan under this paragraph shall be prepared in time to be included with the annual budget under section 2009 of title 39, United States Code, next due to be submitted after the end of the 6–month period beginning on the date of the appointment of the first Inspector General to be appointed pursuant to the amendments made by this section.

(2) POSTAL INSPECTION SERVICE.—The Chief Postal Inspector shall, with respect to the Postal Inspection Service, prepare a strategic plan similar in content to that required under paragraph (1)(A) with respect to the Office of Inspector General of the United States Postal Service. Such plan shall be prepared in time to be included with the annual budget under section 2009 of such title 39 next due to be submitted after the end of the 30–day period beginning on the date of the enactment of this Act.

<< 39 USCA § 201 NOTE >>

(e) FIRST APPOINTMENT; TRANSFERS; TRANSITION PROVISION.—

(1) FIRST APPOINTMENT.—The first Inspector General of the United States Postal Service appointed pursuant to the amendments made by this section shall be appointed before the end of the 90–day period beginning on the date of the enactment of this Act.

(2) TRANSFERS.—

(A) IN GENERAL.—All measures described in section 8G(b) of the Inspector General Act of 1978 necessary to establish an Office of Inspector General within the United States Postal Service pursuant to this section, including all appropriate transfers, shall occur—

(i) no earlier than the date the appointment under paragraph (1) is made; and

(ii) no later than 60 days after the date the appointment under paragraph (1) is made.

(B) PROVISIONS RELATING TO PERSONNEL.—

(i) CONSULTATION.—Decisions concerning which personnel are to be transferred pursuant to subparagraph (A) shall be made by the Governors (within the meaning of section 102(3) of title 39, United States Code) in consultation with the Inspector General appointed under paragraph (1).

(ii) TRANSFERRED PERSONNEL.—Personnel transferred pursuant to subparagraph (A) shall, to the extent not inconsistent with other provisions of this subsection, be transferred in accordance with applicable laws and regulations relating to the transfer of functions within the United States Postal Service, except that, notwithstanding any provision of section 1003(b) of title 39, United States Code, as amended by this section, the classification and compensation of such personnel shall not be reduced, by reason of having been transferred, for 1 year after being so transferred.

(3) TRANSITION PROVISION.—The Chief Postal Inspector may continue to serve as Inspector General of the United States Postal Service until the date on which an Inspector General is appointed under paragraph (1) or, if earlier, the end of the period referred to in such paragraph. Compensation for any service under this paragraph shall be determined as if this section had not been enacted.

(f) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 39 USCA § 410 >>

(1) Section 410(b) of title 39, United States Code, is amended—

(A) by striking "and" at the end of paragraph (9); and

(B) by amending paragraph (10) to read as follows:

"(10) the Inspector General Act of 1978; and".

<< 39 USCA § 204 >>

(2)(A) Section 204 of such title 39 is amended—

(i) by amending the section heading to read as follows:

AR.03401

"§ 204. General Counsel; Judicial Officer; Chief Postal Inspector";

(ii) in the first sentence by striking "and a Judicial Officer." and inserting "a Judicial Officer, and a Chief Postal Inspector.";

(iii) in the second sentence by striking "and the Judicial Officer" and inserting "the Judicial Officer, and the Chief Postal Inspector"; and

(iv) by adding at the end the following: "The Chief Postal Inspector shall report to, and be under the general supervision of, the Postmaster General. The Postmaster General shall promptly notify the Governors and both Houses of Congress in writing if he or she removes the Chief Postal Inspector or transfers the Chief Postal Inspector to another position or location within the Postal Service, and shall include in any such notification the reasons for the removal or transfer.".

<< 39 USCA Ch. 2 >>

(B) The table of sections for chapter 2 of such title 39 is amended by striking the item relating to section 204 and inserting the following:

"204. General Counsel; Judicial Officer; Chief Postal Inspector.".

<< 5 USCA § 5597 NOTE >>

SEC. 663. VOLUNTARY SEPARATION INCENTIVES FOR EMPLOYEES OF CERTAIN FEDERAL AGENCIES.—(a) DEFINITIONS.—For the purposes of this section—

(1) the term "agency" means any Executive agency (as defined in section 105 of title 5, United States Code), other than an Executive agency (except an agency receiving such authority in the Department of Transportation Appropriations Act, 1997) that is authorized by any other provision of this Act or any other Act to provide voluntary separation incentive payments during all, or any part of, fiscal year 1997; and

(2) the term "employee" means an employee (as defined by section 2105 of title 5, United States Code) who is employed by an agency, is serving under an appointment without time limitation, and has been currently employed for a continuous period of at least 3 years, but does not include—

(A) a reemployed annuitant under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(B) an employee having a disability on the basis of which such employee is or would be eligible for disability retirement under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or another retirement system for employees of the agency;

(C) an employee who is in receipt of a specific notice of involuntary separation for misconduct or unacceptable performance;

(D) an employee who, upon completing an additional period of service as referred to in section 3(b)(2)(B)(ii) of the Federal Workforce Restructuring Act of 1994 (5 U.S.C. 5597 note), would qualify for a voluntary separation incentive payment under section 3 of such Act;

(E) an employee who has previously received any voluntary separation incentive payment by the Federal Government under this section or any other authority and has not repaid such payment;

(F) an employee covered by statutory reemployment rights who is on transfer to another organization; or

(G) any employee who, during the twenty four month period preceding the date of separation, has received a recruitment or relocation bonus under section 5753 of title 5, United States Code, or who, within the twelve month period preceding the date of separation, received a retention allowance under section 5754 of title 5, United States Code.

(b) AGENCY STRATEGIC PLAN.—

(1) IN GENERAL.—The head of each agency, prior to obligating any resources for voluntary separation incentive payments, shall submit to the House and Senate Committees on Appropriations and the Committee on Governmental Affairs of the Senate and the Committee on Government Reform and Oversight of the House of Representatives a strategic plan outlining the intended use of such incentive payments and a proposed organizational chart for the agency once such incentive payments have been completed.

(2) CONTENTS.—The agency's plan shall include—

(A) the positions and functions to be reduced or eliminated, identified by organizational unit, geographic location, occupational category and grade level;

(B) the number and amounts of voluntary separation incentive payments to be offered; and

(C) a description of how the agency will operate without the eliminated positions and functions.

(c) AUTHORITY TO PROVIDE VOLUNTARY SEPARATION INCENTIVE PAYMENTS.—

(1) IN GENERAL.—A voluntary separation incentive payment under this section may be paid by an agency to any employee only to the extent necessary to eliminate the positions and functions identified by the strategic plan.

(2) AMOUNT AND TREATMENT OF PAYMENTS.—A voluntary separation incentive payment—

(A) shall be paid in a lump sum after the employee's separation;

(B) shall be paid from appropriations or funds available for the payment of the basic pay of the employees;

(C) shall be equal to the lesser of—

(i) an amount equal to the amount the employee would be entitled to receive under section 5595(c) of title 5, United States Code; or

(ii) an amount determined by the agency head not to exceed $25,000;

(D) may not be made except in the case of any qualifying employee who voluntarily separates (whether by retirement or resignation) before December 31, 1997;

(E) shall not be a basis for payment, and shall not be included in the computation, of any other type of Government benefit; and

(F) shall not be taken into account in determining the amount of any severance pay to which the employee may be entitled under section 5595 of title 5, United States Code, based on any other separation.

(d) ADDITIONAL AGENCY CONTRIBUTIONS TO THE RETIREMENT FUND.—

(1) IN GENERAL.—In addition to any other payments which it is required to make under subchapter III of chapter 83 of title 5, United States Code, an agency shall remit to the Office of Personnel Management for deposit in the Treasury of the United States to the credit of the Civil Service Retirement and Disability Fund an amount equal to 15 percent of the final basic pay of each employee of the agency who is covered under subchapter III of chapter 83 or chapter 84 of title 5, United States Code, to whom a voluntary separation incentive has been paid under this section.

(2) DEFINITION.—For the purpose of paragraph (1), the term "final basic pay", with respect to an employee, means the total amount of basic pay which would be payable for a year of service by such employee, computed using the employee's final rate of basic pay, and, if last serving on other than a full-time basis, with appropriate adjustment therefor.

(e) EFFECT OF SUBSEQUENT EMPLOYMENT WITH THE GOVERNMENT.—An individual who has received a voluntary separation incentive payment under this section and accepts any employment for compensation with the Government of the United States, or who works for any agency of the United States Government through a personal services contract, within 5 years after the date of the separation on which the payment is based shall be required to pay, prior to the individual's first day of employment, the entire amount of the incentive payment to the agency that paid the incentive payment.

(f) REDUCTION OF AGENCY EMPLOYMENT LEVELS.—

(1) IN GENERAL.—The total number of funded employee positions in the agency shall be reduced by one position for each vacancy created by the separation of any employee who has received, or is due to receive, a voluntary separation incentive payment under this section. For the purposes of this subsection, positions shall be counted on a full-time-equivalent basis.

(2) ENFORCEMENT.—The President, through the Office of Management and Budget, shall monitor the agency and take any action necessary to ensure that the requirements of this subsection are met.

(g) EFFECTIVE DATE.—This section shall take effect October 1, 1996.

<< 31 USCA § 3336 >>

SECTION 664. ELECTRONIC BENEFIT TRANSFER PILOT.

Title 31, United States Code, is amended by inserting after section 3335 the following new section:

"SEC. 3336. Electronic benefit transfer pilot

(a) The Congress finds that:

"(1) Electronic benefit transfer (EBT) is a safe, reliable, and economical way to provide benefit payments to individuals who do not have an account at a financial institution.

"(2) The designation of financial institutions as financial agents of the Federal Government for EBT is an appropriate and reasonable use of the Secretary's authority to designate financial agents.

"(3) A joint federal-state EBT system offers convenience and economies of scale for those states (and their citizens) that wish to deliver state-administered benefits on a single card by entering into a partnership with the federal government.

"(4) The Secretary's designation of a financial agent to deliver EBT is a specialized service not available through ordinary business channels and may be offered to the states pursuant to section 6501 et seq. of this title.

"(b) The Secretary shall continue to carry out the existing EBT pilot to disburse benefit payments electronically to recipients who do not have an account at a financial institution, which shall include the designation of one or more financial institution as a financial agent of the Government, and the offering to the participating states of the opportunity to contract with the financial agent selected by the Secretary, as described in the Invitation for Expressions of Interest to Acquire EBT Services for the Southern Alliance of States dated March 9, 1995, as amended as of June 30, 1995, July 7, 1995, and August 1, 1995.

["(c) The selection and designation of financial agents, the design of the pilot program, and any other matter associated with or related to the EBT pilot described in subsection (b) shall not be subject to judicial review."]

SECTION 2. DESIGNATION OF FINANCIAL AGENTS

<< 12 USCA § 90 >>

1. 12 U.S.C. 90 is amended by adding at the end thereof the following:

"Notwithstanding the Federal Property and Administrative Services Act of 1949, as amended, the Secretary may select associations as financial agents in accordance with any process the Secretary deems appropriate and their reasonable duties may include the provision of electronic benefit transfer services (including State-administered benefits with the consent of the States), as defined by the Secretary.".

2. Make conforming amendments to 12 U.S.C. 265, 266, 391, 1452(d), 1767, 1789a, 2013, 2122 and to 31 U.S.C. 3122 and 3303.

TITLE VII—COUNTER–TERRORISM AND DRUG LAW ENFORCEMENT

DEPARTMENT OF THE TREASURY

DEPARTMENTAL OFFICES

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Foreign Assets Control, $288,000: Provided, That of the amount provided, $288,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

OFFICE OF INSPECTOR GENERAL

SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Inspector General $34,000, to remain available until expended: Provided, That of the amount provided, $34,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

COUNTERTERRORISM FUND

For necessary expenses, as determined by the Secretary, $15,000,000, to remain available until expended, to reimburse any Department of the Treasury organization for the costs of providing support to counter, investigate, or prosecute terrorism, including payment of rewards in connection with these activities: Provided, That the entire amount of this appropriation shall be available only to the extent that an official budget request for a specific dollar amount, that includes designation of the entire amount of the request as an emergency requirement as defined in the Balanced Budget and Emergency Deficit Control Act of

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1985, is transmitted by the President to Congress: Provided further, That the entire amount is designated by Congress as an emergency appropriation pursuant to section 251(b)(2)(D)(i) of such Act.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Federal Law Enforcement Training Center, $1,354,000, to remain available until expended: Provided, That of the amount provided, $1,354,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For an additional amount for the necessary expenses for the acquisition, construction, improvement, and related expenses, $2,700,000, to remain available until expended: Provided, That of the amount provided, $2,700,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## FINANCIAL MANAGEMENT SERVICE

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Financial Management Service, $449,000, to remain available until expended: Provided, That of the amount provided, $449,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

### SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Bureau of Alcohol, Tobacco and Firearms, $66,423,000; of which $3,500,000 shall be available for the construction and expansion of a canine training facility, to remain available until expended; of which $3,000,000 shall be available for conducting a study of car bomb explosives, to remain available until expended; and of which $6,700,000, to remain available until expended, for relocation of the bureau's headquarters building and laboratory facilities; Provided, That of the amount provided, $66,423,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNITED STATES CUSTOMS SERVICE

### SALARIES AND EXPENSES

For an additional amount for the necessary expense of the United States Customs Service, $62,335,000; of which not to exceed $26,400,000 shall be available until expended for funding noncompetitive cooperative agreements with air carriers, airports, or other cargo authorities, which provide for the Customs Service to purchase and assist in installing advanced air cargo inspection equipment for the joint use of such entities and the United States Customs Service: Provided, That of the amount provided, $62,335,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## INTERNAL REVENUE SERVICE

### PROCESSING, ASSISTANCE AND MANAGEMENT

For an additional amount for the necessary expenses for the processing, assistance and management, $10,488,000, to remain available until expended: Provided, That of the amount provided, $10,488,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## UNITED STATES SECRET SERVICE

## SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the United States Secret Service $3,026,000, to remain available until expended: Provided, That of the amount provided, $3,026,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## INDEPENDENT AGENCIES

## OFFICE OF PERSONNEL MANAGEMENT

## SALARIES AND EXPENSES

For an additional amount for the necessary expenses of the Office of Personnel Management $210,000, to remain available until expended: Provided, That of the amount provided, $210,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## FUNDS APPROPRIATED TO THE PRESIDENT

## FEDERAL DRUG CONTROL PROGRAMS

## SPECIAL FORFEITURE FUND

## (INCLUDING TRANSFER OF FUNDS)

For activities authorized by Public Law 100–690, as amended, $112,900,000, of which $42,000,000 shall be transferred to the United States Customs Service for the conversion of one P–3AEW aircraft for the air interdiction program; of which $10,000,000 shall be available for transfer to other Federal agencies for methamphetamine reduction efforts; and of which $60,900,000 shall be available to the Director of the Office of National Drug Control Policy for enhancing other drug control activities, including transfer to other Federal agencies: Provided, That of the amount provided, $112,900,000 is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended to become available only upon receipt by the Congress of a supplemental request from the President requesting such designation.

## TITLE VIII—FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT

<< 31 USCA § 3512 NOTE >>

## SEC. 801. SHORT TITLE

This title may be cited as the "Federal Financial Management Improvement Act of 1996."

<< 31 USCA § 3512 NOTE >>

## SEC. 802. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds the following:

(1) Much effort has been devoted to strengthening Federal internal accounting controls in the past. Although progress has been made in recent years, Federal accounting standards have not been uniformly implemented in financial management systems for agencies.

(2) Federal financial management continues to be seriously deficient, and Federal financial management and fiscal practices have failed to—

(A) identify costs fully;

(B) reflect the total liabilities of congressional actions; and

(C) accurately report the financial condition of the Federal Government.

(3) Current Federal accounting practices do not accurately report financial results of the Federal Government or the full costs of programs and activities. The continued use of these practices undermines the Government's ability to provide credible and reliable financial data and encourages already widespread Government waste, and will not assist in achieving a balanced budget.

(4) Waste and inefficiency in the Federal Government undermine the confidence of the American people in the government and reduce the federal Government's ability to address vital public needs adequately.

(5) To rebuild the accountability and credibility of the Federal Government, and restore public confidence in the Federal Government, agencies must incorporate accounting standards and reporting objectives established for the Federal Government into their financial management systems so that all the assets and liabilities, revenues, and expenditures or expenses, and the full costs of programs and activities of the Federal Government can be consistently and accurately recorded, monitored, and uniformly reported throughout the Federal Government.

(6) Since its establishment in October 1990, the Federal Accounting Standards Advisory Board (hereinafter referred to as the "FASAB") has made substantial progress toward developing and recommending a comprehensive set of accounting concepts and standards for the Federal Government. When the accounting concepts and standards developed by FASAB are incorporated into Federal financial management systems, agencies will be able to provide cost and financial information that will assist the Congress and financial managers to evaluate the cost and performance of Federal programs and activities, and will therefore provide important information that has been lacking, but is needed for improved decision making by financial managers and the Congress.

(7) The development of financial management systems with the capacity to support these standards and concepts will, over the long term, improve Federal financial management.

(b) PURPOSE—The purposes of this Act are to—

(1) provide for consistency of accounting by an agency from one fiscal year to the next, and uniform accounting standards throughout the Federal Government;

(2) require Federal financial management systems to support full disclosure of Federal financial data, including the full costs of Federal programs and activities, to the citizens, the Congress, the President, and agency management, so that programs and activities can be considered based on their full costs and merits;

(3) increase the accountability and credibility of federal financial management;

(4) improve performance, productivity and efficiency of Federal Government financial management;

(5) establish financial management systems to support controlling the cost of Federal Government;

(6) build upon and complement the Chief Financial Officers Act of 1990 (Public Law 101–576; 104 Stat 2838), the Government Performance and Results Act of 1993 (Public Law 103–62 107 Stat. 285) and the Government Management Reform Act of 1994 (Public Law 103–356; 108 Stat. 3410); and

(7) increase the capability of agencies to monitor execution of the budget by more readily permitting reports that compare spending of resources to results of activities.

<< 31 USCA § 3512 NOTE >>

SEC. 803 IMPLEMENTATION OF FEDERAL FINANCIAL MANAGEMENT IMPROVEMENTS.

(a) IN GENERAL.—Each agency shall implement and maintain financial management systems that comply substantially with Federal financial management systems requirements, applicable Federal accounting standards, and the United States Government Standard General Ledger at the transaction level.

(b) AUDIT COMPLIANCE FINDING.—

(1) IN GENERAL.—Each audit required by section 3521(e) of title 31, United States Code, shall report whether the agency financial management systems comply with the requirements of subsection (a).

(2) CONTENT OF REPORTS.—When the person performing the audit required by section 3521(e) of title 31, United States Code, reports that the agency financial management systems do not comply with the requirements of subsection (a), the person performing the audit shall include in the report on the audit—

(A) the entity or organization responsible for the financial management systems that have been found not to comply with the requirements of subsection (a);

(B) all facts pertaining to the failure to comply with the requirements of subsection (a), including—

  (i) the nature and extent of the noncompliance including areas in which there is substantial but not full compliance;

  (ii) the primary reason or cause of the noncompliance;

  (iii) the entity or organization responsible for the non-compliance[sic]; and

  (iv) any relevant comments from any responsible officer or employee; and

  (C) a statement with respect to the recommended remedial actions and the time frames to implement such actions.

(c) COMPLIANCE IMPLEMENTATION.—

 (1) DETERMINATION.—No later than the date described under paragraph (2), the Head of an agency shall determine whether the financial management systems of the agency comply with the requirements of subsection (a). Such determination shall be based on—

  (A) a review of the report on the applicable agency-wide audited financial statement;

  (B) any other information the Head of the agency considers relevant and appropriate.

 (2) DATE OF DETERMINATION.—The determination under paragraph (1) shall be made no later than 120 days after the earlier of—

  (A) the date of the receipt of an agency-wide audited financial statement; or

  (B) the last day of the fiscal year following the year covered by such statement.

 (3) REMEDIATION PLAN.—

  (A) If the Head of an agency determines that the agency's financial management systems do not comply with the requirements of subsection (a), the head of the agency, in consultation with the Director, shall establish a remediation plan that shall include resources, remedies, and intermediate target dates necessary to bring the agency's financial management systems into substantial compliance.

  (B) If the determination of the head of the agency differs from the audit compliance findings required in subsection (b), the Director shall review such determinations and provide a report on the findings to the appropriate committees of the Congress.

 (4) TIME PERIOD FOR COMPLIANCE.—A remediation plan shall bring the agency's financial management systems into substantial compliance no later than 3 years after the date a determination is made under paragraph (1), unless the agency, with concurrence of the Director—

  (A) determines that the agency's financial management systems cannot comply with the requirements of subsection (a) within 3 years;

  (B) specifies the most feasible date for bringing the agency's financial management systems into compliance with the requirements of subsection (a); and

  (C) designates an official of the agency who shall be responsible for bringing the agency's financial management systems into compliance with the requirements of subsection (a) by the date specified under subparagraph (B).

<< 31 USCA § 3512 NOTE >>

SEC. 804. REPORTING REQUIREMENTS.

 (a) REPORTS BY THE DIRECTOR.—No later than March 31 of each year, the Director shall submit a report to the Congress regarding implementation of this Act. The Director may include the report in the financial management status report and the 5–year financial management plan submitted under section 3512(a)(1) of title 31, United States Code.

 (b) REPORTS BY THE INSPECTOR GENERAL.—Each Inspector General who prepares a report under section 5(a) of the Inspector General Act of 1978 (5 U.S.C.App.) shall report to Congress instances and reasons when an agency has not met the intermediate target dates established in the remediation plan required under section 3(c). Specifically the report shall include—

  (1) the entity or organization responsible for the non-compliance;

  (2) the facts pertaining to the failure to comply with the requirements of subsection (a), including the nature and extent of the non-compliance, the primary reason or cause for the failure to comply, and any extenuating circumstances; and

  (3) a statement of the remedial actions needed to comply.

 (c) REPORTS BY THE COMPTROLLER GENERAL.—No later than October 1, 1997, and October 1, of each year thereafter, the Comptroller General of the United States shall report to the appropriate committees of the Congress concerning—

(1) compliance with the requirements of section 3(a) of this Act, including whether the financial statements of the Federal Government have been prepared in accordance with applicable accounting standards; and

(2) the adequacy of applicable accounting standards for the Federal Government.

<< 31 USCA § 3512 NOTE >>

SEC. 805. CONFORMING AMENDMENTS.

<< 31 USCA § 3521 >>

(a) AUDITS BY AGENCIES.—Section 3521(f)(1) of title 31, United States Code, is amended in the first sentence by inserting "and the Controller of the Office of Federal Financial Management" before the period.

<< 31 USCA § 3512 >>

(b) FINANCIAL MANAGEMENT STATUS REPORT.—Section 3512(a)(2) of title 31, United States Code, is amended by—

(1) in subparagraph (D) by striking "and' after the semicolon;

(2) by redesignating subparagraph (E) as subparagraph (F); and

(3) by inserting after subparagraph (D) the following:

"(E) a listing of agencies whose financial management systems do not comply substantially with the requirements of Section 3(a) the Federal Financial Management Improvement Act of 1996, and a summary statement of the efforts underway to remedy the noncompliance; and"

<< 5 USCA App. 3 § 5 >>

(c) INSPECTOR GENERAL ACT OF 1978.—Section 5(a) of the Inspector General Act of 1978 is amended—

(1) in paragraph (11) by striking "and" after the semicolon;

(2) in paragraph (12) by striking the period and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(13) the information described under section 05(b) of the Federal Financial Management Improvement Act of 1996."

<< 31 USCA § 3512 NOTE >>

SEC. 806. DEFINITIONS.

For purposes of this title:

(1) AGENCY.—The term "agency" means a department or agency of the United States Government as defined in section 901(b) of title 31, United States Code.

(2) DIRECTOR.—The term "Director" means the Director of the Office of Management and Budget.

(3) FEDERAL ACCOUNTING STANDARDS.—The term "Federal accounting standards" means applicable accounting principles, standards, and requirements consistent with section 902(a)(3)(A) of title 31, United States Code.

(4) FINANCIAL MANAGEMENT SYSTEMS.—The term "financial management systems" includes the financial systems and the financial portions of mixed systems necessary to support financial management, including automated and manual processes, procedures, controls, data, hardware, software, and support personnel dedicated to the operation and maintenance of system functions.

(5) FINANCIAL SYSTEM.—The term "financial system" includes an information system, comprised of one or more applications, that is used for—

(A) collecting, processing, maintaining, transmitting, or reporting data about financial events;

(B) supporting financial planning or budgeting activities;

(C) accumulating and reporting costs information; or

(D) supporting the preparation of financial statements.

(6) MIXED SYSTEM.—The term "mixed system' means an information system that supports both financial and nonfinancial functions of the Federal Government or components thereof.

<< 31 USCA § 3512 NOTE >>

SEC. 807. EFFECTIVE DATE.

 This title shall take effect for the fiscal year ending September 30, 1997.

SEC. 808. REVISION OF SHORT TITLES.—

<< 31 USCA § 3512 NOTE >>

<< 41 USCA § 251 NOTE >>

 (a) Section 4001 of Public Law 104–106 (110 Stat. 642; 41 U.S.C. 251 note) is amended to read as follows:

"SEC. 4001. SHORT TITLE.

 "This division and division E may be cited as the 'Clinger–Cohen Act of 1996'.".

<< 31 USCA 3512 NOTE >>

<< 41 USCA § 1401 NOTE >>

 (b) Section 5001 of Public Law 104–106 (110 Stat. 679; 40 U.S.C. 1401 note) is amended to read as follows:

"SEC. 5001. SHORT TITLE.

 "This division and division D may be cited as the 'Clinger–Cohen Act of 1996'.".

<< 10 USCA § 113 nt >>

<< 10 USCA § 2315 >>

<< 15 USCA § 278g–3 >>

<< 28 USCA § 612 >>

<< 31 USCA § 3512 NOTE >>

<< 38 USCA § 310 >>

<< 40 USCA §§ 1411 nt, 1441 nt >>

<< 44 USCA §§ 3502, 3504, 3518 >>

 (c) Any reference in any law, regulation, document, record, or other paper of the United States to the Federal Acquisition Reform Act of 1996 or to the Information Technology Management Reform Act of 1996 shall be considered to be a reference to the Clinger–Cohen Act of 1996.
 This Act may be cited as the "Treasury, Postal Service, and General Government Appropriations Act, 1997".

TITLE II—ECONOMIC GROWTH AND REGULATORY PAPERWORK REDUCTION

SEC. 2001. SHORT TITLE; TABLE OF CONTENTS; DEFINITIONS

<< 12 USCA § 226 NOTE >>

(a) SHORT TITLE.—This title may be cited as the "Economic Growth and Regulatory Paperwork Reduction Act of 1996".

(b) TABLE OF CONTENTS.—The table of contents for this title is as follows:

TITLE II—ECONOMIC GROWTH AND REGULATORY PAPERWORK REDUCTION

Sec. 2001. Short title; table of contents; definitions

Subtitle A—Streamlining the Home Mortgage Lending Process

Sec. 2101. Simplification and unification of disclosures required under RESPA and TILA for mortgage transactions.

Sec. 2102. General exemption authority for loans.

Sec. 2103. Reductions in Real Estate Settlement Procedures Act of 1974 regulatory burdens.

Sec. 2104. Waiver for certain borrowers.

Sec. 2105. Alternative disclosures for adjustable rate mortgages.

Sec. 2106. Restitution for violations of the Truth in Lending Act.

Sec. 2107. Limitation on liability under the Truth in Lending Act.

Subtitle B—Streamlining Government Regulation

CHAPTER 1—ELIMINATING UNNECESSARY REGULATORY REQUIREMENTS AND PROCEDURES

Sec. 2201. Elimination of redundant approval requirement for Oakar transactions.

Sec. 2202. Elimination of duplicative requirements imposed upon bank holding companies.

Sec. 2203. Elimination of the per branch capital requirement for national banks and State member banks.

Sec. 2204. Elimination of branch application requirements for automatic teller machines.

Sec. 2205. Elimination of requirement for approval of investments in bank premises for well capitalized and well managed banks.

Sec. 2206. Elimination of approval requirement for divestitures.

Sec. 2207. Streamlined nonbanking acquisitions by well capitalized and well managed banking organizations.

Sec. 2208. Elimination of unnecessary filing for officer and director appointments.

Sec. 2209. Amendments to the Depository Institution Management Interlocks Act.

Sec. 2210. Elimination of recordkeeping and reporting requirements for officers.

Sec. 2211. Repayment of Treasury loan.

Sec. 2212. Branch closures.

Sec. 2213. Foreign banks.

Sec. 2214. Disposition of foreclosed assets.

Sec. 2215. Exemption authority for antitying provision.

Sec. 2216. FDIC approval of new State bank powers.

CHAPTER 2—ELIMINATING UNNECESSARY REGULATORY BURDENS

Sec. 2221. Small bank examination cycle.

Sec. 2222. Required review of regulations.

Sec. 2223. Repeal of identification of nonbank financial institution customers.

Sec. 2224. Repeal of certain reporting requirements.

Sec. 2225. Increase in home mortgage disclosure exemption threshold.

Sec. 2226. Elimination of stock loan reporting requirement.

Sec. 2227. Credit availability assessment.

CHAPTER 3—REGULATORY MICROMANAGEMENT

Sec. 2241. National bank directors.

Sec. 2242. Paperwork reduction review.

Sec. 2243. State bank representation on Board of Directors of the FDIC.

Sec. 2244. Consultation among examiners.

Subtitle C—Regulatory Impact on Cost of Credit and Credit Availability

Sec. 2301. Audit costs.

Sec. 2302. Incentives for self-testing.

Sec. 2303. Qualified thrift investment amendments.

Sec. 2304. Limited purpose banks.

Sec. 2305. Amendment to Fair Debt Collection Practices Act.

Sec. 2306. Increase in certain credit union loan ceilings.

Sec. 2307. Bank investments in Edge Act and agreement corporations.

Subtitle D—Consumer Credit

CHAPTER 1—CREDIT REPORTING REFORM

Sec. 2401. Short title.

Sec. 2402. Definitions.

Sec. 2403. Furnishing consumer reports; use for employment purposes.

Sec. 2404. Use of consumer reports for prescreening and direct marketing; prohibition on unauthorized or uncertified use of information.

Sec. 2405. Consumer consent required to furnish consumer report containing medical information.

Sec. 2406. Obsolete information and information contained in consumer reports.

Sec. 2407. Compliance procedures.

Sec. 2408. Consumer disclosures.

Sec. 2409. Procedures in case of the disputed accuracy of any information in a consumer's file.

Sec. 2410. Charges for certain disclosures.

Sec. 2411. Duties of users of consumer reports.

Sec. 2412. Civil liability.

Sec. 2413. Responsibilities of persons who furnish information to consumer reporting agencies.

Sec. 2414. Investigative consumer reports.

Sec. 2415. Increased criminal penalties for obtaining information under false pretenses.

Sec. 2416. Administrative enforcement.

Sec. 2417. State enforcement of Fair Credit Reporting Act.

Sec. 2418. Federal Reserve Board authority.

Sec. 2419. Preemption of State law.

Sec. 2420. Effective date.

Sec. 2421. Relationship to other law.

Sec. 2422. Federal Reserve Board study.

CHAPTER 2—CREDIT REPAIR ORGANIZATIONS

Sec. 2451. Regulation of credit repair organizations.

Sec. 2452. Credit worthiness.

Subtitle E—Asset Conservation, Lender Liability, and Deposit Insurance Protection

Sec. 2501. Short title.

Sec. 2502. CERCLA lender and fiduciary liability limitations amendments.

Sec. 2503. Conforming amendment.

Sec. 2504. Lender liability rule.

Sec. 2505. Effective date.

Subtitle F—Miscellaneous

Sec. 2601. Federal Reserve Board study.

Sec. 2602. Treatment of claims arising from breach of contracts executed by the receiver or conservator.

Sec. 2603. Criminal sanctions for fictitious financial instruments and counterfeiting.

Sec. 2604. Amendments to the Truth in Savings Act.

Sec. 2605. Consumer Leasing Act amendments.

Sec. 2606. Study of corporate credit unions.

Sec. 2607. Report on the reconciliation of differences between regulatory accounting principles and generally accepted accounting principles.

Sec. 2608. State-by-State and metropolitan area-by-metropolitan area study of bank fees.

Sec. 2609. Prospective application of gold clauses in contracts.

Sec. 2610. Qualified family partnerships.

Sec. 2611. Cooperative efforts between depository institutions and farmers and ranchers in drought-stricken areas.

Sec. 2612. Streamlining process for determining new nonbanking activities.

Sec. 2613. Authorizing bank service companies to organize as limited liability partnerships.

Sec. 2614. Retirement certificates of deposits.

Sec. 2615. Prohibitions on certain depository institution associations with Government-sponsored enterprises.

Subtitle G—Deposit Insurance Funds

Sec. 2701. Short title.

Sec. 2702. Special assessment to capitalize SAIF.

Sec. 2703. Financing corporation funding.

Sec. 2704. Merger of BIF and SAIF.

Sec. 2705. Creation of SAIF special reserve.

Sec. 2706. Refund of amounts in deposit insurance fund in excess of designated reserve amount.

Sec. 2707. Assessment rates for SAIF members may not be less than assessment rates for BIF members.

Sec. 2708. Assessments authorized only if needed to maintain the reserve ratio of a deposit insurance fund.

Sec. 2709. Treasury study of common depository institution charter.

Sec. 2710. Definitions.

Sec. 2711. Deductions for special assessments.

<< 12 USCA § 252 NOTE >>

(c) DEFINITIONS.—Except as otherwise specified in this title, the following definitions shall apply for purposes of this title:

(1) APPRAISAL SUBCOMMITTEE.—The term "Appraisal Subcommittee" means the Appraisal Subcommittee established under section 1011 of the Federal Financial Institutions Examination Council Act of 1978 (as in existence on the day before the date of enactment of this Act).

(2) APPROPRIATE FEDERAL BANKING AGENCY.—The term "appropriate Federal banking agency" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

(3) BOARD.—The term "Board" means the Board of Governors of the Federal Reserve System.

(4) CORPORATION.—The term "Corporation" means the Federal Deposit Insurance Corporation.

(5) COUNCIL.—The term "Council" means the Financial Institutions Examination Council established under section 1004 of the Federal Financial Institutions Examination Council Act of 1978.

(6) INSURED CREDIT UNION.—The term "insured credit union" has the same meaning as in section 101 of the Federal Credit Union Act.

(7) INSURED DEPOSITORY INSTITUTION.—The term "insured depository institution" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

Subtitle A—Streamlining the Home Mortgage Lending Process

<< 12 USCA § 2601 NOTE >>

SEC. 2101. SIMPLIFICATION AND UNIFICATION OF DISCLOSURES REQUIRED UNDER RESPA AND TILA FOR MORTGAGE TRANSACTIONS.

(a) IN GENERAL.—With respect to credit transactions which are subject to the Real Estate Settlement Procedures Act of 1974 and the Truth in Lending Act, the Board of Governors of the Federal Reserve System (hereafter in this section referred to as the "Board") and the Secretary of Housing and Urban Development (hereafter in this section referred to as the "Secretary") shall take such action as may be necessary before the end of the 6–month period beginning on the date of enactment of this Act—

(1) to simplify and improve the disclosures applicable to such transactions under such Acts, including the timing of the disclosures; and

(2) to provide a single format for such disclosures which will satisfy the requirements of each such Act with respect to such transactions.

(b) REGULATIONS.—To the extent that it is necessary to prescribe any regulation in order to effect any changes required to be made under subsection (a), the proposed regulation shall be published in the Federal Register before the end of the 6–month period referred to in subsection (a).

(c) RECOMMENDATIONS FOR LEGISLATION.—If the Board and the Secretary find that legislative action may be necessary or appropriate in order to simplify and unify the disclosure requirements under the Real Estate Settlement Procedures Act of 1974 and the Truth in Lending Act, the Board and the Secretary shall submit a report containing recommendations to the Congress concerning such action.

SEC. 2102. GENERAL EXEMPTION AUTHORITY FOR LOANS.

<< 15 USCA § 1603 >>

(a) REGULATORY FLEXIBILITY.—Section 104 of the Truth in Lending Act (15 U.S.C. 1603) is amended—

(1) by redesignating paragraphs (5) and (6) as paragraphs (6) and (7), respectively; and

(2) by inserting after paragraph (4) the following new paragraph:

"(5) Transactions for which the Board, by rule, determines that coverage under this title is not necessary to carry out the purposes of this title.".

<< 15 USCA § 1604 >>

(b) EXEMPTION AUTHORITY.—Section 105 of the Truth in Lending Act (15 U.S.C. 1604) is amended by adding at the end the following new subsection:

"(f) EXEMPTION AUTHORITY.—

"(1) IN GENERAL.—The Board may exempt, by regulation, from all or part of this title any class of transactions, other than transactions involving any mortgage described in section 103(aa), for which, in the determination of the Board, coverage under all or part of this title does not provide a meaningful benefit to consumers in the form of useful information or protection.

"(2) FACTORS FOR CONSIDERATION.—In determining which classes of transactions to exempt in whole or in part under paragraph (1), the Board shall consider the following factors and publish its rationale at the time a proposed exemption is published for comment:

"(A) The amount of the loan and whether the disclosures, right of rescission, and other provisions provide a benefit to the consumers who are parties to such transactions, as determined by the Board.

"(B) The extent to which the requirements of this title complicate, hinder, or make more expensive the credit process for the class of transactions.

"(C) The status of the borrower, including—

"(i) any related financial arrangements of the borrower, as determined by the Board;

"(ii) the financial sophistication of the borrower relative to the type of transaction; and

"(iii) the importance to the borrower of the credit, related supporting property, and coverage under this title, as determined by the Board;

"(D) whether the loan is secured by the principal residence of the consumer; and

"(E) whether the goal of consumer protection would be undermined by such an exemption.".

SEC. 2103. REDUCTIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT OF 1974 REGULATORY BURDENS.

<< 12 USCA § 2605 >>

(a) UNNECESSARY DISCLOSURE.—Section 6(a) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2605(a)) is amended to read as follows:

"(a) DISCLOSURE TO APPLICANT RELATING TO ASSIGNMENT, SALE, OR TRANSFER OF LOAN SERVICING.—Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.".

<< 12 USCA § 2606 >>

(b) CONSISTENCY OF REAL ESTATE SETTLEMENT PROCEDURES ACT AND TRUTH IN LENDING ACT EXEMPTION OF BUSINESS LOANS.—Section 7 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2606) is amended—

(1) by striking "This Act" and inserting the following:

"(a) IN GENERAL.—This Act"; and

(2) by adding at the end the following new subsection:

"(b) INTERPRETATION.—In prescribing regulations under section 19(a), the Secretary shall ensure that, with respect to subsection (a) of this section, the exemption for credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, as provided in section 7(1) of the Real Estate Settlement Procedures Act of 1974 shall be the same as the exemption for such credit transactions under section 104(1) of the Truth in Lending Act.".

(c) REDESIGNATION OF CONTROLLED BUSINESS ARRANGEMENTS AS AFFILIATED BUSINESS ARRANGEMENTS.—The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.) is amended—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 2602 >>

(1) in section 3(7), by striking "controlled business arrangement" and inserting "affiliated business arrangement"; and

<< 12 USCA § 2607 >>

(2) in subsections (c)(4) and (d)(6) of section 8, by striking "controlled business arrangements" and inserting "affiliated business arrangements".

(d) DISCLOSURES BY TELEPHONE OR ELECTRONIC MEDIA.—Section 8(c)(4) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2607(c)(4)(A)) is amended by striking subparagraph (A) and inserting the following "(A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred (i) in the case of a face-to-face referral or a referral made in writing or by electronic media, at or before the time of the referral (and compliance with this requirement in such case may be evidenced by a notation in a written, electronic, or similar system of records maintained in the regular course of business); (ii) in the case of a referral made by telephone, within 3 business days after the referral by telephone, (and in such case an abbreviated verbal disclosure of the existence of the arrangement and the fact that a written disclosure will be provided within 3 business days shall be made to the person being referred during the telephone referral); or (iii) in the case of a referral by a lender (including a referral by a lender to an affiliated lender), at the time the estimates required under section 5(c) are provided (notwithstanding clause (i) or (ii)); and any required written receipt of such disclosure (without regard to the manner of the disclosure under clause (i), (ii), or (iii)) may be obtained at the closing or settlement (except that a person making a face-to-face referral who provides the written disclosure at or before the time of the referral shall attempt to obtain any required written receipt of such disclosure at such time and if the person being referred chooses not to acknowledge the receipt of the disclosure at that time, that fact shall be noted in the written, electronic, or similar system of records maintained in the regular course of business by the person making the referral),".

<< 12 USCA § 2614 >>

(e) LIMITATION ON CLAIMS ARISING FROM VIOLATIONS OF REQUIREMENTS FOR SERVICING MORTGAGES AND ADMINISTERING ESCROW ACCOUNTS.—Section 16 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2614) is amended—

(1) by striking "section 8 or 9" and inserting "section 6, 8, or 9"; and

(2) by striking "within one year" and inserting "within 3 years in the case of a violation of section 6 and 1 year in the case of a violation of section 8 or 9".

<< 12 USCA § 2617 >>

(f) DELAY OF EFFECTIVENESS OF RECENT FINAL REGULATION RELATING TO PAYMENTS TO EMPLOYEES. —Section 19 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2617) is amended by adding at the end the following new subsection:

"(d) DELAY OF EFFECTIVENESS OF RECENT FINAL REGULATION RELATING TO PAYMENTS TO EMPLOYEES. —

"(1) IN GENERAL.—The amendment to part 3500 of title 24 of the Code of Federal Regulations contained in the final regulation prescribed by the Secretary and published in the Federal Register on June 7, 1996, which will, as of the effective date of such amendment—

"(A) eliminate the exemption for payments by an employer to employees of such employer for referral activities which is currently codified as section 3500.14(g)(1)(vii) of such title 24; and

"(B) replace such exemption with a more limited exemption in new clauses (vii), (viii), and (ix) of section 3500.14 of such title 24,

shall not take effect before July 31, 1997.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) CONTINUATION OF PRIOR RULE.—The regulation codified as section 3500.14(g)(1)(vii) of title 24 of the Code of Federal Regulations, relating to employer-employee payments, as in effect on May 1, 1996, shall remain in effect until the date the amendment referred to in paragraph (1) takes effect in accordance with such paragraph.

"(3) PUBLIC NOTICE OF EFFECTIVE DATE.—The Secretary shall provide public notice of the date on which the amendment referred to in paragraph (1) will take effect in accordance with such paragraph not less than 90 days and not more than 180 days before such effective date.".

(g) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 12 USCA § 2603 >>

(1) Section 4(a) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2603(a)) is amended by striking "Federal Home Loan Bank Board" and inserting "Director of the Office of Thrift Supervision".

<< 12 USCA § 2609 >>

(2) Section 10(c)(1)(C) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2609(c)(1)(C)) is amended by striking "Not later than the expiration of the 90-day period beginning on the date of the enactment of the Cranston–Gonzalez National Affordable Housing Act, the" and inserting "The".

<< 12 USCA §§ 2611, 2612, 2613 >>

(h) REPEAL OF OBSOLETE PROVISIONS.—The Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.) is amended by striking sections 13, 14 and 15.

<< 15 USCA § 1604 >>

SEC. 2104. WAIVER FOR CERTAIN BORROWERS.

Section 105 of the Truth in Lending Act (15 U.S.C. 1604) is amended by adding at the end the following new subsection:

"(g) WAIVER FOR CERTAIN BORROWERS.—

"(1) IN GENERAL.—The Board, by regulation, may exempt from the requirements of this title certain credit transactions if—

"(A) the transaction involves a consumer—

"(i) with an annual earned income of more than $200,000; or

"(ii) having net assets in excess of $1,000,000 at the time of the transaction; and

"(B) a waiver that is handwritten, signed, and dated by the consumer is first obtained from the consumer.

"(2) ADJUSTMENTS BY THE BOARD.—The Board, at its discretion, may adjust the annual earned income and net asset requirements of paragraph (1) for inflation.".

<< 15 USCA § 1638 >>

SEC. 2105. ALTERNATIVE DISCLOSURES FOR ADJUSTABLE RATE MORTGAGES.

Section 128(a) of the Truth in Lending Act (15 U.S.C. 1638(a)) is amended by adding at the end the following new paragraph:

"(14) In the case of any variable interest rate residential mortgage transaction, in disclosures provided at application as prescribed by the Board for a variable rate transaction secured by the consumer's principal dwelling, at the option of the creditor, a statement that the periodic payments may increase or decrease substantially, and the maximum interest rate and payment for a $10,000 loan originated at a recent interest rate, as determined by the Board, assuming the maximum periodic increases in rates and payments under the program, or a historical example illustrating the effects of interest rate changes implemented according to the loan program.".

<< 15 USCA § 1607 >>

## SEC. 2106. RESTITUTION FOR VIOLATIONS OF THE TRUTH IN LENDING ACT.

Section 108(e)(3) of the Truth in Lending Act (15 U.S.C. 2602(3)) is amended—
  (1) by striking "ordered (A) if" and inserting the following: "ordered—
    "(A) if";
  (2) by striking "may require a partial" and inserting "may—
    "(i) require a partial";
  (3) by striking ", except that with respect" and all that follows through "Act, the agency shall require" and inserting "; or
    "(ii) require";
  (4) by striking "reasonable, (B) the" and inserting the following: "reasonable, if (in the case of an agency referred to in paragraph (1), (2), or (3) of subsection (a)), the agency determines that a partial adjustment or making partial payments over an extended period is necessary to avoid causing the creditor to become undercapitalized pursuant to section 38 of the Federal Deposit Insurance Act;
    "(B) the"; and
  (5) by striking "(C) except" and inserting the following:
    "(C) except".

## SEC. 2107. LIMITATION ON LIABILITY UNDER THE TRUTH IN LENDING ACT.

<< 15 USCA § 1649 >>

  (a) IN GENERAL.—Section 139(a) of the Truth in Lending Act (15 U.S.C. 1649(a)) is amended by striking "For any consumer credit transaction subject to this title" and inserting "For any closed end consumer credit transaction that is secured by real property or a dwelling, that is subject to this title, and".

<< 15 USCA § 1649 NOTE >>

  (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as of September 30, 1995.

Subtitle B—Streamlining Government Regulation

CHAPTER 1—ELIMINATING UNNECESSARY REGULATORY REQUIREMENTS AND PROCEDURES

## SEC. 2201. ELIMINATION OF REDUNDANT APPROVAL REQUIREMENT FOR OAKAR TRANSACTIONS.

<< 12 USCA § 1815 >>

  (a) IN GENERAL.—Section 5(d)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1815(d)(3)) is amended—
  (1) in subparagraph (A), by striking "with the prior written approval of" and inserting "if the transaction is approved by";
  (2) in subparagraph (E)—
    (A) by striking clauses (i) and (iv);
    (B) by redesignating clauses (ii) and (iii) as clauses (i) and (ii), respectively; and
    (C) by adding at the end the following new clause:
      "(iii) CAPITAL REQUIREMENTS.—A transaction described in this paragraph shall not be approved under section 18(c) (2) unless the acquiring, assuming, or resulting depository institution will meet all applicable capital requirements upon consummation of the transaction.";
  (3) by striking subparagraph (G); and
  (4) by redesignating subparagraphs (H) through (J) as subparagraphs (G) through (I), respectively.
  (b) CONFORMING AMENDMENTS.—

<< 12 USCA § 215c >>

(1) REVISED STATUTES.—Section 5156A(b)(1) of the Revised Statutes of the United States (12 U.S.C. 215c(b)(1)) is amended by striking "by section 5(d)(3) of the Federal Deposit Insurance Act or any other" and inserting "under any".

<< 12 USCA § 1467a >>

(2) HOME OWNERS' LOAN ACT.—Section 10(s)(2)(A) of the Home Owners' Loan Act (12 U.S.C. 1467a(s)(2)(A)) is amended by striking "under section 5(d)(3) of the Federal Deposit Insurance Act or any other" and inserting "under any".

SEC. 2203. ELIMINATION OF DUPLICATIVE REQUIREMENTS IMPOSED UPON BANK HOLDING COMPANIES.

<< 12 USCA § 1467a >>

(a) EXEMPTION FOR BANK HOLDING COMPANIES.—Section 10 of the Home Owners' Loan Act (12 U.S.C. 1467a) is amended by adding at the end the following new subsection:

"(t) EXEMPTION FOR BANK HOLDING COMPANIES.—This section shall not apply to a bank holding company that is subject to the Bank Holding Company Act of 1956, or any company controlled by such bank holding company.".

<< 12 USCA § 1467a >>

(b) DEFINITION.—Section 10(a)(1)(D) of the Home Owners' Loan Act (12 U.S.C. 1467a(a)(1)(D)) is amended to read as follows:

"(D) SAVINGS AND LOAN HOLDING COMPANY.—

"(i) IN GENERAL.—Except as provided in clause (ii), the term 'savings and loan holding company' means any company that directly or indirectly controls a savings association or that controls any other company that is a savings and loan holding company.

"(ii) EXCLUSION.—The term 'savings and loan holding company' does not include a bank holding company that is registered under, and subject to, the Bank Holding Company Act of 1956, or to any company directly or indirectly controlled by such company (other than a savings association).".

(c) ACQUISITIONS.—Section 10(e)(1) of the Home Owners' Loan Act (12 U.S.C. 1467a(e)(1)) is amended—

(1) in subparagraph (A)(iii)(VII), by inserting "or" at the end;

(2) in subparagraph (A)(iv), by inserting "and" at the end; and

(3) in subparagraph (B)—

(A) by striking "or (ii)" and inserting "(ii)"; and

(B) by inserting before the first period ", or (iii) acquired by a bank holding company that is registered under, and subject to, the Bank Holding Company Act of 1956, or any company controlled by such bank holding company".

<< 12 USCA § 1843 >>

(d) AMENDMENTS TO THE BANK HOLDING COMPANY ACT OF 1956.—Section 4(i) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(i)) is amended by adding at the end the following new paragraphs:

"(4) SOLICITATION OF VIEWS.—

"(A) NOTICE TO DIRECTOR.—Upon receiving any application or notice by a bank holding company to acquire, directly or indirectly, a savings association under subsection (c)(8), the Board shall solicit comments and recommendations from the Director with respect to such acquisition.

"(B) COMMENT PERIOD.—The comments and recommendations of the Director under subparagraph (A) with respect to any acquisition subject to such subparagraph shall be transmitted to the Board not later than 30 days after the receipt by the Director of the notice relating to such acquisition (or such shorter period as the Board may specify if the Board advises the Director that an emergency exists that requires expeditious action).

"(5) EXAMINATION.—

"(A) SCOPE.—The Board shall consult with the Director, as appropriate, in establishing the scope of an examination by the Board of a bank holding company that directly or indirectly controls a savings association.

AR.03420

"(B) ACCESS TO INSPECTION REPORTS.—Upon the request of the Director, the Board shall furnish the Director with a copy of any inspection report, additional examination materials, or supervisory information relating to any bank holding company that directly or indirectly controls a savings association.

"(6) COORDINATION OF ENFORCEMENT EFFORTS.—The Board and the Director shall cooperate in any enforcement action against any bank holding company that controls a savings association, if the relevant conduct involves such association.

"(7) DIRECTOR DEFINED.—For purposes of this section, the term 'Director' means the Director of the Office of Thrift Supervision.".

<< 12 USCA § 36 >>

## SEC. 2204. ELIMINATION OF THE PER BRANCH CAPITAL REQUIREMENT FOR NATIONAL BANKS AND STATE MEMBER BANKS.

Section 5155(h) of the Revised Statutes of the United States (12 U.S.C. 36(h)) is amended to read as follows:

"(h) [Repealed]".

## SEC. 2205. ELIMINATION OF BRANCH APPLICATION REQUIREMENTS FOR AUTOMATIC TELLER MACHINES.

<< 12 USCA § 36 >>

(a) "BRANCH" UNDER NATIONAL BANK ACT.—Section 5155(j) of the Revised Statutes of the United States (12 U.S.C. 36(j)) is amended by adding at the end the following: "The term 'branch', as used in this section, does not include an automated teller machine or a remote service unit.".

<< 12 USCA § 1813 >>

(b) "DOMESTIC BRANCH" UNDER THE FEDERAL DEPOSIT INSURANCE ACT.—Section 3(o) of the Federal Deposit Insurance Act (12 U.S.C. 1813(o)) is amended by striking "lent; and the" and inserting "lent. The term 'domestic branch' does not include an automated teller machine or a remote service unit. The".

<< 12 USCA § 371d >>

## SEC. 2206. ELIMINATION OF REQUIREMENT FOR APPROVAL OF INVESTMENTS IN BANK PREMISES FOR WELL CAPITALIZED AND WELL MANAGED BANKS.

Section 24A of the Federal Reserve Act (12 U.S.C. 371d) is amended to read as follows:

"SEC. 24A. INVESTMENT IN BANK PREMISES OR STOCK OF CORPORATION HOLDING PREMISES.

"(a) CONDITIONS OF INVESTMENT.—No national bank or State member bank shall invest in bank premises, or in the stock, bonds, debentures, or other such obligations of any corporation holding the premises of such bank, or make loans to or upon the security of any such corporation—

"(1) unless the bank receives the prior approval of the Comptroller of the Currency (with respect to a national bank) or the Board (with respect to a State member bank);

"(2) unless the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation that is an affiliate of the bank, is less than or equal to the amount of the capital stock of such bank; or

"(3) unless—

"(A) the aggregate of all such investments and loans, together with the amount of any indebtedness incurred by any such corporation that is an affiliate of the bank, is less than or equal to 150 percent of the capital and surplus of the bank; and

"(B) the bank—

"(i) has a CAMEL composite rating of 1 or 2 under the Uniform Financial Institutions Rating System (or an equivalent rating under a comparable rating system) as of the most recent examination of such bank;

"(ii) is well capitalized and will continue to be well capitalized after the investment or loan; and

"(iii) provides notification to the Comptroller of the Currency (with respect to a national bank) or to the Board (with respect to a State member bank) not later than 30 days after making the investment or loan.

"(b) DEFINITIONS.—For purposes of this section—

"(1) the term 'affiliate' has the same meaning as in section 2 of the Banking Act of 1933; and

"(2) the term 'well capitalized' has the same meaning as in section 38(b) of the Federal Deposit Insurance Act.".

<< 12 USCA § 1841 >>

SEC. 2207. ELIMINATION OF APPROVAL REQUIREMENT FOR DIVESTITURES.

Section 2(g) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(g)) is amended—

(1) in paragraph (1), by adding "and" at the end;

(2) in paragraph (2), by striking "; and" and inserting a period; and

(3) by striking paragraph (3).

SEC. 2208. STREAMLINED NONBANKING ACQUISITIONS BY WELL CAPITALIZED AND WELL MANAGED BANKING ORGANIZATIONS.

<< 12 USCA § 1843 >>

(a) NOTICE REQUIREMENTS.—Section 4(j) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(j)) is amended—

(1) in paragraph (1)(A), by striking "No" and inserting "Except as provided in paragraph (3), no"; and

(2) by adding at the end the following new paragraphs:

"(3) NO NOTICE REQUIRED FOR CERTAIN TRANSACTIONS.—No notice under paragraph (1) of this subsection or under subsection (c)(8) or (a)(2)(B) is required for a proposal by a bank holding company to engage in any activity or acquire the shares or assets of any company, other than an insured depository institution, if the proposal qualifies under paragraph (4).

"(4) CRITERIA FOR STATUTORY APPROVAL.—A proposal qualifies under this paragraph if all of the following criteria are met:

"(A) FINANCIAL CRITERIA.—Both before and immediately after the proposed transaction—

"(i) the acquiring bank holding company is well capitalized;

"(ii) the lead insured depository institution of such holding company is well capitalized;

"(iii) well capitalized insured depository institutions control at least 80 percent of the aggregate total risk-weighted assets of insured depository institutions controlled by such holding company; and

"(iv) no insured depository institution controlled by such holding company is undercapitalized.

"(B) MANAGERIAL CRITERIA.—

"(i) WELL MANAGED.—At the time of the transaction, the acquiring bank holding company, its lead insured depository institution, and insured depository institutions that control at least 90 percent of the aggregate total risk-weighted assets of insured depository institutions controlled by such holding company are well managed.

"(ii) LIMITATION ON POORLY MANAGED INSTITUTIONS.—Except as provided in paragraph (6), no insured depository institution controlled by the acquiring bank holding company has received 1 of the 2 lowest composite ratings at the later of the institution's most recent examination or subsequent review.

"(C) ACTIVITIES PERMISSIBLE.—Following consummation of the proposal, the bank holding company engages directly or through a subsidiary solely in—

"(i) activities that are permissible under subsection (c)(8), as determined by the Board by regulation or order thereunder, subject to all of the restrictions, terms, and conditions of such subsection and such regulation or order; and

"(ii) such other activities as are otherwise permissible under this section, subject to the restrictions, terms and conditions, including any prior notice or approval requirements, provided in this section.

"(D) SIZE OF ACQUISITION.—

"(i) ASSET SIZE.—The book value of the total assets to be acquired does not exceed 10 percent of the consolidated total risk-weighted assets of the acquiring bank holding company.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(ii) CONSIDERATION.—The gross consideration to be paid for the securities or assets does not exceed 15 percent of the consolidated Tier 1 capital of the acquiring bank holding company.

"(E) NOTICE NOT OTHERWISE WARRANTED.—For proposals described in paragraph (5)(B), the Board has not, before the conclusion of the period provided in paragraph (5)(B), advised the bank holding company that a notice under paragraph (1) is required.

"(F) COMPLIANCE CRITERION.—During the 12–month period ending on the date on which the bank holding company proposes to commence an activity or acquisition, no administrative enforcement action has been commenced, and no cease and desist order has been issued pursuant to section 8 of the Federal Deposit Insurance Act, against the bank holding company or any depository institution subsidiary of the holding company, and no such enforcement action, order, or other administrative enforcement proceeding is pending as of such date.

"(5) NOTIFICATION.—

"(A) COMMENCEMENT OF ACTIVITIES APPROVED BY RULE.—A bank holding company that qualifies under paragraph (4) and that proposes to engage de novo, directly or through a subsidiary, in any activity that is permissible under subsection (c)(8), as determined by the Board by regulation, may commence that activity without prior notice to the Board and must provide written notification to the Board not later than 10 business days after commencing the activity.

"(B) ACTIVITIES PERMITTED BY ORDER AND ACQUISITIONS.—

"(i) IN GENERAL.—At least 12 business days before commencing any activity pursuant to paragraph (3) (other than an activity described in subparagraph (A) of this paragraph) or acquiring shares or assets of any company pursuant to paragraph (3), the bank holding company shall provide written notice of the proposal to the Board, unless the Board determines that no notice or a shorter notice period is appropriate.

"(ii) DESCRIPTION OF ACTIVITIES AND TERMS.—A notification under this subparagraph shall include a description of the proposed activities and the terms of any proposed acquisition.

"(6) RECENTLY ACQUIRED INSTITUTIONS.—Any insured depository institution which has been acquired by a bank holding company during the 12–month period preceding the date on which the company proposes to commence an activity or acquisition pursuant to paragraph (3) may be excluded for purposes of paragraph (4)(B)(ii) if—

"(A) the bank holding company has developed a plan for the institution to restore the capital and management of the institution which is acceptable to the appropriate Federal banking agency; and

"(B) all such insured depository institutions represent, in the aggregate, less than 10 percent of the aggregate total risk-weighted assets of all insured depository institutions controlled by the bank holding company.

"(7) ADJUSTMENT OF PERCENTAGES.—The Board may, by regulation, adjust the percentages and the manner in which the percentages of insured depository institutions are calculated under paragraph (4)(B)(i), (4)(D), or (6)(B) if the Board determines that any such adjustment is consistent with safety and soundness and the purposes of this Act.".

<< 12 USCA § 1841 >>

(b) DEFINITIONS.—Section 2(o) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(o)) is amended—

(1) by striking paragraph (1) and inserting the following new paragraph:

"(1) CAPITAL TERMS.—

"(A) INSURED DEPOSITORY INSTITUTIONS.—With respect to insured depository institutions, the terms 'well capitalized', 'adequately capitalized', and 'undercapitalized' have the same meanings as in section 38(b) of the Federal Deposit Insurance Act.

"(B) BANK HOLDING COMPANY.—

"(i) ADEQUATELY CAPITALIZED.—With respect to a bank holding company, the term 'adequately capitalized' means a level of capitalization which meets or exceeds all applicable Federal regulatory capital standards.

"(ii) WELL CAPITALIZED.—A bank holding company is 'well capitalized' if it meets the required capital levels for well capitalized bank holding companies established by the Board.

"(C) OTHER CAPITAL TERMS.—The terms 'Tier 1' and 'risk-weighted assets' have the meanings given those terms in the capital guidelines or regulations established by the Board for bank holding companies."; and

(2) by adding at the end the following new paragraphs:

"(8) LEAD INSURED DEPOSITORY INSTITUTIONS.—

"(A) IN GENERAL.—The term 'lead insured depository institution' means the largest insured depository institution controlled by the subject bank holding company at any time, based on a comparison of the average total risk-weighted assets controlled by each insured depository institution during the previous 12–month period.

"(B) BRANCH OR AGENCY.—For purposes of this paragraph and section 4(j)(4), the term 'insured depository institution' includes any branch or agency operated in the United States by a foreign bank.

"(9) WELL MANAGED.—The term 'well managed' means—

"(A) in the case of any company or depository institution which receives examinations, the achievement of—

"(i) a CAMEL composite rating of 1 or 2 (or an equivalent rating under an equivalent rating system) in connection with the most recent examination or subsequent review of such company or institution; and

"(ii) at least a satisfactory rating for management, if such rating is given; or

"(B) in the case of a company or depository institution that has not received an examination rating, the existence and use of managerial resources which the Board determines are satisfactory.".

<< 12 USCA § 1831i >>

SEC. 2209. ELIMINATION OF UNNECESSARY FILING FOR OFFICER AND DIRECTOR APPOINTMENTS.

Section 32 of the Federal Deposit Insurance Act (12 U.S.C. 1831i) is amended—

(1) in subsection (a)—

(A) by inserting "(or such other period, as determined by the appropriate Federal banking agency)" after "30 days";

(B) by striking "if the insured depository institution or depository institution holding company" and inserting "if";

(C) by striking paragraphs (1) and (2);

(D) by redesignating paragraph (3) as paragraph (1);

(E) in paragraph (1), as redesignated—

(i) by inserting "the insured depository institution or depository institution holding company" before "is not in compliance"; and

(ii) by striking the period at the end and inserting "; or"; and

(F) by adding at the end the following new paragraph:

"(2) the agency determines, in connection with the review by the agency of the plan required under section 38 or otherwise, that such prior notice is appropriate."; and

(2) in subsection (b), by striking "30–day period" and inserting "notice period, not to exceed 90 days,".

SEC. 2210. AMENDMENTS TO THE DEPOSITORY INSTITUTION MANAGEMENT INTERLOCKS ACT.

<< 12 USCA § 3203 >>

(a) DUAL SERVICE AMONG LARGER ORGANIZATIONS—Section 204 of the Depository Institution Management Interlocks Act (12 U.S.C. 3203) is amended—

(1) by striking "$1,000,000,000" and inserting "$2,500,000,000";

(2) by striking "$500,000,000" and inserting "$1,500,000,000"; and

(3) by adding at the end the following: "In order to allow for inflation or market changes, the appropriate Federal depository institutions regulatory agencies may, by regulation, adjust, as necessary, the amount of total assets required for depository institutions or depository holding companies under this section.".

<< 12 USCA § 3205 >>

(b) EXTENSION OF GRANDFATHER EXEMPTION.—Section 206 of the Depository Institution Management Interlocks Act (12 U.S.C. 3205) is amended—

(1) in subsection (a), by striking "for a period of, subject to the requirements of subsection (c), 20 years after the date of enactment of this title";

(2) in subsection (b), by striking the second sentence; and

AR.03424

(3) by striking subsection (c).

<< 12 USCA § 3207 >>

(c) REGULATIONS.—Section 209 of the Depository Institution Management Interlocks Act (12 U.S.C. 3207) is amended—
(1) in subsection (a)—
  (A) by striking "(a) IN GENERAL.—Rules and regulations" and inserting "Regulations";
  (B) by inserting ", including regulations that permit service by a management official that would otherwise be prohibited by section 203 or section 204, if such service would not result in a monopoly or substantial lessening of competition," after "title";
  (C) in paragraph (4)—
    (i) by striking "Federal Home Loan Bank Board" and inserting "Director of the Office of Thrift Supervision"; and
    (ii) by striking "Savings and Loan" and inserting "Deposit"; and
(2) by striking subsections (b) and (c).

<< 12 USCA § 375b >>

SEC. 2211. ELIMINATION OF RECORDKEEPING AND REPORTING REQUIREMENTS FOR OFFICERS.

(a) EMPLOYEE BENEFIT PLANS.—Section 22(h)(2) of the Federal Reserve Act (12 U.S.C. 375b(2)) is amended—
(1) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively, and indenting appropriately;
(2) by striking "(2) PREFERENTIAL TERMS PROHIBITED.—" and inserting the following:
"(2) PREFERENTIAL TERMS PROHIBITED.—
  "(A) IN GENERAL.—"; and
(3) by adding at the end the following new subparagraph:
  "(B) EXCEPTION.—Nothing in this paragraph shall prohibit any extension of credit made pursuant to a benefit or compensation program—
    "(i) that is widely available to employees of the member bank; and
    "(ii) that does not give preference to any officer, director, or principal shareholder of the member bank, or to any related interest of such person, over other employees of the member bank.".
(b) EXCEPTION FOR EXTENSIONS OF CREDIT TO EXECUTIVE OFFICERS AND DIRECTORS OF AFFILIATES.—Section 22(h)(8)(B) of the Federal Reserve Act (12 U.S.C. 375b(8)(B)) is amended to read as follows:
  "(B) EXCEPTION.—The Board may, by regulation, make exceptions to subparagraph (A) for any executive officer or director of a subsidiary of a company that controls the member bank if—
    "(i) the executive officer or director does not have authority to participate, and does not participate, in major policymaking functions of the member bank; and
    "(ii) the assets of such subsidiary do not exceed 10 percent of the consolidated assets of a company that controls the member bank and such subsidiary (and is not controlled by any other company).".

<< 12 USCA § 3337 >>

SEC. 2212. REPAYMENT OF TREASURY LOAN.

Section 1108 of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 3337) is amended by adding at the end the following new subsection.—
  "(c) REPAYMENT OF TREASURY LOAN.—Not later than September 30, 1998, the Appraisal Subcommittee shall repay to the Secretary of the Treasury the unpaid portion of the $5,000,000 paid to the Appraisal Subcommittee pursuant to this section.".

<< 12 USCA § 1831r–1 >>

SEC. 2213. BRANCH CLOSURES.

Section 42 of the Federal Deposit Insurance Act (12 U.S.C. 1831r–1) is amended by adding at the end the following new subsection:

"(e) SCOPE OF APPLICATION.—This section shall not apply with respect to—

"(1) an automated teller machine;

"(2) the relocation of a branch or consolidation of one or more branches into another branch, if the relocation or consolidation—

"(A) occurs within the immediate neighborhood; and

"(B) does not substantially affect the nature of the business or customers served; or

"(3) a branch that is closed in connection with—

"(A) an emergency acquisition under—

"(i) section 11(n); or

"(ii) subsection (f) or (k) of section 13; or

"(B) any assistance provided by the Corporation under section 13(c).".

<< 12 USCA § 3105 >>

SEC. 2214. FOREIGN BANKS.

(a) EXAMINATION OF BRANCHES AND AGENCIES BY BOARD.—Section 7(c) of the International Banking Act of 1978 (12 U.S.C. 3105(c)) is amended—

(1) by striking "(c)" and inserting the following:

"(c) FOREIGN BANK EXAMINATIONS AND REPORTING.—";

(2) in paragraph (1)(B), by adding at the end the following new clause:

"(iii) AVOIDANCE OF DUPLICATION.—In exercising its authority under this paragraph, the Board shall take all reasonable measures to reduce burden and avoid unnecessary duplication of examinations.";

(3) by striking subparagraph (C) of paragraph (1) and inserting the following:

"(C) ON–SITE EXAMINATION.—Each Federal branch or agency, and each State branch or agency, of a foreign bank shall be subject to on-site examination by an appropriate Federal banking agency or State bank supervisor as frequently as would a national bank or a State bank, respectively, by the appropriate Federal banking agency."; and

(4) in paragraph (1)(D), by inserting before the period at the end the following: ", only to the same extent that fees are collected by the Board for examination of any State member bank".

(b) ESTABLISHMENT OF FOREIGN BANK OFFICES IN THE UNITED STATES.—Section 7(d) of the International Banking Act of 1978 (12 U.S.C. 3105(d)) is amended—

(1) in paragraph (2), by striking "The Board" and inserting "Except as provided in paragraph (6), the Board";

(2) in paragraph (5), by striking "Consistent with the standards for approval in paragraph (2), the"; and inserting "The"; and

(3) by adding at the end the following new paragraphs:

"(6) EXCEPTION.—

"(A) IN GENERAL.—If the Board is unable to find, under paragraph (2), that a foreign bank is subject to comprehensive supervision or regulation on a consolidated basis by the appropriate authorities in its home country, the Board may nevertheless approve an application by such foreign bank under paragraph (1) if—

"(i) the appropriate authorities in the home country of the foreign bank are actively working to establish arrangements for the consolidated supervision of such bank; and

"(ii) all other factors are consistent with approval.

"(B) OTHER CONSIDERATIONS.—In deciding whether to use its discretion under subparagraph (A), the Board shall also consider whether the foreign bank has adopted and implements procedures to combat money laundering. The Board may also take into account whether the home country of the foreign bank is developing a legal regime to address money laundering or is participating in multilateral efforts to combat money laundering.

"(C) ADDITIONAL CONDITIONS.—In approving an application under this paragraph, the Board, after requesting and taking into consideration the views of the appropriate State bank supervisor or the Comptroller of the Currency, as the case may be, may impose such conditions or restrictions relating to the activities or business operations of the proposed branch, agency,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.03426

or commercial lending company subsidiary, including restrictions on sources of funding, as are considered appropriate. The Board shall coordinate with the appropriate State bank supervisor or the Comptroller of the Currency, as appropriate, in the implementation of such conditions or restrictions.

"(D) MODIFICATION OF CONDITIONS.—Any condition or restriction imposed by the Board in connection with the approval of an application under authority of this paragraph may be modified or withdrawn.

"(7) TIME PERIOD FOR BOARD ACTION.—

"(A) FINAL ACTION.—The Board shall take final action on any application under paragraph (1) not later than 180 days after receipt of the application, except that the Board may extend for an additional 180 days the period within which to take final action on such application after providing notice of, and the reasons for, the extension to the applicant foreign bank and any appropriate State bank supervisor or the Comptroller of the Currency, as appropriate.

"(B) FAILURE TO SUBMIT INFORMATION.—The Board may deny any application if it does not receive information requested from the applicant foreign bank or appropriate authorities in the home country of the foreign bank in sufficient time to permit the Board to evaluate such information adequately within the time periods for final action set forth in subparagraph (A).

"(C) WAIVER.—A foreign bank may waive the applicability of this paragraph with respect to any application under paragraph (1).".

(c) TERMINATION OF FOREIGN BANK OFFICES IN THE UNITED STATES.—Section 7(e)(1)(A) of the International Banking Act of 1978 (12 U.S.C. 3105(e)(1)(A)) is amended—

(1) by inserting "(i)" after "(A)";

(2) by striking "or" at the end and inserting "and"; and

(3) by adding at the end the following new clause:

"(ii) the appropriate authorities in the home country of the foreign bank are not making demonstrable progress in establishing arrangements for the comprehensive supervision or regulation of such foreign bank on a consolidated basis; or".

<< 12 USCA § 1843 >>

SEC. 2215. DISPOSITION OF FORECLOSED ASSETS.

Section 4(c)(2) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(2)) is amended—

(1) by striking "for not more than one year at a time"; and

(2) by striking "but no such extensions shall extend beyond a date five years" and inserting "and, in the case of a bank holding company which has not disposed of such shares within 5 years after the date on which such shares were acquired, the Board may, upon the application of such company, grant additional exemptions if, in the judgment of the Board, such extension would not be detrimental to the public interest and, either the bank holding company has made a good faith attempt to dispose of such shares during such 5–year period, or the disposal of such shares during such 5–year period would have been detrimental to the company, except that the aggregate duration of such extensions shall not extend beyond 10 years".

SEC. 2216. EXEMPTION AUTHORITY FOR ANTITYING PROVISION.

<< 12 USCA § 1972 >>

(a) FEDERAL RESERVE BOARD AUTHORITY.—Section 106(b)(1) of the Bank Holding Company Act Amendments of 1970 (12 U.S.C. 1972(1)) is amended in the last sentence, by inserting "and the prohibitions of section 4(f)(9) and 4(h)(2) of the Bank Holding Company Act of 1956" after "prohibition".

<< 12 USCA § 1464 >>

(b) OTS AUTHORITY.—Section 5(q) of the Home Owners' Loan Act (12 U.S.C. 1464(q)) is amended by adding at the end the following new paragraph:

"(6) EXCEPTIONS.—The Director may, by regulation or order, permit such exceptions to the prohibitions of this subsection as the Director considers will not be contrary to the purposes of this subsection and which conform to exceptions granted

by the Board of Governors of the Federal Reserve System pursuant to section 106(b) of the Bank Holding Company Act Amendments of 1970.".

<< 12 USCA § 1831a >>

SEC. 2217. FDIC APPROVAL OF NEW STATE BANK POWERS.

Section 24 of the Federal Deposit Insurance Act (12 U.S.C. 1831a) is amended—
  (1) in subsection (a)—
  (A) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and indenting appropriately;
  (B) by striking "IN GENERAL.—" and inserting the following: "PERMISSIBLE ACTIVITIES.—
  "(1) IN GENERAL.—"; and
  (C) by adding at the end the following new paragraph:
  "(2) PROCESSING PERIOD.—
  "(A) IN GENERAL.—The Corporation shall make a determination under paragraph (1)(A) not later than 60 days after receipt of a completed application that may be required under this subsection.
  "(B) EXTENSION OF TIME PERIOD.—The Corporation may extend the 60–day period referred to in subparagraph (A) for not more than 30 additional days, and shall notify the applicant of any such extension."; and
  (2) in subsection (d), by adding at the end the following new paragraph:
  "(3) PROCESSING PERIOD.—
  "(A) IN GENERAL.—The Corporation shall make a determination under paragraph (1)(A) not later than 60 days after receipt of a completed application that may be required under this subsection.
  "(B) EXTENSION OF TIME PERIOD.—The Corporation may extend the 60–day period referred to in subparagraph (A) for not more than 30 additional days, and shall notify the applicant of any such extension.".

CHAPTER 2—ELIMINATING UNNECESSARY REGULATORY BURDENS

<< 12 USCA § 1820 >>

SEC. 2221. SMALL BANK EXAMINATION CYCLE.

Section 10(d) of the Federal Deposit Insurance Act (12 U.S.C. 1820(d)) is amended—
  (1) by redesignating the second paragraph designated as paragraph (8) as paragraph (10), and by inserting that paragraph, as redesignated, immediately after paragraph (9); and
  (2) in paragraph (10), as redesignated, by striking "$175,000,000" and inserting "$250,000,000".

<< 12 USCA § 3311 >>

SEC. 2222. REQUIRED REVIEW OF REGULATIONS.

  (a) IN GENERAL.—Not less frequently than once every 10 years, the Council and each appropriate Federal banking agency represented on the Council shall conduct a review of all regulations prescribed by the Council or by any such appropriate Federal banking agency, respectively, in order to identify outdated or otherwise unnecessary regulatory requirements imposed on insured depository institutions.
  (b) PROCESS.—In conducting the review under subsection (a), the Council or the appropriate Federal banking agency shall—
  (1) categorize the regulations described in subsection (a) by type (such as consumer regulations, safety and soundness regulations, or such other designations as determined by the Council, or the appropriate Federal banking agency); and
  (2) at regular intervals, provide notice and solicit public comment on a particular category or categories of regulations, requesting commentators to identify areas of the regulations that are outdated, unnecessary, or unduly burdensome.
  (c) COMPLETE REVIEW.—The Council or the appropriate Federal banking agency shall ensure that the notice and comment period described in subsection (b)(2) is conducted with respect to all regulations described in subsection (a) not less frequently than once every 10 years.

(d) REGULATORY RESPONSE.—The Council or the appropriate Federal banking agency shall—

(1) publish in the Federal Register a summary of the comments received under this section, identifying significant issues raised and providing comment on such issues; and

(2) eliminate unnecessary regulations to the extent that such action is appropriate.

(e) REPORT TO CONGRESS.—Not later than 30 days after carrying out subsection (d)(1), the Council shall submit to the Congress a report, which shall include—

(1) a summary of any significant issues raised by public comments received by the Council and the appropriate Federal banking agencies under this section and the relative merits of such issues; and

(2) an analysis of whether the appropriate Federal banking agency involved is able to address the regulatory burdens associated with such issues by regulation, or whether such burdens must be addressed by legislative action.

SEC. 2223. REPEAL OF IDENTIFICATION OF NONBANK FINANCIAL INSTITUTION CUSTOMERS.

Subchapter II of chapter 53 of title 31, United States Code, is amended—

<< 31 USCA § 5327 >>

(1) by striking section 5327;

<< 31 USCA Ch. 53 >>

(2) in the chapter analysis, by striking the item relating to section 5327; and

<< 31 USCA § 5321 >>

(3) in section 5321(a), by striking paragraph (7).

SEC. 2224. REPEAL OF CERTAIN REPORTING REQUIREMENTS.

<< 12 USCA § 251 >>

(a) FDIA.—Section 477 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 251) is repealed.

<< 12 USCA § 1833 >>

(b) FIRREA.—Section 918 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 1833 note) is repealed.

<< 12 USCA § 3912 >>

(c) ILS.—Section 913 of the International Lending Supervision Act of 1983 (12 U.S.C. 3912) is repealed.

SEC. 2225. INCREASE IN HOME MORTGAGE DISCLOSURE EXEMPTION THRESHOLD.

<< 12 USCA § 2808 >>

(a) IN GENERAL.—Section 309 of the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2808) is amended—

(1) by striking "This title" and inserting "(a) IN GENERAL.—This title";

(2) in the 3d sentence, by inserting "(as determined without regard to the adjustment made by subsection (b))" before the period; and

(2) by adding at the end the following new subsection:

"(b) CPI ADJUSTMENTS.—

AR.03429

"(1) IN GENERAL.—Subject to paragraph (2), the dollar amount applicable with respect to institutions described in section 303(2)(A) under the 2d sentence of subsection (a) shall be adjusted annually after December 31, 1996, by the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers published by the Bureau of Labor Statistics.

"(2) 1–TIME ADJUSTMENT FOR PRIOR INFLATION.—The first adjustment made under paragraph (1) after the date of the enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996 shall be the percentage by which—

"(A) the Consumer Price Index described in such paragraph for the calendar year 1996, exceeds

"(B) such Consumer Price Index for the calendar year 1975.

"(3) ROUNDING.—The dollar amount applicable under paragraph (1) for any calendar year shall be the amount determined in accordance with subparagraphs (A) and (B) of paragraph (2) and rounded to the nearest multiple of $1,000,000.".

<< 12 USCA § 2803 >>

(b) OPPORTUNITY TO REDUCE COMPLIANCE BURDEN.—Section 304 of the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2803) is amended by adding at the end the following new subsection:

"(m) OPPORTUNITY TO REDUCE COMPLIANCE BURDEN.—

"(1) IN GENERAL.—

"(A) SATISFACTION OF PUBLIC AVAILABILITY REQUIREMENTS.—A depository institution shall be deemed to have satisfied the public availability requirements of subsection (a) if the institution compiles the information required under that subsection at the home office of the institution and provides notice at the branch locations specified in subsection (a) that such information is available from the home office of the institution upon written request.

"(B) PROVISION OF INFORMATION UPON REQUEST.—Not later than 15 days after the receipt of a written request for any information required to be compiled under subsection (a), the home office of the depository institution receiving the request shall provide the information pertinent to the location of the branch in question to the person requesting the information.

"(2) FORM OF INFORMATION.—In complying with paragraph (1), a depository institution shall, in the sole discretion of the institution, provide the person requesting the information with—

"(A) a paper copy of the information requested; or

"(B) if acceptable to the person, the information through a form of electronic medium, such as a computer disk.".

<< 21 USCA § 1817 >>

SEC. 2226. ELIMINATION OF STOCK LOAN REPORTING REQUIREMENT.

Section 7(j) of the Federal Deposit Insurance Act (12 U.S.C. 1817(j)) is amended—

(1) in paragraph (9)(A)—

(A) by striking "financial institution and any affiliate of any financial institution" and inserting "foreign bank, or any affiliate thereof,"; and

(B) by striking "by the financial institution and such institution's affiliates" and inserting "by the foreign bank or any affiliate thereof";

(2) in paragraph (9)(B)—

(A) by striking "paragraph—" and inserting "paragraph, the following definitions shall apply:";

(B) by striking clause (i) and inserting the following:

"(i) FOREIGN BANK.—The terms 'foreign bank' and 'affiliate' have the same meanings as in section 1 of the International Banking Act of 1978."; and

(C) in clause (iii), by striking "financial institution" and inserting "foreign bank or any affiliate thereof";

(3) in paragraph (9)(C)—

(A) by striking "financial institution or any of its affiliates" and inserting "foreign bank or any affiliate thereof"; and

(B) by striking "financial institution or its affiliates" and inserting "foreign bank or any affiliate thereof";

(4) in paragraph (9)(D)—

(A) in clause (i)—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(i) by striking "the financial institution and all affiliates of the institution" and inserting "the foreign bank and all affiliates thereof"; and

(ii) by striking "financial institution or any such affiliate" and inserting "foreign bank or affiliate thereof";

(B) in clause (ii), by striking "financial institution and any affiliate of such institution" and inserting "foreign bank and any affiliate thereof"; and

(C) in clause (iii), by striking "financial institution" and inserting "foreign bank or any affiliate thereof"; and

(5) in paragraph (9)(E)—

(A) in clause (i)—

(i) by striking "a financial institution and the affiliates of such institution" and inserting "a foreign bank or any affiliate thereof"; and

(ii) by striking "institution or affiliate" each place such term appears and inserting "foreign bank or any affiliate thereof"; and

(B) in clause (ii), by striking "financial institution and any affiliate of such institution" and inserting "foreign bank and any affiliate thereof".

<< 12 USCA § 252 >>

SEC. 2227. CREDIT AVAILABILITY ASSESSMENT.

(a) STUDY.—

(1) IN GENERAL.—Not later than 12 months after the date of enactment of this Act, and once every 60 months thereafter, the Board, in consultation with the Director of the Office of Thrift Supervision, the Comptroller of the Currency, the Board of Directors of the Corporation, the Administrator of the National Credit Union Administration, the Administrator of the Small Business Administration, and the Secretary of Commerce, shall conduct a study and submit a report to the Congress detailing the extent of small business lending by all creditors.

(2) CONTENTS OF STUDY.—The study required under paragraph (1) shall identify, to the extent practicable, those factors which provide policymakers with insights into the small business credit market, including—

(A) the demand for small business credit, including consideration of the impact of economic cycles on the levels of such demand;

(B) the availability of credit to small businesses;

(C) the range of credit options available to small businesses, such as those available from insured depository institutions and other providers of credit;

(D) the types of credit products used to finance small business operations, including the use of traditional loans, leases, lines of credit, home equity loans, credit cards, and other sources of financing;

(E) the credit needs of small businesses, including, if appropriate, the extent to which such needs differ, based upon product type, size of business, cash flow requirements, characteristics of ownership or investors, or other aspects of such business;

(F) the types of risks to creditors in providing credit to small businesses; and

(G) such other factors as the Board deems appropriate.

(b) USE OF EXISTING DATA.—The studies required by this section shall not increase the regulatory or paperwork burden on regulated financial institutions, other sources of small business credit, or small businesses.

CHAPTER 3—REGULATORY MICROMANAGEMENT RELIEF

<< 12 USCA § 72 >>

SEC. 2241. NATIONAL BANK DIRECTORS.

Section 5146 of the Revised Statutes of the United States (12 U.S.C. 72) is amended in the first sentence, by striking "except" and all that follows through the end of the sentence and inserting the following: "except that the Comptroller may, in the discretion of the Comptroller, waive the requirement of residency.".

<< 12 USCA § 4803 >>

SEC. 2242. PAPERWORK REDUCTION REVIEW.

 Section 303(a) of the Riegle Community Development and Regulatory Improvement Act of 1994 (12 U.S.C. 4803(a)) is amended—

   (1) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

   (2) by inserting after paragraph (1) the following new paragraph:

 "(2) review the extent to which existing regulations require insured depository institutions and insured credit unions to produce unnecessary internal written policies and eliminate such requirements, where appropriate;".

<< 12 USCA § 1812 >>

SEC. 2243. STATE BANK REPRESENTATION ON BOARD OF DIRECTORS OF THE FDIC.

 Section 2(a)(1)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1812(a)(1)(C)) is amended by inserting before the period ", 1 of whom shall have State bank supervisory experience".

<< 12 USCA § 1820 >>

SEC. 2244. CONSULTATION AMONG EXAMINERS.

 (a) IN GENERAL.—Section 10 of the Federal Deposit Insurance Act (12 U.S.C. 1820) is amended by adding at the end the following new subsection:

 "(j) CONSULTATION AMONG EXAMINERS.—

 "(1) IN GENERAL.—Each appropriate Federal banking agency shall take such action as may be necessary to ensure that examiners employed by the agency—

   "(A) consult on examination activities with respect to any depository institution; and

   "(B) achieve an agreement and resolve any inconsistencies in the recommendations to be given to such institution as a consequence of any examinations.

 "(2) EXAMINER–IN–CHARGE.—Each appropriate Federal banking agency shall consider appointing an examiner-in-charge with respect to a depository institution to ensure consultation on examination activities among all of the examiners of that agency involved in examinations of the institution.".

 (b) COORDINATED AND UNIFIED EXAMINATION FLEXIBILITY.—Section 10(d)(6)(B) of the Federal Deposit Insurance Act (12 U.S.C. 1820(d)(6)(B)) is amended by inserting "or State bank supervisors" after "one of the Federal agencies".

Subtitle C—Regulatory Impact on Cost of Credit and Credit Availability

<< 12 USCA § 1831m >>

SEC. 2301. AUDIT COSTS.

 (a) AUDITOR ATTESTATIONS.—Section 36 of the Federal Deposit Insurance Act (12 U.S.C. 1831m) is amended by striking subsection (e) and inserting the following:

 "(e) [Repealed]".

 (b) INDEPENDENT AUDIT COMMITTEES.—Section 36(g)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1831m(g)(1)) is amended—

   (1) in subparagraph (A), by inserting ", except as provided in subparagraph (D)" after "management of the institution"; and

   (2) by adding at the end the following new subparagraph:

   "(D) EXEMPTION AUTHORITY.—

     "(i) IN GENERAL.—An appropriate Federal banking agency may, by order or regulation, permit the independent audit committee of an insured depository institution to be made up of less than all, but no fewer than a majority of, outside directors, if the agency determines that the institution has encountered hardships in retaining and recruiting a sufficient number of competent outside directors to serve on the internal audit committee of the institution.

AR.03432

"(ii) FACTORS TO BE CONSIDERED.—In determining whether an insured depository institution has encountered hardships referred to in clause (i), the appropriate Federal banking agency shall consider factors such as the size of the institution, and whether the institution has made a good faith effort to elect or name additional competent outside directors to the board of directors of the institution who may serve on the internal audit committee.".

(c) PUBLIC AVAILABILITY.—Section 36(a)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1831m(a)(3)) is amended by adding at the end the following: "Notwithstanding the preceding sentence, the Corporation and the appropriate Federal banking agencies may designate certain information as privileged and confidential and not available to the public.".

SEC. 2302. INCENTIVES FOR SELF–TESTING.

(a) EQUAL CREDIT OPPORTUNITY.—

<< 15 USCA § 1691c–1 >>

(1) IN GENERAL.—The Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) is amended by inserting after section 704 the following new section:

"SEC. 704A. INCENTIVES FOR SELF–TESTING AND SELF–CORRECTION.

"(a) PRIVILEGED INFORMATION.—

"(1) CONDITIONS FOR PRIVILEGE.—A report or result of a self-test (as that term is defined by regulations of the Board) shall be considered to be privileged under paragraph (2) if a creditor—

"(A) conducts, or authorizes an independent third party to conduct, a self-test of any aspect of a credit transaction by a creditor, in order to determine the level or effectiveness of compliance with this title by the creditor; and

"(B) has identified any possible violation of this title by the creditor and has taken, or is taking, appropriate corrective action to address any such possible violation.

"(2) PRIVILEGED SELF–TEST.—If a creditor meets the conditions specified in subparagraphs (A) and (B) of paragraph (1) with respect to a self-test described in that paragraph, any report or results of that self-test—

"(A) shall be privileged; and

"(B) may not be obtained or used by any applicant, department, or agency in any—

"(i) proceeding or civil action in which one or more violations of this title are alleged; or

"(ii) examination or investigation relating to compliance with this title.

"(b) RESULTS OF SELF–TESTING.—

"(1) IN GENERAL.—No provision of this section may be construed to prevent an applicant, department, or agency from obtaining or using a report or results of any self-test in any proceeding or civil action in which a violation of this title is alleged, or in any examination or investigation of compliance with this title if—

"(A) the creditor or any person with lawful access to the report or results—

"(i) voluntarily releases or discloses all, or any part of, the report or results to the applicant, department, or agency, or to the general public; or

"(ii) refers to or describes the report or results as a defense to charges of violations of this title against the creditor to whom the self-test relates; or

"(B) the report or results are sought in conjunction with an adjudication or admission of a violation of this title for the sole purpose of determining an appropriate penalty or remedy.

"(2) DISCLOSURE FOR DETERMINATION OF PENALTY OR REMEDY.—Any report or results of a self-test that are disclosed for the purpose specified in paragraph (1)(B)—

"(A) shall be used only for the particular proceeding in which the adjudication or admission referred to in paragraph (1) (B) is made; and

"(B) may not be used in any other action or proceeding.

"(c) ADJUDICATION.—An applicant, department, or agency that challenges a privilege asserted under this section may seek a determination of the existence and application of that privilege in—

"(1) a court of competent jurisdiction; or

"(2) an administrative law proceeding with appropriate jurisdiction.".

<< 15 USCA § 1691c–1 NOTE >>

(2) REGULATIONS.—

  (A) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, in consultation with the Secretary of Housing and Urban Development and the agencies referred to in section 704 of the Equal Credit Opportunity Act, and after providing notice and an opportunity for public comment, the Board shall prescribe final regulations to implement section 704A of the Equal Credit Opportunity Act, as added by this section.

  (B) SELF–TEST.—

   (i) DEFINITION.—The regulations prescribed under subparagraph (A) shall include a definition of the term "self-test" for purposes of section 704A of the Equal Credit Opportunity Act, as added by this section.

   (ii) REQUIREMENT FOR SELF–TEST.—The regulations prescribed under subparagraph (A) shall specify that a self-test shall be sufficiently extensive to constitute a determination of the level and effectiveness of compliance by a creditor with the Equal Credit Opportunity Act.

   (iii) SUBSTANTIAL SIMILARITY TO CERTAIN FAIR HOUSING ACT REGULATIONS.—The regulations prescribed under subparagraph (A) shall be substantially similar to the regulations prescribed by the Secretary of Housing and Urban Development to carry out section 814A(d) of the Fair Housing Act, as added by this section.

  (3) CLERICAL AMENDMENT.—The table of sections for title VII of the Consumer Credit Protection Act is amended by inserting after the item relating to section 704 the following new item:

"704A. Incentives for self-testing and self-correction.".

 (b) FAIR HOUSING.—

<< 42 USCA § 3614–1 >>

  (1) IN GENERAL.—The Fair Housing Act (42 U.S.C. 3601 et seq.) is amended by inserting after section 814 the following new section:

"SEC. 814A. INCENTIVES FOR SELF–TESTING AND SELF–CORRECTION.

 "(a) PRIVILEGED INFORMATION.—

 "(1) CONDITIONS FOR PRIVILEGE.—A report or result of a self-test (as that term is defined by regulation of the Secretary) shall be considered to be privileged under paragraph (2) if any person—

   "(A) conducts, or authorizes an independent third party to conduct, a self-test of any aspect of a residential real estate related lending transaction of that person, or any part of that transaction, in order to determine the level or effectiveness of compliance with this title by that person; and

   "(B) has identified any possible violation of this title by that person and has taken, or is taking, appropriate corrective action to address any such possible violation.

  "(2) PRIVILEGED SELF–TEST.—If a person meets the conditions specified in subparagraphs (A) and (B) of paragraph (1) with respect to a self-test described in that paragraph, any report or results of that self-test—

   "(A) shall be privileged; and

   "(B) may not be obtained or used by any applicant, department, or agency in any—

    "(i) proceeding or civil action in which one or more violations of this title are alleged; or

    "(ii) examination or investigation relating to compliance with this title.

 "(b) RESULTS OF SELF–TESTING.—

  "(1) IN GENERAL.—No provision of this section may be construed to prevent an aggrieved person, complainant, department, or agency from obtaining or using a report or results of any self-test in any proceeding or civil action in which a violation of this title is alleged, or in any examination or investigation of compliance with this title if—

   "(A) the person to whom the self-test relates or any person with lawful access to the report or the results—

    "(i) voluntarily releases or discloses all, or any part of, the report or results to the aggrieved person, complainant, department, or agency, or to the general public; or

"(ii) refers to or describes the report or results as a defense to charges of violations of this title against the person to whom the self-test relates; or

"(B) the report or results are sought in conjunction with an adjudication or admission of a violation of this title for the sole purpose of determining an appropriate penalty or remedy.

"(2) DISCLOSURE FOR DETERMINATION OF PENALTY OR REMEDY.—Any report or results of a self-test that are disclosed for the purpose specified in paragraph (1)(B)—

"(A) shall be used only for the particular proceeding in which the adjudication or admission referred to in paragraph (1)(B) is made; and

"(B) may not be used in any other action or proceeding.

"(c) ADJUDICATION.—An aggrieved person, complainant, department, or agency that challenges a privilege asserted under this section may seek a determination of the existence and application of that privilege in—

"(1) a court of competent jurisdiction; or

"(2) an administrative law proceeding with appropriate jurisdiction.".

<< 42 USCA § 3614–1 NOTE >>

(2) REGULATIONS.—

(A) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, in consultation with the Board and after providing notice and an opportunity for public comment, the Secretary of Housing and Urban Development shall prescribe final regulations to implement section 814A of the Fair Housing Act, as added by this section.

(B) SELF–TEST.—

(i) DEFINITION.—The regulations prescribed by the Secretary under subparagraph (A) shall include a definition of the term "self-test" for purposes of section 814A of the Fair Housing Act, as added by this section.

(ii) REQUIREMENT FOR SELF–TEST.—The regulations prescribed by the Secretary under subparagraph (A) shall specify that a self-test shall be sufficiently extensive to constitute a determination of the level and effectiveness of the compliance by a person engaged in residential real estate related lending activities with the Fair Housing Act.

(iii) SUBSTANTIAL SIMILARITY TO CERTAIN EQUAL CREDIT OPPORTUNITY ACT REGULATIONS.—The regulations prescribed under subparagraph (A) shall be substantially similar to the regulations prescribed by the Board to carry out section 704A of the Equal Credit Opportunity Act, as added by this section.

<< 15 USCA § 1691c–1 NOTE >>

(c) APPLICABILITY.—

(1) IN GENERAL.—Except as provided in paragraph (2), the privilege provided for in section 704A of the Equal Credit Opportunity Act or section 814A of the Fair Housing Act (as those sections are added by this section) shall apply to a self-test (as that term is defined pursuant to the regulations prescribed under subsection (a)(2) or (b)(2) of this section, as appropriate) conducted before, on, or after the effective date of the regulations prescribed under subsection (a)(2) or (b)(2), as appropriate.

(2) EXCEPTION.—The privilege referred to in paragraph (1) does not apply to such a self-test conducted before the effective date of the regulations prescribed under subsection (a) or (b), as appropriate, if—

(A) before that effective date, a complaint against the creditor or person engaged in residential real estate related lending activities (as the case may be) was—

(i) formally filed in any court of competent jurisdiction; or

(ii) the subject of an ongoing administrative law proceeding;

(B) in the case of section 704A of the Equal Credit Opportunity Act, the creditor has waived the privilege pursuant to subsection (b)(1)(A)(i) of that section; or

(C) in the case of section 814A of the Fair Housing Act, the person engaged in residential real estate related lending activities has waived the privilege pursuant to subsection (b)(1)(A)(i) of that section.

SEC. 2303. QUALIFIED THRIFT INVESTMENT AMENDMENTS.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 1464 >>

(a) CREDIT CARDS.—Section 5(b) of the Home Owners' Loan Act (12 U.S.C. 1464(b)) is amended—

(1) by striking paragraph (4); and

(2) by redesignating paragraph (5) as paragraph (4).

(b) LOANS OR INVESTMENTS WITHOUT PERCENTAGE OF ASSETS LIMITATION.—Section 5(c)(1) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(1)) is amended by adding at the end the following new subparagraphs:

"(T) CREDIT CARD LOANS.—Loans made through credit cards or credit card accounts.

"(U) EDUCATIONAL LOANS.—Loans made for the payment of educational expenses.".

(c) COMMERCIAL AND OTHER LOANS.—Section 5(c)(2)(A) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(2)(A)) is amended to read as follows:

"(A) COMMERCIAL AND OTHER LOANS.—Secured or unsecured loans for commercial, corporate, business, or agricultural purposes. The aggregate amount of loans made under this subparagraph may not exceed 20 percent of the total assets of the Federal savings association, and amounts in excess of 10 percent of such total assets may be used under this subparagraph only for small business loans, as that term is defined by the Director.".

(d) LOANS OR INVESTMENTS LIMITED TO 5 PERCENT OF ASSETS.—Section 5(c)(3) of the Home Owners' Loan Act (12 U.S.C. 1464(c)(3)) is amended—

(1) by striking subparagraph (A); and

(2) by redesignating subparagraphs (B), (C), and (D) as subparagraphs (A), (B), and (C), respectively.

<< 12 USCA § 1467a >>

(e) QUALIFIED THRIFT LENDER TEST.—Section 10(m)(1) of the Home Owners' Loan Act (12 U.S.C. 1467a(m)(1)) is amended—

(1) by redesignating subparagraph (B) as clause (ii);

(2) in subparagraph (A), by striking "(A) the savings" and inserting "(B)(i) the savings"; and

(3) by inserting after "if—" the following new subparagraph:

"(A) the savings association qualifies as a domestic building and loan association, as such term is defined in section 7701(a)(19) of the Internal Revenue Code of 1986; or".

<< 12 USCA § 1464 >>

(f) BRANCHING.—Section 5(r) of the Home Owners' Loan Act (12 U.S.C. 1464(r)) is amended—

(1) in paragraph (1)—

(A) in the first sentence—

(i) by inserting before the period ", or qualifies as a qualified thrift lender, as determined under section 10(m) of this Act"; and

(ii) by striking "(c)" and inserting "(C)"; and

(B) in the second sentence, by inserting before the period "or as a qualified thrift lender, as determined under section 10(m) of this Act, as applicable"; and

(2) in paragraph (2), by striking subparagraph (C) and inserting the following:

"(C) the law of the State where the branch is located, or is to be located, would permit establishment of the branch if the association was a savings association or savings bank chartered by the State in which its home office is located; or".

<< 12 USCA § 1467a >>

(g) DEFINITION.—Section 10(m)(4) of the Home Owners' Loan Act (12 U.S.C. 1467a(m)(4)) is amended—

(1) by striking "subsection—" and inserting "subsection, the following definitions shall apply:";

(2) in subparagraph (C)—

(A) in clause (ii), by adding at the end the following new subclause:

"(VII) Loans for educational purposes, loans to small businesses, and loans made through credit cards or credit card accounts."; and

(B) in clause (iii), by striking subclause (VI) and inserting the following:

"(VI) Loans for personal, family, or household purposes (other than loans for personal, family, or household purposes described in clause (ii)(VII))."; and

(3) by adding at the end the following new subparagraphs:

"(D) CREDIT CARD.—The Director shall issue such regulations as may be necessary to define the term 'credit card'.

"(E) SMALL BUSINESS.—The Director shall issue such regulations as may be necessary to define the term 'small business'.".

SEC. 2304. LIMITED PURPOSE BANKS.

<< 12 USCA § 1843 >>

(a) GROWTH CAP RELIEF.—Section 4(f)(3)(B) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(f)(3)(B)) is amended—

(1) in clause (ii), by adding "or" at the end;

(2) in clause (iii), by striking "; or" at the end and inserting a period; and

(3) by striking clause (iv).

<< 12 USCA § 1841 >>

(b) LIMITED PURPOSE BANK EXCEPTION.—Section 2(c)(2)(F) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(c)(2)(F)) is amended by inserting ", including an institution that accepts collateral for extensions of credit by holding deposits under $100,000, and by other means" after "An institution".

SEC. 2305. AMENDMENT TO FAIR DEBT COLLECTION PRACTICES ACT.

<< 15 USCA § 1692e >>

(a) IN GENERAL.—Section 807(11) of the Fair Debt Collection Practices Act (15 U.S.C. 1692e(11)) is amended to read as follows:

"(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.".

<< 15 USCA § 1692e NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 90 days after the date of enactment of this Act and shall apply to all communications made after that date of enactment.

<< 12 USCA § 1757 >>

SEC. 2306. INCREASE IN CERTAIN CREDIT UNION LOAN CEILINGS.

Section 107(5)(A) of the Federal Credit Union Act (12 U.S.C. 1757(5)(A)) is amended—

(1) in clause (iv), by striking "$10,000" and inserting "$20,000"; and

(2) in clause (v), by striking "$10,000" and inserting "$20,000".

<< 12 USCA § 618 >>

## SEC. 2307. BANK INVESTMENTS IN EDGE ACT AND AGREEMENT CORPORATIONS.

The 10th undesignated paragraph of section 25A of the Federal Reserve Act (12 U.S.C. 618) is amended by striking the last sentence and inserting the following: "Any national bank may invest in the stock of any corporation organized under this section. The aggregate amount of stock held by any national bank in all corporations engaged in business of the kind described in this section or section 25 shall not exceed an amount equal to 10 percent of the capital and surplus of such bank unless the Board determines that the investment of an additional amount by the bank would not be unsafe or unsound and, in any case, shall not exceed an amount equal to 20 percent of the capital and surplus of such bank.".

Subtitle D—Consumer Credit

CHAPTER 1—CREDIT REPORTING REFORM

<< 15 USCA § 1601 NOTE >>

## SEC. 2401. SHORT TITLE.

This chapter may be cited as the "Consumer Credit Reporting Reform Act of 1996".

<< 15 USCA § 1681a >>

## SEC. 2402. DEFINITIONS.

(a) ADVERSE ACTION.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(k) ADVERSE ACTION.—

"(1) ACTIONS INCLUDED.—The term 'adverse action'—

"(A) has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act; and

"(B) means—

"(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;

"(ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

"(iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D); and

"(iv) an action taken or determination that is—

"(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii); and

"(II) adverse to the interests of the consumer.

"(2) APPLICABLE FINDINGS, DECISIONS, COMMENTARY, AND ORDERS.—For purposes of any determination of whether an action is an adverse action under paragraph (1)(A), all appropriate final findings, decisions, commentary, and orders issued under section 701(d)(6) of the Equal Credit Opportunity Act by the Board of Governors of the Federal Reserve System or any court shall apply.".

(b) FIRM OFFER OF CREDIT OR INSURANCE.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(*l*) FIRM OFFER OF CREDIT OR INSURANCE.—The term 'firm offer of credit or insurance' means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:

"(1) The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established—

"(A) before selection of the consumer for the offer; and

"(B) for the purpose of determining whether to extend credit or insurance pursuant to the offer.

"(2) Verification—

"(A) that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

"(B) of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

"(3) The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was—

"(A) established before selection of the consumer for the offer of credit or insurance; and

"(B) disclosed to the consumer in the offer of credit or insurance.".

(c) CREDIT OR INSURANCE TRANSACTION THAT IS NOT INITIATED BY THE CONSUMER.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (b) of this section) is amended by adding at the end the following new subsection:

"(m) CREDIT OR INSURANCE TRANSACTION THAT IS NOT INITIATED BY THE CONSUMER.—The term 'credit or insurance transaction that is not initiated by the consumer' does not include the use of a consumer report by a person with which the consumer has an account or insurance policy, for purposes of—

"(1) reviewing the account or insurance policy; or

"(2) collecting the account.".

(d) STATE.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (c) of this section) is amended by adding at the end the following new subsection:

"(n) STATE.—The term 'State' means any State, the Commonwealth of Puerto Rico, the District of Columbia, and any territory or possession of the United States.".

(e) DEFINITION OF CONSUMER REPORT.—Section 603(d) of the Fair Credit Reporting Act (15 U.S.C. 1681a(d)) is amended—

(1) by striking "(d) The term" and inserting the following:

"(d) CONSUMER REPORT.—

"(1) IN GENERAL.—The term";

(2) by striking "for (1) credit" and inserting the following: "for—

"(A) credit";

(3) by striking "purposes, or (2)" and all that follows through "section 604." and inserting the following: "purposes;

"(B) employment purposes; or

"(C) any other purpose authorized under section 604."; and

(4) by striking the second sentence and inserting the following:

"(2) EXCLUSIONS.—The term 'consumer report' does not include—

"(A) any—

"(i) report containing information solely as to transactions or experiences between the consumer and the person making the report;

"(ii) communication of that information among persons related by common ownership or affiliated by corporate control; or

"(iii) any communication of other information among persons related by common ownership or affiliated by corporate control, if it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons and the consumer is given the opportunity, before the time that the information is initially communicated, to direct that such information not be communicated among such persons;

"(B) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device;

"(C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his or her decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures to the consumer required under section 615; or

"(D) a communication described in subsection (o).".

(f) EXCLUSION OF CERTAIN COMMUNICATIONS BY EMPLOYMENT AGENCIES FROM DEFINITION OF CONSUMER REPORT.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(o) EXCLUDED COMMUNICATIONS.—A communication is described in this subsection if it is a communication—

"(1) that, but for subsection (d)(2)(E), would be an investigative consumer report;

"(2) that is made to a prospective employer for the purpose of—

"(A) procuring an employee for the employer; or

"(B) procuring an opportunity for a natural person to work for the employer;

"(3) that is made by a person who regularly performs such procurement;

"(4) that is not used by any person for any purpose other than a purpose described in subparagraph (A) or (B) of paragraph (2); or

"(5) with respect to which—

"(A) the consumer who is the subject of the communication—

"(i) consents orally or in writing to the nature and scope of the communication, before the collection of any information for the purpose of making the communication;

"(ii) consents orally or in writing to the making of the communication to a prospective employer, before the making of the communication; and

"(iii) in the case of consent under clause (i) or (ii) given orally, is provided written confirmation of that consent by the person making the communication, not later than 3 business days after the receipt of the consent by that person;

"(B) the person who makes the communication does not, for the purpose of making the communication, make any inquiry that if made by a prospective employer of the consumer who is the subject of the communication would violate any applicable Federal or State equal employment opportunity law or regulation; and

"(C) the person who makes the communication—

"(i) discloses in writing to the consumer who is the subject of the communication, not later than 5 business days after receiving any request from the consumer for such disclosure, the nature and substance of all information in the consumer's file at the time of the request, except that the sources of any information that is acquired solely for use in making the communication and is actually used for no other purpose, need not be disclosed other than under appropriate discovery procedures in any court of competent jurisdiction in which an action is brought; and

"(ii) notifies the consumer who is the subject of the communication, in writing, of the consumer's right to request the information described in clause (i).".

(g) CONSUMER REPORTING AGENCY THAT COMPILES AND MAINTAINS FILES ON A NATIONWIDE BASIS.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) (as amended by subsection (f) of this section) is amended by adding at the end the following new subsection:

"(p) CONSUMER REPORTING AGENCY THAT COMPILES AND MAINTAINS FILES ON CONSUMERS ON A NATIONWIDE BASIS.—The term 'consumer reporting agency that compiles and maintains files on consumers on a nationwide basis' means a consumer reporting agency that regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity, each of the following regarding consumers residing nationwide:

"(1) Public record information.

"(2) Credit account information from persons who furnish that information regularly and in the ordinary course of business.".

<< 15 USCA § 1681b >>

SEC. 2403. FURNISHING CONSUMER REPORTS; USE FOR EMPLOYMENT PURPOSES.

(a) FURNISHING CONSUMER REPORTS FOR BUSINESS TRANSACTIONS.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended—

(1) by inserting "(a) IN GENERAL.—" before "A consumer reporting agency"; and

(2) in subsection (a)(3) (as so designated by paragraph (1) of this subsection), by striking subparagraph (E) and inserting the following:

"(E) intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

"(F) otherwise has a legitimate business need for the information—

"(i) in connection with a business transaction that is initiated by the consumer; or

"(ii) to review an account to determine whether the consumer continues to meet the terms of the account.".

(b) FURNISHING AND USING CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended by adding at the end the following new subsection:

"(b) CONDITIONS FOR FURNISHING AND USING CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.—

"(1) CERTIFICATION FROM USER.—A consumer reporting agency may furnish a consumer report for employment purposes only if—

"(A) the person who obtains such report from the agency certifies to the agency that—

"(i) the person has complied with paragraph (2) with respect to the consumer report, and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable; and

"(ii) information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation; and

"(B) the consumer reporting agency provides with the report a summary of the consumer's rights under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).

"(2) DISCLOSURE TO CONSUMER.—A person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—

"(A) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and

"(B) the consumer has authorized in writing the procurement of the report by that person.

"(3) CONDITIONS ON USE FOR ADVERSE ACTIONS.—In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—

"(A) a copy of the report; and

"(B) a description in writing of the rights of the consumer under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).".

SEC. 2404. USE OF CONSUMER REPORTS FOR PRESCREENING; PROHIBITION ON UNAUTHORIZED OR UNCERTIFIED USE OF INFORMATION.

<< 15 USCA § 1681b >>

(a) IN GENERAL.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) (as amended by section 2403 of this chapter) is amended—

(1) in subsection (a), by striking "A consumer reporting agency" and inserting "Subject to subsections (c), any consumer reporting agency"; and

(2) by adding at the end the following new subsections:

"(c) FURNISHING REPORTS IN CONNECTION WITH CREDIT OR INSURANCE TRANSACTIONS THAT ARE NOT INITIATED BY THE CONSUMER.—

"(1) IN GENERAL.—A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) in connection with any credit or insurance transaction that is not initiated by the consumer only if—

"(A) the consumer authorizes the agency to provide such report to such person; or

"(B)(i) the transaction consists of a firm offer of credit or insurance;

"(ii) the consumer reporting agency has complied with subsection (e); and

"(iii) there is not in effect an election by the consumer, made in accordance with subsection (e), to have the consumer's name and address excluded from lists of names provided by the agency pursuant to this paragraph.

"(2) LIMITS ON INFORMATION RECEIVED UNDER PARAGRAPH (1)(B).—A person may receive pursuant to paragraph (1)(B) only—

"(A) the name and address of a consumer;

"(B) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer; and

"(C) other information pertaining to a consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity.

"(3) INFORMATION REGARDING INQUIRIES.—Except as provided in section 609(a)(5), a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer.

"(d) Reserved

"(e) ELECTION OF CONSUMER TO BE EXCLUDED FROM LISTS.—

"(1) IN GENERAL.—A consumer may elect to have the consumer's name and address excluded from any list provided by a consumer reporting agency under subsection (c)(1)(B) in connection with a credit or insurance transaction that is not initiated by the consumer, by notifying the agency in accordance with paragraph (2) that the consumer does not consent to any use of a consumer report relating to the consumer in connection with any credit or insurance transaction that is not initiated by the consumer.

"(2) MANNER OF NOTIFICATION.—A consumer shall notify a consumer reporting agency under paragraph (1)—

"(A) through the notification system maintained by the agency under paragraph (5); or

"(B) by submitting to the agency a signed notice of election form issued by the agency for purposes of this subparagraph.

"(3) RESPONSE OF AGENCY AFTER NOTIFICATION THROUGH SYSTEM.—Upon receipt of notification of the election of a consumer under paragraph (1) through the notification system maintained by the agency under paragraph (5), a consumer reporting agency shall—

"(A) inform the consumer that the election is effective only for the 2–year period following the election if the consumer does not submit to the agency a signed notice of election form issued by the agency for purposes of paragraph (2)(B); and

"(B) provide to the consumer a notice of election form, if requested by the consumer, not later than 5 business days after receipt of the notification of the election through the system established under paragraph (5), in the case of a request made at the time the consumer provides notification through the system.

"(4) EFFECTIVENESS OF ELECTION.—An election of a consumer under paragraph (1)—

"(A) shall be effective with respect to a consumer reporting agency beginning 5 business days after the date on which the consumer notifies the agency in accordance with paragraph (2);

"(B) shall be effective with respect to a consumer reporting agency—

"(i) subject to subparagraph (C), during the 2–year period beginning 5 business days after the date on which the consumer notifies the agency of the election, in the case of an election for which a consumer notifies the agency only in accordance with paragraph (2)(A); or

"(ii) until the consumer notifies the agency under subparagraph (C), in the case of an election for which a consumer notifies the agency in accordance with paragraph (2)(B);

"(C) shall not be effective after the date on which the consumer notifies the agency, through the notification system established by the agency under paragraph (5), that the election is no longer effective; and

"(D) shall be effective with respect to each affiliate of the agency.

"(5) NOTIFICATION SYSTEM.—

"(A) IN GENERAL.—Each consumer reporting agency that, under subsection (c)(1)(B), furnishes a consumer report in connection with a credit or insurance transaction that is not initiated by a consumer, shall—

"(i) establish and maintain a notification system, including a toll-free telephone number, which permits any consumer whose consumer report is maintained by the agency to notify the agency, with appropriate identification, of the consumer's election to have the consumer's name and address excluded from any such list of names and addresses provided by the agency for such a transaction; and

AR.03442

310

"(ii) publish by not later than 365 days after the date of enactment of the Consumer Credit Reporting Reform Act of 1996, and not less than annually thereafter, in a publication of general circulation in the area served by the agency—

"(I) a notification that information in consumer files maintained by the agency may be used in connection with such transactions; and

"(II) the address and toll-free telephone number for consumers to use to notify the agency of the consumer's election under clause (i).

"(B) ESTABLISHMENT AND MAINTENANCE AS COMPLIANCE.—Establishment and maintenance of a notification system (including a toll-free telephone number) and publication by a consumer reporting agency on the agency's own behalf and on behalf of any of its affiliates in accordance with this paragraph is deemed to be compliance with this paragraph by each of those affiliates.

"(6) NOTIFICATION SYSTEM BY AGENCIES THAT OPERATE NATIONWIDE.—Each consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall establish and maintain a notification system for purposes of paragraph (5) jointly with other such consumer reporting agencies.".

(b) USE OF INFORMATION OBTAINED FROM REPORTS.—Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(f) CERTAIN USE OR OBTAINING OF INFORMATION PROHIBITED.—A person shall not use or obtain a consumer report for any purpose unless—

"(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

"(2) the purpose is certified in accordance with section 607 by a prospective user of the report through a general or specific certification.".

<< 15 USCA § 1681b NOTE >>

(c) FTC GUIDELINES REGARDING PRESCREENING FOR INSURANCE TRANSACTIONS.—The Federal Trade Commission may issue such guidelines as it deems necessary with respect to the use of consumer reports in connection with insurance transactions that are not initiated by the consumer pursuant to section 604(c) of the Fair Credit Reporting Act, as added by subsection (a) of this section.

<< 15 USCA § 1681b >>

SEC. 2405. CONSUMER CONSENT REQUIRED TO FURNISH CONSUMER REPORT CONTAINING MEDICAL INFORMATION.

Section 604 of the Fair Credit Reporting Act (15 U.S.C. 1681b) is amended by adding at the end the following new subsection:

"(g) FURNISHING REPORTS CONTAINING MEDICAL INFORMATION.—A consumer reporting agency shall not furnish for employment purposes, or in connection with a credit or insurance transaction or a direct marketing transaction, a consumer report that contains medical information about a consumer, unless the consumer consents to the furnishing of the report.".

SEC. 2406. OBSOLETE INFORMATION AND INFORMATION CONTAINED IN CONSUMER REPORTS.

<< 15 USCA § 1681c >>

(a) AMENDMENT TO LARGE–DOLLAR EXCEPTION.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended—

(1) by inserting "INFORMATION EXCLUDED FROM CONSUMER REPORTS.—" after "(a)";

(2) in subsection (b)—

(A) in paragraph (1), by striking "$50,000" and inserting "$150,000";

(B) in paragraph (2), by striking "$50,000" and inserting "$150,000"; and

(C) in paragraph (3), by striking "$20,000" and inserting "$75,000".

(b) CLARIFICATION OF REPORTING PERIOD.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) (as amended by subsection (a) of this section) is amended by adding at the end the following new subsection:

"(c) RUNNING OF REPORTING PERIOD.—

"(1) IN GENERAL.—The 7–year period referred to in paragraphs (4) and (6) of subsection (a) shall begin, with respect to any delinquent account that is placed for collection (internally or by referral to a third party, whichever is earlier), charged to profit and loss, or subjected to any similar action, upon the expiration of the 180–day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit and loss, or similar action.

"(2) EFFECTIVE DATE.—Paragraph (1) shall apply only to items of information added to the file of a consumer on or after the date that is 455 days after the date of enactment of the Consumer Credit Reporting Reform Act of 1996.".

(c) ADDITIONAL INFORMATION ON BANKRUPTCY FILINGS REQUIRED.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended by adding at the end the following new subsection:

"(d) INFORMATION REQUIRED TO BE DISCLOSED.—Any consumer reporting agency that furnishes a consumer report that contains information regarding any case involving the consumer that arises under title 11, United States Code, shall include in the report an identification of the chapter of such title 11 under which such case arises if provided by the source of the information. If any case arising or filed under title 11, United States Code, is withdrawn by the consumer before a final judgment, the consumer reporting agency shall include in the report that such case or filing was withdrawn upon receipt of documentation certifying such withdrawal.".

(d) INDICATION OF CLOSURE OF ACCOUNT; INDICATION OF DISPUTE BY CONSUMER.—Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended by adding at the end the following new subsections:

"(e) INDICATION OF CLOSURE OF ACCOUNT BY CONSUMER.—If a consumer reporting agency is notified pursuant to section 623(a)(4) that a credit account of a consumer was voluntarily closed by the consumer, the agency shall indicate that fact in any consumer report that includes information related to the account.

"(f) INDICATION OF DISPUTE BY CONSUMER.—If a consumer reporting agency is notified pursuant to section 623(a)(3) that information regarding a consumer who was furnished to the agency is disputed by the consumer, the agency shall indicate that fact in each consumer report that includes the disputed information.".

(e) CONFORMING AMENDMENTS.—

(1) Section 605 of the Fair Credit Reporting Act (15 U.S.C. 1681c) is amended in the section heading, by striking "OBSOLETE INFORMATION" and inserting "REQUIREMENTS RELATING TO INFORMATION CONTAINED IN CONSUMER REPORTS".

(2) The table of sections for the Fair Credit Reporting Act (15 U.S.C. 1681a et seq.) is amended by striking the item relating to section 605 and inserting the following:

"605. Requirements relating to information contained in consumer reports.".

<< 15 USCA § 1681e >>

SEC. 2407. COMPLIANCE PROCEDURES.

(a) DISCLOSURE OF CONSUMER REPORTS BY USERS.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding at the end the following new subsection:

"(c) DISCLOSURE OF CONSUMER REPORTS BY USERS ALLOWED.—A consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report.".

(b) NOTICE TO USERS AND PROVIDERS OF INFORMATION TO ENSURE COMPLIANCE.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding after subsection (c) (as added by subsection (a) of this section) the following new subsection:

"(d) NOTICE TO USERS AND FURNISHERS OF INFORMATION.—

"(1) NOTICE REQUIREMENT.—A consumer reporting agency shall provide to any person—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) who regularly and in the ordinary course of business furnishes information to the agency with respect to any consumer; or

"(B) to whom a consumer report is provided by the agency;

a notice of such person's responsibilities under this title.

"(2) CONTENT OF NOTICE.—The Federal Trade Commission shall prescribe the content of notices under paragraph (1), and a consumer reporting agency shall be in compliance with this subsection if it provides a notice under paragraph (1) that is substantially similar to the Federal Trade Commission prescription under this paragraph.".

(c) RECORD OF IDENTITY OF USERS AND PURPOSES CERTIFIED BY USERS OF REPORTS.—Section 607 of the Fair Credit Reporting Act (15 U.S.C. 1681e) is amended by adding after subsection (d) (as added by subsection (b) of this section) the following new subsection:

"(e) PROCUREMENT OF CONSUMER REPORT FOR RESALE.—

"(1) DISCLOSURE.—A person may not procure a consumer report for purposes of reselling the report (or any information in the report) unless the person discloses to the consumer reporting agency that originally furnishes the report—

"(A) the identity of the end-user of the report (or information); and

"(B) each permissible purpose under section 604 for which the report is furnished to the end-user of the report (or information).

"(2) RESPONSIBILITIES OF PROCURERS FOR RESALE.—A person who procures a consumer report for purposes of reselling the report (or any information in the report) shall—

"(A) establish and comply with reasonable procedures designed to ensure that the report (or information) is resold by the person only for a purpose for which the report may be furnished under section 604, including by requiring that each person to which the report (or information) is resold and that resells or provides the report (or information) to any other person—

"(i) identifies each end user of the resold report (or information);

"(ii) certifies each purpose for which the report (or information) will be used; and

"(iii) certifies that the report (or information) will be used for no other purpose; and

"(B) before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).".

SEC. 2408. CONSUMER DISCLOSURES.

<< 15 USCA § 1681g >>

(a) ALL INFORMATION IN CONSUMER'S FILE REQUIRED TO BE DISCLOSED.—Section 609(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)(1)) is amended to read as follows:

"(1) All information in the consumer's file at the time of the request, except that nothing in this paragraph shall be construed to require a consumer reporting agency to disclose to a consumer any information concerning credit scores or any other risk scores or predictors relating to the consumer.".

(b) MORE INFORMATION CONCERNING RECIPIENTS OF REPORTS REQUIRED.—Section 609(a)(3) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)) is amended to read as follows:

"(3)(A) Identification of each person (including each end-user identified under section 607(e)(1)) that procured a consumer report—

"(i) for employment purposes, during the 2–year period preceding the date on which the request is made; or

"(ii) for any other purpose, during the 1–year period preceding the date on which the request is made.

"(B) An identification of a person under subparagraph (A) shall include—

"(i) the name of the person or, if applicable, the trade name (written in full) under which such person conducts business; and

"(ii) upon request of the consumer, the address and telephone number of the person.".

(c) INFORMATION REGARDING INQUIRIES.—Section 609(a) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)) is amended by adding at the end the following new paragraph:

"(5) A record of all inquiries received by the agency during the 1–year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer.".

AR.03445
313

(d) SUMMARY OF RIGHTS REQUIRED TO BE INCLUDED WITH DISCLOSURE.—

(1) IN GENERAL.—Section 609 of the Fair Credit Reporting Act (15 U.S.C. 1681g) is amended by adding at the end the following new subsection:

"(c) SUMMARY OF RIGHTS REQUIRED TO BE INCLUDED WITH DISCLOSURE.—

"(1) SUMMARY OF RIGHTS.—A consumer reporting agency shall provide to a consumer, with each written disclosure by the agency to the consumer under this section—

"(A) a written summary of all of the rights that the consumer has under this title; and

"(B) in the case of a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, a toll-free telephone number established by the agency, at which personnel are accessible to consumers during normal business hours.

"(2) SPECIFIC ITEMS REQUIRED TO BE INCLUDED.—The summary of rights required under paragraph (1) shall include—

"(A) a brief description of this title and all rights of consumers under this title;

"(B) an explanation of how the consumer may exercise the rights of the consumer under this title;

"(C) a list of all Federal agencies responsible for enforcing any provision of this title and the address and any appropriate phone number of each such agency, in a form that will assist the consumer in selecting the appropriate agency;

"(D) a statement that the consumer may have additional rights under State law and that the consumer may wish to contact a State or local consumer protection agency or a State attorney general to learn of those rights; and

"(E) a statement that a consumer reporting agency is not required to remove accurate derogatory information from a consumer's file, unless the information is outdated under section 605 or cannot be verified.

"(3) FORM OF SUMMARY OF RIGHTS.—For purposes of this subsection and any disclosure by a consumer reporting agency required under this title with respect to consumers' rights, the Federal Trade Commission (after consultation with each Federal agency referred to in section 621(b)) shall prescribe the form and content of any such disclosure of the rights of consumers required under this title. A consumer reporting agency shall be in compliance with this subsection if it provides disclosures under paragraph (1) that are substantially similar to the Federal Trade Commission prescription under this paragraph.

"(4) EFFECTIVENESS.—No disclosures shall be required under this subsection until the date on which the Federal Trade Commission prescribes the form and content of such disclosures under paragraph (3).".

<< 15 USCA § 1681d >>

(2) TECHNICAL AMENDMENT.—Section 606(a)(1)(B) of the Fair Credit Reporting Act (15 U.S.C. 1681d(a)(1)(B)) is amended by inserting "and the written summary of the rights of the consumer prepared pursuant to section 609(c)" before the semicolon.

(e) FORM OF DISCLOSURES.—

<< 15 USCA § 1681h >>

(1) IN GENERAL.—Subsections (a) and (b) of section 610 of the Fair Credit Reporting Act (15 U.S.C. 1681h) are amended to read as follows:

"(a) IN GENERAL.—

"(1) PROPER IDENTIFICATION.—A consumer reporting agency shall require, as a condition of making the disclosures required under section 609, that the consumer furnish proper identification.

"(2) DISCLOSURE IN WRITING.—Except as provided in subsection (b), the disclosures required to be made under section 609 shall be provided under that section in writing.

"(b) OTHER FORMS OF DISCLOSURE.—

"(1) IN GENERAL.—If authorized by a consumer, a consumer reporting agency may make the disclosures required under 609—

"(A) other than in writing; and

"(B) in such form as may be—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(i) specified by the consumer in accordance with paragraph (2); and

"(ii) available from the agency.

"(2) FORM.—A consumer may specify pursuant to paragraph (1) that disclosures under section 609 shall be made—

"(A) in person, upon the appearance of the consumer at the place of business of the consumer reporting agency where disclosures are regularly provided, during normal business hours, and on reasonable notice;

"(B) by telephone, if the consumer has made a written request for disclosure by telephone;

"(C) by electronic means, if available from the agency; or

"(D) by any other reasonable means that is available from the agency.".

<< 15 USCA § 1681g NOTE >>

(2) SIMPLIFIED DISCLOSURE.—Not later than 90 days after the date of enactment of this Act, each consumer reporting agency shall develop a form on which such consumer reporting agency shall make the disclosures required under section 609(a) of the Fair Credit Reporting Act, for the purpose of maximizing the comprehensibility and standardization of such disclosures.

(3) GOALS.—The Federal Trade Commission shall take appropriate action to assure that the goals of comprehensibility and standardization are achieved in accordance with paragraph (2).

<< 15 USCA § 1681h >>

(4) DEFAMATION.—Section 610(e) of the Fair Credit Reporting Act (15 U.S.C. 1681h(e)) is amended by inserting "or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report" before "except".

(5) CONFORMING AMENDMENTS.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

<< 15 USCA § 1681g >>

(A) in section 609(a), in the matter preceding paragraph (1), by striking "and proper identification of any consumer" and inserting ", and subject to section 610(a)(1)";

<< 15 USCA § 1681h >>

(B) in section 610, in the section heading, by inserting "AND FORM" after "CONDITIONS"; and

(C) in the table of sections at the beginning of that Act, in the item relating to section 610, by inserting "and form" after "conditions".

<< 15 USCA § 1681i >>

SEC. 2409. PROCEDURES IN CASE OF THE DISPUTED ACCURACY OF ANY INFORMATION IN A CONSUMER'S FILE.

(a) IN GENERAL.—Section 611(a) of the Fair Credit Reporting Act (15 U.S.C. 1681i(a)) is amended to read as follows:

"(a) REINVESTIGATIONS OF DISPUTED INFORMATION.—

"(1) REINVESTIGATION REQUIRED.—

"(A) IN GENERAL.—If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

"(B) EXTENSION OF PERIOD TO REINVESTIGATE.—Except as provided in subparagraph (C), the 30–day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30–day period that is relevant to the reinvestigation.

"(C) LIMITATIONS ON EXTENSION OF PERIOD TO REINVESTIGATE.—Subparagraph (B) shall not apply to any reinvestigation in which, during the 30–day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

"(2) PROMPT NOTICE OF DISPUTE TO FURNISHER OF INFORMATION.—

"(A) IN GENERAL.—Before the expiration of the 5–business–day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

"(B) PROVISION OF OTHER INFORMATION FROM CONSUMER.—The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

"(3) DETERMINATION THAT DISPUTE IS FRIVOLOUS OR IRRELEVANT.—

"(A) IN GENERAL.—Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

"(B) NOTICE OF DETERMINATION.—Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

"(C) CONTENTS OF NOTICE.—A notice under subparagraph (B) shall include—

"(i) the reasons for the determination under subparagraph (A); and

"(ii) identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

"(4) CONSIDERATION OF CONSUMER INFORMATION.—In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

"(5) TREATMENT OF INACCURATE OR UNVERIFIABLE INFORMATION.—

"(A) IN GENERAL.—If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation.

"(B) REQUIREMENTS RELATING TO REINSERTION OF PREVIOUSLY DELETED MATERIAL.—

"(i) CERTIFICATION OF ACCURACY OF INFORMATION.—If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

"(ii) NOTICE TO CONSUMER.—If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

"(iii) ADDITIONAL INFORMATION.—As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion—

"(I) a statement that the disputed information has been reinserted;

"(II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

AR.03448

316

"(III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

"(C) PROCEDURES TO PREVENT REAPPEARANCE.—A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).

"(D) AUTOMATED REINVESTIGATION SYSTEM.—Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

"(6) NOTICE OF RESULTS OF REINVESTIGATION.—

"(A) IN GENERAL.—A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.

"(B) CONTENTS.—As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5–day period referred to in subparagraph (A)—

"(i) a statement that the reinvestigation is completed;

"(ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

"(iii) a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

"(iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

"(v) a notice that the consumer has the right to request under subsection (d) that the consumer reporting agency furnish notifications under that subsection.

"(7) DESCRIPTION OF REINVESTIGATION PROCEDURE.—A consumer reporting agency shall provide to a consumer a description referred to in paragraph (6)(B)(iv) by not later than 15 days after receiving a request from the consumer for that description.

"(8) EXPEDITED DISPUTE RESOLUTION.—If a dispute regarding an item of information in a consumer's file at a consumer reporting agency is resolved in accordance with paragraph (5)(A) by the deletion of the disputed information by not later than 3 business days after the date on which the agency receives notice of the dispute from the consumer in accordance with paragraph (1)(A), then the agency shall not be required to comply with paragraphs (2), (6), and (7) with respect to that dispute if the agency—

"(A) provides prompt notice of the deletion to the consumer by telephone;

"(B) includes in that notice, or in a written notice that accompanies a confirmation and consumer report provided in accordance with subparagraph (C), a statement of the consumer's right to request under subsection (d) that the agency furnish notifications under that subsection; and

"(C) provides written confirmation of the deletion and a copy of a consumer report on the consumer that is based on the consumer's file after the deletion, not later than 5 business days after making the deletion.".

(b) CONFORMING AMENDMENT.—Section 611(d) of the Fair Credit Reporting Act (15 U.S.C. 1681i(d)) is amended by striking "The consumer reporting agency shall clearly" and all that follows through the end of the subsection.

<< 15 USCA § 1681j >>

SEC. 2410. CHARGES FOR CERTAIN DISCLOSURES.

Section 612 of the Fair Credit Reporting Act (15 U.S.C. 1681j) is amended to read as follows:

"SEC. 612. CHARGES FOR CERTAIN DISCLOSURES.

"(a) REASONABLE CHARGES ALLOWED FOR CERTAIN DISCLOSURES.—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(1) IN GENERAL.—Except as provided in subsections (b), (c), and (d), a consumer reporting agency may impose a reasonable charge on a consumer—

  "(A) for making a disclosure to the consumer pursuant to section 609, which charge—

   "(i) shall not exceed $8; and

   "(ii) shall be indicated to the consumer before making the disclosure; and

  "(B) for furnishing, pursuant to section 611(d), following a reinvestigation under section 611(a), a statement, codification, or summary to a person designated by the consumer under that section after the 30–day period beginning on the date of notification of the consumer under paragraph (6) or (8) of section 611(a) with respect to the reinvestigation, which charge—

   "(i) shall not exceed the charge that the agency would impose on each designated recipient for a consumer report; and

   "(ii) shall be indicated to the consumer before furnishing such information.

  "(2) MODIFICATION OF AMOUNT.—The Federal Trade Commission shall increase the amount referred to in paragraph (1)(A)(i) on January 1 of each year, based proportionally on changes in the Consumer Price Index, with fractional changes rounded to the nearest fifty cents.

 "(b) FREE DISCLOSURE AFTER ADVERSE NOTICE TO CONSUMER.—Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to section 609 without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to section 615, or of a notification from a debt collection agency affiliated with that consumer reporting agency stating that the consumer's credit rating may be or has been adversely affected, the consumer makes a request under section 609.

 "(c) FREE DISCLOSURE UNDER CERTAIN OTHER CIRCUMSTANCES.—Upon the request of the consumer, a consumer reporting agency shall make all disclosures pursuant to section 609 once during any 12–month period without charge to that consumer if the consumer certifies in writing that the consumer—

  "(1) is unemployed and intends to apply for employment in the 60–day period beginning on the date on which the certification is made;

  "(2) is a recipient of public welfare assistance; or

  "(3) has reason to believe that the file on the consumer at the agency contains inaccurate information due to fraud.

 "(d) OTHER CHARGES PROHIBITED.—A consumer reporting agency shall not impose any charge on a consumer for providing any notification required by this title or making any disclosure required by this title, except as authorized by subsection (a).".

SEC. 2411. DUTIES OF USERS OF CONSUMER REPORTS.

<< 15 USCA § 1681m >>

 (a) DUTIES OF USERS TAKING ADVERSE ACTIONS.—Section 615(a) of the Fair Credit Reporting Act (15 U.S.C. 1681m(a)) is amended to read as follows:

 "(a) DUTIES OF USERS TAKING ADVERSE ACTIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER REPORTS.—If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—

 "(1) provide oral, written, or electronic notice of the adverse action to the consumer;

 "(2) provide to the consumer orally, in writing, or electronically—

  "(A) the name, address, and telephone number of the consumer reporting agency (including a toll-free telephone number established by the agency if the agency compiles and maintains files on consumers on a nationwide basis) that furnished the report to the person; and

  "(B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

 "(3) provide to the consumer an oral, written, or electronic notice of the consumer's right—

  "(A) to obtain, under section 612, a free copy of a consumer report on the consumer from the consumer reporting agency referred to in paragraph (2), which notice shall include an indication of the 60–day period under that section for obtaining such a copy; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) to dispute, under section 611, with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.".

(b) DUTIES OF USERS MAKING CERTAIN CREDIT SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(d) DUTIES OF USERS MAKING WRITTEN CREDIT OR INSURANCE SOLICITATIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER FILES.—

"(1) IN GENERAL.—Any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, that is provided to that person under section 604(c)(1)(B), shall provide with each written solicitation made to the consumer regarding the transaction a clear and conspicuous statement that—

"(A) information contained in the consumer's consumer report was used in connection with the transaction;

"(B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer;

"(C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral;

"(D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer; and

"(E) the consumer may exercise the right referred to in subparagraph (D) by notifying a notification system established under section 604(e).

"(2) DISCLOSURE OF ADDRESS AND TELEPHONE NUMBER.—A statement under paragraph (1) shall include the address and toll-free telephone number of the appropriate notification system established under section 604(e).

"(3) MAINTAINING CRITERIA ON FILE.—A person who makes an offer of credit or insurance to a consumer under a credit or insurance transaction described in paragraph (1) shall maintain on file the criteria used to select the consumer to receive the offer, all criteria bearing on credit worthiness or insurability, as applicable, that are the basis for determining whether or not to extend credit or insurance pursuant to the offer, and any requirement for the furnishing of collateral as a condition of the extension of credit or insurance, until the expiration of the 3–year period beginning on the date on which the offer is made to the consumer.

"(4) AUTHORITY OF FEDERAL AGENCIES REGARDING UNFAIR OR DECEPTIVE ACTS OR PRACTICES NOT AFFECTED.—This section is not intended to affect the authority of any Federal or State agency to enforce a prohibition against unfair or deceptive acts or practices, including the making of false or misleading statements in connection with a credit or insurance transaction that is not initiated by the consumer.".

(c) DUTIES OF USERS MAKING OTHER SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(e)

(d) CONFORMING AMENDMENT.—Section 615(c) of the Fair Credit Reporting Act (15 U.S.C. 1681m(c)) is amended by striking "subsections (a) and (b)" and inserting "this section".

(e) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—Section 615(b) of the Fair Credit Reporting Act (15 U.S.C. 1681m(b)) is amended—

(1) by striking "(b) Whenever credit" and inserting the following:

"(b) ADVERSE ACTION BASED ON INFORMATION OBTAINED FROM THIRD PARTIES OTHER THAN CONSUMER REPORTING AGENCIES.—

"(1) IN GENERAL.—Whenever credit";

(2) by adding at the end the following new paragraph:

"(2) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—

"(A) DUTIES, GENERALLY.—If a person takes an action described in subparagraph (B) with respect to a consumer, based in whole or in part on information described in subparagraph (C), the person shall—

"(i) notify the consumer of the action, including a statement that the consumer may obtain the information in accordance with clause (ii); and

"(ii) upon a written request from the consumer received within 60 days after transmittal of the notice required by clause (i), disclose to the consumer the nature of the information upon which the action is based by not later than 30 days after receipt of the request.

"(B) ACTION DESCRIBED.—An action referred to in subparagraph (A) is an adverse action described in section 603(k)(1)(A), taken in connection with a transaction initiated by the consumer, or any adverse action described in clause (i) or (ii) of section 603(k)(1)(B).

"(C) INFORMATION DESCRIBED.—Information referred to in subparagraph (A)—

"(i) except as provided in clause (ii), is information that—

"(I) is furnished to the person taking the action by a person related by common ownership or affiliated by common corporate control to the person taking the action; and

"(II) bears on the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the consumer; and

"(ii) does not include—

"(I) information solely as to transactions or experiences between the consumer and the person furnishing the information; or

"(II) information in a consumer report.".

SEC. 2412. CIVIL LIABILITY.

<< 15 USCA § 1681n >>

(a) CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL.—Any person who".

(b) MINIMUM CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681n(1)), as so designated by subsection (a) of this section, is amended to read as follows:

"(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

"(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;".

(c) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(b) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Any person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater.".

<< 15 USCA § 1681o >>

(d) CIVIL LIABILITY FOR NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681o) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL.—Any person who".

(e) ATTORNEY'S FEES.—

<< 15 USCA § 1681n >>

(1) WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(c) ATTORNEY'S FEES.—Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 15 USCA § 1681*o* >>

(2) NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681*o*) is amended by adding at the end the following new subsection:

"(b) ATTORNEY'S FEES.—On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

SEC. 2413. RESPONSIBILITIES OF PERSONS WHO FURNISH INFORMATION TO CONSUMER REPORTING AGENCIES.

(a) IN GENERAL.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

<< 15 USCA § 1681t >>

(1) by redesignating section 623 as section 624; and

<< 15 USCA § 1681s–2 >>

(2) by inserting after section 622 the following:

"SEC. 623. RESPONSIBILITIES OF FURNISHERS OF INFORMATION TO CONSUMER REPORTING AGENCIES.

"(a) DUTY OF FURNISHERS OF INFORMATION TO PROVIDE ACCURATE INFORMATION.—

"(1) PROHIBITION.—

"(A) REPORTING INFORMATION WITH ACTUAL KNOWLEDGE OF ERRORS.—A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

"(B) REPORTING INFORMATION AFTER NOTICE AND CONFIRMATION OF ERRORS.—A person shall not furnish information relating to a consumer to any consumer reporting agency if—

"(i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and

"(ii) the information is, in fact, inaccurate.

"(C) NO ADDRESS REQUIREMENT.—A person who clearly and conspicuously specifies to the consumer an address for notices referred to in subparagraph (B) shall not be subject to subparagraph (A); however, nothing in subparagraph (B) shall require a person to specify such an address.

"(2) DUTY TO CORRECT AND UPDATE INFORMATION.—A person who—

"(A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

"(B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate,

shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate.

"(3) DUTY TO PROVIDE NOTICE OF DISPUTE.—If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

"(4) DUTY TO PROVIDE NOTICE OF CLOSED ACCOUNTS.—A person who regularly and in the ordinary course of business furnishes information to a consumer reporting agency regarding a consumer who has a credit account with that person

shall notify the agency of the voluntary closure of the account by the consumer, in information regularly furnished for the period in which the account is closed.

"(5) DUTY TO PROVIDE NOTICE OF DELINQUENCY OF ACCOUNTS.—A person who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall, not later than 90 days after furnishing the information, notify the agency of the month and year of the commencement of the delinquency that immediately preceded the action.

"(b) DUTIES OF FURNISHERS OF INFORMATION UPON NOTICE OF DISPUTE.—

"(1) IN GENERAL.—After receiving notice pursuant to section 611(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

"(A) conduct an investigation with respect to the disputed information;

"(B) review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2);

"(C) report the results of the investigation to the consumer reporting agency; and

"(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

"(2) DEADLINE.—A person shall complete all investigations, reviews, and reports required under paragraph (1) regarding information provided by the person to a consumer reporting agency, before the expiration of the period under section 611(a)(1) within which the consumer reporting agency is required to complete actions required by that section regarding that information.

"(c) LIMITATION ON LIABILITY.—Sections 616 and 617 do not apply to any failure to comply with subsection (a), except as provided in section 621(c)(1)(B).

"(d) LIMITATION ON ENFORCEMENT.—Subsection (a) shall be enforced exclusively under section 621 by the Federal agencies and officials and the State officials identified in that section.".

(b) CONFORMING AMENDMENT.—The table of sections at the beginning of the Fair Credit Reporting Act (15 U.S.C. 1681a et seq.) is amended by striking the item relating to section 623 and inserting the following:

"623. Responsibilities of furnishers of information to consumer reporting agencies.

"624. Relation to State laws.".

<< 15 USCA § 1681d >>

SEC. 2414. INVESTIGATIVE CONSUMER REPORTS.

Section 606 of the Fair Credit Reporting Act (15 U.S.C. 1681d) is amended—

(1) in subsection (a)(1), by striking "or" at the end and inserting "and";

(2) by striking subsection (a)(2) and inserting the following:

"(2) the person certifies or has certified to the consumer reporting agency that—

"(A) the person has made the disclosures to the consumer required by paragraph (1); and

"(B) the person will comply with subsection (b).";

(3) in subsection (b), by striking "shall" the second place such term appears; and

Sec. 2414(4)

(4) by adding at the end the following new subsection:

"(d) PROHIBITIONS.—

"(1) CERTIFICATION.—A consumer reporting agency shall not prepare or furnish an investigative consumer report unless the agency has received a certification under subsection (a)(2) from the person who requested the report.

"(2) INQUIRIES.—A consumer reporting agency shall not make an inquiry for the purpose of preparing an investigative consumer report on a consumer for employment purposes if the making of the inquiry by an employer or prospective employer of the consumer would violate any applicable Federal or State equal employment opportunity law or regulation.

"(3) CERTAIN PUBLIC RECORD INFORMATION.—Except as otherwise provided in section 613, a consumer reporting agency shall not furnish an investigative consumer report that includes information that is a matter of public record and that

relates to an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment, unless the agency has verified the accuracy of the information during the 30–day period ending on the date on which the report is furnished.

"(4) CERTAIN ADVERSE INFORMATION.—A consumer reporting agency shall not prepare or furnish an investigative consumer report on a consumer that contains information that is adverse to the interest of the consumer and that is obtained through a personal interview with a neighbor, friend, or associate of the consumer or with another person with whom the consumer is acquainted or who has knowledge of such item of information, unless—

"(A) the agency has followed reasonable procedures to obtain confirmation of the information, from an additional source that has independent and direct knowledge of the information; or

"(B) the person interviewed is the best possible source of the information.".

SEC. 2415. INCREASED CRIMINAL PENALTIES FOR OBTAINING INFORMATION UNDER FALSE PRETENSES.

<< 15 USCA § 1681q >>

(a) OBTAINING INFORMATION UNDER FALSE PRETENSES.—Section 619 of the Fair Credit Reporting Act (15 U.S.C. 1681q) is amended by striking "fined not more than $5,000 or imprisoned not more than one year, or both" and inserting "fined under title 18, United States Code, imprisoned for not more than 2 years, or both".

<< 15 USCA § 1681r >>

(b) UNAUTHORIZED DISCLOSURES BY OFFICERS OR EMPLOYEES.—Section 620 of the Fair Credit Reporting Act (15 U.S.C. 1681r) is amended by striking "fined not more than $5,000 or imprisoned not more than one year, or both" and inserting "fined under title 18, United States Code, imprisoned for not more than 2 years, or both".

<< 15 USCA § 1681s >>

SEC. 2416. ADMINISTRATIVE ENFORCEMENT.

(a) AVAILABLE ENFORCEMENT POWERS.—Section 621(a) of the Fair Credit Reporting Act (15 U.S.C. 1681s(a)) is amended—

(1) by inserting "(1)" after "(a)";

(2) by adding at the end the following new paragraph:

"(2)(A) In the event of a knowing violation, which constitutes a pattern or practice of violations of this title, the Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person that violates this title. In such action, such person shall be liable for a civil penalty of not more than $2,500 per violation.

"(B) In determining the amount of a civil penalty under subparagraph (A), the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

"(3) Notwithstanding paragraph (2), a court may not impose any civil penalty on a person for a violation of section 623(a)(1) unless the person has been enjoined from committing the violation, or ordered not to commit the violation, in an action or proceeding brought by or on behalf of the Federal Trade Commission, and has violated the injunction or order, and the court may not impose any civil penalty for any violation occurring before the date of the violation of the injunction or order.

"(4) Neither the Commission nor any other agency referred to in subsection (b) may prescribe trade regulation rules or other regulations with respect to this title.".

(b) AGENCIES RESPONSIBLE FOR ENFORCEMENT.—Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended—

(1) in subsection (a), by inserting "ENFORCEMENT BY FEDERAL TRADE COMMISSION.—" before "Compliance with the requirements";

(2) in subsection (b), by striking the matter preceding paragraph (1) and inserting the following:

"(b) ENFORCEMENT BY OTHER AGENCIES.—Compliance with the requirements imposed under this title with respect to consumer reporting agencies, persons who use consumer reports from such agencies, persons who furnish information to such agencies, and users of information that are subject to subsection (d) or (e) of section 615 shall be enforced under—"; and

(3) in subsection (c), by adding at the end the following: "Notwithstanding the preceding, no agency referred to in subsection (b) may conduct an examination of a bank, savings association, or credit union regarding compliance with the provisions of this title, except in response to a complaint (or if the agency otherwise has knowledge) that the bank, savings association, or credit union has violated a provision of this title, in which case, the agency may conduct an examination as necessary to investigate the complaint. If an agency determines during an investigation in response to a complaint that a violation of this title has occurred, the agency may, during its next 2 regularly scheduled examinations of the bank, savings association, or credit union, examine for compliance with this title.".

<< 15 USCA § 1681s >>

SEC. 2417. STATE ENFORCEMENT OF FAIR CREDIT REPORTING ACT.

Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended—
(1) by redesignating subsection (c) as subsection (d); and
(2) by inserting after subsection (b) the following new subsection:
"(c) STATE ACTION FOR VIOLATIONS.—
"(1) AUTHORITY OF STATES.—In addition to such other remedies as are provided under State law, if the chief law enforcement officer of a State, or an official or agency designated by a State, has reason to believe that any person has violated or is violating this title, the State—
"(A) may bring an action to enjoin such violation in any appropriate United States district court or in any other court of competent jurisdiction;
"(B) subject to paragraph (5), may bring an action on behalf of the residents of the State to recover—
"(i) damages for which the person is liable to such residents under sections 616 and 617 as a result of the violation;
"(ii) in the case of a violation of section 623(a), damages for which the person would, but for section 623(c), be liable to such residents as a result of the violation; or
"(iii) damages of not more than $1,000 for each willful or negligent violation; and
"(C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.
"(2) RIGHTS OF FEDERAL REGULATORS.—The State shall serve prior written notice of any action under paragraph (1) upon the Federal Trade Commission or the appropriate Federal regulator determined under subsection (b) and provide the Commission or appropriate Federal regulator with a copy of its complaint, except in any case in which such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Federal Trade Commission or appropriate Federal regulator shall have the right—
"(A) to intervene in the action;
"(B) upon so intervening, to be heard on all matters arising therein;
"(C) to remove the action to the appropriate United States district court; and
"(D) to file petitions for appeal.
"(3) INVESTIGATORY POWERS.—For purposes of bringing any action under this subsection, nothing in this subsection shall prevent the chief law enforcement officer, or an official or agency designated by a State, from exercising the powers conferred on the chief law enforcement officer or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.
"(4) LIMITATION ON STATE ACTION WHILE FEDERAL ACTION PENDING.—If the Federal Trade Commission or the appropriate Federal regulator has instituted a civil action or an administrative action under section 8 of the Federal Deposit Insurance Act for a violation of this title, no State may, during the pendency of such action, bring an action under this section against any defendant named in the complaint of the Commission or the appropriate Federal regulator for any violation of this title that is alleged in that complaint.
"(5) LIMITATIONS ON STATE ACTIONS FOR VIOLATION OF SECTION 623(a)(1).—

"(A) VIOLATION OF INJUNCTION REQUIRED.—A State may not bring an action against a person under paragraph (1)(B) for a violation of section 623(a)(1), unless—

"(i) the person has been enjoined from committing the violation, in an action brought by the State under paragraph (1)(A); and

"(ii) the person has violated the injunction.

"(B) LIMITATION ON DAMAGES RECOVERABLE.—In an action against a person under paragraph (1)(B) for a violation of section 623(a)(1), a State may not recover any damages incurred before the date of the violation of an injunction on which the action is based.".

<< 15 USCA § 1681s >>

## SEC. 2418. FEDERAL RESERVE BOARD AUTHORITY.

Section 621 of the Fair Credit Reporting Act (15 U.S.C. 1681s) is amended by adding at the end the following new subsection:

"(e) INTERPRETIVE AUTHORITY.—The Board of Governors of the Federal Reserve System may issue interpretations of any provision of this title as such provision may apply to any persons identified under paragraph (1), (2), and (3) of subsection (b), or to the holding companies and affiliates of such persons, in consultation with Federal agencies identified in paragraphs (1), (2), and (3) of subsection (b).".

<< 15 USCA § 1681t >>

## SEC. 2419. PREEMPTION OF STATE LAW.

Section 624 of the Fair Credit Reporting Act (as redesignated by section 2413(a) of this chapter) is amended—

(1) by striking "This title" and inserting "(a) IN GENERAL.—Except as provided in subsections (b) and (c), this title"; and

(2) by adding at the end the following new subsection:

"(b) GENERAL EXCEPTIONS.—No requirement or prohibition may be imposed under the laws of any State—

"(1) with respect to any subject matter regulated under—

"(A) subsection (c) or (e) of section 604, relating to the prescreening of consumer reports;

"(B) section 611, relating to the time by which a consumer reporting agency must take any action, including the provision of notification to a consumer or other person, in any procedure related to the disputed accuracy of information in a consumer's file, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996;

"(C) subsections (a) and (b) of section 615, relating to the duties of a person who takes any adverse action with respect to a consumer;

"(D) section 615(d), relating to the duties of persons who use a consumer report of a consumer in connection with any credit or insurance transaction that is not initiated by the consumer and that consists of a firm offer of credit or insurance;

"(E) section 605, relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996; or

"(F) section 623, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—

"(i) with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996); or

"(ii) with respect to section 1785.25(a) of the California Civil Code (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996);

"(2) with respect to the exchange of information among persons affiliated by common ownership or common corporate control, except that this paragraph shall not apply with respect to subsection (a) or (c)(1) of section 2480e of title 9, Vermont Statutes Annotated (as in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996); or

"(3) with respect to the form and content of any disclosure required to be made under section 609(c).

"(c) DEFINITION OF FIRM OFFER OF CREDIT OR INSURANCE.—Notwithstanding any definition of the term 'firm offer of credit or insurance' (or any equivalent term) under the laws of any State, the definition of that term contained in section 603(l) shall be construed to apply in the enforcement and interpretation of the laws of any State governing consumer reports.

"(d) LIMITATIONS.—Subsections (b) and (c)—

"(1) do not affect any settlement, agreement, or consent judgment between any State Attorney General and any consumer reporting agency in effect on the date of enactment of the Consumer Credit Reporting Reform Act of 1996; and

"(2) do not apply to any provision of State law (including any provision of a State constitution) that—

"(A) is enacted after January 1, 2004;

"(B) states explicitly that the provision is intended to supplement this title; and

"(C) gives greater protection to consumers than is provided under this title.".

<< 15 USCA § 1681a NOTE >>

SEC. 2420. EFFECTIVE DATE.

(a) IN GENERAL.—Except as otherwise specifically provided in this chapter, the amendments made by this chapter shall become effective 365 days after the date of enactment of this Act.

(b) EARLY COMPLIANCE.—Any person or other entity that is subject to the requirements of this chapter may, at its option, comply with any provision of this chapter before the date on which that provision becomes effective under this chapter, in which case, each of the corresponding provisions of this chapter shall be fully applicable to such person or entity.

<< 15 USCA § 1681a NOTE >>

SEC. 2421. RELATIONSHIP TO OTHER LAW.

Nothing in this chapter or the amendments made by this chapter shall be considered to supersede or otherwise affect section 2721 of title 18, United States Code, with respect to motor vehicle records for surveys, marketing, or solicitations.

SEC. 2422. FEDERAL RESERVE BOARD STUDY.

(a) STUDY REQUIRED.—The Board of Governors of the Federal Reserve System, in consultation with the other Federal banking agencies (as defined in section 3 of the Federal Deposit Insurance Act) and the Federal Trade Commission, shall conduct a study of whether organizations which, as of the date of the enactment of this Act, are not subject to the Fair Credit Reporting Act as consumer reporting agencies (as defined in section 603 of such Act) are engaged in the business of making sensitive consumer identification information, including social security numbers, mothers' maiden names, prior addresses, and dates of birth, available to the general public.

(b) DETERMINATION OF POTENTIAL FOR FRAUD.—If the Board of Governors of the Federal Reserve System determines that organizations referred to in subsection (a) are engaged in the business of making sensitive consumer identification information available to the general public, the Board shall determine—

(1) whether such activities create undue potential for fraud and risk of loss to insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act); and

(2) if so, whether changes in Federal law are necessary to address such risks of fraud and loss.

(c) REPORT TO CONGRESS.—Before the end of the 6–month period beginning on the date of the enactment of this Act, the Board of Governors of the Federal Reserve System shall submit a report to the Congress containing—

(1) the findings and conclusion of the Board in connection with the study required under subsections (a) and (b); and

(2) recommendations for such legislative or administrative action as the Board determines to be appropriate.

CHAPTER 2—CREDIT REPAIR ORGANIZATIONS

SEC. 2451. REGULATION OF CREDIT REPAIR ORGANIZATIONS.

Title IV of the Consumer Credit Protection Act (Public Law 90–321, 82 Stat. 164) is amended to read as follows:

<< 15 USCA Ch. 41 >>

"TITLE IV—CREDIT REPAIR ORGANIZATIONS

"Sec.

"401. Short title.

"402. Findings and purposes.

"403. Definitions.

"404. Prohibited practices.

"405. Disclosures.

"406. Credit repair organizations contracts.

"407. Right to cancel contract.

"408. Noncompliance with this title.

"409. Civil liability.

"410. Administrative enforcement.

"411. Statute of limitations.

"412. Relation to State law.

"413. Effective date.

<< 15 USCA § 1601 NOTE >>

"SEC. 401. SHORT TITLE.

"This title may be cited as the 'Credit Repair Organizations Act'.

<< 15 USCA § 1679 >>

"SEC. 402. FINDINGS AND PURPOSES.

"(a) FINDINGS.—The Congress makes the following findings:

"(1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.

"(2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

"(b) PURPOSES.—The purposes of this title are—

"(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

"(2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

<< 15 USCA § 1679a >>

"SEC. 403. DEFINITIONS.

"For purposes of this title, the following definitions apply:

"(1) CONSUMER.—The term 'consumer' means an individual.

"(2) CONSUMER CREDIT TRANSACTION.—The term 'consumer credit transaction' means any transaction in which credit is offered or extended to an individual for personal, family, or household purposes.

"(3) CREDIT REPAIR ORGANIZATION.—The term 'credit repair organization'—

"(A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

"(i) improving any consumer's credit record, credit history, or credit rating; or

"(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

"(B) does not include—

"(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986;

"(ii) any creditor (as defined in section 103 of the Truth in Lending Act), with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or

"(iii) any depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act) or any Federal or State credit union (as those terms are defined in section 101 of the Federal Credit Union Act), or any affiliate or subsidiary of such a depository institution or credit union.

"(4) CREDIT.—The term 'credit' has the meaning given to such term in section 103(e) of this Act.

<< 15 USCA § 1679b >>

"SEC. 404. PROHIBITED PRACTICES.

"(a) IN GENERAL.—No person may—

"(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to—

"(A) any consumer reporting agency (as defined in section 603(f) of this Act); or

"(B) any person—

"(i) who has extended credit to the consumer; or

"(ii) to whom the consumer has applied or is applying for an extension of credit;

"(2) make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to—

"(A) any consumer reporting agency;

"(B) any person—

"(i) who has extended credit to the consumer; or

"(ii) to whom the consumer has applied or is applying for an extension of credit;

"(3) make or use any untrue or misleading representation of the services of the credit repair organization; or

"(4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

"(b) PAYMENT IN ADVANCE.—No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

<< 15 USCA § 1679c >>

"SEC. 405. DISCLOSURES.

 "(a) DISCLOSURE REQUIRED.—Any credit repair organization shall provide any consumer with the following written statement before any contract or agreement between the consumer and the credit repair organization is executed:

 " 'Consumer Credit File Rights Under State and Federal Law
 " 'You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any "credit repair" company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.
 " 'You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.
 " 'You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.
 " 'You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.
 " 'Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.
 " 'You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.
 " 'If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.
 " 'The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:
 " 'The Public Reference Branch
 " 'Federal Trade Commission
 " 'Washington, D.C. 20580'.
 "(b) SEPARATE STATEMENT REQUIREMENT.—The written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.
 "(c) RETENTION OF COMPLIANCE RECORDS.—
 "(1) IN GENERAL.—The credit repair organization shall maintain a copy of the statement signed by the consumer acknowledging receipt of the statement.
 "(2) MAINTENANCE FOR 2 YEARS.—The copy of any consumer's statement shall be maintained in the organization's files for 2 years after the date on which the statement is signed by the consumer.

<< 15 USCA § 1679d >>

"SEC. 406. CREDIT REPAIR ORGANIZATIONS CONTRACTS.

 "(a) WRITTEN CONTRACTS REQUIRED.—No services may be provided by any credit repair organization for any consumer—

"(1) unless a written and dated contract (for the purchase of such services) which meets the requirements of subsection (b) has been signed by the consumer; or

"(2) before the end of the 3–business–day period beginning on the date the contract is signed.

"(b) TERMS AND CONDITIONS OF CONTRACT.—No contract referred to in subsection (a) meets the requirements of this subsection unless such contract includes (in writing)—

"(1) the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person;

"(2) a full and detailed description of the services to be performed by the credit repair organization for the consumer, including—

"(A) all guarantees of performance; and

"(B) an estimate of—

"(i) the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete; or

"(ii) the length of the period necessary to perform such services;

"(3) the credit repair organization's name and principal business address; and

"(4) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'.

<< 15 USCA § 1679e >>

"SEC. 407. RIGHT TO CANCEL CONTRACT.

"(a) IN GENERAL.—Any consumer may cancel any contract with any credit repair organization without penalty or obligation by notifying the credit repair organization of the consumer's intention to do so at any time before midnight of the 3rd business day which begins after the date on which the contract or agreement between the consumer and the credit repair organization is executed or would, but for this subsection, become enforceable against the parties.

"(b) CANCELLATION FORM AND OTHER INFORMATION.—Each contract shall be accompanied by a form, in duplicate, which has the heading 'Notice of Cancellation' and contains in bold face type the following statement:

" 'You may cancel this contract, without any penalty or obligation, at any time before midnight of the 3rd day which begins after the date the contract is signed by you.

" 'To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]

" 'I hereby cancel this transaction,

[date]

[purchaser's signature].'.

"(c) CONSUMER COPY OF CONTRACT REQUIRED.—Any consumer who enters into any contract with any credit repair organization shall be given, by the organization—

"(1) a copy of the completed contract and the disclosure statement required under section 405; and

"(2) a copy of any other document the credit repair organization requires the consumer to sign, at the time the contract or the other document is signed.

<< 15 USCA § 1679f >>

"SEC. 408. NONCOMPLIANCE WITH THIS TITLE.

"(a) CONSUMER WAIVERS INVALID.—Any waiver by any consumer of any protection provided by or any right of the consumer under this title—

"(1) shall be treated as void; and

"(2) may not be enforced by any Federal or State court or any other person.

"(b) ATTEMPT TO OBTAIN WAIVER.—Any attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under this title shall be treated as a violation of this title.

"(c) CONTRACTS NOT IN COMPLIANCE.—Any contract for services which does not comply with the applicable provisions of this title—

"(1) shall be treated as void; and

"(2) may not be enforced by any Federal or State court or any other person.

<< 15 USCA § 1679g >>

"SEC. 409. CIVIL LIABILITY.

"(a) LIABILITY ESTABLISHED.—Any person who fails to comply with any provision of this title with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

"(1) ACTUAL DAMAGES.—The greater of—

"(A) the amount of any actual damage sustained by such person as a result of such failure; or

"(B) any amount paid by the person to the credit repair organization.

"(2) PUNITIVE DAMAGES.—

"(A) INDIVIDUAL ACTIONS.—In the case of any action by an individual, such additional amount as the court may allow.

"(B) CLASS ACTIONS.—In the case of a class action, the sum of—

"(i) the aggregate of the amount which the court may allow for each named plaintiff; and

"(ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

"(3) ATTORNEYS' FEES.—In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

"(b) FACTORS TO BE CONSIDERED IN AWARDING PUNITIVE DAMAGES.—In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors—

"(1) the frequency and persistence of noncompliance by the credit repair organization;

"(2) the nature of the noncompliance;

"(3) the extent to which such noncompliance was intentional; and

"(4) in the case of any class action, the number of consumers adversely affected.

<< 15 USCA § 1679h >>

"SEC. 410. ADMINISTRATIVE ENFORCEMENT.

"(a) IN GENERAL.—Compliance with the requirements imposed under this title with respect to credit repair organizations shall be enforced under the Federal Trade Commission Act by the Federal Trade Commission.

"(b) VIOLATIONS OF THIS TITLE TREATED AS VIOLATIONS OF FEDERAL TRADE COMMISSION ACT.—

"(1) IN GENERAL.—For the purpose of the exercise by the Federal Trade Commission of the Commission's functions and powers under the Federal Trade Commission Act, any violation of any requirement or prohibition imposed under this title with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act.

"(2) ENFORCEMENT AUTHORITY UNDER OTHER LAW.—All functions and powers of the Federal Trade Commission under the Federal Trade Commission Act shall be available to the Commission to enforce compliance with this title by any person subject to enforcement by the Federal Trade Commission pursuant to this subsection, including the power to enforce the provisions of this title in the same manner as if the violation had been a violation of any Federal Trade Commission trade regulation rule, without regard to whether the credit repair organization—

"(A) is engaged in commerce; or

"(B) meets any other jurisdictional tests in the Federal Trade Commission Act.

"(c) STATE ACTION FOR VIOLATIONS.—

"(1) AUTHORITY OF STATES.—In addition to such other remedies as are provided under State law, whenever the chief law enforcement officer of a State, or an official or agency designated by a State, has reason to believe that any person has violated or is violating this title, the State—

"(A) may bring an action to enjoin such violation;

"(B) may bring an action on behalf of its residents to recover damages for which the person is liable to such residents under section 409 as a result of the violation; and

"(C) in the case of any successful action under subparagraph (A) or (B), shall be awarded the costs of the action and reasonable attorney fees as determined by the court.

"(2) RIGHTS OF COMMISSION.—

"(A) NOTICE TO COMMISSION.—The State shall serve prior written notice of any civil action under paragraph (1) upon the Federal Trade Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action.

"(B) INTERVENTION.—The Commission shall have the right—

"(i) to intervene in any action referred to in subparagraph (A);

"(ii) upon so intervening, to be heard on all matters arising in the action; and

"(iii) to file petitions for appeal.

"(3) INVESTIGATORY POWERS.—For purposes of bringing any action under this subsection, nothing in this subsection shall prevent the chief law enforcement officer, or an official or agency designated by a State, from exercising the powers conferred on the chief law enforcement officer or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

"(4) LIMITATION.—Whenever the Federal Trade Commission has instituted a civil action for violation of this title, no State may, during the pendency of such action, bring an action under this section against any defendant named in the complaint of the Commission for any violation of this title that is alleged in that complaint.

<< 15 USCA § 1679i >>

"SEC. 411. STATUTE OF LIMITATIONS.

"Any action to enforce any liability under this title may be brought before the later of—

"(1) the end of the 5–year period beginning on the date of the occurrence of the violation involved; or

"(2) in any case in which any credit repair organization has materially and willfully misrepresented any information which—

"(A) the credit repair organization is required, by any provision of this title, to disclose to any consumer; and

"(B) is material to the establishment of the credit repair organization's liability to the consumer under this title,

the end of the 5–year period beginning on the date of the discovery by the consumer of the misrepresentation.

<< 15 USCA § 1679j >>

"SEC. 412. RELATION TO STATE LAW.

"This title shall not annul, alter, affect, or exempt any person subject to the provisions of this title from complying with any law of any State except to the extent that such law is inconsistent with any provision of this title, and then only to the extent of the inconsistency.

<< 15 USCA §§ 1679 NOTE, 1679a nt, 1679b nt, 1679c nt, 1679d
nt, 1679e nt, 1679f nt, 1679g nt, 1679h nt, 1679i nt, 1679j nt >>

"SEC. 413. EFFECTIVE DATE.

"This title shall apply after the end of the 6–month period beginning on the date of the enactment of the Credit Repair Organizations Act, except with respect to contracts entered into by a credit repair organization before the end of such period.".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 2452. CREDIT WORTHINESS.

It is the sense of the Senate that—

(1) individuals should generally be judged for credit worthiness based on their own credit worthiness and not on the zip code or neighborhood in which they live; and

(2) the Federal Trade Commission, after consultation with the appropriate Federal banking agency, should report to the Committee on Banking, Housing, and Urban Affairs of the Senate as to whether and how the location of the residence of an applicant for unsecured credit is considered by many companies and financial institutions in deciding whether an applicant should be granted credit.

Subtitle E—Asset Conservation, Lender Liability, and Deposit Insurance Protection

<< 42 USCA § 9601 NOTE >>

SEC. 2501. SHORT TITLE.

This subtitle may be cited as the "Asset Conservation, Lender Liability, and Deposit Insurance Protection Act of 1996".

SEC. 2502. CERCLA LENDER AND FIDUCIARY LIABILITY LIMITATIONS AMENDMENTS.

(a) IN GENERAL.—Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9607) is amended by adding at the end the following:

<< 42 USCA § 9607 >>

"(n) LIABILITY OF FIDUCIARIES.—

"(1) IN GENERAL.—The liability of a fiduciary under any provision of this Act for the release or threatened release of a hazardous substance at, from, or in connection with a vessel or facility held in a fiduciary capacity shall not exceed the assets held in the fiduciary capacity.

"(2) EXCLUSION.—Paragraph (1) does not apply to the extent that a person is liable under this Act independently of the person's ownership of a vessel or facility as a fiduciary or actions taken in a fiduciary capacity.

"(3) LIMITATION.—Paragraphs (1) and (4) do not limit the liability pertaining to a release or threatened release of a hazardous substance if negligence of a fiduciary causes or contributes to the release or threatened release.

"(4) SAFE HARBOR.—A fiduciary shall not be liable in its personal capacity under this Act for—

"(A) undertaking or directing another person to undertake a response action under subsection (d)(1) or under the direction of an on scene coordinator designated under the National Contingency Plan;

"(B) undertaking or directing another person to undertake any other lawful means of addressing a hazardous substance in connection with the vessel or facility;

"(C) terminating the fiduciary relationship;

"(D) including in the terms of the fiduciary agreement a covenant, warranty, or other term or condition that relates to compliance with an environmental law, or monitoring, modifying or enforcing the term or condition;

"(E) monitoring or undertaking 1 or more inspections of the vessel or facility;

"(F) providing financial or other advice or counseling to other parties to the fiduciary relationship, including the settlor or beneficiary;

"(G) restructuring, renegotiating, or otherwise altering the terms and conditions of the fiduciary relationship;

"(H) administering, as a fiduciary, a vessel or facility that was contaminated before the fiduciary relationship began; or

"(I) declining to take any of the actions described in subparagraphs (B) through (H).

"(5) DEFINITIONS.—As used in this Act:

"(A) FIDUCIARY.—The term 'fiduciary'—

"(i) means a person acting for the benefit of another party as a bona fide—

"(I) trustee;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(II) executor;

"(III) administrator;

"(IV) custodian;

"(V) guardian of estates or guardian ad litem;

"(VI) receiver;

"(VII) conservator;

"(VIII) committee of estates of incapacitated persons;

"(IX) personal representative;

"(X) trustee (including a successor to a trustee) under an indenture agreement, trust agreement, lease, or similar financing agreement, for debt securities, certificates of interest or certificates of participation in debt securities, or other forms of indebtedness as to which the trustee is not, in the capacity of trustee, the lender; or

"(XI) representative in any other capacity that the Administrator, after providing public notice, determines to be similar to the capacities described in subclauses (I) through (X); and

"(ii) does not include—

"(I) a person that is acting as a fiduciary with respect to a trust or other fiduciary estate that was organized for the primary purpose of, or is engaged in, actively carrying on a trade or business for profit, unless the trust or other fiduciary estate was created as part of, or to facilitate, 1 or more estate plans or because of the incapacity of a natural person; or

"(II) a person that acquires ownership or control of a vessel or facility with the objective purpose of avoiding liability of the person or of any other person.

"(B) FIDUCIARY CAPACITY.—The term 'fiduciary capacity' means the capacity of a person in holding title to a vessel or facility, or otherwise having control of or an interest in the vessel or facility, pursuant to the exercise of the responsibilities of the person as a fiduciary.

"(6) SAVINGS CLAUSE.—Nothing in this subsection—

"(A) affects the rights or immunities or other defenses that are available under this Act or other law that is applicable to a person subject to this subsection; or

"(B) creates any liability for a person or a private right of action against a fiduciary or any other person.

"(7) NO EFFECT ON CERTAIN PERSONS.—Nothing in this subsection applies to a person if the person—

"(A)(i) acts in a capacity other than that of a fiduciary or in a beneficiary capacity; and

"(ii) in that capacity, directly or indirectly benefits from a trust or fiduciary relationship; or

"(B)(i) is a beneficiary and a fiduciary with respect to the same fiduciary estate; and

"(ii) as a fiduciary, receives benefits that exceed customary or reasonable compensation, and incidental benefits, permitted under other applicable law.

"(8) LIMITATION.—This subsection does not preclude a claim under this Act against—

"(A) the assets of the estate or trust administered by the fiduciary; or

"(B) a nonemployee agent or independent contractor retained by a fiduciary.".

<< 42 USCA § 9601 >>

(b) DEFINITION OF OWNER OR OPERATOR.—Section 101(20) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601(20)) is amended by adding at the end the following:

"(E) EXCLUSION OF LENDERS NOT PARTICIPANTS IN MANAGEMENT.—

"(i) INDICIA OF OWNERSHIP TO PROTECT SECURITY.—The term 'owner or operator' does not include a person that is a lender that, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect the security interest of the person in the vessel or facility.

"(ii) FORECLOSURE.—The term 'owner or operator' does not include a person that is a lender that did not participate in management of a vessel or facility prior to foreclosure, notwithstanding that the person—

"(I) forecloses on the vessel or facility; and

"(II) after foreclosure, sells, re-leases (in the case of a lease finance transaction), or liquidates the vessel or facility, maintains business activities, winds up operations, undertakes a response action under section 107(d)(1) or under the

AR.03466

direction of an on-scene coordinator appointed under the National Contingency Plan, with respect to the vessel or facility, or takes any other measure to preserve, protect, or prepare the vessel or facility prior to sale or disposition,

if the person seeks to sell, re-lease (in the case of a lease finance transaction), or otherwise divest the person of the vessel or facility at the earliest practicable, commercially reasonable time, on commercially reasonable terms, taking into account market conditions and legal and regulatory requirements.

"(F) PARTICIPATION IN MANAGEMENT.—For purposes of subparagraph (E)—

"(i) the term 'participate in management'—

"(I) means actually participating in the management or operational affairs of a vessel or facility; and

"(II) does not include merely having the capacity to influence, or the unexercised right to control, vessel or facility operations;

"(ii) a person that is a lender and that holds indicia of ownership primarily to protect a security interest in a vessel or facility shall be considered to participate in management only if, while the borrower is still in possession of the vessel or facility encumbered by the security interest, the person—

"(I) exercises decisionmaking control over the environmental compliance related to the vessel or facility, such that the person has undertaken responsibility for the hazardous substance handling or disposal practices related to the vessel or facility; or

"(II) exercises control at a level comparable to that of a manager of the vessel or facility, such that the person has assumed or manifested responsibility—

"(aa) for the overall management of the vessel or facility encompassing day-to-day decisionmaking with respect to environmental compliance; or

"(bb) over all or substantially all of the operational functions (as distinguished from financial or administrative functions) of the vessel or facility other than the function of environmental compliance;

"(iii) the term 'participate in management' does not include performing an act or failing to act prior to the time at which a security interest is created in a vessel or facility; and

"(iv) the term 'participate in management' does not include—

"(I) holding a security interest or abandoning or releasing a security interest;

"(II) including in the terms of an extension of credit, or in a contract or security agreement relating to the extension, a covenant, warranty, or other term or condition that relates to environmental compliance;

"(III) monitoring or enforcing the terms and conditions of the extension of credit or security interest;

"(IV) monitoring or undertaking 1 or more inspections of the vessel or facility;

"(V) requiring a response action or other lawful means of addressing the release or threatened release of a hazardous substance in connection with the vessel or facility prior to, during, or on the expiration of the term of the extension of credit;

"(VI) providing financial or other advice or counseling in an effort to mitigate, prevent, or cure default or diminution in the value of the vessel or facility;

"(VII) restructuring, renegotiating, or otherwise agreeing to alter the terms and conditions of the extension of credit or security interest, exercising forbearance;

"(VIII) exercising other remedies that may be available under applicable law for the breach of a term or condition of the extension of credit or security agreement; or

"(IX) conducting a response action under section 107(d) or under the direction of an on-scene coordinator appointed under the National Contingency Plan,

if the actions do not rise to the level of participating in management (within the meaning of clauses (i) and (ii)).

"(G) OTHER TERMS.—As used in this Act:

"(i) EXTENSION OF CREDIT.—The term 'extension of credit' includes a lease finance transaction—

"(I) in which the lessor does not initially select the leased vessel or facility and does not during the lease term control the daily operations or maintenance of the vessel or facility; or

"(II) that conforms with regulations issued by the appropriate Federal banking agency or the appropriate State bank supervisor (as those terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813) or with regulations issued by the National Credit Union Administration Board, as appropriate.

AR.03467

"(ii) FINANCIAL OR ADMINISTRATIVE FUNCTION.—The term 'financial or administrative function' includes a function such as that of a credit manager, accounts payable officer, accounts receivable officer, personnel manager, comptroller, or chief financial officer, or a similar function.

"(iii) FORECLOSURE; FORECLOSE.—The terms 'foreclosure' and 'foreclose' mean, respectively, acquiring, and to acquire, a vessel or facility through—

"(I)(aa) purchase at sale under a judgment or decree, power of sale, or nonjudicial foreclosure sale;

"(bb) a deed in lieu of foreclosure, or similar conveyance from a trustee; or

"(cc) repossession,

if the vessel or facility was security for an extension of credit previously contracted;

"(II) conveyance pursuant to an extension of credit previously contracted, including the termination of a lease agreement; or

"(III) any other formal or informal manner by which the person acquires, for subsequent disposition, title to or possession of a vessel or facility in order to protect the security interest of the person.

"(iv) LENDER.—The term 'lender' means—

"(I) an insured depository institution (as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813));

"(II) an insured credit union (as defined in section 101 of the Federal Credit Union Act (12 U.S.C. 1752));

"(III) a bank or association chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.);

"(IV) a leasing or trust company that is an affiliate of an insured depository institution;

"(V) any person (including a successor or assignee of any such person) that makes a bona fide extension of credit to or takes or acquires a security interest from a nonaffiliated person;

"(VI) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Federal Agricultural Mortgage Corporation, or any other entity that in a bona fide manner buys or sells loans or interests in loans;

"(VII) a person that insures or guarantees against a default in the repayment of an extension of credit, or acts as a surety with respect to an extension of credit, to a nonaffiliated person; and

"(VIII) a person that provides title insurance and that acquires a vessel or facility as a result of assignment or conveyance in the course of underwriting claims and claims settlement.

"(v) OPERATIONAL FUNCTION.—The term 'operational function' includes a function such as that of a facility or plant manager, operations manager, chief operating officer, or chief executive officer.

"(vi) SECURITY INTEREST.—The term 'security interest' includes a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person.".

<< 42 USCA § 6991b >>

SEC. 2503. CONFORMING AMENDMENT.

Section 9003(h) of the Solid Waste Disposal Act (42 U.S.C. 6991b(h)) is amended by striking paragraph (9) and inserting the following:

"(9) DEFINITION OF OWNER OR OPERATOR.—

"(A) IN GENERAL.—As used in this subtitle, the terms 'owner' and 'operator' do not include a person that, without participating in the management of an underground storage tank and otherwise not engaged in petroleum production, refining, or marketing, holds indicia of ownership primarily to protect the person's security interest.

"(B) SECURITY INTEREST HOLDERS.—The provisions regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) and the provisions regarding fiduciaries at section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 shall apply in determining a person's liability as an owner or operator of an underground storage tank for the purposes of this subtitle.

"(C) EFFECT ON RULE.—Nothing in subparagraph (B) shall be construed as modifying or affecting the final rule issued by the Administrator on September 7, 1995 (60 Fed.Reg. 46,692), or as limiting the authority of the Administrator to amend the final rule, in accordance with applicable law. The final rule in effect on the date of enactment of this subparagraph shall

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

prevail over any inconsistent provision regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) or any inconsistent provision regarding fiduciaries in section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. Any amendment to the final rule shall be consistent with the provisions regarding holders of security interests in subparagraphs (E) through (G) of section 101(20) and the provisions regarding fiduciaries in section 107(n) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. This subparagraph does not preclude judicial review of any amendment of the final rule made after the date of enactment of this subparagraph.".

SEC. 2504. LENDER LIABILITY RULE.

 (a) IN GENERAL.—Effective on the date of enactment of this Act, the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344), prescribing section 300.1105 of title 40, Code of Federal Regulations, shall be deemed to have been validly issued under authority of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.) and to have been effective according to the terms of the final rule. No additional judicial proceedings shall be necessary or may be held with respect to such portion of the final rule. Any reference in that portion of the final rule to section 300.1100 of title 40, Code of Federal Regulations, shall be deemed to be a reference to the amendments made by this subtitle.

 (b) JUDICIAL REVIEW.—Notwithstanding section 113(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9613(a)), no court shall have jurisdiction to review the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344) that prescribed section 300.1105 of title 40, Code of Federal Regulations.

 (c) AMENDMENT.—No provision of this section shall be construed as limiting the authority of the President or a delegee of the President to amend the portion of the final rule issued by the Administrator of the Environmental Protection Agency on April 29, 1992 (57 Fed.Reg. 18,344), prescribing section 300.1105 of title 40, Code of Federal Regulations, consistent with the amendments made by this subtitle and other applicable law.

 (d) JUDICIAL REVIEW.—No provision of this section shall be construed as precluding judicial review of any amendment of section 300.1105 of title 40, Code of Federal Regulations, made after the date of enactment of this Act.

<< 42 USCA §§ 6991b NOTE, 9601 nt, 9607 nt >>

SEC. 2505. EFFECTIVE DATE.

 The amendments made by this subtitle shall be applicable with respect to any claim that has not been finally adjudicated as of the date of enactment of this Act.

Subtitle F—Miscellaneous

SEC. 2601. FEDERAL RESERVE BOARD STUDY.

 (a) STUDY OF ELECTRONIC STORED VALUE PRODUCTS.—

 (1) STUDY.—The Board shall conduct a study of electronic stored value products which evaluates whether provisions of the Electronic Fund Transfer Act could be applied to such products without adversely impacting the cost, development, and operation of such products.

 (2) CONSIDERATIONS.—In conducting its study under paragraph (1), the Board shall consider whether alternatives to regulation under the Electronic Fund Transfer Act, such as allowing competitive market forces to shape the development and operation of electronic stored value products, could more efficiently achieve the objectives embodied in that Act.

 (b) REPORT.—The Board shall submit a report of its study under subsection (a) to the Congress not later than 6 months after the date of enactment of this Act.

 (c) ACTION TO FINALIZE.—The Board shall take no action to finalize any amendments to regulations under the Electronic Fund Transfer Act that would regulate electronic stored value products until the later of—

 (1) 3 months after the date on which the report is submitted to the Congress under subsection (b); or

 (2) 9 months after the date of enactment of this Act.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 12 USCA § 1821 >>

SEC. 2602. TREATMENT OF CLAIMS ARISING FROM BREACH OF CONTRACTS EXECUTED BY THE RECEIVER OR CONSERVATOR.

Section 11(d) of the Federal Deposit Insurance Act (12 U.S.C. 1821(d)) is amended by adding at the end the following new paragraph:

"(20) TREATMENT OF CLAIMS ARISING FROM BREACH OF CONTRACTS EXECUTED BY THE RECEIVER OR CONSERVATOR.—Notwithstanding any other provision of this subsection, any final and unappealable judgment for monetary damages entered against a receiver or conservator for an insured depository institution for the breach of an agreement executed or approved by such receiver or conservator after the date of its appointment shall be paid as an administrative expense of the receiver or conservator. Nothing in this paragraph shall be construed to limit the power of a receiver or conservator to exercise any rights under contract or law, including to terminate, breach, cancel, or otherwise discontinue such agreement.".

SEC. 2603. CRIMINAL SANCTIONS FOR FICTITIOUS FINANCIAL INSTRUMENTS AND COUNTERFEITING.

<< 18 USCA §§ 474, 474A >>

(a) INCREASED PENALTIES FOR COUNTERFEITING VIOLATIONS.—Sections 474 and 474A of title 18, United States Code, are amended by striking "class C felony" each place that term appears and inserting "class B felony".

(b) CRIMINAL PENALTY FOR PRODUCTION, SALE, TRANSPORTATION, POSSESSION OF FICTITIOUS FINANCIAL INSTRUMENTS PURPORTING TO BE THOSE OF THE STATES, OF POLITICAL SUBDIVISIONS, AND OF PRIVATE ORGANIZATIONS.—

<< 18 USCA § 514 >>

(1) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by inserting after section 513, the following new section:

"§ 514. Fictitious obligations

"(a) Whoever, with the intent to defraud—

"(1) draws, prints, processes, produces, publishes, or otherwise makes, or attempts or causes the same, within the United States;

"(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; or

"(3) utilizes interstate or foreign commerce, including the use of the mails or wire, radio, or other electronic communication, to transmit, transport, ship, move, transfer, or attempts or causes the same, to, from, or through the United States,

any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

"(b) For purposes of this section, any term used in this section that is defined in section 513(c) has the same meaning given such term in section 513(c).

"(c) The United States Secret Service, in addition to any other agency having such authority, shall have authority to investigate offenses under this section.".

<< 18 USCA Ch. 25 >>

(2) TECHNICAL AMENDMENT.—The analysis for chapter 25 of title 18, United States Code, is amended by inserting after the item relating to section 513 the following:

"514. Fictitious obligations.".

SEC. 2604. AMENDMENTS TO THE TRUTH IN SAVINGS ACT.

<< 12 USCA § 4310 >>

<< 12 USCA § 4310 NOTE >>

 (a) REPEAL.—Effective as of the end of the 5–year period beginning on the date of the enactment of this Act, section 271 of the Truth in Savings Act (12 U.S.C. 4310) is repealed.

<< 12 USCA § 4302 >>

 (b) ON–PREMISES DISPLAYS.—Section 263(c) of the Truth in Savings Act (12 U.S.C. 4302(c)) is amended—
 (1) by striking paragraph (2);
 (2) by striking "(1) IN GENERAL.—"; and
 (3) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively, and indenting appropriately.

<< 12 USCA § 4313 >>

 (c) DEPOSITORY INSTITUTION DEFINITION.—Section 274(6) of the Truth in Savings Act (12 U.S.C. 4313(6)) is amended by inserting before the period ", but does not include any nonautomated credit union that was not required to comply with the requirements of this title as of the date of enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996, pursuant to the determination of the National Credit Union Administration Board".

<< 12 USCA § 4305 >>

 (d) TIME DEPOSITS.—Section 266(a)(3) of the Truth in Savings Act (12 U.S.C. 4305(a)(3)) is amended by inserting "has a maturity of more than 30 days" after "deposit which".

SEC. 2605. CONSUMER LEASING ACT AMENDMENTS.

<< 15 USCA § 1667f NOTE >>

 (a) CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSES.—
 (1) FINDINGS.—The Congress finds that—
  (A) competition among the various financial institutions and other firms engaged in the business of consumer leasing is greatest when there is informed use of leasing;
  (B) the informed use of leasing results from an awareness of the cost of leasing by consumers; and
  (C) there has been a continued trend toward leasing automobiles and other durable goods for consumer use as an alternative to installment credit sales and that leasing product advances have occurred such that lessors have been unable to provide consistent industry-wide disclosures to fully account for the competitive progress that has occurred.
 (2) PURPOSES.—The purposes of this section are—
  (A) to assure a simple, meaningful disclosure of leasing terms so that the consumer will be able to compare more readily the various leasing terms available to the consumer and avoid the uninformed use of leasing, and to protect the consumer against inaccurate and unfair leasing practices;
  (B) to provide for adequate cost disclosures that reflect the marketplace without impairing competition and the development of new leasing products; and
  (C) to provide the Board with the regulatory authority to assure a simplified, meaningful definition and disclosure of the terms of certain leases of personal property for personal, family, or household purposes so as to—
   (i) enable the lessee to compare more readily the various lease terms available to the lessee;
   (ii) enable comparison of lease terms with credit terms, as appropriate; and

(iii) assure meaningful and accurate disclosures of lease terms in advertisements.

(b) REGULATIONS.—

<< 15 USCA § 1667f >>

(1) IN GENERAL.—Chapter 5 of the Truth in Lending Act (15 U.S.C. 1667 et seq.) is amended by adding at the end the following new section:

"SEC. 187. REGULATIONS.

"(a) REGULATIONS AUTHORIZED.—

"(1) IN GENERAL.—The Board shall prescribe regulations to update and clarify the requirements and definitions applicable to lease disclosures and contracts, and any other issues specifically related to consumer leasing, to the extent that the Board determines such action to be necessary—

"(A) to carry out this chapter;

"(B) to prevent any circumvention of this chapter; or

"(C) to facilitate compliance with the requirements of the chapter.

"(2) CLASSIFICATIONS, ADJUSTMENTS.—Any regulations prescribed under paragraph (1) may contain classifications and differentiations, and may provide for adjustments and exceptions for any class of transactions, as the Board considers appropriate.

"(b) MODEL DISCLOSURE.—

"(1) PUBLICATION.—The Board shall establish and publish model disclosure forms to facilitate compliance with the disclosure requirements of this chapter and to aid the consumer in understanding the transaction to which the subject disclosure form relates.

"(2) USE OF AUTOMATED EQUIPMENT.—In establishing model forms under this subsection, the Board shall consider the use by lessors of data processing or similar automated equipment.

"(3) USE OPTIONAL.—A lessor may utilize a model disclosure form established by the Board under this subsection for purposes of compliance with this chapter, at the discretion of the lessor.

"(4) EFFECT OF USE.—Any lessor who properly uses the material aspects of any model disclosure form established by the Board under this subsection shall be deemed to be in compliance with the disclosure requirements to which the form relates.".

<< 15 USCA § 1667f NOTE >>

(2) EFFECTIVE DATE.—

(A) IN GENERAL.—Any regulation of the Board, or any amendment or interpretation of any regulation of the Board issued pursuant to section 187 of the Truth in Lending Act (as added by paragraph (1) of this subsection), shall become effective on the first October 1 that follows the date of promulgation of that regulation, amendment, or interpretation by not less than 6 months.

(B) LONGER PERIOD.—The Board may, at the discretion of the Board, extend the time period referred to in subparagraph (A) in accordance with subparagraph (C), to permit lessors to adjust their disclosure forms to accommodate the requirements of section 127 of the Truth in Lending Act (as added by paragraph (1) of this subsection).

(C) SHORTER PERIOD.—The Board may shorten the time period referred to in subparagraph (A), if the Board makes a specific finding that such action is necessary to comply with the findings of a court or to prevent an unfair or deceptive practice.

(D) COMPLIANCE BEFORE EFFECTIVE DATE.—Any lessor may comply with any means of disclosure provided for in section 127 of the Truth in Lending Act (as added by paragraph (1) of this subsection) before the effective date of such requirement.

(E) DEFINITIONS.—For purposes of this subsection, the term "lessor" has the same meaning as in section 181 of the Truth in Lending Act.

(3) CLERICAL AMENDMENT.—The table of sections for chapter 5 of title I of the Truth in Lending Act (15 U.S.C. 1601 et seq.) is amended by inserting after the item relating to section 186 the following new item:

"187. Regulations.".

<< 15 USCA § 1667c >>

(c) CONSUMER LEASE ADVERTISING.—Section 184 of the Truth in Lending Act (15 U.S.C. 1667c) is amended—

(1) by striking subsections (a) and (c);

(2) by redesignating subsection (b) as subsection (c); and

(3) by inserting before subsection (c), as so redesignated, the following:

"(a) IN GENERAL.—If an advertisement for a consumer lease includes a statement of the amount of any payment or a statement that any or no initial payment is required, the advertisement shall clearly and conspicuously state, as applicable—

"(1) the transaction advertised is a lease;

"(2) the total amount of any initial payments required on or before consummation of the lease or delivery of the property, whichever is later;

"(3) that a security deposit is required;

"(4) the number, amount, and timing of scheduled payments; and

"(5) with respect to a lease in which the liability of the consumer at the end of the lease term is based on the anticipated residual value of the property, that an extra charge may be imposed at the end of the lease term.

"(b) ADVERTISING MEDIUM NOT LIABLE.—No owner or employee of any entity that serves as a medium in which an advertisement appears or through which an advertisement is disseminated, shall be liable under this section.".

<< 12 USCA § 1752a NOTE >>

SEC. 2606. STUDY OF CORPORATE CREDIT UNIONS.

(a) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

(1) ADMINISTRATION.—The term "Administration" means the National Credit Union Administration.

(2) BOARD.—The term "Board" means the National Credit Union Administration Board.

(3) CORPORATE CREDIT UNION.—The term "corporate credit union" has the meaning given such term by rule or regulation of the Board.

(4) FUND.—The term "Fund" means the National Credit Union Share Insurance Fund established under section 203 of the Federal Credit Union Act.

(5) SECRETARY.—The term "Secretary" means the Secretary of the Treasury.

(b) STUDY.—

(1) IN GENERAL.—The Secretary, in consultation with the Board, the Corporation, the Comptroller of the Currency, and the Administration, shall conduct a study and evaluation of—

(A) the oversight and supervisory practices of the Administration concerning the Fund, including the treatment of amounts deposited in the Fund pursuant to section 202(c) of the Federal Credit Union Act, including analysis of—

(i) whether those amounts should be—

(I) refundable; or

(II) treated as expenses; and

(ii) the use of those amounts in determining equity capital ratios;

(B) the potential for, and potential effects of, administration of the Fund by an entity other than the Administration;

(C) the 10 largest corporate credit unions in the United States, conducted in cooperation with appropriate employees of other Federal agencies with expertise in the examination of federally insured financial institutions, including—

(i) the investment practices of those credit unions; and

(ii) the financial stability, financial operations, and financial controls of those credit unions;

(D) the regulations of the Administration; and

(E) the supervision of corporate credit unions by the Administration.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(c) REPORT.—Not later than 12 months after the date of enactment of this Act, the Secretary shall submit to the appropriate committees of the Congress, a report that includes the results of the study and evaluation conducted under subsection (b), together with any recommendations that the Secretary considers to be appropriate.

SEC. 2607. REPORT ON THE RECONCILIATION OF DIFFERENCES BETWEEN REGULATORY ACCOUNTING PRINCIPLES AND GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

Not later than 180 days after the date of enactment of this Act, each appropriate Federal banking agency shall submit to the Committee on Banking and Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate, a report describing both the actions that have been taken by the agency and the actions that will be taken by the agency to eliminate or conform inconsistent or duplicative accounting and reporting requirements applicable to reports or statements filed with any such agency by insured depository institutions, as required by section 121 of the Federal Deposit Insurance Corporation Improvement Act of 1991.

<< 12 USCA § 1811 NOTE >>

SEC. 2608. STATE–BY–STATE AND METROPOLITAN AREA–BY–METROPOLITAN AREA STUDY OF BANK FEES.

Section 1002(b)(2)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (12 U.S.C. 1811 note) is amended to read as follows:

"(A) a description of any discernible trend, in the Nation as a whole, in each of the 50 States, and in each consolidated metropolitan statistical area or primary metropolitan statistical area (as defined by the Director of the Office of Management and Budget), in the cost and availability of retail banking services (including fees imposed for providing such services), that delineates differences between insured depository institutions on the basis of both the size of the institution and any engagement of the institution in multistate activity; and".

<< 31 USCA § 5118 >>

SEC. 2609. PROSPECTIVE APPLICATION OF GOLD CLAUSES IN CONTRACTS.

Section 5118(d)(2) of title 31, United States Code, is amended by adding at the end the following: "This paragraph shall apply to any obligation issued on or before October 27, 1977, notwithstanding any assignment or novation of such obligation after October 27, 1977, unless all parties to the assignment or novation specifically agree to include a gold clause in the new agreement. Nothing in the preceding sentence shall be construed to affect the enforceability of a Gold Clause contained in any obligation issued after October 27, 1977 if the enforceability of that Gold Clause has been finally adjudicated before the date of enactment of the Economic Growth and Regulatory Paperwork Reduction Act of 1996.".

<< 12 USCA § 1841 >>

SEC. 2610. QUALIFIED FAMILY PARTNERSHIPS.

Section 2 of the Bank Holding Company Act of 1956 (12 U.S.C. 1841) is amended—

(1) in subsection (b), by inserting ", and shall not include a qualified family partnership" after "by any State"; and

(2) in subsection (o), by adding at the end the following:

"(10) QUALIFIED FAMILY PARTNERSHIP.—The term 'qualified family partnership' means a general or limited partnership that the Board determines—

"(A) does not directly control any bank, except through a registered bank holding company;

"(B) does not control more than 1 registered bank holding company;

"(C) does not engage in any business activity, except indirectly through ownership of other business entities;

"(D) has no investments other than those permitted for a bank holding company pursuant to section 4(c);

"(E) is not obligated on any debt, either directly or as a guarantor;

"(F) has partners, all of whom are either—

AR.03474

"(i) individuals related to each other by blood, marriage (including former marriage), or adoption; or

"(ii) trusts for the primary benefit of individuals related as described in clause (i); and

"(G) has filed with the Board a statement that includes—

"(i) the basis for the eligibility of the partnership under subparagraph (F);

"(ii) a list of the existing activities and investments of the partnership;

"(iii) a commitment to comply with this paragraph;

"(iv) a commitment to comply with section 7 of the Federal Deposit Insurance Act with respect to any acquisition of control of an insured depository institution occurring after date of enactment of this paragraph; and

"(v) a commitment to be subject, to the same extent as if the qualified family partnership were a bank holding company—

"(I) to examination by the Board to assure compliance with this paragraph; and

"(II) to section 8 of the Federal Deposit Insurance Act.".

## SEC. 2611. COOPERATIVE EFFORTS BETWEEN DEPOSITORY INSTITUTIONS AND FARMERS AND RANCHERS IN DROUGHT–STRICKEN AREAS.

(a) FINDINGS.—The Congress hereby finds the following:

(1) Severe drought is being experienced in the Plains and the Southwest portions of our country.

(2) Soil erosion is becoming a critical issue as the dry season approaches and summer winds may rob these fields of nutrient-rich topsoil.

(3) Without immediate assistance, ranchers and farmers would be forced to cull their herds bringing tremendous volatility in the beef market.

(4) The American people will feel the impact of this drought in their pocketbooks through higher prices for grain products.

(5) The communities in drought-stricken areas are suffering and borrowers may have difficulty meeting their obligations to financial institutions.

(6) Congress has already passed the Depository Institutions Disaster Relief Act of 1992 which allows financial institutions to make emergency exceptions to the appraisal requirement in times of national disasters.

(b) SENSE OF THE CONGRESS.—It is the sense of the Congress that financial institutions and Federal bank regulators should work cooperatively with farmers and ranchers in communities affected by drought conditions to allow financial obligations to be met without imposing undue burdens.

<< 12 USCA § 1843 >>

## SEC. 2612. STREAMLINING PROCESS FOR DETERMINING NEW NONBANKING ACTIVITIES.

Section 4(c)(8) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(c)(8)) is amended by striking "and opportunity for hearing" and inserting the following: "(and opportunity for hearing in the case of an acquisition of a savings association)".

## SEC. 2613. AUTHORIZING BANK SERVICE COMPANIES TO ORGANIZE AS LIMITED LIABILITY COMPANIES.

<< 12 USCA § 1861 >>

(a) AMENDMENT TO SHORT TITLE.—Section 1 of the Bank Service Corporation Act (12 U.S.C. 1861(a)) is amended by striking subsection (a) and inserting the following new subsection:

"(a) SHORT TITLE.—This Act may be cited as the 'Bank Service Company Act'.";

(b) AMENDMENTS TO DEFINITIONS.—Section 1(b) of the Bank Service Corporation Act (12 U.S.C. 1861(b)) is amended—

(1) by striking paragraph (2) and inserting the following new paragraph:

"(2) the term 'bank service company' means—

"(A) any corporation—

"(i) which is organized to perform services authorized by this Act; and

"(ii) all of the capital stock of which is owned by 1 or more insured banks; and

"(B) any limited liability company—

"(i) which is organized to perform services authorized by this Act; and

"(ii) all of the members of which are 1 or more insured banks.";

(2) in paragraph (6)—

(A) by striking "corporation" and inserting "company"; and

(B) by striking "and" after the semicolon;

(3) by redesignating paragraph (7) as paragraph (8) and inserting after paragraph (6) the following new paragraph:

"(7) the term 'limited liability company' means any company, partnership, trust, or similar business entity organized under the law of a State (as defined in section 3 of the Federal Deposit Insurance Act) which provides that a member or manager of such company is not personally liable for a debt, obligation, or liability of the company solely by reason of being, or acting as, a member or manager of such company; and"; and

(4) in paragraph (8) (as so redesignated)—

(A) by striking "corporation" each place such term appears and inserting "company"; and

(B) by striking "capital stock" and inserting "equity".

<< 12 USCA § 1862 >>

(c) AMENDMENTS TO SECTION 2.—Section 2 of the Bank Service Corporation Act (12 U.S.C. 1862) is amended—

(1) by striking "corporation" and inserting "company";

(2) by striking "corporations" and inserting "companies"; and

(3) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1863 >>

(d) AMENDMENTS TO SECTION 3.—Section 3 of the Bank Service Corporation Act (12 U.S.C. 1863) is amended—

(1) by striking "corporation" each place such term appears and inserting "company"; and

(2) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1864 >>

(e) AMENDMENTS TO SECTION 4.—Section 4 of the Bank Service Corporation Act (12 U.S.C. 1864) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) in subsection (b), by inserting "or members" after "shareholders" each place such term appears;

(3) in subsections (c) and (d), by inserting "or member" after "shareholder" each place such term appears;

(4) in subsection (e)—

(A) by inserting "or members" after "national bank and State bank shareholders";

(B) by striking "its national bank shareholder or shareholders" and inserting "any shareholder or member of the company which is a national bank";

(C) by striking "its State bank shareholder or shareholders" and inserting "any shareholder or member of the company which is a State bank";

(D) by striking "such State bank or banks" and inserting "any such State bank"; and

(E) by inserting "or members" after "State bank and national bank shareholders"; and

(5) in the heading for such section, by striking "CORPORATION" and inserting "COMPANY".

<< 12 USCA § 1865 >>

(f) AMENDMENTS TO SECTION 5.—Section 5 of the Bank Service Corporation Act (12 U.S.C. 1865) is amended—

(1) by striking "corporation" each place such term appears and inserting "company"; and

(2) in the heading for such section, by striking "CORPORATIONS" and inserting "COMPANIES".

<< 12 USCA § 1866 >>

(g) AMENDMENTS TO SECTION 6.—Section 6 of the Bank Service Corporation Act (12 U.S.C. 1866) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) by inserting "or is not a member of" after "does not own stock in";

(3) by striking "the nonstockholding institution" and inserting "such depository institution";

(4) by inserting "or is a member of" after "that owns stock in";

(5) in paragraphs (1) and (2), by inserting "or nonmember" after "nonstockholding"; and

(6) in the heading for such section by inserting "OR NONMEMBERS" after "NONSTOCKHOLDERS".

<< 12 USCA § 1867 >>

(h) AMENDMENTS TO SECTION 7.—Section 7 of the Bank Service Corporation Act (12 U.S.C. 1867) is amended—

(1) by striking "corporation" each place such term appears and inserting "company";

(2) in subsection (a)—

  (A) by inserting "or principal member" after "principal shareholder"; and

  (B) by inserting "or member" after "other shareholder"; and

(3) in the heading for such section, by striking "CORPORATIONS" and inserting "COMPANIES".

SEC. 2614. RETIREMENT CERTIFICATES OF DEPOSITS.

<< 12 USCA § 1813 >>

(a) IN GENERAL.—Section 3(l)(5) of the Federal Deposit Insurance Act (12 U.S.C. 1813(l)(5) is amended—

(1) in subparagraph (A), by striking "and" at the end;

(2) in subparagraph (B), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

  "(C) any liability of an insured depository institution that arises under an annuity contract, the income of which is tax deferred under section 72 of the Internal Revenue Code of 1986.".

<< 12 USCA § 1813 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to any liability of an insured depository that arises under an annuity contract issued on or after the date of enactment of this Act.

SEC. 2615. PROHIBITIONS ON CERTAIN DEPOSITORY INSTITUTION ASSOCIATIONS WITH GOVERNMENT– SPONSORED ENTERPRISES.

<< 12 USCA § 1781 >>

(a) CREDIT UNIONS.—Section 201 of the Federal Credit Union Act (12 U.S.C. 1781) is amended by adding at the end the following new subsection:

"(e) PROHIBITION ON CERTAIN ASSOCIATIONS.—

"(1) IN GENERAL.—No insured credit union may be sponsored by or accept financial support, directly or indirectly, from any Government-sponsored enterprise, if the credit union includes the customers of the Government-sponsored enterprise in the field of membership of the credit union.

"(2) ROUTINE BUSINESS FINANCING.—Paragraph (1) shall not apply with respect to advances or other forms of financial assistance generally provided by a Government-sponsored enterprise in the ordinary course of business of the enterprise.

"(3) GOVERNMENT–SPONSORED ENTERPRISE DEFINED.—For purposes of this subsection, the term 'Government-sponsored enterprise' has the meaning given to such term in section 1404(e)(1)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

"(4) EMPLOYEE CREDIT UNION.—No provision of this subsection shall be construed as prohibiting any employee of a Government-sponsored enterprise from becoming a member of a credit union whose field of membership is the employees of such enterprise.".

<< 12 USCA § 1828 >>

(b) BANKS AND SAVINGS ASSOCIATIONS.—Section 18 of the Federal Deposit Insurance Act (12 U.S.C. 1828) is amended by adding at the end the following new subsection:

"(s) PROHIBITION ON CERTAIN AFFILIATIONS.—

"(1) IN GENERAL.—No depository institution may be an affiliate of, be sponsored by, or accept financial support, directly or indirectly, from any Government-sponsored enterprise.

"(2) EXCEPTION FOR MEMBERS OF A FEDERAL HOME LOAN BANK.—Paragraph (1) shall not apply with respect to the membership of a depository institution in a Federal home loan bank.

"(3) ROUTINE BUSINESS FINANCING.—Paragraph (1) shall not apply with respect to advances or other forms of financial assistance provided by a Government-sponsored enterprise pursuant to the statutes governing such enterprise.

"(4) GOVERNMENT–SPONSORED ENTERPRISE DEFINED.—For purposes of this subsection, the term 'Government-sponsored enterprise' has the meaning given to such term in section 1404(e)(1)(A) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.".

<< 12 USCA § 1781 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply on and after January 1, 1996.

Subtitle G—Deposit Insurance Funds

<< 12 USCA § 1811 NOTE >>

SEC. 2701. SHORT TITLE.

This subtitle may be cited as the "Deposit Insurance Funds Act of 1996".

SEC. 2702. SPECIAL ASSESSMENT TO CAPITALIZE SAIF.

<< 12 USCA § 1817 NOTE >>

(a) IN GENERAL.—Except as provided in subsection (f), the Board of Directors of the Federal Deposit Insurance Corporation shall impose a special assessment on the SAIF-assessable deposits of each insured depository institution in accordance with assessment regulations of the Corporation at a rate applicable to all such institutions that the Board of Directors, in its sole discretion, determines (after taking into account the adjustments described in subsections (g), (h), and (j)) will cause the Savings Association Insurance Fund to achieve the designated reserve ratio on the first business day of the 1st month beginning after the date of the enactment of this Act.

(b) FACTORS TO BE CONSIDERED.—In carrying out subsection (a), the Board of Directors shall base its determination on—

(1) the monthly Savings Association Insurance Fund balance most recently calculated;

(2) data on insured deposits reported in the most recent reports of condition filed not later than 70 days before the date of enactment of this Act by insured depository institutions; and

(3) any other factors that the Board of Directors deems appropriate.

(c) DATE OF DETERMINATION.—For purposes of subsection (a), the amount of the SAIF-assessable deposits of an insured depository institution shall be determined as of March 31, 1995.

(d) DATE PAYMENT DUE.—Except as provided in subsection (g), the special assessment imposed under this section shall be—

(1) due on the first business day of the 1st month beginning after the date of the enactment of this Act; and

(2) paid to the Corporation on the later of—

(A) the first business day of the 1st month beginning after such date of enactment; or

(B) such other date as the Corporation shall prescribe, but not later than 60 days after the date of enactment of this Act.

(e) ASSESSMENT DEPOSITED IN SAIF.—Notwithstanding any other provision of law, the proceeds of the special assessment imposed under this section shall be deposited in the Savings Association Insurance Fund.

(f) EXEMPTIONS FOR CERTAIN INSTITUTIONS.—

(1) EXEMPTION FOR WEAK INSTITUTIONS.—The Board of Directors may, by order, in its sole discretion, exempt any insured depository institution that the Board of Directors determines to be weak, from paying the special assessment imposed under this section if the Board of Directors determines that the exemption would reduce risk to the Savings Association Insurance Fund.

(2) GUIDELINES REQUIRED.—Not later than 30 days after the date of enactment of this Act, the Board of Directors shall prescribe guidelines setting forth the criteria that the Board of Directors will use in exempting institutions under paragraph (1). Such guidelines shall be published in the Federal Register.

(3) EXEMPTION FOR CERTAIN NEWLY CHARTERED AND OTHER DEFINED INSTITUTIONS.—

(A) IN GENERAL.—In addition to the institutions exempted from paying the special assessment under paragraph (1), the Board of Directors shall exempt any insured depository institution from payment of the special assessment if the institution—

(i) was in existence on October 1, 1995, and held no SAIF-assessable deposits before January 1, 1993;

(ii) is a Federal savings bank which—

(I) was established de novo in April 1994 in order to acquire the deposits of a savings association which was in default or in danger of default; and

(II) received minority interim capital assistance from the Resolution Trust Corporation under section 21A(w) of the Federal Home Loan Bank Act in connection with the acquisition of any such savings association; or

(iii) is a savings association, the deposits of which are insured by the Savings Association Insurance Fund, which—

(I) before January 1, 1987, was chartered as a Federal savings bank insured by the Federal Savings and Loan Insurance Corporation for the purpose of acquiring all or substantially all of the assets and assuming all or substantially all of the deposit liabilities of a national bank in a transaction consummated after July 1, 1986; and

(II) as of the date of that transaction, had assets of less than $150,000,000.

(B) DEFINITION.—For purposes of this paragraph, an institution shall be deemed to have held SAIF-assessable deposits before January 1, 1993, if—

(i) it directly held SAIF-assessable deposits before that date; or

(ii) it succeeded to, acquired, purchased, or otherwise holds any SAIF-assessable deposits as of the date of enactment of this Act that were SAIF-assessable deposits before January 1, 1993.

(4) EXEMPT INSTITUTIONS REQUIRED TO PAY ASSESSMENTS AT FORMER RATES.—

(A) PAYMENTS TO SAIF AND DIF.—Any insured depository institution that the Board of Directors exempts under this subsection from paying the special assessment imposed under this section shall pay semiannual assessments—

(i) during calendar years 1996, 1997, and 1998, into the Savings Association Insurance Fund, based on SAIF-assessable deposits of that institution, at assessment rates calculated under the schedule in effect for Savings Association Insurance Fund members on June 30, 1995; and

(ii) during calendar year 1999—

(I) into the Deposit Insurance Fund, based on SAIF-assessable deposits of that institution as of December 31, 1998, at assessment rates calculated under the schedule in effect for Savings Association Insurance Fund members on June 30, 1995; or

(II) in accordance with clause (i), if the Bank Insurance Fund and the Savings Association Insurance Fund are not merged into the Deposit Insurance Fund.

(B) OPTIONAL PRO RATA PAYMENT OF SPECIAL ASSESSMENT.—This paragraph shall not apply with respect to any insured depository institution (or successor insured depository institution) that has paid, during any calendar year from 1997 through 1999, upon such terms as the Corporation may announce, an amount equal to the product of—

(i) 16.7 percent of the special assessment that the institution would have been required to pay under subsection (a), if the Board of Directors had not exempted the institution; and

(ii) the number of full semiannual periods remaining between the date of the payment and December 31, 1999.

(g) SPECIAL ELECTION FOR CERTAIN INSTITUTIONS FACING HARDSHIP AS A RESULT OF THE SPECIAL ASSESSMENT.—

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) ELECTION AUTHORIZED.—If—

 (A) an insured depository institution, or any depository institution holding company which, directly or indirectly, controls such institution, is subject to terms or covenants in any debt obligation or preferred stock outstanding on September 13, 1995; and

 (B) the payment of the special assessment under subsection (a) would pose a significant risk of causing such depository institution or holding company to default or violate any such term or covenant,

the depository institution may elect, with the approval of the Corporation, to pay such special assessment in accordance with paragraphs (2) and (3) in lieu of paying such assessment in the manner required under subsection (a).

 (2) 1ST ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay an assessment in an amount equal to 50 percent of the amount of the special assessment that would otherwise apply under subsection (a), by the date on which such special assessment is payable under subsection (d).

 (3) 2D ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay a 2d assessment, by the date established by the Board of Directors in accordance with paragraph (4), in an amount equal to the product of 51 percent of the rate determined by the Board of Directors under subsection (a) for determining the amount of the special assessment and the SAIF-assessable deposits of the institution on March 31, 1996, or such other date in calendar year 1996 as the Board of Directors determines to be appropriate.

 (4) DUE DATE OF 2D ASSESSMENT.—The date established by the Board of Directors for the payment of the assessment under paragraph (3) by a depository institution shall be the earliest practicable date which the Board of Directors determines to be appropriate, which is at least 15 days after the date used by the Board of Directors under paragraph (3).

 (5) SUPPLEMENTAL SPECIAL ASSESSMENT.—An insured depository institution which makes an election under paragraph (1) shall pay a supplemental special assessment, at the same time the payment under paragraph (3) is made, in an amount equal to the product of—

 (A) 50 percent of the rate determined by the Board of Directors under subsection (a) for determining the amount of the special assessment; and

 (B) 95 percent of the amount by which the SAIF-assessable deposits used by the Board of Directors for determining the amount of the 1st assessment under paragraph (2) exceeds, if any, the SAIF-assessable deposits used by the Board for determining the amount of the 2d assessment under paragraph (3).

(h) ADJUSTMENT OF SPECIAL ASSESSMENT FOR CERTAIN BANK INSURANCE FUND MEMBER BANKS.—

 (1) IN GENERAL.—For purposes of computing the special assessment imposed under this section with respect to a Bank Insurance Fund member bank, the amount of any deposits of any insured depository institution which section 5(d)(3) of the Federal Deposit Insurance Act treats as insured by the Savings Association Insurance Fund shall be reduced by 20 percent—

 (A) if the adjusted attributable deposit amount of the Bank Insurance Fund member bank is less than 50 percent of the total domestic deposits of that member bank as of June 30, 1995; or

 (B) if, as of June 30, 1995, the Bank Insurance Fund member—

  (i) had an adjusted attributable deposit amount equal to less than 75 percent of the total assessable deposits of that member bank;

  (ii) had total assessable deposits greater than $5,000,000,000; and

  (iii) was owned or controlled by a bank holding company that owned or controlled insured depository institutions having an aggregate amount of deposits insured or treated as insured by the Bank Insurance Fund greater than the aggregate amount of deposits insured or treated as insured by the Savings Association Insurance Fund.

 (2) ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT.—For purposes of this subsection, the "adjusted attributable deposit amount" shall be determined in accordance with section 5(d)(3)(C) of the Federal Deposit Insurance Act.

<< 12 USCA § 1815 >>

<< 12 USCA § 1817 NOTE >>

(i) ADJUSTMENT TO THE ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT FOR CERTAIN BANK INSURANCE FUND MEMBER BANKS.—Section 5(d)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1815(d)(3)) is amended—

(1) in subparagraph (C), by striking "The adjusted attributable deposit amount" and inserting "Except as provided in subparagraph (K), the adjusted attributable deposit amount"; and

(2) by adding at the end the following new subparagraph:

"(K) ADJUSTMENT OF ADJUSTED ATTRIBUTABLE DEPOSIT AMOUNT.—The amount determined under subparagraph (C)(i) for deposits acquired by March 31, 1995, shall be reduced by 20 percent for purposes of computing the adjusted attributable deposit amount for the payment of any assessment for any semiannual period that begins after the date of the enactment of the Deposit Insurance Funds Act of 1996 (other than the special assessment imposed under section 2702(a) of such Act), for a Bank Insurance Fund member bank that, as of June 30, 1995—

"(i) had an adjusted attributable deposit amount that was less than 50 percent of the total deposits of that member bank; or

"(ii)(I) had an adjusted attributable deposit amount equal to less than 75 percent of the total assessable deposits of that member bank;

"(II) had total assessable deposits greater than $5,000,000,000; and

"(III) was owned or controlled by a bank holding company that owned or controlled insured depository institutions having an aggregate amount of deposits insured or treated as insured by the Bank Insurance Fund greater than the aggregate amount of deposits insured or treated as insured by the Savings Association Insurance Fund.".

<< 12 USCA § 1817 NOTE >>

(j) ADJUSTMENT OF SPECIAL ASSESSMENT FOR CERTAIN SAVINGS ASSOCIATIONS.—

(1) SPECIAL ASSESSMENT REDUCTION.—For purposes of computing the special assessment imposed under this section, in the case of any converted association, the amount of any deposits of such association which were insured by the Savings Association Insurance Fund as of March 31, 1995, shall be reduced by 20 percent.

(2) CONVERTED ASSOCIATION.—For purposes of this subsection, the term "converted association" means—

(A) any Federal savings association—

(i) that is a member of the Savings Association Insurance Fund and that has deposits subject to assessment by that fund which did not exceed $4,000,000,000, as of March 31, 1995; and

(ii) that had been, or is a successor by merger, acquisition, or otherwise to an institution that had been, a State savings bank, the deposits of which were insured by the Federal Deposit Insurance Corporation before August 9, 1989, that converted to a Federal savings association pursuant to section 5(i) of the Home Owners' Loan Act before January 1, 1985;

(B) a State depository institution that is a member of the Savings Association Insurance Fund that had been a State savings bank before October 15, 1982, and was a Federal savings association on August 9, 1989;

(C) an insured bank that—

(i) was established de novo in order to acquire the deposits of a savings association in default or in danger of default;

(ii) did not open for business before acquiring the deposits of such savings association; and

(iii) was a Savings Association Insurance Fund member before the date of enactment of this Act; and

(D) an insured bank that—

(i) resulted from a savings association before December 19, 1991, in accordance with section 5(d)(2)(G) of the Federal Deposit Insurance Act; and

(ii) had an increase in its capital in conjunction with the conversion in an amount equal to more than 75 percent of the capital of the institution on the day before the date of the conversion.

SEC. 2703. FINANCING CORPORATION FUNDING.

<< 12 USCA § 1441 >>

(a) IN GENERAL.—Section 21 of the Federal Home Loan Bank Act (12 U.S.C. 1441) is amended—

(1) in subsection (f)(2)—

(A) in the matter immediately preceding subparagraph (A)—

(i) by striking "To the extent the amounts available pursuant to paragraph (1) are insufficient to cover the amount of interest payments, issuance costs, and custodial fees," and inserting "In addition to the amounts obtained pursuant to paragraph (1),";

(ii) by striking "Savings Association Insurance Fund member" and inserting "insured depository institution"; and

(iii) by striking "members" and inserting "institutions"; and

(B) by striking ", except that—" and all that follows through the end of the paragraph and inserting ", except that—

"(A) the assessments imposed on insured depository institutions with respect to any BIF-assessable deposit shall be assessed at a rate equal to $\frac{1}{5}$ of the rate of the assessments imposed on insured depository institutions with respect to any SAIF assessable deposit; and

"(B) no limitation under clause (i) or (iii) of section 7(b)(2)(A) of the Federal Deposit Insurance Act shall apply for purposes of this paragraph."; and

(2) in subsection (k)—

(A) by striking "section—" and inserting "section, the following definitions shall apply:";

(B) by striking paragraph (1);

(C) by redesignating paragraphs (2) and (3) as paragraphs (1) and (2), respectively; and

(D) by adding at the end the following new paragraphs:

"(3) INSURED DEPOSITORY INSTITUTION.—The term 'insured depository institution' has the same meaning as in section 3 of the Federal Deposit Insurance Act

"(4) DEPOSIT TERMS.—

"(A) BIF–ASSESSABLE DEPOSITS.—The term 'BIF-assessable deposit' means a deposit that is subject to assessment for purposes of the Bank Insurance Fund under the Federal Deposit Insurance Act (including a deposit that is treated as a deposit insured by the Bank Insurance Fund under section 5(d)(3) of the Federal Deposit Insurance Act).

"(B) SAIF–ASSESSABLE DEPOSIT.—The term 'SAIF-assessable deposit' has the meaning given to such term in section 2710 of the Deposit Insurance Funds Act of 1996.".

<< 12 USCA § 1817 >>

(b) CONFORMING AMENDMENT.—Section 7(b)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)) is amended by striking subparagraph (D).

<< 12 USCA 1441 NOTE >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Subsections (a) and (c) and the amendments made by such subsections shall apply with respect to semiannual periods which begin after December 31, 1996.

(2) TERMINATION OF CERTAIN ASSESSMENT RATES.—Subparagraph (A) of section 21(f)(2) of the Federal Home Loan Bank Act (as amended by subsection (a)) shall not apply after the earlier of—

(A) December 31, 1999; or

(B) the date as of which the last savings association ceases to exist.

(d) PROHIBITION ON DEPOSIT SHIFTING.—

(1) IN GENERAL.—Effective as of the date of the enactment of this Act and ending on the date provided in subsection (c)(2) of this section, the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Director of the Office of Thrift Supervision shall take appropriate actions, including enforcement actions, denial of applications, or imposition of entrance and exit fees as if such transactions qualified as conversion transactions pursuant to section 5(d) of the Federal Deposit Insurance Act, to prevent insured depository institutions and depository institution holding companies from facilitating or encouraging the shifting of deposits from SAIF-assessable deposits to BIF-assessable deposits (as defined in section 21(k) of the Federal Home Loan Bank Act) for the purpose of evading the assessments imposed on insured depository institutions with respect to SAIF-assessable deposits under section 7(b) of the Federal Deposit Insurance Act and section 21(f)(2) of the Federal Home Loan Bank Act.

(2) REGULATIONS.—The Board of Directors of the Federal Deposit Insurance Corporation may issue regulations, including regulations defining terms used in paragraph (1), to prevent the shifting of deposits described in such paragraph.

(3) RULE OF CONSTRUCTION.—No provision of this subsection shall be construed as prohibiting conduct or activity of any insured depository institution which—

(A) is undertaken in the ordinary course of business of such depository institution; and

(B) is not directed towards the depositors of an insured depository institution affiliate (as defined in section 2(k) of the Bank Holding Company Act of 1956) of such depository institution.

SEC. 2704. MERGER OF BIF AND SAIF.

<< 12 USCA § 1821 NOTE >>

(a) IN GENERAL.—

(1) MERGER.—The Bank Insurance Fund and the Savings Association Insurance Fund shall be merged into the Deposit Insurance Fund established by section 11(a)(4) of the Federal Deposit Insurance Act, as amended by this section.

(2) DISPOSITION OF ASSETS AND LIABILITIES.—All assets and liabilities of the Bank Insurance Fund and the Savings Association Insurance Fund shall be transferred to the Deposit Insurance Fund.

(3) NO SEPARATE EXISTENCE.—The separate existence of the Bank Insurance Fund and the Savings Association Insurance Fund shall cease.

(b) SPECIAL RESERVE OF THE DEPOSIT INSURANCE FUND.—

(1) IN GENERAL.—Immediately before the merger of the Bank Insurance Fund and the Savings Association Insurance Fund, if the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, the amount by which that reserve ratio exceeds the designated reserve ratio shall be placed in the Special Reserve of the Deposit Insurance Fund, established under section 11(a)(5) of the Federal Deposit Insurance Act, as amended by this section.

(2) DEFINITION.—For purposes of this subsection, the term "reserve ratio" means the ratio of the net worth of the Savings Association Insurance Fund to the aggregate estimated amount of deposits insured by the Savings Association Insurance Fund.

(c) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on January 1, 1999, if no insured depository institution is a savings association on that date.

(d) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 12 USCA § 1821 >>

(1) DEPOSIT INSURANCE FUND.—Section 11(a)(4) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)) is amended—

(A) by redesignating subparagraph (B) as subparagraph (C);

(B) by striking subparagraph (A) and inserting the following:

"(A) ESTABLISHMENT.—There is established the Deposit Insurance Fund, which the Corporation shall—

"(i) maintain and administer;

"(ii) use to carry out its insurance purposes in the manner provided by this subsection; and

"(iii) invest in accordance with section 13(a).

"(B) USES.—The Deposit Insurance Fund shall be available to the Corporation for use with respect to Deposit Insurance Fund members."; and

(C) by striking "(4) GENERAL PROVISIONS RELATING TO FUNDS.—" and inserting the following:

"(4) ESTABLISHMENT OF THE DEPOSIT INSURANCE FUND.—".

(2) OTHER REFERENCES.—Section 11(a)(4)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)(C), as redesignated by paragraph (1) of this subsection) is amended by striking "Bank Insurance Fund and the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund".

(3) DEPOSITS INTO FUND.—Section 11(a)(4) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(4)) is amended by adding at the end the following new subparagraph:

"(D) DEPOSITS.—All amounts assessed against insured depository institutions by the Corporation shall be deposited in the Deposit Insurance Fund.".

(4) SPECIAL RESERVE OF DEPOSITS.—Section 11(a)(5) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(5)) is amended to read as follows:

"(5) SPECIAL RESERVE OF DEPOSIT INSURANCE FUND.—

"(A) ESTABLISHMENT.—

"(i) IN GENERAL.—There is established a Special Reserve of the Deposit Insurance Fund, which shall be administered by the Corporation and shall be invested in accordance with section 13(a).

"(ii) LIMITATION.—The Corporation shall not provide any assessment credit, refund, or other payment from any amount in the Special Reserve.

"(B) EMERGENCY USE OF SPECIAL RESERVE.—Notwithstanding subparagraph (A)(ii), the Corporation may, in its sole discretion, transfer amounts from the Special Reserve to the Deposit Insurance Fund, for the purposes set forth in paragraph (4), only if—

"(i) the reserve ratio of the Deposit Insurance Fund is less than 50 percent of the designated reserve ratio; and

"(ii) the Corporation expects the reserve ratio of the Deposit Insurance Fund to remain at less than 50 percent of the designated reserve ratio for each of the next 4 calendar quarters.

"(C) EXCLUSION OF SPECIAL RESERVE IN CALCULATING RESERVE RATIO.—Notwithstanding any other provision of law, any amounts in the Special Reserve shall be excluded in calculating the reserve ratio of the Deposit Insurance Fund under section 7.".

<< 12 USCA § 1441b >>

(5) FEDERAL HOME LOAN BANK ACT.—Section 21B(f)(2)(C)(ii) of the Federal Home Loan Bank Act (12 U.S.C. 1441b(f)(2)(C)(ii)) is amended—

(A) in subclause (I), by striking "to Savings Associations Insurance Fund members" and inserting "to insured depository institutions, and their successors, which were Savings Association Insurance Fund members on September 1, 1995"; and

(B) in subclause (II), by striking "to Savings Associations Insurance Fund members" and inserting "to insured depository institutions, and their successors, which were Savings Association Insurance Fund members on September 1, 1995".

(6) REPEALS.—

<< 12 USCA § 1813 >>

(A) SECTION 3.—Section 3(y) of the Federal Deposit Insurance Act (12 U.S.C. 1813(y)) is amended to read as follows:

"(y) DEFINITIONS RELATING TO THE DEPOSIT INSURANCE FUND.—

"(1) DEPOSIT INSURANCE FUND.—The term 'Deposit Insurance Fund' means the fund established under section 11(a)(4).

"(2) RESERVE RATIO.—The term 'reserve ratio' means the ratio of the net worth of the Deposit Insurance Fund to aggregate estimated insured deposits held in all insured depository institutions.

"(3) DESIGNATED RESERVE RATIO.—The designated reserve ratio of the Deposit Insurance Fund for each year shall be—

"(A) 1.25 percent of estimated insured deposits; or

"(B) a higher percentage of estimated insured deposits that the Board of Directors determines to be justified for that year by circumstances raising a significant risk of substantial future losses to the fund.

<< 12 USCA § 1817 >>

(B) SECTION 7.—Section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817) is amended—

(i) by striking subsection (l);

(ii) by redesignating subsections (m) and (n) as subsections (l) and (m), respectively;

(iii) in subsection (b)(2), by striking subparagraphs (B) and (F), and by redesignating subparagraphs (C), (E), (G), and (H) as subparagraphs (B) through (E), respectively.

<< 12 USCA § 1821 >>

(C) SECTION 11.—Section 11(a) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)) is amended—

(i) by striking paragraphs (6) and (7); and

(ii) by redesignating paragraph (8) as paragraph (6).

<< 12 USCA § 24 >>

(7) SECTION 5136 OF THE REVISED STATUTES.—The paragraph designated the "Eleventh" of section 5136 of the Revised Statutes of the United States (12 U.S.C. 24) is amended in the 5th sentence, by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 338a >>

(8) INVESTMENTS PROMOTING PUBLIC WELFARE; LIMITATIONS ON AGGREGATE INVESTMENTS.—The 23d undesignated paragraph of section 9 of the Federal Reserve Act (12 U.S.C. 338a) is amended in the 4th sentence, by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 347b >>

(9) ADVANCES TO CRITICALLY UNDERCAPITALIZED DEPOSITORY INSTITUTIONS.—Section 10B(b)(3)(A)(ii) of the Federal Reserve Act (12 U.S.C. 347b(b)(3)(A)(ii)) is amended by striking "any deposit insurance fund in" and inserting "the Deposit Insurance Fund of".

<< 2 USCA § 905 >>

(10) AMENDMENTS TO THE BALANCED BUDGET AND EMERGENCY DEFICIT CONTROL ACT OF 1985.—Section 255(g)(1)(A) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 905(g)(1)(A)) is amended—

(A) by striking "Bank Insurance Fund" and inserting "Deposit Insurance Fund"; and
(B) by striking "Federal Deposit Insurance Corporation, Savings Association Insurance Fund;".
(11) FURTHER AMENDMENTS TO THE FEDERAL HOME LOAN BANK ACT.—The Federal Home Loan Bank Act (12 U.S.C. 1421 et seq.) is amended—

<< 12 USCA § 1431 >>

(A) in section 11(k) (12 U.S.C. 1431(k))—
(i) in the subsection heading, by striking "SAIF" and inserting "THE DEPOSIT INSURANCE FUND"; and
(ii) by striking "Savings Association Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1441a >>

(B) in section 21A(b)(4)(B) (12 U.S.C. 1441a(b)(4)(B)), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";
(C) in section 21A(b)(6)(B) (12 U.S.C. 1441a(b)(6)(B))—
(i) in the subparagraph heading, by striking "SAIF–INSURED BANKS" and inserting "CHARTER CONVERSIONS"; and
(ii) by striking "Savings Association Insurance Fund member" and inserting "savings association";
(D) in section 21A(b)(10)(A)(iv)(II) (12 U.S.C. 1441a(b)(10)(A)(iv)(II)), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1441b >>

(E) in section 21B(e) (12 U.S.C. 1441b(e))—
(i) in paragraph (5), by inserting "as of the date of funding" after "Savings Association Insurance Fund members" each place such term appears;
(ii) by striking paragraph (7); and
(iii) by redesignating paragraph (8) as paragraph (7); and
(F) in section 21B(k) (12 U.S.C. 1441b(k))—

(i) by striking paragraph (8); and

(ii) by redesignating paragraphs (9) and (10) as paragraphs (8) and (9), respectively.

(12) AMENDMENTS TO THE HOME OWNERS' LOAN ACT.—The Home Owners' Loan Act (12 U.S.C. 1461 et seq.) is amended—

<< 12 USCA § 1464 >>

(A) in section 5—

(i) in subsection (c)(5)(A), by striking "that is a member of the Bank Insurance Fund";

(ii) in subsection (c)(6), by striking "As used in this subsection—" and inserting "For purposes of this subsection, the following definitions shall apply:";

(iii) in subsection (o)(1), by striking "that is a Bank Insurance Fund member";

(iv) in subsection (o)(2)(A), by striking "a Bank Insurance Fund member until such time as it changes its status to a Savings Association Insurance Fund member" and inserting "insured by the Deposit Insurance Fund";

(v) in subsection (t)(5)(D)(iii)(II), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";

(vi) in subsection (t)(7)(C)(i)(I), by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund"; and

(vii) in subsection (v)(2)(A)(i), by striking ", the Savings Association Insurance Fund" and inserting "or the Deposit Insurance Fund"; and

<< 12 USCA § 1467a >>

(B) in section 10—

(i) in subsection (e)(1)(A)(iii)(VII), by adding "or" at the end;

(ii) in subsection (e)(1)(A)(iv), by adding "and" at the end;

(iii) in subsection (e)(1)(B), by striking "Savings Association Insurance Fund or Bank Insurance Fund" and inserting "Deposit Insurance Fund";

(iv) in subsection (e)(2), by striking "Savings Association Insurance Fund or the Bank Insurance Fund" and inserting "Deposit Insurance Fund"; and

(v) in subsection (m)(3), by striking subparagraph (E), and by redesignating subparagraphs (F), (G), and (H) as subparagraphs (E), (F), and (G), respectively.

(13) AMENDMENTS TO THE NATIONAL HOUSING ACT.—The National Housing Act (12 U.S.C. 1701 et seq.) is amended—

<< 12 USCA § 1723i >>

(A) in section 317(b)(1)(B) (12 U.S.C. 1723i(b)(1)(B)), by striking "Bank Insurance Fund for banks or through the Savings Association Insurance Fund for savings associations" and inserting "Deposit Insurance Fund"; and

<< 12 USCA § 1735f–14 >>

(B) in section 526(b)(1)(B)(ii) (12 U.S.C. 1735f–14(b)(1)(B)(ii)), by striking "Bank Insurance Fund for banks and through the Savings Association Insurance Fund for savings associations" and inserting "Deposit Insurance Fund".

(14) FURTHER AMENDMENTS TO THE FEDERAL DEPOSIT INSURANCE ACT.—The Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.) is amended—

<< 12 USCA § 1813 >>

(A) in section 3(a)(1) (12 U.S.C. 1813(a)(1)), by striking subparagraph (B) and inserting the following:

"(B) includes any former savings association.";

<< 12 USCA § 1815 >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) in section 5(b)(5) (12 U.S.C. 1815(b)(5)), by striking "the Bank Insurance Fund or the Savings Association Insurance Fund;" and inserting "Deposit Insurance Fund,";

(C) in section 5(d) (12 U.S.C. 1815(d)), by striking paragraphs (2) and (3);

(D) in section 5(d)(1) (12 U.S.C. 1815(d)(1))—

(i) in subparagraph (A), by striking "reserve ratios in the Bank Insurance Fund and the Savings Association Insurance Fund" and inserting "the reserve ratio of the Deposit Insurance Fund";

(ii) by striking subparagraph (B) and inserting the following:

"(2) FEE CREDITED TO THE DEPOSIT INSURANCE FUND.—The fee paid by the depository institution under paragraph (1) shall be credited to the Deposit Insurance Fund.";

(iii) by striking "(1) UNINSURED INSTITUTIONS.—"; and

(iv) by redesignating subparagraphs (A) and (C) as paragraphs (1) and (3), respectively, and moving the margins 2 ems to the left;

(E) in section 5(e) (12 U.S.C. 1815(e))—

(i) in paragraph (5)(A), by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

(ii) by striking paragraph (6); and

(iii) by redesignating paragraphs (7), (8), and (9) as paragraphs (6), (7), and (8), respectively;

<< 12 USCA § 1816 >>

(F) in section 6(5) (12 U.S.C. 1816(5)), by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1817 >>

(G) in section 7(b) (12 U.S.C. 1817(b))—

(i) in paragraph (1)(D), by striking "each deposit insurance fund" and inserting "the Deposit Insurance Fund";

(ii) in clauses (i)(I) and (iv) of paragraph (2)(A), by striking "each deposit insurance fund" each place such term appears and inserting "the Deposit Insurance Fund";

(iii) in paragraph (2)(A)(iii), by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund";

(iv) by striking clause (iv) of paragraph (2)(A);

(v) in paragraph (2)(C) (as redesignated by paragraph (6)(B) of this subsection)—

(I) by striking "any deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(II) by striking "that fund" each place such term appears and inserting "the Deposit Insurance Fund";

(vi) in paragraph (2)(D) (as redesignated by paragraph (6)(B) of this subsection)—

(I) in the subparagraph heading, by striking "FUNDS ACHIEVE" and inserting "FUND ACHIEVES"; and

(II) by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund";

(vii) in paragraph (3)—

(I) in the paragraph heading, by striking "FUNDS" and inserting "FUND";

(II) by striking "members of that fund" where such term appears in the portion of subparagraph (A) which precedes clause (i) of such subparagraph and inserting "insured depository institutions";

(III) by striking "that fund" each place such term appears (other than in connection with term amended in subclause (II) of this clause) and inserting "the Deposit Insurance Fund";

(IV) in subparagraph (A), by striking "Except as provided in paragraph (2)(F), if" and inserting "If";

(V) in subparagraph (A), by striking "any deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(VI) by striking subparagraphs (C) and (D) and inserting the following:

"(C) AMENDING SCHEDULE.—The Corporation may, by regulation, amend a schedule prescribed under subparagraph (B)."; and

(viii) in paragraph (6)—

(I) by striking "any such assessment" and inserting "any such assessment is necessary";

(II) by striking "(A) is necessary—";

(III) by striking subparagraph (B);

(IV) by redesignating clauses (i), (ii), and (iii) as subparagraphs (A), (B), and (C), respectively, and moving the margins 2 ems to the left; and

(V) in subparagraph (C) (as redesignated), by striking "; and" and inserting a period;

<< 12 USCA § 1821 >>

(H) in section 11(f)(1) (12 U.S.C. 1821(f)(1)), by striking ", except that—" and all that follows through the end of the paragraph and inserting a period;

(I) in section 11(i)(3) (12 U.S.C. 1821(i)(3))—

(i) by striking subparagraph (B);

(ii) by redesignating subparagraph (C) as subparagraph (B); and

(iii) in subparagraph (B) (as redesignated), by striking "subparagraphs (A) and (B)" and inserting "subparagraph (A)";

<< 12 USCA § 1821a >>

(J) in section 11A(a) (12 U.S.C. 1821a(a))—

(i) in paragraph (2), by striking "LIABILITIES.—" and all that follows through "Except" and inserting "LIABILITIES.—Except";

(ii) by striking paragraph (2)(B); and

(iii) in paragraph (3), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "the Deposit Insurance Fund";

(K) in section 11A(b) (12 U.S.C. 1821a(b)), by striking paragraph (4);

(L) in section 11A(f) (12 U.S.C. 1821a(f)), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1823 >>

(M) in section 13 (12 U.S.C. 1823)—

(i) in subsection (a)(1), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund, the Special Reserve of the Deposit Insurance Fund,";

(ii) in subsection (c)(4)(E)—

(I) in the subparagraph heading, by striking "FUNDS" and inserting "FUND"; and

(II) in clause (i), by striking "any insurance fund" and inserting "the Deposit Insurance Fund";

(iii) in subsection (c)(4)(G)(ii)—

(I) by striking "appropriate insurance fund" and inserting "Deposit Insurance Fund";

(II) by striking "the members of the insurance fund (of which such institution is a member)" and inserting "insured depository institutions";

(III) by striking "each member's" and inserting "each insured depository institution's"; and

(IV) by striking "the member's" each place such term appears and inserting "the institution's";

(iv) in subsection (c), by striking paragraph (11);

(v) in subsection (h), by striking "Bank Insurance Fund" and inserting "Deposit Insurance Fund";

(vi) in subsection (k)(4)(B)(i), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund"; and

(vii) in subsection (k)(5)(A), by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1824 >>

(N) in section 14(a) (12 U.S.C. 1824(a)) in the 5th sentence—

(i) by striking "Bank Insurance Fund or the Savings Association Insurance Fund" and inserting "Deposit Insurance Fund"; and

(ii) by striking "each such fund" and inserting "the Deposit Insurance Fund";

(O) in section 14(b) (12 U.S.C. 1824(b)), by striking "Bank Insurance Fund or Savings Association Insurance Fund" and inserting "Deposit Insurance Fund";

(P) in section 14(c) (12 U.S.C. 1824(c)), by striking paragraph (3);

(Q) in section 14(d) (12 U.S.C. 1824(d))—

(i) by striking "BIF" each place such term appears and inserting "DIF"; and

(ii) by striking "Bank Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1825 >>

(R) in section 15(c)(5) (12 U.S.C. 1825(c)(5))—

(i) by striking "the Bank Insurance Fund or Savings Association Insurance Fund, respectively" each place such term appears and inserting "the Deposit Insurance Fund"; and

(ii) in subparagraph (B), by striking "the Bank Insurance Fund or the Savings Association Insurance Fund, respectively" and inserting "the Deposit Insurance Fund";

<< 12 USCA § 1827 >>

(S) in section 17(a) (12 U.S.C. 1827(a))—

(i) in the subsection heading, by striking "BIF, SAIF," and inserting "THE DEPOSIT INSURANCE FUND"; and

(ii) in paragraph (1), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," each place such term appears and inserting "the Deposit Insurance Fund";

(T) in section 17(d) (12 U.S.C. 1827(d)), by striking "the Bank Insurance Fund, the Savings Association Insurance Fund," each place such term appears and inserting "the Deposit Insurance Fund";

<< 12 USCA § 1828 >>

(U) in section 18(m)(3) (12 U.S.C. 1828(m)(3))—

(i) by striking "Savings Association Insurance Fund" each place such term appears and inserting "Deposit Insurance Fund"; and

(ii) in subparagraph (C), by striking "or the Bank Insurance Fund";

(V) in section 18(p) (12 U.S.C. 1828(p)), by striking "deposit insurance funds" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831a >>

(W) in section 24 (12 U.S.C. 1831a) in subsections (a)(1) and (d)(1)(A), by striking "appropriate deposit insurance fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831e >>

(X) in section 28 (12 U.S.C. 1831e), by striking "affected deposit insurance fund" each place such term appears and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831h >>

(Y) by striking section 31 (12 U.S.C. 1831h);

<< 12 USCA § 1831m >>

(Z) in section 36(i)(3) (12 U.S.C. 1831m(i)(3)) by striking "affected deposit insurance fund" and inserting "Deposit Insurance Fund";

<< 12 USCA § 1831*o* >>

(AA) in section 38(a) (12 U.S.C. 1831*o*(a)) in the subsection heading, by striking "FUNDS" and inserting "FUND";

(BB) in section 38(k) (12 U.S.C. 1831*o*(k))—

(i) in paragraph (1), by striking "a deposit insurance fund" and inserting "the Deposit Insurance Fund"; and

(ii) in paragraph (2)(A)—

(I) by striking "A deposit insurance fund" and inserting "The Deposit Insurance Fund"; and

(II) by striking "the deposit insurance fund's outlays" and inserting "the outlays of the Deposit Insurance Fund"; and

(CC) in section 38(o) (12 U.S.C. 1831*o*(o))—

(i) by striking "ASSOCIATIONS.—" and all that follows through "Subsections (e)(2)" and inserting "ASSOCIATIONS.—Subsections (e)(2)";

(ii) by redesignating subparagraphs (A), (B), and (C) as paragraphs (1), (2), and (3), respectively, and moving the margins 2 ems to the left; and

(iii) in paragraph (1) (as redesignated), by redesignating clauses (i) and (ii) as subparagraphs (A) and (B), respectively, and moving the margins 2 ems to the left.

(15) AMENDMENTS TO THE FINANCIAL INSTITUTIONS REFORM, RECOVERY, AND ENFORCEMENT ACT OF 1989.—The Financial Institutions Reform, Recovery, and Enforcement Act is amended—

<< 12 USCA § 1833a >>

(A) in section 951(b)(3)(B) (12 U.S.C. 1833a(b)(3)(B)), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund"; and

<< 12 USCA § 3341 >>

(B) in section 1112(c)(1)(B) (12 U.S.C. 3341(c)(1)(B)), by striking "Bank Insurance Fund, the Savings Association Insurance Fund," and inserting "Deposit Insurance Fund".

<< 12 USCA § 1834 >>

(16) AMENDMENT TO THE BANK ENTERPRISE ACT OF 1991.—Section 232(a)(1) of the Bank Enterprise Act of 1991 (12 U.S.C. 1834(a)(1)) is amended by striking "section 7(b)(2)(H)" and inserting "section 7(b)(2)(G)".

<< 12 USCA § 1841 >>

(17) AMENDMENT TO THE BANK HOLDING COMPANY ACT OF 1956.—Section 2(j)(2) of the Bank Holding Company Act of 1956 (12 U.S.C. 1841(j)(2)) is amended by striking "Savings Association Insurance Fund" and inserting "Deposit Insurance Fund".

<< 12 USCA § 1821 >>

SEC. 2705. CREATION OF SAIF SPECIAL RESERVE.

Section 11(a)(6) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(6)) is amended by adding at the end the following new subparagraph:

"(L) ESTABLISHMENT OF SAIF SPECIAL RESERVE.—

"(i) ESTABLISHMENT.—If, on January 1, 1999, the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, there is established a Special Reserve of the Savings Association Insurance Fund, which shall be administered by the Corporation and shall be invested in accordance with section 13(a).

"(ii) AMOUNTS IN SPECIAL RESERVE.—If, on January 1, 1999, the reserve ratio of the Savings Association Insurance Fund exceeds the designated reserve ratio, the amount by which the reserve ratio exceeds the designated reserve ratio shall be placed in the Special Reserve of the Savings Association Insurance Fund established by clause (i).

AR.03490

"(iii) LIMITATION.—The Corporation shall not provide any assessment credit, refund, or other payment from any amount in the Special Reserve of the Savings Association Insurance Fund.

"(iv) EMERGENCY USE OF SPECIAL RESERVE.—Notwithstanding clause (iii), the Corporation may, in its sole discretion, transfer amounts from the Special Reserve of the Savings Association Insurance Fund to the Savings Association Insurance Fund for the purposes set forth in paragraph (4), only if—

"(I) the reserve ratio of the Savings Association Insurance Fund is less than 50 percent of the designated reserve ratio; and

"(II) the Corporation expects the reserve ratio of the Savings Association Insurance Fund to remain at less than 50 percent of the designated reserve ratio for each of the next 4 calendar quarters.

"(v) EXCLUSION OF SPECIAL RESERVE IN CALCULATING RESERVE RATIO.—Notwithstanding any other provision of law, any amounts in the Special Reserve of the Savings Association Insurance Fund shall be excluded in calculating the reserve ratio of the Savings Association Insurance Fund.".

<< 12 USCA § 1817 >>

SEC. 2706. REFUND OF AMOUNTS IN DEPOSIT INSURANCE FUND IN EXCESS OF DESIGNATED RESERVE AMOUNT.

Subsection (e) of section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817(e)) is amended to read as follows:

"(e) REFUNDS.—

"(1) OVERPAYMENTS.—In the case of any payment of an assessment by an insured depository institution in excess of the amount due to the Corporation, the Corporation may—

"(A) refund the amount of the excess payment to the insured depository institution; or

"(B) credit such excess amount toward the payment of subsequent semiannual assessments until such credit is exhausted.

"(2) BALANCE IN INSURANCE FUND IN EXCESS OF DESIGNATED RESERVE.—

"(A) IN GENERAL.—Subject to subparagraphs (B) and (C), if, as of the end of any semiannual assessment period beginning after the date of the enactment of the Deposit Insurance Funds Act of 1996, the amount of the actual reserves in—

"(i) the Bank Insurance Fund (until the merger of such fund into the Deposit Insurance Fund pursuant to section 2704 of the Deposit Insurance Funds Act of 1996); or

"(ii) the Deposit Insurance Fund (after the establishment of such fund),

exceeds the balance required to meet the designated reserve ratio applicable with respect to such fund, such excess amount shall be refunded to insured depository institutions by the Corporation on such basis as the Board of Directors determines to be appropriate, taking into account the factors considered under the risk-based assessment system.

"(B) REFUND NOT TO EXCEED PREVIOUS SEMIANNUAL ASSESSMENT.—The amount of any refund under this paragraph to any member of a deposit insurance fund for any semiannual assessment period may not exceed the total amount of assessments paid by such member to the insurance fund with respect to such period.

"(C) REFUND LIMITATION FOR CERTAIN INSTITUTIONS.—No refund may be made under this paragraph with respect to the amount of any assessment paid for any semiannual assessment period by any insured depository institution described in clause (v) of subsection (b)(2)(A).".

<< 12 USCA § 1817 >>

SEC. 2707. ASSESSMENT RATES FOR SAIF MEMBERS MAY NOT BE LESS THAN ASSESSMENT RATES FOR BIF MEMBERS.

Section 7(b)(2)(C) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(E), as redesignated by section 2704(d)(6) of this subtitle) is amended—

(1) by striking "and" at the end of clause (i);

(2) by striking the period at the end of clause (ii) and inserting "; and"; and

(3) by adding at the end the following new clause:

"(iii) notwithstanding any other provision of this subsection, during the period beginning on the date of enactment of the Deposit Insurance Funds Act of 1996, and ending on December 31, 1998, the assessment rate for a Savings Association Insurance Fund member may not be less than the assessment rate for a Bank Insurance Fund member that poses a comparable risk to the deposit insurance fund.".

<< 12 USCA § 1817 >>

SEC. 2708. ASSESSMENTS AUTHORIZED ONLY IF NEEDED TO MAINTAIN THE RESERVE RATIO OF A DEPOSIT INSURANCE FUND.

(a) IN GENERAL.—Section 7(b)(2)(A)(i) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)(i)) is amended in the matter preceding subclause (I) by inserting "when necessary, and only to the extent necessary" after "insured depository institutions".

(b) LIMITATION ON ASSESSMENT.—Section 7(b)(2)(A)(iii) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2) (A)(iii)) is amended to read as follows:

"(iii) LIMITATION ON ASSESSMENT.—Except as provided in clause (v), the Board of Directors shall not set semiannual assessments with respect to a deposit insurance fund in excess of the amount needed—

"(I) to maintain the reserve ratio of the fund at the designated reserve ratio; or

"(II) if the reserve ratio is less than the designated reserve ratio, to increase the reserve ratio to the designated reserve ratio.".

(c) EXCEPTION TO LIMITATION ON ASSESSMENTS.—Section 7(b)(2)(A) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)(A)) is amended by adding at the end the following new clause:

"(v) EXCEPTION TO LIMITATION ON ASSESSMENTS.—The Board of Directors may set semiannual assessments in excess of the amount permitted under clauses (i) and (iii) with respect to insured depository institutions that exhibit financial, operational, or compliance weaknesses ranging from moderately severe to unsatisfactory, or are not well capitalized, as that term is defined in section 38.".

SEC. 2709. TREASURY STUDY OF COMMON DEPOSITORY INSTITUTION CHARTER.

(a) STUDY REQUIRED.—The Secretary of the Treasury shall conduct a study of all issues which the Secretary considers to be relevant with respect to the development of a common charter for all insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act) and the abolition of separate and distinct charters between banks and savings associations.

(b) REPORT TO THE CONGRESS.—

(1) IN GENERAL.—The Secretary of the Treasury shall submit a report to the Congress on or before March 31, 1997, containing the findings and conclusions of the Secretary in connection with the study conducted pursuant to subsection (a).

(2) DETAILED ANALYSIS AND RECOMMENDATIONS.—The report under paragraph (1) shall include—

(A) a detailed analysis of each issue the Secretary considered relevant to the subject of the study;

(B) recommendations of the Secretary with regard to the establishment of a common charter for insured depository institutions (as defined in section 3 of the Federal Deposit Insurance Act); and

(C) such recommendations for legislative and administrative action as the Secretary determines to be appropriate to implement the recommendations of the Secretary under subparagraph (B).

<< 12 USCA § 1821 NOTE >>

SEC. 2710. DEFINITIONS.

For purposes of this subtitle, the following definitions shall apply:

(1) BANK INSURANCE FUND.—The term "Bank Insurance Fund" means the fund established pursuant to section (11)(a) (5)(A) of the Federal Deposit Insurance Act, as that section existed on the day before the date of enactment of this Act.

(2) BIF MEMBER, SAIF MEMBER.—The terms "Bank Insurance Fund member" and "Savings Association Insurance Fund member" have the same meanings as in section 7(l) of the Federal Deposit Insurance Act.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) VARIOUS BANKING TERMS.—The terms "bank", "Board of Directors", "Corporation", "deposit", "insured depository institution", "Federal savings association", "savings association", "State savings bank", and "State depository institution" have the same meanings as in section 3 of the Federal Deposit Insurance Act.

(4) DEPOSIT INSURANCE FUND.—The term "Deposit Insurance Fund" means the fund established under section 11(a)(4) of the Federal Deposit Insurance Act (as amended by section 2704(d) of this subtitle).

(5) DEPOSITORY INSTITUTION HOLDING COMPANY.—The term "depository institution holding company" has the same meaning as in section 3 of the Federal Deposit Insurance Act.

(6) DESIGNATED RESERVE RATIO.—The term "designated reserve ratio" has the same meaning as in section 7(b)(2)(A)(iv) of the Federal Deposit Insurance Act.

(7) SAIF.—The term "Savings Association Insurance Fund" means the fund established pursuant to section 11(a)(6)(A) of the Federal Deposit Insurance Act, as that section existed on the day before the date of enactment of this Act.

(8) SAIF–ASSESSABLE DEPOSIT.—The term "SAIF-assessable deposit"—

(A) means a deposit that is subject to assessment for purposes of the Savings Association Insurance Fund under the Federal Deposit Insurance Act (including a deposit that is treated as insured by the Savings Association Insurance Fund under section 5(d)(3) of the Federal Deposit Insurance Act); and

(B) includes any deposit described in subparagraph (A) which is assumed after March 31, 1995, if the insured depository institution, the deposits of which are assumed, is not an insured depository institution when the special assessment is imposed under section 2702(a).

<< 26 USCA § 162 NOTE >>

SEC. 2711. DEDUCTION FOR SPECIAL ASSESSMENTS.

For purposes of subtitle A of the Internal Revenue Code of 1986—

(1) the amount allowed as a deduction under section 162 of such Code for a taxable year shall include any amount paid during such year by reason of an assessment under section 2702 of this subtitle, and

(2) section 172(f) of such Code shall not apply to any deduction described in paragraph (1).

TITLE III—SPECTRUM ALLOCATION PROVISIONS

SEC. 3001. COMPETITIVE BIDDING FOR SPECTRUM.

(a) COMMISSION OBLIGATION TO MAKE ADDITIONAL SPECTRUM AVAILABLE.—The Federal Communications Commission shall—

(1) reallocate the use of frequencies at 2305–2320 megahertz and 2345–2360 megahertz to wireless services that are consistent with international agreements concerning spectrum allocations; and

(2) assign the use of such frequencies by competitive bidding pursuant to section 309(j) of the Communications Act of 1934 (47 U.S.C. 309(j)).

(b) ADDITIONAL REQUIREMENTS.—In making the bands of frequencies described in subsection (a) available for competitive bidding, the Commission shall—

(1) seek to promote the most efficient use of the spectrum; and

(2) take into account the needs of public safety radio services.

(c) EXPEDITED PROCEDURES.—The Commission shall commence the competitive bidding for the assignment of the frequencies described in subsection (a)(1) no later than April 15, 1997. The rules governing such frequencies shall be effective immediately upon publication in the Federal Register notwithstanding section 553(d), 801(a)(3), and 806(a) of title 5, United States Code. Chapter 6 of such title, and sections 3507 and 3512 of title 44, United States Code, shall not apply to the rules and competitive bidding procedures governing such frequencies. Notwithstanding section 309(b) of the Communications Act of 1934 (47 U.S.C. 309(b)), no application for an instrument of authorization for such frequencies shall be granted by the Commission earlier than 7 days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereto. Notwithstanding section 309(d)(1) of such Act (47 U.S.C. 309(d)(1)), the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Commission may specify a period (no less than 5 days following issuance of such public notice) for the filing of petitions to deny any application for an instrument of authorization for such frequencies.

 (d) DEADLINE FOR COLLECTION.—The Commission shall conduct the competitive bidding under subsection (a)(2) in a manner that ensures that all proceeds of the bidding are deposited in accordance with section 309(j)(8) of the Communications Act of 1934 not later September 30, 1997.

### TITLE IV—ADJUSTMENT OF PAYGO BALANCES

### SEC. 4001. ADJUSTMENT OF PAYGO BALANCES.

 For purposes of section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985, on the calendar day after the Director of the Office of Management and Budget issues the final sequestration report for fiscal year 1997, the Director and the Director of the Congressional Budget Office shall change the balances (as computed pursuant to section 252(b) of that Act) of direct spending and receipts legislation—

 (1) for fiscal year 1997 to zero if such balance for the fiscal year is not an increase in the deficit.

### TITLE V—ADDITIONAL APPROPRIATIONS

### CHAPTER 1

### DEPARTMENT OF AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES

### DEPARTMENT OF AGRICULTURE

### Cooperative State Research, Education, and Extension Service

### Extension Activities

 For an additional amount for payments for cooperative extension work by the colleges receiving the benefits of the second Morrill Act (7 U.S.C. 321–326, 328) and Tuskegee University, $753,000.

### Natural Resources Conservation Service

### Watershed and Flood Prevention Operations

 For an additional amount to repair damages to the waterways and watersheds resulting from the effects of Hurricanes Fran and Hortense and other natural disasters, $63,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### Farm Service Agency

### Emergency Conservation Program

 For an additional amount for emergency expenses resulting from the effects of Hurricanes Fran and Hortense and other natural disasters, $25,000,000, to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### CHAPTER 2

### DISTRICT OF COLUMBIA

### EDUCATION FACILITIES IMPROVEMENT IN THE DISTRICT OF COLUMBIA

### (BY TRANSFER)

SEC. 5201. The District of Columbia Financial Responsibility and Management Assistance Authority (referred to in this section as the "Authority") shall have the authority to contract with a private entity (or entities) to carry out a program of school facility repair of public schools and public charter schools located in public school facilities in the District of Columbia, in consultation with the General Services Administration: Provided, That an amount estimated to be $40,700,000 is hereby transferred and otherwise made available to the Authority until expended for contracting as provided under this section, to be derived from transfers and reallocations as follows: (1) funds made available under the heading "PUBLIC EDUCATION SYSTEM" in Public Law 104–194 for school repairs in a restricted line item; (2) all capital financing authority made available for public school capital improvements in Public Law 104–194; and (3) all capital financing authority made available for public school capital improvements which are or remain available from Public Law 104–134 or any previous appropriations Act for the District of Columbia: Provided further, That the General Services Administration, in consultation with the District of Columbia Public Schools and the District of Columbia Council and subject to the approval of the Authority and the Committees on Appropriations of the Senate and the House of Representatives, shall provide program management services to assist in the short-term management of the repairs and capital improvements: Provided further, That contracting authorized under this section shall be conducted in accordance with Federal procurement rules and regulations and guidelines or such guidelines as prescribed by the Authority.

### SPECIAL RULES REGARDING GENERAL OBLIGATION BOND ACT

SEC. 5202. WAIVER OF CONGRESSIONAL REVIEW.—Notwithstanding section 602(c)(1) of the District of Columbia Self–Government and Governmental Reorganization Act (sec. 1–233(c)(1), D.C.Code), the General Obligation Bond Act of 1996 (D.C.Bill 11–840), if enacted by the Council of the District of Columbia, shall take effect on the date of the enactment of such Act or the date of the enactment of this Act, whichever is later.

### AMENDMENTS TO FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE ACT

SEC. 5203. (a) CALCULATION OF 7–DAY REVIEW PERIOD FOR COUNCIL ACTS.—Section 203(a)(5) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 (sec. 47–392.3(a)(5), D.C.Code) is amended—

(1) by inserting "(excluding Saturdays, Sundays, and legal holidays)" after "7–day period" the first place it appears; and

(2) by striking "the date the Council submits the Act to the Authority" and inserting "the first day (excluding Saturdays, Sundays, and legal holidays) after the Authority receives the Act from the Council".

(b) SPECIFICATION OF PENALTY FOR PROHIBITED ACTS.—Section 103(i)(1) of such Act (sec. 47–391.3(i)(1), D.C.Code) is amended by striking the period at the end and inserting the following: ", and shall be fined not more than $1,000, imprisoned for not more than 1 year, or both.".

(c) WAIVER OF PRIVACY ACT REQUIREMENTS FOR OBTAINING OFFICIAL DATA.—Section 103(c)(1) of such Act (sec. 47–391.3(c)(1), D.C.Code) is amended by striking "Act) and 552b" and inserting "Act), 552a (the Privacy Act of 1974), and 552b".

(d) PERMITTING AUTHORITY REVIEW OF RULEMAKING.—Section 203(b) of such Act (sec. 47–392.3(b), D.C.Code) is amended by adding at the end the following new paragraph:

"(5) APPLICATION TO RULES AND REGULATIONS.—The provisions of this subsection shall apply with respect to a rule or regulation issued or proposed to be issued by the Mayor (or the head of any department or agency of the District government) in the same manner as such provisions apply to a contract or lease.".

(e) DEPOSIT OF ALL DISTRICT BORROWING WITH AUTHORITY.—

(1) IN GENERAL.—Section 204 of such Act (sec. 47–392.4, D.C.Code) is amended—

(A) by redesignating subsections (d) and (e) as subsections (e) and (f); and

(B) by inserting after subsection (c) the following new subsection:

"(d) DEPOSIT OF BORROWED FUNDS WITH AUTHORITY.—If the District government borrows funds during a control year, the funds shall be deposited into an escrow account held by the Authority, to be allocated by the Authority to the Mayor at such intervals and in accordance with such terms and conditions as it considers appropriate, consistent with the financial plan and budget for the year and with any other withholding of funds by the Authority pursuant to this Act.".

(2) CONFORMING AMENDMENTS.—(A) Section 204(e) of such Act, as redesignated by paragraph (1)(A), is amended by inserting after "(b)(1)" the following: "or the escrow account described in subsection (d)".

(B) Section 206(d)(1) of such Act is amended by striking "204(b)" and inserting "204(b), section 204(d),".

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(f) GRANTING AUTHORITY POWER TO ISSUE GENERAL ORDERS.—Section 207 of such Act (sec. 47–392.7, D.C.Code) is amended by adding at the end the following new subsection:

"(d) ADDITIONAL POWER TO ISSUE ORDERS, RULES, AND REGULATIONS.—

"(1) IN GENERAL.—In addition to the authority described in subsection (c), the Authority may at any time issue such orders, rules, or regulations as it considers appropriate to carry out the purposes of this Act and the amendments made by this Act, to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule, or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency.

"(2) NOTIFICATION.—Upon issuing an order, rule, or regulation pursuant to this subsection, the Authority shall notify the Mayor, the Council, the President, and Congress.

"(3) NO JUDICIAL REVIEW OF DECISION TO ISSUE ORDER.—The decision by the Authority to issue an order, rule, or regulation pursuant to this subsection shall be final and shall not be subject to judicial review.".

PROHIBITING FUNDING FOR TERMINATED EMPLOYEES OR CONTRACTORS

SEC. 5204. (a) IN GENERAL.—Except as provided in subsection (b), none of the funds made available to the District of Columbia during any fiscal year (beginning with fiscal year 1996) may be used to pay the salary or wages of any individual whose employment by the District government is no longer required as determined by the District of Columbia Financial Responsibility and Management Assistance Authority, or to pay any expenses associated with a contractor or consultant of the District government whose contract or arrangement with the District government is no longer required as determined by the Authority.

(b) EXCEPTION FOR PAYMENTS FOR SERVICES ALREADY PROVIDED.—Funds made available to the District of Columbia may be used to pay an individual for employment already performed at the time of the Authority's determination, or to pay a contractor or consultant for services already provided at the time of the Authority's determination, to the extent permitted by the District of Columbia Financial Responsibility and Management Assistance Authority.

(c) DISTRICT GOVERNMENT DEFINED.—In this section, the term "District government" has the meaning given such term in section 305(5) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995.

AMENDMENTS TO DISTRICT OF COLUMBIA SCHOOL REFORM ACT OF 1995.

Sec. 5205. (a) PROCESS FOR FILING CHARTER PETITIONS.—Section 2201 of the District of Columbia School Reform Act of 1995 (Public Law 104–134; 110 Stat. 1321–115) is amended by adding at the end the following:

"(d) LIMITATIONS ON FILING.—

"(1) MULTIPLE CHARTERING AUTHORITIES.—An eligible applicant may not file the same petition to establish a public charter school with more than 1 eligible chartering authority during a calendar year.

"(2) MULTIPLE PETITIONS.—An eligible applicant may not file more than 1 petition to establish a public charter school during a calendar year.".

(b) CONTENTS OF PETITION.—Section 2202(6)(B) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–116) is amended to read as follows:

"(B) either—

"(i)(I) an identification of a facility for the school, including a description of the site where the school will be located, any buildings on the site, and any buildings proposed to be constructed on the site, and (II) information demonstrating that the eligible applicant has acquired title to, or otherwise secured the use of, the facility; or

"(ii) a timetable by which an identification described in clause (i)(I) will be made, and the information described in clause (i)(II) will be submitted, to the eligible chartering authority;".

(c) PROCESS FOR APPROVING OR DENYING PUBLIC CHARTER SCHOOL PETITIONS.—Section 2203 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–118) is amended—

(1) by amending subsection (d) to read as follows:

"(d) APPROVAL.—

"(1) IN GENERAL.—Subject to subsection (i) and paragraph (2), an eligible chartering authority shall approve a petition to establish a public charter school, if—

"(A) the eligible chartering authority determines that the petition satisfies the requirements of this subtitle;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) the eligible applicant who filed the petition agrees to satisfy any condition or requirement, consistent with this subtitle and other applicable law, that is set forth in writing by the eligible chartering authority as an amendment to the petition;

"(C) the eligible chartering authority determines that the public charter school has the ability to meet the educational objectives outlined in the petition; and

"(D) the approval will not cause the eligible chartering authority to exceed a limit under subsection (i).

"(2) CONDITIONAL APPROVAL.—

"(A) IN GENERAL.—In the case of a petition that does not contain the identification and information required under section 2202(6)(B)(i), but does contain the timetable required under section 2202(6)(B)(ii), an eligible chartering authority may only approve the petition on a conditional basis, subject to the eligible applicant's submitting the identification and information described in section 2202(6)(B)(i) in accordance with such timetable, or any other timetable specified in writing by the eligible chartering authority in an amendment to the petition.

"(B) EFFECT OF CONDITIONAL APPROVAL.—For purposes of subsections (e), (h), (i), and (j), a petition conditionally approved under this paragraph shall be treated the same as a petition approved under paragraph (1), except that on the date that such a conditionally approved petition ceases to be conditionally approved because the eligible applicant has not timely submitted the identification and information described in section 2202(6)(B)(i), the approval of the petition shall cease to be counted for purposes of subsection (i).";

(2) in subsection (h), by striking "(d)(2)," each place such term appears and inserting "(d),";

(3) by amending subsection (i) to read as follows:

"(i) NUMBER OF PETITIONS.—

"(1) FIRST YEAR.—During calendar year 1996, not more than 10 petitions to establish public charter schools may be approved under this subtitle.

"(2) SUBSEQUENT YEARS.—

"(A) IN GENERAL.—Subject to subparagraph (B), during calendar year 1997, and during each subsequent calendar year, each eligible chartering authority shall not approve more than 10 petitions to establish a public charter school under this subtitle. Any such petition shall be approved during the period that begins on January 1 and ends on April 1.

"(B) EXCEPTION.—If, by April 1 of any calendar year after 1996, an eligible chartering authority has approved fewer than 10 petitions during such calendar year, any other eligible chartering authority may approve more than 10 petitions during such calendar year, but only if—

"(i) the eligible chartering authority completes the approval of any such additional petition before June 1 of the year; and

"(ii) the approval of any such additional petition will not cause the total number of petitions approved by all eligible chartering authorities during the calendar year to exceed 20."; and

(4) by amending subsection (j) to read as follows:

"(j) AUTHORITY OF ELIGIBLE CHARTERING AUTHORITY.—

"(1) IN GENERAL.—Except as provided in paragraph (2), and except for officers or employees of the eligible chartering authority with which a petition to establish a public charter school is filed, no governmental entity, elected official, or employee of the District of Columbia shall make, participate in making, or intervene in the making of, the decision to approve or deny such a petition.

"(2) AVAILABILITY OF REVIEW.—A decision by an eligible chartering authority to deny a petition to establish a public charter school shall be subject to judicial review by an appropriate court of the District of Columbia.".

(d) DISTRICT OF COLUMBIA PUBLIC SCHOOL SERVICES TO PUBLIC CHARTER SCHOOLS.—Section 2209 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–125) is amended—

(1) by inserting "(a) IN GENERAL.—" before "The Superintendent"; and

(2) by adding at the end the following:

"(b) PREFERENCE IN LEASING OR PURCHASING PUBLIC SCHOOL FACILITIES.—

"(1) FORMER PUBLIC SCHOOL PROPERTY.—

"(A) IN GENERAL.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subparagraph (B), the Mayor and the District of Columbia Government shall give preference to an eligible applicant whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2), or a Board of Trustees, with respect to the purchase or lease of a facility or property described in subparagraph (B), provided

that doing so will not result in a significant loss of revenue that might be obtained from other dispositions or uses of the facility or property.

"(B) PROPERTY DESCRIBED.—A facility or property referred to in subparagraph (A) is a facility, or real property—

"(i) that formerly was under the jurisdiction of the Board of Education;

"(ii) that the Board of Education has determined is no longer needed for purposes of operating a District of Columbia public school; and

"(iii) with respect to which the Board of Education has transferred jurisdiction to the Mayor.

"(2) CURRENT PUBLIC SCHOOL PROPERTY.—

"(A) IN GENERAL.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subparagraph (B), the Mayor and the District of Columbia Government shall give preference to an eligible applicant whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2), or a Board of Trustees, in leasing, or otherwise contracting for the use of, a facility or property described in subparagraph (B).

"(B) PROPERTY DESCRIBED.—A facility or property referred to in subparagraph (A) is a facility, real property, or a designated area of a facility or real property, that—

"(i) is under the jurisdiction of the Board of Education; and

"(ii) is available for use because the Board of Education is not using, for educational, administrative, or other purposes, the facility, real property, or designated area.".

(e) CHARTER RENEWAL.—Section 2212 of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–129) is amended—

(1) by amending subsection (a) to read as follows:

"(a) TERMS.—

"(1) INITIAL TERM.—A charter granted to a public charter school shall remain in force for a 15–year period.

"(2) RENEWALS.—A charter may be renewed for an unlimited number of times, each time for a 15–year period.

"(3) REVIEW.—An eligible chartering authority that grants or renews a charter pursuant to paragraph (1) or (2) shall review the charter—

"(A) at least once every 5 years to determine whether the charter should be revoked for the reasons described in subsection (a)(1)(A) or (b) of section 2213 in accordance with the procedures for such revocation established under section 2213(c); and

"(B) once every 5 years, beginning on the date that is 5 years after the date on which the charter is granted or renewed, to determine whether the charter should be revoked for the reasons described in section 2213(a)(1)(B) in accordance with the procedures for such revocation established under section 2213(c)."; and

(2) by amending subsection (d)(6) to read as follows:

"(6) JUDICIAL REVIEW.—A decision by an eligible chartering authority to deny an application to renew a charter shall be subject to judicial review by an appropriate court of the District of Columbia.".

(f) CHARTER REVOCATION.—Section 2213(a) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–130) is amended to read as follows:

"(a) CHARTER OR LAW VIOLATIONS; FAILURE TO MEET GOALS.—

"(1) IN GENERAL.—Subject to paragraph (2), an eligible chartering authority that has granted a charter to a public charter school may revoke the charter if the eligible chartering authority determines that the school—

"(A) committed a violation of applicable laws or a material violation of the conditions, terms, standards, or procedures set forth in the charter, including violations relating to the education of children with disabilities; or

"(B) failed to meet the goals and student academic achievement expectations set forth in the charter.

"(2) SPECIAL RULE.—An eligible chartering authority may not revoke a charter under paragraph (1)(B), except pursuant to a determination made through a review conducted under section 2212(a)(3)(B).".

(g) PUBLIC CHARTER SCHOOL BOARD.—Paragraphs (3) and (4) of section 2214(a) of the District of Columbia School Reform Act of 1995 (110 Stat. 1321–132) are amended to read as follows:

"(3) VACANCIES.—

"(A) OTHER THAN FROM EXPIRATION OF TERM.—Where a vacancy occurs in the membership of the Board for reasons other than the expiration of the term of a member of the Board, the Secretary of Education, not later than 30 days after the vacancy occurs, shall present to the Mayor a list of 3 people the Secretary determines are qualified to serve on the

AR.03498

Board. The Mayor, in consultation with the District of Columbia Council, shall appoint 1 person from the list to serve on the Board. The Secretary shall recommend, and the Mayor shall appoint, such member of the Board taking into consideration the criteria described in paragraph (2). Any member appointed to fill a vacancy occurring prior to the expiration of the term of a predecessor shall be appointed only for the remainder of the term.

"(B) EXPIRATION OF TERM.—Not later than the date that is 60 days before the expiration of the term of a member of the Board, the Secretary of Education shall present to the Mayor, with respect to each such impending vacancy, a list of 3 people the Secretary determines are qualified to serve on the Board. The Mayor, in consultation with the District of Columbia Council, shall appoint 1 person from each such list to serve on the Board. The Secretary shall recommend, and the Mayor shall appoint, any member of the Board taking into consideration the criteria described in paragraph (2).

"(4) TIME LIMIT FOR APPOINTMENTS.—If, at any time, the Mayor does not appoint members to the Board sufficient to bring the Board's membership to 7 within 30 days after receiving a recommendation from the Secretary of Education under paragraph (2) or (3), the Secretary, not later than 10 days after the final date for such mayoral appointment, shall make such appointments as are necessary to bring the membership of the Board to 7.".

(h) TECHNICAL AMENDMENT.—Section 2561(b) of the District of Columbia School Reform Act of 1995 (Public Law 104–134), as amended by section 148 of the District of Columbia Appropriations Act, 1997 (Public Law 104–194), is amended to read as follows:

"(b) LIMITATION.—A waiver under subsection (a) shall not apply to the Davis–Bacon Act (40 U.S.C. 276a et seq.) or Executive Order 11246 or other civil rights standards.".

## DISPOSITION OF CERTAIN SCHOOL PROPERTY BY AUTHORITY

SEC. 5206. (a) IN GENERAL.—Subtitle C of title II of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 is amended by adding at the end the following new section:

"SEC. 225. DISPOSITION OF CERTAIN SCHOOL PROPERTY.

"(a) POWER TO DISPOSE.—Notwithstanding any other provision of law relating to the disposition of a facility or property described in subsection (d), the Authority may dispose (by sale, lease, or otherwise) of any facility or property described in subsection (d).

"(b) PREFERENCE FOR PUBLIC CHARTER SCHOOLS.—In disposing of a facility or property under this section, the Authority shall give preference to an eligible applicant (as defined in section 2002 of the District of Columbia School Reform Act of 1995) whose petition to establish a public charter school has been conditionally approved under section 2203(d)(2) of such Act, or a Board of Trustees (as defined in section 2002 of such Act) of such a public charter school, if doing so will not result in a significant loss of revenue that might be obtained from other dispositions or uses of the facility or property.

"(c) USE OF PROCEEDS FROM DISPOSITION FOR SCHOOL REPAIR AND MAINTENANCE.—

"(1) IN GENERAL.—The Authority shall deposit any proceeds of the disposition of a facility or property under this section in the Board of Education Real Property Maintenance and Improvement Fund (as established by the Real Property Disposal Act of 1990), to be used for the construction, maintenance, improvement, rehabilitation, or repair of buildings and grounds which are used for educational purposes for public and public charter school students in the District of Columbia.

"(2) CONSULTATION.—In disposing of a facility or property under this section, the Authority shall consult with the Superintendent of Schools of the District of Columbia, the Mayor, the Council, the Administrator of General Services, and education and community leaders involved in planning for an agency or authority that will design and administer a comprehensive long-term program for repair and improvement of District of Columbia public school facilities (as described in section 2552(a) of the District of Columbia School Reform Act of 1995).

"(3) LEGAL EFFECT OF SALE.—The Authority may dispose of a facility or property under this section by executing a proper deed and any other legal instrument for conveyance of title to the facility or property, and such deed shall convey good and valid title to the purchaser of the facility or property.

"(d) FACILITY OR PROPERTY DESCRIBED.—A facility or property described in this subsection is a facility or property which is described in section 2209(b)(1)(B) of the District of Columbia School Reform Act of 1995 and with respect to which the Authority has made the following determinations:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(1) The property is no longer needed for purposes of operating a District of Columbia public school (as defined in section 2002 of the District of Columbia School Reform Act of 1995).

"(2) The disposition of the property is in the best interests of education in the District of Columbia.

"(3) The Mayor (or any other department or agency of the District government) has failed to make substantial progress toward disposing the property during the 90–day period which begins on the date the Board of Education transfers jurisdiction over the property to the Mayor (or, in the case of property which is described in section 2209(b)(1)(B) of such Act as of the date of the enactment of this section, during the 90–day period which begins on the date of the enactment of this section).".

(b) CONTROL OVER BOARD OF EDUCATION REAL PROPERTY MAINTENANCE AND IMPROVEMENT FUND.—

(1) IN GENERAL.—Section 2(b) of the Board of Education Real Property Disposal Act of 1990 (sec. 9–402(b), D.C.Code) is amended—

(A) by amending the second sentence to read as follows: "Subject to paragraph (6), the District of Columbia Financial Responsibility and Management Assistance Authority shall administer the Fund and receive all payments into the Fund that are required by law."; and

(B) by adding at the end the following new paragraph:

"(6) Upon the establishment of an agency or authority within the District of Columbia government to administer a public schools facilities revitalization plan pursuant to section 2552(a)(2) of the District of Columbia School Reform Act of 1995, such agency or authority shall administer the Fund and receive all payments into the Fund that are required by law.".

(2) CONFORMING AMENDMENTS.—Section 2(b) of the Board of Education Real Property Disposal Act of 1990 (sec. 9–402(b), D.C.Code) is amended—

(A) in the third sentence of paragraph (1), by striking "; provided that the Board" and all that follows and inserting a period; and

(B) by striking paragraph (5).

(c) CLERICAL AMENDMENT.—The table of contents of subtitle C of title II of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 is amended by adding at the end the following new item:

**"Sec. 225. Disposition of certain school property.".**

## CHAPTER 3

### ENERGY AND WATER DEVELOPMENT

### DEPARTMENT OF DEFENSE—CIVIL

### DEPARTMENT OF THE ARMY

#### Corps of Engineers—Civil

#### Operation and Maintenance, General

For an additional amount for "Operation and Maintenance, General" for emergency expenses resulting from Hurricane Fran and other natural disasters of 1996, $19,000,000, to remain available until expended: Provided: That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISION

SEC. 5301. None of the funds appropriated in the Energy and Water Development Appropriations Act, 1997 may be made available to the Tennessee Valley Authority if the Tennessee Valley Authority is imposing a performance deposit in connection with residential shoreline alteration permits.

## CHAPTER 4

### LEGISLATIVE BRANCH

### HOUSE OF REPRESENTATIVES

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## SALARIES AND EXPENSES

### (RESCISSION)

Immediately upon enactment of this Act, of the funds appropriated in the Legislative Branch Appropriations Act, 1996, for the House of Representatives under the heading "SALARIES AND EXPENSES", there is rescinded $500,000, specified for the following heading and account:

(1) "ALLOWANCES AND EXPENSES", $500,000, as follows: (A)"Government contributions to employees' life insurance fund, retirement funds, Social Security fund, Medicare fund, health benefits fund, and worker's and unemployment compensation."

## JOINT ITEMS

## CAPITOL POLICE BOARD

## CAPITOL POLICE

## SALARIES

### (RESCISSION)

Immediately upon enactment of this Act, of the funds appropriated under this heading in Public Law 104–53, $3,000,000 are rescinded.

## GENERAL EXPENSES

For an additional amount for the Capitol Police Board for necessary expenses for the design and installation of security systems for the Capitol buildings and grounds, $3,250,000, which shall remain available until expended.

## ARCHITECT OF THE CAPITOL

## CAPITOL BUILDINGS AND GROUNDS

## CAPITOL BUILDINGS

For an additional amount for "Capitol Buildings and Grounds, Capitol Buildings", $250,000, to remain available until expended, for architectural and engineering services related to the design and installation of security systems for Capitol buildings and grounds.

## SENATE OFFICE BUILDINGS

Of the funds appropriated under the heading, "ARCHITECT OF THE CAPITOL, Capitol Buildings and Grounds, Senate office buildings" in Public Law 104–53, $650,000 shall remain available until September 30, 1997 for furniture, furnishings, and equipment for the Senate employees' child care center.

## GENERAL PROVISIONS

## CONGRESSIONAL AWARD ACT AMENDMENTS OF 1996

<< 2 USCA § 804 >>

SEC. 5401. (a) EXTENSION OF REQUIREMENTS REGARDING FINANCIAL OPERATIONS OF CONGRESSIONAL AWARD PROGRAM; NONCOMPLIANCE WITH REQUIREMENTS.—Section 5(c)(2)(A) of the Congressional Award Act (2 U.S.C. 804(c)(2)(A)) is amended by striking "and 1994" and inserting "1994, 1995, 1996, 1997, and 1998".

<< 2 USCA § 808 >>

(b) TERMINATION.—Section 9 of the Congressional Award Act (2 U.S.C. 808) is amended by striking "October 1, 1995" and inserting "October 1, 1999".

<< 2 USCA § 808 NOTE >>

(c) SAVINGS PROVISIONS.—During the period of October 1, 1995, through the date of the enactment of this section, all actions and functions of the Congressional Award Board under the Congressional Award Act shall have the same effect as though no lapse or termination of the Congressional Award Board ever occurred.

BILL EMERSON HALL IN THE HOUSE OF REPRESENTATIVES PAGE SCHOOL

<< 2 USCA § 141 NOTE >>

SEC. 5402. The Founders Hall instructional area in the House of Representatives Page School, located in the Thomas Jefferson Building of the Library of Congress, shall be known and designated as "Bill Emerson Hall".

CHAPTER 5

DEPARTMENT OF TRANSPORTATION

FEDERAL AVIATION ADMINISTRATION

OPERATIONS

(Airport and Airway Trust Fund)

For additional operating expenses of the Federal Aviation Administration for airport security activities, $57,900,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1998: Provided, That of the funds provided, $8,900,000 shall be for establishment of additional explosive detection K–9 teams at airports; $5,500,000 shall be for airport vulnerability assessments; $18,000,000 shall be for the hire of additional aviation security personnel: and $25,500,000 shall be for the hire of additional aviation safety inspectors and contract weather observers, air traffic controller training, and implementation of recommendations of the Federal Aviation Administration's "Ninety Day Safety Review", dated September 16, 1996: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

FACILITIES AND EQUIPMENT

(Airport and Airway Trust Fund)

For additional necessary expenses for "Facilities and Equipment", $147,700,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1999: Provided, That of the funds provided, $144,200,000 shall only be for non-competitive contracts or cooperative agreements with air carriers and airport authorities, which provide for the Federal Aviation Administration to purchase and assist in installation of advanced security equipment for the use of such entities and $3,500,000 shall be for accelerated development and deployment of the Online Aviation Safety Information System: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

RESEARCH, ENGINEERING, AND DEVELOPMENT

(Airport and Airway Trust Fund)

For an additional amount for "Research, Engineering, and Development", $21,000,000, to be derived from the Airport and Airway Trust Fund and to remain available until September 30, 1999: Provided, That the funds provided shall only be for aviation security research and operational testing of document trace scanners and explosive detection portals for airport passengers: Provided further, That such amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

GRANTS–IN–AID FOR AIRPORTS

(Airport and Airway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $50,000,000 are rescinded.

FEDERAL HIGHWAY ADMINISTRATION

HIGHWAY–RELATED SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $9,100,000 are rescinded.

FEDERAL–AID HIGHWAYS

(Highway Trust Fund)

For an additional amount for "Emergency Relief Program" for emergency expenses resulting from Hurricanes Fran and Hortense and for other disasters, as authorized by 23 U.S.C. 125, $82,000,000, to be derived from the Highway Trust Fund and to remain available until expended: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

MOTOR CARRIER SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $12,300,000 are rescinded.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

HIGHWAY TRAFFIC SAFETY GRANTS

(Highway Trust Fund)

(Rescission of Contract Authorization)

Of the available contract authority balances under this heading, $11,800,000 are rescinded.

FEDERAL RAILROAD ADMINISTRATION

Northeast Corridor Improvement Program

For additional necessary expenses related to Northeast Corridor improvements authorized by title VII of the Railroad Revitalization and Regulatory Reform Act of 1976, as amended (45 U.S.C. 851 et seq.) and 49 U.S.C. 24909, $60,000,000, to remain available until September 30, 1999.

DIRECT LOAN FINANCING PROGRAM

Notwithstanding any other provision of law, $58,680,000, for direct loans not to exceed $400,000,000 consistent with the purposes of section 505 of the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 825) as in effect on September 30, 1988, to the Alameda Corridor Transportation Authority to continue the Alameda Corridor Project, including replacement of at-grade rail lines with a below-grade corridor and widening of the adjacent major highway: Provided, That loans not to exceed the following amounts shall be made on or after the first day of the fiscal year indicated:

Fiscal year 1997 $140,000,000

Fiscal year 1998 $140,000,000

Fiscal year 1999 $120,000,000

Provided further, That any loan authorized under this section shall be structured with a maximum 30–year repayment after completion of construction at an annual interest rate of not to exceed the 30–year United States Treasury rate and on such terms and conditions as deemed appropriate by the Secretary of Transportation: Provided further, That specific provisions of section 505(a), (b) and (d) through (h) shall not apply: Provided further, That the Alameda Corridor Transportation Authority shall be deemed to be a financially responsible person for purposes of section 505 of the Act.

### GRANTS TO THE NATIONAL RAILROAD PASSENGER CORPORATION

For additional expenses necessary for "Grants to the National Railroad Passenger Corporation", $22,500,000 for operating losses, to remain available until September 30, 1997: Provided, That amounts made available shall only be used to continue service on routes the National Railroad Passenger Corporation currently plans to terminate.

### RESEARCH AND SPECIAL PROGRAMS ADMINISTRATION

### RESEARCH AND SPECIAL PROGRAMS

For additional expenses necessary for "Research and Special Programs" to conduct vulnerability and threat assessments of the nation's transportation system, $3,000,000, to remain available until September 30, 1999: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### NATIONAL TRANSPORTATION SAFETY BOARD

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $6,000,000, to reimburse other federal agencies for previously incurred costs of recovering wreckage from TWA flight 800, and for other costs related to the TWA 800 accident investigation: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### EMERGENCY FUND

For necessary expenses of the National Transportation Safety Board for accident investigations, including hire of passenger motor vehicles and aircraft; services as authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for a GS–18; uniforms, or allowances therefor, as authorized by law (5 U.S.C. 5901–5902), $1,000,000: Provided, That the entire amount is designated by Congress as an emergency requirement pursuant to section 251(b)(2)(D)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

### GENERAL PROVISIONS

Sec. 5501. In fiscal year 1997, the Administrator of the Federal Aviation Administration may establish at individual airports such consortia of government and aviation industry representatives as the Administrator may designate to provide advice on matters related to aviation security and safety: Provided, That such consortia shall not be considered Federal advisory committees.

Sec. 5502. In cases where an emergency ocean condition causes erosion of a bank protecting a scenic highway or byway, fiscal year 1996 or fiscal year 1997 Federal Highway Administration Emergency Relief funds can be used to halt the erosion and stabilize the bank if such action is necessary to protect the highway from imminent failure and is less expensive than highway relocation.

Sec. 5503. Of the funds deducted under 23 U.S.C. subsection 104(a) for fiscal year 1997, $30,000,000 shall be available for allocation to States authorized by section 1069(y) of Public Law 102–240.

SEC. 5504. CONVEYANCE OF PROPERTY IN TRAVERSE CITY, MICHIGAN.

 (a) AUTHORITY TO CONVEY.—The Secretary of Transportation (or any other official having control over the property described in subsection (b)) shall expeditiously convey to the Traverse City Area Public School District in Traverse City, Michigan, without consideration, all right, title, and interest of the United States in and to the property identified, described, and determined by the Secretary under subsection (b), subject to all easements and other interests in the property held by any other person.

 (b) IDENTIFICATION OF PROPERTY.—The Secretary shall identify, describe, and determine the property to be conveyed pursuant to this section.

 (c) REVERSIONARY INTEREST.—In addition to any term or condition established pursuant to subsection (a) or (d), any conveyance of property described in subsection (b) shall be subject to the condition that all right, title, and interest in and to the property so conveyed shall immediately revert to the United States if the property, or any part thereof, ceases to be used by the Traverse City Area Public School District.

 (d) TERMS OF CONVEYANCE.—The conveyance of property under this section shall be subject to such conditions as the Secretary considers to be necessary to assure that—

  (1) the pump room located on the property shall continue to be operated and maintained by the United States for as long as it is needed for this purpose;

  (2) the United States shall have an easement of access to the property for the purpose of operating and maintaining the pump room; and

  (3) the United States shall have the right, at any time, to enter the property without notice for the purpose of operating and maintaining the pump room.

SEC. 5505. AUTHORITY TO CONVEY WHITEFISH POINT LIGHT STATION LAND.

 (a) AUTHORITY TO CONVEY.—

  (1) IN GENERAL.—Except as otherwise provided in this section, the Secretary of the Interior (in this section referred to as the "Secretary") may convey, by an appropriate means of conveyance, all right, title, and interest of the United States in 1 of the 3 parcels comprising the land on which the United States Coast Guard Whitefish Point Light Station is situated (in this section referred to as the "Property"), to each of the Great Lakes Shipwreck Historical Society, located in Sault Ste. Marie, Michigan, the United States Fish and Wildlife Service, and the Michigan Audubon Society (each of which is referred to in this section as a "recipient"), subject to all easements, conditions, reservations, exceptions, and restrictions contained in prior conveyances of record.

  (2) LIMITATION.—Notwithstanding paragraph (1), the Secretary shall retain for the United States all right, title, and interest in—

   (A) any historical artifact, including any lens or lantern, and

   (B) the light, antennas, sound signal, towers, associated lighthouse equipment, and any electronic navigation equipment, which are active aids to navigation,

which is located on the Property, or which relates to the Property.

  (3) IDENTIFICATION OF THE PROPERTY.—The Secretary may identify, describe, and determine the parcels to be conveyed pursuant to this section.

  (4) RIGHTS OF ACCESS.—If necessary to ensure access to a public roadway for a parcel conveyed under this section, the Secretary shall convey with the parcel an appropriate appurtenant easement over another parcel conveyed under this section.

  (5) EASEMENT FOR PUBLIC ALONG SHORELINE.—In each conveyance under this section of property located on the shoreline of Lake Superior, the Secretary shall retain for the public, for public walkway purposes, a right-of-way along the shoreline that extends 30 feet inland from the mean high water line.

 (b) TERMS AND CONDITIONS.—

  (1) IN GENERAL.—Any conveyance pursuant to subsection (a) shall be made—

   (A) without payment of consideration; and

   (B) subject to such terms and conditions as the Secretary considers appropriate.

(2) MAINTENANCE OF NAVIGATION FUNCTONS.—The Secretary shall ensure that any conveyance pursuant to this section is subject to such conditions as the Secretary considers to be necessary to assure that—

(A) the light, antennas, sound signal, towers, and associated lighthouse equipment, and any electronic navigation equipment, which are located on the Property and which are active aids to navigation shall continue to be operated and maintained by the United States for as long as they are needed for this purpose;

(B) the recipients may not interfere or allow interference in any manner with such aids to navigation without express written permission from the United States;

(C) there is reserved to the United States the right to relocate, replace, or add any aids to navigation, or make any changes on any portion of the Property as may be necessary for navigation purposes;

(D) the United States shall have the right, at any time, to enter the Property without notice for the purpose of maintaining aids to navigation;

(E) the United States shall have—

 (i) an easement of access to and across the Property for the purpose of maintaining the aids to navigation and associated equipment in use on the Property; and

 (ii) an easement for an arc of visibility; and

(F) the United States shall not be responsible for the cost and expense of maintenance, repair, and upkeep of the Property.

(3) MAINTENANCE OBLIGATION.—The recipients shall not have any obligation to maintain any active aid to navigation equipment on any parcel conveyed pursuant to this section.

(c) PROPERTY TO BE MAINTAINED IN ACCORDANCE WITH CERTAIN LAWS.—Each recipient shall maintain the parcel conveyed to the recipient pursuant to subsection (a) in accordance with the provisions of the National Historic Preservation Act (16 U.S.C. 470 et seq.), and other applicable laws.

(d) MAINTENANCE STANDARD.—Each recipient shall maintain the parcel conveyed to the recipient pursuant to subsection (a), at its own cost and expense, in a proper, substantial, and workmanlike manner, including the easements of access, the easement for an arc of visibility, the nuisance easement, and the underground easement.

(e) SHARED USE AND OCCUPANCY AGREEMENT.—The Secretary shall require, as a condition of each conveyance of property under this section, that all of the recipients have entered into the same agreement governing the shared use and occupancy of the existing Whitefish Point Light Station facilities. The agreement shall be drafted by the recipients and shall include—

(1) terms governing building occupancy and access of recipient staff and public visitors to public restrooms, the auditorium, and the parking lot; and

(2) terms requiring that each recipient shall be responsible for paying a pro rata share of the costs of operating and maintaining the existing Whitefish Point Light Station facilities, that is based on the level of use and occupancy of the facilities by the recipient.

(f) LIMITATIONS ON DEVELOPMENT AND IMPAIRING USES.—It shall be a term of each conveyance under this section that—

(1) no development of new facilities or expansion of existing facilities or infrastructure on property conveyed under this section may occur, except for purposes of implementing the Whitefish Point Comprehensive Plan of October 1992 or for a gift shop, unless—

(A) each of the recipients consents to the development or expansion in writing;

(B) there has been a reasonable opportunity for public comment on the development or expansion, and full consideration has been given to such public comment as is provided; and

(C) the development or expansion is consistent with preservation of the Property in its predominantly natural, scenic, historic, and forested condition; and

(2) any use of the Property or any structure located on the property which may impair or interfere with the conservation values of the Property is expressly prohibited.

(g) REVISIONARY INTEREST.—

(1) IN GENERAL.—All right, title, and interests in and to property and interests conveyed under this section shall revert to the United States and thereafter be administered by the Secretary of Interior acting through the Director of the United States Fish and Wildlife Service, if—

(A) in the case of such property and interests conveyed to the Great Lakes Shipwreck Historical Society, the property or interests cease to be used for the purpose of historical interpretation;

(B) in the case of such property and interests conveyed to the Michigan Audubon Society, the property or interests cease to be used for the purpose of environmental protection, research, and interpretation; or

(C) in the case any property and interests conveyed to a recipient referred to in subparagraph (A) or (B)—

(i) there is any violation of any term or condition of the conveyance to that recipient; or

(ii) the recipient has ceased to exist.

(2) AUTHORITY TO ENFORCE REVERSIONARY INTEREST.—The Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall have the authority—

(A) to determine for the United States Government whether any act or omission of a recipient results in a reversion of property and interests under paragraph (1); and

(B) to initiate a civil action to enforce that reversion, after notifying the recipient of the intent of the Secretary of the Interior to initiate that action.

(3) MAINTENANCE OF NAVIGATION FUNCTIONS.—In the event of a reversion of property under this subsection, the Secretary of the Interior shall administer the property subject to any conditions the Secretary of Transportation considers to be necessary to maintain the navigation functions.

SEC. 5506. CONVEYANCE OF LIGHTHOUSES.

(a) AUTHORITY TO CONVEY.—

(1) IN GENERAL.—The Secretary of Transportation or the Secretary of the Interior, as appropriate, shall convey, by an appropriate means of conveyance, all right, title, and interest of the United States in and to each of the following properties:

(A) Saint Helena Island Light Station, located in MacKinac County, Moran Township, Michigan, to the Great Lakes Lighthouse Keepers Association.

(B) Presque Isle Light Station, located in Presque Isle Township, Michigan, to Presque Isle Township, Presque Isle County, Michigan.

(2) IDENTIFICATION OF PROPERTY.—The Secretary may identify, describe, and determine the property to be conveyed under this subsection.

(3) EXCEPTION.—The Secretary may not convey any historical artifact, including any lens or lantern, located on the property at or before the time of the conveyance.

(b) TERMS OF CONVEYANCE.—

(1) IN GENERAL.—The conveyance of property under this section shall be made—

(A) without payment of consideration; and

(B) subject to the conditions required by this section and other terms and conditions the Secretary may consider appropriate.

(2) REVERSIONARY INTEREST.—In addition to any term or condition established under this section, the conveyance of property under this subsection shall be subject to the condition that all right, title, and interest in the property shall immediately revert to the United States if—

(A) the property, or any part of the property—

(i) ceases to be used as a nonprofit center for the interpretation and preservation of maritime history;

(ii) ceases to be maintained in a manner that ensures its present or future use as a Coast Guard aid to navigation; or

(iii) ceases to be maintained in a manner consistent with the provisions of the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); or

(B) at least 30 days before that reversion, the Secretary of Transportation provides written notice to the owner that the property is needed for national security purposes.

(3) MAINTENANCE OF NAVIGATION FUNCTIONS.—A conveyance of property under this section shall be made subject to the conditions that the Secretary of Transportation considers to be necessary to assure that—

(A) the lights, antennas, sound signal, electronic navigation equipment, and associated lighthouse equipment located on the property conveyed, which are active aids to navigation, shall continue to be operated and maintained by the United States for as long as they are needed for this purpose;

(B) the owner of the property may not interfere or allow interference in any manner with aids to navigation without express written permission from the Secretary of Transportation;

(C) there is reserved to the United States the right to relocate, replace or add any aid to navigation or make any changes to the property as may be necessary for navigational purposes;

(D) the United States shall have the right, at any time, to enter the property without notice for the purpose of maintaining aids to navigation; and

(E) the United States shall have an easement of access to and across the property for the purpose of maintaining the aids to navigation in use on the property.

(4) OBLIGATION LIMITATION.—The owner of property conveyed under this section is not required to maintain any active aid to navigation equipment on the property.

(5) PROPERTY TO BE MAINTAINED IN ACCORDANCE WITH CERTAIN LAWS.—The owner of property conveyed under this section shall maintain the property in accordance with the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.) and other applicable laws.

(c) MAINTENANCE STANDARD.—The owner of any property conveyed under this section, at its own cost and expense, shall maintain the property in a proper, substantial, and workmanlike manner.

(d) DEFINITIONS.—For purposes of this section:

(1) the term "owner" means the person identified in subsection a(1)(A) and (B), and includes any successor of assign of that person.

(2) The term "Presque Isle Light Station" includes the light tower, attached dwelling, detached dwelling, 3–car garage, and any other improvements on that parcel of land.

## CHAPTER 6

## DEPARTMENT OF THE TREASURY

## COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS

### COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND PROGRAM ACCOUNT

For an additional amount for "Community Development Financial Institutions Fund Program Account" for grants, loans, and technical assistance to qualifying community development lenders, $5,000,000, to remain available until September 30, 1998, of which $850,000 may be used for the cost of direct loans: Provided, That the cost of direct loans, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974.

## ENVIRONMENTAL PROTECTION AGENCY

### SCIENCE AND TECHNOLOGY

For an additional amount for "Science and Technology", $10,000,000, to remain available until September 30, 1998, to conduct health effects research to carry out the purposes of the Safe Drinking Water Act Amendments of 1996, Public Law 104–182.

### ENVIRONMENTAL PROGRAMS AND MANAGEMENT

For an additional amount for "Environmental Programs and Management", $42,221,000, to remain available until September 30, 1998, of which $30,000,000 is to carry out the purposes of the Safe Drinking Water Act Amendments of 1996, Public Law 104–182, and the purposes of the Food Quality Protection Act of 1996, Public Law 104–170, and of which $10,221,000 is for pesticide residue data collection for use in risk assessment activities.

### STATE AND TRIBAL ASSISTANCE GRANTS

For an additional amount for "State and Tribal Assistance Grants", $35,000,000, to remain available until expended, for a grant to the City of Boston, Massachusetts, subject to an appropriate cost share as determined by the Administrator, for the construction of wastewater treatment facilities.

### FEDERAL EMERGENCY MANAGEMENT AGENCY

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses" to increase Federal, State, and local preparedness for mitigating and responding to the consequences of terrorism, $3,000,000.

### EMERGENCY MANAGEMENT PLANNING AND ASSISTANCE

For an additional amount for "Emergency Management Planning and Assistance" to increase Federal, State, and local preparedness for mitigating and responding to the consequences of terrorism, $12,000,000.

### NATIONAL FLOOD INSURANCE FUND

<< 42 USCA § 4016 >>

Section 1309(a)(2) of the National Flood Insurance Act (42 U.S.C. 4016(a)(2)), is amended by striking "$1,000,000,000" and inserting in lieu thereof "$1,500,000,000 through September 30, 1997, and $1,000,000,000 thereafter".

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

### OFFICE OF CONSUMER AFFAIRS

For necessary expenses of the Office of Consumer Affairs, including services authorized by 5 U.S.C. 3109, but at rates for individuals not to exceed the per diem rate equivalent to the rate for GS–18, $1,500,000: Provided, That none of the funds provided under this heading may be made available for any other activities within the Department of Health and Human Services.

### NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

### SCIENCE, AERONAUTICS AND TECHNOLOGY

For an additional amount for "Science, Aeronautics and Technology", $5,000,000, to remain available until September 30, 1998.

### CHAPTER 7

### INTERNATIONAL SECURITY ASSISTANCE

### NONPROLIFERATION, ANTI-TERRORISM, DEMINING AND RELATED PROGRAMS

For an additional amount for nonproliferation, anti-terrorism and related programs and activities, $18,000,000, to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961 for anti-terrorism assistance.

### FOREIGN MILITARY FINANCING PROGRAM

For an additional amount for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $60,000,000.

### PEACEKEEPING OPERATIONS

For necessary expenses to carry out the provisions of section 551 of the Foreign Assistance Act of 1961, $65,000,000: Provided, That none of the funds appropriated under this paragraph shall be obligated or expended except as provided through the regular notification procedures of the Committees on Appropriations.

### CHAPTER 8

### GENERAL PROVISIONS

SEC. 5801. Of the amounts made available in Title IV of the Department of Defense Appropriations Act, 1997, under the heading "Research, Development, Test and Evaluation, Defense–Wide", $56,232,000 shall be made available only for the Corps Surface-to-Air Missile (CORPS SAM) program.

<< 10 USCA § 2012 NOTE >>

SEC. 5802. There is hereby established on the books of the Treasury an account, "Support for International Sporting Competitions, Defense" (hereinafter referred to in this section as the "Account") to be available until expended for logistical and security support for international sporting competitions (other than pay and non-travel-related allowances of members of the Armed Forces of the United States, except for members of the reserve components thereof called or ordered to active duty in connection with providing such support): Provided, That there shall be credited to the Account: (a) unobligated balances of the funds appropriated in Public Laws 103–335 and 104–61 under the headings "Summer Olympics"; (b) any reimbursements received by the Department of Defense in connection with support to the 1993 World University Games; the 1994 World Cup Games; and the 1996 Games of the XXVI Olympiad held in Atlanta, Georgia; (c) any reimbursements received by the Department of Defense after the date of enactment of this Act for logistical and security support provided to international sporting competitions; and (d) amounts specifically appropriated to the Account, all to remain available until expended: Provided further, That none of the funds made available to the Account may be obligated until 45 days after the congressional defense committees have been notified in writing by the Secretary of Defense as to the purpose for which these funds will be obligated.

SEC. 5803. In addition to the amounts made available in Title IV of the Department of Defense Appropriations Act, 1997, under the heading "Research, Development, Test and Evaluation, Defense–Wide", $100,000,000 is hereby appropriated and made available only for the Dual–Use Applications Program.

DIVISION B—OREGON RESOURCE CONSERVATION ACT OF 1996

SECTION 1. SHORT TITLE.

This Act may be cited as the "Oregon Resource Conservation Act of 1996".

TITLE I—OPAL CREEK WILDERNESS AND SCENIC RECREATION AREA

<< 16 USCA § 545b NOTE >>

SEC. 101. SHORT TITLE.

This title may be cited as the "Opal Creek Wilderness and Opal Creek Scenic Recreation Area Act of 1996".

<< 16 USCA § 545b NOTE >>

SEC. 102. DEFINITIONS.

In this title:

(1) BULL OF THE WOODS WILDERNESS.—The term "Bull of the Woods Wilderness" means the land designated as wilderness by section 3(4) of the Oregon Wilderness Act of 1984 (Public Law 98–328; 16 U.S.C. 1132 note).

(2) OPAL CREEK WILDERNESS.—The term "Opal Creek Wilderness" means certain land in the Willamette National Forest in the State of Oregon comprising approximately 12,800 acres, as generally depicted on the map entitled "Proposed Opal Creek Wilderness and Scenic Recreation Area", dated July 1996.

(3) SCENIC RECREATION AREA.—The term "Scenic Recreation Area" means the Opal Creek Scenic Recreation Area, comprising approximately 13,000 acres, as generally depicted on the map entitled "Proposed Opal Creek Wilderness and Scenic Recreation Area", dated July 1996 and established under section 104(a)(3) of this title.

(4) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

<< 16 USCA § 545b NOTE >>

SEC. 103. PURPOSES.

The purposes of this title are:

(1) to establish a wilderness and scenic recreation area to protect and provide for the enhancement of the natural, scenic, recreational, historic, and cultural resources of the area in the vicinity of Opal Creek;

(2) to protect and support the economy of the communities in the Santiam Canyon; and

(3) to provide increased protection for an important drinking water source for communities served by the north Santiam River.

<< 16 USCA § 545b NOTE >>

<< 16 USCA § 1132 NOTE >>

SEC. 104. ESTABLISHMENT OF OPAL CREEK WILDERNESS AND SCENIC RECREATION AREA.

(a) ESTABLISHMENT.—On a determination by the Secretary under subsection (b)—

(1) the Opal Creek Wilderness, as depicted on the map described in section 102(2), is hereby designated as wilderness, subject to the provisions of the Wilderness Act of 1964, shall become a component of the National Wilderness System, and shall be known as the Opal Creek Wilderness;

(2) the part of the Bull of the Woods Wilderness that is located in the Willamette National Forest shall be incorporated into the Opal Creek Wilderness; and

(3) the Secretary shall establish the Opal Creek Scenic Recreation Area in the Willamette National Forest in the State of Oregon, comprising approximately 13,000 acres, as generally depicted on the map described in section 102(3).

(b) CONDITIONS.—The designations in subsection (a) shall not take effect unless the Secretary makes a determination, not later than 2 years after the date of enactment of this title, that the following conditions have been met:

(1) the following have been donated to the United States in an acceptable condition and without encumbrances—

(A) all right, title, and interest in the following patented parcels of land—

(i) Santiam number 1, mineral survey number 992, as described in patent number 39–92–0002, dated December 11, 1991;

(ii) Ruth Quartz Mine number 2, mineral survey number 994, as described in patent number 39–91–0012, dated February 12, 1991;

(iii) Morning Star Lode, mineral survey number 993, as described in patent number 36–91–0011, dated February 12, 1991;

(B) all right, title, and interest held by any entity other than the Times Mirror Land and Timber Company, its successors and assigns, in and to lands located in section 18, township 8 south, range 5 east, Marion County, Oregon, Eureka numbers 6, 7, 8, and 13 mining claims; and

(C) an easement across the Hewitt, Starvation, and Poor Boy Mill Sites, mineral survey number 990, as described in patent number 36–91–0017, dated May 9, 1991. In the sole discretion of the Secretary, such easement may be limited to administrative use if an alternative access route, adequate and appropriate for public use, is provided.

(2) a binding agreement has been executed by the Secretary and the owners of record as of March 29, 1996, of the following interests, specifying the terms and conditions for the disposition of such interests to the United States Government—

(A) the lode mining claims known as Princess Lode, Black Prince Lode, and King number 4 Lode, embracing portions of sections 29 and 32, township 8 south, range 5 east, Willamette Meridian, Marion County, Oregon, the claims being more particularly described in the field notes and depicted on the plat of mineral survey number 887, Oregon; and

(B) Ruth Quartz Mine number 1, mineral survey number 994, as described in patent number 39–91–0012, dated February 12, 1991.

(c) ADDITIONS TO THE WILDERNESS AND SCENIC RECREATION AREAS.—

(1) Lands or interests in lands conveyed to the United States under this section shall be included in and become part of, as appropriate, Opal Creek Wilderness or the Opal Creek Scenic Recreation Area.

(2) On acquiring all or substantially all of the land located in section 36, township 8 south, range 4 east, of the Willamette Meridian, Marion County, Oregon, commonly known as the Rosboro section, by exchange, purchase from a willing seller, or by donation, the Secretary shall expand the boundary of the Scenic Recreation Area to include such land.

(3) On acquiring all or substantially all of the land located in section 18, township 8 south, range 5 east, Marion County, Oregon, commonly known as the Times Mirror property, by exchange, purchase from a willing seller, or by donation, such land shall be included in and become a part of the Opal Creek Wilderness.

<< 16 USCA § 545b NOTE >>

SEC. 105. ADMINISTRATION OF THE SCENIC RECREATION AREA.

(a) IN GENERAL.—The Secretary shall administer the Scenic Recreation Area in accordance with this title and the laws (including regulations) applicable to the National Forest System.

(b) OPAL CREEK MANAGEMENT PLAN.—

(1) IN GENERAL.—Not later than 2 years after the date of establishment of the Scenic Recreation Area, the Secretary, in consultation with the advisory committee established under section 106(a), shall prepare a comprehensive Opal Creek Management Plan (Management Plan) for the Scenic Recreation Area.

(2) INCORPORATION IN LAND AND RESOURCE MANAGEMENT PLAN.—Upon its completion, the Opal Creek Management Plan shall become part of the land and resource management plan for the Willamette National Forest and supersede any conflicting provision in such land and resource management plan. Nothing in this paragraph shall be construed to supersede the requirements of the Endangered Species Act or the National Forest Management Act or regulations promulgated under those Acts, or any other law.

(3) REQUIREMENTS.—The Opal Creek Management Plan shall provide for a broad range of land uses, including—

(A) recreation;

(B) harvesting of nontraditional forest products, such as gathering mushrooms and material to make baskets; and

(C) educational and research opportunities.

(4) PLAN AMENDMENTS.—The Secretary may amend the Opal Creek Management Plan as the Secretary may determine to be necessary, consistent with the procedures and purposes of this title.

(c) RECREATION.—

(1) RECOGNITION.—Congress recognizes recreation as an appropriate use of the Scenic Recreation Area.

(2) MINIMUM LEVELS.—The management plan shall permit recreation activities at not less than the levels in existence on the date of enactment of this title.

(3) HIGHER LEVELS.—The management plan may provide for levels of recreation use higher than the levels in existence on the date of enactment of this title if such uses are consistent with the protection of the resource values of Scenic Recreation Area.

(4) The management plan may include public trail access through section 28, township 8 south, range 5 east, Willamette Meridian, to Battle Axe Creek, Opal Pool and other areas in the Opal Creek Wilderness and the Opal Creek Scenic Recreation Area.

(d) TRANSPORTATION PLANNING.—

(1) IN GENERAL.—Except as provided in this subparagraph, motorized vehicles shall not be permitted in the Scenic Recreation Area. To maintain reasonable motorized and other access to recreation sites and facilities in existence on the date of enactment of this title, the Secretary shall prepare a transportation plan for the Scenic Recreation Area that:

(A) evaluates the road network within the Scenic Recreation Area to determine which roads should be retained and which roads should be closed;

(B) provides guidelines for transportation and access consistent with this title;

(C) considers the access needs of persons with disabilities in preparing the transportation plan for the Scenic Recreation Area;

(D) allows forest road 2209 beyond the gate to the Scenic Recreation Area, as depicted on the map described in 102(2), to be used by motorized vehicles only for administrative purposes and for access by private inholders, subject to such terms and conditions as the Secretary may determine to be necessary; and

(E) restricts construction on or improvements to forest road 2209 beyond the gate to the Scenic Recreation Area to maintaining the character of the road as it existed upon the date of enactment of this title, which shall not include paving or widening. In order to comply with subsection 107(b) of this title, the Secretary may make improvements to forest road 2209 and its bridge structures consistent with the character of the road as it existed on the date of enactment of this title.

(e) HUNTING AND FISHING.—

(1) IN GENERAL.—Subject to applicable Federal and State law, the Secretary shall permit hunting and fishing in the Scenic Recreation Area.

(2) LIMITATION.—The Secretary may designate zones in which, and establish periods when, no hunting or fishing shall be permitted for reasons of public safety, administration, or public use and enjoyment of the Scenic Recreation Area.

(3) CONSULTATION.—Except during an emergency, as determined by the Secretary, the Secretary shall consult with the Oregon State Department of Fish and Wildlife before issuing any regulation under this subsection.

(f) TIMBER CUTTING.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall prohibit the cutting and/or selling of trees in the Scenic Recreation Area.

(2) PERMITTED CUTTING.—

(A) IN GENERAL.—Subject to subparagraph (B), the Secretary may allow the cutting of trees in the Scenic Recreation Area only—

(i) for public safety, such as to control the continued spread of a forest fire in the Scenic Recreation Area or on land adjacent to the Scenic Recreation Area;

(ii) for activities related to administration of the Scenic Recreation Area, consistent with the Opal Creek Management Plan; or

(iii) for removal of hazard trees along trails and roadways.

(B) SALVAGE SALES.—The Secretary may not allow a salvage sale in the Scenic Recreation Area.

(g) WITHDRAWAL.—

(1) Subject to valid existing rights, all lands in the Scenic Recreation Area are withdrawn from—

(i) any form of entry, appropriation, or disposal under the public land laws;

(ii) location, entry, and patent under the mining laws; and

(iii) disposition under the mineral and geothermal leasing laws.

(h) BORNITE PROJECT.—

(1) Nothing in this title shall be construed to interfere with or approve any exploration, mining, or mining-related activity in the Bornite Project Area, depicted on the map described in subsection 102(3), conducted in accordance with applicable laws.

(2) Nothing in this title shall be construed to interfere with the ability of the Secretary to approve and issue, or deny, special use permits in connection with exploration, mining, and mining-related activities in the Bornite Project Area.

(3) Motorized vehicles, roads, structures, and utilities (including but not limited to power lines and water lines) may be allowed inside the Scenic Recreation Area to serve the activities conducted on land within the Bornite Project.

(4) After the date of enactment of this title, no patent or claim shall be issued for any mining claim under the general mining laws located within the Bornite Project Area.

(i) WATER IMPOUNDMENTS.—Notwithstanding the Federal Power Act (16 U.S.C. 791a et seq.), the Federal Energy Regulatory Commission may not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project work in the Scenic Recreation Area, except as may be necessary to comply with the provisions of subsection 105(h) with regard to the Bornite Project.

(j) CULTURAL AND HISTORIC RESOURCE INVENTORY.—

(1) IN GENERAL.—Not later than 1 year after the date of establishment of the Scenic Recreation Area, the Secretary shall review and revise the inventory of the cultural and historic resources on the public land in the Scenic Recreation Area developed pursuant to the Oregon Wilderness Act of 1984 (Public Law 98–328; 16 U.S.C. 1132).

(2) INTERPRETATION.—Interpretive activities shall be developed under the management plan in consultation with State and local historic preservation organizations and shall include a balanced and factual interpretation of the cultural, ecological, and industrial history of forestry and mining in the Scenic Recreation Area.

(k) PARTICIPATION.—So that the knowledge, expertise, and views of all agencies and groups may contribute affirmatively to the most sensitive present and future use of the Scenic Recreation Area and its various subareas for the benefit of the public:

(1) ADVISORY COUNCIL.—The Secretary shall consult on a periodic and regular basis with the advisory council established under section 106 with respect to matters relating to management of the Scenic Recreation Area.

(2) PUBLIC PARTICIPATION.—The Secretary shall seek the views of private groups, individuals, and the public concerning the Scenic Recreation Area.

(3) OTHER AGENCIES.—The Secretary shall seek the views and assistance of, and cooperate with, any other Federal, State, or local agency with any responsibility for the zoning, planning, or natural resources of the Scenic Recreation Area.

AR.03513

(4) NONPROFIT AGENCIES AND ORGANIZATIONS.—The Secretary shall seek the views of any nonprofit agency or organization that may contribute information or expertise about the resources and the management of the Scenic Recreation Area.

<< 16 USCA § 545b NOTE >>

SEC. 106. ADVISORY COUNCIL.

(a) ESTABLISHMENT.—Not later than 90 days after the establishment of the Scenic Recreation Area, the Secretary shall establish an advisory council for the Scenic Recreation Area.

(b) MEMBERSHIP.—The advisory council shall consist of not more than 13 members, of whom—

(1) 1 member shall represent Marion County, Oregon, and shall be designated by the governing body of the county;

(2) 1 member shall represent the State of Oregon and shall be designated by the Governor of Oregon; and

(3) 1 member shall represent the city of Salem, and shall be designated by the mayor of Salem, Oregon;

(4) 1 member from a city within a 25–mile radius of the Opal Creek Scenic Recreation Area, to be designated by the Governor of the State of Oregon from a list of candidates provided by the mayors of the cities located within a 25–mile radius of the Opal Creek Scenic Recreation Area; and

(5) not more than 9 members shall be appointed by the Secretary from among persons who, individually or through association with a national or local organization, have an interest in the administration of the Scenic Recreation Area, including, but not limited to, representatives of the timber industry, environmental organizations, the mining industry, inholders in the Opal Creek Wilderness and Scenic Recreation Area, economic development interests and Indian Tribes.

(c) STAGGERED TERMS.—Members of the advisory council shall serve for staggered terms of three years.

(d) CHAIRMAN.—The Secretary shall designate one member of the advisory council as chairman.

(e) VACANCIES.—The Secretary shall fill a vacancy on the advisory council in the same manner as the original appointment.

(f) COMPENSATION.—Members of the advisory council shall receive no compensation for service on the advisory council.

<< 16 USCA § 545b NOTE >>

SEC. 107. GENERAL PROVISIONS.

(a) LAND ACQUISITION.—

(1) IN GENERAL.—Subject to the other provisions of this title the Secretary may acquire any lands or interests in land in the Scenic Recreation Area or the Opal Creek Wilderness that the Secretary determines are needed to carry out this title.

(2) PUBLIC LAND.—Any lands or interests in land owned by a State or a political subdivision of a State may be acquired only by donation or exchange.

(3) CONDEMNATION.—Within the boundaries of the Opal Creek Wilderness or the Scenic Recreation Area, the Secretary may not acquire any privately owned land or interest in land without the consent of the owner unless the Secretary finds that—

(A) the nature of land use has changed significantly, or the landowner has demonstrated intent to change the land use significantly, from the use that existed on the date of the enactment of this title; and

(B) acquisition by the Secretary of the land or interest in land is essential to ensure use of the land or interest in land in accordance with the purposes of this title or the management plan prepared under section 105(b).

(4) Nothing in this title shall be construed to enhance or diminish the condemnation authority available to the Secretary outside the boundaries of the Opal Creek Wilderness or the Scenic Recreation Area.

(b) ENVIRONMENTAL RESPONSE ACTIONS AND COST RECOVERY.—

(1) RESPONSE ACTIONS.—Nothing in this title shall limit the authority of the Secretary or a responsible party to conduct an environmental response action in the Scenic Recreation Area in connection with the release, threatened release, or cleanup of a hazardous substance, pollutant, or contaminant, including a response action conducted under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.).

(2) LIABILITY.—Nothing in this title shall limit the authority of the Secretary or a responsible party to recover costs related to the release, threatened release, or cleanup of any hazardous substance or pollutant or contaminant in the Scenic Recreation Area.

(c) MAPS AND DESCRIPTION.—

(1) IN GENERAL.—As soon as practicable after the date of enactment of this title, the Secretary shall file a map and a boundary description for the Opal Creek Wilderness and for the Scenic Recreation Area with the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

(2) FORCE AND EFFECT.—The boundary description and map shall have the same force and effect as if the description and map were included in this title, except that the Secretary may correct clerical and typographical errors in the boundary description and map.

(3) AVAILABILITY.—The map and boundary description shall be on file and available for public inspection in the Office of the Chief of the Forest Service, Department of Agriculture.

(d) Nothing in this title shall interfere with any activity for which a special use permit has been issued, has not been revoked, and has not expired, before the date of enactment of this title, subject to the terms of the permit.

<< 16 USCA § 545b NOTE >>

SEC. 108. ROSBORO LAND EXCHANGE.

(a) AUTHORIZATION.—Notwithstanding any other law, if the Rosboro Lumber Company (referred to in this section as "Rosboro") offers and conveys marketable title to the United States to the land described in subsection (b), the Secretary of Agriculture shall convey all right, title and interest held by the United States to sufficient lands described in subsection (c) to Rosboro, in the order in which they appear in subsection (c), as necessary to satisfy the equal value requirements of subsection (d).

(b) LAND TO BE OFFERED BY ROSBORO.—The land referred to in subsection (a) as the land to be offered by Rosboro shall comprise Section 36, Township 8 South, range 4 east, Willamette Meridian.

(c) LAND TO BE CONVEYED BY THE UNITED STATES.—The land referred to in subsection (a) as the land to be conveyed by the United States shall comprise sufficient land from the following prioritized list to be of equal value under subparagraph (d):

(1) Section 5, Township 17 South, Range 4 East, Lot 7 (37.63 acres).

(2) Section 2, Township 17 South, Range 4 East, Lot 3 (29.28 acres).

(3) Section 13, Township 17 South, Range 4 East, S 1/2 SE 1/4 (80 acres).

(4) Section 2, Township 17 South, Range 4 East, SW 1/4 SW 1/4 (40 acres).

(5) Section 2, Township 17 South, Range 4 East, NW 1/4 SE 1/4 (40 acres).

(6) Section 8, Township 17 South, Range 4 East, SE 1/4 SW 1/4 (40 acres).

(7) Section 11, Township 17 South, Range 4 East, W 1/2 NW 1/4 (80 acres).

(d) EQUAL VALUE.—The land and interests in land exchanged under this section shall be of equal market value as determined by nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Standards for Federal Land Acquisition, the Uniform Standards of Professional Appraisal Practice, or shall be equalized by way of payment of cash pursuant to the provisions of section 206(d) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(d)), and other applicable law. The appraisal shall consider access costs for the parcels involved.

(e) TIMETABLE.—

(1) The exchange directed by this section shall be consummated not later than 120 days after the date Rosboro offers and conveys the property described in subsection (b) to the United States.

(2) The authority provided by this section shall lapse if Rosboro fails to offer the land described in subsection (b) within two years after the date of enactment of this title.

(f) Rosboro shall have the right to challenge in United States District Court for the District of Oregon a determination of marketability under subsection (a) and a determination of value for the lands described in subsections (b) and (c) by the Secretary of Agriculture. The Court shall have the authority to order the Secretary to complete the transaction contemplated in this Section.

(g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

<< 16 USCA § 545b NOTE >>

<< 16 USCA § 1274 >>

SEC. 109. DESIGNATION OF ELKHORN CREEK AS A WILD AND SCENIC RIVER.

Section 3(a) of the Wild and Scenic Rivers Act (16 U.S.C. 1274(a)) is amended by adding at the end the following:

"( )(A) ELKHORN CREEK.—The 6.4 mile segment traversing federally administered lands from that point along the Willamette National Forest boundary on the common section line between Sections 12 and 13, Township 9 South, Range 4 East, Willamette Meridian, to that point where the segment leaves federal ownership along the Bureau of Land Management boundary in Section 1, Township 9 South, Range 3 East, Willamette Meridian, in the following classes:

"(i) a 5.8–mile wild river area, extending from that point along the Willamette National Forest boundary on the common section line between Sections 12 and 13, Township 9 South, Range 4 East, Willamette Meridian, to its confluence with Buck Creek in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to be administered as agreed on by the Secretaries of Agriculture and the Interior, or as directed by the President; and

"(ii) a 0.6–mile scenic river area, extending from the confluence with Buck Creek in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to that point where the segment leaves federal ownership along the Bureau of Land Management boundary in Section 1, Township 9 South, Range 3 East, Willamette Meridian, to be administered by the Secretary of Interior, or as directed by the President.

"(B) Notwithstanding section 3(b) of this Act, the lateral boundaries of both the wild river area and the scenic river area along Elkhorn Creek shall include an average of not more than 640 acres per mile measured from the ordinary high water mark on both sides of the river."

<< 16 USCA § 545b NOTE >>

SEC. 110. ECONOMIC DEVELOPMENT.

(a) ECONOMIC DEVELOPMENT PLAN.—As a condition for receiving funding under subsection (b) of this section, the State of Oregon, in consultation with Marion County and the Secretary of Agriculture, shall develop a plan for economic development projects for which grants under this section may be used in a manner consistent with this title and to benefit local communities in the vicinity of the Opal Creek area. Such plan shall be based on an economic opportunity study and other appropriate information.

(b) FUNDS PROVIDED TO THE STATES FOR GRANTS.—Upon completion of the Opal Creek Management Plan, and receipt of the plan referred to in subsection (a) of this section, the Secretary shall provide, subject to appropriations, $15,000,000, to the State of Oregon. Such funds shall be used to make grants or loans for economic development projects that further the purposes of this title and benefit the local communities in the vicinity of Opal Creek.

(c) REPORT.—The State of Oregon shall—

(1) prepare and provide the Secretary and Congress with an annual report on the use of the funds made available under this section;

(2) make available to the Secretary and to Congress, upon request, all accounts, financial records, and other information related to grants and loans made available pursuant to this section; and

(3) as loans are repaid, make additional grants and loans with the money made available for obligation by such repayments.

TITLE II—UPPER KLAMATH BASIN

SEC. 201. UPPER KLAMATH BASIN ECOLOGICAL RESTORATION PROJECTS.

(a) DEFINITIONS.—In this section:

(1) ECOSYSTEM RESTORATION OFFICE.—The term "Ecosystem Restoration Office" means the Klamath Basin Ecosystem Restoration Office operated cooperatively by the United States Fish and Wildlife Service, Bureau of Reclamation, Bureau of Land Management, and Forest Service.

(2) WORKING GROUP.—The term "Working Group" means the Upper Klamath Basin Working Group, established before the date of enactment of this title, consisting of members nominated by their represented groups, including:

(A) 3 tribal members;

(B) 1 representative of the city of Klamath Falls, Oregon;

(C) 1 representative of Klamath County, Oregon;

(D) 1 representative of institutions of higher education in the Upper Klamath Basin;

(E) 4 representatives of the environmental community, including at least one such representative from the State of California with interests in the Klamath Basin National Wildlife Refuge Complex;

(F) 4 representatives of local businesses and industries, including at least one representative of the wood products industry and one representative of the ocean commercial fishing industry and/or the recreational fishing industry based in either Oregon or California;

(G) 4 representatives of the ranching and farming community, including representatives of Federal lease-land farmers and ranchers and of private land farmers and ranchers in the Upper Klamath Basin;

(H) 2 representatives from State of Oregon agencies with authority and responsibility in the Klamath River Basin, including one from the Oregon Department of Fish and Wildlife and one from the Oregon Water Resources Department;

(I) 4 representatives from the local community;

(J) 1 representative each from the following Federal resource management agencies in the Upper Klamath Basin: Fish and Wildlife Service, Bureau of Reclamation, Bureau of Land Management, Bureau of Indian Affairs, Forest Service, Natural Resources Conservation Service, National Marine Fisheries Service and Ecosystem Restoration Office; and

(K) 1 representative of the Klamath County Soil and Water Conservation District.

(3) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(4) TASK FORCE.—The term "Task Force" means the Klamath River Basin Fisheries Task Force as established by the Klamath River Basin Fishery Resource Restoration Act (Public Law 99–552, 16 U.S.C. 460ss–3, et. seq.).

(5) COMPACT COMMISSION.—The term "Compact Commission" means the Klamath River Basin Compact Commission created pursuant to the Klamath River Compact Act of 1954.

(6) CONSENSUS.—The term "consensus" means a unanimous agreement by the Working Group members present and consisting of at least a quorum at a regularly scheduled business meeting.

(7) QUORUM.—The term "quorum" means one more than half of those qualified Working Group members appointed and eligible to serve.

(8) TRINITY TASK FORCE.—The term "Trinity Task Force" means the Trinity River Restoration Task Force created by Public Law 98–541, as amended by Public Law 104–143.

(b) IN GENERAL.—

(1) The Working Group through the Ecosystem Restoration Office, with technical assistance from the Secretary, will propose ecological restoration projects, economic development and stability projects, and projects designed to reduce the impacts of drought conditions to be undertaken in the Upper Klamath Basin based on a consensus of the Working Group membership.

(2) The Secretary shall pay, to the greatest extent feasible, up to 50 percent of the cost of performing any project approved by the Secretary or his designee, up to a total amount of $1,000,000 during each of fiscal years 1997 through 2001.

(3) Funds made available under this title through the Department of the Interior or the Department of Agriculture shall be distributed through the Ecosystem Restoration Office.

(4) The Ecosystem Restoration Office may utilize not more than 15 percent of all Federal funds administered under this section for administrative costs relating to the implementation of this title.

(5) All funding recommendations developed by the Working Group shall be based on a consensus of Working Group members.

(c) COORDINATION.—

(1) The Secretary shall formulate a cooperative agreement among the Working Group, the Task Force, the Trinity Task Force and the Compact Commission for the purposes of ensuring that projects proposed and funded through the Working Group are consistent with other basin-wide fish and wildlife restoration and conservation plans, including but not limited to plans developed by the Task Force and the Compact Commission.

(2) To the greatest extent practicable, the Working Group shall provide notice to, and accept input from, two members each of the Task Force, the Trinity Task Force, and the Compact Commission, so appointed by those entities, for the express purpose of facilitating better communication and coordination regarding additional basin-wide fish and wildlife and ecosystem restoration and planning efforts. The roles and relationships of the entities involved shall be clarified in the cooperative agreement.

AR.03517

(d) PUBLIC MEETINGS.—The Working Group shall conduct all meetings subject to applicable open meeting and public participation laws. The chartering requirements of 5 U.S.C. App 2 ss 1–15 are hereby deemed to have been met by this section.

(e) TERMS AND VACANCIES.—Working Group members shall serve for 3–year terms, beginning on the date of enactment of this title. Vacancies which occur for any reason after the date of enactment of this title shall be filled by direct appointment of the governor of the State of Oregon, in consultation with the Secretary of the Interior and the Secretary of Agriculture, in accordance with nominations from the appropriate groups, interests, and government agencies outlined in subsection (a)(2).

(f) RIGHTS, DUTIES AND AUTHORITIES UNAFFECTED.—The Working Group will supplement, rather than replace, existing efforts to manage the natural resources of the Klamath Basin. Nothing in this title affects any legal right, duty or authority of any person or agency, including any member of the working group.

(g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this title $1,000,000 for each of fiscal years 1997 through 2002.

TITLE III—DESCHUTES BASIN

SEC. 301. DESCHUTES BASIN ECOSYSTEM RESTORATION PROJECTS.

(a) DEFINITIONS.—In this section:

(1) WORKING GROUP.—The term "Working Group" means the Deschutes River Basin Working Group established before the date of enactment of this title, consisting of members nominated by their represented groups, including:

(A) 5 representatives of private interests including one each from hydroelectric production, livestock grazing, timber, land development, and recreation/tourism;

(B) 4 representatives of private interests including two each from irrigated agriculture and the environmental community;

(C) 2 representatives from the Confederated Tribes of the Warm Springs Reservation of Oregon;

(D) 2 representatives from Federal agencies with authority and responsibility in the Deschutes River Basin, including one from the Department of the Interior and one from the Agriculture Department;

(E) 2 representatives from the State of Oregon agencies with authority and responsibility in the Deschutes River Basin, including one from the Oregon Department of Fish and Wildlife and one from the Oregon Water Resources Department; and

(F) 4 representatives from county or city governments within the Deschutes River Basin county and/or city governments.

(2) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

(3) FEDERAL AGENCIES.—The term "Federal agencies" means agencies and departments of the United States, including, but not limited to, the Bureau of Reclamation, Bureau of Indian Affairs, Bureau of Land Management, Fish and Wildlife Service, Forest Service, Natural Resources Conservation Service, Farm Services Agency, the National Marine Fisheries Service, and the Bonneville Power Administration.

(4) CONSENSUS.—The term "consensus" means a unanimous agreement by the Working Group members present and constituting at least a quorum at a regularly scheduled business meeting.

(5) QUORUM.—The term "quorum" means one more than half of those qualified Working Group members appointed and eligible to serve.

(b) IN GENERAL.—

(1) The Working Group will propose ecological restoration projects on both Federal and non-Federal lands and waters to be undertaken in the Deschutes River Basin based on a consensus of the Working Group, provided that such projects, when involving Federal land or funds, shall be proposed to the Bureau of Reclamation in the Department of the Interior and any other Federal agency with affected land or funds.

(2) The Working Group will accept donations, grants or other funds and place such funds received into a trust fund, to be expended on ecological restoration projects which, when involving Federal land or funds, are approved by the affected Federal agency.

(3) The Bureau of Reclamation shall pay from funds authorized under subsection (h) of this title up to 50 percent of the cost of performing any project proposed by the Working Group and approved by the Secretary, up to a total amount of $1,000,000 during each of the fiscal years 1997 through 2001.

(4) Non–Federal contributions to project costs for purposes of computing the Federal matching share under paragraph (3) of this subsection may include in-kind contributions.

 (5) Funds authorized in subsection (h) of this title shall be maintained in and distributed by the Bureau of Reclamation in the Department of the Interior. The Bureau of Reclamation shall not expend more than 5 percent of amounts appropriated pursuant to subsection (h) for Federal administration of such appropriations pursuant to this title.

 (6) The Bureau of Reclamation is authorized to provide by grant to the Working Group not more than 5 percent of funds appropriated pursuant to subsection (h) of this title for not more than 50 percent of administrative costs relating to the implementation of this title.

 (7) The Federal agencies with authority and responsibility in the Deschutes River Basin shall provide technical assistance to the Working Group and shall designate representatives to serve as members of the Working Group.

 (8) All funding recommendations developed by the Working Group shall be based on a consensus of the Working Group members.

(c) PUBLIC NOTICE AND PARTICIPATION.—The Working Group shall conduct all meetings subject to applicable open meeting and public participation laws. The chartering requirements of 5 U.S.C. App 2 ss 1–15 are hereby deemed to have been met by this section.

(d) PRIORITIES.—The Working Group shall give priority to voluntary market-based economic incentives for ecosystem restoration including, but not limited to, water leases and purchases; land leases and purchases; tradable discharge permits; and acquisition of timber, grazing, and land development rights to implement plans, programs, measures, and projects.

(e) TERMS AND VACANCIES.—Members of the Working Group representing governmental agencies or entities shall be named by the represented government agency. Members of the Working Group representing private interests shall be named in accordance with the articles of incorporation and bylaws of the Working Group. Representatives from Federal agencies will serve for terms of 3 years. Vacancies which occur for any reason after the date of enactment of this title shall be filled in accordance with this title.

 (f) ADDITIONAL PROJECTS.—Where existing authority and appropriations permit, Federal agencies may contribute to the implementation of projects recommended by the Working Group and approved by the Secretary.

(g) RIGHTS, DUTIES AND AUTHORITIES UNAFFECTED.—The Working Group will supplement, rather than replace, existing efforts to manage the natural resources of the Deschutes Basin. Nothing in this title affects any legal right, duty or authority of any person or agency, including any member of the working group.

 (h) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this title $1,000,000 for each of fiscal years 1997 through 2001.

TITLE IV—MOUNT HOOD CORRIDOR

SEC. 401. LAND EXCHANGE.

 (a) AUTHORIZATION.—Notwithstanding any other law, if Longview Fibre Company (referred to in this section as "Longview") offers and conveys title that is acceptable to the United States to some or all of the land described in subsection (b), the Secretary of the Interior (referred to in this section as the "Secretary") shall convey to Longview title to some or all of the land described in subsection (c), as necessary to satisfy the requirements of subsection (d).

(b) LAND TO BE OFFERED BY LONGVIEW.—The land referred to in subsection (a) as the land to be offered by Longview are those lands depicted on the map entitled "Mt. Hood Corridor Land Exchange Map", dated July 18, 1996.

(c) LAND TO BE CONVEYED BY THE SECRETARY.—The land referred to in subsection (a) as the land to be conveyed by the Secretary are those lands depicted on the map entitled "Mt. Hood Corridor Land Exchange Map", dated July 18, 1996.

(d) EQUAL VALUE.—The land and interests in land exchanged under this section shall be of equal market value as determined by nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Standards for Federal Land Acquisition, the Uniform Standards of Professional Appraisal Practice, or shall be equalized by way of payment of cash pursuant to the provisions of section 206(d) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(d)), and other applicable law.

(e) REDESIGNATION OF LAND TO MAINTAIN REVENUE FLOW.—So as to maintain the current flow of revenue from land subject to the Act entitled "An Act relating to the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant land situated in the State of Oregon", approved August 28, 1937 (43 U.S.C. 1181a et seq.), the Secretary may redesignate public domain land located in and west of Range 9 East, Willamette Meridian, Oregon, as land subject to that Act.

Case 3:20-cv-07721-SI   Document 58-3   Filed 11/10/20   Page 3543 of 3864

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104–208, September...

(f) TIMETABLE.—The exchange directed by this section shall be consummated not later than 1 year after the date of enactment of this title.

(g) WITHDRAWAL OF LANDS.—All lands managed by the Department of the Interior, Bureau of Land Management, located in Townships 2 and 3 South, Ranges 6 and 7 East, Willamette Meridian, which can be seen from the right-of-way of U.S. Highway 26 (in this section, such lands are referred to as the "Mt. Hood Corridor Lands"), shall be managed primarily for the protection or enhancement of scenic qualities. Management prescriptions for other resource values associated with these lands shall be planned and conducted for purposes other than timber harvest, so as not to impair the scenic qualities of the area.

(h) TIMBER CUTTING.—Timber cutting may be conducted on Mt. Hood Corridor Lands following a resource-damaging catastrophic event. Such cutting may only be conducted to achieve the following resource management objectives, in compliance with the current land use plans—

(1) to maintain safe conditions for the visiting public;

(2) to control the continued spread of forest fire;

(3) for activities related to administration of the Mt. Hood Corridor Lands; or

(4) for removal of hazard trees along trails and roadways.

(i) ROAD CLOSURE.—The forest road gate located on Forest Service Road 2503, located in T. 2 S., R. 6 E., sec. 14, shall remain closed and locked to protect resources and prevent illegal dumping and vandalism. Access to this road shall be limited to—

(1) Federal and State officers and employees acting in an official capacity;

(2) employees and contractors conducting authorized activities associated with the telecommunication sites located in T. 2 S., R. 6 E., sec. 14; and

(3) the general public for recreational purposes, except that all motorized vehicles will be prohibited.

(j) NEPA EXEMPTION.—The National Environmental Policy Act of 1969 (P.L. 91–190) shall not apply to this section for one year after the date of enactment of this title.

(k) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

<< 25 USCA § 715c >>

TITLE V—COQUILLE TRIBAL FOREST

SEC. 501. CREATION OF THE COQUILLE FOREST.

(a) The Coquille Restoration Act (P.L. 101–42) is amended by inserting at the end of section 5 the following:

"(d) CREATION OF THE COQUILLE FOREST.—

"(1) DEFINITIONS.—In this subsection:

"(A) the term 'Coquille Forest' means certain lands in Coos County, Oregon, comprising approximately 5,400 acres, as generally depicted on the map entitled 'Coquille Forest Proposal', dated July 8, 1996.

"(B) the term 'Secretary' means the Secretary of the Interior.

"(C) the term 'the Tribe' means the Coquille Tribe of Coos County, Oregon.

"(2) MAP.—The map described in subparagraph (d)(1)(A), and such additional legal descriptions which are applicable, shall be placed on file at the local District Office of the Bureau of Land Management, the Agency Office of the Bureau of Indian Affairs, and with the Senate Committee on Energy and Natural Resources and the House Committee on Resources.

"(3) INTERIM PERIOD.—From the date of enactment of this subsection until two years after the date of enactment of this subsection, the Bureau of Land Management shall:

"(A) retain Federal jurisdiction for the management of lands designated under this subsection as the Coquille Forest and continue to distribute revenues from such lands in a manner consistent with existing law; and,

"(B) prior to advertising, offering or awarding any timber sale contract on lands designated under this subsection as the Coquille Forest, obtain the approval of the Assistant Secretary for Indian Affairs, acting on behalf of and in consultation with the Tribe.

"(4) TRANSITION PLANNING AND DESIGNATION.—

AR.03520

388

"(A) During the two year interim period provided for in paragraph (3), the Assistant Secretary for Indian Affairs, acting on behalf of and in consultation with the Tribe, is authorized to initiate development of a forest management plan for the Coquille Forest. The Secretary, acting through the Director of the Bureau of Land Management, shall cooperate and assist in the development of such plan and in the transition of forestry management operations for the Coquille Forest to the Assistant Secretary for Indian Affairs.

"(B) Two years after the date of enactment of this subsection, the Secretary shall take the lands identified under subparagraph (d)(1)(A) into trust, and shall hold such lands in trust, in perpetuity, for the Coquille Tribe. Such lands shall be thereafter designated as the Coquille Forest.

"(C) So as to maintain the current flow of revenue from land subject to the Act entitled 'An Act relating to the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant land situated in the State of Oregon' (the O & C Act), approved August 28, 1937 (43 U.S.C. 1181a et seq.), the Secretary shall redesignate, from public domain lands within the tribe's service area, as defined in this Act, certain lands to be subject to the O & C Act. Lands redesignated under this subparagraph shall not exceed lands sufficient to constitute equivalent timber value as compared to lands constituting the Coquille Forest.

"(5) MANAGEMENT.—The Secretary of Interior, acting through the Assistant Secretary for Indian Affairs, shall manage the Coquille Forest under applicable State and Federal forestry and environmental protection laws, and subject to critical habitat designations under the Endangered Species Act, and subject to the standards and guidelines of Federal forest plans on adjacent or nearby Federal lands, now and in the future. The Secretary shall otherwise manage the Coquille Forest in accordance with the laws pertaining to the management of Indian Trust lands and shall distribute revenues in accord with Public Law 101–630, 25 U.S.C. 3107.

"(A) Unprocessed logs harvested from the Coquille Forest shall be subject to the same Federal statutory restrictions on export to foreign Nations that apply to unprocessed logs harvested from Federal lands.

"(B) Notwithstanding any other provision of law, all sales of timber from land subject to this subsection shall be advertised, offered and awarded according to competitive bidding practices, with sales being awarded to the highest responsible bidder.

"(6) INDIAN SELF DETERMINATION ACT AGREEMENT.—No sooner than two years after the date of enactment of this subsection, the Secretary may, upon a satisfactory showing of management competence and pursuant to the Indian Self–Determination Act (25 U.S.C. 450 et seq.), enter into a binding Indian self-determination agreement (agreement) with the Coquille Indian Tribe. Such agreement may provide for the tribe to carry out all or a portion of the forest management for the Coquille Forest.

"(A) Prior to entering such an agreement, and as a condition of maintaining such an agreement, the Secretary must find that the Coquille Tribe has entered into a binding memorandum of agreement (MOA) with the State of Oregon, as required under paragraph 7.

"(B) The authority of the Secretary to rescind the Indian self-determination agreement shall not be encumbered.

"(i) The Secretary shall rescind the agreement upon a demonstration that the tribe and the State of Oregon are no longer engaged in a memorandum of agreement as required under paragraph 7.

"(ii) The Secretary may rescind the agreement on a showing that the Tribe has managed the Coquille Forest in a manner inconsistent with this subsection, or the Tribe is no longer managing, or capable of managing, the Coquille Forest in a manner consistent with this subsection.

"(7) MEMORANDUM OF AGREEMENT.—The Coquille Tribe shall enter into a memorandum of agreement (MOA) with the State of Oregon relating to the establishment and management of the Coquille Forest. The MOA shall include, but not be limited to, the terms and conditions for managing the Coquille Forest in a manner consistent with paragraph (5) of this subsection, preserving public access, advancing jointly-held resource management goals, achieving tribal restoration objectives and establishing a coordinated management framework. Further, provisions set forth in the MOA shall be consistent with federal trust responsibility requirements applicable to Indian trust lands and paragraph (5) of this subsection.

"(8) PUBLIC ACCESS.—The Coquille Forest shall remain open to public access for purposes of hunting, fishing, recreation and transportation, except when closure is required by state or federal law, or when the Coquille Indian Tribe and the State of Oregon agree in writing that restrictions on access are necessary or appropriate to prevent harm to natural resources, cultural resources or environmental quality; *Provided,* That the State of Oregon's agreement shall not be required when immediate action is necessary to protect archeological resources.

"(9) JURISDICTION.—

"(A) The United States District Court for the District of Oregon shall have jurisdiction over actions against the Secretary arising out of claims that this subsection has been violated. Consistent with existing precedents on standing to sue, any affected citizen may bring suit against the Secretary for violations of this subsection, except that suit may not be brought against the Secretary for claims that the MOA has been violated. The Court has the authority to hold unlawful and set aside actions pursuant to this subsection that are arbitrary and capricious, an abuse of discretion, or otherwise an abuse of law.

"(B) The United States District Court for the District of Oregon shall have jurisdiction over actions between the State of Oregon and the Tribe arising out of claims of breach of the MOA.

"(C) Unless otherwise provided for by law, remedies available under this subsection shall be limited to equitable relief and shall not include damages.

"(10) STATE REGULATORY AND CIVIL JURISDICTION.—In addition to the jurisdiction described in paragraph 7 of this subsection, the State of Oregon may exercise exclusive regulatory civil jurisdiction, including but not limited to adoption and enforcement of administrative rules and orders, over the following subjects:

"(A) management, allocation and administration of fish and wildlife resources, including but not limited to establishment and enforcement of hunting and fishing seasons, bag limits, limits on equipment and methods, issuance of permits and licenses, and approval or disapproval of hatcheries, game farms, and other breeding facilities; Provided, That nothing herein shall be construed to permit the State of Oregon to manage fish or wildlife habitat on Coquille Forest lands;

"(B) allocation and administration of water rights, appropriation of water and use of water;

"(C) regulation of boating activities, including equipment and registration requirements, and protection of the public's right to use the waterways for purposes of boating or other navigation;

"(D) fills and removals from waters of the State, as defined in Oregon law;

"(E) protection and management of the State's proprietary interests in the beds and banks of navigable waterways;

"(F) regulation of mining, mine reclamation activities, and exploration and drilling for oil and gas deposits;

"(G) regulation of water quality, air quality (including smoke management), solid and hazardous waste, and remediation of releases of hazardous substances;

"(H) regulation of the use of herbicides and pesticides; and

"(I) enforcement of public health and safety standards, including standards for the protection of workers, well construction and codes governing the construction of bridges, buildings, and other structures.

"(11) SAVINGS CLAUSE, STATE AUTHORITY.—

"(A) Nothing in this subsection shall be construed to grant tribal authority over private or State-owned lands.

"(B) To the extend that the State of Oregon is regulating the foregoing areas pursuant to a delegated Federal authority or a Federal program, nothing in this subsection shall be construed to enlarge or diminish the State's authority under such law.

"(C) Where both the State of Oregon and the United States are regulating, nothing herein shall be construed to alter their respective authorities.

"(D) To the extent that Federal law authorizes the Coquille Indian Tribe to assume regulatory authority over an area, nothing herein shall be construed to enlarge or diminish the tribe's authority to do so under such law.

"(E) Unless and except to the extent that the tribe has assumed jurisdiction over the Coquille Forest pursuant to Federal law, or otherwise with the consent of the State, the State of Oregon shall have jurisdiction and authority to enforce its laws addressing the subjects listed in subparagraph 10 of this subsection on the Coquille Forest against the Coquille Indian Tribe, its members and all other persons and entities, in the same manner and with the same remedies and protections and appeal rights as otherwise provided by general Oregon law. Where the State of Oregon and Coquille Indian Tribe agree regarding the exercise of tribal civil regulatory jurisdiction over activities on the Coquille Forest lands, the tribe may exercise such jurisdiction as is agreed upon.

"(12) In the event of a conflict between Federal and State law under this subsection, Federal law shall control."

### TITLE VI—BULL RUN WATERSHED PROTECTION

<< 16 USCA § 482b NOTE >>

SEC. 601. The first sentence of section 2(a) of Public Law 95–200 is amended after "referred to in this subsection (a)" by striking "2(b)" and inserting in lieu thereof "2(c)".

<< 16 USCA § 482b NOTE >>

SEC. 602. The first sentence of section 2(b) of Public Law 95–200 is amended after "the policy set forth in subsection (a)" by inserting "and (b)".

<< 16 USCA § 482b NOTE >>

SEC. 603. Section 2(b) of Public Law 95–200 is redesignated as "2(c)".

<< 16 USCA § 482b NOTE >>

SEC. 604(a) Public Law 95–200 is amended by adding a new subsection 2(b) immediately after subsection 2(a), as follows: "(b) TIMBER CUTTING.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary of Agriculture shall prohibit the cutting of trees in that part of the unit consisting of the hydrographic boundary of the Bull Run River Drainage, including certain lands within the unit and located below the headworks of the city of Portland, Oregon's water storage and delivery project, and as depicted in a map dated July 22, 1996 and entitled "Bull Run River Drainage".

(2) PERMITTED CUTTING.—

(A) IN GENERAL.—Subject to subparagraph (B), the Secretary of Agriculture shall prohibit the cutting of trees in the area described in paragraph (1).

(B) PERMITTED CUTTING.—Subject to subparagraph (C), the Secretary may only allow the cutting of trees in the area described in paragraph (1)—

(i) for the protection or enhancement of water quality in the area described in paragraph (1); or

(ii) for the protection, enhancement, or maintenance of water quantity available from the area described in paragraph (1); or

(iii) for the construction, expansion, protection or maintenance of municipal water supply facilities; or

(iv) for the construction, expansion, protection or maintenance of facilities for the transmission of energy through and over the unit or previously authorized hydroelectric facilities or hydroelectric projects associated with municipal water supply facilities.

(C) SALVAGE SALES.—The Secretary of Agriculture may not authorize a salvage sale in the area described in paragraph (1)."

(b) Redesignate subsequent subsections of Public Law 95–200 accordingly.

SEC. 605. REPORT TO CONGRESS.

(a) The Secretary of Agriculture shall, in consultation with the city of Portland and other affected parties, undertake a study of that part of the Little Sandy Watershed that is within the unit (hereinafter referred to as the "study area"), as depicted on the map described in section 604 of this title.

(b) The study referred to in (a) shall determine—

(1) the impact of management activities within the study area on the quality of drinking water provided to the Portland Metropolitan area;

(2) the identity and location of certain ecological features within the study area, including late successional forest characteristics, aquatic and terrestrial wildlife habitat, significant hydrological values, or other outstanding natural features; and

(3) the location and extent of any significant cultural or other values within the study area.

(c) The study referred to in subsection (a) shall include both legislative and regulatory recommendations to Congress on the future management of the study area. In formulating such recommendations, the Secretary shall consult with the city of Portland and other affected parties.

(d) To the greatest extent possible, the Secretary shall use existing data and processes to carry out this study and report.

(e) The study referred to in subsection (a) shall be submitted to the Senate Committees on Energy and Natural Resources and Agriculture and the House Committees on Resources and Agriculture not later than one year from the date of enactment of this section.

(f) The Secretary is prohibited from advertising, offering or awarding any timber sale within the study area for a period of two years after the date of enactment of this section.

(g) Nothing in this section shall in any way affect any State or Federal law governing appropriation, use of or Federal right to water on or flowing through National Forest System lands. Nothing in this section is intended to influence the relative strength of competing claims to the waters of the Little Sandy River. Nothing in this section shall be construed to expand or diminish Federal, State, or local jurisdiction, responsibility, interests, or rights in water resources development or control, including rights in and current uses of water resources in the unit.

  SEC. 606. Lands within the Bull Run Management Unit, as defined in Public Law 95–200, but not contained within the Bull Run River Drainage, as defined by this title and as depicted on the map dated July 1996 described in Section 604 of this title, shall continue to be managed in accordance with Public Law 95–200.

<< 16 USCA § 1132 NOTE >>

TITLE VII—OREGON ISLANDS WILDERNESS, ADDITIONS

SEC. 701. OREGON ISLANDS WILDERNESS, ADDITIONS.

  (a) In furtherance of the purposes of the Wilderness Act of 1964, certain lands within the boundaries of the Oregon Islands National Wildlife Refuge, Oregon, comprising approximately ninety-five acres and as generally depicted on a map entitled "Oregon Island Wilderness Additions—Proposed" dated August 1996, are hereby designated as wilderness. The map shall be on file and available for public inspection in the offices of the Fish and Wildlife Service, Department of the Interior.

  (b) All other federally owned named, unnamed, surveyed and unsurveyed rocks, reefs, islets and islands lying within three geographic miles off the coast of Oregon and above mean high tide, not currently designated as wilderness and also within the Oregon Islands National Wildlife Refuge boundaries under the administration of the United States Fish and Wildlife Service, Department of the Interior, as designated by Executive Order 7035, Proclamation 2416, Public Land Orders 4395, 4475 and 6287, and Public Laws 91–504 and 95–450, are hereby designated as wilderness.

  (c) All federally owned named, unnamed, surveyed and unsurveyed rocks, reefs, islets and islands lying within three geographic miles off the coast of Oregon and above mean high tide, and presently under the jurisdiction of the Bureau of Land Management, except Chiefs Island, are hereby designated as wilderness, shall become part of the Oregon Islands National Wildlife Refuge and the Oregon Islands Wilderness and shall be under the jurisdiction of the United States Fish and Wildlife Service, Department of the Interior.

  (d) As soon as practicable after this title takes effect, a map of the wilderness area and a description of its boundaries shall be filed with the Senate Committee on Energy and Natural Resources and the House Committee on Resources, and such map shall have the same force and effect as if included in this title: Provided, however, That correcting clerical and typographical errors in the map and land descriptions may be made.

  (e) Public Land Order 6287 of June 16, 1982, which withdrew certain rocks, reefs, islets and islands lying within three geographical miles off the coast of Oregon and above mean high tide, including the ninety-five acres described in subsection (a), as an addition to the Oregon Islands National Wildlife Refuge is hereby made permanent.

TITLE VIII—UMPQUA RIVER LAND EXCHANGE STUDY

SEC. 801. UMPQUA RIVER LAND EXCHANGE STUDY: POLICY AND DIRECTION.

  (a) IN GENERAL.—The Secretaries of the Interior and Agriculture (Secretaries) are hereby authorized and directed to consult, coordinate, and cooperate with the Umpqua Land Exchange Project (ULEP), affected units and agencies of State and local government, and, as appropriate, the World Forestry Center and National Fish and Wildlife Foundation, to assist ULEP's ongoing efforts in studying and analyzing land exchange opportunities in the Umpqua River basin and to provide scientific, technical,

research, mapping and other assistance and information to such entities. Such consultation, coordination, and cooperation shall at a minimum include, but not be limited to:

(1) working with ULEP to develop or assemble comprehensive scientific and other information (including comprehensive and integrated mapping) concerning the Umpqua River Basin's resources of forest, plants, wildlife, fisheries (anadromous and other), recreational opportunities, wetlands, riparian habitat, and other physical or natural resources;

(2) working with ULEP to identify general or specific areas within the basin where land exchanges could promote consolidation of forestland ownership for long-term, sustained timber production; protection and restoration of habitat for plants, fish, and wildlife (including any federally listed threatened or endangered species); protection of drinking water supplies; recovery of threatened and endangered species; protection and restoration of wetlands, riparian lands, and other environmentally sensitive areas; consolidation of land ownership for improved public access and a broad array of recreational uses; and consolidation of land ownership to achieve management efficiency and reduced costs of administration; and

(3) developing a joint report for submission to the Congress which discusses land exchange opportunities in the basin and outlines either a specific land exchange proposal or proposals which may merit consideration by the Secretaries or the Congress, or ideas and recommendations for new authorizations, direction, or changes in existing law or policy to expedite and facilitate the consummation of beneficial land exchanges in the basin via administrative means.

(b) MATTERS FOR SPECIFIC STUDY.—In analyzing land exchange opportunities with ULEP, the Secretaries shall give priority to assisting ULEP's ongoing efforts in:

(1) studying, identifying, and mapping areas where the consolidation of land ownership via land exchanges could promote the goals of long term species and watershed protection and utilization, including but not limited to the goals of the Endangered Species Act of 1973 more effectively than current land ownership patterns and whether any changes in law or policy applicable to such lands after consummation of an exchange would be advisable or necessary to achieve such goals;

(2) studying, identifying and mapping areas where land exchanges might be utilized to better satisfy the goals of sustainable timber harvest, including studying whether changes in existing law or policy applicable to such lands after consummation of an exchange would be advisable or necessary to achieve such goals;

(3) identifying issues and studying options and alternatives, including possible changes in existing law or policy, to insure that combined post-exchange revenues to units of local government from State and local property, severance, and other taxes or levies and shared Federal land receipts will approximate pre-exchange revenues;

(4) identifying issues and studying whether possible changes in law, special appraisal instruction, or changes in certain Federal appraisal procedures might be advisable or necessary to facilitate the appraisal of potential exchange lands which may have special characteristics or restrictions affecting land values;

(5) identifying issues and studying options and alternatives, including changes in existing laws or policy, for achieving land exchanges without reducing the net supply of timber available to small businesses;

(6) identifying, mapping, and recommending potential changes in land use plans, land classifications, or other actions which might be advisable or necessary to expedite, facilitate or consummate land exchanges in certain areas;

(7) analyzing potential sources for new or enhanced Federal, State, or other funding to promote improved resource protection, species recovery, and management in the basin; and

(8) identifying and analyzing whether increased efficiency and better land and resource management could occur through either consolidation of Federal forest management under one agency or exchange lands between the Forest Service and the Bureau of Land Management.

## SEC. 802. REPORT TO CONGRESS.

No later than February 1, 1998, ULEP and the Secretaries shall submit a joint report to the Committee on Resources of the United States House of Representatives and to the Committee on Energy and Natural Resources of the United States Senate concerning their studies, findings, recommendations, mapping and other activities conducted pursuant to this title.

## SEC. 803. AUTHORIZATION OF APPROPRIATIONS.

In furtherance of the purposes of this title, there is hereby authorized to be appropriated the sum of $2 million, to remain available until expended.

DIVISION C—ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

SEC. 1. SHORT TITLE OF DIVISION; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; APPLICATION OF DEFINITIONS OF SUCH ACT; TABLE OF CONTENTS OF DIVISION; SEVERABILITY.

<< 8 USCA § 1101 NOTE >>

(a) SHORT TITLE.—This division may be cited as the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—

(1) whenever in this division an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered to be made to that section or provision in the Immigration and Nationality Act; and

(2) amendments to a section or other provision are to such section or other provision before any amendment made to such section or other provision elsewhere in this division.

(c) APPLICATION OF CERTAIN DEFINITIONS.—Except as otherwise specifically provided in this division, for purposes of titles I and VI of this division, the terms "alien", "Attorney General", "border crossing identification card", "entry", "immigrant", "immigrant visa", "lawfully admitted for permanent residence", "national", "naturalization", "refugee", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act.

(d) TABLE OF CONTENTS OF DIVISION.—The table of contents of this division is as follows:

Sec. 1. Short title of division; amendments to Immigration and Nationality Act; application of definitions of such Act; table of contents of division; severability.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

Subtitle A—Improved Enforcement at the Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Hiring and training standards.
Sec. 107. Report on border strategy.
Sec. 108. Criminal penalties for high speed flights from immigration checkpoints.
Sec. 109. Joint study of automated data collection.
Sec. 110. Automated entry-exit control system.
Sec. 111. Submission of final plan on realignment of border patrol positions from interior stations.
Sec. 112. Nationwide fingerprinting of apprehended aliens.

Subtitle B—Facilitation of Legal Entry

Sec. 121. Land border inspectors.
Sec. 122. Land border inspection and automated permit pilot projects.
Sec. 123. Preinspection at foreign airports.
Sec. 124. Training of airline personnel in detection of fraudulent documents.
Sec. 125. Preclearance authority.

Subtitle C—Interior Enforcement

Sec. 131. Authorization of appropriations for increase in number of certain investigators.
Sec. 132. Authorization of appropriations for increase in number of investigators of visa overstayers.
Sec. 133. Acceptance of State services to carry out immigration enforcement.

Sec. 134. Minimum State INS presence.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

Sec. 201. Wiretap authority for investigations of alien smuggling or document fraud.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

Subtitle B—Deterrence of Document Fraud

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New document fraud offenses; new civil penalties for document fraud.
Sec. 213. New criminal penalty for failure to disclose role as preparer of false application for immigration benefits.
Sec. 214. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 215. Criminal penalty for false claim to citizenship.
Sec. 216. Criminal penalty for voting by aliens in Federal election.
Sec. 217. Criminal forfeiture for passport and visa related offenses.
Sec. 218. Penalties for involuntary servitude.
Sec. 219. Admissibility of videotaped witness testimony.
Sec. 220. Subpoena authority in document fraud enforcement.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary departure (revised and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

Subtitle B—Criminal Alien Provisions

Sec. 321. Amended definition of aggravated felony.
Sec. 322. Definition of conviction and term of imprisonment.
Sec. 323. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 324. Penalty for reentry of deported aliens.
Sec. 325. Change in filing requirement.
Sec. 326. Criminal alien identification system.
Sec. 327. Appropriations for criminal alien tracking center.
Sec. 328. Provisions relating to State criminal alien assistance program.
Sec. 329. Demonstration project for identification of illegal aliens in incarceration facility of Anaheim, California.
Sec. 330. Prisoner transfer treaties.
Sec. 331. Prisoner transfer treaties study.
Sec. 332. Annual report on criminal aliens.

Sec. 333. Penalties for conspiring with or assisting an alien to commit an offense under the Controlled Substances Import and Export Act.

Sec. 334. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.

### Subtitle C—Revision of Grounds for Exclusion and Deportation

Sec. 341. Proof of vaccination requirement for immigrants.

Sec. 342. Incitement of terrorist activity and provision of false documentation to terrorists as a basis for exclusion from the United States.

Sec. 343. Certification requirements for foreign health-care workers.

Sec. 344. Removal of aliens falsely claiming United States citizenship.

Sec. 345. Waiver of exclusion and deportation ground for certain section 274C violators.

Sec. 346. Inadmissibility of certain student visa abusers.

Sec. 347. Removal of aliens who have unlawfully voted.

Sec. 348. Waivers for immigrants convicted of crimes.

Sec. 349. Waiver of misrepresentation ground of inadmissibility for certain alien.

Sec. 350. Offenses of domestic violence and stalking as ground for deportation.

Sec. 351. Clarification of date as of which relationship required for waiver from exclusion or deportation for smuggling.

Sec. 352. Exclusion of former citizens who renounced citizenship to avoid United States taxation.

Sec. 353. References to changes elsewhere in division.

### Subtitle D—Changes in Removal of Alien Terrorist Provisions

Sec. 354. Treatment of classified information.

Sec. 355. Exclusion of representatives of terrorist organizations.

Sec. 356. Standard for judicial review of terrorist organization designations.

Sec. 357. Removal of ancillary relief for voluntary departure.

Sec. 358. Effective date.

### Subtitle E—Transportation of Aliens

Sec. 361. Definition of stowaway.

Sec. 362. Transportation contracts.

### Subtitle F—Additional Provisions

Sec. 371. Immigration judges and compensation.

Sec. 372. Delegation of immigration enforcement authority.

Sec. 373. Powers and duties of the Attorney General and the Commissioner.

Sec. 374. Judicial deportation.

Sec. 375. Limitation on adjustment of status.

Sec. 376. Treatment of certain fees.

Sec. 377. Limitation on legalization litigation.

Sec. 378. Rescission of lawful permanent resident status.

Sec. 379. Administrative review of orders.

Sec. 380. Civil penalties for failure to depart.

Sec. 381. Clarification of district court jurisdiction.

Sec. 382. Application of additional civil penalties to enforcement.

Sec. 383. Exclusion of certain aliens from family unity program.

Sec. 384. Penalties for disclosure of information.

Sec. 385. Authorization of additional funds for removal of aliens.

Sec. 386. Increase in INS detention facilities; report on detention space.

Sec. 387. Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.

Sec. 388. Report on interior repatriation program.

## TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

### Subtitle A—Pilot Programs for Employment Eligibility Confirmation

Sec. 401. Establishment of programs.
Sec. 402. Voluntary election to participate in a pilot program.
Sec. 403. Procedures for participants in pilot programs.
Sec. 404. Employment eligibility confirmation system.
Sec. 405. Reports.

### Subtitle B—Other Provisions Relating to Employer Sanctions

Sec. 411. Limiting liability for certain technical violations of paperwork requirements.
Sec. 412. Paperwork and other changes in the employer sanctions program.
Sec. 413. Report on additional authority or resources needed for enforcement of employer sanctions provisions.
Sec. 414. Reports on earnings of aliens not authorized to work.
Sec. 415. Authorizing maintenance of certain information on aliens.
Sec. 416. Subpoena authority.

### Subtitle C—Unfair Immigration–Related Employment Practices

Sec. 421. Treatment of certain documentary practices as unfair immigration-related employment practices.

## TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

### Subtitle A—Eligibility of Aliens for Public Assistance and Benefits

Sec. 501. Exception to ineligibility for public benefits for certain battered aliens.
Sec. 502. Pilot programs on limiting issuance of driver's licenses to illegal aliens.
Sec. 503. Ineligibility of aliens not lawfully present for Social Security benefits.
Sec. 504. Procedures for requiring proof of citizenship for Federal public benefits.
Sec. 505. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits.
Sec. 506. Study and report on alien student eligibility for postsecondary Federal student financial assistance.
Sec. 507. Verification of immigration status for purposes of Social Security and higher educational assistance.
Sec. 508. No verification requirement for nonprofit charitable organizations.
Sec. 509. GAO study of provision of means-tested public benefits to aliens who are not qualified aliens on behalf of eligible individuals.
Sec. 510. Transition for aliens currently receiving benefits under the Food Stamp program.

### Subtitle B—Public Charge Exclusion

Sec. 531. Ground for exclusion.

### Subtitle C—Affidavits of Support

Sec. 551. Requirements for sponsor's affidavit of support.
Sec. 552. Indigence and battered spouse and child exceptions to Federal attribution of income rule.
Sec. 553. Authority of States and political subdivisions of States to limit assistance to aliens and to distinguish among classes of aliens in providing general cash public assistance.

### Subtitle D—Miscellaneous Provisions

Sec. 561. Increased maximum criminal penalties for forging or counterfeiting seal of a Federal department or agency to facilitate benefit fraud by an unlawful alien.
Sec. 562. Treatment of expenses subject to emergency medical services exception.
Sec. 563. Reimbursement of States and localities for emergency ambulance services.
Sec. 564. Pilot programs to require bonding.

Sec. 565. Reports.

Subtitle E—Housing Assistance

Sec. 571. Short title.
Sec. 572. Prorating of financial assistance.
Sec. 573. Actions in cases of termination of financial assistance.
Sec. 574. Verification of immigration status and eligibility for financial assistance.
Sec. 575. Prohibition of sanctions against entities making financial assistance eligibility determinations.
Sec. 576. Eligibility for public and assisted housing.
Sec. 577. Regulations.

Subtitle F—General Provisions

Sec. 591. Effective dates.
Sec. 592. Not applicable to foreign assistance.
Sec. 593. Notification.
Sec. 594. Definitions.

TITLE VI—MISCELLANEOUS PROVISIONS

Subtitle A—Refugees, Parole, and Asylum

Sec. 601. Persecution for resistance to coercive population control methods.
Sec. 602. Limitation on use of parole.
Sec. 603. Treatment of long-term parolees in applying worldwide numerical limitations.
Sec. 604. Asylum reform.
Sec. 605. Increase in asylum officers.
Sec. 606. Conditional repeal of Cuban Adjustment Act.

Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act

Sec. 621. Alien witness cooperation.
Sec. 622. Waiver of foreign country residence requirement with respect to international medical graduates.
Sec. 623. Use of legalization and special agricultural worker information.
Sec. 624. Continued validity of labor certifications and classification petitions for professional athletes.
Sec. 625. Foreign students.
Sec. 626. Services to family members of certain officers and agents killed in the line of duty.

Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency

Sec. 631. Validity of period of visas.
Sec. 632. Elimination of consulate shopping for visa overstays.
Sec. 633. Authority to determine visa processing procedures.
Sec. 634. Changes regarding visa application process.
Sec. 635. Visa waiver program.
Sec. 636. Fee for diversity immigrant lottery.
Sec. 637. Eligibility for visas for certain Polish applicants for the 1995 diversity immigrant program.

Subtitle D—Other Provisions

Sec. 641. Program to collect information relating to nonimmigrant foreign students.
Sec. 642. Communication between government agencies and the Immigration and Naturalization Service.
Sec. 643. Regulations regarding habitual residence.
Sec. 644. Information regarding female genital mutilation.
Sec. 645. Criminalization of female genital mutilation.
Sec. 646. Adjustment of status for certain Polish and Hungarian parolees.

Sec. 647. Support of demonstration projects.

Sec. 648. Sense of Congress regarding American-made products; requirements regarding notice.

Sec. 649. Vessel movement controls during immigration emergency.

Sec. 650. Review of practices of testing entities.

Sec. 651. Designation of a United States customs administrative building.

Sec. 652. Mail-order bride business.

Sec. 653. Review and report on H–2A nonimmigrant workers program.

Sec. 654. Report on allegations of harassment by Canadian customs agents.

Sec. 655. Sense of Congress on discriminatory application of New Brunswick provincial sales tax.

Sec. 656. Improvements in identification-related documents.

Sec. 657. Development of prototype of counterfeit-resistant Social Security card.

Sec. 658. Border Patrol Museum.

Sec. 659. Sense of the Congress regarding the mission of the Immigration and Naturalization Service.

Sec. 660. Authority for National Guard to assist in transportation of certain aliens.

Subtitle E—Technical Corrections

Sec. 671. Miscellaneous technical corrections.

<< 7 USCA § 2015 nt >>

<< 8 USCA §§ 1101 NOTE, 1102 nt, 1103 nt, 1105a nt, 1151 nt, 1152 nt, 1154 nt, 1155 nt, 1156 nt, 1157 nt, 1158 nt, 1159 nt, 1160 nt, 1182 nt, 1183 nt, 1183a nt, 1184 nt, 1186a nt, 1186b nt, 1187 nt, 1189 nt, 1201 nt, 1202 nt, 1206 nt, 1221 nt, 1222 nt, 1223 nt, 1224 nt, 1225 nt, 1226 nt, 1227 nt, 1228 nt, 1230 nt, 1251 nt, 1252 nt, 1252a nt, 1252b nt, 1253 nt, 1254 nt, 1254a nt, 1255 nt, 1255a nt, 1256 nt, 1257 nt, 1258 nt, 1259 nt, 1282 nt, 1284 nt, 1288 nt, 1303 nt, 1304 nt, 1306 nt, 1321 nt, 1322 nt, 1323 nt, 1324 nt, 1324a nt, 1324b nt, 1324c nt, 1325 nt, 1326 nt, 1327 nt, 1329 nt, 1330 nt, 1356 nt, 1357 nt, 1360 nt, 1361 nt, 1362 nt, 1364 nt, 1427 nt, 1429 nt, 1483 nt, 1503 nt, 1522 nt, 1531 nt, 1532 nt, 1534 nt, 1535 nt, 1537 nt, 1612 nt, 1631 nt, 1632 nt, 1641 nt, 1642 nt >>

<< 8 USCA §§ 1225a nt, 1229 nt, 1229a nt, 1229b nt, 1229c nt, 1231 nt, 1324d nt, 1363a nt, 1363b nt, 1366 nt, 1367 nt, 1368 nt, 1369 nt, 1370 nt, 1371 nt, 1372 nt, 1373 nt, 1374 nt, 1375 nt, 1623 nt, 1624 nt >>

<< 18 USCA §§ 506 nt, 982 nt, 1015 nt, 1028 nt, 1425 nt, 1426 nt, 1427 nt, 1541 nt, 1542 nt, 1543 nt, 1544 nt, 1546 nt, 1581 nt, 1583 nt, 1584 nt, 1588 nt, 1961 nt, 2424 nt, 2516 nt, 3563 nt, 4113 nt >>

<< 18 USCA §§ 116 nt, 611 nt, 758 nt >>

<< 20 USCA § 1091 nt >>

<< 22 USCA §§ 618 nt, 2508 nt >>

<< 28 USCA § 1821 nt >>

<< 32 USCA § 112 nt >>

<< 42 USCA §§ 402 nt, 1320b–7, 1436a >>

<< 50 USCA §§ 47c, 191, 503h, 855 >>

 (e) SEVERABILITY.—If any provision of this division or the application of such provision to any person or circumstances is held to be unconstitutional, the remainder of this division and the application of the provisions of this division to any person or circumstance shall not be affected thereby.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

### Subtitle A—Improved Enforcement at the Border

#### SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.

(a) INCREASED NUMBER OF BORDER PATROL AGENTS.—The Attorney General in each of fiscal years 1997, 1998, 1999, 2000, and 2001 shall increase by not less than 1,000 the number of positions for full-time, active-duty border patrol agents within the Immigration and Naturalization Service above the number of such positions for which funds were allotted for the preceding fiscal year.

(b) INCREASE IN BORDER PATROL SUPPORT PERSONNEL.—The Attorney General, in each of fiscal years 1997, 1998, 1999, 2000, and 2001, may increase by 300 the number of positions for personnel in support of border patrol agents above the number of such positions for which funds were allotted for the preceding fiscal year.

(c) DEPLOYMENT OF BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that additional border patrol agents shall be deployed among Immigration and Naturalization Service sectors along the border in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis. The previous sentence shall not apply to border patrol agents located at checkpoints.

(2) PRESERVATION OF LAW ENFORCEMENT FUNCTIONS AND CAPABILITIES IN INTERIOR STATES.—The Attorney General shall, when deploying border patrol personnel from interior stations to border stations, coordinate with, and act in conjunction with, State and local law enforcement agencies to ensure that such deployment does not degrade or compromise the law enforcement capabilities and functions currently performed at interior border patrol stations.

(3) REPORT.—Not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on—

(A) the progress and effectiveness of the forward deployment under paragraph (1); and

(B) the measures taken to comply with paragraph (2).

#### SEC. 102. IMPROVEMENT OF BARRIERS AT BORDER.

<< 8 USCA § 1103 NOTE >>

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

<< 8 USCA § 1103 >>

(d) LAND ACQUISITION AUTHORITY.—

(1) IN GENERAL.—Section 103 (8 U.S.C. 1103) is amended—

(A) by redesignating subsections (b), (c), and (d) as subsections (c), (d), and (e), respectively; and

(B) by inserting after subsection (a) the following:

"(b)(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this Act.

"(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

"(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728; 25 Stat. 357).

"(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).".

(2) CONFORMING AMENDMENT.—Section 103(e) (as so redesignated by paragraph (1)(A)) is amended by striking "subsection (c)" and inserting "subsection (d)".

<< 8 USCA § 1103 NOTE >>

SEC. 103. IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.

The Attorney General is authorized to acquire and use, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

<< 8 USCA § 1101 NOTE >>

(b) EFFECTIVE DATES.—

(1) CLAUSE A.—Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 18 months after the date of the enactment of this Act.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) CLAUSE B.—Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.

<< 8 USCA § 1325 >>

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

(2) by inserting after subsection (a) the following:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

"(1) at least $50 and not more than $250 for each such entry (or attempted entry); or

"(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.

Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.".

<< 8 USCA § 1325 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to illegal entries or attempts to enter occurring on or after the first day of the sixth month beginning after the date of the enactment of this Act.

<< 8 USCA § 1103 NOTE >>

SEC. 106. HIRING AND TRAINING STANDARDS.

(a) REVIEW OF HIRING STANDARDS.—Not later than 60 days after the date of the enactment of this Act, the Attorney General shall complete a review of all prescreening and hiring standards used by the Commissioner of Immigration and Naturalization, and, where necessary, revise such standards to ensure that they are consistent with relevant standards of professionalism.

(b) CERTIFICATION.—At the conclusion of each of fiscal years 1997, 1998, 1999, 2000, and 2001, the Attorney General shall certify in writing to the Committees on the Judiciary of the House of Representatives and of the Senate that all personnel hired by the Commissioner of Immigration and Naturalization for such fiscal year were hired pursuant to the appropriate standards, as revised under subsection (a).

(c) REVIEW OF TRAINING STANDARDS.—

(1) REVIEW.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall complete a review of the sufficiency of all training standards used by the Commissioner of Immigration and Naturalization.

(2) REPORT.—

(A) IN GENERAL.—Not later than 90 days after the completion of the review under paragraph (1), the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the review, including—

(i) a description of the status of efforts to update and improve training throughout the Immigration and Naturalization Service; and

(ii) an estimate of when such efforts are expected to be completed.

(B) AREAS REQUIRING FUTURE REVIEW.—The report shall disclose those areas of training that the Attorney General determines require further review in the future.

<< 8 USCA § 1103 NOTE >>

SEC. 107. REPORT ON BORDER STRATEGY.

(a) EVALUATION OF STRATEGY.—The Comptroller General of the United States shall track, monitor, and evaluate the Attorney General's strategy to deter illegal entry in the United States to determine the efficacy of such strategy.

(b) COOPERATION.—The Attorney General, the Secretary of State, and the Secretary of Defense shall cooperate with the Comptroller General of the United States in carrying out subsection (a).

(c) REPORT.—Not later than one year after the date of the enactment of this Act, and every year thereafter for the succeeding 5 years, the Comptroller General of the United States shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the activities undertaken under subsection (a) during the previous year. Each such report shall include an analysis of the degree to which the Attorney General's strategy has been effective in reducing illegal entry. Each such report shall include a collection and systematic analysis of data, including workload indicators, related to activities to deter illegal entry and recommendations to improve and increase border security at the border and ports of entry.

SEC. 108. CRIMINAL PENALTIES FOR HIGH SPEED FLIGHTS FROM IMMIGRATION CHECKPOINTS.

<< 18 USCA § 758 NOTE >>

(a) FINDINGS.—The Congress finds as follows:

(1) Immigration checkpoints are an important component of the national strategy to prevent illegal immigration.

(2) Individuals fleeing immigration checkpoints and leading law enforcement officials on high speed vehicle chases endanger law enforcement officers, innocent bystanders, and the fleeing individuals themselves.

(3) The pursuit of suspects fleeing immigration checkpoints is complicated by overlapping jurisdiction among Federal, State, and local law enforcement officers.

(b) HIGH SPEED FLIGHT FROM IMMIGRATION CHECKPOINTS.—

<< 18 USCA § 758 >>

(1) IN GENERAL.—Chapter 35 of title 18, United States Code, is amended by adding at the end the following:

"§ 758. High speed flight from immigration checkpoint

"Whoever flees or evades a checkpoint operated by the Immigration and Naturalization Service, or any other Federal law enforcement agency, in a motor vehicle and flees Federal, State, or local law enforcement agents in excess of the legal speed limit shall be fined under this title, imprisoned not more than five years, or both.".

<< 18 USCA Ch. 35 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 757 the following:

"758. High speed flight from immigration checkpoint.".

<< 8 USCA § 1251 >>

(c) GROUNDS FOR DEPORTATION.—Section 241(a)(2)(A) (8 U.S.C. 1251(a)(2)(A)) is amended—

(1) by redesignating clause (iv) as clause (v);

(2) by inserting after clause (iii) the following:

"(iv) HIGH SPEED FLIGHT.—Any alien who is convicted of a violation of section 758 of title 18, United States Code, (relating to high speed flight from an immigration checkpoint) is deportable."; and

(3) in clause (v) (as so redesignated by paragraph (1)), by striking "and (iii)" and inserting "(iii), and (iv)".

SEC. 109. JOINT STUDY OF AUTOMATED DATA COLLECTION.

(a) STUDY.—The Attorney General, together with the Secretary of State, the Secretary of Agriculture, the Secretary of the Treasury, and appropriate representatives of the air transport industry, shall jointly undertake a study to develop a plan for making the transition to automated data collection at ports of entry.

(b) REPORT.—Nine months after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives on the outcome of the joint initiative under subsection (a), noting specific areas of agreement and disagreement, and recommending further steps to be taken, including any suggestions for legislation.

<< 8 USCA § 1221 NOTE >>

SEC. 110. AUTOMATED ENTRY–EXIT CONTROL SYSTEM.

(a) SYSTEM.—Not later than 2 years after the date of the enactment of this Act, the Attorney General shall develop an automated entry and exit control system that will—

(1) collect a record of departure for every alien departing the United States and match the records of departure with the record of the alien's arrival in the United States; and

(2) enable the Attorney General to identify, through on-line searching procedures, lawfully admitted nonimmigrants who remain in the United States beyond the period authorized by the Attorney General.

(b) REPORT.—

(1) DEADLINE.—Not later than December 31 of each year following the development of the system under subsection (a), the Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and of the Senate on such system.

(2) INFORMATION.—The report shall include the following information:

(A) The number of departure records collected, with an accounting by country of nationality of the departing alien.

(B) The number of departure records that were successfully matched to records of the alien's prior arrival in the United States, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant.

(C) The number of aliens who arrived as nonimmigrants, or as a visitor under the visa waiver program under section 217 of the Immigration and Nationality Act, for whom no matching departure record has been obtained through the system or through other means as of the end of the alien's authorized period of stay, with an accounting by the alien's country of nationality and date of arrival in the United States.

(c) USE OF INFORMATION ON OVERSTAYS.—Information regarding aliens who have remained in the United States beyond their authorized period of stay identified through the system shall be integrated into appropriate data bases of the Immigration and Naturalization Service and the Department of State, including those used at ports of entry and at consular offices.

SEC. 111. SUBMISSION OF FINAL PLAN ON REALIGNMENT OF BORDER PATROL POSITIONS FROM INTERIOR STATIONS.

Not later than November 30, 1996, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a final plan regarding the redeployment of border patrol personnel from interior locations to the front lines of the border. The final plan shall be consistent with the following:

(1) The preliminary plan regarding such redeployment submitted by the Attorney General on May 17, 1996, to the Committee on Appropriations of the House of Representatives and the Committee on Appropriations of the Senate.

(2) The direction regarding such redeployment provided in the joint explanatory statement of the committee of conference in the conference report to accompany the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104–134).

SEC. 112. NATIONWIDE FINGERPRINTING OF APPREHENDED ALIENS.

There are authorized to be appropriated such additional sums as may be necessary to ensure that the "IDENT" program (operated by the Immigration and Naturalization Service) is expanded to apply to illegal or criminal aliens apprehended nationwide.

Subtitle B—Facilitation of Legal Entry

SEC. 121. LAND BORDER INSPECTORS.

In order to eliminate undue delay in the thorough inspection of persons and vehicles lawfully attempting to enter the United States, the Attorney General and the Secretary of the Treasury each shall increase, by approximately equal numbers in each of fiscal years 1997 and 1998, the number of full-time land border inspectors assigned to active duty by the Immigration and Naturalization Service and the United States Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes currently in use, under construction, or whose construction has been authorized by the Congress, except such low-use lanes as the Attorney General may designate.

SEC. 122. LAND BORDER INSPECTION AND AUTOMATED PERMIT PILOT PROJECTS.

<< 8 USCA § 1356 >>

(a) EXTENSION OF LAND BORDER INSPECTION PROJECT AUTHORITY; ESTABLISHMENT OF AUTOMATED PERMIT PILOT PROJECTS.—Section 286(q) is amended—

(1) by striking the matter preceding paragraph (2) and inserting the following:

"(q) LAND BORDER INSPECTION FEE ACCOUNT.—(1)(A)(i) Notwithstanding any other provision of law, the Attorney General is authorized to establish, by regulation, not more than 6 projects under which a fee may be charged and collected for inspection services provided at one or more land border points of entry. Such projects may include the establishment of commuter lanes to be made available to qualified United States citizens and aliens, as determined by the Attorney General.

"(ii) The program authorized in this subparagraph shall terminate on September 30, 2000, unless further authorized by an Act of Congress.

"(iii) This subparagraph shall take effect, with respect to any project described in clause (1) that was not authorized to be commenced before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 30 days after submission of a written plan by the Attorney General detailing the proposed implementation of such project.

"(iv) The Attorney General shall prepare and submit on a quarterly basis, until September 30, 2000, a status report on each land border inspection project implemented under this subparagraph.

"(B) The Attorney General, in consultation with the Secretary of the Treasury, may conduct pilot projects to demonstrate the use of designated ports of entry after working hours through the use of card reading machines or other appropriate technology."; and

(2) by striking paragraph (5).

<< 8 USCA § 1356 NOTE >>

(b) CONFORMING AMENDMENT.—The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1994 (Public Law 103–121, 107 Stat. 1161) is amended by striking the fourth proviso under the heading "Immigration and Naturalization Service, Salaries and Expenses".

SEC. 123. PREINSPECTION AT FOREIGN AIRPORTS.

<< 8 USCA § 1225a >>

(a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 235 the following:

"PREINSPECTION AT FOREIGN AIRPORTS

"SEC. 235A. (a) ESTABLISHMENT OF PREINSPECTION STATIONS.—

"(1) NEW STATIONS.—Subject to paragraph (5), not later than October 31, 1998, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of inadmissible alien passengers who arrive from abroad by air at ports of entry within the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of such Act.

"(2) REPORT.—Not later than October 31, 1998, the Attorney General shall report to the Committees on the Judiciary of the House of Representatives and of the Senate on the implementation of paragraph (1).

"(3) DATA COLLECTION.—Not later than November 1, 1997, and each subsequent November 1, the Attorney General shall compile data identifying—

"(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years;

"(B) the number and nationality of such aliens arriving from each such foreign airport; and

"(C) the primary routes such aliens followed from their country of origin to the United States.

"(4) ADDITIONAL STATIONS.—Subject to paragraph (5), not later than October 31, 2000, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines, based on the data compiled under paragraph (3) and such other information as may be available, would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States who are inadmissible to the United States. Such preinspection stations shall be in addition to those established prior to the date of the enactment of such Act or pursuant to paragraph (1).

"(5) CONDITIONS.—Prior to the establishment of a preinspection station, the Attorney General, in consultation with the Secretary of State, shall ensure that—

"(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection;

"(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety; and

"(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967), or that an alien in the country otherwise has recourse to avenues of protection from return to persecution.

"(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(3), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.".

(b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 235 the following:

"Sec. 235A. Preinspection at foreign airports.".

SEC. 124. TRAINING OF AIRLINE PERSONNEL IN DETECTION OF FRAUDULENT DOCUMENTS.

(a) USE OF FUNDS.—

<< 8 USCA § 1356 >>

(1) IN GENERAL.—Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

(A) in clause (iv), by inserting ", including training of, and technical assistance to, commercial airline personnel regarding such detection" after "United States"; and

(B) by adding at the end the following:

"The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.".

<< 8 USCA § 1356 NOTE >>

(2) APPLICABILITY.—The amendments made by paragraph (1) shall apply to expenses incurred during or after fiscal year 1997.

(b) COMPLIANCE WITH DETECTION REGULATIONS.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(f) (8 U.S.C. 1182(f)) is amended by adding at the end the following: "Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.".

<< 8 USCA § 1182 NOTE >>

(2) DEADLINE.—The Attorney General shall first issue, in proposed form, regulations referred to in the second sentence of section 212(f) of the Immigration and Nationality Act, as added by the amendment made by paragraph (1), not later than 90 days after the date of the enactment of this Act.

<< 8 USCA § 1103 >>

SEC. 125. PRECLEARANCE AUTHORITY.

Section 103(a) of the Immigration and Nationality Act (8 U.S.C. 1103(a)) is amended by adding at the end the following: "After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws. Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.".

Subtitle C—Interior Enforcement

SEC. 131. AUTHORIZATION OF APPROPRIATIONS FOR INCREASE IN NUMBER OF CERTAIN INVESTIGATORS.

(a) AUTHORIZATION.—There are authorized to be appropriated such funds as may be necessary to enable the Commissioner of Immigration and Naturalization to increase the number of investigators and support personnel to investigate potential violations of sections 274 and 274A of the Immigration and Nationality Act by a number equivalent to 300 full-time active-duty investigators in each of fiscal years 1997, 1998, and 1999.

(b) ALLOCATION OF INVESTIGATORS.—At least one-half of the investigators hired with funds made available under subsection (a) shall be assigned to investigate potential violations of section 274A of the Immigration and Nationality Act.

(c) LIMITATION ON OVERTIME.—None of the funds made available under subsection (a) shall be available for administrative expenses to pay any employee overtime pay in an amount in excess of $25,000 for any fiscal year.

SEC. 132. AUTHORIZATION OF APPROPRIATIONS FOR INCREASE IN NUMBER OF INVESTIGATORS OF VISA OVERSTAYERS.

There are authorized to be appropriated such funds as may be necessary to enable the Commissioner of Immigration and Naturalization to increase the number of investigators and support personnel to investigate visa overstayers by a number equivalent to 300 full-time active-duty investigators in fiscal year 1997.

<< 8 USCA § 1357 >>

SEC. 133. ACCEPTANCE OF STATE SERVICES TO CARRY OUT IMMIGRATION ENFORCEMENT.

Section 287 (8 U.S.C. 1357) is amended by adding at the end the following:

"(g)(1) Notwithstanding section 1342 of title 31, United States Code, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

"(2) An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

"(3) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General.

"(4) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State may use Federal property or facilities, as provided in a written agreement between the Attorney General and the State or subdivision.

"(5) With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

"(6) The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

"(7) Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of title 5, United States Code, (relating to compensation for injury) and sections 2671 through 2680 of title 28, United States Code (relating to tort claims).

"(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

"(9) Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

"(10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

"(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

"(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.".

SEC. 134. MINIMUM STATE INS PRESENCE.

<< 8 USCA § 1103 >>

(a) IN GENERAL.—Section 103 (8 U.S.C. 1103), as amended by section 102(e) of this division, is further amended by adding at the end the following:

"(f) The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this Act.".

<< 8 USCA § 1103 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 90 days after the date of the enactment of this Act.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

<< 18 USCA § 2516 >>

## SEC. 201. WIRETAP AUTHORITY FOR INVESTIGATIONS OF ALIEN SMUGGLING OR DOCUMENT FRAUD.

Section 2516(1) of title 18, United States Code, is amended—

(1) in paragraph (c), by striking "or section 1992 (relating to wrecking trains)" and inserting "section 1992 (relating to wrecking trains), a felony violation of section 1028 (relating to production of false identification documentation), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passports), section 1544 (relating to misuse of passports), or section 1546 (relating to fraud and misuse of visas, permits, and other documents)";

(2) by striking "or" at the end of paragraph (l);

(3) by redesignating paragraphs (m), (n), and (o) as paragraphs (n), (o), and (p), respectively; and

(4) by inserting after paragraph (l) the following new paragraph:

"(m) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (8 U.S.C. 1324, 1327, or 1328) (relating to the smuggling of aliens);".

<< 18 USCA § 1961 >>

## SEC. 202. RACKETEERING OFFENSES RELATING TO ALIEN SMUGGLING.

Section 1961(1) of title 18, United States Code, as amended by section 433 of Public Law 104–132, is amended—

(1) by striking "if the act indictable under section 1028 was committed for the purpose of financial gain";

(2) by inserting "section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers)," after "section 1344 (relating to financial institution fraud),";

(3) by striking "if the act indictable under section 1542 was committed for the purpose of financial gain";

(4) by striking "if the act indictable under section 1543 was committed for the purpose of financial gain";

(5) by striking "if the act indictable under section 1544 was committed for the purpose of financial gain"; and

(6) by striking "if the act indictable under section 1546 was committed for the purpose of financial gain".

## SEC. 203. INCREASED CRIMINAL PENALTIES FOR ALIEN SMUGGLING.

<< 8 USCA § 1324 >>

(a) COMMERCIAL ADVANTAGE.—Section 274(a)(1)(B)(i) (8 U.S.C. 1324(a)(1)(B)(i)) is amended by inserting "or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain" after "subparagraph (A)(i)".

(b) ADDITIONAL OFFENSES.—Section 274(a) (8 U.S.C. 1324(a)) is amended—

(1) in paragraph (1)(A)—

(A) by striking "or" at the end of clause (iii);

(B) by striking the comma at the end of clause (iv) and inserting "; or"; and

(C) by adding at the end the following new clause:

"(v)(I) engages in any conspiracy to commit any of the preceding acts, or

"(II) aids or abets the commission of any of the preceding acts,";

(2) in paragraph (1)(B)—

(A) in clause (i), by inserting "or (v)(I)" after "(A)(i)";

(B) in clause (ii), by striking "or (iv)" and inserting "(iv), or (v)(II)";

(C) in clause (iii), by striking "or (iv)" and inserting "(iv), or (v)"; and

(D) in clause (iv), by striking "or (iv)" and inserting "(iv), or (v)";

(3) in paragraph (2)(B), by striking "be fined" and all that follows and inserting the following: "be fined under title 18, United States Code, and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years."; and

(4) by adding at the end the following new paragraph:

"(3)(A) Any person who, during any 12–month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under title 18, United States Code, or imprisoned for not more than 5 years, or both.

"(B) An alien described in this subparagraph is an alien who—

"(i) is an unauthorized alien (as defined in section 274A(h)(3)), and

"(ii) has been brought into the United States in violation of this subsection.".

(c) SMUGGLING OF ALIENS WHO WILL COMMIT CRIMES.—Clause (i) of section 274(a)(2)(B) (8 U.S.C. 1324(a)(2)(B)) is amended to read as follows:

"(i) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,".

(d) APPLYING CERTAIN PENALTIES ON A PER ALIEN BASIS.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended by striking "for each transaction constituting a violation of this paragraph, regardless of the number of aliens involved" and inserting "for each alien in respect to whom a violation of this paragraph occurs".

<< 28 USCA § 994 NOTE >>

(e) SENTENCING GUIDELINES.—

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines for offenders convicted of offenses related to smuggling, transporting, harboring, or inducing aliens in violation of section 274(a) (1)(A) or (2) of the Immigration and Nationality Act (8 U.S.C. 1324(a)(1)(A), (2)(B)) in accordance with this subsection.

(2) REQUIREMENTS.—In carrying out this subsection, the Commission shall, with respect to the offenses described in paragraph (1)—

(A) increase the base offense level for such offenses at least 3 offense levels above the applicable level in effect on the date of the enactment of this Act;

(B) review the sentencing enhancement for the number of aliens involved (U.S.S.G. 2L1.1(b)(2)), and increase the sentencing enhancement by at least 50 percent above the applicable enhancement in effect on the date of the enactment of this Act;

(C) impose an appropriate sentencing enhancement upon an offender with 1 prior felony conviction arising out of a separate and prior prosecution for an offense that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(D) impose an additional appropriate sentencing enhancement upon an offender with 2 or more prior felony convictions arising out of separate and prior prosecutions for offenses that involved the same or similar underling conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(E) impose an appropriate sentencing enhancement on a defendant who, in the course of committing an offense described in this subsection—

(i) murders or otherwise causes death, bodily injury, or serious bodily injury to an individual;

(ii) uses or brandishes a firearm or other dangerous weapon; or

(iii) engages in conduct that consciously or recklessly places another in serious danger of death or serious bodily injury;

AR.03542

(F) consider whether a downward adjustment is appropriate if the offense is a first offense and involves the smuggling only of the alien's spouse or child; and

(G) consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments.

(3) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 8 USCA § 1324 NOTE >>

(f) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

SEC. 204. INCREASED NUMBER OF ASSISTANT UNITED STATES ATTORNEYS.

(a) IN GENERAL.—The number of Assistant United States Attorneys employed by the Department of Justice for the fiscal year 1997 shall be increased by at least 25 above the number of Assistant United States Attorneys that were authorized to be employed as of September 30, 1996.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall prosecute persons who bring into the United States or harbor illegal aliens or violate other criminal statutes involving illegal aliens.

SEC. 205. UNDERCOVER INVESTIGATION AUTHORITY.

<< 8 USCA § 1363a >>

(a) IN GENERAL.—Title II is amended by adding at the end the following new section:

"UNDERCOVER INVESTIGATION AUTHORITY

"SEC. 294. (a) IN GENERAL.—With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—

"(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

"(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),

"(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),

"(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),

"(D) the third undesignated paragraph under the heading 'Miscellaneous' of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),

"(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),

"(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and

"(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254(a) and (c));

"(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);

"(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and

"(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

 "(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

 "(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection (a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

 "(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.".

 (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 293 the following:

 "Sec. 294. Undercover investigation authority.".

Subtitle B—Deterrence of Document Fraud

SEC. 211. INCREASED CRIMINAL PENALTIES FOR FRAUDULENT USE OF GOVERNMENT–ISSUED DOCUMENTS.

 (a) FRAUD AND MISUSE OF GOVERNMENT–ISSUED IDENTIFICATION DOCUMENTS.—(1) Section 1028(b) of title 18, United States Code, is amended—

<< 18 USCA § 1028 >>

 (A) in paragraph (1), by inserting "except as provided in paragraphs (3) and (4)," after "(1)" and by striking "five years" and inserting "15 years";

 (B) in paragraph (2), by inserting "except as provided in paragraphs (3) and (4)," after "(2)" and by striking "and" at the end;

 (C) by redesignating paragraph (3) as paragraph (5); and

 (D) by inserting after paragraph (2) the following new paragraphs:

 "(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);

 "(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and".

<< 18 USCA §§ 1425, 1426, 1427, 1541, 1542, 1543, 1544, 1546 >>

 (2) Sections 1425 through 1427, sections 1541 through 1544, and section 1546(a) of title 18, United States Code, are each amended by striking "imprisoned not more" and all that follows through "years" each place it appears and inserting the following: "imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facility such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense)".

<< 28 USCA § 994 NOTE >>

 (b) CHANGES TO THE SENTENCING LEVELS.—

(1) IN GENERAL.—Pursuant to the Commission's authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines for offenders convicted of violating, or conspiring to violate, sections 1028(b)(1), 1425 through 1427, 1541 through 1544, and 1546(a) of title 18, United States Code, in accordance with this subsection.

(2) REQUIREMENTS.—In carrying out this subsection, the Commission shall, with respect to the offenses referred to in paragraph (1)—

(A) increase the base offense level for such offenses at least 2 offense levels above the level in effect on the date of the enactment of this Act;

(B) review the sentencing enhancement for number of documents or passports involved (U.S.S.G. 2L2.1(b)(2)), and increase the upward adjustment by at least 50 percent above the applicable enhancement in effect on the date of the enactment of this Act;

(C) impose an appropriate sentencing enhancement upon an offender with 1 prior felony conviction arising out of a separate and prior prosecution for an offense that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category;

(D) impose an additional appropriate sentencing enhancement upon an offender with 2 or more prior felony convictions arising out of separate and prior prosecutions for offenses that involved the same or similar underlying conduct as the current offense, to be applied in addition to any sentencing enhancement that would otherwise apply pursuant to the calculation of the defendant's criminal history category; and

(E) consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments.

(3) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 18 USCA § 1028 NOTE >>

(c) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

SEC. 212. NEW DOCUMENT FRAUD OFFENSES; NEW CIVIL PENALTIES FOR DOCUMENT FRAUD.

<< 8 USCA § 1324c >>

(a) ACTIVITIES PROHIBITED.—Section 274C(a) (8 U.S.C. 1324c(a)) is amended—

(1) in paragraph (1), by inserting before the comma at the end the following: "or to obtain a benefit under this Act";

(2) in paragraph (2), by inserting before the comma at the end the following: "or to obtain a benefit under this Act";

(3) in paragraph (3)—

(A) by inserting "or with respect to" after "issued to";

(B) by adding before the comma at the end the following: "or obtaining a benefit under this Act"; and

(C) by striking "or" at the end;

(4) in paragraph (4)—

(A) by inserting "or with respect to" after "issued to";

(B) by adding before the period at the end the following: "or obtaining a benefit under this Act"; and

(C) by striking the period at the end and inserting ", or"; and

(5) by adding at the end the following new paragraphs:

"(5) to prepare, file, or assist another in preparing or filing, any application for benefits under this Act, or any document required under this Act, or any document submitted in connection with such application or document, with knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted, or

"(6)(A) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States, and (B) to fail to present such document to an immigration officer upon arrival at a United States port of entry.".

(b) DEFINITION OF FALSELY MAKE.—Section 274C (8 U.S.C. 1324c), as amended by section 213 of this division, is further amended by adding at the end the following new subsection:

"(f) FALSELY MAKE.—For purposes of this section, the term 'falsely make' means to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a fact which is material to the purpose for which it was submitted.".

(c) CONFORMING AMENDMENT.—Section 274C(d)(3) (8 U.S.C. 1324c(d)(3)) is amended by striking "each document used, accepted, or created and each instance of use, acceptance, or creation" each place it appears and inserting "each document that is the subject of a violation under subsection (a)".

(d) WAIVER BY ATTORNEY GENERAL.—Section 274C(d) (8 U.S.C. 1324c(d)) is amended by adding at the end the following new paragraph:

"(7) WAIVER BY ATTORNEY GENERAL.—The Attorney General may waive the penalties imposed by this section with respect to an alien who knowingly violates subsection (a)(6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).".

<< 8 USCA § 1324c NOTE >>

(e) EFFECTIVE DATE.—Section 274C(f) of the Immigration and Nationality Act, as added by subsection (b), applies to the preparation of applications before, on, or after the date of the enactment of this Act.

<< 8 USCA § 1324c >>

SEC. 213. NEW CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS PREPARER OF FALSE APPLICATION FOR IMMIGRATION BENEFITS.

Section 274C (8 U.S.C. 1324c) is amended by adding at the end the following new subsection:

"(e) CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS DOCUMENT PREPARER.—(1) Whoever, in any matter within the jurisdiction of the Service, knowingly and willfully fails to disclose, conceals, or covers up the fact that they have, on behalf of any person and for a fee or other remuneration, prepared or assisted in preparing an application which was falsely made (as defined in subsection (f)) for immigration benefits, shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both, and prohibited from preparing or assisting in preparing, whether or not for a fee or other remuneration, any other such application.

"(2) Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for immigration benefits pursuant to this Act, or the regulations promulgated thereunder, whether or not for a fee or other remuneration and regardless of whether in any matter within the jurisdiction of the Service, shall be fined in accordance with title 18, United States Code, imprisoned for not more than 15 years, or both, and prohibited from preparing or assisting in preparing any other such application.".

<< 18 USCA § 1546 >>

SEC. 214. CRIMINAL PENALTY FOR KNOWINGLY PRESENTING DOCUMENT WHICH FAILS TO CONTAIN REASONABLE BASIS IN LAW OR FACT.

The fourth paragraph of section 1546(a) of title 18, United States Code, is amended by striking "containing any such false statement" and inserting "which contains any such false statement or which fails to contain any reasonable basis in law or fact".

<< 18 USCA § 1015 >>

### SEC. 215. CRIMINAL PENALTY FOR FALSE CLAIM TO CITIZENSHIP.

Section 1015 of title 18, United States Code, is amended—

(1) by striking the dash at the end of paragraph (d) and inserting "; or", and

(2) by inserting after paragraph (d) the following:

"(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal or State benefit or service, or to engage unlawfully in employment in the United States; or

"(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—".

### SEC. 216. CRIMINAL PENALTY FOR VOTING BY ALIENS IN FEDERAL ELECTION.

<< 18 USCA § 611 >>

(a) IN GENERAL.—Title 18, United States Code, is amended by inserting after section 610 the following:

"§ 611. Voting by aliens

"(a) It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless—

"(1) the election is held partly for some other purpose;

"(2) aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and

"(3) voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

"(b) Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.".

<< 18 USCA Ch. 29 >>

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 29 of title 18, United States Code, is amended by inserting after the item relating to section 610 the following new item:

"611. Voting by aliens.".

<< 18 USCA § 982 >>

### SEC. 217. CRIMINAL FORFEITURE FOR PASSPORT AND VISA RELATED OFFENSES.

Section 982(a) of title 18, United States Code, is amended by inserting after paragraph (5) the following new paragraph:

"(6)(A) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law—

"(i) any conveyance, including any vessel, vehicle, or aircraft used in the commission of a violation of, or a conspiracy to violate, subsection (a); and

"(ii) any property real or personal—

"(I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of a violation of, or a conspiracy to violate, subsection (a), section 274A(a)(1) or 274A(a)(2) of the Immigration and Nationality Act, or section 1028, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title; or

"(II) that is used to facilitate, or is intended to be used to facilitate, the commission of a violation of, or a conspiracy to violate, subsection (a), section 274A(a)(1) or 274A(a)(2) of the Immigration and Nationality Act, or section 1028, 1425, 1426, 1427, 1541, 1542, 1543, 1544, or 1546 of this title.

The court, in imposing sentence on such person, shall order that the person forfeit to the United States all property described in this subparagraph.

"(B) The criminal forfeiture of property under subparagraph (A), including any seizure and disposition of the property and any related administrative or judicial proceeding, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), other than subsections (a) and (d) of such section 413.".

SEC. 218. CRIMINAL PENALTIES FOR INVOLUNTARY SERVITUDE.

<< 18 USCA §§ 1581, 1583, 1584, 1588 >>

(a) AMENDMENTS TO TITLE 18.—Sections 1581, 1583, 1584, and 1588 of title 18, United States Code, are amended by striking "five" each place it appears and inserting "10".

<< 28 USCA § 994 NOTE >>

(b) REVIEW OF SENTENCING GUIDELINES.—The United States Sentencing Commission shall ascertain whether there exists an unwarranted disparity—

(1) between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for kidnapping offenses in effect on the date of the enactment of this Act; and

(2) between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for alien smuggling offenses in effect on the date of the enactment of this Act and after the amendment made by subsection (a).

(c) AMENDMENT OF SENTENCING GUIDELINES.—

(1) IN GENERAL.—Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall review its guidelines on sentencing for peonage, involuntary servitude, and slave trade offenses under sections 1581 through 1588 of title 18, United States Code, and shall amend such guidelines as necessary to—

(A) reduce or eliminate any unwarranted disparity found under subsection (b) that exists between the sentences for peonage, involuntary servitude, and slave trade offenses, and the sentences for kidnapping offenses and alien smuggling offenses;

(B) ensure that the applicable guidelines for defendants convicted of peonage, involuntary servitude, and slave trade offenses are sufficiently stringent to deter such offenses and adequately reflect the heinous nature of such offenses; and

(C) ensure that the guidelines reflect the general appropriateness of enhanced sentences for defendants whose peonage, involuntary servitude, or slave trade offenses involve—

(i) a large number of victims;

(ii) the use or threatened use of a dangerous weapon; or

(iii) a prolonged period of peonage or involuntary servitude.

(2) EMERGENCY AUTHORITY TO SENTENCING COMMISSION.—The Commission shall promulgate the guidelines or amendments provided for under this subsection as soon as practicable in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

<< 18 USCA § 1581 NOTE >>

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act.

<< 8 USCA § 1324 >>

SEC. 219. ADMISSIBILITY OF VIDEOTAPED WITNESS TESTIMONY.

Section 274 (8 U.S.C. 1324) is amended by adding at the end thereof the following new subsection:

"(d) Notwithstanding any provision of the Federal Rules of Evidence, the videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation if the witness was available for cross examination and the deposition otherwise complies with the Federal Rules of Evidence.".

<< 8 USCA § 1324c >>

SEC. 220. SUBPOENA AUTHORITY IN DOCUMENT FRAUD ENFORCEMENT.

Section 274C(d)(1) (8 U.S.C. 1324c(d)(1)) is amended—
(1) by striking "and" at the end of subparagraph (A);
(2) by striking the period at the end of subparagraph (B) and inserting ", and"; and
(3) by inserting after subparagraph (B) the following:
  "(C) immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).".

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

SEC. 301. TREATING PERSONS PRESENT IN THE UNITED STATES WITHOUT AUTHORIZATION AS NOT ADMITTED.

<< 8 USCA § 1101 >>

(a) "ADMISSION" DEFINED.—Paragraph (13) of section 101(a) (8 U.S.C. 1101(a)) is amended to read as follows:
  "(13)(A) The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.
  "(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.
  "(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—
  "(i) has abandoned or relinquished that status,
  "(ii) has been absent from the United States for a continuous period in excess of 180 days,
  "(iii) has engaged in illegal activity after having departed the United States,
  "(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,
  "(v) has committed an offense identified in section 212(a)(2), unless since such offense the alien has been granted relief under section 212(h) or 240A(a), or
  "(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.".
(b) INADMISSIBILITY OF ALIENS PREVIOUSLY REMOVED AND UNLAWFULLY PRESENT.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Section 212(a) (8 U.S.C. 1182(a)) is amended by redesignating paragraph (9) as paragraph (10) and by inserting after paragraph (8) the following new paragraph:
  "(9) ALIENS PREVIOUSLY REMOVED.—
  "(A) CERTAIN ALIENS PREVIOUSLY REMOVED.—
  "(i) ARRIVING ALIENS.—Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of

the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(ii) OTHER ALIENS.—Any alien not described in clause (i) who—

"(I) has been ordered removed under section 240 or any other provision of law, or

"(II) departed the United States while an order of removal was outstanding,

and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(iii) EXCEPTION.—Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

"(B) ALIENS UNLAWFULLY PRESENT.—

"(i) IN GENERAL.—Any alien (other than an alien lawfully admitted for permanent residence) who—

"(I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 244(e)) prior to the commencement of proceedings under section 235(b)(1) or section 240, and again seeks admission within 3 years of the date of such alien's departure or removal, or

"(II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

"(ii) CONSTRUCTION OF UNLAWFUL PRESENCE.—For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

"(iii) EXCEPTIONS.—

"(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

"(III) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(IV) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if 'violation of the terms of the alien's nonimmigrant visa' were substituted for 'unlawful entry into the United States' in subclause (III) of that paragraph.

"(iv) TOLLING FOR GOOD CAUSE.—In the case of an alien who—

"(I) has been lawfully admitted or paroled into the United States,

"(II) has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

"(III) has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

"(v) WAIVER.—The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

"(C) ALIENS UNLAWFULLY PRESENT AFTER PREVIOUS IMMIGRATION VIOLATIONS.—

"(i) IN GENERAL.—Any alien who—

"(I) has been unlawfully present in the United States for an aggregate period of more than 1 year, or

"(II) has been ordered removed under section 235(b)(1), section 240, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

"(ii) EXCEPTION.—Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.".

<< 8 USCA § 1258 >>

(2) LIMITATION ON CHANGE OF STATUS.—Section 248 (8 U.S.C. 1258) is amended by inserting "and who is not inadmissible under section 212(a)(9)(B)(i) (or whose inadmissibility under such section is waived under section 212(a)(9)(B)(v))" after "maintain that status".

<< 8 USCA § 1182 NOTE >>

(3) TREATMENT OF UNLAWFUL PRESENCE BEFORE EFFECTIVE DATE.—In applying section 212(a)(9)(B) of the Immigration and Nationality Act, as inserted by paragraph (1), no period before the title III–A effective date shall be included in a period of unlawful presence in the United States.

(c) REVISION TO GROUND OF INADMISSIBILITY FOR ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—

<< 8 USCA § 1182 >>

(1) IN GENERAL.—Subparagraphs (A) and (B) of section 212(a)(6) (8 U.S.C. 1182(a)(6)) are amended to read as follows:

"(A) ALIENS PRESENT WITHOUT ADMISSION OR PAROLE.—

"(i) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

"(ii) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien who demonstrates that—

"(I) the alien qualifies for immigrant status under subparagraph (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),

"(II)(a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

"(III) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

"(B) FAILURE TO ATTEND REMOVAL PROCEEDING.—Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.".

<< 8 USCA § 1182 NOTE >>

(2) TRANSITION FOR BATTERED SPOUSE OR CHILD PROVISION.—The requirements of subclauses (II) and (III) of section 212(a)(6)(A)(ii) of the Immigration and Nationality Act, as inserted by paragraph (1), shall not apply to an alien who demonstrates that the alien first arrived in the United States before the title III–A effective date (described in section 309(a) of this division).

<< 8 USCA § 1251 >>

(d) ADJUSTMENT IN GROUNDS FOR DEPORTATION.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended—

(1) in the matter before paragraph (1) of subsection (a), by striking "in the United States" and inserting "in and admitted to the United States";

(2) in subsection (a)(1), by striking "EXCLUDABLE" each place it appears and inserting "INADMISSIBLE";

(3) in subsection (a)(1)(A), by striking "excludable" and inserting "inadmissible"; and

(4) by amending subparagraph (B) of subsection (a)(1) to read as follows:

  "(B) PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.

SEC. 302. INSPECTION OF ALIENS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING (REVISED SECTION 235).

<< 8 USCA § 1225 >>

(a) IN GENERAL.—Section 235 (8 U.S.C. 1225) is amended to read as follows:

"INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL
OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING

"SEC. 235. (a) INSPECTION.—

  "(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this Act an applicant for admission.

  "(2) STOWAWAYS.—An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.

  "(3) INSPECTION.—All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

  "(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

  "(5) STATEMENTS.—An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

"(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

  "(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES AND CERTAIN OTHER ALIENS WHO HAVE NOT BEEN ADMITTED OR PAROLED.—

    "(A) SCREENING.—

      "(i) IN GENERAL.—If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7), the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution.

      "(ii) CLAIMS FOR ASYLUM.—If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)

AR.03552

(C) or 212(a)(7) and the alien indicates either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

"(iii) APPLICATION TO CERTAIN OTHER ALIENS.—

"(I) IN GENERAL.—The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

"(II) ALIENS DESCRIBED.—An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2–year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

"(B) ASYLUM INTERVIEWS.—

"(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

"(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

"(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

"(I) IN GENERAL.—Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

"(II) RECORD OF DETERMINATION.—The officer shall prepare a written record of a determination under subclause (I). Such record shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution. A copy of the officer's interview notes shall be attached to the written summary.

"(III) REVIEW OF DETERMINATION.—The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution. Such review shall include an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection. Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I).

"(IV) MANDATORY DETENTION.—Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.

"(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.

"(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term 'credible fear of persecution' means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

"(C) LIMITATION ON ADMINISTRATIVE REVIEW.—Except as provided in subparagraph (B)(iii)(III), a removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 207, or to have been granted asylum under section 208.

"(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii).

"(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term 'asylum officer' means an immigration officer who—

"(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and

"(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

"(F) EXCEPTION.—Subparagraph (A) shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry.

"(2) INSPECTION OF OTHER ALIENS.—

"(A) IN GENERAL.—Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 240.

"(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(C) TREATMENT OF ALIENS ARRIVING FROM CONTIGUOUS TERRITORY.—In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 240.

"(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 240.

"(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

"(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

"(A) order the alien removed, subject to review under paragraph (2);

"(B) report the order of removal to the Attorney General; and

"(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

"(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

"(B) If the Attorney General—

"(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

"(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

"(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

"(3) SUBMISSION OF STATEMENT AND INFORMATION.—The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

"(d) AUTHORITY RELATING TO INSPECTIONS.—

"(1) AUTHORITY TO SEARCH CONVEYANCES.—Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

"(2) AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.—Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

"(A) to detain the alien on the vessel or at the airport of arrival, and

"(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

"(3) ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.—The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.

"(4) SUBPOENA AUTHORITY.—(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.

"(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.".

<< 8 USCA § 1225 NOTE >>

(b) GAO STUDY ON OPERATION OF EXPEDITED REMOVAL PROCEDURES.—

(1) STUDY.—The Comptroller General shall conduct a study on the implementation of the expedited removal procedures under section 235(b)(1) of the Immigration and Nationality Act, as amended by subsection (a). The study shall examine—

(A) the effectiveness of such procedures in deterring illegal entry,

(B) the detention and adjudication resources saved as a result of the procedures,

(C) the administrative and other costs expended to comply with the provision,

(D) the effectiveness of such procedures in processing asylum claims by undocumented aliens who assert a fear of persecution, including the accuracy of credible fear determinations, and

(E) the cooperation of other countries and air carriers in accepting and returning aliens removed under such procedures.

(2) REPORT.—By not later than 18 months after the date of the enactment of this Act, the Comptroller General shall submit to the Committees on the Judiciary of the House of Representatives and the Senate a report on the study conducted under paragraph (1).

SEC. 303. APPREHENSION AND DETENTION OF ALIENS (REVISED SECTION 236).

<< 8 USCA § 1226 >>

(a) IN GENERAL.—Section 236 (8 U.S.C. 1226) is amended to read as follows:

"APPREHENSION AND DETENTION OF ALIENS

"SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole; but

"(3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

"(b) REVOCATION OF BOND OR PAROLE.—The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

"(c) DETENTION OF CRIMINAL ALIENS.—

"(1) CUSTODY.—The Attorney General shall take into custody any alien who—

"(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),

"(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D),

"(C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or

"(D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) RELEASE.—The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

"(d) IDENTIFICATION OF CRIMINAL ALIENS.—(1) The Attorney General shall devise and implement a system—

"(A) to make available, daily (on a 24–hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

"(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

"(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

"(2) The record under paragraph (1)(C) shall be made available—

"(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

"(B) to officials of the Department of State for use in its automated visa lookout system.

"(3) Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

"(e) JUDICIAL REVIEW.—The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.".

<< 8 USCA § 1226 NOTE >>

(b) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendment made by subsection (a) shall become effective on the title III–A effective date.

<< 8 USCA § 1226 NOTE, 1252 nt >>

(2) NOTIFICATION REGARDING CUSTODY.—If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and Immigration and Naturalization Service personnel available to carry out section 236(c) of the Immigration and Nationality Act, as amended by subsection (a), or the amendments made by section 440(c) of Public Law 104–132, the provisions in paragraph (3) shall be in effect for a 1–year period beginning on the date of such notification, instead of such section or such amendments. The Attorney General may extend such 1–year period for an additional year if the Attorney General provides the same notice not later than 10 days before the end of the first 1–year period. After the end of such 1–year or 2–year periods, the provisions of such section 236(c) shall apply to individuals released after such periods.

<< 8 USCA § 1226 NOTE >>

(3) TRANSITION PERIOD CUSTODY RULES.—

(A) IN GENERAL.—During the period in which this paragraph is in effect pursuant to paragraph (2), the Attorney General shall take into custody any alien who—

(i) has been convicted of an aggravated felony (as defined under section 101(a)(43) of the Immigration and Nationality Act, as amended by section 321 of this division),

(ii) is inadmissible by reason of having committed any offense covered in section 212(a)(2) of such Act,

(iii) is deportable by reason of having committed any offense covered in section 241(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of such Act (before redesignation under this subtitle), or

(iv) is inadmissible under section 212(a)(3)(B) of such Act or deportable under section 241(a)(4)(B) of such Act (before redesignation under this subtitle),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(B) RELEASE.—The Attorney General may release the alien only if the alien is an alien described in subparagraph (A)(ii) or (A)(iii) and—

(i) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding, or

(ii) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

SEC. 304. REMOVAL PROCEEDINGS; CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS; VOLUNTARY DEPARTURE (REVISED AND NEW SECTIONS 239 TO 240C).

(a) IN GENERAL.—Chapter 4 of title II is amended—

<< 1 USCA § 1229 >>

<< 1 USCA § 1224 >>

(1) by redesigning section 239 (8 U.S.C. 1229) as section 234 and by moving such section to immediately follow section 233;

<< 8 USCA § 1230 >>

(2) by redesignating section 240 (8 U.S.C. 1230) as section 240C; and

(3) by inserting after section 238 the following new sections:

<< 8 USCA § 1229 >>

"INITIATION OF REMOVAL PROCEEDINGS

"SEC. 239. (a) NOTICE TO APPEAR.—

"(1) IN GENERAL.—In removal proceedings under section 240, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged to have been violated.

"(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.

"(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

"(iii) The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.

"(G)(i) The time and place at which the proceedings will be held.

"(ii) The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.

"(2) NOTICE OF CHANGE IN TIME OR PLACE OF PROCEEDINGS.—

"(A) IN GENERAL.—In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—

"(i) the new time or place of the proceedings, and

"(ii) the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.

"(B) EXCEPTION.—In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F).

"(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

"(b) SECURING OF COUNSEL.—

"(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.

"(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

"(3) RULE OF CONSTRUCTION.—Nothing in this subsection may be construed to prevent the Attorney General from proceeding against an alien pursuant to section 240 if the time period described in paragraph (1) has elapsed and the alien has failed to secure counsel.

"(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).

"(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.

"(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

<< 8 USCA § 1229a >>

"REMOVAL PROCEEDINGS

"SEC. 240. (a) PROCEEDING.—

"(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

"(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).

"(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.

"(b) CONDUCT OF PROCEEDING.—

"(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this Act.

"(2) FORM OF PROCEEDING.—

"(A) IN GENERAL.—The proceeding may take place—

"(i) in person,

"(ii) where agreed to by the parties, in the absence of the alien,

"(iii) through video conference, or

"(iv) subject to subparagraph (B), through telephone conference.

"(B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

"(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

"(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

"(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

"(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this Act, and

"(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

"(5) CONSEQUENCES OF FAILURE TO APPEAR.—

"(A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

"(B) NO NOTICE OF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

"(C) RESCISSION OF ORDER.—Such an order may be rescinded only—

"(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

"(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 239(a) or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion by the immigration judge.

"(D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

"(E) ADDITIONAL APPLICATION TO CERTAIN ALIENS IN CONTIGUOUS TERRITORY.—The preceding provisions of this paragraph shall apply to all aliens placed in proceedings under this section, including any alien who remains in a contiguous foreign territory pursuant to section 235(b)(2)(C).

"(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

"(A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

"(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

"(7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

"(c) DECISION AND BURDEN OF PROOF.—

"(1) DECISION.—

"(A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

"(B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

"(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

"(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or

"(B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

"(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—

"(A) IN GENERAL.—In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"(B) PROOF OF CONVICTIONS.—In any proceeding under this Act, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

"(i) An official record of judgment and conviction.

"(ii) An official record of plea, verdict, and sentence.

"(iii) A docket entry from court records that indicates the existence of the conviction.

"(iv) Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

"(v) An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

"(vi) Any document or record prepared by, or under the direction of, the court in which the conviction was entered that indicates the existence of a conviction.

"(vii) Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

"(C) ELECTRONIC RECORDS.—In any proceeding under this Act, any record of conviction or abstract that has been submitted by electronic means to the Service from a State or court shall be admissible as evidence to prove a criminal conviction if it is—

"(i) certified by a State official associated with the State's repository of criminal justice records as an official record from its repository or by a court official from the court in which the conviction was entered as an official record from its repository, and

"(ii) certified in writing by a Service official as having been received electronically from the State's record repository or the court's record repository.

A certification under clause (i) may be by means of a computer-generated signature and statement of authenticity.

"(4) NOTICE.—If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

"(5) MOTIONS TO RECONSIDER.—

"(A) IN GENERAL.—The alien may file one motion to reconsider a decision that the alien is removable from the United States.

"(B) DEADLINE.—The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

"(C) CONTENTS.—The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

"(6) MOTIONS TO REOPEN.—

"(A) IN GENERAL.—An alien may file one motion to reopen proceedings under this section.

"(B) CONTENTS.—The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

"(C) DEADLINE.—

"(i) IN GENERAL.—Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

"(ii) ASYLUM.—There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

"(iii) FAILURE TO APPEAR.—The filing of a motion to reopen an order entered pursuant to subsection (b)(5) is subject to the deadline specified in subparagraph (C) of such subsection.

"(d) STIPULATED REMOVAL.—The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.

"(e) DEFINITIONS.—In this section and section 240A:

"(1) EXCEPTIONAL CIRCUMSTANCES.—The term 'exceptional circumstances' refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.

"(2) REMOVABLE.—The term 'removable' means—

"(A) in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or

"(B) in the case of an alien admitted to the United States, that the alien is deportable under section 237.

<< 8 USCA § 1229b >>

"CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS

"SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

"(2) has resided in the United States continuously for 7 years after having been admitted in any status, and

"(3) has not been convicted of any aggravated felony.

"(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—

Case 3:20-cv-07721-SL    Document 58-3    Filed 11/10/20    Page 3585 of 3864

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT, 1997, P.L. 104-208, September...

"(1) IN GENERAL.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

"(B) has been a person of good moral character during such period;

"(C) has not been convicted of an offense under section 212(a)(2), 237(a)(2), or 237(a)(3); and

"(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

"(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien demonstrates that—

"(A) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);

"(B) the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

"(C) the alien has been a person of good moral character during such period;

"(D) the alien is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and

"(E) the removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

"(3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

"(c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

"(1) An alien who entered the United States as a crewman subsequent to June 30, 1964.

"(2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

"(3) An alien who—

"(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

"(B) is subject to the two-year foreign residence requirement of section 212(e), and

"(C) has not fulfilled that requirement or received a waiver thereof.

"(4) An alien who is inadmissible under section 212(a)(3) or deportable under section 237(a)(4).

"(5) An alien who is described in section 241(b)(3)(B)(i).

"(6) An alien whose removal has previously been cancelled under this section or whose deportation was suspended under section 244(a) or who has been granted relief under section 212(c), as such sections were in effect before the date of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

"(d) SPECIAL RULES RELATING TO CONTINUOUS RESIDENCE OR PHYSICAL PRESENCE.—

"(1) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

  "(2) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

  "(3) CONTINUITY NOT REQUIRED BECAUSE OF HONORABLE SERVICE IN ARMED FORCES AND PRESENCE UPON ENTRY INTO SERVICE.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

    "(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

    "(B) at the time of the alien's enlistment or induction was in the United States.

  "(e) ANNUAL LIMITATION.—The Attorney General may not cancel the removal and adjust the status under this section, nor suspend the deportation and adjust the status under section 244(a) (as in effect before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996), of a total of more than 4,000 aliens in any fiscal year. The previous sentence shall apply regardless of when an alien applied for such cancellation and adjustment and whether such an alien had previously applied for suspension of deportation under such section 244(a).

<< 8 USCA § 1229c >>

"VOLUNTARY DEPARTURE

"SEC. 240B. (a) CERTAIN CONDITIONS.—

  "(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

  "(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

  "(3) BOND.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

  "(4) TREATMENT OF ALIENS ARRIVING IN THE UNITED STATES.—In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

"(b) AT CONCLUSION OF PROCEEDINGS.—

  "(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the immigration judge enters an order granting voluntary departure in lieu of removal and finds that—

    "(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);

    "(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

    "(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and

    "(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

  "(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.

  "(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(6)(A).

AR.03563

"(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249. The order permitting the alien to depart voluntarily shall inform the alien of the penalties under this subsection.

"(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens. No court may review any regulation issued under this subsection.

"(f) JUDICIAL REVIEW.—No court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure under subsection (b), nor shall any court order a stay of an alien's removal pending consideration of any claim with respect to voluntary departure.".

<< 8 USCA § 1182 >>

(b) REPEAL OF SECTION 212(c).—Section 212(c) (8 U.S.C. 1182(c)) is repealed.

(c) STREAMLINING REMOVAL OF CRIMINAL ALIENS.—

<< 8 USCA § 1252a >>

(1) IN GENERAL.—Section 242A(b)(4) (8 U.S.C. 1252a(b)(4)), as amended by section 442(a) of Public Law 104–132 and before redesignation by section 308(b)(5) of this division, is amended—

(A) by striking subparagraph (D);

(B) by amending subparagraph (E) to read as follows:

"(D) a determination is made for the record that the individual upon whom the notice for the proceeding under this section is served (either in person or by mail) is, in fact, the alien named in such notice;"; and

(C) by redesignating subparagraphs (F) and (G) as subparagraph (E) and (F), respectively.

<< 8 USCA § 1252a NOTE >>

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall be effective as if included in the enactment of section 442(a) of Public Law 104–132.

SEC. 305. DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED (NEW SECTION 241).

(a) IN GENERAL.—Title II is further amended—

<< 8 USCA § 1227 >>

(1) by striking section 237 (8 U.S.C. 1227),

<< 8 USCA § 1251 >>

<< 8 USCA § 1227 >>

(2) by redesignating section 241 (8 U.S.C. 1251) as section 237 and by moving such section to immediately follow section 236, and

<< 8 USCA § 1231 >>

(3) by inserting after section 240C (as redesignated by section 304(a)(2)) of this division the following new section:

"DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED

"SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS ORDERED REMOVED.—

"(1) REMOVAL PERIOD.—

"(A) IN GENERAL.—Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').

"(B) BEGINNING OF PERIOD.—The removal period begins on the latest of the following:

"(i) The date the order of removal becomes administratively final.

"(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

"(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

"(C) SUSPENSION OF PERIOD.—The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

"(2) DETENTION.—During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 212(a)(2) or 212(a)(3)(B) or deportable under section 237(a)(2) or 237(a)(4)(B).

"(3) SUPERVISION AFTER 90–DAY PERIOD.—If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

"(A) to appear before an immigration officer periodically for identification;

"(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

"(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

"(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

"(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPERVISED RELEASE, OR PROBATION.—

"(A) IN GENERAL.—Except as provided in section 343(a) of the Public Health Service Act (42 U.S.C. 259(a)) and paragraph (2), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

"(B) EXCEPTION FOR REMOVAL OF NONVIOLENT OFFENDERS PRIOR TO COMPLETION OF SENTENCE OF IMPRISONMENT.—The Attorney General is authorized to remove an alien in accordance with applicable procedures under this Act before the alien has completed a sentence of imprisonment—

"(i) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 101(a)(43)(B), (C), (E), (I), or (L) and (II) the removal of the alien is appropriate and in the best interest of the United States; or

"(ii) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 101(a)(43)(C) or (E)), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

"(C) NOTICE.—Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

"(D) NO PRIVATE RIGHT.—No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

"(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS ILLEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this Act, and the alien shall be removed under the prior order at any time after the reentry.

"(6) INADMISSIBLE OR CRIMINAL ALIENS.—An alien ordered removed who is inadmissible under section 212, removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

"(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—

"(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

"(B) the removal of the alien is otherwise impracticable or contrary to the public interest.

"(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—

"(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—

"(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

"(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

"(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

"(i) The country of which the alien is a citizen, subject, or national.

"(ii) The country in which the alien was born.

"(iii) The country in which the alien has a residence.

"(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

"(2) OTHER ALIENS.—Subject to paragraph (3)—

"(A) SELECTION OF COUNTRY BY ALIEN.—Except as otherwise provided in this paragraph—

"(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

"(ii) the Attorney General shall remove the alien to the country the alien so designates.

"(B) LIMITATION ON DESIGNATION.—An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

"(C) DISREGARDING DESIGNATION.—The Attorney General may disregard a designation under subparagraph (A)(i) if—

"(i) the alien fails to designate a country promptly;

"(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

"(iii) the government of the country is not willing to accept the alien into the country; or

"(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

"(D) ALTERNATIVE COUNTRY.—If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—

"(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

AR.03566

"(ii) is not willing to accept the alien into the country.

"(E) ADDITIONAL REMOVAL COUNTRIES.—If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

"(i) The country from which the alien was admitted to the United States.

"(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

"(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

"(iv) The country in which the alien was born.

"(v) The country that had sovereignty over the alien's birthplace when the alien was born.

"(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

"(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

"(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

"(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

"(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

"(3) RESTRICTION ON REMOVAL TO A COUNTRY WHERE ALIEN'S LIFE OR FREEDOM WOULD BE THREATENED.—

"(A) IN GENERAL.—Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

"(B) EXCEPTION.—Subparagraph (A) does not apply to an alien deportable under section 237(a)(4)(D) or if the Attorney General decides that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

"(iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or

"(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. For purposes of clause (iv), an alien who is described in section 237(a)(4)(B) shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States.

"(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—

"(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(b)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—

"(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

"(B) the alien is a stowaway—

"(i) who has been ordered removed in accordance with section 235(a)(1),

"(ii) who has requested asylum, and

"(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

"(2) STAY OF REMOVAL.—

"(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—

"(i) immediate removal is not practicable or proper; or

"(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

"(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'—

"(i) the cost of maintenance of the alien; and

"(ii) a witness fee of $1 a day.

"(C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

"(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

"(ii) condition that the alien appear when required as a witness and for removal; and

"(iii) other conditions the Attorney General may prescribe.

"(3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

"(i) while the alien is detained under subsection (d)(1), and

"(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

"(I) subsection (d)(2)(A) or (d)(2)(B)(i),

"(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

"(III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

"(B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

"(i) the alien is a crewmember;

"(ii) the alien has an immigrant visa;

"(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

"(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

"(v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

"(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

"(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

"(vi) the individual claims to be a national of the United States and has a United States passport.

"(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

"(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

"(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

"(B) take the alien to the foreign country to which the alien is ordered removed.

AR.03568

"(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

"(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

"(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

"(i) for medical treatment,

"(ii) for detention of the stowaway by the Attorney General, or

"(iii) for departure or removal of the stowaway; and

"(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if the requester has obtained any travel documents necessary for departure or repatriation of the stowaway and removal of the stowaway will not be unreasonably delayed.

"(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

"(e) PAYMENT OF EXPENSES OF REMOVAL.—

"(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—

"(A) pay the cost from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'; and

"(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

"(2) COSTS OF REMOVAL TO PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

"(A) THROUGH APPROPRIATION.—Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(B) THROUGH OWNER.—

"(i) IN GENERAL.—In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

"(ii) ALIENS DESCRIBED.—An alien described in this clause is an alien who—

"(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or

"(II) is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.

"(C) COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.

"(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

"(1) IN GENERAL.—If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

AR.03569

"(2) COSTS.—The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

"(g) PLACES OF DETENTION.—

"(1) IN GENERAL.—The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses', without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

"(2) DETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

"(h) STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1326 >>

(b) REENTRY OF ALIEN REMOVED PRIOR TO COMPLETION OF TERM OF IMPRISONMENT.—Section 276(b) (8 U.S.C. 1326(b)), as amended by section 321(b) of this division, is amended—

(1) by striking "or" at the end of paragraph (2),

(2) by adding "or" at the end of paragraph (3), and

(3) by inserting after paragraph (3) the following new paragraph:

"(4) who was removed from the United States pursuant to section 241(a)(4)(B) who thereafter, without the permission of the Attorney General, enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be fined under title 18, United States Code, imprisoned for not more than 10 years, or both.

<< 8 USCA § 1182 >>

(c) MISCELLANEOUS CONFORMING AMENDMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a) of this division, is amended by striking "241(a)(5)(B)" each place it appears and inserting "237(a)(5)(B)".

SEC. 306. APPEALS FROM ORDERS OF REMOVAL (NEW SECTION 242).

(a) IN GENERAL.—Section 242 (8 U.S.C. 1252) is amended—

<< 8 USCA § 1252 >>

<< 8 USCA § 1231 >>

(1) by redesignating subsection (j) as subsection (i) and by moving such subsection and adding it at the end of section 241, as inserted by section 305(a)(3) of this division; and

<< 8 USCA § 1252 >>

(2) by amending the remainder of section 242 to read as follows:

"JUDICIAL REVIEW OF ORDERS OF REMOVAL

"SEC. 242. (a) APPLICABLE PROVISIONS.—

"(1) GENERAL ORDERS OF REMOVAL.—Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

"(2) MATTERS NOT SUBJECT TO JUDICIAL REVIEW.—

"(A) REVIEW RELATING TO SECTION 235(b)(1).—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

"(ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

"(iii) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

"(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

"(B) DENIALS OF DISCRETIONARY RELIEF.—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(i) any judgment regarding the granting of relief under section 212(h), 212(i), 240A, 240B, or 245, or

"(ii) any other decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General, other than the granting of relief under section 208(a).

"(C) ORDERS AGAINST CRIMINAL ALIENS.—Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 212(a)(2) or 237(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 237(a)(2)(A) (ii) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 237(a) (2)(A)(i).

"(3) TREATMENT OF CERTAIN DECISIONS.—No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).

"(b) REQUIREMENTS FOR REVIEW OF ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

"(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

"(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

"(3) SERVICE.—

"(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 240 was entered.

"(B) STAY OF ORDER.—Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

"(C) ALIEN'S BRIEF.—The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause shown. If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

"(4) SCOPE AND STANDARD FOR REVIEW.—Except as provided in paragraph (5)(B)—

"(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

"(B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

"(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

"(D) the Attorney General's discretionary judgment whether to grant relief under section 208(a) shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

"(5) TREATMENT OF NATIONALITY CLAIMS.—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

"(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

"(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

"(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.—When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

"(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

"(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

"(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

"(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

"(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

"(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

"(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

"(8) CONSTRUCTION.—This subsection—

"(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

"(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

"(C) does not require the Attorney General to defer removal of the alien.

"(9) CONSOLIDATION OF QUESTIONS FOR JUDICIAL REVIEW.—Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section.

"(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal—

"(1) shall attach a copy of such order, and

"(2) shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

"(d) REVIEW OF FINAL ORDERS.—A court may review a final order of removal only if—

"(1) the alien has exhausted all administrative remedies available to the alien as of right, and

"(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

"(e) JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).—

"(1) LIMITATIONS ON RELIEF.—Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—

"(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 235(b)(1) except as specifically authorized in a subsequent paragraph of this subsection, or

"(B) certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

"(2) HABEAS CORPUS PROCEEDINGS.—Judicial review of any determination made under section 235(b)(1) is available in habeas corpus proceedings, but shall be limited to determinations of—

"(A) whether the petitioner is an alien,

"(B) whether the petitioner was ordered removed under such section, and

"(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207, or has been granted asylum under section 208, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

"(3) CHALLENGES ON VALIDITY OF THE SYSTEM.—

"(A) IN GENERAL.—Judicial review of determinations under section 235(b) and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

"(i) whether such section, or any regulation issued to implement such section, is constitutional; or

"(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this title or is otherwise in violation of law.

"(B) DEADLINES FOR BRINGING ACTIONS.—Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

"(C) NOTICE OF APPEAL.—A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

"(D) EXPEDITIOUS CONSIDERATION OF CASES.—It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

"(4) DECISION.—In any case where the court determines that the petitioner—

"(A) is an alien who was not ordered removed under section 235(b)(1), or

"(B) has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 207, or has been granted asylum under section 208, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

"(5) SCOPE OF INQUIRY.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

"(f) LIMIT ON INJUNCTIVE RELIEF.—

"(1) IN GENERAL.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

"(2) PARTICULAR CASES.—Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

"(g) EXCLUSIVE JURISDICTION.—Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.".

<< 8 USCA § 1105a >>

(b) REPEAL OF SECTION 106.—Section 106 (8 U.S.C. 1105a) is repealed.

<< 8 USCA § 1252 NOTE >>

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Subject to paragraph (2), the amendments made by subsections (a) and (b) shall apply to all final orders of deportation or removal and motions to reopen filed on or after the date of the enactment of this Act and subsection (g) of section 242 of the Immigration and Nationality Act (as added by subsection (a)), shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act.

(2) LIMITATION.—Paragraph (1) shall not be considered to invalidate or to require the reconsideration of any judgment or order entered under section 106 of the Immigration and Nationality Act, as amended by section 440 of Public Law 104–132.

<< 8 USCA §§ 1105a, 1182, 1252, 1252a >>

<< 8 USCA § 1182 NOTE >>

(d) TECHNICAL AMENDMENT.—Effective as if included in the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), subsections (a), (c), (d), (g), and (h) of section 440 of such Act are amended by striking "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i)" and inserting "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i)".

<< 8 USCA § 1253 >>

SEC. 307. PENALTIES RELATING TO REMOVAL (REVISED SECTION 243).

(a) IN GENERAL.—Section 243 (8 U.S.C. 1253) is amended to read as follows:

"PENALTIES RELATED TO REMOVAL

"SEC. 243. (a) PENALTY FOR FAILURE TO DEPART.—

"(1) IN GENERAL.—Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—

"(A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

"(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

"(C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

"(D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

"(2) EXCEPTION.—It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

"(3) SUSPENSION.—The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—

"(A) the age, health, and period of detention of the alien;

"(B) the effect of the alien's release upon the national security and public peace or safety;

"(C) the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;

"(D) the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;

"(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

"(F) the eligibility of the alien for discretionary relief under the immigration laws.

"(b) WILLFUL FAILURE TO COMPLY WITH TERMS OF RELEASE UNDER SUPERVISION.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

"(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—

"(1) CIVIL PENALTIES.—

"(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.

"(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

"(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.

"(2) CLEARING VESSELS AND AIRCRAFT.—

"(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

"(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

"(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.".

SEC. 308. REDESIGNATION AND REORGANIZATION OF OTHER PROVISIONS; ADDITIONAL CONFORMING AMENDMENTS.

(a) CONFORMING AMENDMENT TO TABLE OF CONTENTS; OVERVIEW OF REORGANIZED CHAPTERS.—The table of contents, as amended by sections 123(b) and 671(e)(1) of this division, is amended—

(1) by striking the item relating to section 106, and

(2) by striking the item relating to chapter 4 of title II and all that follows through the item relating to section 244A and inserting the following:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL

"Sec. 231. Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.

"Sec. 232. Detention of aliens for physical and mental examination.

AR.03575

143

"Sec. 233. Entry through or from foreign territory and adjacent islands; landing stations.

"Sec. 234. Designation of ports of entry for aliens arriving by civil aircraft.

"Sec. 235. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.

"Sec. 235A. Preinspection at foreign airports.

"Sec. 236. Apprehension and detention of aliens not lawfully in the United States.

"Sec. 237. General classes of deportable aliens.

"Sec. 238. Expedited removal of aliens convicted of committing aggravated felonies.

"Sec. 239. Initiation of removal proceedings.

"Sec. 240. Removal proceedings.

"Sec. 240A. Cancellation of removal; adjustment of status.

"Sec. 240B. Voluntary departure.

"Sec. 240C. Records of admission.

"Sec. 241. Detention and removal of aliens ordered removed.

"Sec. 242. Judicial review of orders of removal.

"Sec. 243. Penalties relating to removal.

"Sec. 244. Temporary protected status.

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".
  (b) REORGANIZATION OF OTHER PROVISIONS.—Chapters 4 and 5 of title II are amended as follows:

<< 8 USCA Ch. 12 >>

(1) AMENDING CHAPTER HEADING.—Amend the heading for chapter 4 of title II to read as follows:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL".

<< 8 USCA § 1222 >>

(2) REDESIGNATING SECTION 232 AS SECTION 232(a).—Amend section 232 (8 U.S.C. 1222)—
  (A) by inserting "(a) DETENTION OF ALIENS.—" after "SEC. 232.", and
  (B) by amending the section heading to read as follows:

"DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION".
(3) REDESIGNATING SECTION 234 AS SECTION 232(b).—Amend section 234 (8 U.S.C. 1224)—

<< 8 USCA § 1224 >>

  (A) by striking the heading,
  (B) by striking "SEC. 234." and inserting the following: "(b) PHYSICAL AND MENTAL EXAMINATION.—", and

AR.03576

<< 8 USCA §§ 1222, 1224 >>

(C) by moving such provision to the end of section 232.

<< 8 USCA § 1228 >>

<< 8 USCA § 1223 >>

(4) REDESIGNATING SECTION 238 AS SECTION 233.—Redesignate section 238 (8 U.S.C. 1228) as section 233 and move the section to immediately follow section 232.

<< 8 USCA § 1252a >>

<< 8 USCA § 1228 >>

(5) REDESIGNATING SECTION 242A AS SECTION 238.—Redesignate section 242A as section 238, strike "DEPORTATION" in its heading and insert "REMOVAL", and move the section to immediately follow section 237 (as redesignated by section 305(a)(2)).

<< 8 USCA § 1252b >>

(6) STRIKING SECTION 242B.—Strike section 242B (8 U.S.C. 1252b).

<< 8 USCA § 1254 >>

<< 8 USCA § 1254a >>

(7) STRIKING SECTION 244 AND REDESIGNATING SECTION 244A AS SECTION 244.—Strike section 244 (8 U.S.C. 1254) and redesignate section 244A as section 244.

<< 8 USCA Ch. 12 >>

(8) AMENDING CHAPTER HEADING.—Amend the heading for chapter 5 of title II to read as follows:

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".

(c) ADDITIONAL CONFORMING AMENDMENTS.—

(1) EXPEDITED PROCEDURES FOR AGGRAVATED FELONS (FORMER SECTION 242A).—Section 238 (which, previous to redesignation under section 308(b)(5) of this division, was section 242A) is amended—

<< 8 USCA § 1228 >>

(A) in subsection (a)(1), by striking "section 242" and inserting "section 240";

(B) in subsection (a)(2), by striking "section 242(a)(2)" and inserting "section 236(c)"; and

(C) in subsection (b)(1), by striking "section 241(a)(2)(A)(iii)" and inserting "section 237(a)(2)(A)(iii)".

(2) TREATMENT OF CERTAIN HELPLESS ALIENS.—

<< 8 USCA § 1222 >>

(A) CERTIFICATION OF HELPLESS ALIENS.—Section 232 (8 U.S.C. 1222), as amended by section 308(b)(2) of this division, is further amended by adding at the end the following new subsection:

"(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.—If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.".

<< 8 USCA § 1182 >>

(B) GROUND OF INADMISSIBILITY FOR PROTECTION AND GUARDIANSHIP OF ALIENS DENIED ADMISSION FOR HEALTH OR INFANCY.—Subparagraph (B) of section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(a)(1) of this division, is amended to read as follows:

"(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—

"(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and

"(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.".

<< 8 USCA § 1323 >>

(3) CONTINGENT CONSIDERATION IN RELATION TO REMOVAL OF ALIENS.—Section 273(a) (8 U.S.C. 1323(a)) is amended—

(A) by inserting "(1)" after "(a)", and

(B) by adding at the end the following new paragraph:

"(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.".

<< 8 USCA § 1228 >>

(4) CLARIFICATION.—(A) Section 238(a)(1), which, previous to redesignation under section 308(b)(5) of this division, was section 242A(a)(1), is amended by adding at the end the following: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

<< 8 USCA § 1101 NOTE >>

(B) Section 225 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) is amended by striking "and nothing in" and all that follows up to "shall".

(d) ADDITIONAL CONFORMING AMENDMENTS RELATING TO EXCLUSION AND INADMISSIBILITY.—

(1) SECTION 212.—Section 212 (8 U.S.C. 1182(a)) is amended—

<< 8 USCA § 1182 >>

(A) in the heading, by striking "EXCLUDED FROM" and inserting "INELIGIBLE FOR";

(B) in the matter in subsection (a) before paragraph (1), by striking all that follows "(a)" and inserting the following: "CLASSES OF ALIENS INELIGIBLE FOR VISAS OR ADMISSION.—Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States;";

(C) in subsection (a), by striking "is excludable" and inserting "is inadmissible" each place it appears;

(D) in subsections (a)(5)(C) (before redesignation by section 343(c)(1) of this division), (d)(1), and (k), by striking "exclusion" and inserting "inadmissibility";

(E) In subsections (b), (d)(3), (h)(1)(A)(i), and (k), by striking "excludable" each place it appears and inserting "inadmissible";

(F) in subsection (b)(2), by striking "or ineligible for entry";

(G) in subsection (d)(7), by striking "excluded from" and inserting "denied"; and

(H) in subsection (h)(1)(B), by striking "exclusion" and inserting "denial of admission".

(2) SECTION 241.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended—

<< 8 USCA § 1251 >>

(A) in subsection (a)(1)(H), by striking "excludable" and inserting "inadmissible";
(B) in subsection (a)(4)(C)(ii), by striking "excludability" and inserting "inadmissibility";
(C) in subsection (c), by striking "exclusion" and inserting "inadmissibility"; and

<< 8 USCA § 1251 >>

<< 8 USCA § 1227 NOTE >>

(D) effective upon enactment of this Act, by striking subsection (d), as added by section 414(a) of the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132).
(3) OTHER GENERAL REFERENCES.—The following provisions are amended by striking "excludability" and "excludable" each place each appears and inserting "inadmissibility" and "inadmissible", respectively:

<< 8 USCA §§ 1101, 1183, 1224, 1251, 1322, 1327, 1356 >>

<< 8 USCA § 1182 NOTE >>

(A) Sections 101(f)(3), 213, 234 (before redesignation by section 308(b) of this division), 241(a)(1) (before redesignation by section 305(a)(2) of this division), 272(a), 277, 286(h)(2)(A)(v), and 286(h)(2)(A)(vi).

<< 8 USCA § 1182 NOTE >>

(B) Section 601(c) of the Immigration Act of 1990.

<< 8 USCA § 1182 NOTE >>

(C) Section 128 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138).
(D) Section 1073 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337).

<< 8 USCA § 1182 NOTE >>

(E) Section 221 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).
(4) RELATED TERMS.—

<< 8 USCA § 1101 >>

(A) Section 101(a)(17) (8 U.S.C. 1101(a)(17)) is amended by striking "or expulsion" and inserting "expulsion, or removal".

<< 8 USCA § 1102 >>

(B) Section 102 (8 U.S.C. 1102) is amended by striking "exclusion or deportation" and inserting "removal".

<< 8 USCA § 1103 >>

(C) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "been excluded or deported" and inserting "not been admitted or have been removed".

<< 8 USCA § 1156 >>

AR.03579

(D) Section 206 (8 U.S.C. 1156) is amended by striking "excluded from admission to the United States and deported" and inserting "denied admission to the United States and removed".

<< 8 USCA § 1186a >>

(E) Section 216(f) (8 U.S.C. 1186a) is amended by striking "exclusion" and inserting "inadmissibility".

<< 8 USCA § 1187 >>

(F) Section 217 (8 U.S.C. 1187) is amended by striking "excluded from admission" and inserting "denied admission at the time of arrival" each place it appears.

<< 8 USCA § 1201 >>

(G) Section 221(f) (8 U.S.C. 1201) is amended by striking "exclude" and inserting "deny admission to".

<< 8 USCA § 1222 >>

(H) Section 232(a) (8 U.S.C. 1222(a)), as redesignated by subsection (b)(2), is amended by striking "excluded by" and "the excluded classes" and inserting "inadmissible under" and "inadmissible classes", respectively.

<< 8 USCA § 1322 >>

(I)(i) Section 272 (8 U.S.C. 1322) is amended—
 (I) by striking "EXCLUSION" in the heading and inserting "DENIAL OF ADMISSION",
 (II) in subsection (a), by striking "excluding condition" and inserting "condition causing inadmissibility", and
 (III) in subsection (c), by striking "excluding".
 (ii) The item in the table of contents relating to such section is amended by striking "exclusion" and inserting "denial of admission".

<< 8 USCA § 1326 >>

(J) Section 276(a) (8 U.S.C. 1326(a)) is amended—
 (i) in paragraph (1), as amended by section 324(a) of this division—
  (I) by striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed", and
  (II) by striking "exclusion or deportation" and inserting "exclusion, deportation, or removal"; and
 (ii) in paragraph (2)(B), by striking "excluded and deported" and inserting "denied admission and removed".

<< 8 USCA § 1356 >>

(K) Section 286(h)(2)(A)(vi) (8 U.S.C. 1356(h)(2)(A)(vi)) is amended by striking "exclusion" each place it appears and inserting "removal".

<< 8 USCA § 1357 >>

(L) Section 287 (8 U.S.C. 1357) is amended—
 (i) in subsection (a), by striking "or expulsion" each place it appears and inserting "expulsion, or removal", and
 (ii) in subsection (c), by striking "exclusion from" and inserting "denial of admission to".

<< 8 USCA § 1360 >>

(M) Section 290(a) (8 U.S.C. 1360(a)) is amended by striking "admitted to the United States, or excluded therefrom" each place it appears and inserting "admitted or denied admission to the United States".

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1361 >>

(N) Section 291 (8 U.S.C. 1361) is amended by striking "subject to exclusion" and inserting "inadmissible" each place it appears.

<< 8 USCA § 1362 >>

(O) Section 292 (8 U.S.C. 1362) is amended by striking "exclusion or deportation" each place it appears and inserting "removal".

<< 8 USCA § 1503 >>

(P) Section 360 (8 U.S.C. 1503) is amended—
  (i) in subsection (a), by striking "exclusion" each place it appears and inserting "removal", and
  (ii) in subsection (c), by striking "excluded from" and inserting "denied".

<< 8 USCA § 1537 >>

(Q) Section 507(b)(2)(D) (8 U.S.C. 1537(b)(2)(D)) is amended by striking "exclusion because such alien is excludable" and inserting "removal because such alien is inadmissible".

<< 8 USCA § 1255a NOTE >>

(R) Section 301(a)(1) of the Immigration Act of 1990 is amended by striking "exclusion" and inserting "inadmissibility".

<< 8 USCA § 1522 NOTE >>

(S) Section 401(c) of the Refugee Act of 1980 is amended by striking "deportation or exclusion" and inserting "removal".

<< 8 USCA § 1522 NOTE >>

(T) Section 501(e)(2) of the Refugee Education Assistance Act of 1980 (Public Law 96–422) is amended—
  (i) by striking "exclusion or deportation" each place it appears and inserting "removal", and
  (ii) by striking "deportation or exclusion" each place it appears and inserting "removal".

<< 18 USCA § 4113 >>

(U) Section 4113(c) of title 18, United States Code, is amended by striking "exclusion and deportation" and inserting "removal".

<< 8 USCA §§ 1225, 1227 >>

<< 8 USCA § 1225 NOTE >>

(5) REPEAL OF SUPERSEDED PROVISION.—Effective as of the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, section 422 of such Act is repealed and the Immigration and Nationality Act shall be applied as if such section had not been enacted.
(e) REVISION OF TERMINOLOGY RELATING TO DEPORTATION.—
  (1) Each of the following is amended by striking "deportation" each place it appears and inserting "removal":

<< 8 USCA § 1154 >>

(A) Subparagraphs (A)(iii)(II), (A)(iv)(II), and (B)(iii)(II) of section 204(a)(1) (8 U.S.C. 1154(a)(1)).

<< 8 USCA § 1182 >>

(B) Section 212(d)(1) (8 U.S.C. 1182(d)(1)).
(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)).

<< 8 USCA § 1184 >>

(D) Section 214(k)(4)(C) (8 U.S.C. 1184(k)(4)(C)), as redesignated by section 671(a)(3)(A) of this division.

<< 8 USCA § 1251 >>

(E) Section 241(a)(1)(H) (8 U.S.C. 1251(a)(1)(H)), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1252a >>

(F) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(5).

<< 8 USCA § 1254a >>

(G) Subsections (a)(3) and (b)(5)(B) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by subsection (b)(7).

<< 8 USCA § 1256 >>

(H) Section 246(a) (8 U.S.C. 1256(a)).

<< 8 USCA § 1284 >>

(I) Section 254 (8 U.S.C. 1284).

<< 8 USCA § 1303 >>

(J) Section 263(a)(4) (8 U.S.C. 1303(a)(4)).

<< 8 USCA § 1326 >>

(K) Section 276(b) (8 U.S.C. 1326(b)).

<< 8 USCA § 1356 >>

(L) Section 286(h)(2)(A)(v) (8 U.S.C. 1356(h)(2)(A)(v)).

<< 8 USCA § 1357 >>

(M) Section 287(g) (8 U.S.C. 1357(g)) (as added by section 122 of this division).

<< 8 USCA § 1361 >>

(N) Section 291 (8 U.S.C. 1361).

<< 8 USCA § 1429 >>

(O) Section 318 (8 U.S.C. 1429).

<< 8 USCA § 1158 >>

<< 8 USCA § 1158 NOTE >>

(P) Section 130005(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322).

<< 18 USCA § 4113 >>

(Q) Section 4113(b) of title 18, United States Code.

(2) Each of the following is amended by striking "deported" each place it appears and inserting "removed":

<< 8 USCA § 1182 >>

(A) Section 212(d)(7) (8 U.S.C. 1182(d)(7)).

<< 8 USCA § 1184 >>

(B) Section 214(d) (8 U.S.C. 1184(d)).

<< 8 USCA § 1251 >>

(C) Section 241(a) (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1252a >>

(D) Section 242A(c)(2)(D)(iv) (8 U.S.C. 1252a(c)(2)(D)(iv)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5).

<< 8 USCA § 1282 >>

(E) Section 252(b) (8 U.S.C. 1282(b)).

<< 8 USCA § 1284 >>

(F) Section 254 (8 U.S.C. 1284).

<< 8 USCA § 1306 >>

(G) Subsections (b) and (c) of section 266 (8 U.S.C. 1306).

<< 8 USCA § 1255a NOTE >>

(H) Section 301(a)(1) of the Immigration Act of 1990.

<< 18 USCA § 4113 >>

(I) Section 4113 of title 18, United States Code.

<< 8 USCA § 1101 >>

(3) Section 101(g) (8 U.S.C. 1101(g)) is amended by inserting "or removed" after "deported" each place it appears.

<< 8 USCA § 1103 >>

(4) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "suspension of deportation" and inserting "cancellation of removal".

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1151 >>

(5) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) is amended by striking "deportation is suspended" and inserting "removal is canceled".

<< 8 USCA § 1182 >>

(6) Section 212(l)(2)(B) (8 U.S.C. 1182(l)(2)(B)) is amended by striking "deportation against" and inserting "removal of".

<< 8 USCA § 1186a >>

(7) Subsections (b)(2), (c)(2)(B), (c)(3)(D), (c)(4)(A), and (d)(2)(C) of section 216 (8 U.S.C. 1186a) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" each place each appears and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

<< 8 USCA § 1186b >>

(8) Subsections (b)(2), (c)(2)(B), (c)(3)(D), and (d)(2)(C) of section 216A (8 U.S.C. 1186b) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

<< 8 USCA § 1187 >>

(9) Section 217(b)(2) (8 U.S.C. 1187(b)(2)) is amended by striking "deportation against" and inserting "removal of".

<< 8 USCA § 1252a >>

(10) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(6), is amended, in the headings to various subdivisions, by striking "DEPORTATION" and "DEPORTATION" and inserting "REMOVAL" and "REMOVAL", respectively.

(11) Section 244A(a)(1)(A) (8 U.S.C. 1254a(a)(1)(A)), before redesignation as section 244 by subsection (b)(8), is amended—

<< 8 USCA § 1254a >>

(A) in subsection (a)(1)(A), by striking "deport" and inserting "remove", and

(B) in subsection (e), by striking "SUSPENSION OF DEPORTATION" and inserting "CANCELLATION OF REMOVAL".

<< 8 USCA § 1284 >>

(12) Section 254 (8 U.S.C. 1284) is amended by striking "deport" each place it appears and inserting "remove".

<< 8 USCA § 1323 >>

(13) Section 273(d) (8 U.S.C. 1323(d)) is repealed.

<< 8 USCA § 1326 >>

(14)(A) Section 276 (8 U.S.C. 1326) is amended by striking "DEPORTED" and inserting "REMOVED".

(B) The item in the table of contents relating to such section is amended by striking "deported" and inserting "removed".

<< 8 USCA § 1429 >>

(15) Section 318 (8 U.S.C. 1429) is amended by striking "suspending" and inserting "canceling".

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1255a NOTE >>

(16) Section 301(a) of the Immigration Act of 1990 is amended by striking "DEPORTATION" and inserting "REMOVAL".

<< 8 USCA § 1158 NOTE >>

(17) The heading of section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended by striking "DEPORTATION" and inserting "REMOVAL".

<< 22 USCA § 2508 >>

(18) Section 9 of the Peace Corps Act (22 U.S.C. 2508) is amended by striking "deported" and all that follows through "Deportation" and inserting "removed pursuant to chapter 4 of title II of the Immigration and Nationality Act".

<< 22 USCA § 618 >>

(19) Section 8(c) of the Foreign Agents Registration Act (22 U.S.C. 618(c)) is amended by striking "deportation" and all that follows and inserting "removal pursuant to chapter 4 of title II of the Immigration and Nationality Act".

(f) REVISION OF REFERENCES TO ENTRY.—

(1) The following provisions are amended by striking "entry" and inserting "admission" each place it appears:

<< 8 USCA § 1101 >>

(A) Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)).
(B) Section 101(a)(30) (8 U.S.C. 1101(a)(30)).

<< 8 USCA § 1182 >>

(C) Section 212(a)(2)(D) (8 U.S.C. 1182(a)(2)(D)).
(D) Section 212(a)(6)(C)(i) (8 U.S.C. 1182(a)(6)(C)(i)).
(E) Section 212(h)(1)(A)(i) (8 U.S.C. 1182(h)(1)(A)(i)).
(F) Section 212(j)(1)(D) (8 U.S.C. 1182(j)(1)(D)).

<< 8 USCA § 1184 >>

(G) Section 214(c)(2)(A) (8 U.S.C. 1184(c)(2)(A)).
(H) Section 214(d) (8 U.S.C. 1184(d)).

<< 8 USCA § 1186a >>

(I) Section 216(b)(1)(A)(i) (8 U.S.C. 1186a(b)(1)(A)(i)).
(J) Section 216(d)(1)(A)(i)(III) (8 U.S.C. 1186a(d)(1)(A)(i)(III)).

<< 8 USCA § 1230 >>

(K) Subsection (b) of section 240 (8 U.S.C. 1230), before redesignation as section 240C by section 304(a)(2) of this division.

<< 8 USCA § 1251 >>

(L) Subsection (a)(1)(G) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division.

(M) Subsection (a)(1)(H) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, other than the last time it appears.

(N) Paragraphs (2) and (4) of subsection (a) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division.

<< 8 USCA § 1255 >>

(O) Section 245(e)(3) (8 U.S.C. 1255(e)(3)).

<< 8 USCA § 1257 >>

(P) Section 247(a) (8 U.S.C. 1257(a)).

<< 8 USCA § 1182 NOTE >>

(Q) Section 601(c)(2) of the Immigration Act of 1990.

(2) The following provisions are amended by striking "enter" and inserting "be admitted":

<< 8 USCA § 1154 >>

(A) Section 204(e) (8 U.S.C. 1154(e)).

<< 8 USCA § 1201 >>

(B) Section 221(h) (8 U.S.C. 1201(h)).

<< 8 USCA § 1255 >>

(C) Section 245(e)(2) (8 U.S.C. 1255(e)(2)).

(3) The following provisions are amended by striking "enters" and inserting "is admitted to":

<< 8 USCA § 1182 >>

(A) Section 212(j)(1)(D)(ii) (8 U.S.C. 1154(e)).

<< 8 USCA § 1184 >>

(B) Section 214(c)(5)(B) (8 U.S.C. 1184(c)(5)(B)).

<< 8 USCA § 1228 >>

(4) Subsection (a) of section 238 (8 U.S.C. 1228), before redesignation as section 233 by section 308(b)(4) of this division, is amended by striking "entry and inspection" and inserting "inspection and admission".

<< 8 USCA § 1251 >>

(5) Subsection (a)(1)(H)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2) of this division, is amended by striking "at entry".

<< 50 USCA § 403h >>

(6) Section 7 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 403h) is amended by striking "that the entry", "given entry into", and "entering" and inserting "that the admission", "admitted to", and "admitted to".

<< 50 USCA § 47c >>

(7) Section 4 of the Atomic Weapons and Special Nuclear Materials Rewards Act (50 U.S.C. 47c) is amended by striking "entry" and inserting "admission".

(g) CONFORMING REFERENCES TO REORGANIZED SECTIONS.—

<< 8 USCA §§ 1182, 1221, 1252a, 1321, 1356, 1364, 1531 >>

<< 8 USCA §§ 1224 NOTE, 1254a NOTE, 1255a NOTE >>

<< 42 USCA § 402 >>

(1) REFERENCES TO SECTIONS 232, 234, 238, 239, 240, 241, 242A, AND 244A.—Any reference in law in effect on the day before the date of the enactment of this Act to section 232, 234, 238, 239, 240, 241, 242A, or 244A of the Immigration and Nationality Act (or a subdivision of such section) is deemed, as of the title III–A effective date, to refer to section 232(a), 232(b), 233, 234, 234A, 237, 238, or 244 of such Act (or the corresponding subdivision of such section), as redesignated by this subtitle. Any reference in law to section 241 (or a subdivision of such section) of the Immigration and Nationality Act in an amendment made by a subsequent subtitle of this title is deemed a reference (as of the title III–A effective date) to section 237 (or the corresponding subdivision of such section), as redesignated by this subtitle.

(2) REFERENCES TO SECTION 106.—

<< 8 USCA § 1252a >>

(A) Sections 242A(b)(3) and 242A(c)(3)(A)(ii) (8 U.S.C. 1252a(b)(3), 1252a(c)(3)(A)(ii), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), are each amended by striking "106" and inserting "242".

<< 8 USCA § 1160 >>

(B) Sections 210(e)(3)(A) and 245A(f)(4)(A) (8 U.S.C. 1160(e)(3)(A), 1255a(f)(4)(A)) are amended by inserting "(as in effect before October 1, 1996)" after "106".

<< 8 USCA § 1252a >>

(C) Section 242A(c)(3)(A)(iii) (8 U.S.C. 1252a(c)(3)(A)(iii)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), is amended by striking "106(a)(1)" and inserting "242(b)(1)".

(3) REFERENCES TO SECTION 236.—

<< 8 USCA §§ 1155, 1159 >>

(A) Sections 205 and 209(a)(1) (8 U.S.C. 1155, 1159(a)(1)) are each amended by striking "236" and inserting "240".

<< 18 USCA § 4113 >>

(B) Section 4113(c) of title 18, United States Code, is amended by striking "1226 of title 8, United States Code" and inserting "240 of the Immigration and Nationality Act".

(4) REFERENCES TO SECTION 237.—

<< 8 USCA § 1159 >>

(A) Section 209(a)(1) (8 U.S.C. 1159(a)(1)) is amended by striking "237" and inserting "241".

<< 8 USCA § 1182 >>

(B) Section 212(d)(7) (8 U.S.C. 1182(d)(7)) is amended by striking "237(a)" and inserting "241(c)".

<< 8 USCA § 1330 >>

(C) Section 280(a) (8 U.S.C. 1330(a)) is amended by striking "237, 239, 243" and inserting "234, 243(c)(2)".

(5) REFERENCES TO SECTION 242.—

<< 8 USCA §§ 1184, 1282, 1357 >>

(A)(i) Sections 214(d), 252(b), and 287(f)(1) (8 U.S.C. 1184(d), 1282(b), 1357(f)(1)) are each amended by striking "242" and inserting "240".

<< 8 USCA § 1252a >>

(ii) Subsection (c)(4) of section 242A (8 U.S.C. 1252a), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), are each amended by striking "242" and inserting "240".

<< 8 USCA § 1255a >>

(iii) Section 245A(a)(1)(B) (8 U.S.C. 1255a(a)(1)(B)) is amended by inserting "(as in effect before October 1, 1996)" after "242".

(iv) Section 4113 of title 18, United States Code, is amended—

<< 18 USCA § 4113 >>

(I) in subsection (a), by striking "section 1252(b) or section 1254(e) of title 8, United States Code," and inserting "section 240B of the Immigration and Nationality Act"; and

(II) in subsection (b), by striking "section 1252 of title 8, United States Code," and inserting "section 240 of the Immigration and Nationality Act".

<< 8 USCA § 1252 NOTE >>

(B) Section 130002(a) of Public Law 103–322, as amended by section 345 of this division, is amended by striking "242(a)(3)(A)" and inserting "236(d)".

<< 8 USCA § 1252a >>

(C) Section 242A(b)(1) (8 U.S.C. 1252a(b)(1)), before redesignation as section 238 by section 308(b)(5) of this division, is amended by striking "242(b)" and inserting "240".

(D) Section 242A(c)(2)(D)(ii) (8 U.S.C. 1252a(c)(2)(D)(ii)), as amended by section 671(b)(13) of this division but before redesignation as section 238 by subsection (b)(5), is amended by striking "242(b)" and inserting "240".

<< 28 USCA § 1821 >>

(E) Section 1821(e) of title 28, United States Code, is amended by striking "242(b)" and inserting "240".

<< 8 USCA § 1252 NOTE >>

(F) Section 130007(a) of Public Law 103–322 is amended by striking "242(i)" and inserting "239(d)".

(G) Section 20301(c) of Public Law 103–322 is amended by striking "242(j)(5)" and "242(j)" and inserting "241(h)(5)" and "241(h)", respectively.

(6) REFERENCES TO SECTION 242B.—

<< 8 USCA § 1254a NOTE >>

(A) Section 303(d)(2) of the Immigration Act of 1990 is amended by striking "242B" and inserting "240(b)(5)".

<< 8 USCA § 1252b NOTE >>

(B) Section 545(g)(1)(B) of the Immigration Act of 1990 is amended by striking "242B(a)(4)" and inserting "239(a)(4)".

(7) REFERENCES TO SECTION 243.—

<< 8 USCA § 1184 >>

 (A) Section 214(d) (8 U.S.C. 1184(d)) is amended by striking "243" and inserting "241".

<< 8 USCA § 1534 >>

 (B) Section 504(k)(2) (8 U.S.C. 1534(k)(2)) is amended by striking "withholding of deportation under section 243(h)" and inserting "by withholding of removal under section 241(b)(3)".

<< 8 USCA § 1253 NOTE >>

 (C)(i) Section 315(c) of the Immigration Reform and Control Act of 1986 is amended by striking "243(g)" and "1253(g)" and inserting "243(d)" and "1253(d)" respectively.

<< 8 USCA § 1201 NOTE >>

 (ii) Section 702(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1988 is amended by striking "243(g)" and inserting "243(d)".
 (iii) Section 903(b) of Public Law 100–204 is amended by striking "243(g)" and inserting "243(d)".

<< 7 USCA § 2015 >>

 (D)(i) Section 6(f)(2)(F) of the Food Stamp Act of 1977 (7 U.S.C. 2015(f)(2)(F)) is amended by striking "243(h)" and inserting "241(b)(3)".

<< 42 USCA § 1436a >>

 (ii) Section 214(a)(5) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(a)(5)) is amended by striking "243(h)" and inserting "241(b)(3)".

<< 8 USCA § 1254a >>

 (E)(i) Subsection (c)(2)(B)(ii) of section 244A (8 U.S.C. 1254a), before redesignated as section 244 by section 308(b)(7), is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

<< 8 USCA § 1255a NOTE >>

 (ii) Section 301(e)(2) of the Immigration Act of 1990 is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

<< 8 USCA § 1427 >>

 (F) Section 316(f) (8 U.S.C. 1427(f)) is amended by striking "subparagraphs (A) through (D) of paragraph 243(h)(2)" and inserting "clauses (i) through (v) of section 208(b)(2)(A)".
(8) REFERENCES TO SECTION 244.—

<< 8 USCA § 1151 >>

 (A)(i) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) and subsection (e) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by section 308(b)(7) of this division, are each amended by striking "244(a)" and inserting "240A(a)".

<< 8 USCA § 1254a NOTE >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(ii) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(a)" and inserting "240A(a)".

<< 8 USCA § 1534 >>

(B) Section 504(k)(3) (8 U.S.C. 1534(k)(3)) is amended by striking "suspension of deportation under subsection (a) or (e) of section 244" and inserting "cancellation of removal under section 240A".

<< 8 USCA § 1254a NOTE >>

(C) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(b)(2)" and inserting "240A(b)(2)".

<< 8 USCA § 1367 >>

(D) Section 364(a)(2) of this division is amended by striking "244(a)(3)" and inserting "240A(a)(3)".

<< 8 USCA § 1641 >>

(E) Section 431(c)(1)(B)(iii) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as added by section 501 of this division, is amended by striking "suspension of deportation and adjustment of status pursuant to section 244(a)(3) of such Act" and inserting "cancellation of removal under section 240A of such Act".
(9) REFERENCES TO CHAPTER 5.—

<< 8 USCA § 1206 >>

(A) Sections 266(b), 266(c), and 291 (8 U.S.C. 1306(b), 1306(c), 1361) are each amended by striking "chapter 5" and inserting "chapter 4".

<< 50 USCA § 855 >>

(B) Section 6(b) of the Act of August 1, 1956 (50 U.S.C. 855(b)) is amended by striking "chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)" and inserting "chapter 4 of title II of the Immigration and Nationality Act".
(10) MISCELLANEOUS CROSS–REFERENCE CORRECTIONS FOR NEWLY ADDED PROVISIONS.—

<< 8 USCA § 1182 >>

(A) Section 212(h), as amended by section 301(h) of this division, is amended by striking "section 212(c)" and inserting "paragraphs (1) and (2) of section 240A(a)".

<< 8 USCA § 1255 >>

(B) Section 245(c)(6), as amended by section 332(d) of this division, is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

<< 8 USCA § 1259 >>

(C) Section 249(d), as amended by section 332(e) of this division, is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

<< 8 USCA § 1324c >>

(D) Section 274C(d)(7), as added by section 212(d) of this division, is amended by striking "withholding of deportation under section 243(h)" and inserting "withholding of removal under section 241(b)(3)".

<< 18 USCA § 3563 >>

(E) Section 3563(b)(21) of title 18, United States Code, as inserted by section 374(b) of this division, is amended by striking "242A(d)(5)" and inserting "238(d)(5)".

<< 8 USCA § 1252 NOTE >>

(F) Section 130007(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 671(a)(6) of this division, is amended by striking "242A(a)(3)" and inserting "238(a)(3)".

<< 8 USCA § 1368 >>

(G) Section 386(b) of this division is amended by striking "excludable" and "EXCLUDABLE" and inserting "inadmissible" and "INADMISSIBLE", respectively, each place each appears.

<< 8 USCA §§ 1105a, 1182, 1252, 1252a >>

(H) Subsections (a), (c), (d), (g), and (h) of section 440 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), as amended by section 306(d) of this division, are amended by striking "241(a)(2)(A)(ii)" and "241(a)(2)(A)(i)" and inserting "237(a)(2)(A)(ii)" and "237(a)(2)(A)(i)", respectively.

<< 8 USCA § 1101 NOTE >>

SEC. 309. EFFECTIVE DATES; TRANSITION.

(a) IN GENERAL.—Except as provided in this section and sections 303(b)(2), 306(c), 308(d)(2)(D), or 308(d)(5) of this division, this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act (in this title referred to as the "title III–A effective date").

(b) PROMULGATION OF REGULATIONS.—The Attorney General shall first promulgate regulations to carry out this subtitle by not later than 30 days before the title III–A effective date.

(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

(2) ATTORNEY GENERAL OPTION TO ELECT TO APPLY NEW PROCEDURES.—In a case described in paragraph (1) in which an evidentiary hearing under section 236 or 242 and 242B of the Immigration and Nationality Act has not commenced as of the title III–A effective date, the Attorney General may elect to proceed under chapter 4 of title II of such Act (as amended by this subtitle). The Attorney General shall provide notice of such election to the alien involved not later than 30 days before the date any evidentiary hearing is commenced. If the Attorney General makes such election, the notice of hearing provided to the alien under section 235 or 242(a) of such Act shall be valid as if provided under section 239 of such Act (as amended by this subtitle) to confer jurisdiction on the immigration judge.

(3) ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1), the Attorney General may elect to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings under chapter 4 of title II the Immigration and Nationality Act (as amended by this subtitle). Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding.

(4) TRANSITIONAL CHANGES IN JUDICIAL REVIEW.—In the case described in paragraph (1) in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act, notwithstanding any provision of section 106 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act) to the contrary—

(A) in the case of judicial review of a final order of exclusion, subsection (b) of such section shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of such in the same manner as they apply to judicial review of orders of deportation;

(B) a court may not order the taking of additional evidence under section 2347(c) of title 28, United States Code;

(C) the petition for judicial review must be filed not later than 30 days after the date of the final order of exclusion or deportation;

(D) the petition for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed;

(E) there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(i), 244, or 245 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act);

(F) service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise; and

(G) there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2) or section 241(a)(2)(A)(iii), (B), (C), or (D) of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act), or any offense covered by section 241(a)(2)(A)(ii) of such Act (as in effect on such date) for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 241(a)(2)(A)(i) of such Act (as so in effect).

(5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

(6) TRANSITION FOR CERTAIN FAMILY UNITY ALIENS.—The Attorney General may waive the application of section 212(a)(9) of the Immigration and Nationality Act, as inserted by section 301(b)(1) of this division, in the case of an alien who is provided benefits under the provisions of section 301 of the Immigration Act of 1990 (relating to family unity).

(7) LIMITATION ON SUSPENSION OF DEPORTATION.—The Attorney General may not suspend the deportation and adjust the status under section 244 of the Immigration and Nationality Act of more than 4,000 aliens in any fiscal year (beginning after the date of the enactment of this Act). The previous sentence shall apply regardless of when an alien applied for such suspension and adjustment.

(d) TRANSITIONAL REFERENCES.—For purposes of carrying out the Immigration and Nationality Act, as amended by this subtitle—

(1) any reference in section 212(a)(1)(A) of such Act to the term "inadmissible" is deemed to include a reference to the term "excludable", and

(2) any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation.

(e) TRANSITION.—No period of time before the date of the enactment of this Act shall be included in the period of 1 year described in section 212(a)(6)(B)(i) of the Immigration and Nationality Act (as amended by section 301(c) of this division).

Subtitle B—Criminal Alien Provisions

SEC. 321. AMENDED DEFINITION OF AGGRAVATED FELONY.

<< 8 USCA § 1101 >>

(a) IN GENERAL.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 441(e) of the Antiterrorism and Effective Death Penalty Act of 1996 (P.L. 104–132), is amended—

(1) in subparagraph (A), by inserting ", rape, or sexual abuse of a minor" after "murder";

(2) in subparagraph (D), by striking "$100,000" and inserting "$10,000";

(3) in subparagraphs (F), (G), (N), and (P), by striking "is at least 5 years" each place it appears and inserting "at least one year";

(4) in subparagraph (J), by striking "sentence of 5 years' imprisonment" and inserting "sentence of one year imprisonment";

(5) in subparagraph (K)(ii), by inserting "if committed" before "for commercial advantage";

AR.03592

(6) in subparagraph (L)—

(A) by striking "or" at the end of clause (i),

(B) by inserting "or" at the end of clause (ii), and

(C) by adding at the end the following new clause:

"(iii) section 601 of the National Security Act of 1947 (relating to protecting the identity of undercover agents);";

(7) in subparagraph (M), by striking "$200,000" each place it appears and inserting "$10,000";

(8) in subparagraph (N), by striking "for which the term" and all that follows and inserting the following: ", except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act";

(9) in subparagraph (P), by striking "18 months" and inserting "12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this Act";

(10) in subparagraph (R), by striking "for which a sentence of 5 years' imprisonment or more may be imposed" and inserting "for which the term of imprisonment is at least one year"; and

(11) in subparagraph (S), by striking "for which a sentence of 5 years' imprisonment or more may be imposed" and inserting "for which the term of imprisonment is at least one year".

(b) EFFECTIVE DATE OF DEFINITION.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended by adding at the end the following new sentence: "Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph.".

<< 8 USCA § 1101 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred, and shall apply under section 276(b) of the Immigration and Nationality Act only to violations of section 276(a) of such Act occurring on or after such date.

SEC. 322. DEFINITION OF CONVICTION AND TERM OF IMPRISONMENT.

(a) DEFINITION.—

<< 8 USCA § 1101 >>

(1) IN GENERAL.—Section 101(a) (8 U.S.C. 1101(a)) is amended by adding at the end the following new paragraph:

"(48)(A) The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

"(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

"(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

"(B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.".

(2) CONFORMING AMENDMENTS.—

<< 8 USCA § 1101 >>

(A) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended by striking "imposed (regardless of any suspension of imprisonment)" each place it appears in subparagraphs (F), (G), (N), and (P).

<< 8 USCA § 1182 >>

(B) Section 212(a)(2)(B) (8 U.S.C. 1182(a)(2)(B)) is amended by striking "actually imposed".

(b) REFERENCE TO PROOF PROVISIONS.—For provisions relating to proof of convictions, see subparagraphs (B) and (C) of section 240(c)(3) of the Immigration and Nationality Act, as inserted by section 304(a)(3) of this division.

<< 8 USCA § 1101 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to convictions and sentences entered before, on, or after the date of the enactment of this Act. Subparagraphs (B) and (C) of section 240(c)(3) of the Immigration and Nationality Act, as inserted by section 304(a)(3) of this division, shall apply to proving such convictions.

<< 8 USCA § 1303 >>

SEC. 323. AUTHORIZING REGISTRATION OF ALIENS ON CRIMINAL PROBATION OR CRIMINAL PAROLE.

Section 263(a) (8 U.S.C. 1303(a)) is amended by striking "and (5)" and inserting "(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)".

SEC. 324. PENALTY FOR REENTRY OF DEPORTED ALIENS.

<< 8 USCA § 1326 >>

(a) IN GENERAL.—Section 276(a)(1) (8 U.S.C. 1326(a)(1)) is amended to read as follows:
"(1) has been arrested and deported, has been excluded and deported, or has departed the United States while an order of exclusion or deportation is outstanding, and thereafter".
(b) TREATMENT OF STIPULATIONS.—The last sentence of section 276(b) (8 U.S.C. 1326(b)) is amended by inserting "(or not during)" after "during".

<< 8 USCA § 1326 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to departures that occurred before, on, or after the date of the enactment of this Act, but only with respect to entries (and attempted entries) occurring on or after such date.

<< 18 USCA § 2424 >>

SEC. 325. CHANGE IN FILING REQUIREMENT.

Section 2424 of title 18, United States Code, is amended—
(1) in the first undesignated paragraph of subsection (a)—
  (A) by striking "alien" each place it appears;
  (B) by inserting after "individual" the first place it appears the following: ", knowing or in reckless disregard of the fact that the individual is an alien"; and
  (C) by striking "within three years after that individual has entered the United States from any country, party to the arrangement adopted July 25, 1902, for the suppression of the white-slave traffic";
(2) in the second undesignated paragraph of subsection (a)—
  (A) by striking "thirty" and inserting "five business"; and
  (B) by striking "within three years after that individual has entered the United States from any country, party to the said arrangement for the suppression of the white-slave traffic,"; and
(3) in the text following the third undesignated paragraph of subsection (a), by striking "two" and inserting "10".

<< 8 USCA § 1252 NOTE >>

SEC. 326. CRIMINAL ALIEN IDENTIFICATION SYSTEM.

Subsection (a) of section 130002 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 432 of Public Law 104–132, is amended to read as follows:

"(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.".

<< 8 USCA § 1252 NOTE >>

SEC. 327. APPROPRIATIONS FOR CRIMINAL ALIEN TRACKING CENTER.

Section 130002(b) of the Violent Crime Control and Law Enforcement Act of 1994 (8 U.S.C. 1252 note) is amended—
(1) by inserting "and" after "1996;", and
(2) by striking paragraph (2) and all that follows through the period at the end and inserting the following:
"(2) $5,000,000 for each of fiscal years 1997 through 2001.".

SEC. 328. PROVISIONS RELATING TO STATE CRIMINAL ALIEN ASSISTANCE PROGRAM.

(a) MODIFICATION OF AUTHORITY.—

<< 8 USCA § 1231 >>

(1) IN GENERAL.—Section 241(i), as redesignated by section 306(a)(1) of this division, is amended—
(A) in paragraph (3)(A), by striking "felony and sentenced to a term of imprisonment" and inserting "felony or two or more misdemeanors", and
(B) by adding at the end the following new paragraph:
"(6) To the extent of available appropriations, funds otherwise made available under this section with respect to a State (or political subdivision, including a municipality) for incarceration of an undocumented criminal alien may, at the discretion of the recipient of the funds, be used for the costs of imprisonment of such alien in a State, local, or municipal prison or jail.".

<< 8 USCA § 1231 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply beginning with fiscal year 1997.
(b) SENSE OF THE CONGRESS WITH RESPECT TO PROGRAM.—
(1) FINDINGS.—The Congress finds as follows:
(A) Of the $130,000,000 appropriated in fiscal year 1995 for the State Criminal Alien Assistance Program, the Department of Justice disbursed the first $43,000,000 to States on October 6, 1994, 32 days before the 1994 general election, and then failed to disburse the remaining $87,000,000 until January 31, 1996, 123 days after the end of fiscal year 1995.
(B) While H.R. 2880, the continuing appropriation measure funding certain operations of the Federal Government from January 26, 1996 to March 15, 1996, included $66,000,000 to reimburse States for the cost of incarcerating documented illegal immigrant felons, the Department of Justice failed to disburse any of the funds to the States during the period of the continuing appropriation.
(2) SENSE OF THE CONGRESS.—It is the sense of the Congress that—
(A) the Department of Justice was disturbingly slow in disbursing fiscal year 1995 funds under the State Criminal Alien Assistance Program to States after the initial grants were released just prior to the 1994 election; and
(B) the Attorney General should make it a high priority to expedite the disbursement of Federal funds intended to reimburse States for the cost of incarcerating illegal immigrants, aiming for all State Criminal Alien Assistance Program funds to be disbursed during the fiscal year for which they are appropriated.

SEC. 329. DEMONSTRATION PROJECT FOR IDENTIFICATION OF ILLEGAL ALIENS IN INCARCERATION FACILITY OF ANAHEIM, CALIFORNIA.

(a) AUTHORITY.—The Attorney General shall conduct a project demonstrating the feasibility of identifying, from among the individuals who are incarcerated in local governmental prison facilities prior to arraignment on criminal charges, those individuals who are aliens unlawfully present in the United States.

(b) DESCRIPTION OF PROJECT.—The project authorized by subsection (a) shall include—

(1) the detail to incarceration facilities within the city of Anaheim, California and the county of Ventura, California, of an employee of the Immigration and Naturalization Service who has expertise in the identification of aliens unlawfully in the United States, and

(2) provision of funds sufficient to provide for—

(A) access for such employee to records of the Service necessary to identify such aliens, and

(B) in the case of an individual identified as such an alien, pre-arraignment reporting to the court regarding the Service's intention to remove the alien from the United States.

(c) TERMINATION.—The authority under this section shall cease to be effective 6 months after the date of the enactment of this Act.

<< 18 USCA § 4100 NOTE >>

SEC. 330. PRISONER TRANSFER TREATIES.

(a) NEGOTIATIONS WITH OTHER COUNTRIES.—(1) Congress advises the President to begin to negotiate and renegotiate, not later than 90 days after the date of enactment of this Act, bilateral prisoner transfer treaties, providing for the incarceration, in the country of the alien's nationality, of any alien who—

(A) is a national of a country that is party to such a treaty; and

(B) has been convicted of a criminal offense under Federal or State law and who—

(i) is not in lawful immigration status in the United States, or

(ii) on the basis of conviction for a criminal offense under Federal or State law, or on any other basis, is subject to deportation or removal under the Immigration and Nationality Act,

for the duration of the prison term to which the alien was sentenced for the offense referred to in subparagraph (B). Any such agreement may provide for the release of such alien pursuant to parole procedures of that country.

(2) In entering into negotiations under paragraph (1), the President may consider providing for appropriate compensation, subject to the availability of appropriations, in cases where the United States is able to independently verify the adequacy of the sites where aliens will be imprisoned and the length of time the alien is actually incarcerated in the foreign country under such a treaty.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

(1) the focus of negotiations for such agreements should be—

(A) to expedite the transfer of aliens unlawfully in the United States who are (or are about to be) incarcerated in United States prisons,

(B) to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States courts,

(C) to eliminate any requirement of prisoner consent to such a transfer, and

(D) to allow the Federal Government or the States to keep their original prison sentences in force so that transferred prisoners who return to the United States prior to the completion of their original United States sentences can be returned to custody for the balance of their prison sentences;

(2) the Secretary of State should give priority to concluding an agreement with any country for which the President determines that the number of aliens described in subsection (a) who are nationals of that country in the United States represents a significant percentage of all such aliens in the United States; and

(3) no new treaty providing for the transfer of aliens from Federal, State, or local incarceration facilities to a foreign incarceration facility should permit the alien to refuse the transfer.

(c) PRISONER CONSENT.—Notwithstanding any other provision of law, except as required by treaty, the transfer of an alien from a Federal, State, or local incarceration facility under an agreement of the type referred to in subsection (a) shall not require consent of the alien.

(d) ANNUAL REPORT.—Not later than 90 days after the date of the enactment of this Act, and annually thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate stating whether each prisoner transfer treaty to which the United States is a party has been effective in the preceding 12 months in bringing about the return of deportable incarcerated aliens to the country of which they are nationals and in ensuring that they serve the balance of their sentences.

(e) TRAINING FOREIGN LAW ENFORCEMENT PERSONNEL.—(1) Subject to paragraph (2), the President shall direct the Border Patrol Academy and the Customs Service Academy to enroll for training an appropriate number of foreign law enforcement personnel, and shall make appointments of foreign law enforcement personnel to such academies, as necessary to further the following United States law enforcement goals:

  (A) Preventing of drug smuggling and other cross-border criminal activity.

  (B) Preventing illegal immigration.

  (C) Preventing the illegal entry of goods into the United States (including goods the sale of which is illegal in the United States, the entry of which would cause a quota to be exceeded, or the appropriate duty or tariff for which has not been paid).

  (2) The appointments described in paragraph (1) shall be made only to the extent there is capacity in such academies beyond what is required to train United States citizens needed in the Border Patrol and Customs Service, and only of personnel from a country with which the prisoner transfer treaty has been stated to be effective in the most recent report referred to in subsection (d).

(f) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.

## SEC. 331. PRISONER TRANSFER TREATIES STUDY.

(a) REPORT TO CONGRESS.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State and the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report that describes the use and effectiveness of the prisoner transfer treaties with the three countries with the greatest number of their nationals incarcerated in the United States in removing from the United States such incarcerated nationals.

(b) USE OF TREATY.—The report under subsection (a) shall include—

  (1) the number of aliens convicted of a criminal offense in the United States since November 30, 1977, who would have been or are eligible for transfer pursuant to the treaties;

  (2) the number of aliens described in paragraph (1) who have been transferred pursuant to the treaties;

  (3) the number of aliens described in paragraph (2) who have been incarcerated in full compliance with the treaties;

  (4) the number of aliens who are incarcerated in a penal institution in the United States who are eligible for transfer pursuant to the treaties; and

  (5) the number of aliens described in paragraph (4) who are incarcerated in Federal, State, and local penal institutions in the United States.

(c) RECOMMENDATIONS.—The report under subsection (a) shall include the recommendations of the Secretary of State and the Attorney General to increase the effectiveness and use of, and full compliance with, the treaties. In considering the recommendations under this subsection, the Secretary and the Attorney General shall consult with such State and local officials in areas disproportionately impacted by aliens convicted of criminal offenses as the Secretary and the Attorney General consider appropriate. Such recommendations shall address—

  (1) changes in Federal laws, regulations, and policies affecting the identification, prosecution, and deportation of aliens who have committed criminal offenses in the United States;

  (2) changes in State and local laws, regulations, and policies affecting the identification, prosecution, and deportation of aliens who have committed a criminal offense in the United States;

  (3) changes in the treaties that may be necessary to increase the number of aliens convicted of criminal offenses who may be transferred pursuant to the treaties;

(4) methods for preventing the unlawful reentry into the United States of aliens who have been convicted of criminal offenses in the United States and transferred pursuant to the treaties;

(5) any recommendations by appropriate officials of the appropriate government agencies of such countries regarding programs to achieve the goals of, and ensure full compliance with, the treaties;

(6) whether the recommendations under this subsection require the renegotiation of the treaties; and

(7) the additional funds required to implement each recommendation under this subsection.

<< 8 USCA § 1366 >>

SEC. 332. ANNUAL REPORT ON CRIMINAL ALIENS.

Not later than 12 months after the date of the enactment of this Act, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—

(1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;

(2) the number of illegal aliens convicted of felonies in any Federal or State court, but not sentenced to incarceration, in the year before the report was submitted, stating the number convicted for each type of offense;

(3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal; and

(4) methods for identifying and preventing the unlawful reentry of aliens who have been convicted of criminal offenses in the United States and removed from the United States.

<< 28 USCA § 994 NOTE >>

SEC. 333. PENALTIES FOR CONSPIRING WITH OR ASSISTING AN ALIEN TO COMMIT AN OFFENSE UNDER THE CONTROLLED SUBSTANCES IMPORT AND EXPORT ACT.

(a) REVIEW OF GUIDELINES.—Not later than 6 months after the date of the enactment of this Act, the United States Sentencing Commission shall conduct a review of the guidelines applicable to an offender who conspires with, or aids or abets, a person who is not a citizen or national of the United States in committing any offense under section 1010 of the Controlled Substance Import and Export Act (21 U.S.C. 960).

(b) REVISION OF GUIDELINES.—Following such review, pursuant to section 994(p) of title 28, United States Code, the Commission shall promulgate sentencing guidelines or amend existing sentencing guidelines to ensure an appropriately stringent sentence for such offenders.

<< 28 USCA § 994 NOTE >>

SEC. 334. ENHANCED PENALTIES FOR FAILURE TO DEPART, ILLEGAL REENTRY, AND PASSPORT AND VISA FRAUD.

(a) FAILING TO DEPART.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under section 242(e) and 276(b) of the Immigration and Nationality Act (8 U.S.C. 1252(e) and 1326(b)) to reflect the amendments made by section 130001 of the Violent Crime Control and Law Enforcement Act of 1994.

(b) PASSPORT AND VISA OFFENSES.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under chapter 75 of title 18, United States Code to reflect the amendments made by section 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

Subtitle C—Revision of Grounds for Exclusion and Deportation

SEC. 341. PROOF OF VACCINATION REQUIREMENT FOR IMMIGRANTS.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(1)(A) (8 U.S.C. 1182(a)(1)(A)) is amended—

(1) by redesignating clauses (ii) and (iii) as clauses (iii) and (iv), respectively, and

(2) by inserting after clause (i) the following new clause:

"(ii) who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,".

(b) WAIVER.—Section 212(g) (8 U.S.C. 1182(g)) is amended by striking ", or" at the end of paragraph (1) and all that follows and inserting a semicolon and the following:

"in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

"(2) subsection (a)(1)(A)(ii) in the case of any alien—

"(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

"(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

"(C) under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

"(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to applications for immigrant visas or for adjustment of status filed after September 30, 1996.

SEC. 342. INCITEMENT OF TERRORIST ACTIVITY AND PROVISION OF FALSE DOCUMENTATION TO TERRORISTS AS A BASIS FOR EXCLUSION FROM THE UNITED STATES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(3)(B) (8 U.S.C. 1182(a)(3)(B)) is amended—

(1) by redesignating subclauses (III) and (IV) of clause (i) as subclauses (IV) and (V), respectively;

(2) by inserting after subclause (II) of clause (i) the following new subclause:

"(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity,"; and

(3) in clause (iii)(III), by inserting "documentation or" before "identification";

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of the enactment of this Act and shall apply to incitement regardless of when it occurs.

<< 8 USCA § 1182 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 343. CERTIFICATION REQUIREMENTS FOR FOREIGN HEALTH–CARE WORKERS.

Section 212(a)(5) (8 U.S.C. 1182(a)(5)) is amended—

(1) by redesignating subparagraph (C) as subparagraph (D), and

(2) by inserting after subparagraph (B) the following new subparagraph:

"(C) UNCERTIFIED FOREIGN HEALTH–CARE WORKERS.—Any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is excludable unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that—

"(i) the alien's education, training, license, and experience—

"(I) meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

"(II) are comparable with that required for an American health-care worker of the same type; and

"(III) are authentic and, in the case of a license, unencumbered;

"(ii) the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

"(iii) if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.".

SEC. 344. REMOVAL OF ALIENS FALSELY CLAIMING UNITED STATES CITIZENSHIP.

<< 8 USCA § 1182 >>

(a) EXCLUSION OF ALIENS WHO HAVE FALSELY CLAIMED UNITED STATES CITIZENSHIP.—Section 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)) is amended—

(1) by redesignating clause (ii) as clause (iii), and

(2) by inserting after clause (i) the following new clause:

"(ii) FALSELY CLAIMING CITIZENSHIP.—Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this Act (including section 274A) or any other Federal or State law is excludable.".

<< 8 USCA § 1251 >>

(b) DEPORTATION OF ALIENS WHO HAVE FALSELY CLAIMED UNITED STATES CITIZENSHIP.—Section 241(a)(3) (8 U.S.C. 1251(a)(3)) is amended by adding at the end the following new subparagraph:

"(D) FALSELY CLAIMING CITIZENSHIP.—Any alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this Act (including section 274A) or any Federal or State law is deportable.".

<< 8 USCA §§ 1182 NOTE, 1251 nt >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to representations made on or after the date of the enactment of this Act.

SEC. 345. WAIVER OF EXCLUSION AND DEPORTATION GROUND FOR CERTAIN SECTION 274C VIOLATORS.

<< 8 USCA § 1182 >>

(a) EXCLUSION GROUNDS.—Section 212 (8 U.S.C. 1182) is amended—

(1) by amending subparagraph (F) of subsection (a)(6) to read as follows:

"(F) SUBJECT OF CIVIL PENALTY.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.

"(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12)."; and

(2) by adding at the end of subsection (d) the following new paragraph:

"(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)—

"(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 211(b), and

"(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),

if no previous civil money penalty was imposed against the alien under section 274C and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.".

<< 8 USCA § 1251 >>

(b) GROUND OF DEPORTATION.—Subparagraph (C) of section 241(a)(3) (8 U.S.C. 1251(a)(3)), before redesignation by section 305(a)(2) of this division, is amended to read as follows:

"(C) DOCUMENT FRAUD.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.

"(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if no previous civil money penalty was imposed against the alien under section 274C and the offense was incurred solely to assist, aid, or support the alien's spouse or child (and no other individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this clause.".

SEC. 346. INADMISSIBILITY OF CERTAIN STUDENT VISA ABUSERS.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(6) (8 U.S.C. 1182(a)(6)) is amended by adding at the end the following new subparagraph:

"(G) STUDENT VISA ABUSERS.—An alien who obtains the status of a nonimmigrant under section 101(a)(15)(F)(i) and who violates a term or condition of such status under section 214(l) is excludable until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to aliens who obtain the status of a nonimmigrant under section 101(a)(15)(F) of the Immigration and Nationality Act after the end of the 60–day period beginning on the date of the enactment of this Act, including aliens whose status as such a nonimmigrant is extended after the end of such period.

SEC. 347. REMOVAL OF ALIENS WHO HAVE UNLAWFULLY VOTED.

<< 8 USCA § 1182 >>

(a) EXCLUSION OF ALIENS WHO HAVE UNLAWFULLY VOTED.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(b) of this division, is amended by adding at the end the following new subparagraph:

"(D) UNLAWFUL VOTERS.—Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is excludable.".

<< 8 USCA § 1251 >>

(b) DEPORTATION OF ALIENS WHO HAVE UNLAWFULLY VOTED.—Section 241(a) (8 U.S.C. 1251(a)), before redesignation by section 305(a)(2) of this division, is amended by adding at the end the following new paragraph:

"(6) UNLAWFUL VOTERS.—Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is deportable.".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to voting occurring before, on, or after the date of the enactment of this Act.

SEC. 348. WAIVERS FOR IMMIGRANTS CONVICTED OF CRIMES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(h) (8 U.S.C. 1182(h)) is amended by adding at the end the following: "No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective on the date of the enactment of this Act and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date.

<< 8 USCA § 1182 >>

SEC. 349. WAIVER OF MISREPRESENTATION GROUND OF INADMISSIBILITY FOR CERTAIN ALIEN.

Subsection (i) of section 212 (8 U.S.C. 1182) is amended to read as follows:

"(i)(1) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien.

"(2) No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).".

SEC. 350. OFFENSES OF DOMESTIC VIOLENCE AND STALKING AS GROUND FOR DEPORTATION.

<< 8 USCA § 1251 >>

(a) IN GENERAL.—Section 241(a)(2) (8 U.S.C. 1251(a)(2)) is amended by adding at the end the following:

"(E) CRIMES OF DOMESTIC VIOLENCE, STALKING, OR VIOLATION OF PROTECTION ORDER, CRIMES AGAINST CHILDREN AND.—

"(i) DOMESTIC VIOLENCE, STALKING, AND CHILD ABUSE.—Any alien who at any time after entry is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term 'crime of domestic violence' means any crime of violence (as defined in section 16 of title 18, United States Code) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

"(ii) VIOLATORS OF PROTECTION ORDERS.—Any alien who at any time after entry is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term 'protection order' means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.".

<< 8 USCA § 1227 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to convictions, or violations of court orders, occurring after the date of the enactment of this Act.

SEC. 351. CLARIFICATION OF DATE AS OF WHICH RELATIONSHIP REQUIRED FOR WAIVER FROM EXCLUSION OR DEPORTATION FOR SMUGGLING.

<< 8 USCA § 1182 >>

(a) EXCLUSION.—Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by inserting "an individual who at the time of such action was" after "aided only".

<< 8 USCA § 1251 >>

(b) DEPORTATION.—Section 241(a)(1)(E)(iii) (8 U.S.C. 1251(a)(1)(E)(iii) is amended by inserting "an individual who at the time of the offense was" after "aided only".

<< 8 USCA § 1182 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications for waivers filed before, on, or after the date of the enactment of this Act, but shall not apply to such an application for which a final determination has been made as of the date of the enactment of this Act.

SEC. 352. EXCLUSION OF FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID UNITED STATES TAXATION.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(b) of this division and as amended by section 347(a) of this division, is amended by adding at the end the following:

"(E) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to individuals who renounce United States citizenship on and after the date of the enactment of this Act.

SEC. 353. REFERENCES TO CHANGES ELSEWHERE IN DIVISION.

(a) DEPORTATION FOR HIGH SPEED FLIGHT.—For provision making high speed flight from an immigration checkpoint subject to deportation, see section 108(c) of this division.

(b) INADMISSIBILITY OF ALIENS PREVIOUSLY REMOVED AND UNLAWFULLY PRESENT.—For provision making aliens previously removed and unlawfully present in the United States inadmissible, see section 301(b) of this division.

(c) INADMISSIBILITY OF ILLEGAL ENTRANTS.—For provision revising the ground of inadmissibility for illegal entrants and immigration violators, see section 301(c) of this division.

(d) DEPORTATION FOR VISA VIOLATORS.—For provision revising the ground of deportation for illegal entrants, see section 301(d) of this division.

(e) LABOR CERTIFICATIONS FOR PROFESSIONAL ATHLETES.—For provision providing for continued validity of labor certifications and classification petitions for professional athletes, see section 624 of this division.

Subtitle D—Changes in Removal of Alien Terrorist Provisions

SEC. 354. TREATMENT OF CLASSIFIED INFORMATION.

(a) LIMITATION ON PROVISION OF SUMMARIES; USE OF SPECIAL ATTORNEYS IN CHALLENGES TO CLASSIFIED INFORMATION.—

<< 8 USCA § 1534 >>

(1) NO PROVISION OF SUMMARY IN CERTAIN CASES.—Section 504(e)(3)(D) (8 U.S.C. 1534(e)(3)(D)) is amended—

(A) in clause (ii), by inserting before the period at the end the following: "unless the judge makes the findings under clause (iii)", and

(B) by adding at the end the following new clause:

"(iii) FINDINGS.—The findings described in this clause are, with respect to an alien, that—

"(I) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

"(II) the provision of the summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.".

(2) SPECIAL CHALLENGE PROCEDURES.—Section 504(e)(3) (8 U.S.C. 1534(e)(3)) is amended by adding at the end the following new subparagraphs:

"(E) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in subparagraph (D)(iii)—

"(i) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subparagraph (F) shall apply; and

"(ii) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to this paragraph.

"(F) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

"(i) IN GENERAL.—The procedures described in this subparagraph are that the judge (under rules of the removal court) shall designate a special attorney to assist the alien—

"(I) by reviewing in camera the classified information on behalf of the alien, and

"(II) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

"(ii) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under clause (i)—

"(I) shall not disclose the information to the alien or to any other attorney representing the alien, and

"(II) who discloses such information in violation of subclause (I) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.".

<< 8 USCA § 1535 >>

(3) APPEALS.—Section 505(c) (8 U.S.C. 1535(c)) is amended—

(A) in paragraph (1), by striking "The decision" and inserting "Subject to paragraph (2), the decision";

(B) in paragraph (3)(D), by inserting before the period at the end the following: ", except that in the case of a review under paragraph (2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 504(c)(3), the Court of Appeals shall review questions of fact de novo";

(C) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

(D) by inserting after paragraph (1) the following new paragraph:

"(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

"(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 504(e)(3) and with respect to which the procedures described in section 504(e)(3)(F) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

"(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 504(e)(3)(F)(i) on behalf of the alien.".

<< 8 USCA § 1532 >>

(4) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—Section 502 (8 U.S.C. 1532) is amended by adding at the end the following new subsection:

"(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The removal court shall provide for the designation of a panel of attorneys each of whom—

"(1) has a security clearance which affords the attorney access to classified information, and

"(2) has agreed to represent permanent resident aliens with respect to classified information under section 504(e)(3) in accordance with (and subject to the penalties under) this title.".

<< 8 USCA § 1531 >>

(5) DEFINITION OF SPECIAL ATTORNEY.—Section 501 (8 U.S.C. 1531) is amended—

(A) by striking "and" at the end of paragraph (5),

(B) by striking the period at the end of paragraph (6) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(7) the term 'special attorney' means an attorney who is on the panel established under section 502(e).".

<< 8 USCA § 1534 >>

(b) OTHER PROVISIONS RELATING TO CLASSIFIED INFORMATION.—

(1) INTRODUCTION OF CLASSIFIED INFORMATION.—Section 504(e) (8 U.S.C. 1534(e)) is amended—

(A) in paragraph (1)—

(i) by inserting after "(A)" the following: "the Government is authorized to use in a removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act and", and

(ii) by striking "the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.)" and inserting "such Act"; and

(B) by striking the period at the end of paragraph (3)(A) and inserting the following: "and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to this paragraph. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.".

(2) MAINTENANCE OF CONFIDENTIALITY OF CLASSIFIED INFORMATION IN ARGUMENTS.—Section 504(f) (8 U.S.C. 1534(f)) is amended by adding at the end the following: "The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.".

(3) MAINTENANCE OF CONFIDENTIALITY OF CLASSIFIED INFORMATION IN ORDERS.—Section 504(j) (8 U.S.C. 1534(j)) is amended by adding at the end the following: "Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.".

<< 8 USCA § 1182 >>

## SEC. 355. EXCLUSION OF REPRESENTATIVES OF TERRORISTS ORGANIZATIONS.

Section 212(a)(3)(B)(i)(IV) (8 U.S.C. 1182(a)(3)(B)(i)(VI)), as inserted by section 411(1)(C) of Public Law 104–132, is amended by inserting "which the alien knows or should have known is a terrorist organization" after "219,".

<< 8 USCA § 1189 >>

## SEC. 356. STANDARD FOR JUDICIAL REVIEW OF TERRORIST ORGANIZATION DESIGNATIONS.

Section 219(b)(3) (8 U.S.C. 1189(b)(3)), as added by section 302(a) of Public Law 104–132, is amended—

(1) by striking "or" at the end of subparagraph (B),

(2) by striking the period at the end of subparagraph (C) and inserting a semicolon, and

(3) by adding at the end the following:

"(D) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under paragraph (2), or

"(E) not in accord with the procedures required by law.".

<< 8 USCA § 1534 >>

## SEC. 357. REMOVAL OF ANCILLARY RELIEF FOR VOLUNTARY DEPARTURE.

Section 504(k) (8 U.S.C. 1534(k)) is amended—

(1) by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), and

(2) by inserting after paragraph (3) the following new paragraph:

"(4) voluntary departure under section 244(e);".

<< 8 USCA § 1182 NOTE >>

## SEC. 358. EFFECTIVE DATE.

The amendments made by this subtitle shall be effective as if included in the enactment of subtitle A of title IV of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132).

SUBTITLE E—Transportation of Aliens

## SEC. 361. DEFINITION OF STOWAWAY.

<< 8 USCA § 1101 >>

(a) STOWAWAY DEFINED.—Section 101(a) (8 U.S.C. 1101(a)), as amended by section 322(a)(1) of this division, is amended by adding at the end the following new paragraph:

"(49) The term 'stowaway' means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.".

<< 8 USCA § 1101 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1228 >>

SEC. 362. TRANSPORTATION CONTRACTS.

(a) COVERAGE OF NONCONTIGUOUS TERRITORY.—Section 238 (8 U.S.C. 1228), before redesignation as section 233 under section 308(b)(4) of this division, is amended—

(1) in the heading, by striking "CONTIGUOUS", and

(2) by striking "contiguous" each place it appears in subsections (a), (b), and (d).

(b) COVERAGE OF RAILROAD TRAIN.—Subsection (d) of such section is further amended by inserting "or railroad train" after "aircraft".

SUBTITLE F—Additional Provisions

SEC. 371. IMMIGRATION JUDGES AND COMPENSATION.

<< 8 USCA § 1101 >>

(a) DEFINITION OF TERM.—Paragraph (4) of section 101(b) (8 U.S.C. 1101(b)) is amended to read as follows:

"(4) The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.".

(b) SUBSTITUTION FOR TERM "SPECIAL INQUIRY OFFICER".—The Immigration and Nationality Act is amended by striking "a special inquiry officer", "A special inquiry officer", "special inquiry officer", and "special inquiry officers" and inserting "an immigration judge", "An immigration judge", "immigration judge", and "immigration judges", respectively, each place it appears in the following sections:

<< 8 USCA § 1105a >>

(1) Section 106(a)(2) (8 U.S.C. 1105a(a)(2)), before its repeal by section 306(c) of this division.

<< 8 USCA § 1159 >>

(2) Section 209(a)(2) (8 U.S.C. 1159(a)(2)).

<< 8 USCA § 1224 >>

(3) Section 234 (8 U.S.C. 1224), before redesignation by section 308(b) of this division.

<< 8 USCA § 1225 >>

(4) Section 235 (8 U.S.C. 1225), before amendment by section 302(a) of this division.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1226 >>

(5) Section 236 (8 U.S.C. 1226), before amendment by section 303 of this division.

<< 8 USCA § 1252 >>

(6) Section 242(b) (8 U.S.C. 1252(b)), before amendment by section 306(a)(2) of this division.

<< 8 USCA § 1252b >>

(7) Section 242B(d)(1) (8 U.S.C. 1252b(d)(1)), before repeal by section 306(b)(6) of this division.

<< 8 USCA § 1323 >>

(8) Section 273(d) (8 U.S.C. 1323(d)), before its repeal by section 308(e)(13) of this division.

<< 8 USCA § 1362 >>

(9) Section 292 (8 U.S.C. 1362).

<< 8 USCA § 1103 NOTE >>

(c) COMPENSATION FOR IMMIGRATION JUDGES.—
 (1) IN GENERAL.—There shall be four levels of pay for immigration judges, under the Immigration Judge Schedule (designated as IJ–1, 2, 3, and 4, respectively), and each such judge shall be paid at one of those levels, in accordance with the provisions of this subsection.
 (2) RATES OF PAY.—
  (A) The rates of basic pay for the levels established under paragraph (1) shall be as follows:

IJ-1 .......... 70% of the next to highest rate of basic pay for the Senior Executive Service

IJ-2 .......... 80% of the next to highest rate of basic pay for the Senior Executive Service

IJ-3 .......... 90% of the next to highest rate of basic pay for the Senior Executive Service

IJ-4 .......... 92% of the next to highest rate of basic pay for the Senior Executive Service.

  (B) Locality pay, where applicable, shall be calculated into the basic pay for immigration judges.
 (3) APPOINTMENT.—
  (A) Upon appointment, an immigration judge shall be paid at IJ–1, and shall be advanced to IJ–2 upon completion of 104 weeks of service, to IJ–3 upon completion of 104 weeks of service in the next lower rate, and to IJ–4 upon completion of 52 weeks of service in the next lower rate.
  (B) Notwithstanding subparagraph (A), the Attorney General may provide for appointment of an immigration judge at an advanced rate under such circumstances as the Attorney General may determine appropriate.
 (4) TRANSITION.—Immigration judges serving as of the effective date shall be paid at the rate that corresponds to the amount of time, as provided under paragraph (3)(A), that they have served as an immigration judge, and in no case shall be paid less after the effective date than the rate of pay prior to the effective date.
(d) EFFECTIVE DATES.—

<< 8 USCA § 1101 NOTE >>

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 8 USCA § 1103 NOTE >>

(2) Subsection (c) shall take effect 90 days after the date of the enactment of this Act.

<< 8 USCA § 1103 >>

## SEC. 372. DELEGATION OF IMMIGRATION ENFORCEMENT AUTHORITY.

Section 103(a) (8 U.S.C. 1103(a)) is amended—

(1) inserting "(1)" after "(a)",

(2) By designating each sentence (after the first sentence) as a separate paragraph with appropriate consecutive numbering and initial indentation,

(3) by adding at the end the following new paragraph:

"(8) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this Act or regulations issued thereunder upon officers or employees of the Service.".

<< 8 USCA § 1103 >>

## SEC. 373. POWERS AND DUTIES OF THE ATTORNEY GENERAL AND THE COMMISSIONER.

Section 103 (8 U.S.C. 1103) is amended—

(1) by adding at the end of subsection (a) the following new paragraph:

"(9) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—

"(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

"(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service."; and

(2) by adding at the end of subsection (c), as redesignated by section 102(d)(1) of this division, the following: "The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.".

## SEC. 374. JUDICIAL DEPORTATION.

<< 8 USCA § 1252a >>

(a) IN GENERAL.—Section 242A(d) (8 U.S.C. 1252a(d)), as added by section 224(a) of Immigration and Nationality Technical Corrections Act of 1994 and before redesignation by section 308(b)(5) of this division, is amended—

(1) in paragraph (1), by striking "whose criminal conviction causes such alien to be deportable under section 241(a)(2)(A)" and inserting "who is deportable";

(2) in paragraph (4), by striking "without a decision on the merits"; and

(3) by adding at the end the following new paragraph:

"(5) STIPULATED JUDICIAL ORDER OF DEPORTATION.—The United States Attorney, with the concurrence of the Commissioner, may, pursuant to Federal Rule of Criminal Procedure 11, enter into a plea agreement which calls for the alien, who is deportable under this Act, to waive the right to notice and a hearing under this section, and stipulate to the entry of

a judicial order of deportation from the United States as a condition of the plea agreement or as a condition of probation or supervised release, or both. The United States district court, in both felony and misdemeanor cases, and a United States magistrate judge in misdemeanor cases, may accept such a stipulation and shall have jurisdiction to enter a judicial order of deportation pursuant to the terms of such stipulation.".

<< 18 USCA § 3563 >>

(b) DEPORTATION AS A CONDITION OF PROBATION.—Section 3563(b) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (20);

(2) by redesignating paragraph (21) as paragraph (22); and

(3) by inserting after paragraph (20) the following new paragraph:

"(21) be ordered deported by a United States district court, or United States magistrate judge, pursuant to a stipulation entered into by the defendant and the United States under section 242A(d)(5) of the Immigration and Nationality Act, except that, in the absence of a stipulation, the United States district court or a United States magistrate judge, may order deportation as a condition of probation, if, after notice and hearing pursuant to such section, the Attorney General demonstrates by clear and convincing evidence that the alien is deportable; or".

<< 18 USCA § 1228 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a)(2) shall be effective as if included in the enactment of section 224(a) of the Immigration and Nationality Technical Corrections Act of 1994.

<< 8 USCA § 1255 >>

SEC. 375. LIMITATION ON ADJUSTMENT OF STATUS.

Section 245(c) (8 U.S.C. 1255(c)) is amended—

(1) by striking "or (6)" and inserting "(6)"; and

(2) by inserting before the period at the end the following: "; (7) any alien who seeks adjustment of status to that of an immigrant under section 203(b) and is not in a lawful nonimmigrant status; or (8) any alien who was employed while the alien was an unauthorized alien, as defined in section 274A(h)(3), or who has otherwise violated the terms of a nonimmigrant visa".

SEC. 376. TREATMENT OF CERTAIN FEES.

<< 8 USCA § 1255 >>

(a) INCREASE IN FEE.—Section 245(i) (8 U.S.C. 1255(i)), as added by section 506(b) of Public Law 103–317, is amended—

(1) in paragraph (1), by striking "five times the fee required for the processing of applications under this section" and inserting "$1,000"; and

(2) by amending paragraph (3) to read as follows:

"(3)(A) The portion of each application fee (not to exceed $200) that the Attorney General determines is required to process an application under this section and is remitted to the Attorney General pursuant to paragraphs (1) and (2) of this subsection shall be disposed of by the Attorney General as provided in subsections (m), (n), and (o) of section 286.

"(B) Any remaining portion of such fees remitted under such paragraphs shall be deposited by the Attorney General into the Immigration Detention Account established under section 286(s).".

<< 8 USCA § 1256 >>

(b) IMMIGRATION DETENTION ACCOUNT.—Section 286 (8 U.S.C. 1356) is amended by adding at the end the following new subsection:

"(s) IMMIGRATION DETENTION ACCOUNT.—(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Detention Account'. Notwithstanding any other section of this title, there

shall be deposited as offsetting receipts into the Immigration Detention Account amounts described in section 245(i)(3)(B) to remain available until expended.

 "(2)(A) The Secretary of the Treasury shall refund out of the Immigration Detention Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for the detention of aliens under sections 236(c) and 241(a).

 "(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

 "(C) The amounts required to be refunded from the Immigration Detention Account for fiscal year 1997 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years. Any proposed changes in the amounts designated in such budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of Public Law 104–134.

 "(D) The Attorney General shall prepare and submit annually to the Congress statements of financial condition of the Immigration Detention Account, including beginning account balance, revenues, withdrawals, and ending account balance and projection for the ensuing fiscal year.".

<< 8 USCA § 1255 NOTE >>

 (c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications made on or after the end of the 90–day period beginning on the date of the enactment of this Act.

SEC. 377. LIMITATION ON LEGALIZATION LITIGATION.

<< 8 USCA § 1255a >>

 (a) LIMITATION ON COURT JURISDICTION.—Section 245A(f)(4) (8 U.S.C. 1255a(f)(4)) is amended by adding at the end the following new subparagraph:

 "(C) JURISDICTION OF COURTS.—Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person in fact filed an application under this section within the period specified by subsection (a)(1), or attempted to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer.".

<< 8 USCA § 1255a NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall be effective as if included in the enactment of the Immigration Reform and Control Act of 1986.

SEC. 378. RESCISSION OF LAWFUL PERMANENT RESIDENT STATUS.

<< 8 USCA § 1256 >>

 (a) IN GENERAL.—Section 246(a) (8 U.S.C. 1256(a)) is amended by adding at the end the following sentence: "Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.".

<< 8 USCA § 1256 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the title III–A effective date (as defined in section 309(a) of this division).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 379. ADMINISTRATIVE REVIEW OF ORDERS.

<< 8 USCA §§ 1324a, 1324c >>

 (a) IN GENERAL.—Sections 274A(e)(7) and 274C(d)(4) (8 U.S.C. 1324a(e)(7), 1324c(d)(4)) are each amended—
 (1) by striking "unless, within 30 days, the Attorney General modifies or vacates the decision and order" and inserting "unless either (A) within 30 days, an official delegated by regulation to exercise review authority over the decision and order modifies or vacates the decision and order, or (B) within 30 days of the date of such a modification or vacation (or within 60 days of the date of decision and order of an administrative law judge if not so modified or vacated) the decision and order is referred to the Attorney General pursuant to regulations"; and
 (2) by striking "a final order" and inserting "the final agency decision and order".

<< 8 USCA § 1324a NOTE >>

 (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to orders issued on or after the date of the enactment of this Act.

SEC. 380. CIVIL PENALTIES FOR FAILURE TO DEPART.

<< 8 USCA § 1324d >>

 (a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 274C the following new section:

"CIVIL PENALTIES FOR FAILURE TO DEPART

 "SEC. 274D. (a) IN GENERAL.—Any alien subject to a final order of removal who—
 "(1) willfully fails or refuses to—
 "(A) depart from the United States pursuant to the order,
 "(B) make timely application in good faith for travel or other documents necessary for departure, or
 "(C) present for removal at the time and place required by the Attorney General; or
 "(2) conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,

shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.
 "(b) CONSTRUCTION.—Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.".
 (b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 274C the following new item:

"Sec. 274D. Civil penalties for failure to depart.".

<< 8 USCA § 1324d NOTE >>

 (c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to actions occurring on or after the title III–A effective date (as defined in section 309(a) of this division).

SEC. 381. CLARIFICATION OF DISTRICT COURT JURISDICTION.

<< 8 USCA § 1329 >>

 (a) IN GENERAL.—Section 279 (8 U.S.C. 1329) is amended—
 (1) by amending the first sentence to read as follows: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this title.", and

(2) by adding at the end the following new sentence: "Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.".

<< 8 USCA § 1329 NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions filed after the date of the enactment of this Act.

SEC. 382. APPLICATION OF ADDITIONAL CIVIL PENALTIES TO ENFORCEMENT.

<< 8 USCA § 1330 >>

(a) IN GENERAL.—Subsection (b) of section 280 (8 U.S.C. 1330) is amended to read as follows:

"(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Enforcement Account'. Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.

"(2) The amounts described in this paragraph are the following:

"(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.

"(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).

"(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title. Such activities include—

"(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;

"(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and

"(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.

"(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

"(C) The amounts required to be refunded from the Immigration Enforcement Account for fiscal year 1996 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years. Any proposed changes in the amounts designated in such budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 605 of Public Law 104–134.

"(D) The Attorney General shall prepare and submit annually to the Congress statements of financial condition of the Immigration Enforcement Account, including beginning account balance, revenues, withdrawals, and ending account balance and projection for the ensuing fiscal year.".

<< 8 USCA § 1356 >>

(b) IMMIGRATION USER FEE ACCOUNT.—Section 286(h)(1)(B) (8 U.S.C. 1356(h)(1)(B)) is amended by striking "271" and inserting "243(c), 271,".

<< 8 USCA § 1330 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to fines and penalties collected on or after the date of the enactment of this Act.

<< 8 USCA § 1255a NOTE >>

## SEC. 383. EXCLUSION OF CERTAIN ALIENS FROM FAMILY UNITY PROGRAM.

(a) IN GENERAL.—Section 301(e) of the Immigration Act of 1990 (8 U.S.C. 1255a note) is amended—

(1) by striking "or" at the end of paragraph (1),

(2) by striking the period at the end of paragraph (2) and inserting ", or", and

(3) by adding at the end the following new paragraph:

"(3) has committed an act of juvenile delinquency which if committed by an adult would be classified as—

"(A) a felony crime of violence that has an element the use or attempted use of physical force against another individual, or

"(B) a felony offense that by its nature involves a substantial risk that physical force against another individual may be used in the course of committing the offense.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to benefits granted or extended after the date of the enactment of this Act.

<< 8 USCA § 1367 >>

## SEC. 384. PENALTIES FOR DISCLOSURE OF INFORMATION.

(a) IN GENERAL.—Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice (including any bureau or agency of such Department)—

(1) make an adverse determination of admissibility or deportability of an alien under the Immigration and Nationality Act using information furnished solely by—

(A) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty,

(B) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty,

(C) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty), or

(D) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

unless the alien has been convicted of a crime or crimes listed in section 241(a)(2) of the Immigration and Nationality Act; or

(2) permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under clause (iii) or (iv) of section 204(a)(1)(A), clause (ii) or (iii) of section 204(a)(1)(B), section 216(c)(4)(C), or section 244(a)(3) of such Act as an alien (or the parent of a child) who has been battered or subjected to extreme cruelty.

The limitation under paragraph (2) ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

(b) EXCEPTIONS.—

(1) The Attorney General may provide, in the Attorney General's discretion, for the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

(2) The Attorney General may provide in the discretion of the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.

(3) Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information.

(4) Subsection (a)(2) shall not apply if all the battered individuals in the case are adults and they have all waived the restrictions of such subsection.

(c) PENALTIES FOR VIOLATIONS.—Anyone who willfully uses, publishes, or permits information to be disclosed in violation of this section shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each such violation.

(d) CONFORMING AMENDMENTS TO OTHER DISCLOSURE RESTRICTIONS.—

<< 8 USCA §§ 1160, 1255a >>

<< 8 USCA § 1367 >>

(1) IN GENERAL.—The last sentence of section 210(b)(6) and the second sentence of section 245A(c)(5) (8 U.S.C. 1255a(c) (5)) are each amended to read as follows: "Anyone who uses, publishes, or permits information to be examined in violation of this paragraph shall be subject to appropriate disciplinary action and subject to a civil money penalty of not more than $5,000 for each violation.".

<< 8 USCA § 1367 >>

<< 8 USCA § 1160 NOTE >>

(2) EFFECTIVE DATE.—The amendments made by this subsection shall apply to offenses occurring on or after the date of the enactment of this Act.

SEC. 385. AUTHORIZATION OF ADDITIONAL FUNDS FOR REMOVAL OF ALIENS.

In addition to the amounts otherwise authorized to be appropriated for each fiscal year beginning with fiscal year 1996, there are authorized to be appropriated to the Attorney General $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal, the hiring of more investigators, and the hiring of more detention and deportation officers.

<< 8 USCA § 1368 >>

SEC. 386. INCREASE IN INS DETENTION FACILITIES; REPORT ON DETENTION SPACE.

(a) INCREASE IN DETENTION FACILITIES.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the detention facilities of the Immigration and Naturalization Service to at least 9,000 beds before the end of fiscal year 1997.

(b) REPORT ON DETENTION SPACE.—

(1) IN GENERAL.—Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate estimating the amount of detention space that will be required, during the fiscal year in which the report is submitted and the succeeding fiscal year, to detain—

(A) all aliens subject to detention under section 236(c) of the Immigration and Nationality Act (as amended by section 303 of this title) and section 241(a) of the Immigration and Nationality Act (as inserted by section 305(a)(3) of this title);

(B) all excludable or deportable aliens subject to proceedings under section 238 of the Immigration and Nationality Act (as redesignated by section 308(b)(5) of this title) or section 235(b)(2)(A) or 240 of the Immigration and Nationality Act; and

(C) other excludable or deportable aliens in accordance with the priorities established by the Attorney General.

(2) ESTIMATE OF NUMBER OF ALIENS RELEASED INTO THE COMMUNITY.—

(A) CRIMINAL ALIENS.—

(i) IN GENERAL.—The first report submitted under paragraph (1) shall include an estimate of the number of criminal aliens who, in each of the 3 fiscal years concluded prior to the date of the report—

(I) were released from detention facilities of the Immigration and Naturalization Service (whether operated directly by the Service or through contract with other persons or agencies); or

(II) were not taken into custody or detention by the Service upon completion of their incarceration.

(ii) ALIENS CONVICTED OF AGGRAVATED FELONIES.—The estimate under clause (i) shall estimate separately, with respect to each year described in such clause, the number of criminal aliens described in such clause who were convicted of an aggravated felony.

(B) ALL EXCLUDABLE OR DEPORTABLE ALIENS.—The first report submitted under paragraph (1) shall also estimate the number of excludable or deportable aliens who were released into the community due to a lack of detention facilities in each of the 3 fiscal years concluded prior to the date of the report notwithstanding circumstances that the Attorney General believed justified detention (for example, a significant probability that the released alien would not appear, as agreed, at subsequent exclusion or deportation proceedings).

(C) SUBSEQUENT REPORTS.—Each report under paragraph (1) following the first such report shall include the estimates under subparagraphs (A) and (B), made with respect to the 6–month period immediately preceding the date of the submission of the report.

<< 8 USCA § 1231 NOTE >>

SEC. 387. PILOT PROGRAM ON USE OF CLOSED MILITARY BASES FOR THE DETENTION OF INADMISSIBLE OR DEPORTABLE ALIENS.

(a) ESTABLISHMENT.—The Attorney General and the Secretary of Defense shall establish one or more pilot programs for up to 2 years each to determine the feasibility of the use of military bases, available because of actions under a base closure law, as detention centers by the Immigration and Naturalization Service. In selecting real property at a military base for use as a detention center under the pilot program, the Attorney General and the Secretary shall consult with the redevelopment authority established for the military base and give substantial deference to the redevelopment plan prepared for the military base.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of Defense, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, and the Committees on Armed Services of the House of Representatives and of the Senate, on the feasibility of using military bases closed under a base closure law as detention centers by the Immigration and Naturalization Service.

(c) DEFINITION.—For purposes of this section, the term "base closure law" means each of the following:

(1) The Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note).

(2) Title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).

(3) Section 2687 of title 10, United States Code.

(4) Any other similar law enacted after the date of the enactment of this Act.

<< 8 USCA § 1231 NOTE >>

SEC. 388. REPORT ON INTERIOR REPATRIATION PROGRAM.

Not later than 30 months after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of the program of interior repatriation developed under section 437 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132).

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Subtitle A—Pilot Programs for Employment Eligibility Confirmation

<< 8 USCA § 1324a NOTE >>

SEC. 401. ESTABLISHMENT OF PROGRAMS.

(a) IN GENERAL.—The Attorney General shall conduct 3 pilot programs of employment eligibility confirmation under this subtitle.

(b) IMPLEMENTATION DEADLINE; TERMINATION.—The Attorney General shall implement the pilot programs in a manner that permits persons and other entities to have elections under section 402 of this division made and in effect no later than 1 year after the date of the enactment of this Act. Unless the Congress otherwise provides, the Attorney General shall terminate a pilot program at the end of the 4–year period beginning on the first day the pilot program is in effect.

(c) SCOPE OF OPERATION OF PILOT PROGRAMS.—The Attorney General shall provide for the operation—

(1) of the basic pilot program (described in section 403(a) of this division) in, at a minimum, 5 of the 7 States with the highest estimated population of aliens who are not lawfully present in the United States;

(2) of the citizen attestation pilot program (described in section 403(b) of this division) in at least 5 States (or, if fewer, all of the States) that meet the condition described in section 403(b)(2)(A) of this division; and

(3) of the machine-readable-document pilot program (described in section 403(c) of this division) in at least 5 States (or, if fewer, all of the States) that meet the condition described in section 403(c)(2) of this division.

(d) REFERENCES IN SUBTITLE.—In this subtitle—

(1) PILOT PROGRAM REFERENCES.—The terms "program" or "pilot program" refer to any of the 3 pilot programs provided for under this subtitle.

(2) CONFIRMATION SYSTEM.—The term "confirmation system" means the confirmation system established under section 404 of this division.

(3) REFERENCES TO SECTION 274A.—Any reference in this subtitle to section 274A (or a subdivision of such section) is deemed a reference to such section (or subdivision thereof) of the Immigration and Nationality Act.

(4) I–9 OR SIMILAR FORM.—The term "I–9 or similar form" means the form used for purposes of section 274A(b)(1)(A) or such other form as the Attorney General determines to be appropriate.

(5) LIMITED APPLICATION TO RECRUITERS AND REFERRERS.—Any reference to recruitment or referral (or a recruiter or referrer) in relation to employment is deemed a reference only to such recruitment or referral (or recruiter or referrer) that is subject to section 274A(a)(1)(B)(ii).

(6) UNITED STATES CITIZENSHIP.—The term "United States citizenship" includes United States nationality.

(7) STATE.—The term "State" has the meaning given such term in section 101(a)(36) of the Immigration and Nationality Act.

<< 8 USCA § 1324a note >>

SEC. 402. VOLUNTARY ELECTION TO PARTICIPATE IN A PILOT PROGRAM.

(a) VOLUNTARY ELECTION.—Subject to subsection (c)(3)(B), any person or other entity that conducts any hiring (or recruitment or referral) in a State in which a pilot program is operating may elect to participate in that pilot program. Except as specifically provided in subsection (e), the Attorney General may not require any person or other entity to participate in a pilot program.

(b) BENEFIT OF REBUTTABLE PRESUMPTION.—

(1) IN GENERAL.—If a person or other entity is participating in a pilot program and obtains confirmation of identity and employment eligibility in compliance with the terms and conditions of the program with respect to the hiring (or recruitment or referral) of an individual for employment in the United States, the person or entity has established a rebuttable presumption that the person or entity has not violated section 274A(a)(1)(A) with respect to such hiring (or such recruitment or referral).

(2) CONSTRUCTION.—Paragraph (1) shall not be construed as preventing a person or other entity that has an election in effect under subsection (a) from establishing an affirmative defense under section 274A(a)(3) if the person or entity complies with the requirements of section 274A(a)(1)(B) but fails to obtain confirmation under paragraph (1).

(c) GENERAL TERMS OF ELECTIONS.—

(1) IN GENERAL.—An election under subsection (a) shall be in such form and manner, under such terms and conditions, and shall take effect, as the Attorney General shall specify. The Attorney General may not impose any fee as a condition of making an election or participating in a pilot program.

(2) SCOPE OF ELECTION.—

AR.03617

(A) IN GENERAL.—Subject to paragraph (3), any electing person or other entity may provide that the election under subsection (a) shall apply (during the period in which the election is in effect)—

 (i) to all its hiring (and all recruitment or referral) in the State (or States) in which the pilot program is operating, or

 (ii) to its hiring (or recruitment or referral) in one or more pilot program States or one or more places of hiring (or recruitment or referral, as the case may be) in the pilot program States.

 (B) APPLICATION OF PROGRAMS IN NON–PILOT PROGRAM STATES.—In addition, the Attorney General may permit a person or entity electing—

 (i) the basic pilot program (described in section 403(a) of this division) to provide that the election applies to its hiring (or recruitment or referral) in one or more States or places of hiring (or recruitment or referral) in which the pilot program is not otherwise operating, or

 (ii) the citizen attestation pilot program (described in 403(b) of this division) or the machine-readable-document pilot program (described in section 403(c) of this division) to provide that the election applies to its hiring (or recruitment or referral) in one or more States or places of hiring (or recruitment or referral) in which the pilot program is not otherwise operating but only if such States meet the requirements of 403(b)(2)(A) and 403(c)(2) of this division, respectively.

(3) ACCEPTANCE AND REJECTION OF ELECTIONS.—

 (A) IN GENERAL.—Except as provided in subparagraph (B), the Attorney General shall accept all elections made under subsection (a).

 (B) REJECTION OF ELECTIONS.—The Attorney General may reject an election by a person or other entity under this section or limit its applicability to certain States or places of hiring (or recruitment or referral) if the Attorney General has determined that there are insufficient resources to provide appropriate services under a pilot program for the person's or entity's hiring (or recruitment or referral) in any or all States or places of hiring.

 (4) TERMINATION OF ELECTIONS.—The Attorney General may terminate an election by a person or other entity under this section because the person or entity has substantially failed to comply with its obligations under the pilot program. A person or other entity may terminate an election in such form and manner as the Attorney General shall specify.

(d) CONSULTATION, EDUCATION, AND PUBLICITY.—

 (1) CONSULTATION.—The Attorney General shall closely consult with representatives of employers (and recruiters and referrers) in the development and implementation of the pilot programs, including the education of employers (and recruiters and referrers) about such programs.

 (2) PUBLICITY.—The Attorney General shall widely publicize the election process and pilot programs, including the voluntary nature of the pilot programs and the advantages to employers (and recruiters and referrers) of making an election under this section.

 (3) ASSISTANCE THROUGH DISTRICT OFFICES.—The Attorney General shall designate one or more individuals in each District office of the Immigration and Naturalization Service for a Service District in which a pilot program is being implemented—

 (A) to inform persons and other entities that seek information about pilot programs of the voluntary nature of such programs, and

 (B) to assist persons and other entities in electing and participating in any pilot programs in effect in the District, in complying with the requirements of section 274A, and in facilitating confirmation of the identity and employment eligibility of individuals consistent with such section.

(e) SELECT ENTITIES REQUIRED TO PARTICIPATE IN A PILOT PROGRAM.—

 (1) FEDERAL GOVERNMENT.—

 (A) EXECUTIVE DEPARTMENTS.—

 (i) IN GENERAL.—Each Department of the Federal Government shall elect to participate in a pilot program and shall comply with the terms and conditions of such an election.

 (ii) ELECTION.—Subject to clause (iii), the Secretary of each such Department—

 (I) shall elect the pilot program (or programs) in which the Department shall participate, and

 (II) may limit the election to hiring occurring in certain States (or geographic areas) covered by the program (or programs) and in specified divisions within the Department, so long as all hiring by such divisions and in such locations is covered.

(iii) ROLE OF ATTORNEY GENERAL.—The Attorney General shall assist and coordinate elections under this subparagraph in such manner as assures that—

(I) a significant portion of the total hiring within each Department within States covered by a pilot program is covered under such a program, and

(II) there is significant participation by the Federal Executive branch in each of the pilot programs.

(B) LEGISLATIVE BRANCH.—Each Member of Congress, each officer of Congress, and the head of each agency of the legislative branch, that conducts hiring in a State in which a pilot program is operating shall elect to participate in a pilot program, may specify which pilot program or programs (if there is more than one) in which the Member, officer, or agency will participate, and shall comply with the terms and conditions of such an election.

(2) APPLICATION TO CERTAIN VIOLATORS.—An order under section 274A(e)(4) or section 274B(g) of the Immigration and Nationality Act may require the subject of the order to participate in, and comply with the terms of, a pilot program with respect to the subject's hiring (or recruitment or referral) of individuals in a State covered by such a program.

(3) CONSEQUENCE OF FAILURE TO PARTICIPATE.—If a person or other entity is required under this subsection to participate in a pilot program and fails to comply with the requirements of such program with respect to an individual—

(A) such failure shall be treated as a violation of section 274A(a)(1)(B) with respect to that individual, and

(B) a rebuttable presumption is created that the person or entity has violated section 274A(a)(1)(A).

Subparagraph (B) shall not apply in any prosecution under section 274A(f)(1).

(f) CONSTRUCTION.—This subtitle shall not affect the authority of the Attorney General under any other law (including section 274A(d)(4)) to conduct demonstration projects in relation to section 274A.

<< 8 USCA § 1324a note >>

SEC. 403. PROCEDURES FOR PARTICIPANTS IN PILOT PROGRAMS.

(a) BASIC PILOT PROGRAM.—A person or other entity that elects to participate in the basic pilot program described in this subsection agrees to conform to the following procedures in the case of the hiring (or recruitment or referral) for employment in the United States of each individual covered by the election:

(1) PROVISION OF ADDITIONAL INFORMATION.—The person or entity shall obtain from the individual (and the individual shall provide) and shall record on the I–9 or similar form—

(A) the individual's social security account number, if the individual has been issued such a number, and

(B) if the individual does not attest to United States citizenship under section 274A(b)(2), such identification or authorization number established by the Immigration and Naturalization Service for the alien as the Attorney General shall specify,

and shall retain the original form and make it available for inspection for the period and in the manner required of I–9 forms under section 274A(b)(3).

(2) PRESENTATION OF DOCUMENTATION.—

(A) IN GENERAL.—The person or other entity, and the individual whose identity and employment eligibility are being confirmed, shall, subject to subparagraph (B), fulfill the requirements of section 274A(b) with the following modifications:

(i) A document referred to in section 274A(b)(1)(B)(ii) (as redesignated by section 412(a) of this division) must be designated by the Attorney General as suitable for the purpose of identification in a pilot program.

(ii) A document referred to in section 274A(b)(1)(D) must contain a photograph of the individual.

(iii) The person or other entity has complied with the requirements of section 274A(b)(1) with respect to examination of a document if the document reasonably appears on its face to be genuine and it reasonably appears to pertain to the individual whose identity and work eligibility is being confirmed.

(B) LIMITATION OF REQUIREMENT TO EXAMINE DOCUMENTATION.—If the Attorney General finds that a pilot program would reliably determine with respect to an individual whether—

(i) the person with the identity claimed by the individual is authorized to work in the United States, and

(ii) the individual is claiming the identity of another person,

if a person or entity could fulfill the requirement to examine documentation contained in subparagraph (A) of section 274A(b) (1) by examining a document specified in either subparagraph (B) or (D) of such section, the Attorney General may provide that, for purposes of such requirement, only such a document need be examined. In such case, any reference in section 274A(b)(1)(A) to a verification that an individual is not an unauthorized alien shall be deemed to be a verification of the individual's identity.

(3) SEEKING CONFIRMATION.—

  (A) IN GENERAL.—The person or other entity shall make an inquiry, as provided in section 404(a)(1) of this division, using the confirmation system to seek confirmation of the identity and employment eligibility of an individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring (or recruitment or referral, as the case may be).

  (B) EXTENSION OF TIME PERIOD.—If the person or other entity in good faith attempts to make an inquiry during such 3 working days and the confirmation system has registered that not all inquiries were received during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation system registers that it has received all inquiries. If the confirmation system cannot receive inquiries at all times during a day, the person or entity merely has to assert that the entity attempted to make the inquiry on that day for the previous sentence to apply to such an inquiry, and does not have to provide any additional proof concerning such inquiry.

(4) CONFIRMATION OR NONCONFIRMATION.—

  (A) CONFIRMATION UPON INITIAL INQUIRY.—If the person or other entity receives an appropriate confirmation of an individual's identity and work eligibility under the confirmation system within the time period specified under section 404(b) of this division, the person or entity shall record on the I–9 or similar form an appropriate code that is provided under the system and that indicates a final confirmation of such identity and work eligibility of the individual.

  (B) NONCONFIRMATION UPON INITIAL INQUIRY AND SECONDARY VERIFICATION.—

   (i) NONCONFIRMATION.—If the person or other entity receives a tentative nonconfirmation of an individual's identity or work eligibility under the confirmation system within the time period specified under 404(b) of this division, the person or entity shall so inform the individual for whom the confirmation is sought.

   (ii) NO CONTEST.—If the individual does not contest the nonconfirmation within the time period specified in section 404(c) of this division, the nonconfirmation shall be considered final. The person or entity shall then record on the I–9 or similar form an appropriate code which has been provided under the system to indicate a tentative nonconfirmation.

   (iii) CONTEST.—If the individual does contest the nonconfirmation, the individual shall utilize the process for secondary verification provided under section 404(c) of this division. The nonconfirmation will remain tentative until a final confirmation or nonconfirmation is provided by the confirmation system within the time period specified in such section. In no case shall an employer terminate employment of an individual because of a failure of the individual to have identity and work eligibility confirmed under this section until a nonconfirmation becomes final. Nothing in this clause shall apply to a termination of employment for any reason other than because of such a failure.

   (iv) RECORDING OF CONCLUSION ON FORM.—If a final confirmation or nonconfirmation is provided by the confirmation system under section 404(c) of this division regarding an individual, the person or entity shall record on the I–9 or similar form an appropriate code that is provided under the system and that indicates a confirmation or nonconfirmation of identity and work eligibility of the individual.

  (C) CONSEQUENCES OF NONCONFIRMATION.—

   (i) TERMINATION OR NOTIFICATION OF CONTINUED EMPLOYMENT.—If the person or other entity has received a final nonconfirmation regarding an individual under subparagraph (B), the person or entity may terminate employment (or recruitment or referral) of the individual. If the person or entity does not terminate employment (or recruitment or referral) of the individual, the person or entity shall notify the Attorney General of such fact through the confirmation system or in such other manner as the Attorney General may specify.

   (ii) FAILURE TO NOTIFY.—If the person or entity fails to provide notice with respect to an individual as required under clause (i), the failure is deemed to constitute a violation of section 274A(a)(1)(B) with respect to that individual and the applicable civil monetary penalty under section 274A(e)(5) shall be (notwithstanding the amounts specified in such section) no less than $500 and no more than $1,000 for each individual with respect to whom such violation occurred.

(iii) CONTINUED EMPLOYMENT AFTER FINAL NONCONFIRMATION.—If the person or other entity continues to employ (or to recruit or refer) an individual after receiving final nonconfirmation, a rebuttable presumption is created that the person or entity has violated section 274A(a)(1)(A). The previous sentence shall not apply in any prosecution under section 274A(f)(1).

(b) CITIZEN ATTESTATION PILOT PROGRAM.—

(1) IN GENERAL.—Except as provided in paragraphs (3) through (5), the procedures applicable under the citizen attestation pilot program under this subsection shall be the same procedures as those under the basic pilot program under subsection (a).

(2) RESTRICTIONS.—

(A) STATE DOCUMENT REQUIREMENT TO PARTICIPATE IN PILOT PROGRAM.—The Attorney General may not provide for the operation of the citizen attestation pilot program in a State unless each driver's license or similar identification document described in section 274A(b)(1)(D)(i) issued by the State—

(i) contains a photograph of the individual involved, and

(ii) has been determined by the Attorney General to have security features, and to have been issued through application and issuance procedures, which make such document sufficiently resistant to counterfeiting, tampering, and fraudulent use that it is a reliable means of identification for purposes of this section.

(B) AUTHORIZATION TO LIMIT EMPLOYER PARTICIPATION.—The Attorney General may restrict the number of persons or other entities that may elect to participate in the citizen attestation pilot program under this subsection as the Attorney General determines to be necessary to produce a representative sample of employers and to reduce the potential impact of fraud.

(3) NO CONFIRMATION REQUIRED FOR CERTAIN INDIVIDUALS ATTESTING TO U.S. CITIZENSHIP.—In the case of a person or other entity hiring (or recruiting or referring) an individual under the citizen attestation pilot program, if the individual attests to United States citizenship (under penalty of perjury on an I–9 or similar form which form states on its face the criminal and other penalties provided under law for a false representation of United States citizenship)—

(A) the person or entity may fulfill the requirement to examine documentation contained in subparagraph (A) of section 274A(b)(1) by examining a document specified in either subparagraph (B)(i) or (D) of such section; and

(B) the person or other entity is not required to comply with respect to such individual with the procedures described in paragraphs (3) and (4) of subsection (a), but only if the person or entity retains the form and makes it available for inspection in the same manner as in the case of an I–9 form under section 274A(b)(3).

(4) WAIVER OF DOCUMENT PRESENTATION REQUIREMENT IN CERTAIN CASES.—

(A) IN GENERAL.—In the case of a person or entity that elects, in a manner specified by the Attorney General consistent with subparagraph (B), to participate in the pilot program under this paragraph, if an individual being hired (or recruited or referred) attests (in the manner described in paragraph (3)) to United States citizenship and the person or entity retains the form on which the attestation is made and makes it available for inspection in the same manner as in the case of an I–9 form under section 274A(b)(3), the person or entity is not required to comply with the procedures described in section 274A(b).

(B) RESTRICTION.—The Attorney General shall restrict the election under this paragraph to no more than 1,000 employers and, to the extent practicable, shall select among employers seeking to make such election in a manner that provides for such an election by a representative sample of employers.

(5) NONREVIEWABLE DETERMINATIONS.—The determinations of the Attorney General under paragraphs (2) and (4) are within the discretion of the Attorney General and are not subject to judicial or administrative review.

(c) MACHINE–READABLE–DOCUMENT PILOT PROGRAM.—

(1) IN GENERAL.—Except as provided in paragraph (3), the procedures applicable under the machine-readable-document pilot program under this subsection shall be the same procedures as those under the basic pilot program under subsection (a).

(2) STATE DOCUMENT REQUIREMENT TO PARTICIPATE IN PILOT PROGRAM.—The Attorney General may not provide for the operation of the machine-readable-document pilot program in a State unless driver's licenses and similar identification documents described in section 274A(b)(1)(D)(i) issued by the State include a machine-readable social security account number.

(3) USE OF MACHINE–READABLE DOCUMENTS.—If the individual whose identity and employment eligibility must be confirmed presents to the person or entity hiring (or recruiting or referring) the individual a license or other document described in paragraph (2) that includes a machine-readable social security account number, the person or entity must make

an inquiry through the confirmation system by using a machine-readable feature of such document. If the individual does not attest to United States citizenship under section 274A(b)(2), the individual's identification or authorization number described in subsection (a)(1)(B) shall be provided as part of the inquiry.

(d) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE CONFIRMATION SYSTEM.—No person or entity participating in a pilot program shall be civilly or criminally liable under any law for any action taken in good faith reliance on information provided through the confirmation system.

<< 8 USCA § 1324a note >>

SEC. 404. EMPLOYMENT ELIGIBILITY CONFIRMATION SYSTEM.

(a) IN GENERAL.—The Attorney General shall establish a pilot program confirmation system through which the Attorney General (or a designee of the Attorney General, which may be a nongovernmental entity)—

(1) responds to inquiries made by electing persons and other entities (including those made by the transmittal of data from machine-readable documents under the machine-readable pilot program) at any time through a toll-free telephone line or other toll-free electronic media concerning an individual's identity and whether the individual is authorized to be employed, and

(2) maintains records of the inquiries that were made, of confirmations provided (or not provided), and of the codes provided to inquirers as evidence of their compliance with their obligations under the pilot programs.

To the extent practicable, the Attorney General shall seek to establish such a system using one or more nongovernmental entities.

(b) INITIAL RESPONSE.—The confirmation system shall provide confirmation or a tentative nonconfirmation of an individual's identity and employment eligibility within 3 working days of the initial inquiry. If providing confirmation or tentative nonconfirmation, the confirmation system shall provide an appropriate code indicating such confirmation or such nonconfirmation.

(c) SECONDARY VERIFICATION PROCESS IN CASE OF TENTATIVE NONCONFIRMATION.—In cases of tentative nonconfirmation, the Attorney General shall specify, in consultation with the Commissioner of Social Security and the Commissioner of the Immigration and Naturalization Service, an available secondary verification process to confirm the validity of information provided and to provide a final confirmation or nonconfirmation within 10 working days after the date of the tentative nonconfirmation. When final confirmation or nonconfirmation is provided, the confirmation system shall provide an appropriate code indicating such confirmation or nonconfirmation.

(d) DESIGN AND OPERATION OF SYSTEM.—The confirmation system shall be designed and operated—

(1) to maximize its reliability and ease of use by persons and other entities making elections under section 402(a) of this division consistent with insulating and protecting the privacy and security of the underlying information;

(2) to respond to all inquiries made by such persons and entities on whether individuals are authorized to be employed and to register all times when such inquiries are not received;

(3) with appropriate administrative, technical, and physical safeguards to prevent unauthorized disclosure of personal information; and

(4) to have reasonable safeguards against the system's resulting in unlawful discriminatory practices based on national origin or citizenship status, including—

(A) the selective or unauthorized use of the system to verify eligibility;

(B) the use of the system prior to an offer of employment; or

(C) the exclusion of certain individuals from consideration for employment as a result of a perceived likelihood that additional verification will be required, beyond what is required for most job applicants.

(e) RESPONSIBILITIES OF THE COMMISSIONER OF SOCIAL SECURITY.—As part of the confirmation system, the Commissioner of Social Security, in consultation with the entity responsible for administration of the system, shall establish a reliable, secure method, which, within the time periods specified under subsections (b) and (c), compares the name and social security account number provided in an inquiry against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided regarding an individual whose identity and employment eligibility must be confirmed, the correspondence of the name and number, and whether the individual has presented a social security

AR.03622

490

account number that is not valid for employment. The Commissioner shall not disclose or release social security information (other than such confirmation or nonconfirmation).

(f) RESPONSIBILITIES OF THE COMMISSIONER OF THE IMMIGRATION AND NATURALIZATION SERVICE.— As part of the confirmation system, the Commissioner of the Immigration and Naturalization Service, in consultation with the entity responsible for administration of the system, shall establish a reliable, secure method, which, within the time periods specified under subsections (b) and (c), compares the name and alien identification or authorization number described in section 403(a)(1)(B) of this division which are provided in an inquiry against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided, the correspondence of the name and number, and whether the alien is authorized to be employed in the United States.

(g) UPDATING INFORMATION.—The Commissioners of Social Security and the Immigration and Naturalization Service shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information, including instances in which it is brought to their attention in the secondary verification process described in subsection (c).

(h) LIMITATION ON USE OF THE CONFIRMATION SYSTEM AND ANY RELATED SYSTEMS.—

(1) IN GENERAL.—Notwithstanding any other provision of law, nothing in this subtitle shall be construed to permit or allow any department, bureau, or other agency of the United States Government to utilize any information, data base, or other records assembled under this subtitle for any other purpose other than as provided for under a pilot program.

(2) NO NATIONAL IDENTIFICATION CARD.—Nothing in this subtitle shall be construed to authorize, directly or indirectly, the issuance or use of national identification cards or the establishment of a national identification card.

<< 8 USCA § 1324a note >>

SEC. 405. REPORTS.

The Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate reports on the pilot programs within 3 months after the end of the third and fourth years in which the programs are in effect. Such reports shall—

(1) assess the degree of fraudulent attesting of United States citizenship,

(2) include recommendations on whether or not the pilot programs should be continued or modified, and

(3) assess the benefits of the pilot programs to employers and the degree to which they assist in the enforcement of section 274A.

Subtitle B—Other Provisions Relating to Employer Sanctions

SEC. 411. LIMITING LIABILITY FOR CERTAIN TECHNICAL VIOLATIONS OF PAPERWORK REQUIREMENTS.

<< 8 USCA § 1324a >>

(a) IN GENERAL.—Section 274A(b) (8 U.S.C. 1324a(b)) is amended by adding at the end the following new paragraph:

"(6) GOOD FAITH COMPLIANCE.—

"(A) IN GENERAL.—Except as provided in subparagraphs (B) and (C), a person or entity is considered to have complied with a requirement of this subsection notwithstanding a technical or procedural failure to meet such requirement if there was a good faith attempt to comply with the requirement.

"(B) EXCEPTION IF FAILURE TO CORRECT AFTER NOTICE.—Subparagraph (A) shall not apply if—

"(i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure,

"(ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and

"(iii) the person or entity has not corrected the failure voluntarily within such period.

"(C) EXCEPTION FOR PATTERN OR PRACTICE VIOLATORS.—Subparagraph (A) shall not apply to a person or entity that has or is engaging in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).".

<< 8 USCA § 1324a NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to failures occurring on or after the date of the enactment of this Act.

SEC. 412. PAPERWORK AND OTHER CHANGES IN THE EMPLOYER SANCTIONS PROGRAM.

<< 8 USCA § 1324a >>

(a) REDUCING THE NUMBER OF DOCUMENTS ACCEPTED FOR EMPLOYMENT VERIFICATION.—Section 274A(b)(1) (8 U.S.C. 1324a(b)(1)) is amended—

(1) in subparagraph (B)—

(A) by striking clauses (ii) through (iv),

(B) in clause (v), by striking "or other alien registration card, if the card" and inserting ", alien registration card, or other document designated by the Attorney General, if the document" and redesignating such clause as clause (ii), and

(C) in clause (ii), as so redesignated—

(i) in subclause (I), by striking "or" before "such other personal identifying information" and inserting "and",

(ii) by striking "and" at the end of subclause (I),

(iii) by striking the period at the end of subclause (II) and inserting ", and", and

(iv) by adding at the end the following new subclause:

"(III) contains security features to make it resistant to tampering, counterfeiting, and fraudulent use.";

(2) in subparagraph (C)—

(A) by adding "or" at the end of clause (i),

(B) by striking clause (ii), and

(C) by redesignating clause (iii) as clause (ii); and

(3) by adding at the end the following new subparagraph:

"(E) AUTHORITY TO PROHIBIT USE OF CERTAIN DOCUMENTS.—If the Attorney General finds, by regulation, that any document described in subparagraph (B), (C), or (D) as establishing employment authorization or identity does not reliably establish such authorization or identity or is being used fraudulently to an unacceptable degree, the Attorney General may prohibit or place conditions on its use for purposes of this subsection.".

(b) REDUCTION OF PAPERWORK FOR CERTAIN EMPLOYEES.—Section 274A(a) (8 U.S.C. 1324a(a)) is amended by adding at the end the following new paragraph:

"(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOYEES.—

"(A) IN GENERAL.—For purposes of this section, if—

"(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

"(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

"(B) PERIOD.—The period described in this subparagraph is 3 years, or, if less, the period of time that the individual is authorized to be employed in the United States.

"(C) LIABILITY.—

"(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an alien not authorized to work in the United States, then for the purposes of paragraph (1)(A), subject to clause

(ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an alien not authorized to work in the United States.

"(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and could not reasonably have known) that the individual at the time of hiring or afterward was an alien not authorized to work in the United States.

"(iii) EXCEPTION.—Clause (i) shall not apply in any prosecution under subsection (f)(1).".

(c) ELIMINATION OF DATED PROVISIONS.—Section 274A (8 U.S.C. 1324a) is amended by striking subsections (i) through (n).

(d) CLARIFICATION OF APPLICATION TO FEDERAL GOVERNMENT.—Section 274A(a) (8 U.S.C. 1324a(a)), as amended by subsection (b), is amended by adding at the end the following new paragraph:

"(7) APPLICATION TO FEDERAL GOVERNMENT.—For purposes of this section, the term 'entity' includes an entity in any branch of the Federal Government.".

<< 8 USCA § 1324a NOTE >>

(e) EFFECTIVE DATES.—

(1) The amendments made by subsection (a) shall apply with respect to hiring (or recruitment or referral) occurring on or after such date (not later than 12 months after the date of the enactment of this Act) as the Attorney General shall designate.

(2) The amendment made by subsection (b) shall apply to individuals hired on or after 60 days after the date of the enactment of this Act.

(3) The amendment made by subsection (c) shall take effect on the date of the enactment of this Act.

(4) The amendment made by subsection (d) applies to hiring occurring before, on, or after the date of the enactment of this Act, but no penalty shall be imposed under subsection (e) or (f) of section 274A of the Immigration and Nationality Act for such hiring occurring before such date.

SEC. 413. REPORT ON ADDITIONAL AUTHORITY OR RESOURCES NEEDED FOR ENFORCEMENT OF EMPLOYER SANCTIONS PROVISIONS.

<< 8 USCA § 1324a NOTE >>

(a) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on any additional authority or resources needed—

(1) by the Immigration and Naturalization Service in order to enforce section 274A of the Immigration and Nationality Act, or

(2) by Federal agencies in order to carry out the Executive Order of February 13, 1996 (entitled "Economy and Efficiency in Government Procurement Through Compliance with Certain Immigration and Naturalization Act Provisions") and to expand the restrictions in such order to cover agricultural subsidies, grants, job training programs, and other Federally subsidized assistance programs.

(b) REFERENCE TO INCREASED AUTHORIZATION OF APPROPRIATIONS.—For provision increasing the authorization of appropriations for investigators for violations of sections 274 and 274A of the Immigration and Nationality Act, see section 131 of this division.

SEC. 414. REPORTS ON EARNINGS OF ALIENS NOT AUTHORIZED TO WORK.

<< 8 USCA § 1360 >>

(a) IN GENERAL.—Subsection (c) of section 290 (8 U.S.C. 1360) is amended to read as follows:

"(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1996), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate quantity of social security account numbers issued to aliens not authorized to be employed, with respect to which, in such fiscal year, earnings were reported to the Social Security Administration.

 "(2) If earnings are reported on or after January 1, 1997, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.".

<< 8 USCA § 1360 NOTE >>

 (b) REPORT ON FRAUDULENT USE OF SOCIAL SECURITY ACCOUNT NUMBERS.—The Commissioner of Social Security shall transmit to the Attorney General, by not later than 1 year after the date of the enactment of this Act, a report on the extent to which social security account numbers and cards are used by aliens for fraudulent purposes.

<< 8 USCA § 1304 >>

SEC. 415. AUTHORIZING MAINTENANCE OF CERTAIN INFORMATION ON ALIENS.

 Section 264 (8 U.S.C. 1304) is amended by adding at the end the following new subsection:
 "(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.".

<< 8 USCA § 1324a >>

SEC. 416. SUBPOENA AUTHORITY.

 Section 274A(e)(2) (8 U.S.C. 1324a(e)(2)) is amended—
 (1) by striking "and" at the end of subparagraph (A);
 (2) by striking the period at the end of subparagraph (B) and inserting ", and"; and
 (3) by inserting after subparagraph (B) the following:
 "(C) immigration officers designated by the Commissioner may compel by subpoena the attendance of witnesses and the production of evidence at any designated place prior to the filing of a complaint in a case under paragraph (2).".

Subtitle C—Unfair Immigration–Related Employment Practices

SEC. 421. TREATMENT OF CERTAIN DOCUMENTARY PRACTICES AS UNFAIR IMMIGRATION–RELATED EMPLOYMENT PRACTICES.

<< 8 USCA § 1324b >>

 (a) IN GENERAL.—Section 274B(a)(6) (8 U.S.C. 1324b(a)(6)) is amended—
 (1) by striking "For purposes of paragraph (1), a" and inserting "A"; and
 (2) by striking "relating to the hiring of individuals" and inserting the following: "if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1)".

<< 8 USCA § 1324b NOTE >>

 (b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to requests made on or after the date of the enactment of this Act.

TITLE V—RESTRICTIONS ON BENEFITS FOR ALIENS

Subtitle A—Eligibility of Aliens for Public Assistance and Benefits

<< 8 USCA § 1641 >>

## SEC. 501. EXCEPTION TO INELIGIBILITY FOR PUBLIC BENEFITS FOR CERTAIN BATTERED ALIENS.

Section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1641) is amended by adding at the end the following new subsection:

"(c) TREATMENT OF CERTAIN BATTERED ALIENS AS QUALIFIED ALIENS.—For purposes of this title, the term 'qualified alien' includes—

"(1) an alien who—

"(A) has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to, or acquiesced in, such battery or cruelty, but only if (in the opinion of the Attorney General, which opinion is not subject to review by any court) there is a substantial connection between such battery or cruelty and the need for the benefits to be provided; and

"(B) has been approved or has a petition pending which sets forth a prima facie case for—

"(i) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A) of the Immigration and Nationality Act,

"(ii) classification pursuant to clause (ii) or (iii) of section 204(a)(1)(B) of the Act,

"(iii) suspension of deportation and adjustment of status pursuant to section 244(a)(3) of such Act, or

"(iv) status as a spouse or child of a United States citizen pursuant to clause (i) of section 204(a)(1)(A) of such Act, or classification pursuant to clause (i) of section 204(a)(1)(B) of such Act; or

"(2) an alien—

"(A) whose child has been battered or subjected to extreme cruelty in the United States by a spouse or a parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, and the alien did not actively participate in such battery or cruelty, but only if (in the opinion of the Attorney General, which opinion is not subject to review by any court) there is a substantial connection between such battery or cruelty and the need for the benefits to be provided; and

"(B) who meets the requirement of clause (ii) of subparagraph (A).

This subsection shall not apply to an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual subjected to such battery or cruelty.".

<< 8 USCA § 1621 NOTE >>

## SEC. 502. PILOT PROGRAMS ON LIMITING ISSUANCE OF DRIVER'S LICENSES TO ILLEGAL ALIENS.

(a) IN GENERAL.—Pursuant to guidelines prescribed by the Attorney General not later than 6 months after the date of the enactment of this Act, all States may conduct pilot programs within their State to determine the viability, advisability, and cost-effectiveness of the State's denying driver's licenses to aliens who are not lawfully present in the United States. Under a pilot program a State may deny a driver's license to aliens who are not lawfully present in the United States. Such program shall be conducted in cooperation with relevant State and local authorities.

(b) REPORT.—Not later than 3 years after the date of the enactment of this Act, the Attorney General shall submit a report to the Judiciary Committees of the House of Representatives and of the Senate on the results of the pilot programs conducted under subsection (a).

<< 42 USCA § 402 >>

## SEC. 503. INELIGIBILITY OF ALIENS NOT LAWFULLY PRESENT FOR SOCIAL SECURITY BENEFITS.

(a) IN GENERAL.—Section 202 of the Social Security Act (42 U.S.C. 402) is amended by adding at the end the following new subsection:

"Limitation on Payments to Aliens

"(y) Notwithstanding any other provision of law, no monthly benefit under this title shall be payable to any alien in the United States for any month during which such alien is not lawfully present in the United States as determined by the Attorney General.".

<< 42 USCA § 402 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to benefits for which applications are filed on or after the first day of the first month that begins at least 60 days after the date of the enactment of this Act.

<< 8 USCA § 1642 >>

SEC. 504. PROCEDURES FOR REQUIRING PROOF OF CITIZENSHIP FOR FEDERAL PUBLIC BENEFITS.

Section 432(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1642) is amended—
(1) by inserting "(1)" after the dash, and
(2) by adding at the end the following:
"(2) Not later than 18 months after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of Health and Human Services, shall also establish procedures for a person applying for a Federal public benefit (as defined in section 401(c)) to provide proof of citizenship in a fair and nondiscriminatory manner.".

<< 8 USCA § 1623 >>

SEC. 505. LIMITATION ON ELIGIBILITY FOR PREFERENTIAL TREATMENT OF ALIENS NOT LAWFULLY PRESENT ON BASIS OF RESIDENCE FOR HIGHER EDUCATION BENEFITS.

(a) IN GENERAL.—Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.
(b) EFFECTIVE DATE.—This section shall apply to benefits provided on or after July 1, 1998.

<< 8 USCA § 1611 NOTE >>

SEC. 506. STUDY AND REPORT ON ALIEN STUDENT ELIGIBILITY FOR POSTSECONDARY FEDERAL STUDENT FINANCIAL ASSISTANCE.

(a) GAO STUDY AND REPORT.—
(1) STUDY.—The Comptroller General shall conduct a study to determine the extent to which aliens who are not lawfully admitted for permanent residence are receiving postsecondary Federal student financial assistance.
(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Comptroller General shall submit a report to the appropriate committees of the Congress on the study conducted under paragraph (1).
(b) REPORT ON COMPUTER MATCHING PROGRAM.—
(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Education and the Commissioner of Social Security shall jointly submit to the appropriate committees of the Congress a report on the computer matching program of the Department of Education under section 484(p) of the Higher Education Act of 1965.
(2) REPORT ELEMENTS.—The report under paragraph (1) shall include the following:
(A) An assessment by the Secretary and the Commissioner of the effectiveness of the computer matching program, and a justification for such assessment.
(B) The ratio of successful matches under the program to inaccurate matches.
(C) Such other information as the Secretary and the Commissioner jointly consider appropriate.

(c) APPROPRIATE COMMITTEES OF THE CONGRESS.—For purposes of this section the term "appropriate committees of the Congress" means the Committee on Economic and Educational Opportunities and the Committee on the Judiciary of the House of Representatives and the Committee on Labor and Human Resources and the Committee on the Judiciary of the Senate.

## SEC. 507. VERIFICATION OF IMMIGRATION STATUS FOR PURPOSES OF SOCIAL SECURITY AND HIGHER EDUCATIONAL ASSISTANCE.

<< 42 USCA § 1320b–7 >>

(a) SOCIAL SECURITY ACT STATE INCOME AND ELIGIBILITY VERIFICATION SYSTEMS.—Section 1137(d)(4)(B)(i)) of the Social Security Act (42 U.S.C. 1320b–7(d)(4)(B)(i)) is amended to read as follows:

"(i) the State shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,".

<< 20 USCA § 1091 >>

(b) ELIGIBILITY FOR ASSISTANCE UNDER HIGHER EDUCATION ACT OF 1965.—Section 484(g)(4)(B)(i) of the Higher Education Act of 1965 (20 U.S.C. 1091(g)(4)(B)(i)) is amended to read as follows:

"(i) the institution shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,".

<< 8 USCA § 1642 >>

## SEC. 508. NO VERIFICATION REQUIREMENT FOR NONPROFIT CHARITABLE ORGANIZATIONS.

Section 432 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1642) is amended by adding at the end the following new subsection:

"(d) NO VERIFICATION REQUIREMENT FOR NONPROFIT CHARITABLE ORGANIZATIONS.—Subject to subsection (a), a nonprofit charitable organization, in providing any Federal public benefit (as defined in section 401(c)) or any State or local public benefit (as defined in section 411(c)), is not required under this title to determine, verify, or otherwise require proof of eligibility of any applicant for such benefits.".

## SEC. 509. GAO STUDY OF PROVISION OF MEANS–TESTED PUBLIC BENEFITS TO ALIENS WHO ARE NOT QUALIFIED ALIENS ON BEHALF OF ELIGIBLE INDIVIDUALS.

Not later than 180 days after the date of the enactment of this Act, the Comptroller General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate and to the Inspector General of the Department of Justice a report on the extent to which means-tested public benefits are being paid or provided to aliens who are not qualified aliens (as defined in section 431(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) in order to provide such benefits to individuals who are United States citizens or qualified aliens (as so defined). Such report shall address the locations in which such benefits are provided and the incidence of fraud or misrepresentation in connection with the provision of such benefits.

## SEC. 510. TRANSITION FOR ALIENS CURRENTLY RECEIVING BENEFITS UNDER THE FOOD STAMP PROGRAM.

<< 8 USCA § 1612 NOTE >>

Effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, subclause (I) of section 402(a)(2)(D)(ii) (8 U.S.C. 1612(a)(2)(D)(ii)) is amended to read as follows:

<< 8 USCA § 1612 >>

"(I) IN GENERAL.—With respect to the specified Federal program described in paragraph (3)(B), ineligibility under paragraph (1) shall not apply until April 1, 1997, to an alien who received benefits under such program on the date of enactment of this Act, unless such alien is determined to be ineligible to receive such benefits under the Food Stamp Act of 1977. The State agency shall recertify the eligibility of all such aliens during the period beginning April 1, 1997, and ending August 22, 1997.".

Subtitle B—Public Charge Exclusion

SEC. 531. GROUND FOR EXCLUSION.

<< 8 USCA § 1182 >>

(a) IN GENERAL.—Paragraph (4) of section 212(a) (8 U.S.C. 1182(a)) is amended to read as follows:
"(4) PUBLIC CHARGE.—
  "(A) IN GENERAL.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable.
  "(B) FACTORS TO BE TAKEN INTO ACCOUNT.—(i) In determining whether an alien is excludable under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's—
    "(I) age;
    "(II) health;
    "(III) family status;
    "(IV) assets, resources, and financial status; and
    "(V) education and skills.
  "(ii) In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 213A for purposes of exclusion under this paragraph.
  "(C) FAMILY–SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 201(b)(2) or 203(a) is excludable under this paragraph unless—
    "(i) the alien has obtained—
      "(I) status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A), or
      "(II) classification pursuant to clause (ii) or (iii) of section 204(a)(1)(B); or
    "(ii) the person petitioning for the alien's admission (including any additional sponsor required under section 213A(f)) has executed an affidavit of support described in section 213A with respect to such alien.
  "(D) CERTAIN EMPLOYMENT–BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is excludable under this paragraph unless such relative has executed an affidavit of support described in section 213A with respect to such alien.".

<< 8 USCA § 1182 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications submitted on or after such date, not earlier than 30 days and not later than 60 days after the date the Attorney General promulgates under section 551(c)(2) of this division a standard form for an affidavit of support, as the Attorney General shall specify, but subparagraphs (C) and (D) of section 212(a)(4) of the Immigration and Nationality Act, as so amended, shall not apply to applications with respect to which an official interview with an immigration officer was conducted before such effective date.

Subtitle C—Affidavits of Support

SEC. 551. REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT.

<< 8 USCA § 1183a >>

(a) IN GENERAL.—Section 213A (8 U.S.C. 1183a), as inserted by section 423(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, is amended to read as follows:

"REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT

"SEC. 213A. (a) ENFORCEABILITY.—

"(1) TERMS OF AFFIDAVIT.—No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not excludable as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—

"(A) in which the sponsor agrees to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line during the period in which the affidavit is enforceable;

"(B) that is legally enforceable against the sponsor by the sponsored alien, the Federal Government, any State (or any political subdivision of such State), or by any other entity that provides any means-tested public benefit (as defined in subsection (e)), consistent with the provisions of this section; and

"(C) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).

"(2) PERIOD OF ENFORCEABILITY.—An affidavit of support shall be enforceable with respect to benefits provided for an alien before the date the alien is naturalized as a citizen of the United States, or, if earlier, the termination date provided under paragraph (3).

"(3) TERMINATION OF PERIOD OF ENFORCEABILITY UPON COMPLETION OF REQUIRED PERIOD OF EMPLOYMENT, ETC.—

"(A) IN GENERAL.—An affidavit of support is not enforceable after such time as the alien (i) has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters as provided under subparagraph (B), and (ii) in the case of any such qualifying quarter creditable for any period beginning after December 31, 1996, did not receive any Federal means-tested public benefit (as provided under section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) during any such period.

"(B) QUALIFYING QUARTERS.—For purposes of this section, in determining the number of qualifying quarters of coverage under title II of the Social Security Act an alien shall be credited with—

"(i) all of the qualifying quarters of coverage as defined under title II of the Social Security Act worked by a parent of such alien while the alien was under age 18, and

"(ii) all of the qualifying quarters worked by a spouse of such alien during their marriage and the alien remains married to such spouse or such spouse is deceased.

No such qualifying quarter of coverage that is creditable under title II of the Social Security Act for any period beginning after December 31, 1996, may be credited to an alien under clause (i) or (ii) if the parent or spouse (as the case may be) of such alien received any Federal means-tested public benefit (as provided under section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) during the period for which such qualifying quarter of coverage is so credited.

"(C) PROVISION OF INFORMATION TO SAVE SYSTEM.—The Attorney General shall ensure that appropriate information regarding the application of this paragraph is provided to the system for alien verification of eligibility (SAVE) described in section 1137(d)(3) of the Social Security Act.

"(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—

"(1) REQUEST FOR REIMBURSEMENT.—

"(A) REQUIREMENT.—Upon notification that a sponsored alien has received any means-tested public benefit, the appropriate nongovernmental entity which provided such benefit or the appropriate entity of the Federal Government, a State, or any political subdivision of a State shall request reimbursement by the sponsor in an amount which is equal to the unreimbursed costs of such benefit.

AR.03631

"(B) REGULATIONS.—The Attorney General, in consultation with the heads of other appropriate Federal agencies, shall prescribe such regulations as may be necessary to carry out subparagraph (A).

"(2) ACTIONS TO COMPEL REIMBURSEMENT.—

"(A) IN CASE OF NONRESPONSE.—If within 45 days after a request for reimbursement under paragraph (1)(A), the appropriate entity has not received a response from the sponsor indicating a willingness to commence payment an action may be brought against the sponsor pursuant to the affidavit of support.

"(B) IN CASE OF FAILURE TO PAY.—If the sponsor fails to abide by the repayment terms established by the appropriate entity, the entity may bring an action against the sponsor pursuant to the affidavit of support.

"(C) LIMITATION ON ACTIONS.—No cause of action may be brought under this paragraph later than 10 years after the date on which the sponsored alien last received any means-tested public benefit to which the affidavit of support applies.

"(3) USE OF COLLECTION AGENCIES.—If the appropriate entity under paragraph (1)(A) requests reimbursement from the sponsor or brings an action against the sponsor pursuant to the affidavit of support, the appropriate entity may appoint or hire an individual or other person to act on behalf of such entity acting under the authority of law for purposes of collecting any amounts owed.

"(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.

"(d) NOTIFICATION OF CHANGE OF ADDRESS.—

"(1) GENERAL REQUIREMENT.—The sponsor shall notify the Attorney General and the State in which the sponsored alien is currently a resident within 30 days of any change of address of the sponsor during the period in which an affidavit of support is enforceable.

"(2) PENALTY.—Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall, after notice and opportunity to be heard, be subject to a civil penalty of—

"(A) not less than $250 or more than $2,000, or

"(B) if such failure occurs with knowledge that the sponsored alien has received any means-tested public benefits (other than benefits described in section 401(b), 403(c)(2), or 411(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996) not less than $2,000 or more than $5,000.

The Attorney General shall enforce this paragraph under appropriate regulations.

"(e) JURISDICTION.—An action to enforce an affidavit of support executed under subsection (a) may be brought against the sponsor in any appropriate court—

"(1) by a sponsored alien, with respect to financial support; or

"(2) by the appropriate entity of the Federal Government, a State or any political subdivision of a State, or by any other nongovernmental entity under subsection (b)(2), with respect to reimbursement.

"(f) SPONSOR DEFINED.—

"(1) IN GENERAL.—For purposes of this section the term 'sponsor' in relation to a sponsored alien means an individual who executes an affidavit of support with respect to the sponsored alien and who—

"(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

"(B) is at least 18 years of age;

"(C) is domiciled in any of the several States of the United States, the District of Columbia, or any territory or possession of the United States;

"(D) is petitioning for the admission of the alien under section 204; and

"(E) demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

"(2) INCOME REQUIREMENT CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(E) but accepts joint and several liability together with an individual under paragraph (5).

"(3) ACTIVE DUTY ARMED SERVICES CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(E) but is on active duty (other than active duty for training) in the Armed Forces of the United States, is petitioning for the admission of the alien under section 204 as the spouse or child of the individual, and demonstrates (as provided in paragraph (6)) the means to maintain an annual income equal to at least 100 percent of the Federal poverty line.

"(4) CERTAIN EMPLOYMENT–BASED IMMIGRANTS CASE.—Such term also includes an individual—

"(A) who does not meet the requirement of paragraph (1)(D), but is the relative of the sponsored alien who filed a classification petition for the sponsored alien as an employment-based immigrant under section 203(b) or who has a significant ownership interest in the entity that filed such a petition; and

"(B)(i) who demonstrates (as provided under paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line, or

"(ii) does not meet the requirement of paragraph (1)(E) but accepts joint and several liability together with an individual under paragraph (5).

"(5) NON–PETITIONING CASE.—Such term also includes an individual who does not meet the requirement of paragraph (1)(D) but who accepts joint and several liability with a petitioning sponsor under paragraph (2) or relative of an employment-based immigrant under paragraph (4) and who demonstrates (as provided under paragraph (6)) the means to maintain an annual income equal to at least 125 percent of the Federal poverty line.

"(6) DEMONSTRATION OF MEANS TO MAINTAIN INCOME.—

"(A) IN GENERAL.—

"(i) METHOD OF DEMONSTRATION.—For purposes of this section, a demonstration of the means to maintain income shall include provision of a certified copy of the individual's Federal income tax return for the individual's 3 most recent taxable years and a written statement, executed under oath or as permitted under penalty of perjury under section 1746 of title 28, United States Code, that the copies are certified copies of such returns.

"(ii) FLEXIBILITY.—For purposes of this section, aliens may demonstrate the means to maintain income through demonstration of significant assets of the sponsored alien or of the sponsor, if such assets are available for the support of the sponsored alien.

"(iii) PERCENT OF POVERTY.—For purposes of this section, a reference to an annual income equal to at least a particular percentage of the Federal poverty line means an annual income equal to at least such percentage of the Federal poverty line for a family unit of a size equal to the number of members of the sponsor's household (including family and non-family dependents) plus the total number of other dependents and aliens sponsored by that sponsor.

"(B) LIMITATION.—The Secretary of State, or the Attorney General in the case of adjustment of status, may provide that the demonstration under subparagraph (A) applies only to the most recent taxable year.

"(h) FEDERAL POVERTY LINE DEFINED.—For purposes of this section, the term 'Federal poverty line' means the level of income equal to the official poverty line (as defined by the Director of the Office of Management and Budget, as revised annually by the Secretary of Health and Human Services, in accordance with section 673(2) of the Omnibus Budget Reconciliation Act of 1981 (42 U.S.C. 9902)) that is applicable to a family of the size involved.

"(i) SPONSOR'S SOCIAL SECURITY ACCOUNT NUMBER REQUIRED TO BE PROVIDED.—(1) An affidavit of support shall include the social security account number of each sponsor.

"(2) The Attorney General shall develop an automated system to maintain the social security account number data provided under paragraph (1).

"(3) The Attorney General shall submit an annual report to the Committees on the Judiciary of the House of Representatives and the Senate setting forth—

"(A) for the most recent fiscal year for which data are available the number of sponsors under this section and the number of sponsors in compliance with the financial obligations of this section; and

"(B) a comparison of such numbers with the numbers of such sponsors for the preceding fiscal year.".

(b) CONFORMING AMENDMENTS.—

<< 8 USCA §§ 1631, 1632 >>

(1) Section 421(a)(1) and section 422(a)(1) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631(a)(1), 1632(a)(1)) are each amended by inserting "and as amended by section 551(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996" after "section 423".

<< 8 USCA § 1183a NOTE >>

(2) Section 423 of such Act (8 U.S.C. 1138a note) is amended by striking subsection (c).

<< 8 USCA § 1183a NOTE >>

(c) EFFECTIVE DATE; PROMULGATION OF FORM.—

  (1) IN GENERAL.—The amendments made by this section shall apply to affidavits of support executed on or after a date specified by the Attorney General, which date shall be not earlier than 60 days (and not later than 90 days) after the date the Attorney General formulates the form for such affidavits under paragraph (2).

  (2) PROMULGATION OF FORM.—Not later than 90 days after the date of the enactment of this Act, the Attorney General, in consultation with the heads of other appropriate agencies, shall promulgate a standard form for an affidavit of support consistent with the provisions of section 213A of the Immigration and Nationality Act, as amended by subsection (a).

<< 8 USCA § 1631 >>

SEC. 552. INDIGENCE AND BATTERED SPOUSE AND CHILD EXCEPTIONS TO FEDERAL ATTRIBUTION OF INCOME RULE.

  Section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631) is amended by adding at the end the following new subsection:

  "(e) INDIGENCE EXCEPTION.—

  "(1) IN GENERAL.—For an alien for whom an affidavit of support under section 213A of the Immigration and Nationality Act has been executed, if a determination described in paragraph (2) is made, the amount of income and resources of the sponsor or the sponsor's spouse which shall be attributed to the sponsored alien shall not exceed the amount actually provided for a period beginning on the date of such determination and ending 12 months after such date.

  "(2) DETERMINATION DESCRIBED.—A determination described in this paragraph is a determination by an agency that a sponsored alien would, in the absence of the assistance provided by the agency, be unable to obtain food and shelter, taking into account the alien's own income, plus any cash, food, housing, or other assistance provided by other individuals, including the sponsor. The agency shall notify the Attorney General of each such determination, including the names of the sponsor and the sponsored alien involved.

  "(f) SPECIAL RULE FOR BATTERED SPOUSE AND CHILD.—

  "(1) IN GENERAL.—Subject to paragraph (2) and notwithstanding any other provision of this section, subsection (a) shall not apply to benefits—

  "(A) during a 12 month period if the alien demonstrates that (i) the alien has been battered or subjected to extreme cruelty in the United States by a spouse or a parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented to or acquiesced to such battery or cruelty, or (ii) the alien's child has been battered or subjected to extreme cruelty in the United States by the spouse or parent of the alien (without the active participation of the alien in the battery or cruelty), or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the battery or cruelty described in clause (i) or (ii) (in the opinion of the agency providing such public benefits, which opinion is not subject to review by any court) has a substantial connection to the need for the public benefits applied for; and

  "(B) after a 12 month period (regarding the batterer's income and resources only) if the alien demonstrates that such battery or cruelty under subparagraph (A) has been recognized in an order of a judge or administrative law judge or a prior determination of the Immigration and Naturalization Service, and that such battery or cruelty (in the opinion of the agency providing such public benefits, which opinion is not subject to review by any court) has a substantial connection to the need for the benefits.

"(2) LIMITATION.—The exception under paragraph (1) shall not apply to benefits for an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual who was subjected to such battery or cruelty.".

<< 8 USCA § 1624 >>

## SEC. 553. AUTHORITY OF STATES AND POLITICAL SUBDIVISIONS OF STATES TO LIMIT ASSISTANCE TO ALIENS AND TO DISTINGUISH AMONG CLASSES OF ALIENS IN PROVIDING GENERAL CASH PUBLIC ASSISTANCE.

(a) IN GENERAL.—Subject to subsection (b) and notwithstanding any other provision of law, a State or political subdivision of a State is authorized to prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance furnished under the law of the State or a political subdivision of a State.

(b) LIMITATION.—The authority provided for under subsection (a) may be exercised only to the extent that any prohibitions, limitations, or restrictions imposed by a State or political subdivision of a State are not more restrictive than the prohibitions, limitations, or restrictions imposed under comparable Federal programs. For purposes of this section, attribution to an alien of a sponsor's income and resources (as described in section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631)) for purposes of determining eligibility for, and the amount of, benefits shall be considered less restrictive than a prohibition of eligibility for such benefits.

Subtitle D—Miscellaneous Provisions

<< 18 USCA § 506 >>

## SEC. 561. INCREASED MAXIMUM CRIMINAL PENALTIES FOR FORGING OR COUNTERFEITING SEAL OF A FEDERAL DEPARTMENT OR AGENCY TO FACILITATE BENEFIT FRAUD BY AN UNLAWFUL ALIEN.

Section 506 of title 18, United States Code, is amended to read as follows:

"§ 506. Seals of departments or agencies

"(a) Whoever—

"(1) falsely makes, forges, counterfeits, mutilates, or alters the seal of any department or agency of the United States, or any facsimile thereof;

"(2) knowingly uses, affixes, or impresses any such fraudulently made, forged, counterfeited, mutilated, or altered seal or facsimile thereof to or upon any certificate, instrument, commission, document, or paper of any description; or

"(3) with fraudulent intent, possesses, sells, offers for sale, furnishes, offers to furnish, gives away, offers to give away, transports, offers to transport, imports, or offers to import any such seal or facsimile thereof, knowing the same to have been so falsely made, forged, counterfeited, mutilated, or altered,

shall be fined under this title, or imprisoned not more than 5 years, or both.

"(b) Notwithstanding subsection (a) or any other provision of law, if a forged, counterfeited, mutilated, or altered seal of a department or agency of the United States, or any facsimile thereof, is—

"(1) so forged, counterfeited, mutilated, or altered;

"(2) used, affixed, or impressed to or upon any certificate, instrument, commission, document, or paper of any description; or

"(3) with fraudulent intent, possessed, sold, offered for sale, furnished, offered to furnish, given away, offered to give away, transported, offered to transport, imported, or offered to import,

with the intent or effect of facilitating an alien's application for, or receipt of, a Federal benefit to which the alien is not entitled, the penalties which may be imposed for each offense under subsection (a) shall be two times the maximum fine, and 3 times the maximum term of imprisonment, or both, that would otherwise be imposed for an offense under subsection (a).

"(c) For purposes of this section—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(1) the term 'Federal benefit' means—

"(A) the issuance of any grant, contract, loan, professional license, or commercial license provided by any agency of the United States or by appropriated funds of the United States; and

"(B) any retirement, welfare, Social Security, health (including treatment of an emergency medical condition in accordance with section 1903(v) of the Social Security Act (19 U.S.C. 1396b(v))), disability, veterans, public housing, education, food stamps, or unemployment benefit, or any similar benefit for which payments or assistance are provided by an agency of the United States or by appropriated funds of the United States; and

"(2) each instance of forgery, counterfeiting, mutilation, or alteration shall constitute a separate offense under this section.".

<< 8 USCA § 1369 >>

## SEC. 562. TREATMENT OF EXPENSES SUBJECT TO EMERGENCY MEDICAL SERVICES EXCEPTION.

(a) IN GENERAL.—Subject to such amounts as are provided in advance in appropriation Acts, each State or political subdivision of a State that provides medical assistance for care and treatment of an emergency medical condition (as defined in subsection (d)) through a public hospital or other public facility (including a nonprofit hospital that is eligible for an additional payment adjustment under section 1886 of the Social Security Act) or through contract with another hospital or facility to an individual who is an alien not lawfully present in the United States is eligible for payment from the Federal Government of its costs of providing such services, but only to the extent that such costs are not otherwise reimbursed through any other Federal program and cannot be recovered from the alien or another person.

(b) CONFIRMATION OF IMMIGRATION STATUS REQUIRED.—No payment shall be made under this section with respect to services furnished to an individual unless the immigration status of the individual has been verified through appropriate procedures established by the Secretary of Health and Human Services and the Attorney General.

(c) ADMINISTRATION.—This section shall be administered by the Attorney General, in consultation with the Secretary of Health and Human Services.

(d) EMERGENCY MEDICAL CONDITION DEFINED.—For purposes of this section, the term "emergency medical condition" means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(1) placing the patient's health in serious jeopardy,

(2) serious impairment to bodily functions, or

(3) serious dysfunction of any bodily organ or part.

(e) EFFECTIVE DATE.—Subsection (a) shall apply to medical assistance for care and treatment of an emergency medical condition furnished on or after January 1, 1997.

<< 8 USCA § 1370 >>

## SEC. 563. REIMBURSEMENT OF STATES AND LOCALITIES FOR EMERGENCY AMBULANCE SERVICES.

Subject to the availability of appropriations, the Attorney General shall fully reimburse States and political subdivisions of States for costs incurred by such a State or subdivision for emergency ambulance services provided to any alien who—

(1) is injured while crossing a land or sea border of the United States without inspection or at any time or place other than as designated by the Attorney General; and

(2) is under the custody of the State or subdivision pursuant to a transfer, request, or other action by a Federal authority.

## SEC. 564. PILOT PROGRAMS TO REQUIRE BONDING.

<< 8 USCA § 1183a NOTE >>

(a) IN GENERAL.—

(1) The Attorney General of the United States shall establish a pilot program in 5 district offices of the Immigration and Naturalization Service to require aliens to post a bond in addition to the affidavit requirements under section 213A of the

Immigration and Nationality Act and the deeming requirements under section 421 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1631). Any pilot program established pursuant to this subsection shall require an alien to post a bond in an amount sufficient to cover the cost of benefits described in section 213A(d)(2)(B) of the Immigration and Nationality Act (as amended by section 551(a) of this division) for the alien and the alien's dependents and shall remain in effect until the departure, naturalization, or death of the alien.

  (2) Suit on any such bonds may be brought under the terms and conditions set forth in section 213A of the Immigration and Nationality Act.

 (b) REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Attorney General shall issue regulations for establishing the pilot programs, including—

  (1) criteria and procedures for—

   (A) certifying bonding companies for participation in the program, and

   (B) debarment of any such company that fails to pay a bond, and

  (2) criteria for setting the amount of the bond to assure that the bond is in an amount that is not less than the cost of providing benefits under the programs described in subsection (a)(1) for the alien and the alien's dependents for 6 months.

 (c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section.

 (d) ANNUAL REPORTING REQUIREMENT.—Beginning 9 months after the date of implementation of the pilot program, the Attorney General shall submit annually to the Committees on the Judiciary of the House of Representatives and the Senate a report on the effectiveness of the program. The Attorney General shall submit a final evaluation of the program not later than 1 year after termination.

 (e) SUNSET.—The pilot program under this section shall terminate after 3 years of operation.

<< 8 USCA § 1183 >>

<< 8 USCA § 1183a NOTE >>

 (f) BONDS IN ADDITION TO SPONSORSHIP AND DEEMING REQUIREMENTS.—Section 213 (8 U.S.C. 1183) is amended by inserting "(subject to the affidavit of support requirement and attribution of sponsor's income and resources under section 213A)" after "in the discretion of the Attorney General".

<< 8 USCA § 1371 >>

SEC. 565. REPORTS.

 Not later than 180 days after the end of each fiscal year, the Attorney General shall submit a report to the Inspector General of the Department of Justice and the Committees on the Judiciary of the House of Representatives and of the Senate describing the following:

  (1) PUBLIC CHARGE DEPORTATIONS.—The number of aliens deported on public charge grounds under section 241(a)(5) of the Immigration and Nationality Act during the previous fiscal year.

  (2) INDIGENT SPONSORS.—The number of determinations made under section 421(e) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (as added by section 552 of this division) during the previous fiscal year.

  (3) REIMBURSEMENT ACTIONS.—The number of actions brought, and the amount of each action, for reimbursement under section 213A of the Immigration and Nationality Act (including private collections) for the costs of providing public benefits.

Subtitle E—Housing Assistance

<< 42 USCA § 1436a NOTE >>

SEC. 571. SHORT TITLE.

 This subtitle may be cited as the "Use of Assisted Housing by Aliens Act of 1996".

<< 42 USCA § 1436a >>

## SEC. 572. PRORATING OF FINANCIAL ASSISTANCE.

Section 214(b) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(b)) is amended—

(1) by inserting "(1)" after "(b)"; and

(2) by adding at the end the following new paragraph:

"(2) If the eligibility for financial assistance of at least one member of a family has been affirmatively established under the program of financial assistance and under this section, and the ineligibility of one or more family members has not been affirmatively established under this section, any financial assistance made available to that family by the Secretary of Housing and Urban Development shall be prorated, based on the number of individuals in the family for whom eligibility has been affirmatively established under the program of financial assistance and under this section, as compared with the total number of individuals who are members of the family.".

<< 42 USCA § 1436a >>

## SEC. 573. ACTIONS IN CASES OF TERMINATION OF FINANCIAL ASSISTANCE.

Section 214(c)(1) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(c)(1)) is amended—

(1) in the matter preceding subparagraph (A), by striking "may, in its discretion," and inserting "shall";

(2) in subparagraph (A), by adding at the end the following: "Financial assistance continued under this subparagraph for a family may be provided only on a prorated basis, under which the amount of financial assistance is based on the percentage of the total number of members of the family that are eligible for that assistance under the program of financial assistance and under this section."; and

(3) in subparagraph (B)—

(A) by striking "3 years" and inserting "18-months";

(B) by inserting "(i)" after "(B)";

(C) by striking "Any deferral" and inserting the following:

"(ii) Except as provided in clause (iii), any deferral"; and

(D) by adding at the end the following new clauses:

"(iii) The time period described in clause (ii) shall not apply in the case of a refugee under section 207 of the Immigration and Nationality Act or an individual seeking asylum under section 208 of that Act.".

<< 42 USCA § 1436a >>

## SEC. 574. VERIFICATION OF IMMIGRATION STATUS AND ELIGIBILITY FOR FINANCIAL ASSISTANCE.

Section 214(d) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(d)) is amended—

(1) in the matter preceding paragraph (1), by inserting "or to be" after "being";

(2) in paragraph (1)(A), by adding at the end the following: "If the declaration states that the individual is not a citizen or national of the United States and that the individual is younger than 62 years of age, the declaration shall be verified by the Immigration and Naturalization Service. If the declaration states that the individual is a citizen or national of the United States, the Secretary of Housing and Urban Development, or the agency administering assistance covered by this section, may request verification of the declaration by requiring presentation of documentation that the Secretary considers appropriate, including a United States passport, resident alien card, alien registration card, social security card, or other documentation.";

(3) in paragraph (2)—

(A) in the matter preceding subparagraph (A), by striking "on the date of the enactment of the Housing and Community Development Act of 1987" and inserting "on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996 or applying for financial assistance on or after that date"; and

(B) by adding at the end the following:

AR.03638
506

"In the case of an individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, the Secretary may not provide any such assistance for the benefit of that individual before documentation is presented and verified under paragraph (3) or (4).";

(4) in paragraph (4)—

(A) in the matter preceding subparagraph (A), by striking "on the date of the enactment of the Housing and Community Development Act of 1987" and inserting "on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996 or applying for financial assistance on or after that date";

(B) in subparagraph (A)—

(i) in clause (i)—

(I) by inserting ", not to exceed 30 days," after "reasonable opportunity"; and

(II) by striking "and" at the end; and

(ii) by striking clause (ii) and inserting the following:

"(ii) in the case of any individual receiving assistance on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, may not delay, deny, reduce, or terminate the eligibility of that individual for financial assistance on the basis of the immigration status of that individual until the expiration of that 30–day period; and

"(iii) in the case of any individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, may not deny the application for such assistance on the basis of the immigration status of that individual until the expiration of that 30–day period; and"; and

(C) in subparagraph (B), by striking clause (ii) and inserting the following:

"(ii) pending such verification or appeal, the Secretary may not—

"(I) in the case of any individual receiving assistance on the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, delay, deny, reduce, or terminate the eligibility of that individual for financial assistance on the basis of the immigration status of that individual; and

"(II) in the case of any individual applying for financial assistance on or after the date of enactment of the Use of Assisted Housing by Aliens Act of 1996, deny the application for such assistance on the basis of the immigration status of that individual; and";

(5) in paragraph (5), by striking "status—" and all that follows through the end of the paragraph and inserting the following: "status, the Secretary shall—

"(A) deny the application of that individual for financial assistance or terminate the eligibility of that individual for financial assistance, as applicable;

"(B) provide that the individual may request a fair hearing during the 30–day period beginning upon receipt of the notice under subparagraph (C); and

"(C) provide to the individual written notice of the determination under this paragraph, the right to a fair hearing process, and the time limitation for requesting a hearing under subparagraph (C)."; and

(6) by striking paragraph (6) and inserting the following:

"(6) The Secretary shall terminate the eligibility for financial assistance of an individual and the members of the household of the individual, for a period of not less than 24 months, upon determining that such individual has knowingly permitted another individual who is not eligible for such assistance to reside in the public or assisted housing unit of the individual. This provision shall not apply to a family if the ineligibility of the ineligible individual at issue was considered in calculating any proration of assistance provided for the family.".

<< 42 USCA § 1436a >>

SEC. 575. PROHIBITION OF SANCTIONS AGAINST ENTITIES MAKING FINANCIAL ASSISTANCE ELIGIBILITY DETERMINATIONS.

Section 214(e) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(e)) is amended—

(1) in paragraph (2), by adding "or" at the end;

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) in paragraph (3), by adding at the end the following: "the response from the Immigration and Naturalization Service to the appeal of that individual."; and

(3) by striking paragraph (4).

<< 42 USCA § 1436a >>

SEC. 576. ELIGIBILITY FOR PUBLIC AND ASSISTED HOUSING.

Section 214 of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a) is amended by adding at the end the following new subsection:

"(h) VERIFICATION OF ELIGIBILITY.—

"(1) IN GENERAL.—Except in the case of an election under paragraph (2)(A), no individual or family applying for financial assistance may receive such financial assistance prior to the affirmative establishment and verification of eligibility of at least the individual or one family member under this section by the Secretary or other appropriate entity.

"(2) RULES APPLICABLE TO PUBLIC HOUSING AGENCIES.—A public housing agency (as that term is defined in section 3 of the United States Housing Act of 1937)—

"(A) may elect not to comply with this section; and

"(B) in complying with this section—

"(i) may initiate procedures to affirmatively establish or verify the eligibility of an individual or family under this section at any time at which the public housing agency determines that such eligibility is in question, regardless of whether or not that individual or family is at or near the top of the waiting list of the public housing agency;

"(ii) may affirmatively establish or verify the eligibility of an individual or family under this section in accordance with the procedures set forth in section 274A(b)(1) of the Immigration and Nationality Act; and

"(iii) shall have access to any relevant information contained in the SAVE system (or any successor thereto) that relates to any individual or family applying for financial assistance.

"(3) ELIGIBILITY OF FAMILIES.—For purposes of this subsection, with respect to a family, the term 'eligibility' means the eligibility of each family member.".

<< 42 USCA § 1436a NOTE >>

SEC. 577. REGULATIONS.

(a) ISSUANCE.—Not later than the 60 days after the date of enactment of this Act, the Secretary of Housing and Urban Development shall issue any regulations necessary to implement the amendments made by this part. Such regulations shall be issued in the form of an interim final rule, which shall take effect upon issuance and shall not be subject to the provisions of section 533 of title 5, United States Code, regarding notice or opportunity for comment.

(b) FAILURE TO ISSUE.—If the Secretary fails to issue the regulations required under subsection (a) before the date specified in that subsection, the regulations relating to restrictions on assistance to noncitizens, contained in the final rule issued by the Secretary of Housing and Urban Development in RIN–2501–AA63 (Docket No. R–95–1409; FR–2383–F–050), published in the Federal Register on March 20, 1995 (Vol. 60, No. 53; pp. 14824–14861), shall not apply after that date.

Subtitle F—General Provisions

<< 8 USCA § 1101 NOTE >>

SEC. 591. EFFECTIVE DATES.

Except as provided in this title, this title and the amendments made by this title shall take effect on the date of the enactment of this Act.

<< 8 USCA § 1101 NOTE >>

AR.03640
508

SEC. 592. NOT APPLICABLE TO FOREIGN ASSISTANCE.

 This title does not apply to any Federal, State, or local governmental program, assistance, or benefits provided to an alien under any program of foreign assistance as determined by the Secretary of State in consultation with the Attorney General.

<< 8 USCA § 1101 NOTE >>

SEC. 593. NOTIFICATION.

 (a) IN GENERAL.—Each agency of the Federal Government or a State or political subdivision that administers a program affected by the provisions of this title, shall, directly or through the States, provide general notification to the public and to program recipients of the changes regarding eligibility for any such program pursuant to this title.
 (b) FAILURE TO GIVE NOTICE.—Nothing in this section shall be construed to require or authorize continuation of eligibility if the notice under this section is not provided.

<< 8 USCA § 1101 NOTE >>

SEC. 594. DEFINITIONS.

 Except as otherwise provided in this title, for purposes of this title—
   (1) the terms "alien", "Attorney General", "national", "naturalization", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act; and
   (2) the term "child" shall have the meaning given such term in section 101(c) of the Immigration and Nationality Act.

TITLE VI—MISCELLANEOUS PROVISIONS

Subtitle A—Refugees, Parole, and Asylum

SEC. 601. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.

 (a) DEFINITION OF REFUGEE.—

<< 8 USCA § 1101 >>

 (1) Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended by adding at the end the following: "For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.".

<< 8 USCA § 1101 NOTE >>

 (2) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and countries of origin of aliens granted refugee status or asylum under determinations pursuant to the amendment made by paragraph (1). Each such report shall also contain projections regarding the number and countries of origin of aliens that are likely to be granted refugee status or asylum for the subsequent 2 fiscal years.

<< 8 USCA § 1157 >>

 (b) NUMERICAL LIMITATION.—Section 207(a) (8 U.S.C. 1157(a)) is amended by adding at the end the following new paragraph:

"(5) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the third sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).".

SEC. 602. LIMITATION ON USE OF PAROLE

<< 8 USCA § 1182 >>

(a) PAROLE AUTHORITY.—Section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)) is amended by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit".

<< 8 USCA § 1182 NOTE >>

(b) REPORT TO CONGRESS.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and categories of aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act. Each such report shall provide the total number of aliens paroled into and residing in the United States and shall contain information and data for each country of origin concerning the number and categories of aliens paroled, the duration of parole, the current status of aliens paroled, and the number and categories of aliens returned to the custody from which they were paroled during the preceding fiscal year.

<< 8 USCA § 1151 >>

SEC. 603. TREATMENT OF LONG–TERM PAROLEES IN APPLYING WORLDWIDE NUMERICAL LIMITATIONS.

Section 201(c) (8 U.S.C. 1151(c)) is amended—

(1) by amending paragraph (1)(A)(ii) to read as follows:

"(ii) the sum of the number computed under paragraph (2) and the number computed under paragraph (4), plus"; and

(2) by adding at the end the following new paragraphs:

"(4) The number computed under this paragraph for a fiscal year (beginning with fiscal year 1999) is the number of aliens who were paroled into the United States under section 212(d)(5) in the second preceding fiscal year—

"(A) who did not depart from the United States (without advance parole) within 365 days; and

"(B) who (i) did not acquire the status of aliens lawfully admitted to the United States for permanent residence in the two preceding fiscal years, or (ii) acquired such status in such years under a provision of law (other than section 201(b)) which exempts such adjustment from the numerical limitation on the worldwide level of immigration under this section.

"(5) If any alien described in paragraph (4) (other than an alien described in paragraph (4)(B)(ii)) is subsequently admitted as an alien lawfully admitted for permanent residence, such alien shall not again be considered for purposes of paragraph (1).".

SEC. 604. ASYLUM REFORM.

<< 8 USCA § 1158 >>

(a) ASYLUM REFORM.—Section 208 (8 U.S.C. 1158) is amended to read as follows:

"ASYLUM

"SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

"(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b).

"(2) EXCEPTIONS.—

"(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

"(B) TIME LIMIT.—Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States.

"(C) PREVIOUS ASYLUM APPLICATIONS.—Subject to subparagraph (D), paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

"(D) CHANGED CIRCUMSTANCES.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

"(3) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2).

"(b) CONDITIONS FOR GRANTING ASYLUM.—

"(1) IN GENERAL.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

"(2) EXCEPTIONS.—

"(A) IN GENERAL.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

"(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

"(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

"(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

"(vi) the alien was firmly resettled in another country prior to arriving in the United States.

"(B) SPECIAL RULES.—

"(i) CONVICTION OF AGGRAVATED FELONY.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

"(ii) OFFENSES.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

"(C) ADDITIONAL LIMITATIONS.—The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1).

"(D) NO JUDICIAL REVIEW.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

"(3) TREATMENT OF SPOUSE AND CHILDREN.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

"(c) ASYLUM STATUS.—

"(1) IN GENERAL.—In the case of an alien granted asylum under subsection (b), the Attorney General—

"(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

"(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

"(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

"(2) TERMINATION OF ASYLUM.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

"(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

"(B) the alien meets a condition described in subsection (b)(2);

"(C) the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

"(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

"(E) the alien has acquired a new nationality and enjoys the protection of the country of his or her new nationality.

"(3) REMOVAL WHEN ASYLUM IS TERMINATED.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

"(d) ASYLUM PROCEDURE.—

"(1) APPLICATIONS.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). The Attorney General may require applicants to submit fingerprints and a photograph at such time and in such manner to be determined by regulation by the Attorney General.

"(2) EMPLOYMENT.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

"(3) FEES.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

"(4) NOTICE OF PRIVILEGE OF COUNSEL AND CONSEQUENCES OF FRIVOLOUS APPLICATION.—At the time of filing an application for asylum, the Attorney General shall—

"(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

"(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

"(5) CONSIDERATION OF ASYLUM APPLICATIONS.—

"(A) PROCEDURES.—The procedure established under paragraph (1) shall provide that—

"(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

"(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

"(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

"(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and

"(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

"(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.

"(6) FRIVOLOUS APPLICATIONS.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.

"(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) CONFORMING AND CLERICAL AMENDMENTS.—

(1) The item in the table of contents relating to section 208 is amended to read as follows:

"Sec. 208. Asylum.".

<< 8 USCA § 1159 NOTE >>

(2) Section 104(d)(1)(A) of the Immigration Act of 1990 (Public Law 101–649) is amended by striking "208(b)" and inserting "208".

<< 8 USCA § 1158 NOTE >>

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications for asylum filed on or after the first day of the first month beginning more than 180 days after the date of the enactment of this Act.

## SEC. 605. INCREASE IN ASYLUM OFFICERS.

Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of asylum officers to at least 600 asylum officers by fiscal year 1997.

<< 8 USCA § 1255 NOTE >>

## SEC. 606. CONDITIONAL REPEAL OF CUBAN ADJUSTMENT ACT.

(a) IN GENERAL.—Public Law 89–732 is repealed effective only upon a determination by the President under section 203(c)(3) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (Public Law 104–114) that a democratically elected government in Cuba is in power.

(b) LIMITATION.—Subsection (a) shall not apply to aliens for whom an application for adjustment of status is pending on such effective date.

Subtitle B—Miscellaneous Amendments to the Immigration and Nationality Act

<< 8 USCA § 1184 >>

## SEC. 621. ALIEN WITNESS COOPERATION.

Section 214(j)(1) (8 U.S.C. 1184(j)(1)) (as added by section 130003(b)(2) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 2025)) (relating to numerical limitations on the number of aliens who may be provided a visa as nonimmigrants under section 101(a)(15)(S) of the Immigration and Nationality Act) is amended—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) by striking "100." and inserting "200."; and

(2) by striking "25." and inserting "50.".

SEC. 622. WAIVER OF FOREIGN COUNTRY RESIDENCE REQUIREMENT WITH RESPECT TO INTERNATIONAL MEDICAL GRADUATES.

<< 8 USCA § 1182 NOTE >>

(a) EXTENSION OF WAIVER PROGRAM.—Section 220(c) of the Immigration and Nationality Technical Corrections Act of 1994 (8 U.S.C. 1182 note) is amended by striking "1996." and inserting "2002.".

<< 8 USCA § 1182 >>

(b) CONDITIONS ON FEDERALLY REQUESTED WAIVERS.—Section 212(e) (8 U.S.C. 1182(e)) is amended by inserting after "except that in the case of a waiver requested by a State Department of Public Health, or its equivalent" the following: ", or in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii),".

<< 8 USCA § 1184 >>

(c) RESTRICTIONS ON FEDERALLY REQUESTED WAIVERS.—Section 214(k) (8 U.S.C. 1184(k)) (as added by section 220(b) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416; 108 Stat. 4319)) is amended to read as follows:

"(k)(1) In the case of a request by an interested State agency, or by an interested Federal agency, for a waiver of the 2–year foreign residence requirement under section 212(e) on behalf of an alien described in clause (iii) of such section, the Attorney General shall not grant such waiver unless—

"(A) in the case of an alien who is otherwise contractually obligated to return to a foreign country, the government of such country furnishes the Director of the United States Information Agency with a statement in writing that it has no objection to such waiver;

"(B) in the case of a request by an interested State agency, the grant of such waiver would not cause the number of waivers allotted for that State for that fiscal year to exceed 20;

"(C) in the case of a request by an interested Federal agency or by an interested State agency—

"(i) the alien demonstrates a bona fide offer of full-time employment at a health facility or health care organization, which employment has been determined by the Attorney General to be in the public interest; and

"(ii) the alien agrees to begin employment with the health facility or health care organization within 90 days of receiving such waiver, and agrees to continue to work for a total of not less than 3 years (unless the Attorney General determines that extenuating circumstances exist, such as closure of the facility or hardship to the alien, which would justify a lesser period of employment at such health facility or health care organization, in which case the alien must demonstrate another bona fide offer of employment at a health facility or health care organization for the remainder of such 3–year period); and

"(D) in the case of a request by an interested Federal agency (other than a request by an interested Federal agency to employ the alien full-time in medical research or training) or by an interested State agency, the alien agrees to practice medicine in accordance with paragraph (2) for a total of not less than 3 years only in the geographic area or areas which are designated by the Secretary of Health and Human Services as having a shortage of health care professionals.

"(2)(A) Notwithstanding section 248(2), the Attorney General may change the status of an alien who qualifies under this subsection and section 212(e) to that of an alien described in section 101(a)(15)(H)(i)(b).

"(B) No person who has obtained a change of status under subparagraph (A) and who has failed to fulfill the terms of the contract with the health facility or health care organization named in the waiver application shall be eligible to apply for an immigrant visa, for permanent residence, or for any other change of nonimmigrant status, until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least 2 years following departure from the United States.

"(3) Notwithstanding any other provision of this subsection, the 2–year foreign residence requirement under section 212(e) shall apply with respect to an alien described in clause (iii) of such section, who has not otherwise been accorded status under section 101(a)(27)(H), if—

"(A) at any time the alien ceases to comply with any agreement entered into under subparagraph (C) or (D) of paragraph (1); or

"(B) the alien's employment ceases to benefit the public interest at any time during the 3–year period described in paragraph (1)(C).".

SEC. 623. USE OF LEGALIZATION AND SPECIAL AGRICULTURAL WORKER INFORMATION.

<< 8 USCA § 1255a >>

(a) CONFIDENTIALITY OF INFORMATION.—Section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) is amended to read as follows:

"(5) CONFIDENTIALITY OF INFORMATION.—

"(A) IN GENERAL.—Except as provided in this paragraph, neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

"(i) use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, for enforcement of paragraph (6), or for the preparation of reports to Congress under section 404 of the Immigration Reform and Control Act of 1986;

"(ii) make any publication whereby the information furnished by any particular applicant can be identified; or

"(iii) permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

"(B) REQUIRED DISCLOSURES.—The Attorney General shall provide the information furnished under this section, and any other information derived from such furnished information, to a duly recognized law enforcement entity in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

"(C) AUTHORIZED DISCLOSURES.—The Attorney General may provide, in the Attorney General's discretion, for the furnishing of information furnished under this section in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

"(D) CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

"(ii) CRIMINAL CONVICTIONS.—Information concerning whether the applicant has at any time been convicted of a crime may be used or released for immigration enforcement or law enforcement purposes.

"(E) CRIME.—Whoever knowingly uses, publishes, or permits information to be examined in violation of this paragraph shall be fined not more than $10,000.".

<< 8 USCA § 1160 >>

(b) SPECIAL AGRICULTURAL WORKERS.—Section 210(b)(6) (8 U.S.C. 1160(b)(6)) is amended to read as follows:

"(6) CONFIDENTIALITY OF INFORMATION.—

"(A) IN GENERAL.—Except as provided in this paragraph, neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

"(i) use the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, including a determination under subsection (a)(3)(B), or for enforcement of paragraph (7);

"(ii) make any publication whereby the information furnished by any particular individual can be identified; or

"(iii) permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

"(B) REQUIRED DISCLOSURES.—The Attorney General shall provide information furnished under this section, and any other information derived from such furnished information, to a duly recognized law enforcement entity in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).

"(C) CONSTRUCTION.—

"(i) IN GENERAL.—Nothing in this paragraph shall be construed to limit the use, or release, for immigration enforcement purposes or law enforcement purposes of information contained in files or records of the Service pertaining to an application filed under this section, other than information furnished by an applicant pursuant to the application, or any other information derived from the application, that is not available from any other source.

"(ii) CRIMINAL CONVICTIONS.—Information concerning whether the applicant has at any time been convicted of a crime may be used or released for immigration enforcement or law enforcement purposes.

"(D) CRIME.—Whoever knowingly uses, publishes, or permits information to be examined in violation of this paragraph shall be fined not more than $10,000.".

SEC. 624. CONTINUED VALIDITY OF LABOR CERTIFICATIONS AND CLASSIFICATION PETITIONS FOR PROFESSIONAL ATHLETES.

<< 8 USCA § 1182 >>

(a) LABOR CERTIFICATION.—Section 212(a)(5)(A) (8 U.S.C. 1182(a)(5)(A)) is amended by adding at the end the following:

"(iii) PROFESSIONAL ATHLETES.—

"(I) IN GENERAL.—A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

"(II) DEFINITION.—For purposes of subclause (I), the term 'professional athlete' means an individual who is employed as an athlete by—

"(aa) a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

"(bb) any minor league team that is affiliated with such an association.".

<< 8 USCA § 1154 >>

(b) CLASSIFICATION PETITIONS.—Section 204 (8 U.S.C. 1154) is amended by adding at the end the following:

"(i) PROFESSIONAL ATHLETES.—

"(1) IN GENERAL.—A petition under subsection (a)(4)(D) for classification of a professional athlete shall remain valid for the athlete after the athlete changes employers, if the new employer is a team in the same sport as the team which was the employer who filed the petition.

"(2) DEFINITION.—For purposes of paragraph (1), the term 'professional athlete' means an individual who is employed as an athlete by—

"(A) a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

"(B) any minor league team that is affiliated with such an association.".

SEC. 625. FOREIGN STUDENTS.

(a) LIMITATIONS.—

AR.03648

<< 8 USCA § 1184 >>

(1) IN GENERAL.—Section 214 (8 U.S.C. 1184) is amended by adding at the end the following new subsection:

"(l)(1) An alien may not be accorded status as a nonimmigrant under section 101(a)(15)(F)(i) in order to pursue a course of study—

"(A) at a public elementary school or in a publicly funded adult education program; or

"(B) at a public secondary school unless—

"(i) the aggregate period of such status at such a school does not exceed 12 months with respect to any alien, and (ii) the alien demonstrates that the alien has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at such school for the period of the alien's attendance.

"(2) An alien who obtains the status of a nonimmigrant under section 101(a)(15)(F)(i) in order to pursue a course of study at a private elementary or secondary school or in a language training program that is not publicly funded shall be considered to have violated such status, and the alien's visa under section 101(a)(15)(F) shall be void, if the alien terminates or abandons such course of study at such a school and undertakes a course of study at a public elementary school, in a publicly funded adult education program, in a publicly funded adult education language training program, or at a public secondary school (unless the requirements of paragraph (1)(B) are met).".

<< 8 USCA § 1101 >>

(2) CONFORMING AMENDMENT.—Section 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)) is amended by inserting "consistent with section 214(l)" after "such a course of study".

(b) REFERENCE TO NEW GROUND OF EXCLUSION FOR STUDENT VISA ABUSERS.—For addition of ground of inadmissibility for certain nonimmigrant student abusers, see section 347 of this division.

<< 8 USCA §§ 1101 NOTE, 1184 nt >>

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to individuals who obtain the status of a nonimmigrant under section 101(a)(15)(F) of the Immigration and Nationality Act after the end of the 60–day period beginning on the date of the enactment of this Act, including aliens whose status as such a nonimmigrant is extended after the end of such period.

SEC. 626. SERVICES TO FAMILY MEMBERS OF CERTAIN OFFICERS AND AGENTS KILLED IN THE LINE OF DUTY.

<< 8 USCA § 1363b >>

(a) IN GENERAL.—Title II, as amended by section 205(a) of this division, is amended by adding at the end the following new section:

"TRANSPORTATION OF REMAINS OF IMMIGRATION OFFICERS
AND BORDER PATROL AGENTS KILLED IN THE LINE OF DUTY

"SEC. 295. (a) IN GENERAL.—To the extent provided in appropriation Acts, when an immigration officer or border patrol agent is killed in the line of duty, the Attorney General may pay from appropriations available for the activity in which the officer or agent was engaged—

"(1) the actual and necessary expenses of transportation of the remains of the officer or agent to a place of burial located in any State, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, the Federated States of Micronesia, or the Republic of Palau;

"(2) travel expenses, including per diem in lieu of subsistence, of the decedent's spouse and minor children to and from such site at rates not greater than those established for official government travel under subchapter I of chapter 57 of title 5, United States Code; and

"(3) any other memorial service authorized by the Attorney General.

"(b) PREPAYMENT.—The Attorney General may prepay any expense authorized to be paid under this section.".

(b) CLERICAL AMENDMENT.—The table of contents, as amended by section 205(b) of this division, is amended by inserting after the item relating to section 294 the following new item:

"Sec. 295. Transportation of remains of immigration officers and border patrol agents killed in the line of duty.".

Subtitle C—Provisions Relating to Visa Processing and Consular Efficiency

<< 8 USCA § 1201 >>

SEC. 631. VALIDITY OF PERIOD OF VISAS.

(a) EXTENSION OF VALIDITY OF IMMIGRANT VISAS TO 6 MONTHS.—Section 221(c) (8 U.S.C. 1201(c)) is amended by striking "four months" and inserting "six months".

(b) AUTHORIZING APPLICATION OF RECIPROCITY RULE FOR NONIMMIGRANT VISA IN CASE OF REFUGEES AND PERMANENT RESIDENTS.—Such section is further amended by inserting before the period at the end of the third sentence the following: "; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States".

SEC. 632. ELIMINATION OF CONSULATE SHOPPING FOR VISA OVERSTAYS.

<< 8 USCA § 1202 >>

(a) IN GENERAL.—Section 222 (8 U.S.C. 1202) is amended by adding at the end the following:

"(g)(1) In the case of an alien who has been admitted on the basis of a nonimmigrant visa and remained in the United States beyond the period of stay authorized by the Attorney General, such visa shall be void beginning after the conclusion of such period of stay.

"(2) An alien described in paragraph (1) shall be ineligible to be readmitted to the United States as a nonimmigrant, except—

"(A) on the basis of a visa (other than the visa described in paragraph (1)) issued in a consular office located in the country of the alien's nationality (or, if there is no office in such country, in such other consular office as the Secretary of State shall specify); or

"(B) where extraordinary circumstances are found by the Secretary of State to exist.".

<< 8 USCA § 1202 NOTE >>

(b) APPLICABILITY.—

(1) VISAS.—Section 222(g)(1) of the Immigration and Nationality Act, as added by subsection (a), shall apply to a visa issued before, on, or after the date of the enactment of this Act.

(2) ALIENS SEEKING READMISSION.—Section 222(g)(2) of the Immigration and Nationality Act, as added by subsection (a), shall apply to any alien applying for readmission to the United States after the date of the enactment of this Act, except an alien applying for readmission on the basis of a visa that—

(A) was issued before such date; and

(B) is not void through the application of section 222(g)(1) of the Immigration and Nationality Act, as added by subsection (a).

<< 8 USCA § 1152 >>

SEC. 633. AUTHORITY TO DETERMINE VISA PROCESSING PROCEDURES.

Section 202(a)(1) (8 U.S.C. 1152(a)(1)) is amended—

(1) by inserting "(A)" after "NONDISCRIMINATION.—"; and

(2) by adding at the end the following:

"(B) Nothing in this paragraph shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.".

<< 8 USCA § 1202 >>

## SEC. 634. CHANGES REGARDING VISA APPLICATION PROCESS.

(a) NONIMMIGRANT APPLICATIONS.—Section 222(c) (8 U.S.C. 1202(c)) is amended—

(1) by striking "personal description" through "marks of identification);";

(2) by striking "applicant" and inserting "applicant, the determination of his eligibility for a nonimmigrant visa,"; and

(3) by adding at the end the following: "At the discretion of the Secretary of State, application forms for the various classes of nonimmigrant admissions described in section 101(a)(15) may vary according to the class of visa being requested.".

(b) DISPOSITION OF APPLICATIONS.—Section 222(e) (8 U.S.C. 1202(e)) is amended—

(1) in the first sentence, by striking "required by this section" and inserting "for an immigrant visa"; and

(2) in the fourth sentence—

  (A) by striking "stamp" and inserting "stamp, or other

  (B) by striking "by the consular officer".

## SEC. 635. VISA WAIVER PROGRAM.

<< 8 USCA § 1187 >>

(a) ELIMINATION OF JOINT ACTION REQUIREMENT.—Section 217 (8 U.S.C. 1187) is amended—

(1) in subsection (a), by striking "Attorney General and the Secretary of State, acting jointly" and inserting "Attorney General, in consultation with the Secretary of State";

(2) in subsection (c)(1), by striking "Attorney General and the Secretary of State acting jointly" and inserting "Attorney General, in consultation with the Secretary of State,"; and

(3) in subsection (d), by striking "Attorney General and the Secretary of State, acting jointly," and inserting "Attorney General, in consultation with the Secretary of State,".

(b) EXTENSION OF PROGRAM.—Section 217(f) (8 U.S.C. 1187(f)) is amended by striking "1996" and inserting "1997.".

(c) DURATION AND TERMINATION OF DESIGNATION OF PILOT PROGRAM COUNTRIES.—

(1) IN GENERAL.—Section 217(g) (8 U.S.C. 1187(g)) is amended to read as follows:

"(g) DURATION AND TERMINATION OF DESIGNATION.—

"(1) IN GENERAL.—

  "(A) DETERMINATION AND NOTIFICATION OF DISQUALIFICATION RATE.—Upon determination by the Attorney General that a pilot program country's disqualification rate is 2 percent or more, the Attorney General shall notify the Secretary of State.

  "(B) PROBATIONARY STATUS.—If the program country's disqualification rate is greater than 2 percent but less than 3.5 percent, the Attorney General shall place the program country in probationary status for a period not to exceed 2 full fiscal years following the year in which the determination under subparagraph (A) is made.

  "(C) TERMINATION OF DESIGNATION.—Subject to paragraph (3), if the program country's disqualification rate is 3.5 percent or more, the Attorney General shall terminate the country's designation as a pilot program country effective at the beginning of the second fiscal year following the fiscal year in which the determination under subparagraph (A) is made.

"(2) TERMINATION OF PROBATIONARY STATUS.—

  "(A) IN GENERAL.—If the Attorney General determines at the end of the probationary period described in paragraph (1) (B) that the program country placed in probationary status under such paragraph has failed to develop a machine-readable passport program as required by section (c)(2)(C), or has a disqualification rate of 2 percent or more, the Attorney General shall terminate the designation of the country as a pilot program country. If the Attorney General determines that the program country has developed a machine-readable passport program and has a disqualification rate of less than 2 percent, the Attorney General shall redesignate the country as a pilot program country.

"(B) EFFECTIVE DATE.—A termination of the designation of a country under subparagraph (A) shall take effect on the first day of the first fiscal year following the fiscal year in which the determination under such subparagraph is made. Until such date, nationals of the country shall remain eligible for a waiver under subsection (a).

"(3) NONAPPLICABILITY OF CERTAIN PROVISIONS.—Paragraph (1)(C) shall not apply unless the total number of nationals of a pilot program country described in paragraph (4)(A) exceeds 100.

"(4) DEFINITION.—For purposes of this subsection, the term 'disqualification rate' means the percentage which—

"(A) the total number of nationals of the pilot program country who were—

"(i) excluded from admission or withdrew their application for admission during the most recent fiscal year for which data are available; and

"(ii) admitted as nonimmigrant visitors during such fiscal year and who violated the terms of such admission; bears to

"(B) the total number of nationals of such country who applied for admission as nonimmigrant visitors during such fiscal year.".

<< 8 USCA § 1187 NOTE >>

(2) TRANSITION.—A country designated as a pilot program country with probationary status under section 217(g) of the Immigration and Nationality Act (as in effect on the day before the date of the enactment of this Act) shall be considered to be designated as a pilot program country on and after such date, subject to placement in probationary status or termination of such designation under such section (as amended by paragraph (1)).

<< 8 USCA § 1187 >>

(3) CONFORMING AMENDMENT.—Section 217(a)(2)(B) (8 U.S.C. 1187(a)(2)(B)) is amended by striking "or is" through "subsection (g)." and inserting a period.

<< 8 USCA § 1153 NOTE >>

SEC. 636. FEE FOR DIVERSITY IMMIGRANT LOTTERY.

The Secretary of State may establish a fee to be paid by each applicant for an immigrant visa described in section 203(c) of the Immigration and Nationality Act. Such fee may be set at a level that will ensure recovery of the cost to the Department of State of allocating visas under such section, including the cost of processing all applications thereunder. All fees collected under this section shall be used for providing consular services. All fees collected under this section shall be deposited as an offsetting collection to any Department of State appropriation and shall remain available for obligations until expended. The provisions of the Act of August 18, 1856 (11 Stat. 58; 22 U.S.C. 4212–4214), concerning accounting for consular fees, shall not apply to fees collected under this section.

<< 8 USCA § 1153 NOTE >>

SEC. 637. ELIGIBILITY FOR VISAS FOR CERTAIN POLISH APPLICANTS FOR THE 1995 DIVERSITY IMMIGRANT PROGRAM.

(a) IN GENERAL.—The Attorney General, in consultation with the Secretary of State, shall include among the aliens selected for diversity immigrant visas for fiscal year 1997 pursuant to section 203(c) of the Immigration and Nationality Act any alien who, on or before September 30, 1995—

(1) was selected as a diversity immigrant under such section for fiscal year 1995;

(2) applied for adjustment of status to that of an alien lawfully admitted for permanent residence pursuant to section 245 of such Act during fiscal year 1995, and whose application, and any associated fees, were accepted by the Attorney General, in accordance with applicable regulations;

(3) was not determined by the Attorney General to be excludable under section 212 of such Act or ineligible under section 203(c)(2) of such Act; and

(4) did not become an alien lawfully admitted for permanent residence during fiscal year 1995.

(b) PRIORITY.—The aliens selected under subsection (a) shall be considered to have been selected for diversity immigrant visas for fiscal year 1997 prior to any alien selected under any other provision of law.

(c) REDUCTION OF IMMIGRANT VISA NUMBER.—For purposes of applying the numerical limitations in sections 201 and 203(c) of the Immigration and Nationality Act, aliens selected under subsection (a) who are granted an immigrant visa shall be treated as aliens granted a visa under section 203(c) of such Act.

Subtitle D—Other Provisions

<< 8 USCA § 1372 >>

SEC. 641. PROGRAM TO COLLECT INFORMATION RELATING TO NONIMMIGRANT FOREIGN STUDENTS AND OTHER EXCHANGE PROGRAM PARTICIPANTS.

(a) IN GENERAL.—

(1) PROGRAM.—The Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall develop and conduct a program to collect from approved institutions of higher education and designated exchange visitor programs in the United States the information described in subsection (c) with respect to aliens who—

(A) have the status, or are applying for the status, of nonimmigrants under subparagraph (F), (J), or (M) of section 101(a) (15) of the Immigration and Nationality Act; and

(B) are nationals of the countries designated under subsection (b).

(2) DEADLINE.—The program shall commence not later than January 1, 1998.

(b) COVERED COUNTRIES.—The Attorney General, in consultation with the Secretary of State, shall designate countries for purposes of subsection (a)(1)(B). The Attorney General shall initially designate not less than 5 countries and may designate additional countries at any time while the program is being conducted.

(c) INFORMATION TO BE COLLECTED.—

(1) IN GENERAL.—The information for collection under subsection (a) with respect to an alien consists of—

(A) the identity and current address in the United States of the alien;

(B) the nonimmigrant classification of the alien and the date on which a visa under the classification was issued or extended or the date on which a change to such classification was approved by the Attorney General;

(C) in the case of a student at an approved institution of higher education, the current academic status of the alien, including whether the alien is maintaining status as a full-time student or, in the case of a participant in a designated exchange visitor program, whether the alien is satisfying the terms and conditions of such program; and

(D) in the case of a student at an approved institution of higher education, any disciplinary action taken by the institution against the alien as a result of the alien's being convicted of a crime or, in the case of a participant in a designated exchange visitor program, any change in the alien's participation as a result of the alien's being convicted of a crime.

(2) FERPA.—The Family Educational Rights and Privacy Act of 1974 shall not apply to aliens described in subsection (a) to the extent that the Attorney General determines necessary to carry out the program under subsection (a).

(3) ELECTRONIC COLLECTION.—The information described in paragraph (1) shall be collected electronically, where practicable.

(4) COMPUTER SOFTWARE.—

(A) COLLECTING INSTITUTIONS.—To the extent practicable, the Attorney General shall design the program in a manner that permits approved institutions of higher education and designated exchange visitor programs to use existing software for the collection, storage, and data processing of information described in paragraph (1).

(B) ATTORNEY GENERAL.—To the extent practicable, the Attorney General shall use or enhance existing software for the collection, storage, and data processing of information described in paragraph (1).

(d) PARTICIPATION BY INSTITUTIONS OF HIGHER EDUCATION AND EXCHANGE VISITOR PROGRAMS.—

(1) CONDITION.—The information described in subsection (c) shall be provided by as a condition of—

(A) in the case of an approved institution of higher education, the continued approval of the institution under subparagraph (F) or (M) of section 101(a)(15) of the Immigration and Nationality Act; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) in the case of an approved institution of higher education or a designated exchange visitor program, the granting of authority to issue documents to an alien demonstrating the alien's eligibility for a visa under subparagraph (F), (J), or (M) of section 101(a)(15) of such Act.

(2) EFFECT OF FAILURE TO PROVIDE INFORMATION.—If an approved institution of higher education or a designated exchange visitor program fails to provide the specified information, such approvals and such issuance of visas shall be revoked or denied.

(e) FUNDING.—

(1) IN GENERAL.—Beginning on April 1, 1997, an approved institution of higher education and a designated exchange visitor program shall impose on, and collect from, each alien described in paragraph (3), with respect to whom the institution or program is required by subsection (a) to collect information, a fee established by the Attorney General under paragraph (4) at the time—

(A) when the alien first registers with the institution or program after entering the United States; or

(B) in a case where a registration under subparagraph (A) does not exist, when the alien first commences activities in the United States with the institution or program.

(2) REMITTANCE.—An approved institution of higher education and a designated exchange visitor program shall remit the fees collected under paragraph (1) to the Attorney General pursuant to a schedule established by the Attorney General.

(3) ALIENS DESCRIBED.—An alien referred to in paragraph (1) is an alien who has nonimmigrant status under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act (other than a nonimmigrant under section 101(a)(15)(J) of such Act who has come to the United States as a participant in a program sponsored by the Federal Government).

(4) AMOUNT AND USE OF FEES.—

(A) ESTABLISHMENT OF AMOUNT.—The Attorney General shall establish the amount of the fee to be imposed on, and collected from, an alien under paragraph (1). Except as provided in subsection (g)(2), the fee imposed on any individual may not exceed $100. The amount of the fee shall be based on the Attorney General's estimate of the cost per alien of conducting the information collection program described in this section.

(B) USE.—Fees collected under paragraph (1) shall be deposited as offsetting receipts into the Immigration Examinations Fee Account (established under section 286(m) of the Immigration and Nationality Act) and shall remain available until expended for the Attorney General to reimburse any appropriation the amount paid out of which is for expenses in carrying out this section.

(f) JOINT REPORT.—Not later than 4 years after the commencement of the program established under subsection (a), the Attorney General, the Secretary of State, and the Secretary of Education shall jointly submit to the Committees on the Judiciary of the Senate and the House of Representatives a report on the operations of the program and the feasibility of expanding the program to cover the nationals of all countries.

(g) WORLDWIDE APPLICABILITY OF THE PROGRAM.—

(1) EXPANSION OF PROGRAM.—

(A) IN GENERAL.—Not later than 6 months after the submission of the report required by subsection (f), the Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall commence expansion of the program to cover the nationals of all countries.

(B) DEADLINE.—Such expansion shall be completed not later than 1 year after the date of the submission of the report referred to in subsection (f).

(2) REVISION OF FEE.—After the program has been expanded, as provided in paragraph (1), the Attorney General may, on a periodic basis, revise the amount of the fee imposed and collected under subsection (e) in order to take into account changes in the cost of carrying out the program.

(h) DEFINITIONS.—As used in this section:

(1) APPROVED INSTITUTION OF HIGHER EDUCATION.—The term "approved institution of higher education" means a college or university approved by the Attorney General, in consultation with the Secretary of Education, under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act.

(2) DESIGNATED EXCHANGE VISITOR PROGRAM.—The term "designated exchange visitor program" means a program that has been—

AR.03654
522

(A) designated by the Director of the United States Information Agency for purposes of section 101(a)(15)(J) of the Immigration and Nationality Act; and

(B) selected by the Attorney General for purposes of the program under this section.

<< 8 USCA § 1373 >>

## SEC. 642. COMMUNICATION BETWEEN GOVERNMENT AGENCIES AND THE IMMIGRATION AND NATURALIZATION SERVICE.

(a) IN GENERAL.—Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES.—Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) OBLIGATION TO RESPOND TO INQUIRIES.—The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

<< 48 USCA § 1901 NOTE >>

## SEC. 643. REGULATIONS REGARDING HABITUAL RESIDENCE.

Not later than 6 months after the date of the enactment of this Act, the Commissioner of Immigration and Naturalization shall issue regulations governing rights of "habitual residence" in the United States under the terms of the following:

(1) The Compact of Free Association between the Government of the United States and the Governments of the Marshall Islands and the Federated States of Micronesia (48 U.S.C. 1901 note).

(2) The Compact of Free Association between the Government of the United States and the Government of Palau (48 U.S.C. 1931 note).

<< 8 USCA § 1374 >>

## SEC. 644. INFORMATION REGARDING FEMALE GENITAL MUTILATION.

(a) PROVISION OF INFORMATION REGARDING FEMALE GENITAL MUTILATION.—The Immigration and Naturalization Service (in cooperation with the Department of State) shall make available for all aliens who are issued immigrant or nonimmigrant visas, prior to or at the time of entry into the United States, the following information:

(1) Information on the severe harm to physical and psychological health caused by female genital mutilation which is compiled and presented in a manner which is limited to the practice itself and respectful to the cultural values of the societies in which such practice takes place.

(2) Information concerning potential legal consequences in the United States for (A) performing female genital mutilation, or (B) allowing a child under his or her care to be subjected to female genital mutilation, under criminal or child protection statutes or as a form of child abuse.

(b) LIMITATION.—In consultation with the Secretary of State, the Commissioner of Immigration and Naturalization shall identify those countries in which female genital mutilation is commonly practiced and, to the extent practicable, limit the provision of information under subsection (a) to aliens from such countries.

(c) DEFINITION.—For purposes of this section, the term "female genital mutilation" means the removal or infibulation (or both) of the whole or part of the clitoris, the labia minora, or labia majora.

SEC. 645. CRIMINALIZATION OF FEMALE GENITAL MUTILATION.

<< 18 USCA § 116 NOTE >>

(a) FINDINGS.—The Congress finds that—

(1) the practice of female genital mutilation is carried out by members of certain cultural and religious groups within the United States;

(2) the practice of female genital mutilation often results in the occurrence of physical and psychological health effects that harm the women involved;

(3) such mutilation infringes upon the guarantees of rights secured by Federal and State law, both statutory and constitutional;

(4) the unique circumstances surrounding the practice of female genital mutilation place it beyond the ability of any single State or local jurisdiction to control;

(5) the practice of female genital mutilation can be prohibited without abridging the exercise of any rights guaranteed under the first amendment to the Constitution or under any other law; and

(6) Congress has the affirmative power under section 8 of article I, the necessary and proper clause, section 5 of the fourteenth Amendment, as well as under the treaty clause, to the Constitution to enact such legislation.

(b) CRIME.—

<< 18 USCA § 116 >>

(1) IN GENERAL.—Chapter 7 of title 18, United States Code, is amended by adding at the end the following:

"§ 116. Female genital mutilation

"(a) Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned not more than 5 years, or both.

"(b) A surgical operation is not a violation of this section if the operation is—

"(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

"(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

"(c) In applying subsection (b)(1), no account shall be taken of the effect on the person on whom the operation is to be performed of any belief on the part of that person, or any other person, that the operation is required as a matter of custom or ritual.".

<< 18 USCA Ch. 7 >>

(2) CONFORMING AMENDMENT.—The table of sections at the beginning of chapter 7 of title 18, United States Code, is amended by adding at the end the following new item:

"116. Female genital mutilation.".

<< 18 USCA § 116 NOTE >>

(c) EFFECTIVE DATE.—The amendments made by subsection (b) shall take effect on the date that is 180 days after the date of the enactment of this Act.

<< 8 USCA § 1255 NOTE >>

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 646. ADJUSTMENT OF STATUS FOR CERTAIN POLISH AND HUNGARIAN PAROLEES.

 (a) IN GENERAL.—The Attorney General shall adjust the status of an alien described in subsection (b) to that of an alien lawfully admitted for permanent residence if the alien—

  (1) applies for such adjustment;

  (2) has been physically present in the United States for at least 1 year and is physically present in the United States on the date the application for such adjustment is filed;

  (3) is admissible to the United States as an immigrant, except as provided in subsection (c); and

  (4) pays a fee (determined by the Attorney General) for the processing of such application.

 (b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided in subsection (a) shall only apply to an alien who—

  (1) was a national of Poland or Hungary; and

  (2) was inspected and granted parole into the United States during the period beginning on November 1, 1989, and ending on December 31, 1991, after being denied refugee status.

 (c) WAIVER OF CERTAIN GROUNDS FOR INADMISSIBILITY.—The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) of the Immigration and Nationality Act shall not apply to adjustment of status under this section and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) and subparagraphs (A), (B), (C), or (E) of paragraph (3)) with respect to such an adjustment for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

 (d) DATE OF APPROVAL.—Upon the approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission as an alien lawfully admitted for permanent residence as of the date of the alien's inspection and parole described in subsection (b)(2).

 (e) NO OFFSET IN NUMBER OF VISAS AVAILABLE.—When an alien is granted the status of having been lawfully admitted for permanent residence under this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act.

<< 8 USCA § 1448 NOTE >>

SEC. 647. SUPPORT OF DEMONSTRATION PROJECTS.

 (a) IN GENERAL.—The Attorney General shall make available funds under this section, in each of fiscal years 1997 through 2001, to the Commissioner of Immigration and Naturalization or to other public or private nonprofit entities to support demonstration projects under this section at 10 sites throughout the United States. Each such project shall be designed to provide for the administration of the oath of allegiance under section 337(a) of the Immigration and Nationality Act on a business day around Independence Day to approximately 500 people whose application for naturalization has been approved. Each project shall provide for appropriate outreach and ceremonial and celebratory activities.

 (b) SELECTION OF SITES.—The Attorney General shall, in the Attorney General's discretion, select diverse locations for sites on the basis of the number of naturalization applicants living in proximity to each site and the degree of local community participation and support in the project to be held at the site. Not more than 2 sites may be located in the same State. The Attorney General shall consider changing the sites selected from year to year.

 (c) AMOUNTS AVAILABLE; USE OF FUNDS.—

  (1) AMOUNT.—The amount made available under this section with respect to any single site for a year shall not exceed $5,000.

  (2) USE.—Funds made available under this section may be used only to cover expenses incurred in carrying out oath administration ceremonies at the demonstration sites under subsection (a), including expenses for—

   (A) cost of personnel of the Immigration and Naturalization Service (including travel and overtime expenses);

   (B) rental of space; and

   (C) costs of printing appropriate brochures and other information about the ceremonies.

  (3) AVAILABILITY OF FUNDS.—Funds that are otherwise available to the Immigration and Naturalization Service to carry out naturalization activities shall be available, to the extent provided in appropriation Acts, to carry out this section.

(d) APPLICATION.—In the case of an entity other than the Immigration and Naturalization Service seeking to conduct a demonstration project under this section, no amounts may be made available to the entity under this section unless an appropriate application has been made to, and approved by, the Attorney General, in a form and manner specified by the Attorney General.

<< 8 USCA § 1101 NOTE >>

SEC. 648. SENSE OF CONGRESS REGARDING AMERICAN–MADE PRODUCTS; REQUIREMENTS REGARDING NOTICE.

(a) PURCHASE OF AMERICAN–MADE EQUIPMENT AND PRODUCTS.—It is the sense of the Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available under this division should be American-made.

(b) NOTICE TO RECIPIENTS OF GRANTS.—In providing grants under this division, the Attorney General, to the greatest extent practicable, shall provide to each recipient of a grant a notice describing the statement made in subsection (a) by the Congress.

<< 50 USCA § 191 >>

SEC. 649. VESSEL MOVEMENT CONTROLS DURING IMMIGRATION EMERGENCY.

Section 1 of the Act of June 15, 1917 (50 U.S.C. 191) is amended in the first sentence by inserting "or whenever the Attorney General determines that an actual or anticipated mass migration of aliens en route to, or arriving off the coast of, the United States presents urgent circumstances requiring an immediate Federal response," after "United States," the first place such term appears.

SEC. 650. REVIEW OF PRACTICES OF TESTING ENTITIES.

(a) IN GENERAL.—The Attorney General shall investigate, and submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate regarding, the practices of entities authorized to administer standardized citizenship tests pursuant to section 312.3(a) of title 8, Code of Federal Regulations. The report shall include any findings of fraudulent practices by such entities.

(b) PRELIMINARY AND FINAL REPORTS.—Not later than 90 days after the date of the enactment of this Act, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a preliminary report on the investigation conducted under subsection (a). The Attorney General shall submit to such Committees a final report on such investigation not later than 275 days after the submission of the preliminary report.

SEC. 651. DESIGNATION OF A UNITED STATES CUSTOMS ADMINISTRATIVE BUILDING.

(a) DESIGNATION.—The United States Customs Administrative Building at the Ysleta/Zaragoza Port of Entry located at 797 South Zaragosa Road in El Paso, Texas, is designated as the "Timothy C. McCaghren Customs Administrative Building".

(b) LEGAL REFERENCES.—Any reference in any law, regulation, document, record, map, or other paper of the United States to the building referred to in subsection (a) is deemed to be a reference to the "Timothy C. McCaghren Customs Administrative Building".

<< 8 USCA § 1375 >>

SEC. 652. MAIL–ORDER BRIDE BUSINESS.

(a) FINDINGS.—The Congress finds as follows:

(1) There is a substantial "mail-order bride" business in the United States. With approximately 200 companies in the United States, an estimated 2,000 to 3,500 men in the United States find wives through mail-order bride catalogs each year. However, there are no official statistics available on the number of mail-order brides entering the United States each year.

(2) The companies engaged in the mail-order bride business earn substantial profits.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) Although many of these mail-order marriages work out, in many other cases, anecdotal evidence suggests that mail-order brides find themselves in abusive relationships. There is also evidence to suggest that a substantial number of mail-order marriages are fraudulent under United States law.

(4) Many mail-order brides come to the United States unaware or ignorant of United States immigration law. Mail-order brides who are battered often think that if they flee an abusive marriage, they will be deported. Often the citizen spouse threatens to have them deported if they report the abuse.

(5) The Immigration and Naturalization Service estimates that the rate of marriage fraud between foreign nationals and United States citizens or aliens lawfully admitted for permanent residence is 8 percent. It is unclear what percentage of these marriage fraud cases originate as mail-order marriages.

(b) INFORMATION DISSEMINATION.—

(1) REQUIREMENT.—Each international matchmaking organization doing business in the United States shall disseminate to recruits, upon recruitment, such immigration and naturalization information as the Immigration and Naturalization Service deems appropriate, in the recruit's native language, including information regarding conditional permanent residence status and the battered spouse waiver under such status, permanent resident status, marriage fraud penalties, the unregulated nature of the business engaged in by such organizations, and the study required under subsection (c).

(2) CIVIL PENALTY.—

(A) VIOLATION.—Any international matchmaking organization that the Attorney General determines has violated subsection (b) shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $20,000 for each such violation.

(B) PROCEDURES FOR IMPOSITION OF PENALTY.—Any penalty under subparagraph (A) may be imposed only after notice and opportunity for an agency hearing on the record in accordance with sections 554 through 557 of title 5, United States Code.

(c) STUDY.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization and the Director of the Violence Against Women Initiative of the Department of Justice, shall conduct a study of mail-order marriages to determine, among other things—

(1) the number of such marriages;

(2) the extent of marriage fraud in such marriages, including an estimate of the extent of marriage fraud arising from the services provided by international matchmaking organizations;

(3) the extent to which mail-order spouses utilize section 244(a)(3) of the Immigration and Nationality Act (providing for suspension of deportation in certain cases involving abuse), or section 204(a)(1)(A)(iii) of such Act (providing for certain aliens who have been abused to file a classification petition on their own behalf);

(4) the extent of domestic abuse in mail-order marriages; and

(5) the need for continued or expanded regulation and education to implement the objectives of the Violence Against Women Act of 1994 and the Immigration Marriage Fraud Amendments of 1986 with respect to mail-order marriages.

(d) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate setting forth the results of the study conducted under subsection (c).

(e) DEFINITIONS.—As used in this section:

(1) INTERNATIONAL MATCHMAKING ORGANIZATION.—

(A) IN GENERAL.—The term "international matchmaking organization" means a corporation, partnership, business, or other legal entity, whether or not organized under the laws of the United States or any State, that does business in the United States and for profit offers to United States citizens or aliens lawfully admitted for permanent residence, dating, matrimonial, or social referral services to nonresident noncitizens, by—

(i) an exchange of names, telephone numbers, addresses, or statistics;

(ii) selection of photographs; or

(iii) a social environment provided by the organization in a country other than the United States.

(B) EXCEPTION.—Such term does not include a traditional matchmaking organization of a religious nature that otherwise operates in compliance with the laws of the countries of the recruits of such organization and the laws of the United States.

(2) RECRUIT.—The term "recruit" means a noncitizen, nonresident person, recruited by the international matchmaking organization for the purpose of providing dating, matrimonial, or social referral services to United States citizens or aliens lawfully admitted for permanent residence.

SEC. 653. REVIEW AND REPORT ON H–2A NONIMMIGRANT WORKERS PROGRAM.

(a) SENSE OF THE CONGRESS.—It is the sense of the Congress that the H2–A nonimmigrant worker program should be reviewed and may need improvement in order to meet the need of producers of labor-intensive agricultural commodities and livestock in the United States for an adequate workforce.

(b) REVIEW.—The Comptroller General shall review the effectiveness of the H–2A nonimmigrant worker program to ensure that the program provides a sufficient supply of agricultural labor in the event of future shortages of domestic workers after the enactment of this Act. Among other things, the Comptroller General shall review the H–2A nonimmigrant worker program to determine—

(1) whether the program ensures that an adequate supply of qualified United States workers is available at the time and place needed for employers seeking such workers after the date of enactment of this Act;

(2) whether the program ensures that there is timely approval of applications for temporary foreign workers under the program in the event of shortages of United States workers after the date of the enactment of this Act;

(3) whether the program ensures that implementation of the program is not displacing United States agricultural workers or diminishing the terms and conditions of employment of United States agricultural workers;

(4) if, and to what extent, the program is contributing to the problem of illegal immigration; and

(5) that the program adequately meets the needs of agricultural employers for all types of temporary foreign agricultural workers, including higher-skilled workers in occupations which require a level of specific vocational preparation of 4 or higher (as described in the 4th edition of the Dictionary of Occupational Title, published by the Department of Labor).

(c) REPORT.—Not later than December 31, 1996, or 3 months after the date of the enactment of this Act, whichever occurs earlier, the Comptroller General shall submit a report to the appropriate committees of the Congress setting forth the conclusions of the Comptroller General from the review conducted under subsection (b).

(d) DEFINITIONS.—As used in this section:

(1) The term "Comptroller General" means the Comptroller General of the United States.

(2) The term "H–2A nonimmigrant worker program" means the program for the admission of nonimmigrant aliens described in section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act.

SEC. 654. REPORT ON ALLEGATIONS OF HARASSMENT BY CANADIAN CUSTOMS AGENTS.

(a) STUDY AND REVIEW.—

(1) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act, the Commissioner of the United States Customs Service shall initiate a study of harassment by Canadian customs agents allegedly undertaken for the purpose of deterring cross-border commercial activity along the United States–New Brunswick border. Such study shall include a review of the possible connection between any incidents of harassment and the discriminatory imposition of the New Brunswick provincial sales tax on goods purchased in the United States by New Brunswick residents, and with any other actions taken by the Canadian provincial governments to deter cross-border commercial activities.

(2) CONSULTATION.—In conducting the study under paragraph (1), the Commissioner of the United States Customs Service shall consult with representatives of the State of Maine, local governments, local businesses, and any other knowledgeable persons who the Commissioner considers to be important to the completion of the study.

(b) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Commissioner of the United States Customs Service shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report on the study and review conducted under subsection (a). The report shall include recommendations for steps that the United States Government can take to help end any harassment by Canadian customs agents that is found to have occurred.

SEC. 655. SENSE OF CONGRESS ON DISCRIMINATORY APPLICATION OF NEW BRUNSWICK PROVINCIAL SALES TAX.

(a) FINDINGS.—The Congress finds as follows:

 (1) In July 1993, Canadian customs officers began collecting an 11 percent New Brunswick provincial sales tax on goods purchased in the United States by New Brunswick residents, an action that has caused severe economic harm to United States businesses located in proximity to the border with New Brunswick.

 (2) This impediment to cross-border trade compounds the damage already done from the Canadian Government's imposition of a 7 percent tax on all goods bought by Canadians in the United States.

 (3) Collection of the New Brunswick provincial sales tax on goods purchased outside of New Brunswick is effected only along the United States–Canadian border, not along New Brunswick's borders with other Canadian provinces; the tax is thus being administered by Canadian authorities in a manner uniquely discriminatory to Canadians shopping in the United States.

 (4) In February 1994, the United States Trade Representative publicly stated an intention to seek redress from the discriminatory application of the New Brunswick provincial sales tax under the dispute resolution process in chapter 20 of the North American Free Trade Agreement (NAFTA), but the United States Government has still not made such a claim under NAFTA procedures.

 (5) Initially, the United States Trade Representative argued that filing a New Brunswick provincial sales tax claim was delayed only because the dispute mechanism under NAFTA had not yet been finalized, but more than a year after such mechanism has been put in place, the claim has still not been put forward by the United States Trade Representative.

(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

 (1) the provincial sales tax levied by the Canadian province of New Brunswick on Canadian citizens of that province who purchase goods in the United States—

   (A) raises questions about a possible violation of the North American Free Trade Agreement in the discriminatory application of the tax to cross-border trade with the United States; and

   (B) damages good relations between the United States and Canada; and

 (2) the United States Trade Representative should move forward without further delay in seeking redress under the dispute resolution process in chapter 20 of the North American Free Trade Agreement for the violation.

<< 5 USCA § 301 NOTE >>

## SEC. 656. IMPROVEMENTS IN IDENTIFICATION–RELATED DOCUMENTS.

 (a) BIRTH CERTIFICATES.—

 (1) STANDARDS FOR ACCEPTANCE BY FEDERAL AGENCIES.—

   (A) IN GENERAL.—

   (i) GENERAL RULE.—Subject to clause (ii), a Federal agency may not accept for any official purpose a certificate of birth, unless the certificate—

    (I) is a birth certificate (as defined in paragraph (3)); and

    (II) conforms to the standards set forth in the regulation promulgated under subparagraph (B).

   (ii) APPLICABILITY.—Clause (i) shall apply only to a certificate of birth issued after the day that is 3 years after the date of the promulgation of a final regulation under subparagraph (B). Clause (i) shall not be construed to prevent a Federal agency from accepting for official purposes any certificate of birth issued on or before such day.

   (B) REGULATION.—

   (i) CONSULTATION WITH GOVERNMENT AGENCIES.—The President shall select 1 or more Federal agencies to consult with State vital statistics offices, and with other appropriate Federal agencies designated by the President, for the purpose of developing appropriate standards for birth certificates that may be accepted for official purposes by Federal agencies, as provided in subparagraph (A).

   (ii) SELECTION OF LEAD AGENCY.—Of the Federal agencies selected under clause (i), the President shall select 1 agency to promulgate, upon the conclusion of the consultation conducted under such clause, a regulation establishing standards of the type described in such clause.

   (iii) DEADLINE.—The agency selected under clause (ii) shall promulgate a final regulation under such clause not later than the date that is 1 year after the date of the enactment of this Act.

   (iv) MINIMUM REQUIREMENTS.—The standards established under this subparagraph—

(I) at a minimum, shall require certification of the birth certificate by the State or local custodian of record that issued the certificate, and shall require the use of safety paper, the seal of the issuing custodian of record, and other features designed to limit tampering, counterfeiting, and photocopying, or otherwise duplicating, the birth certificate for fraudulent purposes;

(II) may not require a single design to which birth certificates issued by all States must conform; and

(III) shall accommodate the differences between the States in the manner and form in which birth records are stored and birth certificates are produced from such records.

(2) GRANTS TO STATES.—

(A) ASSISTANCE IN MEETING FEDERAL STANDARDS.—

(i) IN GENERAL.—Beginning on the date a final regulation is promulgated under paragraph (1)(B), the Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics and after consulting with the head of any other agency designated by the President, shall make grants to States to assist them in issuing birth certificates that conform to the standards set forth in the regulation.

(ii) ALLOCATION OF GRANTS.—The Secretary shall provide grants to States under this subparagraph in proportion to the populations of the States applying to receive a grant and in an amount needed to provide a substantial incentive for States to issue birth certificates that conform to the standards described in clause (i).

(B) ASSISTANCE IN MATCHING BIRTH AND DEATH RECORDS.—

(i) IN GENERAL.—The Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics and after consulting with the head of any other agency designated by the President, shall make grants to States to assist them in developing the capability to match birth and death records, within each State and among the States, and to note the fact of death on the birth certificates of deceased persons. In developing the capability described in the preceding sentence, a State that receives a grant under this subparagraph shall focus first on individuals born after 1950.

(ii) ALLOCATION AND AMOUNT OF GRANTS.—The Secretary shall provide grants to States under this subparagraph in proportion to the populations of the States applying to receive a grant and in an amount needed to provide a substantial incentive for States to develop the capability described in clause (i).

(C) DEMONSTRATION PROJECTS.—The Secretary of Health and Human Services, acting through the Director of the National Center for Health Statistics, shall make grants to States for a project in each of 5 States to demonstrate the feasibility of a system under which persons otherwise required to report the death of individuals to a State would be required to provide to the State's office of vital statistics sufficient information to establish the fact of death of every individual dying in the State within 24 hours of acquiring the information.

(3) BIRTH CERTIFICATE.—As used in this subsection, the term "birth certificate" means a certificate of birth—

(A) of—

(i) an individual born in the United States; or

(ii) an individual born abroad—

(I) who is a citizen or national of the United States at birth; and

(II) whose birth is registered in the United States; and

(B) that—

(i) is a copy, issued by a State or local authorized custodian of record, of an original certificate of birth issued by such custodian of record; or

(ii) was issued by a State or local authorized custodian of record and was produced from birth records maintained by such custodian of record.

(b) STATE–ISSUED DRIVERS LICENSES AND COMPARABLE IDENTIFICATION DOCUMENTS.—

(1) STANDARDS FOR ACCEPTANCE BY FEDERAL AGENCIES.—

(A) IN GENERAL.—A Federal agency may not accept for any identification-related purpose a driver's license, or other comparable identification document, issued by a State, unless the license or document satisfies the following requirements:

(i) APPLICATION PROCESS.—The application process for the license or document shall include the presentation of such evidence of identity as is required by regulations promulgated by the Secretary of Transportation after consultation with the American Association of Motor Vehicle Administrators.

(ii) SOCIAL SECURITY NUMBER.—Except as provided in subparagraph (B), the license or document shall contain a social security account number that can be read visually or by electronic means.

(iii) FORM.—The license or document otherwise shall be in a form consistent with requirements set forth in regulations promulgated by the Secretary of Transportation after consultation with the American Association of Motor Vehicle Administrators. The form shall contain security features designed to limit tampering, counterfeiting, photocopying, or otherwise duplicating, the license or document for fraudulent purposes and to limit use of the license or document by impostors.

(B) EXCEPTION.—The requirement in subparagraph (A)(ii) shall not apply with respect to a driver's license or other comparable identification document issued by a State, if the State—

(i) does not require the license or document to contain a social security account number; and

(ii) requires—

(I) every applicant for a driver's license, or other comparable identification document, to submit the applicant's social security account number; and

(II) an agency of the State to verify with the Social Security Administration that such account number is valid.

(C) DEADLINE.—The Secretary of Transportation shall promulgate the regulations referred to in clauses (i) and (iii) of subparagraph (A) not later than 1 year after the date of the enactment of this Act.

(2) GRANTS TO STATES.—Beginning on the date final regulations are promulgated under paragraph (1), the Secretary of Transportation shall make grants to States to assist them in issuing driver's licenses and other comparable identification documents that satisfy the requirements under such paragraph.

(3) EFFECTIVE DATES.—

(A) IN GENERAL.—Except as otherwise provided in this paragraph, this subsection shall take effect on the date of the enactment of this Act.

(B) PROHIBITION ON FEDERAL AGENCIES.—Subparagraphs (A) and (B) of paragraph (1) shall take effect beginning on October 1, 2000, but shall apply only to licenses or documents issued to an individual for the first time and to replacement or renewal licenses or documents issued according to State law.

(c) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary of Health and Human Services shall submit a report to the Congress on ways to reduce the fraudulent obtaining and the fraudulent use of birth certificates, including any such use to obtain a social security account number or a State or Federal document related to identification or immigration.

(d) FEDERAL AGENCY DEFINED.—For purposes of this section, the term "Federal agency" means any of the following:

(1) An Executive agency (as defined in section 105 of title 5, United States Code).

(2) A military department (as defined in section 102 of such title).

(3) An agency in the legislative branch of the Government of the United States.

(4) An agency in the judicial branch of the Government of the United States.

<< 42 USCA § 405 NOTE >>

SEC. 657. DEVELOPMENT OF PROTOTYPE OF COUNTERFEIT–RESISTANT SOCIAL SECURITY CARD.

(a) DEVELOPMENT.—

(1) IN GENERAL.—The Commissioner of Social Security (in this section referred to as the "Commissioner") shall, in accordance with the provisions of this section, develop a prototype of a counterfeit-resistant social security card. Such prototype card—

(A) shall be made of a durable, tamper-resistant material such as plastic or polyester;

(B) shall employ technologies that provide security features, such as magnetic stripes, holograms, and integrated circuits; and

(C) shall be developed so as to provide individuals with reliable proof of citizenship or legal resident alien status.

(2) ASSISTANCE BY ATTORNEY GENERAL.—The Attorney General shall provide such information and assistance as the Commissioner deems necessary to achieve the purposes of this section.

(b) STUDIES AND REPORTS.—

(1) IN GENERAL.—The Comptroller General and the Commissioner of Social Security shall each conduct a study, and issue a report to the Congress, that examines different methods of improving the social security card application process.

AR.03663

531

(2) ELEMENTS OF STUDIES.—The studies shall include evaluations of the cost and work load implications of issuing a counterfeit-resistant social security card for all individuals over a 3, 5, and 10 year period. The studies shall also evaluate the feasibility and cost implications of imposing a user fee for replacement cards and cards issued to individuals who apply for such a card prior to the scheduled 3, 5, and 10 year phase-in options.

(3) DISTRIBUTION OF REPORTS.—Copies of the reports described in this subsection, along with facsimiles of the prototype cards as described in subsection (a), shall be submitted to the Committees on Ways and Means and Judiciary of the House of Representatives and the Committees on Finance and Judiciary of the Senate not later than 1 year after the date of the enactment of this Act.

SEC. 658. BORDER PATROL MUSEUM.

(a) AUTHORITY.—Notwithstanding section 203 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 484) or any other provision of law, the Attorney General is authorized to transfer and convey to the Border Patrol Museum and Memorial Library Foundation, incorporated in the State of Texas, such equipment, artifacts, and memorabilia held by the Immigration and Naturalization Service as the Attorney General may determine is necessary to further the purposes of the Museum and Foundation.

(b) TECHNICAL ASSISTANCE.—The Attorney General is authorized to provide technical assistance, through the detail of personnel of the Immigration and Naturalization Service, to the Border Patrol Museum and Memorial Library Foundation for the purpose of demonstrating the use of the items transferred under subsection (a).

SEC. 659. SENSE OF THE CONGRESS REGARDING THE MISSION OF THE IMMIGRATION AND NATURALIZATION SERVICE.

It is the sense of the Congress that the mission statement of the Immigration and Naturalization Service should include a statement that it is the responsibility of the Service to detect, apprehend, and remove those aliens unlawfully present in the United States, particularly those aliens involved in drug trafficking or other criminal activity.

<< 32 USCA § 112 >>

SEC. 660. AUTHORITY FOR NATIONAL GUARD TO ASSIST IN TRANSPORTATION OF CERTAIN ALIENS.

Section 112(d)(1) of title 32, United States Code, is amended by adding at the end the following new sentence: "The plan as approved by the Secretary may provide for the use of personnel and equipment of the National Guard of that State to assist the Immigration and Naturalization Service in the transportation of aliens who have violated a Federal or State law prohibiting or regulating the possession, use, or distribution of a controlled substance.".

Subtitle E—Technical Corrections

SEC. 671. MISCELLANEOUS TECHNICAL CORRECTIONS.

(a) AMENDMENTS RELATING TO PUBLIC LAW 103–322 (VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994).—

<< 8 USCA § 1324 >>

(1) Section 60024(1)(F) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) (in this subsection referred to as "VCCLEA") is amended by inserting "United States Code," after "title 18,".

<< 8 USCA § 1258 >>

(2) Section 130003(b)(3) of VCCLEA is amended by striking "Naturalization" and inserting "Nationality".

<< 8 USCA § 1184 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3)(A) Section 214 (8 U.S.C. 1184) is amended by redesignating the subsection (j), added by section 130003(b)(2) of VCCLEA (108 Stat. 2025), and the subsection (k), as amended by section 622(c) of this division, as subsections (k) and (l), respectively.

<< 8 USCA § 1101 >>

(B) Section 101(a)(15)(S) (8 U.S.C. 1101(a)(15)(S)) is amended by striking "214(j)" and inserting "214(k)".

<< 8 USCA § 1255 >>

(4)(A) Section 245 (8 U.S.C. 1255) is amended by redesignating the subsection (i) added by section 130003(c)(1) of VCCLEA as subsection (j).

<< 8 USCA § 1251 >>

(B) Section 241(a)(2)(A)(i)(I) (8 U.S.C. 1251(a)(2)(A)(i)(I)), as amended by section 130003(d) of VCCLEA and before redesignation by section 305(a)(2) of this division, is amended by striking "245(i)" and inserting "245(j)".

<< 8 USCA § 1255 >>

(5) Section 245(j)(3), as added by section 130003(c)(1) of VCCLEA and as redesignated by paragraph (4)(A), is amended by striking "paragraphs (1) or (2)" and inserting "paragraph (1) or (2)".

<< 8 USCA § 1252 NOTE >>

(6) Section 130007(a) of VCCLEA is amended by striking "242A(d)" and inserting "242A(a)(3)".

<< 8 USCA § 1101 NOTE >>

(7) The amendments made by this subsection shall be effective as if included in the enactment of the VCCLEA.
(b) AMENDMENTS RELATING TO IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994.—

<< 8 USCA § 1401 NOTE >>

(1) Section 101(d) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) (in this subsection referred to as "INTCA") is amended—
  (A) by striking "APPLICATION" and all that follows through "This" and inserting "APPLICABILITY OF TRANSMISSION REQUIREMENTS. This";
  (B) by striking "any residency or other retention requirements for" and inserting "the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States"; and
  (C) by striking "as in effect" and all that follows through the end and inserting "to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.".

<< 8 USCA § 1433 NOTE >>

(2) Section 102 of INTCA is amended by adding at the end the following:
 "(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to 'five years, at least two of which' is deemed a reference to '10 years, at least 5 of which'.".

<< 8 USCA § 1483 >>

(3) Section 351(a) (8 U.S.C. 1483(a)), as amended by section 105(a)(2)(A) of INTCA, is amended by striking the comma after "nationality".

<< 8 USCA § 1255b >>

(4) Section 207(2) of INTCA is amended by inserting a comma after "specified".

<< 8 USCA § 1101 >>

(5) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended in subparagraph (K)(ii), by striking the comma after "1588".

<< 8 USCA § 1323 >>

(6) Section 273(b) (8 U.S.C. 1323(b)), as amended by section 209(a) of INTCA, is amended by striking "remain" and inserting "remains".

(7) Section 209(a)(1) of INTCA is amended by striking "$3000" and inserting "$3,000".

<< 8 USCA § 1323 NOTE >>

(8) Section 209(b) of INTCA is amended by striking "subsection" and inserting "section".

<< 8 USCA § 1255a NOTE >>

(9) Section 219(cc) of INTCA is amended by striking " 'year 1993 the first place it appears' " and inserting " 'year 1993' the first place it appears".

<< 8 USCA § 1161 NOTE >>

(10) Section 219(ee) of INTCA is amended by adding at the end the following:

"(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.".

<< 8 USCA § 1356 >>

(11) Paragraphs (4) and (6) of section 286(r) (8 U.S.C. 1356(r)) are amended by inserting "the" before "Fund" each place it appears.

<< 8 USCA § 1101 NOTE >>

(12) Section 221 of INTCA is amended—

  (A) by striking each semicolon and inserting a comma,

  (B) by striking "disasters." and inserting "disasters,"; and

  (C) by striking "The official" and inserting "the official".

<< 8 USCA § 1252a >>

(13) Section 242A (8 U.S.C. 1252a), as added by section 224(a) of INTCA and before redesignation as section 238 by section 308(b)(5) of this division, is amended by redesignating subsection (d) as subsection (c).

<< 8 USCA § 1101 NOTE >>

(14) Except as otherwise provided in this subsection, the amendments made by this subsection shall take effect as if included in the enactment of INTCA.

(c) AMENDMENTS RELATING TO PUBLIC LAW 104–132 (ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996).—

AR.03666

<< 8 USCA § 1189 >>

(1) Section 219 (8 U.S.C. 1189), as added by section 302(a) of Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132) (in this subsection referred to as "AEDPA"), is amended by striking the heading and all that follows through "(a)" and inserting the following:

"DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS

"SEC. 219. (a)".

(2) Section 302(b) of AEDPA is amended by striking ", relating to terrorism,".

<< 8 USCA § 1105a >>

(3) Section 106(a) (8 U.S.C. 1105a(a)), as amended by sections 401(e) and 440(a) of AEDPA, is amended—

   (A) by striking "and" at the end of paragraph (8);

   (B) by striking the period at the end of paragraph (9) and inserting "; and"; and

   (C) in paragraph (10), by striking "Any" and inserting "any".

(4) Section 440(a) of the AEDPA is amended by striking "Section 106 of the Immigration and Nationality Act (8 U.S.C. 1105a(a)(10)) is amended to read as follows:" and inserting "Section 106(a) of the Immigration and Nationality Act (8 U.S.C. 1105a(a)) is amended by adding at the end the following:".

<< 8 USCA § 1252a >>

(5) Section 440(g)(1)(A) of AEDPA is amended—

   (A) by striking "of this title"; and

   (B) by striking the period after "241(a)(2)(A)(i)".

(6) Section 440(g) of AEDPA is amended by striking paragraph (2).

<< 8 USCA § 1189 NOTE >>

(7) The amendments made by this subsection shall take effect as if included in the enactment of subtitle A of title IV of AEPDA.

(d) STRIKING REFERENCES TO SECTION 210A.—

<< 8 USCA § 1151 >>

(1)(A) Section 201(b)(1)(C) (8 U.S.C. 1151(b)(1)(C)) is amended by striking ", 210A,".

<< 8 USCA § 1324b >>

(B) Section 274B(a)(3)(B) (8 U.S.C. 1324b(a)(3)(B)) is amended by striking ", 210A(a),".

<< 8 USCA § 1251 >>

(C) Section 241(a)(1) (8 U.S.C. 1251(a)(1)), before redesignation by section 305(a)(2) of this division, is amended by striking subparagraph (F).

<< 8 USCA § 1255a NOTE >>

(2) Sections 204(c)(1)(D)(i) and 204(j)(4) of Immigration Reform and Control Act of 1986 are each amended by striking ", 210A,".

(e) MISCELLANEOUS CHANGES IN THE IMMIGRATION AND NATIONALITY ACT.—

(1) Before being amended by section 308(a)(2) of this division, the item in the table of contents relating to section 242A is amended to read as follows:

"Sec. 242A. Expedited deportation of aliens convicted of committing aggravated felonies.".

<< 8 USCA § 1101 >>

(2) Section 101(c)(1) (8 U.S.C. 1101(c)(1)) is amended by striking ", 321, and 322" and inserting "and 321".

<< 8 USCA § 1182 >>

(3) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by inserting a comma after "(4) thereof)".
(4) Pursuant to section 6(b) of Public Law 103–272 (108 Stat. 1378)—

<< 8 USCA § 1184 >>

(A) section 214(f)(1) (8 U.S.C. 1184(f)(1)) is amended by striking "section 101(3) of the Federal Aviation Act of 1958" and inserting "section 40102(a)(2) of title 49, United States Code"; and

<< 8 USCA § 1288 >>

(B) section 258(b)(2) (8 U.S.C. 1288(b)(2)) is amended by striking "section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)" and inserting "section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code".

<< 8 USCA § 1356 >>

(5) Section 286(h)(1)(A) (8 U.S.C. 1356(h)(1)(A)) is amended by inserting a period after "expended".
(6) Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—
(A) by striking "and" at the end of clause (iv);
(B) by moving clauses (v) and (vi) 2 ems to the left;
(C) by striking "; and" in clauses (v) and (vi) and inserting "and for";
(D) by striking the colons in clauses (v) and (vi); and
(E) by striking the period at the end of clause (v) and inserting "; and".

<< 8 USCA § 1522 >>

(7) Section 412(b) (8 U.S.C. 1522(b)) is amended by striking the comma after "is authorized" in paragraph (3) and after "The Secretary" in paragraph (4).

<< 8 USCA § 1101 NOTE >>

(f) MISCELLANEOUS CHANGE IN THE IMMIGRATION ACT OF 1990.—Section 161(c)(3) of the Immigration Act of 1990 is amended by striking "an an" and inserting "of an".
(g) MISCELLANEOUS CHANGES IN OTHER ACTS.—

<< 8 USCA § 1430 NOTE >>

(1) Section 506(a) of the Intelligence Authorization Act, Fiscal Year 1990 (Public Law 101–193) is amended by striking "this section" and inserting "such section".

<< 8 USCA § 1182 NOTE >>

(2) Section 140 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, as amended by section 505(2) of Public Law 103–317, is amended—
(A) by moving the indentation of subsections (f) and (g) 2 ems to the left; and
(B) in subsection (g), by striking "(g)" and all that follows through "shall" and inserting "(g) Subsections (d) and (e) shall".

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

DIVISION D

SMALL BUSINESS PROGRAMS IMPROVEMENT ACT

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

<< 15 USCA §§ 6313 NOTE, 634 nt, 636 nt, 638 nt, 644 nt, 648 nt, 687*l* nt, 695 nt, 696 nt, 697 nt, 697b nt >>

(a) SHORT TITLE.—This division may be cited as the "Small Business Programs Improvement Act of 1996".
(b) TABLE OF CONTENTS.—

Sec. 1. Short title; table of contents.

Sec. 2. Administrator defined.

Sec. 3. Effective date.

TITLE I—AMENDMENTS TO SMALL BUSINESS ACT

Sec. 101. References.

Sec. 102. Risk management database.

Sec. 103. Section 7(a) loan program.

Sec. 104. Disaster loans.


Sec. 105. Microloan demonstration program.

Sec. 106. Small business development center program.

Sec. 107. Miscellaneous authorities to provide loans and other financial assistance.

Sec. 108. Small business competitiveness demonstration program.

Sec. 109. Amendment to Small Business Guaranteed Credit Enhancement Act of 1993.

Sec. 110. STTR program extension.

Sec. 111. Level of participation for export working capital loans.

TITLE II—AMENDMENTS TO SMALL BUSINESS INVESTMENT ACT

Sec. 201. References.

Sec. 202. Modifications to development company debenture program.

Sec. 203. Required actions upon default.

Sec. 204. Loan liquidation pilot program.

Sec. 205. Registration of certificates.

Sec. 206. Preferred surety bond guarantee program.

Sec. 207. Sense of the Congress.

Sec. 208. Small business investment company improvements.

<< 15 USCA § 631 NOTE >>

SEC. 2. ADMINISTRATOR DEFINED.

 For purposes of this Act, the term "Administrator" means the Administrator of the Small Business Administration.

<< 15 USCA § 633 NOTE >>

SEC. 3. EFFECTIVE DATE.

 Except as otherwise expressly provided, this Act and the amendments made by this Act shall take effect on October 1, 1996.

TITLE I—AMENDMENTS TO SMALL BUSINESS ACT

SEC. 101. REFERENCES.

 Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Small Business Act (15 U.S.C. 631 et seq.).

<< 15 USCA § 633 >>

SEC. 102. RISK MANAGEMENT DATABASE.

 Section 4(b) (15 U.S.C. 633) is amended by inserting after paragraph (2) the following:
 "(3) RISK MANAGEMENT DATABASE.—
 "(A) ESTABLISHMENT.—The Administration shall establish, within the management system for the loan programs authorized by subsections (a) and (b) of section 7 of this Act and title V of the Small Business Investment Act of 1958, a management information system that will generate a database capable of providing timely and accurate information in order to identify loan underwriting, collections, recovery, and liquidation problems.
 "(B) INFORMATION TO BE MAINTAINED.—In addition to such other information as the Administration considers appropriate, the database established under subparagraph (A) shall, with respect to each loan program described in subparagraph (A), include information relating to—
 "(i) the identity of the institution making the guaranteed loan or issuing the debenture;
 "(ii) the identity of the borrower;
 "(iii) the total dollar amount of the loan or debenture;
 "(iv) the total dollar amount of government exposure in each loan;
 "(v) the district of the Administration in which the borrower has its principal office;
 "(vi) the principal line of business of the borrower, as identified by Standard Industrial Classification Code (or any successor to that system);
 "(vii) the delinquency rate for each program (including number of instances and days overdue);
 "(viii) the number and amount of repurchases, losses, and recoveries in each program;
 "(ix) the number of deferrals or forbearances in each program (including days and number of instances);
 "(x) comparisons on the basis of loan program, lender, Administration district and region, for all the data elements maintained; and
 "(xi) underwriting characteristics of each loan that has entered into default, including term, amount and type of collateral, loan-to-value and other actual and projected ratios, line of business, credit history, and type of loan.
 "(C) DEADLINE FOR OPERATIONAL CAPABILITY.—The database established under subparagraph (A) shall—

AR.03670

538

"(i) be operational not later than June 30, 1997; and

"(ii) capture data beginning on the first day of the second quarter of fiscal year 1997 beginning after such date and thereafter.".

SEC. 103. SECTION 7(a) LOAN PROGRAM.

<< 15 USCA § 636 >>

(a) SERVICING AND LIQUIDATION OF LOANS BY PREFERRED LENDERS.—Section 7(a)(2)(C)(ii)(II) (15 U.S.C. 636(a)(2)(C)(ii)(II)) is amended to read as follows:

"(II) complete authority to service and liquidate such loans without obtaining the prior specific approval of the Administration for routine servicing and liquidation activities, but shall not take any actions creating an actual or apparent conflict of interest.".

(b) CERTIFIED LENDERS PROGRAM.—Section 7(a)(19) (15 U.S.C. 636(a)(19)) is amended by adding at the end the following new subparagraph:

"(C) AUTHORITY TO LIQUIDATE LOANS.—

"(i) IN GENERAL.—The Administrator may permit lenders participating in the Certified Lenders Program to liquidate loans made with a guarantee from the Administration pursuant to a liquidation plan approved by the Administrator.

"(ii) AUTOMATIC APPROVAL.—If the Administrator does not approve or deny a request for approval of a liquidation plan within 10 business days of the date on which the request is made (or with respect to any routine liquidation activity under such a plan, within 5 business days) such request shall be deemed to be approved.".

(c) LIMITATION ON CONDUCTING PILOT PROJECTS.—Section 7(a) (15 U.S.C. 636(a)) is amended by adding at the end the following new paragraph:

"(25) LIMITATION ON CONDUCTING PILOT PROJECTS.—

"(A) IN GENERAL.—Not more than 10 percent of the total number of loans guaranteed in any fiscal year under this subsection may be awarded as part of a pilot program which is commenced by the Administrator on or after October 1, 1996.

"(B) PILOT PROGRAM DEFINED.—In this paragraph, the term 'pilot program' means any lending program initiative, project, innovation, or other activity not specifically authorized by law.

"(C) LOW DOCUMENTATION LOAN PROGRAM.—The Administrator may carry out the low documentation loan program for loans of $100,000 or less only through lenders with significant experience in making small business loans. Not later than 90 days after the date of enactment of this subsection, the Administrator shall promulgate regulations defining the experience necessary for participation as a lender in the low documentation loan program.".

(d) CALCULATION OF SUBSIDY RATE.—Section 7(a) (15 U.S.C. 636(a)) is amended by adding at the end the following new paragraph:

"(26) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this subsection shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing loans under this Act.".

<< 15 USCA § 634 >>

(e) SALE OF UNGUARANTEED PORTIONS OF SBA LOANS.—Section 5(f)(3) (15 U.S.C. 634(f)(3)) is amended by adding at the end the following: "Beginning on March 31, 1997, the sale of the unguaranteed portion of any loan made under section 7(a) shall not be permitted until a final regulation that applies uniformly to both depository institutions and other lenders is promulgated by the Administration setting forth the terms and conditions under which such sales can be permitted, including maintenance of appropriate reserve requirements and other safeguards to protect the safety and soundness of the program."

<< 15 USCA § 636 >>

(f) CONDITIONS ON PURCHASE OF LOANS.—Section 7(a)(4) (15 U.S.C. 636(a)(4)) is amended—

(1) by striking "(4) Notwithstanding" and inserting the following:

"(4) INTEREST RATES AND FEES.—

"(A) INTEREST RATES.—Notwithstanding"; and

(2) by adding at the end the following new subparagraph:

"(B) PAYMENT OF ACCRUED INTEREST.—

"(i) IN GENERAL.—Any bank or other lending institution making a claim for payment on the guaranteed portion of a loan made under this subsection shall be paid the accrued interest due on the loan from the earliest date of default to the date of payment of the claim at a rate not to exceed the rate of interest on the loan on the date of default, minus one percent.

"(ii) LOANS SOLD ON SECONDARY MARKET.—If a loan described in clause (i) is sold on the secondary market, the amount of interest paid to a bank or other lending institution described in that clause from the earliest date of default to the date of payment of the claim shall be no more than the agreed upon rate, minus one percent.".

(g) PLAN FOR TRANSFER OF LOAN SERVICING FUNCTIONS TO CENTRALIZED CENTERS.—

(1) IMPLEMENTATION PLAN REQUIRED.—The Administrator shall submit a detailed plan for completing the consolidation, in one or more centralized centers, of the performance of the various functions relating to the servicing of loans directly made or guaranteed by the Administration pursuant to the Small Business Act, addressing the matters described in paragraph (2) by the deadline specified in paragraph (3).

(2) CONTENTS OF PLAN.—In addition to such other matters as the Administrator may deem appropriate, the plan required by paragraph (1) shall include—

(A) the proposed number and location of such centralized loan servicing centers;

(B) the proposed workload (identified by type and numbers of loans and their geographic origin by the Small Business Administration district office) and staffing of each such center;

(C) a detailed, time-phased plan for the transfer of the identified loan servicing functions to each proposed center; and

(D) any identified impediments to the timely execution of the proposed plan (including adequacy of available financial resources, availability of needed personnel, facilities, and related equipment) and the recommendations of the Administrator for addressing such impediments.

(3) DEADLINE FOR SUBMISSION.—Not later than February 28, 1997, the plan required by paragraph (1) shall be submitted to the Committees on Small Business of the House of Representatives and Senate.

<< 15 USCA § 634 NOTE >>

(h) PREFERRED LENDER STANDARD REVIEW PROGRAM.—Not later than 90 days after the date of enactment of this Act, the Administrator shall commence a standard review program for the Preferred Lender Program established by section 5(b)(7) of the Small Business Act (15 U.S.C. 634(b)(7)), which shall include annual or more frequent assessments of the participation of the lender in the program, including defaults, loans, and recoveries of loans made by that lender under the authority of this section. The Administrator shall require such standard review for each new entrant to the Preferred Lender Program.

(i) INDEPENDENT STUDY OF LOAN PROGRAMS.—

(1) STUDY REQUIRED.—The Administrator shall contract with one or more private sector parties to conduct a comprehensive assessment of the performance of the loan programs authorized by section 7(a) of the Small Business Act (15 U.S.C. 636(a)) and title V of the Small Business Investment Act of 1958 (15 U.S.C. 661) addressing the matters described in paragraph (2) and resulting in a report to the Congress pursuant to paragraph (5).

(2) MATTERS TO BE ASSESSED.—In addition to such other matters as the Administrator considers appropriate, the assessment required by paragraph (1) shall address, with respect to each loan program described in paragraph (1) for each of the fiscal years described in paragraph (3)—

(A) the number and frequency of deferrals and defaults;

(B) default rates;

(C) comparative loss rates, by—

(i) type of lender (separately addressing preferred lenders, certified lenders, and general participation lenders);

(ii) term of the loan;

(iii) dollar value of the loan at disbursement; and

(iv) underwriting characteristics of each loan that has entered into default, including term, amount and type of collateral, loan-to-value and other actual and projected ratios, line of business, credit history, and type of loan; and

(D) the economic models used by the Office of Management and Budget to calculate the credit subsidy rate applicable to the loan programs.

AR.03672

(3) PERIOD OF ASSESSMENT.—The assessments undertaken pursuant to paragraph (2) shall address data for the period beginning with fiscal year 1986 of each loan program described in paragraph (1).

(4) ACCESS TO INFORMATION.—The Administrator shall provide to the contractor access to any information collected by or available to the Administration with regard to the loan programs being assessed. The contractor shall preserve the confidentiality of any information for which confidentiality is protected by law or properly asserted by the person submitting such information.

(5) CONTRACT FUNDING.—The Administrator shall fund the cost of the contract from the amounts appropriated for the salaries and expenses of the Administration for fiscal year 1997.

(6) REPORT TO THE CONGRESS.—

(A) CONTENTS.—The contractor shall prepare a report of—

(i) its analyses of the matters to be assessed pursuant to paragraph (2); and

(ii) its independent recommendations for improving program performance with respect to each loan program, regarding—

(I) improving the timely collection and subsequent management by the Administration of data to measure the performance of each loan program described in paragraph (1); and

(II) reducing loss rates for and improving the performance of each such loan program.

(B) SUBMISSION TO THE CONGRESS.—Not later than June 30, 1997, the Administrator shall submit the report prepared under subparagraph (A) to the Committees on Small Business of the House of Representatives and the Senate. The Administrator shall append his comments, and those of the Office of Management and Budget, if any, to the report.

SEC. 104. DISASTER LOANS.

<< 15 USCA § 636 NOTE >>

(a) PRIVATE SECTOR LOAN SERVICING DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—

(A) DEMONSTRATION PROGRAM REQUIRED.—Notwithstanding any other provision of law, the Administration shall conduct a demonstration program, within the parameters described in paragraph (2), to evaluate the comparative costs and benefits of having the Administration's portfolio of disaster loans serviced under contract rather than directly by employees of the Administration. All costs of the demonstration program shall be paid from amounts made available for the Salaries and Expenses Account of the Administration.

(B) INITIATION DATE.—Not later than 90 days after the date of enactment of this Act, the Administration shall issue a request for proposals for the program parameters described in paragraph (2).

(2) DEMONSTRATION PROGRAM PARAMETERS.—

(A) LOAN SAMPLE.—The sample of loans for the demonstration program shall be randomly drawn from the Administration's portfolio of loans made pursuant to section 7(b) of the Small Business Act and shall include a representative group of not less than 30 percent of all loans for residential properties, including 30 percent of all loans made during the demonstration program after the date of enactment of this Act, which loans shall be selected by the Administration on the basis of geographic distribution and such other factors as the Administration determines to be appropriate.

(B) CONTRACT AND OPTIONS.—The Administration shall solicit and competitively award one or more contracts to service the loans included in the sample of loans described in subparagraph (A) for a term of not less than one year, with 3 one-year contract renewal options, each of which shall be exercised by the Administration unless the Administration terminates the contractor or contractors for good cause.

(3) TERM OF DEMONSTRATION PROGRAM.—The demonstration program shall commence not later than October 1, 1997.

(4) REPORTS.—

(A) INTERIM REPORTS.—Not later than 120 days before the expiration of the initial 4–year contract performance period, the Administrator shall submit to the Committees on Small Business of the House of Representatives and the Senate an interim report on the conduct of the demonstration program. The contractor shall be afforded a reasonable opportunity to attach comments to each such report.

(B) FINAL REPORT.—Not later than 120 days after the termination of the demonstration program, the Administrator shall submit to the Committees on Small Business of the House of Representatives and the Senate a final report on the performance of the demonstration program, together with the recommendations of the Administrator for continuation, termination, or modification of the demonstration program.

(b) DEFINITION OF DISASTER.—

<< 15 USCA § 632 >>

(1) IN GENERAL.—Section 3(k) (15 U.S.C. 632(k)) is amended by inserting "commercial fishery failures or fishery resource disasters (as determined by the Secretary of Commerce under section 308(b) of the Interjurisdictional Fisheries Act of 1986)," after "tidal waves,".

<< 15 USCA § 632 NOTE >>

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall be effective with respect to any disaster occurring on or after March 1, 1994.

<< 15 USCA § 636 >>

SEC. 105. MICROLOAN DEMONSTRATION PROGRAM.

Section 7(m)(7)(B) (15 U.S.C. 636(m)(4)) is amended by adding at the end the following: "If, however, at the beginning of the fourth quarter of a fiscal year the Administration determines that a portion of appropriated microloan funds are unlikely to be awarded during that year, the Administration may make additional funds available to a State in excess of 125 percent of the pro rata share of that State.".

<< 15 USCA § 648 >>

SEC. 106. SMALL BUSINESS DEVELOPMENT CENTER PROGRAM.

(a) ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS DEVELOPMENT CENTERS.—

(1) DUTIES.—Section 21(h) (15 U.S.C. 648(h)) is amended to read as follows:

"(h) ASSOCIATE ADMINISTRATOR FOR SMALL BUSINESS DEVELOPMENT CENTERS.—

"(1) APPOINTMENT AND COMPENSATION.—The Administrator shall appoint an Associate Administrator for Small Business Development Centers who shall report to an official who is not more than one level below the Office of the Administrator and who shall serve without regard to the provisions of title 5 governing appointments in the competitive service, and without regard to chapter 51, and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at a rate not less than the rate of GS–17 of the General Schedule.

"(2) DUTIES.—

"(A) IN GENERAL.—The sole responsibility of the Associate Administrator for Small Business Development Centers shall be to administer the small business development center program. Duties of the position shall include recommending the annual program budget, reviewing the annual budgets submitted by each applicant, establishing appropriate funding levels therefore, selecting applicants to participate in this program, implementing the provisions of this section, maintaining a clearinghouse to provide for the dissemination and exchange of information between small business development centers and conducting audits of recipients of grants under this section.

"(B) CONSULTATION REQUIREMENTS.—In carrying out the duties described in this subsection, the Associate Administrator shall confer with and seek the advice of the Board established by subsection (i) and Administration officials in areas served by the small business development centers; however, the Associate Administrator shall be responsible for the management and administration of the program and shall not be subject to the approval or concurrence of such Administration officials.".

(2) REFERENCES TO ASSOCIATE ADMINISTRATOR.—Section 21 (15 U.S.C. 648) is amended—

(A) in subsection (c)(7), by striking "Deputy Associate Administrator of the Small Business Development Center program" and inserting "Associate Administrator for Small Business Development Centers"; and

(B) in subsection (i)(2), by striking "Deputy Associate Administrator for Management Assistance" and inserting "Associate Administrator for Small Business Development Centers".

(b) EXTENSION OR RENEWAL OF COOPERATIVE AGREEMENTS.—Section 21(k)(3) (15 U.S.C. 648(k)(3)) is amended to read as follows:

"(3) EXTENSION OR RENEWAL OF COOPERATIVE AGREEMENTS.—

"(A) IN GENERAL.—In extending or renewing a cooperative agreement of a small business development center, the Administration shall consider the results of the examination and certification program conducted pursuant to paragraphs (1) and (2).

"(B) CERTIFICATION REQUIREMENT.—After September 30, 2000, the Administration may not renew or extend any cooperative agreement with a small business development center unless the center has been approved under the certification program conducted pursuant to this subsection, except that the Associate Administrator for Small Business Development Centers may waive such certification requirement, in the discretion of the Associate Administrator, upon a showing that the center is making a good faith effort to obtain certification.".

(c) TECHNICAL CORRECTION.—Section 21(l) (15 U.S.C. 648(l)) is amended to read as follows:

"(l) CONTRACT AUTHORITY.—The authority to enter into contracts shall be in effect for each fiscal year only to the extent and in the amounts as are provided in advance in appropriations Acts. After the administration has entered a contract, either as a grant or a cooperative agreement, with any applicant under this section, it shall not suspend, terminate, or fail to renew or extend any such contract unless the Administration provides the applicant with written notification setting forth the reasons therefore and affording the applicant an opportunity for a hearing, appeal, or other administrative proceeding under the provisions of chapter 5 of title 5, United States Code.".

<< 15 USCA § 636 >>

SEC. 107. MISCELLANEOUS AUTHORITIES TO PROVIDE LOANS AND OTHER FINANCIAL ASSISTANCE.

(a) FUNDING LIMITATION; SEMINARS.—Section 7(d) (15 U.S.C. 636(d)) is amended—

(1) by striking "(d)(1)" and inserting "(d)"; and

(2) by striking paragraph (2).

(b) TRADE ADJUSTMENT LOANS.—Section 7(e) (15 U.S.C. 636(e)) is amended to read as follows:

"(e) [RESERVED].".

(c) WAIVER OF CREDIT ELSEWHERE TEST FOR COLLEGES AND UNIVERSITIES.—Section 7(f) (15 U.S.C. 636(f)) is amended to read as follows:

"(f) [RESERVED].".

(d) LOANS TO SMALL BUSINESS CONCERNS FOR SOLAR ENERGY AND ENERGY CONSERVATION MEASURES.—Section 7(l) (15 U.S.C. 636(l)) is amended to read as follows:

"(l) [RESERVED].".

SEC. 108. SMALL BUSINESS COMPETITIVENESS DEMONSTRATION PROGRAM.

<< 15 USCA § 644 NOTE >>

(a) EXTENSION OF DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—Section 711(c) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3890) is amended by striking "September 30, 1996" and inserting "September 30, 1997".

(2) REPEAL.—Section 717(f) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note) is repealed.

(b) REPORTING OF SUBCONTRACT PARTICIPATION IN CONTRACTS FOR ARCHITECTURAL AND ENGINEERING SERVICES.—Section 714(b)(5) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3892) is amended to read as follows:

"(5) DURATION.—The system described in subsection (a) shall be established not later than October 1, 1996 (or as soon as practicable thereafter on the first day of a subsequent quarter of fiscal year 1997), and shall terminate on September 30, 1997.".

(c) REPORTS TO THE CONGRESS.—

  (1) IN GENERAL.—Section 716 of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3893 is amended—

    (A) in subsection (a), by striking "fiscal year 1991 and 1995" and inserting "each of fiscal years 1991 through 1996";

    (B) in subsection (b), by striking "results" and inserting "cumulative results"; and

    (C) in subsection (c), by striking "1996" and inserting "1997".

  (2) CUMULATIVE REPORT THROUGH FISCAL YEAR 1995.—A cumulative report of the results of the Small Business Competitiveness Demonstration Program for fiscal years 1991 through 1995 shall be submitted not later than February 28, 1997 pursuant to section 716(a) of the Small Business Competitiveness Demonstration Program Act of 1988 (15 U.S.C. 644 note; 102 Stat. 3893), as amended by paragraph (1) of this subsection.

SEC. 109. AMENDMENT TO SMALL BUSINESS GUARANTEED CREDIT ENHANCEMENT ACT OF 1993.

<< 15 USCA §§ 634 NOTE, 636 nt >>

  (a) IN GENERAL.—Section 7 of the Small Business Guaranteed Credit Enhancement Act of 1993 (Public Law 103–81; 15 U.S.C. 634 note) is repealed effective September 29, 1996.

  (b) CLERICAL AMENDMENT.—The table of contents for the Small Business Guaranteed Credit Enhancement Act of 1993 (Public Law 103–81; 15 U.S.C. 631 note) is amended by striking the item relating to section 7.

<< 15 USCA § 638 >>

SEC. 110. STTR PROGRAM EXTENSION.

  Section 9(n)(1)(C) (15 U.S.C. 638(n)(1)(C)) is amended by striking "fiscal year 1996" and inserting "fiscal years 1996 and 1997".

<< 15 USCA § 636 >>

SEC. 111. LEVEL OF PARTICIPATION FOR EXPORT WORKING CAPITAL LOANS.

  Section 7(a)(2) (15 U.S.C. 636(a)(2)) is amended by adding at the end the following:

  "(D) PARTICIPATION UNDER EXPORT WORKING CAPITAL PROGRAM.—Notwithstanding subparagraph (A), in an agreement to participate in a loan on a deferred basis under the Export Working Capital Program established pursuant to paragraph (14)(A), such participation by the Administration shall not exceed 90 percent.".

TITLE II—AMENDMENTS TO SMALL BUSINESS INVESTMENT ACT

SEC. 201. REFERENCES.

  Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Small Business Investment Act of 1958 (15 U.S.C. 661 et seq.).

SEC. 202. MODIFICATIONS TO DEVELOPMENT COMPANY DEBENTURE PROGRAM.

<< 15 USCA § 696 >>

  (a) DECREASED LOAN TO VALUE RATIOS.—Section 502(3) (15 U.S.C. 696(3)) is amended to read as follows:

  "(3) CRITERIA FOR ASSISTANCE.—

"(A) IN GENERAL.—Any development company assisted under this section or section 503 of this title must meet the criteria established by the Administration, including the extent of participation to be required or amount of paid-in capital to be used in each instance as is determined to be reasonable by the Administration.

"(B) COMMUNITY INJECTION FUNDS.—

"(i) SOURCES OF FUNDS.—Community injection funds may be derived, in whole or in part, from—

"(I) State or local governments;

"(II) banks or other financial institutions;

"(III) foundations or other not-for-profit institutions; or

"(IV) the small business concern (or its owners, stockholders, or affiliates) receiving assistance through a body authorized by this title.

"(ii) FUNDING FROM INSTITUTIONS.—Not less than 50 percent of the total cost of any project financed pursuant to clauses (i), (ii), or (iii) of subparagraph (C) shall come from the institutions described in subclauses (I), (II), and (III) of clause (i).

"(C) FUNDING FROM A SMALL BUSINESS CONCERN.—The small business concern (or its owners, stockholders, or affiliates) receiving assistance through a body authorized by this title shall provide—

"(i) at least 15 percent of the total cost of the project financed, if the small business concern has been in operation for a period of 2 years or less;

"(ii) at least 15 percent of the total cost of the project financed if the project involves the construction of a limited or single purpose building or structure;

"(iii) at least 20 percent of the total cost of the project financed if the project involves both of the conditions set forth in clauses (i) and (ii); or

"(iv) at least 10 percent of the total cost of the project financed, in all other circumstances, at the discretion of the development company.".

<< 15 USCA § 697 >>

(b) GUARANTEE FEE FOR DEVELOPMENT COMPANY DEBENTURES.—Section 503(b)(7)(A) (15 U.S.C. 697(b)(7) (A)) is amended by striking "equal to 0.125 percent" and all that follows before the semicolon and inserting the following: "equal to the lesser of—

"(i) 0.9375 percent per year of the outstanding balance of the loan; or

"(ii) such percentage per year of the outstanding balance of the loan as the Administrator may determine to be necessary to reduce the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures under this Act to an amount that, taking into consideration any available appropriated funds, would permit the Administration to purchase or guarantee $2,000,000,000 of debentures in fiscal year 1997".

(c) FEES TO OFFSET SUBSIDY COST.—Section 503(d) (15 U.S.C. 697(d)) is amended to read as follows:

"(d) CHARGES FOR ADMINISTRATION EXPENSES.—

"(1) LEVEL OF CHARGES.—The Administration may impose an additional charge for administrative expenses with respect to each debenture for which payment of principal and interest is guaranteed under subsection (a).

"(2) PARTICIPATION FEE.—The Administration shall collect a one-time fee in an amount equal to 50 basis points on the total participation in any project of any institution described in subclause (I), (II), or (III) of section 502(3)(B)(i). Such fee shall be imposed only when the participation of the institution will occupy a senior credit position to that of the development company. All proceeds of the fee shall be used to offset the cost (as that term is defined in section 502 of the Credit Reform Act of 1990) to the Administration of making guarantees under subsection (a).

"(3) DEVELOPMENT COMPANY FEE.—The Administration shall collect annually from each development company a fee of 0.125 percent of the outstanding principal balance of any guaranteed debenture authorized by the Administration after September 30, 1996. Such fee shall be derived from the servicing fees collected by the development company pursuant to regulation, and shall not be derived from any additional fees imposed on small business concerns. All proceeds of the fee shall be used to offset the cost (as that term is defined in section 502 of the Credit Reform Act of 1990) to the Administration of making guarantees under subsection (a).".

(d) EFFECTIVE DATE.—Section 503 (15 U.S.C. 697) is amended by adding at the end the following new subsection:

"(f) EFFECTIVE DATE.—The fees authorized by subsections (b) and (c) shall apply to financings approved by the Administration on or after October 1, 1996, but shall not apply to financings approved by the Administration on or after October 1, 1997.".

(e) CALCULATION OF SUBSIDY RATE.—Section 503 (15 U.S.C. 697(a) is amended by adding at the end of the following new subsection:

"(g) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this section shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures under this Act.".

<< 15 USCA § 697 >>

SEC. 203. REQUIRED ACTIONS UPON DEFAULT.

Section 503 (15 U.S.C. 697) is amended by adding at the end the following new subsection:

"(h) REQUIRED ACTIONS UPON DEFAULT.—

"(1) INITIAL ACTIONS.—Not later than the 45th day after the date on which a payment on a loan funded through a debenture guaranteed under this section is due and not received, the Administration shall—

"(A) take all necessary steps to bring such a loan current; or

"(B) implement a formal written deferral agreement.

"(2) PURCHASE OR ACCELERATION OF DEBENTURE.—Not later than the 65th day after the date on which a payment on a loan described in paragraph (1) is due and not received, and absent a formal written deferral agreement, the administration shall take all necessary steps to purchase or accelerate the debenture.

"(3) PREPAYMENT PENALTIES.—With respect to the portion of any project derived from funds set forth in section 502(3), the Administration—

"(A) shall negotiate the elimination of any prepayment penalties or late fees on defaulted loans made prior to September 30, 1996;

"(B) shall not pay any prepayment penalty or late fee on the default based purchase of loans issued after September 30, 1996; and

"(C) for any project financed after September 30, 1996, shall not pay any default interest rate higher than the interest rate on the note prior to the date of default.".

<< 15 USCA § 695 NOTE >>

SEC. 204. LOAN LIQUIDATION PILOT PROGRAM.

(a) IN GENERAL.—The Administrator shall carry out a loan liquidation pilot program (in this section referred to as the "pilot program") in accordance with the requirements of this section.

(b) SELECTION OF DEVELOPMENT COMPANIES.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Administrator shall establish a pilot program under which certain development companies authorized to make loans and issue debentures under title V of the Small Business Investment Act of 1958 are selected by the Administrator in accordance with this subsection to carry out loan liquidations.

(2) CONFLICTS OF INTEREST.—The development companies selected under paragraph (1) shall agree not to take any action that would create a potential conflict of interest involving the development company, the third party lender, or an associate of the third party lender.

(3) QUALIFICATIONS.—In order to qualify to participate in the pilot program under this section, each development company shall—

(A) have not less than 6 years of experience in the program established by title V of the Small Business Investment Act of 1958;

(B) have made, during the 6 most recent fiscal years, an average of not less than 10 loans per year through the program established by such title V of the Small Business Investment Act of 1958;

(C) have not less than 2 years of experience in liquidating loans under the authority of a Federal, State, or other lending program; and

(D) meet such other requirements as the Administration may establish.

(c) AUTHORITY OF DEVELOPMENT COMPANIES.—The development companies selected under subsection (b) shall, for loans in their portfolio of loans made through debentures guaranteed under title V of the Small Business Investment Act of 1958 that are in default after the date of enactment of this Act, be authorized to—

(1) perform all liquidation and foreclosure functions, including the acceleration or purchase of community injection funds, subject to such company obtaining prior written approval from the Administrator before committing the agency to purchase any other indebtedness secured by the property: Provided, That the Administrator shall approve or deny a request for such purchase within a period of 10 business days; and

(2) liquidate such loans in a reasonable and sound manner and according to commercially accepted practices pursuant to a liquidation plan approved by the administrator in advance of its implementation. If the administrator does not approve or deny a request for approval of a liquidation plan within 10 business days of the date on which the request is made (or with respect to any routine liquidation activity under such a plan, within 5 business days) such request shall be deemed to be approved.

(d) AUTHORITY OF THE ADMINISTRATOR.—In carrying out the pilot program, the Administrator shall—

(1) have full authority to rescind the authority granted any development company under this section upon a 10–day written notice stating the reasons for the rescission; and

(2) not later than 90 days after the admission of the development companies specified in subsection (b), implement the pilot program.

(e) REPORT.—

(1) IN GENERAL.—The Administrator shall issue a report on the results of the pilot program to the Committees on Small Business of the House of Representatives and the Senate. The report shall include information relating to—

(A) the total dollar amount of each loan and project liquidated;

(B) the total dollar amount guaranteed by the Administration;

(C) total dollar losses;

(D) total recoveries both as percentage of the amount guaranteed and the total cost of the project; and

(E) a comparison of the pilot program information with the same information for liquidation conducted outside the pilot program over the period of time.

(2) REPORTING PERIOD.—The report shall be based on data from, and issued not later than 90 days after the close of, the first eight 8 fiscal quarters of the pilot program's operation after the date of implementation.

SEC. 205. REGISTRATION OF CERTIFICATES.

<< 15 USCA § 634 >>

(a) CERTIFICATES SOLD PURSUANT TO SMALL BUSINESS ACT.—Section 5(h) of the Small Business Act (15 U.S.C. 634(h)) is amended—

(1) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D);

(2) by striking "(h)" and inserting "(h)(1)";

(3) by striking subparagraph (A), as redesignated by paragraph (1) of this subsection, and inserting the following:

"(A) provide for a central registration of all loans and trust certificates sold pursuant to subsections (f) and (g) of this section;"; and

(4) by adding at the end the following:

"(2) Nothing in this subsection shall prohibit the utilization of a book-entry or other electronic form of registration for trust certificates. The Administration may, with the consent of the Secretary of the Treasury, use the book-entry system of the Federal Reserve System.".

<< 15 USCA § 687*l* >>

(b) CERTIFICATES SOLD PURSUANT TO SMALL BUSINESS INVESTMENT COMPANY PROGRAM.—Section 321(f) (15 U.S.C. 687*l*(f)) is amended—

(1) in paragraph (1), by striking "Such central registration shall include" and all that follows through the period at the end of the paragraph; and

(2) by adding at the end the following:

"(5) Nothing in this subsection shall prohibit the use of a book-entry or other electronic form of registration for trust certificates.".

<< 15 USCA § 697b >>

(c) CERTIFICATES SOLD PURSUANT TO DEVELOPMENT COMPANY PROGRAM.—Section 505(f) (15 U.S.C. 697b(f)) is amended—

(1) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D);

(2) by striking "(f)" and inserting "(f)(1)";

(3) by striking subparagraph (A), as redesignated by paragraph (1) of this subsection, and inserting the following:

"(A) provide for a central registration of all trust certificates sold pursuant to this section;" and

(4) by adding at the end the following:

"(2) Nothing in this subsection shall prohibit the utilization of a book-entry or other electronic form of registration for trust certificates.".

SEC. 206. PREFERRED SURETY BOND GUARANTEE PROGRAM.

<< 15 USCA § 694b >>

(a) ADMISSIONS OF ADDITIONAL PROGRAM PARTICIPANTS.—Section 411(a) (15 U.S.C. 694(a)) is amended by adding a new paragraph (5), as follows:

"(5)(A) The Administration shall promptly act upon an application from a surety to participate in the Preferred Surety Bond Guarantee Program, authorized by paragraph (3), in accordance with criteria and procedures established in regulations pursuant to subsection (d).

"(B) The Administration is authorized to reduce the allotment of bond guarantee authority or terminate the participation of a surety in the Preferred Surety Bond Guarantee Program based on the rate of participation of such surety during the 4 most recent fiscal year quarters compared to the median rate of participation by the other sureties in the program.".

<< 15 USCA § 694b NOTE >>

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply with respect to applications received (or pending substantive evaluation) on or after October 1, 1995.

SEC. 207. SENSE OF THE CONGRESS.

(a) IN GENERAL.—It is the sense of the Congress that the subsidy models prepared by the Office of Management and Budget relative to loan programs sponsored by the United States Small Business Administration have a tendency to—

(1) overestimate potential risks of loss; and

(2) overemphasize historical losses that may be anomalous and do not truly reflect the success of the programs as a whole.

(b) INDEPENDENT STUDY.—Consequently, the Congress mandates the independent study in section 103(h) in an attempt to improve the ability of the Office of Management and Budget to reflect more accurately the budgetary implications of such programs.

SEC. 208. SMALL BUSINESS INVESTMENT COMPANY IMPROVEMENTS.

<< 15 USCA § 662 >>

(a) DEFINITIONS.—

AR.03680
548

(1) SMALL BUSINESS CONCERN.—Section 103(5) (15 U.S.C. 662(5)) is amended by inserting before the semicolon the following: ", except that, for purposes of this Act, an investment by a venture capital firm, investment company (including a small business investment company) employee welfare benefit plan or pension plan, or trust, foundation, or endowment that is exempt from Federal income taxation—

"(A) shall not cause a business concern to be deemed not independently owned and operated;

"(B) shall be disregarded in determining whether a business concern satisfies size standards established pursuant to section 3(a)(2) of the Small Business Act; and

"(C) shall be disregarded in determining whether a small business concern is a smaller enterprise".

(2) PRIVATE CAPITAL.—Section 103(9) (15 U.S.C. 662(9)) is amended to read as follows:

"(9) the term 'private capital'—

"(A) means the sum of—

"(i) the paid-in capital and paid-in surplus of a corporate licensee, the contributed capital of the partners of a partnership licensee, or the equity investment of the members of a limited liability company licensee; and

"(ii) unfunded binding commitments, from investors that meet criteria established by the Administrator, to contribute capital to the licensee: Provided, That such unfunded commitments may be counted as private capital for purposes of approval by the Administrator of any request for leverage, but leverage shall not be funded based on such commitments; and

"(B) does not include any—

"(i) funds borrowed by a licensee from any source;

"(ii) funds obtained through the issuance of leverage; or

"(iii) funds obtained directly or indirectly from any Federal, State, or local government, or any government agency or instrumentality, except for—

"(I) funds invested by an employee welfare benefit plan or pension plan; and

"(II) any qualified nonprivate funds (if the investors of the qualified nonprivate funds do not control, directly or indirectly, the management, board of directors, general partners, or members of the licensee);".

(3) NEW DEFINITIONS.—Section 103 (15 U.S.C. 662) is amended by striking paragraph (10) and inserting the following:

"(10) the term 'leverage' includes—

"(A) debentures purchased or guaranteed by the Administration;

"(B) participating securities purchased or guaranteed by the Administration; and

"(C) preferred securities outstanding as of October 1, 1995;

"(11) the term 'third party debt' means any indebtedness for borrowed money, other than indebtedness owed to the Administration;

"(12) the term 'smaller enterprise' means any small business concern that, together with its affiliates—

"(A) has—

"(i) a net financial worth of not more than $6,000,000, as of the date on which assistance is provided under this Act to that business concern; and

"(ii) an average net income for the 2–year period preceding the date on which assistance is provided under this Act to that business concern, of not more than $2,000,000, after Federal income taxes (excluding any carryover losses); or

"(B) satisfies the standard industrial classification size standards established by the Administration for the industry in which the small business concern is primarily engaged;

"(13) the term 'qualified nonprivate funds' means any—

"(A) funds directly or indirectly invested in any applicant or licensee on or before August 16, 1982, by any Federal agency, other than the Administration, under a provision of law explicitly mandating the inclusion of those funds in the definition of the term 'private capital';

"(B) funds directly or indirectly invested in any applicant or licensee by any Federal agency under a provision of law enacted after September 4, 1992, explicitly mandating the inclusion of those funds in the definition of the term 'private capital'; and

"(C) funds invested in any applicant or licensee by one or more State or local government entities (including any guarantee extended by those entities) in an aggregate amount that does not exceed 33 percent of the private capital of the applicant or licensee;

"(14) the terms 'employee welfare benefit plan' and 'pension plan' have the same meanings as in section 3 of the Employee Retirement Income Security Act of 1974, and are intended to include—

"(A) public and private pension or retirement plans subject to such Act; and

"(B) similar plans not covered by such Act that have been established and that are maintained by the Federal Government or any State or political subdivision, or any agency or instrumentality thereof, for the benefit of employees;

"(15) the term 'member' means, with respect to a licensee that is a limited liability company, a holder of an ownership interest or a person otherwise admitted to membership in the limited liability company; and

"(16) the term 'limited liability company' means a business entity that is organized and operating in accordance with a State limited liability company statute approved by the Administration.".

(b) ORGANIZATION OF SMALL BUSINESS INVESTMENT COMPANIES.—

<< 15 USCA § 681 >>

(1) LIMITED LIABILITY COMPANIES.—Section 301(a) (15 U.S.C. 681(a)) is amended in the first sentence, by striking "body or" and inserting "body, a limited liability company, or".

(2) ISSUANCE OF LICENSE.—Section 301(c) (15 U.S.C. 681(c)) is amended to read as follows:

"(c) ISSUANCE OF LICENSE.—

"(1) SUBMISSION OF APPLICATION.—Each applicant for a license to operate as a small business investment company under this Act shall submit to the Administrator an application, in a form and including such documentation as may be prescribed by the Administrator.

"(2) PROCEDURES.—

"(A) STATUS.—Not later than 90 days after the initial receipt by the Administrator of an application under this subsection, the Administrator shall provide the applicant with a written report detailing the status of the application and any requirements remaining for completion of the application.

"(B) APPROVAL OR DISAPPROVAL.—Within a reasonable time after receiving a completed application submitted in accordance with this subsection and in accordance with such requirements as the Administrator may prescribe by regulation, the Administrator shall—

"(i) approve the application and issue a license for such operation to the applicant if the requirements of this section are satisfied; or

"(ii) disapprove the application and notify the applicant in writing of the disapproval.

"(3) MATTERS CONSIDERED.—In reviewing and processing any application under this subsection, the Administrator—

"(A) shall determine whether—

"(i) the applicant meets the requirements of subsections (a) and (c) of section 302; and

"(ii) the management of the applicant is qualified and has the knowledge, experience, and capability necessary to comply with this Act;

"(B) shall take into consideration—

"(i) the need for and availability of financing for small business concerns in the geographic area in which the applicant is to commence business;

"(ii) the general business reputation of the owners and management of the applicant; and

"(iii) the probability of successful operations of the applicant, including adequate profitability and financial soundness; and

"(C) shall not take into consideration any projected shortage or unavailability of leverage.

"(4) EXCEPTION.—

"(A) IN GENERAL.—Notwithstanding any other provision of this Act, the Administrator may, in the discretion of the Administrator and based on a showing of special circumstances and good cause, approve an application and issue a license under this subsection with respect to any applicant that—

"(i) has private capital of not less than $3,000,000;

"(ii) would otherwise be issued a license under this subsection, except that the applicant does not satisfy the requirements of section 302(a); and

"(iii) has a viable business plan reasonably projecting profitable operations and a reasonable timetable for achieving a level of private capital that satisfies the requirements of section 302(a).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) LEVERAGE.—An applicant licensed pursuant to the exception provided in this paragraph shall not be eligible to receive leverage as a licensee until the applicant satisfies the requirements of section 302(a).".

(3) SPECIALIZED SMALL BUSINESS INVESTMENT COMPANIES.—

(A) REPEAL.—Section 301(d) (15 U.S.C. 681(d)) is repealed.

<< 15 USCA § 681 NOTE >>

(B) EFFECT ON EXISTING LICENSES.—The repeal under subparagraph (A) shall not be construed to require the Administrator to cancel, revoke, withdraw, or modify any license issued under section 301(d) of the Small Business Investment Act of 1958 before the date of enactment of this Act.

<< 15 USCA § 682 >>

(c) CAPITAL REQUIREMENTS.—

(1) INCREASED MINIMUM CAPITAL REQUIREMENTS.—Section 302(a) (15 U.S.C. 682(a)) is amended by striking "(a)" and all that follows through "The Administration shall also determine the ability of the company," and inserting the following:

"(a) AMOUNT.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the private capital of each licensee shall be not less than—

"(A) $5,000,000, or

"(B) $10,000,000, with respect to each licensee authorized or seeking authority to issue participating securities to be purchased or guaranteed by the Administration under this Act.

"(2) EXCEPTION.—The Administrator may, in the discretion of the Administrator and based on a showing of special circumstances and good cause, permit the private capital of a licensee authorized or seeking authorization to issue participating securities to be purchased or guaranteed by the Administration to be less than $10,000,000, but not less than $5,000,000, if the Administrator determines that such action would not create or otherwise contribute to an unreasonable risk of default or loss to the Federal Government.

"(3) ADEQUACY.—In addition to the requirements of paragraph (1), the Administrator shall—

"(A) determine whether the private capital of each licensee is adequate to assure a reasonable prospect that the licensee will be operated soundly and profitably, and managed actively and prudently in accordance with its articles; and

"(B) determine that the licensee will be able".

(2) EXEMPTION FOR CERTAIN LICENSEES.—Section 302(a) (15 U.S.C. 682(a)) is amended by adding at the end the following new paragraph:

"(4) EXEMPTION FROM CAPITAL REQUIREMENTS.—The Administrator may, in the discretion of the Administrator, approve leverage for any licensee licensed under subsection (c) or (d) of section 301 before the date of enactment of the Small Business Program Improvement Act of 1996 that does not meet the capital requirements of paragraph (1), if—

"(A) the licensee certifies in writing that not less than 50 percent of the aggregate dollar amount of its financings after the date of enactment of the Small Business Program Improvement Act of 1996 will be provided to smaller enterprises; and

"(B) the Administrator determines that such action would not create or otherwise contribute to an unreasonable risk of default or loss to the United States Government.".

(3) DIVERSIFICATION OF OWNERSHIP.—Section 302(c) (15 U.S.C. 682(c)) is amended to read as follows:

"(c) DIVERSIFICATION OF OWNERSHIP.—The Administrator shall ensure that the management of each licensee licensed after the date of enactment of the Small Business Program Improvement Act of 1996 is sufficiently diversified from and unaffiliated with the ownership of the licensee in a manner that ensures independence and objectivity in the financial management and oversight of the investments and operations of the licensee.".

(d) BORROWING.—

<< 15 USCA § 683 >>

(1) DEBENTURES.—Section 303(b) (15 U.S.C. 683(b)) is amended in the first sentence, by striking "(but only" and all that follows through "terms)".

(2) THIRD PARTY DEBT.—Section 303(c) (15 U.S.C. 683(c)) is amended to read as follows:

"(c) THIRD PARTY DEBT.—The Administrator—

"(1) shall not permit a licensee having outstanding leverage to incur third party debt that would create or contribute to an unreasonable risk of default or loss to the Federal Government; and

"(2) shall permit such licensees to incur third party debt only on such terms and subject to such conditions as may be established by the Administrator, by regulation or otherwise.".

(3) REQUIREMENT TO FINANCE SMALLER ENTERPRISES.—Section 303(d) (15 U.S.C. 683(d)) is amended to read as follows:

"(d) REQUIREMENT TO FINANCE SMALLER ENTERPRISES.—The Administrator shall require each licensee, as a condition of approval of an application for leverage, to certify in writing that not less than 20 percent of the aggregate dollar amount of the financings of the licensee will be provided to smaller enterprises.".

(4) CAPITAL IMPAIRMENT REQUIREMENTS.—

(A) IN GENERAL.—Section 303(e) (15 U.S.C. 683(e)) is amended to read as follows:

"(e) CAPITAL IMPAIRMENT.—Before approving any application for leverage submitted by a licensee under this Act, the Administrator—

"(1) shall determine that the private capital of the licensee meets the requirements of section 302(a); and

"(2) shall determine, taking into account the nature of the assets of the licensee, the amount and terms of any third party debt owed by such licensee, and any other factors determined to be relevant by the Administrator, that the private capital of the licensee has not been impaired to such an extent that the issuance of additional leverage would create or otherwise contribute to an unreasonable risk of default or loss to the Federal Government.".

<< 15 USCA § 683 NOTE >>

(B) REGULATIONS.—

(i) UNIFORM APPLICABILITY.—Any regulation issued by the Administration to implement section 303(e) of the Small Business Investment Act of 1958 that applies to any licensee with outstanding leverage obtained before the effective date of that regulation, shall apply uniformly to all licensees with outstanding leverage obtained before that effective date.

(ii) DEFINITIONS.—For purposes of this subparagraph, the terms "Administration", "leverage" and "licensee" have the same meanings as in section 103 of the Small Business Investment Act of 1958.

<< 15 USCA § 683 >>

(5) EQUITY INVESTMENT REQUIREMENT.—Section 303(g)(4) (15 U.S.C. 683(g)(4)) is amended by striking "and maintain".

(6) FEES.—Section 303 (15 U.S.C. 683) is amended—

(A) in subsection (b), in the fifth sentence, by striking "1 per centum", and all that follows before the period at the end of the sentence and inserting the following: "1 percent, plus an additional charge of 1 percent per annum which shall be paid to and retained by the Administration";

(B) in subsection (g)(2), by striking "1 per centum," and all that follows before the period at the end of the paragraph and inserting the following: "1 percent, plus an additional charge of 1 percent per annum which shall be paid to and retained by the Administration"; and

(C) by adding at the end the following new subsections:

"(i) LEVERAGE FEE.—With respect to leverage granted by the Administration to a licensee, the Administration shall collect from the licensee a nonrefundable fee in an amount equal to 3 percent of the face amount of leverage granted to the licensee, payable upon the earlier of the date of entry into any commitment for such leverage or the date on which the leverage is drawn by the licensee.

"(j) CALCULATION OF SUBSIDY RATE.—All fees, interest, and profits received and retained by the Administration under this section shall be included in the calculations made by the Director of the Office of Management and Budget to offset the cost (as that term is defined in section 502 of the Federal Credit Reform Act of 1990) to the Administration of purchasing and guaranteeing debentures and participating securities under this Act.".

AR.03684

<< 15 USCA § 687 >>

(e) LIABILITY OF THE UNITED STATES.—Section 308(e) (15 U.S.C. 687(e)) is amended by striking "Nothing" and inserting "Except as expressly provided otherwise in this Act, nothing".

<< 15 USCA § 687b >>

(f) EXAMINATIONS; VALUATIONS.—

  (1) EXAMINATIONS.—Section 310(b) (15 U.S.C. 687b(b)) is amended in the first sentence by inserting "which may be conducted with the assistance of a private sector entity that has both the qualifications to conduct and expertise in conducting such examinations," after "Investment Division of the Administration,".

  (2) VALUATIONS.—Section 310(d) (15 U.S.C. 687b(d)) is amended to read as follows:

"(d) VALUATIONS.—

  "(1) FREQUENCY OF VALUATIONS.—

    "(A) IN GENERAL.—Each licensee shall submit to the Administrator a written valuation of the loans and investments of the licensee not less often than semiannually or otherwise upon the request of the Administrator, except that any licensee with no leverage outstanding shall submit such valuations annually, unless the Administrator determines otherwise.

    "(B) MATERIAL ADVERSE CHANGES.—Not later than 30 days after the end of a fiscal quarter of a licensee during which a material adverse change in the aggregate valuation of the loans and investments or operations of the licensee occurs, the licensee shall notify the Administrator in writing of the nature and extent of that change.

    "(C) INDEPENDENT CERTIFICATION.—

      "(i) IN GENERAL.—Not less than once during each fiscal year, each licensee shall submit to the Administrator the financial statements of the licensee, audited by an independent certified public accountant approved by the Administrator.

      "(ii) AUDIT REQUIREMENTS.—Each audit conducted under clause (i) shall include—

        "(I) a review of the procedures and documentation used by the licensee in preparing the valuations required by this section; and

        "(II) a statement by the independent certified public accountant that such valuations were prepared in conformity with the valuation criteria applicable to the licensee established in accordance with paragraph (2).

  "(2) VALUATION CRITERIA.—Each valuation submitted under this subsection shall be prepared by the licensee in accordance with valuation criteria, which shall—

    "(A) be established or approved by the Administrator; and

    "(B) include appropriate safeguards to ensure that the noncash assets of a licensee are not overvalued.".

(g) TRUSTEE OR RECEIVERSHIP OVER LICENSEES.—

  (1) FINDING.—It is the finding of the Congress that increased recoveries on assets in liquidation under the Small Business Investment Act of 1958 are in the best interests of the Federal Government.

  (2) DEFINITIONS.—For purposes of this subsection—

    (A) the term "Administrator" means the Administrator of the Small Business Administration;

    (B) the term "Administration" means the Small Business Administration; and

    (C) the term "licensee" has the same meaning as in section 103.

  (3) LIQUIDATION PLAN.—

    (A) IN GENERAL.—Not later than October 15, 1996, the Administrator shall submit to the Committees on Small Business of the Senate and the House of Representatives a detailed plan to expedite the orderly liquidation of all licensee assets in liquidation, including assets of licensees in receivership or in trust held by or under the control of the Administration or its agents.

    (B) CONTENTS.—The plan submitted under paragraph (1) shall include a timetable for liquidating the liquidation portfolio of small business investment company assets owned by the Administration, and shall contain the findings and recommendations of the Administrator on various options providing for the fair and expeditious liquidation of such assets within a reasonable period of time, giving due consideration to the option of entering into one or more contracts with private sector entities having the capability to carry out the orderly liquidation of similar assets.

(h) TECHNICAL AND CONFORMING AMENDMENTS.—

 (1) SMALL BUSINESS INVESTMENT ACT OF 1958.—The Small Business Investment Act of 1958 (15 U.S.C. 661 et seq.) is amended—

<< 15 USCA § 683 >>

 (A) in section 303—

 (i) in subsection (a), by striking "debenture bonds," and inserting "securities,";

 (ii) by striking subsection (f) and inserting the following:

"(f) REDEMPTION OR REPURCHASE OF PREFERRED STOCK.—Notwithstanding any other provision of law—

 "(1) the Administrator may allow the issuer of any preferred stock sold to the Administration before November 1, 1989 to redeem or repurchase such stock, upon the payment to the Administration of an amount less than the par value of such stock, for a repurchase price determined by the Administrator after consideration of all relevant factors, including—

 "(A) the market value of the stock;

 "(B) the value of benefits provided and anticipated to accrue to the issuer;

 "(C) the amount of dividends paid, accrued, and anticipated; and

 "(D) the estimate of the Administrator of any anticipated redemption; and

 "(2) any moneys received by the Administration from the repurchase of preferred stock shall be available solely to provide debenture leverage to licensees having 50 percent or more in aggregate dollar amount of their financings invested in smaller enterprises."; and

 (iii) in subsection (g)(8)—

 (I) by striking "partners or shareholders" and inserting "partners, shareholders, or members";

 (II) by striking "partner's or shareholder's" and inserting "partner's, shareholder's, or member's"; and

 (III) by striking "partner or shareholder" and inserting "partner, shareholder, or member";

<< 15 USCA § 687 >>

 (B) in section 308(h), by striking "subsection (c) or (d) of section 301" each place that term appears and inserting "section 301";

<< 15 USCA § 687b >>

 (C) in section 310(c)(4), by striking "not less than four years in the case of section 301(d) licensees and in all other cases,";

<< 15 USCA § 687d >>

 (D) in section 312—

(i) by striking "shareholders or partners" and inserting "shareholders, partners, or members"; and

(ii) by striking "shareholder, or partner" each place that term appears and inserting "shareholder, partner, or member";

<< 15 USCA §§ 687i, 687j >>

<< 15 USCA §§ 687k, 687*l*, 687m, 80a–18 >>

 (E) by striking sections 317 and 318, and redesignating sections 319 through 322 as sections 317 through 320, respectively;

<< 15 USCA § 687*l* >>

 (F) in section 319, as redesignated—

(i) in subsection (a), by striking ", including companies operating under the authority of section 301(d),"; and

(ii) in subsection (f)(2), by inserting "or investments in obligations of the United States" after "accounts";

AR.03686

<< 15 USCA § 687m >>

  (G) in section 320, as redesignated, by striking "section 321" and inserting "section 319"; and

<< 15 USCA § 697f >>

  (H) in section 509—
  (i) in subsection (a)(1), by striking the second sentence; and
  (ii) in subsection (e)(1)(B), by striking "subsection (c) or (d) of section 301" and inserting "section 301".

<< 12 USCA § 1431 >>

  (2) AMENDMENT IN OTHER LAW.—Section 11(h) of the Federal Home Loan Bank Act (12 U.S.C. 1431(h)) is amended by striking "301(d)" and inserting "301".
(i) AMENDMENTS TO THE SMALL BUSINESS ACT.—

<< 15 USCA § 634 >>

  (1) POWERS OF THE ADMINISTRATOR.—Section 5(b)(7) of the Small Business Act (15 U.S.C. 634(b)(7)) is amended by striking the colon and all that follows before the semicolon at the end of the paragraph and inserting the following: ": Provided, That with respect to deferred participation loans, the Administrator may, in the discretion of and pursuant to regulations promulgated by the Administrator, authorize participating lending institutions to take actions relating to loan servicing on behalf of the Administrator, including determining eligibility and creditworthiness and loan monitoring, collection, and liquidation".

<< 15 USCA § 631 NOTE >>

  (2) AUTHORIZATION OF APPROPRIATIONS.—Section 20(p)(3) of the Small Business Act (15 U.S.C. 631 note) is amended by striking subparagraph (B) and inserting the following:
  "(B) $300,000,000 in guarantees of debentures; and".

<< 15 USCA §§ 80a–18 nt, 631 nt, 634 NOTE, 662 nt, 681 nt, 683 nt, 687 nt,
687b nt, 687c nt, 687d nt, 687i nt, 687j nt, 687k nt, 687*l* nt, 687m nt, 697 nt >>

  (j) EFFECTIVE DATE.—This section and the amendments made by this section shall become effective on the date of enactment of this Act.

DIVISION E

  TITLE I—CALIFORNIA BAY–DELTA ENVIRONMENTAL ENHANCEMENT AND WATER SECURITY ACT
Sec. 101. Short Title.
This title may be cited as the "California Bay–Delta Environmental Enhancement and Water Security Act."
Sec. 102. Program Funding.
(a) Authorization of Appropriations.—For each of the fiscal years 1998, 1999 and 2000, there are authorized to be appropriated an additional $143,300,000 for both (1) the initial Federal share of the cost of developing and implementing that portion of an ecosystem protection plan for the Bay–Delta, referred to as "the Category III program" emanating out of the document entitled "Principles for Agreement on Bay–Delta Standards Between the State of California and the Federal Government," dated December 15, 1994, and, (2) the initial Federal share of the cost of developing and implementing the ecosystem restoration elements of the long-term CALFED Bay–Delta Program, pursuant to the cost-sharing agreement required by Section 78684.10 of California Senate Bill 900, Chapter 135, Statutes of 1996, signed by the Governor of California on July 11, 1996. Funds appropriated pursuant to this section shall remain available until expended and shall be administered in accordance with procedures established by CALFED Bay–Delta Program until Congress authorizes another entity that is recommended by CALFED Bay–Delta Program to carry out this section.

(b) Funds authorized to be appropriated pursuant to this section to those agencies that are currently or subsequently become participants in the CALFED Bay–Delta Program shall be in addition to the baseline funding levels established pursuant to section 103 of this title, for currently authorized projects and programs under the Central Valley Project Improvement Act, Title 34 of Public Law 102–575 and other currently authorized Federal programs for the purpose of Bay–Delta ecosystem protection and restoration.

 (c) Nothing in this title shall be deemed to diminish the Federal interest in and responsibility for working with the State of California through the CALFED Bay–Delta Program in developing, funding and implementing a balanced, long-term solution to the problems of ecosystem quality, water quality, water supply and reliability, and system vulnerability affecting the San Francisco Bay/Sacramento–San Joaquin Delta Watershed in California. Participation in such long-term solution shall only be undertaken pursuant to authorization provided by law other than this title, and shall be based on the equitable allocation of program costs among beneficiary groups that the CALFED Bay–Delta programs shall develop.

 (d) To the extent not otherwise authorized, those agencies and departments that are currently or subsequently become participants in the CALFED Bay–Delta Program are hereby authorized to undertake the activities and programs for which Federal cost sharing is provided by this section. The United States shall immediately initiate coordinated consultations and negotiations with the State of California to expeditiously execute the cost-sharing agreement required by Section 78684.10 of California Senate Bill 900, Chapter 135, Statutes of 1996, signed by the Governor of California on July 11, 1996. Such activities shall include, but not be limited to, planning, design, technical assistance and construction for ecosystem restoration programs and projects.

 SEC. 103. BUDGET CROSSCUT.—The Office of Management and Budget is directed to submit to the House and Senate Committees on Appropriations, as part of the President's Fiscal Year 1998 Budget, an interagency budget crosscut that displays Federal spending for fiscal years 1993 through 1998 on ecosystem restoration and other purposes in the Bay–Delta region, separately showing funding provided previously or requested under both preexisting authorities and new authorities granted by this title.

 SEC. 104. EFFECTIVE DATE.—Section 102 of this title shall take effect on the date of passage of California State Proposition 204.

 This Act may be cited as the "Omnibus Consolidated Appropriations Act, 1997".

Approved September 30, 1996.

PL 104–208, 1996 HR 3610

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PL 107–56, October 26, 2001, 115 Stat 272

UNITED STATES PUBLIC LAWS

107th Congress - First Session

Convening January, 2001

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed

PL 107–56 (HR 3162)

October 26, 2001

UNITING AND STRENGTHENING AMERICA BY PROVIDING APPROPRIATE TOOLS
REQUIRED TO INTERCEPT AND OBSTRUCT TERRORISM (USA PATRIOT ACT) ACT OF 2001

An Act To deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

<< 18 USCA § 1 NOTE >>

(a) SHORT TITLE.—This Act may be cited as the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title and table of contents.

Sec. 2. Construction; severability.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

Sec. 101. Counterterrorism fund.

Sec. 102. Sense of Congress condemning discrimination against Arab and Muslim Americans.

Sec. 103. Increased funding for the technical support center at the Federal Bureau of Investigation.

Sec. 104. Requests for military assistance to enforce prohibition in certain emergencies.

Sec. 105. Expansion of National Electronic Crime Task Force Initiative.

Sec. 106. Presidential authority.

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

Sec. 201. Authority to intercept wire, oral, and electronic communications relating to terrorism.

Sec. 202. Authority to intercept wire, oral, and electronic communications relating to computer fraud and abuse offenses.

Sec. 203. Authority to share criminal investigative information.

Sec. 204. Clarification of intelligence exceptions from limitations on interception and disclosure of wire, oral, and electronic communications.

Sec. 205. Employment of translators by the Federal Bureau of Investigation.

Sec. 206. Roving surveillance authority under the Foreign Intelligence Surveillance Act of 1978.

Sec. 207. Duration of FISA surveillance of non-United States persons who are agents of a foreign power.

Sec. 208. Designation of judges.

Sec. 209. Seizure of voice-mail messages pursuant to warrants.

Sec. 210. Scope of subpoenas for records of electronic communications.

Sec. 211. Clarification of scope.

Sec. 212. Emergency disclosure of electronic communications to protect life and limb.

Sec. 213. Authority for delaying notice of the execution of a warrant.

Sec. 214. Pen register and trap and trace authority under FISA.

Sec. 215. Access to records and other items under the Foreign Intelligence Surveillance Act.

Sec. 216. Modification of authorities relating to use of pen registers and trap and trace devices.

Sec. 217. Interception of computer trespasser communications.

Sec. 218. Foreign intelligence information.

Sec. 219. Single-jurisdiction search warrants for terrorism.

Sec. 220. Nationwide service of search warrants for electronic evidence.

Sec. 221. Trade sanctions.

Sec. 222. Assistance to law enforcement agencies.

Sec. 223. Civil liability for certain unauthorized disclosures.

Sec. 224. Sunset.

Sec. 225. Immunity for compliance with FISA wiretap.

## TITLE III—INTERNATIONAL MONEY LAUNDERING ABATEMENT AND ANTI–TERRORIST FINANCING ACT OF 2001

Sec. 301. Short title.

Sec. 302. Findings and purposes.

Sec. 303. 4–year congressional review; expedited consideration.

### Subtitle A—International Counter Money Laundering and Related Measures

Sec. 311. Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern.

Sec. 312. Special due diligence for correspondent accounts and private banking accounts.

Sec. 313. Prohibition on United States correspondent accounts with foreign shell banks.

Sec. 314. Cooperative efforts to deter money laundering.

Sec. 315. Inclusion of foreign corruption offenses as money laundering crimes.

Sec. 316. Anti-terrorist forfeiture protection.

Sec. 317. Long-arm jurisdiction over foreign money launderers.

Sec. 318. Laundering money through a foreign bank.

Sec. 319. Forfeiture of funds in United States interbank accounts.

Sec. 320. Proceeds of foreign crimes.

Sec. 321. Financial institutions specified in subchapter II of chapter 53 of title 31, United States code.

Sec. 322. Corporation represented by a fugitive.

Sec. 323. Enforcement of foreign judgments.

Sec. 324. Report and recommendation.

Sec. 325. Concentration accounts at financial institutions.

Sec. 326. Verification of identification.

Sec. 327. Consideration of anti-money laundering record.

Sec. 328. International cooperation on identification of originators of wire transfers.

Sec. 329. Criminal penalties.

Sec. 330. International cooperation in investigations of money laundering, financial crimes, and the finances of terrorist groups.

### Subtitle B—Bank Secrecy Act Amendments and Related Improvements

Sec. 351. Amendments relating to reporting of suspicious activities.

Sec. 352. Anti-money laundering programs.

Sec. 353. Penalties for violations of geographic targeting orders and certain recordkeeping requirements, and lengthening effective period of geographic targeting orders.

Sec. 354. Anti-money laundering strategy.

Sec. 355. Authorization to include suspicions of illegal activity in written employment references.

Sec. 356. Reporting of suspicious activities by securities brokers and dealers; investment company study.

Sec. 357. Special report on administration of bank secrecy provisions.

Sec. 358. Bank secrecy provisions and activities of United States intelligence agencies to fight international terrorism.

Sec. 359. Reporting of suspicious activities by underground banking systems.

Sec. 360. Use of authority of United States Executive Directors.

Sec. 361. Financial crimes enforcement network.

Sec. 362. Establishment of highly secure network.

Sec. 363. Increase in civil and criminal penalties for money laundering.

Sec. 364. Uniform protection authority for Federal Reserve facilities.

Sec. 365. Reports relating to coins and currency received in nonfinancial trade or business.

Sec. 366. Efficient use of currency transaction report system.

Subtitle C—Currency Crimes and Protection

Sec. 371. Bulk cash smuggling into or out of the United States.

Sec. 372. Forfeiture in currency reporting cases.

Sec. 373. Illegal money transmitting businesses.

Sec. 374. Counterfeiting domestic currency and obligations.

Sec. 375. Counterfeiting foreign currency and obligations.

Sec. 376. Laundering the proceeds of terrorism.

Sec. 377. Extraterritorial jurisdiction.

TITLE IV—PROTECTING THE BORDER

Subtitle A—Protecting the Northern Border

Sec. 401. Ensuring adequate personnel on the northern border.

Sec. 402. Northern border personnel.

Sec. 403. Access by the Department of State and the INS to certain identifying information in the criminal history records of visa applicants and applicants for admission to the United States.

Sec. 404. Limited authority to pay overtime.

Sec. 405. Report on the integrated automated fingerprint identification system for ports of entry and overseas consular posts.

Subtitle B—Enhanced Immigration Provisions

Sec. 411. Definitions relating to terrorism.

Sec. 412. Mandatory detention of suspected terrorists; habeas corpus; judicial review.

Sec. 413. Multilateral cooperation against terrorists.

Sec. 414. Visa integrity and security.

Sec. 415. Participation of Office of Homeland Security on Entry–Exit Task Force.

Sec. 416. Foreign student monitoring program.

Sec. 417. Machine readable passports.

Sec. 418. Prevention of consulate shopping.

Subtitle C—Preservation of Immigration Benefits for Victims of Terrorism

Sec. 421. Special immigrant status.

Sec. 422. Extension of filing or reentry deadlines.

Sec. 423. Humanitarian relief for certain surviving spouses and children.

Sec. 424. "Age-out" protection for children.

Sec. 425. Temporary administrative relief.

Sec. 426. Evidence of death, disability, or loss of employment.

Sec. 427. No benefits to terrorists or family members of terrorists.

Sec. 428. Definitions.

TITLE V—REMOVING OBSTACLES TO INVESTIGATING TERRORISM

Sec. 501. Attorney General's authority to pay rewards to combat terrorism.

Sec. 502. Secretary of State's authority to pay rewards.

Sec. 503. DNA identification of terrorists and other violent offenders.

Sec. 504. Coordination with law enforcement.

Sec. 505. Miscellaneous national security authorities.

Sec. 506. Extension of Secret Service jurisdiction.

Sec. 507. Disclosure of educational records.

Sec. 508. Disclosure of information from NCES surveys.

TITLE VI—PROVIDING FOR VICTIMS OF TERRORISM, PUBLIC SAFETY OFFICERS, AND THEIR FAMILIES

Subtitle A—Aid to Families of Public Safety Officers

Sec. 611. Expedited payment for public safety officers involved in the prevention, investigation, rescue, or recovery efforts related to a terrorist attack.

Sec. 612. Technical correction with respect to expedited payments for heroic public safety officers.

Sec. 613. Public safety officers benefit program payment increase.

Sec. 614. Office of Justice programs.

Subtitle B—Amendments to the Victims of Crime Act of 1984

Sec. 621. Crime victims fund.

Sec. 622. Crime victim compensation.

Sec. 623. Crime victim assistance.

Sec. 624. Victims of terrorism.

TITLE VII—INCREASED INFORMATION SHARING FOR CRITICAL INFRASTRUCTURE PROTECTION

Sec. 701. Expansion of regional information sharing system to facilitate Federal-State-local law enforcement response related to terrorist attacks.

TITLE VIII—STRENGTHENING THE CRIMINAL LAWS AGAINST TERRORISM

Sec. 801. Terrorist attacks and other acts of violence against mass transportation systems.

Sec. 802. Definition of domestic terrorism.

Sec. 803. Prohibition against harboring terrorists.

Sec. 804. Jurisdiction over crimes committed at U.S. facilities abroad.

Sec. 805. Material support for terrorism.

Sec. 806. Assets of terrorist organizations.

Sec. 807. Technical clarification relating to provision of material support to terrorism.

Sec. 808. Definition of Federal crime of terrorism.

Sec. 809. No statute of limitation for certain terrorism offenses.

Sec. 810. Alternate maximum penalties for terrorism offenses.

Sec. 811. Penalties for terrorist conspiracies.

Sec. 812. Post-release supervision of terrorists.

Sec. 813. Inclusion of acts of terrorism as racketeering activity.

Sec. 814. Deterrence and prevention of cyberterrorism.

Sec. 815. Additional defense to civil actions relating to preserving records in response to Government requests.

Sec. 816. Development and support of cybersecurity forensic capabilities.

Sec. 817. Expansion of the biological weapons statute.

## TITLE IX—IMPROVED INTELLIGENCE

Sec. 901. Responsibilities of Director of Central Intelligence regarding foreign intelligence collected under Foreign Intelligence Surveillance Act of 1978.

Sec. 902. Inclusion of international terrorist activities within scope of foreign intelligence under National Security Act of 1947.

Sec. 903. Sense of Congress on the establishment and maintenance of intelligence relationships to acquire information on terrorists and terrorist organizations.

Sec. 904. Temporary authority to defer submittal to Congress of reports on intelligence and intelligence-related matters.

Sec. 905. Disclosure to Director of Central Intelligence of foreign intelligence-related information with respect to criminal investigations.

Sec. 906. Foreign terrorist asset tracking center.

Sec. 907. National Virtual Translation Center.

Sec. 908. Training of government officials regarding identification and use of foreign intelligence.

## TITLE X—MISCELLANEOUS

Sec. 1001. Review of the department of justice.

Sec. 1002. Sense of congress.

Sec. 1003. Definition of "electronic surveillance".

Sec. 1004. Venue in money laundering cases.

Sec. 1005. First responders assistance act.

Sec. 1006. Inadmissibility of aliens engaged in money laundering.

Sec. 1007. Authorization of funds for dea police training in south and central asia.

Sec. 1008. Feasibility study on use of biometric identifier scanning system with access to the fbi integrated automated fingerprint identification system at overseas consular posts and points of entry to the United States.

Sec. 1009. Study of access.

Sec. 1010. Temporary authority to contract with local and State governments for performance of security functions at United States military installations.

Sec. 1011. Crimes against charitable americans.

Sec. 1012. Limitation on issuance of hazmat licenses.

Sec. 1013. Expressing the sense of the senate concerning the provision of funding for bioterrorism preparedness and response.

Sec. 1014. Grant program for State and local domestic preparedness support.

Sec. 1015. Expansion and reauthorization of the crime identification technology act for antiterrorism grants to States and localities.

Sec. 1016. Critical infrastructures protection.

<< 18 USCA § 1 NOTE >>

SEC. 2. CONSTRUCTION; SEVERABILITY.

  Any provision of this Act held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to give it the maximum effect permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event such provision shall be deemed severable from this Act and shall not affect the remainder thereof or the application of such provision to other persons not similarly situated or to other, dissimilar circumstances.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

<< 28 USCA § 524 NOTE >>

SEC. 101. COUNTERTERRORISM FUND.

  (a) ESTABLISHMENT; AVAILABILITY.—There is hereby established in the Treasury of the United States a separate fund to be known as the "Counterterrorism Fund", amounts in which shall remain available without fiscal year limitation—
    (1) to reimburse any Department of Justice component for any costs incurred in connection with—
     (A) reestablishing the operational capability of an office or facility that has been damaged or destroyed as the result of any domestic or international terrorism incident;
     (B) providing support to counter, investigate, or prosecute domestic or international terrorism, including, without limitation, paying rewards in connection with these activities; and
     (C) conducting terrorism threat assessments of Federal agencies and their facilities; and
    (2) to reimburse any department or agency of the Federal Government for any costs incurred in connection with detaining in foreign countries individuals accused of acts of terrorism that violate the laws of the United States.
  (b) NO EFFECT ON PRIOR APPROPRIATIONS.—Subsection (a) shall not be construed to affect the amount or availability of any appropriation to the Counterterrorism Fund made before the date of the enactment of this Act.

SEC. 102. SENSE OF CONGRESS CONDEMNING DISCRIMINATION AGAINST ARAB AND MUSLIM AMERICANS.

  (a) FINDINGS.—Congress makes the following findings:
   (1) Arab Americans, Muslim Americans, and Americans from South Asia play a vital role in our Nation and are entitled to nothing less than the full rights of every American.
   (2) The acts of violence that have been taken against Arab and Muslim Americans since the September 11, 2001, attacks against the United States should be and are condemned by all Americans who value freedom.
   (3) The concept of individual responsibility for wrongdoing is sacrosanct in American society, and applies equally to all religious, racial, and ethnic groups.
   (4) When American citizens commit acts of violence against those who are, or are perceived to be, of Arab or Muslim descent, they should be punished to the full extent of the law.
   (5) Muslim Americans have become so fearful of harassment that many Muslim women are changing the way they dress to avoid becoming targets.
   (6) Many Arab Americans and Muslim Americans have acted heroically during the attacks on the United States, including Mohammed Salman Hamdani, a 23–year–old New Yorker of Pakistani descent, who is believed to have gone to the World Trade Center to offer rescue assistance and is now missing.
  (b) SENSE OF CONGRESS.—It is the sense of Congress that—
   (1) the civil rights and civil liberties of all Americans, including Arab Americans, Muslim Americans, and Americans from South Asia, must be protected, and that every effort must be taken to preserve their safety;
   (2) any acts of violence or discrimination against any Americans be condemned; and
   (3) the Nation is called upon to recognize the patriotism of fellow citizens from all ethnic, racial, and religious backgrounds.

SEC. 103. INCREASED FUNDING FOR THE TECHNICAL SUPPORT CENTER AT THE FEDERAL BUREAU OF INVESTIGATION.

There are authorized to be appropriated for the Technical Support Center established in section 811 of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132) to help meet the demands for activities to combat terrorism and support and enhance the technical support and tactical operations of the FBI, $200,000,000 for each of the fiscal years 2002, 2003, and 2004.

<< 18 USCA § 2332e >>

SEC. 104. REQUESTS FOR MILITARY ASSISTANCE TO ENFORCE PROHIBITION IN CERTAIN EMERGENCIES.

Section 2332e of title 18, United States Code, is amended—
  (1) by striking "2332c" and inserting "2332a"; and
  (2) by striking "chemical".

<< 18 USCA § 3036 NOTE >>

SEC. 105. EXPANSION OF NATIONAL ELECTRONIC CRIME TASK FORCE INITIATIVE.

The Director of the United States Secret Service shall take appropriate actions to develop a national network of electronic crime task forces, based on the New York Electronic Crimes Task Force model, throughout the United States, for the purpose of preventing, detecting, and investigating various forms of electronic crimes, including potential terrorist attacks against critical infrastructure and financial payment systems.

SEC. 106. PRESIDENTIAL AUTHORITY.

Section 203 of the International Emergency Powers Act (50 U.S.C. 1702) is amended—
  (1) in subsection (a)(1)—

<< 50 USCA § 1702 >>

(A) at the end of subparagraph (A) (flush to that subparagraph), by striking "; and" and inserting a comma and the following:

"by any person, or with respect to any property, subject to the jurisdiction of the United States;";

<< 50 USCA § 1702 >>

(B) in subparagraph (B)—
  (i) by inserting ", block during the pendency of an investigation" after "investigate"; and
  (ii) by striking "interest;" and inserting "interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and";

<< 50 USCA § 1702 >>

(C) by striking "by any person, or with respect to any property, subject to the jurisdiction of the United States'; and

<< 50 USCA § 1702 >>

(D) by inserting at the end the following:
"(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States;

and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes."; and

<< 50 USCA § 1702 >>

(2) by inserting at the end the following:

"(c) CLASSIFIED INFORMATION.—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.".

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

SEC. 201. AUTHORITY TO INTERCEPT WIRE, ORAL, AND ELECTRONIC COMMUNICATIONS RELATING TO TERRORISM.

Section 2516(1) of title 18, United States Code, is amended—

<< 18 USCA § 2516 >>

(1) by redesignating paragraph (p), as so redesignated by section 434(2) of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132; 110 Stat. 1274), as paragraph (r); and

<< 18 USCA § 2516 >>

(2) by inserting after paragraph (p), as so redesignated by section 201(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 110 Stat. 3009–565), the following new paragraph:

"(q) any criminal violation of section 229 (relating to chemical weapons); or sections 2332, 2332a, 2332b, 2332d, 2339A, or 2339B of this title (relating to terrorism); or".

<< 18 USCA § 2516 >>

SEC. 202. AUTHORITY TO INTERCEPT WIRE, ORAL, AND ELECTRONIC COMMUNICATIONS RELATING TO COMPUTER FRAUD AND ABUSE OFFENSES.

Section 2516(1)(c) of title 18, United States Code, is amended by striking "and section 1341 (relating to mail fraud)," and inserting "section 1341 (relating to mail fraud), a felony violation of section 1030 (relating to computer fraud and abuse),".

SEC. 203. AUTHORITY TO SHARE CRIMINAL INVESTIGATIVE INFORMATION.

(a) AUTHORITY TO SHARE GRAND JURY INFORMATION.—

<< FRCRP Rule 6 >>

(1) IN GENERAL.—Rule 6(e)(3)(C) of the Federal Rules of Criminal Procedure is amended to read as follows:

"(C)(i) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—

"(I) when so directed by a court preliminarily to or in connection with a judicial proceeding;

"(II) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury;

"(III) when the disclosure is made by an attorney for the government to another Federal grand jury;

"(IV) when permitted by a court at the request of an attorney for the government, upon a showing that such matters may disclose a violation of State criminal law, to an appropriate official of a State or subdivision of a State for the purpose of enforcing such law; or

"(V) when the matters involve foreign intelligence or counterintelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 401a)), or foreign intelligence information (as defined in clause (iv) of this subparagraph), to any Federal law enforcement, intelligence, protective, immigration, national defense, or national security official in order to assist the official receiving that information in the performance of his official duties.

"(ii) If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct.

"(iii) Any Federal official to whom information is disclosed pursuant to clause (i)(V) of this subparagraph may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information. Within a reasonable time after such disclosure, an attorney for the government shall file under seal a notice with the court stating the fact that such information was disclosed and the departments, agencies, or entities to which the disclosure was made.

"(iv) In clause (i)(V) of this subparagraph, the term 'foreign intelligence information' means—

"(I) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—

"(aa) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(bb) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(cc) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of foreign power; or

"(II) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—

"(aa) the national defense or the security of the United States; or

"(bb) the conduct of the foreign affairs of the United States.".

<< FRCRP Rule 6 >>

(2) CONFORMING AMENDMENT.—Rule 6(e)(3)(D) of the Federal Rules of Criminal Procedure is amended by striking "(e)(3)(C)(i)" and inserting "(e) (3)(C)(i)(I)".

(b) AUTHORITY TO SHARE ELECTRONIC, WIRE, AND ORAL INTERCEPTION INFORMATION.—

<< 18 USCA § 2517 >>

(1) LAW ENFORCEMENT.—Section 2517 of title 18, United States Code, is amended by inserting at the end the following:

"(6) Any investigative or law enforcement officer, or attorney for the Government, who by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to any other Federal law enforcement, intelligence, protective, immigration, national defense, or national security official to the extent that such contents include foreign intelligence or counterintelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 401a)), or foreign intelligence information (as defined in subsection (19) of section 2510 of this title), to assist the official who is to receive that information in the performance of his official duties. Any Federal official who receives information pursuant to this provision may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information.".

(2) DEFINITION.—Section 2510 of title 18, United States Code, is amended by—

<< 18 USCA § 2510 >>

(A) in paragraph (17), by striking "and" after the semicolon;

<< 18 USCA § 2510 >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) in paragraph (18), by striking the period and inserting "; and"; and

<< 18 USCA § 2510 >>

(C) by inserting at the end the following:
"(19) 'foreign intelligence information' means—
"(A) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—
"(i) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
"(ii) sabotage or international terrorism by a foreign power or an agent of a foreign power; or
"(iii) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or
"(B) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—
"(i) the national defense or the security of the United States; or
"(ii) the conduct of the foreign affairs of the United States.".

<< 18 USCA § 2517 NOTE >>

(c) PROCEDURES.—The Attorney General shall establish procedures for the disclosure of information pursuant to section 2517(6) and Rule 6(e)(3)(C)(i)(V) of the Federal Rules of Criminal Procedure that identifies a United States person, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801)).

<< 50 USCA § 403–5d >>

(d) FOREIGN INTELLIGENCE INFORMATION.—
(1) IN GENERAL.—Notwithstanding any other provision of law, it shall be lawful for foreign intelligence or counterintelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 401a)) or foreign intelligence information obtained as part of a criminal investigation to be disclosed to any Federal law enforcement, intelligence, protective, immigration, national defense, or national security official in order to assist the official receiving that information in the performance of his official duties. Any Federal official who receives information pursuant to this provision may use that information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information.
(2) DEFINITION.—In this subsection, the term "foreign intelligence information" means—
(A) information, whether or not concerning a United States person, that relates to the ability of the United States to protect against—
(i) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
(ii) sabotage or international terrorism by a foreign power or an agent of a foreign power; or
(iii) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or
(B) information, whether or not concerning a United States person, with respect to a foreign power or foreign territory that relates to—
(i) the national defense or the security of the United States; or
(ii) the conduct of the foreign affairs of the United States.

<< 18 USCA § 2511 >>

SEC. 204. CLARIFICATION OF INTELLIGENCE EXCEPTIONS FROM LIMITATIONS ON INTERCEPTION AND DISCLOSURE OF WIRE, ORAL, AND ELECTRONIC COMMUNICATIONS.

Section 2511(2)(f) of title 18, United States Code, is amended—
(1) by striking "this chapter or chapter 121" and inserting "this chapter or chapter 121 or 206 of this title"; and

(2) by striking "wire and oral" and inserting "wire, oral, and electronic".

<< 28 USCA § 532 NOTE >>

## SEC. 205. EMPLOYMENT OF TRANSLATORS BY THE FEDERAL BUREAU OF INVESTIGATION.

(a) AUTHORITY.—The Director of the Federal Bureau of Investigation is authorized to expedite the employment of personnel as translators to support counterterrorism investigations and operations without regard to applicable Federal personnel requirements and limitations.

(b) SECURITY REQUIREMENTS.—The Director of the Federal Bureau of Investigation shall establish such security requirements as are necessary for the personnel employed as translators under subsection (a).

(c) REPORT.—The Attorney General shall report to the Committees on the Judiciary of the House of Representatives and the Senate on—

(1) the number of translators employed by the FBI and other components of the Department of Justice;

(2) any legal or practical impediments to using translators employed by other Federal, State, or local agencies, on a full, part-time, or shared basis; and

(3) the needs of the FBI for specific translation services in certain languages, and recommendations for meeting those needs.

<< 50 USCA § 1805 >>

## SEC. 206. ROVING SURVEILLANCE AUTHORITY UNDER THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978.

Section 105(c)(2)(B) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805(c)(2)(B)) is amended by inserting ", or in circumstances where the Court finds that the actions of the target of the application may have the effect of thwarting the identification of a specified person, such other persons," after "specified person".

## SEC. 207. DURATION OF FISA SURVEILLANCE OF NON–UNITED STATES PERSONS WHO ARE AGENTS OF A FOREIGN POWER.

(a) DURATION.—

<< 50 USCA § 1805 >>

(1) SURVEILLANCE.—Section 105(e)(1) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805(e)(1)) is amended by—

(A) inserting "(A)" after "except that"; and

(B) inserting before the period the following: ", and (B) an order under this Act for a surveillance targeted against an agent of a foreign power, as defined in section 101(b)(1)(A) may be for the period specified in the application or for 120 days, whichever is less".

<< 50 USCA § 1824 >>

(2) PHYSICAL SEARCH.—Section 304(d)(1) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1824(d)(1)) is amended by—

(A) striking "forty-five" and inserting "90";

(B) inserting "(A)" after "except that"; and

(C) inserting before the period the following: ", and (B) an order under this section for a physical search targeted against an agent of a foreign power as defined in section 101(b)(1)(A) may be for the period specified in the application or for 120 days, whichever is less".

(b) EXTENSION.—

<< 50 USCA § 1805 >>

(1) IN GENERAL.—Section 105(d)(2) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805(d)(2)) is amended by—

(A) inserting "(A)" after "except that"; and

(B) inserting before the period the following: ", and (B) an extension of an order under this Act for a surveillance targeted against an agent of a foreign power as defined in section 101(b)(1)(A) may be for a period not to exceed 1 year".

<< 50 USCA § 1824 >>

(2) DEFINED TERM.—Section 304(d)(2) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1824(d)(2) is amended by inserting after "not a United States person," the following: "or against an agent of a foreign power as defined in section 101(b)(1)(A),".

<< 50 USCA § 1803 >>

SEC. 208. DESIGNATION OF JUDGES.

Section 103(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(a)) is amended by—

(1) striking "seven district court judges" and inserting "11 district court judges"; and

(2) inserting "of whom no fewer than 3 shall reside within 20 miles of the District of Columbia" after "circuits".

SEC. 209. SEIZURE OF VOICE-MAIL MESSAGES PURSUANT TO WARRANTS.

Title 18, United States Code, is amended—

(1) in section 2510—

<< 18 USCA § 2510 >>

(A) in paragraph (1), by striking beginning with "and such" and all that follows through "communication"; and

<< 18 USCA § 2510 >>

(B) in paragraph (14), by inserting "wire or" after "transmission of"; and

<< 18 USCA § 2703 >>

(2) in subsections (a) and (b) of section 2703—

(A) by striking "CONTENTS OF ELECTRONIC" and inserting "CONTENTS OF WIRE OR ELECTRONIC" each place it appears;

(B) by striking "contents of an electronic" and inserting "contents of a wire or electronic" each place it appears; and

(C) by striking "any electronic" and inserting "any wire or electronic" each place it appears.

SEC. 210. SCOPE OF SUBPOENAS FOR RECORDS OF ELECTRONIC COMMUNICATIONS.

Section 2703(c)(2) of title 18, United States Code, as redesignated by section 212, is amended—

<< 18 USCA § 2703 >>

(1) by striking "entity the name, address, local and long distance telephone toll billing records, telephone number or other subscriber number or identity, and length of service of a subscriber" and inserting the following: "entity the—

"(A) name;

"(B) address;

"(C) local and long distance telephone connection records, or records of session times and durations;

"(D) length of service (including start date) and types of service utilized;

"(E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

"(F) means and source of payment for such service (including any credit card or bank account number),

of a subscriber"; and

<< 18 USCA § 2703 >>

(2) by striking "and the types of services the subscriber or customer utilized,".

SEC. 211. CLARIFICATION OF SCOPE.

Section 631 of the Communications Act of 1934 (47 U.S.C. 551) is amended—

(1) in subsection (c)(2)—

<< 47 USCA § 551 >>

(A) in subparagraph (B), by striking "or";

<< 47 USCA § 551 >>

(B) in subparagraph (C), by striking the period at the end and inserting "; or"; and

<< 47 USCA § 551 >>

(C) by inserting at the end the following:

"(D) to a government entity as authorized under chapters 119, 121, or 206 of title 18, United States Code, except that such disclosure shall not include records revealing cable subscriber selection of video programming from a cable operator."; and

<< 47 USCA § 551 >>

(2) in subsection (h), by striking "A governmental entity" and inserting "Except as provided in subsection (c)(2)(D), a governmental entity".

SEC. 212. EMERGENCY DISCLOSURE OF ELECTRONIC COMMUNICATIONS TO PROTECT LIFE AND LIMB.

(a) DISCLOSURE OF CONTENTS.—

(1) IN GENERAL.—Section 2702 of title 18, United States Code, is amended—

<< 18 USCA § 2702 >>

(A) by striking the section heading and inserting the following:

"§ 2702. Voluntary disclosure of customer communications or records";

(B) in subsection (a)—

<< 18 USCA § 2702 >>

(i) in paragraph (2)(A), by striking "and" at the end;

<< 18 USCA § 2702 >>

(ii) in paragraph (2)(B), by striking the period and inserting "; and"; and

AR.03703

<< 18 USCA § 2702 >>

(iii) by inserting after paragraph (2) the following:

"(3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1) or (2)) to any governmental entity.";

<< 18 USCA § 2702 >>

(C) in subsection (b), by striking "EXCEPTIONS.—A person or entity" and inserting "EXCEPTIONS FOR DISCLOSURE OF COMMUNICATIONS.— A provider described in subsection (a)";

(D) in subsection (b)(6)—

<< 18 USCA § 2702 >>

(i) in subparagraph (A)(ii), by striking "or";

<< 18 USCA § 2702 >>

(ii) in subparagraph (B), by striking the period and inserting "; or"; and

<< 18 USCA § 2702 >>

(iii) by adding after subparagraph (B) the following:

"(C) if the provider reasonably believes that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure of the information without delay."; and

<< 18 USCA § 2702 >>

(E) by inserting after subsection (b) the following:

"(c) EXCEPTIONS FOR DISCLOSURE OF CUSTOMER RECORDS.—A provider described in subsection (a) may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))—

"(1) as otherwise authorized in section 2703;

"(2) with the lawful consent of the customer or subscriber;

"(3) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;

"(4) to a governmental entity, if the provider reasonably believes that an emergency involving immediate danger of death or serious physical injury to any person justifies disclosure of the information; or

"(5) to any person other than a governmental entity.".

<< 18 USCA prec. § 2701 >>

(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 121 of title 18, United States Code, is amended by striking the item relating to section 2702 and inserting the following:

"2702. Voluntary disclosure of customer communications or records.".

(b) REQUIREMENTS FOR GOVERNMENT ACCESS.—

(1) IN GENERAL.—Section 2703 of title 18, United States Code, is amended—

<< 18 USCA § 2703 >>

(A) by striking the section heading and inserting the following:

AR.03704

"§ 2703. Required disclosure of customer communications or records";

<< 18 USCA § 2703 >>

(B) in subsection (c) by redesignating paragraph (2) as paragraph (3);
(C) in subsection (c)(1)—

<< 18 USCA § 2703 >>

(i) by striking "(A) Except as provided in subparagraph (B), a provider of electronic communication service or remote computing service may" and inserting "A governmental entity may require a provider of electronic communication service or remote computing service to";

<< 18 USCA § 2703 >>

(ii) by striking "covered by subsection (a) or (b) of this section) to any person other than a governmental entity.
"(B) A provider of electronic communication service or remote computing service shall disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a) or (b) of this section) to a governmental entity' and inserting ')";

<< 18 USCA § 2703 >>

(iii) by redesignating subparagraph (C) as paragraph (2);

<< 18 USCA § 2703 >>

(iv) by redesignating clauses (i), (ii), (iii), and (iv) as subparagraphs (A), (B), (C), and (D), respectively;

<< 18 USCA § 2703 >>

(v) in subparagraph (D) (as redesignated) by striking the period and inserting "; or"; and

<< 18 USCA § 2703 >>

(vi) by inserting after subparagraph (D) (as redesignated) the following:
"(E) seeks information under paragraph (2)."; and

<< 18 USCA § 2703 >>

(D) in paragraph (2) (as redesignated) by striking "subparagraph (B)" and insert "paragraph (1)".

<< 18 USCA prec. § 2701 >>

(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 121 of title 18, United States Code, is amended by striking the item relating to section 2703 and inserting the following:

"2703. Required disclosure of customer communications or records.".

SEC. 213. AUTHORITY FOR DELAYING NOTICE OF THE EXECUTION OF A WARRANT.

Section 3103a of title 18, United States Code, is amended—

<< 18 USCA § 3103a >>

(1) by inserting "(a) IN GENERAL.—" before "In addition"; and

<< 18 USCA § 3103a >>

(2) by adding at the end the following:

"(b) DELAY.—With respect to the issuance of any warrant or court order under this section, or any other rule of law, to search for and seize any property or material that constitutes evidence of a criminal offense in violation of the laws of the United States, any notice required, or that may be required, to be given may be delayed if—

"(1) the court finds reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result (as defined in section 2705);

"(2) the warrant prohibits the seizure of any tangible property, any wire or electronic communication (as defined in section 2510), or, except as expressly provided in chapter 121, any stored wire or electronic information, except where the court finds reasonable necessity for the seizure; and

"(3) the warrant provides for the giving of such notice within a reasonable period of its execution, which period may thereafter be extended by the court for good cause shown.".

SEC. 214. PEN REGISTER AND TRAP AND TRACE AUTHORITY UNDER FISA.

(a) APPLICATIONS AND ORDERS.—Section 402 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1842) is amended—

<< 50 USCA § 1842 >>

(1) in subsection (a)(1), by striking "for any investigation to gather foreign intelligence information or information concerning international terrorism" and inserting "for any investigation to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution";

<< 50 USCA § 1842 >>

(2) by amending subsection (c)(2) to read as follows:

"(2) a certification by the applicant that the information likely to be obtained is foreign intelligence information not concerning a United States person or is relevant to an ongoing investigation to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution.";

<< 50 USCA § 1842 >>

(3) by striking subsection (c)(3); and

<< 50 USCA § 1842 >>

(4) by amending subsection (d)(2)(A) to read as follows:

"(A) shall specify—

"(i) the identity, if known, of the person who is the subject of the investigation;

"(ii) the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied;

"(iii) the attributes of the communications to which the order applies, such as the number or other identifier, and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied and, in the case of a trap and trace device, the geographic limits of the trap and trace order.".

(b) AUTHORIZATION DURING EMERGENCIES.—Section 403 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1843) is amended—

<< 50 USCA § 1843 >>

  (1) in subsection (a), by striking "foreign intelligence information or information concerning international terrorism" and inserting "foreign intelligence information not concerning a United States person or information to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution"; and

<< 50 USCA § 1843 >>

  (2) in subsection (b)(1), by striking "foreign intelligence information or information concerning international terrorism" and inserting "foreign intelligence information not concerning a United States person or information to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution".

SEC. 215. ACCESS TO RECORDS AND OTHER ITEMS UNDER THE FOREIGN INTELLIGENCE SURVEILLANCE ACT.

<< 50 USCA §§ 1861, 1862, 1863 >>

  Title V of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1861 et seq.) is amended by striking sections 501 through 503 and inserting the following:

<< 50 USCA § 1861 >>

"SEC. 501. ACCESS TO CERTAIN BUSINESS RECORDS FOR FOREIGN INTELLIGENCE AND INTERNATIONAL TERRORISM INVESTIGATIONS.

  "(a)(1) The Director of the Federal Bureau of Investigation or a designee of the Director (whose rank shall be no lower than Assistant Special Agent in Charge) may make an application for an order requiring the production of any tangible things (including books, records, papers, documents, and other items) for an investigation to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution.

  "(2) An investigation conducted under this section shall—

  "(A) be conducted under guidelines approved by the Attorney General under Executive Order 12333 (or a successor order); and

  "(B) not be conducted of a United States person solely upon the basis of activities protected by the first amendment to the Constitution of the United States.

  "(b) Each application under this section—

  "(1) shall be made to—

  "(A) a judge of the court established by section 103(a); or

  "(B) a United States Magistrate Judge under chapter 43 of title 28, United States Code, who is publicly designated by the Chief Justice of the United States to have the power to hear applications and grant orders for the production of tangible things under this section on behalf of a judge of that court; and

  "(2) shall specify that the records concerned are sought for an authorized investigation conducted in accordance with subsection (a)(2) to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities.

  "(c)(1) Upon an application made pursuant to this section, the judge shall enter an ex parte order as requested, or as modified, approving the release of records if the judge finds that the application meets the requirements of this section.

  "(2) An order under this subsection shall not disclose that it is issued for purposes of an investigation described in subsection (a).

  "(d) No person shall disclose to any other person (other than those persons necessary to produce the tangible things under this section) that the Federal Bureau of Investigation has sought or obtained tangible things under this section.

"(e) A person who, in good faith, produces tangible things under an order pursuant to this section shall not be liable to any other person for such production. Such production shall not be deemed to constitute a waiver of any privilege in any other proceeding or context.

<< 50 USCA § 1862 >>

"SEC. 502. CONGRESSIONAL OVERSIGHT.

"(a) On a semiannual basis, the Attorney General shall fully inform the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate concerning all requests for the production of tangible things under section 402.

"(b) On a semiannual basis, the Attorney General shall provide to the Committees on the Judiciary of the House of Representatives and the Senate a report setting forth with respect to the preceding 6–month period—

"(1) the total number of applications made for orders approving requests for the production of tangible things under section 402; and

"(2) the total number of such orders either granted, modified, or denied.".

SEC. 216. MODIFICATION OF AUTHORITIES RELATING TO USE OF PEN REGISTERS AND TRAP AND TRACE DEVICES.

<< 18 USCA § 3121 >>

(a) GENERAL LIMITATIONS.—Section 3121(c) of title 18, United States Code, is amended—

(1) by inserting "or trap and trace device" after "pen register";

(2) by inserting ", routing, addressing," after "dialing"; and

(3) by striking "call processing" and inserting "the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communications".

(b) ISSUANCE OF ORDERS.—

<< 18 USCA § 3123 >>

(1) IN GENERAL.—Section 3123(a) of title 18, United States Code, is amended to read as follows:

"(a) IN GENERAL.—

"(1) ATTORNEY FOR THE GOVERNMENT.—Upon an application made under section 3122(a)(1), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation. The order, upon service of that order, shall apply to any person or entity providing wire or electronic communication service in the United States whose assistance may facilitate the execution of the order. Whenever such an order is served on any person or entity not specifically named in the order, upon request of such person or entity, the attorney for the Government or law enforcement or investigative officer that is serving the order shall provide written or electronic certification that the order applies to the person or entity being served.

"(2) STATE INVESTIGATIVE OR LAW ENFORCEMENT OFFICER.—Upon an application made under section 3122(a) (2), the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device within the jurisdiction of the court, if the court finds that the State law enforcement or investigative officer has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

"(3)(A) Where the law enforcement agency implementing an ex parte order under this subsection seeks to do so by installing and using its own pen register or trap and trace device on a packet-switched data network of a provider of electronic communication service to the public, the agency shall ensure that a record will be maintained which will identify—

"(i) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network;

"(ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information;

"(iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and

"(iv) any information which has been collected by the device.

To the extent that the pen register or trap and trace device can be set automatically to record this information electronically, the record shall be maintained electronically throughout the installation and use of such device.

"(B) The record maintained under subparagraph (A) shall be provided ex parte and under seal to the court which entered the ex parte order authorizing the installation and use of the device within 30 days after termination of the order (including any extensions thereof).".

(2) CONTENTS OF ORDER.—Section 3123(b)(1) of title 18, United States Code, is amended—

<< 18 USCA § 3123 >>

(A) in subparagraph (A)—

(i) by inserting "or other facility" after "telephone line"; and

(ii) by inserting before the semicolon at the end "or applied"; and

<< 18 USCA § 3123 >>

(B) by striking subparagraph (C) and inserting the following:

"(C) the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of an order authorizing installation and use of a trap and trace device under subsection (a)(2), the geographic limits of the order; and".

<< 18 USCA § 3123 >>

(3) NONDISCLOSURE REQUIREMENTS.—Section 3123(d)(2) of title 18, United States Code, is amended—

(A) by inserting "or other facility" after "the line"; and

(B) by striking ", or who has been ordered by the court" and inserting "or applied, or who is obligated by the order".

(c) DEFINITIONS.—

<< 18 USCA § 3127 >>

(1) COURT OF COMPETENT JURISDICTION.—Section 3127(2) of title 18, United States Code, is amended by striking subparagraph (A) and inserting the following:

"(A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals having jurisdiction over the offense being investigated; or".

<< 18 USCA § 3127 >>

(2) PEN REGISTER.—Section 3127(3) of title 18, United States Code, is amended—

(A) by striking "electronic or other impulses" and all that follows through "is attached" and inserting "dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication"; and

<< 18 USCA § 3127 >>

(B) by inserting "or process" after "device" each place it appears.

(3) TRAP AND TRACE DEVICE.—Section 3127(4) of title 18, United States Code, is amended—

(A) by striking "of an instrument" and all that follows through the semicolon and inserting "or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;"; and

(B) by inserting "or process" after "a device".

<< 18 USCA § 3127 >>

(4) CONFORMING AMENDMENT.—Section 3127(1) of title 18, United States Code, is amended—
  (A) by striking "and"; and
  (B) by inserting ", and 'contents' " after "electronic communication service".

<< 18 USCA § 3124 >>

(5) TECHNICAL AMENDMENT.—Section 3124(d) of title 18, United States Code, is amended by striking "the terms of".

<< 18 USCA § 3124 >>

(6) CONFORMING AMENDMENT.—Section 3124(b) of title 18, United States Code, is amended by inserting "or other facility" after "the appropriate line".

SEC. 217. INTERCEPTION OF COMPUTER TRESPASSER COMMUNICATIONS.

Chapter 119 of title 18, United States Code, is amended—
  (1) in section 2510—

<< 18 USCA § 2510 >>

(A) in paragraph (18), by striking "and" at the end;

<< 18 USCA § 2510 >>

(B) in paragraph (19), by striking the period and inserting a semicolon; and

<< 18 USCA § 2510 >>

(C) by inserting after paragraph (19) the following:
"(20) 'protected computer' has the meaning set forth in section 1030; and
"(20)
"(21) 'computer trespasser'—
  "(A) means a person who accesses a protected computer without authorization and thus has no reasonable expectation of privacy in any communication transmitted to, through, or from the protected computer; and
  "(B) does not include a person known by the owner or operator of the protected computer to have an existing contractual relationship with the owner or operator of the protected computer for access to all or part of the protected computer."; and

<< 18 USCA § 2511 >>

(2) in section 2511(2), by inserting at the end the following:
"(i) It shall not be unlawful under this chapter for a person acting under color of law to intercept the wire or electronic communications of a computer trespasser transmitted to, through, or from the protected computer, if—
  "(I) the owner or operator of the protected computer authorizes the interception of the computer trespasser's communications on the protected computer;
  "(II) the person acting under color of law is lawfully engaged in an investigation;
  "(III) the person acting under color of law has reasonable grounds to believe that the contents of the computer trespasser's communications will be relevant to the investigation; and
  "(IV) such interception does not acquire communications other than those transmitted to or from the computer trespasser.".

<< 50 USCA § 1804 >>

<< 50 USCA § 1823 >>

SEC. 218. FOREIGN INTELLIGENCE INFORMATION.

 Sections 104(a)(7)(B) and section 303(a)(7)(B) (50 U.S.C. 1804(a)(7)(B) and 1823(a)(7)(B)) of the Foreign Intelligence Surveillance Act of 1978 are each amended by striking "the purpose" and inserting "a significant purpose".

<< FRCRP Rule 41 >>

SEC. 219. SINGLE–JURISDICTION SEARCH WARRANTS FOR TERRORISM.

 Rule 41(a) of the Federal Rules of Criminal Procedure is amended by inserting after "executed" the following: "and (3) in an investigation of domestic terrorism or international terrorism (as defined in section 2331 of title 18, United States Code), by a Federal magistrate judge in any district in which activities related to the terrorism may have occurred, for a search of property or for a person within or outside the district".

SEC. 220. NATIONWIDE SERVICE OF SEARCH WARRANTS FOR ELECTRONIC EVIDENCE.

 (a) IN GENERAL.—Chapter 121 of title 18, United States Code, is amended—

<< 18 USCA § 2703 >>

 (1) in section 2703, by striking "under the Federal Rules of Criminal Procedure" every place it appears and inserting "using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation"; and
 (2) in section 2711—

<< 18 USCA § 2711 >>

 (A) in paragraph (1), by striking "and";

<< 18 USCA § 2711 >>

 (B) in paragraph (2), by striking the period and inserting "; and"; and

<< 18 USCA § 2711 >>

 (C) by inserting at the end the following:
 "(3) the term 'court of competent jurisdiction' has the meaning assigned by section 3127, and includes any Federal court within that definition, without geographic limitation.".

<< 18 USCA § 2703 >>

 (b) CONFORMING AMENDMENT.—Section 2703(d) of title 18, United States Code, is amended by striking "described in section 3127(2)(A)".

SEC. 221. TRADE SANCTIONS.

 (a) IN GENERAL.—The Trade Sanctions Reform and Export Enhancement Act of 2000 (Public Law 106–387; 114 Stat. 1549A–67) is amended—

<< 22 USCA § 7203 >>

 (1) by amending section 904(2)(C) to read as follows:

"(C) used to facilitate the design, development, or production of chemical or biological weapons, missiles, or weapons of mass destruction.";

<< 22 USCA § 7205 >>

(2) in section 906(a)(1)—
  (A) by inserting ", the Taliban or the territory of Afghanistan controlled by the Taliban," after "Cuba"; and
  (B) by inserting ", or in the territory of Afghanistan controlled by the Taliban," after "within such country"; and

<< 22 USCA § 7205 >>

(3) in section 906(a)(2), by inserting ", or to any other entity in Syria or North Korea" after "Korea".

<< 22 USCA § 7210 >>

  (b) APPLICATION OF THE TRADE SANCTIONS REFORM AND EXPORT ENHANCEMENT ACT. — Nothing in the Trade Sanctions Reform and Export Enhancement Act of 2000 shall limit the application or scope of any law establishing criminal or civil penalties, including any Executive order or regulation promulgated pursuant to such laws (or similar or successor laws), for the unlawful export of any agricultural commodity, medicine, or medical device to—
  (1) a foreign organization, group, or person designated pursuant to Executive Order No. 12947 of January 23, 1995, as amended;
  (2) a Foreign Terrorist Organization pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132);
  (3) a foreign organization, group, or person designated pursuant to Executive Order No. 13224 (September 23, 2001);
  (4) any narcotics trafficking entity designated pursuant to Executive Order No. 12978 (October 21, 1995) or the Foreign Narcotics Kingpin Designation Act (Public Law 106–120); or
  (5) any foreign organization, group, or persons subject to any restriction for its involvement in weapons of mass destruction or missile proliferation.

<< 18 USCA § 3124 NOTE >>

SEC. 222. ASSISTANCE TO LAW ENFORCEMENT AGENCIES.

  Nothing in this Act shall impose any additional technical obligation or requirement on a provider of a wire or electronic communication service or other person to furnish facilities or technical assistance. A provider of a wire or electronic communication service, landlord, custodian, or other person who furnishes facilities or technical assistance pursuant to section 216 shall be reasonably compensated for such reasonable expenditures incurred in providing such facilities or assistance.

SEC. 223. CIVIL LIABILITY FOR CERTAIN UNAUTHORIZED DISCLOSURES.

  (a) Section 2520 of title 18, United States Code, is amended—

<< 18 USCA § 2520 >>

  (1) in subsection (a), after "entity", by inserting ", other than the United States,";

<< 18 USCA § 2520 >>

  (2) by adding at the end the following:
  "(f) ADMINISTRATIVE DISCIPLINE.—If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true

and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted. If the head of the department or agency involved determines that disciplinary action is not warranted, he or she shall notify the Inspector General with jurisdiction over the department or agency concerned and shall provide the Inspector General with the reasons for such determination."; and

<< 18 USCA § 2520 >>

 (3) by adding a new subsection (g), as follows:
 "(g) IMPROPER DISCLOSURE IS VIOLATION.—Any willful disclosure or use by an investigative or law enforcement officer or governmental entity of information beyond the extent permitted by section 2517 is a violation of this chapter for purposes of section 2520(a).".
 (b) Section 2707 of title 18, United States Code, is amended—

<< 18 USCA § 2707 >>

 (1) in subsection (a), after "entity", by inserting ", other than the United States,";

<< 18 USCA § 2707 >>

 (2) by striking subsection (d) and inserting the following:
 "(d) ADMINISTRATIVE DISCIPLINE.—If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted. If the head of the department or agency involved determines that disciplinary action is not warranted, he or she shall notify the Inspector General with jurisdiction over the department or agency concerned and shall provide the Inspector General with the reasons for such determination."; and

<< 18 USCA § 2707 >>

 (3) by adding a new subsection (g), as follows:
 "(g) IMPROPER DISCLOSURE.—Any willful disclosure of a 'record', as that term is defined in section 552a(a) of title 5, United States Code, obtained by an investigative or law enforcement officer, or a governmental entity, pursuant to section 2703 of this title, or from a device installed pursuant to section 3123 or 3125 of this title, that is not a disclosure made in the proper performance of the official functions of the officer or governmental entity making the disclosure, is a violation of this chapter. This provision shall not apply to information previously lawfully disclosed (prior to the commencement of any civil or administrative proceeding under this chapter) to the public by a Federal, State, or local governmental entity or by the plaintiff in a civil action under this chapter.".
 (c)(1) Chapter 121 of title 18, United States Code, is amended by adding at the end the following:

<< 18 USCA § 2712 >>

"§ 2712. Civil actions against the United States
 "(a) IN GENERAL.—Any person who is aggrieved by any willful violation of this chapter or of chapter 119 of this title or of sections 106(a), 305(a), or 405(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U. S.C. 1801 et seq.) may commence an action in United States District Court against the United States to recover money damages. In any such action, if a person who is aggrieved successfully establishes such a violation of this chapter or of chapter 119 of this title or of the above specific provisions of title 50, the Court may assess as damages—
 "(1) actual damages, but not less than $10,000, whichever amount is greater; and
 "(2) litigation costs, reasonably incurred.

"(b) PROCEDURES.—(1) Any action against the United States under this section may be commenced only after a claim is presented to the appropriate department or agency under the procedures of the Federal Tort Claims Act, as set forth in title 28, United States Code.

"(2) Any action against the United States under this section shall be forever barred unless it is presented in writing to the appropriate Federal agency within 2 years after such claim accrues or unless action is begun within 6 months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. The claim shall accrue on the date upon which the claimant first has a reasonable opportunity to discover the violation.

"(3) Any action under this section shall be tried to the court without a jury.

"(4) Notwithstanding any other provision of law, the procedures set forth in section 106(f), 305(g), or 405(f) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) shall be the exclusive means by which materials governed by those sections may be reviewed.

"(5) An amount equal to any award against the United States under this section shall be reimbursed by the department or agency concerned to the fund described in section 1304 of title 31, United States Code, out of any appropriation, fund, or other account (excluding any part of such appropriation, fund, or account that is available for the enforcement of any Federal law) that is available for the operating expenses of the department or agency concerned.

"(c) ADMINISTRATIVE DISCIPLINE.—If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted. If the head of the department or agency involved determines that disciplinary action is not warranted, he or she shall notify the Inspector General with jurisdiction over the department or agency concerned and shall provide the Inspector General with the reasons for such determination.

"(d) EXCLUSIVE REMEDY.—Any action against the United States under this subsection shall be the exclusive remedy against the United States for any claims within the purview of this section.

"(e) STAY OF PROCEEDINGS.—(1) Upon the motion of the United States, the court shall stay any action commenced under this section if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related investigation or the prosecution of a related criminal case. Such a stay shall toll the limitations periods of paragraph (2) of subsection (b).

"(2) In this subsection, the terms 'related criminal case' and 'related investigation' mean an actual prosecution or investigation in progress at the time at which the request for the stay or any subsequent motion to lift the stay is made. In determining whether an investigation or a criminal case is related to an action commenced under this section, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the 2 proceedings, without requiring that any one or more factors be identical.

"(3) In requesting a stay under paragraph (1), the Government may, in appropriate cases, submit evidence ex parte in order to avoid disclosing any matter that may adversely affect a related investigation or a related criminal case. If the Government makes such an ex parte submission, the plaintiff shall be given an opportunity to make a submission to the court, not ex parte, and the court may, in its discretion, request further information from either party.".

<< 18 USCA prec. § 2701 >>

(2) The table of sections at the beginning of chapter 121 is amended to read as follows:

"2712. Civil action against the United States.".

<< 18 USCA § 2510 NOTE >>

SEC. 224. SUNSET.

(a) IN GENERAL.—Except as provided in subsection (b), this title and the amendments made by this title (other than sections 203(a), 203(c), 205, 208, 210, 211, 213, 216, 219, 221, and 222, and the amendments made by those sections) shall cease to have effect on December 31, 2005.

(b) EXCEPTION.—With respect to any particular foreign intelligence investigation that began before the date on which the provisions referred to in subsection (a) cease to have effect, or with respect to any particular offense or potential offense that began or occurred before the date on which such provisions cease to have effect, such provisions shall continue in effect.

SEC. 225. IMMUNITY FOR COMPLIANCE WITH FISA WIRETAP.

<< 50 USCA § 1805 >>

Section 105 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1805) is amended by inserting after subsection (g) the following:

"(h) No cause of action shall lie in any court against any provider of a wire or electronic communication service, landlord, custodian, or other person (including any officer, employee, agent, or other specified person thereof) that furnishes any information, facilities, or technical assistance in accordance with a court order or request for emergency assistance under this Act.".

## TITLE III—INTERNATIONAL MONEY LAUNDERING
## ABATEMENT AND ANTI–TERRORIST FINANCING ACT OF 2001

<< 31 USCA § 5301 NOTE >>

SEC. 301. SHORT TITLE.

This title may be cited as the "International Money Laundering Abatement and Financial Anti–Terrorism Act of 2001".

<< 31 USCA § 5311 NOTE >>

SEC. 302. FINDINGS AND PURPOSES.

(a) FINDINGS.—The Congress finds that—

(1) money laundering, estimated by the International Monetary Fund to amount to between 2 and 5 percent of global gross domestic product, which is at least $600,000,000,000 annually, provides the financial fuel that permits transnational criminal enterprises to conduct and expand their operations to the detriment of the safety and security of American citizens;

(2) money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks;

(3) money launderers subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine the integrity of United States financial institutions and of the global financial and trading systems upon which prosperity and growth depend;

(4) certain jurisdictions outside of the United States that offer "offshore" banking and related facilities designed to provide anonymity, coupled with weak financial supervisory and enforcement regimes, provide essential tools to disguise ownership and movement of criminal funds, derived from, or used to commit, offenses ranging from narcotics trafficking, terrorism, arms smuggling, and trafficking in human beings, to financial frauds that prey on law-abiding citizens;

(5) transactions involving such offshore jurisdictions make it difficult for law enforcement officials and regulators to follow the trail of money earned by criminals, organized international criminal enterprises, and global terrorist organizations;

(6) correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions;

(7) private banking services can be susceptible to manipulation by money launderers, for example corrupt foreign government officials, particularly if those services include the creation of offshore accounts and facilities for large personal funds transfers to channel funds into accounts around the globe;

(8) United States anti-money laundering efforts are impeded by outmoded and inadequate statutory provisions that make investigations, prosecutions, and forfeitures more difficult, particularly in cases in which money laundering involves foreign persons, foreign banks, or foreign countries;

(9) the ability to mount effective counter-measures to international money launderers requires national, as well as bilateral and multilateral action, using tools specially designed for that effort; and

(10) the Basle Committee on Banking Regulation and Supervisory Practices and the Financial Action Task Force on Money Laundering, of both of which the United States is a member, have each adopted international anti-money laundering principles and recommendations.

(b) PURPOSES.—The purposes of this title are—

(1) to increase the strength of United States measures to prevent, detect, and prosecute international money laundering and the financing of terrorism;

(2) to ensure that—

(A) banking transactions and financial relationships and the conduct of such transactions and relationships, do not contravene the purposes of subchapter II of chapter 53 of title 31, United States Code, section 21 of the Federal Deposit Insurance Act, or chapter 2 of title I of Public Law 91–508 (84 Stat. 1116), or facilitate the evasion of any such provision; and

(B) the purposes of such provisions of law continue to be fulfilled, and such provisions of law are effectively and efficiently administered;

(3) to strengthen the provisions put into place by the Money Laundering Control Act of 1986 (18 U.S.C. 981 note), especially with respect to crimes by non-United States nationals and foreign financial institutions;

(4) to provide a clear national mandate for subjecting to special scrutiny those foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts that pose particular, identifiable opportunities for criminal abuse;

(5) to provide the Secretary of the Treasury (in this title referred to as the "Secretary") with broad discretion, subject to the safeguards provided by the Administrative Procedure Act under title 5, United States Code, to take measures tailored to the particular money laundering problems presented by specific foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts;

(6) to ensure that the employment of such measures by the Secretary permits appropriate opportunity for comment by affected financial institutions;

(7) to provide guidance to domestic financial institutions on particular foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions that are of primary money laundering concern to the United States Government;

(8) to ensure that the forfeiture of any assets in connection with the anti-terrorist efforts of the United States permits for adequate challenge consistent with providing due process rights;

(9) to clarify the terms of the safe harbor from civil liability for filing suspicious activity reports;

(10) to strengthen the authority of the Secretary to issue and administer geographic targeting orders, and to clarify that violations of such orders or any other requirement imposed under the authority contained in chapter 2 of title I of Public Law 91–508 and subchapters II and III of chapter 53 of title 31, United States Code, may result in criminal and civil penalties;

(11) to ensure that all appropriate elements of the financial services industry are subject to appropriate requirements to report potential money laundering transactions to proper authorities, and that jurisdictional disputes do not hinder examination of compliance by financial institutions with relevant reporting requirements;

(12) to strengthen the ability of financial institutions to maintain the integrity of their employee population; and

(13) to strengthen measures to prevent the use of the United States financial system for personal gain by corrupt foreign officials and to facilitate the repatriation of any stolen assets to the citizens of countries to whom such assets belong.

<< 31 USCA § 5311 NOTE >>

SEC. 303. 4–YEAR CONGRESSIONAL REVIEW; EXPEDITED CONSIDERATION.

(a) IN GENERAL.—Effective on and after the first day of fiscal year 2005, the provisions of this title and the amendments made by this title shall terminate if the Congress enacts a joint resolution, the text after the resolving clause of which is as

follows: "That provisions of the International Money Laundering Abatement and Anti–Terrorist Financing Act of 2001, and the amendments made thereby, shall no longer have the force of law.".

(b) EXPEDITED CONSIDERATION.—Any joint resolution submitted pursuant to this section should be considered by the Congress expeditiously. In particular, it shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Control Act of 1976.

Subtitle A—International Counter Money Laundering and Related Measures

SEC. 311. SPECIAL MEASURES FOR JURISDICTIONS, FINANCIAL INSTITUTIONS, OR INTERNATIONAL TRANSACTIONS OF PRIMARY MONEY LAUNDERING CONCERN.

<< 31 USCA § 5318A >>

(a) IN GENERAL.—Subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after section 5318 the following new section:

"§ 5318A. Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern

"(a) INTERNATIONAL COUNTER–MONEY LAUNDERING REQUIREMENTS.—

"(1) IN GENERAL.—The Secretary of the Treasury may require domestic financial institutions and domestic financial agencies to take 1 or more of the special measures described in subsection (b) if the Secretary finds that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern, in accordance with subsection (c).

"(2) FORM OF REQUIREMENT.—The special measures described in—

"(A) subsection (b) may be imposed in such sequence or combination as the Secretary shall determine;

"(B) paragraphs (1) through (4) of subsection (b) may be imposed by regulation, order, or otherwise as permitted by law; and

"(C) subsection (b)(5) may be imposed only by regulation.

"(3) DURATION OF ORDERS; RULEMAKING.—Any order by which a special measure described in paragraphs (1) through (4) of subsection (b) is imposed (other than an order described in section 5326)—

"(A) shall be issued together with a notice of proposed rulemaking relating to the imposition of such special measure; and

"(B) may not remain in effect for more than 120 days, except pursuant to a rule promulgated on or before the end of the 120–day period beginning on the date of issuance of such order.

"(4) PROCESS FOR SELECTING SPECIAL MEASURES.—In selecting which special measure or measures to take under this subsection, the Secretary of the Treasury—

"(A) shall consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, as defined in section 3 of the Federal Deposit Insurance Act, the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board, and in the sole discretion of the Secretary, such other agencies and interested parties as the Secretary may find to be appropriate; and

"(B) shall consider—

"(i) whether similar action has been or is being taken by other nations or multilateral groups;

"(ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

"(iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, or class of transactions; and

"(iv) the effect of the action on United States national security and foreign policy.

"(5) NO LIMITATION ON OTHER AUTHORITY.—This section shall not be construed as superseding or otherwise restricting any other authority granted to the Secretary, or to any other agency, by this subchapter or otherwise.

"(b) SPECIAL MEASURES.—The special measures referred to in subsection (a), with respect to a jurisdiction outside of the United States, financial institution operating outside of the United States, class of transaction within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts are as follows:

"(1) RECORDKEEPING AND REPORTING OF CERTAIN FINANCIAL TRANSACTIONS.—

"(A) IN GENERAL.—The Secretary of the Treasury may require any domestic financial institution or domestic financial agency to maintain records, file reports, or both, concerning the aggregate amount of transactions, or concerning each transaction, with respect to a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or class of transactions to be of primary money laundering concern.

"(B) FORM OF RECORDS AND REPORTS.—Such records and reports shall be made and retained at such time, in such manner, and for such period of time, as the Secretary shall determine, and shall include such information as the Secretary may determine, including—

"(i) the identity and address of the participants in a transaction or relationship, including the identity of the originator of any funds transfer;

"(ii) the legal capacity in which a participant in any transaction is acting;

"(iii) the identity of the beneficial owner of the funds involved in any transaction, in accordance with such procedures as the Secretary determines to be reasonable and practicable to obtain and retain the information; and

"(iv) a description of any transaction.

"(2) INFORMATION RELATING TO BENEFICIAL OWNERSHIP.—In addition to any other requirement under any other provision of law, the Secretary may require any domestic financial institution or domestic financial agency to take such steps as the Secretary may determine to be reasonable and practicable to obtain and retain information concerning the beneficial ownership of any account opened or maintained in the United States by a foreign person (other than a foreign entity whose shares are subject to public reporting requirements or are listed and traded on a regulated exchange or trading market), or a representative of such a foreign person, that involves a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts if the Secretary finds any such jurisdiction, institution, or transaction or type of account to be of primary money laundering concern.

"(3) INFORMATION RELATING TO CERTAIN PAYABLE–THROUGH ACCOUNTS.—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a payable-through account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a payable through account through which any such transaction may be conducted, as a condition of opening or maintaining such account—

"(A) to identify each customer (and representative of such customer) of such financial institution who is permitted to use, or whose transactions are routed through, such payable-through account; and

"(B) to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

"(4) INFORMATION RELATING TO CERTAIN CORRESPONDENT ACCOUNTS.—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary may require any domestic financial institution or domestic financial agency that opens or maintains a correspondent account in the United States for a foreign financial institution involving any such jurisdiction or any such financial institution operating outside of the United States, or a correspondent account through which any such transaction may be conducted, as a condition of opening or maintaining such account—

"(A) to identify each customer (and representative of such customer) of any such financial institution who is permitted to use, or whose transactions are routed through, such correspondent account; and

"(B) to obtain, with respect to each such customer (and each such representative), information that is substantially comparable to that which the depository institution obtains in the ordinary course of business with respect to its customers residing in the United States.

"(5) PROHIBITIONS OR CONDITIONS ON OPENING OR MAINTAINING CERTAIN CORRESPONDENT OR PAYABLE–THROUGH ACCOUNTS.—If the Secretary finds a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States to be of primary money laundering concern, the Secretary, in consultation with the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System, may prohibit, or impose conditions upon, the opening or maintaining in the United States of a correspondent account or payable- through account by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution, if such correspondent account or payable-through account involves any such jurisdiction or institution, or if any such transaction may be conducted through such correspondent account or payable-through account.

"(c) CONSULTATIONS AND INFORMATION TO BE CONSIDERED IN FINDING JURISDICTIONS, INSTITUTIONS, TYPES OF ACCOUNTS, OR TRANSACTIONS TO BE OF PRIMARY MONEY LAUNDERING CONCERN.—

"(1) IN GENERAL.—In making a finding that reasonable grounds exist for concluding that a jurisdiction outside of the United States, 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts is of primary money laundering concern so as to authorize the Secretary of the Treasury to take 1 or more of the special measures described in subsection (b), the Secretary shall consult with the Secretary of State and the Attorney General.

"(2) ADDITIONAL CONSIDERATIONS.—In making a finding described in paragraph (1), the Secretary shall consider in addition such information as the Secretary determines to be relevant, including the following potentially relevant factors:

"(A) JURISDICTIONAL FACTORS.—In the case of a particular jurisdiction—

"(i) evidence that organized criminal groups, international terrorists, or both, have transacted business in that jurisdiction;

"(ii) the extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

"(iii) the substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction;

"(iv) the relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

"(v) the extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

"(vi) whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of United States law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

"(vii) the extent to which that jurisdiction is characterized by high levels of official or institutional corruption.

"(B) INSTITUTIONAL FACTORS.—In the case of a decision to apply 1 or more of the special measures described in subsection (b) only to a financial institution or institutions, or to a transaction or class of transactions, or to a type of account, or to all 3, within or involving a particular jurisdiction—

"(i) the extent to which such financial institutions, transactions, or types of accounts are used to facilitate or promote money laundering in or through the jurisdiction;

"(ii) the extent to which such institutions, transactions, or types of accounts are used for legitimate business purposes in the jurisdiction; and

"(iii) the extent to which such action is sufficient to ensure, with respect to transactions involving the jurisdiction and institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

"(d) NOTIFICATION OF SPECIAL MEASURES INVOKED BY THE SECRETARY.—Not later than 10 days after the date of any action taken by the Secretary of the Treasury under subsection (a)(1), the Secretary shall notify, in writing, the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate of any such action.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(e) DEFINITIONS.—Notwithstanding any other provision of this subchapter, for purposes of this section and subsections (i) and (j) of section 5318, the following definitions shall apply:

"(1) BANK DEFINITIONS.—The following definitions shall apply with respect to a bank:

"(A) ACCOUNT.—The term 'account'—

"(i) means a formal banking or business relationship established to provide regular services, dealings, and other financial transactions; and

"(ii) includes a demand deposit, savings deposit, or other transaction or asset account and a credit account or other extension of credit.

"(B) CORRESPONDENT ACCOUNT.—The term 'correspondent account' means an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution.

"(C) PAYABLE–THROUGH ACCOUNT.—The term 'payable-through account' means an account, including a transaction account (as defined in section 19(b)(1)(C) of the Federal Reserve Act), opened at a depository institution by a foreign financial institution by means of which the foreign financial institution permits its customers to engage, either directly or through a subaccount, in banking activities usual in connection with the business of banking in the United States.

"(2) DEFINITIONS APPLICABLE TO INSTITUTIONS OTHER THAN BANKS.—With respect to any financial institution other than a bank, the Secretary shall, after consultation with the appropriate Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act), define by regulation the term 'account', and shall include within the meaning of that term, to the extent, if any, that the Secretary deems appropriate, arrangements similar to payable-through and correspondent accounts.

"(3) REGULATORY DEFINITION OF BENEFICIAL OWNERSHIP.—The Secretary shall promulgate regulations defining beneficial ownership of an account for purposes of this section and subsections (i) and (j) of section 5318. Such regulations shall address issues related to an individual's authority to fund, direct, or manage the account (including, without limitation, the power to direct payments into or out of the account), and an individual's material interest in the income or corpus of the account, and shall ensure that the identification of individuals under this section does not extend to any individual whose beneficial interest in the income or corpus of the account is immaterial.

"(4) OTHER TERMS.—The Secretary may, by regulation, further define the terms in paragraphs (1), (2), and (3), and define other terms for the purposes of this section, as the Secretary deems appropriate.".

<< 31 USCA prec. § 5301 >>

(b) CLERICAL AMENDMENT.—The table of sections for subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5318 the following new item:

"5318A. Special measures for jurisdictions, financial institutions, or international transactions of primary money laundering concern.".

SEC. 312. SPECIAL DUE DILIGENCE FOR CORRESPONDENT ACCOUNTS AND PRIVATE BANKING ACCOUNTS.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318 of title 31, United States Code, is amended by adding at the end the following:

"(i) DUE DILIGENCE FOR UNITED STATES PRIVATE BANKING AND CORRESPONDENT BANK ACCOUNTS INVOLVING FOREIGN PERSONS.—

"(1) IN GENERAL.—Each financial institution that establishes, maintains, administers, or manages a private banking account or a correspondent account in the United States for a non-United States person, including a foreign individual visiting the United States, or a representative of a non-United States person shall establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts.

"(2) ADDITIONAL STANDARDS FOR CERTAIN CORRESPONDENT ACCOUNTS.—

"(A) IN GENERAL.—Subparagraph (B) shall apply if a correspondent account is requested or maintained by, or on behalf of, a foreign bank operating—

"(i) under an offshore banking license; or

"(ii) under a banking license issued by a foreign country that has been designated—

"(I) as noncooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member, with which designation the United States representative to the group or organization concurs; or

"(II) by the Secretary of the Treasury as warranting special measures due to money laundering concerns.

"(B) POLICIES, PROCEDURES, AND CONTROLS.—The enhanced due diligence policies, procedures, and controls required under paragraph (1) shall, at a minimum, ensure that the financial institution in the United States takes reasonable steps—

"(i) to ascertain for any such foreign bank, the shares of which are not publicly traded, the identity of each of the owners of the foreign bank, and the nature and extent of the ownership interest of each such owner;

"(ii) to conduct enhanced scrutiny of such account to guard against money laundering and report any suspicious transactions under subsection (g); and

"(iii) to ascertain whether such foreign bank provides correspondent accounts to other foreign banks and, if so, the identity of those foreign banks and related due diligence information, as appropriate under paragraph (1).

"(3) MINIMUM STANDARDS FOR PRIVATE BANKING ACCOUNTS.—If a private banking account is requested or maintained by, or on behalf of, a non-United States person, then the due diligence policies, procedures, and controls required under paragraph (1) shall, at a minimum, ensure that the financial institution takes reasonable steps—

"(A) to ascertain the identity of the nominal and beneficial owners of, and the source of funds deposited into, such account as needed to guard against money laundering and report any suspicious transactions under subsection (g); and

"(B) to conduct enhanced scrutiny of any such account that is requested or maintained by, or on behalf of, a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure that is reasonably designed to detect and report transactions that may involve the proceeds of foreign corruption.

"(4) DEFINITION.—For purposes of this subsection, the following definitions shall apply:

"(A) OFFSHORE BANKING LICENSE.—The term 'offshore banking license' means a license to conduct banking activities which, as a condition of the license, prohibits the licensed entity from conducting banking activities with the citizens of, or with the local currency of, the country which issued the license.

"(B) PRIVATE BANKING ACCOUNT.—The term 'private banking account' means an account (or any combination of accounts) that—

"(i) requires a minimum aggregate deposits of funds or other assets of not less than $1,000,000;

"(ii) is established on behalf of 1 or more individuals who have a direct or beneficial ownership interest in the account; and

"(iii) is assigned to, or is administered or managed by, in whole or in part, an officer, employee, or agent of a financial institution acting as a liaison between the financial institution and the direct or beneficial owner of the account.".

<< 31 USCA § 5318 NOTE >>

(b) REGULATORY AUTHORITY AND EFFECTIVE DATE.—

(1) REGULATORY AUTHORITY.—Not later than 180 days after the date of enactment of this Act, the Secretary, in consultation with the appropriate Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act) of the affected financial institutions, shall further delineate, by regulation, the due diligence policies, procedures, and controls required under section 5318(i)(1) of title 31, United States Code, as added by this section.

(2) EFFECTIVE DATE.—Section 5318(i) of title 31, United States Code, as added by this section, shall take effect 270 days after the date of enactment of this Act, whether or not final regulations are issued under paragraph (1), and the failure to issue such regulations shall in no way affect the enforceability of this section or the amendments made by this section. Section 5318(i) of title 31, United States Code, as added by this section, shall apply with respect to accounts covered by that section 5318(i), that are opened before, on, or after the date of enactment of this Act.

SEC. 313. PROHIBITION ON UNITED STATES CORRESPONDENT ACCOUNTS WITH FOREIGN SHELL BANKS.

<< 31 USCA § 5318 >>

 (a) IN GENERAL.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(j) PROHIBITION ON UNITED STATES CORRESPONDENT ACCOUNTS WITH FOREIGN SHELL BANKS.—

 "(1) IN GENERAL.—A financial institution described in subparagraphs (A) through (G) of section 5312(a)(2) (in this subsection referred to as a 'covered financial institution') shall not establish, maintain, administer, or manage a correspondent account in the United States for, or on behalf of, a foreign bank that does not have a physical presence in any country.

 "(2) PREVENTION OF INDIRECT SERVICE TO FOREIGN SHELL BANKS.—A covered financial institution shall take reasonable steps to ensure that any correspondent account established, maintained, administered, or managed by that covered financial institution in the United States for a foreign bank is not being used by that foreign bank to indirectly provide banking services to another foreign bank that does not have a physical presence in any country. The Secretary of the Treasury shall, by regulation, delineate the reasonable steps necessary to comply with this paragraph.

 "(3) EXCEPTION.—Paragraphs (1) and (2) do not prohibit a covered financial institution from providing a correspondent account to a foreign bank, if the foreign bank—

 "(A) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and

 "(B) is subject to supervision by a banking authority in the country regulating the affiliated depository institution, credit union, or foreign bank described in subparagraph (A), as applicable.

 "(4) DEFINITIONS.—For purposes of this subsection—

 "(A) the term 'affiliate' means a foreign bank that is controlled by or is under common control with a depository institution, credit union, or foreign bank; and

 "(B) the term 'physical presence' means a place of business that—

 "(i) is maintained by a foreign bank;

 "(ii) is located at a fixed address (other than solely an electronic address) in a country in which the foreign bank is authorized to conduct banking activities, at which location the foreign bank—

 "(I) employs 1 or more individuals on a full-time basis; and

 "(II) maintains operating records related to its banking activities; and

 "(iii) is subject to inspection by the banking authority which licensed the foreign bank to conduct banking activities.".

<< 31 USCA § 5318 NOTE >>

 (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect at the end of the 60–day period beginning on the date of enactment of this Act.

<< 31 USCA § 5311 NOTE >>

SEC. 314. COOPERATIVE EFFORTS TO DETER MONEY LAUNDERING.

 (a) COOPERATION AMONG FINANCIAL INSTITUTIONS, REGULATORY AUTHORITIES, AND LAW ENFORCEMENT AUTHORITIES.—

 (1) REGULATIONS.—The Secretary shall, within 120 days after the date of enactment of this Act, adopt regulations to encourage further cooperation among financial institutions, their regulatory authorities, and law enforcement authorities, with the specific purpose of encouraging regulatory authorities and law enforcement authorities to share with financial institutions information regarding individuals, entities, and organizations engaged in or reasonably suspected based on credible evidence of engaging in terrorist acts or money laundering activities.

 (2) COOPERATION AND INFORMATION SHARING PROCEDURES.—The regulations adopted under paragraph (1) may include or create procedures for cooperation and information sharing focusing on—

(A) matters specifically related to the finances of terrorist groups, the means by which terrorist groups transfer funds around the world and within the United States, including through the use of charitable organizations, nonprofit organizations, and nongovernmental organizations, and the extent to which financial institutions in the United States are unwittingly involved in such finances and the extent to which such institutions are at risk as a result;

(B) the relationship, particularly the financial relationship, between international narcotics traffickers and foreign terrorist organizations, the extent to which their memberships overlap and engage in joint activities, and the extent to which they cooperate with each other in raising and transferring funds for their respective purposes; and

(C) means of facilitating the identification of accounts and transactions involving terrorist groups and facilitating the exchange of information concerning such accounts and transactions between financial institutions and law enforcement organizations.

(3) CONTENTS.—The regulations adopted pursuant to paragraph (1) may—

(A) require that each financial institution designate 1 or more persons to receive information concerning, and to monitor accounts of individuals, entities, and organizations identified, pursuant to paragraph (1); and

(B) further establish procedures for the protection of the shared information, consistent with the capacity, size, and nature of the institution to which the particular procedures apply.

(4) RULE OF CONSTRUCTION.—The receipt of information by a financial institution pursuant to this section shall not relieve or otherwise modify the obligations of the financial institution with respect to any other person or account.

(5) USE OF INFORMATION.—Information received by a financial institution pursuant to this section shall not be used for any purpose other than identifying and reporting on activities that may involve terrorist acts or money laundering activities.

(b) COOPERATION AMONG FINANCIAL INSTITUTIONS.—Upon notice provided to the Secretary, 2 or more financial institutions and any association of financial institutions may share information with one another regarding individuals, entities, organizations, and countries suspected of possible terrorist or money laundering activities. A financial institution or association that transmits, receives, or shares such information for the purposes of identifying and reporting activities that may involve terrorist acts or money laundering activities shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision thereof, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure, or any other person identified in the disclosure, except where such transmission, receipt, or sharing violates this section or regulations promulgated pursuant to this section.

(c) RULE OF CONSTRUCTION.—Compliance with the provisions of this title requiring or allowing financial institutions and any association of financial institutions to disclose or share information regarding individuals, entities, and organizations engaged in or suspected of engaging in terrorist acts or money laundering activities shall not constitute a violation of the provisions of title V of the Gramm–Leach–Bliley Act (Public Law 106–102).

(d) REPORTS TO THE FINANCIAL SERVICES INDUSTRY ON SUSPICIOUS FINANCIAL ACTIVITIES.—At least semiannually, the Secretary shall—

(1) publish a report containing a detailed analysis identifying patterns of suspicious activity and other investigative insights derived from suspicious activity reports and investigations conducted by Federal, State, and local law enforcement agencies to the extent appropriate; and

(2) distribute such report to financial institutions (as defined in section 5312 of title 31, United States Code).

SEC. 315. INCLUSION OF FOREIGN CORRUPTION OFFENSES AS MONEY LAUNDERING CRIMES.

Section 1956(c)(7) of title 18, United States Code, is amended—

(1) in subparagraph (B)—

<< 18 USCA § 1956 >>

(A) in clause (ii), by striking "or destruction of property by means of explosive or fire" and inserting "destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16)";

<< 18 USCA § 1956 >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(B) in clause (iii), by striking "1978" and inserting "1978)"; and

<< 18 USCA § 1956 >>

(C) by adding at the end the following:

"(iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

"(v) smuggling or export control violations involving—

"(I) an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or

"(II) an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730–774); or

"(vi) an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States;"; and

<< 18 USCA § 1956 >>

(2) in subparagraph (D)—

(A) by inserting "section 541 (relating to goods falsely classified)," before "section 542";

(B) by inserting "section 922(1) (relating to the unlawful importation of firearms), section 924(n) (relating to firearms trafficking)," before "section 956";

(C) by inserting "section 1030 (relating to computer fraud and abuse)," before "1032"; and

(D) by inserting "any felony violation of the Foreign Agents Registration Act of 1938," before "or any felony violation of the Foreign Corrupt Practices Act".

SEC. 316. ANTI–TERRORIST FORFEITURE PROTECTION.

<< 18 USCA § 983 NOTE >>

(a) RIGHT TO CONTEST.—An owner of property that is confiscated under any provision of law relating to the confiscation of assets of suspected international terrorists, may contest that confiscation by filing a claim in the manner set forth in the Federal Rules of Civil Procedure (Supplemental Rules for Certain Admiralty and Maritime Claims), and asserting as an affirmative defense that—

(1) the property is not subject to confiscation under such provision of law; or

(2) the innocent owner provisions of section 983(d) of title 18, United States Code, apply to the case.

<< 18 USCA § 983 NOTE >>

(b) EVIDENCE.—In considering a claim filed under this section, a court may admit evidence that is otherwise inadmissible under the Federal Rules of Evidence, if the court determines that the evidence is reliable, and that compliance with the Federal Rules of Evidence may jeopardize the national security interests of the United States.

<< 18 USCA § 983 NOTE >>

(c) CLARIFICATIONS.—

(1) PROTECTION OF RIGHTS.—The exclusion of certain provisions of Federal law from the definition of the term "civil forfeiture statute" in section 983(i) of title 18, United States Code, shall not be construed to deny an owner of property the right to contest the confiscation of assets of suspected international terrorists under—

(A) subsection (a) of this section;

(B) the Constitution; or

(C) subchapter II of chapter 5 of title 5, United States Code (commonly known as the "Administrative Procedure Act").

(2) SAVINGS CLAUSE.—Nothing in this section shall limit or otherwise affect any other remedies that may be available to an owner of property under section 983 of title 18, United States Code, or any other provision of law.

<< 18 USCA § 983 >>

(d) TECHNICAL CORRECTION.—Section 983(i)(2)(D) of title 18, United States Code, is amended by inserting "or the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. 1701 et seq.)" before the semicolon.

SEC. 317. LONG–ARM JURISDICTION OVER FOREIGN MONEY LAUNDERERS.

Section 1956(b) of title 18, United States Code, is amended—

<< 18 USCA § 1956 >>

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and moving the margins 2 ems to the right;

<< 18 USCA § 1956 >>

(2) by inserting after "(b)" the following: "PENALTIES.—
"(1) IN GENERAL.—";

<< 18 USCA § 1956 >>

(3) by inserting ", or section 1957" after "or (a)(3)"; and

<< 18 USCA § 1956 >>

(4) by adding at the end the following:
"(2) JURISDICTION OVER FOREIGN PERSONS.—For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and—
   "(A) the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;
   "(B) the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or
   "(C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.
"(3) COURT AUTHORITY OVER ASSETS.—A court described in paragraph (2) may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.
"(4) FEDERAL RECEIVER.—
   "(A) IN GENERAL.—A court described in paragraph (2) may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.
   "(B) APPOINTMENT AND AUTHORITY.—A Federal Receiver described in subparagraph (A)—
      "(i) may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;
      "(ii) shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

AR.03725

37

"(iii) shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant—

  "(I) from the Financial Crimes Enforcement Network of the Department of the Treasury; or

  "(II) from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.".

<< 18 USCA § 1956 >>

## SEC. 318. LAUNDERING MONEY THROUGH A FOREIGN BANK.

Section 1956(c) of title 18, United States Code, is amended by striking paragraph (6) and inserting the following:

  "(6) the term 'financial institution' includes—

  "(A) any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

  "(B) any foreign bank, as defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101).".

## SEC. 319. FORFEITURE OF FUNDS IN UNITED STATES INTERBANK ACCOUNTS.

<< 18 USCA § 981 >>

(a) FORFEITURE FROM UNITED STATES INTERBANK ACCOUNT.—Section 981 of title 18, United States Code, is amended by adding at the end the following:

"(k) INTERBANK ACCOUNTS.—

  "(1) IN GENERAL.—

  "(A) IN GENERAL.—For the purpose of a forfeiture under this section or under the Controlled Substances Act (21 U.S.C. 801 et seq.), if funds are deposited into an account at a foreign bank, and that foreign bank has an interbank account in the United States with a covered financial institution (as defined in section 5318(j)(1) of title 31), the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign bank, may be restrained, seized, or arrested.

  "(B) AUTHORITY TO SUSPEND.—The Attorney General, in consultation with the Secretary of the Treasury, may suspend or terminate a forfeiture under this section if the Attorney General determines that a conflict of law exists between the laws of the jurisdiction in which the foreign bank is located and the laws of the United States with respect to liabilities arising from the restraint, seizure, or arrest of such funds, and that such suspension or termination would be in the interest of justice and would not harm the national interests of the United States.

  "(2) NO REQUIREMENT FOR GOVERNMENT TO TRACE FUNDS.—If a forfeiture action is brought against funds that are restrained, seized, or arrested under paragraph (1), it shall not be necessary for the Government to establish that the funds are directly traceable to the funds that were deposited into the foreign bank, nor shall it be necessary for the Government to rely on the application of section 984.

  "(3) CLAIMS BROUGHT BY OWNER OF THE FUNDS.—If a forfeiture action is instituted against funds restrained, seized, or arrested under paragraph (1), the owner of the funds deposited into the account at the foreign bank may contest the forfeiture by filing a claim under section 983.

  "(4) DEFINITIONS.—For purposes of this subsection, the following definitions shall apply:

  "(A) INTERBANK ACCOUNT.—The term 'interbank account' has the same meaning as in section 984(c)(2)(B).

  "(B) OWNER.—

  "(i) IN GENERAL.—Except as provided in clause (ii), the term 'owner'—

  "(I) means the person who was the owner, as that term is defined in section 983(d)(6), of the funds that were deposited into the foreign bank at the time such funds were deposited; and

  "(II) does not include either the foreign bank or any financial institution acting as an intermediary in the transfer of the funds into the interbank account.

"(ii) EXCEPTION.—The foreign bank may be considered the 'owner' of the funds (and no other person shall qualify as the owner of such funds) only if—

"(I) the basis for the forfeiture action is wrongdoing committed by the foreign bank; or

"(II) the foreign bank establishes, by a preponderance of the evidence, that prior to the restraint, seizure, or arrest of the funds, the foreign bank had discharged all or part of its obligation to the prior owner of the funds, in which case the foreign bank shall be deemed the owner of the funds to the extent of such discharged obligation.".

<< 31 USCA § 5318 >>

(b) BANK RECORDS.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(k) BANK RECORDS RELATED TO ANTI–MONEY LAUNDERING PROGRAMS.—

"(1) DEFINITIONS.—For purposes of this subsection, the following definitions shall apply:

"(A) APPROPRIATE FEDERAL BANKING AGENCY.—The term 'appropriate Federal banking agency' has the same meaning as in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813).

"(B) INCORPORATED TERM.—The term 'correspondent account' has the same meaning as in section 5318A(f)(1)(B).

"(2) 120–HOUR RULE.—Not later than 120 hours after receiving a request by an appropriate Federal banking agency for information related to anti-money laundering compliance by a covered financial institution or a customer of such institution, a covered financial institution shall provide to the appropriate Federal banking agency, or make available at a location specified by the representative of the appropriate Federal banking agency, information and account documentation for any account opened, maintained, administered or managed in the United States by the covered financial institution.

"(3) FOREIGN BANK RECORDS.—

"(A) SUMMONS OR SUBPOENA OF RECORDS.—

"(i) IN GENERAL.—The Secretary of the Treasury or the Attorney General may issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank.

"(ii) SERVICE OF SUMMONS OR SUBPOENA.—A summons or subpoena referred to in clause (i) may be served on the foreign bank in the United States if the foreign bank has a representative in the United States, or in a foreign country pursuant to any mutual legal assistance treaty, multilateral agreement, or other request for international law enforcement assistance.

"(B) ACCEPTANCE OF SERVICE.—

"(i) MAINTAINING RECORDS IN THE UNITED STATES.—Any covered financial institution which maintains a correspondent account in the United States for a foreign bank shall maintain records in the United States identifying the owners of such foreign bank and the name and address of a person who resides in the United States and is authorized to accept service of legal process for records regarding the correspondent account.

"(ii) LAW ENFORCEMENT REQUEST.—Upon receipt of a written request from a Federal law enforcement officer for information required to be maintained under this paragraph, the covered financial institution shall provide the information to the requesting officer not later than 7 days after receipt of the request.

"(C) TERMINATION OF CORRESPONDENT RELATIONSHIP.—

"(i) TERMINATION UPON RECEIPT OF NOTICE.—A covered financial institution shall terminate any correspondent relationship with a foreign bank not later than 10 business days after receipt of written notice from the Secretary or the Attorney General (in each case, after consultation with the other) that the foreign bank has failed—

"(I) to comply with a summons or subpoena issued under subparagraph (A); or

"(II) to initiate proceedings in a United States court contesting such summons or subpoena.

"(ii) LIMITATION ON LIABILITY.—A covered financial institution shall not be liable to any person in any court or arbitration proceeding for terminating a correspondent relationship in accordance with this subsection.

"(iii) FAILURE TO TERMINATE RELATIONSHIP.—Failure to terminate a correspondent relationship in accordance with this subsection shall render the covered financial institution liable for a civil penalty of up to $10,000 per day until the correspondent relationship is so terminated.".

<< 31 USCA § 5318 NOTE >>

(c) GRACE PERIOD.—Financial institutions shall have 60 days from the date of enactment of this Act to comply with the provisions of section 5318(k) of title 31, United States Code, as added by this section.

(d) AUTHORITY TO ORDER CONVICTED CRIMINAL TO RETURN PROPERTY LOCATED ABROAD.—

<< 21 USCA § 853 >>

(1) FORFEITURE OF SUBSTITUTE PROPERTY.—Section 413(p) of the Controlled Substances Act (21 U.S.C. 853) is amended to read as follows:

"(p) FORFEITURE OF SUBSTITUTE PROPERTY.—

"(1) IN GENERAL.—Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant—

"(A) cannot be located upon the exercise of due diligence;

"(B) has been transferred or sold to, or deposited with, a third party;

"(C) has been placed beyond the jurisdiction of the court;

"(D) has been substantially diminished in value; or

"(E) has been commingled with other property which cannot be divided without difficulty.

"(2) SUBSTITUTE PROPERTY.—In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

"(3) RETURN OF PROPERTY TO JURISDICTION.—In the case of property described in paragraph (1)(C), the court may, in addition to any other action authorized by this subsection, order the defendant to return the property to the jurisdiction of the court so that the property may be seized and forfeited.".

<< 21 USCA § 853 >>

(2) PROTECTIVE ORDERS.—Section 413(e) of the Controlled Substances Act (21 U.S.C. 853(e)) is amended by adding at the end the following:

"(4) ORDER TO REPATRIATE AND DEPOSIT.—

"(A) IN GENERAL.—Pursuant to its authority to enter a pretrial restraining order under this section, the court may order a defendant to repatriate any property that may be seized and forfeited, and to deposit that property pending trial in the registry of the court, or with the United States Marshals Service or the Secretary of the Treasury, in an interest-bearing account, if appropriate.

"(B) FAILURE TO COMPLY.—Failure to comply with an order under this subsection, or an order to repatriate property under subsection (p), shall be punishable as a civil or criminal contempt of court, and may also result in an enhancement of the sentence of the defendant under the obstruction of justice provision of the Federal Sentencing Guidelines.".

<< 18 USCA § 981 >>

SEC. 320. PROCEEDS OF FOREIGN CRIMES.

Section 981(a)(1)(B) of title 18, United States Code, is amended to read as follows:

"(B) Any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense—

"(i) involves the manufacture, importation, sale, or distribution of a controlled substance (as that term is defined for purposes of the Controlled Substances Act), or any other conduct described in section 1956(c)(7)(B);

"(ii) would be punishable within the jurisdiction of the foreign nation by death or imprisonment for a term exceeding 1 year; and

AR.03728

"(iii) would be punishable under the laws of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.".

SEC. 321. FINANCIAL INSTITUTIONS SPECIFIED IN SUBCHAPTER II OF CHAPTER 53 OF TITLE 31, UNITED STATES CODE.

<< 31 USCA § 5312 >>

(a) CREDIT UNIONS.—Subparagraph (E) of section 5312(2) of title 31, United States Code, is amended to read as follows:
"(E) any credit union;".

<< 31 USCA § 5312 >>

(b) FUTURES COMMISSION MERCHANT; COMMODITY TRADING ADVISOR; COMMODITY POOL OPERATOR. —Section 5312 of title 31, United States Code, is amended by adding at the end the following new subsection:
"(c) ADDITIONAL DEFINITIONS.—For purposes of this subchapter, the following definitions shall apply:
"(1) CERTAIN INSTITUTIONS INCLUDED IN DEFINITION.—The term 'financial institution' (as defined in subsection (a)) includes the following:
"(A) Any futures commission merchant, commodity trading advisor, or commodity pool operator registered, or required to register, under the Commodity Exchange Act.".

<< 31 USCA § 5318 NOTE >>

(c) CFTC INCLUDED.—For purposes of this Act and any amendment made by this Act to any other provision of law, the term "Federal functional regulator" includes the Commodity Futures Trading Commission.

<< 28 USCA § 2466 >>

SEC. 322. CORPORATION REPRESENTED BY A FUGITIVE.

Section 2466 of title 18, United States Code, is amended by designating the present matter as subsection (a), and adding at the end the following:
"(b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.".

SEC. 323. ENFORCEMENT OF FOREIGN JUDGMENTS.

Section 2467 of title 28, United States Code, is amended—

<< 28 USCA § 2467 >>

(1) in subsection (d), by adding the following after paragraph (2):
"(3) PRESERVATION OF PROPERTY.—
"(A) IN GENERAL.—To preserve the availability of property subject to a foreign forfeiture or confiscation judgment, the Government may apply for, and the court may issue, a restraining order pursuant to section 983(j) of title 18, at any time before or after an application is filed pursuant to subsection (c)(1) of this section.
"(B) EVIDENCE.—The court, in issuing a restraining order under subparagraph (A)—
"(i) may rely on information set forth in an affidavit describing the nature of the proceeding or investigation underway in the foreign country, and setting forth a reasonable basis to believe that the property to be restrained will be named in a judgment of forfeiture at the conclusion of such proceeding; or
"(ii) may register and enforce a restraining order that has been issued by a court of competent jurisdiction in the foreign country and certified by the Attorney General pursuant to subsection (b)(2).

"(C) LIMIT ON GROUNDS FOR OBJECTION.—No person may object to a restraining order under subparagraph (A) on any ground that is the subject of parallel litigation involving the same property that is pending in a foreign court.";

<< 28 USCA § 2467 >>

(2) in subsection (b)(1)(C), by striking "establishing that the defendant received notice of the proceedings in sufficient time to enable the defendant" and inserting "establishing that the foreign nation took steps, in accordance with the principles of due process, to give notice of the proceedings to all persons with an interest in the property in sufficient time to enable such persons";

<< 28 USCA § 2467 >>

(3) in subsection (d)(1)(D), by striking "the defendant in the proceedings in the foreign court did not receive notice" and inserting "the foreign nation did not take steps, in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property"; and

<< 28 USCA § 2467 >>

(4) in subsection (a)(2)(A), by inserting ", any violation of foreign law that would constitute a violation or an offense for which property could be forfeited under Federal law if the offense were committed in the United States" after "United Nations Convention".

<< 31 USCA § 5311 NOTE >>

SEC. 324. REPORT AND RECOMMENDATION.

Not later than 30 months after the date of enactment of this Act, the Secretary, in consultation with the Attorney General, the Federal banking agencies (as defined at section 3 of the Federal Deposit Insurance Act), the National Credit Union Administration Board, the Securities and Exchange Commission, and such other agencies as the Secretary may determine, at the discretion of the Secretary, shall evaluate the operations of the provisions of this subtitle and make recommendations to Congress as to any legislative action with respect to this subtitle as the Secretary may determine to be necessary or advisable.

<< 31 USCA § 5318 >>

SEC. 325. CONCENTRATION ACCOUNTS AT FINANCIAL INSTITUTIONS.

Section 5318(h) of title 31, United States Code, as amended by section 202 of this title, is amended by adding at the end the following:
"(3) CONCENTRATION ACCOUNTS.—The Secretary may prescribe regulations under this subsection that govern maintenance of concentration accounts by financial institutions, in order to ensure that such accounts are not used to prevent association of the identity of an individual customer with the movement of funds of which the customer is the direct or beneficial owner, which regulations shall, at a minimum—
"(A) prohibit financial institutions from allowing clients to direct transactions that move their funds into, out of, or through the concentration accounts of the financial institution;
"(B) prohibit financial institutions and their employees from informing customers of the existence of, or the means of identifying, the concentration accounts of the institution; and
"(C) require each financial institution to establish written procedures governing the documentation of all transactions involving a concentration account, which procedures shall ensure that, any time a transaction involving a concentration account commingles funds belonging to 1 or more customers, the identity of, and specific amount belonging to, each customer is documented.".

SEC. 326. VERIFICATION OF IDENTIFICATION.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

"(l) IDENTIFICATION AND VERIFICATION OF ACCOUNTHOLDERS.—

"(1) IN GENERAL.—Subject to the requirements of this subsection, the Secretary of the Treasury shall prescribe regulations setting forth the minimum standards for financial institutions and their customers regarding the identity of the customer that shall apply in connection with the opening of an account at a financial institution.

"(2) MINIMUM REQUIREMENTS.—The regulations shall, at a minimum, require financial institutions to implement, and customers (after being given adequate notice) to comply with, reasonable procedures for—

"(A) verifying the identity of any person seeking to open an account to the extent reasonable and practicable;

"(B) maintaining records of the information used to verify a person's identity, including name, address, and other identifying information; and

"(C) consulting lists of known or suspected terrorists or terrorist organizations provided to the financial institution by any government agency to determine whether a person seeking to open an account appears on any such list.

"(3) FACTORS TO BE CONSIDERED.—In prescribing regulations under this subsection, the Secretary shall take into consideration the various types of accounts maintained by various types of financial institutions, the various methods of opening accounts, and the various types of identifying information available.

"(4) CERTAIN FINANCIAL INSTITUTIONS.—In the case of any financial institution the business of which is engaging in financial activities described in section 4(k) of the Bank Holding Company Act of 1956 (including financial activities subject to the jurisdiction of the Commodity Futures Trading Commission), the regulations prescribed by the Secretary under paragraph (1) shall be prescribed jointly with each Federal functional regulator (as defined in section 509 of the Gramm–Leach–Bliley Act, including the Commodity Futures Trading Commission) appropriate for such financial institution.

"(5) EXEMPTIONS.—The Secretary (and, in the case of any financial institution described in paragraph (4), any Federal agency described in such paragraph) may, by regulation or order, exempt any financial institution or type of account from the requirements of any regulation prescribed under this subsection in accordance with such standards and procedures as the Secretary may prescribe.

"(6) EFFECTIVE DATE.—Final regulations prescribed under this subsection shall take effect before the end of the 1–year period beginning on the date of enactment of the International Money Laundering Abatement and Financial Anti–Terrorism Act of 2001.".

(b) STUDY AND REPORT REQUIRED.—Within 6 months after the date of enactment of this Act, the Secretary, in consultation with the Federal functional regulators (as defined in section 509 of the Gramm–Leach–Bliley Act) and other appropriate Government agencies, shall submit a report to the Congress containing recommendations for—

(1) determining the most timely and effective way to require foreign nationals to provide domestic financial institutions and agencies with appropriate and accurate information, comparable to that which is required of United States nationals, concerning the identity, address, and other related information about such foreign nationals necessary to enable such institutions and agencies to comply with the requirements of this section;

(2) requiring foreign nationals to apply for and obtain, before opening an account with a domestic financial institution, an identification number which would function similarly to a Social Security number or tax identification number; and

(3) establishing a system for domestic financial institutions and agencies to review information maintained by relevant Government agencies for purposes of verifying the identities of foreign nationals seeking to open accounts at those institutions and agencies.

SEC. 327. CONSIDERATION OF ANTI–MONEY LAUNDERING RECORD.

(a) BANK HOLDING COMPANY ACT OF 1956.—

<< 12 USCA § 1842 >>

(1) IN GENERAL.—Section 3(c) of the Bank Holding Company Act of 1956 (12 U.S.C. 1842(c)) is amended by adding at the end the following new paragraph:

"(6) MONEY LAUNDERING.—In every case, the Board shall take into consideration the effectiveness of the company or companies in combatting money laundering activities, including in overseas branches.".

<< 12 USCA § 1842 NOTE >>

(2) SCOPE OF APPLICATION.—The amendment made by paragraph (1) shall apply with respect to any application submitted to the Board of Governors of the Federal Reserve System under section 3 of the Bank Holding Company Act of 1956 after December 31, 2001, which has not been approved by the Board before the date of enactment of this Act.

(b) MERGERS SUBJECT TO REVIEW UNDER FEDERAL DEPOSIT INSURANCE ACT.—

(1) IN GENERAL.—Section 18(c) of the Federal Deposit Insurance Act (12 U. S.C. 1828(c)) is amended—

<< 12 USCA § 1828 >>

(A) by redesignating paragraph (11) as paragraph (12); and

<< 12 USCA § 1828 >>

(B) by inserting after paragraph (10), the following new paragraph:

"(11) MONEY LAUNDERING.—In every case, the responsible agency, shall take into consideration the effectiveness of any insured depository institution involved in the proposed merger transaction in combatting money laundering activities, including in overseas branches.".

<< 12 USCA § 1828 NOTE >>

(2) SCOPE OF APPLICATION.—The amendment made by paragraph (1) shall apply with respect to any application submitted to the responsible agency under section 18(c) of the Federal Deposit Insurance Act after December 31, 2001, which has not been approved by all appropriate responsible agencies before the date of enactment of this Act.

<< 31 USCA § 5311 NOTE >>

## SEC. 328. INTERNATIONAL COOPERATION ON IDENTIFICATION OF ORIGINATORS OF WIRE TRANSFERS.

The Secretary shall—

(1) in consultation with the Attorney General and the Secretary of State, take all reasonable steps to encourage foreign governments to require the inclusion of the name of the originator in wire transfer instructions sent to the United States and other countries, with the information to remain with the transfer from its origination until the point of disbursement; and

(2) report annually to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate on—

(A) progress toward the goal enumerated in paragraph (1), as well as impediments to implementation and an estimated compliance rate; and

(B) impediments to instituting a regime in which all appropriate identification, as defined by the Secretary, about wire transfer recipients shall be included with wire transfers from their point of origination until disbursement.

<< 31 USCA § 5311 NOTE >>

## SEC. 329. CRIMINAL PENALTIES.

Any person who is an official or employee of any department, agency, bureau, office, commission, or other entity of the Federal Government, and any other person who is acting for or on behalf of any such entity, who, directly or indirectly, in connection with the administration of this title, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for—

AR.03732

   (1) being influenced in the performance of any official act;

   (2) being influenced to commit or aid in the committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

   (3) being induced to do or omit to do any act in violation of the official duty of such official or person,

shall be fined in an amount not more than 3 times the monetary equivalent of the thing of value, or imprisoned for not more than 15 years, or both. A violation of this section shall be subject to chapter 227 of title 18, United States Code, and the provisions of the United States Sentencing Guidelines.

## SEC. 330. INTERNATIONAL COOPERATION IN INVESTIGATIONS OF MONEY LAUNDERING, FINANCIAL CRIMES, AND THE FINANCES OF TERRORIST GROUPS.

 (a) NEGOTIATIONS.—It is the sense of the Congress that the President should direct the Secretary of State, the Attorney General, or the Secretary of the Treasury, as appropriate, and in consultation with the Board of Governors of the Federal Reserve System, to seek to enter into negotiations with the appropriate financial supervisory agencies and other officials of any foreign country the financial institutions of which do business with United States financial institutions or which may be utilized by any foreign terrorist organization (as designated under section 219 of the Immigration and Nationality Act), any person who is a member or representative of any such organization, or any person engaged in money laundering or financial or other crimes.

 (b) PURPOSES OF NEGOTIATIONS.—It is the sense of the Congress that, in carrying out any negotiations described in paragraph (1), the President should direct the Secretary of State, the Attorney General, or the Secretary of the Treasury, as appropriate, to seek to enter into and further cooperative efforts, voluntary information exchanges, the use of letters rogatory, mutual legal assistance treaties, and international agreements to—

   (1) ensure that foreign banks and other financial institutions maintain adequate records of transaction and account information relating to any foreign terrorist organization (as designated under section 219 of the Immigration and Nationality Act), any person who is a member or representative of any such organization, or any person engaged in money laundering or financial or other crimes; and

   (2) establish a mechanism whereby such records may be made available to United States law enforcement officials and domestic financial institution supervisors, when appropriate.

<div align="center">Subtitle B—Bank Secrecy Act Amendments and Related Improvements</div>

## SEC. 351. AMENDMENTS RELATING TO REPORTING OF SUSPICIOUS ACTIVITIES.

<div align="center">&lt;&lt; 31 USCA § 5318 &gt;&gt;</div>

 (a) AMENDMENT RELATING TO CIVIL LIABILITY IMMUNITY FOR DISCLOSURES.—Section 5318(g)(3) of title 31, United States Code, is amended to read as follows:

  "(3) LIABILITY FOR DISCLOSURES.—

  "(A) IN GENERAL.—Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

  "(B) RULE OF CONSTRUCTION.—Subparagraph (A) shall not be construed as creating—

  "(i) any inference that the term 'person', as used in such subparagraph, may be construed more broadly than its ordinary usage so as to include any government or agency of government; or

  "(ii) any immunity against, or otherwise affecting, any civil or criminal action brought by any government or agency of government to enforce any constitution, law, or regulation of such government or agency.".

<< 31 USCA § 5318 >>

(b) PROHIBITION ON NOTIFICATION OF DISCLOSURES.—Section 5318(g)(2) of title 31, United States Code, is amended to read as follows:

"(2) NOTIFICATION PROHIBITED.—

"(A) IN GENERAL.—If a financial institution or any director, officer, employee, or agent of any financial institution, voluntarily or pursuant to this section or any other authority, reports a suspicious transaction to a government agency—

"(i) the financial institution, director, officer, employee, or agent may not notify any person involved in the transaction that the transaction has been reported; and

"(ii) no officer or employee of the Federal Government or of any State, local, tribal, or territorial government within the United States, who has any knowledge that such report was made may disclose to any person involved in the transaction that the transaction has been reported, other than as necessary to fulfill the official duties of such officer or employee.

"(B) DISCLOSURES IN CERTAIN EMPLOYMENT REFERENCES.—

"(i) RULE OF CONSTRUCTION.—Notwithstanding the application of subparagraph (A) in any other context, subparagraph (A) shall not be construed as prohibiting any financial institution, or any director, officer, employee, or agent of such institution, from including information that was included in a report to which subparagraph (A) applies—

"(I) in a written employment reference that is provided in accordance with section 18(w) of the Federal Deposit Insurance Act in response to a request from another financial institution; or

"(II) in a written termination notice or employment reference that is provided in accordance with the rules of a self-regulatory organization registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission,

except that such written reference or notice may not disclose that such information was also included in any such report, or that such report was made.

"(ii) INFORMATION NOT REQUIRED.—Clause (i) shall not be construed, by itself, to create any affirmative duty to include any information described in clause (i) in any employment reference or termination notice referred to in clause (i).".

SEC. 352. ANTI–MONEY LAUNDERING PROGRAMS.

<< 31 USCA § 5318 >>

(a) IN GENERAL.—Section 5318(h) of title 31, United States Code, is amended to read as follows:

"(h) ANTI–MONEY LAUNDERING PROGRAMS.—

"(1) IN GENERAL.—In order to guard against money laundering through financial institutions, each financial institution shall establish anti-money laundering programs, including, at a minimum—

"(A) the development of internal policies, procedures, and controls;

"(B) the designation of a compliance officer;

"(C) an ongoing employee training program; and

"(D) an independent audit function to test programs.

"(2) REGULATIONS.—The Secretary of the Treasury, after consultation with the appropriate Federal functional regulator (as defined in section 509 of the Gramm–Leach–Bliley Act), may prescribe minimum standards for programs established under paragraph (1), and may exempt from the application of those standards any financial institution that is not subject to the provisions of the rules contained in part 103 of title 31, of the Code of Federal Regulations, or any successor rule thereto, for so long as such financial institution is not subject to the provisions of such rules.".

<< 31 USCA § 5318 NOTE >>

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect at the end of the 180–day period beginning on the date of enactment of this Act.

<< 31 USCA § 5318 NOTE >>

(c) DATE OF APPLICATION OF REGULATIONS; FACTORS TO BE TAKEN INTO ACCOUNT.—Before the end of the 180–day period beginning on the date of enactment of this Act, the Secretary shall prescribe regulations that consider the extent to which the requirements imposed under this section are commensurate with the size, location, and activities of the financial institutions to which such regulations apply.

SEC. 353. PENALTIES FOR VIOLATIONS OF GEOGRAPHIC TARGETING ORDERS AND CERTAIN RECORDKEEPING REQUIREMENTS, AND LENGTHENING EFFECTIVE PERIOD OF GEOGRAPHIC TARGETING ORDERS.

<< 31 USCA § 5321 >>

(a) CIVIL PENALTY FOR VIOLATION OF TARGETING ORDER.—Section 5321(a)(1) of title 31, United States Code, is amended—

(1) by inserting "or order issued" after "subchapter or a regulation prescribed"; and

(2) by inserting ", or willfully violating a regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "sections 5314 and 5315)".

<< 31 USCA § 5322 >>

(b) CRIMINAL PENALTIES FOR VIOLATION OF TARGETING ORDER.—Section 5322 of title 31, United States Code, is amended—

(1) in subsection (a)—

(A) by inserting "or order issued" after "willfully violating this subchapter or a regulation prescribed"; and

(B) by inserting ", or willfully violating a regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "under section 5315 or 5324)"; and

<< 31 USCA § 5322 >>

(2) in subsection (b)—

(A) by inserting "or order issued" after "willfully violating this subchapter or a regulation prescribed"; and

(B) by inserting "or willfully violating a regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "under section 5315 or 5324),".

(c) STRUCTURING TRANSACTIONS TO EVADE TARGETING ORDER OR CERTAIN RECORDKEEPING REQUIREMENTS.—Section 5324(a) of title 31, United States Code, is amended—

<< 31 USCA § 5324 >>

(1) by inserting a comma after "shall";

<< 31 USCA § 5324 >>

(2) by striking "section—" and inserting "section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508—";

<< 31 USCA § 5324 >>

(3) in paragraph (1), by inserting ", to file a report or to maintain a record required by an order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508" after "regulation prescribed under any such section"; and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 31 USCA § 5324 >>

  (4) in paragraph (2), by inserting ", to file a report or to maintain a record required by any order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508," after "regulation prescribed under any such section".

<< 31 USCA § 5326 >>

  (d) LENGTHENING EFFECTIVE PERIOD OF GEOGRAPHIC TARGETING ORDERS.—Section 5326(d) of title 31, United States Code, is amended by striking "more than 60" and inserting "more than 180".

<< 31 USCA § 5341 >>

SEC. 354. ANTI–MONEY LAUNDERING STRATEGY.

  Section 5341(b) of title 31, United States Code, is amended by adding at the end the following:
  "(12) DATA REGARDING FUNDING OF TERRORISM.—Data concerning money laundering efforts related to the funding of acts of international terrorism, and efforts directed at the prevention, detection, and prosecution of such funding.".

<< 12 USCA § 1828 >>

SEC. 355. AUTHORIZATION TO INCLUDE SUSPICIONS OF ILLEGAL ACTIVITY IN WRITTEN EMPLOYMENT REFERENCES.

  Section 18 of the Federal Deposit Insurance Act (12 U.S.C. 1828) is amended by adding at the end the following:
  "(w) WRITTEN EMPLOYMENT REFERENCES MAY CONTAIN SUSPICIONS OF INVOLVEMENT IN ILLEGAL ACTIVITY.—
  "(1) AUTHORITY TO DISCLOSE INFORMATION.—Notwithstanding any other provision of law, any insured depository institution, and any director, officer, employee, or agent of such institution, may disclose in any written employment reference relating to a current or former institution-affiliated party of such institution which is provided to another insured depository institution in response to a request from such other institution, information concerning the possible involvement of such institution-affiliated party in potentially unlawful activity.
  "(2) INFORMATION NOT REQUIRED.—Nothing in paragraph (1) shall be construed, by itself, to create any affirmative duty to include any information described in paragraph (1) in any employment reference referred to in paragraph (1).
  "(3) MALICIOUS INTENT.—Notwithstanding any other provision of this subsection, voluntary disclosure made by an insured depository institution, and any director, officer, employee, or agent of such institution under this subsection concerning potentially unlawful activity that is made with malicious intent, shall not be shielded from liability from the person identified in the disclosure.
  "(4) DEFINITION.—For purposes of this subsection, the term 'insured depository institution' includes any uninsured branch or agency of a foreign bank.".

SEC. 356. REPORTING OF SUSPICIOUS ACTIVITIES BY SECURITIES BROKERS AND DEALERS; INVESTMENT COMPANY STUDY.

<< 31 USCA § 5318 NOTE >>

  (a) DEADLINE FOR SUSPICIOUS ACTIVITY REPORTING REQUIREMENTS FOR REGISTERED BROKERS AND DEALERS.—The Secretary, after consultation with the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System, shall publish proposed regulations in the Federal Register before January 1, 2002, requiring brokers and dealers registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 to

AR.03736

submit suspicious activity reports under section 5318(g) of title 31, United States Code. Such regulations shall be published in final form not later than July 1, 2002.

<< 31 USCA § 5318 NOTE >>

(b) SUSPICIOUS ACTIVITY REPORTING REQUIREMENTS FOR FUTURES COMMISSION MERCHANTS, COMMODITY TRADING ADVISORS, AND COMMODITY POOL OPERATORS.—The Secretary, in consultation with the Commodity Futures Trading Commission, may prescribe regulations requiring futures commission merchants, commodity trading advisors, and commodity pool operators registered under the Commodity Exchange Act to submit suspicious activity reports under section 5318(g) of title 31, United States Code.

(c) REPORT ON INVESTMENT COMPANIES.—

(1) IN GENERAL.—Not later than 1 year after the date of enactment of this Act, the Secretary, the Board of Governors of the Federal Reserve System, and the Securities and Exchange Commission shall jointly submit a report to the Congress on recommendations for effective regulations to apply the requirements of subchapter II of chapter 53 of title 31, United States Code, to investment companies pursuant to section 5312(a)(2)(I) of title 31, United States Code.

(2) DEFINITION.—For purposes of this subsection, the term "investment company"—

(A) has the same meaning as in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a–3); and

(B) includes any person that, but for the exceptions provided for in paragraph (1) or (7) of section 3(c) of the Investment Company Act of 1940 (15 U.S.C. 80a–3(c)), would be an investment company.

(3) ADDITIONAL RECOMMENDATIONS.—The report required by paragraph (1) may make different recommendations for different types of entities covered by this subsection.

(4) BENEFICIAL OWNERSHIP OF PERSONAL HOLDING COMPANIES.—The report described in paragraph (1) shall also include recommendations as to whether the Secretary should promulgate regulations to treat any corporation or business or other grantor trust whose assets are predominantly securities, bank certificates of deposit, or other securities or investment instruments (other than such as relate to operating subsidiaries of such corporation or trust) and that has 5 or fewer common shareholders or holders of beneficial or other equity interest, as a financial institution within the meaning of that phrase in section 5312(a)(2)(I) and whether to require such corporations or trusts to disclose their beneficial owners when opening accounts or initiating funds transfers at any domestic financial institution.

SEC. 357. SPECIAL REPORT ON ADMINISTRATION OF BANK SECRECY PROVISIONS.

(a) REPORT REQUIRED.—Not later than 6 months after the date of enactment of this Act, the Secretary shall submit a report to the Congress relating to the role of the Internal Revenue Service in the administration of subchapter II of chapter 53 of title 31, United States Code (commonly known as the "Bank Secrecy Act").

(b) CONTENTS.—The report required by subsection (a)—

(1) shall specifically address, and contain recommendations concerning—

(A) whether it is advisable to shift the processing of information reporting to the Department of the Treasury under the Bank Secrecy Act provisions to facilities other than those managed by the Internal Revenue Service; and

(B) whether it remains reasonable and efficient, in light of the objective of both anti-money-laundering programs and Federal tax administration, for the Internal Revenue Service to retain authority and responsibility for audit and examination of the compliance of money services businesses and gaming institutions with those Bank Secrecy Act provisions; and

(2) shall, if the Secretary determines that the information processing responsibility or the audit and examination responsibility of the Internal Revenue Service, or both, with respect to those Bank Secrecy Act provisions should be transferred to other agencies, include the specific recommendations of the Secretary regarding the agency or agencies to which any such function should be transferred, complete with a budgetary and resources plan for expeditiously accomplishing the transfer.

SEC. 358. BANK SECRECY PROVISIONS AND ACTIVITIES OF UNITED STATES INTELLIGENCE AGENCIES TO FIGHT INTERNATIONAL TERRORISM.

<< 31 USCA § 5311 >>

(a) AMENDMENT RELATING TO THE PURPOSES OF CHAPTER 53 OF TITLE 31, UNITED STATES CODE.—Section 5311 of title 31, United States Code, is amended by inserting before the period at the end the following: ", or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism".

<< 31 USCA § 5318 >>

(b) AMENDMENT RELATING TO REPORTING OF SUSPICIOUS ACTIVITIES.—Section 5318(g)(4)(B) of title 31, United States Code, is amended by striking "or supervisory agency" and inserting ", supervisory agency, or United States intelligence agency for use in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism".

<< 31 USCA § 5319 >>

(c) AMENDMENT RELATING TO AVAILABILITY OF REPORTS.—Section 5319 of title 31, United States Code, is amended to read as follows:

"§ 5319. Availability of reports
  "The Secretary of the Treasury shall make information in a report filed under this subchapter available to an agency, including any State financial institutions supervisory agency, United States intelligence agency or self-regulatory organization registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission, upon request of the head of the agency or organization. The report shall be available for a purpose that is consistent with this subchapter. The Secretary may only require reports on the use of such information by any State financial institutions supervisory agency for other than supervisory purposes or by United States intelligence agencies. However, a report and records of reports are exempt from disclosure under section 552 of title 5.".

<< 12 USCA § 1829b >>

(d) AMENDMENT RELATING TO THE PURPOSES OF THE BANK SECRECY ACT PROVISIONS.—Section 21(a) of the Federal Deposit Insurance Act (12 U.S.C. 1829b(a)) is amended to read as follows:
  "(a) CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSE.—
    "(1) FINDINGS.—Congress finds that—
      "(A) adequate records maintained by insured depository institutions have a high degree of usefulness in criminal, tax, and regulatory investigations or proceedings, and that, given the threat posed to the security of the Nation on and after the terrorist attacks against the United States on September 11, 2001, such records may also have a high degree of usefulness in the conduct of intelligence or counterintelligence activities, including analysis, to protect against domestic and international terrorism; and
      "(B) microfilm or other reproductions and other records made by insured depository institutions of checks, as well as records kept by such institutions, of the identity of persons maintaining or authorized to act with respect to accounts therein, have been of particular value in proceedings described in subparagraph (A).
    "(2) PURPOSE.—It is the purpose of this section to require the maintenance of appropriate types of records by insured depository institutions in the United States where such records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, recognizes that, given the threat posed to the security of the Nation on and after the terrorist attacks against the United States on September 11, 2001, such records may also have a high degree of usefulness in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism.".

<< 12 USCA § 1953 >>

(e) AMENDMENT RELATING TO THE PURPOSES OF THE BANK SECRECY ACT.—Section 123(a) of Public Law 91–508 (12 U.S.C. 1953(a)) is amended to read as follows:
  "(a) REGULATIONS.—If the Secretary determines that the maintenance of appropriate records and procedures by any uninsured bank or uninsured institution, or any person engaging in the business of carrying on in the United States any of the functions referred to in subsection (b), has a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, and that, given the threat posed to the security of the Nation on and after the terrorist attacks against the United

States on September 11, 2001, such records may also have a high degree of usefulness in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism, he may by regulation require such bank, institution, or person.".

(f) AMENDMENTS TO THE RIGHT TO FINANCIAL PRIVACY ACT.—The Right to Financial Privacy Act of 1978 is amended—

<< 12 USCA § 3412 >>

(1) in section 1112(a) (12 U.S.C. 3412(a)), by inserting ", or intelligence or counterintelligence activity, investigation or analysis related to international terrorism" after "legitimate law enforcement inquiry";

(2) in section 1114(a)(1) (12 U.S.C. 3414(a)(1))—

<< 12 USCA § 3414 >>

(A) in subparagraph (A), by striking "or" at the end;

<< 12 USCA § 3414 >>

(B) in subparagraph (B), by striking the period at the end and inserting "; or"; and

<< 12 USCA § 3414 >>

(C) by adding at the end the following:

"(C) a Government authority authorized to conduct investigations of, or intelligence or counterintelligence analyses related to, international terrorism for the purpose of conducting such investigations or analyses."; and

<< 12 USCA § 3420 >>

(3) in section 1120(a)(2) (12 U.S.C. 3420(a)(2)), by inserting ", or for a purpose authorized by section 1112(a)" before the semicolon at the end.

(g) AMENDMENT TO THE FAIR CREDIT REPORTING ACT.—

<< 15 USCA § 1681u >>

(1) IN GENERAL.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

(A) by redesignating the second of the 2 sections designated as section 624 (15 U.S.C. 1681u) (relating to disclosure to FBI for counterintelligence purposes) as section 625; and

<< 15 USCA § 1681v >>

(B) by adding at the end the following new section:

"§ 626. Disclosures to governmental agencies for counterterrorism purposes

"(a) DISCLOSURE.—Notwithstanding section 604 or any other provision of this title, a consumer reporting agency shall furnish a consumer report of a consumer and all other information in a consumer's file to a government agency authorized to conduct investigations of, or intelligence or counterintelligence activities or analysis related to, international terrorism when presented with a written certification by such government agency that such information is necessary for the agency's conduct or such investigation, activity or analysis.

"(b) FORM OF CERTIFICATION.—The certification described in subsection (a) shall be signed by a supervisory official designated by the head of a Federal agency or an officer of a Federal agency whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate.

"(c) CONFIDENTIALITY.—No consumer reporting agency, or officer, employee, or agent of such consumer reporting agency, shall disclose to any person, or specify in any consumer report, that a government agency has sought or obtained access to information under subsection (a).

"(d) RULE OF CONSTRUCTION.—Nothing in section 625 shall be construed to limit the authority of the Director of the Federal Bureau of Investigation under this section.

"(e) SAFE HARBOR.—Notwithstanding any other provision of this title, any consumer reporting agency or agent or employee thereof making disclosure of consumer reports or other information pursuant to this section in good-faith reliance upon a certification of a governmental agency pursuant to the provisions of this section shall not be liable to any person for such disclosure under this subchapter, the constitution of any State, or any law or regulation of any State or any political subdivision of any State.".

  (2) CLERICAL AMENDMENTS.—The table of sections for the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

    (A) by redesignating the second of the 2 items designated as section 624 as section 625; and

    (B) by inserting after the item relating to section 625 (as so redesignated) the following new item:

"626. Disclosures to governmental agencies for counterterrorism purposes. ".

<< 12 USCA § 1829b NOTE >>

  (h) APPLICATION OF AMENDMENTS.—The amendments made by this section shall apply with respect to reports filed or records maintained on, before, or after the date of enactment of this Act.

SEC. 359. REPORTING OF SUSPICIOUS ACTIVITIES BY UNDERGROUND BANKING SYSTEMS.

<< 31 USCA § 5312 >>

  (a) DEFINITION FOR SUBCHAPTER.—Section 5312(a)(2)(R) of title 31, United States Code, is amended to read as follows:

    "(R) a licensed sender of money or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;".

<< 31 USCA § 5330 >>

  (b) MONEY TRANSMITTING BUSINESS.—Section 5330(d)(1)(A) of title 31, United States Code, is amended by inserting before the semicolon the following: "or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;".

<< 31 USCA § 5318 >>

  (c) APPLICABILITY OF RULES.—Section 5318 of title 31, United States Code, as amended by this title, is amended by adding at the end the following:

  "(l) APPLICABILITY OF RULES.—Any rules promulgated pursuant to the authority contained in section 21 of the Federal Deposit Insurance Act (12 U. S.C. 1829b) shall apply, in addition to any other financial institution to which such rules apply, to any person that engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system.".

<< 31 USCA § 5311 NOTE >>

  (d) REPORT.—Not later than 1 year after the date of enactment of this Act, the Secretary of the Treasury shall report to Congress on the need for any additional legislation relating to persons who engage as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside

of the conventional financial institutions system, counter money laundering and regulatory controls relating to underground money movement and banking systems, including whether the threshold for the filing of suspicious activity reports under section 5318(g) of title 31, United States Code should be lowered in the case of such systems.

<< 22 USCA § 262p–4r >>

## SEC. 360. USE OF AUTHORITY OF UNITED STATES EXECUTIVE DIRECTORS.

(a) ACTION BY THE PRESIDENT.—If the President determines that a particular foreign country has taken or has committed to take actions that contribute to efforts of the United States to respond to, deter, or prevent acts of international terrorism, the Secretary may, consistent with other applicable provisions of law, instruct the United States Executive Director of each international financial institution to use the voice and vote of the Executive Director to support any loan or other utilization of the funds of respective institutions for such country, or any public or private entity within such country.

(b) USE OF VOICE AND VOTE.—The Secretary may instruct the United States Executive Director of each international financial institution to aggressively use the voice and vote of the Executive Director to require an auditing of disbursements at such institutions to ensure that no funds are paid to persons who commit, threaten to commit, or support terrorism.

(c) DEFINITION.—For purposes of this section, the term "international financial institution" means an institution described in section 1701(c)(2) of the International Financial Institutions Act (22 U.S.C. 262r(c)(2)).

## SEC. 361. FINANCIAL CRIMES ENFORCEMENT NETWORK.

(a) IN GENERAL.—Subchapter I of chapter 3 of title 31, United States Code, is amended—

<< 31 USCA § 310 >>

<< 31 USCA § 311 >>

(1) by redesignating section 310 as section 311; and

<< 31 USCA § 310 >>

(2) by inserting after section 309 the following new section:

"§ 310. Financial Crimes Enforcement Network

"(a) IN GENERAL.—The Financial Crimes Enforcement Network established by order of the Secretary of the Treasury (Treasury Order Numbered 105–08, in this section referred to as 'FinCEN') on April 25, 1990, shall be a bureau in the Department of the Treasury.

"(b) DIRECTOR.—

"(1) APPOINTMENT.—The head of FinCEN shall be the Director, who shall be appointed by the Secretary of the Treasury.

"(2) DUTIES AND POWERS.—The duties and powers of the Director are as follows:

"(A) Advise and make recommendations on matters relating to financial intelligence, financial criminal activities, and other financial activities to the Under Secretary of the Treasury for Enforcement.

"(B) Maintain a government-wide data access service, with access, in accordance with applicable legal requirements, to the following:

"(i) Information collected by the Department of the Treasury, including report information filed under subchapter II of chapter 53 of this title (such as reports on cash transactions, foreign financial agency transactions and relationships, foreign currency transactions, exporting and importing monetary instruments, and suspicious activities), chapter 2 of title I of Public Law 91–508, and section 21 of the Federal Deposit Insurance Act.

"(ii) Information regarding national and international currency flows.

"(iii) Other records and data maintained by other Federal, State, local, and foreign agencies, including financial and other records developed in specific cases.

"(iv) Other privately and publicly available information.

"(C) Analyze and disseminate the available data in accordance with applicable legal requirements and policies and guidelines established by the Secretary of the Treasury and the Under Secretary of the Treasury for Enforcement to—

"(i) identify possible criminal activity to appropriate Federal, State, local, and foreign law enforcement agencies;

"(ii) support ongoing criminal financial investigations and prosecutions and related proceedings, including civil and criminal tax and forfeiture proceedings;

"(iii) identify possible instances of noncompliance with subchapter II of chapter 53 of this title, chapter 2 of title I of Public Law 91–508, and section 21 of the Federal Deposit Insurance Act to Federal agencies with statutory responsibility for enforcing compliance with such provisions and other appropriate Federal regulatory agencies;

"(iv) evaluate and recommend possible uses of special currency reporting requirements under section 5326;

"(v) determine emerging trends and methods in money laundering and other financial crimes;

"(vi) support the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism; and

"(vii) support government initiatives against money laundering.

"(D) Establish and maintain a financial crimes communications center to furnish law enforcement authorities with intelligence information related to emerging or ongoing investigations and undercover operations.

"(E) Furnish research, analytical, and informational services to financial institutions, appropriate Federal regulatory agencies with regard to financial institutions, and appropriate Federal, State, local, and foreign law enforcement authorities, in accordance with policies and guidelines established by the Secretary of the Treasury or the Under Secretary of the Treasury for Enforcement, in the interest of detection, prevention, and prosecution of terrorism, organized crime, money laundering, and other financial crimes.

"(F) Assist Federal, State, local, and foreign law enforcement and regulatory authorities in combatting the use of informal, nonbank networks and payment and barter system mechanisms that permit the transfer of funds or the equivalent of funds without records and without compliance with criminal and tax laws.

"(G) Provide computer and data support and data analysis to the Secretary of the Treasury for tracking and controlling foreign assets.

"(H) Coordinate with financial intelligence units in other countries on anti-terrorism and anti-money laundering initiatives, and similar efforts.

"(I) Administer the requirements of subchapter II of chapter 53 of this title, chapter 2 of title I of Public Law 91–508, and section 21 of the Federal Deposit Insurance Act, to the extent delegated such authority by the Secretary of the Treasury.

"(J) Such other duties and powers as the Secretary of the Treasury may delegate or prescribe.

"(c) REQUIREMENTS RELATING TO MAINTENANCE AND USE OF DATA BANKS.—The Secretary of the Treasury shall establish and maintain operating procedures with respect to the government-wide data access service and the financial crimes communications center maintained by FinCEN which provide—

"(1) for the coordinated and efficient transmittal of information to, entry of information into, and withdrawal of information from, the data maintenance system maintained by the Network, including—

"(A) the submission of reports through the Internet or other secure network, whenever possible;

"(B) the cataloguing of information in a manner that facilitates rapid retrieval by law enforcement personnel of meaningful data; and

"(C) a procedure that provides for a prompt initial review of suspicious activity reports and other reports, or such other means as the Secretary may provide, to identify information that warrants immediate action; and

"(2) in accordance with section 552a of title 5 and the Right to Financial Privacy Act of 1978, appropriate standards and guidelines for determining—

"(A) who is to be given access to the information maintained by the Network;

"(B) what limits are to be imposed on the use of such information; and

"(C) how information about activities or relationships which involve or are closely associated with the exercise of constitutional rights is to be screened out of the data maintenance system.

"(d) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for FinCEN such sums as may be necessary for fiscal years 2002, 2003, 2004, and 2005.".

<< 31 USCA § 5314 NOTE >>

(b) COMPLIANCE WITH REPORTING REQUIREMENTS.—The Secretary of the Treasury shall study methods for improving compliance with the reporting requirements established in section 5314 of title 31, United States Code, and shall submit a report on such study to the Congress by the end of the 6–month period beginning on the date of enactment of this Act and each 1–year period thereafter. The initial report shall include historical data on compliance with such reporting requirements.

<< 31 USCA prec. § 301 >>

(c) CLERICAL AMENDMENT.—The table of sections for subchapter I of chapter 3 of title 31, United States Code, is amended—

  (1) by redesignating the item relating to section 310 as section 311; and

  (2) by inserting after the item relating to section 309 the following new item:

"310. Financial Crimes Enforcement Network.".

<< 31 USCA § 310 NOTE >>

SEC. 362. ESTABLISHMENT OF HIGHLY SECURE NETWORK.

(a) IN GENERAL.—The Secretary shall establish a highly secure network in the Financial Crimes Enforcement Network that—

  (1) allows financial institutions to file reports required under subchapter II or III of chapter 53 of title 31, United States Code, chapter 2 of Public Law 91–508, or section 21 of the Federal Deposit Insurance Act through the secure network; and

  (2) provides financial institutions with alerts and other information regarding suspicious activities that warrant immediate and enhanced scrutiny.

(b) EXPEDITED DEVELOPMENT.—The Secretary shall take such action as may be necessary to ensure that the secure network required under subsection (a) is fully operational before the end of the 9–month period beginning on the date of enactment of this Act.

SEC. 363. INCREASE IN CIVIL AND CRIMINAL PENALTIES FOR MONEY LAUNDERING.

<< 31 USCA § 5321 >>

(a) CIVIL PENALTIES.—Section 5321(a) of title 31, United States Code, is amended by adding at the end the following:

"(7) PENALTIES FOR INTERNATIONAL COUNTER MONEY LAUNDERING VIOLATIONS.—The Secretary may impose a civil money penalty in an amount equal to not less than 2 times the amount of the transaction, but not more than $1,000,000, on any financial institution or agency that violates any provision of subsection (i) or (j) of section 5318 or any special measures imposed under section 5318A.".

<< 31 USCA § 5322 >>

(b) CRIMINAL PENALTIES.—Section 5322 of title 31, United States Code, is amended by adding at the end the following:

"(d) A financial institution or agency that violates any provision of subsection (i) or (j) of section 5318, or any special measures imposed under section 5318A, or any regulation prescribed under subsection (i) or (j) of section 5318 or section 5318A, shall be fined in an amount equal to not less than 2 times the amount of the transaction, but not more than $1,000,000.".

<< 12 USCA § 248 >>

SEC. 364. UNIFORM PROTECTION AUTHORITY FOR FEDERAL RESERVE FACILITIES.

Section 11 of the Federal Reserve Act (12 U.S.C. 248) is amended by adding at the end the following:

"(q) UNIFORM PROTECTION AUTHORITY FOR FEDERAL RESERVE FACILITIES.—

"(1) Notwithstanding any other provision of law, to authorize personnel to act as law enforcement officers to protect and safeguard the premises, grounds, property, personnel, including members of the Board, of the Board, or any Federal reserve bank, and operations conducted by or on behalf of the Board or a reserve bank.

"(2) The Board may, subject to the regulations prescribed under paragraph (5), delegate authority to a Federal reserve bank to authorize personnel to act as law enforcement officers to protect and safeguard the bank's premises, grounds, property, personnel, and operations conducted by or on behalf of the bank.

"(3) Law enforcement officers designated or authorized by the Board or a reserve bank under paragraph (1) or (2) are authorized while on duty to carry firearms and make arrests without warrants for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States committed or being committed within the buildings and grounds of the Board or a reserve bank if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony. Such officers shall have access to law enforcement information that may be necessary for the protection of the property or personnel of the Board or a reserve bank.

"(4) For purposes of this subsection, the term 'law enforcement officers' means personnel who have successfully completed law enforcement training and are authorized to carry firearms and make arrests pursuant to this subsection.

"(5) The law enforcement authorities provided for in this subsection may be exercised only pursuant to regulations prescribed by the Board and approved by the Attorney General.".

SEC. 365. REPORTS RELATING TO COINS AND CURRENCY RECEIVED IN NONFINANCIAL TRADE OR BUSINESS.

<< 31 USCA § 5331 >>

(a) REPORTS REQUIRED.—Subchapter II of chapter 53 of title 31, United States Code, is amended by adding at the end the following new section:

"§ 5331. Reports relating to coins and currency received in nonfinancial trade or business

"(a) COIN AND CURRENCY RECEIPTS OF MORE THAN $10,000.—Any person—

"(1) who is engaged in a trade or business; and

"(2) who, in the course of such trade or business, receives more than $10,000 in coins or currency in 1 transaction (or 2 or more related transactions),

shall file a report described in subsection (b) with respect to such transaction (or related transactions) with the Financial Crimes Enforcement Network at such time and in such manner as the Secretary may, by regulation, prescribe.

"(b) FORM AND MANNER OF REPORTS.—A report is described in this subsection if such report—

"(1) is in such form as the Secretary may prescribe;

"(2) contains—

"(A) the name and address, and such other identification information as the Secretary may require, of the person from whom the coins or currency was received;

"(B) the amount of coins or currency received;

"(C) the date and nature of the transaction; and

"(D) such other information, including the identification of the person filing the report, as the Secretary may prescribe.

"(c) EXCEPTIONS.—

"(1) AMOUNTS RECEIVED BY FINANCIAL INSTITUTIONS.—Subsection (a) shall not apply to amounts received in a transaction reported under section 5313 and regulations prescribed under such section.

"(2) TRANSACTIONS OCCURRING OUTSIDE THE UNITED STATES.—Except to the extent provided in regulations prescribed by the Secretary, subsection (a) shall not apply to any transaction if the entire transaction occurs outside the United States.

"(d) CURRENCY INCLUDES FOREIGN CURRENCY AND CERTAIN MONETARY INSTRUMENTS.—

"(1) IN GENERAL.—For purposes of this section, the term 'currency' includes—

"(A) foreign currency; and

"(B) to the extent provided in regulations prescribed by the Secretary, any monetary instrument (whether or not in bearer form) with a face amount of not more than $10,000.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(2) SCOPE OF APPLICATION.—Paragraph (1)(B) shall not apply to any check drawn on the account of the writer in a financial institution referred to in subparagraph (A), (B), (C), (D), (E), (F), (G), (J), (K), (R), or (S) of section 5312(a)(2).".

(b) PROHIBITION ON STRUCTURING TRANSACTIONS.—

(1) IN GENERAL.—Section 5324 of title 31, United States Code, is amended—

<< 31 USCA § 5324 >>

(A) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively; and

<< 31 USCA § 5324 >>

(B) by inserting after subsection (a) the following new subsection:

"(b) DOMESTIC COIN AND CURRENCY TRANSACTIONS INVOLVING NONFINANCIAL TRADES OR BUSINESSES.—No person shall, for the purpose of evading the report requirements of section 5333 or any regulation prescribed under such section—

"(1) cause or attempt to cause a nonfinancial trade or business to fail to file a report required under section 5333 or any regulation prescribed under such section;

"(2) cause or attempt to cause a nonfinancial trade or business to file a report required under section 5333 or any regulation prescribed under such section that contains a material omission or misstatement of fact; or

"(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with 1 or more nonfinancial trades or businesses.".

(2) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 31 USCA § 5324 >>

(A) The heading for subsection (a) of section 5324 of title 31, United States Code, is amended by inserting "INVOLVING FINANCIAL INSTITUTIONS" after "TRANSACTIONS".

<< 31 USCA § 5317 >>

(B) Section 5317(c) of title 31, United States Code, is amended by striking "5324(b)" and inserting "5324(c)".

(c) DEFINITION OF NONFINANCIAL TRADE OR BUSINESS.—

(1) IN GENERAL.—Section 5312(a) of title 31, United States Code, is amended—

<< 31 USCA § 5312 >>

(A) by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), respectively; and

<< 31 USCA § 5312 >>

(B) by inserting after paragraph (3) the following new paragraph:

"(4) NONFINANCIAL TRADE OR BUSINESS.—The term 'nonfinancial trade or business' means any trade or business other than a financial institution that is subject to the reporting requirements of section 5313 and regulations prescribed under such section.".

(2) TECHNICAL AND CONFORMING AMENDMENTS.—

<< 31 USCA § 5312 >>

(A) Section 5312(a)(3)(C) of title 31, United States Code, is amended by striking "section 5316," and inserting "sections 5333 and 5316,".

<< 31 USCA §§ 5318, 5321, 5326, 5328 >>

(B) Subsections (a) through (f) of section 5318 of title 31, United States Code, and sections 5321, 5326, and 5328 of such title are each amended—

(i) by inserting "or nonfinancial trade or business" after "financial institution" each place such term appears; and

(ii) by inserting "or nonfinancial trades or businesses" after "financial institutions" each place such term appears.

<< 31 USCA prec. § 5301 >>

(c) CLERICAL AMENDMENT.—The table of sections for chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5332 (as added by section 112 of this title) the following new item:

"5331. Reports relating to coins and currency received in nonfinancial trade or business.".

<< 31 USCA § 5331 NOTE >>

(f) REGULATIONS.—Regulations which the Secretary determines are necessary to implement this section shall be published in final form before the end of the 6–month period beginning on the date of enactment of this Act.

<< 31 USCA § 5313 NOTE >>

SEC. 366. EFFICIENT USE OF CURRENCY TRANSACTION REPORT SYSTEM.

(a) FINDINGS.—The Congress finds the following:

(1) The Congress established the currency transaction reporting requirements in 1970 because the Congress found then that such reports have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings and the usefulness of such reports has only increased in the years since the requirements were established.

(2) In 1994, in response to reports and testimony that excess amounts of currency transaction reports were interfering with effective law enforcement, the Congress reformed the currency transaction report exemption requirements to provide—

(A) mandatory exemptions for certain reports that had little usefulness for law enforcement, such as cash transfers between depository institutions and cash deposits from government agencies; and

(B) discretionary authority for the Secretary of the Treasury to provide exemptions, subject to criteria and guidelines established by the Secretary, for financial institutions with regard to regular business customers that maintain accounts at an institution into which frequent cash deposits are made.

(3) Today there is evidence that some financial institutions are not utilizing the exemption system, or are filing reports even if there is an exemption in effect, with the result that the volume of currency transaction reports is once again interfering with effective law enforcement.

(b) STUDY AND REPORT.—

(1) STUDY REQUIRED.—The Secretary shall conduct a study of—

(A) the possible expansion of the statutory exemption system in effect under section 5313 of title 31, United States Code; and

(B) methods for improving financial institution utilization of the statutory exemption provisions as a way of reducing the submission of currency transaction reports that have little or no value for law enforcement purposes, including improvements in the systems in effect at financial institutions for regular review of the exemption procedures used at the institution and the training of personnel in its effective use.

(2) REPORT REQUIRED.—The Secretary of the Treasury shall submit a report to the Congress before the end of the 1–year period beginning on the date of enactment of this Act containing the findings and conclusions of the Secretary with regard to the study required under subsection (a), and such recommendations for legislative or administrative action as the Secretary determines to be appropriate.

Subtitle C—Currency Crimes and Protection

SEC. 371. BULK CASH SMUGGLING INTO OR OUT OF THE UNITED STATES.

<< 31 USCA § 5332 NOTE >>

(a) FINDINGS.—The Congress finds the following:

(1) Effective enforcement of the currency reporting requirements of subchapter II of chapter 53 of title 31, United States Code, and the regulations prescribed under such subchapter, has forced drug dealers and other criminals engaged in cash-based businesses to avoid using traditional financial institutions.

(2) In their effort to avoid using traditional financial institutions, drug dealers and other criminals are forced to move large quantities of currency in bulk form to and through the airports, border crossings, and other ports of entry where the currency can be smuggled out of the United States and placed in a foreign financial institution or sold on the black market.

(3) The transportation and smuggling of cash in bulk form may now be the most common form of money laundering, and the movement of large sums of cash is one of the most reliable warning signs of drug trafficking, terrorism, money laundering, racketeering, tax evasion and similar crimes.

(4) The intentional transportation into or out of the United States of large amounts of currency or monetary instruments, in a manner designed to circumvent the mandatory reporting provisions of subchapter II of chapter 53 of title 31, United States Code,, is the equivalent of, and creates the same harm as, the smuggling of goods.

(5) The arrest and prosecution of bulk cash smugglers are important parts of law enforcement's effort to stop the laundering of criminal proceeds, but the couriers who attempt to smuggle the cash out of the United States are typically low-level employees of large criminal organizations, and thus are easily replaced. Accordingly, only the confiscation of the smuggled bulk cash can effectively break the cycle of criminal activity of which the laundering of the bulk cash is a critical part.

(6) The current penalties for violations of the currency reporting requirements are insufficient to provide a deterrent to the laundering of criminal proceeds. In particular, in cases where the only criminal violation under current law is a reporting offense, the law does not adequately provide for the confiscation of smuggled currency. In contrast, if the smuggling of bulk cash were itself an offense, the cash could be confiscated as the corpus delicti of the smuggling offense.

<< 31 USCA § 5332 NOTE >>

(b) PURPOSES.—The purposes of this section are—
(1) to make the act of smuggling bulk cash itself a criminal offense;
(2) to authorize forfeiture of any cash or instruments of the smuggling offense; and
(3) to emphasize the seriousness of the act of bulk cash smuggling.

<< 31 USCA § 5332 >>

(c) ENACTMENT OF BULK CASH SMUGGLING OFFENSE.—Subchapter II of chapter 53 of title 31, United States Code, is amended by adding at the end the following:

"§ 5332. Bulk cash smuggling into or out of the United States
"(a) CRIMINAL OFFENSE.—

"(1) IN GENERAL.—Whoever, with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States, or from a place outside the United States to a place within the United States, shall be guilty of a currency smuggling offense and subject to punishment pursuant to subsection (b).

"(2) CONCEALMENT ON PERSON.—For purposes of this section, the concealment of currency on the person of any individual includes concealment in any article of clothing worn by the individual or in any luggage, backpack, or other container worn or carried by such individual.

"(b) PENALTY.—

"(1) TERM OF IMPRISONMENT.—A person convicted of a currency smuggling offense under subsection (a), or a conspiracy to commit such offense, shall be imprisoned for not more than 5 years.

"(2) FORFEITURE.—In addition, the court, in imposing sentence under paragraph (1), shall order that the defendant forfeit to the United States, any property, real or personal, involved in the offense, and any property traceable to such property, subject to subsection (d) of this section.

"(3) PROCEDURE.—The seizure, restraint, and forfeiture of property under this section shall be governed by section 413 of the Controlled Substances Act.

"(4) PERSONAL MONEY JUDGMENT.—If the property subject to forfeiture under paragraph (2) is unavailable, and the defendant has insufficient substitute property that may be forfeited pursuant to section 413(p) of the Controlled Substances Act, the court shall enter a personal money judgment against the defendant for the amount that would be subject to forfeiture.

"(c) CIVIL FORFEITURE.—

"(1) IN GENERAL.—Any property involved in a violation of subsection (a), or a conspiracy to commit such violation, and any property traceable to such violation or conspiracy, may be seized and, subject to subsection (d) of this section, forfeited to the United States.

"(2) PROCEDURE.—The seizure and forfeiture shall be governed by the procedures governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code.

"(3) TREATMENT OF CERTAIN PROPERTY AS INVOLVED IN THE OFFENSE.—For purposes of this subsection and subsection (b), any currency or other monetary instrument that is concealed or intended to be concealed in violation of subsection (a) or a conspiracy to commit such violation, any article, container, or conveyance used, or intended to be used, to conceal or transport the currency or other monetary instrument, and any other property used, or intended to be used, to facilitate the offense, shall be considered property involved in the offense.".

<< 31 USCA prec. § 5301 >>

(c) CLERICAL AMENDMENT.—The table of sections for subchapter II of chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5331, as added by this Act, the following new item:

"5332. Bulk cash smuggling into or out of the United States.".

SEC. 372. FORFEITURE IN CURRENCY REPORTING CASES.

<< 31 USCA § 5317 >>

(a) IN GENERAL.—Subsection (c) of section 5317 of title 31, United States Code, is amended to read as follows:

"(c) FORFEITURE.—

"(1) CRIMINAL FORFEITURE.—

"(A) IN GENERAL.—The court in imposing sentence for any violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit such violation, shall order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto.

"(B) PROCEDURE.—Forfeitures under this paragraph shall be governed by the procedures established in section 413 of the Controlled Substances Act.

"(2) CIVIL FORFEITURE.—Any property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy, may be seized and forfeited to the United States in accordance with the procedures governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code.".

(b) CONFORMING AMENDMENTS.—

<< 18 USCA § 981 >>

(1) Section 981(a)(1)(A) of title 18, United States Code, is amended—

(A) by striking "of section 5313(a) or 5324(a) of title 31, or"; and

(B) by striking "However" and all that follows through the end of the subparagraph.

<< 18 USCA § 982 >>

(2) Section 982(a)(1) of title 18, United States Code, is amended—

(A) by striking "of section 5313(a), 5316, or 5324 of title 31, or"; and

(B) by striking "However" and all that follows through the end of the paragraph.

SEC. 373. ILLEGAL MONEY TRANSMITTING BUSINESSES.

<< 18 USCA § 1960 >>

(a) SCIENTER REQUIREMENT FOR SECTION 1960 VIOLATION.—Section 1960 of title 18, United States Code, is amended to read as follows:

"§ 1960. Prohibition of unlicensed money transmitting businesses
"(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.
"(b) As used in this section—
"(1) the term 'unlicensed money transmitting business' means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—
"(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;
"(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or
"(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to be used to promote or support unlawful activity;
"(2) the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and
"(3) the term 'State' means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.".

<< 18 USCA § 981 >>

(b) SEIZURE OF ILLEGALLY TRANSMITTED FUNDS.—Section 981(a)(1)(A) of title 18, United States Code, is amended by striking "or 1957" and inserting ", 1957 or 1960".

<< 18 USCA prec. § 1951 >>

(c) CLERICAL AMENDMENT.—The table of sections for chapter 95 of title 18, United States Code, is amended in the item relating to section 1960 by striking "illegal" and inserting "unlicensed".

SEC. 374. COUNTERFEITING DOMESTIC CURRENCY AND OBLIGATIONS.

(a) COUNTERFEIT ACTS COMMITTED OUTSIDE THE UNITED STATES.—Section 470 of title 18, United States Code, is amended—

<< 18 USCA § 470 >>

(1) in paragraph (2), by inserting "analog, digital, or electronic image," after "plate, stone,"; and

<< 18 USCA § 470 >>

(2) by striking "shall be fined under this title, imprisoned not more than 20 years, or both" and inserting "shall be punished as is provided for the like offense within the United States".

<< 18 USCA § 471 >>

(b) OBLIGATIONS OR SECURITIES OF THE UNITED STATES.—Section 471 of title 18, United States Code, is amended by striking "fifteen years" and inserting "20 years".

<< 18 USCA § 472 >>

(c) UTTERING COUNTERFEIT OBLIGATIONS OR SECURITIES.—Section 472 of title 18, United States Code, is amended by striking "fifteen years" and inserting "20 years".

<< 18 USCA § 473 >>

(d) DEALING IN COUNTERFEIT OBLIGATIONS OR SECURITIES.—Section 473 of title 18, United States Code, is amended by striking "ten years" and inserting "20 years".

(e) PLATES, STONES, OR ANALOG, DIGITAL, OR ELECTRONIC IMAGES FOR COUNTERFEITING OBLIGATIONS OR SECURITIES.—

<< 18 USCA § 474 >>

(1) IN GENERAL.—Section 474(a) of title 18, United States Code, is amended by inserting after the second paragraph the following new paragraph:

"Whoever, with intent to defraud, makes, executes, acquires, scans, captures, records, receives, transmits, reproduces, sells, or has in such person's control, custody, or possession, an analog, digital, or electronic image of any obligation or other security of the United States; or".

<< 18 USCA § 474 >>

(2) AMENDMENT TO DEFINITION.—Section 474(b) of title 18, United States Code, is amended by striking the first sentence and inserting the following new sentence: "For purposes of this section, the term 'analog, digital, or electronic image' includes any analog, digital, or electronic method used for the making, execution, acquisition, scanning, capturing, recording, retrieval, transmission, or reproduction of any obligation or security, unless such use is authorized by the Secretary of the Treasury.".

<< 18 USCA § 474 >>

(3) TECHNICAL AND CONFORMING AMENDMENT.—The heading for section 474 of title 18, United States Code, is amended by striking "**or stones**" and inserting ", **stones, or analog, digital, or electronic images**".

<< 18 USCA prec. § 470 >>

(4) CLERICAL AMENDMENT.—The table of sections for chapter 25 of title 18, United States Code, is amended in the item relating to section 474 by striking "or stones" and inserting ", stones, or analog, digital, or electronic images".

<< 18 USCA § 476 >>

(f) TAKING IMPRESSIONS OF TOOLS USED FOR OBLIGATIONS OR SECURITIES.—Section 476 of title 18, United States Code, is amended—

(1) by inserting "analog, digital, or electronic image," after "impression, stamp,"; and

(2) by striking "ten years" and inserting "25 years".

<< 18 USCA § 477 >>

(g) POSSESSING OR SELLING IMPRESSIONS OF TOOLS USED FOR OBLIGATIONS OR SECURITIES.—Section 477 of title 18, United States Code, is amended—

(1) in the first paragraph, by inserting "analog, digital, or electronic image," after "imprint, stamp,";

(2) in the second paragraph, by inserting "analog, digital, or electronic image," after "imprint, stamp,"; and

AR.03750

(3) in the third paragraph, by striking "ten years" and inserting "25 years".

<< 18 USCA § 484 >>

 (h) CONNECTING PARTS OF DIFFERENT NOTES.—Section 484 of title 18, United States Code, is amended by striking "five years" and inserting "10 years".

<< 18 USCA § 493 >>

 (i) BONDS AND OBLIGATIONS OF CERTAIN LENDING AGENCIES.—The first and second paragraphs of section 493 of title 18, United States Code, are each amended by striking "five years" and inserting "10 years".

SEC. 375. COUNTERFEITING FOREIGN CURRENCY AND OBLIGATIONS.

<< 18 USCA § 478 >>

 (a) FOREIGN OBLIGATIONS OR SECURITIES.—Section 478 of title 18, United States Code, is amended by striking "five years" and inserting "20 years".

<< 18 USCA § 479 >>

 (b) UTTERING COUNTERFEIT FOREIGN OBLIGATIONS OR SECURITIES.—Section 479 of title 18, United States Code, is amended by striking "three years" and inserting "20 years".

<< 18 USCA § 480 >>

 (c) POSSESSING COUNTERFEIT FOREIGN OBLIGATIONS OR SECURITIES.—Section 480 of title 18, United States Code, is amended by striking "one year" and inserting "20 years".
 (d) PLATES, STONES, OR ANALOG, DIGITAL, OR ELECTRONIC IMAGES FOR COUNTERFEITING FOREIGN OBLIGATIONS OR SECURITIES.—

<< 18 USCA § 481 >>

 (1) IN GENERAL.—Section 481 of title 18, United States Code, is amended by inserting after the second paragraph the following new paragraph:
 "Whoever, with intent to defraud, makes, executes, acquires, scans, captures, records, receives, transmits, reproduces, sells, or has in such person's control, custody, or possession, an analog, digital, or electronic image of any bond, certificate, obligation, or other security of any foreign government, or of any treasury note, bill, or promise to pay, lawfully issued by such foreign government and intended to circulate as money; or".

<< 18 USCA § 481 >>

 (2) INCREASED SENTENCE.—The last paragraph of section 481 of title 18, United States Code, is amended by striking "five years" and inserting "25 years".

<< 18 USCA § 481 >>

 (3) TECHNICAL AND CONFORMING AMENDMENT.—The heading for section 481 of title 18, United States Code, is amended by striking "**or stones**" and inserting ", **stones, or analog, digital, or electronic images**".

<< 18 USCA prec. § 470 >>

 (4) CLERICAL AMENDMENT.—The table of sections for chapter 25 of title 18, United States Code, is amended in the item relating to section 481 by striking "or stones" and inserting ", stones, or analog, digital, or electronic images".

<< 18 USCA § 482 >>

(e) FOREIGN BANK NOTES.—Section 482 of title 18, United States Code, is amended by striking "two years" and inserting "20 years".

<< 18 USCA § 483 >>

(f) UTTERING COUNTERFEIT FOREIGN BANK NOTES.—Section 483 of title 18, United States Code, is amended by striking "one year" and inserting "20 years".

<< 18 USCA § 1956 >>

SEC. 376. LAUNDERING THE PROCEEDS OF TERRORISM.

Section 1956(c)(7)(D) of title 18, United States Code, is amended by inserting "or 2339B" after "2339A".

<< 18 USCA § 1029 >>

SEC. 377. EXTRATERRITORIAL JURISDICTION.

Section 1029 of title 18, United States Code, is amended by adding at the end the following:
"(h) Any person who, outside the jurisdiction of the United States, engages in any act that, if committed within the jurisdiction of the United States, would constitute an offense under subsection (a) or (b) of this section, shall be subject to the fines, penalties, imprisonment, and forfeiture provided in this title if—
    "(1) the offense involves an access device issued, owned, managed, or controlled by a financial institution, account issuer, credit card system member, or other entity within the jurisdiction of the United States; and
    "(2) the person transports, delivers, conveys, transfers to or through, or otherwise stores, secrets, or holds within the jurisdiction of the United States, any article used to assist in the commission of the offense or the proceeds of such offense or property derived therefrom.".

TITLE IV—PROTECTING THE BORDER

Subtitle A—Protecting the Northern Border

SEC. 401. ENSURING ADEQUATE PERSONNEL ON THE NORTHERN BORDER.

The Attorney General is authorized to waive any FTE cap on personnel assigned to the Immigration and Naturalization Service on the Northern border.

SEC. 402. NORTHERN BORDER PERSONNEL.

There are authorized to be appropriated—
  (1) such sums as may be necessary to triple the number of Border Patrol personnel (from the number authorized under current law), and the necessary personnel and facilities to support such personnel, in each State along the Northern Border;
  (2) such sums as may be necessary to triple the number of Customs Service personnel (from the number authorized under current law), and the necessary personnel and facilities to support such personnel, at ports of entry in each State along the Northern Border;
  (3) such sums as may be necessary to triple the number of INS inspectors (from the number authorized on the date of the enactment of this Act), and the necessary personnel and facilities to support such personnel, at ports of entry in each State along the Northern Border; and
  (4) an additional $50,000,000 each to the Immigration and Naturalization Service and the United States Customs Service for purposes of making improvements in technology for monitoring the Northern Border and acquiring additional equipment at the Northern Border.

SEC. 403. ACCESS BY THE DEPARTMENT OF STATE AND THE INS TO CERTAIN IDENTIFYING INFORMATION IN THE CRIMINAL HISTORY RECORDS OF VISA APPLICANTS AND APPLICANTS FOR ADMISSION TO THE UNITED STATES.

(a) AMENDMENT OF THE IMMIGRATION AND NATIONALITY ACT.—Section 105 of the Immigration and Nationality Act (8 U.S.C. 1105) is amended—

<< 8 USCA § 1105 >>

(1) in the section heading, by inserting "; DATA EXCHANGE" after "SECURITY OFFICERS";

<< 8 USCA § 1105 >>

(2) by inserting "(a)" after "SEC. 105.";

<< 8 USCA § 1105 >>

(3) in subsection (a), by inserting "and border" after "internal" the second place it appears; and
(4) by adding at the end the following:

<< 8 USCA § 1105 >>

"(b)(1) The Attorney General and the Director of the Federal Bureau of Investigation shall provide the Department of State and the Service access to the criminal history record information contained in the National Crime Information Center's Interstate Identification Index (NCIC–III), Wanted Persons File, and to any other files maintained by the National Crime Information Center that may be mutually agreed upon by the Attorney General and the agency receiving the access, for the purpose of determining whether or not a visa applicant or applicant for admission has a criminal history record indexed in any such file.

"(2) Such access shall be provided by means of extracts of the records for placement in the automated visa lookout or other appropriate database, and shall be provided without any fee or charge.

"(3) The Federal Bureau of Investigation shall provide periodic updates of the extracts at intervals mutually agreed upon with the agency receiving the access. Upon receipt of such updated extracts, the receiving agency shall make corresponding updates to its database and destroy previously provided extracts.

"(4) Access to an extract does not entitle the Department of State to obtain the full content of the corresponding automated criminal history record. To obtain the full content of a criminal history record, the Department of State shall submit the applicant's fingerprints and any appropriate fingerprint processing fee authorized by law to the Criminal Justice Information Services Division of the Federal Bureau of Investigation.

"(c) The provision of the extracts described in subsection (b) may be reconsidered by the Attorney General and the receiving agency upon the development and deployment of a more cost-effective and efficient means of sharing the information.

"(d) For purposes of administering this section, the Department of State shall, prior to receiving access to NCIC data but not later than 4 months after the date of enactment of this subsection, promulgate final regulations—

"(1) to implement procedures for the taking of fingerprints; and

"(2) to establish the conditions for the use of the information received from the Federal Bureau of Investigation, in order—

"(A) to limit the redissemination of such information;

"(B) to ensure that such information is used solely to determine whether or not to issue a visa to an alien or to admit an alien to the United States;

"(C) to ensure the security, confidentiality, and destruction of such information; and

"(D) to protect any privacy rights of individuals who are subjects of such information.".

<< 8 USCA § 1105 NOTE >>

(b) REPORTING REQUIREMENT.—Not later than 2 years after the date of enactment of this Act, the Attorney General and the Secretary of State jointly shall report to Congress on the implementation of the amendments made by this section.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.03753   65

<< 8 USCA § 1379 >>

(c) TECHNOLOGY STANDARD TO CONFIRM IDENTITY.—

(1) IN GENERAL.—The Attorney General and the Secretary of State jointly, through the National Institute of Standards and Technology (NIST), and in consultation with the Secretary of the Treasury and other Federal law enforcement and intelligence agencies the Attorney General or Secretary of State deems appropriate and in consultation with Congress, shall within 2 years after the date of the enactment of this section, develop and certify a technology standard that can be used to verify the identity of persons applying for a United States visa or such persons seeking to enter the United States pursuant to a visa for the purposes of conducting background checks, confirming identity, and ensuring that a person has not received a visa under a different name or such person seeking to enter the United States pursuant to a visa.

(2) INTEGRATED.—The technology standard developed pursuant to paragraph (1), shall be the technological basis for a cross-agency, cross-platform electronic system that is a cost-effective, efficient, fully integrated means to share law enforcement and intelligence information necessary to confirm the identity of such persons applying for a United States visa or such person seeking to enter the United States pursuant to a visa.

(3) ACCESSIBLE.—The electronic system described in paragraph (2), once implemented, shall be readily and easily accessible to—

(A) all consular officers responsible for the issuance of visas;

(B) all Federal inspection agents at all United States border inspection points; and

(C) all law enforcement and intelligence officers as determined by regulation to be responsible for investigation or identification of aliens admitted to the United States pursuant to a visa.

(4) REPORT.—Not later than 18 months after the date of the enactment of this Act, and every 2 years thereafter, the Attorney General and the Secretary of State shall jointly, in consultation with the Secretary of Treasury, report to Congress describing the development, implementation, efficacy, and privacy implications of the technology standard and electronic database system described in this subsection.

(5) FUNDING.—There is authorized to be appropriated to the Secretary of State, the Attorney General, and the Director of the National Institute of Standards and Technology such sums as may be necessary to carry out the provisions of this subsection.

<< 8 USCA § 1105 NOTE >>

(d) STATUTORY CONSTRUCTION.—Nothing in this section, or in any other law, shall be construed to limit the authority of the Attorney General or the Director of the Federal Bureau of Investigation to provide access to the criminal history record information contained in the National Crime Information Center's (NCIC) Interstate Identification Index (NCIC–III), or to any other information maintained by the NCIC, to any Federal agency or officer authorized to enforce or administer the immigration laws of the United States, for the purpose of such enforcement or administration, upon terms that are consistent with the National Crime Prevention and Privacy Compact Act of 1998 (subtitle A of title II of Public Law 105–251; 42 U.S.C. 14611–16) and section 552a of title 5, United States Code.

SEC. 404. LIMITED AUTHORITY TO PAY OVERTIME.

The matter under the headings "Immigration And Naturalization Service: Salaries and Expenses, Enforcement And Border Affairs" and "Immigration And Naturalization Service: Salaries and Expenses, Citizenship And Benefits, Immigration And Program Direction" in the Department of Justice Appropriations Act, 2001 (as enacted into law by Appendix B (H.R. 5548) of Public Law 106–553 (114 Stat. 2762A–58 to 2762A–59)) is amended by striking the following each place it occurs: "*Provided,* That none of the funds available to the Immigration and Naturalization Service shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 2001:".

<< 8 USCA § 1379 NOTE >>

SEC. 405. REPORT ON THE INTEGRATED AUTOMATED FINGERPRINT IDENTIFICATION SYSTEM FOR PORTS OF ENTRY AND OVERSEAS CONSULAR POSTS.

(a) IN GENERAL.—The Attorney General, in consultation with the appropriate heads of other Federal agencies, including the Secretary of State, Secretary of the Treasury, and the Secretary of Transportation, shall report to Congress on the feasibility of enhancing the Integrated Automated Fingerprint Identification System (IAFIS) of the Federal Bureau of Investigation and other identification systems in order to better identify a person who holds a foreign passport or a visa and may be wanted in connection with a criminal investigation in the United States or abroad, before the issuance of a visa to that person or the entry or exit from the United States by that person.

(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated not less than $2,000,000 to carry out this section.

<div align="center">Subtitle B—Enhanced Immigration Provisions</div>

SEC. 411. DEFINITIONS RELATING TO TERRORISM.

(a) GROUNDS OF INADMISSIBILITY.—Section 212(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)) is amended—

(1) in subparagraph (B)—

(A) in clause (i)—

<div align="center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(i) by amending subclause (IV) to read as follows:

"(IV) is a representative (as defined in clause (v)) of—

"(aa) a foreign terrorist organization, as designated by the Secretary of State under section 219, or

"(bb) a political, social or other similar group whose public endorsement of acts of terrorist activity the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities,";

<div align="center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(ii) in subclause (V), by inserting "or" after "section 219,"; and

<div align="center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(iii) by adding at the end the following new subclauses:

"(VI) has used the alien's position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities, or

"(VII) is the spouse or child of an alien who is inadmissible under this section, if the activity causing the alien to be found inadmissible occurred within the last 5 years,";

<div align="center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(B) by redesignating clauses (ii), (iii), and (iv) as clauses (iii), (iv), and (v), respectively;

<div align="center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(C) in clause (i)(II), by striking "clause (iii)" and inserting "clause (iv)";

<div align="center">&lt;&lt; 8 USCA § 1182 &gt;&gt;</div>

(D) by inserting after clause (i) the following:

"(ii) EXCEPTION.—Subclause (VII) of clause (i) does not apply to a spouse or child—

"(I) who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

"(II) whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.";

(E) in clause (iii) (as redesignated by subparagraph (B))—

<< 8 USCA § 1182 >>

(i) by inserting "it had been" before "committed in the United States"; and

<< 8 USCA § 1182 >>

(ii) in subclause (V)(b), by striking "or firearm" and inserting ", firearm, or other weapon or dangerous device";

<< 8 USCA § 1182 >>

(F) by amending clause (iv) (as redesignated by subparagraph (B)) to read as follows:

"(iv) ENGAGE IN TERRORIST ACTIVITY DEFINED.—As used in this chapter, the term 'engage in terrorist activity' means, in an individual capacity or as a member of an organization—

"(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

"(II) to prepare or plan a terrorist activity;

"(III) to gather information on potential targets for terrorist activity;

"(IV) to solicit funds or other things of value for—

"(aa) a terrorist activity;

"(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate that he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity;

"(V) to solicit any individual—

"(aa) to engage in conduct otherwise described in this clause;

"(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) for membership in a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate that he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity; or

"(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

"(aa) for the commission of a terrorist activity;

"(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

"(cc) to a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(dd) to a terrorist organization described in clause (vi)(III), unless the actor can demonstrate that he did not know, and should not reasonably have known, that the act would further the organization's terrorist activity.

This clause shall not apply to any material support the alien afforded to an organization or individual that has committed terrorist activity, if the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, concludes in his sole unreviewable discretion, that this clause should not apply.'; and

<< 8 USCA § 1182 >>

(G) by adding at the end the following new clause:

"(vi) TERRORIST ORGANIZATION DEFINED.—As used in clause (i)(VI) and clause (iv), the term 'terrorist organization' means an organization—

"(I) designated under section 219;

"(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General, as a terrorist organization, after finding that the organization engages in the activities described in subclause (I), (II), or (III) of clause (iv), or that the organization provides material support to further terrorist activity; or

"(III) that is a group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II), or (III) of clause (iv)."; and

<< 8 USCA § 1182 >>

(2) by adding at the end the following new subparagraph:

"(F) ASSOCIATION WITH TERRORIST ORGANIZATIONS.—Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.".

(b) CONFORMING AMENDMENTS.—

<< 8 USCA § 1227 >>

(1) Section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)) is amended by striking "section 212(a)(3)(B)(iii)" and inserting "section 212(a)(3)(B)(iv)".

<< 8 USCA § 1158 >>

(2) Section 208(b)(2)(A)(v) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(2)(A)(v)) is amended by striking "or (IV)" and inserting "(IV), or (VI)".

<< 8 USCA § 1182 NOTE >>

(c) RETROACTIVE APPLICATION OF AMENDMENTS.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to—

(A) actions taken by an alien before, on, or after such date; and

(B) all aliens, without regard to the date of entry or attempted entry into the United States—

(i) in removal proceedings on or after such date (except for proceedings in which there has been a final administrative decision before such date); or

(ii) seeking admission to the United States on or after such date.

(2) SPECIAL RULE FOR ALIENS IN EXCLUSION OR DEPORTATION PROCEEDINGS.—Notwithstanding any other provision of law, sections 212(a)(3)(B) and 237(a)(4)(B) of the Immigration and Nationality Act, as amended by this Act, shall apply to all aliens in exclusion or deportation proceedings on or after the date of the enactment of this Act (except for proceedings in which there has been a final administrative decision before such date) as if such proceedings were removal proceedings.

(3) SPECIAL RULE FOR SECTION 219 ORGANIZATIONS AND ORGANIZATIONS DESIGNATED UNDER SECTION 212(a)(3)(B)(vi)(II)—

(A) IN GENERAL.—Notwithstanding paragraphs (1) and (2), no alien shall be considered inadmissible under section 212(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)), or deportable under section 237(a)(4)(B) of such Act (8 U.S.C. 1227(a)(4)(B)), by reason of the amendments made by subsection (a), on the ground that the alien engaged in a terrorist activity described in subclause (IV)(bb), (V)(bb), or (VI)(cc) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a group at any time when the group was not a terrorist organization designated by the Secretary of State under section 219 of such Act (8 U.S.C. 1189) or otherwise designated under section 212(a)(3)(B)(vi)(II) of such Act (as so amended).

(B) STATUTORY CONSTRUCTION.—Subparagraph (A) shall not be construed to prevent an alien from being considered inadmissible or deportable for having engaged in a terrorist activity—

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(i) described in subclause (IV)(bb), (V)(bb), or (VI)(cc) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a terrorist organization at any time when such organization was designated by the Secretary of State under section 219 of such Act or otherwise designated under section 212(a)(3)(B)(vi)(II) of such Act (as so amended); or

(ii) described in subclause (IV)(cc), (V)(cc), or (VI)(dd) of section 212(a)(3)(B)(iv) of such Act (as so amended) with respect to a terrorist organization described in section 212(a)(3)(B)(vi)(III) of such Act (as so amended).

(4) EXCEPTION.—The Secretary of State, in consultation with the Attorney General, may determine that the amendments made by this section shall not apply with respect to actions by an alien taken outside the United States before the date of the enactment of this Act upon the recommendation of a consular officer who has concluded that there is not reasonable ground to believe that the alien knew or reasonably should have known that the actions would further a terrorist activity.

(c) DESIGNATION OF FOREIGN TERRORIST ORGANIZATIONS.—Section 219(a) of the Immigration and Nationality Act (8 U.S.C. 1189(a)) is amended—

<< 8 USCA § 1189 >>

(1) in paragraph (1)(B), by inserting "or terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. 2656f(d)(2)), or retains the capability and intent to engage in terrorist activity or terrorism" after "212(a)(3)(B)";

<< 8 USCA § 1189 >>

(2) in paragraph (1)(C), by inserting "or terrorism" after "terrorist activity";

<< 8 USCA § 1189 >>

(3) by amending paragraph (2)(A) to read as follows:

"(A) NOTICE.—

"(i) TO CONGRESSIONAL LEADERS.—Seven days before making a designation under this subsection, the Secretary shall, by classified communication, notify the Speaker and Minority Leader of the House of Representatives, the President pro tempore, Majority Leader, and Minority Leader of the Senate, and the members of the relevant committees of the House of Representatives and the Senate, in writing, of the intent to designate an organization under this subsection, together with the findings made under paragraph (1) with respect to that organization, and the factual basis therefor.

"(ii) PUBLICATION IN FEDERAL REGISTER.—The Secretary shall publish the designation in the Federal Register seven days after providing the notification under clause (i).";

<< 8 USCA § 1189 >>

(4) in paragraph (2)(B)(i), by striking "subparagraph (A)" and inserting "subparagraph (A)(ii)";

<< 8 USCA § 1189 >>

(5) in paragraph (2)(C), by striking "paragraph (2)" and inserting "paragraph (2)(A)(i)";

<< 8 USCA § 1189 >>

(6) in paragraph (3)(B), by striking "subsection (c)" and inserting "subsection (b)";

<< 8 USCA § 1189 >>

(7) in paragraph (4)(B), by inserting after the first sentence the following: "The Secretary also may redesignate such organization at the end of any 2–year redesignation period (but not sooner than 60 days prior to the termination of such period) for an additional 2–year period upon a finding that the relevant circumstances described in paragraph (1) still exist. Any redesignation shall be effective immediately following the end of the prior 2–year designation or redesignation period unless a different effective date is provided in such redesignation.";

(8) in paragraph (6)(A)—

<< 8 USCA § 1189 >>

(A) by inserting "or a redesignation made under paragraph (4)(B)" after "paragraph (1)";

<< 8 USCA § 1189 >>

(B) in clause (i)—
  (i) by inserting "or redesignation" after "designation" the first place it appears; and
  (ii) by striking "of the designation"; and

<< 8 USCA § 1189 >>

(C) in clause (ii), by striking "of the designation";

<< 8 USCA § 1189 >>

(9) in paragraph (6)(B)—
  (A) by striking "through (4)" and inserting "and (3)"; and
  (B) by inserting at the end the following new sentence: "Any revocation shall take effect on the date specified in the revocation or upon publication in the Federal Register if no effective date is specified.";

<< 8 USCA § 1189 >>

(10) in paragraph (7), by inserting ", or the revocation of a redesignation under paragraph (6)," after "paragraph (5) or (6)"; and

<< 8 USCA § 1189 >>

(11) in paragraph (8)—
  (A) by striking "paragraph (1)(B)" and inserting "paragraph (2)(B), or if a redesignation under this subsection has become effective under paragraph (4)(B)";
  (B) by inserting "or an alien in a removal proceeding" after "criminal action"; and
  (C) by inserting "or redesignation" before "as a defense".

## SEC. 412. MANDATORY DETENTION OF SUSPECTED TERRORISTS; HABEAS CORPUS; JUDICIAL REVIEW.

<< 8 USCA § 1226a >>

 (a) IN GENERAL.—The Immigration and Nationality Act (8 U.S.C. 1101 et seq.) is amended by inserting after section 236 the following:

    "MANDATORY DETENTION OF SUSPECTED TERRORISTS; HABEAS CORPUS; JUDICIAL REVIEW
"SEC. 236A. (a) DETENTION OF TERRORIST ALIENS—
  "(1) CUSTODY.—The Attorney General shall take into custody any alien who is certified under paragraph (3).
  "(2) RELEASE.—Except as provided in paragraphs (5) and (6), the Attorney General shall maintain custody of such an alien until the alien is removed from the United States. Except as provided in paragraph (6), such custody shall be maintained irrespective of any relief from removal for which the alien may be eligible, or any relief from removal granted the alien, until the Attorney General determines that the alien is no longer an alien who may be certified under paragraph (3). If the alien is finally determined not to be removable, detention pursuant to this subsection shall terminate.
  "(3) CERTIFICATION.—The Attorney General may certify an alien under this paragraph if the Attorney General has reasonable grounds to believe that the alien—
    "(A) is described in section 212(a)(3)(A)(i), 212(a)(3)(A)(iii), 212(a)(3)(B), 237(a)(4)(A)(i), 237(a)(4)(A)(iii), or 237(a)(4)(B); or

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(B) is engaged in any other activity that endangers the national security of the United States.

"(4) NONDELEGATION.—The Attorney General may delegate the authority provided under paragraph (3) only to the Deputy Attorney General. The Deputy Attorney General may not delegate such authority.

"(5) COMMENCEMENT OF PROCEEDINGS.—The Attorney General shall place an alien detained under paragraph (1) in removal proceedings, or shall charge the alien with a criminal offense, not later than 7 days after the commencement of such detention. If the requirement of the preceding sentence is not satisfied, the Attorney General shall release the alien.

"(6) LIMITATION ON INDEFINITE DETENTION.—An alien detained solely under paragraph (1) who has not been removed under section 241(a)(1)(A), and whose removal is unlikely in the reasonably foreseeable future, may be detained for additional periods of up to six months only if the release of the alien will threaten the national security of the United States or the safety of the community or any person.

"(7) REVIEW OF CERTIFICATION.—The Attorney General shall review the certification made under paragraph (3) every 6 months. If the Attorney General determines, in the Attorney General's discretion, that the certification should be revoked, the alien may be released on such conditions as the Attorney General deems appropriate, unless such release is otherwise prohibited by law. The alien may request each 6 months in writing that the Attorney General reconsider the certification and may submit documents or other evidence in support of that request.

"(b) HABEAS CORPUS AND JUDICIAL REVIEW.—

"(1) IN GENERAL.—Judicial review of any action or decision relating to this section (including judicial review of the merits of a determination made under subsection (a)(3) or (a)(6)) is available exclusively in habeas corpus proceedings consistent with this subsection. Except as provided in the preceding sentence, no court shall have jurisdiction to review, by habeas corpus petition or otherwise, any such action or decision.

"(2) APPLICATION.—

"(A) IN GENERAL.—Notwithstanding any other provision of law, including section 2241(a) of title 28, United States Code, habeas corpus proceedings described in paragraph (1) may be initiated only by an application filed with—

"(i) the Supreme Court;

"(ii) any justice of the Supreme Court;

"(iii) any circuit judge of the United States Court of Appeals for the District of Columbia Circuit; or

"(iv) any district court otherwise having jurisdiction to entertain it.

"(B) APPLICATION TRANSFER.—Section 2241(b) of title 28, United States Code, shall apply to an application for a writ of habeas corpus described in subparagraph (A).

"(3) APPEALS.—Notwithstanding any other provision of law, including section 2253 of title 28, in habeas corpus proceedings described in paragraph (1) before a circuit or district judge, the final order shall be subject to review, on appeal, by the United States Court of Appeals for the District of Columbia Circuit. There shall be no right of appeal in such proceedings to any other circuit court of appeals.

"(4) RULE OF DECISION.—The law applied by the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit shall be regarded as the rule of decision in habeas corpus proceedings described in paragraph (1).

"(c) STATUTORY CONSTRUCTION.—The provisions of this section shall not be applicable to any other provision of this Act.".

(b) CLERICAL AMENDMENT.—The table of contents of the Immigration and Nationality Act is amended by inserting after the item relating to section 236 the following:

"Sec. 236A. Mandatory detention of suspected terrorist; habeas corpus; judicial review.".

<< 8 USCA § 1226a NOTE >>

(c) REPORTS.—Not later than 6 months after the date of the enactment of this Act, and every 6 months thereafter, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate, with respect to the reporting period, on—

(1) the number of aliens certified under section 236A(a)(3) of the Immigration and Nationality Act, as added by subsection (a);

(2) the grounds for such certifications;

(3) the nationalities of the aliens so certified;

(4) the length of the detention for each alien so certified; and

(5) the number of aliens so certified who—

(A) were granted any form of relief from removal;

(B) were removed;

(C) the Attorney General has determined are no longer aliens who may be so certified; or

(D) were released from detention.

SEC. 413. MULTILATERAL COOPERATION AGAINST TERRORISTS.

Section 222(f) of the Immigration and Nationality Act (8 U.S.C. 1202(f)) is amended—

<< 8 USCA § 1202 >>

(1) by striking "except that in the discretion of" and inserting the following: "except that—

"(1) in the discretion of"; and

<< 8 USCA § 1202 >>

(2) by adding at the end the following:

"(2) the Secretary of State, in the Secretary's discretion and on the basis of reciprocity, may provide to a foreign government information in the Department of State's computerized visa lookout database and, when necessary and appropriate, other records covered by this section related to information in the database—

"(A) with regard to individual aliens, at any time on a case-by-case basis for the purpose of preventing, investigating, or punishing acts that would constitute a crime in the United States, including, but not limited to, terrorism or trafficking in controlled substances, persons, or illicit weapons; or

"(B) with regard to any or all aliens in the database, pursuant to such conditions as the Secretary of State shall establish in an agreement with the foreign government in which that government agrees to use such information and records for the purposes described in subparagraph (A) or to deny visas to persons who would be inadmissible to the United States.".

SEC. 414. VISA INTEGRITY AND SECURITY.

<< 8 USCA § 1365a NOTE >>

(a) SENSE OF CONGRESS REGARDING THE NEED TO EXPEDITE IMPLEMENTATION OF INTEGRATED ENTRY AND EXIT DATA SYSTEM.—

(1) SENSE OF CONGRESS.—In light of the terrorist attacks perpetrated against the United States on September 11, 2001, it is the sense of the Congress that—

(A) the Attorney General, in consultation with the Secretary of State, should fully implement the integrated entry and exit data system for airports, seaports, and land border ports of entry, as specified in section 110 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1365a), with all deliberate speed and as expeditiously as practicable; and

(B) the Attorney General, in consultation with the Secretary of State, the Secretary of Commerce, the Secretary of the Treasury, and the Office of Homeland Security, should immediately begin establishing the Integrated Entry and Exit Data System Task Force, as described in section 3 of the Immigration and Naturalization Service Data Management Improvement Act of 2000 (Public Law 106–215).

(2) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated such sums as may be necessary to fully implement the system described in paragraph (1)(A).

(b) DEVELOPMENT OF THE SYSTEM.—In the development of the integrated entry and exit data system under section 110 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1365a), the Attorney General and the Secretary of State shall particularly focus on—

(1) the utilization of biometric technology; and

(2) the development of tamper-resistant documents readable at ports of entry.

(c) INTERFACE WITH LAW ENFORCEMENT DATABASES.—The entry and exit data system described in this section shall be able to interface with law enforcement databases for use by Federal law enforcement to identify and detain individuals who pose a threat to the national security of the United States.

(d) REPORT ON SCREENING INFORMATION.—Not later than 12 months after the date of enactment of this Act, the Office of Homeland Security shall submit a report to Congress on the information that is needed from any United States agency to effectively screen visa applicants and applicants for admission to the United States to identify those affiliated with terrorist organizations or those that pose any threat to the safety or security of the United States, including the type of information currently received by United States agencies and the regularity with which such information is transmitted to the Secretary of State and the Attorney General.

<< 8 USCA § 1365a NOTE >>

SEC. 415. PARTICIPATION OF OFFICE OF HOMELAND SECURITY ON ENTRY–EXIT TASK FORCE.

Section 3 of the Immigration and Naturalization Service Data Management Improvement Act of 2000 (Public Law 106–215) is amended by striking "and the Secretary of the Treasury," and inserting "the Secretary of the Treasury, and the Office of Homeland Security".

SEC. 416. FOREIGN STUDENT MONITORING PROGRAM.

<< 8 USCA § 1372 NOTE >>

(a) FULL IMPLEMENTATION AND EXPANSION OF FOREIGN STUDENT VISA MONITORING PROGRAM REQUIRED.—The Attorney General, in consultation with the Secretary of State, shall fully implement and expand the program established by section 641(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372(a)).

<< 8 USCA § 1372 NOTE >>

(b) INTEGRATION WITH PORT OF ENTRY INFORMATION.—For each alien with respect to whom information is collected under section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372), the Attorney General, in consultation with the Secretary of State, shall include information on the date of entry and port of entry.

(c) EXPANSION OF SYSTEM TO INCLUDE OTHER APPROVED EDUCATIONAL INSTITUTIONS.—Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C.1372) is amended—

<< 8 USCA § 1372 >>

(1) in subsection (a)(1), subsection (c)(4)(A), and subsection (d)(1) (in the text above subparagraph (A)), by inserting ", other approved educational institutions," after "higher education" each place it appears;

<< 8 USCA § 1372 >>

(2) in subsections (c)(1)(C), (c)(1)(D), and (d)(1)(A), by inserting ", or other approved educational institution," after "higher education" each place it appears;

<< 8 USCA § 1372 >>

(3) in subsections (d)(2), (e)(1), and (e)(2), by inserting ", other approved educational institution," after "higher education" each place it appears; and

<< 8 USCA § 1372 >>

(4) in subsection (h), by adding at the end the following new paragraph:

"(3) OTHER APPROVED EDUCATIONAL INSTITUTION.—The term 'other approved educational institution' includes any air flight school, language training school, or vocational school, approved by the Attorney General, in consultation with the

AR.03762

Secretary of Education and the Secretary of State, under subparagraph (F), (J), or (M) of section 101(a)(15) of the Immigration and Nationality Act.".

(d) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Department of Justice $36,800,000 for the period beginning on the date of enactment of this Act and ending on January 1, 2003, to fully implement and expand prior to January 1, 2003, the program established by section 641(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1372(a)).

SEC. 417. MACHINE READABLE PASSPORTS.

<< 8 USCA § 1187 NOTE >>

(a) AUDITS.—The Secretary of State shall, each fiscal year until September 30, 2007—

(1) perform annual audits of the implementation of section 217(c)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1187(c)(2)(B));

(2) check for the implementation of precautionary measures to prevent the counterfeiting and theft of passports; and

(3) ascertain that countries designated under the visa waiver program have established a program to develop tamper-resistant passports.

<< 8 USCA § 1187 NOTE >>

(b) PERIODIC REPORTS.—Beginning one year after the date of enactment of this Act, and every year thereafter until 2007, the Secretary of State shall submit a report to Congress setting forth the findings of the most recent audit conducted under subsection (a)(1).

<< 8 USCA § 1187 >>

(c) ADVANCING DEADLINE FOR SATISFACTION OF REQUIREMENT.—Section 217(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1187(a)(3)) is amended by striking "2007" and inserting "2003".

(d) WAIVER.—Section 217(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1187(a)(3)) is amended—

<< 8 USCA § 1187 >>

(1) by striking "On or after" and inserting the following:

"(A) IN GENERAL.—Except as provided in subparagraph (B), on or after"; and

<< 8 USCA § 1187 >>

(2) by adding at the end the following:

"(B) LIMITED WAIVER AUTHORITY.—For the period beginning October 1, 2003, and ending September 30, 2007, the Secretary of State may waive the requirement of subparagraph (A) with respect to nationals of a program country (as designated under subsection (c)), if the Secretary of State finds that the program country—

"(i) is making progress toward ensuring that passports meeting the requirement of subparagraph (A) are generally available to its nationals; and

"(ii) has taken appropriate measures to protect against misuse of passports the country has issued that do not meet the requirement of subparagraph (A).".

SEC. 418. PREVENTION OF CONSULATE SHOPPING.

<< 8 USCA § 1201 NOTE >>

(a) REVIEW.—The Secretary of State shall review how consular officers issue visas to determine if consular shopping is a problem.

(b) ACTIONS TO BE TAKEN.—If the Secretary of State determines under subsection (a) that consular shopping is a problem, the Secretary shall take steps to address the problem and shall submit a report to Congress describing what action was taken.

Subtitle C—Preservation of Immigration Benefits for Victims of Terrorism

SEC. 421. SPECIAL IMMIGRANT STATUS.

(a) IN GENERAL.—For purposes of the Immigration and Nationality Act (8 U. S.C. 1101 et seq.), the Attorney General may provide an alien described in subsection (b) with the status of a special immigrant under section 101(a)(27) of such Act (8 U.S.C. 1101(a(27)), if the alien—

(1) files with the Attorney General a petition under section 204 of such Act (8 U.S.C. 1154) for classification under section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4)); and

(2) is otherwise eligible to receive an immigrant visa and is otherwise admissible to the United States for permanent residence, except in determining such admissibility, the grounds for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4)) shall not apply.

(b) ALIENS DESCRIBED.—

(1) PRINCIPAL ALIENS.—An alien is described in this subsection if—

(A) the alien was the beneficiary of—

(i) a petition that was filed with the Attorney General on or before September 11, 2001—

(I) under section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) to classify the alien as a family-sponsored immigrant under section 203(a) of such Act (8 U.S.C. 1153(a)) or as an employment-based immigrant under section 203(b) of such Act (8 U.S.C. 1153(b)); or

(II) under section 214(d) (8 U.S.C. 1184(d)) of such Act to authorize the issuance of a nonimmigrant visa to the alien under section 101(a)(15)(K) of such Act (8 U.S.C. 1101(a)(15)(K)); or

(ii) an application for labor certification under section 212(a)(5)(A) of such Act (8 U.S.C. 1182(a)(5)(A)) that was filed under regulations of the Secretary of Labor on or before such date; and

(B) such petition or application was revoked or terminated (or otherwise rendered null), either before or after its approval, due to a specified terrorist activity that directly resulted in—

(i) the death or disability of the petitioner, applicant, or alien beneficiary; or

(ii) loss of employment due to physical damage to, or destruction of, the business of the petitioner or applicant.

(2) SPOUSES AND CHILDREN.—

(A) IN GENERAL.—An alien is described in this subsection if—

(i) the alien was, on September 10, 2001, the spouse or child of a principal alien described in paragraph (1); and

(ii) the alien—

(I) is accompanying such principal alien; or

(II) is following to join such principal alien not later than September 11, 2003.

(B) CONSTRUCTION.—For purposes of construing the terms "accompanying" and "following to join" in subparagraph (A)(ii), any death of a principal alien that is described in paragraph (1)(B)(i) shall be disregarded.

(3) GRANDPARENTS OF ORPHANS.—An alien is described in this subsection if the alien is a grandparent of a child, both of whose parents died as a direct result of a specified terrorist activity, if either of such deceased parents was, on September 10, 2001, a citizen or national of the United States or an alien lawfully admitted for permanent residence in the United States.

(c) PRIORITY DATE.—Immigrant visas made available under this section shall be issued to aliens in the order in which a petition on behalf of each such alien is filed with the Attorney General under subsection (a)(1), except that if an alien was assigned a priority date with respect to a petition described in subsection (b)(1)(A)(i), the alien may maintain that priority date.

(d) NUMERICAL LIMITATIONS.—For purposes of the application of sections 201 through 203 of the Immigration and Nationality Act (8 U.S.C. 1151–1153) in any fiscal year, aliens eligible to be provided status under this section shall be treated as special immigrants described in section 101(a)(27) of such Act (8 U.S.C. 1101(a)(27)) who are not described in subparagraph (A), (B), (C), or (K) of such section.

SEC. 422. EXTENSION OF FILING OR REENTRY DEADLINES.

(a) AUTOMATIC EXTENSION OF NONIMMIGRANT STATUS.—

  (1) IN GENERAL.—Notwithstanding section 214 of the Immigration and Nationality Act (8 U.S.C. 1184), in the case of an alien described in paragraph (2) who was lawfully present in the United States as a nonimmigrant on September 10, 2001, the alien may remain lawfully in the United States in the same nonimmigrant status until the later of—

    (A) the date such lawful nonimmigrant status otherwise would have terminated if this subsection had not been enacted; or

    (B) 1 year after the death or onset of disability described in paragraph (2).

  (2) ALIENS DESCRIBED.—

    (A) PRINCIPAL ALIENS.—An alien is described in this paragraph if the alien was disabled as a direct result of a specified terrorist activity.

    (B) SPOUSES AND CHILDREN.—An alien is described in this paragraph if the alien was, on September 10, 2001, the spouse or child of—

      (i) a principal alien described in subparagraph (A); or

      (ii) an alien who died as a direct result of a specified terrorist activity.

  (3) AUTHORIZED EMPLOYMENT.—During the period in which a principal alien or alien spouse is in lawful nonimmigrant status under paragraph (1), the alien shall be provided an "employment authorized" endorsement or other appropriate document signifying authorization of employment not later than 30 days after the alien requests such authorization.

(b) NEW DEADLINES FOR EXTENSION OR CHANGE OF NONIMMIGRANT STATUS.—

  (1) FILING DELAYS.—In the case of an alien who was lawfully present in the United States as a nonimmigrant on September 10, 2001, if the alien was prevented from filing a timely application for an extension or change of nonimmigrant status as a direct result of a specified terrorist activity, the alien's application shall be considered timely filed if it is filed not later than 60 days after it otherwise would have been due.

  (2) DEPARTURE DELAYS.—In the case of an alien who was lawfully present in the United States as a nonimmigrant on September 10, 2001, if the alien is unable timely to depart the United States as a direct result of a specified terrorist activity, the alien shall not be considered to have been unlawfully present in the United States during the period beginning on September 11, 2001, and ending on the date of the alien's departure, if such departure occurs on or before November 11, 2001.

  (3) SPECIAL RULE FOR ALIENS UNABLE TO RETURN FROM ABROAD.—

    (A) PRINCIPAL ALIENS.—In the case of an alien who was in a lawful nonimmigrant status on September 10, 2001, but who was not present in the United States on such date, if the alien was prevented from returning to the United States in order to file a timely application for an extension of nonimmigrant status as a direct result of a specified terrorist activity—

      (i) the alien's application shall be considered timely filed if it is filed not later than 60 days after it otherwise would have been due; and

      (ii) the alien's lawful nonimmigrant status shall be considered to continue until the later of—

        (I) the date such status otherwise would have terminated if this subparagraph had not been enacted; or

        (II) the date that is 60 days after the date on which the application described in clause (i) otherwise would have been due.

    (B) SPOUSES AND CHILDREN.—In the case of an alien who is the spouse or child of a principal alien described in subparagraph (A), if the spouse or child was in a lawful nonimmigrant status on September 10, 2001, the spouse or child may remain lawfully in the United States in the same nonimmigrant status until the later of—

      (i) the date such lawful nonimmigrant status otherwise would have terminated if this subparagraph had not been enacted; or

      (ii) the date that is 60 days after the date on which the application described in subparagraph (A) otherwise would have been due.

  (4) CIRCUMSTANCES PREVENTING TIMELY ACTION.—

    (A) FILING DELAYS.—For purposes of paragraph (1), circumstances preventing an alien from timely acting are—

      (i) office closures;

      (ii) mail or courier service cessations or delays; and

      (iii) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

    (B) DEPARTURE AND RETURN DELAYS.—For purposes of paragraphs (2) and (3), circumstances preventing an alien from timely acting are—

      (i) office closures;

      (ii) airline flight cessations or delays; and

(iii) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(c) DIVERSITY IMMIGRANTS.—

(1) WAIVER OF FISCAL YEAR LIMITATION.—Notwithstanding section 203(e)(2) of the Immigration and Nationality Act (8 U.S.C. 1153(e)(2)), an immigrant visa number issued to an alien under section 203(c) of such Act for fiscal year 2001 may be used by the alien during the period beginning on October 1, 2001, and ending on April 1, 2002, if the alien establishes that the alien was prevented from using it during fiscal year 2001 as a direct result of a specified terrorist activity.

(2) WORLDWIDE LEVEL.—In the case of an alien entering the United States as a lawful permanent resident, or adjusting to that status, under paragraph (1) or (3), the alien shall be counted as a diversity immigrant for fiscal year 2001 for purposes of section 201(e) of the Immigration and Nationality Act (8 U.S.C. 1151(e)), unless the worldwide level under such section for such year has been exceeded, in which case the alien shall be counted as a diversity immigrant for fiscal year 2002.

(3) TREATMENT OF FAMILY MEMBERS OF CERTAIN ALIENS.—In the case of a principal alien issued an immigrant visa number under section 203(c) of the Immigration and Nationality Act (8 U.S.C. 1153(c)) for fiscal year 2001, if such principal alien died as a direct result of a specified terrorist activity, the aliens who were, on September 10, 2001, the spouse and children of such principal alien shall, until June 30, 2002, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a), (b), or (c) of section 203 of such Act, be entitled to the same status, and the same order of consideration, that would have been provided to such alien spouse or child under section 203(d) of such Act as if the principal alien were not deceased and as if the spouse or child's visa application had been adjudicated by September 30, 2001.

(4) CIRCUMSTANCES PREVENTING TIMELY ACTION.—For purposes of paragraph (1), circumstances preventing an alien from using an immigrant visa number during fiscal year 2001 are—

(A) office closures;

(B) mail or courier service cessations or delays;

(C) airline flight cessations or delays; and

(D) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(d) EXTENSION OF EXPIRATION OF IMMIGRANT VISAS.—

(1) IN GENERAL.—Notwithstanding the limitations under section 221(c) of the Immigration and Nationality Act (8 U.S.C. 1201(c)), in the case of any immigrant visa issued to an alien that expires or expired before December 31, 2001, if the alien was unable to effect entry into the United States as a direct result of a specified terrorist activity, then the period of validity of the visa is extended until December 31, 2001, unless a longer period of validity is otherwise provided under this subtitle.

(2) CIRCUMSTANCES PREVENTING ENTRY.—For purposes of this subsection, circumstances preventing an alien from effecting entry into the United States are—

(A) office closures;

(B) airline flight cessations or delays; and

(C) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(e) GRANTS OF PAROLE EXTENDED.—

(1) IN GENERAL.—In the case of any parole granted by the Attorney General under section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)) that expires on a date on or after September 11, 2001, if the alien beneficiary of the parole was unable to return to the United States prior to the expiration date as a direct result of a specified terrorist activity, the parole is deemed extended for an additional 90 days.

(2) CIRCUMSTANCES PREVENTING RETURN.—For purposes of this subsection, circumstances preventing an alien from timely returning to the United States are—

(A) office closures;

(B) airline flight cessations or delays; and

(C) other closures, cessations, or delays affecting case processing or travel necessary to satisfy legal requirements.

(f) VOLUNTARY DEPARTURE.—Notwithstanding section 240B of the Immigration and Nationality Act (8 U.S.C. 1229c), if a period for voluntary departure under such section expired during the period beginning on September 11, 2001, and ending on October 11, 2001, such voluntary departure period is deemed extended for an additional 30 days.

SEC. 423. HUMANITARIAN RELIEF FOR CERTAIN SURVIVING SPOUSES AND CHILDREN.

(a) TREATMENT AS IMMEDIATE RELATIVES.—

(1) SPOUSES.—Notwithstanding the second sentence of section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)), in the case of an alien who was the spouse of a citizen of the United States at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, if the citizen died as a direct result of a specified terrorist activity, the alien (and each child of the alien) shall be considered, for purposes of section 201(b) of such Act, to remain an immediate relative after the date of the citizen's death, but only if the alien files a petition under section 204(a)(1)(A)(ii) of such Act within 2 years after such date and only until the date the alien remarries. For purposes of such section 204(a)(1)(A)(ii), an alien granted relief under the preceding sentence shall be considered an alien spouse described in the second sentence of section 201(b)(2)(A)(i) of such Act.

(2) CHILDREN.—

  (A) IN GENERAL.—In the case of an alien who was the child of a citizen of the United States at the time of the citizen's death, if the citizen died as a direct result of a specified terrorist activity, the alien shall be considered, for purposes of section 201(b) of the Immigration and Nationality Act (8 U.S.C. 1151(b)), to remain an immediate relative after the date of the citizen's death (regardless of changes in age or marital status thereafter), but only if the alien files a petition under subparagraph (B) within 2 years after such date.

  (B) PETITIONS.—An alien described in subparagraph (A) may file a petition with the Attorney General for classification of the alien under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)). For purposes of such Act, such a petition shall be considered a petition filed under section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)).

(b) SPOUSES, CHILDREN, UNMARRIED SONS AND DAUGHTERS OF LAWFUL PERMANENT RESIDENT ALIENS.—

(1) IN GENERAL.—Any spouse, child, or unmarried son or daughter of an alien described in paragraph (3) who is included in a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1153(a)(2)) that was filed by such alien before September 11, 2001, shall be considered (if the spouse, child, son, or daughter has not been admitted or approved for lawful permanent residence by such date) a valid petitioner for preference status under such section with the same priority date as that assigned prior to the death described in paragraph (3)(A). No new petition shall be required to be filed. Such spouse, child, son, or daughter may be eligible for deferred action and work authorization.

(2) SELF–PETITIONS.—Any spouse, child, or unmarried son or daughter of an alien described in paragraph (3) who is not a beneficiary of a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act may file a petition for such classification with the Attorney General, if the spouse, child, son, or daughter was present in the United States on September 11, 2001. Such spouse, child, son, or daughter may be eligible for deferred action and work authorization.

(3) ALIENS DESCRIBED.—An alien is described in this paragraph if the alien—

  (A) died as a direct result of a specified terrorist activity; and

  (B) on the day of such death, was lawfully admitted for permanent residence in the United States.

(c) APPLICATIONS FOR ADJUSTMENT OF STATUS BY SURVIVING SPOUSES AND CHILDREN OF EMPLOYMENT–BASED IMMIGRANTS.—

(1) IN GENERAL.—Any alien who was, on September 10, 2001, the spouse or child of an alien described in paragraph (2), and who applied for adjustment of status prior to the death described in paragraph (2)(A), may have such application adjudicated as if such death had not occurred.

(2) ALIENS DESCRIBED.—An alien is described in this paragraph if the alien—

  (A) died as a direct result of a specified terrorist activity; and

  (B) on the day before such death, was—

   (i) an alien lawfully admitted for permanent residence in the United States by reason of having been allotted a visa under section 203(b) of the Immigration and Nationality Act (8 U.S.C. 1153(b)); or

   (ii) an applicant for adjustment of status to that of an alien described in clause (i), and admissible to the United States for permanent residence.

(d) WAIVER OF PUBLIC CHARGE GROUNDS.—In determining the admissibility of any alien accorded an immigration benefit under this section, the grounds for inadmissibility specified in section 212(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(4)) shall not apply.

SEC. 424. "AGE–OUT" PROTECTION FOR CHILDREN.

For purposes of the administration of the Immigration and Nationality Act (8 U.S.C. 1101 et seq.), in the case of an alien—

(1) whose 21st birthday occurs in September 2001, and who is the beneficiary of a petition or application filed under such Act on or before September 11, 2001, the alien shall be considered to be a child for 90 days after the alien's 21st birthday for purposes of adjudicating such petition or application; and

(2) whose 21st birthday occurs after September 2001, and who is the beneficiary of a petition or application filed under such Act on or before September 11, 2001, the alien shall be considered to be a child for 45 days after the alien's 21st birthday for purposes of adjudicating such petition or application.

SEC. 425. TEMPORARY ADMINISTRATIVE RELIEF.

The Attorney General, for humanitarian purposes or to ensure family unity, may provide temporary administrative relief to any alien who—

(1) was lawfully present in the United States on September 10, 2001;

(2) was on such date the spouse, parent, or child of an individual who died or was disabled as a direct result of a specified terrorist activity; and

(3) is not otherwise entitled to relief under any other provision of this subtitle.

SEC. 426. EVIDENCE OF DEATH, DISABILITY, OR LOSS OF EMPLOYMENT.

(a) IN GENERAL.—The Attorney General shall establish appropriate standards for evidence demonstrating, for purposes of this subtitle, that any of the following occurred as a direct result of a specified terrorist activity:

(1) Death.

(2) Disability.

(3) Loss of employment due to physical damage to, or destruction of, a business.

(b) WAIVER OF REGULATIONS.—The Attorney General shall carry out subsection (a) as expeditiously as possible. The Attorney General is not required to promulgate regulations prior to implementing this subtitle.

SEC. 427. NO BENEFITS TO TERRORISTS OR FAMILY MEMBERS OF TERRORISTS.

Notwithstanding any other provision of this subtitle, nothing in this subtitle shall be construed to provide any benefit or relief to—

(1) any individual culpable for a specified terrorist activity; or

(2) any family member of any individual described in paragraph (1).

SEC. 428. DEFINITIONS.

(a) APPLICATION OF IMMIGRATION AND NATIONALITY ACT PROVISIONS.—Except as otherwise specifically provided in this subtitle, the definitions used in the Immigration and Nationality Act (excluding the definitions applicable exclusively to title III of such Act) shall apply in the administration of this subtitle.

(b) SPECIFIED TERRORIST ACTIVITY.—For purposes of this subtitle, the term "specified terrorist activity" means any terrorist activity conducted against the Government or the people of the United States on September 11, 2001.

TITLE V—REMOVING OBSTACLES TO INVESTIGATING TERRORISM

<< 18 USCA § 3071 NOTE >>

SEC. 501. ATTORNEY GENERAL'S AUTHORITY TO PAY REWARDS TO COMBAT TERRORISM.

(a) PAYMENT OF REWARDS TO COMBAT TERRORISM.—Funds available to the Attorney General may be used for the payment of rewards pursuant to public advertisements for assistance to the Department of Justice to combat terrorism and defend the Nation against terrorist acts, in accordance with procedures and regulations established or issued by the Attorney General.

(b) CONDITIONS.—In making rewards under this section—

(1) no such reward of $250,000 or more may be made or offered without the personal approval of either the Attorney General or the President;

(2) the Attorney General shall give written notice to the Chairmen and ranking minority members of the Committees on Appropriations and the Judiciary of the Senate and of the House of Representatives not later than 30 days after the approval of a reward under paragraph (1);

(3) any executive agency or military department (as defined, respectively, in sections 105 and 102 of title 5, United States Code) may provide the Attorney General with funds for the payment of rewards;

(4) neither the failure of the Attorney General to authorize a payment nor the amount authorized shall be subject to judicial review; and

(5) no such reward shall be subject to any per—or aggregate reward spending limitation established by law, unless that law expressly refers to this section, and no reward paid pursuant to any such offer shall count toward any such aggregate reward spending limitation.

SEC. 502. SECRETARY OF STATE'S AUTHORITY TO PAY REWARDS.

Section 36 of the State Department Basic Authorities Act of 1956 (Public Law 885, August 1, 1956; 22 U.S.C. 2708) is amended—

(1) in subsection (b)—

<< 22 USCA § 2708 >>

(A) in paragraph (4), by striking "or" at the end;

<< 22 USCA § 2708 >>

(B) in paragraph (5), by striking the period at the end and inserting ", including by dismantling an organization in whole or significant part; or"; and

<< 22 USCA § 2708 >>

(C) by adding at the end the following:

"(6) the identification or location of an individual who holds a key leadership position in a terrorist organization.";

<< 22 USCA § 2708 >>

(2) in subsection (d), by striking paragraphs (2) and (3) and redesignating paragraph (4) as paragraph (2); and

<< 22 USCA § 2708 >>

(3) in subsection (e)(1), by inserting ", except as personally authorized by the Secretary of State if he determines that offer or payment of an award of a larger amount is necessary to combat terrorism or defend the Nation against terrorist acts." after "$5,000,000".

<< 42 USCA § 14135a >>

SEC. 503. DNA IDENTIFICATION OF TERRORISTS AND OTHER VIOLENT OFFENDERS.

Section 3(d)(2) of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a(d)(2)) is amended to read as follows:

"(2) In addition to the offenses described in paragraph (1), the following offenses shall be treated for purposes of this section as qualifying Federal offenses, as determined by the Attorney General:

"(A) Any offense listed in section 2332b(g)(5)(B) of title 18, United States Code.

"(B) Any crime of violence (as defined in section 16 of title 18, United States Code).

"(C) Any attempt or conspiracy to commit any of the above offenses.".

SEC. 504. COORDINATION WITH LAW ENFORCEMENT.

<< 50 USCA § 1806 >>

(a) INFORMATION ACQUIRED FROM AN ELECTRONIC SURVEILLANCE.—Section 106 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1806), is amended by adding at the end the following:

"(k)(1) Federal officers who conduct electronic surveillance to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against—

"(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

"(2) Coordination authorized under paragraph (1) shall not preclude the certification required by section 104(a)(7)(B) or the entry of an order under section 105.".

<< 50 USCA § 1825 >>

(b) INFORMATION ACQUIRED FROM A PHYSICAL SEARCH.—Section 305 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1825) is amended by adding at the end the following:

"(k)(1) Federal officers who conduct physical searches to acquire foreign intelligence information under this title may consult with Federal law enforcement officers to coordinate efforts to investigate or protect against—

"(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

"(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

"(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power.

"(2) Coordination authorized under paragraph (1) shall not preclude the certification required by section 303(a)(7) or the entry of an order under section 304.".

SEC. 505. MISCELLANEOUS NATIONAL SECURITY AUTHORITIES.

(a) TELEPHONE TOLL AND TRANSACTIONAL RECORDS.—Section 2709(b) of title 18, United States Code, is amended—

<< 18 USCA § 2709 >>

(1) in the matter preceding paragraph (1), by inserting "at Bureau headquarters or a Special Agent in Charge in a Bureau field office designated by the Director" after "Assistant Director";

<< 18 USCA § 2709 >>

(2) in paragraph (1)—

(A) by striking "in a position not lower than Deputy Assistant Director"; and

(B) by striking "made that" and all that follows and inserting the following: "made that the name, address, length of service, and toll billing records sought are relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely on the basis of activities protected by the first amendment to the Constitution of the United States; and"; and

AR.03770

<< 18 USCA § 2709 >>

(3) in paragraph (2)—

(A) by striking "in a position not lower than Deputy Assistant Director"; and

(B) by striking "made that" and all that follows and inserting the following: "made that the information sought is relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.".

<< 12 USCA § 3414 >>

(b) FINANCIAL RECORDS.—Section 1114(a)(5)(A) of the Right to Financial Privacy Act of 1978 (12 U.S.C. 3414(a)(5)(A)) is amended—

(1) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge in a Bureau field office designated by the Director" after "designee"; and

(2) by striking "sought" and all that follows and inserting "sought for foreign counter intelligence purposes to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.".

(c) CONSUMER REPORTS.—Section 624 of the Fair Credit Reporting Act (15 U. S.C. 1681u) is amended—

<< 15 USCA § 1681u >>

(1) in subsection (a)—

(A) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge of a Bureau field office designated by the Director" after "designee" the first place it appears; and

(B) by striking "in writing that" and all that follows through the end and inserting the following: "in writing, that such information is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.";

<< 15 USCA § 1681u >>

(2) in subsection (b)—

(A) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge of a Bureau field office designated by the Director" after "designee" the first place it appears; and

(B) by striking "in writing that" and all that follows through the end and inserting the following: "in writing that such information is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States."; and

<< 15 USCA § 1681u >>

(3) in subsection (c)—

(A) by inserting "in a position not lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in Charge in a Bureau field office designated by the Director" after "designee of the Director"; and

(B) by striking "in camera that" and all that follows through "States. " and inserting the following: "in camera that the consumer report is sought for the conduct of an authorized investigation to protect against international terrorism or clandestine intelligence activities, provided that such an investigation of a United States person is not conducted solely upon the basis of activities protected by the first amendment to the Constitution of the United States.".

SEC. 506. EXTENSION OF SECRET SERVICE JURISDICTION.

<< 18 USCA § 1030 >>

(a) Concurrent Jurisdiction Under 18 U.S.C. 1030—Section 1030(d) of title 18, United States Code, is amended to read as follows:

"(d)(1) The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

"(2) The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

"(3) Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.".

<< 18 USCA § 3056 >>

(b) Reauthorization of Jurisdiction under 18 U.S.C. 1344—Section 3056(b)(3) of title 18, United States Code, is amended by striking "credit and debit card frauds, and false identification documents or devices" and inserting "access device frauds, false identification documents or devices, and any fraud or other criminal or unlawful activity in or against any federally insured financial institution".

SEC. 507. DISCLOSURE OF EDUCATIONAL RECORDS.

<< 20 USCA § 1232g >>

Section 444 of the General Education Provisions Act (20 U.S.C. 1232g), is amended by adding after subsection (i) a new subsection (j) to read as follows:

"(j) INVESTIGATION AND PROSECUTION OF TERRORISM.—

"(1) IN GENERAL.—Notwithstanding subsections (a) through (i) or any provision of State law, the Attorney General (or any Federal officer or employee, in a position not lower than an Assistant Attorney General, designated by the Attorney General) may submit a written application to a court of competent jurisdiction for an ex parte order requiring an educational agency or institution to permit the Attorney General (or his designee) to—

"(A) collect education records in the possession of the educational agency or institution that are relevant to an authorized investigation or prosecution of an offense listed in section 2332b(g)(5)(B) of title 18 United States Code, or an act of domestic or international terrorism as defined in section 2331 of that title; and

"(B) for official purposes related to the investigation or prosecution of an offense described in paragraph (1)(A), retain, disseminate, and use (including as evidence at trial or in other administrative or judicial proceedings) such records, consistent with such guidelines as the Attorney General, after consultation with the Secretary, shall issue to protect confidentiality.

"(2) APPLICATION AND APPROVAL.—

"(A) IN GENERAL.—An application under paragraph (1) shall certify that there are specific and articulable facts giving reason to believe that the education records are likely to contain information described in paragraph (1)(A).

"(B) The court shall issue an order described in paragraph (1) if the court finds that the application for the order includes the certification described in subparagraph (A).

"(3) PROTECTION OF EDUCATIONAL AGENCY OR INSTITUTION.—An educational agency or institution that, in good faith, produces education records in accordance with an order issued under this subsection shall not be liable to any person for that production.

"(4) RECORD–KEEPING.—Subsection (b)(4) does not apply to education records subject to a court order under this subsection.".

SEC. 508. DISCLOSURE OF INFORMATION FROM NCES SURVEYS.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 20 USCA § 9007 >>

Section 408 of the National Education Statistics Act of 1994 (20 U.S.C. 9007), is amended by adding after subsection (b) a new subsection (c) to read as follows:

"(c) INVESTIGATION AND PROSECUTION OF TERRORISM.—

"(1) IN GENERAL.—Notwithstanding subsections (a) and (b), the Attorney General (or any Federal officer or employee, in a position not lower than an Assistant Attorney General, designated by the Attorney General) may submit a written application to a court of competent jurisdiction for an ex parte order requiring the Secretary to permit the Attorney General (or his designee) to—

"(A) collect reports, records, and information (including individually identifiable information) in the possession of the center that are relevant to an authorized investigation or prosecution of an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, or an act of domestic or international terrorism as defined in section 2331 of that title; and

"(B) for official purposes related to the investigation or prosecution of an offense described in paragraph (1)(A), retain, disseminate, and use (including as evidence at trial or in other administrative or judicial proceedings) such information, consistent with such guidelines as the Attorney General, after consultation with the Secretary, shall issue to protect confidentiality.

"(2) APPLICATION AND APPROVAL.—

"(A) IN GENERAL.—An application under paragraph (1) shall certify that there are specific and articulable facts giving reason to believe that the information sought is described in paragraph (1)(A).

"(B) The court shall issue an order described in paragraph (1) if the court finds that the application for the order includes the certification described in subparagraph (A).

"(3) PROTECTION.—An officer or employee of the Department who, in good faith, produces information in accordance with an order issued under this subsection does not violate subsection (b)(2) and shall not be liable to any person for that production.".

TITLE VI—PROVIDING FOR VICTIMS OF TERRORISM, PUBLIC SAFETY OFFICERS, AND THEIR FAMILIES

Subtitle A—Aid to Families of Public Safety Officers

<< 42 USCA § 3796c–1 >>

SEC. 611. EXPEDITED PAYMENT FOR PUBLIC SAFETY OFFICERS INVOLVED IN THE PREVENTION, INVESTIGATION, RESCUE, OR RECOVERY EFFORTS RELATED TO A TERRORIST ATTACK.

(a) IN GENERAL.—Notwithstanding the limitations of subsection (b) of section 1201 or the provisions of subsections (c), (d), and (e) of such section or section 1202 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796, 3796a), upon certification (containing identification of all eligible payees of benefits pursuant to section 1201 of such Act) by a public agency that a public safety officer employed by such agency was killed or suffered a catastrophic injury producing permanent and total disability as a direct and proximate result of a personal injury sustained in the line of duty as described in section 1201 of such Act in connection with prevention, investigation, rescue, or recovery efforts related to a terrorist attack, the Director of the Bureau of Justice Assistance shall authorize payment to qualified beneficiaries, said payment to be made not later than 30 days after receipt of such certification, benefits described under subpart 1 of part L of such Act (42 U.S.C. 3796 et seq.).

(b) DEFINITIONS.—For purposes of this section, the terms "catastrophic injury", "public agency", and "public safety officer" have the same meanings given such terms in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796b).

SEC. 612. TECHNICAL CORRECTION WITH RESPECT TO EXPEDITED PAYMENTS FOR HEROIC PUBLIC SAFETY OFFICERS.

Section 1 of Public Law 107–37 (an Act to provide for the expedited payment of certain benefits for a public safety officer who was killed or suffered a catastrophic injury as a direct and proximate result of a personal injury sustained in the line of duty in connection with the terrorist attacks of September 11, 2001) is amended by—

  (1) inserting before "by a" the following: "(containing identification of all eligible payees of benefits pursuant to section 1201)";

  (2) inserting "producing permanent and total disability" after "suffered a catastrophic injury"; and

  (3) striking "1201(a)" and inserting "1201".

## SEC. 613. PUBLIC SAFETY OFFICERS BENEFIT PROGRAM PAYMENT INCREASE.

<< 42 USCA § 3796 >>

 (a) PAYMENTS.—Section 1201(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796) is amended by striking "$100,000" and inserting "$250,000".

<< 42 USCA § 3796 NOTE >>

 (b) APPLICABILITY.—The amendment made by subsection (a) shall apply to any death or disability occurring on or after January 1, 2001.

## SEC. 614. OFFICE OF JUSTICE PROGRAMS.

 Section 112 of title I of section 101(b) of division A of Public Law 105–277 and section 108(a) of appendix A of Public Law 106–113 (113 Stat. 1501A–20) are amended—

  (1) after "that Office", each place it occurs, by inserting "(including, notwithstanding any contrary provision of law (unless the same should expressly refer to this section), any organization that administers any program established in title 1 of Public Law 90–351"; and

  (2) by inserting "functions, including any" after "all".

### Subtitle B—Amendments to the Victims of Crime Act of 1984

## SEC. 621. CRIME VICTIMS FUND.

 (a) DEPOSIT OF GIFTS IN THE FUND.—Section 1402(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(b)) is amended—

<< 42 USCA § 10601 >>

 (1) in paragraph (3), by striking "and" at the end;

<< 42 USCA § 10601 >>

 (2) in paragraph (4), by striking the period at the end and inserting "; and"; and

<< 42 USCA § 10601 >>

 (3) by adding at the end the following:
 "(5) any gifts, bequests, or donations to the Fund from private entities or individuals.".

<< 42 USCA § 10601 >>

 (b) FORMULA FOR FUND DISTRIBUTIONS.—Section 1402(c) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(c)) is amended to read as follows:

"(c) FUND DISTRIBUTION; RETENTION OF SUMS IN FUND; AVAILABILITY FOR EXPENDITURE WITHOUT FISCAL YEAR LIMITATION.—

  "(1) Subject to the availability of money in the Fund, in each fiscal year, beginning with fiscal year 2003, the Director shall distribute not less than 90 percent nor more than 110 percent of the amount distributed from the Fund in the previous fiscal year, except the Director may distribute up to 120 percent of the amount distributed in the previous fiscal year in any fiscal year that the total amount available in the Fund is more than 2 times the amount distributed in the previous fiscal year.

  "(2) In each fiscal year, the Director shall distribute amounts from the Fund in accordance with subsection (d). All sums not distributed during a fiscal year shall remain in reserve in the Fund to be distributed during a subsequent fiscal year. Notwithstanding any other provision of law, all sums deposited in the Fund that are not distributed shall remain in reserve in the Fund for obligation in future fiscal years, without fiscal year limitation.".

(c) ALLOCATION OF FUNDS FOR COSTS AND GRANTS.—Section 1402(d)(4) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)(4)) is amended—

<< 42 USCA § 10601 >>

  (1) by striking "deposited in" and inserting "to be distributed from";

<< 42 USCA § 10601 >>

  (2) in subparagraph (A), by striking "48.5" and inserting "47.5";

<< 42 USCA § 10601 >>

  (3) in subparagraph (B), by striking "48.5" and inserting "47.5"; and

<< 42 USCA § 10601 >>

  (4) in subparagraph (C), by striking "3" and inserting "5".

<< 42 USCA § 10601 >>

  (d) ANTITERRORISM EMERGENCY RESERVE.—Section 1402(d)(5) of the Victims of Crime Act of 1984 (42 U.S.C. 10601(d)(5)) is amended to read as follows:

  "(5)(A) In addition to the amounts distributed under paragraphs (2), (3), and (4), the Director may set aside up to $50,000,000 from the amounts transferred to the Fund in response to the airplane hijackings and terrorist acts that occurred on September 11, 2001, as an antiterrorism emergency reserve. The Director may replenish any amounts expended from such reserve in subsequent fiscal years by setting aside up to 5 percent of the amounts remaining in the Fund in any fiscal year after distributing amounts under paragraphs (2), (3) and (4). Such reserve shall not exceed $50,000,000.

  "(B) The antiterrorism emergency reserve referred to in subparagraph (A) may be used for supplemental grants under section 1404B and to provide compensation to victims of international terrorism under section 1404C.

  "(C) Amounts in the antiterrorism emergency reserve established pursuant to subparagraph (A) may be carried over from fiscal year to fiscal year. Notwithstanding subsection (c) and section 619 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2001 (and any similar limitation on Fund obligations in any future Act, unless the same should expressly refer to this section), any such amounts carried over shall not be subject to any limitation on obligations from amounts deposited to or available in the Fund.".

<< 42 USCA § 10601 NOTE >>

  (e) VICTIMS OF SEPTEMBER 11, 2001.—Amounts transferred to the Crime Victims Fund for use in responding to the airplane hijackings and terrorist acts (including any related search, rescue, relief, assistance, or other similar activities) that occurred on September 11, 2001, shall not be subject to any limitation on obligations from amounts deposited to or available in the Fund, notwithstanding—

(1) section 619 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2001, and any similar limitation on Fund obligations in such Act for Fiscal Year 2002; and

(2) subsections (c) and (d) of section 1402 of the Victims of Crime Act of 1984 (42 U.S.C. 10601).

SEC. 622. CRIME VICTIM COMPENSATION.

<< 42 USCA § 10602 >>

(a) ALLOCATION OF FUNDS FOR COMPENSATION AND ASSISTANCE.—Paragraphs (1) and (2) of section 1403(a) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(a)) are amended by inserting "in fiscal year 2002 and of 60 percent in subsequent fiscal years" after "40 percent".

<< 42 USCA § 10602 >>

(b) LOCATION OF COMPENSABLE CRIME.—Section 1403(b)(6)(B) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(b)(6)(B)) is amended by striking "are outside the United States (if the compensable crime is terrorism, as defined in section 2331 of title 18), or".

<< 42 USCA § 10602 >>

(c) RELATIONSHIP OF CRIME VICTIM COMPENSATION TO MEANS–TESTED FEDERAL BENEFIT PROGRAMS. —Section 1403 of the Victims of Crime Act of 1984 (42 U.S.C. 10602) is amended by striking subsection (c) and inserting the following:

"(c) EXCLUSION FROM INCOME, RESOURCES, AND ASSETS FOR PURPOSES OF MEANS TESTS.— Notwithstanding any other law (other than title IV of Public Law 107–42), for the purpose of any maximum allowed income, resource, or asset eligibility requirement in any Federal, State, or local government program using Federal funds that provides medical or other assistance (or payment or reimbursement of the cost of such assistance), any amount of crime victim compensation that the applicant receives through a crime victim compensation program under this section shall not be included in the income, resources, or assets of the applicant, nor shall that amount reduce the amount of the assistance available to the applicant from Federal, State, or local government programs using Federal funds, unless the total amount of assistance that the applicant receives from all such programs is sufficient to fully compensate the applicant for losses suffered as a result of the crime.".

(d) DEFINITIONS OF "COMPENSABLE CRIME" AND "STATE".—Section 1403(d) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(d)) is amended—

<< 42 USCA § 10602 >>

(1) in paragraph (3), by striking "crimes involving terrorism,"; and

<< 42 USCA § 10602 >>

(2) in paragraph (4), by inserting "the United States Virgin Islands," after "the Commonwealth of Puerto Rico,".

(e) RELATIONSHIP OF ELIGIBLE CRIME VICTIM COMPENSATION PROGRAMS TO THE SEPTEMBER 11TH VICTIM COMPENSATION FUND.—

<< 42 USCA § 10602 >>

(1) IN GENERAL.—Section 1403(e) of the Victims of Crime Act of 1984 (42 U.S.C. 10602(e)) is amended by inserting "including the program established under title IV of Public Law 107–42," after "Federal program,".

<< 49 USCA § 40101 NOTE >>

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(2) COMPENSATION.—With respect to any compensation payable under title IV of Public Law 107–42, the failure of a crime victim compensation program, after the effective date of final regulations issued pursuant to section 407 of Public Law 107–42, to provide compensation otherwise required pursuant to section 1403 of the Victims of Crime Act of 1984 (42 U.S.C. 10602) shall not render that program ineligible for future grants under the Victims of Crime Act of 1984.

SEC. 623. CRIME VICTIM ASSISTANCE.

<< 42 USCA § 10603 >>

(a) ASSISTANCE FOR VICTIMS IN THE DISTRICT OF COLUMBIA, PUERTO RICO, AND OTHER TERRITORIES AND POSSESSIONS.—Section 1404(a) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(a)) is amended by adding at the end the following:

"(6) An agency of the Federal Government performing local law enforcement functions in and on behalf of the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, or any other territory or possession of the United States may qualify as an eligible crime victim assistance program for the purpose of grants under this subsection, or for the purpose of grants under subsection (c)(1).".

(b) PROHIBITION ON DISCRIMINATION AGAINST CERTAIN VICTIMS.—Section 1404(b)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(b)(1)) is amended—

<< 42 USCA § 10603 >>

(1) in subparagraph (D), by striking "and" at the end;

<< 42 USCA § 10603 >>

(2) in subparagraph (E), by striking the period at the end and inserting "; and"; and

<< 42 USCA § 10603 >>

(3) by adding at the end the following:

"(F) does not discriminate against victims because they disagree with the way the State is prosecuting the criminal case.".

<< 42 USCA § 10603 >>

(c) GRANTS FOR PROGRAM EVALUATION AND COMPLIANCE EFFORTS.—Section 1404(c)(1)(A) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(1)(A)) is amended by inserting ", program evaluation, compliance efforts," after "demonstration projects".

(d) ALLOCATION OF DISCRETIONARY GRANTS.—Section 1404(c)(2) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(2)) is amended—

<< 42 USCA § 10603 >>

(1) in subparagraph (A), by striking "not more than" and inserting "not less than"; and

<< 42 USCA § 10603 >>

(2) in subparagraph (B), by striking "not less than" and inserting "not more than".

(e) FELLOWSHIPS AND CLINICAL INTERNSHIPS.—Section 1404(c)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10603(c)(3)) is amended—

<< 42 USCA § 10603 >>

(1) in subparagraph (C), by striking "and" at the end;

<< 42 USCA § 10603 >>

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

<< 42 USCA § 10603 >>

(3) by adding at the end the following:
  "(E) use funds made available to the Director under this subsection—
  "(i) for fellowships and clinical internships; and
  "(ii) to carry out programs of training and special workshops for the presentation and dissemination of information resulting from demonstrations, surveys, and special projects.".

SEC. 624. VICTIMS OF TERRORISM.

<< 42 USCA § 10603b >>

 (a) COMPENSATION AND ASSISTANCE TO VICTIMS OF DOMESTIC TERRORISM.—Section 1404B(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10603b(b)) is amended to read as follows:
 "(b) VICTIMS OF TERRORISM WITHIN THE UNITED STATES.—The Director may make supplemental grants as provided in section 1402(d)(5) to States for eligible crime victim compensation and assistance programs, and to victim service organizations, public agencies (including Federal, State, or local governments) and nongovernmental organizations that provide assistance to victims of crime, which shall be used to provide emergency relief, including crisis response efforts, assistance, compensation, training and technical assistance, and ongoing assistance, including during any investigation or prosecution, to victims of terrorist acts or mass violence occurring within the United States.".

<< 42 USCA § 10603b >>

 (b) ASSISTANCE TO VICTIMS OF INTERNATIONAL TERRORISM.—Section 1404B(a)(1) of the Victims of Crime Act of 1984 (42 U.S.C. 10603b(a)(1)) is amended by striking "who are not persons eligible for compensation under title VIII of the Omnibus Diplomatic Security and Antiterrorism Act of 1986".

<< 42 USCA § 10603c >>

 (c) COMPENSATION TO VICTIMS OF INTERNATIONAL TERRORISM.—Section 1404C(b) of the Victims of Crime Act of 1984 (42 U.S.C. 10603c(b)) is amended by adding at the end the following: "The amount of compensation awarded to a victim under this subsection shall be reduced by any amount that the victim received in connection with the same act of international terrorism under title VIII of the Omnibus Diplomatic Security and Antiterrorism Act of 1986.".

TITLE VII—INCREASED INFORMATION SHARING FOR CRITICAL INFRASTRUCTURE PROTECTION

SEC. 701. EXPANSION OF REGIONAL INFORMATION SHARING SYSTEM TO FACILITATE FEDERAL–STATE–LOCAL LAW ENFORCEMENT RESPONSE RELATED TO TERRORIST ATTACKS.

Section 1301 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796h) is amended—

<< 42 USCA § 3796h >>

(1) in subsection (a), by inserting "and terrorist conspiracies and activities" after "activities";
(2) in subsection (b)—

<< 42 USCA § 3796h >>

 (A) in paragraph (3), by striking "and" after the semicolon;

<< 42 USCA § 3796h >>

(B) by redesignating paragraph (4) as paragraph (5); and

<< 42 USCA § 3796h >>

(C) by inserting after paragraph (3) the following:

"(4) establishing and operating secure information sharing systems to enhance the investigation and prosecution abilities of participating enforcement agencies in addressing multi-jurisdictional terrorist conspiracies and activities; and (5)'; and

<< 42 USCA § 3796h >>

(3) by inserting at the end the following:

"(d) AUTHORIZATION OF APPROPRIATION TO THE BUREAU OF JUSTICE ASSISTANCE. — There are authorized to be appropriated to the Bureau of Justice Assistance to carry out this section $50,000,000 for fiscal year 2002 and $100,000,000 for fiscal year 2003.".

TITLE VIII—STRENGTHENING THE CRIMINAL LAWS AGAINST TERRORISM

SEC. 801. TERRORIST ATTACKS AND OTHER ACTS OF VIOLENCE AGAINST MASS TRANSPORTATION SYSTEMS.

<< 18 USCA § 1993 >>

Chapter 97 of title 18, United States Code, is amended by adding at the end the following:

"§ 1993. Terrorist attacks and other acts of violence against mass transportation systems

"(a) GENERAL PROHIBITIONS.—Whoever willfully—

"(1) wrecks, derails, sets fire to, or disables a mass transportation vehicle or ferry;

"(2) places or causes to be placed any biological agent or toxin for use as a weapon, destructive substance, or destructive device in, upon, or near a mass transportation vehicle or ferry, without previously obtaining the permission of the mass transportation provider, and with intent to endanger the safety of any passenger or employee of the mass transportation provider, or with a reckless disregard for the safety of human life;

"(3) sets fire to, or places any biological agent or toxin for use as a weapon, destructive substance, or destructive device in, upon, or near any garage, terminal, structure, supply, or facility used in the operation of, or in support of the operation of, a mass transportation vehicle or ferry, without previously obtaining the permission of the mass transportation provider, and knowing or having reason to know such activity would likely derail, disable, or wreck a mass transportation vehicle or ferry used, operated, or employed by the mass transportation provider;

"(4) removes appurtenances from, damages, or otherwise impairs the operation of a mass transportation signal system, including a train control system, centralized dispatching system, or rail grade crossing warning signal without authorization from the mass transportation provider;

"(5) interferes with, disables, or incapacitates any dispatcher, driver, captain, or person while they are employed in dispatching, operating, or maintaining a mass transportation vehicle or ferry, with intent to endanger the safety of any passenger or employee of the mass transportation provider, or with a reckless disregard for the safety of human life;

"(6) commits an act, including the use of a dangerous weapon, with the intent to cause death or serious bodily injury to an employee or passenger of a mass transportation provider or any other person while any of the foregoing are on the property of a mass transportation provider;

"(7) conveys or causes to be conveyed false information, knowing the information to be false, concerning an attempt or alleged attempt being made or to be made, to do any act which would be a crime prohibited by this subsection; or

"(8) attempts, threatens, or conspires to do any of the aforesaid acts,

shall be fined under this title or imprisoned not more than twenty years, or both, if such act is committed, or in the case of a threat or conspiracy such act would be committed, on, against, or affecting a mass transportation provider engaged in or affecting interstate or foreign commerce, or if in the course of committing such act, that person travels or communicates across a State line in order to commit such act, or transports materials across a State line in aid of the commission of such act.

  "(b) AGGRAVATED OFFENSE.—Whoever commits an offense under subsection (a) in a circumstance in which—

  "(1) the mass transportation vehicle or ferry was carrying a passenger at the time of the offense; or

  "(2) the offense has resulted in the death of any person, shall be guilty of an aggravated form of the offense and shall be fined under this title or imprisoned for a term of years or for life, or both.

  "(c) DEFINITIONS.—In this section—

  "(1) the term 'biological agent' has the meaning given to that term in section 178(1) of this title;

  "(2) the term 'dangerous weapon' has the meaning given to that term in section 930 of this title;

  "(3) the term 'destructive device' has the meaning given to that term in section 921(a)(4) of this title;

  "(4) the term 'destructive substance' has the meaning given to that term in section 31 of this title;

  "(5) the term 'mass transportation' has the meaning given to that term in section 5302(a)(7) of title 49, United States Code, except that the term shall include schoolbus, charter, and sightseeing transportation;

  "(6) the term 'serious bodily injury' has the meaning given to that term in section 1365 of this title;

  "(7) the term 'State' has the meaning given to that term in section 2266 of this title; and

  "(8) the term 'toxin' has the meaning given to that term in section 178(2) of this title.".

<< 18 USCA prec. § 1991 >>

  (f) CONFORMING AMENDMENT.—The analysis of chapter 97 of title 18, United States Code, is amended by adding at the end:

"1993. Terrorist attacks and other acts of violence against mass transportation systems.".

SEC. 802. DEFINITION OF DOMESTIC TERRORISM.

  (a) DOMESTIC TERRORISM DEFINED.—Section 2331 of title 18, United States Code, is amended—

<< 18 USCA § 2331 >>

  (1) in paragraph (1)(B)(iii), by striking "by assassination or kidnapping" and inserting "by mass destruction, assassination, or kidnapping";

<< 18 USCA § 2331 >>

  (2) in paragraph (3), by striking "and";

<< 18 USCA § 2331 >>

  (3) in paragraph (4), by striking the period at the end and inserting "; and"; and

<< 18 USCA § 2331 >>

  (4) by adding at the end the following:

  "(5) the term 'domestic terrorism' means activities that—

  "(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

  "(B) appear to be intended—

  "(i) to intimidate or coerce a civilian population;

  "(ii) to influence the policy of a government by intimidation or coercion; or

  "(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

"(C) occur primarily within the territorial jurisdiction of the United States.".

<< 18 USCA § 3077 >>

(b) CONFORMING AMENDMENT.—Section 3077(1) of title 18, United States Code, is amended to read as follows:

"(1) 'act of terrorism' means an act of domestic or international terrorism as defined in section 2331;".

SEC. 803. PROHIBITION AGAINST HARBORING TERRORISTS.

<< 18 USCA § 2339 >>

(a) IN GENERAL.—Chapter 113B of title 18, United States Code, is amended by adding after section 2338 the following new section:

"§ 2339. Harboring or concealing terrorists

"(a) Whoever harbors or conceals any person who he knows, or has reasonable grounds to believe, has committed, or is about to commit, an offense under section 32 (relating to destruction of aircraft or aircraft facilities), section 175 (relating to biological weapons), section 229 (relating to chemical weapons), section 831 (relating to nuclear materials), paragraph (2) or (3) of section 844(f) (relating to arson and bombing of government property risking or causing injury or death), section 1366(a) (relating to the destruction of an energy facility), section 2280 (relating to violence against maritime navigation), section 2332a (relating to weapons of mass destruction), or section 2332b (relating to acts of terrorism transcending national boundaries) of this title, section 236(a) (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284(a)), or section 46502 (relating to aircraft piracy) of title 49, shall be fined under this title or imprisoned not more than ten years, or both.".

"(b) A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.".

<< 18 USCA prec. § 2331 >>

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 113B of title 18, United States Code, is amended by inserting after the item for section 2338 the following:

"2339. Harboring or concealing terrorists.".

SEC. 804. JURISDICTION OVER CRIMES COMMITTED AT U.S. FACILITIES ABROAD.

<< 18 USCA § 7 >>

Section 7 of title 18, United States Code, is amended by adding at the end the following:

"(9) With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act—

"(A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and

"(B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.".

SEC. 805. MATERIAL SUPPORT FOR TERRORISM.

(a) IN GENERAL.—Section 2339A of title 18, United States Code, is amended—

<< 18 USCA § 2339A >>

(1) in subsection (a)—
  (A) by striking ", within the United States,";
  (B) by inserting "229," after "175,";
  (C) by inserting "1993," after "1992,";
  (D) by inserting ", section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284)," after "of this title";
  (E) by inserting "or 60123(b)" after "46502"; and
  (F) by inserting at the end the following: "A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law."; and

<< 18 USCA § 2339A >>

(2) in subsection (b)—
  (A) by striking "or other financial securities" and inserting "or monetary instruments or financial securities"; and
  (B) by inserting "expert advice or assistance," after "training,".

<< 18 USCA § 1956 >>

 (b) TECHNICAL AMENDMENT.—Section 1956(c)(7)(D) of title 18, United States Code, is amended by inserting "or 2339B" after "2339A".

SEC. 806. ASSETS OF TERRORIST ORGANIZATIONS.

<< 18 USCA § 981 >>

 Section 981(a)(1) of title 18, United States Code, is amended by inserting at the end the following:
  "(G) All assets, foreign or domestic—
   "(i) of any individual, entity, or organization engaged in planning or perpetrating any act of domestic or international terrorism (as defined in section 2331) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization;
   "(ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing an act of domestic or international terrorism (as defined in section 2331) against the United States, citizens or residents of the United States, or their property; or
   "(iii) derived from, involved in, or used or intended to be used to commit any act of domestic or international terrorism (as defined in section 2331) against the United States, citizens or residents of the United States, or their property.".

<< 22 USCA § 7211 >>

SEC. 807. TECHNICAL CLARIFICATION RELATING TO PROVISION OF MATERIAL SUPPORT TO TERRORISM.

 No provision of the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX of Public Law 106–387) shall be construed to limit or otherwise affect section 2339A or 2339B of title 18, United States Code.

SEC. 808. DEFINITION OF FEDERAL CRIME OF TERRORISM.

 Section 2332b of title 18, United States Code, is amended—

<< 18 USCA § 2332b >>

 (1) in subsection (f), by inserting "and any violation of section 351(e), 844(e), 844(f)(1), 956(b), 1361, 1366(b), 1366(c), 1751(e), 2152, or 2156 of this title," before "and the Secretary"; and

<< 18 USCA § 2332b >>

(2) in subsection (g)(5)(B), by striking clauses (i) through (iii) and inserting the following:

"(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 or 175b (relating to biological weapons), 229 (relating to chemical weapons), subsection (a), (b), (c), or (d) of section 351 (relating to congressional, cabinet, and Supreme Court assassination and kidnaping), 831 (relating to nuclear materials), 842(m) or (n) (relating to plastic explosives), 844(f) (2) or (3) (relating to arson and bombing of Government property risking or causing death), 844(i) (relating to arson and bombing of property used in interstate commerce), 930(c) (relating to killing or attempted killing during an attack on a Federal facility with a dangerous weapon), 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), 1030(a)(1) (relating to protection of computers), 1030(a)(5)(A)(i) resulting in damage as defined in 1030(a)(5)(B)(ii) through (v) (relating to protection of computers), 1114 (relating to killing or attempted killing of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons), 1203 (relating to hostage taking), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States), 1366(a) (relating to destruction of an energy facility), 1751(a), (b), (c), or (d) (relating to Presidential and Presidential staff assassination and kidnaping), 1992 (relating to wrecking trains), 1993 (relating to terrorist attacks and other acts of violence against mass transportation systems), 2155 (relating to destruction of national defense materials, premises, or utilities), 2280 (relating to violence against maritime navigation), 2281 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2339 (relating to harboring terrorists), 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture) of this title;

"(ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

"(iii) section 46502 (relating to aircraft piracy), the second sentence of section 46504 (relating to assault on a flight crew with a dangerous weapon), section 46505(b)(3) or (c) (relating to explosive or incendiary devices, or endangerment of human life by means of weapons, on aircraft), section 46506 if homicide or attempted homicide is involved (relating to application of certain criminal laws to acts on aircraft), or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.".

## SEC. 809. NO STATUTE OF LIMITATION FOR CERTAIN TERRORISM OFFENSES.

<< 18 USCA § 3286 >>

(a) IN GENERAL.—Section 3286 of title 18, United States Code, is amended to read as follows:

"§ 3286. Extension of statute of limitation for certain terrorism offenses

"(a) EIGHT–YEAR LIMITATION.—Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for any noncapital offense involving a violation of any provision listed in section 2332b(g)(5)(B), or a violation of section 112, 351(e), 1361, or 1751(e) of this title, or section 46504, 46505, or 46506 of title 49, unless the indictment is found or the information is instituted within 8 years after the offense was committed. Notwithstanding the preceding sentence, offenses listed in section 3295 are subject to the statute of limitations set forth in that section.

"(b) NO LIMITATION.—Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a forseeable risk of, death or serious bodily injury to another person.".

<< 18 USCA § 3286 NOTE >>

(b) APPLICATION.—The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section.

SEC. 810. ALTERNATE MAXIMUM PENALTIES FOR TERRORISM OFFENSES.

<< 18 USCA § 81 >>

(a) ARSON.—Section 81 of title 18, United States Code, is amended in the second undesignated paragraph by striking "not more than twenty years" and inserting "for any term of years or for life".

(b) DESTRUCTION OF AN ENERGY FACILITY.—Section 1366 of title 18, United States Code, is amended—

<< 18 USCA § 1366 >>

(1) in subsection (a), by striking "ten" and inserting "20"; and

<< 18 USCA § 1366 >>

(2) by adding at the end the following:

"(d) Whoever is convicted of a violation of subsection (a) or (b) that has resulted in the death of any person shall be subject to imprisonment for any term of years or life.".

<< 18 USCA § 2339A >>

(c) MATERIAL SUPPORT TO TERRORISTS.—Section 2339A(a) of title 18, United States Code, is amended—

(1) by striking "10" and inserting "15"; and

(2) by striking the period and inserting ", and, if the death of any person results, shall be imprisoned for any term of years or for life.".

<< 18 USCA § 2339B >>

(d) MATERIAL SUPPORT TO DESIGNATED FOREIGN TERRORIST ORGANIZATIONS.—Section 2339B(a)(1) of title 18, United States Code, is amended—

(1) by striking "10" and inserting "15"; and

(2) by striking the period after "or both" and inserting ", and, if the death of any person results, shall be imprisoned for any term of years or for life.".

<< 18 USCA § 2155 >>

(e) DESTRUCTION OF NATIONAL–DEFENSE MATERIALS.—Section 2155(a) of title 18, United States Code, is amended—

(1) by striking "ten" and inserting "20"; and

(2) by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

(f) SABOTAGE OF NUCLEAR FACILITIES OR FUEL.—Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), is amended—

<< 42 USCA § 2284 >>

(1) by striking "ten" each place it appears and inserting "20";

<< 42 USCA § 2284 >>

(2) in subsection (a), by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life."; and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

<< 42 USCA § 2284 >>

(3) in subsection (b), by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

<< 49 USCA § 46505 >>

(g) SPECIAL AIRCRAFT JURISDICTION OF THE UNITED STATES.—Section 46505(c) of title 49, United States Code, is amended—
(1) by striking "15" and inserting "20"; and
(2) by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

<< 49 USCA § 60123 >>

(h) DAMAGING OR DESTROYING AN INTERSTATE GAS OR HAZARDOUS LIQUID PIPELINE FACILITY.—Section 60123(b) of title 49, United States Code, is amended—
(1) by striking "15" and inserting "20"; and
(2) by striking the period at the end and inserting ", and, if death results to any person, shall be imprisoned for any term of years or for life.".

SEC. 811. PENALTIES FOR TERRORIST CONSPIRACIES.

<< 18 USCA § 81 >>

(a) ARSON.—Section 81 of title 18, United States Code, is amended in the first undesignated paragraph—
(1) by striking ", or attempts to set fire to or burn"; and
(2) by inserting "or attempts or conspires to do such an act," before "shall be imprisoned".

<< 18 USCA § 930 >>

(b) KILLINGS IN FEDERAL FACILITIES.—Section 930(c) of title 18, United States Code, is amended—
(1) by striking "or attempts to kill";
(2) by inserting "or attempts or conspires to do such an act," before "shall be punished"; and
(3) by striking "and 1113" and inserting "1113, and 1117".

<< 18 USCA § 1362 >>

(c) COMMUNICATIONS LINES, STATIONS, OR SYSTEMS.—Section 1362 of title 18, United States Code, is amended in the first undesignated paragraph—
(1) by striking "or attempts willfully or maliciously to injure or destroy"; and
(2) by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 18 USCA § 1363 >>

(d) BUILDINGS OR PROPERTY WITHIN SPECIAL MARITIME AND TERRITORIAL JURISDICTION.—Section 1363 of title 18, United States Code, is amended—
(1) by striking "or attempts to destroy or injure"; and
(2) by inserting "or attempts or conspires to do such an act," before "shall be fined" the first place it appears.

<< 18 USCA § 1992 >>

(e) WRECKING TRAINS.—Section 1992 of title 18, United States Code, is amended by adding at the end the following:

"(c) A person who conspires to commit any offense defined in this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.".

<< 18 USCA § 2339A >>

(f) MATERIAL SUPPORT TO TERRORISTS.—Section 2339A of title 18, United States Code, is amended by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 18 USCA § 2340A >>

(g) TORTURE.—Section 2340A of title 18, United States Code, is amended by adding at the end the following:

"(c) CONSPIRACY.—A person who conspires to commit an offense under this section shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense, the commission of which was the object of the conspiracy.".

(h) SABOTAGE OF NUCLEAR FACILITIES OR FUEL.—Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), is amended—

<< 42 USCA § 2284 >>

(1) in subsection (a)—
  (A) by striking ", or who intentionally and willfully attempts to destroy or cause physical damage to";
  (B) in paragraph (4), by striking the period at the end and inserting a comma; and
  (C) by inserting "or attempts or conspires to do such an act," before "shall be fined"; and

<< 42 USCA § 2284 >>

(2) in subsection (b)—
  (A) by striking "or attempts to cause"; and
  (B) by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 49 USCA § 46504 >>

(i) INTERFERENCE WITH FLIGHT CREW MEMBERS AND ATTENDANTS.—Section 46504 of title 49, United States Code, is amended by inserting "or attempts or conspires to do such an act," before "shall be fined".

<< 49 USCA § 46505 >>

(j) SPECIAL AIRCRAFT JURISDICTION OF THE UNITED STATES.—Section 46505 of title 49, United States Code, is amended by adding at the end the following:

"(e) CONSPIRACY.—If two or more persons conspire to violate subsection (b) or (c), and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as provided in such subsection.".

<< 49 USCA § 60123 >>

(k) DAMAGING OR DESTROYING AN INTERSTATE GAS OR HAZARDOUS LIQUID PIPELINE FACILITY.—Section 60123(b) of title 49, United States Code, is amended—
  (1) by striking ", or attempting to damage or destroy,"; and
  (2) by inserting ", or attempting or conspiring to do such an act," before "shall be fined".

<< 18 USCA § 3583 >>

SEC. 812. POST–RELEASE SUPERVISION OF TERRORISTS.

Section 3583 of title 18, United States Code, is amended by adding at the end the following:

"(j) SUPERVISED RELEASE TERMS FOR TERRORISM PREDICATES.—Notwithstanding subsection (b), the authorized term of supervised release for any offense listed in section 2332b(g)(5)(B), the commission of which resulted in, or created a foreseeable risk of, death or serious bodily injury to another person, is any term of years or life.".

SEC. 813. INCLUSION OF ACTS OF TERRORISM AS RACKETEERING ACTIVITY.

<< 18 USCA § 1961 >>

Section 1961(1) of title 18, United States Code, is amended—
  (1) by striking "or (F)" and inserting "(F)"; and
  (2) by inserting before the semicolon at the end the following: ", or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B)".

SEC. 814. DETERRENCE AND PREVENTION OF CYBERTERRORISM.

 (a) CLARIFICATION OF PROTECTION OF PROTECTED COMPUTERS.—Section 1030(a)(5) of title 18, United States Code, is amended—

<< 18 USCA § 1030 >>

 (1) by inserting "(i)" after "(A)";

<< 18 USCA § 1030 >>

 (2) by redesignating subparagraphs (B) and (C) as clauses (ii) and (iii), respectively;

<< 18 USCA § 1030 >>

 (3) by adding "and" at the end of clause (iii), as so redesignated; and

<< 18 USCA § 1030 >>

 (4) by adding at the end the following:
 "(B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused)—
  "(i) loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
  "(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
  "(iii) physical injury to any person;
  "(iv) a threat to public health or safety; or
  "(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security;".

<< 18 USCA § 1030 >>

 (b) PROTECTION FROM EXTORTION.—Section 1030(a)(7) of title 18, United States Code, is amended by striking ", firm, association, educational institution, financial institution, government entity, or other legal entity,".
 (c) PENALTIES.—Section 1030(c) of title 18, United States Code, is amended—

<< 18 USCA § 1030 >>

 (1) in paragraph (2)—

(A) in subparagraph (A)—
  (i) by inserting "except as provided in subparagraph (B)," before "a fine";
  (ii) by striking "(a)(5)(C)" and inserting "(a)(5)(A)(iii)"; and
  (iii) by striking "and" at the end;

<< 18 USCA § 1030 >>

 (B) in subparagraph (B), by inserting "or an attempt to commit an offense punishable under this subparagraph," after "subsection (a)(2)," in the matter preceding clause (i); and

<< 18 USCA § 1030 >>

 (C) in subparagraph (C), by striking "and" at the end;

<< 18 USCA § 1030 >>

 (2) in paragraph (3)—
  (A) by striking ", (a)(5)(A), (a)(5)(B)," both places it appears; and
  (B) by striking "(a)(5)(C)" and inserting "(a)(5)(A)(iii)"; and

<< 18 USCA § 1030 >>

 (3) by adding at the end the following:
  "(4)(A) a fine under this title, imprisonment for not more than 10 years, or both, in the case of an offense under subsection (a)(5)(A)(i), or an attempt to commit an offense punishable under that subsection;
  "(B) a fine under this title, imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(5)(A)(ii), or an attempt to commit an offense punishable under that subsection;
  "(C) a fine under this title, imprisonment for not more than 20 years, or both, in the case of an offense under subsection (a)(5)(A)(i) or (a)(5)(A)(ii), or an attempt to commit an offense punishable under either subsection, that occurs after a conviction for another offense under this section.".
(d) DEFINITIONS.—Section 1030(e) of title 18, United States Code is amended—

<< 18 USCA § 1030 >>

 (1) in paragraph (2)(B), by inserting ", including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States" before the semicolon;

<< 18 USCA § 1030 >>

 (2) in paragraph (7), by striking "and" at the end;

<< 18 USCA § 1030 >>

 (3) by striking paragraph (8) and inserting the following:
 "(8) the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information;";

<< 18 USCA § 1030 >>

 (4) in paragraph (9), by striking the period at the end and inserting a semicolon; and

<< 18 USCA § 1030 >>

 (5) by adding at the end the following:

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"(10) the term 'conviction' shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

"(11) the term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

"(12) the term 'person' means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity.".

<< 18 USCA § 1030 >>

(e) DAMAGES IN CIVIL ACTIONS.—Section 1030(g) of title 18, United States Code is amended—

(1) by striking the second sentence and inserting the following: "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages."; and

(2) by adding at the end the following: "No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.".

<< 28 USCA § 994 NOTE >>

(f) AMENDMENT OF SENTENCING GUIDELINES RELATING TO CERTAIN COMPUTER FRAUD AND ABUSE.— Pursuant to its authority under section 994(p) of title 28, United States Code, the United States Sentencing Commission shall amend the Federal sentencing guidelines to ensure that any individual convicted of a violation of section 1030 of title 18, United States Code, can be subjected to appropriate penalties, without regard to any mandatory minimum term of imprisonment.

<< 18 USCA § 2707 >>

SEC. 815. ADDITIONAL DEFENSE TO CIVIL ACTIONS RELATING TO PRESERVING RECORDS IN RESPONSE TO GOVERNMENT REQUESTS.

Section 2707(e)(1) of title 18, United States Code, is amended by inserting after "or statutory authorization" the following: "(including a request of a governmental entity under section 2703(f) of this title)".

<< 28 USCA § 509 NOTE >>

SEC. 816. DEVELOPMENT AND SUPPORT OF CYBERSECURITY FORENSIC CAPABILITIES.

(a) IN GENERAL.—The Attorney General shall establish such regional computer forensic laboratories as the Attorney General considers appropriate, and provide support to existing computer forensic laboratories, in order that all such computer forensic laboratories have the capability—

(1) to provide forensic examinations with respect to seized or intercepted computer evidence relating to criminal activity (including cyberterrorism);

(2) to provide training and education for Federal, State, and local law enforcement personnel and prosecutors regarding investigations, forensic analyses, and prosecutions of computer-related crime (including cyberterrorism);

(3) to assist Federal, State, and local law enforcement in enforcing Federal, State, and local criminal laws relating to computer-related crime;

(4) to facilitate and promote the sharing of Federal law enforcement expertise and information about the investigation, analysis, and prosecution of computer-related crime with State and local law enforcement personnel and prosecutors, including the use of multijurisdictional task forces; and

(5) to carry out such other activities as the Attorney General considers appropriate.

(b) AUTHORIZATION OF APPROPRIATIONS.—

(1) AUTHORIZATION.—There is hereby authorized to be appropriated in each fiscal year $50,000,000 for purposes of carrying out this section.

(2) AVAILABILITY.—Amounts appropriated pursuant to the authorization of appropriations in paragraph (1) shall remain available until expended.

## SEC. 817. EXPANSION OF THE BIOLOGICAL WEAPONS STATUTE.

Chapter 10 of title 18, United States Code, is amended—
(1) in section 175—

<< 18 USCA § 175 >>

(A) in subsection (b)—
(i) by striking "does not include" and inserting "includes";
(ii) by inserting "other than" after "system for"; and
(iii) by inserting "bona fide research" after "protective";

<< 18 USCA § 175 >>

(B) by redesignating subsection (b) as subsection (c); and

<< 18 USCA § 175 >>

(C) by inserting after subsection (a) the following:
"(b) ADDITIONAL OFFENSE.—Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be fined under this title, imprisoned not more than 10 years, or both. In this subsection, the terms 'biological agent' and 'toxin' do not encompass any biological agent or toxin that is in its naturally occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source.";

<< 18 USCA § 175b >>

(2) by inserting after section 175a the following:

"SEC. 175b. POSSESSION BY RESTRICTED PERSONS.
"(a) No restricted person described in subsection (b) shall ship or transport interstate or foreign commerce, or possess in or affecting commerce, any biological agent or toxin, or receive any biological agent or toxin that has been shipped or transported in interstate or foreign commerce, if the biological agent or toxin is listed as a select agent in subsection (j) of section 72.6 of title 42, Code of Federal Regulations, pursuant to section 511(d)(l) of the Antiterrorism and Effective Death Penalty Act of 1996 (Public Law 104–132), and is not exempted under subsection (h) of such section 72.6, or appendix A of part 72 of the Code of Regulations.
"(b) In this section:
"(1) The term 'select agent' does not include any such biological agent or toxin that is in its naturally-occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source.
"(2) The term 'restricted person' means an individual who—
"(A) is under indictment for a crime punishable by imprisonment for a term exceeding 1 year;
"(B) has been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year;
"(C) is a fugitive from justice;
"(D) is an unlawful user of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));
"(E) is an alien illegally or unlawfully in the United States;
"(F) has been adjudicated as a mental defective or has been committed to any mental institution;
"(G) is an alien (other than an alien lawfully admitted for permanent residence) who is a national of a country as to which the Secretary of State, pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A

of chapter 1 of part M of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), or section 40(d) of chapter 3 of the Arms Export Control Act (22 U.S.C. 2780(d)), has made a determination (that remains in effect) that such country has repeatedly provided support for acts of international terrorism; or

 "(H) has been discharged from the Armed Services of the United States under dishonorable conditions.

 "(3) The term 'alien' has the same meaning as in section 1010(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(3)).

 "(4) The term 'lawfully admitted for permanent residence' has the same meaning as in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)).

 "(c) Whoever knowingly violates this section shall be fined as provided in this title, imprisoned not more than 10 years, or both, but the prohibition contained in this section shall not apply with respect to any duly authorized United States governmental activity.'; and

<< 18 USCA prec. § 175 >>

 (3) in the chapter analysis, by inserting after the item relating to section 175a the following:

"175b. Possession by restricted persons.".

TITLE IX—IMPROVED INTELLIGENCE

SEC. 901. RESPONSIBILITIES OF DIRECTOR OF CENTRAL INTELLIGENCE REGARDING FOREIGN INTELLIGENCE COLLECTED UNDER FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978.

 Section 103(c) of the National Security Act of 1947 (50 U.S.C. 403–3(c)) is amended—

<< 50 USCA § 403–3 >>

 (1) by redesignating paragraphs (6) and (7) as paragraphs (7) and (8), respectively; and

<< 50 USCA § 403–3 >>

 (2) by inserting after paragraph (5) the following new paragraph (6):

 "(6) establish requirements and priorities for foreign intelligence information to be collected under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.), and provide assistance to the Attorney General to ensure that information derived from electronic surveillance or physical searches under that Act is disseminated so it may be used efficiently and effectively for foreign intelligence purposes, except that the Director shall have no authority to direct, manage, or undertake electronic surveillance or physical search operations pursuant to that Act unless otherwise authorized by statute or Executive order;".

SEC. 902. INCLUSION OF INTERNATIONAL TERRORIST ACTIVITIES WITHIN SCOPE OF FOREIGN INTELLIGENCE UNDER NATIONAL SECURITY ACT OF 1947.

 Section 3 of the National Security Act of 1947 (50 U.S.C. 401a) is amended—

<< 50 USCA § 401a >>

 (1) in paragraph (2), by inserting before the period the following: ", or international terrorist activities"; and

<< 50 USCA § 401a >>

 (2) in paragraph (3), by striking "and activities conducted" and inserting ", and activities conducted,".

SEC. 903. SENSE OF CONGRESS ON THE ESTABLISHMENT AND MAINTENANCE OF INTELLIGENCE RELATIONSHIPS TO ACQUIRE INFORMATION ON TERRORISTS AND TERRORIST ORGANIZATIONS.

It is the sense of Congress that officers and employees of the intelligence community of the Federal Government, acting within the course of their official duties, should be encouraged, and should make every effort, to establish and maintain intelligence relationships with any person, entity, or group for the purpose of engaging in lawful intelligence activities, including the acquisition of information on the identity, location, finances, affiliations, capabilities, plans, or intentions of a terrorist or terrorist organization, or information on any other person, entity, or group (including a foreign government) engaged in harboring, comforting, financing, aiding, or assisting a terrorist or terrorist organization.

SEC. 904. TEMPORARY AUTHORITY TO DEFER SUBMITTAL TO CONGRESS OF REPORTS ON INTELLIGENCE AND INTELLIGENCE–RELATED MATTERS.

(a) AUTHORITY TO DEFER.—The Secretary of Defense, Attorney General, and Director of Central Intelligence each may, during the effective period of this section, defer the date of submittal to Congress of any covered intelligence report under the jurisdiction of such official until February 1, 2002.

(b) COVERED INTELLIGENCE REPORT.—Except as provided in subsection (c), for purposes of subsection (a), a covered intelligence report is as follows:

(1) Any report on intelligence or intelligence-related activities of the United States Government that is required to be submitted to Congress by an element of the intelligence community during the effective period of this section.

(2) Any report or other matter that is required to be submitted to the Select Committee on Intelligence of the Senate and Permanent Select Committee on Intelligence of the House of Representatives by the Department of Defense or the Department of Justice during the effective period of this section.

(c) EXCEPTION FOR CERTAIN REPORTS.—For purposes of subsection (a), any report required by section 502 or 503 of the National Security Act of 1947 (50 U.S.C. 413a, 413b) is not a covered intelligence report.

(d) NOTICE TO CONGRESS.—Upon deferring the date of submittal to Congress of a covered intelligence report under subsection (a), the official deferring the date of submittal of the covered intelligence report shall submit to Congress notice of the deferral. Notice of deferral of a report shall specify the provision of law, if any, under which the report would otherwise be submitted to Congress.

(e) EXTENSION OF DEFERRAL.—(1) Each official specified in subsection (a) may defer the date of submittal to Congress of a covered intelligence report under the jurisdiction of such official to a date after February 1, 2002, if such official submits to the committees of Congress specified in subsection (b)(2) before February 1, 2002, a certification that preparation and submittal of the covered intelligence report on February 1, 2002, will impede the work of officers or employees who are engaged in counterterrorism activities.

(2) A certification under paragraph (1) with respect to a covered intelligence report shall specify the date on which the covered intelligence report will be submitted to Congress.

(f) EFFECTIVE PERIOD.—The effective period of this section is the period beginning on the date of the enactment of this Act and ending on February 1, 2002.

(g) ELEMENT OF THE INTELLIGENCE COMMUNITY DEFINED.—In this section, the term "element of the intelligence community" means any element of the intelligence community specified or designated under section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)).

SEC. 905. DISCLOSURE TO DIRECTOR OF CENTRAL INTELLIGENCE OF FOREIGN INTELLIGENCE–RELATED INFORMATION WITH RESPECT TO CRIMINAL INVESTIGATIONS.

(a) IN GENERAL.—Title I of the National Security Act of 1947 (50 U.S.C. 402 et seq.) is amended—

<< 50 USCA § 403–5b >>

<< 50 USCA § 403–5c >>

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) by redesignating subsection 105B as section 105C; and

<< 50 USCA § 403–5b >>

(2) by inserting after section 105A the following new section 105B:

"DISCLOSURE OF FOREIGN INTELLIGENCE ACQUIRED IN CRIMINAL INVESTIGATIONS;
NOTICE OF CRIMINAL INVESTIGATIONS OF FOREIGN INTELLIGENCE SOURCES

"SEC. 105B. (a) DISCLOSURE OF FOREIGN INTELLIGENCE—(1) Except as otherwise provided by law and subject to paragraph (2), the Attorney General, or the head of any other department or agency of the Federal Government with law enforcement responsibilities, shall expeditiously disclose to the Director of Central Intelligence, pursuant to guidelines developed by the Attorney General in consultation with the Director, foreign intelligence acquired by an element of the Department of Justice or an element of such department or agency, as the case may be, in the course of a criminal investigation.

"(2) The Attorney General by regulation and in consultation with the Director of Central Intelligence may provide for exceptions to the applicability of paragraph (1) for one or more classes of foreign intelligence, or foreign intelligence with respect to one or more targets or matters, if the Attorney General determines that disclosure of such foreign intelligence under that paragraph would jeopardize an ongoing law enforcement investigation or impair other significant law enforcement interests.

"(b) PROCEDURES FOR NOTICE OF CRIMINAL INVESTIGATIONS.—Not later than 180 days after the date of enactment of this section, the Attorney General, in consultation with the Director of Central Intelligence, shall develop guidelines to ensure that after receipt of a report from an element of the intelligence community of activity of a foreign intelligence source or potential foreign intelligence source that may warrant investigation as criminal activity, the Attorney General provides notice to the Director of Central Intelligence, within a reasonable period of time, of his intention to commence, or decline to commence, a criminal investigation of such activity.

"(c) PROCEDURES.—The Attorney General shall develop procedures for the administration of this section, including the disclosure of foreign intelligence by elements of the Department of Justice, and elements of other departments and agencies of the Federal Government, under subsection (a) and the provision of notice with respect to criminal investigations under subsection (b).".

(b) CLERICAL AMENDMENT.—The table of contents in the first section of that Act is amended by striking the item relating to section 105B and inserting the following new items:

"Sec. 105B. Disclosure of foreign intelligence acquired in criminal investigations; notice of criminal investigations of foreign intelligence sources.

"Sec. 105C. Protection of the operational files of the National Imagery and Mapping Agency.".

SEC. 906. FOREIGN TERRORIST ASSET TRACKING CENTER.

(a) REPORT ON RECONFIGURATION.—Not later than February 1, 2002, the Attorney General, the Director of Central Intelligence, and the Secretary of the Treasury shall jointly submit to Congress a report on the feasibility and desirability of reconfiguring the Foreign Terrorist Asset Tracking Center and the Office of Foreign Assets Control of the Department of the Treasury in order to establish a capability to provide for the effective and efficient analysis and dissemination of foreign intelligence relating to the financial capabilities and resources of international terrorist organizations.

(b) REPORT REQUIREMENTS.—(1) In preparing the report under subsection (a), the Attorney General, the Secretary, and the Director shall consider whether, and to what extent, the capacities and resources of the Financial Crimes Enforcement Center of the Department of the Treasury may be integrated into the capability contemplated by the report.

(2) If the Attorney General, Secretary, and the Director determine that it is feasible and desirable to undertake the reconfiguration described in subsection (a) in order to establish the capability described in that subsection, the Attorney General, the Secretary, and the Director shall include with the report under that subsection a detailed proposal for legislation to achieve the reconfiguration.

SEC. 907. NATIONAL VIRTUAL TRANSLATION CENTER.

(a) REPORT ON ESTABLISHMENT.—(1) Not later than February 1, 2002, the Director of Central Intelligence shall, in consultation with the Director of the Federal Bureau of Investigation, submit to the appropriate committees of Congress a report on the establishment and maintenance within the intelligence community of an element for purposes of providing timely and accurate translations of foreign intelligence for all other elements of the intelligence community. In the report, the element shall be referred to as the "National Virtual Translation Center".

(2) The report on the element described in paragraph (1) shall discuss the use of state-of-the-art communications technology, the integration of existing translation capabilities in the intelligence community, and the utilization of remote-connection capacities so as to minimize the need for a central physical facility for the element.

(b) RESOURCES.—The report on the element required by subsection (a) shall address the following:

(1) The assignment to the element of a staff of individuals possessing a broad range of linguistic and translation skills appropriate for the purposes of the element.

(2) The provision to the element of communications capabilities and systems that are commensurate with the most current and sophisticated communications capabilities and systems available to other elements of intelligence community.

(3) The assurance, to the maximum extent practicable, that the communications capabilities and systems provided to the element will be compatible with communications capabilities and systems utilized by the Federal Bureau of Investigation in securing timely and accurate translations of foreign language materials for law enforcement investigations.

(4) The development of a communications infrastructure to ensure the efficient and secure use of the translation capabilities of the element.

(c) SECURE COMMUNICATIONS.—The report shall include a discussion of the creation of secure electronic communications between the element described by subsection (a) and the other elements of the intelligence community.

(d) DEFINITIONS.—In this section:

(1) FOREIGN INTELLIGENCE.—The term "foreign intelligence" has the meaning given that term in section 3(2) of the National Security Act of 1947 (50 U.S.C. 401a(2)).

(2) ELEMENT OF THE INTELLIGENCE COMMUNITY.—The term "element of the intelligence community" means any element of the intelligence community specified or designated under section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)).

<< 28 USCA § 509 NOTE >>

## SEC. 908. TRAINING OF GOVERNMENT OFFICIALS REGARDING IDENTIFICATION AND USE OF FOREIGN INTELLIGENCE.

(a) PROGRAM REQUIRED.—The Attorney General shall, in consultation with the Director of Central Intelligence, carry out a program to provide appropriate training to officials described in subsection (b) in order to assist such officials in—

(1) identifying foreign intelligence information in the course of their duties; and

(2) utilizing foreign intelligence information in the course of their duties, to the extent that the utilization of such information is appropriate for such duties.

(b) OFFICIALS.—The officials provided training under subsection (a) are, at the discretion of the Attorney General and the Director, the following:

(1) Officials of the Federal Government who are not ordinarily engaged in the collection, dissemination, and use of foreign intelligence in the performance of their duties.

(2) Officials of State and local governments who encounter, or may encounter in the course of a terrorist event, foreign intelligence in the performance of their duties.

(c) AUTHORIZATION OF APPROPRIATIONS.—There is hereby authorized to be appropriated for the Department of Justice such sums as may be necessary for purposes of carrying out the program required by subsection (a).

TITLE X—MISCELLANEOUS

<< 5 USCA App. 3 § 8E NOTE >>

SEC. 1001. REVIEW OF THE DEPARTMENT OF JUSTICE.

The Inspector General of the Department of Justice shall designate one official who shall—

  (1) review information and receive complaints alleging abuses of civil rights and civil liberties by employees and officials of the Department of Justice;

  (2) make public through the Internet, radio, television, and newspaper advertisements information on the responsibilities and functions of, and how to contact, the official; and

  (3) submit to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate on a semi-annual basis a report on the implementation of this subsection and detailing any abuses described in paragraph (1), including a description of the use of funds appropriations used to carry out this subsection.

SEC. 1002. SENSE OF CONGRESS.

  (a) FINDINGS.—Congress finds that—

  (1) all Americans are united in condemning, in the strongest possible terms, the terrorists who planned and carried out the attacks against the United States on September 11, 2001, and in pursuing all those responsible for those attacks and their sponsors until they are brought to justice;

  (2) Sikh–Americans form a vibrant, peaceful, and law-abiding part of America's people;

  (3) approximately 500,000 Sikhs reside in the United States and are a vital part of the Nation;

  (4) Sikh–Americans stand resolutely in support of the commitment of our Government to bring the terrorists and those that harbor them to justice;

  (5) the Sikh faith is a distinct religion with a distinct religious and ethnic identity that has its own places of worship and a distinct holy text and religious tenets;

  (6) many Sikh–Americans, who are easily recognizable by their turbans and beards, which are required articles of their faith, have suffered both verbal and physical assaults as a result of misguided anger toward Arab–Americans and Muslim–Americans in the wake of the September 11, 2001 terrorist attack;

  (7) Sikh–Americans, as do all Americans, condemn acts of prejudice against any American; and

  (8) Congress is seriously concerned by the number of crimes against Sikh–Americans and other Americans all across the Nation that have been reported in the wake of the tragic events that unfolded on September 11, 2001.

  (b) SENSE OF CONGRESS.—Congress—

  (1) declares that, in the quest to identify, locate, and bring to justice the perpetrators and sponsors of the terrorist attacks on the United States on September 11, 2001, the civil rights and civil liberties of all Americans, including Sikh–Americans, should be protected;

  (2) condemns bigotry and any acts of violence or discrimination against any Americans, including Sikh–Americans;

  (3) calls upon local and Federal law enforcement authorities to work to prevent crimes against all Americans, including Sikh–Americans; and

  (4) calls upon local and Federal law enforcement authorities to prosecute to the fullest extent of the law all those who commit crimes.

<< 50 USCA § 1801 >>

SEC. 1003. DEFINITION OF "ELECTRONIC SURVEILLANCE".

  Section 101(f)(2) of the Foreign Intelligence Surveillance Act (50 U.S.C. 1801(f)(2)) is amended by adding at the end before the semicolon the following: ", but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511(2)(i) of title 18, United States Code".

SEC. 1004. VENUE IN MONEY LAUNDERING CASES.

<< 18 USCA § 1956 >>

Section 1956 of title 18, United States Code, is amended by adding at the end the following:

"(i) VENUE.—(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in—

"(A) any district in which the financial or monetary transaction is conducted; or

"(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

"(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

"(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.".

<< 28 USCA § 509 NOTE >>

SEC. 1005. FIRST RESPONDERS ASSISTANCE ACT.

(a) GRANT AUTHORIZATION.—The Attorney General shall make grants described in subsections (b) and (c) to States and units of local government to improve the ability of State and local law enforcement, fire department and first responders to respond to and prevent acts of terrorism.

(b) TERRORISM PREVENTION GRANTS.—Terrorism prevention grants under this subsection may be used for programs, projects, and other activities to—

(1) hire additional law enforcement personnel dedicated to intelligence gathering and analysis functions, including the formation of full-time intelligence and analysis units;

(2) purchase technology and equipment for intelligence gathering and analysis functions, including wire-tap, pen links, cameras, and computer hardware and software;

(3) purchase equipment for responding to a critical incident, including protective equipment for patrol officers such as quick masks;

(4) purchase equipment for managing a critical incident, such as communications equipment for improved interoperability among surrounding jurisdictions and mobile command posts for overall scene management; and

(5) fund technical assistance programs that emphasize coordination among neighboring law enforcement agencies for sharing resources, and resources coordination among law enforcement agencies for combining intelligence gathering and analysis functions, and the development of policy, procedures, memorandums of understanding, and other best practices.

(c) ANTITERRORISM TRAINING GRANTS.—Antiterrorism training grants under this subsection may be used for programs, projects, and other activities to address—

(1) intelligence gathering and analysis techniques;

(2) community engagement and outreach;

(3) critical incident management for all forms of terrorist attack;

(4) threat assessment capabilities;

(5) conducting followup investigations; and

(6) stabilizing a community after a terrorist incident.

(d) APPLICATION.—

(1) IN GENERAL.—Each eligible entity that desires to receive a grant under this section shall submit an application to the Attorney General, at such time, in such manner, and accompanied by such additional information as the Attorney General may reasonably require.

(2) CONTENTS.—Each application submitted pursuant to paragraph (1) shall—

(A) describe the activities for which assistance under this section is sought; and

(B) provide such additional assurances as the Attorney General determines to be essential to ensure compliance with the requirements of this section.

(e) MINIMUM AMOUNT.—If all applications submitted by a State or units of local government within that State have not been funded under this section in any fiscal year, that State, if it qualifies, and the units of local government within that State, shall receive in that fiscal year not less than 0.5 percent of the total amount appropriated in that fiscal year for grants under this section.

(f) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated $25,000,000 for each of the fiscal years 2003 through 2007.

## SEC. 1006. INADMISSIBILITY OF ALIENS ENGAGED IN MONEY LAUNDERING.

<< 8 USCA § 1182 >>

(a) AMENDMENT TO IMMIGRATION AND NATIONALITY ACT.—Section 212(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(2)) is amended by adding at the end the following:
  "(I) MONEY LAUNDERING.—Any alien—
  "(i) who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of title 18, United States Code (relating to laundering of monetary instruments); or
  "(ii) who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section;

is inadmissible.".

<< 8 USCA § 1182 NOTE >>

(b) MONEY LAUNDERING WATCHLIST.—Not later than 90 days after the date of the enactment of this Act, the Secretary of State shall develop, implement, and certify to the Congress that there has been established a money laundering watchlist, which identifies individuals worldwide who are known or suspected of money laundering, which is readily accessible to, and shall be checked by, a consular or other Federal official prior to the issuance of a visa or admission to the United States. The Secretary of State shall develop and continually update the watchlist in cooperation with the Attorney General, the Secretary of the Treasury, and the Director of Central Intelligence.

## SEC. 1007. AUTHORIZATION OF FUNDS FOR DEA POLICE TRAINING IN SOUTH AND CENTRAL ASIA.

In addition to amounts otherwise available to carry out section 481 of the Foreign Assistance Act of 1961 (22 U.S.C. 2291), there is authorized to be appropriated to the President not less than $5,000,000 for fiscal year 2002 for regional antidrug training in the Republic of Turkey by the Drug Enforcement Administration for police, as well as increased precursor chemical control efforts in the South and Central Asia region.

## SEC. 1008. FEASIBILITY STUDY ON USE OF BIOMETRIC IDENTIFIER SCANNING SYSTEM WITH ACCESS TO THE FBI INTEGRATED AUTOMATED FINGERPRINT IDENTIFICATION SYSTEM AT OVERSEAS CONSULAR POSTS AND POINTS OF ENTRY TO THE UNITED STATES.

(a) IN GENERAL.—The Attorney General, in consultation with the Secretary of State and the Secretary of Transportation, shall conduct a study on the feasibility of utilizing a biometric identifier (fingerprint) scanning system, with access to the database of the Federal Bureau of Investigation Integrated Automated Fingerprint Identification System, at consular offices abroad and at points of entry into the United States to enhance the ability of State Department and immigration officials to identify aliens who may be wanted in connection with criminal or terrorist investigations in the United States or abroad prior to the issuance of visas or entry into the United States.

(b) REPORT TO CONGRESS.—Not later than 90 days after the date of the enactment of this Act, the Attorney General shall submit a report summarizing the findings of the study authorized under subsection (a) to the Committee on International Relations and the Committee on the Judiciary of the House of Representatives and the Committee on Foreign Relations and the Committee on the Judiciary of the Senate.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 1009. STUDY OF ACCESS.

(a) IN GENERAL.—Not later than 120 days after enactment of this Act, the Federal Bureau of Investigation shall study and report to Congress on the feasibility of providing to airlines access via computer to the names of passengers who are suspected of terrorist activity by Federal officials.

(b) AUTHORIZATION.—There are authorized to be appropriated not more than $250,000 to carry out subsection (a).

<< 10 USCA § 2465 NOTE >>

SEC. 1010. TEMPORARY AUTHORITY TO CONTRACT WITH LOCAL AND STATE GOVERNMENTS FOR PERFORMANCE OF SECURITY FUNCTIONS AT UNITED STATES MILITARY INSTALLATIONS.

(a) IN GENERAL.—Notwithstanding section 2465 of title 10, United States Code, during the period of time that United States armed forces are engaged in Operation Enduring Freedom, and for the period of 180 days thereafter, funds appropriated to the Department of Defense may be obligated and expended for the purpose of entering into contracts or other agreements for the performance of security functions at any military installation or facility in the United States with a proximately located local or State government, or combination of such governments, whether or not any such government is obligated to provide such services to the general public without compensation.

(b) TRAINING.—Any contract or agreement entered into under this section shall prescribe standards for the training and other qualifications of local government law enforcement personnel who perform security functions under this section in accordance with criteria established by the Secretary of the service concerned.

(c) REPORT.—One year after the date of enactment of this section, the Secretary of Defense shall submit a report to the Committees on Armed Services of the Senate and the House of Representatives describing the use of the authority granted under this section and the use by the Department of Defense of other means to improve the performance of security functions on military installations and facilities located within the United States.

SEC. 1011. CRIMES AGAINST CHARITABLE AMERICANS.

<< 15 USCA § 6101 NOTE >>

(a) SHORT TITLE.—This section may be cited as the "Crimes Against Charitable Americans Act of 2001".

(b) TELEMARKETING AND CONSUMER FRAUD ABUSE.—The Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. 6101 et seq.) is amended—

<< 15 USCA § 6102 >>

(1) in section 3(a)(2), by inserting after "practices" the second place it appears the following: "which shall include fraudulent charitable solicitations, and";

(2) in section 3(a)(3)—

<< 15 USCA § 6102 >>

(A) in subparagraph (B), by striking "and" at the end;

<< 15 USCA § 6102 >>

(B) in subparagraph (C), by striking the period at the end and inserting "; and"; and

<< 15 USCA § 6102 >>

(C) by adding at the end the following:

"(D) a requirement that any person engaged in telemarketing for the solicitation of charitable contributions, donations, or gifts of money or any other thing of value, shall promptly and clearly disclose to the person receiving the call that the purpose of

the call is to solicit charitable contributions, donations, or gifts, and make such other disclosures as the Commission considers appropriate, including the name and mailing address of the charitable organization on behalf of which the solicitation is made.'; and

<< 15 USCA § 6106 >>

(3) in section 7(4), by inserting ", or a charitable contribution, donation, or gift of money or any other thing of value," after "services".

<< 18 USCA § 917 >>

(c) RED CROSS MEMBERS OR AGENTS.—Section 917 of title 18, United States Code, is amended by striking "one year" and inserting "5 years".

(d) TELEMARKETING FRAUD.—Section 2325(1) of title 18, United States Code, is amended—

<< 18 USCA § 2325 >>

(1) in subparagraph (A), by striking "or" at the end;

<< 18 USCA § 2325 >>

(2) in subparagraph (B), by striking the comma at the end and inserting "; or";

<< 18 USCA § 2325 >>

(3) by inserting after subparagraph (B) the following:

"(C) a charitable contribution, donation, or gift of money or any other thing of value,'; and

<< 18 USCA § 2325 >>

(4) in the flush language, by inserting "or charitable contributor, or donor" after "participant".

SEC. 1012. LIMITATION ON ISSUANCE OF HAZMAT LICENSES.

(a) LIMITATION.—

<< 49 USCA § 5103a >>

(1) IN GENERAL.—Chapter 51 of title 49, United States Code, is amended by inserting after section 5103 the following new section:

"§ 5103a. Limitation on issuance of hazmat licenses
"(a) LIMITATION.—
"(1) ISSUANCE OF LICENSES.—A State may not issue to any individual a license to operate a motor vehicle transporting in commerce a hazardous material unless the Secretary of Transportation has first determined, upon receipt of a notification under subsection (c)(1)(B), that the individual does not pose a security risk warranting denial of the license.
"(2) RENEWALS INCLUDED.—For the purposes of this section, the term 'issue', with respect to a license, includes renewal of the license.
"(b) HAZARDOUS MATERIALS DESCRIBED.—The limitation in subsection (a) shall apply with respect to—
"(1) any material defined as a hazardous material by the Secretary of Transportation; and
"(2) any chemical or biological material or agent determined by the Secretary of Health and Human Services or the Attorney General as being a threat to the national security of the United States.
"(c) BACKGROUND RECORDS CHECK.—

"(1) IN GENERAL.—Upon the request of a State regarding issuance of a license described in subsection (a)(1) to an individual, the Attorney General—

"(A) shall carry out a background records check regarding the individual; and

"(B) upon completing the background records check, shall notify the Secretary of Transportation of the completion and results of the background records check.

"(2) SCOPE.—A background records check regarding an individual under this subsection shall consist of the following:

"(A) A check of the relevant criminal history data bases.

"(B) In the case of an alien, a check of the relevant data bases to determine the status of the alien under the immigration laws of the United States.

"(C) As appropriate, a check of the relevant international data bases through Interpol–U.S. National Central Bureau or other appropriate means.

"(d) REPORTING REQUIREMENT.—Each State shall submit to the Secretary of Transportation, at such time and in such manner as the Secretary may prescribe, the name, address, and such other information as the Secretary may require, concerning—

"(1) each alien to whom the State issues a license described in subsection (a); and

"(2) each other individual to whom such a license is issued, as the Secretary may require.

"(e) ALIEN DEFINED.—In this section, the term 'alien' has the meaning given the term in section 101(a)(3) of the Immigration and Nationality Act.".

<< 49 USCA prec. § 5101 >>

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 5103 the following new item:

"5103a. Limitation on issuance of hazmat licenses.".

(b) REGULATION OF DRIVER FITNESS.—Section 31305(a)(5) of title 49, United States Code, is amended—

<< 49 USCA § 31305 >>

(1) by striking "and" at the end of subparagraph (A);

<< 49 USCA § 31305 >>

(2) by inserting "and" at the end of subparagraph (B); and

<< 49 USCA § 31305 >>

(3) by adding at the end the following new subparagraph:

"(C) is licensed by a State to operate the vehicle after having first been determined under section 5103a of this title as not posing a security risk warranting denial of the license.".

<< 49 USCA § 5103a >>

(c) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated for the Department of Transportation and the Department of Justice such amounts as may be necessary to carry out section 5103a of title 49, United States Code, as added by subsection (a).

SEC. 1013. EXPRESSING THE SENSE OF THE SENATE CONCERNING THE PROVISION OF FUNDING FOR BIOTERRORISM PREPAREDNESS AND RESPONSE.

(a) FINDINGS.—The Senate finds the following:

(1) Additional steps must be taken to better prepare the United States to respond to potential bioterrorism attacks.

(2) The threat of a bioterrorist attack is still remote, but is increasing for a variety of reasons, including—

(A) public pronouncements by Osama bin Laden that it is his religious duty to acquire weapons of mass destruction, including chemical and biological weapons;

(B) the callous disregard for innocent human life as demonstrated by the terrorists' attacks of September 11, 2001;

(C) the resources and motivation of known terrorists and their sponsors and supporters to use biological warfare;

(D) recent scientific and technological advances in agent delivery technology such as aerosolization that have made weaponization of certain germs much easier; and

(E) the increasing access to the technologies and expertise necessary to construct and deploy chemical and biological weapons of mass destruction.

(3) Coordination of Federal, State, and local terrorism research, preparedness, and response programs must be improved.

(4) States, local areas, and public health officials must have enhanced resources and expertise in order to respond to a potential bioterrorist attack.

(5) National, State, and local communication capacities must be enhanced to combat the spread of chemical and biological illness.

(6) Greater resources must be provided to increase the capacity of hospitals and local health care workers to respond to public health threats.

(7) Health care professionals must be better trained to recognize, diagnose, and treat illnesses arising from biochemical attacks.

(8) Additional supplies may be essential to increase the readiness of the United States to respond to a bio-attack.

(9) Improvements must be made in assuring the safety of the food supply.

(10) New vaccines and treatments are needed to assure that we have an adequate response to a biochemical attack.

(11) Government research, preparedness, and response programs need to utilize private sector expertise and resources.

(12) Now is the time to strengthen our public health system and ensure that the United States is adequately prepared to respond to potential bioterrorist attacks, natural infectious disease outbreaks, and other challenges and potential threats to the public health.

(b) SENSE OF THE SENATE.—It is the sense of the Senate that the United States should make a substantial new investment this year toward the following:

(1) Improving State and local preparedness capabilities by upgrading State and local surveillance epidemiology, assisting in the development of response plans, assuring adequate staffing and training of health professionals to diagnose and care for victims of bioterrorism, extending the electronics communications networks and training personnel, and improving public health laboratories.

(2) Improving hospital response capabilities by assisting hospitals in developing plans for a bioterrorist attack and improving the surge capacity of hospitals.

(3) Upgrading the bioterrorism capabilities of the Centers for Disease Control and Prevention through improving rapid identification and health early warning systems.

(4) Improving disaster response medical systems, such as the National Disaster Medical System and the Metropolitan Medical Response System and Epidemic Intelligence Service.

(5) Targeting research to assist with the development of appropriate therapeutics and vaccines for likely bioterrorist agents and assisting with expedited drug and device review through the Food and Drug Administration.

(6) Improving the National Pharmaceutical Stockpile program by increasing the amount of necessary therapies (including smallpox vaccines and other post-exposure vaccines) and ensuring the appropriate deployment of stockpiles.

(7) Targeting activities to increase food safety at the Food and Drug Administration.

(8) Increasing international cooperation to secure dangerous biological agents, increase surveillance, and retrain biological warfare specialists.

<< 42 USCA § 3714 >>

SEC. 1014. GRANT PROGRAM FOR STATE AND LOCAL DOMESTIC PREPAREDNESS SUPPORT.

(a) IN GENERAL.—The Office for State and Local Domestic Preparedness Support of the Office of Justice Programs shall make a grant to each State, which shall be used by the State, in conjunction with units of local government, to enhance the

AR.03801

capability of State and local jurisdictions to prepare for and respond to terrorist acts including events of terrorism involving weapons of mass destruction and biological, nuclear, radiological, incendiary, chemical, and explosive devices.

(b) USE OF GRANT AMOUNTS.—Grants under this section may be used to purchase needed equipment and to provide training and technical assistance to State and local first responders.

(c) AUTHORIZATION OF APPROPRIATIONS.—

(1) IN GENERAL.—There is authorized to be appropriated to carry out this section such sums as necessary for each of fiscal years 2002 through 2007.

(2) LIMITATIONS.—Of the amount made available to carry out this section in any fiscal year not more than 3 percent may be used by the Attorney General for salaries and administrative expenses.

(3) MINIMUM AMOUNT.—Each State shall be allocated in each fiscal year under this section not less than 0.75 percent of the total amount appropriated in the fiscal year for grants pursuant to this section, except that the United States Virgin Islands, America Samoa, Guam, and the Northern Mariana Islands each shall be allocated 0.25 percent.

SEC. 1015. EXPANSION AND REAUTHORIZATION OF THE CRIME IDENTIFICATION TECHNOLOGY ACT FOR ANTITERRORISM GRANTS TO STATES AND LOCALITIES.

Section 102 of the Crime Identification Technology Act of 1998 (42 U.S.C. 14601) is amended—

(1) in subsection (b)—

<< 42 USCA § 14601 >>

(A) in paragraph (16), by striking "and" at the end;

<< 42 USCA § 14601 >>

(B) in paragraph (17), by striking the period and inserting "; and"; and

<< 42 USCA § 14601 >>

(C) by adding at the end the following:

"(18) notwithstanding subsection (c), antiterrorism purposes as they relate to any other uses under this section or for other antiterrorism programs.'; and

<< 42 USCA § 14601 >>

(2) in subsection (e)(1), by striking "this section" and all that follows and inserting "this section $250,000,000 for each of fiscal years 2002 through 2007.".

SEC. 1016. CRITICAL INFRASTRUCTURES PROTECTION.

<< 42 USCA § 5195c >>

(a) SHORT TITLE.—This section may be cited as the "Critical Infrastructures Protection Act of 2001".

(b) FINDINGS.—Congress makes the following findings:

(1) The information revolution has transformed the conduct of business and the operations of government as well as the infrastructure relied upon for the defense and national security of the United States.

(2) Private business, government, and the national security apparatus increasingly depend on an interdependent network of critical physical and information infrastructures, including telecommunications, energy, financial services, water, and transportation sectors.

(3) A continuous national effort is required to ensure the reliable provision of cyber and physical infrastructure services critical to maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States.

(4) This national effort requires extensive modeling and analytic capabilities for purposes of evaluating appropriate mechanisms to ensure the stability of these complex and interdependent systems, and to underpin policy recommendations, so as to achieve the continuous viability and adequate protection of the critical infrastructure of the Nation.

(c) POLICY OF THE UNITED STATES.—It is the policy of the United States—

  (1) that any physical or virtual disruption of the operation of the critical infrastructures of the United States be rare, brief, geographically limited in effect, manageable, and minimally detrimental to the economy, human and government services, and national security of the United States;

  (2) that actions necessary to achieve the policy stated in paragraph (1) be carried out in a public-private partnership involving corporate and non-governmental organizations; and

  (3) to have in place a comprehensive and effective program to ensure the continuity of essential Federal Government functions under all circumstances.

(d) ESTABLISHMENT OF NATIONAL COMPETENCE FOR CRITICAL INFRASTRUCTURE PROTECTION.—

  (1) SUPPORT OF CRITICAL INFRASTRUCTURE PROTECTION AND CONTINUITY BY NATIONAL INFRASTRUCTURE SIMULATION AND ANALYSIS CENTER.—There shall be established the National Infrastructure Simulation and Analysis Center (NISAC) to serve as a source of national competence to address critical infrastructure protection and continuity through support for activities related to counterterrorism, threat assessment, and risk mitigation.

  (2) PARTICULAR SUPPORT.—The support provided under paragraph (1) shall include the following:

   (A) Modeling, simulation, and analysis of the systems comprising critical infrastructures, including cyber infrastructure, telecommunications infrastructure, and physical infrastructure, in order to enhance understanding of the large-scale complexity of such systems and to facilitate modification of such systems to mitigate the threats to such systems and to critical infrastructures generally.

   (B) Acquisition from State and local governments and the private sector of data necessary to create and maintain models of such systems and of critical infrastructures generally.

   (C) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide education and training to policymakers on matters relating to—

    (i) the analysis conducted under that subparagraph;

    (ii) the implications of unintended or unintentional disturbances to critical infrastructures; and

    (iii) responses to incidents or crises involving critical infrastructures, including the continuity of government and private sector activities through and after such incidents or crises.

   (D) Utilization of modeling, simulation, and analysis under subparagraph (A) to provide recommendations to policymakers, and to departments and agencies of the Federal Government and private sector persons and entities upon request, regarding means of enhancing the stability of, and preserving, critical infrastructures.

  (3) RECIPIENT OF CERTAIN SUPPORT.—Modeling, simulation, and analysis provided under this subsection shall be provided, in particular, to relevant Federal, State, and local entities responsible for critical infrastructure protection and policy.

(e) CRITICAL INFRASTRUCTURE DEFINED.—In this section, the term "critical infrastructure" means systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters.

 (f) AUTHORIZATION OF APPROPRIATIONS.—There is hereby authorized for the Department of Defense for fiscal year 2002, $20,000,000 for the Defense Threat Reduction Agency for activities of the National Infrastructure Simulation and Analysis Center under this section in that fiscal year.

Approved October 26, 2001.

PL 107–56, 2001 HR 3162

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.03803  15

West's Annotated Code of Maryland
  Alcoholic Beverages (Refs & Annos)
    Division I. General Provisions Affecting Multiple Jurisdictions [Titles 1-8] (Refs & Annos)
      Title 6. Forfeitures; Enforcement; Prohibited Acts; Penalties (Refs & Annos)
        Subtitle 3. Prohibited Acts (Refs & Annos)
          Part II. Prohibited Acts by License Holder (Refs & Annos)

MD Code, Alcoholic Beverages, § 6-307
Formerly cited as MD Code, Art. 2B, § 12-108

§ 6-307. Selling or providing alcoholic beverages to intoxicated individual

Effective: July 1, 2016

Currentness

A license holder or an employee of the license holder may not sell or provide alcoholic beverages to an individual who, at the time of the sale or delivery, is visibly under the influence of an alcoholic beverage.

**Credits**

Added by Acts 2016, c. 41, § 2, eff. July 1, 2016.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2016, c. 41):

> This section is new language derived without substantive change from former Art. 2B, § 12-108(a)(1)(ii) and, as they related to selling and furnishing alcoholic beverages to an intoxicated individual, (b)(1) and (c)(2).

> This section is revised to combine the substantively identical prohibitions stated in former Art. 2B, § 12-108(a)(1) (ii), which applied to all counties not listed in former subsection (c)(1); the second part of (c)(2), which applied to all counties listed in former subsection (c)(1); and the second part of (b)(1), which applied to Worcester County.

> The former phrase "at any time" is deleted as surplusage.

> Defined terms: "Alcoholic beverage" § 1-101

> "License holder" § 1-101

Notes of Decisions (12)

MD Code, Alcoholic Beverages, § 6-307, MD AL BEV § 6-307
Current through all legislation from the 2020 Regular Session of the General Assembly.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Annotated Code of Maryland
  Alcoholic Beverages (Refs & Annos)
    Division I. General Provisions Affecting Multiple Jurisdictions [Titles 1-8] (Refs & Annos)
      Title 6. Forfeitures; Enforcement; Prohibited Acts; Penalties (Refs & Annos)
        Subtitle 4. Penalties (Refs & Annos)

MD Code, Alcoholic Beverages, § 6-402
Formerly cited as MD CODE, Art. 2B, § 16-503; MD CODE, Art. 2B, § 16-504

§ 6-402. General penalty

Effective: July 1, 2016
Currentness

**In general**

(a) If a person violates this article and no penalty other than the suspension or revocation of a license or permit is provided, the person is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 2 years or a fine not exceeding $1,000 or both.

**Imposition of penalty**

(b) If a court has imposed a penalty on an individual license holder who has obtained a license for or on behalf of a corporation, a partnership, or an unincorporated association:

  (1) if the penalty is a fine, the corporation, partnership, or unincorporated association also shall be liable for the payment of the fine; and

  (2) if the penalty is imprisonment, the individual license holder shall be liable to serve the term of imprisonment.

**Credits**
Added by Acts 2016, c. 41, § 2, eff. July 1, 2016.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2016, c. 41):

  This section is new language derived without substantive change from former Art. 2B, §§ 16-503 and 16-504.

  In subsection (a) of this section, the former reference to imprisonment in "the House of Correction, or jail" is deleted as unnecessary.

  Defined terms: "License" § 1-101

---

AR.03806

1

"License holder" § 1-101

"Person" § 1-101

MD Code, Alcoholic Beverages, § 6-402, MD AL BEV § 6-402
Current through all legislation from the 2020 Regular Session of the General Assembly.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Annotated Code of Maryland
   Criminal Law (Refs & Annos)
     Title 3. Other Crimes Against the Person
       Subtitle 8. Stalking and Harassment

MD Code, Criminal Law, § 3-804
Formerly cited as MD CODE Art. 27, § 555A

§ 3-804. Misuse of telephone facilities and equipment

Currentness

**Prohibited**

(a) A person may not use telephone facilities or equipment to make:

   (1) an anonymous call that is reasonably expected to annoy, abuse, torment, harass, or embarrass another;

   (2) repeated calls with the intent to annoy, abuse, torment, harass, or embarrass another; or

   (3) a comment, request, suggestion, or proposal that is obscene, lewd, lascivious, filthy, or indecent.

**Penalty**

(b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $500 or both.

**Credits**
Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002.

**Formerly** Art. 27, § 555A.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2002, c. 26):

   This section is new language derived without substantive change from former Art. 27, § 555A.

   In the introductory language of subsection (a) of this section, the reference to "mak[ing]" calls is added to state expressly that which only was implied in the former law.

In subsection (a)(1) of this section, the former reference to "calls" is deleted in light of Art. 1, § 8, which provides that the singular generally includes the plural.

In subsection (a)(1) and (2) of this section, the word "another" is substituted for the former references to "one or more persons" for brevity. *See also* Art. 1, § 8.

In subsection (b) of this section, the former phrase "in the discretion of the court" is deleted as implicit in the establishment of a maximum penalty.

Defined term: "Person" § 1-101

Notes of Decisions (28)

MD Code, Criminal Law, § 3-804, MD CRIM LAW § 3-804
Current through all legislation from the 2020 Regular Session of the General Assembly.

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

> West's Annotated Code of Maryland
>   Criminal Law (Refs & Annos)
>     Title 4. Weapon Crimes
>       Subtitle 1. General Provisions

MD Code, Criminal Law, § 4-101

Formerly cited as MD CODE Art. 27, § 36

§ 4-101. Dangerous weapons

Currentness

### Definitions

(a)(1) In this section the following words have the meanings indicated.

(2) "Nunchaku" means a device constructed of two pieces of any substance, including wood, metal, or plastic, connected by any chain, rope, leather, or other flexible material not exceeding 24 inches in length.

(3)(i) "Pepper mace" means an aerosol propelled combination of highly disabling irritant pepper-based products.

(ii) "Pepper mace" is also known as oleoresin capsicum (o.c.) spray.

(4) "Star knife" means a device used as a throwing weapon, consisting of several sharp or pointed blades arrayed as radially disposed arms about a central disk.

(5)(i) "Weapon" includes a dirk knife, bowie knife, switchblade knife, star knife, sandclub, metal knuckles, razor, and nunchaku.

(ii) "Weapon" does not include:

1. a handgun; or

2. a penknife without a switchblade.

### Exceptions for certain individuals

(b) This section does not prohibit the following individuals from carrying a weapon:

(1) an officer of the State, or of any county or municipal corporation of the State, who is entitled or required to carry the weapon as part of the officer's official equipment, or by any conservator of the peace, who is entitled or required to carry

the weapon as part of the conservator's official equipment, or by any officer or conservator of the peace of another state who is temporarily in this State;

(2) a special agent of a railroad;

(3) a holder of a permit to carry a handgun issued under Title 5, Subtitle 3 of the Public Safety Article; or

(4) an individual who carries the weapon as a reasonable precaution against apprehended danger, subject to the right of the court in an action arising under this section to judge the reasonableness of the carrying of the weapon, and the proper occasion for carrying it, under the evidence in the case.

### Prohibited

(c)(1) A person may not wear or carry a dangerous weapon of any kind concealed on or about the person.

(2) A person may not wear or carry a dangerous weapon, chemical mace, pepper mace, or a tear gas device openly with the intent or purpose of injuring an individual in an unlawful manner.

(3)(i) This paragraph applies in Anne Arundel County, Baltimore County, Caroline County, Cecil County, Harford County, Kent County, Montgomery County, Prince George's County, St. Mary's County, Talbot County, Washington County, and Worcester County.

(ii) A minor may not carry a dangerous weapon between 1 hour after sunset and 1 hour before sunrise, whether concealed or not, except while:

1. on a bona fide hunting trip; or

2. engaged in or on the way to or returning from a bona fide trap shoot, sport shooting event, or any organized civic or military activity.

### Penalties

(d)(1) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

(2) For a person convicted under subsection (c)(1) or (2) of this section, if it appears from the evidence that the weapon was carried, concealed or openly, with the deliberate purpose of injuring or killing another, the court shall impose the highest sentence of imprisonment prescribed.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.03811    2

**Credits**

Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002. Amended by Acts 2002, c. 213, § 6, eff. Oct. 1, 2002; Acts 2002, c. 571, § 1, eff. Oct. 1, 2002; Acts 2003, c. 17, § 1, eff. Oct. 1, 2003; Acts 2003, c. 21, § 1, eff. April 8, 2003.

**Formerly** Art. 27, § 36.

**Editors' Notes**

<p align="center">**LEGISLATIVE NOTES**</p>

Revisor's Note (Acts 2002, c. 26):

This section is new language derived without substantive change from former Art. 27, § 36.

Throughout this section, the references to a "deadly" weapon are deleted as included in the references to a "dangerous" weapon.

Subsection (a)(1) of this section is new language used as the standard introductory language to a definition subsection.

In subsection (b)(1) of this section, the reference to a "municipal corporation" is substituted for the former reference to "any ... city" for consistency with usage in Md. Constitution, Art. XI-E.

In subsection (b)(3) of this section, the reference to a permit to carry a "handgun" under Art. 27, § 36E is substituted for the former reference to a "concealed weapon" permit for clarity, because Art. 27, § 36E only applies to a permit to carry a handgun.

In subsection (b)(4) of this section, the reference to an "individual" is substituted for the former reference to a "person" because only a natural person may apprehend danger. Similarly, in subsection (c)(2) of this section, the reference to an "individual" is substituted for the former reference to a "person" because only a natural person may be injured by these weapons.

In subsection (c)(4)(ii) of this section, the former reference to a weapon "other than a handgun" is deleted as redundant of the exclusion of a "handgun" from the term "weapon" defined in subsection (a)(5) of this section.

In subsection (d)(1) of this section, the former reference to imprisonment "in jail, or sentenced to the Maryland Department of Correction" is deleted for consistency within this article. Currently, inmates are sentenced to the custody of a unit such as the Division of Correction and then are placed in a particular facility. *See* CS § 9-103.

In subsection (d)(1)(ii) of this section, the term "killing" is substituted for the former reference to "destroying the life of" another, for clarity.

The Criminal Law Article Review Committee notes, for the consideration of the General Assembly, that, in subsection (b)(1) of this section, it is unclear whether the reference to an "officer of the State" who is entitled to wear a dangerous weapon denotes a "law enforcement officer" or some other, broader class of State official. Similarly, in subsection (b)(1) of this section, the reference to an officer of a "county or municipal corporation" entitled to wear a dangerous weapon, which is substituted for the former reference to an officer of a "county or city" so entitled, does not appear to include a law enforcement officer of a special taxing district such as Crofton, and

may not include a law enforcement officer of a multicounty unit such as the Maryland-National Capital Park and Planning Commission. The General Assembly may wish to address the scope of law enforcement or other officers who are exempt from this section but are not employed by a State unit or a county or municipal corporation.

The Criminal Law Article Review Committee also notes, for the consideration of the General Assembly, that in subsection (b)(2) of this section, it is unclear whether the reference to a "special agent of a railroad" who is entitled to wear a dangerous weapon denotes a "Maryland railroad police officer" appointed under Art. 23, §§ 256 through 266 or some other class of railroad agent.

The Criminal Law Article Review Committee also notes, for the consideration of the General Assembly, that the crimes established in subsection (c)(3) and (4) of this section apply only to minors, although they are not characterized as delinquent acts. It appears from the statute that these crimes would be prosecuted in criminal rather than juvenile court, although in practice they apparently are not.

The Criminal Law Article Review Committee also notes, for the consideration of the General Assembly, that in subsection (d)(1) of this section, the penalty for anyone carrying a concealed dangerous weapon is either imprisonment not exceeding 3 years or a fine not exceeding $1,000 *but not both*. However, the penalty for a minor carrying pepper mace under subsection (d)(2) of this section is imprisonment not exceeding 3 years or a fine not exceeding $1,000 *or both*. The General Assembly may wish to address the disparity between these sentences.

Defined terms: "County" § 1-101

"Minor" § 1-101

"Person" § 1-101

"State" § 1-101

Notes of Decisions (126)

MD Code, Criminal Law, § 4-101, MD CRIM LAW § 4-101
Current through all legislation from the 2020 Regular Session of the General Assembly.

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated Code of Maryland
   Criminal Law (Refs & Annos)
      Title 6. Crimes Against Property
         Subtitle 1. Arson and Burning

MD Code, Criminal Law, § 6-105

Formerly cited as MD CODE Art. 27, § 8

§ 6-105. Malicious burning of personal property in the second degree

Currentness

**Scope**

(a) This section applies to a violation involving property damage of less than $1,000.

**Prohibited**

(b) A person may not willfully and maliciously set fire to or burn the personal property of another.

**Penalty**

(c) A person who violates this section is guilty of the misdemeanor of malicious burning in the second degree and on conviction is subject to imprisonment not exceeding 18 months or a fine not exceeding $500 or both.

**Credits**

Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002.

**Formerly** Art. 27, § 8.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2002, c. 26):

   This section is new language derived without substantive change from former Art. 27, § 8(a)(1) and (2).

   In subsection (b) of this section, the former reference to another "person" is deleted as implicit and for consistency within this article.

   Defined terms: "Maliciously" § 6-101

   "Person" § 1-101

   "Willfully" § 6-101

Notes of Decisions (1)

MD Code, Criminal Law, § 6-105, MD CRIM LAW § 6-105
Current through all legislation from the 2020 Regular Session of the General Assembly.

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated Code of Maryland
  Criminal Law (Refs & Annos)
    Title 6. Crimes Against Property
      Subtitle 2. Burglary and Related Crimes

MD Code, Criminal Law, § 6-205

Formerly cited as MD CODE Art. 27, § 32

§ 6-205. Burglary in the fourth degree

Currentness

**Prohibited--Breaking and entering dwelling**

(a) A person may not break and enter the dwelling of another.

**Prohibited--Breaking and entering storehouse**

(b) A person may not break and enter the storehouse of another.

**Prohibited--Being in or on dwelling, storehouse, or environs**

(c) A person, with the intent to commit theft, may not be in or on:

   (1) the dwelling or storehouse of another; or

   (2) a yard, garden, or other area belonging to the dwelling or storehouse of another.

**Prohibited--Possession of burglar's tool**

(d) A person may not possess a burglar's tool with the intent to use or allow the use of the burglar's tool in the commission of a violation of this subtitle.

**Penalty**

(e) A person who violates this section is guilty of the misdemeanor of burglary in the fourth degree and on conviction is subject to imprisonment not exceeding 3 years.

**Conviction of theft**

(f) A person who is convicted of violating § 7-104 of this article may not also be convicted of violating subsection (c) of this section based on the act establishing the violation of § 7-104 of this article.

**Credits**
Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002.

**Formerly** Art. 27, § 32.

**Editors' Notes**

### LEGISLATIVE NOTES

Revisor's Note (Acts 2002, c. 26):

This section is new language derived without substantive change from former Art. 27, § 32.

In subsection (f) of this section, the former reference to "acts" is deleted in light of Art. 1, § 8, which provides that the singular includes the plural.

Defined terms: "Break" § 6-201

"Burglar's tool" § 6-201

"Dwelling" § 6-201

"Enter" § 6-201

"Person" § 1-101

"Storehouse" § 6-201

Notes of Decisions (163)

MD Code, Criminal Law, § 6-205, MD CRIM LAW § 6-205
Current through all legislation from the 2020 Regular Session of the General Assembly.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated Code of Maryland
  Criminal Law (Refs & Annos)
    Title 7. Theft and Related Crimes
      Subtitle 2. Unlawful Use of Goods

MD Code, Criminal Law, § 7-203

Formerly cited as MD CODE Art. 27, § 349

§ 7-203. Unauthorized removal of property

Effective: October 1, 2008

Currentness

### In general

(a) Without the permission of the owner, a person may not take and carry away from the premises or out of the custody of another or use of the other, or the other's agent, or a governmental unit any property, including:

   (1) a vehicle;

   (2) a motor vehicle;

   (3) a vessel; or

   (4) livestock.

### Fines and penalties

(b) A person who violates this section is guilty of a misdemeanor and on conviction:

   (1) is subject to imprisonment for not less than 6 months and not exceeding 4 years or a fine not less than $50 and not exceeding $100 or both; and

   (2) shall restore the property taken and carried away in violation of this section or, if unable to restore the property, shall pay to the owner the full value of the property.

### Defenses

(c) It is not a defense to this section that the person intends to hold or keep the property for the person's present use and not with the intent of appropriating or converting the property.

**Credits**

Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002. Amended by Acts 2003, c. 21, § 1, eff. April 8, 2003; Acts 2008, c. 315, § 1, eff. Oct. 1, 2008.

**Formerly** Art. 27, § 349.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2002, c. 26):

This section is new language derived without substantive change from former Art. 27, § 349.

Throughout this section, the former phrase "his or their aiders and abettors" is deleted in light of the abrogation of the distinction between principals and accessories before the fact. *See* General Revisor's Note to article and CP § 204.

In subsection (a) of this section, the term "governmental unit" is substituted for the former phrase "body ... politic in the State", for clarity.

Also in subsection (a) of this section, the former reference to a "body corporate" in the State is deleted as included in the defined term "person".

In subsection (a)(1) of this section, the reference to a "vehicle" is substituted for the former reference to any "carriage, wagon, buggy, [or] cart", for clarity and brevity.

Also in subsection (a)(1) of this section, the former phrase "shall enter, or being upon" is deleted as implicit in the reference to "premises".

In subsection (a)(2) of this section, the former reference to a motor vehicle "as defined in the laws of this State relating to such" is deleted as surplusage.

In subsection (a)(3) of this section, the reference to a "vessel" is substituted for the former reference to a "boat, craft, [or] vessel", for clarity and brevity.

The Criminal Law Article Review Committee notes, for the consideration of the General Assembly, that in subsection (a)(4) of this section, the reference to "livestock" is substituted for the former reference to a "horse, mare, colt, gelding, mule, ass, sheep, hog, ox or cow", for clarity and brevity. The substitution may include other, more exotic livestock, such as bison and llamas, which would otherwise fall under the general reference to "any property" in the introductory language to this section. No substantive change is intended.

In subsection (b)(2) of this section, the former phrase "in the discretion of the court" is deleted as implicit in the establishment of minimum and maximum penalties.

Also in subsection (b)(2) of this section, the former phrase "or be imprisoned in the county or city jail, or the house of correction" is deleted for consistency within this article. Currently, inmates are sentenced to the custody of a unit such as the Division of Correction and then are placed into a particular facility. *See* CS § 9-103.

AR.03819

Defined term: "Person" § 1-101

Notes of Decisions (69)

MD Code, Criminal Law, § 7-203, MD CRIM LAW § 7-203
Current through all legislation from the 2020 Regular Session of the General Assembly.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

📙 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Annotated Code of Maryland
  Tax-General (Refs & Annos)
    Title 13. Procedure (Refs & Annos)
      Subtitle 10. Crimes and Offenses (Refs & Annos)

MD Code, Tax - General, § 13-1015

§ 13-1015. Fines and penalties for willful transportation of unstamped cigarettes or tobacco products

Effective: October 1, 2013
Currentness

### In general

(a) A person who willfully ships, imports, sells into or within, or transports within, this State cigarettes or other tobacco products on which the tobacco tax has not been paid in violation of Title 12 of this article or § 16-219, § 16-222, § 16.5-215, or § 16.5-216 of the Business Regulation Article is guilty of a felony and, on conviction, is subject to the penalties set forth in subsections (b) and (c) of this section.

### Fines for first and subsequent violations

(b)(1) For a first violation, a person is subject to a mandatory fine of $150 for each carton of cigarettes or each package of other tobacco products transported.

(2) For each subsequent violation, a person is subject to a mandatory fine of $300 for each carton of cigarettes or each package of other tobacco products transported.

### Imprisonment in addition to fine

(c) In addition to the mandatory fine set forth in subsection (b) of this section, for a first or subsequent violation, a person may be subject to imprisonment not exceeding 2 years.

### Credits

Added by Acts 1988, c. 2, § 1, eff. Jan. 1, 1989. Amended by Acts 1992, c. 26, § 2; Acts 1999, c. 121, § 3, eff. July 1, 2000; Acts 1999, c. 262, § 1, eff. July 1, 1999; Acts 2010, c. 388, § 1, eff. May 1, 2011; Acts 2013, c. 174, § 1, eff. Oct. 1, 2013.

**Formerly** Art. 81, § 455.

Notes of Decisions (4)

MD Code, Tax - General, § 13-1015, MD TAX GENERAL § 13-1015
Current through all legislation from the 2020 Regular Session of the General Assembly.

Case 3:20-cv-07721-SI    Document 58-3    Filed 11/10/20    Page 3845 of 3864

§ 13-1015. Fines and penalties for willful transportation of..., MD TAX GENERAL §...

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Minnesota Statutes Annotated
  Crimes; Expungement; Victims (Ch. 609-624)
    Chapter 609. Criminal Code (Refs & Annos)
      General Principles

M.S.A. § 609.02

609.02. Definitions

Effective: July 1, 2019

Currentness

**Subdivision 1. Crime.** "Crime" means conduct which is prohibited by statute and for which the actor may be sentenced to imprisonment, with or without a fine.

**Subd. 2. Felony.** "Felony" means a crime for which a sentence of imprisonment for more than one year may be imposed.

Subd. 2a. Repealed by Laws 1999, c. 194, § 11.

**Subd. 3. Misdemeanor.** "Misdemeanor" means a crime for which a sentence of not more than 90 days or a fine of not more than $1,000, or both, may be imposed.

**Subd. 4. Gross misdemeanor.** "Gross misdemeanor" means any crime which is not a felony or misdemeanor. The maximum fine which may be imposed for a gross misdemeanor is $3,000.

**Subd. 4a. Petty misdemeanor.** "Petty misdemeanor" means a petty offense which is prohibited by statute, which does not constitute a crime and for which a sentence of a fine of not more than $300 may be imposed.

**Subd. 5. Conviction.** "Conviction" means any of the following accepted and recorded by the court:

(1) a plea of guilty; or

(2) a verdict of guilty by a jury or a finding of guilty by the court.

**Subd. 6. Dangerous weapon.** "Dangerous weapon" means any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, any combustible or flammable liquid or other device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm, or any fire that is used to produce death or great bodily harm.

As used in this subdivision, "flammable liquid" means any liquid having a flash point below 100 degrees Fahrenheit and having a vapor pressure not exceeding 40 pounds per square inch (absolute) at 100 degrees Fahrenheit but does not include intoxicating liquor as defined in section 340A.101. As used in this subdivision, "combustible liquid" is a liquid having a flash point at or above 100 degrees Fahrenheit.

**Subd. 7. Bodily harm.** "Bodily harm" means physical pain or injury, illness, or any impairment of physical condition.

**Subd. 7a. Substantial bodily harm.** "Substantial bodily harm" means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member.

**Subd. 8. Great bodily harm.** "Great bodily harm" means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm.

**Subd. 9. Mental state.** (1) When criminal intent is an element of a crime in this chapter, such intent is indicated by the term "intentionally," the phrase "with intent to," the phrase "with intent that," or some form of the verbs "know" or "believe."

(2) "Know" requires only that the actor believes that the specified fact exists.

(3) "Intentionally" means that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result. In addition, except as provided in clause (6), the actor must have knowledge of those facts which are necessary to make the actor's conduct criminal and which are set forth after the word "intentionally."

(4) "With intent to" or "with intent that" means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result.

(5) Criminal intent does not require proof of knowledge of the existence or constitutionality of the statute under which the actor is prosecuted or the scope or meaning of the terms used in that statute.

(6) Criminal intent does not require proof of knowledge of the age of a minor even though age is a material element in the crime in question.

**Subd. 10. Assault.** "Assault" is:

(1) an act done with intent to cause fear in another of immediate bodily harm or death; or

(2) the intentional infliction of or attempt to inflict bodily harm upon another.

AR.03824

**Subd. 11. Second or subsequent violation or offense.** "Second or subsequent violation" or "second or subsequent offense" means that prior to the commission of the violation or offense, the actor has been adjudicated guilty of a specified similar violation or offense.

Subds. 12, 13. Repealed by Laws 1993, c. 326, art. 2, § 34.

Subd. 14. Repealed by Laws 2014, c. 263, § 4, eff. May 17, 2014.

**Subd. 15. Probation.** "Probation" means a court-ordered sanction imposed upon an offender for a period of supervision no greater than that set by statute. It is imposed as an alternative to confinement or in conjunction with confinement or intermediate sanctions. The purpose of probation is to deter further criminal behavior, punish the offender, help provide reparation to crime victims and their communities, and provide offenders with opportunities for rehabilitation.

**Subd. 16. Qualified domestic violence-related offense.** "Qualified domestic violence-related offense" includes a violation of or an attempt to violate sections 518B.01, subdivision 14 (violation of domestic abuse order for protection); 609.185 (first-degree murder); 609.19 (second-degree murder); 609.221 (first-degree assault); 609.222 (second-degree assault); 609.223 (third-degree assault); 609.2231 (fourth-degree assault); 609.224 (fifth-degree assault); 609.2242 (domestic assault); 609.2245 (female genital mutilation); 609.2247 (domestic assault by strangulation); 609.342 (first-degree criminal sexual conduct); 609.343 (second-degree criminal sexual conduct); 609.344 (third-degree criminal sexual conduct); 609.345 (fourth-degree criminal sexual conduct); 609.377 (malicious punishment of a child); 609.713 (terroristic threats); 609.748, subdivision 6 (violation of harassment restraining order); 609.749 (harassment or stalking); 609.78, subdivision 2 (interference with an emergency call); 617.261 (nonconsensual dissemination of private sexual images); and 629.75 (violation of domestic abuse no contact order); and similar laws of other states, the United States, the District of Columbia, tribal lands, and United States territories.

**Subd. 17. Ammunition.** "Ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm. Ammunition does not include ornaments, curiosities, or souvenirs constructed from or resembling ammunition or ammunition components that are not operable as ammunition.

**Credits**

Laws 1963, c. 753. Amended by Laws 1969, c. 735, § 3, eff. July 1, 1969; Laws 1971, Ex.Sess., c. 27, §§ 42, 43, eff. Aug. 4, 1971; Laws 1977, c. 355, § 2, eff. Aug. 1, 1977; Laws 1979, c. 258, §§ 2, 3; Laws 1983, c. 274, § 14, eff. June 7, 1983; Laws 1983, c. 331, §§ 4, 5, eff. Aug. 1, 1983; Laws 1985, c. 167, § 1; Laws 1986, c. 444; Laws 1987, c. 307, §§ 1, 2, eff. Aug. 1, 1987; Laws 1987, c. 329, § 3, eff. Aug. 1, 1987; Laws 1987, c. 384, art. 2, § 1; Laws 1989, c. 5, §§ 1, 2, eff. Aug. 1, 1989; Laws 1992, c. 571, art. 6, § 10; Laws 1993, c. 326, art. 5, § 6; Laws 1997, c. 239, art. 9, § 34, eff. May 31, 1997; Laws 1997, 1st Sp., c. 2, §§ 59, 60; Laws 1999, c. 194, § 5; Laws 2000, c. 488, art. 5, § 2, 3; Laws 2001, 1st Sp., c. 8, art. 10, § 7; Laws 2005, c. 136, art. 17, § 8; Laws 2006, c. 260, art. 1, § 12; Laws 2007, c. 54, art. 2, § 2, eff. Aug. 1, 2007; Laws 2010, c. 299, § 14, par. (b), eff. Aug. 1, 2010; Laws 2012, c. 227, § 1, eff. Aug. 1, 2012; Laws 2015, c. 65, art. 3, § 16, eff. Aug. 1, 2015; Laws 2016, c. 126, § 3, eff. Aug. 1, 2016; Laws 2019, 1st Sp., c. 5, art. 2, § 29, eff. July 1, 2019.

**Editors' Notes**

**RULES OF CRIMINAL PROCEDURE**

<Section 480.059, subd. 7, provides in part that statutes which relate to substantive criminal law found in chapter 609, except for sections 609.115 and 609.145, remain in full force and effect notwithstanding the Rules of Criminal Procedure.>

## ADVISORY COMMITTEE COMMENT [1963]

The policy pursued in this revision has been to define the terms as used with respect to the specific crimes. Also where words have been defined elsewhere in the statutes for the purposes of the statutes generally it was the policy not to duplicate or undertake a different definition of the same term. These definitions appear particularly in Minn.St. §§ 645.44 and 645.45.

This has reduced the number of definitions needed for the criminal code and many of the definitions now appearing in Minn.St. §§ 610.01 and 610.02 have not been duplicated.

A number of terms, however, of special application to the criminal code are used in the revision in a number of instances and in connection with different crimes and general definitions are needed in these instances.

These definitions will apply to sections outside of the revised criminal code under the provisions of § 609.015 Subd. 2.

Minn.St. § 610.02, by its terms, applies to Part V of the Minnesota Statutes. In a few sections of Part V not being repealed as a result of this revision, terms are used which are presently defined in § 610.02, and which are not defined under the recommended § 609.02. The definitions involved are of limited value and it is believed the courts will experience little difficulty in construing the terms in their context without the need for statutory definitions.

**Subds. 1 to 4:** The words "crime," "felony," "misdemeanor," and "gross misdemeanor" are now defined in Minn.St. § 610.01, substantially as recommended.

**Subd. 5:** Since the term "conviction" is frequently used in the revised code it was felt desirable to define the term. This has been done in accordance with presently prescribed criminal procedure.

Minn.St. § 611.03 provides:

"No person indicted for any offense shall be convicted thereof, unless by admitting the truth of the charge in his demurrer, or plea, by confession in open court, or by verdict of a jury, accepted and recorded by the court."

Minn.St. § 630.26 provides in part:

"If the demurrer shall be disallowed or the indictment amended, the court shall permit the defendant, at his election, to plead forthwith or at such time as the court may allow. If he does not plead, judgment shall be pronounced against him."

The recommended definition incorporates the principles of these provisions.

In State v. Corey, 1931, 182 Minn. 48, 52, 233 N.W. 590, the court defined "confession in open court" as "a formal admission that the specific crime or one included within the indictment was committed, the confession being entered of record virtually amounting to a change of plea to guilty."

Defendant's testimony given in open court showing as a matter of law that he had committed the crime was held not to come within the definition.

**Subd. 6:** There is presently no definition of the term "dangerous weapon" in the Minnesota statutes. The definition recommended is taken without change from the Wisconsin code, § 939.22, Clause (10). The term is used in several sections of the recommended code.

**Subds. 7 and 8:** These definitions are taken from the Wisconsin code, 939.22, Clauses (4) and (14). There are presently no corresponding Minnesota definitions.

**Subd. 9:** These terms are uniformly used throughout the criminal code. Such terms as "knowingly," "wilfully," "maliciously," and the like have led to great confusion in their interpretation by the courts. In place, if knowledge of a fact is required, the term "know" has been used. Where an intent is required to establish a crime these definitions will indicate the meaning with which the term is used.

The definitions are taken verbatim from Wisconsin St. § 939.23. Uniformity of definitions and interpretations of the terms will thus result.

### COMMENT BY MAYNARD E. PIRSIG [1963]

The terms "offense" and "criminal offense" are occasionally used in the new Criminal Code. They are used in the same sense as the term "crime". Violations of municipal ordinances are not intended to be included under either term. See State v. Robitshek, 60 Minn. 123, 61 N.W. 1023, 1895; State v. End, 232 Minn. 266, 45 N.W.2d 378, 1950.

In addition to the above definition of "Conviction", the original proposed section 609.02, subd. 5, included the following:

"A judgment entered upon failure to plead as provided by law when a demurrer is overruled."

"A confession in open court."

Some of the above comments of the Advisory Committee are directed to these proposed provisions.

Objection was made to the Committee that these procedures, while provided for in Minn.St., §§ 611.03 and 630.26, are, in practice unknown. If a demurrer is overruled, opportunity to plead over is invariably granted. A confession in open court without a plea of guilty is unknown. Accordingly these two provisions were deleted in the final recommendations of the Committee.

At the same time, the words, "or a finding of guilty by the court" were added by the Committee, a necessary provision previously overlooked.

The Wisconsin definition of "great bodily harm" from which subd. 8, above, was taken, was construed in State v. Bronston, 7 Wis.2d 627, 633, 97 N.W.2d 504, modified, rehearing denied, 98 N.W.2d 468, as follows:

"Mrs. Zilke's injury resulting from the blow consisted of a two-inch laceration of the scalp on the left rear portion of her head that required four sutures to close. She remained in the hospital but a few hours and was released. The place on the skull where struck is where the left jaw bones are connected to the skull. For some time she had headaches and suffered pain in the left jaw which was diagnosed as traumatic arthritis of the left mandibular joint. Mrs. Zilke testified that she thought the headaches were a nervous reaction. She received medical treatment for the jaw condition and after a while she did not have any more pain.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

"Penal statutes are to be interpreted strictly against the state and liberally in favor of the accused. * * * Because of this rule, in construing sec. 939.22(14), Stat., containing the definition of 'great bodily harm', we deem that the further canon of statutory interpretation of *ejusdem generis* is applicable. The nervous headaches and pain in the jaw which Mrs. Zilke suffered and which did not endure for a protracted period are not in the same category as 'permanent or protracted loss or impairment of the function of any bodily member or organ.' "

Notes of Decisions (215)

M. S. A. § 609.02, MN ST § 609.02
Current with all legislation from the 2020 Regular Session and 1st through 5th Special Sessions. Some statute sections may be more current, see credits for details. The statutes are subject to change as determined by the Minnesota Revisor of Statutes. (These changes will be incorporated later this year.)

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.03828    6

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

McKinney's Consolidated Laws of New York Annotated
   Penal Law (Refs & Annos)
      Chapter 40. Of the Consolidated Laws (Refs & Annos)
         Part Three. Specific Offenses
         Title I. Offenses Involving Damage to and Intrusion upon Property
            Article 145. Criminal Mischief and Related Offenses (Refs & Annos)

McKinney's Penal Law § 145.05

§ 145.05 Criminal mischief in the third degree

Effective: November 1, 2003

Currentness

A person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:

1. damages the motor vehicle of another person, by breaking into such vehicle when it is locked with the intent of stealing property, and within the previous ten year period, has been convicted three or more times, in separate criminal transactions for which sentence was imposed on separate occasions, of criminal mischief in the fourth degree as defined in section 145.00, criminal mischief in the third degree as defined in this section, criminal mischief in the second degree as defined in section 145.10, or criminal mischief in the first degree as defined in section 145.12 of this article; or

2. damages property of another person in an amount exceeding two hundred fifty dollars.

Criminal mischief in the third degree is a class E felony.

**Credits**
(L.1965, c. 1030. Amended L.1971, c. 961, § 2; L.2003, c. 276, § 1, eff. Nov. 1, 2003.)

**Editors' Notes**

**PRACTICE COMMENTARY**

*by William C. Donnino*

*See* Practice Commentary at the end of Penal Law § 145.00.

Notes of Decisions (76)

McKinney's Penal Law § 145.05, NY PENAL § 145.05

AR.03829

Current through L.2019, chapter 758 & L.2020, chapters 1 to 249. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

McKinney's Consolidated Laws of New York Annotated
   Penal Law (Refs & Annos)
      Chapter 40. Of the Consolidated Laws (Refs & Annos)
         Part Three. Specific Offenses
            Title M. Offenses Against Public Health and Morals
               Article 220. Controlled Substances Offenses (Refs & Annos)

McKinney's Penal Law § 220.06

§ 220.06 Criminal possession of a controlled substance in the fifth degree

Effective: November 1, 2003

Currentness

A person is guilty of criminal possession of a controlled substance in the fifth degree when he knowingly and unlawfully possesses:

1. a controlled substance with intent to sell it; or

2. one or more preparations, compounds, mixtures or substances containing a narcotic preparation and said preparations, compounds, mixtures or substances are of an aggregate weight of one-half ounce or more; or

3. phencyclidine and said phencyclidine weighs fifty milligrams or more; or

4. one or more preparations, compounds, mixtures or substances containing concentrated cannabis as defined in paragraph (a) of subdivision four of section thirty-three hundred two of the public health law and said preparations, compounds, mixtures or substances are of an aggregate weight of one-fourth ounce or more; or

5. cocaine and said cocaine weighs five hundred milligrams or more.

6. ketamine and said ketamine weighs more than one thousand milligrams; or

7. ketamine and has previously been convicted of possession or the attempt to commit possession of ketamine in any amount; or

8. one or more preparations, compounds, mixtures or substances containing gamma hydroxybutyric acid, as defined in paragraph four of subdivision (e) of schedule I of section thirty-three hundred six of the public health law, and said preparations, compounds, mixtures or substances are of an aggregate weight of twenty-eight grams or more.

Criminal possession of a controlled substance in the fifth degree is a class D felony.

**Credits**

(Added L.1973, c. 276, § 19. Amended L.1973, c. 1051, § 8; L.1977, c. 360, § 5; L.1978, c. 772, § 6; L.1979, c. 410, § 11; L.1985, c. 341, § 3; L.1988, c. 178, § 1; L.1995, c. 75, § 1; L.1997, c. 635, § 3, eff. Jan. 22, 1998; L.1998, c. 537, § 14, eff. Nov. 1, 1998; L.2003, c. 264, § 25, eff. Nov. 1, 2003.)

**Editors' Notes**

### PRACTICE COMMENTARY

*by William C. Donnino*

See Practice Commentary at the end of Penal Law § 220.00.

Notes of Decisions (82)

McKinney's Penal Law § 220.06, NY PENAL § 220.06
Current through L.2019, chapter 758 & L.2020, chapters 1 to 249. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title P. Offenses Against Public Safety
          Article 275. Offenses Relating to Unauthorized Recording (Refs & Annos)

McKinney's Penal Law § 275.34

§ 275.34 Unlawful operation of a recording device in a motion picture or live theater in the first degree

Effective: December 6, 2008

Currentness

A person is guilty of unlawful operation of a recording device in a motion picture or live theater in the first degree when he or she commits the crime of unlawful operation of a recording device in a motion picture or live theater in the second degree as defined in section 275.33 of this article and has previously been convicted within the past ten years of violating section 275.33 of this article or this section.

Unlawful operation of a recording device in a motion picture or live theatre in the first degree is a class E felony.

**Credits**
(Added L.2008, c. 639, § 4, eff. Dec. 6, 2008.)

**Editors' Notes**

**PRACTICE COMMENTARY**

by William C. Donnino

See Practice Commentary at the end of Penal Law § 275.00.

McKinney's Penal Law § 275.34, NY PENAL § 275.34
Current through L.2019, chapter 758 & L.2020, chapters 1 to 249. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Opinion, 548 F.3d 787, superseded and withdrawn.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Lovan v. Holder, 8th Cir., October 13, 2011

554 F.3d 1203
United States Court of Appeals,
Ninth Circuit.

Yewhalashet ABEBE, Petitioner,

v.

Michael B. MUKASEY,
Attorney General, Respondent.

No. 05–76201.
|
Argued and Submitted March 25, 2008.
|
Filed Jan. 5, 2009.

**Synopsis**

**Background:** Alien filed petition for review of a decision of the Board of Immigration Appeals (BIA), which affirmed an immigration judge's (IJ) denial of his applications for asylum, withholding of removal, relief under the Convention Against Torture (CAT), and discretionary waiver of deportation. A panel of the Court of Appeals, 493 F.3d 1092, denied the petition in part and remanded in part. Rehearing en banc was granted.

**Holdings:** The en banc Court of Appeals held that:

[1] BIA did not violate alien's right to equal protection by finding him ineligible for discretionary waiver of deportation; overruling *Tapia–Acuna v. INS,* 640 F.2d 223, and

[2] alien failed to exhaust his claim that IJ erred in denying his claim for withholding of removal; overruling *Ladha v. INS,* 215 F.3d 889.

Petition denied in part and dismissed in part.

Clifton, Circuit Judge, filed opinion concurring in part, in which Silverman and Gould, Circuit Judges, joined.

Thomas, Circuit Judge, filed dissenting opinion in which Pregerson, Circuit Judge, joined.

West Headnotes (5)

[1] **Aliens, Immigration, and Citizenship** 🗝️ Waiver of inadmissibility or removal in general

**Constitutional Law** 🗝️ Immigration and Naturalization

Congress had rational basis for providing relief from inadmissibility, but not deportation, and, thus, Board of Immigration Appeals (BIA) did not violate alien's right to equal protection by finding him ineligible for discretionary waiver of deportation; overruling *Tapia–Acuna v. INS,* 640 F.2d 223. U.S.C.A. Const.Amend. 14; Immigration and Nationality Act, § 212(c), 8 U.S.C.(1994 Ed.) § 1182(c).

55 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** 🗝️ Power to regulate in general

Congress has particularly broad and sweeping powers when it comes to immigration, and is therefore entitled to an additional measure of deference when it legislates as to admission, exclusion, removal, naturalization, or other matters pertaining to aliens.

10 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** 🗝️ Presentation and preservation of questions at administrative level

Alien failed to exhaust his claim that immigration judge (IJ) erred in denying his claim for withholding of removal, where he filed a brief before the Board of Immigration Appeals (BIA), but failed to raise the withholding of removal claim in that brief; overruling *Ladha v. INS,* 215 F.3d 889. Immigration and Nationality Act, § 242(d)(1), 8 U.S.C.A. § 1252(d)(1).

66 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Presentation and preservation of questions at administrative level

When a petitioner files no brief before the Board of Immigration Appeals (BIA) and relies entirely on the notice of appeal to make an immigration argument, then the notice of appeal serves in lieu of a brief, and he will be deemed to have exhausted all issues raised therein. 8 C.F.R. § 1003.38(f).

55 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Presentation and preservation of questions at administrative level

When a petitioner files a brief before the Board of Immigration Appeals (BIA), the BIA is entitled to look to the brief for an explication of the issues that the petitioner is presenting to have reviewed, and the petitioner will therefore be deemed to have exhausted only those issues he raised and argued in his brief before the BIA.

75 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1204** Robert B. Jobe (argued) and Fatma Marouf, Law Office of Robert B. Jobe, San Francisco, CA, for the petitioner.

Zachary Miller Nightingale, Avantika Shastri, and Marc Van Der Hout, Van Der Hout, Brigagliano and Nightingale, LLP, San Francisco, CA, for amicus curiae, the National Immigration Project of the National Lawyers Guild.

Marc Christopher Fleming and James Quarles, Wilmer Cutler Pickering Hale & Dorr, LLP, Boston, MA, for amicus curia, Joel Judulang.

Thomas H. Dupree, Jr., Deputy Assistant Attorney General; Peter D. Keisler, Assistant Attorney General; M. Jocelyn Lopez Wright, Assistant Director, Office of Immigration

Litigation; Song E. Park, Office of Immigration Litigation, Washington, DC, for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXX–XXX–941.

Before ALEX KOZINSKI, Chief Judge, HARRY PREGERSON, ANDREW J. KLEINFELD, SIDNEY R. THOMAS, BARRY G. SILVERMAN, RONALD M. GOULD, RICHARD C. TALLMAN, RICHARD R. CLIFTON, CONSUELO M. CALLAHAN, CARLOS T. BEA and N. RANDY SMITH, Circuit Judges.

Per Curiam Opinion; Concurrence by Judge CLIFTON; Dissent by Judge THOMAS.

**ORDER**

The per curiam opinion that was filed November 20, 2008, was filed in error. The opinion accompanying this order is substituted as the opinion of the court. The previously filed concurrence and dissent are unaffected by this order.

The petition for rehearing remains pending. Within 14 days, respondent shall file a response to the petition. Petitioner may reply within 14 days of the response; the reply shall not exceed the length permitted for the response. *See* 9th Cir. R. 40–1.

**OPINION**

PER CURIAM:

**1.** Petitioner became a lawful permanent resident in 1984 and, in 1992, pled guilty to lewd and lascivious conduct upon a child. Cal.Penal Code § 288(a). INS commenced removal proceedings on the ground that he was deportable as having committed an "aggravated felony," 8 U.S.C. § 1227(a)(2)(A)(iii)—"sexual abuse of a minor," *id.* § 1101(a) (43)(A). The Immigration Judge (IJ) denied petitioner's asylum, withholding of removal and Convention Against Torture claims, and found **\*1205** petitioner ineligible for a discretionary waiver of deportation under former Immigration and Nationality Act § 212(c), 8 U.S.C. § 1182(c) (repealed 1996).[1] On appeal to the Board of Immigration Appeals (BIA), petitioner argued that he's

eligible for section 212(c) relief. The BIA affirmed, and Abebe petitions for review.

**[1]  2.** Petitioner argues that, by finding him ineligible for section 212(c) relief, the BIA denied him equal protection. Relying on *Komarenko v. INS,* 35 F.3d 432, 434–35 (9th Cir.1994), the three-judge panel held that petitioner isn't eligible for section 212(c) relief. *Abebe v. Gonzales,* 493 F.3d 1092, 1104–05 (9th Cir.2007), *vacated,* 514 F.3d 909 (9th Cir.2008). Under *Komarenko,* 35 F.3d at 434–35, a deportable alien can be eligible for section 212(c) relief only if his grounds for deportation are substantially identical to a ground for inadmissibility. [2] Here, petitioner is deportable for committing an "aggravated felony," 8 U.S.C. § 1227(a)(2)(A)(iii), which the panel held isn't substantially identical to the most analogous ground for inadmissibility—committing a "crime involving moral turpitude," *id.* § 1182(a)(2)(A)(i)(I). *Abebe,* 493 F.3d at 1104–05. Petitioner claims that the rationale of *Komarenko* can't be squared with that of *Tapia–Acuna v. INS,* 640 F.3d 223, 225 (9th Cir.1981). He therefore asks us to overrule *Komarenko,* and hold that a deportable alien can only be eligible for section 212(c) relief if his *conviction* is substantially identical to a ground for inadmissibility. *See Abebe,* 493 F.3d at 1106 (Berzon, J., concurring).

Under its plain language, section 212(c) gives the Attorney General discretion to grant lawful permanent residents relief only from *inadmissibility* [3]—not deportation. *See* 8 U.S.C. § 1182(c) (repealed 1996). *Tapia–Acuna,* though, followed *Francis v. INS,* 532 F.2d 268, 273 (2d Cir.1976), and held that equal protection required us to extend section 212(c) relief to aliens facing deportation—if such aliens would have been eligible for section 212(c) relief from inadmissibility, had they left the United States and attempted to reenter. *Tapia–Acuna,* 640 F.2d at 225. In following *Francis, Tapia–Acuna* reasoned that there is no rational basis for granting additional immigration relief to aliens who temporarily leave the United States and try to reenter (i.e., aliens facing inadmissibility), and not to aliens who remain in the United States (i.e., aliens facing deportation). *Tapia–Acuna,* 640 F.2d at 225. According to *Francis* and *Tapia–Acuna,* it is wholly irrational for Congress to give *any*

advantage to aliens outside the United States that it denies to similarly situated aliens within the United States.

**[2]**  We are not convinced that *Francis* and *Tapia–Acuna* accorded sufficient deference **\*1206** to this complex legislative scheme, and therefore reconsider this question, as we are authorized to do en banc. We note at the outset that the statute doesn't discriminate against a discrete and insular minority or trench on any fundamental rights, and therefore we apply a standard of bare rationality. *United States v. Barajas–Guillen,* 632 F.2d 749, 752 (9th Cir.1980) (quoting *Alvarez v. Dist. Dir. of the U.S. INS,* 539 F.2d 1220, 1224 (9th Cir.1976)). Congress has particularly broad and sweeping powers when it comes to immigration, and is therefore entitled to an additional measure of deference when it legislates as to admission, exclusion, removal, naturalization or other matters pertaining to aliens. *See Kleindienst v. Mandel,* 408 U.S. 753, 769–70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Boutilier v. INS,* 387 U.S. 118, 123–24, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967); *Flemming v. Nestor,* 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Our task, therefore, is to determine, not whether the statutory scheme makes sense to us, but whether we can conceive of a rational reason Congress may have had in adopting it. [4]

We can: Congress could have limited section 212(c) relief to aliens seeking to enter the country from abroad in order to "create[ ] an incentive for deportable aliens to leave the country." *Requena–Rodriguez v. Pasquarell,* 190 F.3d 299, 309 (5th Cir.1999) (quoting *LaGuerre v. Reno,* 164 F.3d 1035, 1041 (7th Cir.1998)); *see DeSousa v. Reno,* 190 F.3d 175, 185 (3d Cir.1999). A deportable alien who wishes to obtain section 212(c) relief will know that he can't obtain such relief so long as he remains in the United States; if he departs the United States, however, he could become eligible for such relief. By encouraging such self-deportation, the government could save resources it would otherwise devote to arresting and deporting these aliens. *See Jurado–Gutierrez v. Greene,* 190 F.3d 1135, 1153 (10th Cir.1999), *abrogated in part by INS v. St. Cyr,* 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Saving scarce resources that would otherwise be paid for by taxpayers is certainly a legitimate congressional objective.

Our dissenting colleagues argue that the reason we attribute to Congress is not so rational after all because aliens who are "excludable yet potentially eligible for a section 212(c) waiver ... [are] generally allowed to enter and to apply for waiver from within the country," and so the government will wind up having to deport those aliens anyway, if they are denied 212(c) relief. Dissent at 1215. But the fact that the government may choose, as a matter of grace, to admit aliens who seem very likely to be granted 212(c) relief does not mean that it won't exclude those it believes are less likely to obtain such relief. The rationality of the statute lies in giving that discretion, on a case by case basis, to an agency that can assess the likelihood of the alien's success and the cost of his removal. [5]

**\*1207** The dissent makes a similar error when it argues that it is inconsistent with the statutory scheme to assume "that a rational Congress would want these persons to leave the country." Dissent at 1216. The supposed irrationality here, as we understand it, would be in having people leave the country only to be re-admitted after they are granted relief.

The dissent overlooks the fact that not all those who apply for relief ultimately receive it; many, perhaps most, will not. And as to those, it makes perfect sense to want them to be outside our borders when they get the bad news. At that point, they cannot rely on inertia to remain in the country despite the adverse decision, and force the government to chase them down and pay for their deportation. As Judge Posner noted in *LaGuerre v. Reno*, 164 F.3d 1035, 1041 (7th Cir.1998), "[t]o induce their voluntary departure, a little carrot is dangled before them, consisting of the opportunity to seek a waiver should they seek to return to the country and by doing so trigger exclusion proceedings." To what extent this will actually save the government resources is something we won't know until we try it, but it is hardly irrational to presume that a significant number of aliens may decide to depart in order to get a shot at 212(c) relief. Congress certainly is entitled to experiment, without interference from the judiciary. [6] For much the same reason, the dissent is mistaken in arguing that we've undermined the validity of 8 C.F.R. § 1212.3(f)(5) under the rationale of *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Dissent at 1216. The INS may certainly choose to treat different classes of aliens the same, even though the statute does not, and nothing in *St. Cyr* prevents it from doing so. Of course, our ruling might cause the government to reconsider the regulation, and eventually repeal it as no longer necessary. But that's up to

the government; nothing we say today casts any doubt on the regulation.

We thus overrule *Tapia–Acuna*'s holding that there's no rational basis for providing section 212(c) relief from inadmissibility, but not deportation. The BIA therefore didn't violate petitioner's right to equal protection by finding him ineligible for section 212(c) relief from deportation. Since petitioner was not eligible for section 212(c) relief in the first place, the BIA could not have committed an equal protection violation by denying him such relief. We affirm the BIA's section 212(c) ruling, and have no reason to reconsider *Komarenko*. Indeed, under our ruling today, *Komarenko* becomes a dead letter, as its only purpose was to fill a gap created by *Tapia–Acuna*.

**[3]** **[4]** **[5]** **3.** Petitioner also argues that the IJ erred by denying his claim for withholding of removal. But petitioner **\*1208** didn't raise a withholding of removal claim in his brief before the BIA, and the BIA was therefore not required to consider it. *See, e.g., Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 n. 11 (3d Cir.2007) (issues raised in the notice of appeal but not argued in appellant's principal brief are deemed abandoned). When a petitioner files no brief and relies entirely on the notice of appeal to make an immigration argument, as he may do before the BIA, *see* 8 C.F.R. § 1003.38(f), then the notice of appeal serves in lieu of a brief, and he will be deemed to have exhausted all issues raised therein. But when a petitioner does file a brief, the BIA is entitled to look to the brief for an explication of the issues that petitioner is presenting to have reviewed. Petitioner will therefore be deemed to have exhausted only those issues he raised and argued in his brief before the BIA. Here, petitioner did file a brief, which did not raise the withholding of removal issue. He therefore didn't exhaust that claim, and we lack jurisdiction to review it. *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir.2004) (citing 8 U.S.C. § 1252(d)(1)). To the extent *Ladha v. INS*, 215 F.3d 889, 903 (9th Cir.2000), is to the contrary, it is overruled.

**PETITION DENIED IN PART and DISMISSED IN PART.** [7]

CLIFTON, Circuit Judge, with whom Circuit Judges SILVERMAN and GOULD join, concurring in the judgment:

Abebe v. Mukasey, 554 F.3d 1203 (2009)
2009 Daily Journal D.A.R. 141

I concur in the judgment, denying in part and dismissing in part Yewhalashet Abebe's petition for review. I do not join most of the majority opinion, [1] however, because I believe it is both unnecessary and unwise to overrule our prior decision in 🚩 *Tapia–Acuna v. INS,* 640 F.2d 223 (9th Cir.1981), to reach that result. The government has not advocated such a drastic step. The original decision by a three-judge panel of our court, 🚩 *Abebe v. Gonzales,* 493 F.3d 1092 (9th Cir.2007), reached the same result in this case as the majority reaches today, simply by applying our existing precedent, 🚩 *Komarenko v. INS,* 35 F.3d 432 (9th Cir.1994). The en banc panel should do the same.

I share the concern expressed in the dissent with overruling more than sixty years of agency precedent and more than twenty-seven years of our own precedent. I also share the fear that the path taken by the majority puts into jeopardy the agency's ability to continue to grant discretionary relief in removal proceedings pursuant to 8 C.F.R. § 1212.3. Although the majority says otherwise, its interpretation of the statute appears to leave no room for that practice to continue. In addition, I would prefer to avoid aggravating a circuit split with the numerous other courts that have adopted the same balance we struck in *Komarenko.*

I nevertheless concur in the judgment because I conclude that aliens who could have been, but were not, charged with removal on grounds equivalent to a ground for inadmissibility are not similarly situated to aliens who were actually charged. Abebe's equal protection challenge therefore fails. Put another way, although I agree with most of Part I of the dissent, I disagree with Part II and do not believe **\*1209** we should overturn our decision in *Komarenko* and follow Second Circuit's recent decision in 🚩 *Blake v. Carbone,* 489 F.3d 88 (2d Cir.2007). I would adhere to *Komarenko* and deny Abebe's petition accordingly.

## I.

As the dissent points out, since at least 1940 the Executive Branch (now in the form of the Department of Homeland Security, or DHS, and formerly through the Immigration and Naturalization Service, or INS) has interpreted the Immigration and Nationality Act (INA) as granting it the discretion to afford relief from both deportation (of an alien inside the United States, a process now called removal) and

exclusion (of an alien seeking admission to this country at the border, now described as inadmissibility). *See* 🚩 *Matter of L.,* 1 I. & N. Dec. 1 (BIA 1940). Congress was aware of this practice when it drafted the 1952 amendments to the INA, including section 212(c). *See* 🚩 *In the Matter of S.,* 6 I. & N. Dec. 392, 394–96 (BIA 1955) (examining the legislative history). Although the amendments made it harder for aliens to qualify for such discretionary relief, there is nothing in the legislative history, which catalogued other perceived abuses, to suggest that Congress disapproved of the government's use of the predecessor to section 212(c) to grant waivers in deportation proceedings. This is among the reasons that the Board of Immigration Appeals held, shortly after the amendments' passage, that the Attorney General retained the discretion under section 212(c) to grant relief in both deportation and exclusion proceedings. *Id.*

Initially, the government permitted aliens to apply for relief from deportation only if they had temporarily left the country such that they might have been subject to exclusion. In 1981, we held in *Tapia–Acuna* that there was no rational basis in the context of section 212(c) for discriminating against aliens who had remained in the United States. 🚩 *Tapia–Acuna v. INS,* 640 F.2d 223, 225 (9th Cir.1981).

Today, the majority holds that we were mistaken in *Tapia–Acuna* and that there is a legitimate basis for so limiting the availability of section 212(c) relief. Even assuming there are arguments in favor of that position, we rejected it twenty-seven years ago. There is no compelling reason to overturn that judgment now. No relevant circumstances have changed, and our decision has been on the books for nearly three decades without causing any mischief in the law. The majority may be animated by a desire to avoid future problems or more expansive conceptions of equal protection, such as that expressed by the Second Circuit in *Blake,* but that appears to me to be an empty fear. We haven't extended *Tapia–Acuna's* rationale to other situations, and any putative harm in the future could more easily be avoided by continuing to limit that precedent to its context.

The majority doesn't quarrel with the legal rule of *Tapia–Acuna,* that the Equal Protection Clause prohibits irrational disparities in treatment. It simply disagrees with the application of that long-settled rule to a statutory provision that was repealed a dozen years ago. It disagrees that the disparate treatment our court previously concluded was irrational is, in fact, irrational. Reasonable minds may always

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

disagree over the outcome of a close case, however, and our prior conclusion is consistent with the conclusions of every other circuit. I see no justification for saying now that all of those decisions were incorrect, especially when the vitality of section 212(c), a statute long since repealed, has already diminished to near insignificance. There is no pressing need to pay so little **\*1210** heed to the weight of precedent and correct what, at most, is simply a misapplication of an agreed upon rule.

The "rational basis" the majority identifies in support of discriminating against aliens who failed to temporarily leave the United States after committing an offense that might qualify them for removal or inadmissibility relies on a tenuous chain of inferences. The majority hypothesizes that Congress anticipated that some aliens might decide to travel across the border based on knowledge that, under the immigration statute, they could be eligible for discretionary relief if they left the country and returned, but would not be so eligible if they did not leave the country. The majority further speculates that, from the group of aliens who left the country for this reason, some might be successfully stopped at the border upon their return and denied reentry, thereby saving the government the expense of having to later remove them. Perhaps. But it is not an accident that the majority opinion finds it necessary to acknowledge, at 217, n. 4, that it is not seeking to identify the actual rationale for the legislation. I doubt that anyone believes that the majority's tortured construct was in the mind of anybody on Capitol Hill. Justifications for overruling one of our court's longstanding precedents should be made of sterner stuff. We might just as well say that Congress simply preferred to let the agency grant discretionary relief only to those aliens who love international travel. We must place some rational bounds on what survives rational basis review if the constitutional right of equal protection is to have any meaning whatsoever outside the context of suspect classifications. [2]

Not only does the majority overrule our precedent, it casts doubt on DHS's power to grant section 212(c) relief in deportation or removal proceedings. It concludes that "[u]nder its plain language, section 212(c) only gives the Attorney General discretion to grant lawful permanent residents relief from *inadmissibility*—not deportation." Majority Op. at 1205 (emphasis in original). In doing so, the majority holds that sixty-eight years of agency practice was contrary to the will of Congress and in violation of the plain language of the statute the agency is charged with interpreting, and that countless otherwise deportable or

removable aliens have remained in this country due to the agency's error.

Later, when addressing the dissent, the majority says otherwise and contends that nothing in the opinion undermines the validity of 8 C.F.R. § 1212.3(f)(5). That regulation codifies DHS's approach, which we approved of in *Komarenko,* of limiting the availability of section 212(c) relief in removal proceedings to aliens charged with removal on a ground that has a substantially identical statutory counterpart in the INA's inadmissibility provisions (the "statutory counterpart rule"). 8 C.F.R. § 1212.3(f)(5); *Komarenko v. INS,* 35 F.3d 432, 434 (9th Cir.1994). But if the statute itself does not authorize DHS to grant section 212(c) relief in any removal proceedings whatsoever, as the majority holds, where does authority to grant similar relief from inadmissibility come from?

It is not an answer to say that the government may choose to treat different classes or aliens the same. The statute in question is one that authorizes INS (now **\*1211** DHS) to grant *discretionary* waivers to persons in exclusion proceedings. If the agency had the authority to grant discretionary waivers to everyone, including persons in deportation proceedings, whether or not the statute provides such authority, then there would be no reason for the statute in the first place. The whole thrust of the majority's reasoning is that Congress, in adopting the relevant statute, could rationally distinguish between deportation and exclusion proceedings and could limit the ability of INS to grant discretionary waivers only to those in exclusion proceedings. Under the reasoning of the majority, the agency does not have the authority to grant such waivers to aliens in deportation proceedings, and if that's the case, 8 C.F.R. § 1212.3(f)(5) serves no purpose.

Finally, not only has every circuit to consider the question accepted *Tapia–Acuna*'s conclusion that section 212(c) relief is available in deportation and removal proceedings regardless of whether an alien has left the country, but every circuit to consider the question except the Second Circuit, *see Blake,* 489 F.3d at 104, has also followed *Komarenko* and upheld the constitutionality of DHS's statutory counterpart rule. *See Kim v. Gonzales,* 468 F.3d 58, 62–63 (1st Cir.2006); *Caroleo v. Gonzales,* 476 F.3d 158, 162–63 (3rd Cir.2007); *Brieva–Perez v. Gonzales,* 482 F.3d 356, 362 (5th Cir.2007); *Gjonaj v. INS,* 47 F.3d 824, 827 (6th Cir.1995)

("Numerous courts have held there must be a comparable ground of exclusion for an alien in deportation proceedings to be eligible for[section] 212(c) relief. We decline to change this well-established rule.") *Valere v. Gonzales,* 473 F.3d 757, 762 (7th Cir.2007) (holding that if "the removable alien's crime of conviction is not substantially equivalent to a ground of inadmissibility ... then the removable alien is not similarly situated for purposes of claiming an equal protection right to apply for § 212(c) relief"); *Soriano v. Gonzales,* 489 F.3d 909 (8th Cir.2006); *Rodriguez–Padron v. INS,* 13 F.3d 1455, 1459 (11th Cir.1994); *see also Zamora– Mallari v. Mukasey,* 514 F.3d 679, 691–92 (7th Cir.2008) (rejecting the reasoning of the Second Circuit's decision in *Blake* ); *Vue v. Gonzales,* 496 F.3d 858, 860–62 (8th Cir.2007) (same). In overruling *Tapia–Acuna* and discarding *Komarenko* as a dead letter, the majority creates a three-way circuit split between those circuits that follow *Komarenko,* those that follow *Tapia–Acuna* but not *Komarenko,* and our court. Because I can discern no good reason to abandon our sister circuits after they have faithfully accompanied us down this now well-worn path, I cannot join the majority opinion.

## II.

Turning to the merits of Abebe's equal protection challenge, the dissent states that "[i]n cases such as this, it is the act or offense itself that makes one alien similarly situated to another, not the grounds the government chooses to use to deport the aliens." Dissent at 1217. I disagree.

The government sought to remove Abebe on two independent grounds: (1) his two convictions for committing crimes involving moral turpitude (CIMTs) and (2) his conviction for committing an aggravated felony. Abebe argues that his aggravated felony conviction could also qualify as a CIMT and that, if the government had sought to remove him solely for CIMTs, which can also render an alien eligible for exclusion, then he would have been eligible for discretionary relief under section 212(c). He contends that DHS's statutory counterpart rule violates his right to equal protection under the Due Process Clause because it denies him the benefit of section **1212** 212(c) relief simply because the government chose to remove him as an aggravated felon instead of an alien who had committed CIMTs. Abebe asks that the court impose a rule under which an immigration judge would be forced to determine whether, given a particular conviction,

the government *could* have sought to remove an alien on a ground equivalent to a ground for inadmissibility.

Abebe cannot demonstrate that he has been irrationally subjected to discriminatory treatment, however, because he cannot show that he was in the same position as an alien who was charged with removal on a substantially similar ground to a ground for inadmissibility. Put simply, two aliens who have been charged with removal on different statutory grounds are not similarly situated. That the underlying facts are such that the government could have charged them with removal under similar statutory grounds is not enough. If that rule were adopted, it would create a host of problems in countless situations, predictable and unpredictable, where the government is vested with, and exercises, discretion. To take the most obvious example, imagine the quotidian circumstance of a prosecutor faced with the decision of what charges to bring against an individual based on a given set of facts. Each charge will carry different consequences, but a defendant cannot contest the charges actually brought against him by arguing that the government could have charged him with a different offense under a different statutory provision.

Congress has vested the executive branch with discretion in whether, when, and how to charge an alien with removal. How it exercises that discretion will have a serious impact on the life of a removable alien, whether it means forcible removal from the country or the availability of section 212(c) relief. To hold that the exercise of that discretion is unconstitutional where it is not exercised in the most advantageous way possible for a given alien under the circumstances would open the door to a torrent of claims. An alien is no more entitled to section 212(c) relief when charged with a ground of removal that has no statutory counterpart under the INA's inadmissibility provisions than a defendant is entitled to a sentencing range consistent with the least serious crime with which he could have been charged.

This is not to say that the executive branch's exercise of discretion is without constitutional limits. We have permitted claims to proceed against prosecutors whose decisions were allegedly made on the basis of sex, race, or religion. *United States v. Redondo–Lemos,* 955 F.2d 1296, 1300 (9th Cir.1992), *overruled on other grounds by United States v. Armstrong,* 48 F.3d 1508 (9th Cir.1995) (en banc), *rev'd,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Absent evidence of discrimination against a suspect class, however, there is no judicial remedy for even arbitrary

charging or plea bargaining decisions, even though "such an arbitrary exercise of power would be a Due Process violation." *Morris v. U.S. Dist. Court,* 363 F.3d 891, 896 (9th Cir.2004) (citing *Redondo–Lemos,* 955 F.2d at 1300). This is because judicial inquiry "into prosecutors' decision-making processes would entangle [courts] 'in the core decisions of another branch of government,' " raising separation-of-powers concerns. *Id.*

In *Komarenko,* this court provided additional, pragmatic reasons for denying section 212(c) relief to an alien charged with deportation under a subsection of the former deportation statute that was not "substantially identical" to a subsection of the former exclusion statute. Like Abebe, the petitioner in *Komarenko* argued that his underlying conviction could have qualified **\*1213** as a CIMT, a statutory ground for exclusion, which would have made him eligible for section 212(c) relief. The court held that the two grounds were "entirely dissimilar" and that "the distinction between the two classes is not arbitrary or unreasonable." 35 F.3d at 435 (citing *Campos v. INS,* 961 F.2d 309, 316 (1st Cir.1992) ("We cannot say that it is absurd that for purposes of discretionary deportation review Congress chooses to treat different crimes differently.")). We declined to engage in speculation over whether a particular alien "*could have been* excluded under the moral turpitude provision," and noted that adopting the petitioner's proposed approach "would extend discretionary review to every ground for deportation that could constitute the essential elements of a crime involving moral turpitude." *Id.* (emphasis in original) (internal quotation marks omitted). The court concluded that "[s]uch judicial legislating would vastly overstep our limited scope of judicial inquiry into immigration legislation, and would interfere with the broad enforcement powers Congress has delegated to the Attorney General." *Id.* (internal citations and quotation marks omitted). This reasoning applies with equal force today and, as discussed above, six of the seven other circuits to face the question have reached the same result.

This is not a situation, as the dissent contends, where two lawful permanent residents are being treated differently because one chose to "step across the border for a day." Dissent at 1213. It is a situation where two individuals are being treated differently because the charges against them are materially different, and different charges bring different consequences. This simple fact is as true in immigration proceedings as it is in criminal law. We cannot look only to the underlying conduct; rather, the consequences that ultimately

flow from an individual's actions depend heavily on the government's exercise of its charging discretion.

Here, *Abebe* had a number of prior convictions. The government could have chosen to seek removal based on (1) his convictions for CIMTs, (2) his aggravated felony conviction, or (3) both. It chose option three, aggressively seeking removal on every available ground. The court should not put immigration judges in the business of second-guessing such charging decisions. In light of how the government chose to charge Abebe with removal, he was not similarly situated to an alien charged with being inadmissible, or an alien charged with removal on a ground with a statutory counterpart in the INA's inadmissibility provisions, and his equal protection challenge fails.

I therefore concur in the judgment of the court.

THOMAS, Circuit Judge, with whom PREGERSON, Circuit Judge, joins, dissenting:

Distilled to its essence, this case involves the irrationality of affording privileges to lawful permanent residents who step across the border for a day, but denying the same privileges to those who do not. The majority not only blesses this unequal treatment, but goes much further, overruling more than 60 years of precedent, approving an unconstitutional statutory scheme not even the Board of Immigration Appeals endorses, and implicitly declaring unconstitutional a federal regulation.

I respectfully dissent.

I

First, some background. Prior to enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), there were separate procedures **\*1214** and substantive rules relating to (1) the deportation of persons already present in the United States, and (2) the exclusion of persons seeking entry. *Armendariz–Montoya v. Sonchik,* 291 F.3d 1116, 1122 (9th Cir.2002). The INA defined deportable aliens in § 241, 8 U.S.C. § 1251 (transferred to § 237, 8 U.S.C. § 1227), and excludable aliens in § 212(a), 8 U.S.C. § 1182. The exclusion procedures did not only apply to those seeking entry into the United States in the first instance. If a non-citizen residing in the United